IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR01-3046 |
| Plaintiff, | Sioux City, Iowa |
| | April 12, 2005 |
| vs. | 8:08 a.m. |
| ANGELA JANE JOHNSON, | VOIR DIRE OF |
| | PANEL A |
| Defendant. | |

/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff:      C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA  52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA  50319

For the Defendant:      PATRICK J. BERRIGAN, ESQ.
Watson & Dameron
2500 Holmes
Kansas City, MO  64108

DEAN STOWERS, ESQ.
Rosenberg, Stowers & Morse
1010 Insurance Exchange Building
505 Fifth Avenue
Des Moines, IA  50309

ALFRED E. WILLETT, ESQ.
Terpstra, Epping & Willett
Higley Building - Suite 500
118 Third Avenue Southeast
Cedar Rapids, IA  52401

Also present:      Bill Basler

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1 of 3245

(Proceedings convened outside the presence of the jury venire.)

THE COURT:  Okay.  I wanted to talk to the lawyers about jury selection this morning.  If you'd take a look at the PowerPoint slides that are handed out, after I introduce the name of the case, I'm going to go through these rules to follow in jury selection until trial, and they'll be passed out to each of the jurors.  They'll actually be on their chairs so that they'll have it.  And I'm going to actually read it and go through it with them.  Then I'm going to go through the slides in order, but I just wanted to alert you to a couple things because I made some changes.

In the jury selection process, I'm telling them that we think it will take two to three weeks; we're bringing in a small group each day.  I'm going to introduce the lawyers and have a few questions, and there will be group questioning of potential jurors by both sides and then individual questioning about pretrial publicity.  And then the rest is kind of new information.

They'll know at the end of today whether or not you're still in the jury pool or dismissed from jury service.  If you're told you're in the jury pool at the end of the day today, you still have about a 50 percent chance of serving as a juror in this case because if you added up 22, 10 strikes, that's about 50 percent.  My math is off a little bit, but I think I

4

Page 2

ought to let them know that.

And then when we manage to impanel the number of jurors we need, we'll notify each juror by telephone call whether they've been selected or not and when the trial begins, and we'll give them as much notice as we can.

And then I'm going to tell them that the trial will run four days a week almost always Monday through Thursday. And this is probably news to everybody in the room but me, but we are taking the week of the 10th through the 17th off. So that way they can plan ahead for family vacations and the like because I'm going to be out of town that week.

Now, as I've been thinking about this, I mean, I'm willing to do this group questioning on the death penalty stuff today. I don't see any advantage to it, and I actually see -- I mean, I just totally disagree with you, Mr. Berrigan, that there's an advantage in doing it that way. I just don't believe it. I'm willing to try it today. You have no right to do it that way. And I think you would agree that almost all of your colleagues insist on individual questioning, and so in terms of who's out of the mainstream, it would be you rather than me on this issue.

Here's the downside that I see to it. The advantage of the way we did it in Honken was that after -- we questioned each individual juror about their views on the death penalty. That's really when we took up the for-cause challenge, and so it

5

was immediately after questioning each juror where everything that juror said was fresh in my mind, and I didn't have to think back to what questions lawyers asked five hours earlier in the

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3 of 3245

day. You know, we just did it right on the spot, and it was much easier to rule on challenges for cause.

Your way of doing it makes it much more difficult to try and recall everything that every juror said in group questioning when it comes time for challenges for cause. And I think there's a greater error -- greater likelihood of making an error on a challenge for cause because of the delay between the group questioning and the final challenges for cause. And I see that as a huge drawback.

That's probably an advantage to you because it gives you an opportunity to create error, but largely because I don't see any advantage in doing group questioning, you know, unless it works wonderfully well today and I see some huge advantage over doing individual questioning, I'm inclined to change my mind and go back to individual questioning for that reason. I just think it's more burdensome to rule on the challenges for cause. It was very easy last time because we did it after each -- after we questioned each juror individually.

So -- I just don't understand your argument about why it's better to question them individually. I mean, it runs -- in group. It runs against everything I've read, everything I've heard. I think you probably stand alone in that view. You may

6

be right, but I just don't see it. And because you have no right to do it that way, you have no constitutional right to do it that way, but I'm willing to try it for today, maybe even another day, and see how it goes.

And -- yeah, well, that's all I'll say on that. Anything else from anybody?

Mr. Williams?

Page 4

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 4 of 3245

MR. WILLIAMS: Your Honor, we offered the defense to go first today simply because they had a better idea of how they thought this was going to go, and so they're going to go first, and Mr. Miller's going to handle questioning for us today.

THE COURT: Okay. And then so will it be Mr. Miller at the end that's then going to ask the question about pretrial publicity?

MR. MILLER: I'll ask for a raise of hands.

THE COURT: Okay. Anything else? Mr. Berrigan?

MR. BERRIGAN: I just wondered if we would be provided with a chart.

THE COURT: Do you have your microphone on? You don't have a seating chart?

MR. BERRIGAN: No, sir, not yet.

THE CLERK: Suzanne just checked them in, so I was waiting.

THE COURT: Okay. Thank you. One other matter just so we're clear, the juror questionnaires in my view are done as

7

an aid to counsel for two reasons: For making challenges for cause -- I guess three reasons: To give you insight and information to question the prospective jurors, to help you in formulating challenges for cause, and to help you in exercising peremptory challenges. The questionnaires are not in evidence. And I'm not going -- and I have not read through the questionnaires. I look at a couple key questions that I have an interest in.

So the questionnaires are not in evidence. You cannot rely on something in the questionnaire to make a challenge for cause. You can rely on it all you want for a peremptory

Page 5

challenge, but you can't rely on anything in the questionnaire for a challenge for cause. It has to be in the record we're going to be making each day in jury selection, and I just didn't want anybody to be confused about that.

So if there's a question in the questionnaire that you think would be grounds for challenge for cause, you better make sure they say something similar when you question them because I'm not going to let you rely on, well, gee, here's what they said in the questionnaire when it comes time for arguing challenges for cause. And I want to be super clear about that.

Anything else?

MR. WILLIAMS: Not on behalf of the United States.

THE COURT: Mr. Willett?

MR. WILLETT: Just one question, Your Honor. I've

8

done a number jury one time before in my career, United States versus Sons of Silence motorcycle club with Judge Melloy, and I know to facilitate the asking of questions of jurors by using their number, the clerk's office gave each juror a little hand sign, if you will, that had their number.

THE COURT: They're going to have a little badge with a number on it just like we had throughout the Honken trial.

MR. WILLETT: Okay. Thanks, Judge.

THE COURT: I like that, they raise their --

MR. WILLETT: It was sort of like an auction.

THE COURT: Come on down, raise your number. No. I think you'll be able to read their numbers very easily from here.

MR. WILLETT: Okay.

THE COURT: Okay. Well, I'll see you back here at

Page 6

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 6 of 3245

8:30, and we'll bring the jurors in. Thanks.

(Recess at 8:16 a.m.)

THE COURT: Ready to have the prospective jurors brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. WILLETT: Yes, Your Honor.

(Panel A entered the courtroom.)

THE COURT: Good morning, everybody. If each of you would remain standing and raise your right hand, I'm going to swear you in.

9

(Panel A was sworn.)

THE COURT: Please be seated. Good morning. I wanted to welcome each of you to the United States District Court for the Northern District of Iowa. I am, let's see -- that's who I am. I'm Mark Bennett. I'm the chief judge of the United States District Court for the Northern District of Iowa, and I'm going to be the trial judge in this case.

I think as all of you know, the case is United States of America versus Angela Johnson.

I just kind of wanted to let you know who the folks are, and then you'll be hearing from them, and I'll actually be having them introduce themselves in a few minutes. But -- and why don't you actually just raise your hand. C.J. Williams, Tom Miller. Mr. Williams and Mr. Miller are the two prosecutors in this case.

Then with them at counsel table is Special Agent Bill Basler. Would you please raise your hand. And I mispronounced your name, didn't I?

SPECIAL AGENT BASLER: Yes, sir.

Page 7

THE COURT:  I apologize for that.  Basler.

SPECIAL AGENT BASLER:  Correct.

THE COURT:  Sorry about that.

Over at the other table, Mr. Pat Berrigan, Al Willett, and Dean Stowers is in the back there.

And then Angela Johnson, would you please raise your

10

hand.

Now, I wanted to go over some rules to follow that was on your chair, and we'll just go over this.  Conduct of potential jurors during jury selection and trial.  To ensure fairness, you as potential jurors must obey the following rules until the end of the case if you are selected for the jury or until you are excused from serving on the jury in this case. These rules apply whether you are in the courtroom, in the courthouse, at home, or anywhere else until you are excused from further service in this case.

First, do not talk among yourselves about this case or about anyone involved with it.  Second, do not talk with anyone else about this case or about anyone involved with it.

Third, when you're outside the courtroom, do not let anyone tell you anything about the case.  If someone should try to talk to you about the case during jury selection or the trial, please report it to me.

Fourth, do not talk with or speak to any of the parties, lawyers, witnesses involved in the case.  You should not even pass the time of day with any of them.  It is important that you not only do justice in this case but that you also give the appearance of doing justice.  If a person from one side of the case sees you talking to a person from the other side, even

Page 8

if it is simply to pass the time of day, an unwarranted and unnecessary suspicion about your fairness might be aroused. If

any lawyer, party, or witness does not speak with you when you pass in the hall, ride the elevator, or the like, it is because they are not supposed to talk or visit with you.

Fifth, do not read any news stories or articles about the case or about anyone involved with it or listen to any radio or television reports about the case or anyone involved with it. If you want, you can have a spouse or friend clip out any stories and set them aside to give you after the trial is over or you are excused from serving on the jury in this case. I can assure you, however, that if you are selected for the jury in this case, by the time you have heard the evidence, you will know more about the case than anyone will learn through the news media.

Sixth, do not do any research on the Internet, in libraries, in the newspapers, or in any other way or make any investigation about this case on your own. If you are selected for the jury, you must decide this case based on the evidence presented in court.

Seventh, if you are not excused from serving on the jury today, please take this instruction with you so that you can refer to it if you have any questions between now and the date you are required to return for trial. Dated this 12th day of April, 2005, signed by me.

Okay. I just wanted to let you know kind of who the courtroom participants are. I have one of my law clerks with

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 9 of 3245

me, Carey. She'll be sitting at that table throughout the trial. Carey is an honors graduate of the Drake University Law School, and she's in a two-year federal clerkship with me, and not too long after this case is over she'll be leaving and moving to Seattle for her next career move.

We have our court reporter Shelly. Shelly has, I think, the toughest job in the courtroom because she can never take a break. She has to take down everything that everybody says, and we're very fortunate. She's a very experienced court reporter and does a superb job.

We always have a United States marshal or two in the courtroom, and this case would be no different. And so you may see them switching back and forth, and particularly if you're selected as jurors and once we get the witnesses coming in, there will be more U.S. marshal activity in the courtroom, but that's typical in every criminal case.

Then we have court security officers. They're pretty easy to spot. They have the blue blazer, the earpiece, and the little badge. And they have a lot of responsibilities in the courthouse, but they'll make sure you get back and forth from the jury room and the like, and they're of great assistance to us.

We obviously have the lawyers and the parties they represent.

Then I wanted to talk a little bit about the jury and

13

the judge in this case. I'll start with myself first. I'm kind of responsible for the whole show. You know, we've done a lot of pretrial work in this case as you can imagine. I've met more times than I could ever count with the lawyers in the case.

Page 10

We've had a lot of issues we've worked on, and we've got this case ready to be tried. Then I'll have responsibilities during the trial. I have to rule on any motions the lawyers make, rule on any evidentiary questions, and so I'll have a lot of responsibilities.

Towards -- well, at the beginning of the trial once we get the jury selected and right before opening statements, I'll give you preliminary jury instructions in the case which will tell you in some detail what the case is about, what the crimes are that are charged, and then at the very end of the trial after all of the evidence, I'll give a more detailed set of written instructions. And my instructions tell you what the law is. So my job is to tell you what the law is.

But I do not decide -- I'm sorry. I do not decide the facts. I need to go back here. As jurors, you decide what the facts are in the case. So the job of the jury will be to listen to all the evidence. You have to decide the credibility of witnesses; in other words, is the witness telling the whole truth, maybe just some of the truth, maybe not being truthful at all? That's for each individual juror to decide. That's not my job in a jury trial. So you have to listen to evidence. You

14

decide who's telling the truth.

You have to decide what happened, and then you take the facts as you find them, apply it to the law in my instructions, and that's how you reach a verdict in the case. So in a very real sense, as jurors, you are the judges of the facts in the case.

You may have heard the term voir dire. It's a French term, and it's the French term for jury selection which is what

we're going to do today. And it simply means to speak the truth.

You are our first group of jurors coming in during jury selection, and I'm going to explain to you the process of jury selection that we're using in this case in a minute. But our goal is to find 18 jurors, 6 of whom will be alternate jurors, although the alternates will not know they're alternates.

We're going to ask a lot of questions today primarily by the lawyers. There are no right or wrong answers to any of the questions, but for our system to work, you must answer openly and honestly.

You're reminded to refer to your juror number throughout these proceedings rather than your name, and the lawyers will address you by your number.

I wanted to kind of go through the jury selection process. We think jury selection will take two to three weeks,

15

but it's hard to know how long it will take, but that's our best guess. Every day we're bringing in a small group of potential jurors to question. You're our first group.

I will introduce the lawyers in a few minutes, and then I just have a couple questions for you. Most of the questioning in jury selection will be done by the lawyers on each side.

We're going to question you primarily as a group, the eight of you that we have now, although there will most likely be individual questioning of potential jurors about the pretrial publicity, in other words, what have you read, heard, or what do you know about this case.

Page 12

And what we're going to do after we're done with the group questioning, we'll send you all down to the jury room. The lawyers will ask a question about who knows anything about the case other than what you've received from our court. And if you answer yes to that, we'll bring you back up individually and find out exactly what you recall reading or hearing about the case or what you know about the case. So there will be some individual questioning.

When you bring -- when we bring you back up, we'll just have you sit in one of the chairs in the front row, and you'll have a microphone, and then the lawyers will question you.

Now, you will know at the end of the day today whether

16

or not you're still in the jury pool or whether or not you're dismissed from jury service in this case. If you're dismissed, that's easy. You don't have to worry anything about this case at all.

But you'll kind of probably want to know what does it mean to still be in the jury pool. Here's what it means. If I tell you you're still in the jury pool at the end of the day, we're going to send you home, but you have about a 50 percent chance of actually winding up on the jury. If I tell you you're still in the jury pool, you have about a 50 percent chance. But we won't know whether you're actually going to be on the jury or not until we're at the end of the jury selection process.

And when we manage to impanel the number of jurors we need, we'll notify each juror by telephone call whether or not you have been selected or not and when the trial will begin. We'll try and give you as much notice as possible. It will

Page 13

probably only be a couple of days at most.

So if this is confusing, some of you will know at the end of the day today that you're already done. The rest of you will be in the jury pool which means you have a 50 percent chance of being on the jury. When we get enough jurors and we find out who's on the jury and who's not, we'll call and let you know either you're on the jury or you're not on the jury. So that's how it's going to work.

We're going to run the trial four days a week once we

finish jury selection and start the trial. For the most part it will be Mondays through Thursdays. I think there's one or two weeks in there where it's the Monday that we'll be taking off. But for those of you who get selected to serve as jurors, I'll give you a written schedule the remaining two and a half months that we think the trial will go what days we'll be in trial and what days we won't, but it will only be four days per week, and for the most part you can plan on not being here on Fridays.

Now we'll start with the prosecutors, and they'll introduce themselves. Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. My name is C.J. Williams. I'm an assistant U.S. attorney, and I office in our office over in Cedar Rapids, Iowa.

This is Tom Miller. He's a special assistant U.S. attorney from Des Moines.

MR. MILLER: Good morning.

MR. WILLIAMS: You met Bill Basler. He's a special agent in charge in Mason City. He's what we call our case agent. He'll be sitting with us throughout this trial at counsel table, and he's the lead investigator in this case.

Page 14

We have a number of people in the office here in Sioux City where we have our United States Attorney's Office. Our U.S. Attorney's Office is headed by Chuck Larson currently in Baghdad. He offices in Cedar Rapids with me.

Over here in Sioux City you have the following

18

attorneys in our office: Forde Fairchild, Martha Fagg, Kevin Fletcher, Mike Hobart, Jack Lammers, Janet Petersen, and Shawn Wehde. In addition to those attorneys, we have six staff members working with us in the office here, paralegals, legal assistants, receptionists, and so forth.

THE COURT: Now, do any of you know Mr. Williams, Mr. Miller, Mr. Basler, or members of the U.S. Attorney's Office or -- let me expand that -- anybody that might work at the federal courthouse here? Okay. We're going to use the microphone. Rick's got the microphone. And is that microphone on?

PROSPECTIVE JUROR 529: Test.

THE COURT: Yes, it is on. And it's easiest if we just leave it on, and I'll make you a deal, Juror 529. If you speak directly into the microphone, I won't put up any karaoke on the screen for you to sing. How's that? Fair deal?

PROSPECTIVE JUROR 529: Fair deal.

THE COURT: Who do you know?

PROSPECTIVE JUROR 529: Mike Hobart.

THE COURT: Okay. Mike Hobart is an assistant U.S. attorney. How well do you know Mr. Hobart?

PROSPECTIVE JUROR 529: Mike and I worked together while Mike served on the Sioux City Planning and Zoning Commission. I'm the -- at that time was the planning director

Page 15

for the city of Sioux City.  We've attended many, many meetings

19

together, many lunches, spent a lot of time together for that purpose.

THE COURT:  What about socially?  Have you been in his home or he in yours?

PROSPECTIVE JUROR 529:  No, I have not.  Lunches would be as close to that.

THE COURT:  And they had a business purpose or not really?

PROSPECTIVE JUROR 529:  Some were, and some were not.

THE COURT:  Sure.  Okay.  Anything about -- the fact that you know Mr. Hobart and Mr. Hobart is an assistant United States attorney, would that affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 529:  I don't think so.

THE COURT:  He's not going to have any involvement in this case that I know of.  Mr. Williams?

MR. WILLIAMS:  Not at all, Your Honor.

THE COURT:  Yeah.  So . . .

PROSPECTIVE JUROR 529:  I guess the only thing I can say is because of my working knowledge and over the years meeting with Mike, I guess my only concern is I may place more emphasis possibly on information or the statements from that office is my only concern.

THE COURT:  Okay.  Well, let me ask you a couple follow-up questions, and certainly the lawyers will too.  Have

20

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 16 of 3245

you ever discussed anything about this case with Mr. Hobart?

PROSPECTIVE JUROR 529:  No, I've not.  I did -- when I found out that I was going to be a juror on this case, I did attempt to reach Mike to see -- because of that relationship, but he would not speak to me, and I understand.

THE COURT:  Okay.  And he was just following his professional obligation not to speak to you about it.

PROSPECTIVE JUROR 529:  Certainly.  I understand.

THE COURT:  How, if at all, do you think it might affect your ability to be fair and impartial?

PROSPECTIVE JUROR 529:  I'm really not sure.  I just wanted to bring that up.

THE COURT:  Okay.  Okay.  Anybody else know anybody on the government side?

Okay.  Why don't we flip over.  Mr. Berrigan?

MR. BERRIGAN:  Mr. Willett's going to --

THE COURT:  Oh, okay.

MR. WILLETT:  Thank you, Your Honor.  If it please the Court.  Good morning, ladies and gentlemen of the jury.  My name is Al Willett.  I'm an attorney from Cedar Rapids, Iowa.  I practice in a group Terpstra, Epping, and Willett.  We sort of have the tongue twister firm in our town.  I practice with Ray Terpstra and Greg Epping.  I'm assisted today by Pat Berrigan --

MR. BERRIGAN:  Morning.

MR. WILLETT:   -- who is an attorney from Kansas City.

21

Associated with Mr. Berrigan who will be assisting us is Miss Lisa Dahl.

MS. DAHL:  Morning.

MR. WILLETT:  And then also I have my other co-counsel

Page 17

Mr. Dean Stowers from Des Moines. Mr. Stowers practices with the law firm of Rosenberg, Stowers, and Morse. And the people that are in his office are Mr. Brent Rosenberg, Mr. David Morse, and Ms. Heather Wood.

And then most importantly, I'd like to introduce you to my client, Miss Angela Johnson.

Now then, I've just rattled off a bunch of names in a very quick manner, but does anyone think that they know me or my co-counsel or Ms. Dahl or, most importantly, my client?

THE COURT: Okay. No hands go up. Thank you.

Now, we estimate that the trial will last three months. It's always hard to estimate the length of a trial. It's a little bit easier with shorter trials to estimate the length of trial. And that three months includes the jury selection.

So I'm going to ask you in a minute or two about whether it would be a severe or extraordinary hardship to serve, but before I ask you that, I want to give you some information and some of my views on it.

Jury service is obviously very important, and it's easier to serve on a case -- we have a lot of two- to three-day

22

trials, week-long trials, two-week trials. It's obviously, for most people, less of a burden to serve on a shorter trial. I've only had two very lengthy trials that approach the length of this trial. And in each of those trials, I've been incredibly impressed by the willingness of citizens in the Northern District of Iowa to make really substantial personal sacrifices to serve as jurors.

While I ultimately have to make the decision whether I

Page 18

think an excuse is good enough and would be a severe or extraordinary hardship, it's up to each of you to -- you know, to try and make that tough decision, are you willing to serve your country. And that's exactly what it is. I get an opportunity to serve our country every day because I work for the United States government. And I feel honored to be able to serve in a trial of this importance and this magnitude and for this length. And it certainly creates a burden on me because I have 600 other cases that I have to be worried about.

And matter of fact, I'm running at least several trials on the weekends, and I'll be holding night court and evening court on my other cases, and it will be a huge burden on my family, but I get paid to accept those burdens. You all don't, and I understand that. I'm not simply saying that because it's a burden on me that you all have to serve too. I mean, everybody's uniquely different. But I hope you'd look at it as this is really a unique opportunity to serve your country.

23

And I know when each of you came in here you were probably hoping that you would be taken off, that you won't be selected to serve, that you won't be on this jury, and I understand that because most people are fairly skeptical of jury service.

All I can do is tell you this. I've been a United States District Court judge for coming up on 11 years. I started September 6, 1994. And in every trial I've conducted I use a juror questionnaire, so at the end of the trial the juror -- I personally hand it to the jurors. They take it home. They fill it out. They get to evaluate the lawyers. They get to evaluate me as a judge. They get to evaluate the whole

Page 19

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 19 of 3245

process. So I've had an opportunity now over ten and a half years to read thousands of responses by jurors.

And it's really one of the most fulfilling parts of my job when I read the questionnaires and the jurors tell me how fulfilling jury service was for them. And most come in very skeptical. I understand that. Most people do not want to be here. You did not wake up this morning, jump out of bed, and say, I just hope I get selected and have three months of my life disrupted so I can serve on this jury. I totally understand that.

And it is a hardship. Even in the best-case scenario, it's going to be a hardship for anybody. And so I just hope you'll think about those things and make the sacrifice if you're

24

in a position to do it.

I can think of individual jurors -- in the two long trials I've had, I can think of two farmers who farmed full time, worked full time, were not getting paid in their manufacturing jobs beyond two weeks if they got selected to serve as a juror. The trial occurred during fall harvesting. And these two people -- I tried to talk them out of serving because I thought it was too big of a burden even on them. And they were willing to serve.

Now, that's extraordinary. We don't really expect that kind of extraordinariness, but again, I don't want to beat a dead horse. I know it's a hardship. Everybody's got an individual reason or reasons why they feel they can't serve, but I'm asking you to take a good look at it, reevaluate your position, and if there's any way you can serve do so even though it would be a hardship for you, unless it's a severe or

Page 20

extraordinary hardship.

So having said that, I'm just going to start in the back row.  Why don't we -- where's that microphone?  Where did it wind up?  Okay.  I'll tell you what.  Why don't we start with 529.  Would it be a severe or extraordinary hardship if you're selected to serve as a juror in this case?

PROSPECTIVE JUROR 529:  Like you explained, it would be a hardship, but I don't think it's severe.

THE COURT:  Okay.  Thank you very much.

25

Juror 685.

PROSPECTIVE JUROR 685:  I serve over 500 students and 74 staff.  In this time of year it's -- it would not be severe, but it would be -- to keep everything going to wrap up a school year, it would be difficult for me.  I'll be honest.

THE COURT:  Well, we're prob -- you know, we won't start for at least two weeks, probably more like three weeks.  I know it --

PROSPECTIVE JUROR 685:  That would help.

THE COURT:  Are you willing to do it if --

PROSPECTIVE JUROR 685:  Sure.

THE COURT:  Okay.  Thank you very much.

Juror 726.

PROSPECTIVE JUROR 726:  No hardship.

THE COURT:  Okay.  Thank you very much.

Juror 569.

PROSPECTIVE JUROR 569:  My only hardship would be the -- to endure the pain of sitting here.  I've got a pain pump.  I have to have that filled every five weeks.  There's no out because it's narcotics.  And I live on narcotics all day.

Page 21

THE COURT: How does that -- can I ask you a question? How does that affect your ability to pay attention?

PROSPECTIVE JUROR 569: I fall asleep, plain and simple. I require constant visual stimulation or I just fall asleep.

26

THE COURT: Well, there will be plenty of stimulation in this trial. That's up to the lawyers. But I've seen all these lawyers, and it will be stimulating. And I've only had to take pain medication for very short periods of time, but it made me very sleepy. Would you have a difficult time staying awake do you think?

PROSPECTIVE JUROR 569: Oh, it'd be impossible.

THE COURT: Okay.

PROSPECTIVE JUROR 569: I'm on about 140 milligrams of morphine a day plus supplement so -- and a pain pump.

THE COURT: Okay.

PROSPECTIVE JUROR 569: So I just don't see --

THE COURT: There's really no way you could serve.

PROSPECTIVE JUROR 569: Right.

THE COURT: Even if you wanted to.

PROSPECTIVE JUROR 569: I'd be willing. I'd be glad to.

THE COURT: Yeah, but for the pain pump, you'd be willing to serve.

PROSPECTIVE JUROR 569: Yeah. I don't think it'd be fair to the defendant.

THE COURT: Okay. Okay. Well, maybe it would be if you slept through the government's evidence but not through the defense evidence. You probably can't control when you fall

Page 22

asleep like that.

27

Does either side have any objection if I excuse Juror 569?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: None by the defense.

THE COURT: Okay. Thank you. You're excused. Thank you so much.

PROSPECTIVE JUROR 569: Thank you.

THE COURT: Juror 97?

PROSPECTIVE JUROR 97: Should be no hardship.

THE COURT: Okay. Thank you.

Juror 730.

PROSPECTIVE JUROR 730: The only hardship I would have would be that I'm a mother of three young children.

THE COURT: I read that in your questionnaire.

PROSPECTIVE JUROR 730: So especially once school is out, then I will have all three of them home instead of just two. And I'm willing to, you know, do this and look for child care, but that will be a hardship. My husband's schedule varies every two weeks, and so daytime child care, nighttime child care, afternoon because it's a two-and-a-half-hour drive to get home, so that would be it, but I am willing.

THE COURT: You come from probably the farthest reaches of where we go to get jurors in the Northern District of Iowa for Sioux City cases because that's a long commute. I mean, our average juror probably has about an hour. So you're a

28

long ways away.

PROSPECTIVE JUROR 730: Yes.

THE COURT: And we probably go most days 8:30 to 4:30 or so. But you still wouldn't -- and you have the option of staying overnight here, and you could mix and match. But you're willing to do it I take it, but it would be a hardship.

PROSPECTIVE JUROR 730: I am willing to do it, but yes, it would be a hardship and just some working.

THE COURT: Okay. Thank you.

And, Juror 569, you're excused, so you can actually leave now. We'll take a moment and let you gather your stuff, and you're excused.

PROSPECTIVE JUROR 569: Thank you, Your Honor.

THE COURT: Thank you very much. Good luck to you.

(Prospective Juror 569 exited the courtroom.)

THE COURT: Juror 533?

PROSPECTIVE JUROR 533: It would not be a hardship.

THE COURT: Thank you very much.

Juror 545.

PROSPECTIVE JUROR 545: And it would not be a hardship.

THE COURT: Thank you very much. That's it for me. Now we're going to turn it over to the lawyers, and, Mr. Berrigan, are you going to start, or Mr. Willett?

MR. BERRIGAN: I was going to start, sir.

29

THE COURT: Okay. Mr. Berrigan?

MR. BERRIGAN: Good morning. Thank you for coming. We all appreciate your service very much, both the parties and the Court.

Angela Johnson is 41 years old. She has three

Page 24

sisters -- Wendy, Jamie, and Holly -- a brother Jim. Her mother's still alive. Her name is Pearl Jean. They grew up in the Mason City/Clear Lake area of kind of north central Iowa. She has two daughters, Alyssa who's 21 and Marvea who's 11, and a granddaughter who's just 2 years old. Her name is Angeleah. With that further information, does anybody think they know any of those folks? Okay.

She's charged with a very serious crime which is why we're here. Government has alleged that she intentionally murdered five people including two little girls, ten and six years old, and that these murders occurred during the course of a drug conspiracy and in furtherance of a continuing criminal enterprise.

And because of the nature of the charges, the government is seeking the death penalty in this case if she's convicted. So Judge Bennett has graciously allowed us really an expanded opportunity to discuss with you some of the important issues that are going to arise in this case, and this is our chance to do that now.

We will not be able to come back later on after you've

30

heard the evidence and ask you kind of what you think then, so to some extent we're asking you to kind of project in your own mind and give us your best estimate as to how you feel about these things.

As the judge has indicated, there are no right or wrong answers. We are not here to judge you. We respect your views greatly. You're entitled to them, and we would expect that.

We just need to know what they are so that we can pick

the best 12 people to hear this particular case; okay? Is anybody here nervous except for me? I've been doing this a while, and it's still -- I got little sleep, and we want you to try to be as comfortable as you can. And we certainly appreciate answering a question even if you're hesitant as to whether you think it applies to you; okay? And so far we've been doing just great.

I want to start by talking about one of the most important issues that we're going to address during this process, and that is how you feel about the death penalty and life imprisonment as potential punishments. And I say -- ask you these questions knowing that we have the cart way before the horse, don't we?

We're sitting here. The woman's just charged. She's obviously not been convicted of anything. She's presumed to be innocent. And Mr. Willett's going to get a chance to ask you

31

some questions about some of the other areas that we'll discuss.

But we need to discuss this issue about punishment now because, as I mentioned, we won't have a chance to do it later. We wouldn't be able to come back after if she was convicted and say, Well, you know, Number 726, what do you think about the death penalty and life in prison? We have to do that now, so I hope you'll bear with me.

I'm going to start with, if I might, the gentleman with the lowest number, Number 97. Of course, we have the benefit of your questionnaire. One of the things I noticed -- and I apologize for the -- you probably haven't been addressed by number before, and it is awkward for us, and please accept my apologies.

PROSPECTIVE JUROR 97: Okay.

MR. BERRIGAN: Mr. 97, I noticed on your questionnaire that one of the things you had checked in response to a death penalty question is that you believe in an eye for an eye, and I wanted to ask you what you meant by that concept or what that means to you.

PROSPECTIVE JUROR 97: Well, I guess if something was done to me, I feel it should be done to them if it was actually done to me is the way I always felt about it. When I was a kid, if my brothers or my sisters were fighting with me, then I'm going to retaliate at that point I guess. At that point when we were kids, that's kinda -- we held our own; everybody held their

32

own.

MR. BERRIGAN: Sure. Yeah. If you don't you get trampled; right?

PROSPECTIVE JUROR 97: That's right.

MR. BERRIGAN: And now we're adults, of course, and some of these principles stick with us our whole lives.

PROSPECTIVE JUROR 97: That's right.

MR. BERRIGAN: Some of them are things that we've been taught by our parents perhaps or in school. Certainly we've all heard of the religious eye for an eye from the Old Testament; right?

PROSPECTIVE JUROR 97: Right.

MR. BERRIGAN: And what I'm interested in is not so much about what happened, these fights when you were kids, but kind of how you feel about it now.

PROSPECTIVE JUROR 97: Well, I think it's probably changed because I've grown up, but as we were kids, it was

Page 27

probably a different story. We're all more mature now, and you have to realize the consequences of what you're thinking at that time, so today I probably know death penalty is very, very severe. It'd have to be very harsh to give that kind of a penalty so . . .

MR. BERRIGAN: I want to be clear that the allegations are harsh. Could we agree?

PROSPECTIVE JUROR 97: Yes, they are.

33

MR. BERRIGAN: I've had some people tell me on occasion, Mr. 97, Listen, Mr. Berrigan, if you intentionally take somebody's life, you in that action have forfeited the right to live yourself, and that's just how things are. It's similar to this proposition of an eye for an eye, and I don't know if that is a proposition that resonates with you, but I am very interested in what you think about that.

PROSPECTIVE JUROR 97: I'm not real sure. I'm not sure how to respond to that really, but I like to see the facts. I'm a person that likes to be involved and see all the facts before I make a judgment these days.

MR. BERRIGAN: Sure. And that is -- obviously it's -- a horrible disadvantage of this process is that you do not have the facts. And we understand that. But there's no other way for us to explore these concepts just as a practical matter; okay?

PROSPECTIVE JUROR 97: Yes.

MR. BERRIGAN: So we'll ask you to kind of do your best based on at least what you know now regarding the charges.

PROSPECTIVE JUROR 97: Correct.

MR. BERRIGAN: Let me ask it this way. Do you think a

Page 28

person convicted of an intentional murder, do you think that in your view life in prison without possibility of parole would be a severe-enough sentence for such a person?

PROSPECTIVE JUROR 97: In today's world it probably

34

is.

MR. BERRIGAN: What do you mean by that, in today's world?

PROSPECTIVE JUROR 97: Well, with all the people that are convicted of crimes of this severity, that if you had the death penalty, there would be a lot of deaths. They'd have to put a lot of people to death because there are more than probably we even know about.

MR. BERRIGAN: There are a lot of murders. You're right. We live with that every day, don't we?

PROSPECTIVE JUROR 97: Right.

MR. BERRIGAN: And not everybody's put to death. We all know that.

PROSPECTIVE JUROR 97: Correct.

MR. BERRIGAN: We've had some recent examples of that. But I'm really interested in what you think about it. Do you think that -- are you okay with that? Are you all right with that proposition that these people commit intentional murder and they're not executed? They're getting life sentences. How's that sit with you?

PROSPECTIVE JUROR 97: I think in the most case it's probably -- it's fair at this point. You know, they are a human life, and they potentially have -- they can make something good out of their life yet.

MR. BERRIGAN: One -- I'm asking you a little bit

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 29 of 3245

about the life sentence because I did have this concern about one of your responses. And let me tell you first before I go further, a lot of people said this. A life sentence is a waste of the taxpayers' money. I can't tell you how many times I've seen that in these questionnaires, and we've looked at a lot of these. It's a waste of the taxpayers' money putting these people in jail for the rest of their lives. We're feeding them three squares a day. Some folks have mentioned, you know, they got television; they get to play cards. Who the heck knows what's going on there? Could be better than us, you know. They've got it better than us. And as a result of that, the people who feel that way, they don't really think that's a severe-enough punishment. And I respect that. I really do. Are you in that camp?

PROSPECTIVE JUROR 97: I think so.

MR. BERRIGAN: Tell me about that.

PROSPECTIVE JUROR 97: I think if somebody does -- they need to pay a price for what they have done, and to me that is not a price. It needs to be a little bit -- I don't know -- put a value to it, you know. You gave -- you took a life. Well, now you need to rebuild something to regain some respect or something like that. You have to work to get that back. And sitting in a prison, you do your exercise programs. You go to your meals. You do whatever you do. That's not kind of a repayment program, you know.

I'm not sure what there is out there for that type of

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 30 of 3245

situation, but there needs to be some kind of a program for that so that -- you know, you see some of these movies back in the days where they go to the old rock pile, something like that. They actually have taken part of the physical portion of their life away and tried to rebuild a little bit. But I don't know what's out there.

MR. BERRIGAN: We don't do rock piles anymore, do we?

PROSPECTIVE JUROR 97: You're right. We don't. We don't.

MR. BERRIGAN: So let me ask you, you know, the jurors have no control over what happens in prison. None of us do. The judge doesn't run the prisons. They do whatever they're going to do.

PROSPECTIVE JUROR 97: That's right.

MR. BERRIGAN: And not having any control over that, does that trouble you in terms of that being a severe-enough punishment for a case such as an intentional murder?

PROSPECTIVE JUROR 97: As a juror up here, we're here to do our job, and you're there to do your job, so if we would say not convict a person or convict them, we've done our portion of what we're supposed to do. It's -- the rest of the government will take care of the rest of that portion.

MR. BERRIGAN: You're satisfied that that wouldn't enter into your consideration at all.

37

PROSPECTIVE JUROR 97: I don't think so.

MR. BERRIGAN: Okay. Does it change the equation at all when we're talking about the intentional killing of children?

PROSPECTIVE JUROR 97: No.

Page 31

MR. BERRIGAN: No, okay. I reserve the right to come back to you, but I'm going to let you off the hook, and I wonder if you could pass the microphone to Juror 730 if you would. Thank you, sir.

Ma'am, I wanted to ask you some of the same types of questions; okay?

PROSPECTIVE JUROR 730: Okay.

MR. BERRIGAN: Your questionnaire indicated that you were one of these folks I think that arguably had some problems with the concept of life in prison as a really severe-enough punishment. Is that fair?

PROSPECTIVE JUROR 730: Yes.

MR. BERRIGAN: Could you tell us a little bit about how you feel about that?

PROSPECTIVE JUROR 730: A lot of it comes from television shows, watching, you know, what goes on in prison and just hearing, like you said, you know, they get their three square meals a day and television and all of that and just, you know, some of the other things that maybe are available to them. I just have a hard time realizing that that is a strong

38

punishment.

I do, however, see that being torn away from your family, you know, there is a punishment there, and I just -- in a case like this, I just wonder if life in prison really is the correct punishment. And sometimes I question life in prison without parole. Is that really true? I mean, do some ever get parole? I mean, I just question whether or not they are there for good. And I guess that scares me.

MR. BERRIGAN: Does it scare you to the point that in

Page 32

a case such as this, to use your words, that's not a punishment that you think is really severe enough for the type of crime that we're talking about?

PROSPECTIVE JUROR 730: Correct.

MR. BERRIGAN: Okay. There wasn't much hesitancy there. You sound pretty positive about your feelings, and I know you've had a little bit of time to reflect on it since you filled out the questionnaire. And what I'm hearing is a consistent position today as to what you wrote down. Is that accurate?

PROSPECTIVE JUROR 730: Yes, I suppose so.

MR. BERRIGAN: And I -- let me ask -- let me put it to you this way. Would it be fair of me to, given your response, suggest that it would be difficult for you to impose a sentence of life in prison based on the way you feel in a case involving the intentional murder of children?

39

PROSPECTIVE JUROR 730: The children being involved is what makes me so sure that life in prison would not be a strong-enough punishment. However, I do feel that I probably would consider the facts that are brought before us and take that into account. I mean, I wouldn't go into it saying, you know, if we convict, definitely the death penalty. I am sure of the fact that I would pay attention to the facts that are presented to us and take those into account.

MR. BERRIGAN: When you're talking -- when you say that I would consider the facts, do you have in your mind examples of what you're talking about?

PROSPECTIVE JUROR 730: You mean things that I've heard about the case, or what do you mean?

Page 33

MR. BERRIGAN: Well, sometimes people tell me they consider the facts, and what they're really suggesting is, well, maybe it's a case of self-defense or maybe it was an accidental killing or perhaps this is a person who is mentally ill, some severe mental defect. That's sometimes what people are thinking. I don't know if that's what you're thinking.

PROSPECTIVE JUROR 730: When I filled out the questionnaire, I took into account the things that we were told, you know, in the informational letter and, you know, maybe things that I heard about the case or the previous case, and I think I made my judgments according to that. I'm one that will kind of come to a conclusion right away and then listen to the

40

facts and reserve the right to be able to change my opinion if that makes sense.

MR. BERRIGAN: Sure.

PROSPECTIVE JUROR 730: I'm not sure if that's answering your question or not.

MR. BERRIGAN: Well, to some extent, but as I explained with Mr. 97, we don't have that opportunity to listen to the facts before we ask you these questions. So we have to kind of rely on you based upon what you've been told about the case so far in terms of the allegations to really give us your best judgment because you're in the position to know. And if your best judgment is, look, Mr. Berrigan, you're talking about five people being intentionally killed, intentionally killed, the allegation it has to do with drugs and continuing criminal enterprise and two of them are little girls, ten and six years old. I'm just wondering whether, given what you've told me so far, a life sentence is really a realistic option for you.

Page 34

PROSPECTIVE JUROR 730:  Probably not.

MR. BERRIGAN:  Okay.  I appreciate your honesty. Thank you.  Tell you what, could you just pass it forward to Mr. 726?  Thank you very much.

Mr. 726, I wanted to ask you kind of the same kinds of questions; okay?

PROSPECTIVE JUROR 726:  All right.

MR. BERRIGAN:  Just rephrase that last question.  We

kind of start from the back and go; okay?  In the kind of case that we're talking about here, intentional killing of children -- and again, this is an opinion you're absolutely entitled to, and we respect it.  But is that a case where you would realistically be willing to consider a life sentence as a sufficient punishment for that type of a crime?

PROSPECTIVE JUROR 726:  That would be difficult, but I'd say yes.

MR. BERRIGAN:  Okay.  And I probably know the answer to this, but why don't you just tell me.  Why would it be difficult?

PROSPECTIVE JUROR 726:  Taking a human life is a rather tough thing to do.

MR. BERRIGAN:  Sure.

PROSPECTIVE JUROR 726:  And sometimes life in prison is not really as great as it sounds sometimes, and the things they endure in there are often much more than we know about too. So I'd really have some problem just saying death penalty and walking away from it.

MR. BERRIGAN:  Would it matter to you what the background of the person is?  In other words, let me give you

Page 35

this analogy: Two people commit the same exact crime; okay? And, of course, the law has punishments that are available for all kinds of crimes. They're usually not fixed, but sometimes they are. And one person has a disadvantaged background.

42

Perhaps there was abuse or some emotional or psychological problems in the family growing up. And the other person really had every advantage, grew up in a middle class or upper middle class family, had every opportunity, went to school. And these two people come in, and they've committed the same crime, okay, exactly the same? In your view, should we punish those people based on the crime or based on their background, or how would you handle that?

PROSPECTIVE JUROR 726: I would say in all fairness based on the crime. I don't think that the background -- I understand that it's difficult in some cases, but we all have to face those things as we get older. We need to know that we have certain things that we can't do and can do, and I don't think the background is going to be that much different.

MR. BERRIGAN: You don't think the background would be a relevant consideration in your mind.

PROSPECTIVE JUROR 726: No.

MR. BERRIGAN: Okay. I appreciate that. One other thing I wanted to discuss with you, then let you go; okay? You also mention in your questionnaire -- let me make sure I've got it right -- this was in response to the question about life imprisonment being a severe enough punishment for intentional murder, and you said, Are they really in for life? Should the taxpayers -- you know what? I'm reading the wrong one. I'm sorry.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 36 of 3245

PROSPECTIVE JUROR 726:  Okay.

MR. BERRIGAN:  I'm reading Juror 730 which she already told us about.  You said the person convicted of life in prison still has a chance of getting out some day even if they say no parole which is exactly what this lady reflected; okay?  Is that a concern that you have?

PROSPECTIVE JUROR 726:  It is somewhat, yes.

MR. BERRIGAN:  Would it be at all alleviated if you were told that life without parole means exactly that, life without parole, you die your last breath in the institution in which you're incarcerated?

PROSPECTIVE JUROR 726:  Yes.

MR. BERRIGAN:  Does that help you?

PROSPECTIVE JUROR 726:  Oh, yeah.

MR. BERRIGAN:  Okay.  Okay.  Thank you, sir.

PROSPECTIVE JUROR 726:  You're welcome.

MR. BERRIGAN:  I wonder if I could go to Mr. 529.  I wanted to start on a different subject with you, sir, only because you brought it up.  Are you okay with that?

PROSPECTIVE JUROR 529:  Certainly.

MR. BERRIGAN:  Your questionnaire mentioned this, and you reiterated it to the judge this morning, that you've been in city government and you know a lot of people in this city and you've known them for a long time including the police chief.

PROSPECTIVE JUROR 529:  That's correct.

MR. BERRIGAN:  And you have a high regard for the officers that you know undoubtedly.

PROSPECTIVE JUROR 529:  I certainly do.

MR. BERRIGAN:  And you mention that in the questionnaire.  You consider these people people of character, people that you believe and trust and rely on and that you'd have a tendency to consider their testimony a little differently than the testimony of other people.  Is that a fair summary?

PROSPECTIVE JUROR 529:  That's accurate.

MR. BERRIGAN:  And you were also quite candid that that would include at least this particular United States attorney, assistant United States attorney that we spoke of this morning, Mr. --

THE COURT:  Hobart.

MR. BERRIGAN:  -- Hobart.

PROSPECTIVE JUROR 529:  Hobart.

MR. BERRIGAN:  To the extent that you think so much of Mr. Hobart that you tried to contact him when you were summoned.

PROSPECTIVE JUROR 529:  That's true.

MR. BERRIGAN:  Could I ask you why you were trying to contact him?

PROSPECTIVE JUROR 529:  Certainly.  Once I understood that I had been notified to serve on the jury or to at least be -- go through the process, my concern was my knowledge and relationship with Mr. Hobart, if anyone knew that or if that

45

should be brought to someone's attention now, and that was my only reason for calling him, but he wouldn't speak to me anyway, and I understand why.

MR. BERRIGAN:  Still your motives were quite pure.  You wanted it to be on the record that you had this relationship with Mr. Hobart.

Page 38

PROSPECTIVE JUROR 529: Yes, sir.

THE COURT: Mr. Berrigan, could I interrupt for just one second?

MR. BERRIGAN: Yes, sir.

THE COURT: This might put you a little bit at ease, Juror 529. I can count on one hand the number of trials I've had where a potential juror didn't know Mr. Hobart. I really can. I mean, he's the one that comes up in virtually every jury selection in every case. There's somebody he knows. One, he's been in the community a very long time. He's been very active. He was a public defender. He was a county attorney.

PROSPECTIVE JUROR 529: Planning commission.

THE COURT: He's been very active in the community, and he's a nice guy, and he's well liked and well regarded.

PROSPECTIVE JUROR 529: Certainly is.

THE COURT: So matter of fact, it's the standing joke if we have a trial and nobody knows Mike Hobart. So you're in a lot of good company over the years.

PROSPECTIVE JUROR 529: Thank you.

46

MR. BERRIGAN: I don't have the pleasure of knowing Mr. Hobart, but he's obviously a very popular fellow. But the serious part of that relationship is the thing that you brought up which I want to just ask you about again if you don't mind. And that is the judge asked you whether your relationship with Mr. Hobart might make it difficult for you to sit as the fair and impartial juror you'd like to be in a case such as this. Do you remember him asking you that?

PROSPECTIVE JUROR 529: Certainly.

MR. BERRIGAN: And at least my notes reflect that you

Page 39

were a little hesitant before you said, I don't -- I don't think so, and then he asked you -- well, there was some other question about it, and you said you thought you might place more emphasis on the position of the U.S. Attorney's Office as a result of your opinion and relationship with Mr. Hobart.

PROSPECTIVE JUROR 529: That's all accurate except for one thing.

MR. BERRIGAN: Okay.

PROSPECTIVE JUROR 529: My answer was I wasn't sure.

MR. BERRIGAN: Okay.

PROSPECTIVE JUROR 529: And I'm still not sure.

MR. BERRIGAN: And that's -- yeah, that's -- that is exactly what we want. We're not -- you are the only person that can tell us that in the entire world. Not even Mr. Hobart can say what's in your mind respecting your relationship with him.

47

PROSPECTIVE JUROR 529: Okay.

MR. BERRIGAN: So we appreciate that very much. As you sit here right now, do you have some uncertainty, uncertainty --

PROSPECTIVE JUROR 529: It's true.

MR. BERRIGAN: -- about your ability to be the fair and impartial juror you'd like to be normally because of this relationship you have with Mr. Hobart?

PROSPECTIVE JUROR 529: And also if I may, the questionnaire asked about the relationship with other law enforcement officers. You've already brought that up. My relationship, for instance, with the police chief is at a different level than Mr. Hobart.

MR. BERRIGAN: Okay.

Page 40

PROSPECTIVE JUROR 529:  We vacation together.

MR. BERRIGAN:  It's even closer.

PROSPECTIVE JUROR 529:  Oh, oh, much closer.

MR. BERRIGAN:  Okay.  And you mention that -- you mention that to us for a reason.  Why?

PROSPECTIVE JUROR 529:  I think because the questionnaire asked if I might place more emphasis on their testimony or input than possibly others, and my answer was yes, I may do that.

MR. BERRIGAN:  Okay.  I mean, it probably seems obvious, but one of the things we ask jurors to do is to treat

48

police officers just like everybody else because, you know, they are just like everybody else theoretically.  They're human beings.  I was a police officer one day for two years.  But sometimes that's hard to do.  Some of us are married to police officers, you know.  We have very close relationships, and we feel very proud to know them and be associated with them and have a high regard for them.  And I'm hearing you're in that situation.

PROSPECTIVE JUROR 529:  (Nodded head.)

MR. BERRIGAN:  Okay.  Thank you very much for your honesty, sir, and I'm going to skip over you on the death penalty questions if that won't offend you.  Is that okay?

PROSPECTIVE JUROR 529:  That's okay.

MR. BERRIGAN:  All right.  I wonder if you could pass the mike back to number 545 if that would be okay.

First of all, Mr. 545, thank you for coming in.  I understand you got kind of late notice, and we appreciate your willingness to come.  I've had a chance just to briefly look at

your questionnaire, and I did notice that on the questions regarding the death penalty you repeated on several questions that you really didn't have an opinion -- let me see if I can more accurately state that. You've given the death penalty much thought, but if I were placed in the position of determining the penalty should the defendant be found guilty, I'd have to think long and hard about it. Does that sound accurate?

49

PROSPECTIVE JUROR 545: Yes.

MR. BERRIGAN: Okay. And you were asked questions about life in prison. What are your thoughts and opinions about life in prison as a punishment for a person who's guilty of intentional murder? And you said, The person has to be found guilty before -- I think you said before an opinion can be formed. Does that sound right?

PROSPECTIVE JUROR 545: Yes.

MR. BERRIGAN: Okay. And I understand that when you filled out these questionnaires there was very little guidance in terms of this process. But I also understand you've been on three juries in the past; is that right?

PROSPECTIVE JUROR 545: I was on two juries in district court, both civil, and one jury here which was a mistrial.

MR. BERRIGAN: Okay. And so you know somewhat a little bit about this process of asking questions of people.

PROSPECTIVE JUROR 545: Yes.

MR. BERRIGAN: And I'd like you to -- if you're willing to do it, I'd like to revisit this death penalty issue with you and ask you to do the best you can to kind of project into the future now that you know sort of the nature of the

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 42 of 3245

charges how you feel about the death penalty for a case of intentional murder. Could you tell us that, sir?

PROSPECTIVE JUROR 545: I always believe in life that

50

we do not make judgments of matters until we are absolutely addressed with them. In the questionnaire that I received, it continued to -- in my opinion was bias towards, okay, what would you do, this murder case and yada, yada, yada -- excuse me -- and I believe that it's unfair to make judgments such as that until you know all the facts and evidence. It's unfair to the prosecution. It's unfair to the defense.

MR. BERRIGAN: Yes. And, you know, and I -- I'll apologize because we had some role in helping prepare this questionnaire, and I think the last thing we wanted to suggest to anybody was that they sit at home at their kitchen table and decide what would happen to Angela Johnson based on questions in a piece of paper. That was, let me tell you, the last thing in our minds; okay? So to the extent we've done that in your view, I want to apologize for that.

But here we are making tremendously important decisions about the 12 people that will decide this case, and one of the things both sides want to know in making the determination about the best 12 people are how do these folks feel about the death penalty? What -- you know, if I came to you, we sort of knew each other and we were sitting in a coffee shop one day reading the paper together, and I said, Well, Mr. 545, we've known each other for years. I've never asked you about the death penalty. There was an article today in the paper about the death penalty and I turn to you and say, Hey,

51

what do you think about the death penalty; we've never discussed it, what would you say to me?

PROSPECTIVE JUROR 545: Twenty years ago I was a little more set in my ways. Usually as you get older you become set in your ways.

MR. BERRIGAN: That's right.

PROSPECTIVE JUROR 545: When I was younger, I was more set in my ways. As I have become older, I have been reflective in my ways. In the case of death penalty, 20 years ago I probably would have said the person deserved it. But as we mature, our opinions differ, and I would not be as -- I'm not saying that I would not give someone or as a juror make that decision, but as I become older, I don't even try to address stuff like that unless I'm absolutely put in that position.

MR. BERRIGAN: That's kind of what we're doing, isn't it?

PROSPECTIVE JUROR 545: Because that's unfair. It's unfair. It's unfair.

MR. BERRIGAN: Sure. Well, can I ask you about life imprisonment then because, you know, that's another option for intentional murder even for the killing of children? How do you feel about that? Is that a severe-enough punishment?

PROSPECTIVE JUROR 545: Life in prison is a staple for Iowa for murder.

MR. BERRIGAN: Sure. Of course, we're in federal

52

court; right?

PROSPECTIVE JUROR 545: Yes, and, granted, that's

Page 44

different.

MR. BERRIGAN: Sure. How do you feel about it? I don't care about Iowa. But how do you feel about that?

PROSPECTIVE JUROR 545: Life in prison in general, not in this case, in general.

MR. BERRIGAN: How do you feel about it in general?

PROSPECTIVE JUROR 545: I believe that we read in newspapers of people being sentenced to life in prison or the death penalty. It is not my position to judge as to what these people were sentenced much less I stay a neutral position because I was not there to make that judgment. It was a group of people who sat in a jury box who made that decision, and it's not fair for me to make decisions on that.

My opinion on life imprisonment, I've never been placed in that position, so I can't make an opinion, and I'm sincere on that. I guess I'm getting soft in my old age, but I don't think so. But in that respect, I just try to leave it to each individual case and not as a generalization.

MR. BERRIGAN: Can I ask you then before I let you alone then, what about the intentional murder of children, not life in prison generally for murder but the intentional murder of two children? Is that a case where you could realistically consider a life sentence as an appropriate punishment?

53

PROSPECTIVE JUROR 545: Hypothetically, wrong is wrong, and if it was proven through evidence and facts that it did happen, then it would be a consideration.

MR. BERRIGAN: What would be a consideration?

PROSPECTIVE JUROR 545: Consideration of life imprisonment, death penalty, even if the evidence does not prove

Page 45

itself out.  Then acquittal would be the option.  But you have to consider all the options.

MR. BERRIGAN:  Let me ask you the same question I asked gentleman Number 726 about the same crime, two different people.  If you were asked to assess the punishments in that type of a situation, in your view is it appropriate to punish people for the crime they've committed, or would you take into account their background in making a determination?

PROSPECTIVE JUROR 545:  It would be the crime and not the status or the education or the background.  A crime is a crime.

MR. BERRIGAN:  Things such as a disturbed childhood, physical abuse or sexual abuse or psychological issues, do you really think that's an appropriate consideration in making a determination about punishment?

PROSPECTIVE JUROR 545:  If it is put in as the evidence or facts, it should be taken into consideration.  However, I believe also you put in there earlier of upper class or middle class, and that's where I was coming at the point of a

54

crime is a crime.

MR. BERRIGAN:  Right.  Okay.  I gotcha now, and I didn't mean to mislead you there.  I'm really interested in this issue because the law says -- and I'm going to talk with some other jurors about this in a minute -- you're given some guidance when you're making this decision as you would expect.  The law gives some guidance, and one of the things it says is that any aspect of the defendant's background or character can be submitted to you as a circumstance that might warrant a sentence of life imprisonment; okay?  So the things that we've

Page 46

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 46 of 3245

mentioned in passing, sexual abuse, physical abuse as a child, a disruptive, emotionally unstable childhood, those are things that the law not only allows a defendant to put before a jury in considering the appropriate punishment, but it requires the jurors to consider them and give whatever weight to them you deem appropriate; okay? Do you understand me?

PROSPECTIVE JUROR 545: Yes.

MR. BERRIGAN: Is that -- if your view is that we're going to punish people for the crime that they've committed, would you be willing to take that type of information into account?

PROSPECTIVE JUROR 545: I believe that when we are sent to our jury room for our final deliberations we take all factors into consideration, accept the ones that we consider worthy and reject the ones that we do not. It is up to us as a

55

panel or as a group to make that decision.

MR. BERRIGAN: And I want to -- and I know you don't know all of these little rules yet, but let me suggest to you that that particular process of considering mitigating circumstances, it's an individual thing. That is, Juror Number 726, he might find that some of the information that he hears in the course of the trial is mitigating to him, and in his view that might warrant a sentence of life or towards life. You might not agree with him on those issues. You might think these other issues or your view are more important to you. And you're not only entitled to your opinions, but the law acknowledges that that's your responsibility, that you individually take these matters into account; okay?

PROSPECTIVE JUROR 545: Yes.

Page 47

MR. BERRIGAN: Would you personally be willing to do that?

PROSPECTIVE JUROR 545: I believe that were I selected and we were to go into the room to deliberate our decision, I believe everyone has the right to their own opinion, but it is the consensus of the group to make the final decision for the defendant.

MR. BERRIGAN: Okay. I'm going to come back to that. I'm going to let you off the hook for a little bit; okay? And I wonder if you would pass the microphone if you would, sir, to Juror Number 685 who's the lady with the pretty red hair in

56

front of you.

How are you, ma'am?

PROSPECTIVE JUROR 685: I'm fine. Thank you.

MR. BERRIGAN: I know you've been paying close attention to the discussion so far because I've been watching you and you've nodded a couple of times. And from your questionnaire, I take it that you are a person who would not have any problems considering either of these available options, life in prison or the death penalty if the case was appropriate.

PROSPECTIVE JUROR 685: I think it depends on the case, and I think the death penalty needs to be there with every case just as an option. It just depends on the severity and what the facts are that are brought out.

MR. BERRIGAN: Okay. Have you had occasion -- I just don't recollect -- of serving on a jury before?

PROSPECTIVE JUROR 685: No.

MR. BERRIGAN: Okay. You know, in the usual case -- and Mr. 545 I'm sure will remember this -- jurors sit on the --

Page 48

they sit and they listen to the evidence. You have really three obligations as jurists. You have to sit, pay attention to and analyze the evidence; okay? And then you have to follow the instructions of the Court because the Court will give you instructions at the end of the case. And then you have an obligation to not only form your own opinions but to also listen to your fellow jurors and take into account what they say even

57

if you might not agree with them. And you're not obligated to agree with anybody. Nobody's going to bully you into changing your position in the jury room. We wouldn't expect you to do that to anybody else. But we do expect the jurors to talk and discuss and take each other's opinions into account. And I bet everybody could do that. Could you do that?

PROSPECTIVE JUROR 685: Yes.

MR. BERRIGAN: Okay. What's really different about this case is it doesn't all take place in one part. There's going to be three separate and distinct parts to the trial, and the first part has to do with the guilt or innocence of Angela Johnson of these very serious charges for which she's been charged. And there's going to be evidence presented, and the jurors are going to be asked, just as I've mentioned, to analyze the evidence critically and to listen to it and, after the evidence is all in, to go back in the jury room and decide what they believe the facts are, who to believe, who not to believe, what evidence has convinced them of what facts beyond a reasonable doubt; okay? You following me?

PROSPECTIVE JUROR 685: Uh-huh.

MR. BERRIGAN: And in that process it's very much like television. You've heard these things before. You know, you

Page 49

have to prove every element beyond a reasonable doubt. The jury has to unanimously agree that a person is guilty. If even one juror says no, no, not in my heart and conscience, then that's a

58

not guilty or a hung jury. But it's not a conviction; okay?

But if the jurors all agreed, if they all agreed on guilt, okay, then there's going to be a second part of the trial where there's not going to be evidence presented, but the judge is going to give instructions and ask the jurors based on what they've heard so far answer these questions: Has the government proven these things beyond a reasonable doubt; okay? And that's the same process, of course, in terms of discussing the evidence you've heard. And the jurors have to decide whether or not they all agree beyond any reasonable doubt that these particular factors have been met. And for lack of a better term, we call them gateway factors. They're things that the jury has to determine for the case really to go any further towards the issue of punishment; all right?

And then finally there's going to be this third part of the trial perhaps where the jurors actually have to weigh the evidence on punishment; okay? And there are two types of evidence that are presented. And one type of evidence is what's called aggravating factors. And they are things that the legislature -- there's 12 aggravating factors in the statute. They're all different kinds of things.

Killing somebody for pecuniary gain is an aggravating factor. If the victim was very young or old or infirm and then so particularly susceptible, that's an aggravating factor. If you had two prior drug convictions for distribution of drugs,

59

Page 50

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 50 of 3245

that's an aggravating factor. There's a list. You'll be told which ones to consider; okay?

And the jury can go all the way back to the beginning of the trial and remember the evidence in making that determination about aggravating factors. And the important thing about aggravating factors is the same rules apply. You all have to agree, and they have to be proven beyond any reasonable doubt; okay? Are you with me on that?

PROSPECTIVE JUROR 685: Yes.

MR. BERRIGAN: Okay. Now, these mitigating factors as you might expect, they're sort of the flip side of the coin. These are factors that would warrant consideration of a life sentence. And there's a list of ten of those as well, and you'll be told which ones to consider, and they're things like having a minor role in the offense, relatively minor role, not enough to not be guilty but minor. Not having a significant criminal record, that's a mitigating circumstance.

And then there's a mitigating circumstance that's -- it's quite broad as I discussed with Juror 545 -- that any aspect of the defendant's background or character or anything about the crime that the defendant might advance is a mitigating factor such as background is a legitimate mitigating factor that warrants consideration by the jury in making their determination; okay? Are you with me?

PROSPECTIVE JUROR 685: Yes.

60

MR. BERRIGAN: So you have the aggravating circumstances that you've decided beyond a reasonable doubt, all 12. And then you have these mitigating circumstances, and you

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 51 of 3245

weigh them. We've all seen that Lady Justice blindfolded with the scales, haven't we, you know, the weighing? That's what the jurors are doing in this last part of the trial in determining punishment; okay? You with me still?

PROSPECTIVE JUROR 685: Yes, I am.

MR. BERRIGAN: There are some important rules about the mitigating circumstances that are different than the aggravating circumstances. One is the mitigating circumstances do not, do not, have to be proven beyond a reasonable doubt; okay? The standard to prove mitigating circumstances, it's a preponderance of the evidence. If you find that it's more likely true that that is a mitigating circumstance, you are entitled to consider it; okay? Not beyond a reasonable doubt, just preponderance of the evidence.

Secondly, you don't have to agree on the mitigating circumstances. Just as Juror Number 545 and I were discussing, he might think, hey, you know, I think A, B, and C, those are mitigating circumstances to me. And Juror Number 726 might say, Well, I'm not sure about B and C. I'll go with you on A. I think E and F are mitigating circumstances for me. They don't have to agree. Nobody has to agree. And yet if you personally find the mitigating circumstance, you get to weigh it; all

61

right? So instead of the whole jury holding up these scales, each one of the jurors has the scales. Are you with me on that, 685?

PROSPECTIVE JUROR 685: (Nodded head.)

MR. BERRIGAN: And that's a lot different than most trials. One final thing about these mitigating circumstances and aggravating circumstances -- and we call them aggravating

Page 52

factors and mitigating factors -- it is not, it is not, a numbers game; okay? The government could present a single aggravating factor that you might think is more important than two or three mitigating circumstances, or it could be the other way around. You could have three or four aggravating circumstances and you've got this one or two mitigating circumstances. The three doesn't beat the two. Four doesn't beat one, because you give the mitigating circumstances and the aggravating circumstances whatever weight you personally decide. You still with me?

PROSPECTIVE JUROR 685: (Nodded head.)

MR. BERRIGAN: So you could decide, look, in my mind that mitigating circumstance outweighs for me those aggravating circumstances. That's okay. Everybody with me there? Okay. Whatever, whatever, that weighing process comes out to for you, the mitigating circumstances could be way down here. There could be no mitigating circumstances at all, just aggravating circumstances. A juror's never required to vote for death,

62

ever. Do you understand that?

PROSPECTIVE JUROR 685: Yes.

MR. BERRIGAN: Could you pass the mike back to last but not least Juror 533?

THE COURT: Mr. Berrigan, before your next question, I just wanted to give the jurors a little stretch break. Why don't you just stand up and take a stretch break. Then in about 30 minutes, we'll give you a real break.

MR. BERRIGAN: May it please the Court.

THE COURT: Mr. Berrigan.

MR. BERRIGAN: Ma'am, Juror 533.

Page 53

PROSPECTIVE JUROR 533:  Yes.

MR. BERRIGAN:  I noticed from your questionnaire that this particular issue is one that you took very seriously in answering the questions, the issue about the death penalty. Would that be fair?

PROSPECTIVE JUROR 533:  Yes.

MR. BERRIGAN:  And one of the issues you raised is whose responsibility is this?  Is it something that we should leave to God, or is it appropriate that the state should do this or the government should do this?  Is that right?

PROSPECTIVE JUROR 533:  Yes.

MR. BERRIGAN:  Okay.  You can see from this process that we've discussed now that it's a long and fairly involved process.  Would you agree?

63

PROSPECTIVE JUROR 533:  Yes, very.

MR. BERRIGAN:  And there are a number of checks and balances to make sure that not only is this a very carefully considered decision but that nobody is forced to do anything that they might not choose to do.  You understand that?

PROSPECTIVE JUROR 533:  Yes.

MR. BERRIGAN:  Okay.  So I need to know whether this is something you could do.

PROSPECTIVE JUROR 533:  Vote for the death penalty?

MR. BERRIGAN:  No, not exactly.  Could you do those three things we talked about earlier?  That is, analyze the evidence and follow the instructions and take into account your fellow jurors' views.

PROSPECTIVE JUROR 533:  Sure.

MR. BERRIGAN:  And you understood, did you, what I was

Page 54

discussing with Juror 685 about the weighing of the mitigating and aggravating circumstances?

PROSPECTIVE JUROR 533: Uh-huh, yes.

MR. BERRIGAN: Understood that there's no requirement --

PROSPECTIVE JUROR 533: Yes.

MR. BERRIGAN: -- even if you found aggravating circumstances outweighed mitigating circumstances that you had to vote for death. You understand that?

PROSPECTIVE JUROR 533: Yes.

64

MR. BERRIGAN: But it is something that the law contemplates is that you would give consideration to a death verdict if, if, not only you decided that that was appropriate given the particular facts of the case but that all the other jurors decided that as well because unless all 12 people decide death penalty, there is no death penalty; okay?

PROSPECTIVE JUROR 533: Yes.

MR. BERRIGAN: That's a decision that only happens if all 12 people make that determination after their individual weighing. So do you think you could do that, that you could do the individual weighing of the aggravating and mitigating circumstances? Would you be willing to do that?

PROSPECTIVE JUROR 533: I could, but I know I couldn't vote for the death penalty.

MR. BERRIGAN: Okay. Not under any circumstances.

PROSPECTIVE JUROR 533: They'd have to be like a Hitler or something like that.

MR. BERRIGAN: Well, we expect this to be a difficult decision. I think that almost goes without saying. And right

Page 55

off the bat Juror 97 mentioned it. Right off the bat this is a tough decision. We expect that.

PROSPECTIVE JUROR 533: Uh-huh.

MR. BERRIGAN: But, you know, it's a decision that the law entrusts to a jury of Angela Johnson's peers, regular people that come in and listen to the evidence. Not even the judge

65

makes the determination about the punishment. So we, you know, have to rely on people, not only people who favor the death penalty but people that may not favor the death penalty. It wouldn't be hardly fair, would it, if the whole jury decided a case such as this where they all favored the death penalty? Do you think that would be fair?

PROSPECTIVE JUROR 533: And that I didn't?

MR. BERRIGAN: No, no, just that somebody sitting on trial for their life were to be judged strictly by people who favored the death penalty. Would that seem unfair?

PROSPECTIVE JUROR 533: Yeah, it would.

MR. BERRIGAN: The law contemplates that we have a mixture of people to make this decision, that we don't comprise jurors with the idea, juries with the idea, that they're going to vote for the death penalty and that that's a requirement; okay?

PROSPECTIVE JUROR 533: Sure.

MR. BERRIGAN: So we'll ask you to kind of make your best -- your best guess I suppose. Do you think that you could go through this process and only if you found the appropriate circumstances and your fellow jurors agreed with you would you be capable of joining them if you thought it was appropriate on a sentence other than life?

Page 56

PROSPECTIVE JUROR 533:  That would be very difficult.

MR. BERRIGAN:  And I hate to ask you this, but I have

66

to.

PROSPECTIVE JUROR 533:  Uh-huh.

MR. BERRIGAN:  Despite the fact that it might be very difficult, can you assure us that you would try and you think you could do it?

PROSPECTIVE JUROR 533:  Sure, I could try to do it, yes.

MR. BERRIGAN:  All right.  Thank you, ma'am.  Could I have just a moment, sir?  I think I'm done.

THE COURT:  You may.

MR. BERRIGAN:  Thank you.  You've been very patient with me.  That's all I have.  Thank you, sir.

THE COURT:  Okay.  Now Mr. Willett?

MR. WILLETT:  Thank you, Judge.

Chief Judge Bennett, if it please the Court, counsel for the government, counsel for the defense, Miss Johnson.

Ladies and gentlemen, my name is Al Willett, and I had a chance to briefly introduce myself at the very beginning of the morning.  And now this portion of the voir dire for the defense turns to sort of the more traditional way one might think.

Instead of talking about the penalty phase first for you as Mr. Berrigan has done, I'm going to talk to you about some of the more traditional concepts that we discuss when we're considering issues of innocence versus guilt.  And to give you

67

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 57 of 3245

just a little bit of a glimpse into the case, what you, I don't believe, have heard yet is that Miss Johnson is charged with ten different counts, ten different counts. Now then, a murder of the various victims is attached to each count. But the counts break out into basically two different government theories. There are five counts that deal with what is called a continuing criminal enterprise.

Now, notwithstanding my many years of service in federal court and notwithstanding my knowledge of the criminal law, I will not attempt to explain a continuing criminal enterprise to you. I'm going to leave that for Judge Bennett. He'll have an instruction that will define that for you and give you guidance. And quite frankly, I just don't want to show the limits of my intellectual ability to you at this moment.

But the other five counts deal with a conspiracy, and the law on conspiracy is a criminal agreement. In this situation, the government is alleging a conspiracy involving my client, that she allegedly entered into a criminal agreement to manufacture or distribute methamphetamine.

Now, during the course of this trial, you may hear evidence of drug transactions or drug deals or methamphetamine attempting to be manufactured or manufactured. You may hear evidence about labs. But in this state we have heard a lot about methamphetamine. And what I'm really curious to just sort of broach with you initially is the fact that five of these

68

charges deal with a criminal agreement to either manufacture methamphetamine or distribute it. Is it going to be hard for you to give my client a fair trial? Will it be difficult for

Page 58

you to be fair and impartial based upon the fact that the drug in question here is methamphetamine?

Mr. 529, I don't know if you have the microphone. Thank you. Our CSO does. You'll hear a lot of testimony about methamphetamine. And you've been in city government, and I'm assuming that you've certainly heard this subject discussed, and I've got a feeling you have some opinions. How do you feel about methamphetamine being a prevalent part of this case?

PROSPECTIVE JUROR 529: I think my only comment would be is that that particular drug, meth, damages a lot of people. It's readily available as I understand. It's easy to produce. It's very damaging to those who are in contact with it. I don't know that methamphetamine in particular is more harmful or less harmful than other drugs. I don't know that much about it. But, you know, we do have a training center here. We do have, I guess, a little higher level of awareness maybe in this state that meth is a serious problem.

MR. WILLETT: Can you give Miss Johnson a fair trial even though in your own words meth is a serious problem?

PROSPECTIVE JUROR 529: I don't think that the particular drug would influence my decision.

MR. WILLETT: Okay. If you'd pass the microphone down

69

to Mr. 726. And I apologize for this awkwardness of referring to you by numbers. It's only the second time in my career I've done this.

But, Mr. 726, this issue that you're going to hear a lot about methamphetamine in this case, that it's sort of the undertone to this case, I mean, we're here because of these murders, but the undertone is this methamphetamine conspiracy.

Page 59

Can you give Miss Johnson a fair trial?

PROSPECTIVE JUROR 726:  I think so.

MR. WILLETT:  Okay.  Is there -- and just a question for the rest of the jurors.  Is there anyone who feels, Mr. Willett, I mean, you know, here we are discussing five murders, but now another layer to this story is methamphetamine?  Is there anybody who feels that they can't listen to all the evidence, that they can't be fair, that they can't give my client the presumption of innocence that she's entitled to?  I don't see any heads disagreeing with me.

Would you please pass the microphone back to Mr. 97.  Mr. 97, my client sits here at this moment presumed to be innocent.  She's been charged with ten different criminal counts.  Do you think she's guilty of something just because she's been indicted and she's been charged with ten counts?

PROSPECTIVE JUROR 97:  No.  Everybody's innocent till proven guilty.

MR. WILLETT:  And let me give you just a little bit of

70

a civics lecture about how a case gets to federal court.  Have you ever heard the phrase the grand jury?

PROSPECTIVE JUROR 97:  No.

MR. WILLETT:  Okay.  The grand jury is a body of citizens that meets in the Northern District of Iowa.  Certainly my understanding, there's a grand jury that convenes here every month in Sioux City.  I believe we may even have two grand juries every month in Cedar Rapids.  But the grand jury meets to hear evidence that is presented by the prosecution.

Now, when the prosecutor -- and we'll use Mr. Williams as an example.  He's certainly participated in probably hundreds

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 60 of 3245

of grand juries in his career. When Mr. Williams goes into the grand jury room to present evidence, who do you think's there?

PROSPECTIVE JUROR 97: I can't answer that. I have no idea.

MR. WILLETT: Okay. Would it make sense to you that the testifying witness is there who's answering Mr. Williams' questions? Would it make sense to you there's a body of citizens there listening to the evidence trying to make up their mind?

PROSPECTIVE JUROR 97: Yes.

MR. WILLETT: And I'm sure somebody will correct me if I misstate, but usually the grand jury consists of usually between 16 and 24 people at a time to receive evidence. Would it make sense to you that a lady such as Miss Semmler, our court

71

reporter, might be in that room recording what's being said?

PROSPECTIVE JUROR 97: She shouldn't be there.

MR. WILLETT: You don't think a court reporter should be there to transcribe the testimony?

PROSPECTIVE JUROR 97: She should be there if that's her job to be there, but as a spectator, no.

MR. WILLETT: Certainly. But a qualified court reporter to take down the minutes, you would agree that that's fine.

PROSPECTIVE JUROR 97: You bet.

MR. WILLETT: So we have a prosecutor. We have citizens of our district. We have the witness who's answering Mr. Williams' questions. Is a defense attorney there?

PROSPECTIVE JUROR 97: I have no idea.

MR. WILLETT: Okay. Would it surprise you to know

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 61 of 3245

that a defense attorney is not allowed in the grand jury room?

PROSPECTIVE JUROR 97: I have no idea.

MR. WILLETT: Okay. Well, that's the way the system works. Mr. Williams presents his evidence. He brings witnesses to support his theory of the case. Those witnesses testify to the grand jury. But if you will, they don't hear the other side of the story because the closest I can ever get to the grand jury room is the hallway outside the grand jury room.

Now then, that's different than what we're doing here today, isn't it?

72

PROSPECTIVE JUROR 97: Correct.

MR. WILLETT: You've been introduced to me. You've been introduced to Mr. Berrigan, my co-counsel, Mr. Stowers. And in a criminal jury trial in this courtroom, you will hear both sides of the story. Do you understand the distinctions?

PROSPECTIVE JUROR 97: Yes.

MR. WILLETT: And would you want to hear both sides of the story?

PROSPECTIVE JUROR 97: Definitely.

MR. WILLETT: Pass the microphone to Miss 730 if you will. Miss 730, do you understand the distinctions as to how a case is brought in criminal court in a federal courtroom versus how a case is tried?

PROSPECTIVE JUROR 730: Yes, I do.

MR. WILLETT: Okay. And that may have been sort of a simplistic distinction, but I want to make sure everybody understands the process. Is there anybody who didn't understand the process or the distinctions between grand jury bringing a case to court and a criminal trial jury where these issues are

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 62 of 3245

contested if you will?

Now then, Miss 730, my client is charged with 10 different charges. Is she guilty of at least one, I mean, the volume theory? Mr. Willett, she's got ten counts. She's gotta be guilty of something.

PROSPECTIVE JUROR 730: I know it's wrong, but yes, I

73

probably feel like if the charges -- if it came this far, there must be something there that did happen that was wrong.

MR. WILLETT: Okay. If I may interrupt for just a second because you used a phrase that I want to speak with you about. If it came this far, now, what were you thinking of when you said to me, Mr. Willett, if it came this far?

PROSPECTIVE JUROR 730: Just the investigation, the charges that were brought, going to the grand jury, now coming to jury selection and trial.

MR. WILLETT: So the fact that Miss Johnson is just sitting here and you haven't heard opening statements, you haven't heard the first witness, you haven't seen the first piece of evidence that Mr. Williams or Mr. Miller will introduce, in your mind does my client have a problem right now with you?

PROSPECTIVE JUROR 730: At this point, I suppose so. I feel guilty saying that because I know that --

MR. WILLETT: No, ma'am, do not feel guilty. Your candor and your honesty is what we're looking for, so I am not your judge. I am just asking you questions and hoping that you'll do what Judge Bennett asked of you earlier this morning.

PROSPECTIVE JUROR 730: I do know -- and maybe I'm not supposed to go on -- but I do know that I would, you know,

Page 63

listen to the testimony and the facts and everything, and I guess I'm backwards that way is that I will take the information

74

afterwards and then -- I don't know what I'm saying. I'm sorry.

MR. WILLETT: No, no, that's okay.

PROSPECTIVE JUROR 730: Yes, at this point I guess I would see some guilt there. Whether it's of all ten counts, that's yet to be determined, but I feel like there would be at this point some guilt I would recognize.

MR. WILLETT: If you'd pass the microphone to Mr. 545.

Mr. 545, is it a problem that my client has been charged ten times?

PROSPECTIVE JUROR 545: Okay. Is there a problem?

MR. WILLETT: Is that a problem for you?

PROSPECTIVE JUROR 545: No.

MR. WILLETT: Okay. And it's my understanding that one of the instructions Judge Bennett will give you later in this trial is that you have to consider each count, the innocence or guilt of each count, separate from the other count. So in other words, once you decide Count 1, regardless of the verdict, we wipe the slate; we turn our attention to Count 2. We decide that count. We wipe the slate. We turn our attention to Count 3. Do you feel where I'm going there?

PROSPECTIVE JUROR 545: Yes.

MR. WILLETT: Will that be a problem for you?

PROSPECTIVE JUROR 545: No.

MR. WILLETT: So you think you could judge this case fairly and impartially even though there's ten counts as opposed

75

Page 64

to just one or as opposed to just five?

PROSPECTIVE JUROR 545:  I think you judge each one on one-count basis.  As you said, you go from one count to the second count.  And if that is what is required of us, that is what we will do or shall do or must do.

MR. WILLETT:  Okay.  Hang on to the microphone for a second.  We'll just sort of dovetail into the next subject.  Do you understand that the issues you determine are the evidence that comes in through this witness box?  In other words, the testimony of the witnesses that is allowed, the documents, the exhibits, the physical items of evidence that are allowed, that that's what the jury decides.

PROSPECTIVE JUROR 545:  Yes.

MR. WILLETT:  And here's where I'm going if you're saying, Well, Mr. Willett, that seems sort of simplistic.  I've known many people who've served on juries, and all of them come back to me and very frequently they say, Well, you know, Al, the problem is is we all had this question back in the jury room and it never got answered.  It never got answered.  Now, maybe it was just completely relevant to their deliberations, or maybe it was just natural curiosity that had nothing to do with their deliberations.  But do you realize that what you have to decide this case on is the evidence, the witnesses' testimony, and the objects of evidence that come in through their testimony?

PROSPECTIVE JUROR 545:  Maybe there was a purpose that

76

the question wasn't brought up for one reason.  Secondly, because it wasn't brought up, it shouldn't be considered because it wasn't part of the evidence and facts.

MR. WILLETT:  So that won't bother you.  You'll be

Page 65

able to focus on what comes in.

PROSPECTIVE JUROR 545: You have to determine what you've been given with the input and the evidence.

MR. WILLETT: And let's say you get into your jury deliberation room and you think, you know, man, something about this bothers me, but I just don't think the evidence that I heard or saw supports what I'm concerned about. Can you cast aside that concern and focus on the evidence?

PROSPECTIVE JUROR 545: That is our purpose.

MR. WILLETT: Would you hand the microphone down to Ms. 685? Thank you. Pop quiz: Who has the burden of proof in this case?

PROSPECTIVE JUROR 685: (Prospective juror indicated.)

MR. WILLETT: And you gestured toward the government table.

PROSPECTIVE JUROR 685: That's correct.

MR. WILLETT: Does Miss Johnson have the burden of proof to prove anything to you?

PROSPECTIVE JUROR 685: No.

MR. WILLETT: Does she have to prove that she's innocent?

77

PROSPECTIVE JUROR 685: No.

MR. WILLETT: So you understand that it's the government's burden to prove my client guilty.

PROSPECTIVE JUROR 685: Beyond a reasonable doubt.

MR. WILLETT: And you just passed the last question of the pop quiz which is what I was about to ask you. Does anybody have a problem with this issue of burden of proof? Pass it to Mr. 726. Mr. 726, you understand the government has the burden

Page 66

of proof?

PROSPECTIVE JUROR 726: Correct.

MR. WILLETT: At the end of this trial, is Miss Johnson going to have to prove anything to you?

PROSPECTIVE JUROR 726: No, sir.

MR. WILLETT: And you understand proof beyond a reasonable doubt?

PROSPECTIVE JUROR 726: Yes, sir.

MR. WILLETT: Pass the microphone back to 730. Miss 730, I apologize. Burden of proof, who has the burden of proof, Miss 730?

PROSPECTIVE JUROR 730: The government.

MR. WILLETT: Okay. Do you have a problem with that concept?

PROSPECTIVE JUROR 730: Even after what I said, no.

MR. WILLETT: Okay. And does it bother you that the burden of proof is beyond a reasonable doubt?

78

PROSPECTIVE JUROR 730: No.

MR. WILLETT: Now, I believe one of our jurors earlier -- and I apologize. I'm thinking it was Mr. 545 who sat on two civil juries. If I've misidentified you -- okay. Mr. 545 has sat on two civil juries which has a lower burden of proof. You ever heard by a preponderance of the evidence?

PROSPECTIVE JUROR 545: Uh-huh.

MR. WILLETT: Is that a yes?

PROSPECTIVE JUROR 545: Yes. I'm sorry.

MR. WILLETT: But in a criminal case the burden of proof is beyond a reasonable doubt which is a higher standard of proof. Does that make sense to you?

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 67 of 3245

PROSPECTIVE JUROR 545:  Yes.

MR. WILLETT:  Doesn't offend you in any way in a criminal case where we're talking about freedom that the standard of proof for the government should be higher?

PROSPECTIVE JUROR 545:  No.

THE COURT:  Mr. Willett, would it offend you in any way if we took a break now?

MR. WILLETT:  Not at all, Judge.

THE COURT:  Okay.  It's ten after ten.  We'll take a break until 10:30.  I'd like you to try and -- that's actually an atomic clock.  It sends out a signal, so it's real accurate. I used to tease in this building we were on federal time.  If there were 118 clocks in the building, every one had a different

79

time.  But we've solved it by this atomic clock.  So according to the atomic clock and not necessarily my watch, it's ten after.  And we'll see you back here at 10:30.  Please remember my cautionary instruction about not discussing this case among yourselves at all, and we'll see you back here at 10:30.  Thank you.

(Panel A exited the courtroom.)

THE COURT:  Anything we need to discuss?

MR. WILLIAMS:  No, Your Honor.

MR. WILLETT:  No, Judge.

THE COURT:  Thank you.

(Recess at 10:10 a.m.)

MR. WILLETT:  Judge, may I ask one quick question before the jurors are brought in?

THE COURT:  Sure.

MR. WILLETT:  My quick question was this.

Page 68

THE COURT: Why don't you get to the microphone. Please be seated.

MR. WILLETT: I apologize. Your Honor, my quick question is I'm assuming when I'm done with my portion of the voir dire I don't have to announce whether or not we pass for cause because we're going to still be having things --

THE COURT: Correct, right.

MR. WILLETT: Thank you. I'm ready.

THE COURT: There's no passing for cause until you

80

exercise your strikes. That's your pass for cause.

MR. WILLETT: Right. I just wanted to make sure I was tracking. Thank you.

(Panel A entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Willett?

MR. WILLETT: Thank you, Judge Bennett. Good morning again, ladies and gentlemen. The nice thing about breaks is it allows me to focus and study my questions, so there's only just a very few topics I have left to discuss with you.

I'm going to start off with an easy one. It's my understanding that Judge Bennett's law clerk Carey passed out to you at the very beginning of the morning a list of the potential witnesses, government and defense, that will testify in this trial. Have all of you had a chance to at least partially review that list? And I'm seeing nods of affirmation, so I'm taking that to be a group yes.

Is there anyone who recognizes a name of a potential witness now that you've reviewed the list or at least partially reviewed the list? Mr. 726, if you'll wait for the microphone.

Page 69

We'll get the microphone in front of you.

PROSPECTIVE JUROR 726:  Possibly.

MR. WILLETT:  Who do you possibly recognize, sir?

PROSPECTIVE JUROR 726:  Duane White.

MR. WILLETT:  Okay.  My memory is that Mr. Duane White

81

will be a government witness, so I'm going to allow the government to discuss Mr. Duane White with you to see if there's any recognition by you once they discuss Mr. White with you.  Is that fair?

PROSPECTIVE JUROR 726:  That's fair.

MR. WILLETT:  Okay.  Two other areas I want to discuss with this panel.  One is the issue of law enforcement.  Would you please pass the microphone back to Miss 730?

Miss 730, a general question.  Is a witness who testifies for the government necessarily truthful just because they're testifying for the government?

PROSPECTIVE JUROR 730:  No.

MR. WILLETT:  How about if they're a law enforcement agent?

PROSPECTIVE JUROR 730:  Not necessarily.

MR. WILLETT:  Okay.  Do you give a law enforcement agent's testimony more value because they're a law enforcement agent?

PROSPECTIVE JUROR 730:  I may only because I'm married to one.

MR. WILLETT:  Yes, ma'am, and that's where I was going.

PROSPECTIVE JUROR 730:  Yes.  I may.  However, I still feel that I would be able to determine whether or not I feel

Page 70

that they're being truthful.

MR. WILLETT:  Okay.  Can they make assumptions that are incorrect?

PROSPECTIVE JUROR 730:  Yes.

MR. WILLETT:  Can they make mistakes?

PROSPECTIVE JUROR 730:  Yes.

MR. WILLETT:  Let me ask you -- and I have the benefit of your questionnaire here.  Question 59, in your personal opinion, is there anything in your background, experience, or personal views that might affect how you would consider the testimony of a police officer or possibly cause you to give a police officer's testimony more or less weight?  Now, it indicates that you answered yes.  You checked the box yes, and then please explain your thoughts.  I may give the officer's testimony more weight since I know so many people employed in law enforcement and am married to one of them.  Do you still feel that way as you sit here today in regards to your earlier written response?

PROSPECTIVE JUROR 730:  You know, I guess I initially would give them more weight.  But I also know that I feel that my husband's not always right about things either.  So, I mean, I just -- I honestly know that he's human or that some are not always truthful.

MR. WILLETT:  Is he not always right about things professionally, or is he not always right about things personally?  And that's as far as I'll go.

PROSPECTIVE JUROR 730: He won't go into a lot of his professional stuff, but we do differ on opinions sometimes.

MR. WILLETT: Okay. Would you be so kind as to pass the microphone down to Mr. 529?

Mr. 529, I appreciate your earlier discussion about Mr. Hobart, and I know based upon his lengthy career in this area of the state that a lot of people know Mr. Hobart. I also -- if I took down in my notes correctly, I made the notation that you know the chief of police of Sioux City quite well.

PROSPECTIVE JUROR 529: That's true.

MR. WILLETT: And did I hear you correctly say you vacationed with him in the past?

PROSPECTIVE JUROR 529: Yes, I do.

MR. WILLETT: Do you give a law enforcement agent's testimony more value because they're a law enforcement agent as opposed to a regular citizen?

PROSPECTIVE JUROR 529: I have to tell you that I would.

THE COURT: Let me ask you this, and I'm going to jump in here. Excuse me, Mr. Willett.

MR. WILLETT: It's okay, Judge.

THE COURT: Juror 529 and Juror 730, the law is that you can't give a law enforcement officer more weight. And I'm going to give a written instruction on that. Now, there's no

84

way that you would know that ahead of time, but I'm just going to give you a little preview. So despite your personal feelings -- and let me preface that by saying I've had agents lie in this courtroom including an FBI agent on a very important

Page 72

matter. No question he lied about it. That's not open for discussion because I had the grand jury testimony where he testified the opposite way but didn't remember.

So -- and, you know, there was a police officer indicted in federal court over in Waterloo or convicted, I guess sentenced last month, and I've often thought about putting a collage up on the screen of all the law enforcement officers that had been indicted and charged in the country because I read the New York Times, Washington Post. You can't really go a week without reading about some law enforcement officer indicted for perjury or lying about this and that. And I'm not here to denigrate law enforcement officers.

I'm here to tell you, though, the law is that nobody has an advantage when they take the oath and sit in the witness box. Everybody starts equal. And then you have to decide are they telling the whole truth, some of the truth, or none of the truth. And you have to do that with every witness.

But every witness starts equal under the law. There's no presumption that people are either truthful or not truthful. Everybody starts equal. And you have to look at all of the factors, and you get to decide for yourself -- it's not like I'm

85

going to tell you whether they're lying or Mr. Willett or Mr. Williams. You have to decide that.

And I just want to know if I tell you that the law is you can't give law enforcement officers any advantage when they testify that you have to judge their credibility just like you do every other witness. Could you follow that? Could 529 follow it?

PROSPECTIVE JUROR 529: I understand what your

Page 73

instructions would be. I'm just very concerned that I would -- personally with my working knowledge of others in the law enforcement side, I feel like I may tend to give their testimony more emphasis. I need to be truthful and say.

THE COURT: That's okay.

PROSPECTIVE JUROR 529: Even though your instructions would be clear, would I --

THE COURT: You might not be able to follow the instructions just like my daughter; right? She doesn't always follow everything I ask her to do, nor my spouse nor anybody else, my law clerks or my secretary. I understand that. Just because I tell you as a federal judge that's the law, I would hope that you would -- here's what my hope is. You would either follow it or tell me ahead of time, hey, Judge, I just don't think I could follow that. Doesn't make you a bad person. I don't think anything less of you if you couldn't follow that instruction. Matter of fact, I think more of you because you're

86

honest enough to come forward and tell us that.

PROSPECTIVE JUROR 529: I think that's where I need to be. I need to be able to make sure you understand I do have a question there. I question myself could I follow those instructions and not place more emphasis. You know, I don't know. I've never been in this position before. Fortunately for me I don't know of any of these law enforcement officers who have been in trouble. The people that I know, that I sometimes vacation with are not that kind of officers. I just -- I don't want to leave this hanging, but I can't say that I wouldn't place more emphasis on the testimony of a law enforcement officer, so I'm sorry I guess.

Page 74

THE COURT: Okay. You don't have to be sorry. That's your honest answer, and that's all we're looking for is honest answers.

PROSPECTIVE JUROR 529: That's the answer.

THE COURT: Honest answers aren't good or bad or right or wrong. All they are are honest answers, and I appreciate your response. Can you pass it back to 730 because I'm curious as to what Potential Juror 730 has to say.

PROSPECTIVE JUROR 730: I honestly think that I would be able to weigh all the testimonies equally.

THE COURT: Okay. Thank you. Excuse me for interrupting, Mr. Willett.

MR. WILLETT: That's okay, Judge.

87

PROSPECTIVE JUROR 730: Can I say that one of the names on here keeps popping up, the name of Kevin Pals? Is he -- and the only reason I'm thinking maybe he's in law enforcement and I've heard the name somehow through that. And if not, I probably don't know the person.

MR. WILLETT: Well, here's what I'm going to do again, and I don't wish to delegate my responsibilities to the government, but Mr. Pals is also a government witness, and I just think it's fair for them to discuss that witness with you, but I'm sure Mr. Williams will not forget that now he has two witnesses to discuss with the panel, Mr. Duane White and Mr. Kevin Pals. Is that fair?

PROSPECTIVE JUROR 730: Yes. Thank you.

MR. WILLETT: Final subject. When we were discussing the grand jury versus the trial jury system, you know, how a case gets here versus how a case is, you know, tried, I can't

remember if I was talking to Mr. 97 or Mr. 726, but I remember saying wouldn't you like to hear the other side of the story, and we were discussing that.

Miss Johnson has a right under the Constitution to decide whether or not she wishes to testify. And if she chooses not to testify, that decision is something that cannot be held against her. And Judge Bennett will give you an instruction that will define that and give you clarity so you understand that concept. But is everybody familiar with that

88

constitutional right we're talking about?

Okay. Now then, I'm going to be very honest with every panel that I meet until we get a jury picked. Miss Johnson will not take the stand in her own defense. In a perfect world, how many of you would prefer to hear from Miss Johnson, you'd prefer to hear her testimony? And let me just see your raising of hands so I know who to come back to. Mr. 97, Miss 730, Mr. 529, Mr. 726. Have I missed anybody? Ms. 685, I see your head --

PROSPECTIVE JUROR 685: I'm vacillating.

MR. WILLETT: You're vacillating, so I won't forget to talk to you on the way. Would you hand the microphone to Mr. 97? We'll just try to do this sequentially. Why would you like to have Miss Johnson testify?

PROSPECTIVE JUROR 97: When I try to make decisions, I like to get as much information about what I'm into, so that's why I'd do it.

MR. WILLETT: Certainly. Pass the microphone to our friend Miss 730. Miss 730, why would you want to hear Angela Johnson testify?

Page 76

PROSPECTIVE JUROR 730:  I guess I would just like to hear her personal side of the story.

MR. WILLETT:  Hand the microphone down to Mr. 726.  Mr. 726, why would you like to hear Miss Johnson testify?

PROSPECTIVE JUROR 726:  I like to compare testimonies

89

and hear what each person has to say.

MR. WILLETT:  Okay.  Now then, I've told you -- and you can rely on this -- that she won't testify in her own defense.  Does that create any more thoughts in your mind besides what you've just told me?

PROSPECTIVE JUROR 726:  No, not really.

MR. WILLETT:  We'll go backwards again.  Miss 730, now that you know she's not testifying, is there anything else that is generating through your mind about this issue?

PROSPECTIVE JUROR 730:  No.

MR. WILLETT:  Hand it back to Mr. 97.

PROSPECTIVE JUROR 97:  Should be fine.

MR. WILLETT:  She'd be fine in what sense, sir?

PROSPECTIVE JUROR 97:  That that's her prerogative that she has that choice.

MR. WILLETT:  Okay.  Let's get the microphone down to Mr. 529.  One of the things I've heard in trying criminal cases when we get to this issue is some jurors have a concern that, well, if she doesn't testify in her own defense, isn't she guilty of something?  Mr. 529, how would you respond to that?

PROSPECTIVE JUROR 529:  I think that thought would cross my mind.  You didn't ask me like the others the reason that I raised my hand, but that's --

MR. WILLETT:  I will now.

Page 77

PROSPECTIVE JUROR 529: Okay. Only because, you know,

the person who is closest to this case has the most knowledge, and as a juror, I would like to hear from that person.

MR. WILLETT: Pass the microphone to Miss 685 who was vacillating earlier. Is Miss Johnson guilty of something if she doesn't take the stand in her own defense?

PROSPECTIVE JUROR 685: No, that isn't what I was coming from. I guess to make that decision ahead of time before you actually get into litigation and the trial, you know, I guess I'm wondering if it's about you and it looks like there might be an opportunity that would -- you could explain, I'm wondering why you'd want to make that decision ahead of time and close that door.

MR. WILLETT: You'll have to forgive me, but I can't explain that.

PROSPECTIVE JUROR 685: I understand, but that's the thought that crossed my mind is, you know -- and in my position and what I do, you take in all the surrounding details before you make a decision.

MR. WILLETT: And if I remember in your questionnaire right, working with the school system.

PROSPECTIVE JUROR 685: Correct.

THE COURT: Excuse me, Mr. Willett. Juror 685, I'm a curious person. I would hope people in my position would be curious. I was curious about the same thing. So I think it's natural to be curious. But they don't have to tell me. My

curiosity is never going to be answered, and I'm very

comfortable with that. And the bottom line is just so you hear it from me, I happen to think that the Fifth Amendment is the most precious right that belongs to each of us. And in a lot of trials defendants exercise their Fifth Amendment right not to testify.

PROSPECTIVE JUROR 685: And that's okay.

THE COURT: And it's absolutely okay. Of course, that's my job to make sure that I don't hold that against a defendant, and I never do, and I never do because I really think it's the most precious right we have. And there's all kinds of reasons why people decide not to testify. I used to teach this subject in law school, and I'd fill up a blackboard full of reasons why people might not want to testify in a case. And the bottom line is I don't even guess as to what that might be. While I may be curious, I just put it beyond me. I'll never guess. I'll never give it a second thought. And I just want to make sure that you can do that as well.

PROSPECTIVE JUROR 685: Oh, I can do that. I have no problem with that.

THE COURT: Sorry for interrupting.

MR. WILLETT: That's okay, Judge. So the bottom line is you could set aside your curiosity.

PROSPECTIVE JUROR 685: Oh, sure.

MR. WILLETT: Is there anyone who couldn't set aside

92

this preference, this concern, this confusion and say, Mr. Willett, if she's not going to take the stand, what am I doing here for the next three months? Would you pass the microphone to Mr. 726? Is this going to bother you if she doesn't take the stand, sir?

Page 79

PROSPECTIVE JUROR 726: No, sir, not at all.

MR. WILLETT: So you can follow the judge's instructions later on in this trial when he says that that decision cannot be held against Miss Johnson, you should not take a negative inference from that?

PROSPECTIVE JUROR 726: I believe so.

MR. WILLETT: Do you think this would be the easiest place to sit?

PROSPECTIVE JUROR 726: No.

MR. WILLETT: If you were the defendant, do you think this would be the easiest place to sit?

PROSPECTIVE JUROR 726: Not at all.

MR. WILLETT: If the issues were life or death, do you think this would be an easier place to sit?

PROSPECTIVE JUROR 726: Very uncomfortable.

MR. WILLETT: Might be nervous.

PROSPECTIVE JUROR 726: I would say so.

MR. WILLETT: Might have a few beads of sweat on your forehead.

PROSPECTIVE JUROR 726: Absolutely.

93

MR. WILLETT: My 11-year-old son stutters a little bit when he's nervous, and we've had speech pathologists work with him all through grade school, and he's much better, but still every once in a while when he's really excited or he's really nervous, that stuttering comes out.

PROSPECTIVE JUROR 726: Sure.

MR. WILLETT: Not because he's done anything wrong but just because he's nervous.

PROSPECTIVE JUROR 726: Right.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 80 of 3245

MR. WILLETT: So do you think it might be hard to sit in that chair even if you were innocent as a newborn baby and still be able to maintain composure?

PROSPECTIVE JUROR 726: I would say it would be extremely difficult.

MR. WILLETT: Do you think it would be an easy place to be if you didn't have the benefit of a great deal of formal education and you had to answer questions from a government attorney who is very bright and very capable and has tried many cases in his career?

PROSPECTIVE JUROR 726: I'm sure that'd be very ill at ease.

MR. WILLETT: Hand the microphone back to our friend Mr. 97 if you would.

Mr. 97, you understand that this place is not the easiest place to sit?

94

PROSPECTIVE JUROR 97: Yes, sir, I do. I've been there before.

MR. WILLETT: Okay. Was it easy for you?

PROSPECTIVE JUROR 97: No, it wasn't.

MR. WILLETT: Little bit of nervousness?

PROSPECTIVE JUROR 97: Very much.

MR. WILLETT: Were there a few beads of sweat maybe?

PROSPECTIVE JUROR 97: Maybe not that, but it was very nervous (sic).

MR. WILLETT: Hand the microphone down to Mr. 529.

Easy place to sit right here?

PROSPECTIVE JUROR 529: I'm sure not.

MR. WILLETT: Just one last concept I just want to

touch on, Mr. Berrigan touched on a little bit.  I just want to make sure that everyone in this panel realizes that their opinion is just as important as the person they're sitting next to and that if you're picked for this jury you won't have any hesitation in expressing your opinion.  Would you hand the microphone to Miss 685?  Miss 685, I assume that if you're in the jury room you won't hesitate to share your opinion whether you agree or disagree with one of your peers.

PROSPECTIVE JUROR 685:  When asked, I would share my opinion.

MR. WILLETT:  Well, let me take that one step further. Let's assume you're not asked but Mr. 97 says something and

95

you're just thinking, oh, boy, I don't agree with that.  Now, would you speak up, or would you be polite and courteous and wait to be called upon?

PROSPECTIVE JUROR 685:  I would speak up.

MR. WILLETT:  Okay.  That's what I'm looking for. Hand the microphone to Mr. 726.  Right next to you, I'm sorry.

Mr. 726, you'd be willing to express your opinions?

PROSPECTIVE JUROR 726:  Yes.

MR. WILLETT:  If you had a question, you'd raise that with your fellow jurors.

PROSPECTIVE JUROR 726:  Yes.

MR. WILLETT:  Anyone think they'll have a problem with this concept of speaking up their own -- presenting their own individual opinions?

Back to Mr. 545.  Mr. 545, if you're deliberating on this jury, you'll express your opinions?

PROSPECTIVE JUROR 545:  Yes.  If I feel convicted to

Page 82

do, yes, I will.

MR. WILLETT: Okay. Whether you're in agreement or whether you're in disagreement, if you feel convicted, you'd speak up.

PROSPECTIVE JUROR 545: If I felt -- if I had different views on something, I would express them.

MR. WILLETT: Okay. You won't be shy and sit in the corner for the entire time, will you?

PROSPECTIVE JUROR 545: I've been known to not be shy.

MR. WILLETT: Okay. Thank you very much.

Your Honor, that's all the questions I have at this time. Thank you.

THE COURT: Okay.

MR. WILLETT: Thank you, ladies and gentlemen.

THE COURT: Who's going to take the lead for the government? Mr. Miller?

MR. MILLER: Yes, Your Honor.

THE COURT: Thank you.

MR. MILLER: Morning, folks. One of the things I'm going to try to do is speak right directly in this microphone I'll stay close to the podium as much as possible, but if I wander from it and my volume goes down, if I don't have my microphone on, and of all of the work that happens -- and having it on helps even more -- as Judge Bennett indicated, the job of the court reporter does not allow her to daydream. I'm sure it's not yet true of any of you folks, but it has been known to happen during the course of an hour or a month or a several-month trial for some of the less-exciting portions of the trial to cause people to daydream a little bit. Our court

reporter cannot do so. She is duty bound to make a record of everything each of us says, and the most difficult part of that job is right here in jury selection because instead of listening to one lawyer and one questioner, she listens to one lawyer and

97

today seven people answering those questions. So please speak up good and loud and in a manner in which our court reporter can take down what you have to say.

What I want to do with you here in short order, I want to visit with you folks here today and then sit down, and we'll move along. I want to take just a few minutes to get just a little bit better acquainted with each of you folks. We have only seven of you here. We are going to have some, if not all, of you serving as a juror with us for a matter of weeks and deciding a very important case and the fate of a woman on trial, and it's important that all of us have some understanding with who our judges are going to be. And you folks will be just that. Judge Bennett will be the judge of the facts (sic), and he will give us much guidance as to what the law is, as to what our duties are in this courtroom, and I trust you are thankful for that fact. You want to have some guidance. You aren't professional witnesses.

But by the same token, ultimately, two verdicts will be rendered, a verdict as to whether or not the defendant is guilty of the indictment charged against her and, if so, a second proceeding at the following of which a verdict will be entered by you folks as to the punishment. And it's our only opportunity here today to visit with you about some of the factors that we would be derelict in our job if we did not visit with you and all of your possible fellow jurors.

Page 84

Juror 97, sir, you, I note, have three sons and were planning a trip to Colorado this past month.

PROSPECTIVE JUROR 97: Yes, sir.

MR. MILLER: Did you get that done and out of the way?

PROSPECTIVE JUROR 97: Yes, sir, we did.

MR. MILLER: I hope you enjoyed that without worrying about jury duty coming up after the vacation.

PROSPECTIVE JUROR 97: It was sure nice that it was delayed for that purpose, yes.

MR. MILLER: I noted that one of your three sons happens to be in the field of horticulture and that you yourself have some interest in that. Can you tell me just very briefly what your son does, what his business involves?

PROSPECTIVE JUROR 97: He graduated from Hawkeye Tech probably about a year ago down in Cedar Rapids -- Cedar Falls, and he's a landscaper in Cedar Falls area right now. So he will probably pursue that career for a while.

MR. MILLER: Has he any particular area of specialization?

PROSPECTIVE JUROR 97: Not right now.

MR. MILLER: Do you happen to work with him at all in that?

PROSPECTIVE JUROR 97: Only on -- his first project was my house, so that kind of got him interested in the program, and that's what he pursued after that.

MR. MILLER: As you approach retirement yourself, will

you think -- possibly volunteer some more service with him or getting into the business yourself?

PROSPECTIVE JUROR 97:  Oh, I would hope so.

MR. MILLER:  Miss Kueper, you're a scrapbooker.

PROSPECTIVE JUROR 730:  Yes.

MR. MILLER:  Is that correct?  Kueper?

PROSPECTIVE JUROR 730:  Kueper.

THE COURT:  Well, we're using numbers.

MR. MILLER:  I'm very sorry.

THE COURT:  That's okay.

MR. MILLER:  It's Ms. 730.

PROSPECTIVE JUROR 730:  Yes.

MR. MILLER:  And I apologize for that.  Can you tell me just very briefly about that?  I have children of my own, and I have shoeboxes full of photographs, but they are as scrambled as can be, and I always hope some day to get around to organizing them, but it's one of those things that's easy to put off and a lot of work to actually get around to do.  Any secrets to that business?

PROSPECTIVE JUROR 730:  Well, that would be my job would be to instruct you on how to take those photographs out of the shoe boxes and the drawers and put them into scrapbook albums.  It's a direct sellers home-based business where I do classes and parties in people 's homes or some in my own home

100

where I teach people how to do the scrapbooking and to continue to preserve their memories that way.  I've been doing it for ten years as a consultant.

MR. MILLER:  Over those ten years, have you had some success at it?

Page 86

PROSPECTIVE JUROR 730:  Yes.

MR. MILLER:  Ms. -- excuse me, Ms. 533, you are a retired teacher, but I take it that since your retirement you've had continued -- or correct me if I'm wrong -- in some of the contact with prison pen pals or persons who need assistance from people on the outside.

PROSPECTIVE JUROR 533:  Yes, I did, I have.  The one that I wrote to for four or five years, she has been through the RTF center here, and she's moved on to Oklahoma.

MR. MILLER:  I've worked with our Iowa prison system enough to know that it doesn't function very well without the help of volunteers to sit down with these folks and talk to them about their lives and their futures.  Have you found that rewarding, and have you, more importantly, found some benefit to the people you visit with?

PROSPECTIVE JUROR 533:  Yes.  I think it was very important to her, especially while she was in prison, to be encouraged.  And when she came to Sioux City and sought employment, I helped her with that and then helped her to find friends and to be with her sister and things like that.

101

MR. MILLER:  If you could pass that microphone just one more to the left, I'm going to just keep going right down the row.

Mr. 545, good morning to you, sir.

PROSPECTIVE JUROR 545:  Morning.

MR. MILLER:  You were a late addition here, and I thank you for taking the time out of your day to come over here to see us.  I noted from your questionnaire that in addition to being a post office worker you also find time to write and read.

Page 87

Can you give us some idea how much time you're able to give to that and if you've had any particular success or anything that you've enjoyed reading? Tell us briefly what that's been.

PROSPECTIVE JUROR 545: Well, basically I read books pertaining to -- well, I read all of Steinbeck and Hemingway when I was younger. In writing aspects, I write about events that I have seen in my life. I've written about the nature around me or the world around me or my opinion of what is going on in the world around me. I just did a four-day trip over in eastern Iowa, and this is the first time I've ever put pictures with my writings. That was kind of interesting. I've been on -- some of my writings have been on National Public Radio or Iowa Public Radio I guess.

MR. MILLER: So you're one of those who can say that he's been published.

PROSPECTIVE JUROR 545: Yeah.

102

MR. MILLER: That's a significant and not uncommon accomplishment in the field.

PROSPECTIVE JUROR 545: Except I didn't get paid.

MR. MILLER: Getting published is first. Fair statement? Sir, if you would hand that down in front of you just for a minute if I might get acquainted with Mr. Hanson.

THE COURT: Numbers.

MR. MILLER: I'm sorry, Your Honor. I'll try to correct that. Excuse me.

Mr. 509 (sic), you are the community development director of Sioux City.

PROSPECTIVE JUROR 529: Correct.

MR. MILLER: Would you please briefly describe for us

Page 88

what your duty, responsibilities are?

PROSPECTIVE JUROR 529: Certainly. The community development department is made up of four different separate divisions. I'm responsible for overseeing the building permit division, also called inspections services; the housing division that provides assistance for folks looking for housing in our community that would be eligible under certain programs; also have the planning division that does all the current and long-range planning functions for the community from processing simple things like street and alley vacations to complicated zoning requirements to -- and right now we're working on the city's long-range development plan. And then we have

103

neighborhood services, and that would be the division who oversees the federal funds, the community development block grant dollars that we use to improve our neighborhoods.

MR. MILLER: You've been in that position how long, sir?

PROSPECTIVE JUROR 529: Four years I believe.

MR. MILLER: And have you been able to notice significant changes in your city during that period of time?

PROSPECTIVE JUROR 529: I have. Prior to that I was the city's planning director, and there's been a lot of significant changes here especially in the last, I'd say, 10 to 14 years.

MR. MILLER: You've had a lot of civic improvements in this town.

PROSPECTIVE JUROR 529: Yes, we have.

MR. MILLER: Any thoughts on how you plan to continue to employ those talents if at all after retirement, sir?

PROSPECTIVE JUROR 529: I'm sorry. I didn't . . .

MR. MILLER: Down the road have you given any thoughts as to further ways to utilize your talents as a community leader?

PROSPECTIVE JUROR 529: You know, I have. I've actually been approached by individuals interested in hiring me for different functions, most recently to do some planning in the downtown area possibly after retirement, those types of

104

things.

MR. MILLER: Mr. 529, you did indicate -- and again, we appreciate your candor. It's the reason we're here. But we appreciate your candor in pointing out the fact that you do have close friends and colleagues in law enforcement and are by the nature of your job required to work on a regular basis with the chief of police of your community. Anyone in your position would be expected to do so.

In this case you will be hearing testimony from members of law enforcement. I don't expect we'll be hearing from the chief of police of Sioux City or anyone with whom you're personally acquainted with. But nevertheless, these are people who work in law enforcement. Did you have an opportunity to review the witness list?

PROSPECTIVE JUROR 529: Yes.

MR. MILLER: Did you happen to recognize any names as people with whom you're personally acquainted?

PROSPECTIVE JUROR 529: No, I didn't.

MR. MILLER: Frankly, I can well understand and would tend to agree with you as far as how one might assess and we always assess the testimony of everyone we deal with throughout

Page 90

our daily life. But you understand that peace officers cover a very broad range of human beings in our society.

PROSPECTIVE JUROR 529: Certainly.

MR. MILLER: And like you and me and everyone else in

this courtroom, they are all human, subject to the same possible mistakes as all of us are. Fair statement?

PROSPECTIVE JUROR 529: Fair statement.

MR. MILLER: It's my sad responsibility on occasion to prosecute peace officers who've allowed temptation to lead them in violation of the law. And it's sad not just for what it does to themselves and their families but for what it does to all of us in the business of trying to enforce the law, but nevertheless, that has to be done. You understand that does happen.

PROSPECTIVE JUROR 529: I understand.

MR. MILLER: Ultimately whenever anyone takes an oath and testifies, whether he be a peace officer or a man from any other walk of life, he's a human being, and it's important for you as a judge to weigh his credibility on any number of factors and not simply on the basis of his occupation. Fair statement?

PROSPECTIVE JUROR 529: Another fair statement, yes.

MR. MILLER: And I just want to ask you one more. If you happen to be required on this jury, I expect you will receive an instruction from the Court that the nature of the man's employment as a government official or a law enforcement officer does not in and of and totally by itself allow you to treat his testimony different. In other words, you are expected to look at all of the witnesses and judge their credibility accordingly. Do you feel you can do that, sir?

PROSPECTIVE JUROR 529:  I understand that those instructions will be made and that I'm expected to follow those instructions.

MR. MILLER:  And you have no problem following those instructions, I take it.

PROSPECTIVE JUROR 529:  I have no problem following the instructions.  My comment before was that just from my experience with the police officers that I know here in Sioux City, my concern was -- and these are professional law enforcement officers who have not been in trouble.  My concern is would I place more emphasis on the testimony of other law enforcement officers based on my experience here, and my answer to that is still I'm not sure.

MR. MILLER:  And we appreciate you bringing that to our attention.  That's why we are here today.  My question to you is if you're giving -- and here's the problem.  You've not been on a jury before.

PROSPECTIVE JUROR 529:  No, sir.

MR. MILLER:  So I'm asking you to put yourself in a position you've never been in before and envision how you're going to deal with it.  It's a very hypothetical thing.  On the other hand, you, sir, are the only one who can answer the question.

Do you feel that after listening to the Court's instructions -- and that will be your job after all is to listen

to and follow the Court's instructions -- that you could follow the Court's instructions that tells you that you are not to

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 92 of 3245

afford special credibility to anyone on the basis of their occupation as a government employee but to evaluate all of the things that go into that person's credibility as a witness as you judge it as a member of the jury?

PROSPECTIVE JUROR 529: I keep coming back to the same answer. I understand the instructions, and I will try my very, very best to follow all of those instructions as given. I cannot assure you that I would not place more emphasis on that testimony. That's as honest as I can be.

MR. MILLER: No, I appreciate that, sir, and I'm not trying to debate with you. I'm simply trying to make sure that we have a clear understanding of where you are on that.

Let me see here. It's --

PROSPECTIVE JUROR 685: 685.

MR. MILLER: -- 685, thank you. That saves me mentioning your name. I appreciate you just jumping right out with the number.

PROSPECTIVE JUROR 685: That's my job.

MR. MILLER: You're a principal of not one but two schools.

PROSPECTIVE JUROR 685: That's correct.

MR. MILLER: I can't help but believe that that's twice the work.

108

PROSPECTIVE JUROR 685: It's an important job for kids.

MR. MILLER: We've already talked a little bit about what effect that's going to have on all of the many responsibilities this upcoming spring, and it's a busy time for those in education and those who are parents. Nevertheless,

Page 93

you've indicated that despite the fact that that's a hardship it's a hardship with which as an American citizen you're prepared to deal.

PROSPECTIVE JUROR 685: Yes. I have some reservations because I have a son graduating, but those are personal. That's not, you know . . .

MR. MILLER: Let me explore that because graduation ordinarily is on a Friday. There's also graduation parties. There's a lot of things that you hope to have memories about later; right?

PROSPECTIVE JUROR 685: Correct.

MR. MILLER: How does that look? To some degree are you able to work around that and put more social events on Fridays as opposed to the middle of the week, or is that a concern?

PROSPECTIVE JUROR 685: It will be on a weekend. It just depends on state track and all the things that go along with being a senior.

MR. MILLER: And preparation for all those events as

109

well.

PROSPECTIVE JUROR 685: Correct.

MR. MILLER: I have two sons who are seniors, one in high school and one in college, and it's a very important month for me, and I'm sure it is for you. It's hard not to think about those things going on.

PROSPECTIVE JUROR 685: Uh-huh.

MR. MILLER: Appreciate your candor and your willingness to do your best. You've mentioned that you work in mock trials, so this process, whether you've served as a juror

Page 94

before or not, is not new to you.

PROSPECTIVE JUROR 685:  That's correct.

MR. MILLER:  You've studied it.

PROSPECTIVE JUROR 685:  That's correct.

MR. MILLER:  How many classes have you taken -- how many teams if you recall?

PROSPECTIVE JUROR 685:  I've had approximately 24 middle school teams and about six high school teams that I've worked with over the years, and I don't do it anymore.

MR. MILLER:  How have they done?

PROSPECTIVE JUROR 685:  Probably half of my middle school teams made it to state every year.  And I had two high school teams out of six make it to state, and I had a couple of teams place high in the top five.

MR. MILLER:  Very good.  The practice of law and the

110

courtroom in particular is I think at least as much an art as a science, and one can learn a great deal from observing the way other people do their job.  And if you find that you've had very talented young people who could teach me a thing or two I hope because they are, frankly, very talented young men who give it thought and are very excited about pursuing --

PROSPECTIVE JUROR 685:  And women.  I think it's as much thinking on your feet as it is all the learning you do ahead of time.

MR. MILLER:  Combination of that and some preparation too.  Let's see now.  Mr. White, missing some softball this season, aren't we?

PROSPECTIVE JUROR 726:  Yep.

THE COURT:  You know, I'm going to ask you to cross

Page 95

out all the names.

MR. MILLER: I'm sorry.

THE COURT: I don't know what's going on.

MR. MILLER: I'm sorry, Your Honor. Old habit that's hard to break, and I've got --

THE COURT: I understand that.

MR. MILLER: And I have them marked out in pencil, and pencil doesn't cover ink sometimes, but it's Mr. 726.

PROSPECTIVE JUROR 726: Correct.

MR. MILLER: And I apologize to you, sir, and all of your colleagues. How much of that -- are you missing the whole

111

season?

PROSPECTIVE JUROR 726: Pardon?

MR. MILLER: Are you missing the whole season as a result of that?

PROSPECTIVE JUROR 726: Softball?

MR. MILLER: Yes, sir.

PROSPECTIVE JUROR 726: I don't play softball. I do attend softball games of the grandkids on Saturday.

MR. MILLER: So you'll still be able to participate as a --

PROSPECTIVE JUROR 726: Spectator, yes.

MR. MILLER: -- spectator. Very good. You mentioned in response to questions about the death penalty, Mr. 726, that you are not necessarily entirely in agreement with the phrase eye for an eye. Can you just tell us in your own words what you meant by that?

PROSPECTIVE JUROR 726: An eye for an eye is if you chop off somebody's finger or they chop off yours you chop off

Page 96

theirs. An intentional thing, if it is intentional, if we all did that, pretty quick there wouldn't be anybody here. Somewhere we have to stop and decide what's right, what's wrong, how we're going to heal this up without destroying each other.

MR. MILLER: Taken to the extreme, the phrase eye for an eye can cause a great many problems, can't it?

PROSPECTIVE JUROR 726: Yes.

112

MR. MILLER: If we look at it as being a broader concept that a serious crime should be dealt with by punishments that are comparable in seriousness, punishments that did not depreciate or minimize the seriousness of the crime, is that another way of saying that it is at least to that extent appropriate to have eye for an eye even though it isn't literally eye for an eye?

PROSPECTIVE JUROR 726: Yes, yes.

MR. MILLER: Mr. White, if you're required to serve on this jury, you'll be required to shoulder a certain amount of responsibility, that of being a juror among other things. Have you been a juror before, sir?

PROSPECTIVE JUROR 726: No, sir.

MR. MILLER: I'm sure we had one here. Mr. 525 (sic), can you tell us how you felt about jury duty, sir?

PROSPECTIVE JUROR 545: Sometimes it was exhilarating, and sometimes it was exceptionally long.

MR. MILLER: Hurry up and wait on occasion.

PROSPECTIVE JUROR 545: In the one case it was very interesting and detailed and moved right along, and the other civil case that I was on, they kept pounding the same facts over and over again for a long period of time.

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 97 of 3245

MR. MILLER: Is there anyone here besides Mr. Cleve -- excuse me, Mr. 545 who's served on a jury before? Yes, it's Ms. 533.

113

PROSPECTIVE JUROR 533: I did. It was a driving under the influence, and we acquitted him.

MR. MILLER: That's fine. How did you find the experience?

PROSPECTIVE JUROR 533: It was very interesting. That was the first time I had ever done that.

MR. MILLER: There are five others sitting beside you who if I don't miss my guess came in here today with a certain amount of nervousness thinking, my goodness, I'm on jury duty, and I've never done that before. Can you assure them they'll all live through the experience?

PROSPECTIVE JUROR 533: They'll live through it.

MR. MILLER: Can you maybe even assure them that they might at least even some of the time find it interesting and educational?

PROSPECTIVE JUROR 533: Yes, it is, very.

MR. MILLER: Ms. 533, one of the things that you learned when handling a jury trial before is that the government has the burden of proof and that in the absence of carrying that burden of proof the defendant is presumed innocent and not guilty. You recall that?

PROSPECTIVE JUROR 533: Yes.

MR. MILLER: And, Mr. 97, we didn't have to hear that today for you to know that. You've heard that phrase many times before I'm sure. Fair statement?

114

PROSPECTIVE JUROR 97:  Yes.

MR. MILLER:  It make sense to you, sir?

PROSPECTIVE JUROR 97:  Yes.

MR. MILLER:  Is there anybody here to whom that does not make sense?  You understand that protects not just Angela Johnson but it protects you and me and everybody else in our society.  Fair statement?  We have any veterans here?  Mr. 545, did you serve overseas, sir?

PROSPECTIVE JUROR 545:  Yes.

MR. MILLER:  And when you fought, I trust you felt that you were fighting for your country.

PROSPECTIVE JUROR 545:  Fortunately, I didn't have to go to Vietnam, but I was close enough.  And yes, defense of your country was very important at that time.

MR. MILLER:  And in defending your country, you were not only defending your friends and neighbors and loved ones but also defending their way of life.

PROSPECTIVE JUROR 545:  Yes.

MR. MILLER:  And that the presumption of innocence and our freedoms that we enjoy and those freedoms that are protected in our courtrooms are a part of that way of life.

PROSPECTIVE JUROR 545:  If you've been in a country with a dictatorship, you appreciate the American way of democracy far more.

MR. MILLER:  You mentioned, sir, that you would not

115

take the death penalty lightly.  Can you just --

PROSPECTIVE JUROR 545:  In any sentencing I don't take

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 99 of 3245

lightly because it involves an individual's life and their livelihood.

MR. MILLER: And the lives of their loved ones as well; fair statement?

PROSPECTIVE JUROR 545: Yes.

MR. MILLER: You understand that in any criminal case the burden rests upon the government to prove beyond a reasonable doubt the guilt of the defendant.

PROSPECTIVE JUROR 545: Yes.

MR. MILLER: In this case since it is a death penalty case, your job does not end at that point. In many cases it does. In this case it does not. Should you as a juror find beyond a reasonable doubt that Angela Johnson is guilty as charged of multiple counts of murder, under those circumstances, sir, there would be a second proceeding called the penalty phase. And I want to visit just briefly with all five of you -- all seven of you about that. Then I'm going to sit down.

But that penalty phase is like the guilt phase in this respect. You aren't just left to your own devices. You will be given instructions by the Court as to what the burden of proof is in the guilt phase and what the elements of the crime charged and how you should go about your job as jurors. I trust you would want such instructions. Fair statement?

116

PROSPECTIVE JUROR 545: Yes.

MR. MILLER: And if after finding -- again, assuming that you were to find the defendant in this case guilty of one or more of those ten charges of murder, at that point you would receive more instructions, more guidance from the Court as to what your job is.

Page 100

Now, I want to be very clear about this, ladies and gentlemen. I'm a lawyer. And while lawyers study the law and interpret the law and argue the law, they sometimes disagree, and they are always subject to what the judge decides. And you will at the end of the case have instructions from the judge as to what the law of the United States is on this subject.

But I think it will -- in order to visit with you about your ability to do that job, I need to paraphrase what I expect the Court will be instructing you, and again bear in mind that not what I say but rather what the Court says at the end of the trial is the law.

But assuming you have found beyond any reasonable doubt that Angela Johnson is guilty, the government would then be required to prove to your satisfaction and, again, beyond any reasonable doubt, that one or more aggravating factors has been proven. If we fail to make that proof, then it would be your job to return a verdict of life and not death. Does that make sense in the absence of an aggravating factor?

But if an aggravating factor is proved -- and it would

117

have to be proven beyond a reasonable doubt -- under those circumstances your job is still not done. An aggravating factor such as the killing of multiple individuals or the killing of vulnerable victims such as children, despite the fact that that was proven and proven beyond a reasonable doubt, that would at that point merely allow you to consider, it would not mandate a death penalty. And my question to each of the seven of you is would you at that point be able to consider both possible punishments? Mr. 97.

PROSPECTIVE JUROR 97: I think so.

Page 101

MR. MILLER: Miss 730.

PROSPECTIVE JUROR 730: Yes.

MR. MILLER: Mr. 726.

PROSPECTIVE JUROR 726: Yes, I think so. Yes.

MR. MILLER: Ms. 685.

PROSPECTIVE JUROR 685: Yes, I would.

MR. MILLER: Mr. 529.

PROSPECTIVE JUROR 529: Yes.

MR. MILLER: Behind you, Mr. 545, do you feel you could do so, sir?

PROSPECTIVE JUROR 545: I would take it under serious consideration, yes.

MR. MILLER: And you understand -- and again, I have not laid out the process to you in as much detail as it would be done by the Court at the end of the case. But you would be

118

asked to fairly consider both possible punishments. Do you feel you could do that, sir?

PROSPECTIVE JUROR 545: Yes.

MR. MILLER: I'm trying to make sure I've got the right numbers. Ms. 533; is that correct?

PROSPECTIVE JUROR 533: I could consider it.

MR. MILLER: Now, Ms. 533, just a couple questions. And again, as Mr. Berrigan mentioned, there are no wrong answers. Our job here is to find out what's in your heart, and I assume that the seven of you have at least slightly different things in your hearts, and that's fine. That's as it should be.

But you made a couple comments that caused me to wonder. You indicated that God alone can pass these judgments and that there must be at least two witnesses to a murder. Can

Page 102

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 102 of 3245

you tell me about --

PROSPECTIVE JUROR 533: To a crime, to the crime, to convict, yes.

MR. MILLER: Tell me your understanding about that.

PROSPECTIVE JUROR 533: Well, I just feel that there have to be witnesses to it in order to do a death penalty. It just can't be circumstantial.

MR. MILLER: Now, is that a feeling that comes from within, or is that something that's been told to you by others?

PROSPECTIVE JUROR 533: It's in Scripture.

MR. MILLER: Now, among the many instructions you'll

119

receive from the Court if you're required to serve as a juror in this case, ma'am, will be description of the laws of evidence and as to how much evidence is necessary and what sort of things constitute evidence. And I again am not going to try to set that out for you in detail. The Court will do that in due course. But if you are instructed that there is no minimum number of witnesses necessary and that circumstantial evidence is not inherently any lesser or stronger than direct evidence but simply evidence that you should weigh based upon the weight that you deem it appropriate, do you feel under those circumstances that you would have difficulty imposing the death penalty or finding anyone guilty even though there were not two witnesses to the offense?

PROSPECTIVE JUROR 533: It would be difficult.

MR. MILLER: And the reason it would be difficult is what, ma'am?

PROSPECTIVE JUROR 533: What I've said, that I feel that there have to be witnesses, and I think that somewhere

Page 103

there has to be forgiveness sometimes.

MR. MILLER: And we appreciate your candor, ma'am.

PROSPECTIVE JUROR 533: Uh-huh, and I just -- I feel that way.

MR. MILLER: And we ask only for your feelings.

PROSPECTIVE JUROR 533: Yes.

MR. MILLER: Your honest and candid feelings are all

120

I'm seeking here.

PROSPECTIVE JUROR 533: And this person may not be the same today as when that happened. They may not be the same person.

MR. MILLER: And when you stated in your questionnaire that you do not know if you could impose the death penalty, you --

PROSPECTIVE JUROR 533: I don't think I could.

MR. MILLER: You don't believe that you could.

PROSPECTIVE JUROR 533: No, I don't believe I could. I wouldn't want to.

MR. MILLER: You don't believe you could do so.

PROSPECTIVE JUROR 533: I don't think I could, no.

MR. MILLER: We appreciate your candor, ma'am.

Is there anyone else here who feels so? Ms. --

PROSPECTIVE JUROR 685: 585 -- 685.

MR. MILLER: -- 685 -- very good -- you've indicated that you absolutely refuse to offer opinions at this point because you simply feel you don't have the information.

PROSPECTIVE JUROR 685: That's correct.

MR. MILLER: And that is a fair and laudable position. Let me just twist that around one quick way for you if I can.

Page 104

You understand that in our system the burden of proof rests on the government and that the defendant is presumed innocent from the start. Should I happen to rest my case at this point having

121

heard nothing more than what you heard here during voir dire, what would your verdict be?

PROSPECTIVE JUROR 685: I don't think that's a fair question.

MR. MILLER: Well, you're absolutely right, and I apologize. It wasn't a fair question. But what I was looking for to some degree is an acknowledgment that at this point the verdict would have to be not guilty because unless and until Mr. Miller and Mr. Williams present evidence that proves guilt, the presumption of innocence prevails, and the verdict must be not guilty.

PROSPECTIVE JUROR 685: That is correct.

MR. MILLER: You agree with that?

PROSPECTIVE JUROR 685: (Nodded head.)

MR. MILLER: That's one of those principles of our American government that we seek to protect.

PROSPECTIVE JUROR 685: That's correct.

MR. MILLER: Is there anyone here who disagrees with that notion in any fashion?

Thank you very much, folks. Your Honor.

Oh, I have one more question. We wanted to ask you folks because a number of you I do believe have been exposed through the news media or other avenues to at least some information about this case, so on an individual basis so that one of you isn't telling the other everything you know about the

122

case, we'd like to bring you back and visit with you just briefly on that subject. Could I have a raising of the hands of those who feel they have some familiarity with this case, and if so, raise your hand?

THE COURT: If you're unsure, go ahead and raise your hand. It's better that we find out so . . .

MR. MILLER: Very good. Thank you, Your Honor.

THE COURT: Okay. I've just got a few -- occasionally I'm going to ask questions. And, Juror 533, I've got a few questions for you, so we'll wait till you get the microphone.

PROSPECTIVE JUROR 533: Yes.

THE COURT: You know, as a trial judge in a case, I don't usually know exactly what the evidence -- I never know exactly what the evidence is going to be, and even the lawyers I think don't know exactly what the evidence is, but because they're lawyers and it's their case and they've worked on it, they always have a much greater knowledge of what the evidence is going to be. So I wanted to preface my comments. I don't exactly know what the evidence will be in this case. I think I know what some of it is. And others I don't know.

PROSPECTIVE JUROR 533: Uh-huh.

THE COURT: Let's assume that there is no eyewitness testimony about any of the five alleged murders. Let's just assume that.

PROSPECTIVE JUROR 533: Okay.

123

THE COURT: How do you think that might affect your ability to determine whether Miss Johnson is guilty or not guilty of the crimes charged if there are no eyewitnesses and no
Page 106

eyewitness testimony?

PROSPECTIVE JUROR 533: Someone else may have done it.

THE COURT: That's true. Someone else may have done it.

PROSPECTIVE JUROR 533: Uh-huh.

THE COURT: Absolutely. That's why we're here. That's one of the things -- nobody has to prove who did it, but the government has to prove beyond a reasonable doubt that Miss Johnson's guilty.

PROSPECTIVE JUROR 533: That she did it.

THE COURT: And she may not be guilty of these charges. Matter of fact, she's presumed to be not guilty.

PROSPECTIVE JUROR 533: Uh-huh.

THE COURT: And so when I look at Miss Johnson, I see somebody who's absolutely not guilty because she's entitled to the full benefit of the presumption of innocence.

PROSPECTIVE JUROR 533: Uh-huh.

THE COURT: But I want to know, assuming that there is no testimony by eyewitnesses, how do you think that might affect your view of the evidence?

PROSPECTIVE JUROR 533: I could still view the evidence and then make decisions. Do you mean as far as -- as

124

what?

THE COURT: Well, I understood you to say at one point that your belief in scriptures was that there had to be two eyewitnesses.

PROSPECTIVE JUROR 533: Before you would give the death penalty.

THE COURT: Okay. That's not limited to guilt or

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 107 of 3245

innocence. That's the death penalty.

PROSPECTIVE JUROR 533: Yes, yes.

THE COURT: Okay. Okay. Now, if there weren't any eyewitnesses in this case that ever testified in any part of the trial, how would that affect your ability to fairly consider the death penalty as well as life in prison?

PROSPECTIVE JUROR 533: Then you couldn't. I wouldn't -- it would have to be life in prison.

THE COURT: You couldn't fairly consider the death penalty if there were no eyewitnesses.

PROSPECTIVE JUROR 533: No.

THE COURT: Okay. Can we pass it down to Juror 726? I'm sorry. That would be the gentleman in front of you there on the end of the row. Thank you.

Juror 726, and I don't mean to pick on Mr. Miller. Sometimes he used the phrase "could you consider the death penalty and life imprisonment." I like to add the word fairly because that to me imparts you would give fair consideration to

125

both. If you just say, Could you consider it, you'd say, Yeah, I consider it, but I automatically reject it, so you really haven't considered it. So I'm going to use the word fairly.

Could you -- if we ever get to that in this case -- and I have no idea if we'd ever get to that in this case. Certainly the government would have to overcome Miss Johnson's presumption of innocence. The jury would have to unanimously agree that she was guilty of one or more of the ten charges. There would then have to be -- one of the gateway factors would have to be determined beyond a reasonable doubt. And then and only then would we ever get to the penalty phase. And then

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 108 of 3245

you'd probably hear evidence both mitigating and aggravating. But when you got down to deliberating if it ever goes that far, do you think you could fairly consider in this case both a life sentence and a death sentence for Miss Johnson?

PROSPECTIVE JUROR 726: Yes, I think I could. I think that's possible.

THE COURT: Okay.

PROSPECTIVE JUROR 726: All things would have to be proven as such.

THE COURT: But you think you could fairly consider both.

PROSPECTIVE JUROR 726: Yes.

THE COURT: Anyone else among the jurors believe that they could not fairly consider both penalties if we ever get to

126

a penalty phase? Raise your hand if you think that would be difficult.

Okay. That's all the questions I have.

MR. WILLIAMS: Your Honor, if I may, this is double teaming, but with the Court's permission, there was two witnesses whose names came up, and I just thought I'd mention those.

THE COURT: Well, we're allowing -- the defense double teamed, and you can too.

MR. WILLIAMS: Very good. Kevin Pals is one of the names that came up. Kevin Pals is a deputy sheriff in Mason City. Actually now he's the sheriff I think in Cerro Gordo County, Iowa. And then Duane White is a resident of this area, around the Sioux City area, and has been since at least the mid-1990s. So at this point I don't know if you want to cover

it or --

THE COURT: Why don't you -- I'd like you to cover it.

MR. WILLIAMS: Very good. I guess it was Miss 730, you thought you might know Mr. Pals; is that correct?

PROSPECTIVE JUROR 730: I don't feel that I know him. I just recognize the name and didn't know if I needed to mention that or not. But I would not personally know him.

MR. WILLIAMS: Having heard the name, do you think that would affect your ability to be a fair and impartial juror in any way?

127

PROSPECTIVE JUROR 730: No.

MR. WILLIAMS: Okay. And forgive me. I forget who thought they might know Duane White. I'm sorry, right there. 726, does that sound like the Duane White you think you knew?

PROSPECTIVE JUROR 726: He has been around here. He's been in other parts of the countries too. I haven't heard from him or seen from him or heard of him for the last six, seven years.

MR. WILLIAMS: Let's say that the Duane White that you think you knew from six or seven years ago actually testifies as a witness here today or during the trial. Do you think you could treat that person's testimony the same as you would any other witness's testimony?

PROSPECTIVE JUROR 726: I'd have some problem with that, yes.

MR. WILLIAMS: Okay. And your problems would be -- would you give it greater credibility or greater weight or less weight?

PROSPECTIVE JUROR 726: Less, definitely less.

MR. WILLIAMS: And that's just because of things you know about this Duane White through your own personal experience.

PROSPECTIVE JUROR 726: Yes.

MR. WILLIAMS: Very good. That's all the questions I have, Your Honor, on that issue.

128

THE COURT: Is there anything you can do, Mr. Williams, to clarify whether the individual he thinks -- that he knows is the same individual that's going to be a witness in this case because I'm a little bit confused?

MR. WILLIAMS: Certainly, Your Honor. I can -- you know, with all the witnesses in this case, I don't recall a whole lot of details about Mr. White that would allow me to determine for sure whether it's the same Mr. White. In the time that we're going to take a break to do some individual questioning, though, if we could have Mr. 726 come back with that group, in the meantime I can grab a file, get more details, and might be able to explore that in a little bit more detail.

THE COURT: Okay. Could I see the lawyers at sidebar for one second? We don't need the whole team. We need one lawyer or maybe two. We can have two.

(At sidebar on the record.)

THE COURT: Is there really any serious dispute that 730, 533, and 529 are out of here? I mean, is there any possible argument that they're not?

MR. BERRIGAN: Not with 730 and 529.

THE COURT: Oh, come on.

MR. BERRIGAN: I just wanted to ask you, I didn't know if you were going to allow us follow-up questioning to your

Page 111

questioning or not. The only reservation I have, Judge, about 533, I don't think anybody's made it clear to her that it's not

129

required -- I understand she has this Biblical philosophy -- but that there's no requirement whatsoever that there be eyewitness testimony in the penalty phase of the trial in order for the jurors to have to consider both possible punishments. And I understand you asked her she's required that, but I don't think she's been confronted with the proposition that, look, it's not required. And if you're going to stick to that belief, then, you know, that makes you unqualified. That's all I want to ask her. That would be it. Or if you think it's more appropriate that you ask her, fine. I know we all know this, but I don't really think anybody's told her that in the penalty phase, whatever the Bible might say the law is, that's not a requirement and you need to understand that, and if knowing that you're still telling us you need two eyewitnesses, that's fine. I'm not going to fight you on a strike for cause. I'm just asking did somebody tell her that.

THE COURT: Well, there are other reasons why she's substantially impaired based on a lot of other answers, but you really want to go through that.

MR. BERRIGAN: She certainly has reservations about the death penalty.

THE COURT: She never said she'd fairly consider it.

MR. BERRIGAN: She didn't say fairly because you're the only one that asked her fairly. And that was in the context of -- at least I think the context of the two witnesses.

130

Page 112

THE COURT: If you want to ask her follow-up questions, then I'll allow the government to ask follow-up questions.

MR. BERRIGAN: I just want to ask her that one.

MR. WILLIAMS: On 730, I'm not so sure she's subject to strike. On the police officers, she indicated that she was not going to give any more weight to a police officer than anybody else, contrary to 529 who clearly is out. No doubt about it, he's out. 730 said, No, I'm not going to give weight. I know people lie. I know my husband lies -- doesn't lie, but I know my husband makes mistakes, and on the death penalty I don't think she's on an extreme view. I mean, she was asked, Can you fairly consider both options?

MR. BERRIGAN: She has a presumption of innocence problem. I agree I don't think she's a death penalty problem. She says repeatedly, Yeah, you've got a problem with me right now with the presumption of innocence.

THE COURT: Absolutely.

MR. BERRIGAN: And she says it in the questionnaire.

THE COURT: She's out on that.

MR. BERRIGAN: She's got relatives in the area.

THE COURT: She's out on that. She said she couldn't give her the presumption of innocence.

MR. WILLIAMS: You're right. And I had forgotten about that part of it.

131

THE COURT: You're right on the other thing.

MR. WILLIAMS: I was caught up on the other two.

THE COURT: So my point is why don't we just get rid

Page 113

of those two.

MR. BERRIGAN: If we could just ask 533 that one question, that's it.

THE COURT: And we may get rid of her too. We may get rid of her.

(The sidebar was concluded.)

THE COURT: Sorry about that. I try and keep those conferences to a minimum. Mr. Berrigan?

MR. BERRIGAN: May it please the Court? Thank you, Your Honor. It's too bad we don't play music.

Miss 533, I want to ask you a final question, and I hate to put you on the spot, but this is so important to all of us. You need to know that the law -- whatever your feelings might be regarding the two eyewitnesses and the Bible, the law does not require that of the government. That is, if they are able to muster the appropriate level of proof in terms of aggravating circumstances beyond a reasonable doubt, that does not contemplate a requirement of two eyewitnesses; okay?

PROSPECTIVE JUROR 533: Uh-huh.

MR. BERRIGAN: Just to be clear about that.

PROSPECTIVE JUROR 533: Yes.

MR. BERRIGAN: All right. Given that proposition,

132

would you be able to follow the law and not require the two eyewitnesses? We understand it might be your preference, but can you set aside your personal preference in deference to the rule of law?

PROSPECTIVE JUROR 533: Okay. Okay. Okay.

MR. BERRIGAN: Yes.

PROSPECTIVE JUROR 533: But then -- I can't do the

Page 114

death penalty bit even if it's the law.

MR. BERRIGAN: Okay. All right.

PROSPECTIVE JUROR 533: Okay.

MR. BERRIGAN: You wouldn't be able to consider it at all, eyewitnesses or no eyewitnesses.

PROSPECTIVE JUROR 533: I could consider it, but I don't -- I wouldn't want to do that.

MR. BERRIGAN: And I would hope nobody would, you know, necessarily want to, ma'am.

PROSPECTIVE JUROR 533: No, but even -- I could consider it, but . . .

MR. BERRIGAN: It'd be very, very hard for you.

PROSPECTIVE JUROR 533: Yes.

MR. BERRIGAN: Extremely hard.

PROSPECTIVE JUROR 533: Yes, I don't -- uh-huh.

MR. BERRIGAN: Thank you for that indulgence, Your Honor. That's all I have.

THE COURT: Okay. Any follow-up questions from the

133

government?

MR. MILLER: Just briefly, Your Honor.

THE COURT: And it's Juror 533.

MR. MILLER: 533. And I apologize to all you folks for using your names. I'll strive to do better.

Ms. 533, just briefly, as I take it, we have two different phases in the case, the guilt and the death penalty. Should we happen to get to the death penalty, you would feel the necessity of two witnesses before you could vote for death.

PROSPECTIVE JUROR 533: And I don't think I'd vote for death. I just don't think I could do that.

Page 115

MR. MILLER: And in all fairness -- and again, we appreciate your candor -- it's what's in your heart that counts here today.

PROSPECTIVE JUROR 533: Yes.

MR. MILLER: You do not feel you can vote for the death penalty.

PROSPECTIVE JUROR 533: I don't think so, no.

MR. MILLER: Thank you, ma'am. I appreciate your candor and your time.

PROSPECTIVE JUROR 533: Yes.

THE COURT: Okay. Could I see the lawyers again at sidebar? I'll try and keep it briefer this time. I think I will.

(At sidebar on the record.)

134

THE COURT: Any problems with dismissing 730, 533, and 529 for cause?

MR. BERRIGAN: I have to make a very brief objection on 533, Your Honor, and I know you're going to use the substantially impaired standard. But she has said now I think at least when I asked her she wouldn't require the two witnesses on the death penalty.

THE COURT: I understand that, but she said she couldn't fairly consider it.

MR. BERRIGAN: She said, I don't think I could vote for death. That's what she said.

THE COURT: Well, you think that qualifies her to serve on the jury?

MR. BERRIGAN: Well, I think you have to take her statements in context. You obviously at least, I think, feel

Page 116

that she's substantially impaired. I think it's at least arguable. I admit she's very, very firmly opposed to the death penalty, but when asked to consider it which at least in my view is part of the standard under Witherspoon versus Wainwright and the progeny of cases, she admits she can consider it.

THE COURT: Well, here's what I'm going to do. I'm going to dismiss 730 and 529 by agreement. We'll bring them all back for questioning after lunch on the pretrial publicity.

MR. BERRIGAN: Might I suggest if you're willing that we just make a short record on 533? I think you're inclined to

135

dismiss her. And rather than bring her back, if you do, then I'm fine with that. I just want to make a very brief record. I don't need to question her further.

THE COURT: I either have to send them out or not, so I'm going to send them out.

MR. BERRIGAN: Okay.

THE COURT: I'm not bringing them in, bringing them out.

(The sidebar was concluded.)

THE COURT: Okay. Here's what we're going to do. With the consent of both sides, I'm going to dismiss Jurors 730 and 529. There's no point bringing you back here to ask questions about pretrial publicity because based on your answers we've made the decision that this isn't the case for you to serve on. I think you'd be terrific jurors, I really do, but in another case. And you'll still be eligible in another case. That's the bad news. The good news is you're not going to be serving on this case. The bad news is you're going to be eligible in other cases of ours.

Page 117

But rather than bring you back here, your time's very valuable to me. And so when I can -- and that's what I was meeting with the lawyers about -- I don't want to waste any more of the jurors' time. So, 730 and 529, you'll be dismissed.

When you go down to the jury room now, we're going to take a lunch break. We'll come back at one o'clock, and then

136

we'll start bringing the rest of the jurors up individually at one o'clock, and I don't think it will take very long. We'll get you out of here all pretty early this afternoon I think. But Jurors 730 and 529, when you go back down, you're free to leave. The others we all want you back here for individual questioning.

And I'd just ask 730 and 529 not to -- it really goes for all the potential jurors. You're not supposed to discuss this case with anybody else. And so I'd ask you even though I've dismissed you not to discuss it with anybody else. When you go back to your homes, you can discuss it all you want with your spouses and friends and all about jury selection. But until you leave the building and are away from the other potential jurors, we'd ask you not to discuss this case at all.

Okay. We'll see you back here at one o'clock. If you'll just report down in the jury room, hopefully you brought books or magazines per my original letter to all of you, and we'll try and do the individual questioning as quick as we can and then let you know who's going to be in the jury pool and who's not. But we know now that 730 and 529 are no longer in the jury pool. Thank you.

(Panel A exited the courtroom.)

THE COURT: We'll see you back here at one o'clock.

Page 118

Anything else?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense.

THE COURT: Okay. Thank you.

(Lunch recess at 11:50 a.m.)

THE COURT: Please be seated. Before we bring the jury in in four and a half minutes, Mr. Berrigan -- I'm sorry, Mr. Berrigan has requested that we take up Juror 533 for cause.

MR. BERRIGAN: Well, I suspect the prosecution would move for cause, so I want to respond to that if they intend to do so, sir.

THE COURT: Okay.

MR. WILLIAMS: We intend to move for cause. This juror is not capable of fairly considering the death penalty. Her views on the Scripture substantially impairs her ability to realistically consider the death penalty.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: The defense objects to the excusal of Juror 533 for cause, Your Honor, because, first of all, she did finally admit that if presented with law that would indicate to her that there was no requirement there be two eyewitnesses in order to be able to consider the death penalty she would follow that instruction. She also said on more than one occasion she was willing to consider the death penalty. And I will admit that the record will certainly reflect she also said that she didn't think she could vote for the death penalty, that it would be very, very difficult for her.

But our view is that the law, specifically Witherspoon versus Illinois which I'm sure the Court's well familiar with, the 1968 case in this area, holds that removal of jurors merely because of general scruples against capital punishment denies the defendant due process to an impartial jury. The juror can be excused for cause only if she makes it unmistakably clear -- that's the court's language -- that she would automatically vote against the death penalty or that she could not be impartial as to guilt or innocence.

We do not believe Juror 533 meets either of those two tests. So we respectfully urge the Court to deny the government's motion to strike Juror 533 on that basis.

THE COURT: Mr. Williams, any response?

MR. WILLIAMS: Your Honor, the law has also changed since then to make it clear that not only can't they take the position of absolutely will not consider it, but if their views on the death penalty substantially impairs their ability to consider a punishment, that disqualifies them, whether it's inability to consider life or inability to consider the death penalty. This juror's view is that the Scripture tells her that unless there's two witnesses to a murder she cannot impose the death penalty, and she cannot do it. And she said repeatedly, I cannot do it. So I think it's very clear.

THE COURT: I think she said repeatedly that she couldn't do it. I know she gave somewhat inconsistent answers.

139

But in evaluating all the answers in the context of her entire testimony, I find that Juror 533 is substantially impaired in the performance of her duties and would not be able to follow the instructions to fairly consider both life and the death

Page 120

penalty in this case. So I'm going to sustain the government's challenge for cause.

So 533 is out. And then are you ready now? Any particular order? We really only have what? Four left?

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Start with 97, then go to 545, 726, 685? Is that order fine?

MR. BERRIGAN: That's fine, Your Honor. We just want to be sure that you intend to call Juror 726 back. He did not actually raise his hand. Or if he did, I missed it, but his responses in the questionnaire make it quite clear --

THE COURT: No, you're right. 726 did not raise his hand.

MR. BERRIGAN: And I know you're not using these as a basis for cause, but at least in terms of further questioning, Juror 726 makes it quite clear in the questionnaire that he does have familiarity with this case as a result of media accounts. Now, he might have misunderstood the question.

THE COURT: Why don't we bring him in and find out.

MR. BERRIGAN: That's all. I just wanted to make sure.

140

THE COURT: Sure. Do you have any problem bringing him in?

MR. BERRIGAN: No, sir. I'd also like the Court's permission, although I really think this issue regarding Duane White is a very important issue, that if we could get it resolved today we should find out more about that, and the reason it's important --

THE COURT: Well, we're past one o'clock.

Page 121

MR. BERRIGAN: Okay.

THE COURT: Let's find out from the government. Did you make any progress?

MR. WILLIAMS: Yes, Your Honor. I'm prepared to give some additional information to the juror to help identify him, make sure they know the same person.

THE COURT: And if you know something about him -- we've kind of gotten into this thing if it's government -- I was really surprised the defense took that position. I think if it's your turn to ask the question and they respond that they know a witness, then it's your obligation to explore that, not just punt it to the other side.

MR. BERRIGAN: We think this --

MR. WILLETT: Judge, I apologize. I was the one who did that, and I won't do it again.

MR. BERRIGAN: If I could request --

THE COURT: It's not a big deal, but I just think it'd

141

be easier to take it up.

MR. BERRIGAN: Maybe we could save some time. If we're at least talking about the same fellow, we believe this is a gentleman that in approximately 1998 was working with Angela Johnson on the collection of drug debts that she had at that time. It's a particular individual by the name of Jimmy Rodriguez that supposedly owed her money. If the juror has a negative view of this man, if that's true -- and I think so far that certainly is indication -- that could do nothing but reflect poorly on our client because of the association she had with Mr. White. And so this isn't an issue that's going to prejudice the government, but it could prejudice the defendant

Page 122

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 122 of 3245

quite greatly if he has knowledge about Mr. White.

THE COURT: I don't care who it prejudices. What the juror said was they wouldn't consider that witness credible. So it doesn't make any difference whether it prejudices the government or prejudices the defense. We're not putting somebody on a jury who has a preconceived notion about the credibility of a witness.

MR. BERRIGAN: Well, if that's the same fellow, Your Honor, then I would move we strike --

THE COURT: Well, we gotta find out if it's the same fellow.

MR. BERRIGAN: Okay.

THE COURT: So you can explore that some more. Let me

142

just go grab my robe, and then -- but I guess we can tell Juror 533 that -- Carey, who's going to do that?

THE CLERK: I can do that.

THE COURT: Why don't you do that. Juror 533 is excused. And then in just one minute we can bring up Juror 97, and we're going to bring them all up, 97, 545, 726, and 685, even though 726 did not raise his hand; correct?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay.

(Recess at 1:02 p.m.)

THE COURT: Our annotation monitors are down, but Rick's going to try and get them up and running by the time the trial starts.

(Prospective Juror 97 entered the courtroom.)

THE COURT: Anywhere in the first row where you're comfortable, Juror 97. Please be seated.

Page 123

Who's going to take the lead here?  Mr. Berrigan.

MR. BERRIGAN:  May it please the Court.  Thank you, sir.

THE COURT:  Thank you.

EXAMINATION

BY MR. BERRIGAN:

Q.    How are you, sir?

A.    Just fine.  Thank you.

Q.    I hope you're having a good time so far.

143

A.    It's been an experience.

Q.    We are asking people to come back at this point to ask them about what they might have learned about the case before the trial started.  And we noted that your questionnaire indicated and you yourself rose your hand in response to the publicity question.  You said that you had possibly saw some television news about it, remember some murders near Mason City broadcast on the news, and that the TV said it was possibly drug related. Does that sound familiar?

A.    Correct.

Q.    Sometimes, sir, there's more publicity after you fill out the questionnaire or in hindsight you might remember more than the questionnaire indicated, and so we wanted to be absolutely sure that we knew everything that you knew about this case.

A.    Right.

Q.    Could you tell us what else you might be able to -- do you know about it?

A.    I remember from the past I believe when Dennis Honken's trial was on, I just remember hearing about it from Mason City, that it was here or whatever.  That's -- and that it was drug

Page 124

related is basically what I remember and then that this trial was coming to town, and it's about that time I got the notice or whatever, and then two days ago or was it last night I heard the trial selection was starting today. That's all I seen. I watch the news every night, so it's pretty hard to miss it.

144

Q. The news that you watch every night, what news is that?

A. Channel 4.

Q. Is that a local Sioux City broadcast?

A. Yes, yes.

Q. You mentioned that you saw something at least about Mr. Honken's trial.

A. Correct.

Q. And that trial went for some long time. Do you recollect that lasting a while?

A. I don't remember how long it was. All I remember, it was a case, a murder trial, from Mason City area. That's all I really recall about it and pretty much the extent of it I think.

Q. Could you tell us, sir, do you recollect from the TV accounts that you saw, did you learn what the result was in Mr. Honken's case?

A. I remember that he was found guilty I believe.

Q. And what about his punishment, if anything? What did you learn from the TV accounts of that?

A. I don't recall anything other than what was published in our papers here.

Q. Okay. The fact that you might have heard on television that Mr. Honken was found guilty --

A. Correct.

Q. -- does that cause you to have any opinions as you sit here

about the guilt or innocence of Miss Johnson?

145

A.    No, it doesn't.

Q.    Are you able to completely disassociate whatever it is that you heard of Mr. Honken's case from your obligations as a juror in this case?

A.    I hope I can, yes.

Q.    And I'm taking that when you say I hope you can not that you have a concern about it but that you expect you will do that.

A.    I will -- I will do that, yes.

Q.    Do you have as you sit here -- and I know it's difficult because we haven't had the trial.  But do you have any self-doubt about your ability to completely and utterly forget, put aside at least, if not forget, and completely disregard anything you might have seen on television regarding Mr. Honken's case if you're selected as a juror in Miss Johnson's case?

A.    I feel I can -- what's past is past, and I don't reflect enough from the back past to do anything in the future here.

Q.    I'll tell you what happens sometimes, Mr. 97, is that our recollections are refreshed when we sit through the trial. We're going to hear perhaps some of the same things that we heard on television, and it will come back to us even though right now I understand you might not remember it.

A.    You're right.

Q.    And there's nothing to be done about that.  That's just,

146

Page 126

you know, the nature of how our minds work. But what's very important to the Court and all of us --

MR. BERRIGAN: God bless you.

THE REPORTER: Thank you.

Q. -- is that the jurors in this case be able to decide Miss Johnson's fate wholly and completely from the testimony they hear in this courtroom and the exhibits presented to them and not any extraneous source whatsoever. Do you understand that concern?

A. Yes, I do.

Q. Do you think that's a fair concern for us to have?

A. Yes, you do.

Q. And is it one that you would abide by and promise us that even if you did remember something about Mr. Honken's case and you were selected as a juror in this case, whatever that was, not only wouldn't be considered by you but you'd never speak to other jurors about it or mention it to anybody?

A. (Nodded head.)

Q. Okay. That's all we can ask. Thank you very much, sir.

A. Thank you.

MR. BERRIGAN: That's all I have of 97.

THE COURT: Thank you, Mr. Berrigan.

MR. WILLIAMS: No questions, Your Honor.

MR. MILLER: No questions, Your Honor.

THE COURT: Okay. Juror 97, if you'll just go

147

downstairs, we're going to finish questioning just 3 more jurors, and then we'll let everybody know what your status is; okay?

PROSPECTIVE JUROR 97: Thank you.

Page 127

THE COURT:  Thank you.

(Prospective Juror 97 exited the courtroom.)

(Prospective Juror 545 entered the courtroom.)

THE COURT:  Anywhere you're comfortable, Juror 545. Mr. Berrigan's going to start off with some questions.

MR. BERRIGAN:  Thank you, sir.

EXAMINATION

BY MR. BERRIGAN:

Q.   Welcome back, sir.

A.   Thank you.

Q.   I'm sure you noticed that near the conclusion of the prosecution's questions there was a question regarding whether anybody had learned anything about the case through the media before their appearance today.  And I do have the benefit -- we all do -- of your questionnaire where you were also asked about this.  And you indicated in question 63 that you had vaguely heard about it, never heard of her as a part of the crime, and I'm presuming you're talking about Miss Johnson.

A.   Right.

Q.   I know it involved drugs, but that was about it.  Is that correct?

148

A.   In my case, our TV antenna broke three years ago.

Q.   Okay.

A.   And I find it's a lot easier not to have a TV antenna at my house.  You don't hear such things.  I will say that I heard two items on this case.  One was the change of venue being proposed, venue.  And then the only other thing I ever heard was that it was not accepted, it was rejected, the change of venue.  That's all I've ever heard of this case.

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 128 of 3245

And as for the other case, I don't even -- I just vaguely know of it.

Q. Okay.

A. I never -- I didn't even know when the person was tried, so I'm about as naive as you're going to find someone I guess.

Q. Well, we noticed that you had indicated, in fact, most of the radio you'd gotten -- the information was from the radio, not the television; is that right?

A. Yes.

Q. And I think you mentioned earlier that you're an NPR listener on occasion. You've been on NPR yourself.

A. Right. Iowa Public, an affiliate of NPR, yes.

Q. And I'll confess I don't know what coverage, if any, NPR has given to this case, but if you had heard coverage on the radio, do you think it would have been from NPR or some other source?

A. When I heard of the change of venue, I believe I was

149

listening to a Sioux City station, and even then it was just in passing. The only thing that piqued my attention was the change of venue.

As for any other aspect of this case, as with the instructions, I have chosen to ignore it, but since I haven't had to be confronted with it, I haven't had the need to ignore it. So I have not heard of anything.

Q. Let me -- I don't want to probably jar your recollection too much, but let me suggest to you there was a gentleman named Dustin Honken that was tried last fall. Does that ring any bells with you?

A. No.

Page 129

Q. Not at all. The reason we're asking you these questions if it's not painfully obvious, Mr. 545, is that anybody who comes into a courtroom such as this, particularly if they're on trial for their life as this woman is deserves to have jurors that would decide the case solely and utterly on the basis of testimony and exhibits presented to them during the trial and not any extraneous sources whatsoever, whether they be reliable, unreliable, or otherwise. Do you agree with that proposition?

A. Yes.

Q. Okay. If it turns out --

A. And -- go ahead.

Q. Go ahead. I didn't mean to interrupt you. Go ahead.

A. I believe a person is innocent until proven otherwise.

150

Q. Okay. Sometimes what happens -- we know this from our experience doing this work -- that as the trial progresses you may hear things that remind you of a radio account or something you might have read or seen before that you don't remember right as you sit here. Do you understand what I'm saying?

A. Yes.

Q. Because our memories can get jarred when we hear the same thing twice. So let's just say if that happened and you were selected as a juror in this case and you're hearing evidence during the course of the trial and it suddenly dawns on you, I sort of remember that; I remember hearing something like this from the radio or the television or I read it in the newspaper, do you think there's any danger that that recollection would at all affect your ability to judge the case based on the evidence you heard in this courtroom?

A. Truthfully, no, because you can't base on what you vaguely

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 130 of 3245

remember. Furthermore, when you're in here and you're judging a person's future, I mean, literally, this is the only thing that counts.

Q. That's right.

A. This is the most important thing, and whatever you may have vaguely heard in the previous past time is immaterial.

Q. We're going to ask you to even go a step further than that, Mr. 545. And not only would you not rely on it -- we're going to ask you to promise us this. Not only would you not rely on

151

information coming outside of this courtroom in making your decision but that you would completely and utterly disregard it, that it's not something you'd mention to your fellow jurors or that it would come up in any context whatsoever during your service as a juror. Would you promise us that you could do that?

A. I could do that. In fact, I can promise you that I won't even tell my wife about it.

Q. Okay. Well, that's really the ultimate test.

A. When I was in the military, I maintained a top secret crypto clearance, and I went for years of jobs in southeast Asia for a segment of my life, and to this day, it's still -- I'm the only one so . . .

Q. That's what Judge Bennett requires, top secret crypto clearance, don't talk; okay? Thank you very much for your time, sir.

A. Thank you.

THE COURT: Oh, we still have the government to go. They may have some questions. They may not.

MR. MILLER: We do not.

Page 131

THE COURT: Okay. Well, you guessed right.

PROSPECTIVE JUROR 545: Thank you, Judge.

THE COURT: No questions. You go down, and we're going to let you know in just a little bit when we're done with the next two jurors where everybody stands.

152

PROSPECTIVE JUROR 545: Thank you, Your Honor.

THE COURT: Thank you.

(Prospective Juror 545 exited the courtroom.)

(Prospective Juror 726 entered the courtroom.)

THE COURT: Sir, if you'd just please be seated in the middle there. Please be seated.

Juror 726, I don't recall that you actually raised your hand about any pretrial publicity, but just out of an abundance of caution, I thought we'd have you come up and give the lawyers an opportunity to question you about it.

So Mr. Berrigan?

MR. BERRIGAN: Thank you, Your Honor.

EXAMINATION

BY MR. BERRIGAN:

Q. Welcome back, sir.

A. Thank you.

Q. We're not going to keep you nearly as long. I hope you'll be comforted by that. We did notice in your questionnaire that you indicated, if I can find it, that you were somewhat familiar with the case that Dustin Honken was trying to influence others to act on his behalf to scare off murder witnesses and carry on his criminal enterprise and that his girlfriend was involved. Does that sound familiar to you?

A. I've heard that on -- I don't remember whether it was in

Page 132

the newspaper or what it was, but yeah, I'd read that.

153

Q.   You had checked off that you had heard this at least in part through word of mouth, that people had talked to you about it.

A.   Well, yeah, discussion at work.

Q.   At work.

A.   There's a lot of people come through there, and at the time that it hit the paper or something, why, they were discussing it or talking about it.

Q.   You indicated in the questionnaire that acquaintances had said the participants were cruel and ruthless and should be punished.  Does that sound familiar?

A.   Yeah, that's possible.

Q.   And furthermore, as a result of this publicity, you indicated that you did and had formed an opinion regarding Miss Johnson's punishment, that she be sentenced to the greatest sentence allowed by law.  Did you mean the death penalty?

A.   Whatever sentence is allowed by law is what I meant if that's the death penalty or whatever.

Q.   Okay.  Has something happened between the filling out of this questionnaire and as you sit here to change these views?

A.   Not really a whole lot.  That part where you said I said she should be sentenced to that if that was -- if you're referring to the death sentence type of thing.

Q.   Yes, sir.

A.   Is that what you're referring to?

154

Q.   Let me find it specifically.  I don't want to mislead you

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 133 of 3245

at all.

A. That would be great. I'd like to hear that again.

Q. Okay. Let me find it for you. This is question 73, and I have this if you'd like to look at it, sir.

A. Go ahead. Just read it. I'll take your word for it.

Q. Do you have any beliefs or opinions as to the appropriate punishment for Angela Johnson if she were found guilty of the intentional killing of five people including two children? You checked yes, she should be sentenced to the greatest sentence allowed by law.

A. Okay.

Q. Is --

A. I don't really -- I don't really believe in the death penalty, but, you know, if that's the greater sentence and they feel that that's greater than life imprisonment . . .

Q. Yes, sir. I think most of us would probably agree with that, that the death penalty would be the greater of those two punishments. And so I'm really just trying to ask you, you know, whether something's happened since the time you filled out this questionnaire to change your --

A. No, no, not really. Sometimes -- sometimes the greater punishment to me would not be the death sentence but more that they're locked up in a situation where they have no control over what they do and they're there for an extended length of time,

155

and it's certainly not going to be a nice place for them to be.

Q. So maybe the death penalty might be a better sentence for the individual.

A. It could be, yes.

Q. I need to ask you just a couple more questions in this

Page 134

area, sir.

A.    Sure.

Q.    You know, there's been some discussion about the presumption of innocence and the burden of proof.  This opinion about Miss Johnson's -- not only her guilt but her punishment, would you agree with me that that's somewhat inconsistent with what we would hope to have in a typical case, that is, a juror who had not formed any opinions about guilt or innocence much less punishment?

A.    If the juror had formed an opinion that she was guilty?

Q.    No.

A.    Repeat that, please.

Q.    Yes, sir.  I don't think I was clear.  Our goal is -- although it's often difficult is to have jurors hopefully who have not formed an opinion about the case before it's been heard.

A.    Okay.

Q.    You would understand the reason for that.

A.    Right.

Q.    But sometimes that's difficult because some cases get a lot

156

of media attention, and this may be one of those cases, and we all read the paper or watch the television news or listen to the radio, and we're just human.  We hear information.  We talk to people.  We form opinions.  That's what we do.

A.    Right.

Q.    Right?

A.    Right.

Q.    And I'm just looking at this questionnaire.  It sounds like that's what you've done.

Page 135

A.    That I've already formed an opinion?

Q.    Yes.

A.    That if she is guilty or that she was guilty?  If she is guilty, then yeah, she definitely needs to be punished by law. But I don't think that it says there that I declared that she was guilty or believed her to be guilty.

Q.    I see what you mean.  I gotcha.  Could you tell me a little bit about the people who talked to you about the case, the people who told you that people involved in this crime need to be brought to justice and punished for their crime, or is that something you've told people?

A.    This was an at-work thing.  I work with three or four other people.  And we were talking about this thing.  And I said, you know, if this case is really this horrendous and this is what has happened, yes, they do need to be brought to justice. Absolutely.

157

Q.    That was you talking to your coworkers?

A.    That was -- we were discussing that back and forth, and I probably said that, and I'm sure one of the others -- most of the others were in agreement with that type of thing.

Q.    And could you tell us specifically what you meant by that, Mr. 726?

A.    That they should be brought to justice?

Q.    Yes, sir.

A.    That if they had done these things then they need to pay for them.

Q.    By the maximum punishment?

A.    Whatever, whether it's to be locked up in prison or the death penalty, whatever happens there, but they do need --

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 136 of 3245

something needs to be done. I mean, you don't just turn people loose and let them continue on down this road.

Q. Okay. The response -- and I don't want to be too technical about this.

A. Sure.

Q. So straighten me out if I'm reading this wrong. The response on that question -- I'm going to read it to you.

A. Okay.

Q. Have you talked about this case, the crime, or any of the people involved? That's the question. You checked yes.

And then the next line says, Please describe what you have said and to whom you have said it. The response then is

158

that people involved in this crime -- I think that says need or maybe it's used to be brought to justice and punished for their crime.

A. It's probably "need."

Q. Need, that makes sense.

A. Yeah.

Q. It doesn't say if these people are guilty or --

A. Didn't say, no.

Q. It sort of suggests -- and again, correct me if I'm wrong, sir. But it sort of suggests that when you were talking to your coworkers informally before anybody gave you a summons to come in here and be a juror and answer all these questions that you had heard enough about the case to at least at that time have formed an opinion about the guilt of these people. Is that accurate?

A. No, I did not have a definite opinion formed as to the guilt of them. I said -- when we discussed it, I said, no, if

this is what happened and this is what has gone down and they are guilty, they need to be -- they do need to be punished. Absolutely.

Q. The very next sentence was, Have you heard other people talking about this case, the crime, or any of the people involved, and you checked yes as well. And it said, Please describe what you heard and who said it. And you wrote, Acquaintances said the participants were cruel and ruthless and

159

should be punished.

A. Yeah.

Q. Which acquaintances were you referring to?

A. People I work with.

Q. Okay. And so would it be fair to say that at least your coworkers at the time of these discussions had some pretty definite opinions about the people involved?

A. I would say it was more with the crime involved, that if -- you know, that this -- whoever did this and if these people did it, then they need to be brought to trial and justice needs to be served.

Q. Okay.

A. But to -- I don't think they precondemned them or anything like that.

Q. I see. There's a question number 70 that says have you read, seen, or heard any information related to a possible motive for the alleged crime, and you checked the box yes on that. And then it says, Please explain. And you wrote, Drugs were involved. People were preventing witness from testifying. I think this says something about informants.

A. Yeah. I think that was something that came over the radio

Page 138

or something, and it said that somebody was snitching on them or had snitched on or was working with the law enforcement officials and that they had killed them to prevent them from testifying.

160

Q. And you indicated to us in the questionnaire that the information that you gathered about this case came not only from word of mouth with your coworkers but you saw both television and newspaper accounts.

A. That could be.

Q. Did you follow Mr. Honken's case in the newspaper?

A. No, I didn't follow it real close, no, but I did hear about it.

Q. Do you have a subscription to a newspaper?

A. No.

Q. Not at all.

A. No, I just pick it up at the newsstand.

Q. And do you do that as a custom and habit?

A. Quite often, yes, more often than not.

Q. Is it custom for you to talk to your coworkers during breaks at work and so on about current events in the news?

A. Occasionally, yes.

Q. And this obviously would have been such an event.

A. Absolutely.

Q. I wonder if I could change topics for just a second.

A. Sure.

Q. You were asked a little earlier about a fella by the name of Duane White.

A. Right.

Q. Do you remember that?

Page 139

A.    Right.

Q.    Could you tell us everything you know about Mr. White?

A.    I'm not sure this is the same Mr. White, but the Mr. White I know would probably be about 42 years of age.  He has been incarcerated more than once.  He has been involved in a lot of drug activity.  That type of person I have a real problem believing.

Q.    How do you know this gentleman?

A.    He is a nephew.

Q.    And, in fact, you talk in your questionnaire -- I'm not going to go back over it -- about Mr. White abusing your -- would it have been your -- oh, maybe I'm mistaken.  There was something about abuse of your daughter.  Did that have anything to do with Mr. White?

A.    No, that was -- would you read that part?

Q.    Sure.

A.    I'm not sure what I wrote there.

Q.    And I apologize if I -- let me look for it just for a second real quickly, make sure we're not talking about the same thing.  It was a question regarding experience with addiction, and you said, The person involved a daughter.  She married a man who used drugs.  She was the love, support of the family.  He was in prison.  I was wondering -- that's not Mr. White.

A.    No, her husband was in prison.  Duane may have been involved with her husband possibly.  I don't know that he was,

but he was around at that time.

Q.   You sort of gave us an indication that you have a somewhat negative view of this gentleman.

A.   Very definitely.

Q.   And could you tell us why you have a negative view of him and what you exactly think about him?

A.   Why do I have a negative view?

Q.   Yeah.  I know that might sound obvious, sir, but we need it for the record.  I apologize.

A.   Well, I've known him since he was very small, since he was a baby, and all through the years as I watched him grow up and leave home and the things he does, I mean, he was -- he was always on the other side of the line getting into trouble.  He was not above trying to get somebody to help him in his drug enterprises or whatever, and he could lie to you as quick as -- I mean, he was nobody you would trust.  Never would you trust this person.

Q.   Do you hold a similar view of his friends and associates?

A.   I don't know his friends and associates, but I'm sure they're not real terrific if they're in his league.

Q.   Okay.  And he has been involved with drugs did you say?

A.   Oh, yes, he's been incarcerated I know two, maybe three times.

Q.   And did that involve personal use, distribution, or do you know?  Does he sell drugs or use them?

163

A.   He was selling drugs at least twice that I know of.

MR. BERRIGAN:  I think those are all the questions I have.  Thanks for your patience, sir.

PROSPECTIVE JUROR 726:  You're welcome.

THE COURT:  Thank you, Mr. Berrigan.

Page 141

Mr. Williams, Mr. Miller?

MR. MILLER:  Thank you, Your Honor.

EXAMINATION

BY MR. MILLER:

Q.   Just briefly, sir.

A.   Okay.

Q.   The Duane White in question is a young man approximately 45 years old, 6-foot-2, 150 to 60 pounds, convicted of drug crimes in the late 1990s.  Does that sound like the person --

A.   Sounds like the person.

Q.   Okay.  And should he be a witness in this case, it would, of course, be your duty to listen to the testimony of all of the witnesses, and I take it you're telling us you would have significant difficulty listening to his testimony.

A.   I could listen to it, but I would have to have it corroborated by --  what he said by somebody else.  I would not really believe too highly in what he told me.

Q.   Moreover, if he were to be found to be an associate or a friend of another witness or a party in this case, I take it that would affect your opinion of that other party.

164

A.   Very definitely could.

MR. MILLER:  Very good.  Mr. 726, I thank you for your candor.  Your openness is the most important thing to us getting through this part of the case, and I thank you for your time, sir.

PROSPECTIVE JUROR 726:  You're welcome.

THE COURT:  Mr. 726, you can go back downstairs. We've got one more juror to go, and then we'll let everybody know when we're done where everybody stands.  Thank you.

Page 142

(Prospective Juror 726 exited the courtroom.)

(Prospective Juror 685 entered the courtroom.)

PROSPECTIVE JUROR 685:  Do I need to sing karaoke now?

THE COURT:  Yes, you do.  Please be seated.  What selection would you like for the karaoke?

PROSPECTIVE JUROR 685:  Shania Twain.

THE COURT:  It's not on my computer.  Sorry to let you down.

Okay.  Mr. Berrigan?

MR. BERRIGAN:  May it please the Court.

EXAMINATION

BY MR. BERRIGAN:

Q.    Welcome back, ma'am.

A.    Thank you.

Q.    We're only going to keep you a couple minutes.  You were one of the people that indicated both in your questionnaire and

165

when asked that you had been exposed to some publicity about the case before coming in today to be questioned.

Your questionnaire indicated that you were somewhat familiar.  I don't know a lot about the case, only what I saw on the news when Mr. Honken was convicted.  I saw headlines in the Sioux City Journal but did not read much of the articles.  I heard it was moved to Sioux City.  Does that sound right?

A.    Yes.

Q.    And then you had a discussion with your secretary when she received the juror packet.

A.    Yes, I did.

Q.    And briefly discussed the case and the possibility of her being selected, and turns out you got your own packet.

Page 143

A.    She got the last -- yeah, I teased her about it.  I learned a lesson.

Q.    It's kind of like the lottery.  And then you heard that two children were slain as well plus the number of five murders piqued your attention a little bit more.

A.    Yes, it did.

Q.    And that the motive as you heard it in the media, drugs, the possible motive to keep a drug enterprise going and shut people up.

A.    That's correct.

Q.    And then you were asked whether you had an opinion as a result of the information that you had received, and you said

166

you really don't know much about her and the alleged role she may have played in the case and then certainly said you were unsure about punishment not knowing the details, without hearing them makes it difficult to have beliefs and form opinions on the appropriate punishment which certainly makes perfectly good sense.

A.    That's correct.

Q.    We nonetheless have to be extraordinarily cautious that the jurors who hear a case such as this, given the magnitude of the decisions involved, are making their decision solely and utterly on the testimony and the evidence, exhibits, and so forth that come in during trial in this case in this courtroom.  That makes sense, does it not?

A.    Yes, it does.

Q.    And one concern that we always have when people have been exposed to publicity, one is that they may have formed opinions about the guilt or innocence of the defendant before even

Page 144

hearing any evidence. And your questionnaire certainly suggests that that's not a problem. But we need to ask you that. As you sit here now, do you have an opinion as to the guilt or innocence of Angela Johnson?

A.    No, I don't.

Q.    Okay. And you've already answered very directly that you're more than willing and will follow the law regarding her being presumed innocent. As the judge said, she sits here right

167

now -- and, in fact, that presumption of innocence stays with her during the entire portion of the evidence until the jury goes back and decides, if they do, whether that's been overcome. You know that from your work with trial students.

A.    Yes, I do.

Q.    So let's just say theoretically you're selected as a juror and you're sitting during the trial and you hear testimony or evidence that reminds you of something that you saw in the newspaper or you saw on television perhaps months ago connected with Mr. Honken's case. We need to know that you would not only not consider what you saw outside of this courtroom but that you would not even discuss it with other people, that it wouldn't even in any fashion introduce its way into this case. Could you promise us that?

A.    Yes, I could. The nature of what I do in my work, I have to maintain confidentiality when working with children and families, and if I don't, then I end up with my -- in trouble. So yeah, I understand.

Q.    We've had another gentleman talk about this. It's kind of top secret clearance stuff, and it's very close to that.

A.    I understand.

Page 145

Q.   The other concern obviously is that Mr. Honken -- you mentioned you knew that he was convicted.

A.   Yes.

Q.   And we're very concerned about that issue, particularly for

168

fear that people might by association think that Miss Johnson, well, look, this is a fellow; they have a child together.  Maybe that means she has something to do with this also.  Do you understand that concern?

A.   Yes.

Q.   All right.  Are you able to completely divorce and set aside whatever happened to Mr. Honken in your deliberations in viewing the evidence in Miss Johnson's case?

A.   Yes, because she's a different person, and you don't know the circumstances.  You have to hear it.

MR. BERRIGAN:  Okay.  Great.  That's all we can ask. Thank you, ma'am.  That's all I have.

THE COURT:  Mr. Miller?

MR. MILLER:  No questions for 685, Your Honor.

THE COURT:  Okay.  685, if you'll go back downstairs, we're going to let everybody know in a little bit.  We'll bring you all back up and let you know your status.  Thank you very much.

(Prospective Juror 685 exited the courtroom.)

THE COURT:  So now we go challenges for cause, and we're starting with the defense?

MR. BERRIGAN:  Yes, sir.  We would move to strike Juror Number 726, Your Honor.

THE COURT:  Any objection?

MR. WILLIAMS:  No, Your Honor.

Page 146

THE COURT: Okay. 726 is struck. Now, is there any reason why -- I guess the defense will go first with regard to peremptories.

MR. WILLIAMS: That's my understanding.

THE COURT: Okay. Is there any reason why we can't do it out loud? Our normal system is to pass the clipboard back and forth.

MR. BERRIGAN: None whatsoever.

THE COURT: But that's because the jurors are sitting there. There are three remaining jurors, 97, 545 and 685; is that correct?

MR. BERRIGAN: Yes, sir.

THE COURT: Do you exercise peremptory challenges against any or all of those three jurors?

MR. BERRIGAN: May I have just a moment?

THE COURT: Absolutely.

MR. BERRIGAN: I think we're almost ready to do this.

THE COURT: No, you take what time you need.

MR. BERRIGAN: The defense would exercise 2 of its 15 peremptory challenges on Jurors Number 97 and 545.

THE COURT: Does the government have a peremptory challenge with regard to Juror 685?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. So I will tell everybody that they are dismissed from the case except Juror 685; correct?

170

MR. BERRIGAN: Yes, Your Honor.

MR. WILLIAMS: Yes, Your Honor.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 147 of 3245

THE COURT: Okay.

MR. BERRIGAN: May we approach?

THE COURT: What do you --

MR. BERRIGAN: No, they can come in. A sidebar very briefly?

THE COURT: Let's take it up now.

MR. BERRIGAN: I heard you admonish the jurors at one point regarding sequestration responsibilities, but I think it's particularly important, even though we only have one, that the jurors that are coming back perhaps two or three weeks hence have very severe admonishments regarding their responsibilities as jurors. I understand you have written rules and you mentioned it already, but we would respectfully request that --

THE COURT: Close the door, please, Rick. Just a second. Close that door. Thank you. What do you want me to cover?

MR. BERRIGAN: I'd like you to do what you normally do, Your Honor, but that they are very -- in this case one juror is firmly advised that she cannot talk about the case, be in the hearing or presence of people that are talking about it, read any newspaper accounts, television accounts, radio accounts of the trial, not even have discussions with her spouse or children or anybody else close to her about this case nor allow them to

171

talk to her about the case and whatever other admonishments I'm sure the Court knows far better than I.

THE COURT: Now, let me ask you this.

MR. BERRIGAN: Yes, sir.

THE COURT: This isn't something we covered yesterday. I'll be happy to do all of that. Do you think I should tell the

Page 148

jurors to contact us if something happens?

MR. BERRIGAN: Yes, sir.

THE COURT: So we know ahead of time?

MR. BERRIGAN: Yes, sir, because you know that problem arose once before. I'd ask the Court furthermore, even though there are other jurors that have been dismissed -- you know, you can see some of these people; they're talking to other people at work. There's that lady that survived. Her secretary has a summons, so there is potential for the other people, even though they're being dismissed, to also influence potential jurors we've not yet questioned.

So I'd like the admonishment, frankly, to go to the entire panel for fear, unlikely as it might be, that jurors yet to arrive here might be talking to these folks.

THE COURT: Until we have a jury empanelled and start the case.

MR. BERRIGAN: Exactly, yes. That's all I'd request.

THE COURT: Yeah.

MR. BERRIGAN: Thank you, sir.

172

MR. WILLIAMS: No objection.

THE COURT: Okay.

(Panel A entered the courtroom.)

THE COURT: Thank you. Please be seated. There is only one juror who remains in the jury pool and will be asked to come back, and that would be Juror 685. So, Juror 685, you'll be coming back. You have approximately about a 50 percent chance of actually winding up on the jury. I'd like to be able to tell you exactly when you're coming back, but I don't know the answer to that. If I did, you'd be the second one to know,

but I don't know. As soon as we find that out, we will let you know.

I've just been discussing some matters with the lawyers, and I wanted to share it with you. You know, there are hundreds of potential jurors in this case, so normally -- and jury selection is -- you know, normally we pick a jury -- in a typical criminal case, we start at 8:30; we're done by noon. This is not a typical criminal case, and our jury selection reflects that.

So I'm going to ask all of you not to discuss this case with anyone else. That would be even for the three who aren't coming back. I mean, you're technically dismissed. But, you know, you never know if you said something to somebody and they said something to somebody else who is then on one of our later panels -- I mean, northwest Iowa's a small community. And

173

that could happen.

So normally I'd say you can say anything to anybody. But I'd ask you to wait until we have the jury selected in the case before you discuss your experiences in jury selection or say anything to anybody about the case. So that would go for the three of you.

For Juror 685 who is still in the jury pool, it's absolutely critical that you not only not talk to anybody about the case, even your spouse if you have one, I don't remember from the questionnaire. And here's why. If you get sworn in to serve as a juror in the case, we can't have you influenced by any outside source. It wouldn't be fair to either party in the case to have you influenced by a spouse or friend or acquaintance or somebody you work with.
Page 150

And so you have to work as hard as you possibly can to isolate yourself from the pretrial publicity. And there's going to be pretrial publicity between now and when we start the trial with preliminary instructions and opening statements. And so you have to do everything you can to isolate yourself from that even if it means not listening to local news. Listen to national news instead of local news.

Have your husband if you -- I don't know what paper you would get if you do read a local newspaper. Even, you know, the Des Moines Register covers it. The Omaha paper may or may not cover it. Have them clip out any articles first before you

174

look at the newspaper, put them in a file. When you're all done with the case, you're finally dismissed by me, you can read all those articles to your heart's content.

And it's really important not to do any research, not to get on the Internet, go to libraries because our system depends on 12 people deciding this case who decide it solely on the evidence that comes from the witnesses, from the witness box, and get admitted into evidence. And that's just critical. So we have to rely on you to do, you know, a really terrific job of not putting yourself in a position where you could even possibly be influenced by any outside influence.

If something were to happen between now and when you come back -- we're hoping that it doesn't. In other words, somebody comes up to you and says, Oh, I hear you might be a juror, and then gives their opinion or for some reason you were to read an article or you forgot about my instruction in not getting on the Internet, you got on the Internet one night and you tried to find out some things, we expect you to report that

Page 151

back to me if something should happen so we can bring you back here, find out what happened.

Nobody's going to be mad at you if it does. Things happen. I have learned that in almost 11 years as a trial judge. Things that we could not anticipate happen, and it happens with well-intended people. I mean, that's the nature of the uncertainty of life. Things happen.

175

So if something does happen, I want you to feel free to call the clerk's office. You'll have that number on your information. They'll relay it to us, and I'll then relay it to the lawyers, and we may or may not bring you back in. But if anything unusual happens that could in any way affect your ability to be fair and impartial in the case, we need to know about it between now and when we bring you back.

Anything else I need to cover?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense.

THE COURT: Okay. Yes. Can we get that microphone? And I won't put up the karaoke.

PROSPECTIVE JUROR 685: Is it -- I have to go to Baltimore and Washington on Sunday, and I won't be back till Wednesday. Is that all right? This coming --

THE COURT: That is absolutely okay. I would be thrilled if we had a jury selected by next Wednesday, but it's not going to happen.

PROSPECTIVE JUROR 685: Okay. I won't worry about it. Thank you.

THE COURT: Don't worry about that; okay? And I wanted to thank all of you. I've been so impressed today as I

Page 152

am on most occasions in selecting jurors. You know, when so few people had an extraordinary hardship, you know, that's just amazing because I go to a lot of conferences with other judges.

176

And I know if this case were being tried in Chicago or Baltimore or New York or a major metropolitan area, when I ask that question about an undue hardship, I think every hand would probably go up. And I don't mean to pick on folks in those areas. But it's one of the things that I find so fulfilling is dealing with people in Iowa who just really try so hard to do the right thing.

So very impressed with everybody's willingness to participate today and your candor and honesty in your answers, and it's appreciated very much.

So the three of you are dismissed. And, Juror 685, we will let you know. You're still in the pool. Thank you.

(Panel A exited the courtroom.)

THE COURT: Please be seated. Carey, have you provided counsel with the supplemental jurors that we know about that are filling in on the panels?

THE CLERK: Yeah, I gave them a tentative seating chart for Panel B, and I also gave them a list Suzanne created regarding substitution.

THE COURT: Okay. And we'll just review at the end of each day. You used 2 of your 15 peremptory challenges.

MR. BERRIGAN: Yes, sir.

THE COURT: And the government has 15 left.

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Okay. Anything else we need to talk about

177

Page 153

before Panel B tomorrow?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Well, I don't know if we need to talk about it, sir. The Court had indicated this morning that it was at least uncertain whether the process would continue in the general kind of group voir dire. It's certainly helpful to our side of the table I suppose if you've made a decision about that. If we could know about that, we'd appreciate it. If you haven't --

THE COURT: Sure. No, I need to make a decision on it, and I think I have made a decision, but I'd like to actually hear from the government lawyers before I make my final decision.

MR. WILLIAMS: Your Honor, our experience in having now gone through group voir dire, our position is we think we get much more candid answers from these jurors when they're by themselves. I can't help but think that these jurors are going to be influenced and they were influenced today by the statements that other people made about their views of the death penalty, and that can be manipulated.

And I'm not trying to cast aspersions on anybody, but, you know, by going to this person who you know has the opinion you want them to say and talking to that person first before this person, you talk to them about their death penalty opinion, you can influence that person's view because you've talked to

178

the person you want them to follow, and then you go to that person and try to get them to go along with it.

Page 154

Our experience is you're going to get much more candid answers if you get them up there by themselves. If that's intimidating, leave them over there. That's fine. But by themselves I think they're going to come out much more with what their true feelings are and we can explore it without them feeling like they are being weighed by the other people on this panel in what they believe.

And that's our opinion. I just -- I was not satisfied today that we're getting totally candid answers, and we would like to see you go to individual voir dire.

THE COURT: What about the speed issue?

MR. WILLIAMS: The speed I think will be slower, no doubt about it. But given the panels and the time, we got through the same number of people in the last trial in days -- I think there was only one day we started to go past five o'clock, and I think that was one of the first days before we really got into the groove of remembering how to -- or learning how to do it.

I don't think we're going to have, you know, days we're going to quit at two o'clock if we go back to individual voir dire, but I think we're going to have much more candid, full answers from these jurors if we go back to individual voir dire. I think we can get things completed within a day, and I

179

certainly know from our standpoint that we will keep our questions limited and not spend too much time.

THE COURT: Let me ask you this. Assuming it's an advantage for a particular party to have group questioning, particularly on the death penalty issue, is that somewhat moderated by the fact that tomorrow the government goes first

Page 155

and you'll be able to select who you want to talk with among the group first and in what order based on their questionnaire answers?

MR. WILLIAMS: It's moderated, but what it puts me in a position of is something I'm not comfortable with, and that is playing games. And I would rather just get the person up and ask them questions.

Now, if we want to do a group voir dire about the stuff that Mr. Willett covered, that's fine. We can get a lot of that stuff out of the way, do the group voir dire, cover the standard stuff.

But on the issue of death penalty, I don't think there's any substitute for getting the person by themselves and they can just give their own views on it, and I think that's where I'm not comfortable.

THE COURT: Okay.

MR. WILLIAMS: Maybe a combination can speed things up if we do group on everything but death penalty and publicity.

THE COURT: Mr. Berrigan, why do you think you get

180

more honest answers in the group situation?

MR. BERRIGAN: Well, I think the proof is in the pudding today, Your Honor. My view of the responses today I guess is quite different than Mr. Williams'. I thought the jurors were quite candid. And I didn't think there was anybody that we could point to and say, looking back, that this juror was influenced by this juror's response. And yet it provides them, I believe, with some comfort when they're sitting there as a group and they get to listen to each other and nobody's picking on them by themselves.

Page 156

It somewhat I think enables them to be less concerned that we're kind of ganging up on them. There's three people at the government table. We've got another five here. The Court's there. And if we're doing individual voir dire, it's just the one juror by himself or herself. It's not playing games.

And, frankly, I think it would be very difficult to explain some of these concepts -- and they are different than typical trials regarding how mitigating circumstances work and how aggravating circumstances work -- to each juror when we could do it in a group setting like that. I didn't hear anybody complain about that, that that was somehow gamesmanship or we were not informing them accurately as to how the process worked. I think they take some comfort in knowing how the process works.

THE COURT: But you can do that as a group. You could certainly ask -- you could certainly do the explanation about

181

how the trial will proceed and the role of mitigating factors and aggravating factors and do that as a group without getting in -- and just ask if they understand that's how it's going to work and then wait till individual questioning to get into individual questions about the prospective juror's individual views about the death penalty.

MR. BERRIGAN: You could, Your Honor. But I don't see the point of it. I reject the premise that this is gamesmanship or that there's some great advantage because one side gets to use a group voir dire. Mr. Williams and certainly Mr. Miller are very skilled advocates. I have no doubt that when they start tomorrow they'll do whatever they can to make sure that the process goes fairly just as they did today.

If there's some juror that they could point to today

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 157 of 3245

and actually claim that they think some juror was influenced by this process unfairly, I've yet to hear that. I think the jurors gave very fair responses. It was 1:50 in the afternoon, and we were done.

THE COURT: Yeah, but we had a very small -- we will seldom have this small of a group.

MR. BERRIGAN: Tomorrow we'll have ten, right. And it will be a little bit longer. But certainly there's an economy of savings, and it does not prejudice either side in my view.

THE COURT: Mr. Williams?

MR. WILLIAMS: Well, I think the order of questioning

182

that was done on death penalty saving 533 for last could be seen as an attempt to let 533 know what the correct answer is supposed to be from everybody else before we get to the last one that they know is the most dangerous one for them to have, and they struggled and fought very hard to try to get 533 to give the answer that they thought would keep her on the panel. That's the type of at least appearance if nothing else of gamesmanship that is avoided if we get them by themselves.

And I'm not suggesting that's what happened, but that certainly looks like what happened when you save the worst one for you till last, ask everybody else questions, then you get to the one you know is the worst for you.

And so again, I'm just more comfortable and I think we're going to get much more honest answers if we do the individual questions. I like your individual --

THE COURT: Worst. I thought she was the best one for them.

MR. WILLIAMS: Worst one for them to keep on. Vice --

Page 158

it depends on how you look at it. Maybe that was going to be the worst one for them to have to deal with.

THE COURT: The hardest one to keep on but the best juror for their position.

MR. WILLIAMS: Sure, absolutely. And I like your idea of, you know, we can do the full explanation of how the process works, make sure everybody understands that, do that as a group.

183

That's going to save us some time and then -- and say, you know, we're going to bring you back for publicity, we're going to bring you back on death penalty issues and then get into the individual questions at that point.

THE COURT: Your notion, Mr. Berrigan, that you get more honest answers in group questioning is contrary to my entire life's experience as a lawyer and a judge, contrary to everything I've ever read about the subject, contrary to all the social science studies I've read. And it seems to me -- and I've done it both ways. But you never have I guess is what you're telling me because you like -- you want the group in every case.

But you stand alone of any lawyer I know -- and I'm not just talking about a death penalty case. Every time I've had a difficult issue in a case, the lawyers have clamored for individual questioning of jurors. And my experience has been that you get the most candid answers when you question a juror individually.

Now, are they maybe a little bit more nervous because they're all by themselves? Sure. They lose the kind of safety in numbers. But I just find that they're willing to say things that they're unwilling to say in front of a group of their

Page 159

peers.

So I'm having a hard time understanding what the basis for your belief is because it's contrary to everything I've

read. It's contrary to my entire life experience, and it's contrary to what other lawyers ask in every case when I've done individual questioning. I've never had a case where there was a difficult issue where the lawyers say, Oh, we want to do it by group. Never had that experience. It's always been the other way. So what am I missing?

MR. BERRIGAN: Well, I respectfully disagree with you regarding the social studies on this area, Your Honor. I think the social studies at least that I've seen suggest that there is a very significant inhibiting effect bringing a single juror in to a courtroom such as this and having a big group of people ask that one juror questions.

And I have had experience with individual voir dire, just not in the death penalty qualification context. We did it today with these people on publicity. I've done it a bazillion times.

But I believe people, when questioned about the death penalty, are more comfortable in a group setting. And I've yet to see an example or even anybody suggest that some juror's been influenced by the process.

Of course we asked Juror Number 533 last. I don't know what the complaint is about that unless there's some suggestion we put words in her mouth. She was struck for cause based on her answers. Of course I fought for her, and I would do that in an individual setting just as vigorously, I can

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 160 of 3245

assure you.

THE COURT: But what was the reason for having her go last?

MR. BERRIGAN: Well, because that was a juror that I had some concerns about. I'm an advocate. This isn't some process where we're not trying to win, and to suggest otherwise is crazy. This whole process -- you heard Mr. Miller's questions. He's not trying to keep people on that he wants to get rid of. This is an adversarial system. But it does not operate against the detriment of the government somehow because we have a group setting as opposed to an individual setting.

And with all due respect -- and I do respect the Court's observations in this area -- I respectfully disagree. I think that the group setting works well. I think it will be very difficult to explain these concepts in a group and then ask people about them individually. It's much easier to do it as it was done today. While we're asking -- while we're explaining it, we're asking the questions. So . . .

THE COURT: Anything else the government would like to add?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: I'd like to take an hour or so to think about it, so you can just -- why don't we meet back here at three o'clock, and I'll let you know.

MR. BERRIGAN: Thank you, sir.

186

THE COURT: Okay?

MR. WILLIAMS: Thank you.

THE COURT: Anything else? I guess not. We'll be in

Page 161

recess. Thank you.

(Recess at 2:03 p.m.)

THE COURT: Please be seated. Anything else anybody wants to add?

MR. WILLIAMS: Not on behalf of the United States, Your Honor. Thank you.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Nothing further, sir.

THE COURT: It's not something I really have strong feelings about either way. And I know you're not going to like this, and I'll probably get in trouble -- I usually get in trouble for my candor. But, Mr. Berrigan, I thought you were just so off the wall on your challenge for cause on that one juror, and I can see that coming. I mean, I kind of expected it in this case. It came true. I think it's going to be like that the whole way. And it's just going to be easier for me to exercise challenges for cause if we do it after individual questioning of jurors.

So that's -- I mean, I think your inability to concede what to me was incredibly obvious -- and who knows? I could be wrong about it -- means that we're going to have a lot of dogfights over challenges for cause. And you have a right to

187

challenge anybody for cause you want to. But I just think it's going to be a lot easier to deal with challenges for cause if we do individual questioning.

And I just totally disagree with you. I just think jurors give more candid answers in individual questioning. That's always been my experience. And I think I've tried a lot more cases than you have in my career as a judge versus a

lawyer. I think that's true for almost any lawyer. And I've never had a lawyer suggest that group questioning somehow gets more honest answers from jurors. I've never had a lawyer suggest it. I personally don't believe it. And I just think justice is better served by individual questioning of jurors. So that's what we're going to do.

So the format of it, I guess we'll -- what I'd like you -- and I'd like you to -- no offense, but I thought the explanation of how the death penalty works and the aggravators and the mitigators and the pass at trifurcation was quite confusing. And you can confuse the jurors if you want to, but I just didn't find it a very coherent explanation for lay people.

And I'd encourage you to try and get a more succinct explanation because I just think you're going to wind up having very confused jurors. But that's my own take.

And you ought to get in sync -- I mean, I have ordered trifurcation, and I think to the extent sometimes, Mr. Miller, that you were talking about it, you talked -- you kind of

188

glossed over that, that middle -- there is a middle step. And I think for them to be articulating it, all due respect to Mr. Berrigan, not in a very cogent or articulate way for lay people to understand and then for Mr. Miller to be like ignoring it, not that anybody understood it anyway, but if there was any chance of having an understanding, for one side to be talking about a three-step process and the other side to be talking about a two-step process, the odds that any potential juror -- I guess we just have one potential juror -- actually understands what's going to happen is, in my view, slim and none.

And no offense, I think that's part of the problem
Page 163

about letting lawyers do so much voir dire. I don't think there's a single juror who has internalized the presumption of innocence based on what I saw today for starters, but, you know, I'm going down this path of letting the lawyers do it, and I'm going to stick with it.

So I would like you to, you know, introduce them to the death penalty concepts as a group and then take up individual views individually. And then when we're -- and then we'll go back to a system where after we've taken each juror individually and talked to them about their death penalty views and pretrial publicity views, then as we'll -- we'll send the juror out. We'll have our discussion on the record about any challenge for cause. I'll rule. We'll bring the juror back in and let them know one of two things: They're either still in

189

the pool, or they're dismissed.

MR. WILLIAMS: Except we would not have exercised our peremptories at that point, so I'm wondering if we need --

THE COURT: Yeah, but if somebody's challenged for cause and I sustain it --

MR. WILLIAMS: Then I think we bring them in and send them out. If not, it may just make more sense to let them stay down there, pull the next one up, do them, and then we can exercise our peremptories at the end.

THE COURT: Wouldn't it better after we -- if we're going to send them out and then we're going to have the for-cause argument and I'm going to rule, if I sustain a for-cause challenge --

MR. WILLIAMS: Let them go right then.

THE COURT: Why not?

Page 164

MR. WILLIAMS: Absolutely.

THE COURT: I'm sorry. I'm not tracking you.

MR. WILLIAMS: I'm just saying on the ones where you don't sustain a for-cause challenge --

THE COURT: Oh, yeah, they'll go back down.

MR. WILLIAMS: I'm not even sure we have to bring them in and tell them that they're -- at that point there's no reason to bring them back into the courtroom if we've not struck them for cause because we may yet strike them for peremptories. Maybe I'm not articulating myself well.

The way we did it last time, Judge, is we had them stand right out there in the doorway, and then we made our ruling, and no matter what, struck or not struck, we brought them back in and said you're struck. If you're not struck, we said, You're still in the pool. In this case they may not still be in the pool.

THE COURT: Well, they're still in the pool until you exercise peremptories.

MR. WILLIAMS: Oh, okay. I misunderstood what you're saying.

THE COURT: They're still in the pool until you exercise peremptories. Now, are you suggesting we only bring them back in if I sustain the challenge for cause? Is that what you're suggesting?

MR. WILLIAMS: Yeah, and then we can leave them downstairs until we figure out peremptories, and then we can bring the remainder back up and let everybody know -- basically at that point you just say you're in or you're not in just like you did at the end.

Page 165

THE COURT: Well, but just as a practical matter, we bring the juror in. Both sides question them on the death penalty and on pretrial publicity. We send them out. We then hear -- I hear argument, and I rule only on the for-cause challenge. The juror's either still in the pool or they're out.

MR. WILLIAMS: Correct.

191

THE COURT: If they're out, are you suggesting we bring them in and tell them they're out? That's what I'm suggesting.

MR. WILLIAMS: Yes.

THE COURT: Okay. If they're still in, are you suggesting we don't bring them back in to tell them they're still in? We just send them -- just have the CSO send them back downstairs?

MR. WILLIAMS: Right, until we get through the rest of the group.

THE COURT: Right. There's no reason to really bring them back in if they're still in because there's another round of challenges -- of peremptory strikes.

MR. WILLIAMS: Right.

THE COURT: Yeah, that's fine. Sure. It will save bringing the people in who aren't challenged for cause and telling them.

MR. WILLIAMS: Right.

THE COURT: Right. Have I thoroughly confused you?

MR. BERRIGAN: Not on that point, sir, but we are unclear as to whether or not the entire voir dire will be individual.

THE COURT: No, the entire voir dire will not be

Page 166

individual.  The only thing that's -- I don't know how that could be unclear, but apparently it is.  The only thing that

192

will be individual which I've said three times now since three o'clock would be the jurors' individual views on the death penalty and pretrial publicity.  Everything else will be in group.

MR. BERRIGAN:  And will the group be before or after the individual voir dire?

THE COURT:  The group will be before.  It's just like we did it today with the one exception that when we bring them individually -- now, which -- you know, you guys can do it any way you want.  I thought it was incredibly odd to start with death penalty questions first.  Talk about sending a message to potential jurors that we think there's going to be a penalty phase and start with it rather than do general questioning and then go to the penalty phase, you know, I didn't get why you did it that way.  I guess you have a reason for doing it that way, and that's fine.  But I thought it was incredibly odd.  My staff thought it was incredibly odd.  But you can do it that way, but I guess now I'm depriving you of your right to talk to the jurors about the death penalty first, and is that your problem?

MR. BERRIGAN:  I only asked the question, sir.  I wasn't commenting on the process.  You made a ruling.  We'll abide by it.

THE COURT:  Okay.  Is there anything else that you're unclear about?

MR. BERRIGAN:  No.  That's all we have, sir.

193

Page 167

THE COURT: Okay. Anything else we need to talk about?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. We'll see you tomorrow morning at 8:30. If there's something that arises earlier, I expect you -- I'll be here earlier. I expect you to come get me, and we can take it up earlier.

MR. WILLIAMS: To the extent that we are continuing to meet with the defense counsel and trying to attempt to exercise these strikes of the extreme views on the death penalty, I think the process we're just using is contacting your staff and letting them know. Is that still okay?

THE COURT: Yeah, that's fine.

MR. WILLIAMS: Very good.

THE COURT: You know, I don't know how well the clerk's office will be able to do to, you know, get -- move jurors up in panels, but I guess they're willing to try.

MR. WILLIAMS: And we'll move as fast as, you know, we can.

THE COURT: Great. Okay. Thanks. We'll see you tomorrow morning.

(The foregoing trial was adjourned at 3:11 p.m.)

CERTIFICATE
I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.
12-22-05
Shelly Semmler, RMR, CRR                    Date

                                                           194


INDEX

PROSPECTIVE JUROR:                                    PAGE:

Prospective Juror 97
        MR. BERRIGAN                                  142

Page 168

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 168 of 3245

```
                    PANEL A, 4-12-05
Prospective Juror 545
              MR. BERRIGAN                              147

Prospective Juror 726
              MR. BERRIGAN                              152
              MR. MILLER                                163

Prospective Juror 685
              MR. BERRIGAN                              164


                        * * * * *
```

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 169 of 3245

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR01-3046 |
| Plaintiff, | Sioux City, Iowa |
| | April 13, 2005 |
| vs. | 8:22 a.m. |
| ANGELA JANE JOHNSON, | VOIR DIRE OF |
| | PANEL B |
| Defendant. | |

/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀                                                          196

APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                          Assistant United States Attorney
                          Suite 400 - Hach Building
                          401 First Street Southeast
                          Cedar Rapids, IA  52401

                          THOMAS HENRY MILLER, ESQ.
                          Iowa Attorney General's Office
                          Area Prosecutions Division
                          Hoover State Office Building
                          Des Moines, IA  50319

For the Defendant:        PATRICK J. BERRIGAN, ESQ.
                          Watson & Dameron
                          2500 Holmes
                          Kansas City, MO  64108

                          DEAN STOWERS, ESQ.
                          Rosenberg, Stowers & Morse
                          1010 Insurance Exchange Building
                          505 Fifth Avenue
                          Des Moines, IA  50309

                          ALFRED E. WILLETT, ESQ.
                          Terpstra, Epping & Willett
                          Higley Building - Suite 500
                          118 Third Avenue Southeast
                          Cedar Rapids, IA  52401

Also present:             Bill Basler

Page 1

PANEL B, 4-13-05
Court Reporter:          Shelly Semmler, RMR, CRR
                         320 Sixth Street
                         Sioux City, IA  51101
                         (712) 233-3846

197

(Proceedings reconvened outside the presence of the jury venire.)

THE COURT:  Good morning.  Please be seated.  I only have one thing on the agenda, and that is during jury selection yesterday -- I think it was during jury selection -- Mr. Miller mentioned that he had two children graduating, one from high school, one from college.  I think the lawyers who've been in front of me know I try and accommodate personal lawyer things as much as I possibly can.  I just believe very strongly -- I expect a lot of lawyers, but in return I think I need to honor their vacations and those type of things.

So if you can give me a heads-up, we can try and structure the trial so if people need to get, you know -- and that's true obviously for the defense.  It goes across the board for everybody.  To the extent that I can, I want to accommodate -- your child only graduates from high school, you know, or once from college, and that's a very important event in a family.  And you're not going to miss it because of this trial.  I don't care what we have to do.

So if you just give us a heads-up, we'll work with you, and then everybody will know, and we can tell the jurors ahead of time.

But -- and I don't know, Mr. Berrigan, if you're in that situation, but you come from a farther distance than everybody, and to the extent we possibly can, I want to try and

accommodate all of those things.  It's a long-enough trial that if we take a day off here or a day off there to accommodate those things, it's not going to be a problem, not from my perspective.  So just give us a heads-up on what days you need to get out of here early, and we'll knock the trial off early.

MR. MILLER:  Thank you, Your Honor.  I'd like to take the whole month of May off, and I realize that's impossible.  I have --

THE COURT:  Well, if it's okay with Mr. Williams, it's okay with me, Tom.

MR. MILLER:  I've felt for some time that aside possibly from Ms. Johnson there isn't anyone here less desiring to be here this week.  But I have -- the older boy graduates in the middle of the week in New Jersey, and I just don't see any possibility that I can ask for any accommodation on that.

However, the other, the high school kid, graduates on a Friday, and if we need to quit a few hours early, that might accommodate that.  Missing his baccalaureate is not a big deal for me.

THE COURT:  Well --

MR. MILLER:  But his ceremony I can make.  It's on a Friday.

THE COURT:  You're going to miss your child's graduation because it's out east?

MR. MILLER:  Yeah, and that knucklehead might end up

199

flunking a course the last semester anyway, Judge.  The biggest thing to me was the fact that my younger boy enters the Marines in the middle of June, and I don't really see much possibility

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 172 of 3245

of spending time with both boys together before then until I observed yesterday that we're taking a week off right before then, and that works wonderfully for me.

THE COURT: When's the graduation? It's in the middle of the week?

MR. MILLER: Yeah, the 18th I believe it is of May, and I -- again, that's -- him graduating is more important to me than showing up and seeing him do it. He's been a -- he's been a struggle for years, and I'll be happy enough just that he gets the sheepskin, and I'm going to make the younger boy's graduation. The baccalaureate is meaningless to me which is the only thing I would actually ultimately end up missing that I would otherwise not. So I'm fine with it, particularly with a week off.

THE COURT: What if we took one day off and then maybe the one travel day Mr. Williams just handled it in your absence? I mean, we can accommodate -- we can do that.

MR. MILLER: I appreciate that. The biggest thing to me was being able to spend a week with both boys before my younger boy ships off to boot camp, and the fact that we're taking the week of the 10th to the 17th of June off is the biggest thing for me, and I just --

200

THE COURT: Okay. But if you want us to accommodate your travel to graduation, I'll be happy -- we'll figure out a way to do it.

MR. MILLER: I'll sure bring that to the Court's attention if I feel --

THE COURT: Yeah, even if we have to take two days off in the middle of a week.

Page 4

MR. MILLER: Thank you, Your Honor.

THE COURT: Yeah. I guess we have one juror that's going to be 15 minutes late, and I'm not waiting 15 minutes. So I don't quite understand it. The juror had car problems. But the juror lives in Merrill. You could walk from Merrill to here and be here by 8:30 if you left early enough. Do we know what juror number that is?

THE CLERK: Yes, Juror Number 598 -- I'm sorry, yeah, 598.

THE COURT: Okay.

THE CLERK: However, there is a juror down there, Number 720 from panel R, who came on the wrong day that we could substitute in.

THE COURT: Would you like --

MR. WILLIAMS: If they're here, let's do it.

THE COURT: Any objection from the defense?

MR. BERRIGAN: No, sir, although we prefer not to take him first if you don't mind in the individual.

201

THE COURT: Oh, no. We'll move him to the end so that we'll have a lunch break for you to go over the questionnaires. So we'll take 598, and they'll come back some other day. What date I don't know. And what's the new number there, Carey?

THE CLERK: 720.

THE COURT: 720. But then when we do the individual questioning, we'll take 720 last; okay?

MR. BERRIGAN: Thank you.

THE COURT: Anything else we need to take up? Mr. Williams?

MR. WILLIAMS: Your Honor, we provided defense --

Page 5

we've been providing them all along witness lists and exhibit lists. We provided them just to make sure they had the latest version. This morning I have a witness list for Your Honor, and then we will be providing to you any time you want to today your set of exhibits and exhibit list as well.

THE COURT: Sali beat you to the punch. She brought them in this morning. I already have them.

MR. WILLIAMS: Very good. I'll bring this up to you if you want it now.

THE COURT: Thank you.

MR. WILLIAMS: Nothing else on behalf of the United States, Your Honor.

THE COURT: Anything from the defense before we get started this morning?

202

MR. BERRIGAN: No, sir.

THE COURT: Okay. Thank you. Mr. Williams, I don't think you were in the room, but Mr. Miller was. I added to the PowerPoint on the slide that talks about voir dire and kind of the rules, and I tell the jurors to -- not to use their own names. I ought to add the lawyers. I then added in brackets the reason why, and I'm going to explain the reason why is to protect them from the press.

MR. WILLIAMS: Yeah, that's a great idea.

THE COURT: Yeah.

Okay. Ready to have the jurors brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. WILLETT: Yes, Your Honor.

THE COURT: Thank you.

(Panel B entered the courtroom.)

Page 6

THE COURT: If you'd please remain standing, would you all raise your right hand? I'm going to swear you in.

(Panel B was sworn.)

THE COURT: Okay. Please be seated. Good morning. I wanted to welcome all of you to the United States District Court for the Northern District of Iowa. My name is Mark Bennett. I'm the chief judge of the United States District Court. And you all know why you're here.

I imagine when you went to bed last night and got up this morning you were just so excited about the prospects of

203

being selected to serve as a juror in this case. And I say that a little bit facetiously.

But I've been a United States District Court judge now -- I'm in my eleventh year. I started September 6, 1994. I've had hundreds of trials.

Is that sunlight -- where is that sunlight coming from? Back here? Let me get that out of your eyes. Is that better?

And I've had hundreds of trials, and it's pretty true in every trial whether it's a two-day trial or a three-month trial. When people come in in the morning for jury selection, not too many people actually want to serve on the jury, and I understand that. I can see it in their faces. But it's also been my experience that if you do get selected to serve you'll find it to be an incredibly rewarding and interesting experience.

This is a long trial. Everybody knows that. I've only had two trials of the approximate length of this. But in each of those cases, the jurors really found it an unbelievable

service to the country and found it incredibly interesting, and they all came in very skeptical.

So I think if you do get selected you'll find it far more interesting and far more fulfilling, and I think it will really be one of the most interesting life experiences that any of you have. But I want to kind of explain what we're going to

204

be doing this morning.

Let me introduce everybody. Seated at the table closest to the jury box is Mr. C.J. Williams. He's one of the prosecutors in the case. Tom Miller is one of the prosecutors in the case. And seated next to Mr. Miller is Special Agent Bill Basler.

And over on this side would be Mr. Pat Berrigan, Mr. Al Willett, Dean Stowers, and then the defendant Angela Johnson seated between Mr. Willett and Mr. Berrigan. And you'll be meeting all of them in a little bit.

You should have on your chair some rules to follow, and I wanted to go over that with you before we proceed further with jury selection this morning.

Conduct of potential jurors during jury selection and trial. To ensure fairness, you as potential jurors must obey the following rules until the end of the case if you are selected for the jury or until you are excused from serving on the jury in this case. These rules apply whether you are in the courtroom, in the courthouse, at home, or anywhere else until you are excused from further service in this case.

First, do not talk among yourselves about this case or about anyone involved with it.

Second, do not talk with anyone else about this case

Page 8

or about anyone involved with it.

Third, when you are outside the courtroom, do not let

205

anyone tell you anything about the case. If someone should try and talk to you about the case during jury selection or the trial, please report it to me.

Fourth, do not talk with or speak to any of the parties, lawyers, or witnesses involved in this case. You should not even pass the time of day with any of them. It is important that you not only do justice in this case but that you also give the appearance of doing justice. If a person from one side of the case sees you talking to a person from the other side, even if it is simply to pass the time of day, an unwarranted and unnecessary suspicion about your fairness might be aroused. If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or the like, it is because they are not supposed to talk or visit with you.

Fifth, do not read any news stories or articles about the case or about anyone involved with it or listen to any radio or television reports about the case or about anyone involved with it. If you want, you can have your spouse or a friend clip out any stories and set them aside to give you after the trial is over or you are excused from serving on the jury in this case. I can assure you, however, that if you are selected for the jury in this case, by the time you have heard all of the evidence, you will know more about this case than anyone will learn through the news media.

Sixth, do not do any research on the Internet, in

206

Page 9

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 178 of 3245

libraries, in the newspapers, or in any other way or make any investigation about this case on your own. If you are selected for the jury, you must decide this case based on the evidence presented in court.

Seventh, if you are not excused from serving on the jury today, please take this instruction with you so that you can refer to it if you have any questions between now and the date you are required to return for the trial.

Dated the 13th of April, 2005, signed by me, Mark Bennett, chief judge.

Okay. I just kind of wanted to explain who everybody is in the courtroom to you. I have one of my law clerks, Carey, seated at the table over there. She's an honors graduate of the Drake University Law School. She's in a second-year clerkship with me, and at the end of the summer I regret that she'll be leaving, but she's moving on to Seattle and her next career in the law. And she'll be here throughout the trial.

We have our court reporter Shelly who's seated right in front of me. In many ways Shelly has the toughest job in the courtroom because while the rest of us can occasionally daydream -- I never get tired of looking at this ceiling; I always find something new in it -- and while trials are generally somewhat interesting, even the most interesting trial has periods in it where it's not exactly as riveting as what you see on TV.

207

So I don't encourage you to daydream, but, you know, in a long trial there may be a little bit of that. Shelly never gets an opportunity to do that because she's got to take down everything that's said.

Page 10

We have some United States marshals in the courtroom, and depending upon where we are in the trial and what witnesses we have, there may be fewer or greater members of U.S. marshals. We have them in every single criminal case. They're always in the courtroom in varying numbers depending upon what's happening in the case.

We also will have court security officers, CSOs. They're easy to spot because they have the blue blazers and the badge and a little earpiece. They have a lot of responsibilities in our courthouse, but one of their important duties is make sure the jurors get back and forth up to the courtroom on time, down to the jury room on time, and make sure that your deliberations are confidential and nobody intrudes into the jury room once deliberations start.

We have the lawyers and the parties they represent, and you'll be meeting them in a minute.

And then I wanted to talk a little bit about the role of the jury and then the role of the judge in the case. I'll talk a little bit about my role first and then go back to the jury.

As the trial judge in this case, I'm ultimately

208

responsible really for everything that happens in the case. I take jury service very seriously, and I know your time is incredibly important and valuable to you, and it's important and valuable to me too. And I put in all kinds of procedures to try and waste as little of your time as possible. I mean, I really do value your time.

And I have ruled on lots of pretrial issues in this case and tried to structure jury selection so that each juror

Page 11

would just have to come one day and then ultimately we'll get a jury selected and then start the trial. We have a lot of flexibility in jury selection, and we could have had the jurors come every day for three weeks. And I know you're probably not happy about being here, but if you look at what some of the alternatives are, it's not too bad.

I have the responsibility for running the trial, running jury selection, running the trial once we get started, making sure things happen on time, we don't waste your time.

I have the responsibility -- there will be lots of motions that I don't even know about yet that will happen during the course of the trial, and there always are. I'll have to rule on those motions.

One of my other critical responsibilities is to tell you what the law is in this case. This case, the defendant is charged with ten separate crimes, and I'll be defining those crimes for you in preliminary jury instructions that you will

209

receive right before we hear the opening statements in the case for those of you who get selected to serve on the jury.

Let's go back to the jury's job. In all trials the jury's job is to be the judges of the facts. In a jury trial I don't determine what the facts are. The jury does. So in a sense you're really the judges of the facts.

There's our witness box. In this case there well could be over a hundred witnesses testifying. And you'll have to listen to the testimony of the witness. There probably will be more than 500 exhibits introduced into evidence. That's just a guess. And you'll have to weigh through all of the witness testimony, all of the exhibits, and figure out what actually

Page 12

happened because you decide what happened. You decide what the facts are.

You'll have to determine the credibility of the witnesses. What I mean by credibility is is the witness telling the whole truth, just some of the truth, or maybe nothing the witness testifies to is truthful. Each of you get to decide the credibility of the witnesses, so it's a very important job.

And then after all the evidence is in, then you take my jury instructions. You'll get a set of final instructions. I give a set to each juror. You go back into the jury room, and you'll deliberate, and you'll have to figure out what the facts are and then apply the facts to the law that I give you in the instructions and that way determine in the initial part of the

210

case whether the defendant is not guilty or guilty of any of the crimes charged.

And then if the defendant is found guilty of one or more of the ten charges, there will be a second phase where there probably won't be any evidence presented but there will just be argument, and then you'll have to determine what we've generally called the gateway factor, and that would be -- there will be a list of factors, and if you find a certain factor, then the defendant -- then we would all move into what's called the penalty phase.

Now, we may never have a penalty phase. The defendant may be found not guilty, or you may not find any gateway factors, so there may never be a penalty phase.

If there is a penalty phase, it's almost like a second trial, but it will be shorter than what we call the guilt phase. It will be shorter, but there will be a separate set of

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 182 of 3245

instructions, different rules that you have to follow.  You'll hear terms that the lawyers may discuss later today I'm not going to get into, mitigating factors, aggravating factors. There will be evidence presented.  You'll get a separate set of instructions, and then you'll decide the penalty:  Life imprisonment or the death penalty.

And just so you know, a couple of things:  To my knowledge -- and I think I'm fairly knowledgeable about this -- the only time a jury decides the penalty in federal court is if

211

the defendant is eligible for the death penalty.  Then the jury gets involved.

Should there be a finding of guilt, a finding of the gateway factors, and there actually is a penalty phase, then the jury decides the question of life imprisonment or the death penalty.  You never have to impose the death penalty, but it can become an option if there is a penalty phase to the trial.

In all other cases, the judge decides the penalty. That's just a little bit of background about what your duties will be in the case.

Now, we're going to do today -- it will take us probably a good chunk of the day -- what lawyers call voir dire. It's a French term.  It's a French term for jury selection, and literally translated voir dire means to speak the truth.

And so our goal is to find 18 jurors ultimately who will sit in this case, 6 of whom will be alternates, but the 6 alternates won't actually know that they're alternates.  And in almost any trial of this length, it's quite likely that the alternates would wind up replacing some of the actual jurors due to illness, emergencies, and the like.  So that's why we're

Page 14

using so many alternates is because of the length of the case.

I'm only going to be asking a couple of questions this morning about one specific area, and the lawyers are going to do most of the questioning today. But there are no right or wrong answers to their questions.

212

And I'm just guessing that some of you are probably a little bit nervous or a little bit anxious or a little bit apprehensive about the types of questions that you're going to be asked. Take a deep breath and relax. It's not like a civics quiz. Nobody's going to ask you what amendment guarantees Miss Johnson the right to trial by jury in a criminal case. It would be the Sixth Amendment, but nobody's going to ask you a question like that.

They're just going to ask you opinions -- questions about your background, life experiences, your opinions on various matters. And nobody's here to judge your opinions in the sense of saying that they're right or wrong. Opinions aren't right or wrong. They're just your opinions.

But you have to answer the questions openly and honestly for our system to work. And you've taken an oath to do that, and I'm sure you'll do your very best to answer the questions openly and honestly.

Now, just a reminder that throughout the jury selection you have numbers, and I'll ask you to not use your names, and the lawyers will make their best efforts to call you by number and not use your names, and I want to tell you why.

Because of the length of the trial and because by any definition this would be what I call a high-profile case -- lot of public interest in the case, lot of media interest in the

Page 15

case.  And if we used your names and the press would print your

213

names, my view is that it might be likely that what I call idle curiosity seekers might just -- somebody might just come and knock on your door and want to talk to you about the trial.  And you don't need that.  You don't need that.  And so it's really just to make your lives as easy as possible during the course of the trial.

I made the decision.  It was my decision, my decision alone, to use numbers which we have a right to do.  And it's really just to keep your names from floating out in the press and have everybody who doesn't have something else better to do call you up, write you letters, knock on your door and the like.  So I take full responsibility for it.  That's why I did it.  I think ultimately you'll appreciate it, and that's the reason why.

I want to go through the jury selection process so you kind of understand what we're going to do.  We anticipate that jury selection will take about two to three weeks which is not unusual in a case like this.  We're bringing in a small group of potential jurors each day.  I'll be introducing the lawyers, and there will be a few questions by me largely about the issue of whether or not serving on this jury would be an undue hardship for you.

Then there will be group questioning of potential jurors by both sides.  You know, they're going to talk to you as an entire group.  And every once in a while I'm going to jump in

214

Page 16

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 185 of 3245

and ask some questions too. Primarily the lawyers are going to be asking the questions, but I have a right to ask the questions that I want to ask, and don't be surprised if -- I'll hopefully do it politely, but I'll interrupt the jurors and jump in and either clarify something or ask a question.

And then there will be some individual questioning of potential jurors about pretrial publicity and also about your views on the death penalty. And so I want to try and explain to you how that's going to work. I'll wait till I finish this, and then I'll give you the actual kind of how-to.

You will know at the end of the questioning today whether or not you're still in the jury pool or whether you're dismissed from service in the case. Now, if you are told you're still in the jury pool at the end of today, you have about a 50 percent chance of serving as a juror in this case. And the reason why is the parties have what are called peremptory challenges or strikes, and a certain number of you can be stricken before we bring in the final group to serve as jurors.

So even if you -- at the end of the day today I tell you you're still in the jury pool, the way it works which is a little bit complicated -- and I'm not trying to hide it from you, but there's no value really in explaining it -- you have about a 50 percent chance of being selected. So I'll leave it at that.

When we manage to empanel the number of jurors we

215

need -- and we don't know when that will be; it's just our estimate, two to three weeks, and you're the second group; we started yesterday; you're the second group -- we'll notify each juror by telephone whether you've been selected or not and when

Page 17

the trial begins, and we'll try and give you as much notice as possible.

We'll run the trial four days per week, and almost always it will be Monday through Thursday. We'll be taking Fridays off. We won't be taking Fridays off. You all will. I have a lot of -- I have 600 other cases to worry about, so I'll be working on those on Friday. I've got a couple trials set on the weekends where I'm going to be trying a case Friday, Saturday, and Sunday so I don't get too far behind.

But for those folks on the jury, for the most part we'll be going Monday through Thursday. We are taking the week of June 10 through the 17th off. And when we actually start the trial, I'll give you a written schedule so you know exactly what days we'll be in trial and what days we won't. But, you know, for the most part it's going to be Monday through Thursday.

Now, with regard to today, after I'm done, we're going to start -- the government will go first. We rotate every day. Yesterday we started, the defense went first. Today we start, the government goes first with the questions. No particular advantage or reason why who goes first, but out of fairness we just thought we would alternate, and that was actually something

216

the lawyers suggested. It was a very good suggestion.

So the government will go first. Then the defense will go. And there may be more than one lawyer from each side that questions you during each side's opportunity.

And once we're done with the group questioning, we're going to send you all down to the jury room, and then we're going to bring you back one at a time. And we'll just have you sit kind of in the middle of the jury box. You'll have a

Page 18

handheld microphone because the acoustics aren't very good, and you'll get to see the operation of that soon. And I'll make you a deal. As long as you speak into the microphone nice and loud, I won't put up any karaoke for anybody requiring you to sing in front of the lawyers and Miss Johnson. So that's really how we're going to do it today.

Now I'm just going to ask the government table, so to speak, Mr. Williams, if you would introduce the people at his table. Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. Good morning. My name is C.J. Williams. I'm an assistant United States attorney, and I work over in Cedar Rapids at our office in Cedar Rapids, Iowa.

With me at counsel table is Tom Miller. He's a special assistant United States attorney from Des Moines.

MR. MILLER: Good morning.

MR. WILLIAMS: And also with us is Special

217

Agent-In-Charge Bill Basler. He is a special agent with the DCI from Mason City. He's what we call our case agent. He's the lead investigator in this case. He'll be sitting at counsel table with us throughout the trial.

We have an office that's headed up by Chuck Larson Senior. He's actually in Baghdad right now serving the government. He's the head of our office as the U.S. attorney.

We have a branch office here in Sioux City, and I'm going to list out the names of the people and the staff there. We have seven lawyers and seven staff members. The lawyers are Forde Fairchild, Martha Fagg, Kevin Fletcher, Mike Hobart, Jack Lammers, Janet Petersen, and Shawn Wehde. Our staff members are

Page 19

Shayne Mayer, Del Tompkins, Penny Schlotman, Michelle Schwebach, Michelle Hatting, Carol McEntaffer, and Pat Calhoun.

And also I should mention I've got -- Sali Van Weelden is a legal assistant in my office, and also in the back is Shari Konarske who is a staff person in our office as well assisting us throughout this case.

THE COURT: Thank you, Mr. Williams.

Now, does anybody know Mr. Williams, Mr. Miller, Mr. Basler, any members of the U.S. Attorney's Office? And let me expand that. How about anybody who works at the federal courthouse here? Anybody?

Okay. Why don't we switch over, and we'll ask the defense to do the same. Mr. Willett?

218

MR. WILLETT: Thank you, Judge. Ladies and gentlemen, good morning. My name is Al Willett. I practice in Cedar Rapids, Iowa. I'm with the practice of Terpstra, Epping, and Willett. I practice with Ray Terpstra and Greg Epping, and I have two co-counsel in this case, Mr. Patrick Berrigan with the law firm of Watson and Dameron in Kansas City, Missouri, and associated with Mr. Berrigan is Ms. Lisa Dahl, Ms. Lisa Dahl.

I have the benefit of another co-counsel, Mr. Dean Stowers. Mr. Dean Stowers is from Des Moines, Iowa. He practices with the law firm of Rosenberg, Stowers, and Morse, and he practices with Brent Rosenberg, David Morse, and Heather Wood.

And then most importantly my client, Miss Angela Johnson, Angela, if you'd stand up so the jury can see you, please. Thank you.

I don't recognize any of you. Do any of you recognize

Page 20

either myself or any of the names that I've -- or people I've just introduced you to?  I don't see any nods of affirmation.

Thank you, Judge.

THE COURT:  Okay.  Thank you, Mr. Willett.

Did all of you get a prospective witness list?  Okay. Well, the lawyers are going to be asking you about that later on.  And hopefully you've had a chance to go through it, but if you haven't, there will be breaks, and we'll have a lunch break, and you'll have an opportunity to go through it because we want

219

to find out if you know any of the potential witnesses.

And you might think, well, that's kind of silly. What's the likelihood that you'd know a potential witness? Yesterday we had a prospective juror who knew a potential witness.  So we do it in every single case.

Now, I want to talk to you about the estimated length of the trial.  It is very hard to estimate the length of the trial.  We don't even do that good of job sometimes on the week-long trials.  We can be off a couple of days.  It's just hard to do for a whole lot of reasons.  And the more witnesses you have and the more complicated the case is and the longer it's going to be, the harder it is to estimate the length of trial.

And the lawyers have done their best job of estimating it.  We think it's going to take pretty much three months, but that includes the jury selection so -- which started yesterday. It could take a little bit longer.  My guess is it's actually going to be shorter, but that's just a guess.  I wish I had a crystal ball and I could tell you exactly how long it would take.  If I had a crystal ball, I don't think I'd be sitting

Page 21

here, though. I'd probably be in Las Vegas playing blackjack today. But I don't have a crystal ball, so that's a good-faith estimate of how long it will take.

So we need to talk about whether it would be a severe or extraordinary hardship. And I want to spend a little bit of

220

time covering that. Yesterday it was really gratifying -- I mean, I love jury selection because you get to talk to, you know, citizens and people in the community, and it's just so interesting because everybody has an interesting life and a different story.

And there was only one person who asked to be excused yesterday because it was a severe or extraordinary hardship, and that was because he was -- he had some real serious health problems. He was actually on a pain pump and was on a narcotic pain medication, and he literally couldn't stay awake during the trial. So we excused him.

No one else, even though they wrote down on their juror questionnaires -- about half of them said it was an extraordinary hardship -- when push came to shove, nobody else asked to get off because it'd be an extraordinary hardship, and that's kind of what I want to talk to you about.

Jury service is really a unique opportunity to serve your country, and I absolutely believe that. I mean, I feel very lucky because I get to serve my country every day in my job. I mean, I'm a United States District Court judge. I get to apply and enforce the laws of the United States and try and do justice in every decision I make and every ruling I do. And hopefully that's a service to the country whether people agree with my rulings or not.

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 191 of 3245

But for most of the rest of folks who don't work for

the government, it's not very often that you have a unique opportunity to serve the country. I guess Friday's one of them. It's the deadline for paying taxes. I was just working on my -- the only tax form I know besides 1040 is called 4868. That's the extension. I think I will have filed my 27th out of 28 years extension. So I was working on it this morning actually. But Friday's an opportunity to serve your country.

But jury service really is an extraordinary opportunity to serve your country even in a two-day trial. In a trial of this magnitude, it's even a more significant opportunity to serve your country. And I know that most of you, if you had your choice, would not want to serve on this case. I mean, I totally understand that, because we're all creatures of routine. We all are used to doing exactly the same thing, and anything that disrupts our routine is difficult.

And it's hard to be away from your families and your communities. And some of you come from a pretty good distance. You have the option of staying overnight. Some jurors will stay overnight. Some will drive back and forth every day. And I know something about that. Last year I was in Cedar Rapids 16 times. Several years ago I tried about a ten-week trial in Cedar Rapids.

And just like -- none of the lawyers are from Sioux City in this case. So these five lawyers are all going to be away from their families for the entire duration of the trial.

And it's a hardship on you all. But it's a hardship that I hope
Page 23

you all take seriously.

And before you ask to get off, I really want you to search, search, and make a decision why you ought to be able to get off and other people ought to have to serve. And it's going to be a different hardship for different people. I understand that. But I'm only going to let you off if I think it's a severe or extraordinary hardship.

And I guess what I'm saying is you've all been called randomly. It's time to step up to the plate and make the sacrifice to serve your country if there's any way you can reasonably do it.

I had a trial last year of this length, and in jury selection -- I'll never forget this because on the same -- it was either the same day or two days apart -- we had two farmers, and it was during harvest season. And they worked full time. They had manufacturing jobs, and they also farmed full time. And both of them were not going to get paid other than for the first two weeks on their manufacturing job. It came right in the middle of harvest. And they both said that they were willing to serve. I actually told them, Hey, I'll let you off; even the tough judge thinks it's too severe of a hardship. And they were both willing to serve.

We had a person who had no source of income for their family if they served, and they talked it over with their spouse

223

the night before they came in, and they said they were willing to deplete their savings because they thought jury service was so important. That's an extraordinary citizen in my view.

So I'm just going to start with -- down in the corner here, 139. The microphone is on, and I've got a simple

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 193 of 3245

question.  Are you willing to serve as a juror in this case?

PROSPECTIVE JUROR 139:  Yes.

THE COURT:  Okay.  Thank you.

Juror 666, are you willing to serve if selected as a juror in this case?

PROSPECTIVE JUROR 666:  Yes.

THE COURT:  Okay.  Thank you.

Juror 446.

PROSPECTIVE JUROR 446:  Yes.

THE COURT:  Thank you very much.

Juror 508.

PROSPECTIVE JUROR 508:  Yes.

THE COURT:  Thank you.

Juror 202.

PROSPECTIVE JUROR 202:  I have two things that I would like to have you take under consideration.

THE COURT:  Sure.

PROSPECTIVE JUROR 202:  I have been -- these are prior commitments -- asked to serve in the capacity of an elder delegate to the Reformed Church senate -- general senate which

224

will be held in New York starting the second week of June.

THE COURT:  Do you know the days?

PROSPECTIVE JUROR 202:  Yes, I have those.

THE COURT:  Okay.  What are those days?

PROSPECTIVE JUROR 202:  We would leave on the 14th of June.  The general senate actually commences its work on the 16th, and I would return on the 25th.

And then a family consideration, we will be celebrating our first -- 50th anniversary.  My children, three

Page 25

of them, have asked us, my wife and myself, to join them at Old Faithful Park at the first week of July, and they have in the past year about a year ago put in for leave in their particular jobs and have gotten that time off.

So those two events I'd like to have you take under consideration. Outside of that, yes, I'm willing to serve.

THE COURT: Okay. Thank you. Both are very important matters. I understand that.

Mr. Williams, in your view, will we still be here in July?

MR. WILLIAMS: I'd be extremely surprised if we were, Your Honor. I think we should be done --

THE COURT: Sometime in June?

MR. WILLIAMS: Sometime in June at the very worst, at the end of June, but I think sometime in June.

THE COURT: Okay. Mr. Willett?

225

MR. WILLETT: Your Honor, based upon what I know at this moment, I would concur with Mr. Williams that our goal is not to be here the month of July, but I would also agree with Mr. Williams that at this point we would be litigating this case in the month of June.

THE COURT: Okay. Thank you. You can make Old Faithful, but we can't -- we would not be able to accommodate you going to New York. So the question becomes for you -- you know, I don't want to pit somebody between their country and their faith. How would you feel if you didn't go to New York?

PROSPECTIVE JUROR 202: I've got mixed feelings for that. I spent 20 years in the United States Navy serving my country, and I do believe it's an honor, privilege, and

Page 26

responsibility to serve my country in this capacity. But I also believe I have the responsibility to serve in the capacity of an elder delegate to a church organization when it gets to the highest authority and decision-making process.

THE COURT: I don't feel that that's a decision I can make for you. I appreciate you raising it, but I feel that I have to defer to you on that. Every once in a while I just simply -- I'm not in a position to make that judgment. Can you see it from my perspective?

PROSPECTIVE JUROR 202: Yes.

THE COURT: You need to make that judgment, and I think I speak for the lawyers that we'll -- I see them

226

nodding -- we're going to respect the judgment that you make. But I don't feel I could do that. I don't think it would be fair for me to do it for you. Nobody's going to be mad at you if you choose service to your church. On the other hand, you sound like you'd be a terrific juror, so it's your call.

And there's still a 50 percent -- I'll remind you there's still a 50 percent chance that even if you survived all the questioning today and you get selected to stay in the pool, there's still only a 50 percent chance you would actually be selected as a juror. But you better plan on being selected because for you it's kind of an all-or-nothing thing.

So are you willing to be a juror, or do you feel you have to honor your commitment? I assume they can find someone else to go in your place but that you want to go, and I understand that. I understand that. So you tell us.

PROSPECTIVE JUROR 202: Do you want that answer now, sir?

THE COURT: Yes.

PROSPECTIVE JUROR 202: Then I guess I would like to request humbly to be excused.

THE COURT: Okay. You're excused. Thank you very much. Hope we see you back here on another case.

PROSPECTIVE JUROR 202: I would like that.

THE COURT: Because I think you'd make a great juror; okay? Thank you very much. Why don't you pass the

227

microphone -- you're free to leave now. And why don't you pass the microphone to the gentleman behind you.

Juror 720, are you willing to serve as a juror in this case if selected?

PROSPECTIVE JUROR 720: First of all, I would like to -- I don't feel good today, and I'm not quite to understand sometime in the talking. English is my second language.

THE COURT: English is your second language?

PROSPECTIVE JUROR 720: Yes, sir.

THE COURT: And have you had a difficult time understanding everything I've said?

PROSPECTIVE JUROR 720: Yes, sir.

THE COURT: Well, then you're going to have a real difficult time when we get to the lawyers. I was trying to be funny. It's a very serious matter, but we can have a little humor too. Do you think it would be too difficult for you to understand the English language, because it's important that you understand everything?

PROSPECTIVE JUROR 720: I do understand, but sometime no.

THE COURT: Sometimes no?

Page 28

PROSPECTIVE JUROR 720: Sometime no, I don't understand. Even when I was working with a friend, sometime they talking kind of hard time. I have to ask them would you explain it on and on and on.

228

THE COURT: Okay. Your English is very good, but unfortunately the way the trial works, sometimes I'd like to stop the lawyers and ask them to explain things, but it really doesn't work that way. And so I'll leave it up -- you don't think your English is probably good enough to serve.

PROSPECTIVE JUROR 720: It's not good enough, yes, sir.

THE COURT: Okay. Will you do me a favor? Will you keep working on your English? It's very good. It's very good. So maybe if it gets better sometime in the future we could have you back; okay? But I'm going to go ahead and excuse you now.

PROSPECTIVE JUROR 720: Thank you, sir.

THE COURT: Okay? The sunlight's still in your eyes a little bit, isn't it?

PROSPECTIVE JUROR 222: Not that I'm noticing.

THE COURT: It's not bothering you?

Sir, 720, you're free to go. Thank you very much.

Juror 222, are you willing to serve?

PROSPECTIVE JUROR 222: Yes.

THE COURT: Okay. Thank you.

Juror 430, are you willing to serve?

PROSPECTIVE JUROR 430: Yes, sir.

THE COURT: Thank you very much.

Juror 513?

PROSPECTIVE JUROR 513: Yes.

Page 29

THE COURT: Thank you.

Juror 677.

PROSPECTIVE JUROR 677: Yes, but I would like to bring up one item of consideration. I do have a nine-month-old daughter at home that I'm still nursing, so that would have to be considered with breaks and things to allow for that. I don't know if that would be possible or . . .

THE COURT: These are the types of questions they don't teach you in new judges' school which I went to ten years ago to deal with. Well, let me tell you -- let me do it this way. Let me tell you what our schedule is like every day, and then we'll see if that would accommodate your desire to continue breastfeeding; okay?

We will generally start at 8:30 in the morning. We will take a 20- or 25-minute break right around 10:00. I like to kind of see where we are with a witness. It's usually not before 10, and it's usually not later than 10:30. We'll take a 20- to 25-minute break.

Then we'll have -- I haven't decided yet -- probably 45 minutes or an hour for lunch, maybe 45 minutes just to try and get more in in the day. If I'm going to let you all go out for lunch, it will probably be an hour lunch. If I decide to have lunch brought in every day for the jury, it will be a 45-minute lunch break.

Then in the afternoon, usually between 2:30 and 3

we'll take another 25-minute break. And then we'll be done

every day usually around 4:30, quarter to 5; okay? So that would be our schedule.

PROSPECTIVE JUROR 677: Okay. And I can work with that.

THE COURT: Can you work with that?

PROSPECTIVE JUROR 677: Yeah.

THE COURT: Great. Thanks for your flexibility. Thank you.

Okay. Terrific. Thank you all very much. I'm done with my questions now, and so we're going to start with the lawyers doing the questions. And yesterday it was the defense. Today it's the government.

And, Mr. Williams, will you be --

MR. WILLIAMS: I will, Your Honor.

THE COURT: Okay. Mr. Williams.

MR. WILLIAMS: Thank you.

Good morning, ladies and gentlemen. What I'm going to do is to start off just talking to you about a few things individually. I'm going to get to some concepts we're going to run into in this case, and hopefully we won't be at this too long.

As the judge indicated, you know, the goal here is really just to talk to you all and get your true feelings on these things. There's no right or wrong answers. You guys

231

could be great jurors on some case and not a good juror on this particular case. And what we need from you is to let us know honestly what your real opinions are, what your real thoughts are so we can make a judgment, so the judge can make a judgment about whether this is the right case for you.

Page 31

So don't hold back on your feelings. Don't feel that anybody's going to be judgmental about your thoughts or your views or your opinions because that's not what this is about. This is about just trying to figure out whether you can sit as a good juror in this case. And our goal really is to find 18 jurors who can be fair and impartial jurors, can listen to the evidence, they'll wait to make up their minds until all the evidence is brought in and then ultimately be able to weigh the evidence fairly for both sides. And that's our goal.

With that goal in mind, I just want to go through and ask some individual questions to begin with here and get to know you to start off with just a little bit better.

222, you indicated in your questionnaire -- and thank you, by the way, for the questionnaires that you filled out. I know those were lengthy questionnaires, but believe me, they'll actually speed up the process because it avoids us having to ask all those questions again. I do have some things I just want to follow up on. You indicated in your questionnaire that you were engaged. Have you been married yet?

PROSPECTIVE JUROR 222: No.

232

MR. WILLIAMS: And what does your fiance do?

PROSPECTIVE JUROR 222: He works at EXOPack in Sibley, Iowa.

MR. WILLIAMS: At what time -- or what company?

PROSPECTIVE JUROR 222: EXOPack.

MR. WILLIAMS: What's he do there?

PROSPECTIVE JUROR 222: He's a palletizer.

MR. WILLIAMS: Palletizer. And what is that?

PROSPECTIVE JUROR 222: He smashes the boxes.

Page 32

MR. WILLIAMS: Does he enjoy his job?

PROSPECTIVE JUROR 222: For the most part.

MR. WILLIAMS: You indicated in your questionnaire that at least in one area of the law and one area particularly in federal law of crack cocaine that you have a view that the laws aren't very equal, that there are some sentencing disparities, if you will, or unfair sentences on crack cocaine versus perhaps other crimes and so forth.

My question to you, in this case you're going to hear a lot about methamphetamine, not crack cocaine but a lot about methamphetamine. Do you think in any way that your views about crack cocaine would interfere with your ability to listen to the evidence in this case?

PROSPECTIVE JUROR 222: No, because I used crack. I don't know anything about meth.

MR. WILLIAMS: And so the concern you had that the

233

federal law on sentencing in crack cocaine may not be fair, that's not going to impact your ability to be a juror in this case at all.

PROSPECTIVE JUROR 222: I don't think so, no.

MR. WILLIAMS: Okay. Very good. Thank you.

Juror 430, let's see, you indicated in your questionnaire you're a caregiver?

PROSPECTIVE JUROR 430: That's correct.

MR. WILLIAMS: Is that for an older adult?

PROSPECTIVE JUROR 430: It's for an 86-year-old woman.

MR. WILLIAMS: And how do you enjoy that work?

PROSPECTIVE JUROR 430: Most of the time it's pretty rewarding.

Page 33

MR. WILLIAMS: In what way?

PROSPECTIVE JUROR 430: Well, just different aspects of her life and what she's overcome and all the changes that have happened.

MR. WILLIAMS: Have you been doing that for a while?

PROSPECTIVE JUROR 430: Two and a half years now.

MR. WILLIAMS: Did you do that before this as well, or did you do a different type of job?

PROSPECTIVE JUROR 430: No. Actually before that I was a waitress and a homemaker.

MR. WILLIAMS: Very good. If you could pass the microphone down, 513, at least at the time you filled out your

234

questionnaire, you'd been at a bank for a couple months. Are you still at the bank?

PROSPECTIVE JUROR 513: Yes, I am.

MR. WILLIAMS: And you are a loan officer's assistant, and I'm just not familiar with what that is. What are your duties on a daily basis?

PROSPECTIVE JUROR 513: More or less I push a lot of papers. I do a lot of paperwork.

MR. WILLIAMS: Join the club.

PROSPECTIVE JUROR 513: So they're kind of training me to eventually take over and take on some customers, that type of thing.

MR. WILLIAMS: How do you like it so far?

PROSPECTIVE JUROR 513: Quite a bit. I like it.

MR. WILLIAMS: Are your hours pretty decent hours, or do you work --

PROSPECTIVE JUROR 513: 8 to 4:30, 8 to 5.

Page 34

MR. WILLIAMS: This will be right down your line then if you're a juror in this case. One of the questions you had down, you indicated that someone close to you was charged with breaking and entering. The way the question was asked, question 48 indicated that someone close to you, a friend, a relative, something, something -- and so it didn't really indicate in there -- had been charged with breaking and entering and charges were dropped. Do you recall that answer?

235

PROSPECTIVE JUROR 513: Yeah. I think it was one of my friends, they just had an argument with an -- an ongoing argument with another guy, and they went to their house and went in and knocked on the door, and no one answered, so they went in, and he came out with a gun and just kind of tried to scare him away, that type of thing, pressed charges.

MR. WILLIAMS: I think -- I'm sorry?

PROSPECTIVE JUROR 513: I think he pressed charges, but then they ended up getting dropped so . . .

MR. WILLIAMS: Okay. My real interest in asking that question is that experience by your friend, that didn't -- is that going to have any impact you think in your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 513: I don't think so.

MR. WILLIAMS: I just want to make sure it wasn't so close that you had bad feelings about it or something like that.

PROSPECTIVE JUROR 513: No.

MR. WILLIAMS: Okay. Thank you. If you could pass the microphone down the line. 677, you indicated that I think you're an area manager for the Upper Des Moines Opportunity Incorporated.

Page 35

PROSPECTIVE JUROR 677: Uh-huh.

MR. WILLIAMS: What is that?

PROSPECTIVE JUROR 677: That's a community action agency is what Upper Des Moines is, and I actually work for the

236

Head Start program. And with being an area manager, I do the home visits with the families that are parents of children three to five, and I work with them on family goals like self-sufficiency to try and maybe get them back going to school or get them a job, different things to kind of help them improve their lives, and those families that are in Head Start are -- meet the hundred percent poverty level, so they're low-income families so . . .

MR. WILLIAMS: How long have you been doing that?

PROSPECTIVE JUROR 677: Four years.

MR. WILLIAMS: And how do you like it?

PROSPECTIVE JUROR 677: I like it.

MR. WILLIAMS: What's the best part of that job for you?

PROSPECTIVE JUROR 677: I guess when you see the families improve, that's really rewarding when you know you've helped them get started and see their lives improve I guess.

MR. WILLIAMS: One thing you said in your questionnaire -- I think it was question 47 -- you said that childhood experiences can affect a person, but when a person becomes an adult, they become responsible for their own choices. Do you remember making something to that effect?

PROSPECTIVE JUROR 677: Uh-huh. And I guess in my line of work it seems like a lot of the parents I work with try to blame things constantly on their childhood. And I do think

Page 36

that affects the way they parent and the way they interact with their lives as they get older, but I think sometimes there needs to be a point -- and I try and tell them that now they're an adult and they're responsible to make the right choices and they can't just blame their parents for -- you know, because it just seems like sometimes, you know, they might abuse their child or something and then they try to say, well, they were abused, so it's an excuse. So I just think that there comes a time when you can't use that excuse anymore.

MR. WILLIAMS: Thank you.

PROSPECTIVE JUROR 677: Does that clarify it?

MR. WILLIAMS: If you could pass the microphone down right in front of you to 508. I'm sorry. I have my seating chart right in front of me. I just have it in the wrong order.

508, you indicated you were in the pharmacy area, pharmacy technician?

PROSPECTIVE JUROR 508: That's correct.

MR. WILLIAMS: You've been doing that for quite some time; is that right?

PROSPECTIVE JUROR 508: Yes, part time. I just went full time in June.

MR. WILLIAMS: Okay. And you're now at the Hy-Vee doing that?

PROSPECTIVE JUROR 508: That's correct.

MR. WILLIAMS: And you used to be with the hospital?

PROSPECTIVE JUROR 508: I'm still at the hospital part time.

MR. WILLIAMS: Oh, still at the hospital?

PROSPECTIVE JUROR 508: Hy-Vee full time and hospital part time.

MR. WILLIAMS: That's a lot of hours.

PROSPECTIVE JUROR 508: That's correct.

MR. WILLIAMS: Is there a real difference in your job between the hospital and Hy-Vee, or is it basically the same?

PROSPECTIVE JUROR 508: Pretty much the same. Hospital, we just deliver to the floors, and Hy-Vee, we give to customers.

MR. WILLIAMS: Did you have to receive any type of special training in that area?

PROSPECTIVE JUROR 508: I went to school.

MR. WILLIAMS: And where did you go to school at?

PROSPECTIVE JUROR 508: Western Iowa Tech. It was just a -- two semesters.

MR. WILLIAMS: Is there a program particularly in that area?

PROSPECTIVE JUROR 508: Yeah, they do this class for the certification, but now WIT just started up a two-year program.

MR. WILLIAMS: Interesting. If you could pass the microphone next to you to 446, sir, you're currently a food

239

inspector for the U.S.D.A.?

PROSPECTIVE JUROR 446: Yeah.

MR. WILLIAMS: And where do you do that at?

PROSPECTIVE JUROR 446: Mostly in Sioux Center, but we do occasionally go on detail to plants around Iowa and Nebraska, packing plants.

Page 38

MR. WILLIAMS: Do you enjoy that job?

PROSPECTIVE JUROR 446: No.

MR. WILLIAMS: And why not?

PROSPECTIVE JUROR 446: It's real monotonous.

MR. WILLIAMS: Yeah.

PROSPECTIVE JUROR 446: And the people tend to be a little rough. You know, packing-house people tend to be a little -- I don't know -- just kind of rough around the edges I guess.

MR. WILLIAMS: Do you have to know a lot of regulations to do that job?

PROSPECTIVE JUROR 446: It seems like not that many, but, you know, once you've done it for ten years, you probably know more -- it seems like you don't know anything after a while, but you probably know more than it seems.

MR. WILLIAMS: Kind of internalize some of those regulations?

PROSPECTIVE JUROR 446: Right, right.

MR. WILLIAMS: Sure. You indicated in your

240

questionnaire, question 25, that back in 1992 you'd actually applied for a police officer's job at one point.

PROSPECTIVE JUROR 446: Yeah.

MR. WILLIAMS: Do you still have an interest in that area, or was that kind of a passing interest you had at one point and don't have an interest anymore?

PROSPECTIVE JUROR 446: I still have an interest in it.

MR. WILLIAMS: And why is that? What interests you about law enforcement?

Page 39

PROSPECTIVE JUROR 446:  I don't know if it's -- this probably isn't a good reason to have an interest in something, but it's mostly I like being outside.

MR. WILLIAMS:  Sure.

PROSPECTIVE JUROR 446:  And outside the plant, and that's what appeals to me, and, you know, there might be some exciting -- more exciting things that happen, accidents or, you know, just a little more dynamic workplace than what I'm at now.

MR. WILLIAMS:  I understand.  My brother is a police officer in a small town in Iowa, and one of the primary things he likes is just being out, not having a desk job, being out from behind the desk and being able to get around, so it makes some sense.

The main point I wanted to raise with that is as I indicated earlier on, we're looking for jurors who can be fair

241

and impartial in this case.  And do you think that your interest in law enforcement would interfere with your ability in any way to be a fair and impartial juror?

PROSPECTIVE JUROR 446:  No.

MR. WILLIAMS:  We're going to have police officers testify in this case.  Do you think that simply because they're a police officer and you've had an interest in that line of work that you're going to just automatically give them any more credibility than any other witness that might appear before you?

PROSPECTIVE JUROR 446:  No.

MR. WILLIAMS:  One of the questions in the questionnaire indicated or asked you to list the three biggest problems facing the criminal justice system or something to that effect.  And one of the things you put down was that people

Page 40

involved lie or spin the truth.  Do you remember putting something like that down?

PROSPECTIVE JUROR 446:  Yeah.

MR. WILLIAMS:  Who are you thinking of when you wrote that down that you think in the system lie or spin the truth?

PROSPECTIVE JUROR 446:  What was the question again?

MR. WILLIAMS:  It asked you to list the three biggest problems you see in the criminal justice system, and you had a couple other ones which I want to talk to you about later.

PROSPECTIVE JUROR 446:  I guess I was mostly thinking about white-collar crime.

242

MR. WILLIAMS:  Okay.

PROSPECTIVE JUROR 446:  And how difficult it is to get evidence against someone who's willing to continually spin things.

MR. WILLIAMS:  Makes sense, especially with the latest headlines in the news and everything with Enron and so forth.

PROSPECTIVE JUROR 446:  Exactly.

MR. WILLIAMS:  And again, the reason I ask that is I just wanted to make sure that your views wasn't that you thought that -- and you wouldn't -- it wouldn't be the first time we heard that all lawyers lie or spin the truth or something like that that would affect your ability to be fair and impartial. And I take it from you, your thoughts on that, do you think that would impact your ability to be a fair juror in this case?

PROSPECTIVE JUROR 446:  No.

MR. WILLIAMS:  Very good.  Thank you.  If you could pass the microphone down to 666.

You work with Midwest Farmers Co-Op.
Page 41

PROSPECTIVE JUROR 666:  Uh-huh.

MR. WILLIAMS:  You've been doing that for a couple years.

PROSPECTIVE JUROR 666:  Yeah, at that company.  Well, eight years total.

MR. WILLIAMS:  Okay.  With another company before that you did the same type of work?

243

PROSPECTIVE JUROR 666:  Yeah.

MR. WILLIAMS:  And how do you like that?

PROSPECTIVE JUROR 666:  I like it.

MR. WILLIAMS:  Why?  What's the best part?

PROSPECTIVE JUROR 666:  You do a variety of things, you know.  You're outside, meet customers and, you know, typically with that job I always know I'm going to get home usually so . . .

MR. WILLIAMS:  Sure.

PROSPECTIVE JUROR 666:  You know.

MR. WILLIAMS:  As opposed to work late or something like that you mean?

PROSPECTIVE JUROR 666:  Well, it's a lot of overtime I'm saying, but, you know, I just -- versus like maybe driving a truck or something.  I get to be home every night.

MR. WILLIAMS:  Oh, I see.

PROSPECTIVE JUROR 666:  Yeah.

MR. WILLIAMS:  Sure.  If you could pass the microphone next to you to 139.

You've been working with Micro Tower Incorporated.  Is that for 20 years you've been doing the same job?

PROSPECTIVE JUROR 139:  Yes.  Well, I traded several

Page 42

places along the way, but it's a family business, so I'd come back.

MR. WILLIAMS: And you're a job foreman for that

244

company now?

PROSPECTIVE JUROR 139: Yes.

MR. WILLIAMS: Have you been in the foreman position for a while?

PROSPECTIVE JUROR 139: Probably half that.

MR. WILLIAMS: And do I understand this is putting up like towers for like cell phone --

PROSPECTIVE JUROR 139: Cell phone, radio, anything under 500 foot.

MR. WILLIAMS: And what's your range of -- radius of coverage here? Do you cover all of Iowa that you put these towers up, or do you go beyond the state --

PROSPECTIVE JUROR 139: Well, it's worldwide. I've been to Guam, Argentina. I'm scheduled to go back to Africa in May, but I don't know.

MR. WILLIAMS: Interesting. Now, at some point in your past you had a run-in with the law and some type of charge, but you indicated you were satisfied -- you thought the charges were justified and you were satisfied with the outcome of that. Is that something you're comfortable talking about in this setting, or would you rather do that when we bring you back?

PROSPECTIVE JUROR 139: I'd rather do that when I come in.

MR. WILLIAMS: Great. Now let me turn if I could then to some general concepts I want to discuss with you all. Judge

245

Page 43

indicated that there's several phases to -- potential phases to this trial, and so let me talk to you about the first phase, and that is the guilt phase or the phase of the trial where we're going to be determining -- you all are going to be determining whether the defendant is guilty or not guilty of the charges brought against her.

During that part of the trial you guys are really the judges in this case. Judge Bennett is still the judge of the law in this case, but you ultimately become the judges of the facts which require you to listen to witnesses, all of whom will appear in this witness box. You'll be required to review documents and look at objects and through all that try to determine what the truth is, what really happened, who's responsible for the crimes alleged and not necessarily who is but whether this defendant is responsible as charged for the crimes in this case.

First of all, part of that, as I said, is witnesses. You had an opportunity to look at this witness list that we handed out to you. Let me just ask you, does anybody in this panel recognize any of the names on this witness list? If so, please raise your hand. Yes, 677? Hang on. If you could, 139, could you pass that back?

PROSPECTIVE JUROR 677: Wayne Sidles of Waterloo.

MR. WILLIAMS: And how do you know Wayne Sidles?

PROSPECTIVE JUROR 677: He, I guess, is from the town

246

I live in now and is the best friend of one of our friends, and he was in the same wedding as my husband I guess, but I don't --

Page 44

I'm not really that good of friends. It's more acquaintance type.

MR. WILLIAMS: All right. First of all, anybody else on this list you recognize other than Wayne Sidles?

PROSPECTIVE JUROR 677: Huh-uh.

MR. WILLIAMS: Okay. Now, Wayne Sidles is a correctional officer with the Waterloo -- or I'm sorry, Black Hawk County Jail. He will be testifying in this case. If he appears in this box here and testifies, do you think the fact that you are an acquaintance of him, is that going to affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 677: I don't think so.

MR. WILLIAMS: Do you think you'd give his testimony any more weight than any other witness, or would you try like every other witness to see if it's corroborated by other facts, whether it was consistent and so forth?

PROSPECTIVE JUROR 677: Yeah, I would try to, like you said, be fair.

MR. WILLIAMS: Bottom line is -- and you're the judge. Do you think if Wayne Sidles is in this case as a witness that that's going to affect your ability to be a fair and impartial juror to both sides in this case?

PROSPECTIVE JUROR 677: Right. No.

247

MR. WILLIAMS: Very good. Any other juror recognize any other names on this witness list? Okay. I see no hands. Thank you very much.

Now, as I indicated and particularly just now with Juror 677, some of the witnesses are going to be law enforcement officers. Now, law enforcement officers come from all walks of

Page 45

life. And we know from reading the papers that some law enforcement officers are arrested and are prosecuted for crimes they commit while they're a law enforcement officer. They're humans. They're not infallible. They make mistakes.

The judge is going to instruct you as part of his instructions during this trial that you are not to give more weight to a law enforcement officer simply because of the position they hold, that you should evaluate their testimony like you would any other witness in this case.

Now, some jurors can't do that. Some jurors come at their life experiences with a view that law enforcement officers are different and can't judge them that way. And that's fine. But if so, we need to know that.

Does any juror here believe that simply because somebody's a law enforcement officer you're going to give more weight or credibility to that person because of their position? If so, you can just raise your hand. Okay. I don't see anybody there.

On the other spectrum of witnesses, we're going to

248

have people that are going to come in here in custody. They are inmates. They are going to be testifying having committed felony offenses in the past, and they are still going to be witnesses in this case.

Now, the judge will also instruct you with regard to those witnesses that you should look at those witnesses skeptically because of their background. You should consider the fact that they're in custody and consider the fact whether they're testifying because they anticipate getting something in exchange for their testimony, and he's going to help you with

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 215 of 3245

that instruction, recognize that's somebody you want to look at carefully.

At the same time, you're expected to at least listen to that testimony and consider that testimony taking into account their background. Is any juror here -- and again, some jurors just have the feeling that, boy, if somebody's in custody, I'm just not even going to listen to their testimony; they're automatically shut out for me; I don't trust them; I'm not going to listen to anything they have to say. And if so, that's fine. I just need to know if anybody feels that way about somebody who's been incarcerated or is currently incarcerated. And if so, just raise your hand. Okay. Don't see anybody.

Can everybody follow the instructions from the Court on those regard -- with regard to police officers and with

249

regard to somebody who has been incarcerated? Okay. Everybody looks like they say yes.

Now, we're here because a grand jury returned an indictment against the defendant in this case charging her with ten counts of murder. There have been five murders, and they're charged two different ways, so it's a total of ten counts. And so I want to talk to you about that.

First of all, an indictment is a charge. That's all it is. It's a method of charging somebody. And so simply because a grand jury has returned an indictment against the defendant is not a finding of guilt, and you should not attach any meaning to that other than it's a way of charging a defendant in the case. It's required actually by the United States Constitution.

Page 47

Right across the block here in the county courthouse, a county prosecutor can charge somebody with a felony offense without passing it by any other citizens. They can themselves review the evidence and determine there's probable cause to charge somebody and charge them.

The federal system back when our founding fathers set up this system years and years ago, they wanted -- if you're going to charge somebody with a federal offense, felony offense at the federal level, we have to run it by a group of citizens, between 16 and 23 citizens pulled in from the community like you all are that sit with us for a period of time, sometimes a year,

250

year and a half, and they listen to evidence. They listen to testimony. They have the power to subpoena documents and subpoena witnesses in.

And they have two jobs really. Their job is to help us investigate crime and then help us to determine if we get to that point if there's probable cause to believe that somebody's committed a felony offense and then ultimately pass on whether that indictment should be brought.

Because it's an investigatory body, the proceedings are secret. In other words, people aren't allowed into that room other than the people involved in the case, so the prosecutor, the witness, whoever that might be, a court reporter like Shelly, and then the grand jurors themselves. And the questioning is conducted in that setting and doesn't become public unless and until any charges are brought.

Now, first of all, do the jurors understand the basic concept of how the grand jury works in the first place? Does anybody not understand it? If so, raise your hand.

Page 48

And more importantly, what I want to get across here is that you need to understand that it is a process for bringing charges against a defendant. It is not evidence in and of itself of anything. It is the equivalent of a prosecutor in county court finding probable cause to believe somebody committed a crime only in this case we run some evidence by the grand jury. The grand jury doesn't hear all the evidence. They

251

don't hear closing arguments, opening statements. What it is is a presentation of evidence sufficient to establish probable cause to believe somebody's committed a crime.

Now, when jurors come in here and you realize that somebody's been charged with a crime, some people think, well, jeez, the defendant must be guilty because otherwise we wouldn't be here at this point. Obviously there must be something there. And that may be human nature.

What we need, though, is for people to recognize that the fact that Angela Johnson is in court here is not evidence of her guilt. Does everybody recognize that in this jury? Does anybody believe that simply because she's here that she automatically must be guilty of something? And that's fine if you do. Just raise your hand then, and we'll talk about it for a little bit. Okay. I don't see any hands going up.

Let me talk to you about another concept here. It's called the presumption of innocence. And it's a concept that we have in our judicial system that requires the jury to presume the defendant is innocent until and unless proven guilty by the government beyond a reasonable doubt.

The presumption of innocence stays with the defendant throughout the trial. So right now without any presentation of

Page 49

evidence, if you were asked to vote which would never happen but if you were asked to vote on her guilt or innocence, you'd have to vote not guilty because we've presented no evidence against

252

her at this point. She's presumed innocent.

Now, some people -- and again, this is not being judgmental at all. Some people just because of their life experiences or backgrounds come at it with the concept that I just can't buy into that premise; I just don't believe that; if she's here, if she's been charged, there must be something; she can't be presumed innocent. And if you feel that way, that's fine. But if you feel that way, we need to talk about it.

So does anybody on this panel feel that they can't provide the defendant in this case the presumption of innocence? Okay. I don't see any hands.

Let me talk to you about the burden of proof. I mentioned it. The burden of proof in this case the government has is to prove its case beyond a reasonable doubt. Beyond a reasonable doubt is a concept that ultimately we left for you to decide. It's not beyond all possible doubt. It's beyond a reasonable doubt. And the judge will give you some instructions to help you with that concept as we get on.

It's a higher burden than exists in civil cases. So if this was a case about a car wreck and who's responsible for a car wreck, the standard would be by a preponderance of the evidence. In other words, one side simply needs to show it's more likely than not that the other side was responsible for it. Proof beyond a reasonable doubt's different from that. The government has that burden.

253

Page 50

Now, again, because of background, some people come in thinking I think that's too high of a standard for the government; I think, you know, when we got a criminal case, it ought to be a lower standard than proof beyond a reasonable doubt.

On the other hand, some people think it should be higher than beyond a reasonable doubt; it should be 100 percent beyond all possible doubt or else we shouldn't be convicting anybody.

Either view is fine again, and you're entitled to that view. I just need to know from this jury, does anybody disagree with the concept of proof beyond a reasonable doubt, either thinks it's too low or too high? Anybody in this panel? Okay. I don't see any hands.

The defendant -- it's important for you to know -- has no burden of proof in this case. The defendant has no burden of doing anything in this case. The defendant doesn't have to give opening statements. The defendant doesn't have to cross-examine any of the witnesses that Mr. Miller and I put on the stand. The defendant doesn't have to give a closing argument. The defendant doesn't have to put on any evidence herself. And the presumption of innocence alone is sufficient for a jury to ultimately find the government hasn't proven its case beyond a reasonable doubt, and she doesn't have to prove her innocence.

Again, some people don't agree with that. Some people

254

think that if a defendant's brought into court they have an obligation to prove something themselves. They have to prove their innocence. They have to put on witnesses. They have to

Page 51

do something like that.

And if you feel that way, that's fine. You're entitled to those views. We just need to know if you feel that way, and we can talk about it for a little bit.

Does anybody here feel that now that we've brought the defendant into court and she's charged with a crime, by gosh, you're going to hold it against her if that team over there doesn't put on some evidence on her behalf? Does anybody feel that way? Okay. I don't see any heads indicating that way.

Part of that burden issue is the defendant has an absolute right, an absolute right, under the Fifth Amendment of the United States Constitution to not testify. It's her choice and her choice alone. I can't make her testify. Her attorneys can't make her testify. She has a right to testify if she wants to, but she has an absolute right guaranteed to her under the Fifth Amendment not to testify in this case if that's her choice.

And there can be a host of reasons why somebody might not testify. It has nothing to do with guilt or innocence. They can't speak well. They're nervous, whatever it may be. You can think of them yourselves. What's important, though, is that no juror would ever hold it against somebody to invoke

255

their Fifth Amendment right. That's a right that's there for everybody to have.

Now, I imagine in this group there are those of you who, if you were accused of a crime, you couldn't be held off the witness stand. You would want to get up there, tell your side of the story, protest your innocence, and you would definitely get on the stand. And that's fine. And you're

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 221 of 3245

entitled to have those views you'd do it yourself.

What's very important for the government as much as for the defendant in this case, though, is that despite what you may think you would do in a case that you wouldn't hold it against this defendant if she chose to invoke her constitutional right and not testify in this case.

So let me just ask you. Does any member of this jury feel that if you sat in this trial and you listened to the government's evidence that we put on and we went through all that evidence and we got to the point where we rested our case and the defendant didn't testify, do you think anybody here would hold that against her back in the jury room? And it's fine if you feel that way. Just let us know. We can talk about it for a little bit. Anybody here feel that way? Yes, 677.

PROSPECTIVE JUROR 677: I think honestly I would probably question why she wouldn't want to testify, you know, if she was not guilty. I think that's just being honest. I would try not to hold it against her, but honestly I probably would

256

wonder why.

MR. WILLIAMS: Sure. And it would be human nature to wonder, wouldn't it?

PROSPECTIVE JUROR 677: Uh-huh.

MR. WILLIAMS: It would be hard not to be thinking, you know, Mr. Williams mentioned nervousness and hard time speaking, and you'd be wondering, you know, I wonder if one of those factors, and that's fine. And that's human nature.

The judge will instruct you that in this case if the defendant doesn't testify you can't, you cannot, take that into account in determining her guilt or innocence in this case. And

Page 53

you can't even discuss it back in the jury room. You can't even speculate. You can't even talk about, jeez, I wonder why she didn't do it. Doesn't mean you have to erase your memory bank or erase your curiosity. It just means you have to be able to promise us and you have to be able to follow Judge Bennett's instructions that you're not going to allow that to enter into your thinking.

Now, if you're just thinking, gosh, I can't make that promise; I just know it will; I know it's going to affect me; I just know I'm going to hold it against her, that's fine, and we need that kind of open and honest answer.

But on the other hand, if you think you can follow that instruction, then we need to know that. So you tell us where do you think you fall on that?

257

PROSPECTIVE JUROR 677: I think I can follow that instruction to not hold it against her, but I just know that I'll probably, human nature, be kind of wondering about it.

MR. WILLIAMS: Can you put your wondering aside, do you think, as a juror?

PROSPECTIVE JUROR 677: I think I can.

MR. WILLIAMS: Recognize she has that right not to testify?

PROSPECTIVE JUROR 677: Uh-huh.

MR. WILLIAMS: Thank you.

THE COURT: Juror 677, I just wanted to give you my perspective on it. Mr. Williams got it exactly right. I'm still curious sometimes when a defendant doesn't testify, and I think that's natural. And sometimes I'll think, I wonder if it was this reason, I wonder if it was that reason. I wish I were

Page 54

a mouse in the corner when the defense lawyers and the defendant discussed the pros and cons just because I'm curious.

But I always then just set that aside because I know and I totally believe -- matter of fact, I actually believe that the Fifth Amendment right is the most precious right that all of us have and that to hold it against a defendant in any way because they exercise the constitutional right that we all have would be violating the United States Constitution. And so I'm sure you wouldn't want to intentionally violate the United States Constitution, would you?

258

PROSPECTIVE JUROR 677: Right.

THE COURT: Right. And I heard you say you think you could not hold it against her.

And I'll try and get that light out of your eyes. That's not working very well today. There we go.

Do you think that recognizing that if you did hold it against her in any way or let it affect your consideration of whether she's not guilty or guilty of any of the crimes that that would actually violate the Constitution? And I know you wouldn't want to do that. Do you think you could be positive you couldn't hold it against her or not? Maybe you can't be positive of that. That's fine if you can't be.

PROSPECTIVE JUROR 677: I can be positive. I think that I can.

THE COURT: So it's okay to be curious, and that's a natural human tendency, but we can't let that curiosity affect our judgment about whether she's not guilty or guilty of the crimes. Do you think you can do that?

PROSPECTIVE JUROR 677: I can.
Page 55

Case 3:09-cv-03064-MWB-LTS Document 284-70 Filed 06/23/11 Page 224 of 3245

THE COURT: You sure you can do it?

PROSPECTIVE JUROR 677: Yeah, I can.

THE COURT: Okay. Thank you. Excuse me for interrupting.

MR. WILLIAMS: Not at all, Your Honor.

So let me just kind of recap some things here about

259

the presumption of innocence. The defendant is presumed innocent. She has no burden to put on any evidence in this case. The government has and embraces that burden of putting on its case beyond a reasonable doubt. The defendant has an absolute constitutional right not to testify.

Now, we need jurors who are willing and able to give the defendant the full benefit of the presumption of innocence that incorporates all those concepts. If you can't do that, then part of being a good juror, part of being a good citizen is to say, you know what? I just can't. You know, I can't do that, and if anything, we'll respect you even more because of your honesty. But if everybody can do that, then that's what we're looking for.

So I need you to look in your own hearts, in your own minds. Does anybody here think that for any reason they can't give the defendant in this case the full benefit of the presumption of innocence? And if so, just raise your hand. I don't see any hands. Thank you.

The judge ultimately in this case is going to spend a long time providing you with instructions on the law and the concepts here. Let me talk to you just a little bit about this.

First of all, the defendant, as I indicated earlier, is charged with ten counts. Really it's five murders committed

Page 56

and charged in two different ways, but it's just five murders, five murders charged as in furtherance of a drug conspiracy, the

260

same five murders charged as part of a continuing criminal enterprise.

And the judge ultimately will instruct you as to what those mean and what parts -- you know, what it takes for the government to prove each of those charges. They're called elements, and they're kind of like factors. We have to prove certain factors to prove the defendant guilty in this case.

Now, first of all, the fact that the defendant's charged with ten counts in this case, does somebody think simply because there's ten counts, gosh, she's gotta be guilty of one of the ten or else we wouldn't have ten counts here? Does anybody feel that way at all? Okay. Does anybody have a concern that she's charged with the same five murders two different ways? Does anybody think, jeez, that's not fair; that's piling up or somehow that we shouldn't have charged her with the same five murders in furtherance of a conspiracy and the same five murders in furtherance of a continuing criminal enterprise, that somehow we've done something improper there? And if you do, that's fine. I just want to talk to you for a little bit.

PROSPECTIVE JUROR 446: Seems a little odd.

THE COURT: If you could pass that down to 446. I'm sorry? Your comment?

PROSPECTIVE JUROR 446: That seems a little strange to me. I don't know. It seems like if five is enough to convict

261

Page 57

you for life that that would be enough.

MR. WILLIAMS: Okay. And let's talk about that. As I indicated earlier, the judge is going to say there are certain factors that the government has to prove for each of these. What you're going to learn, factors are different. There are certain factors we have to prove to prove she committed these murders in furtherance of a drug conspiracy, and those factors are different from some of the factors we have to prove to prove that she was guilty of a continuing criminal enterprise and committing murders in furtherance of that.

Can you recognize that coming into a trial like this that there would be legitimate reasons for charging both of those recognizing that there may be some factors that the proof may be stronger on on some cases, stronger on the other ones and charging it both ways for that reason?

PROSPECTIVE JUROR 446: It seems like you would have to prosecute that as a separate case because what you present as evidence would be different and how would you -- I don't know. It seems -- how would you decide was that evidence for these first five or for the second five?

MR. WILLIAMS: And that's the wonderful thing about a jury. That's your job. Actually the evidence is the same. It's one set, one body of facts, and we're going to present it to you, and part of the jury's job is to determine whether she committed both crimes. They're the same five murders, but

262

they're five murders in furtherance of two -- in violation of two -- potentially in violation of two different crimes. That's her allegation.

Page 58

And so the jurors' job is going to be to take all those facts and look at the factors for this crime and find out if she violated that crime and look at the factors for this crime and determine if there's a violation of that crime as opposed to having two different trials presenting the same facts over again.

And so the bottom line is this: Would anybody in this jury hold it against the government for the fact that we charged this two different ways? Do you think -- does anybody think that that's going to impact your ability to be fair and impartial to the government in this case in evaluating the evidence that we charged it in two different manners? And if so, again, that's fine. We just want to talk about it for a little bit. Does anybody feel that way? And if so, just raise your hand. Okay.

One of the charges, as I indicated, was conspiracy, and the judge will give you instructions ultimately on what conspiracy means. But conspiracy in a simple term, in a simple concept is this: It's an agreement by two or more people to commit a crime. It's the agreement. It's the agreement, not the act, that is the crime.

Now, in this case the evidence is going to be that

263

there are acts that were carried out in furtherance of this agreement. But it's really an agreement by two or more people. And it's interesting. A conspiracy can be something that is ongoing, or it can be something that's very short. It can be a conspiracy between two or more people or people -- it can be more than two or more people. It can be 5, 10, 20 people. People can come and go from a conspiracy and still there's a

Page 59

conspiracy there as long as there's a core group of people all acting in furtherance of the same crime.

Let me give you an example of how a conspiracy might work. A couple years ago we had a flood over in Cedar Rapids, and my supervisor's house was flooded. His basement was flooded, and he frantically called up for people from the office to come out and give him a hand trying to put sandbags around his house and everything else to prevent it. And he called the office. He called his friends. Neighbors came over, and what happened is we all went down to the house to fight this flood, and a truck backed up with sandbags. And, you know, people just automatically formed a line, and we started passing sandbags down trying to create a barrier against it.

And it went on for a long time. Some people came later. Some people left earlier. They weren't there for the whole time. But if fighting a flood was a crime, we would have been guilty of being engaged in a conspiracy to fight a flood. We had an agreement. It wasn't express. We didn't sit down and

264

write it out. But we had an agreement implied by the way we acted together to fight this flood. We acted toward a common goal, and that was to fight a flood.

Now, people came and left from this group, and yet we had a core group that kept doing it, kept fighting the flood. And so an agreement like that, a conspiracy, is simply an agreement by a group of people to act in furtherance of a crime that memberships of which can come and go.

Does anybody feel that a conspiracy, an agreement to commit a crime, shouldn't itself be a crime at all? And it's fine if you do. I just need to know if anybody feels that way.

Page 60

Does anybody have difficulty with the concept that people can come and go from a conspiracy and it doesn't take away the conspiracy that exists?

Does anybody think that a conspiracy ought to be the same group of people from the beginning to the very end without any additions or subtractions from that group of people to be a conspiracy? Okay. Don't see any hands there.

Let me ask you this. The judge mentioned taxes, and periodically in the juries that I try cases in front of, we have citizens who have had difficulties with the government, and frequently if there's a problem, it's with the area of taxes.

Does anybody here, has anybody here, had any serious difficulties with the federal government over regulations, over taxes, over anything like that in the past that you think would

265

impact you in this case?

First of all, has anybody had that type of serious difficulties with the government at all, with the federal government? Okay. I don't see any hands.

All right. Let me turn now if I can to the next phases of the trial that we are likely -- or may have in this case we have to talk about now. And you should not in any way presume anything from this. This is our one chance and only chance to talk to you as jurors, and so simply because I'm going to talk to you about the penalty phase, don't derive any meaning from that. Don't think that somehow the defendant's guilty because I'm going to talk to you about the penalty phase, but I want to talk to you about a general concept of the penalties, and then ultimately we're going to bring you back and ask individual questions of you, but I want to cover some general

Page 61

concepts, at least talk about that; all right?

THE COURT: Mr. Williams, before you do that, would now be a good time for the break?

MR. WILLIAMS: Sure, Your Honor.

THE COURT: Okay. Members of the jury, it's ten o'clock. We'll take a 20-minute recess until 20 after. That's kind of the clock we use. It's an atomic clock. It sends out a signal. It's supposed to be exactly accurate. Otherwise every clock in the courthouse has a different time on it. So we'll meet you back here at 10:20, and please remember not to discuss

266

this case among yourselves or talk to anybody else about this case. Thank you. See you back here at 10:20.

(Panel B exited the courtroom.)

THE COURT: Anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: We have a couple legal matters, but they don't need to be taken up right now unless you'd like to, sir.

THE COURT: Okay. Why don't we.

MR. BERRIGAN: The defense did not make a contemporaneous objection. I want to point out the obvious, but it's our very strong position that the prosecution is not in a position to be able to legitimately discuss the defendant's Fifth Amendment right not to testify.

As the Court knows, that's a very fluid concept despite some pronouncements of counsel yesterday, particularly Mr. Willett, on this particular subject. And it can change, and if it were to change, certainly it would not be appropriate for the prosecution in our view to discuss it because, frankly, the

Page 62

defendant has the prerogative of not discussing it at all.

There is some concern sometimes when jurors are told of this concept that they will hold it against the defendant. Many lawyers choose not -- even when offered the chance to submit an instruction on this issue choose not to do it for that very reason, and I'm sure the Court's probably had that

267

experience. It's an area of the law and an area for discussion with the jurors that we think, frankly, may be the only one that's solely within the purview of the defense.

THE COURT: Do you have any authority for that?

MR. BERRIGAN: I don't with me, Your Honor.

THE COURT: I can't imagine there is.

MR. BERRIGAN: Well, that's our position. I just wanted to --

THE COURT: I appreciate you making your record on that.

MR. BERRIGAN: Certainly that's been my own personal experience, very few experiences in federal court.

The other thing is really a minor matter, but I wanted to point it out because I think it's very much inadvertent and something easily corrected.

The parties and the Court have occasionally used the term "guilt phase" to discuss the first phase of the trial. And although I'm not sure whether that's innocuous, there's certainly a suggestion in the term that that's what's going to happen.

THE COURT: Except it's immediately -- when I've used it I've -- immediately the next phrase is the guilt phase which means to determine whether the defendant is not guilty which I

Page 63

always say first.

MR. BERRIGAN: Yes, and I don't question that for a

moment.

THE COURT: And we use the phrase in the instructions.

MR. BERRIGAN: We may, Your Honor. I don't know that the instructions have been submitted yet, but certainly it's going to be our effort to change that to the "first phase of the trial" which we think is a very innocuous subject. We don't call it the "innocence phase" or the "not-guilty phase," so why call it the "guilt phase"?

THE COURT: Yeah, I don't have a problem with -- how about the "not-guilty/guilty phase" or the "merits phase"?

MR. BERRIGAN: The merits phase or the first phase.

THE COURT: First phase, okay. I will make my best efforts not to use the guilt phase.

MR. BERRIGAN: Thank you. I appreciate it.

THE COURT: It's a subtle thing, but I understand.

MR. BERRIGAN: It's very subtle.

THE COURT: And I think it's so easy to pick a neutral phrase to describe that that perhaps the guilt phase isn't the most artful way to do it.

MR. BERRIGAN: Thank you, sir.

THE COURT: And not the most neutral way to do it.

MR. BERRIGAN: I believe that's all we have.

THE COURT: Okay. Government want to respond?

MR. WILLIAMS: Your Honor, we have no problem with referring to it as the merits phase.

With regard to not talking about the Fifth Amendment right, I'm not aware of any authority that would prohibit us, and I think I have a duty as an officer of the Court to make sure that a juror's not going to hold it against the defendant if she does not testify. I made it very clear I did not, as Mr. Willett did yesterday, make the statement that she was not going to testify. I don't know that. That's her choice. I made it very clear to the jury that she may or may not.

But I think as an officer of the Court I have a duty to make sure that some juror's not going to sit there without even talking about the subject and then find out after the fact that because the defendant didn't testify they held that against her and talked about it in the jury room.

And I think it would be -- I think it would be a very bad jury selection for nobody to talk about it and to simply leave it to counsel on defense to maybe or maybe not bring it up and run that risk. And I don't think it's just incumbent upon the defendant. I think as an officer of the Court I have that duty as well.

THE COURT: Well, I guess, Mr. Berrigan, under your view it's been inappropriate the hundreds of times I've brought it up because I always bring it up in jury selection.

MR. BERRIGAN: That would be my view, that not even the Court can make that decision, and by suggesting to the jurors that this is actually an issue under discussion,

270

Mr. Williams himself mentioned "I can't force her to testify" as if that were a legitimate consideration for the jurors. It is not. That's not something they should even be thinking about.

This particular issue is solely the purview of the
Page 65

defendant. And if she chooses not to mention it, frankly, for fear that jurors would hold it against her, she could choose to do that in my view, sir. And again, I don't have any ready authority for that position certainly, but that's been my experience in the 20 years of practice.

THE COURT: I mean, you've never had a judge bring up in jury selection the defendant's Fifth Amendment right?

MR. BERRIGAN: Never once, sir. Never once.

THE COURT: Well, I've done it in every single case since I've been an Article III judge.

MR. BERRIGAN: Obviously this is our first time together.

THE COURT: This is the first time I've ever had an objection. Matter of fact, the lawyers have encouraged me bring it up. They'd rather have me bring it up.

MR. BERRIGAN: Frankly, I'd rather have you bring it up rather than the prosecutor there because I think the Court does a much better job of it, not to be critical of Mr. Williams.

THE COURT: I think he did a nice job. What is it -- I realize it would be totally inappropriate for Mr. Williams to

271

have said, Well, yesterday Mr. Willett said Miss Johnson isn't going to testify, and you need to know that. I mean, that would have been inappropriate. He totally stayed away from it. But . . .

MR. BERRIGAN: It's very akin -- if you'll allow me, Your Honor, it's somewhat akin to talking to police officers during direct examination about the defendant not making a statement. We think that's improper. It's a constitutional
Page 66

right the defendant has, but that doesn't mean the jurors get to hear about it because there's a fear that, well, they might think they should have, that defendant should have made a statement on this topic as well.

It's a decision the defense has to make in my view about whether to address this with the jurors. And sometimes defendants choose not to address it at all hoping it's not a subject that's discussed, the jurors won't think about it. Now, that may be a very naive position and in my mind probably is.

THE COURT: And it's certainly a position that's contrary to what Mr. Willett did yesterday.

MR. BERRIGAN: Well, if you don't -- frankly, if we don't ask for the instruction at the instruction conference, I don't know what authority there would be for the Court to give it, and I don't know why if you can't give an instruction unless we request it we can force a discussion during voir dire unless we request it. I think there's an analogous consideration, so

272

I'm just asking the Court --

THE COURT: And that wasn't lost on me.

MR. BERRIGAN: Thank you, sir.

THE COURT: I realize that in the final instruction it's the defendant's choice whether to have that in the instruction. And that's what -- that's the only thing that makes your argument something for me to consider. I'd like to think about it a little bit more. I mean, I understood why Mr. Williams did it, and I think he was motivated by really the purest motives.

MR. BERRIGAN: I don't question his motives, sir. And he apparently is used to this as well. But I was shocked, to be

Page 67

honest. I've never seen it done because I have had that experience that that's been --

THE COURT: Why is it different than any other right like cross-examination, for example?

MR. BERRIGAN: Well, because it's a right unique to the defendant. That is the decision --

THE COURT: So is the Sixth Amendment right to cross-examine the government witnesses. That's unique to the defendant.

MR. BERRIGAN: No, it's not unique to this defendant. I mean, that's a right that all defendants have.

THE COURT: But so is the Fifth Amendment right that all defendants have.

273

MR. BERRIGAN: But the decision is unique to this defendant.

THE COURT: Well, the decision to cross-examine a witness belongs to each individual defendant.

MR. BERRIGAN: Yeah, but there's no inherent prejudice that results, not in the same way that choosing not to take the witness stand might create a prejudice.

THE COURT: Sure there is. Jurors might wonder why aren't they cross-examining any witnesses because they have a right not to. They have a right to, and they have a right not to. Same thing with testifying.

MR. BERRIGAN: Sure.

THE COURT: They have a right to, and they have a right not to. It's an individual right that belongs to the defendant. How is it any different?

MR. BERRIGAN: Well, with all due respect, sir, based

Page 68

on the answers you've already heard when jurors express concern about why wouldn't the defendant say something in her own defense, I've never heard people say that necessarily about cross-examination. We choose not to cross-examine frequently because the witness didn't hurt us, there's nothing to ask them about. That wasn't a bad witness. We don't really care what they had to say. Why get up there? And that's going to happen I suspect during this trial. And if we're concerned about it, we'll address it, but you're not. You haven't heard it raised

274

in voir dire.

But this is an issue again -- and I think the instructions are instructive, frankly, on this point. There are few instructions I think that fall into this category, and I think --

THE COURT: Let me ask you this. How is there any prej -- I mean, assuming that you would do it the same way yesterday -- today as you did yesterday, that is, raise the issue, or are you telling me you're not going to raise the issue?

MR. BERRIGAN: Well, I can't, of course, divulge that, Your Honor, because Miss Johnson could at any moment say --

THE COURT: No, no, no, I'm not talking -- I'm talking in jury selection you're going to raise the issue with the jurors.

MR. BERRIGAN: Yeah, I suspect we would raise the issue, but we could change our mind. I mean, that's the whole thing about this as you point out. Miss Johnson could turn around during this break and say, I'm going to testify, and there isn't anybody in this room that could prevent that

Page 69

including me or Mr. Willett or Mr. Stowers.

And so if we tell the jurors she's not going to testify, we've taken that on ourselves based on our -- obviously our privileged communications with her. Nobody else is in a position to be able to do that.

275

THE COURT: And I understand that, and that's why it would be inappropriate for Mr. Williams to have said that which he didn't say. He didn't bring up the fact that counsel said yesterday she wasn't going to testify.

MR. BERRIGAN: My only point is if Miss Johnson chose not to testify, nobody at defense counsel table has to say a word about it. We don't have to say anything in voir dire if we choose not to, and we don't have to ask for an instruction, and we might even hope, if nobody said anything about it, the jurors wouldn't consider that adversely to her. And that might be a naive presumption, but it's one we could advance if we chose to. We'd be within I think the legal strategy of the defense to do it, and it is frequently done, frankly. So that's about as much --

THE COURT: What's frequently done?

MR. BERRIGAN: Lawyers choose not to bring this issue back up in front of jurors. Sometimes they don't bring it up at all. Their client's not going to testify, or maybe the decision's not made at the time of the beginning of the voir dire. They don't address it in voir dire because maybe they don't know what's going to happen. And even if the defendant doesn't testify, they sometimes choose not to ask for the instruction because they think it gives undue emphasis to the fact the defendant did not testify. And despite the clear words

Page 70

of the instruction that the jurors are reminded that if the

defendant didn't testify in the instruction, they might not be able to follow that particularly if it wasn't covered earlier.

MR. WILLIAMS: Judge, just so I can weigh in on this, we have -- number one, I don't think there's any prejudice given that the defense themselves brought up this issue yesterday. So I don't understand it. I understand it from the standpoint that it's a tactical decision on their part. They think -- maybe they think it's better for them to raise it and not the government to raise it just from the perspective of the views of the jurors. I understand it's a trial tactic. We have no problem with that.

If the defense thinks that we shouldn't be bringing this up from now on, I'm not going to bring it up. We do reserve the right that if they bring it up during jury selection themselves and they are now challenging jurors on that issue to conduct rebuttal voir dire for the purpose of exploring that issue a little bit more.

But if they think that somehow it's improper for the government to bring it up, that's fine. I think the record is made that they're prohibiting us from bringing it up and they are waiving -- if they do not bring it up, they are waiving any error down the road that if we get a juror on this case that's going to hold it against the defendant for not testifying that they've barred us from inquiring into that and they've waived any error in that regard. But we have no problem not bringing

this up from here on out if they think it's an issue.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  Yes, sir.

THE COURT:  I think you're dead wrong, but even if you're right, are you open to the possibility that it actually might have more impact on the jury and it might be more favorable to you and your client for the government lawyers to raise the issue rather than for you to raise the issue?  Do you understand reasons why that might actually -- I think it's better if I raise it which is why I do.  And you're free to disagree, and I think you probably do.  But just from sitting up at the bench, it has much more -- it's much more favorable to the defense for him to raise it than for you to raise it.  And I guess you don't see that.

MR. BERRIGAN:  No, I would respectfully disagree all together, although I've only seen it once, Your Honor.  It's just this one time, so I probably don't have a good basis of knowledge to go on.  But when Mr. Williams gets to say, I don't get to call the defendant to the witness stand, that troubles me a great deal.

So I do not think the way it was done today benefits my client in the least as compared to the defense bringing it up if we choose to or asking the Court to do it.  Either of those two alternatives would be preferable, but I do think the choice is uniquely ours.

278

THE COURT:  There's no authority for that.

MR. BERRIGAN:  Again, I think we've addressed this.  I don't have any case law.  We'll rely on the defendant's Fifth and Sixth Amendment rights.

Page 72

THE COURT: Well, Mr. Williams has voluntarily agreed not to raise it. You haven't asked for any relief.

MR. BERRIGAN: Well, I think we failed to make a contemporaneous objection, Your Honor.

THE COURT: Well, I understand you did. Was there any reason why you didn't make an objection?

MR. BERRIGAN: Only because I suspect that the rules are that the lawyers shouldn't be double teaming on objections, and I didn't have a chance to confer with Mr. Willett on this subject in a --

THE COURT: Well, but you're both going to be doing voir dire today, so there's no . . .

MR. BERRIGAN: We are, except I'm doing the individual voir dire, and he's doing the group voir dire, and obviously this was a group voir dire situation. So we didn't get that done in time, sir. And if I could confer with my colleagues over the break, short break, we'll be better prepared to address a remedy if at all we request one.

THE COURT: Well, you're the one that made the objection. You didn't request a remedy.

MR. BERRIGAN: All right, sir. Well, at this time

279

then I'll request that the Court consider striking the entire panel based on what the defense believes was an inappropriate discussion of the defendant's Fifth Amendment rights by the government attorneys.

THE COURT: You're untimely.

MR. BERRIGAN: I already acknowledged that, sir.

THE COURT: Well, you're doubly untimely. You didn't make an objection. You didn't make a contemporaneous objection.

Page 73

When you did object late, you didn't ask for any remedy until I asked you if you were asking for a remedy. And then you don't have any reason why you didn't ask for a remedy earlier.

MR. BERRIGAN: None other than what I've already stated, Your Honor.

THE COURT: Mr. Williams?

MR. WILLIAMS: With leave of Court, could I think about this for a moment?

THE COURT: Sure.

MR. WILLIAMS: I don't want to risk having this be the one issue on appeal that I have to deal with years from now.

THE COURT: There will be so many more issues, don't even think about it. We're just getting started.

MR. WILLIAMS: I recognize that, but I certainly don't want to add to my list of issues that I have to brief. If I could think about this and discuss it with counsel, if I really think there's some authority for this and that's the relief

280

they're asking, we may acquiesce in it. But let me -- can I have some time over the short break to think about it?

THE COURT: Sure, sure. Looks like our break time is up. You want me to tell the jury --

MR. WILLIAMS: Take me two minutes.

THE COURT: Well, why don't we take an additional ten minutes. Would you let the jury know? Thank you.

(Recess at 10:18 a.m.)

THE COURT: Please be seated. There's just -- you know, the analogy that Mr. Berrigan raises is actually a pretty poor one, although it's the only one that I can think of, and it was the first one that I thought of. But there's a huge

Page 74

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 243 of 3245

difference between at the end of the case when a defendant does not testify that whether or not that should be in the jury instruction belongs to the defense from the proposition of discussing in general what the rights are that a defendant has in a trial towards the purpose of trying to find jurors who can be fair and impartial.

And I'm confident that I can raise it, the government can raise it, the defense can raise it. And there's absolutely no possible prejudice to a defendant by my raising it or by the government raising it. There's no contrary authority that I know of. What authority that we were able to find quickly just confirms what I just said. And so, you know, I don't know what your position is.

281

MR. WILLIAMS: My position's the same, Your Honor. Obviously we didn't have a lot of time to do the research on this any more than you did, but my assessment is the same as yours. I don't think there's any constitutional violation, and we would oppose the defendant's motion to strike the panel.

THE COURT: Mr. Berrigan, anything else you want to add?

MR. BERRIGAN: Only just briefly, Your Honor. We appreciate the Court having given us these two cases for the record.

THE COURT: Is your microphone on?

MR. BERRIGAN: No, sir. We appreciate the Court having given us these two cases one of which is Carter versus R.C. Lee. It's a Westlaw opinion from the Fourth Circuit, Case Number 99-10, 202 Fed. 3d 257. And the other opinion is United States versus -- excuse me, Green versus Johnson which is an

Page 75

opinion from the Fifth Circuit, 1998, 160 Fed. 3d 1029.

The only thing I wanted to point out to the Court is that certainly in the Carter case the court says the following in citing to a Supreme Court decision, Lakeside versus Oregon 435 U.S. 333, specifically at page 338, 1978. The Supreme Court has noted it is clear from even a cursory review of the facts and the square holding of the Griffin case that the court there was concerned only with the adverse comment, whether by the prosecutor or the trial judge.

282

We think the question that distinguishes perhaps the discussion in this case from that had here today in voir dire was Mr. Williams telling the jurors that he can't call Angela Johnson as a witness in the case. That obvious adverse inference from our perspective is that he'd like to do that because it would help him establish her guilt.

And so unlike the situation in these cases where their comment seemed a fairly innocuous description of the Fifth Amendment right, we think Mr. Williams went further than the prosecutors did in the two cases the Court has provided us, and we renew our motion to quash the panel at this time.

THE COURT: Your untimely motion to quash the panel at this time.

Mr. Williams, anything you want to add?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: I understood his statement as just an explanation that nobody has the power to call the defendant as a witness including the defense lawyers, the government lawyers, the judge, or anybody unless the defendant wants to testify. I mean, I don't think there's any authority for your proposition.

Page 76

I think it's perfectly permissible voir dire. I'm not even going to say the government can't do it Friday when you're up. You may want to voluntarily not do it. But I don't see the argument at all. I don't think it has any merit. I just don't see it.

283

So it's untimely. The objection could have been made timely. It wasn't. When the objection was made, there was no request for a remedy. That was untimely. It wasn't until I asked you, so I think it's untimely.

I think there's no merit to the argument. And I think in light of one potential juror having been told by the defense that the defendant is clearly not going to testify in the case that, you know, even if there could have been error, which there isn't, it's harmless beyond a reasonable doubt in my view. So let's have the jury brought in.

(Panel B entered the courtroom.)

THE COURT: Thank you. Please be seated. Sorry for the delay. We were actually working. Remember when I told you that things come up in trials that we didn't anticipate? We just had one of those experiences, the first of many I'm sure.

Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

We're back after the break, ladies and gentlemen, and I was just before we took the break talking about the penalty phase. We got through the merits phase, the first part of the case we talked about. And we're talking about this penalty phase -- and again I want to emphasize you should not infer from that in any way that the defendant's guilty. But we only have one chance to talk with you, and that's now. And so by

Page 77

necessity we have to talk with you about views of -- your views

284

on the penalty before we even get to that point. We may never get to that point, and you need to all recognize that.

Now, I just want to cover some general concepts with you before we bring you back up and talk to you individually. So let me just kind of go back over a little bit what the judge explained to you.

The penalty phase in this case is going to have really two parts. Assuming that the jury finds the defendant guilty of any of the ten counts, we would be back again before you. The parties will have an opportunity then to argue to you about whether the government through the evidence that it presented also established the existence of two or more aggravating factors or factors that make this a case in which the jury's allowed to even consider the death penalty.

After we're done arguing to you about what the evidence showed, you all would go back. You would deliberate and determine whether, in fact, we proved those aggravating factors beyond a reasonable doubt.

If the jury came back and said that we did not prove those beyond a reasonable doubt, there would be no more trial. The case would be over at that point, and you would not have an opportunity to evaluate whether the defendant should or should not receive the death penalty.

If, on the other hand, the jury came back and unanimously found that the government had proved the existence

285

of those aggravating factors beyond a reasonable doubt, at that
Page 78

point we do go into another mini trial, if you will. In that instance it doesn't mean that you have to impose the death penalty. You never will have to impose the death penalty.

But what that does mean is if you find those factors, it means that the jury would be entitled to consider the possibility of the death penalty as a punishment in this case. Does everybody understand essentially what the first part of the penalty phase would encompass? Okay. I don't see anybody indicating that you're confused by that.

So let's say we get to that point. You have found the defendant guilty of one or more of the counts. We've had you go back. You've deliberated on the gateway aggravating factors, and you found those sufficient to consider the death penalty as an option.

At that point the government would put on additional evidence of additional aggravating factors, additional facts that you haven't heard, additional evidence that we would argue would suggest the defendant should receive the death penalty.

The defense can but has no obligation to put on evidence of mitigating factors, factors that they would suggest doesn't require or would suggest life in prison would be the more appropriate punishment.

Now, you all need to understand that life in prison without parole in the federal system means just that. If

286

somebody is sentenced on that sentence, there is no parole in the federal system. They would be in jail for the rest of their life.

During this penalty phase, the second part of the penalty phase, when the government would put on evidence of

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 248 of 3245

additional aggravating factors, we still have the burden of proving those factors to you beyond a reasonable doubt. And for the jury to find the existence of those factors, just like in the guilt phase, you would have to find those unanimously, that we did, in fact, prove those aggravating factors beyond a reasonable doubt before you could consider them.

Mitigating factors are a little bit different. If the defendant chooses to put on evidence of mitigating factors, the burden of proof there is only by a preponderance of the evidence, and a single individual juror could find a mitigating factor. And if any single juror finds that a mitigating factor was established by the defense, then the entire panel can, if they want to, consider that mitigating factor in their weighing decision.

Ultimately, when you all would go back down to the jury room after hearing the evidence in the case, your job would be this. It would be to weigh all of the aggravating factors and any mitigating factors that may exist and to compare them.

It's not a numbers game. It's not whether the government proved 5 or 10 aggravating factors versus 2 or 3

287

mitigating or the defense proved 10 or 12 mitigating factors, the government 2 or 3 aggravating factors. It's a weighing process that you would conduct based on your judgment of how much weight you would give to any one of those factors. You may find a single factor, an aggravating factor, outweighs all the mitigating factors or vice versa. You may find a single mitigating factor was so important that it outweighed any of the government's aggravating factors.

It's an individual judgment by the jurors. Each one

Page 80

of you would be able to make that determination on your own and on what you thought of the weight to be given to those factors.

What we're looking for is a group of jurors who are willing to wait to hear the evidence during the aggravate -- or during the penalty phase if we get that far and are willing to keep an open mind that you haven't at this point already decided that, you know, I could never impose the death penalty or, jeez, if I find the defendant guilty, I will always impose the death penalty, that you're willing to listen to all of the evidence and you're willing to go back in the jury room and weigh all of that and consider both options.

Now, when we bring you back up here, we're going to be talking to you about whether, in fact, you can do that. Some people can consider both options. Some people can't. And that's going to be one of the things we're going to want to be talking to you about.

288

Does anybody have any difficulty understanding now how the penalty phase is going to work in this case if we get that far? And if so, raise your hand.

Okay. I don't see any. Thank you, Your Honor. I have no further questions.

THE COURT: Okay. Thank you, Mr. Williams.

Mr. Willett?

MR. WILLETT: Thank you, Your Honor. If it please the Court, I would go first. Your Honor, if it please the Court, counsel for the government, counsel for the defense, Miss Johnson.

Good morning, ladies and gentlemen. I introduced myself briefly this morning, but I'm still Al Willett, and I'm

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 250 of 3245

one of the attorneys who are defending Ms. Johnson in this case.

There's five concepts I'd like to discuss with you. The Court has mentioned some things in passing. Mr. Williams has touched upon some concepts with you, but I'd like to explore them a little further.

As a young lawyer, I realized one very quick truth, that when you're selecting a jury, you want to make sure you talk to everybody. And I'm going to endeavor to make sure that in the time I have here I can at least sit down and say, you know, I had a conversation with the eight people in front of me about at least some of the five issues I wanted to discuss with them.

289

Now then, the first thing I'd like to talk to you about is the number of counts. You heard Chief Judge Bennett mention in passing that there are ten criminal counts facing Ms. Johnson. You heard Mr. Williams describe in more detail that those ten counts involve two different theories of the law, of criminal law, one being a conspiracy which Mr. Williams articulated to you, and the other theory is called a continuing criminal enterprise.

Now, even for somebody like me who's been doing federal criminal defense work since 1989 -- this is my 27th federal criminal jury trial -- I'm not going to show you the limits of my intellectual ability by trying to articulate for you what a continuing criminal enterprise is. I will leave this to Chief Judge Bennett who will do it very ably at the appropriate time in the case.

But those are the two theories, and as Mr. Williams has articulated, the five murders that are driving this case are

attached to each theory.

But this is my concern: Ten different counts, ten different counts. And what Judge Bennett will explain to you later is that if you're a part of this jury, when you deliberate, each count has to be considered separately and independently from your decision about the next count. But it's still ten counts.

Now, in my mind, ten is a big number. This isn't just

290

one criminal count. This isn't just five criminal counts involving the five murders. There's ten counts. So for this case to end at the end of the merits phase, I have to hear -- along with the rest of the participants in this courtroom, I have to hear not guilty said ten times in a row for the trial to conclude at that stage.

Now then, this is my concern. If there's ten counts, I am concerned that maybe one of you or more of you is thinking, well, gee, Mr. Willett, if there's ten counts, isn't she at least guilty of one of them? Now, I have that concern.

Juror 222, do you have that concern? Should I -- and could we pass the microphone -- I'm sorry -- to Juror 222? I have that concern being a defense lawyer. Do you have that concern that if Miss Johnson is facing ten different counts that, gee, Mr. Willett, isn't she guilty of something or one of them or two of them? I see you smiling.

PROSPECTIVE JUROR 222: Not necessarily, no.

MR. WILLETT: Not necessarily.

PROSPECTIVE JUROR 222: Not necessarily, no.

MR. WILLETT: When you say not necessarily, no, that could be a qualifier, and I want to make sure I don't just leave

Page 83

you to the next person. Do you have any question, hesitation about that or concern about that?

PROSPECTIVE JUROR 222: In what I heard today so far, I'm beginning to realize it's an overall process that's going to

291

require listening from beginning to end before you can make any judgments.

MR. WILLETT: Would you be kind enough to pass the microphone to Juror 430, the lady sitting next to you?

Ms. 430 -- and first of all, I know it's sort of awkward to refer to somebody by a number, but Judge Bennett has explained to you the purpose of that, so if you will -- you know, obviously we're doing that for a reason.

But, Miss 430, I'm concerned maybe there's somebody sitting here in these 8 people in front of me that, you know, this volume theory, Mr. Willett, there's 10 counts, isn't she guilty of something here? Do you have that concern, Miss 430?

PROSPECTIVE JUROR 430: As far as myself goes, no, I don't. I'd be willing to listen to every bit of testimony and evidence or anything else you guys want to bring to the table, so on.

MR. WILLETT: Be so kind if you will to pass the microphone down to Miss 508.

PROSPECTIVE JUROR 508: No. At this point I do not have any judgmental facts provided.

MR. WILLETT: Good. Now then, what I touched upon just a minute or so ago that when the jury retires to deliberate you will treat each count separately, in other words, when you get down -- get done deliberating on Count 1 and you've reached a verdict, you'll set that aside and completely and

Page 84

independently turn your attention to Count 2.  Will that pose a problem for you, or will you be thinking, well, you know, this is what we did in Count 1; can't we just roll this over and get this thing moving here?

PROSPECTIVE JUROR 508:  No.  I will honestly view each fact or case independently.

MR. WILLETT:  Okay.  Would you please pass the microphone to Mr. 446.

PROSPECTIVE JUROR 446:  I think I can paraphrase what you're saying is that if you put four guilty on the first charge or less than half and less than half on the second charge, that doesn't -- you can't total that up and say, oh, she must be guilty of one.

MR. WILLETT:  And I think we're on the same page.  I want to make sure we're looking at this from the same point of view.  What I'm saying is, first of all, I want to make sure that you don't have any concerns that, Mr. Willett, ten counts is a big number, and isn't she going to be guilty of at least -- of one or a few or some of these ten?  Do you have that -- should I be concerned about that with you, sir?

PROSPECTIVE JUROR 446:  No.

MR. WILLETT:  Okay.  And then the second point I was trying to make -- and Miss 508 correctly articulated back to me what I was looking for is let's say you retire to the jury room and you get done deliberating over -- we'll just pick a count,

Count 2.  I want to make sure that whatever your verdict is you

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 254 of 3245

completely set aside that verdict to turn your attention to Count 3.

PROSPECTIVE JUROR 446:  Uh-huh.

MR. WILLETT:  And that that will be decided by you independently.  Just because Mr. Williams has styled this indictment in two theories, I'm concerned that there won't be, well, if this theory on this count was guilty, we can just run through the next four, and then we'll turn our attention to Count 6 which discusses a new theory.  Do you see what I'm saying?

PROSPECTIVE JUROR 446:  Uh-huh.

MR. WILLETT:  And is that a yes?  We have to answer audibly for our court reporter.  I'm sorry.  If you say uh-huh or huh-uh --

PROSPECTIVE JUROR 446:  Yes.

MR. WILLETT:  Thank you very much.  I'm sorry.  Would you please pass the microphone to Juror 666.

PROSPECTIVE JUROR 666:  Yes, I would keep every count separate.

MR. WILLETT:  Okay.  And you understand what I'm saying is that regardless of what the verdict is for the first count, there won't be sort of this --

PROSPECTIVE JUROR 446:  Don't keep rolling it over. Yeah, I understand.

294

MR. WILLETT:  Correct.  Thank you so very much.

The undertone to this entire case is methamphetamine; okay?  Obviously the main thing that's driving this case is the murder of five individuals.  But the undertone to this case is methamphetamine.  And when I tell you that my client has been

Page 86

charged with five counts of conspiracy involving either the distribution of or the manufacture of methamphetamine, what are your initial thoughts? And if you will, Mr. 666, I'm going to ask you to pass the microphone back to Miss 222 in the back row.

PROSPECTIVE JUROR 222: Would you say that again?

MR. WILLETT: Yes, ma'am. When I tell you that my client has been charged with drug crimes involving methamphetamine, what is your initial reaction, just that methamphetamine was involved? How does that strike you? Do you react favor -- do you react neutrally, adversely, with an open mind, favorably? I mean, just . . .

PROSPECTIVE JUROR 222: I actually don't have a reaction.

MR. WILLETT: Okay. Okay. Well, let me tell you where I'm coming from. You were very candid in your questionnaire, and you were very candid earlier this morning that -- and if I'm remembering correctly, you had used an illegal substance prior in your life.

PROSPECTIVE JUROR 222: Yes.

MR. WILLETT: Now, ma'am, first of all, I want to

295

congratulate you for your strength of character because I have represented and defended many individuals associated with that drug, and I have a very keen understanding of what that drug can do. So I want to congratulate you for your strength of character and your candor.

But my concern is how will Miss 222 react to the fact that now we're talking about methamphetamine? And I think it's fair to say that we've heard a lot about methamphetamine in this state and what it can do and the impact it has on people and the

Page 87

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 256 of 3245

cost it has not only on society but on the criminal justice system. And now I'm thinking, do I need to be concerned about Miss 222 and how she might feel about this based upon her own personal history that she brings to this case?

PROSPECTIVE JUROR 222: No.

MR. WILLETT: Okay. I can certainly be satisfied with no, but, I mean, do you need to elaborate on that answer for me at all or explain that for me at all? Is no going to suffice?

PROSPECTIVE JUROR 222: I think no suffices.

MR. WILLETT: Okay. Thank you so very much. Would you pass the microphone down to Mr. 513.

Mr. 513, what's your initial reaction when you learn that the undertone to this case is methamphetamine trafficking?

PROSPECTIVE JUROR 513: It concerns me a little bit because if it's trafficking, then there's a good chance maybe they were on it, and I know nothing like about the effects of

296

it, but it might cause them to do things they wouldn't normally do.

MR. WILLETT: Very fair answer. I thought I heard you bringing sort of two theories through your answer. I want to take both. First of all, you were concerned that there may be trafficking. Did I understand that correctly?

PROSPECTIVE JUROR 513: Right.

MR. WILLETT: What is your concern about -- and this may seem like a simplistic question from a criminal defense lawyer, but what is your concern about trafficking of methamphetamine?

PROSPECTIVE JUROR 513: Well, it's distributing, right, is more or less what it would be, trafficking?

Page 88

MR. WILLETT: There's going to be two different prongs. There's going to be a manufacturing prong, that there was a criminal agreement to make it, and there's going to be basically a distribution prong, that there was a criminal agreement let's move it. We've made the product. Now let's move it; okay?

PROSPECTIVE JUROR 513: All right. How do you mean it concerns me? I mean, you obviously don't want it around.

MR. WILLETT: Can you give Miss Johnson a fair trial?

PROSPECTIVE JUROR 513: Yes.

MR. WILLETT: So your concerns about distribution are what, sir?

297

PROSPECTIVE JUROR 513: That it's happening I guess.

MR. WILLETT: Okay.

PROSPECTIVE JUROR 513: Not necessarily that she's doing it but that it's occurring.

MR. WILLETT: Okay. It bothers you that it's part of the facts of this case.

PROSPECTIVE JUROR 513: Yes.

MR. WILLETT: Are you willing to listen to all of the evidence?

PROSPECTIVE JUROR 513: Yes.

MR. WILLETT: Okay. Can you keep an open mind throughout all of the evidence?

PROSPECTIVE JUROR 513: Yes.

MR. WILLETT: And this is really how this works. The government gets to go first because they have the burden. And what the defense gets to do is we get to choose with each and every government witness do we wish to cross-examine, do we wish

Page 89

to ask our own questions, or maybe we pass. Maybe a witness is brought to the stand for a very narrow purpose and Miss Johnson's name's not mentioned and we just go, Nice to see you; okay? But you're not going to get to hear the defense side of the case for weeks. I think that's fair to say, for weeks. And that's why it's important that we know, you know, witness after witness for the government, exhibit after exhibit, it's like, okay, well, I still gotta wait. I haven't heard from

298

Mr. Willett or Mr. Berrigan or Mr. Stowers. Can you wait?

PROSPECTIVE JUROR 513: Yes, I can.

MR. WILLETT: Okay. The second part of your answer that I heard is I believe I heard you say it would bother you if somebody was on it?

PROSPECTIVE JUROR 513: My concern was if they're -- it's found they were trafficking, it's a good chance they were on it too maybe.

MR. WILLETT: And if that is the case -- and we're not going to display the whole trial to you at this moment. You wouldn't have a reason to come back. But if that was the case, if one of the actors in this play, if you will, was on it, how does that make you feel?

PROSPECTIVE JUROR 513: It just concerns me that their actions might have been altered and that type of thing I guess.

MR. WILLETT: Do you look at that as a negative that their actions might have been altered, or do you look at that as something of, well, maybe I have a better understanding of the person if their actions were altered?

PROSPECTIVE JUROR 513: Probably a negative I guess.

MR. WILLETT: Okay. Negative in what sense, sir?

Page 90

PROSPECTIVE JUROR 513: It's going to make their judgment -- alter their judgment. They might have done things they wouldn't normally have done, so it's going to make . . .

MR. WILLETT: If that is the case, do you think you

299

could still give Miss Johnson a fair trial and be impartial towards her?

PROSPECTIVE JUROR 513: Yeah, I think so.

MR. WILLETT: Do you have any -- I mean, I heard you say "I think so" which is a normal answer, but do you have any hesitation about that?

PROSPECTIVE JUROR 513: No.

MR. WILLETT: Okay. Pass the microphone if you will to Ms. 677.

Miss 677, I was listening to your job and your job duties with interest. What do you think about methamphetamine in Iowa?

PROSPECTIVE JUROR 677: Well, I know it's a big problem in Iowa, and I live and work in Clay County which is the number three county for meth in Iowa. So I have had to deal with it in my work.

MR. WILLETT: I need to ask you a northwest Iowa geography question to make sure I'm tracking. Is Clay County the county seat Spencer?

PROSPECTIVE JUROR 677: Yes.

MR. WILLETT: So I'm there with you. I know where we're at now. Because you're aware that it's a big problem in Iowa, can you give Miss Johnson a fair and impartial trial?

PROSPECTIVE JUROR 677: I believe I can.

MR. WILLETT: Okay. Any hesitation in your mind about

Page 91

that?

PROSPECTIVE JUROR 677:  No.

MR. WILLETT:  If you would, hand the microphone directly down to Mr. 139 if you will.  I sort of hopscotched around him, and I don't think we've had a chance to talk yet.

Mr. Williams discussed the Fifth Amendment with you, my client's decision whether or not to take the stand in her own defense, and you remember some of the constitutional concepts he was discussing with you.

PROSPECTIVE JUROR 139:  Yeah, yes.

MR. WILLETT:  We're going to add one more layer to that discussion.  Angela Johnson will not take the stand in her own defense.

PROSPECTIVE JUROR 139:  Okay.

MR. WILLETT:  She will exercise her Fifth Amendment rights.  Judge Bennett will most likely give instruction defining that for you.

PROSPECTIVE JUROR 139:  Okay.  Yes.

MR. WILLETT:  Will you be able to give Miss Johnson a fair trial if she doesn't take the stand in her own defense?

PROSPECTIVE JUROR 139:  Yes, I believe that's her right to do so either way.

MR. WILLETT:  Is there anyone here in this group of eight that that causes a problem for, my representation to you right now that Angela Johnson will not take the stand in her own

defense?  Hand the microphone to Mr. 666.  How do you feel about that?

PROSPECTIVE JUROR 666: I believe it's her right, so I don't really have any feelings I guess.

MR. WILLETT: Would you want to hear her testify in her own defense?

PROSPECTIVE JUROR 666: Would I want to?

MR. WILLETT: Yeah.

PROSPECTIVE JUROR 666: That's up to her I guess.

MR. WILLETT: Okay. Okay. I didn't mean to cut you off.

PROSPECTIVE JUROR 666: Yeah, if that's what she'd want to do, I guess, you know, we would listen.

MR. WILLETT: Okay. And if she chose not to, then you'd follow the Court's instructions as to the law.

PROSPECTIVE JUROR 666: Right.

MR. WILLETT: Hand the microphone to Mr. 446.

Mr. 446, my client won't take the stand. What's your reaction to that?

PROSPECTIVE JUROR 446: My reaction is I had something happen to me recently where I got in trouble at work, and I was being punished, and I wrote a response, but then when the punishment came down in a written form, then I had the option to dispute the punishment.

MR. WILLETT: Sure.

302

PROSPECTIVE JUROR 446: And I didn't dispute it.

MR. WILLETT: Okay.

PROSPECTIVE JUROR 446: And then when the next letter came, the lady from Washington says in furtherance or in making my determination of the final punishment, the fact that you did not respond is reason to give you a stiffer punishment.

Page 93

MR. WILLETT: Okay.

PROSPECTIVE JUROR 446: And I was mad as a hornet about that and filed a grievance about it and stuff. So I'm definitely a believer that you don't have to respond to a charge.

MR. WILLETT: Okay. Great. Would you pass the microphone to 508?

Miss 508, I don't know -- and it probably was just early on and I missed it. This is the witness stand in this courtroom. Do you think this might be the easiest place to sit if you're on trial?

PROSPECTIVE JUROR 508: Depends if I want to exercise my right to testify or not to testify.

MR. WILLETT: Well, let's go back to the initial question. What do you think about my representation to you that Miss Johnson will not take the stand and testify?

PROSPECTIVE JUROR 508: That's her choice, and that's one that she's made, and I represent (sic) that.

MR. WILLETT: Hold it against her?

303

PROSPECTIVE JUROR 508: No, I do not.

MR. WILLETT: Follow the Court's instructions?

PROSPECTIVE JUROR 508: Yes, I will.

MR. WILLETT: Okay. Any curiosity you'd set aside and . . .

PROSPECTIVE JUROR 508: All curiosity set aside.

MR. WILLETT: Okay. Okay. Does anybody in the back row have a problem with this issue that Miss Johnson will not take the stand and testify? Pass the microphone back up to 430 if you would, Miss 430. I apologize.

Page 94

The issue I was broaching with Miss 508, do you think a witness stand would be the easiest place to participate in a trial from?

PROSPECTIVE JUROR 430: No, I'm sure it's difficult just going through the whole situation.

MR. WILLETT: Certainly. Do you think it might be possible to be nervous here?

PROSPECTIVE JUROR 430: I'm nervous here, so I'm sure it would be.

MR. WILLETT: Do you think it would be possible that if one was sitting here that one would be concerned about making a mistake?

PROSPECTIVE JUROR 430: I don't know the defendant, so I really can't answer for her.

MR. WILLETT: Okay. Pass the microphone to Miss 222.

304

Do you think it would have an impact if you were sitting here and you were worried about maybe, well, gee, I don't have as much education as one of these gentlemen sitting at the government table? Do you think that might enter into your mind?

PROSPECTIVE JUROR 222: Yes.

MR. WILLETT: Okay. Do you think even if you were convinced of your own situation that maybe just sitting here would make you nervous?

PROSPECTIVE JUROR 222: Definitely.

MR. WILLETT: Maybe fidget a little bit or maybe a few beads of sweat pop out on your forehead occasionally?

PROSPECTIVE JUROR 222: Uh-huh, yes.

MR. WILLETT: And have you ever maybe even seen a

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 264 of 3245

nervous person do that?

PROSPECTIVE JUROR 222: Yes. I stutter when I'm nervous.

MR. WILLETT: Well, since you broach that, you understand that somebody -- that that could be one of the afflictions of being nervous is just you might get hung up on a word or as my young 11-year-old son does, he gets hung up on a series of words. He might repeat two or three words in a row until he, you know, gets himself started again.

PROSPECTIVE JUROR 222: At my age I forget them.

MR. WILLETT: I understand that.

305

Witnesses, witness was an issue that was brought up, and I would like to touch on that with you for just a second. And what we're going to see in this case is we're going to see witnesses that could very easily be thought of as contradictory. In other words, as Judge Bennett very appropriately pointed out to you, there might be witnesses you believe everything. There might be witnesses that you believe some things. There might be witnesses you believe nothing about. And do you understand that it's sort of a mixed bag when it comes to witnesses?

PROSPECTIVE JUROR 222: Yes.

MR. WILLETT: And if you would, pass the microphone to Miss 430 again.

Let me try and use an analogy here. Let's say you've gone home at the end of the day. You're relaxing in your home, and just assume with me, if you will, that your home was adjacent to either a large grassy lot or a neighborhood park and as you're sitting down preparing your evening meal a really nicely hit baseball comes through the front window, and there's

Page 96

a bunch of children standing in your yard all sort of looking up, down, around, or anywhere else, but you're trying to figure out, okay, who put the baseball through my window because nobody's come up to say, Miss 430, I'm really sorry that I hit that ball so well and so much in the wrong direction. What would you try to do to figure out who broke your window?

PROSPECTIVE JUROR 430: Well, I don't know.

306

MR. WILLETT: Would you want to start out by asking questions?

PROSPECTIVE JUROR 430: Yeah, I would. I would start by asking questions and see which one was most interested in having the ball back maybe.

MR. WILLETT: Very good answer. Would you might want to look at their faces to determine what you could tell from just looking at their faces or their body language?

PROSPECTIVE JUROR 430: Not all the time.

MR. WILLETT: Would you want to maybe -- if there were a bunch of kids in your yard, would you maybe to want take one or two of them aside or at different points and say, Hey, I've known you ever since you were a little boy; what happened?

PROSPECTIVE JUROR 430: I have mixed feelings on singling out.

MR. WILLETT: Okay. If you were talking to different children, would you want to see if there was a common thread through the story? In other words, well, we all know it was Sam at the plate, Miss 430.

PROSPECTIVE JUROR 430: Yeah, so they say.

MR. WILLETT: So they say. So they say. So what would you do to try to corroborate or affirm what it is they

Page 97

say?

PROSPECTIVE JUROR 430: Well, then I guess I would have to go back and individually ask each child what they seen

307

or not see or if they had a chance to hit the ball I guess.

MR. WILLETT: Would it matter to you if a number of people said approximately the same thing? Well, Miss 430, it was always Sam who was at the plate.

PROSPECTIVE JUROR 430: Well, I suppose when you have a number, you know, a certain number of people that are going to say the same thing, yes.

MR. WILLETT: Okay. Do me a favor if you will and pass the microphone down to Mr. 666. No, I tell you what, one over, Mr. 139. I don't feel like I've spoken to him as much as I've spoken to everybody else.

Mr. Williams touched on a category of witness that will come before you, witnesses who are incarcerated who -- the politically correct phrase is cooperating witnesses or cooperating individuals. I use a phrase that's less politically correct. I refer to these people as snitches. And just in general do you have a visual idea of the type of individuals you might be seeing come up?

PROSPECTIVE JUROR 139: Yes, yes, I do.

MR. WILLETT: Would you want to know if a cooperating witness was receiving some kind of benefit or potential benefit from the United States Attorney's Office in exchange for their testimony?

PROSPECTIVE JUROR 139: Not really, no, no.

MR. WILLETT: Would it matter to you if maybe counts

308

Page 98

had been dismissed or less counts had been brought against them in exchange for their testimony?

PROSPECTIVE JUROR 139: Yes. If that was known, yes, I would wonder exactly why their story's the way it is.

MR. WILLETT: Okay. So that might make you question their credibility if you know, well, hey, I just heard that they got a deal or a potential deal to testify against Miss Johnson.

PROSPECTIVE JUROR 139: Yes.

MR. WILLETT: That would make a difference to you.

PROSPECTIVE JUROR 513: Yes, I think it would.

MR. WILLETT: What if somebody got basically a pass? In other words, okay, if you come in and testify, we may not even charge you even though your knowledge may have some criminal aspects to it. Is that something you'd want to know?

PROSPECTIVE JUROR 139: Yes, I think I would, yes.

MR. WILLETT: Pass the microphone to our friend Mr. 666. How about a cooperating individual who comes into this courtroom and sits in this box and wants to get his sentence reduced? Mr. 666, I'm in prison, and I want to get out as soon as I can. Is that going to make you think about that individual's credibility?

PROSPECTIVE JUROR 666: Yeah, probably, yeah.

MR. WILLETT: How about the length of the witness's sentence that they're trying to reduce? Is it going to make you look at them if they have a longer sentence?

309

PROSPECTIVE JUROR 666: Yeah, I believe so.

MR. WILLETT: Okay. Because if my memory serves me

Page 99

correctly and if things haven't changed, you're going to get to meet one individual who's serving a life sentence in federal prison and would like to have his sentence reduced. So would you factor that in to your determination about that person's credibility?

PROSPECTIVE JUROR 666: Maybe. You know, I'd have to hear about it first.

MR. WILLETT: That's fair. You'd want to hear all the circumstances of that individual's situation.

PROSPECTIVE JUROR 666: Right.

MR. WILLETT: Okay. Would you pass the microphone down to Miss 508.

Miss 508, would you want to know about the circumstances of these various cooperating individuals who come before you?

PROSPECTIVE JUROR 508: Yes, I would.

MR. WILLETT: Okay. And would you factor that in to your determination of their credibility?

PROSPECTIVE JUROR 508: Yes, I would.

MR. WILLETT: Okay. And what's going to help you is is Judge Bennett will give you instructions at the appropriate time about here's what you do to assess a person's credibility. And it's sort of the discussion I was having with Miss 430 about

310

the baseball coming through the window and how do we determine that. You're going to get some guidance. The judge will give you guidance on that. But this isn't a situation where you just say, Mr. Willett, I don't care; I don't care if they're in jail; I don't care if they're serving life; if they've got testimony against Miss Johnson, I don't want to hear it; I'm not going to

Page 100

filter that. You'd like to know as much as you could about these people.

PROSPECTIVE JUROR 508: Yes, I would.

MR. WILLETT: Okay. Is there anyone who feels, Mr. Willett, I don't need to know this? Everybody's the same, law enforcement agents, cooperating individuals, citizens of good character in the community. I just want to know what they know. I'm not going to look for credibility, consistency, motive, bias. I just want to hear the true scoop. Does anybody feel that way?

Pass the microphone back, if you will, to Mr. 513.

Sir, do you have any thoughts along those lines, that you really don't want to be bothered by the detail of who these people are? You just want to know what they know.

PROSPECTIVE JUROR 513: I'd like to know the details.

MR. WILLETT: Pass the microphone to Miss 6 -- I'm getting my numbers mixed up, 677.

Miss 677, do you want to know about these people to the best of your ability?

311

PROSPECTIVE JUROR 677: Yeah, I do. I think that would make me more skeptical and, you know, want to listen more detailed to -- like you say, to the consistencies.

MR. WILLETT: Sure. Final concept, Mr. Williams spoke to you about burden of proof, presumption of innocence, beyond a reasonable doubt. Does -- let's see, who has the microphone? Miss 677, to make sure everybody followed Mr. Williams' line of questioning, who has the burden of proof in this case?

PROSPECTIVE JUROR 677: The prosecutor.

MR. WILLETT: Okay. Representing the government.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 270 of 3245

PROSPECTIVE JUROR 677:  Yeah.

MR. WILLETT:  Very good.  Does anybody feel to the contrary?  Hand the microphone down to Mr. 666.  Sir, do I have to prove Miss Johnson's innocence to you when you return to deliberate on the verdicts in these ten counts?

PROSPECTIVE JUROR 666:  Do you have to?  No.

MR. WILLETT:  Okay.  And you would agree with Miss 677 that the burden of proof is on the government?

PROSPECTIVE JUROR 666:  Right, yes.

MR. WILLETT:  Does anybody disagree with that concept?  And do you understand that the burden of proof is beyond a reasonable doubt?

PROSPECTIVE JUROR 666:  I understand.

MR. WILLETT:  Do you have a problem with that high standard, beyond a reasonable doubt?

312

PROSPECTIVE JUROR 666:  No.

MR. WILLETT:  Okay.  I mean, we're discussing -- obviously we're discussing issues such as freedom here, so that doesn't bother you in any way.

PROSPECTIVE JUROR 666:  No, it doesn't.

MR. WILLETT:  Okay.  Hand the microphone over to Mr. 139 if you would, please.  Mr. Williams touched upon beyond a reasonable doubt.  Judge Bennett will give you a very detailed instruction to define it.  But a very quick catch phrase that I use is a hesitation to act.  Now, if I would suggest to you, sir, that reasonable doubt would equate to a hesitation to act, do you have any problem in your own life affairs or in your own analogy that you could make -- sort of visualizing to yourself what that hesitation might be?

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 271 of 3245

PROSPECTIVE JUROR 139:  No, not really.

MR. WILLETT:  Does anybody have a -- here will be a good example.  Mr. 446, hand the microphone down to him.  You got an appropriate job that we can discuss this visualization.  My memory is you're a food and meats inspector for the U.S.D.A.

PROSPECTIVE JUROR 446:  Yes.

MR. WILLETT:  And obviously you have to go out to plants occasionally and check the products to make sure that they're what we want to eat; correct?

PROSPECTIVE JUROR 446:  Yeah.

MR. WILLETT:  Now then, I'm assuming that if you're

313

checking whether it's beef or pork or whatever you might be checking that day, if you had a hesitation about the quality of what you were examining, you wouldn't hit it with a big old stamp and say it's fine, pass it on, would you?

PROSPECTIVE JUROR 446:  No.

MR. WILLETT:  Okay.  Hesitation to act, do you understand where I'm coming from?

PROSPECTIVE JUROR 446:  So would that example you just said, would that be hesitation to act, or would that be not hesitation to act?

MR. WILLETT:  Well, if you kept the product, if you thought something was wrong with the product and you kept it to look, isn't that something that you do in your job capacity, you know, a reasonable person would hesitate to act, to pass on an inferior portion of beef or pork or whatever?  So you'd stop it and reflect upon it and say, No, I better not do this.

PROSPECTIVE JUROR 446:  And would that be hesitation to act, or would that not be hesitation to act?

Page 103

MR. WILLETT: That would be hesitation to act. Let me make sure we're on the same page. You're a meat inspector.

PROSPECTIVE JUROR 446: Yes.

MR. WILLETT: You're looking at a beef carcass at some plant in northwestern Iowa.

PROSPECTIVE JUROR 446: Right.

MR. WILLETT: You have severe concerns that it's good

314

beef. Now, you wouldn't pass it on, would you?

PROSPECTIVE JUROR 446: No.

MR. WILLETT: Okay. Hesitation to act; right?

PROSPECTIVE JUROR 446: I would be acting, though, because I'd be putting the beef out.

MR. WILLETT: Yes, you'd be taking it --

PROSPECTIVE JUROR 446: I'd be taking it out and letting the veterinarian check.

MR. WILLETT: Certainly.

PROSPECTIVE JUROR 446: So I wouldn't be hesitating to act.

MR. WILLETT: Well, you wouldn't be hesitating to act in your decision on what to do with a bad piece of beef, but you'd certainly be hesitating to act in your decision, oh, no, let's just let it roll on.

PROSPECTIVE JUROR 446: To pass it.

MR. WILLETT: Yeah, let's just let it roll on and pass it.

PROSPECTIVE JUROR 446: Okay.

MR. WILLETT: Are you with me?

PROSPECTIVE JUROR 446: Yes.

MR. WILLETT: I'm sorry if I confused you. Sometimes

Page 104

I think I've got a great analogy and I still don't articulate.

PROSPECTIVE JUROR 446:  I would be hesitating to act --

315

MR. WILLETT:  By holding on to the bad beef and saying, No, no, we don't want to let this be part of the final product.

PROSPECTIVE JUROR 446:  Okay.  I see it.  It seems kind of backwards to me because my act would actually -- because the beef carcass would go -- if I hesitate to act, the beef carcass would be passed.

MR. WILLETT:  Sure.

PROSPECTIVE JUROR 446:  Automatically because I don't stamp them passed.  All I stamp them is condemned.

MR. WILLETT:  Well, and that was probably the proper analogy since I didn't know your job well enough.  If you saw an inferior piece of beef that you thought you should condemn, you certainly wouldn't let it pass on to the consumer, would you?

PROSPECTIVE JUROR 446:  No.

MR. WILLETT:  Am I correct, sir?

PROSPECTIVE JUROR 446:  That's correct.

MR. WILLETT:  And so your hesitation to -- your hesitation to let it go through to the consumer, that's the type of reasonable doubt I'm looking for in trying to help you visualize this.

PROSPECTIVE JUROR 446:  Uh-huh.

MR. WILLETT:  And I've probably made a complete mess of it by now, but do you see where I'm going?

PROSPECTIVE JUROR 446:  Yes.

316

Page 105

MR. WILLETT: Does anybody have a problem with this concept of hesitation to act and reasonable doubt? And trust me by now, Judge Bennett will give you a much better instruction than what I've been trying to outline for you.

Your Honor, if I can just check my individual questionnaires for the moment --

THE COURT: Sure.

MR. WILLETT: -- but I think I can see the stretch drive. Could I confer with my co-counsel for one moment?

THE COURT: You may.

MR. WILLETT: Thank you. I appreciate that.

Ms. 222 -- Mr. 446, if you could pass the microphone back to Miss 222, and I apologize. We have the benefit of your juror questionnaires, so when you saw me laying this stack of paper down on this lectern, we've had that benefit, and the defense team has read these and reviewed these, and on just a couple of matters I have just questions because I want to make sure -- I can certainly read the written word, but I want to perceive that I truly understand your answer.

Question 42, do you believe that the possession or sale of drugs should be a crime, and you checked the answer yes. And you were asked the question why, and this is the answer -- yes, this is the answer that I have you giving. Because drugs kill and destroy lives just as any weapon could or does. Possession for personal use is a personal choice. It appears

317

selling drugs is wrong if I've read your handwriting correctly.

PROSPECTIVE JUROR 222: Okay.

MR. WILLETT: Did I read your answer correctly?

Page 106

PROSPECTIVE JUROR 222: As far as I can remember, yes.

MR. WILLETT: Okay. And if you'd like to look at your questionnaire, I'll be glad to have it handed to you.

PROSPECTIVE JUROR 222: I'm fine.

MR. WILLETT: My concern, we talked very early in my voir dire portion with you about the undertone to this case is methamphetamine and that the criminal agreement to manufacture and distribute -- and I talked with I believe some of the gentlemen in the first row about that, and we discussed it back and forth. Selling drugs is wrong. Do I need to be concerned now about you being fair and impartial towards Angela Johnson, because let me make this clear if I haven't made this clear? The government's theory will certainly be that Miss Johnson was part of a criminal agreement to manufacture and distribute methamphetamine. They will say she was involved.

Now then, because of that portion of your answer that says, In my opinion selling drugs is wrong -- and that's certainly an appropriate opinion -- do I need to be worried about your ability to give Miss Johnson a fair and impartial trial?

PROSPECTIVE JUROR 222: You know, I'm really divided. There's a part of me that wants to say absolutely yes. But

318

there's another part of me that's been listening today that says there's more here than what is obvious and that you have to listen and you have to pay attention and you have to judge the individual facts as they are presented. And my personal opinion is not necessarily what's important as well as being open to hearing what is reality.

MR. WILLETT: Okay. And I appreciate that answer. I

guess the only thing I want to come back to is at the very beginning when you said part of me today would say yes and part of me -- and then you went on to explain to me what you've just finished explaining. This is the only chance I get to talk to you. I don't get to ask you three weeks from now where are we at. If you had to tell me today, right now where you're at, is it, Mr. Willett, part of me says yes, that selling drugs is wrong and I'm not sure I can be a fair and impartial juror for Miss Johnson, or is it, Mr. Willett, I need to listen to everything here?

PROSPECTIVE JUROR 222: I need to listen to everything here.

MR. WILLETT: Okay. Okay. Let me ask you one other question in a general sense, and I'll also give you the opportunity to talk about this individually later if you want. You make reference to some family members. Is that something you'd rather discuss with us individually later, or is that something you'd allow me to just --

319

PROSPECTIVE JUROR 222: Go ahead.

MR. WILLETT: Okay. Thank you so very much. You mention a nephew and niece who had addiction problems.

PROSPECTIVE JUROR 222: Yes.

MR. WILLETT: And that the treatment was successful for the niece.

PROSPECTIVE JUROR 222: Yes.

MR. WILLETT: And that the impact was the inability to work or function in life. Now, I guess what I didn't know is is the drug in your nephew and niece's situation the same drug we're talking about in this case?

Page 108

PROSPECTIVE JUROR 222: No.

MR. WILLETT: Okay. The fact that your nephew and niece have had addiction problems, would that cause you in any way to make it impossible for you to be fair or impartial towards Miss Johnson?

PROSPECTIVE JUROR 222: I have an addiction problem.

MR. WILLETT: Okay. Okay. And I remembered. I hadn't forgotten. I just -- defense lawyers worry about covering all bases. So forgive me. I take it since you just told me the fact that you had an addiction problem you can keep an open mind towards Miss Johnson.

PROSPECTIVE JUROR 222: I would hope the world would keep an open mind towards me.

MR. WILLETT: Amen. Could you please pass the

320

microphone to Miss 430.

Miss 430, same question. You reference a family member in your answer that had issues that we've been discussing recently.

PROSPECTIVE JUROR 430: Yes.

MR. WILLETT: Is this something you'd feel more comfortable discussing with us individually later, or may I ask you about that a little bit right now?

PROSPECTIVE JUROR 430: I'll be willing to answer your questions.

MR. WILLETT: Okay. You mention a brother who had some addiction problems.

PROSPECTIVE JUROR 430: Correct.

MR. WILLETT: And he was able to successfully take care of the problem if I understood your questionnaire.

Page 109

PROSPECTIVE JUROR 430: So far, yes. It's a day-to-day ongoing battle, of course.

MR. WILLETT: Absolutely. And you mention how it affected your family, how it affected you personally.

PROSPECTIVE JUROR 430: Correct.

MR. WILLETT: Now, was the drug in that situation the same drug we're dealing with in this case?

PROSPECTIVE JUROR 430: Actually I'm kind of naive about the drug names I guess you would say.

MR. WILLETT: Methamphetamine is referred to by some

321

different slang names. You may hear methamphetamine referred to as crank. You may hear methamphetamine referred to as crystal.

PROSPECTIVE JUROR 430: Yes, it was.

MR. WILLETT: Okay. Now then, the fact that your brother had this situation with the same drug that we're talking about in this case, should I be concerned about your ability to be a fair and impartial juror towards Miss Johnson?

PROSPECTIVE JUROR 430: No.

MR. WILLETT: So you'll be able to set that aside and your brother's battles.

PROSPECTIVE JUROR 430: Well, my brother is also a grown adult, you know, I mean. I can't live for him either so -- I mean, of course, I'm concerned about their actions or his actions, but them are my own personal feelings.

MR. WILLETT: Okay. Thank you so very much.

Your Honor, thank you so very much. Thank you, ladies and gentlemen.

THE COURT: Could I see the lawyers at sidebar for just one minute? Please stay there. We'll give you a little

Page 110

preview of what might happen in the trial.

(At sidebar on the record.)

THE COURT: What I thought I would do is send them all out except 222 in the corner. She would be the first one. We're just going to take them in order. Just have her move in the front row, go back to you and start the questioning. We

322

probably can get one done before lunch.

MR. WILLIAMS: You bet.

MR. WILLETT: My understanding, Judge, the only reason I'm hesitating is I think that -- can I ask Mr. Berrigan -- I didn't know if Mr. Berrigan wanted to have any statement to them before we went into the individual. I'm not sure how we left it.

THE COURT: What do you mean?

MR. WILLETT: Well, in other words, I mean, I've had a chance to present the constitutional concepts. I didn't know if Mr. Berrigan wanted to stand up and to have any discussion of the death penalty before we went into this individually kind of like what I did.

THE COURT: Oh, I see. Okay. Why don't you find that out.

MR. BERRIGAN: I was reading the screen, and I didn't see. I'm sorry.

MR. WILLETT: I didn't want to speak for you. I assume you wanted to stand up and at least have some discussion with the jury.

MR. BERRIGAN: No, we're ready to go.

THE COURT: You're ready to go individually.

MR. BERRIGAN: Yes.

Page 111

THE COURT: Or do you want to talk to them as the group about the death penalty?

323

MR. BERRIGAN: No. I'm ready to go.

THE COURT: Okay. We'll take our first one now.

(The sidebar was concluded.)

THE COURT: Okay. Here's what's going to happen next. In terms of individual questioning, we're just going to do it -- we'll start with 222 first. So I'm going to send the other jurors out, and we're just going to go down the line in order. So, 139, you'll be last which means we won't get to you till sometime this afternoon.

So for purposes of lunch hour and all, you're free to go out on your lunch hour. We won't get to anybody until 222 -- until after lunch. So nobody has to be back until one o'clock, and that would probably just be Juror 430. But, you know, 513 ought to be ready to go a little bit after one. It might take us a little longer.

But, 139, we're not going to get to you till probably three o'clock or after would be my guess. So just to try and give you a heads-up. I think in my letter to everybody I said bring something to read, but it's a nice day out there, so if you want to go outside, walk around, and do some shopping, you're more than welcome to do that.

And then we'll deal with each one of you individually. And after we talk to you individually, we'll just send you out in the hallway, and then I'll let you know whether or not you're dismissed or you need to stick around till the end of the day.

324

Page 112

You actually have two different chances to get dismissed today. But you'll either know right after we talk to you individually whether you're gone or we'll let you know at the end of the day whether you're still in the pool or not. So that's the best I can tell you.

All of the jurors are free to leave. We'll see Juror 430 back here about one o'clock. And, 222, if you want to just move into the front row, we'll hand you a microphone and start with individual questioning. Thank you.

(Panel B exited the courtroom, Prospective Juror 222 remaining.)

THE COURT: Please be seated.

Mr. Miller?

MR. MILLER: May it please the Court.

EXAMINATION

BY MR. MILLER:

Q. Good morning, ma'am.

A. Hi.

Q. I'm going to put this on so that this lady can hear me clearly. One of the hardest jobs that the judge referred to is making sure that she gets everything accurately recorded, and this part of the trial is probably the most challenging for her in that regard.

MR. MILLER: Testing. Is that good?

THE REPORTER: Perfect.

325

Q. Good morning. My name again is Tom Miller. How do you do?

A. Fine.

Q. I want to visit with you about just a couple issues, and

Page 113

then we'll move along. First I noted among your hobbies is reading. Is there any particular area of subject that you enjoy reading?

A. Crime novels and romance novels basically. I have certain authors I always look for.

Q. But they're a good escape.

A. They're wonderful.

Q. Get us away and thinking about other things. Anything in particular you'd recommend for us?

A. Anything by Patricia Cornwell.

Q. Very good, yes. She has some expertise in what she talks about, doesn't she?

A. Yes, she does.

Q. A couple subjects I wanted to visit with you about, and then I'll let Mr. Berrigan visit with you briefly. I want to ask you, first of all, about any familiarity you may have with this case in the form of publicity or otherwise, and then we need to visit just briefly about the death penalty and your feelings and thoughts about that; okay?

A. (Nodded head.)

Q. Do you recall having heard about this case before?

A. As I said in my questionnaire, I might have read about it,

326

but normally I do not read the Sioux City paper, so no.

Q. Very good. And we appreciate your having taken the time to fill this out. Sometimes coming here and talking about it jogs a recollection. You've not recalled anything more since sitting here today.

A. No, I haven't.

Q. And I trust if in the course of sitting here as a juror

Page 114

should that be your responsibility if this trial sparks any further recollections you understand that it's what you hear in this courtroom and not anything you may recall having heard elsewhere that must be the basis for your verdict.

A.    Yes.

Q.    And you agree with that, ma'am?

A.    Yes.

Q.    Thank you so much.  I want to visit with you for a few minutes about the death penalty.  After you got this questionnaire, I assume it caused you to pause and think about the tremendous responsibility that could ultimately fall on your shoulders if you end up on this jury.

A.    Yes.

Q.    Can you just share your thoughts with us a little bit about that, ma'am?

A.    I found myself being less tolerant and leaning more heavily towards the possibility of the death penalty as I read the charges against Miss Johnson.

327

Q.    There's some very serious allegations, aren't there?

A.    Yes, there are.

Q.    You indicated in your response that you believe that the death penalty can be an appropriate punishment.

A.    Yes.

Q.    And you also indicated that you understand that the sentence of life in prison is a very harsh punishment as well, not a life, merely an existence frequently.

A.    Yes.

Q.    So you understand it would be serious in either event.

A.    Yes.

Page 115

Q. Mr. Williams explained what the procedure is. The government as you understand now clearly -- and you probably understood before -- has the burden of proving beyond any reasonable doubt all of the elements of the offense before you and your fellow jurors can find Ms. Johnson guilty of a charge. You understand that.

A. Yes.

Q. In the event -- and again, this is a hypothetical question, but now is our opportunity to visit with you about it. In the event that you and your fellow jurors would unanimously find Ms. Johnson guilty of one or more of these charges, in that event only there would be a second and third phase possibly.

The second phase is the determination of whether or not there is sufficient aggravating -- proof of aggravating

328

factors to make the death penalty a possibility. If you and your fellow jurors would unanimously decide that the government has proven beyond any reasonable doubt not only the guilt of the defendant in this case but also the existence of sufficient aggravating factors to allow the death penalty to be considered, then and in only that circumstance would there become the third and final phase where you and your fellow jurors would be called upon to pass judgment as to a sentence.

In that circumstance, ma'am, the government would again have the burden of proof, and it would be by the highest standard of proof, beyond a reasonable doubt, to establish certain aggravating factors, and you would consider not only those aggravating factors, if proved, but also any mitigating factors or factors that would be in favor of Ms. Johnson. And those factors don't have to be proven beyond a reasonable doubt

Page 116

but only by a preponderance of the evidence.  Are you with me so far?

A.    I think so.

Q.    Very good.  And I realize this does get a little convoluted, and the Court will explain it to you fully if we ever get to that point and you're on this jury, and I trust you take some satisfaction in the fact that you would have instruction from the judge on how to go about that; fair statement?

A.    (Nodded head.)

329

Q.    My question to you is this:  Do you feel, based upon your understanding of what we've talked about so far and the death penalty as a concept, that you could give fair consideration to both possible punishments if we were to ever reach that third stage?

A.    After listening to Mr. Willett talk about mitigating circumstances, yes, I could.

Q.    And we appreciate that.  And these questions I'm asking you are unusual ones, ones you've never been asked before; right?

A.    Right.

Q.    Okay.  And the only answer that's the right answer is the one that comes from your heart, and we appreciate your candor on these things.  I have to just follow up with just a couple more.

You understand from what was in the judge's questionnaire that this case involves allegations of multiple killings, allegations of the killing of very vulnerable people, children namely.  If at that third stage you were to find beyond a reasonable doubt those particular elements and if the evidence shows that that was the fact, would you still be able to

Page 117

consider both possible punishments, both the possibility of the death penalty and also still give honest consideration to the possibility that life in prison would be an appropriate punishment understanding that you would never be required to impose death? Could you still consider both potential punishments, ma'am?

330

A.    Yes.

Q.    Thank you, ma'am. Again, I appreciate your candor. This case may also include mitigating factors such as if the evidence were to show, for example, that Ms. Johnson was an aider and abettor by which I mean someone who may have assisted or encouraged these crimes but not actually the one who pulled the trigger, so to speak. Under those circumstances, do you feel if the evidence were to show that that you could still consider both possible punishments?

A.    Yes.

Q.    And finally, ultimately if the evidence in this case establishes to your satisfaction and in accordance with the Court's instructions that the death penalty is the appropriate punishment and you unanimously feel that as a jury, under those circumstances, ma'am, you would have to sign your name to a form of verdict that would have the practical effect of imposing that punishment. Do you feel that you could shoulder that responsibility, Ms. 222?

A.    Yes.

Q.    And I don't ask that lightly. It is -- it is a question that gives you pause. Fair statement?

A.    (Nodded head.)

Q.    But you feel you can do that, ma'am?

Page 118

A.    Yes.

        MR. MILLER:  Thank you so much for your time.

331

        I appreciate it, Your Honor.

        THE COURT:  Did you want to ask about pretrial publicity?

        MR. WILLIAMS:  He did, Your Honor.

        THE COURT:  Oh, you're going to divide it up?

        MR. WILLIAMS:  No, I think he already covered it. It's the first thing he covered.

        THE COURT:  You covered it completely with this juror?

        MR. WILLIAMS:  I believe so.

BY MR. MILLER:

Q.    Is there anything else about what you heard about this case pretrial that wasn't expressed in your response?

A.    I really don't recall hearing about it.

        THE COURT:  Okay.

        MR. MILLER:  Very good.  Thank you so much.

        THE COURT:  Thank you.

        Mr. Berrigan?

        MR. BERRIGAN:  Thank you.

                        EXAMINATION

BY MR. BERRIGAN:

Q.    Good morning, Miss 222.  Aren't you glad you didn't draw 666?

A.    Yes, I am.

Q.    That poor fellow.  Would you like some water, ma'am?

A.    No thank you.

332

Page 119

Q. My name is Pat Berrigan. I know Mr. Willett introduced me as part of the defense team, but I have the privilege of being able to ask you some questions about these two very important areas. But before I did that, I wanted to reiterate a concept the judge talked about very early on when he was going through his overhead PowerPoint presentation and ask you if you remember this, that the obligation and the responsibilities of the jury in this process, questioning, okay, is not to be fair and impartial. It's not to listen to the evidence because we're not going to present any evidence. It's not to consult with your other jurors and share opinions and determine, you know, whether that might influence you. It's only to give us your honest and open responses about how you feel about these matters. Do you understand that?

A. If I understand what you're saying, yes.

Q. In other words, when you said a little earlier in response to a question Mr. Willett had asked you -- let me see if I can find that. He was asking you about your feelings about drugs and whether that might cause you some problems serving as a juror in this case where it's alleged that Miss Johnson was part of a conspiracy not only distributing but manufacturing methamphetamine, and I noted that you said, Part of me wants to say absolutely yes, but another part of me says I should listen to everything. My personal opinion's not necessarily more important than the facts we'll hear. Do you remember saying

333

something like that?

A. Yes.

Q. I want to suggest to you just for this questioning that that might not be right, that in this process your personal

Page 120

opinion is everything to us, okay, because we're not asking you to judge the evidence at this point. We're not going to give you any. Okay? You with me?

A.    I think so.

Q.    Okay. So let me ask you a little bit about this questionnaire that you filled out if I could turn my attention to that. First of all, had you ever done anything like this before, fill out a 20-page questionnaire?

A.    Oh, no, no.

Q.    It's kind of a big deal, isn't it?

A.    Yes, it was.

Q.    Did you take it seriously? That is, I mean did you take the time to fill it out completely?

A.    It was at times very painful to fill out.

Q.    Sure. And I can see that in the responses because it requires self-disclosure of things you might not want under the usual circumstance other people to know; is that right?

A.    Yes.

Q.    And let me reiterate I'm sure how we all feel about your candor particularly regarding your past difficulties with drugs. Are these answers honest reflections of how you feel?

334

A.    Yes.

Q.    Okay. Let me start and ask you some questions about the publicity, and I'll offer the same opportunity. If this doesn't sound familiar, I'll hand it right over to you, and you can take a look; okay? The questionnaire that you filled out reflects that, as you told Mr. Miller, you were somewhat familiar with the facts of the case. And there's a question number 63 that says, What have you read, seen, or heard about this case, the

Page 121

crime, or the people involved? Include as many details as you recall even if they were not included in the statement above. And you wrote, Since receiving these papers, I know I've heard about the case before. I really don't have any detailed recollection of news reports right now. I've tried to remember. Does that sound accurate?

A. Yeah.

Q. Is that still true since you filled out the questionnaire? Is that still accurate?

A. Yes.

Q. Okay. And then you indicated that the sources of whatever information you might have gotten would have been either newspaper or television, one or the other or both.

A. Right.

Q. And then you were asked a question on the following page in this same section. First of all, you said you did not have an opinion on the guilt or innocence of Angela Johnson based on

335

what you could remember. That sounds right.

A. Yes.

Q. But on the question, Do you have any beliefs or opinions as to the appropriate punishment for Angela Johnson if she were found guilty of the intentional killing of five people including two children, you said you were unsure and that you wrote, I have a prejudice against people who victimize children, so I'm unsure of my reaction in this situation. Does that accurately reflect your views?

A. Yes.

Q. Okay. And then you were faced with a series of questions about punishment that came right after that regarding the death

Page 122

penalty.  Question 75, What are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of intentional murder?  And you said, I believe in the death penalty as a punishment in this type of situation.  Lives are lost for no good reason, and two children who were helpless are dead.  No punishment changes the facts of this, but I do believe the death penalty far surpasses life in prison in balancing the scales of justice.  Is that accurate?

A.    I'm very noble, aren't I?

Q.    That was eloquent, frankly.  But that's a true reflection of how you feel about this, isn't it?

A.    Yes.

Q.    You have a problem with this case that a lot of people

336

have, and that is there are two dead innocent children, one 6 and one 10, who were intentionally murdered for no good reason; okay?  That's what the allegations are.  Do you understand that?

A.    Yes.

Q.    When we're talking about punishment and asking you your views about punishment, you need to understand that we're not asking you this as if you haven't heard the evidence or the trial's just starting.  We're asking you in your own mind to jump ahead because we can't come back and ask you questions later.  We're asking you to consider that you were part of a jury that did listen to all the evidence; okay?  When you said earlier, I'd like to listen to all the evidence, well, when we're in this part of the case about punishment, that's happened.  Are you with me?

A.    No.

Q.    Okay.  Well, when we're asking you these questions about

whether you'd consider this punishment or that punishment, we're asking you to do that with the assumption that you would be a juror and that you've heard all of the evidence by the point you're making this decision; okay?

A.   (Nodded head.)

Q.   Is that all right?

A.   Okay.

Q.   I know that it sounds like it's the cart before the horse, and it is because we haven't presented the evidence.  But we

337

have to make a decision, all of us, including the judge, about who are the best 12 people for this particular case.  And as the prosecutor said this morning, you know, it's not always the case that everybody can sit on every kind of a case.

I had my house burglarized 20 years ago, but still if I were ever in a position to be called for jury service, my memories of that are remarkably fresh, and I just don't think I could do it despite my wish to do it, very deeply to do it.  I would be willing to say and consider what kind of juror would I want judging me if I was sitting over there and this was a burglary case.  That's kind of what we're asking you to do; okay?

A.   Okay.

Q.   So here's the situation.  You've heard all the evidence; all right?  And you've considered it.  And you've talked to your fellow jurors about it, and you have decided, all 12 of you, beyond any reasonable doubt that it's a case of intentional murder.  Are you with me so far?

A.   Yes.

Q.   Okay.  Now, you also have made a decision because, as the

Page 124

judge explained, there's going to be a second part of the trial where the state -- I mean the government has to prove from the evidence that's been presented aggravating factors and what we call gateway factors. And one of the aggravating factors here that's alleged is we have two children. They're particularly

338

vulnerable victims because of their age. We could agree on that, couldn't we?

A. Yes, we could.

Q. Okay. And now we're at a situation in our fictitious circumstances here where the jury's not only decided intentional murder, guilty beyond a reasonable doubt. Now we've decided it was the intentional murder, perhaps premeditated murder, after substantial planning of two innocent children including a six- and ten-year-old girl in addition to three other people that have been killed; okay? When I'm looking at these questionnaire responses, I'm concerned that that's not a case in which a life sentence would be a realistic option for you. Is that a fair concern that I have?

A. Yes, it is.

Q. Okay.

A. At the time that I filled out the questionnaire, though, never in my wildest imagination did I think I would be here today.

Q. Oh, I know it. I think probably all your fellow jurors would say the same. But as you've told us, I mean, you weren't lying to us.

A. (Shook head.)

Q. And you're a grown woman. I mean, this is something that you took seriously at the time, and you've told us today, This

is how I feel.  Am I right?

A.    Yes.

Q.    Okay.  We're not asking you to change your opinion.  I think everybody's told you that, but I want to reiterate that.  The goal here is not to convert people into some kind of autonomous fair and impartial people for this particular trial.  We are not attempting to do that; okay?  None of us are.

You were asked this question, number 76:  Why do you feel this way, or what are some of the reasons for your beliefs?  And your response, If the murders were intentional, why should the murderer be allowed to live?  A minor note is the cost of keeping anyone in prison for life.  But my basic feeling comes down to the early death of people, what they'll miss, those that miss them.  The murderer doesn't deserve to live.  That's what you wrote.

A.    Yes, I did.

Q.    Okay.  Was that true?

A.    Yes.

Q.    Question 78, Do you believe in an eye for an eye?  And you checked yes and wrote, As I said above, lives are lost, wasted.  People suffer because of this.  Why do we think the murderer's rights are more important than the dead?  They took a life.  They should lose theirs.  Does that sound accurate?

A.    Yes.

Q.    Okay.  You know, I don't mean this to be a cross-examination, and I sort of feel like maybe it is, but it's

Page 126

very important for us you can imagine. Do you feel that way? If somebody intentionally, intentionally, takes the life after premeditation, substantially planning, of five people including two children, would it be your position that that person's made a decision already to forfeit their life?

A.  I'm struggling because what you're reading to me in my mind is extraordinarily judgmental. And I do not want to see myself as that way.

Q.  It's not, and I'm sorry. It's not judgmental. The reason we ask these questions honestly is so we can go through this process and try to find 12 people who are suited for this case. And the judge I'm sure is going to tell you because of the responses you've given you are articulate, forthcoming. You've divulged information that many people would not want to talk about in an open courtroom. And you've done all that out of your sense of responsibility and civic service. And we appreciate that. Honestly we do. And we're not trying to judge you, honestly. I know that doesn't sound true, but we --

A.  No, no, no, I don't think you're trying to judge me. I said I feel I'm very judgmental.

Q.  Okay. Well, don't judge yourself. But we need to know this obviously.

A.  Right.

Q.  Would it be fair to say that because this case involves these allegations of the intentional murders of children after

341

substantial planning and premeditation that this is not a case in which you would realistically be able to consider a sentence of life imprisonment, that death really is the only appropriate punishment in this case?

Page 127

A.    No.

Q.    No.    Why do you say no?

A.    Because I'm learning today; okay?  Because I'm learning today.

Q.    Well, let me ask you this then.  Let me read this answer to you first.  Have you ever felt -- held a different view about the death penalty?  Yes.  And you wrote, I was once more unsure of my feelings.  I question the taking of a life as a punishment.  I'm still unsure of the Bible's view but have become more convinced in mine.  Is that accurate?

A.    When I filled out that questionnaire, Angela Johnson was not a person.

Q.    Sure.

A.    You introduced her to me today.

Q.    Right.

A.    Okay?

Q.    Sure.

A.    That makes a difference.

Q.    The fact that you've been introduced to her.

A.    She's a person.

Q.    Sure.  But anybody in this situation who would be facing

342

these kind of charges and this kind of punishment, they're people; right?

A.    Not when the questionnaire was filled out, no.

Q.    This is what you wrote in response to question 82.  What are your thoughts and opinions about life in prison as a punishment for a person who is guilty of intentional murder?  And as you heard, that's the alternative to the death penalty; right?  You wrote, First of all, it's not a life, merely an

Page 128

existence. I mentioned before the cost to the state to care for lifers and the strain on budgets already strained. If an individual could use that sentence as a means of any sort to aid others, educate others sparing their lives, then this has meaning.

And then you're asked this question: Why do you feel this way, or what are some of the reasons for your beliefs about life in prison without the possibility of parole or release? And you wrote, I guess from reading about noted murderers and what their life consists of in prison on death row. Also from reading about those who used the time for good and tried to help those on the outside.

Is that right? That at least suggests to me that if we're doing this weighing in the second part of the trial and on the side of the government we have the intentional murders of five people including two children that the defense would need to balance that off in some way, have to present to you some

343

mitigating evidence in order for us to have a chance at a life sentence given your strong preference for death in this type of a case. Is that true?

A.    I never thought about it before.

Q.    Well, you were asked about some factors the jurors might be asked to consider in this case. Please review each of the situations listed below. After each situation describe what effect, if any, each have on your thoughts and opinions about an appropriate punishment. For a person guilty of intentional murder, for -- factor the guilty person killed more than one person at the same time, you wrote, This was not a crime of passion, lost control, the death penalty seems appropriate. Is

Page 129

that right?

A. I guess so.

Q. The guilty person was -- I'm sorry. Yes. The guilty person was pregnant at the time of committing the murder doesn't change the fact that somebody dies. With the appeals process, the baby will be born before the punishment is enacted; right? Does that sound right?

A. (Nodded head.)

Q. And then this one here, the guilty person participates in the killing of children, and you wrote, I have no mercy here. Children are seldom to never able to protect themselves. Does that sound right?

A. It certainly does.

344

Q. Is that a true feeling of your views?

A. Yes, it is.

Q. That says no mercy for somebody who intentionally kills children. Am I reading that right?

A. You're right.

Q. Okay. Is that how you feel?

A. Yes.

Q. Okay. You were asked to consider if the guilty person assisted, encouraged the murders but was not the person who pulled the trigger, and you said, All the more reason for the death penalty. They sure didn't try to prevent murder. Is that accurate?

A. Yes, it is.

Q. That's what we lawyers might refer to as a mitigating circumstance because it's a relatively minor role in the offense. It doesn't mean somebody's not guilty. Do you

Page 130

understand? Are you following me?

A. I'm following you.

Q. Okay. And instead of that being something towards life, you think that would really be a factor towards death.

A. That's what I wrote, yes, it is.

Q. In response to this factor, the guilty person was mentally, emotionally, physically abused and neglected as a child, you wrote, Wouldn't it be nice if everyone from this environment could use this as a reason for our failing -- failings and

345

actions? They still had a choice not to commit murder. Is that an accurate account of how you feel?

A. If that's what I wrote, yes.

Q. Does that sound like what you wrote? Would you like to see it?

A. No, no, no, I believe you.

Q. Okay.

THE COURT: Could I see the lawyers at sidebar for a second?

MR. BERRIGAN: Yes.

(At sidebar on the record.)

THE COURT: We need to be at the microphone here. You're not going to seriously try and rehabilitate her, are you?

MR. MILLER: I might ask her the one question, but I think we're --

THE COURT: I don't care how she answers that question. I'm confident that I could rehabilitate her enough that --

MR. BERRIGAN: I'm sure you could, sir.

THE COURT: I'm sure I can, but I'm not going to

Page 131

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 300 of 3245

because I would have no confidence in the fact that I had rehabilitated her. She's gone. There isn't anything anybody could say to convince me otherwise. Thanks.

(The sidebar was concluded.)

MR. BERRIGAN: You've been very candid not only

346

earlier today but in this questionnaire. Thank you very much for your time.

THE COURT: Juror 222, I just wanted to echo what Mr. Berrigan said. You know, I talked at the beginning about serving the country by doing jury service, and I really forgot to say you serve your country as well or better just by being honest in your answers. You've been incredibly honest. I think you've done a lot of soul searching. I've been incredibly impressed by you. I think you would make a wonderful juror but not in this case, but not in this case, in another case where the death penalty wasn't an issue. I think you'd be a terrific juror for both sides.

And so it's ultimately my call, and I'm going to exercise my judgment to let you go in this case and dismiss you, but I want you to know I have a lot of admiration for you. We covered a lot of things that were not easy, and you were exceptionally forthcoming, and that's just absolutely terrific. I really applaud how you handled yourself today. And so you're dismissed. Thank you very much.

PROSPECTIVE JUROR 222: Thank you.

THE COURT: Thank you. Good luck to you.

(Prospective Juror 222 exited the courtroom.)

THE COURT: Anything we need to take up before one?

MR. WILLIAMS: Yes, Your Honor. We may want to do

Page 132

this at sidebar, though, if we could.

347

THE COURT: Okay.

(At sidebar on the record.)

MR. WILLIAMS: We just got in the criminal history on one of the jurors, Mr. Hughes, which is 139.

MR. BERRIGAN: Involuntary manslaughter. Was it a felony?

MR. WILLIAMS: It was a felony. Looks like it's from the state of Nebraska. What I don't know -- and we're going to have to ask some questions of him in this area. It appears that he was sentenced to one year to four years' confinement which would fit as a felony conviction. It may have been deferred. It may have been expunged. And it was out of Nebraska, so we don't have the underlying documentation on that, but I wanted to alert you and alert you.

MR. BERRIGAN: He didn't try to hide it, Your Honor. It's in his questionnaire. He talks about it at length.

THE COURT: Does that disqualify him statutorily?

MR. WILLIAMS: Well, if it's a felony it would. And what I don't know is whether it's a -- it wasn't clear from the questionnaire whether he was actually convicted. It wasn't clear whether he was deferred judgment. I mean, he disclosed he had it.

THE COURT: Why don't we just take it up with him individually.

MR. WILLIAMS: Sure. I just wanted to alert

348

everybody.

Page 133

THE COURT: Thanks.

(The sidebar was concluded.)

THE COURT: We'll see you back here at one. Anything else?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: No.

THE COURT: Okay. Thank you.

(Lunch recess at 12:08 p.m.)

THE COURT: Ready for Juror 430?

MR. WILLIAMS: Yes, Your Honor.

MR. BERRIGAN: Yes, sir.

(Prospective Juror 430 entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

EXAMINATION

BY MR. WILLIAMS:

Q.   Good afternoon, ma'am.

A.   Hello.

Q.   I know you may be a little nervous. Please try not to be. We're going to try to ask you questions, and again, it's the same as what we said before. There's no right or wrong answers. What we really need to do is have you tell us what you're really feeling, what's really in your heart, and what you really

349

believe. The goal, as I said previously, is we need to find people who realistically and honestly can consider both possible punishments in this case, and so that's one of the main things we're going to be talking to you about.

I want to talk to you briefly before we get into that

Page 134

topic, though, about publicity. You indicated in your questionnaire that you had only just heard about this case, and I think that you'd heard about Dustin Honken and that he had killed a woman and two children and two agents over drugs in response to question number 63. Does that sound familiar?

A. That does, yes.

Q. Okay. And then you indicated in response to question 65, describe -- when it asks you to describe if people have said things to you about it or you may have said something, you said, Just that I'm glad that they found the bodies of these people so that their loved ones could have some sort of closure. I've said this to your grandmother and to your sister; is that right?

A. That's correct.

Q. On the next page continuing on this publicity issue, question 72, it'd asked if you had formulated any opinions or beliefs about the guilt of the defendant. And you indicated you would not be able to come to conclusions of guilt or innocence unless selected as a juror and able to hear all of the testimony. Do you recall writing that down?

A. I do recall that, and that's what I believe.

350

Q. Okay. And that's where I want to go with this. First of all, since you filled out this questionnaire, have you seen any other publicity on this case, heard anything else about this case?

A. No, I have not.

Q. All right. And you do know a little bit about this case, and you picked that up through newspapers and television according to your questionnaire. Is that fair to say?

A. Yes, sir.

Page 135

Q.    You know what we need in this case are jurors that are going to decide this case based on the evidence in this case, the testimony from the witness stand, the actual documents and so forth, and not over what you may have heard from the press or read in the newspaper or heard on TV.  You can appreciate that that's what we're looking for.

A.    Yes.

Q.    Only you can really tell us, ma'am, if you feel you're the type of juror who can set aside anything they may have heard about this case from the press, recognize that, you know, that's kind of secondhand knowledge of the case.  That's not evidence. It's not something that was sworn to under oath.  It wasn't anything you've seen in front of the -- as a juror and be able to set that aside and decide this case based on the evidence alone.  Some people can do that.  Some people can't.  And you're going to have to tell us yourself what you think of that.  What

351

do you think?

A.    I believe as the type of person that I am that I don't tend to pass judgment unless I do have all the facts no matter who the person is.

Q.    And you think that despite the fact that you've heard stuff about this case you can set that stuff aside in your mind, you won't discuss it with any other jurors down in the jury room, and you'll decide this case on these facts.

A.    Yes, I do.

Q.    Did you hear about the -- let me start over.

You've heard that somebody was killed.  You heard about bodies being recovered.  Have you heard about any other legal proceedings at all related to this case?

Page 136

A. No, I have not.

Q. Very good. Let me talk to you then and move to this topic about penalty. The next question that we get to in the questionnaire talks about do you have any beliefs or opinions about the appropriate punishment for Angela Johnson if she were found guilty of the intentional murder -- intentional killing of five people including two children, question 73, and you wrote -- you checked the box that said unsure, and you said, Life without parole with definite mental health therapy or the death penalty would be my choice. Do you recall writing that down?

A. Yes, I do.

352

Q. And do you still have those feelings that those are appropriate punishments?

A. Yes, I do, but I would still have to hear further testimony as to what all happened and what facts led up to that and keep an open mind.

Q. That's a great point. I mean, because, as we explained earlier to you, you don't have all the facts at this point. You have, in fact, no evidence in front of you.

A. Right.

Q. And so when we're asking you these questions, we're never going to ask you to predict how you will, in fact, vote on anything. What we're going to be asking you to do is to do your best to tell us what you think might have an impact, what you think you might do in certain circumstances.

So, for example, you know, some people come in and they hear that this case involves the murder of children, and they decide, you know, given that and given that fact alone, I'm

Page 137

not going to listen to anything else. That fact alone is enough for me to say death penalty. It doesn't matter what else the evidence is. Doesn't matter to me what else anybody else presents. You know, you're involved in murdering children, and you get the death penalty. And some people feel that way, and that's fine. You know, if they have that opinion, we want to know it.

A.    Uh-huh.

353

Q.    And we respect people who have that opinion because we respect everybody's opinion. What we're looking for, though, is people that aren't like that, that are able to keep an open mind because we need people that can fairly and reasonably consider both sides of the issue, both possible punishments.

Now, one of the questions involved in this case -- or in this questionnaire is question 83, and it just asks you right before that about life imprisonment, and one of the things you wrote down here is -- in question 83 is that life may be harder for them, that life imprisonment might be harder for somebody than even the death penalty. Do you remember writing that down?

A.    Yes, I do.

Q.    And what are your thoughts on that? Why do you think that that might be harder?

A.    Well, just being in the same place every day, the monotony, other inmates or people that you could possibly clash with every day over who knows what.

Q.    Life imprisonment is a long time.

A.    Yes, it is.

Q.    Person would actually --

A.    Depending how long you live.

Page 138

Q.   Sure.  A person would actually die in prison.  You indicated in your questionnaire in response to question 79 which talked about if a jury sentences a person to the death penalty, do you believe the individual will actually be executed based on

354

the jury's verdict, and you said, No, I believe the judge has the final say.  He has the power to overturn or minimize sentences.

I want to explore that with you for just a minute.  The judge will ultimately instruct you on the law in this case.  But when it comes to the issue of the death penalty or life imprisonment, that ultimately is the decision of the jury.  The judge can overturn the trial if there was a mistake during the trial, if there was a need for a new trial or, you know, insufficient evidence or something like that.  But when the jury ultimately makes the decision on the penalty, that decision sticks.  It's the jurors' decision, not the judge's decision.  Life imprisonment, as I said before, is life in prison in the federal system.  There's no parole.  If you get sentenced to life, it means the rest of your life.  Do you understand that distinction now, because this is --

A.   Now I do, yes.  Thank you.

Q.   You never had the benefit of discussing this issue before.

A.   Only the second time I've been in a courtroom so . . .

Q.   Very good.  Now, in question 75 you indicated that the death penalty is the best punishment for intentional murder.  And then when we get over to question 87 which raises a number of potential factors called situations as we list them there and it talks about a person killing more than one person at a time, the person was pregnant and so forth, do you remember that

Page 139

series of questions?

A.    Yes.

Q.    And in response to each one of those you wrote death penalty after each one of them.  You gave some explanation, but ultimately you said death penalty.  Now, those are some situations, and you recognize that you don't have all the evidence in front of you at this time.

A.    Correct.

Q.    Are you the type of juror who is willing to wait to hear all the evidence before you ultimately make up your mind?

A.    Yes, I am.  And based on that set of questions, I was assuming that that was just -- that was the evidence was that single question.  So in my response to that, I did have to write what I thought.

Q.    And that's great.  And here's my concern, ma'am, and I'm just going to be very frank with you.  I have a duty, as does everybody in this courtroom, to make sure that any juror that sits in this case can tell us honestly and realistically that despite a case where five people were murdered, including two children, that they're still willing to consider the possibility of life imprisonment as a possible punishment, that it may be sufficiently severe.  And if you don't feel that way, that's fine.  But we need to know if you're able to do that because we can't have jurors sitting here that aren't willing to do that.  And only you can tell us whether you can do that.  You know,

given your answers here and the fact you wrote death penalty

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 309 of 3245

after each one of those, it leads me to be concerned whether you can do that.

A. I can weigh facts, you know, or testimonies or different things. But my belief still is in the death penalty, yes.

Q. Okay. And so you believe in the death penalty.

A. I do believe in the death penalty.

Q. Okay. And the question I have for you is a little bit different from that, though. It's not do you believe in the death penalty as a possible punishment but just the opposite in a way. Do you believe life imprisonment could be a sufficiently severe penalty for somebody found guilty of killing five people including two children?

A. I would have to hear all the testimony.

Q. And are you willing to do that before you make up your mind?

A. Yes.

Q. Are you automatically thinking, you know, I don't care what the evidence is going to be in this case?

A. No, sir. I'm not that type of person.

Q. Okay. And that's the sense I got. Let me just put it to you again very bluntly, and I really appreciate your patience with me and your honesty here.

A. No, I like honesty.

Q. You understand how critical it is. We want to make

357

absolutely certain that you're willing to give Angela Johnson the option here of concerning life imprisonment. We can't have somebody on the jury that has already come in and has already made up their mind that, boy, if you kill children, you kill five people, I don't care what other evidence there is; I don't

Page 141

care about any other facts at all. I've made up my mind that person deserves the death penalty. There's no way life imprisonment is a sufficiently severe penalty for somebody who does that.

And if you feel that way, that's fine. Everybody's entitled to their opinion, and nobody's going to judge you. But if you can promise us that that isn't your view, then we need to hear that. But you tell me, where are you at on that topic?

A. Well, as I said before, when I answered that series of questions, it was based on one sentence which them are the only facts there are. And in my belief to that particular sentence, that was my answer. There was no other facts. In Miss Johnson's case, I don't know any of her testimony or her background or her life history or anything, so, you know, being said, I couldn't decide until I heard everything.

Q. Okay. Let me add one last twist to this before I sit down with you; okay? As I outlined how this process works ahead of time, the government has an obligation to come forward and present evidence of aggravating factors, number one, before the jury can even consider the possibility of the death penalty.

358

And if those are found, then afterwards the government's going to come forward and present evidence of aggravating factors, and we have to do that beyond a reasonable doubt. But just as in the guilt phase, the defense has no obligation to present any evidence at all. So we could go through this penalty phase if we get to that point, we could go through the penalty phase with the government just providing evidence and the defense not providing anything, and they don't have an obligation to provide any evidence. They don't have an

Page 142

obligation to tell you anything about her background, to prove any mitigating factors at all. Despite that, are you still willing to consider life imprisonment as a possible punishment?

A. I'm open minded, like I said, so that's the only answer I can give you.

Q. Would you --

A. In everything in my life, not just about this case. It's a very serious issue, but in day-to-day living, that's -- open mindedness is part of my belief so . . .

Q. You're not a juror who is going to get to the penalty phase and if the defense doesn't get up and present some type of mitigating evidence you're just going to make up your mind then that the death penalty's it?

A. No. I'm a thinker.

MR. WILLIAMS: Very good. Thank you. I have no further questions, Your Honor.

359

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Thank you, Your Honor.

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, ma'am?

A. Good, thank you. And you?

Q. I'm sure you were delighted to come back, huh? We're not going to keep you so long.

A. Okay.

Q. I want to reiterate something not only as the Court said but the prosecutor has now as well, and it's really an important concept in this process; okay?

A. Okay.

Page 143

Q.   We are not doing this questioning to determine whether people would be willing to listen to the evidence because we assume -- and you've certainly made it very, very clear -- that you're willing and able to do that; is that true?

A.   That's correct.

Q.   And not only that, but you are telling us that if you were presented with evidence you wouldn't make a decision until you had heard it all.

A.   Yes.

Q.   Is that what I'm hearing from you?

A.   Yes, it is.

Q.   And part of this is unfair as has been alluded to because

360

you haven't heard any evidence.  We all admit that.  We've given you some facts or at least allegations in this questionnaire because we do not have the opportunity, much as we'd like, to have you sit through the trial and listen to all the evidence and then come back and say, hey, would you do this or that?  So we have to rely on this process, as inartful as it is, to try to make a determination about the best 12 people for this particular case; okay?

A.   Okay.

Q.   Some jurors are fine and just absolutely wonderful jurors in some type of cases, and then because of their background and human life experiences that we all have, other cases might not be great for them; okay?

As an example, I noticed that you talked a lot about your brother's difficulties with drugs.  And maybe a case involving just drugs and not murder might be a difficult situation for you.  I don't know.  But I point that out as maybe

Page 144

a potential example; all right?

A. Right.

Q. So I want to kind of fast forward with you if you would do that with me theoretically and ask you to assume that you've had the opportunity you wanted. You have been selected, and you've listened to the evidence. And not only have you listened to it, but you've listened to it with your fellow jurors. You've analyzed it critically, and you've discussed it with them.

361

You've considered their opinions, and you formed some of your own opinions. And you deliberate upon that evidence, talk to them, discuss it, and make a determination that what you've determined beyond any reasonable doubt is a case involving intentional murder; okay?

A. (Nodded head.)

Q. That's kind of where we are in this process when we're asking these questions. We're past the point of listening to the evidence, frankly. We've heard the evidence, and we're asking you to make some determinations now based on these theoretical facts; okay? So that's -- in that light I wanted to review a couple of these responses with you if I might.

The first -- very first question about the death penalty says, What are your thoughts and opinions about the death penalty as a punishment for a person who is guilty of intentional murder? That was the question. And you wrote, I believe this is the best punishment for intentional murder. People who kill maliciously should pay the ultimate price for their actions.

Now, I see you wrote maliciously, and the question said intentional, but is there a difference in your mind, or are

Page 145

those things about the same?

A. To me, intentional murder is malicious.

Q. Okay. And you were asked, Why do you feel this way, or what are some of the reasons for your beliefs? I think those

362

who show no remorse whatsoever should be punished to the full extent. Does that sound accurate?

A. That does.

Q. And when you say the full extent, does that mean the death penalty?

A. Yes.

Q. Okay. You were asked this question: Do you believe in an eye for an eye? And you checked yes, and you were asked to please explain. You said, I think do unto others as what you would want done to you. And you added this kind of flip side which I hadn't seen anybody do, and you said, And it's nice to watch out for others and they would do that back for you. Does that sound right?

A. Yes.

Q. Okay. Your last question 84, Do you think that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder, and your answer was no. No, the murderer had time to deliberate, plan, and be strategic to when, where, or how they would carry out their plans. Does that sound right?

A. Yeah.

Q. Okay. And are -- these responses that I've given, are they not only accurate, but do they reflect your true feelings?

A. Yes, they do.

Page 146

Q.   Okay.  So then let me ask you this question.  I want you to kind of jump ahead now again.  I understand you'd want to listen to all the evidence, but let's assume you've done that; all right?  You've made this decision.  Not just you, you and your fellow jurors decided beyond a reasonable doubt, all 12, this was a case of intentional, to use your words, malicious murder.  Not only that, there are five people that have been killed.  Two of them are innocent children, girls ten and six years of age.  You with me?

A.   I'm with you.

Q.   Okay.  Given these responses that we've reviewed, is it fair to say that in your view that kind of a case -- you've heard the evidence; you've made that decision -- that's the kind of case that the death penalty is the only appropriate punishment?

A.   I agree.

Q.   Okay.  Life without parole as you said yourself in question 84 would be an insufficient punishment for that type of person -- I mean that type of a crime.  Am I accurate about that?

A.   That's what I believe, yes.

Q.   Okay.  In fact, you were -- as the prosecutor mentioned, you were given a series of things to consider.  Please review each of the situations listed below.  This is question 87.  After each situation describe what effect, if any, each have on

your thoughts and opinions about an appropriate punishment for a person guilty of intentional murder.  The first one was the

person killed more than one person at the same time. And you wrote death penalty. They had time to plan and carry out their actions. Is that accurate?

A. Yep.

Q. Is that how you feel?

A. Yes, I do.

Q. The factor the guilty person was pregnant at the time of committing murder, you wrote death penalty, place the baby up for adoption to a caring family. Is that right?

A. That's what I wrote.

Q. The guilty person participated in the killing of children. You wrote death penalty. The killing of children intentionally is unforgivable is what you wrote. Is that how you feel?

A. That is how I feel.

Q. The guilty person had a past history of drug use, and you wrote death penalty. Even under the influence people know murder is wrong. Is that accurate?

A. That is what I believe.

Q. Okay. And then this one here, the guilty person is a parent of two children, and you wrote death penalty. The children shouldn't -- that's should not -- be subject to constant reminders of parents who kill. And I want to make sure I understood that right. Does that mean that it would be better

℉

365

for the children that the parents got the death penalty so that they would not -- the parents would not be around as reminders of these crimes? Is that what you meant to tell us?

A. Can you repeat it, please?

Q. Yeah. This is the language that you -- here's the factor: The guilty person -- that would be the person who committed the

Page 148

murders -- the guilty person is a parent of two children, and you were asked to consider that factor in deciding the appropriate punishment, and you wrote death penalty. The children shouldn't, should not, be subject to constant reminders of parents who kill. That's what the questionnaire says.

A.    Right.

Q.    What does that mean?

A.    Well, when I wrote that, I meant that -- granted, I have not been in that situation, but I think it would be tougher on the children if they were constantly reminded that their parents were in jail for first-degree murder or intentional murder, I mean, not just from their own but from society and, you know . . .

Q.    So your view would be that that would benefit the children of the murderer, the defendant, if the parent was put to death so that that wouldn't remind -- the parent wouldn't remind the child -- the parent's existence would remind the child that this is a parent who had killed people.

A.    Yeah.

366

Q.    Is that accurate?

A.    That's what I think.

MR. BERRIGAN:  Okay.  That's all I have, ma'am.  Thank you.

PROSPECTIVE JUROR 430:  Thank you.

EXAMINATION

BY MR. WILLIAMS:

Q.    Ma'am, I just want to come back to one of the questions or a couple questions that Mr. Berrigan asked you.  It kind of raises that same concern I had before.  And what I'm fearful of

Page 149

is we've got a couple lawyers up here that are putting words in your mouth, and I don't -- neither one of us want to do that, and so I want to try to give you as open ended of a question as I can and really let you tell us from your heart what you're feeling.

Let's go with Mr. Berrigan's assumptions of the case; okay? You sat with your jury. You have found the defendant guilty beyond a reasonable doubt of intentionally killing five people including two little kids. You're back in the jury room, and you're trying in your own mind to figure out what the appropriate punishment is. You have two options: Death penalty and life imprisonment. What are you thinking at that point?

A. Based on all the evidence I have heard hypothetically, if the person is convicted of intentional murder of five people including two children, my personal opinion or view if I were a

367

judge would be the death penalty.

Q. Would you even consider life imprisonment as an option?

A. I would consider, I mean.

Q. And let me do this. And by consider I mean not just, okay, yeah, it's a hypothetical punishment, but I mean consider. I mean really fairly consider it, look at that as an option, think about the consequences of somebody spending the rest of their life in prison, weigh that with all the other facts in the case, and really give it consideration. Or is your mind made up enough that, you know, somebody who kills five people including two little kids, it's just the death penalty? And we're going to respect whatever you say. We want this to come out in your own words and not what either one of us is putting in your mouth. So you please tell us where you are at on this issue.

Page 150

A.   My views on intentional murder is capital punishment.  I can't -- even with all evidence that I couldn't change my mind, it'd be something I'd have to highly think about for a while as to a death sentence or life in prison.

Q.   So do I hear you then saying you don't really think you could consider life in prison as an option for intentional murder?

A.   I said it's something I couldn't change my mind about like overnight.  I'd have to think about it.

MR. WILLIAMS:  Okay.  All right.  Thank you very much.

PROSPECTIVE JUROR 430:  Thank you.

368

THE COURT:  Ma'am, if you'd just step outside, we'll let you know in a minute.

PROSPECTIVE JUROR 430:  Okay.  Thank you.

(Prospective Juror 430 exited the courtroom.)

THE COURT:  Two things.  Mr. Berrigan, I know you wanted to get up and ask some more questions.

MR. BERRIGAN:  Actually I wasn't sure we were permitted to do that in the first place.

THE COURT:  Until Mr. Williams did it.

MR. BERRIGAN:  Right, until he did it.

THE COURT:  I could sense that, and it's not something we had actually talked about.

MR. BERRIGAN:  Okay.

THE COURT:  But I know you -- I suspect you wanted to ask more questions.

MR. BERRIGAN:  No, I did not.  I thought that juror was done, Your Honor.

THE COURT:  I think she's done too.  I think she's

Page 151

done too, and I think my opinion counts a little more on this one.

MR. BERRIGAN:  I think it does as well.

THE COURT:  Yeah, but you're going to move for cause.

MR. BERRIGAN:  Yes, sir, we do move for cause.

THE COURT:  And Mr. Williams?

MR. WILLIAMS:  No objection.

369

THE COURT:  Let's bring her back in.  Then we need to talk about the procedure.

(Prospective Juror 430 entered the courtroom.)

THE COURT:  Ma'am, thank you very much.  We're going to go ahead and excuse you.  We really appreciate how honest you've been in response to everybody's questions.  That's very admirable, and I'd ask you to do this:  Until we get a jury actually selected in this case which would be probably maybe two to three more weeks, we'd ask you not to talk to anybody about jury selection because you never know if you're talking to somebody who then talks to somebody else who's a potential juror a week or two down the road; okay?  Okay.  Thank you very much for serving.

(Prospective Juror 430 exited the courtroom.)

THE COURT:  Gene, would you wait one minute before you bring the next juror up?  Thank you.

Yeah, we really haven't decided this issue. Mr. Berrigan, in Honken there was kind of this unlimited Ping-Pong match back and forth, and usual -- and sometimes jurors would change their mind as often as I would let a juror -- a lawyer question them.  My inclination is to either do one of two things:  Allow rebuttal but only one round.  In other

Page 152

words, on the government's day, they would get to go last. On your day you would get to go last. But I think my preference is after both sides question for me to ask the question.

370

MR. BERRIGAN: I'd be fine with that, Judge. I thought we would kind of use the rules we used for examination of witnesses. If there's no new area that's covered -- and I can't imagine there would be because we're only talking about two issues --

THE COURT: And the question I intend to ask is can you fairly consider both penalties. To me it's a very simple question. I know you don't like it, but I like it better than the long complicated hypotheticals that I think tend to get the jurors confused. I'm open to suggestions. But I really think that is the best single -- I'm not saying I'm not going to ask follow-up questions.

MR. BERRIGAN: Do you intend to ask that of all of the jurors, sir?

THE COURT: Probably unless it's just so -- you know, unless I think there's no possibility of a challenge for cause.

MR. BERRIGAN: Well, I think the tendency of jurors to answer that question when the judge asks them, with all due respect, is much greater -- the likelihood of the answer being yes is much greater than if either Mr. Williams or I ask that question. I just think that the trappings of the Court if you will --

THE COURT: What question do you want me to ask?

MR. BERRIGAN: I wasn't going to suggest that the Court needed to ask questions. Let's -- if you felt that there

371

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 322 of 3245

was further qualification necessary after the two of us sat down, I'd be happy to go another round. Mr. Williams could do it as well. But it seems to me that most of these people would -- when the second questioner sits down everybody should have an idea as to whether that juror's qualified. We've had every opportunity to ask every question we want, and all we do is get the juror to flip flop when we keep popping back up.

THE COURT: What's your basis that a juror's going to answer falsely to my question?

MR. BERRIGAN: Not falsely, Your Honor.

THE COURT: I think implicit in your argument is they wouldn't answer truthfully.

MR. BERRIGAN: Jurors, like attorneys, we like to please judges, particularly federal judges, and when they're asking us --

THE COURT: I've never noticed that. I've never noticed that.

MR. BERRIGAN: And you're asking us can you be fair, and I know that's not the exact question.

THE COURT: It isn't. It's can you fairly consider, and a lot of people said no to that.

MR. BERRIGAN: Well, I'd rather have Mr. Williams ask it.

THE COURT: Do you think this woman would have said she could fairly consider? I don't think so. And if she said

372

yes, you know what? I wouldn't have believed it. She would have been gone. She's one that if I asked that question and she

Page 154

said yes she's still gone because I wouldn't have believed it.

MR. BERRIGAN:   Then I guess my position would be why ask it.   If you're comfortable enough that you don't think you need to ask the question, then I --

THE COURT:   Because sometimes I'm unsure.

MR. BERRIGAN:   Okay.

THE COURT:   That's the only reason why.   Sometimes I'm unsure.   Well -- so you would actually prefer to have rebuttal I guess.

MR. BERRIGAN:   No, I would prefer that we each got our one shot at the apple and then we sat down and if you were unsure after that then you could invite us for further questioning, but I'm hopeful that that's not going to happen too often.

THE COURT:   I think it's going to happen most of the time.

MR. BERRIGAN:   You think it will be most of the time. Well, with that I would say rebuttal once on each side and that's it.   You get back up, that's your second time, you're done.

THE COURT:   What's your position?   What's the government's position?

MR. MILLER:   Your Honor, I --

373

THE COURT:   You're on.

MR. MILLER:   Can you hear me?

THE COURT:   Yes.

MR. MILLER:   Whether there's no rebuttal or multiple rebuttal, either one's fine with me.   The question that I'm concerned about is foreclosing the Court.   I think the Court has

Page 155

to have the opportunity to quiz these jurors himself because you're the one making not only a question about whether the record reflects qualification but whether you believe that the person --

THE COURT: Because ultimately I'm the judge of the credibility of the potential juror.

MR. MILLER: You're making a credibility assessment.

THE COURT: And I know you want to keep me out of it as much as you can. That's been loud and clear. But -- and that's fine. I mean, that's one view. I respect that. I happen not to agree with it. But I respect it. But, you know, I guess we could go to the Dean Whipple system and pick a jury in two days or a day.

MR. BERRIGAN: No, and I'm not encouraging that, of course.

THE COURT: We could where I'd ask all the questions.

MR. BERRIGAN: I thought this juror was a good example of my concern. Before we got to the mitigating circumstances, I think that was a little bit vague. But when you heard that

374

response to what would you do to a parent who murdered, in my mind, that's as crystal clear as to this juror's views as anything. And I just don't know that the Court -- when you say fairly consider that the juror's thinking along those lines. Oh, I see. Let me look at these mitigating circumstances, and these are the aggravators, and they're going through that whole process in the few seconds that --

THE COURT: Well, they're not, and that's the beauty of it because to be honest with you, neither side does a very good job in my view of explaining to lay people aggravators and

Page 156

mitigators, but I don't think you need to do it because I think fairly consider encompasses it all for a layperson. You're not talking to lawyers, and your knowledge of this is so far advanced to mine and certainly to the jurors, and I think the better question is can you fairly consider it, and then the question is how much confidence do I have in that answer. I would have had no confidence in this case. She was clearly gone based on your questioning. The government couldn't have rehabilitated her. Could I have rehabilitated her? Sure I could have. I have great confidence in my ability to rehabilitate potential jurors which is exactly why I don't do it.

MR. BERRIGAN: As do I. That's why I'm concerned about it.

THE COURT: But I don't think that's really a real

375

rehabilitation. It's just -- because -- and I would have had no need to ask her because she was gone in my view.

MR. BERRIGAN: Your Honor, I believe that the law, specifically Lockhart versus McCree, requires that the jurors be able to consider, and they mean consider, not, oh, I'll look at it but not take it into account. They mean consider mitigating circumstances. It's more than would you consider both punishments. If they're not willing to consider the evidence that the defense --

THE COURT: Oh, I understand that completely. You can certainly ask that. Have I precluded you from asking that question?

MR. BERRIGAN: No, sir. All I'm suggesting is that the one question the Court's contemplating, I don't think it

Page 157

answers that question.

THE COURT: It doesn't answer that question.

MR. BERRIGAN: Okay.

THE COURT: But you have all the opportunity in the world to ask that question.

MR. BERRIGAN: Well, I suppose at the end of the day, Your Honor, it depends on what you base your judgment upon, and as long as it's not that answer, fine. And I guess if we hear that question, we'll have reason to be concerned that we haven't made it unambiguous as to the juror's position. But my preference would be, of course, that the Court not ask it.

376

THE COURT: Okay. You ready --

MR. WILLIAMS: Could I just weigh in very quickly on this thing?

THE COURT: Yes.

MR. WILLIAMS: Number one is my experience with you in Honken is that I thought your questioning cleared up some ambiguity when we had jurors who we couldn't figure out where they were at. We would encourage you to step in wherever you think necessary to ask questions to clarify where they're at in their position. We think it was helpful in Honken. We think it would be helpful here.

The other point I want to make, though, is the defense is labeling certain facts as mitigating factors, and I take issue with that. For example, the defendant is a parent of two children and intentionally murders two little girls, the defense says that's a mitigating factor. That same fact can be looked upon as an aggravating factor: How dare she kill two little girls when she has her own two little girls herself? That is a

Page 158

selfish, evil move, and so I can take any one of these facts that the defense is labeling as a mitigating factor and say it's not.

And so what I'm concerned about is that the defense is going down a road that if they establish that a juror has an answer to any fact that they label as a mitigating factor that they don't like, that doesn't show in their view a sufficient

377

view of mitigation, that somehow they've persuaded the Court that juror cannot be fair and impartial, and I don't think that's accurate.

We can go to the accessory after the fact. If I'm with Tom and Tom is a coward but I convince him to kill Bill Basler here, I haven't pulled the trigger, but I've encouraged Tom to commit an act, and my act of encouraging him to do it is far more evil than Tom's act of actually pulling the trigger. So I have a real strong concern with the defense labeling any of these mitigating factors.

Now, if they want to label mitigating factors and call them that and argue them to the jury, they're obviously free to do that. But what I don't want them to do and I'm asking the Court not to take as established that certain of these facts are mitigators that if the juror gives an answer they don't like to that, therefore, the juror ought to be struck because I don't buy that, and I don't think that's what is established by the law in this case. And so I just want to raise that.

THE COURT: Okay. Mr. Berrigan, anything you want to add?

MR. BERRIGAN: Just briefly. The Court's probably well familiar with the statute, but the fact is that there is a

Page 159

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 328 of 3245

mitigating circumstance under 21, 848(m)(3) that the defendant's punishable as a principal in the offense which was committed by another but the defendant's participation was relatively minor

378

regardless of whether the participation was so minor as to constitute a defense to the charge. Same paragraph, subsection (10), Other factors in the defendant's background or character mitigate against the imposition of the death sentence.

It's true that a juror might not consider a certain mitigating factor a mitigating factor. That doesn't mean that Mr. Williams could argue that evidence presented in mitigation because it in his view is aggravation is, in fact, aggravation. That's a determination left to the jurors as to what weight to give it, but they have to be able to consider it.

But all of that is beside the point. I have not labelled those subparts as mitigating factors with the potential jurors.

What was clear from that woman's response was it doesn't matter what factors were presented. She had already made a determination, so she wrote death penalty next to everything that was written down there. And I think, you know, her position was clear as a result. We can argue when it comes to closing about mitigating and aggravating, but there's no argument here presently.

THE COURT: Not that I see currently, but I'm sure it will arise, and I'll give you the opportunity with our next juror, 513.

(Prospective Juror 513 entered the courtroom.)

THE COURT: Thank you. Please be seated. And we're

379

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 329 of 3245

going to start our questioning from the government.

Mr. Miller?

MR. MILLER:  Thank you, Your Honor.

EXAMINATION

BY MR. MILLER:

Q.    Good afternoon, Mr. 513.

A.    Good afternoon.

Q.    How are you holding up so far?

A.    Oh, not too bad.

Q.    This kind of an unusual day for you?

A.    Little bit.

Q.    Good.  At least we broke up your week a little.  We want to visit with you this afternoon about a couple issues, one, any pretrial exposure that you may have had to publicity about this case, and I notice there was a little note in your questionnaire, but we need to cover that and also your views on the death penalty; okay?

A.    All right.

Q.    Before I get to that, just I'm curious.  Tell me about tractor restoration.  What's that involve?

A.    Oh, just like tearing down tractors and putting them back together more or less.

Q.    Okay.  Not little toy tractors but the whole big thing?

A.    Yeah.

Q.    How long you been doing that?

380

A.    I just do it with my dad a little bit.  Right now he's restoring a tractor that his dad had, the original one he had, just taking it all down, painting it back up, taking all the

dents out, that type of thing.

Q. Then do you sell them?

A. No.

Q. Just you have a collection of your own then?

A. Yeah. Well, they actually use them too.

Q. Okay. Practical restoration project. Very good, sir.

Now, you indicated that you had little recollection about what little you read about or saw about this case other than what was in the Court's questionnaire. As we've visited with you here today, has that sparked any further recollection?

A. Not really.

Q. What do you remember about this case from any pretrial publicity?

A. I think I just heard about basically where it took place is about it, just Mason City, Manson, that type of thing. Other than that, I just hadn't really paid that strong attention to it.

Q. I trust that news exposure didn't cause you to form any fixed opinions about the merits of the case.

A. No.

Q. And should you happen to be required to serve on this jury, you understand that any recollection that might be sparked by

381

evidence that comes in here is not evidence. It's only what happens here in the courtroom that you're to consider.

A. Yep.

Q. Okay. Can we have your assurance that you would do that if required to serve as a juror in this case?

A. Yes.

Q. Thank you very much, sir. Now, the death penalty, and you

Page 162

PANEL B, 4-13-05

gave us answers to those questions as well, so that's going to shorten this process significantly. Instead of me going over that, can you just tell me in your own words right now your feelings about the subject? I'm sure you've given it some thought over the last few weeks.

A. I guess the best way to describe it is if you did happen to kill five people, you probably deserve to die, but I think it might not be our place to tell you that. Might be our place to tell you to sit in a prison cell and think about it for a good number of years and, like I said in the statement thing there, that I think, you know, you should sit in prison for a while and then go to the death penalty or something like that, but I know that's not a cost-effective type of thing to have happen.

Q. You indicated that the death penalty is a fitting punishment apparently under some circumstances.

A. Yes.

Q. You also indicated in response to your thoughts about life in prison as a punishment for a person who was guilty of

382

intentional murder that that makes sense probably more so than the death penalty. Do you recall answering in that fashion?

A. Yes.

Q. So it would be fair for me to infer from that that you see some merit to both possible punishments.

A. Yes.

Q. Now, Mr. Williams explained this morning about the process that's involved, and it's a little unusual and convoluted. There are steps to the process. You've never served as a juror before I trust.

A. Nope.

Page 163

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 332 of 3245

Q. But you understand that in every case the defendant is presumed innocent until proven guilty beyond a reasonable doubt.

A. Yes.

Q. If and only if that happens in this case, there would be a later phase or phases relating to the possible punishment, a first phase being a gateway phase we call it in which the jury looks at evidence and determines whether or not the government has proven beyond a reasonable doubt aggravating factors that would make the death penalty even a possibility such as the killing of multiple victims or the killing of particularly vulnerable victims such as children. Are you with me so far?

A. Yes.

Q. And what I want to do is talk with you just briefly about a hypothetical situation that would arise at a third step if the

383

first two steps were passed. If you and your fellow jurors had already found Ms. Johnson guilty of one or more counts of murder in connection with this case and if you and your fellow jurors had found her to be eligible under the law and in accordance with the Court's instructions for the death penalty, then and only at that point would it be your duty to make a determination of punishment and to do it on the basis of additional evidence coming in at the punishment phase. And we need to find jurors who can assure us honestly and sincerely that they could at that phase give full consideration to both possible punishments. Do you feel you could do so, sir?

A. I believe I could do so.

Q. Realizing that at that point you would already have found Ms. Johnson to have committed or at least participated in the commission of multiple intentional murders including that of a

Page 164

couple very vulnerable victims, if the evidence were to show that, would you still be able to give fair and full and reasonable consideration to both possible punishments, Mr. 513?

A. Yes.

Q. We're talking about killing children, and obviously we're talking about something that's an aggravator and a serious thing. That wouldn't shut the door to you at that point? You would still be willing to give serious and honest consideration to both possible punishments, Mr. 513?

A. I suppose it would depend kind of on the brutality of the

384

crime and that type of thing to see which way I would lean, but I'd still keep an open mind to both possibilities.

Q. Well, you know, it's not my place to ask you what you will do, and this is a subtle distinction perhaps, but it's not fair for me to ask you under any circumstances what your verdict will be. We're simply trying to determine whether or not we can find jurors who can honestly tell us that they will have an open mind and fairly consider both possible punishments if they get to that point. Do you feel you can do so, sir?

A. Yes, I do.

Q. In response to the question 87 where there were listed a series of hypothetical situations, one of them was -- and you were asked to indicate what effect, if any, that might have upon your opinion about an appropriate punishment. One of those indicated the guilty person participated in the killing of children, and your response was, Higher degree of punishment, death penalty likely. Can you give me any thoughts about that, sir?

A. I suppose just you're taking more life away if you're

Page 165

killing a child, I guess, prospectively.

Q.   Children are more vulnerable.

A.   Yeah, they're more vulnerable.  They have more life ahead of them than, say, a 30-, 40-, 50-year-old in most cases.  I'm not saying in all cases.

Q.   Taking more years away from a person under those

385

circumstances.

A.   Yes.

Q.   And that's fair, and that's why it would be considered an aggravator.  You said death penalty likely.  You didn't say death penalty definitely.  I take it from that that you mean you would consider still both possible punishments?

A.   Yeah.

Q.   If you are on a jury in this case that gets to that stage, you would not be ever required to impose the death penalty, and you could only do so if the government proves certain aggravating factors beyond a reasonable doubt.  The defense could but it is not required to present what it considers to be mitigating or lessening factors that might cause one to think that there are circumstances that would tend toward leniency.  Should that occur and should there be such evidence, that evidence need not be beyond a reasonable doubt but only by a preponderance of the evidence.  Do you feel you could give full consideration to both kinds of evidence, evidence of aggravation and evidence of mitigation or lessening of guilt at that stage?

A.   Yes, I think I could.

Q.   And again, ultimately if you find yourself ultimately in that situation -- and we are talking hypothetically -- do you, sir, Mr. 513, feel you could give fair consideration to both

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 335 of 3245

possible and potential punishments?

A.    Yes.

386

MR. MILLER:  Thank you, sir.  I have no further questions.

THE COURT:  Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q.    How are you, sir?

A.    Not too bad.

Q.    We all recognize that this is kind of an artificial process, that we're asking you questions about stuff you haven't heard anything about and asking you, well, what do you think about this and what do you think about that, but I hope you'll appreciate the importance of our effort to get the 12 best people on the case such as this.  Do you?

A.    Yes.

Q.    Would you want -- if you were, God forbid, ever in that kind of a situation, you'd want the judge and the lawyers to do just what we're doing, wouldn't you?

A.    Oh, yeah.

Q.    One thing that you wrote that I wanted to ask you about regarding your views on the death penalty, it's a fitting punishment as they will be truly judged when they die, but I think they should first have to spend a lot of time in a prison secluded to think about what they did and knowing they will die for it.  But I know money issues will prevent this from happening.  And you sort of reiterated that earlier.

387

Page 167

A.    Yeah.

Q.    First of all, tell us what benefit you do think it would be for somebody to sit and contemplate their actions.

A.    Well, for one thing, if they knew they were going to die, they could -- they have that to look forward to.  That's kind of their punishment.  But then they can think about maybe trying to repent for it or whatever I guess and actually feel sorry for it.

Q.    Do you consider yourself a fairly religious person?

A.    Yeah.

Q.    I saw references to that here in a couple of these answers.

A.    Yeah.

Q.    Let me ask you, do you believe life in prison without parole truly is life in prison without parole?

A.    Yeah.

Q.    Okay.  Because we want to make sure you understand that's absolutely right.  Last breath locked in a prison; okay?

A.    Uh-huh.

Q.    The money part of your concern, you mentioned you thought that was one of the problems with the criminal justice system, the cost of incarceration and appeals in death penalty cases. Do you think that's wasted money for our society?

A.    Not necessarily because you want to have -- if you're going to send someone to the death penalty, you want to be completely and absolutely sure.  I mean, even if you're sending them to

388

life in prison, you want to be completely and absolutely sure.

Q.    You know, one issue that comes up a lot in these questionnaires is the relative cost of keeping somebody in

Page 168

prison versus the death penalty; okay? And a lot of folks seem to think it's more expensive to keep somebody in prison for the rest of their life, and there are certainly studies that indicate completely the opposite. But the important thing about that issue is do you think that's a proper consideration for a juror in making a decision about punishment, you know, what the costs would be to the taxpayer?

A. It's probably not the best way to decide. It might be a factor.

Q. If we ask you to set that aside because nobody's going to present any evidence I don't think during this trial about the death penalty being more expensive than life in prison -- that's just not going to happen; okay? And it's not -- to be honest, it's not something that the jurors are going to have a lot to consider, that that's not one of the issues that we want at all factored into this equation about whether somebody lives or dies; okay? You with me?

A. Yeah.

Q. And given your concern about it -- and it's perfectly legitimate and a lot of people share it, but do you think you could just completely kind of keep that out of the equation if you were selected as a juror at this point?

389

A. I think I could.

Q. The other thing I wanted to reiterate the prosecutor mentioned is that, you know, the part of the trial we're talking about right now, it's kind of the end of a three-step process. Do you follow that pretty good?

A. Yes.

Q. And the rules are just so much different in this part of

Page 169

the trial. The rules aren't any different for jurors, at least in terms of listening to evidence. We would expect you to do that, and we would expect you to follow the instructions of the Court. And when the case is finally given you to decide, we would expect that you would confer with your fellow jurors but make your own determination about what in your heart and conscience was true and just and right; okay?

Do you think you're -- you're kind of a young guy as compared to some of the folks that are going to be on this jury, not to suggest they'd try to bully you or get you to leave a position that you held and believed. But do you have any concern about your ability to kind of stick up for your own position?

A. Not really.

Q. Okay.

A. I'm not a highly opinionated person, but I think I can stand up for myself pretty well.

Q. Well, we expect and certainly I can guarantee that Judge

390

Bennett is going to demand that the jurors throughout this trial be respected in every conceivable way. And we expect they would respect each other, and that is that they would listen to the fellow jurors' views and take that into consideration in making their own determination about what the evidence was and how to apply that to the law; okay? But on this particular issue about punishment, these decisions, that decision really, is an individual decision. Do you understand what I'm saying?

A. Yes, I do.

Q. The weighing process that we've talked about, the juror, you, have to determine the weight of the aggravating

Page 170

circumstances that have been found beyond a reasonable doubt, and then you have to on this side weigh the mitigating circumstances. And the mitigating circumstances -- and the judge will give you a list of the things you can consider on both aggravating and mitigating. But one of the mitigating circumstances he's going to tell you I can almost guarantee you is that you need to consider any aspect of the defendant's background or character that the defense advances as the reason to give life; okay? Do you understand that?

A. Yes.

Q. And I wanted to bring that up with you particularly because I noticed that that's something you're inclined to do anyway. You talked about punishment being something where both the crime and the person are considered. Is that your feeling?

391

A. Yes, it is.

Q. Do you believe it's appropriate to consider a person's background, even childhood experiences that might have been traumatic or abusive as affecting what should happen to them later in life?

A. Yes, it should be considered.

Q. Would you be willing to do that?

A. Yes.

Q. I wanted to ask you this question. Let's assume for a second Miss Johnson, she has three sisters and a brother, and some of these experiences that they've had, some of them, they've shared, you know, as a family. Do you have siblings?

A. I have a sister.

Q. Okay. And you know how it is. I mean, you and your sister have shared a lot in life, and this family has as well. But

Page 171

those other brothers and sisters aren't accused of murder; okay? And so one of the dilemmas that I wanted to ask you about is if you are asked to consider Miss Johnson's childhood and experiences -- bad experiences that had happened to her, how would you reconcile this idea that, well, you know, her brother didn't kill anybody; her sisters didn't kill anybody? How would you be able to reconcile that in your weighing process?

A. You can't look at just the way they were raised. That's going to be a big part, but then after they're out of the nest, they're still going to have to -- they're experiencing much

392

different things like he's in completely different circumstances than what she is.

Q. I noticed too you mentioned there are personality traits people have that will affect kind of how they'll turn out later in life as well. Do you believe that?

A. Yeah.

Q. You know, if I had a -- instead of that water there, if that was an egg carton full of eggs and I tipped it over, what do you think would happen to those eggs?

A. I would say they'd break.

Q. You think every one of them would?

A. No, probably not.

Q. Some of them are going to turn out differently, don't you think?

A. Yep.

Q. Even though they suffered the traumatic experience of landing in the middle of the courtroom three feet down?

A. Yes.

Q. The other thing you mentioned I wanted to ask you whether

Page 172

you think it's appropriate, question 87, which was the one that the prosecutor mentioned where you're given a series of factors to take into consideration about punishment. And one of them was drugs, and you said, It's their own choice. May have affected their actions, but they made that choice, no effect on punishment. Is that how you feel?

393

A.    I think so for the most part.

Q.    I want to be really clear because I think sometimes when people are filling out the questionnaires they don't know all this legal gobbledegook that we've been talking about, and they're thinking, well, drugs, you don't get off for drugs. I mean, that's not a defense to a crime. If you left this courthouse and voluntarily took some illicit drugs and committed some crime, you're not going to be able to say, hey, you know, I was on drugs. We agree on that; right?

A.    Correct.

Q.    What we're talking about here is the punishment issue, okay, not the legal responsibility but, if you will, the moral culpability. Do you think people behave differently under the influence of drugs?

A.    Yes, I do.

Q.    Have you seen that yourself not personally, but have you seen friends or relatives perhaps that have had bad effects from the use of drugs?

A.    Well, even like alcohol you can see a different -- they act different. They're more flamboyant.

Q.    You mentioned even in your questionnaire that drugs have a large effect regardless of the amount taken. Does that sound right?

Page 173

A.    Yes.

Q.    What effect did you mean?

394

A.    They just kind of loosen your inhibitions type thing.

Q.    Inhibitions, sure.  All right.  I wanted to ask you just one last thing -- well, two very brief things.  You said you would think life imprisonment without possibility of parole was a sufficient punishment even for premeditated, intentional murder, but you wrote, As long as life imprisonment does not include luxuries such as TV, gourmet meals, and such things.  I don't know of any prisons giving out gourmet meals.

A.    You know the --

Q.    Right, but, you know, TVs, I don't know how much of a big deal that is to you, but I do -- I bring it up because we don't have any control over those things; okay?  The judge doesn't run the prisons.  None of us lawyers do.  God knows the jury don't have any say in what inmates get or don't get or do they get cable or black and white or who knows; okay?  And I just wanted to be sure.  I felt pretty confident it wasn't really something that you would make your decision on whether there were gourmet meals or TVs.

A.    No, no.

Q.    Okay.  And then this last thing then the prosecutor mentioned in closing, kids, you wrote, Higher degree of punishment, death penalty likely.  As he pointed out quite accurately, you know, this case involves the deaths, intentional, the government would argue premeditated deaths, substantial planning involved of five people including two

395

Page 174

little girls six and ten years old; okay? And I need to know if the government proved that beyond a reasonable doubt -- and that's certainly an aggravating circumstance -- am I going to have to do something? Am I going to have to present some evidence to you? Or our team, are we going to have to do something to get you away from your position here that you're going to likely give the death penalty?

A.   I guess I really can't say for sure.  It's going to be hard for me regardless to send someone to die because I don't know if that's my place, but I will highly consider it.  It'd be hard not -- it'd be hard to say she deserves to live if she did what they're accusing or whatever.

Q.   Well, the reason I mention that is because we don't have that obligation under the law; okay?  What the law says is Miss Johnson can sit there at that table for three months and her attorneys can sit there.  We don't have to ask these questions of the jurors.  We don't have to make any openings.  We don't have to put on witnesses, cross-examine anybody, and the burden always, always, always is on that table over there; okay?

A.   Yes.

Q.   To prove guilt, to go through this process in the penalty stage, and even to present these aggravating circumstances and then ask for death.  We don't have to do anything.  I don't want to suggest to you we're not going to fight hard for Miss Johnson; okay?  But nonetheless, I mean, this question, are you

396

going to give us some kind of a burden that the law doesn't give us in order to be able to consider life imprisonment as an option?

A.   I'll always keep it as an option.  I mean, I'm not saying

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 344 of 3245

that I'm going to instantly think she's gotta die for that.

Q. Okay.

A. I guess I'd say no, I wouldn't.

Q. All right. If we were looking at a football field, okay, and the 50-yard line was just like right on and I mean right on the middle of life and death and one goal line is the death penalty and the other goal line is the life in prison without any possibility of parole and we have here the intentional, premeditated killing of 5 people, 2 children, where are you on the football field for that type of a crime?

A. I'd say on the 40 on the death penalty side.

Q. Okay. You're just kind of leaning a little bit that way.

A. Yeah.

Q. But you could definitely go the other way.

A. Yes.

MR. BERRIGAN: Okay. That's all we can ask. Thank you, sir. That's all I have, sir.

THE COURT: Thank you, Mr. Berrigan.

Mr. Miller?

MR. MILLER: No more questions, Your Honor.

THE COURT: Okay. Juror 513, if you'd just stand

397

outside for a minute, we'll let you know your status. Thank you.

(Prospective Juror 513 exited the courtroom.)

THE COURT: Please be seated. Any challenges for cause?

MR. MILLER: We pass for cause.

MR. BERRIGAN: None by the defense.

THE COURT: Okay. Thank you.
Page 176

PANEL B, 4-13-05

(Prospective Juror 513 entered the courtroom.)

THE COURT: Juror 513, you're still in the jury pool, so we won't know for certain till the end of the day whether you'll remain in the jury pool or not, so we'll ask you to go back down to the jury room, and then we'll let you know at the end of the day; okay?

PROSPECTIVE JUROR 513: All right.

THE COURT: Thank you.

(Prospective Juror 513 exited the courtroom.)

THE COURT: Ready for the next juror?

MR. BERRIGAN: Yes, sir.

MR. WILLIAMS: Yes, sir.

(Prospective Juror 677 entered the courtroom.)

THE COURT: Right in the middle of the front row, please.

PROSPECTIVE JUROR 677: Okay.

THE COURT: Thank you. Please be seated, everybody.

398


Mr. Williams, whenever you're ready, you can begin the questioning.

MR. WILLIAMS: Thank you.

EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, ma'am.

A. Hi.

Q. We're going to try to make this quick. We've just got a couple topics we're going to cover with you.

A. Okay.

Q. The rules for you kind of remain the same: No right or wrong answers. We just need to know what's in your heart and

Page 177

what you really believe, okay, and everybody here is going to respect whatever your views are, so don't hold back, don't hesitate.

A.    Okay.

Q.    All right?  First of all, I want to talk to you about publicity.  We have some questions in the questionnaire about publicity.  And, first of all, since you filled out the questionnaire, have you heard anything else about this case at all on news, TV?

A.    I just heard a little bit on the radio about that this trial was going to be occurring and that they were starting --

Q.    You knew that already.

A.    Yeah, which I already knew and that selection would be

399

happening this week and the defendant was accused of murder, five counts, and then it was a meth conspiracy is kind of about the extent of what I've heard.

Q.    And you had heard something about this case before.  You'd heard about Dustin Honken.  You heard that he was convicted of a crime in that case.

A.    Uh-huh, yeah.

Q.    Now, in the same questionnaire you indicated at question 67 you hadn't heard anything about Angela Johnson, and that was at least at the time you filled out the questionnaire.

A.    Right.

Q.    And since then you have heard that her trial's coming up.

A.    Yes, yes.

Q.    And you indicated in your questionnaire, though, when you were asked at question 72, Do you have any beliefs or opinions about the guilt or innocence of Angela Johnson, you checked the

box no. Do you recall checking no on that?

A. Yeah.

Q. Has that changed since you filled this out at all? Do you have any opinion at this point about the defendant's guilt or innocence? Have you made up your mind based on what you've heard?

A. No, I haven't. I guess I really don't know anything about the case really other than what you've told us I guess.

Q. And you understand nothing we've told you or even in this

400

packet is evidence.

A. I mean in the packet that, you know, gave her information, but that's it.

Q. Here's the ultimate question. You've obviously heard something about this case. You've heard that Dustin Honken was convicted.

A. Uh-huh.

Q. Are you able to set that aside and recognize that if you're picked as a juror in this case you need to make the decision based on the evidence presented in this case, not on what happened with Dustin Honken, not what you may have heard on radio or read in the newspaper about this case? But your entire decision has got to be based solely on what comes from this witness stand and the evidence presented to you in court, and some jurors, frankly, can do that, and some jurors can't. They just know they're going to be influenced by what they've heard before. They know they're going to be influenced by the fact that Dustin Honken was convicted, and they just can't set that aside. You're going to have to tell us where you are on that.

A. I believe I can set it aside because I -- I really don't

Page 179

know much about -- I just heard he was convicted. I guess I really don't know much about his case other than that either, so I think I can, you know, put that aside and look for what happens in this case and happens here.

Q. And you recognize his case is a different case.

401

A. Right.

Q. It's a separate case. We're at a new case, new defendant.

A. Probably new different charges and everything.

Q. Everything's going to have to be based on this case.

A. Uh-huh.

Q. You understand that.

A. Uh-huh, I do.

Q. Did you hear anything one way or the other about any punishment regarding Dustin Honken?

A. I did hear that I think he was sentenced to the death penalty. I don't know if that's true, but I guess that's what -- when I heard about that case, maybe it was even just that he was up for it. I'm not sure that he actually got that or not.

Q. Regardless of the outcome on that based on what you heard, how's that impact you as a juror?

A. You mean in regards to what I think about him and this case?

Q. In regards to this case, yeah, exactly.

A. I guess it probably really has no relevance. Really it shouldn't anyway as far as . . .

Q. Well, the bottom line is does it with you?

A. Right, no.

Q. And you're going to set aside anything you know about this

Page 180

case from the news or anything that happened with Dustin Honken

402

and just pay attention to the evidence in this case?

A.    Yes.

Q.    And you can assure us all you can do that.

A.    Yes.

Q.    Let me move on to the death penalty here.  You were asked a number of questions about the death penalty, and you indicated that you believe it would be an appropriate punishment.  You also indicated life imprisonment is a good punishment.  And then there's a series of situations we called them in question 87.  And like the person killed more than one person, you put more severe.  Let's see.  There's another one here where the guilty person was mentally, emotionally, physically abused or neglected as a child, and you said maybe more lenient on punishment under those factors.  And the sense I got from here is that you're kind of middle of the road on this whole thing.  How would you describe yourself on the issue of the death penalty?

A.    Well, I guess I -- I believe in the death penalty.  I think, you know, that it should be upheld.  But then I guess sometimes I don't know how I would be as far as if I had to actually sentence someone to death.  I just question, you know, whether I could actually say that or if I'd be more comfortable with, you know, like a life -- life in prison type, you know, so I don't -- I think when it came down to it I'd have a hard time -- I'd take that decision very seriously I guess.

        And as far as like the severe, I guess I think if

403

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 350 of 3245

there are more people killed, I guess then they would just -- if she was found guilty that she would deserve a more severe punishment than, you know, if there were less people. I guess it just kind of -- I don't know -- seems to make sense to me in my mind.

Q. Sure.

A. And then as far as with the abuse and things that way, I guess I would maybe think, you know, if, you know, there's been a terrible life or things that have led up to that that, you know, maybe it should be a little more lenient as far as like not the death penalty and go more towards the life in prison without parole.

But then sometimes I think, you know, what's the quality of life in prison for the rest of your life? You know, then they have to -- they're dealing with that, you know, their whole entire life.

So I think both are very severe punishments that don't -- you know, that don't need to be taken lightly, that you need to think, you know, through that.

Q. And are you willing to do that in this case?

A. I believe so.

Q. Let me ask it to you this way. Let's assume -- let's fast forward in a hypothetical situation, that you and the rest of the jurors have determined that the defendant is guilty of intentional murder. In this case let's say you determine she

404

intentionally murdered five people including two children. And you're a mother yourself.

A. Uh-huh.

Q. Can you tell the Court that you could still fairly consider

Page 182

the possibility of life imprisonment as a sufficiently severe punishment for somebody found guilty of intentionally killing children?

A.   You mean that I could still do the life in prison, or you mean that I wouldn't think --

Q.   Yeah.  Could you still consider it as a possibility?  No one's asking you how you will vote.

A.   Okay.

Q.   No one will ask you that, but picture yourself at the point that you now know the defendant's been found guilty of killing five people including two children.  Don't tell us how you're going to vote because you haven't even heard the evidence yet. You have no idea at this point.

A.   Sure.  But you're meaning would I think that was a severe-enough punishment?  Is that -- I guess I --

Q.   Right.  Yeah.  Would you still think that would be a severe-enough punishment under those circumstances, or would you think that it just automatically has to be the death penalty if you kill children?

A.   No, I wouldn't think it'd automatically need to be the death penalty.  I would think it could be severe enough with

405

life in prison.  But if found guilty of killing children, I would prob -- I would be more likely to consider the death penalty honestly where maybe if children wouldn't have been involved, I would have thought, you know, maybe life in prison would have been enough, you know, but I -- you know, as far as -- I probably could go either way I suppose, but I would be open to either way I think.

Q.   You'd fairly consider both options?

Page 183

A.     Right.

Q.     And it sounds like you recognize that for you to intelligently make a decision like this you're going to need to look at everything to really weigh this out.  And you recognize this is a tough decision.

A.     Yes.

Q.     And are you the type of juror who's willing to weigh out all the evidence and consider both options?

A.     Yes.

Q.     Now, you indicated earlier that you believe the death penalty should be an option, but, you know, it's something that'd be very difficult.  And I think in your question to -- or your answer to question 75 you said, I believe it would be an appropriate punishment, yet I question my ability to do this.

A.     Uh-huh.

Q.     Let me ask you a question here.  If in the end you're on a jury that has found the defendant guilty and hypothetically

406

let's say you and the rest of the jurors have all deliberated and you have found after weighing all the factors in this case that the death penalty is the appropriate punishment, would you be able to actually sign your name to a verdict form that had the practical effect of causing another person to be executed?

A.     See, that's where I think -- I think I would be able to, but then when it came down to it, I -- that's where I'm saying I think I would question -- I think I would have to be very sure that that had happened, you know, that -- like you said, beyond a reasonable doubt that she was guilty before I could sign something like that.  And just being honest, without sitting in that spot, it's hard to know what you would actually do.  But I

Page 184

think I could because I really -- I'm a person that believes that -- you know, kind of the eye for an eye type, you know, and so I do believe in that, but then sometimes I just question if I would have the, you know -- I don't know -- the guts, if you will, or whatever to actually do that.

Q.   And what do you think?  I mean, do you think you would in the end?  Is that what I'm hearing?

A.   I think I would.

Q.   And we recognize no one's going to ask you to predict what you're going to do.  And no one's going to ask that.  But we're just trying to get a sense.  Some people know coming in here that while they absolutely believe in the death penalty, they think it's an appropriate punishment in some cases, they just

407

know in their heart I personally couldn't sign the death penalty; let somebody else do that job; I believe it; I back it; I'll vote to it; I know I could never sign a death penalty verdict form.  And some people think that, and that's fine if you feel that way.  We just need to know that.

A.   Sure.

Q.   What do you think?

A.   Well, I guess it's hard to tell -- you know, I guess it's one of those things kind of like what you're saying.  I'm very comfortable with somebody else giving it, but then when it comes down to me I think -- you know, I think I would have a hard time with that, and I may not be able to, to sign that.  I guess I'm not sure.  You know, maybe if the case was so compelling that it was such a terrible crime, you know, then I might be swayed that way to think, oh, you know, they deserve the death penalty, but as of right now, I still kind of question whether I would be

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 354 of 3245

able to or not, to sign that.

Q. And it is a tough question, and it should be a tough question, shouldn't it?

A. Yeah, yeah.

Q. It's something you're going to want weigh very, very carefully before you do it. Let me ask you this. You mentioned earlier that you'd want to be really, really sure, and the burden in this case is proof beyond a reasonable doubt. Now, some jurors when you get to the point of the death penalty and

408

you're talking about the death penalty, not guilt now, not guilt or innocence or guilty or not guilty but, you know, the death penalty, some people believe that it's gotta be even higher than that. It's not sufficient for the government to prove its case beyond a reasonable doubt. It's gotta be beyond all doubt. It's gotta be 100 percent, no possibility of any exception to it before I could impose the death penalty and if you don't do that, I'm telling you right now I couldn't impose the death penalty.

MR. BERRIGAN: I'm sorry to interrupt. I'm sorry to interrupt, Your Honor, but I need to lodge an objection to that question in that I think that is misleading. Certainly the government does not have any burden beyond a reasonable doubt, higher than beyond a reasonable doubt regarding the guilt or innocence of Miss Johnson.

THE COURT: Well, I haven't heard the full question to know whether it would be misleading or not, so I'm going to wait until he finishes, and then I'll give you an opportunity to lodge an objection to it.

MR. BERRIGAN: Thank you.

Page 186

THE COURT: Thank you.

BY MR. WILLIAMS:

Q. So I said some jurors feel that way and some people feel that they've gotta have proof a hundred percent, no exception. What do you feel? Where are you at on this? In order to impose

409

a death penalty, what level of evidence do you think the government should have to prove its case?

A. On the death penalty? I would be more likely to say I would have to be positive, you know, the 100 percent sure that that had happened before I could sign on to that. As far as -- I think I'd be more likely to do the other, that if I had any doubt at all, maybe, you know, then I would be more likely to say life in prison.

Q. You recognize that in this case the government has the burden of proving its case beyond a reasonable doubt.

A. Uh-huh.

Q. And that includes at the penalty phase we have to prove aggravating factors beyond a reasonable doubt.

A. Uh-huh.

Q. That's not all possible doubt. You recognize at least that's what the judge will instruct you.

A. Uh-huh.

Q. Do you think you could realistically consider the death penalty if the government met its burden of proving it beyond all reasonable doubt but not all possible doubt? Do you think that if we don't prove our aggravating factors beyond all doubt, period, that you could not impose the death penalty?

A. I think I -- yeah, I agree with that, that I would have a hard time. If I had any possible doubt, I think I would have a

Page 187

hard time signing that saying that, you know, the death penalty.

410

Q.   And let me come at it from a different angle.  Is that the burden you would have to have met before you could impose that penalty on somebody, absolute no doubt at all?

A.   For the death penalty.

Q.   For the death penalty.

A.   Yes.

Q.   And if the judge instructed you that the government's burden in the penalty phase still is just beyond a reasonable doubt and not beyond all possible doubt, would you have trouble given your belief system in the death penalty in following those instructions?

A.   I think I would have trouble in following that.  I would try, you know, to do that, but I think I would -- since I would, you know -- so I'm kind of wishy washy on the death penalty.  I would probably have a hard time signing if I had any type of doubt at all where, you know, the life imprisonment, I -- I just -- I wouldn't want to go home after this and think about it, oh, if I would have -- you know, I wouldn't want to have any doubt.  Just being honest, I wouldn't want to have that after-effect.  I would want to be sure if I signed that.

Q.   And believe us, like we said, there's no right or wrong answers.  We're trying to figure out where you're at on this.  And given your belief system and your own personal ability and what you can and cannot do, if -- what I'm hearing is -- and please correct me if I'm misinterpreting what you're saying, but

411

do you think that your own thoughts about your ability to impose
Page 188

the death penalty would interfere with your ability to follow the judge's instructions on what the government's burden of proof is in this case?

A.    Yes.

MR. WILLIAMS:  Thank you very much.  I don't have any other questions.

THE COURT:  Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q.    How are you, Miss 677?

A.    Good.  How are you?

Q.    I bet you've never been called Miss 677 before today, have you?

A.    No, never.

Q.    I listened carefully to your responses, and I just want to make sure that you're not confused so that we're not confused about where you are; okay?

A.    Sure.

Q.    Because this is a complicated process for lawyers, believe me, and even some judges, not this one, and certainly people who come in who don't know anything about this gobbledygook legal stuff and we ask them all these questions and they're thinking, what are you talking about?  But this trial is essentially designed to have three possible stages if you will, okay, if you

412

can think of it as a play with three acts.

In the first act, the actors come on, and you sit there as a juror, and the actors come, and they testify from the witness stand under oath, and you listen to them and watch them, and you with your fellow jurors, you determine what the story

is. The judge doesn't do that. The lawyers don't do it. You listen. You decide who's credible, what are they saying, what are the facts; okay? And then you make a decision, and how you do that is just how you might expect. You listen yourself and analyze the evidence. You talk to your fellow jurors. You take into account their opinions. You follow the instructions of the Court, and you make a decision; okay?

Act 1 in this trial is for the government to try to prove beyond any reasonable doubt that Angela Johnson intentionally murdered five people during the course of either a drug conspiracy or a continuing criminal enterprise. But they have to prove that to those jurors in act 1 beyond any reasonable doubt. You with me?

A.    Uh-huh.

Q.    If one juror didn't agree --

THE COURT:    Excuse me. You'll have to answer out loud.

Q.    Yeah. I'm sorry.

A.    Yeah.

THE COURT:    And technically, you know, that whole

413

question you asked, that's outside the scope of what we're doing in this round of questioning.

MR. BERRIGAN:    I understand, Judge, but I just wanted to clarify the parameters of when the jurors want beyond a reasonable doubt for a certain thing, I'm not -- and may be my own ignorance. I'm not sure where she is. I thought she might be missing these two different parts of the trial.

THE COURT:    Okay.

MR. BERRIGAN:    So I'll make it brief.

Page 190

BY MR. BERRIGAN:

Q.    Are you okay with that idea?

A.    Yes.

Q.    They have to show beyond a reasonable doubt.  That's all the law requires; okay?

A.    Right.

Q.    So you're all right being a juror I guess up until that point if you were selected.  You could do that.

A.    Yes, uh-huh.

Q.    And then they have -- there's going to be a second part of this trial, act 2 if you will, that is not going to involve additional evidence, but there's going to be instructions to the jury regarding what are called gateway factors and aggravating factors.  And to put it in its essence, these are things the jurors have to find also beyond a reasonable doubt based on what they've heard so far in order for us to get to the point where

414

we're talking about punishment; okay?

A.    Okay.

Q.    So act 2 is looking back at the evidence you heard in act 1, taking the judge's instructions, and making a determination were these proven beyond a reasonable doubt, these things.  If the answer's no, that's it.  The trial's over; okay?  The punishment will lie with the judge, and the jurors would be done.  But if the jurors now for the second time deliberate, find that these things have been met beyond a reasonable doubt, now we're into this third part of the case, the part involving punishment; okay?

A.    Okay.

Q.    In that part of the trial, the government advances
Page 191

aggravating factors. Now, some of these things they've already proven, but now they're asking you to consider them for punishment; okay?

A. Okay.

Q. And the test is exactly the same: Do all the jurors agree, and is it beyond a reasonable doubt? That's what the test is; all right?

A. Okay.

Q. The mitigating circumstances, these are reasons to vote for life. Jurors are obligated to consider those also, but not all the jurors have to agree on what a mitigating circumstance is for you. That is, you could decide -- you're the head --

415

administrative head of the local Head Start or the regional Head Start program; is that right?

A. I'm not the head, no. I'm an area manager. There's a director.

Q. I was giving you a promotion.

A. Yeah, thank you.

Q. But one of the things you mentioned earlier when I heard you talk about your dealings with parents who abuse their children is frequently they've been abused themselves.

A. Correct.

Q. And they've mentioned that to you, and you note that that's something you'd be willing to consider is somebody's background if there had been abuse involved; is that right?

A. Correct. I would consider that but yet not see it as an excuse either.

Q. Right, exactly. And that's a great point. You know, these mitigating circumstances, they're not excuses. At this point in

Page 192

the trial, the defendant has been convicted beyond a reasonable doubt -- if it was this trial, the jury's already decided at this point that Angela Johnson had committed these crimes. There's no excuse that could be offered at that point. These are just things that be taken into consideration that sort of are on the life side of the punishment equation; okay?

A.   Okay.

Q.   Not excuses.  They're just things that a jury might

416

consider as I think that might be appropriate in considering punishment.  For example, lack of a significant criminal record, that's -- the law says that's something the jurors should consider in assessing punishment.  That doesn't excuse the crime.  But when you're making a decision about punishment, that's very relative.  Would you agree?

A.   Right.

Q.   So that background, the childhood trauma, whatever kind of abuse existed, it's like not having a criminal record.  It doesn't excuse the murder.  It's not an excuse.  It's a mitigating factor.  Are you with me?

A.   Yeah, I'm with you.

Q.   During this weighing process, at no point, at no point, are the jurors required to go one way or the other.  It's an individual decision they have to make.  The government has no more burden to prove these aggravating circumstances than they did to prove Angela Johnson's guilt; all right?

A.   Uh-huh.

Q.   But what you need to know is if you're worried about, well, I'm not sure if she's the person who committed the crime or maybe there will be DNA evidence or something like that, that

has already been decided well before we get to the part where we're talking about punishment.

And the only reason I mention that is because when I heard that hesitancy about I need to be sure, I had the sense

417

that maybe you were talking about her guilt; that is, I have to be persuaded she's really guilty. And all I'm telling you is you've already made that determination.

A. Right, yeah, and I realize that. I just -- I just, I guess, take the death penalty very seriously and the fact that I guess I don't want to be waking up 30 years from now thinking, oh, you know, was I responsible for this, you know, because I -- you know, that's just what I meant before when I said that. But I think I could do the reasonable doubt for the -- you know, for the guilt.

Q. Well, we would expect it'd be a difficult decision for any of the jurors, to be honest. You've been very forthright in expressing how serious it would be for you. But the law doesn't require these aggravating circumstances. For example, one of the aggravating circumstances alleged is that there are two children. Children are particularly vulnerable victims -- we could all agree -- six and ten years old. Government only has to prove that beyond a reasonable doubt. And once they've done that, the jury can consider it. Do you think they would have to prove that element beyond all doubt that the children were six and ten?

A. For the punishment stage? Is that what you're --

Q. Yeah, that's what Mr. Williams is talking about when he's talking about aggravating circumstances. It's not did this woman do it.

Page 194

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 363 of 3245

418

A.    Right.

Q.    These are additional factors that go towards a sentence of death, that we have children involved, for example; okay?

A.    (Nodded head.)

Q.    So when he asked you that question about do we have to prove these aggravating factors beyond all doubt, these are the things he's talking about, not innocence, did this woman do it, but are these additional things present; okay?

A.    Uh-huh.

Q.    Does that help you at all or change your response, or does the government -- in your mind do they have some higher obligation for you than they do under the law in terms of proving those aggravating circumstances?

A.    Just to be honest, it probably would be a higher bar for the aggravated.  Like I said to him, I would have to have beyond all doubt in order to do the death penalty I would think.

Q.    You'd have -- it would be beyond beyond a reasonable doubt for you.

A.    Yes, just honestly before I could probably sign my name to the death penalty.

        MR. BERRIGAN:  Okay.  Well, we appreciate your honesty, ma'am.  Thank you so much.

        PROSPECTIVE JUROR 677:  Thank you.

        MR. WILLIAMS:  No further questions, Your Honor.

        THE COURT:  Juror 677, if you would just please stand

419

outside for a minute, we'll let you know your status.  Thank

Page 195

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 364 of 3245

you.

(Prospective Juror 677 exited the courtroom.)

MR. WILLIAMS: Your Honor, the United States would move to strike this juror for cause, 677. It's clear that her ability to follow the Court's instructions would be substantially impaired by her views on the death penalty and would impose a higher burden than beyond a reasonable doubt for the aggravators. I think she'd make a wonderful juror in all other respects. I just think that's where she just doesn't qualify.

THE COURT: And you're not volunteering to use your generous congressional allotment of peremptory challenges.

MR. WILLIAMS: Not on this one, Your Honor.

THE COURT: Okay. Mr. Berrigan.

MR. BERRIGAN: Frankly, I -- I believe the juror was confused about proving the aggravating circumstances beyond all doubt as opposed to making the decision that she wanted to be a hundred percent sure of her decision. But I'll have to admit that's not what she said. She said that the government would need to prove the aggravators beyond all doubt. We know that's not the standard, Your Honor. So I'm constrained to agree that this juror, based on her responses, is not qualified.

THE COURT: And it's not really a residual doubt issue, although it's close.

420

MR. BERRIGAN: Yes, sir.

THE COURT: And I was wondering if it would make any sense to weigh into residual doubt and at least let her know that -- if I do what I did in Honken -- and, by the way, I'm not sure I'm going to do that, but if I did, that would be at least

Page 196

something she could use in the weighing process. But that really wasn't her -- it's related, but it wasn't what she was saying.

MR. BERRIGAN: It was not what she was saying.

THE COURT: It may be what she meant.

MR. BERRIGAN: It may be. I truly believe what she was saying is before I make a decision about death I want to be a hundred percent, not beyond a reasonable doubt, I want to be 100 percent convinced of my decision. But she's couching that in response to questions about aggravating circumstances, and I was not able to fix that during the questioning, so the record is what it is.

THE COURT: Okay. I'm going to then sustain the government's challenge for cause.

(Prospective Juror 677 entered the courtroom.)

THE COURT: Juror 677, we all think you'd be a wonderful juror but probably not in this case, so you're going to go ahead and be dismissed. Thanks so much for answering all of our questions today.

Because northwest Iowa is kind of a small community

421

and it's going to take us a couple of weeks, maybe longer, to get a jury selected, even though you're dismissed from the case, I'd ask you not to discuss this case with anybody else because somebody else might know another juror who's going to be coming in down the road during jury selection. So once we get a jury selected, you can discuss it all you want; okay? Okay. Thank you very much. Good luck to you. Thank you.

(Prospective Juror 677 exited the courtroom.)

THE COURT: Want to do one more and then take a break?

Page 197

How's everybody's bladder?

MR. WILLIAMS: Doing great over here, Your Honor.

MR. MILLER: Oh, I don't know.

MR. WILLIAMS: Maybe not.

MR. WILLETT: Your Honor, if it please Court, getting older is an inconvenience for me, and if the Court would allow me a few minutes, I would be grateful.

MR. MILLER: I'm with Mr. Willett on that.

THE COURT: Okay. Do you all actually have to sit in on this? I mean, you got three lawyers.

MR. WILLETT: No.

THE COURT: Can we keep going?

MR. WILLETT: No, keep rolling.

MR. MILLER: This is my turn. I'd just as soon have a restroom break if we could.

THE COURT: Okay. Well, why don't we just take a

422

regular break until -- try until three o'clock; okay? We'll come back at three. Thanks.

(Recess at 2:42 p.m.)

THE COURT: We ready to go?

MR. WILLIAMS: Yes, Your Honor.

MR. MILLER: Yes, Your Honor.

THE COURT: Okay. 508 is next?

(Prospective Juror 508 entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

THE COURT: You may question Juror 508.

EXAMINATION

Page 198

BY MR. MILLER:

Q.  Good afternoon, Miss 508.

A.  Hi there.

Q.  How you holding up?

A.  Great.

Q.  What's going on down there waiting and waiting and waiting? Anybody bring a set of cards?

A.  No, nobody's touched them.

Q.  Did we think to advise you to bring magazines or books along?

A.  Yes, they did.

Q.  We need to visit with you about just a couple issues and

423

then get you on your way.  One is we want to know in particular about any recollections you have about any pretrial publicity on this case.  And, second, we will need to visit with you a little bit about the issue of the death penalty; okay?

A.  Sure.

Q.  Before I get to that, I'm just curious.  You follow sports a bit.  What are your teams?

A.  Kansas and North Carolina, Roy Williams, Iowa Hawkeyes.

Q.  So you've had a good season.

A.  Yeah, they have.

Q.  Very good.  On the issue of pretrial publicity if I can get to this -- I earmarked these ahead of time, but if you can just tell me what exposure do you recall hearing about this case?

A.  Very little.  Possibly just headlines and never really got into it.  I wasn't really interested in it.

Q.  Do you today recall any particular facts beyond what was included in the questionnaire that was sent out?

Page 199

A.   No, I don't.

Q.   Have you ever served on a jury before, ma'am?

A.   No, I have not.

Q.   You understand clearly I'm sure nevertheless that if you are required to serve on this jury and the evidence sparks a recollection of something you've seen on TV, you have to realize that as being just news and not evidence and base your verdict solely on what comes in here.

424

A.   That's correct.

Q.   On the subject of the death penalty, ma'am, you were good enough to fill out in detail in your own words your feelings about it, and have you even looked at that questionnaire lately?

A.   No, I have not.  I never made a copy.

Q.   And that's just fine.  Let me just -- without even trying to recall what you wrote, if you can give us just in a few words your thoughts and feelings about the death penalty.  I'm sure you've given it more thought in the last few weeks, haven't you?

A.   Sure.  Probably the last few minutes too.

Q.   Sure.

A.   I guess, you know, if the crime follows the guidelines set by the government and the justice system and it, you know, goes to the seriousness of the death penalty, then I do think that's what should be put forth.  I still think there's kind of maybe wishy washy, you know, in the jury -- in the justice system that each crime is kind of looked at in a different way rather than a standardized setting for the death penalty.

Q.   You think it depends on the merits of the particular case?

A.   I do.

Q.   And you expressed as much in response to your

Page 200

questionnaire. You indicated -- and this may bring back your recollection. It's no different really than what you're telling us today. Based on the severity, intent of the crime, the death penalty should be a possible sentence. Life in prison without

425

parole should be considered if the just cause not to sentence the person to the death penalty. In other words, I take it you've indicated a willingness to consider both possible punishments.

A.    That's correct.

Q.    And that's important. That's what we're looking for, and that's what we need to quiz you about just a little bit to be sure that you're one who can do that for us, consider both possible punishments. In the event -- and I'm going to try to give you just a very brief hypothetical.

In the event that you are required to serve on this jury and in the event and only in the event that you and your fellow jurors find Ms. Johnson guilty of one or more charges that qualify her for a possible death penalty, under those circumstances, you will find yourself at the punishment phase only if you and your fellow jurors have also concluded beyond a reasonable doubt that there are certain gateway factors proven, certain aggravators such as participation in the murders of multiple victims as an aggravator and the murder of particularly vulnerable victims such as children. In other words, you won't reach a situation where you're called upon to decide punishment between life and death unless you as a jury have already decided those sorts of aggravating factors.

If the evidence shows those things, multiple murders, the killing of vulnerable victims, at that point in the

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 370 of 3245

proceedings would you still be able to fairly and seriously give consideration to both possible punishments?

A.    Following the justice guidelines, I'm presuming that that's going to be -- you know, they'll explain as to what classifies as the death penalty versus punishment in prison.  Following guidelines set, yes, I could.

Q.    Okay.  And you raise a very good point, and I should have mentioned to you already both at the guilt phase and at any later phase if there is one, you'll have the benefit of instructions from the Court as to what the law is and how you should go about doing your job, and I trust you take some comfort in that fact that you would have guidance from the Court.

A.    Okay.

Q.    Under those circumstances, do you feel you could follow the Court's instructions as to how you go about weighing aggravating factors and how you go about weighing mitigating factors if any are offered in an open-minded fashion not prejudging what your punishment should be?

A.    Yes, I do.

Q.    And if ultimately, ma'am, you find yourself in a situation where you found the defendant guilty beyond a reasonable doubt, you found the gateway factors, the aggravating factors that allowed you to consider the death penalty, and if after weighing all of the factors including possibly mitigating factors as

well, if after all of that you feel and your fellow jurors unanimously feel that the death penalty is the appropriate

penalty in this case, do you understand under those circumstances, ma'am, you could not impose that without signing your name to a verdict form that would have the practical effect of imposing just that punishment? Do you feel you can shoulder that responsibility of doing that in those circumstances, ma'am?

A. Yes, I do.

MR. MILLER: Thank you, ma'am. I have no further questions.

PROSPECTIVE JUROR 508: Thank you.

THE COURT: Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, Miss 508?

A. Great.

Q. If it will help you, I'd like you to think about this trial as a basketball game.

A. Okay.

Q. And the first half of the game, okay, right up until the buzzer at the end of the first half, that's what we've been talking about as kind of the first part of the trial having to do with whether or not this woman is guilty beyond a reasonable doubt of the crimes for which she's charged which you've heard many times now are very serious: Intentional murder of five

428

people including two children, two girls six and ten years old.

And then there's a halftime, if you will, where we're not going to have evidence but the jury is going to be asked to consider, to weigh what they've already heard and determine whether or not there's what's -- a gateway -- what we call a gateway factor has been met and an aggravating circumstance or

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 372 of 3245

more have been proven; okay? And that's -- at least in the great scheme of things in terms of time, that probably will be kind of like halftime. It will be a lot shorter than either of the halves that preceded or followed it.

And then the last -- the second half of the game has to do with the penalty. Now, we don't -- unlike a basketball game, we don't have to get to the second half. We could call it quits. The jury could come back in the first half at the buzzer and say this woman's not guilty of these charges. Maybe she's guilty of something else, but it's not the intentional murders for which she's been charged, not beyond a reasonable doubt; okay? And then we'd be done. We wouldn't even get to the halftime.

But we could go through the first half and then the halftime and the jurors could say, you know, I don't think they've proven these aggravating circumstances beyond a reasonable doubt, not to all 12 of us. And if you jurors and you decided that, the game would be over, and we'd go home; okay? We're only going to get to that second half if there's

429

the first half guilty beyond a reasonable doubt, and then the halftime was beyond a reasonable doubt we have these aggravating circumstances and gateway factors. Do you follow me so far?

A. Yes, I am.

Q. Okay. So these questions that we're asking you, we're asking you to put yourself in the second half. Skip the whole first half. Skip the halftime and for the purposes of this questioning process artificially jump ahead; okay? We know that's putting the cart before the horse and you haven't heard the evidence in the case and we're asking you to tell us how you

Page 204

feel based upon certain propositions that haven't been proven, but we're going to ask you to assume they have; all right?

A. Okay.

Q. You've helped us tremendously by filling in this questionnaire, and I'm going to refer to bits and pieces of it at times. And I don't know. How long ago was it that you filled this out?

A. I don't know. Couple months, three months.

Q. Okay. It's been a while, huh?

A. Yes, it has.

Q. And you probably don't have a copy you keep at home I suspect.

A. No, I do not.

Q. But at the time did you have enough time to fill it out and answer all the questions and so on?

430

A. Yes, I did.

Q. And do they reflect your truthful responses?

A. Yes, they did.

Q. There was one answer regarding the publicity questions that I just wanted to ask you about because I wasn't sure about what you were saying.

A. Uh-huh.

Q. You made it very clear you had no opinion of the guilt or innocence of Angela Johnson based on the limited access to information that you had had through the media. Is that right?

A. That's correct.

Q. And then you were asked this question: Do you have any beliefs or opinions as to the appropriate punishment for Angela if she were -- if she were found guilty of the intentional

killing of five people including two children? And you checked the yes box there and said, If proven guilty for the crime, she should be charged accordingly to the crime. And I just wasn't sure what you meant by that.

A. You know, as far as like what the justice system states like, you know, for this crime, her punishment would be, number one, if she was held accountable for all of it, death penalty and, second, if we couldn't prove every issue, then life in prison.

Q. Okay. I think I've got it now. That's very helpful. This crime we're talking about, these intentional killings of the

431

five children (sic), the government has an obligation to prove the crime beyond a reasonable doubt. It's just like any other case in that respect other than, of course, how serious those charges are.

If they were to do that, okay, if they did that to your satisfaction beyond any reasonable doubt, not just you but your fellow jurors, okay, is this the type of crime in your mind where the death penalty would be the only appropriate type of punishment?

A. If all the facts lead to that, yes.

Q. I say that because as you probably surmised by now, there is this alternative punishment available, life imprisonment without possibility of parole. And, in fact, you were asked about that question, and I know three months ago I'm sure you might not remember it specifically. But you were asked this question, number 84: Do you think that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree

Page 206

murder? Now, that question doesn't talk about the children, but it certainly talks about intentional, premeditated murder. And you said, No, if they are convicted of intentional, premeditated first-degree murder, then they should be charged with the death penalty. Is that how you feel?

A. Right.

Q. Okay. Is there anything that's happened today to change

432

your mind about that?

A. No, there isn't.

Q. Okay. So let me just see if I can sum this up and get you out of here.

A. Okay.

Q. If -- and I know it's a big if, okay, because we're going to spend a lot of time, maybe weeks, arguing about that if. But if you could in your mind advance yourself to the place where you've heard all the evidence, you've considered it all, not just you, you and your fellow jurors, you've deliberated with them, and you have come to a determination beyond any reasonable doubt, all 12, that this is a case of the intentional premeditated murder of five people including two children, is there any punishment other than the death penalty that would be appropriate in your view?

A. No.

MR. BERRIGAN: Okay. I appreciate your honesty.

PROSPECTIVE JUROR 508: Certainly.

MR. MILLER: No questions, Your Honor.

THE COURT: Okay. Juror 508, if you'd just stand outside for a minute, we'll let you know your status. Thank you.

Page 207

(Prospective Juror 508 exited the courtroom.)

THE COURT:  Any challenge for cause?

MR. BERRIGAN:  Defendant would move for cause on Juror

433

508, sir.

THE COURT:  Government's position?

MR. MILLER:  None, Your Honor.

THE COURT:  Okay.  508 is outta here.

(Prospective Juror 508 entered the courtroom.)

THE COURT:  Thank you.  We're going to go ahead and dismiss you as a juror in this case.

Even though you're no longer a juror, I'd ask that you not talk about this case with anyone else until we've got the jury selected because you never know.  You might say something and then they say something to another person who might be a potential juror down the road.  This is going to take several weeks.

Does the new Hy-Vee on Hamilton opening next month affect your job at all?

PROSPECTIVE JUROR 508:  No, I might transfer there, but they haven't given me the okay yet.

THE COURT:  Okay.  Well, good luck to you.

(Prospective Juror 508 exited the courtroom.)

THE COURT:  Ready for our next juror, Juror 446?

MR. WILLIAMS:  Yes, Your Honor.

(Prospective Juror 446 entered the courtroom.)

THE COURT:  Thank you.  Please be seated.

Mr. Williams, you may question Juror 446 first.  Thank you.

434

MR. WILLIAMS:  Thank you, Your Honor.

EXAMINATION

BY MR. WILLIAMS:

Q.  Good afternoon, sir.  It's been a long day for you.  I know.  We appreciate your patience --

A.  That's all right.

Q.  -- in waiting here.  We just have two topics we want to talk to you about that we're doing individually.  The first one's publicity, and I think this is going to go pretty quickly given the answers to your questionnaire.  At the time you filled out the questionnaire, when you were asked if you knew anything about this case, you said you're not at all familiar and you knew nothing about the case.  Since the time you filled out the questionnaire, have you heard anything on the news, have you read anything in the newspaper about the case?

THE COURT:  You'll have to hold your microphone up, sir.  Thank you.

A.  Yeah, let me think.  I did see one story on the news that was something about the boyfriend or something was convicted.  That's all.

Q.  All right.  And do you recall anything, any other details about it other than that?

A.  No.

Q.  All right.  Now, you recognize that this is a different case.  This is a different defendant.  And the fact that the

435

boyfriend was convicted is not evidence in this case.

A.  Yeah.

Page 209

Q.   You understand that?

A.   Yeah, I understand that.

Q.    If you were picked as a juror, could you set aside anything you knew about the boyfriend's case and just weigh the evidence that you hear in this case, or do you think -- the fact that you knew the boyfriend was convicted, do you think that would interfere with your ability to be a fair juror in this case?

A.   No.

Q.   Could you set that aside?

A.   I could set that aside, yeah.

Q.   And in answer to your questionnaire, you say you've not formulated an opinion as to the defendant's guilt in this case. Is that still your opinion?

A.   Yeah.

Q.   Despite the fact what you heard about the boyfriend.

A.   Yes.

Q.   And let's say you're a juror in this case and as evidence started to come in maybe something jogged in your memory about something else you heard on the news beyond just what you recall today.  That's always a possibility.  Can you assure us that you could set that aside as well and not discuss those things with fellow jurors and still render a verdict just based on what you

436

hear in this case as opposed to what you may have -- now recall after having your memory jogged?

A.   Yes.

Q.   All right.  Let's move on then to the death penalty issue. You indicated when asked about your thoughts and opinions about the death penalty some things in your questionnaire, and you

Page 210

answered some questions, and let me just put it to you now. I assume you've had some more time to reflect upon this issue of the death penalty since you filled out this questionnaire.

A. Yeah.

Q. What are your thoughts today on the death penalty?

A. I think it's a good deterrent, but I wouldn't be for it all the time. And I guess I still -- basically the same. I still question whether it's in the best interests of the country since the cost of the appeals and all that, the cost basically.

Q. Sure. The cost of appeals that would occur afterwards?

A. Yeah.

Q. Do you think the appeals are appropriate, though, under those circumstances? I mean, you understand there's a purpose for the appeals.

A. Right. You have to have the appeals process too.

Q. All right. Given your views on you wonder whether it's really best for the country, is it a punishment that you could realistically consider in this case if you were a juror?

A. Yeah.

437

Q. Let's talk a little bit about some of your answers here. You indicate that when asked why you feel that way, you said the Bible verse, an eye for an eye, a tooth for a tooth. On the very next page you predicted what one of the questions was going to be to you because it says, Do you believe in an eye for an eye? And you have, I think unique among the jurors who received questionnaire at least that I've reviewed so far, checked both those boxes. You said yes and no to that. Can you explain what you mean by that, that sometimes you believe in an eye for an eye and sometimes not?

Page 211

A.   Well, I guess it just depends if you're going -- a Christian's point of view would be -- or a New Testament point of view would be you have to give more weight to forgiveness and compassion whereas an Old Testament point of view would be more eye for an eye and tooth for a tooth.

Q.   So do I kind of hear from you that you kind of see both sides of that coin then?

A.   Yeah.

Q.   You indicated when asked what your thoughts were on life in prison without parole what your thoughts were on that.  And you said that would be a minimal punishment.  Can you explain to us what your thoughts are on that, what you mean by that?

A.   I think this might contradict what I said before, but, you know, that would be an eye for an eye, a tooth for a tooth. That would be going from that mind-set.

438

Q.   And --

A.   So for a murder you would -- punishment would be death going from eye for an eye, tooth for a tooth.

Q.   And what are your thoughts on this?  I mean, if we have a case where -- and let's assume in this situation -- we kind of explained how this is going to work.  But for you to ever get to the point of struggling with the question of what penalty should be imposed in this case, we don't get there unless the jury's already found that the defendant intentionally murdered one or more people.

So let's assume that you're sitting on a jury.  You have all found the defendant intentionally murdered one or more people.  And let's just say in this case you found that she was involved with murdering five people including two children; all

Page 212

right?

Now you're back, and you're struggling with what do you do about it, what is the appropriate punishment. And that's ultimately going to be the jury's decision in this case. You have two options. You have either the death penalty, or you have life imprisonment as an option. Your job as a juror is going to be to weigh all the factors in front of you, all the circumstances of the crime and the aggravating factors proven to you, any mitigating factors proven to you, and to weigh all that stuff.

Now, some jurors know coming in here that, jeez, you

439

know, intentional murder of five people, two individuals, I just know there's no way I could ever realistically consider life imprisonment without parole. You do that; it's going to have to be the death penalty, and I don't care what else you tell me. I'm there already.

Other jurors come in and say, I don't care what you prove to me. Life in prison is the only option for me. I could never ever consider the death penalty, and that's where I'm at. Where are you at?

A. I'd probably have to go with my gut on that day.

Q. Okay. What is your thought about life imprisonment without parole? Is that a severe penalty for you?

A. Life imprisonment without parole could be considered more severe than death.

Q. And why do you say that?

A. Well, because there's -- if you're miserable enough, then death is no punishment.

Q. And can you imagine yourself as a juror in considering the

Page 213

possibility of life in prison without parole as a sufficiently severe punishment for somebody who has intentionally killed five people? Is that a possibility for you?

A. Yes.

Q. You say yes?

A. Yes.

Q. Okay. And please understand there's no right or wrong

440

answers. You know, we're just looking for what your position is on this, and there are some jurors who are great jurors in a death penalty case, and there are some jurors that are great jurors on other cases, and we just have to figure out where you are in this case and then make an assessment ourselves of where you fall.

You indicated that -- in answers to question 87, there's a number of situations that were kind of posed to you, you know, the person killed more than one person or the guilty person was pregnant at the time, the person aided and/or encouraged the crime but didn't pull the trigger. Do you remember that series of questions in there?

A. I think so.

Q. You say you think so?

A. I think so, yeah.

Q. And in response to some you said not a factor to you. Some you said lesser sentence than the trigger puller, for example, and on other ones for the killing of children you said slightly worse than an adult killing. You don't have the evidence in this case yet, and at some point you are going to be -- if you're picked as a juror in this case, you're going to be presented with evidence that is going to present perhaps a

Page 214

number of situations to you, a number of factors, some of which you as an individual juror might view as aggravating or worse suggesting the death penalty's more appropriate, some of which

441

may suggest to you that the death penalty is not appropriate and life imprisonment's more appropriate in this case.

In response to some of these questions, it looks to me like you've kind of gone both ways on this and you're weighing both of those. Some factors you find more aggravating and some factors more mitigating. Are you the type of juror who is willing to do that if you're called upon as a juror in this case to weigh all the factors and try to look at all of them and then figure out which to you are more important than the other ones?

A. Yes. I think, though -- I think you can continually weigh and weigh and weigh. And if you're in a balanced state, your logic is a -- your logic actually becomes an inferior way to determine to come to a decision. You'd have to use your gut.

Q. And is there any factor that you think -- when you're thinking about the death penalty or life imprisonment, is there any factor that you're thinking in your own mind, boy, if that factor exists, I'm sorry, it's just going to have to be the death penalty; I really don't care about any other factors at that point; there's just one that's just so overwhelming I'm just going to have to do the death penalty.

A. No, because, like I said, I don't necessarily consider death a more severe punishment than life imprisonment.

Q. Now, one question that you had I wanted to talk to you about for a minute. You said in response to this question 87, a guilty person killed more than one person at a time, and your

442

Page 215

answer was -- in response to basically what do you think about that, you said, The question arises what punishment can be fair for multiple murders except torture which is a fate worse than death? What do you mean by that? What are your thoughts there when you were answering that?

A.    Well, I was going from the eye for the eye, a tooth for a tooth construct that if you've murdered one person to be punished with your life doesn't -- doesn't balance with the second murder because there's nothing you can give for the second murder so that if torture were legal, going from that construct of eye for an eye, tooth for a tooth, that may bring justice.

Q.    So let me see if I can understand where you are on this. Do you think given your personal value set, your own personal beliefs that everybody's going to respect, whatever they are, that if somebody intentionally murders somebody else that they have automatically forfeited their life at that point?

A.    No, I can't say that definitely, no.

Q.    You think there are other factors that may weigh in that would suggest even though they've killed somebody there may be something else that would make you think they may not have to forfeit their life, that life imprisonment may be sufficiently severe?

A.    Yes.    There's a point where you've got to say further killing or further punishment isn't going to bring more justice

443

or bring more -- or bring the victims back again.    There's no further goal with more punishment.

Q.    Let's say you're on this jury and that you found the

Page 216

defendant guilty of intentionally murdering these people. You and the other jurors have gone back. You've deliberated. You've listened to all the evidence. You've weighed the factors. You've looked at all of the factors suggesting the death penalty's appropriate. You've looked at all the factors suggesting life imprisonment's appropriate, and the ultimate conclusion is that every one of you believe the death penalty is the appropriate punishment in this case.

The tougher question maybe at that point is could you actually take the next step of signing your name to a verdict form if you knew that that had the practical effect of causing somebody else to die?

Now, some people come in and just know right up front, you know, it's okay for somebody else to impose the death penalty. I believe in the system. I believe in the death penalty, but I know in my heart I can never sign a paper. What are you thinking?

A. I could sign the paper.

Q. Could you also -- equally important, sir, could you -- if you went back there and you did all that weighing and you ultimately decided life in prison is the appropriate punishment, could you stick to your guns on that and say, That's my verdict?

444

A. Yes.

MR. WILLIAMS: Nothing further.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Thank you.

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, sir?

Page 217

A.    Good.

Q.    Delighted to be here, I suspect.

A.    It's better than looking at pigs.

Q.    I'm glad to hear that.  I gotta tell you, I wanted to start off with something that the prosecutor talked about kind of near the end, and it was this question 87 in your questionnaire just to make sure.  I want to be sure I'm hearing you clearly; okay?  You've told us a number of times you're certainly aware of the concept of an eye for an eye from the Old Testament; is that right?

A.    That's correct.

Q.    And, in fact, you cited that as the reason why you thought the death penalty was an appropriate punishment, the Bible verse, an eye for an eye, a tooth for a tooth.  That was in response to the question why do you feel this way or what are some of the reasons for your beliefs; is that right?

A.    That's correct.

Q.    I gotta tell you that most of the time -- and you can

445

imagine we've looked at a lot of these questionnaires.  A lot of people have that feeling.  They believe that.  The Bible teaches this.  It's a religious conviction that they have.  And the last impression I want to give you -- and none of us want to convey this -- we're trying to change anybody's beliefs.  That's not what's happening here; okay?  We all have life experiences.  You're still a pretty young man, but you've had different experiences than I've had.  We have different backgrounds, and we bring all of that stuff into the courtroom, and one of those is our religious convictions.

But this idea of an eye for an eye, a tooth for a
Page 218

tooth, would you agree with me that if somebody intentionally, intentionally, takes another human's life that that concept of an eye for an eye would dictate that if you take somebody else's life intentionally you have in the process forfeited by your actions your own right to live?

A.   Yes, I'd agree with that.

Q.   All right.  Do you believe that?

A.   Didn't you just ask me that?

Q.   Oh, I was acquainting the concepts.

A.   Oh.

Q.   But you've answered my question.  Okay.  That's a belief that you have; true?

A.   You forfeited your right to life.  That doesn't mean you forfeited life.

446

Q.   Okay.  Well, when you were asked about the possibility of life without parole as an alternative sentence for somebody who committed intentional murder, I thought I heard you say you could consider that because that could be a worse sentence than the death penalty.  Do you believe life without parole to be a worse sentence than the death penalty?

A.   That would depend on the person.

Q.   Okay.

A.   If you have a lot of fear of death, you probably wouldn't think that.

Q.   Well, what do you think about it as a punishment?

A.   If it was me personally being convicted?

Q.   Yes, sir.

A.   Personally, I would take death.

Q.   Okay.  This question you were asked about I want to return

Page 219

to very briefly, and it is the issue please review each of the situations listed below, question 87. After each situation describe what effect, if any, each have on your thoughts and opinions about an appropriate punishment for a person guilty of intentional murder. And then the very first one listed is the guilty person killed more than one at the same time. That was the factor you were asked to consider. And you wrote, The question arises what punishment can be fair for multiple murders except torture which is a fate worse than death? Does that sound about right?

447

A. I think you read it right, yes.

Q. Okay. And you just mentioned that -- I mean, we all know this. Torture obviously is not one of the available punishments, is it?

A. That's right.

Q. But there's at least a suggestion by the answer -- and you tell me -- that if torture was allowed that in your view that would be appropriate for somebody who intentionally killed more than one person.

A. Oh, I think it's appropriate in some countries. I don't think it'd be appropriate for this country, no.

Q. Well, then what did you mean to say except torture? That is, no punishment will be appropriate except torture.

A. No punishment would be -- in the rational sense of Old Testament justice, no punishment would be just except torture for multiple murders.

Q. Okay. That's fair. The question does not, you know, reference the Old Testament, however. You know, they're not asking you what the Old Testament says; right? You'd agree with

Page 220

me.

A.   You want to know what I say.

Q.   That's right.  That's what's important to us, what you say.

A.   For me, I don't think I would use logic to determine the punishment.  It would be more of a intuition.

Q.   And when you say logic, I just want to make sure.  We're

448

talking about all this, you know, weighing of aggravating circumstances and mitigating circumstances and all these instructions of the Court.  Is that the logic you're talking about?

A.   Yeah.

Q.   This is kind of a gut check thing for you.

A.   Yeah.

     MR. BERRIGAN:  Gotcha.  Okay.  Thanks a lot, sir. Appreciate your honesty.

     MR. WILLIAMS:  No further questions, Your Honor.

     THE COURT:  If you'll step out for a minute, we'll let you know your status.  Thank you.

     (Prospective Juror 446 exited the courtroom.)

     THE COURT:  Any challenge for cause?

     MR. WILLIAMS:  Not on behalf of the United States, Your Honor.

     MR. BERRIGAN:  The defense challenges this juror for cause, Your Honor.  It's painfully obvious that he would not follow the instructions of the Court regarding really any aspects of the punishment phase of the trial.  This is kind of a gut check thing for him, that whatever his gut tells him the day that that decision's going to be made is kind of how it's going to go.  So I think he is substantially impaired.
Page 221

His discussion about torture I don't think warrants further comments, frankly, regarding the killing of more than

449

one person, although he arguably tried to save himself today I hope without success.  So the defense moves to strike Juror Number 446.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  I'm not going to object.  I think it's a close call, but we won't object to the defense motion for cause.

THE COURT:  Which is closer?  The gut check or the torture?

MR. WILLIAMS:  Well, I think he was all over the place, and I think he's inconsistent, and, you know -- but that said . . .

THE COURT:  It'd make my instructions a lot easier if we ever get to the penalty phase to use the gut check.  We'd save a lot of trees.

MR. WILLIAMS:  Sure would.

THE COURT:  We'll bring 446 in.

(Prospective Juror 446 entered the courtroom.)

THE COURT:  Thanks for your answers.  We're going to go ahead and excuse you.  We'd ask that you not talk to other people about this case until after we get a jury empanelled and we start our trial because you never know who you'd talk to might be a potential juror for us in the coming weeks ahead; okay?

PROSPECTIVE JUROR 446:  Okay.

450

Page 222

THE COURT: Thanks for your honest answers, and good luck to you.

(Prospective Juror 446 exited the courtroom.)

THE COURT: Close the door. I don't know whether eating meat will quite ever be the same after hearing this juror, but we'll find out.

Next juror, please, 666, which is the one that has the --

MR. BERRIGAN: This one.

MR. WILLIAMS: No, the last one.

THE COURT: Last one, 139?

(Prospective Juror 666 entered the courtroom.)

THE COURT: Okay. Everybody be seated. And who's going to go first? Mr. Miller.

Juror 666, Mr. Miller will question you first on behalf of the United States.

MR. MILLER: Thank you, Your Honor.

EXAMINATION

BY MR. MILLER:

Q. Good afternoon, Mr. 666.

A. Good afternoon.

Q. How are you holding up?

A. Good.

Q. Good. We need to visit with you about two subject matters and then get you on your way.

451

A. Okay.

Q. One is exposure to pretrial publicity, and the other is the matter of the death penalty.

Page 223

I noted that you really indicated limited, if any, recollection of any news exposure on this case. Since you filled out the questionnaire, have you since heard anything or recalled anything about this case beyond what's in the Court's --

A.    Very little, yeah.

Q.    And I trust you fully understand that in the event that you were ever required to serve on this or any other jury in any case your duty would be to listen and base your verdict only on the evidence and not on anything you heard outside the courtroom.  You understand that, sir?

A.    I do understand that.

Q.    Very good.  We'll move along to the other issue which is the death penalty, and I want to tell you in advance that all of us here appreciate your candor.  That's all we're looking for here.  We are not looking for any responses couched toward what you think we want to hear.  What we want to hear is what's in your heart, and we appreciate your candor.

You were very forthcoming and straightforward in indicating in your questionnaire -- and I quote -- I do not like the death penalty, close quote.  Can you simply just go ahead and expand for me your feelings on that?

452

A.    Well, yeah.  I really -- is that all I put, I don't like the death penalty?

Q.    You indicated a couple other things.  You wrote -- just so I can indicate the full context, you said in response to the question what are your thoughts and opinions about the death penalty as a punishment for a person who is guilty of intentional murder, your response was, I think some people are

Page 224

in prison and are not always guilty, so I do not like the death penalty. You went on to indicate in response to question 82, what are your thoughts and opinions about life in prison as a punishment for a person who is guilty of intentional murder, you responded, Life in prison is the way to go.

Any expanding on those thoughts, or is that -- I mean, that puts it pretty plainly, but any other thoughts you can tell us about that, sir?

A. Well, as far as the death penalty, I guess the way I was raised and brought up was that it's really not, you know, in our hands to decide whether -- you know, to take somebody's life. So that's what I believe, that it's not up to us to decide that.

Q. Sure. And we appreciate your candor, sir, and you're not alone. People have a full range of opinions on that, and I trust that's an opinion that you grew up with and were taught as a youngster.

A. Uh-huh.

Q. Is that fair?

453

A. That's fair.

Q. And I assume when you filled this out you had that upbringing in mind and that this is your honest and firmly held belief on the subject; fair statement?

A. Yes.

Q. Okay. And just so we can get to the bottom line, in the event that you were required to serve on a jury in this or any other death penalty case where that was by law a potential punishment, do you feel that you could honestly and sincerely see yourself actually giving honest consideration and signing your name to a death verdict?

Page 225

A.    To sign my name to it?

Q.    Right.

A.    You're saying if that's --

Q.    Could you ever sign your name to a verdict imposing death punishment on another human being, sir?

A.    No.

Q.    Thank you, sir.  I appreciate your honesty.  Your candor is all we ask for, and we much appreciate it.  That's what we brought you in here for.

      Ultimately in this case -- and you understand very serious charges are filed -- if you were required to serve on this jury and it got to that point, it would be only because a jury had decided beyond a reasonable doubt that aggravating factors had occurred including possibly the killing of multiple

454

victims including vulnerable victims such as children.  Even under those circumstances, sir, I take it you don't feel that you could sign a verdict that would have the effect of imposing the death penalty on another human being; is that fair?

A.    That's fair.

      MR. MILLER:  Thank you, sir.  I appreciate your candor.

                        EXAMINATION

BY MR. BERRIGAN:

Q.    How are you, sir?

A.    Good.

Q.    I gotta tell you that I for one am extremely curious as to whether anything bad's happened to you since you've been assigned Number 666.

A.    No, not yet.

Page 226

Q.   Okay.  Good.  You know, the law does not require that jurors, even jurors who sit on a case that has the potential for a death penalty verdict, be in favor of the death penalty; okay?

A.   Okay.

Q.   What it does require, however, is that no matter how strongly they have a belief about the death penalty one way or the other, they have to be able to set aside that belief at least temporarily in deference to the rule of law that will be given by the Court.  You with me?

A.   I'm with you.

455

Q.   Okay.  Do you think it would be fair if people on trial such as Miss Johnson were forced to have the jurors comprised solely of people who were pro death penalty folks?

A.   Do I think that'd be fair?

Q.   Right.

A.   No.

Q.   Okay.  There's a process, and it's been talked about a little bit in this trial.  It's a very careful process to make sure that the jurors who participate in a trial such as this go through a number of steps before they're even faced with the prospect of making this decision; okay?

A.   Okay.

Q.   The prosecutor talked a little bit about those this morning.  I think the judge has made some reference to them. But you understand that in order to be in a position where you're making this determination about life or death, the jury's already decided that there's been guilt beyond a reasonable doubt and that special aggravating circumstances have been proven, gateway factors have been proven beyond a reasonable

Page 227

doubt, and then the jurors have weighed mitigating circumstances, reasons that they could choose to vote for life. You following me?

A.    Uh-huh.

Q.    In terms of at least participating in the process, doing what the law requires in terms of listening to the evidence,

456

talking to your fellow jurors, and making a decision about guilt or not -- guilt or innocence or guilty or not guilty, is that something you could do irrespective of your views about the death penalty?

A.    I could.

Q.    Okay.  It's when we get to the punishment part of the trial that you think you might have a problem is kind of what I'm hearing.

A.    Right.

Q.    Okay.  Well, first, the law doesn't require the death penalty no matter what kind of a murder case is presented.  No matter what the circumstances are, there's no law that says if this happens the jury must return a sentence of death; okay?

A.    Okay.

Q.    You understand that?

A.    Yes.

Q.    The law also is that the alternative punishment, life without parole, that means life without parole, die in prison; all right?

A.    Okay.

Q.    So the difference between these two punishments is when the person dies, whether they're executed or they die of natural causes or whatnot.  You understand that?

Page 228

A. Yes.

Q. Somebody who's found guilty of the crimes of the type of

457

which are charged in this case, if aggravating circumstances are shown, will die in prison. There's just no question about that; okay?

A. Okay.

Q. The sentiments that you've expressed being raised and brought up to believe it's not appropriate for us to take another person's life, I don't know, but was that discussion one that you had with your parents regarding jury service, or is that, you know, it's not appropriate to take somebody's life, period; we don't kill people?

A. Yeah, it wasn't anything to do with the court system. This was years ago even so . . .

Q. Well, you're a pretty young guy, aren't you? How old are you now?

A. I'll be 25 this month.

Q. And certainly you've probably never been in this situation, even been asked to think about this issue perhaps as serious as you have today.

A. No, I never have.

Q. You heard this morning the judge talk about some of the people that have made very serious personal sacrifices in order to fulfill their obligations as jurors to serve when asked to do so at the request of their country or their state or their local government.

A. Yes.

458

Page 229

Q.    Do you believe that's an obligation that you have as a potential juror?

A.    Yeah, I do.

Q.    It really comes down to this.  You have this situation where you've been asked to serve.  You have these requirements or instructions that the Court's going to give that at least in some very limited circumstance if all these steps have been followed, all these aggravating circumstances are proven, and this balancing has taken place and the juror has decided that the aggravating circumstances outweigh the mitigating circumstances and all 12 of the jurors happen to agree on that after their independent assessment, an eligible juror has to be able to consider the death penalty as an option to life without parole.  They're not required in any circumstances to impose it, but they have to give it legitimate consideration.  Do you understand?

A.    Okay.

Q.    Okay.  So I'll just ask you then, do you think that that's something you'd be willing and able to do if you were asked to do that, sit on this jury?

A.    To consider the death penalty?

Q.    Yes, sir, legitimately consider it, not, you know, whoa, okay, but, you know, under these very limited circumstances after the evidence was in and all this weighing had taken place and all these protections had been followed, you could be in

459

that position -- it's possible -- where you as a juror would be asked to consider it.

A.    So -- yeah, I don't know.  That'd be pretty tough.  I don't -- I don't think I would be able to -- you're telling me

Page 230

that I would have to or you're asking me if I would?

Q. Well, I don't know. We can't predict that because we can't tell you for sure what's going to happen, but certainly the process is such that that's a probability; okay? The government could prove their case beyond a reasonable doubt. They could prove that Angela Johnson's guilty. They might prove these gateway and aggravating circumstances. And then the jurors would be looking at the mitigating circumstances that the defense would present, and they'd be obligated to weigh them, you know. And as it's already been pointed out, that's an individual decision; okay?

A. Yeah.

Q. The jurors, they don't have to go one way or the other. They can decide based on their heart and conscience which one has more weight for me, this mitigating circumstance or this aggravating circumstance. But if upon weighing the aggravating and mitigating circumstances an individual juror came to a determination, you know, I think the aggravating circumstances do outweigh the mitigating circumstances for me and if all the other jurors came to that same independent determination, then certainly the death penalty at that point's an option. It's not

460

required ever, but it's an option, and the government has a right to have jurors who could consider that punishment which is why we're asking these questions.

A. Okay.

Q. So as difficult as that would obviously be for you given what you've told us so far, is it something you believe you could do?

A. I don't believe I could.

Page 231

MR. BERRIGAN: Okay. Well, we very much appreciate your candor about it and your struggle with it. Thank you. Nothing further.

THE COURT: Juror 666, if you'd just wait outside one minute, I'll talk to the lawyers and then bring you back in and let you know your status.

PROSPECTIVE JUROR 666: Thank you.

(Prospective Juror 666 exited the courtroom.)

THE COURT: Mr. Miller?

MR. MILLER: Government challenges for cause, Your Honor.

THE COURT: Any resistance?

MR. BERRIGAN: No position on this juror, sir.

THE COURT: For-cause challenge is sustained. Bring in Juror 666, please.

(Prospective Juror 666 entered the courtroom.)

THE COURT: Sir, on behalf of the lawyers and the

461

parties, I wanted to thank you for your service and your honest and candid answers to the questions. We appreciate it very much. I'm going to go ahead and dismiss you as a potential juror in this case.

We'd ask that you not discuss this with anybody till after we've got a jury selected because we wouldn't want any comments that you might make -- it's a small area, northwest Iowa. We've got several hundred other potential jurors out there. Once we get the trial underway, you're free to talk to anybody you want about it. We appreciate that. Good luck to you. Thank you very much.

(Prospective Juror 666 exited the courtroom.)

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 401 of 3245

THE COURT: Ready for Juror 139?

MR. WILLIAMS: Your Honor, do you want us to raise the criminal history, or do you want to raise it? I'm comfortable either way.

THE COURT: Why don't you do it.

MR. WILLIAMS: Very good.

THE COURT: My new jury selection mode where I -- less is better.

MR. WILLIAMS: Very good.

THE COURT: It's hard, but I'm adjusting.

(Prospective Juror 139 entered the courtroom.)

THE COURT: Please be seated. And, Juror 139, thank you for being so patient. It's been a long day for you. We're

462

going to start with questions from Mr. Williams.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, sir. We do appreciate your patience. It's been a long day for you.

One of the things I talked about very briefly with you early on was your criminal charge that you had before, and I just want to touch base with you on that before we go into anything else first. That was a charge that arose back in 1987; is that right?

A. Yes.

Q. And did you serve some time on that?

A. Yeah, one year.

Q. And was that in a prison?

Page 233

A.    Yes, Lincoln, Nebraska.

Q.    Okay.  And that was from what?  Roughly April 14 of '87 until -- I think you were paroled on April 21 of 1988?

A.    Yes.

Q.    And you actually served that time in prison.

A.    Yes.

Q.    And you were paroled after that.

A.    Yes.

MR. WILLIAMS:  Your Honor, I would move for cause at

463

this point.

THE COURT:  Yeah.  Mr. Berrigan?

MR. BERRIGAN:  I have no objection if that questioning has established conclusively that it's a felony.  Maybe we could just ask the potential juror that question.

THE COURT:  Yeah, he may or may not know, but you can go ahead and ask.

MR. WILLIAMS:  Certainly.

BY MR. WILLIAMS:

Q.    Do you know whether that was classified as a felony or not?

A.    Class 3 I think it was, class 3 felony.

Q.    It was?

A.    Yes.

MR. WILLIAMS:  Very good.

MR. BERRIGAN:  No objection.

THE COURT:  Okay.  Juror 139, let me say this.  In my view you've absolutely paid your debt to society, so that's not really an issue.  But under federal law, because that was a felony, you're not eligible for jury service in federal court. And so we're going to go ahead and dismiss you.  I think you

Page 234

would have been a terrific juror. And sorry you had to sit around all day and we take 30 seconds with you to let you know that, but there was some confusion. It was in that gray area where it might have been a misdemeanor under Nebraska law. Every state law is different.

464

PROSPECTIVE JUROR 139: I've asked all the way up, but nobody seemed to be able to answer that so I --

THE COURT: I appreciate that. Nobody is at all critical of you in any way.

PROSPECTIVE JUROR 139: Appreciate that.

THE COURT: I hope you understand that. I'm sorry you've had to spend the entire day at the federal courthouse. Sometimes I think it's the best system we have, but we sure could improve it, and this is one good example. So I apologize that we've wasted your time today. But at least you were just here 1 day, not 20 or 30, so good luck to you.

PROSPECTIVE JUROR 139: I've been in worse places.

THE COURT: Thank you very much. Good luck to you.

(Prospective Juror 139 exited the courtroom.)

THE COURT: Okay. Please be seated.

By my calculation, Juror 513 would be the only juror that was not removed for cause. Would that be correct?

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: And it would be the government's turn to exercise their peremptory challenges first.

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Do you have a peremptory challenge with regard to 513?

MR. WILLIAMS: No, Your Honor.

THE COURT: Does the defense?

MR. BERRIGAN: No, sir.

THE COURT: Okay. We've now doubled our pool of jurors. We'll bring 513 back in -- I guess that's the only one left -- and let 513 know that they're still in the jury pool; correct?

MR. BERRIGAN: Yes, sir, and we'd ask if you'd be willing to give the same admonishment as yesterday. Thank you.

THE COURT: Sure, sure.

(Prospective Juror 513 entered the courtroom.)

THE COURT: Please be seated. Juror 513, it's not quite like winning the lottery, but I do want to let you know you are the only one today that is still in the jury pool.

PROSPECTIVE JUROR 513: Okay.

THE COURT: And so we'll let you know as soon as we know whether or not you're actually going to be on the jury or not.

PROSPECTIVE JUROR 513: Okay.

THE COURT: It's going to be at least a couple of weeks down the road. I'm pretty confident of that.

I did want to advise you, we had the little written sheet that I went over with you when we first started jury selection this morning. But I just wanted to try and impart on you how important it is for you not to read anything about this case. Don't do any independent research, get on the Internet. It's very important that if you are selected to serve that you

466

Page 236

base your judgment solely on the evidence presented from the witnesses and the other exhibits admitted into court and on my instructions, and we don't want you influenced by any outside source.

So we're going to ask that you not speak to anybody about this case or let anybody talk to you about the case. Should anything unusual occur, you feel free to call the number on the form for the clerk's office, and we can bring you back in and find out if something's happened. I don't anticipate that anything will, but if it does, we need to know about it.

And it's just very important that you not read anything about the case. Try and avoid listening to any radio or television reports about the case. And like I said, don't do any research on the Internet or anywhere else. And hopefully when we get the number of jurors needed, we'll let you know whether or not you've been selected to serve; okay?

PROSPECTIVE JUROR 513: All right.

THE COURT: Okay. Thank you very much.

(Prospective Juror 513 exited the courtroom.)

THE COURT: Please be seated.

Anything else we need to take up today?

MR. WILLIAMS: No, Your Honor, not on behalf of the United States.

MR. BERRIGAN: Nothing by the defendant, sir.

THE COURT: Okay. I would just like to kind of

467

brainstorm with the lawyers. I'm not sure that there's anything we can do to speed things up because everybody's been challenged for cause and -- you know, but I wouldn't mind trying to brainstorm a little bit. And I'd be happy to do it just back in

Page 237

chambers informally, but if anybody wants to do it formally on the record, we can certainly do that. So if anybody wants to, that's certainly fine.

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. BERRIGAN: I guess our preference would be to have Miss Johnson present, Your Honor, so in that circumstance if you don't mind doing it in the courtroom, that would be -- it doesn't have to be on the record.

THE COURT: No, we can do it on the record. Yeah, that's fine. Let's just go on the record. We'll just stay on the record. Anybody have any ideas?

MR. WILLIAMS: Time limitations is something that we could certainly live with on behalf of the United States, Your Honor. The overall process I'm not sure is taking much longer than it did in the Honken case, and we were able to process those pretty well. If we have 15, it might get a little bit lengthy, if we actually get 15 people in, but we'll probably lose a number of those for cause like we did last time.

But we'd be willing to adopt a time limitation for both sides without a problem and both for the group voir dire

468

and for the individual voir dire. The defense just cut out at least ten minutes of my group voir dire today.

THE COURT: You're not going to continue to talk about the Fifth Amendment?

MR. WILLIAMS: I doubt it.

THE COURT: I think you're on much firmer ground than you --

MR. WILLIAMS: I think I'm on very firm ground, Your

Page 238

Honor. It's just one of those that --

THE COURT: But that's fine. Actually, you know, they have a different take on it, and I think you're doing the defense a huge favor by talking about it. And to the extent that you don't, even if they do, it doesn't have the impact as it does coming from a person on the other side.

But they don't see it that way. And if you don't want to talk about it, that's fine. I'm not going to bar you from talking about it because I think it's perfectly permissible.

MR. WILLIAMS: Thank you, Your Honor.

THE COURT: Mr. Berrigan, any ideas?

MR. BERRIGAN: I guess I just don't -- if the view is that the process is going too slowly, I guess I don't share that view with all due respect. I think we've been trying to expedite it.

I will point out, not that we can do much about it, but the defense did propose to strike by agreement I think two

469

of the jurors we ended up striking today after questioning, and we're willing to continue that process, Your Honor. Some of these people we think are fairly strong strikes on the questionnaire, belated as the attempts have been made.

THE COURT: That's really the problem. That's the problem I think we find ourselves in.

MR. BERRIGAN: Well, we still have this issue where we may be questioning people we don't need to be questioning.

THE COURT: Well, that's exactly right. We could have spent -- had you done what I actually thought you had done because when I heard that you had sent back the agreed-upon list of jurors to strike, I assumed incorrectly that you had followed

Page 239

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 408 of 3245

what I had very clearly expected you to do, and that was go through the entire questionnaire and agree, not just on one area.

And so -- but, you know, we just can't do much about that given the situation we're in now. I think the clerk's office is scrambling to . . .

MR. BERRIGAN: I believe we can. I think the parties could do better, and I know you're not privy to these discussions, but I'm raising it for the benefit of the --

THE COURT: Well, maybe you can. I don't know. But there's really nothing I can do about that. The point is even if you did that now, it's so late that as a practical matter it's very difficult. I mean, look at today. We had ten. We

470

didn't have 15. Had you done this 3 weeks ago, we'd have 15 people in here today.

MR. BERRIGAN: That's true, Your Honor.

THE COURT: And we might have qualified two or three more. I don't know. We might not have.

MR. BERRIGAN: We'll have 14 by Friday, and I suspect our numbers thereafter should be pretty good. But still we don't -- seems to me at least it benefits none of us to question people that don't need to be questioned. And we're proposing --

THE COURT: Well, that must be -- I mean, I hate to beat a dead horse, but that was so self-evident that that's why I asked you to do what you didn't do, and it seems like it has just become self-evident to you today like you're a late convert.

MR. BERRIGAN: I think what I'm really realizing through this process is I'm not sure it would have made any

Page 240

difference. We haven't been able to agree on the people we've been proposing now. If I did it a month ago, I feel quite confident the results wouldn't have been any different. We're looking at people in my view that we should not be questioning, and I just want to encourage to the extent that --

THE COURT: Well, but, you know, let me ask you about that.

MR. BERRIGAN: Okay.

THE COURT: Juror 666 you spent 12 minutes trying to

471

rehabilitate. You know, you don't want me to ask a single question to rehabilitate. You have no problem spending 12 minutes on somebody who is so clearly not qualified. Despite all your efforts to try and do it, he still didn't budge. That was a total waste of time.

MR. BERRIGAN: Well, with all due respect --

THE COURT: Because I never would have let him serve.

MR. BERRIGAN: The people that have gone out on motions because they would not consider life far outnumber in our questionnaires the people of the opposite view.

THE COURT: I understand that. I didn't say that. I didn't say anything to the contrary. I'm just using Juror 666 as an example.

MR. BERRIGAN: And I think that, Your Honor, that that's a juror that I need to try -- he did not make it clear on his questionnaire that he was an ineligible juror.

THE COURT: He made it clear in his questioning.

MR. BERRIGAN: Right.

THE COURT: And after five minutes of your questioning, he made it equally clear. He never budged. He

Page 241

never varied, but you wouldn't stop.  You just kept going.

MR. BERRIGAN:  Well, then that was probably another ten minutes.  I don't regret having made that attempt whatsoever.  That's a juror on the questionnaire I thought was a qualified juror.  The fact that the government got to go first

472

resulted in him being eligible for cause, but up until that point, I certainly didn't think he would be.  And yes, I did try to save him.  I have no regrets about that.

THE COURT:  Well, you have no regrets about it, but it wasted ten minutes of time because it was absolutely clear he could not be rehabilitated.

MR. BERRIGAN:  Not in my view, sir.

THE COURT:  He was repeatedly insistent.  So I guess you don't really have any ideas for how to -- well, you know, you're going to have to come up with some ideas because -- you know, or I'll just dramatically change how we do jury selection so . . .

MR. BERRIGAN:  We'll certainly discuss that, Your Honor, now that we're on notice.

THE COURT:  Okay.

MR. WILLIAMS:  And, Your Honor, I feel compelled to at least make a record here because the suggestion's been made that somehow the government's been uncooperative in the efforts to strike these jurors of extreme views.

THE COURT:  We don't really need to get into that.

MR. WILLIAMS:  All right.

THE COURT:  But you can make any record.  It's not going to have any impact on me.

MR. WILLIAMS:  As long as the Court doesn't have any

Page 242

ill feelings toward the government, I feel no need to make any

473

record, Your Honor, and I trust you don't have those feelings.

THE COURT: Not in this case.

MR. WILLIAMS: Fair enough.

THE COURT: Okay. Anything else?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. How many do we have tomorrow?

THE CLERK: Nine I believe.

THE COURT: Nine? Why don't you see if Suzanne can get some of the people on Friday to come in tomorrow.

THE CLERK: Okay. I'll let her know.

THE COURT: We'll just try, and she'll let you know. If you want to stick around till five, we'll let you know so you'll know which ones can come in, and you'll have the questionnaires tonight to work on. Okay. Thanks.

MR. WILLIAMS: Thank you.

(The foregoing trial was adjourned at 4:10 p.m.)

                    CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                    12-29-05
                                            Date

474

INDEX
Page 243

PANEL B, 4-13-05

PROSPECTIVE JUROR:                                                      PAGE:

Prospective Juror 222
            MR. MILLER                                                   324
            MR. BERRIGAN                                                 331

Prospective Juror 430
            MR. WILLIAMS                                                 348
            MR. BERRIGAN                                                 359
            MR. WILLIAMS                                                 366

Prospective Juror 513
            MR. MILLER                                                   379
            MR. BERRIGAN                                                 386

Prospective Juror 677
            MR. WILLIAMS                                                 398
            MR. BERRIGAN                                                 411

Prospective Juror 508
            MR. MILLER                                                   422
            MR. BERRIGAN                                                 427

Prospective Juror 446
            MR. WILLIAMS                                                 434
            MR. BERRIGAN                                                 444

Prospective Juror 666
            MR. MILLER                                                   450
            MR. BERRIGAN                                                 454

Prospective Juror 139
            MR. WILLIAMS                                                 462

* * * * *

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 413 of 3245

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR01-3046 |
| Plaintiff, | Sioux City, Iowa<br>April 14, 2005<br>8:26 a.m. |
| vs. | |
| ANGELA JANE JOHNSON, | VOIR DIRE OF<br>PANEL C |
| Defendant. | |

/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

476

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | C. J. WILLIAMS, ESQ.<br>Assistant United States Attorney<br>Suite 400 - Hach Building<br>401 First Street Southeast<br>Cedar Rapids, IA  52401 |
| | THOMAS HENRY MILLER, ESQ.<br>Iowa Attorney General's Office<br>Area Prosecutions Division<br>Hoover State Office Building<br>Des Moines, IA  50319 |
| For the Defendant: | PATRICK J. BERRIGAN, ESQ.<br>Watson & Dameron<br>2500 Holmes<br>Kansas City, MO  64108 |
| | DEAN STOWERS, ESQ.<br>Rosenberg, Stowers & Morse<br>1010 Insurance Exchange Building<br>505 Fifth Avenue<br>Des Moines, IA  50309 |
| | ALFRED E. WILLETT, ESQ.<br>Terpstra, Epping & Willett<br>Higley Building - Suite 500<br>118 Third Avenue Southeast<br>Cedar Rapids, IA  52401 |
| Also present: | Bill Basler |

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 414 of 3245

PANEL C, 4-14-05
Court Reporter:            Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA  51101
(712) 233-3846

477

(Proceedings reconvened outside the presence of the jury venire.)

THE COURT:  Good morning.  Please be seated.  I just wanted to change the PowerPoint slides to reflect the switch that we're going to do individual questioning first.

Any matters we need to take up before we have the jurors brought in?

MR. WILLIAMS:  No, Your Honor.

MR. BERRIGAN:  Nothing by the defense, sir.

THE COURT:  Thank you.  And let's see, the defense is going first today?

MR. BERRIGAN:  Yes, sir.

MR. WILLIAMS:  Your Honor, just for your information, we liked the way the defense is doing this, so we're going to adopt their style.  I'm going to do all the individual questioning for today, and then Tom's going to do the group, and then we may switch that off from time to time, but we like their idea of getting face time of both of us in front of the jury.  Not too old to learn.

THE COURT:  None of us are or should be.  Why don't we have the jurors brought in.

(Panel C entered the courtroom.)

THE COURT:  Good morning.  If you'd all raise your right hand, I'm going to swear you in.

(Panel C was sworn.)

478

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 415 of 3245

THE COURT: Okay. Good morning. Please be seated. I wanted to welcome all of you to the United States District Court for the Northern District of Iowa. And I wanted to remind you all that there is no federal law against smiling this morning. I know you're a pretty glum-looking group, and I understand why, but that's what I want to talk to you about for a few minutes this morning.

My name's Mark Bennett. I'm the chief judge of the United States District Court for the Northern District of Iowa, and it's my honor to welcome all of you here today.

Let me just speak very candidly to you. I imagine when you got the original questionnaire that you had to fill out and you first learned that you were potential jurors in a case that could last three months that that was probably not the most thrilling piece of information that you've all received this year, and I do understand that completely.

We've tried to set up a system in jury selection. We have great flexibility. There's no one way to do it. There are approximately 600 federal district court judges, and I expect there's at least 600 different ways of doing it. I've done it several different ways, so I'm responsible for a variety of ways to do jury selection.

I've met with the lawyers extensively about it. We've tried to come up with a system that would not require you to spend more than one day at the United States Courthouse. And my

479

secretary was called for jury duty in state court, and she's been there a number of days now, and her sister was called for jury duty in federal court this week, and she spent three days

Page 3

at the federal courthouse and actually never got questioned by a judge or lawyer.

So the system that we've come up with I think is really unique and really tries to minimize the amount of time that you'll need to spend here. And I hope you appreciate the effort that went into that.

I just wanted to introduce who everybody is. You'll meet them in a little bit more detail in a minute, but it would be rude of me not to introduce them.

I'm going to start with the government's table, and I'll just have them raise their hand. C.J. Williams and Tom Miller, they're both federal prosecutors, and they'll be prosecuting the case. And with them is Special Agent Bill Basler, and Bill Basler's what's called the case agent. He's a law enforcement officer, and he'll be sitting at counsel table throughout the trial.

Then over on the defense side, we have Patrick Berrigan and Al Willett, Dean Stowers, and they're the three lawyers. And then Angela Johnson who's seated between Mr. Berrigan and Mr. Willett is the defendant who's on trial in this case.

You should have on your chair a little written set of

480

rules, and I wanted to go over that with you kind of first thing. And after I do that, then I'm going to explain exactly what's going to happen this morning.

Conduct of potential jurors during jury selection and trial. To ensure fairness, you as potential jurors must obey the following rules until the end of the case if you are selected for the jury or until you are excused from serving on

Page 4

the jury in this case.  These rules apply whether you are in the courtroom, in the courthouse, at home, or anywhere else until you are excused from further service in this case.

First, do not talk among yourselves about this case or about anyone involved with it.

Second, do not talk with anyone else about the case or about anyone involved with it.

Third, when you're outside the courtroom, do not let anyone tell you anything about the case.  If someone should try to talk to you about the case during jury selection or the trial, please report it to me.

Fourth, do not talk with or speak to any of the parties, lawyers, or witnesses involved in this case.  You should not even pass the time of day with any of them.  It is important that you not only do justice in this case but that you also give the appearance of doing justice.  If a person from one side of the case sees you talking to a person from the other side, even if it is simply to pass the time of day, an

481

unwarranted and unnecessary suspicion about your fairness might be aroused.  If any lawyer, party, or witness does not speak with you when you pass in the hall, ride the elevator, or the like, it is because they are not supposed to talk or visit with you.

Fifth, do not read any news stories or articles about the case or about anyone involved with it or listen to any radio or television reports about the case or about anyone involved with it.  If you want, you can have your spouse or a friend clip out any stories and set them aside to give you after the trial is over or you are excused from serving on the jury in this

Page 5

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 418 of 3245

case. I can assure you, however, that if you are selected for the jury in this case, by the time you have heard the evidence you will know more about the case than anyone will learn through the news media.

Sixth, do not do any research on the Internet, in libraries, in the newspapers, or in any other way or make any investigation about this case on your own. If you are selected for the jury, you must decide this case based on the evidence presented in court.

Seventh, if you are not excused from serving on the jury today, please take this instruction with you so that you can refer to it if you have any questions between now and the date you are required to return for the trial.

Dated the 14th day of April, 2005, signed by me, Mark

482

Bennett, chief judge.

Now, I wanted to explain to you who kind of the courtroom participants are because I imagine -- well, let me ask. Raise your hand if this is the first time you've been to this courtroom before.

Okay. Looks like -- I think everybody had their hand up, so first time for everybody, and I just want to try and put you at ease because I imagine -- I've had a couple hundred trials, so I've had a little bit of experience in this. I imagine most of you are a little bit nervous, maybe a little bit anxious, kind of what's going to happen today, what kind of questions is this judge going to ask you and are the lawyers going to ask you, and it's understandable that you'd be nervous.

I'd like you all to just kind of take a deep breath and relax. It's really not going to be that painful, I can

Page 6

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 419 of 3245

assure you. My best friend is a dentist, and he wouldn't appreciate this, but it's a lot better experience today than it would be going to his office, and he's a wonderful dentist.

I have one of my law clerks with me for this trial, Carey. Carey's an honors graduate from the Drake University Law School in Des Moines. She's in the second year of a federal clerkship with me. At the end of the summer she'll be headed off to Seattle for her next job.

We have our court reporter Shelly. Shelly sits right in front of me. I say this, and I think it's true. She's got

483

the most difficult job in the courtroom because she always, always, has to take down everything that's said in the courtroom. She can't daydream like maybe the rest of us might. Most trials are interesting, but even the most interesting trial -- and I assure you this will be an interesting trial. But even the most interesting trial isn't interesting all of the time. And Shelly's got to pay attention whether it's interesting or not and take down everything we say to make a perfect record which I'm confident she will do.

We have some United States marshals in the courtroom, and that would be true in any case. We always have United States marshals in the courtroom when we have a court proceeding going on.

We also have some court security officers. They're the easiest people to identify because they have the blue blazers and the badge and the little earpiece, and they have a lot of responsibilities in our courthouse, but one of their major responsibilities during trials would be to make sure that jurors get down to the jury room, get back here on time, and the

Page 7

like.

We have the lawyers and the parties they represent, and you've met them. You'll meet them in a little more detail in a moment or two.

And then I want to talk a little bit about the role of the jury and my job, and then I'll start with me and then go

484

back to the jury. As the trial judge in this case, I've had a lot of responsibility, and it started long before we started jury selection on Tuesday of this week. We've had lots of pretrial motions as you might imagine. It's the parties' obligations to raise various issues prior to trial. Both sides have done an excellent job in doing that, and I'm pleased to say I believe I'm current and I've ruled on all of the motions in the case.

There will be motions that arise during the course of the trial. There always are. There will be objections to evidentiary matters that I'll have to rule on. I've made a lot of rulings in this case. I have a lot more to go. I understand that. And that's part of my responsibility.

Personally since I've been a judge, I've always thought that a huge part of my responsibility was trying to put in place systems that minimize any waste of your time.

Now, I was a practicing lawyer for 16 years before I became a judge, and it dawned on me that some judges were concerned about jurors and others really weren't, and they didn't really do anything to make the jurors' job easier.

I'm not one of those judges. I put a lot of thought into trying to make your job easier, and that's one of the reasons why you're just coming in for one day rather than

Page 8

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 421 of 3245

sitting here for maybe a month during jury selection.

And my other major responsibility in this trial -- you

485

know, one of them is to not waste your time if I can help that. That's very, very important to me, and the lawyers know that, and we've had discussions about that. But another major responsibility I have is to tell you what the law is.

In this case the defendant is charged with ten separate crimes. And for those of you who get selected to serve on the jury, I'll be defining those crimes in quite a bit of detail in a set of preliminary instructions that you'll get right before we hear the opening statements and then after all the evidence is in on the first phase of the trial -- and that first phase is to decide whether Angela Johnson is not guilty or guilty of one or more of the crimes charged -- and then right before closing arguments you'll get a set of more detailed instructions. So that's my job.

Now, what's the jurors' job? Your job is to listen to all of the evidence. There's the witness box. All the witnesses will testify from the witness box. There will be lots of exhibits. I think there will probably likely be -- by the time the trial is over, I imagine there could be anywhere between 70 and 100 witnesses or more testifying. And there will be many hundreds of exhibits in the case in all likelihood. And you'll have to listen to all of the testimony, all of the exhibits, and you'll have to decide what actually happened.

And in that sense you are the judges of the facts. It's not my responsibility in the trial to decide what happened.

486

Page 9

It's my responsibility to tell you what the law is.  It's your responsibility to figure out what happened, make findings of fact, figure out what happened, and then apply the facts to my instructions and then figure out at least in the first phase of the trial whether or not Angela Johnson is not guilty or guilty of one or more of the crimes charged.

Now, in deciding what the facts are, you determine what we call the credibility of the witnesses.  And what that means is is each witness telling the whole truth, just part of the truth, or maybe none of the truth.  And that's each individual juror's job.  So in that sense you are the judges of the facts, and you're the judges of the credibility of the witnesses.

Now, we're about to start a process that lawyers call voir dire.  It's a French term.  It's the French term for jury selection.  And literally translated it means to speak the truth.  And what does that mean?

Well, it means that our goal is to find 18 jurors in this case -- we're going to have 12 trial jurors and 6 alternate jurors because it's a long case, so I like to use the maximum number of alternates I can.  The good news is you won't know whether you're a trial juror or an alternate juror.  I don't tell them because I think if you knew you were an alternate juror you might not pay as careful attention.  And in any trial of this length, it's very likely that we'll lose a couple of

487

jurors along the way, emergencies, health issues.  You just never know.  But I've only had a couple of trials of this length, and we lost jurors in both cases.  And I've lost jurors in much shorter trials, so that's why we're using six

Page 10

alternates.

Now, in order to find 18 jurors we want, we're going to ask you a lot of questions, and I want to make sure you understand we're not here to judge you. There are no right or wrong answers to any of the questions. And relax about the questions. I think you'll find that the lawyers aren't really prying really deeply into your backgrounds. They really just want to get a sense of your views on a lot of different topics to try and determine whether they think you would be an appropriate juror in this case. Some jurors would be great jurors in one type of case but not so good in another type of case depending upon their particular views.

So for our system to work it's very important that you answer openly and honestly to all of the questions that are asked of you.

And you're reminded to refer to your juror number rather than use your name, and the lawyers will make their best efforts to call you by your juror number.

Let me tell you the reason. I made the decision to use numbers in this case rather than names, and here's why. By any standard this would be what I call a high-profile case.

488

There's a lot of public interest in this case. There will be a lot of newspaper articles and TV stories. And I was concerned that if we used your names in public -- I mean, we all know your names. We can look them up. We all have your questionnaires with your names on them. But I was concerned that if we used your names in public and then the press picked it up that you could have any idle curiosity seeker call you up, drive by, send you letters, knock on the door.

Page 11

And it's tough enough for those of you who will be selected to give up two to three months of your life to serve as a juror to have all kinds of whackos maybe -- and maybe they're not whackos, but you'd be shocked at all the letters I get. I just kind of wanted to spare you that. That was my reason behind it. So I hope you'll appreciate that.

I want to explain kind of what we're doing. We anticipate that jury selection will take about two to three weeks. We are now in our third day. We started on Tuesday, so we had Tuesday and yesterday. Today's our third day. You're our third group coming in. We think it will take about two to three weeks. May take a little bit longer. I'm not sure.

We bring in a small group of potential jurors each day. Today we have 13. I'll introduce you to the lawyers. I have a few questions for you, and then we're going to do individual questioning. Each side has an opportunity to question you. The individual questioning will primarily focus

489

on pretrial publicity, what, if anything, you know or have heard about the case and what your views are on life imprisonment and the death penalty.

And the way that will work is after I'm done in a little bit, we'll send you downstairs to the jury room, and then we're going to bring you back one at a time and question you individually, and then this will become obvious. After we do the individual questioning, there will be some group questioning. We'll bring you all back in a group. But after the individual questioning, we're going to make a decision at that point whether to dismiss you from jury service or keep you in the jury pool.

Page 12

So after we bring you up individually -- it averages about 20 to 30 minutes per juror -- we'll ask you to step out of the room.  It usually only takes a minute or less, bring you back in, and I'll give you either you're on the jury pool and you'll continue which means you have to stick around today or you're off the jury pool and you won't be serving as a juror in this case.  So you'll know that right after we question you.

If you're still in the jury pool, we're still going to have you stay the rest of the day because there's yet another opportunity for you to be dismissed at the end of the day.  So you actually have two chances to be dismissed from the jury pool today.

So you'll know at the end of the questioning today

490

whether or not you're still in the jury pool or dismissed from jury service.  And if you're still in the jury pool at the end of today, we send you home, and I say, You're still in the jury pool; you still only have about a 50 percent chance of winding up on the jury, because what happens is after we get the necessary numbers that we need, about 34 potential jurors in our pool, we're only going to wind up with about 8 -- we're going to wind up with 18 on the jury.  So even if you make the pool of 34 at the end of today, you still only have about a 50 percent chance of being selected.

And then when we manage to empanel the number of jurors we need which is 34, we -- we know how many we need.  We just don't know what day or what week we'll get there.  We'll notify each juror by telephone whether you've been selected or not and when the trial will begin, and we'll try and give you as much notice as possible.  For most of you you'll know today, you

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 426 of 3245

know -- well, you'll all know today whether you're still in the pool or out of the pool. If you're out of the pool, you have no chance of being a juror, and you'll know that.

Once we start the trial, we're going to run four days per week. Almost always that will be Monday through Thursday. There may be some weeks where we run Tuesday through Friday, but if there are, I'll give the jurors a schedule so you'll know weeks in advance what our schedule will be. But for the most part, we'll be running trial Monday through Thursday, and we're

491

going to take the week of June 10 through 17 off.

Now, Mr. Williams, would you introduce yourself?

MR. WILLIAMS: Thank you, Your Honor. My name is C.J. Williams. I'm an assistant United States attorney. I'm with our office over in Cedar Rapids, Iowa. With me at counsel table is Special Assistant United States Attorney Tom Miller from Des Moines.

MR. MILLER: Good morning.

MR. WILLIAMS: And then you also met Special Agent-in-Charge Bill Basler. He's from Mason City.

MR. BASLER: Good morning.

MR. WILLIAMS: Assisting us in this case is Sali Van Weelden. She's a legal assistant in my office. And then Shari Konarske is in the back bench. She's also a staff member in my office.

We have an office here of U.S. Attorney's Office in Sioux City. Our office is headed by Chuck Larson Senior. He's actually serving in Baghdad right now. We have seven attorneys here in Sioux City, and we have seven staff members. I'm going to read off their names in the event that maybe one of you know

Page 14

the folks that live out in this area: Forde Fairchild, Martha Fagg, Kevin Fletcher, Mike Hobart, Jack Lammers, Janet Petersen, and Shawn Wehde. Those are all the attorneys, assistant United States attorneys, that work here in Sioux City.

And then we have staff members Shayne Mayer, Del

492

Tompkins, Penny Schlotman, Michelle Schwebach, Michelle Hatting, Carol McEntaffer, and Pat Calhoun. Thank you.

THE COURT: Thank you. Now, do any of the potential jurors know any of the individuals that Mr. Williams identified? Or I'll expand that a little bit. Do you know anybody who works at the federal courthouse here? Anybody?

Okay. Why don't we shift over to the defense side. Mr. Willett?

MR. WILLETT: Thank you, Your Honor. Good morning, ladies and gentlemen. My name is Al Willett. I'm an attorney from Cedar Rapids, Iowa. And I practice law with the group of Terpstra, Epping, and Willett. Now, the gentlemen I practice with are Ray Terpstra and Greg Epping.

I think it's most important to introduce you to my client again first, Miss Angela Johnson. Ms. Johnson was born in the decade of the 1960s. She grew up in the Mason City/Clear Lake area, and I'm assuming those are familiar Iowa names to you, but that's in north central Iowa if those towns are not familiar to you. And her formal education consisted of completing the ninth grade at Forest City High School.

Do any of you think you know either myself or my client, Miss Johnson? I don't see any nods of affirmation.

I brought attorneys with me to assist on this case, Mr. Patrick Berrigan from the Watson and Dameron firm in Kansas

Page 15

City, Missouri. Associated with Mr. Berrigan is Ms. Lisa Dahl

493

who will be assisting.

And then the other co-counsel I have the privilege of trying this case with is Mr. Dean Stowers from Des Moines. Mr. Stowers is with the law firm of Rosenberg, Stowers, and Morse. And he practices there with Brent Rosenberg, David Morse, and Heather Wood.

Now, do any of you know my co-counsel or anybody associated with my co-counsel?

Thank you so very much, Your Honor.

THE COURT: Thank you, Mr. Willett.

Okay. Now, we've estimated that the trial will last three months. That includes jury selection. It's very difficult to estimate the length of a trial because so many things can happen during a trial that we really have no control over and can't anticipate.

But our best estimate -- I think it's been a generous estimate. In other words, I don't really think it's going to take the full three months, but when I was speaking to the lawyers yesterday, everybody's pretty confident we'll be done by the end of June. That's our best guess.

Now, I want to take a minute to introduce this concept of a severe or extraordinary hardship. It is always a hardship to take people out of their daily routine, haul them down to Sioux City, and ask you to serve on jury duty. It can be a hardship in a two-day trial. There's a greater likelihood it's

494

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 429 of 3245

going to be a hardship in a longer trial.

Yesterday not a single juror, not a single one -- even though many of them said in their questionnaires that it would be an extraordinary hardship, not a single juror said it would be an extraordinary hardship. The day before that, I believe there was only one, and he had a real serious health problem. He was actually on -- had a pain pump and was taking narcotic drugs, and he couldn't literally stay awake, and so that would be an extraordinary hardship. And I guess yesterday we did have one juror that had an extraordinary hardship. That's right. We did.

And one of the things that I've been surprised in this job is when I go to meetings and talk to my federal judge colleagues around the country, they complain that so many people try and get off jury service. That has not been my experience. I think it's one of the most rewarding parts of the job is when I get to this issue about would it be a severe or extraordinary hardship and find that people in northwest Iowa are willing to make substantial sacrifices to serve their country, and that's exactly what jury service is.

I mean, that's why I love my job. I get to serve our country every single day because I'm enforcing and applying the laws of the United States of America making important judgments about people's lives in civil cases and criminal cases. And I'm a public servant. I'm honored to be a public servant. I feel

495

very lucky. I wake up each morning early excited to come to work. I pinch myself. I can't believe I get to do this job. I don't really expect that each of you would have that level of enthusiasm about jury service, but I kind of hope that you

Page 17

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 430 of 3245

would.

And one of the neat things about this job, when I started on September 6, 1994, in every trial I've ever had, I put together a questionnaire for the jurors, and so at the end of the trial when your job is completely done, I go down to the jury room, and I hand out a questionnaire to each one of you with a stamped, self-addressed envelope. You don't have to fill it out. It's a voluntary procedure. Ninety percent of the jurors fill it out and mail it back. And in that questionnaire you get to evaluate the lawyers. You get to evaluate the trial process. You get to evaluate me as a trial judge.

And we've literally made major changes in the way our court does business based on what the jurors have told us. That feedback's very important.

But I raise this because one of the things that I've so much enjoyed reading -- and I read the answers to every questionnaire -- is that jurors almost to a person find jury service to be surprisingly fulfilling and rewarding.

And so when you come in here, you're very skeptical, and very few people want to serve, and I understand that. But my experience is for those who pass the job interview as jurors

496

and make it on the jury, they wouldn't trade that experience for almost anything in life. They really think it's an incredible experience.

You'd be surprised at how often we have jurors wanting to know how can I get on the jury again. The good news is if you serve on this case you're off. You know, for at least several years you're not eligible.

Having said all that, there are situations where it

Page 18

would be a severe or extraordinary hardship. I had a lengthy trial last year, a trial almost this long, and I remember in jury selection one day we had two farmers, and they both farmed full time and worked full time in manufacturing jobs, and they weren't getting paid beyond the first two weeks of jury service in the manufacturing jobs. And the trial was during harvest season. So I thought for sure they would say it was an extreme or extraordinary hardship. And both of them said they were willing to serve. And I had to actually say, Are you sure? I will let you off. I think it's maybe too much of a hardship to ask. And they were willing to serve.

We had another juror who would have no income for his family for the two to three months of that trial, and he said he talked it over with his wife the night before, and they were willing to deplete their life savings, they were willing to deplete their life savings, so that he could serve his country as a juror in the case. That's extraordinary. And I just tell

497

you that because you have a unique opportunity to serve.

Now, on the other hand -- that's true with regard to this question. On the other hand, when the lawyers ask you questions, you have to be totally honest because while you have an obligation to serve, you also have an obligation not to serve if you have certain beliefs or opinions, all of which we respect, that would mean you wouldn't really be a good juror in this case. But that's for the lawyers and I to kind of sort out.

So I'm just going to start with Juror 621. We've got the microphone. And it's going to be on, and I'll make all of you a deal. If you speak directly into the microphone, I won't

Page 19

put karaoke up on the big screen. But I'm going to ask you a simple question. Are you willing to serve in this case, 621?

PROSPECTIVE JUROR 621: Yes.

THE COURT: Okay. Thank you very much.

Juror 146?

PROSPECTIVE JUROR 146: Yes.

THE COURT: Thank you very much.

Juror 717.

PROSPECTIVE JUROR 717: Yes.

THE COURT: Thank you.

Juror 102.

PROSPECTIVE JUROR 102: Monday my boss was diagnosed with cancer, prostate, and there's only three of us that work in

498

the main office. So if he needs treatment, it could be a hardship to my business or their business because I handle all the administrative duties.

THE COURT: Okay. Well, knowing that -- I'm sure your boss knows that you received this packet and you were a potential juror.

PROSPECTIVE JUROR 102: Right.

THE COURT: Was there any contingency planning done in the event that you were going to be selected?

PROSPECTIVE JUROR 102: Unfortunately, we have a small staff, and we don't have anyone to cross-train. I've trained a couple people to handle, you know, one job or two jobs. But I would feel obligated that I would need to work evenings and weekends for them to --

THE COURT: Sure.

PROSPECTIVE JUROR 102: Because I do all the

Page 20

statistical work.  We have an audit coming up next month.

THE COURT:  What city are you in?

PROSPECTIVE JUROR 102:  Here in Sioux City.

THE COURT:  Oh, you're here, okay.  Well, for you it'd be fairly easy in the sense that some of your colleagues -- some of your fellow jurors come from two and a half hours away.

PROSPECTIVE JUROR 102:  Right.

THE COURT:  120, 130 miles away.

PROSPECTIVE JUROR 102:  Right.

499

THE COURT:  And I realize it'd be a sacrifice, but I work every evening.  I work every Saturday and Sunday.  I'm on call 7 days a week, 24, 7.

PROSPECTIVE JUROR 102:  Yeah.

THE COURT:  And for three months would you be willing to work weekends and evenings and you'd have all day Fridays?

PROSPECTIVE JUROR 102:  Yeah, I could do that.

THE COURT:  So do you think -- I realize this situation with your boss and the recent diagnosis throws a lot of unknown into it.

PROSPECTIVE JUROR 102:  Yeah.

THE COURT:  But do you think by working evenings, weekends -- you can even work -- if you're an early riser, you can work early in the morning because we probably won't start till 8:30 each day, and we'll probably be done by 4:30 or so.

PROSPECTIVE JUROR 102:  Okay.

THE COURT:  Do you think you'd be able to work through it?

PROSPECTIVE JUROR 102:  Sure.

THE COURT:  Okay.  It'd be a hardship.  I understand

Page 21

that.

PROSPECTIVE JUROR 102:  Yeah.

THE COURT:  It would be.  And you'd be probably making a greater sacrifice than a lot of the rest of us would be.  But the question is are you willing to do it do you think?

500

PROSPECTIVE JUROR 102:  Sure.

THE COURT:  Okay.  Thank you.

Juror 797.

PROSPECTIVE JUROR 797:  Yes.

THE COURT:  Thank you.

Juror 52.

PROSPECTIVE JUROR 52:  Yes.

THE COURT:  Thank you.

Juror 223.

PROSPECTIVE JUROR 223:  Yes.

THE COURT:  Thanks.  If you'd pass it directly back to Juror 258.

PROSPECTIVE JUROR 258:  Yes.

THE COURT:  Thank you.

Juror 653.

PROSPECTIVE JUROR 653:  Yes, Your Honor.

THE COURT:  Thank you very much.

Juror 55.

PROSPECTIVE JUROR 55:  Yes.

THE COURT:  Thank you.

Juror 345.

PROSPECTIVE JUROR 345:  Yes.

THE COURT:  Thank you.

Juror 504.

Page 22

PROSPECTIVE JUROR 504: Yes.

501

THE COURT: Thank you so much.

Juror 398.

PROSPECTIVE JUROR 398: Yes.

THE COURT: I am just -- I'm so appreciative I can't tell you. Yes. Can you pass it down to Juror 146?

PROSPECTIVE JUROR 146: Sorry. I have a question. I wasn't sure if this was the time to tell you.

THE COURT: Sure.

PROSPECTIVE JUROR 146: My grandmother's ashes are going to be buried in July, and I'm not sure if this is the time to bring it up, but we're waiting on buying tickets to go to Washington to do that, and I'm not sure if that's the point to bring that up.

THE COURT: Great question, yes. We had this come up -- I think it was yesterday. Someone had some kind of like a family reunion thing in July, and the lawyers said we will be done by the end of June, but great question. Thanks for asking. Now is the time to raise it, so thank you.

Anybody else?

Okay. Now's the time for the lawyers to ask questions, and here's what we're going to do. I want to try and explain this as best I can. We're going to send you all down to the jury room, and then we're going to start one at a time, and I think we'll start with Juror 258 in the back row, and then we're going to just go down the row and then go to Juror 223.

502

So, Juror 621, unfortunately you are the last juror
Page 23

we're going to talk to individually. Now, it's going to be quite a while till we get to you, Juror 621. I wish I could tell you the time. But I'm pretty confident we're not going to get to you this morning. So it will be some time in the afternoon. It could be, you know, a little bit -- mid afternoon or so. So I don't want to, you know, force you all to be in the jury room.

On the other hand, like 258, 653, 55, you all probably ought to stick around. 345, 504, 398, you want to go out and have a cup of coffee or something, we probably won't get to you for an hour or so would be my guess. And then just judge yourselves accordingly.

So you're free to leave the building. You don't have to wait in the jury room. But -- and you gotta err on the side of being here when we need you. So I guess my preference would be you stick around. I told you in the letter that I sent you bring something to read. We got a great inquiry from a juror yesterday wanting to know if they could bring a DV D player and watch a movie. Great idea. Watch all the movies you want.

But we're just going to go ahead and take you one at a time. Then after we're done with each of you, that will be kind of the first cut. Some of you probably will be cut, and I'll tell you you're no longer needed as a juror in this case. The rest will remain in the pool. Then we'll have a second cut at

503

the very end of the day, probably close to five o'clock this afternoon, and then you'll know if you're still in the pool or not.

If you're not in the pool, you're dismissed. If you're still in the pool, you still only have a 50 percent

chance of making it on the jury. So that's the best I can tell you now.

Juror 258, why don't you just stay in the courtroom. We'll send everybody down. Please remember my instructions about not discussing this case among yourselves or don't let anybody else talk to you about this case. Thank you.

(Panel C exited the courtroom, Prospective Juror 258 remaining.)

THE COURT: Juror 258, we're just going to kind of ask you to come down to the middle of the front row, and Rick will give you the microphone.

Everybody please be seated.

Mr. Berrigan, whenever you're ready, you may proceed.

MR. BERRIGAN: Thank you, sir. May it please the Court.

EXAMINATION

BY MR. BERRIGAN:

Q. Good morning, sir.

A. Good morning.

Q. How are you today?

504

A. Good.

Q. I saw by your questionnaire you're a maintenance supervisor.

A. Yes.

Q. How do you pronounce that company you work for?

A. Aramark.

Q. Aramark. And you've been there for 22 years.

A. Yes.

Q. We are going to be asking you some questions in this
Page 25

individual setting today largely because the judge has graciously determined that this is a very important part of the case. Miss Johnson's charged with five counts of intentional murder, and two of these five victims are two little girls. One's ten, and the other one's six; okay? These murders are alleged to have been committed during the course of a drug conspiracy and/or a continuing criminal enterprise. And because of the nature of the charges, one of the possible punishments is the death penalty, the other being life in prison without any possibility of parole. Are you with me?

A.     Yes.

Q.     Okay. I guess we could agree that's pretty serious.

A.     Yes.

Q.     And so we have this opportunity to talk to people one by one, and the hope is that it would make you less nervous and more free to discuss your views. That's our goal; okay?

505

A.     (Nodded head.)

Q.     And let me reiterate for both parties here, the government and Miss Johnson, that, you know, we're not here to criticize your feelings. We respect very much what your opinions are no matter what they are. We appreciate your service in coming in here today. But all we're trying to do is get honest, open responses so we can get the best 12 people; okay?

A.     Okay.

Q.     So that's kind of the premise upon which we're operating; all right? I saw from your questionnaire that you had fairly limited exposure to this case through the media. Is that accurate?

A.     Yes.

Page 26

Q. Tell us a little bit about that.

A. As far as before, I mean, the original trial with the other individual, of course, you hear about some news, watch the news and stuff. And I guess I have read the paper a little bit about it. But it's been a while ago, and I guess it really -- I know very little about it I guess.

Q. Okay.

A. I mean, I know certain names, you know, just by the situation but . . .

Q. What names kind of stick in your mind?

A. Hoiken or --

Q. Honken?

506

A. Honken, yes.

Q. Of course --

A. I think everybody knows the situation on that. I mean, I don't know how anybody could not -- you know, I mean, if you paid attention to it or not, I guess you know the name and what happened.

Q. There was a lot of publicity surrounding Mr. Honken's case. Would you agree with me?

A. Yes.

Q. What is it that you remember about that publicity?

A. Just not a whole lot. Just what it involved, murders and over drugs and stuff and not much more than that I guess.

Q. Do you know how Mr. Honken's case turned out?

A. Yes.

Q. Could you tell us?

A. He was found guilty.

Q. All right. Did you get any information from the media

Page 27

regarding the punishment?

A.   As far as what the punishment was?

Q.   Yes, sir.

A.   Yes, death penalty I think was . . .

Q.   Okay.  Do you remember Angela's name coming up at all, Angela Johnson?

A.   Probably not at the time.

Q.   You know what happens sometimes, sir, is we're sitting,

507

somebody's asking us what do you remember about something that happened a while ago, and, you know, we only -- we weren't preparing for a test.

A.   Right.

Q.   So we haven't retained that information particularly, but when you sit here as a juror during the trial, I can promise you what's going to happen is you're going to hear stuff from the witness stand here behind me, and it's going to refresh your recollection about some of that stuff that you saw in the media. Do you know what I'm saying?

A.   Yes.

Q.   Let me ask you, the information about that you did get from Mr. Honken's case, where was that from primarily?

A.   Probably from news and probably newspaper.

Q.   Okay.  Do you get a regular subscription to the Sioux City Journal?

A.   I buy one every day, yes.

Q.   And do you read it fairly routinely?

A.   Yes.

Q.   Okay.  And, you know, my recollection is at the time of Mr. Honken's case -- correct me if I'm wrong -- but that his

Page 28

case was in the paper pretty much every day.

A.    Yes.

Q.    Was that your recollection?

A.    Yes.

508

Q.    Would you have read the articles each day?

A.    I can't say I read it every day, but I did read articles, yes.

Q.    Okay.  And so at least at the time it was going on, would it be your recollection that you were pretty familiar with it at that time?

A.    Yes.

Q.    Okay.  Now, we ask all these questions I'm sure for the obvious reasons, sir, and that is we have a concern that that publicity -- you know, we all claim we don't believe what we read in the papers, we don't believe these people on TV, but the truth is we rely on those folks to give us information about what's going on in the world, don't you think?

A.    Yes.

Q.    Do you have a pretty good opinion of your local paper?

A.    Yeah.

Q.    There's no reporters here I hope.

A.    I hope everything I read is the truth I guess.

Q.    Okay.  So let me ask you this.  As a result of following Mr. Honken's case at least at the time pretty closely, have you formed any opinions about Miss Johnson's situation?

A.    No, I guess, no.

Q.    Do you have some hesitancy in your own --

A.    No, it's just -- I guess not before -- during the trial I guess I never -- her name probably I don't remember during his

Page 29

trial, so no.  I guess no.

Q.    Since you filled out your questionnaire -- and I know in your questionnaire you said you had not formed an opinion.

A.    No.

Q.    But since you filled out the questionnaire -- that was probably a few weeks back now I suspect -- have you heard anything new about Miss Johnson's case?

A.    No, no.

Q.    So would it be still the situation as Miss Johnson sits here right now she's presumed innocent; you've not formed any opinion regarding her guilt?

A.    Yes.

Q.    And later on we'll talk about the concepts of presumption of innocence.  I'm sure you've heard that term before.

A.    Yes.

Q.    But as of right now, are you willing to presume her innocent?

A.    Yes.

Q.    I'd like to turn our attention now -- one last thing on this topic; okay?  Let's say you're selected as a juror, all right, and what I suggested happens.  That is, you're sitting there and you're listening to this evidence paying attention and evaluating the witnesses and it hits you, I remember that now. I read about that in the Sioux City Journal in Mr. Honken's case.  That's kind of coming back to me; okay?  It's critically

important that you be able to not only not consider what was in

Page 30

the paper or on the media but really completely and utterly set that aside and just base your opinion about the case and your decision in Angela Johnson's case on what you hear from the witness stand and the exhibits in her case; okay?

A.    Yes.

Q.    Does that seem fair to you?

A.    Yes.

Q.    That she should not be judged on what might have been in the paper on Mr. Honken's case?

A.    Yes.

Q.    Okay.  And would you agree with me that wouldn't even be a subject that would be discussed with your fellow jurors?  That is, you know, if you did remember something or somebody remembered something from the media accounts of Mr. Honken, that's not something that should come up in the jury room.  We agree?

A.    Yes.

Q.    Okay.  Thank you, sir.  Let's ask -- let me ask you a little bit about the death penalty.  And again, you were kind enough to give an account of your death penalty views.  But if you and I were just in a doughnut shop -- let's say we had been friends for a while and I turned to you and said, you know, Mr. 258 -- I probably wouldn't call you Mr. 258, but I'd say, Mr. 258, we never talked about the death penalty, what do you

511

think about it, what would you tell me?

A.    Well, I believe in the death penalty for certain crimes I guess, for violent, you know -- the most violence, yes, I do agree -- I do believe in the death penalty.

Q.    All right.  Now, this crime, you know, that Miss Johnson's

Page 31

charged with, would you agree that's a pretty violent crime?

A.    Yes.

Q.    We're talking about, you know, the intentional murder of five people, these two children.  The government alleges that these crimes were committed after premeditation and with substantial planning; okay?  Do you understand what I mean?

A.    Yes.

Q.    Let me just ask you something.  Is that the kind of crime in your mind that would deserve a sentence perhaps other than death?

A.    Yes.

Q.    You could consider another punishment, or that is the death penalty?  I'm not sure I understood.

A.    Well, I guess if she was found guilty of all, yes, I would think -- in my mind, yes, it'd be equivalent to a death penalty, yes.

Q.    We kind of have to ask you -- and I know it's unfair to some extent because you haven't heard any evidence, but we're asking you to kind of jump ahead in your thinking to the point where you were sitting on a jury and you had already heard the

512

evidence and you were going to make a determination about the punishment.  And if you're at that point, we need to be clear you've already determined beyond a reasonable doubt guilt, okay, of these crimes; all right?  So to the extent that might not be clear to you, the fact of the crimes at least have already been determined; okay?  You following me?

A.    Yes.

Q.    What is it about the allegations particularly that you think justify a death penalty in your mind?

Page 32

A. Intent to commit murder. I guess children involved is definitely -- I don't know -- definitely weighs a factor in it. Planning the murder, committing or carrying it out, I think all that is . . .

Q. I had noticed in your questionnaire there was a question about number 82, What are your thoughts and opinions about life in prison as a punishment for a person who is guilty of intentional murder, and you said, Mixed, it all depends on the case; is that right?

A. Yes.

Q. And what I really want to ask you is a case -- if the case is intentional murder, premeditated after substantial planning, five people, two little girls ten and six, is that the kind of case you were thinking of when you said life without parole might be a possibility?

A. No.

513

Q. Okay. Let me see if I can just sum up a little bit for you, sir. Tell me this. If it were proven to you beyond a reasonable doubt, okay, not just you but you and your fellow jurors that this was a case of intentional murder, five victims, two of them children, and it had been done after substantial planning and premeditation, is the death penalty the only appropriate punishment in your view?

A. Yes, I believe so.

MR. BERRIGAN: Okay. That's all I have. Thank you, sir.

PROSPECTIVE JUROR 258: Thank you.

MR. WILLIAMS: Just a few short questions. Won't be long.

Page 33

THE COURT: Okay. Thank you. Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Q. Morning, sir.

A. Good morning.

Q. How you doing today?

A. Good.

Q. Appreciate your frankness, and I want you to be equally frank with me. What I want to do is just clarify something with you. In your questionnaire when you were asked about the death penalty, you were asked, Do you think that life in prison without the possibility of parole is a severe-enough punishment

514

for a person convicted of intentional and premeditated first-degree murder? That was question 84. You said, Yes. To me life in prison would be worse than the death penalty. Do you recall that answer and that question?

A. Yes.

Q. Do you feel that way today?

A. Well, I guess maybe I answered that --

(Brief power outage.)

THE COURT: Don't know what that is.

MR. WILLIAMS: I don't know if we have the sound system. I can keep my voice up.

THE COURT: Why don't you try and keep your voice up. And, John, would you get ahold of Rick, and we'll -- I think we can just reset our sound system. It should be fine in a couple minutes.

BY MR. WILLIAMS:

Q. Sir, I would just ask if you could keep your voice up too

Page 34

for Shelly's sake. And you were about to say, sir?

A. Well, maybe I answered that more of an opinion of myself. I guess I look at it if I was in that situation I would -- I mean, a lot of people instead of -- spending life in prison I just think is as bad or worse than being committed, you know, to the death penalty. Maybe that was more of an opinion of myself, how I would look at it.

Q. Okay. There was a question 87 that had a number of

515

situations and asked jurors to kind of give their response to these different situations and what they might think about the proper penalty. And one was a guilty person killed more than one person at the same time, and you wrote death penalty. A guilty person was pregnant at the time of committing murder; you wrote death penalty. A guilty person participated in the killing of children; you wrote death penalty. The guilty person had a past history of drug use; you wrote death penalty.

But then when it gets down to the last three, you had a different answer, and you said -- a guilty person who's a parent of two children, you said death or life in prison. The next question was the guilty person was mentally, emotionally, physically abused or neglected as a child, and you said life in prison. And the last one was the guilty person assisted or encouraged the murders but was not the person who pulled the trigger, and you said life in prison.

Are there certain factors like that that to you, even though -- let's assume that we have, as Mr. Berrigan said, the death of five people, the intentional, premeditated murder of five people including two little girls. If there are other factors present like the person didn't pull the trigger but was

Page 35

an aider and abettor or that the person had suffered some type of emotional abuse as a child, that despite the fact that the person participated in the intentional, premeditated murder of five people including two little girls, could you under those

516

circumstances realistically consider life imprisonment as a possible punishment?

A.    Yes.

Q.    And so are you willing -- the way this is going to work, sir, is once we go through the guilt phase, you -- let's assume you and the rest of the jurors have sat through this trial, and to get to the penalty phase you will have all necessarily found the defendant guilty beyond a reasonable doubt of intentionally participating in a drug conspiracy or continuing criminal enterprise in killing -- intentionally killing one or more people.  And let's say in this case you find all five people were intentionally murdered.  You and the rest of the jurors have found that at this point.

The government will have an obligation to come forward and prove certain aggravating factors or things that we say make this crime so bad that the jury ought to be able to consider the death penalty, and there are several factors that we have to prove.  We call them gateway factors, things like there were vulnerable victims involved, the children and so forth.  And the jury has to find those factors before you can even consider the death penalty as an option.

If you go back and you deliberate and you say, We don't find those gateway factors, then the case is over, and life imprisonment is the punishment.

But let's assume you've passed that stage and you and

Page 36

the rest of the jurors have found the necessary factors to at least consider the death penalty.

What's going to happen then is kind of a mini trial. At that point we're going to put on additional evidence. The government will present additional evidence of aggravating factors. The defendant may but doesn't have an obligation to put on evidence of mitigating factors or things that they say would suggest that life in prison is the appropriate punishment.

The obligation of the jurors at that point is going to be to go back and, regardless of whether the defense puts on any mitigating evidence or not, to look at the entire circumstances of the crime, to look at the entire circumstances of what you know about the defendant, and to go back and weigh all those factors, factors like whether the defendant pulled the trigger or not, factors like whether she -- what her background is, what her circumstances are, factors like whether she is a parent of two children or not, and compare those to factors like the fact there were children involved that were particularly vulnerable and other aggravating factors.

And the jurors, each one, is going to be weighing those things, and you're going to put your own weight to them. You determine what you think is more weighty than not. It's not a numbers game. It's not how many factors did one side pile up or the other. It's regardless you weigh it all.

And then you have to come to a decision. After you

get all that evidence, you have to come to a decision. And you have to weigh the different things back and forth.

What we're looking for are for jurors who can tell us honestly and in their hearts that they can go back in that jury room and realistically consider both options.

Now, some people can't, and they tell us they can't, and we absolutely respect those opinions whether it's I can never impose the death penalty or I would just have to impose the death penalty under those circumstances.

But for us to seat a jury in this case, we need people who can say they're willing to consider both options and they can realistically do so, not just yeah, okay, yeah, an option, you know, life imprisonment's an option but really be able to consider that as an option given the facts of the case. Having explained that in a little bit more detail to you, sir, what do you think about that?

A.  Well, I guess if I sat through a trial and if I -- if it came guilty and no doubt about it and all the circumstances were right, I guess I would probably lean towards the death penalty if everything was -- if I felt it was guilty and everything came up -- all the evidence leaned that way.  Yeah, I could keep an open mind, but I'd probably lean more toward the death penalty.

Q.  And leaning one way or the other is fine.  But here's the real question.  Mr. Berrigan asked you this question. Intentional murder of five people including two little girls,

519

now, there's other factors out there but that's not going to disappear.  We don't get to the penalty phase unless you've found that.

Now, come on, Mr. 258, come on.  The intentional murder of five people including two little girls, can you realistically consider life imprisonment as an option?  And if

Page 38

you can't, that's fine.  But if you can, tell us.

A.    Well, if I had no doubt in my mind it was guilty and everything, I would probably choose death penalty.

Q.    Okay.  You'd probably choose the death penalty.

A.    Right.

Q.    Could you realistically consider life imprisonment, or that'd just be shut out for you as an option if you found her guilty of killing five people including two little girls?

A.    If found guilty, I would choose death penalty.

Q.    Would you even consider life imprisonment?

A.    If found -- no, if found guilty and everything, no.

        MR. WILLIAMS:  Thank you very much.

        Your Honor, we would move for cause.

        MR. BERRIGAN:  Nothing further, sir.

        THE COURT:  Okay.  The government just moved for cause --

        MR. BERRIGAN:  Oh, I'm sorry.

        THE COURT:  I assume --

        MR. BERRIGAN:  I apologize.  I didn't hear that.  No

                                                            520

objections.

        THE COURT:  I didn't think you heard it.  I just wanted to find out if you had any objections.  I didn't think you would, but I want to be careful.

        MR. BERRIGAN:  No, sir.

        THE COURT:  Juror 258, we're going to let you go, and you won't be in our jury pool.  Hopefully you can come back and serve in another case.  I think you'd be a terrific juror but probably in another case that doesn't involve the death penalty. So thank you so much for coming in this morning and for being so

Page 39

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 452 of 3245

candid and open and honest with your answers.  We all appreciate that very much.  You've served your country just as well by doing that as if you were selected to serve, so thank you.

PROSPECTIVE JUROR 258:  Thank you, Your Honor.

(Prospective Juror 258 exited the courtroom.)

THE COURT:  Ready for Juror 653?

MR. WILLIAMS:  Yes, Your Honor.

(Prospective Juror 653 entered the courtroom.)

THE COURT:  Everybody please be seated.

Anywhere in the middle there is fine, Juror 653.  And we're going to start this morning with questions from Mr. Berrigan.

MR. BERRIGAN:  Thank you, Your Honor.

EXAMINATION

BY MR. BERRIGAN:

521

Q.    Good morning, sir.

A.    Morning.

Q.    I bet you've never been called Juror 653 before today, have you?

A.    No, not yet.

Q.    Getting to like it or what?

A.    Oh, yeah, it's intriguing.

Q.    The judge has graciously allowed us this opportunity to talk to you privately in the hope that this setting would provide the best environment to give open and honest responses about these issues because they're critically important as you could imagine given the nature of the charges.  Would you agree?

A.    Yes.

Q.    We're not here to get right or wrong answers.  We just want

Page 40

to know how you feel. That's all. We -- everybody in this courtroom very much respects your opinions. And sometimes, as the judge mentioned, jurors are phenomenal jurors for some cases, but because of their life experiences -- our life experiences have all been different -- we bring in attitudes and beliefs and opinions into the courtroom just like we do everywhere else. Sometimes those aren't compatible with particular kinds of cases, and so we have to make that judgment based on your responses today, and I hope you'll look at this in the same vein as if you were ever in a situation where you found yourself accused of a crime and wanted lawyers to ask probing

522

questions of the people that might judge you; okay? We're not here to pry into your background. We just want to know how you feel; all right?

A.    Sure.

Q.    I saw from your questionnaire that this is a case that you had heard nothing about; is that right?

A.    That's right.

Q.    Okay. I want to suggest to you that there was a trial in the fall here in Sioux City. There's a fellow by the name of Dustin Honken, and the question may not have been very specific, but does that name ring any bells with you?

A.    No, not really.

Q.    Do you get a subscription to the Sioux City Journal or --

A.    No, Sioux Falls.

Q.    I'm sorry?

A.    Sioux Falls paper.

Q.    Sioux Falls, I'm sorry. Do you read the Sioux Falls paper regularly?

Page 41

A. Just scan it. I have other interests. I don't pay much attention to the news or the newspaper.

Q. Okay. What about television? You know, some of us watch the nightly news and try to keep an eye on what's going on in the world.

A. Not very often.

Q. Okay.

523

A. Like I say, I have other interests.

Q. All right. So as Miss Johnson sits here -- can you see her over there?

A. Yes.

Q. It's a long way away.

A. Yes.

Q. Do you have any opinion about her guilt based at least on media coverage?

A. Not a bit.

Q. And then we have the benefit also of your questions regarding the death penalty and life imprisonment without parole. And I wanted to ask you something in regards to punishment generally that appeared in the questionnaire, and that is that you were asked whether it's appropriate to punish a person based on the crime that had been committed or the person's background or some combination of those two. Do you remember being asked that?

A. Yes.

Q. And the question specifically -- I know you don't have this in front of you, so let me read it and see if it helps you. It was question 61. In your opinion should the punishment for a crime be based on the crime, the person, or both, something else

Page 42

all together, and you wrote -- first you checked the crime.  And you wrote, In my opinion there is only one constant factor, and this is the crime itself.  All people are different, so in my

524

opinion it would be difficult to be consistent based on the person.  Does that sound about right?

A.    Yes.

Q.    Well, the crime here, okay, that's alleged is the intentional murder of five people during the course of a drug conspiracy or a criminal enterprise, continuing criminal enterprise, or both and that two of these people who were killed intentionally are particularly vulnerable victims; that is, they're little girls that are ten and six years of age and obviously completely innocent victims and that this murder, the government alleges, was committed after deliberation -- or excuse me, premeditation and substantial planning; okay?  Can you imagine a more serious crime than that?

A.    No.

Q.    And what I'm interested in knowing is based on this view if this is your view about punishment based on the crime, if you have an opinion about the punishment for that particular type of crime involving these five people and two little girls.

A.    Well, I never been in a position where I've heard intelligent arguments one way or the other, and I'd like to reserve entering that until after I've heard at least some intelligent discussion.  There's a lot of stuff on the street that's not worth listening to, you know.

Q.    You know, I suspect that if we asked people if they would like to reserve making a call on that, a lot of them would.

525

Page 43

We're in this unfortunate predicament where we won't be able to question you later.

A.   Well, what would be your direct question?

Q.   The question is your view -- we're not going to debate it with you because we're going to respect what you tell us -- your view about punishment for this crime, five people intentionally murdered, two of them little girls, the murders committed during the course of a drug conspiracy or continuing criminal enterprise involving these vulnerable victims and done after substantial planning or premeditation.  That's the crime.  And we're asking for your view about what you think an appropriate punishment might be for that kind of a crime.

A.   If the evidence showed that they are guilty of the crime, there should be punishment for crime, yes.  But whether it's 30 days in jail or life in prison or the death penalty, I would have no opinion about it.

Q.   You have -- as you sit there now knowing those allegations, do you really -- are you telling us that 30 days in jail would be a sufficient punishment in your mind for somebody found --

A.   No, I didn't say that.  Whether it is one or the other or any combination of others, you can't do that until you hear the evidence.  There is punishment, yes, but the severity of the punishment I would think would have something to do with the crime.

Q.   Obviously, sir.

526

A.   Yes.

Q.   And maybe I wasn't clear, and I apologize.  The punishments

Page 44

that are available for that kind of crime are really only two.

A.   Okay.

Q.   One's the death penalty.  The other's life imprisonment without any possibility of parole; okay?  So the option earlier to the extent 30 days anybody would reasonably consider, that's not -- we're not talking about that.  So now that I've made that more clear, I hope that helps you.  Do you think that those punishments are appropriate for that kind of a crime?

A.   If those are the only two options, yes, then they are appropriate.

Q.   Okay.  And do you really think that life imprisonment without any possibility of parole would be an appropriate punishment for somebody who had been found guilty?  That is, to put this in context, we're asking you to kind of jump ahead, the cart before the horse, if you will, and imagine yourself in a situation where you really have heard all the evidence; okay? The concern about listening to all the evidence, that's done.

Not only that, but you've already deliberated with your fellow jurors about the evidence, and all 12 of you agree beyond a reasonable doubt that's what happened, intentional murder, premeditated, substantial planning, drug conspiracy, vulnerable victims; okay?  So that's kind of at the point that we are and when we're talking about punishment.

527

A.   We would have a lot better -- be in a lot better position to make a decision just in the discussion with the jurors as to which one of those would be the most appropriate.  I have no preconceived notion of whether it should be one or the other at this point.

Q.   Okay.

Page 45

A. Understanding -- I understand that's the only two options. I understand that.

Q. So you don't really have an opinion about either one of those.

A. No, I don't.

Q. You were asked a series of questions about certain factors that you might consider in making a decision such as this. It was question 87. Please review each of the situations listed below. After each situation, describe what effect, if any, each have on your thoughts and opinions about an appropriate punishment for a person guilty of intentional murder. Do you remember that question?

A. I think so, yes.

Q. Okay. I'm going to try to read my printing instead of your writing, not that it's all that bad. One of the options is the guilty person participated in the killing of children, and then -- and you wrote -- I want to make sure I have this correctly. Either killing an adult or children, the punishable act is the killing. It just seems sadder if children. Does

528

that sound right?

A. Yes.

Q. Okay. And I just want to make sure because this is an aspect of the case that I think is particularly troubling, frankly, to most people is that innocent children are victims in this case. And there's certainly no dispute that these two children were killed. In such a situation such as that involving children particularly, do you think a life sentence would be an appropriate punishment?

A. Well, like I said, I couldn't really answer that until we

Page 46

had deliberation with a group of people. We have a lot more information. Certainly it would be an appropriate punishment, but probably the death penalty would be too. You don't know that until you have a chance to -- in some kind of forum to discuss that. And I've never been a part of a forum to discuss either one.

Q. Well, I want to be clear that we're not asking you to tell us what your vote would be.

A. No, I understand that.

Q. We know that you'd have to listen to all the evidence.

A. Yeah.

Q. By the same token, I suppose we could bring everybody in and say -- the judge could say, Hey, look, I'm going to give you some instructions; will you follow the law; will you be fair, and everybody raises their hand and sits down, and they don't

529

know what the facts are. They don't know what the law is, you know.

Some folks might say, I don't really believe in self-defense. Well, the law recognizes self-defense as a defense. Some people might say, Hey, I don't care if somebody's crazy and they don't know what they were doing and couldn't appreciate the wrongfulness of the conduct. Well, the law recognizes that as a defense. The law recognizes certain things that you might not be aware of as both aggravating factors.

The government -- this thing about children is an aggravating factor recognized under the law. And so we have to do the best we can in discussing these topics to just ask you what you think about them; okay?

So are you telling me that in regards to the

Page 47

intentional killing of children do you have any thoughts about that in terms of punishment?

A.    Here again, the crime is the important factor.  Whether it's a child or adult, I would have no opinion about it at all --

Q.    Okay.

A.    -- to make that they're different.  I understand they're different in age, but the killing has happened.  Whether it's a child or an adult would make no difference to me.

Q.    Okay.  I'm going to finish up then by going back to something I started with you a little earlier, okay, and that

530

was this idea that we're going to punish somebody for the crime. If you found yourself in a situation theoretically where two people of very different backgrounds had committed exactly the same crime, okay, and one person had a background probably similar to myself, grew up in a middle-class household, had every opportunity, got a good education, really had very little hardships in life, and somebody else came from a background that was quite different and perhaps suffered some serious abuse as a child, maybe psychological, maybe neglect, physical abuse, maybe didn't have advantages that some of the rest of us had, and yet these people, you know, they committed the same crime, exactly the same crime, do you really think there should be any difference in terms of the sentencing?

A.    No.

Q.    No, okay.  So let me ask you this then.  Well, let me ask you why.  I should ask you that first.  Why don't you think so?

A.    Well, a life has been taken, and to base -- to try to justify it based on the fact that this person had that kind of

Page 48

background or that kind of background, it doesn't make any difference. Not all -- not all mentally ill people, for example, kill somebody, not all sick people, not all whackos, not all normal people. It's a cross range. So it's still the crime that's only the constant figure.

Q. So if I could follow up with this question then, in the case of a murder, okay, and if we're going to change the crime

531

now to be a little more specific, intentional murder, five people, children, premeditation, substantial planning, the whole ball of wax we've been talking about, would it really matter to you the sentencing decision given what you've expressed to us, you know, what the defendant's background was and kind of what their childhood experiences had been and things of that nature?

A. It would probably give us a greater understanding of why it happened, but the act of murder is still the deciding factor.

Q. In terms of the punishment.

A. Yes.

Q. Okay. So that might help you in terms of was there a murder or what was the murder, was this the person that committed the murder, but in terms of the punishment assessment, that's not information you'd consider.

A. Oh, you have to consider it, yes.

Q. Well, I don't mean consider it, consider it as look at it. But based on what you've told me about it really doesn't matter, Mr. Berrigan, because we're punishing people for the crime, would you realistically weigh that type of evidence?

A. Oh, yes, I would weigh that, yes.

Q. How would you weigh it?

A. Well, it gives you a greater understanding of why something

Page 49

happened.

Q.    Right.

A.    But poorness, for example, or mental illness would not give

532

a person the license to kill, but it may have had a impact on it.  And if that impact was that great, then it could make your -- it could affect your decision on it, yes.

Q.    Yeah, I don't want to suggest to you that we're talking about a defense to the crime.  You know, somebody's background's not going to be a defense if they committed murder.  You and I are on the same page on that; right?  Is that what you're telling me?

A.    I think so, yes.

Q.    Okay.  But in terms of sentencing, you know, that's a different issue all together.

A.    Yes.

Q.    And what I heard you say earlier -- and correct me if I'm wrong, but what I thought I heard you say earlier is, Look, it's the crime they committed.  If we found -- and I know that's a big if.  But if I found that this was the crime, the person's background's not going to affect the punishment.  It's the crime itself.

A.    Well, it's not a clearcut thing, either yes, they did it or no, they did not.  What their background is or what happened in that person's life would certainly have an impact on your decision, yes.

Q.    On your decision about the crime or the punishment.

A.    About the punishment.

Q.    I see.  So this idea of -- that we talked about earlier,

533

Page 50

punishing a person specifically for the crime --

A. That's the only thing that's constant is the crime, but the reason for the crime is influenced by a lot of other things. You have to take that into account when you talk about making a decision about the crime.

Q. Okay. And, you know, I sort of think we're on the same page, but I just want to be clear.

A. That's fine. I have no problem.

Q. Because this is important.

A. Oh, yeah.

Q. When you're looking at the crime and was the crime committed, is this the person that did it, was it done with substantial planning, intentionally, all that other stuff, you'd be willing to look at the person's background in making that assessment.

A. Oh, yeah.

Q. Now, let's jump forward, and you've done that now; okay?

A. Okay.

Q. You looked at the background and so on, whatever was presented to you, and you decided, hey, the crime happened. No defense, guilty beyond a reasonable doubt, I and all 12 agree, premeditated, substantial planning, the whole thing. At that point now, at that point does it matter what the background is now when we're coming to the punishment?

A. If I understand you right, I would say yes.

534

Q. Why?

A. Well, the decision -- or the trial is not about whether guilty or not guilty. The trial is about the punishment; is

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 464 of 3245

that right?

Q. No, sir. The trial's about -- I know the way we're questioning it it sure doesn't seem that way, but there's absolutely issues of guilt or innocence in this trial.

A. Well, yeah, then I would say that their background would make a difference on whether they're guilty or not guilty or at least a greater understanding. The facts have still got to be presented upon which you make your decision, whether it's to get one response or the other.

Q. Right. I understand you on that. It was this other issue about we're punishing people for the crime. I guess maybe I wasn't clear, and I apologize I haven't been able to make myself clear.

A. Yeah, that would certainly make a difference on what type of punishment would be dished out.

Q. Well, thank you, sir.

A. I have some familiarity with penitentiaries and, you know, what they have to offer, what they don't have to offer and what a person can get or cannot get. I'd still be interested in that victim or the one that's being prosecuted, what's going to be provided for that person after the punishment begins.

MR. BERRIGAN: Thank you for your answers.

535

PROSPECTIVE JUROR 653: Thank you.

MR. BERRIGAN: Appreciate it. That's all I had, sir.

THE COURT: Thank you.

Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Q. Morning, sir. How you doing?

Page 52

A.    Good morning.

Q.    I just want to follow up on some additional questions along this line here.  You volunteer some time at a prison in South Dakota; is that right?

A.    That's right.

Q.    And what led you into that area of volunteering?

A.    Well, I spent about 20 years in rehabilitation for the mentally, emotionally ill, physically handicapped people.  I did that as a profession.  I have my master's degree in it, and I administrated a program of that.  I did that for about 20 years.  Then I decided to make a career change.  And after making that career change, then the opportunity -- some other people got involved.  They wanted to provide something in the penitentiary, and they asked me to be a part of it because of my experience in rehab.  So I'm on the board there is what it amounts to.  And I don't administrate it.  I'm on the board.  And I do visit that penitentiary once in a while because there's a factory there, full-fledged factory inside the prison walls of Sioux Falls.

536

Q.    Now, do you work one on one with inmates there to try to rehabilitate them?

A.    No, no.  The best would be what I tell people is that I hobnob with the prisoners.

Q.    Very good.  Let me follow up on some of the questions Mr. Berrigan had of you.  And let's talk about this issue of the death penalty, first of all.  I notice throughout -- number one, you're a very well-educated man, and throughout some of these questions you said, I've never had an opportunity to really debate this; it's intellectually interesting to me.  You know, I'm sure there's some academic issues here and so forth.

Page 53

What I want to make sure you understand is if you're picked to be a juror in this case, this trial will not be a case where either one of us gets on and provides you with any studies about the effectiveness of the death penalty. No one's going to put on evidence about whether, you know, it deters or doesn't deter.

This case is going to be about the facts of this case, and the juror's going to have two options of what punishment to impose. And so I want to make sure you don't -- you're not going to be expecting, for you to be able to make a decision, any type of analysis of the pros and cons of the death penalty as a general matter.

A. No, but there would be a forum in which this could be discussed. That'd be the jury. There would be a forum in a

537

sense in that both the defendant and the prosecution would make their case. There would be instructions from the judge. Taking that all into account, then you could make those decisions. That is a lot better forum and a place of input for me than off the street or the local cafe or, you know, some Bible study groups and that kind of stuff where everybody gets a rah, rah, rah and ha, ha, ha and everybody agrees and everybody's got the right answer. I mean, that's ridiculous. We even do that with the price of oats and the price of corn.

Q. And I just want to make sure that are you the type of person you think you're prepared to make a decision pro or con on the death penalty without having any of the intellectual, academic background on the pros and cons of the death penalty, because that's not going to be part of this case?

A. No, but there will be a forum. If you understand by forum,

Page 54

there will be people with whom you could discuss that, and I'd want that, and I would be influenced by that, and I would make my decision based on some of that input and then some of my own personal beliefs which 50 one way and 50 the other at this point.

Q. Let's talk about some of these factors, and Mr. Berrigan focused on the background of the defendant and where that plays in. He also raised the issue of children on that one question, 87. With regard to whether children were murdered or not, your response was doesn't matter. The act is the killing whether

538

it's an adult or a child.

You had the same response essentially for the factor of one murder versus multiple murders. Your response was essentially the same. That doesn't really matter. It's the act. One murder, five murders, doesn't matter at all.

Your response was kind of the same with regard to, you know, kind of the background of the defendant.

And here's where I'm trying to figure out where you're coming from on this. If you're back trying to make this decision whether it should be a death penalty or life in prison, are you going to consider those factors in making that decision, or are those factors to you not part of the decision of death penalty or life in prison?

A. See, I see those -- that background information as information that you use because death penalty and life in prison both are pretty severe penalties. Believe me, living in a prison, a penitentiary, is not gravy train. So to me that issue of life in prison or death penalty is a wash.

Q. All right.

Page 55

A.   Now, why a person did it and the background of that person, whether kids were involved or whether adults were involved makes -- it makes a difference, yes, as to what happened.   One other piece, whether it's a child or an adult, that's a wash I would think unless I'm convinced otherwise.

Q.   When you say it's a wash, let's say you're back in that

539

jury room and you and the rest of the jurors are trying to figure out death penalty or life in prison, death penalty or life in prison.   Are you going to consider at all the fact that there were children murdered, or is that a factor to you that on that issue, on that question of punishment that doesn't matter to you whether it's children or adults; that's an irrelevant factor; you're looking at other things?

A.   Mostly, yes.

Q.   And when you say mostly --

A.   That gives me greater understanding why that person did it, but the end results is somebody died.   It doesn't make any difference how old that person is or what color that person is or how -- what nationality, but somebody died.   Now, knowing all the other stuff, you know, helps me or hinders me or makes me believe that person's guilty or not guilty, yes.   But it's just as easy to kill an adult as it is a child, so that doesn't make any difference.

Q.   Okay.   And let's go to the defendant's background.   Again, Mr. Berrigan talked about this.   If the evidence is that the background of the defendant was disadvantaged in some way and you're back there and you're debating, death penalty, life in prison, death penalty, life in prison and you're trying to figure out what -- the appropriate punishment, does it matter to

Page 56

you or is it irrelevant what her background --

A.    It would matter, yes.  First of all, it helps me understand

540

that person, and if there is a difference in severity between life in prison and death penalty, that's going to come out in the trial I would guess.  That certainly may have an impact on the severity of the punishment.

Q.    And when you say you would expect it to come out in the course of the trial, what are you expecting maybe to come out in the course of the trial on the severity between life in prison and the death penalty?

A.    Well, somebody's going to have to, you know, explain or do whatever they gotta do to -- they're going to advise us or recommend or make a motion to have the death penalty or the life in prison I would guess, and they're going to give the reasons for it and the rationale and the law and all that, and the judge is going to see that that happens, you know, follows the law, and I would certainly be in favor of following all the intentions of the law and whatnot.  You know what I mean?

Q.    Sure.  Let me tell you, if we get to that point, I'm going to be the one standing in front of you.  And I'm going to be the one telling you in that instance that I want you to take into consideration as a factor in determining whether the defendant should receive the death penalty the fact that children were murdered, and the judge will instruct you that that is an aggravating factor that you can consider in this case.

A.    If the judge directs me that I have to take that into account, then I will take that into account because I have to

541

Page 57

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 470 of 3245

listen to his instructions just as well as your case. At this point I would say it'd make no difference, but if I'm instructed to take that into account, then I would take that into account definitely. I have to. Otherwise I'm not a good juror.

Q. If you get to that point in the case, the government's burden all along is to prove its case including aggravating factors beyond a reasonable doubt. So, for example, an aggravating factor is that there is not just premeditation but substantial planning and premeditation. An aggravating factor is that the defendant intentionally engaged in a course of conduct intending murders to occur. We have to prove those to you beyond a reasonable doubt.

A. Yes.

Q. Now, some jurors say, Look, if we're talking about the death penalty, beyond a reasonable doubt's not good enough for me. It's going to have to be 100 percent no doubt whatsoever. Other jurors understand the burden is proof beyond a reasonable doubt, not proof beyond all doubt. How do you feel about that?

A. Well, first of all, I'd say there's hardly anything such as an absolute, so it has to be reasonable doubt. And you have to make some judgment as to the reasonableness of that doubt, and that's based on evidence.

Q. Okay. And if you get to the point in this case, sir, where you and the rest of the jurors have deliberated -- first of all, the defendant's been found guilty of intentionally murdering

542

let's say five people and two kids; okay? We've gone through the penalty phase. You've heard additional evidence. You are now downstairs, and you're deliberating with your other jurors.

Page 58

And let's say all 12 of you have deliberated and you agree, having weighed everything, that death penalty is the appropriate punishment. There will be a time at that point that you and every other juror if you reach that point will have to sign your name to a verdict form that will have the practical effect of causing her execution.

Now, I don't want you to tell me how you're going to vote. You don't have any idea how you're going to vote at this point. But what I do want to know from you is that if it came to that point, do you believe you could sign your name to a verdict form that would have the effect of causing the defendant's death?

A. If that was the jury's decision, yes. That's why I'm on the jury. I'm one member -- I'd be one of those members, and if we all agree, then we better be able to put our name on what we decided. You can't decide something and then refuse to put your name on it. That doesn't make any sense.

Q. In the appropriate case, sir, in the appropriate case, whatever you think that is, but in an appropriate case, could you impose the death penalty on somebody else?

A. Theoretically, yes.

Q. And can you imagine a case where you could do that?

543

A. Yes. But I also could do that to life imprisonment, so . . .

Q. And I understood that to be the case, and I want to make sure you're able to do that as well.

A. Yeah.

MR. WILLIAMS: Very good. I have no further questions.

Page 59

THE COURT: Thank you.

MR. BERRIGAN: Nothing further, sir.

THE COURT: If you'd just step outside for a minute, we'll let you know what your status is. Thank you, Juror 653.

PROSPECTIVE JUROR 653: Thank you. Have a good day.

THE COURT: Thanks. Going to bring you right back in and let you know where you stand.

(Prospective Juror 653 exited the courtroom.)

THE COURT: Mr. Berrigan?

MR. BERRIGAN: The defense moves to strike Juror Number 653 for cause, Your Honor.

THE COURT: What's your basis?

MR. BERRIGAN: Because this is a gentleman who would not give meaningful consideration to mitigating circumstances, and I'm going to be the first to admit he gave contradictory responses on that issue amongst other issues, frankly. There's some question in my mind whether he thought it made any difference in the world whether there were children being

544

victims or not or, for that matter, how he would consider that if he did consider it. My view is based on his responses that's a consideration he gives to first phase evidence, what happened, what took place here.

THE COURT: You need to be a little bit more succinct. I understand your argument.

MR. BERRIGAN: Okay. I'm sorry.

THE COURT: Mr. Williams?

MR. WILLIAMS: I fully agree.

THE COURT: I totally disagree. Challenge for cause denied. His -- this juror would not -- he may not be a great

Page 60

juror, but there's nothing that he testified to taken as a whole his views would not substantially impair his performance of his duties in accordance with the instructions and their oaths. You may not like him for other reasons, but I do not find that he is subject to a challenge for cause, so we'll bring him in.

(Prospective Juror 653 entered the courtroom.)

THE COURT: Sir, you're still in the jury pool, so we probably won't get to the remaining jurors till three o'clock or after. I doubt if you'd have to be back here before about three o'clock, but you're certainly welcome to stick around in case we get to the entire group earlier because we have a lot of other individual jurors to go through, so you're still in the jury pool.

PROSPECTIVE JUROR 653: I can leave and be back here

545

by 2:30?

THE COURT: That's fine. You can leave and be back here by 2:30.

Juror 55 is next.

(Prospective Juror 653 exited the courtroom.)

(Prospective Juror 55 entered the courtroom.)

THE COURT: Everybody please be seated.

And Mr. Berrigan, you may question Juror 555 (sic).

EXAMINATION

BY MR. BERRIGAN:

Q. Good morning, sir.

A. Good morning.

Q. We have an opportunity to ask you questions on two different areas in this setting in the hopes that it will make people more relaxed and to be able to give us their honest, open

Page 61

responses to these issues. And the only thing really that we ask you to consider is that we're not here to judge your opinion at all. We really just want to know what it is in order to get the best 12 people for this case; okay?

A. Yes, sir.

Q. All right. I noticed you are one of our folks who really didn't have any familiarity with this case as a result of media accounts. Is that accurate?

A. Yes, sir.

Q. Okay. Do you get the paper regularly?

546

A. Yes, sir. I just don't have a chance to read it because my job starts up at five in the morning, and sometimes I don't get home until five at night. I just don't have time to read it. I drive school bus.

Q. That has to be a difficult job in so many respects other than the hours. I can't imagine, frankly. I wouldn't trade jobs for all the world, and we all respect what you do. So it sounds like even the television news is pretty much probably a rare thing for you.

A. Yeah, and since I got notice that I was going to be a witness on this, I tried to avoid all of -- even my wife has clipped out a couple for me to read, and I haven't read them.

Q. We appreciate that very much. Your questionnaire response did indicate that you were not at all familiar but that you did say this in response to question 63. What have you read, seen, or heard about this case, the crime, or the people involved? Include as many details as you recall. You said, Only in the statement above is all I know about the case.

A. Right.

Page 62

Q. Okay. And I guess what I was curious about is the information in the statement above, where had you heard that before?

A. Just what you have -- you guys sent me in the questionnaire --

Q. Yes.

547

A. That's all that I know about.

Q. I misunderstood.

A. That's the statement above.

Q. In other words, you read it, okay, that's it.

A. That's it.

Q. Okay. Got it. So obviously -- and you indicated regarding opinions you said -- no matter what you have read, seen, or heard, do you now have any beliefs or opinions about the guilt or innocence of Angela Johnson? You said, No, I have no opinion as I only know what is written here. Is that still true?

A. That's right. That's still true.

Q. And then there was a question right after that that said, Do you have any beliefs or opinions as to the appropriate punishment for Angela Johnson if she were found guilty of the intentional killing of five people including two children? And you checked unsure. It depends on why and how. Since I have no information on this, I cannot form an opinion.

A. That's right.

Q. Is that still the case?

A. That's still the case.

Q. Okay. This case, as you've already heard, Number 55, concerns very serious allegations.

A. Yes, sir.

Page 63

Q. And we have here a jury who's going to determine whether Angela Johnson beyond a reasonable doubt intentionally killed

548

five different people, two of them children, innocent victims ten and six years of age. And the government alleges furthermore that these murders were done after premeditation and substantial planning. Do you understand that?

A. Yes, sir.

Q. Would you agree with me those are serious charges?

A. Yes, they are serious charges.

Q. Okay. In regards to the punishments available -- and you probably gleaned this from the questionnaire -- but there are really only two for a person convicted, if convicted -- and that's -- you know, that's a big if. We're putting the cart way before the horse here. But unfortunately we can't wait until people listen to the evidence and then come back and ask them questions about what do you think about the death penalty. It just wouldn't be very practical.

A. Right.

Q. So we have to do it here; okay?

A. Right.

Q. So we're asking you to assume some things here that may not come to pass. And one of them is the possibility that, you know, this charge could be proven; okay?

A. True.

Q. It could be proven beyond any reasonable doubt to 12 people such as yourself. And in that circumstance we're asking people to tell us what they think about these punishments, life in

549

Page 64

prison and the death penalty.

A.   Well, I got kind of mixed emotions.

Q.   Tell us a little.

A.   On some of them, if they're really brutal and the person, I mean, proves to be and is shown to me that they would turn around and do it again if they had the opportunity, I don't see where the death penalty wouldn't be substantiated for that person.

Q.   Okay.

A.   Now, if the person got PO'ed at somebody, say, and just out of rage did it and was really sorry that they'd done it, then -- and could prove that they were really truthful on their statements, then I would say life would be more for that person.

Q.   More appropriate in your view.

A.   Right.

Q.   Okay.  Let me see if I can focus a little better on what we're talking about here.  There are some situations in which people are killed that aren't intentional murders, and you know that.

A.   Right.

Q.   And they range from anything from drunk driver crashing into somebody to a wife or a husband finding themselves -- their spouse with somebody else.

A.   Right.

Q.   People get into a fight in a bar.  I gotta tell you we're

550

not talking about any of that kind of stuff; okay?

A.   Right.

Q.   That wouldn't be the kind of murder that's going on that the government's alleged here.  So I want to make sure you

Page 65

understand that. Those crimes clearly might be better and more appropriate for lesser punishments. We agree?

A. Right.

Q. Okay. But what about this crime, okay, the one that we're talking about? Do you think -- life in prison without possibility of parole, is that a sentence that you think is appropriate in this kind of a case as a possible punishment?

A. It's a possibility. There's a possibility there. Like I said, I don't know the whole story, so there's -- you know, it's kind of hard to judge the thing without . . .

Q. Do you find yourself just as you sit here kind of leaning one way or the other? Let me give you --

A. No. Right now I'm not leaning either way because I do not know anything about it.

Q. Are you a football fan?

A. No, sir.

Q. Okay. Well, this will be of no help then. Like any sports at all?

A. Actually I don't watch any sports at all.

Q. Okay. Well, I was going to use a little football analogy. You know what a football field looks like.

551

A. You can do that. I understand the game.

Q. Let's imagine we're looking at a football field, okay, and the 50-yard line --

A. Right.

Q. -- the 50-yard line is somebody who's like completely on the fence about whether they prefer the death penalty or life without parole. And on one end zone, right at the end zone, is the death penalty, and one end zone is life without parole.

Page 66

A.   Right.

Q.   You got the image.

A.   Right.

Q.   And so here's the question, you know.  If selected as a juror and you heard -- again, we're jumping way ahead now.

A.   Right.

Q.   -- and you had heard all the evidence and you had determined with your fellow jurors after talking to them and you decided, you know, the government has proven this.  They have proven that beyond a reasonable doubt five people intentionally killed, two of them were vulnerable victims, ten- and six-year-old girls, innocence, and that these murders were done during the course of a drug conspiracy or continuing criminal enterprise and, furthermore, they were done after premeditation and substantial planning, none of this rage stuff.  Would you find yourself more towards one end zone than the other just on those facts alone?

552

A.   Just on those facts, no.

Q.   Okay.  You'd still be either way.

A.   Right, because there's a lot of things that could have transpired in between here and there.

Q.   Okay.  And I'm going to ask you -- I'm going to switch gears very quickly and then ask you this question.  One of the things you're going to be asked to consider -- I've given you kind of the bad facts, okay?

A.   Uh-huh.

Q.   Some of those are what we call aggravating circumstances, the fact that there are children, all right, obviously.

A.   Right.

Page 67

Q. Premeditation, substantial planning, that's an aggravating factor. And the government has the right and will offer those as reasons for the death penalty; okay?

A. Uh-huh.

Q. And the defense can also offer what we call mitigating circumstances, and these are essentially reasons for life imprisonment. The defendant had no criminal -- significant criminal history. Would you agree that would be a factor to be considered?

A. Yes.

Q. Okay. Maybe the background of the defendant. You know, we can offer really any evidence about Angela's background and character that we thought should be considered by the jurors as

553

a sentence for less than death, life imprisonment. Do you think background of the person that would be judged in this kind of a situation, would that be important to you?

A. Yeah, all the information that's pertinent to which way this should go, it would be -- as far as I'm concerned, you gotta look at the whole picture. I mean, there's a lot of things can happen that she had no control of or this or that or -- in this case it's her.

Q. Sure.

A. And, you know, I'm a human.

Q. We all are I hope.

A. Right. And I could make the wrong judgment, but I think 12 of us together should come out with a fair . . .

Q. Okay. I'm going to leave you with this last concept, sir, and ask you to just consider this. I didn't notice. Have you been on a jury before?

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 481 of 3245

A.   No, sir.  Well, excuse me.  Yes, sir, once.

Q.   Were you?

A.   I was in the Navy.

Q.   Okay.

A.   And it was a court martial and . . .

Q.   Well, that's a little different deal, isn't it?

A.   It's a little different deal, but it's about the same thing.  You gotta listen to all the facts before you . . .

Q.   That's right.  And you know probably at least -- although

554

you probably don't get to watch much TV it sounds like, but you know from television they have these law shows on all the time, and I think probably you know that after the jurors listen to all the evidence they make a decision, all 12 of them.

A.   Right.

Q.   And that that decision usually has to be unanimous.  They have to agree that the government's proven the case beyond a reasonable doubt or they have to agree that hasn't happened; right?

A.   (Nodded head.)

Q.   And if they aren't able to agree, then we call that, us lawyers, a mistrial.

A.   Hung jury.

Q.   Yeah, we do it again; okay?

A.   Right.

Q.   There's a part of this case that's very different than that, and I want to just talk with you briefly about that. That's true.  That scenario where people have to agree, that's true in the first part of this trial where the government is going to try to prove that Angela Johnson did these crimes

Page 69

beyond a reasonable doubt.

A.    Right.

Q.    The jurors have to make a decision unanimously on that one way or the other.  And then we're also going to have a -- if you will, a second part or the middle part of the trial where the

555

jurors are going to be asked by the judge -- he's going to give them instructions to see whether certain factors -- they're called gateway factors and aggravating factors, and he'll give you a list -- whether or not these have been proven beyond a reasonable doubt, and that's also all 12 people have to agree; okay?  You with me?

A.    I'm with you.

Q.    If that happens and we get through both of those stages of the trial, then we're getting to this punishment part.  That part, the jurors don't have to agree; okay?

A.    Right.

Q.    Because a decision on life and death, that's a decision each juror has to make himself or herself.  Do you understand that?

A.    Yeah, I understand that.

Q.    You might decide, for example, that some of the mitigating evidence that's been presented favoring life, that that's important to you, and one of your fellow jurors might not think it's that important.  And you might decide, well, I don't think that's so important to me, but this is really important to me on the mitigating circumstances, and that's okay.  You don't even have to agree what the mitigating circumstances are; okay?  You do have to agree on the aggravating circumstances.

          And when you're weighing these -- and that's what
Page 70

you're going to be asked to do in your heart and conscience.

556

You're going to weigh these aggravating circumstances, and we already know some of these: Murder of vulnerable children, the premeditation, substantial planning versus perhaps things about the defendant's background that you might be asked to consider. You weigh that yourself; okay? You with me?

A. Right.

Q. It doesn't matter what the numbers are. You know, the government could have one or two aggravating circumstances that could be more important and outweigh seven or eight mitigating circumstances for a particular individual. And the opposite could be true, that this thing about the defendant for me is more important than these aggravating circumstances. Whatever that decision is, you need to know it's your decision. Do you understand that?

A. Yes, sir.

Q. Now, the hope is that the jury might -- would all come to the same conclusion, you know, but it doesn't have to be that way. And, in fact, the law says that if they don't agree and some jurors are for the death penalty and some jurors are for the life imprisonment, that is life imprisonment. That's what's going to happen. Are you comfortable with that?

A. Yes, sir.

Q. That's a little different than everybody having to come to the same conclusion.

A. Right.

557

Page 71

Q. And you could do that.

A. Right.

MR. BERRIGAN: All right. Appreciate your time, sir. The prosecutor might have some questions.

PROSPECTIVE JUROR 55: Thank you.

THE COURT: Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Q. Good morning, sir. How you doing?

A. Not too bad. How about yourself?

Q. I'm doing fine. Thank you. You mentioned you were in the Navy. You served on the aircraft carrier Forrestal; is that right?

A. Yes, sir.

Q. There was a tragic fire onboard that vessel at some point.

A. There were several tragic fires aboard that ship.

Q. Any while you were there?

A. I fought 40 fires in 4 hours.

Q. You indicated you'd also been here in Sioux City when Flight 232 went down as well.

A. Right.

Q. So you're not a stranger, if you will, to tragic events.

A. No, sir.

Q. In this case if you're picked as a juror, you are going to be asked potentially if we get to the penalty phase to weigh

558

potentially a very difficult decision, and that is whether to cause the execution of another person. Now, some people have a theoretical belief in the death penalty. Sure, the death penalty has its place, I believe in it, I think it's a good

Page 72

idea. We need it out there for this, that, or the other reason. And if some other jury found the death penalty on a case, that's fine with me; I'm okay with that.

But when it came down to sitting as a juror and you knew that in -- you believed that the death penalty was called for and all the other jurors believed the death penalty was called for unanimously, everybody agrees on it, but then you knew you had to sign your name to a verdict form that was going to have the practical effect of causing that woman's death --

A. Right.

Q. -- some people know they can't do it. I just -- I know I can't do it. I just can't sign that piece of paper even if I believe in it. Even if I thought the death penalty was appropriate, I know I couldn't do it. Other people, they have broad-enough shoulders. They say, I can do it. If I think that's the right decision and everybody else on my jury agrees with it, I can do it. Where do you fall, sir?

A. I could do it.

Q. In the appropriate case you could impose the death penalty?

A. In the appropriate case, if everybody -- if in my mind I thought that she deserved it, yes.

559

Q. And you understand that -- Mr. Berrigan did a great job of I think explaining how this process is going to work. You are going to be asked to weigh a number of factors, some of which are aggravating, some of which are mitigating.

Now, the government has to prove its aggravating factors beyond a reasonable doubt. That means, for example, we need to prove to your satisfaction an aggravating factor that the defendant intentionally engaged in conduct intending the

Page 73

murders of people, that the defendant engaged in substantial planning and premeditation. We have to prove that to you beyond a reasonable doubt for you to consider the death penalty.

Now, some jurors come into a situation like this, and knowing how serious the death penalty is, they know they're going to need something more than proof beyond a reasonable doubt. Proof beyond a reasonable doubt is not proof beyond all doubt. It's proof beyond a reasonable doubt.

Some jurors know, jeez, you're talking about ending somebody else's life, and before I could do that, I'm sorry, but you're going to have to prove it to me 100 percent. It's going to have to be proof beyond all possible doubt or I'm just not going to be able to do it. I don't care how -- whether you prove it by proof beyond a reasonable doubt. That's not good enough for me. If you're going to prove those aggravating factors to me, it's gotta be beyond all possible doubt or I'm not going to be able to impose the death penalty. What do you

560

think, sir?

A. Well, for one thing, you're going to have to have the burden of proof to me that she deserves this or he deserves this, in this case, like I said before, she. But anyway, if the death penalty is what is warranted in this case or another case, yes, I would definitely say it. But like I said, there's a lot of proof to be done first before I'd go that far.

Q. Absolutely. And there should be; right?

A. Right.

Q. Okay. But my question, is that proof to you going to have to be beyond all possible doubt, or do you understand the burden is never higher than proof beyond a reasonable doubt?

Page 74

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 487 of 3245

A.    You have to prove beyond reasonable doubt.  To me I would have to consider everything before I'd even say yes to death penalty.  I mean, I -- proof beyond a reasonable doubt to me is just about as good as beyond.  You know what I mean?  I'm trying to think of the word you said, and I can't.

Q.    No, no, no.  Beyond all possible doubt.

A.    Possible doubt, yeah.  There's a thin line for everything, and like I said, I'd just have to weigh everything before I would say one way or another.  I don't know if I'd be hard to convince one way or the other because I don't know any of the circumstances, but I'd have to weigh everything before I'd ever say one way or the other.

Q.    And you're assuring me and the defense in this case that

561

you're willing to consider and realistically consider the possibility you could impose either option depending on what the evidence is.

A.    Right.

Q.    But you're prepared to do either one.

A.    Right.

          MR. WILLIAMS:  Great.  Thank you very much.

          I have no further questions, Your Honor.

          THE COURT:  If you'd just step out for a minute, Juror 55, we'll let you know your status.  Thank you.

          (Prospective Juror 55 exited the courtroom.)

          THE COURT:  Does the defense challenge for cause?

          MR. BERRIGAN:  No, sir.

          THE COURT:  Does the government?

          MR. WILLIAMS:  No, sir.

          THE COURT:  Okay.  Why don't we bring Juror 55 back

Page 75

in.

(Prospective Juror 55 entered the courtroom.)

THE COURT: Juror 55, you're still in the jury pool, so we're going to have some group questioning with those who remain in the jury pool later this afternoon. I'm positive we're not going to need you before three o'clock, so you're free to do anything you want. You can stay in the jury room if you want to, but as long as you're back by three, we'll be fine. And it will probably be beyond three o'clock, but I'd like to

562

have you back here by three. Thank you very much.

PROSPECTIVE JUROR 55: By three, all right.

THE COURT: Thank you.

PROSPECTIVE JUROR 55: Thank you.

(Prospective Juror 55 exited the courtroom.)

THE COURT: We're going to take a break now, so it will be a little bit of time before our next juror.

Please be seated for one second. According to my math, with even a 30-minute lunch break and two 25-minute breaks, it will be about five o'clock this evening before we get to group questioning. And I just don't think it's fair to the jurors to do that. So you're either going to have to speed up.

Now, I realize we've only done three, but at some point -- and it may not be today; it may be starting tomorrow -- I am going to impose time limits because there's just no other way around it. The more I give you, the more you abuse it in my view. That's just my observation of it. The more opportunities I give you, the more abuse there is. So I'm going to fix that. And that's all I can say. So we'll see you back here in 20 minutes or whenever they bring Miss Johnson back in, whichever

Page 76

is first.

(Recess at 10:31 a.m.)

THE COURT: Ready for Juror 345?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay.

563

(Prospective Juror 345 entered the courtroom.)

THE COURT: Juror 345, please be seated somewhere in the middle there, wherever you feel like sitting.

PROSPECTIVE JUROR 345: I forgot my sheet.

THE COURT: You don't need it.

PROSPECTIVE JUROR 345: Okay.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: May it please the Court.

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, sir?

A. Fine. Thanks.

Q. Good. The judge has given us this opportunity to talk to you in this setting by yourself, the goal being people might be less nervous. Is it working?

A. I'll let you know.

Q. Okay. We're going to ask your opinions about just really two areas, and the important thing you need to know when we're asking these questions, we're not here to judge your views. We very much respect them. We just need to know what they are in our efforts for both sides to pick the best 12 people for this case; okay?

A. Yep.

Q. I noticed that the situation for you regarding publicity

Page 77

was that you really didn't have that much information about the

564

case.  Is that right?

A.   Yeah.  I -- watching news, unless it was on the radio -- I listen to the radio a lot, but I don't watch a lot of news.  I definitely don't read a lot of newspapers.

Q.   In fact, you said you weren't at all familiar with the case.

A.   That is true.

Q.   Even after that little paragraph in there.

A.   Well, that was all I heard was what I read in that paper.

Q.   Have you heard anything since that time?

A.   No.

Q.   Now you know the charges we're dealing with are very serious; would you agree?

A.   Yep.

Q.   We have the government alleging there were five people that were intentionally murdered, that they were murdered in the course of, furtherance of a drug conspiracy or criminal -- continuing criminal enterprise and that two of these children are vulnerable -- what we call vulnerable victims.  They're children, ten- and six-year-old girls.

A.   Yeah.

Q.   And the government also alleges that this was done -- these murders were committed after premeditation and substantial planning; okay?

A.   Yep.

565

Q.   And you were asked some views about punishment that you
Page 78

were kind enough to answer in the questionnaire, and I wanted to cover a little bit with you about that.

A.   Okay.

Q.   Although you did not have any opinions coming into the case about whether or not Miss Johnson was guilty because you hadn't heard anything --

A.   Right.

Q.   -- you did have an opinion about punishment for that type of a case.

A.   Right.

Q.   And I just want to read this back and just see if -- tell me if it's accurate; okay?  Question 73, Do you have any beliefs or opinions as to the appropriate punishment for Angela Johnson if she were found guilty of an intentional killing of five people including two children?  You checked yes and said, If she were found guilty without doubt, she deserves the stiffest punishment allowed.

A.   Yes.

Q.   And I want to tell you in case you didn't know, the stiffest punishment is the death penalty.  Is that what you meant by the stiffest punishment?

A.   Yes.

Q.   And then question 76 asks you about your reasons for beliefs about the death penalty.  Why do you feel this way, or

566

what are some of the reasons for your beliefs?  You said, If a person kidnaps a child and then murders that child, that person deserves the death penalty.  He has committed an act that is very wrong.  However, in my opinion, if the father of that child killed the person who killed this child, the father does not

Page 79

deserve the death penalty.

A.   Right.

Q.   We can take that last part out.

A.   Okay.

Q.   Because obviously -- maybe it's not obvious.

A.   Right.

Q.   But that's not the allegation.

A.   Yep.

Q.   What we are talking about here is somebody else's children; okay?

A.   Yes.

Q.   Is that accurate?

A.   Yes.

Q.   The death penalty for that kind of a crime?

A.   Like I said, without reasonable doubt.

Q.   Yeah.  You make an excellent point.  Part of the difficulty of the process is we know you haven't heard all the evidence.

A.   Yes.

Q.   But for purposes of these questions, we're going to ask you to assume that you've kind of jumped ahead.

567

A.   Okay.

Q.   And in our questions we're asking you to assume you've heard all the evidence and you've already made a decision, not just you, you and the other jurors.

A.   Right.

Q.   You've heard all the evidence the government or the defense has to proffer about these crimes, and you've decided beyond any reasonable doubt this is what happened:  Five people intentionally killed, two little girls, premeditation,

Page 80

substantial planning, drug conspiracy, criminal enterprise; okay?

A.    Yeah.

Q.    That's what I'm talking about.

A.    Yep.

Q.    Is that kind of a crime the one where the death penalty's the only appropriate punishment for you?

A.    The only?  Maybe not, but I think that's the most deserving I guess.

Q.    You wrote when -- you were asked in question 87, Please review each of the situations listed below.  After each situation, describe what effect, if any, each have on your thoughts and opinions about an appropriate punishment for a person guilty of intentional murder.  Do you remember that question?

A.    Yep.

568

Q.    And you said the guilty person -- the first situation was the guilty person killed more than one person at a time, and you said, Depending on the situation but probably the death penalty.

A.    Right.

Q.    The second one, the guilty person was pregnant at the time of committing murder, you said, Depending on the situation but probably the death penalty after the child was born?

A.    Right.

Q.    And then the third one was the guilty person participated in the killing of children, and you just wrote two words:  Death penalty.

A.    Yeah.

Q.    That wasn't one where you kind of qualified it.  You know

Page 81

what I'm saying?

A. Right.

Q. Does that reflect your true feelings?

A. Sure, yes.

Q. And again, we're assuming and understand we haven't had the trial. But if it were proven to you death -- you know, that these two children, ten- and six-year-old girls -- there's no disagreement those are vulnerable victims. We can all agree.

A. Right.

Q. If they're killed not only intentionally but after substantial planning and premeditation, is the death penalty the appropriate punishment?

569

A. Yes.

Q. Do you really feel that life in prison in that kind of a case would at all be appropriate?

A. Yes.

Q. Under what circumstances?

A. I guess I wrote in there also I think our imprisonment is a little easy on what you are allowed to do and not to do. But yeah, that would be appropriate as well if, you know, we couldn't agree upon the death penalty or whatever so . . .

Q. Well, one thing you did note throughout your questionnaire is you thought that the penalties that we have for crimes really aren't stiff enough in our criminal justice system.

A. I would agree with that.

Q. And you made note about that regarding a question about offenses involving drugs. You said, I do not believe our drug laws are stiff enough. The penalties need to be stiffer; right?

A. Yes.

Page 82

Q. The number-one problem you thought about the criminal justice system was the ability to enforce stiffer penalties.

A. Yes.

Q. You were asked if the death penalty, the use was appropriate, and you thought it was used too seldom, and you said yes when you were asked if you believe in an eye for an eye. I feel that if we had stiffer penalties that maybe our crime rate would go down.

570

A. Yes.

Q. And then you mentioned life imprisonment. You were asked your views about that, question 82. This could be a better punishment if our prisons were not so nice. The prison I went and visited had a nice gym and a weight room, TVs everywhere. What kind of punishment is that? A person should be in a five-by-five cell with a toilet, bed, sink. They should be fed bread and water. Is that your view?

A. Under the right circumstances for what we're talking about, yes.

Q. Okay. Well, you know, that's just not going to happen.

A. I know. I know.

Q. All right?

A. Yep.

Q. And you don't have control over the prisons.

A. Nope.

Q. And neither do we.

A. Right.

Q. But I can assure you they're not serving people bread and water.

A. Right. I know.

Page 83

Q.    We all know that.

A.    I was just trying to get a point across.

Q.    I understand, right.  But here's the concern that I have, and again, you know, this isn't a right or wrong, give us the

571

right answer kind of a test; okay?  We just want to know how you feel.  It sounds to me like one of the things you're unhappy about is that prisons really aren't providing the punishment aspect --

A.    Right.

Q.    -- that you think they should; right?

A.    Right.

Q.    Okay.  And you're not happy about the penalties to begin with, that is, that they're not stiff enough.

A.    Right.

Q.    And here we have this very, very serious crime.  Hard to imagine something more serious than this.  Would you agree?

A.    Yes.

Q.    And you've got these two options, all right, the death penalty and life without parole.  And based at least on the questionnaire, it seems to me that this would be an opportunity for you to tell us what you believe.  I mean, there's no question as to the stiffer of those two penalties, is there?

A.    Yep.

Q.    And what I'm hearing in some of these responses is, hey, look, Mr. Berrigan, you got two kids; all right?  They're dead. They've been killed intentionally.  What?  Are you kidding me? Premeditation, substantial planning, and you want to talk about life imprisonment.  Forget about it; okay?

A.    Right.

Page 84

Q.   And I don't know if that's really how you feel or not, but that comes across on paper.

A.   I'd agree with that.

Q.   Is that how you feel?

A.   Yes.

MR. BERRIGAN:  Okay.  That's all we can ask, sir.  I appreciate your honesty.

PROSPECTIVE JUROR 345:  You bet.

MR. BERRIGAN:  Thanks.

THE COURT:  Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Q.   I just want to clarify with you on this.  Those are some of the facts of the case, that there are two children who were intentionally murdered in this case.  And are those two facts alone enough for you to say it's gotta be death -- I'm sorry, the death penalty; I'm not even willing to consider life imprisonment?  Or are you willing to weigh other facts against those facts to determine --

A.   Right.  I would weigh other facts against that as well that I may not be aware of.

Q.   Okay.  Now, I'm just going to be blunt with you; okay?  Intentionally killed two kids, two little innocent girls who didn't do anything wrong.

A.   Right.

Q.   Blown away; okay?  Now, are you telling us that even under

those facts you're willing to wait to weigh all the evidence and you would still realistically, realistically consider life imprisonment?

A. I don't know all the -- like if you're going back to what he said, if that's the way it came out, that she was guilty with no doubt, yeah, I'd definitely say death penalty.

Q. Okay. But --

A. Going on -- what I'm saying is if she's found guilty, I would say death penalty.

Q. Okay. But would you say death penalty regardless of what the other facts are?

A. Yes.

Q. Okay.

A. Yes.

Q. And you're not even willing to consider any other facts to determine if life imprisonment might be more appropriate.

A. No.

MR. WILLIAMS: Okay. Thank you, Your Honor. Pass for cause.

MR. BERRIGAN: Nothing further, Your Honor.

THE COURT: I assume you --

MR. BERRIGAN: No objection. If there was a motion or if there's not, I'll make a motion --

THE COURT: Okay.

574

MR. BERRIGAN: -- that Juror 345 with our appreciation be excused.

THE COURT: Okay. Thank you. And the government doesn't resist that.

MR. WILLIAMS: That's correct, Your Honor.

Page 86

THE COURT: Okay. Juror 345, thank you very much for your honesty and candor in answering the questions. You'd be a terrific juror but probably not for this case, so I'm going to exercise my judgment and let you go.

PROSPECTIVE JUROR 345: Okay.

THE COURT: And you're free to leave. Hopefully you'll -- we'd like you not to talk about any part of this case at least until you see in the newspaper or hear that we get the jury selected because northwest Iowa's pretty small, and there are a couple other hundred potential jurors.

PROSPECTIVE JUROR 345: Sure. It's amazing how many people down here know somebody who knows somebody else.

THE COURT: It's a small place. Good luck to you, and thanks so much.

PROSPECTIVE JUROR 345: Thanks a lot.

(Prospective Juror 345 exited the courtroom.)

THE COURT: 504 is next.

(Prospective Juror 504 entered the courtroom.)

THE COURT: Juror 504, why don't you just pick a chair you're comfortable with in the front row there.

575

Everybody else can be seated. And we're going to start with questioning first from Mr. Berrigan.

                    EXAMINATION

BY MR. BERRIGAN:

Q. How are you this morning, sir?

A. Just fine.

Q. Great. We've consulted with each other, and you have the best-dressed award for the jurors today. I hope you're gratified by that.

Page 87

A.    It's my work uniform or when I was working.

Q.    We appreciate your patience this morning.  The judge has kindly allowed us to do this in this individual questioning in the hopes that it will make jurors a little more comfortable and relaxed because our goal is here not to have you tell us, I'm going to be fair and impartial or follow instructions, but we really want kind of your honest opinions about the two issues we're going to cover.  There's just really two; okay?

A.    Okay.

Q.    One of them has to do with publicity, and that is what kind of media attention that you've been exposed to before you walked into the courtroom today.  And, of course, we have the benefit of your questionnaire, and I know you probably filled that out how long ago now?

A.    It was in January I think.

Q.    Sure.  So it's a while back.

576

A.    Yes.

Q.    And maybe you've had some media exposure since that time.  Have you?  I mean to this case.

A.    Not really.  I noticed -- and I just opened up the newspaper yesterday, and there was a picture of some woman.  I didn't even -- I saw one juror selected, and I said, This is something I should not be looking at.  I closed it up.  And on television one night, I saw the standard picture of Mr. Honken being taken out of the courthouse.  That's -- I have avoided anything.

Q.    We very much appreciate that; all of us do.  And it's hard to do it really because as the trial starts, particularly this case will --

Page 88

A.    There's going to be a lot more.

Q.    You bet.  And I've noted to myself I thought it was funny when you said the standard picture of Dustin Honken, and in my mind's eye I have that picture.  I know exactly what you're talking about because we've seen it time and time and time again.  And we may have that kind of thing with Miss Johnson unfortunately.  I mean, that's beyond our control.

A.    Uh-huh.

Q.    But you can understand why this area's of some concern to all of us here.

A.    Sure.

Q.    You mentioned that you were somewhat familiar with the

577

case.  I saw several reports on TV about Dustin Honken being convicted.  You thought it was drug related, and then you were asked a question about whether you had an opinion about -- I guess first you had a question -- it was a question about whether you formed an opinion about Miss Johnson, that is, her guilt based on the coverage you had heard.  Have you done that?

A.    No, I don't think so.

Q.    Okay.  And then you were asked an opinion about, well, if she were convicted what would be the appropriate punishment?  You said, I think the sentencing criteria should be followed.  Does that sound familiar?

A.    Yes.

Q.    Okay.  And I don't know if you knew at the time what the sentencing criteria was.  I don't know why you would, but maybe you did.

A.    No, not really, but I know -- well, at least at that point, I think that they may have even changed it, but at that point I

Page 89

knew that there was such a thing, that there is a federal criteria for certain crimes get certain maximums and minimums.

Q. That's right, yeah. That's exactly right. You know, not many people know that. We have a -- it's a huge book. It's called the federal sentencing guidelines. Judge Bennett probably knows them by heart. Yeah. And they're very specific. That is, that all kinds of factors are taken into account depending on the crime, and you get points, and then there's a

578

scale based on your criminal history, and it's almost like tic tac toe. You kind of match and, boom, there you are.

That's not true here; okay? That's critically important that you understand that. If there is a sentencing decision -- and I say if, and that's a big if -- we're talking about punishment, and I realize you haven't heard any evidence. Here's a woman presumed innocent that hasn't even been to trial yet, and we're talking about punishments, but the only reason we do that is because we want to have a chance to do it later, and we need to know your views about that subject now; okay?

A. Uh-huh.

Q. But there are only two possible punishments. One is the death penalty, and the other one's life imprisonment without possibility of parole for these types of crimes; okay? And I don't know if you garnered from what the judge said how serious these crimes are. The government has alleged that five people have been murdered. Two of those are children which the law classifies as vulnerable victims, two girls ten and six years old, and three other people and that these murders were done during the course or in furtherance of a drug conspiracy or a continuing criminal enterprise. The government's alleged that

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 503 of 3245

these murders were committed not just intentionally but after premeditation and substantial planning. Are you following me?

A. Uh-huh.

Q. Okay. So for that kind of a crime, life imprisonment or

579

the death penalty are the two potential options; all right? And I wanted to ask you though we have the benefit of your questionnaire, what do you think about the death penalty?

A. I think it's allowed. I know -- my questionnaire also says that I'm a Catholic, and I know that they've -- the church has changed their teaching on it. I went to school long enough ago that the teaching was different when I went to school, and I have always believed that under whatever circumstances it's -- it is an acceptable punishment.

Q. And you wrote that exactly. I believe it is acceptable.

A. Uh-huh.

Q. And, of course, you know, we all have different religious faiths and beliefs.

A. Sure.

Q. And I'm Catholic. I know the church is opposed to the death penalty. But in this courtroom that doesn't matter. What we're asking people to do is in essence and in many respects is when they come into this courtroom to at least temporarily sometimes set aside their beliefs if they can in deference to the rule of law.

A. I mean, for me what it means is that it would be a punishment that -- I suppose if it were generally agreed that I could agree with.

Q. Okay. Let me jump ahead then to -- what about life imprisonment? Looks like your questionnaire indicated you

Page 91

thought that was also an acceptable punishment.

A.   Yeah.  You know, just because someone -- if someone were convicted of a terrible crime, that would not mean they have to have the death penalty.  You know, life imprisonment certainly if that would be what would be selected or chosen.

Q.   In fact, you said that also.  Question 82, What are your thoughts and opinions about life in prison as a possible punishment for a person guilty of intentional murder?  And you said, I can be -- it can be an acceptable alternative.

A.   Uh-huh.

Q.   Is that how you feel?

A.   Yes.

Q.   This decision about punishment, it's a decision that's different than other decisions the jurors are going to make in the case.  Have you ever had occasion to be a juror, sir?

A.   No, I've never been on a jury.  I know that it's a two-part process.

Q.   Okay.

A.   The guilt portion and then the penalty portion.

Q.   Did you get that from the discussion just this morning?

A.   No, no.  It goes back to the Timothy McVeigh thing and other trials that, you know, have been high profile.

Q.   There's going to be a little difference in this case, but it's significant, and I want to tell you about that.  That guilt portion that you're talking about in Timothy McVeigh's case,

that was a discussion about whether or not Mr. McVeigh was responsible beyond a reasonable doubt for the murders that he

was alleged to have committed. Do you understand that?

A. Uh-huh.

Q. That is going to happen here. That will be what we call the first phase of this trial. The government is going to have to prove if they can beyond a reasonable doubt Angela Johnson committed these crimes.

A. Right.

Q. If that happens, if that happens, the jury is convinced beyond a reasonable doubt, then the judge is going to read some additional instructions, and there's going to be some argument but not additional evidence because the jurors have to decide two other issues based on what they've already heard. And that is does that evidence meet what we call gateway factors and aggravating circumstance factors. And those are merely steps that the jurors would have to agree had occurred beyond a reasonable doubt in order for us to even get to the punishment part of the trial; okay? You with me?

A. Uh-huh.

Q. And only if that happens -- so we're putting in this one additional step from what you knew from Mr. McVeigh's situation. Only if we get through one step 1, guilt or innocence, step 2, gateway factor/aggravating factor, do we get to step 3 which is the punishment part of the trial.

582

A. Okay.

Q. You with me?

A. Yes.

Q. The thing I wanted to tell you about in the punishment part to be sure you understand, unlike the first two parts of the trial where the jurors all have to agree one way or the other,

Page 93

they have to agree that the government met their burden of proof beyond a reasonable doubt, or they have to agree that that didn't happen; okay? But there has to be a unanimous decision in order for there to be a verdict. You with me?

A.    Okay.

Q.    If they're not able to agree after sufficient deliberation -- and that's determined by the Court -- then that trial is going to be a hung jury or a mistrial, and it may have to happen again; okay?

The punishment part of the trial doesn't work like that. When we're getting to the issue of life or death, the jurors are asked to make an individual decision first; okay? They have to weigh the aggravating evidence that's been presented by the government, things such as what we've talked about: Children have been murdered, that the murder was done after premeditation and substantial planning. If those things are proved to the jurors beyond a reasonable doubt, they must consider those, okay, as aggravating circumstances tending towards a death penalty verdict.

583

The defense can but is not obligated to present evidence that might get the jury towards a life sentence. And some of that is in the law. Things like no substantial criminal history would be something that might be asked of a jury to consider, and some of it's a little more nebulous, and by that I mean it's maybe a little more vague.

The defense can present any aspect of a defendant's background and character that we think would warrant consideration of a life sentence in that second part of the trial. If a juror found that to be true, then he should

Page 94

consider it. And the jurors don't have to agree on that; okay? There might be a half a dozen or more mitigating circumstances that you're asked to consider.

You might decide, I think these three for me are important and they're mitigating circumstances, and I find that they exist, and I'm going to consider them.

Some other juror might find two different ones that they think's important to them. Maybe you don't think that's a mitigating circumstance for you in your weighing process. But whatever each juror believes to be mitigating is mitigating for him or her. You with me?

A. Yes.

Q. And then it's kind of like the scales of justice, you know, the blindfolded Lady Justice with the scales? And in your heart and conscience you have to kind of weigh these things, the

584

aggravating circumstance the government's presented, the mitigating factors that the defense has presented, and you have to come to a decision about whether or not the aggravating circumstances outweigh the mitigating circumstances and vice versa. If the mitigating circumstances have more weight for you, that is a life sentence, life without parole; okay?

A. Uh-huh.

Q. If there's a tie, the defense wins the ties. It's only if the aggravating circumstances in your view outweigh the mitigating circumstances that you could consider a life -- a punishment of death at that point; all right?

A. Okay.

Q. You're never required -- the law never requires you to vote for death even in that circumstance. Even if you made a

Page 95

determination the aggravating circumstances outweigh the mitigating circumstances, you're not obligated, the law doesn't require you to vote for death. But you do have to be able to consider both punishments. That's only fair to the government that the death penalty has to be given consideration. And by that I mean true consideration as a possible alternative if the aggravators outweigh the mitigators. You with me?

A.    Yes.

Q.    Is that a process you believe you could go through?

A.    Yes.

Q.    The one last thing I want to ask you about, sir, is -- oh,

585

before I finish, when we were talking about the jurors having to be unanimous, they don't have to be unanimous on this point. The law says that if the jurors aren't unanimous, that's still a verdict. They don't go home. We don't lock you up. That is a verdict of life imprisonment because the law says unless everybody agrees on the death penalty it's not going to happen; okay?

        The government's burden of proof throughout this entire proceeding is always the same. For everything that they have to prove, guilt, aggravating circumstances, gateway factors, it's always, always, always proof beyond a reasonable doubt. It is never proof beyond all doubt, proof to a hundred percent, nothing like that.

        And I need to know that you wouldn't give them a greater burden than the law gives them, that is, that they only have to prove their factors, their aggravating factors, on the scale, they only have to prove those beyond a reasonable doubt. Do you understand that?

Page 96

A. I think so.

Q. Okay. Now, some people say, Well, I need to be really sure, Mr. Berrigan. I need to be positive about my decision a hundred percent on life or death. You can be 100 percent confident, and in my view you should be 100 percent confident in your decision after this weighing process. We want you to be confident. You've got to live with that decision for the rest

586

of your life. But it does not force the government to have to prove their case 100 percent. Do you understand the distinction?

A. I think so.

Q. It's a matter of proof. You know, when the government has to prove Angela Johnson guilty if they can, the law says they gotta prove it beyond a reasonable doubt. It does not say beyond all doubt. Doesn't say a hundred percent. Most people are okay with that.

A. Uh-huh.

Q. Are you all right with that?

A. I think.

Q. When the law says the government, if you want to ask for the death penalty, you have to prove these gateway factors and these aggravating circumstances beyond a reasonable doubt, it's exactly the same; okay?

A. Okay.

Q. That is not a decision process on death or life. The jurors when they're deciding whether there's an aggravating circumstance, the question's not does that mean death or does that mean life because that takes place before the weighing ever takes place; okay? The weighing part is a different deal. If

you want to be a hundred percent sure based on what the government's proven, you have that right. You have a right to be a hundred percent confident in your decision, but you can't

587

force them to prove that there was an aggravating circumstance a hundred percent if the law says beyond a reasonable doubt. And, frankly, who knows what the difference is; okay? Are you with me?

A.    I think so.

Q.    Is that something you're able and willing to do?

A.    I believe so, yes.

MR. BERRIGAN:  Okay.  I appreciate your patience, sir. Those are all the questions I have.

THE COURT:  Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Q.    Sir, I understand you are friends with Judge O'Brien?

A.    I've known him for many years, not a close personal friend, but he knows my name, I see him in a restaurant or something.

Q.    Okay.  And the only reason I bring that up, I just want to make sure that besides the newspapers and so forth you read, have you ever had any discussions with Judge O'Brien or any other person about the facts of the other case?

A.    Of this?

Q.    Yes.

A.    No.

Q.    Okay.  Very good.  I just have a couple quick questions for you, sir.  If you served on a jury and you -- as Mr. Berrigan described the process to you and you went through that entire

588

Page 98

process and you and the other jurors all decided having done this weighing process that death -- death penalty is the appropriate punishment in this case, you will ultimately have to sign a verdict, each and every one of you, a verdict form that would have the practical effect, the real effect, of causing the execution of the defendant in this case.

Now, when we talk to some people and they say, Yeah, I support the death penalty, I believe it's an appropriate punishment, when it comes down to it, they also know, aw, jeez, it's an appropriate punishment if some other jury imposes it. It's an appropriate punishment for somebody else to do. But I know in my heart of hearts that when it came down to it no matter whether I believe the death penalty was the appropriate punishment or not, I know I just could never sign a verdict form that caused the death of another human being. What do you think about that, sir?

A.    I think I could sign that.

Q.    In the appropriate case you could impose the death penalty.

A.    Yes, I think so.

MR. WILLIAMS:  Thank you very much.  No further questions, Your Honor.

THE COURT:  Sir, if you'd just step outside for one minute -- matter of fact, I don't think it's going to take a full minute -- then we'll bring you back in and let you know your status.  Thank you.

589

(Prospective Juror 504 exited the courtroom.)

THE COURT:  Is there any challenge for cause by the

Page 99

defense?

MR. BERRIGAN: No, sir.

THE COURT: By the government.

MR. WILLIAMS: No, sir.

THE COURT: Okay. We can bring -- I was pretty sure that was it but . . .

(Prospective Juror 504 entered the courtroom.)

THE COURT: Sir, you're still in the jury pool, and we're going to bring everybody back who stays in the jury pool later this afternoon. It won't be before three o'clock. I'm pretty confident of that. It may be after three, but you're free to leave the building. We'd just ask you to be back in the jury room by three o'clock, and hopefully it won't be too much more of a wait after three; okay? Okay. Thank you.

(Prospective Juror 504 exited the courtroom.)

THE COURT: Ready for Juror 398?

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 398 entered the courtroom.)

THE COURT: Juror 398, if you'd just grab a seat in the front row there. Anywhere is fine. Anywhere you choose. Thank you.

Please be seated. And we're going to start your questioning, Juror 398, with Mr. Dean Stowers from the defense,

590

and then one of the government lawyers will have a chance to ask you some questions after Mr. Stowers is done.

EXAMINATION

BY MR. STOWERS:

Q.    Good morning.

A.    Morning.

Page 100

Q. How are you?

A. Fine, thank you.

Q. Ma'am, we're here to visit with you separate from the other jurors as we've done with all of them just to make sure that we cover some things with each person separate and apart from the others and to make sure that you have a full opportunity to express your views outside their presence and in ours; okay?

A. Okay.

Q. So just go ahead and feel free to jump in and say whatever you wish when you get the opportunity; all right?

First thing I wanted to talk to you about is the issue of publicity, television, news accounts, perhaps information that you may have come into on the streets of Charter Oak, Iowa; is that right?

A. Yes.

Q. Have you heard anything at all about this case? By that I mean Angela Johnson or Dustin Honken or something that sounds familiar to that.

A. I hadn't heard anything about it until I was sent my papers

591

to fill out from court here.

Q. And when you were sent the papers -- obviously you read them, and there was some information in there -- did that refresh your memory as to whether or not you'd heard anything before?

A. No.

Q. Okay. And had you heard anything before you got the papers?

A. No.

Q. And have you heard anything since you got the papers?

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 514 of 3245

A.    No.  I can't recall hearing anything.

Q.    Okay.

A.    Actually I get the Omaha news channel, so I don't know if that's maybe why I don't -- hadn't heard anything if it had been on the news.  I don't know.

Q.    Okay.  The other topic that we wanted to visit with you about is your views on punishment and specifically the death penalty.  You were asked some questions in a questionnaire on that subject, and it may seem kind of odd that before you've heard any evidence or before you've had the opportunity to even be selected potentially as a juror in this case and before you've heard any of the facts or the arguments of the attorneys or what the particular allegations are that you'd be asked about that, but we have to do that because of the nature of the case to make sure that you can evaluate that issue.  What are your

592

views just generally?  What do you think of the death penalty?

A.    I think sometimes I see things that happen in the world and I guess I kinda think that maybe they deserve it, but I also see cases that is the opposite.  I have opposite feelings.  I really don't have no strong belief on it.

Q.    That's kind of what I picked up out of your questionnaire.

A.    Okay.

Q.    And I think that's what I wanted to visit with you about, and I think that's what Mr. Williams wanted to visit with you about, the prosecutor, as well.  One of the things that you indicated in your questionnaire is that you sometimes believed in the concept an eye for an eye.  Remember saying that?

A.    Yes.

Q.    What did you mean by that?

Page 102

A.   I guess sometimes certain crimes you see had happened -- I guess I just feel that way with certain things.  For instance, the little girl being kidnapped and buried here recently ago from Florida, I kinda had that feeling.

Q.   What feeling?

A.   An eye for an eye.

Q.   And what would that mean?

A.   I mean -- I don't know.  I just feel a lot of pain -- I felt a lot of pain for that girl, and I guess I -- you don't hear anything in the media about this man or his life.  We just heard about that girl, that certain girl from Florida.  So I

593

guess those are just my beliefs from what I had heard.

Q.   And an eye for an eye applied to that context would mean to you what?

A.   Well, I don't think he has the right to live.  That's what I mean.

Q.   And by taking her life in that Florida scenario that you're describing, the person who had caused that girl's death should forfeit his life; is that correct?

A.   I think I had that feeling on that one, yes.

Q.   Well, I think you probably picked up from the questionnaire that this case does involve five murders --

A.   Yes.

Q.   -- the government has alleged.  And if you get to the point in this case where you're going to be considering the issue of punishment and the two punishments you would be considering if you get to that point in the trial -- and that point in the trial would only be reached after the jury, if you were on the jury, you being one of them, had found beyond a reasonable doubt

Page 103

that Ms. Johnson, Angela Johnson, had participated in the intentional killing of five persons including two young girls, ages six and ten, and that she had done so intentionally, become involved with that activity and caused their death -- knowing just that about the case, that before you could even be to the point of considering punishment that's what you would have to essentially have found, would you in that circumstance believe

594

in the principle an eye for an eye?

A.   From just knowing what she is being accused of doing, I guess I don't know if she even did it.  All's I know is what I read in what the Court sent me, so I guess she's innocent until she's proven guilty.

Q.   And now we're kind of taking you beyond that question in your mind and imagining yourself as having been selected as a juror and having been one of the 12 jurors on this case who convicted Ms. Johnson of these crimes beyond a reasonable doubt. And you've already decided that question:  She is guilty of those crimes, killing two young children and three other persons and being involved in that with substantial planning and premeditation and those sorts of things.  Do you at that point in time when you're now down to the point where you're going to be considering punishment believe that you would apply the principle an eye for an eye as --

          MR. WILLIAMS:  Objection, Your Honor.  I'm sorry. Objection, Your Honor.  I think it's an improper question given your prior ruling.

          THE COURT:  Sustained.  You can rephrase the question.

          MR. STOWERS:  That's fine.

BY MR. STOWERS:

Page 104

Q.  Well, assume that you've already convicted her.  Just assume that that's what's happened and now we're here to the point where punishment is the issue, okay?  Do you understand

what I'm saying now?

A.  Yes.  Do I still believe in that?  You know, I really don't know what my beliefs are on the death penalty, you know.  I wrote an eye for an eye, and I think in some cases I do believe that like I told you.  I don't look at every case that way.  I don't have any strong religious beliefs on the death penalty.  I really don't even know what I believe on the death penalty. I've never really -- I've never been in this situation before of having to tell somebody my beliefs, so, you know, I don't know if going through a 12-week trial and hearing all that if I'm still going to have that belief or if I would feel stronger about it.  I don't know.

Q.  But you've already indicated one of the major factors that troubles you or could trouble you is this concept of the killing of a child.

A.  I have five children.  That could bother me.

Q.  And this case involves allegations of killing of a six-year-old and a ten-year-old child.

A.  Yes.

Q.  And you've said that just seeing the reports about this Florida case in the media has led you to have something of an emotional reaction to that circumstance; is that right?

A.  Yes.

Q.  You're going to be in this case called upon to personally listen to, inspect photographs and exhibits concerning homicides

of two children and three other persons.  Do you believe as you sit here today that you could handle that on an emotional level?

A.   I don't know.

Q.   Now, let me ask you a question.  One of your questions you were asked about is the concept of life without parole.  Can you explain -- you gave an answer as to when -- I think it is when you thought that life without parole would be appropriate, and you said, It depends on how it was done.  I'm not really sure how I feel.  Can you explain that a little bit better for us?

A.   I guess there's probably people that commit crimes and, you know, once you've done it, it's done.  I don't believe it makes you a bad person forever.  I believe in people being rehabilitated.

Q.   In the case of the killing of two young children and three other persons, multiple murders, intentionally planning and all of those bad things, do you think that you would be able to honestly give actual consideration to imposing any sentence other than the death penalty in that type of a case?

A.   I don't know what her situation was.  I know there was lots of questions in there about drugs.  Was there some questions about sexual -- sexual molestating (sic)?  You know, I don't know.

Q.   And those things that you bring up, drugs and prior history of abuse, are some things that you did address in your questionnaire as factors that you have some opinions about; is

597

that correct?

A.   Yes.

Q.   And how they can impact a person later in life?
Page 106

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 519 of 3245

A.   Yes.

Q.   And are those factors that you believe you could consider in the context of evaluating what should be done with a person who has been found guilty of the intentional murder of five persons including two children, that you would look at those factors, somebody's background, whatever it was, in weighing what should happen with them after they were convicted, that is, whether or not they should be sentenced to life in prison without the possibility of parole or the death penalty?

A.   Yes.

Q.   And why do you think those factors matter, somebody's background?

A.   I think it could be very disturbing to a person.  It's just -- I just have that feeling.

Q.   You believe that things that can happen to a person early on in sort of their formative years of life can have a longstanding and long-term impact on their future mental state, their future conduct, their future actions?

A.   Yes, I do.

Q.   And you expressed that in your questionnaire; is that correct?

A.   Yes, I think so.  I really don't remember what I wrote in

598

there.

MR. STOWERS:  Thank you.  That's all I have.

THE COURT:  Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Q.   Good morning, ma'am.

A.   Good morning.

Page 107

Q.    How you doing this morning?

A.    Fine, thank you.

Q.    Good.  I want to make it very brief with you, and I want to go straight to the issue that Mr. Stowers was talking with you about last, and that is the death penalty.  What I hear from you is that you've not ever had to struggle with that idea much before and you don't really know exactly where you are on it, but you're not really leaning necessarily one way or the other at this point.

A.    Right.

Q.    Are you willing to consider factors from both sides that would suggest life imprisonment in one situation and death penalty in the other situation and weigh those factors?

A.    Yes.

Q.    Now, imagine yourself if you will -- and this is a hypothetical.  Just imagine yourself being back in that jury room.  You've listened to 12 weeks' worth of evidence.  You are back there with the rest of your jurors.  You've deliberated.

599

And it ends up that all 12 of you after looking at this evidence decide the death penalty is the appropriate punishment to be imposed for this crime.  Each of you are going to have to sign a verdict form that has the real and practical effect of causing the execution of the defendant in this case.

Now, we talk to some jurors, and they say, Yeah, I support the death penalty; I believe the death penalty; I think it's an appropriate punishment.  But what they mean by that is I don't object to it.  It's okay for other jurors to do it.  It's okay for other juries to impose it.  It's okay for my government to impose it, but I know, I know in my heart, I personally could

Page 108

never do it. Even if I thought it was the right thing to do, I just know I could never sign a piece of paper that would cause the execution of another person.

Other people know they can do it. If they found that that was appropriate, they know they could do it. What do you think?

A.   I don't know. I think it would be something very hard to have to do. You'd have to have very, very strong -- very strongly believe that it was true.

Q.   And it should be hard, shouldn't it?

A.   Yes.

Q.   I mean, this is the ultimate punishment to be imposed.

A.   Right.

Q.   Do you think in the appropriate case you could impose the

600

death penalty?

A.   I don't know.

Q.   And why do you hesitate on that?

A.   I just -- I don't know. It's just something -- it's the final thing, and I just -- I don't know.

Q.   Do you see yourself being able to impose the death penalty on somebody else realistically?

A.   I don't know. I would have to feel very, very, very strongly about it I think.

Q.   Let me talk to you just a moment about that concept of how strongly you need to feel. The government's burden of proof is beyond a reasonable doubt, and that burden of proof remains with us through the guilt phase. It remains -- or the merits phase of the case which is where we decided not guilty or guilty. It remains with us if we get to a penalty phase and we have to

Page 109

prove certain aggravating factors for the jury to even consider the death penalty, and then we'd have to prove additional aggravating factors beyond a reasonable doubt if there were any for you all to consider in the weighing process about the appropriate penalty. And our burden of proof is beyond a reasonable doubt. It's not proof beyond all possible doubt. It's proof beyond a reasonable doubt.

Some people know that the death penalty is such a weighty issue with them they just know coming into this that I understand conceptually the burden on the government's proof

601

beyond a reasonable doubt, but I know in my heart before I ever impose the death penalty if they were claiming aggravating factors that require the imposition of the death penalty, they'd have to prove those to me beyond all possible doubt. Because we're talking about the death penalty here, it'd have to be beyond all possible doubt. Proof beyond a reasonable doubt's not good enough for me when we're talking about the death penalty. What do you feel about that?

A.   You kind of summed it up a little bit. If somebody were admitting and pleading guilty with no care about it, had shown no remorse, I think in that way I would think the death penalty would be the right thing to do.

Q.   So kind of in your mind you would need so much certainty you'd have to have either a confession or an admission of guilt before you felt that that would be enough for you to impose the death penalty on somebody?

A.   I think so.

MR. WILLIAMS:  Thank you, ma'am.

I have no further questions, Your Honor.

Page 110

THE COURT: Mr. Stowers?

MR. STOWERS: Did we decide yesterday if we could ask a few follow-up questions?

THE COURT: Go ahead. I'm not sure we decided, no, but go ahead.

MR. STOWERS: Well, we decided so many things, I'm not

602

sure we finally decided anything.

THE COURT: I don't think we did actually.

MR. STOWERS: Thank you.

EXAMINATION

BY MR. STOWERS:

Q. Ma'am, in response to that last question, let me make sure I understand what it is that you're saying. To make certain determinations in this case and to evaluate this case, the judge is going to give you a very large set of jury instructions. He's going to read them. And he's also going to give them to you in written form. And you've not been a juror before, have you?

A. No.

Q. And those instructions, although in lawyer language, are going to be hopefully sufficiently clear that you're going to understand exactly what it is that the government has to prove in this case, what it is that they don't have to prove, and by how much evidence they have to prove something. Do you understand that?

A. Yes.

Q. And the government's going to be required I believe by the Court to prove various things in this case to what is called a standard of proof beyond a reasonable doubt. Do you understand

Page 111

that?

A.    Yes.

Q.    You may have a concept in your mind about what beyond a reasonable doubt means.  But the judge is actually going to give an instruction in writing, and he's going to read it to you that tells you what that means.  Do you understand that?

A.    Yes.

Q.    And that instruction, even though we do our best to try and explain that to you, is still open to a good deal of interpretation and argument between lawyers, lawyers and judges, and jurors when they go into their deliberations.  But it would essentially say something like they must prove their case beyond a reasonable doubt, and that would mean something to the effect that it would be to such a degree of certainty that once you have decided upon that matter that you did not any longer have any hesitation to act and decide that that matter was, in fact, proven, okay, so that you were firmly convinced, okay, really kind of convinced without concern that when you woke up the following day you'd reflect back and say, Maybe I was wrong.  Do you understand that?

A.    Yes, I do.

Q.    It's been explained a lot of different ways in the law. Now, if the judge told you that's what the law was, something along the lines of what I've just described, and he gave you a set of instructions telling you what the government's burden was, would you be able to follow those instructions, and could you give us your assurance here today, your fair assurance, that

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 525 of 3245

you'd be able to follow the Court's instructions?

A.    Yes, I would.

Q.    And so whatever thoughts you might have in your mind about how you feel about this or that or what beyond a reasonable doubt really kind of means to you as you've heard that phrase thrown around, you'd follow the judge's instructions; is that right?

A.    Could you repeat that, please?

Q.    Well, whatever you -- maybe I shouldn't.  But whatever you think in your own mind about beyond a reasonable doubt, you'd follow the judge's instructions if you got sworn in as a juror in this case and what he told you on that; is that right?  Maybe I've con --

A.    I guess --

Q.    Have I confused you again?

A.    I guess beyond a reasonable doubt I would assume means you have no other feeling, no doubt at all.

Q.    And the judge is going to tell you the particular wordage of what beyond a reasonable doubt means, and it may be a little different than what you've just expressed; okay?  So if he tells you something a little different than what you have in your mind, will you be able to assure us that you can follow his instructions about what beyond a reasonable doubt means?

A.    I guess I don't understand what you're --

Q.    Okay.

605

A.    What will his instructions say?

Q.    Well, we're going to be addressing that later.  But he's going to essentially tell you what it means, and it's going to

Page 113

be something close to what you're saying but probably something slightly different. The language will be different. But he will tell you what it means, and once he tells you, that's what it means, and you're required as a juror in a case to follow those instructions as best you can; okay? Do you understand that part?

A.    Yes.

Q.    And will you be able to do that assuming that you understand the instruction and can read it and understand and comprehend it?

A.    Right, yes.

Q.    Now, it doesn't mean at the same time that if you ultimately decide on Ms. Johnson's fate one way or the other that you ought not to be convinced and highly confident that you made the right decision for yourself. Do you understand that?

A.    Yes.

        MR. STOWERS:  Thank you. That's all I have.

        THE COURT:  Mr. Williams, anything further?

        MR. WILLIAMS:  No. Thank you, Your Honor.

        THE COURT:  I just wanted to try and clarify one thing, and I hope I'll clarify it and not confuse it for you, Juror 398. In order for any defendant to ever receive the death

606

penalty, all 12 jurors would have to unanimously agree that that is the appropriate sentence. Do you understand that?

        PROSPECTIVE JUROR 398:  Yes.

        THE COURT:  It wouldn't just fall on one juror's shoulders. In other words, if you thought the defendant deserved the death penalty but nobody else did, the defendant would not be getting the death penalty. Do you understand that?

Page 114

PROSPECTIVE JUROR 398:  Yes.

THE COURT:  I just wanted to make sure you understood that.

PROSPECTIVE JUROR 398:  Thank you.

THE COURT:  Now -- I think that's all the questions I'm going to ask you so if you -- anybody want to ask any follow-up questions?

MR. WILLIAMS:  No.  Thank you, Your Honor.

THE COURT:  Mr. Stowers?

MR. STOWERS:  No, Your Honor.

THE COURT:  Okay.  If you'd just step outside, we'll let you know your status in a minute; okay?

PROSPECTIVE JUROR 398:  Thank you.

THE COURT:  Thank you so much.

(Prospective Juror 398 exited the courtroom.)

THE COURT:  Challenge for cause by the defense?

MR. BERRIGAN:  None by the defense.

THE COURT:  Mr. Williams?

607

MR. WILLIAMS:  Yes, Your Honor, on a couple grounds. Contrary to Mr. Stowers' suggestion to what she was saying about proof beyond a reasonable doubt being very close to what her definition was, it's not close at all.  In her mind proof beyond a reasonable doubt is proof beyond all doubt.  And in this case I think her answers made it abundantly clear that's where she has to be in the proof that the government gives her before she can impose the death penalty.

She equated it to a confession.  And there's case law that supports that a juror who comes up with some type of impossible evidentiary standard like a confession or a guilty

Page 115

plea before they can impose the death penalty is a standard that's beyond that required and that person has views about the death penalty that substantially impairs their ability to serve as a juror and to follow the Court's instructions.

The other thing that I think disqualifies this juror is she never could give firm answers concerning her beliefs about the death penalty. She repeatedly said, I don't know what I think; I don't know what I believe on the death penalty. And again, there's case law, Deputy v. Taylor, a Third Circuit case from 1994, United States versus Moore which is an Eighth Circuit case from 1998, that when a juror cannot articulate what their views are on the death penalty then they are not qualified to serve because we cannot tell whether they could or could not impose the death penalty. So for those reasons we'd move to

608

strike.

THE COURT: Now you really are double teaming me. For him to ask the questions and you to do the argument, that's the classic double -- I mean . . .

MR. BERRIGAN: The advantage is I was able to take notes, Your Honor, and that's sometimes very helpful. But if you want Mr. Stowers to make the record, I'll attempt to assist him.

THE COURT: Well, I mean, if a lawyer's going to get up and question a juror, then they better be prepared to defend that juror's position in my view so -- but given your greater expertise in this area, I'll make an exception to that general rule.

MR. BERRIGAN: And now we're on notice as to what the practice will be. I appreciate it.

Page 116

THE COURT: No, it's probably going to be an exception acr -- you know.

MR. BERRIGAN: What happened here in my view is that Mr. Williams did what he did to one juror yesterday, and he asked this question, and I was writing it down. If the government presents aggravating factors that require the imposition of the death penalty, he then asked them whether or not they were going to require the government to prove that to a standard higher than beyond a reasonable doubt.

And the problem with that question, in addition to the

609

fact the death penalty's never required, is it mixes two separate and very distinct concepts that I tried to address with the previous juror.

One is the burden of proof on the aggravating circumstances, and we all agree we know what that is and the juror has to be able to find it.

The other, however, is the decision about life or death, Your Honor. There's no standard there. The jurors aren't told that they have to decide beyond a reasonable doubt vote for life or beyond a reasonable doubt vote for death. That decision is entrusted to their judgment after they've listened to all the evidence.

And what this juror is telling us is on that decision as between life or death she has to be 100 percent sure or confident. That's not the same as telling the government you have to prove beyond a reason -- a standard beyond a reasonable doubt as to your aggravating circumstances.

But the questions mix those concepts together, and the jurors are thinking about punishment when they're really being

Page 117

asked about a step that precedes punishment by a good measure, and that is whether or not the government's proven their aggravating circumstances. So that is a response to the first point.

And the second point merely is this juror said repeatedly there are circumstances under which she could

610

consider the death penalty in an appropriate case and even gave us an example of a child killing in Florida which she thought in her view the death penalty was appropriate. She used that term eye for an eye.

So there's no question but that she could consider death in the appropriate case nor would she hold the government to a burden that exceeded that required by law. But she does want to be a hundred percent sure in her decision. She's entitled to that in our view under the law and shouldn't be stricken for having stated that position perhaps in an inartful fashion in response to confusing questions by the government. So we'd ask the Court to overrule the government's challenge for cause as respecting Juror Number 398.

THE COURT: Well, both sides are guilty of confusing questions to laypersons in my view.

But she did say -- Mr. Williams said, So kind of in your mind you would need so much certainty you'd have to have either a confession or an admission of guilt before you felt that would be enough for you to impose the death penalty on somebody. Answer, I think so. Now, if I believe that answer, why is she qualified to serve as a juror in this case?

MR. BERRIGAN: Well, if you took that in isolation -- and you have the questions before you I suspect. If you took

Page 118

that response in isolation, you might not. But that's a follow-up question to a series of questions on this very issue,

611

the mixing of holding the government to a burden of proof beyond a reasonable doubt and punishment and whether or not she wants to be a hundred percent certain as to punishment. That wasn't a question in isolation. It was a question that followed a series of questions on this topic. And that's where the jurors get confused because there's no distinction made between these two very separate and distinct concepts.

THE COURT: Mr. Williams?

MR. WILLIAMS: I think taken as a whole this juror expressed an unwillingness to be able to impose the death penalty unless she had proof of a confession or something equivalent, and that is not the test. Any juror who requires some extraordinary evidentiary showing like that has views of the death penalty that substantially impairs her ability to fairly consider the death penalty in this case. And that is supported by the case law, in the Flores decision, 63 Fed. 3d at 1355, and Drew versus Collins, 964 Fed. 2d at 417, 1992 decision. When a juror can only impose the death penalty with a confession or the equivalent thereof, that is not the test, and that is not a requirement for the government.

And I think if you take all of her answers as a whole, that's what she's going to have to have in order to do it. And I think, you know, looking at this juror, I simply don't think she's qualified, and I think if you take all of her answers as a whole she just is not somebody who can fairly consider the death

612

Page 119

penalty when it really came down to it.

THE COURT: Any response you'd like to make, Mr. Berrigan?

MR. BERRIGAN: Not without repeating myself, Your Honor. That simply was not her position.

THE COURT: I'm going to overrule the government's objection. It's a very close call, but I'm going to overrule the government's objection.

(Prospective Juror 398 entered the courtroom.)

THE COURT: Ma'am, you're still in the jury pool, so we're going to bring those who are still in the jury pool from today's group back some time after three o'clock this afternoon. So you're free to leave or go to lunch or go shopping or whatever you'd like to do as long as you're back by three. I suspect we won't get to you by three, but we'd like to have everybody here back by three in any event; okay? Thank you very much.

PROSPECTIVE JUROR 398: Thank you.

(Prospective Juror 398 exited the courtroom.)

MR. BERRIGAN: Your Honor?

THE COURT: Yes.

MR. BERRIGAN: I'm sorry to interrupt. I see the clock as well as you that it's noon, but if you would permit us one more juror --

THE COURT: That's fine.

613

MR. BERRIGAN: -- this is one Mr. Williams and I think might be short.

THE COURT: That's fine. And before we get to that juror --

Page 120

MR. BERRIGAN: Yes, sir.

THE COURT: -- you keep saying something, and I'm a little bit confused by it. Everybody can be seated because this is going to take a minute or so, and I don't recall my penalty phase instructions verbatim, and I'm going to call them up on the screen, but I understand I did give an instruction the jurors never have to impose the death penalty, but it seems to me that if a juror engages in the weighing process and finds that the aggravating factors outweigh the mitigating factors, it would be a violation of the instructions then for me to tell the juror that even if you find the aggravators outweigh the mitigators you don't have to vote for the death penalty. But you're telling me that's the law.

MR. BERRIGAN: I believe that to be the law, Your Honor. I don't know how else the jurors could be told that they're never obligated to vote for --

THE COURT: Because they're never obligated to find that the aggravators outweigh the mitigators. They're never obligated to find that. But once they make that finding, they wouldn't be following the instructions if they didn't vote for the death penalty.

614

MR. BERRIGAN: Well, I see the point you're taking with it.

THE COURT: Yeah.

MR. BERRIGAN: That if they came to the conclusion the aggravators outweigh the mitigators they have to vote for death, but that's not my view of the law, and I'd be happy to try and find some case law for you. I don't have any handy. I think the reason that the jurors are told that they are never

Page 121

obligated to vote for death is because even if there aren't any mitigating circumstances presented, none whatsoever, how could they weigh in that circumstance? The law makes it very clear that they're obligated --

THE COURT: Because they can weigh mitigators that they find that aren't offered by the defense.

MR. BERRIGAN: Well, they could, but they'd still have mitigators. I think the law is very clear that even if there are no mitigators present, not only -- I mean, we just --

THE COURT: That's a different question. I think the law is clear that if there are no mitigators present they have an obligation to try and look at the evidence, and they're allowed to find any mitigators they want and then weigh it with the aggravators. But I don't think -- your view is really -- it's informal jury nullification, and I don't think that's the law. But we can get to that in the instructions.

MR. BERRIGAN: Okay.

615

THE COURT: It's going to come up in the instructions, but I think your view is really almost an instruction on jury nullification. You can find aggravators outweigh the mitigators, but you don't actually have to follow the instructions.

MR. BERRIGAN: I don't think the instructions require even in that circumstance a vote for death. And I say that knowing that some states absolutely do require that. Kansas is a perfect example. If the jurors find that the mitigators don't outweigh the aggravators, they shall vote for death. That's what the instruction and the law says.

THE COURT: Right.

Page 122

MR. BERRIGAN: That is not the situation as I understand it in the federal law. And because this is an individual decision and we sort of all agree on the weighing process, I don't know how we could view it otherwise. Even if they decided aggravators outweigh mitigators or there weren't any mitigators, they're never in a position --

THE COURT: So according to you, you'd be entitled to an instruction that says, Even if you find that the aggravators outweigh the mitigators, you still don't have to vote for the death penalty.

MR. BERRIGAN: I think that's what that instruction says. Now, I think that's the meaning of the instruction that says they're never required to vote for death. It's essentially

616

exactly what you've said, Your Honor, just different language. Yes, that's the principle involved.

THE COURT: Okay. Thanks. We'll save that for another day. You ready for 223?

MR. WILLIAMS: Yes, Your Honor.

MR. BERRIGAN: Yes.

THE COURT: Okay. 223.

(Prospective Juror 223 entered the courtroom.)

THE COURT: Please be seated. Mr. Berrigan's going to question you first.

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, ma'am? I'm right here. I can understand your confusion. There's a lot of people here. And the judge actually made this possible for us to question you individually so you'd feel a little more comfortable we hope so that you

Page 123

could give us your open and honest responses about these two different areas we're going to ask you about; okay?

A.    Okay.

Q.    We know people are nervous in these settings, and I guess all we can ask you to do is take a big deep breath and we'll plow forward; all right?

The two areas we wanted to cover were publicity.  And by that I mean what type of media exposure you may have had to the case before walking in today.  And then the other area we

617

wanted to cover with you is your views about the death penalty as a potential punishment; okay?

A.    Okay.

Q.    And I have the benefit, as do the government lawyers, of having your questionnaire, as does the Court, and so we're going to use that if we might to clarify some of these issues.  You indicated that you were really not at all familiar about the case; is that right?

A.    That's correct.

Q.    Is that still true?  I realize some people filled these questionnaires out quite a long time ago.

A.    No, I'm still not aware of anything.

Q.    Okay.  But you did say in response to question 72 which is a question that had to do with if -- I'm going to read it verbatim so you get it.  No matter what you have read, seen, or heard, do you have any -- now have any beliefs or opinions about the guilt or innocence of Angela Johnson?  And you said, Yes. Even though she has only been charged with these crimes, I would have a very difficult time presuming she was innocent until proven guilty.  Is that accurate?

Page 124

A. Yes.

Q. Is that still your position?

A. Yes.

Q. You're looking at me like I'm going to be upset, but we're not.

618

A. Okay.

Q. The whole reason for this process -- this is not some kind of test for right or wrong answers honestly. Some people just have different feelings about this case, and it's kind of important for all of us to know before we start where people are; okay?

A. Okay.

Q. Let me read another one for you here, question 73. Do you have any beliefs or opinions as to the appropriate punishment for Angela Johnson if she were found guilty of intentional killing of five people including two children? And you said, Yes, death penalty. Is that your view?

A. Yes.

Q. Okay. Question 74, If you were selected as a juror in this case, it will be necessary for you to look at photographs of the skeletal remains of the victims including their gunshot wounds and listen to sometimes graphic testimony about their deaths. Do you think you might have difficulty looking at these photographs and listening to this type of evidence? And you checked the yes box, and you said, I'm afraid I couldn't put this out of my mind and, therefore, could not be objective in listening to the testimony of Angela Johnson. Is that --

A. That's correct.

Q. I'm going to jump ahead a little bit here, go past the
Page 125

death penalty for a moment, and this question appears near the

619

end, number 99. In your opinion is there anything about this case, the issues, and/or the people involved in this case that might hinder you even slightly from being an impartial juror? And you said yes. And you said, I feel that Angela Johnson is guilty because she was charged with these crimes, and it usually takes a lot of evidence to even arrest and charge someone with the crime of murder. Does that sound right?

A. Yes.

Q. Okay. And is that how you feel about the situation right now?

A. Yes.

Q. I'm just kind of guessing you've heard this idea about the presumption of innocence and that people -- we can't always afford them that; okay? That's why we ask -- we don't assume that people come in and they can always do what they and we would like them to be able to do, and that's one of these issues. Sometimes we just have feelings about a person or a case that it's really our duty to say something. And so it's all right if you can't presume Miss Johnson innocent. We just need to know that.

A. Okay.

Q. Would that be true even if the judge said, Hey, look, you know, that's the law? And he would say that much more eloquently and firmly than I. You have to be able to do that to be a juror. You have to be able to sit at the beginning of the

620

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 539 of 3245

case and be able to look at that defendant in the eye and say under oath, I can presume that you're innocent. Is that something you think you could do here?

A.  No, I honestly don't, no.

MR. BERRIGAN:  That's all I have.  Thank you, ma'am.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  I believe I would join the defense motion.

MR. BERRIGAN:  Yes.  I'm sorry, Your Honor.  I'll make a motion, thank the juror for her gracious responses, but we move for cause.

THE COURT:  I'm just curious.  I'm going to grant the motion.  But I'm just curious.  If you were ever charged with a crime, how would you like a bunch of jurors with your view sitting on the jury that couldn't give you the benefit of the presumption of innocence?

PROSPECTIVE JUROR 223:  Well, I would probably -- would probably have a problem with that, but again, I am just being honest.

THE COURT:  I understand that.

PROSPECTIVE JUROR 223:  I --

THE COURT:  But, you know, that's a bedrock principle in this country that we give individuals charged with a crime the full benefit of the presumption of innocence.

PROSPECTIVE JUROR 223:  Uh-huh.

621

THE COURT:  And for whatever reason, you're unwilling to do that.  I'm offended by that.  I'm deeply offended by that.

PROSPECTIVE JUROR 223:  Okay.  I'm sorry.

THE COURT:  If I could take your citizenship away, I

Page 127

would.

PROSPECTIVE JUROR 223:  Okay.

THE COURT:  They're not going to judge you.  I am. I'm deeply offended by people who are unwilling to follow the Constitution and unwilling to give individuals the full benefit of the presumption of innocence.  And if you ever got charged with a crime -- plenty of innocent people do -- you'd be the first one screaming bloody murder insisting 12 people be in that jury box who would give you the full benefit of the presumption of innocence.  And fortunately there are judges who insist on that too, and I'm one of them.

But for whatever reason, you're unwilling or unable to give Miss Johnson what you would expect if you were on trial.

Now, I agree with the lawyers.  I very much appreciate your honesty because you're absolutely not qualified to serve on this jury or any jury in the United States of America.  But if I were you, I'd go home and reexamine why you have those views.

PROSPECTIVE JUROR 223:  Okay.

THE COURT:  Okay?

PROSPECTIVE JUROR 223:  Okay.

THE COURT:  Good luck to you.

622

PROSPECTIVE JUROR 223:  Thank you.

THE COURT:  Thank you.

(Prospective Juror 223 exited the courtroom.)

THE COURT:  Ready to take your lunch break?

MR. BERRIGAN:  Yes, sir.

MR. WILLIAMS:  Sure, Your Honor.

THE COURT:  Okay.  Would one o'clock be a good starting time?

Page 128

MR. BERRIGAN:  That would be fine for the defense, Your Honor.

MR. WILLIAMS:  Certainly, Your Honor.

THE COURT:  Thank you.

(Lunch recess at 12:10 p.m.)

THE COURT:  Ready for Juror 52?

MR. WILLIAMS:  Yes, Your Honor.

(Prospective Juror 52 entered the courtroom.)

THE COURT:  Juror 52, anywhere you're comfortable sitting in that front row is fine.  Thank you.

Everybody else please be seated.  And we're going to start this afternoon with questioning first from Mr. Berrigan.

PROSPECTIVE JUROR 52:  Okay.

MR. BERRIGAN:  May it please the Court.

EXAMINATION

BY MR. BERRIGAN:

Q.   How are you, ma'am?

♀

623

A.   Good.

Q.   Thanks, first of all, for your patience with us.  This is a little bit of a slow process, but because it's so important, the judge thought that we should be able to talk to you in an individual setting.  The hope is that you'll be more comfortable and less nervous and that in that manner we can get, you know, honest, open responses.

Before I ask you any questions, I want to tell you that we aren't here looking for right or wrong answers.  It isn't a test.  Both the government and the defense and the Court, we all just want to know what your open and honest views are about a couple of these issues so we can get the best 12

Page 129

people for this particular case; okay?

A. Okay.

Q. Sometimes it turns out either from our own life experiences, our backgrounds, or maybe some things that we've been exposed to that we could be great jurors for some kind of cases and not as good as we'd like for others. Do you know what I mean?

A. Uh-huh.

Q. So that's what this is about; all right?

A. Okay.

Q. And there are two areas we're going to cover. One has to do with pretrial publicity, and you might recall that you were asked some questions about that in your questionnaire. Do you

624

remember?

A. Uh-huh.

Q. Can I ask you first, when -- do you remember when you filled out this questionnaire, roughly how long ago?

A. About a month ago.

Q. Oh, not too bad, okay. There were some questions about, you know, the exposure that you had had to the case through the news media, and you indicated you were somewhat familiar with the case. Is that accurate still?

A. Just hearing it on the news. I really didn't pay a whole lot of attention, no.

Q. And, in fact, you checked the television as the source of the information.

A. Uh-huh.

Q. There was a specific question about what you had seen that said -- question 63, What have you read, seen, or heard about

Page 130

this case or the crime or the people involved?  And you said,
Pretty much the same as the news release above in that Dustin
Honken was convicted and there are some questions on jury
tampering with that one -- I think that says, Person released?

A.    Right.

Q.    Does that sound right?

A.    Uh-huh.

Q.    And to be honest, not a lot of people remembered that.
What do you remember about Mr. Honken's case?

625

A.    Like I said, not a whole lot.  I mean, I just would hear it
as it was going on, and then I heard about the juror and
something about something happened I think at her workplace or
something like that.

Q.    At her workplace, okay.  Go ahead.  I'm sorry to interrupt
you.

A.    Oh, that's fine.  And like I said, just -- I didn't follow
it real closely because I tried to stay away from the news
because of my children.

Q.    Sure, sure.  You mean your children don't like you watching
the news and not paying attention to them or what?

A.    No.  After 9-11 happened, my youngest daughter got so upset
by it that she developed a stomach condition that she had to
take a prescription medicine for to calm her stomach down, and I
thought, well, that's fine.  If the news is upsetting her, we
just pretty much won't watch.

Q.    I'm sorry to hear that.

A.    So I just kind of hit and miss, and it's calmed down.

Q.    And you have two daughters, 15 and 12 years of age.

A.    Yes.

Page 131

Q. Do you remember hearing anything about what happened to Mr. Honken in terms of the result in his case?

A. No, I don't. I just know he was found guilty. I didn't listen for the sentencing or anything.

Q. There was a question about whether you had had occasion to

626

talk about the case, the crime, or any of the people involved. It was question 65. And you said yes, just what a shame it is that the children were killed.

A. Yes.

Q. I want to ask you just a little bit about that. Do you remember the context of that discussion in terms of who you were talking to?

A. Just fellow employees at work. We would talk about it because they would bring -- someone else would have been listening to it and was -- you know, brought something up.

Q. Sure.

A. To me children shouldn't -- there's no reason a child should be killed.

Q. No, of course not. And at the time of Mr. Honken's trial, do you remember there was quite a bit of media coverage about it at that time? Maybe you didn't see it, but were you made aware of that?

A. Yes.

Q. I imagine when you talked to people at work, was that one of the kind of current topics of the day people would discuss?

A. It would maybe be brought up once every couple of days. It wasn't a daily event.

Q. You work at a local health center as a customer service rep.

Page 132

A.    Uh-huh.

627

Q.    Have you had any occasion to more recently have any conversations with anybody about either Mr. Honken's case or Miss Johnson's case?

A.    No.

Q.    I wanted to ask you a few questions about -- well, before we just leave that for just a second, the reason we're asking these questions is a lot of jurors have heard about Mr. Honken's case, frankly, particularly people here in Sioux City.

A.    Uh-huh.

Q.    And that doesn't necessarily mean they formed an opinion that they're going to bring into the courtroom.  It doesn't necessarily mean that just because they know something about Mr. Honken's case it's going to have any effect on their decision or the deliberations or how they view the evidence.  But it's really more than that that's required of jurors.  What we really ask and demand them to do is to make a decision on Miss Johnson's case, literally a life-or-death decision, about what takes place in this courtroom during this trial.  Do you understand that?

A.    Yes.

Q.    There's going to be witnesses that will testify back here from the witness stand.  There will be exhibits and things that will be admitted into evidence for the jury to consider.  And we have to be sure that the jurors are relying solely on that testimony and on those exhibits and not something they read in

628

the newspaper six months before -- maybe they heard somebody on
Page 133

the radio or television -- entering into that evidence at all; okay?

A.    Uh-huh.

Q.    So it's not just I wouldn't weigh that, Mr. Berrigan, I wouldn't consider it.  It's I wouldn't even bring that up.  In my mind as a juror, that would be wholly inappropriate for even any discussion about it because it doesn't -- it's not this case.  I mean, it's not what we're deciding about.  Do you agree with that?

A.    Yes.

Q.    And is that something you think you could do for us if you were selected?

A.    Yes.

Q.    Okay.  You're doing great so far.  So let's talk about this other issue, and this is an issue that is certainly important as well, and that is your views about the death penalty.

And before I ask you any questions, I want to make it clear to you again -- and if it's not already -- you know, there are people all over our country that have different views about the death penalty, and they range, let me tell you, from one side of the spectrum to the other, and all of us have heard those views.  We're not trying to change anybody's opinions today.  That's not our goal.  There aren't any right or wrong views about this issue.  Your views are your views.  They're

629

entitled to respect, and that's exactly what you're going to get.  But we need to know what they are.  And we need people to come in and tell us their views without worrying about, boy, I wonder if that's what I should have said or I wonder if that's what the law says.  We just want to know how you feel; okay?

Page 134

A. Okay.

Q. So let's talk about the death penalty specifically. And let me just, you know, ask you that question. How do you feel about the death penalty?

A. I believe in the death penalty.

Q. And how strongly do you believe in the death penalty?

A. Pretty strongly.

Q. How long have you had that view?

A. Quite a while.

Q. Okay. You know, some people have had occasions in their lives where they've talked to people about their views on the death penalty, and a few people haven't. We've had people come in and say, I've never really been asked about it before, frankly. And I just wonder if you've had occasion to talk about it in the past in kind of formulating your views whether you've discussed it with others.

A. I'm sure I have.

Q. When you got this questionnaire in the mail, this packet as we've been calling it, is that one of the things that might have entered your mind is, holy Toledo, this is a case that might

630

involve the death penalty?

A. Yes.

Q. And even though you weren't very familiar, you were somewhat familiar with Mr. Honken's case, were you aware as to whether that was an issue in his case at all?

A. The death penalty being --

Q. Yes, ma'am.

A. Not so much with the Dustin Honken case, you know, because it could have been something for a lesser charge or something

Page 135

along that line.

Q. You didn't hear anything about the result there.

A. No.

Q. Okay. Do you think the death penalty -- well, let me change this around. How do you feel about the death penalty as a punishment for intentional murder?

A. I believe that's fair.

Q. Okay. And I want to add a couple of things into the equation. The intentional murder that's charged in this case is intentional murder of five different people. Two of the individuals are girls, little girls. Kandi Duncan was ten years of age at the time of her death, Amber Duncan six years of age at the time she died, obviously innocent victims. The law even can classify them as what we call vulnerable victims; okay? And so that -- would you -- in your mind is that a more aggravated situation than even intentional murder of adults?

631

A. Yes, I think so.

Q. In your questionnaire you were asked some questions about the death penalty.

A. Uh-huh.

Q. Question 75 was, What are your thoughts and opinions about the death penalty as a punishment for a person who is guilty of intentional murder? And you said, I think it is an appropriate punishment if found guilty without a reasonable doubt. There would have to be overwhelming evidence that a person had participated. Does that sound right?

A. Yes.

Q. I want to ask you one little quick question about the overwhelming evidence part. The government's burden in this

Page 136

case is the same, frankly, as if you got a parking ticket in Sioux City.

A.    Sure.

Q.    And you went to court and the judge was listening to the evidence and he'd bring in the meter maid and ask questions, and he'd have to make a decision was that proof beyond a reasonable doubt.  And I don't want to suggest to you even the slightest that this is anything close to a parking ticket; okay?

A.    Uh-huh.

Q.    But that burden is no different, frankly.  The government has exactly the same burden in this case, no more, no less.  And when you say overwhelming evidence, I just want to make sure is

632

proof beyond a reasonable doubt sufficiently overwhelming evidence for you?

A.    Yes.

Q.    Okay.  So those are equal concepts.

A.    Uh-huh.

Q.    All right.  And you said -- question 76, Why do you feel this way, or what are some of the reasons for your beliefs?  And you said, What gives a person a right to take lives and then live in prison for the rest of their life being taken care of? They do not deserve that kind of life after denying others.

      And I don't want to read too much into that, but it sort of suggests that if somebody has intentionally taken somebody else's life, that is, by that I mean they made a conscious choice, okay, to kill somebody else, that's -- to me when I read it, it sounds like, you know, prison is not really a sufficient punishment, that that's a person who made a choice to take somebody else's life and in the process they've also
      Page 137

forfeited their life, but maybe that's not right. What did you mean by that response?

A. Your response is pretty close.

Q. Okay. If somebody consciously or intentionally -- I should use the proper term -- intentionally made a decision to take somebody else's life, is it your view that the death penalty would be the appropriate punishment then?

A. Yes.

633

Q. I want to add these other factors back in now; okay? Now we're going to talk about children. The intentional killing of five people including two children, would the death penalty be the appropriate punishment for you?

MR. WILLIAMS: Objection, Your Honor, based on your prior ruling.

THE COURT: Sustained.

BY MR. BERRIGAN:

Q. In such a case, would the death penalty be in your view the appropriate punishment?

MR. WILLIAMS: Objection, same.

THE COURT: Sustained.

MR. BERRIGAN: May we approach?

THE COURT: Nope. You can rephrase your question to comply with my ruling.

MR. BERRIGAN: All right, sir.

BY MR. BERRIGAN:

Q. Let me turn it around the other way and ask it this way. In a case involving the intentional murder of five people including two children, do you have a view as to what the appropriate punishment should be in such a case as that?

Page 138

A.    It would be the death penalty.

Q.    Is life imprisonment in that kind of a case appropriate do you think?

A.    I'm sorry?  I didn't catch the last part of it.

634

Q.    In that kind of a case, is life imprisonment in your view at all appropriate?

A.    No.

Q.    The government is going to allege that not only is this a case of intentional murder, five people, two children, but they are going to allege that this is a case involving premeditation and substantial planning; okay?

A.    Uh-huh.

Q.    If that were found by a jury, if you were on a jury -- and I'm asking you to kind of imagine here, if you will, that you had heard all the evidence in the case and that you had made a determination that they had met their burden of proof beyond any reasonable doubt, not just you but you and your other jurors, all the stuff we've talked about, the intentional murders of five people, the children, now it's premeditation and substantial planning, what do you think the appropriate punishment in that kind of a case is?

          MR. WILLIAMS:  Objection, Your Honor.

          THE COURT:  Sustained.

BY MR. BERRIGAN:

Q.    If the government in a case showed intentional murder, premeditation, five victims, two children, substantial planning and premeditation, do you have a view as to the appropriate punishment?

A.    Death penalty.

Page 139

Q.    What about life imprisonment?

A.    No.

MR. BERRIGAN:  Thank you, ma'am.  Appreciate your time.

THE COURT:  Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Q.    Good afternoon, ma'am.

A.    Hello.

Q.    I just want to clarify some things with you concerning the death penalty and life imprisonment.  Do you understand, first of all, life imprisonment in the federal system means exactly that, life, the rest of your life?  You will die in prison.  Do you understand that, first of all?

A.    Yes.

Q.    Do you understand also that part of the decision of a jury in this case when they're ultimately asked, if they ever get to that point, to determine what the appropriate punishment would be, their task will be to weigh all of the facts in the case, not just facts that the defendant's counsel has raised with you here today but all the facts in the case and facts that you can think of as a juror on your own, things about the defendant's background, things about her role in the offense, things like that?

And your job will be to weigh all those facts together

636

to try to determine whether life imprisonment or the death

Page 140

penalty is the most appropriate. You will never be asked to vote just based on these two facts what's your vote. You're going to be given a number of factors. Your job is to weigh all those factors and determine what you believe is an appropriate punishment.

What we're looking for are jurors who know that they can go back and consider both possible punishments. They're willing to listen to all the evidence. They're willing to look at all the factors, not just were children murdered in this case, not just whether more than one person was murdered in this case but what is the defendant's background, what was her role in the offense, and look at all the factors and then determine whether life imprisonment is appropriate or whether the death penalty is appropriate.

Now, some jurors honestly come in here, and we absolutely respect their opinion. They have a religious belief against the death penalty, and they just say, Doesn't matter to me. Whatever the facts are, I could never do it.

There are other jurors who come in and certain facts such as the killing of children is just too much for them and they say, you know, I don't -- it's not going to matter to me honestly what her background is or what her role is in the offense. You tell me that she was involved in killing children. It's going to absolutely be the death penalty, and I won't be

637

able to do that weighing process. Can you share with us what your thoughts are on your ability to do the weighing process in this case?

A. Well, since I don't know, you know, everything that goes on and I don't know a whole lot about Angela Johnson or anybody as

Page 141

to what their role was, yes, I could see that because until you get all of the information you don't know.

Q. Do you think -- one of the questions of you in this questionnaire was, you know, do you think -- question 84, Do you think life imprisonment without the possibility of parole is severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder? You didn't check either box. You said, I'm unsure. I would need to know all the circumstances involved, who was involved, how they were involved. Is that still your position?

A. Yes.

Q. Is life imprisonment a sufficiently severe punishment at least in theory for you that you would seriously consider?

A. Yes.

Q. Fairly consider as a possibility even in a case where somebody -- let's assume you found the defendant guilty of killing five people including two little girls. Let's assume you got that far because we're not going to get to the penalty phase unless and until that happens. You found that. Is life imprisonment still a realistic possibility for you?

638

A. Yes.

Q. Would you be willing to look at the rest of the factors in the case?

A. Yes.

Q. And I want you to be frank with us. As Mr. Berrigan said, there is no right or wrong answers here. I don't want you to ever think, jeez, what answer is he looking for, and I'll make sure I give that right answer. I don't want you to feel that way at all. If you don't think you could give life imprisonment

Page 142

a realistic chance in this case if the defendant's found guilty of being involved in killing five people including two girls, then just say so.

On the other hand, if you think you can give that a realistic opportunity and you're willing to consider that as a realistic option, then we need to know that too. So you share with us what are your thoughts on that.

A. Well, you need to know the role of what she played in it. She might have known about it, but she didn't actually participate in it. There's a whole bunch of different extenuating factors I think to consider.

Q. Would things about her background be a factor you'd be willing to consider in determining whether having found the defendant guilty of these crimes -- and again, in our hypothetical, would things in her background be things you would still be willing to consider on that process of trying to figure

639

out death penalty or life in prison?

A. Such as?

Q. Things in her background. Maybe she didn't have a good education or she was abused as a child or any -- you know, come up with your own thoughts of what might happen. But can you recognize there may be things in her background that -- not to excuse the crime but that would be a relevant factor for you to be thinking about when you're trying to figure out should I sentence this person to death or would life imprisonment be sufficiently severe given these factors and other factors?

A. Yes, I think so.

Q. That's something you'd be willing to look at.

A. Yes.

Page 143

Q. The -- if you served on a jury that agreed -- let me do it this way. If you served on a jury that had to have agreed in order to get to the penalty phase that the defendant was guilty of these crimes and let's take it a step further and suggest now that you're on this jury, you've listened to the evidence, and you've gone back and you've deliberated. You've done that weighing process. You've now looked at her background. You've looked at what her role is. You've looked at some aggravating things, you know, the fact that children were involved as victims, the fact there was more than one person, and you're back there doing this weighing process and trying to figure out what's the appropriate penalty. Are you willing, first of all,

640

to consider both of those options?

A. Yes.

Q. And are you -- if you decide that the death penalty is appropriate and the rest of the jurors agree with you, you're going to have to sign a verdict form that would have the real effect of causing the execution of the defendant. Now, some people know coming in, I support the death penalty; I'm behind it, but what they mean by that is it's okay if somebody else does it. I know I personally -- when it comes down to it, I support it in theory, but I know personally I could just never sign a verdict form that would cause the death of another person. Other people know they can do that. Where are you at on that?

A. I think I could.

Q. In the appropriate case you could impose the death penalty.

A. Yes.

Q. Equally important, ma'am, absolutely equally important, in

Page 144

the appropriate case, could you determine even after somebody's been found guilty of killing five people including two little girls, could you still consider the possibility of life imprisonment without parole as a realistic option?

A.    Yes.

MR. WILLIAMS:   Thank you.   No further questions, Your Honor.

THE COURT:   Mr. Berrigan, would you like some

641

follow-up?

MR. BERRIGAN:   I'll be brief, Your Honor.

THE COURT:   No need to be brief in this instance.

MR. BERRIGAN:   I appreciate that, sir.

THE COURT:   You take what time you need.

EXAMINATION

BY MR. BERRIGAN:

Q.    There's two points I wanted to follow up based on the prosecutor's questions, ma'am.   One is I hear you saying you want to hear all the evidence; you'd be willing to consider all the circumstances.   I don't know that any juror would not want to do that; okay?

But I want to point out to you that the circumstances of the offense you mentioned -- I thought it was an excellent response -- Mr. Williams asked you if you'd consider, you know, Miss Johnson's role in the offense.   And you said, Sure, I'd want to know about that.   Maybe she knew about the crime and didn't participate in it; okay?

A.    Uh-huh.

Q.    That might not even be a crime.   What the government's alleging is that she did participate in it; okay?   If she didn't

Page 145

participate in it, we might not even get to this portion of the case where we're talking about punishment. What they're alleging is she did participate, and they're going to put on a great deal of evidence and try to convince the jury of that

642

beyond a reasonable doubt. And the jury's going to have an opportunity to listen to all the evidence at that point; okay?

But the theory -- theoretical concept we're trying to advance here is we're asking you to imagine yourself in a situation where that's actually happened. The jury has considered all the evidence including, you know, her participation, and they've made this decision about guilty, intentional murder, five people, two children. And then they're going to have to prove additional aggravating circumstances, the government will, in order for you to get to the point of talking about punishment. And those include the fact that these were two 10- and 6-year-old girls and perhaps that the murders were done with substantial planning and premeditation, that they were done with those concepts as well.

You could hear evidence -- Mr. Williams says, you know, would you consider evidence about her background and so on, but you may not hear evidence. You could be at the punishment phase of the trial left with the evidence that this conviction happened, it's been proved beyond a reasonable doubt.

Now, it sounds like to me at least -- you tell me; you tell us -- from your earlier responses when I was asking the questions, I had the impression that if that happened, okay, you'd listened to the evidence about how these crimes were committed, who participated, who did what, but if you had made a determination, look, Mr. Berrigan, these are five people you're

Page 146

telling me, two kids, intentional murder, that's it. That's the death penalty for me, not life in prison without parole. But tell us, is that true?

A. That I think that the death penalty would be -- if it was proven, probably yes.

Q. And this stuff about background and so on, if you didn't hear that kind of evidence given your response that you just gave me, if you didn't hear some kind of evidence about background or so on, are you telling us the death penalty would be your selection?

MR. WILLIAMS: Objection, Your Honor.

MR. BERRIGAN: I'm exploring the burden of proof, Your Honor.

THE COURT: Overruled.

BY MR. BERRIGAN:

Q. Did you understand my question, ma'am?

A. Not really, no.

Q. Okay. I'm sorry. We had earlier talked -- I don't want to belabor -- go back to the earlier questions because you're doing fantastic. But earlier we had talked about this proposition that if a person made a decision to intentionally take somebody else's life, I thought I heard you say they've made a decision to forfeit theirs.

A. Yes.

Q. Okay. That decision doesn't have anything to do with their

background. You know what I'm saying?

A. Yes.

Page 147

Q. It doesn't really matter if they were -- what their background was. If they made that call themselves, then that's the punishment. That's what I was hearing.

A. Well, their background leads them to where they got to that date.

Q. Where they made -- to the decision.

A. Right.

Q. Okay. I'm with you there. You would consider their background certainly in making a decision about whether they did what they're accused of.

A. Yes.

Q. But now, as we've pointed out, we've passed that hurdle; okay?

A. Uh-huh.

Q. Now does the background matter?

A. If I don't hear it, I don't know so . . .

Q. Okay. If you didn't hear it, do you at least have a conception in your mind as to what you think should happen?

MR. WILLIAMS: I'd object, Your Honor.

THE COURT: Why don't we finish up with this juror, and then we'll sort it out. But make the record you need to make. The objection's overruled.

MR. WILLIAMS: Thank you.

645

BY MR. BERRIGAN:

Q. I'm sorry. Did you understand my question?

A. Okay. So I don't hear the background and you're asking me --

Q. I think there may or may not be some confusion about when you're going to hear this background evidence; okay?
Page 148

A.    Uh-huh.

Q.    In this trial there's going to be a lot of evidence presented perhaps from both sides about what happened, who's guilty, were these murders committed, and so forth; okay?

A.    Uh-huh.

Q.    And as we've pointed out I think a number of times, the charges we're talking about are these very serious charges of intentional murder, five people, children, premeditation, planning.  You may hear evidence of the background of Angela Johnson or the defendant in that setting as to whether or not these crimes occurred, is she the person that did it, and so on; okay?  And I'm sure you would consider it because you've said that several times.

A.    Uh-huh.

Q.    But if you had considered it, okay, let's assume you did consider it, you considered all the evidence, and then you've come to this point where you've actually made a decision, yes, beyond a reasonable doubt killing of children intentionally, five victims, these murders are committed during the course of a

646

drug conspiracy or a continuing criminal enterprise, and they're done after substantial planning or premeditation.  I heard you saying that's enough for me; that's the death penalty, and the background after that is largely meaningless.

A.    Yeah.

          MR. BERRIGAN:  Okay.  I appreciate your candor, ma'am.

          PROSPECTIVE JUROR 52:  Thank you.

          THE COURT:  Mr. Williams, any follow-up questions?

          MR. WILLIAMS:  No, Your Honor.

          THE COURT:  Just hang on one second.  I may have a
                          Page 149

question or two for you.

PROSPECTIVE JUROR 52: No problem.

THE COURT: Let me ask you a question in a little bit different way. Based upon what the lawyers have told you about the case so far -- and that's not evidence; it's just their view of what some of the evidence in the case might be -- and based on what you read in the questionnaire, if you're selected to serve as a juror in this case -- and now here's a big if -- if the jury finds Miss Johnson guilty beyond a reasonable doubt on one or more of the ten charges and if the jury finds these gateway factors which I'm not going to explain, but that has to happen, then you get into the penalty phase, and you would hear evidence in the penalty phase, and then ultimately you'd go back to the jury room, and you'd have to decide the appropriate punishment which could be either one of two things: Life

647

imprisonment or the death penalty. Are you with me so far?

PROSPECTIVE JUROR 52: I think so.

THE COURT: Okay. Well, if you're not, let me know because that's pretty important. What -- is there something you didn't understand?

PROSPECTIVE JUROR 52: I guess are you saying we go through all the court trial and everything and we find her guilty and then during the penalty phase they come back with the background?

THE COURT: Right.

PROSPECTIVE JUROR 52: Okay.

THE COURT: They don't have to come back. The defense never has to put on any evidence, but there may be evidence of the background.

Page 150

PROSPECTIVE JUROR 52: Okay.

THE COURT: There might be evidence of her background that comes in from the prosecution too. You don't know. I don't know what the evidence is going to be in the penalty phase, but there will be some evidence in the penalty phase. I'm pretty confident of that.

PROSPECTIVE JUROR 52: Okay.

THE COURT: Here's my question for you. Do you think you can fairly consider both a life sentence and the death penalty, or are you leaning so strongly towards the death penalty that you really can't fairly consider the death

648

penalty -- I mean a life sentence? And that's okay. Nobody's going to criticize you for that view. But, you know, do you think you're leaning -- based on what you know so far, if it ever gets to the penalty phase, do you think you'd be leaning towards the death penalty?

PROSPECTIVE JUROR 52: Probably, yes.

THE COURT: Okay. How strong do you think you'd be leaning towards the death penalty?

PROSPECTIVE JUROR 52: Not that strongly. You know, it's one thing to say, yep, death penalty, pwew, but you've got to know everything about it, and I don't know very much about it at all. So until you actually go through and listen to it, you don't know.

THE COURT: Do you understand the basics of football?

PROSPECTIVE JUROR 52: Yes.

THE COURT: Okay. You probably know more about it than I do, although I actually played it years ago, not very well I might add. And this was an analogy that Mr. Berrigan
Page 151

used, and I think it's kind of helpful. In a football field, the 50-yard line is kind of the middle of the field, and if you could envision yourself in the penalty phase, consider that as a football field, where do you stand right now? Are you on the 50-yard line which you equally consider both? Are you kind of more down towards the goal line of the death penalty side rather than the goal line on the life sentence side?

649

PROSPECTIVE JUROR 52: I would think I'm more on the 50-yard line because you've got to hear everything before you can move whichever way you want to move.

THE COURT: Well, I'm just going to be as brutally honest with you as I can be; okay?

PROSPECTIVE JUROR 52: Okay.

THE COURT: It seemed to me -- and this is just my impression, but I'm going to share it with you. When Mr. Berrigan was talking to you initially, it seemed to me that you were almost on the death penalty goal line. You were pretty far down there.

PROSPECTIVE JUROR 52: Uh-huh.

THE COURT: Then when Mr. Williams had a chance to talk to you, you kind of moved back somewhere, and I'm having a very difficult time knowing where you're at in terms of whether you could fairly consider both penalties. You don't have to be able to fairly consider both penalties, but I need to know where you are on that issue. And when I say fairly consider, I don't mean just think, oh, yeah, life imprisonment, I'll consider it but, you know, I'll rule that out pretty quickly because I'm kind of leaning towards the death penalty. I mean even though you're leaning one way or the other, could you fairly consider,

Page 152

give great consideration to both a life sentence and a death sentence before you'd make up your mind?

PROSPECTIVE JUROR 52: I don't know if I could fairly.

650

You know, one thing that Mr. Berrigan said was the children being the vulnerable victims. They might be to where they were just there; they weren't involved in all the premeditation. But still with the children, I think I would have probably a hard -- harder time. I could consider it, but I would have a harder time for life imprisonment versus . . .

THE COURT: Because for you the impact of the death of two children is really a strong thing.

PROSPECTIVE JUROR 52: It's huge, yes.

THE COURT: It's huge, right. Could you fairly consider a life sentence, I mean, truly, fairly consider it? And it's okay if you can't. I just need to know really where you stand, and only you know. Maybe you don't even know. But if anybody knows, it'd be you. And if you don't know, that's okay too because like Mr. Berrigan said, we're asking you to kind of fast forward ahead to a stage we may never ever reach in this case. You know, the jury may very well find the defendant not guilty so we'll never have a penalty phase. But this is the only chance we have to question you now, so we have to find out ahead of time.

PROSPECTIVE JUROR 52: Sure.

THE COURT: So we have to go through all these contingencies. If the government can prove it beyond a reasonable doubt, overcome Miss Johnson's presumption of innocence, if the jury finds unanimously that that's done,

651

Page 153

unanimously finds gateway factors, then we get into the penalty phase.  But if we do get there, can you fairly consider a life sentence?

PROSPECTIVE JUROR 52:  I guess the death penalty is weighing a little bit more.  If you put them on the scales, the death penalty would be weighing a little bit more than the life in prison.

THE COURT:  And by a little bit more, what does that mean to you?

PROSPECTIVE JUROR 52:  Maybe 10 or 20 percent more, but, you know, until you hear all the evidence, you don't know.

THE COURT:  Would either side like to ask some follow-up questions?

MR. BERRIGAN:  None by the defendant.  Thank you, sir.

MR. WILLIAMS:  No, Your Honor.  Thank you.

THE COURT:  Okay.  If you'd step outside, ma'am, we'll let you know in a couple of minutes; okay?  Thank you very much.

(Prospective Juror 52 exited the courtroom.)

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  We would move to strike Juror Number 52, Your Honor.  I think it would be at least fair to say that she was inconsistent in her responses.  I sometimes think -- and the Court may disagree wholly, but when people are sitting down filling out these questionnaires, they're in their kitchen, and nobody's judging them -- that they give some of the most open

652

and honest responses that we see.  And I do think that's the case here.

Page 154

THE COURT: Can you point me to any specifics you're talking about in the questionnaire?

MR. BERRIGAN: Yes, sir. On question number -- 75 asks you about the death penalty. I'll get you the page, sir.

THE COURT: No, I'm there.

MR. BERRIGAN: Okay. The answer that follows immediately thereafter.

THE COURT: The 76 question, What gives the person a right --

MR. BERRIGAN: Yes, sir, 76. And then I also think question -- the response on question number -- I think it's 83 is illustrative, although I'll admit she gave some inconsistent responses to other questions.

THE COURT: Mr. Williams?

MR. WILLIAMS: To the extent that there's any inconsistent statements, it's on the grounds -- and I'm going to be objecting to and we'll be hopefully discussing -- is because of the stakeout questions that are being used by the defense. When the defense is saying here, I'm going to give you two facts; how you going to vote, jeez, on those two facts I'd vote for the death penalty if somebody just gave me those two facts and that's all I knew. And so I don't think you can take anything she said and say they were inconsistent.

653

When I and when you said, Look, there's a bunch of facts out here; are you willing to fairly consider both of them, she was consistent in saying, Yes, I am willing to consider both of them. She said at most she's 10 or 20 percent leaning toward the death penalty, and that doesn't disqualify her as being a valid juror. She said to me flat out she is -- and I said, Even

Page 155

though, you know, you found the defendant guilty of intentionally killing five people including two little girls, you know, can you still realistically consider life imprisonment, and she said yes.

Now, if we want to go to the questionnaire, answer to question 73, the first thing she says when she's asked, Do you have in your mind an appropriate penalty, she says, Life in prison. When she is asked, Do you believe in an eye for an eye, she says, No, not necessarily. It depends on the situation. She is asked, In your opinion is the death penalty used too often, an appropriate amount, too seldom? She says, An appropriate amount. It is a hard decision to use the death penalty. The person committing the crime needs to show remorse for what they did, not what they are facing.

On the life imprisonment question, she talks about that life imprisonment is appropriate if enough evidence is not shown for the death penalty.

This is not a juror by the questionnaire or by her questions that is on either goal post. She is by her own

654

description leaning slightly toward the death penalty, and that's all. And that's not somebody that's disqualified as serving as a juror in this case.

THE COURT: Mr. Berrigan, let me ask it this way, and if it's easier to sit down, you can just sit down.

MR. BERRIGAN: I'm used to this.

THE COURT: Why shouldn't I credit her last response that she gave me about I'm leaning, you know, 15 or whatever it was, 10, 15, 20 percent, but I'm open to both?

MR. BERRIGAN: Well, a very small part of that is --

Page 156

my position, to be consistent with the past, is because you're asking. But, you know, seriously, some jurors -- and we've seen this before -- when you ask them to consider all circumstances, what they're thinking about are the circumstances of the crime. So Mr. Williams is asking them about weighing the evidence and the defendant's background. And what I believe this woman was saying is absolutely I'm going to do that, and I would consider her background.

THE COURT: What does that have to do with the merits phase?

MR. BERRIGAN: Exactly, right.

THE COURT: Nothing.

MR. BERRIGAN: Exactly. But she doesn't know that.

THE COURT: I understand that.

MR. BERRIGAN: We do. She's thinking like -- we had

655

an earlier gentleman; you remember he said rage. I wouldn't give the death penalty in a situation of rage because that's what they're thinking about. We're talking about the circumstances of the offense. We're talking about mitigation and aggravation. They're thinking about what happened. And so of course she's going to consider everything presented.

But once she gets to this point where she's done that -- and I don't think it's unfair. The questions comport with the evidence, killing of five, two kids. They're the ones that are alleging premeditation, substantial planning. Those are all government allegations.

The point that she's there, she doesn't even need the substantial planning. If she got to that point, it's death. You've decided to kill somebody intentionally. You've decided

Page 157

to forfeit your own life. She's one of those folks. She'll consider every single thing up to that point. Everything you can give her, this woman, I truly believe, would consider it.

But once she gets to that point, this other stuff really is extraneous. And I think -- and it's nobody's fault because it happens a lot -- the jurors can't discern these questions as definitively as we're trying to make them.

THE COURT: No question about that.

MR. BERRIGAN: Right.

THE COURT: They don't think in phases like we do.

MR. BERRIGAN: Exactly, right.

656

THE COURT: They look at the whole ball of wax kind of.

MR. BERRIGAN: Exactly, Your Honor. And I don't believe for a moment that that woman was fabricating her responses or suggesting anything other than what she truly believes. She's just not on the same page as the rest of us. I think her beliefs are, you know, well, I wouldn't give the death penalty if this was a crime of rage. You might recall her response. She was going to give life for somebody who knew about the crime but didn't participate because that's how she's thinking. And I don't know that there's much to be done other than the Court will have to carefully analyze the responses.

But our position -- and if I haven't moved to strike her -- I guess I have -- is that at the very least this woman's substantially impaired about her views regarding the deaths of children. I'll point out she has two little girls herself, and undoubtedly that's affecting her views which I suspect it would for any of us. So I respectfully disagree with Mr. Williams'

Page 158

analysis. I think she should be stricken for cause.

THE COURT: Mr. Williams?

MR. WILLIAMS: I don't think there's a thing confusing about your questions, Judge, and in response to your questions, she understood that we're talking about after she found them guilty and you said, Where are you at, and she said, I'm in the middle of the ball field. And you clarified it a little bit

657

more, and she said, I'm leaning, I'm leaning 10 or 20 percent. There's nothing ambiguous about that. There's nothing ambiguous about your questions to her.

And with all due respect, I disagree that my questions were in any way ambiguous. I explained to her you found her guilty. Now are you willing to consider both options, and she said yes. It was only in response to limited facts given to her that she said, Well, yeah, if that's it, then yeah, I'd say death penalty. And that's just not fair questioning, and that's not fair to the jurors because they're not being told that they have the options and how they're going to be allowed to weigh these things.

So we disagree, and I think you just need to make the call. Thank you, Judge.

THE COURT: Well, here's my take on it. Her answers were far from, in my view, consistent. I think she has considerable confusion about the process. But -- and I know, Mr. Berrigan, you put no stock or faith in my questions whatsoever. I understand that. But I do, and that's just something we're going to have to agree to disagree on. And if I thought that she was just trying to answer my questions in a certain way or that I didn't actually believe the answer, I

Page 159

would sustain your objection.

But I believed her answer. I found her credible. And while it's certainly not free from all possible doubt in my

658

mind, that's not the standard. Do I have some residual doubt about this juror? Teeny bit, yeah. But on the standard of whether her views would prevent or substantially impair the performance of her duties in accordance with the instructions and their oaths, I find that she is not so substantially impaired. And, therefore, I'm going to overrule the defendant's challenge for cause to this juror.

Why don't we bring in Juror 52, and I'll let her know her status. Then we have to take up the question of the stakeout questions.

(Prospective Juror 52 entered the courtroom.)

THE COURT: Juror 52, here's your status. You're still in the jury pool, so we're going to bring you back later on this afternoon. I was telling jurors earlier it'd be about three o'clock. I'm going to up that to about four o'clock, maybe even a little later. We'll bring you back for some general questioning. And then after the general questioning, I'll let you all know each of your status; okay? Thank you very much.

(Prospective Juror 52 exited the courtroom.)

THE COURT: Okay. Please be seated. I think you did get into stakeout questions, Mr. Berrigan, and you obviously don't think you did.

MR. BERRIGAN: I don't think I did anything with this juror that's different than what I have been doing previously.

659

Page 160

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 573 of 3245

But if so --

THE COURT:  That just may be that the government didn't object earlier.  I don't know.  I'm not taking a position on that.  But I think when you say, Assume A, B, and C, how will you vote, that's a stakeout question as I defined it in my ruling, and I think they're prohibited.

MR. BERRIGAN:  I should not have used the term vote, and I agree that's not appropriate.  So if I did that, I just missed it, Your Honor.

THE COURT:  Yeah, and I think you -- there was no intent.

MR. BERRIGAN:  Right.

THE COURT:  I'm not even saying you did violate the ruling.  If you did, it was totally inadvertent.  I believe that.

MR. BERRIGAN:  I'll be honest.  When I sat down, I wrote Mr. Stowers a note asking what happened because I was clueless, but if it was vote -- and I may very well have done that.  I didn't mean to, and I --

THE COURT:  Well, you might not have exactly used the word vote, but if you didn't, you did everything but that, and it was clearly in my view a stakeout question.  Assume A, B, and C.  What would the result be for you?  That's what I'm saying you can't ask.  I'm letting you ask virtually anything else, but I did try and as carefully as I knew how to do it define what a

660

stakeout question was in my ruling to try and give some guidance.  And I think you crossed the line, and I'm also convinced it was a hundred percent inadvertent.  So anything
Page 161

else we need to add?

MR. BERRIGAN: Nothing by the defendant, sir.

THE COURT: Okay. You ready for Juror 797?

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 797 entered the courtroom.)

THE COURT: Juror 797, you just sit wherever you're most comfortable. And please be seated. We're going to start the questioning from the defense side of the table, and Mr. Stowers is going to lead off, and then we'll hear from one of the government lawyers.

EXAMINATION

BY MR. STOWERS:

Q. Hi, ma'am. How are you?

A. Fine.

Q. Good. We're going to be, as the judge told you I think this morning when you were last in here, talking to jurors individually about a couple of issues, and those issues are going to be the issue of your exposure, if any, to any pretrial publicity or information -- sometimes publicity is a loaded term -- that you may have heard about the case and then also your views on punishment; okay?

A. Okay.

661

Q. Can you hear me all right?

A. Yes, fine.

Q. All right. You're going to need to speak out loud so that our court reporter over here can get your words down.

Have you heard anything about this case at all?

A. No, not until I received the packet of information.

Q. Okay. And so your first information that drew your

Page 162

attention to this type of case was, in fact, the mail you received with the big questionnaire.

A.    Right.

Q.    Have you heard anything since then?

A.    No, I have not.

Q.    And you're from Sioux Center in Sioux County?

A.    Right.

Q.    Now, let's take it this way.  Do you understand that at the conclusion of this case -- and I say the conclusion which starts the confusion, so let me start my question again.  Let me explain to you that there's going to be -- basically for the purposes of our discussion today, there's going to basically be two parts of the case; okay?  And at the conclusion of the first part, part and a half we'll call it, you will, if you are a juror on this case, have made certain determinations; okay?  You following me so far?

A.    Right.

Q.    And essentially at that point in the case if you were

662

selected you would have determined that Angela Johnson over here was guilty and she had committed the crimes of which she is charged which are murders, five separate murders of five separate persons including two young children ages six and ten.  And those determinations would have been made based on the evidence you heard over this lengthy trial.  And you would have agreed that those things had been proven and established beyond a reasonable doubt.  Do you understand that?

A.    Yes.

Q.    And I know we haven't even started the case yet.  We haven't even picked a jury yet.  We're trying to do that.  So

Page 163

what we're trying to do, though, at this time is figure out your views about punishment because that's sort of the second half of the case; all right?

A. All right.

Q. So that's where we are now. We're here in our minds -- I say we; I'm asking you to get into that place -- thinking about this case as if you had convicted a person of these crimes that we just described, and you're now being asked to evaluate two punishments, and those punishments are life in prison without the opportunity of parole or the death penalty. And you are a juror on this case; okay?

A. Okay.

Q. Now, in your questionnaire you said a couple of things. You said in response to -- I believe it was question 75 that you

663

were not really opposed to the death penalty but that a life sentence without parole is a proper sentence for many persons. Remember that?

A. Yeah. It's kinda hard to remember what I put in there exactly but some . . .

Q. And then you said that you thought that multiple murders were cases where the death penalty should be considered; is that right?

A. That sounds about right, yes.

Q. Okay. So we're at that point in the case now in our hypothetical scenario where Ms. Johnson has been convicted of multiple murders. And now we're doing just that, considering the death penalty.

A. All right.

Q. And you went on to write in your questionnaire that the

Page 164

death penalty would be justified in cases of multiple victims and those where the lives of children had been taken. Do you remember saying that?

A. Some -- yeah, okay. I think there's a lot of different things that should be considered for that.

Q. Now, that was what I wanted to ask you. You're not saying in your questionnaire or are you saying in your questionnaire -- that's what I want to know -- that if we were at that point, Ms. Johnson having been convicted of multiple murders involving two children ages six and ten that you would go ahead and impose

664

theoretically under this hypothetical scenario a death sentence?

MR. WILLIAMS: Objection, Your Honor.

A. I --

THE COURT: Sustained. Rephrase the question.

BY MR. STOWERS:

Q. Would you consider at that point any sentence other than the death penalty?

A. Yes.

Q. And can you explain to me how it is you might approach that issue in your mind?

A. I guess I don't know exactly all the laws governing the giving of the death penalty in this state if there is -- I'm sure there's certain criteria that has to be met and it's not just the one thing. There has to be other things involved. I'm not sure everything that -- how it works. I guess it would just be according to what the law is on that.

Q. In your questionnaire you made reference to life without parole. And let me see what you said about that just to read it correctly. You were asked in question 82, What are your

Page 165

thoughts and opinions about life imprisonment as punishment for a person who's guilty of intentional murder? And you indicated, This is sufficient punishment in a lot of cases if it is life without parole. Can you explain to me what you meant by saying if it is life without parole?

A.   I don't -- I think you said something or the question asked

665

if it was a life sentence, and I think the life sentence should be without the parole.

Q.   Okay. And so -- I'm sorry.

A.   Yeah.

Q.   Did you finish your answer?

A.   Not -- I mean, I don't mean parole -- I mean, if you give a life sentence and it means parole after ten years, I'm not sure that it is.

Q.   Right. Oh, I see what you're saying. So the way that the question was worded which asked about life in prison, you wanted to make sure in your response --

A.   That it was life.

Q.   Without parole.

A.   Right.

Q.   Okay. And that's what we'd be talking about here.

A.   Okay.

Q.   Does that make you better understand the two options that would be under consideration?

A.   Yes.

Q.   At the penalty phase of this case?

A.   Right.

Q.   Either the death penalty or life without any opportunity for parole.

Page 166

A.    Okay.

Q.    And so are you then saying that in a case -- let me go back

666

then now that I think I understand.  In the case where there were multiple victims and children's lives had been taken, would you be willing to consider life without parole?

A.    Yes.

Q.    You'd also be willing to consider the death penalty.

A.    Yes.

Q.    Now, in doing that, I think you were asked a question about factors and how you would believe that factors that are not related to the crime but are related, for example, to the individual person whose fate you were considering might be considered by you.  Do you remember some questions like that?

A.    Yes, I believe so.

Q.    And I think at one point you indicated that -- and stated that sometimes persons' backgrounds, even though children I think you gave the same -- raised in the same home might be very different people as adults.

A.    Correct.

Q.    And so would you find it an appropriate or proper consideration for you to evaluate somebody's background whose fate you were considering in determining whether or not life without parole was an appropriate punishment versus the death penalty?

A.    Yeah, I think it's -- it's necessary to consider it all.

Q.    And, of course, we're not talking about excuses when we're talking about those things.  You understand that.

667

Page 167

A.    Right.

Q.    This would be on down the road after the person was convicted.  And the only options at that point again would be the life without parole or the death penalty.

A.    Okay.

Q.    And so I think some of your responses seemed to be in question 87 that you felt that you didn't think somebody should essentially be able to rely on their past life experience as a way of, quote, unquote, getting off the hook, if you will, for the crime itself; right?

A.    For the crime itself, correct.

Q.    But you do agree that their background, their upbringing, the way they were raised can affect the choices I think you said that they might make as an adult.

A.    Yes, it can.

Q.    Would those be factors that you would find it appropriate to consider for somebody in a case where you were evaluating punishment, life without parole versus the death penalty?

A.    Yeah, I think it would.  It wouldn't be for the guilt or innocence of the crime, but you might consider it more for the punishment, yes.

Q.    You did say something in your questionnaire which I wanted to ask you about in response to question 87.  The question asked you to review the situations below -- there was a list of them -- and then describe after each situation what effect each

668

situation might have on your thoughts and opinions about an appropriate punishment for a person guilty of intentional murder.  And one of the factors that you were asked to consider

Page 168

was that the guilty person assisted or encouraged the murders but was not the person who pulled the trigger. Do you remember that?

A. Vaguely.

Q. Okay. And you wrote in, Depending on involvement, comma, should be sentenced as if had pulled the trigger. What did you mean by that?

A. I guess if you assist somebody, I don't think that it's less than the person who actually had done it, I guess, depending on how much you assisted them or made it possible.

Q. So would you or would you not consider the degree of involvement that a person had in committing a crime for which you were evaluating whether they should be sentenced to death or receive life without parole?

A. Yes.

Q. You would consider that?

A. Yes, I think so.

Q. Could you tell me in light of your answer which said that they should be sentenced the same as if they had pulled the trigger?

A. Well, I guess you're assuming that if you're there and you're making it possible for them to commit the murder or -- I

669

don't know how much less involvement or, you know -- I guess I don't know exactly how to do that because you don't really -- there's so many different possibilities.

Q. Okay. I'm just trying to understand your questionnaire and your thinking about the person who, as you put it, pulled the trigger versus somebody who did not do that and what your thinking is in that regard which was expressed in this answer.

Page 169

Can you help us?

A. I guess I'm thinking, well, if you brought this person to the person with the trigger or with the gun and said -- you know, and stood by while they did that, you are just as guilty as the person that did it, you know, for that amount of involvement, for -- I don't know. I guess I can't think of a lesser amount of involvement that you would have.

Q. Well, again, we're here talking about punishment, and if somebody was a person who assisted another person in committing, for example, a murder, aided and abetted them, for example, they'd be convicted.

A. Right.

Q. And then you'd have to evaluate perhaps if it were a death penalty case how the role, if you want to call it that, played in -- how their role played in your analysis or evaluation of the appropriate punishment. What I'm trying to do is get some insight for us all on what your thinking is there in light of your answer.

670

A. I guess I don't -- I'm not -- I don't think you would do the death penalty for someone assisting in a murder that -- I don't think that would be happening. I'm not sure either.

Q. That'd be something you'd want to look at at least; is that right?

A. I doubt that there's -- I guess I don't think the death penalty would be appropriate for assisting if that's what you're asking me.

Q. Now, in a case where, for example, you had concluded that a person had merely assisted, aided and abetted, in committing a murder or multiple murders, would you be able to -- if the Court

Page 170

Q. told you that even though that's the case, the death penalty is still a possible punishment, would you be able to consider and evaluate that person before you in the trial as a possible death penalty candidate?

A. If the Court told me it was an appropriate punishment for this, yes.

Q. And you'd be able to do that fairly; is that correct?

A. Yes.

Q. And you would give that serious consideration in light of all the facts of the case; is that correct?

A. Correct.

Q. Together with all the facts about the person whose fate you were passing on as a juror.

A. Correct.

671

Q. Now, in this case if you're selected as a juror, you would -- and you got to this final part of the trial all the way two months down the road or more, okay, and Ms. Johnson had been convicted, you would then have to evaluate this death penalty issue. There would be some instructions from the Court on that. And you may at that point if you were evaluating that question be asked to consider some aggravating factors that the government has alleged in this case.

A. All right.

Q. And the government has to prove those beyond a reasonable doubt; okay?

A. Okay.

Q. And the judge would explain to you what that means, beyond a reasonable doubt; okay?

A. Yes.

Page 171

Q. And then you'd be asked to consider some mitigating factors that we might bring to your attention or that might exist in the case as well. Do you understand that?

A. Yes.

Q. And then you'd weigh those aggravating factors and any mitigating factors that you might find to exist; okay?

A. Correct.

Q. You're going to weigh those yourself.

A. Okay.

Q. Would you agree with me that you'd want to be highly,

672

highly confident, very confident, in the correctness of your decision about what the appropriate penalty should be?

A. Yes.

Q. Particularly if you were going to sign a sheet with your name on it agreeing with your 11 other jurors that Ms. Johnson should be sentenced to death.

A. Yes.

Q. You'd want to be very confident, wouldn't you?

A. Of course.

Q. And you could do that if you needed to, couldn't you?

A. I have never faced that situation, but yes, I'm -- I could do that.

Q. And you could also, if needed to, impose a life sentence if needed.

A. Yes.

MR. STOWERS: Thank you.

THE COURT: Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Page 172

Q.  Good afternoon, ma'am.  I'm going to be brief with you.  I just want to follow up on a couple questions.  One is can you imagine in your own mind circumstances where somebody who didn't pull the trigger might actually be more culpable than the person that pulled the trigger?  Can you imagine a situation, for example, where the person who pulled the trigger might not have

673

done it but for the person encouraging them, pushing them, urging them on to do it?

A.    Yes.

Q.    Can you imagine that kind of situation?

A.    Yes.

Q.    And so let me ask you this.  I think your answer to one of the questions is if the Court told me it was an appropriate punishment for -- and I think the question was an aider and abettor, then yes, you could consider the death penalty for an aider and abettor.

A.    Correct.

Q.    I will tell you -- and the judge will correct me very quickly if I'm wrong -- the judge will never tell you what an appropriate punishment is in the case.  The decision on what the appropriate punishment is is for the jury to decide.

A.    Okay.

Q.    The judge will tell you that the death penalty can be an appropriate punishment for somebody who aided and abetted or assisted or encouraged somebody else to commit a murder and so is life imprisonment without parole a possible appropriate punishment for that crime.  The judge won't tell you which one's the appropriate one.  That's the decision for the jury to make.

A.    Okay.

Page 173

Q. What I need to know is if the judge doesn't tell you which one's appropriate but tells you either one's appropriate and

674

it's up to you to decide on that stuff, could you realistically consider imposing the death penalty on somebody who didn't actually pull the trigger?

A. Yes.

Q. All right. And I think you were kind of asked this question, but I want to ask it in a slightly different way. If you were on this jury -- and I know we're having you imagine a lot of things. But imagine you're on this jury, you found the defendant guilty beyond a reasonable doubt of committing these crimes, and you've now heard additional evidence during the penalty phase. You and the rest of the jurors are back, and you're doing this weighing process. You now know all the facts. You're trying to figure out death penalty or life imprisonment. You're taking into account the role in the offense and the victims and the background or whatever else you decide you're going to take into account, and you've done that weighing process now, and everybody, including yourself, has decided we think the death penalty is appropriate; all right? Try to picture yourself there for a minute.

Now, when we talk to some jurors, they say, Yeah, I believe in the death penalty; I think it's an appropriate punishment. But what they really mean is for somebody else to impose. When it really comes down to it, yeah, if some other jury finds the death penalty in a case, I don't have a problem with that. I think it's appropriate. I think that's the right

675

Page 174

punishment for that case. But I know in my heart, I know in my heart, that if I'm on a jury and I have to sign my name to a verdict form the effect of which, the real effect of which, is that it's going to result in the defendant in this case being executed, they know in their heart I can never do that. I can never, ever sign that piece of paper.

Other people can look inside themselves, and they can say, If I got to that point and I thought that was the appropriate punishment and the rest of my jurors agreed with that that I could, if I thought that was appropriate punishment, sign my name to a verdict form to impose the death penalty. Where do you see yourself on that spectrum?

A.   I think I could sign it at that time.

Q.   In the appropriate case --

A.   Yes.

Q.   -- you could impose the death penalty.

A.   Yes.

MR. WILLIAMS:  Thank you very much.  No more questions, Your Honor.

THE COURT:  Any more questions?

MR. STOWERS:  No, Your Honor.

THE COURT:  Okay.  Juror 797, if you'd please step outside, I'll let you know your status in just a minute.  Thank you.

(Prospective Juror 797 exited the courtroom.)

676

THE COURT:  Any challenge for cause by the defense?

MR. STOWERS:  No, Your Honor.

THE COURT:  By the government.

MR. WILLIAMS:  No, Your Honor.

Page 175

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 588 of 3245

THE COURT: Okay. Thank you.

(Prospective Juror 797 entered the courtroom.)

THE COURT: Juror 797, you're still in our jury pool. Here's what's going to happen. We're going to bring you back later on this afternoon. I was hoping it was going to be about three. I think it's going to be closer to four along with a group of other jurors who are still in the pool. There will be some more questioning, and then at the end of the questioning I'll let you know your status at that time; okay? Thank you very much.

Next juror, please, 102.

(Prospective Juror 797 exited the courtroom.)

THE COURT: Could you hold that juror just for one second and close the door? Gene, close the door, please. Always close the door first. Thanks.

Do you want time limits on the remaining jurors, or do you want time limits on the group questioning?

MR. BERRIGAN: This particular juror I suspect is going to meet within any time limits you could possibly think of to impose. Having said that, Your Honor, I mean, I suppose we'd rather have --

677

THE COURT: What do you suggest?

MR. BERRIGAN: I'd rather have it on the general voir dire. I think we're going to finish this one quickly, and then we have three left, so my estimate would be -- obviously we'll have a break, but we probably at most have another 90 minutes of questioning on the outside.

THE COURT: Okay.

MR. BERRIGAN: So whatever that does for your

Page 176

perception of the time.

MR. WILLETT: Judge, if you want to impose a time limitation on me for my group questioning, I'll accept whatever you impose upon me.

THE COURT: Well, you better find out what I'm going to impose before you so graciously agree to accept it. I'm not expecting you to accept it.

MR. WILLETT: Judge, I've been in front of you enough, I'll trust your judgment.

THE COURT: Okay. Thank you. But you'll always have a chance to object to anything that I do.

MR. MILLER: I only ask that I have as much time as Al has.

THE COURT: That will happen. Let's bring the next juror in. Thanks.

(Prospective Juror 102 entered the courtroom.)

THE COURT: Juror 102, just pick any spot you're

678

comfortable with in the front row. And when you find a chair you like, your lucky chair, you can be seated, look for the lottery ticket underneath to see if there's a winner. I'm just kidding. And we're going to start off with questioning from Mr. Berrigan, and then we'll have one of the government lawyers question you; okay?

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, ma'am?

A. Good.

Q. First of all, we appreciate your patience in hanging around the whole day. The judge has given us this opportunity really

Page 177

in the hopes that this setting might make you a little less nervous and thereby willing to express openly and honestly your true feelings about the issues we're going to talk about which are very limited, frankly, and that's our goal. We're not going to criticize or judge your responses. They're your opinions, and you're entitled to them. Everybody in the room respects them greatly. We just need to know what they are because our job is to pick the best 12 people for this particular case; okay? You with me?

A. Uh-huh.

Q. There are really just two areas that we're going to talk about, and I think we'll do that briefly. And one was publicity or exposure to news accounts of the case before coming in today;

679

okay?

A. Uh-huh.

Q. And we have the benefit of your questionnaire. We thank you for doing that. And you said you were somewhat familiar with the case. Is that right?

A. Right.

Q. Okay.

A. Knowing the names, I mean, recalling, I mean, not that I know a lot about it. It just was familiar to me.

Q. And, in fact, you said you did not know enough to have formed an opinion about Miss Johnson's guilt or innocence.

A. That's correct.

Q. But if -- and I realize that might be a big if. But if she were found guilty of the intentional killing of five people including two children, you did have a fairly definite opinion about what the result should be. Would that be fair?

Page 178

A. Yes.

Q. And you checked yes on question 73 and said she needs to be punished by death.

A. Yes.

Q. And then you were asked some questions regarding the death penalty in the questionnaire. And question 75, What are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of intentional murder, and you wrote, Absolutely. Does that sound right?

680

A. Uh-huh.

Q. Does that accurately reflect your view?

A. Yes.

Q. And then you were asked on question number -- this would be 78, Do you believe in an eye for an eye, and you said yes. If they've murdered someone, they do not deserve to live, especially children. And I presume you meant if they murdered children.

A. That's correct, that's correct.

Q. And is that how you feel?

A. Yes.

Q. It sounds like that's a pretty strong belief, but do you feel pretty strongly about it?

A. Yes, I do.

Q. Okay. You were asked about your opinions about life imprisonment as a possible punishment for intentional murder, and the question didn't say anything about children, but you wrote, This may not be a severe-enough punishment. Is that how you feel?

A. Can you repeat that for me?

Page 179

Q. Sure. This is -- I'm reading question 82. What are your thoughts and opinions about life imprisonment as punishment for a person who's guilty of intentional murder? This may not be severe enough. Is that --

A. Yeah, I -- yeah, I feel that way.

681

Q. And the reason I said it doesn't mention children --

A. Right, right.

Q. -- because would there be any question if children were intentionally killed --

A. For life imprisonment?

Q. Yeah.

A. No.

MR. BERRIGAN: Okay. Appreciate your responses. Thank you, ma'am.

PROSPECTIVE JUROR 102: You bet.

THE COURT: Mr. Williams?

MR. WILLIAMS: Very briefly.

EXAMINATION

BY MR. WILLIAMS:

Q. And I just want to make perfectly clear in this case, your views are so strong that in your mind it doesn't matter what any other facts are in the case. If you were on a jury where a defendant was found guilty of killing -- intentionally killing children, you would automatically vote for the death penalty?

A. Yes, I would.

MR. WILLIAMS: Okay. Thank you. Your Honor, we'd move for cause.

THE COURT: Okay. Mr. Berrigan, you join in the government's motion?

Page 180

MR. BERRIGAN: Yes, sir.

682

THE COURT: Okay. Juror 102, you're going to be excused at this time. Thank you.

I'd ask you to do this. Even though I'm excusing you from jury service, because we have a couple hundred other potential jurors that may be coming in in the course of the next couple weeks, I'd ask you not to comment or say anything at all about this process to anybody until we have a jury selected and the trial gets underway; okay?

PROSPECTIVE JUROR 102: You bet.

THE COURT: Okay. Thank you very much, and good luck to you.

PROSPECTIVE JUROR 102: Thank you.

THE COURT: Thank you.

(Prospective Juror 102 exited the courtroom.)

THE COURT: Shall we take one more before we take a break?

MR. BERRIGAN: Certainly.

MR. WILLIAMS: Sure.

THE COURT: 717?

(Prospective Juror 717 entered the courtroom.)

THE COURT: In the front row, whatever seat you like. Pick your lucky seat.

PROSPECTIVE JUROR 717: Okay.

THE COURT: Oh, that's the hard question seat.

PROSPECTIVE JUROR 717: Is it really?

683

Page 181

THE COURT: That's one where they ask the tough questions.

PROSPECTIVE JUROR 717: Okay. I'm ready.

THE COURT: I'm just kidding.

PROSPECTIVE JUROR 717: I'm ready.

THE COURT: Good, good. And we're going to start off with Mr. Berrigan for the defense asking questions first, and then Mr. Williams for the government will get an opportunity to ask some questions.

EXAMINATION

BY MR. BERRIGAN:

Q. Good afternoon, ma'am.

A. Hi.

Q. You can see how easy this is going to be.

A. Okay.

Q. The judge decided that we'd question people one at a time in hopes that people would be comfortable, a little more comfortable, maybe not quite as nervous as they might be in a group setting. We hope that works. We don't know. But I will tell you that we are going to be asking you questions about a couple of different areas, and it's important that you understand the purpose of our questioning.

We understand and appreciate and would expect people to have views and opinions about these issues that we're going to cover. I mean, we -- none of us just rolled off the turnip

684

cart. And it's important for us to explore those with you, but we're not judging them.

Issues like the death penalty, for example, as you undoubtedly know, people have views over a wide spectrum in that

Page 182

particular area, and everybody's entitled to their views, you know, based on their life experiences and their upbringing, their religious beliefs. We respect everybody's views including yours greatly. We just need to know what they are because we're trying to pick the best 12 people for this particular case. And as you know, there are very serious allegations that are involved; okay?

A. Uh-huh.

Q. Okay. I'll ask you just a couple of questions about publicity because it doesn't look like you knew much about this case from the media. At least that's what the questionnaire indicates.

A. Right. No, I don't.

Q. Tell us what had you heard about it.

A. All I know about it is I just saw that Dustin Honken was -- and that's all I know -- is he was convicted of something on TV, and that's all I know.

Q. I think your questionnaire indicated that you got most of that information from television; is that right?

A. Yep, yep.

Q. And you did mention in the questionnaire that you knew that

685

Mr. Honken had been found guilty.

A. Uh-huh.

Q. Yes?

A. Yep. Of what I have no clue.

Q. Okay. I was going to ask you did you know what happened to him, that is, in terms of sentence?

A. No, no, no.

Q. You know, I remember when that case was going on there was

Page 183

quite a lot of publicity kind of during the trial. How often do you think you saw news accounts about Mr. Honken's case?

A. I don't remember anything. I was busy going to school at the time.

Q. I see that. You both work and go to school?

A. Yes.

Q. Let me see. I thought I made a note. Oh, you're a nurse.

A. Yes, yes.

Q. At the Community Memorial Health Center?

A. Uh-huh.

Q. And what are you going to school for?

A. I'm continuing my education as an R.N. I've finished that, and I'm working on my bachelor's degree in nursing.

Q. Good for you. And so that much -- we appreciate your sacrifice that much more in being willing to be with us.

Let me ask you just a few questions about your views about the death penalty; okay? You should understand if you

686

don't already that the charges that Miss Johnson faces are ten in number, but there are really five murders, and they're charged in two different ways. And lawyers are going to talk about those things later.

I only mention it because the murders are alleged to have been intentional murders committed during the course of a drug conspiracy or a continuing criminal enterprise or both, that two of these victims are young girls. Kandi Duncan was ten years old at the time she died, Amber Duncan six, and obviously innocent victims. And the government has further alleged that the murders were committed after substantial planning and premeditation, so these are serious charges. Would you agree?

Page 184

A. Uh-huh.

Q. Okay. If -- and it's a really big if; okay? This is a real artificial process in that respect that we're going to talk about punishment without there having been a trial. This woman hasn't been found guilty of anything. She's presumed to be innocent, and we're having all these questions about punishment. You know, we're concerned about that, but there's nothing we can do about it. We can't come back to you at the end of the case and ask you questions before the punishment part of the trial if we get that far. So we have to do it now; okay?

A. Okay.

Q. I don't want you to necessarily assume certainly anybody on the defense team thinks Angela Johnson's guilty just because

687

we're asking these questions; okay?

A. Okay.

Q. Tell me how you feel about the death penalty just generally.

A. I really don't have an opinion because it's -- it's never been part of my life I guess. And as a nurse, I'm there to save lives, not to hinder lives, but I really don't have an opinion on it.

Q. You kind of reflected that in your questionnaire response. I don't know if you remember all this stuff.

A. No, because . . .

Q. How long ago did you prepare this?

A. I don't know, but the hardest part was the -- it wasn't in numerical order, so I was going --

Q. Sorry about that.

A. That's cool.

Page 185

Q.   That was not our intention, I can assure you.

A.   That's cool.  That's cool.

Q.   Let me read this answer just so we have it on the record, and I'll ask you if it's accurate today; okay?

A.   Okay.

Q.   What are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of intentional murder? And you wrote, I'm on both sides of the fence.  Why should the murderer get to continue to live as the victim has no choices

688

now?  But then I think the accused, if kept alive, has to face those family members and has to deal with prison life which is no picnic.  Does that sound right?

A.   Yep.  I remember that, absolutely.

Q.   You know, I'm just kind of presuming you haven't spent any time in prison.

A.   Absolutely not.

Q.   This issue about facing the victims' family members, you know, there might be testimony in this case -- the government has the right certainly to present testimony from victims' family members.  They can come in and talk about how the loss of their loved one has affected them.

A.   Uh-huh.

Q.   And as you might imagine, particularly in a case of little girls, that could be fairly emotional testimony.

A.   Absolutely.

Q.   And one issue I wanted to ask you about is if you were selected as a juror, is that the kind of testimony that you could listen to and objectively evaluate?

A.   Yes.

Page 186

Q. It doesn't have any special place in our law. I mean, it's testimony just like any other testimony, and the jurors apply the same standards, if you will, in evaluating it. But that would ignore I think the legitimate tendency we all have to have compassion for people who have lost loved ones, particularly

689

little children. But you think you can handle that and evaluate it fairly?

A. Yep, absolutely.

Q. Do you think it would have any tendency to unduly prejudice you?

A. No.

Q. You were asked a question about the death penalty, whether you thought it was being used too often or too seldom. Let me see if I can find it here. In your opinion -- this is question 77. In your opinion is the death penalty used too often, an appropriate amount, or too seldom? And you checked too seldom and said, Habitual offender, why should they get a roof over their head, three meals a day, and a warm place to live? And I just wanted to ask you what you were -- particularly the habitual offender part interested me. What were you talking about or thinking about when you wrote that?

A. It's probably not at a high level but someone that -- just, for example, a drunk person, a drunk driver, one that gets arrested for drunk driving all the time, they go in jail, and they spend time, and then they're let out, and then they do it again, and they're let out, but I know that doesn't have a death sentence type thing.

Q. Right.

A. So . . .

Page 187

Q. That's a frustrating situation.

690

A. Yeah.

Q. You know, there's not an allegation about habitual offender here. This is a murder case; okay?

A. Right.

Q. But there is that other concern that's inherent in this response I think, and that is, you know, maybe people in jail have it a little too easy or people in prison have it too easy. And if you feel that way, let me tell you, you're not alone. There are a whole lot of people that have expressed these concerns in the three meals a day and television sets and weight rooms. And let me tell you, there's quite a list. I want to know if that's a concern for you.

A. As far as?

Q. As the prison really being a little too easy in terms of being a sufficient punishment.

A. I just think being locked up would be enough.

Q. Do you believe that life in prison without parole means life in prison without parole?

A. Not necessarily.

Q. You got some doubt about it; right?

A. Yeah, I do, I do.

Q. Let me just tell you right now, life in prison without parole in the federal system means life in prison without parole. You spend your last breath in prison, okay, just so that's completely put to bed.

691

A. Okay.

Page 188

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 601 of 3245

Q. Does that ease any concerns you might have of people getting a life sentence and getting out at some early point?

A. It eases it a lot, a lot.

Q. With that said now, okay, let me ask you this question. Is life in prison without parole a punishment that you would consider for a person who committed murders such as what are alleged here, five people dead including two children, intentional murders, these vulnerable victims killed after premeditation and substantial planning? Would you consider that punishment to be sufficient?

A. I think, I think.

Q. Okay. You know, part of the process is that the jurors are going to have an opportunity to consider not only those bad things that I just talked about but perhaps some reasons that the defense might proffer, evidence that we might give to you that we would hope you'd consider for going to life; okay?

A. Uh-huh.

Q. We call those mitigating factors. The government has aggravating factors such as the killing of children. That's vulnerable victims. Substantial planning and premeditation, that's an aggravating factor. And then we have this other side of the coin. An example of a mitigating circumstance would be something like no substantial criminal history; okay?

A. Uh-huh.

692

Q. And you're worried about habitual offenders, so you understand how not being a habitual offender might be something in your favor.

A. Right.

Q. One really broad area of mitigating factor is this. The

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 602 of 3245

defense can really offer any evidence of a defendant's background or character or the circumstances of the crime that we think warrants consideration of a life sentence; okay?

A. Uh-huh.

Q. That might include things like somebody's childhood. If it was a traumatic childhood where perhaps things such as abuse or neglect took place, we might ask the jurors to hear that evidence and consider it. Is that something you'd be willing to do?

A. Sure.

Q. Do you think that people's childhood experiences affect them later in life as adults?

A. There again, I'm on both sides of the fence.

Q. Okay. Tell me.

A. You know, we're all adults, and we can make our life, but I never grew up as an abused child.

Q. Sure.

A. So I don't know that side.

Q. Okay.

A. So there's always that one in a billion that it could.

693

Q. All right.

A. So . . .

Q. Let me -- I want to be clear about this point because sometimes I think I confuse people. When I'm talking about childhood experiences and maybe emotional or physical abuse, sexual abuse, neglect, I want to be crystal clear. Nobody is contending that's an excuse for the crime; okay?

A. Right.

Q. You with me on that?

Page 190

A.    Absolutely.

Q.    Just like your prior criminal record wouldn't possibly be an excuse for committing a crime, this isn't either.

A.    Right.

Q.    But it's a factor, a legitimate factor, that jurors are obligated to consider if it's presented to them; okay?

A.    Uh-huh.

Q.    That's why I asked you whether you thought these childhood factors might affect people's decisions, and I gave you their decisions, but it might affect the decisions they make later in life.  Is that something you would be able to do?

A.    I could deal with that.

Q.    Okay.  Do you have any hesitancy?

A.    No.

Q.    Okay.  Let me close up with this last proposition because I think this is new to people also in this position.  We watch

694

these trials on television, and we read them in the paper, Michael Jackson and O.J. and all this stuff.  And, you know, in large measure the jurors hear the evidence.  They make a decision has the state or the government proven the case beyond a reasonable doubt?  Do we all 12 agree?  And they make a decision, and, boom, the trial's over.  A lot of times the sentencing decision is left to the judge.  That's true in all federal cases except cases such as this.  And the trial's over with; okay?

A.    Uh-huh.

Q.    And so the jurors when they're talking about the case, they're making decisions as a single body.

A.    Uh-huh.

Page 191

Q. In this case if there's a penalty phase -- and again, it's a big if -- the jurors may be asked to consider these aggravating and mitigating circumstances. They're going to have to judge those for themselves. In other words, the mitigating circumstances, you don't have to agree on what's mitigating for you. You might decide, you know, I think this is a mitigating circumstance. Maybe Miss Johnson's role in the offense wasn't as great as I thought it could have been, or you might think this is a mitigating circumstance, her background. Some other jurors could disagree with you. That doesn't mean you can't consider them; okay?

A. Okay.

695

Q. You get to do that.

A. Okay.

Q. And then you have to weigh them with the aggravating circumstances the government's going to present, and those are the things we've already talked about. Those things you will have already agreed, all 12 of you, do exist. By the time we're talking about mitigating and aggravating circumstances, you've already decided about the aggravating circumstances; okay?

A. Okay.

Q. So you have to weigh those.

A. Right.

Q. And when you're coming to this decision, it's really important to understand it's not a numbers game. It's not like, hey, you got three mitigating circumstances, and those guys have two aggravating circumstances, so you win or vice versa, because you give whatever weight you want to these mitigating and aggravating circumstances; okay?

Page 192

A.    Uh-huh.

Q.    If -- the jurors, when they assess these things individually, they may not reach agreement.  In your conscience and heart you might come to a determination one way.  Another juror might come to another decision.  And the jurors aren't required to agree.  If they disagree, what the law says is that's a life verdict.  Unless all 12 people come in and say, Hey, we all agree; we've done this individual weighing, and we

696

think the death penalty's the appropriate punishment, there is no death penalty; all right?

If that happened, if that happened in a case, in any case, jurors sign a verdict form that says that's what we agreed, and that form is what, you know, will result in the death penalty.  Is that something you could do if you were selected as a juror, go through all of that process and weigh the evidence and make a decision yourself?

A.    Sure, yep.

Q.    If and only if -- and again, talk about big ifs.  But if and only if not only you but your other jurors agreed, you know, this was a death sentence, would you be willing to sign the form indicating that?

A.    Uh-huh.

Q.    Okay.  We would expect that to be a hard decision for anybody.

A.    Very much so.

Q.    Okay.  But it's important that you have to be fair to both parties.  The government only has to prove their aggravating circumstances beyond a reasonable doubt, not beyond all doubt; okay?  You can -- when you're making the weighing decision, all

Page 193

you've determined, those aggravating circumstances have been proven beyond a reasonable doubt. If you want -- we want you to be a hundred percent confident in the decision about life and death, but that hundred percent doesn't apply to the burden of

697

proof on the government. Do you understand that?

A. (Nodded head.)

Q. Those are two different things. When it comes to the final decision, you be as confident as you want to, but in terms of applying the rules of law and burden of proof and so on, can you follow the instructions the judge will give you?

A. Uh-huh, uh-huh.

MR. BERRIGAN: Okay. Well, listen, you've been great. Thank you very much.

PROSPECTIVE JUROR 717: Thank you.

THE COURT: Mr. Williams?

Thank you, Mr. Berrigan.

EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, ma'am. I'm going to be brief. I just want to talk to you about a couple things. One is you indicated earlier in response to one of the questions that you are trained to be a nurse. And part of that academic background and part of what they teach you there is your job is to save lives, not take them. You also I think indicated a couple different places in your questionnaire references to scripture.

A. Uh-huh.

Q. And struggled, I picked up from the questionnaire, with exactly what the Bible has to say with regard to the death penalty.

Page 194

A.    Uh-huh.

Q.    And here's where I'm at.  I've got a very good friend that I work with.  He's Catholic.  He is a fellow prosecutor with me, absolutely believes in the death penalty, thinks it's appropriate, supports it, thinks it ought to be out there.  But he knows because of his own personal value system, because of what's taught him in his faith, and because of his own beliefs, he knows he could never, ever, ever support the death penalty if he was the one who had to sign the piece of paper that caused another person to die.

And so it's one thing to believe yeah, I think it's -- the death penalty, I could consider that; I think that's an option.  It's a whole 'nother thing to struggle with your own value system.

In your case, you know, you're being taught to save lives, not end lives.  You are struggling with what scripture says about this issue.  If you ultimately served as a juror in this case and if you ultimately came to the conclusion that the death penalty was appropriate, you've done the weighing that Mr. Berrigan has told you about, and you've weighed the factors, and you've struggled with those issues, and you've considered both life and the death penalty, and you've concluded and so has every other juror concluded the death penalty is the appropriate punishment in this case, you're going to have to sign a piece of paper if you decide that's what you want to do and everybody

else does, in order to put your verdict into play, it would

require you to sign a verdict form reflecting that that's your verdict.

A.    Right.

Q.    If everybody did that, that would have the absolute real effect, not hypothetical but the real effect, of causing the execution of that woman.  Now, some people know that they can do that, and some people know they can't.  Where do you fall on that?

A.    I could do that.

Q.    In the appropriate case you could impose the death penalty.

A.    Or I could go with it.

Q.    And I was going to get to that.  And equally important, in the appropriate case, you could decide life in prison?

A.    Uh-huh.

Q.    That's yes?

A.    Uh-huh, yes.

Q.    She needs to take down yes or no.

A.    Oh, I'm sorry.  I'm sorry.

Q.    And what I hear from you at this point is you don't really have a firm feel at this point on whether you believe life imprisonment's appropriate or the death penalty's appropriate.

A.    Right.

Q.    In your questionnaire one of the questions asked you about a situation where a guilty person assisted or encouraged the

700

murders but was not the person who pulled the trigger, so I want to talk to you about that concept for a minute.

Going back to the scenario where you are having to try to figure out whether death penalty's appropriate or life in prison is appropriate, if the evidence showed in a case that the

Page 196

defendant didn't actually pull the trigger involved in these murders but was an aider and abettor of the person who did, could you realistically consider the death penalty as a potential penalty under those circumstances, or would that in your view be automatically life imprisonment if they didn't pull the trigger themselves?

A. Well, first of all, I wouldn't say automatically because you'd have to listen to all the evidence given first and then proceed from there, you know, what were the circumstances involved? You know, there's both sides of the fence kind of thing.

Q. Okay. And so could you realistically consider the possibility of the death penalty for somebody who aided and abetted somebody else who pulled the trigger?

A. I could if the evidence proved.

Q. Right, and nobody -- trust me, nobody's asking you to vote one way or the other.

A. Okay.

Q. We're asking you could you consider, realistically consider, that option at that point? And some people say, No, I

701

just couldn't do that. But you're saying --

A. Sure.

Q. And can you envision yourself situations where perhaps the aider and abettor might even be more culpable, more responsible for a murder, say a situation where the person who pulled the trigger might not have pulled the trigger absent the other person encouraging them, pushing them, cajoling them into doing it? Could you imagine that kind of situation?

A. I could see that happening.

Page 197

Q.    And what I'm hearing from you is you want to hear all the evidence in this case.

A.    Yep.

Q.    And you're willing to consider both options.

A.    Yep.

Q.    And in the appropriate case, you could impose the death penalty.

A.    (Nodded head.)

Q.    And in the appropriate case, you could also impose life in prison even though by this point you would have found the defendant had intentionally killed and let's just say intentionally killed five people including two little girls. You could still realistically and fairly consider life imprisonment as a possible punishment.

A.    Yes, sir.

        MR. WILLIAMS:   Thank you, Your Honor.

                                                    702

        THE COURT:   Thank you, Mr. Williams.

        Mr. Berrigan, any follow-up?

        MR. BERRIGAN:   No, sir.   Thank you.

        THE COURT:   Okay.   Thank you.   Ma'am, if you'd just step outside for a minute, we'll let you know what your status is; okay?   Thank you.

        (Prospective Juror 717 exited the courtroom.)

        THE COURT:   Any challenge for cause by the defense?

        MR. BERRIGAN:   None by the defense, sir.

        MR. WILLIAMS:   None by the United States, Your Honor.

        THE COURT:   Okay.

        (Prospective Juror 717 entered the courtroom.)

        THE COURT:   Juror 717, you're still in our jury pool,

                        Page 198

and we've got two more jurors to interview. Then we're going to bring the ones who are still in the pool back for some group questioning. Then at the end of the group questioning we'll let you know whether you're still in the jury pool or not at that point again; okay? Thank you. So hopefully we'll get to the whole group by about four o'clock, maybe a little earlier. Thanks.

(Prospective Juror 717 exited the courtroom.)

THE COURT: We're going to take our break now. Okay. Twenty minutes or whenever Angela Johnson is back in the courtroom, whichever occurs first. Thanks.

(Recess at 2:53 p.m.)

703

THE COURT: We ready for 146?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay.

(Prospective Juror 146 entered the courtroom.)

THE COURT: Juror 146, just grab any chair you feel comfortable in in the front row.

And everybody can be seated. And when you're ready, Mr. Berrigan, you can begin the questioning.

MR. BERRIGAN: Thank you. May it please the Court.

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, sir?

A. Good. How are you?

Q. Have you been called Juror 146 before today?

A. No, not before today. I've been called other things but not 146.

Q. I can imagine. The judge was gracious enough to give us

Page 199

this opportunity to talk to you individually for this purpose, that it's so important that we get people's two open and honest feelings about the issues we're going to talk about. He thought people would be more comfortable in this setting. I don't know if it's working. We're hoping. Some people have been nervous nonetheless, but I'd ask you to try to be as at ease as possible. It's important that you understand the purpose of the questioning. We are, none of us, here to judge your opinions

704

about the matters we're going to discuss.

A.   Sure.

Q.   The truth is issues like the death penalty, a lot of people have opinions, and they're different, frankly. And they're entitled to them. Some of them are based upon how they were raised and what their belief systems are. Maybe they have religious beliefs that affect how they view the death penalty. It doesn't really matter so much what their views might be affected by. We just need to hear them; okay?

A.   Uh-huh.

Q.   But before I ask you about the death penalty, you had maybe a unique situation amongst the jurors certainly we've talked to so far regarding publicity in this case.

A.   Yep.

Q.   I understand you're an on-air radio personality at KSOU.

A.   Correct.

Q.   I'm going to have to confess I'm not familiar with KSOU which would be no offense to the radio station because I live in Kansas City, but what kind of a radio station is that?

A.   It's an adult contemporary music format, but it's basically news and information station as well, so it's, you know, your

Page 200

basic run-of-the mill radio station.

Q.    And what specifically do you do at the radio station?

A.    I'm kind of a jack of all trades at the radio station.  A lot of what I've been hired for is to cover certain shifts.  My

705

background in college was to become in radio.  I have a news background as well.  I have filled in for the news director, a lot of political stuff, that sort of thing, deejaying, you know, so that sort of thing.

Q.    So this is a job you've not only trained for but you've educated yourself for.

A.    Correct.

Q.    And the news part, of course, are what we were interested in because you've indicated that you're somewhat familiar with this case as a result of the work that you do.

A.    Yeah.  I mean, I have read different stories.  I read a lot of stories.  I can't recall everything.  Ever since I got the notice I've tried to stay away from anything relating to that.  But, you know, I have read news, written news since then.

Q.    Were you working at the radio station last fall, late last summer and last fall?

A.    I was not, no.  I've been working there since August.

Q.    August of last year?

A.    Of this year.  Yeah, August of -- I apologize.  Last year.

Q.    I wasn't sure if I had the right year.

A.    I had it wrong.

Q.    You scared me there.  Well, you probably remember -- and I think your questionnaire indicates that you did -- that there were stories about Dustin Honken's case last summer and fall.

A.    Correct.

Page 201

Q. And this is a full-time job for you?

A. Yes, it is.

Q. You're there five days a week?

A. Yep.

Q. Do you recall reporting about Mr. Honken's case?

A. I do recall reporting on the stories. I know general specifics of what the case was about. I can't tell you exactly what all occurred other than . . .

Q. Okay. I'm not going to test you about that too much, but it's sort of the frequency of the coverage I was interested in. You know, my recollection -- even though I don't live here, we, of course, followed Mr. Honken's case as you might imagine, and it looked to me like there was almost daily reporting at least in the local paper and in a good many papers outside of the immediate metropolitan area, and although I didn't listen to the radio stations, I'm sort of guessing maybe that was true of them as well.

A. Yes. We get wire feed, and basically the Sioux City stories will feed in, and we'll read that. You know, quite often we don't cover specific stories in Sioux City, but there has been a couple occasions since I've gotten that that some stories have popped up that I've tried to avoid but caught some of.

Q. And I guess one of the things we're envisioning is that you're going to continue to work at your job --

A. Uh-huh.

Q. -- when you can during this trial.

A.    Correct.

Q.    And you yourself expressed a little bit of concern about that in your questionnaire I noticed.  And we really appreciate you doing this, by the way.

A.    Sure.

Q.    Question 94, Do you have any personal or professional obligations that you feel might prevent you from giving your full attention to this case at this time, and you checked yes and said, I sometimes have to read news stories that contain information about -- I think it says, About a case.

A.    Yeah.  My writing's bad.

Q.    Not that bad.  I will try to stay away from it, but working at a radio station, I'm bound to hear things about cases or read about them?

A.    Uh-huh.

Q.    And so obviously one issue is, you know, how would that work if you were a juror and there's reporting about the case that takes place?  You know, most jurors don't have these kind of issues where they're so directly involved in actually providing news coverage, but it sounds like you actually do the news sometimes.

A.    Once in a while, yeah, especially if I -- I work one Saturday a month.  I'm the news guy all morning, and whenever

708

the news director's gone, I am.

Q.    When that happens, when you're the news guy on Saturdays, because we won't be in court hopefully not too much on Saturday, you would be the fellow reporting.

A.    Correct.

Q.    And that news, I don't suppose you get to edit it?

Page 203

A.    In some ways I do, but, you know, usually you want to get the local things on, and Sioux City is local to us, so generally if it's coming out of Sioux City, it's usually newsworthy.

Q.    So this case specifically, would you anticipate much as in Mr. Honken's case that this would be newsworthy for the radio station?

A.    Sure it is.  It has been reported since I filled this out.

Q.    And it will likely continue to be.

A.    Oh, yeah, I'm sure it will.

Q.    And it seems like if you want to work, you're going to be involved in that.

A.    Or around it, yes.

Q.    Okay.  Let me ask you a little bit about the death penalty; okay?

A.    Sure.

Q.    First I guess --

THE COURT:  Could I stop you for a second?  Could I just see the lawyers at sidebar?

(At sidebar on the record.)

709

THE COURT:  I mean, it seems to me we ought to just let him go.

MR. BERRIGAN:  That's my position, sir.

MR. WILLIAMS:  I'm just not sure -- he looks on paper frankly as a wonderful juror on all the other aspects, but I don't know how he'd work around this issue.

MR. BERRIGAN:  We'd have to question him after every weekend.

THE COURT:  Right.  I just think it'd be fraught with potential problems.  I think he'd do his best to avoid it, but

Page 204

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 617 of 3245

he can't.

MR. WILLIAMS: Your admonition at the end of every day would have to be edited for him.

THE COURT: I think he'd be a great juror. I thought we'd just short circuit it.

MR. WILLIAMS: I'm with you. Thanks.

(The sidebar was concluded.)

MR. BERRIGAN: We appreciate your responses, sir. I think the judge will address our concerns with you, but thank you for . . .

THE COURT: Juror 146, we just had a rare moment in this case. All three of us agreed on something. And what we agreed on was -- we all said it -- you'd be a terrific juror, but it would be too difficult for you. We would be putting you in such an incredibly awkward position, and none of us think you

710

deserve that. So you'd be a great juror hopefully in another case that wouldn't generate this kind of publicity, but I think you'd just be in a very, very difficult situation, that it wouldn't be fair of any of us to put you in that.

PROSPECTIVE JUROR 146: I've been ducking news stories or trying to for the last couple of weeks.

THE COURT: And I appreciate it, but at some point your employer's going to say you need to do your job too, and it's a small -- is it up in Sioux Center?

PROSPECTIVE JUROR 146: Yes.

THE COURT: So it's probably a fairly small station.

PROSPECTIVE JUROR 146: Yes, it is.

THE COURT: Okay. Good. Thank you very much. Good luck to you. Thank you.

Page 205

(Prospective Juror 146 exited the courtroom.)

THE COURT: Ready for 621?

MR. WILLIAMS: Yes, Your Honor.

MR. BERRIGAN: Yes, sir.

(Prospective Juror 621 entered the courtroom.)

THE COURT: Juror 621, just grab any chair you're comfortable with in the middle there.

Everybody can be seated, and we're going to start with questions from Mr. Berrigan.

MR. BERRIGAN: Thank you, Your Honor. May it please the Court.

711

EXAMINATION

BY MR. BERRIGAN:

Q. Last but certainly not least, this is purely random that the order turned out this way, sir.

A. That's fine.

Q. Thanks for your patience. The judge has graciously allowed us to question people individually in the hopes that you might be less nervous than in a group setting. We don't know if it's working, but you let us know; okay?

A. Okay.

Q. The goal of this process really is to hopefully make people comfortable enough that they're willing to share with us their true feelings and honest beliefs about some of these issues and not to try to give us right or wrong answers or what you think we want to hear; okay?

The truth is, you know, these are issues that we all have opinions about, things like the death penalty. There's opinions all over the board based upon how we were raised or

Page 206

what our religious beliefs and convictions are or whatever. And everybody's entitled to their opinion. We respect those opinions very much, including yours; okay?

A. Okay.

Q. So we're not here to judge them, but we really do need to know them because we're trying to pick the best 12 people for this particular case; okay?

712

A. Okay.

Q. Why don't I deal with an issue first that looks like it's going to be very easy for us to work with, and that is publicity. We've been asking jurors whether or not they've kind of followed this case in the media or they know anything about it, you know, before they came in here today, so we need to ask you that. Have you followed it at all in the media or television, radio, newspaper?

A. Just what I've seen in the last couple days on the six o'clock news.

Q. What have you seen the last couple days?

A. Just said that jury selection started, and, you know, since I'd been selected to do that, you know, you're kind of alert a little bit more about it but didn't know nothing about it until I really received the summons to appear.

Q. When did you happen to get that summons, by the way?

A. Probably three, four weeks ago.

Q. And is that when you filled out your questionnaire?

A. Yes.

Q. And you got the Court's instructions at that time?

A. Correct.

Q. Okay. The questionnaire indicates that you had heard vague
Page 207

news reports, and I'm assuming that that was true at the time you filled out the questionnaire.

A.   Yes.

713

Q.   And you checked television as the source of your information.

A.   Yes.

Q.   Is that accurate?

A.   Yeah.

Q.   Do you get the paper?

A.   And, you know, you probably -- you know, you just remember vague things about stuff like that.

Q.   Okay.  Could you tell us with any detail at all any of the accounts or any of the things you recollect from these --

A.   None hardly at all.

Q.   And then the television segments you watched the last two nights on the nightly news, that was about the jury selection process?

A.   Correct.

Q.   Was there stuff -- a little bit of stuff, you know, about what the case was about?

A.   No, just whatever's on the news.

Q.   Whatever the news accounts were, did they put it in the context of what the charges were and who's on trial?

A.   It was a murder trial.

Q.   Okay.  It might have been just that I couldn't read your writings.  I apologize.  That might be me, not you.  You can see these glasses.  But let me ask you about this particular response.  There was a question number 67.  It says, What other

714

information have you heard about this case, Angela Johnson, or any of the victims or their family members?  Please describe.  And you had just the -- it looks like shock news, but I must be reading that -- just the blank news reports.

A.   Can I see that?

        MR. BERRIGAN:  May I approach the juror, Your Honor?

        THE COURT:  Sure, you may.

        MR. BERRIGAN:  Thank you.

A.   That's short news report.  Sorry.

Q.   That takes care of that.  Okay.  And you didn't at least at the time of the questionnaire form any opinions regarding the guilt or innocence of Miss Johnson.

A.   No.

Q.   Let me ask you a little bit about the death penalty; okay?

A.   Okay.

Q.   Let's just imagine just for a second you and I had known each other a long time and we were having a cup of coffee down at the local diner one morning and there was something in the paper about the death penalty and I turned to you and said, Hey, Juror 621, we've never talked about the death penalty in all the years I've known you, what do you think about the death penalty?

A.   It's properly warranted in severe cases.

Q.   When you say severe cases, what do you have in mind?

A.   Timothy McVeigh, you know.

Q.   Sure.  I don't know, you know, what you recollect from what

715

the judge told you this morning about the charges, but there are serious charges in this case.  There are ten counts of murder,

Page 209

although there are five people that are actually killed, and they're charged in duplicate under two different theories if you will. But two of the victims are little girls ten and six years of age.

A. Uh-huh.

Q. The government's alleged that Miss Johnson, my client, committed these murders intentionally; okay? Does that fall into the category of what you're thinking about in terms of serious cases?

A. Yes and no. I mean, it's serious, yes, but, you know, versus like mass murders, you know, it's probably not as serious as that.

Q. I gotta give you that it's hard to meet the standard, thank God, of Timothy McVeigh, but it's still a case that I think you should know the law certainly provides for the death penalty as a possible punishment.

A. Okay.

Q. And the other possible punishment is life imprisonment without parole.

A. Uh-huh.

Q. And I want you to recognize the artificial nature of this questioning because here's a woman who hasn't been tried for anything. She's presumed innocent. We're going to talk about

716

possible punishments regarding the charges against her; okay? I hope you won't get the impression that means I or any of this defense team think she's guilty; all right? But we don't have a chance to come back later after you hear the evidence and then say, Hey, Juror 621, what are your views about the death penalty?

A.    Sure.

Q.    This is it for us; okay?

A.    Yeah.

Q.    So let me ask you this question, kind of the flip side. What do you think about life without possibility of parole as a punishment?

A.    That's just about like the death penalty.  I mean, you have no -- no life there.

Q.    Do you believe it when I say life without parole?  And I guess the inference is that nobody gets out.  You know, you're in.  Do you think that's true?

A.    Oh, in -- you hear in some instances where people, you know, are there with life without parole and they do get out.  I can't name any offhand, but, you know, I'm sure there's some instances out there and everything.  But if it's life without parole, you know, that person should stay in prison for life.

Q.    Let me just suggest to you -- and I personally haven't had that experience of even hearing of it, but that doesn't mean that you're not correct; okay?  But let me tell you that in this

717

case and in federal court if you get a life sentence without parole, it means life without parole.  You spend your last breath locked in a federal institution.  Are we clear on that?

A.    Clear.

Q.    Okay.  And so if you had a concern -- you haven't said you did.  But if you had a concern about that being life without parole, I want to at least ease that concern; okay?

A.    Sure.

Q.    So let me ask you this, Mr. 621.  Is -- that kind of a sentence, life without parole, no possibility of parole, is that

Page 211

in your view a sentence that you'd be able to consider as appropriate for a crime such as the one that we're talking about here, five people intentionally murdered, two children ten and six years old, killed during the course of a drug conspiracy or a continuing criminal enterprise?

A.    Yeah, that'd be -- that would be a charge that would fit.

Q.    Okay.  You know, we talk to people all day about consider, consider, and I don't think we're real clear sometimes about what we mean, but what we really mean is we mean realistically consider that alternative, not just, oh, I'll look at that, but that's nonsense, Mr. Berrigan.  I think you kill kids, you get death.  We mean really, you know, really look at that and seriously consider it as a punishment.

A.    If proven guilty, that'd be a punishment.

Q.    Okay.  You know, you did mention this in your questioning,

718

and so let me just ask you about it, in the questionnaire. There's this kind of long question.  It starts off -- this is number 87.  Please review each of the situations listed below. After each situation describe what effect, if any, each have on your thoughts and opinions about an appropriate punishment of a person guilty of intentional murder.  I don't know if you remember that question, but then it has a series of factors, okay, and let me just review a few of them, the three you filled out.

A guilty person killed more than one person at a time, and you said life in prison.  The guilty person participated in the killing -- I'm sorry.  The guilty person was pregnant at the time of committing murder; you said life in prison.  And then the next one was the guilty person participated in the killing

Page 212

of children; okay? And you wrote death penalty.

A.    Uh-huh.

Q.    And I only bring that up given what you told me; okay? We are going to rely on what you tell us here, not on a piece of paper.

A.    Okay.

Q.    So despite what you wrote down on the paper, are you telling us that life in prison really is truly in your heart a viable consideration for a case in which children were killed intentionally?

A.    Yeah, uh-huh.

719

Q.    Okay. I want to briefly visit with you, sir, about this process that we're going to be engaged in before we finish, okay, because it's a lot different. I can't recollect. Have you been on a jury before?

A.    No.

Q.    Okay. And I see you run your own company, and you're undoubtedly a very busy guy, and we really appreciate you being here.

A.    Yeah.

Q.    And when the judge was talking about sacrifices, you're one of those people, and on behalf of all of us, thanks for that.

A.    Sure.

Q.    You know, in most cases you watch on television and we hear about in the news media, the jurors listen to the evidence. They make a decision has the government proven the case or the state beyond a reasonable doubt. If they have, guilty. If not, not guilty, case is over; okay? And the jurors have to agree, either way. They have to agree on guilt, or they have to agree

Page 213

on not guilty or else that trial's going to happen again. It's going to be a mistrial, what we call a hung jury, and other people will have to come back and make a decision. Are you with me?

A. Sure.

Q. This case is a little different, a little different. That's still true in the first part of this trial where the

720

government is going to present witnesses, lots of witnesses and exhibits, and they're going to try to convince the jury beyond any reasonable doubt that Angela's guilty of these crimes, of these murders; all right? The jury's going to analyze that evidence critically, and then they're going to go back at the end of hearing all the evidence, confer with their fellow jurors and make a decision, and it's the same decision that jurors would make in any case in this country: Has the government proven their case beyond a reasonable doubt? And if they have, then that means guilty, and if they haven't, that means not guilty. You with me?

A. I'm with you.

Q. If that happened -- and again, I understand you haven't heard any evidence in this whole process, this cart before the horse, but if something like that happened, then we're going to have a brief second part of the trial where the jury's going to be asked to look at evidence that they've already heard, and they're going to be asked to answer questions, and the questions have to do with whether or not gateway factors have been met. The judge is going to give you an instruction that says this is a gateway factor, and you jurors have to decide has it been proven beyond a reasonable doubt; okay?

Page 214

A. Okay.

Q. There's another factor that has to be proven called an aggravating factor. The judge is going to tell you these are

721

aggravating factors. He's going to say, You tell me. You go deliberate and tell me whether these have been proven beyond a reasonable doubt; all right? The judge doesn't determine any of the facts. You jurors do.

A. Sure.

Q. So again you're going to be asked to deliberate for the second time now and decide and come back as a group one way or the other yes, Judge, they've proven it beyond a reasonable doubt or no, they have not. But the process is a group process; okay?

A. Okay.

Q. You still with me?

A. I'm with you.

Q. I know it's late, and I appreciate you hanging in.

A. I'm fine.

Q. Here's the important thing now. We're making it now. If that happened, you got guilt, and we have these gateway and aggravating factors. Now we're going to talk about punishment, and there's going to really be almost a whole trial with new witnesses coming in and testifying all about what should the punishment be, the death penalty or life imprisonment.

A. Okay.

Q. The jurors are going to listen to that evidence just like they did the evidence earlier on in the case, and they're going to have to go back and make a decision, and the decision now is

722

Page 215

going to be literally a life-or-death decision.

A.   Okay.

Q.   When the jurors are making that decision, there are some very important distinctions from the earlier decisions that they're making that I want to talk with you about.

One is that the juror is making a decision -- who is making a decision about life or death to a large extent's doing that himself or herself.  That's a decision that is personal to the juror, not to the group, because each juror has to decide for himself or herself what factors weigh more heavily with them.  The government's going to have some factors perhaps.  The killing of two children is a factor.  That's a murder of vulnerable victims.  If they proved that the killings took place after premeditation and substantial planning, that's also an aggravating factor.  The defense could have mitigating factors or factors that would warrant consideration of life.  No substantial criminal history, would you think that would be a mitigating factor?

A.   If it's the first time, it probably would be, yeah.

Q.   Yeah.  The law -- that's what the law says.  It says if you have no substantial criminal history, then that's a mitigating factor.

A.   Yeah.

Q.   Would that be something you'd be willing to consider?

A.   Yeah, I would look at that.

723

Q.   One of the other potential considerations is consideration about the defendant's background.  Any information about the defendant's background or character or even about the
Page 216

circumstances of the crime that the defense offered as mitigating circumstances needs to be looked at and assessed by the jurors; okay? And when I say that, I'm talking about things such as a childhood involving perhaps abuse or neglect, sexual or physical abuse, things that may have caused this person to grow up differently than you or I perhaps. And the jurors are asked to consider those factors in making a decision about punishment as well; okay?

A. Uh-huh.

Q. Let me ask you this question. Do you think that things that happen to us in childhood have any lasting effects in terms of who we turn out to be as adults?

A. Yes, they do.

Q. Have you had any notable examples in your life, people that are close to you that you felt were affected by something that had happened to them as children?

A. Not severe, no.

Q. Okay. But you've certainly heard of that.

A. Yes.

Q. And I want to be clear, Mr. 621. Nobody's saying that's an excuse for anything; okay?

A. Sure.

724

Q. You need to understand that just because somebody was abused, that doesn't mean they get to go out and kill people; okay? It's not being offered as a defense to the crime.

A. Okay.

Q. It's being offered for the same way that no prior criminal record is offered. It's something to be considered in assessing what's appropriate in this case. You with me?

Page 217

A.    Yeah.

Q.    Okay.  And then the juror takes these mitigating circumstances, mitigating circumstances and aggravating circumstances, and just kind of like Lady Justice -- you know that statue with the blindfold?

A.    Yeah.

Q.    You weigh them.  It's not a group dynamic; okay?  It's your decision.  You're doing the weighing.

A.    Yeah.

Q.    And whatever the decision is in your heart and conscience that's true and just, that is your decision.

A.    Okay.

Q.    You're entitled to it.  It's entitled to respect by the jurors.  That doesn't mean that you don't take into consideration their views.  You understand?

A.    Yes.

Q.    They may have views about the evidence that you might want to know about.  We would expect you would.  But that decision's

725

your decision; okay?

A.    Yep.

Q.    There's never a requirement -- the law never says you have to vote for the death penalty.  Do you understand that?

A.    I understand that.

Q.    The law also -- the law also allows the jurors to disagree about this result.  We talked earlier about the other cases, and the jurors had to come back with one decision.  There had to be a consensus.  All 12 had to agree.  They don't have to agree on this; okay?  You with me?

A.    I understand.

Page 218

Q.    The law says if they don't agree, that is a verdict. That's a verdict for life because unless 12 people say death, there's not going to be death; okay?

A.    Okay.

Q.    All right.  Does that sound like a process that you can engage in?

A.    Yes.

Q.    All right.  I want to close with just these other couple of questions.  You know, jurors have a right to be as confident in that decision as they want to be.  That is, you're going to live with that the rest of your life if you're in that position as a juror, and you have the right to say, I want to be 100 percent sure in the decision I'm making about life or death.  Do you think that's fair?

726

A.    That's fair.

Q.    Okay.  That does not mean, however, that you get to hold the state to some different burden than the law requires or require more proof of them than the law obligates them to provide; okay?  The law provides that the government only has to provide proof beyond a reasonable doubt.  Whatever that is, that's the standard; all right?  It's not beyond all doubt. They have to provide the evidence of aggravating circumstances beyond any reasonable doubt.  They have to prove guilt beyond any reasonable doubt.

You get the parking ticket here while you're sitting here all day.  You go to court.  They gotta show beyond a reasonable doubt you're an overtime parker.  The standard doesn't change, and I'm not equating murder to parking, but that is important that you not hold them to a burden they don't have;

Page 219

okay? Are you willing to be fair to them and give them the burden the law gives them?

A. Yes.

Q. All right. And then, you know, you could be in a position perhaps where you made a determination in a particular case that in your heart and conscience death penalty was the appropriate verdict because you had determined that the aggravating circumstances outweighed the mitigating circumstances and you thought that was an appropriate verdict, and your other jurors could agree. They may have done their own weighing and come to

727

the same conclusion. And if everybody agreed, then that would be a verdict for the death penalty, and you'd be obligated to sign a form that indicated as such that would be given to the Court. That's part of this process as well; okay?

A. Okay.

Q. If -- and I know that's a huge if -- but if you were ever in that situation where you've gone through all of this very careful analysis and deliberation and weighing and so on and that was the situation, would you be able to sign such a form as that knowing that that would be, you know -- that would be the result, that this isn't a game? If that's a verdict, that's what's going to be carried out; okay? Would you be able to do that?

A. Yes.

MR. BERRIGAN: Okay. Well, you've been very patient with me, sir. Thank you very much.

THE COURT: Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Page 220

Q. Good afternoon, sir.

A. Hi.

Q. I'm C.J. Williams. I'm one of the prosecutors in the case. We met earlier today, but it's been a long day. I will be very brief with you.

I want to go back to some of the questions or answers

728

you gave earlier and just explore these a little bit. When you were talking earlier on about cases where you believe the death penalty might be appropriate, I think you gave the example of Timothy McVeigh.

A. Yes.

Q. And some people come at this issue of the death penalty and they recognize that it's a needed punishment. I think you've indicated that. And they believe in the death penalty. But they have in their own mind a category of cases for which the death penalty is appropriate. And if it doesn't fall into that category of cases, then they're really not thinking of that type of case for the death penalty.

So when you say Timothy McVeigh, Timothy McVeigh killed 168 people including a bunch of children in that case. What I'm concerned about is for you to consider the death penalty are you needing something equivalent to a Timothy McVeigh type of crime, some type of mass murder for you to realistically consider the death penalty?

A. No.

Q. In a case like this the judge will instruct you that if we get to the point where we've proven our case beyond a reasonable doubt that the defendant intentionally killed one or more people as part of a drug conspiracy or a continuing criminal enterprise

Page 221

and if we prove to the satisfaction of the jury certain
aggravating factors, gateway factors that make it available, the

729

judge will instruct you that that is a possible punishment in
this case. Killing a single person intentionally as part of a
drug organization or as part of a CCE, a continuing criminal
enterprise, can be a crime that could carry the death penalty.

A. Okay.

Q. Could you realistically consider imposing the death penalty
in a case like that?

A. If the -- you know, if it was severe enough, yes.

Q. Okay. And I just want to make sure we're on the same page.
Severe enough to you doesn't require a mass murder. It doesn't
require a hundred, two hundred victims or something like that.

A. No.

Q. All right. And I didn't think that's where we were, but I
just wanted to make sure we were on the same page.

Likewise, if the evidence in this case demonstrated
that the defendant didn't pull the trigger, wasn't the person
who actually pulled the trigger on the murders but was an aider
and abettor of the murders, could you under those circumstances
realistically consider the death penalty as a possible
punishment for somebody in those circumstances?

MR. BERRIGAN: I'm going to object, Your Honor. I
think this is misleading given there's no discussion about
aggravating circumstances, gateway factors, weighing, or
anything else. Just a suggestion that if somebody who aids and
abets could be subject to the death penalty is wrong and

730

Page 222

misleading.

THE COURT: Overruled.

BY MR. WILLIAMS:

Q. Did you understand my question, sir?

A. Yeah. You meant that if they didn't pull the trigger could I impose the death penalty?

Q. Could you consider imposing the death penalty?

A. And again, it would depend on some of the evidence.

Q. Okay. And that's all anybody would ask of jurors is that they not have categories that they're just blocking out. In other words, if you're telling me that you have not already blocked out the one, well, jeez, if the person didn't pull the trigger, I've already decided I could not even consider the death penalty, but you're saying you could.

A. Depending on evidence.

Q. Sure. And you want to hear -- you'd want to hear -- just as Mr. Berrigan explained to you, there's going to be a lot of things that you're going to be asked to weigh. You want to hear all the evidence. But you haven't just automatically struck out the idea of considering the death penalty for somebody who's an aider and abettor.

A. No.

Q. And can you consider or imagine, sir, a situation where somebody who didn't pull the trigger could be more culpable than the person who pulled the trigger? For example, the person who

731

pulled the trigger in the murder wouldn't have done it if the person aiding them wasn't saying do it or encouraging them or pushing them along. Could you imagine a situation where --

Page 223

MR. BERRIGAN: I'm sorry. I really am. I object, Your Honor. That is not an aggravating circumstance, nor is it a qualification for consideration of murder as a possible punishment.

THE COURT: Even if you're right, it doesn't make the question impermissible, so the objection's overruled.

BY MR. WILLIAMS:

Q. Can you imagine a situation where an aider and abettor could be more culpable than the person who pulled the trigger?

A. Yes.

MR. WILLIAMS: All right. I have no further questions, Your Honor.

THE COURT: Sir, if you'd just step outside for a minute, I'm going to let you know your status.

PROSPECTIVE JUROR 621: Okay.

THE COURT: Yes.

PROSPECTIVE JUROR 621: I have a trip planned leaving the 21st of April and be back the 30th of April. I don't know if that's a problem with this or not. I'll be in Florida at the time, so I just want to throw that out there.

THE COURT: Well, it could be a problem depending on when we get the jury selected. What's the purpose of the trip?

732

PROSPECTIVE JUROR 621: I belong to a YPO group that we're having a forum retreat in Key West. Then I'm visiting my family after that in Tampa. So it's not a dire emergency or anything, but we have tickets bought already so . . .

THE COURT: And even the nonrefundable tickets actually -- I mean, I -- what's today? The 14th?

PROSPECTIVE JUROR 621: Yes. I would be back in town

Page 224

April 30.

THE COURT: What do the lawyers think?

MR. WILLIAMS: Your Honor, I think it may be a close call on when we get this jury selected. It may be perfectly fine, and we may not have it done by then, or we may be ready to go a day or two before that. I'm not sure what kind of flexibility he has to change -- for the juror to change the time coming back.

THE COURT: Generally nonrefundable tickets are a misnomer. For a hundred bucks you can change the return date.

PROSPECTIVE JUROR 621: Yep, that's right.

THE COURT: Here's my best guess unless the defense wants to weigh in. Do you want to weigh in on this one?

MR. BERRIGAN: No, sir. I really think this is kind of uniquely your call. I'll be surprised if we were going to start before April 30, but it certainly could happen, and who knows?

THE COURT: Here's my guess. I wouldn't be shocked if

733

we started after April 30. I'm obviously not willing to hold up the whole trial for one juror, and I think you can appreciate that.

PROSPECTIVE JUROR 621: Yep.

THE COURT: Worst-case scenario, you could clearly go, but I might ask you to try and come back a couple of days early.

PROSPECTIVE JUROR 621: Yeah. It's just -- so they'd leave a voice mail or something instead of a letter because we're not going to get our mail.

THE COURT: Right. If you survive today, before you go home, will you do me a favor?

Page 225

PROSPECTIVE JUROR 621: Sure.

THE COURT: If you survive today, I'm going to hook you up with my -- if you just tell me, I'll write it down and lose it. But if you tell Carey, my law clerk, can you give us a cell phone number or something?

PROSPECTIVE JUROR 621: You bet.

THE COURT: And then we'll be able to call you. We'll give you as much of a heads-up as possible. But I want you to go on the trip. It may be -- we may not be ready to go by the 30th.

PROSPECTIVE JUROR 621: That's fine.

THE COURT: It's probably better to go and come back a couple days early than not go at all.

PROSPECTIVE JUROR 621: It's just FYI.

734

THE COURT: Because you're making a sacrifice, and whether you get selected or not -- this will be my only chance to tell you this -- several of my closest friends in this community own mid-sized businesses about the size of yours. I know what an enormous -- and I mean that -- what an enormous sacrifice this is for you. You easily could have taken yourself off this morning. Nobody would have batted an eye at it. So I just want you to know how incredible your willingness to serve is, and it just means a whole lot to me. Just step outside, and we'll get you back here in about 30 seconds.

(Prospective Juror 621 exited the courtroom.)

THE COURT: Okay. Any challenge for cause by the defense?

MR. BERRIGAN: No, sir.

THE COURT: Any challenge for cause by the government?

Page 226

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Now, how much time do you want for general questioning? And, Mr. Willett, I'm fairly confident you are not going to be able to use your line that you've always been taught or told or you always engage in the practice of asking every juror a question. I don't think you're going to have enough time to do that.

MR. WILLETT: I agree.

THE COURT: You may.

MR. WILLETT: No, I agree with you.

735

THE COURT: You're going to have to be like the Fed Ex commercial guy if you're going to do that.

MR. WILLETT: No, I agree, Your Honor. It was not my intent to make sure I spoke to every juror.

THE COURT: Would 20 minutes be -- would you feel unduly crimped at 20 minutes?

MR. WILLETT: No, Judge, I don't. I would appreciate it if someone in a gentle way would give me a couple minutes' notice.

THE COURT: Would you like a two-minute gentle warning?

MR. WILLETT: I would like a two-minute gentle warning so I'm not sitting there like a deer in the headlights at 19 minutes and 45 seconds.

THE COURT: I'm going to tell the jurors ahead of time I'm going to give a two-minute warning.

MR. WILLETT: Okay.

THE COURT: Mr. Miller, would you feel unduly crimped by 20 minutes?

Page 227

MR. WILLIAMS: We'll do 20.

THE COURT: Ready to have all the jurors brought in? I guess we need to -- we need to bring this juror in, and then we'll just have him stay and have the other jurors come up.

(Prospective Juror 621 entered the courtroom.)

THE COURT: Juror 621, you're still in our jury pool,

736

but we've got some group questioning that's only going to last about 40 minutes. And when we're done with the group questioning, I'll let you know your status after today. So you can just go -- be ready in your spot, and we'll have all the other jurors brought up.

MR. WILLETT: Judge, will the jurors go back to their chairs they were in?

THE COURT: Yes, if they remember. And, Gene, could you let the jurors know we want them in their original chairs if they remember? If not, we'll help them. Carey, you want to take the seating chart over there and help anybody who gets lost?

(Panel C entered the courtroom.)

THE COURT: I'm going to ask you to return to your original seats or as close as you can. Some folks are gone because they've been dismissed.

Okay. Please be seated. Members of the jury, we're going to have some general questioning now. Because of the lateness of the hour, I've limited each side to 20 minutes, and they've asked for a 2-minute warning, so if you hear me give the 2-minute warning, you'll know why I'm giving it.

Mr. Willett.

MR. WILLETT: Chief Judge Bennett, if it please the

Page 228

Court, counsel for the government, counsel for the defense, Miss Johnson.

737

Good afternoon, ladies and gentlemen.  Obviously if you just hang with me for 20 minutes, I'm going to be done.  So if I speak just a little fast, forgive me, and I'll apologize to our court reporter later.  But there's a few concepts I want to make sure I get through with you.  I'm sure you had ample time while you were sitting in a different part of this courthouse to review the potential witness list.  Did everybody review the potential witness list?  And I'm seeing nods of affirmation, so I assume that to be true.

Mr. 55, you read that witness list?

PROSPECTIVE JUROR 55:  (Nodded head.)

MR. WILLETT:  Thank you very much, sir.  Now then, let me discuss with you some of the names on that list, and these are family members of my client.  Pearl Jean Johnson of Mason City.  My client Angela has three sisters:  Wendy Jacobson, Holly Dirksen, and Jamie Jo Hays.  My client has a brother, Jim Johnson.  My client has two daughters, Alyssa Johnson and Marvea Honken.  And believe it or not, my client is a grandmother.  She has a granddaughter whose name is Angeleah.

Now then, those are some of the names you would have seen on that witness list.  Does anyone think they know any of my client's family members who I've just listed off to you?  And I see no nods of affirmation.

Second question, did anyone see a name on the witness list besides the names that I've just discussed where you go, I

738

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 642 of 3245

recognize that person or I think I recognize that person or maybe I recognize that person? Any witness names and recognition by any of the remaining members of the panel here? And I'm seeing no nods of affirmation.

Now then, I would like to discuss just a few concepts with you. In fact, hopefully in the next few minutes I can discuss three concepts with you. During your individual voir dire, you heard the term burden of proof, presumption of innocence, and beyond a reasonable doubt. And those are all concepts that are very, very important to the merits phase of the trial, the first phase of the trial.

So if I asked you, Mr. 504, who had the burden of proof in this case to prove or to attempt to prove my client's guilt, who would you tell me has the burden of proof?

PROSPECTIVE JUROR 504: Government.

MR. WILLETT: Okay. Very good. You passed that part of the quiz. And, Mr. 621, if we --

THE COURT: And wait for the microphone too.

MR. WILLETT: I apologize, Judge. I apologize.

THE COURT: That's okay.

MR. WILLETT: If you'd pass the microphone down to Mr. 621. And, Mr. 621, if I asked you which party to this case enjoyed the presumption of innocence, who would you tell me enjoys the presumption of innocence at this stage?

PROSPECTIVE JUROR 621: Plaintiff's side -- or your

739

side.

MR. WILLETT: Which would be the defendant's side.

PROSPECTIVE JUROR 621: Defendant's side.

MR. WILLETT: So would you agree with me that Miss

Page 230

Johnson has the presumption of innocence unless or until the government meets its burden?

PROSPECTIVE JUROR 621: Correct.

MR. WILLETT: And if you would be so kind as to hand the microphone to Miss 717.

And, Miss 717, based upon your discussions earlier this afternoon, what is that burden of proof? What's that called? Beyond a reasonable doubt?

PROSPECTIVE JUROR 717: Yeah.

MR. WILLETT: And do you understand that the government -- if they can prove my client guilty of any of the ten counts that Judge Bennett has mentioned to you in passing, that it has to be by proof beyond a reasonable doubt?

PROSPECTIVE JUROR 717: (Nodded head.)

MR. WILLETT: And is that a yes?

PROSPECTIVE JUROR 717: Yes, sir.

MR. WILLETT: And does that make sense to you, ma'am?

PROSPECTIVE JUROR 717: Yes.

MR. WILLETT: And, Mr. 621, do you have any problem with the fact that my client is presumed innocent?

PROSPECTIVE JUROR 621: No.

740

MR. WILLETT: In fact, does any member of the remaining panel have a problem with that? Would you pass the microphone down the row, and Miss 52's going to pass the microphone back up to Mr. 653 I believe if my glasses are coming in clear.

PROSPECTIVE JUROR 653: Yes, sir.

MR. WILLETT: Mr. 653, do you have any problem with who has the burden of proof in this case?

Page 231

PROSPECTIVE JUROR 653: No.

MR. WILLETT: Do you understand why the government would have the burden of proof?

PROSPECTIVE JUROR 653: Yes.

MR. WILLETT: Why would they have the burden of proof, sir?

PROSPECTIVE JUROR 653: Because the person is innocent until proven guilty.

MR. WILLETT: Very good. If you'd hand the microphone to Mr. 55 for a second.

And, Mr. 55, do you have any problem with the prospect that my client's presumed innocent until this burden is met or if it's met?

PROSPECTIVE JUROR 55: No.

MR. WILLETT: I'm going to switch subjects, but I want you to hang on to the microphone; okay? Now then, the driving force in this case is murder; okay? That is the driving force

741

in this case, but there's a very solid undertone of a completely separate issue, and that's illegal drugs and specifically methamphetamine.

Now then, I think it's fair to say that we've heard about that drug in this state, that that's a drug that there's been a lot of discussion about, a lot of effort made by prosecutors to attempt to curb for lack of a better word.

So, Mr. 55, when I say the word methamphetamine to you, what do you think?

PROSPECTIVE JUROR 55: It's a nasty drug.

MR. WILLETT: Okay. Now, that's the nasty drug that's in this case; okay? The conspiracy that may have been mentioned

Page 232

early this morning involves five of the criminal counts against my client, and that conspiracy or that criminal agreement has to do with the making of or the delivery of methamphetamine; okay?

PROSPECTIVE JUROR 55: (Nodded head.)

MR. WILLETT: Can you give my client a fair trial because of that nasty drug in this case?

PROSPECTIVE JUROR 55: I don't see why not.

MR. WILLETT: Okay. If you would pass the microphone to Mr. -- I believe we started with Mr. 604 again. Mr. 60 --

PROSPECTIVE JUROR 55: 504.

MR. WILLETT: I apologize. Thank you for correcting me.

Mr. 504, can you give my client a fair trial because

742

the underlying drug in this case deals with the illegal making or delivering of methamphetamine?

PROSPECTIVE JUROR 504: I think I can.

MR. WILLETT: Okay. Pass the microphone back down to Mr. 653.

Mr. 653, you were very gracious about telling us about your education and your history in rehab this morning, and I took very careful notes about that because obviously it caught my attention. Will you have a problem giving my client a fair trial because the drug at issue in this case is methamphetamine?

PROSPECTIVE JUROR 653: No, no problem.

MR. WILLETT: And if you would hear evidence from the government then in any way that methamphetamine pertains to Ms. Johnson, will you still be able to give her a fair trial?

PROSPECTIVE JUROR 653: Yes.

MR. WILLETT: Okay. Is anybody going to have a

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 646 of 3245

problem giving Miss Johnson a fair trial because the underlying tone to this case is a methamphetamine case? Mr. -- we're going to go real quickly all the way to the opposite corner. Mr. 6 -- I'm sorry, Mr. -- what is your number? Mr. 653, would you pass the microphone down to Ms. 52 who's going to pass it all the way over to Mr. 621.

Sir, will you have any problem with the fact that this case involves methamphetamine?

PROSPECTIVE JUROR 621: No.

743

MR. WILLETT: Now then, this may not even be an issue in your company, sir, but I know I've been involved in cases where certain trucking companies -- that issue is a problem because their drivers may drive very long hours for very many miles, and I've heard situations where, well, Al, my driver had a problem with this, and I'm not -- I'm certainly not implying that your company has a problem with this, but I just want to make sure that there's no extra sensitivity on your part to the fact that we're dealing with methamphetamine which some people use as a method to stay up for long periods of time, stay awake, be able to do many things.

PROSPECTIVE JUROR 621: No.

MR. WILLETT: So you'll be able to give Ms. Johnson a fair trial.

PROSPECTIVE JUROR 621: Yeah.

MR. WILLETT: Great. Okay. Now then, sir, Mr. 621, while I am with you, I noticed one answer in your questionnaire that I just need to ask you about very quickly. You were asked what are three of the biggest problems in the criminal justice system, and if I remember your questionnaire right, you took

Page 234

issue with lawyers. Am I right, sir?

PROSPECTIVE JUROR 621: Yes.

MR. WILLETT: Now then, I do not mean to put you on the spot because I took it in the context that this is a man who owns a middle-sized business, who owns a trucking company who

744

might just be sick and tired of plaintiffs' personal injury lawyers. Now, that's the way I took it, but I wanted to make sure that you didn't have a problem with what I and Mr. Berrigan and Mr. Stowers are doing.

PROSPECTIVE JUROR 621: No.

MR. WILLETT: Okay. Because you realize -- and here's another pop quiz. Have you heard of the Sixth Amendment to the United States Constitution?

PROSPECTIVE JUROR 621: No.

MR. WILLETT: Okay. Well, then --

PROSPECTIVE JUROR 621: You always hear about the Fifth.

MR. WILLETT: I realize that, and thank you because we're going to turn to that in just a moment. But the Sixth Amendment to the Constitution reads in part, In all criminal prosecutions, the accused shall enjoy -- and there's many things that the accused shall enjoy pursuant to the Sixth Amendment to the Constitution -- but the very last phrase is -- states as follows: And to have the assistance of counsel for his defense.

Now, here obviously it's Miss Johnson who has the assistance of myself and Mr. Berrigan and Mr. Stowers for her defense. And I just want to make absolutely sure that you don't have a problem with the three of us representing Miss Johnson in this very important case.

Page 235

PROSPECTIVE JUROR 621:  No.

745

MR. WILLETT:  Okay.  And does anybody have that problem?  And I see no nods.

Now then, if you will hand the microphone back up to Mr. 504, Mr. 621 anticipated the very last concept I want to discuss with you in I believe the relatively approximately ten or less minutes that I have.  The Fifth Amendment to the Constitution, are you familiar with that through television or movies?

PROSPECTIVE JUROR 504:  That you don't have to testify against yourself.

MR. WILLETT:  Very good, Mr. 504.  That's exactly where I'm going.  The decision by any client in any criminal case whether or not to testify in his or her own defense or the decision to invoke the Fifth Amendment, and Chief Judge Bennett would instruct you at the appropriate time that that decision could not be held against Miss Johnson or given any negative inference to her if she invokes that right.  Are you familiar with that concept?

PROSPECTIVE JUROR 504:  Yes.

MR. WILLETT:  Now then, here's what all of you get to find out at the same time.  Miss Johnson will not take the stand in her own defense.  How do you feel about that, sir?

PROSPECTIVE JUROR 504:  I'm fine with that.

MR. WILLETT:  Okay.  Why are you fine with that?

PROSPECTIVE JUROR 504:  And I'm not sure -- I think

746

Page 236

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 649 of 3245

many times it's more sensible to not bring the person who is accused. I mean, the Michael Jackson they're talking about, different people, you know, that you don't want to have on the stand.

MR. WILLETT: So would it make sense to you that there may be many reasons why a criminal defendant would not choose to take the stand?

PROSPECTIVE JUROR 504: Sure. And they don't tell you.

MR. WILLETT: Correct. Correct. You don't get to know what we might know.

PROSPECTIVE JUROR 504: Right.

MR. WILLETT: But does it make sense to you that there are many reasons why a criminal defendant just might not choose to take the stand?

PROSPECTIVE JUROR 504: Yes, it does.

MR. WILLETT: Would you pass the microphone to Mr. 55.

Mr. 55, can you give my client a fair and impartial trial if you never hear from her in this trial?

PROSPECTIVE JUROR 55: I think so.

MR. WILLETT: Okay. And will you respect her rights to make that decision and not hold it against her?

PROSPECTIVE JUROR 55: Yes.

MR. WILLETT: And if Judge Bennett gives you instruction on the Fifth Amendment, you would follow his

747

instructions?

PROSPECTIVE JUROR 55: Definitely.

MR. WILLETT: Great. If you'd pass the microphone to Mr. 653.

Page 237

Mr. 653, do you have any trouble with what I've told you this afternoon, that Miss Johnson will not take the stand?

PROSPECTIVE JUROR 653: No, I don't, sir.

MR. WILLETT: Okay. And do you understand there may be many legitimate reasons why a person would just choose --

PROSPECTIVE JUROR 653: Oh, yes.

MR. WILLETT: -- not to take the stand? Hand the microphone down to Miss 52.

Miss 52, do you understand this concept we've been talking about of the right to choose whether to take the stand or not?

PROSPECTIVE JUROR 52: Yes.

MR. WILLETT: Do you think that this witness box might be the easiest place in the world for a defendant to sit?

PROSPECTIVE JUROR 52: No.

MR. WILLETT: Even if you were convinced of your own innocence, do you think there just might be reasons why I'm not sure I want to sit here to explain myself?

PROSPECTIVE JUROR 52: Right, yeah.

MR. WILLETT: And can you give Miss Johnson a fair trial?

748

PROSPECTIVE JUROR 52: Yes.

MR. WILLETT: Pass the microphone back down to Ms. 717. Thank you so much.

Miss 717, do you have any problem with what I've told you?

PROSPECTIVE JUROR 717: No.

MR. WILLETT: Pass the microphone to Mr. 621.

Mr. 621, any problem with what I've told you, Miss

Page 238

Johnson will not take the stand in her own defense?

PROSPECTIVE JUROR 621: I'm kind of confused why not.

MR. WILLETT: I understand. And why are you confused, sir?

PROSPECTIVE JUROR 621: Well, I mean, you should be able to -- if you're innocent, you should be able to tell everybody you're innocent.

MR. WILLETT: I understand. But let's get back to the discussion I think Mr. 504 and I were having initially. Can you think that there might be some reasons why a defendant would choose not to do this?

PROSPECTIVE JUROR 621: Yeah, I think there would be some reason.

MR. WILLETT: Do you think it would be easy if a person such as my client who's not blessed with a great deal of formal education had to sit here and respond to questions from a very talented government prosecutor who has a great deal of

749

formal education?

PROSPECTIVE JUROR 621: That's probably why I said lawyers in my comments.

MR. WILLETT: And I appreciate your honest answer. But can you understand that there are reasons why --

PROSPECTIVE JUROR 621: Yes.

MR. WILLETT: -- a defendant would say, I just don't feel comfortable in getting into that witness box.

PROSPECTIVE JUROR 621: Yeah.

MR. WILLETT: Now, even though you have these concerns or you either said concerns or curiosities -- I apologize -- can you set those aside and put them out of your mind and still give

Page 239

my client a fair and impartial trial?

PROSPECTIVE JUROR 621: Yes.

MR. WILLETT: I realize I haven't talked to everybody, and I apologize. It wasn't my intent to exclude you, but for the people I didn't talk to, is there anything you want to raise your hand about and say, Well, Mr. Willett, I had a problem, but you never talked to me?

Judge, I think I got done within 20 minutes.

THE COURT: Well within 20 minutes.

MR. WILLETT: Thank you.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: May it please the Court, counsel.

750

Good afternoon, folks. Thank you for your patience. We visited with you at such length today that I think we all have some understanding of all of your abilities to be fair and impartial jurors in this case. So it really shouldn't take us very long, but I wanted to visit with you about a couple things.

First, let me reintroduce myself. My name is Tom Miller. As Mr. Williams indicated, I'm a special assistant United States attorney. Mr. Williams is merely an assistant United States attorney. I'm a special assistant United States attorney. One definition of the word special means better or more important. I wish that were the case.

The actual definition that applies in my case means special as opposed to general. I'm limited. I am an assistant attorney general for this case appointed for the case involving these five deaths and only for this case and in relation to these five deaths. I'm ordinarily and am actually full time a

Page 240

prosecutor for the state of Iowa working out of the capitol in Des Moines representing and I hope serving our country in representing the people of the state of Iowa but technically only representing the people of the state of Iowa. So it's a privilege and an honor for me now to be speaking on behalf of and serving our nation as you all are and as everyone is here in participating in this process.

A couple things I do want to visit with you briefly about, and since you have the microphone there, Mr. 621, we'll

751

just start with you. And let's see if in 20 minutes I can pass that microphone once around, and then I'll sit down as well, sir. You have hundreds of employees in your employ.

PROSPECTIVE JUROR 621: Yes.

MR. MILLER: And obviously that means that you're a man who is accustomed to shouldering a fair amount of responsibility. You've been doing that for how many years, sir?

PROSPECTIVE JUROR 621: For about 25.

MR. MILLER: Is there anyone -- have you ever served on a jury before? I believe not, have you?

PROSPECTIVE JUROR 621: No.

MR. MILLER: Has anyone here done so? And I see no hands. You've heard about it enough, however, I'm sure to at least be roughly familiar with the concept. Judge Bennett described for you this morning the fact that it's the role of the juror to decide what actually happened. And does that square with your understanding even before you came here today, sir?

PROSPECTIVE JUROR 621: Yes.

MR. MILLER: In other words, you're a judge of the

Page 241

facts. Now, in the course of how ever long you may serve as a juror, you will find that we follow a great number of rules and regulations and procedures as we must. But this is not an elaborate ritual. It's also a very practical business. It's the means by which we find facts and determine controversies in

752

this country. And your role in that is an important one, a very practical one of figuring out and determining what actually happened. Would that be your goal should you be required to serve on this jury, sir?

PROSPECTIVE JUROR 621: Yes.

MR. MILLER: Thank you, sir. And I'll ask you to pass that microphone.

It's Ms. 717. And your goal in life is to be an R.N., and you're already a practicing nurse; is that correct, ma'am?

PROSPECTIVE JUROR 717: Yes.

MR. MILLER: As we discussed with Juror 621, you're a person who's accustomed to shouldering some responsibility.

PROSPECTIVE JUROR 717: Uh-huh.

MR. MILLER: You deal with people's health, welfare, and even on occasion perhaps their lives.

PROSPECTIVE JUROR 717: Yes.

MR. MILLER: That's what we're asking you to do here is to shoulder some responsibility. Do you feel you have those broad shoulders and you can come in here and share that responsibility of making a decision in a very important case, ma'am?

PROSPECTIVE JUROR 717: Yes, sir.

MR. MILLER: Every criminal case, in fact, every case of any nature, is the most important case in the world to

Page 242

whoever happens to be parties to that case. But you can see

this is by any measure a very important case. Mr. Willett spoke with you about a couple important concepts, burden of proof and presumption of innocence. You understand whenever government brings criminal actions it willingly assumes the burden of proving its case beyond any reasonable doubt?

PROSPECTIVE JUROR 717: ( Nodded head.)

MR. MILLER: You agree with that, ma'am?

PROSPECTIVE JUROR 717: Uh-huh, yes.

MR. MILLER: Thank you, Ms. 717. I'll ask you to pass the microphone if you would to Juror 797.

Good afternoon, ma'am.

PROSPECTIVE JUROR 797: Good afternoon.

MR. MILLER: You've been volunteering as a paramedic as I understand it.

PROSPECTIVE JUROR 797: Yes.

MR. MILLER: For how long, ma'am?

PROSPECTIVE JUROR 797: I've been an EMT for 12 years; I've been a paramedic for 6.

MR. MILLER: Very good. It requires continued training.

PROSPECTIVE JUROR 797: Yes.

MR. MILLER: And that's something you're on duty how often, ma'am?

PROSPECTIVE JUROR 797: About 24 hours a week or 30 hours a week depending on the week.

MR. MILLER: What was it that caused you to say to

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 656 of 3245

yourself one day, That's what I want to do? Can you tell us?

PROSPECTIVE JUROR 797: It's been a long time since I -- but I still do enjoy it. I like the patient care, and I just enjoy all parts of it. It's -- I wasn't involved in a whole lot in our community at the time that I was approached to do it, and I thought it was a good way to do it.

MR. MILLER: And you have to enjoy it to continue doing it.

PROSPECTIVE JUROR 797: Yes.

MR. MILLER: Because it requires some sacrifice.

PROSPECTIVE JUROR 797: Yes.

MR. MILLER: And it also requires you to shoulder some responsibility.

PROSPECTIVE JUROR 797: A great deal.

MR. MILLER: Again, lives in your hands.

PROSPECTIVE JUROR 797: Right.

MR. MILLER: And you're no stranger to responsibility either, I take it then.

PROSPECTIVE JUROR 797: No.

MR. MILLER: Can you view the job of being a juror as that same sort of responsibility, something that must be taken seriously that requires you to go above and beyond what we ordinarily ask every citizen to do every single day?

PROSPECTIVE JUROR 797: Yes.

755

MR. MILLER: Thank you, ma'am. I'll let you pass that one more time.

A mother of a couple daughters.

PROSPECTIVE JUROR 52: Uh-huh, yes.

MR. MILLER: Enjoy spending some time watching them

Page 244

engage in sporting activities I believe.

PROSPECTIVE JUROR 52:  Yes.

MR. MILLER:  What sports are those?

PROSPECTIVE JUROR 52:  Track and field and soccer.

MR. MILLER:  Very good.  I've spoken with some of the folks about shouldering responsibility and as something they do in the course of their employment, but I don't think any of them would disagree with the fact that probably the greatest responsibility that any of us shoulder is that of being a parent.

PROSPECTIVE JUROR 52:  Yes.

MR. MILLER:  You agree with me, ma'am?

PROSPECTIVE JUROR 52:  Yes.

MR. MILLER:  That's not always an easy job, is it?

PROSPECTIVE JUROR 52:  No.

MR. MILLER:  You're required to make decisions about their welfare that aren't pleasant decisions to make.  Fair statement?

PROSPECTIVE JUROR 52:  Fair statement.

MR. MILLER:  I think most of us are parents here, and

756

I'm not going to ask you to tell us about the difficult ones you've had.  We've all had them.  But you can think about those.  Do you feel that that's prepared you for the job of being a juror, ma'am?

PROSPECTIVE JUROR 52:  Yes.

MR. MILLER:  You're going to be asked to assess the credibility of witnesses in this case and to judge from all of the evidence in this case.  Think your experience as a mother is something that would help prepare you for that job?

Page 245

PROSPECTIVE JUROR 52:  Yes.

MR. MILLER:  Because you have to do that every day as an adult, don't you?

PROSPECTIVE JUROR 52:  Yes.

MR. MILLER:  We're going to be hearing from a number of witnesses, some of which come from different walks of life, peace officers, possibly people who are themselves convicted criminals, and people who are from any number of walks of life in between, physicians, experts, citizens who just happened to be somewhere at a time when they observed something that you folks should hear about.  Will you listen to all of their evidence, all of their testimony?

PROSPECTIVE JUROR 52:  Yes.

MR. MILLER:  And I'm not asking you and it wouldn't be right for me ahead of time to ask you to commit to believing any one or disbelieving any one, but you'll listen to all of them.

757

PROSPECTIVE JUROR 52:  Yes.

MR. MILLER:  And consider that.

PROSPECTIVE JUROR 52:  Uh-huh.

MR. MILLER:  Thank you, ma'am.  Miss 52, if you'd just pass it behind you to Mr. 653, you've been exposed to some things that most of the folks on this jury and all of our society haven't, and that's life inside those walls; right, sir?

PROSPECTIVE JUROR 653:  Yes, sir.

MR. MILLER:  And that's over a period of a number of years, and I find that interesting because I myself have worked inside a maximum security institution for a period of time, and would you agree with me that people who are in my walk of life and deal with this, it would be good for all of us to see what

Page 246

life is like in there?

PROSPECTIVE JUROR 653: Yes.

MR. MILLER: It's important that we have people volunteering time. Otherwise those institutions would not function. You mentioned to us earlier today when you were in here alone that you do on occasion visit with people who are incarcerated.

PROSPECTIVE JUROR 653: Yes, sir.

MR. MILLER: I expect you may hear from one or more of them as witnesses in this case. You always believe everything they tell you?

PROSPECTIVE JUROR 653: No.

758

MR. MILLER: Do you always disbelieve everything they tell you?

PROSPECTIVE JUROR 653: No.

MR. MILLER: You judge it on their merits and try to determine whether you're getting the straight scoop from them.

PROSPECTIVE JUROR 653: There is a consequence in the role I play. There's no consequence as to whether it's true or it's not true. I'm not an authority figure over them.

MR. MILLER: They are subject to rules, however.

PROSPECTIVE JUROR 653: Yes.

MR. MILLER: And they're also subject to the pressure of their peers.

PROSPECTIVE JUROR 653: Yeah.

MR. MILLER: And what their peers may think of them should they choose to speak with authority; fair statement?

PROSPECTIVE JUROR 653: Yes.

MR. MILLER: And if one or more of them testify
Page 247

here -- and I'm not going to ask you ahead of time to tell us whether you'll believe or disbelieve anybody. That wouldn't be fair of me. But will you listen?

PROSPECTIVE JUROR 653: Oh, definitely.

MR. MILLER: And you would want any juror in your situation to listen to the testimony.

PROSPECTIVE JUROR 653: Right.

MR. MILLER: Thank you, sir. If you can pass that

759

microphone, it's Juror 55? Am I seeing that correctly?

PROSPECTIVE JUROR 55: Yes, sir.

MR. MILLER: My eyes are getting a little nearsighted at my age, but I think I can read that. Mr. 55, you told us about a couple of your experiences. You didn't really tell us about them so much as acknowledge them, and I know these memories are probably not the most pleasant in your life. But you've served your country in military service as many have. Unlike many who have, however, you've experienced one of the more horrific incidents in our military history which is the fires on the USS Forrestal.

In addition to that, sir, I note that you, as many of your fellow citizens in this community, participated in responding to the disaster of Flight 232, so you've had really more exposure to widespread tragedy in our current events in this country than many of our fellow citizens have. Do you feel that's helped prepare you for shouldering responsibility, sir?

PROSPECTIVE JUROR 55: Yes, sir.

MR. MILLER: As a man who has served in the military, we heard from Mr. Willett briefly about the presumption of innocence and the burden of proof. When you wore that uniform

Page 248

and went overseas in a time when our country was in combat, did you feel that in wearing that uniform and in representing your country you were protecting the values that we hold dear in this country?

760

PROSPECTIVE JUROR 55: Yes, sir, and our rights.

MR. MILLER: Our freedoms.

PROSPECTIVE JUROR 55: Yes.

MR. MILLER: And that our rights and our freedoms that are protected right here in this courtroom are among those that you were fighting for I trust.

PROSPECTIVE JUROR 55: Yes.

MR. MILLER: Did you see it that way, sir?

PROSPECTIVE JUROR 55: Yes.

MR. MILLER: And so I trust you don't take lightly the fact that all jurors should presume innocent anyone who is accused and to impose upon the government the burden of proving its case beyond a reasonable doubt. That a fair statement, sir? You agree with that?

PROSPECTIVE JUROR 55: That -- until they're proven guilty, yes.

MR. MILLER: These are among the values and the freedoms that we enjoy as Americans.

PROSPECTIVE JUROR 55: Yes, sir.

MR. MILLER: Almost unique throughout this world.

PROSPECTIVE JUROR 55: ( Nodded head.)

MR. MILLER: And you understand that whenever the government brings charges it assumes the duty of carrying that burden of proof.

PROSPECTIVE JUROR 55: Yes, sir.
Page 249

MR. MILLER: You agree with that, sir? I'll ask you to pass that one more time over to Juror 504.

Good afternoon, sir.

PROSPECTIVE JUROR 504: Good afternoon.

MR. MILLER: I noticed that you're retired. I believe you indicated that you had been a teacher as well as you'd worked for the city.

PROSPECTIVE JUROR 504: I worked for the city, yes.

MR. MILLER: Okay. Can you tell me just a little bit about what your responsibilities were before retirement, sir?

PROSPECTIVE JUROR 504: I administered -- well, the last five years with the city I administered three federal programs, Community Development Block Grant, Home Investment Partnership Program, and Emergency Shelter Grant Program. It added up to between three and four million dollars worth of work, supervised seven or eight people.

MR. MILLER: And that's a certain amount of responsibility you had to shoulder as well.

PROSPECTIVE JUROR 504: Yes.

MR. MILLER: When did you retire, sir?

PROSPECTIVE JUROR 504: Next month it will be two years.

MR. MILLER: And probably even before you retired you have been volunteering for the Boy Scouts of America.

PROSPECTIVE JUROR 504: Yes.

MR. MILLER: I assume that's something you've been

Page 250

doing most of your adult life, or am I wrong about that?

PROSPECTIVE JUROR 504: Twenty years.

MR. MILLER: What do you enjoy most about that, sir?

PROSPECTIVE JUROR 504: At this point it's the adult association, knowing that -- well, because I don't deal a lot with the youth anymore other than ensuring that we have a good program for the youth.

MR. MILLER: You take some satisfaction out of that, sir?

PROSPECTIVE JUROR 504: Oh, great deal of satisfaction.

MR. MILLER: How much of your time does that demand?

PROSPECTIVE JUROR 504: Well, it's kind of a full-time job at this point. I'm very active. I was the district commissioner up until in January, and I'm still pretty involved.

MR. MILLER: The BSA simply wouldn't function without volunteer effort, would it?

PROSPECTIVE JUROR 504: Well, no, without the volunteers.

MR. MILLER: I also noted that I believe you have a nephew who is in law enforcement, sir.

PROSPECTIVE JUROR 504: Yes.

MR. MILLER: We talked briefly with Juror 653 about testimony you may be hearing from people who have been convicted

763

of crimes and are incarcerated. You, I am sure, will be hearing from people who are in law enforcement, people who work for government in law enforcement in one capacity or another as does your nephew.

Now, we all hope that peace officers, every last one

Page 251

of them, is as honest and as forthright and as accurate as he can possibly be, but I trust you would agree with me that even though you have family members in the field that peace officers, like everyone else, are human.

PROSPECTIVE JUROR 504: Certainly.

MR. MILLER: And if you are instructed by the Court as I expect you would be if you're required to serve on this jury that their testimony is to be viewed as that of other witnesses and not be given extra credibility simply by virtue of their employment, you could follow that instruction?

PROSPECTIVE JUROR 504: Oh, yes.

MR. MILLER: Thank you, sir. If you'll pass that just one more time, it's, if I'm reading it correctly, Ms. 398; is that right?

THE COURT: Mr. Miller, I'm going to give you the two-minute warning.

MR. MILLER: Thank you, Your Honor. I think we'll get this done.

How are you this afternoon?

PROSPECTIVE JUROR 398: Fine. Thank you.

764

MR. MILLER: Five children I believe.

PROSPECTIVE JUROR 398: Yes.

MR. MILLER: Is that right? And all of them young?

PROSPECTIVE JUROR 398: Yes.

MR. MILLER: And when I talked with your fellow jurors about shouldering responsibility, that's something you're no stranger to either.

PROSPECTIVE JUROR 398: Yes.

MR. MILLER: Raising those kids can be as much of a

Page 252

responsibility as any of us ever have; right?

PROSPECTIVE JUROR 398: Oh, yes.

MR. MILLER: Being a juror is a responsibility as well. It's similar in a way, and it's different in a way. I expect that anyone who is required to serve on this jury will be asked to listen to testimony about some matters that I think you would find unpleasant. We're talking about the violent deaths of five people including two young children. And I know from personal experience that even though everyone wants to be able to do their duty some people simply can't handle that kind of thing without emotions unduly affecting them, and I respect that if it describes you. It's simply something we need to learn now rather than later if that's the case. Do you feel that would be a problem for you at all, ma'am?

PROSPECTIVE JUROR 398: I don't know that I could answer that right now.

765

MR. MILLER: That does concern you, I take it.

PROSPECTIVE JUROR 398: Yes.

MR. MILLER: And what I need to know is can you assure us that if you would happen to be required to serve on this jury that you would be able to listen to all of the evidence, the testimony, including that which would graphically describe the violent death of a ten-year-old girl and a six-year-old girl without that unduly affecting your ability to listen to the evidence fairly and impartially and judge it? Can you assure me that that would not interfere with your ability to do so?

PROSPECTIVE JUROR 398: Yes.

MR. MILLER: Thank you, ma'am. I appreciate that. Does anyone here feel they would have such a problem? And if so

Page 253

let me know. Anyone here have a problem with the idea of sitting in judgment on a fellow citizen? And I don't ask that facetiously because I know some people simply feel they cannot.

THE COURT: Mr. Miller, your time's up; okay?

MR. MILLER: And I take --

THE COURT: You can finish the last question.

MR. MILLER: I take the lack of any responses affirmatively that you can handle that, and I thank you folks for your time.

THE COURT: Okay. I'm going to ask you to step outside, and actually I don't think it's necessary to go all the way down to the jury room because I don't think this will take

766

maybe but a couple minutes. So you can just maybe put them out in the hallway on that bench out there, and we'll get back to them as soon as we can. Thank you.

(Panel C exited the courtroom.)

THE COURT: Wait one second. The CSO just told me that this last juror, Juror 55, wanted to talk to me personally. Of course, I'm not going to talk to him personally, but I'm going to bring him back in, see if he will disclose to everybody what it is that he wanted to say to me personally; okay?

MR. BERRIGAN: Yes, sir.

(Prospective Juror 55 entered the courtroom.)

THE COURT: Could you hand him the microphone? Juror 55, why don't you just grab that first seat there. And I just want to let you know -- everybody be seated -- the message I got was that you wanted to talk to me personally.

PROSPECTIVE JUROR 55: Yes.

THE COURT: Under the rules I'm not allowed to talk to

Page 254

you without everybody being present. I hope you understand that.

PROSPECTIVE JUROR 55: That's fine.

THE COURT: What is it that you wanted to tell us?

PROSPECTIVE JUROR 55: I have something that's never been brought up. I have a son that's 31 years old. He's sitting in prison right now in a federal penitentiary for drugs; okay? He had a little boy with his girlfriend. He is missing

767

half his brain because he was a drug baby, and I -- drugs I hate. You gotta understand. That ain't saying I'm not -- I understand what it goes through. I understand what the people go through for drugs and everything. But I just wanted that brought out so that if it's brought out later on and you're going to say, hey, how come this wasn't brought out?

THE COURT: Sure. Anything else you want to tell us?

PROSPECTIVE JUROR 55: No, that's it. I adopted my grandkids. He is my son now, but I wanted to make sure that was brought out so you guys didn't have nothing that --

THE COURT: Thank you so much for bringing that up. No, you're not done. You know what? I'm going to give the lawyers an opportunity to ask you some questions about it; okay?

PROSPECTIVE JUROR 55: Okay.

THE COURT: Okay. Why don't we start with Mr. Berrigan.

MR. BERRIGAN: May I, sir?

THE COURT: You may.

MR. BERRIGAN: Thank you.

Let me echo our appreciation for telling us that, sir. We saw that in your questionnaire.

Page 255

PROSPECTIVE JUROR 55:  Well, it was never brought up so I --

MR. BERRIGAN:  That's okay.  What we didn't know was the extent to which this affects you because it's a piece of

768

paper, and you've made it pretty clear that this is a big deal.  So let's talk about it for just a second.

PROSPECTIVE JUROR 55:  All right.

MR. BERRIGAN:  This is the case where the government's alleging that our client not only participated in the distribution of methamphetamine but the manufacturing of methamphetamine as well; okay?

PROSPECTIVE JUROR 55:  Right.  That --

MR. BERRIGAN:  Go ahead.

PROSPECTIVE JUROR 55:  That's why I brought the subject up.  That's the only reason why.

MR. BERRIGAN:  So tell me then, how does that affect your --

PROSPECTIVE JUROR 55:  Well, it affected the little boy more than anything.  We've -- he's in special ed.  His left side of his brain is mostly gone which is your thinking side, so we had to teach him how to use the right side of his brain.  Actually what like the doctor said, we have to reconnect his wires.  Okay.  We've gone through where a normal kid would learn how to crawl.  Well, I had to get on the floor and move his hands and his legs at two years of age to teach him to crawl, and after that he got up and walked.  But this is just an example.  I mean, you know, that's . . .

MR. BERRIGAN:  You know, I think sympathize with your position would hardly describe how we all feel about it.

Page 256

PROSPECTIVE JUROR 55:  Right.

MR. BERRIGAN:  What you're doing is remarkable, frankly, but here's what we're worried about just to put it on the table; okay?

PROSPECTIVE JUROR 55:  Right.

MR. BERRIGAN:  Is that what happened to your grandson as a result of drugs might bleed into this case in the way that you might look at the case.  Is that a concern that you have?

PROSPECTIVE JUROR 55:  A little bit.  Because this is a murder trial, the drugs has an effect to the murder trial, of course, as you know.  And I wanted -- the reason why I wanted to bring it up is that somebody could point, well, it's not going to be a fair trial because this wasn't brought up, his past, and it comes up later on that it was in my past.

MR. BERRIGAN:  Right.  We're not worried about it being in your past.  We're worried about it being right now; okay?

PROSPECTIVE JUROR 55:  Okay.

MR. BERRIGAN:  And --

PROSPECTIVE JUROR 55:  Right now, no.

THE COURT:  Could I jump in here?  Let me just jump in for a minute.  You can finish up.  Juror 55, here's what I want to know.  How, if at all, do you think this situation that you've just described to us might affect your ability as a juror in this case or might influence your ability?

770

PROSPECTIVE JUROR 55:  Well, I hope none honestly.

But if drugs were administered to the kids or something which I
Page 257

don't know, it might affect me then because I have kind of a hatred for that kind of thing.

THE COURT: Of course. Of course you would. Okay.

Mr. Berrigan, I'm sorry. Any more questions? I didn't mean to chase you off, Mr. Berrigan.

MR. BERRIGAN: No, no, no, no. All we can ask you to do, sir, is to not certainly forget about your grandson's situation.

PROSPECTIVE JUROR 55: Right.

MR. BERRIGAN: But to try to separate that.

PROSPECTIVE JUROR 55: Right.

MR. BERRIGAN: As the judge has suggested, we really need somebody that can listen to the evidence here and not --

PROSPECTIVE JUROR 55: Right, I understand. I understand that.

MR. BERRIGAN: Okay. Can you promise us you'll do that?

PROSPECTIVE JUROR 55: I'll do the best I can.

MR. BERRIGAN: Okay. Do you have some -- obviously you have at least a little bit of question about it. But --

PROSPECTIVE JUROR 55: Most of my question was mostly on the legal standpoint.

MR. BERRIGAN: Letting us know.

771

PROSPECTIVE JUROR 55: Yes.

MR. BERRIGAN: Okay. Great. We know, and now if you're willing to put it aside at least for purposes of this trial, we appreciate --

PROSPECTIVE JUROR 55: Right.

MR. BERRIGAN: -- it.

Page 258

PROSPECTIVE JUROR 55: That's the only thing that bothered me about it.

THE COURT: Great. Now, Mr. Williams, Mr. Miller, do either one of you have any questions?

MR. MILLER: No. I just want to thank you for bringing that to our attention, sir.

THE COURT: Again, thank you for bringing it to our attention. Thank you.

(Prospective Juror 55 exited the courtroom.)

THE COURT: Now, does the defense have any challenges for cause?

MR. BERRIGAN: No, sir.

THE COURT: Does the government have any challenges for cause?

MR. WILLIAMS: Yes, Your Honor. We would --

challenges for cause?

THE COURT: We're on challenges for cause.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Now, with regard to peremptories,

772

my understanding is that the defense is going to exercise their peremptories first on defense days.

MR. BERRIGAN: That's correct, Your Honor.

THE COURT: Okay. Now, I'm going to exercise my discretion -- you can object to it if you want -- to make one exception to that, and here's the exception. Both of you made challenges for cause with regard to Juror 653. I am very confident in my judgment. I've reviewed the realtime transcript. I am very comfortable with my ruling.

On the other hand, because you both made challenges
Page 259

for cause, I'm going to give the government with regard to this one juror the first opportunity to exercise a peremptory challenge. In other words, I'm shifting the rule but only with regard to this one juror today on the theory that if I did make a mistake which I'm confident I did not, any possible prejudice to the defense would be cured by the government's exercise and use of a peremptory challenge before the defense chose to exercise one if, in fact, they do which I assume that they will.

So I'm going to give you the opportunity only if you want to to exercise a peremptory challenge with regard to Juror 653. In other words -- well, I'll just stop right there.

MR. WILLIAMS: I don't think we have a problem with 653, but let me -- can I talk to co-counsel just a minute?

THE COURT: Sure.

MR. WILLIAMS: No, we don't have a problem with 653.

773

THE COURT: Well, you did this morning.

MR. WILLIAMS: Well, I joined in the motion because they made it, but otherwise we think he's a fine juror.

THE COURT: Okay. Now we'll go back to the defense. You may exercise any or all of your 13 remaining peremptory challenges with regard to any of the jurors still in the jury pool.

MR. BERRIGAN: I wanted to ask the Court if you'd just give us a very few short minutes to consult with each other, Your Honor, because we've gone through the questioning pretty much nonstop for a little while. We haven't had a chance to talk to each other about this issue. It won't take very long. Could we have just a couple of minutes? We don't even need to leave the courtroom. Thank you.

Page 260

THE COURT: Sure, sure.

MR. BERRIGAN: We appreciate that, sir.

THE COURT: That was quick.

MR. BERRIGAN: Well, you know, we've been looking at these folks. We just hadn't had a chance to talk to each other.

The defense will exercise two peremptory challenges at this time, Juror Number 653 and Juror Number 52. And I think the record will reflect those were both defense motions for cause.

THE COURT: 653 and 52.

MR. BERRIGAN: Yes, sir.

774

THE COURT: Okay. Does the government choose to exercise any of its peremptory challenges?

MR. WILLIAMS: Just one, Your Honor, with respect to Juror 398.

THE COURT: Okay. Let's bring them in.

(Panel C entered the courtroom.)

THE COURT: Please be seated. First of all, you've been an outstanding group today, and I wanted to thank all of you for your patience and the exemplary manner in which each and every one of you conducted yourselves today during jury selection.

Three of you are going to be dismissed, and that would be Juror 653, Juror 52, and Juror 398. You'll be dismissed, but just hang on for a minute. That means Juror -- and the lawyers are going to double-check my work here -- Juror 55, 504, 797, 717, and 621 remain in the jury pool. Is that correct, Mr. Berrigan?

MR. BERRIGAN: That is correct, sir.

Page 261

THE COURT: And Mr. Williams.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Now, with regard to the three of you who are dismissed, when you leave, you're free to go. You are done with this case. I would ask you to do the following, though. And that is because there are a lot of potential jurors that we're going to be interviewing for this case coming from a

775

relatively small area population-wise, I'd ask you not to talk about jury selection to anybody because something that you said might influence somebody else, and then they might know a potential juror.

I'll give you an example. Yesterday in the group we had two people from one office who both got packets. One came in yesterday. One's coming in down the road in a couple of weeks. We may have a jury selected before we ever get to that second person.

So for those three of you, we'd just ask you not to comment at all until we get a jury empanelled and we get the trial underway. Then you can talk as much as you want about it.

For the remaining group who are still in the pool, you still have about a 50 percent chance of, if you want to serve, being selected, if you don't want to serve, not being selected. And we won't know that until we have our entire pool of eligible jurors. And so we don't know whether you'll ultimately be on the jury or not. All I can tell you is the odds are about 50 percent. When we do know, we will let you know as soon as possible. I anticipate that it will be another couple of weeks before we'll know, but I don't know exactly when that will be.

So in the meantime, for those of you who still have a

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 675 of 3245

50 percent chance of being ultimately on the jury in this case, it's very, very, very important that you take as seriously as anything in your life my instruction to each of you not to

776

listen to any news reports about the case. Don't read anything in the newspaper about it. By all means have your loved ones or friends or spouses clip out any articles, put them in a folder, and when the entire trial is done and we're totally completed with our work and we send you on your way or else if you find out a couple of weeks from now that you're not in the jury, then you can read till your heart's content.

With regard to the nightly news and radio reports, do everything you can to try and avoid listening to or hearing anything about this case. Don't let anybody discuss it with you, and don't discuss any aspect of this case with anybody else. Very importantly, don't get on the Internet and do any research about this case or about anyone associated with this case. It's very, very important that both the government and Miss Johnson receive the fairest trial that each of us are capable of giving them.

So thank you very much for the day. Sorry it turned out to be such a long day. And because I think you'd be terrific jurors, I hope to see at least some of you back here when we do start the jury trial in the case.

And, Juror 621, on the way out, I'm going to ask Carey to grab your cell phone number, or have you already done that?

PROSPECTIVE JUROR 621: Yeah, Suzanne did.

THE COURT: Thank you all very much, and good luck to each of you. Thank you.

777

(Panel C exited the courtroom.)

THE COURT: Okay. Please be seated for a minute. While we were engaged in jury selection, I was working on a PowerPoint slide or two. Actually it turned out to be three because I think we made a huge mistake in not going through the trial process, and I would have done that, but, you know, to a large part I've been excluded from it. So I was surprised that you all hadn't thought about that. I think it was a serious mistake, but maybe it's part of the defense strategy. I don't know.

But here's what I would suggest unless there's any serious objection to it, and I want to go through it with you. And this was just something I did on the fly. I really haven't had a chance to think about it, but I did get out my old Honken instructions and looked at it.

And there's a lot that one could say about particularly the penalty phase. But I don't think there's a need to say a lot about it. I don't think you have to get into the shifting burdens in jury selection. Now, if you all want to do it, you can, but we have to give them some information or they're totally confused which I think a great number of the jurors were today.

Here's what I would say: It's potentially a three-phase process. The first phase is the merits or the not-guilty/guilty phase.

778

The second phase -- and only if there is a unanimous finding by all 12 jurors beyond a reasonable doubt in the first

Page 264

phase do we even have a second phase. The second phase is called the eligibility or gateway factors. And in that phase the prosecution must prove one or more of the gateway factors beyond a reasonable doubt. In the second phase only if the jury unanimously finds that the prosecution proves a gateway factor beyond a reasonable doubt do we reach the third phase.

The third phase is called the penalty phase. In this phase, if we ever get there, you would be required to weigh aggravating and mitigating factors that I instruct you on to determine whether Miss Johnson would receive life imprisonment or the death penalty.

Penalty phase, only if the jury unanimously votes for the death penalty will Ms. Johnson be sentenced to death by me.

Now I'm up -- I'm more than welcome (sic) for additions, modifications, corrections. I think we need to tell them something. I've erred to keep it rather simple because I think it's better to keep it simple and have them understand it than confuse it with -- I looked at some of the questions that you all asked.

Now, it didn't beat Charlie Rogers. His opening question on the death penalty lasted four and a half minutes. Each government lawyer had questions in the two- to three-minute range, so you're still a little bit short of Charlie Rogers'

779

question that I'll tell you is going to make it into a case book. In my view you can't ask a multi-minute question with multiple compound phrases on an area that's so difficult or you simply confuse the jurors.

And while this does not pretend to cover everything -- matter of fact, it leaves out a lot -- I'd rather have the

Page 265

jurors understand the basics than have them be totally confused.

And also, you know, I seriously doubt that we're going to lose a juror because the defense has the burden on mitigation by a preponderance and the government has aggravators by beyond a reasonable doubt. I just doubt that we're ever going to lose a juror because of that, so I don't feel the need to explain it.

Now, I'm not barring you all from explaining it. You can discuss all of that stuff as much as you want. But this is what I suggest doing, and I'd just incorporate it in. I don't know if I'd do it towards the beginning of the jury selection of my limited role or towards the end. I haven't decided where it belongs, but I believe I would have discretion to determine where it would belong in the presentation, and I would exercise that discretion accordingly. Any input? Mr. Berrigan?

MR. BERRIGAN: Your Honor, I'm sorry. I was wondering if you could scroll through the third-phase part.

THE COURT: Sure. You bet. Let's just go back -- what I should do is print it out for you, but let's just go back, and we'll just go through the whole thing.

780

Potentially a three-phase process. First phase, merits -- see, I -- merits, that doesn't mean anything to lay people, and I know you don't like guilty phase. That's why I put not guilty/guilty. And you'll notice I always put not guilty first. I've been doing that for years. And I think they understand that. We're going -- and I'm going to explain it to them. The first phase we're going to decide what we do in every trial: Is the defendant not guilty or guilty of one or more of the ten charges?

Second phase, only if there is a unanimous finding by

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 679 of 3245

all 12 jurors beyond a reasonable doubt in the first phase do we even have a second phase. I put the word "only" in bold and italics and larger type.

Second phase, eligibility or gateway factors. The prosecution must prove one or more of the gateway factors beyond a reasonable doubt.

MR. BERRIGAN: Could we address that briefly, sir?

THE COURT: Sure.

MR. BERRIGAN: I neglected to bring the trifurcation order with me, but my recollection was that that would be a stage in the trial where the government would have to prove a gateway factor and one or more aggravating factors for the case to go to the third phase. That's my recollection based on the order. And I think that is the law actually in terms -- what we were trying --

781

THE COURT: I think that wasn't the law you suggested. That was what I came up with.

MR. BERRIGAN: That's what you came up with.

THE COURT: It isn't what you all suggested.

MR. BERRIGAN: Well, it's the order in the case, and I just wanted to suggest maybe the --

THE COURT: Sure, sure. This should reflect my order, right. And I haven't gone back and looked at that order. So I'd certainly be happy to look at that.

MR. WILLIAMS: Your Honor, if I could just jump in on that.

THE COURT: Sure.

MR. WILLIAMS: I think you might be able to get to there simply by saying, Second phase, eligibility or gateway

Page 267

factors, must prove two or more of these factors beyond a reasonable doubt because we have to prove a gateway factor and we have to prove one or more aggravating statutory factors to get to that point.

Rather than try to go through that detail, I think you could simply say we have to prove two or more factors -- of these factors beyond a reasonable doubt. And they'll get -- they'll understand when we get to that point what we have to prove. But if we're just looking to make it technically correct, I think that would solve the problem without getting into the mass details.

782

THE COURT: Would you consider that a friendly amendment?

MR. BERRIGAN: No, sir, they don't consider the gateway factors in that penalty -- the third phase, penalty phase of the trial. And my concern is that that kind of mixes apples and oranges. I think it should reflect what, in fact, the order says. I don't think it's that confusing. The jurors are going to be asked very specifically in the instruction I suspect aggravating -- did you find an aggravating factor, two or more, and I think the language that we're telling them at the beginning should comport with whatever it is that you're intending to do with the instruction, at least as best we can.

THE COURT: Mr. Williams?

MR. WILLIAMS: I'll live with how ever you want to put it, Judge. I'll work with it. I don't care.

THE COURT: Let me go back and re-read my order and try and conform that bullet point to the order, and I'll give you an opportunity to comment on it in the morning.

Page 268

MR. BERRIGAN: Thank you.

THE COURT: Okay? Continuing -- and, you know, I'd have to conform that one too instead of a gateway, whatever language I come up with. Do you have any problem with the second bullet point?

MR. BERRIGAN: I would only suggest, Your Honor, I would prefer if we left out the language "that I instruct you

783

on" only because of that general mitigating concept that any evidence --

THE COURT: Yeah, but I instruct them on that.

MR. BERRIGAN: I understand.

THE COURT: Well, the problem with not saying "that I instruct you on," it leaves them with the impression that they're on their own to figure out, and that was the value -- I'm just telling you my motivation in putting it in. Remember the jurors, oh, you know, some of them didn't realize that I was actually going to instruct them on that. So I'd like to let them know I am going to instruct them on it because I am, and I'm going to instruct them on --

MR. BERRIGAN: It's a very minor point, Your Honor.

THE COURT: How strongly do you feel about it?

MR. BERRIGAN: Not very. Not near as strongly as I feel about the gateway factors.

THE COURT: But you're entitled to feel strongly about anything you want to in this case.

MR. BERRIGAN: It was only a suggestion.

THE COURT: I'm not trying to limit you in what you feel strongly about.

MR. BERRIGAN: This is not terrible at all, and we

Page 269

could live with this easily.

THE COURT: Okay. And then penalty phase, only if the jury unanimously votes for the death penalty will Ms. Johnson be

784

sentenced to death by me.

MR. WILLIAMS: And, Your Honor, I guess before this one or at the top, put that one at the bottom --

THE COURT: You want to go back? You want to add one here?

MR. WILLIAMS: Yeah, maybe above this one. But my only thought is -- I'm sorry, Judge.

THE COURT: I'll tell you what. You know what? Why don't you all work on it, come back tomorrow morning and tell me what you've agreed upon. You want to do that? Would you rather do that?

MR. WILLIAMS: No. Actually I like what you -- can you just flip back one time? Actually now that I think about it, you may have covered some of this.

THE COURT: Hey, I was doing this and trying to listen to everything at the same time. I haven't had a chance to run this by a law clerk. This is just me freelancing this afternoon.

MR. WILLIAMS: In this instruction if you could say, Be required to weigh and fairly consider aggravating and mitigating factors I instruct you on, I think that helps them understand what they're supposed to do, and I think it would fit fine in that line.

THE COURT: I'm looking at my actual instruction on the weighing process. Well, I do say, You must consider the

785

Page 270

weight and value of each factor.  That's the closest I ever come to saying that they have to consider anything.

MR. WILLIAMS:  Well, and I think the word "consider" in there then I think would be helpful to them.  You're required to consider and weigh because really what we're going to get to with them is are you willing to consider, and I think it'd be helpful if you introduce the concept that they need to consider these factors and weigh them.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  I think it's inherent in the concept of weighing that they have considered them, Your Honor.  If they haven't considered them, then they aren't going to weigh them, and I'm a little concerned -- I guess maybe Mr. Williams is modifying it with the "fairly consider," but I don't think that's necessary.

THE COURT:  No, I'm not -- no, I don't think "fairly consider" is part of the instruction.

MR. WILLIAMS:  And I did amend my suggestion.

THE COURT:  So it could be, You would be required to consider and weigh.

MR. WILLIAMS:  Yeah, that's all I'm asking for.

THE COURT:  You don't really have a problem with that, do you?

MR. BERRIGAN:  Not really, Your Honor, not really.

THE COURT:  Okay.

786

MR. BERRIGAN:  I do think -- I do have a problem with going from here to the last one.

THE COURT:  Okay.  You have a problem with this one?
Page 271

Is that what you mean?

MR. BERRIGAN: Yes, sir, because this destroys the entire concept I think of the individual responsibility of making a determination which is what we've talked about.

THE COURT: How does it destroy that?

MR. BERRIGAN: Well, because it says, Only if the jury unanimously votes for the death penalty, and that's what they've been doing up to the point that we're in the penalty phase is making unanimous decisions, trying to reach a consensus one way or the other. The instruction suggests that will continue into the penalty phase, and I don't believe that's the law.

THE COURT: The law isn't that only if the jury unanimously votes for the death penalty?

MR. BERRIGAN: No, just that this instruction suggests that it's not an individualized determination and that we have no instruction before this --

THE COURT: Yeah, but I'm going to fully instruct on that.

MR. BERRIGAN: I understand, sir. But this is what they're going to take with them.

THE COURT: But this is a true statement.

MR. BERRIGAN: It is, but it's omitting important

787

information that should be given to them.

THE COURT: Yeah, just like the burden of proof on mitigating factors is omitted.

MR. BERRIGAN: Well, yeah, that is important, I agree, but it's not as important as the concept that they're not required to vote as a unanimous body on this issue which I believe this suggests.

Page 272

THE COURT: How could this possibly suggest that? It says, Only if the jury unanimously votes for the death penalty. The converse of it is if a single juror does not vote for the death penalty, she's not sentenced to death.

MR. BERRIGAN: The suggestion is that it's a group dynamic, that they are with each other making a determination whether the aggravating and mitigating circumstance warrant the death penalty or life, and that's not the law.

THE COURT: Well, what you said isn't accurate. They are with each other. It's not like they go off in individual rooms and deliberate in 12 different jury rooms and then come back and report the separate verdicts to me. It's a process where they're all together. You said the suggestion is that it's a group dynamic, that they are with each other making a determination. Of course they're with each other.

MR. BERRIGAN: It's an individualized determination as to punishment, sir. If they all agree, fine. But this instruction does not say anything about making an individualized

788

determination about punishment, and that's a critical aspect of this process that --

THE COURT: Well, it's no different than -- I don't know how you could read this and not conclude you have to make an individual judgment.

MR. WILLIAMS: And, Judge, the defense can explain that to the jury all they want to. I mean, this is a correct statement of the law. And if they think it's necessary, then they can get up and explain the individual part of it.

THE COURT: Would you prefer this language? Only if each juror votes for the death penalty?

Page 273

MR. BERRIGAN: Yes, that would be much preferable to what we have.

THE COURT: Because that kind of combines a little bit of the concept you're trying to incorporate with the unanimous concept.

MR. BERRIGAN: Yes, sir. I'd ask you to put each juror separately votes or separately determines if you'd prefer that language.

THE COURT: I'll take that under advisement as well. Anything else?

MR. WILLIAMS: If you could reduce that font on the "only" from 14 points to 13 --

THE COURT: You'd appreciate that?

MR. WILLIAMS: Yeah. No, nothing else on behalf of

789

the United States.

THE COURT: How about this? I'll put it in the same font size but leave it bold and italics.

MR. WILLIAMS: I don't care. I have no care on that.

THE COURT: Now, as long as we're being technically accurate --

MR. BERRIGAN: Yes, sir.

THE COURT: -- let me jump on you on two things.

MR. BERRIGAN: Okay.

THE COURT: You have misrepresented repeatedly to the jury my position in this case, repeatedly. I have never once said -- and I invite you to go through the realtime transcript. Have I ever once said that individual questioning makes the jurors more comfortable or less nervous? I've never once said that, and I don't believe it. It makes them less comfortable

Page 274

and more nervous.  You have repeatedly confused the concept of comfort with the concept of candor, and they're very different.

My belief is certainly established once again today that in individual questioning jurors are more candid.  One of the reasons why they're more candid is because they don't have the comfort of hiding on the coattails of the folks next to them.

But you have repeatedly told the jury that I have said that they'd be more comfortable individually.  I've never made that claim in my entire life.  Do you understand the difference

790

between comfort and candor?

MR. BERRIGAN:  I do, Your Honor, and I think I also mentioned that we were doing this to get more open and honest responses.

THE COURT:  Yeah, but, you know, I can go back.  With regard to almost every juror you said that I said that individual questioning makes them more comfortable and less nervous.  I've never said that.  So we're just talking about you want me to be as accurate on the instructions.  I'd like you to be as accurate in representing to the jurors what my position is because I've never said that.  Have I ever said that they would be more comfortable?

MR. BERRIGAN:  No, sir.

THE COURT:  Do you agree that there's a difference between comfort and candor?

MR. BERRIGAN:  Not exactly.  I think jurors being comfortable would aid our efforts to have them candid.

THE COURT:  I think the social science is quite the contrary, that it's easier for people to misrepresent the truth
Page 275

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 688 of 3245

when they're in a comfortable situation. But whether you agree with it or not, I've never said that. Did I ever once say that individual questioning makes the jurors more comfortable?

MR. BERRIGAN: I already stated my response, Judge.

THE COURT: Okay. Now, secondly, you misrepresent repeatedly that life imprisonment without parole -- you leave

791

the impression that there's no -- matter of fact, you used the phrase they'll have their last breath in prison. That may or may not be true because they're eligible for a Presidential pardon, and they're also eligible, as we know from Mr. McNeese, for a Rule 35(b) motion.

So there are at least two ways I know of that a life sentence does not mean that an individual will breathe their last life -- will breathe their last breath in prison. You want them to believe that, and I think we all know as a practical matter the odds of either one can be categorized as slim and none, but that's not exactly an accurate impression to leave them with, is it?

MR. BERRIGAN: I believe the law requires that they understand that life in prison is life in prison and it would be a wholly inappropriate consideration that they think otherwise which is why we address it.

THE COURT: Well, don't you agree with me that the two ways I indicated are possible ways in which an individual who receives a life sentence in federal court would not actually serve a life sentence?

MR. BERRIGAN: It's possible, but I think Caldwell versus Mississippi makes it quite clear that the Court should not suggest other than I've suggested which is life in prison

Page 276

means life in prison, and that's the goal because when we're choosing between these two alternatives, parole or early

792

release, none of that should be a consideration.

THE COURT: Well, I think when you say life imprisonment without parole that that's a more accurate statement even though I think actually when -- because there is no parole. Doesn't make any difference whether there's a Presidential pardon or a Rule 35(b) motion. There's still no parole. The life sentence is commuted to a term of years, and the person can serve their sentence and be released, but there's no parole.

So that's an absolutely accurate statement when you say life imprisonment without parole means there is no parole or how ever you phrase it. But when you say they're going to gasp their last breath in prison, that may or may not be true.

So would you have any problem not using -- as long as you want to be so technical on the things you want to be technical with, I'm going to reciprocate. Would you mind not using the phrase "breathe their last breath"?

MR. BERRIGAN: Of course not. If the Court's ordering me not to do that, I will not do it.

THE COURT: Well, I'm not ordering you not to do it. I'm suggesting that you shouldn't say that.

MR. BERRIGAN: Well, I think, Your Honor, I'm trying to answer an important concept. Maybe the language is not what you would prefer, but the concept is that this woman, if she were sentenced or anybody in her predicament sentenced to life

793

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 690 of 3245

without parole, dies in prison, that they don't have an opportunity for release whether that parole --

THE COURT: Well, they do have an opportunity for release. They have a Rule 35(b) motion.

MR. BERRIGAN: I understand that, sir, but Caldwell versus Mississippi I think makes it very clear and its progeny that that's not information that's given to jurors in assessing whether or not the death penalty or life imprisonment would be the proper option.

So they're routinely told, just as I've told them, that there is no other option other than dying in prison as a result of execution or through natural causes because those are the two appropriate punishments to be considered, not Rule 35 motions or anything else.

So I understand your concern about the language. With all due respect, I think that's a very important concept. I'm willing to modify my language so it doesn't offend the Court, but the concept itself is something I intend to continue to stress with the jurors if allowed to do so.

THE COURT: You're certainly allowed to say life imprisonment, there is no possibility of parole. Do you have a need to say more than that? And if so, exactly what is it that you have a need to say?

MR. BERRIGAN: I think I've said all I need to say about this matter, sir. I will modify my language and give it

794

some thought tonight as to what might be more appropriate.

THE COURT: Okay. Now, are there any changes or modifications in the process of jury selection that the parties

Page 278

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 691 of 3245

want to suggest?

MR. WILLIAMS:  No, not at this point on behalf of the United States, Your Honor.  We think your addition of the explanation up front actually is going to save hopefully a substantial amount of time of repeatedly trying to explain the process to each juror as we go through.

THE COURT:  And I want to make it clear, I'm not trying to limit your explanation of the penalty phase process at all.  You're free to explain anything else you want to explain.  Is that clear?

MR. BERRIGAN:  It is, Your Honor, and I don't think in fairness we have explained the process to every juror.  There's some that clearly don't need an explanation because of what they've indicated in their questionnaire responses.  So I don't feel you've limited us in that regard at all during the questioning process.

THE COURT:  But I want to make it clear I'm not trying to limit you.

MR. BERRIGAN:  I understand.

THE COURT:  If you feel it's important for the jurors to understand any aspect of the trial process including the penalty phase process and all the nuances, you're free to

795

totally explore that.  I just didn't want you to think my PowerPoint slide was an attempt to truncate your explanation.

MR. BERRIGAN:  No, and you've not suggested as much. I do think it's an important concept because it's so different than what people normally conceive of as the usual jury process, that the rules are different, and I think they should know that and be advised of it at the earliest opportunity.  That's all.

Page 279

THE COURT: Anything else we need to talk about?

MR. WILLIAMS: No, Your Honor. Thank you.

MR. BERRIGAN: Nothing by the defense.

THE COURT: Okay. I think we only have -- do we have nine coming in tomorrow?

THE CLERK: Yep, we have nine.

THE COURT: And my hope was that for the people who have to travel a good deal you could get out of here a little bit early. That may or may not happen, but that was my hope. I mean, I had the option of asking them to fill in more than nine on a Friday, and I elected not to do it.

MR. BERRIGAN: We appreciate that, sir. I think some of us are traveling and some not, and I'll be in the not category, but thanks for the consideration.

MR. WILLETT: Your Honor, I appreciate the courtesy because I know that my wife is holding on to our income tax returns, but they require my signature because they weren't prepared before my departure for Sioux City, so I appreciate the

796

courtesy.

THE COURT: And, you know, Mr. Berrigan, I've told you this. If you don't mind me getting into a CJA matter, if you want to try and fly home, I'll certainly authorize that.

MR. BERRIGAN: I have plenty of work to do here, sir. I appreciate the thought, and hopefully my wife's talking about maybe coming up with the kids during a short visit, so I think we'll be just fine. I appreciate you thinking about that.

THE COURT: Okay. Thanks. Okay. We'll see you tomorrow morning. Why don't we meet back here at eight o'clock and critique the PowerPoint slides. Thank you.

Page 280

PANEL C, 4-14-05

(The foregoing trial was

adjourned at 5:09 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR

12-31-05
Date

797

INDEX

| PROSPECTIVE JUROR: | | PAGE: |
|---|---|---|
| Prospective Juror 258 | | |
| | MR. BERRIGAN | 503 |
| | MR. WILLIAMS | 513 |
| Prospective Juror 653 | | |
| | MR. BERRIGAN | 520 |
| | MR. WILLIAMS | 535 |
| Prospective Juror 55 | | |
| | MR. BERRIGAN | 545 |
| | MR. WILLIAMS | 557 |
| Prospective Juror 345 | | |
| | MR. BERRIGAN | 563 |
| | MR. WILLIAMS | 572 |
| Prospective Juror 504 | | |
| | MR. BERRIGAN | 575 |
| | MR. WILLIAMS | 587 |
| Prospective Juror 398 | | |
| | MR. STOWERS | 590 |
| | MR. WILLIAMS | 598 |
| | MR. STOWERS | 602 |
| Prospective Juror 223 | | |
| | MR. BERRIGAN | 616 |
| Prospective Juror 52 | | |
| | MR. BERRIGAN | 622 |
| | MR. WILLIAMS | 635 |
| | MR. BERRIGAN | 641 |
| Prospective Juror 797 | | |

Page 281

<pre>
                    PANEL C, 4-14-05
          MR. STOWERS                                 660
          MR. WILLIAMS                                672
Prospective Juror 102
          MR. BERRIGAN                                678
          MR. WILLIAMS                                681
Prospective Juror 717
          MR. BERRIGAN                                683
          MR. WILLIAMS                                697
Prospective Juror 146
          MR. BERRIGAN                                703
Prospective Juror 621
          MR. BERRIGAN                                711
          MR. WILLIAMS                                727


                        * * * * *
</pre>

Page 282

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 695 of 3245

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR01-3046 |
| Plaintiff, | Sioux City, Iowa |
| | April 15, 2005 |
| vs. | 8 a.m. |
| ANGELA JANE JOHNSON, | VOIR DIRE OF |
| | PANEL D |
| Defendant. | |
| / | |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

799

APPEARANCES:

For the Plaintiff:    C. J. WILLIAMS, ESQ.
                      Assistant United States Attorney
                      Suite 400 - Hach Building
                      401 First Street Southeast
                      Cedar Rapids, IA  52401

                      THOMAS HENRY MILLER, ESQ.
                      Iowa Attorney General's Office
                      Area Prosecutions Division
                      Hoover State Office Building
                      Des Moines, IA  50319

For the Defendant:    PATRICK J. BERRIGAN, ESQ.
                      Watson & Dameron
                      2500 Holmes
                      Kansas City, MO  64108

                      DEAN STOWERS, ESQ.
                      Rosenberg, Stowers & Morse
                      1010 Insurance Exchange Building
                      505 Fifth Avenue
                      Des Moines, IA  50309

                      ALFRED E. WILLETT, ESQ.
                      Terpstra, Epping & Willett
                      Higley Building - Suite 500
                      118 Third Avenue Southeast
                      Cedar Rapids, IA  52401

Also present:         Bill Basler

Page 1

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 696 of 3245

PANEL D, 4-15-05
Court Reporter:                Shelly Semmler, RMR, CRR
                               320 Sixth Street
                               Sioux City, IA  51101
                               (712) 233-3846

800

(Proceedings reconvened outside the presence of the jury venire.)

THE COURT:  We're on the record now.  The government goes first today.  Do you want to continue with the way we did it yesterday?

MR. WILLIAMS:  Yeah, I think it actually went pretty smoothly, and I think each day we're going to hone down our questions to the ones that really matter so . . .

I like doing it that way.

THE COURT:  Let me ask you this.  Mr. Berrigan, on the days where the defense goes first --

MR. BERRIGAN:  Yes, sir.

THE COURT:   -- would you rather flip-flop it and do group questioning?

MR. BERRIGAN:  I would, Your Honor, sure.

THE COURT:  You would?

MR. BERRIGAN:  That would be my strong preference, sure.  I'm not abandoning that request, although I don't think this has been a disaster by any stretch.  My strong preference is still for group voir dire.

THE COURT:  And you have an equally strong resistance to his strong preference?

MR. WILLIAMS:  I do.  I'm just -- I am so much more convinced that we're getting full, truthful answers.  I think we're feeling comfortable spending as much time as we need to

801

Page 2

work with these jurors individually, and it just isn't there in that group setting, so I feel very strongly we're getting much more truthful answers from these people sitting down with them one at a time.

THE COURT:  And what do you like better about the group?

MR. BERRIGAN:  Well, there's two things I think, Your Honor.  One is that it's much easier to explain the concept of the penalty phase process which I think is critical in a group setting only because it's not so repetitive, and I feel sometimes that it does take time, and doing it for every juror is a difficult proposition, although, admittedly, the Court's not preventing me from doing that.  I'm just mentioning it as a practical matter.

THE COURT:  But as a practical matter, if you do that for every juror in as much detail as you want to, you wouldn't be able to ask all the questions you'd like to ask.

MR. BERRIGAN:  Exactly.  You have not imposed any time constraints.  By the same token, we're also very aware of how many jurors are coming in each day and trying not to put ourselves in a position where we're under time constraints, so I'm trying to be conscious of that.

The second thing as I mentioned -- and we just -- I guess we all respectfully disagree with each other's positions, but I do think the jurors take some comfort with the group

802

setting because they're with colleagues as opposed to coming into this process by themselves facing lawyers and a judge and sort of the trappings of the courtroom.  I don't think most

Page 3

people have ever been in this kind of an environment where they're being asked questions by themselves.

THE COURT: Well, I totally agree with you on that part. I totally agree with you, totally, that they're more comfortable in a group setting. Where we disagree is the effect of that comfort on their answers.

MR. BERRIGAN: Right.

THE COURT: That's where we disagree, not that they're more comfortable.

MR. BERRIGAN: I -- yes. I think the comfort level makes them more likely to give open and honest responses, and I understand you feel otherwise. But that's about it.

THE COURT: Okay. Now, Mr. Williams, what's the big harm if on the days you go first we do it one way and on the days he -- I know it's odd, you know. I mean, I realize it's not what I had actually planned on doing, but what's the downside to it, because nobody really knows -- I mean, we don't have a way of knowing which way is better. And obviously I get paid these big bucks to decide some of those things.

But truthfully I don't have a high level of confidence that individual questioning is better. I think it is. You know, I'm pretty sure it is, but I don't see the huge harm. I

803

mean, I understand some of what you pointed out. There's a little more gamesmanship doing it that way, but, you know, you have a lot of strikes.

MR. WILLIAMS: If you want to do that, obviously that's fine and certainly something we could live with. I would ask simply that you watch the dynamics again if we do another group setting and use your judgment because I'm convinced -- if

Page 4

you have another shot to see it in a group dynamic against what we've done the last couple days, I'm convinced you're going to see a difference in how candid and how open people are in discussing their views on the death penalty and not foreclose the possibility that we shift back to individual voir dire if you're convinced that we're getting more truthful answers individually than we are as a group. But if you want to flip back the other way and let --

THE COURT: I'd like to experiment a little bit more because it's an educational process for me too, and each side has relatively strong feelings about it, and there's really no reason why -- I mean, my job isn't to accommodate people in this job. I never viewed that as my role. But if I can accommodate each side's views without doing any harm to the overall process and trying to get at justice, I'm not opposed to that.

I mean, I -- I'm a contrarian by nature but -- and I fully recognize that. But when I can accommodate other views that are contrary to my own and I don't think it harms the

804

process -- because I may be a contrarian, but I don't hold that view so strongly that individual questioning -- yeah, I think it is better, but I don't hold -- it's not a strongly held belief of mine.

So I'd like to experiment a little bit more solely because this is a learning process for everybody, and I don't see any harm in the experimentation.

MR. WILLIAMS: Just a heads-up for a practical matter then is you're going to have to have two versions of a PowerPoint because you're going to have to explain the process differently.

Page 5

THE COURT: Right.

MR. WILLIAMS: So a logistical matter.

THE COURT: Right. The only thing I have to flip is the individual questioning.

MR. WILLIAMS: Right.

THE COURT: Yeah, yeah, but that's fine. I've already done that once. That will be pretty easy to do.

Now, the real interesting thing -- the better way to do it, though, would be on the days where you go first to have the group and the days where you go first to have the individual questioning or to actually rotate it through that way rather than each have you use the one you like the best from a social science perspective.

MR. WILLIAMS: I feel a little bit like an

805

experimental rat right now.

THE COURT: Well, that's because maybe in this regard you are. But for today we'll -- it's the government's day, so we'll do individual questioning like we did yesterday. For Monday we'll go back to group questioning. And then we'll see where we are after Monday. I mean, it's not a big burden to switch without a whole lot of notice, is there? I mean, you've got Monday's notice.

MR. BERRIGAN: Not at all, sir. We have the questionnaires.

THE COURT: Yeah. Okay. Anything else we need to take up?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Berrigan, anything else?

MR. BERRIGAN: Nothing, sir.

Page 6

THE COURT:  Okay.  Thanks.

(Recess at 8:08 a.m.)

THE COURT:  You all ready?

MR. WILLIAMS:  Yes, Your Honor.

MR. BERRIGAN:  Yes, sir.

THE COURT:  Okay.  Thank you.

(Panel D entered the courtroom.)

THE COURT:  Good morning.  If you'd all remain standing, I need to swear you in.

(Panel D was sworn.)

806

THE COURT:  Okay.  Good morning.  Please be seated.  I wanted to welcome you all to the United States District Court for the Northern District of Iowa.  How many of you have been in this third-floor courtroom before?  Anybody?

Okay.  My name's Mark Bennett.  I'm the chief judge of the United States District Court for the Northern District of Iowa.  I'll be the trial judge in this case.  And it's my pleasure to welcome you all.  I wanted to remind each of you that it is not a violation of federal law to smile in the morning so -- there we go.  And I say that because I know that when you went to bed last night and when you got up this morning you probably weren't jumping for joy on the thought that you just might get selected to serve in a three-month trial.  So I understand that.  I do understand that.

Okay.  Let me introduce the individuals in the courtroom.  I'll start at the table closest to the jury box.  We have Mr. C.J. Williams -- he's just going to raise his hand -- and Mr. Tom Miller.  They are two federal prosecutors who will be prosecuting this case.  And seated next to the two federal

Page 7

prosecutors is Special Agent Bill Basler who's what we call the case agent, and he'll be sitting at counsel table for the government throughout the entire trial.

Shifting over on the defense side -- and we're going to come back, and you're actually going to meet them in a little bit more detail in a few minutes, but first we have Mr. Pat

807

Berrigan and then Mr. Al Willett and then in back Mr. Dean Stowers. And seated at the front table between Mr. Berrigan and Mr. Willett is Angela Johnson, and she's the defendant in the case.

And we have certain rules that we're going to need you to follow, and so that should be on each of your chairs. I want to go over that with you.

Conduct of potential jurors during jury selection and trial. To ensure fairness, you as potential jurors must obey the following rules until the end of the case if you are selected for the jury or until you are excused from serving on the jury in this case. These rules apply whether you are in the courtroom, in the courthouse, at home, or anywhere else until you are excused from further service in this case.

First, do not talk among yourselves about this case or about anyone involved with it.

Second, do not talk with anyone else about this case or about anyone involved with it.

Third, when you are outside the courtroom, do not let anyone tell you anything about the case. If somebody should try to talk to you about the case during jury selection or trial, please report it to me.

Fourth, do not talk with or speak to any of the

Page 8

parties, lawyers, or witnesses involved in this case. You should not even pass the time of day with any of them. It is

808

important that you not only do justice in this case but that you also give the appearance of doing justice. If a person from one side of the case sees you talking to a person from the other side, even if it is simply to pass the time of day, an unwarranted and unnecessary suspicion about your fairness might be aroused. If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator or the like, it is because they are not supposed to talk or visit with you.

Fifth, do not read any news stories or articles about this case or about anyone involved with it or listen to any radio or television reports about the case or about anyone involved with it. If you want, you can have your spouse or friend clip any stories and set them aside to give you after the trial is over or after you are excused from serving on the jury in this case. I can assure you, however, that if you are selected for the jury in this case by the time you have heard the evidence you will know more about the case than anyone will learn through the news media.

Sixth, do not do any research on the Internet, in libraries, in the newspapers or in any other way or make any investigation about this case on your own. If you are selected for the jury, you must decide this case based on the evidence presented in court.

Seventh, if you are not excused from serving on the jury today, please take this instruction with you so that you

809

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 704 of 3245

can refer to it if you have any questions between now and the date you are required to return for the trial.

Dated this 15th day of April, 2005, signed by me, Mark W. Bennett, chief judge, United States District Court, Northern District of Iowa.

Now, I wanted to explain who everybody is in the courtroom. I have one of my three and a half law clerks with me -- maybe some day we'll bring the half in -- Carey. She's in her second year of a federal clerkship with me. She's an honors graduate from the Drake University Law School in Des Moines. And at the end of the summer she's going to be moving out to Seattle.

We have our court reporter Shelly sitting -- seated right in front of me. Shelly has the most difficult job because she's got to take down everything that everybody says throughout the entire jury selection and entire trial. And to make her job a little bit easier, when it comes time for questioning the jurors, we're going to be passing a handheld microphone around because it's a historic courtroom built in 1931. We've got a great electronic sound system, but it only works if you speak directly into the microphone. And when they pass that handheld microphone down to each of you, I'll make you a deal. If you speak directly into it, I will not put up any karaoke music to sing. If you don't speak directly into it, I'm going to have to put the music up. So we probably don't want that.

810

We have some United States marshals who are in the courtroom. That's true in every -- every time I'm on the bench we have United States marshals in the courtroom, and that's very typical. And depending upon what's going on in the trial and

Page 10

how many witnesses we're having in a given day, we may have more or less marshals once the trial gets underway.

We also have some court security officers. We have two in the courtroom right now. They're easy to spot because they have the blue blazer, the badge, and the earpiece. And they have a lot of responsibilities in our courthouse. One of their major responsibilities is to take care of the jury, make sure you get down to the jury room, get back up to the courtroom on time. And we're very lucky to have such highly competent CSOs as we call them in our building.

We have the lawyers which you met and you'll be meeting in more detail in a few minutes and the parties they represent. Of course, the two prosecutors represent the United States government. The defense lawyers represent Angela Johnson in this case.

And then I want to talk a little bit about kind of our roles, the jury, your role if you're a juror in this case, and then my role as the judge. I'll start with me.

I obviously have the responsibility of running the trial. I've had a lot of responsibility on pretrial matters in this case. I've ruled on lots of motions filed by both sides

811

which would be expected in a case like this. It will be my responsibility to try and make the trial run as fairly as I'm capable of but also try and do it efficiently.

And, for example, we have a lot of flexibility in designing jury selection, particularly for a lengthy case like this. One of the systems I could have used would have required you to come to the courthouse every day for three weeks.

And, in fact, my secretary's sister was called to jury

duty this week in the federal court in Minnesota in Minneapolis, and she was at the courthouse three days in a row and never got out of the basement, never even got up to a courtroom, but she had to come every single day and sit there all day long.

And my secretary was called for jury duty this week over in state court, and she was there for half a day, and then she'll have to go back -- I think that's her second time and she goes back in another week or two.

Working with the lawyers in this case, we set up a system where we bring the potential jurors in just for one day. It's going to be a long day. But it's one day. And at the end of the day, you will know -- and some of you will know before the end of the day -- that you're going to be dismissed, but by the end of the day, you'll know whether you're still in the jury pool or not. And then once we get enough jurors in the pool, we'll select 12 jurors and 6 alternates and let you know.

But the good news is -- and I'll explain in quite a

812

bit of detail what we're actually going to do today, but the good news is today's the only day you'll have to come to the courthouse other than if you're selected to serve on the jury, and we've done that to save your time because your time is valuable, and I do view that as part of my job. My number-one job is to make sure that Angela Johnson gets a fair trial and that the United States government gets a fair trial. That's my number-one job.

But right up there, right up there, is to make sure that I don't waste any of your time because I know your time is valuable to you, particularly when we ask you to serve in a rather long case like this.

Page 12

My other major responsibility would be right before opening statements I'm going to give you a very detailed set of instructions, and Miss Johnson is charged with ten separate crimes. And I'm going to define each of those crimes for you. And then towards the end of what we call the first phase of the trial -- and I'll explain the phases later on this morning, but at the end of the first phase I'll give you a much more detailed set of instructions which tell you exactly what the law is in the case.

Now, let's go back to your job. If you're selected to serve as a juror in this case, your job will be to listen to all of the evidence, and the evidence will come in through that witness box. Even though this is a historic courtroom, it's a

813

high-tech courtroom, one of the best high-tech courtrooms in the country, and you'll be able to visualize all of the evidence that gets introduced. It gets put up on the big screen. And in this case I have reason to believe there could be in excess of 500 exhibits introduced. There may well be more than right around a hundred witnesses. May not be that many, but there could be that many, maybe a few more, so there will be lots of witnesses and lots of exhibits being introduced. You'll have a note pad, and you'll be able to take notes obviously to help you keep track of the evidence.

But your job is to figure out what happened. That's your job. You have to figure out what happened. That's not my job. I don't decide the credibility of the witnesses -- in other words, is a witness telling the whole truth, just some of the truth, or part of the truth -- because I'm not the judge of the facts in this case. You are.

Page 13

And that's really what I'd like to describe as your role. Your role is you're the judges of the facts. You have to listen to the evidence, weigh it carefully, decide what happened, then take my instructions, apply the facts to the law in my instructions. And at the very end of the first phase of the trial which we call the merits phase or the not-guilty/guilty phase, you'll have to determine is Angela Johnson not guilty or guilty of one or more of the ten charges. That's what you'll do in the first part of the trial.

814

Now, we're going to start what we call jury selection. It's often called voir dire. It's a French term. It's just another name for jury selection. And literally translated, it means to speak the truth. And what do we mean by that? Well, it means that I'm going to be asking you a couple of questions, but in this case the lawyers are going to be doing the bulk of the questionings.

And let me ask you this. How many of you are a little bit anxious or just slightly nervous about being here this morning? Yeah, okay. Almost everybody raised their hand. That's totally understandable, totally understandable. I do want to put you at ease, though. It's not going to be as bad as you think. It really isn't.

And the lawyers are going to ask you questions about your views on things and your background and experience and your views. And they're going to respect your views no matter what they are. Nobody is here to try and talk you out of anything you believe in. We have total respect for your views, and there's going to be a wide range of views on the questions the lawyers are going to ask you. And the great thing about America

Page 14

is you can believe whatever you want.

So we're going to ask you the questions because we want to find 18 jurors including 6 alternates, but there are no right or wrong answers to any of the questions asked. But for our system to work, you have to answer openly and honestly. And

815

that's part of your oath as jurors, to answer the questions as openly and honestly as you can.

Now, you all have numbers on, and I'm going to remind you to use your number rather than your name, and the lawyers are going to address you by number. So it will be a little odd at first. They'll be saying Miss 403 and referring to you by number.

I want to explain why we're using numbers. That was totally my decision. This is a -- what I would call, I think what anybody would call, a high-profile case. In other words, there's a lot of interest statewide in this case. There will be a lot of newspaper articles, radio and TV generated about this case.

And it's tough enough that you're going to have to give two to three months of your lives to serve as a juror in this case. I didn't want your names out in the public so that what I call idle curiosity seekers would be contacting you. You would be surprised at how many letters and phone calls I get every day from what I call idle curiosity seekers, and I try and answer all of them. But I get paid to do that. You don't.

And so it was my idea. I just didn't want somebody reading your name in the newspaper and looking you up and coming knocking on your door and interviewing you about, hey, what's it like to be a juror in this case? I just didn't want to put you

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 710 of 3245

through that. If you want to volunteer to people and talk to

them, that's one thing, but I just didn't want these idle curiosity seekers. That's the only reason why we used numbers. It was just to give you some measure of privacy if you get selected to serve.

Now, I want to try and go through the process with you. We anticipate that jury selection will take two to three weeks. It went a little slow -- we started on Tuesday. Tuesday, Wednesday went a little bit slow. Yesterday we had a pretty good day. We qualified quite a few jurors. Every day's going to be different. It's only an estimate. We think it's going to take two to three weeks.

We're bringing in small groups each day because the lawyers and I all agree that it just works better with small groups. I was reading about jury selection they were doing in some case. I was just reading it earlier this week, and they were bringing in 400 jurors to some convention center in some city, and they were going to have them fill out the questionnaires in the convention center and start jury selection. I know some judges do that, and they may have those 400 people there for a couple of weeks or something just for jury selection. We opted to bring in small groups each day, and it's worked very well.

After my introduction of the lawyers and I'll have a few questions for you and then I'm going to explain the trial process to you because this is a po -- it is a death penalty

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 711 of 3245

case. In other words, if Miss Johnson is convicted beyond a reasonable doubt of one or more of the ten charges, then potentially the death penalty could be in play in this case, and I want to talk to you about that because that makes this case different than your typical case in federal court, and I'm going to go through that with you.

But anyway, the lawyers are going to ask you questions. We're going to start off with individual questioning of you. After we're done in the group this morning in about half an hour or so, we're going to send you down to the jury room, and then we're going to bring you up one at a time. And the lawyers are going to question you primarily about two things: Pretrial publicity and your views on life imprisonment and the death penalty.

And then when we're done with questioning individual jurors, we'll bring you all back up and do some general questioning, and then by the end of the day you'll know whether you can go home and totally forget about this case or whether you're still in the jury pool or not. So we'll have the group questioning.

And you will know at the end of the day whether or not you're still in the jury pool or you're dismissed from service. If you're in the jury pool, you'll have about a 50 percent chance of being selected as a juror.

Here's kind of how the numbers work. We're going to

818

get 34 people, maybe a few more than that, but right around 34. We may go up to 40. I haven't decided yet for sure, and that will be our jury pool, and then from that group we're going to select 18. So I just approximated you have about a 50 percent

Page 17

chance if you make it into the jury pool by the end of the day today. Some of you may be dismissed earlier than that. Just never know.

So once we get the numbers we need empanelled, then we'll notify you by telephone whether or not you've been selected to serve on the jury and when the trial will begin, and we'll give you as much notice as possible. The trial's not going to begin next week, and it probably won't begin the week after, so that's just our best guess about when we'll get started.

Now, once we get into the actual trial part, I'm going to run the trial four days per week. Almost always it will be Monday through Thursday. We will start at 8:30 in the morning, and we'll go till about 4:30 in the afternoon, sometimes a little more than that, quarter to 5. It depends. If we've got a witness maybe from way across the state or out of state and we can go ten more minutes to finish up that witness so we don't have to inconvenience that witness, we'll go to a quarter to 5 or so, but most days we'll be going from 8:30 to right around 4:30. We will be taking the week of June 10 through the 17th off.

819

Now, I'm going to have the lawyers introduce themselves to you, and we'll find out if you know any of them. Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

Good morning, ladies and gentlemen. My name is C.J. Williams. I'm an assistant U.S. attorney. I live over in Cedar Rapids, and I work in our Cedar Rapids office.

With me at counsel table is Tom Miller. He's a

Page 18

special assistant United States attorney from Des Moines, Iowa.

MR. MILLER: Good morning.

MR. WILLIAMS: And also Bill Basler. He's a special agent-in-charge from Mason City, Iowa.

Back at this table is Sali Van Weelden. She's a legal assistant in my office, and she'll be assisting us throughout trial as well.

The U.S. Attorney's Office is headed by Chuck Larson Senior. He's actually in Baghdad right now, but he's the U.S. attorney for the Northern District of Iowa.

We have an office here in Sioux City that has seven attorneys and seven support people, so I'm going to go through those names because there's more likelihood you might know some of those. The attorneys are Forde Fairchild, Martha Fagg, Kevin Fletcher, Mike Hobart, Jack Lammers, Janet Petersen, and Shawn Wehde.

The support staff is Shayne Mayer, Del Tompkins, Penny

820

Schlotman, Michelle Schwebach, Michelle Hatting, Carol McEntaffer, and Pat Calhoun.

THE COURT: Okay. Thank you, Mr. Williams.

Now, do any of you know Mr. Williams, Mr. Miller, Mr. Basler, any members of the U.S. Attorney's Office or -- let me add to that -- anybody who works at the federal courthouse here? Anybody?

Okay. Why don't we switch over to defense side. Mr. Willett?

MR. WILLETT: Thank you, Your Honor. If it please the Court, ladies and gentlemen of the jury, I'd like to start with the most important introduction. This is Miss Angela Johnson.

Page 19

Miss Angela Johnson was born in the decade of the '40s (sic). She's originally from the Mason City and Clear Lake area of Iowa, and I think you know where that is, but it's north central Iowa right below the Minnesota border. Angela has three sisters, one brother, two daughters, and even one granddaughter. She finished her formal education at Forest City High School where she went through the ninth grade, but she's also achieved her GED.

THE COURT: Mr. Willett, I think you misspoke. You said the decade of the '40s. Not even you were born in the decade of the '40s.

MR. WILLETT: I apologize. The decade of the '60s, the decade of the '60s. Judge, I was trying so hard not to say

821

my client's age, I went too far, so I apologize. My client was born in the decade of the '60s.

Do any of you recognize Miss Johnson?

Would you please sit down.

And now then, my name is Al Willett. I'm a criminal defense attorney from Cedar Rapids, Iowa. I practice law with the firm of Terpstra, Epping, and Willett. I practice law with Ray Terpstra and Greg Epping.

I have two co-counsel with me. First, Mr. Patrick Berrigan from Kansas City. He practices law in the law firm of Watson and Dameron.

Associated with Mr. Berrigan is Ms. Lisa Dahl who is from that area of the country also.

And my other co-counsel, Mr. Dean Stowers. Mr. Stowers practices law in Des Moines, Iowa, with the law firm of Rosenberg, Stowers, and Morse. Specifically he practices law

Page 20

with Brent Rosenberg, David Morse, and Heather Wood.

Now, do any of you recognize myself, Mr. Berrigan, Ms. Dahl, Mr. Stowers, or any of the people associated with our firms?  I see no nods of affirmation.

Judge, thank you.

THE COURT:  Thank you, Mr. Willett.  I was only concerned because if she was from the '40s, that would put me back in the '30s, and I was going to go in and prepare my retirement form.

822

Now, we have estimated that the length of trial will be three months.  It's always difficult to estimate the length of a trial, and the longer we think the trial will be, the more difficult it is to estimate the length of it because things just happen in trials that are unanticipated sometimes that adds to the length of the trial.  But more often than not, that actually means the trial's going to run faster than anybody could anticipate.  But I had to have something to tell you, so I met with the lawyers.  We've talked about it.  Our best guess is that the trial will be over towards the end of June.  That's our best guess.  Could be over before that.  Might run a little longer, but I seriously doubt it.

I tell you that because I'm going to ask you a question about whether it would be a severe or extraordinary hardship for you to serve, but I want to talk to you about that for a few minutes before I ask, and I'm going to ask each individual juror.

In my job, I get to serve our country every single day, and that's one of the things that I just love about this job, that I'm in public service.  I love being in public

Page 21

service. Took a huge pay cut to do it, but I love doing it. And it's very rewarding and very fulfilling that I get to apply federal law every single day and try and do justice in every single ruling that I'm called upon to make every single day.

But I'm pretty lucky because I get to do this, and I

823

was appointed by the President and confirmed by the Senate in 1994, and I'm now in my eleventh year as a United States District Court judge.

But for most people you don't get a lot of opportunities to really serve your country. You do today because it's April 15, and you get to pay taxes or do what I did. I filed an extension yesterday. It's the only form I know, the 4868, and I filed it yesterday. So today's a big day for most people serving their country. You get to pay all those taxes.

But jury service really is, if you think about it, a unique opportunity to serve your nation. And let's be realistic. I know that when most of you came in here this morning you're hoping that you do not get selected to serve. I understand that.

And -- but let me just share my experience with you. In every trial I've had -- and I've had hundreds of trials. We're actually the busiest trial court in the nation if you look at numbers of trials per federal judge. In three of the last four years we were number one in the nation. In the year we weren't number one, we were number two. We are very, very busy. We get to do a lot of trials.

And because we do so many trials, I've had an opportunity to talk to the jurors. Matter of fact, I do more

Page 22

than that.  Starting with my very first trial, at the end of

824

each trial, once the jury's reached a verdict, I go down to the jury room, and I pass out a questionnaire with a stamped, self-addressed envelope.  You get to take it home, and you'll get to evaluate the entire trial process.  You'll get to evaluate each of the lawyers.  You actually get to rate them. You get to evaluate me as a judge.  And you get to evaluate everything about our process.  And I do that because we have made dramatic changes in how our court conducts business based upon what jurors have told us.  What you tell us is very, very important to me.

But one of the things I've noticed when I read each and every one of the questionnaires is that well over 90 percent -- I would put it up at probably 98 percent -- of the jurors who have served find it to be a much more interesting, rewarding, and fulfilling experience than they ever thought it would be.

In other words, cutting to the bottom line, most people come in here hoping they don't get selected.  They think it's going to be a negative, lousy experience.  And, in fact, when they're selected, they find it to be one of the most interesting things they've done in their life, and they feel so good about the fact that they've been able to serve their country.

Now, it's a little bit easier to do that in a two- to three-day trial, and we have a lot of those, and it isn't a

825

trial of this length.

Page 23

So one of the things I've noticed this week in jury selection is very few individuals, even though in their questionnaires they indicate that this might be a hardship, very few individuals -- yesterday I don't think we had a single one. The day before that I think we had two. One had an extraordinary medical condition, extraordinary, was actually taking narcotic drugs through a pain pump and couldn't stay awake through the trial. And one other individual had an extraordinary situation. And on the first -- basically nobody has asked to get off jury service. I know it's going to be a hardship for you to serve.

Yesterday we had a gentleman who was the president and CEO of a company of 350 employees, and, you know, a lot of people would say, Gee, I'm too important; I'm too busy to serve. He didn't even try and get off.

Last year I had a lengthy trial that went about this long, and I'll never forget these two farmers. One day -- we took three weeks to pick a jury in that case. And one day we had two farmers in the panel. This was during harvest season. And they both farmed big operations and worked full time in manufacturing jobs. And neither one was going to get paid other than the first two weeks of jury service. Couldn't come at a worst time during harvest season. Both of them were willing to serve in a three-month trial.

826

I remember another person in that trial who said that he wasn't going to get paid at all for the three months, but he talked to his wife. They had a heart-to-heart talk the night before, and they were willing to deplete their family savings so that he could serve his country as a juror in the case,

Page 24

extraordinary, truly extraordinary.

And, you know, it falls differently for different people because everybody has a different life situation and a different life story.

So I'm going to ask you -- we'll take the microphone, Rick, and if you would hand it, please, to Juror 403, I could ask if it'd be a severe or extraordinary hardship, but I'm going to ask the flip side of that. Are you willing to serve as a juror in this case if you're selected, Juror 403?

PROSPECTIVE JUROR 403: Yes.

THE COURT: Okay. Thank you.

Juror 686, are you willing to serve if you're selected?

PROSPECTIVE JUROR 686: Yeah.

THE COURT: Okay. Thank you.

Juror 450.

PROSPECTIVE JUROR 450: Yes.

THE COURT: Okay. Thank you very much.

Juror 176.

PROSPECTIVE JUROR 176: Yes.

827

THE COURT: Thank you very, very much.

Juror 573.

PROSPECTIVE JUROR 573: Yes.

THE COURT: Okay. Thank you.

Juror 544.

PROSPECTIVE JUROR 544: No.

THE COURT: Okay. Why is that?

PROSPECTIVE JUROR 544: I'm a stay-at-home mom of four children, eight to one. I have a dog -- I raise Maltese dogs.

Page 25

If I'm not there, most of the puppies die.  But, Your Honor, if you see that this is not a good excuse, I will serve.

THE COURT:  Well, I could just see the headline: Federal judge puppy killer.  I need to know more about it.  I assume -- and maybe I shouldn't assume these things.  Have you made some preparations, or were you just pretty sure you were going to be able to talk your way out of jury service?  Have you made some plans in case you are selected?

PROSPECTIVE JUROR 544:  Yes.  In my mind, yeah.  I mean, I -- yeah.  I don't have a day care provider, so I'd have to find one, but there's time between now and the trial that I could.

THE COURT:  You could find that.  And what about the dogs?

PROSPECTIVE JUROR 544:  We'd have to figure something out.

828

THE COURT:  Okay.  Do you think you'd be able to do that?

PROSPECTIVE JUROR 544:  I think so, yeah.

THE COURT:  Okay.  I don't want to put words in your mouth.  Is it -- but I'm just -- I get a sense -- you'd rather not serve, but if you have to, you will.  Is that a fair statement?

PROSPECTIVE JUROR 544:  I have two brothers serving my country now, and I feel it is a duty that you could do, so if -- you know, I will if you require me to.

THE COURT:  Okay.  And if you ultimately wind up getting selected, yeah.  Okay.  Thank you very much.  Thank you.

Juror 311?

Page 26

PROSPECTIVE JUROR 311:  Yes.

THE COURT:  Thank you.

Juror 506.

PROSPECTIVE JUROR 506:  Yes.

THE COURT:  Thank you.

Juror 64.  It should be on hopefully.

PROSPECTIVE JUROR 64:  Yes.

THE COURT:  Okay.  Thank you.  That's great.

I want to tell you a little bit about kind of the trial process, and this would be what happens if you actually get selected to serve on the jury, but I think it will help you to respond to the questions this morning and this afternoon if

829

you know something about the process.

Most trials are really a single phase, but because this is a death penalty trial potentially, it has a potential of being a three-phase process, and I want to try and go through it and explain it to you.

The first phase is what I would call the merits or the not-guilty/guilty phase.  And in that sense it's like every other trial.  And Mr. Berrigan used a good example of somebody facing a parking ticket.  It really -- while it's so much more serious than that and I don't mean to make light of somebody with a parking ticket, the actual trial is very similar, or one of our typical criminal cases, a bank robbery case.  The trial is about is the defendant not guilty or guilty of the crimes charged.  And that's the entire trial.

And in our typical criminal case, it's just one phase, and then if the defendant is found not guilty, it's over.  If the defendant is found guilty, if the government can prove

Page 27

beyond a reasonable doubt and overcome the defendant's presumption of innocence and if the jury unanimously agrees that the government proved its case beyond a reasonable doubt and finds the defendant guilty of one or more charges, then the trial's over at that point, and then there's a sentencing usually about 80 or 90 days down the road which is my responsibility.

This case is different. But the first phase of the

830

case is exactly the same. The question is is Angela Johnson not guilty or guilty of one or more of the ten charges she's charged with. So the first phase remains the same just like any other trial.

Now, the second phase -- and we'd only have a second phase -- if the jury unanimously finds beyond a reasonable doubt that Angela Johnson is guilty of one or more of the ten counts in the first phase do we even have a second phase.

Now, the second phase is what I've called the eligibility or the gateway phase. And that's going to be a little bit different because there isn't going to be any evidence presented. But should the jury come back with a finding of guilty on one or more of the ten counts, then we'll have a second phase, and I'm calling that the eligibility or gateway phase. And in that phase, the eligibility or gateway phase, is where the jury will have to decide if the prosecution has proved what we call a gateway or eligibility factor and one or more federal statutory aggravating factor or factors beyond a reasonable doubt.

If the jury unanimously agrees that the prosecution has proved this, then and only then would we reach the third

Page 28

phase. One of the lawyers -- I believe it was Mr. Berrigan talked about a basketball game with two halves and a halftime, and it was a pretty good analogy. And the halftime would be this second phase because there's not going to be any evidence

831

presented.

If Angela Johnson is found guilty of one or more of the crimes in the first phase, we'll have the second phase. It will have its own set of jury instructions and arguments by the lawyers but no evidence. Then the jury will go back and deliberate on these questions in the second phase. And if they find a gateway factor and one or more statutory aggravating factors, then we'd have the third phase.

And the third phase is what I call the penalty phase. In this phase if we ever get there -- and there are several ways that we would not have a penalty phase: One, the jury may find that the government has not proved its case beyond a reasonable doubt on any of the ten charges in the first phase. And if that's true, then there is no second phase, and there certainly isn't a third phase. Or the jury could find Angela Johnson guilty of one or more of the ten charges but in the second phase find that the government hasn't proved an eligibility or gateway factor and hasn't proved one or more of the statutory aggravating factors. In that situation then we would never reach a third phase.

So if we do get to the third phase, that would be the penalty phase. And in this phase, if we ever get there, you would be required to consider and weigh aggravating and mitigating factors that I would instruct you on to determine whether Miss Johnson should receive life imprisonment or the

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 724 of 3245

death penalty.

And in this third phase, the penalty phase, it'd almost be like a mini trial. Be like the second half of a basketball game, but I think we all agree it probably isn't going to be as long as the first half. But both sides would have an opportunity to present evidence in the second phase -- I'm sorry, in the third phase.

And then in that third phase, only if each juror unanimously votes for the death penalty will Miss Johnson be sentenced to death by me.

So that's just to give you a little bit of overview about what the process is going to be like if you're selected, and the lawyers are going to ask some follow-up questions, and I think they'll do a better job of explaining the process than I have.

So what we've been doing is we've been alternating every day. One day we start with the defense lawyers going first and one day with the government lawyers going first. And today would be the government's day to start. Mr. Williams or Mr. Miller?

MR. WILLIAMS: Me, Your Honor, and we were going to do the individual.

THE COURT: Oh, that's right, yep. So here's what we're going to do. We're going to send -- we're going to start with the front row, and we're going to start with Juror 176.

833

You'll be first. And then we'll go just down the front row, and

then we'll go to the back row to Juror 573 and go down the back row, so the last juror we're going to talk to individually would be Juror 64.

At this time except for Juror 176 who can remain in the courtroom, we're going to send you all down to the jury room. Just as kind of a rough estimate, we've been spending about on the average 20 to 30 minutes per juror, and then we're not taking much of a lunch break today. Right around noon or so whenever we finish with a juror we're going to take about a 30-minute lunch break.

So, Juror 64, we're not going to get to you obviously by 9:30 or 10 or even 10:30 or probably 11. I can't exactly tell you when we're going to get to you, but you're going to be last. So it's going to be a while because we're going to have to talk to the other eight jurors first.

So you don't have to stay in the jury room, but we want you back here in time so that we don't have to wait for any potential juror. So if you do leave, you ought to just use maybe -- be conservative -- 20 minutes per juror as a rough guess about when you're going to have to be here, and we're just going to go down the first row, then go to the back and go down that row. Once we talk to you all individually, then we're going to bring you back in the entire group and have some general questions for you in the group.

834

So that's how we're going to proceed. If everybody but Juror 176 would leave now and go down to the jury room, and please remember my instruction about not discussing this case among yourselves or with anybody else. Thank you.

(Panel D exited the courtroom, Prospective Juror 176

Page 31

remaining.)

THE COURT:  Juror 176, would you like to kind of move down to the middle there?  Thank you.

Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

EXAMINATION

BY MR. WILLIAMS:

Q.    Good morning, Juror 176.

A.    Good morning.

Q.    How you doing this morning?

A.    Good.  Thank you.

Q.    Have you ever served on a jury before?

A.    No, I have not.

Q.    So this is kind of a new experience for you then.

A.    Yes.

Q.    We're going to just discuss a few things with you.  I see that you work at Tyson Foods.  You've been doing that for 29 years?

A.    Yes, sir.

Q.    Now, was it always Tyson?  I know that Harkers got taken

835

over by Tyson up here in LeMars back in the --

A.    No, it was IBP.

Q.    IBP before that?  Let me -- we're going to talk to you in this individual setting just on a couple issues, and that is your knowledge of the case through publicity, and then we're going to talk a little bit about life imprisonment and death penalty as issues.  In the questionnaire you indicated that you had only just heard a little bit about this case.  What do you recall hearing about this case?

Page 32

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 727 of 3245

A.    Just that the boyfriend or whatever before, what was in the newspaper then.

Q.    And I think in your --

A.    And what was on the news, just not a whole lot.  I wasn't that interested in it.

Q.    Do you recall what the outcome of that case was?

A.    He was found guilty.

Q.    And do you remember thinking about punishment in that case?

A.    Death penalty.

Q.    In this questionnaire you indicate you either work or did work with a juror on the Honken case; is that correct?

A.    Yes.

Q.    And has that juror shared with you any of the details of what he learned during his service -- is it a he or a she?

A.    It's a he.

Q.    It's a he? -- during his service as a juror in the Honken

836

case?

A.    Just that it was interesting, and, you know, he thought that -- knowing that I had to come here today that if I'm selected that I'd be interested in it, that it'd be serious but at the same time rewarding.

Q.    Did he tell you anything about the evidence that he heard?

A.    No, we didn't discuss evidence.

Q.    Okay.  Now, how's that going to be?  Let's assume that you get picked as a juror in this case.  You know, first of all, how much do you work with this other employee?

A.    We're both supervisors at Tyson Foods.  We work in the same processing room.  We have daily contact, but we don't work side by side.

Page 33

Q. Would it be difficult for you serving as a juror in this case to, if you served as a juror, not to discuss this case with that other employee?

A. No. We have things all the time that we don't talk about. You know, he did his thing, and we left him alone, respected that, and I'm sure he'd do the same.

Q. Now, based on either anything that you read, heard in the news or anything that this other employee told you, you indicated in your questionnaire that you've not formed any opinions concerning whether the defendant in this case is guilty or not guilty.

A. No. I didn't perform (sic) any opinions of the last one

837

other than, you know -- because I didn't hear the evidence. This one, I haven't heard the evidence.

Q. Do you recognize how very important this is that in this case it's Angela Johnson who's on trial?

A. Yes.

Q. Not Dustin Honken.

A. Right.

Q. And you understand that if you served as a juror in this case how very important it would be that you base your judgment in this case not based on what the outcome was in Dustin Honken's case --

A. No.

Q. -- not based on anything that happened in that case but based on the evidence in this case?

A. Yes.

Q. Can you do that?

A. Yes. With the job that I have, we have a lot of problem

Page 34

areas if I can elaborate just a minute.

Q. You bet.

A. For instance, I've got six cattle pullers, six guys that do the same job. You know, we have to evaluate each guy separately. You know, one guy messes up; we don't burn all six of them. So everybody develops their own way in life, you know, should be judgmented -- or judged, excuse me, on their own merits.

838

Q. And can you imagine the evidence in this case might be different than the evidence in the Honken case?

A. Exactly.

Q. And you're willing to wait to see what that evidence is before you arrive at any opinions yourself on what the outcome ought to be.

A. Yes.

Q. You indicated -- in response to the question about whether you formulated any opinions about appropriate punishment, you said unsure, and you said you would need to hear the facts and how much participation was actually involved in the case. Is that still your views?

A. Yes.

Q. Do you have any opinion at this point on what the appropriate punishment ought to be for Angela Johnson if found guilty?

A. No. There again, you know, you'd have to -- depend on what happened, and until you hear all the evidence, you don't know what happened.

Q. Let's talk about the possible punishments here. The judge explained to you that we have two possible punishments if we get

to that point. If the jury finds the defendant guilty and we get to that third phase of the trial, there's two possible outcomes: Life imprisonment and the death penalty.

Let's talk about the first one first. Life in prison

839

in the federal system means life in prison without parole unlike maybe some state sentences of life. In the federal system, if you get sentenced to life, it's life without parole. You don't get paroled. You don't get off for good behavior or something like that. It is life without parole. Do you understand that that's what the penalty -- one of the penalties is in this case?

A. Yes.

Q. What do you think about that? Is that a severe penalty?

A. Very severe, very severe.

Q. The other alternative is the death penalty. And what are your general views about the death penalty, sir?

A. In my opinion, it's -- could be almost a blessing compared to life in prison. You know, they're both very harsh.

Q. And at this point in your mind, do you have a value in your mind that one is more harsh than the other, or do you think they're both pretty harsh?

A. I think they're both serious and they both serve a purpose, not one being harsher than the other, but one may be deserved more than the other because of evidence.

Q. And what's the type of evidence that you think would help you determine if you're trying to figure out -- or do you have in mind any particular type of evidence that would help you determine which would be more appropriate?

A. I would feel bad if I felt somebody was -- else may be in danger, for instance, if somebody was an extremely violent

Page 36

person and they were going to go to prison where you'd be endangering guards or other inmates, putting that person in there for life where there's no other way of punishing them. They're already there. If I felt somebody wasn't going to endanger somebody, well, then life in prison might be the way to go.

Q. Okay. So that's one factor that you've thought about that might enter into your analysis. Can you imagine that there are maybe other factors out there that you haven't even thought of yet that could weigh in on that decision?

A. I'm sure there is, and I'm sure we'd hear it in trial, and the person would have to take it more in thought if presented that decision.

Q. The judge in his instructions or in his -- not instructions but in his PowerPoint indicated up here that what we're looking for are jurors who are going to ultimately have to consider and then weigh those factors. We call them aggravating and mitigating factors. Do you understand those terms, aggravating meaning things that would suggest the death penalty is more appropriate for somebody and mitigating suggesting that maybe life imprisonment would be more appropriate?

And we need jurors who are willing and able to consider those. And what we mean by consider is fairly and honestly consider them, not just say, Oh, yeah, okay, fine, I considered that, but willing to really think about them, weigh

those things out, and consider all the factors to determine what the appropriate punishment could be. What do you think about

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 732 of 3245

your own ability to do that, sir?

A.    I think part of my job, you know, where I work has given me that ability and has helped teach me to make those decisions, to weigh what's best and to listen to all the evidence.  You know, like I said, with the different -- you have six different employees.  You know, you've gotta give each one of them their own account, and there's a lot of times when there's heated battles and talk of discipline and whatnot.  You always have to weigh it out.

Q.    Sounds like you have some experience in that weighing process then.

A.    Yes, being a supervisor.

Q.    If the evidence in this case showed that the defendant didn't actually pull the trigger on the murders but aided and abetted or assisted or encouraged the murders in some way, would the death penalty still be an option that you would be willing to consider as punishment for somebody who didn't pull the trigger but otherwise participated in the crime in that manner?

A.    Would I still consider it?

Q.    Yes.

A.    Given the facts, if it warranted it, yes.

Q.    Okay.  And what I mean by that is you haven't already decided in your mind, oh, jeez, if all she did was aid and abet,

842

didn't actually pull the trigger, I'm not even going to consider the death penalty.  You're still willing to consider the death penalty as a potential punishment.  We're not asking how you'd vote, but you'd be willing to still consider it.

A.    Yes.

Q.    And can you imagine in your mind that there may be

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 733 of 3245

circumstances where somebody who didn't pull the trigger could be more culpable than the person who pulled the trigger?  For example, if the person who pulled the trigger wouldn't have done it but for the encouragement or the --

A.    Yes.

Q.    -- pushing of the person who was aiding and abetting?  Can you imagine that?

A.    Yes.

Q.    Let me talk to you a little bit about the ultimate decision that may have to be made in this case if you and the other jurors ultimately reach that point.  Now, keep in mind, because we're talking about the death penalty here, don't arrive at any conclusions at all that we've made any determination on the defendant's guilt or -- whether she's guilty or not guilty. That's going to come in the trial, and you will all make that decision.  But for us to be able to even make a decision who's a good juror in this case, we gotta talk about the death penalty here.

So I want you to imagine at this point that you're on

843

the jury.  You have determined the defendant has intentionally murdered one or more people.  Beyond a reasonable doubt you made that determination.  We've gone through what the judge described as the second phase.  We've gone through the third phase.  You have received additional evidence, and now you're back down in that jury room.  And you and each of the other jurors have done this weighing process in your own minds on what you think the outcome ought to be, and you have ultimately decided, each and every one of you, that the death penalty's the appropriate punishment.

Page 39

Now, the time will come at that point that you would have to sign a verdict form to reflect that verdict that would have the practical and real effect of causing the execution of the defendant in this case.

Now, I've got a good friend I work with, and he's totally in favor of the death penalty, believes in it, but because of his own personal belief system and his religious upbringing, he knows -- personally as much as he supports it as a principle, as something that he believes our society ought to have, he knows he could never sign a verdict form imposing the death penalty because of his own personal beliefs.  Other people can.  What are your thoughts about that, sir?

A.   I believe that it'd be a hard decision, one I'd take serious but one decision I'd make with pride at the same time.

Q.   It would be a hard decision and appropriately so; right?

844

A.   Yes.

Q.   In the appropriate case, even though somebody has been found guilty of murdering five people -- in this case the government's alleged that two of those five were two little girls ages six and ten.  Even in a case like that, are you willing to still wait to see the evidence and still be willing to consider as a possible punishment life imprisonment without parole?

A.   Especially in a case like that you need to wait till all the evidence before you make up your mind.  You gotta -- it's a final decision, and it would be unfair to my own conscience if I didn't wait till the end.

Q.   In this case in this hypothetical you and the jury have already found that the defendant intentionally killed five

Page 40

people including two little girls. You're still willing to realistically consider life imprisonment as a possible punishment for that crime.

A. Oh, yes.

Q. And the converse of that, in the appropriate case, could you consider imposing the death penalty as a punishment?

A. Yes.

MR. WILLIAMS: Thank you very much for your time, sir.

PROSPECTIVE JUROR 176: Thank you, Mr. Williams.

THE COURT: Mr. Berrigan?

EXAMINATION

845

BY MR. BERRIGAN:

Q. Good morning, sir.

A. Good morning.

Q. Were you at work this morning at 4:30 in the morning?

A. Yes, I was, sir.

Q. Okay. I don't know frankly how you can do it to be honest. I have just -- I really have a question about that. I think, you know, we don't know what you're used to in terms of your schedule, and now the judge has indicated that we have this trial schedule that starts at 8:30 in the morning and could go as late as 4:30 or 4:45 in the evening. Would you expect any problems about being able to be alert?

A. No, I don't expect any problems at all.

Q. Okay. What time do you usually go to sleep when you do sleep?

A. I'm --

THE COURT: If.

MR. BERRIGAN: Yeah, if.

Page 41

THE COURT: If he sleeps.

A. I actually probably sleep too much. I sleep -- I -- excuse me. I share the house -- I'm married. I have seven kids. Two of my kids -- three of them are still home, but I have three women at home, three daughters -- or two daughters at home and my wife, and they've got girlfriends. I'm in the habit of coming home, going down to my bedroom where I got 27-inch

846

surround sound, and I hibernate. So I'm in there napping -- it could be as early as 3:30, 4:00 where I'm down there watching TV and napping. And I've got my shower and my restroom and everything, and lot of time my meal's brought down to me if I don't grab something before I go down.

Q. Get yourself in that cave and relax, huh?

A. Exactly.

Q. Well, there won't be any cave here I guess. Mid-afternoon at 3 or 3:30, you can guarantee we'll probably still be plowing ahead.

A. There's a lot of times I wasn't getting off work until even 4 or 4:30. If I'm in bed by 7, 8:00, I'm fine.

Q. You're okay. All right. This issue about working with a juror who was on Mr. Honken's case is one I'd like to explore a little further with you if you don't mind.

A. Okay.

Q. First of all, how well do you know this fellow, this coworker that supervises --

A. Just an acquaintance. I mean, we don't talk about family life. The only thing we really share is what we have to talk about at work.

Q. Okay. You guys don't go out and have a beer together or

Page 42

socialize at all, huh?

A.   No, no.

Q.   And you've been at the plant 29 years; is that right?

847

A.   Yes.

Q.   How long has this fellow been there?

A.   Probably 20, 22.

Q.   So you've at least known him a long, long time.

A.   As well as you know an acquaintance at work.  You know, there's several thousand people work out there.

Q.   Sure.  You know, Mr. Honken's trial was over last fall.  Were you aware of that?

A.   I don't relate the time, but it's been --

Q.   It's been a while.

A.   Been a while.

Q.   And, of course, you know, I'm sure during the trial you probably didn't talk to this fellow at all about the case other than, you know, good luck and passing time.

A.   Yeah.  He'd come to work at 4:30 in the morning and leave at 7, 7:30.  And most of the talk was, you know, I don't know how you're putting in all these long hours, and I don't know why you're coming to work.  You know, you shouldn't have to.

Q.   Did he have to?

A.   And talk like that.

Q.   Did he have to?

A.   Excuse me?

Q.   Did the fellow have to come to work?

A.   He did come to work every morning.

Q.   Would you have to go to work every morning?

848

Page 43

A.   I think it would be more on a volunteer-type situation.

Q.   Okay.

A.   Different periods of time out there there's different levels of pressure.  And he felt that he was serving the management team coming in helping for that couple hours.

Q.   What happened when Mr. Honken's trial was over?  I mean, he -- you know certainly that during the trial he couldn't talk about the case.

A.   Right.

Q.   Right?  But when the trial's over, you know, the judge releases the jurors from that obligation that they've had during the trial, and they're free to talk about the case if they choose to with anybody they want.  Did you have any discussions with this gentleman after Mr. Honken's trial was over?

A.   Nothing that I'd remember or that really related to any facts or details, just that it was a tough decision, he was glad it was over.

Q.   You did know about the punishment, though.  Mr. Honken had -- I think you mentioned had gotten the death penalty.

A.   Right.  I haven't followed up on when or where.

Q.   I was just curious, Mr. 176 -- it's kind of awkward using these numbers.  Forgive me.  How did you find that out?

A.   Well, I believe it was in the newspaper right out of the gate and probably on the news.

Q.   Okay.  And you checked that you get the newspaper or you

849

read the newspaper I suppose.

A.   I don't get the newspaper a lot of times.  I glance at the

Page 44

headlines.  I might stop at the store on the way home and pick one up three, four days a week.

Q.    Okay.  It's not a subscription or anything like that.

A.    No.

Q.    I was mostly interested in whether after this fellow finished that experience -- and as the judge mentioned, I mean, a trial like this, obviously it's a pretty unique experience even for people that have jury service.  This is a big deal. And a lot of times people haven't been able to talk about it for months, and they've listened to all this evidence, and they can't even talk to their spouse about what's going on, and the trial's over, and finally, you know, they're free.  They're unshackled, and they want to share that experience because nobody, hardly anybody, that had an experience like the fellow that you work with has had.  And I just was curious about whether he had done that with you, shared with you.

A.    No.

Q.    Not at all.

A.    Our circumstances at work are kind of a hundred percent work once we're there.  We don't get a lot of idle time where we sit and talk, especially since we don't work side by side.  But we're together about 10, 15 minutes in the morning before we go to our work areas, and we're going over schedules and yields.

850

And, you know, that's all monopolized with our meeting.  We go to our work areas, our work sites, manage our people.  Supposed to get a 15-minute break.  That's usually about 5.  You're doing paperwork during that time.  Lunch hour's the same.  Our office is shaped a lot like this area here so -- then there's two offices, so you're sitting at a counter, and you're doing

Page 45

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 740 of 3245

paperwork. Lyle and I sit in separate rooms even. He was building a house about that same time. A lot of our conversation was more dealing with his house.

Q. Sure.

A. There wasn't a whole lot of anything.

Q. Okay. Well, let me switch gears then; okay? Appreciate you telling us a little more about that.

The death penalty questions you were kind enough to answer in your questionnaire. And thank you for doing that. These are long, and I'm sure it was -- given your work schedule, this probably took some effort. You mentioned in response to the question about -- this is 75. What are your thoughts and opinions about the death penalty as a punishment for a person who is guilty of intentional murder? And you said, I believe that the death penalty is justified to prevent the possible future murder of and/or the safety of officers and inmates. Is that right?

A. Yes, like I stated earlier.

Q. That's exactly right. You told us about that earlier. And

851

not as many people express this sentiment in terms of being concerned about safety of people in the institution as you might imagine, frankly. And I was wondering if you had had any experience or where you knew of somebody, correctional officer perhaps or somebody who had been hurt by somebody who was serving time in an institution.

A. No, just what you see on TV and movies and whatnot, you know, and knowing the reality of what it must be like.

Q. Sure. You mean in prison.

A. Right.

Page 46

Q.   You already told us that you thought life in prison was a very serious punishment.

A.   Yes.

Q.   And as the prosecutor mentioned, when we're talking about life in prison, we're talking about life in prison.  You understand that.

A.   Uh-huh.

Q.   Some folks have expressed some concern, you know, this person could get out some day.  Who knows?  They have preconceived ideas that you're going to be eligible for parole.

A.   Uh-huh.

Q.   When we say life without parole, we mean life without parole; okay?

A.   Uh-huh.

Q.   No question in your mind about that.

852

A.   No question.

Q.   You did express this little concern about life without parole, and I want to ask you about it just to make sure I understand what you're telling us; okay?

A.   Okay.

Q.   You indicated in -- question 82, What are your thoughts and opinions about life in prison as a punishment for a person who is guilty of intentional murder, and you wrote, Could be unsafe for others.  After a while loses its purpose.  At some point in time a person can be or should be rehabilitated.  Does that sound about right?

A.   Under a perfect system you think there'd be some rehabilitation.

Q.   Yeah, that's exactly -- that's an excellent point because

Page 47

I -- we don't want to suggest to you that that might be the case.  None of us run the prisons.

A.    No.

Q.    And we have no control over what goes on there, okay, and whether they make efforts at rehabilitation or not.  Certainly it's well out of the control of even this judge.  So I don't know if you're concerned about the necessity for rehabilitation as being a component of something you'd require of somebody that was serving a life in prison term.

A.    I think no, you're not going to be rehabilitated, but if you're going to get along, you're going to settle into the --

853

their world of like our city, like our jobs.  You know, I'm sure they find work for them.  They get into their -- I can't think of the words for it, their --

Q.    Routine?

A.    Routine, exactly.  That's what I was looking for.

Q.    Let me ask you this, sir.  Again, you expressed this concern about the safety of other people in the institution. And I'm just wondering whether you'd have to be persuaded that that wasn't an issue in a particular case in order to give somebody a sentence of life in prison.  Do you know what I mean?

A.    Restate that, please.

Q.    Yeah.  I know you're concerned about people being hurt, potentially being hurt in the institution, and I think you're talking about correctional officers and guards and the people, the staff that work at the institutions and maybe even other inmates.  You might even include those I suppose.  And I'm just wondering if your concern about that is so great that I'd have to convince you that, you know, that's not something you need to

Page 48

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 743 of 3245

worry about.

A.    No.  I think if you looked at somebody that's more of an habitual -- say armed robber, you know, somebody that's had gang fights over and over again, records a mile long versus something like things just happened once and they're not likely to happen again --

Q.    Gotcha.

854

A.    -- you know, there's two different types of people there. You gotta look at the evidence to decide which would be the best.

Q.    Okay.  I got it.  You did indicate in response to this question, Do you think that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder which was question 84, you checked the no box on that, and you were asked to explain, and you said, Not in all cases.  And so that begs kind of the obvious question which is what are you thinking about there when you say not in all cases?

A.    What was the question again?

Q.    Yeah, let me give it to you again.  I know this is probably a while ago you filled this thing out.

A.    It was a while ago, and it was probably in haste, and it was over a few days' time, so I don't remember my answers.

Q.    I think your answers are very responsive to the questions. You said -- this is the question.  Do you think that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder?  That was the question; okay? And then there were two boxes, a yes and a no.  You checked the

Page 49

no, and you were asked to explain, and you said, Not in all cases.

A.    Right.  First degree versus manslaughter or second degree,

855

that's more of an accidental, you know.  Depending on the circumstances, you know, if it was just plain cold blooded, thought put into it, you know, well, then they des -- they might deserve the death penalty.

Q.    You need to understand that this is not an allegation of an accidental killing; okay?  That's not what the government's claiming.

A.    I understand that.

Q.    And they're not claiming this is something that happened in the heat of passion, you know, and something that we might call a manslaughter or something of that nature or even a second-degree murder where somebody kills somebody while they were committing some other type of crime.  They're alleging that Angela Johnson intentionally committed or participated in committing five murders, intentional murder, that of these five victims two of them were children, two little girls.  They're ten and six years old.  And the government's alleging that these murders were committed during the course or in furtherance of a drug conspiracy or continuing criminal enterprise or both; okay?  They're further alleging that they were done after premeditation and substantial planning; all right?  So is that pretty serious deal in your book?

A.    It's pretty serious.

Q.    And, in fact, I mean, you knew Mr. Honken faced similar types of charges at least, didn't you?

856

Page 50

A.   Uh-huh, yes.

Q.   So let me ask you then and get back to this question, okay, that we just went through here.  Do you think that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of that type of crime?  That is, is that the kind of punishment you'd be willing to consider for that type of offense?

A.   I wouldn't want to form an opinion at this time without hearing the facts.

Q.   Sure.  And we're not asking you how you'd vote.

A.   Exactly.

Q.   Right.

A.   And either one of them would definitely be an option.

Q.   Okay.  And so, you know, when the prosecutor said consider, as he pointed out, we don't mean just kind of, well, why don't you take a look at that, you know, look at that flag, it's a beautiful flag, we're familiar with it.  We're talking about embracing that concept.  We mean it.  We mean really seriously looking at it and actually considering it realistically, okay, as an option.

A.   Yes, life imprisonment is definitely an option.

Q.   Okay.  Even for the type of crime that would be charged, is charged here.

A.   There again, like I said earlier, I'd be weighing whether or not it would endanger someone down the road if this person is

857

potential hazard to themselves or others in the future.

Q.   That's right.  And one of the things you told the prosecutor is you'd want to wait and hear all the facts.  And

Page 51

jurors say that to us a lot. They want to, and we would expect that they would; okay?

A. Yes.

Q. But you have to understand it's the artificial process we're in where we have to ask you questions about punishment.

A. Sure.

Q. We're not -- we're going to be fighting hard in this case to persuade the jury the government hasn't met their burden of proof. Don't think for a minute I think Angela Johnson's guilty or any one of her lawyers does just because we're asking questions about punishment; okay?

A. Yes.

Q. But the fact is that if we got to this point in the trial as the judge has explained, if we're in the penalty phase of the trial, that means the jury has considered all the evidence. They've already done it. And they sat there, and they decided beyond a reasonable doubt, all 12, guilty. Then they went through the halftime of the basketball portion of the case where they decided, you know, the government has met these gateway factors beyond a reasonable doubt. They've met these aggravating circumstance or circumstances beyond a reasonable doubt. So all of that's already been decided; okay? And with

858

that further explanation that we're in the third phase, we're in the second half of the game, you're telling us and promising us you'd still be able to consider both life --

A. Either one, yes.

Q. Either one, okay. All right. I'm going to finish up then with just a couple of real quick concepts for you because I think this is a little confusing, and the judge is permitting us

Page 52

to explain it a little more in depth briefly.

You know, in most cases as the judge pointed out, you listen to the evidence, you make a decision, the jury acts as a single unit. And by that I mean they have to render a unanimous decision. They all say guilty, or they all say not guilty, and then the trial's over, and you go home. And once in a while as you undoubtedly know, they can't make an agreement, you know. People vote their heart and conscience. They don't feel the same way, and they disagree. And then we try those cases again because that case has to have a resolution where there's an agreement. We call it a mistrial or a hung jury, and there's no fault to that. It happens.

If we get to the penalty part of this trial, okay, it's important to understand that that rule doesn't apply the way it does in the first part of the trial. Exactly what the judge said, in the first part of the trial when you're determining guilt or innocence, it's like any other case. All 12 of you listen to the evidence. You talk to each other. You

859

make your decision, has the government met their burden of proof? If so, that's guilty. If they haven't, then that's not guilty; okay? And you're going to do the same thing with those gateway factors in the middle. All of you have to talk and agree.

But when we get to the punishment part, you as a juror individually, you have to weigh the evidence; okay? And you gotta make that decision yourself first. You've got to decide whether the aggravating evidence outweighs the mitigating evidence or vice versa, and you get to put whatever weight on those things that you want. It's not a group decision; okay?

Page 53

And if in your heart and conscience you come to a decision that's different than other people's, you have the right to have your decision respected just as much as you'd respect somebody else's. Would you agree with me?

A.   Yes.

Q.   This is a decision that you as a juror have to live with the rest of your life as well; right? You agree?

A.   Yes.

Q.   You should know that no matter what this process ends up in in terms of weighing these aggravating and mitigating circumstances, the law never tells you you have to vote for death; okay? You understand that?

A.   Yes.

MR. BERRIGAN:  You've been very patient. Thank you,

860

sir. I don't have anything else.

THE COURT:  Mr. Williams, any follow-up?

MR. WILLIAMS:  No, Your Honor. Thank you.

THE COURT:  Sir, if you'd just wait outside, we'll let you know what your status is in a minute.

PROSPECTIVE JUROR 176:  Thank you, sir.

THE COURT:  Thank you so much.

(Prospective Juror 176 exited the courtroom.)

THE COURT:  Does the government challenge 176 for cause?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Does the defense?

MR. BERRIGAN:  We do, Your Honor, and it's based solely on the predicament this gentleman finds himself in, not the answers. He's working at the same place in the same

Page 54

position with a gentleman who sat in Mr. Honken's trial. And he made it quite clear I think in his questions that there wasn't any specific conversation about Mr. Honken's case certainly that he can remember.

But we don't know what's going to happen -- I'm almost less concerned about him than I am Mr. Honken's juror who's no longer under any admonition. This gentleman I'm sure would try to follow the instructions of the Court, but we have no control over this other gentleman, and their close proximity every day working there in the same office side by side causes us grave

861

concerns.

And given the numbers of jurors that we have to choose from, it seems to us an unnecessary risk to have this gentleman in the situation he's in. He's almost like the radio personality, maybe not quite as the same situation, but it's a very risky situation and one we won't be able to cure later if something goes wrong. So we'd ask the Court out of an abundance of caution to strike him for that reason.

THE COURT: But is it a true challenge for cause?

MR. BERRIGAN: I believe it is, Your Honor. I mean, it's not in terms of did he say something or indicate in the questionnaire that he could be unfair, but I think you'd have to agree with the radio man. I mean, he gave terrific responses, and a number of jurors, you know, are excused for reasons other than their views on the case or that they might have done something wrong. It's just the predicament they find themselves in doesn't lend them to the degree I suppose that we'd like to have in order to be able to make sure that nothing bad's going to happen if this person's a juror. It's the same reason we get

Page 55

rid of jurors who know witnesses as well even though they say it wouldn't matter, we wouldn't talk to them. They're just too closely associated --

THE COURT: Actually I don't get rid of jurors who know witnesses if it doesn't have any impact on the ability to judge the witness fairly and impartially. Maybe other judges

862

do, but I don't.

MR. BERRIGAN: Okay. And that may have been a bad analogy, but I suspect if somebody knew Miss Johnson, for example, no matter what they said, they're gone. And this gentleman I'm afraid through no fault of his own --

THE COURT: It's the risk. There's a potential risk that in your view we shouldn't take.

MR. BERRIGAN: Exactly, sir. That's it.

THE COURT: Mr. Williams?

MR. WILLIAMS: I couldn't disagree more, Your Honor. I mean, this was explored at great detail about the amount of conversation they have, the amount of contact they have. This isn't a close friendship. This isn't even a close working relationship. They don't -- even when this juror was -- this Honken juror was done, the Honken juror didn't talk about the case and didn't talk about the details of the case.

THE COURT: So far it's been fine. But wouldn't you agree that there's a greater risk for a problem than in a situation where he doesn't have a coworker who served on the Honken jury who -- I don't see a specific problem now, but I think there's -- you know, this -- we never thought we'd have a problem with a Honken juror and the boss, and this is a greater risk of a problem than that one that surfaced in my view, but

Page 56

it's hypothetical.

MR. WILLIAMS: Well, not only is it hypothetical, but

863

I don't think it's a very strong risk given what he's told us about his prior contact with this guy in the first place. I think we have as much of a risk with any juror --

THE COURT: But, Mr. Williams, he's not been selected yet. What happens if he gets selected and all of a sudden this juror who we have no control over says, Oh, here's my field day now to tell him what I think, and he comes in here and says, Hey, guess what happened; my coworker, once he found out I got on the jury, started telling me what he thought I ought to do? That's a real risk. I mean, I'm not saying it's going to happen, but it's certainly a risk. Why should we take that risk?

MR. WILLIAMS: Well, number one, because we don't have a completely limitless number of potential jurors. And this juror, frankly, of all the jurors we've seen so far is more what we want as a juror I think than any other juror we've seen so far. This guy is so willing to listen to both sides and consider both sides, I think he's a great juror, and I think this is just speculation that he's going to be exposed to something. We have --

THE COURT: It is speculation because nobody has a crystal ball.

MR. WILLIAMS: I think he'll follow the instructions, and in the worst-case scenario, we have alternates.

THE COURT: That's what -- Mr. Berrigan's not so much

864

Page 57

worried about this juror. He's worried about the one we have no control over.

MR. WILLIAMS: No, but this juror has the control to walk away from it, and I think he would. I mean, given this guy, if this other juror tried to talk to him, he's going to turn around and walk away, and we all know that from looking at this guy. I just think it's a risk -- I mean, if the defense wants to, they can exercise a peremptory on this guy if they think the risk's that high. I don't think there's a risk here, and it's a risk I'm willing to take because I think he's an outstanding juror for both sides in this case.

THE COURT: I think he would be an excellent juror, but I think the risk is too high for me to run in this case. And the easy thing for me to do would be just let them take a peremptory challenge on it because I don't think it actually qualifies for cause. But I'm not going to take a chance. And so -- I don't think it would be fair to have them burn a peremptory, and I think he'd be a terrific juror.

But, you know, as a practical matter, they're never going to leave him on. I just think it's a potential accident waiting to happen and that we shouldn't put ourselves in the situation of running that risk. Better than a 50 percent chance nothing would happen, but we all have too much at stake in this case in terms of time and effort to create that kind of risk on the jury panel, and I just think it's an unusual situation not

865

likely to be a reoccurring problem in jury selection.

I mean, I agree with everything you say, that he'd be a terrific juror, and I think Mr. Berrigan thinks he'd be a

Page 58

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 753 of 3245

terrific juror. It's just that we got a lot of folks out there. Why run the risk? This case isn't going to turn on one juror. You know, we're not going to run out of jurors because I excuse this guy. So I understand your points, and I agree with you. I'm just going to exercise some caution and care and strike 176 for cause. Thank you.

(Prospective Juror 176 entered the courtroom.)

THE COURT: Sir, we've had a discussion, and we all think you'd be an absolutely terrific juror. You are -- we couldn't have designed a better person. You are exactly what I am looking for. I can't speak for the lawyers, but I think that's what they're looking for. I think you'd be terrific.

What I'm afraid of is that we would be putting you in a difficult position should your other colleague ever say anything to you. And, you know, it doesn't sound like he's going to. I'm just not willing to run that risk. And so I think you'd be terrific. Hopefully you'll be back here on another shorter case for you, but I'm just not willing to take the risk given that you two work together, so I hope you understand.

PROSPECTIVE JUROR 176: I assure you we wouldn't be talking about.

866

THE COURT: I know you wouldn't be, but you don't really have any control over what this other guy says, and I'm just a little gun shy. I think there's a 90 percent chance it wouldn't be a problem, but if there was a problem, it would put you in a very difficult position.

PROSPECTIVE JUROR 176: Yes, sir.

THE COURT: I know you want to serve. I'm very

Case 3:09-cv-03064-MWB-LTS Document 284-70 Filed 06/23/11 Page 754 of 3245

impressed by that. I think you'd be a terrific juror, but I've seen things go wrong in cases, and I'm just not willing to take the chance, and I hope even though you disagree with me you'll respect my view.

PROSPECTIVE JUROR 176: Oh, yes, sir.

THE COURT: That I'm just trying to be cautious because I think you'd be fabulous; okay? So you're free to leave. Do us a favor. We'd appreciate you not saying anything about jury selection to anybody because there's a likelihood that maybe some other jurors we're going to be interviewing next week or the week after might -- you might say something to somebody. They might say it to somebody else. Northwest Iowa's a pretty small place as you know, so we'd appreciate you not saying anything until we get the jury empanelled in this case. Good luck to you. Thank you very much.

PROSPECTIVE JUROR 176: Thank you. Good luck to everybody.

THE COURT: Thank you.

867

MR. WILLIAMS: Thank you.

(Prospective Juror 176 exited the courtroom.)

THE COURT: Ready for 450?

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 450 entered the courtroom.)

THE COURT: Ma'am, any seat you want to grab in the middle there. Thank you.

Everybody be seated. And we're going to start our questioning with one of the prosecutors, Mr. Williams.

EXAMINATION

BY MR. WILLIAMS:

Page 60

Q. Good morning, ma'am. How you doing?

A. Good morning. Good.

Q. Good. We're going to talk to you just for a little bit one on one here about some of the issues that we want to handle individually, and that is the publicity, what you may know about this case, and then your views on the death penalty.

And let me just start with the latter. You answered a questionnaire, and we really appreciate that. It's a long questionnaire. I'm guessing you spent a fair amount of time going through here to answer these. And a number of the questions in here was about your beliefs, values, and opinions about punishment. Rest assured, as the judge said earlier, we respect everybody's opinion, and believe us, you know, when we've gone through this process, we have heard opinions from

868

both sides of the spectrum. This is, among other issues, a highly debated issue in the public.

What we're looking for is for you to be just candid with us on your views. And it looks like you were in the questionnaire. Do you feel like you were pretty candid about your views in there?

A. Yeah, I think so.

Q. Let me just ask you just plain and simple here. We have a case where the government has alleged the defendant intentionally killed five people including two little girls. And assume that you're on a jury, that has been found by the jury, beyond a reasonable doubt she participated in this.

Now, there may be some other factors. Perhaps the evidence will show she didn't pull the trigger, somebody else did, and perhaps you're going to learn other things about her or

Page 61

her background or things like that. But that core set of facts, murdering five people and including two little girls, let's assume that's there no matter what the other factors are.

In that kind of a case, I need to know from you and everybody here needs to know, could you realistically consider the possibility that life imprisonment would be a possible punshment for somebody involved in that type of a crime?

A. Yes. It would be possible.

Q. And when you say it would be possible, can you explain what you mean? Is that something that you could really consider?

869

A. Yes, although when you talk about killing children, I have a harder time with that.

Q. Sure. The -- if you get to the point in this case -- and the judge talked about there are three phases to this trial. By the time you get to the third phase, as I said, you will have already found the defendant guilty of participating in one or more of these killings. And just for the sake of discussion here, let's assume you found her guilty of participating in all five murders. We're looking for jurors who can actually weigh both possible punshments and consider both possible punshments.

Now, some people, they just come in, and they know that their views are -- I mean, they're so upset about the killing of children and that angers them so much that while they're willing to say, Yeah, okay, I can consider life imprisonment as a possible punshment in theory, they know in their heart realistically I don't care what else you say to me; I don't care what else the evidence is; I just know that I could never really sentence somebody to life imprisonment for killing

Page 62

children. I just know I can't do that. And that's perfectly fine. People have those views, and we respect those.

I'm just trying to get a real good feel from you because from your questionnaire, candidly, it looks like you're in that camp. It looks like you're in the position where I just can't do it. I'm just going to have to impose the death penalty

870

for somebody in that situation. Can you --

A. I would sway more towards the death penalty than life in prison.

Q. Okay. And swaying's fine. Would you still consider the possibility of life imprisonment?

A. Yes.

Q. Realistically consider that.

A. I -- yeah, I'd say I'd sway more towards the death penalty, but depending on what comes out in the case, yeah.

Q. What are some of the factors, or do you have in your own mind some factors that -- you know, we've got on this end these set of facts, killing of five people including two little girls.

A. If there would be any doubt in my mind that she wasn't guilty, life imprisonment is what I would choose.

Q. Okay.

A. But if there would be no doubt in my mind that she did it, I would want the death penalty.

Q. Would you be willing to consider other factors in that determination? One factor you mentioned is maybe some doubt, some --

A. Uh-huh.

Q. Now, you would have already found her guilty beyond a reasonable doubt. But are you talking some still lingering

Page 63

doubt that you might have? It's beyond a reasonable doubt but maybe something else that might enter into your analysis?

871

A. Yeah, something maybe just bothering me that maybe I'm not completely sold on.

Q. Okay. So you're not a hundred percent sure. You're beyond a reasonable doubt but maybe not a hundred percent. It's not beyond all possible doubt, and because it's not beyond all possible doubt, you might be willing to consider that factor.

A. Right.

Q. Are there other factors that you'd be willing to consider? Let me throw out some ideas, for example. When you're in there and you're trying to weigh this decision -- and it's a tough decision to weigh -- what about the defendant's background? Is that something that to you could enter into your analysis, not about whether she's guilty or not? That decision's been made, but now you're deciding punishment. If she had a different background, if she had an abusive background or something like that, is that something that you'd be willing to consider as a factor in determining penalty, or is that something that to you in the overall analysis just doesn't matter?

A. I don't think that it'd matter too much because when the murders were done, they didn't care about the people that they killed. They didn't think about it that maybe they had kids either.

Q. Okay.

A. So at the time they didn't think about it so . . .

Q. Okay. Would you be willing to consider it but you're

872

Page 64

Q. saying it just wouldn't weigh very heavily with you?

A. Right, wouldn't weigh very heavily.

Q. What about the person's role in the offense? In the course of the trial in this case, we're going to be presenting a lot of evidence concerning events, you know, the surrounding events in this case. Would the role that the defendant played in the crime be a factor that you would take into account? Again, you've already found her guilty of participating in the crime. But would her role in the crime be a factor that you think would be relevant and you would consider in determining what the appropriate punishment ought to be?

A. No, because she probably knew what was going to happen. She didn't -- she didn't have any clue, you know -- she knew definitely what was going to happen, and it's not that she was totally clueless as to what was going on around her.

Q. Okay.

A. So . . .

Q. Let's talk about that issue about what she knew and what she didn't know. At this point, you know, when we go into these trials, we have this thing called presumption of innocence, and defendants are presumed to be innocent, and they're entitled to that. Every citizen's entitled to the presumption of innocence coming in. And it's our job, Mr. Miller's and my job, in this case to overcome that presumption of innocence by proving our case beyond a reasonable doubt.

873

But as a practical matter in cases like this, either because you've learned something through the press or from what other people say or even just from the outline of the facts in this case some people come in here honestly and they've -- they

know they've already formulated an opinion in their minds that they just can't get out of there, that they've already made up their minds this person is guilty and I know I'm supposed to give presumption of innocence; I know that's what I'm supposed to do, my civic duty.

But you're under oath right now, and your duty is to tell us what your real thoughts are. Do you think that your knowledge of this case either through the press or through the facts that have been related to you in this thing have influenced you so much that do you think you're going to be able to give her the full benefit of the presumption of innocence in this case?

A.   I'd like to say yes, but from what I've heard, I've kind of got an opinion in my mind that she is guilty already.

Q.   And I get the feeling from you that this is tough.  I mean, this is something you would struggle hard to put out of your mind but -- and you know what your civic duty is, but you're being honest with us that you just think that is going to weigh so heavily it's going to interfere with your ability to be fair and impartial in this case?

A.   Yeah, I think so.

874

Q.   And I think the judge would be the first one to say that all we can ask for is what you've just done, and that is be frank with us on your opinion.  And you're the only one that can tell us.  Do you think that you could be a fair juror in this case?

And let me back up for a second.  Don't feel like we're being judgmental at all.  I mean, when somebody says fair, everybody says, Jeez, I don't want to say I'm not fair, right,

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 761 of 3245

because that sounds bad; okay?

But in reality what we're looking for is somebody to look inside their own heart and say can I really be -- if I was Angela Johnson in this case, would I want to have you as a juror in this case or would I know that you've already had your mind made up so much that it's going to be really interfering with your ability to be a good juror in this case?

A.    I guess I've got a pretty strong opinion already about the case and about killing other people, especially children, and so I can't honestly say that I would be fair.  I would try to be as fair as I could.  But I don't know that I could honestly say that I would.

MR. WILLIAMS:  I appreciate that.  Your Honor, with all due respect to this juror's honest answers, we'd move for cause in this case.

THE COURT:  Any objection, Mr. Berrigan?

MR. BERRIGAN:  No, sir.

875

THE COURT:  Juror 450, thank you very much for coming in today.  I'm going to go ahead and dismiss you.  I think you'd be a good juror but not in this case.  So we really appreciate how honest you've been with us.  Thank you so much.

Could you do us a favor?  Because we still have potentially hundreds of more jurors to talk to over the next several weeks, we'd ask that you not talk to anybody about this experience until you read in the paper that we have a jury selected, and then you can because we wouldn't want any comments that you would make to somebody else who then might talk to somebody else who you don't know who's got that packet and they're coming in next week or the week after; okay?

Page 67

PROSPECTIVE JUROR 450:  Yep.

THE COURT:  Thank you very much.  Good luck to you.

(Prospective Juror 450 exited the courtroom.)

THE COURT:  Would you like to take a 20-minute recess at this time?

MR. WILLIAMS:  Sure.

MR. BERRIGAN:  Sure.

THE COURT:  Okay.  Thank you.

(Recess at 10:09 a.m.)

THE COURT:  Ready for 686?

MR. WILLIAMS:  Yes, Your Honor.

MR. BERRIGAN:  Yes.

THE COURT:  Okay.

876

(Prospective Juror 686 entered the courtroom.)

THE COURT:  686, if you'd just grab any seat in the front row, be seated.

Everybody else can be seated, and we're going to start with questioning from one of the federal prosecutors, Mr. Williams.

MR. WILLIAMS:  Thank you, Your Honor.

EXAMINATION

BY MR. WILLIAMS:

Q.   How you doing today, sir?

A.   Oh, all right.

Q.   Good.  Probably first time you've ever been questioned in a situation like this; right?

A.   Yeah.

Q.   Try to relax.  These questions are pretty easy.  All we're going to be asking you about is your own personal views and

Page 68

beliefs. So it's not a test, and everybody here I know from experience is very friendly, so nothing to worry about here.

I just want to talk to you, first of all, about publicity, and this one's going to be pretty easy with you. At least on your questionnaire whenever you filled that out you were asked about what you knew about this case from TV, from, you know, word on the street or anything like that. You said not at all familiar with it. Is that still the case?

A. I've just heard, you know, little bits and pieces, caught

877

an article every once in a great while, but otherwise I really don't know much about it yet.

Q. And is it mostly from newspapers that maybe you picked up something on this, or have you talked -- do you have friends that know anything about it?

A. Yeah, newspaper, Internet. That's about it.

Q. What do you know about the case? Do you remember any details about it at all?

A. Just that whatever, Miss Johnson and her boyfriend, let's see, are whatever you could say, accused.

Q. Sure.

A. Whatever, two of her boyfriend's contacts and murdering them and her whatever -- one of their contact's girlfriend's kids and along with the girlfriend are no longer . . .

Q. The boyfriend, what do you know about his legal situation, if anything?

A. Nothing really. Just he had a trial last year or something like that, and he's already in jail I think.

Q. Did you hear about the outcome of that trial one way or the other?

Page 69

A.    Huh-uh, not really I don't think.

Q.    Do you have any friends who have talked to you about the case at all?

A.    Not really.

Q.    Let me ask you this.  Regardless of what maybe you've

878

picked up either through newspaper articles or whatnot on this case, have you formulated any opinions yourself based on that stuff about what you think the facts are of this case?

A.    Yes and no.  I think I'd have to hear more of it to form a better opinion on stuff I would say.

Q.    Do you have an opinion, even a half-formulated one, at this point about whether the defendant's guilty or not guilty at this point?

A.    I don't know.  Just from the little tidbits I've read, I would say guilty, but, you know, that's just going, you know, till proven guilty or innocent you could say so . . .

Q.    Okay.  Now, the judge will instruct you as part of the instructions if you're sworn in as a juror in this case that defendants are presumed to be innocent.

A.    Uh-huh.

Q.    And that it's our job, Mr. Miller's and my job, to overcome that presumption of innocence by proof beyond a reasonable doubt.  Is that something, an instruction you could follow?

A.    Yeah.

Q.    Even though you've kind of thought in your mind at this point based on just what little you've read that, jeez, kind of looks guilty, is that something you could put out of your mind and give her the presumption of innocence?

A.    I suppose.  I got a hard time making up my mind about

Page 70

anything so -- but . . .

879

Q.    Okay.

A.    I tend to waver back and forth about stuff even if I want to do something on the weekends so . . .

Q.    Fair enough.  In a situation like this it's going to be pretty critically important that you be able to give her the presumption of innocence, and, frankly, some people can do it, and some people can't.  No matter how much they try, they know coming in that they've already kind of made up their mind, and they know the judge is going to tell them to get it out of there, but they also know if they're being honest and being open which is what we're asking you to do here, they know it's not going to work.  They know they've already kind of made up their mind and, you know --

A.    Gotta focus on everything and stuff.

Q.    Right.  So where are you at on that?

A.    I was surprised to be picked for this.  I don't know.  I guess I got a wedding coming up in June, so that's where kind of all my thoughts and my focus is now, getting stuff paid for for that.

Q.    Sure.

A.    And fiancée's grandma isn't doing too well, so, you know, my thoughts are kind of every which way and stuff.

Q.    How's that going to affect you if you're going to be sitting here as a juror?  What's going on here is important. What's going on in your life's important obviously.  What we're

880

Page 71

going to need are jurors who can give 100 percent attention while they're here to what's going on in this courtroom. Is what's going on with your life such that it's going to interfere with your ability to do that?

A. I suppose it'd just be -- make things work and one more little obstacle to overcome and make the best of it.

Q. Do you think you can do that?

A. If I had to, yeah.

Q. Let me go back to this presumption of innocence thing for a minute. Have you -- based on what you've heard on this case or what you've read, are you at the point where do you think you can put aside any conclusions you've reached from that and give the defendant in this case a fair trial, or do you think that what you've heard so far is going to so substantially influence you that you just don't think you can give her a fair trial? Where do you think you're at on that?

A. It's kinda hard to say. I would -- I don't know. I would try to, you know, brush what I've heard or read aside and try to give, you know, a fair opinion and stuff, but it might influence a little bit, but, I mean, you gotta hear the facts.

Q. You know, in life trying counts for a lot. I always tell my son that. Trying is very, very important. In a situation like this where we're talking about the possibility of a death penalty, to be frank with you, trying's not good enough. It's gotta be one of those --

881

A. You gotta be sure.

Q. -- we need to have you assure us that you can put aside your preconceived notions of the defendant's guilt in this case and you can do it and you will do it. We need to have that

Page 72

comfort level, and, you know, sometimes jurors have a duty not to serve. Sometimes if you know you can't do that, you have a duty to tell us that, and everybody's going to respect that because you're being honest with us, and we need to know that.

On the other hand, if you don't think you can -- or if you think you can put it aside, then we need to know that too but not just try, but can you actually do that in this case?

A. I think as of now I don't think I could.

MR. WILLIAMS: Okay. Appreciate your honesty.

Your Honor, United States would move for cause.

MR. BERRIGAN: No objections.

THE COURT: Okay. Juror 686, you are excused. We'd ask you to do us a favor. Because northwest Iowa's relatively small population-wise -- we have hundreds of other jurors we may be talking to -- could you not say anything about this experience until after we get a panel selected and the trial underway because -- jury selected and the trial underway because you could say something to somebody who then says something to somebody else and that somebody else might be a potential juror?

PROSPECTIVE JUROR 686: Word gets around in small towns.

882

THE COURT: It does. And good luck to you on your wedding. That's exciting. Thank you so much for coming in today.

(Prospective Juror 686 exited the courtroom.)

THE COURT: Next juror, please.

(Prospective Juror 403 entered the courtroom.)

THE COURT: Any chair in the middle there. One of them has a winning lottery ticket underneath it. Oops. You

Page 73

went past it.  Sorry.

PROSPECTIVE JUROR 403:  That's okay.

THE COURT:  Thank you.  We're going to start with questioning first from one of the federal prosecutors, Mr. Williams.  Then we'll hear from the defense.

PROSPECTIVE JUROR 403:  Okay.

THE COURT:  Thanks.

EXAMINATION

BY MR. WILLIAMS:

Q.    Morning, ma'am.  How are you doing today?

A.    Good.  How are you?

Q.    Good, thanks.  You work at Tyson's up there in South Dakota just over the border?

A.    Yes.

Q.    How long you worked up there?

A.    A little over a year.

Q.    And how do you like it up there?

883

A.    I like it.

Q.    We want to talk to you in this setting without the rest of the jurors on just a couple subjects with the hope that we can get very candid and honest answers from the jurors at this point.  As the judge said earlier in the slide presentation that was done, there's no right or wrong answers here, and we're not going to try to talk you into one view or the other view.  Your view is your own belief system, and we respect that.  We just need to know about it and find out a little bit about how you would be as a juror in this case.  So we encourage you just to tell us what is really on your mind and what your real beliefs are.

Page 74

I'm going to start off with the subject of publicity in this case. And in the questionnaire -- and we appreciate the time you spent filling out the questionnaire in this case -- you indicated at least at the time that you filled it out that you had only just heard about the case a little bit. Can you share with us a little bit about at least generally what you recall about this case?

A.    Not much. Just that I think -- I don't even know if it's related but Dustin Honken or something was tried here, and pretty much that's all. I don't really know that much about it.

Q.    Do you remember hearing what the outcome of that case was on Dustin Honken?

A.    Not really.

884

Q.    Okay. Do you remember any details of what the events were?

A.    Just something about drugs and -- I know drugs were involved and that somebody was murdered, but I don't really know that much.

Q.    Beyond that, you're kind of at a loss.

A.    Right. I don't watch a lot of news, so I don't really know that much about it.

Q.    At the time you filled out this questionnaire, you were asked a follow-up question to your knowledge from the press or from other people about what influence that has or have you formulated any opinions or beliefs about whether the defendant's guilty or not guilty in this case. And at the time you filled it out you said, No, I haven't formulated any opinions. Where are you at on that issue today?

A.    Same thing. I have no idea. I'd have to see, you know, what happened, what -- you know, what evidence you can show me

Page 75

and then form my own opinion.

Q.   Same thing was asked of you about the appropriate punishment and asked if you have an idea of what you think the appropriate punishment ought to be.  And at the time you said, Nope, I don't know all the facts.

A.   Right.

Q.   Is that still your thoughts today?

A.   Right.  I'd want to know a lot of details before I made a decision on anything like that.

885

Q.   Let's talk about the options.  The judge explained to you with the slides that there's potentially a three-phase trial coming up here.  We're definitely going to do the first phase, and then potentially there's two other phases.  It's in that third phase if we get to that point that we're going to be asking jurors to deal with the issue of punishment.

So for the sake of argument, let's assume we're going to get to that point, and now I want to talk to you about the two potential punishments that are available here, first of all, life in prison.  And first of all, let me explain to you that in the federal system life in prison means life in prison without parole.  There's -- unlike some states, life in prison doesn't mean you go to the parole board after seven years and you may get out.  In the federal system there is no parole.  If you are sentenced to life in prison, it is no parole.  There's no early release for good behavior or anything like that.  Do you understand that that's what life in prison without parole means in the federal system?

A.   Yes.

Q.   Is that a serious punishment to you?

Page 76

A.    Yes.

Q.    The other alternative in this case is the death penalty, and the death penalty can be imposed in this case only after the jurors get to the point of weighing a lot of factors that would impact a decision of that nature between those two choices.

886

What we're looking for in this case are jurors who are willing to consider both those options. And when we mean consider as the judge used that word up on the screen, we mean to realistically and seriously consider that as an option, life in prison as an option and death penalty as an option.

Now, some people because of religious backgrounds or whatever just know coming in they could never consider the death penalty as an option. They just know that. And some people because of their belief system know that they can't consider life in prison as an option. And we're looking for people who can consider both of those; all right?

A.    Uh-huh.

Q.    In this case there's going to be a number of factors that at some point the jurors are going to have to weigh, and they're going to be things like the circumstances of the case, the role of the defendant in the offense, maybe something about her character or background or things like that. We don't know at this point. And at some point the juror's going to have a number of factors to weigh. Are you the type of person who would be willing to consider factors like those and weigh those factors to determine what the appropriate punishment should be?

A.    Yes.

Q.    If the evidence in this case demonstrated that the defendant was involved as not the person who actually pulled the

Page 77

trigger but as an aider and abettor of the crime in the murders

887

of five people including two little girls ages six and ten, under those circumstances, could you consider still the possibility of life imprisonment as a potential punishment for that person?

A.    Yes.

Q.    Now, you would have by this point have already determined, you and the other jurors, that beyond a reasonable doubt the defendant intentionally and with premeditation engaged in this conduct that she aided and abetted or encouraged another person into killing five people including two little girls.  You're telling us under those circumstances you're still willing to consider life imprisonment as a possible punishment?

A.    Yes.

Q.    And what about the death penalty?  Is that something that you would consider as a possible punishment under those circumstances?

A.    I'd consider it, yes.

Q.    Have you made up your mind at this point which way it ought to go?

A.    No.  I haven't seen anything, and I haven't been given any information, so I wouldn't -- something that important as what to do with somebody's life is not something you could make up before you see anything, before you're given any information on it.

Q.    In this case, as I said, if the evidence showed that the

888

defendant aided and abetted and didn't pull the trigger, some
Page 78

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 773 of 3245

people have already figured out, jeez, you know, if they didn't actually pull the trigger, then the death penalty shouldn't apply to them. Other people aren't of that view. Where are you at on that?

A. I don't know. I'd still have to see everything. It just depends on what information is given. Without being given any information, you can't really make a decision on whether it's right or wrong. If it's being offered as a possible punishment, then there has to be enough reason for it to be offered. So it's offered; then somebody believes that there's enough information to make it an option. And I'd have to make that decision with the information I was given.

Q. And are you willing to wait to hear all that information before you arrive at an opinion?

A. Yeah.

Q. Can you imagine a situation where somebody who didn't actually pull the trigger could be more culpable or more to blame for the crime than somebody who actually pulled the trigger; for example, the person who pulled the trigger might not have done it but for the person encouraging them or pushing them to do the crime? Can you imagine a situation like that?

A. Yes.

Q. Let me talk to you about -- some of the answers in your questionnaire suggest very strong feelings about the death

889

penalty, so I want to go through those and explore those with you a little bit and encourage you as you have been doing just to be very frank with us about your views. When you were asked about your thoughts about the death penalty on question 75, you said, Do it faster; it would save the government some money.

Page 79

A.   Uh-huh.

Q.   What do you mean by that?

A.   Well, there's some people -- I don't know -- I've heard where even though they've been sentenced to death it takes them a long time before the sentence actually -- or before the punishment is actually served before they're actually given the death penalty.  With all that time, it's a waste of time.  If they've been given that punishment, take it.  I don't know.  I feel like it's a little kid.  You know, you give the little kid a punishment:  Go sit in your corner.  You're not saying, Well, you've got five minutes to think about what you've done before you go sit in the corner.  That's your punishment.  Take it, whatever punishment you're given.

Q.   Let's talk about that for a minute.  In this trial the judge has indicated there's going to be perhaps over a hundred witnesses and there's going to be lots of exhibits.  The judge described his job as ruling on motions and to make sure that everybody receives a fair trial in this case.  Can you imagine going through a trial of this nature and this length that a number of issues might arise where the judge is going to have to

890

make decisions on those issues that might be right and might be wrong and it might be a good idea for some other judges to look at just to make sure that everybody received a fair trial?  Can you imagine that that's a good process to have?

A.   Uh-huh.

Q.   And that's a yes?

A.   Yes.

Q.   Shelly needs to take down yeses or nos.  I'm sorry.  I should have told you that up front.

Page 80

A.    All right.

Q.    Can you imagine that that's even that much more important when we're talking about potential punishment of the death penalty?

A.    Yes.

Q.    That that appeal process is really necessary because we're not just talking about having a kid go sit in the corner for five minutes but we're talking about taking somebody's life.

A.    Yeah, it's not like that.  It's like how you might watch TV and you hear about somebody who's been waiting on death row for five years.  That's a long time.

Q.    Sometimes the legal process takes a long time.

A.    That's what I meant.  That's a pretty long time.

Q.    Is your view that that's -- that you don't like the length of time that occurs after the death penalty's imposed, do you think that's going to impair your ability to consider life

891

imprisonment as a possible punishment in this case or the death penalty?

A.    No.  Once I've made my decision and once the punishment's given, it's not my choice.  It's the law.  There's no -- it's not my decision as to what happens there.  It's just for me to look and see what my belief is on this and what I think really happened.

Q.    You were asked a question at question 77, In your opinion is the death penalty used too often, an appropriate amount, too seldom, and you kind of checked both an appropriate amount and too seldom.  And when asked to explain, you said, I'm not sure. I don't know all the statistics, but I don't think someone punished to death should get to wait very long for the

Page 81

punishment.  Is that the same thing we've been talking about up to this point?

A.    Same thing, yes.

Q.    When asked about your thoughts about life imprisonment as a punishment, question 82, you indicated, It takes up too much money.  Could you share with us your thoughts on that?

A.    Sometimes it does, and I think at that time I probably was focusing a little bit too much on the money.  In some cases it does.  Sometimes I think some people should get life imprisonment.  Depends on what they did.  Depends on what all happened and what their circumstances are.  But in other cases, life -- or, you know, they should get death.  And I don't know

892

any of the other cases but . . .

Q.    The judge, as I said, will -- and as he said on his slide will ultimately instruct you as to certain what we call aggravating factors and mitigating factors, and those are -- aggravating are factors that the government would assert call for the death penalty, and mitigating factors are items that the defense can but doesn't have an obligation to present suggesting life imprisonment ought to be more appropriate.  I'm fairly confident the judge will never instruct jurors that the cost of life imprisonment versus the death penalty are factors that the jury's to consider one way or the other.  Are you comfortable with that?

A.    Yeah.  That's just my personal view on a question that you guys asked on a piece of paper.

Q.    Sure.  And we welcome that, and I just want to make sure you're comfortable, though -- see, some people come in, and they're so concerned about life in prison costing so much that

Page 82

it really influences their ability to consider it as an option.

A.  No.  An evil person that gets the death penalty, an evil person who has done an evil crime, get it over with.  Get them out of the system.  Get them out of there.  Get it over, and get it done.  I understand there's processes to go through.  That's fine.  That's legal.  It has nothing to do with me.  I just -- that's my opinion.

Q.  Sure.  And we very much respect your opinion.  What I'm

893

hearing from you -- and I want you to help me; correct me if I'm wrong on this, though -- that you don't have such strong views that life in prison costs so much money that you're not willing to consider life in prison as an option, as a real option in this case if the defendant's found guilty?

A.  I would consider both.  I'd weigh them both equally.

Q.  One of the things that you were asked in here is do you think that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder?  And you were only given two boxes, yes and no, and then asked to explain. You checked no.  And you said, Should be sentenced to death. Now, at that point you weren't given any other facts about role in the offense or background or anything else.  But can you share with us what your thoughts were at the time you filled that out?

A.  I think the only thing I focused on there was that it was premeditated.  And if it's proven beyond a reasonable doubt, then it doesn't make a difference their background, not -- in that circumstance it wouldn't if it's premeditated.

Q.  Okay.  And here's my concern is that in this case we're not

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 778 of 3245

going to get to the death penalty issue unless the jury's found the defendant has intentionally and with premeditation engaged in conduct that resulted in the murder of these five people and the two little girls, including the two little girls; okay? And

894

so the jury necessarily would have found premeditation and intention, intentional acts here, and my concern is this. We need to make sure that given those facts, because we're not going to get to the death penalty until we get to that point, that you could still realistically consider life in prison without parole. And looking at this answer, I'm thinking, jeez, I don't think so. It sounds to me like she's already determined intentional murder equals death penalty.

A.    I could still -- I could still weigh them equally. Again, it's just an answer on a piece of paper.

Q.    Okay. And I think something that maybe explains your position best is in question 87 you were asked to review a number of situations below and then describe what effect, if any, it would have on your thought about appropriate punishment. And there was a number of factors listed: More than one person killed, the person was pregnant at the time of the murders, role in the offense, and so forth. And you put kind of a big arrow to the side, and you said it would all depend on the details and circumstances. Do you recall putting that down?

A.    Uh-huh, yes, I do.

Q.    And can you share with us what you mean by that, what your thoughts are on that?

A.    I still wouldn't be able to make a decision on what to do with very little information. I'd have to have a lot of information and a lot of evidence to make any kind of decision.

Page 84

It just goes back to how do you find the answer to a question if you don't have all the ans -- or all the little questions answered.  You have to have everything done before you can make a decision.  So you can't just give me one little story and say is it true or did they do it or did they not do it, is this punishment right or is it not.  You would have to have -- I would have to have all the information myself.  I wouldn't feel comfortable making a decision without all the information.

Q.    What we're looking for, ma'am, are jurors who can tell us coming in here that they're willing to do that, they're willing to look at all the evidence, and they're willing to consider and realistically consider both options, life imprisonment and the death penalty.  Could you do that?

A.    Yes, I could.

Q.    In the appropriate case, could you impose the death penalty?

A.    I could, yes.

Q.    In the appropriate case, even though you would have necessarily as a jury found the defendant guilty of killing five people including two little girls, could you consider life imprisonment as a sufficiently severe punishment for that person?

A.    I could, yes.

Q.    If you and the rest of the jurors found that the death penalty was appropriate unanimously and you'd arrived at that

verdict, you would be required, to carry out that verdict, to

Page 85

sign your name to a piece of paper, to a verdict form that would have the real and practical effect of causing the defendant to be executed.

Now, some people believe in the death penalty as a concept, and they think it's great if other jurors do it. If other juries do it, they agree with the verdicts in those cases and so forth, but they know in their heart that if it really came down to it they couldn't sign a piece of paper that would cause somebody else to be executed. Other people can. Where do you think you are on that?

A. I could. I live in this community. I've grown up in this community, and, you know, I look after my neighbors as they are my own family, so I wouldn't have a problem with putting anyone away or having them executed for something that they've done wrong. It's their punishment. They've done it. I haven't done anything wrong. Just carrying out their punishment.

MR. WILLIAMS: Thank you very much. I have no further questions, Your Honor.

THE COURT: Thank you, Mr. Williams.

Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, ma'am?

A. I'm good. How are you?

897

Q. Good. Thank you. I see that you are the mother of two young children, little boy --

A. Yes, I am.

Q. -- is seven, little girl is two?

A. Yes.

Page 86

Q. And you'd like in a perfect world to be an archaeologist, anthropologist or an astronomer.

A. I like science.

Q. I'm going to go back -- let me first kind of reiterate something I hope maybe you know at this point. You know, the judge does such a terrific job in explaining to people about their obligation to serve as jurors and their obligation to their country that we've had very few people attempt to be excused as a result of -- and even in some cases where people are really going to be very severely inconvenienced. They really are. And then they're willing to do that. And I think, you know, the Court explains that so well to people, and they feel good about their service.

The concern I sometimes have -- and I'm having a little bit of that now, to be honest with you -- is that people might be maybe less willing to tell us about problems that they might have about the case because they want to serve, they do want to fulfill that obligation; okay?

And I mention that to you specifically because of some things in this questionnaire that I'd have to say concern me.

898

And in asking these questions, I'd hope you'd imagine -- and I'm sure it will never happen -- but if you were ever in a horrible predicament of being a criminal defendant in any kind of a case that you'd want your attorney to explore very carefully the views and opinions of folks that might decide your fate; okay?

A. Uh-huh.

Q. And that's what we're trying to do, both sides, and the judge will make the call about which jurors are going to be here or not; okay? But let me go back to the publicity for a second

Page 87

before we talk about the death penalty because you indicated that you had -- you knew Mr. Honken was tried.

A.   Uh-huh.

Q.   Went to trial.

A.   Yes.

Q.   And then Mr. Williams asked you something about the outcome, and you said -- whether you knew about the outcome. You said not really.  Did you not know whether or not Mr. Honken was convicted or not?

A.   I think he was found guilty, but I really don't know.

Q.   Okay.

A.   I don't remember, and I didn't pay very much attention to it.

Q.   And then what about his penalty?  Did you learn anything about that?

A.   I have no idea.

899

Q.   I see.  You did know that drugs were involved and somebody was murdered.  Does that sound right?

A.   Yeah, I think I might have heard that there were children involved, but I don't remember how many.

Q.   Okay. All right.  Let's go over to the death penalty for just a moment.  And I want to ask you about some of the same questions I suppose that Mr. Williams did.  When you were asked your thoughts and opinions about the death penalty, as you've pointed out, you said, Do it faster; it would save the government money; right?

A.   Yes.

Q.   And you were asked why do you feel this way, and you said, High taxes while they wait for their punishment?

Page 88

A.    Uh-huh.

Q.    Does that sound right?

A.    Yes.

Q.    You were asked at question number 82, What are your thoughts and opinions about life in prison as a punishment for a person who's guilty of intentional murder?  And you said, Takes up too much money, that is, putting somebody in prison would cost the taxpayers too much money.  Is that accurate?

A.    Not that, no.  It's that it takes too long for it to get over with.

Q.    Okay.  And because it takes too long, the taxpayers are paying for the cost of that person's incarceration; is that

900

right?

A.    No.  You are asking my opinion of why -- what my opinion is on somebody who's been convicted and how long they -- or what I think about life imprisonment.  I don't think -- or not -- the death penalty.  I don't think they should sit forever, but then again, it's not my decision.

Q.    Well, I just wanted to know what you meant by this response.  Let me read this whole question to you, question 82.  What are your thoughts and opinions about life in prison as a punishment for a person who is guilty of intentional murder?  And your response was, Takes up too much money.  Does that sound right?

A.    Yeah, they're sitting there for a long time on something that they've done.  Well, in states where there's not an option of the death penalty and if the option of the death penalty was there, they would be convicted to death, then I think -- I don't agree with that.

Page 89

Q. You don't agree with what? I'm sorry? I misunderstood.

A. That if the death penalty was an option and it would have been chosen if it was an option in that state and not including our state, but if it would have been there and they are convicted to life, I don't think that's right. But again, that's just my personal opinion.

Q. Okay. And you expressed your feelings about life imprisonment in this question. This is question 83. Why do you

901

feel this way, or what are some of the reasons for your beliefs about life in prison without the possibility of release? That was the question. And you said, It's not like they're going to have a positive impact on society while in prison.

A. Not really.

Q. Okay.

A. Not that I can see.

Q. All right. And I'm looking at those in combination if you would. The first -- these are questions one right after the other.

A. Uh-huh.

Q. The first one you thought life in prison takes up too much money. In the second one, keeping people in prison, they're not going to have a positive impact on society is kind of a suggestion why bother?

A. Well, they're -- in some circumstances, then yes, they should get life. If it doesn't warrant the death penalty and it wasn't severe enough to get the death penalty, then yes, they should get life in prison because they do have families and they -- even though they're not going to have an impact on society, society can still have an impact on them.

Page 90

Q. Well, these questions weren't so much I suppose asking you to make a decision as much as kind of what your views are about life imprisonment. And is that a concern that you have, people -- we're spending money on these people and it's not like

902

they're going to have a positive impact on society while they're there?

A. No.

Q. Is that how you feel?

A. It's not a concern, no.

Q. Let me ask you about this questionnaire then. How long ago did you fill that out?

A. Couple weeks ago.

Q. And has something happened in the two weeks since you filled it out till today to change your views about these matters?

A. No.

Q. When you filled it out, did you see there were instructions about how to fill it out and your responsibilities to give truthful and honest answers?

A. Yes.

Q. Okay. I thought you told Mr. Williams -- in fact, in response to this very issue about the cost of life imprisonment, you explained, An evil person who's done an evil crime, get it over with, get them out of the system, get it done.

A. Yes.

Q. And when you were talking about get it done, you're talking about the death penalty?

A. Yes.

Q. Question 84, Do you think that life in prison without the

possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder, and you checked no and said they should be sentenced to death.

A.    Right.

Q.    Okay.  Now, I understand you've said repeatedly you'd like to hear all the facts, like to hear all the evidence, can't make a decision about the case until that happens.  Is that accurate?

A.    That is correct, yes.

Q.    You know, a lot of people tell us that, and I think sometimes we confuse people coming in here because of this process that we're engaged in.  You know, Angela Johnson hasn't been tried for anything.  You haven't heard any facts, haven't heard any evidence.  But the jurors that are going to be selected on this case need to be asked these questions about punishment because we can't come back later and ask them, How do you feel about these issues now that you've heard all the evidence; okay?

A.    Uh-huh.

Q.    And so we have to ask people to kind of put themselves artificially in a position as if they were jurors; all right?  And so I want to ask you to do that for me just a minute.  And imagine that you have heard all the evidence; okay?  The government is going to attempt to prove beyond any reasonable doubt that Angela Johnson intentionally committed the murders of

904

five people including two little girls ages ten and six, that those murders were committed during the course of a drug

conspiracy and/or a continuing criminal enterprise, and not only were the murders intentional alleges the government, they were premeditated and after substantial planning; okay?

And you've heard all the evidence now in the case, not just you but you and your fellow jurors have heard it. And you've made a decision not only in your own mind but with your fellow jurors guilty, that's what happened. We heard all the evidence. We made a decision; okay?

Now, I heard you say to Mr. Williams in response to a question if proven beyond a reasonable doubt it was premeditated -- and I'm just paraphrasing.

A. Right.

Q. I'm trying to write. The judge has these things on the screen. I just couldn't get it down. But if proven beyond a reasonable doubt, premeditated murder wouldn't matter what the background of the defendant was. If it was premeditated, it doesn't make a difference what their background is. That's a death penalty situation. And so if I heard that right and if you were on a jury that found these things beyond a reasonable doubt, would you really be able to consider a punishment other than the death penalty for pre --

A. Yes, I would.

Q. For premeditated --

905

A. I would still weigh them equally.

Q. You'd still weigh them equally.

A. Yes. I would consider both of them equally. I might believe personally that yes, it is right that they would get the death penalty with premeditation, but still I'd have to weigh that equally. It's a person's life that you're handling there

Page 93

in that situation. It's not something you can go in believing yes one way or the other.

Q. Well, I think to be honest with you, a lot of people do. They do come in here, and as I think we've pointed out -- if we haven't, forgive us -- that's okay. You know, that's your other part of your civic obligation here is not only to do your duty for your country, but in doing that you have to be able to openly and honestly disclose your views about these matters. That's part -- as much as being here, that's doing your duty as well; okay?

And so when I see a -- I hear that response, if proven guilty of premeditated murders, Mr. Berrigan, it doesn't matter what the background is, hear these concerns about, you know, this is costing the taxpayers money, let's get it over with, when I see this response here, question 84, Do you think life in prison without the possibility of parole is a severe-enough punishment for a person convicted of intentional and premeditated first-degree murder, no, no is the answer, they should be sentenced to death, it sure sounds like okay; it just

906

sounds like you had some views about that two weeks ago, that subject, and we just want to know if you did if those are your views.

A. It's just an answer on a piece of paper. There are some circumstances when yes, I do believe that -- I'd still have to see all the evidence. I do believe that beyond -- if they're proven beyond a reasonable doubt that yes, they did this, yes, it was premeditated, then yes, death penalty.

Q. Okay.

A. But then again, I'd still have to get all the evidence. If

Page 94

their -- if you -- I don't know. I'd still have to look at everything. I still would not be able to make a decision. Even if she was proven without a reasonable doubt and it was premeditated, I'd still have to weigh both of them equally. I could not make a decision still at that time.

Q. Okay. Well, let's say that you would have to weigh them equally just theoretically; okay? Would you admit that your position at least based on maybe some of the responses we've heard today and what's in your questionnaire is that you at least have a notion of which punishment you would favor in a situation involving intentional premeditated murders of five people including two children?

A. I don't know. Not really. I still couldn't make a decision or even give an honest answer without knowing everything.

907

Q. You're not even leaning one way or the other, huh?

A. No, not -- well, the death penalty doesn't bother me, and life in prison doesn't bother me if that's -- if that makes sense.

MR. BERRIGAN: Thank you, ma'am. I appreciate your candor.

THE COURT: Mr. Williams, anything further for this witness?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Ma'am, if you'd just step outside, we'll let you know in a couple of minutes. Thank you.

PROSPECTIVE JUROR 403: Okay. Thank you.

(Prospective Juror 403 exited the courtroom.)

THE COURT: Does the government move for cause?

Page 95

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Yes, Your Honor, we do move for cause. This is a juror who I believe when she's talking about listening to all the evidence is talking about making a determination about whether this is premeditated murder. But once she's there, once she's made that decision after listening to all the evidence, the death penalty in her mind based on some of her responses is really the realistic alternative for her.

And I know you have the ability to check these responses on the screen, but there were a couple that were

908

notable. And one was that if it were proven -- and I'm paraphrasing it. She said it to Mr. Williams, not to me. If it were proven beyond a reasonable doubt premeditated murder, it really wouldn't matter what the background was or the circumstances; that's the death penalty. And I know she gave some, I would argue at least, somewhat inconsistent responses, certainly inconsistencies between the questionnaire and her responses --

THE COURT: No question she gave inconsistent responses.

MR. BERRIGAN: And I know the Court isn't using the questionnaires in terms of having them part of the record, but the answers that she admits she gave I hope will be considered, and certainly I think there's a very severe question as to whether or not this young lady has views about the death penalty, the cost of imprisonment, how quickly this process is taking, or how slowly in her mind that raise substantial concerns whether she could fairly follow the instructions of the
Page 96

Court. And so we'd ask that she be excused pursuant to the standard of Wainwright versus Witt.

THE COURT: Mr. Williams?

MR. WILLIAMS: We would oppose the motion, Your Honor. I'm not so sure that her position was that inconsistent. What I heard and I think is consistent with her questionnaire is she's disgusted with the system. She's frustrated as many people that

909

after somebody's sentenced to death it takes, you know, sometimes decades for people to be executed, and she's frustrated with that system. She's frustrated that her tax dollars are paying for people to sit in prison for a long period of time. But when I asked her about that, she said repeatedly, I understand that's out of my hands.

THE COURT: Wait till she figures out the defendant in this case was originally charged in 2000.

MR. WILLIAMS: What she said is she understands that that's out of her hands, and she's frustrated, and her questionnaire clearly reflects her frustration with that. But when she was asked the question -- and Mr. Berrigan never got her to ever back off of that -- are you willing to consider both options as a potential punishment, she says yes.

Now, sure she's frustrated with how it's carried out. But she's very adamant and very consistent that she's willing to consider both options in this case. And so given that, I don't think a strike is proper.

THE COURT: Mr. Berrigan, anything else you want to add?

MR. BERRIGAN: No, Your Honor. I think the Court will have to weigh her answers in the entire context as opposed to

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 792 of 3245

one at a time, and I hope that if that's done you'll see that there's such a remarkable inconsistency, frankly, that we can't be sure that this woman's going to be able to follow the

910

instructions of the Court.

THE COURT: We can never be totally sure of that. But, I mean, I think there -- I have a -- I'm not able to harmonize her answers as well as Mr. Williams is. I see some inconsistencies, but -- and I realize it's your job to just argue one side of it.

But if you look at the other part of her questionnaire, when it came to 87, she just said it would all depend on the details and circumstances, and she was fairly consistent about that. If I were in your shoes, I'd have grave concerns about this juror too, and I fully expect you to exercise a peremptory challenge, and I'm going to give you that opportunity because on the for-cause basis, I found her credible when she said that she would consider both. I think she had some opinions, but I also think that she would -- and I think she would fairly consider both. Would I be worried about her if I was the defense lawyer? You bet I would be.

But based on my credibility of her answers, she doesn't meet the standard because she's not substantially impaired in her ability to follow the instructions. So I'm going to deny your motion to strike her for cause. Let's bring 403 in.

(Prospective Juror 403 entered the courtroom.)

THE COURT: Ma'am, you're still in our jury pool. So you can go back down to the jury room. We still have five more

911

Page 98

jurors we have to interview, so it's going to be a while before we bring you all back for some group questioning, but you're still in our pool; okay?

PROSPECTIVE JUROR 403:  Do I wait there?

THE COURT:  Well, it will be at least -- you know, we're not going to get everybody back until probably close to one o'clock, so I'd say you can at least take an hour off and you'll be pretty safe, probably longer.

PROSPECTIVE JUROR 403:  So I could like go to lunch and come back around 12:30?

THE COURT:  Yes, that'd be fine.  Thank you.  And then you'll still probably have to wait some, but we'd like to have everybody here so we don't get held up.  Thank you.

(Prospective Juror 403 exited the courtroom.)

THE COURT:  Ready for Juror 573?

MR. WILLIAMS:  Yes, Your Honor.

MR. BERRIGAN:  Yes.

(Prospective Juror 573 entered the courtroom.)

THE COURT:  Sir, just grab any seat in the middle there.

Everybody can be seated, and we're going to start with questioning first from the prosecutors, Mr. Williams, and then we'll hear from the defense.

Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

912

EXAMINATION

BY MR. WILLIAMS:

Page 99

Q. Good morning, sir. How you doing today?

A. Fine.

Q. Good. I see on here you have been working for the last 15 years at Elastomer --

A. Yes.

Q. -- Engineering? What kind of product does Elastomer make?

A. It's a plastics plant, make all kinds of different urethane parts.

Q. For machines or for . . .

A. Yeah, little plastic washers or we make -- our main thing is we make -- chocks that go on to a railroad car, on a flatbed, you see them hauling cars?

Q. Sure.

A. Okay. We make the chocks that strap those cars on.

Q. Oh. And how many employees are at that plant?

A. Right now probably about 30.

Q. And you're the plant manager there?

A. Yeah.

Q. How do you like that work?

A. It's fine.

Q. What we're going to talk about in this individual setting is just a couple topics, one of which is what you know about this case, you know, what have you read about the case. And the

913

other thing is we're going to explore a little bit just your views on the possible punishments that may come into play in this case if the defendant's found guilty.

So let me just talk about the first one. On publicity in the questionnaire -- and we appreciate the time you took to fill this out -- you indicate that you only have just heard

Page 100

about the case. When asked to explain, you said, I saw him in handcuffs on TV once, and that's it. Do you recall the name of the person you're referring to here?

A. No, I don't know the name.

Q. Okay. Other than watching it on that TV screen one time, have you seen much of other news about the case at all?

A. Well, since then that's all there is. You get in your car, turn your radio on. That's all there is in town this week.

Q. What have you heard this week in town about the case?

A. How long it's going to go, expected to go and that they're supposed to use a lot of the same evidence and stuff like that.

Q. Any explanation what the evidence is that you've been hearing?

A. No.

Q. From your knowledge of the case from before, do you have any idea what the evidence is going to be in this case?

A. I have no idea.

Q. When you filled out the questionnaire, sir, you had indicated that based on what you knew at that time that you had

914

not formulated any opinion about the defendant's guilt, whether she's guilty or not guilty. Is that still the case?

A. Yeah.

Q. And you hadn't formulated any opinion about what you thought the appropriate punishment should be. And is that still the case?

A. Yeah.

Q. So let's go to the issue of punishment and talk about that for just a few minutes. The judge explained to you with his screen the two possible punishments we're going to be talking

Page 101

about is life in prison and the death penalty. So let me explain, first of all, life in prison in the federal system unlike maybe some states where if you get life in prison you get up for parole after seven years or something and you might get out, in the federal system life in prison is without parole. There's no parole board. A person sentenced to prison for life in the federal system doesn't get a chance to appear in front of some body and get out early. They don't get off early for good behavior or something like that. It means life without parole. Do you understand that that's what it means in the federal system?

A. Yeah.

Q. To you, sir, what do you think? Is that a serious sentence?

A. Yeah.

915

Q. Can you imagine that being a fairly unpleasant sentence to serve out?

A. Yeah.

Q. The other option in this case is the death penalty which can be imposed for these crimes if we get to that point and the jury finds certain factors here. You were asked some questions about your views on the death penalty, and you indicated in your questionnaire, I believe in the death penalty if it's proven absolutely. Can you share with us your thoughts on what you meant by that?

A. Well, if the proof is there that they actually did something that the law says requires the death penalty.

Q. And when you say proven absolutely, do you have in mind what level of proof would satisfy you on that?

Page 102

A. I probably wouldn't know until I got to that level.

Q. Sure. The Court will instruct the jury that the government's burden of proof in this case is proof beyond a reasonable doubt, not proof beyond all possible doubt. And my concern that I have once in a while is that some jurors have the feeling that if you're talking about the death penalty proof beyond a reasonable doubt isn't good enough. It's gotta be proof beyond all possible doubt before you could ever impose the death penalty. What do you think about that, sir?

A. I don't know. You can't -- I don't think you can prove anything absolute, you know.

916

Q. And that's not something you're going to require of the government in this case if you were chosen to be a juror is to prove it absolutely.

A. Gotta be within reason -- you know, reasonable doubt.

Q. Beyond a reasonable doubt.

A. Yeah.

Q. Yeah. And you're okay with that standard.

A. Yeah.

Q. Okay. You indicate -- in a question about your opinions on life imprisonment as a possible punishment for somebody who's convicted of intentional murder, you said it's appropriate. Can you share with us your views? If there's a case where somebody is convicted of intentional murder, is life in prison without parole an appropriate punishment for somebody like that? Is it at least possible?

A. If it's proven that they did it.

Q. Sure.

A. Yeah.

Page 103

Q. In this case I want you to imagine if you would that you're on the jury and the jury's deliberated and found the defendant guilty. Assume that the evidence shows that the defendant aided and assisted another person in killing five people, two of whom were little girls ages six and ten. Under those circumstances there will be other factors and other evidence that the jury can consider back there, but under those circumstances if you know

917

just those facts, is life in prison without the possibility of parole in your mind still a realistic option as something that you would consider as a possible punishment for the defendant guilty of assisting somebody else in killing five people?

A. Yeah.

Q. Some jurors believe that the death penalty should be reserved for only the people who pull the trigger and if the defendant assisted but didn't actually pull the trigger in committing the murders that the death penalty just can't apply to somebody that fits in those circumstances. What do you think about that, sir?

A. I think if they were part of it and the death penalty was there, that should be it.

Q. You'd consider it under those circumstances?

A. (Nodded head.)

Q. Can you imagine, sir, of circumstances where the aider and abettor, if you will, could be more culpable or more responsible for what happened than perhaps the person who pulled the trigger, for example, the person who pulled the trigger maybe wouldn't have done it but for the person who was pushing or encouraging them to do that? Can you imagine that circumstances like that could exist?

Page 104

A.    I don't see how somebody could force somebody to do it.

Q.    Oh, sure, sure.  But can you imagine that somebody might encourage somebody to do it?

918

A.    Well, yeah.

Q.    Let me ask you, in this case there may be facts that we're going to ask the jury to consider, and you were asked on question 87 about some of these situations:  They killed more than one person, for example, or they have a history of drug use or they had an abused background or what their role was in the offense.

What we're looking for are jurors who are willing to consider all those factors and perhaps other factors and realistically give consideration to both the death penalty and life in prison and not come into this situation with their mind already made up that they're going to impose one punishment or the other punishment if they've found the defendant guilty of killing five people including two little girls.  Where are you at on that, sir?

A.    I'm not quite sure what you just said there.

Q.    All right.  Let me back up and break it down.  If you were called upon to be a juror in this case, are you willing to look at a number of different factors to determine what the proper punishment should be?

A.    Yeah.

Q.    Would you be willing to look at both the death penalty and life imprisonment as an option?

A.    Yeah.

Q.    Despite the fact that you found the defendant guilty of

919

Page 105

killing five people and two little girls, would you still be willing to consider the possibility -- I mean realistically consider the possibility -- of life imprisonment as sufficiently severe punishment for somebody like that?

A.   Yeah.

Q.   And would you be willing to consider in the appropriate case imposition of the death penalty?

A.   Yeah.

MR. WILLIAMS:   Thank you for your time, sir.   I have no further questions.

THE COURT:   Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q.   Good morning, Mr. 573.   How are you?

A.   All right.

Q.   Probably you've never been called 573 before, have you?

A.   No.

Q.   I wanted to start with explaining to you, sir -- this is kind of a backwards process we have.   We're asking you questions about punishment as if the trial had already taken place.   And Angela hasn't been convicted of anything; okay?   But we're trying to do this because we need to understand your views about a couple of these topics in making our decisions about who the 12 best jurors might be.   You following me?

A.   Yeah.

920

Q.   Okay.   And we're asking people to come in here one at a time hoping that it allows them to be, you know, completely candid and open and honest with us about their views,
Page 106

understanding that we're not judging what your opinions are. You have a right to them, and we will respect those. We just want to know what they are; okay? You with me?

A. Yeah.

Q. Okay. I wanted to ask you about the publicity situation here first. You told Mr. Williams that lately this thing's been on the news or I guess on the radio quite a lot; is that right?

A. Yeah.

Q. Is that where you get your news largely?

A. I'm in the -- in my vehicle a lot, and I listen to talk radio.

Q. Okay. What stations are you interested in?

A. 1370.

Q. Is that a talk radio kind of station?

A. Yeah.

Q. And what have you heard about the case here lately?

A. That's just it. I shut it off because I knew I was coming here. I'd go to a different channel. But by the time you realize what's on there, you hear a couple things.

Q. I see. And one of the things you heard about was how long the jury process, the jury selection process --

A. How long the trial might take. They said like four weeks.

921

Q. All right. And then something about a lot of the same evidence and stuff was going to be used in this trial?

A. Yeah, that's why they figured it'd take about four weeks because that's how long the other trial took. They was going to use about the same evidence.

Q. Did you know what other trial they were talking about?

A. The guy that was involved.

Page 107

Q.    Okay.  His trial went to trial last fall here in Sioux City.  Were you listening to the radio at that time?

A.    No, I had no idea.

Q.    I'm sorry?

A.    I had no idea about his trial.  I just saw him on TV once.

Q.    Oh, I see.  Okay.  Well, you said you spent a lot of time in your car, and I was just wondering if last fall you might have been listening to the radio.

A.    I don't remember hearing nothing about it then.

Q.    Okay.  So you don't remember anything about Mr. Honken's trial at all?

A.    No.  Like I say, I just saw him on TV in handcuffs once.

Q.    Okay.  Well, let me ask you a little bit about the death penalty then if we might turn our attention to that.  You were asked some questions about this in your questionnaire, your views about the death penalty and life in prison.

A.    Uh-huh.

Q.    And I suppose when you were asked that question it may or

922

may not have been the first time anybody really asked you about it.  Have you ever had occasion to talk to anybody about your views about the death penalty before?

A.    Not really.

Q.    Okay.  Well, when you think in your mind about cases that you think are appropriate for the death penalty, what kind of cases are you thinking of?

A.    I don't know.  I never really -- I don't know.  If you intentionally kill kids or anything like that.

Q.    When you're thinking about cases involving life without parole as an appropriate punishment, in your mind and in your

Page 108

opinion, what kind of cases are you thinking of?

A. I don't know. If it wasn't intended, if it was -- you know, you had time -- you didn't have much time to think about it, it was anger or something like that, it's something you're not normally going to do but out of anger or something like that.

Q. Something that happened kind of suddenly?

A. Yeah.

Q. An emotional reaction maybe to a situation?

A. Yeah.

Q. Okay. You need to understand that -- and I know, you know, you don't -- probably didn't learn hardly anything it doesn't sound like before you came in here, but this particular case is not one where the government's claiming that these murders were

923

committed out of anger or some kind of a sudden emotion; okay? You with me?

A. Yeah.

Q. They're claiming that these were intentional murders, and they're claiming that they were done in the course of a drug conspiracy or a continuing criminal enterprise or both, and they're also claiming that these murders are premeditated, they're done after substantial planning. You with me?

A. Yeah.

Q. Okay. And, of course, as you heard, the murders involve five people and two of them, little girls ten and six years of age. You with me still?

A. Yes.

Q. Okay. Now, what we're asking you to imagine in this situation we find ourselves in here is you've already heard the

Page 109

evidence; okay? Now, I know you haven't. You know you haven't. But we're asking you to imagine you have; all right? Can you do that for me for a minute?

A. Yeah.

Q. And you've listened to the witnesses and you've looked at the exhibits and you've talked to your fellow jurors because you're on the jury, considered their opinions, and you've come to a decision; okay? You've heard all the evidence. You've come to a decision guilty beyond a reasonable doubt. You with me still?

924

A. (Nodded head.)

Q. Not just you. You and your fellow jurors have all made that determination.

A. Yeah.

Q. Okay? So that's the position that you're in when we're talking about these punishment situations; okay? And I don't know if that was real clear. In terms of wanting to consider all the evidence and all the circumstances, that's happened; okay? So here's the question for you. If in your mind, look, Berrigan, intentional murder, that's the kind of thing I'm thinking about death penalty, we've got intentional, premeditated, substantial planning, five people, two kids, is that the kind of case that you'd consider the death penalty as an appropriate punishment?

MR. WILLIAMS: Objection, Your Honor.

THE COURT: Well, can you rephrase the question?

MR. BERRIGAN: Sure.

BY MR. BERRIGAN:

Q. You following where we are in this kind of fictitious line;
Page 110

okay? You made this decision. I'm asking you whether or not -- if you've already made that determination whether you'd be willing to consider the death penalty appropriate, as an appropriate punishment.

A. Yeah.

Q. Okay. Now, the flip side of that coin is life

925

imprisonment; okay? In that situation would you really consider life imprisonment as an appropriate punishment?

A. I'd consider both of them.

Q. Okay. Would you be leaning one way or the other?

A. Not really.

Q. Not at all.

A. (Shook head.)

Q. Okay. Well, let me ask you this then. Children aspect to it, the kids, does that make any difference to you one way or the other?

A. It brings it to another level.

Q. Okay. What do you think about the idea that you might be presented with information about the defendant's background in the second part of the trial, things like emotional abuse or physical abuse that happened when she was a child? Do you think that type of stuff has any effect on people's later decisions in life?

A. I know people that's been physically, mentally abused when they were kids growing up, and they're living good lives.

Q. And you said that in your questionnaire. You know abused people that don't kill; right? And there's a question in there about whether people should be punished based on the crime they've committed or the person or a combination of both. Do

Page 111

you remember that question?

A.    I don't.

926

Q.    Okay.  Let me see if I can find it.  It's 61.  Let me read it to you real quick.  It says, In your opinion should the punishment for a crime be based on -- and these were the options -- the crime, the person, or both or something else all together?  And you put an X in the box that says the crime.  Is that what you believe?

A.    Yeah.  If I understood it right, the punishment should fit the crime.

Q.    Okay.  Let me ask this question to you, sir.  I want you to imagine a situation in which you have two different people charged with the exact same crime and they're convicted of it; okay?  Now, they're two different cases, but it's exactly the same thing that they did.  Are you with me so far?

A.    Uh-huh.

Q.    And one of the persons has a background maybe something like mine where they really didn't have any hardships in life, grew up in a middle-class family, had every opportunity, able to get a good education, and the other person had a whole different scenario.  They had an abusive childhood.  There might have been some physical or sexual abuse, maybe neglect, emotional problems within the family and real hardship.  Does that really make any difference in determining the punishment of the crime for those two people?

A.    I don't think so.  I think it'd be the same.

Q.    I ask you that question because, you know, if we get to

927

Page 112

this punishment part of the trial or the penalty part of the trial, one of the things that I could do is present to the jurors information about Mr. Johnson -- Miss Johnson's background and talk about some of the issues that have happened in her life, okay, emotional problems, neglect, abuse, and so on.  These aren't things that are going to come up when we're talking about did she commit premeditated, intentional murder; all right?  That's going to already have been decided.  You understand?

A.    Uh-huh.

Q.    So it's the situation kind of like I was talking to you about with the two people.  They've been convicted of the crime, and now we're looking at their background; all right?  Would that type of information really make any difference to you if your view is, hey, look, it's the crime, Berrigan; if they committed the same crime, then they get the same punishment?

A.    I don't think it'd make any difference.  Like I said before, I know people that were really abused when they were kids, and they're friends of mine.  They're fine.

Q.    All right.  Because if you're selected as a juror, you know, you might be asked to consider that type of evidence.  And based on your own life experiences and your friends I guess is what you're really telling me, not yourself but your friends that you know, I'm hearing you telling me, look, that's not going to make a decision -- that's not going to make a

928

difference hearing about her past experiences or background or family abuse, that kind of stuff, at least as to the punishment.  Am I hearing you?

Page 113

A.    Yeah.

Q.    Okay.  Is that right?

A.    Yeah.

MR. BERRIGAN:  Okay.  Okay.  Thank you, sir.  I appreciate your candor.

PROSPECTIVE JUROR 573:  Thank you.

THE COURT:  Mr. Williams, any follow-up questions?

MR. WILLIAMS:  Just a short one.

EXAMINATION

BY MR. WILLIAMS:

Q.    Sorry, sir.  This will be real quick.  I just want to follow up on that last set of questions.  The judge is going to instruct the jurors at some point about aggravating and mitigating factors to be considered by the jury.

THE COURT:  But only if we get to that point.

MR. WILLIAMS:  Yes.  I'm sorry.

THE COURT:  That's okay.

BY MR. WILLIAMS:

Q.    I should premise this very carefully.  This is only assuming we get to the point of punishment.

A.    Right.

Q.    If we get to that third phase the judge told about --

929

A.    Right.

Q.    -- and we're talking about punishment, the judge will instruct the jury about factors that the jury's to consider.  Now, every individual juror can give whatever weight they want to to any individual factor.  You could say, I'm going to consider that, but I don't personally feel that has any weight for me to that factor.  This factor over here, I think it has a

Page 114

lot of weight, so I'm going to give that factor a lot of weight. But if you're instructed to consider a list of factors, are you willing to follow that instruction and consider those factors?

A.  Sure.

Q.  And what I'm hearing from you is if one of those factors is the defendant's background and how she was raised and that kind of stuff, it's not going to mean much to you in the overall scheme of things.  Is that fair to say?

A.  Yeah, but I'd still consider it.

MR. WILLIAMS:  All right.  I have no further questions, Your Honor.

THE COURT:  Mr. Berrigan, any follow-up?

MR. BERRIGAN:  I'll be quick, sir.

EXAMINATION

BY MR. BERRIGAN:

Q.  You know, when we say consider the factors, that's really a little different than considering the punishments.  You actually have to weigh these things.  And I'm looking at question 87 in

930

the questionnaire, and let me read you some of these responses and see if they're accurate reflections of how you feel about these things; okay?

A.  Okay.

Q.  Please review each of the situations listed below.  After each situation, describe what effect, if any, each have on your thoughts and opinions about an appropriate punishment for a person guilty of intentional murder, and then the first factor is the guilty person killed more than one person at the same time, and you wrote in there, They would kill again.  Does that sound right?

Page 115

A. Yeah, if they intentionally did it the first time.

Q. That they'd likely do it again.

A. Yeah.

Q. Okay. And then there's one, the guilty person was pregnant at the time of committing murder. You said, It would not matter. Is that how you feel?

A. Not if they did it intentionally.

Q. Okay. The guilty person participated in the killing of children. You said, Treated the same as anyone else. Is that accurate?

A. Yeah.

Q. Guilty person had a past history of drug use, Treated the same as anybody else?

A. Yeah.

931

Q. Guilty person is a parent of two children, Should be treated the same as anyone else; right?

A. (Nodded head.)

Q. And guilty person was mentally, emotionally, physically abused and neglected as a child, and you wrote, A lot of people are abused as a child, but they don't kill, which is what you told us earlier; right?

A. Yeah.

Q. And then the last one was the guilty person assisted or encouraged the murders but was not the person who pulled the trigger, and you put, Just as guilty; right?

A. If they assisted them, encouraged them.

Q. Okay. What I'm hearing not just from these responses but from your earlier responses is, look, if -- and it's a big if. We'll grant you that; okay? But if the government was able to

Page 116

prove the crime, this stuff about the defendant's background isn't a big factor for you. It's the crime that's important to you, what did they do.

A. Yeah. I would consider what happened to somebody as a child, but like I say, I know people that have been abused bad when they were kids, and they didn't grow up to kill people.

Q. Right. And so it wouldn't really -- I mean, when you say you'd look at it, you'd certainly listen to it. Am I right there?

A. Yeah.

932

Q. In terms of that having any real weight with you, it really doesn't, does it?

A. Not really, no, not if they intentionally did something.

MR. BERRIGAN: I got it. I appreciate it, sir. Thank you.

THE COURT: Let me ask you this, Juror 573. Do you think in this case based on what you know the lawyers have told you about it so far, do you think you could fairly consider both a life sentence and the death penalty as appropriate punishments in the case?

PROSPECTIVE JUROR 573: Yes.

THE COURT: Well, how do you think you would determine which it would be, a life sentence or a death sentence? How do you think you would make that decision?

PROSPECTIVE JUROR 573: I don't know. I think the lawyers would -- with the evidence would have to show me how I would make the difference in that decision.

THE COURT: And you'd expect the government to probably -- if we ever got that far, they'd be arguing for the

Page 117

death penalty, and the defense would be arguing for a life sentence. That's pretty obvious; right?

PROSPECTIVE JUROR 573: Yeah.

THE COURT: Well, what factors do you think might sway you towards a life sentence? You don't know what the factors are going to be, but I'm just -- of all the possible factors out

933

there, what do you think you might want to hear about in order to determine a life sentence?

PROSPECTIVE JUROR 573: Well, if somebody didn't actually do the killing, I mean, it's the same there if you're there egging somebody on, but I'd consider a life sentence if they're not the ones that pulled the trigger. Does that answer your question?

THE COURT: Yeah, that'd be a factor. Can you think of anything else?

PROSPECTIVE JUROR 573: No. If somebody intentionally kills somebody, it's premeditated, they go out and they do it to protect themselves from going to jail, I don't see where that's -- where they shouldn't get the death penalty.

THE COURT: And there isn't much that would persuade you otherwise, is there?

PROSPECTIVE JUROR 573: Like I say, not if they did it intentionally to protect themselves.

THE COURT: Okay. I really appreciate your answering our questions today. If you'd just step outside -- let me give the lawyers an opportunity to ask some follow-up questions. I'm sorry.

Mr. Williams?

MR. WILLIAMS: No, Your Honor.

Page 118

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 813 of 3245

THE COURT: Mr. Berrigan?

MR. BERRIGAN: No, sir. Thank you.

934

THE COURT: Okay. If you'd just step outside, we're going to let you know pretty quickly what your status is, so thank you.

PROSPECTIVE JUROR 573: Thank you.

(Prospective Juror 573 exited the courtroom.)

THE COURT: Here's what I'm doing in case you haven't figured out. On the day the government goes, I always ask you first.

MR. WILLIAMS: Right.

THE COURT: Okay.

MR. WILLIAMS: No motion, Your Honor.

MR. BERRIGAN: The defendant would move for excusal for cause. This is probably one of maybe the first or second of many examples I'm sure that will come where the Court does a better job than defense counsel getting the views of the juror, but it's clear, Your Honor, that this is not a juror who's going to consider mitigating circumstances once he makes the decision, and admittedly that might be a tough decision for him, but once he's made the decision --

THE COURT: I don't think it'd be very tough. I'm going to sustain your objection. Yeah, this juror's out. Let's bring him in.

(Prospective Juror 573 entered the courtroom.)

THE COURT: Juror 573, thank you so much for answering our questions today. We're going to relieve you of jury duty in

935

Page 119

this case. We think you'd make a terrific juror but probably in another case, and so if you could do us a favor and just not talk to anybody about this until we get the trial underway because northwest Iowa's pretty small and you may say something to somebody else who says it to somebody else, and then that person's going to be here next week being interviewed; okay?

PROSPECTIVE JUROR 573: Okay.

THE COURT: Okay. Thank you very much.

(Prospective Juror 573 exited the courtroom.)

MR. WILLIAMS: Judge, could we have just a minute to talk?

THE COURT: Yeah. Please be seated.

MR. WILLIAMS: Here's my concern, Your Honor, is the case law is very clear that a juror doesn't have to give one whit of weight to any mitigating factor the defense --

THE COURT: That isn't what bothered me about him. It wasn't the mitigation. It was the fact that he wasn't going to consider anything. He had his mind made up that if it was intentional, that's what he just told me. I understand you on mitigation.

MR. WILLIAMS: Okay.

THE COURT: I think --

MR. WILLIAMS: But I -- and you made your decision. I'm not arguing with you, but I just want to make sure I understand when he said --

936

THE COURT: They have to consider it. They don't have to give it any weight which is somewhat ridiculous to me, but I understand what the law is. That isn't what moved me in my decision was his view on mitigation.

Page 120

MR. WILLIAMS: All right.

THE COURT: Matter of fact, I was prepared to overrule his objection on mitigation. But when I asked him some follow-up questions, I understood him to say premeditation, that's it, death penalty which isn't what he told anybody else, but it is what he told me.

MR. WILLIAMS: Right before that, though, he said if it was aiding and abetting he would consider life imprisonment, so I'm not --

THE COURT: Yeah, but then he turns around and says if it's premeditated it's the death penalty, no ifs, ands, or buts, and I thought that was his true feeling. It took a while to get at it, but I thought I got at it. And so I just want you -- I understand your position on mitigation. That didn't have a whit to do with my decision to remove him, not anything.

MR. WILLIAMS: Very good.

THE COURT: I thought he met the standard for mitigation.

MR. WILLIAMS: Very good. That's all I wanted to do was clarify and make sure I understood where you were coming from.

937

THE COURT: And I appreciate it because it would have been a mistake for me to disqualify him based on a misapprehension of the law, and I understand that.

MR. WILLIAMS: Thank you. And I'm not debating your ruling.

THE COURT: No, no, and that's fine. You can -- even if you want to debate it, you can debate it all you want because I've already done it. But I appreciate that. But I just wanted

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 816 of 3245

you to know it wasn't what bothered me was not the mitigation.

MR. WILLIAMS: That's helpful to me, Your Honor.

THE COURT: Okay. Thanks. Okay. Why don't we take a 30-minute lunch break; okay? Thank you.

(Lunch recess at 11:54 a.m.)

THE COURT: Ready for our next juror?

MR. BERRIGAN: Yes, sir.

THE COURT: 544.

(Prospective Juror 544 entered the courtroom.)

THE COURT: Juror 544, if you'd just pick any chair in the middle there you'd like, you can be seated, and you'll be questioned first by one of the prosecutors, Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

EXAMINATION

BY MR. WILLIAMS:

Q. How you doing this afternoon, ma'am?

A. Fine.

938

Q. Good. We're going to talk to you just about a couple topics here individually, and then you're going to be brought back potentially as a group to answer some other questions. Two topics, publicity and then your views on possible punishment in this case, so let's start with the first one.

When you answered the questionnaire -- and we appreciate the time you spent doing that -- it asked you some questions about your knowledge of the case, and you had an opportunity of checking some boxes, and you checked the box that said only just heard about it, meaning the case. And when asked to explain, you said, Dustin Honken was convicted of murder. He was a drug trafficker. That's about it. I don't listen much to

Page 122

the news. Do you recall filling out the questionnaire for that?

A. Yes.

Q. Now, when did you fill out this question just roughly?

A. Two days after I received it in the mail, whenever that was.

Q. Month or two ago maybe?

A. Yeah.

Q. Since that time, have you heard anything else in the news about it?

A. No, I have not.

Q. Other than the details you put down there which isn't a whole lot, do you recall today any additional details you knew about the case from before?

939

A. Just that five people were killed, and I don't -- we don't have television and -- by choice, and I don't listen to radio very much. Well, just a little bit. So I'm really not in on it too much.

Q. Very good. You were asked a follow-up question whether you had formed any opinion concerning the defendant's guilt, whether she's guilty or not guilty. And in the questionnaire you checked the box saying, No, I only hear -- I only heard her name in passing, didn't pay any attention to it. What are your feelings today? Have you formulated any opinion based on what's happened up to this point about whether the defendant's guilty or not guilty?

A. I always have the thing guilty by association, but that's what I've always been brought up with in school. If you're hanging around with the wrong kids and the wrong crowd, you are assumed you're doing the wrong thing too, but that's just my

Page 123

feeling.

Q.    You recognize in a court of law that there's a presumption of innocence that attaches to somebody?

A.    Yep.

Q.    Are you willing to set aside your guilt by association theory?

A.    Yeah.

Q.    Okay.  Based on anything you've heard about this case, has anything influenced your views on the outcome of this case based

940

on anything you may have heard on the radio?

A.    No.

Q.    When asked if you had formulated up to this point any opinions about the appropriate punishment, you said it all depends on her involvement and how much she participated, and you checked the box unsure.  Is that still your views today?

A.    Yeah.

Q.    Let's talk about the possible punishment in this case.  The judge in the presentation he gave you indicated there's going to be two possible punishments if we ever get to that point.  You understand there's first gotta be a verdict of guilt in the case, and we have to get through that second phase.

But in the event we get to the third phase, there's going to be two possible punishments, life imprisonment and the death penalty.  Let's talk about life in prison, first of all.  In the federal system, unlike in some state systems, there's no parole.  If you get a life sentence, it is a life sentence.  You don't go before a parole board after so many years and get to argue to get out before the end of your life.  There's no early release for good behavior.  Life in prison without parole in the

Page 124

federal system means just that, life in prison without parole.
Do you understand that?

A.    Yes.

Q.    To you is that a severe punishment?

A.    Not if it's fitting the crime.

941

Q.    Okay.  Just in principle, does spending the rest of life in prison away from your family deprived of freedom, does that sound pretty bad to you?

A.    To me, yeah, but -- yeah, yeah, it is.

Q.    The other possibility is death penalty in this case, and I want to talk to you about your views on that.  Just -- you answered some questions in your questionnaire, but could you just share with us today, if I just asked you what do you think about the death penalty, what would you say?

A.    It's biblical.

Q.    In what sense?

A.    In the Bible it says that yeah, to be put to death for your crime it's -- I mean, it's been since the beginning of time.  And I don't think there's anything cruel or unusual about it.

Q.    All right.  Do you think there's some cases where the death penalty might be appropriate and some cases where life imprisonment might be appropriate?

A.    Yeah.  Just depends on the crime and the evidence with that.

Q.    In this case the defendant has been charged, as the judge explained to you, with five counts of murder two different ways, so there's a total of ten counts, basically two different theories but five murders.  And picture yourself, if you will, having passed through the first two phases of this trial.

Page 125

You've gone through the guilt phase, and you're now at the

942

penalty phase. And you're at the third part of the penalty phase, and you're going to be asked to do something.

You're going to be asked to weigh a number of factors to try to determine what the appropriate punishment should be between those two choices. Are you willing to look at factors and look at different facts, circumstances of the case, circumstances about the defendant herself to try to determine what the appropriate punishment should be?

A.   Yes.

Q.   You understand in this case the allegations are that the defendant participated in the killing of five people including two little girls. If the evidence showed in this case that the defendant aided and assisted another person in killing those five people including two little girls, given those circumstances, are you still willing to consider life in prison without the possibility of parole as a potential punishment for somebody participating in that crime?

A.   Please rephrase it.

Q.   Sure. If you were serving on this jury and if the evidence showed you that the defendant assisted another person in killing five people, didn't actually pull the trigger herself but assisted another person in killing five people and among those five people were two little girls -- now you're back in the jury room, and you're still weighing what punishment to give -- are you willing, given those facts and understanding there may be

943

Page 126

other facts, but given those facts, has the possibility of life in prison without parole been foreclosed for you just simply based on that, or are you still willing to consider life in prison without parole?

A.  I would consider it.

Q.  Okay.  There are going to be a number of facts and circumstances that you may be asked to weigh in this case.  Is there anything in your mind at this point that forecloses either one of the possible punishments?  In other words, have you made up your mind that, jeez, if this happened or if that happened I just would never consider life imprisonment or I would never consider the death penalty?

A.  No.

Q.  The -- if the evidence demonstrated that the defendant didn't pull the trigger but --

A.  Did not?

Q.  Did not but assisted somebody else in committing these murders, is the death penalty still an option for you?  Is it still a possible punishment?

A.  It depends on all the other factors weighed in.

Q.  Okay.  So you're not ready to foreclose that possibility at this point.

A.  No.

Q.  All right.  Can you imagine yourself in your own mind that there may be circumstances where the person who pulled the

944

trigger might be less culpable in some ways or at least less blameworthy in some sense than the person who was assisting?

A.  Could be.

Q.  Perhaps the person who pulled the trigger maybe wouldn't

Page 127

have done it but for the other person pushing them or cajoling them or something like that. Is that maybe a circumstance that could --

A. Yes.

Q. -- exist? In this case you answered some questions about life imprisonment, and one of the questions was, Do you think that life in prison without the possibility of parole is severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder, and you were given just two boxes to check, yes or no, and you checked no. You said, Not a premeditated murder. That is the lowest form of evil a person can ever stoop to. Do you remember putting that answer down?

A. Yes.

Q. Candidly, our concern's going to be this. With that kind of an answer, I'm thinking this juror can't realistically consider the possibility of life in prison without parole as an option then. She's kind of made up her mind if you've engaged in premeditated murder, then you get the death penalty; I don't care what the other facts are; I don't care what the defendant's background is, how she was raised, what happened to her in her

945

past; I don't care whether she was the triggerman or an aider or abettor; if you engage in intentional conduct of killing somebody, I've already made up my mind; it's the death penalty. Is that where you are?

A. I don't know any of the facts of -- I'm very ignorant with all of the situations that have come into play, so just -- I read it as if somebody premeditated a murder, yeah, that's how I answered the question, not if this person did this or this or

Page 128

this. It was just premeditated. That's kind of how I answered it.

Q. And perhaps the question was unfair too because it only gave you certain facts and only gave you two choices to put down there. Here's what we really need to know, and that is are you willing to realistically consider both life in prison and -- without possibility of parole and the death penalty as potential punishments for somebody found guilty of intentionally killing five people including two little girls?

A. Yes.

Q. If you are among a jury having reached that point where you've found the defendant guilty and you've passed the second phase and you would have gone through the third phase now, kind of the mini trial as the judge described to you that constituted the second half, you've received all the evidence and you and the rest of the jurors are downstairs in the jury room, and you're deliberating, and your job is going to be, as the judge

946

said, to weigh all these factors to try to figure out what the appropriate punishment's going to be, and it's an individual decision. I mean, you're going to be able to make that for yourself, what you think ought to happen.

And once you do that, then you get together with the rest of the jurors and find out what their position is. If any one of you believes that life in prison without parole is the appropriate punishment, it doesn't matter what anybody else thinks at that point. It's life in prison without parole. Do you understand that?

A. Yep.

Q. On the other hand, if all of you having done that analysis,

Page 129

after you talked and you discussed it but you are weighing this yourself and in your mind you've determined the death penalty's appropriate and so has all other 12 jurors agreed with you at that point, to reflect that verdict, you would have to sign your name to a verdict form that would have the real effect of causing the execution of another human being.  Some people believe in the death penalty in principle, believe it's a good idea.  They back decisions where it's occurred, but they also know that they themselves could never actually sign a verdict form causing the death of another person.  Other people can. Can you share with us where you think you are on that?

A.    If I know beyond a reasonable doubt that this person is guilty, yes, then I could.

947

Q.    Now, children were involved in this crime.  Children were involved as victims.  I mean, they are vulnerable victims, innocent victims in this case.  Does that make you think that the death penalty just has to be the answer because children were involved as victims?

A.    Half of me says yes because I have children of my own.  The other half, it just depends on all the factors that are involved.

Q.    So you can recognize there may be other factors that while that's a pretty strong aggravating factor in your mind maybe you can recognize there may be other factors that could be weighed against that in determining what the appropriate punishment should be?

A.    Yep.

Q.    So in the appropriate case, you could impose life in prison for this crime?

Page 130

A.    Yes.

Q.    In the appropriate case you could impose the death penalty?

A.    Yes.

        MR. WILLIAMS:  Thank you.  No further questions, Your Honor.

        THE COURT:  Mr. Berrigan?

        MR. BERRIGAN:  Thank you, Your Honor.

                        EXAMINATION

BY MR. BERRIGAN:

948

Q.    How are you, ma'am?

A.    Fine.

Q.    I hope your puppies are doing okay in your absence.

A.    I don't know.

Q.    I want to start by reiterating kind of why we're here doing this.  You can see these are really important issues, and although jurors rightly consider, as the judge mentioned this morning, service as a juror in a case such as this to be one of their obligations as citizens -- and we applaud that, you know, vigorously -- they also have an obligation to be open and honest with us in this process.  This part is not a test about whether you can follow rules, whether you're going to be fair and impartial, whether you're going to do this or that.  What we're trying to do is to get people to just tell us how they feel about these things so we can make our best choices; okay?

        And it's done in the spirit if you could imagine this -- I'm sure it will never happen to you, but if you were ever in the unfortunate predicament of being a criminal defendant in a case how much you'd want to know about the people that are going to sit and decide your fate and how they feel

Page 131

about things so you could have the best 12 people; okay?

I see you've already made note of it. You have four children including two little ones, right, at three and a nine-month-old?

A. Yeah.

949

Q. I'm going to touch just briefly on the publicity situation because one thing you mentioned caught me. In the questionnaire responses here you indicated you had just heard about the case that Dustin Honken was convicted of murder, he was a drug trafficker. That's about it. I don't listen much to the news. Does that sound about right?

A. Yep.

Q. And you got this apparently from the radio?

A. Yes.

Q. Okay. Because you don't have a TV.

A. No.

Q. Good for you. I'd like to get that rule in my house. And then you were asked some questions by the prosecutor about the presumption of innocence. You remember him asking you about that?

A. (Nodded head.)

Q. And one of the things that I thought you said -- and I'm just going to paraphrase this for you -- he asked you whether or not given what you knew about Mr. Honken's situation you could presume Angela Johnson to be innocent, and you said, I always have the feeling of guilt by association. I was brought up in school or maybe you got that from school. I'm not sure. But hanging around with the wrong kids and the wrong crowd, you're assuming you're doing the wrong thing also. Does that sound

Page 132

about right?

A.    Yeah.

Q.    Tell us a little bit about that.  How does that relate to Mr. Honken and Miss Johnson?

A.    If they were in a relationship together, I would think that they'd talk and there's not too many people that one partner knows one thing and the other doesn't know at least something of it.

Q.    Okay.  And so obviously you know what happened to Mr. Honken; right?

A.    Not really.

Q.    Okay.  Well, at least that he was convicted.  You're right.  I didn't ask you about that.  I'm glad you reminded me.  Did you find out what happened to him?

A.    I know he was guilty or was found guilty.

Q.    You just haven't heard about his punishment.

A.    Nope.

Q.    You know, you could hear evidence that these folks -- and I'm sort of getting a sense already that there's some association in your mind between Mr. Honken and Miss Johnson.  What is that association?

A.    That she was his girlfriend, and that's about it.  I don't know what type of relationship or what.

Q.    Okay.  And so part of the concern you have is if they're kind of together and he's done this type of stuff that if she didn't participate in it she certainly would have known about

it, and under this theory of, you know, hanging around,
Page 133

association, that's something that you wanted to raise with us.

A.   Yeah, I just -- that's just what was in my mind.

Q.   Okay.  Let me ask you this question.  You know, would you agree with me that when people come into a courtroom and they're charged with a crime, particularly a serious crime, that the presumption of innocence is the right thing to do, that that's something that not only does the law order but it's only fair that that should happen?

A.   Yes.

Q.   And that they should be judged in the circumstances presented in a case.

A.   Yes.

Q.   And, you know, in most cases, to be honest, 90 percent of the cases or more that we're involved in, that isn't an issue because there aren't articles in the paper.  There's not television coverage, newspaper, radio, all this stuff.  And so people walking in the courtroom, they don't know that person from Adam who's sitting across the room there at the table, couldn't tell you in a million years who they are or anything about their case.

        And then we have the sort of opposite end of the spectrum, if you will, where Miss Johnson's seated where we've had a great deal -- I know you haven't seen the television accounts or coverage, but there's been a lot of coverage in

952

certainly Mr. Honken's case, and you didn't mention the newspaper, so I presume you don't read the newspaper that much.

A.   No.  Don't have time.

Q.   But we have this idea that, you know, right now as she sits there Angela Johnson is presumed to be innocent, and by that we

Page 134

mean really completely truly innocent. That's the presumption. Some folks, much as they'd like to do that, because of the information that they've gotten, they haven't been able to do it. We had a man just this morning, a gentleman who would have been a phenomenal juror undoubtedly, but he had heard enough that as much as he'd try, he had some concerns himself about his ability to completely presume her innocent. And we have to rely on the jurors on that in that regard; okay? We don't know what's in your mind.

So let me ask you this question. Based upon your knowledge about Mr. Honken at least having been convicted of the murder, he's a drug trafficker, and then this association with Miss Johnson, do you have any doubt in your own mind about your ability to completely and utterly presume that she's innocent not just now but throughout the trial until you were -- heard all the evidence and went back to the jury room to make your decision?

A.    If I heard all the evidence and thought she was innocent, then yeah.

Q.    Yeah. Well, unfortunately that's not exactly my question;

953

okay, because it starts right now. The presumption of innocence is already attached to Angela Johnson. At this very moment it's there. And I'm hearing -- and you tell me. I'm hearing perhaps that may not be in your case particular -- completely 100 percent true.

A.    Not 100 percent.

Q.    Okay. And so this question what I meant to ask but not very well earlier is right now as Angela Johnson is sitting over there right now, are you able to confidently assure us without

Page 135

really any question that you can presume her to be completely innocent?

A.    No.

THE COURT:   Mr. Berrigan, I'm going to cut you off because I've heard enough to rule on this witness.

MR. BERRIGAN:   Thank you.  I appreciate your --

THE COURT:   And I understand -- I understand she said all the right things, Mr. Williams.

But I'm going to let you go, ma'am.  You might be a good juror but not in this case.  And we'd appreciate it -- you're free to leave now, and we'd appreciate it if you don't talk to anybody about this experience because somebody you might talk to might talk to somebody else, and we've got hundreds of jurors lined up to come in to be interviewed, and so we appreciate it.  Good luck to you and your puppies.  Thank you.

(Prospective Juror 544 exited the courtroom.)

954

THE COURT:   Just close the door for one second.

Mr. Williams, I know I didn't give you a chance to rehabilitate her, and I know she said a lot of the right things. I just didn't believe her, and I don't think she would have been a good juror.  She may be fine with her puppies, but I wouldn't sleep well at night entrusting her with any decision let alone an important decision like this, any decision in this court.  I just have a very bad feeling about her, and that whole guilt by association thing is a big thing in her life, and I just don't think she could have ever overcome it no matter what I told her. That's what I felt.  There wasn't anything that was going to change my mind.  I was unwilling to give her the presumption of innocence.

Page 136

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 831 of 3245

MR. WILLIAMS:  I respect your decision.

THE COURT:  I understand she said all the right things.  I could have easily let her go.  Mr. Berrigan couldn't have gotten my decision overturned in a million years, but it just -- I felt actually about as strong about her as any juror we've had.  Sometimes they say all the right things, but I just read it differently, and whether I'm right or wrong, I'm going to go with my judgment on it because that's the only judgment I have to go on is mine.

MR. WILLIAMS:  I respect that, Your Honor.

THE COURT:  Okay.  Thank you.

(Prospective Juror 311 entered the courtroom.)

955

THE COURT:  Juror 311, anywhere in the front row.

PROSPECTIVE JUROR 311:  Okay.

THE COURT:  Please be seated in any chair, and we're going to start first with Mr. Williams, one of the government prosecutors.  And then we'll hear from Mr. Berrigan on the defense side; okay?

PROSPECTIVE JUROR 311:  Okay.

THE COURT:  Thank you.

EXAMINATION

BY MR. WILLIAMS:

Q.   Good afternoon, ma'am.  My name's C.J. Williams.  I was introduced to you this morning.  How you doing this afternoon?

A.   Doing fine.  Thank you.

Q.   Good, good.  I understand you're a graphic artist.

A.   Yes.

Q.   You've been doing that for six years?

A.   Uh-huh.

Page 137

Q.   How did you get into that area?

A.   I answered an ad in the paper, and it was a gentleman in Paullina who had this business, and we just kind of learned as we went along because he just started his business on his own so . . .

Q.   Interesting.  No real formal training in that area.

A.   No, huh-uh.

Q.   Interesting.  Well, welcome to another area you probably

956

don't have any formal training in.

A.   That's right.

Q.   And that is being a juror.

A.   That's right.

Q.   Have you ever served on a jury before?

A.   No, I have not.

Q.   Very good.  Well, what we're going to do right now is actually just ask you a couple topics, some questions that we need to have some answers to to help us decide whether you're going to be a good juror for this particular case.

A.   Okay.

Q.   All we need from you is something pretty simple, and that is you just be open and honest with us about your views, whatever they are.

A.   Okay.

Q.   And don't ever think at any point that the lawyers are trying to get you to say one thing or that there's a right answer or the judge will be mad if you don't say this, that, or the other thing.

A.   Uh-huh.

Q.   It's whatever you feel that's going to be important.

Page 138

A.    Okay.

Q.    First topic I want to talk to you about is publicity, and some people know something about this case; some people don't. And so we want to explore that for obvious reasons.   You'd

957

indicated that you'd only just heard about this case.   You recall today what you know about the case?

A.    All I had heard was that Angela Johnson was going to be tried.   That's the only thing that I'd heard on the news, that she was going to trial.

Q.    Now, you'd indicated in your questionnaire you'd heard of Honken's name before in a news broadcast.   What do you recall about Dustin Honken, if anything?

A.    All that I had heard was that he had been convicted of the crime.

Q.    All right.   And did you hear anything about the punishment he received, if anything?

A.    No.

Q.    Now, do you recognize that -- the fact that Dustin Honken got convicted, does that have anything to do with whether Angela Johnson's guilty of a crime beyond a reasonable doubt?

A.    No, because she's an individual.

Q.    And do you recognize that what's going to be important if you serve as a juror is going to be what comes from this witness box right here and the evidence you're actually going to see?

A.    Right.

Q.    Can you in your mind set aside the fact that you know that Dustin Honken got convicted of crimes that may be very similar to these?   Can you set that aside in your mind?

A.    Yes, I can because she's an individual.   I mean, you know,

Page 139

I don't know -- I didn't ever hear that she was part of his life, so I -- yeah, I feel that I can.

Q.   And if you're back in that jury room and as you're listening to the evidence come out through trial you think, oh, yeah, now I remember that; I remember -- you know, I had forgotten it now today when they were questioning me as a juror, but later on when you hear the evidence it jogs your memory, you say, Oh, yeah, I remember that now; I remember that coming out during the Honken case or something like that, what we would need you to do is be able to assure us that you can set aside, again, anything you recall about the Honken case, the outcome of the Honken case, and decide this case based on the evidence that you receive as a juror.

A.   Right.

Q.   Can you do that?

A.   Yeah, I believe I can.

Q.   The -- one of the questions you were asked is, you know, up to this point before you have any evidence have you formed any opinions about the appropriate punishment for the charges in this case, and your answer in the questionnaire to question 73 was yes.  You said, The punishment should fit the involvement Angela, parentheses, if any, end parentheses, had in the crime or had, if any, in the crime.  Do you recall writing something like that?

A.   Yes, I do.

Q.   Can you share with us what your thoughts are when you say,

Page 140

Should fit the involvement Angela had in the crime?

A. Well, it would -- yeah. Any punishment or, you know, guilt or whatever would depend upon what they could prove as far as, you know, any involvement that she had with him or with what happened.

Q. Have you made up in your mind at all what you think that punishment ought to be one way or the other at this point?

A. No, I have not.

Q. Let's talk about the possible punishments that could be available in this case. You recognize when the judge went through how this works today that there could be three stages to this case.

A. Right.

Q. We only get to the punishment part if the jury has found beyond a reasonable doubt that the defendant has committed one or more murders in connection with some drug activity.

A. Uh-huh.

Q. And so let's assume we're there, and let's further assume that the jury has found beyond a reasonable doubt that the defendant engaged in conduct, the intentional and premeditated murder of five people; okay?

A. Uh-huh.

Q. The jury's found that beyond a reasonable doubt. That's the stage at which we'll be talking about possible punishment.

960

A. Uh-huh.

Q. Do you recognize that?

A. Yes, I do.

Q. Okay. Let's say we're at that point. The two possible punishments that are available are life in prison without parole

Page 141

and the death penalty. So let me talk about each of those.

Life in prison without parole in the federal system means just that. There is no parole. Unlike in many states, if you're sentenced to life in the federal system, you don't go before a parole board at some point down the road and ask to get out early. You don't get any time off for good behavior. Life without parole means life in prison for the rest of your life. Do you understand that?

A. Yes, I do.

Q. Okay. Does that seem like a pretty severe punishment to you?

A. Considering what -- you know, if it was what you talked about with the murders, I think it would be fair.

Q. Okay. And the other possibility is the death penalty.

A. Uh-huh.

Q. And what we're looking for are jurors who are willing to consider both of those options as possible punishments. Now, to be honest with you, some people come in here -- and we totally respect their opinions, but some people come in here; they just know they can't consider one or the other option. Either their

961

upbringing or their belongings (sic) or just their views on the case, they just have already foreclosed one of those two options. Can you share with us where you're at on that? Have you foreclosed either one of those options in your mind at this point?

A. No, I have not. It would have to be according to the evidence, according to attitudes.

Q. Let me talk about one of the answers you had in here. It asked about your thoughts on the death penalty, and you said, If

Page 142

there's absolutely no doubt and this was a horrendous crime with no sense of remorse from the criminal, then I would believe in the death penalty. It would depend on the reasons behind the crime. If it came from the results of much continued abuse to the criminal from the victim, I wouldn't necessarily agree with the death penalty. Do you remember writing something like that?

A. Yes, I do.

Q. It's an interesting answer because you've kind of fit in a number of different factors that at least in your mind immediately popped up that could influence your decision on the penalty. Is that fair to say?

A. Yes, it is.

Q. You recognize there may be other factors you didn't even think about that could influence your decision.

A. Absolutely.

Q. Now, you indicate that if there is absolutely -- and you

962

actually wrote it in all caps -- absolutely no doubt on the guilt, then you could consider the death penalty. So let me talk to you about that for a moment. The judge will instruct you ultimately in this case the government has the burden to prove its case beyond a reasonable doubt.

A. Uh-huh.

Q. Beyond a reasonable doubt isn't beyond all possible doubt, but it's beyond a reasonable doubt. And that's the standard the government has throughout the trial, not just during the merits or the not-guilty/guilty phase but also if we get to the later phases throughout those phases. We have to prove to the jury -- if we say here's some aggravating factors we think you ought to consider to impose the death penalty, we gotta prove those exist

Page 143

beyond a reasonable doubt.

Now, some jurors come in here and think, boy, when you're talking about the death penalty and as serious as that is, beyond a reasonable doubt's not good enough for me.

A.    Uh-huh.

Q.    If you're asking me to impose the death penalty, then those factors, those things you're telling me that ought to call for the death penalty, you're going to have to prove those to me 100 percent beyond all possible doubt because if you don't prove those factors to me, I couldn't possibly consider the death penalty.  Other jurors can accept proof beyond a reasonable doubt as an acceptable burden of proof in a case like this.

963

A.    Uh-huh.

Q.    Can you share with us what your thoughts are?

A.    I think it'd have to be beyond -- you know, I mean, there's no absolutes, but it would have to be very strong proof of guilt for the death penalty.

Q.    In your mind is strong proof the same thing as proof beyond a reasonable doubt?

A.    Yeah, it would be.

Q.    Okay.  And so if the judge instructed you at some point that the government's burden is to prove this beyond a reasonable doubt, you're okay with that level of proof.

A.    Yes, I am.

Q.    All right.  If the evidence demonstrated to you in this case that there was actually two people involved and the defendant in this case didn't actually pull the trigger in the murders but assisted and aided somebody else, encouraged maybe them to do the crimes and involved in that was the death of five

Page 144

people including two little girls ages six and ten years old, now, if you were told that that was -- or if that was the evidence presented in this case, you saw evidence that her role, the defendant's role, in this case was to assist somebody in carrying these out but she didn't actually pull the trigger, could the death penalty still be an option for you?

A. I think it could depending upon, you know -- there would have to be more evidence to me as to what exactly her role was,

964

you know, what part in the planning, what part -- you know, there's only going to be one person that's going to pull the trigger but what in the whole planning process.

Q. And that's where I want to go too. You haven't foreclosed the whole idea of the death penalty if she's not the person who pulled the trigger, in other words.

A. Right.

Q. All right. And can you imagine a situation where somebody who didn't pull the trigger, the aider and abettor, if you will, could be more blameworthy in some sense than the person who pulled the trigger? For example, if the person who pulled the trigger may not have done it but for the other person encouraging them or doing something like that --

A. Right.

Q. -- can you imagine a situation like that?

A. Yeah.

Q. The factors that you may be in a position to consider could include things about the circumstances of the crime like we've just discussed, the role the person played. There could be a lot of different things. Could be things about the defendant's background, could be things about, you know, how she was raised

Page 145

and so forth. Are you willing to consider all of those factors to try to figure out what the appropriate penalty should be?

A.    Absolutely.

Q.    One thing I want to talk to you about real briefly here,

965

you were asked a question do you believe in, quote, an eye for an eye, and then you were given a couple boxes to check yes or no, and you said yes. And then in the place where it gave you a chance to explain you said, But according to the definition God intended it in the Bible.

Now, I've taken some Bible study classes myself. I have to tell you I've not studied that section of the Bible, so can you share with us what your views are on what you understand God meant in the Bible by an eye for an eye?

A.    I guess that's a little difficult to explain, but . . .

Q.    I suspect there are probably books written on that topic.

A.    Yeah.

Q.    What I'm trying to get a sense from you, though, ma'am, and here's our concern. I'll just -- maybe I'll see if this helps. What we wouldn't want is somebody thinking that if I intentionally kill somebody else I have automatically forfeited my life. It doesn't matter any other circumstances. That's it. I don't have to hear anything else. Eye for an eye, you kill somebody; you die.

A.    No, there was judgment. I mean, you know, God judged things I guess is what, you know -- you know, there's proof positive again of involvement in those types of things.

Q.    Okay. So you're not feeling that way, that it has to be --

A.    Oh, absolute -- no, no, no.

Q.    Very good. And I didn't take that from there, but I just

Page 146

wanted to clarify with you on that.

A.    Uh-huh.

Q.    At some point again in this hypothetical imagine you're on this jury.  You and the rest of the jurors have found beyond a reasonable doubt that the defendant committed these crimes.  You have now heard the penalty phase.  You've heard additional evidence of factors, you know, that we've talked about and other factors you haven't even heard about yet maybe.  And now you're back in the jury room, and you're deliberating, and you're thinking about the possible punishments that could be imposed here, the death penalty or life in prison without parole down there.

First of all, it's going to be kind of an individual decision down there.  You need to talk and exchange views with your other jurors, but it's going to be your own judgment about what weight to give to the different factors and what to come up with.

A.    Right.

Q.    Among the 12 of you if any one of you decides life in prison without parole, that's the way I'm just going to go with and you've listened to the other jurors but you say, That's my view on it, then the verdict is life in prison without parole.  Doesn't matter what everybody else thinks.  If one juror thinks life in prison without parole, that's the verdict.  Do you understand that?

A.    Only one juror would decide that?

Q.    One juror alone could decide life in prison without parole,

Page 147

and it doesn't matter if everybody else says death penalty. If one juror says life in prison without parole, then it cannot be the death penalty. The judge put the slide up and said the death penalty only occurs if all 12 jurors agree. Do you understand that?

A. Yes, I do.

Q. Okay. But if all 12 jurors agree and let's say you're one of those jurors and you and the other jurors have all agreed that the death penalty is appropriate and you've looked at all the facts, you've weighed all the factors going this way and that and you and the other 12 jurors have all decided death penalty is the appropriate punishment in this case, to reflect that verdict, you and every other juror is going to have to sign their name to a verdict form that will have the real effect, the real effect, of causing the death of another person.

A. Right.

Q. Now, some people believe in the death penalty. I've got a good friend that works with me in my office who says, I believe in the death penalty. He supports the death penalty but because of his own personal and religious beliefs knows that he could never himself sign a verdict form that imposed the death penalty on another person.

A. Uh-huh.

968

Q. Other people feel they can do that. Can you share with us what you think about that? Could you, if you thought it was appropriate, sign your name to a verdict form to impose the death penalty?

A. Yes. If I'd heard all the facts and had made that decision and was one of those jurors, yes, I could.

Page 148

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 843 of 3245

Q.   So in the appropriate case you could impose the death penalty.

A.   Uh-huh.

Q.   And in the appropriate case could you also consider life imprisonment without parole even though you would have found the defendant guilty at this point of having killed five people including two little girls?  Are you still willing to consider as a possible punishment life in prison without parole?

A.   Yes, because it again would depend upon the entire evidence and the circumstances behind the exact role that was played.

          MR. WILLIAMS:  Thank you very much for your time, ma'am.

          I have no further questions, Your Honor.

          THE COURT:  Mr. Berrigan?

          MR. BERRIGAN:  Thank you, sir.

          THE COURT:  You thought you might be off the hook, huh?

          PROSPECTIVE JUROR 311:  No.

          THE COURT:  I saw you move.  Maybe you were thinking

                                                        969

you could go now.

                         EXAMINATION

BY MR. BERRIGAN:

Q.   It won't be so bad.

A.   Okay.

Q.   The prosecutor gets to ask the questions first and often preempts me because he's a smart fellow and knows what we're going to ask anyway.

A.   Okay.

Q.   But let me -- I wanted to ask you one question, ma'am, and
                         Page 149

I don't think this is a problem.  I noticed you had been an EMT, an emergency medical technician, for quite a long time.

A.    Yes, I was.

Q.    And in that line of work I suspect there were occasions at least where you were involved very directly in the saving of people's lives.

A.    Uh-huh.

Q.    Through your work; right?

A.    Uh-huh.

Q.    Now you find yourself in the situation where if selected as a juror I can assure you the government is going to be asking you to take a life which is not, I don't imagine, anything you've ever had the experience of even thinking about.  But it sounds like you're going to be able to do that if and only if the appropriate circumstances arise.

970

A.    Absolutely.

Q.    Okay.  So let's talk a little bit about that just for a second.  I gotta admit, when I saw the response about -- let me see if I can find it quickly -- eye for an eye, yes, but according to the definition God intended in the Bible, I also was confused just as the prosecutor.

A.    Uh-huh.

Q.    And to be honest, I'm still not sure I exactly get it, but I think I do get this because most folks when they tell us eye for an eye, what they really mean is, look, if you made a decision to intentionally take somebody else's life, you considered it, you did it, that in the process you forfeited -- that's a choice.  You made two choices really.  You made the choice to take the other person's life, and in the process you

Page 150

made a choice that your own life was thereby forfeited. And they frequently put that in the context of that biblical Old Testament eye for an eye phraseology.

A. Uh-huh.

Q. But it doesn't sound like that's at all where you're at. I just want to be sure. Or are you?

A. No. You know, like I said, it's the circumstances. It's -- you know, there's many, you know, like I said, what would be, you know, considered as the exact role that was played as to whether the death penalty and guilt, where the guilt was at.

971

Q. Okay. And you mentioned this role thing several times, and I'm awfully glad you did because there's actually a specific circumstance the jurors are asked to consider regarding role, the role in the offense.

A. Uh-huh.

Q. And whether or not that was what we call a minor role in the offense that might warrant consideration of a life sentence; okay?

A. Uh-huh.

Q. But before you get anywhere close to that point, you need to sort of understand what's happening. Do you remember the judge talking about the basketball game?

A. Yeah.

Q. Okay. Well, in that first half of the game, there was this decision made already, just as the prosecutor pointed out, guilty. Twelve jurors heard all the circumstances surrounding the offense, and they said guilty, five murders, intentionally committed, two of them children. They may have decided also

Page 151

that these murders were committed after substantial planning and premeditation in the course of a drug conspiracy or a continuing criminal enterprise. Pretty serious allegations.

A. Uh-huh.

Q. And before we're ever talking about penalties, before we're ever into even that third stage, the second half of the basketball game, those facts at least in terms of the

972

intentional murder of the five people in the drug conspiracy or the drug criminal enterprise, that's happened already; okay? So I only raise that just to be clear. I'm trying to be clear in my own mind when you were talking about I want to consider all the circumstances in terms of making a decision about the case.

A. Uh-huh.

Q. That has already been determined. Intentional murder is done. We've already made that decision; okay?

THE COURT: Now you've got me a little bit confused. He's talking hypothetically.

MR. BERRIGAN: Yes, oh, yes.

THE COURT: You never actually said that.

MR. BERRIGAN: I'm sorry. We've been doing this so long, I forgot.

THE COURT: I know, and that's okay.

MR. BERRIGAN: No. Thank you for reminding me, Your Honor.

BY MR. BERRIGAN:

Q. You know, I have told most of the folks, you know, we stand up here and we talk about this punishment as if the trial's over with.

A. Right.

Page 152

Q. And here's this poor woman, she tells me this once in a while, you know, snap out of it. I haven't been tried for anything. I'm sitting here presumed to be an innocent woman,

973

and you're talking to these people about whether they're going to kill me or not.

A. Right.

Q. Please understand -- I'm glad the judge reminded me because I have forgotten maybe the last couple of times, but that's not our position; okay?

A. Right.

Q. We are going to fight hard for Angela Johnson. The government has to prove that she's guilty, and she's presumed innocent.

A. Right.

Q. Unless and until they do that --

A. Right.

Q. -- that presumption of innocence lasts through the moment that the jurors decide otherwise in the deliberation room after listening to the evidence if they make that determination at all; okay?

A. Right, right.

Q. So when I'm asking these questions, please, I'm not suggesting we're even going to get there. But we do not have an opportunity to come back later if we got there and say, Hey, Miss 311, what do you think about these punishments?

A. Right, right.

Q. That would be great, but it would be kind of impractical. We'd need a whole room full of people, so we have to do it now;

974

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 848 of 3245

okay?

A. Right, uh-huh.

Q. So this idea about role in the offense and then this other thing about aiding and abetting are sometimes a little confusing, and I just want to ask you about that before we get anywhere. When the prosecutor's asking questions about aiding and abetting, he's not talking about the punishment part of the trial. He's talking about that first half of the basketball game; okay?

A. Right.

Q. The law is that a person who commits an offense or a person who aids and abets the person committing the offense are equally legally culpable; okay? That is, if that's true beyond a reasonable doubt, they're both guilty of the same crime.

A. Uh-huh.

Q. You know, if you and I went to rob the bank and you drove me and I'm the bank robber, you don't get any breaks because you're out in the car when I rob the bank --

A. Right.

Q. -- in terms of your guilt. Now, in assessing punishment, that's a whole different matter.

A. Right.

Q. Somebody could look at your role and say, Wait a minute. She's sitting over in the car. Berrigan's the guy doing the deal in there. You might be guilty of the bank robbery. That

975

doesn't mean we deserve equal punishments.

A. Right.

Page 154

Q. Because your role might be different.

A. Uh-huh.

Q. Okay? Even though you're guilty.

A. Right.

Q. Are you following that concept?

A. Yes, I am.

Q. All right. I want to do just one last thing, and I'm going to sit down with you. The prosecutor alluded to this idea that the decision in the second phase of the trial is an individual decision, and it was clear to me because we're familiar with these rules.

A. Uh-huh.

Q. But most of the folks that come in here for this selection process, they've never done anything like this in their life.

A. Right.

Q. And we tell them this is how it goes; the judge tells them this is how it goes, and the prosecutor tells them this is how it goes. And sometimes it takes more than that, and later on they get instructions to tell them how it goes.

A. Right.

Q. But that part of the trial when you're deciding the case is so much different than what jurors usually experience. They usually come in; they hear the evidence; they evaluate it,

976

analyze it, talk to their fellow jurors; and they have to answer one question and one alone: Has the government or the state or the city, whoever's prosecuting this case, proven it beyond a reasonable doubt; okay?

A. Uh-huh.

Q. And if they answer that question in the affirmative, then

Page 155

that's a guilty verdict.  They go home.  If they answer that question in the negative, well, maybe he's guilty or not, but they didn't prove it beyond a reasonable doubt, that's a not-guilty verdict, and they go home.  Once in a blue moon they can't agree.

A.    Uh-huh.

Q.    You know, they try their best, but they respect each other's opinions, and they agree to disagree, and that case has to be retried because that's a mistrial or what we call a hung jury.

A.    Right.

Q.    In this penalty part of the trial here at the end --

A.    Uh-huh.

Q.    -- that weighing of the individual aggravating and mitigating circumstances as you're going to be presented with, you're doing that yourself; okay?

A.    Right.

Q.    The prosecutor's right.  People are going to consult with each other because you don't have to agree.  You don't have to

977

agree on what the mitigating circumstances are.

A.    Uh-huh.

Q.    You do have to agree on the aggravating circumstances.  You know, the rules for the government are always the same.  They always have to convince people of whatever they want to prove. They've got to show it beyond a reasonable doubt, no more than that, and they have to convince all 12 people.  They have to do that with the guilt.  They have to do that with these gateway factors the judge talked about.  They have to do it with the aggravating factors that the judge talked about.  Are you

Page 156

following me?

A.   Uh-huh.

Q.   But the defense presenting mitigating circumstances, we have different rules.  And one rule is these mitigating circumstances or reasons that somebody might vote for life, we don't have to prove them beyond a reasonable doubt.  We only have to prove them to a preponderance of the evidence which is a legal term that means simply more likely true than not; okay?  You haven't been on any juries; right?

A.   No.

Q.   You know, if you were here for a car accident case and you had to make a decision about whether the person driving the car was negligent when they crashed into a building, that would be the burden of proof.

A.   Uh-huh.

978

Q.   Is it more likely that he was negligent or not?  And that's the same standard for these mitigating circumstances; okay?

A.   Okay.

Q.   One of the circumstances that you might hear about is information about the background of Miss Johnson.

A.   Uh-huh.

Q.   And I mean childhood background, some bad experiences that occurred in terms of abuse that we ask jurors to take into consideration in making an assessment about the punishment.

A.   Uh-huh.

Q.   Is that kind of information that you would be willing to consider and give effect to if you found it to be present?

A.   Yes, it would.

Q.   Okay.  How do you feel about childhood experiences

Page 157

affecting people later in life?

A.   Well, I do believe they have a direct effect on life, but I also believe that, you know, there are opportunities sometimes in a person's life to be able to, you know, bring them, you know, to make their lives better beyond those things.

Q.   And we all know people that have had very bad childhoods and yet have grown up to be productive, law-abiding adults.

A.   Yes.

Q.   Would you agree?

A.   Absolutely, yes.

Q.   And certainly if you hear this type of evidence, it's

979

important you understand it's not being presented as an excuse for any crimes that have been committed, particularly not for murder.

A.   Right.

Q.   It's in the same kind of category as you would want to know information about a person's prior criminal record.

A.   Okay.

Q.   That wouldn't make any difference as to whether somebody committed a crime, would it, whether they had a prior criminal record?

A.   Well, not according -- not when it was up against that crime right then.  It makes no difference what happened before.

Q.   Exactly.  But when you were looking at the decision about how to punish them, would that be important information to you?

A.   Their childhood?

Q.   No, whether they had done something criminal before, you know, whether this is a person who routinely engaged in criminal behavior.

Page 158

A. Well, yeah, you would want to look at that, yes.

Q. Sure, okay. And so the law says a person that doesn't have a significant criminal history, that's a mitigating circumstance that would weigh in favor of a life sentence; okay?

A. Okay.

Q. So that's just another example.

A. Uh-huh, okay.

980

Q. The very last thing -- I promise this is the last thing -- you sound like a lady who just your life experiences and the way you've conducted yourself here would lead me to believe that if you came a decision that in your heart and conscience you thought was true and just you wouldn't easily abandon that to other people who might want you to change your mind.

A. Exactly.

Q. It is important that jurors consider the views of their other jurors; okay?

A. Uh-huh, yeah.

Q. But it's also critically important, particularly in this second half of the game, that this decision, the decision you're going to live with the rest of your life, is one that you can be comfortable with.

A. Right.

Q. And you can be a hundred percent comfortable with that if you want. You have that right; okay?

A. Right.

MR. BERRIGAN: Thank you for your patience, ma'am. Nothing else.

THE COURT: Mr. Williams, anything further for 311?

MR. WILLIAMS: No. Thank you, Your Honor.

Page 159

THE COURT: Ma'am, if you'd just step outside for one minute, we'll let you know what your status is.

PROSPECTIVE JUROR 311: Okay.

981

(Prospective Juror 311 exited the courtroom.)

THE COURT: Any challenge for cause by the government?

MR. WILLIAMS: No, Your Honor.

THE COURT: By the defense?

MR. BERRIGAN: None by the defendant, sir.

THE COURT: Okay.

(Prospective Juror 311 entered the courtroom.)

THE COURT: Ma'am, you're going to be in our jury pool. We're going to question who's ever left in our jury pool. We've got two more to go. Then we're going to bring you back for some more group questioning. I don't think that will take a real long time, and then we'll let you know what your status is, but right now you've made it into our pool; okay? Thank you.

PROSPECTIVE JUROR 311: Thank you.

(Prospective Juror 311 exited the courtroom.)

THE COURT: Ready for 506?

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 506 entered the courtroom.)

THE COURT: Sir, if you'd just grab a seat in the middle there.

Everybody can be seated, and you'll be questioned first by one of the federal prosecutors, Mr. Williams, and then by Mr. Berrigan on the defense side. And Mr. Williams is right in front of you.

MR. WILLIAMS: Thank you.

982

Page 160

EXAMINATION

BY MR. WILLIAMS:

Q. I'm right here, sir.

A. Okay.

Q. Good afternoon.

A. Afternoon.

Q. Hopefully your wait hasn't been too bad today. We're just going to talk to you about a couple areas as an individual, and then if that works okay, we may have you back talking to you as a group. But what we really want you to do is relax and just be frank with us about your views, and that's all we're looking for. There's no right or wrong answers. You don't have to please anybody. Just tell us what you think on some things.

One of the things I want to talk to you about is publicity and what you know about this case, and you were asked questions in your questionnaire -- and, by the way, thank you very much for spending the time. It speeds up this process tremendously. You indicated that you had only just heard about the case. You said you vaguely remember details, if any, and it had been several years ago. Do you remember -- can you articulate for us anything you remember about the case at all?

A. I think I just remember her boyfriend had been -- he's in prison in Colorado.

Q. All right. Anything else you recall?

A. No.

983

Q. Do you know whether he has any legal proceedings or has had any legal proceeding in connection with this case?

A. Possibly on the death row. I'm not sure.
Page 161

Q.   Okay.  You just don't have a real strong firm memory of any of this it doesn't sound like.

A.   No.

Q.   Do you watch the news or read the newspaper on a regular basis?

A.   Yeah.

Q.   And you are from the Sheldon, Iowa, area.

A.   Right.

Q.   What paper do you read over there?

A.   Oh, Sioux City Journal, Des Moines Register.

Q.   And do you subscribe to those papers?

A.   Not anymore, no.

Q.   Were you subscribing to them back in August of this last year?

A.   No.

Q.   In the questionnaire at one point -- and I can't remember where -- it brings up the name of Dustin Honken.  Had you heard that name before?

A.   No.

Q.   Based on what little, if anything, you know at this point, have you formulated any opinions yourself at this point about whether the defendant's guilty or not guilty based on anything

984

you would have heard outside of the courtroom?

A.   I suspect she's . . .

Q.   Suspect she might be guilty?

A.   Yeah.

Q.   Okay.  And let's talk about that a little bit.  Kind of makes sense that if she's here facing charges that somebody must have had some evidence against her; right?

Page 162

A.    Right.

Q.    Because hopefully we just don't go and pull people off the street and arrest them and put them in the courtroom and start bringing a case against them.

A.    Right.

Q.    Okay.  And so it's kind of natural I think among us that if we come to court and we know that somebody's accused of the crime your initial reaction is, well, there must be something there because the authorities have arrested that person and they're in court and they're facing charges.  Is that fair to say?

A.    Right.

Q.    All right.  In this case in the charges brought against the defendant, they're accusations.  They're allegations.  Basically the charge is simply the government alleging the defendant committed a crime.  It's not evidence of anything.  It's just an allegation.  Do you recognize that?

A.    Right.

985

Q.    What we have trials for is for the very purpose of determining whether somebody's guilty or not.  And the judge will instruct you ultimately there's this thing called presumption of innocence.  When we in the federal system or in the -- in this country even in state courts have somebody accused of a crime, they're entitled to a presumption of innocence meaning they're presumed innocent from the moment they step in court unless and until the government proves their guilt beyond a reasonable doubt.  Do you recognize that?

A.    Right.

Q.    Is that a principle that you believe in?

Page 163

A.     Yes.

Q.     Okay.  Certainly if you were ever accused of a crime, you would want a jury to presume you innocent I assume.

A.     Yes, if I was innocent.

Q.     You'd want to be entitled to all the benefits of a trial that would attach in the United States, I assume.

A.     Yes.

Q.     Okay.  In this case the government has the burden of proving the defendant's guilt beyond a reasonable doubt.  Defendant doesn't have a burden to prove anything.  Do you understand that?

A.     Right.

Q.     And if the government fails to prove its case beyond a reasonable doubt, it's the jury's duty to vote not guilty, to

986

acquit the defendant.  And that's despite the fact that clearly the defendant's been arrested.  There must have been some evidence against her.  But that's not the same thing as proof beyond a reasonable doubt.  Proof beyond a reasonable doubt is not simply suspecting somebody of a crime and having a little bit of evidence, but it's beyond a reasonable doubt.  Do you recognize that distinction there?

A.     Yes, I do.

Q.     So the question I have of you in this case is do you think you can provide this defendant the presumption of innocence?  Can you presume her innocent in this case?

A.     Honestly, no.

          MR. WILLIAMS:  All right.  Thank you very much.

          Your Honor, we'd go ahead and move for cause.

          MR. BERRIGAN:  No objection, sir.

Page 164

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 859 of 3245

THE COURT: Okay. Sir, we're going to go ahead and excuse you as a juror in this case. Thank you. Do us a favor and because we still have quite a few other jurors for the next couple weeks to talk to, we'd appreciate you not talking to anybody about this because they might say something to somebody else who's a potential juror; okay?

PROSPECTIVE JUROR 506: Thank you.

THE COURT: Thank you.

(Prospective Juror 506 exited the courtroom.)

THE COURT: You know, I've quickly figured out what

987

the two most feared words are when you ask a juror do you know anything about this case and they say, Not really.

MR. BERRIGAN: It's unbelievable.

THE COURT: It's unbelievable what "not really" can actually mean.

MR. BERRIGAN: In fairness to him, he did say unsure about presumption of innocence.

THE COURT: Yeah, but I've just marvelled at these, but I wasn't talking about him, but the others that say, Do you know anything about this case, not really, gives new meaning to "not really."

Juror 64.

(Prospective Juror 64 entered the courtroom.)

THE COURT: Anywhere in the front row, Juror 64. You're our last individual juror today but certainly not least. So we're going to start with questions from Mr. Williams.

EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, sir. We appreciate your patience waiting

Page 165

here today. And we're going to try to make this as quick as we can, and still we want to take the time necessary to really explore your views and listen to you and find out what you think about different subjects so it helps us make a decision whether you're the type of juror that will work in a case like this. So we encourage you to just be open and frank with us about your

988

views and share with us what you think about some things.

The first one I want to talk to you about is publicity in this case. You were asked questions in the questionnaire -- and thank you for filling this out. It actually speeds up the process dramatically. In this questionnaire you were asked if you knew anything about the case and how much you knew, and you were given a series of boxes to check, and you checked the one that said only just heard about it. And you indicated that Dustin Honken was charged and found guilty. Can you share with us, do you recall many details about that case?

A. It was just lead-in for the news. At night I normally turn the TV on and go in and take care of my stuff in the restroom, and then I come back in and the news -- or the news is normally over and the weather's on. I watch the weather, and then the TV goes off.

Q. So this is something you heard kind of just as a lead-in story at some point?

A. Yeah.

Q. Was it just one program you saw it on, or have you seen multiple stories?

A. It's normally the news out of Sioux City.

Q. All right. And had you seen a couple different stories on it over the course of time or just the one announcing the

Page 166

verdict or something?

A.    It was like one where they said that he'd been charged one

989

night and then something about the trial which I didn't really catch any of it, and then it said that he had been convicted.

Q.    All right.  Do you read the newspaper very often?

A.    Certain parts of it like entertainment and sports but not really like the news.

Q.    Do you recall reading much in the newspaper about this case?

A.    No.

Q.    What's going to be important and obviously the reason we're asking these questions is we're all very concerned that the defendant in this case be tried on the evidence that's presented in this courtroom, not based on what you may have heard on the TV or what you may have read in the newspaper but just on the evidence in this courtroom from the witnesses who testify and from the documents that are presented as evidence in this case. And we're concerned about people who know anything about the Dustin Honken case being influenced by that.  Can you share with us what your views are on that?

A.    I really don't accept views until I have all the information on anything, so I guess I really couldn't.

Q.    Can you recognize how critically important it is that if you're picked as a juror in this case that you be able to decide this case based solely on the evidence presented in this case and not based on what you may have heard on TV?  Can you understand how important that is?

990

Page 167

A.    Yes, I do.

Q.    Can you do that?

A.    Yes, I believe I could.

Q.    The -- based on what you have heard or seen on the news, you were asked the question in the questionnaire, Do you have any beliefs or opinions about the guilt or innocence of Angela Johnson, and you checked the box no.  Is that still your position today?

A.    Yeah, because I don't know all the information.

Q.    And are you willing to wait for all the information before you make up your mind?

A.    Yes, I am.

Q.    Now, you were asked as well whether you have at this point formulated any opinions about the appropriate punishment in the case, and you checked the box no.  Is that still your position today?

A.    Yes.

Q.    So you come in here to us as a juror who hasn't made up their mind about whether the defendant's guilty or not guilty, and you haven't made up your mind about what the appropriate punishment should be if she's found guilty?  Is that fair?

A.    That's true.

Q.    All right.  Let's talk about the possible punishments that could in theory apply in this case, and you remember the judge talked to you about the possible phases of trial that we could

991

go through.

        First there's a phase that we call the merits or the not-guilty/guilty phase in which the government's burden is to

Page 168

prove its case -- prove the defendant committed these crimes beyond a reasonable doubt. And you understand that's the first part of the trial. The issue of punishment doesn't really arise unless we get by that point. You recognize that?

A. Yes, I do.

Q. So let's assume we're past that point. Let's assume we're past as what the judge described as the halftime which is some factors that we have to argue to you we've shown during the first phase to get to the point where you can consider the death penalty. So can you work with me and assume we're at that point in the trial?

A. Yes.

Q. At this point you will have already found the defendant guilty beyond a reasonable doubt and let's just assume of all five murders; okay? At that point and only at that point in having past what we call the gateway factors would you be now trying to figure out what's the appropriate punishment, and you're going to have two options, life in prison and the death penalty, so I want to talk to you about those two options for a minute.

In the federal system, life in prison means just that, life in prison without parole, unlike in some state courts where

992

if you get a life sentence you go to prison and then after seven years or something you appear before a parole board and they can let you out early or you might get out early for good behavior. In the federal system, if you get a life sentence, it means life. Do you understand that?

A. Yes.

Q. To you is -- a life sentence, is that a severe punishment

Page 169

for somebody?

A. Yes.

Q. The other option is the death penalty. And can you share with us just your gut reaction? What do you think about the death penalty?

A. I believe it is appropriate in some cases.

Q. And in your questionnaire you were asked kind of a similar question, and you wrote, I think it's bad, but sometimes this is the only punishment that fits the crime. Can you share with us when you said you think it's bad, what do you mean by that?

A. I guess it's bad that there's people out there that more or less don't care about society and how to get along.

Q. The death penalty is a severe punishment, isn't it, sir?

A. Yes, it is.

Q. The hypothetical situation I've outlined for you, assuming that you're in this jury and you found the defendant guilty of the crime beyond a reasonable doubt, I want you to assume we're at that point. You and the rest of the jurors have already

993

found this to have occurred. If the evidence was that the defendant didn't pull the trigger, she was actually involved with somebody else but she didn't pull the trigger but she aided and abetted or assisted or maybe encouraged the crime and the crime was killing five people including among those victims two little girls ages six and ten, what we're looking for are people that under those circumstances -- and there may be other facts and there will be other facts for you to consider but at least up to that point having reached that part of the trial would still be willing to consider both possible punishments, life in prison without parole and the death penalty. Could you do that?

Page 170

A.   I would have to give the decision that I could live with.

Q.   And have you made up your mind what decision that is?

A.   No, because I don't know all the facts.

Q.   And when you say it would have to be a decision you could live with, what do you mean by that?

A.   Well, I plan on living for a long time, and I don't want it to be bothering me.

Q.   So it's going to be a decision you're going to want to weigh very carefully, I trust.

A.   Yes.

Q.   Some people believe -- and we respect everybody's views, and so this isn't judgmental.  I'm just trying to figure out where you are on this.  Some people thinking about the death penalty and thinking about when it's appropriate and when it

994

isn't appropriate think that the death penalty really is only appropriate if it's the person who pulls the trigger on the weapon that causes the murder and if the role of the person on trial is that of an aider and abettor that it doesn't really matter what other facts there are.  If that's that person's role, then the death penalty is not -- would never be an appropriate punishment for somebody who didn't themselves pull the trigger causing the murder.  Can you share with us what you think about that?

A.   I would have to have all the facts and decide that if this person did not help the trigger person if the crime could have happened.

Q.   Okay.  And so if you found that the defendant aided and abetted the murder but didn't actually pull the trigger but aided and abetted, assisted, encouraged the murders in this

Page 171

case, could you still consider the possibility of the death penalty as an appropriate punishment?

A.    Yes.

Q.    Now, again, in this hypothetical we're talking about the killing of two little girls.  Some people again -- and I'm not trying to be judgmental at all.  We absolutely respect these views.  But you tell them murders of two little girls, and they say, I'm sorry; I don't need any other facts.  At that point you tell me that somebody was involved in killing two little innocent girls, they thought about it, they planned it, they

995

premeditated the murders in this case, they did that?  I've already made up my mind.  It's the death penalty.  I wouldn't even consider life in prison without parole.  Other people are willing to still consider life in prison without parole.  Can you tell us what you think about that?

A.    I think a murderer's a murderer.

Q.    And what do you mean?

A.    Like how old somebody is shouldn't to a degree I guess do the sentence.

Q.    Okay.  Maybe it's a factor to take into account?

A.    Minor.

Q.    Okay.  So it's something that you would be willing to consider as a factor.  I mean, if the Court instructs you that a vulnerable victim, killing of a vulnerable victim, is an aggravating factor, in other words, something that the jury can consider in favor of the death penalty, are you willing to consider that as an aggravating factor in favor of the death penalty?

A.    Yes.

Page 172

Q. But for you it's not the end-all be-all.

A. No.

Q. All right. Can you -- going back to this aiding and abetting situation, can you imagine a situation where the person who aided or assisted or encouraged the crime could be in some ways more blameworthy than the person who pulled the trigger?

996

For example, if the person who pulled the trigger might not have done so if it wasn't for the person encouraging and pushing them to do it, can you imagine that situation?

A. Yes.

Q. Let's -- on this hypothetical I'm with you on, you're on the jury. You've found the defendant guilty of these charges. You've gone through the whole penalty phase. There's going to be some factors presented to you from both sides. The government's going to present aggravating factors to you, the vulnerable victims and other things. The defense can, don't have an obligation to but they can present mitigating factors to you, things that would suggest life in prison should be the appropriate punishment instead of the death penalty. Can you weigh different factors like that against each other?

A. I believe so.

Q. And let's say you've done that now. You've gone back to the jury room, and you weighed those different factors. At that point you're going to be talking with the other jurors and sharing your views and sharing your thoughts.

But if you get to that penalty phase, the decision that you need to make individually is how do they weigh out for me? Do the aggravating factors -- regardless of the number of them, their importance, do they outweigh the mitigating factors,

Page 173

how ever many number there are? Do they outweigh the importance of the mitigating factors or vice versa? And you're going to

997

have to do that judgment yourself. Do you understand that?

A.   Yes.

Q.   Now, the way this works is very different from a regular jury trial on guilt. If you meet with your other 12 jurors and let's say 11 of the 12 say, We've done that weighing process, and we say death penalty, one juror says, I've done that weighing process, and I say life in prison, then unless after discussion minds are changed, if it's still one person says life in prison, then there is no death penalty, do you understand that that was part of what the judge was instructing there?

A.   Yes.

Q.   But let's do the assumption that all 12 of you have now decided death penalty. You've each individually done that weighing unanimously. You've come back. You've talked about it, and every one of you says, you know, Weighing out everything, we think the death penalty's appropriate. To reflect that verdict, each and every juror is going to have to sign their name to a verdict form, and the real effect of that is that it's going to cause the death of another person.

Now, I have a good friend I work with who supports the death penalty. He believes in it, thinks it's right. But because of his own personal belief system, he knows he could never sign a verdict form causing the death of another person. No matter how much he believes in the death penalty in principle and believes that it ought to be out there as a deterrent or

998

Page 174

whatever he believes, he says to himself, I know I can't sign a verdict form because of my own personal belief system. Other people can. Where do you see yourself falling on that, sir?

A.   If I know all the facts and after I've decided if I could live with it, I could sign it.

Q.   So in the appropriate case, you could impose the death penalty.

A.   Yes.

Q.   And likewise, sir, equally important, in the appropriate case, despite the fact that you will have necessarily found that the defendant was involved in the murder of five people including two little girls, could you still consider life imprisonment as a possible punishment?

A.   Yes.

MR. WILLIAMS:  Sir, thank you very much for your time.

THE COURT:  Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q.   How are you, sir?

A.   Fine, thank you.

Q.   I hope you'll bear with us with these numbers. It's a little bit awkward at least for us. I can't imagine people have called you Number 506 before today.

A.   No.

Q.   Or 64. I can't even get your number right. My apologies.

999

I wanted to reiterate something I think that's already been mentioned but just out of an abundance of caution is that there isn't a person in this room that doesn't respect your views on the topics we're going to talk about. It's not a right

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 870 of 3245

or wrong answer kind of a thing.  It isn't a test to see if you're fair and impartial as much as it is an effort to get you to express your open and honest opinions about these subjects; okay?

A.  Okay.

Q.  So, you know, we have to rely on you basically.  We can't read your mind.  Just tell us how you feel about these things; all right?  This thing about Mr. Honken being convicted, I noted that although you said you'd heard about it on television, you also indicated that you apparently read the newspaper.  Was that the Sioux City Journal?

A.  It's probably the Spencer paper.

Q.  The Spencer paper, okay.  Did they carry news events of Mr. Honken's case in the Spencer paper?

A.  It might have been the Des Moines paper.  We don't get the Sioux City paper.

Q.  Oh, okay.  I know for a fact -- I can assure you I know the Des Moines Register if that's the one you're talking about --

A.  The Sunday paper.

Q.  The Sunday paper, okay.  Well, they certainly had coverage of Mr. Honken's case during his trial.  Do you think you might

1000

have, if you got the paper at that time, read articles about his case?

A.  I normally don't read that part of the paper.

Q.  Okay.  I think you mentioned that.  You like the entertainment and the sports part of it.

A.  That and the advertising or classified ads.

Q.  Okay.  But nonetheless you are aware that Mr. Honken had a trial.

Page 176

A.    Yes.

Q.    And that he went to trial for murder.

A.    Yes.

Q.    And that he was convicted.

A.    Yes.

Q.    And our concern is really twofold.  One has to do with does that in the very smallest way cause you to think that there's some association with Miss Johnson and Mr. Honken such that because he was found guilty that there's some inference of guilt that attaches to her?

A.    No.

Q.    Kind of a guilt by association thing, if you will.

A.    Yeah.

Q.    That's not a problem for you.

A.    No.

Q.    The second concern we have, frankly, is just a little different, and the prosecutor asked you about it.  People come

1001

in and testify, and there's going to be evidence presented in this case, and we trust and rely on the jurors to listen to that evidence and evaluate the exhibits and testimony and make their decision solely, utterly, and completely based on the evidence they hear in this courtroom; okay?  Could you do that?

A.    Yes.

Q.    And what that means essentially is that there are going to be some folks -- and you might be one of them -- that, you know, as you hear evidence sometimes we've forgotten things temporarily, but we hear something that springs to mind, oh, I sort of remember that now because I've been reminded of it.  And if that happened, you'd have to completely put that out of the

Page 177

case, completely out. It wouldn't even be a topic that you'd discuss with anybody if selected as a juror. Oh, you know, I remember Mr. Honken's case now. I remember hearing this or that. Could you agree to do that?

A. Yes.

Q. Okay. Thank you. Let me ask you a little bit about your questionnaire responses regarding the death penalty; okay?

A. Okay.

Q. How long ago did you fill that questionnaire out?

A. I believe I got it maybe in January or February.

Q. Okay. So it's been a little while.

A. Yes.

Q. But I'm presuming your views haven't changed that much

1002

probably since January or February, have they?

A. No.

Q. Okay. You mentioned that in regards -- let me get the actual language of the question here. You were asked a question, What are your thoughts and opinions about the death penalty as a punishment for a person who is guilty of intentional murder? You said, I think it's bad, but sometimes this is the only punishment that fits the crime. And the part that interested me about that response was the last part, fits the crime. What did you mean by that specifically?

A. Like when -- it's kinda hard to explain. When they don't want to live in a civilized world, they want to make it like their own so their -- they don't care what happens or what they do.

Q. Okay. And when you are thinking about those people, do you have in mind particular kinds of incidences or circumstances or

Page 178

cases in your mind?

A.    Like I guess most mass murderers.

Q.    Certainly mass murderers would fall into that category.  Be no argument from me.  Are there other kinds of cases you're thinking about?

A.    It would depend on the facts.

Q.    Okay.  You know, some people have told us in different words regarding the crime of intentional murder specifically, okay, in a case of intentional murder where a person makes a

1003

choice to intentionally take another person's life that they really in essence have made two choices.  They made that choice to kill somebody else, and in the process they have made a choice regarding their own life, and that is the choice to forfeit it.  That is, if you intentionally choose to kill some other person that you've also chosen to forfeit your own life or at least your right to life.  I know you don't say that here in the questionnaire certainly in those words.

A.    No.

Q.    I don't know if that might be a sentiment that you have.

A.    Yes.

Q.    And I wanted to ask you.  Yeah?

A.    (Nodded head.)

Q.    Okay.  Maybe you could put it in your words instead of my words.

A.    It's kind of like they don't care what they do to others and they really don't care what other people do to them.

Q.    Okay.

A.    As long as they get what they want.

Q.    All right.  It's kind of a selfish motivation, isn't it?

Page 179

A.    Yeah, it's kind of like a white lie gone bad.

Q.    You know, the prosecutor was talking to you about circumstances and wanting to listen to all the evidence and be willing to consider all the evidence that were presented to you; okay?  You remember him asking you those questions?

1004

A.    Yes.

Q.    Well, the prosecution will present evidence in this case, and they're going to try to convince 12 people that these crimes that we're talking about are intentional murders, and we would expect the jurors to listen to all the evidence that's presented; okay?

And if there were evidence of a defense, you know, that this didn't happen, it wasn't Miss Johnson -- and one of the things the judge occasionally asks me to remind people is, you know, this trial hasn't taken place yet, and we're talking about the punishment.  And I don't want to give you the wrong impression that that's an issue that's already been decided; okay?  But we're in this artificial situation where we have to ask people about their views about punishment even though we might not get to that issue in the case because this is our only opportunity to talk to you; okay?

But the jurors are obligated to consider the evidence, all of the evidence, that's presented to them, consult with their fellow jurors, and then make a decision.  You know, has the government proven the facts that they've alleged?  Have they proven the fact -- the charges, intentional murder beyond a reasonable doubt; okay?

And here they've alleged there were five people killed that were killed during the furtherance of a drug conspiracy or

Page 180

a continuing criminal enterprise or both.  Two of the victims

1005

are children, ten- and six-year-old girls; okay?

What I'm wondering about is if -- and it's a big if.  But if you were on a jury that made a decision in a case such as that where that had been proven to your satisfaction beyond any reasonable doubt, all 12 of you, okay, does that sound like the kind of case that you're envisioning where you'd be willing to consider the death penalty?

A.  I think it'd probably be one of the hardest decisions of my life, but yes.

Q.  Okay.  Now, the flip side of that coin, okay, is that there are some people, as the prosecutor mentioned, who have said to us, Look, if we get that far in the case, we're at the first half of the basketball game, and I've heard all the evidence, and there's not a defense to the crime that I'm willing to believe, that this is, in fact, exactly what the government has claimed, these intentional murders and so on beyond a reasonable doubt, I don't really need to hear anything else in terms of the person's background or their criminal record or anything else really because that's enough for me.  Come on.  We got -- that's plenty.  I've already made a decision about the punishment in my own mind as to what's a just punishment.  And I'm just wondering whether or not you might be in that category.

A.  I'm kinda stubborn and want to hear all the information.

Q.  Okay.  Well, the only other information you would hear would be about the punishment part; okay?  So let me ask you

1006

Page 181

this question.

In assessing a punishment for a person who commits a crime, one of the questions you're asked in this questionnaire, number 61, In your opinion should the punishment for a crime be based on -- and you have a number of options -- the crime, the person, or both or something else all together? And you checked the crime.

A. Yes.

Q. And you wrote under that, That's why we go to court; right?

A. Yes.

Q. Okay. "The person" was an option there, and so was "both." That is, you could check the crime and the person if you wanted to. But that -- you didn't do that.

A. No.

Q. Okay. Does it really matter what the background of the person is in assessing punishment in your view?

A. I've had some really good friends that have done things bad, and I've probably had some bad friends that done things that are good. I believe there's good and bad in everybody.

Q. Okay. You bring me to an excellent point, and that is if you'd consider for a moment maybe your bad friends versus your good friends; okay? Let's imagine we had two people who committed the identical crime, that is, not together but they committed separately the same exact crime.

A. The punishment should be the same.

1007

Q. Okay. You kind of anticipated my response.

A. Yes.

Q. If there was a difference in their backgrounds -- let's just say one of them was kind of like me and grew up in a

Page 182

middle-class family and had every opportunity, got a good education, loving parents, and the other one really had a disadvantaged background. Maybe there had been abuse, neglect, bad things had happened. Under that view that you're talking about, would it be fair for me to say that really wouldn't matter in terms of the punishment if they committed the same crime?

A. Slightly, but I don't think it would be a major concern.

Q. What do you mean by that?

A. There is help out there for people.

Q. Okay.

A. And if they had gotten help . . .

Q. They might not have committed the crime.

A. Yes.

Q. And I hear you saying to me basically, Hey, that's one of the reasons I would not consider that bad childhood background is because that person may have been able to get help and did not.

A. Yes.

Q. Okay. Well, that takes us to this other point. You know, you could get an instruction from the judge that says, you know,

1008

the jurors are obligated to take into account, consider circumstances regarding the defendant's background that could include the things that I've mentioned in terms of abuse, sexual or physical or emotionally traumatic childhood. There's some -- there are some jurors that would not really consider that. They wouldn't give any effect to it. It wouldn't affect their decision at all even if they found it to be true. And others think it's important; okay? Where are you on that issue?

Page 183

A.   I would have to listen to the evidence, and once again, it's a decision I would have to live with, one I'd have to make.

Q.   Okay.  But what about that evidence?  Is that really something that you would consider and give any effect to if your view is, look, Berrigan, I mean, they had a chance to perhaps have gotten counseling or something?  That doesn't affect the choice that they made.  You've told me -- at least I'm hearing you say that shouldn't affect their punishment.

A.   We make choices every day of how we live.

Q.   Right.  And so why would a person's background make any difference if they made a choice to commit murder?  Would it?

A.   It shouldn't.

Q.   In your mind does it?

A.   No.

Q.   Okay.  Just one last thing I'm going to ask you, and I'm going to sit down.  You've been very patient with me.  One other thing -- and you talk about this a lot in responses to your

1009

questions -- is about remorse.

A.   Yes.

Q.   And what's important about that to you?

A.   I guess if they don't show remorse, once again, they just don't care.

Q.   Okay.  Would you expect a person to show remorse in order to have consideration for a life sentence?

A.   Yes.

Q.   And if that didn't happen, that there wasn't remorse, no remorse shown to you at all, would you still be able to consider a life sentence as an appropriate punishment?

A.   There's different forms of remorse like real remorse and

Page 184

remorse that you got caught.

Q. Okay. Well, I'm giving you the scenario of none, okay, no fake remorse, no real remorse, none; all right?

A. Yes.

Q. Didn't happen. You didn't see it. Nobody presented any evidence to you. It did not occur. You weren't presented with that. And you've stressed it a number of times in the questionnaire, and I'm just wondering, look, if that was the situation, intentional murder, no remorse presented, would you still realistically be able to consider a life sentence under those circumstances?

A. If I knew more information. I wouldn't base it just on that.

1010

Q. Okay. Is that a -- that would certainly be a pretty serious strike against this person, wouldn't it?

A. Yes.

Q. You'd want to see some remorse.

A. Yes.

Q. And if you didn't see it, would it be fair to say you'd at least hold it against them?

A. I would question what was wrong with them.

MR. BERRIGAN: Okay. Well, I appreciate your candor, Number 64. Thank you, sir.

THE COURT: Mr. Williams?

MR. WILLIAMS: No further questions, Your Honor. Thank you.

THE COURT: Sir, if you'd just step outside, we'll let you know your status in a minute.

(Prospective Juror 64 exited the courtroom.)

Page 185

THE COURT: Does the government have a challenge for cause?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: We do, Your Honor, for two reasons.

One, although I know there's been some informal discussions, our opinion is that a juror has to be able to give meaningful effect to mitigating circumstances, and I rely on Eddings versus Oklahoma, and I apologize for not having a copy

1011

with me, and I'll have that certainly at the beginning of the week. But this is not a juror, frankly, who really cares anything at all about a person's background, and I think he made that very clear. He would give no meaningful effect to any mitigation evidence that was presented by Miss Johnson regarding her --

THE COURT: You know, just state the basis for it. I don't really need you to argue it, and I'm sorry I haven't been clear about it.

MR. BERRIGAN: Okay. And this is the last one. I guess we haven't had so many that I'm sure how much I need to say. So my basis is that he would give no meaningful effect to mitigating circumstances. And secondly, he puts upon the defense a burden it does not have which is to present evidence of remorse. That's all, sir.

THE COURT: Mr. Williams?

MR. WILLIAMS: Disagree, Your Honor. We don't think that his answers indicate he wouldn't give meaningful effect. It doesn't mean much to him. It's clear that her background doesn't mean much to him, but he indicated repeatedly that he'd

Page 186

be willing to consider different factors, and he was never given -- he never flat out said, Boy, I wouldn't even consider it. In response to leading questions, he ultimately got to the point where he said, Well, you know, it really wouldn't mean much to me; I wouldn't give it any meaningful effect. But those

1012

weren't his words. Those were Berrigan's words.

And then with respect to the burden, he at no point said he's placing the burden of her showing remorse. Remorse can be a mitigating factor, but he at no point said, you know, I'm requiring her to show remorse. He said, I would consider life imprisonment and the death penalty given the totality of the circumstances and at no point said, But, you know, only if she shows remorse. Again, that was in response to leading questions he went down that line of saying, Yeah, it's a significant factor for me, but he never said that he had to be shown that.

THE COURT: I'm going to overrule the government's objection and put Juror 64 into the jury pool.

MR. WILLIAMS: Just for the record, you said you're going to overrule the government's objection.

THE COURT: I'm sorry, overrule the defense objection. Thank you.

MR. WILLIAMS: Thank you.

THE COURT: So now we -- I need to tell them what we're going to do. How much time do you want to do general questioning on three jurors, Mr. Willett? You did a fine job in less than your allotted 20 minutes yesterday, and we have less than half as many jurors.

MR. WILLETT: You know, I sort of feel like going --

Page 187

excuse me, Judge. I sort of feel like I'm in the dilemma of

1013

going to Congress. If I don't spend all the money from last year, I don't get as much next year. There is one area that might slow me down a little bit.

THE COURT: All I want to know is how much time. I don't want argument on it. I want to know how much time. What do you need to look at Mr. Berrigan for? I'm asking you.

MR. WILLETT: Because he passed me a note, and I was going to say something to you. I'm trying to respond --

THE COURT: I'm asking you how much time do you feel you need, not what Mr. Berrigan thinks he needs or wants for you. How much time do you need?

MR. WILLETT: Thank you, Judge. Fifteen minutes.

THE COURT: Okay. Not a problem. Do you need any more than that, Mr. Miller?

MR. MILLER: It took me 20 minutes yesterday. I'd like to have 20, but I think I can easily do it in 20.

THE COURT: Well, I think you'll get 15. Thanks.

(Prospective Juror 64 entered the courtroom.)

THE COURT: Sir, you're still in our jury pool, so why don't you go to your original seat, and we'll bring up the other two. By my records there are two other jurors, 403 and 311. Would that be correct?

MR. WILLIAMS: That's correct, Your Honor.

(Panel D entered the courtroom.)

THE COURT: You know, why don't you just come down to

1014

the front row. I think it'd be easier. We've only got three.
Page 188

We'll have them sit anywhere.  They all have numbers.

Okay.  Please be seated.  The three of you are the ones who are still in the jury pool.  And we're going to now have some general questioning by both sides.  And we're going to start with the government, and I believe Mr. Miller's going to go.  I've given them a time limit of 15 minutes, so each side will be able to question you for 15 more minutes.  And then after that we'll send you out of the room for a little bit and then bring you back in and let you know whether you're still in the jury pool or whether you can go home and totally forget about this case; okay?  Thank you.

Mr. Miller?

MR. MILLER:  Thank you, Your Honor.

Madam Court Reporter, is this sufficiently --

THE REPORTER:  It is.  Thank you, Mr. Miller.

MR. MILLER:  Good afternoon, folks.  This is the group voir dire, but you're not really a very large group, so I think we're going to be able to move this along fairly quickly.  The time you spent visiting with Mr. Williams and Mr. Berrigan I think gave everybody a good opportunity to judge your willingness and ability to serve as fair and impartial jurors, so I'm just going to cover a couple matters and sit down.  Again, thank you so much for your time here today.

We have given you earlier a list of witnesses.  Did

1015

you folks each have an opportunity to look through that, and would you simply raise your hand for me if you happened to notice any of the names as being someone with whom you might be acquainted or familiar?  I take it none of you are.

Mr. 64, I noted that you have an uncle -- and we're

going to pass these microphones down here, and please do speak good and loud and clear again so our court reporter can make an accurate record of these proceedings -- that you had an uncle who was on the Ames Police Department.

PROSPECTIVE JUROR 64: Yeah, he's deceased now.

MR. MILLER: Can you tell me a little bit about that, when he was on the force and what you knew about his job?

PROSPECTIVE JUROR 64: I really don't know too much about him. I think I seen him maybe four or five times in my lifetime.

MR. MILLER: So you were not close to him.

PROSPECTIVE JUROR 64: No.

MR. MILLER: The reason I ask about him in particular is that we're going to have a number of witnesses from a broad spectrum of society testifying. We're going to have members of law enforcement. We're going to have people who are themselves convicted criminals, and we're going to have people from any number of walks of life in between, citizens who just happen to have information, scientists, physicians, people from a number of walks of life, but certainly one of those will be peace

1016

officers. And I expect should you serve on this jury, you will be advised by the Court as to what your job is and how you go about doing that job. And I assume you would want instructions to help do your job.

One of them is about the testimony of peace officers, and I'm not going to try to represent to you that word for word this is what the law is, but the Court will give you the law, but in general it will be to the effect that you don't attach extra credibility to a witness's testimony simply by virtue of

Page 190

the fact that he may be a government employee or a peace officer. Is that fair?

PROSPECTIVE JUROR 64: Yes.

MR. MILLER: And you can follow that, Mr. 64?

PROSPECTIVE JUROR 64: (Nodded head.)

MR. MILLER: And I'll take a nod as a sufficient acknowledgment from the both of you. Is that correct for you as well? Thank you so much.

Conversely -- and I mentioned already you may hear from -- and I expect you will hear from one or more witnesses who are incarcerated, people who've been convicted of a crime before. And as with a peace officer, there will be a special instruction from the judge as to assessing that person's credibility, and I take it it makes sense to you that you would want to consider the person's position and their background and whether or not they think they have something to gain from

1017

testifying, Mr. 64. You agree with that?

PROSPECTIVE JUROR 64: Yes.

MR. MILLER: Nevertheless, would you listen to that and all of the witnesses' testimony?

PROSPECTIVE JUROR 64: Yes.

MR. MILLER: Thank you, sir. And I'll let you pass that to your left, and I'll ask my next question or two of Juror 403.

Good afternoon, ma'am.

PROSPECTIVE JUROR 403: Hello.

MR. MILLER: You have a couple children.

PROSPECTIVE JUROR 403: Yes.

MR. MILLER: They're young children.
Page 191

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 886 of 3245

PROSPECTIVE JUROR 403:  Uh-huh.

MR. MILLER:  And I expect that takes a lot of not only your time but your attention and concentration and concern.

PROSPECTIVE JUROR 403:  Yes.

MR. MILLER:  That's a big -- maybe the biggest part of your life is being a mother and a wife.  You've never served on a jury before, have you, ma'am?

PROSPECTIVE JUROR 403:  No, I have not.

MR. MILLER:  And I take it that's the case for all three of you?  I trust you view serving on a jury as a responsibility.

PROSPECTIVE JUROR 403:  Yes.

1018

MR. MILLER:  Now, the fact that you are a mother tells me that you're no stranger to responsibility.  That's as important a job as any of us ever has is being a parent, and even though your children are still very young, I trust you've been required to make some decisions that aren't always the most pleasant, but somebody's gotta make them, and you're a parent.  By golly, you're the one shouldered with that responsibility.  Is that a fair statement?

PROSPECTIVE JUROR 403:  Yes, that is correct.

MR. MILLER:  And I don't want to get into what those have been in your case, but do you feel that's broadened your shoulders in the last seven years to where you're a person a lot more comfortable with responsibility now than you were before you were a parent?

PROSPECTIVE JUROR 403:  Yes.

MR. MILLER:  Fair statement?

And, Mr. 64, I think you indicated in your

Page 192

questionnaire that at one point in your life you were a supervisor.

PROSPECTIVE JUROR 64: Yes.

MR. MILLER: Did you ever have -- and you better hold on to that microphone while I ask this question because Shelly won't be real happy with me if we don't make a clear record.

Did you ever have occasion to have to discipline or even recommend termination for any of those employees?

1019

PROSPECTIVE JUROR 64: Not to the point of termination, but yes.

MR. MILLER: And you knew that that was at least a possibility when you took on that job.

PROSPECTIVE JUROR 64: Yes.

MR. MILLER: That's not the sort of decision that would necessarily be a pleasant decision I take it.

PROSPECTIVE JUROR 64: No.

MR. MILLER: But somebody would have to make it, and you were willing to shoulder that responsibility.

PROSPECTIVE JUROR 64: Yes.

MR. MILLER: Do you feel that being a juror could be similar to that, at least to the extent that it may not necessarily be the sort of responsibility that's always the most pleasant, but, by golly, somebody has to do it, and it has to be somebody who feels that he can shoulder substantial responsibility.

PROSPECTIVE JUROR 64: Yes.

MR. MILLER: Do you feel you can do that, sir?

PROSPECTIVE JUROR 64: Yes.

MR. MILLER: Okay. Now, you heard from Judge Bennett

earlier about the job of a juror. Can you tell me in your own words what you see the goal and responsibility of a juror being?

PROSPECTIVE JUROR 64: To sort the facts out to the best of our ability with the help of the Court.

1020

MR. MILLER: Very good. And you're going to have some help. You're going to have instructions that are going to tell you how to do your job and what the law is as it applies to this case. But I believe we already heard from Judge Bennett that the jurors' job is to determine what actually happened. That accords with what your understanding was even before you came here today I assume.

PROSPECTIVE JUROR 64: Yes.

MR. MILLER: We have a lot of rules and procedures in a courtroom, but this isn't just an elaborate ritual. It's a very practical business of going about and deciding disputes in our society right here. Would that be your goal, simply to determine the facts from the evidence, sir?

PROSPECTIVE JUROR 64: Yes.

MR. MILLER: Thank you, Mr. 64.

And passing the microphone down, would you agree with that, Madam 403?

PROSPECTIVE JUROR 403: Yes.

MR. MILLER: And passing it to Juror 311, do you agree with that?

PROSPECTIVE JUROR 311: Yes, I do.

MR. MILLER: You've indicated that you raised a son and now enjoy spending time with a couple grandchildren?

PROSPECTIVE JUROR 311: Yes.

MR. MILLER: Granddaughters.
Page 194

PROSPECTIVE JUROR 311:  Granddaughters.

MR. MILLER:  How many?

PROSPECTIVE JUROR 311:  Two.

MR. MILLER:  What are their ages?

PROSPECTIVE JUROR 311:  Nine and ten months.

MR. MILLER:  Can you tell us just a little bit about them, what they do and what you enjoy doing with them?

PROSPECTIVE JUROR 311:  Well, the grand -- the oldest granddaughter and I enjoy going to movies and just enjoy having activities, computer activities and just spending time together. The baby, of course, you know, we haven't bonded quite as closely because she's, you know, still nursing with Mom, and so we don't get to spend overnights or anything yet at this point in time.

MR. MILLER:  Do you live close enough to your son and his family that you're able to spend a lot of time with those grandchildren?

PROSPECTIVE JUROR 311:  Yeah, we live just 20 miles apart.

MR. MILLER:  Very good.  I expect you're not only expecting to but hoping to share in some of the time spent and influencing these to be healthy and prosperous citizens as they grow up.

PROSPECTIVE JUROR 311:  Absolutely.

MR. MILLER:  You are now a graphic artist.

PROSPECTIVE JUROR 311:  Uh-huh.

Page 195

MR. MILLER: Can you tell me just a little bit about that job? I notice that you design CD covers.

PROSPECTIVE JUROR 311: Yeah. We're a company, a music company, and we duplicate CDs and cassettes for musicians, and we design the covers and do it all from beginning to end except for the recording process.

MR. MILLER: And for what artists in particular if you can think of any offhand?

PROSPECTIVE JUROR 311: Well, they're not any, you know, big-name artists. We have polka bands out of Nebraska and Minnesota, and we do some big bands out of New York.

MR. MILLER: Polka bands are big in Minnesota.

PROSPECTIVE JUROR 311: Yeah, they are in Nebraska too.

MR. MILLER: Great, that's great. Dancing music.

PROSPECTIVE JUROR 311: Uh-huh, uh-huh.

MR. MILLER: 403, you're a dancer.

PROSPECTIVE JUROR 403: Yes.

MR. MILLER: Polka ever?

PROSPECTIVE JUROR 403: No. Salsa.

MR. MILLER: Try it some time. You were also at one time an emergency medical technician.

PROSPECTIVE JUROR 311: Yes.

MR. MILLER: What level did you achieve, and what were

1023

your responsibilities there if you can tell us?

PROSPECTIVE JUROR 311: I was director of the ambulance team out of -- at one point in time, so I was making schedules and such but also, you know, an active member and being on call and taking those duties.

Page 196

MR. MILLER:  In what community?

PROSPECTIVE JUROR 311:  Primghar.

MR. MILLER:  Our communities can't function without volunteers doing that, can they?

PROSPECTIVE JUROR 311:  Huh-uh.

MR. MILLER:  That caused you to not only as a parent but also as a volunteer in your community to shoulder responsibility.

PROSPECTIVE JUROR 311:  Absolutely.

MR. MILLER:  Do you feel comfortable with the responsibility of being a juror here?

PROSPECTIVE JUROR 311:  Yes, I do.

MR. MILLER:  And I'm going to ask this question not at all to be facetious, and I don't think it probably applies to any of you folks, but in my experience it sometimes does apply to some people that the responsibility of sitting in judgment on their fellow human being, particularly in a matter as serious as this, is something that they simply do not feel comfortable with, and we respect that for those that simply feel that way. Some people simply don't feel that they can handle that

1024

responsibility.  And unfortunately, after the case is tried, it's too late to find that out.  That doesn't apply to you I trust, does it, ma'am?

PROSPECTIVE JUROR 311:  No, not at all.

MR. MILLER:  Nor to you, Ms. 403?

PROSPECTIVE JUROR 403:  No.

MR. MILLER:  Nor to you, Mr. 64?

PROSPECTIVE JUROR 64:  (Shook head.)

MR. MILLER:  Likewise, you understand from what you've

Page 197

already heard about the nature of this case that it involves -- I don't expect you're going to be exposed to gore in the sense of photographs of bloody garments and blood and that sort of thing because we're talking about skeletonized remains.

Nevertheless, the nature of the crimes and, therefore, the nature of the evidence necessary to prove those crimes is not the sort of thing that I would expect any of you to find pleasant.

Despite that fact, we can't have a system of justice that functions unless we ask citizens such as yourselves to come in here and listen to such evidence. Despite the nature of such evidence, do you feel you can sit here and listen to and serve as a juror, ma'am?

PROSPECTIVE JUROR 311: Yes, I can.

MR. MILLER: And Mr. 403?

PROSPECTIVE JUROR 403: Yes.

1025

MR. MILLER: And Mr. 64?

PROSPECTIVE JUROR 64: Yes.

MR. MILLER: I believe that the attorneys touched on this already briefly, but I want to touch on it as well. You've all -- even though you've never been jurors before, have heard the phrase presumption of innocence and burden of proof. You've heard that, Ms. 311?

PROSPECTIVE JUROR 311: Uh-huh, yes.

MR. MILLER: As you understand it, do you feel that you can afford to the defendant the presumption of innocence in this case, ma'am?

PROSPECTIVE JUROR 311: Yes, absolutely.

MR. MILLER: And you understand that that isn't

Page 198

something that tells us what the facts are. That's a law in this country that protects not just Ms. Johnson, but it protects all of us in our society.

PROSPECTIVE JUROR 311: Yes.

MR. MILLER: Ms. 403, you agree with that?

PROSPECTIVE JUROR 403: Yes.

MR. MILLER: And Mr. 64?

PROSPECTIVE JUROR 64: Yes.

MR. MILLER: Likewise, the burden of proof is the same thing. It's something that protects all of us. It's one of the freedoms we enjoy in this country, and I trust you agree with that.

1026

PROSPECTIVE JUROR 311: Absolutely.

MR. MILLER: And you understand the government willingly accepts that burden whenever it brings criminal charges in any courtroom in this country.

PROSPECTIVE JUROR 311: Yes.

MR. MILLER: Pass that down. Do you agree with that, Ms. 403?

PROSPECTIVE JUROR 403: Yes.

MR. MILLER: And passing it one more, Mr. 64, do you agree with that, sir?

PROSPECTIVE JUROR 64: Yes, I do.

MR. MILLER: I've got three minutes, and I just want to use a couple of them if I can. We have here an indictment that charges ten counts. You already understand that there are five deaths, and I just want to be clear that what that indictment of ten counts is is relating to the five deaths in violation of two different laws. In other words, each of the

Page 199

five deaths is accused to have been committed in connection with a drug conspiracy. That's five counts.

And the indictment also charges that each of those five deaths occurred in connection with a continuing criminal enterprise. Both of those are federal crimes; and, therefore, there are ten rather than five counts. I just wanted there to be no misunderstanding. Does the fact that there are 10 counts here cause you any concern in according the presumption of

1027

innocence and in examining each of those 10 counts on its own merits, Mr. 64? Does that cause you any concern at all?

PROSPECTIVE JUROR 64: No.

MR. MILLER: And passing that to your left one, Ms. 403, do you feel that that's any problem for you?

PROSPECTIVE JUROR 403: No.

MR. MILLER: And Ms. 311.

PROSPECTIVE JUROR 311: No.

MR. MILLER: Finally, Ms. 311, in talking about this presumption of innocence, you understand that should you be required to serve on this jury and you listen to all of the evidence, at the conclusion of the merits phase of this case, in other words, the phase where it's your job to determine whether your verdict is guilty or not guilty, at that point if you have any reasonable doubt about the guilt of the defendant, it would be your duty to find the defendant not guilty. Would you under those circumstances return a verdict of not guilty?

PROSPECTIVE JUROR 311: Yeah, if they could not prove reasonable doubt.

MR. MILLER: Yeah, that would be your duty to return such a verdict; right?

Page 200

PROSPECTIVE JUROR 311:  Yes.

MR. MILLER:  Conversely, if the evidence establishes to your satisfaction and beyond any reasonable doubt that Angela Johnson is guilty as charged, under those circumstances, ma'am,

1028

what would your verdict be?

PROSPECTIVE JUROR 311:  Be guilty.

MR. MILLER:  Ms. 403?

PROSPECTIVE JUROR 403:  Yes, the same.

MR. MILLER:  And Mr. 64.

PROSPECTIVE JUROR 64:  Yes, on both, not guilty or guilty.

MR. MILLER:  Under the last circumstances it would be guilty?

PROSPECTIVE JUROR 64:  Yes.

MR. MILLER:  And that's not necessarily even an easy word to say, is it?

PROSPECTIVE JUROR 64:  No.

MR. MILLER:  Very serious matter, isn't it?

PROSPECTIVE JUROR 403:  Yes, it is.

MR. MILLER:  But you folks all have broad-enough shoulders to handle that responsibility I trust?

PROSPECTIVE JUROR 64:  Yes.

PROSPECTIVE JUROR 403:  Yes.

MR. MILLER:  Thank you, folks.

THE COURT:  Mr. Willett?

MR. WILLETT:  Thank you, Judge.  Judge Bennett, if it please the Court, counsel for the government, counsel for the defense, Miss Johnson.

Good afternoon, ladies and gentlemen.  I know we have

Page 201

a set amount of time here, and I'm reminded of one of my favorite quotes of United States Bankruptcy Judge Paul J. Kilburg:  There is no such thing as a bad short speech.  So then I will try to get right to the point.

I want to cover the issue of witnesses very quickly. Ms. 311, if you'd hand the microphone to Ms. 403, but I'd like each of you, Mr. 64 and 311, to listen to this one question to make sure we cover it.  I know you were asked about did you recognize any witness names.  But there are certain witnesses that are family members of my client, Miss Johnson, and I just want to reiterate some of those names to make sure there's no spark of recognition.

We have Pearl Johnson who is my client's mother. Angela Johnson has three sisters, Wendy Jacobson, Holly Dirksen, and Jamie Jo Hays.  Angela has a brother who's name is Jim Johnson.  Angela has two daughters, Alyssa Johnson and Marvea Johnson, and Angela has a brand new granddaughter, Angeleah, who is the daughter of Alyssa Johnson.

Now, Ms. 403 did you recognize any of those names?

PROSPECTIVE JUROR 403:  No.

MR. WILLETT:  And hopefully with the microphone in the middle we can hear both of you.  Mr. 64 and 311.

PROSPECTIVE JUROR 64:  No.

PROSPECTIVE JUROR 311:  No.

MR. WILLETT:  Thank you so very much.  The wonderful

1030

thing I love about the practice of law is I'm always learning, and I learned something just very late last night.  I've been
Page 202

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 897 of 3245

reading all your questionnaires. I know the answers in them. I'm probably working on my trifocal prescription before the end of this trial. But I realized last night that if I would have asked one gentleman just one more question out of his questionnaire it probably would have saved some time because it was a subject that he wanted to talk to us about. So I'm going to start with your questionnaires and work into some subjects that are covered there.

Miss 403, if you'd be so kind as to hand the microphone to Mr. 64.

And, Mr. 64, I'm looking at question 51 in your questionnaire. As compared to other witnesses, what would you think of a witness who is or was in jail or prison who agreed to cooperate with the government by testifying against a person charged with a crime? Now, the politically correct name for those types of people are cooperating individual or cooperating informants. The less politically correct label for those individuals are snitches. But your answer, sir, was, I wouldn't hold it against them. I wasn't sure what you weren't holding. Was it the fact that they were incarcerated or had previously been incarcerated, or was it the fact that they were testifying against somebody? What exactly did you mean by that, sir?

PROSPECTIVE JUROR 64: I wouldn't hold it against them

1031

that they were incarcerated.

MR. WILLETT: Okay. Would you want to factor that into their credibility, the fact that they might have a record or they were incarcerated?

PROSPECTIVE JUROR 64: No.

MR. WILLETT: Would you want to know if they were

Page 203

trying to reduce their own sentence if they were still serving one by testifying?

PROSPECTIVE JUROR 64: No.

MR. WILLETT: Okay. Very quickly, you mentioned to Mr. Miller that you had I believe an uncle on the Ames police force before he passed away.

PROSPECTIVE JUROR 64: Yes.

MR. WILLETT: You wouldn't give any extra credibility to law enforcement agents if they testified in this trial because of that fact, would you?

PROSPECTIVE JUROR 64: No. Like I said, I just met him a couple times.

MR. WILLETT: Mr. 64, would you please pass the microphone down to Ms. 311?

Miss 311, I noticed that your son for a while was training to be in law enforcement. Did I read your questionnaire correctly?

PROSPECTIVE JUROR 311: Yes, you did.

MR. WILLETT: Are you going to give law enforcement

1032

officers any extra credibility, if you will, when they testify?

PROSPECTIVE JUROR 311: No.

MR. WILLETT: Okay. Now then, you also in response to the question about cooperating individuals stated, Every witness should be looked at the same. And my questions for you are very similar to Mr. 64. Would you want to know other factors about this witness? For example, would you want to know if they were trying to reduce their own sentence by testifying against Miss Johnson?

PROSPECTIVE JUROR 311: I don't think so.

Page 204

MR. WILLETT: Okay. Would you want to know the length of that person's sentence? For example, I'm testifying against Miss Johnson because my sentence is virtually life, and I'd really like to get out of prison. Would you want to know that?

PROSPECTIVE JUROR 311: Well, if they were going to, you know, testify to get out of a life sentence -- I guess I'm not really sure. I would want everybody to -- I mean, you would have to weigh, you know, some of their, you know, characteristics to know about whether they would be credible, yeah.

MR. WILLETT: Certainly. And would you be willing to look at those characteristics of each and every one who comes before you?

PROSPECTIVE JUROR 311: Every witness, absolutely.

MR. WILLETT: And I assume, Mr. 64, you'd be willing

1033

to look at each and every witness's characteristics that come before you.

PROSPECTIVE JUROR 64: (Nodded head.)

MR. WILLETT: Now then, would you pass the microphone back to Ms. 403. Ms. 403, I specifically saved you for last and here's the reason. You were very candid in your questionnaire about some of the life experiences that you bring to this trial.

PROSPECTIVE JUROR 403: Uh-huh.

MR. WILLETT: Every juror brings their own unique life experiences, and that's what I think is fascinating about jury selection. Some of the life experiences that have occurred in your life deal directly with issues in this case, and I think you know where I'm going, don't you?

PROSPECTIVE JUROR 403: Yes.
Page 205

MR. WILLETT: Now then, you marked some of those answers private. Some of them you didn't. I want to absolutely err on the side of caution. I don't want to pick and choose and find out that I've just asked you a question that's mortified you in front of Mr. 64 and Ms. 311. If the judge would allow, would you be willing to speak to us in private about those couple of issues that I think have to do with this case if the judge would allow that?

PROSPECTIVE JUROR 403: I'd be fine here. This is a small-enough group.

MR. WILLETT: Okay. You're sure.

1034

PROSPECTIVE JUROR 403: Uh-huh, yes.

MR. WILLETT: Now then, the first issue was drugs.

PROSPECTIVE JUROR 403: Uh-huh.

MR. WILLETT: And starting at question 42, Do you believe that the possession or sale of drugs should be a crime? Yes. Why? And your answer was, it ruins people's lives. And if I may go ahead, Has any member of your family or a close personal friend used any drugs, been addicted to drugs, or been placed in a drug treatment program? May I go ahead with that answer?

PROSPECTIVE JUROR 403: Yes.

MR. WILLETT: Your answer was yes. My whole family has been on or used drugs at one time or another. Was the treatment successful? And will power was a great ingredient in your family it appears. What impact did the problems have on the person and their family? Family was upset, and the individuals all had financial and emotional problems. Do you blame anyone for the problem? Yes. Whom do you blame, and why?

Page 206

The dealers, manufacturers, users, everyone involved. They all know what they are doing is wrong, but they are too selfish to stop.

PROSPECTIVE JUROR 403: That is correct.

MR. WILLETT: Now then, I realize an answer that you gave to Mr. Williams and Mr. Berrigan during the course of the morning was, well, it's an answer on a piece of paper I think is

1035

the phrase you used which is an appropriate answer. My concern is it's your answer on this piece of paper; okay?

PROSPECTIVE JUROR 403: Yes.

MR. WILLETT: And that's why I need to talk to you a little bit. The heavy undertone to this case is methamphetamine, a criminal agreement to manufacture or make methamphetamine, a criminal agreement to deliver methamphetamine, to disburse it, to give it to others, to make a profit. Now then, even though this case is being driven by five murders, with this healthy undertone of drug trafficking, can you give my client a fair trial?

PROSPECTIVE JUROR 403: Yes, I can.

MR. WILLETT: More importantly, does it affect any of your death penalty opinions that you articulated to Mr. Berrigan this morning?

PROSPECTIVE JUROR 403: No.

MR. WILLETT: Can you still fairly and -- fairly and legitimately consider a life sentence as an ultimate penalty in this case now that you know that drug trafficking is the underlying tone to this case?

PROSPECTIVE JUROR 403: Yes.

MR. WILLETT: Okay. One other issue real quickly -- I

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 902 of 3245

realize I'm probably running close to my time, but I think I can work this in. Your father-in-law was the victim of a violent crime.

1036

PROSPECTIVE JUROR 403: Yes, he was.

MR. WILLETT: And if I may read question 55, Has anyone close to you ever been the victim of a violent crime, and your answer was yes. May I read the answer?

PROSPECTIVE JUROR 403: Yes.

MR. WILLETT: Thank you. My father-in-law was murdered in Guatemala along with his wife. There has been no justice. Their legal system is a lot different than ours.

Now, I would certainly agree with you the comparative legal systems in Guatemala are probably certainly different than the United States.

PROSPECTIVE JUROR 403: Yes.

MR. WILLETT: But obviously you've had an impact on this. I mean, your husband's been impacted by this. I'm certainly assuming because of the impact on your husband it's impacted you. Here we have five murders. Now then, once again, I know this is an answer on a piece of paper, but it's your answer. Should I have concerns about you being a potential juror in this case based upon these family experiences involving violent crime and specifically murder in your own nuclear -- or in your own family there?

PROSPECTIVE JUROR 403: No.

MR. WILLETT: Can you give Miss Johnson a fair trial, an impartial trial, based upon the tragedy that occurred with your father-in-law?

1037

Page 208

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 903 of 3245

PROSPECTIVE JUROR 403:   Yes.

MR. WILLETT:   Okay.   Would it impact at all your opinions on a potential sentence because of this, whether it's the death penalty or whether it's life?

PROSPECTIVE JUROR 403:   No, it's a different person. Circumstances are all different.

MR. WILLETT:   Okay.   I just don't want to -- I just want to make sure that we're not just sort of murder's murder.

PROSPECTIVE JUROR 403:   No.

MR. WILLETT:   Do you understand my concern?

PROSPECTIVE JUROR 403:   Uh-huh.

MR. WILLETT:   So you could fairly and legitimately consider imposing the death penalty based upon the situations in your own family involving controlled substances, involving violent crime.

PROSPECTIVE JUROR 403:   It just means that I've -- I know drug users on a personal basis, and people are people no matter what they do or what their choices in life are.

MR. WILLETT:   Okay.   You could fairly consider a life sentence in this case based upon your experiences involving controlled substances and violent crime.

PROSPECTIVE JUROR 403:   Yes.

MR. WILLETT:   And you made the statement to me just a second ago that you know these people.

PROSPECTIVE JUROR 403:   Uh-huh.

1038

MR. WILLETT:   People are people.   Because you know these people, is my client, Miss Johnson, going to get a

Page 209

negative start with you? Is she in the hole because the allegation, the evidence the government will try to present here will be that my client was knee deep in a methamphetamine conspiracy? She was one of the people involved in the criminal agreement; okay? Maybe it's the manufacturing aspect. Maybe it's the delivery aspect. Maybe it's both. But they will certainly bring evidence to this courtroom that Miss Johnson was involved in a criminal conspiracy, a criminal agreement to make and deliver methamphetamine. Does that change any of the opinions that you've just given me?

PROSPECTIVE JUROR 403: No.

MR. WILLETT: Regarding your ability to be fair?

PROSPECTIVE JUROR 403: No.

MR. WILLETT: Regarding your ability to consider both alternate punishments if the case ever gets to that point?

PROSPECTIVE JUROR 403: No, it wouldn't make -- it wouldn't change anything.

MR. WILLETT: Okay. Okay. So I shouldn't have any concern about you once I sit down.

PROSPECTIVE JUROR 403: No.

MR. WILLETT: And more importantly, my client shouldn't have any concern about you once I sit down.

PROSPECTIVE JUROR 403: No.

1039

MR. WILLETT: Chief Judge Bennett, I hope I finished within my allotted time.

THE COURT: You have.

MR. WILLETT: Thank you. Thank you, ladies and gentleman.

Okay. Juror 64, I've got some questions for you

Page 210

because I'm a little bit puzzled by your answer. I thought I understood you to answer Mr. Willett's question that if a witness was hoping to get a reduction in their sentence -- an incarcerated witness, okay, incarcerated witness, somebody who's in prison who has a sentence and they may be able to get some time off their sentence by testifying in a case, you wouldn't want to know that to help determine the credibility of the witness?

PROSPECTIVE JUROR 64: I misunderstood the question. But yes, I would.

THE COURT: Okay. Now, do you understand that it would be totally up to each individual juror to decide whether or not the hope of getting time off their sentence affects the truthfulness of what they're saying?

PROSPECTIVE JUROR 64: Yes.

THE COURT: But you'd want to know that, wouldn't you?

PROSPECTIVE JUROR 64: Yes.

THE COURT: Can you imagine that some witnesses who receive sentences would say or do virtually anything to try and

1040

get out of some of the time they have to serve? Can you imagine that?

PROSPECTIVE JUROR 64: There's probably a lot of them that would.

THE COURT: And that for some witnesses taking the oath --

PROSPECTIVE JUROR 64: Doesn't mean anything.

THE COURT: Yeah, it certainly doesn't mean that they wouldn't fib if they thought they could get some time cut off their sentence; right?

Page 211

PROSPECTIVE JUROR 64: Yes.

THE COURT: But it's going to be up for you to decide whether that happens in this case or not with any particular witness. Do you understand that?

PROSPECTIVE JUROR 64: Yes.

THE COURT: And, in fact, I'm going to give you an instruction that says that you ought to view the testimony of such a witness with some special caution and care precisely because of that situation. Do you understand that?

PROSPECTIVE JUROR 64: Yes.

THE COURT: But it's up for you to decide whether they're telling the truth or not. Do you understand that?

PROSPECTIVE JUROR 64: Yes.

THE COURT: And I just wanted to make sure that you would be willing to factor the motivation of an in-custody

1041

witness, take that into account what their motivation is in determining whether or not they're telling the truth.

PROSPECTIVE JUROR 64: Yes.

THE COURT: And you're sure you'd be able to do that?

PROSPECTIVE JUROR 64: Yes.

THE COURT: What is it about Mr. Willett's question that you didn't understand if you recall?

PROSPECTIVE JUROR 64: Could I hear the question again as it was?

THE COURT: Sure. Would you want to know if they were trying to reduce their own sentence if they were still serving one by testifying? Answer, no.

PROSPECTIVE JUROR 64: I would want to know, and hopefully if they were lying, they would get caught on their

Page 212

testimony either by questions from the prosecuting or defending attorney.

THE COURT: Well, but, you know, there's only -- there are only 12 people in the courtroom who can catch a witness lying.

PROSPECTIVE JUROR 64: Yes.

THE COURT: And who would those 12 be?

PROSPECTIVE JUROR 64: Us.

THE COURT: The jurors, right. Even if I think a witness is lying, I can't stop the trial and jump up and say, Jurors, I think this witness is fibbing on this point.

1042

PROSPECTIVE JUROR 64: But hopefully I would be able to tell.

THE COURT: Okay. But that's why it's so important for you to judge the credibility of the witness; right?

PROSPECTIVE JUROR 64: (Nodded head.)

THE COURT: And that would be a factor among a lot of other factors that you would want to take into consideration in determining whether a witness is telling the truth.

PROSPECTIVE JUROR 64: Yes.

THE COURT: Okay. Any follow-up questions by either side?

MR. WILLETT: Not in regards to Mr. 64, Your Honor.

THE COURT: Well, in regards to anything else because I didn't ask anybody another question?

MR. WILLETT: No thank you, Judge.

THE COURT: Maybe I misunderstood your statement.

MR. WILLETT: No, no. I was just trying -- I was being too specific. No follow-up. Thank you, Judge.

Page 213

THE COURT: Mr. Miller?

MR. MILLER: No, Your Honor.

THE COURT: Okay. Now, if you three will step outside for a minute.

PROSPECTIVE JUROR 64: May I say something, please?

THE COURT: Sure.

PROSPECTIVE JUROR 64: About that question, when I

1043

answered it that way, I thought he was still talking about would I hold it against him, and no, I wouldn't hold it against him that he was incarcerated.

THE COURT: Okay, right, because that was the question he asked you right before he asked you that one.

PROSPECTIVE JUROR 64: Right.

THE COURT: Okay.

PROSPECTIVE JUROR 64: That's what I meant.

THE COURT: Good. Thank you.

(Panel D exited the courtroom.)

THE COURT: Any challenges for cause -- please be seated -- by the government?

MR. WILLIAMS: No, Your Honor.

THE COURT: I'm sorry. Any -- okay. Any challenges for cause? I asked you that. Right. Any peremptory challenges by the government?

MR. WILLIAMS: No, Your Honor.

THE COURT: Any challenges for cause by the defense?

MR. BERRIGAN: No challenges for cause other than those previously lodged which we'll renew at this time for the record.

THE COURT: Sure. How about peremptories?

Page 214

MR. BERRIGAN: Yes, Your Honor. The defendant would exercise 2 peremptory challenges of the remaining 3 jurors, those specifically on Jurors 64 and 403. Both of those the

1044

record will hopefully reflect were subject to defense motions for challenges for cause.

THE COURT: Well, as Judge Vietor always says, the record reflects what it reflects.

MR. BERRIGAN: Exactly.

THE COURT: Right. Okay. So by my calculation, are you now down to -- you have nine left?

MR. BERRIGAN: I believe that's accurate, Your Honor. I haven't been keeping the numbers as well as I should, but that sounds right.

THE COURT: Mr. Stowers?

MR. STOWERS: I think we've used five.

THE COURT: Carey?

THE CLERK: I have them using six after today.

THE COURT: Okay. If you think you've used five, you better check. I think your own consultant acknowledges you've used six.

MR. STOWERS: Okay. She would know.

THE COURT: Well, hopefully somebody's keeping track. So you have nine left, and the government has used what? One or two?

MR. WILLIAMS: One, Your Honor.

THE COURT: One, so you have fourteen left. And the only juror that makes it into the pool then is 311?

MR. WILLIAMS: That's correct.

1045

Page 215

THE COURT: Okay. We'll bring them in. Thanks.

(Panel D entered the courtroom.)

THE COURT: Why don't you be seated just for a second. It won't take me very long. Okay. Juror 311, you're still in the pool. Juror 64 and 403 -- do I have that right on the end, 403? -- you are no longer in the jury pool, so the two on the ends, you'll be dismissed from further jury service. We'll ask to you do this, though. Because we have probably several more weeks of jury selection and northwest Iowa is a surprisingly small place -- it's kind of big geographically but not that well populated -- that we'd ask you not to say anything else until we get a jury empanelled because you could say something to Mr. X and could tell Mrs. Y and, sure enough, Mrs. Y pops up here in a week and a half in jury selection. So we'd ask you not to say anything to anybody else.

Juror 311, because you're still in the pool and you now have about a 50 percent chance of winding up on this jury, I've got a little bit stronger statement for you. It's very, very important that you not put yourself in a situation where you're exposed to any news media, and I know that's going to take some readjusting, pretty minor in your life, but it's very important that you do that. And you'll get all the information you ever need right in this courtroom. And believe me, that will be the accurate evidence that you'll be able to base your judgment on. It's very important that you not do any research

1046

on your own, hop on the Internet, want to research what a fine fellow I am or these lawyers and all. It's just not relevant, and we don't want you to do any research of any kind or make any

Page 216

investigation.

If anything weird happens to you that you think would be something I as the judge in this case would want to know between now and we either tell you you're on the jury and you have to show up or we tell you you're not, I mean, somebody calls you out of the blue and has found out you're going to be on the jury and they start questioning you, anything out of the ordinary, and if it concerns you in any way, you feel free to call your number on your packet, the clerk's office. They'll let me know. I can't ever talk to you without everybody present, so we'd bring you down and find out what's going on and what to do about it because I don't want you to feel that you're out on your own there.

Anything else that I need to tell any of the jurors, Mr. Williams?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: No, sir.

THE COURT: Okay. Good luck to all three of you. And, Juror 311, we'll let you know as soon as we can whether you're going to be on the jury panel in this case; okay? Thank

1047

you very much.

(Panel D exited the courtroom.)

THE COURT: Please be seated. Anything we need to talk about before we get together at eight o'clock or so on Monday morning?

MR. WILLIAMS: No, Your Honor. Just to clarify I suppose, we are going to be doing the group voir dire system,

Page 217

and it's going to be the defense turn to go first?

THE COURT: Correct. I've already changed my PowerPoint, so it's ready to go Monday morning. How many do we have for Monday? Do you know, Carey?

THE CLERK: Fourteen.

THE COURT: Fourteen. Now, what -- we're going to do them all in a group, and then the only thing we're going to question them individually on is pretrial publicity; right?

MR. WILLIAMS: That'd be my understanding.

MR. BERRIGAN: Yes, sir.

THE COURT: Well, why don't we do this. I don't remember if we did it this time -- this way or not when we did it I guess on Tuesday or whatever day we did it your way. I feel like the owner of Burger King, have it your way for jury selection. At the end of the group questioning, we might as well do our challenges for cause. We can do them again if something pops up in individual questioning, but there's no point questioning somebody individually about pretrial publicity

1048

that is going to be gone; right? Is that how we did it?

MR. BERRIGAN: That is how we did it, sir.

THE COURT: Any other fine tuning or tinkering you can think of that would make it run better?

MR. WILLIAMS: Not that I can think of, Your Honor.

MR. BERRIGAN: None by the defense, sir. We have a completely unrelated matter, more of a question.

THE COURT: Okay. Why don't you go ahead with it.

MR. BERRIGAN: I want to know how I could address a matter of Miss Johnson having her family being able to visit her. Apparently that's not permitted, a contact visit in the
Page 218

PANEL D, 4-15-05

jail nor will the marshal's service do that without an order, and I'm happy to file a motion, Your Honor.

THE COURT: Well, no, I don't want you to have to file a formal written motion. But maybe that's something we could take up Monday morning at eight o'clock, and we'll get somebody from the marshal's service down here.

MR. BERRIGAN: Appreciate it. I just wanted to bring it to your attention.

THE COURT: Yeah.

MR. BERRIGAN: Thank you.

THE COURT: Okay. Thank you. See you all Monday morning.

(The foregoing trial was adjourned at 2:53 p.m.)

1049

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR    1-4-06
                            Date

INDEX

PROSPECTIVE JUROR:                          PAGE:

Prospective Juror 176
    MR. WILLIAMS                            834
    MR. BERRIGAN                            845
Prospective Juror 450
    MR. WILLIAMS                            867
Prospective Juror 686
    MR. WILLIAMS                            876
Prospective Juror 403
    MR. WILLIAMS                            882
    MR. BERRIGAN                            896
Prospective Juror 573

Page 219

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 914 of 3245

                    PANEL D, 4-15-05
                MR. WILLIAMS                                  912
                MR. BERRIGAN                                  919
                MR. WILLIAMS                                  928
                MR. BERRIGAN                                  929
        Prospective Juror 544
                MR. WILLIAMS                                  937
                MR. BERRIGAN                                  947
        Prospective Juror 311
                MR. WILLIAMS                                  955
                MR. BERRIGAN                                  969
        Prospective Juror 506
                MR. WILLIAMS                                  982
        Prospective Juror 64
                MR. WILLIAMS                                  987
                MR. BERRIGAN                                  998

                                * * * * *

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 915 of 3245

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

       Plaintiff,                          Sioux City, Iowa
                                April 18, 2005
   vs.                                       7:54 a.m.

ANGELA JANE JOHNSON,                          VOIR DIRE OF
                                PANEL E
       Defendant.
                       /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

1051

APPEARANCES:

For the Plaintiff:          C. J. WILLIAMS, ESQ.
                            Assistant United States Attorney
                            Suite 400 - Hach Building
                            401 First Street Southeast
                            Cedar Rapids, IA  52401

                            THOMAS HENRY MILLER, ESQ.
                            Iowa Attorney General's Office
                            Area Prosecutions Division
                            Hoover State Office Building
                            Des Moines, IA  50319

For the Defendant:          PATRICK J. BERRIGAN, ESQ.
                            Watson & Dameron
                            2500 Holmes
                            Kansas City, MO  64108

                            DEAN STOWERS, ESQ.
                            Rosenberg, Stowers & Morse
                            1010 Insurance Exchange Building
                            505 Fifth Avenue
                            Des Moines, IA  50309

                            ALFRED E. WILLETT, ESQ.
                            Terpstra, Epping & Willett
                            Higley Building - Suite 500
                            118 Third Avenue Southeast
                            Cedar Rapids, IA  52401

Also present:               Bill Basler

Page 1

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 916 of 3245

PANEL E, 4-18-05
Court Reporter:          Shelly Semmler, RMR, CRR
                         320 Sixth Street
                         Sioux City, IA  51101
                         (712) 233-3846

1052

(Proceedings reconvened outside the presence of the jury venire.)

THE COURT:  Is there anything either party would like to raise this morning?

MR. WILLIAMS:  Not on behalf of the United States, Your Honor.

MR. BERRIGAN:  Your Honor, we did mention to the Court on Friday afternoon I believe that Miss Johnson was very hopeful and was going to make a request of the Court that at some point during the trial she might be able to have contact visits with just -- there are really only two individuals, her daughters and her granddaughter.  Those are the only folks under consideration.

THE COURT:  Duane, can you come up to the podium?

DEPUTY WALHOF:  Sure.

THE COURT:  This is Duane Walhof, our chief deputy marshal-in-charge.  I probably butchered your title, but you're the chief as far as I'm concerned over here on the frontier.  I don't know what they call you over in Cedar Rapids.  What's your view?

DEPUTY WALHOF:  I can arrange a visit, but a contact visit for security reasons I cannot do.

THE COURT:  Even with her children?

DEPUTY WALHOF:  It's totally against policy.  I'd have to kick that one up a notch, I mean, over to Cedar Rapids and

probably headquarters because I can't authorize that one on my own.

THE COURT: Well, I'm -- and the policy is no contact visitation?

DEPUTY WALHOF: Correct.

THE COURT: And is that the policy over at Woodbury County Jail too?

DEPUTY WALHOF: Yes. It's just for security things on what can be brought in that is not detected by a magnetometer. There's a number of things that aren't allowed in correctional settings that aren't detectable.

THE COURT: Mr. Berrigan, my policy has always been to not interfere with the marshal's -- you know, if they have a policy on something, I mean, unless there's some kind of constitutional challenge to it or something.

MR. BERRIGAN: No, I doubt there is, Your Honor, but these are somewhat extraordinary circumstances. She's been in jail for, as you know --

THE COURT: Yeah.

MR. BERRIGAN: -- for almost five years without being able to have a contact visit with her children. And it seems that this setting would be one in which the security concerns of the marshal's service would be able to be met. I mean, obviously Miss Johnson's willing to subject herself to whatever searches or anything, frankly. She'd stand on her head if she

1054

could get --

THE COURT: Why don't -- not this week but at some -- this is going to be a long trial. Why don't you take it -- why

Page 3

don't you talk to the supervisors about it, see if they'd be willing to make an exception with whatever additional security measures that you deem appropriate, and if the answer's no, have them call me.

DEPUTY WALHOF: I'll do that, Your Honor.

THE COURT: Okay? Thank you.

MR. BERRIGAN: Thank you, Your Honor. That's all the defense had.

MR. WILLIAMS: Your Honor, we just want to be on the record. Regardless of what the marshals come back with, the United States is opposed to -- I mean, this is a high-security case. In recent events there have been more violence in courthouses just recently. I mean, this is an area where I think you defer to the people who are experts, so I just want to indicate --

THE COURT: I'm certainly aware of the recent events, but I'm not going to let the government use that as some kind of -- I mean, every -- some kind of blanket response. I mean, every case has to look at it individually, and you say this is a high-security case. Not by my definition of high security.

MR. WILLIAMS: Well, it's a case where we moved for an anonymous jury, and we set out reasons for it. Now, the

1055

Court -- we talked about it, and we backed off of an anonymous jury. But all the reasons we put forth in that memo are still present, and we have those concerns. This is a defendant who has had assaultive behavior in the last five years she's been in the local jails. This has not been a model prisoner. She's assaulted four different people in the course of the last four years, and she's capable of violence, and she's capable of

Page 4

assaulting people. And so I do have concerns, and I just wanted to express them, and obviously you'll rule how ever you think is best, but I just wanted to make sure I was clear.

THE COURT: I will take your concerns under advisement.

MR. WILLIAMS: Thank you, Your Honor.

THE COURT: It's kind of like mitigation evidence. I have to give it some consideration, but the weight is up for me to decide.

Would that be an accurate paraphrase, Mr. Berrigan?

MR. BERRIGAN: Well, Your Honor, I think I filed a little brief this week --

THE COURT: You did, and actually these are all mitigation voir dire cases that I've been reading.

MR. BERRIGAN: And I suspect that list is a lot longer than what was in my brief, Your Honor.

THE COURT: It is, but I understand the constraints that you operate under when you're away from your office and

1056

all.

MR. BERRIGAN: Yes, sir.

THE COURT: But as I understand it -- this is kind of a segue into your brief -- I mean, there are certainly cases -- and I have them -- that says jurors have to consider them, but, in fact, they can give them weight as an aggravator. That mitigation evidence is a double-edged sword. And, for example, there are several cases that deal with youth where the defense was arguing that youth was a mitigating factor and it came up in jury selection and some of the prospective jurors would say, well, gee, I think that could be an aggravating factor. And the

Page 5

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 920 of 3245

court said that's fine. As long as they give -- as long as they consider it, the weight to be given the consideration, even if it goes exactly opposite of what the defense intends, and a juror wants to consider it as an aggravator, they can do that. That's what the cases say. I've got one in front of me if you'd like me to quote it to you.

MR. BERRIGAN: No, sir, but on that mitigator in particular, just in early March the Supreme Court rendered a decision in Simmons versus Roper. I'm intimately familiar with that case because I represented Mr. Simmons through his habeas procedures and his state habeas where he was granted relief. And even in that case, although it wasn't decided on the issue, the Supreme Court was very critical of the prosecutor doing exactly what you say, suggesting that Mr. Simmons' age was, in

1057

fact, an aggravator; in essence if he could do the crime at this age, God only knows what would happen in the future.

THE COURT: Yeah.

MR. BERRIGAN: And the court was critical of that. It certainly didn't base its ruling, as you well know, on that particular factor, but I think that's an issue that the Supreme Court has yet to specifically address, and I suspect given Justice O'Connor's pronouncements in the past, that is not how they're going to look at it.

THE COURT: Yeah, that may very well be. But what's your thumbnail view as to what the test is on mitigation?

MR. BERRIGAN: That in order to give full effect, that means that the juror based on that evidence could give a different result. In other words, a juror who might be leaning towards the death penalty after considering mitigation should be

Page 6

able to say, I could change my mind if mitigation evidence were presented to me. Certainly doesn't commit them to changing their mind but that they would be willing to give it weight, some weight, where they might go the other way. Otherwise I don't know what full effect means, frankly.

MR. WILLIAMS: And, Your Honor, I don't think the case law supports that position. The case law cited by the defendant and the only case law in this area that I'm aware of deals with constraints put on the consideration of mitigating factors by reason of either the statutes or by court rulings, not

1058

individual juror's consideration of weight to be given to a mitigating factor.

To suggest that a litmus test to a juror here is if I tell you that she was abused in her background will that or could that affect your decision in giving the death penalty or not, if that's the litmus test, then that's saying that that juror has to accept that that's pretty significant weighty evidence. If it's going to change a person's view about whether to impose the death penalty or not, if it could have that impact -- and that's saying that has significant weight.

Now, that's a big difference between that and saying, Are you willing to consider it, are you willing to look at it and consider that and weigh that in with the rest of the factors? That's one test. The other test is saying, Will it change your mind? And if a juror says, No, I don't think that's going to change my mind; everything else being equal, I don't think that's going to change my mind, then throwing them off that is not the test, and there's no case law to suggest that.

So I disagree that we have some type of litmus test

Page 7

that the defense can impose in this case.  I think it's sufficient if a juror says, Yeah, I will look at that along with every other factor, and I won't just automatically dismiss it. And if they can say that, that's sufficient, and there's not a case that cites it to the contrary.

THE COURT:  There's certainly not a case that I read

1059

that says -- so what are you suggesting, Mr. Berrigan?

MR. BERRIGAN:  Well, I only filed this, Your Honor, because I thought last week I did not very artfully articulate my views when this issue came up in respect to a couple of jurors, so this gave me an opportunity to clarify my position at least.

But I think Justice O'Connor's pronouncements regarding this issue in Mr. Penry's case not once but twice now indicate to me that it's not enough to give a wink and a nod at consideration of mitigating circumstances without the juror being able to give full effect.  And those are her words, not mine.  And she does impose that responsibility on the juror, not just the exclusion of mitigation evidence.

It's a juror's responsibility in order to be qualified to be able to give full effect, full consideration and -- it's a conjunctive -- and full effect to the mitigating evidence.  And if that means, well, that doesn't mean you have to give it any weight, then I think that's an inconsistent proposition.

And admittedly, perhaps there haven't been circuit courts yet making that determination, but frankly I do think that's the position of the United States Supreme Court.

MR. WILLIAMS:  And with all due respect to Mr. Berrigan who has far more experience than I do in this area,

Page 8

I don't read that as the decision in the ruling at all. The language is the jury must be able to consider and give full

effect to mitigating evidence. And again, the underlying facts in the Penry case was the statutory setup was such that the jury wasn't even able to consider, able to consider, these mitigating factors because they weren't even asked to find them.

So to read into that language that somehow Justice O'Connor is creating a new standard for jurors to -- that they have to consider and give effect to a mitigating factor is not what that case stands for. It's not the background of the procedures that led to that ruling, and I think it's just contrary to common sense. I mean, since when can we dictate to a juror what weight they give to a factor?

THE COURT: Exactly.

MR. WILLIAMS: All we have to get them to say is I'm willing to consider it so . . .

THE COURT: Yeah, and I'm not willing to go beyond the I'm-willing-to-consider test. I mean, I think as long as a juror says that they're willing to consider mitigation evidence and they may consider it as aggravating evidence, but they have to consider it. But the weight to be given it -- I'm not -- I don't believe that you're entitled to ask a juror if they're going to give mitigating evidence full effect. I mean, in every -- I've got about a dozen mitigation cases here, and in every single one of them they point out the limits that the trial judge can impose on counsel in asking questions in this area.

And I think you'll agree, Mr. Berrigan, I've gone way beyond that. I mean, my ruling goes way beyond every other reported decision on what you're being allowed to ask in voir dire.

And see, this is what I meant when I said the other day it's never enough. I mean, I have gone way beyond what any judge -- you find -- you find a reported decision that comes even close to mine in terms of the scope I'm allowing you to question jurors on. Could you find one?

MR. BERRIGAN: No, no, sir, and --

THE COURT: And your job is to push. I understand that.

MR. BERRIGAN: Right, exactly. I think these are apples and oranges. These suggestions are not criticisms of what the Court's allowed us to do so far. I wish you wouldn't take it that way. One of my responsibilities is to at least bring to the Court's attention issues that we may feel differently about.

There was a perfect example with the issue regarding the prosecution talking about the defendant's right not to testify. That's not something apparently that the Court had opportunity to consider before. I raised it. You considered it. You ruled. But that's my responsibility to raise these issues. That's how the law kind of expands and changes.

THE COURT: Evolves, that's right.

1062

MR. BERRIGAN: That's right. If we don't do it here, it never gets to the United States Supreme Court. So I hope you'll forgive me. I'm not -- I don't mean to give offense to -- rulings respecting the questioning in this case have been

Page 10

phenomenal. The trial brief on the mitigation is as good as anything I've ever seen. That doesn't mean that we don't want and in our view deserve more.

And in this particular area I do think that in my -- with all due respect already to what the Court said and to Mr. Williams, Justice O'Connor particularly has been very strong. And the last quote there, that subparagraph on page 6, in my view says it all. She puts an onus on the jurors to be able to give more than just consideration. They have to give effect. There's no other reason to put "and full effect." And that has to mean something.

THE COURT: But it says, A sentencer must be allowed to give full consideration and full effect, must be allowed to. It doesn't say they're required to. You have to put them in a position where they can give full effect to the evidence. But it doesn't mean that ahead of time you're entitled to a commitment from them that they will give it certain weight. That's my view. I realize it's not your view.

MR. BERRIGAN: I understand.

THE COURT: And it's okay to disagree. And I'm glad you're making a record on it. You will never find me not

1063

encouraging lawyers to make records on things. I frequently remind lawyers to make a record on something that's adverse to how I've ruled when they've forgotten to do it. I don't think many judges do that.

So I don't take it personally. I fully understand your job is not to agree with me. But it's oftentimes frustrating from my point of view when I give you more than I think any other judge has given and it never seems to be enough.

Page 11

But that's just part of the process, and I understand that.

MR. BERRIGAN: Okay.

THE COURT: And while I may get frustrated, it's nothing personal.

MR. BERRIGAN: No, I don't take it personally at all, sir. I do not.

THE COURT: Because it never is.

MR. BERRIGAN: I understand that.

THE COURT: And I think you're doing a terrific job, and I have great respect and admiration not only for your role in the process but for you personally --

MR. BERRIGAN: Thank you.

THE COURT: -- in how you've conducted yourself from the beginning in this case and how I'm sure you'll conduct yourself in the future. Doesn't mean we're always going to agree on things.

MR. BERRIGAN: I suspect not. Thank you, sir.

1064

THE COURT: Thank you. So, you know, I'm just kind of sticking with my original ruling but applying it to mitigation. You can be allowed to ask if they'll consider the evidence, but you can't be allowed to phrase it in a stakeout question so that they'll consider the evidence in a certain way that might have a certain effect on their ultimate opinion in the case. Beyond that, I'm not really in a position to give you any more guidance than that, but we can just kind of take it up as we go.

Anything else?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. BERRIGAN: Not by the defendant, sir.

Page 12

THE COURT: We will be taking a break at noon today which should work fine because we'll still be in the group questioning. But I think you all know this. I serve on the Defender Services Committee where we approve -- we have to actually review all budgets where the lawyers have exceeded $500,000, and we're having a telephonic meeting today to do that. But they kindly set it around my schedule, so we're going to meet for an hour at noon, from noon to one, and that's when we'll be taking our lunch break.

And then the reason why we're not having jury selection next Monday is that I'm going to an in-person meeting for the Defender Services Committee where we look at the -- I'm not even supposed to tell you what cases we look at, but they're

1065

the national security cases where we look at the budgets in those cases. They often exceed -- I'm not going to tell you what they exceed, but they're staggering at best, and that requires in-person review, so I'm going to be doing that all day next Monday. And it's just so important I just felt I had to do it. So that's why we'll only be going four days next week.

Okay. We'll see you back here at 8:30 then. Thank you.

(Recess at 8:13 a.m.)

THE COURT: Ready to have the jurors brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. BERRIGAN: Yes.

THE COURT: Okay. Thank you.

(Panel E entered the courtroom.)

THE COURT: Good morning. Would everybody raise their right hand, please.

Page 13

(Panel E was sworn.)

THE COURT: Okay. Good morning. Please be seated. I wanted to welcome all of you to the United States District Court for the Northern District of Iowa. While this is a very, very serious matter, perhaps as serious of a matter as any of us will deal with in our lifetime, I did want to remind each of you that there is no federal law against smiling this morning; okay? Thank you. I did see a few smiles.

I'm Mark Bennett. I'm the chief judge of the United

1066

States District Court for the Northern District of Iowa. And I'm the trial judge in this case. And I wanted to welcome all of you here today.

And let me just say this. I assume that when each of you went to bed last night and woke up early this morning you weren't absolutely thrilled or just incredibly excited about being here today, and I understand that. But we have worked really hard, the lawyers and I -- and I'm going to introduce the lawyers, everybody in the courtroom in a minute -- to set up a system where you'd only have to come in for one day for jury selection.

And I hope you appreciate that because we have a lot of flexibility in how we set up jury selection. And my secretary who's also a lawyer has been called for jury duty in state court, and she goes one day a week, and she's over there and she's over there and she's over there. And her sister who lives up in Minneapolis was just called for jury duty in federal court last week in Minneapolis, and she sat there for three days in the basement of the courthouse and never even got called up to be questioned by anybody and then got sent home to come back

Page 14

in a couple of weeks to do it all over again.

So while I'm sure none of you were thrilled about getting that big packet and filling out the questionnaire in this case, the good news is we're just bringing you in for one day at a time, and I'll tell you more about that in a little

1067

bit.

As all of you know, this case is United States of America versus Angela Johnson, but I wanted to introduce you to everybody. Seated at the table closest to the jury box -- and I'll just have them raise their hand, and in a little bit they're going to stand up and introduce themselves -- C.J. Williams and Thomas Miller seated next to C.J. Williams. They're assistant United States attorneys, federal prosecutors prosecuting this case. Mr. Miller is actually a special assistant United States attorney. He normally works for the attorney general of Iowa who has the same name but is no relation to Tom Miller prosecuting cases in state court, but he's been made a special assistant U.S. attorney and is a co-prosecutor with Mr. Williams in this case. And then seated next to them is Special Agent Bill Basler.

And switching over to the far table, we have Patrick Berrigan who's a defense lawyer from Kansas City and Al Willett who's a defense lawyer from Cedar Rapids. And then in between those two would be Angela Johnson. She's the defendant in the case. And then at the back counsel table would be Dean Stowers, a defense lawyer from Des Moines.

Now, there are certain rules that we want you to follow, and I've actually had those rules typed up. They were on each of your chairs, but I have to go over them with you this

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 930 of 3245

morning.

1068

Conduct of potential jurors during jury selection and trial. To ensure fairness, you as potential jurors must obey the following rules until the end of the case if you are selected for the jury or until you are excused from serving on the jury in this case. These rules apply whether you are in the courtroom, in the courthouse, at home, or anywhere else until you are excused from further service in this case.

First, do not talk among yourselves about this case or about anyone involved with it.

Second, do not talk with anyone else about this case or about anyone involved with it.

Third, when you're outside the courtroom, do not let anyone tell you anything about the case. If somebody should try to talk to you about the case during jury selection or the trial, please report it to me.

Fourth, do not talk with or speak to any of the parties, lawyers, or witnesses involved in this case. You should not even pass the time of day with any of them. It is important that you not only do justice in this case but that you also give the appearance of doing justice. If a person from one side of the case sees you talking to a person from the other side, even if it is simply to pass the time of day, an unwarranted and unnecessary suspicion about your fairness might be aroused. If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator or the like, it

1069

Page 16

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 931 of 3245

is because they are not supposed to talk or visit with you.

Fifth, do not read any news stories or articles about this case or about anyone involved with it or listen to any radio or television reports about this case or about anyone involved with it. If you want, you can have your spouse or friend clip out any stories and set them aside to give you after the trial is over or you are excused from serving on the jury in this case. I can assure you, however, that if you are selected for the jury in this case, by the time you have heard the evidence you will know more about this case than anyone will learn through the news media.

Sixth, do not do any research on the Internet, in libraries, in the newspapers or in any other way or make any investigation about this case on your own. If you are selected for the jury, you must decide this case based on the evidence presented in court.

Seventh, if you are not excused from serving on the jury today, please take this instruction with you so that you can refer to it if you have any questions between now and the date you are required to return for the trial.

Dated this 18th day of April, 2005, signed by me, Mark Bennett, chief judge.

Okay. Now, I want to explain to you who the courtroom participants are. I have one of my law clerks, Carey, seated over at the table there. She'll be sitting in not only through

1070

jury selection but throughout the entire trial.

We have our court reporter seated right in front of me, Shelly. Shelly comes to us from Florida. And she's been with us now a number of years. She has the most difficult job

Page 17

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 932 of 3245

in the courtroom in my view because while the rest of us can kind of daydream for a second or tune out for a second, Shelly can never do that. She's got to take down every word that's said to make an entire record of the trial, and she does a great job.

We have some United States marshals seated in the courtroom. And depending on what phase we are in the trial, there may be more or less marshals depending upon what witnesses are testifying. Nothing unusual about that. In every criminal case we have U.S. marshals seated in the courtroom.

We also have some court security officers, what we like to call CSOs. And they're always in the courtroom too in any case, civil or criminal. And they're easy to spot because they have the blue blazers, the big badge, and the earpiece. They have a variety of duties throughout the courthouse. And we have a number of CSOs. You'll see them just rotating throughout the day. But one of their main priorities is to make sure the jury gets down to the jury room and back and forth in a timely fashion and that there are no problems.

We have the lawyers and the parties they represent, and you'll be meeting them in more detail in just a minute.

1071

Then we have you folks, the potential jurors, and then myself as the judge. I'm going to talk about what I do, and then I'm going to talk about what your role as jurors are.

My job in this case is I've had the responsibility of ruling on lots and lots and lots of pretrial motions filed by both sides, and I've done that. I'm totally current. My job is to -- with input from the lawyers was to design a system for jury selection that wasted as little of each of your time as

Page 18

possible because my goal in every trial -- my number-one goal is to give the defendant, in this case Angela Johnson, and the United States government the fairest trial I'm capable of giving them.

My secondary goal just right below it is to make sure we run the trial as efficiently as possible. Fortunately we have a lot of experience at running trials. There are 94 federal district courts in the country. Three out of the last four years our district led the nation in numbers of trials per judge. So -- in the year we didn't lead the nation we were second. So I can safely say that we're the busiest trial court in the nation. I have lots and lots of trials. Hopefully I've learned something from all those trials. And while the number-one goal always has to be fairness, I think we run our trials very, very efficiently.

I demand a lot of the lawyers ahead of time. They've been working on this case for a long period of time. We meet

1072

every morning before we bring the prospective jurors in even in jury selection to anticipate any potential problems. And we meet every afternoon when we send you all home, and we'll do that throughout the entire length of the trial to make sure that when the jury is here we're working hard and not wasting your time.

I'll have lots and lots of evidentiary rulings and motions that I don't even know are out there yet to rule on during the course of the trial, particularly in a trial of this importance and this length. There will be a lot of things for me to rule on during the trial. My job, like I said, is to run the trial as fairly and efficiently as possible.

Page 19

I also have the obligation of telling the jurors what the law is in this case. Angela Johnson's charged with ten separate federal crimes. And once we get a jury selected, immediately before we hear the opening statements from the lawyers, I'll be giving the 18 jurors who are selected, the 12 trial jurors and the 6 alternates, a very, very detailed set of preliminary instructions laying out what each of the charges are and what all of the rules are that you'll be obliged to follow during the course of the trial. So those are some of my duties.

I wanted to switch back to the jury. For those of you who get selected to serve on this jury, your job will be -- you're really judges of the facts. In a jury trial I don't decide what the facts are. The jury does. There's our witness

1073

box directly across from you. I anticipate in this case there could be more than a hundred witnesses testifying. There might not be, but there could be more than a hundred witnesses.

There will probably be well in excess of 500 exhibits introduced into evidence in this case. Most of the exhibits you'll be able to see on the big screen as the witnesses are talking about it which is one of the big advantages of having a high-technology courtroom like this. You get to visualize the evidence as it's admitted into evidence.

But your job will be to listen very carefully to all of the evidence. You'll have notebooks so you can take notes if you want to.

And then at the end of the first part of the trial you'll have to decide what actually happened, what the facts are, look at my jury instructions, how I define the various ten crimes, and then apply the facts to my instructions and

Page 20

determine in that way whether Angela Johnson is not guilty or guilty of one or more of the ten charges. That's at least the first phase. We're going to talk about the phases of the trial towards the end.

So the most important job you have is you're the judges of the facts. And when you judge what the facts are, you have to decide what we like to call the credibility of the witnesses. In other words, is each witness telling the entire truth, just some of the truth, or none of the truth? That's

1074

your job individually as jurors to decide, how credible are each and every witness that's called to testify.

Now, we're bringing you in today for what we call voir dire. It's a French term. It means jury selection. That's kind of how we use it. The literal translation is to speak the truth. What do we mean by that? Well, our goal for this trial is to find 18 jurors, 6 of whom will be alternates. The alternates won't actually know that you're alternates. And in order to find those 18 jurors, we're going to ask you lots of questions today, and I want to make sure you understand there are no right or wrong answers. You can't pass or fail the quiz. There are no right or wrong answers.

The lawyers are going to do the bulk of the questioning. And it's very important that in response to my questions and the lawyers' questions that you answer those questions openly and honestly. That's your duty to do that, and we expect that you will do that.

Now, the lawyers are going -- and I will be referring to you by your number. I and I alone made the decision in this case to use numbers. There's only one reason that I made the

Page 21

decision to use numbers, and that is by any objective or subjective standard, this would be considered a high-profile case. What do I mean by that? Well, there's a lot of news media attention to it. And it's a case that has drawn interest all across the state.

1075

And so I wanted to protect your identities basically from the press. I didn't want your names being put in the newspaper so that any idle curiosity seeker anywhere in Iowa or anywhere else could call you up and start asking you about your jury service or could come knocking on your door and hounding you about your jury service. It's a tough-enough task if you're selected to serve for three months without having a lot of outside forces tracking you down to quiz you about it or to give you a hard time about it.

So that's the only reason why we're using numbers in this case, and that's a decision that I made to try and protect the individual privacy of each juror.

Now, I wanted to go through the process with you just so you understand what we're doing. We anticipate that jury selection will take two to three weeks. We started last Tuesday, so we had four days of jury selection last week. We'll be going five days this week and then four days the next. And then if we need a fourth or fifth week, we will take those. Hopefully we'll have a jury selected at the end of next week, but we never really know for sure.

We're bringing in small groups of potential jurors each day. It varies. I think our low was about 8 or 9, and we're at a peak today with 14, but it varies from day to day depending on who was available.

Page 22

My task is to introduce the lawyers, and there will be

a few questions by me, and then what we're going to do is we're going to do group questioning by both sides. So you'll all remain in the courtroom, and we've been alternating. Some days -- one day we start with the government. Then the next day we start with the defense. If I have it correct, this would be a defense day to start first, so you'll be hearing from one or more of the defense lawyers, and then when they're done with group questioning, you'll be hearing from one or more of the government lawyers.

Then when we're all done with group questioning -- and I anticipate that would be some time this afternoon -- then we're going to bring you back individually to question you primarily about one area, and that is questions about pretrial publicity, how much have you read or heard about the case from other sources other than what you'll hear today and who'd you hear it from, where did you hear it, what'd you hear, that type of thing.

You will know at the end of the questioning today whether or not you're still in the jury pool or you're dismissed from jury service in this case -- in this trial. If you're dismissed, that's the end of it. If you're still in the pool, that means you do have a chance of actually winding up on the jury. And just so you know, you've got about a 50 percent chance. Technically I think we're trying to get a pool of 34 jurors, and of those 34 jurors, 18 will wind up as actual jurors

in the case. So I rounded it off to about 50 percent.

If you make it through today's questioning -- and I'm sure you're all eager to do that -- then you have about a 50 percent chance of being selected to serve as a juror in this case. And then when we get up to 34 jurors who we qualify in our jury pool, we'll let you know whether you've been selected for the jury or not selected for the jury, and then we'll start the jury trial within a couple of days of jury selection being finalized.

Once we start the trial, the trial will run four days per week. Almost always it will be Monday through Thursday. We will take the week of June 10 through 17 off. And we'll generally start the trial at 8:30 in the morning, and we'll be done usually between 4:30 and 4:45 each day. We'll take probably an hour for lunch unless we're moving slowly. We may cut that back a little bit, and we'll have usually a 20- to 25-minute break mid-morning about 10:00 and then about 2:30 to 3 in the afternoon.

Yeah. I'd like the lawyers to introduce themselves, so I'm going to start with Mr. Williams on the prosecution team. Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. Good morning, ladies and gentlemen. My name is C.J. Williams. I'm a prosecutor. I live over in Cedar Rapids, Iowa.

With me at counsel table is Tom Miller. He's from

1078

Des Moines. He's also a federal prosecutor.

MR. MILLER: Morning.

MR. WILLIAMS: And then also at counsel table is Special Agent-in-Charge Bill Basler. He's an agent from Mason City, Iowa. He's what we call a case agent, in other words, the

Page 24

lead investigator on this case. And he'll be sitting at counsel table with us throughout the trial.

Sitting back at this trial -- or table is Sali Van Weelden. She's a legal assistant in my office, and she'll be sitting with us in trial as well.

Our office is headed up by Chuck Larson Senior. He's actually in Baghdad right now. He offices over in Cedar Rapids. We have an office here in Sioux City as well, and we have seven attorneys and seven staff members. So let me run through those names in case any of you recognize them.

Forde Fairchild, Martha Fagg, Kevin Fletcher, Mike Hobart, Jack Lammers, Janet Petersen, and Shawn Wehde are all assistant United States attorneys like me.

And then we have seven staff members: Shayne Mayer, Del Tompkins, Penny Schlotman, Michelle Schwebach, Michelle Hatting, Carol McEntaffer, and Pat Calhoun.

THE COURT: Okay. Now, do any of you know Mr. Williams, Mr. Miller, Special Agent Basler, any members of the U.S. Attorney's Office, any people who work in the U.S. Attorney's Office -- and let me broaden that -- or anybody that

1079

works at the federal courthouse here? Anybody know anybody?

Okay. No hands go up.

We'll switch over to the defense. Mr. Willett?

MR. WILLETT: Thank you, Your Honor. Good morning, ladies and gentlemen. My name is Al Willett. I want to make the first introduction, that of my client, Miss Angela Johnson. Miss Angela Johnson is originally from the Mason City/Clear Lake area of Iowa. She was born in the decade of the '60s. She attended Forest City High School where her formal education

Page 25

stopped after the ninth grade, but she's obtained her GED certificate since then.

Angela has three sisters, one brother. Her parents are still living. Angela has two daughters and one granddaughter.

Now, does anybody think they recognize or know my client, Angela Johnson? I see no nods of affirmation. Please be seated.

As I stated earlier, my name is Al Willett. I practice with the group of Terpstra, Epping, and Willett in Cedar Rapids, Iowa, and I practice law with Ray Terpstra and Greg Epping.

My co-counsel who are with me is Mr. Patrick Berrigan from the Watson and Dameron law firm in Kansas City, Missouri, and associated with Mr. Berrigan is Ms. Lisa Dahl.

And then my other co-counsel is Mr. Dean Stowers from

1080

the law firm of Rosenberg, Stowers, and Morse in Des Moines, Iowa. And Dean practices law with Brent Rosenberg, David Morse, and Heather Wood.

Now, do any of you think you recognize myself or any of my co-counsel or the people associated with them? I see no nods of affirmation.

THE COURT: Okay. Thank you, Mr. Willett. Now, we're estimating that the trial will last three months. That includes jury selection. So current thinking is the trial will be done the end of June. It's always hard to estimate the length of trial, and the longer the trial it's going to be the harder it is to estimate what the exact length of it is.

And I tell you that because my next question is going

Page 26

to be about a severe or extraordinary hardship for any of you to serve, and I'm going to talk to each one of you individually about that. But I wanted to give you some background information.

I've been a United States District Court judge since the President appointed me on September 6, 1994. That was actually the date I started here in Sioux City. And I have had lots and lots and lots of trials as you might imagine. And in every single trial when I became a judge, I decided I would develop a juror questionnaire.

So at the end of every trial, whether it's a civil case, criminal case -- doesn't make any difference -- after the

1081

jury reaches a verdict, I go down to the jury room, and I hand each juror an envelope with a stamped, self-addressed envelope in it and with a jury questionnaire in it. And in that questionnaire you get to evaluate each one of the lawyers in the case. You get to evaluate me, the type of job I did as a judge. You get to evaluate our process. And we've made major changes in how we do business based on what jurors have told us in those questionnaires.

The other thing that I find really interesting in the questionnaires -- and it was really my main point -- I can pretty much tell that when folks come in for jury selection, whether it's a three-month trial like this or a three-day trial, you really don't want to be here. And I can see it in your faces.

But the interesting thing is when I read those questionnaire answers, I would say ninety-eight or nine percent of the people, well over ninety-five percent, find jury service

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 942 of 3245

to be much more interesting and much more fulfilling. And by fulfilling, people leave this court after serving as jurors knowing that they have had a unique opportunity to serve their country, and that's what jury service is.

So while most of you probably don't want to be selected, if you are selected to serve on the jury, I think you will find it to be one of the most interesting, fulfilling, and rewarding experiences that you've had in your life.

1082

And, you know, I'm lucky. At least for me I'm lucky, from my perspective. I get to serve our country every day. I mean, I'm a public servant, and every single day I get to decide issues of federal law and make rulings that affect people's lives every day. And I had a great private practice. I loved being a practicing trial lawyer. It was very exciting. I got to go all over the country and try cases. But I really love what I'm doing because I love the sense of public service.

And so if you get selected to serve as a juror, you have a unique -- particularly in a case of this magnitude, this importance, this length with so much at stake, you have a unique opportunity to serve your country.

And one of the things that I've found incredibly rewarding is that we now -- this will be our fifth day of jury selection. In most days not a single juror -- I don't care what you said in your questionnaire. I mean, that's important what you said in your questionnaire. Most jurors tried to come up with every excuse that they could think of that might help them get off jury duty, and I understand that. But most days not a single person has asked to be excused because it would be a severe or extraordinary hardship.

Page 28

I tried a lengthy couple-month case last year, and we started -- I don't even remember when we started. We started in August and went through October. And that was right in fall harvesting season. And we had a number of potential (sic)

1083

farmers in the jury pool. And I remember one specific day because we had two farmers. They farmed full time, but both of them worked full time in manufacturing jobs because it's hard to make it on the family farm anymore. And in both cases they would not get paid except for their first two weeks of jury service. After that they were on their own nickel. They wouldn't get any money from their employer. And both of those farmers said that they were willing to serve. I actually gave them every opportunity to get off because I actually thought it was too much of a hardship.

And we had another gentleman who was not going to get paid, and he talked to his wife the night before he came in to be questioned. It was kind of a small group like this. And he and his wife agreed that they would not only go into but probably deplete their life savings because he thought it was so important to serve his country as a juror in the case.

And so in about a minute I'm going to listen to any reasons or excuses that people have about why they can't serve. And I understand there are -- we had a gentleman I think our second day of jury selection last week, last Wednesday, who was -- had a pain pump, was on narcotic medication, and literally couldn't stay awake. Well, of course that would be a severe or extraordinary hardship, not so much for him but for the lawyers and the parties. I mean, it just wouldn't be fair to put somebody on the jury who couldn't stay awake for the

Page 29

evidence.  So that was somebody I dismissed.

But short of that, we haven't had a whole lot of people even asking to get off because, you know, now's the time to step up to the plate and serve your country.  That's how I view it, even if it is a hardship.  Question is is it a severe or extraordinary hardship.  We're going to take this microphone that Gary has.  We're going to start with Juror 147.  And I'm going to ask you -- and I'll make you a deal.

Is the mike on, Gary?

CSO SWANSON:  Yes, sir.

THE COURT:  Okay.  As long as you leave the mike on and as long as you hold it close and as long as you answer out loud so our court reporter can take it down -- and this goes for all of you -- no uh-huhs because it's really hard for her to take that down, but if you answer out loud, then I won't put up any karaoke music and require you to sing in front of everybody.

Juror 147, is that a deal?

PROSPECTIVE JUROR 147:  That's a deal.

THE COURT:  Okay.  Now, are you willing to serve as a juror in this case?

PROSPECTIVE JUROR 147:  Yes.

THE COURT:  Okay.

Juror 227.

PROSPECTIVE JUROR 227:  Yes.

THE COURT:  Thank you very much.

Juror 335.

PROSPECTIVE JUROR 335:  I think so.

THE COURT:  Thank you.

Juror 89.

PROSPECTIVE JUROR 89:  Yes.

THE COURT:  Thank you.

Juror 170.

PROSPECTIVE JUROR 170:  Yes.

THE COURT:  Thank you.

Juror 120.

PROSPECTIVE JUROR 120:  Yes.

THE COURT:  Thank you.

Juror 638.

PROSPECTIVE JUROR 638:  Yes.

THE COURT:  Thank you very much.

Back to 301, are you willing to serve as a juror in this case if selected?

PROSPECTIVE JUROR 301:  Yes.

THE COURT:  Thank you.

Juror 528.

PROSPECTIVE JUROR 528:  Yes.

THE COURT:  Thank you very much.

Juror 489.

PROSPECTIVE JUROR 489:  Yes.

THE COURT:  Thank you very much.

1086

Juror 657.

PROSPECTIVE JUROR 657:  Yes.

THE COURT:  Thank you so much.

Juror 637.

PROSPECTIVE JUROR 637:  Yes.

Page 31

THE COURT: Thank you.

Juror 738.

PROSPECTIVE JUROR 738: Yes.

THE COURT: Thank you.

Juror 263, the pressure's on.

PROSPECTIVE JUROR 263: Yes.

THE COURT: Thank you very much. This is absolutely -- it gives me goose bumples -- goose bumps when I hear every single person say yes, they're willing to serve. Because I'm chief judge of the district and I have a lot of administrative duties, I wind up going to a lot of meetings over the course of a year with other federal judges. There are about 600 United States District Court judges in the country. And when I tell them that I actually had a day on a 3-month trial where I brought in 14 citizens and they all said they were willing to serve, they won't believe me because in their districts in Detroit and Chicago and Boston and the big cities, they'd be lucky if three of you answered that question yes. And I just think it's so terrific about the northern half of Iowa and Iowa in general that people take their duties so seriously.

1087

So I appreciate that very much.

Now, I wanted to talk to you about this concept. I'm super big as you can tell on your duty to serve, and all of you said if selected you're willing to serve. But you also have an equal duty not to serve, and here's what I mean by that.

The lawyers primarily now are going to be asking you a lot of questions. And it's very important that you answer those questions as honestly as you can. How many of you are a little bit anxious about the type of questions they're going to ask? I

Page 32

imagine some of you are a little anxious.  Most of you have probably never been to federal court.  Most of you have probably not been to your county courts before.  So you haven't gone through jury selection.

Relax.  I guarantee you it's -- take a deep breath and relax.  It's not going to be that difficult.  They're just going to ask for your views and opinions and life experiences on things.  There are no right or wrong answers.

But why do I say you have an equal duty not to serve? Well, here's why.  Because all of you are so willing to serve which is a wonderful thing, that doesn't mean that you should tell the lawyers or me what you think we want to hear because we have no preconceived notion of how you're going to answer the questions.  And believe me, there is no right or wrong answer to any of our questions.  We will respect all of your opinions, but if some of you hold certain opinions, then perhaps you're not

1088

suited to serve as a juror in this case.  Maybe you'd be better off in a civil case, for example, or in some other type of case.

So in order for us to figure out whether you should be a juror on this case, you need to answer your questions that the lawyers ask as honestly as you can.  And when you do that, even if you're not selected today and you don't make it into the jury pool, you serve your country just as well by being honest in your answers as another juror who is also honest in his or her answers and winds up being selected to serve.

So it's just as important not to serve if for whatever reason some of your answers would indicate that you'd be a better juror in some other type of case.

Now, this is an unusual case because it's, quote, a

Page 33

death penalty case. And that's very rare. Iowa does not have the death penalty. The federal courts have the death penalty. But it's only my second death penalty case in coming up on 11 years. And the trial process is very different in a case where the potential penalty is the death penalty.

I'll tell you the biggest difference right off the bat. In all of my other cases I'm the one that determines the sentence. I determined sentences for over 200 people last year. I had 200 sentencings. In this case I will not determine what the sentence is. The jury will determine the sentence if we ever get that far. So that's a huge difference.

But let me go through the trial process. There are

1089

potentially -- it's potentially a three-phase process. The first phase -- I like to put labels on things -- is what I call the merits phase or the not-guilty/guilty phase. And that is just like any other trial. The government will present evidence. The defense may or may not present evidence. They never have an obligation to present evidence because the defendant is presumed to be innocent. And the prosecutors have the burden of proof to establish the defendant's guilt on one or more of the ten charges beyond a reasonable doubt.

And then at the end of that first phase you'll decide the question did the government prove the defendant guilty beyond a reasonable doubt thereby overcoming Miss Johnson's presumption of innocence on any one of the ten criminal charges, one or more of the ten criminal charges.

If the answer is no, the government did not prove her guilty of one or more of the ten criminal charges beyond a reasonable doubt, then the trial's over. There won't be a

Page 34

second phase or a third phase. And in that way it's very much like just a regular nondeath penalty trial.

Now, there will be a second phase only if there is a unanimous finding by all 12 jurors beyond a reasonable doubt that Angela Johnson is guilty of one or more of the ten counts in the first phase. And then we have a second phase, but only in the event the jury would find her guilty of one or more of the ten charges would we have a second phase.

1090

Now, the second phase is what I'll call the eligibility or gateway phase. And Mr. Berrigan who you're going to hear from I'm fairly confident later today asking you questions, he came up with a good analogy or metaphor for this trial. And he talked about it being a basketball game where you have a first half, a intermission, and kind of a second half. And that's a rough kind of analogy that we'll use.

The first half is just like the regular trial, the merits phase, guilty/not guilty. If you find the defendant guilty of one or more of the charges, we have a second phase, and that's a pretty short phase, so it's kind of like the intermission. And in that phase there won't be any additional evidence. There will just be written instructions from me, arguments from the lawyers, and then you'll go back to deliberate.

And you'll determine in the second phase, the eligibility or gateway phase, and that's where you'll decide if the prosecution has proved what we call a gateway or eligibility factor and one or more statutory aggravating factor or factors beyond a reasonable doubt. If the jury unanimously agrees that the prosecution has proved this, then and only then would we

Page 35

reach the third phase.

So we have the merits phase if there's a guilty verdict on one or more of the ten counts.

We have the second phase which is the eligibility or

1091

gateway phase. And what it is, it's the eligibility to decide whether or not the defendant should receive the death penalty or not. So there's that second phase.

Then in the third phase we have what's called the penalty phase. That's like the second half of the basketball game. And in that phase it's almost like a mini trial. It's like a second trial because the government will put on evidence. The defense doesn't have to put on evidence, but they can if they want to.

And I will ultimately give you instructions on what are called mitigating factors which favor the defense and aggravating factors which favor the government or the death penalty. And then I will instruct you that you're required to consider and weigh aggravating and mitigating factors that I instruct you on to determine whether Miss Johnson should receive life imprisonment or the death penalty.

And then in that third phase, the penalty phase, only if each juror unanimously votes for the death penalty will Miss Johnson be sentenced to death by me. So that's kind of a big overview of how the process will work.

Now I'm going to turn it over to Mr. Berrigan. And he will start with questions. Good morning.

MR. BERRIGAN: Thank you, Your Honor.

How's everybody doing so far? Not so painful, huh? I want to reiterate something the judge said just before the

Page 36

process was explained to you. We all come into this courtroom with different life experiences. We have different attitudes and beliefs and opinions and views about things. And we're entitled to those. That's one of the things we most treasure I think about living in this country is that we value very much the ability of people to differ with each other about issues of the day.

And we are not here, please believe me, on either side, to criticize your views or try to get you to change them. But our goal is, as the judge has pointed out, to try to find the best 12 people for this particular case which is a difficult task.

Twenty-three years ago when I was just a law student, my house was burglarized, and it had never happened to me before. And even though I wasn't home and only a few really trinkets were taken, probably kids, I gotta tell you it really bothered me, that sense of invasion of your home, people being able to come into your most private places and take your things.

And even though if I were in your shoes and somebody was being tried for a burglary case, I think I'd have to say in my heart of hearts, you know, I don't think this would be the best case for me because I don't want to relive those memories. And I just have some problems with that kind of activity. I don't want to -- I'd rather not do it because I don't think I could be the fair, impartial juror I'd want to be, the best

juror I'd want to be.

And so that's kind of what we're looking for. There

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 952 of 3245

really isn't really a test I suppose of fair and impartial, but it's an effort for us to get your opinions, and what we're going to talk about this morning really is a fairly limited area, and that's the issue of punishment.

Now, that alone, I tell you, is a strange thing. Here I am the defense lawyer representing this young woman. We are going to be fighting very hard to convince you that the government has not met its burden of proof in this case. And here I am asking you questions about punishment, and I think it would be perfectly appropriate if you thought, what the heck are you doing, Berrigan? We haven't heard the evidence, and you're asking us questions about whether we should kill your client or not.

And the problem is we don't have an opportunity to come back, you know, after you hear the evidence and say, Hey, you know, Juror 301, what do you think about punishment? We have to do it now; okay? So as much as it is the cart before the horse scenario, that's kind of how we're going to have to do it. Everybody okay with that? All right.

Let's talk a little bit about what the allegations are first. The government is alleging that Angela Johnson participated, aided and abetted or she herself committed five intentional murders, five intentional murders, and, furthermore,

1094

these murders were premeditated and took place after substantial planning and that they were committed during the course of a drug conspiracy or a continuing criminal enterprise or both; okay? Everybody understand me so far? Okay.

There are a number of people and there's a number of folks here that have indicated in their questionnaire responses,

Page 38

you know, when we're making a decision about punishment, the thing we should be looking at is the crime.

You folks remember -- I bet it's been a while since some of you filled out these questionnaires, but there was a question in there about how do you think we should punish somebody who's committed a crime?  Should it be based on the crime -- that was a box -- the person -- that was a box -- both -- that was a box -- or something all together different, and there was a box.

How many people remember checking the crime; that is, we should punish based on what was the crime committed?  How many folks feel that way?  No hands?  Okay.  Mr. 489?  Okay.  Oh, that's okay.  I'm not going to ask you questions yet about it.  Let me just identify folks first.  Thank you, sir.  And I thought I saw a couple other hands up before I noted it.  Okay.  Mr. 637.  Anybody else?  Okay.  Miss 263.  Miss 147, I sort of remember from your questionnaire that you had marked that also.  Do you remember?

PROSPECTIVE JUROR 147:  I thought I marked both.

1095

MR. BERRIGAN:  Okay.  How about you, Mr. 227?

PROSPECTIVE JUROR 227:  I can't remember.

MR. BERRIGAN:  Okay.  And Miss 335?

THE COURT:  Well, we're going to have to use the microphone if you're getting oral responses.

MR. BERRIGAN:  I guess we could just kind of hand it to 147 and go from there.  It's almost like being on the Letterman show.  Here's why I'm interested in that; okay?  Here's our situation.  I'm going to have to ask you to kind of fast forward yourselves, and I want you to imagine this

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 954 of 3245

scenario, okay, as you're sitting here, that you have been selected as a juror. That's happened. And now you've listened to the evidence.

And what do I mean by that? I mean just what the judge described, kind of the first half of the basketball game. You sat there for weeks and heard witnesses testify from this witness stand behind me. And you considered exhibits that were presented to you. You conferred with your other fellow jurors at the appropriate time. And the evidence that you have heard involves everything about the crime, what happened, how did it happen, who did it, when did it occur, why did it occur.

You've also listened to any defense evidence that might have been presented. Maybe there was some evidence of self-defense or we didn't do it, or maybe the evidence was it was an accidental death or it wasn't an intentional murder.

1096

Everybody with me?

And you've listened to all that evidence, and now you've come to a decision. And when I say you, I mean all 12 of you; okay? And here's what you've decided. You decided that beyond any reasonable doubt the accused was guilty, all right, guilty of the intentional murders of five different people.

Further, furthermore, you've made a decision during this half time, if you will, second stage in the proceedings, that not only is this intentional murder, Mr. Berrigan, but we all 12 agree these murders were committed after substantial planning and premeditation. That's what's happened.

If your view is, look, Berrigan, if that's the situation, okay, we got five intentional, premeditated, planned murders, drug conspiracy, continuing criminal enterprise, that

Page 40

is enough for me; in my mind the only punishment I could reasonably consider would be the death penalty, and we need to know that; okay?

I see Mr. 89 just nodding. I'm not going to get to you right now, sir, but I appreciate your at least acknowledging -- does everybody follow me so far? I know this can be confusing.

So let me ask it right now. Let me ask you that question; okay? Intentional, five, premeditated, substantial planning. Who here under these circumstances proved beyond a reasonable doubt is at a point where that's enough? At that

1097

point if that were proven beyond a reasonable doubt -- and I realize it's a big if -- but if that were proven to me, I'm sufficiently satisfied the only appropriate punishment I would consider under that circumstance would be the death penalty? I don't see any hands yet. Okay. Yes, sir. Mr. 637?

THE COURT: Can you pass the microphone back, please? Thank you.

MR. BERRIGAN: We'll have to help you with that because I know you don't know each other's numbers, and I'll apologize. I'm sure you were never called Number 637 before today. I hope you'll bear with us. We just -- you don't want people calling you from the paper, nonsense like that; okay? Tell me how you feel about that, Mr. 637.

PROSPECTIVE JUROR 637: All I can say is at this point, yes, that's what I would have to consider. I mean, it's early. I know, you know, very little about it, but yes, if that was the consensus of the jury, I guess that's something I would consider.

Page 41

MR. BERRIGAN: And you mentioned this in your questionnaire when you were asked about the death penalty. It's clear from the responses that I saw that you're a very religious man. I see you attend church twice every week. You're involved in a Bible study program, and you noted in the questionnaire regarding your views about the death penalty that you believe in an eye for an eye, tooth for a tooth. That's what the Bible

1098

teaches. Am I reflecting that accurately?

PROSPECTIVE JUROR 637: That is accurate.

MR. BERRIGAN: Is that how you feel?

PROSPECTIVE JUROR 637: Yes, I do.

MR. BERRIGAN: And you're not a 21-year-old. Neither am I. But I mention that only because it's something -- it sounds to me like you've considered, that is, it's not an off-the-cuff response that you're giving me, that this is an issue that for you -- based on your religious beliefs and training is an issue you hold dearly and firmly. Is that fair?

PROSPECTIVE JUROR 637: I think so.

MR. BERRIGAN: Okay. If your belief is such as you've stated, an eye for an eye, tooth for a tooth -- and that is the Bible view -- does that meet your standard of an eye for an eye, tooth for a tooth or, more appropriately, a life for a life?

PROSPECTIVE JUROR 637: I'm not sure. I'm not sure.

MR. BERRIGAN: Okay. Let me see if anybody else is with you on that so far, not necessarily based on a religious view but maybe just based on your own view. Does anybody feel, hey, Mr. Berrigan, that's enough? Ma'am, Number 263, is that right?

PROSPECTIVE JUROR 263: Correct.

Page 42

MR. BERRIGAN: Tell me how you feel about that, ma'am.

PROSPECTIVE JUROR 263: An eye for an eye.

MR. BERRIGAN: Okay. And is that a religious position

for you?

PROSPECTIVE JUROR 263: Yes.

MR. BERRIGAN: Okay. I don't want to be unfair to Number 637, but you appear a little younger than he does. Is this a belief that you've had for any considerable period of time?

PROSPECTIVE JUROR 263: Probably for about five years.

MR. BERRIGAN: I gotta tell you I've been doing this for a little while, but I'm just as nervous as you are, and one of the things that happens to me is my mouth feels like cotton literally, so if you'll forgive me.

So let me ask you the same thing I asked Gentleman 637. If that's your view and you hold it firmly -- do you hold it firmly?

PROSPECTIVE JUROR 263: Yes.

MR. BERRIGAN: Then if we have the situation, intentional, premeditated, planned murders, not one, five, does that meet your standard of an eye for an eye, tooth for a tooth?

MR. WILLIAMS: Objection, Your Honor.

THE COURT: Overruled.

PROSPECTIVE JUROR 263: May I answer?

MR. BERRIGAN: Yes.

THE COURT: You may.

PROSPECTIVE JUROR 263: Yes.

MR. BERRIGAN: Okay. Is there anybody else that feels

that way?  And again, we just need to know it.  I hope you're going to listen to these questions in this spirit, that if you were ever in the position -- and I'm sure none of you ever will be -- where you're being charged with a serious crime and your lawyer was trying to ask questions for you to find the people that were going to sit on your jury, how candid, open, and honest would you want those people to be; okay?  That's kind of where we are here; all right?  Nobody else?

Yes, sir, Mr. 120.  Tell me how you feel, sir.

PROSPECTIVE JUROR 120:  Well, I feel if it's premeditated and anything that I would have no problem with a death sentence.

MR. BERRIGAN:  I think -- and I don't want to put words in these people's mouths, but they've talked about this in terms of an eye for an eye.  Did you hear that discussion?

PROSPECTIVE JUROR 120:  Right.

MR. BERRIGAN:  Is that where you are, or is it something different?

PROSPECTIVE JUROR 120:  That's about the way I feel.

MR. BERRIGAN:  And the same questions I asked them.  Is it a firm opinion that you have?

PROSPECTIVE JUROR 120:  Yes.

MR. BERRIGAN:  Is it an "I'm not going to be able to talk you out of it" kind of a thing?

PROSPECTIVE JUROR 120:  No.

1101

MR. BERRIGAN:  All right.  So the same question for you, Mr. 120, if we had this -- and I know that's a big if.  But

Page 44

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 959 of 3245

I'm asking you to fast forward, right, and you've listened to everything about the crime. People tell me all the time, Mr. Berrigan, I want to hear all the evidence, I want to hear all the evidence. Okay. We've done that; okay? We heard the who, what, when, where, why of the crime. We heard all the defenses, and we rejected them, not 1 but all 12 beyond a reasonable doubt the government proved intentional, planned, and premeditated. Does that meet your standard?

PROSPECTIVE JUROR 120:  Yes.

MR. WILLIAMS:  Objection, Your Honor, stakeout question.

MR. BERRIGAN:  I'm asking whether it meets his eye-for-an-eye standard, Your Honor.

THE COURT:  Overruled.

PROSPECTIVE JUROR 120:  Yes.

MR. BERRIGAN:  Anybody else?  I want to throw in one additional factor, and it's a big one.  The government is alleging that of these five victims one was a mother and that two were her two daughters.  They were ten.  Kandi Duncan was ten years old, Amber Duncan six years old.  We would all agree those are innocent victims, wouldn't we?  The law classifies them as vulnerable, particularly vulnerable victims.  Let's add that to the mix.

1102

THE COURT:  Just a second.  The law doesn't classify them that way.  That's a finding --

MR. BERRIGAN:  That's a jury, you're right --

THE COURT:  Jury may or may not make --

MR. BERRIGAN:  I'm sorry, Your Honor.  That is something the law gives you an opportunity to make a decision.

Page 45

That is, the law says that people who are particularly young, old, or infirm may be what the law says are vulnerable victims; okay? And you'll have to determine whether six and ten are vulnerable victims. But let's say that the government proved that to you. In this middle stage, the halftime, if you will, that was proved, again, all 12 beyond a reasonable doubt; all right?

So now we have that on top of the intentional and premeditated. Does that change -- the folks that haven't answered so far, does that now -- is there anybody in the camp of, hey, that's it; now we're talking about kids? We've had people tell us that. You were okay till you got to the kids. And if this involves the intentional, premeditated, planned murders of kids, then that is not a situation where I would be able to consider a punishment other than death is appropriate. That's a perfectly legitimate feeling if you have it. We just need to know about it. Mr. 301.

THE COURT: Pass the microphone back to the corner, please.

1103

MR. BERRIGAN: Okay. Sir, how do you feel about that?

PROSPECTIVE JUROR 301: I guess kids bring out a bit of a special aspect to it to me, show special callousness I guess.

MR. BERRIGAN: You have a couple of children.

PROSPECTIVE JUROR 301: Yes.

MR. BERRIGAN: And I see by your questionnaire that you're expecting a third. Congratulations.

PROSPECTIVE JUROR 301: Thanks.

MR. BERRIGAN: And you told us in your questionnaire

Page 46

where you were asked about the effect the killing of kids might have or children -- it says children -- Speaking as a father this is one of the particularly abhorrent crimes imaginable. Does that ring a bell?

PROSPECTIVE JUROR 301: Yeah.

MR. BERRIGAN: Okay. So, Mr. 301, is that a situation, intentional, five, premeditated, planned killing of kids, would you be able to consider punishment other than the death penalty if that were proven beyond a reasonable doubt?

PROSPECTIVE JUROR 301: If it was beyond a reasonable doubt?

MR. BERRIGAN: Yes, sir.

PROSPECTIVE JUROR 301: I would probably choose the death penalty.

MR. BERRIGAN: Okay. Do you have some uncertainty in

1104

your own mind when you say probably? I'm curious about that.

PROSPECTIVE JUROR 301: Well, it's hard to say when we don't know anything about the case really yet so --

MR. BERRIGAN: Yeah, you're right.

PROSPECTIVE JUROR 301: There's a bit of uncertainty in there, I guess.

MR. BERRIGAN: We have to ask you these questions, as I pointed out, before you heard everything, and I appreciate the fact that that's difficult. I really do. We just can't come back later and ask it; okay? It's just the process of this questioning is at the beginning of the trial; okay? So given that you haven't heard the evidence and I understand that, I've asked you to kind of fast forward yourself to imagine that you have and that you've made these findings as a juror; okay? Five

Page 47

intentional murders, premeditated, planned, children. You with me?

PROSPECTIVE JUROR 301: Yep.

MR. BERRIGAN: Okay. Under that -- those circumstances if you found, a big if, but if you found beyond a reasonable doubt that those things existed, had been proven to you, would you be able to consider a punishment other than the death penalty as appropriate?

PROSPECTIVE JUROR 301: I guess I would say I would not at that point.

MR. BERRIGAN: I thought I saw some other hands on

1105

that issue with children. Mr. 89, you're sort of -- it's not an auction, but I saw your hand starting to go. Are you up or down on this?

PROSPECTIVE JUROR 89: I'd say I'd have to prefer the death penalty.

MR. BERRIGAN: Okay. That's an interesting term that you used, prefer. Under those circumstances, would you realistically be able to consider a sentence of life imprisonment without parole?

PROSPECTIVE JUROR 89: No.

MR. BERRIGAN: Anybody else on the children? Nobody? Mr. 738 -- actually could you do me a favor and pass that back to 89, sir? I just wanted to point this out, sir, because I saw it in your questionnaire and I forgot to ask you about it. But you told us this in the questionnaire. There's a question near the end, number 99, that asks you to identify if there's anything about the case that might hinder your ability to be fair and impartial, and you said yes. Don't like baby killers.

Page 48

And, you know, you're cringing. You shouldn't be; all right? You know, one of the reasons we give these questionnaires is so people can be sitting down at their kitchen table and they're not in front of a judge and a bunch of lawyers and they're asked questions and they don't have to think about, hey, you know, well, I wonder how this sounds. That's okay. There's a lot of people that say exactly that same thing, believe me; all right?

1106

But is that how you feel?

PROSPECTIVE JUROR 89: Yes. I'm a grandparent, and my daughter does day care, and I like kids. I'm sorry.

MR. BERRIGAN: Okay. All right. Go ahead and give it back to 738. Thank you, sir.

Mr. 738, how do you feel about this issue, sir?

PROSPECTIVE JUROR 738: Well, I'm not really dependent on the death penalty in this case, but I guess by the evidence is what I'd go for. I do have four kids, and I like my kids.

MR. BERRIGAN: I hope so. You know, you mentioned in your questionnaire that your views about the death penalty depended upon the severity of the crime. Does that sound about right?

PROSPECTIVE JUROR 738: Right.

MR. BERRIGAN: And you were asked why you had those views, and you said, Just examples, cold-blooded killer should probably get death penalty; somebody protecting somebody on their property, a prison sentence. Does that sound right?

PROSPECTIVE JUROR 738: Right.

MR. BERRIGAN: Okay. I just want to be clear what we're talking about here is no -- there's no allegation, you know, Miss Johnson's protecting somebody on her property. You

Page 49

understand.

PROSPECTIVE JUROR 738: Uh-huh, yes, sir.

MR. BERRIGAN: Okay. And I don't know whether this is

1107

a crime in your view that would be in the cold-blooded killer category, but I am interested in that, that is, whether you think that it is, and, if so, how does that affect your view of punishment?

PROSPECTIVE JUROR 738: I don't know much about the case, but I wouldn't consider it cold-blooded killer in this case.

MR. BERRIGAN: Would or would not?

PROSPECTIVE JUROR 738: I would not.

MR. BERRIGAN: Would not, okay. You're not there that this is a cold-blooded killing.

PROSPECTIVE JUROR 738: I don't really know. I just don't know if she's -- if the person guilty here is -- like I say, if it was premeditated or what. I don't know -- cold-blooded killer is the severity of the case, what I consider.

MR. BERRIGAN: Okay. And were you with me on this explanation in terms of fast forwarding?

PROSPECTIVE JUROR 738: Yes, sir.

MR. BERRIGAN: Okay. So you understand that at the time a jury would be making that decision, getting into the third phase of the case, the penalty phase --

PROSPECTIVE JUROR 738: Right.

MR. BERRIGAN: These things are decided; okay?

PROSPECTIVE JUROR 738: Yes.

1108

Page 50

MR. BERRIGAN: Okay. All right. And you're still out on whether that's cold blooded.

PROSPECTIVE JUROR 738: Depends upon the evidence I guess.

MR. BERRIGAN: Okay. All right. Fair enough. At least at this point --

PROSPECTIVE JUROR 738: Right.

MR. BERRIGAN: -- you're uncertain.

PROSPECTIVE JUROR 738: Right.

MR. BERRIGAN: Who else on children? 657?

PROSPECTIVE JUROR 657: Well, these are innocent children, and I -- I have a lot of ambivalent feelings about this happening.

MR. BERRIGAN: Sure. Well, we probably all agree that children have a special place in our hearts and they deserve our protection, not situations such as this. Would you agree with me, ma'am?

PROSPECTIVE JUROR 657: Uh-huh.

MR. BERRIGAN: Okay. Does children, the killing of children, kind of put it over the top for you that if that were proven -- and that's a big if -- if that were proven of these five, premeditated, planned, intentional killings of children, would you be able to consider punishment of life in prison without parole?

PROSPECTIVE JUROR 657: I don't know.

1109

MR. BERRIGAN: Okay. You've got some uncertainty.

PROSPECTIVE JUROR 657: Yes.

MR. BERRIGAN: I appreciate your honesty there. Let

Page 51

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 966 of 3245

me -- would you pass the microphone down to 528?  How are you, ma'am?

PROSPECTIVE JUROR 528:  Fine.

MR. BERRIGAN:  I wanted to ask you this issue specifically because of your questionnaire responses; okay?  And I don't know.  Do you remember how long ago it was that you filled those out?

PROSPECTIVE JUROR 528:  Long time ago.

MR. BERRIGAN:  Okay.  But I imagine, you know, my experience, this is kind of unusual.  When people get these questionnaires in the mail, this isn't your typical little one-page deal that you fill out to go to serve in the county courthouse on a car accident case.  It's an 18-page questionnaire.  There's over a hundred questions on there, and the judge provided instructions about your obligation to take this very seriously, answer the questions fully and truthfully; right?  And I think most people do that.  Did you?

PROSPECTIVE JUROR 528:  Yes.

MR. BERRIGAN:  Okay.  And so let me ask you about this response that you have regarding the death penalty.  You were asked your views about the death penalty.  You said, Sentence of death would fit the punishment for multiple murders, for

1110

premeditated murder.

PROSPECTIVE JUROR 528:  But I also thought they put in with the use of a firearm and if it was a drug offense.

MR. BERRIGAN:  Okay.  And I think I -- I hope I have mentioned that the government's certainly alleging that these offenses were committed during the course of a drug offense.

PROSPECTIVE JUROR 528:  Uh-huh.

Page 52

MR. BERRIGAN: And/or a continuing criminal enterprise; okay?

PROSPECTIVE JUROR 528: Uh-huh.

MR. BERRIGAN: And certainly the -- there might be evidence that people were murdered with a gun. I don't know if that's significant to you or not.

PROSPECTIVE JUROR 528: It is for me.

MR. BERRIGAN: Okay. So what does that mean if those elements were found to exist in terms of your views about the death penalty?

PROSPECTIVE JUROR 528: Again, it depends on the evidence presented. But if it was proven beyond a doubt, I probably would vote death penalty.

MR. BERRIGAN: This -- I do want to mention this because this comes up a lot. This proven beyond a doubt, you know, the law is very specific about this, and the law says the government's obligation throughout this case, whatever they have to prove they have to prove beyond a reasonable doubt; okay?

1111

Now, what beyond a reasonable doubt is is largely determined by the juror. But it's the same standard, frankly, that if you got a parking ticket you wanted to contest or a speeding ticket and you went down to municipal court, said, I'm not guilty; they'd have to prove you guilty beyond a reasonable doubt, no more, not beyond all doubt, not beyond a doubt, beyond a reasonable doubt.

And I don't want to for a second try to equate a parking ticket with the charges we're talking about, but in terms of the government's responsibility, that's what it always is; okay?

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 968 of 3245

So I only mention that because when you say beyond a doubt, I sort of assume you're talking about beyond a reasonable doubt, but I sometimes shouldn't assume that because sometimes people say, No, that's not what I meant, Mr. Berrigan; I meant beyond all doubt, you know, 100 percent. They'd have to prove something 100 percent for me, not beyond a reasonable doubt; okay?

PROSPECTIVE JUROR 528: Uh-huh.

MR. BERRIGAN: So having that further explanation, when you say if it were proven beyond a doubt, is reasonable doubt enough for you?

PROSPECTIVE JUROR 528: Yes.

MR. BERRIGAN: Okay. So if you could go back to my little scenario for a second, intentional, five murders,

1112

premeditated, substantially planned, children, in light of your questionnaire response, sentence of death would fit the punishment for multiple murders or premeditated murder -- and that doesn't even address kids -- would you be able to consider a sentence other than death as appropriate in that circumstance if proven beyond a reasonable doubt?

PROSPECTIVE JUROR 528: I don't know.

MR. BERRIGAN: You're uncertain.

PROSPECTIVE JUROR 528: I'm uncertain.

MR. BERRIGAN: Okay. Well, appreciate your honesty on that, ma'am. Let me see if this makes any difference to you. I want to go back to a couple of questionnaire responses that you gave in addition to that one.

You said that you have personally witnessed the extreme hurt and sorrow of family members of a murder victim; is

Page 54

that right?

PROSPECTIVE JUROR 528: Yes.

MR. BERRIGAN: Is that somebody close to you?

PROSPECTIVE JUROR 528: My husband's uncle.

MR. BERRIGAN: And you saw --

PROSPECTIVE JUROR 528: Or my mother-in-law I should say, how it affected her.

MR. BERRIGAN: You saw the effect of that.

PROSPECTIVE JUROR 528: Yes.

MR. BERRIGAN: And, in fact, you know, we expect that

1113

there will be testimony -- these victims' family members can and undoubtedly will come in and talk about how the deaths of their loved ones have affected them. Would you expect that to be rather emotional testimony?

PROSPECTIVE JUROR 528: Oh, sure.

MR. BERRIGAN: Particularly regarding the deaths of children.

PROSPECTIVE JUROR 528: Uh-huh.

MR. BERRIGAN: And you mentioned when you were asked a question about whether you could consider life without possibility of parole as a punishment for intentional premeditated murder -- this was question 84. You said, No, the person who is spending time in prison is still allowed communication, visits, et cetera, from family. What does the victim get or the family of the victim?

PROSPECTIVE JUROR 528: Uh-huh.

MR. BERRIGAN: Is that how you feel?

PROSPECTIVE JUROR 528: Yes.

MR. BERRIGAN: Okay. Now, if that's true, if you

Page 55

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 970 of 3245

would not be able to consider life without parole for intentional, premeditated murder, would you be able to consider it if we added in children?

PROSPECTIVE JUROR 528:  Probably.

MR. BERRIGAN:  Probably what?

PROSPECTIVE JUROR 528:  Probably the death penalty.

1114

MR. BERRIGAN:  Okay.  When you say probably, I have to pin you down just a little if I can, and maybe not.  Maybe your position is that's where I am.  But realistically in that situation would you be able to consider a sentence of life imprisonment without possibility of parole as an appropriate punishment?

PROSPECTIVE JUROR 528:  I don't know right now.

MR. BERRIGAN:  You have some doubt about that?

PROSPECTIVE JUROR 528:  Uh-huh.

MR. BERRIGAN:  If I could use a football -- are you a football fan?

PROSPECTIVE JUROR 528:  No.

MR. BERRIGAN:  Okay.  Doesn't always work sometimes when people aren't football fans.  But you know what a football field looks like?

PROSPECTIVE JUROR 528:  Yes.

MR. BERRIGAN:  Let's imagine that the 50-yard line is a position that a person would take who's like right in the middle of these two options, life in prison without possibility of parole and the death penalty; okay?  And the death penalty is on one end zone over here, and life in prison without possibility of parole's the opposite end zone down the other side of the field; okay?  If you have five intentional murders

Page 56

and I were to say to you, Ma'am, if it were proven, if beyond a reasonable doubt five intentional murders in a drug conspiracy

1115

or continuing criminal enterprise, and I said, Where would you be on the field, where would you be on the football field regarding punishment in terms of your view of appropriate punishment at that time, where would you place yourself?

PROSPECTIVE JUROR 528: I'm not following. You're wanting me to move off the 50-yard line?

MR. BERRIGAN: Well, I don't want you to do anything that you don't want to do. But I sort of gleaned from your answer that you said, Hey, listen, Berrigan, I would not consider life without parole -- this was question 84 -- I would not consider life without parole as a sentence in a case of intentional, premeditated murder.

PROSPECTIVE JUROR 528: I would probably lean more toward the death penalty.

MR. BERRIGAN: Okay. And that's kind of what I'm asking you. If you can tell me, can you place yourself on the field in terms of a particular yard line?

PROSPECTIVE JUROR 528: More for -- more toward the death penalty.

MR. BERRIGAN: And how far down the field are you?

PROSPECTIVE JUROR 528: I don't know.

MR. BERRIGAN: You don't know, okay.

THE COURT: Mr. Berrigan, could I jump in here for a second?

MR. BERRIGAN: Yes, sir. I'm obviously not doing a --

1116

Page 57

THE COURT: No, no, no, no, you're doing a fine job. I just thought it might be helpful -- of course, I've had the opportunity to hear this before so -- in other days, and you correct me if I'm wrong. But I think this might be helpful. Somebody on the 50-yard line -- and I'm not trying to put words in your mouth either, but as I understand it, somebody on the 50-yard line would be somebody who's equally open to both possibilities. One would be the death penalty. One would be life imprisonment based on what you know so far. So if you're on the 50-yard line, you're just right down the middle. You're equally open to both a life sentence or a death sentence. Is that a fair characterization --

MR. BERRIGAN: Exactly.

THE COURT: -- of the football analogy?

MR. BERRIGAN: Yes, sir.

THE COURT: I just thought that might be helpful. Now, everybody's gotta decide for themselves, if Mr. Berrigan chooses to ask this question of others, where you are, but I think it would be helpful to understand that somebody who is just equally open to both, doesn't lean one way or the other -- it's okay to lean, and it's okay to say, I absolutely believe in the death penalty; I would never impose the death penalty. Every belief is okay. But for purposes of example, somebody who is equally open to both is on the 50-yard line.

MR. BERRIGAN: Thank you.

1117

Does that help you, Miss 528, in terms of placing yourself on a yard line?

PROSPECTIVE JUROR 528: I guess I'm open, but -- it's

Page 58

like we haven't been -- you're saying to place ourselves beyond, fast forward. Well, it's hard to necessarily be in that place, so I guess I'm still on the 50-yard line.

MR. BERRIGAN: Okay. You're really having a hard time with this fast forward concept, aren't you?

PROSPECTIVE JUROR 528: Uh-huh.

THE COURT: Can I just jump in on that? And I just want to emphasize what Mr. Berrigan said. It is kind of hard to fast forward, and we always have to remember that Angela Johnson is absolutely not guilty. She's entitled to the presumption of innocence. And we're talking about a hypothetical situation that may never happen in this case. But as Mr. Berrigan pointed out -- and the government lawyers will point it out too -- we don't have another chance to ask you these questions. We can't go through the trial and then if Miss Johnson was found guilty of one or more of the ten charges stop the trial, start jury selection all over again and say, Hey, you know, now that she's been convicted and the death penalty is potentially on the table, now how do you feel about it? It just doesn't work that way.

And so the system puts the lawyers in the position of having to fast forward and ask you about things, and it's hard

1118

because you haven't heard all of the evidence yet. But for some people, some people feel so strongly about the death penalty either way in favor of or opposed to it, that they wouldn't have to hear any evidence. The evidence would never make any difference. So that's one of the things we're obviously looking for.

MR. BERRIGAN: I wonder if you could pass the mike to

Page 59

the gentleman in the corner, 638.

How are you today, sir?

PROSPECTIVE JUROR 638:  Good.

MR. BERRIGAN:  You following us so far?

PROSPECTIVE JUROR 638:  Yeah, I'm following you.

MR. BERRIGAN:  You know, we -- this is a difficult concept, legal concept, for lawyers.  It really is.  And some judges, not this one, but it's something we debate amongst ourselves, so we know this is hard.  We really do.  We just ask people to do the best they can; okay?

PROSPECTIVE JUROR 638:  Okay.

MR. BERRIGAN:  I noted in your questionnaire when you were asked about your views about the death penalty, you said, They should be put to death for the killing of another person or sent to prison without parole and let them suffer for what they did.  Is that right?

PROSPECTIVE JUROR 638:  I believe that.

MR. BERRIGAN:  Okay.  And you were asked a similar

1119

question on life without parole as a punishment, you know, what are your views about it, and you said, Hope they get what is coming to them in prison for killing someone needlessly.  And you're asked why do you feel that way.  When another human being kills another over drugs or money, et cetera, they should not be allowed out to walk on the streets.  Does that sound right?

PROSPECTIVE JUROR 638:  I believe that.

MR. BERRIGAN:  The other thing I noted is that you were a person who at least in the questionnaire said, Mr. Berrigan, we punish the crime.  That is, of the options available, punish -- if somebody commits a crime, what are we

Page 60

looking at in terms of how to punish them? It's the crime we should be looking at.

PROSPECTIVE JUROR 638: Right.

MR. BERRIGAN: You said, If someone murders or injures some other human being, he or she should be punished to the max, but someone who does something minor should get a lighter sentence. But what we're looking at is the crime. Is that how you feel?

PROSPECTIVE JUROR 638: Correct.

MR. BERRIGAN: So let me ask you about this issue that we've been discussing, okay, when we're talking about the crime. We're talking about some pretty serious stuff.

PROSPECTIVE JUROR 638: Yeah.

MR. BERRIGAN: We got the intentional murders. We've

1120

got the premeditated, substantial planning. We've got the children; okay? And what I'm interested in knowing given your views about let's punish somebody for the crime, do you have any views about your thoughts regarding the appropriate punishments that you'd be able to consider?

In other words -- if I could fix that confusing sentence, the question I just asked you -- is this a case where you have all three now; right? We're doing the fast forward; okay? Would you realistically be able to consider the death penalty in that kind of a case?

PROSPECTIVE JUROR 638: I thought I could, but I don't know. I mean, I'm kind of undecided. I thought I did. Let's put it that way.

MR. BERRIGAN: Let me ask you the flip side of the coin. Would you realistically be able to consider a sentence of

Page 61

life imprisonment without possibility of parole?

PROSPECTIVE JUROR 638:  Considering the crime, yes.

MR. BERRIGAN:  Yeah.  Even on this kind of a crime.

PROSPECTIVE JUROR 638:  Yes.

MR. BERRIGAN:  When we say life without parole, in the federal system, that means life without parole; okay?

PROSPECTIVE JUROR 638:  Right.

MR. BERRIGAN:  You don't get out.

PROSPECTIVE JUROR 638:  Right.

MR. BERRIGAN:  Now, I know some people here on their

1121

questionnaires had some confusion about that because, frankly, the law's different in different states.  Some states you get life, you're eligible for parole after a certain period of time.  Not here; okay?  Can we all be crystal clear about that?  That's what happens; okay?  So what's the concern in your mind about the death penalty as a possible punishment in terms of your ability to consider?

PROSPECTIVE JUROR 638:  Well, I don't know how I'm really feeling here.  I don't know -- with children being involved in this is my biggest issue.

MR. BERRIGAN:  Yeah.

PROSPECTIVE JUROR 638:  Bad enough another human being was murdered.

MR. BERRIGAN:  Right.

PROSPECTIVE JUROR 638:  But when it comes to children, I guess we're all that way.

MR. BERRIGAN:  That's what I heard from the questionnaire.  I heard kind of almost the opposite of what you said now.  Maybe I'm just not understanding you because in the

Page 62

questionnaire, you pointed this out. This might be an area that would be difficult for you to be an impartial juror. You said, Yes, it might be hard for me to be impartial. The death of children is bad enough about grown people, but killing children is unforgivable in my opinion.

PROSPECTIVE JUROR 638: I believe that. I'm sorry. I

1122

do.

MR. BERRIGAN: There's no reason to apologize, none whatsoever. And then you were asked a question about considering certain factors in the sentencing decision. And one of the factors was murder of children, and you wrote in there, Death penalty, hang 'em; right?

PROSPECTIVE JUROR 638: That's the way I was feeling at the time.

MR. BERRIGAN: Well, yeah, and, I mean, I presume you were honest and gave us your true views about these issues at the time.

PROSPECTIVE JUROR 638: Correct.

MR. BERRIGAN: Has anything happened in the last few weeks to change your opinion?

PROSPECTIVE JUROR 638: No, not really.

MR. BERRIGAN: Okay. So is that an accurate reflection of how you feel, that, look, Berrigan, for me --

PROSPECTIVE JUROR 638: I believe if children is involved, anybody that's murdered, they should take what's coming to them, period.

MR. BERRIGAN: Okay.

PROSPECTIVE JUROR 638: If it was me, same way.

MR. BERRIGAN: And if -- take what's coming to them is

Page 63

what I'm interested in.

PROSPECTIVE JUROR 638:  Yeah.

1123

MR. BERRIGAN:  I mean, hang 'em doesn't sound like life in prison without parole to me; okay?  And this idea too that it's unforgivable to kill children --

PROSPECTIVE JUROR 638:  Well, I believe that.

MR. BERRIGAN:  Okay.  So let me ask you this question given your beliefs.  I mean, if you were convinced of that, it was proven beyond a reasonable doubt, we got all this stuff and children, intentionally killed children, are your views as such that you could realistically consider a sentence of life without parole as appropriate?

PROSPECTIVE JUROR 638:  Yes.

MR. BERRIGAN:  You could.

PROSPECTIVE JUROR 638:  Uh-huh.

MR. BERRIGAN:  Despite this hang 'em.

PROSPECTIVE JUROR 638:  Right.

MR. BERRIGAN:  Tell me then how that would work.

PROSPECTIVE JUROR 638:  You know how people are.  You say things when you're upset and you hear things.  I guess when I wrote that, I guess I -- I've not heard the evidence.  I don't know nothing about the case other than what little bit I've heard on TV.

MR. BERRIGAN:  Right.

PROSPECTIVE JUROR 638:  And in the papers.

MR. BERRIGAN:  Well, I guess I should ask you a little bit about that, not to get off topic too much, but you did

1124

Page 64

indicate in your questionnaire that you're one of the folks that does have an opinion about Miss Johnson's guilt.

THE COURT: Aren't we going --

MR. BERRIGAN: You want to wait on that, sir?

THE COURT: I'm going to ask that you wait for individual questioning.

MR. BERRIGAN: We can do it later. I thought we might save time. Sure. Okay. We'll cover that later on. So you feel differently today than you did when you filled out the questionnaire.

PROSPECTIVE JUROR 638: Oh, I guess you have more time to think about it. I'd like to hear the evidence. If that's the case, I might feel different than I would have at that time.

MR. BERRIGAN: Okay. Fair enough. I appreciate that, sir. Okay. All right. Thank you very much. I appreciate that.

Let me -- let's see. I've talked to you, Mr. 120, but I don't think I've talked to you, Mr. 170. And if I did, I didn't jot it down. So let me ask you about your views about this issue; okay?

PROSPECTIVE JUROR 170: Okay.

MR. BERRIGAN: We have this situation. We're asking jurors to kind of fast forward themselves and imagine that they have heard all the evidence; okay? Mr. 638 said he'd want to hear all the evidence. I'm asking you to imagine you have. And

1125

that includes all the evidence about the crime that the government chose to present, the who, what, where, how, when, okay, and you also considered any defenses that might have been proffered, if any, you know, did the defendant have a defense,

Page 65

and you considered that too.

And you made this determination, guilty, all 12, we agree beyond a reasonable doubt. You got the intentional murders. Not only that, you found premeditation, substantial planning, and now children; all right? In that scenario, would you be able to consider as an appropriate sentence a sentence of life imprisonment without possibility of parole?

PROSPECTIVE JUROR 170: Yes.

MR. BERRIGAN: And would you be able to consider a sentence of the death penalty?

PROSPECTIVE JUROR 170: Yes, both.

MR. BERRIGAN: Okay. And you're telling me that even in that circumstance, even in this -- we've got the children, do you think you could consider life without parole as an appropriate sentence?

PROSPECTIVE JUROR 170: (Nodded head.)

MR. BERRIGAN: Okay. You're nodding but --

PROSPECTIVE JUROR 170: Yes, yes, yes. Sorry.

MR. BERRIGAN: The reason I'm asking you that is that there was a little section, a section that asks you to consider certain factors in assessing the punishment. You might remember

1126

it. There's a question what if the accused was pregnant at the time of the murders, what if she was on drugs, what if she was abused. There's a question about the murder, what if the murders were of children. And in that response, you wrote, Definitely death if sane, sick. And I took that to mean if the person was sane, they're sick.

PROSPECTIVE JUROR 170: Yes.

MR. BERRIGAN: But the definitely death, you know,

Page 66

causes me to wonder at least if that was your position when you filled out the questionnaire. Is that you position now?

PROSPECTIVE JUROR 170: Well, yes in a way, and sometimes I got -- I think now that possibly it would be more punishment being alive and having to live with the guilt and get a chance for remorse. Like I said, I filled it out, and sometimes I thought about stuff, and I couldn't answer it the right way, and I thought about changing, so I just left everything the way I had it.

MR. BERRIGAN: Okay. So one of the things that you're thinking about is what would it be like to spend the rest of your life in prison.

PROSPECTIVE JUROR 170: Right.

MR. BERRIGAN: And what you'd be thinking about every day when that took place.

PROSPECTIVE JUROR 170: Right.

MR. BERRIGAN: Okay. So this response here, If kids,

1127

definitely death, should I be worried about that?

PROSPECTIVE JUROR 170: I'm not sure how to -- about that. Like I said, if it was completely sane and not being forced or whatever, like I said, without hearing all the facts you don't know if somebody is mentally being forced or what their involvement with it is, if they actually just knew about it or if they actually did, you know, the actual murders or just knew about it. You know, makes a difference there to me that way.

MR. BERRIGAN: Sure.

PROSPECTIVE JUROR 170: I mean, if they actually went and cold bloodedly did it, yes. But if they just knew about it,

Page 67

were -- I guess I don't know quite how to explain all that.

MR. BERRIGAN: No, I think that's clear. I might not have been clear earlier. The government's alleging more than Angela Johnson merely aided and abetted. That's one of their theories. But they're also contending she intentionally committed these murders. That's what they're saying. That's not just knew about it; okay? So that causes me to ask you to revisit this issue.

PROSPECTIVE JUROR 170: Right, right.

MR. BERRIGAN: And if -- there's nothing wrong with this position. I know I've said that before, but there really isn't. There are people that just feel that that's too much; okay? You got kids. I can't consider a life sentence under

1128

those circumstances. I couldn't do it. And if that's your position, that's fine with us. It really is. We just need to know.

PROSPECTIVE JUROR 170: Just I feel that I'm not the one that, you know, judge life or death that way, you know --

MR. BERRIGAN: Well, the 12 jurors selected --

PROSPECTIVE JUROR 170: -- which is the worst punishment.

MR. BERRIGAN: -- will have to do that. Could you do that?

PROSPECTIVE JUROR 170: Yes.

MR. BERRIGAN: If you were in that position and you found these things now, you know, again, committed intentional murder, premeditated, planning, kids, would you be able to realistically consider a life sentence as an appropriate punishment?

Page 68

PROSPECTIVE JUROR 170: Yes.

MR. BERRIGAN: Okay. You sure?

PROSPECTIVE JUROR 170: Yes, I'm positive, positive.

MR. BERRIGAN: And you're telling me, Berrigan, don't worry about that definitely kids.

PROSPECTIVE JUROR 170: No. Like I said, you know, I don't know what -- I got thinking later what's actually the worst punishment, you know, because death penalty, they're gone. But then I'm not a family of the people that were killed either.

1129

MR. BERRIGAN: Right. And, you know, the jurors, they're going to listen to that evidence, but they're going to be asked to evaluate it just like every other evidence. We would expect people who've lost loved ones to have very emotional compelling responses to that, wouldn't we?

PROSPECTIVE JUROR 170: Yes.

MR. BERRIGAN: But they're not jurors, and you're not them; okay?

PROSPECTIVE JUROR 170: (Nodded head.)

THE COURT: Mr. Berrigan, could we take a break now?

MR. BERRIGAN: Oh, sure. Certainly, sir.

THE COURT: Great. Members -- potential members of the jury, it is about 5 after 10. We're going to use this clock. We'll be in recess until 10:30. You're free to go anywhere you want, but remember my cautionary instruction about not discussing this case among yourselves or with anybody else. And we'll ask you to be back here -- we'll have you go down to the jury room and be back to the jury room a minute or so before 10:30 so we can bring you up right at 10:30. Thank you.

(Panel E exited the courtroom.)
Page 69

THE COURT: Anything we need to take up?

MR. WILLIAMS: Your Honor, the only concern I had --

THE COURT: Why doesn't everybody be seated, and we'll take this up.

MR. WILLIAMS: Very quickly, where I was objecting and

1130

where I think it's a stakeout question is where Mr. Berrigan talks about do you believe in an eye for an eye, a life for a life, and then he says, If you know this fact and this fact and this fact, is that where you are at. That is equivalent to saying, Are you going to vote for death penalty, life for life, if I give you these facts? That is a stakeout question. It's asking them to predict how they're going to vote.

Now, later he shifted to, which isn't objectionable, would you consider life imprisonment or would you only consider the death penalty? That's fine. But I see that as a stakeout question when he phrases it that way.

THE COURT: Well, it's certainly in the gray area. And I understand what you mean. And it's kind of, you know, is it a stakeout question, isn't it. I'm not sure I know every stakeout question when I see it is the problem. So I erred on the side of allowing him to ask it. That wouldn't be enough for me to grant a challenge for cause, and that's one of the reasons why -- because I think somebody who says that could turn around and say, Yeah, but I could fairly consider both penalties because it doesn't preclude the second answer, although it's somewhat incongruent, but I'll bet you half the people who said eye for an eye could also say they could fairly consider both penalties.

So I hear what you're saying. I don't know whether

Page 70

it's a stakeout question or not.  I'll give it some more

1131

thought.  It's getting awfully close I think.  But --
Mr. Berrigan, you have a big need to ask that question in that manner?

MR. BERRIGAN:  No, sir, and I think I can modify that accordingly.

THE COURT:  Okay.

MR. BERRIGAN:  But, frankly, I'm not sure it's that much different than the prosecutor getting up there and telling them, look, if you all 12 agree death penalty's appropriate, would you sign the verdict form?  That seems to me to be a stakeout question, but I haven't objected to that yet.  I will I suppose at the appropriate time.  But I'll modify my question appropriately.

THE COURT:  Well, why don't we take up whether that's a stakeout question or not.  I don't think it's a stakeout question because I think it's just simply saying if they could vote for the death penalty could they also then take the next act of signing the verdict form.

MR. BERRIGAN:  Well, the prosecutor at the same time he's done that has looked over to Miss Johnson on several occasions, pointed to her and say, This defendant.

THE COURT:  Well, we're not talking about signing a verdict form for any other defendant.

MR. BERRIGAN:  I know that, Your Honor.

THE COURT:  Yeah.

1132

Page 71

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 986 of 3245

MR. BERRIGAN: But in my view, that's as close -- well, I think that is a stakeout question, frankly. If -- it's the same kind of thing we're talking about here. If you believe this, will you do this? And I understand he might want to inquire about whether jurors can sign a verdict form, but the manner in which it's being done -- I guess we'll wait to hear -- I think it's a --

THE COURT: Yeah, even if you can call it a stakeout question which I'm not sure it is, it's not a stakeout question on if such and such facts were true, how would they vote. It's simply saying if they could fairly consider the death penalty, could they also then take that final act of signing the verdict form. And both in the Honken case and here, we've had some people that really causes them to pause and hesitate. And so I don't know that that's a stakeout question. And you can object to it if you like. But I doubt if I'm going to sustain the objection just to give you a heads-up.

MR. BERRIGAN: Thank you, sir.

THE COURT: Okay? Anything else?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Okay. Thank you.

(Recess at 10:09 a.m.)

THE COURT: Mr. Stowers, how we coming on that exhibit list?

MR. STOWERS: It's coming along.

1133

THE COURT: What does that mean? When will it be to me?

MR. STOWERS: I think you want it by the end of the week.

Page 72

THE COURT: Yeah. Is that still on track?

MR. STOWERS: Yeah. Mr. Williams and I visited about that last week, and I think we have an understanding what we're planning to do with it, and I don't know if you want to talk about that now or . . .

THE COURT: No. Have the jury brought in.

(Panel E entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Berrigan?

MR. BERRIGAN: May it please the Court. Welcome back. My colleagues have pointed out to me that I may not have asked all the questions I should have with a couple of you before we move on, so I'm going to revisit with just two people I think, and one is Miss 263. I did hear you -- I did hear you loud and clear, ma'am, when you talked about your views on the death penalty and an eye for an eye, and you've had those for about five years I think you mentioned.

PROSPECTIVE JUROR 263: Uh-huh.

MR. BERRIGAN: And intentional murder, you know, meets your -- the criteria that you were thinking of. But I may not have asked you -- and I'm pretty sure I didn't even throw in the

1134

situation with kids, did I?

PROSPECTIVE JUROR 263: (Shook head.)

MR. BERRIGAN: Does that further aggravate the situation?

PROSPECTIVE JUROR 263: Yes.

MR. BERRIGAN: All right. So let me ask this question of you, and again, we're doing our fast forward; okay?

PROSPECTIVE JUROR 263: Yes.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 988 of 3245

MR. BERRIGAN: We've got the intentional murder of five people. We've got proof beyond a reasonable doubt, premeditated, substantial planning. And we have children. If -- and again, I know it's a big if. But if you and your fellow jurors, all 12, decided beyond a reasonable doubt that's what we have, would you realistically, given your views, be able to consider a punishment other than the death penalty?

PROSPECTIVE JUROR 263: Most likely not.

MR. BERRIGAN: So the other flip side of that coin is given your views, would you be able to consider life imprisonment without parole as a just punishment in that kind of a case?

PROSPECTIVE JUROR 263: No.

MR. BERRIGAN: Thank you, ma'am. Could you pass the mike down to 528? Thank you.

Ma'am, I noted when I asked you, you had some concerns in your own mind about your ability to consider a life sentence

1135

under that type of a circumstance. And I at the time failed to look at your questionnaire, and I know you probably haven't seen it in a while, and I wanted to bring one little section to your attention to see if it helps at all. There's a question 87 that says, Please review each of the situations listed below. After each situation, describe what effect, if any, each have on your thoughts and opinions about an appropriate punishment for a person guilty of intentional murder; okay? You with me?

PROSPECTIVE JUROR 528: Uh-huh.

MR. BERRIGAN: The first situation or the thing that you're asked to consider is the guilty person killed more than one person at the same time. And you wrote next to that death.

Page 74

Does that sound right?

PROSPECTIVE JUROR 528: Yes.

MR. BERRIGAN: The second one is the guilty person was pregnant at the time of committing murder, and you wrote, Give the baby a good home, another victim which suffers from the crime. And I'm assuming another victim you're talking about would be the child.

PROSPECTIVE JUROR 528: Yes.

MR. BERRIGAN: The third one, the guilty person participated in the killing of children, and next to that you wrote death. Does that sound right?

PROSPECTIVE JUROR 528: Yes.

MR. BERRIGAN: The fourth one was the guilty person

1136

had a past history of drug abuse, and you wrote, They made the choice to take drugs, so death would apply. Does that reflect your views?

PROSPECTIVE JUROR 528: Yes.

MR. BERRIGAN: The fourth or maybe the fifth or sixth one, the guilty person is a parent of two children. They should have thought about them before and maybe the murder wouldn't -- would not have happened. Is that accurate?

PROSPECTIVE JUROR 528: Yes.

MR. BERRIGAN: The guilty person was mentally, emotionally, physically abused and neglected as a child, and your response was if they know right from wrong, then the death penalty is appropriate. Does that sound right?

PROSPECTIVE JUROR 528: Yes.

MR. BERRIGAN: And then lastly, the guilty person assisted or encouraged the murders but was not the person who

Page 75

pulled the trigger, and you wrote, It's the same as participating. Is that right?

PROSPECTIVE JUROR 528: Uh-huh.

MR. BERRIGAN: Okay. In light of those responses -- and again, nobody's being critical of these responses. We respect your opinions. That's what they are. They're views. We all have them, and I can assure you the views about this issue vary dramatically from person to person. But if those are your views, could you realistically consider a sentence of life

1137

without parole for this situation, intentional, premeditated, planned murders of five people during a drug conspiracy, a continuing criminal enterprise involving the deaths of a mother and two children?

PROSPECTIVE JUROR 528: I'm undecided.

MR. BERRIGAN: You're undecided.

PROSPECTIVE JUROR 528: I'm still at the 50-yard line.

MR. BERRIGAN: Does that mean that -- when you say you're undecided, I'm wondering does that mean you're undecided if you could do it, if you could consider --

PROSPECTIVE JUROR 528: I think I'm open to either.

MR. BERRIGAN: Despite these responses.

PROSPECTIVE JUROR 528: Yes.

MR. BERRIGAN: So what do these responses mean, or what should you want them to mean to us?

PROSPECTIVE JUROR 528: Maybe that's how I felt at the moment, and maybe this is real life here.

MR. BERRIGAN: Okay.

PROSPECTIVE JUROR 528: That's just honestly how I feel.

Page 76

MR. BERRIGAN: Whatever you feel, is there anything that's changed in your life to cause you to feel differently than when you filled out your questionnaire?

PROSPECTIVE JUROR 528: No.

MR. BERRIGAN: Has there -- okay.

1138

PROSPECTIVE JUROR 528: No.

MR. BERRIGAN: Okay. Thank you, ma'am. Appreciate that. Could we pass the microphone down to Number 227?

How are you this af -- this morning, sir? We're still in the morning.

PROSPECTIVE JUROR 227: Doing good.

MR. BERRIGAN: I might have missed it, but I think you said you had no opinion about the death penalty, and I kind of wanted to explore that with you because to be honest with you, not many people give that response.

PROSPECTIVE JUROR 227: Well, my opinion is if you incarcerate a person for a life sentence, they have a lot of time to review what they did where if you give them the death penalty, it's over with.

MR. BERRIGAN: Okay.

PROSPECTIVE JUROR 227: And being a religious person, I think maybe the person when they're in jail would have time to get right with the Lord. That's my personal feeling.

MR. BERRIGAN: Okay. I appreciate that. One of the things you were asked about was life imprisonment, you know, what are your thoughts about that, and you mentioned that it costs us, the taxpayers, too much money, and you won't get much argument about that; okay? But I want to know kind of how strongly you felt about that.

Page 77

PROSPECTIVE JUROR 227: That's just my opinion. It

1139

does. It costs us taxpayers a lot of money.

MR. BERRIGAN: I'm going to suggest to you that there's some real debate about which is more expensive for the taxpayers, having the death penalty or not; all right?

PROSPECTIVE JUROR 227: It doesn't really make any difference to me because I just feel the way I do. I just say if you put them to death, it's over, it's done with, you know, and it probably is cheaper to put them to death than the other. I don't know.

MR. BERRIGAN: Okay. Well, I guess the real important thing is whether it is or it isn't cheaper or more expensive, one punishment or the other, is that a factor you think's appropriate in making a determination about the punishment?

PROSPECTIVE JUROR 227: Not really. I was sitting in Arizona when I filled that out, and I just thought to myself here's the answer for that deal.

MR. BERRIGAN: Okay. Well, you know, a lot of people fill that out sitting right here in Iowa. Arizona probably didn't affect it too much.

PROSPECTIVE JUROR 227: No.

THE COURT: It probably did. He had a golf game he wanted to get to.

MR. BERRIGAN: And that was costing too much money. I have to tell you that there are problems with our prisons, so I'm not telling you anything you don't know. Some folks are

1140

upset that we have televisions in the prisons and that maybe

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 993 of 3245

they're not severe enough in terms of hard labor. And we've had folks say, Hey, it should be bread and water, you know, three times a day and they'd like things to kind of go back to the old days. But the truth is we don't have any control over that, okay, not even Judge Bennett. And so the prisons do what prisons will do.

But it would not be an appropriate consideration for us to make a determination about a person's life based on what we think it's going to cost the taxpayers. Are you and I on the same page on that?

PROSPECTIVE JUROR 227: Yes, sir.

MR. BERRIGAN: Okay. So this is a perfectly legitimate feeling. And let me tell you, a lot of people, probably the majority of folks, feel, you know, it costs a lot of money. And that's okay. But we need to be sure that that's not something they bring into the deliberation room with them and they're sitting down trying to figure out how much is this going to cost a day and somebody's this old. The death penalty costs a whole lot of money too; okay? You all right with that?

PROSPECTIVE JUROR 227: Yes, sir.

MR. BERRIGAN: Okay. Okay. Let me leave you for a moment if that's okay and talk to Juror 147. She's right next to you. I'm sorry. You don't know that, but I do.

How you doing this morning, ma'am?

1141


PROSPECTIVE JUROR 147: Fine.

MR. BERRIGAN: You've been paying attention. I've noticed that. So I'm not going to go through this whole thing with you again; okay?

PROSPECTIVE JUROR 147: Okay.

Page 79

MR. BERRIGAN: But let me cut to the chase and have you fast forward now and here's where we are. Do you have a view as to whether you'd be able to consider the punishment of death in that kind of a circumstance?

PROSPECTIVE JUROR 147: Could I do it? I guess after we were done with everything, then I would -- I guess in my mind when we start the next phase, I would start clean again. You know, I found her guilty of all the charges. But then I just think you have to rethink everything on if you're going to find the death penalty or life in prison, and I could do either/or.

MR. BERRIGAN: All right.

PROSPECTIVE JUROR 147: But I would start -- I don't know -- a clean slate. I don't really -- a clean slate. I would have to give myself time to start over again on what I felt about her because then there's all different kinds of testimony again.

MR. BERRIGAN: Right. That's an excellent point.

PROSPECTIVE JUROR 147: So . . .

MR. BERRIGAN: I mean, some folks have told us, Look, if I got to this point, quite legitimate that's enough for me;

1142

okay, Berrigan? I don't need to hear anything else, and you can present other stuff, but in terms of the punishments that I'd consider, this -- I have a view about what the appropriate punishment is. And then there are other people that don't feel that way. And you're kind of really -- you want to start fresh when you get to the penalty --

PROSPECTIVE JUROR 147: I'm on the 50-yard line, so I can go either way if you want to go back to that.

MR. BERRIGAN: Let me talk to the 50-yard line then,

Page 80

and I think Judge Bennett handled that much better than I do. But we're going -- this penalty phase, okay, the second half of the basketball game, if you will, there are going to be some different rules than what jurors are used to. Jurors come in here, and they've watched television, and they've seen Law and Order. It's the most popular television show of all time. And they've seen the trials, and they may have been on juries, and they know how it works. They know that their responsibility's to listen to the evidence, critically analyze it, talk to their fellow jurors, and make a decision, and when they do that, they do it as a group. You don't do it one person each. You talk about it, and you make a decision as a group.

If all 12 of the people agree on guilty, then that's the verdict. And if all 12 of the people say not guilty, the government didn't meet their burden of proof, then that's the verdict, and there's no in between. You can't have a verdict

1143

where 6 people say this and 6 people say that or 8 and 4, 9 and 3, 10 and 2, 11 and 1. It doesn't work.

If that happens -- and it does happen every single day in this country -- then those cases get retried. You know, we call that a hung jury or a mistrial. Nothing wrong with it. People can have honest disagreements. In somebody's heart and conscience they feel this way, and somebody feels that way. But the jurors have to agree to make a decision; okay?

In this penalty part of the trial, this second phase, if you will, second half of the basketball game, you're going to be presented with evidence, aggravation evidence, some of the stuff we've already talked about, the premeditated, substantial planning, the kids, children. And you're going to be asked to

Page 81

weigh that.

Now, this evidence you have to find beyond a reasonable doubt, all 12 people; okay?  The judge is going to tell you that.  You're going to be looking at this really in the middle of the trial, in the second phase.  You're going to have to make a decision is there a gateway factor, is there an aggravating circumstance here?  So this stuff, that's how you consider it all together; all right?

But against that you're going to weigh what's called mitigating evidence or mitigating circumstances.  And that's different stuff.  The aggravation evidence, this is the evidence the government's going to argue in their view warrants a

1144

sentence of death.  The mitigation evidence is stuff that the defense is going to argue warrants a sentence of life; okay?

Now, this can be stuff like not having a substantial criminal record.  The law says that's a mitigating circumstance if you don't have a criminal record, something that would be considered in assessing the punishment.  It goes towards life.  There might be other mitigating circumstances.  The person's role in the offense might be a mitigating circumstance.  A lot of people have mentioned that sort of in passing:  Well, what part did she play?  If your role is such that you're a relatively minor participant, even though you participated in it, then the jury might want to consider that in assessing punishment; okay?  Are you following me so far?

PROSPECTIVE JUROR 147:  Yes.

MR. BERRIGAN:  Okay.  And then there's a really broad mitigating circumstance, and it's any aspect, any aspect, of a defendant's character or background or any aspect of the crime

Page 82

that the defendant advances as a reason to vote for life. That's a mitigating circumstance; okay? That would include things like what you saw on this questionnaire, abused childhood. Doesn't have to be physical abuse, although it could. It could be sexual abuse. Could be neglect. That would be a mitigating circumstance that might be offered to the jurors to consider; okay?

And then what happens is -- see if I can lift these up

1145

without dropping them -- you weigh them. Now, this process -- this is very important -- this weighing process -- have you folks seen the Lady Justice? She's blindfolded with those scales. Each juror does this himself or herself. It's not a group thing. All the jurors have to agree on the aggravating circumstances.

But they don't have to agree about these mitigating circumstances. Juror 170 might say, Well, I think these two for me, these are mitigating circumstances, and I want to weigh them. I'm not sure on this one if that affects me very much. And Juror Number 227 might say, Oh, wait a second. You know, you're all wet. This is the one. This is the one for me.

That's okay. You don't have to agree on what the mitigating circumstances are in order to weigh them. It's what are important to you as a person in making a decision between life and death in terms of mitigating circumstances. You still following me?

PROSPECTIVE JUROR 147: Yes.

MR. BERRIGAN: Okay. Everybody all okay with me here so far? The other big difference on these mitigating circumstances, these do not, do not, have to be proven beyond a

Page 83

reasonable doubt. What the law says is you gotta prove these by a preponderance of the evidence. That means in simple terms it's more likely true than not that that exists. So if there was evidence presented about child sexual abuse, you don't have

1146

to find that beyond a reasonable doubt. You don't even -- you certainly don't have to find it as a group. You could say -- Juror 89 could say, That for me, it's within a preponderance of the evidence I find that, and I'm going to consider it. Okay? You still with me?

PROSPECTIVE JUROR 147: Yes.

MR. BERRIGAN: Okay. Now, this weighing done individually, you can see that you might get different results because this isn't this group process anymore. And that law says that's okay. The law says that if you do this individually and you don't all agree, that is a verdict. That's a life sentence. If not everybody agrees that aggravating circumstances outweigh mitigating circumstances, that's fine. We're not going to keep you locked up or hold you or keep you around. That's a decision. So one person, one, could say, Hey, not for me. The aggravating circumstances don't outweigh the mitigating circumstances. That's life. If it's a tie, that's life. Everybody with me? Okay. Could you do that?

PROSPECTIVE JUROR 147: Yes.

MR. BERRIGAN: Okay. All right. Can you pass the mike back to Number 738, please? I wanted to come back to you, sir, because of our discussion earlier about a crime being punished based on the crime. You remember we had a little discussion about that?

PROSPECTIVE JUROR 738: Yes.

Page 84

MR. BERRIGAN: And I heard you say -- and you tell me -- you feel that that's proper; we should be punishing people based on the crime they committed.

PROSPECTIVE JUROR 738: I believe that.

MR. BERRIGAN: Okay. In fact, you wrote down, Person should be punished for crime committed, not by who or what they are. Does that sound right?

PROSPECTIVE JUROR 738: Right.

MR. BERRIGAN: Okay. So here I have this little bit of a dilemma. If that's your view -- and there's nothing wrong with it, not a bit. But if we're presenting evidence of Miss Johnson's background that you might hear about physical or emotional abuse or neglect, if that's your view, is that really the kind of evidence that you'd consider in making a decision about punishment? If we should just be looking at the crime, it seems like that wouldn't matter. What's your view on that?

PROSPECTIVE JUROR 738: Basically I would just look -- I would look more at the crime than what the person is.

MR. BERRIGAN: Okay.

PROSPECTIVE JUROR 738: That's my view.

MR. BERRIGAN: All right. And this stuff about childhood experiences and so on, would that really be something you'd consider in making a decision about punishment, or is it going to be the crime that makes it for you?

PROSPECTIVE JUROR 738: Mostly the crime, but if there

is some of that involved, I would look at the evidence.

Page 85

MR. BERRIGAN: Okay. And when you say look at, I want to ask you just a little bit about that because you know what? I bet all the jurors will look at all the evidence. I'm pretty sure about that because they're going to be sitting there. It's going to be presented.

But we're talking about, you know, really consider it, okay, truly consider it in making a decision. You know what I mean? Not just, well, I looked at it. Really considered it.

And my concern is -- and you tell me if it's valid -- that if your view is, hey, look, Berrigan, I think we're looking at the crime. That ensures the people will be punished uniformly, we're punishing everybody the same. Doesn't make any difference if you're O.J. Simpson or you're a pauper on the street. You commit a crime. That's how we punish, what did you do, and that this stuff here doesn't matter. This stuff about your background doesn't really make any difference. So when I say consider it, I mean really consider; okay?

PROSPECTIVE JUROR 738: ( Nodded head.)

MR. BERRIGAN: So would you really consider that?

PROSPECTIVE JUROR 738: I would consider that somewhat.

MR. BERRIGAN: Okay. What do you mean by that?

PROSPECTIVE JUROR 738: I guess I really don't understand the question of what you're asking.

1149

MR. BERRIGAN: All right. Well, I won't belabor it too much, but when you -- let me ask it this way. When you said, Person should be punished for crime committed, not by who or what they are, what do you mean?

PROSPECTIVE JUROR 738: Well, I think -- I look at a

person more at who they are or what they are by how I know them. That's my opinion such as if I'm in a business, I can tell what the person is after I deal with them. That's what I'm trying to say.

MR. BERRIGAN: Well, I mean, the question really is talking about punishing people for crimes, right, not who you know. You know what I mean?

PROSPECTIVE JUROR 738: Right.

MR. BERRIGAN: The question is, hey, look, what's appropriate in making a decision about punishment? What should we be looking at? And my sense of the response was your view was, look, we're not concerned about who the person is, where they came from. You're punished according to what you did, to the crime.

PROSPECTIVE JUROR 738: That's my belief.

MR. BERRIGAN: Okay. We're on the same page so far.

PROSPECTIVE JUROR 738: Right.

MR. BERRIGAN: Well, if we -- if we're then at this point, okay, we're fast forwarding ahead, intentional murder, five of them, substantial planning and premeditation, children,

1150

and we're in the penalty phase and here comes Berrigan -- and that's been proven beyond a reasonable doubt to your satisfaction; right?

PROSPECTIVE JUROR 738: Right.

MR. BERRIGAN: Here comes Berrigan, and he says, Wait a second, what about her background? What about this evidence of abuse? What about the neglect? If your view is, hey, look, that's what's important, Berrigan, not this, we just need to know that. We need to know whether you would really consider

Page 87

this in making a determination about punishment.

PROSPECTIVE JUROR 738:  It might be considered, but I don't know if it'd have any bearing on the case.  That's what I feel.

MR. BERRIGAN:  And when you say bearing on the case, you mean bearing on the decision about punishment?

PROSPECTIVE JUROR 738:  Exactly.

MR. BERRIGAN:  Okay.  So you might consider it, but it might have no bearing on the case.

PROSPECTIVE JUROR 738:  No, I look at the crime.

MR. BERRIGAN:  You look at the crime, okay.  I appreciate your candor on that, sir.  Could I talk to 637, the gentleman next to you for a second?  Thanks.

I wanted to ask you about this same issue, Mr. 637. We're kind of getting to the next step now with these mitigating and aggravating circumstances.  Do you think you're able to

1151

understand the explanation I gave to Juror 147?

PROSPECTIVE JUROR 637:  Yes.

MR. BERRIGAN:  Does that make sense, how it's done there?

PROSPECTIVE JUROR 637:  I think so.

MR. BERRIGAN:  Part of the goal is in making a decision of this magnitude that everybody be comfortable with their individual decision because not only does Angela Johnson live with that the rest of her life, how ever long that might be, but so do the jurors; all right?  One of the things that comes up once in a while is, well, you know, I want to be a hundred percent sure, Mr. Berrigan.  I want to be a hundred percent sure.  And we're not sure whether people are saying,

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1003 of 3245

well, does that mean you gotta be a hundred percent sure of guilt, or does that mean you have to be a hundred percent sure of the punishment decision or what? Would you have to be a hundred percent sure of your decision in making a decision about life and death?

PROSPECTIVE JUROR 637: I think so.

MR. BERRIGAN: Okay. I want to tell you that that's perfectly acceptable, okay, that you can do that. You have that right in making that decision as an individual to demand that you're going to be a hundred percent comfortable, firmly persuaded that you're doing the right thing; okay? That is not the same as holding the government to some burden of proof that

1152

they don't have.

Now, their burden of proof is they have to prove these things beyond a reasonable doubt. You following me? The intentional murder, premeditation and planning, children, beyond a reasonable doubt they have to prove those in order for you to weigh them; okay? But it doesn't require that they prove those elements a hundred percent in order for you to weigh them. Does that make sense?

PROSPECTIVE JUROR 637: Yeah. I don't quite follow you but . . .

MR. BERRIGAN: Beyond a reasonable doubt, you know, is a concept the judge will give you an instruction on. But you largely determine what beyond a reasonable doubt is for you. And that's okay. But you can't hold the government to some burden beyond all -- beyond any doubt is this a case of intentional murder. That's not what they have to prove. They don't have to prove beyond any doubt substantial planning. They

Page 89

don't have to prove beyond any doubt kids.  They only have to prove beyond a reasonable doubt.  You okay with that?

PROSPECTIVE JUROR 637:  (Nodded head.)

MR. BERRIGAN:  That's different than this decision of weighing and wanting to be a hundred percent confident; okay?  Does that make any sense?  You're sort of nodding but you're --

PROSPECTIVE JUROR 637:  I'm not sure.

MR. BERRIGAN:  Okay.  Let me ask you about at least

1153

getting to the point of weighing.  Is that a process that you think you could engage in?

PROSPECTIVE JUROR 637:  I don't know.  I've really struggled with this whole issue.  I just . . .

MR. BERRIGAN:  Tell us how you feel about it then.

PROSPECTIVE JUROR 637:  Well, I think I indicated that earlier, how I feel.  It's just -- maybe I come in with some preconceived notions that, you know, aren't right.  But -- I don't know -- what I said is what I believed, and I don't know if -- this situation, if I could change.

MR. BERRIGAN:  And again, as the judge pointed out, you know, he gave you the flip side of your civic duty.  He does a wonderful job in per -- reminding people what a privilege it is to serve their country.  But the other side of that coin, as he very eloquently pointed out, is you have an obligation also to tell us your open and honest views about these issues so we can make the best decision we can.  And you said a little earlier about cold-blooded killer should probably get the death penalty.  Is that the view you're talking about?

PROSPECTIVE JUROR 637:  Well, yeah, I would support the death penalty.  I don't know about -- yeah, I guess I -- I

Page 90

don't know about the cold blooded, but it just -- the death penalty I would support, yes.

MR. BERRIGAN: Okay. The problem you're having is with the other sentence, life without possibility of parole.

1154

PROSPECTIVE JUROR 637: Yeah. Like I said, I come in here with these preconceived, and I don't know if I would change or not. I just -- I don't know.

MR. BERRIGAN: Let me ask it this way if this is helpful.

THE COURT: Could I interrupt for a second?

MR. BERRIGAN: Yes, sir. Certainly.

THE COURT: What is it that you think you might have to change, because nobody's asking you to change anything?

PROSPECTIVE JUROR 637: No.

THE COURT: So I'm sorry. I've been paying very careful attention, but I'm just a little confused now, and I get confused fairly easily, so can you help me out?

PROSPECTIVE JUROR 637: Well, like I said before, I come in with, you know, what little I've seen about it, and it's very hard for me to see a person do this, and I come in with a preconceived notion. I guess I just assume she's already -- you know, I've seen what she's done, and I just struggle with that.

THE COURT: What do you mean you've seen what she's done?

PROSPECTIVE JUROR 637: Well, I mean the little bit that you've sent us with the five.

THE COURT: It's just an accusation. Doesn't mean she's done anything.

PROSPECTIVE JUROR 637: I know that. I know that.

Page 91

But that's my problem.

THE COURT: She could very much be as not guilty of that crime as you are; right?

PROSPECTIVE JUROR 637: Right.

THE COURT: So that's not your problem.

PROSPECTIVE JUROR 637: Somewhere in there I'm struggling, and I just don't -- I'm not sure what it is. I just . . .

THE COURT: That's okay.

PROSPECTIVE JUROR 637: I don't know. I just --

THE COURT: Well, let me -- I'm going to let Mr. Berrigan go on with the questioning. I may have some questions for you later, but we'll hold them off.

I'm sorry.

MR. BERRIGAN: No, that's all right, sir.

Regarding this issue of punishment, Mr. 637, you're okay certainly with the death penalty being something you'd be willing to consider. Is that fair?

PROSPECTIVE JUROR 637: That's fair.

MR. BERRIGAN: Okay. And so here we got the other side of the coin, okay, and I think you've indicated some concern about the cold-blooded nature of this allegation. If that's where we were, okay, you know, we've got the five people dead. They've been proven to be intentional murders. We've got this premeditation, planning, children, mother. Do you have any

question in your own mind as to whether you'd be able to consider life imprisonment as an appropriate just punishment for

that type of a situation?  Do you have some question about that?

PROSPECTIVE JUROR 637:  I just don't know.  I just don't know.

MR. BERRIGAN:  Okay.  You don't know if you could do it.

PROSPECTIVE JUROR 637:  I'm -- no, I don't.

MR. BERRIGAN:  Well, I appreciate your candor.  Could you hand the microphone to Number 657, please?  Thank you, sir.

How are you today, ma'am?

PROSPECTIVE JUROR 657:  Fine.

MR. BERRIGAN:  Is any of this making any sense?  I sometimes think I confuse people more than aid them with this explanation.  You indicated in your questionnaire that you didn't really think the death penalty is called for, but I guess the pictures of the victims, the way they were brutalized just before thinking they had -- brutalized just thinking what they felt before they were killed, the circumstances around the situation might change your mind.  Did I read that accurately?  Does that sound about right?

PROSPECTIVE JUROR 657:  Yes.

MR. BERRIGAN:  So we have this situation where if you're selected as a juror you go through this process of listening to evidence in both parts of the trial, all three --

1157

it's going to be three parts of the trial, two parts containing evidence.  But we're at the end where we're talking about weighing aggravating and mitigating circumstances.  Is that something you could do?

PROSPECTIVE JUROR 657:  To consider the mitigating circumstances?

Page 93

MR. BERRIGAN: Yes, ma'am. Does it . . .

PROSPECTIVE JUROR 657: I think I could consider it. I don't know if it would make any difference. But I could consider it.

MR. BERRIGAN: Okay. We're talking about the mitigating circumstance -- I'll try to be consistent with my colors -- stuff like the defendant's background, abusive childhood, things of that nature, kind of put you on the spot kind of like I did with Mr. 738. You know, when we say consider, it's not just kind of a wink and a glance. We mean really consider it in the determination about what the appropriate punishment might be; okay? So we can only rely on your judgment in making a determination. Is that something you'd realistically consider in making a decision about punishment, somebody's background?

PROSPECTIVE JUROR 657: I guess I could, yes, yes.

MR. BERRIGAN: Okay. All right. In this weighing process, do you understand that, you know, no matter what the weighing is, you're never required -- there's no requirement

1158

ever that the jurors vote for death? Do you understand what I've just said?

PROSPECTIVE JUROR 657: Yes.

MR. BERRIGAN: You can weigh all day, and nobody's going to tell you you have to vote for death.

PROSPECTIVE JUROR 657: Right.

MR. BERRIGAN: Life is always an option; okay?

PROSPECTIVE JUROR 657: Uh-huh.

MR. BERRIGAN: You all right with that?

PROSPECTIVE JUROR 657: Yes.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1009 of 3245

MR. BERRIGAN: And in your mind, would you be able to consider life without possibility of parole as an appropriate punishment for somebody convicted of five intentional murders after premeditation and planning and the deaths of a mother and two children?

PROSPECTIVE JUROR 657: I think I could, yes.

MR. BERRIGAN: Well, we're going to rely on that then; okay?

PROSPECTIVE JUROR 657: Okay.

MR. BERRIGAN: All right. Thank you. All right. And could you hand the mike over to Number 489, please?

How are you, sir?

PROSPECTIVE JUROR 489: Just great, thanks.

MR. BERRIGAN: I'm not sure I've talked to you yet, have I?

1159

PROSPECTIVE JUROR 489: I'm a quiet guy.

MR. BERRIGAN: What do you think about this issue about the death penalty?

PROSPECTIVE JUROR 489: I don't -- I like analogies.

MR. BERRIGAN: Okay.

PROSPECTIVE JUROR 489: If you had all of the cases in the world that were a capital case where somebody should be punished for the rest of their life as a piece of paper and you had a gray circle in the middle about the size of a baseball, those would be the ones that might warrant considering the death penalty.

MR. BERRIGAN: Okay.

PROSPECTIVE JUROR 489: In the middle of that you had a pin prick. Those are the ones that deserve the death penalty.

Page 95

I assume that we're in the gray area here because we're talking about the death penalty. But whether or not it falls into that pin prick has yet to be determined.

MR. BERRIGAN: That's right. No question about that. We're talking about the death penalty because if the government were to do all the things that the judge has described and prove all of these things, you know, I think he might have made it clear, but just to be crystal clear as they say about these things, you know, if the government doesn't prove intentional murders, this case is over; okay? That's the end of it. It's either not guilty or maybe there's some lesser offense

1160

submitted, but we're done.

If they do, if they do prove this, then they still have that kind of halftime of the basketball game where the judge is going to ask you have they proven one of these gateway factors which he'll tell you what they are, and have they proven an aggravating circumstance; okay?

One of the aggravating circumstances they're alleging is premeditated after substantial planning. If they don't prove that aggravating circumstance or one other aggravating circumstance, the case is over again. We're done. So they have to show this aggravating circumstances in order for us to go forward; okay?

THE COURT: Mr. Berrigan, I'm going to jump in here because actually this juror's raised an interesting question that nobody's really responded to, and I certainly haven't in prior jury selections. I understood your question in a sense to be why is it that the death penalty is at issue in this case, and I'm going to tell you why.

Page 96

Congress has decided that the death penalty is available in a very small number of crimes. I think it's actually about 60 crimes, so that sounds like a lot. But I think overall there are something like 4,800 federal crimes. Don't hold me to that. I could be off a couple thousand either way. There's a lot of different federal crimes. I'm pretty sure it runs something around 5,000, and then in 60 or so -- and

1161

I could be off by a dozen or more on that number too -- Congress has said in these approximately 60 or so crimes the death penalty could be a possible punishment.

So in this case if the defendant is found guilty and we get to the penalty phase, we get by phase 1 and phase 2 -- I'm not saying that's going to happen. But if we do, then the only two punishments the jury will consider is life imprisonment without the possibility of parole or the death penalty. Is that helpful to you?

PROSPECTIVE JUROR 489: Sure. Yeah. I understood his questions.

THE COURT: Okay.

MR. BERRIGAN: And your analogy's very good actually. We hope it's a pin prick on a big giant map, but that is a different issue than your own ability to participate in the process. You know what I mean?

PROSPECTIVE JUROR 489: Sure.

MR. BERRIGAN: There are people with opinions about this that are perfectly legitimate. They don't fit into the equation that they would be part of this process. So I was interested in kind of like your personal views about the death penalty.

Page 97

PROSPECTIVE JUROR 489: Well, I definitely think it's appropriate in the right circumstance.

MR. BERRIGAN: Okay.

1162

PROSPECTIVE JUROR 489: I don't think there's any circumstance that wouldn't warrant the option of an alternative penalty.

MR. BERRIGAN: You mentioned in your questionnaire on that question 87 where there's kind of a laundry list of things you might consider -- this was the pregnant, woman's pregnant, killing of kids, more than one murder, how would you consider the punishment if the defendant was on drugs, and there was one about what would you consider -- let me read it exactly so I don't misstate it. Please review each of the situations listed below. After each situation describe what effect, if any, each have on your thoughts and opinions about an appropriate punishment for a person guilty of intentional murder. And then one of these factors was the person was mentally, emotionally, physically abused and neglected as a child. And my notes reflect that your response to that was, Don't see how this affects things. Need more information. And I just wanted to ask you what you meant by that.

PROSPECTIVE JUROR 489: Well, I don't -- I don't think that something that happened 10, 15, 20 years ago is an automatic free pass.

MR. BERRIGAN: Right. Okay.

PROSPECTIVE JUROR 489: If what happened ten years ago has affected you in a way that makes you unable to cope with things on your present day, then it may have some pretty big

1163

Page 98

weight. If you've been able to get past whatever the situation was that you had and function in society and you can -- you know that it was wrong, well, by knowing that it was wrong, then maybe it's no longer an excuse because you've gotten past that. You realized what happened, and you're not going to duplicate those things. I mean, some people can cope with things a lot better than other people can.

MR. BERRIGAN: That's exactly right. I -- and I think I wasn't clear. When I was talking about mitigating circumstances, they're not excuses for having committed the crime; okay? And if -- let's look at the no prior criminal record; all right? That's a mitigating ex -- mitigating circumstance or mitigating factor if you don't have a prior criminal record. Well, if you murder somebody, that's great, but you're still guilty of murder. It doesn't matter how many prior convictions you have. You kill somebody; that's murder. So people wouldn't be asked to take that into consideration in making a determination about the murder. They'd be asked to take it into consideration regarding the punishment. You understand?

PROSPECTIVE JUROR 489: Sure.

MR. BERRIGAN: We're talking about abuse, childhood abuse. Well, that's not going to be an excuse for committing a crime. Nobody -- let me tell you, nobody is alleging that; okay? I am not telling you that any of this would be an excuse

1164

for having committed murder. Goodness no. Should that be a consideration in making an assessment about punishment? That's

Page 99

what I'm interested in, okay, because that's the kind of evidence that we might offer. Does that make sense?

PROSPECTIVE JUROR 489: Yep.

MR. BERRIGAN: Role in the offense is a tricky concept. If you aid and abet somebody in the commission of a crime -- let's say you and I decided to rob a bank and you're the driver and I go in with the gun and the security guard doesn't -- he doesn't put his gun away quick enough and I decide right there to kill him. Well, maybe that wasn't contemplated, but you know what? You aided and abetted me. We were in this together. And it's unfortunate. You're sitting out in the car when that goes down, but you and I go to trial; we're both going down.

But when it comes time for punishment, do you really think the judge is going to treat us the same? Your role relative to mine in that offense was very different, you know, very different. And it should be treated differently. If yours was a minor role as compared to the other person, then that's something that might be a mitigating factor for you at sentencing. Does that make sense?

PROSPECTIVE JUROR 489: Absolutely.

MR. BERRIGAN: It's -- the difference between you aided and abetted, it makes you legally responsible; you're

1165

guilty. But your moral culpability, if you will, your punishment is different; okay? You all right with that concept?

PROSPECTIVE JUROR 489: Sure.

MR. BERRIGAN: And I wonder if you could pass the mike up to Number 170 right in front of you. I wanted to come back to you, sir, because we hadn't really talked in a while, and you

Page 100

were one of the many folks here, in fact, in the majority that felt, look, we're going to punish people based on the crime. It's the crime that's important to me. Based on the severity of the crime, that's the punishment. And now we've introduced this other concept about things like mitigating circumstances; okay? And so I needed to revisit that with you.

If you are presented with evidence of mitigating circumstances, would you really consider that if your view is we're looking at the crime? You understand my concern?

PROSPECTIVE JUROR 170: Yes, yes. I would look at it maybe not as being just as part of the penalty part, you know, whether death or not death.

MR. BERRIGAN: Yeah, that's what I mean. That's the part we're talking about, the punishment part; right?

PROSPECTIVE JUROR 170: Yes.

MR. BERRIGAN: It's being offered to you just as we just discussed with Juror 489. It's not an excuse for the crime.

PROSPECTIVE JUROR 170: No.

1166

MR. BERRIGAN: But it is a factor the jurors will be asked to consider in making a decision about punishment. You follow me?

PROSPECTIVE JUROR 170: Yes, yes.

MR. BERRIGAN: Sometimes people say -- and again, there's nothing wrong with it. But sometimes people say to me, Hey, look, I hear you, Berrigan. I hear where you're coming from. But my own view is I don't think that should matter. I mean, I don't think it should matter whether you came from a privileged background or a deprived background. I don't think

Page 101

it should make a difference whether you grew up with every opportunity or you had, you know, childhood abuse or neglect in your family because I don't really think those things matter at the end of the day in terms of what you did, and so I'm not going to -- I'm really not going to consider them. I looked at them, but I'm not going to consider them.

And that's all right, that opinion, absolutely okay. I was just concerned maybe that you might have that opinion based on the questionnaire response about the crime. So you tell me, would this stuff, this background information, would that be something you'd really consider?

PROSPECTIVE JUROR 170: Yes, I would.

MR. BERRIGAN: Would you?

PROSPECTIVE JUROR 170: Yes.

MR. BERRIGAN: How would you consider it?

1167

PROSPECTIVE JUROR 170: I'm not exactly sure how to explain that anyway. I guess that's -- when I went through them questions and stuff too, you know, I just take things one at a time and just have to look at everything. I just think of the possibilities that -- you know, without trying to prejudge everything, you know, because I'm not sure what everything goes on and what -- you know, I just kind of figure I just have to wait and see.

MR. BERRIGAN: Okay. But this is something you'd consider?

PROSPECTIVE JUROR 170: Yes.

MR. BERRIGAN: Okay. May I have just a moment to confer with my colleagues? I think I'm finished, sir.

THE COURT: You may. Why don't you all take a stretch

Page 102

break.  Just stand up and stretch for a minute or so.  Thank you.

Okay.  Please be seated.  Now one of the co-counsel, Al Willett, will ask questions on behalf of Miss Johnson.

MR. BERRIGAN:  I just wanted to thank the jurors for their patience, Judge.  Thank you.

THE COURT:  Mr. Willett?

MR. WILLETT:  Thank you, Judge.

THE COURT:  Mr. Willett, just so you know, I'm going to give you till five to noon.

MR. WILLETT:  Okay.  I can do it.

1168

THE COURT:  Thirty minutes.

MR. WILLETT:  Thank you, Judge.

THE COURT:  Then the government will have 30 minutes for general questioning as well.

MR. WILLETT:  Okay.  Thank you.  Well, there's some good news right out of the chute.  Good morning.  My name is Al Willett.  I'm going to have a half hour with you, and what I'm going to do is this, is I want to try to go through some of your individual questionnaires with some of you because I've learned that that's a very important part of this process.

I need to ask you one general question to start with, though, and who was left off with our microphone?  Just hold on to it, Mr. 170.  I am assuming that when you arrived this morning Judge Bennett's clerk gave you a list of potential witnesses in this case that was in alphabetical order.  Have all of you had a chance to review that list before you walked into the courtroom?  And with -- 170, would you hand the microphone to Mr. 120, and then he'll hand it to Mr. 638?

Page 103

120, did you have a chance to review that list, sir?

PROSPECTIVE JUROR 120:  Yes.

MR. WILLETT:  Mr. 638, did you have a chance?

PROSPECTIVE JUROR 638:  Yes, I did.

MR. WILLETT:  Great.  I want to go through some of the names with you, and then I'll just ask a general question.  Many of the witnesses that you may see are my client's family

1169

members:  Pearl Johnson, my client's mother; my client's sisters, Wendy Jacobson, Holly Dirksen, Jamie Jo Hays; my client's brother, Jim Johnson; my client's daughters, Alyssa Johnson and Marvea Johnson.  Were any of those particular names familiar to any of you?  And I'm not seeing any nods of affirmation.

Now then, a more general question.  Were -- did anyone in this panel see any name on the witness list that was familiar to them?  Would you please hand the microphone to Mr. 89, sir?  Mr. 89, who did you recognize?

PROSPECTIVE JUROR 89: DeSotel, third page.

MR. WILLETT:  I'm sorry.  One more time, sir.

PROSPECTIVE JUROR 89:  DeSotel, on the third page.

MR. WILLETT:  And is the gentleman's first name Harvey?

PROSPECTIVE JUROR 89:  Yes.

MR. WILLETT:  Okay.  Now then, I know that gentleman.  He'll be a potential witness.  He is a deputy sheriff with the Linn County Sheriff's Office.  And I don't want to demean -- I think he's also a sergeant.  I don't want to forget his rank.  But Sergeant DeSotel is a Linn County deputy sheriff.  Are we talking about the same individual?

Page 104

PROSPECTIVE JUROR 89: I don't know the individual particularly, but that's my sister-in-law's last name, and she may be related to him, just a coordination there.

1170

MR. WILLETT: Have you ever seen that gentleman?

PROSPECTIVE JUROR 89: No.

MR. WILLETT: Okay. So my describing him to you wouldn't help a whit.

PROSPECTIVE JUROR 89: Right.

MR. WILLETT: The fact that he is -- and I'm sorry, the score card was he's your sister-in-law's --

PROSPECTIVE JUROR 89: That's my sister-in-law's last name. That's her relatives.

MR. WILLETT: Could be a shirttail relative maybe.

PROSPECTIVE JUROR 89: Right.

MR. WILLETT: And Sergeant DeSotel may very well testify for the defense. Would that in any way cause you a problem if you were selected as a juror in this case?

PROSPECTIVE JUROR 89: No.

MR. WILLETT: Okay. Would you give an unfair advantage to the defense if he was testifying for the defense versus the government?

PROSPECTIVE JUROR 89: No.

MR. WILLETT: Okay. Did anybody else recognize a name of a witness? And I'm seeing no nods of affirmation. So, Mr. 89, if you will, just hang on to the microphone for a minute. Let me do this. Since I've been apprised that I have 30 minutes, before I jump into the questionnaires, I want to discuss one group concept with you, and that group concept would

1171

Page 105

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1020 of 3245

be my client's decision whether or not to take the stand in her own defense, and that is usually referred to under our Constitution as a person's Fifth Amendment right to the Constitution.  Mr. 89, have you heard of that right, the Fifth Amendment to the Constitution?

PROSPECTIVE JUROR 89:  No.

MR. WILLETT:  Okay.  Do you realize that in a criminal case, sir, the criminal defendant always has a right to decide whether or not to take the stand in his or her own defense?

PROSPECTIVE JUROR 89:  Okay.

MR. WILLETT:  And you're familiar with that concept?

PROSPECTIVE JUROR 89:  Yes.

MR. WILLETT:  Now then, are you aware that if Miss Johnson decides not to take -- not to exercise that right the government can't compel her to come to the stand?

PROSPECTIVE JUROR 89:  Okay.

MR. WILLETT:  Are you aware of that, sir?

PROSPECTIVE JUROR 89:  I am now.

MR. WILLETT:  Okay.  That's fine.  We'll go through this together.  And if that decision is made, Judge Bennett would instruct the jury accordingly that it's Miss Johnson's right; it's her decision to make; it can't be held against her; and you can't even take a negative inference from it.  In other words, even if you're saying, boy, Mr. Willett, if I was sitting there, I'd be the first one to the witness stand as soon as the

1172

defense case starts, the fact that Miss Johnson may feel contrary, you can't hold that against her or derive a negative inference from it.  Do you understand that, sir?

Page 106

PROSPECTIVE JUROR 89:  Yes.

MR. WILLETT:  Do you have a problem with that?

PROSPECTIVE JUROR 89:  No.

MR. WILLETT:  Okay.  Great.  Now then, let's add on one more layer, and we're going to pass the microphone to Mr. 227.

Mr. 227, I'm telling you and all of your fellow panel members this at the same time.  Ms. Johnson will not take the stand in her own defense.  You may hear other areas of testimony.  You may hear about people testifying to her conversations.  You may hear people testifying to her letters.  But she won't take the stand in her own defense.  Now, how do you feel about that?

PROSPECTIVE JUROR 227:  That's her decision.

MR. WILLETT:  Do you have a problem with it?

PROSPECTIVE JUROR 227:  No.

MR. WILLETT:  Will you hold it as a negative against her if she makes that decision?

PROSPECTIVE JUROR 227:  No.

MR. WILLETT:  Okay.  Could you please pass the microphone down to Mr. 170?  And he's in the same row you are, sir, the blue shirt with the hair color that's similar to my

1173

own.

Now then, Mr. 170, can you think of reasons, legitimate reasons, why somebody might not want to take the stand in their own defense?

PROSPECTIVE JUROR 170:  Like sometimes, you know, you -- I don't know.  I always say whenever I drink coffee or something you start talking about stuff without thinking, you

Page 107

know, and you might say something you don't really mean and people take it wrong, so it's just better off letting people that know what they're doing do the talking for me or whatever.

MR. WILLETT: Sure. Do you think this is the easiest place to sit?

PROSPECTIVE JUROR 170: No, definitely not.

MR. WILLETT: Do you think it might be possible to be nervous?

PROSPECTIVE JUROR 170: A little bit, yeah.

MR. WILLETT: Let me give you a very quick example if I may. I had the opportunity -- as Judge Bennett told you, we've had one week of jury selection. I had the opportunity to return home, make sure I still had a wife, children, a law practice, and I was able to review my mail and the court decisions that came in while I was gone.

And just before we started this trial, I had the privilege of defending a young man in Linn County, Cedar Rapids, state misdemeanor court on what lawyers called a PULA charge.

1174

Now, that's an acronym, but it stands for possession under the legal age, and what it was was this young man was in a tavern in the town where he goes to college, and it was alleged that he possessed a bottle of beer.

Now, the way it works in this particular tavern is if you're underage they give you a little wristband showing you're underage. And the allegation that the city brought against my young client was a police officer who was in the bar checking IDs which he had every right to saw my young client hand a bottle of beer to a young lady. That's the allegation.

Now, my client comes to see me. He says, Mr. Willett,

Page 108

I didn't do anything wrong. We're sitting at a table. This young lady says, Where's my beer? I handed it to her. The next thing I know the city police officer's taking me outside and charging me with a simple misdemeanor.

So we talked to witnesses. We find out that's sort of a common theme, and the young men that were sitting around them said, Yes, Mr. Willett, that's true. The young lady who had the bottle handed to her said, Yes, I asked, Where's my beer, and he handed it to me.

So we went to trial. We had a little trial. We had it in front of one of our magistrates for Linn County. The police officer testified for the city. The young people who were around my client testified in his defense that this was a momentary passing of a beer bottle pursuant to a request.

1175

Got to the point in time where it was my client's decision do I take the stand or not. Very nice young man, highly intelligent, very articulate, nervous as a long-tailed cat in a room full of rocking chairs. And I said, Steven, what would you like to do? And he said, Mr. Willett, he says, I know I didn't do anything wrong, but he says, I can't get in that box. Perfect legitimate reason to exercise the Fifth Amendment right.

So if you'd hand the microphone to Mr. 120, Mr. 120, would you agree that there are certainly legitimate reasons why somebody just wouldn't feel comfortable getting in the witness stand?

PROSPECTIVE JUROR 120: Certainly.

MR. WILLETT: And will you hold it against my client if for whatever reason she decides it's not in her best interest

Page 109

to exercise her Fifth Amendment right and testify?

PROSPECTIVE JUROR 120:  Absolutely not.

MR. WILLETT:  Would you please pass the microphone back up to Number 528, the lady right immediately behind you?

One of the things we haven't had a chance to talk about is obviously this case is driven by the five murders that have taken place.  I mean, that's the driving force.  That's what's driving the boat.

But I'm staying in a very comfortable hotel where I have a beautiful view of the Missouri River.  And every morning

1176

I get up.  I have a quick breakfast, and I see the river, and not only do we see what's on the surface of the river, but we know that there's an undercurrent.  Are you following me?

PROSPECTIVE JUROR 528:  Yes.

MR. WILLETT:  Well, the undercurrent in this case is drugs.  It was mentioned in passing by Judge Bennett that I believe there's ten counts.  It was articulated by Mr. Berrigan that we're talking about a conspiracy for five of the counts, a criminal agreement, that the other five counts deal with a continuing criminal enterprise.  Well, what this criminal agreement is about is manufacturing and delivering methamphetamine.

Now then, Miss 528, if I remember right from your questionnaire, you did have some opinions about controlled substances.

PROSPECTIVE JUROR 528:  (Nodded head.)

MR. WILLETT:  And I know that you answered Mr. Berrigan's questions just as ably as you could in regards to these murders and how that impressed you or how that factored on

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1025 of 3245

you.  But let's add one more layer.  Let me now tell you that the underlying current to this case involves the manufacturing and the delivery of methamphetamine.  And you will certainly hear Mr. Williams stand up and say that my client was knee deep in this criminal agreement to make or deliver meth.  Can you give my client a fair trial based upon this undercurrent that's

1177

now prevalent in this case?

PROSPECTIVE JUROR 528:  Yes.

MR. WILLETT:  Can you give her the presumption of innocence?

PROSPECTIVE JUROR 528:  Yes.

MR. WILLETT:  And just a little pop quiz, who does have the burden of proof in this case?  In terms of my client's guilt, who has to prove her guilty?

PROSPECTIVE JUROR 528:  State.

MR. WILLETT:  Okay.  And does my client have to prove anything to you during the course of this trial to show you that she's innocent?

PROSPECTIVE JUROR 528:  I don't understand.

MR. WILLETT:  Okay.  Do you think my client, Miss Johnson, has any burden in this case to prove her innocence to you?

PROSPECTIVE JUROR 528:  Yes.

MR. WILLETT:  Okay.  Why do you say that, ma'am?

PROSPECTIVE JUROR 528:  To defend herself?  Is that what you mean?

MR. WILLETT:  Well, just in terms of the burden of proof.  In other words, let's say you return to the jury and at the end of all deliberations you're considering not guilty

Page 111

verdicts on each count.  For you to get there, does Miss Johnson have to prove something to you, or is the burden always going to

1178

be on the state -- or excuse me, the government?  I was using your words for just a second.

PROSPECTIVE JUROR 528:  I suppose it should be on both parts.

MR. WILLETT:  Why do you say that?

PROSPECTIVE JUROR 528:  We have to weigh both sides.

MR. WILLETT:  Okay.  Now then, let me give you one more layer.  Judge Bennett will instruct you and -- that the burden of proof is always upon the government, okay, that the only way they can convict my client on any of these ten counts is by carrying that burden of proof by proof beyond a reasonable doubt.  And that the burden is never upon Angela Johnson to prove her innocence to you.

PROSPECTIVE JUROR 528:  Okay.

MR. WILLETT:  You know, I think you heard Judge Bennett say earlier in the morning that he's big on a citizen's right to serve as a juror.  I think it's also a fair description to say that he's big on the burden of proof, and he'll instruct you accordingly; okay?

PROSPECTIVE JUROR 528:  Uh-huh.

MR. WILLETT:  Now then, do you understand that the burden of proof is always upon the government?

PROSPECTIVE JUROR 528:  Sure.

MR. WILLETT:  Do you understand it's proof beyond a reasonable doubt?

1179

Page 112

PROSPECTIVE JUROR 528:  Sure.

MR. WILLETT:  Do you understand that my client doesn't have to do a thing --

PROSPECTIVE JUROR 528:  Sure.

MR. WILLETT:  -- to maintain that presumption of innocence?

PROSPECTIVE JUROR 528:  Uh-huh.

MR. WILLETT:  Do you have a problem with it?

PROSPECTIVE JUROR 528:  No.

MR. WILLETT:  And do you understand now where we're going?

PROSPECTIVE JUROR 528:  Right, yes.

MR. WILLETT:  Let's see.  738, if you could pass the microphone down to 738.

Mr. 738, if my memory serves me correctly in reviewing your questionnaire, you had some opinions, some strong opinions, about controlled substances.  Am I remembering correctly, sir?

PROSPECTIVE JUROR 738:  I believe I might.  I don't really remember.

MR. WILLETT:  Okay.  Okay.  Question 42 -- and I'm looking at your questionnaire, sir -- do you believe that the possession or sale of drugs should be a crime?  And you answered yes.  The question was why.  Too many young people get hooked on drugs.  Suppliers and dealers should be punished.  Sound familiar?

1180

PROSPECTIVE JUROR 738:  Right.

MR. WILLETT:  Sound like your answer?

PROSPECTIVE JUROR 738:  Yes.

Page 113

PANEL E, 4-18-05

MR. WILLETT: Okay. Now then, now that you know that we have a murder case where the undercurrent is all about methamphetamine and manufacturing methamphetamine, what do you think about this case now?

PROSPECTIVE JUROR 738: I'd have to hear the evidence.

MR. WILLETT: Okay. What do you think about methamphetamine in Iowa? There's certainly a lot of news articles about it. You probably hear frequently that somebody had this meth lab or somebody got pulled over for this or somebody had meth or they were buying things to make meth. What do you think about that?

PROSPECTIVE JUROR 738: I think it's a real problem.

MR. WILLETT: Okay.

PROSPECTIVE JUROR 738: And I'm afraid that too many young kids are going to get hooked on it and there's too much of it in our society.

MR. WILLETT: Okay. And based upon that opinion of yours which is completely appropriate, are you going to have any trouble giving my client, Miss Johnson, a fair trial?

PROSPECTIVE JUROR 738: Not really.

MR. WILLETT: Okay. Now, when you say not really, you know, lawyers think too much, and I'll be the first one to admit

1181

I think too much when I hear an answer. But when you say not really, to me that sounds like you're qualifying your answer. Is there something you're thinking about that might impact your decision and make it hard for Miss Johnson in this trial?

PROSPECTIVE JUROR 738: No. I'm just saying that I don't know, you know, what her background is or what another person's background is with drugs, if they were forced into

Page 114

using them or how they come across them. But I believe that everybody is judged on who they are.

MR. WILLETT: If you heard testimony that my client used methamphetamine, would you be able to give her a fair and impartial trial?

PROSPECTIVE JUROR 738: Yes.

MR. WILLETT: Hand the microphone down to Mr. 227 for just a second if you will.

One other major concept I want to try to address, Mr. 227, before I sort of randomly hit some of these questionnaires again, it was mentioned in passing by Chief Judge Bennett that there are ten counts in this case. There's five counts of conspiracy and, with each count, one of the murdered individuals is tied to each count. There's five counts of what is called a continuing criminal enterprise, and each one of the murder victims is tied to each one of those particular counts; okay?

I can explain a conspiracy to you in my sleep. It's a

1182

criminal agreement entered into willfully and knowingly to obtain an unlawful objective. In this case the allegation is two or more people got together and entered into a criminal agreement to manufacture or to make methamphetamine.

Now then, please don't ask me to explain continuing criminal enterprise to you right away because I'm sure I'll be inartful about it, and I'm going to rely upon the Court to do it right. But needless to say, it's a very serious offense; okay?

Now then, here's my concern. There's ten counts, and you'll be instructed that you need to consider each count separately and individually. So when you retire to the jury

Page 115

room to deliberate on a verdict, you'll start with, I'm assuming, Count 1. You and your fellow jurors will decide that count. And then you'll move to Count 2.

Here's my concern. Regardless of what your verdict is on Count 1, you need to decide each count separately. And the concern that I have is in a multiple-count case where volume becomes an issue -- and I don't know about you, but I think ten's a big number -- should I be concerned that you're sitting there going, Well, Mr. Willett, if there's ten counts, isn't she guilty of at least one or some or a few? Do you have that concern, sir?

PROSPECTIVE JUROR 227: Well, I've served twice on a petit jury, and it really concerns me, you know, that you gotta go beyond a reasonable doubt.

1183

MR. WILLETT: Okay. And are you willing to do that for each and every count?

PROSPECTIVE JUROR 227: It's the only way to be fair.

MR. WILLETT: Okay. And so whatever the result is on Count 1, you'll set that aside and say, Okay, clean slate on Count 2; let's start with Count 2, and you'll be able to do that.

PROSPECTIVE JUROR 227: I sure hope so.

MR. WILLETT: Well, I hope so too. That's why I'm asking the question. Now, you said something interesting that you served on two petit juries. Both criminal cases?

PROSPECTIVE JUROR 227: No.

MR. WILLETT: Both civil cases?

PROSPECTIVE JUROR 227: Yeah.

MR. WILLETT: And you realize the standard of proof as

Page 116

has been mentioned is much lower, a preponderance of the evidence, more likely than not. You understand that, sir.

PROSPECTIVE JUROR 227: No.

MR. WILLETT: Okay. In a criminal case the burden of proof for the government is proof beyond a reasonable doubt which is a much higher standard. Do you understand that?

PROSPECTIVE JUROR 227: Right, yeah.

MR. WILLETT: And I don't want to confuse you by talking about civil cases because this obviously isn't a civil case; okay? We're not asking for money. The judge will

1184

instruct you on proof beyond a reasonable doubt and how that's defined, but just one common concept in that is hesitation, that a reasonable doubt is the type of doubt that would make a person hesitate, that when I say that to you, do you have sort of a visual image of where I'm going with hesitation?

PROSPECTIVE JUROR 227: Yeah.

MR. WILLETT: And what would that mean to you, sir? What would hesitation mean to you?

PROSPECTIVE JUROR 227: Well, I've been in business for many years, and I've made a lot of decisions, and I want to tell you what: They haven't all been right, but in a case like this, you'd want to make awful, awful sure that you made the right decision and listened to every part of it because you're involving a person's life here, and it would weigh very heavily on you.

I'll be real honest with you. I'd a whole lot rather not serve on this for the reason that I don't care how hard a person you are. The impact of this thing is somehow going to infect your life because it involves a young lady, and it's a

Page 117

very serious crime that you're talking about, and I -- I just think it's going to interrupt your life somewhat, you know, so . . .

MR. WILLETT: Okay. So if I've heard you correctly, it's now your feeling that if you had your druthers you'd rather not serve.

1185

PROSPECTIVE JUROR 227: Absolutely positively right.

MR. WILLETT: Okay. I want to -- maybe Judge wants to address this separately or -- I mean if -- I can either go to another venire person, Your Honor, or continue or if you want to jump in, I don't --

THE COURT: I don't feel the need to jump in.

MR. WILLETT: Okay. Thank you, Judge.

THE COURT: I could why -- he's not saying he wouldn't serve or that he can't serve fairly. You're just saying if it was up to you you'd rather not serve because this case could potentially involve the decision of whether to take somebody's life or not. And there's probably no more weighty decision that you'll ever make in your life. Is that a fair summary of your position?

PROSPECTIVE JUROR 227: That's exactly right, sir.

THE COURT: Right.

PROSPECTIVE JUROR 227: You're right, Judge.

THE COURT: And that's why you'd be a good juror.

PROSPECTIVE JUROR 227: And you know something? At my age in my life -- I'm 63 years old -- I really don't care about this kind of a deal.

THE COURT: But if you were selected, you would be a conscientious juror.

Page 118

PROSPECTIVE JUROR 227: I probably would, yeah.

THE COURT: I mean, you understand how serious this

1186

is.

PROSPECTIVE JUROR 227: I understand very truly. It's a very, very serious matter.

THE COURT: Right. And you're just saying you'd rather be doing what you normally do every day than sitting in this courtroom for the next three months. And believe me, I understand that.

Okay. But you're free to follow up any way you want.

MR. WILLETT: No. Now I understand perfectly. Number 227, we're going to take the microphone all the way back up to Mr. 301.

Mr. 301, in your questionnaire on question 60, you were asked about the presumption of innocence and the proposition that a defendant is presumed to be innocent, and your answer was, It is something we need to constantly be thinking about as even just an accusation brings with it some presuppositions -- I believe it's "on guilt" as opposed to "of guilt." Is that the way you feel, sir?

PROSPECTIVE JUROR 301: Yes.

MR. WILLETT: So the fact that there have been ten accusations made against my client through the vessel of ten criminal counts, in your mind is there some presupposition of guilt with Angela Johnson as we sit here right now?

PROSPECTIVE JUROR 301: Well, I don't presume her to be guilty. I guess it just -- how do you say it? If there were

1187

Page 119

no charges against her, there would be no presumption, but I can't deny that the fact that there are charges brings some, you know, question into your mind I guess.

MR. WILLETT: And does it bring some question into your mind as we sit here about her presumption of innocence?

PROSPECTIVE JUROR 301: Well, right now I presume her to be innocent right now, but the question is there. I can't deny that it's there I guess because we're all sitting here.

MR. WILLETT: Okay. Does it matter to you that it's ten counts as opposed to one or two?

PROSPECTIVE JUROR 301: No.

MR. WILLETT: Okay. And does my client have to do anything in this case to prove to you that she's innocent?

PROSPECTIVE JUROR 301: I'm required to presume her innocent right now, and I -- you know, it's a struggle to do that with charges, but I would presume her innocent. And you're asking if the government has to prove her guilty, and that's yes.

MR. WILLETT: Would you please pass the microphone down to Mr. 489.

You are Mr. 489, sir. I apologize.

PROSPECTIVE JUROR 489: 489.

MR. WILLETT: There you go. Mr. 489, one of the subjects in this case is going to involve what are called cooperating witnesses or cooperating individuals, individuals

1188

who might be in a position to gain a benefit by testifying against my client. The nonpolitically correct nickname for these people might be snitches. Do you have an idea of who we're talking about?

Page 120

PROSPECTIVE JUROR 489: Yeah, I assume you're talking about people who might have something to gain by --

MR. WILLETT: Yes, absolutely.

PROSPECTIVE JUROR 489: -- giving us their testimony?

MR. WILLETT: Question 51 of your questionnaire, sir, What would you think of a witness who is or was in jail or prison who agreed to cooperate with the government by testifying against a person charged with a crime? A witness is a witness. How their testimony compares to the rest of the issues is what makes it believable or not.

Now, what I took that to mean is you would be looking for a person's consistency or inconsistency in their testimony. Did I read your answer right?

PROSPECTIVE JUROR 489: Well, how it is consistent with other testimony meaning if somebody testified and they were the only person out of eight, there's eight people who testified one way and this person testified the other, you'd probably have to consider whether or not to give that testimony much weight or much balance as opposed to the others.

MR. WILLETT: One of the things Judge Bennett will do is he'll give you an instruction that lists several factors that

1189

you can use to assess a witness's credibility. And I guess what I'd like to know is -- and I think maybe you've already told me this -- is would you want to know if a person was in prison trying to reduce their sentence by testifying against my client? Is that the kind of knowledge you'd like to know in order to assess a person's credibility, or is it just, Mr. Willett, I don't care; I just want to know if their story's believable when I compare it to all the other cooperating individuals?

Page 121

PROSPECTIVE JUROR 489: I don't know if -- if they have something to gain or something to lose by their testimony, I don't know if that makes it more or less credible. I mean, the fact that they're in prison, they might be in there wrong -- I mean, you can't -- you can't base their testimony on what they've done. Everybody's done something. I just can't say whether they're in prison now or not would have much of a -- much bearing on what they had to say, whether it was right or wrong.

MR. WILLETT: Okay. Thank you. Would you please pass the microphone to Ms. 657.

Yes, ma'am, that's you. Good morning. One quick question. You were asked about the presumption of innocence in question 60. How do you feel about the proposition that a defendant is presumed to be innocent of the charges against her, a presumption that can be overcome only if the government is able to prove guilt to each juror unanimously and beyond a

1190

reasonable doubt? And the answer was, The courts say a person is innocent till proven guilty. Absolutely correct answer; okay? I want to know if that's your belief.

PROSPECTIVE JUROR 657: Well, yeah.

MR. WILLETT: Okay. I just wanted to make sure. I wanted to make sure we weren't drawing lines too fine here. And you're absolutely right that the Court will tell you that a person is innocent until proven guilty, and you believe in that proposition yourself.

PROSPECTIVE JUROR 657: Yes, I do.

MR. WILLETT: Okay. Great. Would you please pass the microphone down to Mr. 638, the gentleman in the dark shirt in

Page 122

our front left corner.

Sir, you were asked about the presumption of innocence in question 60, the concept that a defendant is presumed to be innocent, and your answer was, I guess I'm all right as long as the person is innocent. I have no problem. But if they are guilty and the government can't prove it but knows -- and part of your answer was cut off but I think it reads, But knows they are guilty and the person gets away with it, then I have a problem. And I guess I need to know who's your problem going to be with, sir?

PROSPECTIVE JUROR 638: Probably with the system. That's what I was thinking at the time.

MR. WILLETT: Okay. But you realize that there are

1191

cases where no matter what you may think about my client's innocence or guilt at the end of the day it's still the government's burden, proof beyond a reasonable doubt.

PROSPECTIVE JUROR 638: Yeah.

MR. WILLETT: And if they don't get there for whatever reason, you're not going to hold that against Miss Johnson, are you?

PROSPECTIVE JUROR 638: Oh, no, no, no, no, no.

MR. WILLETT: Okay. Okay.

THE COURT: Would you like a three-minute warning?

MR. WILLETT: Yes, Your Honor, I'd appreciate that. And I'm not going to get through everybody, but I'll stop on time.

Question 72, sir -- I'm still on your questionnaire -- No matter what you have read, seen, or heard, do you now have any beliefs or opinions about the guilt or innocence of Angela

Page 123

Johnson? And you answered, Yes. I believe she knew what her boyfriend did. Whether she helped or not, she is guilty if she knew.

Now then, my only concern is, you know, we're sitting here right now. You've heard descriptions of the case, but you haven't heard one whit of evidence.

PROSPECTIVE JUROR 638: Correct.

MR. WILLETT: Is my client still innocent right now?

PROSPECTIVE JUROR 638: Yes.

1192

MR. WILLETT: Okay. It bothers -- it concerns me as her defense lawyer when the sentence starts, I believe she knew what her boyfriend did. What made you say that, sir?

PROSPECTIVE JUROR 638: Well, I guess like if I'm married to my wife and she did something, I would have some idea what was going on. I guess that's where I interpreted that or whatever.

MR. WILLETT: Well, I hate to give you -- I hate to give you a glimpse by my own marriage, but do you think your wife always knows what you're doing and you always know what your wife is doing?

PROSPECTIVE JUROR 638: Probably not.

THE COURT: It's probably a good thing, isn't it?

MR. WILLETT: So are you willing to listen to all the evidence?

PROSPECTIVE JUROR 638: Definitely.

MR. WILLETT: And I think where my concern is, it's the old concept lawyers talk about guilt by association. You're not going to find Miss Johnson guilty right out of the chute just because she may have had a terrible choice in a boyfriend.

Page 124

PROSPECTIVE JUROR 638: No, no.

MR. WILLETT: Number 170, our gentleman in the blue shirt, if you could pass the microphone to him, and I think I can just finish with him and be done.

The question about cooperating individuals, What would

1193

you think of a witness who is or was in jail or prison who agreed to cooperate with the government by testifying against a person charged with a crime, and you answered, Not sure. Now, of course, I'm going to say what weren't you sure about?

PROSPECTIVE JUROR 170: Right, because, like you said, you don't know if you're trying to get -- their credibility might lack. If it ties in, their story, with everybody else, it's good. But if it's just different from somebody else and they're just trying to, like I said, get out of jail early or whatever, just trying to fabricate a story just to better themselves.

MR. WILLETT: So you'd be willing to look at a person's motivation.

PROSPECTIVE JUROR 170: Correct.

MR. WILLETT: Would you be willing to look at the length of their sentence that they're currently serving? In other words, well, Mr. Willett, if it's a very lengthy sentence as opposed to a year or so, maybe I've got to hold that person with a lengthy sentence with higher -- you know, with sort of a different assessment.

PROSPECTIVE JUROR 170: Yes, if they've got something definitely to gain out of it somewhere along the line, something to look at.

MR. WILLETT: Mr. 170, thank you.
Page 125

Judge, I believe I'm at my 30-minute mark, and I'll

1194

stop.  Thank you.

THE COURT:  Thank you.  Members of the jury, we're going to take an hour and five-minute recess.  It is now about -- well, an hour and four minutes.  It's now about 4 minutes to 12.  We'll start back at one o'clock.  You're free to leave the building, go out to lunch.

But please remember my cautionary instructions about not discussing this case among yourselves or with anybody else or let anybody talk to you about the case.  If you come back to the jury room at a few minutes before one, then we'll bring you up exactly at one o'clock, and it will be the government lawyers' turn to ask questions.  Thank you.

(Panel E exited the courtroom.)

THE COURT:  Please be seated for a second.  Is there anything we need to take up from counsel's perspective?

MR. MILLER:  Just briefly and informationally, Your Honor, the prosecution is not splitting voir dire.  I'll -- the time that was spent between Mr. Berrigan and Mr. Willett I'm sure is more than enough for me to cover both areas.  I just wanted the Court to be advised that I wasn't limiting myself to just the general voir dire or the death penalty issue.  I'm going to cover both.

THE COURT:  Oh, that's fine.  Okay.

Mr. Berrigan?

MR. BERRIGAN:  No.  The prosecution kindly told us

1195

Page 126

about that, Your Honor.  I just wanted to make sure we are still going to do publicity individually at the end?

THE COURT:  Yes.

MR. BERRIGAN:  Okay.  Great.

THE COURT:  Now, for your consideration before I impose it but it's for your consideration -- I may or may not impose it -- but I'm leaning towards changing jury selection not dramatically at all.  I tried to pick what I think are the best of how we've done it, and here's what I've come up with.  And we'll talk about it at the end of the day today.

We would start group -- we would start -- right after I'm done which takes us to about nine o'clock, we would start with group voir dire.  The government would always go first just like they would in a regular trial.  Each side would have 30 minutes.  I don't care if you divide it up among one lawyer, two lawyers, or, on the defense side, three lawyers.  Doesn't make any difference to me.  We would then go to individual questioning of jurors.  The government would always start first, but we would alternate.

So this would be the pattern.  The government would start first every day, but then the second juror to be questioned individually the defense would start, then back to the government.  We would just rotate.  Each side would have ten minutes to examine on any area you want.  If you want to go back and cover the stuff in group voir dire and talk to them about

1196

presumption of innocence and not talk about the death penalty, that's fine.  The only requirement would be that if you're going to ask a question about pretrial publicity it must be asked during the individual questioning.

Page 127

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1042 of 3245

Each side would have ten minutes and then probably two minutes' rebuttal for the side that went first. Then when we're done with each individual juror -- here's the rub. When we finish the individual questioning of each juror, you would then exercise both your challenges for cause and your peremptory challenges and we'd just do it in order. If the government went first with individual questioning, then they'd have to exercise their challenge for cause. Then the defense would exercise their challenge for cause. Then we'd come back to the government. They could exercise any of their peremptories or not, and then we'd go to the defense, and then it would just rotate with each witness.

So that's what I'm strongly thinking about doing. I just think it would be more effective, better. When you add up the amount of time, I'm satisfied that with pretrial -- I wouldn't do this without pretrial questionnaires, but given the fact you have pretrial questionnaires, you know an enormous amount about each individual juror. I think this adopts the best of both ways we've been doing it. And I'm extremely comfortable with it. So we can take it up at the end of the day; okay? Thanks.

1197

(Lunch recess at 11:59 a.m.)

THE COURT: Ready to have the jurors brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. MILLER: Yes, sir.

(Panel E entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Miller, you're going to question for the government?

Page 128

MR. MILLER: Yes, Your Honor.

THE COURT: Okay. Any time you're ready, you may proceed. Thank you.

MR. MILLER: Thank you, Your Honor. May it please the Court, counsel.

Good afternoon, folks. How's everybody holding up so far? Okay. I want to do just a couple things this afternoon. I want to briefly reintroduce myself, and then I want to go over with you folks just a couple of the matters that Mr. Willett covered, and then I want to visit with you also about the death penalty issue, and then I'm going to try to sit down. Mr. Williams and I are not going to split this portion of our voir dire or voir dire or how ever you want to pronounce it. I learned to practice law in Guthrie County in western Iowa. We pronounced it jury pickin' out there. But whatever you want to call it, we're not going to split that up this morning. And I hope to be able to sit down here within the next I hope not much

1198

more than an hour. There are a few things I need to visit with you about, of course.

Just, again, to briefly reintroduce myself -- Judge Bennett and Mr. Williams both briefly described my role in this proceeding -- my name is Tom Miller. I am not the attorney general of the state of Iowa. I am a special assistant United States attorney in connection with this case. I like to point out to Mr. Williams that he is merely an assistant attorney general -- excuse me, an assistant U.S. attorney. I am a special assistant U.S. attorney.

And you might ask what makes Miller so special. Unfortunately it's not that I'm more important or better than

Page 129

anyone else. In fact, it's quite the opposite. Special in my case refers to special as opposed to general. Mr. Williams is an assistant U.S. attorney for purposes of all cases that he prosecutes. He prosecutes on behalf of the U.S. Attorney's Office for the Northern District of Iowa.

I am a special assistant U.S. attorney in that I am limited to my participation in that role to the prosecutions arising out of these five deaths. Ordinarily I am a state prosecutor. I work out of Des Moines and travel throughout Iowa prosecuting cases on behalf of the state. And while I like to think of myself as performing and serving my country as a state prosecutor, technically I'm only representing the state in those cases. And so, of course, as with all of you and everyone who

1199

is participating in these proceedings, it's a privilege of me to be acting here as an assistant U.S. attorney. That's my role in this case in a nutshell.

What I want to do with you folks this afternoon in the next hour or so is to get just a little bit better acquainted, not much. Obviously in this room full of people and in the amount of time we have, we're not going to get well acquainted, but I would like to get just a little bit better acquainted with each of you and, again, as I mentioned earlier, cover a couple of the concepts that Mr. Willett covered and also the very serious matter of your opinions about the death penalty as Mr. Berrigan did at some length, and he covered that so well that I don't think it will take me as much time. So let me get to those matters and move on.

It's Juror 489; is that correct, sir?

PROSPECTIVE JUROR 489: (Nodded head.)

Page 130

MR. MILLER: If we can pass the microphone to Juror 489, and I'm going to pick on you first, sir, because I noted in your questionnaire that you've been a juror before.

PROSPECTIVE JUROR 489: Right.

MR. MILLER: A couple of you folks have. I believe you have as well, Mr. 227. Tell us about that experience. How'd you feel about it, sir?

PROSPECTIVE JUROR 489: It was actually in this building. I've actually been across the way in Woodbury County

1200

also. But it was a civil matter. It was basically a lawsuit regarding an employer-employee relationship. Anyway, I come away with it with a pretty good perspect -- I mean, I enjoyed it when it was all said and done. It was very educational.

MR. MILLER: Was it a more positive experience than what you expected going in?

PROSPECTIVE JUROR 489: Yeah. I expected going in to try to get out.

MR. MILLER: We talked about that this morning, and the reason I raise that is except for 227, all of the rest of your colleagues here I believe are here for the first time as jurors, and that is an intimidating situation. We're all a little bit uncomfortable when we're in a new situation. That's true -- it's human nature. We're all that way. I was just hoping that you could assure your fellow jurors that they're going to live through this experience, Mr. 227 (sic).

PROSPECTIVE JUROR 489: Yeah, I enjoyed it. I'm here basically to learn some more. I mean, I thought it was a great experience. I work for an insurance company, so I get to sit on the other end of the deal once in a while.

Page 131

MR. MILLER: Sure.

PROSPECTIVE JUROR 489: No, it's a good experience.

MR. MILLER: And I don't want to spend a lot of time on this, but I'm just curious. You were on a civil claim. Was that a claim that involved recovery possibly against an insured?

1201

PROSPECTIVE JUROR 489: No, that was before I worked for an insurance company. I was just a juror.

MR. MILLER: And again found the experience positive.

PROSPECTIVE JUROR 489: Yeah, positive, very satisfying.

MR. MILLER: That was across the street over in the beautiful --

PROSPECTIVE JUROR 489: No.

MR. MILLER: That was here in this building.

PROSPECTIVE JUROR 489: It was in the federal building.

MR. MILLER: This was here in this building. Did it happen to be Judge Bennett presiding in this case?

PROSPECTIVE JUROR 489: I -- I don't know. I don't remember many of the -- this was probably 10, 12 years ago.

MR. MILLER: Possibly not then because Judge Bennett I believe has been an Article III judge only since 1994, and it might have even been before that.

PROSPECTIVE JUROR 489: Could have been, yes.

MR. MILLER: Did you in that experience receive from the judge a set of instructions?

PROSPECTIVE JUROR 489: Oh, yes.

MR. MILLER: Were you happy to have those?

PROSPECTIVE JUROR 489: Oh, yeah, yeah. We were as

Page 132

naive as kindergartners.  The instructions were gospel.  They

1202

were the Bible.  You got that, and it gave you some place to start, some place to go.

MR. MILLER:  It would have been very difficult to do your job without having guidance from the Court.  Fair statement?

PROSPECTIVE JUROR 489:  Impossible.

MR. MILLER:  And I trust that you and your fellow jurors took those instructions very seriously and did your utmost to follow them.

PROSPECTIVE JUROR 489:  Yes.

MR. MILLER:  And I know you're telling us that about yourself, but did you get the sense that everybody else on the jury felt the same way?

PROSPECTIVE JUROR 489:  I think everybody was pretty serious.  I didn't -- there wasn't any -- it wasn't a very jovial -- it was a very serious matter.

MR. MILLER:  And everyone did their best to follow the Court's instructions.

PROSPECTIVE JUROR 489:  Yes.

MR. MILLER:  I have some good news for you here, and I expect you probably already suspect that in connection with this case should you be required to serve on this jury you will also have the benefit of instructions from the Court, guidance from the Court as to how you should go about doing your job and what the law of this country is as it relates to this case.  I trust

1203

you take some satisfaction in that, sir.
Page 133

PROSPECTIVE JUROR 489: That would be only appropriate I think.

MR. MILLER: I'm not going to try to tell you what the law is in detail. We've had some discussion. I think the best guidance you have is what you had earlier this morning, a little overview of the procedure. Should you be required to serve as a juror in this case, you will have much more detailed instructions. And I want to jump ahead to this death penalty phase understanding that the defendant has the presumption of innocence and you may never get to that stage.

But if you serve on this jury, sir, and if the jury arrives at the stage where they are determining the question of punishment, at that point, sir, you would also receive a set of instructions from the Court, and they would give you guidance on what you are to consider, that there are things that you may consider as aggravating factors, and there are things that you may consider as mitigating factors. You follow me?

PROSPECTIVE JUROR 489: Yep.

MR. MILLER: And you would want that I trust.

PROSPECTIVE JUROR 489: Absolutely.

MR. MILLER: And I don't think you're going to be told that you have to place any particular weight on any particular factor. That's the beauty of the jury system in part is that you bring your own values and you bring your own assessments as

1204

to what is important. But if you were instructed that the killing of children may be considered as an aggravating factor by you, is that something that would make sense to you, sir?

PROSPECTIVE JUROR 489: Sure.

MR. MILLER: And is that something you would consider?

Page 134

PROSPECTIVE JUROR 489:  Yeah, you'd have to if it's part of the instructions.

MR. MILLER:  And likewise, if you were instructed that there may be any number of possible mitigating factors one of which might be the question of whether the defendant was an aider and abettor as opposed to a person who actually pulled the trigger --

MR. BERRIGAN:  I'm sorry to have to object, Your Honor, but I think that does --

THE COURT:  Can you put your microphone on?  I'm sorry.

MR. BERRIGAN:  I think that does misstate the law only in that Mr. Miller's confusing the aggravating circumstances from the first-phase accomplice liability.  He's talking about aiding and abetting as an aggravating -- a mitigating circumstance, and I think probably he means role in the offense but just to be precise.

THE COURT:  I think you're right, so I'll sustain the objection.

MR. MILLER:  Would the level of a person's

1205

participation in an offense be something that you'd want to consider, sir?

PROSPECTIVE JUROR 489:  I would certainly think you should consider that, yeah.

MR. MILLER:  And just so I can make sure I pick on everybody and not just totally on you, Mr. 489, if you'd just pass that to your right.

Ms. 528, how are you today, ma'am?

PROSPECTIVE JUROR 528:  Fine.

Page 135

MR. MILLER: What we need to do is to be sure that we can seat 12 jurors who can assure us that given this responsibility they can fairly consider both possible punishments. You told us earlier about being on the 50-yard line. Do you feel that you can do so, ma'am, fairly consider both possible punishments?

PROSPECTIVE JUROR 528: Yes.

MR. MILLER: And again, understanding that if you ever get to that point where as a juror you are deciding punishment, it would be up to you to decide how much weight to give any particular factor, but you would have guidance from the Court as to what sort of factors to consider, what can be considered as mitigating and what can be considered as aggravating factors. Follow me, ma'am?

PROSPECTIVE JUROR 528: Yes.

MR. MILLER: And again, I trust you'd want such

1206

guidance from the Court.

PROSPECTIVE JUROR 528: Yes.

MR. MILLER: I believe you indicated in your questionnaire that you considered the killing of children to be something that would be very serious.

PROSPECTIVE JUROR 528: Uh-huh.

MR. MILLER: And if the Court were to instruct you that that could be considered as an aggravating factor, that make sense to you, ma'am?

PROSPECTIVE JUROR 528: Yes.

MR. MILLER: You work for a mental health firm?

PROSPECTIVE JUROR 528: Yes.

MR. MILLER: And I trust you believe in the work

Page 136

that's done there.

PROSPECTIVE JUROR 528: Yes.

MR. MILLER: And the fact that they do provide help and rehabilitation to some people there.

PROSPECTIVE JUROR 528: Uh-huh.

MR. MILLER: And if asked to consider issues of mental health as a mitigating factor, is that something you feel you could do?

PROSPECTIVE JUROR 528: Yes.

MR. MILLER: And would you want to, in fact, consider all possible aggravating and mitigating factors before coming to a decision about punishment in this case, ma'am?

1207

PROSPECTIVE JUROR 528: Yes.

MR. MILLER: Ms. 528, I trust you would never wish to impose the death penalty on anyone without first fairly considering the possibility that life in prison is the more appropriate punishment.

PROSPECTIVE JUROR 528: This is very serious.

MR. MILLER: Thank you, ma'am. If you would pass the microphone to Mr. 301.

How are you this afternoon, sir?

PROSPECTIVE JUROR 301: Good.

MR. MILLER: How do you feel about that, sir? Do you feel that you would always want, before ever passing a sentence of death, to be sure that you've fairly considered the possibility that life in prison was a more appropriate punishment?

PROSPECTIVE JUROR 301: Absolutely.

MR. MILLER: Tell us in your own words, sir, if you

Page 137

would a little bit about how you feel about that should that become your responsibility to decide punishment in this case.

PROSPECTIVE JUROR 301: I think when it's as serious as this I guess the jury selection or the decisions of the jury as far as all 12 have to agree, I think that is a very fair process, and I guess so I think it's appropriate.

MR. MILLER: Mr. 301, you told us before that you felt that the killing of children was a serious factor.

1208

PROSPECTIVE JUROR 301: Yes.

MR. MILLER: And I don't think anyone's going to suggest to you that that's not something that you can fairly consider. My question to you is this, sir: If you serve on this jury and find yourself at a point where you are considering punishment and if the evidence shows the killing of two children, would that by itself automatically cause you to return a verdict of death, or would you be willing to consider and able, sir, reasonably and fairly to consider both possible punishments?

PROSPECTIVE JUROR 301: I would still be able to consider both. There's other factors involved.

MR. MILLER: And again understanding that you will have guidance and instructions from the Court as to how you should go about doing that job, would you want to be sure that you had given full consideration to the possibility that life in prison was the more appropriate punishment before ever passing a sentence of death?

PROSPECTIVE JUROR 301: Yes.

MR. MILLER: Can you think of some things that would mitigate in your opinion a person's level of responsibility? We

talked about level of involvement with Miss 528. Can you see how level of involvement might have a factor or play some part in your opinion?

PROSPECTIVE JUROR 301: Yes, it would.

1209

MR. MILLER: Tell me in your own words how that would factor in, how that might factor in. I don't want to know what particular weight you feel you must give to any factor. Can you tell me in your own words how that could be something that might be appropriate to consider?

PROSPECTIVE JUROR 301: Well, I guess active involvement implies that they not only participated but were directly involved with the crimes committed. So, you know, if they were someone who was drawn into the situation but did not actively participate, that would in my mind be a mitigating factor I guess.

MR. MILLER: Would relative positions of leadership and followship be something that you might consider?

PROSPECTIVE JUROR 301: Possibly I guess.

MR. MILLER: Because of the dynamics between two people, sometimes one does influence the other more. Fair statement?

PROSPECTIVE JUROR 301: Fair.

MR. MILLER: I just want to be sure from you, Mr. 301 -- and it's okay if this is not the case. I just need to know what the case is. If the evidence in this case shows that two children were murdered, would you still be able to fairly consider both possible punishments, or would you automatically return a verdict of death under those circumstances?

Page 139

PROSPECTIVE JUROR 301: Not automatically, but if I had to -- I would probably lean more towards one than the other.

MR. MILLER: And I'm taking it in your case you would lean more toward death.

PROSPECTIVE JUROR 301: Probably.

MR. MILLER: And we appreciate your candor, sir. I want you to be just as open as we can. As we indicated, there are no wrong answers as long as the answers are candid and appreciate the fact that you're being so with us here today. If you're on this jury, sir, I expect you will be instructed that the death of children can be considered by you as an aggravating factor and how much weight to place on that aggravating factor is up to you, sir, and that you can place more weight on that than on other factors but still you must be willing to consider all factors before returning a verdict of punishment one way or the other. Do you feel that you can do that, Mr. 301?

PROSPECTIVE JUROR 301: I do.

MR. MILLER: In a nutshell, do you feel that you can assure us that if you're required to serve on this jury that you can fairly consider both punishments in this case?

PROSPECTIVE JUROR 301: Yes, as of right now, yes.

MR. MILLER: You understand you'll be getting instructions from the Court as to how to go about doing that. The government, for example, has a burden of proof beyond a reasonable doubt as to some -- as to the aggravating factors,

and there are many things that the Court will instruct you about

that. I trust you'd want to follow the Court's instructions.

PROSPECTIVE JUROR 301: Yes.

MR. MILLER: But do you feel in your heart that knowing what you know about this case, about the nature of the accusations, that should you ultimately come to a point where you're called upon to pass judgment that you can fairly consider both possible punishments, Mr. 301?

PROSPECTIVE JUROR 301: Yes.

MR. MILLER: Thank you, sir. If you'll pass that microphone to Mr. 638.

How are you today, sir?

PROSPECTIVE JUROR 638: Good.

MR. MILLER: I believe you indicated earlier today that you feel you could consider both possible punishments.

PROSPECTIVE JUROR 638: Yes.

MR. MILLER: And as you've thought about it here for the last noon hour and such, does that remain the case, sir?

PROSPECTIVE JUROR 638: Yes.

MR. MILLER: If you can pass the microphone one more level over to Mr. 120, I believe you indicated similarly that you could consider both possible punishments, sir?

PROSPECTIVE JUROR 120: I'm sure I can.

MR. MILLER: Okay. Mr. 120, I note that you're a self-employed barber.

1212

PROSPECTIVE JUROR 120: Right.

MR. MILLER: Is that correct? Are you one of these guys that has a roomful of barbers, or are you the guy?

PROSPECTIVE JUROR 120: I'm the guy. That's it.

MR. MILLER: And again, it was very conscientious and

Page 141

kind of everybody here to indicate their willingness to serve, and we understand that it is a sacrifice, but I also welcome any thoughts from you as to the amount of sacrifice that you're going through so we can take that into consideration. If you're required to sit through, say, an 11- or 12-week trial here, sir, is that going to cause such an effect upon your business it's going to be difficult for you to concentrate on what your responsibilities are here?

PROSPECTIVE JUROR 120: I would say it would be, yes.

MR. MILLER: And we appreciate that. I mean, I don't want anybody to hold back in telling us what their situation is. Again, we accept your statement that you're willing to serve, and I'm not going to ask you to change your mind about that at all. I think it's important that everyone serve if they possibly can, and we appreciate that. I just want to be sure I understand the level of sacrifice in your case. Anything else you can tell me about that, sir?

PROSPECTIVE JUROR 120: No. It's just, you know, if I'm up here, I've got a shop that's sitting there that's closed up for three months or how ever long it takes, and that would

1213

be, you know, losing customers and if I could get back -- you know, get back the people I have coming in. It would be a hardship for that long a time.

MR. MILLER: I'm not sure all of your customers necessarily would be willing to reschedule it for evening haircuts.

PROSPECTIVE JUROR 120: No. I have one judge that comes down there, and I told him I was going to say, Well, one judge will be mad if he doesn't get his hair cut for three

Page 142

months. He said, No, I wouldn't tell him that.

THE COURT: Can I interrupt for a minute, Mr. Miller?

MR. MILLER: Yes.

THE COURT: Juror 120, I'm just curious why when I asked that question if you were willing to serve you said you were willing to serve because it seems like it would be maybe -- I don't know. People's situations are different. Maybe you have five million dollars in the bank -- I don't know -- or you inherited money. But for most people not having any income for three months unless they have some other outside investments or something would be a severe hardship. So apparently it wouldn't be for you.

PROSPECTIVE JUROR 120: Well, I'm drawing Social Security. I'm on that, so, I mean, I still have some income from that.

THE COURT: So you probably only work part time as a

1214

barber.

PROSPECTIVE JUROR 120: No, I work full time.

THE COURT: Oh, okay. You must not charge very much because I thought you could only earn so much money on Social Security.

PROSPECTIVE JUROR 120: No, I didn't quite understand the question when you came around before. I thought you were going to ask the question later about hardship.

THE COURT: That was it.

PROSPECTIVE JUROR 120: That was it.

THE COURT: That was your chance. But I want to give you a second chance.

PROSPECTIVE JUROR 120: Well, it would be a hardship,

Page 143

yes.

THE COURT: Financially?

PROSPECTIVE JUROR 120: Yes. Well, yes, it would be financially. It's something I can maybe not gain back again. If I lose customers, why, they're gone. If they go to somebody else, why . . .

THE COURT: How many barbers are in the town you're in?

PROSPECTIVE JUROR 120: In Denison where I barber?

THE COURT: Oh, is that where you are? I imagine there's plenty.

PROSPECTIVE JUROR 120: There's just 2 barbers there

1215

and about 16 beauty operators.

THE COURT: What did you think I was -- just out of curiosity because I obviously didn't do as good of a job as I thought I did which is better to find out now than later, but when I was talking about a substantial hardship before --

PROSPECTIVE JUROR 120: Yes.

THE COURT: -- why did you think this isn't the type of thing I was talking about?

PROSPECTIVE JUROR 120: Well, I just -- I just didn't think -- I thought you said you were going to ask later. I didn't know we was supposed to say then.

THE COURT: I see. Well, instead of fast forwarding like the lawyers are asking you to do, let's fast backwards. And if you understood at that time that that was your only chance to tell me about a severe or extraordinary hardship that it would be for you, I take it you would have told me at that time back when I started this morning.

Page 144

PROSPECTIVE JUROR 120:  (Nodded head.)

THE COURT:  Is that right?

PROSPECTIVE JUROR 120:  Yeah.  If I'd have known that, yeah.

THE COURT:  Okay.  Do you have any objection if I dismiss 120, Mr. Miller?

MR. MILLER:  No, Your Honor.

THE COURT:  Mr. Berrigan?

1216

MR. BERRIGAN:  No, sir.

THE COURT:  Okay.  Well, whoever that judge is down in Denison, he or she can get their hair cut now; okay?

PROSPECTIVE JUROR 120:  Thank you.

THE COURT:  You're excused.  Thank you.  Would you do us a favor?  Because the area that we draw potential jurors from is really pretty small populationwise and it's likely that if you said something to somebody else that somebody else might say something to somebody else and that somebody else might be on this -- might be in here Thursday or Friday or next week for jury selection, I'd appreciate it if you wouldn't say anything about jury selection and what you learned about this case in court today until after you read in the newspaper or hear on the radio or TV that we've started the trial and have the jury selected; okay?

PROSPECTIVE JUROR 120:  Okay.

THE COURT:  Okay.  You're excused.  Thank you.

PROSPECTIVE JUROR 120:  Thank you.

THE COURT:  Excuse me for interrupting.  Thank you.

MR. MILLER:  No.  Thank you, Your Honor.  And I believe --

Page 145

THE COURT:  I've got to interrupt you at least as often as I did Mr. Berrigan.

MR. MILLER:  That's fair.  That's fair.

Mr. 170, you ended up with the microphone in your

1217

hands.

PROSPECTIVE JUROR 170:  Correct.

MR. MILLER:  It's going to save time to just move right around, so I think everybody can predict when they're going to get that microphone, and I'll visit with you briefly. First let me ask you did you catch that race on TV yesterday down in Texas?

PROSPECTIVE JUROR 170:  Part of it.

MR. MILLER:  Part of it.

PROSPECTIVE JUROR 170:  Part of it off and on.  Too nice to be inside all the time.

MR. MILLER:  It's a long afternoon of racing.

PROSPECTIVE JUROR 170:  Correct.

MR. MILLER:  And it was a beautiful day to be outside.

PROSPECTIVE JUROR 170:   Right.

MR. MILLER:  Quite a few wrecks in that one, wasn't there?

PROSPECTIVE JUROR 170:  Yeah.

MR. MILLER:  Sir, I noticed in reviewing your questionnaire that you indicated concern about the seriousness of the killing of children on the one hand.  And you also indicated concern about how severe a punishment a person should receive if they aided and abetted as opposed to being a principal.  You expressed some opinion about each of those two factors; fair statement?

Page 146

PROSPECTIVE JUROR 170:  Correct, yes.

MR. MILLER:  And can you envision yourself, sir, sitting on a jury which is asked ultimately to pass judgment on this, that you're asked to do just that, to weigh competing aggravating and mitigating factors?

PROSPECTIVE JUROR 170:  Right, right.

MR. MILLER:  And if the Court were to advise you that the killing of children may be considered by you as an aggravating factor, I trust that would make sense.

PROSPECTIVE JUROR 170:  Yes.

MR. MILLER:  And if the Court were to instruct you that one's level of involvement, if it was merely as an aider and abettor as opposed to principal, may be considered as a mitigating factor?

MR. BERRIGAN:  I'm sorry, Your Honor, I'm constrained to object only because they're not different.  Aiding and abetting qualifies somebody for the death penalty and minor role as a mitigator.

MR. MILLER:  Let me rephrase it.

THE COURT:  That's okay.  I'm going to sustain the objection.  Mr. Miller's going to rephrase the question.  Thank you.

MR. MILLER:  Let's talk about level of involvement. Is it your understanding that in any enterprise, criminal or otherwise, different people may have different levels of

involvement?

PROSPECTIVE JUROR 170:  Yes.

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1062 of 3245

MR. MILLER: Different levels of responsibility?

PROSPECTIVE JUROR 170: Right.

MR. MILLER: We have leaders and followers in situations, and that may be something to consider.

PROSPECTIVE JUROR 170: Yes.

MR. MILLER: And I took it from your answer that that's something that you yourself would want to consider.

PROSPECTIVE JUROR 170: That's correct.

MR. MILLER: Well, let me just ask you a couple quick questions then. If the evidence in this case shows -- and again, we're assuming we're at the punishment phase, that she's already been found guilty. But if at that point you were on this jury and the evidence were to show that Ms. Johnson assisted or encouraged but did not herself pull the trigger, would that -- would you still be able to give fair consideration to both possible punishments, sir?

PROSPECTIVE JUROR 170: Yes, because I'm not sure which is the worse punishment at this time anyway.

MR. MILLER: And you've already pointed out that you can envision life in prison as being a worse punishment.

PROSPECTIVE JUROR 170: Correct.

MR. MILLER: Conversely, if you serve on this jury and arrive at a point where you are passing judgment on punishment,

1220

if the evidence shows that Ms. Johnson was involved in the killing of two children, would you still be willing and able to fairly consider both possible punishments and not automatically impose death or life?

PROSPECTIVE JUROR 170: Yes, I would.

MR. MILLER: Mr. 170, should you ultimately end up

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1063 of 3245

being required to serve on this jury and should this jury ultimately not only find Ms. Johnson guilty but also decide unanimously to impose the sentence of death, under those circumstances, sir, the members of the jury would have to sign off on the verdict, and that signature of yours would have the practical effect of imposing the death penalty. Under those circumstances, sir, do you feel you could do that?

PROSPECTIVE JUROR 170: Yes, I could.

MR. MILLER: Thank you, sir. You can go ahead and pass that microphone.

Good afternoon, Mr. 89.

PROSPECTIVE JUROR 89: Afternoon.

MR. MILLER: How are you holding up?

PROSPECTIVE JUROR 89: Pretty good.

MR. MILLER: I noted that you volunteer for RAGBRAI.

PROSPECTIVE JUROR 89: Yes.

MR. MILLER: Okay. And that's something you enjoy.

PROSPECTIVE JUROR 89: Yes.

MR. MILLER: What are the dates of RAGBRAI this

1221

summer?

PROSPECTIVE JUROR 89: July 23 through the 30th.

MR. MILLER: I expect we'll be done in plenty of time for that. And that's going to be a northern route I believe this summer, isn't it?

PROSPECTIVE JUROR 89: Pardon?

MR. MILLER: That's going to be a northern route this summer?

PROSPECTIVE JUROR 89: Yes.

MR. MILLER: Starting out anywhere around your

Page 149

residence?

PROSPECTIVE JUROR 89: LeMars, yes.

MR. MILLER: Do you feel, sir, as we've discussed it here this afternoon that in the event that you are required to serve on this jury and in the event that the jury is called upon to pass judgment on sentence that you could follow the Court's instructions and fairly consider both possible punishments?

PROSPECTIVE JUROR 89: Yes.

MR. MILLER: Thank you, sir. You can pass that microphone.

Juror 335.

PROSPECTIVE JUROR 335: Yes.

MR. MILLER: How are you today?

PROSPECTIVE JUROR 335: Okay.

MR. MILLER: I'm not sure we visited yet today. I

1222

noted that you are a pianist.

PROSPECTIVE JUROR 335: Yes, an organist.

MR. MILLER: And an organist.

PROSPECTIVE JUROR 335: Yes.

MR. MILLER: And can you tell me how much performing you do and where and what circumstances?

PROSPECTIVE JUROR 335: Sunday mornings.

MR. MILLER: Very good.

PROSPECTIVE JUROR 335: At Christ Lutheran in LeMars, rural.

MR. MILLER: How long have you been doing that?

PROSPECTIVE JUROR 335: About 40 years.

MR. MILLER: Very good. That's a responsibility.

PROSPECTIVE JUROR 335: Yes, it is.
Page 150

MR. MILLER: I also noticed that you indicated -- and again, we appreciate the time you spent filling out the questionnaire, and everybody's candor is vital to the process. The only wrong answer is one that isn't perfectly candid, and we appreciate that you folks have all given right answers to everything simply by opening up and telling us what your opinion is. You did indicate that you don't believe in the death penalty.

PROSPECTIVE JUROR 335: No, I do not.

MR. MILLER: Can you just tell us about that in your own words?

1223

PROSPECTIVE JUROR 335: I guess maybe I just feel God is the choice -- judge of life or death, and I just -- I just don't believe in it.

MR. MILLER: And that's perfectly legitimate and a feeling you share with many others, and it would be improper for me to in any way criticize you about that. But we do need to briefly ask you about that because should you be required to serve on this jury, you would be in what I take would be a very uncomfortable position if you were asked to pass such judgment. Is that a fair statement?

PROSPECTIVE JUROR 335: Yes.

MR. MILLER: And in all fairness, do you feel that you actually could pass judgment in such a case of this nature?

PROSPECTIVE JUROR 335: I don't know.

MR. MILLER: Let me ask you this. If you were called upon to serve on this jury and the jury were to unanimously decide that the defendant in this case, Mrs. Johnson, is guilty, asking you to pass judgment on whether or not she were to

Page 151

receive the death penalty would, I take it, put you in a very awkward position. Fair statement?

MR. BERRIGAN: I'm going --

THE COURT: Pardon me? You need to put your microphone on.

MR. BERRIGAN: I'm sorry, sir. I keep forgetting. I'm going to object as that is violating Court's rule regarding

1224

stakeout questions.

THE COURT: Well, I don't think so because it just asks whether it would put her in an awkward position. So the objection's overruled.

You may answer the question, 335.

PROSPECTIVE JUROR 335: It would put me in an awkward position.

MR. MILLER: Because you'd be being asked to do something that you really do not believe in doing.

PROSPECTIVE JUROR 335: That's correct.

MR. MILLER: And in all fairness, you really cannot impose the death penalty on another, can you, ma'am?

PROSPECTIVE JUROR 335: No.

MR. MILLER: And we appreciate your candor. That's the only way this works is by asking everyone to be perfectly candid, and I appreciate your thoughts. Can you please pass the microphone to Mr. 227 I believe it is?

How about your jury experience, sir? I noticed you had a hung jury.

PROSPECTIVE JUROR 227: Yep.

MR. MILLER: And -- well, you just go ahead and tell me. How was the experience overall for you?

Page 152

PROSPECTIVE JUROR 227: Well, a hung jury was just an older person that -- it was a case where a girl had been molested years ago, and she was in a swimming pool, and this

1225

father was flipping his children, and this girl that had been molested at one time thought that he was fondling her when he really, you know, didn't. And all of us except one older person said, Well, he said there must be something, or why did he bring her to court -- him to court? So that's why we wound up with a hung jury.

MR. MILLER: And I assume some of you reminded him that just being brought to court isn't proof of anything.

PROSPECTIVE JUROR 227: But, you know, we couldn't change that man's mind no matter how hard we talked.

MR. MILLER: I bet that was a little frustrating.

PROSPECTIVE JUROR 227: Well, I was the jury foreman at that time. It's been 30 years ago, but yeah, it was.

MR. MILLER: You wanted to get a verdict.

PROSPECTIVE JUROR 227: Right. We wanted the man off because, to make a long story short, in the end this woman or this man's wife had a day care, and it ruined her business, you know, so it was a sad deal in the end.

MR. MILLER: Mr. 227, you shared some serious thoughts about the whole issue of the death penalty, and I take it it's something that you've given even graver consideration to just in the last couple months since you first learned that you might be sitting here today.

PROSPECTIVE JUROR 227: Right.

MR. MILLER: Anything else you care to share with us

1226

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1068 of 3245

along those lines about your feeling on the subject?

PROSPECTIVE JUROR 227: Well, I'm kind of like she is. I mean, death is final, and, you know, I know, you know, if this -- if what they're accusing her of is true, you know, I still would have a very hard time of putting a person to death. I would rather see them in prison for life and spend their time thinking about it, you know, and having time to get . . .

MR. MILLER: And I appreciate your candor. We all do. We all appreciate your candor, sir, and that's the only way we can have a system that functions here. If you were required to be sitting on this jury and it came to the point of passing judgment on sentence, I take it you couldn't realistically consider both possible options.

PROSPECTIVE JUROR 227: Probably not.

MR. MILLER: And if you were on a jury that unanimously decided to impose the death penalty, understanding that you would have to sign off on that verdict and that your signature would have the effect of sentencing someone to death, that you would be unable to do that, sir.

PROSPECTIVE JUROR 227: I'm sorry. I didn't hear you very well.

MR. MILLER: Would you be able to sign a verdict that would sentence someone to death?

PROSPECTIVE JUROR 227: Would I be able to sentence her --

1227

MR. MILLER: Yes, I'm not asking what you're going to do in this case, sir.

Page 154

PROSPECTIVE JUROR 227: No.

MR. MILLER: But if you were on a jury that were to sentence someone to death, you'd have to sign a verdict to that effect. I take it that would place you in a very uncomfortable position.

PROSPECTIVE JUROR 227: Absolutely positively it would. It would weigh real heavily on my heart.

MR. MILLER: And I take it you would not be able to sign such a verdict, sir.

PROSPECTIVE JUROR 227: Today I don't think I could, but maybe if the evidence was so strong that you just changed your mind, but today, you know, I just feel that it would be really hard for me to sign something putting somebody to death. I mean, it would just really weigh hard.

MR. MILLER: You would have to change your mind about the death penalty itself.

PROSPECTIVE JUROR 227: I'd have to. Yeah, I would.

MR. MILLER: And it's one that you've given serious thought to, particularly in the last two months, and it is that you simply are not in favor of the death penalty.

PROSPECTIVE JUROR 227: No, I haven't been thinking about it that much. Just the last week when I knew I had to -- but I -- okay.

1228

MR. MILLER: Well, we appreciate your candor, sir. Just to put it in final perspective, should you be required to serve on this jury, I take it you do not feel that you could fairly consider both possible options including the death penalty.

PROSPECTIVE JUROR 227: No.

Page 155

MR. MILLER: Thank you, sir. If you could pass the microphone to Juror 147.

Good afternoon, ma'am.

PROSPECTIVE JUROR 147: Good afternoon.

MR. MILLER: Let me consult my notes quickly. Head Start program, that's right. Tell us a little bit about that if you would, please.

PROSPECTIVE JUROR 147: It's a government-sponsored program, and I'm a preschool teacher for 20, three-, four-, and five-year-olds.

MR. MILLER: Enjoy the work?

PROSPECTIVE JUROR 147: Yeah, I like it.

MR. MILLER: I think you're one of the many who indicated on the questionnaire if you could have any job in the world what would you do and you said, I'm doing it already; right?

PROSPECTIVE JUROR 147: Yes.

MR. MILLER: And I always am intrigued by that. I'm not sure that that tells me anything about a person's ability to

1229

be a good juror, but it's interesting to see who loves their work, and it's interesting really to find that most people say, I've already got that job, and that's a wonderful thing. You've been doing that for how long?

PROSPECTIVE JUROR 147: Well, right now I'm almost at two and a half years, but then I substitute taught too.

MR. MILLER: You like working with kids.

PROSPECTIVE JUROR 147: Yes.

MR. MILLER: And you indicated in connection with the question about the killing of children that that is something

Page 156

you consider serious.

PROSPECTIVE JUROR 147: Yes.

MR. MILLER: If you were advised by the Court that that may be considered as an aggravating factor, you wouldn't find that unusual.

PROSPECTIVE JUROR 147: No.

MR. MILLER: You also I think pointed out that it might be the easy way to say that that always calls for the death penalty but that you'd have to look at all of the evidence.

PROSPECTIVE JUROR 147: Right.

MR. MILLER: Do you still feel that way, ma'am?

PROSPECTIVE JUROR 147: Yes.

MR. MILLER: And you indicated earlier that you would want to start clean if you ever got to the point where you were

1230

at the punishment phase.

PROSPECTIVE JUROR 147: Right.

MR. MILLER: Do you still feel that way?

PROSPECTIVE JUROR 147: Yes, I do.

MR. MILLER: One of those 50-yard-line people.

PROSPECTIVE JUROR 147: Yeah.

MR. MILLER: And just to put it the bottom line, should you be in that situation, do you feel that you could give fair consideration to both possible punishments, ma'am?

PROSPECTIVE JUROR 147: Yes, I do.

MR. MILLER: Thank you, Mrs. 147. If you can pass it right behind you, I'll pick on Juror 263 for a couple minutes.

How are you this afternoon, ma'am?

PROSPECTIVE JUROR 263: Pretty good. How are you?

Page 157

MR. MILLER: Just well, thanks. You indicated that you had very mixed thoughts about the death penalty, and that tells me that you've given it some thought.

PROSPECTIVE JUROR 263: Correct.

MR. MILLER: Can you just go ahead and share those thoughts with us to the extent that you haven't already?

PROSPECTIVE JUROR 263: Like I said earlier, I do believe an eye for an eye, but that's a decision that once you make it, you know, if that's -- if you get to that point, that's -- you made it. You're stuck with that, living with that, and that's tough.

1231

MR. MILLER: I take it that whatever your decision would be it would not be one that you would take lightly.

PROSPECTIVE JUROR 263: Absolutely not.

MR. MILLER: You've thought about this for a couple months. You visited with Mr. Berrigan about it at some length, and I assume you've had a little bit of a chance to think about it over the last hour or two. Do you feel, ma'am, that should you be required to serve on this jury that you at that point, if it ever came to that point where you were considering punishment, could fairly consider both possible punishments?

PROSPECTIVE JUROR 263: Yes.

MR. MILLER: Thank you, ma'am. You can pass that microphone to Mr. 738.

Good afternoon, sir.

PROSPECTIVE JUROR 738: Good afternoon.

MR. MILLER: How are you doing?

PROSPECTIVE JUROR 738: Very good.

MR. MILLER: Day like today you'd just as soon be out

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1073 of 3245

golfing I bet.

PROSPECTIVE JUROR 738: That'd be great.

MR. MILLER: How serious a golfer are you, sir?

PROSPECTIVE JUROR 738: I have fun. I'm on a league so . . .

MR. MILLER: Once a week?

PROSPECTIVE JUROR 738: Once a week.

1232

MR. MILLER: Regular group?

PROSPECTIVE JUROR 738: Yes, sir.

MR. MILLER: And I'm just curious. I heard a very experienced lawyer once saying -- and I don't even know what he was drawing in the way of conclusions about it, but he was curious as to whether golfers and the people they play with are in the habit of giving mulligans. Is that done in your group?

PROSPECTIVE JUROR 738: Depends upon how -- if I feel sorry for the guy I'm playing.

MR. MILLER: Are you ever the guy that needs to be felt sorry for off the tee?

PROSPECTIVE JUROR 738: Once in a while.

MR. MILLER: How about winter rules? Do you guys allow each other to bump the ball?

PROSPECTIVE JUROR 738: We play winter rules.

MR. MILLER: And gimmes?

PROSPECTIVE JUROR 738: No gimmes.

MR. MILLER: No gimmes at all.

PROSPECTIVE JUROR 738: No gim -- once in a while, but they've gotta be really close.

MR. MILLER: Even those two-inchers, they need to drop those in.

Page 159

PROSPECTIVE JUROR 738:  Depends upon the guy I'm golfing.  If he's ahead of me, I'm not going to give it to him.

MR. MILLER:  Sometimes they get nervous over those

1233

little short putts too, don't they?

PROSPECTIVE JUROR 738:  That's right.

MR. MILLER:  How do you feel about the death penalty, sir?  Any thoughts beyond what you've shared with us today, sir?

PROSPECTIVE JUROR 738:  Just what I've stated.

MR. MILLER:  And I believe you stated, among other things, that you would look more at the crime than the person.

PROSPECTIVE JUROR 738:  Yes, sir.

MR. MILLER:  And you understand that a couple aspects of this crime, assuming the government's allegations are proven beyond a reasonable doubt, are that there were multiple victims, five victims, and that a couple of those victims were particularly vulnerable victims, namely children.  Now, murder's murder as far as being a crime.  But if you were instructed that you can consider multiple killings or the killings of vulnerable victims as a punishment factor, would you be able to follow that instruction, sir?

PROSPECTIVE JUROR 738:  Yes, I think I would.

MR. MILLER:  And conversely, if you were instructed that any number of possible mitigating factors should be considered such as level of involvement in the offense, would you be able to follow that instruction and consider mitigating as well as aggravating factors?

PROSPECTIVE JUROR 738:  Yes, I think I could.

MR. MILLER:  If the evidence in this case shows that

1234

Page 160

Angela Johnson participated in the killing of two children, would you still be able to fairly consider both possible punishments, sir?

PROSPECTIVE JUROR 738: I could -- one or the other.

MR. MILLER: You would consider both.

PROSPECTIVE JUROR 738: I'm a 50-yard-line man.

MR. MILLER: Conversely, if the evidence in this case shows that Angela Johnson participated by assisting and encouraging but did not herself pull the trigger, could you still fairly consider both possible punishments, sir?

PROSPECTIVE JUROR 738: I would probably -- if she didn't pull the trigger and assisted, I would probably lean more to the life in prison.

MR. MILLER: And that's fair. It's not proper of me to ask you what your verdict will be or would be under any given situation. It's only proper for me to try to determine whether or not you can give fair consideration to both possibilities. Do you feel you could do that, sir?

PROSPECTIVE JUROR 738: I could do that.

MR. MILLER: Thank you very much. I'll ask you to pass that one over again.

Mr. 637, is that right?

PROSPECTIVE JUROR 637: That's right.

MR. MILLER: I believe you're a parts manager?

PROSPECTIVE JUROR 637: Yes, sir.

1235

MR. MILLER: Up in Orange City.

PROSPECTIVE JUROR 637: Yep.

MR. MILLER: I don't want to lose my microphone or our

court reporter will be very unhappy with me. I just have a couple questions for you, sir. One thing I noted is that your hobby, the first interest that you listed, is college soccer. Any particular reason that that particularly interests you in addition to other sports?

PROSPECTIVE JUROR 637: My son just finished playing four years of college soccer.

MR. MILLER: I kind of thought that might have something to do with it. Where did he play, sir?

PROSPECTIVE JUROR 637: In Sioux Center at Dordt College.

MR. MILLER: How'd they do?

PROSPECTIVE JUROR 637: More wins than losses.

MR. MILLER: That's sure worth something.

PROSPECTIVE JUROR 637: Yeah.

MR. MILLER: Was it a positive experience for your son?

PROSPECTIVE JUROR 637: Yes, yes.

MR. MILLER: And are you going to continue to support that team and follow them even though your son isn't on it anymore?

PROSPECTIVE JUROR 637: I will try.

1236

MR. MILLER: Mr. 637, you indicated in your questionnaire life in prison and death penalty as both being possible options in connection with various situations that were posed hypothetically. I visited with your fellow jurors about this, and I'll just put it to you in the same way. Given what you understand now about this case, should you end up on a jury that ultimately has to pass judgment on punishment, do you feel

Page 162

that you could fairly consider both possible punishments?

PROSPECTIVE JUROR 637: Not at this time. I just can't see it.

MR. MILLER: Go ahead and explain to us your death penalty view.

PROSPECTIVE JUROR 637: Well, I believe in the death penalty when it's extreme, and at this point I just feel this is an extreme case, so that's my belief, and I have to -- I feel I have to stay with it.

MR. MILLER: No, that's fine. And again, sir, please don't apologize. This is exactly what we want you to do is to share with us your feelings. Let me just put it to you this way. If the evidence in this case shows that this defendant, Angela Johnson, participated in the killing of two children, do you feel that your verdict would automatically be death and that you would not be able fairly to consider both possible punishments?

PROSPECTIVE JUROR 637: Yes.

1237

MR. MILLER: That sums up your feeling.

PROSPECTIVE JUROR 637: Yes.

MR. MILLER: Well, again, we appreciate your candor, and that's the only way that this process can function, and I thank you for your candor. If you would pass that one more to our last juror.

Madam 657, how are you today?

PROSPECTIVE JUROR 657: Fine. Thank you.

MR. MILLER: Good. One of the things I noted in reading your questionnaire was that you have a granddaughter who's graduating in Texas in May.

Page 163

PROSPECTIVE JUROR 657: That's correct.

MR. MILLER: Is that high school graduation?

PROSPECTIVE JUROR 657: Yes.

MR. MILLER: Well, congratulations.

PROSPECTIVE JUROR 657: Thank you.

MR. MILLER: When is that?

PROSPECTIVE JUROR 657: The end of May.

MR. MILLER: Okay. Is that Memorial Day weekend?

PROSPECTIVE JUROR 657: Yes. Well, I believe it's the 31st. I think Memorial Day weekend's the 28th.

MR. MILLER: I'm not -- if I'm correct, is the 31st a Monday?

PROSPECTIVE JUROR 637: Or is it on a Tuesday?

MR. MILLER: I don't know.

1238

PROSPECTIVE JUROR 657: I'm sorry. I can't tell you that.

MR. MILLER: Well, I'm just curious because, again, as with our barber friend, I want to be sure we explore any hardships that anybody has, and that must be an important occasion for you.

PROSPECTIVE JUROR 657: It is.

MR. MILLER: If -- again, factoring in the time -- there is some travel time involved between getting to Texas and back -- what is your situation as far as your willingness to miss your granddaughter's graduation? And, more importantly, how much time would it take you to travel both ways if that could be accommodated?

PROSPECTIVE JUROR 657: Well, actually we thought we would be a week down there, but if we can't, we can't.

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1079 of 3245

MR. MILLER: Well, as we heard from Judge Bennett earlier, he's the one in charge who passes on these things, and I'm not wanting to open floodgates and cause a parade out here. That's the last thing I want. But I do want to make sure everybody has an opportunity to tell us what their situation is.

In the event that you are required to serve on this jury and in the event that that would interfere with your plans to spend a week with your family in Texas, most especially if it interfered with your plans to witness your granddaughter's graduation, would that have a serious effect on your ability to

1239

give us your full attention here as a juror?

PROSPECTIVE JUROR 657: No.

MR. MILLER: And I don't want to be putting you on the spot. I don't want to be forcing you into saying yes if you feel otherwise.

PROSPECTIVE JUROR 657: Well, I'd like to go.

THE COURT: Let me put her on the spot. It's easier for me to do it than the lawyers.

Juror 657, what's the -- do you know the exact date of the graduation?

PROSPECTIVE JUROR 657: Yes, it's the 31st.

MR. MILLER: What -- you know, I should know what the end of the month of May is going to look like, but I don't. What day of the week is that? Do you know?

PROSPECTIVE JUROR 657: I don't know.

PROSPECTIVE JUROR 147: It's Tuesday.

MR. WILLETT: Your Honor, if it please Court, it's a Tuesday.

THE COURT: It's a Tuesday? And is that the holiday

Page 165

weekend?  What's the -- when is the Memorial Day?

MR. WILLETT:  Your Honor, I just have my checkbook register.  I don't have my calendar in front of me, so I can't tell you.

PROSPECTIVE JUROR 147:  It's that weekend.  I know.  I have a wedding.

1240

THE COURT:  It's that weekend?  But your graduation is on the Tuesday?

PROSPECTIVE JUROR 147:  Tuesday.  30th is Memorial Day.

PROSPECTIVE JUROR 657:  Yes.  See, we thought we'd take our fifth-wheel down there and stay for a few days.  It's 800 miles down there so . . .

THE COURT:  But when I asked about a severe and extraordinary hardship, you didn't put it in that category.

PROSPECTIVE JUROR 657:  Well, it's something we would like to do, but it's -- I guess it's not a hardship.  You know what I'm saying?

THE COURT:  Yeah.

PROSPECTIVE JUROR 657:  I mean, it's not the end of the world, but it would be nice to be there.

THE COURT:  How many grandchildren do you have?

PROSPECTIVE JUROR 657:  Eight.

THE COURT:  Have you had others graduate from high school?

PROSPECTIVE JUROR 657:  Just one.

THE COURT:  Did you make that graduation ceremony?

PROSPECTIVE JUROR 657:  Yes, and that was also in Texas.

Page 166

THE COURT: And I assume you'd like to keep your string intact of attending your -- is it a granddaughter?

1241

PROSPECTIVE JUROR 657: Yes.

THE COURT: Okay. Have any objection from counsel?

MR. MILLER: No, Your Honor.

MR. BERRIGAN: None by the defense, sir.

THE COURT: Okay. I'm going to go ahead and excuse you, ma'am.

PROSPECTIVE JUROR 657: Thank you.

THE COURT: Okay. The way I look at it, it's going to take us long enough to pick a jury. One other juror is probably not that critical, so I want you to make your granddaughter's graduation.

MR. MILLER: I've made full circle, but I'd like to pass the microphone if we could down to 147 only because I believe she indicated she has a wedding that same weekend. Is that a problem at all?

PROSPECTIVE JUROR 147: No, I just -- it's my anniversary that weekend too.

THE COURT: Oh, it's your own wedding, your own anniversary.

PROSPECTIVE JUROR 147: It's my golden anniversary that day.

THE COURT: Okay. We need the microphone, though. That's the problem.

PROSPECTIVE JUROR 147: I just knew because it's my anniversary the 28th, and I got invited to a wedding too, but

1242

Page 167

it's around here.  So I just knew.

THE COURT:  So you won't miss either your own anniversary or the wedding.

PROSPECTIVE JUROR 147:  No.  It's not a big deal.

MR. MILLER:  Well, congratulations anyway.

THE COURT:  And don't tell your husband it's not a big deal.  You gotta hold out for something important.

PROSPECTIVE JUROR 147:  It's my golden one too.

THE COURT:  We won't be calling him telling him it's not important.

PROSPECTIVE JUROR 147:  Thank you.

MR. MILLER:  Thank you, folks.

Thank you, Your Honor.

THE COURT:  Could I see the lawyers at sidebar for a second?  I'm going to blast you with some unpleasant noise here so you don't overhear what we're talking about.

(At sidebar on the record.)

THE COURT:  You want rehabilitation time?

MR. BERRIGAN:  Well, of course.  You know, several people said they'd fairly consider both punishments when Mr. Miller asked them the question, and they clearly indicated when I was asking them they weren't going to be able to do it.

THE COURT:  Let's do it individually.

MR. BERRIGAN:  Okay, fine.

THE COURT:  If you can limit it and not go on forever.

1243

MR. BERRIGAN:  I've got seven people.

THE COURT:  That's fine.  I'd rather take it up individually.

Page 168

MR. BERRIGAN: Okay, sir.

THE COURT: Any objection to knocking off 10?

MR. BERRIGAN: Ten?

THE COURT: I'm sorry, knocking off Juror 637? I give them a numeric score. I give him a 10, 637.

MR. BERRIGAN: No, sir.

THE COURT: It's the one who said that he'd give the death penalty regardless basically. 637? Rather than bring him back individually, I know he's gone. There isn't anything he could say or do from this point on.

MR. BERRIGAN: No, he told us both the same thing.

THE COURT: Do you have any objection if I just excuse him? Okay. We'll bring them back individually.

Now, let me ask you, when we bring them back individually, at the end of it, can't we just go ahead and exercise our strikes for peremptories?

MR. BERRIGAN: Sure, because we can talk to them about the publicity too. There is this issue about the peremptories, Your Honor. I know you're planning to change the rules tomorrow. We were hoping to look at them as a group before we make the decision today, and I know you want to let them go as soon as you can.

1244

THE COURT: I want to let them go. You can make a record on it as soon as it can be made.

MR. MILLER: As I understand it, we're bringing them back individually covering both rehabilitation issues and publicity issues.

THE COURT: Right, and at that point exercise for-cause strikes or peremptories.

Page 169

MR. MILLER: That's fine. I'm going to turn it over to my co-counsel because he was wanting face time to do the publicity issue if that's okay.

THE COURT: That's fine.

(The sidebar was concluded.)

THE COURT: Okay. Juror 637, I'm going to go ahead and excuse you from jury service in this case.

The rest of you -- and I wanted to thank you very much for being so candid. You can actually sit right there because I'm going to let everybody go at this point. But when you all go downstairs, 637, you get to go home because you're finished now. And on behalf of the lawyers and the parties, I wanted to thank you for your very honest, soul-searching answers to our questions. We appreciate it very much. And we'd also appreciate it if you didn't say anything to anybody else about jury selection until we get a jury selected in the case.

The rest of you, we're going to bring you back one at a time, and we're just going to start in the back row with Juror

1245

301. We're going to bring you up for some individual questioning, and that should be relatively quick. And then at the end of the individual questioning, we'll send you out of the room, and then I'll make a record with the lawyers, and then we'll then let you know what your status is, whether you're still in the jury pool -- and you have about that 50-percent chance of being selected for the jury -- or whether you're also excused from jury service in this case.

So when you go back to the jury room, 637 can get on your way, and the rest of you, we'll just bring you back up one at a time, and it shouldn't be very long with each potential

Page 170

juror.

But obviously, 147, you're at the end of the line, so it's two o'clock, you know. We're probably not going to reach you until some time after three o'clock. That'd be a pretty good guess; okay? Thank you very much. And we might as well have 301 just wait in the courtroom and everybody else can go back down to the jury room, and 637 can go home.

(Panel E exited the courtroom, Prospective Juror 301 remaining.)

THE COURT: And, Juror 301, why don't you come down to the front row, and Gene will hand you the microphone.

Okay. Everybody can be seated.

MR. BERRIGAN: May it please the Court.

EXAMINATION

1246

BY MR. BERRIGAN:

Q. How are you, sir?

A. Oh, pretty good.

Q. You still hanging with us?

A. Yeah.

Q. I wanted to start asking you just a few questions about your views on -- or more accurately, information about publicity, you know, what kind of media exposure you received before coming in today about the case. And your questionnaire indicated that you had remembered there was a news report on bodies found near Mason City. Didn't remember specific people involved or details. Is there anything you could add to that?

A. Not really. It just struck a bell when I got the letter in the mail, so that's -- I don't remember any of the details really.

Page 171

Q.   What was the source of that information if you could tell us?

A.   I think it was TV news.

Q.   Television?

A.   Yeah.

Q.   And about how long ago did you hear this?

A.   I don't remember that.

Q.   Okay.  Have you heard anything recently?

A.   Oh, I've -- just that -- I think I heard last week that jury selection had begun which I already knew about, and that

1247

was about it, so I kind of tried to avoid it so . . .

Q.   You indicated that although you didn't have an opinion as to Miss Johnson's guilt based on the publicity you did have an opinion if she were found guilty based upon the allegations.  Am I stating that accurately?

A.   Probably, yeah.

Q.   The language you used regarding the opinion on punishment was, In particularly violent crime especially involving children I would not be unwilling to consider the death penalty.  Does that sound right?

A.   Yes.

Q.   Okay.  And then earlier when you and I were talking about this issue, you kind of reiterated some of these concerns that you had about children being involved in this.  Do you remember?

A.   Yeah, I remember.

Q.   And again, just to put it in the context of where we were in the process, we had the finding.  You remember?

A.   Yes.

Q.   Intentional murder, premeditation, substantial planning,

Page 172

children; right?

A.    Yeah.

Q.    And my recollection is that you told me, Look, Mr. Berrigan, if kids are involved, that shows a special callousness.  Does that sound right?

A.    Yes, that's what I said.

1248

Q.    And is that how you feel?

A.    I -- yes, I feel that way.

Q.    You have children.  I think you've already pointed that out, and you're an expectant father.

A.    Yes.

Q.    And the questionnaire I'm sure reflects the ages of the children, but I don't recollect that right now.  How old are your children?

A.    I have a 3-year-old daughter, a 19-month-old son.

Q.    They're very young children.

A.    Yes.

Q.    You were asked about the killing of children is a factor in punishment, and you said, Speaking as a father, this is one of the particularly abhorrent crimes imaginable.  You remember we talked a little bit about that this morning.

A.    Yeah.

Q.    And then I asked you to fast forward yourself.

        THE COURT:  You know, we're just kind of rehashing the stuff you'd previously asked this witness, and that's not what I intend this time to be.

Q.    Let me see if I can cut to the chase then.  If we can go to this fast-forward position, okay, where you've made these findings and that children are involved, do you have a view as

Page 173

to whether or not the death penalty in your view, would you consider that an appropriate punishment?

1249

                MR. WILLIAMS:  Objection, Your Honor.

                MR. BERRIGAN:  I'll rephrase.

BY MR. BERRIGAN:

Q.    With these circumstances, Mr. 301, would you consideration to the death penalty as an appropriate punishment?

A.    Yes, I would.

Q.    Okay.  Given your views about children and what you talked about this morning in our conversation and that on the questionnaire, would you realistically consider a sentence of life imprisonment as appropriate for that kind of crime?

A.    I would have to say that if there -- I don't know what mitigating factors would be involved, but, I mean, I'd have to at least be able to consider life in prison given once I know all the facts and once I know all the influences that were in effect at that time.  I was just simply stating that I feel especially strong about children and protecting them and that crimes against them I feel more strongly about I guess.

Q.    Okay.  On the football field that we've been talking about today with jurors, where do you put yourself?

A.    I'd have to say probably -- I don't know -- 35-yard line. I don't know.

Q.    Down towards the death penalty.

A.    Probably, yeah.

Q.    And in order to get you back where you might be willing to consider a sentence of life imprisonment without parole, would

1250

Page 174

the defense need to present to you some mitigation evidence to try to sway your view?

THE COURT: Well, that misstates this witness's prior responses.

MR. BERRIGAN: I don't know that we've even covered this, Your Honor.

THE COURT: Well, it says, In order to get you back to where you might be willing to consider a sentence of life. He's already said he is willing to consider a sentence of life. So it assumes -- your question assumes something that is exactly opposite of what he's previously testified to under oath.

MR. BERRIGAN: Okay. I'll see if I can rephrase it.

THE COURT: Okay. That'd be fine.

BY MR. BERRIGAN:

Q. Why don't we talk about this background information, for example. Do you remember we had a discussion with some jurors about that?

A. Yes.

Q. And whether or not things like child abuse, sexual abuse, emotional or psychological abuse as a child would be something a juror would be willing to consider as a mitigating circumstance. Do you remember me asking people about that?

A. Yes.

Q. What's your view about that?

A. I guess I would consider that weighted against if it was

1251

premeditated and thought out. I guess, you know, it's -- I guess I wouldn't put as much weight in background information as much as what happened as far as thought out and plan.

Q. And you're certainly entitled to give it whatever weight

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1090 of 3245

you choose. But when we say consider, we mean, you know, really consider it, not a wink and a nod as I've been saying. You know what I mean?

A. Yes, I understand.

Q. Would you really consider it?

A. I would consider it. I can't say that I'd give it the same amount of weight as other factors.

Q. Okay. Fair enough. But you'd consider it.

A. Yes.

Q. Okay.

MR. BERRIGAN: That's all I have. Thank you.

THE COURT: Thank you, Mr. Berrigan.

MR. WILLIAMS: One moment, Your Honor?

THE COURT: Yes.

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Okay. Juror 301, if you'd step outside, we'll let you know in a minute or so what your status is.

(Prospective Juror 301 exited the courtroom.)

THE COURT: Is there a challenge for cause by the defense?

MR. BERRIGAN: There is, Your Honor.

1252

THE COURT: Okay. State your basis for it.

MR. BERRIGAN: That this juror would not, in fact, fairly consider mitigating circumstances, and we'd ask the Court to take his responses in totality. My view of this morning's responses is he made it quite clear that if children were involved in a premeditated, planned murder the death penalty was the only appropriate considered punishment, would not consider life in prison as appropriate punishment in that type of a case.

Page 176

THE COURT: Mr. Williams?

MR. WILLIAMS: Your Honor, we disagree. We think the fair reading of his testimony taken as a whole is that he's willing to consider both possible punishments. He's leaning very heavily toward death penalty, but that's not the test.

THE COURT: I don't even think he said he was leaning very heavily. 35-yard line leaves -- that's only 15 yards from middle ground. It leaves 35 yards to the goal line.

MR. WILLIAMS: That's true.

THE COURT: So if you take him face value on what he said using the analogy that the defense came up with -- and at one point this morning he said, I would probably choose the death penalty, but it's hard to say.

MR. WILLIAMS: Yeah, he even qualified -- he even qualified it when he was getting, you know, leading questions from the defense during jury selection.

THE COURT: Well . . .

1253

MR. BERRIGAN: Not to belabor that, Your Honor, and he did exactly say what you said, but then the very next question, I asked him to fast forward in the process and then make that determination: Would you still be able to consider punishment other than death as appropriate? My notes reflect that he said, I guess I would have to say not at that point.

THE COURT: He has given inconsistent answers, but anything else you wanted to add?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Okay. The defense challenge for cause is overruled. I think this witness, if you take all of his answers on the whole, while leaning somewhat towards the death penalty,

Page 177

has indicated that he could fairly consider both punishments and could fairly consider mitigation evidence as well.  And in my view, therefore, he is not substantially impaired.  So I'm going to overrule the objection.

Now, do you want to exercise a peremptory strike?

MR. BERRIGAN:  We do, sir.

THE COURT:  Okay.  301 is gone.  We'll bring 301 back in.

(Prospective Juror 301 entered the courtroom.)

THE COURT:  Sir, you've been -- we're going to go ahead and let you go.  Thank you for your service today, and thank you so much for being so honest and open in the answering of your questions.  We appreciate it very much.

1254

And we'd ask you to do us a favor, not to discuss this until after we get a jury selected probably around the 1st of June and get the trial underway, and then you can talk about it as much as you want; okay?

PROSPECTIVE JUROR 301:  Okay.

THE COURT:  Thank you very much.  Appreciate it.

(Prospective Juror 301 exited the courtroom.)

THE COURT:  Just to review, you have by my count I think -- and I'm not keeping written track -- you have eight peremptory challenges left.

Ready for Juror 528?

MR. WILLIAMS:  Yes, Your Honor.

(Prospective Juror 528 entered the courtroom.)

THE COURT:  Any chair you'd like right in the front row there is fine, and we're going to start with some more questions from Mr. Berrigan, and then we'll hear from the

Page 178

government lawyers; okay? Thank you very much.

EXAMINATION

BY MR. BERRIGAN:

Q. Good morning, ma'am -- good afternoon. I'm sorry. I just want to very briefly address with you your views about the death penalty once again.

A. Uh-huh.

Q. Because, frankly, I thought this morning you indicated that you had a doubt in your own mind as to whether you could

1255

realistically consider the death penalty if it had already been proven intentional five murders, substantial planning, and premeditation and children.

A. Uh-huh.

Q. Did I hear that accurately?

A. Well, I think when we initially fill out that 18-page questionnaire and then you send it in and then you really have time over the last couple months to think about it, I think it's a very serious thing, and again, I think it depends on what the evidence is to really weigh your decision on.

Q. Clearly in your questionnaire, as you pointed out, would it be fair to say that when answering all these factors you were pretty strong on the death penalty?

A. Well, by the time you get to the 18th page --

Q. Sure.

A. -- and how everything has kind of built your emotion up and you're adding children and firearms and drugs, I think you feel pretty strong about it. But when you're here and you really see, you know, this is real life and it's very serious, I think it's a very hard decision that you have to weigh all factors.

Page 179

Q. Sure. And I'm not so concerned about the questionnaire responses as your answers this morning when we were discussing this.

A. I'm really -- I think I could go life or death. It really kind of depends on evidence that I don't know.

1256

Q. Okay.

A. I mean, I don't . . .

Q. So -- and again, you know, the difficulty in the process, again, is we have to ask these jurors to fast forward.

A. I know. Sure.

Q. And, you know, we want to hear all the evidence. Well, that's the evidence; okay?

A. Right.

Q. And have your views changed from this morning? Do you feel differently than you did then?

A. Well, I've processed it over lunch. I think I'm just more open. I guess I just think I would be impartial enough to weigh -- look at everything openly and be able to make -- I guess I would be able to go either way.

MR. BERRIGAN: Thank you for coming back.

THE COURT: We still are going to give the government an opportunity to ask some questions.

PROSPECTIVE JUROR 528: Okay.

THE COURT: I don't believe this witness -- I'm sorry, this juror has been asked anything about pretrial publicity.

MR. WILLIAMS: Exactly.

EXAMINATION

BY MR. WILLIAMS:

Q. That's where I thought I would just touch base with you,

Page 180

ma'am.  You asked -- answered a question during the

1257

questionnaire about publicity.  You said you had just heard about the case on TV news; is that correct?

A.    Uh-huh.

Q.    And that's a yes?

A.    Yes.  Sorry.

Q.    Shelly appreciates it.

A.    Yes.

Q.    Tell me, ma'am, do you remember any real details about the case?

A.    No, no.  Just I think on Channel 9 news about the trial was coming.

Q.    All right.  And you answered in the questionnaire -- well, let me ask you this.  Since you filled out this questionnaire a couple months ago, have you learned anything more about the case through the news?

A.    No.

Q.    No, okay.  And then in the questionnaire you indicated that you had not formed any opinions about the defendant's guilt or innocence based on what you knew.

A.    No, no.

Q.    And you hadn't formed any opinions about what the proper punishment should be.

A.    No.

Q.    Okay.  And has that changed at all with you?

A.    No.

1258

Page 181

MR. WILLIAMS: All right. That's all I have. Thank you very much.

THE COURT: Juror 528, if you'd just step outside for a minute, we'll let you know your status. Thank you.

(Prospective Juror 528 exited the courtroom.)

THE COURT: Any challenge for cause by the defense?

MR. BERRIGAN: Yes, sir. We move to challenge this juror for cause in that her views regarding the death -- the killing of children indicate that she would not be able to realistically consider a sentence of less than death, and I ask the Court to reflect on her responses this morning where she was very directly asked that question, Could you realistically consider a sentence of life without parole? She said she didn't know. And I asked her, Do you have a doubt about that? And she said yes.

Now, I think it is one thing for a juror to fill out a questionnaire two months ago, come back, and maybe have different responses. It's quite another for a juror to come back two hours later and have different responses. And we believe at the very least based on these responses she's substantially impaired at being able to follow the instructions of the Court, would ask that she be stricken.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Your Honor, the juror's questions

1259

weren't inconsistent. During questioning by Mr. Berrigan, she twice said that she is on the 50-yard line, that she is undecided. When specifically asked, Can you realistically consider life imprisonment, she says, I'm undecided. I'm still

Page 182

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1097 of 3245

on the 50-yard line.  I'm open to either.  She said that during Mr. Berrigan's questioning this morning.

This afternoon she reiterated with Mr. Miller that she can fairly consider both possible punishments, and she did once again with Mr. Berrigan when questioned again.  I think this juror is open to both punishments, and I don't think she'd be properly struck.

THE COURT:  I think she repeatedly said she was open to both possible punishments.  And in terms of credibility, I find that she would be open to both possible punishments.  She's not substantially impaired.  The challenge for cause is overruled.  Would you like to take a peremptory challenge?

MR. BERRIGAN:  We will, sir.

THE COURT:  Okay.  We'll bring 528 in.

(Prospective Juror 528 entered the courtroom.)

THE COURT:  Ma'am, thank you very much for participating in jury selection.  We're going to let you go.  We really appreciate how hard you struggled with answering the questions.  Thank you very much.  Please do us a favor and not discuss this with anybody else until we get the trial underway; okay?  Thank you very much.  Good luck to you.

1260

(Prospective Juror 528 exited the courtroom.)

THE COURT:  Okay.  489.

MR. BERRIGAN:  I think this 489's been stricken, sir.

THE COURT:  489 was the one I let go to the --

MR. WILLIAMS:  No, no.

MR. BERRIGAN:  Oh, I wrote --

THE COURT:  I don't think so.  489.

(Prospective Juror 489 entered the courtroom.)

Page 183

THE COURT: Sir, anywhere in the middle there is fine or anywhere you want to sit, and we'll start with questions from Mr. Berrigan.

EXAMINATION

BY MR. BERRIGAN:

Q. Welcome back.

A. Thank you.

Q. Sir, I noted from your questionnaire that you had heard about the case but that the statement provided in the questionnaire had more details than you had prior to reading it. Does that sound right?

A. That's -- yeah.

Q. You also wrote that I do recall a conviction announcement of Mr. Honken on the news. Let me ask you a little bit about that. How did you hear that? Was it a television news broadcast?

A. Yeah. I try to catch the weather either at six or at ten,

1261

and other than that, I don't really pay too much attention to the news, but I do remember that being announced.

Q. Before hearing about the conviction, had you heard anything about Mr. Honken's case at all?

A. I remember the name. I don't remember much about the situation, no.

Q. Your questionnaire makes mention that you had a discussion with your dad: My father saw these papers on my table and mentioned he had followed the trial of Mr. Honken in the paper. So he at least had followed the trial.

A. Yeah. He's made mention since then being as I mentioned I had that questionnaire and was coming to jury selection. He had

Page 184

made mention that he followed it pretty close.

Q. What, if anything, did he tell you about Mr. Honken's case?

A. I think he said that he actually got the death penalty. Other than that, I don't really pay attention. My dad's a very biased person, still lives in about 1930 I think. So he's got a lot of preconceived notions that I don't necessarily agree with and can't agree with in order to keep my professional position.

Q. Well, he's not sitting before us. You are, of course. And obviously our concern would be that you might have been -- I mean, you may think, some of us think our dads are biased, but we still love them and certainly value their opinions for what they are. And I guess our really only concern would be that he might have influenced your view of this case based on what he

1262

might have told you about Mr. Honken's case.

A. No. Any conversation we had was basically in passing. It wasn't -- there wasn't much detail involved. My dad's retired now and spends a lot of time doing things to take up his time, and part of it's reading the paper. But I don't -- take it with a grain of salt.

MR. BERRIGAN: Thank you, sir. That's all I have.

PROSPECTIVE JUROR 489: No problem.

THE COURT: Any questions from the government?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Okay. I've got a question for you, Juror 489. If you're selected to serve as a juror in this case or at least if you make it into the pool -- and you won't know for a week or more maybe if you're in the jury -- on the final jury or not -- are you going to be able to refrain from talking to your father about it? I mean, it's great that he has an interest in

Page 185

current events. I think that's wonderful. My father did --
until he passed away would read three to four newspapers a day
and got a foreign newspaper once a week, and he was really up on
current events, and he often wanted to talk to me about it.

But it's important that you not talk to him about what
he remembers about the Honken case. And undoubtedly if you're
selected as a juror in this case, there will be lots of articles
about this case, lots of articles. And it's okay for your dad
to read them, but it's not really okay for you and your dad to

1263

talk about it.

PROSPECTIVE JUROR 489: Understood.

THE COURT: Yeah. Do you think you'll be able to
impose that on your father and he'll be able to refrain from
trying to talk to you about this case if you're selected?

PROSPECTIVE JUROR 489: Sure, yeah. Just be a matter
of having that conversation: Hey, I'll be glad to tell you
anything you want to know. See you in a couple months.

THE COURT: Yeah, and as soon as the trial's over, you
can talk to your father all you want. Is that fair?

PROSPECTIVE JUROR 489: Sure.

THE COURT: Okay. Great. If you'd just stand
outside, we'll let you know your status in a minute. Thank you
very much.

(Prospective Juror 489 exited the courtroom.)

THE COURT: Any challenge for cause by the defense?

MR. BERRIGAN: No, sir.

THE COURT: Any challenge for cause by the government?

MR. WILLIAMS: No, Your Honor.

THE COURT: Any peremptory challenge by the defense?

Page 186

MR. BERRIGAN:  No, sir.

THE COURT:  Any peremptory challenge by the government?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Okay.  Thank you.

1264

(Prospective Juror 489 entered the courtroom.)

THE COURT:  You're still in our jury pool, so you're free to go today.  Follow the cautionary instruction on that sheet of paper, and we will let you know as soon as we get an adequate number of jurors selected whether or not you're actually going to be on the jury or not, but you have about a 50 percent chance as it stands right now; okay?  Okay.  Thank you.

(Prospective Juror 489 exited the courtroom.)

THE COURT:  And our next juror would be what?  738?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Okay.

(Prospective Juror 738 entered the courtroom.)

THE COURT:  Anywhere in the front row.  Please be seated.  Going to start with some questions from Mr. Berrigan and then the government lawyers will have a chance.

MR. BERRIGAN:  Thank you, Your Honor.  May it please the Court.

EXAMINATION

BY MR. BERRIGAN:

Q.   How are you, sir?

A.   Very good.

Q.   We're going to cover this issue about publicity very briefly, and it looks like it might be brief in your case.  Have you heard anything about the case before you came in today?

Page 187

A.    Not a lot.  Just what I've -- you know, little bit in the

1265

newspaper is all and maybe a little bit on the news, on the local news station.

Q.    What paper do you get?

A.    Des Moines Register.

Q.    Okay.  The trial of Mr. Honken, my recollection is at least, got quite a bit of press in the Des Moines Register.  Do you recollect that?

A.    There's some in there, but I don't read a lot.  I just skim the paper basically.

Q.    Is it a subscription that you have?

A.    Yes, sir.

Q.    So do you get it every day?

A.    Yes, sir.

Q.    And what news do you watch?

A.    What news?

Q.    Yes, sir, television.

A.    Local Sioux City channel here.

Q.    Do you recollect back during Mr. Honken's trial his case being on the local news quite a lot?

A.    I don't recollect a lot of it.  I don't watch it a lot.  I pretty much do a lot of work with my business at night.  I just do some paperwork and stuff.

Q.    Tell us what you can about what you do remember about what you read and heard on the news about Mr. Honken's case.

A.    I really haven't followed up on it a lot, just that, you

1266

know, there was a few murders committed, and that's basically
Page 188

all I really know about it.

Q.   Was there any news of Mr. Honken's involvement?

A.   No, I don't recollect anything like that.

Q.   Did you read in the newspaper or see on the TV news whether he was convicted or not?

A.   I do not know that.  Honest to God I don't know if he was convicted or not.

Q.   Your questionnaire said something that you had heard -- if this is right, that you also heard about it from word of mouth.

A.   I run a service station, and there's a lot of talk in the station about different issues in the paper and stuff like that.

Q.   Sure, sure.

A.   So there's a lot of gossip that goes on in my place of business.

Q.   People kind of talk about current events anyway, don't they, when they come in?

A.   Exactly.

Q.   Pass the time of day?

A.   Exactly.

Q.   And I suspect your business was open last fall when Mr. Honken's trial was going on?

A.   Yes, it was.

Q.   These folks that came in to talk to you, are they customers of yours?

1267

A.   Yes, sir.

Q.   Do you recollect them giving you any opinions about what they thought about the case one way or the other?

A.   I don't recollect any.  I hear a lot of stuff during the day.  A lot of it goes in one ear and out the other.
Page 189

Q.   Okay.  Let me just ask you this question then, sir.  You know, if you're selected as a juror in the case, it's really critical that you decide this case based solely on the evidence and the testimony that's presented in this courtroom during this trial.  You following me?

A.   Right.

Q.   It wouldn't hardly be fair, would it, to have Miss Johnson judged on by something that was in the newspaper or television account in Mr. Honken's case?

A.   No.

Q.   Would you agree?

A.   I agree with that.

Q.   So what we're asking jurors to do really is two things.  One is not only not to consider it, what you might have read or heard before -- and you might be reminded.  You know, that happens sometimes when you hear things that are similar to what you read before.  You might be reminded of something you read or saw in the news but that we are asking people to completely set that aside, give it no consideration whatsoever, that that is left outside the courthouse door all together.  Is that

1268

something you think you could do?

A.   I believe I could.

Q.   To the point where even if you heard something in this trial that reminded you of something in Mr. Honken's news accounts, that's not something you'd even discuss with your fellow jurors because it had no place in the deliberative process in Miss Johnson's case.  Would you be willing to do that?

A.   Right, yes.

Page 190

MR. BERRIGAN: Okay. Thank you, sir. Appreciate your time.

THE COURT: Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, sir. Just very briefly, you may have customers -- because as the judge indicated, we're only going to be Monday through Thursday. Presumably if you work on Friday or over the weekend, you may have customers coming in to your business just like they did before during the Honken case not knowing that you're a juror on this case. And they might be wanting to kind of offer up their opinion on the ongoing case. What could you tell the judge about your ability to, you know, hold off those kind of opinions coming to you if you were going to work on Fridays or over the weekend?

A. I hear a lot of opinions of every issue and if it's school,

1269

politics, or whatever, so, you know, everybody has their own opinion, and pretty much basically I have a lot of customers, and I pretty much keep my opinions to myself when I'm working, so I don't want to make anybody mad and not have them come back the next day or whatever. So I basically pretty much keep a lot of my opinions to myself.

Q. Do you think you feel comfortable telling people if they just started right off to, You know, boy, did you hear about that Johnson case, do you think you'd feel comfortable saying, Oh, wait a second, I'm a juror on that case; you cannot talk to me about the case? Do you think you feel comfortable doing that with your customers?

A. I could probably do that.

Page 191

Q.   And you can just tell them that the judge told you that you couldn't even talk about it or even listen to other people's opinions.  And do you think that'd be something that would work for you?

A.   I'd try my best.

Q.   And bottom line is even if in passing somebody made some comment about the case before you had an opportunity to stop them, do you remember Mr. Berrigan's comment to you what's going to be critically important is if you were a juror in this case you decide this case based on the evidence in this case, not based on anybody's opinion even if it came unsolicited to you? Could you do that?

1270

A.   Exactly, yes, sir.

Q.   And you'd ignore anything anybody would have said to you outside this courtroom.

A.   Yes, sir.

         MR. WILLIAMS:  Thank you very much for your time.

         THE COURT:  I have a couple of questions for you, Juror 738.  Do you think you will be able to fairly consider any mitigation evidence that may be presented in the case?  I'm not asking you now how much weight you would give that evidence. I'm asking if you'd at least be open to considering that evidence and whether you think you could fairly consider it.

         PROSPECTIVE JUROR 738:  I could probably consider it.

         THE COURT:  Well, why do you say you could probably consider it?

         PROSPECTIVE JUROR 738:  Well, I would consider -- I would consider anything, you know, that has to do with the case if it involves the outcome of the trial.

Page 192

THE COURT: Okay. And now I'm talking -- I'm talking really about this third phase if we ever get there in this case --

PROSPECTIVE JUROR 738: Right.

THE COURT: -- where you'd be listening to evidence and you'd be receiving jury instructions from me on the penalty phase, and the, you know, really, really, really tough issue is life imprisonment or the death penalty. And I want to know if

1271

you believe you could consider -- and I mean -- by fairly consider, I mean really take a look at it. I'm not talking about how much weight you would ultimately give it with any like aggravating factors and you have to weigh them. I'm not talking about that. I'm just talking about would you consider evidence presented to you about mitigation?

PROSPECTIVE JUROR 738: In other words, you're wanting to know if I can either give the death penalty or the life imprisonment?

THE COURT: Well, I'm not really asking you that. I'm asking you if we get to a penalty phase, the defense doesn't have to but they may choose to put on evidence of mitigation, and I want to know if you would fairly consider that evidence, not how much weight you'd ultimately give it, not whether you'd pick the death sentence or a life sentence, but whether you would fairly consider any mitigation evidence, for example, about Miss Johnson's background and life experiences and childhood, maybe any psychological problems, that type of thing. Would you at least look at that evidence and consider it?

PROSPECTIVE JUROR 738: I would fairly consider that.

THE COURT: Okay. If you'd just step outside, we'll

Page 193

let you know your status.

(Prospective Juror 738 exited the courtroom.)

THE COURT: Any challenge for cause by the defense on 738?

1272

MR. BERRIGAN: Yes, sir. We challenge this juror based on his views regarding mitigation evidence in that he would not realistically consider mitigation evidence. He told me as such during the questioning this morning. In fact, he was asked a question, So you might consider it but give it to bearing, and he said, No, I look at the crime. That's determinative for him.

And even with the Court's questioning, at least his initial response -- and I don't -- I can't imagine he was confused at this point -- he said, I could probably consider it. He qualified even in the response to the Court until he was asked three more questions.

I think that this is a juror -- and, of course, his questionnaire reflects that he believes the crime's punishable based on the crime, not the person.

So we think he's substantially impaired as a juror and that he's unwilling to give full consideration and full effect to mitigation evidence as required under Penry I and Penry II.

THE COURT: Thank you, Mr. Berrigan.

Mr. Williams?

MR. WILLIAMS: Your Honor, I don't think your questions could have been more clear and his answers more clear that he's willing to realistically consider those options.

THE COURT: Well, his answers were clear. The question is are those his true feelings or not. My questions

Page 194

were pretty clear.  I think his answers were clear.  The ultimate question is what are his true feelings.

MR. WILLIAMS:  Well, and I think they are his true feelings because even when Mr. Berrigan was asking him questions about it, what was clear from him is that he doesn't give a lot of weight to these background factors, and he wasn't willing to go and say that it was going to be determinative for him.

But even with Mr. Berrigan, you know, he said he would consider it but it may not have any bearing on the ultimate punishment for him which simply is a read by him that he'd look at it and realistically look at it, but he's not going to tell you in advance that it has a lot of weight.  I think that's all that's required of a juror.

THE COURT:  I'm going to overrule the objection.  I do not believe Juror 738's views would prevent or substantially impair the performance of his duties in accordance with the instructions and their oaths, so the objection's overruled. Would you like to exercise a peremptory strike?

MR. BERRIGAN:  We will, sir.

THE COURT:  Okay.  Let's bring in Juror 738.

(Prospective Juror 738 entered the courtroom.  )

THE COURT:  We're going to go ahead and excuse you from service in this case.  Thanks so much for filling out the questionnaire, for attending today, for your very open and honest efforts to answer all of our questions.  We appreciate it

very much.

Page 195

We'd appreciate it if you wouldn't say anything about jury selection to anybody until the trial's underway because you might talk to one of your customers about it. That person could wind up here this week or next week or the week after. Thank you very much. We appreciate it. You're free to leave.

(Prospective Juror 738 exited the courtroom.)

THE COURT: Next juror, 263.

Carey, do you have a count on how many peremptory challenges the defense has left?

THE CLERK: My count says they have six.

(Prospective Juror 263 entered the courtroom.)

THE COURT: Juror 263, just anywhere in the front row. You move up from the back row to the front row. We're making some progress slowly. Please be seated anywhere, anywhere. We're going to start with Mr. Berrigan, and then the government lawyers may have some questions for you.

EXAMINATION

BY MR. BERRIGAN:

Q. Welcome back, ma'am. How are you?

A. Good. How are you?

Q. Good. I wanted to start with a little different subject than we've been talking about so far, and that is the matter of publicity or media attention the case has gotten; okay? We ask folks kind of what their exposure has been to this case through

1275

television, radio, and the newspaper before they come in, and so I wanted to ask you the same thing. What have you heard about the case before you came in today?

A. It's been minimal, lot of more gossip I'd say at my work because that's what people do is gossip, so it's been a lot of

Page 196

gossip I'd say. That's probably what I hear most. Newspaper, TV's very minimal; radio, none.

Q. Your questionnaire indicated you were somewhat familiar with the case in terms of the boxes to be checked, one being very familiar, one somewhat familiar, only just heard about it, not at all familiar, and you had checked somewhat familiar. Does that sound right?

A. Yeah.

Q. Yeah. And then you were asked your sources, and just as you mentioned I guess, you had seen something about it on television?

A. Yeah, just a little bit, just about, you know -- you just hear about it happening and where it happened and, you know, how many people, things -- just very minimal, the basics, what I've learned from pretty much being here, nothing new.

Q. And you get the newspaper?

A. (Nodded head.)

Q. What paper do you get?

A. Read the Des Moines Register once in a while and Sioux City Journal.

1276

Q. Okay. And then you've had people talk to you about this particular case.

A. Correct.

Q. And you indicated that people have told you about it, drug related, children killed, innocent children; is that right?

A. Correct.

Q. What else have folks told you about the case?

A. Just -- like I said, it's just gossip, what we hear in the break room or whatever, and you hear it. The only thing I'd add

Page 197

to that is last thing I was -- I heard specific would be that she was allowed to wear makeup to court now.

Q.    How did you hear that?

A.    Work.

Q.    Work.  And that was probably pretty recently, wasn't it?

A.    Probably about three weeks ago, two weeks ago.

Q.    Your questionnaire indicated you have a number of part-time jobs?

A.    Yes, I work a lot.

Q.    Okay.  And this is one of your jobs that you heard it at?

A.    I am a human resource trainer at Midwest Industries now which I just took that position, and I also substitute teach and clean houses.

Q.    Okay.  Was there anything else we haven't covered so far that you might have heard about this case?

A.    No.

1277

Q.    Your questionnaire -- this is question 72 I wanted to ask you about briefly.  It says, No matter what you have read, seen, or heard, do you now have any beliefs or opinions about the guilt of Angela Johnson?  And then there are some boxes to check.  One is yes.  One is no.  One is unsure.  And you checked unsure.

A.    Correct.

Q.    Tell us a little bit about that.

A.    If I think she's guilty or innocent as of now or --

Q.    Yeah.  This thing, you know, do you have any beliefs or opinions about the guilt or innocence of Angela Johnson, and you were unsure about that?

A.    Well, I'm unsure because I haven't heard any evidence.  I

Page 198

guess you hear things that say she is and she's being charged, so that, you know, raises a question, the wonder -- you know, wondering, of course, you know, that we're here in the first place.

Q.   Okay.

A.   And it's hard when you throw kids in there too.  That definitely pulls on my heartstrings.

Q.   Right.  And you talked about that a little bit this morning, and we might visit about that in a minute.  But let me ask you about this question or uncertainty you have about whether she's guilty or innocent; okay?

A.   Sure.

1278

Q.   When folks come into a courtroom and they're charged with a crime, 99 percent of the time the crime's not been in the papers or the newspaper, and folks come in, and somebody might be charged with a drug offense or stealing or whatnot.  The people don't know anything about the case at all.  There was no opportunity even to know anything.

And then as the judge has pointed out this morning, there are cases like this one where it's kind of a high-profile case and they've gotten attention through the news media.  And once in a while that makes it difficult for folks because they hear things.  You know, they weren't reading the paper with the idea they might be a juror some day or talking to their friends with the idea I might be a juror here.  They're just doing what we always do.  You know, we pay attention to current events and talk about it, and sometimes we form opinions and sometimes not; okay?

A.   Uh-huh.

Page 199

Q.   And I mention all of that because if you have an opinion about Miss Johnson's guilt that's inconsistent with the presumption of innocence that jurors have to afford criminal defendants, that's something that we need to know now because, again, we won't have a chance to kind of fix that later; okay?

A.   Yes.

Q.   You hear me?

A.   Yep.

1279

Q.   There's nothing wrong with it.  I mean, people -- again, they come to opinions, and sometimes they're hard for them to set aside.  They can't realistically do it.  Sometimes people can.  It isn't a big deal.  We need to know about you in this particular case; okay?

A.   Uh-huh.

Q.   So do you have an opinion about Miss Johnson's guilt or innocence that's inconsistent with the presumption of innocence?

A.   I would say yes.

Q.   Okay.

A.   There is some negative -- more negative feeling there, yeah.

Q.   Okay.  And we have to do our best to rely on your judgment because we can't read your mind or your heart.  Is that a view that you think that you could completely and utterly set aside and completely presume Miss Johnson innocent as the law would require you to do?

A.   Completely and utterly, no.

Q.   Okay.  So even if -- and I think the judge has already maybe alluded to this at the very least.  But, you know, you know there's an obligation to do that, don't you?

Page 200

A.    Yes.

Q.    And you think that's fair, that people should come into a courtroom being presumed to be innocent?

A.    Yes.

1280

Q.    And I just want to make sure.  What I'm hearing you tell us is you've got some question in your own mind whether you can do that.

A.    Yeah.

Q.    And furthermore, you've got a question about whether you could set that aside.

A.    Yes.

        MR. BERRIGAN:  Okay.  I wonder if we might approach, Your Honor, or would you like me to continue?

        THE COURT:  Why don't you finish up.  Do you have quite a bit more?

        MR. BERRIGAN:  I was going to turn to the death penalty questions.

        THE COURT:  Mr. Williams?

        MR. WILLIAMS:  We would join in.

        THE COURT:  Okay.  Okay.  I take that --

        MR. BERRIGAN:  So the defense would move for cause.

        THE COURT:  Yes.

        MR. BERRIGAN:  Thank you.

        THE COURT:  Let's see.  Juror 263, we're going to go ahead and excuse you at this time.  Thank you very much for participating in the process.  And like I said and meant completely when we started jury selection this morning, you serve your country just as faithfully when you give the answers that are honest, which you have, as you do if you were selected

                          Page 201

and had to deliberate on this very difficult case.  So we're going to go ahead and excuse you.  You're free to go home.

We'd like you to do us a favor because jury selection could take a couple of more weeks.  We'd ask you not to say anything to anybody about it till you read in the newspaper and hear that the trial's underway and we have our jury selected.

Now, do you work at Midwest Industries?

PROSPECTIVE JUROR 263:  Uh-huh, correct.

THE COURT:  Is that in Ida Grove?

PROSPECTIVE JUROR 263:  Correct.

THE COURT:  And is that the Godbersons' company?

PROSPECTIVE JUROR 263:  Correct, ShoreLand'r.

THE COURT:  ShoreLand'r, got it.  Thank you.

PROSPECTIVE JUROR 263:  Thank you.

THE COURT:  Good luck to you.  Thank you.

(Prospective Juror 263 exited the courtroom.)

THE COURT:  Okay.  Our next one should be Juror 638.

(Prospective Juror 638 entered the courtroom.)

THE COURT:  Sir, if you'd just sit anywhere in the front row there.

Everybody else can be seated.

MR. BERRIGAN:  May it please the Court.

THE COURT:  Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

1282

Q.   Welcome back, sir.

A.   Thank you.

Page 202

Q.    We have an opportunity to kind of ask you about a whole different subject now, and that has to do with the media attention that the court -- that the case has gotten and what you might know about that before coming in today; okay?  And what we're talking about, as you undoubtedly know, is stuff you might have read about in the newspaper, watched on television, or heard on the radio or even discussions, you know, talking at work around the water cooler or whatever.  And we have the benefit of your questionnaire, of course, which is very helpful, and thank you for filling that in.  Your questionnaire indicated you were somewhat familiar with the case?

A.    Not all that much, just what I had seen, oh, a little bit in the paper, and somebody at work mentioned it.

Q.    Okay.

A.    Other than that, little bit of TV.

Q.    Okay.  And you mention that.  There's a question 63, says, What have you read, seen, or heard about this case, the crime, or the people involved, and you said, Seen on television on the news bits and pieces.  Do not get the newspaper but have heard other people talking about the case.

A.    Yeah, just sitting around having coffee or whatever.

Q.    Okay.  And, in fact, you said, People at work and we all agree life in prison is too good for him and her if she did help

1283

him commit the murders, especially the children.  That was the answer to question 65, Have you talked about the case, the crime, or any of the people involved?  Does that sound right?

A.    Yes.

Q.    And, in fact, you were asked whether you had come to an opinion based upon what you had heard or seen, an opinion.  Let

Page 203

me read this question to you directly. It's question 72. It says, No matter what you've read, seen, or heard, do you now have any beliefs or opinions about the guilt or innocence of Angela Johnson? And you checked yes. I believe she knew what her boyfriend did. Whether she helped or not, she is guilty if she knew. Does that sound right?

A. Yes.

Q. And to be completely candid with you, sir, we've had a lot of people come in and tell us they've not only heard of things about the case but have formed opinions. And when they read about the case or saw it on the news, they weren't knowing they might be jurors someday. You know what I mean?

A. Correct, correct.

Q. I mean, we talk about things in the newspaper every day and things on TV. That's what we share with our coworkers to chat about current events. Don't you agree?

A. I agree.

Q. Okay. And it looks like that was the situation here.

A. Uh-huh.

1284

Q. Yes?

A. Yes.

Q. When you filled out this questionnaire, though, at that point you did know that you were going to perhaps be selected as a juror. Would that be fair to say?

A. Yeah, there's a chance I thought, yeah.

Q. Yeah, sure. Otherwise why would we be sending you this big long questionnaire?

A. Right.

Q. And the instructions on the questionnaire pretty clearly

Page 204

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1119 of 3245

indicated that the Court wanted you to give forthright, honest, truthful answers.

A. True.

Q. And did you do that?

A. I thought I did at the time but . . .

Q. Okay. Well, would this be one of those truthful answers?

A. Pardon?

Q. Would this answer be truthful?

A. Yes, truthful.

Q. Yeah, that you formed an opinion that Miss Johnson knew what her boyfriend did. Whether she helped or not, she's guilty if she knew. Is that right?

A. Yeah.

Q. Now, I know you probably have heard of this idea. We have this presumption of innocence that attaches to people when they

1285

come into court; right?

A. Correct.

Q. And, you know, 99.9 percent of the time the folks that are coming in for jury service, they've never heard of the defendant. You might be charged with selling drugs or stealing a car, robbing a bank, and nobody knows anything about this guy or the case.

A. Right.

Q. But as the judge pointed out, this is not one of those cases; okay? This is one of these high-profile deals that's gotten a lot of attention.

A. Yes, sir.

Q. And you, like many people, have heard information about the case; okay? Sometimes, sometimes, that causes people to have

Page 205

difficulty giving the defendant the full presumption of innocence that we normally would have no problem with.

A.   I agree.  I agree.

Q.   Okay.  And there are occasions where as much as we'd want we can't completely set aside what we've heard or what we've talked about or how we feel about the case because, you know, that's how we feel; okay?

A.   Right, right.

Q.   And so we have the situation here today with this view which you'd agree with me is not exactly the presumption of innocence; right?

1286

A.   Right.

Q.   Okay.  So we have to ask you, you know, if this is still your view, which apparently it is?  Is this something you can completely set aside and really presume Miss Johnson guilty given the discussions you've already had about this case?

        THE COURT:  I think presume her innocent.

        MR. BERRIGAN:  Oh, I'm sorry.  Did I say guilty?

        THE COURT:  Yes.

        MR. BERRIGAN:  Okay.  My fault obviously.

BY MR. BERRIGAN:

Q.   Presume her innocent given the thoughts that you've shared with us here.

A.   I guess I just have -- I probably should not jump to conclusions.  Automatically I thought she knew.  So that's why -- when I filled out the questionnaire, that's the mood I was in, and that's the way I was thinking.

Q.   Well, you also mention on question 99, it says, In your opinion is there anything about this case, the issues, and/or

Page 206

the people involved in this case that might hinder you even slightly from being an impartial juror? And you checked yes. Do you remember that?

A. No. I really don't remember that.

Q. Okay. Would you like to see the questionnaire?

A. Oh, yeah, sure.

MR. BERRIGAN: May I, Your Honor?

1287

THE COURT: Sure. What number question was that, Mr. Berrigan?

MR. BERRIGAN: It's 99, sir.

THE COURT: Thank you.

BY MR. BERRIGAN:

Q. Do you see where I'm talking to you about, sir?

A. Yeah, I see what it was.

Q. And then you checked yes.

A. I checked yes. Maybe I didn't quite understand it.

Q. What did you --

A. I know what I was thinking. I was thinking of the children. That's what I got here.

Q. Could you tell us what you wrote in the questionnaire?

A. Yeah. The death of children is bad, bad enough without grown people, but killing children is unforgivable in my opinion.

Q. So that was something you wrote in at the time of the questionnaire as well.

A. Yes.

Q. May I get that?

A. Sure.

Q. So here's where we kind of find ourselves, Mr. 263 (sic),
Page 207

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1122 of 3245

on this publicity issue if you formed an opinion about Miss Johnson's guilt as a result of what you've heard, whether you are going to be able to completely and utterly set that aside

1288

and afford her -- I'm sorry, did I call you 263? I'm sorry. Mr. 638, my apologies -- afford her the presumption of innocence which the law accords her given what you've already discussed about the case. What do you think about that?

A.   I'm just thinking if I could do it or not. I mean, I've got my opinion. Whether it's right or wrong, I don't know. It's just the way I feel.

Q.   Yeah, it's not -- it's not wrong. It's an opinion.

A.   Right, it's just an opinion.

Q.   Right, right. And the reason we get to ask people in this case is because there's a lot of folks that have read about this case or heard about the case. You know that.

A.   Yes, I do.

Q.   Some of these folks heard enough that they formed an opinion. Others heard like nothing, I mean, literally hardly anything, and they didn't form opinions. You're one in the first category; right?

A.   Yes.

Q.   So it's not a right or wrong thing, but this is this problem. I think it's obvious. We need people that can completely -- and I mean completely -- and utterly presume this woman innocent; okay? That's really what the law requires. And it's a presumption she gets not just now, but it stays with her throughout the course of the trial until all the evidence is in; okay?

1289

Page 208

A. I understand.

Q. It just sounds like -- it looks like in these responses on the questionnaire that there's going to be at least a little problem there with you on that.

A. Probably.

Q. Is that fair?

A. Yes, that'd be fair to say.

MR. BERRIGAN: Okay. I appreciate your candor on that, sir.

I'd move for cause.

Thank you for your response.

MR. WILLIAMS: No objection, Your Honor.

THE COURT: Okay. Juror 638, I've just got a couple questions for you.

PROSPECTIVE JUROR 638: Sure.

THE COURT: In your mind would it make any difference if Angela Johnson found out what Dustin Honken did before or after he did it? Would that make a difference?

PROSPECTIVE JUROR 638: I guess it would, yes. I mean, I don't know what to say to that to tell you the truth.

THE COURT: Well, I'm just curious in your view.

PROSPECTIVE JUROR 638: Well, if she didn't know about it, well, then yes, it'd make a big, big difference, but I guess I just assumed.

THE COURT: Right. And that's okay. But I'm just

1290

trying to find out. You assumed that if she knew about it she'd be guilty. Isn't that essentially it?

Page 209

PROSPECTIVE JUROR 638: Yeah. It was kind of like what you guys were talking about, the bank robber and he goes in the bank. The other guy's driving the car and didn't know it. No, then I don't believe . . .

THE COURT: Okay. What about if a buddy of yours robs a bank and after the fact tells you so now you know he robbed a bank? Are you guilty of the bank robbery?

PROSPECTIVE JUROR 638: Not guilty of the bank robbery, sir, but I sure wouldn't like to keep it quiet if I knew about it, buddy or no buddy. That's where I'm at.

THE COURT: I gotcha. Well, I tell you what. We're going to go ahead and excuse you, and we really appreciate it very much. I think you did a terrific job filling out your questionnaire. You did an absolutely fabulous job answering the questions. Nobody's here to judge whether you're right or wrong because you know what? It's just an opinion, and the beauty of our country is you're entitled to an opinion just like I am. And your opinion isn't any better or worse, and mine isn't any better or worse. They're just our opinions. And so I think you'd be a terrific juror but probably on a case where you hadn't formed any opinion ahead of time. So you're free to leave. And on behalf of the lawyers and Miss Johnson, I wanted to thank you very much.

1291

And we'd ask that you'd do us a little bit of a favor, because we'll still be engaged in jury selection maybe for a couple more weeks, that you not talk about this with any of your buddies or friends because they might say something to somebody else who got a questionnaire, and they might be sitting in here tomorrow or the next day or some day next week.

Page 210

PROSPECTIVE JUROR 638:  I understand.

THE COURT:  Okay.  Great.  Thank you very much.

PROSPECTIVE JUROR 638:  Thank you.

(Prospective Juror 638 exited the courtroom.)

THE COURT:  Okay.  We're going to give our court reporter a 20-minute recess, and so we'll be back at 3:20. Thank you.

(Recess at 3 p.m.)

THE COURT:  We ready for Juror 170?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Okay.

(Prospective Juror 170 entered the courtroom.)

THE COURT:  Juror 170, any chair in the front row there.  Just pick a chair that looks comfortable.  Please be seated.  And we're going to start with questions from Mr. Berrigan.

MR. BERRIGAN:  May it please the Court.

EXAMINATION

BY MR. BERRIGAN:

1292

Q.   Welcome back, sir.  We have a chance to ask you a few questions about what exposure, if any, you might have had to media coverage about the case, and by that I mean simply news accounts and the local paper or perhaps the television news or radio; okay?

A.   Yes.  I haven't heard nothing, no.

Q.   Yeah, and I noticed that in your questionnaire.  Not a lot of people checked that response.  So I just wanted to make sure. You haven't heard anything at all about the case, huh?

A.    No.  The only thing I heard is that the guy or whatever was

Page 211

found guilty, and I guess I really don't know -- after I first found out about this, I never asked really a lot about it either.

Q. Tell me about that. How did you find out this guy was guilty?

A. Tell you the truth, I can't really remember. I just -- you know, somebody just said it, and I heard it, and like I said, then I never asked any more, so that was it.

Q. Gotcha. Do you get a regular newspaper subscription?

A. Yes, just the local paper.

Q. Local paper.

A. Right.

Q. Not the Sioux City --

A. Sunday Journal I get I guess.

Q. The Sioux City Journal?

1293

A. Yes, correct.

Q. But you don't remember seeing anything about it in there?

A. No, not at all.

Q. Great. Let's just say theoretically, just theoretically, you're picked on the jury and maybe you'll hear something similar to what you might have read, somebody said something to you before. We need you to be able to completely and utterly set that aside and just decide the case based on the facts and the evidence, the witnesses you hear in the courtroom. Is that something you could do?

A. Yes, I believe so.

Q. Okay. When you heard about this fellow getting convicted, did you hear anything about his punishment?

A. I think they said he got death. I really -- you know, like

Page 212

I said, I kind of -- you know, it didn't -- you know, that's it.

Q.   How does it affect you -- how do you think it would affect you if you were selected as a juror in this trial?

A.   I think you gotta separate the two because it's two completely different people and different circumstances.

Q.   Okay.  And is that something you're confident you can do?

A.   Yes, I'm sure.

Q.   Do you think it would be only fair to Miss Johnson that she be judged based on the evidence that takes place here in this courtroom?

A.   That's correct.

1294

Q.   And if -- would you be willing not even to say anything to your fellow jurors about something you had heard about Mr. Honken's case or read about Mr. Honken's case or whoever this other fellow is?

A.   Could you reword that again?  I don't want to say the wrong answer when I meant it the right way.  I would not say anything, no.

Q.   Okay.  You'd just forget all about whatever it is you heard.

A.   Right, right.

MR. BERRIGAN:  Great.  That's all we can ask.  Thanks a lot.

THE COURT:  Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Q.   Good afternoon, sir.  I just want to make sure we're clear on this.  You think you've heard that this other fellow was found guilty, and you think you may have heard about the

Page 213

penalty, and we want to make just really sure, everybody in this room does, that that's not going to enter into your analysis of whether this defendant's guilty of the charges she's facing in this case.

A.   No, that should -- huh-uh, no.

Q.   You'll set that completely aside?

A.   Right, right.  Like I said, it's just absolutely like two

1295

different -- I mean, it's not like even if they're twins or whatever.  I mean, it's not -- it's way different.

Q.   Great.  And you won't even bring it up in the jury room if -- because there may be other jurors who hadn't heard anything about the case at all, and you won't even talk about that in the jury room if you're picked as a juror in this case?

A.   No, I won't.

            MR. WILLIAMS:  Very good.  That's all I have.  Thank you.

            PROSPECTIVE JUROR 170:  Thank you.

            THE COURT:  Okay.  I'll tell you what, sir.  If you'll just step outside, I'll let you know in a minute where you stand.

            PROSPECTIVE JUROR 170:  Thank you.

            THE COURT:  Thank you very much.

            (Prospective Juror 170 exited the courtroom.)

            THE COURT:  Any challenge for cause by the defense?

            MR. BERRIGAN:  No, sir.

            THE COURT:  Any challenge for cause by the government?

            MR. WILLIAMS:  No, Your Honor.

            THE COURT:  Any peremptory challenge by the defense?

            MR. BERRIGAN:  No, sir.

Page 214

THE COURT:  Peremptory challenge by the government?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Okay.

1296

(Prospective Juror 170 entered the courtroom.)

THE COURT:  Sir, you're in our jury pool.  So you're free to leave now.

Remember that sheet that we went over this morning with the rules on it.  Be sure and take that home with you.  And we'll call you as soon as we know.  You have about a 50 percent chance of making it on the jury in this case, and as soon as we know, we'll let you know, one, whether you're on the jury or, two, if you're not on the jury, then you're not on the jury.  But if you are on the jury, we'll let you know when the trial starts.  And it's very, very important now that you still have a good chance of getting on the jury that you not read or listen to any radio or TV reports or do any research on your own.

PROSPECTIVE JUROR 170:  I tried that already.

THE COURT:  Okay.  Good.  Thank you.

PROSPECTIVE JUROR 170:  Thank you.

(Prospective Juror 170 exited the courtroom.)

THE COURT:  We ready now for Juror 89?

MR. WILLIAMS:  Yes, Your Honor.

(Prospective Juror 89 entered the courtroom.)

THE COURT:  In the front row, please.  Pick your chair.

And everybody can be seated, and we'll start with questions by Mr. Berrigan.

MR. BERRIGAN:  Thank you, Your Honor.

1297

Page 215

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, sir?

A. Fine.

Q. Welcome back.

A. Thank you.

Q. I wanted to revisit with you an issue that we've talked about now a couple of times today, and that is your views about the death penalty briefly; okay?

A. Okay.

Q. Before that, before we ask too many questions, I just want to make sure some of these answers in the questionnaire seem to be accurate and reflect your views; okay? You mention that your views about the death penalty include the proposition an eye for an eye, life for a life. Is that right?

A. That would be correct.

Q. Okay. Could you explain that to us a little bit? Is it as simple as that sounds?

A. Basically.

Q. And you particularly were concerned about children being killed.

A. Correct.

Q. And mentioned that you have grandchildren.

A. Correct.

Q. And you were concerned about baby killers. In fact, you

1298

put that on the questionnaire as one of the concerns you had about this particular case.

A. Correct.

Page 216

Q.   There's a question -- and I know you don't remember all of these, so I'm going to try to help you.  Question 99, In your opinion is there anything about this case, the issues, and/or the people involved in this case that might hinder you even slightly from being an impartial juror, and you checked yes to that box and wrote, Don't like baby killers.  Does that sound right?

A.   Correct.

Q.   Is that true?

A.   Correct.

Q.   Okay.  And then we had some questioning this morning, and we asked you to do that fast forward thing in your mind.  Do you remember that?

A.   Uh-huh.

Q.   And you were asked about a situation where as a juror you had found five intentional murders and then you had also made a determination beyond a reasonable doubt premeditated murders, substantially planned, substantial planning, and then children.

A.   Uh-huh.

Q.   Right?

A.   Correct.

Q.   Now, I grant you that's a big if, if you found that; okay?

1299

But given your views about children, okay, if you found that beyond a reasonable doubt, would you be able to realistically consider a punishment other than the death penalty?

A.   I would have to think about it a long time, but I probably would sway towards the death penalty.

Q.   Okay.  When -- I asked you kind of the flip side of that question this morning, and let me see if I can ask that.  For
Page 217

that case, that type of facts, would you be able to realistically consider life without parole as a sufficient punishment for that type of situation?

A.   No.

MR. BERRIGAN:  Okay.  We appreciate your candor, sir.  Thank you.

THE COURT:  Mr. Williams, any questions for this witness -- this juror?

MR. WILLIAMS:  Very briefly, Your Honor.

EXAMINATION

BY MR. WILLIAMS:

Q.   Good afternoon, sir.  How you doing?

A.   Good afternoon.

Q.   I just want to ask you just a couple follow-up questions to make sure we understand where you're at.  And again, thank you very much for your candidness.  What's important is you have to tell us what you really feel.  Don't ever feel like you have to give an answer you think is the right answer.  Fair enough?

1300

A.   Thank you.

Q.   All right.  You were asked a number of questions in this questionnaire, one of which is, In light of what you know about this case, have you formed any opinions about the proper punishment?  That was at question 73, and you said, Yes.  And in answer to that question -- and this is after you were told that Angela Johnson was charged with participating with her former boyfriend in the murder of five people including two children, ages six and ten, asked if you had formulated any thoughts about what the appropriate punishment should be, and you said yeah, and you wrote down, Life in prison.  Do you remember writing

Page 218

that down, sir?

A.   Not really but probably did.

Q.   Does that sound --

A.   Close.

Q.   -- like something that immediately came to mind to you as a proper punishment for somebody involved in killing children?

A.   Yeah.

Q.   Okay.  And then asked about the death penalty at question 75, you said, This is a possibility.  And when asked why you felt that way, you explained, Eye for an eye, a life for a life. Does that sound like your answers?

A.   Yes, uh-huh.

Q.   And then on question 82, you were asked, What are your thoughts and opinions about life in prison as a punishment for a

1301

person who's guilty of intentional murder?  And let me just stop for a minute and talk to you about that.  In some state courts when somebody gets sentenced to life in prison, that actually only means a term of years, and then they get to go before a parole board, or they might actually get off for good behavior. In the federal system, life in prison means life in prison, no parole, no time off for good behavior.  It's a life sentence. Do you understand that?

A.   Correct.

Q.   Okay.  When you were asked about your thoughts about life in prison, you said that would be a consideration.  And why do you feel this way, question 83?  You said, This would be for a person demonstrating a lack of human decency.  And I take it from that that life in prison is a serious punishment, sir?

A.   That would be serious, yeah.
Page 219

Q.   The idea of never, ever getting out, never, ever being free strikes you as a serious punishment?

A.   Correct.

Q.   And then asked in question 84, Do you think that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder, and you said, Yes, it separates them from a society they can't live and navigate in. Do you remember writing that, sir?

A.   Somewhat, yeah.

1302

Q.   And do you still feel that those answers are accurate that you gave in the questionnaire?

A.   Yeah, pretty close, yeah.

Q.   Now, Mr. Berrigan's been talking to you about some of the facts in this case, and he's focusing on the intentional killing of children, and that's something that doesn't sit well with you.  Is that a fair way of saying it?

A.   Correct, uh-huh.

Q.   You understand at some point if we get to this stage, if the defendant's found guilty beyond a reasonable doubt and additional factors are shown and the jury's actually able to consider the death penalty that there's going to be a number of factors for the jurors to take into account.  The killing of children is certainly one of those factors, but there may be other factors, for example, whether the defendant pulled the trigger or whether her role in this was to aid and encourage somebody to do it but actually didn't pull the trigger herself.

        And what we're looking for are jurors who can weigh all those factors, not just take one factor that's going to
Page 220

influence them and actually weigh all those factors and fairly consider both options.

Now, here 's where it's very, very important. I want you to tell me what's in your heart, not in any way what you think I want to hear; okay? Some jurors can't do that. Some jurors know, boy, you kill children; I frankly don't care what

1303

other factors you put out there. That's it for me. I can't ever consider life in prison as a possible punishment. That's just too horrible for me.

Other jurors can consider all the factors, and they can tell us, I know they killed children; I'm assuming that at this point, but even if that's assumed, I can still fairly consider both possible options, life in prison and the death penalty. We need to know where you're at on this, sir.

A.   I still say my opinion would be swayed heavily by the children factor if it's proven that there was involvement in their killing. Children don't have the deciding capabilities to make decisions. It's done for them by adults, and that's not a decision that should be imposed upon them, their death, period.

Q.   Makes sense. You remember the football field analogy that Mr. Berrigan used with some of the jurors --

A.   (Nodded head.)

Q.   -- with the idea that the 50-yard line is somebody who really has no position at this point, can equally weigh both life in prison and the death penalty as possible punishments, and, you know, one end zone is the death penalty, and the other end zone's life in prison. Where do you think you'd put yourself on that football field?

A.   I'm probably more towards the death penalty.
Page 221

Q.    Any idea how far away you are?  Are you at the one-yard
line?  Are you --

1304

A.    About the one-yard line.
Q.    Are you?
A.    Yeah.
Q.    You're at the point where those children being killed just
are such a huge factor for you --
A.    It's a big factor, yes, it is.
Q.    To the point where you can't even realistically consider
life in prison?  And if that's your view, that's fine.
A.    It would be hard for me to do that realistically.  I'd try
to be fair, but I still have an overpowering urge to go that
way.
          MR. WILLIAMS:   Thank you very much.
          THE COURT:   Mr. Berrigan, I assume you're going to
move for cause?
          MR. BERRIGAN:   Yes, defense would move for cause on
this juror.
          THE COURT:   Okay.
          MR. WILLIAMS:   No objection, Your Honor.
          THE COURT:   Juror 89, you're going to be excused from
service in this case.  We appreciate very much your willingness
to fill out the questionnaire, come in, answer all of our
questions.  You've done a great job answering the questions.  I
think you'd be a terrific juror but probably not in this case
where the death penalty is at stake.  But you serve your country
just as well by being honest and open in your responses.  So

1305

Page 222

thank you very much for that.

I'd ask that you do us a favor. It's going to take us probably another week or so to get a jury selected. And so we'd ask you not to say anything to anybody else about jury selection because that somebody else could say something to somebody else, and that other person might be one that has a packet coming in later on. So once we get the trial underway, you can talk about it all you want; okay?

PROSPECTIVE JUROR 89: Yes, sir.

THE COURT: Thank you. Good luck to you.

PROSPECTIVE JUROR 89: Thank you, sir.

THE COURT: Thank you.

(Prospective Juror 89 exited the courtroom.)

THE COURT: Okay. Juror 335.

(Prospective Juror 335 entered the courtroom.)

THE COURT: Ma'am, anywhere in the front row you feel comfortable. Just plop down in one of those seats.

And everybody else can be seated. And we're going to hear first from Mr. Berrigan.

MR. BERRIGAN: May it please the Court.

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, ma'am?

A. Nervous.

Q. Nervous? Try not to be. I know that's gotta be hard. I'm

1306

just going to ask you a few questions, and it's a different topic than what we've been talking about; okay?

A. Okay.

Page 223

Q. It has to do with pretrial publicity in this case, that is, what people have heard about the case through media accounts, be that through the newspaper or television news or radio perhaps; okay?

A. Yes.

Q. And, of course, you were kind enough to fill out your questionnaire regarding this area, and it looks like -- you tell us -- that you've come to some conclusions about the case already.

A. I had read about it thoroughly before.

Q. Okay. And, you know, people read about these things they hear on the news. They didn't know they might get called some day for jury service, and I'm sure you didn't either.

A. No, I didn't.

Q. There's nothing wrong with that; okay? What's important to us is whether you formed opinions about the case based upon what media coverage you've experienced; all right? And it looks like from your questionnaire response that you have.

A. Yes, I did.

Q. Okay. Tell us a little bit about that.

A. Well, I just feel that she is guilty because it was a live-in boyfriend. She's had a child by him, and I just feel

1307

that she had to know a lot of what was going on.

Q. Okay. And you told us about that in your questionnaire. You were asked if you had any opinions about the guilt or innocence of Angela Johnson. You said, Yes. I still feel she's made a choice to be involved and is guilty as charged; right?

A. Yes.

Q. Okay. Here's what we need to know about that. You know,

Page 224

people come into court.  You know this.  They have a right to be presumed innocent.

A.    Uh-huh.

Q.    And most of the time, 99 percent of the time, folks come in, and they're charged with stealing a car or maybe selling drugs, and the folks that are coming in to be jurors have never heard of this person.  They don't know them from Adam, don't know anything about their case.

But as the judge has pointed out, this case has gotten quite a good deal of publicity, and so this is a situation where many people, not just yourself, have read or heard and sometimes talked about the case; okay?

A.    Yes.

Q.    And some folks have formed opinions about it just as you have; all right?  And your opinion, would you agree with me, it's inconsistent?  It kind of clashes with our goal which would be to presume Miss Johnson completely innocent?

A.    Yes.

1308

Q.    Is that fair?

A.    Yes.

Q.    Okay.  And we have to rely on you for this answer, and that is given how you feel based on what you've heard about the case already, could you really assure us that you would be able to completely and utterly presume Angela Johnson innocent of these charges as jurors are obligated to do?

A.    No, I don't think I could be fair.

MR. BERRIGAN:  Okay.  Well, we appreciate your candor in that regard, ma'am.

THE COURT:  Thank you, Mr. Berrigan.

Page 225

MR. BERRIGAN: I'll make a motion for cause at this point.

MR. WILLIAMS: Joined in, Your Honor.

THE COURT: Okay. Juror 335, we're going to go ahead and dismiss you. Thank you very much for filling out the questionnaire, coming in today and answering the questions. You'd make a good juror but not in this case because you've already kind of made up your mind, and we need jurors who can give Miss Johnson the full benefit of the presumption of innocence.

So we'd appreciate it if you wouldn't say anything to anybody about jury selection till we get a jury empanelled and the case underway because you might say something to somebody who might say something to somebody else, and that somebody else

1309

might wind up sitting in one of those chairs this week or next week; okay?

PROSPECTIVE JUROR 335: Okay.

THE COURT: Okay. Good luck to you. Thank you so much for coming in.

(Prospective Juror 335 exited the courtroom.)

THE COURT: Ready for Juror 227?

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 227 entered the courtroom.)

THE COURT: 227, any chair you want to grab in the front row is fine. And we're going to start off with some additional questions by Mr. Berrigan.

EXAMINATION

BY MR. BERRIGAN:

Q. Welcome back.

Page 226

A.    Thank you.

Q.    I wanted to cover two areas with you.  I think one is going to be very brief, and that has to do with what exposure you've had to pretrial publicity in the case.  And by that we mean, you know, media coverage, newspaper articles, television news accounts, maybe something on the radio or word of mouth that you might have heard about the case before coming in today; okay?  Your questionnaire just says that you've only just heard about it.  That's pretty much it.  Television is what you have checked.  Is that accurate, Mr. 227?

1310

A.    That's accurate.

Q.    And I know you probably filled this questionnaire out a little while ago, did you?  It's been a few weeks?

A.    Long time ago.

Q.    Well, sometimes people hear about the case after filling out the questionnaire before they come into court.  You know, these cases, when they start, the news folks decide they're going to cover them.  Have you heard anything in the last few weeks since you filled out your questionnaire about the case?

A.    The only thing I heard was that her accomplice was convicted.  That's all I ever heard.

Q.    Do you remember his name?

A.    Dustin -- I'm not sure on the last name.  It begins with an H.

Q.    Honken?

A.    Honken, yeah.

Q.    How did you hear that?

A.    My wife told me she read it in the paper I think.

Q.    Did you hear anything about the punishment that Mr. Honken

Page 227

might have received?

A.    I think she told me that too.

Q.    What did she tell you?

A.    I think she said he got sentenced to death.

Q.    Okay.  And did your wife express any opinions about that at the time that she related that information?

1311

A.    Not really.  She just knew that I was on this case, and then, you know, she read it in the paper, and she related it to me.

Q.    Okay.  Well, you know, the reason we ask people -- it's probably pretty obvious to you I expect.

A.    Yeah, I can understand that.

Q.    -- you know, most cases 99 percent of the time this isn't an issue.  You know, the defendant stole a car or sold some drugs.  His case isn't in the paper.

But we got this problem here, and so we need to make sure that people who come in and are jurors in this case are going to decide the case completely, solely, utterly based on the evidence that they hear in this courtroom from the witness stand or the exhibits that are presented to them.  Some folks have indicated that would be a difficult task for them based on opinions they've already formed about the case, but I'm presuming maybe that's not the situation with you.  Would you have any difficulty setting aside what your wife might have mentioned to you about Mr. Honken's case if you were selected as a juror in this case?

A.    I don't think so.  You gotta be fair.  I mean, you can't base on hearsay, I mean, not when it's a serious thing as putting somebody behind bars for life.  I mean, you better make

Page 228

a right decision.

Q.   Well, you know, some folks, rightly or wrongly, I mean,

1312

they think where there's smoke there's fire, there's guilt by association, that kind of thing.  You know what I mean?

A.   Yeah.

Q.   You're hanging around with the wrong people, some of that kind of rubs off on you, you know, that kind of thing.

A.   Yeah.

Q.   And I don't know if you feel that way or not, but we can't really have that, you know.

A.   I understand that.

Q.   And would you be able to completely judge this case based on the evidence you hear in this courtroom?

A.   Well, like I said, it's a serious deal, and you better not be judging by hearsay.  You better be judging by the facts.

Q.   Exactly, okay.  So that's put to bed.

A.   (Nodded head.)

Q.   Let me turn our attention back to the issue about the death penalty if we could; okay?

A.   Yep.

Q.   I was paying very careful attention I think when Mr. Miller was asking you some questions about your views about the death penalty.  And you gave an interesting answer, that it was a very serious decision to consider a punishment such as death because it's something you'd have to live with the rest of your life. Did I hear you correctly?

A.   That's very true.  That's very true.

1313

Q.    Let me tell you that we would expect this to be a serious decision for each and every one of the people involved, okay, which is why we want them to be confident when they make this decision at the end of the case.  But in order to be a juror, folks have to be able to consider both punishments after going through the appropriate steps.  You with me?

A.    Yes, sir.

Q.    And we -- I'm not going to go through the whole ball of wax like the judge did this morning in terms of this three-part thing.  But I think you -- I hope you know from our discussion this morning that the jurors really are obligated to listen to all the evidence, and in the penalty phase they have to weigh these mitigating and aggravating circumstances.  Do you remember that discussion?

A.    Yes, sir.

Q.    Okay.  Did you understand me when I was talking about that weighing process that that's really an individual decision, that you have to come to your own determination about that?

A.    (Nodded head.)

Q.    Okay.  You're nodding.

A.    That's right.  Yes, I do.  I understand that.

Q.    I just mention that for the benefit of our kind court reporter.  She likes to write the actual answers.

A.    Right.

Q.    And you're not obligated -- you know, nobody ever tells you

1314

you have to vote for death.  You understand that.

A.    That's correct.

Q.    Okay.  But you do have to -- at least in certain circumstances, in certain cases, you have to be able to consider

Page 230

not only life imprisonment as a potential punishment but the death penalty. Do you understand?

A. I understand that, sir. But I have a real problem sentencing somebody to death. That would be a big issue for me.

Q. In fact, you mentioned it -- I heard you say to Mr. Miller that, you know, right now I'm not sure I could do it. I might change my mind. I could change my mind later, and I sort of got the impression maybe that depended on the evidence, but maybe that's not what you were saying.

A. You know, I'll be honest with you. It would have to be terribly, terribly -- I mean, I would -- I don't know how to describe it that I'd have to put somebody to death. I mean, be part of that? I mean, that to me would be the ultimate end.

Q. Sure.

A. I think I'd lay awake at night thinking about this. That's why I said in my statement I would really like to be off this because I don't care about that kind of a deal, I mean, to put -- thinking that I might be involved in putting somebody to death, I mean, this would be the ultimate end for me. I just like . . .

Q. Yeah, it would be awfully hard.

1315

A. Yeah, it would. I'd a whole lot -- I'd feel more comfortable if you could say, Well, she's going -- this person's going to get life in prison, you know. I mean, then if they ever somewhere along the line made a mistake, somebody and come up with some evidence, we didn't bury her. We got a chance to redeem it.

Q. No, and you make a good point, and I'm sure you've heard about some of these cases where people have been on death row.

Page 231

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1146 of 3245

A.    Yeah, yeah.

Q.    But, you know, we're not looking for volunteers in this process.  In other words, what I mean by that is it would hardly be fair, would it, that Miss Johnson be judged by a jury solely composed of people that favor the death penalty?

A.    No, that wouldn't be fair.

Q.    Do you think that would be fair?

A.    No, you can't have a whole -- I mean, that would be . . .

Q.    These folks that are coming in today, they didn't call us on the phone and say, Can I come in?  The judge gave them a subpoena.  Lot of folks don't want to be here, and they also have expressed concern, maybe not as much, about how this process might affect them and how difficult it might be; okay?  We appreciate how difficult it would be.

The issue we really need to know is can you do it; okay?  It's kind of like the judge talking about that extraordinary hardship this morning.  There is some folks that,

1316

boy, they would have loved to have been farming and working a manufacturing job and putting money on the table, but when asked to do it, when asked could you do it, they were able to say, Yeah, I can do it.

Some folks have feelings so strong about the death penalty they tell us quite candidly, Mr. Berrigan, I just couldn't do it.  No matter what the case was, no matter what the circumstances, it doesn't matter.  There's no case under which I can possibly consider the death penalty as an appropriate punishment.  And if that's your view, that's your view.  We're not going to be critical of that; okay?

But if there's a situation in which you can envision

Page 232

after you go through this process and follow the instructions of the Court where that could be a punishment that you could consider, then you may be a qualified juror, okay, as difficult as it might be for you.

A.   It would be difficult.

Q.   Okay.  So let me just ask you flat out.  As difficult as it might be, okay, if, if, you were persuaded that the death penalty was the appropriate punishment, not just you, whether or not -- if 12 other people, 12 other jurors, heard the evidence and did their independent weighing and they made a determination that, you know, we think death is appropriate also, okay, and that's a scenario -- again, it's a scenario -- could you consider imposing a sentence of death?

1317

A.   I really don't think I could.

MR. BERRIGAN:  Okay.  Well, we very much appreciate your candor with that, your struggle with it, sir.  I have no other questions.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  Nothing, Your Honor.

THE COURT:  Okay.  Sir, if you'd just step outside, I need to talk with the lawyers, and we'll let you know your status.  Thank you.

(Prospective Juror 227 exited the courtroom.)

THE COURT:  Any challenge for cause by the defense?

MR. BERRIGAN:  None by the defendant, sir.

THE COURT:  By the government?

MR. WILLIAMS:  Yes, Your Honor.  Given this juror's views, it's very clear that even the last answer was, I really don't think I could.  Bottom line is this juror's views about

Page 233

the death penalty are so strong that he's -- his ability to follow the instructions and realistically consider the death penalty is substantially interfered with, and he would not qualify as a death-qualified juror.

THE COURT: Mr. Berrigan, do you agree?

MR. BERRIGAN: Nothing further, sir.

THE COURT: Well, but I asked if you agree with what Mr. Williams said.

MR. BERRIGAN: I agree with the -- I acknowledge the

1318

veracity of Mr. Williams' accurately restating the juror's position, but I can't join in the position.

THE COURT: Well, I'm asking you point blank, do you agree whether he's substantially impaired or not?

MR. BERRIGAN: It would appear --

THE COURT: I'm not asking you to join in the motion.

MR. BERRIGAN: It would appear that he is, sir.

THE COURT: Thank you. I find that the juror is substantially impaired. He's repeatedly said that he could not impose the death penalty. Sometimes he just said he wasn't sure whether he could do it, but he always had grave reservations. But on several occasions he said he just can't do it. And I think that is his honest answer, and I find that he could not impose the death penalty; and, therefore, he's substantially impaired. So I'm going to grant the government's for-cause challenge.

(Prospective Juror 227 entered the courtroom.)

THE COURT: Sir, we're going to let you go as a potential juror in this case. Thank you very much for participating in the process. We think you'd be a terrific

Page 234

juror but probably on another case where the death penalty is not an option.

And we'd ask you to do us a favor, because this process will go on probably for a couple more weeks, not to say anything about it to anybody until we get the jury selected and

1319

the trial underway because you could say something to somebody, and that somebody might say something to somebody else, and that somebody else might be sitting in one of those chairs later this week or next week. Thank you very much, and good luck to you.

PROSPECTIVE JUROR 227: Thank you.

THE COURT: Thank you.

(Prospective Juror 227 exited the courtroom.)

THE COURT: Okay. Ready for our last juror, 147?

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 147 entered the courtroom.)

THE COURT: Juror 147, we need you to grab that microphone for the karaoke music and pick a chair anywhere in the middle. You can be seated.

Everybody else can be seated, and we're going to start first with questions from Mr. Berrigan.

MR. BERRIGAN: May it please the Court.

EXAMINATION

BY MR. BERRIGAN:

Q. Last but not least, this I think will be very brief, ma'am. We have a chance to ask you some questions about your exposure to pretrial publicity. And by that we just merely mean, you know, media accounts either through television news or the radio or a newspaper. And I was able to read obviously your questionnaire, and you said you were not at all familiar with

Page 235

this case. Is that still the case?

1320

A.    Yeah. I don't get the newspaper.

Q.    Okay.

A.    Haven't for a long couple years.

Q.    Okay.

A.    I don't watch the news. Is that bad?

Q.    No, no. A lot of people are too busy to fool with the news. You did say that you'd talked to your husband. When I got this and saw the statement about the murders, I asked my husband if he ever heard about it, and he said, I think it happened -- I can't quite make this out -- five or so years ago, but that's it. Does that sound right?

A.    Right. I did ask him.

Q.    Okay. Happened back five years ago or so I think is what you said. My apologies. Was that really the extent of the discussion?

A.    That was it. I don't see my husband all week. He drives truck so -- and he's on the road a lot, and he listens to a lot of radio, but it's all talk radio, so he really didn't know much about it either.

Q.    Sometimes what happens is, you know, you got the questionnaire, and so you're kind of on notice, uh-oh, I might be a juror, not look at this stuff. Well, you know, our spouses, they're not under those same obligations. I know my wife would pay no attention whatsoever to some instructions I got. So we just want to make sure that after finding out that

1321

Page 236

you got this questionnaire perhaps your husband didn't say, Oh, wait a second; I'll check that out.

A.    No, no, he didn't.

Q.    Okay.  And the reason we ask these questions -- I'm sure it's obvious to you -- is that we have to be sure that the jurors who are going to judge this case, particularly given the seriousness of the allegations and the potential punishments, are going to make that decision, those decisions, based solely and completely on the evidence they hear in this courtroom, from witnesses testifying under oath and exhibits that will be admitted into evidence and nothing else, and I mean nothing else.  Are you okay with that idea?

A.    Yes.

Q.    Okay.  Is that something you are willing and able to do?

A.    Yes.

Q.    If it turns out -- let's just say theoretically because this happens sometimes.  We've had folks come in and say, I didn't really learn anything about it, and then we ask them questions, and it turns out they knew much more about it than we thought.  And sometimes when folks listen to things they're reminded of something you might have read six months ago.  Do you know what I mean?

A.    Yeah, I haven't -- the only pape --

Q.    You don't think that's --

A.    No, I haven't read -- our Little Rock Valley Bee paper's

1322

about all I read, and that's just who had a baby and who got a speeding ticket, and that's about it.

Q.    So there's not even much chance of you being reminded of anything because you don't think you read anything in the first

Page 237

place.

A.   I don't have time to watch TV or news or anything.  By the time I get home, it's over, and I'm not really interested in it by then to be honest.

MR. BERRIGAN:  All right.  No, that's fine.  That's it.  That's all I have.  Thank you.

PROSPECTIVE JUROR 147:  Okay.

THE COURT:  Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Q.   Good afternoon, ma'am.  Don't cringe too much.  You're almost out of here.

A.   I'm tired.

Q.   I just wanted to talk for a second.  Your husband, is he an over-the-road driver?

A.   Yes.

Q.   Is it a regional, or does he go coast to coast sometimes?

A.   No, just gone around five-state area, gone all week.

Q.   Okay.  Here's the deal.  If your husband happens -- as he's coming back into the state or leaving the state happens to hear a radio program that touches on this case, comes home and he

1323

says, Oh, jeez, you know, that case you're sitting on, I just heard -- and he starts to tell you something like that, do you feel comfortable in your relationship with him to say, Whoa, wait a second; don't talk to me; I'm a juror?

A.   Yeah, he's been on a -- he was a juror once in a robbery case here, so he would come home every night, and I would kind of try to get some questions out of him, and he wouldn't tell me.

Page 238

Q. Turnabout's fair play; right?

A. Yeah. So I -- he's pretty good about that. I can't talk about it, so he's pretty good.

Q. And he'll respect your views.

A. Yes, he does.

MR. WILLIAMS: Very good. That's all I had for you. Thanks.

PROSPECTIVE JUROR 147: Thanks.

THE COURT: Juror 147, if you'd please step outside, we'll let you know your status in just a minute. Thank you.

(Prospective Juror 147 exited the courtroom.)

THE COURT: Any challenge for cause by the defense?

MR. BERRIGAN: None by the defense.

THE COURT: Challenge for cause by the government?

MR. WILLIAMS: No, Your Honor.

THE COURT: Peremptory challenge by the defense?

MR. BERRIGAN: No, sir.

1324

THE COURT: Peremptory challenge by the government?

MR. WILLIAMS: No, Your Honor.

THE COURT: Thank you. We'll bring Juror 147 in and let her know she's in the pool.

(Prospective Juror 147 entered the courtroom.)

THE COURT: Juror 147, you are in our jury pool which means you have about a 50 percent chance of being selected. When we get enough jurors -- and we're not sure exactly how long that's going to take. The earliest would be sometime next week, maybe beyond that, but as soon as we know, we'll let you know whether you're actually going to wind up on the jury or whether you're going to be dismissed from jury service.

Page 239

So I'd ask you to remember my cautionary instructions in that written document, take it home with you, and please do not talk to anybody about the case. Don't let anybody talk to you about the case. And continue your practice of ignoring the news, particularly about this case; okay?

PROSPECTIVE JUROR 147: Okay.

THE COURT: Thank you very much.

(Prospective Juror 147 exited the courtroom.)

THE COURT: Okay. Please be seated. My notes indicate that the following jurors made it into the jury pool: 489, 170, and 147. Does the government agree with that?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Does the defense agree with that?

1325

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. How many do we have now? Nine?

THE CLERK: In the pool we have 11.

THE COURT: Oh, we have 11. Okay. Now let's talk about my proposal for tomorrow which I don't think is all that different than what we did today actually. You want me to run through it again?

MR. WILLIAMS: No. We're fine with it, Your Honor.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: We had only two things we'd like to ask the Court to consider.

THE COURT: Sure.

MR. BERRIGAN: One is the time limitations of ten minutes. I think we were using as long as a half an hour a juror up until today.

THE COURT: Yeah, but we had seven or eight jurors.

Page 240

MR. BERRIGAN: That's right. And I appreciate the fact that we're concerned about having larger groups, but I was going to ask you to consider 12 minutes as opposed to 10 minutes. And those two minutes are rather significant in some instances, and sometimes we won't need them, Your Honor, but I don't think that would add substantially to the questioning process, frankly.

THE COURT: Well, how about this? Twelve minutes per side, no rebuttal. I'll just -- if I feel I'm unsure as to my

1326

ability to make a -- rule on a challenge for cause, I'll ask a neutral question.

MR. BERRIGAN: That would be fine. The defense would be fine with it.

MR. WILLIAMS: Sure.

THE COURT: Okay. Twelve minutes per side and then no so-called rebuttal. And I'll ask a question, but, you know, I'm not so sure you're going to get any follow-up questions to the ones I ask. Normally I've always given follow-up questions after I've asked a question, but I'm not going to get back into the two-minute thing by saying you can ask follow-up questions.

MR. BERRIGAN: We won't assume that, Your Honor.

THE COURT: Okay.

MR. BERRIGAN: The other matter --

THE COURT: Okay.

MR. BERRIGAN: -- is that the defense began this process, as you recall, a week ago Tuesday, a week from tomorrow. And so we went first using our peremptory challenges, and we've done that as well today. Frankly, we think it's an advantage to not using peremptory challenges first. I think

Page 241

that makes sense.  That is that the party who gets to wait to see whether the other side uses their peremptory challenge has some minor advantage.

THE COURT:  But I've been alternating every day.

MR. BERRIGAN:  I understand.  Well, now we're coming

1327

up to a day tomorrow where it would be government's turn to exercise their peremptory challenges, and I know it might seem like a minor matter, but if the government had to go first tomorrow, then we've each at least had --

THE COURT:  An equal number of days.

MR. BERRIGAN:  That's right.  And I know that might sound like a minor thing, but to us it's not.

THE COURT:  No, it's something I never thought of.

MR. BERRIGAN:  After tomorrow if you want to alternate, we're fine with that, but we do believe tomorrow the government should have to go first on their peremptory challenges.

THE COURT:  Do you have any objection to that?

MR. WILLIAMS:  No.

THE COURT:  It's not something I gave any thought to. You're absolutely right.  I don't have a problem with that.

MR. BERRIGAN:  I think that's all I have.  Could I consult with my colleagues very briefly?

THE COURT:  Sure.

MR. BERRIGAN:  Thank you.  Okay.  That's all we had, sir.  Thank you.

THE COURT:  Okay.  Anything else?

MR. WILLIAMS:  Just to clarify, so for tomorrow we are still going to alternate.  The government will take the first --

Page 242

will go first with the first juror in individual questioning.

After that the defense will go first in individual questioning and back and forth, but regardless of who goes first tomorrow, the government will always exercise the peremptories first.

THE COURT: That's my understanding.

MR. BERRIGAN: That's our understanding as well, sir.

THE COURT: Unless you'd like the government to go first on all of the individual questioning to even things out.

MR. BERRIGAN: No. We'd like to go first alternatively with the questions. It's just the peremptory challenges.

THE COURT: Right.

MR. BERRIGAN: And we wanted to be certain. Is the general voir dire contemplated first before the individual questions?

THE COURT: Yep. We're doing general voir dire first.

MR. BERRIGAN: Great.

THE COURT: That will give you a little break in the morning.

MR. BERRIGAN: Thank you, sir.

THE COURT: Get Mr. Willett up there.

MR. BERRIGAN: Right.

THE COURT: Anything else about how we're going to do it?

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. Why don't we just have Carey

summarize so that everybody knows where you stand. We have 11

jurors in the pool, and where do they stand on peremptory challenges?  How many does the defense have left?

THE CLERK:  The defense has six left.

THE COURT:  And the government has?

THE CLERK:  Fourteen.

THE COURT:  Fourteen.  Any question about that?

MR. WILLIAMS:  No, Your Honor.

MR. BERRIGAN:  None by the defense, sir.

THE COURT:  Now, are we still on track to go to -- in our jury pool till we get 34 jurors?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Thirty-four gives us twelve trial jurors, ten peremptory challenges, five for each side, six alternates, three peremptory challenges for each side, and that should add up to thirty-four.  I don't know if it does or not, but it should, or else I've got the wrong number.  But if all that adds up to 34, that's what we're shooting for.

MR. BERRIGAN:  That's what it adds up to, sir.

THE COURT:  Okay.  Sounds good.  Thank you.  We'll be in recess.  See you tomorrow morning.

(The foregoing trial was adjourned at 4:09 p.m.)

CERTIFICATE
I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

                                    1-8-06
    Shelly Semmler, RMR, CRR              Date

⚲

                                              1330


INDEX

PROSPECTIVE JUROR:                                    PAGE:

Prospective Juror 301
        MR. BERRIGAN                                  1246

Prospective Juror 528
        MR. BERRIGAN                                  1254
                        Page 244

|  |  |
|---|---|
| MR. WILLIAMS | 1256 |
| **Prospective Juror 489** | |
| MR. BERRIGAN | 1260 |
| **Prospective Juror 738** | |
| MR. BERRIGAN | 1264 |
| MR. WILLIAMS | 1268 |
| **Prospective Juror 263** | |
| MR. BERRIGAN | 1274 |
| **Prospective Juror 638** | |
| MR. BERRIGAN | 1281 |
| **Prospective Juror 170** | |
| MR. BERRIGAN | 1291 |
| MR. WILLIAMS | 1294 |
| **Prospective Juror 89** | |
| MR. BERRIGAN | 1297 |
| MR. WILLIAMS | 1299 |
| **Prospective Juror 335** | |
| MR. BERRIGAN | 1305 |
| **Prospective Juror 227** | |
| MR. BERRIGAN | 1309 |
| **Prospective Juror 147** | |
| MR. BERRIGAN | 1319 |
| MR. WILLIAMS | 1322 |

* * * * *

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1160 of 3245

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

        Plaintiff,                         Sioux City, Iowa
                                     April 19, 2005
     vs.                                    8:07 a.m.

ANGELA JANE JOHNSON,                         VOIR DIRE OF
                                      PANEL F
        Defendant.
                         /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

1332

APPEARANCES:

For the Plaintiff:         C. J. WILLIAMS, ESQ.
                           Assistant United States Attorney
                           Suite 400 - Hach Building
                           401 First Street Southeast
                           Cedar Rapids, IA  52401

                           THOMAS HENRY MILLER, ESQ.
                           Iowa Attorney General's Office
                           Area Prosecutions Division
                           Hoover State Office Building
                           Des Moines, IA  50319

For the Defendant:         PATRICK J. BERRIGAN, ESQ.
                           Watson & Dameron
                           2500 Holmes
                           Kansas City, MO  64108

                           DEAN STOWERS, ESQ.
                           Rosenberg, Stowers & Morse
                           1010 Insurance Exchange Building
                           505 Fifth Avenue
                           Des Moines, IA  50309

                           ALFRED E. WILLETT, ESQ.
                           Terpstra, Epping & Willett
                           Higley Building - Suite 500
                           118 Third Avenue Southeast
                           Cedar Rapids, IA  52401

Also present:              Bill Basler

Page 1

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1161 of 3245

PANEL F, 4-19-05
Court Reporter:        Shelly Semmler, RMR, CRR
                       320 Sixth Street
                       Sioux City, IA  51101
                       (712) 233-3846

1333

(Proceedings reconvened outside the presence of the jury venire.)

THE COURT:  Anything we need to take up this morning?

MR. WILLIAMS:  Not on behalf of the United States, Your Honor.

MR. BERRIGAN:  Yes, sir, just one matter on behalf of the defense.  Yesterday Juror Number 690 was added to the panel.

THE COURT:  Yes, and I wanted to tell you about that.

MR. BERRIGAN:  Okay.  May I address our concerns?

THE COURT:  Sure.

MR. BERRIGAN:  This juror filled out a questionnaire, of course, and she indicated that she knew you, knew the Court, from the Four Seasons Health Club.  That's on -- and she described you as a friend.  That was question 49.  On question 102, she says, I know Mark Bennett from Four Seasons Health Club.  I feel Mark is a good friend.

That, frankly, causes us some concern, although admittedly there's nothing else in her responses that does.  But our real concern is that we're worried that over the course of the two-month trial naturally there are going to be conflicts that arise during a trial just as a matter of course between the parties and the Court regarding rulings and evidence, and because of this woman's relationship or at least her perception that the Court and she are friends, we have a concern we don't normally have with jurors in terms of her reaction to rulings

and so on.

There's also at least some concern that her decision-making process could be influenced even slightly by her relationship with the Court. This is a situation where at some point she's likely to encounter the Court in the future, and I don't know that she'd expect any explanation based on what her decision was, but that's certainly a concern that we have.

And then finally there's just an appearance, we believe -- impropriety might be too strong a word, but it's not that much different than if a close friend of mine, I suppose, was eligible for jury service and nonetheless said, you know, Mr. Berrigan and I, our relationship wouldn't affect things. I'm sure the prosecution would have some concern about that. I would have concern if they had a friend that was eligible for jury service no matter what they said. And it's a situation that it creates a needless risk to the integrity of the trial process given the number of jurors available.

So we could bring her in and question her, but I suspect she's going to reiterate what she said in the questionnaire, at least about the relationship.

THE COURT: Sure.

MR. BERRIGAN: I'd rather not have to put her through that. So we'd like the Court to consider a strike for cause on her . . .

THE COURT: I actually don't think it's grounds to

1335

strike, but I have no problem striking her.

MR. BERRIGAN: All right, sir.

THE COURT: I don't think it's a for-cause challenge,

Page 3

but I don't have any problem with it. What's the government's position? And here's the thing I'm concerned about. And actually I saw her I think Sunday at the health club, and I didn't know that -- she had never said anything to me that she had gotten a packet, and she said something to me, and I just said, Oh, what panel? And I think she said U or something. And I said, Well, that's good. We'll never get to you. And she said, Well, I wouldn't mind doing it. And I said, Well, would you mind if we moved you up because we were looking for people to move up?

So I actually instructed them to move her up and put her -- I didn't know she was on today's panel, but I said that she'd be willing to move up. And my only concern is that I easily could have said something to her about the Honken trial. I don't know that I did. I would hope that I might not have, but I easily -- I easily could have because I know her pretty well. I've written a letter of recommendation for her. She's trying to get a different job. And, you know, I've known her, I don't know, seven, eight years. I mean, I have -- it's really a health club relationship pretty much, but I can run into her several times a week, and I always talk to her when I do run into her, and I'm pretty good friends with her boyfriend or

1336

ex-boyfriend. I never quite know what their status is. He's opening up a new rib joint, and, you know, I know him quite well.

So I have no problem if you want to take her off. I mean, I didn't really think about it, you know, but I see the points that you're raising. And I agree with you. Why do it?

What's the government's position?

Page 4

MR. WILLIAMS: We have no position on it, Your Honor.

THE COURT: Okay. I think it might be better to just go ahead and take her off. So why don't you --

THE CLERK: She's probably already here.

THE COURT: Yeah, she's pretty conscientious, so I'd be surprised if she wasn't here early. So 690 is done. Okay. Anything else?

MR. BERRIGAN: Nothing by the defendant, sir.

MR. WILLIAMS: Nothing, Your Honor.

THE COURT: Okay.

(Recess at 8:11 a.m.)

THE COURT: Ready to have the jurors brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. BERRIGAN: Your Honor, in light of the fact that we've lost two jurors, I wanted to ask the Court if you'd reconsider the 12-minute time limitation to 15.

THE COURT: Nope.

MR. BERRIGAN: Thank you.

1337

THE COURT: Thanks. Oh, did you tell them that we've lost 407? I just wanted to look at 407's questionnaire. Okay. Let's have the jurors brought in.

(Panel F entered the courtroom.)

THE COURT: Okay. Good morning, everybody. Would you all raise your right hand, and I'll swear you in.

(Panel F was sworn.)

THE COURT: Thank you. Good morning. Wanted to welcome you all to the United States District Court for the Northern District of Iowa. How many of you have ever been to this building before? Okay. Just one? Two I guess.

Page 5

Okay. I'm Mark Bennett. I'm the chief judge of the United States District Court, and it's my pleasure to welcome you all here this morning. The name of the case as you all know is United States of America versus Angela Johnson.

I wanted to introduce who the folks are in the courtroom. We'll start with the table closest to the jury box. There are two federal prosecutors seated at that table, Mr. C.J. Williams and Mr. Tom Miller, and seated next to Mr. Tom Miller is Special Agent Bill Basler.

And then over at the defense table we have Al Willett, lawyer from Cedar Rapids; Pat Berrigan, lawyer from Kansas City; and in between the two is Angela Johnson, the defendant in the case. And then at the back table, the third lawyer is Dean Stowers, a lawyer from Des Moines, and you'll be meeting them in

1338

a little bit.

We have some rules for you to follow, and that was the written sheet that was on your chair this morning. Actually before we get to the rules, I wanted to remind each of you of something. Obviously this is a very serious matter, this case, but there is no federal law against smiling. And I noticed it was a pretty glum-looking group this morning. It's really not that bad. So I do want to go over these rules with you.

Conduct of potential jurors during jury selection and trial. To ensure fairness, you as potential jurors must obey the following rules until the end of the case if you are selected for the jury or until you are excused from serving on the jury in this case. These rules apply whether you are in the courtroom, in the courthouse, at home, or anywhere else until you are excused from further service in this case.

Page 6

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1166 of 3245

First, do not talk among yourselves about this case or about anyone involved with it.

Second, do not talk with anyone else about this case or about anyone involved with it.

Third, when you are outside the courtroom, do not let anyone tell you anything about the case. If someone should try to talk to you about the case during jury selection or the trial, please report it to me.

Fourth, do not talk with or speak to any of the parties, lawyers, or witnesses involved in this case. You

1339

should not even pass the time of day with any of them. It is important that you not only do justice in this case but that you also give the appearance of doing justice. If a person from one side of the case sees you talking to a person from the other side even if it is simply to pass the time of day, an unwarranted and unnecessary suspicion about your fairness might be aroused. If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or the like, it is because they are not supposed to talk or visit with you.

Fifth, do not read any news stories or articles about the case or about anyone involved with it or listen to any radio or television reports about the case or about anyone involved with it. If you want, you can have your spouse or friend clip out any stories and set them aside to give you after the trial is over or you are excused from serving on the jury in this case. I can assure you, however, that if you are selected for the jury in this case, by the time you have heard the evidence, you will know more about the case than anyone will learn through the news media.

Page 7

Sixth, do not do any research on the Internet, in libraries, in the newspapers, or in any other way or make any investigation about this case on your own. If you are selected for the jury, you must decide this case based on the evidence presented in court.

Seventh, if you are not excused from serving on the

1340

jury today, please take this instruction with you so that you can refer to it if you have any questions between now and the date you are required to return for the trial.

Dated this 19th day of April, 2005, signed by me, Mark Bennett, chief judge.

Okay. I wanted to explain to you all who all the courtroom participants are. I have one of my three and a half law clerks, Carey, seated over at the desk there. She's in a second year of a federal clerkship with me. She's an honors graduate of the Drake University Law School, and she'll be leaving the end of the summer.

In front of me is my court reporter Shelly. Shelly has the hardest job in the courtroom because she has to take down everything that is said throughout the entire trial. And while the rest of us can occasionally maybe daydream, look up at this beautiful ceiling -- I've been looking at it for ten years plus; I never get tired of looking at it; I always find something new in it that I haven't seen before -- Shelly has to take down everything that's said.

We'll have some United States marshals in the courtroom which is routine in a criminal case. There are always U.S. marshals in the courtroom. Depending upon where we are in the trial, there may be more or less United States marshals in

Page 8

the courtroom.

We'll also have some court security officers. They're

1341

the easiest ones to spot because they have the blue blazers, the badge, and the earpiece. They have a lot of duties in the courthouse. One of their main duties is to make sure the jurors get between the various jury deliberation rooms back up to this courtroom and down to the other courtrooms on first floor.

We have the lawyers and the parties they represent, and you'll be meeting them in more detail in a moment.

And then I wanted to talk about the role of the jury and my job. My job is I've had to rule on lots of pretrial motions. You can imagine in a high-profile, complex case like this one there have been lots of motions filed by both sides, and I've ruled on those. We're current in the rulings.

It was my responsibility to kind of design jury selection. Because this is a high-profile case, because the death penalty is a potential penalty in this case, we set up jury selection in a different manner than we do in most of our more routine cases. I had a lot of input with the lawyers on both sides in trying to set jury selection. We have a lot of flexibility in how we do jury selection, and we arrived at a system which proved to be an excellent system, maybe a little bit slow but a good system, and here's why.

Each potential juror just comes in for one day. And other systems would require you to come in every day for as many as three to four weeks.

My secretary was called for jury duty right across the

1342

Page 9

street in state court, and she's had to go over there a number of days and sit all day, and she's never actually been questioned by a judge or the lawyers.

And interestingly enough, her sister in Minneapolis was called for jury duty in federal court this month in Minneapolis, and she went to the courthouse three days in a row, sat in the basement in a room, sat there all day each and every day, and never even got up to a courtroom to be questioned by a judge or the lawyers.

So if you look at what other folks are doing, I think we've selected a very good system that ensures that you just spend one day here, and then you'll find out whether you're going to be on the jury or not, and I'll explain that process to you in some detail.

My other responsibilities, once the trial starts, I will give the jurors who get selected very detailed written instructions defining each of the ten crimes that the defendant is charged with giving you a lot of guidance in how to conduct yourself and explain what the trial will be like and all.

And then towards the end of the first phase of the case, I'll give a much more detailed set of instructions telling you exactly what the law is, defining the crimes in specific detail to assist you in your deliberations. So that's essentially my job.

Now, what about the jury? Well, in every trial the

1343

jurors are really the judges of the facts. In a jury trial I don't decide what happened. That's not my job. The jurors decide what happened.

So in this case there will be witnesses testifying in

Page 10

the witness box. We have an electronic courtroom so that if the lawyers choose to, any piece of evidence that's admitted into evidence they can show you up on the big screen, and the witness may be describing the evidence, and you'll actually be able to see it. So that will be a help to you.

But I expect in this case that there may be as many as a hundred witnesses testifying and probably in excess of 500 exhibits that will ultimately be admitted into evidence. That's just a guess at this point. And so by any standard that would be a lot of evidence to look at. And so as jurors, you would have to pay careful attention to the evidence. You'll have a notebook and a pen, so you can take notes if you want to, but you don't have to.

And then after all the evidence is in, at least in the first phase -- and I'll explain these phases in a little bit because potentially this trial has three phases to it -- but in the first phase you would have to listen to all of the evidence, take a look at my instructions, apply the facts as you find them to the instructions. And then the bottom line is you'd have to figure out whether you thought Miss Johnson was not guilty of one or more of the ten charges or guilty of one or more of the

1344

ten charges, so that would be your role at least in the initial phase.

And then unlike most cases, in most cases -- well, in virtually every case that I've had, I decide the punishment. That's how it works in federal court. Federal judges decide the sentencing. There's one exception, and that exception potentially can apply in this case. If the defendant is convicted of a crime and is eligible for the death penalty, then

Page 11

the jury decides the punishment.

So in this case if the defendant was found guilty of one or more of the ten charges each of which carries the death penalty as a potential penalty, there would be a second phase to determine what we call eligibility factors.

And then there would be a third phase if the eligibility factors were established where the jury would actually decide the punishment. And if we get to the third phase, the punishment can only be one of two things: Life imprisonment or the death penalty. That would be the choice of the jury in the case.

So unlike most cases, 99.9 percent of the cases that are processed in criminal court where the judge decides the penalty, in a case such as this where the death penalty is in play potentially if the defendant is found guilty, the jury would decide the penalty. So that makes this case different than the vast majority of the ones that we have.

1345

We're about to start jury selection which is often called voir dire or voir dire. It's pronounced differently, and it's a French term for jury selection. Literally translated, it means to speak the truth. What do I mean by that? What I mean by that is we are trying to find 18 jurors in this case, 6 of whom will be alternates, and we are essentially interviewing you for this job, very important job.

There are no right or wrong answers to any of our questions. We're not here to judge your opinions, to tell you that you're right or wrong, but we're here to find out whether based on your opinions you would be a good juror for this case. Some of you are probably not going to be a good juror for this

case, but you'd be a terrific juror in another case, and that's one of the things we're looking at.

And for our system to work, you have to answer openly and honestly to the questions that I ask and the lawyers ask. Mostly the lawyers will be doing the questioning in this case.

You're each wearing a number, and we'd ask that you not use your names. And the lawyers will make their best effort to call you by your number. I wanted to explain why. It was my decision and my decision alone to use numbers in this case. And there's only one reason, and I'm glad to share it with you.

By any definition this will be what I call a high-profile case. There's a lot of interest in the media and a lot of interest I guess among the public about this case. I was

1346

concerned that if we did what we typically do -- and that is just use your names in open court -- that the media would pick that up which they would have a right to do if we used your names and that that would potentially expose each and every one of you to every idle curiosity seeker out there who would read your name and hometown in the newspaper and then either call you up or come knock on your door and want to find out what it's like to be on a jury where the death penalty is potentially in play.

And I felt it was enough of a sacrifice for those 18 who got selected to serve for 3 months on a jury that the last thing in the world you needed was some whacko knocking on your front door wanting to question you about jury service. So that's the reason why I decided to use numbers in the case.

I want to tell you a little bit about the jury selection process. We anticipate jury selection will take two

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1173 of 3245

to three weeks. We started last Tuesday. We went four days last week, and we're now in our second day this week. And I think it's going rather well. We bring in a small group of potential jurors each day. I think our low was about seven or eight or nine. We're kind of pretty much at our low, and I think our peak was 14. It just varies on who's available what day, but we're bringing in small groups.

And after I introduce the lawyers and there's a few questions by me, then there will be group questioning of you by

1347

both sides. And then after we're done with the group questioning, we're going to send you back down to the jury room and bring you back individually. We'll just have you sit anywhere you want in the front row, and we'll question you -- the lawyers will question you individually.

If history is a good teacher, I suspect that most of the questions individually will be about your views on the death penalty and any pretrial publicity, what you've read or heard about this case prior to you coming in to court this morning.

And then you'll know at the end of the questioning today -- after we question you individually, we just send you out. You stand in the hallway. It usually takes less than 30 or 40 seconds. I bring you back in, and then I let you know your status: Are we sending you home and you're done or are we sending you home and you've actually made it into the jury pool?

If you've made it into the jury pool, you have about a 50 percent chance of then actually being selected. And you'll just have to trust me on the numbers. I round it off. I'm not very good at math. We're trying to get to a pool of 34 jurors. And of those 34, 18 will actually be selected. And we won't

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1174 of 3245

know which of the 18 will be selected until we reach the number 34. We think that may happen next week, maybe the week after. Don't know for sure.

But as soon as it does happen and we manage to empanel the number of jurors we need which is 34, then the clerk's

1348

office will notify you by phone that you're either on the jury or you won't be needed for the jury; that is that if you find out today that you're still in the jury pool. Some of you will just be sent home I'm sure after today if history is a good teacher.

Once we start the trial, we're going to run it four days a week. Generally almost always it will be Monday through Thursday, and we will be taking the week of June 10 through the 17th off. Our trial days will generally start at 8:30 in the morning, and we'll generally be done about 4:30, quarter to 5. I'm going to shoot for 4:30. But sometimes we may have a witness not from this area. And if we can go an extra 5 or 10 minutes to finish up that witness, let that witness get on the road and get back home, we'll do that. But we probably won't go beyond 4:45 each day.

Now, I'd like to start with Mr. Williams, and he's going to introduce the folks on the prosecution team, and then we'll find out if you know any of those folks or any of the other people that work with Mr. Williams.

MR. WILLIAMS: Morning. My name is C.J. Williams. And with me -- I'm from Cedar Rapids, Iowa. I office over there where we work. With me at counsel table is Tom Miller. He's a federal prosecutor also. He's from Des Moines.

MR. MILLER: Morning.

Page 15

MR. WILLIAMS: And also Bill Basler. He's a special

1349

agent-in-charge from Mason City. He's what we call our case agent, and he's the lead investigator in charge of the case, and he'll be sitting at counsel table with us throughout the trial.

At the back table here is Sali Van Weelden. She's a legal assistant in my office, and she'll be assisting us throughout the trial as well.

Our office is headed up by Chuck Larson who's in Baghdad now. He offices over in Cedar Rapids, but we have an office with the U.S. Attorney's Office here in Sioux City as well. And we've got seven attorneys and seven staff members, and so I'm going to run through those names in case any of you happen to run into them which is much more likely out in this area.

The attorneys are Forde Fairchild, Martha Fagg, Kevin Fletcher, Mike Hobart, Jack Lammers, Janet Petersen, and Shawn Wehde.

Staff members are Shayne Mayer, Del Tompkins, Penny Schlotman, Michelle Schwebach, Michelle Hatting, Carol McEntaffer, and Pat Calhoun.

THE COURT: Okay. And so we want to know, do any of you know Mr. Williams, Mr. Miller, Mr. Basler, any members of the U.S. Attorney's Office? And I'll expand that a little bit. How about anybody that works at the federal courthouse here? Anybody think you know anybody? No hands go up?

Okay. We'll switch over -- oh, I'm sorry. Let's go

1350

Page 16

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1176 of 3245

back. We're going to wait till we have a microphone because the acoustics aren't very good without our sound system. So our CSO Rick is going to hand you the microphone. And I'll make all eight of you a deal. If you all speak loudly into the microphone and hold it up close, I won't put up any karaoke music and have you sing in front of everybody. So Juror 687.

PROSPECTIVE JUROR 687: I might possibly know Pat Calhoun if it's who I think it is. The name sounds very familiar. I know the Calhoun family so . . .

THE COURT: Okay. Let me ask you this. If it's the same Pat Calhoun -- well, can you describe her?

PROSPECTIVE JUROR 687: She is probably in her 40s or so, and she was a long-time Catholic school teacher I believe, administrator, so . . .

THE COURT: Okay.

PROSPECTIVE JUROR 687: I know more of her -- if it's who it is, more of her daughters than I would know her.

THE COURT: Okay. If it's the same Pat Calhoun, the fact that she works in the U.S. Attorney's Office, would that affect your ability in any way to be a fair and impartial juror in this case?

PROSPECTIVE JUROR 687: No.

THE COURT: Okay. Good. Thank you very much.

Now we'll switch over and hear from the defense side.

Mr. Willett?

1351

MR. WILLETT: Thank you, Your Honor. Good morning, ladies and gentlemen. The first introduction I'd like to make is that of Miss Angela Johnson. Miss Johnson was born in the decade of the '60s. She's from the Mason City/Clear Lake area

Page 17

which, if you're not familiar with that, is north central Iowa just south of the Minnesota border. Angela went to Forest City High School, completed the ninth grade as far as formal education and later achieved her GED. Her father and mother are still alive. She has three sisters, one brother, two daughters, and one granddaughter. Now, does anybody think they know or recognize Angela?

And then if I may, I'll introduce myself and the rest of the defense team. My name is Al Willett. I'm from Cedar Rapids, Iowa. I practice law with the group of Terpstra, Epping, and Willett. Ray Terpstra and Greg Epping are the gentlemen in my practice.

My co-counsel are Mr. Patrick Berrigan from the Watson and Dameron firm in Kansas City, Missouri. Associated with Mr. Berrigan is Ms. Lisa Dahl.

And then my other co-counsel is Mr. Dean Stowers from Des Moines, Iowa. He practices with Rosenberg, Stowers, and Morse. And the people in his firm are Brent Rosenberg, David Morse, and Heather Wood.

Now, does anyone think they recognize myself or any member of this defense team? And I see no nods of affirmation,

1352

Judge.

THE COURT: Okay. Thank you, Mr. Willett. Now, we're estimating that from when we started jury selection last week that the entire length of the trial will be about three months. In further talking with the lawyers, they think we'll be done some time in June, probably closer to the end of June, but nobody knows for sure. It's always hard to estimate the length of a trial. It's very difficult to be very precise, and the

Page 18

longer we think it's going to take, the less precision we have in our estimates. But that's really our best estimate of how long it's going to take.

And the reason why I'm telling you that is I want to talk to you about whether it would be a severe or extraordinary hardship for any of you to serve. But I have some comments I want to make about that.

First of all, in a general sense about jurors, you all had the typical juror look on your face when you walked in here this morning, and that look was something like this: Gee, I'd rather be anywhere else than in the third-floor courtroom in Sioux City, Iowa. And, you know, I understand that. I mean, I've been doing this for a while. I'm in my eleventh year now, I guess 10 1/2 years, coming up on 11 years as a United States District Court judge. We happen to be in a district that leads the nation in trials per judge. Of the 94 federal districts, 3 out of the last 4 years we were number one, and in the year we

1353

weren't number one, we were number two. So we have a lot of trials, so I get to see the look very often on jurors' eyes.

And I wanted to share this with you. When I started on September 6, 1994, I put together a questionnaire, and I've used it in every trial. And so at the end of the trial I go down, and I physically hand it to each of the jurors, and it's got a stamped, self-addressed envelope so they can take it back with them, fill it out at home, and mail it back. And it gives you an opportunity to evaluate how well the lawyers did. There's actually -- you score them, how they do in opening statement, how they do on cross-examination, how they do on evidence presentation.

Page 19

You get to score me on about ten criteria: How did I do as a judge in this case, was I fair to both sides, was I attentive, a bunch of different factors. You get to evaluate the entire process.

And now the reason why I do that is it's very important to me what jurors say because we can learn so much about how we do business. And, in fact, since I've been chief judge for the last six years, we've made a lot of changes in how our court does business based on what jurors tell us in this form. So it's very important to me.

Now, one of the -- and I read every one that comes in. And well over 90 percent of the jurors mail it back even though it's totally voluntary. You don't have to do it.

1354

And one of the things I've noticed when I read it is that I would say 98 to 99 percent of the people who serve on juries and who send back the questionnaire find it to be a much more interesting, a much more fulfilling and a very rewarding experience. And one of my goals as a judge is to make sure that jury service is as positive an experience for the jurors as it can be. That's really a huge goal of mine, and I think the vast majority of the time it is.

So if you do get selected to serve, I think you'll find it to be much more interesting, rewarding, and fulfilling. And I think you'll find it to be really one of the highlights of your life. I mean, I really do mean that. I think you'll find it to be an incredibly fascinating experience.

Now, this is not a two- to three-day trial. We have a lot of those. Three- to four-day trials, have a lot of those. Week-long trial, we have a lot of those. We don't have many

Page 20

two- to three-month trials. I've had two in my career, and so it's a greater sacrifice, and it has the potential to be a more severe hardship because of the length of the trial. And I understand that.

Yesterday if I'm correct I don't think -- we didn't have a single person -- and we had 14 yesterday -- and I'm going to go and ask each one of you if you'd be willing to serve in this trial, and when I asked it yesterday, not a single person asked to get off. And most days nobody asks to get off even

1355

though in your questionnaires most of you have come up with every reason you can think of about why you can't serve in this case. And I understand that.

But I'd like you to look at it this way. One of the reasons why I love my job and I'm excited every day to come to work as I was my first day, I'm equally excited, is because I love public service. I mean, to me it's -- the most fulfilling thing in my life next to being a parent is the fact that I get to engage in public service every single day. I mean, I just can't imagine a greater calling. I just love it.

For most of you this would be a kind of unique opportunity to serve your country. And that's exactly what jury service is. And it would be extraordinary service to your country because we're asking you to give up almost three months of your life, take you away from your daily routines, and ask you to come here and do what I think would be the most difficult thing you'll ever have to do in your life, and that is decide whether somebody is not guilty or guilty of the crime or crimes. And then if they're found guilty and we get through the second phase and we have this third penalty phase, then you'd have to

Page 21

decide whether somebody should be sentenced to death or to life imprisonment. That's gotta be an enormously difficult task, probably the toughest decision any of you will have to make I would think in your lifetime. So we're asking a lot of you, but it's very, very important that you consider serving in this

1356

case.

So we're going to take the microphone. Gary, do you have the microphone? Oh, we've got it -- I'm sorry. Juror 687, why don't you just pass it down to the end of your row, and we'll start with Juror 185. And I have a really simple question for you: If selected, are you willing to serve as a juror in this case?

PROSPECTIVE JUROR 185: I'm not sure.

THE COURT: Okay.

PROSPECTIVE JUROR 185: I'm still very confused about some things, so I can't --

THE COURT: Well, the only thing I want to know about is is it a severe or extraordinary hardship?

PROSPECTIVE JUROR 185: Possibly. I don't quite understand how -- my husband and I live paycheck to paycheck just like a bunch of other people do.

THE COURT: Sure.

PROSPECTIVE JUROR 185: And we both have hourly paying jobs. And I don't understand how you're paid for jury service, if it's all at the end or if you're paid weekly. And, you know, we have bills that are due each time, and if I'm gone for three months and have no income coming in, we don't have --

THE COURT: No, you can be paid weekly.

PROSPECTIVE JUROR 185: -- we don't have a way to pay

Page 22

the bills.

1357

THE COURT: Sure. I understand that. You can be paid weekly. Now, have you checked -- when you got this packet, did you check with your employer, because here's the deal? Federal law requires that employers can't retaliate against you for jury service. In other words, if you went in and tomorrow said to your employer, Guess what, I got selected to serve on this jury and there's a 50 percent chance I'm going to be on it, they can't fire you. But on the other hand, they don't have to pay you either.

PROSPECTIVE JUROR 185: Right.

THE COURT: And so have you checked with your employer to find out --

PROSPECTIVE JUROR 185: They do have -- I believe they pay the difference of what my hourly -- or what my daily wage would be.

THE COURT: Okay. So you probably have to turn in the money you get, or they pay you the difference or whatever.

PROSPECTIVE JUROR 185: Yeah.

THE COURT: But you're not out of pocket anything.

PROSPECTIVE JUROR 185: I don't think so, but I didn't quite understand, you know, how that all worked.

THE COURT: Well, I'm going to assume then that you're not out of pocket because that's what you're telling me. So we've taken care of that. Is there any other reason why you couldn't serve?

1358

PROSPECTIVE JUROR 185: It's kind of a funny little
Page 23

thing. I have a small business in addition to working full time. I decorate cakes and do baking. And I have graduations coming up, and I have about ten different customers that I've agreed to do baking for.

THE COURT: Okay. But I think you can do that on the night or the weekends. Yeah, that's not a severe or extraordinary hardship.

PROSPECTIVE JUROR 185: No, okay. Yeah.

THE COURT: You may have to stay up a lot later than you're used to.

PROSPECTIVE JUROR 185: I suppose, yes.

THE COURT: Let me give you an example. I had a lengthy trial that was a criminal case last fall, and it went over two months, and we had some individuals who -- one particular individual who was not going to get paid the entire time, and he talked it over with his spouse, and he decided that they were willing to deplete their entire life savings to fulfill his obligation to serve. So if he's willing to do that, I assume you can stay up a little bit later a few nights to bake your cakes.

PROSPECTIVE JUROR 185: Sure.

THE COURT: Would that be a fair assumption?

PROSPECTIVE JUROR 185: Yes.

THE COURT: Great. Thank you. Could we pass it down

1359

to Juror 31?

Are you willing to serve if selected?

PROSPECTIVE JUROR 31: Yes.

THE COURT: Okay. Thank you.

Juror 687, next juror, please.
Page 24

PROSPECTIVE JUROR 687: I have a son that was born at one pound, and over the last year we've experienced many, many things, of course, that come along with being born at one pound. And currently we have all kinds of issues, and, you know, he's a year and a half now, but we're going to -- he's blind in one eye. We're going to be having some appointments in Iowa City that -- that would be about the only obstacle I could foresee is that I really need to be there for those appointments.

THE COURT: Of course you do. Are those appointments already set?

PROSPECTIVE JUROR 687: No. We're scheduling that as we speak, and, you know, he also has feeding issues and eating issues, and we -- I often find myself coming home for lunch to help feed him. You know, that -- that could be adjusted, that part of it.

THE COURT: Where is home for you? I don't remember.

PROSPECTIVE JUROR 687: Here in Sioux City.

THE COURT: Okay. Well, we're prob -- you know, we're going to be taking -- I'm not that mean, so I do let jurors eat. We will be taking a noon hour. And you'd be able to go home on

1360

that noon hour. We're not going to require that you stay at the courthouse. So that would accommodate it. I'm more -- and I'm very sensitive to your issue. I have a daughter who was a pound, 14 ounces, born at 25 1/2 weeks, so I know what that's like. She was in the hospital for four months. I imagine your son --

PROSPECTIVE JUROR 687: Sounds very familiar.

THE COURT: Very familiar, yeah. Do you know when the appointments will be? Will they be in May or June do you think?

PANEL F, 4-19-05

PROSPECTIVE JUROR 185: I'm thinking the eye appointment will probably end up being here early May I'm hoping. Earlier the better.

THE COURT: Will that be in Iowa City?

PROSPECTIVE JUROR 687: That will be Iowa City, and there will obviously be follow-up appointments. They had indicated that there will be -- we'll visit with an ocularist, and there will be conformers that will have to be adjusted monthly so -- like I said, that's my main obstacle.

THE COURT: And the problem is you don't really know when those appointments are going to be.

PROSPECTIVE JUROR 687: You know, we have to work those appointments around my wife's work schedule.

THE COURT: Sure.

PROSPECTIVE JUROR 687: And when we're able to get in. You know, there's -- I'm sure there's waiting lists to get in

1361

for the people we want to see anyway, so we're on their schedule too.

THE COURT: And I doubt, knowing doctors as I do, that they're going to accommodate our trial schedule and get you in on Fridays because we won't be having court on Fridays. But that'd be too much to ask.

So do the lawyers have any objection if I excuse this juror?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: None by the defense.

THE COURT: I just think you have a lot on your mind. I remember my first year -- my first couple years with my daughter, and it was -- I wasn't focusing on things like I did

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1186 of 3245

before that. So I'm going to use my own judgment and wish you well and excuse you from jury service so that you can focus on your son; okay?

PROSPECTIVE JUROR 687: Thank you.

THE COURT: Thank you very much. Okay. Could you pass it back to Juror 727? And you're free to leave now. Thank you. And good luck to you and your family. I hope those appointments go well.

PROSPECTIVE JUROR 687: Thank you.

THE COURT: Juror 727, are you willing to serve?

PROSPECTIVE JUROR 727: Yes.

THE COURT: Okay.

1362

Next juror, please, 243.

PROSPECTIVE JUROR 243: Yes.

THE COURT: Thank you.

Juror 169.

PROSPECTIVE JUROR 169: Yes, Your Honor, but I will add one thing. I take care of my mom's affairs. She's in a nursing home, but if you're only going to have the trial four days a week, usually I spend Fridays on her stuff, so I don't really see any problem with that, so my answer --

THE COURT: Okay. That would work well, yeah, because we will be taking Fridays off.

PROSPECTIVE JUROR 169: So I'd be very honored to serve.

THE COURT: Thank you so much. Thank you.

Juror 49.

PROSPECTIVE JUROR 49: Yeah.

THE COURT: Thank you.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1187 of 3245

Juror 576.

PROSPECTIVE JUROR 576: Yes.

THE COURT: Okay. Thank you. Thank you very much. Now, I just got done telling you how important your duty to serve is. I'm going to take the opposite approach now. You also have an equal duty not to serve. And here's what I mean by that.

It's very important that you try and answer all of our

1363

questions as honestly as you can. And just because you have a duty to serve -- and I'm not ever going to back off from that. You do have a duty to serve, but you also have a duty not to serve if your honest opinions would indicate that maybe this isn't the right case for you to be a juror for. Not every juror is suited to every case.

Some folks would be a terrific juror in a civil case where we're not concerned about things like punishment and the death penalty or being able to give the defendant the full benefit of the presumption of innocence. Those concepts don't apply in civil cases. So somebody could be a terrific juror in a civil case but not be a very good juror in a criminal case.

And so I don't want you to be concerned that your honest answers might indicate to one or more of the lawyers or to me that maybe this isn't the type of case that we should select you for jury service.

So again, it's just very important to answer the questions, and I wouldn't want your perceptions about my beliefs, my strong beliefs, about your duty to serve to influence how you would answer any questions.

And the thing about the questions, I think that's what

Page 28

makes most people nervous. I know if I was going into a strange setting and I knew there'd be a bunch of strangers asking me a bunch of questions, I'd still be -- I know I'd be nervous in that situation, so I assume that most of you are. They're not

1364

tough questions. They're not trick questions. And we're not here to pass judgment on your opinions other than to say, well, maybe you're not suited to be a juror in this case.

But nobody's going to say, Gee, you're a bad person because you think the defendant is guilty. Nobody's going to say that. Nobody's going to judge you that way. And so we just need you to answer the questions as openly and honestly as you can.

I wanted to tell you about the trial process before I turn it over to the lawyers for questioning. This death penalty issue makes it more complicated because in the typical criminal case there's just one phase to it, and that's what I'm going to call the first phase of this case, but in this case there are potentially three phases.

The first phase is what I call the merits phase or the not-guilty/guilty phase. That would be your typical criminal trial. Our typical three- or four-day bank robbery case, you'd come in. You'd listen to all the evidence. At the end you'd go back to the jury room. You'd deliberate. You'd have a set of instructions. You'd have a verdict form, but the bottom line is you'd have to decide is the defendant guilty or not guilty. That would be the decision.

Once you made that decision, you leave; you never have any contact with the case. The case is over from your perspective. If you found the defendant guilty, then about 80

Page 29

days down the road I'd be involved in a sentencing, but that wouldn't be the jury's concern.

This case is different from that, although the first phase is the same. The first thing the jurors are going to have to do in this case is figure out whether or not the government has proved beyond a reasonable doubt that Angela Johnson is guilty of one or more of the ten charges. That's the first phase.

Now, in the second phase, only if there is a unanimous finding by all 12 jurors beyond a reasonable doubt that Angela Johnson is guilty of one or more of the ten counts in the first phase do we even have a second phase. The second phase is what I've labelled the eligibility or gateway phase.

One of the lawyers who you'll meet, Mr. Berrigan, used an analogy in our first week of jury selection. He talked about it's kind of like a basketball game. And the first phase is like the first half, and that's going to take a while, and that's going to be to decide, you know, not guilty or guilty of one or more of the ten charges.

If the jury finds Angela Johnson guilty of one or more of the ten charges, then we have a second phase. But that's more like the intermission of a basketball game because it's not going to take very long I wouldn't think because there's not going to be any evidence in that phase. You would get a separate set of instructions. I would instruct you about these

eligibility or gateway factors, and then you'd go back and

Page 30

deliberate. And here I've got a slide that explains it.

The second phase, the eligibility or the gateway phase, is where you will decide if the prosecution has proved a gateway or eligibility factor and one or more what we call statutory aggravating factor or factors beyond a reasonable doubt.

If the jury unanimously agrees that the prosecution has proved this, then and only then would we reach the third phase. So in that second phase, it's kind of like the intermission. There's no real evidence presented, but you get a set of jury instructions. You'd hear from the lawyers, and you'd have to go back and decide whether or not these eligibility or gateway factors and one or more statutory aggravating factors have been established.

If you answer yes unanimously, then we'd have the third phase, and the third phase would be like the second half of the basketball game. It'd be like another trial. There would be evidence presented by the prosecution. The defense would have the opportunity to present evidence if they wanted to. And that would be the penalty phase.

And in this phase if we ever got there, you would be required to consider and weigh what are called aggravating factors and mitigating factors that I instruct you on and determine whether Miss Johnson should receive life imprisonment

1367

or the death penalty. There would be evidence presented. You'd have a separate set of instructions. There would be closing arguments. There would be both opening statements and then closing arguments by the lawyers.

Then you would go back and deliberate, and you would

Page 31

consider and weigh evidence of mitigating factors and evidence of aggravating factors. Ob -- it may not be obvious to you. I shouldn't say obviously, but the government would be the one putting on evidence of aggravating factors. Those would be factors that would try and tip you towards the death penalty. And the defense doesn't have to but would have the right if they wanted to to put on evidence of mitigation. Mitigation would be factors that would try and sway you in the direction of a life sentence.

Now, in the penalty phase, only if each juror unanimously votes for the death penalty will Miss Johnson be sentenced to death by me. If just -- even if just one juror refused to vote for the death penalty, then the sentence would be life in prison. But that would be the choice in the penalty phase, life imprisonment or the death penalty.

Now, we're going to spend some time today, the lawyers are, asking you your views on the death penalty. And there's something very artificial about this process because there may never be a second or third phase. But yet a lot of the questioning is going to be about the third phase.

1368

And I wouldn't want any of you to assume that I think there will be a third phase. There will only be a second and third phase if the jury were to unanimously agree that Angela Johnson is guilty of one or more of the ten counts. And we tend to kind of brush over that and, what the lawyers talk about, fast forward to the penalty phase because there's not another opportunity to ask you questions about it. It doesn't work that way. We don't do the first phase and then if we're done then ask you questions, Oh, by the way, if the defendant is

Page 32

convicted, how would you feel about the death penalty? Once the trial starts, we don't get to ask you questions.

And so we have to ask you questions now about something in the future that may never happen in this case. But if it does happen, there are very, very important issues, and that's why we're going to be asking you questions about it.

Okay. Now, what we're going to do, we're going to have some general questioning by the lawyers. I've given each side a time limit of 30 minutes. And we're going to start with the government and then switch over to the defense. They'll be able to ask you questions in the group.

And then once we're done with the group questioning, we're going to send you down to the jury room and bring you back up one at a time for individual questioning, and then at the end of the individual questioning, we'll ask you to step out, and I'll let you know your status. It will be one of two things:

1369

You're no longer needed for jury service in this case; you can go home and forget about it. Or you're in our jury pool which means you have about a 50 percent chance of being selected as one of the jurors.

Okay. Mr. Miller, are you going to start this morning?

MR. MILLER: Yes, Your Honor. Thank you.

THE COURT: Okay. Thank you.

MR. MILLER: Testing? Good morning, folks. Let me take a minute to get this contraption on.

My name again is Tom Miller, and I'm going to spend the next 29 minutes visiting with you folks about some of the general concepts involved in jury duty, and let me just begin by

asking you to raise your hand if before today you've ever served on a jury.  Is there anyone who has prior jury experience?  Yes, we do, Mr. 169.

Can you tell us just a little bit about that, sir?

PROSPECTIVE JUROR 169:  Well, the last case I served on --

MR. MILLER:  I'm sorry.

PROSPECTIVE JUROR 169:  I'm sorry.

MR. MILLER:  And this is my fault.  I've been here every day, and you haven't, and I understand some of the procedures we have to follow, and one is that whenever we ask a juror to speak that you have that microphone so our court

1370

reporter can make a record.  Go ahead.  Thanks.

PROSPECTIVE JUROR 169:  The last time I served on -- I think it was a couple two to three years ago -- I served in this courtroom right here -- it was -- can I talk about the case, Your Honor?

THE COURT:  Sure.

PROSPECTIVE JUROR 169:  It was a case where one company was suing another over a trailer hitch situation.  And one other time before that was quite a few years ago.  I served on -- I think it was this same courtroom -- was on a -- I think a federal case where they were trying to convict somebody on drug charges which at the end they made some kind of a plea agreement.  We never did go to the jury on it.  But the first case we did on that one.  And that's the only two times that I've served on a jury.

MR. MILLER:  How do you feel about jury service having done it?

Page 34

PROSPECTIVE JUROR 169:  I really liked it.  I thought like the judge said, it's very fulfilling.  It's kind of an honor to serve.

MR. MILLER:  You have six neighbors and colleagues sitting around you all of whom come in here with the same sort of feelings you did the first time you came in here thinking, what on earth am I getting into; right?

PROSPECTIVE JUROR 169:  No, no.

1371

MR. MILLER:  No?

PROSPECTIVE JUROR 169:  I don't feel that way.  I think I have a little idea of what I'm getting into.

MR. MILLER:  Because you've gone through it.

PROSPECTIVE JUROR 169:  I've gone through it.

MR. MILLER:  I'm talking about way back that first time.  Can you recall --

PROSPECTIVE JUROR 169:  The first time it was a little scary because you don't know what to expect.

MR. MILLER:  And that's what I'm wondering about because you have six fellow citizens around you who probably don't know as well as you do what they have to expect here, and I just wanted to go over that with you, sir, for a minute.

PROSPECTIVE JUROR 169:  Right.

MR. MILLER:  Some people are, frankly, a little fearful about jury duty, and we all fear the unknown to some degree.  I want you to tell me if you can assure these folks they're all going to live through the process; okay?  Fair statement?

PROSPECTIVE JUROR 169:  About -- fear?  Myself, I don't have any fear of serving on a jury.

Page 35

MR. MILLER: Right.

PROSPECTIVE JUROR 169: I don't think they should have any either. I mean, I think once you get into it, you'll find that it's kind of interesting and things go along and it's very

1372

controlled and you really learn a lot from serving as a juror.

MR. MILLER: And you can assure your fellow jurors that it's something not to be feared and it's something they may actually find more interesting than they expected?

PROSPECTIVE JUROR 169: That's true. After they get into it, they may enjoy doing it and serving, and it's very knowledgeable.

MR. MILLER: Thank you very much, sir. Let me ask you this. What was your job as a juror as you recall it?

PROSPECTIVE JUROR 169: What is my job?

MR. MILLER: Right.

PROSPECTIVE JUROR 169: I've been in the optical business about 40 years. Right now I work for a wholesale company down by the airport, and I'm an inspector. I inspect the eyewear before it goes out to make sure it's all made properly and everything is done. I'm one of several inspectors they have, and I only work four days a week Monday through Thursday, and I'm kind of partially -- I draw partial Social Security so . . .

MR. MILLER: The job of making sure that that eyewear is properly functioning is an important one because people are going to depend on that work being done quality.

PROSPECTIVE JUROR 169: That's right. It has to be done right or I hear about it, believe me.

MR. MILLER: It's a matter of carrying some

Page 36

responsibility.

PROSPECTIVE JUROR 169: Yes, a lot of responsibility.

MR. MILLER: Can you compare that to the responsibility of being a juror? Did you feel that that was a job that carried -- required you to carry responsibility?

PROSPECTIVE JUROR 169: I think being a juror, especially in a case like this one here -- any case as far as that's concerned has far more responsibility. I think this trial's going to be long and it's going to be tough at times and it's going to take people that can go the distance.

MR. MILLER: Do you feel you have the ability to carry that responsibility, sir? You've done it before.

PROSPECTIVE JUROR 169: Yes, I do.

MR. MILLER: Thank you, sir. Just talking about that responsibility, can you tell me in your own words what the job of a juror is or the goal of a juror?

PROSPECTIVE JUROR 169: The jury goal is to listen to everything that's said and especially in a case like this one when someone's life is at stake and not form any opinion until the very end until you go to deliberation, not get any presumptions of this or that. Just listen to what is said and weigh it very carefully.

MR. MILLER: And when you do get to the end and you're called upon to render a decision, is it your job and your goal simply to determine what, in fact, did happen from the evidence?

PROSPECTIVE JUROR 169: That's right.

MR. MILLER: That's a very practical business of

trying to determine the truth from the evidence, and that's the way we do it in this country.

PROSPECTIVE JUROR 169: That's right.

MR. MILLER: Thank you, sir. If you could pass that forward to the lady on your right in front of you, Juror 185, what I'm going to do -- and I'm not choosing to pick on you in particular, but I think it will move things along quicker if we just -- instead of passing the microphone all over, we'll just move it around. And you, sir, will be the last to have to give an impromptu speech. I've got four minutes apiece. I could ask you to stand up and give us a four-minute presentation on why you think you'd be a good juror, but that wouldn't really be fair, would it? We're going to ask you just a couple questions, and none of those are questions that have anything other than a right answer as long as you're telling us your feelings, your true feelings about things.

Ma'am, I noticed you are employed as a cook.

PROSPECTIVE JUROR 185: Yes.

MR. MILLER: In addition to being employed as a cook in an institution, you also have a private self-employed business.

PROSPECTIVE JUROR 185: Yes.

MR. MILLER: And that's baking.

1375

PROSPECTIVE JUROR 185: Uh-huh.

MR. MILLER: Decorating cakes. You were asked if you could choose a profession, you'd say you'd be a pastry cook.

PROSPECTIVE JUROR 185: Yes.

MR. MILLER: And you were asked what your hobby was, and the first thing you listed I think was cooking.

Page 38

PROSPECTIVE JUROR 185:  Yes.

MR. MILLER:  I take it you enjoy cooking.

PROSPECTIVE JUROR 185:  Very much.

MR. MILLER:  Tell us what it is about cooking you enjoy so much.

PROSPECTIVE JUROR 185:  I think the creative part of it, and I really enjoy when I make things seeing people enjoy my finished product and making things for people.  That's my way of kind of showing my love and my -- oh, I don't know how I want to say it.  You know, some people, they can, you know, be a good listener or whatever.  I feel I'm a good cook, and that's my way of showing people my love and help for them.

MR. MILLER:  I have a sister who's a professor in management, and one of the things that she studies and that they all study in that field is what is there about people's jobs that give them satisfaction other than, of course, the money.  We all hope to have enough money to survive on.  But a lot of people are satisfied more by a job that pays less money if it brings them some of the intangible satisfactions like ability to

1376

be creative.

PROSPECTIVE JUROR 185:  Right.

MR. MILLER:  Ability to have some feedback from others as to how well you did your job.

PROSPECTIVE JUROR 185:  (Nodded head.)

MR. MILLER:  The ability to have control over the whole process from beginning to end and not just have one little piece of the process.  Would you say all of those things apply to your job?

PROSPECTIVE JUROR 185:  Oh, I think so.  Yeah, I'm not

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1199 of 3245

in this job for the money. It's because I like it.

MR. MILLER: But if you could be one of those stars on Food TV, that wouldn't be bad either.

PROSPECTIVE JUROR 185: No, that'd be cool.

MR. MILLER: I noticed among the things you indicated was on the question of reasonable doubt, you confirmed that you understand that that's an important value, but you also posed almost a philosophical question: How do we define reasonable doubt? And that's, for someone who's never served on a jury before, a particularly interesting question because that's a matter of always concern in our business.

You're fortunately going to have the benefit at the conclusion of this case, should you be required to serve on this jury, of having instructions and guidance from the Court as to what your job is and defining many of the terms including

1377

reasonable doubt; okay?

PROSPECTIVE JUROR 185: Uh-huh.

MR. MILLER: And I hope and trust that you take some satisfaction in that fact. I'm not going to try to define it for you. The Court will define it for you. But just if we can speak in general terms about that, would you agree that there are times in your life when you were firmly convinced about something and there are other times when you have -- even though you may think something is true, you're really not entirely sure and have a reasonable doubt about it?

PROSPECTIVE JUROR 185: Yes, I would say that's true.

MR. MILLER: And if I can just give you an example, I was introduced here as a federal prosecutor, and I'm very proud of the fact that I hold that title here in this courtroom on

Page 40

this occasion. But I'm not all the time a federal prosecutor. I'm a special assistant attorney general simply by virtue of the fact that I've been appointed for the cases arising out of these five deaths. I'm actually employed by the state of Iowa, and I have an office in Des Moines at 1305 East Walnut Building, and I am director of a division of the attorney general's office that's called area prosecutions. I'm not the attorney general. That's the guy who happens to have a very similar, same name as mine, but we're not even related.

I got in the mail a few weeks ago a pen that said Area Prosecutions on it, 1305 East Walnut, and a cover letter asking

1378

me to order a whole bunch of these. Well, our state budget doesn't allow me to just send off -- order pens or anything else for advertising purposes much as I might like to do that. But that pen that arrived unsolicited was a free gift, and I put it right in my pocket; okay? I don't know. There may be others like it, but to my knowledge it's the only other one. I've been using it here today and all the last week.

Now, if I go back and sit down there and I don't see my pen sitting on the desk but I see Agent Basler using a pen that says Area Prosecutions Division, 1305 East Walnut, even though I didn't see anything happen, I can be pretty firmly convinced that he borrowed my pen, couldn't I?

PROSPECTIVE JUROR 185: Most likely, yes.

MR. MILLER: Would I really have any reasonable doubt about it under those circumstances even though I didn't see it happen?

PROSPECTIVE JUROR 185: Probably not.

MR. MILLER: And just to be fair, I'm actually far

Page 41

more likely to swipe something of Agent Basler's than he is of mine. I'm just making that as an example; okay?

And you'll be told what reasonable doubt is, and you'll be asked to follow that and any number of other instructions. But do you feel you can follow those instructions to the best of your ability and would do so in this case?

PROSPECTIVE JUROR 185: Yes.

1379

MR. MILLER: Thank you, ma'am. You can pass the microphone to Mr. 31.

And, sir, I believe you are in the body shop business?

PROSPECTIVE JUROR 31: Yes, I have a collision repair business and also another business. I build tests for military and framing centers.

MR. MILLER: And if I'm not mistaken, you actually participate in supervising programs in teaching young people how to do that?

PROSPECTIVE JUROR 31: No, not -- you mean teach --

MR. MILLER: Well, either that or connected with the community college in some fashion.

PROSPECTIVE JUROR 31: I've been trustee on the community college for 12 years.

MR. MILLER: How did you happen to assume that position, sir?

PROSPECTIVE JUROR 31: I went up for election and won the election, and then I was board chair for 3 terms, 12 years.

MR. MILLER: What was your interest, and what is your interest in the community college?

PROSPECTIVE JUROR 31: My interest in mostly the community and I went to the community college for my training as

Page 42

collision repair, and I just have an interest in the college and making sure that it's organized right.

MR. MILLER: You benefitted from getting an education

1380

that helped you on your career.

PROSPECTIVE JUROR 31: That's right, and that's why I was familiar with the college.

MR. MILLER: And you're paying back to help them do the same thing for other young men.

PROSPECTIVE JUROR 31: Right.

MR. MILLER: I take it not only in connection with that but in connection with your role as a parent you consider yourself no stranger to responsibility.

PROSPECTIVE JUROR 31: Yes.

MR. MILLER: You indicated that you are a veteran, and one thing I was curious about was on the subject of what would you be doing if you could just pick any career. You mentioned airline repair and maintenance.

PROSPECTIVE JUROR 31: I'd like to work on jet engines.

MR. MILLER: Do you have any experience doing that, sir?

PROSPECTIVE JUROR 31: No, but that's what I'd want to do if I wasn't doing what I was doing now.

MR. MILLER: I'm just curious about that because that's an interesting field, if you had any experience with it or friends with experience.

PROSPECTIVE JUROR 31: No, I just -- when I was in the military, the jets interested me and the technical part of it.

1381

Page 43

I'm a performance type of person. I like fast cars and stuff like that, and jets are fast.

MR. MILLER: What were your responsibilities in the service, sir?

PROSPECTIVE JUROR 31: I was a mechanic there. My training was all military, but I was on OJT as a mechanic, and I was levied on my military MOS, but being as I was a mechanic then, I was a mechanic.

MR. MILLER: And were you able to benefit in civilian life from the training you received in the military?

PROSPECTIVE JUROR 31: Just grew up. Basically the mechanical part, I had that training before I went in, but I matured in the service.

MR. MILLER: Those were four important years of your growing up.

PROSPECTIVE JUROR 31: Yes.

MR. MILLER: Sir, I can see you've had a lot of experience in your life. You've raised children.

PROSPECTIVE JUROR 31: Right.

MR. MILLER: And you've shouldered some responsibility as a board member at the community college and in other fashions. Do you feel you could carry those qualities into this courtroom as a juror?

PROSPECTIVE JUROR 31: Yes. My main concern, though, is the businesses I run, I'm overloaded there and the help, and

1382

that's my main concern.

MR. MILLER: We all appreciate the fact that you've

Page 44

expressed a willingness to serve here, but we also understand that each of you does so with some sacrifice and some more than others. Can you tell me just briefly what your sacrifice is so I'll have some idea what you're contributing, sir?

PROSPECTIVE JUROR 31: Well, I guess sacrifice is at the business I write the estimates, and I lost my counter help which I'm in training on that. And then I have a new tech coming in for an alignment. But military desk job, I do all the ordering on that, so that's a strain. I say I can serve because I feel like I'm a can-do person. I try to work around my problems, but that will be on my mind.

MR. MILLER: There will be some long hours for you if you do.

PROSPECTIVE JUROR 31: Right.

MR. MILLER: It's important that whatever other responsibilities anybody has on this jury that they're able during the time that they're here to focus on the evidence. Do you feel that you'd be distracted and at times you might have any difficulty doing that?

PROSPECTIVE JUROR 31: If I can get away at noon and call the shop and give direction, it will ease the problem. There will be a difficulty there because it's going through a change there and mainly on the test project with the other

1383

business because they send orders in, and I'm the one that takes care of that.

MR. MILLER: Thank you for your thoughts, sir. If you'd pass the microphone back to Juror 727 -- 729.

PROSPECTIVE JUROR 727: 727.

MR. MILLER: 727. These eyes don't work quite as well

Page 45

as they did a few years ago. I noted with interest that you have two sons that have -- well, I bet their colleagues are kind of jealous of the careers they have. Can you tell us about that and how they happened to get into that line of work?

PROSPECTIVE JUROR 727: The oldest one works for ESPN -- it's based out of Charlotte, North Carolina -- and travels with the -- mainly with the LPGA golf tour. He got into golf right out of college because it was his goal, and he worked to get there. The other son works for NASCAR Images, and he is a production assistant, and he just was at the right place at the right time to get the job.

MR. MILLER: You, I assume, turn on the TV and try to look behind the scenes and see your sons at work.

PROSPECTIVE JUROR 727: Yeah.

MR. MILLER: I'm curious. Does the first son have a favorite golfer on the LPGA?

PROSPECTIVE JUROR 727: Annika, of course, is one of the tops, but I think he -- he likes them all.

MR. MILLER: I'm a golfer, and I enjoy watching her

1384

golf more than I do any of the men because if I could golf as well as she could . . .

PROSPECTIVE JUROR 727: Yeah.

MR. MILLER: You're going to be asked, should you serve on this jury, to do several things. One is to afford to the defendant the presumption of innocence. You've heard that phrase before, I assume.

PROSPECTIVE JUROR 727: (Nodded head.)

MR. MILLER: Have you given it any thought before you came in here today about your ability to do that, ma'am?

Page 46

PROSPECTIVE JUROR 727: I've got an open mind. I've not heard hardly anything about this case, so I -- you know, I really don't know -- other than what we were sent, I don't know anything about it. And I think I can fairly judge from what we hear.

MR. MILLER: We appreciate that. The presumption of innocence actually asks all of us to do one thing other than to simply be open minded, and that's to actually and honestly and sincerely afford to the defendant not just in this case but in every case where we have a criminal trial the presumption of innocence understanding that unless the government proves guilt beyond a reasonable doubt it is your duty to find the defendant not guilty. Do you feel you could do that, ma'am?

PROSPECTIVE JUROR 727: Yes.

MR. MILLER: And you understand that it's

1385

conceivable -- and I'm not talking about this case. Just in general it's possible that a person might sit on a criminal case and, after listening to the evidence, think to themselves, you know, I think that person's probably guilty, and you understand that that by itself is not the test. It's not sufficient. It has to be proof beyond any reasonable doubt. Fair statement?

PROSPECTIVE JUROR 727: Uh-huh.

MR. MILLER: And you understand that that burden of proof is a burden that the government willingly accepts whenever it brings a criminal case in this country in any court.

PROSPECTIVE JUROR 727: Yes.

MR. MILLER: It's part of our fabric of society and one of the many freedoms that we value in this country. Do you agree with that?

Page 47

PROSPECTIVE JUROR 727: Yes.

MR. MILLER: Is there anybody here who feels otherwise? Very good. Ma'am, if you'd just pass that one over to Mr. 243.

How are you today, sir?

PROSPECTIVE JUROR 243: Good.

MR. MILLER: I'll have to take a look at my notes quickly here. Oh, yes. You're a retired school teacher, and I believe you coached high school golf at the time.

PROSPECTIVE JUROR 243: Yes.

MR. MILLER: How many years did you do that, sir?

1386

PROSPECTIVE JUROR 243: Thirty-three years of teaching and probably twenty-five of the coaching of golf.

MR. MILLER: At what school?

PROSPECTIVE JUROR 243: First at Aurelia and then Cherokee.

MR. MILLER: How'd they do?

PROSPECTIVE JUROR 243: Good and bad. Depends on what their abilities are.

MR. MILLER: Depends on the talent you get every year, doesn't it?

PROSPECTIVE JUROR 243: Absolutely.

MR. MILLER: Although you encourage them to develop that talent.

PROSPECTIVE JUROR 243: Yes.

MR. MILLER: You still have to rely upon them to pursue it to some degree.

PROSPECTIVE JUROR 243: Absolutely. They've gotta play the game as well.

Page 48

MR. MILLER: And in retirement that's something you pursue as well.

PROSPECTIVE JUROR 243: As much as I can.

MR. MILLER: Tell me just a little bit about that. What is -- I mean, some people take the game more seriously than others. Some have a weekend group. Other people play tournament golf. Tell me about your own golf.

1387

PROSPECTIVE JUROR 243: I have some groups that I play with, but also at the same time I just go out and play. It's enjoyable. It's a game you can enjoy by yourself.

MR. MILLER: Has also an opportunity to meet more people too; correct?

PROSPECTIVE JUROR 243: Correct. Truthfully I haven't met very many so-called bad actors on the golf course.

MR. MILLER: You get out there by yourself, it's a good place to make -- have a walk and have some solitude as well; fair statement?

PROSPECTIVE JUROR 243: Very much so, yes.

MR. MILLER: You ever solve your own problems just walking around that golf course thinking about things?

PROSPECTIVE JUROR 243: There are times that it is certainly a relief to get away from things, and you can do that on the golf course.

MR. MILLER: Let me ask you something, sir. In this case, should you be required to serve on this jury -- did you folks receive a list of witnesses?

PROSPECTIVE JUROR 243: Yes.

MR. MILLER: Let me ask you this. Have you had an opportunity to look through the whole list yet?

Page 49

PROSPECTIVE JUROR 243:  I glanced through them, yes.

MR. MILLER:  Did you recognize any of the names on there?

1388

PROSPECTIVE JUROR 243:  Well, a name was familiar, but there was no address associated with it, so I have no idea if it's the person that I taught in school.

MR. MILLER:  What was the name if you'll recall?

PROSPECTIVE JUROR 243:  Lee Evans.

MR. MILLER:  Anybody else here recognize any names on that list?  Yes, sir.

PROSPECTIVE JUROR 169:  Well, I had two on here. Thing of it is, I don't recognize the people.  One of them, it was Bonnie Yates, and my mom's maiden name was Yates, but I don't identify with that.  And the other one was Whitmore, but I don't -- I don't think I'd recognize them if I seen them.

MR. MILLER:  Neither is anyone to whom you're very close.

PROSPECTIVE JUROR 169:  No.

MR. MILLER:  And certainly neither is anyone with whom you've spoken about this case.

PROSPECTIVE JUROR 169:  No.

MR. MILLER:  Should either of those people be -- have any connection that is possible -- and you're not even sure of that -- would that in any way affect your ability to view their testimony fairly and impartially do you think?

PROSPECTIVE JUROR 169:  No.

MR. MILLER:  And, Mr. 243, how about you, sir?

PROSPECTIVE JUROR 243:  None whatsoever.

1389

Page 50

MR. MILLER: Let's pass it down two more. I haven't picked on Juror 49 yet today. How are you, sir?

PROSPECTIVE JUROR 49: Good.

MR. MILLER: You're a 21-year-old man.

PROSPECTIVE JUROR 49: Twenty.

MR. MILLER: And I noticed even though you're not yet married, you don't have any kids, I assume you're at a stage in life when you're thinking about your career.

PROSPECTIVE JUROR 49: Yeah.

MR. MILLER: And I noticed you thought if there's one thing that'd interest you it'd be fire fighting.

PROSPECTIVE JUROR 49: Yes.

MR. MILLER: Have you pursued that at all, sir?

PROSPECTIVE JUROR 49: No, I haven't. I'd like to be a forest fighter.

MR. MILLER: Have you checked into it a little yet?

PROSPECTIVE JUROR 49: Did a little research on the Internet but . . .

MR. MILLER: What is there about that that interests you, sir?

PROSPECTIVE JUROR 49: Working outdoors and just the rush I guess.

MR. MILLER: Well, one thing I noticed from visiting with folks not only today but previously, that we have a lot of people who if they could do anything in life it's what they're

1390

already doing. And I think many of them would tell you the same thing as far as if you can find that job that it's really something you enjoy, it will be worth a great deal to you. Why

Page 51

did you -- let me ask you this. Do you have any plans of seeking education or employment opportunities in that field?

PROSPECTIVE JUROR 49: Well, I want to move to Colorado and get started there, but . . .

MR. MILLER: No immediate plans.

PROSPECTIVE JUROR 49: No.

MR. MILLER: Mr. 49, if you are asked to serve on this jury, you will be asked to shoulder a lot of responsibility, and we've been talking about that before. Responsibility of being a juror which is simply to decide what the facts are in this case, do you feel you can do that, sir?

PROSPECTIVE JUROR 49: Yeah.

MR. MILLER: Do you feel that you could share the responsibility of engaging in a decision which affects another human life just about as gravely as it could possibly be?

PROSPECTIVE JUROR 49: It will be difficult but . . .

MR. MILLER: I would expect it's something that no one would take lightly. I just put it to you, do you feel that you can shoulder that responsibility and share in that as a juror should you be required to do so?

PROSPECTIVE JUROR 49: Yeah, I'll be able to.

MR. MILLER: Thank you, sir. If you'll pass that to

1391

our last juror, Mr. 596 (sic).

How are you today, sir?

PROSPECTIVE JUROR 576: Good.

MR. MILLER: If I can just take a quick look, you're a former coach as well.

PROSPECTIVE JUROR 576: Yes.

MR. MILLER: And left that field for any particular

Page 52

reason, sir?

PROSPECTIVE JUROR 576:  Yeah.  More money.  I was offered more money as a -- working where I'm at now at Iams Company.

MR. MILLER:  We all have a responsibility to support our families, and sometimes that interferes with our first choice of a career, doesn't it?

PROSPECTIVE JUROR 576:  Yes.

MR. MILLER:  I noticed you have a son that's a student as well.  Can you tell me what he's studying?

PROSPECTIVE JUROR 576:  He's at ITT Tech in Omaha studying multi-media.

MR. MILLER:  Very good.  Is he looking forward to that?

PROSPECTIVE JUROR 576:  Oh, yes.

MR. MILLER:  I'm going to close out, sir, but I just wanted to know in your experience both as a parent and as a man who has both shouldered the responsibility of coaching and

1392

guiding youth as well as supporting a family and doing what you can, do you feel that you're a man who can shoulder the responsibility of serving on a case of this seriousness?

PROSPECTIVE JUROR 576:  Yes.

MR. MILLER:  In determining -- providing the presumption of innocence and determining the question of guilt in accordance with the Court's instructions?

PROSPECTIVE JUROR 576:  Yes.

MR. MILLER:  And should the Court -- should the case reach that point, deciding the question of punishment without giving -- giving fair consideration to both possible

Page 53

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1213 of 3245

punishments?

PROSPECTIVE JUROR 576: Yes.

MR. MILLER: Thank you, sir. Your Honor, that's all I have, and thank you all for your time.

THE COURT: Okay. Thank you. Members of the jury, why don't you stand and take a stretch break, and then we'll hear from the defense.

Mr. Willett, whenever you're ready.

MR. WILLETT: Thank you, Your Honor. Chief Judge Bennett, if it please the Court, counsel for the government, counsel for the defense, Angela.

Ladies and gentlemen, I want to take up just one general follow-up question that Mr. Miller broached with you on the issue of witnesses. There are several witnesses listed who

1393

are Angie's family members, and not all of their last names are Johnson, and I just want to make sure that there's no recognition of Angela's family members before we proceed.

Her mother is Pearl Johnson. Her sisters are Wendy Jacobson, Holly Dirksen, and Jamie Jo Hays. Her brother is Jim Johnson. And her two daughters are Alyssa Johnson and Marvea Johnson.

Now, do any of you, after reviewing the witness list -- could we have the microphone passed to Number 169, please? Do you believe you know --

PROSPECTIVE JUROR 169: Earl (sic) Johnson, is that from Sioux City?

MR. WILLETT: No, sir.

PROSPECTIVE JUROR 169: Okay.

MR. WILLETT: Anybody else besides Number 169? Okay.

Page 54

Great.

Now then, what I've done here is I've read your individual questionnaires, and what I'm going to try and do is skip around and talk to different individuals about some of those answers. If in the next 30 minutes I don't speak to you, please do not be offended. It's not that I'm trying to slight you in any way. It's just sort of the process.

Who ended up with the microphone? Number 49, would you be so kind as to pass it down to Number 31, our gentleman in the reddish shirt here?

1394

Mr. 31, one of the important concepts in any criminal jury trial is a constitutional concept, the Fifth Amendment. Now, have you heard about the Fifth Amendment maybe in TV or movies or books?

PROSPECTIVE JUROR 31: Yes.

MR. WILLETT: And do you realize that Angela has the right to choose whether or not to take the stand in her own defense in this case?

PROSPECTIVE JUROR 31: Yes.

MR. WILLETT: Now then, I'm speaking to you directly, but this is for the benefit of the entire panel. She will not take the stand in her own defense in this case. That's the decision that's been made, and she's going to exercise that right not to testify, and at the appropriate time Judge Bennett will give you instructions about that.

My concern is is that maybe you're sitting there going, Well, Mr. Willett, if I was charged with ten counts and five murders, I think I might want to say something in my own behalf. How do you feel about that, sir?

Page 55

PROSPECTIVE JUROR 31: I understand that. She has a right not to speak of it, to intim -- oh, how -- I don't know how to word it, but to -- if I was in that position, I'd do the same thing. You'd be afraid that you'd say something that would be wrong against yourself.

MR. WILLETT: Okay. And thank you, because you sort

1395

of broached an area that I was going to touch on. The witness box which is sitting right here behind me, do you think this might be the easiest place in the world to sit?

PROSPECTIVE JUROR 31: No, that'd be very difficult.

MR. WILLETT: Okay. Especially if you were on trial for serious charges?

PROSPECTIVE JUROR 31: Yes.

MR. WILLETT: In essence if you were on trial for your life?

PROSPECTIVE JUROR 31: That'd be very difficult.

MR. WILLETT: And even if you were as innocent as a newborn, do you think it might be a place that would make you nervous?

PROSPECTIVE JUROR 31: Sitting here is nervous, so that'd be a lot worse.

MR. WILLETT: Fair enough, and I hope I haven't added to that, but I appreciate your candor. Now then, does anybody disagree with Mr. 31? Is anybody sitting there going, man, Mr. Willett, I don't know; this bothers me when you're telling me Miss Johnson's not going to take the stand? Does anybody feel that way? And that's an appropriate opinion. It's just people differ on this issue. Would you be so kind as to hand the microphone back to Ms. 729?

Page 56

Ms. 729 (sic), you appear to have a very serious expression on your face. Wasn't a bad expression whatsoever,

1396

just a serious expression. Are you having any problems with what I just said to you?

PROSPECTIVE JUROR 727: No.

MR. WILLETT: Let me give you an example of sort of nerves. I had the privilege a couple weeks ago of defending a young man in Cedar Rapids on a city charge of possession under the legal age. He was in a college bar. He had on a wrist bracelet indicating that he was underage. He could be in the bar, but he just couldn't hold a beer.

Well, the long and the short of it is he was sitting at a table where a young lady who was 21 said, Where's my beer? My young client was a gentleman and handed the beer to her at the exact moment the city police officer was in there checking IDs, and he got hauled out and charged with possession under the legal age.

We had a little bench trial about a week ago. He had many defense witnesses, many of these people who were sitting around him saying all Mr. Crane did was hand this young lady her bottle when she asked for it. But we got in the point in the trial where it was his turn to decide if he wanted to testify. And he leaned over to me and said, Mr. Willett, I didn't do anything wrong, but he said, I can't get in that box; I just can't do it.

So do you understand that there are -- do you understand that situation?

1397

PROSPECTIVE JUROR 727: Yeah.

MR. WILLETT: Do you have a problem with it?

PROSPECTIVE JUROR 727: No.

MR. WILLETT: Okay. Great. Now then, Miss 727, while I'm with you, I wanted to ask you just a couple questions. We will have -- the government will have many categories of witnesses in this case. You can certainly imagine that in a murder case they're going to have law enforcement agents; okay? And I noticed that in your questionnaire you have a friend and a cousin who serve the city of LeMars as police officers.

PROSPECTIVE JUROR 727: Yes.

MR. WILLETT: Will you -- and Judge Bennett will give you an instruction on how to judge the credibility of witnesses; okay? But you won't get any instruction that, you know, you judge police officers differently than average citizens or people who are incarcerated. You know, there's factors to assess but not because of their title, if you will.

PROSPECTIVE JUROR 727: Right.

MR. WILLETT: Are you going to give a police officer any more credibility in terms of assessing their testimony because they may be a DCI agent or an ATF agent or an FBI agent or city of Mason City police officer or anything like that?

PROSPECTIVE JUROR 727: No.

MR. WILLETT: Okay, okay. So you'll -- let me ask you this. Can police officers make mistakes?

1398

PROSPECTIVE JUROR 727: Sure.

MR. WILLETT: Do you think they can make assumptions on theories that turn out to be wrong?

Page 58

PROSPECTIVE JUROR 727:  Yeah.

MR. WILLETT:  Okay.  So you'd be willing to assess the testimony of a law enforcement agent just as you would any other witness based upon the judge's instructions?

PROSPECTIVE JUROR 727:  Yes.

MR. WILLETT:  That's great.  Okay.  Let's hand the microphone if we may to Mr. 243 who's sitting next to you.

Mr. 243, I read with -- I read with interest your questionnaire on one subject in particular.  Okay.  What are three of the biggest problems facing our criminal justice system today?  Do you remember that question, sir?

PROSPECTIVE JUROR 243:  It's been a while, but yes, I do.

MR. WILLETT:  Would you mind if I share your answer with you?

PROSPECTIVE JUROR 243:  Fine.

MR. WILLETT:  One, too many delays to begin trial. Two, too many poorly qualified officials including some police and attorneys.  Three, some trials determined by -- and I believe your handwriting suggests to me "invalid evidence."  And the last two answers I thought were enlightening.  Now then, as far as attorneys, am I doing okay with you so far?

1399

PROSPECTIVE JUROR 243:  Fine.

MR. WILLETT:  Okay.  And in terms of police, will you be able to assess their testimony just as you would any other individual?

PROSPECTIVE JUROR 243:  I believe so.

MR. WILLETT:  Okay.  Is Mr. Williams at a disadvantage because maybe you put police officers in a harsher light in

Page 59

assessing their testimony?

PROSPECTIVE JUROR 243:  No, sir.

MR. WILLETT:  Okay.  Some trials determined by invalid evidence, now I know you're a retired math teacher, and, of course, when you say invalid, I take that, you know, maybe a different way, but I wanted to make sure I understood what you meant by that.

PROSPECTIVE JUROR 243:  Well, I think probably sometimes during the course of a trial -- I used to teach upper level math, and you get into logic and things like that, and one thing leading to another isn't always necessarily true.

MR. WILLETT:  Okay.  Absolutely.  And would it -- now, this is very simplistic, and you're going to see that my math education stopped after high school algebra, but is the point you're trying to make that the sum is not always equal to its parts?

PROSPECTIVE JUROR 243:  Correct.

MR. WILLETT:  That some of the time the elements just

1400

don't add up?  A plus B plus C may not be D.

PROSPECTIVE JUROR 243:  Correct.

MR. WILLETT:  And you're willing to listen to all of the evidence I assume.

PROSPECTIVE JUROR 243:  Absolutely.

MR. WILLETT:  And assess what you believe to be credible and maybe discard what you believe to be less than persuasive?

PROSPECTIVE JUROR 243:  I've never been on a jury, but I think that would be our job.

MR. WILLETT:  Okay.  Great.  If you would pass the

Page 60

microphone to Ms. 185 who's right down in front of you.

Ms. 185, I notice that your uncle is the chief of police -- is it Hawarden, Iowa?

PROSPECTIVE JUROR 185: Hawarden, yes.

MR. WILLETT: Are you going to give law enforcement agents who testify for the government any leg up, if you will, because they're a law enforcement agent?

PROSPECTIVE JUROR 185: No, I don't believe so.

MR. WILLETT: Okay. You'll be able to assess their testimony just as you would any other individual.

PROSPECTIVE JUROR 185: Yes.

MR. WILLETT: Okay. Now then, in regards to your questionnaire, do you remember being asked about the possession or sale of drugs and whether or not that should be a crime?

1401

PROSPECTIVE JUROR 185: I remember that being a question.

MR. WILLETT: Okay. Now then, obviously this case is being driven by the five murders that are alleged by the government that my client allegedly was involved in. That's what's driving the boat, if you will.

PROSPECTIVE JUROR 185: Right.

MR. WILLETT: But the ten crimes, five of them are a continuing criminal enterprise allegation, and I'm going to let Judge Bennett define that for you later so you don't see the limits of my intellectual ability at this moment.

But the other five counts deal with a criminal conspiracy to manufacture or deliver methamphetamine, and a conspiracy is a criminal agreement, okay, something that's voluntarily and intentionally entered into by the parties to

Page 61

achieve an illegal purpose. And we don't even necessarily have to go out and do that. It's just the agreement. Do you follow me, ma'am?

PROSPECTIVE JUROR 185: Yes.

MR. WILLETT: Now then, first of all, we've heard a lot about methamphetamine in Iowa. What do you think about methamphetamine when I say that to you?

PROSPECTIVE JUROR 185: I feel it's wrong. I'm raising two kids, and one's a preteen, trying to teach him right from wrong and things like that I'm going to be dealing with and

1402

talking to him about, and as a mom I'm real concerned about that.

MR. WILLETT: Well -- and this is a perfect segue because in question 42 you were asked, Do you believe the possession or sale of drugs should be a crime? Yes. Why? Because the use and sale of drugs so often leads to other problems and crimes that if we do not crack down on this society will only get worse.

PROSPECTIVE JUROR 185: Yes.

MR. WILLETT: Now then, I didn't want to read too much or too little into "crack down on this," but when you were writing, If we do not crack down on this, what were you thinking?

PROSPECTIVE JUROR 185: No pun intended on that.

MR. WILLETT: No, no, I -- thank you. Your sense of humor's more in tune than mine this morning, but I wasn't taking it that way. What do you mean by that?

PROSPECTIVE JUROR 185: I just feel that, you know, doing drugs and dealing with that, it in my opinion can only

Page 62

lead to worse things. And any more today, that's all our kids are seeing, and I guess I'm really paying attention to that type of thing right now with my preteen because he is so -- he's into his peers right now, and Mom and Dad aren't so cool.

MR. WILLETT: I understand.

PROSPECTIVE JUROR 185: And you don't want to -- you

1403

know, I want him to be okay and to raise him right and make the best choices possible, and I see drug use and things like that as not a good choice.

MR. WILLETT: I have a 15-year-old daughter who's a sophomore in high school, and every time I go to her high school for an event, the first thing she says to me is, For the love of God, don't embarrass me, Dad.

PROSPECTIVE JUROR 185: Yeah, I've heard that too.

MR. WILLETT: Now then, here's my concern about why I'm asking you about drugs. For a lot of people this case is intense enough just with the allegation of five murders. And then when you add in this heavy undercurrent of manufacturing methamphetamine, distributing methamphetamine, you know, we've heard a lot about methamphetamine in this state. People are very concerned. Now, my concern is now that you know that this will be sort of the undercurrent to this case, can you give Angela a fair trial?

PROSPECTIVE JUROR 185: I believe so. I think it will take a real conscious effort on my part, but I believe I can listen to everything and make a fair judgment.

MR. WILLETT: And the burden of proof is always on the government. You're not going to shift that over to me just because this became a drug case all of a sudden, are you?

Page 63

PROSPECTIVE JUROR 185:  No.

MR. WILLETT:  And it's still proof beyond a reasonable

1404

doubt.  Just because this is a drug case, you won't lessen that standard for the government to maybe get to a certain result, will you?

PROSPECTIVE JUROR 185:  No.

MR. WILLETT:  Okay.  If you would be so kind as to hand the microphone to Mr. 576.

Now then, sir, what I noticed in your answer was you've had some family experience in this issue of methamphetamine.

PROSPECTIVE JUROR 576:  Yes, I did.  My sister was convicted of possession.

MR. WILLETT:  Could we talk about that just a little bit in this context, sir?

PROSPECTIVE JUROR 576:  Sure.

MR. WILLETT:  And if it would be better for you to do this individually, just tell me.

PROSPECTIVE JUROR 576:  No, that's fine.

MR. WILLETT:  My concern is just sort of one level higher because you have direct exposure to this issue.  And I certainly understood what your sister's situation was and sort of the result of your sister's situation, how it impacted your family because of her children.  Should I be concerned if you were selected to sit on this jury to decide my client's innocence or guilt because, I mean, Mr. 576, the allegations by the government are going to be that she's knee deep in a

1405

Page 64

criminal conspiracy to make and deliver methamphetamine?

PROSPECTIVE JUROR 576: I don't believe you have any problem with me, no. My sister was convicted. She was guilty. And she's paying for her crime. As far as I'm concerned, her children are the one right now that are paying for her crime.

MR. WILLETT: Sure. And I understand that, and I don't need to go into that with you because your answers were self-explanatory. I just want to make sure you won't have any problem giving Angela the presumption of innocence just because the heavy undercurrent to this case is methamphetamine.

PROSPECTIVE JUROR 576: With my sister, I presumed she didn't do it either until she was convicted.

MR. WILLETT: Okay. Thank you.

Judge, thank you.

THE COURT: That's all you have?

MR. WILLETT: That's all I need.

THE COURT: Okay. Thank you.

Okay. Potential jurors, it is about almost five after. We're going to take a 25-minute recess. And at 10:30 we're going to start bringing you back in individually. We're going to start with 727 in the far -- the farthest juror from me, and we're just going to go down the front row and then go down the -- go down the back row and then go down the front row.

So, Juror 185, you're going to be the last one. It will take us about 25 minutes or so per juror. So you don't

1406

have to stay in the jury room. But knowing that -- you can just figure out how many are ahead of you and make sure you're back in the jury room with sufficient time so that you don't keep us all waiting. And we'll just go through each one of you until

Page 65

we're done.  And then after each juror, we'll let you know whether you're still in the jury pool or whether you'll be dismissed.  So that's how we'll do it.

And we'll see Juror 727 back here at 10:30.  Thank you.

(Panel F exited the courtroom.)

THE COURT:  Anything we need to take up?

MR. WILLIAMS:  No, Your Honor.

MR. BERRIGAN:  Just one very minor thing, Your Honor.

THE COURT:  Okay.

MR. BERRIGAN:  I think it probably was inadvertent, but Mr. Miller on his general questioning group voir dire on the last juror that he talked to, Number 576, asked that juror could he shoulder responsibility if selected as a juror; would he fairly consider both possible punishments?  That's what my notes reflect.  I will admit that our realtime screen is working today.

I think that that is inappropriate given the constraints of the voir dire, and my concern about it is that jurors are being committed to a proposition about punishment before we have an opportunity to individually ask them about

1407

that.

Again, it was probably inadvertent, but I wanted to bring it to everybody's attention.  If it happened again, I'd feel constrained to object, and I wanted to at least have some notice of what I perceive to be a problem.

THE COURT:  Because -- and it's a problem because?

MR. BERRIGAN:  Well, because we're dealing with the punishments.  I don't have any problem with the shoulder
Page 66

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1226 of 3245

responsibility as a juror. But he went on to then ask the juror whether he'd be able to fairly consider both possible punishments. And as you well know, that's going to be the subject of the individual questioning.

THE COURT: Yeah, but when we did it yesterday, we were doing that in group, so what's the prejudice?

MR. BERRIGAN: Well, I just think that it's committing the juror to a proposition before we've had a chance to individually question them about it. And I do think that's a distinct disadvantage because we don't have the opportunity to do individual questioning obviously in that setting.

THE COURT: Well, I assume it was -- everybody can be seated. I assume that was inadvertent.

MR. MILLER: Your Honor, if by inadvertent we mean accidental, certainly not. Words came out of my mouth as I intended them to come out of my mouth. It didn't occur it was a violation of anything. My thought was --

1408

THE COURT: I don't think it is a violation of anything. I think Mr. Berrigan is suggesting I guess because we're doing individual questioning that it's more appropriate question to be asked individually.

MR. BERRIGAN: Exactly. And we've taken pains to take turns and who's going first and so on, and this kind of throws that out of whack, frankly. At least it could. It has that potential if it continues. So I would prefer --

THE COURT: Well, except that you could have asked the same question when your side went.

MR. BERRIGAN: Well, I just -- yeah, and if we had, my view would be the same, that that would be inappropriate. I

Page 67

understood the punishment questioning to be the individual questioning. Mr. Willett's not asked any questions of the punishment, nor would we intend to do so.

THE COURT: But there's nothing that I've said that would have precluded you from doing it.

MR. BERRIGAN: Well, I suppose other than what we understood to be sort of the rules of the game, sir, so I -- maybe this is a clarification point as much as anything.

THE COURT: Well, yeah. I guess, you know, I mean, there wasn't anything hard and fast in my view, but the purpose of doing the individual questioning was to discuss the jurors' views of the death penalty individually. Did that mean that I precluded you from asking a group question? I didn't really

1409

intend to preclude it. I actually didn't think anybody would ask the question because I thought you would wait for individual questioning.

I personally don't see the harm. I don't see the harm in him having asked the question particularly when they went first and you could have asked the same thing if you thought there was some harm by it. I don't see the -- I don't see -- I don't even see why you're making an issue out of it other than to clarify -- I guess I don't -- I'm not tracking you.

MR. BERRIGAN: Well, I'm not sure. What would have happened if the juror said yes; that is, he couldn't fairly consider both punishments or gave a response that that was an issue? Are we then going to pursue that? Does the defense have an obligation to pursue that with Mr. Willett's voir dire? I just see that as a quagmire that so far the process has avoided, and I'd just like to continue that to avoid discussion --

Page 68

THE COURT: Okay. Let me ask Mr. Miller and Mr. Williams because I don't know. They may be changing off. But would it unduly crimp your style to save any questions about punishment until individual questioning?

MR. MILLER: Your Honor, I think part of the fun of this process has been the fact that we've had a different set of rules every day, much more entertaining. My preference was to ask at least one overall question of the panel whether or not these folks -- because in my experience I've found that there

1410

are, in fact, some people who simply do not feel comfortable shouldering the responsibility that's very weighty in a situation like this and because that involves not only deciding one's guilt or innocence but also potentially one's punishment, that a reasonable part of the general voir dire would be finding out whether or not these people all feel that they're the sort of folks who have the comfort with responsibility to deal in general with both of those serious issues.

Were I to get an affirmative response from any one of them that, hey, on that last question I'm just not so sure, I think it'd be logical to say, Well, we're going to go into detail with you on that question on individual. But certainly I can live with a prohibition of asking that question. It just seems to me to be a logical question during the general portion.

THE COURT: And the problem with him asking the question is?

MR. BERRIGAN: Well, two things. It commits the juror to a proposition regarding punishment when we haven't really discussed that with any depth at all. It was literally the last question he asked of the last juror. And in my view at least I

Page 69

understood the process to be that we're having individual voir dire on the death penalty specifically to address issues concerning punishment.

And I just think this takes it well beyond the bounds of what the intent of the questioning was. It puts us in a

1411

position if you're going to have us respond during the general to start talking about punishment issues with the group which we certainly didn't want to do if we could avoid doing it, at least not in the setting that we have set up now with 30 minutes a side.

THE COURT: I think you can wait and ask punishment questions to the individual jurors. I think it will just be a little cleaner that way. And so I don't think there's anything wrong in you asking the question. I'm not being in any way critical for you asking the question. It was fair game considering the fluid nature of jury selection. Lest I'd be accused of being inflexible, my approach to jury selection in this case should overcome that presumption. I'd just as soon hold off questions to individual questioning.

MR. MILLER: Very well.

THE COURT: Okay. Thank you. Anything else?

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay.

MR. WILLIAMS: Nothing, Your Honor.

THE COURT: Thank you. We'll be in recess.

(Recess at 10:12 a.m.)

THE COURT: Ready for Juror 727?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. And let's just go over the ground

Page 70

rules. The government's going first?

1412

MR. WILLIAMS: Correct.

THE COURT: The government exercises their challenge for cause first and peremptory first, right, today?

MR. WILLIAMS: Right.

THE COURT: And then tomorrow we're going to start alternating.

MR. WILLIAMS: Right.

THE COURT: Okay. 727.

(Prospective Juror 727 entered the courtroom.)

THE COURT: Anyplace in the front row you'd like, Juror 727.

Everybody can be seated, and we're going to start with questions first from Mr. Williams this morning.

EXAMINATION

BY MR. WILLIAMS:

Q. Morning, ma'am. How you doing?

A. Fine.

Q. Good. We're just going to ask you a few questions on some limited areas. The first one is publicity. You had indicated in your questionnaire that you had only just heard about it, and you said, I don't remember hearing anything about the case other than the questionnaire it appears, and you were asked on the next page if you had formed any opinions about the defendant's guilt or about the punishment, and on the guilt you said you hadn't formed any opinions, and as for punishment you said you

1413

Page 71

were unsure. Is that where you are still today?

A. Yes.

Q. Have you heard anything else about this case other than what you'd indicated in the questionnaire?

A. No, I have not.

Q. Okay. Very good. Next thing I want to talk to you about is this concept of the death penalty. As you recall, the judge described for you that we were kind of in a way fast forwarding. We're going to assume for the sake of argument that the defendant was found guilty of one or more of the murders, and we are now trying to struggle with the issue of whether a juror can be fair and impartial during the penalty phase --

A. Uh-huh.

Q. -- as well as the guilt phase. As the judge described for you, there's really going to be two possible penalties if we get to that stage of the trial, and that's the death penalty and life in prison. And, first of all, I want to tell you that life in prison in the federal system means just that. Unlike in some state courts where somebody serves a life term, they can go before a parole board after, you know, a number of years and get out early or earn time off for good behavior and so forth, in the federal system, if you get sentenced to life without parole, there is no parole. There is no time off for good behavior. Do you understand that?

A. Yes.

1414

Q. Does that strike you as a serious sentence for somebody to receive?

A. Yes.

Q. What will happen if we reach the stage of the case is kind

Page 72

of a weighing process. As the judge indicated, jurors will be asked to consider aggravating factors and mitigating factors to determine punishment. So the idea of punishment just isn't on the crime itself, but it is, you know, the circumstances of the crime, perhaps the defendant's role in the crime, and other factors surrounding the circumstances, but it may also encompass circumstances about the defendant herself, her background, character, things like that. And the jurors are going to be asked to conduct a weighing process to kind of look at all these factors, figure out for themselves which weighs more heavily toward one end or the other and ultimately arrive at a verdict. Is that something you think you'd be capable of doing, weighing factors like that?

A. I think so.

Q. You can probably imagine there are factors the government will be alleging are more serious in the government's position. We're going to be arguing these factors militate toward death penalty, and they're things like more than one victim, the fact that children were involved as victims. There may be circumstances from the crime itself that the jury could consider as mitigating factors, perhaps the defendant's role in the case.

1415

And then the defense may, if they want to, put on additional evidence concerning mitigating factors about the defendant's background, something like that.

If the evidence in this case demonstrated to you that the defendant was somebody who aided and assisted, maybe encouraged the murders of these five people, including the two children, wasn't actually the person who pulled the trigger but was part of the criminal conduct, encouraged it, aided it,

Page 73

assisted in that conduct, given those limited facts at this point, is that something where you would be able to still consider both possible punishments, the death penalty or life in prison?

A. Yeah.

Q. In other words, what we want to make sure is some people come in here -- and again, there's no right or wrong answers here. We're just looking for your true feelings. Some people come in, and they say, Jeez, you know, when I find out that a mother and her two children were murdered in this case, you know, that's all I need. Given those facts alone, I don't care what the other facts are. I'm telling you right now I can't consider life in prison as a possible punishment. That's just too bad for me.

Other people come in. They say, You're telling me she didn't pull the trigger. Well, if she didn't pull the trigger, I don't care how many people she killed or what ages they were;

1416

I'll never consider the death penalty if this is a person who didn't pull the trigger.

Can you share with us your thoughts? Do you fall into either one of those categories?

A. So if she actually didn't do it, whether she should have the death penalty or the life imprisonment? That's what you're asking?

Q. Yeah. Couple of things. Let me break it down a little bit. Do you have the feeling that because children were involved as victims in this case, you know, a mother and her children were murdered, that that alone is all you need and you're going to reject any possibility of life in prison because

Page 74

that's -- those facts alone are so aggravating to you that you won't consider life in prison? Do you feel that way at all?

A. No, you'd have to hear the whole thing.

Q. Okay. And let's take the converse of that on just one of the factors here, and that is that let's say the evidence shows the defendant didn't pull the trigger but she aided and encouraged or assisted in some way the murders of these five people. The fact that she didn't pull the trigger herself, is that enough for you to say, Well, if that's true, I would never consider the death penalty? Do you feel that way at all?

A. No. Again, you'd have to hear the whole thing before you could make any kind of judgment like that.

Q. Okay. And can you imagine that there may be circumstances

1417

where somebody who aided and abetted might be more morally responsible or culpable than the person who actually pulled the trigger, for example, if the person who pulled the trigger might not have done it but for the person who was assisting and encouraging them to do it? Can you imagine that circumstance as a possibility?

A. Yeah.

Q. The defense has no obligation to present any mitigating evidence during the penalty phase, but if they do, one of the things that we're looking for is to determine if jurors are willing to look at a defendant's background, circumstances, whether perhaps they had a bad upbringing, were abused, or something like that and consider that as a factor.

Now, the weight you give to any one of these factors, you know, children or, you know, the role in the offense or an abused background, the weight you give to any of those factors

Page 75

is going to be for an individual juror to decide. All we ask is that the jurors are willing to consider all of the factors the Court will ultimately instruct you are either aggravating factors or mitigating factors. Can you do that?

A. Yeah.

Q. Would you be willing to consider, for example, the defendant's background, whether she suffered abuse as a child or something like that, as one of these factors that you're going to be engaging in the weighing process?

1418

A. Yes.

Q. The -- again, under this analysis or this assumption we're working under that we've reached the penalty phase, bear with me, and let's assume we got there and we're at the penalty phase. You know, the government has presented additional evidence during the penalty phase. The defense may or may not have presented evidence during the penalty phase, but ultimately regardless the jury's job is to go back and weigh these factors as I've described.

Let's assume you've gone back and you've weighed all those factors. Individually you weighed them in your own mind, and you've said, The aggravating factors outweigh the mitigating factors, and I think the death penalty's appropriate.

And let's further assume that everybody else on the jury has done that individual analysis and they've all come back the same way. You've talked about it. You've discussed it, and in the end you all come back unanimously and conclude the death penalty is the appropriate punishment. To actually reflect that verdict, each juror is going to have to sign their name to a verdict form. Now, some people support the death penalty in

Page 76

principle. They say, you know, I'm not opposed to the death penalty. But when it comes down to it and they're faced with the idea of actually having to sign a piece of paper that would have the real effect of executing another person, they know in their heart they could never do that. No matter how much they

1419

may think the death penalty is appropriate, they know they couldn't do that. Other people can do it. Do you have an idea where you are on that spectrum?

A.   That's a hard question because I never been faced with something like that.

Q.   Sure. And please understand we're not asking you in any way how to vote, just whether you know in your heart if you got to that point could you actually sign your name to a verdict form. And if you can't, that's fine. We just need to get a feel for it.

A.   I would think I could. You know, till you're actually faced with that, you know, it's hard to answer that. I think so.

Q.   It would be a tough decision. Is that fair to say?

A.   Yeah.

Q.   And it should be a tough decision, shouldn't it, in our system?

A.   Yeah, it's not something you enter into lightly.

Q.   Do you think in the appropriate case you could impose the death penalty, though?

A.   Oppose it?

Q.   I'm sorry. In the appropriate case, do you think you could impose?

A.   Oh, impose. Yeah.

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1237 of 3245

Q. Now, one of the questions in your questionnaire indicated

1420

that -- asked if you thought that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of intentional and premeditated first-degree murder, and you checked the box no, and you said, Premeditated makes it seem like something more should be done. Do you recall that answer?

A. Yeah, if they thought about doing it, yeah.

Q. Okay. And you say, It seems like something more should be done. And it's okay to kind of lean on this issue one way or the other. But what's important is that you're able to really consider, give realistic consideration, to both possible punishments. If you know in your mind you've already rejected one of these, then you might be a good juror for some other case but not this case. If you can assure us that you can equally weigh and consider both of those factors, that's what we're looking for as jurors in this case. What do you think?

A. I think I could equally evaluate both ways.

THE COURT: Mr. Williams, your time is up.

MR. WILLIAMS: Thank you.

THE COURT: You can finish up.

MR. WILLIAMS: I was about to close up, so I'm done. Thank you.

THE COURT: Okay.

Mr. Berrigan?

EXAMINATION

1421

BY MR. BERRIGAN:

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1238 of 3245

Q. How are you this morning, ma'am?

A. Fine.

Q. You know, I think some folks come in here, and they've given a lot of thought to issues about the death penalty, and other folks come in here, and they really haven't had an opportunity in their life to give it much thought, and I was wondering which category you'd put yourself in.

A. Probably not giving it a whole lot of thought.

Q. Okay. One part that's very confusing -- the judge mentioned it a little earlier -- is this idea that we haven't had a trial, and we're talking about the penalty; okay? And I don't want you to think I believe Angela is guilty or anybody on our team does because of this questioning process. But it is important we explore people's views about punishment. You can understand that.

A. Yes.

Q. So here's the context of where we are when we're asking these questions; okay?

A. Okay.

Q. The government has charged Angela with ten counts of intentional murder, five people who've been intentionally killed; okay? That's what they've alleged. They've alleged that these were intentional murders committed during a drug conspiracy or a continuing criminal enterprise. And as a juror,

1422

potential juror, I need to ask you to think about this situation: That you've listened to all the evidence. You talked about you'd want to hear all the evidence. You've heard all the evidence. For weeks evidence was presented about the who, why, where, when, how did these murders get committed.

Page 79

The defense might have presented some defense evidence: We didn't do it, or that's not what happened; it was self-defense. But I want you to imagine you've rejected that and you believe beyond a reasonable doubt guilty; okay? You with me?

A. Uh-huh.

Q. That's guilty of intentional five people dead; all right? And now I want you to further imagine that the government has alleged that, you know, it wasn't just intentional murder. These murders were premeditated and substantially planned murders. Do you understand what I'm saying?

A. Yeah.

Q. And you and your fellow jurors made that determination beyond a reasonable doubt. Some folks have come into the process and said to us, Look, if that's what we have, okay, you got intentional murder, premeditated, substantially planned murder, that's enough for me. That's enough for me to make a decision. I have a view about the only appropriate punishment. They tell us that. And I'm curious about your views about this given your response to the questionnaire; okay? You remember

1423

the judge said one of your duties here not only is to serve but not to serve?

A. Yeah.

Q. And are you willing to do that, that is, not to serve if you thought that this might not be the case for you?

A. Sure.

Q. What about this idea? The response to question 84 was -- let me read you the question so you have it exactly for you. Do you think that life in prison without the possibility of parole

Page 80

is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder? And you checked no. You said, Premeditated makes it seem like something more should be done. Does that sound right?

A. Yeah.

Q. When I was reading the "something more should be done," the only thing I could envision more than life in prison without parole was the death penalty. And I'm -- I don't want to assume that's what you meant, so let me just ask you, is that what you were talking about?

A. It's been a while since I filled that out. I guess I really don't remember what I was thinking at that time to tell you the truth. I don't know.

Q. Okay. Well, let's talk about what you're thinking today; all right? If that -- and I can tell just the way you answered this question that you took some time in doing it and you were

1424

thoughtful and careful, and your answers seemed to be very open and honest. And I don't imagine something's happened in your life to change the views that you might have written down a month or two ago, has there?

A. No, not really.

Q. Okay. So let's talk about that situation. Let's fast forward; all right?

A. Okay.

Q. And here we are. We've got intentional -- we've got exactly what that question asked you. We've got intentional murders of five people done with premeditation and substantial planning. If that's your view, would you be able to realistically consider a punishment other than death in that

Page 81

situation?

A.    Yeah.

Q.    Okay.  Let me throw in one other thing.  The government's alleging that of these five victims one was a mother and two were children, two little girls ten and six years old; okay?  And I know your children are a little older than that now, but we all have pretty strong feelings about children.

A.    Uh-huh.

Q.    Let's add that to the mix; all right?  Beyond a reasonable doubt the jury's found that.  If -- and I know that's a big if.  But if that were the circumstance, would you reasonably be able to consider -- I mean realistically consider -- a punishment

1425

other than the death penalty for that crime, crimes?

A.    Yeah, because if you're in jail for life, that's -- that's substantial punishment.

Q.    Okay.

A.    If you have no chance of ever getting out.

Q.    That's right.  No chance of getting out.  Okay.  Did you understand that to be the situation when you filled out the questionnaire?

A.    Probably.  Yeah, it's been a couple months ago.

Q.    So tell me if you can how can we reconcile, how can we that are listening reconcile this view that premeditated murder makes it seem like something more should be done with what you've told me today, that I could -- Mr. Berrigan, I could consider some other punishment other than death?  How do we do that?

A.    Well, after hearing all the -- you know, you hear all the evidence and everybody's said their thing, you weigh the possibility of this person serving a lifetime sentence or dying,

Page 82

it's -- it's a heavy decision. But I think I would be able to weigh everything and come up with either verdict, you know, either one, you know.

Q. It's critically important that we know this now. Everybody can weigh. Everybody comes in here, they can weigh. But not everybody really can realistically consider both punishments, frankly. Some people feel strongly. Some oppose the death penalty. Some are in favor of it. You expressed some concern

1426

about if it's intentional I got a problem. And I'm telling you intentional, premeditated, kids; okay?

A. Uh-huh.

Q. You understand that at some point if you're selected as a juror you may be in a position of having to weigh that versus mitigation circumstances that might be presented to you.

A. Uh-huh.

Q. And I'm just wondering, you know, we should have an opportunity -- the defense is entitled to have jurors that would fairly consider both of the punishments.

A. Right.

Q. You know what I mean?

A. Yes.

Q. Are you such a person?

A. I think so.

Q. Okay. Part of the evidence that the jurors are going to be asked to consider from the mitigation standpoint are things like the defendant doesn't have a substantial criminal history. Is that something you think's significant in assessing --

A. She doesn't have a criminal --

Q. Yeah.

Page 83

A.    Yeah.

Q.    Yeah.  Would that be something you'd consider?

A.    Yeah.

Q.    Another thing you might be asked to consider is her

1427

background, and by that I mean childhood experiences, things like sexual abuse, physical abuse, psychological abuse, neglect. What do you think about those kind of things?

A.    They're very serious, and I'm sure it plays a big role in how you go about doing things in the world.

Q.    It's not an excuse for a crime, is it?

A.    No.

Q.    I don't want to suggest that.

A.    You have to be responsible for your own actions.

Q.    That's right.  And this is the thing -- we're not talking about somebody has a childhood experience of abuse, that means they can commit crime.

A.    Right.

Q.    Okay?  You and I are on the same page there.  But I'm talking about punishment; okay?

A.    Uh-huh.

Q.    You understand?

A.    Okay.

Q.    It's this kind of an idea, that if you and I robbed a bank together which I'm sure we'll never do, but if you were the driver and I went into the bank and, you know, we weren't talking about killing anybody, but I decided that the security guard, you know what?  He didn't give me his gun fast enough, and I blow him away.  I come back out there to the car.  You drive off.  You knew I was going to go in and rob the bank.  You

Page 84

participated. You aided and abetted. Don't you think you are equally guilty of that bank robbery and shooting than I am? Do you think you're guilty if you helped me do it?

A.  Yeah.

Q.  The law would tell you you were.

A.  Yeah.

Q.  But you know what? We wouldn't be punished the same because your role, your role relative to mine, was different. Do you understand?

A.  Right.

Q.  So when we're talking about things like childhood experiences, what I'm asking you to do, I'm asking you to tell us if you can, is not only would you look at that evidence but would you really consider it in making a decision about the appropriate punishment?

A.  Yes.

Q.  Can you promise us you could do that?

A.  Yes.

Q.  Okay. The last thing -- I'm not even sure I'm going to have time. I paid not enough attention. But, you know, the jurors in this case, in this penalty part of the trial, unlike every other part of the trial, they don't have to agree. You know, in the first part of the trial and the judge told you in the first half of the basketball game, the jurors make that decision as a group, guilty or not guilty; in the middle part of

the trial, decisions as a group. This last part, you do this

yourself on this weighing.

A. Uh-huh.

Q. And it's your decision on life or death. You understand?

A. Yes.

Q. You gotta live with this the rest of your life too; right?

A. Yes, I've thought about that.

Q. Yeah, and you should be a hundred percent comfortable with that decision. Don't you think?

A. Yes.

Q. Would you expect other people to respect your decision, whatever it is that you came to? Would you expect them to respect that?

A. Yes.

Q. Would you do likewise? That is, if other -- one or other jurors disagreed with you, would you be willing to respect their decision about this incredibly important issue?

A. Yes.

Q. Okay. I'm going to ask you one last thing if I have time, and the judge will tell me if I don't.

THE COURT: You do.

Q. You told us, you know, in the questionnaire -- and I know you probably don't remember the specific questions, but one of them was would you base punishment based on the crime, the person, a combination, or something else all together, and you

1430

checked the box that said both, and I took some comfort in that because that tells us what we need to know, that you're not going to see that and say death; okay? You're willing to look at the person and their background.

A. Right.

Page 86

Q.   Am I correct?

A.   Yes.

Q.   But the other thing you wrote down was very interesting. You said, I want to look at the severity of the crime and the attitude of the person, and I didn't know what you meant by that.

A.   Oh, if they just have no emotion or -- you know, no disrespect for what's going on. You know, that type of thing is what I was . . .

Q.   There's a certain amount of disrespect in committing crimes like this, don't you think?

A.   Yes.

Q.   You might not see emotion in this courtroom. You might not see Angela crying during the testimony. You may see, on the other hand, victims' relatives coming in here and crying about how this has affected their life. That can be very emotional testimony.

A.   Uh-huh.

Q.   Can you judge that objectively?

A.   I think so.

1431

Q.   Okay. Some time's passed since these incidences. Are you going to be upset if you don't see Angela crying over there at the witness table?

A.   No.

Q.   Is that going to affect your decision do you think?

A.   Probably not.

Q.   We don't want her to be showing emotion here in the courtroom. It's not appropriate in our view; okay? You understand that?

Page 87

A.    Yeah.

Q.    Okay.  And you'll have to try to imagine -- and I know it will never happen -- how you would behave in a similar circumstance.

A.    Yeah.

Q.    Be tough, wouldn't it?

A.    Yes, it would.

MR. BERRIGAN:  Okay.  You've been very patient with me.  Thank you, ma'am.

THE COURT:  Ma'am, if you'd just step outside, I want to discuss it with the lawyers, and we'll let you know your status; okay?

(Prospective Juror 727 exited the courtroom.)

THE COURT:  Any challenge for cause by the government?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Any peremptory challenge by the

1432

government?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  I guess we need to ask them --

MR. WILLIAMS:  Cause, but not a big deal.

THE COURT:  Right, right.

MR. BERRIGAN:  No challenge for cause by the defense, sir.

THE COURT:  Any peremptory challenge?

MR. BERRIGAN:  No, sir.

THE COURT:  Okay.  So Juror 727 is in the jury pool.

(Prospective Juror 727 entered the courtroom.)

THE COURT:  Ma'am, you are in our jury pool which means you're free to go home now.  Please take that sheet with

Page 88

you that I gave you because you're bound by it. It's very important that you not talk to anybody about this case, let anybody talk to you about this case. It's also very important that you not read or listen to any news reports about the case.

And as soon as we get our 34 jurors in the pool, we'll let you know whether you're going to be one of the 18 that will be coming in or whether you'll be dismissed from jury service; okay? The clerk's office will notify you; okay? Thank you.

(Prospective Juror 727 exited the courtroom.)

THE COURT: Can you close the door for one second? The reason why I didn't grant your request for additional time -- I just wanted you to know -- it wasn't an arbitrary

1433

decision. I had actually on my own -- this morning when I found out that we had fewer jurors, I thought about whether to give you more time, and I decided not to, and here's why. There are some days where we're going to have a lot more jurors, and I wanted to try and see if I thought -- it's another experiment, whether I thought 12 minutes was fair enough or not.

And I also thought it would help you hone in and learn how to ask the most important questions in a smaller period of time that I think we'll need in later days. And I just -- I don't expect you to agree with it, but I didn't want you -- I never, ever in my view act arbitrarily, and when I gave you a curt answer, you had a right to assume that that was an arbitrary decision. It wasn't arbitrary.

MR. BERRIGAN: It was a timing thing, Judge. I asked you right before the jury was coming in. We didn't have time to debate it.

THE COURT: But it was something I actually gave a lot

Page 89

of thought to, and I just wanted you to know that.

MR. BERRIGAN:  I appreciate it.

THE COURT:  Because it didn't reflect it at the time, and it was a perfectly reasonable request.

MR. BERRIGAN:  Thank you.

THE COURT:  I would have been surprised had you not made it.

MR. BERRIGAN:  I was going to wait for at least the

1434

second one to go.

MR. WILLIAMS:  Your Honor, that said, he took a full 15 minutes with this last juror at least according --

THE COURT:  He did.

MR. WILLIAMS:  Yes, at least according to our watch.

THE COURT:  See, I'm not a good time keeper.

MR. BERRIGAN:  I don't like to look at the clock. Would you be willing to give me a two-minute warning?

THE COURT:  Yeah, why don't I -- you know, I've never done this.

MR. WILLIAMS:  I was just going to ask do you want us -- I didn't object.

THE COURT:  No, I should be the one to do it.  I'm the one who imposed it.  And even I think I gave you a little bit more.

MR. WILLIAMS:  You may have.  That's just a point of clarification.  I'm trying to figure out whether we should do anything.

THE COURT:  I'll tell you what.  I'll do a better job time keeping.  At the 10-minute mark I'll give you a 2-minute warning.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1250 of 3245

MR. BERRIGAN:  Thank you.

THE COURT:  We're ready for Juror 243.

(Prospective Juror 243 entered the courtroom.)

THE COURT:  Anywhere you're comfortable in the front

row.  Please be seated.

Everybody else can be seated.  And we're going to start with questions from Mr. Berrigan, and I've given each side 12 minutes to ask questions, and I'm going to give them a 10-minute warning, so if I interrupt, that's why.

PROSPECTIVE JUROR 243:  Okay.

THE COURT:  Okay.  Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q.   Good morning, Mr. 243.

A.   Morning.

Q.   I bet you've never been called Mr. 243 before.

A.   No, I haven't.

Q.   I hope you'll bear with us.

A.   Sure.

Q.   We're going to deal with two issues in this setting.  One is going to be very quick, and that has to do with your exposure to pretrial publicity, that is, accounts in the newspaper, television, radio, et cetera.

A.   Okay.

Q.   And your questionnaire -- you're in the minority in this I have to tell you.

A.   Okay.

Q.   You say, Absolutely nothing.  I just haven't heard about it.

Page 91

A.   The only thing I heard at the time of the questionnaire was the information the judge gave me.

Q.   In the questionnaire.

A.   In the questionnaire.  He sent out a letter that went with it, yep.

Q.   All right.  And sometimes people have heard stuff after they got the questionnaire closer to trial.  Has that been the case?

A.   I would say that's correct.

Q.   Okay.  What have you heard here recently?

A.   I scan the Internet in the morning, and one of the things I look at is the Sioux City Journal, and I did notice and didn't read the article but noticed the headlines of jury selection.

Q.   Okay.  And you did not read it because you were a conscientious juror and said --

A.   I was told not to.

Q.   Even though you saw the headline, I'll ask you a silly question.  Is there anything about that headline that caused you to form an opinion about this case?

A.   No, no, no.

Q.   So we can put that to bed.

A.   Yes.

Q.   And let's talk a little bit about the death penalty.

A.   Sure.

Q.   And I know you probably filled out this questionnaire some

time ago.

A.   Yeah, it's been a while.

Page 92

Q. There was a question about the death penalty, essentially what are your thoughts and opinions about it, and you said, I've never been -- I'm sorry, I'm not opposed to -- I'm reading the wrong one. I'm not opposed to the death penalty in extreme cases with indisputable evidence. There appears to be many cases where the death penalty later proved the case was wrong. I would prefer life sentences. And I suspect you're talking about some of these matters involving DNA evidence.

A. That's correct. That's what I'm talking about, yeah.

Q. And you're right. That's happened now --

A. More so.

Q. A sad number of times, frankly. But, you know, this would be a situation where if you were selected as a juror you would see the evidence firsthand. That is, you know, you -- there wouldn't be a thing that happened in this courtroom in terms of evidence being presented that you wouldn't personally get to see and listen to and evaluate; okay?

A. Okay.

Q. And if there was DNA evidence, you'd get to hear and listen and evaluate that as well; okay?

A. Yes.

Q. So there may be more of a comfort factor in participating in the process than reading about it in the paper and not

1438

knowing, well, what the heck did these people hear when they made this decision? Will you be with me?

A. I agree, yeah.

Q. You indicated that you thought the death penalty was used too often. In some states there appears to be many more than in others and, therefore, have more overturned. And that's also

Page 93

true.  Some states clearly have more death penalty verdicts.  My state's one of them.  Missouri, we've had the death penalty for some time.  And as you go south through Oklahoma, the numbers increase.  You go further south to Texas, and the numbers increase.  That is what it is.  Does that affect -- does that have anything to do, do you think, to your ability to be a juror if you were selected?

A.   I don't believe so, no.

Q.   Okay.  And then you said you were not for an eye for an eye.  In fact, in almost all cases you think we should forgive rather than retaliate.  And certainly you thought that life without parole was an appropriate punishment for intentional, premeditated murder.

A.   Yes, I believe so.

Q.   Okay.  Here's the thing, sir.  Would you agree that it might be unfair that Miss Johnson be judged by a group of people that were solely comprised of people favoring the death penalty?  Does that seem like a fair proposition?

A.   That it would not be fair if everybody favored it?

1439

Q.   Yeah, exactly, yeah.

A.   I could see that, yes.

Q.   That we might want to have a mix of people.  I mean, that might be an okay thing.

A.   Sure, sure.

Q.   The law allows that; okay?

A.   Yes.

Q.   You don't have to favor the death penalty to be a juror in a capital murder case; okay?

A.   Yes.

Page 94

Q.   But it does require that the jurors be able to fairly consider -- and when they say consider, they mean really consider.

A.   Uh-huh.

Q.   Not, you know, a wink and a nod.  They mean really consider both possible punishments.

A.   Yes.

Q.   Okay?  And you talk about extreme cases with indisputable evidence, at least in those types of cases.  Are those kind of cases cases in which you'd consider the death penalty is perhaps an appropriate punishment?

A.   Very extreme, and I think murder trials probably would be that.

Q.   Okay.  Let's talk about the extreme very briefly.  Five intentional murders -- that's what the government's alleging --

1440

committed during a drug conspiracy or a CCE.  They were committed substantially and with premeditation and that amongst the five victims was a mother and two children, two little girls ten and six years old.  I want to make sure that's not without -- outside of the sphere of extreme cases that you're thinking about.

A.   I don't think that would be outside of it, no, no.

Q.   Okay.  And then there's -- the other part is the indisputable evidence.  Prosecutor's burden is to prove this case beyond a reasonable doubt, no more, no less; okay?

A.   Correct.

Q.   Just like it is in every aspect of criminal prosecution in this country.

A.   Correct.

Page 95

Q. They don't have to prove things a hundred percent, okay, just beyond a reasonable doubt. Are you okay with that?

A. I would hope that it would be close to a hundred percent.

Q. Okay. Well, sometimes jurors are a little confused about their decision on life or death and the prosecutor's burden, and that's a really important distinction. If you're a juror in a capital case and you're at the point in the trial, as the judge mentioned, in the third phase where you're weighing these aggravating and mitigating circumstances and you have to make a decision, life or death, you have every right to be 100 percent firmly convinced in your position. Would you agree?

1441

A. Absolutely.

Q. These jurors live with these decisions -- they're individual decisions -- for the rest of their lives.

A. Right.

Q. Now, that's a little different than what does the prosecution have to do in order to have evidence that the jury's going to consider; okay?

A. Okay.

Q. When the prosecution's trying to prove -- when they're trying to prove whether or not Angela Johnson's guilty of these five intentional murders, their burden is beyond a reasonable doubt; okay?

A. Right.

Q. Is that fair?

A. Fair.

Q. Would you require more than that?

A. Excuse me?

Q. Would you require them to do more than prove that beyond a
Page 96

reasonable doubt?

A.    I don't think so.

Q.    Okay.  The law says when they're trying to prove whether this was substantially planned and premeditated, it says you have to prove that, government, beyond a reasonable doubt. Would you hold them to a higher burden than that if that's what the law said they had to do in order for you to consider

1442

weighing those circumstances?  Would you make them prove it more than that?

A.    I don't believe so.

Q.    Okay.  They have to prove -- they're alleging that these are vulnerable victims, the six- and ten-year-old; okay?

A.    Yes.

Q.    Seems like a fairly simple concept, but it's a decision the jurors have to make, and the government has to prove it beyond a reasonable doubt.

A.    Correct.

Q.    Is that an unfair burden for them do you think?

A.    None, no.

Q.    Too low or too high?

A.    No, I don't believe so.

Q.    Would you give them more of a burden than to prove that beyond a reasonable doubt?

A.    No, I don't think so.

Q.    Okay.  And then we're going to have this weighing situation where we're weighing the evidence; okay?  Now, at that point, you know what?  You're entitled to give that whatever weight you want.  These aggravating circumstances are going to be weighed against stuff that the defense might present as mitigating

Page 97

circumstances. We might have evidence that the defendant doesn't have a substantial history of -- criminal history; okay?

A. Okay.

1443

Q. Is that something you'd willingly consider?

A. Sure.

THE COURT: Two-minute warning.

MR. BERRIGAN: Thank you, sir.

Q. We might present evidence about the defendant's background, Angela's background. Was she abused sexually, physically, emotionally traumatic childhood? Is that evidence you'd be willing to consider?

A. Certainly.

Q. The important thing about this weighing process, it's kind of like Lady Justice, the blindfolded Lady Justice.

A. Uh-huh.

Q. But unlike all the other decisions in this case, this is an individual one for each juror.

A. Right.

Q. You give whatever weight to these circumstances you choose to. But you have to be able to consider them.

A. Uh-huh.

Q. Okay? Would you be able to do that?

A. Yes.

Q. If -- and I know it's a big if -- but if and only if you came to a conclusion -- let's just assume, okay --

A. Sure.

Q. -- that you came to a conclusion that the aggravating circumstances in your conscience and heart outweighed the

1444

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1258 of 3245

mitigating circumstances and you thought the death penalty was appropriate and if all the others agreed, only then -- that's a big if, but only then would the jurors have to indicate the death penalty was the verdict. Do you understand that?

A. Well, not really. I don't -- the mitigating and the -- I don't know which one is which that you're talking about.

Q. Well, the mitigators, those are factors for life, and the aggravators are factors for death.

A. Okay.

Q. They're kind of flip sides of a coin.

A. Okay.

Q. But the jurors would have to sign a verdict form indicating death if that's what they agreed to.

A. Right.

Q. Is that something you think you could do?

A. Yes.

MR. BERRIGAN: Okay. Thank you. That's all I had, sir.

THE COURT: Thank you.

Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, sir. How you doing?

A. Good.

Q. I'm just going to follow up on some of those questions by

1445

Mr. Berrigan, cover some of the same territory a little bit differently maybe. You're from Cherokee, sir?

Page 99

A. Yes.

Q. Lived there 28 years I understand, at least in that area.

A. Yeah, someplace in there, Cherokee County my whole life so . . .

Q. Great. You're a married man?

A. Married.

Q. How long you been married? I won't tell your wife.

A. Thirty-nine years this fall I believe.

Q. Very good. Your wife is a nurse I understand; is that right?

A. Yes. Primarily an educator nurse, teaches nursing.

Q. Oh, I see. Okay. Let me talk to you a little bit about this death penalty thing for a moment. You reflect in some of your answers to the questions in the questionnaire that in your view a life sentence is more severe, more harsh in your view than the death penalty is. Is that fair, or what are your thoughts on that?

A. I certainly think that the death penalty is severe, but sometimes that life sentence will be a much longer penalty for them to suffer with than the death penalty.

Q. Sure.

A. If I may add, it's similar to I've got a father in a nursing home, and sometimes the quantity of life is far better

1446

than the quality of life.

Q. I understand completely. The answers in your questionnaire indicate I guess from my perspective not a lot of support for the death penalty but at least an acknowledgment that it's a possible punishment.

A. Correct.

Page 100

Q.   Is that fair to say?

A.   Yes.

Q.   I've got a very good friend I work with, another fellow prosecutor.  And his views are that he supports the death penalty.  He's in favor of it.  When he reads in the paper about cases where he believes the death penalty was either appropriately brought or should be brought, he believes that's appropriate.  But he also knows that because of his own personal views, his own personal judgments, that even though he understands it, thinks it's appropriate as a concept, he knows when it really comes down to it he personally could never impose the death penalty.  And, you know, it's for a number of reasons in his personal views.  I'm trying to figure out where you are on that, sir.  I know your wife, for example, says killing is wrong, period, which I would assume to mean even in the context of the death penalty.

A.   Yes, that'd be her feeling, yeah.

Q.   And we all value the views of those people closest to us.

A.   Uh-huh.

1447

Q.   And in a case like this, as Mr. Berrigan said, it is something you're going to have to live with for the rest of your life.

A.   Right.

Q.   And you're going to have to live with it with your wife for the rest of your life.

A.   Correct.

Q.   Given your views on the death penalty, given her views on the death penalty, is this really a situation where you think you could realistically give the death penalty in a case?

Page 101

MR. BERRIGAN: I'm going to object, Your Honor, as a violation of the Court's order.

THE COURT: Sustained.

BY MR. WILLIAMS:

Q. Let me rephrase. Do you think you could realistically consider the possibility of giving the death penalty?

A. I believe so, yes.

Q. Okay. And Mr. Berrigan gave you some factors here, some facts. Let me have you assume if you would that the evidence would show that the defendant in this case never personally pulled the trigger, that the role -- assume that the role was one of somebody who assisted and encouraged or persuaded the other person to pull the trigger but she herself never pulled the trigger.

Now, some people when we talk to them about this, they

1448

say, oh, under those circumstances, that's not what I'm thinking about as an extreme case. I mean, if they didn't personally pull the trigger, the death penalty shouldn't apply to somebody who falls in that category in my view.

Now, other people have different views. And we respect everybody's views. Can you share with us where you're at on that issue?

A. I know that when you are -- I don't know the proper terminology but an assistant or an accomplice or something like that you are basically treated with the same crime pretty much. I think it would certainly be something that you would take into consideration as far as giving the death penalty to over the person that actually did the killing. You certainly have to take that into consideration.

Page 102

Q.   Certainly.  And having taken that into consideration, could you still consider using the death penalty or imposing the death penalty as a penalty for somebody whose role was as I described it?

A.   I think that would -- we would have to look at the circumstances, you know, the situation that we have.

Q.   Sure.

A.   Because one circumstance might be under duress that they assisted, and the other one -- other situation may not be.

Q.   Yeah.  Could you imagine a situation where in some ways maybe the person who assisted was more morally culpable or

1449

responsible than the person who actually pulled the trigger? For example, the person who pulled the trigger might not have done it but for the person assisting or encouraging --

A.   Again, those are other circumstances that we have to treat as we come to them.

Q.   Sure.  Mr. Berrigan asked you this question, and forgive me for asking it again, but I'm trying to make sure I'm comfortable with where you are.  If you got to the point where you and every other juror did this weighing process and you concluded that the death penalty was appropriate, you did your own analysis, you weighed the role and maybe something about background, and you compared that and weighed that against the fact that a mother and children were killed and five people were killed and you've done that weighing process yourself and now you personally have decided the death penalty's appropriate and so has everybody else on the jury panel, to reflect that verdict, you would have to sign a verdict form, and the real outcome of that is cause the execution of another person, another human being, somebody

Page 103

you're going to be looking at for perhaps up to three months of trial. Is that something you think you can do?

A. I believe so.

Q. So in the appropriate case, you believe you could impose the death penalty.

A. Yes.

Q. And you also believe in the appropriate case if you do that

1450

weighing analysis in the appropriate case you could also decide life imprisonment even though this case involved the murder of a young mother and her two children.

A. Yes.

MR. WILLIAMS: Thank you. I have no further questions, Your Honor.

THE COURT: Thank you.

Juror 243, if you'd just wait out in the hallway, we'll let you know your status. Thank you.

(Prospective Juror 243 exited the courtroom.)

THE COURT: Does the government have a challenge for cause?

MR. WILLIAMS: No, Your Honor.

THE COURT: Does the defense have a challenge for cause?

MR. BERRIGAN: No, sir.

THE COURT: Does the government exercise a peremptory challenge?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Let's bring Juror 243 back in.

(Prospective Juror 243 entered the courtroom.)

THE COURT: You can just remain standing, sir. We're

Page 104

going to let you go.

PROSPECTIVE JUROR 243: Okay.

THE COURT: I think you'd be a terrific juror, and I

1451

think you'd be a good juror in this case, but for reasons I can't disclose we're going to let you go. We appreciated very much your willingness to participate in the process, and we hope to see you back here on another case.

If you'd do us a favor, because northwest Iowa's relatively small populationwise and we have panels coming in over the next couple weeks, we'd appreciate you not saying anything about jury selection to anybody else.

PROSPECTIVE JUROR 243: Sure.

THE COURT: Because they could say something to their neighbor, and that neighbor might wind up sitting in one of these chairs.

PROSPECTIVE JUROR 243: Okay.

THE COURT: Thank you so much for coming in. We really appreciate it.

PROSPECTIVE JUROR 243: Okay.

THE COURT: Thank you. Bye now.

PROSPECTIVE JUROR 243: Bye.

(Prospective Juror 243 exited the courtroom.)

THE COURT: Okay. Ready for Juror 169?

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 169 entered the courtroom.)

THE COURT: Sir, if you'd just sit anywhere in the middle row, that would be great.

Everybody can be seated. And we're going to start

1452

Page 105

with questions from the government lawyer. I've given each side 12 minutes.

PROSPECTIVE JUROR 169: Huh?

THE COURT: I've given each side 12 minutes to ask you questions.

PROSPECTIVE JUROR 169: Okay. Yes, sir.

THE COURT: So I may give them a 2-minute warning at the 10-minute mark, but we're going to start with Mr. Williams first.

EXAMINATION

BY MR. WILLIAMS:

Q. Good morning, sir. How you doing?

A. Good morning, sir.

Q. We're going to ask you just a few questions here concerning two issues basically, and that is publicity and then your views on the death penalty.

Let me start with publicity. You were asked some questions in the questionnaire about your knowledge of this case, and you said you were not at all familiar. I don't remember this case at all. And on the next page you were asked if you had formed any opinions about the defendant's guilt based on anything you may have heard about the case, and you checked the box no. Is that still the case, sir?

A. I don't remember anything about this case, I mean, at all. It's totally unfamiliar with me.

1453

Q. Have you formed any opinions at all about her --

A. No, no, I haven't.

Q. You've served as a juror yourself I heard during the voir

Page 106

dire this morning.

A.    Yes, sir.

Q.    And you recognize the presumption of innocence is something that a defendant enjoys in the case until and unless the government proves its case beyond a reasonable doubt.

A.    Yes, sir.

Q.    Since you got this questionnaire, have you heard anything about this case?

A.    No, sir.

Q.    Very good.  You were asked -- the next follow-up question is, Have you formed any opinions about the appropriate punishment?  And you said, Death or life in prison.  So let me talk about that because those are, in fact, the two possible punishments.  If we get to the point in the case where the jury has determined the defendant guilty beyond a reasonable doubt and found those so-called gateway factors the judge has described for you, life in prison in the federal system means just that.  It means life in prison without parole.  Unlike some states where if you get a life sentence you may be up for parole after a number of years or you may get off for good behavior, in the federal system it doesn't work that way.  Did you understand that?

1454

A.    Yes, sir.

Q.    Did you understand that by chance when you were filling out this questionnaire?

A.    Not necessarily.

Q.    Yeah.  Not many people understand necessarily the distinction between the federal and state --

A.    I had a pretty good idea it worked that way, if you got the

Page 107

death penalty and they put it down as life in prison, there was no possibility of parole, no.

Q. Now, as the judge said, the unique thing about this case is if we get to the point of punishment, if we get to that third phase, the jury, unlike usually the judge, imposes the sentence. If we get to this phase in this case, it will be the jury's job to impose the sentence. And jurors in that case would have a pretty unique role because they would be able to consider not just the crime that was committed but also other factors, other circumstances to determine which of these two penalties, life in prison or the death penalty, would be appropriate. If it was a crime alone that dictated the sentence, we wouldn't need a jury to help us decide what the appropriate sentence is. We would just automatically impose it. That's why the jury is so valuable in this situation. You understand what your role would be if you were there?

A. Yes, sir.

Q. What would happen at that point is that as the judge said

1455

there's going to be a case where the government would present factors or additional evidence suggesting in the government's view that the death penalty is called for in this case. There may be facts surrounding the circumstances of the crime or the defendant's role in the offense that the jury could consider as mitigating factors in and of themselves.

In addition, the defense can if they want to -- they have no obligation to do so -- put on additional evidence concerning other mitigating factors, perhaps something about the defendant's background, their childhood, or something like that.

What we're looking for are jurors that are willing to

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1268 of 3245

consider all of those factors, any factors the Court instructs you are either aggravating factors or mitigating factors, that jurors are willing to consider those factors. Is that something you think you could do?

A.    Yeah, I agree with that because you can't determine what you're going to do till actually you've heard everything on both sides, the prosecution as well as the defense. So you can't say that you're for or against that until you actually hear what has been presented and why it's been presented and the circumstances around it.

Q.    Now, in this case the defense doesn't have to put on any mitigating evidence at all if they don't want to. You okay with that?

A.    Yes.

1456

Q.    All right. Now, when we get to these factors, it's kind of unique, but the jurors get to decide on their own how much weight to give to any one of those factors. And each juror individually gets to weigh the factors. It's not a numbers game. It's not whether the government proved ten aggravating factors, the defense two mitigating, or vice versa. But it's weight you put to each one of those. And each juror gets to weigh those factors themselves and then talk as a group, discuss it, but ultimately it's an individual juror's decision whether you think the death penalty's appropriate or life imprisonment's appropriate. Do you understand how that process would work?

A.    Yes.

Q.    Are you willing to consider things like the defendant's background if they present evidence along those lines?

A.    Yes. Like I said, you have to look at everything that's

Page 109

presented, you know, before you determine anything, you know, and sometimes there's circumstances around different things.

Q.    In this case I want you to assume the evidence -- because to get to this point, the government will have proved at least some of this, but let's assume that the government proved beyond a reasonable doubt that the defendant assisted or aided or encouraged another person in the killing of five people.  Among those people was a young mother and two little children, two little girls ages six and ten years old.

Now, some people when we tell them that much, they

1457

say, Ooh, you know, now that you lay that out for me, I'm sorry, but there's no way I could ever consider life in prison as a possible punishment because that's -- you know, those are just horrible facts.  There's no way.  I'm sorry, but to be honest with you, I couldn't consider life in prison.

Other people are still able to consider life in prison as a possible punishment even given those facts.  Where will you fit in there, sir?

A.    Like again, I gotta go back to looking at everything that's presented and why and what, the reasons around it.  I don't know where I'd stand on that until I actually come to it.  I really don't, you know, I mean.  I just have to listen to everything that's said first.

Q.    And what's important is that you haven't made up your mind at this point that, oh, jeez, those facts are all I need to know.  It's the death penalty and nothing else.  You aren't at that point.

A.    Right.

Q.    Okay.  Assume in this case, as I said, that the defendant's
Page 110

PANEL F, 4-19-05

role wasn't as the person who actually pulled the trigger but was a person who assisted or encouraged or aided the person who actually pulled the trigger.  Now, again, some people say, Wait a second; if you're telling me they didn't actually pull the trigger, then the death penalty should never apply to somebody like that.  Death penalty should be reserved only for people who

1458

actually pull the trigger on a weapon.  And if you're telling me that that didn't happen here, I can't ever consider the death penalty as a possible punishment.  What are your thoughts on that?

A.    There again, I'd have to weigh it and see, I mean, listen to the evidence.  I don't know until I actually heard what and why things happened.  I probably would show some leniency there -- you know what I mean? -- if you weren't actually the person that pulled the trigger.  You know what I mean?  But like I say, I've gotta look at what's presented and go by that.

Q.    And that's kind of the unique thing about this because as you can imagine, there's probably going to be factors that push you both -- different directions; right?  Some factors like the killing of children are going to say, Oh, I'm going to lean toward death penalty here.  But, oh, she didn't pull the trigger; I'm going to lean this way.  The unique thing about this is each juror's going to have to balance those competing factors and ultimately arrive at what they think the appropriate punishment is.  You understand that?

A.    Yes, yes, sir.

Q.    And you said look at all the facts.  Can you imagine a situation where somebody who didn't pull the trigger, who actually was the assister or aider in the case, might be more

Page 111

morally culpable or responsible than the person who actually pulled the trigger? Perhaps the person who pulled the trigger

1459

wouldn't have done it but for the other person encouraging them or pushing them to do it.

A. Yeah.

Q. Can you imagine that situation?

A. Yes, I can.

Q. So in the appropriate case, assuming the facts that I've laid out for you at this point, in the appropriate case, are you willing to consider life imprisonment as a possible punishment despite the fact, despite the fact, I want you to assume that the defendant was involved in killing a young mother and two innocent children? You're still willing to consider life in prison as a possibility?

A. Yes, I would.

Q. And in the appropriate case are you willing to consider the death penalty as an appropriate punishment?

A. Yes, yes.

Q. Now, here's sometimes a harder question. Let's assume that you and all the other jurors have done this weighing process. You've gone downstairs. You've talked among yourselves. Each of you have weighed the various factors, and it comes out that everybody believes the death penalty is the appropriate punishment. To reflect that verdict, each of you would have to sign a verdict form, and the real and practical effect of signing a verdict form would be to cause the execution of another person. Is that something that you think you could do?

1460

Page 112

A.   Yeah.   Are you saying if all the other jurors felt that they wanted the death penalty and I didn't?

Q.   Nope, that's not what I'm saying.

A.   Okay.

Q.   It's kind of interesting.   Each juror gets to decide on their own.   So if all the other jurors said death penalty and you said, nope, life in prison, the verdict is life in prison. It has to be a unanimous verdict by all 12 jurors in favor of the death penalty before the death penalty could ever be imposed.

So what I'm suggesting is in my hypothetical that you and every other juror all agreed the death penalty would be appropriate.   And the only way to effectuate that verdict would be to sign a verdict form that would have the practical effect of killing somebody.   Now, some jurors just know when it comes down to that they couldn't do that, that it's okay to support the death penalty in theory, but they know in their heart they could never actually sign a verdict form that would cause the execution of another human being.   Other jurors believe they can do that.   Can you share with us --

A.   I could, yes.

Q.   In the appropriate case.

A.   Yes.

THE COURT:   Two-minute warning.

MR. WILLIAMS:   I'm done, Your Honor.

1461

THE COURT:   Okay.

MR. WILLIAMS:   Thank you very much, sir.

THE COURT:   Mr. Berrigan?

Page 113

BY MR. BERRIGAN:

Q. How are you, Juror 169?

A. Real good, sir.

Q. Good. Were you called by number in your last couple of trials?

A. Yes, sir, 169.

Q. No, I mean in your last two trials where you were a juror, did they use your name?

A. I don't remember, sir.

Q. Well, I'll tell you what. It's awkward for us. I apologize. But obviously there's good reason for it.

You know, you really struck me earlier when Mr. Miller had asked you a question about what the goal of the jury was. You remember him asking you that, Mr. Miller being the gentleman over there?

A. Yes, yes, sir I do.

Q. And you said to him it's to listen to everything that's said and not form any opinion until the end.

A. Yes, sir.

Q. Is that your belief?

A. Yes, sir.

1462

Q. I'll be honest with you. I'm a little worried that maybe that goal might be confused with what we're trying to do, and because the honest truth is, Mr. 169, we're not looking for people that come in here in this process and tell us, I don't really have any opinions until I hear everything, only because that's not so helpful to us, to be honest. Part of our job here is to pick the best 12 people to sit on this particular case,

Page 114

and we expect people to have opinions, to be honest when they hear things like five people intentionally murdered. You know, lot of folks have opinions about that. You know what I mean?

A. Yes, sir.

Q. And then the government's alleged not only are these people intentionally murdered, they were murdered after premeditation and substantial planning. They're claiming that as well; okay? You following me?

A. Yes, sir.

Q. And then they're alleging that of these five victims, one was a mother and the other two of them were two little children, her daughters ten and six years old; okay?

A. Yes, sir.

Q. That's the crime we're talking about here.

A. Yes, sir.

Q. And I looked at your questionnaire, and I have some concerns to be honest. I want to ask you about them.

A. Sure. Go ahead.

1463

Q. When did you -- looks like you signed this January the 16th, so that's a couple months back.

A. Yes, sir.

Q. But being a juror -- and certainly you were aware of this -- the declaration says, I declare under penalty of law I've answered truthfully and completely all questions in this questionnaire, and you did that.

A. Yes, sir.

Q. Okay. There's a question about the presumption of innocence, whether or not you believe in that. And you said you did. I feel they are innocent until proven guilty. Do you

Page 115

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1275 of 3245

remember that?

A. Yes, sir.

Q. There's a question number 61 that comes right after that, and it says, What would you take into consideration in terms of punishing a person for a crime, and you really had four choices. One was punish the crime. One was punish the person. One was punish the person and the crime, and then the other one was I'd take into account something all together different. And your response to that question was punish the crime. If they committed the crime and it's proved, they need to face the punishment. Does that sound right to you?

A. If that's what I have down, yes, sir.

Q. Okay. And then there's a question about the death penalty, and it asks for your feelings about the death penalty and why

1464

you feel that way, number 76. Why do you feel this way? What are some of the reasons for your beliefs? And you said, A life is a very precious thing. If you kill somebody, you need to face the death penalty. Is that how you feel?

A. Yes, sir.

Q. Okay. There's a question that asks you about whether you believe in an eye for an eye, number 78. Do you believe in an eye for an eye? You checked yes, and you said, If a person deliberately kills someone, they should in turn face the death penalty. Is that --

A. Yes, sir.

Q. -- a fair assessment?

A. Yes, sir.

Q. I've had some people express that in a different way, and I want to see if this rings true with you, that if a person

Page 116

intentionally kills somebody, they make a decision to kill somebody --

A.    Yes, sir.

Q.    -- that they've really made two decisions.  They've made a decision to kill that person, that victim, and they've also by their conduct made a decision to forfeit their own life because if you're going to intentionally take somebody else's life, you've also decided that your life should be forfeited.  I don't know if you feel that way.  Some people talk about that when they talk about an eye for an eye, but I'm curious about it.

1465

A.    I do feel that way if someone takes someone else's life, but I also know that there are circumstances, and like I say, you have to listen and understand why.  But like I said before, I put down there a life is a very precious thing, and when someone takes someone else's life, then there's a possibility that their life will also be taken in a court of law.

Q.    There's a question about your thoughts and opinions about life in prison as a punishment for a person who's guilty of intentional murder.  It's question 82.  And you said, It would be okay if can't be given the death penalty.  That is, it was an acceptable alternative if the death penalty was not available.

A.    Yeah, that's true.  But, you know, I also have some other thoughts not down there.  You know, life in prison is not an easy thing, and some people believe that that's about as bad as the death penalty.  And there's a very close relation to the two, believe me.

Q.    Okay.  Let me ask you about that.  You were asked question 83, Why do you feel this way, or what are some of the reasons for your beliefs about life in prison without the possibility of

Page 117

parole? And you said, If they can't give the death penalty, then give life. Is that how you feel?

A.   Yes, sir.

Q.   If the death penalty wasn't an option, then you'd be okay with life.

A.   Okay with life, yes, sir.

1466

Q.   The converse of that certainly suggests, Mr. 169, that if the death penalty was an option, that is the option. Do you understand what I'm saying there?

A.   Yeah. But in the end, though, maybe not everybody wants the death penalty, and it might not very well come up to that.

Q.   Well --

A.   Even myself, after I listen to everything, maybe I might decide, well, this person -- I think life in prison would be appropriate. And like Your Honor said, he's the one in the end that's going to make the final decision. I believe that many people are sentenced to death, but they're never -- they never really are put to death like, all right, the Scott Peterson case. If you look at that, there's a lot that says he'll spend 20 years on death row and it will probably all be plea bargained down to life in prison. And, you know, I left that up to people like Your Honor that's a lot smarter and the lawyers that are a lot smarter because they're going to do what's right in the end. Even though we would give the death penalty, he's the one going to determine what's actually going to happen.

Q.   I think he would tell you, Mr. 169, if you asked him that in this case if the jury says the death penalty it is the death penalty. He has absolutely no discretion under the law to change that to life imprisonment. Do you understand me?

Page 118

A.    Well, yes, I do, but also this morning he did say that he makes the final decision.

1467

Q.    Not on this.  He told you that this is a unique case, that almost all the time he sentences people regularly to punishment but not here.

THE COURT:  Yeah, and I'm sorry if I didn't make that clear.  But Mr. Berrigan is right.  In the typical case that we have, I'm the one that determines the sentence.  In this case the jury determines the sentence, and I'm bound by their sentencing determination.

PROSPECTIVE JUROR 169:  I'm sorry, Judge, because I thought that's what you meant this morning.

THE COURT:  No, I wasn't clear about that, and I apologize for not being clear.  Thank you.

BY MR. BERRIGAN:

Q.    Irrespective -- now you understand, sir.

A.    Yes, sir.

Q.    In question 84 you were asked, Do you think that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder, and you checked no.  And you said -- the question said, Please explain.  And you said, they killed someone.  They need the death penalty.  Does that sound right?

A.    That's right.

Q.    Okay.  Has something happened since January the 16th to change these views?

1468

Page 119

A.    No, but I put that down as how I felt about it, but there's things behind that that I do feel that I couldn't put behind that.  I can only go by the evidence, what's reported.  And if there's going to be leniency shown, I'm, you know, all for that, you know.  Nobody wants to sentence anybody to death.  Nobody wants to do that, and maybe in the very end when I hear all the evidence, maybe life in prison would be fair enough punishment in the end.

Q.    Would it be a fair reading of this questionnaire for me to say that at least back in January your views were, look, if you took somebody's life intentionally, if that's what you did and on top of that it was a premeditated murder, your view, at least at that time, was, hey, Berrigan, that's the death penalty?

A.    Yeah, that's how I feel about it, and I do feel if you take someone's life your life should be taken in turn.

Q.    Okay.  Let me just -- let me ask you this question because I think that's a very fair response.  When you're talking about considering the facts and all the circumstances and the weighing, just like you've done in the past, okay, I want you to assume you've done that; okay?  You're going to have to fast forward yourself in this process.  You've done that.  You listened to the who, when, where, why, how, and you heard that, and you heard the defense arguments, no, we didn't do it, or no, it was self-defense.

You made a decision guilty; okay?  The intentional

1469

murder of five people, you decided guilty.  Premeditated murder, substantial planning, not just you, you and your 12 jurors said guilty.  Not just that, but that two of these people are children, okay, ten and six years old.  All 12 agree.
Page 120

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1280 of 3245

It sounds like from the questionnaire -- you correct me if I'm wrong -- but it sounds like if you've heard all the evidence and you came to that determination given your views -- and I'm not being critical of them honestly. We just need to explore them.

Given your views, look, a life for a life, you kill somebody, you forfeit your life, is it fair to say that in that circumstance -- and that's a big if. That's listening to all the evidence, if we get there, a huge if. But in that circumstance, the death penalty would be the only appropriate punishment that you'd consider.

A.   Yes.

Q.   And in that circumstance, life without parole would not be really -- I mean realistically and honestly, that would not be a sentence that you'd be willing to consider under those circumstances.

A.   Probably not, no.

MR. BERRIGAN:   Thank you, sir.

THE COURT:   Sir, I just wanted to ask you a couple of questions before we let you leave the room, and then we'll tell you your status. Think of it as a football field and somebody

1470

would be on the 50-yard line in this case as it regards punishment if they were equally open to a life sentence and a death sentence. And then at one goal line would be a death sentence, and the other goal line would be a life sentence. Where would you put yourself?

PROSPECTIVE JUROR 169:   Probably life.

THE COURT:   Probably life?

PROSPECTIVE JUROR 169:   (Nodded head.)

Page 121

THE COURT: And why do you say that? Well, where would you put yourself on the football field? Are you at the 50-yard line, down at the goal line for life, the goal line for the death penalty? Are you tracking what I'm saying?

PROSPECTIVE JUROR 169: I think so. I'd probably lean towards life in prison, but I don't know until I actually got there. You know, I honestly don't know.

THE COURT: Okay. Thank you. If you'd just step outside, we'll let you know.

PROSPECTIVE JUROR 169: Thank you, Your Honor.

THE COURT: Thank you very much. And thank you for your prior service too.

PROSPECTIVE JUROR 169: You're welcome.

(Prospective Juror 169 exited the courtroom.)

THE COURT: Mr. Berrigan, just so you know, Cardinal Ratzinger is the new Pope.

MR. BERRIGAN: Oh, thank you. I knew he was the front

1471

runner according to the bookies.

THE COURT: Front runner apparently won.

Okay. Who are we starting with now? I thought we were starting with the government.

MR. WILLIAMS: We are.

THE COURT: Do you have a challenge for cause?

MR. WILLIAMS: No, Your Honor.

THE COURT: Does the defense have a challenge for cause?

MR. BERRIGAN: We do, Your Honor. This is a juror whose views -- I'd have to say it was fair he was inconsistent at the very best, and even he admitted at the end of the day

Page 122

that he wouldn't realistically consider life imprisonment. And then when you asked him the question, despite the answers in the questionnaire, he claimed he was leaning life, and I just -- I think this is a man given his prior jury service he wants to do the right thing, but his attitudes and beliefs are such that this just isn't the case he can participate in.

THE COURT: Mr. Williams.

MR. WILLIAMS: I'm struggling with this juror. You know, we have these answers on the questionnaires, and, frankly, I think it's easy to read too much into them either way, but repeatedly in the questionnaire he also says life or -- death penalty or life in prison, question 73. When asked, Do you have views on the proper punishment, he says death or life in prison.

1472

When you get to question 87 on the factors back there, to the first two factors he says death penalty or life. And then on the rest of them he says death penalty.

So I recognize when he was given kind of a leading question at the end he was willing to say, Yeah, no, I'd only consider the death penalty. But when given open-ended questions and saying where are you at, his responses are very different than that. So I'm not so sure that he isn't life qualified.

THE COURT: What do you have to say to that, Mr. Berrigan?

MR. BERRIGAN: Well, I find it ironic that Mr. Williams thinks the questions he asks are open ended after there's a five-minute discussion about how that answer should be fair and impartial. But that aside, Your Honor --

THE COURT: Well, let's put it this way. I'm not going to accuse either one of you of asking open-ended

Page 123

questions.

MR. BERRIGAN: Right. And that's getting sidetracked. The truth is that this man sat down two months ago and laid out his true feelings about these issues, and we know what they are. He would not consider life imprisonment realistically even for an intentional, premeditated murder, and he fessed up when he was confronted with it, and I had to do that.

But then even when you asked him -- I think if he had given an honest response at least at that point, I think we

1473

could put more credibility in his responses generally. But he was afraid to tell you that he favored the death penalty, and that's the way he is. I mean, he's a person that's been a juror. He knows what the role is. Don't make an opinion until you've heard everything. That's unfortunate because that's colored his ability to give a full disclosure in this process.

In my humble opinion I do think he is substantially impaired in terms of being able to consider life as a potential punishment.

THE COURT: I could easily find otherwise. Would you agree with that based on the answers?

MR. BERRIGAN: I'd be hard pressed, Your Honor.

THE COURT: Really?

MR. BERRIGAN: Yes, sir. I mean, if you just looked at this on paper, I think you're right. Some appellate court reading a transcript and not seeing him answer, you're probably right because he gave responses to some of Mr. Williams' questions that they're going to say, hey, look --

THE COURT: That was enough.

MR. BERRIGAN: They weren't sitting here, and you

Page 124

were, and you saw him.

THE COURT: Right.

MR. BERRIGAN: So I trust your judgment on this.

THE COURT: Well, I don't know about that, but precisely because I did see it, I'm going to sustain your

1474

challenge for cause. It's a close call. It's a close call, but I'm just not willing to -- the close calls we're going to remove people because we've got a lot invested in the process. I was perplexed by a lot of his answers. I don't pretend to understand the inconsistency, but I'm not willing to take a chance. So we'll bring Juror 169 in and let him know.

(Prospective Juror 169 entered the courtroom.)

THE COURT: On behalf of the lawyers and parties, I wanted to thank you very much for participating in jury selection. But we're going to release you from jury service. And you're free to go.

And I hope you'll do us a favor, because northwest Iowa's pretty small, not say anything about this jury selection to anybody else until we get a jury empanelled probably at least a week or two from now because you might say something to somebody, and that somebody might say something to somebody else, and that somebody else might be in one of these chairs later this week or next week. So thank you very much for today.

PROSPECTIVE JUROR 169: Yes, sir.

THE COURT: And thank you very, very much for your prior jury service. It's really terrific. I don't know why some people never get called and others get called three times, but we appreciate it very much.

PROSPECTIVE JUROR 169: I am dismissed?
Page 125

THE COURT: You are dismissed. Thank you.

1475

MR. WILLIAMS: Thank you.

(Prospective Juror 169 exited the courtroom.)

THE COURT: Okay. Please be seated. Would you like to take a 45- to 50-minute lunch break?

MR. WILLIAMS: Sure.

MR. BERRIGAN: That would be fine, sir.

THE COURT: Okay. Why don't we start back at 12:45, and, Rick, could you just let the next juror know that we're going to start in again at 12:45; okay?

(Lunch recess at 11:52 a.m.)

THE COURT: Ready for Juror 49?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay.

(Prospective Juror 49 entered the courtroom.)

THE COURT: Juror 49, if you'd just pick any chair in that front row and be seated.

Everybody else can be seated, and we're going to start first with questions from Mr. Berrigan. Each side has about 12 minutes to question you.

So Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q. Your chance to be in the hot seat.

A. Yeah.

Q. It's not so bad.

1476

Page 126

A.    All right.

Q.    We're really trying to explore with you your views in two different areas.  And just like the judge told you earlier, we just want to know kind of how you feel about these things, no right or wrong answers; okay?

A.    Okay.

Q.    One is publicity, and this looks like it might be a short discussion.  And by that I mean, you know, what exposure you've had to the media in terms of newspapers or television, radio accounts of the case.  And you had indicated in your questionnaire -- and by the way, thank you for doing that.

A.    Yeah, okay.

Q.    -- that you were not at all familiar with the case.  I don't know anything about it till I got this in the mail.

A.    Yeah.

Q.    Okay.  Hadn't talked about it to anybody, hadn't heard anybody talking about it, et cetera; right?

A.    Yeah.

Q.    Has that changed since?

A.    Yeah, it has.  I've heard from other people about what they've heard about it.

Q.    Okay.  Tell us a little bit about that if you would, sir.

A.    They were just telling me about that it happened in Mason City and pretty much the same stuff I already knew, but they were just telling me about it.

1477

Q.    You mean knew from this questionnaire?

A.    Yeah, they told me the same thing that was read in that.

Q.    Okay.  Are these people friends of yours, acquaintances?

A.    They're friends.

Page 127

Q.    And what was the source of their information if you know?

A.    Newspaper probably, news.

Q.    All right.  Did you form any opinions about the case as a result of these discussions?

A.    Not really.  I just said I didn't really know.

Q.    I think this is probably obvious to you, sir, but, you know, it's really important that the jurors who sit on the case would decide the case solely from what they hear in the courtroom and not discussions from outside or newspaper, radio, or television accounts.  Would you agree that's fair?

A.    Yeah, that's fair.

Q.    Is that something you could do?

A.    Yeah.

Q.    And completely and utterly disregard what anybody might have said to you in passing about this case.

A.    (Nodded head.)

Q.    Okay.  Let me ask you a little bit about the death penalty and life in prison without parole.  You probably have sort of gleaned by now that if we get to that third stage, the penalty stage, those are the two punishments that would be available to the jurors if -- and that's a big if -- if we got to that point;

1478

right?

A.    Okay.

Q.    In your questionnaire you discuss both of these things, that you think the death penalty's used an appropriate amount. People are put to death for their actions.  You checked yes for an eye for an eye.  In some circumstances you thought it was necessary.  Are we talking about the death penalty?

A.    Yeah.

Page 128

Q.   You think it's necessary in some circumstances?

A.   In some circumstances, yeah.

Q.   You did express this view which is something I want to ask you about that if people are given the death penalty they should be in jail for 20 or 30 years before they are put to death.  And I'm not sure if you were critical of that or you were encouraging that.  Is that a good thing or a bad thing?

A.   A bad thing.

Q.   Okay.  You know, one of the problems I suppose with our criminal justice system is we don't have any control over those things.  You understand that?

A.   Yeah.

Q.   The lawyers, not even Judge Bennett can control when a case, you know, is finally disposed of.  But we need to be sure that that's not a problem for you that, you know, we don't have any control over these things.

A.   Okay.

1479

Q.   Are you okay with that?

A.   Yeah, I am.

Q.   Are you a person that could consider the death penalty in an appropriate case?

A.   I don't know.  I have no experience, so it's hard to answer.

Q.   Well, you know, to some extent we rely a little bit on these questionnaires, not wholly by any stretch.

A.   Yeah.

Q.   And I noticed on question 87 there was a factor you were presented with.  Please review each of the situations listed below, and after each situation describe what effect, if any,

Page 129

each have on your thoughts and opinions about an appropriate punishment for a person guilty of intentional murder. And the very first one was the guilty person killed more than one person at the same time, and you put down life or death penalty.

A. Okay.

Q. Does that sound right?

A. Yeah, yeah.

Q. Is that a situation in which you would be able to consider the death penalty as a punishment?

A. Yeah.

Q. More than one person were killed?

A. Yeah.

Q. I'm not sure if this is clear to you, but this case is one

1480

in which the government has alleged that there were five people intentionally killed.

A. Okay.

Q. Okay? Five. They've furthermore alleged that these murders were committed after substantial planning and premeditation.

A. Oh, really?

Q. That's right. That's what they're alleging.

A. Yeah.

Q. And they're also alleging that of these five victims one was a mother and two of her children, ten- and six-year-old girls; okay?

A. Yep.

Q. And I gotta ask you to kind of fast forward yourself to this situation, and that's artificial because you haven't heard the evidence. But if you were on a jury that heard that kind of

Page 130

evidence and found it beyond a reasonable doubt that that were true, five people intentionally killed, premeditated, substantial planning, children, is that the kind of case in which you could consider the death penalty as a punishment?

A. Yeah, yeah, it would be.

Q. Could you consider life without parole in that circumstance?

A. Yeah.

Q. I want to ask you just a couple of questions regarding the

1481

government's burden. You know, they only have to prove their case beyond a reasonable doubt.

A. Okay.

Q. This decision about life or death, you can be as sure as you want about that. You can be a hundred percent sure when you're deciding between those two options. But that doesn't mean you can force the government to prove guilt beyond -- beyond a reasonable doubt. You can't give them a higher burden. Some people say, Oh, they gotta prove it beyond all doubt, hundred percent. That's not what the law says regarding their burden; okay?

A. Okay.

Q. Would you give them a higher burden than the law requires? Am I confusing you there?

A. Yeah.

Q. You know, they have to prove Miss Johnson guilty beyond a reasonable doubt if they can just as if she were charged with a traffic ticket to be quite honest. That's the burden. And I'm not equating those two, but that's the level of proof required.

A. Okay.

Page 131

Q. The fact that it's a much more serious charge, certainly you can take that into account in terms of what you feel beyond a reasonable doubt is. But beyond a reasonable doubt is the standard; okay?

A. (Nodded head.)

1482

Q. Is that a fair standard?

A. Yeah.

Q. Okay. And would you make them prove more than what the law says, more than beyond a reasonable doubt, in order for you to be able to consider both punishments?

A. Yeah.

Q. You would?

A. Yeah.

Q. What would you require?

A. I don't know. Just -- what would it -- what would it have to be for it?

Q. Well, they would have to prove, the government, in order --

A. Yeah, yeah, yeah.

Q. Yeah. In order to get to a situation where we're even talking about penalty, they'd have to prove there were five intentional murders, and they'd have to prove that beyond a reasonable doubt.

A. Okay.

Q. They'd have to prove at least one or more what we call aggravating circumstances which are things like premeditation. They'd have to prove that beyond a reasonable doubt.

A. Okay.

Q. They might choose to prove that there are vulnerable victims, and that's up to the jury to decide whether a ten- and

Page 132

six-year-old child are vulnerable victims.  But that decision

1483


has to be proven beyond a reasonable doubt.  Okay?

A.    Okay.

Q.    And if the government did that, then the jurors have to take that evidence, and they'd have to weigh it in making their decision about death or life imprisonment.  You with me so far?

A.    Yep.

Q.    On the other part of that scale -- here's the aggravating circumstances -- are stuff that the defendant might present to you, mitigating circumstances or reasons to vote for life.  And think of it just like a scale.  One side is over here, one side over here.  On the defendant's side, they might present evidence that, you know, Angela Johnson did not have any substantial criminal history; okay?  They might present evidence that she had an abused background, that she was sexually or physically abused or neglected or psychologically traumatized as a child.  Are those things that you'd be willing to consider?

A.    Yeah.

Q.    And when you consider these things and you weigh them, it's really whichever has more weight to you; okay?

A.    Yeah.

Q.    It's not a numbers game.  It doesn't matter if there's three over here or two over here.  It's how you weigh them; all right?

A.    Yeah.

Q.    And all I was saying earlier about the burden of proof on

1484


the government, in order for you to be able to weigh their
Page 133

factors on the scale, they only have to prove it beyond a reasonable doubt. Does that make sense?

A. Yeah.

Q. Is that fair?

A. Yeah.

Q. Are you going to make them prove it a hundred percent in order to weigh their stuff?

A. What would she be?

Q. Yeah. I guess what's confusing is when I say a hundred percent, you might think that is beyond a reasonable doubt. Maybe that is for you. But beyond all doubt is not what they're required. They have to just -- in order for you to weigh this stuff, they only have to show you beyond a reasonable doubt this is true; okay? You with me?

A. Yeah.

Q. Is that okay for you?

A. Yeah.

Q. Let's say -- and it's a big if. But let's just say you did that. You were at the end of the case. You heard all this evidence, and you were weighing these aggravating and mitigating circumstances, and you in your own mind came to a decision I think this is a case where the aggravating circumstances are heavier for me, and that would be towards the death penalty; okay? And let's just say all the other jurors did their own

1485

weighing because you do it by yourself, and they all did the weighing, and they said the same thing. We think it's the death penalty. You with me?

A. Yeah.

Q. In order for the jury to inform the Court that that was the

Page 134

decision, that the jury had all decided death penalty, they'd have to sign a verdict form that indicated with their name that that was the verdict, death. All 12 would have to agree; okay?

A. Okay.

Q. If even one person said, Not for me, I don't agree, that's okay. That's a life sentence; all right?

A. Yeah.

Q. You following me?

A. Yeah.

Q. It's only if all 12 agree the aggravating circumstances outweigh the mitigating circumstances I agree for death. Is that a process you could follow?

A. Yep.

Q. If -- and I know it's a big if again. But if you came to a determination in your heart and conscience, look, Mr. Berrigan, I think the aggravating circumstances outweigh the mitigating circumstances, if you were ever in that position, would you be able to sign a form that said death penalty?

A. Yeah, I'd be able to.

Q. Okay. Along with your other jurors?

1486

A. Yeah, yeah.

THE COURT: Actually your time's up, but I failed to give you the two-minute warning, so you can have two additional minutes if you need it.

MR. BERRIGAN: I'll make it shorter than that, sir.

THE COURT: Okay. Thank you.

BY MR. BERRIGAN:

Q. The whole idea, Mr. 49 -- and I know this is silly with the numbers -- is that you be able to consider both punishments;

Page 135

okay?

A.    Yeah.

Q.    You can lean any way you want, but you have to be able to consider both in order to be a juror.

A.    Yeah.

Q.    Sort of sounds like you can do that.  Is that true?

A.    Yeah, I can do.

Q.    Okay.  You could consider both.

A.    Yeah.

        MR. BERRIGAN:  All right.  Thank you, sir.

        THE COURT:  Thank you.

        Mr. Williams?

                        EXAMINATION

BY MR. WILLIAMS:

Q.    Good afternoon, sir.  How you doing?

A.    Not bad.

1487

Q.    Good.  I'm just going to follow up on some of these questions Mr. Berrigan asked you.  Going back to your questionnaire, at one point on question 73 you were asked, knowing nothing about this case other than what few facts were told to you in this questionnaire, Do you have an opinion about the appropriate punishment for Angela Johnson, and you checked the box yes, and you wrote the word "life" down there.  You meant a life sentence at that point, sir?

A.    Yeah.

Q.    And when asked questions about life in prison, you said, I think life in prison would be much harder on some -- someone than the death penalty is in response to question 82.  Does that sound familiar?

Page 136

A.    Yeah.

Q.    And when asked why, you said, Because prison would be scary, and being there for the rest of your life would really make you think about it.  You said that you thought life in prison would be a sufficiently severe penalty for somebody convicted of premeditated, first-degree murder.  Does that all sound familiar to you?

A.    Yeah.

Q.    Okay.  And then on question 87, it gave you a number of situations and asked you to look at those different situations and kind of give your thought about what you thought about the punishment in light of some different circumstances, and the

1488

first one was a guilty person killed more than one person at the same time.  You wrote life or the death penalty.  And then there's a number of other factors, and after each of those except the last one -- and I'll talk about that in a minute -- you said life including the person participated in the killing of children.  And your response to that was that life in prison was an appropriate punishment.  Is that correct?

A.    Yeah.

Q.    Okay.  On the last one it said the guilty person assisted or encouraged the murders but was not the person who pulled the trigger, and in that you said not life but life with parole.

A.    Okay.

Q.    Okay?  Does that all sound right to you?

A.    Yeah.

Q.    Okay.  I want you to assume in this case that the evidence is that the defendant in this case didn't pull the trigger.

A.    Okay.

Page 137

Q. She assisted another person in committing these murders and that five people were killed including a couple children in this case. Now, you say that, you know, death penalty is something you would consider. In some cases, you know, when somebody says, you know, I'd consider that, well, frankly, I'd consider becoming a stenographer at some point but not really. I mean, I'd consider it. I'd think about it, it, but there's no way I'd try to do her tough job when it really came down to it. You

1489

know, if I said consider, I probably didn't really mean that; okay?

And here's my concern given your questions in the questionnaire. I've got a very good friend that works with me who says, Yeah, I believe in the death penalty. I think it's appropriate. But when it comes down to it, he knows because of his own personal value system that when it comes down to it he knows darn well while he could, you know, in theory consider the death penalty, he knows there's no way he could ever impose the death penalty on somebody else. And particularly when in light of Mr. Berrigan's -- in one of his last questions he said to you, Could you sign the verdict form? And I want you to realize that if you sign a verdict form imposing the death penalty the judge has no say on it at that point. The effect of doing that would be to actually cause this defendant's execution.

A. Yeah.

Q. Okay? Now, we have some people come through here, and, you know, they recognize their duty is not just to tell us what we think -- you think we want to hear but really what's in your heart and what you feel you can and cannot do. And we are just inviting you to be frank about that as well.

Page 138

A.    Yeah.

Q.    What are your thoughts about that?

A.    Well, I don't know if they -- if they can kill little kids and, you know, a mom and whatever, then if it comes to that,

1490

then yeah, I think I'd be able to.

Q.    The -- you're a young man, 20 years old; right?

A.    Yeah.

Q.    You know, one thing that's kind of beneficial is as life goes on you gain some experience, you gain some background and so forth, and that equips us in life to deal with some tougher issues that, frankly, the younger we are the harder it is to deal with some of those issues.  Do you feel comfortable handling some issue of that magnitude?

A.    Yeah.  I mean, I can -- if I have to, I can.

Q.    Let me touch on that for a minute because I want to make sure you understand something.  You'll never have to; okay?

A.    Okay.

Q.    The judge will instruct you that no matter what the factors are, how you weigh things, you will never have to impose the death penalty.

A.    Yeah.

Q.    You understand that?

A.    Yeah, I understand that, but I'm just saying if it -- you know, with everything, I might.

Q.    You think if you got to the point where you made your own judgment that the death penalty was called for, you think you'd feel comfortable actually signing a verdict form causing somebody else's death?

A.    I'm not ready for it but . . .

Page 139

Q.    But in the appropriate case, do you think you could do it?

A.    Yeah.

Q.    Did you play football in school at all?

A.    No.

Q.    You've watched football games, though?

A.    Yeah, I've watched football games.

Q.    I want you to picture for me a football field; all right? 50-yard line is somebody who comes into the courtroom and really doesn't have an opinion one way or the other. We tell you these facts, you know, murder of five people including a couple kids. The person who is on trial was not the person who pulled the trigger. Given those facts, a person at the 50-yard line really has no opinion one way -- isn't leaning toward life imprisonment, isn't leaning toward death penalty. Right now given no more facts than that they're just kind of in the middle there.

A.    Yeah.

Q.    Other people coming in because of just those facts alone already know that they're at one end of the field or the other. You know, they're at life in prison or they're at the death penalty. Where would you place yourself on that football field?

A.    Probably life.

Q.    Okay. And all the way in the end zone of life?

A.    Yeah.

Q.    So given that, that you put yourself in the end zone of

life imprisonment, given these facts, when you're asked the

question could you consider the death penalty, what we're meaning is could you realistically consider the death penalty? Given these facts, could you realistically consider the death penalty as a possible punishment, or are you so far into the end zone of life imprisonment that you really couldn't realistically consider the death penalty as a possible punishment?

A.   It'd have to be with the -- what do you call it?  I don't know.  All the facts and everything.

Q.   Okay.

A.   Yeah, I'd lean more towards the life than . . .

Q.   Sure, and that's fair.  I mean, it's fine.  No one's judging your opinion on anything at this point.  So wherever you're at on the football field is perfectly fine.  We're just trying to get a feel where you are so we can make the decision whether you're the right juror for this case or not.  My question is are you so far into the life imprisonment end zone that is it going to interfere with your ability really to consider the death penalty as a possible punishment?

A.   I don't know.

Q.   Just not sure?

A.   Not sure.

Q.   You yourself placed yourself pretty strongly leaning into the life imprisonment camp.

A.   Yeah, yeah.

1493

Q.   To where you put yourself in the end zone of life in prison on that football field?

A.   (Nodded head.)

MR. WILLIAMS:  Okay.  Thank you very much.

Don't have any other questions, Your Honor.

Page 141

THE COURT: Juror 49, what do you think about your ability to fairly consider both a death sentence and a life sentence in this case?

PROSPECTIVE JUROR 49: What was that? What was the first --

THE COURT: Well, what do you think about your ability to fairly consider both a life sentence and a death sentence?

PROSPECTIVE JUROR 49: I don't know. They're both horrible, but I don't know. I'd say life would be more hard on somebody than the death penalty right away.

THE COURT: Okay. But in this particular case just based on what you've heard so far from me and from the lawyers, do you think you could fairly consider both penalties in this case, a life sentence and a death sentence?

PROSPECTIVE JUROR 49: Yeah, I can consider both of them, yeah.

THE COURT: Would you consider that you're leaning one way or the other? It's okay --

PROSPECTIVE JUROR 49: Yeah, I'd be leaning towards life more than death penalty.

1494

THE COURT: Okay. And if it ever got to a penalty phase in this case, the government would have an opportunity to put on evidence of what's called aggravating factors. Do you think you'd be able to fairly consider the government's evidence of aggravating factors when you go to weigh those factors in the decision about life or death?

And on the other hand, the defense has no obligation to but if they wanted to, they could put on evidence of mitigating factors. Do you think you'd be able to fairly weigh

Page 142

those mitigating factors?

PROSPECTIVE JUROR 49: Yeah.

THE COURT: And on this football analogy, you know, with somebody who was so undecided they weren't leaning any way on a penalty, they could go either way, they'd probably be on the 50-yard line. Would you agree with that?

PROSPECTIVE JUROR 49: Yeah.

THE COURT: Yeah. And I just want to make sure I understand where you put yourself.

PROSPECTIVE JUROR 49: Twenty-five.

THE COURT: And would it be towards the goal line of life; right?

PROSPECTIVE JUROR 49: (Nodded head.)

THE COURT: Rather than the goal line of death.

PROSPECTIVE JUROR 49: Yeah.

THE COURT: Okay. Okay. Thank you very much for

1495

answering our questions. If you'd just step outside, I'm going to discuss it with the lawyers, and then we'll let you know.

(Prospective Juror 49 exited the courtroom.)

THE COURT: Challenge for cause by the government?

MR. WILLIAMS: Your Honor, we would move for cause on this juror. While he was able to articulate the right words from time to time, he also -- a combination of both his questionnaire answers and also what he said in court here today, I think his views in favor of life imprisonment are so strong that they'd substantially impair his ability to fairly consider the death penalty. He's not an absoluter. He's not a "no way would I ever consider the death penalty," but it's pretty clear from his answers that the death penalty is something that's a

Page 143

theoretical possibility for him, but there's no real question in his mind that given the choice he's going to pick life imprisonment. So we'd move for cause.

THE COURT: What about his response to when I asked him about the football analogy on the 25-yard line? If that was the only question -- I'm just curious about a couple things. What's your take on his response? And secondly, if that would be the only question we would ask jurors, at what point in the football analogy is a juror substantially impaired?

MR. WILLIAMS: The -- what do I think about his answer to your question first? Obviously it was more neutral than the answer to the same question I got which put him in the end zone.

1496

Where on the football field, I don't know. I think that's a hard -- I don't think there's a litmus test that the 5-yard line you're okay and below the 5-yard line you're not, but I think it's a combination of factors.

THE COURT: But probably you're okay at the 25-yard line.

MR. WILLIAMS: Yeah, probably all other things being equal, probably at the 25-yard line you're okay. The problem is he just was very inconsistent with his answers on this.

THE COURT: Like many jurors.

MR. WILLIAMS: Yes.

THE COURT: Yeah, I appreciate that.

Mr. Berrigan?

MR. BERRIGAN: I beg to differ. I don't think he was inconsistent, Your Honor, and if you go back and check Mr. Williams' question, he gave that juror one fact, and that was this woman didn't pull the trigger. That's it. Where are

Page 144

you on the football field? That wasn't what you asked him. That's what he asked him. In his questionnaire he checked eye for an eye on the question about eye for an eye and said, People are put to death for their actions. He says, In some circumstances it's necessary.

This guy does not conceptual -- he leans certainly for life. He admits it. But he doesn't have a conceptual problem with the necessity of the death penalty, and there's nothing in

1497

his responses -- the only question arguably that they could advance was this football field analogy, and it was very, in my view, misleading because it only contained the one single fact. And even then they couldn't get him to repeat it. He admits he's leaning, but he's not all the way there. This is a fair juror under Witherspoon versus Witt. He can lean, but he repeatedly said repeatedly he'd consider both punishments.

THE COURT: Where in the football analogy is someone substantially impaired? Assuming I would put stock in the juror's answer, at what point in your football analogy does someone become substantially impaired?

MR. BERRIGAN: I think that would largely depend on the question.

THE COURT: Let's just suppose the question is the question I asked. In this case where are you?

MR. BERRIGAN: Right, and I think that's a fair version. I certainly don't think the 25-yard line -- that's only halfway to the end zone; right? I mean, the Chiefs are on the 25-yard line. There's no guarantee we got a field goal. He's at the 10-yard line; we got a problem. And I think if somebody said something like that, we were in single digits or

Page 145

the 10-yard line -- there was one I think at the 15 -- we're getting close, and it should be considered.

THE COURT:  Or maybe even in the red -- don't they call it the red zone?

1498

MR. BERRIGAN:  Red zone would be at the 20.

THE COURT:  He was 5 yards from the red zone.

MR. BERRIGAN:  He was still there, and in conjunction with his other responses, he wasn't a close call in our view.

THE COURT:  Okay.  Let's just review the bidding. Have you actually challenged him for cause?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  And you object.

MR. BERRIGAN:  We object.

THE COURT:  Your challenge for cause is denied.  Would you like to exercise one of your peremptory challenges?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Okay.  Peremptory challenge by the government on Juror 49.  Thank you.

(Prospective Juror 49 entered the courtroom.)

THE COURT:  Juror 49, we're going to go ahead and let you go.  Thank you very much for participating.

We'd just ask you one favor.  Because we still have a lot of other potential jurors to interview, we'd appreciate it if you wouldn't discuss this experience with anyone until we actually have a jury selected.  It will probably be a week or two from now.  And then you can talk to anybody you want all you want about it; okay?  Thank you very much.  Good luck to you.

(Prospective Juror 49 exited the courtroom.)

THE COURT:  Ready for 576?

Page 146

MR. WILLIAMS: Yes, Your Honor.

MR. BERRIGAN: Yes, sir.

(Prospective Juror 576 entered the courtroom.)

THE COURT: Anywhere you'd like in the front row there, sir. Please be seated. We're going to start with Mr. Williams from the government asking you questions. And each side has 12 minutes to question you, and I'm going to give them if I remember a 2-minute warning after 10 minutes.

So Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, sir. How you doing?

A. Good.

Q. We're going to talk to you about just a couple topics primarily, and that's publicity and then your views on possible punishments involved in this -- potentially involved in this case.

First of all, on the publicity issue, you indicated that you are not at all familiar and hadn't read anything about this case. Is that accurate, sir?

A. That's correct, yes.

Q. And since you got this questionnaire back in January probably, have you learned anything else about this case since then?

1500

A. No.

Q. You indicated that in response to a question you hadn't

Page 147

formulated any opinion about whether the defendant was guilty or not guilty. Is that still true?

A.    That's correct.

Q.    Still true today.

A.    Yes.

Q.    Very good. Let's talk about punishments here. If we get to the point where the jury's found the defendant guilty of one or more of the crimes with which she's charged and we get through the second phase, the gateway intermission as the judge described it, the jury is going to be in the unique position of determining the punishment in this case.

First of all, life in prison in the federal system means just that: Life in prison, no parole. You don't go see a parole board. You don't get off for good behavior. Life in prison is life in prison. Were you aware of that before you came in here today, sir?

A.    Yes.

Q.    Okay. Good enough. So what we're looking at is basically a process where the jury's going to determine between the two possible punishments, life in prison and the death penalty, which punishment they think is the most appropriate. Do you understand that would be your role if we got to that point in the jury?

1501

A.    Yes.

Q.    And the reason we rely on a jury to make this determination -- I mean, we could have a law that simply says you commit this crime and you commit the crime and that's all we need to know about, it's automatically this sentence or that sentence, and we don't need a jury to even consider anything.

Page 148

Instead we have a system where the jurors are asked to look beyond the crime itself, look at the circumstances of the crime, look at the -- maybe the role of the defendant, look at, in some cases, the background of the defendant, whether they have a criminal history or not, that kind of thing, and look at a number of factors to determine what the appropriate sentence should be between those two options. You understand that would be what your role would be?

A.   Yes.

Q.   Now, in your questionnaire you had indicated, you know, how do you think people ought to be punished, should they be punished based on the crime, the person, both, something else, and you said the crime. You said, Punishment should fit that premeditation in that case. Do you understand if called upon to be a juror in this case your responsibility would be to go beyond the crime, to look at other circumstances, to look at the defendant's background perhaps or what her role was in the case? Given your answer in here that you would look at the crime, could you look beyond the crime and look at these other factors?

1502

A.   Yes, certainly.

Q.   And when you answered the crime only in there, share with us what were your thoughts at the time.

A.   Well, I think when you talk about the death penalty, you know, and you throw that up, I think that's a very emotional issue. And I think I probably was thinking with emotion at that time without thinking it straight through.

Q.   Sure. And that's a common reaction. People can --

A.   It's a reaction, and then when you think about it a little bit, it's more -- it broadens your mind a little bit.

Page 149

Q.   Now, in this case if you're picked as a juror in this case and you're back there with the other jurors looking at these different factors, you know, again, the circumstances of the crime and so forth, the unique thing about this process is you as an individual juror can give whatever weight you want to to any factor that the judge instructs you on.

And so in this case children were murdered, and so you as a juror can give whatever weight you want to thinking that's, you know, an aggravating factor; I'm going to give it some weight or a lot of weight.  But that decision on how much weight to give to a factor is completely yours.

Same thing on the other side.  If there's a mitigating factor, say, that the defendant doesn't have a criminal history, you're entitled to give that some weight, no weight, a lot of weight, whatever you want to.

1503

MR. BERRIGAN:  I'm very sorry to interrupt, Your Honor.  I do not think that the juror can give a lack of criminal history no weight.  That's a statutory mitigating circumstance, and I object to that suggestion as a violation again of Penry I and Penry II.

THE COURT:  Well, they don't have to give it any weight.  There's no requirement that the juror give weight.  Anyway, your objection's overruled.

MR. BERRIGAN:  Okay.

BY MR. WILLIAMS:

Q.   What you are required to do, sir, is to consider those factors.  And when we mean consider them, we mean really look at them.  And so, for example, let's take the no criminal history.  You couldn't be a juror on this case and carry out your duties

Page 150

if the judge instructed you that a lack of criminal history was a mitigating factor and you said, Ah, I don't care; I'm not going to look at that; that doesn't mean squat to me.

What it does require you to do is actually look at it, consider it, think about it, carefully consider how that factors in in your decision and to weigh that with other factors.

Now, you may give it no weight or you give it a lot of weight, but how much weight you give to a factor is your decision as long as you're willing to consider any factors the Court instructs you could be mitigating factors or aggravating factors.

1504

MR. BERRIGAN: Again, I apologize to interrupt. May I have a continuing objection to this suggestion that you can give a mitigating circumstance no weight?

THE COURT: You know, why don't you step out for a moment. I have a matter I need to take up with the lawyers.

(Prospective Juror 576 exited the courtroom.)

THE COURT: What's your basis that you have to give a mitigating factor or an aggravating factor weight? Do they have to give an aggravating factor weight?

MR. BERRIGAN: They have to give any statutory aggravating and mitigating circumstances full consideration and full effect. And as we made the point the other day --

THE COURT: Well, you can have a standing objection as to what you think full effect means. I'm not going to instruct them that they have to give them any weight. The weight for any aggravating or mitigating factor is for the individual juror to decide, including no weight. You're confusing, I think, consideration with weight. They have to consider it, but they

don't have to give it any weight.

MR. BERRIGAN: Up until this point, this issue's not arisen because the prosecutor's never suggested to a juror that they can give no weight to a statutory mitigating circumstance.

THE COURT: Now they have.

MR. BERRIGAN: I believe that's happened twice.

THE COURT: I believe they have. I believe that's

1505

come up fairly often since we started jury selection, about Mr. Miller or Mr. Williams saying they have to consider it but they don't have to give it any particular weight or any weight. And I'm just looking at what I said in my Honken instructions which I know you're not a big fan of, but I'm probably going to give the identical instructions in this case subject to any particular modifications. Says, Any juror who find the existence of a mitigating factor must consider it in this case. But then when it gets to the weighting, each of you must weigh any mitigating factor or factors that you've found to exist. Each of you . . .

Well, it doesn't really come out and say you can't give it any weight, but it says each of you must consider the weight. But a juror's free not to -- do you think I have to instruct the jury that they must give each factor they find some weight?

MR. BERRIGAN: No, but I don't think you can suggest to them as the prosecutor's doing that they can give it no weight.

THE COURT: Well, they can if they want to.

MR. BERRIGAN: Well, I respectfully disagree.

THE COURT: What's your authority for the fact that a

Page 152

juror has to give every factor they find some weight?

MR. BERRIGAN: The decision by the United States Supreme Court in 2001 wherein Justice O'Connor said --

1506

THE COURT: Yeah, I disagree with your interpretation of the decision. And no offense, the last time you quoted a Supreme Court decision to me, you were dead wrong.

MR. BERRIGAN: I'm just trying to make a record for the appellate record.

THE COURT: You make whatever record you want, you know, but if you want me to have a lot of faith in your decisions, you ought to be more careful citing them to me because the one you cited to me last week you were 180 degrees off base. It held exactly the opposite of what you told me it held, and I gave you a copy of that opinion.

MR. BERRIGAN: I'm not asking to revisit that, but if I might respond to your question, Your Honor, in terms of what I'm relying on.

THE COURT: Yes, you may.

MR. BERRIGAN: It is the opinion of Justice O'Connor for the majority in Penry verses Johnson which is a 2001 United States Supreme Court decision wherein Justice O'Connor stated that it's an obligation of -- in my view an obligation of the jurors to give full consideration and full effect, e-f-f-e-c-t.

THE COURT: We were through this argument yesterday.

MR. BERRIGAN: I'm just trying to make a record, sir. That's all. I'm not arguing with the Court. Please don't misunderstand.

THE COURT: Yeah, I'm sorry. I just disagree with

1507

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1313 of 3245

your spin on that case.

MR. BERRIGAN:  I respect that.  I just asked for a continuing objection.  That's all.

THE COURT:  You can have a continuing objection if you want.

MR. BERRIGAN:  Thank you, sir.

THE COURT:  Sure.  Okay.  We ready to have the juror brought in?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Okay.

(Prospective Juror 576 entered the courtroom.)

THE COURT:  Sorry for the delay, but that happens every once in a while.  So, Potential Juror 576, please be seated.  And Mr. Williams will continue his questioning.  Thank you.

BY MR. WILLIAMS:

Q.   Let me try to go back where we were.  You recall I was telling you what we're looking for is somebody who can look at and consider all these different factors and give whatever weight you want to or no weight at all or a ton of weight, whatever you want to, but that's your call.  You understand that's what we're looking for in this case.

A.   Yes.

Q.   Okay.  Some people can do that, and some people can't. Some people know coming in that, you know, that factor or

1508

there's a certain factor out there I'm just not going to give any consideration to.  I'm not even going to look at it.  Do you

Page 154

think you fall in that camp at all?

A.    No.

Q.    Okay.  I want you to assume that you're with this jury now and you have all determined beyond a reasonable doubt that the defendant in this case was engaged in the intentional, premeditated murder of five people including a young mother and her two little girls ages six and ten; that they did this after substantial planning and premeditation.

Now, in this case I want you to assume that the defendant's role was not the one to actually pull the trigger but rather as somebody who was assisting and encouraging maybe the murders; okay?  Given those facts, are you able to realistically consider both the possibility of the death penalty and realistically consider that life in prison still might be the most appropriate punishment?

A.    At that point I think -- well, I know the way I feel right now.

Q.    Sure.

A.    That before -- I need more instruction as to the death penalty and life in prison before I could make that decision I think.

Q.    And that's fair.  And you're going to get those instructions from the judge ultimately down the road.  But in

1509

essence what he's going to do is tell you that it's up to you to weigh these various factors.  I mean, on one side you might have a defendant with no criminal history; maybe a background that she was abused or something as a child; the role she played in this murder was such that she didn't pull the trigger.  And on the other side you've got, you know, a young mother who was

Page 155

murdered, two little girls who were murdered.

And so you got competing factors, and that's why we trust a jury of peers to weigh those because, you know, none of them are going to be pointing all in one direction saying this is the absolute outcome of the case. Rather it's something we trust, you know, human beings to struggle with to weigh those things and come to their own conclusion.

Some people know they can't do that. Some people know coming in, you know, I've already made up my mind or that I know, jeez, you're talking about the death of children; I'm sorry; I don't care what other factors are to decide. It's going to be death penalty.

Other people come in and say, Oh, she didn't pull the trigger. Well, if she didn't pull the trigger, then I don't care what other factor's involved, if you kill 10, 20, 30 people or it doesn't matter to me. If she didn't pull the trigger, the death penalty's not an option for me.

And we respect anybody's views. Wherever they come from is fine. We're just trying to get an idea where you're at

1510

on this spectrum so we can make some judgment calls ourself on whether you're a good juror for this trial or not.

A.    Okay. If I understand what you're saying is we're already past phase 1. She has been found guilty.

Q.    Right.

A.    She wasn't actually the person that committed the murder.

Q.    Yep. Assume that.

A.    I still don't think that's enough for me to say how I could judge on that as far as the death penalty.

Q.    And nobody -- and please -- and if I misled you, I

Page 156

apologize.  No one's asking you how you're going to vote at all. No one's asking you to predict your vote.  What I'm asking you is given those facts are you still open to either possible punishment at that point?

A.    Yes.

Q.    Okay.  So even though, you know, in this case assume that the defendant was involved in killing five people including two little girls, you're still open to the possibility that life imprisonment's the appropriate punishment?

A.    Without knowing more information, yes.

Q.    Okay.  And you're open to the possibility that the death penalty is an appropriate punishment.

A.    With that information, yes.

Q.    And you just haven't made up your mind and you're not going to until you hear more evidence.

1511

A.    No.

Q.    And that's fine.  What we're looking for is just people like that that are going to keep an open mind and realistically consider both options.  No matter what the facts are, they know at this point they're ready to listen and weigh everything themselves.  And you're willing to do that.

A.    Yes.

Q.    Now, if we get to the point in this case where you and the rest of the jurors have all decided that the death penalty is appropriate -- you've done the weighing process.  You've talked among yourselves.  Individually you've done the weighing, and you've come to your conclusion the death penalty is appropriate, and all 12 of the other jurors agree with you.  At that point to reflect that verdict you're going to have to sign a verdict

Page 157

form, each and every one of you, indicating the death penalty was what you guys chose.

Now, again, I'm not asking you to predict or suggest that that's what you voted, but can you see yourself if you got to that point being able to sign the verdict form that would actually cause the death of another person?

A.   At that point yes.  And I say that because obviously 12 people gave it all the consideration, and yes at that point.

Q.   And here's kind of the unique thing about the way this process is going to work.  A single juror, if a single juror of those 12 decides life in prison for me is how this weighs out,

1512

doesn't matter what the rest of the 11 thought.  If everybody else says death penalty but one juror says life in prison, that's the verdict.  It's life in prison at that point because the death penalty only gets imposed if all 12 of you agree to the same punishment.  Do you understand that?

A.   Yes.

Q.   And if you got to that point, you think you have broad-enough shoulders to sign a verdict form that would cause the execution of another person if you got to that point and thought that was the appropriate punishment.

A.   Yes.

Q.   And likewise, would you give careful and full consideration -- before you ever imposed or came to the conclusion the death penalty was appropriate, would you give full and fair consideration that life in prison might be an option before you reach the conclusion to impose the death penalty?

A.   I'm not sure.

Page 158

Q.  Yeah, let me rephrase that.  You're back there.  You're doing this weighing process; right?  You're trying to figure out.  Before you got to the point of saying death penalty on this, would you give full and fair consideration to life in prison as an option short of the death penalty before you reached the conclusion to impose the death penalty?

A.  Yes, I believe that would be your duty.

1513

MR. WILLIAMS:  I believe that's all I have, Your Honor.  Thank you.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  May it please the Court.

EXAMINATION

BY MR. BERRIGAN:

Q.  How are you, sir?

A.  Okay.

Q.  Anybody ever called you Number 576 before today?

A.  Never.

Q.  I got to respectfully disagree with something that the prosecutor told you in terms of looking -- that we are at this point looking for people to keep an open mind and weigh both punishments.  That's not what I'm looking for.  We are interviewing for jurors, and what we're -- we're not asking people we've already selected to do things.  We're trying to figure out who should be here; okay?  You with me?

A.  Uh-huh.

Q.  And when the judge was talking this morning about your obligations to your country and your duty to serve, do you recall the discussion he had very almost immediately after was that you also have an obligation not to serve and there are some

Page 159

cases in which we would not be the best jurors that we'd like to be in an ideal situation; okay? Did you hear that discussion?

A. Yes.

1514

Q. That's one of the reasons we're asking people about publicity, for example, because plenty of folks have come in here and said, Hey, look, I saw stuff about this in the paper. I get the Des Moines Register, the Sioux City Journal. I watch TV. I'm not living under a rock, and I was following this thing, and I have an opinion about the case, and this is what I think, which is perfectly acceptable. We do that kind of thing. But we had to know that in order to make a decision about whether that person should be a juror. You with me?

A. (Nodded head.)

Q. So when we're talking about this issue about the death penalty, to be quite honest, if you told me, Oh, I'm going to wait until the end and then make a decision, that's not particularly helpful, okay, because that doesn't tell me anything about how you feel about the death penalty. You following me?

A. Uh-huh.

Q. And you're a pretty bright guy. I can tell not only from the way you've talked but your questionnaire. You used to coach wrestling, and I suspect you have some views about the death penalty in terms of when it's appropriate or not appropriate and that you had those views before you walked into the courthouse today. Am I right?

A. Yes.

Q. Okay. You certainly mention that in your questionnaire.

1515

Page 160

It looks like you took some time and filled that out carefully. And some of the responses in there I'd like to ask you a little bit about. And one was already alluded to by the prosecutor. It was a question number 61. It talks about the concept of what do we look at when we're punishing somebody for a crime. The actual wording of the question is, In your opinion, should the punishment for a crime be based on, and then there were several options. One was the person. One was the crime. One was both, or one was something else all together. And then it asks you to explain based on your response, and you checked the crime. And you wrote, To me premeditated means that the individual that is being accused of the crime planned and schemed to carry out the crime. Thus the punishment should fit that premeditation. Does that sound right?

A. That's what I wrote, yeah.

Q. And I presume you don't get these questionnaires in the mail every day. You signed it. You said you'd answered truthfully and completely all the questions, and I'm sure you meant that. There wasn't any prosecutor there or some defense attorney or even a judge looking over your shoulder to see if you wrote down the right answers; right?

A. Right.

Q. Is that how you feel?

A. Yeah, I think so.

Q. Okay. This idea about if they planned, schemed to carry

1516

out the crime and thus the punishment should fit that premeditation, I don't want to read too much into that, but when I read it, what I thought was that's the death penalty. That's

Page 161

what he's talking about, not life in prison. But let me just ask you that. What were you talking about when you wrote that, fit that premeditation?

A. That's a good question. I guess what I was thinking at the time was the punishment should fit the severity of the crime.

Q. Okay. And does that mean anything to us in terms of punishment?

A. I believe in that questionnaire also I said something about life imprisonment also being similar to the death penalty.

Q. You did. Yeah, you did talk about -- a little bit about life imprisonment. Here's what I recollect. Well, let me just read it to you. It was question 82. The question is, What are your thoughts and opinions about life in prison as a punishment for a person who's guilty of intentional murder? And you said, I believe life in prison is a death penalty. Prison is by nature supposed to be terrible. If a person is sentenced to never being able to get out of prison, then we are trying to rehabilitate them to return to society, so I guess I don't understand what good it does to keep them in prison for their life. Do you remember that?

A. Yes.

Q. Is that accurate?

1517

A. Yes.

Q. And you were asked, Why do you feel this way, or what are some of the reasons for your beliefs about life in prison without the possibility of parole or release? And you said, Like I said, I really can only imagine that prison life is terrible. I don't understand that if they will never be released why it's necessary to imprison them forever; right?

Page 162

A.   That's what I said.

Q.   Again, nobody's here to be critical of your views.  We have had a wide spectrum of opinions, and they're opinions.  We're entitled to our opinions.  This is a free country; right?  We believe that truly in our hearts that everybody has a right to their own view and opinion.  We just need to know what it is.

That suggests to me that you have some question in your mind about why would we have such a sentence as this.  I mean, it doesn't seem to make sense.  If we're putting somebody in prison and the idea is to rehabilitate them but they're not going to get out, what good is that?  What good is the rehabilitation effort in prison for somebody who's never getting out of prison?  Am I hearing that right?

A.   That's what I was thinking, yes.

Q.   Okay.  You indicated that although you had not formed any opinions about the case in terms of Miss Johnson's guilt you were unsure as to whether you had an opinion about the appropriate punishment for her if she were guilty of the

1518

intentional killing of five people including two children.  You said -- this was number 73 -- if she were found guilty, then I would -- by the result of the evidence against her, she should be punished to the full extent that our laws allow.  Does that sound right?

A.   (Nodded head.)

Q.   Now, when you say the full extent of our laws, are we talking about the death penalty?

A.   Can I interject something here?

Q.   Yeah, sure.

A.   Now, I haven't lived under a rock necessarily.  I work

Page 163

nights. I really -- I don't know many facts about the case, only what I read in that letter.

Q. Sure.

A. And I tried to avoid it, so it's kind of hard for me to correlate both, you know, the facts of the case since I don't know anything about it and the death penalty. It's hard for me.

Q. Oh, I understand. And you were very clear, and I understood 100 percent in terms of you had not gotten enough information essentially from the media, virtually no information. Till I opened this envelope, I hadn't heard anything. I read the name Angela Johnson. I didn't recognize the name. I don't usually watch the local news other than the weather. I don't usually read the front page of the paper, actually just the sports section. And you were asked very

1519

directly whether you had an opinion about her guilt or innocence, and you said no. We're on the same page there; right?

A. (Nodded head.)

Q. But then here comes this issue, and it presents this scenario to you. Well, what if, you know? Do you have an opinion about the appropriate punishment if guilty of the intentional murder or intentional killing of five people? And it sounds like you had an opinion at least if -- if A, then this is my opinion. Am I not reading that fairly?

A. No, that's not -- I don't think that's fair. I don't think there's one penalty if it's one crime. That I don't believe. There's circumstances that are surrounding the case that I don't know that I'm sure would have to be weighed.

Q. Let me ask you about this question. This was 86. What do

Page 164

you feel you learned about the death penalty or life in prison from these sources? All that I can say is that I believe life in prison would be awful. If the possibility is that they'd never get out, then I believe that the death penalty (sic). Does that sound right?

A. I didn't hear the question before my answer.

Q. The question was, What do you feel you've learned about the death penalty or life in prison from these sources? And the sources were books, articles, television shows, or movies. And the response that you wrote was, All that I can say is that I

1520

believe life in prison would be awful. If the possibility is that they'd never get out, then I believe that the death penalty.

A. Well, I know when I answered those questions, you know, obviously the death penalty is an emotional issue. I've never had any dealing with it. So the idea was to sit and think death penalty, life in prison. The only cases you know are the well-publicized ones you know.

Q. Sure.

A. And for those you think that's what they deserved.

Q. Okay. Well, I guess this response kind of fits with -- I think it fits with your views that you expressed earlier about, listen, if we're keeping these people in prison forever and the idea is to rehabilitate them and that's not going to happen, what's the point? And again, that's a legitimate opinion or view if you have that opinion. Is it? Is that what you're saying here?

A. As you say it, you know, but then if I was in that position, I wouldn't want to die.

Page 165

Q.    You mean in the position of being a defendant.

A.    Yes.

Q.    Well, of course.  I mean, I would presume that.  None of us would.

A.    But as you put it that way, I don't know.  I really don't know.

1521

Q.    Okay.  You mentioned -- there's a section -- it's question 87, and I know you don't remember all these.  You filled this thing out two months ago.  I appreciate that.  I really do.  But this is a part that says, Please review each of the situations listed below.  After each situation describe what effect, if any, each have on your thoughts and opinions about an appropriate punishment for a person guilty of intentional murder.  And one of the many factors you're presented with has to do with something the prosecutor's already talked about which is a mitigating circumstance.

The specific one is the person -- the guilty person was mentally, emotionally, physically abused and neglected as a child, and you said, If a violent crime has been committed intentionally, I believe the punishment must be deliberated equally.  It kind of goes back to the very first question I was asking you about, the punishment should fit that premeditation.  That suggests to me that if a violent crime has been committed intentionally -- and we could agree, couldn't we, that five intentional murders, that's the kind of thing that you're talking about?

A.    Yeah.

Q.    Okay.  The government's also alleging not only were these five people intentionally killed, but they were killed after

premeditation and substantial planning. And let there be no mistake about it. They're not alleging merely that Angela

1522

Johnson accompanied somebody or aided and abetted them. They've alleged that she's killed these people. That's part of their allegation, that she killed; okay? You with me?

A. (Nodded head.)

Q. And now they're alleging premeditation, substantial planning. And then they're also alleging of these five victims --

THE COURT: Your time's actually up, but you can take another couple minutes.

MR. BERRIGAN: This will be the last question.

Q. Of these five victims, sir, there's a mother and two children, two little girls. One's ten. One's six; okay? So at the time that you're making this kind of a decision, that's been proven beyond a reasonable doubt. I want you to imagine that when I ask you this last question. Given the views at least that you shared in the questionnaire, if you found that situation beyond a reasonable doubt, would you realistically be able to consider punishment other than death?

A. I just don't think I know enough to say that, no. I'm sorry.

Q. You have a hesitancy?

A. Pardon me?

Q. Do you have some hesitancy about your ability to consider a punishment of life in prison?

A. You just told me, you know -- I didn't know about the

1523

Page 167

children.  I mean, I knew there was two children, but I didn't know their ages or anything.  I don't think I can be thrown that and answer that right away.

MR. BERRIGAN:  Appreciate your candor.  Thank you, sir.

THE COURT:  Juror 576, this view that you have about kind of what's the point of keeping somebody in prison if they're never going to get out, is that a poor summary of it?  Why don't you phrase it for me so I . . .

PROSPECTIVE JUROR 576:  I know how that sounds.  It's not exactly what I mean.

THE COURT:  No, and I'm not making any judgment about it.  Just tell me what you actually mean.

PROSPECTIVE JUROR 576:  Okay.

THE COURT:  Yeah.

PROSPECTIVE JUROR 576:  If -- I mean, the death penalty is final, and life in prison to me is hopeless.

THE COURT:  Okay.  Let's use it's hopeless; okay?  How would that view -- and, you know, it's your view.  It's just as important as anybody else's view.  So I'm not trying to minimize your view at all.  Your view is that life imprisonment is hopeless, and that's a perfectly understandable position.

Here's what I want to know.  How would that view affect your ability to fairly consider both a life sentence and a death sentence in this case if at all?  Would it affect your

1524

ability to fairly consider both possible --

PROSPECTIVE JUROR 576:  I don't believe so, no.

THE COURT:  Do you think you could fairly consider

Page 168

both a life sentence and a death sentence in this case based on what you've heard so far?

PROSPECTIVE JUROR 576: Yes.

THE COURT: And do you think you're the type of person who could listen to all of the evidence in the case and if we ever reach that third phase that I talked about, the penalty phase, you could also listen to any evidence presented in the penalty phase and weigh both aggravating factors and mitigating factors and be open minded with regard to both a life sentence and a death sentence?

PROSPECTIVE JUROR 576: Yes, I do.

THE COURT: And do you actually think you'd be open minded to both sentences?

PROSPECTIVE JUROR 576: Yes.

THE COURT: Okay. Sometimes the lawyers have used a football analogy, and it kind of goes like this. You're a potential juror, and we want to figure out where you would put yourself on the football field of punishment. One goal line is a death sentence. The opposite goal line is a life sentence. Somebody who would say that they're on the 50-yard line would be somebody who would say, Gee, I'm just equally balanced. I could consider both of them. I have no preconceived notion about

1525

which punishment I would consider in this case. And I'm just totally neutral, totally open to both possibilities. That would be somebody who would be on the 50-yard line.

And we've had people during jury selection all the way from the end zone on one side, the death penalty end zone, to the death penalty -- to the life imprisonment end zone, in the middle, at the 50-yard line, I think to the 1-yard line,

Page 169

everywhere in between. And it's not a question of right or wrong. But do you understand the kind of analogy of the football field?

PROSPECTIVE JUROR 576: (Nodded head.)

THE COURT: Where would you place yourself in this case if you can?

PROSPECTIVE JUROR 576: That's an interesting analogy. If I had to at this moment say how I would feel without knowing a lot of the facts of the case, I would have to say between the 50-yard line and life in prison, somewhere around the 40.

THE COURT: Okay. So you're on the life side, but you're 40 yards away from the life imprisonment goal line. Is that where you put yourself?

PROSPECTIVE JUROR 576: That's what I would say, yes.

THE COURT: Okay. Thank you so much for answering all of our questions. If you'd just step outside, I'm going to discuss it with the lawyers, and then I'll let you know your status. Thank you.

1526

PROSPECTIVE JUROR 576: Thank you. Thank you.

(Prospective Juror 576 exited the courtroom.)

THE COURT: Mr. Williams?

MR. WILLIAMS: No motion by the government, Your Honor.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: The defendant would respectfully remove -- move to remove Juror Number 576 for cause, Your Honor, in that we believe his views, particularly it's a fairly unique view in my opinion given the questionnaires we've seen so far regarding life in prison. He really thinks it's pointless. And

Page 170

he -- despite his responses, he never abandoned that position.

THE COURT: Yeah, but thinking it's pointless doesn't really have anything to do with how one would view both options in terms of sentencing.

MR. BERRIGAN: Well, I respectfully disagree. If a juror came in and said, What's the point of putting somebody in prison for life, that does tell me something about the sentencing options when there's only two.

THE COURT: It doesn't me actually.

MR. BERRIGAN: Well --

THE COURT: And I think if he were to say that because of that viewpoint I don't think I could fairly consider a life sentence, then I would agree with you completely. But that isn't this juror. That's some other hypothetical juror.

1527

MR. BERRIGAN: Well, I admit that he doesn't discount the possibility that he'd consider life, and the Court has to make its evaluation obviously.

THE COURT: Well, I guess -- wouldn't I have to totally discount his last answer on the football analogy?

MR. BERRIGAN: Well, no, sir, only because the analogy doesn't include the factors that I thought he was struggling with, frankly, when I sat down. He mentions, I just heard about the kids; I'm going to have to think about that. That's the last thing I heard him say when I sat down. The analogy doesn't include those facts. You just put him on the football field and asked him where he is.

THE COURT: I said in this case so it does include those facts. It includes anything either lawyer talked to him about this case. I wasn't talking about a hypothetical case. I

Page 171

was talking about this case.

MR. BERRIGAN: Well, my view is that his response is completely inconsistent with his questionnaire responses. He's not leaning for life at all.

THE COURT: Well, if consistency were the measure, we'd be at this for a couple years if that were the test. I appreciate your objection.

Mr. Williams, you want to respond to it?

MR. WILLIAMS: Well, I guess I'm with the Court on this one. I don't think this juror is -- if anything, that last

1528

question, that last answer to you gives me some pause for concern when he puts himself closer to life. That's -- you know, obviously I'd prefer him the other direction. You know, for the record, answer to question 84 in the questionnaire, Is life imprisonment sufficiently severe, he answers yes to that. And there's nothing else in his questionnaire that says death penalty, I'm unwilling to consider. His concerns about is there a point to life imprisonment is a rhetorical philosophical question and one which has some merit to it, frankly, but doesn't mean that he's not willing to consider life imprisonment. So we respectfully disagree with the defense motion.

THE COURT: Okay. I find his last answer to my last question credible. And even without that question, I would find that this juror's not substantially impaired in his ability to perform his duty in this case. So the defense objection for cause to Juror 576 is overruled.

Would the government like to exercise a peremptory challenge?

Page 172

MR. WILLIAMS: No, Your Honor.

THE COURT: Would the defense like to exercise a peremptory challenge?

MR. BERRIGAN: We would, sir.

THE COURT: Okay. 576 is gone.

(Prospective Juror 576 entered the courtroom.)

1529

THE COURT: Sir, we're going to go ahead and excuse you from this case. On behalf of the lawyers and parties, we appreciate your involvement very much. I think you'd be a terrific juror but maybe in another case.

And we'd ask as a favor that you not mention anything about jury selection to anybody else at least for another two weeks or until we get a jury selected in this case because you may be talking to somebody who then talks to somebody else and that somebody else winds up in one of these chairs later this week or next week. So thank you very much, and you're excused.

(Prospective Juror 576 exited the courtroom.)

THE COURT: I need to take about a ten-minute recess. So we'll just take a ten-minute break and then come back and do the last jurors. Thank you.

(Recess at 2:01 p.m.)

THE COURT: Ready for Juror 31?

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 31 entered the courtroom.)

THE COURT: Juror 31, just any seat in the front row would be fine. Thank you.

Everybody please be seated.

Each side has been allotted 12 minutes to question you, and so we're going to start with Mr. Berrigan on the

Page 173

defense first.  Thank you.

EXAMINATION

1530

BY MR. BERRIGAN:

Q.   How are you, sir?

A.   Good.

Q.   The judge has already told you this, but it's been a long time since this morning.  Appreciate your patience.  We're going to ask you some views about a couple of different issues.  One has to do with pretrial publicity, and the other one has to do with the death penalty.  But it's real important -- and I hope you'll believe us -- that we're not here to criticize those views or judge them.  We just need to know what they are so we can get the best 12 people for this particular case; okay?

A.   Okay.

Q.   And so when I'm asking you these questions, I want you to if you could -- and it will be hard I bet -- but to think of yourself as a criminal defendant and what you'd want your lawyer to know about the 12 people who were going to judge your case before those people sat in the box and were selected; all right?

A.   Okay.

Q.   I notice that you talked a little bit about publicity, that you had really only heard about the case on TV, and that you're not even sure it was the same one.  It was a case where they showed a grove of trees and had to do with drugs and murder. That sound about right?

A.   Yes.

Q.   I'll tell you one thing we've seen happen quite a bit, and

1531

Page 174

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1334 of 3245

you've filled out this questionnaire back on January the 19th, so that's -- well, coming up now on three months tomorrow, right, or is it today? I've lost track of the days. It's possible sometimes that jurors hear things about the case since they filled out their questionnaire. We've had that experience certainly. And again, there's nothing wrong with that. We just kind of need to know. Have you learned anything about the case since back in January?

A. The only thing, I seen it on TV. I was watching TV, and it came up and that there was going to be a trial here, and they didn't know for sure if it was going to be in Sioux City, and at that point I got up and walked to the kitchen.

Q. Okay. So has anything happened to change your response in terms of you haven't formed an opinion about the case?

A. No.

Q. Okay. Appreciate that. You did indicate in your questionnaire in responses to questions about the life in prison possibility and the death penalty that you're a person that could consider both of those punishments.

A. Yes, uh-huh.

Q. And the thing you wrote about the death penalty was that if the murder was planned and without guilt or remorse or for the purpose to receive personal gain without the thought of other people's lives and what it does to them and their families, I would agree to the death penalty. Does that sound right?

1532

A. That's true, uh-huh.

Q. Okay. The area that I'm interested in talking to you about is relating that view to this case. You know, the government's alleged there are five people that have been intentionally

Page 175

murdered here; okay?

A.    Uh-huh.

Q.    And we're going to ask you just for purposes of this question just like the judge said to fast forward.  That's the analogy we've been using.  Press this button.  Even though you haven't heard anything, we want you to imagine you have; okay?  You've heard all the evidence, the who, what, where, why, and when of these crimes, and you heard the defense evidence if there was any presented, whatever it is, self-defense or I didn't do it, whatever it is.  And you're on this jury, and you talk to your fellow jurors, and you come to a decision guilty beyond a reasonable doubt, five intentional murders; okay?  You with me so far?

A.    I believe I am.

Q.    All right.  This is our fast-forward imagining.  The government's also alleging that these five murders were committed after premeditation and substantial planning.  So again, in our analogy, we're asking you to consider that you have listened to the evidence again and you've made a determination, all 12 jurors, that's true beyond a reasonable doubt, premeditated, substantial planning involved in these

1533

killings.

And then they further allege, if that wasn't enough, that of these five victims there was a mother and two little girls ten and six years old; okay?  And the government's going to allege that they were vulnerable victims which is something they would have to prove.  But I'm going to ask you to imagine that you jurors have made that decision as well, okay, and that that's been found beyond a reasonable doubt.

Page 176

And so now you're sitting there, and that's kind of been the evidence that you've determined. And I want to go back to this response because this -- you can see that, boy, we're in a situation that sure sounds like what you're talking about. And I need to know whether or not if you found that to be true -- and I guarantee you that's a big if. I understand and appreciate that; okay? We're asking you to fast forward. But if that were true, would you be able to consider a sentence of life imprisonment as a sufficient punishment for that type of crime?

A. I don't know how to answer it. If I seen it that there was no remorse or anything, it'd be difficult.

Q. Okay. Let me ask you about that remorse just to make sure I understand what you mean. What do you mean when you say, If I saw there was no remorse?

A. If it was heartless, they didn't care about the people or what -- their reaction, if they done it let's say for their gain

1534

just to cover something up and they didn't have no respect for life, I'm afraid that's the route that I would go.

Q. Well, there's certainly I think an inference that if you kill five people intentionally after planning and premeditation, that's no respect for life. Don't you think? That kind of comes with the package if you do something like that?

A. What I'm -- I guess what I'm trying to say is some people get caught up in things or the situation but they're found guilty for committing them because they're in with the situation. They're coerced by somebody or drawed them into it, so yes, they're guilty for that. But if that person did the killing with no remorse and had no respect for life of anybody

Page 177

for their gain, then I'm afraid that's the route that I would think.

Q. I think I hear you. Certainly there's -- you need to know the government, they've been talking about aiding and abetting, but they've also alleged that Angela Johnson intentionally committed these murders; okay? That's what they're alleging, not just that she aided and abetted somebody. You with me?

A. Right, uh-huh.

Q. Now, there's two different concepts, and I want to talk about them and see if you and I are on the same page. One is people who aid and abet, they're equally legally responsible. So if you and I decided to go rob a bank and you drove the car and waited outside and I went in and robbed the bank, hey, you

1535

know, the fact that you weren't in there with me, too bad; right?

A. Right.

Q. We're both in that together. You understand that. You aided and abetted me.

A. Right.

Q. If we came up before the judge for sentencing, he could decide, you know, our roles were different. Your role was a little different than mine. I'm going in there with a submachine gun pointing it at innocent people demanding money. You're sitting out in the car. That doesn't mean you're not guilty of bank robbery, but do you think that might be a consideration that, you know, we were really in different roles?

A. Yes. You know, if you're in the car, if you didn't stick a pistol in somebody's face, maybe you have a less sentence.

Q. Yeah. Do you think that's appropriate?

Page 178

A.    Yeah, I would.

Q.    Okay.   You talk about a little something like that in your discussion about life in prison without parole because you said yeah, you could give a life sentence even in a case of premeditated, intentional murder.  You said, If the person got involved with someone who talked them into it and that person was not the person who actually did the killing, that would seem like an appropriate situation.

A.    Right, uh-huh.

1536

Q.    What I need to know is is that the only appropriate situation?  In other words, would you be able to consider life in prison without parole for that; okay?  None of this didn't pull the trigger, none of this, you know, coerced or kind of got drug into it but that's what happened, five intentional murders, premeditated, substantial planning, including two children.   Did you hear me?

A.    I guess I think I'm following you, but we're coming under the conclusion that that person did the killing; right?

Q.    You'd only -- yeah, we've kind of fast forwarded, and I realize we're going to have a whole trial about that, but yeah, that's right.

A.    Yeah, and if that person did the killing, then that's the route -- a person always can, I suppose, look at things different.  I hate to say my mind is locked that without reason or listening to something.  I've got an open mind, but that's the direction that I see.

Q.    You're entitled to be leaning either way you want.  I don't want to suggest otherwise; okay?

A.    Uh-huh.

Page 179

Q. Some folks have told us real candidly, Look, Berrigan, enough's enough; okay? We got five intentional murders. There's premeditation, planning, children. I don't really need to hear anything else. I mean, that's it for me, and they've been very candid and said, Hey, I couldn't realistically -- I

1537

gotta be honest with you. I couldn't realistically consider a life sentence if that's what I found beyond a reasonable doubt. I don't know. I have no way -- I can't read minds -- of knowing if that's how you feel, and I'm asking you that only because there's some responses in the questionnaire I just wondered about. So you tell us. Are you in that camp, I couldn't consider life without parole?

A. I'm in that camp without parole if that person did the killing with no remorse. I don't know how to explain it different than that. That's the direction I feel that it should go. I can't say never with anything, but that's what I feel about it.

Q. Okay.

A. If there isn't a stop to that, if the penalty isn't strong enough for what the crime is, then that type of crime continues.

Q. Okay.

A. There's no fear of -- no fear of repercussion from it.

THE COURT: Two-minute warning.

Q. That's a fair response. Let me ask you this question. You know, that's the evidence the government's going to present in terms of asking for the death penalty we expect. And we have an opportunity to present mitigation evidence, things like no significant criminal history, things like a defendant's abused background, neglect, or sexual or physical abuse. Some people

Page 180

just don't think that's important. They wouldn't really

1538

consider it in assessing punishment because they think you punish for the crime, not the person. And I wondered what you thought about that.

A.    I think back childhood has an effect on a person. But I have a hard time believing that it comes to murder.

Q.    Well, it's not an excuse; right?

A.    Right.

Q.    Not having a criminal record's not going to excuse your conduct either.

A.    Right.

Q.    But would you weigh it? Let me change that. Would you give that serious consideration in assessing punishment, not whether you're guilty or not but whether the punishment -- what punishment is appropriate or not?

A.    I guess all I can say is you may have a bad childhood, but murder, you'd have to be -- I can't see where it'd be that bad where you'd commit a murder.

Q.    Does that mean you wouldn't be willing to consider that as part of the punishment equation?

A.    No, I can't see that.

        MR. BERRIGAN:    Okay. I appreciate your answers. Thank you.

        THE COURT:    Mr. Williams?

                            EXAMINATION

BY MR. WILLIAMS:

1539

Page 181

Q. Good afternoon, sir.

A. Hi.

Q. Let me just pick up where Mr. Berrigan left off. And that is some of these factors that may lean the other way. Now, Mr. Berrigan piled up some factors over here that he says the government has alleged, and we have alleged those factors in this case. But a juror is going to be in the position in this case if they're picked to be a juror in this case to weigh all the factors in the case, not just the ones the government's alleged or proved but all the factors, the defendant's role in the offense, any evidence there is of the defendant's background, characteristics, and so forth.

You indicated in your questionnaire on this very issue, you said if -- you were asked to give your thoughts on punishment in response to a number of these different situations. And one of them was the guilty person was mentally, emotionally, physically abused, neglected as a child. And you answered, I would have to put that into consideration, but it is not an excuse for murdering someone.

So I want to touch base on that for a second. No, it's not an excuse for murdering somebody, and I don't think the defense in any case -- I'm not talking in this case but in any case is going to say, Oh, if I had a bad childhood, I shouldn't be guilty of murder. And any other juror would be perfectly in their right rejecting that in considering whether the defendant

1540

committed the crime; okay? And so if you're back there trying to figure out did she commit the crime or not, whether she was abused or not in her history, you're in your rights to say that has no bearing on my decision whether she committed a crime and

Page 182

should be held responsible for it.

The next question is this, though, is now you've decided that. You've decided her guilt, and you're struggling between two options, life in prison or the death penalty. And the judge will instruct you ultimately that there's a number of factors that you are to consider in weighing that decision. There's going to be factors the government alleges are aggravating, you know, like the killing of children. There may be factors that the defense -- or that the Court will instruct you are mitigating, that go toward life imprisonment including, you know, perhaps the background history.

Now, as a juror, the interesting thing is the way this works out is you can give any of those factors whatever weight you want to or no weight at all. You can decide, you know, jeez, killing of children is a huge factor to me, and so that weighs pretty heavily. Perhaps the defendant has no criminal history, though, and you say, Oh, you know, that's a huge factor to me, and that weighs pretty heavily with me too. But you can also decide, you know, this factor has really no weight with me. I just don't put any weight on that factor. And that's fine. Each juror can give all weight, no weight, whatever weight you

1541

want to to any of these factors, and it's completely your decision. The only thing the judge will require you to do is consider them, realistically consider those factors.

Now, I join with Mr. Berrigan. We're here to get your candid thoughts, not what you think we want to hear and not some preconceived notion of, boy, I better answer this way or the guy in the black robe's going to get mad at me. We just want to know your real thoughts on stuff.

Page 183

If you think, jeez, a defendant's background is something not that I won't give any weight to but I won't even consider it, I won't even talk about it, then we need to know that. But what strikes me is that would be inconsistent with what you put down in your questionnaire where you said you'd have to take that under consideration. So what are your thoughts on that, sir?

A.    Can you try to tell me that again?

Q.    Yeah. Are you willing to consider these different factors including the defendant's background and then just give whatever weight you think they deserve, but are you willing to at least consider them and seriously consider them?

A.    I'm going to keep an open mind and consider everything, but I guess the question that was before you is about the killing part, and I'm pretty firm with that about intentionally doing a murder. I'm pretty firm with the death sentence on that. I'm not saying I can't -- I never want to say I'll never go a

1542

different direction. I can't say that because things change your mind and stuff. But maybe the whole process changed your mind. I don't know. But you always gotta consider things. You gotta keep an open mind. But I was giving an opinion about the -- that intentionally murdering somebody.

Q.    You'd indicated in your questionnaire that -- you were asked the question, Do you think that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of intentional and premeditated first-degree murder, and you said yes to that.

A.    Yes.

Q.    And you think life imprisonment could be sufficiently

Page 184

severe?

A.   Yes, if they -- if they were just caught up in -- where I was getting with that is if they got caught up in a murder situation where they didn't actually do the killing but they're involved with it yet and they didn't kill people with no remorse or something like that.  That's where I could say a life sentence would be all right.

Q.   Let me ask you this.  Let me ask you to assume that the evidence showed in this case the defendant didn't actually pull the trigger, that her role was as somebody who assisted, maybe encouraged the crime.  She's not the one who pulled the trigger and shot these people.  If you assume with me that that's the evidence, is that the type of case where you'd be willing to

1543

consider the possibility of life in prison without parole?

A.   If the person had -- was in there coercing the murder, it's the same thing as the murder but didn't do the killing.  Then there's a gray subject area between the two for me.

Q.   Okay.  And so I guess what I'm trying to get at is, you know, you don't know what all the factors are, right, at this point?

A.   Yes, uh-huh.

Q.   And you know some of the factors maybe.  We've talked about some of those.  The question really to put to you, sir, is, I mean, at this point right now knowing what you do about the case which isn't, admittedly, very much, but knowing what you do about the case, have you already made up your mind one way or the other that, you know, given those facts it has to be life imprisonment; I wouldn't even realistically consider the death penalty, or I made up my mind; it's the death penalty; I

Page 185

wouldn't even realistically consider life in prison?  Are you at either one of those extremes at this point?

A.    I haven't heard the whole case, so I can't lock one way or the other way.  No, I can't.

Q.    Are you willing to wait and listen for all the evidence --

A.    Yes.

Q.    -- and realistically consider both options?

A.    Yes, uh-huh.

Q.    Let me use a football analogy for you if I could.  You're

1544

familiar with a football field.

A.    I don't watch it.  I know what a football field is, yes.

Q.    Imagine for me that one end of the football field is life in prison and the other end of the football field is the death penalty.  Somebody at the 50-yard line would be somebody who says, you know, Right now knowing what I do about this case, I really haven't moved off of the 50-yard line.  I'm not really toward the death penalty.  I'm not really toward life in prison at this point.  I'm right in the middle.  I really don't have my mind made up, and I'm waiting to hear the evidence.  I'm willing to consider both options equally.

        Some people are leaning one way or the other.  They might be at the 35- or 25-yard line, and some people, frankly, have come in here and said, No, you know what?  I'm already in the end zone.  I'm either all the way in life in prison or I'm all the way in the death penalty.

        Given that metaphor, where would you put yourself on the football field?

A.    In what direction is the evidence?  That they did the killing?

Page 186

Q.   Well, the -- assume if you would for me right now that the evidence would be that the defendant assisted, didn't actually pull the trigger but assisted in the murder of these five people, two of whom were little girls.

A.   But didn't do the killing you're saying.

1545

Q.   Didn't actually pull the trigger.

A.   Okay.  I'd be on the 50-yard line.

Q.   And then what you're telling us, there are things that could move you off that 50-yard line.  For example, if the defendant was really active in assisting or, you know, had a very significant role in the assisting and still didn't pull the trigger but was more assisting, I assume that would move you toward the death penalty.

A.   If the person -- can I give like a scenario?

Q.   Sure.

A.   If the person helped with tying people up or hitting them in the head or knocking them down or running over them with a car to stop them for the other person to kill them, then I would say that would be more to the death sentence because that's the approach they wanted to happen.

Q.   And the question is this.  Based on what you know about the case right now, just assuming those facts with me, are you willing to consider both possible punishments at this point?

A.   Yes, uh-huh.  I don't know enough.

Q.   Okay.  And at this point you haven't rejected the possibility of life in prison without parole.

A.   No.

Q.   Let me ask you this.  Before you ever got to the point of imposing the death penalty on somebody, would you want to

Page 187

realistically consider the possibility life in prison would be a

1546

sufficiently severe punishment for that person?

A.   Again where is the evidence?

Q.   Well, and just I guess assume this factor for me.  Whatever the evidence is, you're back there, and you're thinking about the death penalty; okay?

A.   Uh-huh.

Q.   And you're thinking it might apply in this case.  Whatever the evidence is, you're thinking I'm thinking maybe the death penalty ought to apply in this case.

A.   Uh-huh.

Q.   Before you impose the death penalty, would you want to consider that maybe life in prison might still be an appropriately severe punishment?

A.   I guess I'd keep an open mind, but I can't say that would be the direction I'm going.

Q.   And please, no one's asking you which way you'd vote.

A.   Okay.

Q.   Yeah, because you don't have the facts; right?

A.   Right, yeah.

Q.   Okay.  So nobody's asking you how you'd vote.  What we're looking for is whether your mind has been made up before you come in here.  Frankly, some people come in here, and we respect their views, but they've already made up their mind:  I just can't go this way or can't go that way.

A.   My mind is set pretty solid how I explained before.  If the

1547

murderers that did the killing, there's no remorse and no
Page 188

remorse killing the people and -- my mind is pretty well set for that direction. You know, I can't say -- we all change our minds from listening to things and maybe -- you haven't got an open mind if you can't change it, and you might change your attitude towards things. But right now, that's the direction my mind is set, you know. It's always been that way.

Q. So if it was an intentional murder without any remorse, you'd be leaning pretty heavily toward the death penalty.

A. Yes, I would.

Q. Would you still keep an open mind at that point even though you're leaning that way to life in prison?

A. I would still listen. I'd listen to people and what they have to say and stuff. I'm not right with everything, you know, on my thoughts and stuff, but I'd definitely keep my mind open, you know. I'd listen, and I'd also give them my view, why I think the way I do. But that's all you can do.

Q. Sure. And this would be a hard decision to make I trust.

A. Right, uh-huh.

MR. WILLIAMS: All right. Thank you very much.

I have no further questions, Your Honor.

THE COURT: I have a couple questions for you, Juror 31. And I'll just be real square with you. I'm a little bit confused by your prior answer when you told, I believe, Mr. Williams that you were on the 50-yard line -- remember that?

1548

PROSPECTIVE JUROR 31: Yes.

THE COURT: -- and then your very last answer where you said something like "that is the direction I have pretty much set in my mind" which was I think the direction leaning towards the death penalty. And so I'm sure they're consistent

Page 189

in your mind, and I'd just like to hear the explanation.

PROSPECTIVE JUROR 31: When he's talking about the 50-yard line, I'm looking at it as I don't have the evidence of what all went on yet, so I'm on the 50-yard line. And if -- and then I think I said later that if the evidence looked like the person did the killing and there's no remorse, then I'd be on the 30 or 20 or whatever that is.

THE COURT: Okay. But would you ever actually be -- let's say the -- I don't know how to phrase this. Let's say --

PROSPECTIVE JUROR 31: It's difficult.

THE COURT: It is, because we don't know what the -- I don't even know exactly what the evidence is going to be. But no matter how strong the evidence was that pushed you in the direction of a death penalty, would you still be open to considering a life sentence?

PROSPECTIVE JUROR 31: It'd be difficult. It's just I've always believed it that way, and maybe it's because of the way my father talked and stuff about it, but it'd be difficult.

THE COURT: Okay. And when you say you've always believed it that way, just help me out as to what that means.

1549

PROSPECTIVE JUROR 31: It's just when you kill people and there's no remorse to it, I think those people have to have a penalty strong enough that otherwise the laws in the nation, if there's no restitution to that, people would have no fear of doing that.

THE COURT: Well, how would you feel in the case if you never knew -- let's just -- we're assuming now, huge assumption, but we're jumping ahead to this penalty phase, so we're assuming the jury were to find Angela Johnson guilty of

one or more of the ten charges. We have to assume that or we wouldn't be at the penalty phase. And assume that you never find out in the penalty phase whether Angela Johnson has any remorse or not because I don't know whether you would ever find that out. Would that trouble you if you didn't know the answer to that question?

PROSPECTIVE JUROR 31: That would trouble me. I'm assuming that if you go into the death penalty that the evidence is pretty strong that she participated in the killing, and I don't know if she killed one or two or all the whole works, but if she's involved in doing two or three of them, I would say that's no remorse.

THE COURT: Well, doesn't remorse come after the fact?

PROSPECTIVE JUROR 31: I guess I feel remorse -- well, yeah, you might have a point there, but I'm just feeling that she didn't care about the peop -- what I should say, she didn't

1550

care about the persons' lives, and that's -- I guess maybe I said that wrong.

THE COURT: Isn't that kind of a given in a murder case?

PROSPECTIVE JUROR 31: Meaning?

THE COURT: Isn't that kind of a given that whoever it is that might have murdered somebody probably didn't care a whole lot about the life of the person they murdered? I mean, wouldn't that be true in every murder case?

PROSPECTIVE JUROR 31: Yes, uh-huh, if they did the killing, yes, uh-huh.

THE COURT: Well, is remorse a pretty -- is that an important concept for you in figuring --

Page 191

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1351 of 3245

PROSPECTIVE JUROR 31: No, I might have used the wrong word.

THE COURT: No, no, that's okay. No, I think you used the right word. Why don't you tell me what you think remorse means.

PROSPECTIVE JUROR 31: I guess maybe I had that wrong. Remorse is like I don't care what I'm doing here. I don't care about that person's life. I don't care about their family. I don't care about anything but myself. I'm more important than what's going on here.

THE COURT: But by definition everybody who murders somebody would be in that situation, wouldn't they? They think

1551

they're more important than the person they're killing I guess; right?

PROSPECTIVE JUROR 31: Yeah, they would be.

THE COURT: I think remorse means feeling sorry, and that can only really come I think after the fact, and it may come -- I mean, there are things in my life that I felt remorseful for years later, not anything illegal but things I might have said or done to somebody, and then it took me a number of years to appreciate, gee, that was an insensitive thing to do.

And I've -- in fact, a couple years back I went back and apologized to a childhood friend on something that I had said to them that bothered me all of these years. I used the Internet and tracked them down, but I felt a lot of remorse over what I said when we were seven years old, and it bothered me that whole period of time. And then when I was able to apologize to the person -- they had long since forgot about it,

Page 192

but I hadn't -- I felt a lot better. Now, that's remorse. It came very late. So would you agree with me that using remorse how I'm using it can come at any time in life?

PROSPECTIVE JUROR 31: I agree with that. I was probably using that word the wrong way.

THE COURT: Well, here's my point. I've been through a lot of trials, and I've never known whether a defendant was remorseful or not because our system really isn't set up for

1552

them to tell us that. And so I'm just trying to get at how important it would be for you to make a determination about remorse in this case because what I'm suggesting to you is you might never have the opportunity to do it.

PROSPECTIVE JUROR 31: I guess I gotta leave the word remorse out. I need to put in a different phrase for that. It's just -- I guess if the person did the killing without no respect for life. Maybe I have to use that word.

THE COURT: Okay. And I'm not trying to be -- my wife says I'm just argumentative by nature, and she may be right about that. I'm not trying to be argumentative. But isn't by nature somebody who kills somebody, they have no respect for the life they've killed? Wouldn't it be hard to have a tremendous amount of respect for the life you kill and then kill somebody?

PROSPECTIVE JUROR 31: Can you repeat that?

THE COURT: Yeah. By definition, most killings would involve a situation where the person doesn't have respect for the person they've killed. Wouldn't you agree with that?

PROSPECTIVE JUROR 31: I think you can get into a killing where you kill somebody and it just happened that you never thought about.

Page 193

THE COURT: Like an accidental killing.

PROSPECTIVE JUROR 31: Right, or you got into a situation where things just got totally blown apart and you killed somebody. If you kill more than one person, then it's --

1553

then I would think you'd have more time to think.

THE COURT: Yeah, and I can think of a situation -- I was reading -- I read a lot of books about mountain climbing even though you couldn't get me to climb a 6-foot hill let alone Mount Everest, but I've probably read 30, 40 books about it, and I was reading a book about two best friends, and they were in a real difficult -- I mean a hugely difficult situation, and the one friend actually had to cut the rope knowing that his best friend in life was going to plunge to his death.

Now, that would be a situation where you have great respect for the person, but he was nevertheless responsible for killing him because he cut the rope that sent him to his death. That isn't going to be anything like this trial, though.

So I'm just trying to get at what your feelings are about intentional killing because that is the -- we don't even get to the issue of death penalty unless there's a finding of intentional killing in the case. And how would a finding of intentional killing affect your ability to fairly view a life sentence or a death sentence?

PROSPECTIVE JUROR 31: If it was a planned killing where they planned it to kill the person and had time to think about it, that'd be different than if they got into a shoot-out by just killing each other or whatever.

THE COURT: Okay. Well, let's assume in this case that it was what we call premeditated and there was substantial

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1354 of 3245

planning involved. How do you think that might affect your view of the appropriate punishment?

PROSPECTIVE JUROR 31: Then I'd go in the direction -- if all the evidence showed that, then probably in the direction of a death sentence.

THE COURT: And when you say you're in the direction of the death sentence, can you tell me where you are again on this football field? And it may move depending upon which facts we throw at you, and I think that's what you made clear to me that depending on what facts there are you might be in a different place on the football field.

But let's assume kind of the worst facts from the defendant's perspective. Let's assume that the evidence establishes the worst facts from her perspective which would be I guess the best facts for the prosecution. Where do you think -- you know, that it was intentional, that five people were killed, that there was a six-year-old girl and her sister ten years old and they were killed and it was done after substantial planning and there was premeditation. Pile up all the bad facts you can think of that you've heard tossed around here. Where are you on the football field?

PROSPECTIVE JUROR 31: If she did the killing, I'd be more to the death sentence. If she didn't do the killing, I'd be on the 50-yard line.

THE COURT: And when you say did the killing, you mean

1555

physically pull the trigger if it was with a gun?

Page 195

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1355 of 3245

PROSPECTIVE JUROR 31: Yeah, yeah, knife, gun, or whatever.

THE COURT: And let's just suppose -- I have no reason to suspect that there would ever be any evidence of this, but let's just suppose there was some evidence that Angela Johnson was directly involved in the killing by pulling the trigger. Just hypothesize that. I'm making up facts here. Where would that put you in terms of the football field?

PROSPECTIVE JUROR 31: If she killed one of the persons and it was in like a situation where she got caught up and the first person got killed and then somebody else did the rest of the killing, then that would put me thinking that -- and then here I don't know all the evidence, but that would put me into thinking that she got caught up in a situation that the first person got killed by and from a heated situation. But then if she went to kill several after that, then that'd bring me to the death sentence. Otherwise I'd be on the 50-yard line or moving to the life in prison if the evidence showed that she didn't intentionally want to kill this person in the beginning.

THE COURT: Well, what if the evidence showed that she was involved in planning an intentional killing but didn't actually pull the trigger? Where would you be on the football field?

1556

PROSPECTIVE JUROR 31: Then I'd be in the gray area, the 50-yard line. I don't know what direction I'd want to go there because she's -- planning is the same thing as killing the person, but I would have to think that over.

THE COURT: Well, let me try and ask it this way. Is

there any set of facts that would put you in the end zone for the death penalty? Are there any set of facts that you can imagine that would put you in the end zone labelled death penalty?

PROSPECTIVE JUROR 31: For death penalty?

THE COURT: Yeah. Are there any set of facts?

PROSPECTIVE JUROR 31: If the person planned the whole thing, did the killing, disposed of the people, did the whole works, you know, even if she had help with it, then that'd put me in the end zone.

THE COURT: That'd put you in the end zone.

PROSPECTIVE JUROR 31: Yeah.

THE COURT: And in that situation you're not even open to the possibility of a life sentence.

PROSPECTIVE JUROR 31: I'm pretty firm with my thoughts. I don't ever say I'm not open for anything. Like I said earlier, I like to listen to what people have to say and stuff, but the way my mind's set is now that's the direction. I've always believed that way.

THE COURT: Let me just ask it a slightly different

1557

way, and then I'm going to be done. Envisioning the worst set of facts imaginable for the defendant -- and let's just assume the government could prove those beyond a reasonable doubt -- and you were really moving towards that goal line called the death sentence, even in that situation, do you think before you crossed the goal line and went into the end zone, would you be able to stop and say, Before I do that, before I make the decision on the death penalty, I'm going to fairly consider a life sentence, and I'm going to reevaluate all of the factors,

Page 197

the aggravating factors, the mitigating factors, and I'm going to decide whether I can in good faith vote for a life sentence before I cross that goal line? Now, you don't see football players stop at the goal line, do you?

PROSPECTIVE JUROR 31: No.

THE COURT: I've never seen them do it. I guess I've seen them fumble right about there. But I'm asking actually before you stepped across it would you be willing to stop and totally reevaluate it and actually say to yourself, you know, I want to rule out the life sentence before I jump over that goal line? Would you be willing to do that, or do you think once you start moving quickly towards that goal line you're just going to go ahead and cross it?

PROSPECTIVE JUROR 31: I don't look at it as a contest because it's somebody's life, and I'd definitely want to look at everything all the time. You don't want to leave this thing

1558

with regret, so I definitely would want to listen to everybody. But I would hope before I got to stepping over the line that if I wasn't in that -- that far down that my mind had already been changed, but I'm just giving you my view of what I feel about it.

THE COURT: Okay. Thank you. You know what? I'm going to -- I told you I was done with my questioning. I am. But I'm going to actually open it up and see if the lawyers want to ask any more questions, and I appreciate your patience with us this afternoon.

Mr. Berrigan?

MR. BERRIGAN: Thank you.

EXAMINATION

Page 198

BY MR. BERRIGAN:

Q.   We appreciate your patience very much.  But you can see how this is a difficult and important area.  Here's what I hear you saying, and I just want to make sure; okay?  You've talked about, look, if the person intentionally killed somebody without remorse --

A.   I think I used the word remorse wrong there.

Q.   That's okay.  You explained it to the judge, and I got it.  I understood what you were saying.  It was without regard for the lives of the people they killed.

A.   Right, that's what I meant by that.

Q.   Is that fair?

1559

A.   Right.

Q.   Okay.  Let me use that term.  I want to suggest to you that that's exactly what the government's alleged; okay?  That's this case, five people, not just one.  They've alleged five people got killed intentionally without regard to their lives; okay?  You with me?

A.   I think I am, uh-huh.

Q.   And then on top of that they're saying the murders were premeditated, all five of them.  You understand what we mean, premeditated, substantial planning?

A.   Planning.

Q.   Right.  And we need to be clear.  They've asked you these questions, well, what if she didn't pull the trigger?  What if she did pull the trigger?  They've alleged that as well, that she killed these people; okay?  You understand?

A.   Yes.

Q.   I heard you say, Look, if she was kind of coerced into this

Page 199

and didn't pull the trigger, sort of drug into it, okay, I could go for life; all right? Well, I'm asking you to imagine that's not what they're saying. She killed them. She's on trial. That's what they've said. And then we've got these kids, and you haven't mentioned that as the contributing factor, but -- because it's the intentional part of this that's really important to you, isn't it?

A. Yes.

1560

Q. Okay. But there are kids, two of them. From your responses now -- and you've been pretty candid -- you have some firm views about the death penalty in certain circumstances; right?

A. Right, uh-huh.

Q. Okay. And is that a circumstance where you'd consider the death penalty, if five people -- nobody drug into it, no "I didn't pull the trigger." She did it. That's what they're claiming. She did it. Nobody forced her to do anything. She intentionally killed them. She planned it, premeditated it, and did it.

A. But what you're saying, they have the jury believing that she actually did it.

Q. Yeah, that's exactly right. That's what the government's going to allege. Yeah. Believe me, that's exactly what they're alleging. And we're asking you to do this fast-forward thing, and I hear you: I want to hear all the evidence; I'd listen to all the evidence. But what we're asking you to do is imagine you have done that; okay? That has happened. You did listen to all the evidence, and you found that to be true.

A. I believed it to be true.

Page 200

Q.   Yes, beyond a reasonable doubt, not just you, all your 12 jurors, you and the other 11; okay?  And then this issue arises, well, if that's the circumstance, all right, could you realistically consider a punishment of life for that person who

1561

intentionally did that, planned, premeditated murders of five people?  I mean, could you realistically consider a life sentence for that person?

A.   It'd be difficult.

Q.   It'd be very hard.

A.   Uh-huh, very difficult.

Q.   Okay.  Now, if we're talking about the football field to go to it one last time, okay, now this is where we are, all right, not she didn't pull the trigger, not she got brought into it. That's what happened.  You've decided.  You listened to the evidence.  You made a determination with your fellow jurors five people intentionally killed, premeditated, substantially planned.  Where are we on the football field now?

A.   Now the evidence is showing -- you're saying now that she didn't do the killing?

Q.   She did do the killing.  You determined that.

A.   I've determined it but not --

Q.   The jurors.

A.   Everybody.

Q.   Everybody.  Every person, all 12.

A.   Am I misunderstanding it?  That's the same scenario as the earlier one, isn't it?

Q.   I think so.

A.   Then it's to be the death sentence if it's the same scenario.

Page 201

Q.   Yeah.  Is that in the end zone for the death penalty?

A.   That's the way I'm pushing -- that's for me.

MR. WILLIAMS:  Objection, Your Honor.  Stakeout question.

THE COURT:  It's already in evidence.

BY MR. BERRIGAN:

Q.   Okay.  Well, the flip side of that coin, sir -- and I'm going to let you go honestly.  You've been incredibly good to us -- is if that's how you feel, okay, I mean, would you realistically consider a sentence of life -- there's nothing wrong with that.  That is a legitimate feeling.  But would you really consider -- you know, honestly would you consider a life sentence for that person if you found that to be true -- and that's a big if -- but if you and your fellow jurors found that to be true?

A.   I think I answered that.

Q.   Okay.

A.   I'd be in the direction of the death sentence unless somebody convinced me that that's too cruel or whatever.  But no, I'd be in that direction then.

Q.   If we --

MR. BERRIGAN:  Okay.  All right.  I appreciate it.  Thanks.

THE COURT:  Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Q.   I'm going to try to make this mercifully short for you,

Page 202

sir. I know you've been going through all kinds of stuff here.

A. I didn't realize this was this stressful.

Q. Well, you can understand why we're all working on this so hard. It's critically important for everybody in this room to make sure that if you're going to be a juror in this case that you can fairly consider both possible punishments. I want to do two things. One is I want to clarify with you that if I understand your testimony from before if, in fact, the evidence was that the defendant did not, did not, pull the trigger on these murders, that puts you back at the 50-yard line.

A. Yes.

Q. All right. And going back to the judge's question to you, he said, you know, let's say -- you know, imagine all the horrible things in favor of the government and against the defendant, all these various facts before you cross that goal line. Would you look back and realistically consider life imprisonment before you crossed that goal line? And I think your answer was, boy, I hope I was there before I ever got to the goal line. Does that mean that before you got to the point of deciding the death penalty at some point along the line you're going to be considering the possibility of life imprisonment as a possible option? No matter what the facts are in favor of the death penalty, you would always look at the

1564

possibility of life imprisonment as a possible punishment?

A. I would always keep my mind open for anything. I don't feel being to the goal line is like a drag race, that you gotta get there. I'd always want to look back and analyze what I'm thinking and why I'm thinking that, and you always gotta analyze why you think the way you do. I feel strong what I'm saying,

Page 203

but you never want to say that your mind can't be changed.

Q.    And you'd never say that you wouldn't at least look at the possibility of life in prison no matter what the facts are.

A.    No, I can't say I'd never look at it, no.

MR. WILLIAMS:  Thank you.

THE COURT:  Now let me ask you this question, and I'm going to promise you now this is the last question I'm going to ask you.  If we ever get to a penalty phase in this case, I am going to instruct you on what aggravating factors are and what mitigating factors are.  And it's no surprise that it's the government who's going to allege aggravating factors and the defense who's going to suggest mitigating factors.  Would you be able -- and it's up for me to decide whether something's an aggravating factor or a mitigating factor.  And then if I decide that something is one or the other, then I would give you an instruction, and I would list the aggravating factors, list the mitigating factors.

And the bottom line is I would tell you that if you found an aggravating factor, one or more aggravating factors,

1565

and one or more mitigating factors you would have to consider those and weigh those.  How much weight you give them would be up to you in my view.  Would you be able to fairly consider and then weigh mitigating factors and aggravating factors that I instruct you on in aiding you in your determination of what the appropriate sentence should be?

PROSPECTIVE JUROR 31:  You mean keep them both in balance?

THE COURT:  Well, they're probably not going to be in balance because if they're in balance you probably would never

Page 204

be able to make a decision.

PROSPECTIVE JUROR 31:  Keep them in mind to each one is what you're trying to say?

THE COURT:  Yeah.  Would you be able to consider -- how much weight you give each one is for you to decide.  But what I'm asking is if I tell you the defense has offered A, B, and C as mitigating factors and you have to consider whether or not those have been established by a preponderance of the evidence and then I'm going to tell you the government has argued for A, B, and C aggravating factors and those the government has to prove beyond a reasonable doubt, if you find any one or more aggravators and any one or more mitigators, then you have to weigh those.  And my question for you is would you at least consider every mitigating factor and every aggravating factor that you find was proved by the evidence, and then would

1566

you be able to weigh those in your decision?

PROSPECTIVE JUROR 31:  I believe I could.

THE COURT:  Okay.  I'm going to keep my word that that was the last question.  I'm going to ask you to step out.  I want to join in both lawyers thanking you so much for your willingness to be subjected to our questioning.  And we'll let you know.  It may take a couple minutes, but we'll let you know.

(Prospective Juror 31 exited the courtroom.)

THE COURT:  Any challenge for cause by the government?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Any challenge for cause by the defense?

MR. BERRIGAN:  Yes, we do move for challenge for cause on Juror 31.  He really has a fairly specific criteria for the death penalty, but it's one he holds very firmly, and that is if

Page 205

you commit intentional murder and, to use his words, really show a disregard for life in the process, then that's the death penalty.

THE COURT: Well, he didn't say he'd automatically vote for the death penalty.

MR. BERRIGAN: I don't think anybody asked him ever automatically.

THE COURT: Yeah, he never in my view came close to saying he'd vote for the death penalty, and there are some cases that suggest that's the test.

MR. BERRIGAN: Well, I don't think that is. I think

1567

Wainwright versus Witt makes it very clear that if a juror's views would substantially impair his ability to be a fair and impartial juror and follow the instructions of the Court, that is the test and -- in my humble view, and this juror meets that test. He's way over --

THE COURT: Well, United States versus Paul, an Eighth Circuit case, it said, Defendants may life qualify jurors and may challenge any juror who would automatically vote for the death penalty in every case. That wasn't the test.

MR. BERRIGAN: Well, nobody asked him automatically, and he didn't volunteer.

THE COURT: But no one could -- at least I'm unwilling to find that this is a juror who would automatically vote in favor of the death penalty. Now, I made my decision on a much more relaxed standard than that, but that is the standard the Eighth Circuit has applied, and it comes directly from Morgan.

MR. BERRIGAN: Well, I won't argue with the Eighth Circuit, but the United States Supreme Court's kind of the final

word in this area, and they've not changed their view since Wainwright versus Witt. They believe that if a juror's views would substantially impair their ability to follow the instructions of the Court that's an unqualified juror.

THE COURT: I understand that, but beyond a reasonable doubt to the view on the death penalty, if the juror doesn't automatically believe they would impose the death penalty in

1568

every case, the juror's not substantially impaired within the meaning of Witt.

MR. BERRIGAN: Well, I'd respectfully disagree then obviously with the Eighth Circuit, and I'm sure that counts for nothing.

THE COURT: Well, that's what the Supreme Court said in Morgan. That's a quote from Morgan, 504 U.S. at 729: Will automatically vote for the death penalty in every case.

MR. BERRIGAN: Well, of course, if a juror says that, and that had to do with whether the lawyers could even ask that question. But, of course, if they say automatically, then they meet the standard of substantially impaired. I don't think that equates them. I think certainly if you say automatically either way you're impaired. And I agree he didn't say that.

But in our view he has very firm beliefs about the death penalty. And if it's an intentional murder, in our view basically he's at the doorstep of the end zone, and he very clearly said he would not consider the defendant's background as a mitigating circumstance; it doesn't weigh into his equation. He's looking at the circumstances of the offense only. He also had a very specific criteria --

THE COURT: Well, you know, that's really misleading

Page 207

the way you do that with every witness about the background because you never ask an open-ended question. You just go on that yes-or-no check box. You never ask them if the judge were

1569

to instruct you on what's a mitigating factor, would you be able to consider that. Now, that would be an open-ended question. You never want to ask open-ended questions. You just want to ask leading questions, and there's nothing wrong with that. But I'm not going to give a prospective juror's response to a leading question as much weight as I would to an open-ended question.

MR. BERRIGAN: And again, I'm just stating our position for the record.

THE COURT: Right. No. I appreciate that.

MR. BERRIGAN: You're going to make your decision based on your own ability to ascertain the juror's views obviously. I'm arguing for my client that I think this guy is substantially impaired. And I think he had a very specific criteria for life, frankly, and that was you had to be coerced into the situation and not be the murderer. And if you didn't fit that criteria, then a life sentence is not an appropriate punishment for his consideration.

THE COURT: Or did he say that he was leaning towards a death sentence in that situation?

MR. BERRIGAN: Yeah, he did use that term "leaning." It was interesting. Or I think he said "moving towards" several times, yeah. But he also said -- and he's very firm -- something in reference to his father perhaps having taught him this. He never backed off of that. He has very firm views.

1570

Page 208

He's entitled to them. I just believe they make him substantially impaired. He certainly is not a person in my view who is going to fairly consider both punishments. And so we'd ask that Juror 31 be removed for cause.

THE COURT: Thank you.

Mr. Williams.

MR. WILLIAMS: Not surprisingly, I disagree. In part this is exactly the problem we run into when we move off of McVeigh and we start getting into allowing certain facts to be brought out.

THE COURT: It is.

MR. WILLIAMS: And here's the difficulty. We all know what the evidence in this case is pretty well because we've tried this case before. And the evidence is not going to be that this defendant pulled the trigger. You indicated in your ruling that if we're going to ask these questions we need to ask the questions based on a reasonable understanding of what the evidence will be. A reasonable understanding of what the evidence will be in this case is that the defendant never pulled the trigger.

THE COURT: And you don't have a good-faith basis to suggest otherwise, do you, Mr. Berrigan?

MR. BERRIGAN: I have the indictment, Your Honor, which says that the defendant intentionally --

THE COURT: Well, but you've had complete access to

1571

the discovery file. I realize what they said in the indictment. You've been very clever and effective in using the government's

Page 209

language. But that isn't the test, what they said in the indictment. The test is do you have a good-faith basis that there will be a scintilla of evidence offered by the government that your client pulled the trigger?

MR. BERRIGAN: If there is that evidence, I don't know of it.

THE COURT: And wouldn't you agree that if there was that evidence the government would have had an obligation to tell you?

MR. BERRIGAN: I agree that they should have, Your Honor.

THE COURT: Doesn't mean that they would have.

MR. BERRIGAN: If their position really was that my client didn't intentionally kill these people, why have they charged her with that? That's the allegation. I don't believe she premeditated upon it. So what? It doesn't matter what I believe.

THE COURT: It doesn't, and that's actually another point which we're going to get to when we're done at the end of the day because you've given the personal beliefs of the defense team several times I think inadvertently.

MR. BERRIGAN: I only meant to do that in one circumstance, and that is I don't want to suggest that we

1572

believe she's guilty.

THE COURT: Yeah, but your personal belief is irrelevant as you just acknowledged, and it would be equally irrelevant for you to suggest you have a personal belief to the contrary, but that's a different issue. I wanted to raise it but not at this time.

Page 210

Anything else you want to add?

MR. BERRIGAN: I have nothing further regarding 31, sir.

THE COURT: Okay. But let me -- let me ask you this. When you kind of suggest that -- you indicate what the government alleges, the implication is that there may be evidence in this trial that your client pulled the trigger, and you know that that's not true.

MR. BERRIGAN: I don't know that. How does that work, that I am responsible for what the government's evidence is? They made the allegation. If they're not going to stand up in front of a jury with that indictment and say, This is what we believe, then they shouldn't have charged it. They should have charged her with aiding and abetting and that's all. They've not elected to do that. And by that election I think we're absolutely free to talk about the allegations. Why else would they have done that?

THE COURT: Well, you're not free to talk about an allegation if you don't have a good-faith basis that there's any

1573

evidence to support it.

MR. BERRIGAN: The basis, Your Honor, is an indictment. A grand jury came back and said she killed these people intentionally. She did it. Now, they can make whatever kind of theory they want, but that's the indictment.

THE COURT: I understand that's the indictment, but you're aware of any evidence that the government has that would indicate that your client pulled the trigger.

MR. BERRIGAN: Well, I don't personally. But who am I to say? A lot of these people I haven't talked to.

Page 211

Mr. Williams has access to his own witnesses. They could very well come in here and say God knows what about my client. All I know is he's alleged it. And as an officer of the Court, he's made that determination. He took that evidence before a grand jury, and they found that my client -- there was at least probable cause to believe she intentionally killed these people, not as an aider and abettor, intentionally murdered. And I don't know why I would be prohibited then from inquiring of jurors given the nature of the charge and the allegation, well, what if that's true, because that's what they've charged?

THE COURT: Did I say you were prohibited from doing it?

MR. BERRIGAN: It sounded like we're getting there.

THE COURT: Okay.

Mr. Williams?

1574

MR. WILLIAMS: And I'm not suggesting he's prohibited from doing that. What I am suggesting, though, is in weighing whether this person, whether this juror, is substantially impaired, I think you need to recognize what the evidence will show in this case. And the evidence will be that aside from I think two hearsay statements from juror -- or from inmates there's not going to be a scintilla of evidence to suggest that she pulled the trigger on anybody. One --

THE COURT: Wait. You make me nervous. Aside from, what does that mean?

MR. WILLIAMS: Well, Sara Bramow will testify I think that the defendant at one point said that she took out Lori when Lori made too much noise and woke up the children. Sara doesn't know what that means. A jury could in theory presume that means

Page 212

take out.  Doesn't mean knock down or tie up or kill.  That's one thing.

Bobby McNeese will testify that at one point the defendant in this case indicated that she might have actually pulled the trigger on Terry DeGeus.  Aside from those two things, those two pieces of testimony, there's no evidence to support -- that we're going to be presenting that the defendant did anything other than assist.

THE COURT:  But you keep saying "aside from."  But that is evidence upon which a jury could find.

MR. WILLIAMS:  It is.

1575

THE COURT:  Okay.

MR. WILLIAMS:  And I'm not suggesting otherwise.

THE COURT:  Right.  So there will be evidence.

MR. WILLIAMS:  Yeah, there will be evidence, but the overwhelming evidence is going to be and certainly our argument's going to be --

THE COURT:  Well, just a second.  You know, when you say "aside from" and "overwhelming," you remind me of the jurors who say, Not really; I didn't hear anything about this case, not really.

MR. WILLIAMS:  Fair enough.

THE COURT:  Okay.  That's the first time I've heard that.  I mean, I didn't know that.  There's no reason I would know it.  So that does actually change the mix for me, and I appreciate that you're saying that there's just those two pieces of evidence.

MR. WILLIAMS:  Yeah, certainly that I'm aware of.

THE COURT:  Right.

Page 213

MR. WILLIAMS: And, frankly, I think -- and I've already thought about doing this; I just haven't got around to doing it. When it gets to the penalty phase, we're going to elect between the two of the gateway factors the one that she engaged in conduct intentionally intending somebody else be murdered.

But be that as it may, getting back to Juror 31, what

1576

he says throughout his questionnaire and what he says today suggests somebody who has not made up their mind and who is willing to consider the different possibilities. Is he lean -- if he finds out that she intentionally killed somebody, is he leaning? Yes. But he himself said, you know, I'm always going to keep an open mind, and I am always going to be questioning myself, and I'm always going to be looking back at other possibilities.

In the questionnaire, this litmus test that Mr. Berrigan always has about, you know, did you sign -- base your punishment on the crime or the person or the both, this juror said both. When he gets to the issue of his other litmus test, are you willing to consider life imprisonment as a possible punishment, this juror said yes. When he's asked if he has an opinion about where the defendant should be punished, he said, I would want to hear everything before I would address an opinion for punishment.

On life imprisonment he says, There are some circumstances that would probably fit life imprisonment under question 82. Another litmus test of the defense, an eye for an eye, question 78, he says, No, I don't believe in an eye for an eye.

Page 214

And so not only in the questions in the questionnaire -- well, and then on question 87 again on this question of if she had background of abuse, he said, I would

have to put that into consideration. He says, It wouldn't be an excuse of the crime, but I would have to put that into consideration.

So if anything, his questionnaire reflects that this is a gentleman who is willing to look at everything. He hasn't got a dogmatic position in favor of the death penalty. Sure, if he finds out that she intentionally pulled the trigger on five people and killed them in cold blood, he's thinking death penalty. I would be too.

But he has not once ever said during any of his questioning that he has foreclosed the possibility of life imprisonment as a possible punishment or that he's unwilling to weigh other factors in making that decision. And that's all we can ask of a juror, and in this case I think he's life qualified, and I don't think he should be struck.

MR. BERRIGAN: May I respond very briefly, Your Honor?

THE COURT: Don't even worry about the briefly.

MR. BERRIGAN: We both use these questionnaires to our advantage, and I find it interesting when the juror abandons the questionnaire as he did in this case Mr. Williams wants to point out what he said three months ago. And when he's consistent, well, that's another thing.

THE COURT: But that's the nature of advocacy.

MR. BERRIGAN: Exactly. I have no problem with that, frankly, because I think that's our responsibility. But this

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1375 of 3245

juror, whatever he said in the questionnaire, this is what he had to say about childhood in terms of being a mitigating circumstance. He says he thought that childhood had an effect on a person but I have a hard time believing that when it comes to murder. And that's when I asked him, Well, it's not an excuse; right? Would you give that serious consideration in assessing punishment, not whether guilty or not but whether the punishment -- what punishment is appropriate or not? And he said, I guess all I can say is you may have a bad childhood, but murder -- I can't see where you'd commit a murder. And I asked him again, Does it mean you wouldn't be willing to consider that as a part of the punishment equation? And our view is his answer was, No, I can't see that. Now, I know he told you some different responses.

THE COURT: And one of the reasons why I think -- I mean, there are multiple reasons why they might give me a different response. But there's one thing to have a belief, and there's another thing to find out, oh, the judge is going to instruct you on something different than your belief. And some people can set aside their belief and follow the instruction, and others can't. And nobody's -- when we get into that situation like on mitigation like on the crime or the person, nobody said, Well, the judge is going to instruct you that you have to consider the person. And I am going to instruct them on that. That's what a mitigation instruction is.

1579

But nobody wants to ask the juror, well, what would they do if the judge instructed them on that? And that's why I don't put a whole lot of stock into that question. I mean, it

Page 216

may be how they're leaning, but they may be great at following an instruction on mitigation. So . . .

Anything else you want to add on Juror 31?

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: And, Mr. Williams, you're right. We're precisely in this dilemma because of my pretrial ruling disagreeing with the McVeigh decision. But you know what? I'd rather be in this dilemma than have followed McVeigh. That's just my own view.

MR. WILLIAMS: And please don't take that as any criticism.

THE COURT: I didn't take it as a criticism. No. Matter of fact, I embrace your -- you're exactly right. That's why I'm struggling, because of the ruling I made. I understand that. But I think the easiest way out is to just take McVeigh and you never get to this situation, but I don't think that, in my view, results in a jury that would be fair enough for me, and so I realize that my ruling puts me right where I am right now. I understand that. But you know what? As much as I don't want to make the ruling on this juror, I'm glad I'm in this position because it's just going to result in a fairer trial.

And, you know, my ruling did alter the landscape of

1580

the test, and the test that I have tried to apply is can a juror fairly consider both penalties because I think and based on my ruling -- I'm bringing my sense of justice to this issue -- that's what I'm looking for. I'm looking for a juror who can fairly consider both penalties.

And while I think there's a reasonable possibility that Juror 31 could do that, there's a greater likelihood in my

belief that he could not do it even though he would try to do it. And so it's the closest call we've had for me to make, but I'm going to sustain the defense challenge for cause on Juror 31. Let's bring him in, please.

(Prospective Juror 31 entered the courtroom.)

THE COURT: Juror 31, I wanted to thank you very, very much. Sorry we put you through all the grilling. But I made a decision to go ahead and dismiss you from this case.

PROSPECTIVE JUROR 31: Okay.

THE COURT: And so thank you very, very much. We really appreciate your answers. And you did a lot of personal soul searching. We really appreciate that.

I'd ask you to do us all a favor. You're dismissed from this case, but we'd appreciate it if you wouldn't talk about this jury selection process until we get the jury actually selected. And the reason why is northwest Iowa's a pretty small population base. And if you talk to somebody, that person could talk to somebody else, and that somebody else might wind up in

1581

one of these chairs later this week or next week. So hopefully we'll have a jury selected by the end of next week. Thank you very, very much. We appreciate it. Thank you.

(Prospective Juror 31 exited the courtroom.)

THE COURT: Okay. Ready for Juror 185?

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 185 entered the courtroom.)

THE COURT: Juror 185, please be seated anywhere there. You probably could have baked four or five cakes had we gotten to you earlier; isn't that right?

PROSPECTIVE JUROR 185: Probably, yeah.

Page 218

THE COURT: Well, it was just the unlucky draw that put you last, but we appreciate you waiting. I've given each lawyer 12 minutes to question you. We're going to start with the government. Then the defense will have an opportunity to question you. Thank you.

EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, ma'am.

A. Hi.

Q. My name's C.J. Williams. I introduced myself earlier. We do appreciate your patience today. We appreciate you also filling out this questionnaire. We know it took some time, and you clearly put some thought into it. What we're going to try to do here is primarily talk about a couple subjects. One is

1582

what you know, if anything, about this case and how that might affect your views as a juror, and then we're going to talk a little bit about the possible punishments involved here.

First of all, you indicated in your questionnaire you'd only just heard about this case. You heard on TV about some murders and discovering some bodies around Mason City, Iowa, but it doesn't look like you really discussed it with anybody else or anything along those lines. Does that fairly summarize your knowledge of this case?

A. Yeah. You know, just little snippets on television before I even got a letter saying I was a prospective juror for this.

Q. And since that time that you filled out this questionnaire back in January of this year, have you heard anything new about the case?

A. No. I've tried not to, you know, listen to the TV, and we

don't get a -- we don't get the Sioux City Journal or anything like that, so I haven't really read anything about it either.

Q. When you filled out this questionnaire, you'd indicated that you don't have an opinion about whether the defendant's guilty or not guilty. You just don't know enough about the case.

A. Right.

Q. Do you still feel that way?

A. I do.

Q. All right. And you were asked, Do you have a thought about

1583

what the punishment ought to be, and you said, If the killing was intentional, I would lean more strongly to a harsher punishment. Do you recall putting that down?

A. Uh-huh.

Q. And that's a yes?

A. Yes.

Q. Shelly needs to have yeses or nos.

A. I'm sorry. Yes.

Q. And by harsher punishment, did you have anything in mind in particular at that point?

A. Harsher in my mind means, you know, either life in prison or the death penalty, not . . .

Q. Let's -- I'm sorry. I didn't mean to interrupt you.

A. No, that was basically my thought.

Q. Let's talk about life in prison. First of all, in the federal system, unlike in some state courts, there's no parole. If you get sentenced to life in the federal system, there's no early time out for good behavior or anything like that. Do you understand that life in prison in the federal system means just

Page 220

that? You're in prison for the rest of your life.

A. Yes.

Q. Is that a severe punishment in your view?

A. I think so.

Q. And if we get to this point in the case where the defendant has been found guilty and the jurors are back there trying to

1584

figure out the appropriate punishment, you're going to have these two options. You're going to have death penalty or life imprisonment. Did you understand that's where you might be if you get to that point?

A. Yes, yes.

Q. This is kind of a unique process. You know, we need a jury to decide this issue because the law is not written that if you engage in the intentional murder of somebody else you have an automatic sentence of whatever, death penalty or life in prison. What happens is it actually says one of those two are available, and so we ask for jurors to come in and look not just at the crime because if that was the only test, then we wouldn't need a jury. We ask the jurors to look at the entire set of facts that may impact on what the appropriate punishment should be. Do you understand that would be your role if you got picked as a juror here?

A. Yes.

Q. The judge is going to instruct you at some point if you're a juror if we get to that third phase, if we get to the penalty phase, what the aggravating factors, those facts that suggest death penalty's appropriate, are and what the mitigating factors are, those factors that would suggest life imprisonment. And as a juror, you would have to follow the instruction to consider

Page 221

those factors. Now, what weight you put to them is your own decision.

1585

But would you be able to follow an instruction like that and weigh the different factors that the judge told you that here are the factors; you have to consider these? Could you follow that instruction?

A. Yes. I think that would be very helpful, more so than just having to figure it out in my own mind, having instructions like that.

Q. Sure. Now, the way the system's going to work if we get to this point is that if the judge instructs you that, you know, A, B, and C are aggravating factors and 1, 2, 3 are mitigating factors, you have to consider them which means realistically consider them, realistically look at their value and see if it impacts on your decision. But the weight you give to any of those factors is going to be completely up to you.

So you could -- let's say a mitigating factor is the defendant has no criminal history; okay? Let's just say that's a mitigating factor. To you that could be very weighty. You may decide, boy, I'm going to give a lot of weight to that. You know, I was kind of leaning toward the death penalty, but when I find out this is the first time the defendant has been involved in any criminal activity, that really weighs heavily in my view about whether life imprisonment ought to be involved as the punishment in this case.

Or you could be of the opinion that, you know, it really doesn't matter. I'm not going to give that any weight

1586

Page 222

because in my view it just doesn't mean anything. I'll consider it. I'll look at it. I'll certainly look at it and consider it along with everything else, but I'm just not going to give it any weight. Or you may be someplace in between.

Do you understand it's going to be up to you to decide what kind of weight to put to all these factors?

A. Yes, I do.

Q. Now, in your questionnaire one of the questions -- and there's a ton of questions here. One of the questions was, In your opinion should punishment for a crime be based on -- and then there's a number of things you could check, the crime, the person, both, or something else. And you said, The crime. I feel the severity of the crime should be the main factor in the punishment. The person is responsible for his or her own actions, and I am a believer in the phrase if you do the crime you do the time. Does that sound familiar to you?

A. Yes, it does.

Q. Now, what's interesting is you said it should be the main factor in the punishment, the crime should be. Have you in your mind foreclosed -- and if you're in that unique position of making the decision on punishment, would you take into consideration -- particularly if the judge told you that you had to, take into consideration other factors like the defendant's background or whether she had a criminal history or what her role was in the offense? Would you allow those things to be

1587

considered in your mind to determine what the appropriate punishment would be?

A. I would, but I think it would be -- I would have to work at

Page 223

it to -- I'm not quite sure how I want to say this. I know I would be able to do that because those are my instructions, but, you know, in answering that questionnaire, that was my first gut reaction was, you know, because of the crime. But I'm also able to, you know, process everything and follow through with it all like we're supposed to be instructed to do so.

Q. So you could put aside your gut reaction and follow the Court's instructions?

A. I think so. I'm not so close-minded that I can't do that.

Q. Good enough. Now, in this case there are going to be a lot of different factors, as I said, and you're going to be able to judge yourself how much weight to give to those.

Now, the government has alleged in this case and I want you to assume for the sake of argument that you've sat on a jury and you've found beyond a reasonable doubt that the defendant engaged with another person in killing five people, that it was intentional and premeditated. By that I mean they thought about it; they planned it; it was substantially planned in advance; and five people were killed including two little girls; okay?

Now, what -- for a juror to sit in this case, the juror would have to say, Despite those facts, I'm still willing

1588

to consider life in prison as a possible punishment; I don't know all the facts yet, and I'm still willing to consider that as a -- realistically consider life in prison as a possible punishment.

Now, candidly, some jurors come in here and you hear that many facts, just the fact that two little girls were killed, and they've already made up their mind, you know, I'm

Page 224

sorry, no way could I ever consider life imprisonment; I've already decided death penalty. Can you share your thoughts with us where you're at on that?

A. I'm not quite sure I understand what you mean, where I'm at where?

Q. Well, let me rephrase it then. It was a bad question. If you knew that the evidence in this case -- if the evidence in this case showed that the defendant was involved in the killing of five people including two little girls, could you still realistically consider the possibility of life imprisonment as a possible punishment, or are those facts alone for you so strong that it forecloses even looking at the possibility of life imprisonment?

A. I think, you know, I would -- they are, you know, great factors in my mind, but I think, you know, once you're involved in the case to that level, you know, you're just going to have to consider all these other -- all these other things, that I don't believe I would just focus, you know, straight on the

1589

death penalty. I would, you know, weigh all the factors and . . .

Q. And before you impose the death penalty on somebody, would you want to look back and consider life imprisonment as a possible punishment? Assume the worst facts in the world for a defendant, you know, intentionally killed, you know, five people including two little girls, you know, did this premeditated, thought about it in advance, schemed it, and everything else. Before you cross that line into actually imposing the death penalty, would you look back and realistically consider all the other facts and consider the possibility of life imprisonment?

Page 225

A.   I believe so.  I think we would have to.  I still -- you know, ever since we got the questionnaire, I've struggled with what -- how I really -- how I really feel about that.  I'm -- you know, I'm a Christian, and, you know, my God says in the Bible, you know, you don't kill.  Well, you know, does that mean you don't murder somebody but it's okay if you're on the jury to decide if they have the death penalty, you know?  Is that the same thing?  I don't know.  I can't answer that, and I still -- I still struggle with that a lot.

Q.   It would be a tough decision for anybody to make I would think under those circumstances.  What do you think about that?  I mean, do you think -- let me put it this way to you.  Let's say you're on this jury, okay, and you've done the analysis.  You've done all the weighing, and in your mind you've concluded

1590

that, boy, you know, the factors weigh in favor of the death penalty in this case in my view and you check with your other jurors.  You've discussed it, and every other juror says, Yeah, you know what?  We agree; death penalty is called for in this case.

The next step you'd have to take to actually reflect your verdict would be to sign a verdict form imposing the death penalty on another human being.

I've got a good friend at work with me who supports the death penalty in theory, believes it should be out there, believes it's an appropriate punishment in the right case, but he also knows because of his own personal value system, his own beliefs, in this case religious as well, that push come to shove, he knows he could never sign a verdict form imposing death on another person.  And that's fine.  I have total respect

Page 226

for my friend and that view, and I respect anybody's view on that.

What we need to know is whether you could do that, or is your personal belief system such that you know you could never sign a verdict imposing death on another person?

A. I honestly don't know what I could -- I don't know if I can give you a good answer on that.

Q. It would be a tough decision I take it for you.

A. It would, yes. I think a big factor in my mind is if the defendant has shown any remorse or not.

1591

Q. All right.

A. I sound kind of wishy washy this way, but if -- you know, if there's no remorse, I don't care what I did, I don't care if anybody knows and what they feel and everything, you know, I'd be like, well, you know, maybe they do deserve that. But if they -- if they show remorse, you know, maybe sitting in prison for the rest of their life and having to think about it every single day is a harsher punishment than being put to death.

Q. Let's talk remorse for a minute. Now, remorse I suppose you could find in some evidence -- just because of the way somebody behaved, you could either infer they had remorse or infer they didn't have remorse maybe by the actions they took or something like that.

A. Right.

Q. But you may never be in a position of ever knowing what is in the person's head.

A. Right.

Q. In a given murder case, you may not know that. And this morning Mr. Willett talked to you about the Fifth Amendment

Page 227

right of the defendant not to testify and so forth. Are you going to require, before you'd consider life in prison or the death penalty, some definitive answer on whether the defendant showed remorse or not for you to be able to make that decision?

A. I don't see how I can expect that when we can't know, we can't get into that person's head. We can't know definitely, so

1592

that still leaves me kind of riding the fence, doesn't it?

Q. Sure, and that's exactly where I'm trying to go with you is figure out what impact that has on you. I mean, if you get back in that jury room and maybe there is, maybe there isn't something in the facts that tells you whether the defendant had remorse or not, but let's assume there isn't -- you look at the facts, and you just can't tell; I don't know if she had remorse or not -- what's that going to do to your decision?

A. I would probably lean towards life in prison. I don't think my -- I don't think I could live with that inside me knowing that I was part of, you know, sentencing someone to death like that. I don't think I could.

Q. Do you see yourself realistically ever living with yourself sentencing somebody else to death? And it's okay if you don't. I mean, some people just don't feel comfortable doing that, and they just know they aren't going to feel comfortable.

A. I think it would be really, really hard. I don't -- I don't know if I could. I don't think so.

Q. And that's fair enough. It would be a tough decision I think for anybody to do something like that.

A. Yeah.

Q. You just think your religious beliefs or your personal views are so strong that realistically in your heart of hearts

Page 228

you just know you couldn't ever really sign a verdict form that would cause another person to die?

1593

A.   I don't think I could.  I think it would be really, really hard.

MR. WILLIAMS:  And I appreciate your candor on that, ma'am.

I don't have any other questions, Your Honor.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  No questions.  Thank you, ma'am.

THE COURT:  If you'd just step outside for a moment, we'll let you know.

(Prospective Juror 185 exited the courtroom.)

THE COURT:  Is there a challenge for cause by the government?

MR. WILLIAMS:  Yes, Your Honor.  This defendant (sic) from her statements made it clear that she would not be able to realistically consider the death penalty.

THE COURT:  We've gone full circle now.  Half the time I call them witnesses.  Now you just called the juror a defendant so -- but I knew what you meant.

MR. WILLIAMS:  The juror.  I apologize.

THE COURT:  That's okay.

Mr. Berrigan?

MR. BERRIGAN:  No objection, sir.

THE COURT:  You have no objection to me sustaining their challenge for cause?

MR. BERRIGAN:  Right.  I don't join in the motion.  I

1594

Page 229

guess I'll take no position if that might be more accurate, but obviously I asked no questions, and I understand the government's position.

THE COURT: But you're not taking the position that it would be error for me to sustain the --

MR. BERRIGAN: Right, yeah.

THE COURT: Yeah.

MR. BERRIGAN: I'm not sure I have to object or not object when the state makes a motion unless you think I do. I haven't been doing that in every case I suppose.

THE COURT: No, I don't think you have to, but I'm interested in what your position is.

MR. BERRIGAN: Right, and I don't think I was very clear. I'm going to take no position respecting the state's motion on Juror Number 185.

THE COURT: I'm going to sustain the motion because I think the juror would be substantially impaired in her duties. So we'll bring in Juror 185.

(Prospective Juror 185 entered the courtroom.)

THE COURT: Juror 185, we're going to go ahead and dismiss you from the case. We appreciate very much your hard work of filling out the questionnaire, and I can tell it was a personal struggle for you, but that's what this process is all about, and that's what's hopefully going to lead to a fair selection of jurors who can sit in this case. So thank you very

1595

much. Good luck to you.

We'd ask you all that -- we'd ask you to not discuss this jury selection with anybody at least until we get the jury empanelled which would be about another week or so because if

you said something to somebody and that somebody said something to somebody else, that somebody else might be sitting in one of those chairs later this week or next week.

And one more thing.  Would you mind if I wrote down your name and had you make a cake maybe some time for my family?  I'd really like to try it.  I was so touched by the passion that you bring to baking cakes that I'd like to take you up on it if that'd be okay.

PROSPECTIVE JUROR 185:  That's fine.

THE COURT:  Okay.  Thank you very much.  Good luck to you.  Thank you.

(Prospective Juror 185 exited the courtroom.)

THE COURT:  Okay.  Well, we had beginner's luck today; right?  We started strong with Juror 727 who made it into our jury pool.  And my notes indicate nobody else made it in.  My scribbles are more confusing on who exercised peremptory challenges.  My notes indicate that the government exercised one.

MR. WILLIAMS:  Two actually, Your Honor.

THE COURT:  The government exercised two, that's right.  243 and 49.

1596

MR. WILLIAMS:  That's correct.

THE COURT:  And the defense did not use any of theirs today?

MR. BERRIGAN:  We used Number 576, sir.

THE COURT:  That's right.

MR. MILLER:  See the little Delta sign there, right.  Yeah.  576.  So what's the total?  The defense has how many left?

Page 231

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1391 of 3245

THE CLERK: Five.

THE COURT: Five. And the government has?

THE CLERK: Twelve.

THE COURT: Twelve. And how many jurors do we have tomorrow?

THE CLERK: Twelve.

THE COURT: Okay. We will start at 8:30. I have two sentencings, one at 8 and one at 8:10. I understand that they're not difficult sentencings or they wouldn't be scheduled that way, so as soon as I'm done with my -- you're welcome to come into the courtroom, and we can just -- you can all be settled in, and I can just sentence around you all. I assume they're probably immigration matters because we're going to use a telephonic interpreter. Is that right? Are they immigration cases, do you know?

THE CLERK: I believe they are. I know they are interpreter.

1597

THE COURT: They're the only ones that don't get set for a full hour, so I assume that would be the case.

So anything else we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: This is more of an appellate matter for people who are going to read this transcript, Your Honor, but I just want to make sure because I've never practiced in front of you, when I ask for a continuing objection, in my usual practice, that goes for that witness and then you're done. I mean, if you want to continue objection, you've gotta do it every time. Mr. Williams asked similar questions of Juror 185 regarding giving no weight to statutory mitigating circumstance

Page 232

of no substantial criminal history. I did not object relying, I hope appropriately, on my earlier request for a continuing objection on this issue which the Court granted. And I'm not sure if I'm safe in making that assumption or I should make it.

THE COURT: Wait. I'm confused now. I thought you said your usual practice was it only goes for that one witness. Now you're saying -- oh, but with regard to jurors --

MR. BERRIGAN: Right, exactly.

THE COURT: -- it's across the board.

MR. BERRIGAN: Right. I mean, I know what your ruling's going to be, and I don't want to interrupt Mr. Williams, and I sort of think it's pointless to jump up every time it happens. But on the other hand, there are going

1598

to be appellate lawyers who might feel quite differently and appellate courts who might feel quite differently, and I don't want to put the defendant in jeopardy if and when there's an appeal taken that I didn't make a contemporaneous objection if you think that's necessary.

THE COURT: I don't think it's necessary.

MR. BERRIGAN: Okay. I'm comfortable with that.

THE COURT: Yeah, I'm not sure -- you know, I've always been unsure of continuing objections because of kind of the circuit's view.

MR. BERRIGAN: Right.

THE COURT: They're fine for me, but whether -- here's what -- I never want to take a position for any party about what you need to do to preserve your record because I don't want to be -- I have enough trouble figuring out my own rulings let alone making sure you do what you need to do. It's fine for my

Page 233

purposes.  I understand that you have a continuing objection to every potential juror that we're going to interview, and I understand the basis for it, and my ruling would be the same.

MR. BERRIGAN:  Well, I feel comfortable in not getting up every time because we've had such extensive discussions about this issue, and I think the Court's made its views clear.  I'm certainly clear.  But I just want to make sure it's preserved for the record.  So I think the purpose of jumping up each time is to give you an opportunity to change your mind, and I'm sure

1599

if you change your mind you'll let us know without me jumping up.

THE COURT:  That's true.  And I am going to take home Penry I and II and re-read them tonight.  I've been actually skimming them a little bit today.  And I just -- we just don't view those cases in the same light.

MR. BERRIGAN:  And I'm not arguing with your ruling, sir.  I just want to make sure I don't do something that doesn't preserve this record as best as possible.

THE COURT:  And you can do both.  You can make your record, and you can argue with my rulings; okay?

MR. BERRIGAN:  Okay.  Thank you.  That's all we have, sir.

THE COURT:  That's your job.  Thank you.  We'll see you tomorrow morning.

(The foregoing trial was

adjourned at 3:48 p.m.)

CERTIFICATE

Page 234

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                    1-9-06
                                            Date

                                                    1600

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| Prospective Juror 727 | | |
| | MR. WILLIAMS | 1412 |
| | MR. BERRIGAN | 1421 |
| Prospective Juror 243 | | |
| | MR. BERRIGAN | 1435 |
| | MR. WILLIAMS | 1444 |
| Prospective Juror 169 | | |
| | MR. WILLIAMS | 1452 |
| | MR. BERRIGAN | 1461 |
| Prospective Juror 49 | | |
| | MR. BERRIGAN | 1475 |
| | MR. WILLIAMS | 1486 |
| Prospective Juror 576 | | |
| | MR. WILLIAMS | 1499 |
| | MR. BERRIGAN | 1513 |
| Prospective Juror 31 | | |
| | MR. BERRIGAN | 1530 |
| | MR. WILLIAMS | 1538 |
| | MR. BERRIGAN | 1558 |
| | MR. WILLIAMS | 1563 |
| Prospective Juror 185 | | |
| | MR. WILLIAMS | 1581 |

*****

Page 235

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

          Plaintiff,                         Sioux City, Iowa
                                             April 20, 2005
     vs.                                     8:21 a.m.

ANGELA JANE JOHNSON,                         VOIR DIRE OF
                                             PANEL G
          Defendant.
                                    /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

1602

APPEARANCES:

For the Plaintiff:      C. J. WILLIAMS, ESQ.
                        Assistant United States Attorney
                        Suite 400 - Hach Building
                        401 First Street Southeast
                        Cedar Rapids, IA  52401

                        THOMAS HENRY MILLER, ESQ.
                        Iowa Attorney General's Office
                        Area Prosecutions Division
                        Hoover State Office Building
                        Des Moines, IA  50319

For the Defendant:      PATRICK J. BERRIGAN, ESQ.
                        Watson & Dameron
                        2500 Holmes
                        Kansas City, MO  64108

                        DEAN STOWERS, ESQ.
                        Rosenberg, Stowers & Morse
                        1010 Insurance Exchange Building
                        505 Fifth Avenue
                        Des Moines, IA  50309

                        ALFRED E. WILLETT, ESQ.
                        Terpstra, Epping & Willett
                        Higley Building - Suite 500
                        118 Third Avenue Southeast
                        Cedar Rapids, IA  52401

Also present:           Bill Basler

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1396 of 3245

PANEL G, 4-20-05
Court Reporter:          Shelly Semmler, RMR, CRR
                         320 Sixth Street
                         Sioux City, IA  51101
                         (712) 233-3846

1603

(Proceedings reconvened outside the presence of the jury venire.)

THE COURT:  Okay.  Are there any matters we need to take up this morning?  Mr. Williams?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  Whatever your preference is, Your Honor, but I was wondering if you'd allow me to make just a two-minute record for the benefit of your colleagues on the Eighth Circuit on this issue on no weight.  I'm prepared to do it now.  If you want to do it later, you can.

THE COURT:  Oh, on the -- I was thinking w-a-i-t, but you were w --

MR. BERRIGAN:  E-i-g-h-t.  Could I do it now and just get it over with?

THE COURT:  And before you make your record, let me just ask you a couple questions.  I reread the cases last night and it seems to me what Justice O'Connor was saying -- I'm just going to summarize the gist of it almost in lay terms -- was that -- was it Louisiana I think?

MR. BERRIGAN:  Texas, sir.

THE COURT:  Texas, that's right, Texas.  The problem in the Texas system was their system did not allow for the jury to give full weight to mitigation if they wanted to.  I don't read the opinion as saying that a juror has to give full weight

Page 2

because that would be directing the jury to make a finding on the mitigation, that they have to give full effect to it. I don't think the case said that jurors have to give full effect. I think what the case said was that in that case the state or in this case the federal government could not set up a system where the jurors didn't have a full, fair, and complete opportunity to give full weight to a mitigating factor if they wanted to.

But it doesn't suggest that I can instruct them that they have to give it full weight because I would be directing them in the weighing process more than what the law requires. That's my take of it.

MR. BERRIGAN: I recognize those are two different issues, Your Honor. One is the obligation on the state or in this case the federal government to make sure that the jurors have the opportunity --

THE COURT: To give full effect.

MR. BERRIGAN: That's right. That was the problem in Texas. They had the three-part test, and then they added this mitigation instruction which told them basically to lie in response to your answers on the three questions. If you think mitigation outweighs aggravation, then a life sentence is deserved, and the court said that's not enough to give full effect to the mitigating circumstances. I agree with you, sir. That's one issue.

The other issue is the one I'm talking about, is is it

1605

permissible for a juror to be told that you can give no weight to a mitigating circumstance, and it just seems to me that back since 1972 the whole idea of the Supreme Court trying to channel

Page 3

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1398 of 3245

the discretion of the jury in a fashion that avoids arbitrary and capricious punishment in infliction of the death penalty has been to require the states to come up with a system to try to avoid that. And the system that most states and the federal government have is this weighing of mitigating and aggravating circumstances. That's what they've come up with.

When the legislature says this is a mitigating circumstance -- and there's no question about that in terms of lack of significant criminal history, for example; that's a statutory mitigating circumstance -- it makes no sense, at least in my humble view, that a juror could be instructed you can give that no weight. I think that's the same as no consideration.

Now, I agree the juror has the discretion to give it any weight that they determine is appropriate, but to tell them they can give it no weight is to suggest to them that they can disregard it. And I largely rely on this very short paragraph from Eddings versus Oklahoma. This is at 455 U.S. 104, 114, 115. Just as the state may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. The sentencer may determine the weight to be given relevant mitigating evidence. But they may

1606

not give it no weight by excluding such evidence from their consideration.

And I believe when the prosecutor says you don't have to give lack of significant criminal history any weight, in fact, you can give it no weight, that that contravenes the whole scheme that the United States Supreme Court has put into effect to make sure that these aren't arbitrary and capricious

Page 4

decisions.

THE COURT: So should I tell them they don't have to give -- they have to give effect to the statutory aggravators?

MR. BERRIGAN: No. I think the problem is this language that they've chosen to use which is to tell the juror you can choose to give that mitigating circumstance no weight. That's the language Mr. Williams has been using in the last few jurors.

THE COURT: Well, can I ask you this? Can you tell the jurors that they can give aggravators no weight?

MR. BERRIGAN: No, I don't believe I could do that, no, because they're in the statute. I mean, I think if the legislature came up with this scheme it was for a reason. They want people to take these things into account. Now, how much they take them into account is up to the jury. That's clear.

THE COURT: But a juror could clearly give either an aggravator or a mitigator no weight.

MR. BERRIGAN: Yes, but to suggest that either by an

1607

instruction from the Court or the language that this prosecutor is using I believe is inappropriate. That really is telling the juror, You know what? You don't have to look at that at all because you don't have to give it any weight. And we're talking about the description of the weighing process, and he's telling them, You don't have to give that any weight. That violates the Court's I think constrictors on this process being arbitrary and capricious when you're telling the jurors you don't really have to give any weight to these mitigating circumstances after the legislature says yes, you do. These are things that have to be considered. I think it's inconsistent at the very least, and

Page 5

it's a violation of Miss Johnson's due process rights under the 8th and 14th Amendment in my humble view based on not only Eddings but Penry I and II.

And I don't want to reiterate the same argument, but I do ask the Court to instruct the prosecutor not to use that language that they can tell a juror no weight. That's the objectionable language regarding mitigating circumstances. And then if that objection's overruled, I intend to ask for a continuing objection so as not to unnecessarily interrupt this questioning process which I have no desire to do whatsoever.

THE COURT: How about this phrase? Would you think this is permissible? You must consider every mitigating -- something like this: You must consider every mitigating factor that you find, but you can give it whatever weight you think is

1608

appropriate including no weight.

MR. BERRIGAN: No, it's the "no weight" that I have a problem with, sir. You can give it any weight you deem it's appropriate. That answers the question, frankly.

THE COURT: But any weight includes no weight.

MR. BERRIGAN: I agree it does, but to say no weight suggests disregarding the mitigating circumstance, and I think you might think that's a minor difference, but I think it's significant. I think when you tell a juror you don't have to give it any weight, you're basically telling them you don't have to consider it. Now, I know that's a different terminology, but it has the same effect.

THE COURT: It is, and I think that as long as -- well, let me hear from Mr. Williams first. Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. It makes little

Page 6

sense to me if the defense concedes that a juror can give it no weight that somehow we've crossed the line into violating an Eighth Amendment right to tell the juror what they have a right to do by the defense own admission. I don't see how that's a violation, particularly when the juror says, I'm willing to consider it, acknowledging I may not give it any weight in the end, but I'm willing to consider it.

I think there is a distinction there, and I think as long as the juror says, I'm willing to consider it, they're entitled to and the defendant admits they're entitled to give it

1609

absolutely no weight at all. And to tell the juror they have the right to do that can't violate her Eighth Amendment rights if, in fact, the defense agrees, as they do, the juror has an absolute right to do that. I don't see the violation there.

That said, I'm not wedded to that language either. I think I have an absolute right to stand up there and say that as I think I have the absolute right to stand up and say, You know what? The defendant doesn't have to testify. And I can go into the Fifth Amendment. But sometimes discretion is the better part of valor, and I think in this case what I'm going to do is just simply restrict myself to the language that the jurors can give it whatever weight, if any, they choose.

THE COURT: But it's the "if any" that gets us right back into your problem I assume. No?

MR. BERRIGAN: I'm sorry, sir?

THE COURT: Well, he said, Whatever weight, if any, they choose.

MR. BERRIGAN: Exactly. I mean, and I don't think I'm being very articulate. That last sentence, but they may not

Page 7

give it no weight, I think they mean that. This is a statutory mitigating circumstance.

THE COURT: Well, read that whole sentence.

MR. BERRIGAN: I'll read just the paragraph I read earlier. It's just three sentences. Just as the state may not by statute preclude the sentencer from considering any

1610

mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. The sentencer may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration. I think the Supreme Court is equating those two things.

THE COURT: Yeah, but see, that's the critical phrase. They may not give it no weight by excluding such evidence from their consideration. That's a very important qualifier. So the flip side of that is you may consider it. You must consider mitigation, but you can give it no weight. That's not inconsistent with the case you just cited.

MR. BERRIGAN: With all due respect, I think it is. I don't know how you can say, You know what? I'm going to consider it, but I'm not going to give it any weight. What consideration is that? Consideration by definition is to take into account something in making a decision.

THE COURT: And to think it over and mull it over, and you ultimately conclude I'm unwilling to give it any weight.

MR. BERRIGAN: In my view, sir, I think that's an unqualified juror. They're telling the legislature, I won't consider your mitigating evidence. I don't care what you say is mitigating.

Page 8

THE COURT: That's where we disagree. I think it would be impermissible for Mr. Williams to tell the jury that

1611

they could not consider mit -- that they don't have to consider mitigation and, therefore, they wouldn't have to give it any weight. That would be impermissible. And it would be impermissible I think to say, You don't have to give it any weight -- you can give it no weight without saying first that they have to consider it.

In other words -- but as long as you say, You have to consider mitigation, but the weight, if any to be given it, or you can give it whatever weight you want including no weight is fine as long as he makes clear they have to consider it because I think what the case you just cited -- is it Eddings?

MR. BERRIGAN: Yes, sir.

THE COURT: -- said that they have to consider it, but then they can give it no weight or effect, but they have to consider it. That's the point.

MR. BERRIGAN: Okay.

THE COURT: And so as long as you -- from my perspective, you can talk about no weight as long as you make clear first that they have to consider mitigation. They can give it whatever weight they want including no weight, but if you want to stay away from it, that's your decision.

Any other record you want to make on it?

MR. BERRIGAN: Nothing further other than for the benefit of your judicial colleagues in St. Louis, I'd ask that I have a continuing objection at least through today's jurors on

1612

Page 9

this issue if that's all right.

THE COURT: Yeah, you can have a continuing objection to the extent that that makes a record for you --

MR. BERRIGAN: It helps.

THE COURT: -- through the entire jury selection process, not just for today.

MR. BERRIGAN: Thank you, sir.

THE COURT: Because I know your objection would be the same on any juror we talk about.

MR. BERRIGAN: Right.

THE COURT: Right.

MR. BERRIGAN: And it's hard to know how much is needed to preserve the record.

THE COURT: And I'm not taking a position on that.

MR. BERRIGAN: I understand, sir.

THE COURT: Yeah. If you want to object every time he asks a question, that's fine.

MR. BERRIGAN: You made that clear.

THE COURT: But my ruling would be the same, and I personally don't see any need for it from a trial court's perspective.

MR. BERRIGAN: That's all I had.

THE COURT: Okay. We ready to bring the jurors in?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Thank you.

1613

(Panel G entered the courtroom.)

THE COURT: Okay. If you'd all raise your right hand, I'm going to swear you in.

(Panel G was sworn.)
Page 10

THE COURT: Okay. Good morning. Please be seated. I wanted to welcome you all to the United States District Court for the Northern District of Iowa. How many of you have been to this third-floor courtroom before? Anybody in the group?

Okay. I'm Mark Bennett. I'm the chief judge of the United States District Court for the Northern District of Iowa, and I'm the trial judge in this case. And on behalf of the other judges and employees of our district, I wanted to welcome you all.

I assume that when you went to bed last night and got up this morning you were just excited about the possibility of coming to Sioux City and absolutely thrilled about the prospect of being selected to serve as a juror in a case that could potentially last up to about three months so -- but it's nice to see that some of you are smiling nevertheless. I like to remind jurors in every case that while every case we have is a serious matter and certainly this is as serious of a case as any of us will ever encounter in our lifetime, there's no federal law against smiling in the courtroom. So good morning.

As you all know, this case is United States versus Angela Johnson. I just wanted to introduce you to who everybody

1614

is. And you'll meet them a little bit later in the proceedings this morning. But I would like to start off by introducing them. I'll just have the individuals raise their hand.

At the table closest to the jury box is the prosecution table or team. And Mr. C.J. Williams is a United States -- assistant United States attorney from Cedar Rapids, one of the prosecutors in the case.

Tom Miller seated next to him is a special assistant

Page 11

United States attorney. He normally works for the state of Iowa where he's a area prosecutor, but he's been made a special assistant United States attorney in this case.

And seated next to Mr. -- oh, I would also add with regard to Mr. Miller, some of you, particularly if you read the paper a lot, will note that the attorney general of Iowa is also named Tom Miller. This Tom Miller works for that Tom Miller, the attorney general. They're not related. They just happen to have the same name.

Seated next to Special Assistant U.S. Attorney Tom Miller is Special Agent Bill Basler who's what's called the case agent in this case. And you'll learn more about that in a little bit.

Switching over to the far table would be the defense team, and I'll start with Dean Stowers. Dean Stowers is one of the defense lawyers in the case. He's a lawyer in Des Moines, from Des Moines.

1615

Seated right next to him would be Angela Johnson. She's the defendant in the case.

Seated next to Angela Johnson is Patrick Berrigan. Patrick Berrigan's from Kansas City, and he's one of the defense lawyers in the case.

And then at the back table is Al Willett who is also one of the defense lawyers in the case, and Mr. Willett is from Cedar Rapids.

Now, there are certain rules that we need to follow, and so because we're doing jury selection in a little bit of an unusual way in this case in the sense that we won't have a jury selected today from the entire group -- we're just qualifying

Page 12

people into a jury pool -- I reduced it to writing. So if you'd follow along with me, I want to go over the conduct of potential jurors during jury selection and trial.

To ensure fairness, you as potential jurors must obey the following rules. Oh, do we have -- somebody not have one?

PROSPECTIVE JUROR 509: I don't have one.

THE COURT: Okay. To ensure fairness, you as potential jurors must obey the following rules until the end of the case if you are selected for the jury or until you are excused from serving on the jury in this case. These rules apply whether you are in the courtroom, in the courthouse, at home, or anywhere else until you are excused from further service in the case.

1616

First, do not talk among yourselves about this case or about anyone involved with it.

Second, do not talk with anyone else about this case or about anyone involved with it.

Third, when you are outside the courtroom, do not let anyone tell you anything about the case. If someone should try to talk to you about the case during jury selection or the trial, please report it to me.

Fourth, do not talk with or speak to any of the parties, lawyers, or witnesses involved in the case. You should not even pass the time of day with any of them. It is important that you not only do justice in this case but that you also give the appearance of doing justice. If a person from one side of the case sees you talking to a person from the other side, even if it is simply to pass the time of day, an unwarranted and unnecessary suspicion about your fairness might be aroused. If

Page 13

any party -- if any lawyer, party or witness does not speak to you when you pass in the hall, ride the elevator, or the like, it is because they are not supposed to talk or visit with you.

Fifth, do not read any news stories or articles about the case or about anyone involved with it or listen to any radio or television reports about the case or about anyone involved with it. If you want, you can have your spouse or friend clip any stories and set them aside to give you after the trial is over or you are excused from serving on the jury in this case.

1617

I can assure you, however, that if you are selected for the jury in this case, by the time you have heard the evidence, you will know more about the case than anyone will learn through the news media.

Sixth, do not do any research on the Internet, in libraries, in the newspapers, or in any other way or make any investigation about this case on your own. If you are selected for the jury, you must decide this case based on the evidence presented in court.

Seventh, if you are not excused from serving on the jury today, please take this instruction with you so that you can refer to it if you have any questions between now and the date you are required to return for the trial.

Dated this 20th day of April, 2005, signed by me, Mark Bennett, chief judge.

Now, I wanted to explain to you who the courtroom participants are. Let me ask, is anybody a little bit nervous, a little bit anxious? I imagine some folks are. Most potential jurors are, so I wanted to kind of explain who all the folks are in the courtroom.

Page 14

Seated to my far -- in the corner over here is Carey. Carey is one of -- I have three and a half law clerks. And we're not going to have the half law clerk come into court, but we have a whole one here. And Carey's in her second year of a federal clerkship with me. At the end of the summer she'll be

1618

moving to Seattle. She'll be involved in the entire trial and be seated at that desk over here.

Right in front of me is our court reporter Shelly. Shelly comes to us from court reporting in Florida, but she's been here now for a number of years. I think she has the most difficult job in the courtroom because she has to listen to what everybody says, and she can never daydream or take her mind off matters because she has to take down every single word that everybody says.

We'll have some United States marshals in the courtroom, and that's routine in every criminal case. We always have United States marshals in the courtroom depending upon where we are in the trial. We may have more or less United States marshals in the courtroom.

We also have some court security officers, what we call CSOs. They're really easy to spot because they have the blue blazers, the badge, and the little earpiece. I think they're listening to talk radio right now. Just kidding. And they have a lot of duties in the courthouse, but they'll make sure you get down to the jury room, get back up on time today.

And we have the lawyers and the parties they represent. Obviously we have the potential jurors, and I wanted to talk about the role of the jury and the role of the judge in the case. I'll start with myself.

Page 15

As the trial judge in this case, I've had to rule on a

1619

number, lots and lots, of pretrial motions that both sides have filed. And I would expect that in a case of this magnitude, and the lawyers have met my expectations. They have filed lots of motions. That's a good thing because it helps clarify issues in the case which will make the operation of the trial run more efficiently and more smoothly. And I'm pleased to say I'm current in my rulings on all of the motions.

I had the responsibility with the input from the lawyers in setting up how we would do jury selection. We have a lot of discretion in how to do it. There's no one way to do jury selection. In a lot of cases the judge has the lawyers come in -- this case we anticipate would take two to three weeks to pick a jury. I could have had all the prospective jurors come in every day for three weeks. But I didn't think that was fair to everybody.

Matter of fact, I was just reading about a case being tried in federal court where they brought in 400 jurors. They rented a county auditorium, and they did jury selection in the county auditorium, and every juror has to come every day until they get a jury picked.

My secretary who's also a lawyer was called for jury duty right across the street in Woodbury County court this month, and she's gone over a number of days and sat there all day and never been questioned by the lawyers.

Interestingly enough, her sister up in Minneapolis was

1620

Page 16

called for jury duty this month to federal court there, and her sister went for three days in a row to the basement of the United States Courthouse in Minneapolis to a large room with a bunch of other jurors, never even made it up into a courtroom to be questioned by anybody but had to sit there all day every day for three days.

With the help of the lawyers, we came up with a system where each juror would just come in one day, and so I hope at least you appreciate the fact that we're all concerned about not wasting your time. And as a judge, that's a big thing with me. Your time is very, very valuable. Because my time is valuable to me, I assume that your time is just as valuable if not more valuable to each one of you. So I tried to put into play systems so that we don't waste your time. If you get selected for the trial, I think you'll find that it will run very efficiently.

I'm proud to say we do know what we're doing in conducting trials. Of the 94 federal courts in the country, we're the busiest in terms of numbers of trials per judge. We've led the nation three out of the last four years in numbers of trials per judge. And in the year we didn't lead the nation, we were number two. So we have a lot of trials. We try and learn from our mistakes. Bunch of new ones to make, but we try not to make the same ones over and over again. So I think you'll find that this process will be as efficient as possible.

1621

I also have to balance fairness. That's my number-one concern. I'm concerned about efficiency, but I'm more concerned about fairness. So my job as a judge is to be as fair as I can be to the United States government and make sure that I give

Page 17

Angela Johnson the fairest trial I'm capable of doing, and I intend to do that to the best of my ability.

Once the trial gets underway, my major responsibility, I'll have to rule on objections and motions that happen during trial, and I know these lawyers. There will be many objections. That's their job. They each have a side to represent. They're advocates. They have a duty to object if they think that evidence is not being properly admitted. They would not fulfill their high calling as a lawyer and advocate if they didn't make an objection. There will be lots of objections. There will be lots of things for me to rule on. I have that responsibility.

I also have the responsibility at the beginning of the trial to define for you in written jury instructions that I will give you at the beginning of the trial each of the ten crimes that the defendant is charged with, give you instructions about reasonable doubt and presumption of innocence and credibility of witnesses and give you as much guidance as I can at the beginning of the trial to help you do your job as best you can.

And then at the end of the trial, I'm going to give you a bunch of additional more detailed instructions. So that's kind of my job.

1622

I want to go back to your job. Notice I did not say in my job duties that I have to listen very carefully to all of the evidence and decide what actually happened. That's actually not my job in a jury trial. That's the jurors' job.

In a very real sense, you are the judges of the facts. You are the judges of the facts. That's what jurors do. There's our witness box there, and I anticipate in this case you may well hear from more than a hundred witnesses by the time the

Page 18

case is all over. It may not be that many, but my guess is it will probably be more than that. By the time the case is entirely completed, you may hear from more than a hundred witness -- witnesses. There will be more than 500 exhibits ultimately admitted in the case. That would be my best guess. And so there's a lot of evidence in this case.

Your job as jurors if you get selected to serve will be to listen to all the evidence. You'll have to decide what we call the credibility of the witnesses. That means is a witness telling the whole truth, just some of the truth, or maybe none of the truth. And that's each individual juror's job to decide the credibility of each witness.

Once you've heard all of the evidence -- and there could potentially be as many as three phases to this trial. I'm going to explain that a little bit later. But in the first phase it would be like any other trial. You'd have to decide whether the defendant is not guilty or guilty of any of the

1623

crimes charged.

And the way you would do that is you would listen carefully to all of the evidence. You'd get my instructions. You'd hear the closing arguments of the lawyers where they suggest in the government's case why the defendant is guilty of one or more of the ten charges. And the defense, I would assume that they would suggest that she's not guilty of one or more of the ten charges. And then you would have to deliberate, apply the facts as you find them to the law in the instructions, and at least in the first phase decide whether or not the defendant is not guilty or guilty of one or more of the ten charges. So that's your obligation.

Page 19

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1414 of 3245

Because this is a rare case in federal court where the defendant, if she is convicted, is eligible for the death penalty, then if it gets that far -- and it may not, and we're going to talk about that. But if it does get to what we call the third phase or the penalty phase, then you will have the obligation as jurors to decide what the punishment in this case would be.

There are two possible punishments, life imprisonment without parole or the death penalty. In 99.9 percent of the cases tried in federal court, the penalty decision is for the judge. In other words, in most of my cases, vast majority of my cases, I decide the sentence. But in this case if we get that far, then the jurors would decide what the sentence would be, so

1624

that would be obviously a very, very important responsibility and I would guess probably the toughest decision that anyone would have to make in a lifetime. It's a very, very heavy duty and responsibility.

Okay. We're about to start what we call voir dire which is a French term that lawyers and judges use. It means -- we just refer to it as jury selection, but the actual translation of voir dire means to speak the truth. And what that means is that my goal is to find for this case 18 jurors, 12 of whom will be the trial jurors, 6 of whom will be what we call alternate jurors. If you get selected, you won't know whether you're in one of the 12 or in one of the 6. You won't know if you're an alternate juror or a regular juror. You won't find that out till the very end of the case. But our goal is to find 18 jurors.

And in order to do that, it's kind of like a job

interview. This is a pretty important job. And so we're going to ask you a lot of questions. Mostly the lawyers are going to ask you questions. But I want to assure you there are no right or wrong answers to any of the questions.

And whether you would admit to it or not, I know that most of you are pretty nervous about the questions that we could ask you. I'd be nervous too if I was sitting where you were, and I've been through this hundreds of time. But I'd be nervous too because you got a bunch of strangers that potentially could

1625

ask you almost anything about your life, and not many people really want to go through that, and I understand that.

Take a deep breath and relax because it's not going to be that bad. I guarantee you it's not going to be that bad. Mostly they're going to ask questions about your views on things, your opinions. And the nice thing about opinions is everybody has them pretty much, and they're not right or wrong. There are no right or wrong answers to any of the questions we ask you and that the lawyers ask. There just simply aren't. You're entitled to any opinion or belief that you have, and nobody, nobody, is going to try and talk you out of them or nobody's going to make a judgment that you're not entitled to have that opinion because the beauty of America is we're all entitled to hold whatever opinion we want even if we're the only one in the country that holds that opinion.

And we're not here to talk you out of any opinions, but we need to know what they are so that collectively we can decide on who the best 12 plus 6, the best 18, folks would be to sit as jurors in this case.

Now, so you have to answer openly and honestly. And

Page 21

that's part of your oath.  It's very important for you to answer openly and honestly to the questions that we ask of you.

Now, you will note that you each have a number, and I want to explain to you why we're using numbers in this case.  We actually know what your names are, but we're not going to refer

1626

to you in open court by your name, and here's why.  And it's a decision that I made, and it was my call, my decision alone, and I take full responsibility for it.  Here's why I made the decision.

By any standard this is a high-profile case.  What I mean by that is the news media has a lot of interest in this case and the public has a lot of interest in this case.  And I was concerned that if we used your names which we normally do in jury selection in the vast, vast, vast, vast majority of cases, that the news media would then report your names and they would be in the newspapers.  And I wanted to protect each person who was selected to serve as a juror in this case from what I call idle curiosity seekers, and there are many.  I get e-mails and letters and phone calls about this case and about other cases that even are less high profile than this one.  I get paid to handle that.  You all don't.

And so I thought your job as a juror would be tough enough without somebody knocking on your door at seven o'clock at night, Hey, I read that you're a juror in this case; I wanted to come talk to you about it.  And that's the only reason why I decided to use numbers.

Okay.  Now, I wanted to kind of explain this jury selection process.  At the beginning we anticipated that jury selection would take two to three weeks.  I might add three to

Page 22

four weeks now.  I don't think so.  I think we may be done next

1627

week.  We started last week.  We went four days last week. We're now in our third day this week.  We hope to be done towards the end of next week, but it could spill into the following week a little bit.

And you know what?  It's just going to take as long as it takes.  It's not something we have any control over.  We're committed to the process, and we hope we can get the jury selected by the end of three weeks, but if it takes a little longer, it takes a little longer.

We have decided to bring in small groups of potential jurors each day.  After I introduce the lawyers and there are a few questions by me, I'm basically going to turn it over to the lawyers, and there will be what I call group questioning.  In other words, you'll be in this entire group, and you'll be questioned by each side for about half an hour.

And then once we're done with group questioning, we're going to send you down to the jury room.  We're going to bring you back one at a time.  We're just going to ask you to pick a chair in the front row, sit down, and then the lawyers from each side will question you.  I've given them time limits, so they each have 12 minutes to question you.  Frequently I jump in with questions.  Sometimes I don't.  And that's how we're going to proceed.

The advantage of this system is you will know at the end of the questioning today whether or not you are still in the

1628

jury pool or whether you're dismissed from jury service.  So
Page 23

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1418 of 3245

some of you I can guarantee will be going home today. After we question you individually, we send you out in the hallway. I confer with the lawyers, and a decision is made about whether you're still in the jury pool or whether we send you home. And you'll know that today.

If you're told you're still in the jury pool at the end of today, you have about a 50 percent chance of serving as a juror in this case. I'll tell you what the numbers are. We're going to gather a group in our jury pool of 34 jurors. Of those 34, 18 will be selected. I was never very good at math, so I just rounded it off to 50 percent. But you have an 18/34 chance of being selected to serve as a juror in this case if at the end of the day we tell you you're still in the jury pool.

When we manage to empanel the number of jurors we need which is 34, we'll then notify -- we'll just call those 34 and say to 18 of you the trial starts the next day or the day after that, whenever we can start the trial, or we'll say to you, Thank you very much, but you weren't selected to actually serve as a juror in the case.

Once we start the actual trial, we're going to run it four days a week. I know it's an inconvenience for you all to be in a trial, but it's also an inconvenience for these lawyers. Not one of the five lawyers is from the Sioux City area. Matter of fact, the closest lawyer would be 200 miles away which I

1629

believe would be farther than any juror, and that would be the closest. Two of the lawyers -- two of the lawyers come from 200 miles away. Two of the lawyers come from 330 miles away, and one of the lawyers comes from how far?

MR. BERRIGAN: Far, sir.

Page 24

THE COURT: But Kansas City, how ever -- I know it's a five-hour car drive, and that's pushing it.

So we'll go four days a week, almost always four days a week Monday through Thursday. We are taking the week of June 10 through June 17 off. We hope to have the trial done by the end of June, but that's our best guess.

Now, Mr. Williams, would you introduce yourself, the folks at counsel table with you, and we'll find out if anybody knows anybody.

MR. WILLIAMS: Thank you, Your Honor. My name is C.J. Williams. I office in our Cedar Rapids office.

At counsel table is Tom Miller. You met him earlier.

MR. MILLER: Good morning.

MR. WILLIAMS: And also Special Agent-in-Charge Bill Basler from Mason City.

Mr. Miller I think as you heard was from Des Moines.

Back at this table is Sali Van Weelden. She's a legal assistant in our office, and she'll be assisting us throughout the trial as well.

The U.S. Attorney's Office in the Northern District of

1630

Iowa is headed up by Chuck Larson Senior. He's actually in Baghdad right now, and we have two offices, one in Cedar Rapids, one here in Sioux City.

Since it's unlikely you know anybody from the Cedar Rapids area, I'm going to concentrate on the Sioux City office. We have seven attorneys and seven administrative staff people as well. I'm going to read off their names in the event that maybe you know one of them.

Forde Fairchild, Martha Fagg, Kevin Fletcher, Mike

Hobart, Jack Lammers, Janet Petersen, and Shawn Wehde are the attorneys in our office here.

Shayne Mayer, Del Tompkins, Penny Schlotman, Michelle Schwebach, Michelle Hatting, Carol McEntaffer, and Pat Calhoun are the administrative support staff in our office here.

THE COURT: Does anybody know any of the people Mr. Williams has indicated or know anybody who works at the federal courthouse here? Anybody? Okay. See several hands going up. Why don't we start in the back row, pass it four down to Juror 219. And I'll tell you what. I'll make all of the jurors a deal this morning. The microphone will remain on. The acoustics are great in the courtroom if you use the microphone. They're absolutely horrible if you don't. And if you hold it up and speak directly into it, Juror 219, I won't put up any karaoke for you to sing. How's that?

PROSPECTIVE JUROR 219: That's wonderful.

1631

THE COURT: Okay. Who do you know?

PROSPECTIVE JUROR 219: I believe I know Del Tompkins, and why I say I believe I know him, it's through my husband. I've just lived over here seven years now.

THE COURT: Okay. And how well do you know Mr. Tompkins?

PROSPECTIVE JUROR 219: Well, I've met him a couple times with my husband at a ballgame here, baseball game.

THE COURT: And what does your husband do for a living?

PROSPECTIVE JUROR 219: He owns numerous ready mix plants in the area.

THE COURT: Okay. And what's your understanding of
Page 26

what Mr. Tompkins does?

MR. WILLIAMS: Your Honor, I can probably short circuit this. This Del Tompkins is a female support staff member of our office.

THE COURT: Okay. I didn't know who that -- I've never to my knowledge even --

MR. WILLIAMS: Sure.

THE COURT: So probably not the same Del Tompkins then.

PROSPECTIVE JUROR 219: Not the same one then.

THE COURT: So we don't have a problem; right? Good. Thank you. Can we pass it down to the front row? And I know

1632

Juror 509 on the end had his hand up and one other juror did. I didn't see your hand.

699, okay, grab the microphone. Who do you know?

PROSPECTIVE JUROR 699: The deputy that entered us into the courtroom.

THE COURT: Okay. And how?

PROSPECTIVE JUROR 699: Mr. Saunders.

THE COURT: And how well do you know him?

PROSPECTIVE JUROR 699: I grew up with him in the neighborhood.

THE COURT: Would that affect your ability to be fair and impartial in any way in this case?

PROSPECTIVE JUROR 699: I don't think so.

THE COURT: Do you think it could have any impact on you as a potential juror in the case?

PROSPECTIVE JUROR 699: No.

THE COURT: Would you understand that you couldn't

Page 27

talk to him about the case at all?

PROSPECTIVE JUROR 699:  Sure.

THE COURT:  Okay.  Okay.  Anybody else in that back row?  Okay.  Why don't we pass it down to the front row.  Thank you.

I think, Juror 509, you were one of the first ones to have your hand up.  Who do you know?

PROSPECTIVE JUROR 509:  Penny Schlotman.

1633

THE COURT:  Okay.  And how do you know her?

PROSPECTIVE JUROR 509:  She's my aunt.

THE COURT:  Okay.  What do you understand she does for a living?

PROSPECTIVE JUROR 509:  I just know she works for the federal building.

THE COURT:  Okay.  Would that affect your ability to be a fair juror in this case in any way?

PROSPECTIVE JUROR 509:  No.

THE COURT:  Would you understand that it wouldn't be appropriate to talk to her about this case --

PROSPECTIVE JUROR 509:  Yes.

THE COURT:  -- while you were a juror?

PROSPECTIVE JUROR 509:  Yes.

THE COURT:  How often do you see your aunt?

PROSPECTIVE JUROR 509:  Holidays.

THE COURT:  Okay.  Good.  Anybody else in the front row?

Okay.  Why don't we switch over to the defense side. Oh, Mr. Stowers, you're going to take the lead?

MR. STOWERS:  Yeah, I will, Your Honor.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1423 of 3245

THE COURT: Okay.

MR. STOWERS: My name's Dean Stowers. I'm an attorney in Des Moines, Iowa. I practice law with two other partners, Brent Rosenberg and David Morse, M-o-r-s-e. And then we have an

1634

attorney who I employ, Heather Wood. And does anybody know any of those folks? Nobody knows me either.

Seated to my right is Angela Johnson. Angie, can you go ahead and stand up? She's 41 years old. She grew up and lived most of her life in the Clear Lake area. Why don't you have a seat, Angela.

Next to her is Mr. Patrick Berrigan. Mr. Berrigan is from Kansas City, and although the judge may believe it takes five hours for Mr. Berrigan to drive to and from Sioux City to Kansas City, I can assure you it doesn't take him that long the way he drives.

The next attorney is Mr. Willett, Al Willett, from Cedar Rapids. Al practices law with Ray Terpstra and Greg Epping in Cedar Rapids. Anybody know Al or Mr. Berrigan?

And then seated behind us is our excellent assistant, Miss Lisa Dahl, who's helping the lawyers throughout this process and Angela, help us keep organized on this case. Does anybody know Lisa from Kansas, outside of Kansas City? No. Thank you.

THE COURT: Okay. Thank you. Our estimate of the length of trial is three months. That includes the jury selection process. It's very difficult to estimate the length of a trial, and the more witnesses you have, the harder it is to estimate the length of a trial.

But the lawyers have done a terrific job in going over
Page 29

this and discussing it, and the bottom line is we think the trial will be done by the end of June. But it could go longer, but that's our hope, that the trial will be done by the end of June.

Now, I tell you that because I need to explore with you whether or not it would be a severe or extraordinary hardship for any of you to serve, and I'm going to ask you each individually about that, but I want to give you some background information.

I obviously have very strong feelings about jury service. And in my job -- I've been doing this now for almost 11 years -- I get to serve our country every day. I mean, I'm a public servant. I take that responsibility very seriously, and I find it incredibly rewarding and fulfilling. And I have to apply federal law and make tough decisions every single day.

Matter of fact, we were five minutes late starting this morning. I apologize for that. But I tried to work in two sentencings early in the morning that I did in other cases. I've got about 600 pending cases, and while this case is very important, is my number-one priority, I have to spend a lot of time on my other cases too, and I'm doing some trials on the weekends and a lot of proceedings on the weekends.

And I'm not trying to say that this case would be as big of a hardship for me because that's my job. I get paid to do it, and I love doing it. I understand it would be a huge

hardship for some people.

Page 30

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1425 of 3245

But jury service is very, very important. And for most of you this will be your only opportunity to really serve your country, to serve the federal government, serve the United States of America. Jury service is very important. It's something we take for granted in this country.

But the interesting thing is, you know, when new democracies are developed around the world, one of the first things they put in the new constitution is the right to trial by jury. We take it for granted in this country, but for those of you who have travelled abroad -- you probably don't travel to Paris and talk to them about trial by jury, but I do when I travel. And people around the world revere the right to trial by jury. We all take it for granted. But in those countries where people don't have the right to trial by jury, that's one of the first rights they insist on in their new constitution when new constitutions are drafted. So it's very, very important.

One of the things that's been very gratifying in jury selection so far is despite what you said in your questionnaire answers -- and believe me, I have now read virtually every excuse I could imagine and many that I didn't have the imagination to come up with about why people shouldn't have to serve on juries.

But when push comes to shove and people come in to the

1637

courtroom each morning like we've been doing since last Tuesday, I can count on one hand the number of prospective jurors who have been asked to be relieved from jury duty. I think yesterday nobody asked. Some days no one asks. And it's very rare that people have actually asked to get off.

Page 31

I had a trial last year that ran several months long. It was a long, tough case. And I remember in jury selection one day in particular we had two farmers, both of whom farmed full time, and this trial occurred during harvest season, so usually that's real tough on farmers. And because farming is tough as it is, they both worked full time too in manufacturing jobs. And neither one of them said it would be a severe or extraordinary hardship for them to serve that several-month period of time.

Also in jury selection in that case we had an individual who was not going to get paid at all. He was a sole support for his family, and his company was not going to pay him while he was on jury service. And he told us that he had talked to his wife the night before and he thought it was so important to serve that they were willing to deplete, they were willing -- he was willing to deplete his entire life savings to serve as a juror.

Now, that struck me as a severe or extraordinary hardship. I wouldn't expect someone to do that. As much as I ask of folks, I think that's asking too much. But I'm telling

1638

you there are people out there -- and we've seen them virtually every day -- who are willing to make unique, personal, and extraordinary sacrifices in their own life to serve if you wind up getting selected.

So I just want you to think about that before you indicate that it would be a severe or extraordinary hardship for you to serve.

Now, we're going to pass -- where is the microphone now? Who's got it? Oh, Gary has it.

Page 32

Juror 509, are you willing to serve if selected as a juror in this case?

PROSPECTIVE JUROR 509:  Yes.

THE COURT:  Okay.  Thank you.

Juror 166.

PROSPECTIVE JUROR 166:  Yes.

THE COURT:  Thank you very much.

Juror 171.

PROSPECTIVE JUROR 171:  Okay.  I'm going to be the bad one.

THE COURT:  It doesn't make you bad.

PROSPECTIVE JUROR 171:  I'm widowed and farm.

THE COURT:  Okay.

PROSPECTIVE JUROR 171:  And I have a full-time job. It would be very difficult for me, not impossible but when planting --

1639

THE COURT:  Comes at a bad time.

PROSPECTIVE JUROR 171:  -- baling season comes, I don't know what I'd do.

THE COURT:  Have you given any thought -- do you have a contingency plan if you were -- have you thought through in your own mind either the worst-case scenario or the best-case scenario depending on your -- if you got selected to serve what could you do?  Have you thought that through, or is it just so insurmountable that you didn't try and plan for it?  You know what I mean?

PROSPECTIVE JUROR 171:  I guess I did in the fact that my husband was sick for 13 months, and I took care of him at home.  So I did have family and friends that helped me.  But

Page 33

that might be a little bit different circumstance than it is now to ask them to do that.

THE COURT: Well --

PROSPECTIVE JUROR 171: Unless you want to come and explain it to them?

THE COURT: I'd be happy to. You know --

PROSPECTIVE JUROR 171: It's not impossible. It would be stressful, but it's not impossible.

THE COURT: Okay. Let me ask you this. It is very important to both sides that anybody who's selected to serve as a juror pay very careful attention to the evidence. And I'm wondering if you would be a little bit preoccupied about what's

1640

happening back on the farm --

PROSPECTIVE JUROR 171: Definitely.

THE COURT: -- if you were here every day.

PROSPECTIVE JUROR 171: Yeah, I can see where that would be a distraction.

THE COURT: Well, there are so many variables that it's really -- this is kind of a call I'm going to leave up to you. You know, sometimes -- and I don't mean to pick on any potential juror, but I had a juror yesterday say, well, they baked cakes on the side, and they thought that might be a severe or extraordinary hardship because it would cut into the time to bake cakes, I mean, that they made for other people and sold. And I just said, Nope, that's not; I appreciate it; I understand. And it was very important. Boy, I'll tell you, there's a person who -- that was a passion in life, and I bet she makes some of the best cakes in northwest Iowa. I'm sure she's fabulous at cake making, but I didn't say that was a

Page 34

severe or extraordinary hardship.  That was an easy call for me to make.

Your situation I'd have to know so much more that we'd be here all day, so I'm essentially going to leave it up to you.

PROSPECTIVE JUROR 171:  Okay.

THE COURT:  If you think you can do it and still be a juror that can pay attention to the evidence and figure out a way to manage your farm -- it strikes me as a very difficult

1641

thing to do, but if you can do it, great.  If you can't do it, then I'm going to let you off.  It's up to you.

PROSPECTIVE JUROR 171:  That's a hard decision for me to make when I don't -- you know, I haven't contacted anyone.

THE COURT:  I understand that.  But do you see that I can't really make that decision for you because I don't know all variables?  On the cake making I knew the variables.  She had to make ten cakes in the next month.  She can do that at night and on the weekends.  Your situation, there are so many variables, how big the farm is, your access to help.  You know, there's so many things.  We'd be here for a week figuring it out.  So I'm going to leave it up to you.  Nobody's going to be mad at you or upset with you if you say you just can't do it.

On the other hand, if you can do it, you will join my list of heroes of people who are willing to make extraordinary sacrifices to serve, but you don't have to do that.  It's really up to you.

PROSPECTIVE JUROR 171:  I feel like I should stand up and salute.

THE COURT:  It's totally up to you.  Nobody's going to think ill will of you or think that you didn't want to serve,

Page 35

you know, and you'll hear the lawyers use this phrase, you know: Some people are great jurors for some cases but not for others. You might be a terrific juror for one of our two- to three-day trials because that would not be a hardship.

1642

PROSPECTIVE JUROR 171: No, that would not be a hardship.

THE COURT: Be an inconvenience, but it wouldn't be a severe hardship. But I understand if you say it's a severe or extraordinary hardship, that's fine. I'm not going to . . .

PROSPECTIVE JUROR 171: It would be. It would be.

THE COURT: Okay. Then any objection from the lawyers? I don't think so.

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: No, sir.

THE COURT: Okay.

PROSPECTIVE JUROR 171: Bless your hearts.

THE COURT: Then you get to go home. Thank you very much for coming in today.

PROSPECTIVE JUROR 171: Thank you.

THE COURT: Juror 796.

PROSPECTIVE JUROR 171: I do apologize.

THE COURT: Well, you don't have anything to apologize for. Thank you very much.

Juror 796, are you willing to serve?

PROSPECTIVE JUROR 796: Yes.

THE COURT: Okay. Thank you.

Juror 790.

PROSPECTIVE JUROR 790: Yeah. I'm also a little bit hard of hearing.

Page 36

THE COURT: Have you been able to hear me okay?

PROSPECTIVE JUROR 790: I'm reading lips as well, so I just thought I'd tell you, I'm having a hard time understanding what's going on, so I'm trying to grab as I -- you know, so I thought I'd tell you I'm hard of hearing. I have been since I was a little girl.

THE COURT: Okay. Do you wear hearing aids?

PROSPECTIVE JUROR 790: Yeah.

THE COURT: Okay. How well do you think you've heard me so far?

PROSPECTIVE JUROR 790: Okay so far. As long as I can look at your face, I'm okay.

THE COURT: Okay. And would you be able to read lips of a witness in that witness box, because they're a little bit farther away than I am from you?

PROSPECTIVE JUROR 790: Yeah, I can. Yes, I think I can do it.

THE COURT: Okay. I'll tell you what, we'll -- I'm going to leave you on the jury so far. But if you have problems when the lawyers ask you questions, you let us know; okay?

PROSPECTIVE JUROR 790: Okay. I just thought I'd let you know.

THE COURT: I appreciate that very much. Thank you.

PROSPECTIVE JUROR 790: Thank you.

THE COURT: Juror 108, are you willing to serve as a

juror in this case?

PROSPECTIVE JUROR 108: Yes, sir.

THE COURT:  Okay.  Thank you.  Can you pass it back to Juror 234?

PROSPECTIVE JUROR 234:  Yes, I can serve.

THE COURT:  Okay.  Thank you very much.

Juror 663?

PROSPECTIVE JUROR 663:  I have somewhat of a hearing problem too.

THE COURT:  You have somewhat of a hearing problem?

PROSPECTIVE JUROR 663:  (Nodded head.)

THE COURT:  Have you been able to hear so far?

PROSPECTIVE JUROR 663:  Mostly.

THE COURT:  You'll have to hold that microphone closer to you.

PROSPECTIVE JUROR 663:  Most of it, not all of it.

THE COURT:  Not all of it.

PROSPECTIVE JUROR 663:  (Shook head.)

THE COURT:  What percentage of what I've said do you think you've heard so far?

PROSPECTIVE JUROR 663:  Like your transportation (sic) and instructions.

THE COURT:  Like 80 percent, 90 percent, 99 percent?

PROSPECTIVE JUROR 663:  About 75.

THE COURT:  Okay.  Well, we really need a hundred

1645

percent.  So any objection from the lawyers?

MR. WILLIAMS:  No, Your Honor.

MR. BERRIGAN:  No, sir.

THE COURT:  Okay.  Juror 663, I'm going to go ahead and excuse you.  You're free to leave.

Juror 219.

Page 38

PROSPECTIVE JUROR 219:  Yes.

THE COURT:  You're willing to serve?  Thank you.

Juror 699.

PROSPECTIVE JUROR 699:  Yes.

THE COURT:  Thank you very much.

Juror 293.

PROSPECTIVE JUROR 293:  Yes.

THE COURT:  Thank you very much.

Juror 379.

PROSPECTIVE JUROR 379:  May I ask a question?

THE COURT:  Absolutely.

PROSPECTIVE JUROR 379:  You're taking a week off in June.

THE COURT:  Yep.

PROSPECTIVE JUROR 379:  Will you be taking the following Friday off after that which would be the weekend after Father's Day?  I have a two-day vacation in there.

THE COURT:  Do you know the date?  You know, I should have my calendar.

1646

PROSPECTIVE JUROR 379:  Well, they told me to leave all that stuff in my car.

THE COURT:  There you go.  But the following Friday?

PROSPECTIVE JUROR 379:  Yes, the weekend after Father's Day, and normally I leave on Thursday.  I go on our two -- I ride two wheels.  I'll be like that attorney over there if I leave Thursday night and head for Wisconsin.

THE COURT:  Yeah, we'll be taking that Friday off.

PROSPECTIVE JUROR 379:  Okay.  Good.

THE COURT:  Okay?

Page 39

PROSPECTIVE JUROR 379: And then I leave around the 18th of July for three weeks for the Boy Scout Jamboree. Other than that I can . . .

THE COURT: Okay. Good. You'll be okay. Okay. Can you pass it now down in front to Juror 166?

PROSPECTIVE JUROR 166: I'm willing to serve, but I just do want to say that I am pregnant and will be due on July the 1st, so I don't know if that's going to be a coincidence to you guys. So it's up to you guys.

THE COURT: Yeah. Wow. That's cutting it kind of close, isn't it?

PROSPECTIVE JUROR 166: Yeah.

THE COURT: Do you have any track record of going full -- without getting too personal here, do you have any track record of going full term?

1647

PROSPECTIVE JUROR 166: Yeah, full term.

THE COURT: How have you felt towards the latter part of any prior pregnancies? I mean . . .

PROSPECTIVE JUROR 166: Good.

THE COURT: You know, some people don't do real well, and others do terrific, you know. So . . .

PROSPECTIVE JUROR 166: It's up -- I'm willing to serve. It's just up to the Court, you know, and you guys.

THE COURT: Okay. Well, why don't we see how things go. Thank you.

Now, I've talked to you about your duty to serve, and you obviously know I feel very strongly in that. I wanted to take the flip side of that too. While you have a duty to serve and I believe very strongly in that, you also have a duty not to

Page 40

serve in some cases. And that would be if based on your opinions and beliefs you're just not well suited to be a juror in the case. And that's what we're going to be asking you questions about.

So I don't want -- I want you to answer as truthfully and as honestly and as openly as you can. And don't give us answers that you think we're looking for. We're not looking for any certain answer. We just want to know your true opinions and beliefs. And if based on those true opinions and beliefs we decide that you're not an appropriate juror for this case, you've still served your country just as well by being open and

1648

honest and giving us answers that we can make judgments about than -- matter of fact, you serve your country better than if you were not to give us open and honest questions (sic) and maybe wind up serving on a jury that really would not be the right jury for you to serve on.

Not every person is a good juror for every case. Matter of fact, most people could be good jurors but only in the right case because they have certain beliefs that on one case they'd be a terrible juror because they couldn't be fair, but on another case they'd be a terrific juror, so that's what we're after. And I just want to reenforce how absolutely important it is to give us honest answers.

Now, I want to tell you about the trial process because this case is kind of unique. There are very few federal death penalty cases. And there's a unique process to it. It's quite different than the typical trial that we do, that I've done over the last ten years. And what makes it different is there are potentially three phases to a trial, to this trial.

Page 41

And in most trials there's just one phase, and that's the phase I'm going to talk about now.

In the most -- vast majority of trials I've had, they're a single phase. It's what we call the merits, and the question at that part of the trial is is the person guilty or not guilty.

In the typical case, if the jury finds a defendant

1649

guilty, that's it. You go home. And then it's my responsibility to figure out what the sentence would be. And we have a very elaborate process to do that. From the time somebody's found guilty, it's an 80-day process, and we go through a lot of work with our United States Probation Office, and then we hold a sentencing hearing, and that's the typical case. I decide what the sentence is. But that's not this case.

So we'll have the first phase, and that's like our regular trial. First phase is you decide whether Angela Johnson is not guilty or guilty of one or more of the ten charges.

Now, the second phase, only if there is a unanimous finding by all 12 jurors beyond a reasonable doubt that Angela Johnson is guilty of one or more of the ten counts in the first phase do we even have a second phase. And one of the lawyers -- it was Mr. Berrigan early in jury selection last week -- he used the analogy for this trial. He said it's kind of like a basketball game in the sense that you have the first half, and we'll call that the first phase, this merits phase. Then you have an intermission that doesn't really last very long, and then you have a second half of a basketball game. And that is -- that's not a bad analogy because the second phase is kind of like the intermission. It doesn't last very long.

Page 42

In the second phase of this trial -- and we may not ever have a second phase. The only way we'd have a second phase would be if in the first phase, the merits phase, the jury found

1650

Angela Johnson guilty of one or more of the ten charges and the jury unanimously found that. That means all 12 jurors unanimously found her guilty of one or more of the 10 charges. Then we would have a second phase.

And the second phase would be what I call the eligibility or gateway phase. And the second phase, the gateway or eligibility phase, is where you will decide if the prosecution has proved what we call a gateway or eligibility factor and one or more what we call statutory aggravating factor or factors beyond a reasonable doubt.

If the jury unanimously agrees that the prosecution has proved this, then and only then would we reach the third phase.

So in the second phase the reason why we say it's kind of like the intermission, there's not going to be any evidence presented. If the jury finds the defendant guilty of one or more of the ten charges in the first phase, we have the second phase. The second phase will involve additional jury instructions from me, arguments from the lawyers interpreting those instructions for you, interpreting what the evidence would be. You'd go back and deliberate, and you'd say has the government proved beyond a reasonable doubt one gateway factor and one or more statutory aggravating factors.

If the answer to that question is yes, we have a third phase. If the answer to that question is no, then the trial is

1651

Page 43

over at that point. But if the answer is yes, then we have the third phase.

The third phase is what we call the penalty phase. That's like the second half of the basketball game because that's an actual trial. There would be evidence presented. The government would present evidence. The defense would have an opportunity to present what we call mitigation evidence. They don't have to present any evidence. But they would have the opportunity to present the evidence.

And then at the end of all the evidence we'd have closing arguments. We'd have written jury instructions from me, and the jury would go back, and you would be required to consider and weigh any aggravating and mitigating factors that I instruct you on to determine whether Miss Johnson should receive life imprisonment or the death penalty. That's why we call it the penalty phase, because if we ever get that far, it would be the jury's obligation to decide what the penalty would be, and there are only two choices: Life imprisonment with no parole or the death penalty.

Now, in the penalty phase, only if each juror unanimously votes for the death penalty will Miss Johnson be sentenced to death by me. It would take all 12 jurors unanimously to agree on the death penalty before the death penalty could be imposed. And I tell you this just to give you some background information as to what we anticipate the process

1652

will be.

Now it's the lawyers' turn. So who are we starting

Page 44

with today? Mr. Miller?

MR. MILLER: Yes, Your Honor.

THE COURT: We're going to have some general questioning. Why don't you all stand up and take a stretch break. Let's just stand up and stretch.

Okay. Please be seated. And just to remind you, this morning we're going to do some what we call group questioning, and I've given each side 30 minutes, and we're going to start with Mr. Miller.

MR. MILLER: Thirty minutes, Your Honor?

THE COURT: Yes.

MR. MILLER: Very good.

THE COURT: Thank you.

MR. MILLER: May it please the Court, counsel, Miss Johnson, Mr. Williams, Mr. Basler.

Ladies and gentlemen, good morning. I want to begin by just very briefly reintroducing myself. Mr. Williams and Judge Bennett did a nice job of that. I spend my time traveling around the state of Iowa. My name is Tom Miller again, and I'm what Mr. Williams referred to as a special assistant United States attorney. Mr. Williams is an assistant United States attorney. What makes me special is merely the fact that my authority is limited. I'm not special in the sense of being

1653

better or more important. Just quite the contrary, I'm special in the sense of being special as opposed to general. My authority is limited to cases arising out of these five murders that we are addressing here today.

What I'm going to do here this morning just so you have some idea of what you're in for, within the next half hour,

Page 45

all I want to do is get just a little bit better acquainted with each of you folks and visit with each of you folks about some of the concepts of a criminal jury trial so we can be sure that we're on the same wave length as to some of the considerations and procedures and standards that have to be followed.

Is there anyone here -- and if so, please raise your hand -- who has served on a jury before? And if so, would you please raise your hand? Oh, I have several. Good enough. Who has the microphone at the moment? Thank you. Well, you can hand that to Juror --

PROSPECTIVE JUROR 379: Any jury?

MR. MILLER: Pardon me?

PROSPECTIVE JUROR 379: Any jury?

MR. MILLER: You served on a jury?

PROSPECTIVE JUROR 379: Yes.

MR. MILLER: All the way to a verdict?

PROSPECTIVE JUROR 379: Yes.

MR. MILLER: Very good. And what I'm going to do, just so we can move this along efficiently and so everybody can

1654

know when they're -- when they're up, I'm not going to bounce around. I'm just going to move that microphone down the back row and then across the front. And when Mr. 509 gets it and we're done chatting for a couple minutes, I'll sit down; okay?

Juror 379, can you tell me when, sir, you served on a jury and what court if you recall?

PROSPECTIVE JUROR 379: I think it was about 20, 25 years ago.

MR. MILLER: Very good. Was it a criminal case if you recall?

Page 46

PROSPECTIVE JUROR 379:  I don't believe so.

MR. MILLER:  A civil case.

PROSPECTIVE JUROR 379:  I think so.

MR. MILLER:  Okay.  And either one is fine.  I'm just wanting to get your impression of that experience because you have -- most of your colleagues here are people who've never gone through this procedure before.  How did you feel about it when you got done doing that jury duty, sir?

PROSPECTIVE JUROR 379:  I'm not sure how I felt about it really.

MR. MILLER:  It was a number of years ago, but do you recall being a little bit anxious going into the process wondering what it is that you're getting involved in?

PROSPECTIVE JUROR 379:  Definitely.

MR. MILLER:  And did you feel better about it when it

                                                  1655

was all over with?

PROSPECTIVE JUROR 379:  Yes.

MR. MILLER:  And can you, if nothing else, simply assure your fellow jurors here that they're going to live through the process?

PROSPECTIVE JUROR 379:  They'll make it through.

MR. MILLER:  Good enough.  Did you perhaps even find it educational and interesting to some point?

PROSPECTIVE JUROR 379:  It was interesting.

MR. MILLER:  And understanding this is one opportunity to participate in your government, and one of the nice things about our country is that citizens do, far more than in other countries, participate in government.  Do you agree with that?

PROSPECTIVE JUROR 379:  Yes.

Page 47

MR. MILLER: And you see jury duty as one of those ways of doing that.

PROSPECTIVE JUROR 379: (Nodded head.)

MR. MILLER: You mentioned you have a Boy Scott Jamboree in July I believe.

PROSPECTIVE JUROR 379: Yes.

MR. MILLER: New Mexico?

PROSPECTIVE JUROR 379: Fort A.P. Hill, Fredericksburg, Virginia.

MR. MILLER: Virginia. And how long you been volunteering with the Boy Scouts of America, sir?

1656

PROSPECTIVE JUROR 379: Fifty years.

MR. MILLER: That's a group that really can't function without a lot of volunteer effort, isn't it?

PROSPECTIVE JUROR 379: That's true.

MR. MILLER: What is it that you find about that that keeps you in it after all these years, sir?

PROSPECTIVE JUROR 379: You take the "s" and "c" out of scouting and you have outing. I enjoy the outdoors.

MR. MILLER: Very good. Very good. You have a career in the construction business, electrical and gas; is that correct?

PROSPECTIVE JUROR 379: Yes.

MR. MILLER: And have raised a couple children.

PROSPECTIVE JUROR 379: Yes.

MR. MILLER: At your age, sir, and with that experience, I trust you're no stranger to responsibility.

PROSPECTIVE JUROR 379: Yes.

MR. MILLER: And I don't mention this to be facetious

Page 48

at all.  I don't think it falls in your category at all, but I know that there are some people in our society who simply do not feel comfortable shouldering the responsibility of serving as a juror sitting in judgment on their fellow man, particularly in a case of this obvious seriousness.  I take it that does not describe you, sir.  You feel you can shoulder that responsibility.

1657

PROSPECTIVE JUROR 379:  Yes.

MR. MILLER:  Thank you very much.  If you'd pass that microphone to your right, and I'll visit briefly with Juror 293.

PROSPECTIVE JUROR 293:  Good morning.

MR. MILLER:  Good morning, sir.  And I believe you would agree with the man on your left that being outdoors is an important part of your life as well.

PROSPECTIVE JUROR 293:  Yes, very much so.

MR. MILLER:  I notice that you're a fisherman and a hunter.

PROSPECTIVE JUROR 293:  Right.

MR. MILLER:  Enjoy those things?

PROSPECTIVE JUROR 293:  Yes.

MR. MILLER:  Where do you go fishing, sir?

PROSPECTIVE JUROR 293:  Most any ponds, lakes, rivers. We've been to Canada a couple times.

MR. MILLER:  Where do you go in Canada?

PROSPECTIVE JUROR 293:  About 70 miles north of Kenora.

MR. MILLER:  Up in northwest Ontario.

PROSPECTIVE JUROR 293:  Yeah, Caribou Falls.

MR. MILLER:  Walleye fishing.

Page 49

PROSPECTIVE JUROR 293:  You bet.

MR. MILLER:  Do you have some buddies you go up there with or family?

1658

PROSPECTIVE JUROR 293:  Mostly family.

MR. MILLER:  Got a trip planned this summer?

PROSPECTIVE JUROR 293:  No.  We go every other year, and this is our off year.

MR. MILLER:  Mr. 293, I understand from your questionnaire that you have some experience as a supervisor.

PROSPECTIVE JUROR 293:  Yes.  I was a supervisor the last -- oh, wouldn't have been the last place I worked but before that.

MR. MILLER:  How did you feel about those administrative duties, sir?

PROSPECTIVE JUROR 293:  Well, I don't -- it was a job. I guess I enjoyed it, being responsible for the whole picture rather than just a specific part of it.

MR. MILLER:  Somebody has to take care of those supervisory duties; right?

PROSPECTIVE JUROR 293:  Yes.

MR. MILLER:  Particularly in an outfit where there's a large program going on.  It shouldered you occasionally with the responsibilities that you didn't particularly enjoy I assume.

PROSPECTIVE JUROR 293:  Oh, yeah.

MR. MILLER:  But somebody had to do them.

PROSPECTIVE JUROR 293:  Yeah.

MR. MILLER:  And I assume you would view jury duty possibly somewhat similarly.  It doesn't necessarily have to be

1659

Page 50

something that we always would want to do, but we understand as citizens in this country somebody has to do that. Fair statement, sir?

PROSPECTIVE JUROR 293: Most certainly.

MR. MILLER: And you feel that you can do that, sir.

PROSPECTIVE JUROR 293: Yes.

MR. MILLER: Thank you, Mr. 293. I'll ask you to pass that microphone to Juror 699.

Good morning, sir.

PROSPECTIVE JUROR 699: Morning.

MR. MILLER: And I think we've got yet another outdoorsman here.

PROSPECTIVE JUROR 699: Yes, yeah, I enjoy the outdoors.

MR. MILLER: You indicated you're a camper and a fisherman.

PROSPECTIVE JUROR 699: Yes.

MR. MILLER: Tell us just a little bit about your fishing. Where do you go fishing, and how do you like to do that?

PROSPECTIVE JUROR 699: Along the lakes and reservoirs, and Missouri River, and we do our camping along that area too.

MR. MILLER: As was mentioned, I'm from Des Moines in the sense that that's where I live and that's where I office. I

1660

cringe sometimes at the statement because that's not where I grew up or where I even began practicing law. But even though I'm not particularly good at it, I like to go out fishing with

Page 51

my sons once in a while but never on the Missouri River. What sort of fishing do you do there, and how do you go about it?

PROSPECTIVE JUROR 699: There's walleye and sauger and catfish and that kind of stuff. And, oh, it's an exciting -- there can be exciting moments.

MR. MILLER: A little bit different from lake fishing when you're on that moving water.

PROSPECTIVE JUROR 699: Yes, yes, quite a bit different.

MR. MILLER: You have a son. Do you take him fishing, sir?

PROSPECTIVE JUROR 699: Yes, yes.

MR. MILLER: Is that one of the activities you like to do with your son?

PROSPECTIVE JUROR 699: When he was younger, yeah. Not so much anymore. They like to go the other way a lot of times from their parents when they get a little older.

MR. MILLER: Before you know it they're gone; right?

PROSPECTIVE JUROR 699: Yeah, yeah.

MR. MILLER: How about you, sir? How about the thought of shouldering the responsibility of sitting in a case where very weighty issues are likely to be placed in your lap

1661

should you be required to serve as a juror? Are you comfortable with that feeling?

PROSPECTIVE JUROR 699: I have no problem.

MR. MILLER: Very good, 699. Thank you very much. Pass that, and I'll visit briefly with Juror 219.

How are you this morning, ma'am?

PROSPECTIVE JUROR 219: Fine. Thank you.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1447 of 3245

MR. MILLER:  I noticed that you have several children.

PROSPECTIVE JUROR 219:  Two.  One of each kind.

MR. MILLER:  Pardon me?

PROSPECTIVE JUROR 219:  One of each kind.

MR. MILLER:  Can you tell me what they're doing?

PROSPECTIVE JUROR 219:  My daughter's in Atlanta, Georgia, and she's in human resources with a company, and my son is in Charlotte, North Carolina, and he's owner and CEO of three NASCAR teams.

MR. MILLER:  And that's what struck me.  Can you tell me a little bit about that?  That sounds exciting.

PROSPECTIVE JUROR 219:  It is exciting, but it's very hard work, and he's worked very hard to get where he is, very long hours.

MR. MILLER:  Can you tell me how he got there, because I imagine there are thousands of young men who would love to have a career like that?  How did he happen to succeed in arriving where he is professionally?

1662

PROSPECTIVE JUROR 219:  He worked for Anheuser-Busch in Chicago and southern Illinois, and then Valvoline became interested in him, and they hired him away.  And then Rick Hendrick who is a huge NASCAR person, he was interested in my son.  He wanted to start a team from scratch, and he heard all good things about him and hired him or friends of his hired my son to start a team from scratch, and then -- now it's three teams.

MR. MILLER:  And are any of those teams teams that we might see on TV on weekends?

PROSPECTIVE JUROR 219:  Oh, yeah.  If you watch club

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1448 of 3245

racing, the Army car and the Valvoline car and Centrex.

MR. MILLER: The U.S. Army car?

PROSPECTIVE JUROR 219: Uh-huh.

MR. MILLER: And the Valvoline car, and the other car is what?

PROSPECTIVE JUROR 219: It's a new team they just started, Centrex. It's a financial institution in Denver.

MR. MILLER: So we'll recognize that. That will mean a little bit more to us when we see the U.S. Army car going around.

PROSPECTIVE JUROR 219: Yeah, Joe Nemechek is the driver.

MR. MILLER: Very good. He worked hard at that.

PROSPECTIVE JUROR 219: He did.

1663

MR. MILLER: But I trust he enjoys that very well.

PROSPECTIVE JUROR 219: Uh-huh.

MR. MILLER: I don't recall noticing your hand going up when I asked for the hands of those who had served on a jury before.

PROSPECTIVE JUROR 219: I never have.

MR. MILLER: You never have.

PROSPECTIVE JUROR 219: No.

MR. MILLER: How do you feel about it after listening to some of your colleagues here?

PROSPECTIVE JUROR 219: Well, I was called for jury duty back when -- I'm from Rock Island, Illinois, from the other side of the state, and I just lived over here seven years. I was a widow for 25 years and then got remarried, and my husband had just died, and I was called for jury duty, and we had a

Page 54

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1449 of 3245

business, and it was a hardship for me, and so I was not called then. I mean, I was called, but I wasn't -- didn't have to serve.

MR. MILLER: Sure. Obviously it's an experience, and we all are a little bit anxious about different experiences.

PROSPECTIVE JUROR 219: Uh-huh.

MR. MILLER: That's just human nature. But you've heard about jury duty before. It's not something totally new to you as a concept obviously. You've even been called even though you haven't served before. Do you understand that as the judge

1664

explained your job as a juror is simply to be the judge of the facts? It would be your job to determine what actually happened.

PROSPECTIVE JUROR 219: Yes.

MR. MILLER: And would that be your goal should you be required to serve as a juror in this case?

PROSPECTIVE JUROR 219: Yes. I just -- I'm -- I don't know if I could be a good juror.

MR. MILLER: You're a little apprehensive about it.

PROSPECTIVE JUROR 219: Right, and I've kind of -- I've heard about the jury -- well, you couldn't help but read about it and see it on television.

MR. MILLER: Let me mention to you something. We're going to split up this procedure into two parts. Mr. Stowers and I are each going to spend half an hour visiting with you as a group, and then afterwards we're going to bring you folks in one by one and talk to you about two topics. One is the issue of the death penalty, obviously something that's important we visit with you about, and another is any previous publicity or

Page 55

knowledge from any source you may have about this case, and so we'll want to visit with you about that. Other than your knowledge about this case, is there anything that gives you any pause about serving as a juror?

PROSPECTIVE JUROR 219: No.

MR. MILLER: You understand that should you be

1665

required to do that and assuming there are no problems about pretrial publicity and what have you and that you are chosen to serve on this jury, you would be sharing with 11 others the responsibility of passing judgment in this case on the facts.

PROSPECTIVE JUROR 219: Yes.

MR. MILLER: And do you feel you could do that, ma'am?

PROSPECTIVE JUROR 219: I think.

MR. MILLER: Okay. I take it it's not a responsibility that you're taking lightly.

PROSPECTIVE JUROR 219: No.

MR. MILLER: And that's proper. You shouldn't take it lightly. You should pause and think about the responsibility that you're shouldering, but you're also a woman who is no stranger to responsibility. I can tell that from your background.

PROSPECTIVE JUROR 219: Yeah.

MR. MILLER: Do you feel this would be yet one more occasion when you as a responsible adult would have to call upon that ability to shoulder responsibility; fair statement?

PROSPECTIVE JUROR 219: Fair.

MR. MILLER: Thank you so much, ma'am. You can go ahead and pass that, and good riddance to that microphone; right? The reason we have to pass that around, every time we

Page 56

have proceedings in court, our court reporter is required to make an accurate record of everything that is stated, and it's a

1666

difficult-enough job for her to do when she has just one lawyer standing at a podium and one witness, but when she has up to 12 jurors being visited with at the same time, it can become almost impossible unless we're careful to do it one at a time and with a microphone.

Juror 234, good morning.

PROSPECTIVE JUROR 234:  Good morning.

MR. MILLER:  How are you today, ma'am?

PROSPECTIVE JUROR 234:  Just fine.

MR. MILLER:  I think you started but didn't complete jury service once.

PROSPECTIVE JUROR 234:  Yes.  I served on a civil case in Sac County, and I was there for a week.  We listened to all the evidence, and before we were supposed to report back the next week, they'd settled out of court.

MR. MILLER:  How did you feel about that?

PROSPECTIVE JUROR 234:  I was rather mad.  I sat there all week and listened to all the evidence and started to form some opinions, you know.

MR. MILLER:  Had it yanked out from under you right at the --

PROSPECTIVE JUROR 234:  Yeah, and I never even knew how it turned out, so I was kind of disappointed.

MR. MILLER:  I think that's natural.  You probably went into the proceeding thinking, my goodness, I'd just as soon

1667

Page 57

not have to be in jury duty this week, and by the time they yanked it out from under you, you were interested enough in it, you wanted to decide the case.

PROSPECTIVE JUROR 234:  That's correct.

MR. MILLER:  Would you agree that that is your role and was that your goal as a juror, simply to ascertain the truth from the facts and decide what actually happened?

PROSPECTIVE JUROR 234:  Yes.

MR. MILLER:  In other words, this is not a grand, elaborate ritual we're engaged in here but rather the very practical business of deciding disputes in our society.

PROSPECTIVE JUROR 234:  Yes.

MR. MILLER:  Having our citizens do so.  Fair statement?

PROSPECTIVE JUROR 234:  Uh-huh.

MR. MILLER:  One of the aspects of this proceeding is that because it's a criminal case, not a civil case, the burden of proof that rests upon the plaintiff which in this case is the government, the United States of America, is a little bit higher than it was in that civil case.  In a criminal case the burden is not just by a mere preponderance of the evidence, not just the greater weight of the evidence but rather by proof beyond any reasonable doubt.  And you understand that there's that difference.

PROSPECTIVE JUROR 234:  Yes.

1668

MR. MILLER:  Okay.  Now, you're going to receive instructions from Judge Bennett as to what that is, and you're going to receive instructions with regard to every phase of this

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1453 of 3245

case should there be as many as three phases. I trust you take some comfort in the fact that you'll have the judge telling you, giving you guidance on how to do your job and instructions on what the law is and how you should do your job as a juror.

PROSPECTIVE JUROR 234: Yes.

MR. MILLER: I expect one of those instructions will be that the defendant in this case and indeed in every case in our country of a criminal nature is presumed innocent and not guilty until and unless the government by evidence beyond a reasonable doubt proves her guilt. Following me?

PROSPECTIVE JUROR 234: Yes.

MR. MILLER: That sound fair to you?

PROSPECTIVE JUROR 234: Yes.

MR. MILLER: Any problem with that concept, ma'am?

PROSPECTIVE JUROR 234: No.

MR. MILLER: Okay. In other words, there's no burden on her to do anything. The burden is always the government's. And you understand the United States -- any prosecution willingly accepts that burden whenever it brings a criminal case in this country; okay?

PROSPECTIVE JUROR 234: Okay.

MR. MILLER: I just wanted to visit with you about

1669

that, and I'm not going to pass that microphone back, but is there anybody here who has any concerns -- and we'll visit with you later about it if you do -- any concerns about that concept, raise your hand? Very good. I see no hands.

Another concept I wanted to visit with you about, ma'am, because we did read your questionnaires -- and I thank you so much for the time you spent filling those out. That

Page 59

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1454 of 3245

helps us very much. You indicated in response to a question about assessing the testimony of an inmate, a person who is in prison who might be called, one or more of them who may be called as witnesses in connection with this case, and you indicated a willingness to listen to that person's testimony. Do you recall answering that question?

PROSPECTIVE JUROR 234: Yes, I think I do.

MR. MILLER: And here again, we ask a lot of questions of people not expecting that you already know what the law is by any means but simply wanted to know what your opinions are. If at the conclusion of this case you are one who has served on this jury, I expect you will receive from Judge Bennett an instruction that talks about that very matter and indicates to you that when you listen to someone who is in that position -- and I'm paraphrasing now. Bear in mind you'll get the full instruction from the Court. I'm just paraphrasing.

In that situation you should examine with care the testimony of anyone who is in that situation looking to such

1670

things as to whether or not they feel they have something to gain from their testimony. Does that seem fair to you, ma'am?

PROSPECTIVE JUROR 234: Yes, it does.

MR. MILLER: And understanding that I have not given you the full and exact instruction, do you feel that that's the sort of an instruction that makes sense and that you could follow, would follow?

PROSPECTIVE JUROR 234: Yes, I think I can.

MR. MILLER: Thank you very much, ma'am. You can pass that dreaded microphone forward, and I'll pick on Juror 108 for a moment; okay?

Page 60

PROSPECTIVE JUROR 108:  Thank you.

MR. MILLER:  Good morning, ma'am.

PROSPECTIVE JUROR 108:  Morning.

MR. MILLER:  How are you today?

PROSPECTIVE JUROR 108:  Okay.

MR. MILLER:  Are you with me so far on these concepts of burden of proof and those things?

PROSPECTIVE JUROR 108:  So far.

MR. MILLER:  Am I correct in recalling that you have a friend or relative in law enforcement?

PROSPECTIVE JUROR 108:  I don't think so.

MR. MILLER:  Okay.

PROSPECTIVE JUROR 108:  No.

MR. MILLER:  I think I did notice that you responded

1671

to a question about testimony of law enforcement officials, that you would want to trust their testimony.

PROSPECTIVE JUROR 108:  I would like to.

MR. MILLER:  Okay.  And I think that speaks for all of us.  We should all hope to be able to trust any testimony that comes from anyone who speaks on behalf of government.  But I also must mention to you that as with my discussion with Juror 234, should you be required to serve on this jury, you, I expect, will receive an instruction from the judge about the testimony of law enforcement.  And do you understand that Mr. Basler and all of his colleagues in law enforcement -- and I expect you may hear from a number of them, peace officers, representatives of government, all men with sworn duties and responsibilities and training -- are nevertheless, every last one of them -- and women -- human beings?

Page 61

PROSPECTIVE JUROR 108:  Yes.

MR. MILLER:  All of us who are human are fallible. Fair statement?

PROSPECTIVE JUROR 108:  Oh, yeah.

MR. MILLER:  All of us who are human as a group are subject not just to mistake but also all of the other emotions and influences that we as fallible human beings are subject to. And if you receive an instruction from the Court that you're not to give it special, special, consideration or credibility to a peace officer merely because he's a peace officer or a

1672

representative of government, can you follow that instruction, and will you follow that instruction, ma'am?

PROSPECTIVE JUROR 108:  Oh, yeah, yeah.

MR. MILLER:  Thank you very much.  Let me just say I think I noted that you're actually in charge of housekeeping at a --

PROSPECTIVE JUROR 108:  I've since quit that job.

MR. MILLER:  You've since quit that job.  But you held that position for some time.

PROSPECTIVE JUROR 108:  Yeah.

MR. MILLER:  And we won't talk how many years, but I'll bet there were a lot of guests who went in and out of that place.

PROSPECTIVE JUROR 108:  There was a lot of guests and help.

MR. MILLER:  Okay.  Let me just confess something about myself.  I've already mentioned that I spend a great portion of my professional life living out of a suitcase.  As a father I sometimes regret that, but my father was a man who

Page 62

traveled for a living, and he was gone four nights every week, and I get home a lot more than he did. But even so, I'm gone a lot. And one of my personal problems -- and we all have a few -- is that I'm a bit forgetful. Have you had guests like me that leave things behind a lot?

PROSPECTIVE JUROR 108: How many times did I have to

1673

send you your luggage?

MR. MILLER: Thank you, ma'am. And I don't know as you've ever had to do that, but I thank everyone in your position for the times you've been willing to do that for me.

PROSPECTIVE JUROR 108: Yeah, we have to do that a lot.

MR. MILLER: And I appreciate that. If you would pass that now, I'd appreciate it.

Good morning, Miss 790.

PROSPECTIVE JUROR 790: Good morning.

MR. MILLER: How are we doing so far as far as you being able to follow me?

PROSPECTIVE JUROR 790: I'm doing fine.

MR. MILLER: Very good. Thank you, ma'am. I noticed among other things that you have a variety of hobbies, and one of that's playing the piano.

PROSPECTIVE JUROR 790: Yes.

MR. MILLER: How long have you been doing that, ma'am?

PROSPECTIVE JUROR 790: Since I was in fifth grade.

MR. MILLER: Okay. Enjoy that?

PROSPECTIVE JUROR 790: Yes, I do.

MR. MILLER: Do it purely for your own enjoyment, or do you do it for entertainment of others as well?

Page 63

PROSPECTIVE JUROR 790:  I play in church once a month.

MR. MILLER:  Very good.

1674

PROSPECTIVE JUROR 790:  Yep.

MR. MILLER:  So you're not just a pianist.  You're an organist as well.

PROSPECTIVE JUROR 790:  I never tried that so -- but I enjoy playing for other people too.  I also play for a church in Archer too.

MR. MILLER:  Very good.  And that's a responsibility too, isn't it?

PROSPECTIVE JUROR 790:  Yes, it is.

MR. MILLER:  Being largely nonmusical, I can't imagine.  That's the sort of thing that would make me nervous, trying to be able to perform with a keyboard.

PROSPECTIVE JUROR 790:  Uh-huh.

MR. MILLER:  We have a piano in my home, and it's very good therapy for me to go bang those keys once in a while, but I would cringe if anybody was listening to me.  Can you view jury duty as a similar responsibility, in other words, something where you have to shoulder the responsibility of doing something for others, in this case for your community?

PROSPECTIVE JUROR 790:  No, I have not done any of the jury duty before.

MR. MILLER:  But you feel that you can shoulder that responsibility?

PROSPECTIVE JUROR 790:  Yes, I would.

MR. MILLER:  Very good.  And bearing in mind it's not

1675

Page 64

always a responsibility that's always pleasant but it's one that simply our system cannot function unless we find 12 citizens willing to shoulder that responsibility.  You agree with that, ma'am?

PROSPECTIVE JUROR 790:  Yes.

MR. MILLER:  And likewise, I think you know from the Court's questionnaire that some of the evidence in this case is not the sort of thing that you'd want to listen to all the time. It's not necessarily pleasant hearing about deaths. Nevertheless, we can't have a system that functions unless we have citizens willing to listen to such evidence.  Do you feel you can do that, ma'am?

PROSPECTIVE JUROR 790:  Yes.

MR. MILLER:  Thank you so much.  If you'd pass that microphone to Juror 796.

Good morning.  How are you today?

PROSPECTIVE JUROR 796:  Good morning.  Fine, thank you.

MR. MILLER:  How do you feel about these concepts and the idea of shouldering that responsibility as a juror, ma'am?

PROSPECTIVE JUROR 796:  I think it's our duty.

MR. MILLER:  Very good.  And in company with 11 fellow jurors, do you feel you can shoulder the responsibility of serving as a juror in a case of this nature?

PROSPECTIVE JUROR 796:  Certainly.

1676

MR. MILLER:  And I don't doubt you a bit and say this not for your benefit but everyone on this jury, but I'm looking for a raise of hands of anybody that feels this way.  I think all of us understand that we can't have a system that functions

Page 65

unless we have jurors willing to shoulder that responsibility. But there are, I know from experience, some folks who very sincerely don't feel that they can shoulder such responsibility simply because they are being called to sit in judgment upon their fellow citizen, and some people just very sincerely don't feel that they can fill that role. Does that apply to anyone here? And if so, raise your hand. It doesn't apply to you I take it.

PROSPECTIVE JUROR 796: No, sir, it does not.

MR. MILLER: Would you pass that just right behind you again, over your right shoulder if you would to Juror 219?

Did I get a raise of the hand there?

PROSPECTIVE JUROR 219: You did.

MR. MILLER: And again, I don't mean to place you in the spotlight or make you unnecessarily uncomfortable. But better now than later on when you're sitting in a jury room saying, I'm just not sure I can handle this. Can you share your thoughts with us along that line?

PROSPECTIVE JUROR 219: I just don't know if I could give a fair judgment. I think in my inner mind I've already formed an opinion.

1677

MR. MILLER: Let me just stop you right there. Here we're talking about information you may have heard beforehand about this case.

PROSPECTIVE JUROR 219: Heard and read, yes.

MR. MILLER: Very good. I'm going to ask you to pass that forward, and we're going to visit with you individually shortly about that matter, but thank you so much for raising that to our attention.

Page 66

Juror 796, if you'd just pass that to your left, I've got two minutes left, and I'm going to do it real quickly.

PROSPECTIVE JUROR 166: Okay.

MR. MILLER: How do you feel about it, 166? How do you feel about jury duty, ma'am?

PROSPECTIVE JUROR 166: It's my duty.

MR. MILLER: Very good. Do you feel that's a duty that as a citizen and as an adult that you can shoulder and carry your share of that responsibility here in this case?

PROSPECTIVE JUROR 166: Yes.

MR. MILLER: Thank you so much. And you can pass it to Mr. 509, our last juror.

How about your feelings, sir?

PROSPECTIVE JUROR 509: It's your duty.

MR. MILLER: Very good. And is it a duty you think you can carry out?

PROSPECTIVE JUROR 509: Yes.

1678

MR. MILLER: Fairly and impartially in this case?

PROSPECTIVE JUROR 509: You bet.

MR. MILLER: Okay. You understand that in carrying out that duty if you're required to serve as a juror in this case and you listen to weeks of testimony and after listening to all that testimony and the Court's instructions you conclude that you have a reasonable doubt about the guilt of Angela Johnson, you understand under those circumstances, sir, it would be your duty to return a verdict finding her not guilty. You understand that, sir?

PROSPECTIVE JUROR 509: Yeah.

MR. MILLER: And would you do so under those
Page 67

circumstances?

PROSPECTIVE JUROR 509: Sure.

MR. MILLER: Conversely, should you serve as a juror for weeks and listen to the evidence and the Court's instructions and conclude with all of your fellow jurors unanimously to your own satisfaction and beyond any reasonable doubt that Angela Johnson is guilty and that her guilt has been proven beyond a reasonable doubt, under those circumstances, sir, what would your verdict be?

PROSPECTIVE JUROR 509: It depends on all the evidence and stuff.

MR. MILLER: Absolutely. Assuming with me -- and again, I'm asking you to make an assumption -- that the evidence

1679

proves her guilty beyond a reasonable doubt and you unanimously conclude that, under those circumstances and making that assumption, what would your verdict be, sir?

PROSPECTIVE JUROR 509: Be guilty then.

MR. MILLER: It's not an easy word to say, is it?

PROSPECTIVE JUROR 509: No.

MR. MILLER: But you feel you could do that.

PROSPECTIVE JUROR 509: You bet.

MR. MILLER: Thank you, sir.

Your Honor.

THE COURT: Thank you, Mr. Miller.

Mr. Stowers?

MR. STOWERS: Do you want to take a break?

THE COURT: No.

MR. STOWERS: Go straight through?

THE COURT: We'll go through till 10:30, and then

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1463 of 3245

we'll take our break.

MR. STOWERS: See if we can get this to work. Can everybody hear me? Can you hear me?

THE REPORTER: Thank you. I can.

MR. STOWERS: Thank you. Hi. My name's Dean Stowers. I've worked with Angela Johnson now for four years and with Mr. Willett and Mr. Berrigan on this case.

You've all been provided previously a witness list. I want to make sure that you all are familiar with some of the

1680

folks who might be testifying to make sure that you're aware of certain of Angela's family members.

Her mother is Pearl Jean Johnson. Do you see those names? Did everybody get through that list, by the way? Is everybody nodding? She's got some sisters. I've got notes here to make sure I don't miss anybody. Wendy Jacobson of Dallas, Texas, and Holly Dirksen of Klemme I think it is and Jamie Jo Hays of Faribault, Minnesota. Anybody know those names? Her brother Jim Johnson. He lives in the Chicago area. And she's got two daughters, Alyssa and Marvea, 21 and 11 years old. Nobody knows any of those folks?

Now, I know that you all filled out these large 18-page questionnaires to the best of your ability, and I wanted to thank you for doing that before I visited with you all. Obviously that's a big job, and I'm sure when you got those envelopes in the mail you were wondering how could anybody make you have to do that. It's quite a project, wasn't it? But thank you all for doing that.

And now is the time when we get to visit with you about certain of those questionnaires with the idea on our part

Page 69

that we just want to know what your thoughts are, what your views are, what your opinions are because through this process then we're able to evaluate you all to determine whether or not you might be the best folks or the best individuals to sit on this jury; okay? That's what it's all about. And so we just

1681

want to be able to talk to you a little bit here on an informal basis.

Now, you filled out an 18-page questionnaire and told us all sorts of personal information. Each one of you did. And yet you probably don't know much about us. You've heard my name's Dean Stowers. I'm in Des Moines, Iowa. You heard I'm an attorney, but you probably don't know anything else about me since you've all not raised your hands. I'm 41 years old. I grew up in --

THE COURT: Well, we don't need to get into personal stuff. It's not relevant.

MR. STOWERS: That's fine. And what you also might not know is that we're here, as the Court explained, on something that's very, very serious. So with that in mind and with it also in mind that we're here to find out who might be the best jurors, I wanted to visit with you all about a few topics.

Now, let's talk about something that Mr. Miller began to talk about earlier, and that is the idea that there will be different types of witnesses testifying in this courtroom throughout the course of a very lengthy trial. Some of those folks that are going to come in here are going to be folks who are law enforcement officers, law enforcement officials.

I think he talked to you about that, ma'am, Number
Page 70

108.    And when he talked to you about that, he explained to you

1682

some things.

Now, we have you, Mr. 293 -- if you could take the microphone and hand it over your right shoulder -- I saw from your questionnaire that you once were a law enforcement officer; is that correct?

PROSPECTIVE JUROR 293:  I was with the Woodbury County Sheriff's Reserve for several years.

MR. STOWERS:  And during what time period would that have been?

PROSPECTIVE JUROR 293:  Be the late '70s till about the middle '80s.

MR. STOWERS:  And did you retire after that?

PROSPECTIVE JUROR 293:  Did I retire from . . .

MR. STOWERS:  Law enforcement.

PROSPECTIVE JUROR 293:  Well, yeah, it was a voluntary service.  The sheriff's reserve is a voluntary service.  And my job position made it so that I was not able to attend meetings.

MR. STOWERS:  Are you a member of any law enforcement associations or anything like that now?

PROSPECTIVE JUROR 293:  No.

MR. STOWERS:  Having worked in law enforcement, I assume you got to know a number of law enforcement officers and things like that; is that correct?

PROSPECTIVE JUROR 293:  With the sheriff's department, yes, and a couple of them with the Sioux City Police Department.

1683

Page 71

MR. STOWERS: Okay. And how often did you work in the capacity of reserve during the time period that you've indicated?

PROSPECTIVE JUROR 293: Well, in the summertime somewhat often. Our duties mostly included crowd and traffic control at special events. We did ride with the deputies on occasion as part of our training.

MR. STOWERS: Okay. Now, you're going to hear in the courtroom a number of witnesses testifying from that spot right over there under the big screen who are going to come in and tell you their name, the fact that they're employed as law enforcement officers just like you once volunteered to be one in the reserve role. And do you think it's going to be at all difficult for you to evaluate their testimony just like you would any other witness who might not be a law enforcement officer?

PROSPECTIVE JUROR 293: No, I don't think it would influence me one way or another.

MR. STOWERS: Can you explain why?

PROSPECTIVE JUROR 293: Well, all witnesses are under oath and are assumed to be telling the truth.

MR. STOWERS: And so if somebody walked in, told you that they were a law enforcement officer, deputized, whatever you want to call it, trained accordingly, that you would give their testimony no greater or no lesser weight than any other

1684

witness. Is that what you're telling us?

PROSPECTIVE JUROR 293: More or less, yes.

MR. STOWERS: What about the more or less? Can you explain that?

Page 72

PROSPECTIVE JUROR 293: Well, I guess I would say no, I would not give any testimony any greater credibility than any other.

MR. STOWERS: Even though you worked in that field.

PROSPECTIVE JUROR 293: Yes.

MR. STOWERS: For many years.

PROSPECTIVE JUROR 293: Yes.

MR. STOWERS: And how do you feel about that topic, Mr. 379, if you could pass the microphone?

PROSPECTIVE JUROR 379: What topic?

MR. STOWERS: Yes. You are Mr. 379. I saw you check your number to verify that.

PROSPECTIVE JUROR 379: Yeah.

MR. STOWERS: The topic of police testimony, how do you feel about that?

PROSPECTIVE JUROR 379: I wouldn't have any problem with a police officer giving testimony or anybody else.

MR. STOWERS: Right. If they got up there and said, I'm a police officer, and that's my job, would they start off in your mind sort of ahead of somebody else who got up there and said, I'm Bob Jones from Kokomo, and I'm just a citizen? Would

1685

they start off ahead in terms of what you thought of them and their believability?

PROSPECTIVE JUROR 379: I don't think so.

MR. STOWERS: Would they start off behind?

PROSPECTIVE JUROR 379: I would just take their testimony just equal as far as being truthful.

MR. STOWERS: Okay.

PROSPECTIVE JUROR 379: Wouldn't weigh them any

Page 73

greater or lesser.

MR. STOWERS: And I think, sir, you were asked a question as well about another type of witness who you might hear from in this case, and that's psychological or psychiatric-type testimony. You remember that?

PROSPECTIVE JUROR 379: No, sir.

MR. STOWERS: It was a long questionnaire, wasn't it? And I think in your questionnaire you indicated that you might have some question about testimony from somebody in the field of psychiatry. Do you remember that?

PROSPECTIVE JUROR 379: Not really.

MR. STOWERS: Okay. Let me find the question. Well, what do you think about psychiatric testimony just generally, psychiatrists, psychologists?

PROSPECTIVE JUROR 379: I'm not sure how to read some of them sometimes when they discuss things.

MR. STOWERS: Do you have some views about that type

1686

of thing, that type of field, psychiatric or psychological-type persons?

PROSPECTIVE JUROR 379: I don't have any good views about it, no, not that I can think of.

MR. STOWERS: Do you remember filling out the questionnaire as follows in response to question 62? Question 62 read, In general, what are your thoughts and opinions about psychiatrists, psychologists, or mental health professionals who testify in court in some criminal cases? And you wrote in, Sometime I think they leave doubt about their own sanity.

PROSPECTIVE JUROR 379: Sometimes that could be true.

MR. STOWERS: Does that sound like your answer?

Page 74

PROSPECTIVE JUROR 379:  Yep.

MR. STOWERS:  And what did you mean by that?

PROSPECTIVE JUROR 379:  Sometimes I don't understand where they come from.

MR. STOWERS:  Can you explain that a little bit more?

PROSPECTIVE JUROR 379:  Not really.  Just . . .

MR. STOWERS:  Are you somewhat skeptical of that type of -- of that type of a person and profession?

PROSPECTIVE JUROR 379:  Yes, yes.

MR. STOWERS:  And why would that be?

PROSPECTIVE JUROR 379:  I suppose just from watching TV programs and things like that and how they react, how they come across.

1687

MR. STOWERS:  And how is that that they come across and react?

PROSPECTIVE JUROR 379:  I can't explain that either.

MR. STOWERS:  Okay.  But something about your experience in life in seeing those folks in the field of psychiatric or psychological -- those fields has caused you to be skeptical of them when they talk about things that they say are within their area of expertise; is that correct?

PROSPECTIVE JUROR 379:  That could be true.  That can be decided by just watching programs.

MR. STOWERS:  In fact, maybe you were joking in your questionnaire, but I assume you were being serious when you filled your questionnaire out; is that correct?

PROSPECTIVE JUROR 379:  Uh-huh.

MR. STOWERS:  And you actually went so far in your questionnaire as to indicate that honestly your view is that you

Page 75

think these people are nuts themselves basically. Wouldn't that be fair?

PROSPECTIVE JUROR 379: No, I don't think so. Innocent people you said?

MR. STOWERS: No, the psychiatrists or psychologists that testify in court.

PROSPECTIVE JUROR 379: No. Just that I don't know anything about their field and how they come up with their answers and, you know, their background.

1688

MR. STOWERS: Well, would anybody who came into court here and testified in that connection, whether it be for the government or for the defendant, be viewed skeptically by you as a result of your experiences?

PROSPECTIVE JUROR 379: Would you state that one more time?

MR. STOWERS: Well, would anybody who came into court here and testified from that witness stand over there, said, I'm a psychologist, I'm a psychiatrist, I'm a mental health professional, and gave some testimony in this case, whether the government called that person or the defense did, would you be inherently skeptical of anything they had to say?

PROSPECTIVE JUROR 379: No, I don't think so.

MR. STOWERS: Okay. Even though you indicated you would have questions about that, you don't believe you would be skeptical.

PROSPECTIVE JUROR 379: Skeptical in my questionnaire is just in general of psychologists because I haven't had to deal with any of them.

MR. STOWERS: Do you think your views about those

Page 76

types of persons are strongly held?

PROSPECTIVE JUROR 379: I can't answer that. I don't think they're strongly held, no.

MR. STOWERS: Okay. But you do have some fairly noteworthy views. Would you agree with that?

1689

PROSPECTIVE JUROR 379: I agree.

MR. STOWERS: And to what degree do you believe that those views are going to impact you in your ability to fairly consider that type of testimony if it's presented in this case by either party in all honesty?

PROSPECTIVE JUROR 379: I don't think it would bother me.

MR. STOWERS: Now, Juror Number 293 I believe is seated next to you. I'm sorry. Can you hand that all the way over to Juror Number 219?

Now, ma'am, I assume you have a concept of what I've been talking about with Mr. 379; is that correct?

PROSPECTIVE JUROR 219: Yes, uh-huh.

MR. STOWERS: And you understand there are fields of expertise in the area of psychology, psychiatry, mental health professionals; is that correct? You understand there are such persons out there; right?

PROSPECTIVE JUROR 219: Yes, certainly.

MR. STOWERS: And you understand they have a role to play.

PROSPECTIVE JUROR 219: Yes.

MR. STOWERS: In the process, in court.

PROSPECTIVE JUROR 219: (Nodded head.)

MR. STOWERS: You're familiar with that --

Page 77

PROSPECTIVE JUROR 219:  Yes.

1690

MR. STOWERS:   -- through just life experience; right?

PROSPECTIVE JUROR 219:  Yes.

MR. STOWERS:  And you don't have any problem with those kind of witnesses.

PROSPECTIVE JUROR 219:  I would just assume that they were telling the truth.

MR. STOWERS:  Right.  And you have to evaluate them like any other witness; right?

PROSPECTIVE JUROR 219:  Correct.

MR. STOWERS:  Take into account their training, their background, their expertise, how they presented themselves in court; right?

PROSPECTIVE JUROR 219:  Yes.

MR. STOWERS:  Now, Juror Number 293 I think is down to your left.  You had -- let's switch topics here; okay?  You had talked a little bit in your questionnaire about your view about drug law violations.  You remember that?

PROSPECTIVE JUROR 293:  It's been quit a while since I filled that out, so some of that I don't recall.

MR. STOWERS:  Okay.  And in your questionnaire I believe you indicated you felt that those laws needed to be strictly enforced.

PROSPECTIVE JUROR 293:  Yes.

MR. STOWERS:  And I was kind of wondering what you meant by that.

1691

PROSPECTIVE JUROR 293:  Well, I don't believe that
Page 78

there's a lot of room for flexibility really. I don't believe that there should be -- drug laws are a very, very important part of our law enforcement system because it can affect so many people in such adverse manners that they really need to be strictly adhered to.

MR. STOWERS: And do you feel that our courts aren't doing enough in that regard or that the police aren't doing enough or . . .

PROSPECTIVE JUROR 293: I think both the courts and the law enforcement has a real tough job in dealing with drug violations.

MR. STOWERS: You think they're not doing enough or they're doing it right or . . .

PROSPECTIVE JUROR 293: I think they're probably doing all they can.

MR. STOWERS: What would you like to see changed, if anything?

PROSPECTIVE JUROR 293: I think probably more money should be put into this thing so that we can police it a little better and a little more thorough.

MR. STOWERS: Now, do you view your potential opportunity here as a juror as an opportunity to aid in the enforcement of the drug laws?

PROSPECTIVE JUROR 293: I think it could probably

1692

influence somewhat.

MR. STOWERS: And so would you be thinking about trying to do that as you considered this case? This case, by the way, does involve some allegations that relate to drugs, specifically methamphetamine. Are you aware of that?

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1474 of 3245

PROSPECTIVE JUROR 293:  No, I wasn't.

MR. STOWERS:  Do you think with your views about the drug laws and the need to strictly enforce those and your desire to see that happen that you're going to be able to really fairly sit back on this case and evaluate the case based on the evidence here?

PROSPECTIVE JUROR 293:  This case is not about drugs as far as I'm concerned.  This is a murder trial the way I understand it.

MR. STOWERS:  Well, assume this case is about drugs.  Just assume that.  Do you think your views on drugs are quite strongly held?

PROSPECTIVE JUROR 293:  Yes, they are.

MR. STOWERS:  And your views about enforcing the drug laws are strongly held.

PROSPECTIVE JUROR 293:  Yes.

MR. STOWERS:  And you're maybe going to be asked to sit on a case which largely does involve allegations that concern distribution, manufacture of methamphetamine.  You know methamphetamine is an illegal controlled substance.

1693

PROSPECTIVE JUROR 293:  Yes.

MR. STOWERS:  Your views in that regard with regard to drugs do you think is going to weigh into that process?

PROSPECTIVE JUROR 293:  As far as finding the defendant guilty or not guilty of murder, I don't think that that particular testimony would affect my -- how I would judge it.

MR. STOWERS:  Let me explain a little bit more about what the charges are very quickly.  The charges are that there
Page 80

were five murders committed and that those murders were committed in furtherance of a conspiracy to manufacture methamphetamine and to distribute methamphetamine and that they were also committed pursuant to a continuing criminal enterprise, the enterprise being the manufacture and distribution of methamphetamine. Now that I've explained that to you, do you really think you should or you would be able to sit on this case with your views about drugs in all honesty, sir?

PROSPECTIVE JUROR 293: I really don't know how to answer that. I guess it would depend on whether the evidence was strong enough that the defendant was involved in the distribution, manufacture of methamphetamines to begin with. Is that one of the charges? I guess I have to know the charges in order to answer that question.

MR. STOWERS: It's a part of the charges. It's a part

1694

of all the charges, that there was this conspiracy, that there was this continuing criminal enterprise which associated itself around and was conducted for the purpose of making and distributing methamphetamine. Do you really think, sir, that you could be fair in a case like that to the defendant?

PROSPECTIVE JUROR 293: I think I could be fair in any case depending upon the evidence. I'm prone to listen to the evidence.

MR. STOWERS: And then once you had made your decision regarding guilt or not, you'd be asked to do something different which Mr. Berrigan is going to talk to you about this afternoon probably or later this morning, and I'm not going to go into that right now.

Page 81

Now, Mr. 379, I want to finish up on this topic with you. I think you had expressed a similar view to Mr. 293 next to you, and that is -- I think in your questionnaire you made a comment that there wasn't enough being done to get drugs. Remember that?

PROSPECTIVE JUROR 379: Not enough -- say that again.

MR. STOWERS: There was not enough being done to get drugs.

PROSPECTIVE JUROR 379: Get rid of them.

MR. STOWERS: Get rid of drugs.

PROSPECTIVE JUROR 379: Yeah, not enough money to back up law enforcement and the court system. To me it's plugging up

1695

the court system.

MR. STOWERS: Does that bother you?

PROSPECTIVE JUROR 379: It bothers me that we can't get money where it needs to be put, in the enforcement of it.

MR. STOWERS: And --

PROSPECTIVE JUROR 379: And a lot of that starts at home.

MR. STOWERS: How strongly do you feel about that?

PROSPECTIVE JUROR 379: Well, I think it's a responsibility of everybody in this room that somehow we need to get more money out there, and bringing kids up starts at the home level.

MR. STOWERS: And you might have --

PROSPECTIVE JUROR 379: Big problem.

MR. STOWERS: I'm sorry. Did you finish your answer?

PROSPECTIVE JUROR 379: It's a big problem.

MR. STOWERS: And you might have, you know, those

Page 82

views about drugs and hold them fairly strongly, strongly enough to include them on the questionnaire and share them with us now. How strongly would you say you hold your views in that regard?

PROSPECTIVE JUROR 379:  I don't think anybody should be using drugs unless a physician's been prescribing them to you.

MR. STOWERS:  Now, let me switch to another topic and talk to Juror Number 699.  There you are in the middle there.

1696

Sir, how do you feel about the concept of childhood experiences as impacting somebody later -- later in life?

PROSPECTIVE JUROR 699:  Meaning?

MR. STOWERS:  Do you think that's possible?

PROSPECTIVE JUROR 699:  Explain the question.

MR. STOWERS:  Somebody's childhood experiences.

PROSPECTIVE JUROR 699:  Whose childhood experiences?

MR. STOWERS:  Anybody's, a person.

PROSPECTIVE JUROR 699:  Anybody's childhood experiences in what?

MR. STOWERS:  In their upbringing, with their parents, history perhaps of abuse, history perhaps of sexual abuse.  How do you feel about that impacting somebody in life on down the road as they grow up as an adult?

PROSPECTIVE JUROR 699:  Good or bad experiences or any experiences?

MR. STOWERS:  Well, some of the experiences I just --

PROSPECTIVE JUROR 699:  There's a lot of good experiences, a lot of bad experiences you have when you're growing up.

MR. STOWERS:  Right.  What about bad experiences?
Page 83

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1478 of 3245

PROSPECTIVE JUROR 699:  Everybody's had them including myself, so as you grow older, you learn to live with what you were brought up with, and you get over it.

MR. STOWERS:  And how do you feel about that, Juror

1697

Number 234, over here to your right?  How do you feel about that?

PROSPECTIVE JUROR 234:  I feel that as you're younger you're influenced a lot by your parents and how they treat you and how you are raised.  But I think as you've grown up and if you have had bad experiences that you should be able to deal with them in one way or another, get some help.  There's a lot of help out there you can receive.

MR. STOWERS:  Do you think everybody's equally equipped in that regard to be able to get help?

PROSPECTIVE JUROR 234:  Maybe not equally, but there sure is a lot of help out there they could receive if they just either asked for it or go to the right people that know how to direct them.

MR. STOWERS:  Do you agree that -- or disagree that sometimes people can really just be damaged early in life and never be able to quite get back on track?

PROSPECTIVE JUROR 234:  I agree that it has a big impact on them, but I still think with the help of, you know, other professionals, church people, ministers, counselors, I really think that they could change their lives if they wanted to.

MR. STOWERS:  And let's hand that down to Mr. 293 again.

How do you feel about this subject, childhood
Page 84

experiences, negative, impacting somebody later in life?

PROSPECTIVE JUROR 293:  Some people deal with it in different ways than others.  Some people are able to overcome it and move on and have a perfectly normal adult life, and others it will adversely affect.  I do believe that.

MR. STOWERS:  In what ways do you think?

PROSPECTIVE JUROR 293:  I think real bad influences will tend to create bad behavior in a person in later life.  I agree with the previous juror there that there is help available and should be taken advantage of, but it not always is.

MR. STOWERS:  Okay.  And let me quickly in my last minute or so here hand this down to the front row here.  Over to the far left juror, 108, you've heard what we've talked about here, haven't you?

PROSPECTIVE JUROR 108:  Yes.

MR. STOWERS:  This childhood experiences concept.

PROSPECTIVE JUROR 108:  Yeah.

MR. STOWERS:  How do you feel about that?

PROSPECTIVE JUROR 108:  I feel like the rest of them. There's help out there, and, you know, most people can find help even if it's within the family, you know.  You can go to church. There's somebody there that will help, or they'll direct you in the right place.

MR. STOWERS:  And do you see people that no matter what help is out there they never quite get the help that they

need?  It never quite works for them?

Page 85

PROSPECTIVE JUROR 108:  They don't want to work with it a lot of the times.

MR. STOWERS:  Okay.  And how do you feel about that, ma'am, Number 790?

PROSPECTIVE JUROR 790:  It all depends on where you are, you know, being brought up in the community and so forth.  I don't know.  That's a very good question.  You have to help people that need help, and if they need help, they have to tell them, you know, they should get help.

MR. STOWERS:  One last question for you.  How have you been doing with me this morning?

PROSPECTIVE JUROR 790:  I'm trying to read, but sometimes you turn your face.  I had a hard time.

MR. STOWERS:  Do you know sign language?

PROSPECTIVE JUROR 790:  A little bit, not very many.

MR. STOWERS:  And have you ever tried any kind of a sound amplification like headphones or anything to assist you with your hearing?

PROSPECTIVE JUROR 790:  Yeah, but they don't work too good for me.  I'm sorry.

MR. STOWERS:  That's all right.  Thank you.  I was just wondering.  Thank you.

PROSPECTIVE JUROR 790:  That's okay.

MR. STOWERS:  I actually had a juror this past summer

1700

where the juror was actually deaf and they had a person come in for the whole trial and sign language the whole trial, and the juror actually wound up being on the jury and decided the case over in Des Moines, and I was just wondering if you could work sign language or not?

Page 86

PROSPECTIVE JUROR 790:  I would like to learn more sign language, yeah.

MR. STOWERS:  Thank you.  Appreciate it.

PROSPECTIVE JUROR 790:  Thank you.

MR. STOWERS:  Thank you, Judge.

THE COURT:  Thank you, Mr. Stowers.

Members of the jury, here's what we're going to do. We're going to take about a 20-minute recess.  We're going to send you all down to the jury room.  And then we're going to bring you back individually.  And I've given each side 12 minutes per side to question you individually.  That sometimes gets extended if we run into some unique issues or I jump in and take some of their time for questioning.  And then we'll take probably a 45-minute lunch break.

And I think we'll start -- unfortunately for Juror 509, we'll do what we've done most days.  We're going to start in the back row.  So, Juror 234, you'll be the first one we'll bring up 20 or 25 minutes from now, and then we'll just go through each juror in order.  Those of you towards the end, obviously 796, 166, 509, we're not going to get to you till much

1701

later in the afternoon, you know, probably be -- I don't know. You can kind of do the math.  It's a minimum of usually 24 minutes, close to 30 minutes per side per juror.  So you can do the math and be back in the jury room -- you don't have to stay in the jury room.  You're free to go shopping, have lunch, whatever you want to do, but we'll just kind of go in order.

And I don't know what else to tell you other than follow my instructions about not discussing this case among yourselves.  Don't let anybody talk to you about the case.  And

Page 87

we'll see Juror 234 back here at -- I think we'll just start -- at 11:00 we'll bring you back up; okay? Thank you.

(Panel G exited the courtroom.)

THE COURT: Please be seated for one second. When we do get to the juror who is hearing impaired, we do have a set of infrared headphones, and sometimes that helps jurors with hearing loss. Rather than bringing it up in front of everybody, I thought we'd wait till we got her. I'm going to have Carey have one out. They're all charged, ready to go, and she can try it out and see if that might assist her.

MR. WILLIAMS: My only concern if she only reads lips is, you know, some answers from our witnesses are going to make no sense unless she can understand the question, and we're not going to be facing her asking the questions, so that's the only real concern I have. If there's some way to work around it, I'm all in favor of it, but that's my only concern.

1702

THE COURT: Well, I don't think she relies solely on lip reading.

MR. WILLIAMS: Yeah, it didn't sound like it completely, but I'm not sure -- I want to explore that a little bit more.

THE COURT: Let me ask you this. Any ideas on how we should handle the situation? Mr. Berrigan?

MR. BERRIGAN: I think we have to give her an opportunity, Your Honor, to see how she does. It wouldn't be quite fair I think at this point to make a decision, but I'm fine with the idea that we aid her as much as we can.

THE COURT: Yeah, and that's really all we have available are the headsets. We'll see if that helps her, and

Page 88

then we'll have to make a judgment about whether or not we think she can follow the evidence or not. Okay?

Anything else we need to talk about now?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. Thank you.

(Recess at 10:35 a.m.)

THE COURT: Ready for Juror 234?

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 234 entered the courtroom.)

THE COURT: Ma'am, if you'd pick any chair in the front row. Please be seated. We're going to start with

1703

Mr. Williams from the government and then go to the defense, and each side will have about 12 minutes. I'm going to give them a 2-minute warning.

PROSPECTIVE JUROR 234: Okay.

THE COURT: Thanks.

EXAMINATION

BY MR. WILLIAMS:

Q. Good morning, ma'am. How you doing?

A. Pretty good.

Q. Good. We're going to talk to you primarily just about a couple topics here. One is publicity, and the other one is your views on the penalties that are possible in this case.

You filled out a questionnaire. We all appreciate you doing that. On the questionnaire you indicated you were not at all familiar with the case, you had no opinion about either the defendant's -- whether she's guilty or not guilty or what punishment should be imposed if found guilty. Do you remember

Page 89

answering the questionnaire in that manner?

A.    Yes, I do.

Q.    Since the time you filled out the questionnaire which is probably back in January I'm guessing, did you have any more exposure to the press or anything where you picked up anything about this case?

A.    I just seen maybe one or two articles and just seen a little bit on TV just briefly.

1704

Q.    And what's the general nature of what you picked up from those sources?

A.    Just that she was a girlfriend of a guy that has already been convicted and that now she's on trial.

Q.    Okay.  The fact that you've learned that much, what impact does that have, do you think, on your ability to be a juror in this case?

A.    I really don't think it has any impact.  I have no idea of any of the evidence or anything, but it really wouldn't make a decision or not (sic).

Q.    You would recognize that, you know, the duties of a juror in this case would be to decide the case, as the judge explained, from the evidence presented to you in this courtroom. In other words, you wouldn't want a juror making a decision based on what they read in a newspaper article or reached a conclusion that because somebody else that may be associated with this case was found guilty, therefore, this defendant must be guilty.  Do you recognize the importance of deciding this case based upon the evidence presented in this case?

A.    Yes, I do.

Q.    And do you think you're able to do that?

Page 90

A.    Yes, I think I could.

Q.    It would require you to really completely put aside anything you would have heard about this case, any knowledge you have about anything else dealing with this case.  And even if,

1705

you know, as you were back in the room and thinking about this case or you heard evidence thinking, oh, yeah, I remember reading about that, you'd have to be able to put that aside and decide this case just on the evidence.  Can you do that?

A.    Yes, I think I can.

Q.    Okay.  Let me move on to talk to you a little bit about the penalties that may be available in this case if we get to that point, and the judge explained to you the three phases we have. If we get to that third phase, there are two possible punishments, life in prison and the death penalty.  I want to tell you life in prison in the federal system is just that. It's life in prison unlike in some states.  There's no parole in the federal system.  There's no time off for good behavior, and so if a defendant gets a life sentence, it's a life sentence without parole.  Did you understand that before coming in here today?

A.    Yes, I did.

Q.    Very good.  The reason we have the jury in this case is to help us make that tough decision.  If this was a situation where there was an automatic sentence based on the crime alone, we wouldn't need a jury.  What we need a jury for is to take into consideration more than just the crime, more than just the fact the defendant's been found guilty of something but now look at other factors and try to figure out the appropriate punishment in the case.  Do you recognize that would be your job as a juror

in this case?

A.    Yes, I do.

Q.    You understand that our goal is to find 12 jurors who can fairly consider both possible punishments in this case, life in prison and the death penalty.  Do you recognize that?

A.    Yes, I do.

Q.    Have you, walking in here today, already made up your mind one way or the other that given what you know about this case that it's either going to be death penalty or life in prison?

A.    No, I have not heard any evidence either for or against, so I don't have an opinion, or I mean I can't base my opinion because I haven't heard any evidence.

Q.    Sure.  Fair enough.  Let me ask you this.  Would you ever impose the death penalty on another person without first fairly and fully considering the possibility life in prison might be the more appropriate punishment for that person?

A.    I would consider life imprisonment over the death penalty, yes.

Q.    Okay.  And I'm not -- no one's going to ask you how you're going to vote, but my question to you is just this.  If you got to that point in the deliberations where you were thinking, boy, I'm leaning toward death penalty, I'm thinking death penalty, would you be the type of juror who would still always want to consider the possibility of life in prison as a possible punishment for the crime committed?

A.    Yes.

Q.    You'll probably be comforted to know that you're not going
Page 92

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1487 of 3245

to be having to do this as a juror without some guidance from the Court. The judge ultimately will give you some pretty detailed instructions, and the instructions are going to lay out for you that there are mitigating factors and aggravating factors for the jurors to look at in making this tough decision between these two possible punishments. Now, could you follow instructions like that to consider different factors that would weigh on this issue?

A.   Yes, I can.

Q.   And the judge will instruct you about the factors that you are to consider. There may be aggravating factors. So, for example, the fact that children were victims in this case, victims of the murder, would you agree that that might be an aggravating factor, something that might lean a person toward the death penalty?

A.   Yes, I can see where that would be a factor.

Q.   And the judge will instruct you that there will be mitigating factors, may be mitigating factors, for the jury to consider as well. And would you be able to follow those instructions?

A.   Yes, I could.

Q.   Interestingly, the weight to be given to any of those factors is going to be for the jury themselves to decide. Each

1708

juror is going to be able to determine what weight that they want to put on any one of those factors. And so an individual juror could weigh very heavily one factor and not weigh heavily at all another factor, and that's going to be completely up to the juror.

        What we need, though, are jurors who are willing to

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1488 of 3245

really consider every factor. And you can put whatever weight you want to on them, but we need jurors who can tell us and assure us that they're willing to follow the Court's instructions and consider every factor that may weigh in on this decision. Do you think you could follow an instruction like that?

A.   Yeah, I think I can.

Q.   You had indicated in your questionnaire -- you were given this question, and it didn't elaborate much, but the question went something like this. You know, how do you think somebody ought to be punished? Based on the crime, based on the person, based on both and so forth? And you and many jurors put -- checked the box that said crime.

Now, some jurors think on that question that they're talking about, you know, a celebrity shouldn't be treated any differently than a noncelebrity, so it ought to be based on the crime.

This is a little bit different, and we want to make sure in this case would you be willing to take into

1709

consideration things about the circumstances of the crime or things about the defendant's background in making that tough decision and weighing whether the death penalty or life in prison would be the most appropriate punishment?

A.   I think I could decide whether or not that's appropriate or unappropriate.

Q.   For example, if the evidence showed that the defendant was abused somehow in the background, some jurors say, you know, That's no consideration to me; it's not an excuse for the behavior; I won't even take that into consideration in

Page 94

determining the appropriate punishment. You recognize if evidence like that was presented, it wouldn't be offered as an excuse for the behavior. It'd be offered as something to look at in making the determination about which punishment would be appropriate. Are you the type of juror that'd be willing to take into account background in making that determination?

A. Yes, I would, you know, be willing to listen to the background, but I'm not saying that it would ever -- you know, I'm not saying that I, you know, agree with it or not but . . .

Q. And no one's asking you necessarily to agree with it. As I said, what weight you give any of those factors is completely up to you. What we would need you to do is be able to follow the Court's instructions to truthfully and realistically consider those factors and then determine what weight you want to put to it but be able to consider those factors. Are you able to do

1710

that?

A. Yes.

Q. One of the questions you had or one of the answers you had in your questionnaire indicated -- there was a couple questions here that I wanted to run by you. You were asked, Could life in prison be sufficiently severe punishment for somebody convicted of intentional and premeditated first-degree murder? And you said yes. You said, Only if it was a single murder and under strange circumstances.

And then a couple questions farther down you said in question 87 -- it gave you some situations and asked for your reaction and how that might impact on your decision between life in prison and the death penalty. And the first one is the guilty person killed more than one person at the same time. And

Page 95

you said, Probably the death penalty on that.

What I'm trying to figure out is it appears almost like you have a conflict between these two answers suggesting life in prison's only available in your mind if it's a single murder. If it's more than one person, you've ruled it out, and yet the next answer down below suggests that you haven't just absolutely determined the death penalty even if more than one person was killed. Can you share with us what your thoughts are there?

A. I guess I just feel that the, you know, severity of the crime probably would lead to my feelings of maybe the death

1711

sentence just because it was more severe. You know, maybe it would be more of a punishment if they just were -- you know, committed one murder. Maybe they should sit in prison the rest of their lives and have to deal with it that way. And, you know, I'm thinking of the families involved too. Maybe they'd feel better too if they were put to death too if they committed enough crime -- or, you know, enough murders or whatever.

Q. All right. So I guess what I understand you saying is the number of victims is going to be a factor for you in trying to weigh this decision out.

A. I think so, yes.

Q. And despite the number of victims in this case -- assume for the sake of argument that there were five victims involved in this case -- are you at that point automatically at the death penalty, or are you still willing to consider the possibility of life in prison despite the number of victims in this case?

A. I'm strongly in agreeance with the death penalty, so I wouldn't have a problem with, you know, agreeing that it should

Page 96

be the death penalty.

Q.   And my question was a little bit different from that, but I appreciate your answer.  My question is this, that I understand that you don't have a problem with the death penalty under those circumstances and that certainly would be an important factor to you, the number of victims.  The question's this, though:  Are you still willing to realistically consider life in prison as a

1712

possible punishment knowing that there may be other factors, circumstances of the offense, maybe the defendant's role in the offense, other things that could impact your decision?  Are you still willing to consider life in prison as a possible punishment under the circumstances?

A.   Yes, I think I would.

Q.   Okay.  And another factor in here are children.  Children were victims in this case.  Two little girls ages six and ten were murdered intentionally, premeditation murder in this case. Again, there may be other factors that come in and weigh in this decision process, and what we're trying to figure out, are you the type of person who would be willing to still consider life imprisonment, still be willing to look at all the evidence, consider the different options even though children are involved as victims in this case?

A.   I would try to be able to listen to all the evidence and try to base my opinion on that, but when there's children involved, you know, I love children, and I have two young adults myself, and I worked with kids all my life coaching and stuff. So I -- I don't know.  I just feel different about when there's kids involved so -- but I would, you know, try my best to be fair about it.

Page 97

Q.    Could there be other factors that might weigh into your decision making, for example, the role that the defendant played in the offense?  Say, for example, if the defendant didn't

1713

actually pull the trigger but was assisting or encouraging the crime, would that be a factor that would pull you back, if you will, from your leanings toward the death penalty and make you think about life in prison more?

A.    I don't know.  I just -- I think that, you know, they were involved in some way or another and the results happened with these murders, and I don't know.  I don't know what to think about that.

Q.    Sure.  It would be a tough decision I think for anybody.

A.    Yes.

Q.    And it kind of goes back to one of the earlier questions I asked you.  Knowing children were involved as victims and knowing that there were five people involved as victims in this case, knowing it was premeditated, are you still willing to -- before you ever imposed the death penalty on another human being willing to fully and fairly and realistically consider life in prison as a possible punishment before you ever impose the death penalty on another person?

A.    Yes, I think I would.

Q.    If we got to that point, we would be presenting evidence to you of a number of factors, and as I indicated before, the judge would instruct you to consider all of those factors in determining the outcome.  What weight you put to them is your own call.  But you would be required to consider all these various factors.  Would you be able to follow that instruction?

1714

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1493 of 3245

A.   Yes, I could.

THE COURT:   Mr. Williams, you're beyond your time.   I did not do a good job of keeping track of time, and I'm gonna --

MR. WILLIAMS:   That was my last question.

THE COURT:   And I'm going to give the defense the same amount of time.

EXAMINATION

BY MR. BERRIGAN:

Q.   It's not so bad, is it?

A.   I don't know about that.

Q.   Easy for me to say over here.

A.   Yes.

Q.   Yeah.   You're doing great, frankly.   I want to explore the same couple of areas, and I -- so why don't we go back a little bit and talk about the media exposure; okay?

A.   Okay.

Q.   You can understand why we're interested in that.

A.   Oh, sure.

Q.   You know, 99.9 percent of the time the judge has a trial, there's some fella charged with robbing a bank or selling some drugs.   People come in here.   They've never seen this guy.   They never heard about it.   They don't know anything about it.   It's not even an issue.   That's a little different here; okay?

A.   Uh-huh.

Q.   So tell me a little bit about this -- these news accounts

1715

that you were discussing with the prosecutor.   You said there were a couple articles on television I think.   Did I get that

right?

A. Yes. I just -- like I said, I just seen an article one day in the Sunday paper. I don't read the paper a lot because we don't have access to it. We live on the farm, and it doesn't come to our farm daily. So the only access I ever have to news is just looking at the Today Show or whatever, and that's a broad spectrum of news that I get. And once -- I guess on that Sunday an article appeared about it, so I quick read through it. And like I said, I did see the other day on TV and just a brief news clip of -- I think it was Angela coming out into -- and being put in a car or something.

Q. Okay. About how long ago was the article in the Sunday paper?

A. Probably two weeks ago.

Q. Two weeks ago. Do you know which paper?

A. Des Moines.

Q. Des Moines Register.

A. Uh-huh.

Q. The Des Moines Register -- the article was about this other fellow I'm taking it, or was it about Angela's case or both?

A. I think it was a little bit about both if I'm not mistaken.

Q. And you mentioned to the prosecutor, talked a little bit about her being the girlfriend of this fellow and something

1716

about him being convicted.

A. Yes.

Q. Did it discuss a little bit about his punishment?

A. If it did, I don't really recall other than that I think he was put in prison. That's all I know.

Q. Okay. What else do you remember about it? What else did

Page 100

they talk about?

A.   I think they mentioned the fact about there was drugs involved in the case and, you know, basically that it happened, you know, seven or eight years ago.  I can't remember either but, you know -- and it was from around -- not from around here or where I was from, so I never really heard about the case, you know, from the very beginning, so I didn't know anything about it.

Q.   Yeah, and you mentioned that I think earlier in the original questionnaire.

A.   Yes.

Q.   You said you hadn't heard anything at all.

A.   No.  In fact, I didn't know the case ever existed until I read my information, and I maybe mentioned it to my sister, and she says, Oh, yeah, I do remember that years ago.  Well, I didn't have any inclination about it.

Q.   Gotcha.  The television account a couple weeks ago, could you tell us a little bit about that?

A.   I think that was maybe just last week.

1717

Q.   Oh, last week.

A.   Yes.  Like I said, I just -- I watch the weather a lot because we're farmers, and I watch the weather a lot, and I just happened to see her coming out of somewhere, and they mentioned the name, and I said, Oh, that was the case that I might be on, so then I -- I didn't pay much attention to it I guess.

Q.   Was there any discussion on the television account about any of the allegations or anything in the case?  Did they talk about it being murder charges?

A.   Yes, I think they did say it was a murder charge and that,

Page 101

you know, it happened seven years ago and that she was now being on trial for it.

Q. Some of the same stuff you heard -- you saw in the paper.

A. Yes.

Q. I know before you heard anything about the case, ma'am, when you filled out the questionnaire you told us, Heck, I haven't seen anything about this case; I haven't formed any opinion. But let me ask you this. You know, because this is different than a lot of cases -- we've had a lot of people come in, frankly, and say, Hey, look, you know, I read this stuff in the paper and saw this on television or I might have talked about it with somebody else, and I'm not sure if I have an opinion, you know, or how strongly it is, but when we've asked them this question, are you able to give this woman a complete and utter presumption of innocence, some folks have had a little

1718

trouble with that. They're not in a position where they've made a decision guilty based on the newspaper or television accounts. You with me?

A. Uh-huh.

Q. They haven't done that. But they've been quite open and honest with us in saying, I haven't done that, Mr. Berrigan, but I'm not going to be able to sit here and tell you under oath in front of God and all the world and the judge that I can presume this woman innocent given that I've read this information about the case. I've got at least that amount of information that I'm not going to be able to completely do that as I would if I didn't know anything. And we have to rely on people and their candidness with us about that.

So let me put that to you. Given what you've heard

Page 102

about it -- and I know it's not a tremendous amount, but would you have any doubt in your own mind whether or not -- and I hope you'll think of this as if you were a criminal defendant, and I know that's not a pleasant thought. But do you have any doubt in your own mind about whether you could afford Angela Johnson utterly and completely this presumption of innocence?

A. Well, I would like to think that I would think that she was innocent now after not hearing any evidence in the courtroom other than what I know from the questionnaire or what I've heard in the media, but I do have my own opinions about how I feel about the death penalty and about crimes and about kids being

1719

murdered and drugs and whatever. I mean . . .

Q. Does that factor into this particular area about presumption of innocence? You know, we lawyers kind of separate these things out like they're different boxes, but I'm not quite sure the jurors always do that. Does that -- let's talk about the whole ball of wax, okay, from right now, everything. You throw in the news accounts, everything. Are you able to 100 percent guarantee us as you sit here, look, I've got no doubt absolutely that I could presume this woman completely innocent of these charges? Can you tell us that?

A. No, I don't think I could tell you that.

MR. BERRIGAN: Okay. Well, I appreciate your candor about that, ma'am.

PROSPECTIVE JUROR 234: Thank you.

MR. BERRIGAN: Actually may I approach the --

THE COURT: Yeah, but I'm going to have some questions for the juror too.

MR. BERRIGAN: You are as well.

Page 103

THE COURT: Yeah.

MR. BERRIGAN: Would you like me to continue?

THE COURT: Sure.

MR. BERRIGAN: Why don't we talk a little bit about the --

THE COURT: Let's back up a minute. Your suggestion is a good one, but you can just stay up there if you want

1720

because I don't think it will take too long.

Well, first of all, did I understand you to say you read the article in the Des Moines Register that was out two weeks ago in the Sunday paper?

PROSPECTIVE JUROR 234: Yes.

THE COURT: Well, I instructed you not to do that in the letter I sent you, so I want to know why you violated my order.

PROSPECTIVE JUROR 234: I didn't mean to re -- like I didn't know what the case was about at first, and then I got halfway through the article and realized that was the one, so I didn't --

THE COURT: You didn't figure out that's what we were talking about in this questionnaire that talked about the name Angela Johnson, went through all of these facts and all of a sudden it's on the front page of the newspaper?

PROSPECTIVE JUROR 234: It wasn't on the front page.

THE COURT: Well, whatever page it was on, and you go ahead and read the article? What were you thinking? I'm not very happy with you. Well, you're laughing about it. It's not very funny.

PROSPECTIVE JUROR 234: No, I'm not laughing.

Page 104

THE COURT: When I summon you to court, you won't be laughing, ma'am. You violated my order. Do you understand that?

1721

PROSPECTIVE JUROR 234: Yes. I'm sorry.

THE COURT: It's not funny.

PROSPECTIVE JUROR 234: I did not mean to --

THE COURT: You're laughing about it. It is not a funny matter.

PROSPECTIVE JUROR 234: No, I am not laughing.

THE COURT: Yeah, you were laughing.

PROSPECTIVE JUROR 234: No, I'm not.

THE COURT: I saw you laughing. Get outta here. You know, you violated your duty as a citizen when you read that article. You understand that?

PROSPECTIVE JUROR 234: Yes, I do.

THE COURT: You may slough it off as not important. You're just lucky I am not going to hold you in contempt of court, and I still may. I am very upset with you.

(Prospective Juror 234 exited the courtroom.)

THE COURT: I guess that means you don't need to challenge her for cause.

MR. BERRIGAN: Well, I would have, Your Honor.

THE COURT: I know that.

MR. BERRIGAN: And obviously it would have been sustained but officially --

THE COURT: No, I removed her for cause.

MR. BERRIGAN: That was clear.

THE COURT: Ready for Juror 219?

1722

Page 105

MR. BERRIGAN: Yes, sir.

(Prospective Juror 219 entered the courtroom.)

THE COURT: Good morning, Juror 209 (sic). If you'd please take a seat anywhere in the front row there. Please be seated.

MR. BERRIGAN: May it please the Court.

EXAMINATION

BY MR. BERRIGAN:

Q. How are you this morning, ma'am?

A. Fine. Thank you.

Q. Has anybody ever called you Juror 219 in your life before today?

A. Never.

Q. I hope you'll bear with us. It's a little awkward, but we're actually getting used to it. I'm not sure the jurors are.

A. Okay.

Q. We have two areas that we're going to cover this morning during this questioning process here individually. And in part at least we're doing that to give you an opportunity to be just completely open and honest and forthcoming. And I noticed when the prosecutor was asking you questions this morning, Mr. Miller, that you expressed some concerns a couple of times in responses to questions he asked considering shouldering responsibility. Did I see that right?

A. Yes, you did.

1723

Q. Okay. And, in fact, in your questionnaire in fairness to you, you indicate some concerns that you might have in being able to serve on this case. Is that fair?

Page 106

A.    Yes.

Q.    Let's talk a little bit about the pretrial publicity portion first; okay?

A.    Okay.

Q.    Your questionnaire indicates that you were somewhat familiar with the case, you saw television news accounts and the Sioux City Journal reports and you hadn't really talked to anybody about the case or heard people talking about it.  Is that accurate?

A.    Just my husband.

Q.    Just your husband.

A.    Right.

Q.    Well, we don't often count the spouses in this process, but in truth they give us some very important information sometimes.  Did your husband have some sources other than what you had heard?

A.    I don't think so.

Q.    Okay.  So he's kind of looking at the same thing.

A.    Right.

Q.    And then you were asked a question about whether you had formed an opinion.  I'm going to read it to you exactly.  It says, question 72, No matter what you've read, seen, or heard,

1724

do you now have any beliefs or opinions about the guilt or innocence of Angela Johnson?  And you -- there were three choices, yes, no, and unsure, and you checked unsure, and so we want to discuss that with you; okay?

A.    Okay.

Q.    Are you unsure?

A.    I think I tend to be more that I think she's guilty just

Page 107

from what few things that I read and saw.

Q. Okay.

A. And it's been so long ago that I actually saw that.

Q. Well, I think it's probably pretty obvious to you one of the reasons we're asking this question, because most of the time this isn't an issue. People come in. Even serious crimes like bank robbery or selling drugs, nobody in the courtroom knows this person on trial, and the jurors don't know anything about the case, and they come in quite candidly and say, I've got absolutely no opinion. I don't know this guy from Adam.

But Miss Johnson, Angela's, entitled to a presumption of innocence just like any other defendant. In fact, I would say given the nature of the charges here, she's entitled to that presumption of innocence as much as anybody in her position.

Sometimes folks have formed opinions about the case based on what they read or heard long before they were notified to be jurors and that that opinion's going to make it difficult if not impossible to do what the law requires of them in terms

1725

of being able to presume her innocent; okay? And we have to rely on your honest assessment of that, that is, whether you can do it.

So let me just ask you this question. Despite your -- or because of your views, what you've heard about the case and your opinion, would you have any difficulty presuming her to be completely innocent?

A. I think I would.

Q. You think you would have difficulty in that regard.

A. Uh-huh.

Q. You know, the judge would instruct you that's the law.

Page 108

A.    I understand.

Q.    There's no real debate about that; right?

A.    Yes.

Q.    And you've heard that before.

A.    Right.

Q.    And even though you knew that's the law and that would be something you'd have to follow, you're telling us that would be a hard thing for you to be able to do given your present views. Am I hearing you right?

A.    Yes.

MR. BERRIGAN:  Okay.  I appreciate your candidness, ma'am.

That's all I had, sir.

THE COURT:  We'll come back to you if we need to;

1726

okay?

MR. BERRIGAN:  Okay.  Great.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  No questions, Your Honor.

THE COURT:  Okay.  I've got some questions for you, Juror 219.  How much have you read or heard about this case?

PROSPECTIVE JUROR 219:  Well, nothing recently, of course.  I was out of Iowa for the last four months.  But prior to that it was just whatever I saw on television and --

THE COURT:  But was it about this case, United States versus Angela Johnson?

PROSPECTIVE JUROR 219:  Well, no.  It was when this first came out a long time ago.

THE COURT:  Are you familiar with the name Dustin Honken?

Page 109

PROSPECTIVE JUROR 219:  I did read that, and wasn't that on this list too?

THE COURT:  It was.  Well, what is it about what you heard or read that you could possibly form an opinion?  I mean, I guess you already have formed an opinion but . . .

PROSPECTIVE JUROR 219:  Well, I think with the two little kids that were involved that were murdered --

THE COURT:  Yeah.

PROSPECTIVE JUROR 219:  -- I think that might have swayed me.

1727

THE COURT:  Well, but wait a minute.  There's no question two kids were murdered.

PROSPECTIVE JUROR 219:  I know.

THE COURT:  That's not the issue in the case.  The issue in the case is who did it.

PROSPECTIVE JUROR 219:  Right.

THE COURT:  Well, just because two kids were murdered, why would you assume that Angela Johnson was the one that committed the crime?

PROSPECTIVE JUROR 219:  I --

THE COURT:  I mean, I'm really perplexed.  I'm sorry.  I'm totally perplexed by that.

PROSPECTIVE JUROR 219:  I just feel uncomfortable with it.  I'm sorry I can't give you a different answer.

THE COURT:  Well, no, that's okay.  I'm just trying to understand your answer.

PROSPECTIVE JUROR 219:  Uh-huh.

THE COURT:  It's a fact that two children were killed, a six-year-old and a ten-year-old.

Page 110

PROSPECTIVE JUROR 219: Uh-huh.

THE COURT: But why would you conclude from that that Angela Johnson would be the one that is guilty of the crime?

PROSPECTIVE JUROR 219: I don't know.

THE COURT: Well, you must have some basis for your opinion.

1728

PROSPECTIVE JUROR 219: Well, I just feel she is.

THE COURT: Well, what do you base it on? What fact do you base -- do you just arrive at opinions with no facts whatsoever?

PROSPECTIVE JUROR 219: Well, somewhere I must have read something that made me form that opinion, but I can't tell you right now what it -- where it was or what it was.

THE COURT: Well, do you have a habit of going through life and forming opinions with no factual basis for them? Maybe you're a person who does that all the time. I don't know. I mean, I don't know you, 219. I don't know. Maybe you do. But most people I've met in northwest Iowa want to know all of the facts before they arrive at an opinion on something. You could be different. You know what? You have a right to be different.

PROSPECTIVE JUROR 219: Uh-huh.

THE COURT: Doesn't make you a good or bad person. It just makes you different. But you're telling me you already know the defendant is guilty but you don't know any facts.

PROSPECTIVE JUROR 219: Well, I'm telling you I feel she is. I mean, I don't know. Of course I don't know. And I can't tell you honestly how I've come to that conclusion.

THE COURT: You just know you feel that.

PROSPECTIVE JUROR 219: I just feel that.

Page 111

THE COURT: Do you feel that because you don't want to be a juror?

PROSPECTIVE JUROR 219: Well, I really don't want to be a juror, but I don't think that's the reason.

THE COURT: Well, what is the reason?

PROSPECTIVE JUROR 219: I don't know. I don't know what to tell you.

THE COURT: I mean, do you generally go around forming opinions without having any facts?

PROSPECTIVE JUROR 219: No.

THE COURT: Well, why would you do it in this case do you think?

PROSPECTIVE JUROR 219: I don't have an answer. I'm sorry.

THE COURT: Let me ask you this. Do you think that's fair of you to form an opinion based on some newspaper article that you have no -- you don't even remember what the facts were let alone if any of the facts were true? Is that fair?

PROSPECTIVE JUROR 219: No, I guess it's really not, but I don't think life's fair half the time anymore anyhow.

THE COURT: I agree with you there. Life is not fair. Okay. Thanks for answering our questions. You're excused as a juror in this case. Thank you.

(Prospective Juror 219 exited the courtroom.)

THE COURT: Whoa. That's perplexing to me.

MR. BERRIGAN: I don't know that I need to make a motion, Your Honor, but if the record would reflect I would have

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1507 of 3245

made a motion based on the presumption of innocence.

THE COURT: Yes, I understand that. Thanks for clarifying it.

MR. BERRIGAN: We had beginner's luck yesterday. Today we just may have a reversal of fortune.

THE COURT: Yeah, it could be. Ready for 699?

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 699 entered the courtroom.)

THE COURT: Juror 699, any seat in the front row there. Pick your lucky seat.

PROSPECTIVE JUROR 699: Okay. This looks good.

THE COURT: Okay. We're going to start off with questioning from the government lawyer, Mr. Williams, and then we'll switch over to the defense. They each have about 12 minutes to ask you questions.

EXAMINATION

BY MR. WILLIAMS:

Q. Good morning, sir. How you doing today?

A. Good, good.

Q. Good. We're going to focus on a couple areas here. One is publicity, and the other one is your thoughts on possible penalties that may be involved in this case, so let me start with the first one. You filled out a questionnaire for us back in January. We appreciate you doing that. It actually speeds up this process.

1731

You had some questions in the questionnaire about your knowledge of the case, and at that point you'd said you'd only just heard about it. You had listened to a local Sioux City

Page 113

news station, but you had not formulated any opinions about whether the defendant was guilty or not guilty. Let me ask you, since you filled out this questionnaire in January, have you heard anything else, learned anything else about this case through the press?

A. Yes, I have.

Q. And what's that?

A. What the news media covered in the -- on the television and in the newspaper, in Sioux City Journal.

Q. Okay. And have you read those articles or watched the news?

A. Yes, yeah.

Q. Okay. When you did that, did you form any opinions concerning the defendant's guilt or whether she's guilty or not guilty?

A. To a certain extent, yes, especially after the first trial that was . . .

Q. So you learned about what the outcome was of the first trial as what you picked up in the news?

A. Yeah, uh-huh.

Q. Now, you know, as we go through life, you know, we pay attention to the news. We watch the news. That's where we get

1732

our information and so forth, and out of necessity we kind of form opinions about different things in order to go about our daily lives. When we come into a courtroom, it's a little bit different, though, and that is that there are cases where the Court will instruct jurors that even if they've heard something on the outside and even if they've formulated an opinion about what they've heard which is natural to do that, that they be

Page 114

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1509 of 3245

able to set that opinion aside recognizing that in a court of law it can't function unless people are able to set aside any preconceived notions, any opinions they have and afford a defendant a fair trial by presuming her innocent. Can you do that in this case?

A. Yes.

Q. And it might be difficult; right?

A. Oh, yes.

Q. Because you've heard these things, and in your mind you're already thinking, jeez, I remember reading this or hearing about this other defendant's case. Let me put it this way. If you were ever in a position of being a criminal defendant, would you want to be presumed innocent?

A. Oh, yes.

Q. And had the newspaper carried articles about your case, would you want people to come into court prejudging you without knowing what the facts are?

A. No.

1733

Q. And if you were picked as a juror in this case, would you be able to set aside, completely and utterly set aside, anything you would have heard about this case or about somebody else's case tied to this one and weigh the evidence in this case and decide this case solely on the evidence presented in this courtroom?

A. It'd be hard, but yes, I think I could.

Q. And if the judge instructed you that was going to be your duty, could you carry out those instructions?

A. Yes.

Q. Let's talk a little bit about the penalty in this case,

Page 115

possible penalties. If we get to that point in the trial where the penalties are under consideration -- as the judge described, that's the third phase of the trial -- we're going to have two possible punishments as the judge described for you, life in prison and the death penalty. By the way, in federal court, life in prison means just that. There's no parole. There's no early release. There's no parole board. It means life in prison.

You may be thankful to hear the judge is going to give you instructions to help you through that phase. The judge at some point is going to instruct the jurors about what we call mitigating factors and aggravating factors. Those are things that either tip -- might or arguably according to the parties tip a person toward the death penalty or toward life in prison.

1734

And the Court will ultimately instruct you as to what those factors are and that you are to consider them. Are you willing to follow an instruction like that?

A.    Yes.

Q.    Now, interestingly, the way this thing works is the weight an individual juror gives to any of these factors is completely up to the juror to decide how much weight to give any single factor. And so there may be some factors the judge instructs you that you have to consider that you may give a lot of weight, and there's some that you may not give weight to, and that's going to be completely individual jurors' calls. Do you understand how that might work?

A.    Yes, yeah.

Q.    For example, in this case children were murdered. There are -- there was a six-year-old little girl and a ten-year-old

Page 116

little girl who were murdered. Would you agree with me that might be an aggravating factor pointing toward the death penalty in a particular case, the fact that there were vulnerable victims or young girls that were killed?

A. Because of that reason, yes.

Q. And that would be something that would make sense to you might tip you toward picking the death penalty; is that fair?

A. If the crime fits it, yes.

Q. Okay. Now, there may be other factors the judge will instruct you about, maybe the defendant's role in the offense,

1735

maybe her background, maybe, you know, whether she has a criminal history, things like that, that the judge is going to instruct you to consider that might consider that while we have some factors over here pointing toward the death penalty, there may be some other factors pointing toward life imprisonment. Do you recognize -- would you be able to follow an instruction like that and weigh those different factors?

A. For the children? Pretty hard.

Q. Either way. Let me rephrase. If you're given an instruction by the judge that there are a number of factors to consider, some aggravating factors, some mitigating factors, and your job would be to consider all of them --

A. Okay.

Q. -- could you follow that instruction?

A. Sure, yeah.

Q. Could you weigh some factors that may be very heavy with you? Let's say killing of children might be a heavy aggravating factor for you. Could you -- would you be willing to consider other factors as well that might weigh the other direction?

Page 117

A.    It'd be hard, but yes.

Q.    Okay.  And bottom line is before you would ever impose the death penalty on another person, on another human being, would you be willing to realistically consider the possibility of life in prison might be the more appropriate punishment before you ever imposed the death penalty on another person?

1736

A.    Depends.

Q.    On what, sir?

A.    It depends on the way the crime happened.  It depends on why it happened, how it happened, what led to it.

Q.    So in your mind the circumstances around the offense is something that would be important for you to know.

A.    Yeah, most definitely.

Q.    And that's something you would take into account in determining whether the death penalty was appropriate in a case.

A.    Yes.

Q.    So let me ask you this.  You know, just the fact that children were murdered, that alone, are you still willing to consider other factors that may weigh against the death penalty other than just the fact that children were killed?

A.    Be very hard.

Q.    The judge is going to instruct you the weight you give to any factor is going to be completely up to you.  Your task as a juror, though, is going to be to weigh -- to consider any factor he instructs you to consider.

A.    Uh-huh.

Q.    The important thing is your ability to follow that instruction.  And would you follow that instruction?

A.    Oh, yes.

Page 118

Q. And what we're looking for are jurors who despite what the facts are in the case are always willing to consider both

1737

possible punishments, both life in prison and the death penalty, when they're doing this weighing process.

A. Uh-huh.

Q. Could you do that?

A. Oh, yeah.

Q. Now, there's going to be potentially some strong facts here, you know, five people killed, two little girls killed.

A. Uh-huh.

Q. But we can't function unless we have jurors that despite that are still willing to realistically consider life in prison as a possible punishment for somebody involved in that type of crime. Could you still consider life imprisonment as a possible punishment for somebody involved in that type of crime?

A. Yeah.

Q. In your questionnaire you indicated -- in response to one of the questions whether you think life in prison without parole is a sufficiently severe punishment, you said no. You said, In some cases the death penalty is the best. Do you have in mind -- well, let me ask you this way. When you say in some cases, is that an indication to you that you need to know more facts to be able to determine whether the death penalty's appropriate or not?

A. That too, but, I mean, if it's -- if it was downright outright murder and first-degree murder and you got proof and everything like that, in, I mean, some cases the death penalty

1738

Page 119

should be enforced.

Q. Can you imagine factors that may weigh in like -- I mean, what if the defendant had no criminal history or had a minor role in the offense? Would those be factors that you'd be willing to take into consideration that might weigh in favor of life in prison as sufficiently severe punishment for somebody involved in those murders?

A. In somewhat, yes.

Q. Is it something you would be willing to consider realistically?

A. Yes.

THE COURT: Mr. Williams, your two-minute warning.

MR. WILLIAMS: Thank you. I don't think I have any further questions. Thank you.

THE COURT: Thank you.

Mr. Berrigan?

MR. BERRIGAN: Thank you, sir.

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, sir?

A. Good.

Q. Not so bad, is it?

A. Oh, not too bad.

Q. We aren't here trying to torture people believe it or not. We're just trying to get their honest views about some of these

1739

issues. You can tell how important they are. Pretty obvious.

A. You're trying to get the best jurors you can. I understand.

Q. Yeah. And I don't know if the best is even the way I'd

Page 120

describe it because some jurors clearly are better jurors than others. They're just not suited for particular kind of cases. It's not really so much a value judgment we're making. It's suitability. Does that make sense?

A. Sure.

Q. Almost kind of what kind of car fits your family.

Let me ask you a little about this media situation. You indicated -- I was trying to take notes, but I might have missed some of this -- you'd heard some information since the questionnaire on the television and in the Sioux City Journal; correct?

A. Correct.

Q. Do you get a subscription to the paper?

A. I do not get a subscription to the paper, but I read it every day at my workplace.

Q. And what about television? Do you as a habit watch the evening news in the evening or before you go to bed?

A. I have my favorite channel.

Q. Which is that?

A. Well, I like Channel 14.

Q. And they have a nightly news show.

1740

A. Yeah.

Q. I don't know anything about the local channels. You'll forgive me.

A. I know.

Q. Tell me what it is that you've seen here lately in the -- let's talk about the paper first, what the articles were about.

A. Oh, the Journal carried I think four articles here recently.

Page 121

Q.    Okay.

A.    At the time of the first trial on this murder case.

Q.    You mean the Journal had articles at the time.

A.    Yes, sir.

Q.    Okay.  About Mr. Honken's case?

A.    Yes, sir.

Q.    Okay.  Did you follow the paper pretty regularly at that time?

A.    At that point in time, yeah, yes, I did because I received my questionnaire, so, I mean, you know, it did have a point of interest, you know.

Q.    Sure, sure.  Let's talk about the more recent stuff that's been in the paper.

A.    About this particular trial?

Q.    Yeah.

A.    Okay.

Q.    How many articles have they had?

1741

A.    There's about I think three, three so far maybe.

Q.    Okay.  And what do they concern themselves with?

A.    They just told basic things about the trial.

Q.    Could you --

A.    That the jury selection was going to start.  They got into about the same specifics as was in the questionnaire, what little bit they gave in the questionnaire about the trial and something about the juror number system and not getting into names.  And then they actually got in a little bit more detail.  The last article was a little bit more detailed in the drug -- the paper I think quoted the drug cartel type of thing that was going on with making, manufacturing of methamphetamines and

Page 122

distributing them in northwest Iowa and what led to the murders. And I don't know exactly, you know, but it was -- it was more detailed than maybe even what I even wanted to know but --

Q. What did the -- I'm sorry to interrupt you.

A. No.

Q. What did the paper say about what led to the murders?

A. Well, they -- the drugs basically.

Q. What do you mean the drugs?

A. They were the backbone of the whole thing.

Q. Okay. Was there some information about the people that were killed in terms of why they might have been killed?

A. It said that it was all just tied in with bad drug deals.

Q. Okay. Was Miss Johnson mentioned as well as Mr. Honken?

1742

A. Oh, yes.

Q. What did you understand from the news accounts their relationship to be?

A. Girlfriend-boyfriend.

Q. Okay. The television news accounts that you saw on the evening news -- let me -- before I finish that, is there anything else about the newspaper accounts that you read recently?

A. No.

Q. What about the television accounts that you've seen recently?

A. Mainly it was about the first trial and that it was -- he'd gotten the death penalty in Iowa, so the news media was definitely talking about it.

Q. Did you already know that from having covered or watching television or read the newspaper during Mr. Honken's --

Page 123

A.    I had seen it, and I had heard about it, you know, a few years back and then basically forgot about it, and then it was brought back up, you know, that is this thing still going on?  I thought it was over.  I don't keep up with it.  It happened in a different part of the state, you know.  It wasn't a local thing, but it was still a terrible thing.

Q.    Reported in the -- sure, and reported in the local papers.

A.    Right, right.  At that time the paper carried -- I think maybe the news media, the television media, might have carried

1743

one or two stories about it, but the newspaper carried a little bit more.

Q.    The last most recent article that you read was when?

A.    Here last week.

Q.    Okay.  Some people have told us quite candidly, Mr. 699, you know, that they had formed opinions, and you did too.  Mr. Williams asked you that.

A.    Basically, yes.

Q.    To a certain extent, yes, especially after the first trial.  Does that sound right?

A.    Yes, exactly.

Q.    In your questionnaire you were asked that question.  Question 72, No matter what you have read, seen, or heard, do you now have any beliefs or opinions about the guilt or innocence of Angela Johnson?  And you checked no.  So I wanted to ask you these opinions that you formed, are they because of the recent publicity?

A.    Yeah, exactly.

Q.    Okay.  And the problem with that -- I know you'd do your best to try to set aside your opinion.  You made that clear.

Page 124

A.    Certainly, yes.

Q.    We don't expect people to be super human, and one of the problems that happens that's kind of particular to this case in some respects, if this was a bank robbery or somebody stole a car, you wouldn't know anything about it.  You'd walk in here.

1744

I don't know this guy from Adam, no problem.  And you'd be able to give him a presumption of innocence.  And when we talk about presumption of innocence, you need to understand how important that is.  That means the person on trial is entitled to complete presumption of innocence.  Completely the juror has to be able to really truly completely presume that that person's innocent, not just right now, okay, but throughout the course of the trial until all the evidence is in and they go back and deliberate; all right?

And my concern -- I'll be quite honest with you -- is I don't know how that could work given what you've told us about.  And, you know, what's in the paper's in the paper, but, you know, how does that work?  You sit there, and you've read all this stuff.  You come to an opinion.  And here's this woman on trial for her life, and we're asking you, Hey, 699, I --

A.    Pretty tough.

Q.    I know you wouldn't want to imagine yourself in her situation, but you can understand the concern; right?

A.    You bet, yeah.

Q.    So we have to ask people to give us their judgment about this in terms of whether they have any doubt in their own mind whether they can do it because we can't read your mind.

A.    Right.

Q.    And given what you've told us, do you have any doubt at all

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1520 of 3245

in your own mind whether you could completely and utterly

1745

presume her innocent given your knowledge about the case and the opinions you formed?

A.   At this time before you hear all the evidence and everything like that, I -- it's pretty hard.

Q.   It's hard, okay.

A.   Yeah.

Q.   All right.  So you at least have some question about your ability to do that yourself in all candor.

A.   Yeah, there's always that question, yeah, you bet.

MR. BERRIGAN:  Well, that's -- I don't think I have anything else, sir.

THE COURT:  Okay.  Thank you.

MR. BERRIGAN:  Thank you, sir.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  No, nothing, Your Honor.

THE COURT:  Well, Juror 699, I want to ask you a couple of questions.

PROSPECTIVE JUROR 699:  Sure.

THE COURT:  When you got your packet, I sent you a letter that I personally signed, and on page 2 -- I'm going to read you a paragraph from that letter.  I anticipate that as we get closer to jury selection and trial there will be publicity about this case and Mr. Honken's case.  You are instructed to the extent possible not to read any newspaper or magazine articles about the case or to listen to any television or radio

1746

Page 126

coverage about the case, about them actually. It doesn't seem to me that you followed that.

PROSPECTIVE JUROR 699: I thought it meant if you were picked. I didn't know you had to sustain (sic) from the news and everything. I kind of got -- I thought it was --

THE COURT: Once you were picked?

PROSPECTIVE JUROR 699: If you were picked, yeah.

THE COURT: Oh. You didn't think it applied to --

PROSPECTIVE JUROR 699: Pre. I guess that's why --

THE COURT: Why do you think I was writing you ahead of time and telling you that? I could have waited till we picked a jury and then told the folks. But I went out of my way to write that letter ahead of time.

PROSPECTIVE JUROR 699: I kind of thought everything was coming way ahead of time, you know. I didn't -- I didn't take it that way.

THE COURT: Okay.

PROSPECTIVE JUROR 699: I'm sorry.

THE COURT: No, no, that's fair enough. I must not have been clear.

PROSPECTIVE JUROR 699: I honestly didn't.

THE COURT: Okay. Then that means only one thing to me. I wasn't clear enough because if you didn't take it that way, then I didn't make myself clear, so that's my -- I didn't do the job I thought I did. And I actually appreciate you

1747

pointing that out to me because if I do it again, I'm going to do a lot better job.

PROSPECTIVE JUROR 699: If I would have, I know I wouldn't have.

Page 127

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1522 of 3245

THE COURT: Wouldn't have, right.

PROSPECTIVE JUROR 699: Yes, sir.

THE COURT: But you didn't understand it that way, right.

PROSPECTIVE JUROR 699: I thought it was after. I'm sorry.

THE COURT: Okay. Well, let me ask you this. I mean, it's not surprising that people have read about the case no matter how you took that.

PROSPECTIVE JUROR 699: Oh yeah, especially lately.

THE COURT: But here's what I want to know, and some people can do, it and others can't. It doesn't make you good or bad. It's just everybody's different. Do you think you could set aside everything that you've read or heard about the case and be able to give Angela Johnson the full benefit of the presumption of innocence?

PROSPECTIVE JUROR 699: It's hard.

THE COURT: Okay.

PROSPECTIVE JUROR 699: I'm being honest with you.

THE COURT: I know you are, and I appreciate that. I can tell you're -- why is it -- let me ask it this way. Would

1748

you think that I probably know more about this case than you do?

PROSPECTIVE JUROR 699: That you probably know?

THE COURT: Yeah.

PROSPECTIVE JUROR 699: Yeah.

THE COURT: Yeah, that wouldn't be a surprise, would it?

PROSPECTIVE JUROR 699: No. I think you do.

THE COURT: Okay. And I've ruled --

Page 128

PROSPECTIVE JUROR 699:  I hope you do.

THE COURT:  And I've ruled on gobs of pretrial motions.  I don't even know how many but lots and lots of them.  So it would only be natural.  We would hope that the judge would know more about the case than a citizen that we bring in off the street as a potential juror.  So that's not a surprise; right?

PROSPECTIVE JUROR 699:  Uh-huh.

THE COURT:  Now, when I look at Angela Johnson, I see somebody who is absolutely not guilty.  Even though I know a lot about this case, I see somebody who is absolutely not guilty, and she will remain absolutely not guilty unless and until the government can prove her guilty beyond a reasonable doubt which they may or may not be able to do.  I don't know.  I don't even have an opinion about that.  But I see somebody who's absolutely not guilty.  And maybe it's because it's my training to do that and I've been at it a long time.  But I'm just curious -- and it's really more for my education to help me out -- why is it

1749

that for whatever reason when you look at Angela Johnson you don't see somebody who's absolutely not guilty?

PROSPECTIVE JUROR 699:  Mainly because of the fact that I heard about the case and my feelings towards the methamphetamine that were involved and then -- then the children that were involved.  That's the two big factors.

THE COURT:  Okay.  Do you think I'm in favor of methamphetamine?

PROSPECTIVE JUROR 699:  No, no.

THE COURT:  Okay.  I'm obviously not.  Matter of fact, I spend the largest part of my job sending people to prison for using methamphetamine.  But that doesn't mean that Angela

Page 129

Johnson's guilty in this case, does it, because people use methamphetamine?

PROSPECTIVE JUROR 699: I guess not, no. No, it doesn't.

THE COURT: And the fact that two children were killed, there's no question about that. Two children were killed.

PROSPECTIVE JUROR 699: Yeah.

THE COURT: But that doesn't mean Angela Johnson had anything to do with it, does it?

PROSPECTIVE JUROR 699: Not until you hear all the evidence.

THE COURT: Right.

1750

PROSPECTIVE JUROR 699: Yeah.

THE COURT: Well, let me ask it a different way. If you were on trial for something, would you want 12 jurors who were able to give you the full benefit of the presumption of innocence?

PROSPECTIVE JUROR 699: Yes, yes, I would.

THE COURT: Okay. And now maybe the answer to this question -- maybe it's impossible to answer the following question, but I'm curious. Why is it that that's what you would want but for whatever reason you're unable to do that for Angela Johnson? Is that a pretty good question?

PROSPECTIVE JUROR 699: Yeah, it's a fair question.

THE COURT: What do you think the answer is? Maybe there is no answer.

PROSPECTIVE JUROR 699: Oh, honestly it's hard to -- it's hard to say that if she's not part of something that what

Page 130

happened she wouldn't be here. I know it's kind of prejudging but . . .

THE COURT: Kind of.

PROSPECTIVE JUROR 699: Well, you know, it's hard to say I -- I presume her -- she's innocent till proven guilty.

THE COURT: Do you really, though? That's what we're trying to find out. That's what we want to know. Do you really?

PROSPECTIVE JUROR 699: I have a hard time with it.

1751

THE COURT: Is it that you'd like to be able to do that but you're just not sure you could? Is that it basically --

PROSPECTIVE JUROR 699: Yeah.

THE COURT: Yeah. And you know what?

PROSPECTIVE JUROR 699: I'm being honest with you.

THE COURT: You are. You are. And we really appreciate that. That's a really honest answer. I'm just trying to figure out -- you know what? I'm too curious for my own good. I am. And a lot of people tell me that. I ask way too many questions, and I'm too curious, but I'm curious as to why you would want a juror -- and, boy, if I was ever on trial, I'd want 12 people who would presume that I was absolutely not guilty, but yet you're not able to do that for somebody else. To me that's interesting. I don't know what it means. I have no idea. But it's just interesting.

PROSPECTIVE JUROR 699: I should say yes, I can.

THE COURT: No, you shouldn't say that if you don't feel you can.

PROSPECTIVE JUROR 699: If I didn't -- I haven't heard

Page 131

any of the evidence yet. I mean, maybe she is.

THE COURT: Maybe she is. That's right.

PROSPECTIVE JUROR 699: You don't know till you hear the evidence.

THE COURT: Well, except you kind of do know.

1752

PROSPECTIVE JUROR 699: Just because of what I heard.

THE COURT: Yeah.

PROSPECTIVE JUROR 699: You know, that's -- I guess if I didn't know any of the -- and hadn't heard any of the news or anything like that, I'd most definitely -- and I would want to be innocent till proven guilty.

THE COURT: Yeah.

PROSPECTIVE JUROR 699: That's the way our justice system works. That's the only way it should work, you know. Sister Justice has a blindfold on.

THE COURT: That's right. That's a good point.

PROSPECTIVE JUROR 699: And that's the way I believe in. That's what I believe in. And I find -- but then when the two lawyers ask and you if I can fairly give a nonbiased opinion in this, I've said it all -- it's hard. So, you know, if you'll -- if you want me, I'm here. I have no problem with being a juror.

THE COURT: You know what?

PROSPECTIVE JUROR 699: I've been selected as a juror before. When you asked, you never really -- I raised my hand, but you didn't come back.

THE COURT: I didn't actually ask that question. One of the lawyers did.

PROSPECTIVE JUROR 699: Oh, okay. You had asked if I

Page 132

had been in this courtroom.

1753

THE COURT: I asked if anybody had been in this courthouse, and one of the lawyers asked if anybody had been a juror before, but it's not a question I asked.

I'll tell you what. Why don't you step outside for a minute, and then we'll let you know. We may bring you back in here for some more questioning, or we may just let you go. Just step outside for a minute. Thank you very much.

(Prospective Juror 699 exited the courtroom.)

THE COURT: Do both sides join in a challenge for cause, or do you want to bring him back in here for further questioning?

MR. WILLIAMS: Yeah, I think we just challenge him for cause.

THE COURT: Do you join in it, Mr. Berrigan?

MR. BERRIGAN: Yes, of course.

THE COURT: Okay. We'll bring 699 in.

(Prospective Juror 699 entered the courtroom.)

THE COURT: Juror 699, we're going to let you go in this case. But here's the deal. We think you'd be a really good juror in another case, and so maybe you'll have an opportunity to come back and serve in another case, but on this one we're going to let you go. And, you know, I really appreciate how honest you've been. And you know when I talked about how important it was to serve your country? You serve your country just as much by giving these honest answers.

1754

Nobody's going to judge you harshly for your answers because I
Page 133

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1528 of 3245

could tell you were working hard to really dig inside there and say what was honest, and we really appreciate that. So you're dismissed.

Do us a favor. We're going -- jury selection's going to go on for a while, and we don't want you to talk about this to anybody because that somebody you talk to may talk to somebody else, and maybe they got a packet and that person's going to show up here this week or next week or the week after that. Once we get a jury selected and the trial's underway, you can talk about it all you want; okay? Good luck to you, and thank you so much. Thank you.

(Prospective Juror 699 exited the courtroom.)

THE COURT: Okay. Ready to take our break? You want to start back at one o'clock?

MR. WILLIAMS: Sure.

MR. BERRIGAN: That's fine, sir.

THE COURT: The misery continues at one. We'll see you then. Thank you.

(Lunch recess at 12:10 p.m.)

THE COURT: Let's see. Ready for 293?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay.

(Prospective Juror 293 entered the courtroom.)

THE COURT: Sir, if you'd just be seated in any chair

1755

there, any chair. Great. And we're going to take turns. Each lawyer has about 12 minutes to question you; okay? Thank you.

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, sir?

Page 134

A.    Good morning -- good afternoon.

Q.    Good afternoon.  You've been very patient with us, and we very much appreciate it.  We're going to keep the questioning brief obviously, and we're going to just look at two things, and one happens to be your exposure to pretrial publicity, you know, what you might have saw on television or in the newspaper, perhaps over the radio.  And we, of course, have the benefit of your questionnaires in this regard.  And thank you for filling that out, by the way.  But sometimes what we've noticed is that on occasion since people have filled out the questionnaires more information's become available to them, and we want to know about that.

A.    Okay.

Q.    So tell us what, if anything, you've learned about the case from the media and how that has come to you.

A.    Virtually nothing from the media.  There have been, oh, a few 15-, 20-second sound bites about jury selection is about all I've seen really.

Q.    Okay.

A.    And I don't take the newspaper, so I don't read any

1756

articles.

Q.    Okay.  Great.  And have you ever had occasion to talk to anybody about the case?

A.    Not really.

Q.    All right.  I just -- you know, we're so picky, us lawyers.  When people say not really, my hair stands up.  What does that mean?  Does that mean I have but not seriously or I really haven't, or what are you telling us?

A.    Well, my wife, of course, knows about this, and I've spoken

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1530 of 3245

to my brother about jury selection, and really that's all we've discussed is the actual jury selection part of it and the extent of the questionnaire and so on. But as far as the case itself, no, I haven't discussed that with anybody.

Q. Did your wife happen to follow Mr. Honken's trial last fall by any chance?

A. No, neither one of us did. We're not -- we don't really pay a lot of attention to local news. We watch national news a lot, and, of course, it wasn't covered there.

Q. Right.

A. We were aware of the verdict and the penalty, and that's about all.

Q. What effect does that have on you knowing that Mr. Honken -- I presume you know that he was guilty.

A. Yes, uh-huh.

Q. And what penalty did you understand he received?

1757

A. As I recall, the jury decided on the death penalty.

Q. Okay. And did you glean any information that there was a relationship between Mr. Honken and Miss Johnson?

A. No more than what was in the questionnaire.

Q. Okay.

A. I knew -- in fact, I didn't know that there was any relationship there until I received the questionnaire.

Q. Gotcha. Well, now you have that information, right, at least from the questionnaire?

A. Yes, uh-huh.

Q. And so you know what happened to Mr. Honken, and let me just ask you flat out, you know, how does that affect your view of Miss Johnson knowing that Mr. Honken was convicted and there

Page 136

was a death penalty in his case?

A.    I guess I really haven't formed an opinion, to be quite honest with you.

Q.    All right.

A.    Like I said, I didn't know there was a relationship there. I wasn't aware of Miss Johnson's involvement until I received the questionnaire and really haven't give it a lot of thought.

Q.    Okay.  You know, we didn't mean to suggest involvement by putting this information in the questionnaire, and I'm not hearing you say that, but let me ask you this question because it's very important to us.  Miss Johnson is entitled, as you undoubtedly know from your prior experience, to a presumption of

1758

innocence.

A.    Right.

Q.    You served on an assault trial as a juror yourself; right?

A.    Yes, I did.

Q.    And not only did you afford the defendant the presumption of innocence, he was, in fact, found not guilty; isn't that right?

A.    Right.

Q.    Okay.  So you're in a particularly good place to kind of know what we're talking about.  Most of the time people come in, and they've maybe been accused of selling drugs or a bank robbery, and there's nothing in the paper, the media.  Nobody knows anything about it, wouldn't know him from Adam.  And jurors come in just like yourself and say, Hey, no problem, Berrigan; I can do that; okay?  And you haven't got a lot of information, but yet you got this little information about Mr. Honken.  Does that affect at all even in the slightest your

Page 137

ability to give Miss Johnson the full and complete presumption of innocence?

A.  I don't think it would affect it, no.

Q.  Okay.  And you could do that then.  You're assuring us you can.

A.  Yes.

Q.  We're going to take your word for that.  Thank you on that.

Let me ask you a couple of questions about the death

1759

penalty.  And again, we have the benefit of your questionnaire.  And one thing I noticed that you wrote on your questionnaire -- there's a -- and I know you filled this out way back January 17 it looks like?

A.  Yeah, it's been quite some time.

Q.  It's been a while, and it's not going to be a test can you remember this or that; okay?  But I am going to go through a couple questions just to see if you still feel this way just to make sure we're on the same page.

Question 61 was, In your opinion should the punishment for a crime be based on -- and then they have a bunch of boxes you can check, and the first one says, The crime.  The next one is "the person."  The next one is "or both," or the next one is "or something else all together," and then you have an option to explain your thoughts if you choose to, and you checked the crime, and you didn't write anything else.

A.  No.

Q.  Is that how you feel?

A.  Yes, I believe that the penalty should be based upon the crime that's committed.

Q.  What about the person's background or, you know, where

they're from, what kind of childhood they had, how were they raised? Do you think that's a legitimate consideration or not?
A. That's kinda hard to answer. I think I would have to hear those facts in order to make that judgment, but as an immediate

1760

reaction, I would say no.
Q. Okay. Well, one thing I noticed, that even though you hadn't really heard anything about the case and you were quite candid about that, you did also tell us that you did have an opinion about punishment. This is question 73. Do you have any beliefs or opinions as to the appropriate punishment for Angela Johnson if she were found guilty of the intentional killing of five people including two children? And you checked the yes box, and you explained, The maximum penalty should apply. Does that sound right?
A. Yes.
Q. Okay. Now, I don't know. You tell me. When you were writing down, The maximum penalty should apply, what were you thinking of?
A. I guess just that, the maximum penalty allowed by law.
Q. Okay.
A. If it should be life in prison, so be it. If it should be the death penalty, so be it.
Q. Okay. Well, the penalty options here now, as you know from the judge having described it, are those two, the death penalty and life in prison; okay?
A. Uh-huh.
Q. Could we agree that the death penalty is certainly the more serious of those two punishments?
A. Oh, definitely.

Page 139

Q. Okay. And so what we're interested in is -- let me give you this scenario; okay? We're going to ask you to do something that you were told not to do in your last trial, and that is imagine that you have heard everything, okay, that you've been selected as a juror, and just in this fictitional situation we're going to ask you to consider you have considered the facts. Not just you, you and your fellow jurors have listened to all the evidence, and you've talked to each other, and you've made some determinations. And when I say considered the facts, you've been presented for weeks of testimony with the who, why, when, how, where; okay?

The government has made this allegation that five people were intentionally murdered; all right? That's the allegation. Let's say you found that, guilty beyond a reasonable doubt; okay?

The government has further alleged that these murders were not just intentional but they were committed after premeditation and with substantial planning. Are you following me?

A. (Nodded head.)

Q. Okay.

A. Yes.

Q. And you've made that determination. That's true beyond a reasonable doubt. We all agree; okay?

A. Yes.

Q. Some folks have said to us, Look, I mean, it's bad enough

intentional murder, five people. Now you're telling me premeditated, substantially planned murders. I really don't need any more information than that. I mean, if -- and that's a big if. I'll give you that. But if that were shown to me, I'm not sure I could realistically fairly consider both punishments because some people have a view -- and they've expressed it different ways -- that that's enough to make a determination. And I'm just kind of interested in your view about that.

A.   I think I would have to hear everything.

Q.   Okay. Tell me what you mean by that.

A.   Well, the way I understand it, there is another phase after the verdict.

Q.   That's right.

A.   And I would have to go through all that before I was clear in my own mind which way I would decide to go.

Q.   Okay. Well, let me ask you about that then. First your questionnaire asks a somewhat similar question to what I've just asked you, and I know when you filled out the questionnaire you didn't have the benefit of the judge's explanation. I realize that; okay? I appreciate that. But I want to just kind of ask you to reflect on this.

Question 84, Do you think that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree

1763

murder? That was the question; all right? And you checked no. I believe it is if it's the maximum penalty allowed by law. I just want to make sure we're on the same page. That's premeditated murder, five of them; okay?

A.   Yes.

Page 141

Q. Now, if you're telling me I believe that the maximum punishment's the only appropriate punishment -- I don't know if that's what you're saying. The questionnaire seems to suggest maybe that is. But in that kind of a case, would you realistically be able to consider a life sentence if you found those facts to be true beyond a reasonable doubt?

A. After hearing the instructions given here today, yes, I would consider life in prison as being a sufficient penalty depending upon the facts presented.

Q. Okay. Let me go a little further with you then; okay?

THE COURT: Mr. Berrigan, I just wanted to give you the two-minute warning.

MR. BERRIGAN: Two minutes? Okay.

Q. Now we're going to go into that penalty phase the judge talked about; okay? And to that pile, here's what the government's going to add. Of these five people, one's a mother and her two children, two little girls ten and six years of age; okay? They pile that on.

The defense has an opportunity to present evidence such as no significant prior criminal history, that our client

1764

may have had a disturbed background. Maybe she was physically, emotionally abused as a child, and there would be this weighing process that would take place; okay? You with me?

A. Yes.

Q. Here's what I need to know. In that weighing process if you have that on one arm, is there any way that we're ever going to have enough evidence from the defense perspective that you would consider that we could ever have you in the situation where you're realistically considering a life sentence? Is that

Page 142

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1537 of 3245

even possible for us if we have that?

A.   I cannot say that it wouldn't be possible.

Q.   You couldn't say it would not be.

A.   Yes.

Q.   Okay.  I gotta quit.  That's kind of like two negatives.  I mean, I'm hearing it, but I need you to say it.  And if you can't, that's okay.  But it's sort of a backwards way of telling me I could.  We need you to say that forwards way if you can.

A.   Okay.

Q.   Could you realistically in all candor?

A.   Yes.

MR. BERRIGAN:  Okay.  We'll take that as your final word.  Thank you.

THE COURT:  Actually, Juror 293, that double negative made you sound just like a lawyer.  I understood exactly what you meant.

1765

Thank you very much, Mr. Berrigan.

Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

EXAMINATION

BY MR. WILLIAMS:

Q.   Good afternoon, sir.

A.   Good afternoon.

Q.   I just have a few questions for you along the same lines there.  Hopefully you understood from Mr. Berrigan's questions how this process works, but there is going to be instructions from the Court that you are to consider different factors, some mitigating factors, some aggravating factors.  We don't know what those are at this point.  But if you are picked as a juror

Page 143

and if we get to this last phase of the trial, you'll have the benefit of instructions from the Court telling you that these are mitigating factors and these are aggravating factors, and your job as a juror will be to go back and seriously consider all of those factors in determining what you think the appropriate punishment should be.

First of all, I assume you'd welcome instructions like that to help you do your job.

A.   Yes.

Q.   Are those instructions that you'd be able and willing to follow?

A.   Most definitely.

1766

Q.   The interesting thing about how this process works, sir, is that those factors are going to mean different things to different jurors.  Some jurors may look at an aggravating factor, say the killing of children, as a very weighty factor to them, and they may really think that's significant.  Another juror may look at a mitigating factor of, say, no criminal history, and to them that's a really weighty factor.  But it's going to be up to every individual juror to attribute whatever weight they want to to any one of those factors.  Do you think that's a process you could go through yourself making that determination how much weight you want to give to each of these factors?

A.   I think I could, yes.  I'm not saying it would be easy, but I think I could probably come to a conclusion.

Q.   And the bottom line is that we're looking for jurors who are realistically able to consider both possible punishments, life in prison without parole and the death penalty.  And are

Page 144

you able to do that?

A.    Yes, I think so.

Q.    Are you willing to follow the Court's instructions and consider both mitigating factors and aggravating factors and fairly consider both of those sentencing options?

A.    Yes.

Q.    I want you to assume for a moment in this case that the evidence showed that the defendant in this case didn't actually

1767

pull the trigger, that she was involved in the killing of five people including this mother and two little children but she didn't actually pull the trigger.  She may have assisted and encouraged perhaps the other person to pull the trigger, but she didn't pull the trigger on it.

Now, some jurors tell us, If that's the circumstances, Mr. Williams, under those circumstances, I could never impose the death penalty.  In my view the death penalty ought to be reserved only for the people who actually pull the trigger on a murder.  Do you feel that way at all?

A.    Yeah, I guess I would have to say yes, I do feel that way.

Q.    Could you see yourself ever imposing the death penalty on somebody who did not themselves pull the trigger?

A.    I can't say that I would never say that, no, because there are so many factors involved that to try and sit here and think about on the spur of the moment, I couldn't say that I would never do it.

Q.    Okay.  Are you willing to consider there might be situations where the person who assisted or encouraged might be more morally culpable or more responsible for what happened than the person who pulled the trigger?  For example, the person who

Page 145

pulled the trigger might not have done it but for the other person encouraging them or assisting them in doing that, can you imagine that type of situation occurring?

A. Yes.

1768

Q. Is that something that in your view would factor in in your ability to impose the death penalty? If you got to that point, would you still be willing to consider imposing the death penalty on somebody who played that type of role?

A. I think there would be a possibility, yes.

Q. Okay. Assume with me if you would those facts, that the defendant in this case did not pull the trigger but was in an assisting or aiding and abetting role. Can you realistically consider the possibility of imposing the death penalty for somebody who was an aider and abettor to some murders?

A. That again would depend on how deeply their encouragement and participation was I guess.

Q. Is it something that you're willing to realistically consider as a possibility? In other words, you haven't shut out your mind to the possibility of the death penalty simply because the person was an aider and abettor.

A. I would think it would always be a possibility, yes.

Q. Sir, if you and the rest of the jurors got to the point where you've gone back to the jury room, you've listened to all the evidence in both stages of the case, you found the defendant guilty beyond a reasonable doubt of being involved in the murder of these five people, and you go back to that jury room after hearing the penalty phase evidence, assume with me you're there and you and the other jurors have all done this weighing process. You've weighed aggravators like the killing of

Page 146

innocent children against perhaps mitigators like role in the offense. You've done this weighing process, and you've come out to the determination that I think the death penalty's called for. I've weighed it out, and to me it tips in favor of the death penalty, and I think the death penalty is called for in this case.

And let's further assume the rest of your jurors thought the same way you did. You talked it out, and everybody's agreed unanimously the death penalty is called for.

For you to reflect your verdict and the jury's verdict in that case, each and every one of you would have to sign a verdict form that would have the real effect of causing the death of another human being. Some people just know they can't do that. I've got a friend I work with who believes in the death penalty, supports its existence, but he knows personally he could never, ever sign a verdict form causing the death of another person. How about you, sir?

A.    I don't think I'd take it lightly, but I believe if myself and 11 other jurors had come to that conclusion, yes, I could follow through.

Q.    And we wouldn't want anybody to take it lightly, and I trust you wouldn't either.

A.    No.

Q.    It would be a very serious thing to do. But do you think in the appropriate case you could impose the death penalty?

1770

A.    I believe so.

MR. WILLIAMS:  I have nothing further, Your Honor.
Page 147

THE COURT: Sir, if you'd just step outside, we'll confer, and I'll let you know your status in a minute. Thank you.

(Prospective Juror 293 exited the courtroom.)

THE COURT: Now today are we going back to -- let's see.

MR. WILLIAMS: Whoever goes first.

THE COURT: Whoever starts, okay. Mr. Berrigan, any challenge for cause?

MR. BERRIGAN: No, sir.

THE COURT: Any challenge for cause by the government?

MR. WILLIAMS: No, sir.

THE COURT: Any peremptory challenge?

MR. BERRIGAN: No, sir.

THE COURT: Any peremptory challenge by the government?

MR. WILLIAMS: No, sir.

THE COURT: Okay. So Juror 293 is in the jury pool.

(Prospective Juror 293 entered the courtroom.)

THE COURT: Sir, I wanted to let you know you did make it into our jury pool. That means you're eligible to be a juror in this case. We won't know till we finish jury selection whether you'll actually be a juror or not, but you're in the

1771

pool which means you have about a 50 percent chance of serving. We will let you know as soon as we know when the jury's selected and when the trial will begin, of course, if you're selected to be a trial juror.

I want to make sure you understand how important it is not to talk about this case with anyone and not to read any news

Page 148

reports or listen to any radio or television reports about the case. Everything you'll ever need to know will be presented right here in the courtroom. Do you understand that?

PROSPECTIVE JUROR 293: (Nodded head.)

THE COURT: Okay. Thank you very much, 293. Thank you.

(Prospective Juror 293 exited the courtroom.)

THE COURT: Ready for 379.

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 379 entered the courtroom.)

THE COURT: Juror 379, any chair you want in the front row. Please be seated. Oh, wrong chair. One of them had a free pass -- I'm just kidding you. One of them has a free pass where if you reach underneath you're automatically off jury duty, but you didn't get the right chair today, but it was a good try.

PROSPECTIVE JUROR 379: Better look underneath the chairs.

THE COURT: Yeah, that's right. Thank you for being

1772

patient with us, Juror 379. We're going to start with the government lawyer. And each side -- you're still looking for that pass, aren't you?

PROSPECTIVE JUROR 379: No, the chair leaned back. I didn't know it was going to do that. I didn't know what was going on.

THE COURT: Each lawyer has about 12 minutes to question you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

Page 149

EXAMINATION

BY MR. WILLIAMS:

Q.    Good afternoon, sir.  How you doing?

A.    Okay.

Q.    Good.  We appreciate your patience here today, and we appreciate the time you took to fill out this questionnaire. We're going to talk to you primarily about two subjects, your knowledge of the case through publicity and then your views on the possible punishments that may be available in this case if we get to that point of the trial.

      The first thing about publicity, in reading through your questionnaire, when you filled that out back in January, you indicated you had had actually a number of sources of information of knowledge about this case.  I think you checked newspaper, television, radio, Internet, and word of mouth as all

1773

sources of information you had about this case.  Is that fair?

A.    That's fair.

Q.    Okay.  And you had a choice of classifying yourself about how familiar you were with the case, and you said somewhat familiar.  Do you remember checking that box?

A.    Yes.

Q.    Do you remember a fair amount of the details about this case that you saw in the paper?

A.    Only that this case and along with another happening in south central Iowa at the same time, and I work with a fella that grew up in the Britt area, and four or five of us buy the Des Moines Register paper, so every morning that's what we'd do is go through that paper and do sports and news and stuff like that so . . .

Page 150

Q.   Did you pay particular close attention to this case over other cases or . . .

A.   Not at that particular time.  Just, you know, the two cases in Iowa.

Q.   Sure.  When you were given an opportunity to indicate whether you had an opinion about the defendant's -- whether she's guilty or not guilty, you checked the box no.  Do you still have that view, or have you formed an opinion about the defendant's guilt?

A.   I have not formed a view.

Q.   Now, you necessarily have heard a lot about the case it

1774

sounds like.  Do you know what the outcome was of that other case?

A.   Well, I'm not sure what the legal terms is, yeah, but he's behind the bars.  He's in jail somewhere.

Q.   Okay.  Do you know whether he was found guilty or not found guilty?

A.   I think he was found guilty.

Q.   All right.  And do you know anything about what punishment he received?

A.   Not really.  I don't know what punishment was given.

Q.   Very good.  What we're looking for is to make sure that if we have a juror who knows something like you do from having read stuff in the newspaper about this case that you're able to put that aside, that you're able to recognize that that's newspaper articles, that's not evidence.  The only evidence you're going to get in this case will come from this courtroom, from that witness box, and from the different exhibits that get introduced and to be able to put aside any -- anything you would have heard

Page 151

from the newspapers, any opinions you might have reached from reading those newspaper articles and put those aside, completely aside, and judge the merits of this case based on the evidence that's brought before you as a juror.

Now honestly, sir, some people can do that, and some people can't. What about you?

A. I think I can do that.

1775

Q. You can put anything you would have read just completely out of your mind.

A. How can you say completely out of your mind?

Q. Yeah, that's kind of --

A. There's a storage file cabinet there somewhere.

Q. Sure. And that's a good point. Here's the thing. You're back in that jury room, and you are trying to make a decision on this case. Number one, we wouldn't want you discussing what you knew with any of the jurors. Could you not do that?

A. Yes.

Q. And if you got to that point and you're trying to make a decision about this case, can you compartmentalize what you heard from the newspapers, the Internet, and so forth and say, Okay, I'm not going to rely upon that information in making my decision? Can you do that?

A. Yes.

Q. Obviously we can't make you erase your mind, but what we're looking for is whether you can compartmentalize it, and it sounds like you can.

A. Yes.

Q. Let me spend a few minutes talking to you about the possible punishments in this case. If we get to that stage of

Page 152

the case, the judge indicated there's two possible punishments, the death penalty and life in prison. In the federal system, life in prison means just that, life in prison. There's no

1776

parole. There's no getting out early for good behavior, anything like that. The task of the jurors in this case is going to be one of actually deciding the penalty which is very different from any other case in federal court. The jurors play the role of the sentencer in a way. And just like a sentencer in any other case, they look at not just the crime but everything surrounding the crime, the defendant's role in the crime, maybe the background, whether they have a criminal history, whether they're a recidivist, whether they keep committing crimes over and over again, or whether they've never committed a crime before. They look at all those factors, and in this case we're asking the jurors to look at all those factors and weigh all those factors to determine what the appropriate punishment might be. Do you understand that would be your role in that case?

A. Yes.

Q. The judge is going to provide instructions to the jurors about those factors, and we don't know what those are at this point, but the judge ultimately will instruct the jurors about different factors that are either mitigating factors suggesting the defendant should get life in prison or aggravating factors suggesting the defendant should get the death penalty. And the instructions are going to be that the jurors have to consider those factors.

Now, the amount of weight you give to any one of those

1777

Page 153

factors is completely up to the juror, but you're going to have to be able to consider all those factors in determining the appropriate sentence. Can you follow instructions like that, sir?

A. I think so.

Q. There are two possible punishments here, and what we're looking for are jurors who can realistically consider both possible punishments in determining what to do in this case. Now, some jurors when they hear certain facts say, I've already made up my mind; there's no way I can consider life in prison. Some jurors hear other facts and say, Oh, I could never consider the death penalty under those facts.

We need jurors who are willing to realistically consider both options, wait till we hear the evidence, wait till they get the Court's instructions, and then weigh all those factors and be open minded to considering both possible punishments in this case. Can you do that?

A. I think so.

Q. You hesitate a little bit.

A. Well, you know, like you say, you can't -- everybody to a degree predetermines something before you get to the end a little bit.

Q. Sure.

A. And you just -- what you said is don't do that.

Q. And some jurors can follow that instruction. Some can't.

1778

I mean, realistically some jurors come in here and say, I just can't; I know I can't come in here and put aside my -- you know,

Page 154

my assumptions or my thoughts at this point, and other jurors can. And we're looking for the jurors who can put those aside and equally consider both possible options.

A. I think I could do that.

Q. And keep in mind it's going to be -- you know, the Court's going to instruct you about the different factors that you can take into account in this case, and it's going to be your job to assign whatever weight you want to to those different factors. If you want to give a lot of weight to one factor and very little weight to another, that's completely up to you or vice versa, but it's going to be your call on how much weight. All we need are jurors who despite the different factors are still realistically willing to consider the possibility of both punishments. And can you do that?

A. Yes.

Q. Now, in this case, sir, there is going to be -- I want you to assume with me if you would that the evidence demonstrated that the defendant was involved with the killing of five people including a mother and two little girls ages six and ten. Now, some people come in and say, Oh, that's all I need to hear. Given those facts, I'm not ever going to consider anything but the death penalty given those facts. Without waiting to hear if the defendant has any criminal history, to figure out what the

1779

role was this defendant played in the crime, without waiting to hear anything else, they know that's all I need; it's definitely the death penalty; I'm not going to consider anything else.

Other jurors are willing to wait. They're willing to listen and consider all the factors and take into account the Court's instructions and still keep an open mind to both

Page 155

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1550 of 3245

possible punishments. What about you?

A. I think I could wait.

Q. Would you ever, ever want to impose the death penalty on another human being without fully and fairly considering the possibility that life imprisonment might be the more appropriate punishment?

A. State that again one more time.

Q. Sure. Picture yourself in this position. The judging's in your hands. You are trying to make a determination whether to execute somebody or not. Would you ever want to do that, would you ever want to make that decision, without first fully and fairly considering the possibility that maybe life imprisonment's the more appropriate punishment for that individual?

A. Well, what I've learned in the past is life imprisonment may be cheaper than the other.

Q. Cheaper?

A. Than going through the legal system as far as going through the execution part of it, in other words.

1780

Q. Oh, moneywise.

A. Moneywise, right.

Q. Sure. Now, the judge -- I don't know what the factors are going to be that you're ultimately going to be instructed on, but I'm pretty sure you're never going to be instructed what one or the other option costs can be taken into account. Do you understand that would be a factor it wouldn't be fair to take into account?

A. Yes.

Q. So I guess my question is you're at that point. You are

Page 156

trying to make a decision whether to impose the death penalty, and maybe, you know, you're really thinking all the factors are weighing toward that direction, you know, pretty horrendous crime. You know, you feel very strongly about the death penalty. The question is would you ever want to impose the death penalty on somebody without first fully and fairly considering the possibility that despite where you're going life imprisonment might still be the more appropriate punishment for somebody?

A. It'd be a tough decision to make.

Q. You'd want to look at everything.

A. That's right.

Q. You'd want to weigh all the different factors.

A. (Nodded head.)

Q. And follow the Court's instructions.

1781

A. (Nodded head.)

Q. And you think you can do that?

A. I think so. It's going to be -- it's tough.

THE COURT: Mr. Williams, you can wrap it up. I was a bad time keeper. You're actually beyond your 15 minutes. But you can take two minutes and finish up, and then I'll give the defense an equal amount of time.

MR. WILLIAMS: No, that's fine. I'll go ahead and quit, Your Honor. Thank you.

THE COURT: Thank you.

Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q. Not so bad so far, huh?

Page 157

A.    (Shrugged shoulders.)

Q.    Well, let me go back to what you were talking about with the publicity for just a minute, you know, the media accounts of the case.  Your questionnaire indicated that you were somewhat familiar about the case and you heard about it on the local news and over the Internet, and I was curious about that.  We haven't had that many, frankly, I guess Internet-savvy people come in.

A.    Well, where I work, if we don't get the newspaper, that's where we may go or this and that.  And it's just a discussion item.

Q.    And is it the kind of thing where --

1782

A.    And I didn't really search it for the purpose of that.

Q.    Okay.  But if -- is this a --

A.    I -- you can use the Internet, just kind of read some headlines in different newspapers.  I have lived all over the central part of Iowa, so I just pick different ones now and then.

Q.    I got the impression at the time obviously you didn't have a questionnaire or you weren't expecting to be summoned as a juror; right?

A.    State that again.

Q.    When you were talking to your coworkers and reading about the case, you hadn't gotten a questionnaire and didn't expect to be a juror.

A.    No.

Q.    My experience has been, frankly, people talk about cases like this all the time.  It's big news.  It was in the paper every single day during Mr. Honken's trial last fall.  And I don't know why people wouldn't talk about it, and I'm sort of

Page 158

hearing -- I don't know -- that's the situation at work with you guys. Were you talking about the case at that time?

A. We did discuss it like I mentioned. I work with a gentleman that grew up in that area.

Q. Sure. Well, he would be interested I would suspect in something like this; right?

A. Uh-huh.

1783

Q. That's a pretty big story for north central Iowa, don't you think? That's news?

A. Out in the rural area.

Q. Yeah, of course.

A. Kansas City is totally different.

Q. Sadly you're right. That's exactly true, believe me. Well, what did you learn about it through this experience? What had you learned about the situation regarding the allegations of murder in north central Iowa?

A. I think the sad thing about the whole situation was there was children involved.

Q. Sure, sure.

A. Bottom line.

Q. I'll be honest with you, Number 379. A lot of folks have come in and told us, Look, I didn't have any jury summons last fall. I followed this case. It was in the news. It was big news. And some of them have formed opinions about it, and some of them haven't, to be honest. The people that know more about it usually have some opinion about it, but you're suggesting to us that even back at the time -- and I don't know. Even at the time this was being discussed you didn't have any opinion about the discussion that was going on about the case?

Page 159

A.  You mean like October, November last year?

Q.  Yeah.

A.  The opinion I had?

1784

Q.  Yeah.

A.  I just mentioned that.  You know, it's sad that the situation ended the way it did, and I'm not even sure how many years went by before they found the remains.

Q.  You remember there was a number of years that went by.

A.  It was a number of years.

Q.  You remember about the children.

A.  Yes.

Q.  Do you remember anything about drugs?

A.  The whole thing was a -- drug related, yes.

Q.  Do you remember anything about Miss Johnson's name coming up during that deal or that at least the fellow had a girlfriend that was involved with him?

A.  Not really that I can tack on to anything that would substantially tie it to the . . .

Q.  We ask people about this area because most of the time in most cases, you know, you got a person on trial for selling drugs or maybe they robbed a bank, hasn't really been any media. And folks come in, and the judge asks them, Can you follow these instructions and do this and that, and they say, Sure; I don't know this guy from Adam.  You know what I mean?  And this isn't that kind of case as the judge pointed out to you earlier.  Let me ask about this idea.  You know, Miss Johnson's supposed to be presumed innocent, and that's a little different than forming an opinion about whether she's guilty.  You following me?

1785

Page 160

A.    Yes.

Q.    You can be in a situation where you've heard about a case and you might not have formed an opinion about guilt and still have a difficult time with this other side of the coin, and that is the presumption of innocence.  Again, you know, if you didn't know anything about the situation, I don't imagine that would be a hard thing at all.  But I'm frankly just concerned that you talked about this enough with your fellow coworkers and at least fall when it was going on that you learned enough that this might be an issue, and I just need to ask you about that to be honest.  I mean, the judge will tell you she is entitled to the full, complete presumption of innocence, that as she sits there at that table right now jurors are supposed to be able to look her in the face and say, I can completely presume that you are innocent and really believe it, I mean, not just say it, truly feel that, you know, in their heart of hearts.

Some folks haven't been able to give us 100 percent assurance they can do that because of what they've heard about the case.  And that's okay.  That's the whole purpose of this process.  We are not criticizing people because they read something in the paper, talked about the case, or feel that way or that way.  We just need to know about it; okay?  You with me?

A.    Uh-huh.

Q.    So let me ask you this.  Based on what you've heard about this case and talked to your fellow coworkers and some of the

1786

information you've talked about regarding the children and the drugs and the bodies being found years ago, do you have any question in your own mind and heart as to whether you could give

Angela Johnson the full, complete presumption of innocence?

A.   No.  I think that would come up through the trial as far as the facts.

Q.   Yeah.

A.   And I'm -- you know, I can't recall -- by what I read I know there was a lady friend involved, but, you know, the name didn't ring a bell at all.

Q.   Here's a problem, is that presumption of innocence, it attaches to her now, right now as she sits here, and it stays with her through the trial.  She's entitled to that presumption of innocence during the third week of the trial, during the fifth week of the trial.  If we have seven weeks of evidence, she is entitled to the presumption of evidence -- presumption of innocence until the jury hears everything; okay?

Your situation's a little different than somebody who didn't know anything about the case at all because you're going to hear stuff during the course of the trial that might very easily refresh your recollection about stuff you heard and talked about last fall.  You see what I mean?

A.   Yes.

Q.   So even if you could give her the full presumption of innocence today, I've got some concern that two weeks from now

1787

that might change.  You know what I'm saying?

A.   I know what you're saying.

Q.   And I want you to -- I hope you understand the spirit in which these questions are asked.  We're trying to -- if you were in her shoes, God forbid -- and it will never happen, I know -- but would you want to be able to have jurors on your case that could give you the complete, full presumption of innocence that

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1557 of 3245

the law entitles you to?

A.    Not necessarily.

Q.    What do you think?  Do you think that's a potential problem?

A.    I don't know.  You know, could stir up some things.  The guys that I work with say I have an uncanny memory when it comes to time and thinking about things that happened in the past.  They don't even want me to pick the paper up.

Q.    Let me ask it this kind of flip way if it's -- I don't know if it's helpful.  But if I were to ask you can you give us 100 percent assurance that it would not be a problem, not just today but if you were selected as a juror through the trial, that you're just a hundred percent certain that, you know, I could presume this woman innocent completely and utterly, is that something you can tell us, or do you have some doubt in your own mind about that issue?

A.    Right now I don't think it's a problem, but you never know what might stir up in the future.

1788

Q.    Okay.  I guess I get the sense at least at the time you were following it you followed it pretty -- at least your Britt coworker followed it pretty closely.

A.    We did.  My home office is in Storm Lake, so it's more off that way a little bit in Iowa.

Q.    All right.

A.    But we followed two high-profile cases in Iowa at the same time.

Q.    Okay.  Let me switch over, ask you just a couple of questions about the death penalty.  You know, the prosecutor asked you would you fairly consider both punishments, and I

Page 163

think whenever somebody's asked whether they could be fair, they naturally say yes. If they're asked, Would you wait and listen to all the evidence, and everybody comes in and tells us, Yeah, of course I'd wait and listen to all the evidence, you know, but at the end of the day here's our situation; all right? Let's just assume if you could with me, artificially fast forward in your own mind and assume you've been a juror and you've listened to the evidence and you heard all of it. You listened to the who, what, where, why, how did this happen. And you made this determination guilty beyond a reasonable doubt, five people intentionally murdered and they were murdered during the course of a drug conspiracy or continuing criminal enterprise or both. You with me?

A.    (Nodded head.)

1789

Q.    Wasn't just you. You and your 12 -- your 11 fellow jurors agreed. That was it. And then the government's alleged these murders were committed after premeditation, substantial planning, and you've listened to that evidence. You and your 11 jurors, guilty, no reasonable doubt. And now the government alleges and, by the way, we're alleging that two of these people are the children of the mother that was killed. They're ten-year-old girl -- ten-year-old Kandi Duncan and a six-year-old girl, Amber Duncan. We listen to the evidence. Beyond a reasonable doubt.

        Now, some folks will tell us, Okay, you know, well, I'll listen to the evidence about the defendant's background. Was she abused as a child and psychologically abused? Does she have any criminal history? But at the end of the day realistically when they're weighing that, when they're weighing

Page 164

that against whether the defendant has a criminal history or whether she had an abused background, it's no contest. And some of the responses in your questionnaire make me wonder whether you feel that way. You said you believe in an eye for an eye unless it's self-defense. Do you believe that?

A. Yep.

Q. We're not talking about self-defense; right?

A. Right.

Q. You said, I think it's okay to put someone to death if found guilty. A person who takes a life would pay for the

1790

crime. And I've heard people tell me this in different ways, and one of them is, Look, Berrigan, you intentionally take somebody's life, you made two choices. You decided to kill that person, and you made the choice to forfeit your own life. That's what you did. And they've come very clear out and said, Hey, if that's true, this stuff about the defendant's background, whether you got some prior conviction or not, what difference does that make? You intentionally, premeditatedly, substantially planned and killed five people including two little girls. That is enough. And I'm reading between the lines on this questionnaire, and I'm sort of seeing that. But I don't know because I can't read your mind. So tell us what you think about that. Here's the situation; okay? Would you realistically be able to consider a sentence other than death for somebody who had intentionally killed five people after substantial planning and premeditation including two little girls? Would you realistically be able to do that?

A. I think through the course of the trial you'd have to weigh out the facts that's been given on both sides, and if the party

Page 165

was involved with that, I would say yes.

Q.   You would say what?

A.   The death penalty.

Q.   Yeah.  That -- and I am not being clear, and I hope -- I'm trying to be.  That's decided, okay, beyond a reasonable doubt. We're not even going to get to this point where we're looking at

1791

this death penalty unless the government has done exactly this. There's not even any discussion about the death penalty.  So when you say, I'll look at all the facts, and Mr. Williams asks will you wait till you heard all the facts, you heard the facts. That's what the facts were:  Five dead people intentionally killed, two little girls, premeditated, substantially planned murders.  And against that, against that, you might be asked to weigh, well, does this defendant have a criminal history; was she emotionally, physically abused as a child?  And I'm just wondering if that would make any difference, quite frankly, that evidence versus something like this in your mind.  Do you follow me?

MR. WILLIAMS:  Objection, Your Honor.

THE COURT:  Can you rephrase the question?

MR. BERRIGAN:  Sure.

BY MR. BERRIGAN:

Q.   Let me cut to the chase.  If -- and I know that's a big if, but if you heard all the evidence and that was the situation, would you realistically -- and I mean, you know, in your heart of hearts -- would you realistically be able to consider a punishment other than death for that person who had committed those crimes?

A.   For the person that committed those crimes over there?

Page 166

Q.    That's right, you bet, those crimes.

A.    Death sentence would be okay.

1792

Q.    I hear that.  I'm asking you about a life sentence.

A.    Oh.

Q.    Would you be able to consider a life sentence as an appropriate punishment for a person who committed those crimes? Would you really be able to do that if your views are such as you've expressed here, you forfeit a life, you take a life, eye for an eye?

A.    I think if the facts were brought out through the total course of the trial that if life sentence was what is due for justice then life sentence would be due for justice.

Q.    And, of course --

A.    But you gotta --

Q.    Yeah, it'd be nice if we could come back at the end of the trial and ask you these questions, but we have to ask you to kind of do this artificial fast forwarding where you have heard all the evidence; okay?  That's kind of where we are.  So you're telling me that you would realistically be able to consider a life sentence under those circumstances if that was proven beyond a reasonable doubt?

A.    I could consider that.

Q.    You could realistically.

A.    (Nodded head.)

Q.    This evidence of childhood trauma, somebody having been abused maybe physically, maybe psychologically, whatever, is that something that you think you could balance on the scales in

1793

Page 167

making a determination of punishment?

A.   Possibly.

Q.   Why do you say possibly?

A.   Need to know what kind of abuse and, you know, how long it was and at what, you know, time frame in the life and everything.

Q.   How does that fit in with the concept --

A.   When somebody is older, they ought to know, learn what's right and wrong you would hope.

Q.   It's not a defense certainly, is it?  How does that idea that I would consider that type of thing comport with your view about an eye for an eye?  How do those mesh if you believe, hey, an eye for an eye, life for a life unless self-defense?  Why does it make any difference about the person's background?

A.   Well, if a person just went out and shot and -- or killed somebody on purpose, then that's where I come in with the eye for the eye.

Q.   Yeah, and I've been using the term intentional, but certainly on purpose, we're on the same page.  On purpose or purposely, intentionally, those are relatively indistinguishable; okay?  So what you're talking about --

A.   Purpose, if somebody did something on purpose.

Q.   On purpose, right.  That's what we're talking about, intentional, premeditated, planned murders, and you're telling me I could consider something other than death, and I'm just

1794

looking at this questionnaire, and I'm puzzled about how that fits with what you've told us in the questionnaire.  If you say an eye for an eye, you intentionally or purposely kill somebody,

Page 168

that's death, that's different than looking at somebody's background or whether they had prior convictions or not. Do you agree?

A.   I agree I guess.

Q.   And I'm not trying to get you to change this position certainly. Wouldn't be fair, and, frankly, it would be completely inappropriate. I just need to know if you really feel this way. When you tell us an eye for an eye if you feel that way, great. That's okay. If you tell us you take a life, you forfeit your life, that's okay. Is that how you feel?

A.   I think I have stated that, yes.

Q.   Okay. Is there anything that's taken place here today in terms of the questioning to change those views, eye for an eye, take somebody's life on purpose, you forfeit your own? Have we changed your mind about those things?

A.   Not if it's -- not if it's on purpose type of situation.

Q.   Okay. So if it's on purpose situation, what difference would it make what the background of the defendant was in terms of childhood abuse or something like that? What difference would that make if they committed a murder on purpose?

MR. WILLIAMS:   Objection, Your Honor. It would make a difference.

1795

THE COURT:   Well, your time's up so . . .

MR. BERRIGAN:   Okay. Thank you, sir. Appreciate your patience.

THE COURT:   Juror 379, I'm fairly confused by your answers, so I'm going to try and ask some questions to see if we can clarify it. Based on everything you've heard so far, if you're selected to serve as a juror and if the government could

prove Miss Johnson guilty beyond a reasonable doubt on one or more of the crimes charged and you got to the punishment phase -- I'm passing over the second phase on the eligibility factors.  Let's just suppose you're in punishment.  Are you with me so far?

PROSPECTIVE JUROR 379:  I think so.

THE COURT:  Okay.  Well, you're at that point in the trial, the last phase where you have to decide punishment.  My question is can you fairly consider both a death penalty and life imprisonment?

PROSPECTIVE JUROR 379:  I think so.

THE COURT:  Some of the lawyers have often with other prospective jurors used a football analogy because I think their view is that everybody knows something about a football field.  You know what a football field looks like?  You do, don't you?

PROSPECTIVE JUROR 379:  Uh-huh.

THE COURT:  Where would you place yourself?  Here are the choices.  The 50-yard line would be somebody who, knowing

1796

what you've heard the lawyers talk about the case, would be right on the 50-yard line.  They would be equally open to either punishment.  They have no preconceived leaning.  They're right on the middle.  They don't lean towards a life sentence.  They don't lean towards a death sentence.

Now, as you move down to one goal line, that would be the death penalty goal line.  Then the other goal line would be the life sentence goal line.  And some people, even though they haven't heard any evidence yet, are pretty sure they're, you know, towards one goal line or towards the other.  Some people might even be in the end zone already which means nothing in

Page 170

this trial is probably going to change their mind if the defendant is found guilty. They know for sure they're going to give a life sentence or a death sentence. I want to know where would you place yourself on the football field.

PROSPECTIVE JUROR 379: I'd probably be on the 50-yard line waiting for facts to come out.

THE COURT: Can you tell me just in general if I asked you what is your view about the death penalty, just what do you think about the death penalty, what's your response?

PROSPECTIVE JUROR 293: I think it's a hard way to end somebody's life, for having to put somebody to death.

THE COURT: Do you have any general feelings about when it's an appropriate punishment and when it's not in a murder case? We're talking now about a murder case. Just in

1797

general do you have any general thoughts?

PROSPECTIVE JUROR 379: Nope, don't.

THE COURT: I want to make sure I understand your view on giving Miss Johnson the full benefit of the presumption of innocence. As you sit there and look at her now, do you see somebody who is absolutely not guilty?

PROSPECTIVE JUROR 379: Do I see somebody that's absolutely not guilty?

THE COURT: Yes.

PROSPECTIVE JUROR 379: I can't say one way or another. I mean, do I know she's -- she's presumed not guilty right now.

THE COURT: Right now.

PROSPECTIVE JUROR 379: Presumed not guilty now.

THE COURT: I'm not talking about a month from now or

Page 171

two months from now or tomorrow. I'm talking about now. Right now I'm talking about as she sits there today.

PROSPECTIVE JUROR 379: Yeah.

THE COURT: Is she absolutely not guilty?

PROSPECTIVE JUROR 379: I can't honestly answer that one way or another just from -- just from what I've read on the thing. But she may be not guilty, but we are all not guilty in the courts of law until proven guilty.

THE COURT: Right, and that's what I'm trying to get at. That's what the presumption of innocence says.

1798

PROSPECTIVE JUROR 379: Right.

THE COURT: Somebody is absolutely not guilty unless and until the government proves them guilty beyond a reasonable doubt.

PROSPECTIVE JUROR 379: Right, right.

THE COURT: And do you believe that with regard to Miss Johnson?

PROSPECTIVE JUROR 379: Yes.

THE COURT: And how do you think what you've read about this case or Dustin Honken's case, how do you think that might affect your ability to be a juror in this case?

PROSPECTIVE JUROR 379: Well, I probably would have been better off if I wouldn't have had any knowledge about the case totally.

THE COURT: Yeah, that might be, but that's not the situation.

PROSPECTIVE JUROR 379: I know it. I know it. I know it.

THE COURT: I want to talk about the situation as it

Page 172

is.

PROSPECTIVE JUROR 379: I would have to be very fair and take in the facts, what is brought out.

THE COURT: Let me ask you this. Would you agree with me that whatever you read in the newspaper, those aren't really facts? They could be facts, but they might not be facts. You

1799

agree with that?

PROSPECTIVE JUROR 379: Yes, you gotta water down what's in the newspaper or you gotta filter it out to a large degree.

THE COURT: Do you think you would be able to base your judgment in this case solely, solely, on the evidence presented from that witness stand and the exhibits that get admitted and then my instructions on what the law is?

PROSPECTIVE JUROR 379: Yes, sir.

THE COURT: Are you sure?

PROSPECTIVE JUROR 293: Can anybody be really sure?

THE COURT: That's a great question. That's a great question. Well, let me ask you this. How sure are you that you can base your judgment if you get selected to serve as a juror only on the evidence presented?

PROSPECTIVE JUROR 379: I think I could do a fair job; I mean a good job.

THE COURT: Well, a good job of what?

PROSPECTIVE JUROR 379: Judging the facts.

THE COURT: But only the facts. That's what I'm trying to get at.

PROSPECTIVE JUROR 379: Yes.

THE COURT: Okay. If you'd step outside for a minute,

Page 173

I'm going to talk to the lawyers, and we'll let you know.  Thank you so much.

1800

(Prospective Juror 379 exited the courtroom.)

THE COURT:  Let me ask you a question.  Let me ask Mr. Berrigan a question.  Your side professes the expertise in pretrial publicity based on your motions.  Do you know of any alleged fact in any article that isn't going to actually be presented in the trial?

MR. BERRIGAN:  I can't honestly answer that, Your Honor, because I don't know what was in the newspaper articles.  You know --

THE COURT:  Well, some lawyer on your team must have.  Maybe I'm addressing the question to the wrong lawyer.  Somebody must have read them all.

MR. BERRIGAN:  Well, we certainly compiled them all.  I think we attached them to the change-of-venue motion, as many as we could find.

THE COURT:  How could you attach something to a motion that you hadn't read?  Wouldn't that be a violation of your obligation as an officer of the Court to attach something to a motion you haven't even read?

MR. BERRIGAN:  No.  I mean, I know an article in the Sioux City Journal when I see it without committing it to memory, and I don't know whether the articles contain just the facts from the trial or not, and so I'm not in a position to be able to give you some assurance that I'm familiar with the articles and that they accurately reflected the trial and that I

1801

Page 174

know --

THE COURT:  Well, I'm just trying to understand something.  You actually attached something to a motion that a lawyer on your team hasn't reviewed?

MR. BERRIGAN:  Well, no, I'm not saying we might not have reviewed it.  We obviously were very interested in the proceedings that were going on in Mr. Honken's trial, and we spent a good deal of time and effort collecting all the newspaper articles for the Court in our change-of-venue motion, not just the Sioux City paper but from all over the state of Iowa.

THE COURT:  Well, let me ask you this.  Do you know of any fact in any -- I'll go back to my original question.  Do you know of any fact in any newspaper article, any alleged fact, that won't be offered into evidence in this trial?

MR. BERRIGAN:  I don't know either way.

THE COURT:  That really isn't my question.  My question is do you know of any fact in any newspaper article that -- well, just a second, Mr. Stowers.  I'm talking to him.

MR. STOWERS:  Okay.

THE COURT:  And, you know, if you do that again --

MR. STOWERS:  That's fine.  I was just going to help him because --

THE COURT:  Well, I don't want your help at this point.

1802

MR. STOWERS:  Okay.

THE COURT:  And he doesn't need any help right now and -- because I want to ask each of you individually.

MR. STOWERS:  Okay.

Page 175

THE COURT: Do you know of any fact, alleged fact?

MR. BERRIGAN: I don't know. I'm not familiar enough to know.

THE COURT: Yeah. But I understand you're not saying that there aren't some out there that might be.

MR. BERRIGAN: Exactly.

THE COURT: I understand that. But I'm just saying as you stand there now you don't know of any.

MR. BERRIGAN: No, I do not, sir.

THE COURT: That doesn't preclude that there might be.

MR. BERRIGAN: Exactly.

THE COURT: I understand that.

Okay. Now, Mr. Stowers.

MR. STOWERS: The most prevalent one that I think this juror said he was aware of is it would not be something that would be admitted in the first half of the trial which is the fact that Mr. Honken was, in fact, convicted, and I think this juror said that he was aware of that. Now, in the second half of the trial if there is a second half of the trial, that would be something that would be gotten into probably. But . . .

THE COURT: Yeah, but a lot of the potential jurors

1803

have known the outcome of the Honken trial. That's nothing new to this jury selection with regard to Juror 379.

MR. STOWERS: No, that's true. And I don't know if any of the jurors who've made it through the process at this point have said that they're aware of that fact. We'd have to check our notes. I think there's 12 seated so far.

THE COURT: Well, I haven't disqualified anybody for cause based on that. I know that. But anyway, what's the

Page 176

answer to my question?

MR. STOWERS: That fact would be one that the jurors would not be hearing about through the witness testimony or through exhibits during the first phase of the trial, that fact. There is undoubtedly some other facts that the jury -- that have been written up in the articles that may not come out which would include testimony of some of the jailhouse informants who testified against Mr. Honken in connection with his trial concerning statements that Honken made to them. And those people's testimony will not be received in this trial because of the hearsay Bruton issues that exist, and that's why we've obviously had separate trials as well.

So that testimony which is another area that you addressed in the venue arguments would be the other area of evidence that's clearly been in the papers. It's been described in some amount of detail in the various press accounts including most notably in a good deal of amount of detail on the Globe

1804

Gazette's website from Mason City. I don't know. This juror hasn't specified that that's the Internet site he was looking at. But I do know it was there. I do know it was in the Sioux City paper. There was a good deal of detail about those persons' testimonies and what Mr. Honken said to them. And I think those articles went out on the wire which were picked up by various other newspapers which are all included in that big fat appendix. So that's -- I think that helps maybe answer your question as best as I can.

THE COURT: Yeah, it does.

Mr. Willett?

MR. WILLETT: Your Honor, if it please the Court, my

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1572 of 3245

answer would have been very similar to Mr. Berrigan's. Now, I've had the benefit of being educated by my co-counsel Mr. Stowers, and my memory tracks along with him.

THE COURT: And you can certainly adopt his answer now.

MR. WILLETT: Well, I don't want to be accused of piling on, Judge, but my initial reaction to your question when you posed it to Mr. Berrigan is my answer would have been very similar to his in that I could not think of anything at the moment, but then once we had the benefit of Mr. Stowers, I was tracking with what he was telling the Court.

THE COURT: Okay. Now, was there anything in the -- in any of the articles about what I've called the "Dustin

1805

confessed to me" witnesses that implicates Angela Johnson?

MR. STOWERS: Am I allowed to answer that?

THE COURT: Sure.

MR. STOWERS: Okay. I'm not sure. I believe the one witness from the Honken trial -- for some reason his name is escaping me; he was in prison on I think a murder charge with Mr. Honken -- I believe that he described Mr. Honken describing what it is that Ms. Johnson purportedly did in connection with the murder. Oh, Steven Vest I think might be the individual. I think he said that Mr. Honken had given a version which placed Ms. Johnson on the first four murders as a person who went perhaps posing as an Avon lady or something like this to the home of Miss Duncan and her kids, gaining entry, and then assisting Mr. Honken from that point. I think Mr. Vest's version along those lines was published in the papers. And there may have been another witness who gave a similar version.

Page 178

Each witness gave a little different take on some of these things. But I think that was Vest's version that was elicited.

THE COURT: Of course, we don't know whether that witness knows anything about that or not because nobody bothered to ask.

MR. STOWERS: Yeah, that detail, that's correct.

THE COURT: Excuse me, the juror. At least I didn't call him the defendant. The juror.

MR. STOWERS: Yeah.

1806

THE COURT: Yeah. Okay. Thank you. Okay. Why don't we get back to the argument on the -- I don't even remember where we were. Has somebody moved to --

MR. WILLIAMS: I think you haven't even asked whether anybody's moved for cause.

THE COURT: Okay. And who's turn is it now? You go first?

MR. WILLIAMS: My turn, and we're not moving for cause.

THE COURT: Okay.

MR. BERRIGAN: The defense would move for cause, Your Honor, in two areas. One is the publicity, and I'd just refresh the Court's recollection. It was more than the articles. He discussed the case with his coworker from Britt which is, of course, the area where this all occurred. And by his own admission, his coworkers describe him as a man of uncanny memory I think is the term he used, and he was somewhat concerned about that. He thought right now he'd have a good chance of this presumption of innocence being applied to Miss Johnson. He couldn't promise us down the road because of his -- I took it

Page 179

because of his memory he might remember more about this. And as Mr. Stowers has pointed out and I was unable to, that could be a concern depending on what it is that we remember. And none of us -- I don't think even he could have told us that.

So that's one area that we are very concerned about,

1807

whether he'd be able to afford her the full presumption of innocence. In fact, my own view is I don't think he internalized the presumption of innocence. He used the Court's terminology that I heard in Mr. Honken's case, but you're going to come to your own conclusion about that. I think that's in issue.

THE COURT: Yeah, I don't think he did too, but there's no legal requirement that somebody does.

MR. BERRIGAN: No, I understand. I remember that as being something the Court discussed in Mr. Honken's case. Whether you're applying that standard here I don't know.

THE COURT: I'm not applying it because I'm not doing the questioning on it.

MR. BERRIGAN: Okay. And then we also have concerns and, frankly, do not believe that he is qualified under the Witt standard in terms of whether he's free from substantial impairment because although he said, I'll wait to hear everything, and I'll certainly try to follow the instructions of the Court, he's never been and his essential position which is an eye for an eye if it's not self-defense, he believes in an eye for an eye and if somebody -- purposely was the word he used, and I was talking about intentionally, and I think that may have confused the gentleman. But if someone purposefully takes the life of another, that's death. That's his belief.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1575 of 3245

THE COURT:  How do you explain his answer to my

1808

question about being on the 50-yard line?

MR. BERRIGAN:  I can't.  I frankly can't.  I think he said the same thing to Mr. Williams when he said, Would you follow the instructions?  Yes.  Would you fairly consider them? Yes.  And my sense of the juror is he would like to do that, he would want to do it, and he feels he's a fair person, and he wants to be fair.  But it doesn't mesh.  You're exactly right. It doesn't mesh at all with what he says his true position is which he never modified.  I asked him that actually.  Has something happened to change your views since you wrote them down?  Nothing happened.  That's how he feels.  And those are inconsistent with his ability to follow the instructions despite his stated wishes and desires and beliefs that he could do so. So we believe that under the Witt standard this is a man who eye for an eye is substantially impaired and move for cause.

THE COURT:  Mr. Williams.

MR. WILLIAMS:  Thank you, Your Honor.  We would oppose.  First of all, on the publicity, this juror clearly indicated that he would follow the Court's instructions and set aside anything, compartmentalize anything he may have learned through the press.  His coworker that was from Britt wasn't living in Britt at the time.  And to be clear, he says he was a coworker with me in Storm Lake, so this is somebody who knows nothing more than what was picked up from the press in the first place.  And his only thought after reading all that was not

1809

Page 181

she's guilty but was it's sad. That was his reaction. That was his opinion reading through there. He never once said, I reached a conclusion from reading those articles, other than he was saddened by the events that occurred.

Is he able to tell anybody 100 percent predicting down the road what influence having read those articles is going to have on him? No. I think he was trying to be honest, but he says, Right now I can tell you I'm presuming her innocent. You know, could it impact me down the road? You know, who knows? But he doesn't think so, and he said, I'll follow the Court's instructions to set that aside and base the evidence or base my judgment just on what comes in court, and that's all we can ask of a juror in my view.

As far as the death penalty issue, I think the difficulty is trying to read way, way too much into somebody's reaction to a saying an eye for an eye. An eye for an eye, you know, if somebody asks somebody do you believe in an eye for an eye, oh, yeah, I believe in an eye for an eye. When it comes down to, And you're now in a position of sentencing somebody, are you just going to say eye for an eye and not take into account anything else? No.

And in this case the juror quite clearly repeatedly said, I would take into account other factors in making that determination. An eye for an eye could mean nothing more than he thinks if you kill somebody you forfeited your right to live.

1810

It may not mean that you automatically die, but that may mean that you forfeit your right to live. Now, whether we take that life away from you because you've given up your right to it is a different question from whether you'll automatically be executed

Page 182

as a result of killing somebody else. And I don't think there's any inconsistency between that response and his statement about where he's at on the football field and his willingness to consider all the factors.

I just think the defense is reading way too much into a question they put in this questionnaire that doesn't really explain a person's more complicated views when they are the ones who are going to be making the decision about whether to execute somebody, and I think this juror indicated he could be fair and would consider both options.

THE COURT: I don't believe the potential juror is substantially impaired, so I'm going to overrule the challenge for cause. Let's see. Who's -- I guess the government goes first now with the exercise of the peremptory?

MR. WILLIAMS: That's correct, Your Honor. And we do not exercise peremptory.

MR. BERRIGAN: The defense does exercise a peremptory on Juror Number 379, sir.

THE COURT: Okay. Thank you. Okay. Can we bring 379 in, please?

(Prospective Juror 379 entered the courtroom.)

1811

THE COURT: Juror 379, you're still in the jury pool, so that means you have a 50 percent chance of being selected.

MR. BERRIGAN: Sir?

THE COURT: Yes.

MR. BERRIGAN: I'm sorry to interrupt.

THE COURT: Yeah, that's right. I'm sorry. You're not in the jury pool. I misspoke. So you're dismissed from service in this case. And we'd appreciate it if you'd not talk

Page 183

about this jury selection process to anybody, at least for a couple weeks until we get the jury empanelled because if you said something to somebody, that somebody might say something to somebody else, and that somebody else could be sitting in one of these chairs during jury selection, so you are excused as a juror from this case. I misspoke. Thanks for your service. Thanks for answering our questions so openly and honestly. We really appreciate it very much. Thank you. Good luck to you.

(Prospective Juror 379 exited the courtroom.)

THE COURT: Ready for 108?

MR. BERRIGAN: Yes, sir.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay.

(Prospective Juror 108 entered the courtroom.)

THE COURT: Ma'am, if you'd just take any seat in the front row, whatever you're most comfortable with.

And everybody can be seated. Each lawyer has about 12

1812

minutes to question you, and we're going to start with Mr. Berrigan on the defense.

                    EXAMINATION

BY MR. BERRIGAN:

Q. How are you today, ma'am?

A. Okay.

Q. Thank you for being so patient. We're going to just ask you questions about two different areas. One has to do with what we call pretrial publicity which is basically what kind of media exposure you've had, you know, what have you seen in the paper or heard on the radio or on television, and we have the benefit of your questionnaire, of course, which is very helpful.

Page 184

A.    Okay.

Q.    And you said you had only just heard about the case, only heard a little about the man in the case.  Is that right?

A.    Yeah.  I don't go by the news.  So far it hasn't been -- I don't know.  I don't even listen to the weather.  I figure I go outside and find out what's going on.

Q.    Okay.

A.    So . . .

Q.    All right.

A.    I read the papers.  Usually they're three or four days old, but I have other things to do usually at that time of the evening, and I don't stay up late, so I don't watch the late news.

1813

Q.    That's perfectly all right.  Lot of people don't.

A.    Okay.

Q.    Is that still the situation?  You know, I notice these questionnaires frequently -- and yours is true too -- you filled it out back in January.

A.    Yeah.

Q.    And here we are in April.  Haven't heard anything or seen anything about the case here in the last three months, or have you?

A.    I saw -- whenever I was doing something, I walked into the room, and I saw this lady's picture.  She was coming out of a building or something.  That was it.

Q.    Okay.

A.    And they had already sent me my papers not to watch so . . .

Q.    So you didn't watch.

Page 185

A.    So I didn't watch.

Q.    Can you remember about the picture, what did it look like?

A.    Just an officer and the lady walking by the building.  That was all I saw.

Q.    Can you recognize it as Angela?  I mean, can you put the two together?

A.    Well, she had long pretty hair so -- that's what it looks like.

Q.    Okay.  In the picture was she dressed as nicely as she is

1814

today?

A.    No, no.

Q.    What kind of dress did she have on?

A.    One of those prison things.

Q.    Okay.  And do you remember whether you saw that she was in handcuffs or not?

A.    I don't know.  I didn't -- it just said the name, and as I was going through the room, and I glanced at the TV.  That was all.

Q.    Is there anything about seeing the picture -- and I know that was inadvertent.  But is there anything about that that causes you any concern about your ability to be a fair juror?

A.    I don't think so.

Q.    Okay.  Will you be able to presume Miss Johnson innocent of these charges as the law requires?  When people come into court, they get the presumption of innocence just like everybody else.

A.    Yeah.  There's always two sides to everything.

Q.    Okay.  Great.  Let me ask you the other issue, talk a little bit about that, and that's this issue about the possible penalties involved; okay?  And these are tough issues for some

Page 186

people.  And sometimes folks have given them some thought before they come in, and sometimes not.  But we're trying to find people that could fairly consider both possible punishments as alternatives, and it's -- as the judge pointed out, it's a process that's somewhat complicated.  The jurors listen to all

1815

the evidence about the crime, and that's kind of the first half of the basketball game or what the judge called in his instruction on the overhead the merits phase.

A.    Yeah.

Q.    Do you remember that?

A.    Yeah.

Q.    And that's like a regular trial where the jurors sit and listen to the evidence, who, what, where, how, why, when did this happen, all that stuff.  And then they have to also listen to the defense evidence if there's evidence presented.  We don't have any obligation to, but if we did, you'd have to listen to that.  And then you'd make a determination about guilty versus not guilty.  You with me?

A.    Yeah.

Q.    Okay.  And in that respect that's not much different probably than the trials you watch on television or anything else; right?

A.    No.  That's about it.

Q.    Yeah.  And then we have this other -- kind of the halftime of the basketball game, and it's a second stage of the trial where the jurors are going to be asked to answer a couple of questions, legal questions, based on the evidence they've heard already.  And you'll do the same thing.  You'll sit down with your fellow jurors and talk about it and try to make a

Page 187

determination whether these things have happened beyond a

1816

reasonable doubt.  You with me?

A.    Yes, sir.

Q.    Okay.  And then we get to this penalty part of the trial, and that is a little different, frankly, than almost all trials in federal court because usually, as the judge pointed out, he does the sentencing.  And in this situation if we got to that point -- and that's a big if; okay?  We don't want people to assume we're going to be there, but it could happen.  And we can't stop the trial in the middle and ask people, What are your views about punishment?  We have to do it now; okay?  Does that make any sense?

A.    Yes, sir.

Q.    Well, one of the things you'll be told is you have to consider two different things really.  One thing is called aggravating factors, and an easy way to think of that are these are factors that weigh towards the death penalty; all right?

A.    All right.

Q.    And the government's -- before we've even gotten to that point, they've already done one thing.  They've proven beyond a reasonable doubt five people were intentionally killed; okay?  You gotta understand that.

A.    All right.

Q.    That happened way back in the first phase of the trial or the merits phase; okay?

A.    Okay.

1817

Q.    And then they're going to also attempt to prove that these
                              Page 188

murders were committed after premeditation, substantial planning. You with me?

A. Okay.

Q. And that's an aggravating factor, something that would weigh towards the death penalty; okay?

A. Okay.

Q. And then they're also going to attempt to prove that two of these five victims are what the law calls vulnerable victims. They were two little girls ten years old and six years old; okay?

A. Okay.

Q. Their mother was killed. And so the jurors are going to be asked -- if it's proven, if it's proven, they're going to be asked to weigh that towards the death penalty. You with me?

A. Yes.

Q. The defense has an opportunity to present what we call mitigating factors, and those are just the exact opposite. Those are things or reasons that would tend to go towards life as a punishment; okay? Does that make sense?

A. Yeah.

Q. When we say life, we mean life, okay, life without possibility of parole. You understand?

A. All right.

Q. All right.

1818

A. Locked up.

Q. Yeah, that's it, done, throw away the key.

A. Okay.

Q. That's it. And the defense can present things like Miss Johnson doesn't have any substantial criminal history; okay? We

Page 189

might present that as evidence for the jury to consider towards life. We might present evidence about her role in the offense, and by that I mean she could have been involved with these matters and participated in the killings even if she wasn't the person that pulled the trigger but still be guilty.

You know, if you and I decided to commit a crime together -- let's say we wanted to rob a bank and you were out in the car. I went in and robbed the bank. We get caught. We're both going down for bank robbery; okay?

A.    Okay.

Q.    Does that make sense to you?

A.    Yeah.

Q.    Because you helped me, and you helped me and abetted me.

A.    Okay.

Q.    But if the judge were to sentence us, he might look at us differently because I was in there with the gun holding up the people and you were sitting out in the car. You're still guilty, but maybe our punishments would be different. Does that seem fair?

A.    Yeah.

1819

Q.    Okay. Well, we could present evidence of that, that, hey, look, her role in the offense was minor compared to other people that were involved. That might be something you'd be asked to look at for life. You with me?

A.    Yeah.

Q.    We might ask you to look at evidence of her background, her childhood even, whether she was traumatized, sexually abused, physically abused, things that happened a long time ago that may have affected kind of her choices in life; okay? And that's

Page 190

evidence that the jury can consider because we can present any evidence of her background and character that would vote towards -- go towards life; all right? Would you be willing to do that?

A.    Okay.

Q.    So here's the background; okay?

A.    Yeah.

Q.    And then what happens is there's this weighing going on. You have to do this. This is interesting. You do this yourself, not as a group. You weigh how much weight you want. You don't add up the numbers. That's really important. You say, Hey, this is what this weighs for me. This is what this weighs for me. And you have to come to a decision about which one outweighs the other one; okay?

A.    All right.

Q.    You're never required, never required, to come back with

1820

death as a punishment. But in this process of weighing, you have to make an individual decision as to whether life or death is the more appropriate verdict for you; okay? You with me?

A.    Yes.

Q.    Is that something you could do, do that weighing process?

A.    I think that I could.

Q.    Okay.

A.    Most everything in life is a balancing act.

Q.    Right. You gotta make some choices. And let me tell you, we understand this is a hard one; okay?

A.    Yeah, it would be very hard, yeah.

Q.    Right. And you can be comfortable in your decision. That is, you can be -- you're going to do this yourself. So you make

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1586 of 3245

that decision, you want to be a hundred percent sure, that's okay. Okay?

A. Okay.

Q. You'd want that I suppose, wouldn't you, if you're going to live with this the rest of your life?

A. Yeah, I would want to.

Q. When people are doing this weighing process, any one person or two or three could come out for life and the rest of the people come out for death, that's life. In other words, yeah, one person could say life, that's life. That's the sentence. It's not like the first part of the trial where everybody has to agree one way or the other. You don't have to agree. You with

1821

me?

A. Okay.

Q. Well, it could be a situation, it could, where you make this weighing of the aggravating and mitigating circumstances and people could decide, each of them, death -- I think the aggravating circumstances outweigh the mitigating circumstances; I think the death penalty is appropriate. And if all 12 of the people said that, all 12 individually, then that would be a death sentence. That would be a death verdict by the jury; okay? Only if all 12.

A. Only if all -- okay.

Q. All 12, right. It's not a majority vote or anything like that; okay?

A. Okay.

Q. And then the folks would be required -- if they came to that conclusion, they would sign the verdict form and say that was my determination, death, and they would all sign it because

Page 192

they all came to that conclusion. You with me?

A. Okay.

Q. Does that process make any sense to you?

A. Yes, it's beginning to, yeah.

Q. Okay. Is that something you could do fairly? That is, that you could follow -- these are all going to be given to you in what we call instructions. These aren't Pat Berrigan's rules. These are going to be rules from the Court. Is that

1822

something you can do?

A. I've pretty much done that. I've raised a bunch of kids, and I worked as a head of housekeeping, so I was the inner-between but nothing as serious as this. This is very serious.

Q. And we would expect this to be hard to do for anybody.

A. Yeah, it would be.

Q. But we need people to do it that can do it, you know, fairly consider both possible punishments, you know, both life and death. Is that something you can do, fairly consider both as difficult as it would be?

A. I think I could.

Q. Okay. Would you be able to sign a verdict if -- and I know it's a big if. But if you in your heart of hearts believed that the death penalty was the appropriate punishment, would you be able to sign a verdict form along with your other 11 jurors indicating that? Would you be able to do that?

A. If I was totally convinced --

Q. Yeah.

A. -- I think so. I think I could.

Q. All right. One last point. I'm not -- hopefully not out

Page 193

of time.

THE COURT: You're actually 3 minutes beyond the 15 minutes. Go ahead and finish up.

MR. BERRIGAN: This is my last one.

1823

THE COURT: That's fine.

BY MR. BERRIGAN:

Q. The government has to prove their case beyond a reasonable doubt, okay, not a hundred percent. You with me?

A. All right.

Q. You got a right to make a hundred percent confidence in your decision, but you can't force them to go above what the law requires. You hear me?

A. All right.

Q. Would you be able to follow that instruction?

A. Yes, I think so.

Q. Just make them prove beyond a reasonable doubt.

A. Okay.

MR. BERRIGAN: Okay. Thanks.

I'm sorry I ran over, Judge. Thank you.

THE COURT: No. I didn't give you the warning.

MR. BERRIGAN: That's all right. I gotta pay more attention.

Thank you for your patience, ma'am.

THE COURT: If you figured one thing out, I'm a lousy time keeper.

MR. BERRIGAN: Not as bad as me.

THE COURT: I'm about to shift that responsibility.

Now we're going to have questions from Mr. Williams.

PROSPECTIVE JUROR 108: Okay.
Page 194

EXAMINATION

BY MR. WILLIAMS:

Q.  Good afternoon, ma'am.  How you doing this afternoon?

A.  Okay.

Q.  We sure appreciate your patience here today, and I'm just going to follow up on some of the questions that Mr. Berrigan asked you.  He was talking to you -- you remember he was talking to you about that aiding and abetting concept --

A.  Yes.

Q.  -- about the person who's in the getaway car but doesn't actually walk into the bank?

A.  Uh-huh.

Q.  I want you to assume for me that the evidence in the case showed that in this case the defendant was in that role, was an aider and abettor; the defendant didn't actually pull the trigger on the weapon, didn't actually shoot the victims and kill them.

Now, I want you to think about that in relation to the punishments that are available here, and that is the death penalty and life in prison.

Now, some people think, jeez, if the role of the person -- kind of like the getaway driver.  If the role of the person is an aider and abettor, it isn't the one who actually pulled the trigger on a murder, I could never impose the death penalty on somebody that was in that role.  Other people can

still consider, realistically consider, imposing the death

Page 195

penalty on somebody who is an aider and abettor. Other people just think that the death penalty's reserved for the people who actually pull the trigger, who actually, you know, inflict the wounds that cause the death on somebody.

A.    Okay.

Q.    What do you think about that?

A.    Well, if they planned it together and one waited out to drive the car, I -- I would think they would both be guilty of the same offense if they knew that each other was going to do this.

Q.    Okay. And let me take it a step further. We're past the point of guilt because you're absolutely right. I mean, the law is that a person who drives the getaway car for a bank robber is as guilty of the bank robbery as the person who walks in and actually holds up the teller.

A.    Yeah.

Q.    So the guilt is one issue. And are they equally guilty of the crime is one decision; okay? We're past that point. I want you with me if you can to be past that point. You've determined that the defendant is, in fact, guilty of the murders, that she assisted in planning the murders, but she didn't actually commit the murders. She didn't actually pull the trigger.

Now you're struggling with this issue Mr. Berrigan talked to you about, and that is what punishment to impose. And

1826

it's not guilt anymore, but it's the punishment, and you're trying to figure out, jeez, is the death penalty appropriate, or is life in prison appropriate? Some people believe that death penalty is appropriate only for the people who actually pull the trigger, who actually inflict the wounds. Other people don't.

Page 196

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1591 of 3245

And that's the question I'm trying to see where you're at on.

A. Well, if it was two people or if it was ten, they would be guilty of the same offense I would think myself. I would say that yes, they were as guilty as anybody that pulled the trigger. I -- that's all I can say.

Q. That's helpful to me. That's helpful to me. So in your mind is the possibility of the same punishment available for both the person who aided and the person who pulled the trigger?

A. I would think so, yes.

Q. Okay. Mr. Berrigan talked to you a little bit about this issue of, you know, if you and the other jurors after finding the defendant guilty of these crimes all concluded that the death penalty was appropriate, you'd have to sign a verdict form, and I want to talk to you about that for just a minute. Assume with me, if you will, that you're at that point. You and the other jurors have all found the defendant guilty beyond a reasonable doubt. You have all gone downstairs. You've talked it over. You've done the individual weighing that Mr. Berrigan talked about.

A. All right.

1827

Q. And you personally have concluded that, you know, weighing out these factors you've decided that it tips in favor of the death penalty. In your conclusions the death penalty is the appropriate punishment.

A. All right.

Q. Assume with me that all the other jurors, all other 11 of your jurors, agree with you at that point. In order for you to reflect that verdict, each and every one of you would have to sign a verdict form. The real effect of signing that verdict

Page 197

form would be to cause the execution of a real person, somebody you may be sitting and looking at for three months in trial.

A.   Yeah, it would be very, very hard.

Q.   That would be very tough.

A.   If we've already reached the verdict that it was guilty and we've went over everything and in my heart if that's the way I felt, I think that I could do it.

Q.   So in the appropriate case you think you could impose the death penalty.

A.   I think so.

Q.   If you thought it was appropriate.

A.   I think I could if that was what it was supposed to be in my heart.  I don't know.

Q.   And you understand it's going to be your decision. Mr. Berrigan explained to you that every juror gets to decide this, and the death penalty's only imposed if all 12 of you

1828

agree with each other that the death penalty ought to be imposed.  But if a single juror thinks, boy, I just don't think so, then it's life in prison.  You understand how that works?

A.   Okay.

Q.   Okay.  And you think in the appropriate case you could actually sign a verdict form that would cause a defendant's execution.

A.   It would be very, very hard, but I think that I could.

Q.   And it should be hard, shouldn't it?

A.   Oh, yeah, yeah.

Q.   It should be a tough decision.  We'd want juries to struggle with that decision because it would be something you'd have to live with for the rest of your life.

Page 198

A.    Yes.

Q.    And you're prepared to do that.

A.    Yes, I think I am.

MR. WILLIAMS:  All right.  I don't have any further questions.  Thank you, Your Honor.

THE COURT:  Ma'am, if you'd just step outside, I'm going to consult with the lawyers, and I'll let you know your status in a minute.  Thank you.

(Prospective Juror 108 exited the courtroom.)

MR. BERRIGAN:  No challenge for cause by the defense, sir.

MR. WILLIAMS:  None by the government, Your Honor.

1829

MR. BERRIGAN:  No peremptory challenge by the defense.

MR. WILLIAMS:  None by the government, Your Honor.

THE COURT:  Okay.  108 is in the pool.

(Prospective Juror 108 entered the courtroom.)

THE COURT:  Ma'am, you've made it into our jury pool, and so you have about a 50 percent chance of being selected to serve as a juror.  We'll let you know as soon as we know when the final 18 have been selected and whether you're in that 18 or whether you're not in the 18 and, if you are in the 18, when the trial will start.

I want you to pay very special attention to those instructions I gave you earlier this morning, the particular ones don't talk to anybody about this case, don't let anybody talk to you about the case, don't read anything in the newspapers, don't listen to any radio or television reports about it.  If you serve on the jury, everything you need to know will be presented right in this courtroom; okay?

Page 199

PROSPECTIVE JUROR 108:  Okay.  I can do that.

THE COURT:  All right.  Thank you very much.  Thank you.

(Prospective Juror 108 exited the courtroom.)

THE COURT:  Why don't we do one more, 790, and then we'll take a break.

MR. WILLIAMS:  Judge, this is the juror with the hearing problem if you want --

1830

THE COURT:  Okay.  And Carey's got the -- and I'll take care of explaining that to her when we bring the juror in.

(Prospective Juror 790 entered the courtroom.)

THE COURT:  Any seat in the front row is fine.

Everybody please be seated.

Juror 790, I wanted to offer for you -- if you want to use it, we have a special infrared headset that we use with hearing-impaired jurors.

PROSPECTIVE JUROR 790:  Okay.

THE COURT:  And I don't know if it will help you or not, but would you like to try it to see if it works better?

PROSPECTIVE JUROR 790:  Yes.

THE COURT:  Okay.  I'm going to have my law clerk Carey give it to you and show you how to use it, and you can put it on and wear it.  And if it's not working, just take it off, and we won't use it; okay?

PROSPECTIVE JUROR 790:  Okay.

THE COURT:  And would you have any problem if you do get selected to serve as a juror and you like the headset of using it during the jury trial?  Would you have any problem using it if you like it?

Page 200

PROSPECTIVE JUROR 790:  No, I won't have any problem.

THE COURT:  Okay.  But it's going to be up to you.

PROSPECTIVE JUROR 790:  Yeah.

THE COURT:  Okay.

1831

PROSPECTIVE JUROR 790:  Okay.

THE COURT:  Carey's going to show you how to use it, and we'll see if that helps.

PROSPECTIVE JUROR 790:  Okay.

THE COURT:  Let's just try a test.  Is it too loud? Is it too loud now?  Is it working okay?

PROSPECTIVE JUROR 790:  Okay, yeah.

THE COURT:  Okay.  Why don't you just try it, and then you'll let us know; okay?

PROSPECTIVE JUROR 790:  Okay.

THE COURT:  But if at any time you want to take it off, feel free to take it off.

PROSPECTIVE JUROR 790:  All right.

THE COURT:  Okay?  We're going to start with questioning from the lawyers.

Mr. Williams, are you up?

MR. WILLIAMS:  I am, Your Honor.

THE COURT:  Okay.

MR. WILLIAMS:  Thank you.

EXAMINATION

BY MR. WILLIAMS:

Q.   I just want to make sure, do you have those actually inside your ears?

A.   No.  They're in my microphone on the hearing aid.

Q.   Great.

Page 201

A.   That's the only way I can hear.

Q.   Great.  You knew better than I did on what was going to work best for you.

A.   Okay.

Q.   I just want to touch base shortly with you concerning the hearing difficulties you have.  I understand you rely on reading lips to a large degree.

A.   Yes.

Q.   In this case if the lawyers are asking questions, we're going to be asking questions from that podium over there.

A.   Okay.

Q.   And our back may be turned away from you as we're asking questions of witnesses.  Are you -- do you think you're going to be able to hear the questions without seeing our lips move?

A.   I have before, you know, with some members of my family, yes, but yeah, it's hard to say, but yeah, I have done it.  But there are times people have talked to me, say, Hey, Linda, you know, so . . .

Q.   How are the headphones working out for you now?  Do they help?

A.   Yes.

Q.   Oh, good.  Okay.  Let me talk to you about just a couple topics then, and that is your knowledge of the case through publicity, through the newspapers and whatnot, and I want to talk to you a little bit about the possible punishments that may

be at issue in this case.

A.   Okay.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1597 of 3245

Q. You indicated in the questionnaire that you really hadn't heard anything about this case at the time you filled out the questionnaire.

A. No, I have not.

Q. Since you filled out the questionnaire in February, late February of this year, have you learned anything else about the case?

A. No.

Q. Have you formed any opinion concerning whether this defendant is guilty or not guilty?

A. No, I have not.

Q. Let me talk to you a little bit about the punishment or possible punishments. The Court explained to you that there's potentially three phases to this trial. Do you remember that slide?

A. Uh-huh.

Q. And if we get to the third phase, that's after the jury has found the defendant guilty of one or more of the crimes. If we get to that third phase, it's going to be up to the jury to make the determination on the punishment. Did you understand that's going to be your role at that point if we get to that stage?

A. Yes.

Q. The judge will actually give you instructions if you're a

1834

member of the jury at that point --

A. Okay.

Q. -- that there are certain factors, what we call mitigating factors, factors that would suggest life in prison is the appropriate punishment, and aggravating factors or things that would suggest the death penalty is the appropriate punishment.

Page 203

And the Court will instruct the jurors about these factors that they are to consider. I take it you'd welcome instructions like that to help you make this decision?

A.  Yeah.

Q.  What we're looking for are jurors who are willing to actually consider any of the factors the Court tells them they have to consider as part of their duty. Could you follow instructions like that?

A.  Yes.

Q.  Now, interestingly, the way this works is it's going to be up to you individually as a juror to determine how much weight to give any one of those factors. So, for example, the Court may instruct you that killing children, killing vulnerable victims, is an aggravating factor and, if the government proves that, you can consider that in determining whether the death penalty is an appropriate punishment. Do you understand that?

A.  Yeah.

Q.  Now, how much weight you give to that is going to be completely up to you. You can give that factor, the killing of

1835

children, a lot of weight, or you can give it a little weight. But how much weight you give it is going to be completely up to you to determine yourself. Do you understand that?

A.  Uh-huh.

Q.  Likewise, there may be mitigating factors. Maybe the defendant has no criminal record, or maybe she was abused as a child, or maybe she had a limited role in the murders. And you can take into account those factors in doing this weighing process. Do you think that's something you could do?

A.  Yeah.

Page 204

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1599 of 3245

Q. Do you think you can follow the Court's instructions and consider both the mitigating factors and the aggravating factors and fairly consider both sentencing options, life in prison or the death penalty, if you were picked as a juror in this case?

A. Yes.

Q. There may be some factors -- for example, let's talk about the children in this case. If you understood that -- let's assume the evidence showed the defendant was involved in killing five people including a young mother and her two little girls ages six and ten.

A. Okay.

Q. We're looking for jurors that, given those facts alone, are willing to consider both possible punishments, life in prison and the death penalty, and they haven't already decided that just on those facts, you intentionally planned and killed five

1836

people including two little girls, I've already made up my mind it's the death penalty. We're looking for jurors who are willing to keep an open mind and still consider the possibility of life in prison even with those facts. Can you do that?

A. Yeah.

Q. Now, those are pretty horrendous facts, aren't they, ma'am?

A. Yes, they are.

Q. But despite that, you're willing to consider that life in prison may still be the more appropriate punishment?

A. Yes.

Q. I take it you're the type of juror that before you would decide that -- before you would ever impose the death penalty on another human being you would want to fully and fairly consider the possibility life in prison might be the better punishment.

Would you do that?

A.    Yes.

Q.    No matter how many horrible facts get piled up here, are you still willing at the very end still to consider the possibility life in prison might be more appropriate?

A.    Yes.

Q.    The questionnaire that you provided gave you an opportunity to answer some questions, and one thing you answered was, Do you believe in an eye for an eye, and you checked the box yes.  And you said, If a person did something wrong like kill or hurt someone, they should be treated the same way of what they did to

1837

them.

Now, somebody reading that, just reading that without talking to you, might read that as saying, Well, this juror believes that if you go out and you kill five people you ought to just be killed and they would never consider life imprisonment as a possible punishment.  Should we be reading that answer that way?

A.    No.  I was a little confused at the time trying to understand the instructions, you know, so -- and I'm trying to keep my mind open to understand what's going on.  I know I'm confused at times, but yeah, I'm trying to, you know, be open minded what's going on.

Q.    And please forgive me, and we're all concerned here.  We want to make sure -- everybody in this room wants to make sure that if you are going to be picked as a juror that you're not going to just automatically decide, hey, if this person was involved in killing somebody, they ought to be killed and not be willing to consider life in prison as a possible punishment.

Page 206

And if you have those feelings, that's perfectly fine. Nobody's going to judge you. But you just may not be a good juror for this case. Can you share with us, are you at that point, or are you willing to consider life in prison as a possible punishment?

A. It all depends what the fact is and what's going on, you know, depending what it is, so I can't really say the exact answer until we know the exact truth about what's happening

1838

so . . .

Q. So you're willing to wait to see what all the other factors are, not just -- not just jump to the conclusion that if somebody was involved in murdering somebody they just automatically should be killed themselves?

A. Right, right.

Q. And so we shouldn't be concerned about this answer in here where you say an eye for an eye?

A. Yeah.

Q. That's fair enough. I know. It's kind of hard answering these questions.

A. Right.

Q. I understand. In looking at question 87, you were given a number of situations and -- you were given a number of situations to look at and asked how that impacts your thoughts on penalties. And you were kind of balanced there. I mean, it looks like some factors made you think death penalty and some factors made you think life in prison. Is it a fair assessment that you would do that kind of balancing and not make up your mind ahead of time?

A. Uh-huh.

Q. Are there any one of those factors to you that are just

Page 207

absolute? You know, if you kill more than five people or you kill five or more people, you kill more than one person, it's just automatically life or if you had a minor role it's just

1839

automatically -- I'm sorry, automatically death or if you had a minor role it's just automatically life? Do you have feelings like that on any one of those factors?

A.    I'm not sure yet. I mean, I want to, like you say, consider the factors before I go ahead and decide first whether -- so I can't really say as of the moment now so -- but yeah.

Q.    Sure.

         MR. WILLIAMS: How am I doing on time, Judge?

         THE COURT: You're out actually.

         MR. WILLIAMS: Very good. I meant to look and didn't, so sorry.

         THE COURT: Mr. Berrigan?

         MR. BERRIGAN: Thank you, sir.

                          EXAMINATION

BY MR. BERRIGAN:

Q.    How are you doing so far?

A.    I'm hanging in there.

Q.    Obviously we want to try to accommodate you in being able to hear everything that's going on. I'm sure it's important to you, and it's critically important to us.

A.    Yes, it is.

Q.    One concern I have is the same one that the prosecutor shared, and that is there may be occasions during the trial where it would be virtually impossible for you to be able to

1840

Page 208

read lips, and what we don't know -- and I think you're the only person that could tell us -- is does that machine put you in a position where you could do that without looking at my lips?

A.   Uh-huh.

Q.   Do you know the answer to that question?  Shall we test this out?

A.   Yeah.

Q.   Would that be okay if I just put my back to you for just a second?  I don't want to offend you at all.

A.   No, that's okay.

Q.   You sure?  Okay.  Let me do that.

THE COURT:  Sure.  Absolutely.  And it won't even come out of your 12 minutes.  How's that?

Q.   Okay.  Do you think you can hear me all right now, ma'am?

A.   Yeah.

Q.   Okay.  So let me ask you this question.  Let's just say you and I were having a cup of coffee together and we were old acquaintances and I had never asked you anything about how you feel about the death penalty.  What would you say to me if I said to you, Hey, how do you feel about the death penalty, Juror Number 790?

A.   I could barely understand part of it while you turned your back, so I'm having a hard time understanding.  Sorry.

THE COURT:  Okay.  No, that's okay.

Q.   Yeah.  The last thing I want to do is offend you, ma'am.  I

1841

apologize.

A.   No, no.  That's fine.

Page 209

Q. You know, in the jury room it's really a concern because the judge is going to control what happens in this courtroom. I'm confident of that. Once you get back there in that jury room and people are talking about the case --

A. Uh-huh.

Q. -- we don't know -- we don't know whether they would look at you when they're talking or they might get into an argument that you should be able to hear but they're not looking at you.

A. That's the reason why I answered that last -- that one question. Sometimes I only grab at the things I need to know.

Q. Right.

A. And that's why I put that in there.

Q. You talk about it a lot in the questionnaire, and you said it would be very hard for you.

A. Yes, it is.

Q. Okay. And it was hard when I had my back to you.

A. Right.

MR. BERRIGAN: Okay. Well, I don't know that I have anything else, sir, unless you want me --

THE COURT: Okay. Does either side have any objection if I excuse this juror?

MR. WILLIAMS: No, not at all.

MR. BERRIGAN: No. Thank you.

1842


THE COURT: Juror 790, I wanted to thank you for filling out the questionnaire and thank you for coming in today. I think you would have tried as hard as you possibly can to be the best juror we've ever had, and I honestly believe that. I'm just concerned -- sometimes a case can turn on one question and one answer.

Page 210

**Case 3:09-cv-03064-MWB-LTS Document 284-70 Filed 06/23/11 Page 1605 of 3245**

PROSPECTIVE JUROR 790:  Right.

THE COURT:  And I can think of several cases where it's been one question that has -- and one answer, that that's turned the whole case, and there's just too much of a risk.

PROSPECTIVE JUROR 790:  Right.

THE COURT:  Not that you wouldn't try hard to hear it.

PROSPECTIVE JUROR 790:  Uh-huh.

THE COURT:  But that the lawyers or the witness or that I might screw it up.

PROSPECTIVE JUROR 790:  Uh-huh.

THE COURT:  And we know you would try as hard as you can.  You'd do a better job than we would.  But I'm concerned that we wouldn't be -- do everything we need to do to help you understand every fact in this case.  And it's our failing and our inability to do that, not yours, that requires me to make this decision to let you go, because I think you'd be a great juror.  Do you understand that?

PROSPECTIVE JUROR 790:  Sure.  I understand.

THE COURT:  Okay.  Thank you so much.  Good luck to

1843

you.

PROSPECTIVE JUROR 790:  Thank you too.  Thank you, everybody.

MR. WILLIAMS:  Thank you.

THE COURT:  Thank you.  You can just put that on the rail, or Carey's coming to get it.  Thank you.

(Prospective Juror 790 exited the courtroom.)

THE COURT:  Why don't we take a 20-minute recess until 3:20 and then come back.  And we have what?  Three more jurors; okay?  Thank you.

Page 211

MR. WILLIAMS: Thank you.

(Recess at 3:01 p.m.)

THE COURT: Hold off one second. Please be seated. I wanted to take up the time keeping. I am doing a miserable job of keeping track of time, and I recognize that. So we have -- I can think of one alternative, actually two alternatives. Each side keeps track of their own time, or the other side keeps track of the time because you each have lawyers who aren't actually participating in this process. What do you want to do? I know you won't be able to agree, so ultimately I'll have to decide it anyway, but why don't we go -- traditionally the government goes first. Would you rather have Mr. Miller keep track of your time or have the other side keep track of your time?

MR. WILLIAMS: Frankly, I don't think it's a big deal,

1844

but I'd be fine for Mr. Miller to keep track of my time, and he can just, you know, mention into the microphone I've got two minutes. If you'll just do the courtesy of explaining to the jury what we're doing --

THE COURT: Yeah, I'll be glad to explain that.

MR. WILLIAMS: Then that'd be fine, and they can keep track too, and if they disagree, then we can have a fight about it, but I don't think we'll have a problem.

THE COURT: Okay. Mr. Berrigan?

MR. BERRIGAN: Well, you've seen I keep absolutely no track of the time, sir, so I think that's a good solution.

THE COURT: And I've just failed miserably in my obligations of keeping track in time.

MR. BERRIGAN: It's too hard to keep eye contact with

Page 212

the jurors and looking up at the clock without them thinking you're not paying attention to what they're saying. I know we do it routinely in closing arguments and arguments in front of the Courts of Appeals.

THE COURT: Actually we were thinking of installing lights at the podium. In the next iteration of podiums, we're going to put lights on them because it'd be kind of good -- even on the evidence presentation cart it'd be kind of good for civil cases limiting them to an hour per side on summary judgment and that kind of thing. We never really saw the need for it.

Anyway, each side will keep track. I'll keep rough

1845

track.

MR. WILLETT: Your Honor, if it please the Court, I'll keep track of time for Mr. Berrigan. I'll sit out here, and at ten minutes I'll give him a two-minute warning.

THE COURT: And I'll just explain that to each juror. I think it will work much better. And, you know, if you can't exactly tell the time, err on the side of being generous to your colleague.

MR. WILLETT: Your Honor, I've got my bifocal prescription current, so I'll make sure I've got them tilted at the right angle.

THE COURT: I think what we need are one of those chess clocks. And we can put it right on the podium there. Then each lawyer can hit it when they start or something. But it will be a while before we have that.

So you're all ready for 796.

(Prospective Juror 796 entered the courtroom.)

THE COURT: Juror 796, anywhere in the middle.

Page 213

Everybody can be seated. And each lawyer has 12 minutes to question. And the lawyers are actually going to keep track of time, so at ten minutes you might hear one of the lawyers give their colleague the two-minute-warning signal. And we'll start with Mr. Berrigan on the defense and then flip over to the government. And thank you for being so patient with us today.

1846

PROSPECTIVE JUROR 796: Certainly.

THE COURT: Thank you.

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, Miss 796?

A. Very good. Thank you.

Q. This isn't going to be nearly as bad as you might have anticipated.

A. Okay.

Q. I want to dispose of one of our two areas pretty quickly. That has to do with publicity or your exposure to media accounts of the case.

A. Okay.

Q. And, you know, generally most people, it's newspaper, television, radio. Some folks get information through the Internet, sometimes word of mouth. And, of course, we have the benefit of your questionnaires, and I think we're all very appreciative of the time you took to fill that out.

A. Sure.

Q. And I know it was done a long time ago. Looks like -- well, yours is newer. Yours is in March. Some of these folks filled these out in January.

Page 214

A.   Oh, okay.

Q.   So this may be more current than some of the information we're getting from other folks.  But you indicated you had only

1847

heard about the case.  Everything I know is written in the statement above.  I had heard the name Dustin Honken somewhere before, but with our busy schedule, I've not taken time to keep up with the news.  I've never heard of Angela Johnson until today.  Does that sound right?

A.   Yeah.

Q.   Has anything changed in the month that's gone by?

A.   No.  Our schedule's just as busy, and we have very little time to slow down.

Q.   I saw you have -- you have almost two families.

A.   Two families.  Basically The Brady Bunch.

Q.   Yeah, you have three boys.

A.   I have three stepsons.  I have a daughter and a son of my own, and we have one baby together.

Q.   Wow.

A.   So actually five boys and a daughter.

Q.   I can't imagine.  Well, the other issue we're really interested in talking about is the punishment aspects of this case, and although it's very much a potential situation -- that is, nobody wants to suggest to you we're ever going to be at the point in this trial of talking about penalties -- we don't have a chance to listen to the evidence and then based on the jury's decision bring you back in and then ask you questions about your views about penalty.

     So this is our really only chance to talk to folks

1848

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1610 of 3245

about, well, what do they think about things like the death penalty and life imprisonment. And even though that's kind of artificial and it's somewhat unfair to Angela that we're talking about these punishments and she hasn't been convicted of a thing, that's kind of the process; okay? So if you'll just bear with me, that's kind of how we have to do it; all right?

A.   Certainly.

Q.   And let me tell you a little bit about these charges because they're very, very serious. The government has charged Angela with ten counts, but they really involve the deaths of five people, and they're charged in two different ways. But they have alleged that she committed these murders intentionally, either aiding and abetting somebody or she herself committed them; okay?

A.   Okay.

Q.   So that's one thing. Sometimes it helps people to visualize -- it helps me. I'm not sure this is any help to the people I'm questioning, but let me do it anyway, so I'd like you to look at that green book, and that's the charges that we're looking at in terms of what the government's alleged here; okay?

A.   Okay.

Q.   Would you agree with me those are pretty serious?

A.   I would definitely, yes.

Q.   Yeah, intentional murders of five people. And then the government on top of that is alleging that there are what the

1849

law calls aggravating circumstances that are present in the case that, if proven, might make this case a death penalty-eligible case depending on how the jurors viewed those factors. But one

of the aggravating factors they're alleging is that these five murders were not only intentional but they were committed after premeditation or substantial planning. Might be and substantial planning; okay? You understand what I'm saying?

A.    Certainly.

Q.    That's different -- that's -- obvious -- that's more than just intentional. It's premeditated and substantial planning. And they have also alleged that of these five victims, these people that are dead, one mother and her two children were killed, two little girls ten and six years of age. Kandi and Amber Duncan are their names. And the government is alleging that those little girls are what the law calls vulnerable victims; okay? So those are in essence the nature of the allegations, if you will.

Do you remember the judge talking this morning about the three phases of the trial, the merits phase, kind of the first half of the basketball game, and then the middle phase which is kind of the halftime, what we call kind of the gateway factors part of the trial where you're going to be asked to answer some questions but not hear any more evidence? The third part of the trial is the penalty phase, and that has to do with these two possible punishments.

1850

And I'm going to ask you if you will do this for me, to just imagine yourself kind of fast forwarded to the point where these issues have already been decided. Now, I know that's asking a lot because a lot of folks -- and you say it repeatedly in your questionnaire -- I think we need to hear all the facts. I think everything needs to be presented before we can make a determination, blah, blah, blah. Lot of folks say
Page 217

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1612 of 3245

that; okay? But for our purposes we can't do that in the questioning.

A. Sure.

Q. We can only ask you to put yourself in a position where you could be, and that is making a determination about punishment. You could be there. It's possible. If the government proves those things beyond a reasonable doubt to 12 people that this is intentional murder of 5 people, that they're premeditated, planned murders, and that they involve children or vulnerable victims, we certainly could be at that point; all right? Conceptually is -- when you think of that type of a case, okay, is that a type of a case in which you would be able to consider the death penalty as an option in terms of punishment?

A. I believe that our government has already said that that's something that we should consider if those were the facts.

Q. Yeah, there's no doubt about that.

A. So I would think that would be my obligation, yes.

Q. You're right, right. And I know that, and the lawyers are

1851

aware of these things obviously as is the judge, and he's going to have instructions about that. But, you know, we're not -- we're not coming in here, bringing folks in to drag them in basically to say, We're going to give you some instructions; can you follow them, because that isn't as helpful to us in deciding what jurors are a best -- a good fit for the case. It's kind of like buying a car for your family. You might need a minivan. Maybe it's a Jeep Cherokee. Not all of the cars are suitable for our purposes.

A. Certainly.

Q. And we've had folks come in and tell us, quite frankly, you

Page 218

know, My view, Mr. Berrigan, is -- look, it's almost an eye for an eye. If you intentionally took somebody's life, if -- and that's a big if. But if you did that, you've made a decision essentially in my mind to forfeit your own. You made those two choices. You intentionally kill somebody. You made the choice then to forfeit your life. It's kind of like the Biblical eye for an eye.

Other folks have said, Well, that might not do it, but if you're talking about intentionally, premeditatedly killing two children, I'm there. That's all I really need to hear. I wouldn't really realistically in my heart of hearts be able to consider a punishment other than the death penalty in that situation. We've had views all over the board. But what's important to us is that people have expressed their views; okay?

1852

And that's really what we're trying to figure out is kind of where you are basically.

A.    Okay.

Q.    Okay?

A.    I would have to say that given the instructions, not just following the instructions, I would feel that it would be definitely a possible verdict.

Q.    Okay. Well, the flip side of that coin is life imprisonment, life without possibility of parole. When we say that, we mean it; okay? Is that an appropriate punishment that you would consider in a case even involving facts as horrendous as that?

A.    I would like to think that I wouldn't be in this decision alone. Obviously I'd have 11 other people helping in this decision, but I would think that would also be a possibility.

Page 219

Q.   Ironically, this particular decision you do make on your own. What's going to happen is that the government may present those facts to you, and they're going to argue for the death penalty if the jury meets those facts. The defense may present other facts that would kind of weigh towards life. Maybe one of them would be that Angela has no substantial criminal history; okay? So no prior record would be something we'd put up there and say, Would you consider that? There might be some testimony about her role in the offense being much different than another person who was involved, what we call a minor role in the

1853

offense. Doesn't mean she's not guilty, because if two people agree to commit some illegal conduct and they do it, they're both guilty. It's not an excuse, but it does sometimes make a difference on punishment to people; okay?

A.   Uh-huh.

Q.   Sometimes on some people it doesn't. You might be presented with evidence that --

          MR. WILLETT:  Excuse me, Mr. Berrigan. Your two-minute warning.

          MR. BERRIGAN:  Okay. Seems it comes faster when he does it.

          THE COURT:  I wasn't very good, but I always erred on giving you more time when I was keeping track.

BY MR. BERRIGAN:

Q.   We might ask you to take into consideration evidence about background, you know, childhood experiences, and I bring that up because one of the themes that I got from your questionnaire from you, question 61, The crime is the issue. Who a person is should play no role in the punishment. Our justice system

Page 220

should uphold the same standards for all. Question 87, This should not be -- this is a parent of two children is a factor. This should not be a consideration as a crime is a crime despite whom someone is in the rest of their life. Still the facts are what matters.

So you could see where I might have concern if you're

1854

presented with this kind of evidence whether you'd really be able to consider, you know, realistically consider. What do you say to that?

A. I think there were some other questions based on someone's upbringing.

Q. Yeah, exactly.

A. Do you recall --

Q. Whether they were abused?

A. Right. Do you recall my answers on that?

Q. Yes, I'll read it right to you. The guilty person was mentally, emotionally, physically abused and neglected as a child, and you said, This is a hard obstacle to overcome; yet we all have a choice. I would need more facts?

A. Right.

Q. Okay.

A. I guess my feeling is that I would be able to take all of that and apply it towards whichever of the verdicts was more appropriate.

Q. Including this.

A. Absolutely.

MR. BERRIGAN: Okay. Thank you, ma'am. That's all we can ask.

THE COURT: Thank you, Mr. Berrigan.
Page 221

Mr. Williams?

EXAMINATION

1855

BY MR. WILLIAMS:

Q.   Good afternoon.  How you doing?

A.   Pretty good.  Thank you.

Q.   Good.  I'm going to make this short.  I just have a few follow-up questions on the topics Mr. Berrigan covered here. When he was talking about these various factors and he had the pile of books here and the pile of stuff here, okay, the judge is going to actually instruct the jurors what factors you're to consider in the end.  We don't know what those are at this point.  But if you're picked as a juror, the judge will actually give written instructions to each of the jurors telling you what factors you are supposed to consider in doing this very difficult weighing process to determine what penalty you think is most appropriate.  I trust you'd welcome instructions kind of helping you make that decision?

A.   I would welcome instructions, certainly.  One of the things I didn't realize is that children were considered differently. Hadn't a clue.

Q.   Well, the question, though, is really going to be up to each individual juror whether the children are considered differently or not.  The government alleges that the murder of children is more aggravating because they're vulnerable victims. And so picture yourself in this case we're going to be arguing to you that murder's murder's murder, but if you're looking at what penalty to impose, we would like you to consider the fact

1856

Page 222

that among the victims were two children, and they were particularly vulnerable.

And so we're going to be asking jurors to take that into account in doing this weighing process just like any other factor, but this factor the government's going to allege, this is something that the jurors can take into account on the penalty, and we would allege it's an aggravating factor. It's something that if you're trying to figure out punishment it's going to tip you toward the death penalty because they're particularly vulnerable victims.

But what's interesting about this process that Mr. Berrigan explained to you -- and he's absolutely right on how the process works -- each individual juror gets to assign how ever much weight they want to to any individual factor. Do you understand that?

A. Well, I didn't when he was explaining it, no.

Q. Yeah. Well, and we only have 12 minutes, so it's limited time to explain some of this stuff, so it's not his fault, and that's why I'm going to try to make sure you understand it during my time.

So really when you're back in that jury room, you're going to have these different factors, and it's not a numbers game. It's not whether the government piled up five and the defense piled up four or the defense piled up seven and the government piled up five. It's how much weight do you as a

1857

personal juror put on each of these factors.

Now, maybe the killing of children is something that weighs very heavily with you. When you're thinking about, you

Page 223

know, what penalty to impose, it weighs very heavily. For the next juror it's a factor; it's something they're going to consider, but it maybe doesn't weigh as heavily with them as it does with you. But that's going to be your individual decisions to make how much weight to give to individual factors. Is that something you think you can do?

A. Certainly. I certainly think I could. I guess my personal opinion was I didn't consider children any differently than I would consider an adult.

Q. Sure. And every juror is going to be able to make that own determination how much weight to put on it. The question is if the judge instructs you that the killing of children is an aggravating factor that you are to consider, is it something that you would be willing to consider as an aggravating factor?

A. Certainly.

Q. Okay. Likewise, I want you to assume for me in this case that -- assume the evidence showed that the defendant in this case didn't actually pull the trigger, that she participated in planning, let's say, and she assisted in the actual commission of the crime but didn't actually pull the trigger. That's maybe the limited role of what Mr. Berrigan was talking about, but assume the evidence was that in this case.

1858

Now, some jurors come in here, and when we give them that scenario, they say to us very honestly, I think the death penalty's only reserved for the people who actually pull the trigger; I would never consider the death penalty for somebody who was only in an aiding and assisting role. Other jurors can still realistically consider the death penalty for somebody in that role as well as the person who pulled the trigger. What do

Page 224

you think?

A. I think that would very much depend on how intricate that role was in causing the murders. I think that in many situations there will be somebody that can make something happen without actually doing it themselves.

Q. Can you imagine a situation where somebody who was the aider and abettor may perhaps be more morally culpable or responsible than the person who pulled the trigger? Maybe the person who pulled the trigger wouldn't have done it but for somebody else pushing them or encouraging them or assisting them.

A. In certain circumstances, yes.

Q. Okay. So in your view if the evidence showed that the defendant's role was that of an aider and abettor, that wouldn't automatically take out of the running, if you will, the possibility of the death penalty for you.

A. I wouldn't think so, no.

Q. Very good. If you served on this jury and let's say you

1859

and each of the other jurors go back to the room -- you've talked. This is a group process to the extent that you're supposed to talk, share views, exchange views on what you all think about different factors. You have to find factors, some factors beyond a reasonable doubt. Aggravating factors you have to find beyond a reasonable doubt. Mitigating factors you have to find by a preponderance of the evidence. So you have to talk about these factors, but the evidence weighing process is your own to make.

But let's say you've done that and you're back there. You've done this weighing process, and you've arrived at your

Page 225

decision, and that is -- the balancing you've done tips in favor of the death penalty, and you go around the room, and all 11 other jurors think the same thing, and everybody thinks death penalty. To reflect that verdict -- and that's what it would take, all 12 of you agreeing. To reflect that verdict, each of you would have to sign a verdict form, and that real effect of signing that verdict form would be to cause another person to be executed.

Now, I've got a good friend I work with. He believes in the death penalty and supports its existence, but he knows because of his own views he could never actually sit on a jury and sign a verdict form imposing death on somebody else. Other people come in with different value systems, and they can do that. What about you?

1860

A. I think that if it was appropriate, yes, I could do that.

Q. So in the appropriate case -- I'm sorry, the appropriate case, you think you could impose the death penalty.

A. Yes.

MR. WILLIAMS: Thank you. I have no further questions, Your Honor.

THE COURT: Juror 796, if you'd just wait outside, I'm going to discuss your situation with the lawyers, and we'll let you know your status in just a minute or two.

(Prospective Juror 796 exited the courtroom.)

THE COURT: Any challenge for cause by the defense?

MR. BERRIGAN: None by the defense, sir.

THE COURT: By the government?

MR. WILLIAMS: No, Your Honor.

THE COURT: Peremptory?

Page 226

MR. BERRIGAN: Yes, the defense exercises a peremptory challenge on Juror 796.

THE COURT: Okay. We'll bring 796 in and let her know she's dismissed.

(Prospective Juror 796 entered the courtroom.)

THE COURT: Ma'am, thank you very much, but we're going to dismiss you from service in this case. And we really appreciate your honesty in answering the questionnaire and the questions today.

And we'd ask that you do us a favor, because it's

1861

going to take probably at least until the end of next week to get a jury selected, that you not discuss this process with anybody because if you said something to somebody and then that somebody said something to somebody else, that somebody else might wind up in one of these chairs later this week or next week. Once we get the jury selected, then it's fine to talk about it to whoever you want to; okay?

PROSPECTIVE JUROR 796: Thank you.

THE COURT: Thank you very much.

(Prospective Juror 796 exited the courtroom.)

THE COURT: Ready for Juror 166?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Thank you.

(Prospective Juror 166 entered the courtroom.)

THE COURT: Thank you. If you want to sit anywhere in that front row, that would be fine.

PROSPECTIVE JUROR 166: Okay.

THE COURT: Thank you. Everybody can be seated. And here's what we're doing. Each side gets to question you for up

Page 227

to 12 minutes.

PROSPECTIVE JUROR 166:  Okay.

THE COURT:  At the ten-minute mark, the colleagues will give the lawyer a warning, two-minute warning, that he's got two minutes left; okay?

PROSPECTIVE JUROR 166:  Okay.

1862

THE COURT:  Okay.  Thank you.

EXAMINATION

BY MR. WILLIAMS:

Q.   Good afternoon.  How are you, ma'am?

A.   Good.

Q.   Good.  We appreciate your patience here today.  It's been a long day I know, and we certainly all appreciate your patience here today.  We're here to talk to you about a couple different topics.  One is publicity, what you may have heard about the case before you got here and what impact it has on you, and then also your thoughts on the possible penalties that may be involved in this case.  Let me start on the publicity.  It looks like you really don't know much about this case.  Is that fair to say?

A.   Yes.

Q.   You filled out this questionnaire in February.  Since February have you heard anything, read anything about this case?

A.   Not really a lot.  It's just, you know, on the news.  I recently just heard it was just a murder case.  That's about it.  Other than that, I haven't really heard anything.

Q.   Fair enough.  Based on what you've heard, have you formed any opinions about whether the defendant's guilty or not guilty?

A.   No.

Page 228

Q.    Let me move on to the possible punishments involved here.
As the Court said earlier, the jury's going to be here to

1863

ultimately decide if we get to that point, if we get to the third phase -- and that's only if the government proves beyond a reasonable doubt the defendant's guilty of one or more of these crimes -- then the jury's going to be faced with this pretty hard decision between life in prison and the death penalty.

The judge indicated earlier that, you know, jurors have a duty not to serve in some cases if they aren't an appropriate juror for a particular case.  And some jurors have a real hard time with the concept of the death penalty, and they tell us they do.

In this case you filled out a questionnaire, and you kind of reflected in there your own struggles with this issue. Is that fair to say?

A.    Yes.

Q.    If you served on this jury and you got to the point where you imposed the death penalty, you recognize that's something you'd have to live with for the rest of your life.

A.    Yes.

Q.    And for some people that's very, very tough.  I've got a good friend that I work with who believes in the death penalty as a concept, you know, believes it ought to be out there as a law, but because of his own personal belief system and religious beliefs, he knows he could never impose the death penalty on somebody else.  As much as he, you know, supports the law in general, he knows he couldn't actually impose the death penalty.

1864

Page 229

In this case you reflected some of those thoughts. You said -- what are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of intentional murder? You said, I believe if the crime was violent and the death penalty was a choice for the crime of the guilty person, it should be given but also should be the last option. I myself would find it very difficult to condemn the person to death. I am afraid of not being able to cope with myself if I send someone to death. I would need counseling if I had to make that kind of decision. Does that accurately reflect your views on your ability to carry out that responsibility?

A. Yes. I myself would I think -- you know, I myself would not be able to make that kind of decision. If someone else would, you know, then that would be up to them. But I wouldn't be able to carry out that kind of decision.

Q. No matter what the facts were, no matter how much you may believe, you know, in theory that the death penalty was appropriate for this case, you just don't think you could ever impose the death penalty.

A. I guess if I would have time, you know, to study the case and how violent the crime was and just review myself my own views, I might be able to. And again, like being able to get counseling, I might be able to live with that decision, but that would be my last result (sic). It would have to be a very violent crime.

1865

Q. Would you be concerned that you would need counseling if you were faced with having to make a decision like this?

A. Yes. And mostly it was more concern on behalf of my -- my religion, my beliefs.

Page 230

Q.    Do you mind sharing with us what your religious beliefs are in this area?

A.    I am Christian, and my beliefs is that, you know, no one has a right as a human being to take another human being's life, you know.  So even if they commit that crime, I am no one to take anyone else's life.

Q.    If you were ever picked as a juror in this case, the judge would instruct you that no juror would ever have to impose the death penalty.  In other words, you would not be forced with doing that.  Do you think your religious beliefs would interfere with your ability to even consider the death penalty, though, as an option?

A.    I think I just -- at this time I'm undecided.  I would need to hear the case, and I would need to just see, you know, how the case is going.  At this time it's my -- my values.  Like I say, I just need to review the case and how violent it is, how violent the crime was.

Q.    Sure.  How long have you had your beliefs that -- your religious beliefs that God is the only person that can cause the taking of another person's life?  Has that been something you've kind of grown up with?

1866

A.    I grew up with those values.

Q.    It's still something you firmly believe in at this point?

A.    Yes.

Q.    Do you realistically -- and everybody respects the views that you have, that anybody has in this case.  But what we're looking for is to find out realistically if you think given that firm belief you have that only God has the right to take another person's life, could you realistically consider imposing the

Page 231

death penalty on another human being? This would be somebody you'd be looking at for three months during this trial. Can you realistically ever see yourself imposing the death penalty on somebody else?

MR. BERRIGAN: I'm going to object to that last question, sir, as violating the Court's pretrial order.

THE COURT: Sustained.

BY MR. WILLIAMS:

Q. Let me rephrase it. Can you realistically consider the possibility of the death penalty given your value system?

A. At this time, no, I wouldn't -- at this time without hearing the -- I guess the crime, right now I would say no at all, at this moment at all. I would not give the death penalty at all, and that's just going because of my values.

Q. Do you have in your mind some set of facts that would in your view justify the death penalty?

A. I think if someone was directly involved in the crime, if

1867

they were directly -- maybe did the murder, you know, a violent murder, then I would reconsider. If someone else was a helper towards the violent, that would absolutely have a doubt in my mind for the death penalty.

Q. Okay. Let me ask you to assume for a moment that the evidence would show that the defendant in this case aided and abetted the murder of another individual but didn't actually commit the murders herself. Could you ever consider, realistically consider, as possible punishment the death penalty for somebody who was an aider and abettor?

A. If she did -- physically used her hands with any kind of physical weapon towards the person, I would probably, you know,

Page 232

take some kind of consideration how violent the crime was, but if she didn't use any kind of weapon and just, you know -- I guess you could say just helped carry the bodies or whatever, then absolutely I probably would not give any kind of death penalty at all.

Q. You couldn't even consider a death penalty under those circumstances?

A. Absolutely not.

Q. These values you have seem pretty firm. Here's -- my concern is in question -- answering question 87, you were given a number of situations to think about how that might impact your punishment thoughts, and on each one of them you said life.

A. Life.

1868

Q. Okay. On none of them did you consider or put down that you thought the death penalty might be appropriate for those. Is that fair to say?

A. Correct.

Q. If you are in a jury making this life-and-death decision, are you going to be concerned about whether this is going to have a lasting impact on you to the point where, like you said in your questionnaire, you're going to need counseling to deal with this decision?

MR. MILLER: Two minutes.

Q. Go ahead.

A. It is different. I am not taking another person's life and sending them and taking their soul. Now, I believe that everyone who commits a crime has to, you know, I guess be punished for the crime, you know. And if that's the punishment that they have to take for life imprisonment, I'm okay with that

Page 233

decision.

Q. With life in prison.

A. That's correct.

Q. Are you okay with the death penalty is my question, though?

A. At this time, no.

Q. If you had -- if you always had the choice between life in prison and the death penalty, would you always pick life in prison?

A. Most likely, yes.

1869

MR. WILLIAMS: I have no further questions. Thank you.

THE COURT: Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q. First, thank you for waiting so long. You've been very patient with us. I want to put this questioning kind of in context for you a little bit and tell you what the crime is because you've said several times it would depend on how violent the crime was. Did I hear that right?

A. Yes.

Q. Let me just tell you how violent the government alleges the crime is; okay?

A. Uh-huh.

Q. The government is alleging that Miss Johnson intentionally killed five people, that she either aided and abetted somebody in doing that, helped them do it, or that she did it herself, one of those two things; okay? You with me?

A. Yes.

Q. That's the first part of the trial the judge told you

Page 234

about, the merits phase. The government would have to prove that beyond a reasonable doubt, five people were intentionally killed; okay?

A.    Uh-huh.

Q.    Does that sound like a violent crime to you?

1870

A.    Can you rephrase the question? What are you referring to, violent crime?

Q.    I thought you said violent, and I might have just wrote that down wrong.

A.    I don't really understand your question. What is your question?

Q.    I was trying to see if that -- five intentional murders fit into your concept. When you were talking to the prosecutor, you said at this time -- at least this was one of the answers I thought you said. You said, At this time I'm undecided. I need to review the case. Without hearing the crime, I'd say I wouldn't consider the death penalty.

A.    That's correct.

Q.    Okay. And now I'm going to ask you to consider the crime; okay? That's what I'm hoping to do is to try to show you what the crime is that they're asking you to consider. And part of it is this: Five people intentionally killed; okay? You with me?

A.    Yes.

Q.    Another part of it is the government is claiming that those five people were killed by Angela Johnson after premeditation and substantial planning; okay?

A.    Okay.

Q.    Planned, premeditated, intentional killings.

Page 235

A.    Okay.

1871

Q.    So that's -- this book is premeditated murder.  And then the government is alleging that of these five people one was a mother and her two children were killed, ten-year-old girl named Kandi Duncan and a six-year-old girl named Amber Duncan; okay?

A.    Uh-huh.

Q.    You with me?

A.    Yes.

Q.    So when we're talking to you about what kind of a crime are we asking you to consider these punishments for, that's the type of crime we're talking about.

A.    Okay.

Q.    Does that make sense?

A.    Yes.

Q.    Okay.  And I need to ask you to do something that it doesn't make a lot of sense, but I need you to think that you've heard all the evidence.  I want you to just kind of imagine that; okay?

A.    Yes.

Q.    Because we can't wait till you listen to it and then bring you back and ask you what did you think.

A.    Yeah.

Q.    We have to ask people to kind of imagine you've heard everything and you've considered the evidence.  You listened to the witnesses.  You looked at the exhibits.  And with your fellow jurors, you talked to each other, and you decided, okay,

1872

Page 236

the government had done exactly what they set out to do, that they had proved to you beyond any reasonable doubt five people had been intentionally killed, that the murders were premeditated, planned murders, and that they included the deaths of two children; okay? You with me?

A. Yes.

Q. Now I'd like to ask you about punishment, all right, because that's where you'd be. You wouldn't even think about punishment till you at least found those things to be true beyond a reasonable doubt; okay?

A. Okay.

Q. Okay. So here we are now, and you have these religious convictions which you've expressed quite strongly that we've had other people come in and talk about too, and we've had other people -- and I'm Catholic, for example, and, you know, the Pope will tell you no death penalty if you're Catholic. But I sure know plenty of people in my church, they believe in the death penalty. Not everybody's as conscientious about their religious beliefs as you are. And then some people are conscientious about them, but they're willing to put them aside to do what's asked of them regarding jury service; okay?

A. Yes.

Q. Some folks can do that, and some folks can't, and that's one of the reasons we're asking these questions. If, big if, but if that's the kind of case we're talking about, all right --

1873

and I understand what you're saying about your religious beliefs -- would you be willing and able to temporarily put those aside and decide that kind of a case giving both punishments consideration? Could you do that?

Page 237

A. I think I could do it.

Q. Okay. And I know it would be hard. You made that really like crystal clear; okay?

A. Yes.

Q. We got it. It's supposed to be hard. It's supposed to be really hard to sentence somebody to die; okay? We hope it would be hard. We hope people would struggle with that. We don't want them in counseling. And maybe when you were filling this out you were envisioning like the worst-case scenario.

A. Yeah.

Q. I know. But that's the kind of serious crime we're talking about; okay? And the government has the right to have people on the jury that in that type of crime if -- and it's a big if, but if that were proven, they have the right to have people on the jury that could say, I could consider the death penalty; I could do it. The defense, we have the right -- even in facts as bad as that, even that kind of horrible crime, we have the right to have people come in and say, Even then I could consider life without parole. You see?

A. Yes.

Q. Could you do both of those things? Could you consider both

1874

potential punishments? We're not asking you to vote. But when we say consider, we mean really consider, you know, really, really consider them, each one.

A. I think I could consider going towards the death penalty. Like I said, it just depends how violent the crime was.

Q. Okay.

A. But that would be my very last result.

Q. You would prefer life without parole.

Page 238

A. Exactly.

Q. Let me tell you, you know what? You're entitled to that view. You're entitled to be leaning one way or the other; all right? What we need to determine is whether you're so committed to one position or the other that you wouldn't consider the opposite position. In other words, if you were so committed to the position on life, you wouldn't consider -- you wouldn't even consider the death penalty, then that's fine. That's a very appropriate view for you to have, but if you had that view, we need to know about it because that wouldn't be something we could do.

A. Like I said, it's a very hard decision for me. Like I said, if someone did such a violent crime and they were sent to death, then that's what the punishment was. Mine is just, you know, making that decision.

Q. Let me tell you that you have to make that call yourself; okay?

1875

A. Yes.

Q. And as the prosecutor said, you're never told -- you're never required to vote for death. And, in fact, what the law says is this is an area where the jurors can disagree. They could disagree about whether death or life's appropriate because each person's individually weighing one or the other; okay? If they disagree, if the jurors disagree, the sentence is life. Do you understand what I just said?

A. Yes.

Q. If ten jurors said death and two jurors said life, it doesn't matter. That's life. If it was the other way around, it would be life because the decision has to be that everybody

Page 239

agrees before the death penalty could be imposed; okay?

A.    Okay.

Q.    All right.  And is that a process you could participate in?

A.    Yes.

Q.    And very conscientiously weigh the evidence and make a decision based on your own view of the evidence either way?

A.    Yes.

MR. BERRIGAN:  Okay.  Thank you, ma'am.  That's all I have.

PROSPECTIVE JUROR 166:   Thank you.

THE COURT:  Juror 166, let me ask you this.  Are you familiar with a football field just in general?

PROSPECTIVE JUROR 166:  A little bit.

1876

THE COURT:  A little bit?  Okay.  You understand there's a goal line on each end and an end zone on each end.

PROSPECTIVE JUROR 166:  Yes.

THE COURT:  And the middle of the football field is the 50-yard line; right?

PROSPECTIVE JUROR 166:  Yes.

THE COURT:  Okay.  Here's what I want to ask you. Assume we got to the penalty phase in this case and you had listened to the evidence in the penalty phase and listened to my instructions on aggravating factors and mitigating factors and ultimately make a decision about the penalty, where do you think you stand today?  Are you on the 50-yard line?  That would be somebody who was totally equal, I could just as easily give the death penalty as a life sentence, or are you somewhere else on the football field?  You could be all the way towards one -- you could be in the end zone of a life sentence and that would

Page 240

basically be a person who says, you know, I'm already at a life sentence; I just couldn't give the death penalty. Or you could be in the other end zone at the opposite end of the field, boy, I'd be giving the death sentence, and I doubt if you'd ever get me out of the end zone. Where do you think you'd fit on that football field?

PROSPECTIVE JUROR 166: Right now mostly on the life sentence, probably on the life sentence. It's probably like a 90 percent.

1877

THE COURT: Okay. Well, let's get -- I get percentages confused with the football analogy now. So can you translate for me where would you be -- what yard line would you be on? Would you be in the end zone, on the goal line, on the 10-yard line, the 20-yard line, the 30-yard line, or would you actually be mid field? Where do you think it would be?

PROSPECTIVE JUROR 166: I think it would be more towards the goal -- the goal, not all the way to the goal but halfways, a little bit halfways.

THE COURT: So that'd be like the 25-yard line? Would that be halfway?

PROSPECTIVE JUROR 166: I don't know a lot about football.

THE COURT: Between the 50-yard line and the goal line --

PROSPECTIVE JUROR 166: Is 50 more than 25?

THE COURT: I'm not very good at math, but I'm pretty sure the 25-yard line is halfway. Is that where you'd be?

PROSPECTIVE JUROR 166: 25 -- halfways, I only know halfways where you make the goal.

Page 241

THE COURT: Halfway's good enough. Okay. You know what? If you step outside, we're going to let you know where you stand.

PROSPECTIVE JUROR 166: Thank you.

THE COURT: Thank you so much.

1878

(Prospective Juror 166 exited the courtroom.)

MR. WILLIAMS: United States would move for cause on this juror, Your Honor. We think her views on the death penalty substantially impairs her ability to realistically give it fair consideration. I'd point out two things.

One is her religious beliefs. There's an Eighth Circuit case, Antwine versus Delo, 54 Fed. 3d, 1357, 1995, where religious beliefs interfered with the ability to consider the death penalty.

Her personal consequences, her concern that she expresses in her questionnaire that she believes she'd have to consider going through counseling if she was to do this, there's a case of Tipton -- United States versus Tipton, 90 Fed. 3d 861 -- it's a Fourth Circuit case from 1996 -- in which a juror expressed similar views, just didn't think they could live with the consequences. They'd just wonder about what that would do to them in the end.

And then also on the grounds of aider and abettor, she is pretty clear that if it's aiding and abetting she's not going to even think about the death penalty. In United States versus Moore, 149 Fed. 3d 773 -- it's an Eighth Circuit case from 1998 -- a juror was properly struck in a death penalty case because they couldn't consider the death penalty for somebody who was an aider and abettor.

Page 242

Given this juror's view -- and I think what sums it

1879

up -- the football analogy doesn't work well with somebody who
has no idea what a football is.  And as much as we've been
relying on it in this case, I don't think it fits very well.
But when I said, Look, if you're always going to have those two
options between life and death, are you always going to pick
life and she said yes, and so if anything tells me when she goes
back and she's going to have those two options, I don't think
she's ever going to realistically consider the possibility of
the death penalty because it is contrary to the religious views
that she's grown up with, that she's internalized, and she's
going to be worried about what that does to her, whether she's
going to need counseling.  And so I think if anything this
juror's very impaired and should not be death qualified.

THE COURT:  Let me ask you this.  How did you
understand her counseling comment?  I kind of understood it that
she thought she could like in the middle of deliberations go off
and get counseling to actually get guidance on what to do.
That's how I understood it.  I didn't understand it after the
fact.

MR. WILLIAMS:  I'm not sure.  From the questionnaire
it's not clear.  She says, I would need counseling if I had to
make that kind of decision.  I'm not sure if that means
counseling during or after.  Both bothered me.  If she's going
to go out and get counseling from somebody during deliberations
to help her make a decision on what to do on the death penalty,

1880

she can't make a decision based on somebody else's guidance to
Page 243

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1638 of 3245

her about what her religious beliefs should or should not do in this case.

Counseling after the fact bothers me because she's going to -- if that's what her concern is, that she expressed in her questionnaire, that's going to really interfere with her ability to realistically consider the death penalty.  I mean, she seriously is worried about what this is going to do to her, and under those consequences, she is substantially impaired as a juror to realistically consider the death penalty.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  It was very clear that --

THE COURT:  Well, don't say that.

MR. BERRIGAN:  I haven't finished yet.

THE COURT:  Well, nothing was very clear about this juror.

MR. BERRIGAN:  What was clear to me was Mr. Williams never put that decision in the context under which she's going to make it.  That is, there wasn't any -- she kept talking about I'd need to hear the case.  Everything was qualified with I need to hear the case.  She clearly has a strong preference for life.  Then the case is put before her, and now she doesn't have a problem.  And she, frankly, said quite directly she'd set aside her religious beliefs and follow the instructions of the Court and consider repeatedly both punishments.

1881

Now, she -- it's funny.  The football analogy is I guess used when it's to our benefit.  But she couldn't give you a yard line.  I'll give you that.  But she said halfway, halfway.  And yeah, she leans that way, but that doesn't qualify her.

Page 244

THE COURT: What about this counseling issue? I agree with most of what you said so far.

MR. BERRIGAN: Well, we were on the same page, Your Honor, which I don't think it came up. In the questionnaire it's really clear --

THE COURT: It wasn't clear when she was here. See, I have the advantage. I haven't read the questionnaire.

MR. BERRIGAN: And that may be an advantage.

THE COURT: Well, it is an advantage.

MR. BERRIGAN: I didn't think for a second she's talking about during the trial getting counseling.

THE COURT: That's exactly how I took it. Her response didn't make that clear. She said she couldn't impose it basically without counseling. I got the impression that she thought in the middle of the trial I was going to take a recess so she could go talk to a counselor. That's exactly how I took it. Matter of fact, to me it wasn't even ambiguous.

MR. BERRIGAN: Well, I just I guess respectfully disagree.

THE COURT: Well, let's go look at what she said.

1882

MR. BERRIGAN: Okay.

THE COURT: And she actually never said she could set aside her religious beliefs. You misquoted her on that. She said, I think I could do it. She didn't say she could do it. That's just for starters.

And she says in response to a question by Mr. Williams, Can you realistically consider the possibility of the death sentence given your value system? At this time, no, I wouldn't -- at this time without the hearing -- and then she

Page 245

goes on. But then she says, I would say no at all, at this moment at all. I would not give the death penalty at all, and that's just going to be because of my values.

Well, she says, I might be able to -- and again, like being able to get counseling. I might be able to live with that decision. She's talking about counseling before she makes the decision.

Well, anything else any side wants to add?

MR. WILLIAMS: No. Thank you, Your Honor.

MR. BERRIGAN: I'm sure the record's going to reflect what it reflects, Your Honor, but the quote that you just talked about I'm hopefully looking at, and the juror said, I guess if I would have time, you know, to study the case and how violent the crime was and just review myself my own views, I might be able to -- and again like being able to get counseling, might be able to live with that decision, but that would be my last result.

1883

It would have to be a very violent crime. And that's a theme that she echoed throughout.

THE COURT: Yeah, but it's not -- I took that as being she'd need counseling before she could make the decision.

MR. BERRIGAN: Well --

THE COURT: That's at least a reasonable interpretation of it. You may not take it that way, but that's certainly how I took it.

MR. BERRIGAN: Yeah, I didn't take it that way at all.

THE COURT: Well, is it unreasonable for me to take it that way?

MR. BERRIGAN: In my humble opinion it is, sir.

THE COURT: Well, I think you're unreasonable. I

Page 246

think you're unreasonable in your whole approach to your objections but . . .

MR. BERRIGAN: I'm just answering your questions.

THE COURT: I understand that.

MR. BERRIGAN: I didn't volunteer that information. I might make one suggestion, Your Honor, if this counseling is a pivotal issue, that we ask the juror whether she meant counseling during the trial or after the trial. If that's a critical issue in the Court's mind in making a decision, she's still available to answer that.

THE COURT: Let's bring her in.

(Prospective Juror 166 entered the courtroom.)

1884

THE COURT: If you'd resume your seat, I'm going to have a couple questions for you.

PROSPECTIVE JUROR 166: Okay.

THE COURT: Okay. Everybody can be seated. One of the things I've been discussing with the lawyers is the fact that you brought up counseling, and I'm a little bit confused by that. And so can you tell us what you were referring to?

PROSPECTIVE JUROR 166: It's like I said, like when it involves someone taking someone else's life, as a human being you can go through emotions, and I think if I was in the future to make that kind of decision, I would want just, you know, to be able to go to a counseling person if I'm not able to handle it myself.

THE COURT: Okay. And would you want to go to the counseling person before you made your final decision or afterwards?

PROSPECTIVE JUROR 166: I would want to -- you know,

Page 247

if it's available now, I could do it now or afterwards. You know, whatever resource is available to me.

THE COURT: What do you have in mind when you were talking about getting counseling? Were you talking about it during the trial or before the --

PROSPECTIVE JUROR 166: After, after the trial when -- it was after the trial once I made my decision I would want counseling if I couldn't handle, you know, what was the process,

1885

you know, during the jury.

THE COURT: What do you mean if you couldn't handle it?

PROSPECTIVE JUROR 166: Not handle like just, you know, a lot of people once they make their decisions, they might maybe doubt themselves. I don't know. I never been to a jury, so I don't know what I'm going to be feeling, so I just want those resources available to me.

THE COURT: Okay. But you're talking -- I was a little bit confused whether you're talking about after the fact or while the trial's going on to help you make the decision.

PROSPECTIVE JUROR 166: No. I'm talking about after the fact. Once the decision is made, you know, a lot of times as human beings we could react in different ways or have trouble coping, so -- and sometimes you just have to talk. That way it doesn't bumble -- you know, it just stays inside.

THE COURT: Okay. Thanks. Okay. We'll have you stand outside again, and I'll let you know pretty quick here.

(Prospective Juror 166 exited the courtroom.)

THE COURT: Well, I'll eat the crow, although she gave an ambiguous answer first before she answered it, but I think

Page 248

she was talking about after the fact. I don't think she can fairly consider the death penalty, but I'm going to err on the side of caution and overrule the government's objection so that you can use one of your peremptory challenges.

1886

MR. WILLIAMS: Thank you. I think we will.

THE COURT: I assumed that you would. 166 is out. Okay. Let's bring her in.

(Prospective Juror 166 entered the courtroom.)

THE COURT: Ma'am, we're going to let you go.

PROSPECTIVE JUROR 166: Okay.

THE COURT: You're going to be dismissed. And thank you very much for filling out the questionnaire and for participating in all of our questions and for sitting around all day long.

I'd ask that you do us a favor, because it's going to take us a while to get the jury selected, that you not discuss jury selection with anybody else until we get the trial underway because that person might wind up as a potential juror, might say something to somebody who is a potential juror; okay?

PROSPECTIVE JUROR 166: Okay.

THE COURT: Thank you very much.

PROSPECTIVE JUROR 166: Thank you.

THE COURT: And good luck with your pregnancy too.

PROSPECTIVE JUROR 166: Thanks.

THE COURT: Thanks. Bye now.

(Prospective Juror 166 exited the courtroom.)

THE COURT: Ready for 509?

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 509 entered the courtroom.)
Page 249

THE COURT:  Sir, anywhere in the front row.  Just grab a chair.

Everybody can be seated.  You're going to be questioned first by the defense, and it's about 12 minutes, and there may be a 2-minute warning from one of the lawyers who's keeping track of time, and then the government will have 12 minutes to question you; okay?

PROSPECTIVE JUROR 509:  I got one thing.  I didn't realize Gary Swanson was part of the --

THE COURT:  Oh, was a CSO.  Did you see him some time during the day?

PROSPECTIVE JUROR 509:  Yeah.  Just so you know --

THE COURT:  No, I appreciate that.  I'm going to ask you a couple questions about that.  How well do you know Gary Swanson?

PROSPECTIVE JUROR 509:  Well, I had to tell him who I was.

THE COURT:  So you remember him, but he didn't remember you.

PROSPECTIVE JUROR 509:  He goes to my church.  No.  He goes to my church.

THE COURT:  That'd be the Lutheran church over in Morningside?

PROSPECTIVE JUROR 509:  St. Mark, yeah.

THE COURT:  Have you ever been in his home or he in

1888

yours?

Page 250

PROSPECTIVE JUROR 509:  No.

THE COURT:  Okay.  Anything about the fact that he works here at the courthouse as a court security officer that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR 509:  No.

THE COURT:  Okay.  Good.  Thanks for bringing that up. That's exactly the type of thing we were looking for.  Now I'm going to turn it over to Mr. Berrigan.

MR. BERRIGAN:  May it please the Court.

EXAMINATION

BY MR. BERRIGAN:

Q.    Last but not least, just the bad luck of the draw.

A.    That's okay.

Q.    This isn't going to be so bad.  I did have one question before we're going to ask you about the main issues which are publicity and your views about punishment.  You indicated your wife is a legal assistant?

A.    Yes.

Q.    Could you tell us what type of a firm she works for, what kind of work she does?

A.    Buckmeier and Daane is the only thing -- no, it's not that either.  It's Keane.  I can't remember.

Q.    None of this will get back to her.

A.    Yeah, we don't talk shop talk at home.

1889

Q.    Okay.  Is it a firm that does civil kind of work as opposed to criminal type of work, or do you know that?

A.    I don't know.  To tell you the truth, I don't know.

Q.    No problem.

A.    I don't.

Page 251

Q. Mum is the word.

A. We do not talk shop at home.

Q. Your questionnaire indicated, sir, that you really weren't familiar with this case at all.

A. No.

Q. Hadn't seen anything in the newspaper, radio, television, or even anybody talking to you about it.

A. No.

Q. Is that still the case?

A. Pretty close.

Q. Okay. Tell me about the pretty close part.

A. Just I had asked my wife what this was about, and she kind of gave me a quickie on it. That was when the questionnaire was out. That was it.

Q. When it first came you mean?

A. Yeah.

Q. What did she tell you about it?

A. I can't remember.

Q. Did you get any impression that she might have followed a different trial that was related to this one?

1890

A. I have no idea.

Q. Okay. You know, the important part of that really is even if she had talked to you about it whether or not that's something you could put aside and judge the case just on the evidence that takes place in this courtroom if you're selected as a juror. You know what I mean?

A. That would be no problem.

Q. Okay. Would you expect that if you were on trial that, hey, we shouldn't have my case decided by something in a

Page 252

newspaper or television or somebody's view of what the evidence was?

A.    Yeah.  I can't even remember what we talked about so . . .

Q.    Okay.  All right.  Well, let's talk a little bit about the other issue we're here to discuss with you which is punishment; okay?  And before we do that, I need to kind of put this in context for you because I'm not sure you know a lot about what the charges are.  The government's charged Angela Johnson with ten counts of murder involving five people, and they've alleged that these people were intentionally killed; okay?  You with me so far?

A.    Yeah.

Q.    I'm going to use this book to represent five people intentionally killed; okay?  And then they've also alleged that these murders were committed after substantial planning and premeditation.  They were intentional and after substantial

1891

planning and premeditation; okay?  Of the five people killed, the allegations are that there was a mother and her two daughters, ten-year-old girl by the name of Kandi and a six-year-old named Amber; all right?  So those are the charges.  Pretty serious stuff; wouldn't you agree?

A.    Yeah.

Q.    Okay.  And so that's why we're asking you your views about the penalty phase, not because we're even going to get there necessarily.  You remember the judge told you this morning about the three parts to the trial?  Could be we only have part one, all right, the merits part of the trial.  But it is possible that we could be at this point where a jury's made a decision this stuff has all happened beyond a reasonable doubt:  Five

Page 253

people intentionally killed, they were killed after substantially planning and premeditation, and that they included vulnerable victims, what we call in the law vulnerable victims. It could be that we're at that point in the trial where that's been proven and we're in this third part of the trial, the penalty phase; okay? You with me?

A. Yeah.

Q. Okay. And I noticed in your questionnaire when you were asked about the death penalty, What are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of intentional murder, and you said, I don't have any. And I'll tell you, that's a minority view. We've

1892

certainly had a lot of different opinions. I'll give you that. But most everybody's got an opinion about this thing. It's one of those topics, you know, kind of like abortion and some of the issues of our day, some of the social issues of our day, and this is one that people talk about. But have you given it any thought maybe since the questionnaire about how you feel about this?

A. I couldn't really tell you.

Q. No? When I say to you or ask you, you know, when you think about crimes that would be appropriate for the death penalty, do you have anything in your mind that you would think is a category of crimes that that punishment might be an appropriate consideration for?

A. What was that? Appropriate?

Q. Yeah. A category of crimes in your mind, okay, where you would consider the death penalty perhaps appropriate.

A. Nothing off the top of my head.

Page 254

Q.    No?

A.    No, not really.

Q.    Okay.  Well, the government's going to want to know, and I just might as well just ask you, you know, this kind of a crime the law says the death penalty's a possible punishment, and there's a lot of steps to go through before that happens, okay, but that if that were proven, at least a person might be looking at the death penalty.  That might be one of the possible

1893

punishments.  There are really only two:  Death penalty, life in prison without parole; okay?  And we mean life in prison without parole.  You know what I'm saying?

A.    Yeah.

Q.    No parole.  Do you believe that?

A.    Yeah.

Q.    Okay.  Is that the kind of case you think where you would be able to consider both of those punishments?

A.    I suppose a person would have to decide one or the other.

Q.    Yeah.  But some folks have told us, you know, they might be so far one way or the other that they're not willing to consider the other one.

        Let me give you an example.  We've had some folks come in and say, you know, my view is I believe if you intentionally kill somebody then you deserve to die, almost an eye for an eye Biblical concept; okay?  That's a perfectly legitimate view.  These are just opinions.  And like the judge said, it's America.  You're entitled to your opinion.  Nothing wrong with it.  We're just trying to find out what people's opinions are.  Well, that's a person who wouldn't really consider -- be able to consider a life sentence in that kind of a case.  You hear me?

Page 255

A.    Uh-huh.

Q.    On the other side of the coin, you've got some folks that say, Hey, you know, I've got some religious convictions against the death penalty.  Maybe I'm a really staunch Catholic or

1894

whatever it is.  It doesn't matter, you know.  It could be Hitler on trial and I would not be able to consider the death penalty for him killing seven million Jews, wouldn't be able to do it.  And that's perfectly appropriate also.  And there's a whole bunch of people in the middle, and we're kind of trying to figure out where you might be.

A.    Probably in the middle.

Q.    Okay.

A.    I mean, if -- Hitler, yeah, no problem.  I'd give him the death penalty.

Q.    Pretty extreme example you admit.

A.    You bet.

Q.    Let me tell you something.  On the other side of these -- these two things, this substantial planning and premeditation, we call it in the law an aggravating factor.  And the killing of vulnerable victims is an aggravating factor.  Those are things a juror might consider towards the death penalty; okay?

      The defense might present other kinds of evidence to try to persuade the jury life is more appropriate.  One of those things might be no criminal history, no substantial criminal history.  Another might be the role in the offense is such that it's -- compared to the other people or persons that participated, this woman's role was minor.  You know, maybe she wasn't the person that pulled the trigger; okay?  Is that something you'd be willing to consider in making an assessment

Page 256

about punishment?

A.    Yeah.

Q.    That doesn't mean she wouldn't be guilty because somebody who aids -- helps somebody else committing a murder, they're guilty, but in terms of their punishment, there might be a difference between those two.  Do you follow?

A.    Yes.

Q.    One of the mitigating circumstances, one of the reasons for life that might be presented to you, is a person's background, particularly a traumatic one, things that happened way back in childhood, things like physical and sexual abuse perhaps that may have affected decisions later in life.  Might be something that, presented to the jurors, is a reason to vote for life; okay?  And one thing I need to know is do you really think that that type of evidence is evidence that you'd consider?

        MR. WILLETT:  Excuse me, Mr. Berrigan.  Two minutes.

Q.    That's my co-counsel telling me I got two minutes.

A.    Okay.

Q.    It's like the two-minute warning in a football game.

A.    Yeah.

Q.    Do you -- what do you think about that idea that people -- are they really affected by things that happen to them in childhood?  I mean bad things that happen to them.  You think that makes any difference later in life?

A.    I have no idea.

Q.    Okay.

A.    I'm not a psychologist.

Page 257

Q.    I want to tell you that nobody's claiming these are excuses
for murder; okay?  There's no -- these aren't excuses.  They're
reasons where the punishment might be life.  You with me?

A.    Yes.

Q.    And would you be able to consider those things in making a
decision about punishment?

A.    Yeah.

Q.    This is a deal you're going to have to do yourself.  You
personally are going to have to make a decision about life or
death by yourself, and then that's going to be compared to the
other jurors as to what's going to happen; okay?

A.    Sure.

Q.    If there's a disagreement, then that's a life sentence.  If
some people say life and some say death, that means life.  Do
you follow me?

A.    Yes.

Q.    Would you be able to respect the views of other people if
they disagreed with you on that decision?

A.    I wouldn't disagree with them.  That's their decision.
That's their opinion.

Q.    Would you expect and would you be able to -- what you
thought was right in your heart of hearts regarding punishment,
would you be able to hold firm to that in the face of opposition

1897

from others?

A.    Yeah.

        MR. BERRIGAN:  Okay.  Well, again, thanks for your
patience.  You've been great.  I'm all done.  Thank you.

        PROSPECTIVE JUROR 509:  Thanks.

        THE COURT:  Mr. Williams?

Page 258

EXAMINATION

BY MR. WILLIAMS:

Q.   Good afternoon, sir.  I'm going to be brief with you and just touch base about some of these same topics Mr. Berrigan was discussing with you.

First of all, he used an extreme example trying to figure out where you were on this death penalty and said Hitler, and you said, Hitler I wouldn't have a problem with.  And some people have those views that it's gotta be somebody like Hitler, you know, maybe Timothy McVeigh killing 168 people; on those extreme cases I can consider the death penalty.  Absent that, I'm not really going to be able to consider the death penalty. What do you think about that?

A.   I don't know.

Q.   Well, you heard the explanation that Mr. Berrigan gave you about what the allegations are in this case.  Five people murdered including a young mother and two little girls.  Now, some people, given those facts, they'd consider the death penalty as a possible punishment, realistically think about it

1898

as a possible punishment.  Other jurors come in, and they know that's not enough for me.  Death penalty's reserved for the worst of the worst of the worst.  That's not in that category. Given what you know about the case as explained to you by Mr. Berrigan, could you realistically consider the possibility of the death penalty on those facts?

A.   If the evidence was there, yes.

Q.   Okay.  Let me ask you to assume this.  Assume the evidence shows in this case that the defendant was an aider and abettor, she didn't actually pull the trigger committing the murders.

Page 259

Again, some people -- and we respect, you know, everybody's view coming in here.  Everybody has a different view.  So don't ever think I'm trying to get you to say one thing or another, or don't tell me what you think I want to hear.  I want to know what your real views are in your heart.

Some people when I explain that and I ask them to assume that evidence, they say, Oh, well, death penalty should never be used for somebody who's an aider and abettor.  It should only be reserved for those people who actually pull the trigger.

Other people say, No, it depends on the rest of the facts, but yeah, I mean, the fact that they're an aider and abettor by itself doesn't eliminate the possibility of the death penalty for me.  Can you explain to us or share with us what you think about that?

1899

A.    I'm not too much for words so . . .

Q.    Let me ask you.  If you were sitting in the case and the evidence was that this defendant did not actually pull the trigger, is the death penalty a possible punishment for you realistically?

A.    It could be.

Q.    Okay.

A.    Depending on the rest of the evidence.

Q.    Can you imagine a situation where somebody who was the aider and abettor may actually be more responsible for what happened, for example, the person who actually pulled the trigger may not have done it but for the other person encouraging them or pushing them to do it?  Can you imagine a situation like that?

Page 260

A.    I suppose anything's possible.

Q.    Sure.  Let me ask you this.  If you were sitting on this jury -- Mr. Berrigan explained to you there were going to be factors that you would be able to consider and the judge is going to instruct you what those factors are.  We don't know what they are at this point.  But when it gets to that point, if it gets to that point and only if it gets to that point, the judge will instruct you what those factors are, and it would be your responsibility as a juror to consider all those factors.

But interestingly, the weight you give each of those factors is going to be completely up to you.  So, for example,

1900

the fact that children, you know, little Amber at six and Kandi at ten years old, were murdered may weigh very heavily in some people's views in determining what the appropriate punishment should be.  On the other hand, the fact that the defendant was an aider and abettor or was abused as a child or something, they'll consider that, but it just won't weigh very heavily.  Do you think you can engage in that weighing process yourself?

A.    Yes.

Q.    If you and the other jurors all decided ultimately that you've done this weighing process, you've talked as a group, and you've made some decisions as a group, but individually you've each come to this decision that the factors, when you look at them, they tip in favor of the death penalty and so you've all concluded the death penalty is the appropriate punishment, okay, assume you're with me at that point and every other juror agrees with you.  At that point in order to reflect that verdict, each of you would have to sign your name to a verdict form, and the effect of that, the real effect of that, would be to cause the

Page 261

execution of another person. Some people can do that, and some people know when they come in here and we talk to them like this they just know they could never actually do that. What do you think about yourself?

A. I can do it.

Q. In the appropriate case you could impose the death penalty.

A. Yep.

1901

MR. WILLIAMS: I have no further questions, Your Honor.

THE COURT: Sir, if you'd step outside, we'll let you know your status.

PROSPECTIVE JUROR 509: Okay.

THE COURT: Thank you.

(Prospective Juror 509 exited the courtroom.)

MR. BERRIGAN: There's no question he's a man of few words, Your Honor, but we do not move to strike Juror Number 509.

THE COURT: Okay.

MR. WILLIAMS: Neither do we, Your Honor. Thank you.

MR. BERRIGAN: We do not choose to exercise a peremptory challenge against him either.

MR. WILLIAMS: We do not exercise a peremptory at this time, Your Honor. Thank you.

THE COURT: Okay. So he's in the jury pool; correct?

MR. WILLIAMS: Yes, Your Honor.

MR. BERRIGAN: Yes.

THE COURT: Okay.

(Prospective Juror 509 entered the courtroom.)

THE COURT: Juror 509, you're still in the jury pool.

Page 262

That means you have about a 50 percent chance of being selected. We'll let you know when we fill up the jury pool and figure out which of the 18 of the 34 will wind up on the jury and which

1902

won't. We'll give you as much notice as we can. I don't know when that's going to happen. It could happen towards the end of next week. That's my hope, right around there, either the end of next week or into the beginning of the following week.

So because you're still in the jury pool, it's very important that you follow that list of instructions. Number one, don't talk to anybody about the case. Don't let anybody talk to you about the case. Don't read anything in the newspapers. And to the extent you can, try and avoid listening to any TV or radio reports about the case; okay?

PROSPECTIVE JUROR 509: Okay.

THE COURT: Thank you very much.

PROSPECTIVE JUROR 509: Thank you.

(Prospective Juror 509 exited the courtroom.)

THE COURT: Okay. My notes indicate that in the jury pool today would be Juror 293, 108, and 509.

MR. BERRIGAN: That's correct, sir.

THE COURT: Okay. And how many peremptory challenges did the government use today?

MR. WILLIAMS: One, Your Honor.

THE COURT: And what's their total, Carey?

THE CLERK: They have 11 left.

THE COURT: Okay. And how many did the defense use?

MR. BERRIGAN: Two, sir.

THE COURT: Two?

1903

Page 263

MR. BERRIGAN: Yes, sir.

THE COURT: And you have --

THE CLERK: Three.

THE COURT: -- three left. Well, let me say this. One of the things that frustrates me about this process is that for the most part both lawyers are equally guilty of it, but, Mr. Berrigan, you're my prime candidate simply because I went back and looked at some of your questions. You ask almost always nothing but leading questions, and I think the reason why we have so many inconsistencies is that everybody just asks leading questions.

You don't have the right to even ask questions in jury selection. I've given you the right to do it. I think I have the right to insist that you not ask leading questions, that you ask open-ended questions.

Now, I want to discuss with you whether or not you think I have that right.

MR. BERRIGAN: I certainly have never done any research, Your Honor, but I seriously doubt that you don't. I certainly don't know of any cases that would compel you to --

THE COURT: That's the double negative like the juror.

MR. BERRIGAN: Exactly, right. Yeah.

THE COURT: I'm not saying I'm going to do that, but I assume if you don't -- do you agree with me you don't have the right to ask questions?

1904

MR. BERRIGAN: Yes. I've experienced that. I know it for a fact, yeah, you bet.

Page 264

THE COURT: Okay. So it seems -- and I have the general right with regard to witnesses to control the form of the questions. I definitely have that right because it's in the rules of evidence.

MR. BERRIGAN: Sure. Of course.

THE COURT: 610 or 611. I don't remember the rule exactly.

MR. BERRIGAN: Right.

THE COURT: That it seems to me that I would have the right to insist -- I'm not saying I'm going to do it. I'm thinking about doing it. I would have the right to insist that you ask open-ended questions. And do you know of any authority that I would not have that right, contrary?

MR. BERRIGAN: No, I do not, sir. I mean, if you can prevent me from asking questions, I dare say you could probably direct me as to whether they be open ended or leading or upside down.

THE COURT: Now, tell me why I should allow you to ask leading questions.

MR. BERRIGAN: Well, I think unfortunately we've just had a couple of pretty heated debates about a couple of candidates. But I think if you'll look at this objectively in the calm of the evening, I think you're going to find that for

1905

the most part there weren't that many of those calls that were really close. And there is advocacy. There's no doubt.

THE COURT: Yeah.

MR. BERRIGAN: You know, Mr. Williams gets up -- and I'm not being critical of how he asks the question, but if he goes on for two minutes about how fair and impartial and you

Page 265

need to follow the instructions and then comes a question, I know the juror's going to say yes, and I have to try to undo that. And he has the same problem I suspect when I'm up there.

But that's not an unfair way in my view to get at the juror's true feelings. I know it puts you in a difficult position because you are hearing some inconsistent answers, but it's not that much different I suspect than listening to a witness testify. I mean, you've got to make the call.

THE COURT: Yeah, except generally you hear the direct. That's exactly why we don't have leading questions. That's exactly why leading questions are not allowed on direct.

MR. BERRIGAN: But they are on the cross-examination.

THE COURT: Yeah, but this isn't cross-examination. This is much more like direct or at least -- let me rephrase that. My view of jury selection is that it should be much more like direct, and I have a right to hold that view.

MR. BERRIGAN: Yes, sir.

THE COURT: And I have a right to impose that view on counsel. I'm not saying I'm going to do it. But I -- and I

1906

realize, you know, it's kind of tit for tat. When he does it, you're forced to do it. I totally understand that. And I'm just picking on you, but, you know, I just went and looked at like 5 -- 15 lines, 9 lines, 12 lines, 13 lines, 15 lines for questions, and that's an awfully long leading question for a layperson.

MR. BERRIGAN: Well, in my defense, some of the leading questions, Your Honor, aren't on jurors that are really contested. But with the 12-minute --

THE COURT: Well, that's even worse because then

Page 266

you're just trying to inculcate them because they're not really contested.

MR. BERRIGAN: We're both doing it. We're trying to tell them what the process is. Mr. Williams has followed up quite kindly because I haven't told them, hey, you're not supposed to be counting numbers. You're supposed to be giving it individual weight. I haven't had time to deal with that. He's dealt with it, and when he hasn't dealt with it, I've tried to deal with it because there is some educational process here, no question about it, because it's so different.

Once again, they're just not doing the same thing they usually do, and I don't think either one of us want to be in a situation where the jurors don't know what they're supposed to be doing here at the end of the case, and I know they're going to get instructions, but, frankly, those instructions I think

1907

are hard for lawyers sometimes.

THE COURT: They are hard.

MR. BERRIGAN: And if they don't have some explanation about this process -- and unfortunately it has to be leading because that's the only way we can sort of do it. That's a different concept than getting at their views about the death penalty and life in prison. I understand that. But a lot of the questions are discussing the concepts that are involved, and those certainly are leading, and I don't know how else we could do that.

But I hope you're not looking at this process as broken. Today is our longest day, and it's 10 minutes of 5, and we finished a panel of 12 people, questioned 10 of those, and we have 3 survivors. And, of course, the defense is about to run

Page 267

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1662 of 3245

out of peremptory challenges, so I suspect the survival rate will increase dramatically at that point, and we're still very much on schedule to finish this process I believe the middle of next week. So the Court certainly hasn't suggested this is a time-motivated factor at all.

THE COURT: No, it's not.

MR. BERRIGAN: But I'm concerned about that.

THE COURT: No, it's not. It's not. I mean, . . .

MR. BERRIGAN: It's not perfect, Your Honor, but I don't think there's anything wrong with it. I don't feel certainly unduly disadvantaged when Mr. Williams goes first

1908

because I know I have the ability to get up and ask leading questions. I hope he feels the same way when it's his turn. I think it would be difficult to do it otherwise.

THE COURT: Why do you think it would be difficult to ask open-ended -- to ask nonleading questions?

MR. BERRIGAN: Well, because part of the problem is -- and I don't know that you would agree with me, but from our perspective, we have jurors that have scruples about the death penalty that are dying to get off. Those are the folks that are almost volunteering not to be here. And the people on the other side of the coin that are the people that are close to being automatically death people are the people I have to kind of struggle with to try to get them to admit that perhaps they have a preconceived position about the death penalty that might be inconsistent with their ability to be a juror. Nobody likes to admit that they can't be fair, they can't follow instructions, they can't do whatever jurors are supposed to do.

And it's sometimes quite a task to -- and I failed

Page 268

miserably on many occasions during this process -- but to get people to the point where they might admit, you know, I can't be fair; I feel strongly about the death penalty; I don't think I could be a fair juror; that people that are -- feel strongly against the death penalty are dying to get out of town.

So I view part of my job as trying to get rid of the former, and that's difficult to do without asking them leading

1909

questions, virtually impossible in my experience.

THE COURT: Of course, you never tried asking open-ended questions.

MR. BERRIGAN: I might have done that once. But I learned my lesson.

THE COURT: Mr. Williams, anything you want to add, or Mr. Miller?

MR. WILLIAMS: Number one is do you have the authority? Absolutely you have the authority to limit us to open-ended, nonleading questions. And we will take whatever the Court's order is either way. I recall when we were questioning jurors during the Honken case you paid Tom and I a compliment that you couldn't tell which side we were on when we were asking questions. And I have felt differently in this case because the questioning has gone a different direction.

THE COURT: Yes, probably because of my pretrial ruling.

MR. WILLIAMS: It could be a part of that. It could just be different styles.

THE COURT: A style, right.

MR. WILLIAMS: And, frankly, I'm not comfortable with the style I'm adopting at this point. I'm much more comfortable

Page 269

with what do you think, and I've tried to periodically say, Here's this, here's this, what's your position, what do you think? And I feel a lot more comfortable doing that.

1910

I disagree with the defense that there's this lurking in our populous a number of pro death penalty people who are dying to get on this jury and all of the pro life people are dying to get off the jury, and I throw up 166 as an example of one pro life person who, frankly, if anything, I think was dying to get on this jury. I think she was about as pro life as you could get, and she knew how to answer just enough questions to keep herself on this jury, and I just don't buy it. I don't buy that there's this body of, you know, pro death penalty people that go around trying to get on juries. Nobody wants to sit here for three months, and I don't think leading questions are absolutely necessary in order to, you know, pull these people out and expose their ulterior motives. I don't buy that any more than I buy that there's a bunch of people that are dying to get on this jury to make sure the death penalty can never be imposed. Are there people out there like that? I'm sure there are here and there, but I don't think the leading questions are absolutely necessary to get at it.

So those are my only thoughts. We would welcome and obviously follow any direction from the Court.

THE COURT: Anything else you want to add, Mr. Berrigan?

MR. BERRIGAN: I'll only respond with 379 if you want to talk about 166. I can match him tit for tat all day on this, and we've got two or maybe three peremptories left, and I think

1911

Page 270

that speaks volumes about kind of the difference in what we're seeing in the jury pool. I don't think anybody could look at this process and fairly say that the pro life jurors even come close to the numbers of the pro death jurors. It's reflective of our society, and I have to live with that. I'm fine with it.

But in order to really ferret out the people that have concerns, Your Honor, I really believe we need to be able to ask the leading questions. And I am certainly amenable, as is Mr. Williams obviously, to do whatever you suggest. But I'm trying to fairly do this in a manner in which my client's interests are protected, and I have some really grave concerns that if we're forced to ask merely open-ended questions then that's over.

THE COURT: Well, in our grand experiment, we ought to at least have a couple days where we do everything the same. So as they say, I'll reserve judgment on it for at least another full day. You feel that strongly about your need to be able to ask leading questions.

MR. BERRIGAN: Yes, sir, I do.

THE COURT: Well, Henry David (sic) Wigmore said cross-examination's the greatest engine for truth ever devised, so far be it from me to -- I just don't know if these are more like witnesses or what. I mean, it's -- you know, it's kind of a unique situation. But we've muddled this far. Let's muddle ahead at least for another day without tinkering with the grand

1912

experiment.

So how many jurors do we have coming in tomorrow morning?

Page 271

PANEL G, 4-20-05

THE CLERK: Twelve.

THE COURT: Okay. So we'll see you all at 8:15 or so and see if anything -- if anything arises, let me know before that; okay?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. Thank you.

(The foregoing trial was

adjourned at 4:58 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                    1-17-06
                                             Date

1913

INDEX

WITNESS:                                                PAGE:

Prospective Juror 234
          MR. WILLIAMS                                  1703
          MR. BERRIGAN                                  1714

Prospective Juror 219
          MR. BERRIGAN                                  1722

Prospective Juror 699
          MR. WILLIAMS                                  1730

Page 272

                    MR. BERRIGAN                                    1738

Prospective Juror 293
        MR. BERRIGAN                                    1755
        MR. WILLIAMS                                    1765

Prospective Juror 379
        MR. WILLIAMS                                    1772
        MR. BERRIGAN                                    1781

Prospective Juror 108
        MR. BERRIGAN                                    1812
        MR. WILLIAMS                                    1824

Prospective Juror 790
        MR. WILLIAMS                                    1831
        MR. BERRIGAN                                    1839

Prospective Juror 796
        MR. BERRIGAN                                    1846
        MR. WILLIAMS                                    1855

Prospective Juror 166
        MR. WILLIAMS                                    1862
        MR. BERRIGAN                                    1869

Prospective Juror 509
        MR. BERRIGAN                                    1888
        MR. WILLIAMS                                    1897

                        * * * * *

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1668 of 3245

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CRO1-3046 |
| Plaintiff, | Sioux City, Iowa<br>April 21, 2005<br>8:29 a.m. |
| vs. | |
| ANGELA JANE JOHNSON, | VOIR DIRE OF<br>PANEL H |
| Defendant. | |
| / | |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

1915

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | C. J. WILLIAMS, ESQ.<br>Assistant United States Attorney<br>Suite 400 - Hach Building<br>401 First Street Southeast<br>Cedar Rapids, IA  52401 |
| | THOMAS HENRY MILLER, ESQ.<br>Iowa Attorney General's Office<br>Area Prosecutions Division<br>Hoover State Office Building<br>Des Moines, IA  50319 |
| For the Defendant: | PATRICK J. BERRIGAN, ESQ.<br>Watson & Dameron<br>2500 Holmes<br>Kansas City, MO  64108 |
| | DEAN STOWERS, ESQ.<br>Rosenberg, Stowers & Morse<br>1010 Insurance Exchange Building<br>505 Fifth Avenue<br>Des Moines, IA  50309 |
| | ALFRED E. WILLETT, ESQ.<br>Terpstra, Epping & Willett<br>Higley Building - Suite 500<br>118 Third Avenue Southeast<br>Cedar Rapids, IA  52401 |
| Also present: | Bill Basler |

Page 1

PANEL H, 4-21-05
Court Reporter:          Shelly Semmler, RMR, CRR
                         320 Sixth Street
                         Sioux City, IA  51101
                         (712) 233-3846

                                                1916

(Proceedings reconvened outside the presence of the jury venire.)

THE COURT:  Apparently 787 is a no-show.  Ready to have the jurors brought in?

MR. WILLIAMS:  Yes, Your Honor.

MR. BERRIGAN:  Yes, Your Honor.

THE COURT:  Thank you.

(Panel H entered the courtroom.)

THE COURT:  Good morning.  Would you all raise your right hand.

(Panel H was sworn.)

THE COURT:  Okay.  Please be seated.  I wanted to welcome you all to the United States District Court for the Northern District of Iowa.  I am Mark Bennett.  I'm the chief judge of the United States District Court.  How many of you when you went to bed last night were just so excited about the prospect of coming to Sioux City this morning and being grilled by a judge and five lawyers out there asking you all kinds of questions?  That must have been pretty exciting for each of you.  I say that facetiously.

I know most folks dread coming in for jury service even if it's a two- to three-day trial.  And, of course, we have one that's much longer than that.  And so I do have some empathy for you.

This is a very important matter, and for any of you

who might be selected to serve as one of the jurors in the case, you will have to make decisions in this case that most likely will be some of the most difficult if not the most difficult decisions anyone will be called upon to make in a lifetime. So I do have a lot of empathy for you in that regard.

On the other hand, while most of you are probably dreading the experience and you have all kinds of reasons about why you can't serve in this case -- and we'll get to those -- let me tell you this. I've now been a United States District Court judge since September 6, 1994. Our district, the Northern District of Iowa, is one of 94 federal district courts in the country.

We're actually the busiest trial court in the nation in terms of numbers of trials per judge. We only have two full-time Article III -- appointed under Article III of the United States Constitution district court judges, myself and Judge Reade, Linda Reade, in Cedar Rapids. And then we have two senior judges, Judge McManus who's 85 years old in Cedar Rapids and Judge O'Brien who's 81 years old here in Sioux City.

But of the 94 districts, we've led the nation in numbers of trials per judge three out of the last four years. And in the year we weren't number one, we were number two. And so we do a lot of trials. And my experience is that while jurors are anxious when they come in and most people absolutely I understand do not want to serve, for those people who do get

1918

selected to serve, they find it to be almost to a person a very interesting, rewarding, and fulfilling experience. So I hope if any of you do get selected you'll find that to be true as well.

Page 3

As you know, this is -- United States versus Angela Johnson is the name of the case. I wanted to introduce you to the folks at counsel table. We'll start with the table that is closest to the jury box, and I'm just going to have them raise their hand. And then in a few minutes they're going to get up, and you'll learn more about who everybody is.

But at the table closest to the jury box we have C.J. Williams. He's an assistant United States attorney from Cedar Rapids, one of the two prosecutors in the case.

And Tom Miller seated next to him, Mr. Miller is actually a -- works in the attorney general's office for the state of Iowa. The attorney general of Iowa is also named Tom Miller. They're no relation, and this is not the Tom Miller who is the attorney general of Iowa but an assistant in that office. And he's been appointed a special assistant United States attorney to assist Mr. Williams in the prosecution of this case.

Seated next to those two gentlemen would be Special Agent Bill Basler. He's what's called the case agent, and he'll be at counsel table throughout the trial assisting the two prosecutors in the case.

Moving to the other half of the courtroom, I'll start with -- the individual closest to the jury is Al Willett.

1919

Mr. Willett is a lawyer from Cedar Rapids, Iowa, who specializes in criminal defense work.

Seated next to Mr. Willett would be the defendant in the case, Angela Johnson.

And then seated at the other side of the table is Patrick Berrigan. Mr. Berrigan is a criminal defense lawyer from Kansas City, Missouri.

Page 4

And then at the back table is the third lawyer in the case, Dean Stowers. And Dean Stowers is a lawyer from Des Moines, Iowa, who also specializes in criminal defense.

Now, we have some rules that I have reduced to writing to you, and I'd like to go over those with you at this time. You should have found them each on your chair this morning, and please follow along with me.

Conduct of potential jurors during jury selection and trial. To ensure fairness, you as potential jurors must obey the following rules until the end of the case if you are selected for the jury or until you are excused from serving on the jury in this case. These rules apply whether you are in the courtroom, in the courthouse, at home, or anywhere else until you are excused from further service in this case.

First, do not talk among yourselves about this case or about anyone involved with it.

Second, do not talk with anyone else about this case or about anyone involved with it.

1920

Third, when you're outside the courtroom, do not let anyone tell you anything about the case. If someone should try to talk to you about the case during jury selection or the trial, please report it to me.

Fourth, do not talk with or speak to any of the parties, lawyers, or witnesses involved in the case. You should not even pass the time of day with any of them. It is important that you not only do justice in this case but also that you give the appearance of doing justice. If a person from one side of the case sees you talking to a person from the other side, even if it is simply to pass the time of day, an unwarranted and

Page 5

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1673 of 3245

unnecessary suspicion about your fairness might be aroused. If any lawyer, party, or witness do not speak to you when you pass in the hall, ride the elevator, or the like, it is because they are not supposed to talk or visit with you.

Fifth, do not read any news stories or articles about this case or about anyone involved with it or listen to any radio or television reports about the case or about anyone involved with it. If you want, you can have your spouse or a friend clip out any stories and set them aside to give you after the trial is over or you are excused from serving on the jury in this case. I can assure you, however, that if you are selected for the jury in this case, by the time you have heard the evidence, you will know more about the case than anyone will learn through the news media.

1921

Sixth, do not do any research on the Internet, in libraries, in the newspapers, or in any other way or make any investigation about this case on your own. If you are selected for the jury, you must decide this case based on the evidence presented in court.

Seventh, if you're not excused from serving on the jury today, please take this instruction with you so that you can refer to it if you have any questions between now and the date you are required to return for the trial.

Dated the 21st day of April, 2005, signed by me, Mark Bennett, chief judge.

I wanted to -- well, let me ask you this. How many of you have ever been to this third-floor courtroom? Anybody ever been here before? Okay. Well, I just kind of wanted to explain to you who everybody is, try and put you at ease a little bit

Page 6

because you know what? It's not going to be as painful today as you all kind of think it might be.

Seated at my far left is Carey, one of my three and a half law clerks. And Carey will be in the courtroom throughout this trial. She's in a second year of a federal clerkship with me. She'll be leaving at the end of the summer and moving to Seattle with her husband. And Carey was an honors graduate at the Drake University Law School.

Immediately in front of me is our court reporter Shelly. In my view Shelly has the toughest job in any trial.

1922

She has to take down every single thing that everybody says. She can't afford to make a mistake. She can't daydream like the rest of us sometimes do. Shelly doesn't get the opportunity to look up at this beautiful ceiling like I've done over the last ten or ten and a half years when things get a little tedious or boring sometimes in a trial. So she's got a very difficult job, but she does it very well.

You would assist her today in doing her job: When we ask you questions, there will be a handheld microphone that will be turned on, and we're going to pass it from juror to juror when I ask you questions and then when the lawyers ask you questions. And I'll make a deal with all of you. That microphone will remain on so you don't have to fiddle with the button. All you have to do is hold it up and speak into it. And if you do that for me, I will not put up karaoke music on the screen, so we won't have you sing in front of everybody.

Okay. We also have United States marshals in the courtroom. We have that in every single criminal trial. Sometimes during the course of this trial there may be more

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1675 of 3245

marshals than at other times depending upon the witnesses and what's going on in the courtroom and in the building, and it's just something we all are used to.

We also have what we call CSOs, court security officers. They're very easy to spot because they have the blue blazers, the badge, and the earpiece. I think today it's rock

1923

and roll. Yesterday it was talk radio but -- I'm just kidding. And they have a number of functions including making sure the jurors get down to the jury room and then back to court on time.

You've met the lawyers and the parties they represent, and you'll meet them in more detail in a moment.

But I want to talk about the role that each of us have, the judge and then the jury. And I'll start with my job first. I'm the trial judge in this case, so I've had a lot of responsibility even before we got to jury selection. I have had I don't know how many pretrial motions to rule on. But you can imagine in a high-profile case like this where potentially somebody's life is at stake, both sides were fairly active in filing motions for me to rule on, and they were very active, and I'm pleased to say I'm current in all of the rulings on the case, but it took a lot of work over several years, and that's just the way the process works.

It was my responsibility to figure out a system for jury selection because we have a great discretion. There's no one way to do jury selection. There are about 600 federal district court judges in the country. There are probably about 600 different ways to do jury selection. I'm going to talk about that in a few minutes about how we set it up in this case for your convenience.

Page 8

I will have the job of instructing the jurors.  Right before we start the trial with opening statements, I'll give a

1924

very detailed set of instructions telling the jury kind of what the rules are for the trial, defining each of the ten crimes that Miss Johnson is charged with.  And then after the first phase of the trial before you go back to deliberate on the question of whether Angela Johnson is not guilty or guilty of one or more of the ten charges and whether the government proved its case on one or more of the ten charges beyond a reasonable doubt, I'll be giving you a very detailed set of written jury instructions.  I've actually been working on those for a number of months.

I also have responsibility during the trial -- I know these lawyers, so I know there will be objections during the trial.  And it's their job to object.  That's how the system works.  They have an obligation and responsibility to their client to object to evidence that they don't think is properly admissible or to object to other things that go on in the course of the trial that they believe are improper.  There will be a lot for me to rule on in this case, so I'll have those responsibilities as well.

Now, let's go back and talk about what the responsibility of the jury will be in this case.  In some respects it's like -- part of your responsibilities will be like every other criminal jury trial we have.  It will be your responsibility to decide what actually happened, what the facts are.  That's not my responsibility in a jury trial.  And the way

1925

Page 9

you do that is there will be witnesses, lots of them, probably -- you never know. It wouldn't surprise me if it was between 75 and a hundred or more witnesses that ultimately wind up testifying in this case. Each witness will get into that witness box, take the oath, sit in that chair, and then respond to questions from the lawyers.

And then there will be exhibits introduced into evidence. In this case I wouldn't be surprised if there were 500 or more exhibits that ultimately made it into evidence.

Your job at the end of the day, using day as a metaphor because it's going to be a lot longer than a day, your job after you've heard all the evidence will be what every jury has to decide in a criminal case: Is the defendant not guilty or guilty of the crimes charged or, stated another way, has the United States government proved beyond a reasonable doubt sufficient evidence to convict the defendant of one or more of the ten charges? That will be your job in the first phase.

This case will have more than one phase. I'm going to talk about that a little bit later. Excuse me. It could have more than one phase. It may not. It may just have the one phase because the jury could find the defendant not guilty of any of the charges, and in that case there wouldn't be a second phase or a third phase. But I'm going to explain the phases to you in a bit.

Now, this morning we're going to -- lawyers often

1926

refer to it as voir dire. It's a French term for jury selection. Literally translated, voir dire means to speak the truth, and what do we mean by that? Well, our goal is to find 18 jurors to sit in this case, 6 of whom will be alternates.

Page 10

And if you're an alternate, you won't actually know that you're an alternate. So we do have to pick 18 jurors.

And in order to do that, we're going to interview you for the job of being a juror. That's one way of looking at it. And mostly the lawyers are going to ask you questions, lots of questions. But don't worry about it because they're not trick questions. They're not -- we're not going to ask you what part of the Constitution is the right to trial by jury in a criminal case. You get bonus points, Sixth Amendment, but we're not going to ask you questions like that.

They're going to ask you questions about your attitudes, your beliefs, your views, probably your views on the death penalty, for example, your views on life imprisonment.

And there are no right or wrong answers to any of those questions. Whatever view you have is just as important as any view that I might have or any view that the lawyers might have or anybody else. And we're not here to pass judgment on how good your view is because everybody's entitled to their own view. We are here to make a decision on who would be 18 jurors who would be good jurors for this case. And so in order to do that, we expect you to answer all of the questions as openly and

1927

honestly as you can. And so far we haven't had a whole lot of problems with folks doing that.

I just want to remind you that the lawyers will do their best to refer to you by your juror number. And I want to explain that to you. I and I alone made the decision in this case to use numbers for the jury, and I just wanted to tell you why I made that decision.

This is by any standard a -- what I would call a

Page 11

high-profile case, lot of interest by the news media, the general public in this case. And it's tough enough -- it seems to me if you're selected and you serve in a jury trial that could last up to three months, that's a tough assignment. And if we allowed the newspapers to publish your names, I was concerned that every idle curiosity seeker would feel free to just track you down, call you up, stop by your house at eight o'clock at night, knock on the door and say, Hey, what's it like to be on the Johnson jury? And I didn't want to have your privacy invaded that way.

So I made the decision which I believe I have the discretion to do to use numbers, and that's the only reason why. We actually know all your names. It's no secret. They're on your questionnaires that you filled out. But we're going to refer to you by number just to protect your privacy because we think that's important.

Now, I wanted to explain to you the jury selection

1928

process because, as I said, I had a lot of discretion in designing a jury selection process. And I had a lot of input from all of the lawyers in the case in figuring out what would be the best way to do it. We came up with a system. We're now in our eighth day of jury selection. And we came up with a system where each potential juror would just come in one day.

And while the one day may seem like a lot to all of you, there are other judges who would have all of the jurors come every day all day.

And so, for example, I was reading about a high-profile case in federal court where they have 400 jurors to start with -- we actually started with a few more than that --

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1680 of 3245

and they rented like a convention center, and they brought all the jurors in, and they're going to be there every day for a month or so while they get the jury selected. And I didn't like that. I don't like systems like that because here's why. It's pretty simple. My time is really valuable to you -- to me, and I assume your time is just as valuable to each of you. And so I didn't want to waste your time, but we have to get you in here to ask questions. So we came up with a system where you'd just come in one day.

It's interesting that my secretary who's also a lawyer was called for jury duty in state court right across the street this month. And she's had to go now -- I think she's gone three times, two or three times, and she's yet to actually be

1929

questioned by a judge or a lawyer yet. And she's still gotta go back several more times.

And her sister, interestingly enough, was called for jury duty in federal court in Minneapolis this month, and she went for three days in a row, was at the federal courthouse in Minneapolis, downtown Minneapolis, in the basement for three days in a row and never even made it up into a courtroom to even see a judge or a lawyer let alone be asked questions by them.

So as much as you will undoubtedly complain about having to be here today, I just wanted to tell you it could have been a lot worse.

Now, we anticipate that jury selection will take two to three weeks. Tomorrow will be the end of our second week, but we only started last Tuesday, so we only went four days. We're bringing in small groups of potential jurors like you each day.

Page 13

After I introduce the lawyers and I just have a few questions for you, then we're going to have group questioning of you by both sides. What that means is that all 11 of you will be questioned by the lawyers. I've given them time limits. So each side has 30 minutes to ask all of you general questions.

And then after we do that, we're going to bring you back here individually one at a time. And you'll just come in that door. Rick or one of the other CSOs will hand you the microphone. You'll just pick any seat you want in the first

1930

row. One of them underneath the seat has a pass, and if you sit in the right seat, you guess right, you don't have to serve as a juror. I'm just kidding. We're really not doing that. But you can sit anywhere you want, and then the lawyers will question you individually.

The good news is I've given them time limits for that too, and each side has 12 minutes to question each prospective juror. And the lawyers are keeping track of the time. I actually fired myself. I was the time keeper. I did such a crummy job of it that I reassigned it to the lawyers. So they're going to keep track of their own time, and usually they give the lawyer a warning with 2 minutes to go, but you'll each be questioned for about 12 minutes. Sometimes it doesn't go quite that long.

Then the advantage is that at the end of the individual questioning we'll have you step outside. It usually only takes about 30 seconds to a minute, and then we'll bring you back in, and then I will tell you whether you're dismissed, you're no longer needed, or whether you've actually made it into the jury pool.

Page 14

So you'll know that at the end of the day today. Or actually for some of you before the end of the day as we question you individually, you'll know, and there will be people just taking off and going home, some of whom will be brought back for jurors.

1931

If you're told after your individual questioning that you're still in the jury pool, you have about a 50 percent chance of actually being on the jury. And here's how it works. We're empaneling 34 jurors. And of those 34, 18 will be selected as trial jurors in this case. And so we won't exactly know when we're going to be in a position to tell you if you're actually going to be in the jury or not, but at the end of the individual questioning today, you'll know one of two things: Either you're already dismissed in which -- you have no possibility of being on the jury or you're still in the jury pool, and that means you have about a 50 percent chance. My math isn't very good, but you have 18/34 of a chance of actually winding up on the jury.

Once the trial gets underway -- and we'll start the trial as soon as we get the jury selected. We may take one day off depending upon when we get the jury selected, but we'll start pretty quick after we get the jury selected -- I made the decision to run the trial four days per week.

Just as each of you have to come from some distance to serve as jurors, not one of the five lawyers live in Sioux City. Matter of fact, the closest lawyer, two, one on each side, live in Des Moines, 200 miles away. Two live in Cedar Rapids, 330 miles away, and one lives in Kansas City. So they come from considerable distance as well.

Page 15

We'll run the trial just for planning purposes Monday

1932

through Thursday four days a week, and we're taking the week of June 10th through the 17th off.

Now I'm going to ask Mr. Williams to introduce himself and the other folks at counsel table.

MR. WILLIAMS: Thank you, Your Honor. Good morning, ladies and gentlemen. My name is C.J. Williams. I'm with the U.S. Attorney's Office, and I live and work primarily over in Cedar Rapids, come over here quite a bit and appear in front of Judge Bennett over here.

At counsel table with me you were introduced to Tom Miller. He's from Des Moines, and he's working this case as well.

MR. MILLER: Good morning.

MR. WILLIAMS: And then Bill Basler is a special agent-in-charge of the Mason City DCI office, the Iowa Division of Criminal Investigation. As the judge indicated, he's the case agent. He's the lead investigator in the case, and he'll be sitting at counsel table with us assisting us throughout the table.

Back at this table is Sali Van Weelden. She is an assistant in our office, a legal assistant, and she'll be also assisting us throughout the trial.

The U.S. Attorney's Office in the Northern District of Iowa is headed by Chuck Larson Senior. Now, right now he's in Baghdad, but he primarily offices in Cedar Rapids, Iowa.

1933

Page 16

We have another office of the U.S. Attorney's Office here in Sioux City, and since it's more likely you may know people out this way, I'm going to go through the list of people in our office. We have seven attorneys out here and seven support administrative staff folks. So let me read off their names for you.

Forde Fairchild, Martha Fagg, Kevin Fletcher, Mike Hobart, Jack Lammers, Janet Petersen, and Shawn Wehde are all assistant United States attorneys working here in Sioux City.

Shayne Mayer, Del Tompkins, Penny Schlotman, Michelle Schwebach, Michelle Hatting, Carol McEntaffer, and Pat Calhoun are all the administrative staff folks working in our office out here.

THE COURT: Thank you, Mr. Williams. Now, do any of you know Mr. Williams, Mr. Miller, Mr. Basler, any members of the U.S. Attorney's Office? And let me expand that. Do you know anybody who works at the federal courthouse here? Anybody? Okay. Why don't we pass that microphone down to Juror 16.

Juror 16, when you get the microphone, who is it that you know?

PROSPECTIVE JUROR 16: In the -- who works here? Tomme Fent.

THE COURT: Okay. That would be Judge Zoss's law clerk.

PROSPECTIVE JUROR 16: Yeah.

1934

THE COURT: Yeah. How well do you know Tomme Fent?

PROSPECTIVE JUROR 16: Pretty good friend and neighbor. She lives across the street from me. We quilt together and shop together.

Page 17

THE COURT: Okay. Have you ever had any discussions with her about this case?

PROSPECTIVE JUROR 16: No.

THE COURT: Is -- the fact that you know a law clerk to Magistrate Judge Zoss, would that have any effect on you as a juror in this case?

PROSPECTIVE JUROR 16: I don't think so. I don't know why it would.

THE COURT: Okay. Good. Thank you. You can just hang on to that microphone. What song would you like to sing?

Okay. Now we'll switch over to the defense side.

Mr. Willett, would you introduce yourself and Miss Johnson and the defense team.

MR. WILLETT: Thank you, Your Honor. If it please the Court, I'm going to start with Miss Johnson. Ladies and gentlemen of the jury, this is Angela Johnson. Angela was born in the decade of the '60s. She grew up in the Mason City/Clear Lake area of Iowa. And if that's unfamiliar to any of you, that's north central Iowa right below the Minnesota border. She attended Forest City High School. Her formal education ended after the ninth grade, but she then obtained her GED.

1935

Angela has three sisters, one brother. Both of her parents are still living. She has two daughters and one granddaughter.

Now, do any of you think you know my client, Angela Johnson?

To continue the introductions, my name is Al Willett. I practice law with Terpstra, Epping, and Willett in Cedar Rapids, Iowa. We sort of have the tongue twister-named law

Page 18

firm, but I practice with Ray Terpstra and Greg Epping.

Now then, Mr. Patrick Berrigan is from the law firm of Watson and Dameron in Kansas City, Missouri. Associated with Mr. Berrigan is Ms. Lisa Dahl.

And then my other co-counsel is Mr. Dean Stowers. Mr. Stowers practices law with the firm of Rosenberg, Stowers, and Morse. And he practices law with Brent Rosenberg, David Morse, and Heather Wood.

Now, do any of you think you know me or Mr. Berrigan or Mr. Stowers or anyone associated with us?

And I see no nods of affirmation, Your Honor.

THE COURT: Okay. Thank you, Mr. Willett.

Now, our estimate for the length of trial including jury selection is three months or so. We think it will be done towards the end of June, but it's always hard to estimate that, and the longer the likelihood that the trial will be, in other words, the more witnesses and more exhibits, the more difficult

1936

it is to come up with an accurate estimate. But I've beat up the lawyers pretty hard to come up with an accurate estimate so that we would have accurate information to tell you. And that's our best guess. We think it will be done by the end of June.

So I need to talk to each of you about whether it would be a severe or extraordinary hardship for you to serve, but I've got some comments to make before I'll ask that question. I'm going to ask that question of each of you.

Jury service in my view is a unique opportunity to serve your country. That's exactly what it is. I don't think people very often think of it in that light. But that's exactly what it is. I'm very lucky in the sense that public service is

Page 19

very important to me. And I get to serve our country every single day in this job. And I find that incredibly fulfilling.

For many of you, you don't really have an opportunity to serve our country. Well, you did last week. I guess April 15 is an opportunity to serve your country by paying your taxes. I'm not sure most people see it that way. But, you know, I have withholding now, but when I was in private practice and I'd have to write that check on April 15, and all of my friends would grouse about it, and I always felt incredibly honored to write that check. I really did. I felt very honored to be a citizen and to be able to pay taxes because that's important and that's part of our civic obligation, public duties.

One of the things that's been very rewarding in this

1937

case is that when I've read through the questionnaires you would not believe the creativity of your fellow potential jurors in coming up with excuses to get out of jury service. I mean, it is absolutely intriguing to read all of the reasons that people have come up with. And, you know, I kind of expect -- I've been at this job for a while. I kind of expect that.

The interesting thing is, though, when people actually come into the courtroom, most days nobody asks to get off. Everybody is willing to serve. And for the few folks who have suggested they had reasons that they couldn't serve, they were really for the most part very, very compelling reasons. One individual, for example, was on a pain pump receiving a narcotic injection, you know, all during the day and simply couldn't stay awake. So that was obviously a pretty severe or extraordinary hardship. We wouldn't want a juror sleeping. So I let him off.

Last year I tried a very lengthy criminal case, about

Page 20

the same duration. At least the estimate was. And in jury selection on one day -- and I'll never forget this -- we had two farmers both of whom had full-time manufacturing jobs. And we started that trial in August, so it was going to run right smack dab into the middle of harvest season, worst time for farmers to be on juries. And each of the farmers said that not only did it come in harvest season but they weren't going to get paid for taking time off from their manufacturing jobs. So it was going to be a huge financial sacrifice. But each of them were willing

1938

to do it.

And then on another day we had an individual who wasn't going to get paid on his job, and he had talked it over with his wife, and they figured it would deplete their life savings if the trial actually went three months. And so I assumed he was going to say, well, he thought that was a severe or extraordinary hardship so he'd ask not to serve, that he would ask to get off. And he said no, he had talked it over with his spouse, and he thought it was his civic duty to serve, and he was willing to serve.

And in the seven prior days, not a day has gone by where people haven't been willing to make substantial personal sacrifices to serve their country as a juror in this case.

So -- but I've got to ask each of you, and I'm going to ask you a simple question. If selected, are you willing to serve. And I'll start with 769. Where is the microphone now? I've lost track of it. I thought 16 had it. You don't know the numbers, so just pass it down. We're going to start in this front corner. Are you willing to serve as a juror in this case?

PROSPECTIVE JUROR 769: Yes.

Page 21

THE COURT: Okay. Thank you.

Juror 138.

PROSPECTIVE JUROR 138: Well, I'm a farmer, Your Honor.

THE COURT: Okay.

1939

PROSPECTIVE JUROR 138: And it's going right in to my busy time. I need to do my planting.

THE COURT: Planting season.

PROSPECTIVE JUROR 138: Any other time like in wintertime, yes, I would, but not now.

THE COURT: Just not too much of a -- well, you keep that microphone. It's just too much of a hardship for you.

PROSPECTIVE JUROR 138: Well, yes, it is, sir. This is -- my only income is farming.

THE COURT: And every farming operation is kind of different, you know. Some can do it. Others can't. And I understand that.

PROSPECTIVE JUROR 138: And the planter's hooked under the tractor and ready to roll as soon as it gets dry.

THE COURT: Well, I don't think that will be today.

PROSPECTIVE JUROR 138: No. That's why I don't feel very bad for sitting here today.

THE COURT: Okay. You know what? Any objection from the lawyers?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: No, sir.

THE COURT: Okay. We're going to let you go. Thank you very much.

PROSPECTIVE JUROR 138: I'm excused now, sir?

Page 22

THE COURT:  Yes, you're excused.

1940

PROSPECTIVE JUROR 138:  Thank you.

THE COURT:  Okay.  Juror 601.

PROSPECTIVE JUROR 601:  You gonna ask me a question or . . .

THE COURT:  I think you know what the question is.  Are you willing to serve?

PROSPECTIVE JUROR 601:  I'm willing to serve.  I work for an agriculture repair business.  This is our busy time of the year like the last one.  We're getting right into the planting season, and we will be very busy, and I am the service shop manager of the business.  So it would be kind of a --

THE COURT:  It'd be a sacrifice.

PROSPECTIVE JUROR 601:  Right.

THE COURT:  But is it a sacrifice you're willing to do?  You can work in the evenings and, you know, on Fridays and on the weekends.  I'm sure you probably already do that.

PROSPECTIVE JUROR 601:  I do that too.

THE COURT:  Sure.

PROSPECTIVE JUROR 601:  I can work it in, yeah.

THE COURT:  Okay.  Great.  That's good.  That's terrific.  Thank you.  Pass it to the next juror, please, Juror 16.

PROSPECTIVE JUROR 16:  Well, I have a situation where I started a business five years ago.  I'm the sole proprietor.  I'm the massage therapist.  I'm it.  I'm the only one that does

1941

my business.  I worked five years to build up a clientele, and,
Page 23

you know, I don't have anyone to take my place, to refer my clients to. So my concern is, you know, I think, well, three months without pay because, of course, I don't have jury pay or anything.

THE COURT: Right. There's nobody there to pay you, is there?

PROSPECTIVE JUROR 16: Exactly. I could -- you know, that would be okay if I could go back and my business would be the same, but I essentially have to close my door for the whole trial. And that has me pretty concerned about starting over again with my business, so it's like going to be more than the three months.

THE COURT: Are you here in Sioux City do I recall from your questionnaire?

PROSPECTIVE JUROR 16: Uh-huh, yeah.

THE COURT: Well, you know, we are going to get out at 4:30 most days. I just want to give you the information. I'm not trying to talk you into a position or out of it. We are going to get out at 4:30 most days, so you'd have the evenings, and you'd have the weekends, and you'd have Fridays because we're only going to go four days a week, and you'd know that schedule fairly far out. It seems like it would be a really huge financial sacrifice for you.

PROSPECTIVE JUROR 16: It would, and I thought about

1942

evenings and weekends. Of course, I already work Saturday, and I do work two evenings, but the other thing is I'm like 50, and doing that job, it's hard physical work, and if I'm -- I pretty much have decided that if I do jury duty, I'm probably not going to be able to work the evenings, very many anyways, just because

Page 24

of, you know, getting up early, doing the -- I'm just not probably up to it. It would be a big sacrifice. I don't want to refuse to do it.

THE COURT: You know, and the reason why I'm asking you is everybody's situation is different, and I don't want to get in -- I don't want to invade your privacy and get into all those differences. You might have inherited a million dollars and have it in the bank. And, you know, there are people that do and it wouldn't be a problem. On the other hand, if you don't have a million dollars in the bank, it could be a huge problem to serve for this length of time. And so when we're in a situation like this -- I had an easy one just a couple days ago. A woman baked cakes on the side, and she was going to bake about ten cakes in the next couple months, and she thought that was a severe or extraordinary hardship. I didn't think it was. That was an easy call for me. She could bake the cakes at nights or on the weekends, and I didn't let her off.

Your situation is very different. So, you know, you're the one -- I'm really going to defer to you on it because you know whether or not you can do it or not, and nobody's going

1943

to be upset with you or mad at you or angry with you or think anything less of you if it's too much of a sacrifice.

PROSPECTIVE JUROR 16: Well, it seems to me to be, but like I say, I don't want to refuse to do it if -- you know, I know it's the duty of people to do, but it would be a very huge sacrifice.

THE COURT: Would you say it would be a severe or extraordinary hardship for you?

PROSPECTIVE JUROR 16: I would just because it's going

Page 25

to go beyond the three months if I just sort of open my business again.

THE COURT: Yeah, and I'm sure you've worked very hard to build that up.

PROSPECTIVE JUROR 16: I have for five years.

THE COURT: And there are actually -- you have a lot of competition in this community.

PROSPECTIVE JUROR 16: Well, and I also have a lot of people that rely on me, quite frankly. I have weekly clients and biweekly clients that are in pain, that are going to find somewhere else to go too.

THE COURT: Yeah, but there are other options. I'm more concerned about you than your clients. I realize you're concerned about your clients.

PROSPECTIVE JUROR 16: My concern, like I say, is it would be beyond the three months even which, you know, I could

1944

kind of see, but if I could just go back the way it was, but I know it won't be the same if I close my doors essentially. I'd still have to pay my rent and pay all the other things.

THE COURT: You have all of the other things and all the overhead.

PROSPECTIVE JUROR 16: Just my rent. When I thought about it, it's not a lot of overhead I'd have to pay.

THE COURT: Okay. Do the lawyers have any objection?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: No, sir.

THE COURT: Okay. Juror 16, you're excused.

Now, that's the most we've ever lost, so nobody else can ask to get off. We have a quota system. We've used it up

Page 26

today.  Just kidding.

Juror 458.

PROSPECTIVE JUROR 458:  Yes, I'm willing to serve.

THE COURT:  Okay.  Thank you very, very much.

Juror 628.

PROSPECTIVE JUROR 628:  I get married in September, and starting in like a month I believe every Monday and Wednesday I have to go in for church and take required counseling classes and like classes for the church in order to get married at that church.

THE COURT:  And what -- is there any flexibility on the time of those classes, or are they pretty much --

1945

PROSPECTIVE JUROR 628:  They're pretty much set.

THE COURT:  And I don't recall from your questionnaire.  How far are you from Sioux City?

PROSPECTIVE JUROR 628:  I live in Sioux City.

THE COURT:  Okay.  Well, what time are the classes?

PROSPECTIVE JUROR 628:  That hasn't been set yet.  I just know it's a couple times during the week.

THE COURT:  But is it in the evening?

PROSPECTIVE JUROR 628:  I assume it's during the day. The times haven't been set.

THE COURT:  Why would you assume that actually?

PROSPECTIVE JUROR 628:  Because that's when -- like the church I go to now, the priest -- they put a call out for the priest, so they have a temp, like a clergy.  And he's only here during the day like certain days of the week, so we have to do counseling with him before we can do the church wedding.

THE COURT:  Well, how many sessions are you going to
Page 27

have?

PROSPECTIVE JUROR 628: I'm not sure about that either. Like I said, they haven't like really set that up yet.

THE COURT: Well, how many do you think you're going to have?

PROSPECTIVE JUROR 628: I would assume maybe ten at the most.

THE COURT: Don't you think realistically you could

1946

start those in July? I mean, I realize that wasn't your plan.

PROSPECTIVE JUROR 628: Yeah, it's -- I mean, it's up to the church really. Because of the temp, it's up to them when they tell us when we can do it and when we can't.

THE COURT: Well, I don't want to interfere with your wedding, but I think the church can accommodate your situation and arrange the appointments either in the evenings, on the weekends, or later in the summer. So I'm not going to let you off. Thank you.

Juror 71?

PROSPECTIVE JUROR 71: Yes, I'm willing to serve.

THE COURT: Okay. Thank you.

Juror 755.

PROSPECTIVE JUROR 755: Yes, I'm willing.

THE COURT: Thank you.

Juror 566.

PROSPECTIVE JUROR 566: I'm willing to serve. I just have one concern.

THE COURT: Sure.

PROSPECTIVE JUROR 566: As I wrote in my interview questions, I suffer from irritable bowel syndrome, and that can

Page 28

strike whenever and -- it wants to. And so sitting two to three hours in a courtroom may not be the easiest thing for me to do, and I would surely hate to interrupt the trial and the questioning, so that's my big concern.

1947

THE COURT: Okay. I want to ask you a couple questions about that --

PROSPECTIVE JUROR 566: Sure.

THE COURT: -- and just kind of give you a little bit of what a trial day will look like so you can tell me if that's going to work or not going to work for you. We'll start at 8:30 every morning. I won't have you sit for more than about an hour without standing up and taking a stretch break. I do a lot of stretch breaks. Matter of fact, they can often be more often than an hour because every time we change witnesses, the witnesses come from outside the courtroom, and the jurors can stand up and stretch. So you get a lot of opportunity to stretch.

We'll actually only take restroom breaks usually at 10 for 20 to 25 minutes, and then we'll take -- we may only take 45 minutes for lunch. I haven't decided. And then we'll have a 20- to 25-minute break in the afternoon. And then we'll quit at 4:30.

So I don't know if that helps in any way or not. So let me ask you this question. It's kind of awkward, but I'm just going to ask it.

PROSPECTIVE JUROR 566: That's okay.

THE COURT: If you had to actually rush out, how often do you think that would happen in a typical week?

PROSPECTIVE JUROR 566: It depends.

Page 29

THE COURT:  Yeah.

PROSPECTIVE JUROR 566:  My irritable bowel issues are brought on by stress, and I know this would be stressful for me.

THE COURT:  Yes.

PROSPECTIVE JUROR 566:  And when it does strike, I can have to run to the bathroom 4 to 6 times in a row every 10 to 15 minutes, and it can strike in the morning, or it can strike after lunch.  Those are my two main times.

THE COURT:  Okay.  I'm inclined to let you go.  Let me see what the lawyers think.

MR. WILLIAMS:  No objection, Your Honor.

MR. BERRIGAN:  No objection, sir.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR 566:  Thank you.

THE COURT:  Juror 759, are you willing to serve? Let's see.  You're a farmer with irritable bowel syndrome, and you're a massage therapist on the side.

PROSPECTIVE JUROR 759:  I just started that business.

THE COURT:  You look like somebody who would catch on quickly.  What's your situation?

PROSPECTIVE JUROR 759:  Well, I'm a farmer also, so I've got spring planting coming up.

THE COURT:  Sure.

PROSPECTIVE JUROR 759:  And really I could -- I would work around that.  That wouldn't bother me, but the length of

the trial, a 3-month trial is -- because I also feed 2,000 head

Page 30

of hogs that I have around the time, and I have to -- so, I mean, there's a lot of work. And in the summertime, you start in the summer, and that's when you get your work done, you know, the majority of your work and all that. And I honestly -- coming here I wanted to serve, but just the length of the trial and then if we start into July, maybe running into September --

THE COURT: Oh, no, we won't. It will be -- it would be impossible in my view. I mean, nothing's impossible, but it would be so far out of the realm of possibility that this would go much into July. I mean, the lawyers say the end of June. I could see it going into a little bit of July.

PROSPECTIVE JUROR 759: I thought that was the starting time.

THE COURT: No, no, I'm sorry. I might have misspoke. We'll be done with jury selection either next week or the week after, and then we'll maybe take a day off. So we'll start this trial in May, so I think it will be go most -- it will go May, and it could go most of June. I think we'll be done towards the end of June. Could it possibly go a little bit into July? It's possible. Probably not very likely but possible. It's still a long time -- you're a busy guy. I understand that.

PROSPECTIVE JUROR 759: I mean, that's the main concern to me is it's three months, and it's over an hour drive, and I have three young children at home with my wife and stuff.

1950

THE COURT: You have a lot of responsibility.

PROSPECTIVE JUROR 759: Yeah, it won't leave much time after I get my work done at night when I get home to spend time with the family.

THE COURT: Won't leave any time. Right. You'll be

Page 31

burning the candle at both ends. You know, you're the only one in a position to know. And nobody's going to be upset with you if you say, you know, that is severe, and that's why we have -- we do have an exception for it being a severe hardship. If it was a week, probably you could probably be willing to make the sacrifice.

PROSPECTIVE JUROR 759: Yeah, even a month I would, but just a three-month trial I would feel would be just too much.

THE COURT: Okay. And I totally understand that. Maybe if it were January, February --

PROSPECTIVE JUROR 759: Yeah, in the wintertime would make a lot of difference too because I do have -- I do have time in the winter even with the livestock work and stuff that I could easily have done it. But, like I said, the work all gets pushed in the summertime and then with everything else going on.

THE COURT: Thank you so much for coming in today. I'm going to go ahead and excuse you. Thank you.

Okay. Juror 800.

PROSPECTIVE JUROR 800: I'm willing to serve.

1951

THE COURT: Okay. Thank you very much. Now, I want to talk to you very briefly. We've obviously spent some time now on people's duty to serve. I also want to talk to you about your duty not to serve, and I know that may sound kind of funny because I was just harping on your duty to serve, and here's what I mean by that.

If you hold certain beliefs or opinions that in our judgment we would decide that you wouldn't be a good juror for this case, then in that situation you kind of have a duty not to

Page 32

serve. And so -- I'll give you an example. We're not allowed to sit in cases that we own stock in, and that makes sense. If I have a financial interest in a company, I shouldn't be the judge in litigation involving that company even if it's one share. So in those cases I have a duty not to serve.

And sometimes jurors have a duty not to serve. And the only way that the lawyers and I will be able to tell if you have a duty not to serve is by answering the questions as honestly as you can.

So I just want to remind you -- and when you do that, when you answer the questions honestly and we decide, hey, you'd be a terrific juror but not for this case, you serve your country just as well as somebody who sits here for three months and goes through the whole process. So it's very important that you answer our questions openly and honestly.

Before I turn it over to the lawyers, I want to try

1952

and explain the trial process to you.

You all know something about this case either from media which we're going to ask you about individually or, you know, from the information that we sent you in filling out the lengthy questionnaire.

This case, unlike 99.9 percent of the cases that I've had, is different because it potentially is a three-phase process. Most cases are simply a one-phase process, and that is you have the trial, the jurors come in, they decide guilty or not guilty, and either way, whatever they decide, that's it. The jurors are done. The sentencing is my responsibility. And generally how it works in our court, after somebody pleads guilty or is found guilty by a jury, we set a sentencing hearing

Page 33

80 days from that date, and then 80 days go by, and then I have a sentencing hearing, and ultimately I have to make the decision on what the sentence is.

In this case I won't be doing that. The first phase of this case will be like any other trial. It's what we call the merits phase, the not-guilty/guilty phase. You'll listen to the evidence. You'll get my instructions, and you'll go back and deliberate. And you'll figure out whether Angela Johnson is not guilty or guilty of one or more of the ten charges. That would be the first phase.

If you decide that Angela Johnson is not guilty of any of the charges, then this trial will only have one phase.

1953

That's the end of the trial. And in that sense it would be like every other trial that I have.

If, however, the jurors unanimously agree beyond a reasonable doubt that the government has proved Angela Johnson guilty of one or more of the ten charges, then we would have a second phase. The second phase again would be -- only if there's a unanimous finding by all 12 jurors beyond a reasonable doubt that Angela Johnson is guilty of one or more of the 10 counts in the first phase do we even have a second phase.

The second phase is what we call the eligibility or gateway phase, and that phase would be quite different than the first phase. And also -- and this I can guarantee -- a whole lot shorter because in the second phase we wouldn't have any new evidence. We would just have jury instructions and arguments of the lawyers, and then the jury would go back, and in the second phase they would decide what we call the eligibility or gateway phase. That is, you will decide if the prosecution has proved a

Page 34

gateway or eligibility factor and one or more statutory aggravating factors beyond a reasonable doubt.

If the jury unanimously agrees that the prosecution has proved this, then and only then would we reach the third phase. So let me just try and explain this.

You would determine -- based on my written instructions and the evidence that you heard in the first phase and the arguments of the lawyers in the second phase, you would

1954

determine whether the government proved a gateway factor -- you don't even need to know what those are; I don't want to confuse you -- a gateway factor and what we call an aggravating factor. And only if you decided that unanimously would we then move to the third phase.

Again, if you found the defendant not guilty of all the charges in the first phase, there wouldn't be a second phase. But assuming there is a second phase, just assuming for the sake of explaining the trial process, that's what the second phase would be.

Then the third phase would be if you found the government proved a gateway factor and one or more statutory aggravating factors in the second phase, the third phase would be a penalty phase. And that would be like another trial because there would be evidence presented. The prosecution would put on evidence of what we call aggravating factors, and then Angela Johnson and her lawyers would have the right to put on evidence if they wanted to but they wouldn't have any obligation to put on any evidence of what we call mitigating factors.

At the conclusion of the penalty phase, I would give

Page 35

you written jury instructions that are very detailed on what constitute aggravating factors, what constitute mitigating factors, and your obligation as jurors to consider all the mitigating factors that you find, all the aggravating factors

1955

that you find and weigh those factors in deciding what I think would be an incredibly difficult decision, and that decision would be whether to sentence Angela Johnson to life imprisonment without the possibility of parole or the death penalty.

And when I say life imprisonment without the possibility of parole, that's how it works in the federal system. There is no parole. And your only two choices if we ever got to a penalty phase would be life imprisonment or the death penalty. You would never, ever be required to impose the death penalty. It would simply be an option. And in the penalty phase, only if each juror unanimously votes for the death penalty will Miss Johnson be sentenced to death by me.

So that's just a big overview. It's a little more complicated than that, but I wanted to try and give you the big picture to help you when the lawyers ask you questions.

So it is now coming up on 9:30. We're now going to -- why don't you all stand and take a stretch break. And then we're going to turn it over for some questioning, half an hour per side.

And, Mr. Williams, are you going to start first for the government?

MR. WILLIAMS: I am. Thank you, Your Honor.

THE COURT: Okay. Let's give everybody a stretch.

Okay. Please be seated. Mr. Williams, any time you're ready to proceed.

Page 36

MR. WILLIAMS: Thank you, Your Honor. Good morning, ladies and gentlemen. What we're going to do here is just talk to you for a little bit for the purpose of just trying to get to know you a little bit more, and I'm going to cover some general issues that are concepts that arise in a criminal case that I want to explore with you and find your thoughts on those.

What I'm going to do so you know what's going to happen is I'm going to start the microphone in the back row with Miss 800, and I'm just going to pass it down and come up front, and then I'm going to talk to each of you as we go through for just a little bit. So again, if you could just speak into the microphone, that'd be helpful.

Miss 800, you are -- you have a distribution business from your home; is that right?

PROSPECTIVE JUROR 800: Yes, I do.

MR. WILLIAMS: And what type of distribution business is that?

PROSPECTIVE JUROR 800: It's a newspaper business, and we get 2,200 papers a day out, but my job's done by 8:00 in the morning.

MR. WILLIAMS: So you have the rest of the day off.

PROSPECTIVE JUROR 800: Well, yeah. Not really.

MR. WILLIAMS: Yeah. What time do you have to get up to do that job?

PROSPECTIVE JUROR 800: We're usually up about 4:30.

MR. WILLIAMS: Is that going to run into any difficulties for you? I assume you're going to keep doing that

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1705 of 3245

if you're picked as a juror in this case?

PROSPECTIVE JUROR 800: My husband and I are partners in the business, and we have 18 people who work for us who do contract work for us. I don't think so. I'd be concern -- it is the Sioux City Journal. I'd be concerned that you might think that I would be prejudiced by that, but we only distribute it. I have nothing to do with editorial stuff. I have nothing to do with what they say. Most days I don't read it. My husband reads it thoroughly. I look at the weather, and that's about as far as I go.

MR. WILLIAMS: Very good. The judge will instruct you at some point if you become a juror in this case that you're not to read the newspaper about this case, and I trust you could follow that instruction.

PROSPECTIVE JUROR 800: Yeah.

MR. WILLIAMS: You're also a CASA or CASA volunteer.

PROSPECTIVE JUROR 800: Yes, I am.

MR. WILLIAMS: What do you find rewarding about that job?

PROSPECTIVE JUROR 800: I have a family right now that -- a client family, and there's three wonderful children. My job is to be their voice in the court. And it's a new experience for me. My parents -- my in-laws passed away, and

1958

they left us some farms, and I felt that it was important for us to give back what we had been -- what we had received.

MR. WILLIAMS: Interesting. The judge explained that if you're called as a juror in this case your job is going to be to be the judge of the facts. And facts are going to come to the jury in the form of witnesses and documents and items that

Page 38

are going to be presented. And the witnesses are all going to be testifying from this stand behind me. And there's going to be a whole host of people, every walk of life, frankly, everybody from police officers to people incarcerated to experts and everybody in between. This is an interesting panel in that it appears from the questionnaires that nobody's ever served on a jury before. Have you ever served on a jury before?

PROSPECTIVE JUROR 800: I was once called for a federal grand jury, but the person who was charged committed suicide before the jury was convened, the trial was convened.

MR. WILLIAMS: I see. So you never actually ended up serving as a juror.

PROSPECTIVE JUROR 800: No, I have not.

MR. WILLIAMS: I see. One of the things that I want to talk to you for a moment about, one of the types of witnesses we may have will be people who are, in fact, in prison themselves and serving time or maybe they served time already and they have a criminal record. Interesting response to one of the questions in the questionnaire that you had was you

1959

thought -- it asked, What do you think about somebody's who's incarcerated? And you said you thought that would be brave. The judge at some point may instruct you that you should also consider that testimony with a certain amount of caution and care. Can you imagine that there might be somebody incarcerated who may be testifying who may have a motive for testifying? Perhaps they may hope to get time off or something for their testimony.

PROSPECTIVE JUROR 800: Well, I can relate to that from the perspective of my CASA family, and the mother

Page 39

constantly says, No, I'm not on drugs; I'm not on drugs, but yet she was in a drug bust a few weeks ago, so I know I can't take everything she says at face value.

MR. WILLIAMS: Sure. If the judge gave you an instruction that said if a person testifies who's incarcerated, you should treat that testimony with special care and caution, you can take into account other things. Perhaps you think this is brave for the person to come forward or whatnot. But could you follow an instruction like that from the Court that instructed you to consider that testimony with care and caution?

PROSPECTIVE JUROR 800: I think I can do that. I think I'm discerning enough that I could do that.

MR. WILLIAMS: Right. Could you pass the microphone down, please?

Juror 755, you're a purchasing agent; is that right?

1960

PROSPECTIVE JUROR 755: Yes.

MR. WILLIAMS: And you like theater I noted from your questionnaire.

PROSPECTIVE JUROR 755: Yes.

MR. WILLIAMS: What type of theater do you like?

PROSPECTIVE JUROR 755: Well, we've got season tickets to the Broadway in Sioux City series, so it's a lot of musicals, revues. When I was in high school and college, I did a lot of the technical aspects, so I like to watch it and work on it, but I'm not an actress.

MR. WILLIAMS: Do you participate in actually helping out in the technical stuff in theater here?

PROSPECTIVE JUROR 755: Not anymore. I just don't have time now with my family and work. Now I'm just pretty much

Page 40

a spectator.

MR. WILLIAMS: And I was going to talk to you about that. You do have family at this point.

PROSPECTIVE JUROR 755: Yes.

MR. WILLIAMS: That's a fair amount of responsibility I take it.

PROSPECTIVE JUROR 755: Yes.

MR. WILLIAMS: In this case if you're chosen as a juror, being a juror carries with it a fair amount of responsibility. Do you think that's the type of responsibility that you could shoulder in this case?

1961

PROSPECTIVE JUROR 755: I believe it is.

MR. WILLIAMS: Do you think you could perform the function of listening to perhaps up to a hundred witnesses and judging their credibility day after day?

PROSPECTIVE JUROR 755: I think so.

MR. WILLIAMS: Great. If you could pass the microphone down, please, to 71.

Miss 71, I see that you worked a job at a dry cleaners for 18 years. That's a long time to be in one job.

PROSPECTIVE JUROR 71: Yes.

MR. WILLIAMS: Did you enjoy it?

PROSPECTIVE JUROR 71: Yes.

MR. WILLIAMS: You ended up quitting not too long ago. Are you pursuing other work now?

PROSPECTIVE JUROR 71: Right now I'm not working.

MR. WILLIAMS: Taking some time off for yourself.

PROSPECTIVE JUROR 71: I guess so.

MR. WILLIAMS: What was the best part of that dry

Page 41

cleaning business?

PROSPECTIVE JUROR 71: I worked up front, so I worked with the customers. That's . . .

MR. WILLIAMS: Enjoyed that the most.

PROSPECTIVE JUROR 71: Yes.

MR. WILLIAMS: You heard me explain that the responsibility of a juror in this case is going to be to listen

1962

to the witnesses and kind of judge their credibility, compare their testimony against other testimony. Do you think you could do that?

PROSPECTIVE JUROR 71: I think so.

MR. WILLIAMS: Now, in addition to people who might be incarcerated, we may have -- we will have law enforcement officers testifying in this case. Now, law enforcement officers come with a certain amount of training and experience that can be taken into account. But the judge will instruct you I anticipate at some point that jurors are not to give any more weight to the credibility of a law enforcement officer simply because of the title of the job. Certainly you can take into account their experience or the training, but simply because they're a law enforcement officer doesn't cloak them with more credibility than any other witness. Could you follow an instruction like that?

PROSPECTIVE JUROR 71: Yes.

MR. WILLIAMS: Great. Why don't you pass the microphone down if you could.

Mr. 628, you indicated during the questioning by the judge you're going to be getting married this September; is that right?

Page 42

PROSPECTIVE JUROR 628:   Yes.

MR. WILLIAMS:   What's your fiancée do?

PROSPECTIVE JUROR 628:   She's a cosmetologist.

1963

MR. WILLIAMS:   How long's she been doing that?

PROSPECTIVE JUROR 628:   About six years.

MR. WILLIAMS:   Does she like that work?

PROSPECTIVE JUROR 628:   Yes.

MR. WILLIAMS:   She in a business with a number of other people or just by herself?

PROSPECTIVE JUROR 628:   She's with other people.

MR. WILLIAMS:   In this case we are going to be presenting testimony that I anticipate for everybody may be kind of tough to deal with.  In every murder case obviously there's going to be some evidence that's going to be tough for jurors to view.  In this case there are going to be skeletal remains of people that we're going to be presenting evidence of.  It's going to be difficult for any juror to look at that, and I trust it would be for you as well.  Do you recognize that for us to ever try murder cases, however, we need to have jurors who can shoulder that responsibility of looking at evidence that's hard to look at and not let that affect them in their judgment about whether the evidence shows what the government alleged in a certain case?  Do you think you could do that?

PROSPECTIVE JUROR 628:   I think so, yeah.

MR. WILLIAMS:   Might be a tough job to do, but the importance in that would be to recognize that you can have those emotional responses, but the emotional responses can't interfere with your ability to fairly judge the evidence that comes in.

1964

Page 43

Can you do that?

PROSPECTIVE JUROR 628:  I think I could, yeah.

MR. WILLIAMS:  Thank you very much.  Why don't you pass the microphone down if you would to Juror 458.

I noted from your questionnaire that one of the things you like the most are motorcycles.

PROSPECTIVE JUROR 458:  That's right.

MR. WILLIAMS:  What type of motorcycle do you have?

PROSPECTIVE JUROR 458:  BMW.

MR. WILLIAMS:  How long have you had a BMW?

PROSPECTIVE JUROR 458:  Oh, ten years.

MR. WILLIAMS:  Is that better than a Harley?

PROSPECTIVE JUROR 458:  It doesn't vibrate as much, so I'd say it's better.

MR. WILLIAMS:  Do you go for long drives on your motorcycle?

PROSPECTIVE JUROR 458:  Sometimes.

MR. WILLIAMS:  There's an agent I work with out of Mason City that -- I think it's called the Iron Butt Competition.

PROSPECTIVE JUROR 458:  I'm not interested in that.

MR. WILLIAMS:  They have to ride for a long period of time.  They can't ever exceed the speed limit, but it's basically an endurance test.  You've heard about it.

PROSPECTIVE JUROR 458:  Yes, I have.

1965

MR. WILLIAMS:  Don't participate in that yourself.

PROSPECTIVE JUROR 458:  No.  I'm more into comfort

Page 44

instead of endurance riding.

MR. WILLIAMS: Makes sense. I want to talk to you about a concept in this case, and that is the burden of proof. In every criminal case the government willingly takes on the burden of proving its case beyond a reasonable doubt. Now, the Court will ultimately instruct you about what beyond a reasonable doubt means. Suffice it to say it doesn't mean beyond all possible doubt, but beyond a reasonable doubt is a higher burden than in a simple civil case where one side simply has to prove it's more likely true than not true that their side is right. In a criminal case we have a burden of proving our case beyond a reasonable doubt. Do you believe that's a fair burden on the government?

PROSPECTIVE JUROR 458: Yes, I do.

MR. WILLIAMS: Does anybody in this jury think that the government should have a lower burden of proof than burden of proof beyond a reasonable doubt? Don't see any hands.

Does anybody think it ought to be higher than proof beyond a reasonable doubt, proof beyond all possible doubt, for example? Anybody feel that way? Okay. I don't see any affirmation there.

If you could, why don't you pass the microphone down to Juror 601.

1966

Let me ask you on that issue, sir, you indicated in your questionnaire that if we didn't have these rules of presumption of innocence and proof beyond a reasonable doubt we wouldn't need a court system. Do you remember saying something to that effect in your questionnaire?

PROSPECTIVE JUROR 601: Right.

Page 45

MR. WILLIAMS: Are those concepts that the defendant is presumed innocent and the government has a burden of overcoming that presumption with proof beyond a reasonable doubt something that you believe very strongly in?

PROSPECTIVE JUROR 601: Yes, I do.

MR. WILLIAMS: Let me talk to you about the idea that in this case obviously the defendant is on trial which means she's been charged. In the federal system -- and I think Juror 800 talked about a grand jury. In the federal system, the way charges are brought is through a grand jury, a group of citizens. They meet, and they hear some evidence, and they decide whether there's probable cause to believe that the person committed the crime. It's not proof beyond a reasonable doubt. The defense isn't there. There's not cross-examination. It is a charging mechanism that's guaranteed to the citizens of the United States through the Constitution.

What's very important is while the defendant has been indicted by a grand jury, it's evidence of nothing. It is not evidence of guilt. Now, we don't obviously just pull people off

1967

the street and bring them in and suddenly put them on trial. And so the concern every time we empanel a jury is that jurors are going to come in; they're going to think, boy, there must be something there because, you know, she's charged, and so, therefore, there must be something against her. Jeez, I don't know.

What's important for us to have jurors understand is that a charge, an indictment against the defendant in this case, is not evidence of guilt. She is presumed innocent, and that presumption of innocence stays with her throughout the trial,

and it's only overcome by the government by proof beyond a reasonable doubt.

It's critically important that each and every one of you be able to afford her the full presumption of innocence and require the government to prove its case beyond a reasonable doubt and not reach any conclusion at all from the fact that she has been charged that, therefore, she must be guilty. Can you, sir, Mr. 601, afford this defendant the full presumption of innocence?

PROSPECTIVE JUROR 601: I can at this time, yes.

MR. WILLIAMS: And you're willing to wait to see if at all the government can prove its case beyond a reasonable doubt.

PROSPECTIVE JUROR 601: Yeah.

MR. WILLIAMS: Does every other juror in this panel agree with that premise of our criminal justice system?

1968

Everybody seems to be nodding.

Does any juror disagree, thinks that simply because the defendant has been charged, therefore, she's guilty and you can't afford her a presumption of innocence in this case? Does anybody feel that way? Sir, could you pass it back to 458, sir?

PROSPECTIVE JUROR 458: Yes, I think there must be a reason she's here. I didn't say she's guilty, but she's probably -- you know, there's a reason she's here. I just can't help but think that.

MR. WILLIAMS: Sure. And it's fair to think that, right, because obviously we didn't just walk down the street and pull the first person off the street and say, Okay, you're now going to be a criminal defendant in a trial today because Judge Bennett wants to keep his record of most trials per year, so

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1715 of 3245

let's keep it going. There must be something, right, because otherwise we wouldn't be here, and that's a fair belief that a lot of people have, and it's a fair understanding.

There's a difference between that and being able to put aside any thoughts of that. If that's all it took for somebody to be found guilty, we wouldn't need a jury trial; right? Is that fair to say?

PROSPECTIVE JUROR 458: Right.

MR. WILLIAMS: And so can you recognize that we have a jury trial for the very purpose of deciding whether the government was right in the first instance in charging the

1969

defendant? Can you recognize that?

PROSPECTIVE JUROR 458: Yes, I can.

MR. WILLIAMS: Do you think you as a juror if you're asked to be a juror in this case, can you set aside your initial thoughts that because the defendant's charged there must be something against her? Can you set that aside and hold the government to its burden of proving its case beyond a reasonable doubt?

PROSPECTIVE JUROR 458: Yes, I can.

MR. WILLIAMS: Thank you very much. Appreciate your candidness. If you can go ahead and pass that down to Juror 769.

The questionnaire that you filled out, you're a Spanish and drama teacher; is that right?

PROSPECTIVE JUROR 769: Yes, at this time, yeah.

MR. WILLIAMS: At a high school level.

PROSPECTIVE JUROR 769: Uh-huh.

MR. WILLIAMS: Do you have a spring play you're

Page 48

putting on?

PROSPECTIVE JUROR 769:   No, it was just a drama class. The spring play someone else did.

MR. WILLIAMS:   I see.  Do you like teaching drama?

PROSPECTIVE JUROR 769:   Actually I just got roped into that because the Spanish position was open so -- it's okay.

MR. WILLIAMS:   So the answer is --

1970

PROSPECTIVE JUROR 769:   It's okay.

MR. WILLIAMS:   You like Spanish much better.

PROSPECTIVE JUROR 769:   Yeah, and I can teach English as a second language too.

MR. WILLIAMS:   Have you been teaching Spanish for some time?

PROSPECTIVE JUROR 769:   Yeah, for about 15 years. Actually -- I actually did my student teaching in Mason City -- I don't think that was -- I don't think that came up on the questionnaire -- in 1985.

MR. WILLIAMS:   And I anticipate that doesn't impact your ability.

PROSPECTIVE JUROR 769:   No, I just thought -- I don't think it came up, so I thought I should say it.

MR. WILLIAMS:   Appreciate you raising that.  Do you take trips to Mexico or Spain with students?

PROSPECTIVE JUROR 769:   I haven't taken students, no.

MR. WILLIAMS:   That always struck me when I was going through school as one of the best parts I think of being a language teacher was the opportunity of maybe taking those trips once in a while with students.

PROSPECTIVE JUROR 769:   I like to go myself but not

Page 49

take kids.

MR. WILLIAMS: Not take a gaggle of students with you.

PROSPECTIVE JUROR 769: Huh-uh, no.

1971

MR. WILLIAMS: Understandable. I want to talk to you a little bit about the charges in this case. We have five murders that took place. Among the victims of that crime was a young mother and two little girls ages six and ten. Now, there are ten charges because the government's alleged that these murders were conducted in violation of two different federal laws. And so there were five murders committed in violation of a conspiracy to distribute and manufacture methamphetamine, that also -- five murders were also a violation of a law that prohibits people from committing murder if they're engaged in what's called a continuing criminal enterprise which is a drug conspiracy that has certain factors to it. Now, the judge will explain all that to you.

What I want to get across is that while there are five murders and this is a murder trial by any definition, the murders were committed in -- the government alleges in the indictment in furtherance and in connection with a drug conspiracy and with a continuing criminal enterprise which is a drug organization. So I want to talk to you about that for a minute.

The underlying current to this case, to the murders, is drugs, is methamphetamine. A lot of the jurors we have come through here express in their questionnaires a concern about controlled substances, in particular sometimes methamphetamine. And I think you had indicated, Miss 769, in your questionnaire

1972

Page 50

that you thought in response to one of the questions that drugs have kind of taken over the state, that meth had taken over the state. Is that fair to say?

PROSPECTIVE JUROR 769: It seems to be. It's in the news all the time.

MR. WILLIAMS: It is. Here's the important thing. This is a trial about whether this defendant committed the crimes we've alleged, whether she engaged in the conspiracy, a drug conspiracy, whether she engaged in a CCE, continuing criminal enterprise, and in connection with those participated in the murders of five people. This is not a trial about whether drugs are good or bad. Can you recognize that?

PROSPECTIVE JUROR 769: Yes.

MR. WILLIAMS: And can you recognize that we are not going to be making a decision here -- the jury's never going to have on any of the verdict forms the judge sends back to you the question, boy, do you dislike drugs or do you like drugs? That's not going to be the test or any verdict that we're going to be asking this jury to render. Do you understand that?

PROSPECTIVE JUROR 769: Yes, I do.

MR. WILLIAMS: So what's important is if people have strong views about methamphetamine -- and they're entitled to strong views about methamphetamine -- what's very important for us is to be able to have the jurors set aside those views. It's fine to have strong views about anything coming in as a juror.

1973

But what's important is that you be able to follow the Court's instructions and set aside those views when the Court tells you that you need to find this or that and follow those instructions

Page 51

and set aside views that you may have and decide this case based on the instructions given by the Court. Do you think you could do that?

PROSPECTIVE JUROR 769: Sure.

MR. WILLIAMS: And I want to ask that question to everybody in the panel. Does anybody here feel so strongly about the drug problems we're having that they think that it's going to interfere with their ability to give this defendant a fair trial, that it would interfere with their ability to presume her innocent and require the government to prove its case beyond a reasonable doubt? And if you feel that way, that's fine. We just need to talk with you about it. Does anybody feel that way? Don't see any hands.

I believe that's all I have at this point. Thank you very much for your time.

Thank you, Your Honor.

THE COURT: Thank you.

Mr. Willett?

MR. WILLETT: Thank you, Judge. Your Honor, if it please the Court, Mr. Stowers will give me a three-minute warning.

THE COURT: Okay. Thank you.

1974

MR. WILLETT: And, Your Honor, if it please the Court, I'll proceed now. Counsel for the government, counsel for the defense, Miss Johnson.

Ladies and gentlemen of the jury, again, my name is Al Willett. I'm one of the defense attorneys for Miss Johnson. I sort of like to refer to this part of the group voir dire as the lightning round because I have 30 minutes to get to as many

Page 52

people as possible. And on some days I've had to apologize that I might not hit all of you. Now, my concern is not that great today, but if I do not get to you, please do not feel offended. It's not for any reason I didn't wish to speak to you.

I have reviewed the questionnaires just as Mr. Williams has. And there were -- I sort of placed them in an order of answers I wanted to address. I'm not sure if Mr. Williams did this. If he did, I apologize for repeating myself. But did you all have a chance to review the witness list? Did anybody see a name on the witness list that they recognized, that maybe you just haven't had a chance to raise your hand and tell us about?

Mr. 601 -- Ms. 769, if you'd be so kind as to pass the microphone to Mr. 601.

Mr. 601, who is it that you think you know?

PROSPECTIVE JUROR 601: On the third page there's a person from Hawarden, Iowa, named Ron Finch.

MR. WILLETT: Ron Finch. I'm embarrassed to say that

1975

I'm having a blank moment. I know there's a lot of witnesses, and I know I should know all of them by heart. But, Mr. Williams, is Mr. Finch a government witness?

MR. WILLIAMS: Not a name I recognize.

MR. WILLETT: Well, now I'm doubly embarrassed. How do you think you know Mr. Finch, sir?

PROSPECTIVE JUROR 601: Well, if it's the Ron Finch, he's my next-door neighbor in Hawarden.

MR. WILLETT: Then you would know him. And if your next-door neighbor came in to this courtroom and testified, how would that impact you, sir?

Page 53

PROSPECTIVE JUROR 601: Well, it would make a difference on how I felt and how he would treat me.

MR. WILLETT: Okay. When you say how you felt, do you -- and we won't tell Mr. Finch what your answer is to this question, but, I mean, do you find him to be a believable person?

PROSPECTIVE JUROR 601: Yes, I do.

MR. WILLETT: So if he testified to something, you would accept his story just absolutely and wouldn't question it.

PROSPECTIVE JUROR 601: Yes.

MR. WILLETT: Okay. Now, you also said, How he felt about me. Do you think it would put you in a precarious position?

THE COURT: Mr. Willett, I'm going to interrupt you.

1976

MR. WILLETT: I apologize.

THE COURT: No, no, no, no, no. It's just a suggestion. Before we go any farther with this line of questioning, why don't you meet with your defense team and figure out if it's the same -- or you now know it is the same person.

MR. WILLETT: I'm not sure, Your Honor, without meeting with my defense team.

THE COURT: Why don't you take a minute, meet with them, and then it may obviate the need for further questioning.

MR. WILLETT: Want me to take a moment now?

THE COURT: Yes.

MR. WILLETT: Thank you, Judge.

THE COURT: And it won't even count out of your time. How's that?

Page 54

MR. WILLETT: I appreciate that, Your Honor.

Mr. 601, if it helps you, I've been assured by my co-counsel that the Mr. Finch we're speaking of is not the Mr. Finch you're thinking of. So are you comfortable with that representation, sir?

PROSPECTIVE JUROR 601: Well, there is more than one Mr. Finch, Ron Finch.

MR. WILLETT: I would agree. I would agree. So does that ease your mind?

PROSPECTIVE JUROR 601: Somewhat.

1977

MR. WILLETT: Okay. What gives you pause for concern, sir?

PROSPECTIVE JUROR 601: Well, he's got a son by the name of Ron Finch too.

MR. WILLETT: I see, okay. And if the son came to the stand, would that pose a problem for you?

PROSPECTIVE JUROR 601: No, not at this time.

MR. WILLETT: Not at this time. Now, I'm thinking too much like a lawyer, I know, but to me that's a qualifier for an answer. When you say not at this time --

PROSPECTIVE JUROR 601: Well, that's a question I right now would say no, it wouldn't, but down the road I can't say it wouldn't.

MR. WILLETT: How do you feel it might affect you down the road, sir?

PROSPECTIVE JUROR 601: Well, it could sway my verdict.

MR. WILLETT: So would it sway your verdict to whichever side Mr. Finch testified for?

Page 55

PROSPECTIVE JUROR 601:  Possibly.

MR. WILLETT:  Okay.  Okay.  Thank you.  If you would, please, hand the microphone to Miss 769.

Miss 769, I wanted to start with you.  I noticed that your father's a police officer.

PROSPECTIVE JUROR 769:  He was for a short time back 1978 in the '70s.  He's deceased now so . . .

MR. WILLETT:  So that fact that he used to serve in law enforcement wouldn't impact you --

PROSPECTIVE JUROR 769:  No, I was really young, no.

MR. WILLETT:  And the reason I say that is there's scores of witnesses in this case, a great number of them produced by the government.  You'll get to see FBI agents, Alcohol, Tobacco, and Firearm agents, Drug Enforcement Administration agents, state Department of Criminal Investigation agents, Mason City Police, Cerro Gordo county sheriff.  In my humble opinion there may be days when all you see is law enforcement agents that take the stand.  And I just wanted to make sure that if you had that in your personal history Mr. Williams didn't have a leg up with you in terms of the credibility of his witnesses.

PROSPECTIVE JUROR 769:  Oh, no.  I hadn't even thought about it until that -- until I had to fill out the questionnaire.

MR. WILLETT:  Very good.  There were a couple things in your questionnaire that I wanted to speak to you about.  And you were asked to list three of the biggest problems facing our criminal justice system today.  Do you remember that question?

PROSPECTIVE JUROR 769:  Yes.
Page 56

MR. WILLETT: Question 58, and your first answer was, Too many pleas of innocence. Now, being a defense lawyer, that

1979

caught my attention, and I just wanted to ask you what you meant by that.

PROSPECTIVE JUROR 769: Well, I think a lot of people do things and they just say they're innocent anyway when they've done it.

MR. WILLETT: But do you have a problem with the government having the burden of proof?

PROSPECTIVE JUROR 769: No, no.

MR. WILLETT: To prove guilt beyond a reasonable doubt?

PROSPECTIVE JUROR 769: No, and I was thinking little -- you know, like even speeding. Oh, I don't speed and little things, yeah.

MR. WILLETT: Sure. But this isn't a little thing.

PROSPECTIVE JUROR 769: Right.

MR. WILLETT: Obviously this is one huge thing.

PROSPECTIVE JUROR 769: Right.

MR. WILLETT: Not only is it big in terms of the allegations, it's the ultimate in terms of a potential penalty. And you realize that Angela has this presumption of innocence.

PROSPECTIVE JUROR 769: Yes.

MR. WILLETT: Okay. And this isn't -- this burden of proof isn't shifting if your mind because she's entered a plea of not guilty to these charges. I mean, that's not a problem for you, is it?

1980

Page 57

PROSPECTIVE JUROR 769:  No, no.

MR. WILLETT:  Great.  Your next -- one of your next questions, number 60, you were asked about how do you feel about the proposition that a defendant is presumed to be innocent, and the second part of your answer stated -- and that's question number 60 -- I think many people have gone free due to their attorneys not presenting a good case.  Do you remember that answer?

PROSPECTIVE JUROR 769:  Yeah, vaguely, yeah.

MR. WILLETT:  How am I doing with you so far?  Are we doing okay?

PROSPECTIVE JUROR 769:  Yeah, yeah.

MR. WILLETT:  What did you mean by that answer, ma'am?

PROSPECTIVE JUROR 769:  I'm just saying it could happen that, you know, maybe there are people who aren't guilty but they weren't represented well enough or whatever.  I think that's what I meant.

MR. WILLETT:  Okay.  And you're certainly giving everybody a clean slate here, Mr. Williams and Mr. Miller as well as myself and Mr. Berrigan and Mr. Stowers.

PROSPECTIVE JUROR 769:  Yes, yes.

MR. WILLETT:  Okay.  Great.  Now then, here's one very important concept, and I wanted to broach it with you.  The Fifth Amendment to the United States Constitution -- and you may have heard about the Fifth in movies or TV shows.  The right of

1981

a person to decide whether or not to take the stand in a criminal trial, are you familiar with that?

PROSPECTIVE JUROR 769:  Uh-huh, yes.

Page 58

MR. WILLETT: Some people call it the right against self-incrimination.

PROSPECTIVE JUROR 769: Yes.

MR. WILLETT: Now then, I'm going to speak to you, but this is for the benefit of the entire panel. Miss Johnson will not take the stand in her own defense.

PROSPECTIVE JUROR 769: Okay.

MR. WILLETT: She is exercising her Fifth Amendment right in that regard. Judge Bennett will instruct you at the appropriate time in this case that you cannot hold that against her, you can't take any negative inference from it, and a lot of people react differently to this. Now then, you just happen to be the one holding the microphone, but when I tell you that Angela Johnson will not take the stand in her own defense, what's your first reaction?

PROSPECTIVE JUROR 769: That she's been maybe told by her attorneys that that would be better not to.

MR. WILLETT: Well, advice of counsel and the Sixth Amendment is a very important part of a criminal trial. Now, you're not going to be told the reason why she's made that decision. But would you hold that against her in any way?

PROSPECTIVE JUROR 769: No, I don't think so.

1982

MR. WILLETT: Here's where I'm coming from. A lot of people, a lot of people share the opinion that, Mr. Willett, if I was charged with ten crimes, five of them capital murders, and facing the death penalty, let me tell you I'd be knocking people down trying to get to the witness box to tell my story. And what I want to make sure of is either, A, you don't hold that view or, B, if you do you will certainly set it aside and

Page 59

respect my client's view, Angela's view, on this issue.

PROSPECTIVE JUROR 769:  Yes.

MR. WILLETT:  Does anybody have a problem?  Now that you know Angela Johnson will not take the stand in her own defense, is anybody thinking, oh, boy, Mr. Willett, this is serious stuff and, man, I want to hear from her, and I don't know why she wouldn't, and I'm not sure I could understand why she wouldn't?  Does anyone have this problem?  Would you please pass the microphone to Mr. 628?

THE COURT:  Before we get to 628, I'd like to see the lawyers at sidebar for a second.

(At sidebar on the record.)

THE COURT:  I think you misspoke, and I just didn't want to leave the jury with a false impression.

MR. WILLETT:  I'm sorry.

THE COURT:  You said ten crimes, five of them capital murders.  All ten charges carry --

MR. WILLETT:  I apologize.  And I'll correct that.

1983

THE COURT:  It wasn't intentional, and I didn't want to jump in and correct you.

MR. WILLETT:  No.  I apologize.

THE COURT:  Is that okay?  Did you catch that?  I mean, I caught it.

MR. WILLIAMS:  Yeah.

THE COURT:  I think it's confusing.

MR. WILLETT:  Okay.  Ten crimes, each of which.

THE COURT:  Yes.

MR. WILLETT:  Okay.

(The sidebar was concluded.)

Page 60

THE COURT: Sorry about that.

MR. WILLETT: May I proceed, Your Honor?

THE COURT: You may, thank you.

MR. WILLETT: I may have misstated -- and if you would please pass the microphone to Mr. 628. I may have misstated one part of this case when we were discussing it, Miss 769. There are ten counts, and there's a murder linked to each count, so in essence I may have said five murders. There's murder -- ten counts, a count of murder attached to each count, ten murder counts. Would that have affected your answer to my question about the Fifth Amendment differently?

PROSPECTIVE JUROR 769: No.

MR. WILLETT: Okay. Great.

Mr. 628, you wanted to talk to me about the Fifth

1984

Amendment.

PROSPECTIVE JUROR 628: I don't understand like if you assume yourself innocent that you wouldn't want to get up there and say, This is my side of the story, this is why I'm innocent, stuff like that.

MR. WILLETT: Sure, sure. Well, let me ask you something. Judge Bennett pointed out to you this is the witness box.

PROSPECTIVE JUROR 628: Right.

MR. WILLETT: Do you think this is the easiest place to sit in the world?

PROSPECTIVE JUROR 628: No.

MR. WILLETT: Do you think you could become nervous if you were sitting here?

PROSPECTIVE JUROR 628: Absolutely.

Page 61

MR. WILLETT: Do you think if you didn't have a great deal of formal education you might be nervous answering questions from a very accomplished trial lawyer with a great deal of formal education?

PROSPECTIVE JUROR 628: Yes.

MR. WILLETT: Now then, knowing those things, that this might not be the easiest place in the world to sit and knowing the severity of these charges, the severity of the potential punishment, do you still feel the same way?

PROSPECTIVE JUROR 628: Well, seeing the severity of

1985

it, I would still want to give my side of the story, especially even more so because it's such a big deal.

MR. WILLETT: And I understand that's a completely appropriate answer. But will you be able to respect Miss Johnson's decision that she's not going to take the stand and that under the Constitution she has that right to make that choice?

PROSPECTIVE JUROR 628: Yes.

MR. WILLETT: Okay. The judge will instruct you later on at the appropriate time that you shouldn't take a negative inference from it, you should set it aside. How do you feel about that?

PROSPECTIVE JUROR 628: I understand that.

MR. WILLETT: You understand it, but do you think you can comply?

PROSPECTIVE JUROR 628: Yes.

MR. WILLETT: Okay. Does anybody else want to speak to me about this issue of the Fifth Amendment?

THE COURT: Let me jump in here for a minute --

Page 62

MR. WILLETT: Yes, thank you, Judge.

THE COURT: -- if I may. Juror 628, that's -- I've done jury selection in hundreds of cases, and that's a fairly common response, and a lot of people hold the view that, gee, if I was charged with a crime, you couldn't keep me off the witness box, and that's a perfectly reasonable position to take. But I

1986

just want to make sure you understand -- and I think you do -- and that all -- and everybody understands, for my money the Fifth Amendment right is the most precious right that all of us have, that all of us have.

And are you -- are jurors sometimes curious about why a defendant exercises their right not to testify? That's natural human cure -- I'm curious. I often think -- and you know what? A lot of times I don't know if the defendant is going to testify or not testify till we get to that part of the case and they either testify or they don't. I don't know ahead of time. And I'm always curious. But I would never, ever hold it against a defendant because it's such an important right that all of us have.

So on the one hand -- and this is just really important, and that's why I jumped in -- it's okay for you to believe that you're the type of person who would want to testify, but not everybody is that type of person. And I just want to make sure -- it's okay for you to think that. And, you know, a lot of people think that. Maybe most people think that. And that's okay. But what's not okay would be to penalize or hold it against Angela Johnson in any way because she's exercising this very precious right not to testify if she doesn't want to.

Page 63

So can you promise me and all of the lawyers in the room and, most importantly, Angela Johnson, can you promise us

1987

that even though you would testify you're not going to hold it against her if she doesn't testify?

PROSPECTIVE JUROR 628:  Yes.

THE COURT:  Okay.  It's okay to be curious, but you can't let that curiosity interfere with your judgment that she's got an absolute right not to testify, and any curiosity can't affect your deliberations.  You can't go back into the jury room and discuss it and say, Gee, I wonder why she didn't testify. After the trial's all over and whatever happens happens, you can think about it all you want.  And I'm always -- I mean, I'm a curious person.  I think most jurors are very curious, but I just have to make sure you wouldn't hold it against her in any way, and I understand you're not going to.

Do any of the other jurors have a problem?  Raise your hand if you're for whatever reason unable to give Miss Johnson the full benefit of the presumption of innocence and not hold it against her in any way if she decides not to testify.

Okay.  Thank you.  Sorry to interrupt.

MR. WILLETT:  No, that's okay.  Thank you, Judge.

Mr. 628, I'm going to stay with you because I had your questionnaire next.  You had some opinions about controlled substances that you articulated very plainly in your questionnaire, and I just want to discuss that with you. Question 41, Do you have any opinions about controlled substances or drug laws that might affect how you decide this

1988

Page 64

case, and you answered yes. If yes, please explain. I am very strongly against the use of any drug. Self-evident. I understand completely.

Question 42, do you believe the possession or sale of drugs should be a crime? Answer, Yes. Why? Involvement without -- excuse me, involvement with any kind of drug leads to nothing but trouble for the person and the people around them.

Now then, you heard Mr. Williams explain that the underlying current to this murder case is a conspiracy and a continuing criminal enterprise involving methamphetamine. And the conspiracy is a criminal agreement, in this case the allegation being the making of and the delivery of methamphetamine. And you will hear plenty of evidence from the government that it is their belief that Angela Johnson was knee deep in a criminal conspiracy and that she did things to facilitate, if you will, this continuing criminal enterprise. Does that impact how you would look at Miss Johnson in this case?

PROSPECTIVE JUROR 628: A little I suppose, only because I've had friends that have been involved. I've had friends that have used, and I've seen where it's gone, how it's affected them, how it's affected their families, everyone around them.

MR. WILLETT: Can you still give Angela Johnson the presumption of innocence?

1989

PROSPECTIVE JUROR 628: Yes.

MR. WILLETT: And reflecting upon that, you don't have any doubt in your mind about that.

PROSPECTIVE JUROR 628: No.

Page 65

MR. WILLETT: One further question on your questionnaire, right near the end, 99, In your opinion is there anything about this case, the issues, and/or the people involved in this case that might hinder you even slightly from being an impartial juror, and you checked the yes box. You were asked to describe, and you stated, The fact that there's children involved really bothers me.

Now, you heard from Mr. Williams during his portion of the voir dire that two of the victims are two little girls who at the time of their murder were ten and six. Now then, now knowing about drugs and we've discussed your answers there, now knowing what -- how you feel about children being involved which certainly is an answer that's been articulated before you arrived today, how do you feel about Angela Johnson now?

PROSPECTIVE JUROR 628: The kid thing like really bothers me a lot. I suppose I can still be -- I can be impartial still. Just that's a pretty bad thing.

MR. WILLETT: I had a hard time hearing you, sir.

PROSPECTIVE JUROR 628: The kid thing's really bad, and it bothers me a lot. I could still be impartial, though.

MR. WILLETT: Can you still give Angela Johnson the

1990

presumption of innocence?

PROSPECTIVE JUROR 628: Yes.

MR. WILLETT: Would you please pass the microphone to Ms. 800?

Ms. 800, you were asked about cooperating individuals, and Mr. Williams touched on this answer, but I wanted to go into it with just a little more detail. A cooperating individual is the politically correct name for a person who says, Well, I may

have a record, I may be in jail myself, but I came across a piece of information I'd really like to share. And what a lot of them hope to do is that in return for sharing they get a benefit that might help them in the long run. Are you with me?

PROSPECTIVE JUROR 800: Yes, I am.

MR. WILLETT: The politically incorrect nickname for that group of witness might be a snitch.

PROSPECTIVE JUROR 800: Yeah, I know that.

MR. WILLETT: Which is what I'm more familiar with, but let's call them a cooperating individual. What would you think of a witness who is or was in jail or prison who agreed to cooperate with the government by testifying against a person charged with a crime? And in question 51 your answer was, I would believe in the bravery of that witness. However, I have some, in parentheses, little concern if the motivation is for a plea bargain and this witness doesn't learn from the bargained sentence. Now, I thought the last part of that answer was

1991

tremendously interesting, and I needed to know what you meant by that.

PROSPECTIVE JUROR 800: It was probably about the time I was real frustrated with doing 17 pages of -- I don't know which one it was, but anyway, no, I think what I was saying is yeah, it does require a certain amount of bravery. However, you know, I do have to question that motivation --

MR. WILLETT: And that's what I wanted to make sure --

PROSPECTIVE JUROR 800: -- period.

MR. WILLETT: -- that you respect the person for taking the stand, but you're still willing to look at them with a discerning eye.

Page 67

PROSPECTIVE JUROR 800: Yes, I am.

MR. WILLETT: You were asked in question 58, What are three of the biggest problems facing our criminal justice system today? And part of your answer stated, We have more citizens because of the increasing population with a total disregard for the price of citizenship. I thought I understood, but I wasn't sure, and I wanted to ask. What did you mean by that answer, ma'am?

PROSPECTIVE JUROR 800: Well, it just -- I'm old enough that I can say it seems to me when I was younger -- and I used to hate my mother saying that -- that people had a little bit more respect for citizenship than people do today, and maybe it's just because more people, overcrowding, you know.

1992

MR. WILLETT: Sure, sure. Would you please be so kind as to hand the microphone down to Mr. 601. Mr. 601 has the blue jacket.

Mr. 601, you were asked in question 41, Do you have any opinions about controlled substances or drug laws that might affect how you decide this case, and you answered yes. If yes, please explain. Certain controlled substances should be made legal for medicinal purposes. Now, you didn't specify. Based upon news reports lately and what some states are doing, I thought maybe I was following you, but I didn't want to assume. I wanted to ask what you meant by that answer.

PROSPECTIVE JUROR 601: Well, at one time I had a real good friend that was going through cancer treatment, and they told him at that time that one of the only things that would help him get through that would be the use of marijuana. And it was not legal at the time. So we decided then that it would

Page 68

probably be a good idea for some things to be used for medicinal purposes.

MR. WILLETT: Now then, the fact that methamphetamine is the controlled substance driving this case, is the government at a disadvantage because of your thoughts and reflections about your friend's situation and how marijuana might or might not have helped his physical ailments?

PROSPECTIVE JUROR 601: Well, methamphetamines are not for my society. I had a user down the street. He is right now

1993

in the jail. It just makes for a bad neighborhood, period.

MR. WILLETT: I understand. And not suggesting in any way your opinion about that is wrong, but will your opinion about that reflect adversely when you're trying to make decisions about Angela Johnson?

PROSPECTIVE JUROR 601: I would say no.

MR. WILLETT: Okay. If you'd be so kind as to pass the microphone to Mr. 458.

And, Mr. 458, I wanted to ask if I might, you had some opinions about drugs for lack of a better label based upon personal knowledge. Might I ask you about that, or are you willing to talk about that with me?

PROSPECTIVE JUROR 458: Sure.

MR. WILLETT: Okay. Thank you so very much. Question 43, Has any member of your family or a close personal friend used any drugs, been addicted to drugs, or been placed in a drug treatment program? You answered yes. When asked to explain, you stated, I have been addicted to drugs. What impact did the problems have on their person or family? Ruins families. Do you blame anyone for the problem? Yes, people who have drug

Page 69

problems are responsible for their own problems.

First of all, sir, you're not the first person who's come before us to talk about their own personal situation, and I wanted to compliment you on your courage and your strength of character not only in answering this but being willing to talk

1994

about this with us. Is the drug that you had an addiction to, was that methamphetamine?

PROSPECTIVE JUROR 458: No, it wasn't.

MR. WILLETT: Okay. Now then, your last answer I found very interesting. People who have drug problems are responsible for their own problems. Now, the way I take that is sort of the way my father would talk to me when I was young that, Alfred, you pull yourself up by your own bootstraps. And that's sort of how I took your answer that you're responsible for your own problems and you solve them yourself.

PROSPECTIVE JUROR 458: No, that isn't how I meant it. That is we're all responsible for our own actions.

MR. WILLETT: I understand where you're coming from. Now then, you're going to hear evidence presented by the government that at various times Angela Johnson may have used methamphetamine herself. Is this going to impact you in your ability to decide this case if you hear that evidence?

PROSPECTIVE JUROR 458: No.

MR. WILLETT: Okay. And -- okay. Good. We'll leave it right at that.

Number 71, I don't think we've talked to Miss 71 yet. Miss 71, on your questionnaire, question 58, What are three of the biggest problems facing our criminal justice system today, and your answer was, Not always letting all the evidence into

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1738 of 3245

court.  What did you mean by that, ma'am?

1995

PROSPECTIVE JUROR 71:  Well, a lot of times -- and, I mean, I don't know in real courtrooms, but on TV, you know, they'll say something, you know, and then the judge will say, Well, you have to disregard that or something, you know.  You're not -- you know, if there's something to do with a trial, a case, I think everything should be brought forward, but I think there are times when things aren't allowed in.

MR. WILLETT:  Certainly.  And you understand that that's Judge Bennett's job.  I mean, that's a very important part of his job.

PROSPECTIVE JUROR 71:  Right.

MR. WILLETT:  And the analogy I give -- and this is probably way too simplistic, and I don't mean to make it sound that way, but in a large way Judge Bennett's like a gatekeeper.  And if you will think of it that he's sort of a gatekeeper and inside the gate are a bunch of really nice sheep, and that's the good evidence.  Are you with me?

PROSPECTIVE JUROR 71:  (Nodded head.)

MR. WILLETT:  And he lets the good evidence in, but if the wolves are the bad evidence for whatever reason, you don't want wolves in the same pen with the sheep, do you?

PROSPECTIVE JUROR 71:  No.

MR. WILLETT:  No.  So --

THE COURT:  Mr. Willett, let me jump in here, and it won't count on your 30 minutes, but this book contains the

1996

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1739 of 3245

Federal Rules of Evidence. Now, the federal rules aren't the entire book, but we have Federal Rules of Evidence for a reason. And lawyers and judges have been studying evidence for over 200 years in this country. Some types of evidence are admissible under the federal rules, and other types aren't because they're deemed inherently untrustworthy. Does that make sense to you?

PROSPECTIVE JUROR 71: Yes.

THE COURT: Okay. Let me give you an example we can all relate to. Have you heard the term hearsay?

PROSPECTIVE JUROR 71: Yes.

THE COURT: Everybody's heard that from TV. It's a very complicated concept. There are 27 recognized exceptions to the hearsay rule under the Federal Rules of Evidence. Each exception has some subexceptions. There are thousands of judicial opinions every year on what hearsay means. There are literally hundreds of books, thousands of articles written about it. I've been studying hearsay since my second year of law school when I took my first evidence class in 1973. It's a very complicated matter. And I have to make decisions about whether something's hearsay or not in almost every trial. But it's important that only admissible evidence be admitted into the trial.

Let me give you an example. Have you ever played this game where somebody says something to somebody and usually you sit in a circle? We played it at my daughter's birthday party a

1997

few years back. And you whisper a phrase, and then the next person whispers it, and they go around the room, and then at the end it's totally different. Have you ever played that game, or can you imagine it?

Page 72

PROSPECTIVE JUROR 71:  (Nodded head.)

THE COURT:  I think people call it the telephone game or something.  That's the best example I know of why hearsay is generally not admissible unless it meets one of the 27 exceptions.  Hearsay isn't admissible because when somebody says something to somebody else and that somebody else repeats it and then that somebody else repeats it, it almost always becomes inaccurate.  And so legal scholars for centuries have studied this and decided that what he said what Peter said to Paul who said to Mary who said to Sam who said to Steve who then said to Phil, Phil can't come in and testify to that because it's not reliable.

And I guess I'm asking you to have some faith in the United States Congress who ultimately passes on the Federal Rules of Evidence and the federal judges and the United States Supreme Court who ultimately decide what the Federal Rules of Evidence mean.  It's very important.  Trials would be chaotic without it.  Can you appreciate that?

PROSPECTIVE JUROR 71:  Yes.

THE COURT:  Okay.  Good.  Thank you.

MR. WILLETT:  May I proceed, Your Honor?

1998


THE COURT:  You may.

MR. WILLETT:  Your Honor, if it please Court, I have no idea where I'm at on my 30 minutes, but I just have two concepts left.

THE COURT:  You finish your two concepts.

MR. WILLETT:  Thank you very much.

Miss 71, if you'd hand our microphone down to Mr. 601.

Mr. 601, I now have a little more information for you

Page 73

on Ron Finch.  Mr. Finch used to live in Clear Lake and was a supervisor of my client when she worked at a Pizza Hut in Clear Lake, and it's now our understanding that Mr. Finch now lives in Hawarden, so I'm assuming we're talking about Ron Finch Senior as opposed to Ron Finch Junior.

PROSPECTIVE JUROR 601:  Ron Finch Senior is my neighbor.

MR. WILLETT:  Okay.  Now then, this little bit more information I've been able to impart to you that that's the connection, he'll testify as a defense witness, testify to his knowledge back when he lived in Clear Lake about Angela Johnson, is this going to affect your ability to sit as a juror in any way?

PROSPECTIVE JUROR 601:  I want to say yes, but how do I know?

MR. WILLETT:  Well, when you say, I want to say yes, are you saying, Yes, Mr. Willett it will affect my ability to be

1999

a juror?

PROSPECTIVE JUROR 601:  Yes, it will.

MR. WILLETT:  Okay.  And can you just tell us, sir, how that would be?

PROSPECTIVE JUROR 601:  I would hate to have to put up with the next-door neighbor being on the stand.

MR. WILLETT:  Okay.  This may not be the right word. Is it just a feeling of not being comfortable?

PROSPECTIVE JUROR 601:  Right, right.

MR. WILLETT:  I see.  Anything else you can tell us about how you think Mr. Ron Finch testifying on behalf of my client might affect you since you're next-door neighbors?

Page 74

PROSPECTIVE JUROR 601: Well, not really. It would just make me very uncomfortable, make me uneasy.

MR. WILLETT: Okay. And -- okay. Thank you. If you'd pass the microphone back to Ms. 755 -- and this is my final, Your Honor -- Miss 755, you were asked about corroborating witnesses -- or cooperating witnesses, and I misspoke because I was looking at your answer when I said corroborating, but you were asked what would you think of a witness who is or was in jail or prison who agreed to cooperate with the government by testifying against a person charged with a crime. That was question 51, and your answer was, I would be inclined not to trust them unless somebody, quote, outside, unquote, could corroborate at least a portion of what they

2000

claimed. Everyone has their self-interest in mind.

Now, I don't know about the community theater in Sioux City, but the community theater in Cedar Rapids we always joke it's all about me, and that's what I was sort of thinking of when I read the last part of your answer that everyone has their own self-interest in mind. But what happens if a cooperating individual comes to the stand and testifies and there won't be anybody outside the walls to corroborate what they're saying?

PROSPECTIVE JUROR 755: Well, I think you have to take it on almost a case-by-case basis. You know, if you've got one person who always has information for every case that -- you know, if the person in the cell next to him, he always has information on that, that's different than the one guy who's, you know, model prisoner, you know, never does anything to upset anything. If he comes forward, I think he has a little more weight than the person who's always saying me, me, me, hey,

Page 75

listen to what I say.

MR. WILLETT: Okay. So if somebody maybe walks in here for the first time and says, I've never done this in my life, but I heard this information that I'd like to share, that in your mind might make somebody a little more credible as to a person that I might call a professional snitch, somebody who's always going, I know about him, I know about her, I know about him, let me tell you about him?

PROSPECTIVE JUROR 755: Exactly, exactly. But also if

2001

the person who's the -- we'll call them the professional snitch. If someone says, Hey, you know, this time he -- you know, if they say, Yeah, he -- for example, again, going back to TV, he's in the cell next to him for five years, of course there's going to be something that's not able to be corroborated because, you know, there just may not be, but in general you kind of have to take it on a case-by-case basis.

MR. WILLETT: And I take it from the last sentence in your answer you'd be willing to look at a person's motivation.

PROSPECTIVE JUROR 755: Yes, yes.

MR. WILLETT: Great. Your Honor, thank you. Thank you for allowing me to go over time. I'm assuming I did. Thank you for the courtesy.

THE COURT: That's fine. Thank you.

Members of the jury, we're going to take a 25-minute recess, and then we're going to start individual questioning, and we're just going to follow the same pattern which is good news for Jurors 628 and 71 because we're going to start in the back row. We're going to just go down the back row and then go down the front row.

Page 76

So, 769, I hope you brought something to read to occupy your time with because somebody's gotta go last, and you're the one that's going last. But we have a much smaller group, so we should get through everybody by mid-afternoon.

And again, once you're questioned individually, as

2002

soon as you're done, we'll have you step outside, and then we'll bring you back in, and you'll know your status about whether you're in the jury pool and thus have a 50 percent chance of being selected or whether you're dismissed.

So we'll see the first juror, 628, in about 25 minutes. And then the rest of you, you can kind of judge -- it takes about on average -- you know, each side gets 12 minutes, so we're talking about, you know, 25 minutes or so per juror, so you can kind of figure out when you have to be back in to the jury room. You're free to go out and go shopping or whatever you want to do. But I wouldn't suggest going to a double feature movie because you won't be back in time.

Please remember my cautionary instruction about not discussing this case among yourselves or let anybody talk to you about the case. Thank you.

(Panel H exited the courtroom.)

THE COURT: Anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Do we want to deal with Juror 601 now, sir? This is the gentleman who said that if Ron Finch testifies it's going to affect his deliberations.

THE COURT: Well, why don't we sit down and talk about it. What do you suggest?

MR. BERRIGAN: I suggest we do. Frankly, I'm not sure

Page 77

which way it's going to affect his deliberations, to be quite

2003

honest. He said it would make him uncomfortable.

THE COURT: Well, he also said he'd give him virtually -- he'd find him totally credible. That was the first thing he said.

MR. BERRIGAN: Yeah, that may be true. I'm not sure. Was that what he said?

THE COURT: Yeah.

MR. BERRIGAN: Okay. Well, I think that's more of a government issue.

THE COURT: Maybe that's a poor paraphrase, but I think he said -- what I got out of it was that he found him to be a very believable person and he would find his testimony very believable and that he would treat him differently than he would other witnesses.

MR. BERRIGAN: Okay. All right. I was paying more attention to the last part than the first part.

THE COURT: Right, right.

MR. BERRIGAN: Well, that's not my problem I suppose.

THE COURT: Well . . .

MR. BERRIGAN: I think it's a problem.

THE COURT: I suppose it's everybody's problem.

MR. BERRIGAN: I think it's an issue. Here's a gentleman that says, I know a witness who's going to affect my deliberations. I can't imagine how he could sit as a juror, frankly, even if it's good for me.

2004

THE COURT: Right. I hear you. I hear you.

Page 78

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1746 of 3245

So what's the government's position?

MR. WILLIAMS: I don't know if we have one at this time. It's maybe one that we want to explore individually with him a little bit more. My gut reaction is it doesn't really matter to me. You know, my understanding of Ron Finch is he's going to come in and say something nice about the defendant as a character witness during the penalty phase. And, you know, if the juror gives that witness more credibility about that, that's -- you know, that's not going to decide this case. And it really doesn't bother me one way or the other is my gut reaction to it. But I think we'd like to perhaps explore that a little bit more with him during individual questioning or at least think about it a little bit more at this point.

THE COURT: I made a note I was going to question him further about it, but I just thought I'd do it individually rather than in the group. I mean, I understand your position, but I kind of have a process problem with it, you know, looking at the bigger picture that it doesn't project the type of -- I mean, it's unlikely if he got on the jury that any of the other people today would also be on the jury. I mean, I don't know, but to me it just doesn't send a very good message. We ought to be concerned about the appearance of justice as well as doing justice.

MR. WILLIAMS: Certainly.

2005

THE COURT: I tell them that, and to me it rubs me the wrong way to leave a juror on who has already indicated their view of the credibility of a witness just from an overall -- and it doesn't make any difference who he favors, who he doesn't favor. I'm not even looking at that.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1747 of 3245

MR. BERRIGAN: If I'd have been paying more attention, I would have kept my mouth shut.

THE COURT: No, because you have an obligation.

MR. BERRIGAN: That's right, Judge, because I've never heard a juror say "it would affect my deliberation" and survive that process. I don't know how that works. I'd certainly be concerned about it if I were you.

THE COURT: I am concerned about, and I understand your position that in the whole mix it may not make any difference, and it might not. To me it's a larger-picture issue, you know, not really for this case, but in general is that the kind of message we want to tell prospective jurors, that we're going to leave somebody on who knows a witness and has already judged his credibility? Just doesn't send --

MR. WILLIAMS: Just so we're clear, I don't care. I mean, if he's struck, I don't care if he's struck for that reason. It's just one of those that, you know, we could explore further with him individually. Or if you just want to make a call at this point, that's fine too.

THE COURT: Well, does either side have an objection

2006

if I strike 601?

MR. BERRIGAN: None by the defense, sir.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. And we're sure now that this Ron Finch, the pizza man, is also the Hawarden person.

MR. BERRIGAN: Unless there's more Ron Finches in that town, I think we checked on that. I had Mr. Stowers check on it. So we're pretty sure it's the same guy.

THE COURT: Okay. It is a small world.

Page 80

MR. BERRIGAN: Yeah.

THE COURT: Yeah. I'm going to go ahead -- as much as I would like to get some more jurors added to our jury pool, it's an important big-picture issue to me, so I'm going to go ahead with no objection from the parties and strike 601.

And, Carey, maybe you could just go down and let Juror 601 know that. So he's out.

Okay. We'll see you back here in 20 minutes or so. Thanks.

(Recess at 10:29 a.m.)

THE COURT: Okay. We ready for 628?

MR. BERRIGAN: Yes, sir.

MR. MILLER: Yes, sir.

(Prospective Juror 628 entered the courtroom.)

THE COURT: Juror 628, anywhere in the front row. Thank you.

2007

Everybody be seated. We're going to start first with questions from one of the prosecutors, Mr. Miller.

EXAMINATION

BY MR. MILLER:

Q. Good morning, sir. I want to visit with you about a couple things this morning. First I want to visit with you about anything you may know about this case other than what was in the questionnaire, and I also want to visit with you a little about your thoughts on the death penalty; okay?

First -- and thanks for filling out this questionnaire -- I noted that you did have some exposure to this case in the form of conversations with coworkers and the like before receiving the questionnaire. Can you just tell us in

Page 81

your own words what you recall hearing about this case?

A.    Lot of it was just their own opinions about like what had happened, what should be done because of it, stuff like that, nothing really in particular.

Q.    Well, things like what should be done with it, things like that.  What do you remember being tossed around?

A.    The majority of it's pretty strong towards they think it should be the death penalty, stuff like that.

Q.    Where do you work, sir?

A.    I work at a restaurant, Hardee's.

Q.    So at least for a period of time it was a topic of conversation there?

2008

A.    Among everyone else, right.

Q.    Do you recall when it was last a topic of conversation there?

A.    The last time it was talked about was probably maybe last week.

Q.    Since you got the questionnaire, have you been exposed to people talking around you about the case?

A.    At work a lot.

Q.    Just go ahead and explain to us what exposure you had in that regard.

A.    When they had the print-ups in the paper about the jury selection, there's a lot of talk about what she did, what they assume she did, what they think should be done about it.  It's just water cooler talk basically.

Q.    Sure.  And it's natural for folks to talk about stuff like that; right?

A.    Right.

Page 82

Q.    You gotta talk about something.  Might as well talk about what's in the paper; right?

A.    Uh-huh.

Q.    Now, you understand when you got the questionnaire, however, you were on this jury panel.  I'm just concerned about any additional exposure you've had to opinions or claimed facts about this case since you filled out the questionnaire.  Can you share with us any additional information you may have received

2009

or strong opinions you may have been exposed to because of having to work around a number of people who were talking about it?

A.    Basically what I said.  I work in close proximity with everybody, so everyone's talking to everyone else.  I hear everyone saying that the death penalty should be enforced and that they all think that it happened the way everyone assumes it did and stuff like that.

Q.    Did you join in on any of those conversations?

A.    I'm a back line cook, so I'm pretty busy.  I just overhear things.

Q.    Whether you wanted to participate or not, you're in a spot where you're going to be exposed to those comments.

A.    Right.

Q.    Did those comments, sir, cause you to learn more about the case or form any opinions about this case?

A.    It made me learn a little bit more about it.  I wouldn't say a lot.  As far as the opinions go, I kind of let everyone have their own opinions and just kind of stay out of it.

Q.    You have none I take it.

A.    No.

Page 83

Q. What facts, if any, do you recall hearing about the case?

A. I don't know if I'd call them facts. It's just what people talk about. I heard them talk about how it was like a meth thing running from like down south. I think they said Arizona,

2010

and they run it to Iowa. Something happened between two parties where it went wrong and there was murders.

Q. Now, we don't expect anyone to live in a bubble. You know, folks are exposed to information. We understand that. But, of course, it's our duty to find 12 people who can bring open minds to this case and a presumption of innocence as the Court has already described that. Do you feel that the exposure to the information that you've had here before today would affect your ability to judge this case solely on the evidence that comes out here as opposed to anything anybody's said in your presence?

A. No, I don't think so.

Q. The death penalty, sir, you indicated that you think it should be used in extreme cases and only in extreme cases. You've had some weeks since you filled out this questionnaire, and I would assume it'd only be human nature to give it some more thought thinking about the fact that you may be required to sit on a jury that has that issue before it. Can you share with us any other thoughts you have about the subject, sir, please?

A. The way I view the death penalty is I understand why it's here. I'm not one of the people that goes out and protests and talks down at people who agree with it. My only problem with it is me personally being the one to know that my decision was the reason that these events took place, it like really bothers me.

Q. Sure. And we wouldn't expect anyone would ever take that responsibility lightly. And I assume in the past weeks that's

Page 84

given you pause for some thought?

A.    (Nodded head.)

Q.    Any additional thoughts other than what you've just shared with us and what's in your questionnaire on that subject?

A.    No.

Q.    You just recognize it as a very weighty responsibility I take it.

A.    Uh-huh.

Q.    You weren't taking notes.  You didn't have an opportunity to be writing things down as the judge was telling you about the process this morning, but I'm curious what you recall about it. He indicated that there would possibly be as many as three phases in the trial, the first of which would be a determination whether the defendant's guilty or not.  Do you understand that?

A.    Uh-huh.

Q.    What do you recall if you can share with us what the judge -- your understanding or recollection of what the judge explained about the possible second and third phase?

A.    I don't recall too much about the second phase.  I know it's like we do have to find if they were guilty or innocent, then go to like a sentencing-type thing, and then we decide what the sentence would be, and then the judge would ultimately rule whether the sentence should be enforced.

Q.    Okay.  Do you recall -- that's really a pretty good recollection, and I don't expect you to have a hundred percent.

2012

You weren't taking notes again.  But let me visit with you just

a little bit about that.  Do you recall the judge indicating that if we ever got to that third phase it would be the jurors' duty to consider and weigh factors, both mitigating factors, aggravating factors that the Court could instruct you on that should be weighed before the jury decides what would be the appropriate punishment?

A.     Yes.

Q.     Does that seem like an appropriate system to you, sir?

A.     Yes.

Q.     In fact, you would expect that you would want in every such case for a jury to fully and fairly consider the appropriateness of both penalties before making any decision in such a case. Fair statement?

A.     Yes.

Q.     Do you feel that you could do that, sir?

A.     Yes, but I don't know if I could actually, like I said before, sentence someone to death.  I don't know if I could do that.

Q.     Let's address that then, sir, because this obviously is something that weighs on your mind.  Just share with us your thoughts about your ability to fairly consider personally signing a verdict that would impose the death penalty on another human being.

A.     I really don't know if I could do it because if I had done

2013

that and the sentence is carried out, honestly for the like rest of my life I'm going to know that my decision was the reason that this death penalty was taken -- put forward.

Q.     Do you understand that the defendant in a criminal federal death penalty case cannot be sentenced to death unless all 12

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1754 of 3245

jurors agree?

A. I understand that.

Q. And sign the verdict.

A. (Nodded head.)

Q. And that your signature on such a verdict would, in fact, have that effect. And I'm not sure you understood quite clearly, but it wouldn't be the judge's decision. It would be your decision as a jury. You understand that, sir?

A. Now, yes.

Q. And having that in mind, do you feel that you personally, given your feelings about the matter, could truly, fairly consider imposing the death penalty on another person?

A. No, I don't think I could.

MR. MILLER: Thank you, sir. I appreciate your candor.

THE COURT: Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q. I bet nobody's called you Number 628 before today, huh?

A. (Shook head.)

2014

Q. I suspect they call you a lot of other things at Hardee's but not 628.

A. Yeah, I've got quite a few.

Q. We're not going to get you to change your views about how you feel about the death penalty. Just as the judge said earlier, you're entitled to your opinion, and, in fact, we respect it very much, and you've been quite candid about the difficulty this might cause you if you were a juror. But I just want to see if I can put the situation in context to see if that

Page 87

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1755 of 3245

makes any difference to you, okay, and if it does, it does, and if it doesn't, it doesn't.

By the time we were even looking at penalties, as the judge pointed out, a number of things would have happened; okay? And we're not assuming they're going to happen, but they could, and so we have to ask jurors about their ideas about penalty even though Miss Johnson, as you point out, is presumed innocent, hasn't been convicted of anything.

And one of the things that's going to happen if people are looking at penalty is that the government's going to have proved there were five intentional murders, okay, and that Miss Johnson did them or she aided and abetted somebody that committed. Are you with me? You know, helped, participated.

Before we're looking at the penalty, the government's going to have proved to a jury that the murders were committed with substantial planning and premeditation.

2015

And then they're going to have also attempted to prove that the murders were -- involved what the law calls vulnerable victims, and the evidence they're going to present in this case I suspect is that of these five people that were killed one was a mother and her two children, two little girls. One was ten, and one was six, Kandi and Amber Duncan; okay? So there isn't any discussion or anything about penalty until at least that's happened; okay? You with me okay so far --

A.   Yes.

Q.   -- 628? And then you're going to be asked to balance some things against those facts. We could agree that's pretty serious stuff; right?

A.   Yes.

Page 88

Q. You said repeatedly in your questionnaire you got a real problem with kids.

A. Yes.

Q. And I'm going to come back to that in a minute, but against this we might have evidence on the side of life, what we call mitigating factors, things like no prior criminal history, no significant criminal history. Maybe there would be evidence that the role of Angela in this offense, her role in the murders compared to somebody else's, was a relatively minor one; okay? Doesn't mean she's not guilty, but it's something you'd be asked to take into account and then maybe information about her background in terms of abuse, sexual, physical, neglect when she

2016

was a child that might have affected her decisions later in life.

And then you are -- as a juror, you're obligated to weigh these things. And you have to come to an individual decision. It's different than like you see on TV where everybody decides at once. This penalty part, you do it yourself; okay? And the questions that the prosecutor was asking you regarding signing a verdict form for death, that only happens if you made that decision for death; okay? You with me?

A. Yes.

Q. Not just you but, as the judge pointed out on his slide, each juror would have to agree after their own individual weighing, okay, and if all 12 said yes, then that's the death penalty. If even one person said no, then it's life. That's a verdict, life; okay?

So now we've kind of set the stage for the last couple questions the prosecutor asked you about the signing of the

Page 89

verdict form.  I don't know if that makes any difference to you, frankly, that we have all these kind of procedural safeguards, if you will, before we're ever at a point of deciding life or death.  But we need to know if it does make a difference to you.

A.   I still pretty much feel the same way.

Q.   Okay.  And just to be clear, just to be crystal if we could, all right -- you've been great in terms of your candidness -- are you telling us that there just aren't any

2017

circumstances in the world that you could envision no matter how horrible the case --

A.   No, I don't think I could.

Q.   -- that you could sign such a form?

A.   I don't think I could.

MR. BERRIGAN:  We appreciate your candor, sir.  Thanks a lot for your patience.

That's all I had, sir.

THE COURT:  Okay.  If you'd just step outside, we'll let you know.

(Prospective Juror 628 exited the courtroom.)

THE COURT:  I guess the -- let's see, the government went first so . . .

MR. MILLER:  Your Honor, the government challenges this wit -- or excuse me, this juror for cause.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  No position, sir.

THE COURT:  Okay.  I'm going to sustain the challenge for cause.  I find the juror's substantially impaired in his ability to carry out the instructions and fulfill his obligations as a juror in this case.  So why don't we bring

Page 90

Juror 628 in.

(Prospective Juror 628 entered the courtroom.)

THE COURT: Juror 628, we appreciate very much your filling out the forms and coming in today. We're going to

2018

dismiss you as a juror in this case.

We'd appreciate it if you'd do us a favor and not talk about jury selection until we actually get the jury trial underway. It's going to take us another week or so of jury selection, and I'm concerned if you talked to somebody else that somebody else might say something to somebody else, and that somebody else might wind up on the jury box just like you were. So thank you very much. Good luck to you, and good luck in your wedding later on this year. Thank you.

(Prospective Juror 628 exited the courtroom.)

THE COURT: Ready for 71?

MR. BERRIGAN: Yes, sir.

MR. MILLER: Yes, Your Honor.

(Prospective Juror 71 entered the courtroom.)

THE COURT: Anywhere in the first row. Thank you. Please be seated.

MR. BERRIGAN: May it please the Court.

THE COURT: Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, ma'am?

A. I'm fine.

Q. I hope you'll forgive us with the numbers, but obviously there's good reason for that, so I'll be referring to you as Juror 71 this morning; okay? It won't be too bad. We're really

Page 91

interested in two areas during this process of the questioning, and one has to do with the information you've been exposed to through the media about the case.

A.    Okay.

Q.    And the other has to do with your views about life imprisonment without parole and the death penalty; okay?

A.    Okay.

Q.    We've been talking about the pretrial publicity issue first, so why don't we start with that.  Have you heard things about the case in the media?

A.    I really haven't heard very much.  I just heard something the other day about makeup and wearing the clothes.  That's about the only thing I've heard.

Q.    Okay.  The makeup situation got quite a bit of press, surprisingly enough.  I'm just assuming makeup, whether there was makeup or not, wouldn't really have any effect on any decision.

A.    (Shook head.)

Q.    So I'm not even going to ask you that silly question.  But you did indicate in the questionnaire that you were somewhat familiar with the case, and you said, I remember hearing about it on TV but didn't pay close attention to it.  Does that sound right?

A.    Right.

Q.    And you checked television as the only source of

information that you had received.

A.    Correct.

Page 92

Q. Is that still true other than some -- was the blurb about the makeup on the television?

A. Actually I think that was on the radio. I think that was our local station maybe.

Q. But sometimes those things are kind of hard to avoid, I mean, in terms of you're listening and all of a -- suddenly it hits you. Have you read anything in the paper about the case?

A. No, I have not.

Q. Okay. And nothing on television here recently?

A. No.

Q. Okay. Your questionnaire indicates that you had not formed an opinion about Miss Johnson's guilt as a result of the media coverage that you had seen on television.

A. Correct.

Q. And I need to ask you if that's still true.

A. Yes.

Q. Okay. And so let me switch over a little bit, and let's talk a little bit about the death penalty; okay? And I'd like to start by you imagining that you and I had known each other for 20 years, and we're sitting at a coffee shop one day just chatting and there's something in the paper about the death penalty and I turn to you and I said, you know, Juror 71, what do you think about the death penalty? We've never talked about

2021

that subject. What would you tell me?

A. You know, I really wasn't -- I really hadn't given it much thought before. You know, I would say things like, oh, you know, you would hear something, and you'd say, well, you know, just give them the death penalty, you know; don't pay taxes on them. But when I got this and I had to really think about it,

Page 93

then I really wasn't -- I mean, just saying it is one thing, but actually, you know, doing it is another. So, you know, I'm not real sure how I feel about it yet.

Q. And I didn't mean as to this particular case necessarily, although we are going to talk --

A. Yeah, but any.

Q. I mean just general.

A. Right, right.

Q. It's not something you've given a lot of thought to before today.

A. No, no.

Q. I did note, of course, because I'm supposed to pay attention to these things in the questionnaire, you know, you were asked this question. This is number 73, and I don't -- this isn't a test to see if you remember what you wrote two months ago.

A. And I probably don't.

Q. That's why I'm going to help you; all right? Question 73, Do you have any beliefs or opinions as to the appropriate

2022

punishment for Angela Johnson if she were found guilty of the intentional killing of five people including two children? You checked yes. You said, That's five people. I think she should get the worst punishment, but I'm not sure what that should be. Does that sound about right?

A. Probably.

Q. Okay. And then you were asked the question about the death penalty. What are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of intentional murder? And you said, I know I've said that instead of paying

for a person who was sentenced to life that they should be put to death instead. When I really think about that, I don't believe I have the right to decide if a person should be put to death. And you were asked to explain your views about that, and you said, I'm not an extremely religious person, but I do believe in God, and I don't think whether a person lives or dies is up to me.

And let me first say that that's not the first time we've heard that; okay?

A. Okay.

Q. Then there's one other question I want to bring to your attention. It says, Do you believe in an eye for an eye? And you checked yes. It's something that I grew up saying. In most circumstances, yes. And that last one I want to address first and then come back if you're okay with that.

2023

A. Okay.

Q. Most folks when they come in and say an eye for an eye, that's almost if not identical to saying a life for a life. In other words, they're telling us, Look, Berrigan, if you chose, you intentionally decided to kill somebody, you've also made a decision regarding your own life, and that is it's over. You took a life. You give a life. And that's not the phraseology of the question. And I don't even know whether, you know, you believe in this eye for an eye proposition or that's the same as what I've just described, but I'm sure interested in your thoughts about that. Tell me, this eye for an eye thing, what does that mean?

A. Well, you know, it's kind of vague on there, you know. You know -- let's see. Well, I didn't know how to explain it on

Page 95

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1763 of 3245

there, and I don't really know how to --

Q.   That's okay.  Doesn't matter what's here.  How do you feel about it right now?  You're sitting there, and believe me, we are interested in these matters.

A.   Well, I'm sure you are.

Q.   We kind of put you on the spot a little bit, but it's important obviously for the obvious reasons.

A.   Right.

Q.   So tell me, eye for an eye?

A.   I mean, that's -- it's just growing up that's just an eye for an eye, you know.  You heard it all the time.  I'm sure I've

2024

said it in the past, you know, an eye for an eye, you know.

Q.   Well, do you believe that?  Is that how you feel?

A.   I guess I do.  I guess I do.  You know, I don't know, you know.  Yeah, I would say I do.

Q.   What about this concept that I talked -- just mentioned, this choice, you know, you made a choice, you intentionally kill means you forfeit your life?

A.   Right.

Q.   Do you believe that?

A.   If you intentionally kill, yes.

Q.   Okay.  I gotta tell you that the law, I mean, is different than that, and that's okay.  I mean, people have views all over the spectrum on this.  But the law is going to say that if the government proved their case which is the intentional murder of five people, okay, that's a pretty serious case; would you agree?

A.   Yes.

Q.   That even if they did that, even if they did that, that

Page 96

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1764 of 3245

doesn't mean the death penalty; okay?  The government's also going to try to prove that these murders were committed, those five intentional murders, they were committed after premeditation and substantial planning; okay?  That's what they're going to try to prove.  And they're also going to prove, try to prove, that of those five victims one was a mother and her two children, Kandi Duncan, ten years of age, Amber Duncan,

2025

six years old, and that even if all that were proven to jurors beyond a reasonable doubt that life imprisonment is still an option for sentencing; okay?

Some people tell us nonetheless, That may be true, but that's not how I feel.  I couldn't realistically consider a sentence of life imprisonment if you -- if the government proved that beyond a reasonable doubt.  Other people can.

And we have to largely rely on what people tell us, you know, what -- in your heart of hearts how you feel about that as to making the decision about the best fit for this case of people.  It's almost like buying a car.  Sometimes you know you need a minivan and sometimes an SUV, and so we need to know kind of what you think about that; okay?

Let me just ask you this question.  That's the situation.  I want you to imagine you've heard everything and you find yourself in a situation that's been proven beyond a reasonable doubt and there are these alternatives available. Would you be able to consider the death penalty as an appropriate punishment for that type of a crime?

A.    I suppose I could.

Q.    And the converse of that -- and this is the one I'm concerned about if you believe an eye for an eye; okay?  You can

Page 97

see how I might be concerned. The converse of that is, hey, can you realistically consider a life sentence, life without parole, just what the judge said? That's means life without parole.

2026

But could you realistically consider that as an appropriate punishment for that type of crime, five people intentionally killed after planning, premeditation, children? Could you do that?

A. Yes.

Q. Okay. I know you're hesitating a little bit, so let me just ask you.

MR. STOWERS: Two minutes.

MR. BERRIGAN: Thank you.

Q. Are you sure, because we're going to rely on what you tell us?

A. I realize that, you know. Yes, I think I could.

Q. Okay. All right. I'm going to cover one real quick area in the 90 seconds I have left.

A. All right.

Q. In your questionnaire you talk repeatedly about choices. People make choices in life, and what happened to them earlier in life it sounds like you don't think affects their later life decisions, or maybe you're saying it's not an excuse. I'm not sure.

A. I'm saying it's not an excuse.

Q. Okay. Let me tell you, we're going to perhaps present evidence that this woman had a very traumatic childhood, abuse, neglect. And we're not offering it as an excuse; okay? You hear me on that?

2027

Page 98

A.    Uh-huh.

Q.    That's no excuse for killing anybody, but it is evidence that the jurors are allowed to consider in making an appropriate determination about punishment.  That's evidence that we, the defense, contends weighs towards a life sentence.  And it's not the only evidence we're going to submit, but it is evidence that we're going to proffer; okay?

      And I have a concern that based on these responses that's not going -- that's not evidence you'd really consider.  You know, you just -- that just doesn't matter at all, and maybe that's not true.  But, of course, I need to know that because if we're going to present this evidence and you're not going to consider it at all in your decision about life or death, then that's a problem for me.

A.    Sure.

Q.    So you tell me.  Would you consider it -- I mean really consider it -- in making a decision about life or death?

A.    Yes.

      MR. BERRIGAN:  Okay.  We're going to take you at your word; okay?  You've been very patient.  Thank you, ma'am.

      THE COURT:  Mr. Miller?

      MR. MILLER:  Thank you, Your Honor.

                         EXAMINATION

BY MR. MILLER:

Q.    Good morning, ma'am.

                                                  2028

A.    Hi.

Q.    How you doing?

Page 99

A.    Good.

Q.    Good.  Entirely new experience for you here today, isn't it?

A.    Yes.

Q.    Well, you're doing just fine.  I just wanted to visit with you about the death penalty as a subject.  You've indicated to us a few minutes ago and I think very understandably that like everybody, you know, you have some general off-the-cuff thoughts about the subject, but until you get put in the situation that you find yourself in now and you found yourself in when you received this questionnaire, you don't really struggle with it quite as much or it doesn't hit home.

It was clear to me that it hit home to you and you gave it some serious thought when you wrote -- and I'll ask you if this sounds familiar to you -- When I really think about that, I don't believe I have the right to decide if another person should be put to death.  Can you just share with us what it was you were thinking about it and why you shared those thoughts with us when you filled out that questionnaire, what led to that?

A.    I guess I just don't feel -- I mean, when you think about it, I guess I don't feel that really and truly it's my right to do that, you know, I mean.  Who am I to do that?

2029

Q.    And I appreciate you struggled with that thought before you put those thoughts down on paper I assume, thought about it carefully and gave us your sincere opinion on that.

A.    Right.

Q.    You wrote in the very next question -- and I'll read this back to you again and see if you recall -- and I'm quoting -- I

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1768 of 3245

do believe in God, and I don't think whether a person lives or dies is up to me. In other words, am I correct in taking that it's at the level of a spiritual thing?

A. Right. That's what I -- I guess I'm having the most trouble with.

Q. And that's fine.

A. It's like who am I, I mean, you know?

Q. Those who end up serving on this jury if they determine that the defendant in this case has been proven guilty beyond a reasonable doubt will have on their shoulders the responsibility possibly of deciding the question of punishment.

A. Right.

Q. Given the nature of this case, do you really feel you could do that?

A. I don't know. I keep thinking about this. I don't know. I don't know.

Q. You have an honest and serious doubt about your ability to do so.

A. Yes, I guess I do.

                                                          2030


Q. And just to remind you a little bit of what the judge described in a summary of the procedure this morning, at the third phase if a jury were ever to get to that, it would be instructed to consider factors and to consider and weigh both mitigating and aggravating factors and consider both life imprisonment and the death penalty as possibilities before returning a verdict.

A. Right.

Q. If you were on a jury where yourself and all 12 felt that the death penalty was an appropriate verdict in this case, you

                          Page 101

couldn't return that verdict without reflecting it by your own 12 signatures on the verdict. Do you understand that?

A. Yes.

Q. Do you feel that under those circumstances, ma'am, that you could sign a form of verdict knowing it would have the effect of the execution of another person?

A. I really don't know. I guess since I'm struggling with this so much, probably not. I don't know.

Q. And you're the only one who can decide these things. Nobody can -- but what's in your heart, you're the only one that can answer us. Is it fair to say you have serious doubt about your ability to do that?

A. I guess, yes.

MR. MILLER: Thank you, ma'am. I appreciate your time and your candor.

2031


PROSPECTIVE JUROR 71: Okay.

THE COURT: Oh, you're not done yet.

PROSPECTIVE JUROR 71: Oh, darn.

THE COURT: You anxious to leave? I've got a couple of questions for you if I may. I understand that you have said -- and I wrote it down; of course, I have a hard time reading my own handwriting -- that you didn't feel it was your right to make this decision. Now, the United States Congress disagrees with that because they --

PROSPECTIVE JUROR 71: I know that.

THE COURT: And they set up a statutory scheme where they repose the obligation to determine this life sentence or death sentence in 12 jurors. You understand that.

PROSPECTIVE JUROR 71: I do understand that.

Page 102

THE COURT: And what I want to find out is is this belief of yours, is it just kind of -- is it a religiously based belief, or is it just kind of this generalized belief you just don't feel you have the right to do it?

PROSPECTIVE JUROR 71: I guess maybe a little bit of both.

THE COURT: Okay. And nobody wants to talk you out of that belief because we're not here to do that. Here's what I want to know. Do you think you could set aside that belief and follow my instructions? And just to summarize for you, my instructions would say, if we ever get to the third phase, the

2032

penalty phase, you would have to consider evidence of aggravating factors and evidence of mitigating factors and whether or not those were established, and then you'd have to weigh all of those and then decide what you think the appropriate penalty would be. And I want to know if you think you can do that. And only you really know the answer to that.

PROSPECTIVE JUROR 71: Yeah, I -- you know, you would think I would know that.

THE COURT: Well, but maybe you don't. You know, for example, there are some people who are personally opposed to the death penalty but could go ahead and follow the law and have no problem weighing the factors and making the decision and they'd be able to set aside their personal belief. There are others -- it doesn't make them better, good, diff -- it's just they're different who would say, Well, I can't follow the law because I need to follow my personal belief. And it's not a question of right or wrong, but it makes a huge impact about whether you can serve on the jury, and I think you can appreciate that.

Page 103

PROSPECTIVE JUROR 71:  Yes, I can.

THE COURT:  Yeah.

PROSPECTIVE JUROR 71:  I guess I would really have a problem with that.  I mean, when I sit here and really think about it, I would have a problem with that I think.

THE COURT:  Okay.  So let me just try and see if you can answer this question.  Do you think you would be able to, if

2033

we ever got to the third phase, fairly consider both penalties?

PROSPECTIVE JUROR 71: You know, I would like to think that I would, maybe -- prob -- I'm just kind of going with how I've been answering.  I think I would probably have a hard time with the death penalty.

THE COURT:  You would have a hard time fairly considering that.

PROSPECTIVE JUROR 71:  Yes, I guess.

THE COURT:  Okay.  Thank you so much.  We're going to ask you to step outside, and then it will just take a minute or a couple minutes maybe, and then I'll let you know.

(Prospective Juror 71 exited the courtroom.)

MR. BERRIGAN:  I think I went first, sir, or did I? Yes, I did.  I have no motion for cause.

MR. MILLER:  Your Honor, the government challenges for cause.  She's substantially impaired in her ability to fairly consider both punishments and has clearly expressed that fact.

MR. BERRIGAN:  We have no position, sir.

THE COURT:  Okay.  I find that this juror -- I think she'd try incredibly hard to do the right thing, but I believe she's substantially impaired.  She repeatedly expressed severe reservation about her ability to fairly consider the death

Page 104

penalty, and I think she is substantially impaired in her ability to follow the instructions. And so I'm going to sustain the government's challenge for cause. We'll bring her in and

2034

let her know she can go on her way.

(Prospective Juror 71 entered the courtroom.)

THE COURT: Juror 71, we think you'd be a terrific juror but not in this case, probably in another case. And we really appreciate it. I could tell that for you you were really doing some soul searching and it was really a struggle, and that's -- you know, that's exactly what we ask, and so in terms of service to your country, you do as much service by making those internal struggles and answering the questions as honestly as you have as people who wind up serving on this jury. So we appreciate it very much. Good luck to you.

Could you do us a favor? Because jury selection is probably going to take a little while longer, we'd ask you not to discuss this with anybody because northwest Iowa's a small place, pretty large geographically, small population, and you could easily say something to somebody who would then repeat it, and then somebody sitting on the jury next week might have been exposed to your comments. So we'd appreciate it if you'd not say anything till we get the jury empanelled and the trial underway. Thank you very much, and good luck to you. Thank you.

(Prospective Juror 71 exited the courtroom.)

THE COURT: Ready to do one more?

MR. MILLER: Yes.

MR. BERRIGAN: Yes.

2035

Page 105

THE COURT: To add to our productive morning. Well, it is productive. 755.

(Prospective Juror 755 entered the courtroom.)

THE COURT: Juror 755, any seat you're comfortable in there. Please be seated.

Everybody else can be seated, and we'll start the questioning first with Mr. Miller, and then we'll probably hear from Mr. Berrigan; okay?

PROSPECTIVE JUROR 755: Okay.

EXAMINATION

BY MR. MILLER:

Q. Good morning.

A. Good morning.

Q. How you doing so far?

A. Good.

Q. Kind of a unique day for you.

A. Yes.

Q. Well, I hope we're providing you with a different experience. Two things we need to discuss with you. One is the question of any information you've received in the form of pretrial publicity or other information about the case other than what arrived in this questionnaire. And secondly we need to visit with you about your thoughts on the death penalty, just those two subjects; okay?

A. Okay.

2036

Q. Okay. On the first subject you indicated, Less than what's summarized above. Dustin's trial was somewhat recent but don't even remember the outcome. So I take it at least when you

Page 106

filled out the questionnaire you didn't have a lot of recollection about this.

A.   No, I recognized the name as in I think -- it's one of those I think that might have been related, and then I read the rest of the literature that was with that packet, and that was actually more than what I knew previously.

Q.   Okay.  And just so we're very clear about it, there have been a period of weeks since you filled this out, and whether it's information you learned before you filled out the questionnaire or something you heard afterwards, we're interested in what you do recall about this case in the way of allegations.

A.   There was -- let's see, apart from what was discussed this morning, I really don't think there was anything additional that I can recall.

Q.   Very good.  And the last question on that subject is assuming for a second that you end up finding yourself serving on this jury, would you be able to return a verdict based solely upon what comes out here in the way of evidence and not upon anything you may recall having heard outside the courtroom?

A.   I believe so.

Q.   Thank you, ma'am.  Now, you, I assume -- I could be wrong

2037

about this, but I'm just assuming that until you got this questionnaire that this questionnaire was at least one of the first times if not the first time that you were really asked to come to grips with your thoughts about the death penalty.

A.   Yes.

Q.   Maybe I'm wrong about that.  It was the first time?

A.   This is really the first time that I've had to articulate

Page 107

any feelings I might have.

Q.   And I can only imagine receiving something like this in the mail and being asked to sit down and put thoughts on paper, that it would cause one to think about it, and I can also imagine that in the weeks since then you've naturally given it some thought too.

A.   Yes.

Q.   Can you share your thoughts with us about it, please?

A.   Well, the death penalty's a very final result, so there would have to be absolutely no -- no guess work, no hesitation that there -- you know, you hear about people who, you know, 20 years down the line, all of a sudden they get a conviction overturned.   Well, that's all well and good, but if they've already died, it really has no, you know, good end to it.   So yeah, it's a viable solution, but there better be a hundred percent certainty.

Q.   Very good.   And that's what you indicated in your questionnaire, so, you know, even though you've given it more

2038

thought, that's been consistent.   Your feelings about it have remained the same.   And I just want to explore that with you a little bit.   We wouldn't expect anyone would ever take that responsibility lightly, and you clearly have an understanding of the enormous consequences of the decision that you would be asked to be making.

A.   Uh-huh.

Q.   You've never served on a jury before.

A.   No, I have not.

Q.   And I wouldn't expect you to be familiar with a lot of legal concepts, but I expect should you be required to serve on

Page 108

this jury you would be advised about a great many things, one of which is the burden of proof and that the government is required to prove -- everything that we're required to prove we're required to prove beyond any reasonable doubt. You've heard that phrase before.

A. Yes.

Q. Anything in your own mind about what that means, beyond a reasonable doubt?

A. No, no question.

Q. That there's no question.

A. Right.

Q. Okay. Very good. Very good. It was explained to you this morning that in civil cases the burden for the plaintiff is just by a preponderance or greater weight of the evidence, and proof

2039

beyond a reasonable doubt is a substantially higher burden. Do you understand that?

A. Yes.

Q. My only concern here -- and I just want to be sure I'm not misunderstanding you -- there is -- and some people use the phrase beyond a shadow of a doubt or beyond any conceivable doubt as being something greater than beyond any reasonable doubt. If the Court advises you as to what proof beyond a reasonable doubt is and instructs you that that is the burden, would you hold the government to any higher burden than proof beyond a reasonable doubt because of the nature of the case?

A. I don't quite understand what you're asking.

Q. Let me see if I can put it in these terms. I -- completely unsolicited I received in the mail a personalized pen from a company that wanted to sell the people in my office pens. I'm a

Page 109

government employee. I can't spend taxpayers' money on a whole bunch of pens even though I think, boy, these are nice pens; I really wish all the guys in my office would have a pen like this. But it came in the mail unsolicited, so that one example of a pen was ours. And I could have done whatever with it, but I put it in my pocket because I figured, hey, it's my office; I'm the boss; I'm going to carry that pen; okay? I've got it with me over here, and I've been using it. It's a personalized pen. It may or may not be the only one like it in the world, but it's certainly fairly unique, and if I go back to the chair

2040

and sit down and it isn't there anymore but I look over and I notice that Agent Basler is writing with a pen that's got that same sort of writing on it, would it be reasonable for me to conclude fairly from that even though I hadn't seen him take it that he borrowed my pen?

A.   Yes, that would be reasonable.

Q.   Okay. And would that be an example of even though I didn't have perhaps even a confession from Agent Basler that I had really no reasonable doubt about the fact that he had taken that?

A.   Yes.

Q.   Okay. And you see that in real life we have -- as adults we have to deal with those things all the time.

A.   Yes.

Q.   Is that something that you could understand as an example of what might be reasonable -- proof beyond a reasonable doubt?

A.   Yes.

Q.   And would you require something greater than proof beyond a reasonable doubt simply because of the seriousness of the case?

Page 110

A.    I don't think I can answer that right now.  Right now,
reasonable -- beyond reasonable doubt seems pretty concrete to
me.  Whether things come up throughout the case that might
change that, I don't know at this time.

Q.    Well, if you have any reasonable doubt whatsoever about the
guilt of the defendant, it would be your obligation to acquit

2041

the defendant and find her not guilty.

A.    Yes, I understand.

Q.    But if you and your fellow jurors conclude beyond any
reasonable doubt any proposition, then you find that proposition
has been proved.  Fair statement?

A.    Uh-huh.

Q.    And again, I'm presupposing that you've listened to the
Court's instruction, and there is an instruction on reasonable
doubt.  It will come from the judge, not from me.  But if the
Court instructs you as to what the government's burden is and
the government's burden is to prove these aggravating factors
beyond a reasonable doubt, would you hold the government to any
greater burden, do you think, than what the Court instructs you
to?

A.    No, I would follow the Court's instructions.

Q.    Very good.  One other issue.  You indicated in response to
a number of hypothetical factors when asked to indicate how they
might affect your view of the punishment, as to the killing of
multiple people, you said, The intensity of punishment shouldn't
be magnified for a few people, but slaughters -- and then
parentheses, the number 50, plus, end parentheses, question
mark.  Can you just share your thoughts with us about that a
little bit?

Page 111

A.  Well, I think there's -- for example, the 9-11 killings, there's many people involved.  There's more planning.  There's

2042

more precision in carrying it out.  It's a very well-thought-out thing.  With smaller groups like the one, two, or five people as in this case, just off the top of my head, there isn't that large quantity of planning that is obvious.  It's easier to explain away and find more exceptions to smaller crimes.

MR. WILLIAMS:  Two minutes.

Q.  The number of victims involved is a factor as you've pointed out.

A.  Uh-huh.

Q.  And that's a factor that you would consider in deciding whether or not the death penalty was appropriate.

A.  Well, in the multiple -- multiple people or multiple victims as it was stated, I don't think I would hold one person versus five -- or one murder versus five murders would really change the opinion, but since it was an open-ended question, I kind of took it one step further to the large, large quantity of persons.

Q.  Fifty plus, for example.

A.  Yeah.

Q.  And I don't intend to ask you exactly where you would have to draw the line, but is it fair to say it'd be more than one or five?  It'd be more like 50?

A.  Yeah.  One or five, I don't see that as a large difference.

Q.  Do you see that if -- in other words, if the Court were to instruct you that if you found beyond a reasonable doubt that

2043

Page 112

there were five people killed and that that should be considered as an aggravating factor, would you be able to follow that instruction, or do you feel it really should be more than that?

A.   No, I think I could follow that instruction.

Q.   As to the question of the killing of children, you indicated -- and I'm reading your response here -- Children are just small adults.  Their deaths have the same social ramifications.  Your thoughts on that, please.

A.   Whether you kill a baby, a 10-year-old, a 20-year-old, or an 80-year-old, it's a murder of one sort or another.  It should not be judged in severity due to the age.

Q.   A murder's a murder.

A.   Exactly.

Q.   However, if you were instructed in the penalty phase, should you ever get to that, that the killing of vulnerable victims such as children can be considered as an aggravating factor, could you follow that instruction?

A.   Yes, I could.

Q.   Can you see how children are not as able to defend themselves as adults?

A.   Yes.

            MR. WILLIAMS:  Time.

            MR. MILLER:  Thank you for your time.

            THE COURT:  Thank you, Mr. Miller.

            Mr. Berrigan?

                                                      2044

                        EXAMINATION

BY MR. BERRIGAN:

Q.   It's not so bad, is it?  Thank you for filling out this

Page 113

questionnaire. I know it took a long time, and you carefully -- it's clear you gave it some careful thought.

I want to ask you about this thing that the prosecutor just talked to you about, this idea that murder is murder, because one of the things I sort of see reflected in the questionnaire is that feeling. There's a question about child experiences and whether or not that might have any effect later in life. And you said, What happens as a child can be overcome by anyone if they want to. Plenty of people who had ideal childhoods and have not been a strong adult -- plenty of people who had ideal childhoods have not been strong adults. There are people who had miserable childhoods who were upstanding positive adults. Blaming your childhood is a cop-out. Does that sound right?

A.    Yes.

Q.    And when the prosecutor was asking about some of these other factors in terms of how many people or children, there's a question here, 87, that asks you to take into consideration whether the person was a parent, parent of two children, at the time of the intentional murder, and you said, That should not be a factor in the punishment. The person had a past history of drug use, not a factor in the punishment. Person was mentally,

2045

emotionally, physically abused and neglected as a child. People can't blame what they do as adults on their childhood. They need to be accountable as adults.

A.    Yes.

Q.    So tell me a little bit more about that idea.

A.    Well, like the first comment you read off of mine, there are documented cases where people -- you know, either they've

Page 114

pulled themselves up from, you know, being homeless on the street and becoming -- going to college on their own and becoming solid citizens and that they can say, Well, I started out with a horrible childhood, but I did it all myself as opposed to the people who, you know, they had money, they had a family, and then at 18 they say -- you know, for whatever reason they don't do anything with their life, and they just backslide. You kind of have to take a responsibility. Your childhood happens. You know, some are good. Some are bad. But you can com -- you can combat it. You can overcome it. Or you can fall victim to it. It all is what you want to do.

Q. Okay. Do you think that people are differently equipped to do that, you know, the ability to overcome those childhood experiences?

A. Very possibly, but I don't have enough experience either with people directly to say they -- if most -- I don't have the experience to say that the people who make the news are the exception or the rule.

2046

Q. Okay. Gotcha. Let me ask you then about this concept because I think I hear what you're telling us. Imagine for a moment you're in the position of a judge and two people come before you and they've committed exactly the same crime, okay, identical crimes, not together but the same thing. And one person comes from a background kind of much as you've described, somebody who's had, you know, almost every advantage, maybe a middle-class background, good education, loving parents, really no traumatic childhood experiences and so has had every opportunity in life up to the point where they chose to commit the crime; okay?

Page 115

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1783 of 3245

A. Uh-huh.

Q. The other person's a little different background, and I suppose we could -- I'm going to use the example of somebody who had a worse background or a poor background. Maybe they came from a poor family. Might have been a single-parent household. Perhaps there was abuse -- could be physical, sexual -- neglect. Maybe their educational experience wasn't so great, and perhaps, you know, there were other problems that they experienced, but they've committed the same crime.

A. Uh-huh.

Q. And now they're before you, and you as the decision maker have decided they're guilty. I don't want there to be any question about that. They both committed the crime. And so you're in the position of having to assess punishment; okay?

2047

A. Uh-huh.

Q. How would you treat those people?

A. Well, the person who had the good background, I'd almost say -- I'd almost be a little bit more strict with them just because they did have every advantage and they didn't take advantage of it.

Q. Okay.

A. The person who had the worse background -- I mean, again, not knowing the severity of the crime, the hypothetical crime, if the person had a -- you know, had a worse background and could come up to whatever level of the person from the -- I don't know if I'm articulating well. I would be stricter on the person with the better background I guess.

Q. Okay. And you've described that in terms of that individual really having perhaps better choices and making this

Page 116

bad choice.

A.    Exactly.

Q.    And I'd like to ask you more about that other person.  How does it -- if at all.  It may be it doesn't really matter.  If it's the crime that matters, what did you do, then it would seem like the background may not be a factor.  I don't know.  Do you think that that background is an appropriate factor in sentence, a person with the bad background?

A.    I guess when you phrase it that way, no, the background shouldn't be a real factor either way.  I guess the crime should

2048

be the crime whether it's, you know, something he did to get -- you know, for example, robbing a liquor store.  If he did it to get by because he needed money to buy food, that's one thing.  If he was able -- if he's an 18-year-old who's trying to do this as opposed to the 30-year-old with the good background, I guess there are just so many different situations that I guess making a blanket statement I guess is really hard now that I think further about it.

Q.    Well, I am asking you that because of those responses on the questionnaire; okay?

A.    I know.

Q.    You're kind of getting this, aren't you?

A.    I am.

Q.    You know, the truth is the law doesn't say -- let me tell you what the government's saying in this case.  Five people intentionally murdered.  It was done after substantial planning and premeditation and that of those five one was a mother with two children, two little girls ten and six years of age; okay?  That's the crime that we're talking about.  Now, the law does

Page 117

not say even for that crime this is the punishment.

A.    Uh-huh.

Q.    That's why we're going to have a jury if we even get that far.  They may not be able to prove those things.  But if we're at that point, the law doesn't say this is the punishment.  Sometimes jurors come in, and they tell us, That is the

2049

punishment.  Let me tell you, this is how I feel.  If you intentionally took somebody's life, Berrigan, much less five, if you took five people's lives intentionally, you already made a choice as to your punishment.  You made a choice to forfeit your life.  I mean, that's how I feel.  It's not quite an eye for an eye, but it's that concept.  You know, you made a decision, you made a choice, the same things you're talking about here, and for that choice there is a consequence, and the consequence is fixed for some people.

A.    Okay.

Q.    And for some people that consequence is death; okay?

A.    Uh-huh.

Q.    You hear me?

A.    Uh-huh.

Q.    And I don't know, looking at this questionnaire, if that's where you are, but I'm sure worried about it.

A.    I guess my stand is just going off of not knowing details, it's really hard to say that is the end punishment.

Q.    I gotcha.  But these are the details that are important.

A.    Yeah.

Q.    Five intentional murders, premeditated and planned, substantial planning, children; okay?  Those are the ones we're asking you to think about.  You're right.  You haven't heard the

Page 118

whole story. We couldn't give it to you now. I've got 12 minutes and maybe a minute and a half left. So we're asking you

2050

to do your best. Those are the facts. Let's assume you found them beyond a reasonable doubt; okay?

A.    Uh-huh.

Q.    In that situation could you really consider a life sentence, life without parole, as an appropriate punishment?

A.    I think so.

Q.    You think so?

A.    Yeah.

Q.    What would you look at in making that determination besides the crime?

A.    Well, there's other -- the motivation behind it, the actual execution of the crime, what the planning was. Are we talking about a year? Are we talking about a day?

Q.    You're talking to me about things of the crime; okay?

A.    Uh-huh.

Q.    And what I need to know -- and I just need you to tell us your real heart-of-heart deal -- is if we presented evidence about Angela Johnson's background, okay, that she had a traumatic childhood, that she experienced physical or sexual abuse or neglect, that these might be things presented to you as a factor in punishment, whether or not you'd realistically consider those towards a life sentence, or is it going to be the crime for you? You see? If you're telling me, Hey, Berrigan, look, plenty of people haven't had good backgrounds, what difference does it make?

2051

Page 119

A.    I think I would focus more on the crime than on the background.

Q.    So the other question -- I hear you on the crime because you made it clear.

MR. STOWERS:    Two minutes.

Q.    Two minutes, then a big pail of water opens up on me.    The background part, okay, that's the part that I'm interested in because that's the evidence we're going to present to jurors. And we've had jurors tell us -- I mean, the judge has told you it's okay.    This isn't some kind of little test, this is the right answer, this is the wrong answer.    We need to know how people feel.    If you were in a situation where your life was on the line, you'd want to know about the 12 people making the decision, would you not?

A.    Uh-huh.

Q.    If people aren't going to be able to consider the background of the individual in terms of the type of stuff I'm talking about, we just need to know that.

A.    Well, if they can prove it's pertinent to the crime, I guess I could consider it.    If it's just imma -- not immaterial. If it's just a random, hey, by the way type of comment, no, that -- I don't think I could consider.    If they could consider her -- if they could prove that the background was instrumental in the crime, I could consider it.

Q.    And if there was not a connection directly between the

2052

background and the crime --

A.    Exactly.

Q.    -- you wouldn't consider it.

A.    Correct.

Page 120

MR. BERRIGAN: Gotcha. I appreciate your candor, ma'am. Thank you very much.

THE COURT: Juror 755, I have a few questions for you, probably maybe even more than a few. Why don't we start where you left off with the connection between the defendant's background and the crime.

PROSPECTIVE JUROR 755: Uh-huh.

THE COURT: If we ever get to the penalty phase in this case, I will instruct you on what you can consider are mitigating factors and what you can consider to be aggravating factors. Then you would have to decide whether there was evidence to support a mitigating factor or an aggravating factor. Are you with me so far?

PROSPECTIVE JUROR 755: Yes.

THE COURT: It just so happens -- it gets a little complicated. There's a different burden of proof. The government has to prove aggravating factors beyond a reasonable doubt, the same test that we have for guilty/not guilty. But the defense only has to prove mitigators by what we call a preponderance of the evidence. It's a lesser standard than proof beyond a reasonable doubt. Are you with me so far?

2053

PROSPECTIVE JUROR 755: Yes.

THE COURT: And if I instructed you that the defendant's background was a mitigating factor, would you be able to consider whether there was evidence offered to support whether or not the defense proved by a preponderance of the evidence that background was a mitigating factor?

PROSPECTIVE JUROR 755: I believe so.

THE COURT: Okay. Then I would instruct you that you

Page 121

have to consider the aggravating factors and the mitigating factors and then you would have to weigh those. Are you with me so far?

PROSPECTIVE JUROR 755: I think so.

THE COURT: You'd have to figure out what aggravating factors you found were proved, what mitigating factors you found were proved, and then you would weigh those to determine what the appropriate penalty would be. Do you understand that so far?

PROSPECTIVE JUROR 755: Uh-huh.

THE COURT: Now, the weight, how much weight you give any of those factors, aggravating or mitigating, that's for you to decide. I'm not going to tell you how much weight you have to give any factor. But I am going to tell you you have to consider aggravating and mitigating factors if they've been established by the evidence. Do you think you could do that?

PROSPECTIVE JUROR 755: I think so.

2054

THE COURT: Now, I want to talk to you about this hundred percent certainty that came up a couple of times. And I'm a little bit confused about where that would come into play for you. And so I think it might be helpful if I asked you a few questions. On the guilty/not-guilty phase, I think you understand the government's burden is proof beyond a reasonable doubt. Do you understand that?

PROSPECTIVE JUROR 755: Yes.

THE COURT: And proof beyond a reasonable doubt is not necessarily a hundred percent certainty.

PROSPECTIVE JUROR 755: Right.

THE COURT: Right?

Page 122

PROSPECTIVE JUROR 755:  Right.

THE COURT:  Hundred percent is probably the greatest certainty or the greatest burden we could ever have; right?

PROSPECTIVE JUROR 755:  Uh-huh, yes.

THE COURT:  Let me give you an example.  A couple months ago I was trying a drug case, and it wasn't the defendant's defense, but if the defendant's defense was they couldn't have committed the drug crime on the date alleged because they were on a spaceship circling planet Pluto, that wouldn't be reasonable, would it?

PROSPECTIVE JUROR 755:  Correct.

THE COURT:  And common sense would tell us that if that's the defense you wouldn't have a reasonable doubt about

2055

that defense, would you?

PROSPECTIVE JUROR 755:  No.

THE COURT:  But is it possible?  Is it possible the person was on a spaceship circling planet Pluto?  I guess in the sense anything's possible, that might be possible.

PROSPECTIVE JUROR 755:  Uh-huh.

THE COURT:  You with me so far?

PROSPECTIVE JUROR 755:  Yeah.

THE COURT:  So if the standard was a hundred percent certainty, you know, probably nothing reaches a hundred percent certainty in life, does it?

PROSPECTIVE JUROR 755:  No.

THE COURT:  And I just want to make sure that you would hold the government to its burden of proof beyond a reasonable doubt on the guilty/not-guilty phase but not hold the government to a higher standard of a hundred percent certainty.

Page 123

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1791 of 3245

PROSPECTIVE JUROR 755:  No, just reasonable doubt.

THE COURT:  Okay.  Then do you think the hundred percent certainty comes into play for you in this trial at all if you were selected to serve as a juror?

PROSPECTIVE JUROR 755:  I think that would be a personal thing, yeah.

THE COURT:  Yeah, but how would it come into play?

PROSPECTIVE JUROR 755:  Well, I guess I . . .

THE COURT:  Can I ask -- let me try and ask the

2056

question a different way.  If the government proved beyond a reasonable doubt, it met its standard and established guilt and you voted that way along with all the other jurors and it was unanimous, you'd then go to the second phase.

In the second phase -- and we've told you less about the second phase, so it's a little harder to imagine -- the same thing would apply.  The government would have to prove what we call an eligibility factor and an aggravating factor beyond a reasonable doubt.  You with me so far?

PROSPECTIVE JUROR 755:  Uh-huh.

THE COURT:  Now, if that happened and you were on the jury and you voted in both the first phase and the second phase that the government met its burden beyond a reasonable doubt, in the penalty phase, would you be able to fairly consider both punishments even though the government didn't prove phase 1 or phase 2 by a hundred percent certainty?  Would it be enough for you if they only proved it beyond a reasonable doubt?

PROSPECTIVE JUROR 755:  I would think so.

THE COURT:  Well, that's what the law requires, and I guess another way of asking it is could you set aside any

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1792 of 3245

personal opinions you might have about a hundred percent certainty and follow the instructions that all the government has to do in phase 1 and 2 is prove it beyond a reasonable doubt?

PROSPECTIVE JUROR 755:  Yes, I could.

2057

THE COURT:  And I just want to return for a moment to the -- kind of the crime versus the background issue.

PROSPECTIVE JUROR 755:  Uh-huh.

THE COURT:  Background characteristics of the defendant can and usually are -- form the basis for various arguments about mitigation.  That's just how the law of mitigation works.  And I just want to make sure that if I instruct you that A, B, C, and D and E and F and all the way how many mitigating factors there might be that you would fairly consider those mitigating factors.

PROSPECTIVE JUROR 755:  Yes.

THE COURT:  The weight is for you to decide, but I just want to make sure you would give fair consideration to the evidence on mitigating factors.

PROSPECTIVE JUROR 755:  Yes, I would give fair consideration.

THE COURT:  Okay.  Thank you.  If you'd step outside, we'll let you know.

(Prospective Juror 755 exited the courtroom.)

THE COURT:  What's the government's position?

MR. MILLER:  No challenge, Your Honor.

MR. BERRIGAN:  The defense would challenge this juror for cause, Your Honor, based on our view that her answers both in the questionnaire and here in court indicate that she would

Page 125

make a judgment of penalty based largely on the circumstances of

2058

the crime.

When asked specifically about how mitigating circumstances would be considered by her, she said if they are related to the crime. If there was a connection -- pertinent I think is the term she used -- to the crime, then she'd consider them. But if not, if they weren't instrumental in the crime, then she wasn't going to consider them. Now, admittedly, the Court followed up with questions of its own.

THE COURT: Because I don't think it's fair to not tell them what the law is.

MR. BERRIGAN: But we have 12 minutes.

THE COURT: I understand that. I'm not saying --

MR. BERRIGAN: I don't think I was short.

THE COURT: No, you didn't have enough time. I'm not bound by the 12-minute rule, so I asked the follow-up questions, but I think you don't get a sense of what the juror really would do unless you tell them what the law is. And then if you have some doubt about your ability to follow it, you know, I've bent over backwards for the defense every time I've had even some doubt. And many of the people I've stricken for cause that the defense has argued would have been affirmed in a heartbeat on appeal, but on this juror I have no doubt that she could follow the law. And once she knew all the facts, I have no, no doubt, that she wouldn't be able to follow the law.

MR. BERRIGAN: Could I just complete my record very

2059

Page 126

briefly?

THE COURT: You may, absolutely.

MR. BERRIGAN: Our position is that she's not a qualified juror under Eddings versus Oklahoma regarding to her ability to weigh mitigating circumstances, in particular any evidence of abuse or neglect in the defendant's background, and that that makes her an unqualified juror under the Witt standard pursuant to the decisions in Penry I and Penry II. Thank you, sir.

THE COURT: Thank you. I find otherwise. I think there is -- and if you look at all the answers of the potential juror as a whole, there's nothing at all that indicates to me that she is in any way close to being substantially impaired in her ability to fairly consider the instructions and her oath in this case.

Having said all that, whose turn is it to exercise a peremptory? Obviously the government's not going to exercise one so . . .

MR. BERRIGAN: Assuming they're not, the defense is not going to exercise a peremptory either.

THE COURT: Okay. So we have -- this is Juror 755. She's in the jury pool. Let's bring her in.

MR. MILLER: May it please the Court.

THE COURT: Do you need to talk to me before I talk to this juror?

2060

MR. MILLER: (Nodded head.)

THE COURT: I'm sorry. I brought you in prematurely.

You want to exercise a peremptory challenge.

MR. MILLER: Yes, Your Honor.

Page 127

THE COURT: Okay. I didn't give you an opportunity to. I didn't think you'd want to, but I goofed so . . .

Okay. Juror 755 will not be in the jury pool. Thank you. Sorry. I should have given you the chance.

MR. MILLER: It's quite all right.

THE COURT: My error.

(Prospective Juror 755 entered the courtroom.)

THE COURT: Juror 755, you're going to be dismissed from this case. I think you'd be a terrific juror but in another case, so I thought you were just very conscientious and actually one of the most thoughtful people we've had an opportunity to talk to. You've obviously given this a lot of thought. We appreciate that. Good luck to you. Hope to see you back here on another case because I really think you'd be a good juror, and I think you'd like the experience.

I'd ask you to do us a favor, and that would be, because northwest Iowa's pretty small populationwise and we're still going to have at least another week of jury selection, not to discuss it with anybody else because that somebody else could either wind up in one of these chairs next week or could say something to somebody who would wind up in one of these chairs.

2061

So until we get the jury selected, we'd ask you not to talk about this experience. After the trial's underway, you can talk about it all you want; okay? Thank you very much.

(Prospective Juror 755 exited the courtroom.)

THE COURT: Okay. Why don't we take a 50-minute lunch break or whatever it will be. We'll start in at ten to one; okay? Thanks.

(Lunch recess at 12:03 p.m.)

Page 128

THE COURT: Ready for Juror 800?

MR. BERRIGAN: Yes, sir.

MR. MILLER: Yes, Your Honor.

(Prospective Juror 800 entered the courtroom.)

THE COURT: Juror 800, just please sit anywhere in the front row, anywhere you like. Thank you. Please be seated. We're going to start with questioning first from Mr. Berrigan.

MR. BERRIGAN: May it please the Court.

EXAMINATION

BY MR. BERRIGAN:

Q. It's not going to be so bad. It kind of jumps off your questionnaire how involved with children you have become despite the fact that you're obviously a busy businesswoman, and I was interested in asking you how and why you became interested in being a CASA volunteer.

A. Well, I kind of fell into it. It wasn't too intentional. I think I said this morning that when my father-in-law passed

2062

away, he left us some land.

Q. Yes, ma'am.

A. And I don't think it's any kind of -- well, I just feel like it was important to give back, and so I got on the Internet, and I looked at, you know, what are some volunteer organizations.

Q. And what made you choose this one in particular? I mean, there's a lot of them out there.

A. There's a big need in my county for one thing. Maybe -- after I took the training maybe if I'd had second thoughts, I wouldn't have done it.

Q. Uh-huh. How long have you been a CASA volunteer?

Page 129

A. I took my training last August, and I immediately was appointed as a CASA for a family.

Q. And it's pretty clear you have some passion about it. What do you enjoy most about that kind of work?

A. Well, mostly is I just -- I don't know enough about the whole program because this is my first case, but I just enjoy going talking with the kids every day. I used to be a teacher so, you know . . .

Q. Okay. You mention apparently there are times where you've been called as a witness in court for the children.

A. I'm never called as a witness. I always am an advocate.

Q. I see.

A. I'm a court-appointed special advocate. I advocate for

2063

them in court.

Q. I misunderstood. It said, Yes, I always witness for the safety and security of the CASA children.

A. Advocate for, yeah. That was another time when I was tired of that questionnaire.

Q. Well, we were only halfway through here.

A. Well, I was tired when I started.

Q. We're on page 7. I'm interested in this topic for a very practical reason.

A. Uh-huh.

Q. And that is that the government has alleged in this case that children are amongst the victims; okay?

A. Uh-huh.

Q. They've alleged that five people were intentionally killed. And they've alleged that these killings were done after substantial planning and premeditation, okay, and that of the

Page 130

five people that were intentionally killed after substantial planning and premeditation one was a mother and her two children, ten- and six-year-old girls; okay? And so I have these children.

As the judge mentioned early on, you know, we respect everybody's views that come into this courtroom. We really do. And people have told us a lot of different things about a lot of different subjects, and I think all of us love kids, and a lot of us have kids. Some people have sort of a special

2064

relationship with children and have told us that they can't really be involved in a case like this because of their feelings about them. They might be fine on some other kind of case, robbery case, even a murder case but not if it's involving children. And you mention in your questionnaire when you were asked to consider the killing of children as a factor in sentencing, the word you used is it's beyond belief that somebody could do that; is that right?

A. Uh-huh, yeah.

Q. And I'm not here to cause you pain and consternation, but you can imagine how important it is for us to know how people feel about these kinds of things.

A. Uh-huh.

Q. So let me just ask you this question; okay? The fact that this is the allegation, five people intentionally murdered, planning, premeditation, two children, how do you think that would affect your ability to be the fair and impartial juror you'd like to be in this particular case?

A. A lot of my CASA work appeals to my emotion, but I also have to act out of my intellect. And sometimes the things that

Page 131

I know don't always match the things that I feel.  But I do think I am a pretty discerning person, and that's about the best I can say.

Q.   Let me tell you, because of these allegations, some of the evidence involved is going to be quite descriptive.

2065

A.   I understood that from the preliminary --

Q.   Questionnaire probably.

A.   -- preliminary that came to us.

Q.   Right.  And I think there was some discussion about photographs.

A.   Yes.

Q.   In addition to that, the government may present testimony from relatives of those children, people who could very well come into this courtroom and testify about how the loss of those little girls has affected them, and you might well imagine how emotional that testimony could be.

A.   Uh-huh.

Q.   And I'm wondering whether because you have this close connection to children and you're an advocate for them that you might see yourself -- you know, as much as you might not want to, jurors aren't supposed to be advocates.

A.   That's right.

Q.   They're supposed to come in and judge the facts, and we hope they can come into the courtroom without any preconceived ideas.  But, you know, realistically, the whole reason we go through this process is that just isn't true.  I mean, we all have different life experiences and feelings about different things, and yours are different than other people's, and mine are different.  So what about that issue?  Is there any

Page 132

danger -- and we have to rely on you for this.  Is there any

2066

danger that, look, Berrigan, I mean, this is what I do; I've chosen to do this, to be an advocate for children, that you could kind of cross into that role?

A.    I think that if you understood the CASA program, you would know that part of our -- the objectivity that we have to use in determining what's best for children requires that we go through some strenuous education.  And I've seen some pretty horrific pictures of child abuse.  And one of the things we're cautioned constantly about is getting too close to our families.

Q.    Okay.

A.    And so I have to tell myself that all the time.  While I really feel positive about my family, I know we're going to have setbacks, and I know there's going to be a lot of trauma, and I have to be prepared for that.

Q.    Sure.  But it sure sounds like -- and correct me if I'm wrong because I don't know much about the program, although we certainly have one in my area.

A.    Uh-huh.

Q.    But is your role in the program to be the voice for the children?

A.    Yes.  Actually what they say is you're to be the judge's ears and eyes, and so, you know, in my reports, that's what I have to do.  I have to talk about the things I don't want to talk about.

Q.    Sure.

2067

A.    And I have to talk about the things that I think the judge
Page 133

needs to know aside from what I might feel about it.

Q. Sure. But are those reports supposed to be from the perspective of the best interests of the children?

A. No, absolutely not. I can put some of my own -- there's a part in there for discussion, but no, the reports have to be factual, based on fact, based on experience.

Q. Okay. And I suppose there are other people that participate in this process. When you're submitting reports, other people are submitting reports.

A. That's right. So that means I have to work with all other agencies as well.

Q. Who are your clients in this process?

A. I have no clients.

Q. I see. Okay. I got the impression --

A. I -- this is a volunteer job.

Q. Oh, no, I understand nobody's paying you. I got that clearly.

A. And I have no clients other than I speak for what's best for the children based on the facts that I have researched.

Q. Okay. I got you.

A. Now, lots of times we have hearings where other people are involved too.

Q. Well, you know, all these questions are really an effort to determine whether -- if we had a case like this, okay, where we

2068

have six- and ten-year-old girls dead, whether that's the kind of case that you can truly tell us, oh, I could consider both of the punishments.

A. If you'd read on further in my documentation, I told you that I'm also a mediator, that I'm trained by the Iowa Mediation

Page 134

Service.

Q.   Sure.

A.   And I've had to use a lot of those mediation skills where I put myself in the middle and have to listen to both sides.

Q.   Sure.  I doubt any of your mediation cases have involved anything like this, though, have they?

A.   As a matter of fact, not to this -- not as severe as this, but we have used mediation in family disputes.

MR. STOWERS:  Two minutes.

Q.   Okay.  Let me change gears for a second, and I was particularly interested in one of the areas that you talked about regarding childhood experiences affecting people later in life.

A.   Uh-huh.

Q.   Do you believe that they do?

A.   Yes.

Q.   In what way?

A.   Well, I think that we develop a lot of our propensities for life at an early age, and I believe that -- but that doesn't mean that if we've had a bad childhood that we can't change,

2069

can't predict everything that's going to happen to someone in their lives.

Q.   Sure.

A.   But I think there is a great propensity for -- or we do kind of develop our propensities for life when we're young.

Q.   Do you think that childhood experience would be a proper consideration in assessing a punishment for somebody who'd committed a crime?

A.   I don't -- I'm not sure -- I don't know what weight -- yes,

Page 135

but I don't know what weight you would put on that. I couldn't -- I think you'd have to hear the facts before you could make that determination.

MR. BERRIGAN: Okay. My time is up. Thank you very much for your patience, ma'am.

PROSPECTIVE JUROR 800: Thank you.

THE COURT: Mr. Miller?

EXAMINATION

BY MR. MILLER:

Q. Good afternoon.

A. Hi.

Q. Thank you for your time. We need to cover two things. One, of course, is thoughts about the death penalty. Another is exposure to any publicity or information about the case other than what was in your questionnaire. You indicated you know Dustin Honken's name and that was the extent of it. Do you know

2070

anything other than that?

A. No, because when I got this file from the Court, I thought it probably was relative to something in my CASA case. I had no idea what I was getting into.

Q. You know nothing -- other than what was in the questionnaire, you don't claim to have any knowledge about the facts about this case.

A. No, I do not.

Q. And you would judge this case solely upon the information that came out in court, of course.

A. Yes.

Q. You understand that to be your job.

A. Yes.

Page 136

Q.   Very good.   Along with what Mr. Berrigan spoke with you about -- and I think you made it very clear to us already, but I just wanted to mention that obviously any case involving harm to children is one that's likely to cause most folks some emotional reaction.

A.   Uh-huh.

Q.   And I think you already indicate that you recognize the duty to recognize that for what it is and still base your judgment upon what you understand the true facts to be, not on emotions.

A.   Yes.

Q.   And I take it that you're telling us that from your

2071

training and experience you may actually be better equipped for that than you would have been before you had such training and experience.

A.   Definitely.

Q.   Thank you, ma'am.   You indicated also in answer to the general question about the death penalty that it's something that you've wrestled with for many, many years, and I think everyone in our society hears about it and thinks about it, but actually wrestling with it isn't necessarily something all of us do.   Can you share with us what you've done and thoughts that you've given to this issue over the years?

A.   Well, I also work in the hierarchy of the United Methodist Church in Iowa, and, of course, that's an issue for the church. They don't tell us how we should feel about it one way or the other.   But a lot of our MFA -- or Methodist for Social Action -- Methodist Foundation For Social Action talk a lot about that we should abolish the death penalty.   But I appeal to

Page 137

my more intellectual senses at that point to say how can we maintain life sentences for everyone given overcrowded prisons and so on and so forth. So I don't know where the reality is for that.

Q. You've given it a lot of thought and haven't come to any firm conclusions yet I take it.

A. Right.

Q. Let me ask you this. You'll recall this morning the judge

2072

gave you just a brief summary of how the process is expected to work should you ultimately end up deciding punishment in this case.

A. Yes.

Q. Did it make sense to you as being a logical manner in which you would proceed?

A. Yes.

Q. That jurors in that situation would be asked to fairly consider both possibilities?

A. Yes.

Q. And to consider and weigh all factors on both sides of the issue before arriving at a conclusion?

A. Yes.

Q. And would you do so?

A. Yes.

Q. And finally, I simply have to ask you this question. Should you be in that situation -- and again this is hypothetical, but should you find yourself in a situation where you and your fellow jurors unanimously had concluded beyond any reasonable doubt that this defendant is guilty and following the second and third phases of this trial had unanimously concluded

Page 138

that the death penalty is the appropriate punishment in this case, it would be a verdict that could not be reflected unless all 12 signed their names to a form of verdict that would have that practical effect. Do you feel under those circumstances

2073

you could do that, ma'am?

A.    Yes.

MR. MILLER:  Thank you very much.

THE COURT:  Ma'am, if you would just step outside, we'll let you know your status.

(Prospective Juror 800 exited the courtroom.)

THE COURT:  Any challenge for cause?

MR. BERRIGAN:  None by the defense, sir.

THE COURT:  Any challenge for cause by the government?

MR. MILLER:  No, Your Honor.

THE COURT:  Any peremptory challenge?

MR. BERRIGAN:  Yes, Your Honor.  The defense would exercise a peremptory challenge in respect to Juror Number 800.

THE COURT:  Okay.  Let's bring her in.

(Prospective Juror 800 entered the courtroom.)

THE COURT:  Ma'am, we're going to go ahead and excuse you as a juror in this case.  Thank you very much for participating in the process today.  You're free to leave.

We'd just ask you a favor, that you not talk about this to anybody else until we get the trial underway because you could say something to somebody and then that somebody says -- repeats it, and then somebody winds up on this jury panel next week some day.  So appreciate it.  Thank you so much.  Bye now.

(Prospective Juror 800 exited the courtroom.)

THE COURT:  Okay.  458.

Page 139

(Prospective Juror 458 entered the courtroom.)

THE COURT: Sir, any chair in the front row you'd like. We're going to start first with questions from Mr. Miller.

EXAMINATION

BY MR. MILLER:

Q. Good afternoon, sir.

A. Good afternoon.

Q. How you doing so far?

A. Good.

Q. Very good. Just two matters we need to cover with you. Number one is questions about any exposure you may have had to information about this case other than the questionnaire, and then we need to visit with you about the death penalty; okay?

A. You bet.

Q. Very good. Obviously you read the questionnaire. Aside from the information contained in that, do you recall hearing anything about this case from any other source?

A. Nothing at all.

Q. And since you filled out the questionnaire, have you heard anything further other than what's in the questionnaire?

A. No.

Q. And finally, I trust that that has not caused you to form any opinions about the merits of the case.

A. I have no opinions about the merit of the case.

Q. Very good, sir. The second issue is the death penalty, and

you were very succinct. You said in two words it's okay, and, you know, brevity is some of the best ways to communicate clearly about any subject, but I was hoping perhaps you could just open up and share with us just a little bit more what it is that causes you to feel that it's okay and any feelings -- when you got this questionnaire, I assumed it isn't every day that somebody comes to you and says, Sir, I want you to give me your feelings about the death penalty. It was kind of a unique situation. Have you given it some thought, sir?

A. Yes, I have.

Q. Could you share that with us?

A. I think there's a place for it under extreme circumstances.

Q. It can be an appropriate punishment in the right case.

A. It could be.

Q. In this case, sir, you understand from the questionnaire at least in general what the allegations are, that the defendant in this case participated in the premeditated killings of five people including two children in connection with a conspiracy to manufacture or deal drugs in sort of a nutshell. You understand that to be the allegations?

A. I understand.

Q. If the evidence in this case would show beyond a reasonable doubt that that would be the case and if the jury had concluded that the defendant is guilty of those allegations, then you

2076

would be participating in a second and possibly a third phase of the case in which the issue of the applicability of the death penalty would be for you folks to decide. You recall hearing from the judge a little bit of a nutshell summary about how that process would work?

Page 141

A.    I remember, yes.

Q.    Okay.  And did that seem like a logical way of going about it to you?

A.    Yes, it does.  What I remember the judge saying is that the ultimate decision is up to him.

Q.    Let me just suggest to you that -- and this isn't yourself, sir.  It's any number of jurors may have misunderstood that.  If the jury finds the defendant guilty in this case and if the second phase results in the finding that the government has proved the gateway and an aggravating factor, then the punishment becomes the issue.  And if after listening to all of the evidence which would be evidence trying to show aggravating factors, factors that make this crime more serious, and possibly any evidence showing the contrary, it would be for a jury to decide the punishment and that the jury's decision would be final.  Does that give you pause at all, sir?

A.    I understand what you're saying.

Q.    And does that give you any concern or change your outlook upon the responsibility that we're talking about shouldering you with here?

2077

A.    I know what the responsibilities are.

Q.    Understanding that your responsibility would be final as a member of the jury on that issue, do you have any qualms about taking on that responsibility, sir?

A.    No, I don't.

Q.    Very good.  And if the evidence shows the facts including the intentional killings of five people including two children, would you -- in accordance with the Court's instructions about considering and weighing both mitigating and aggravating

Page 142

factors, would you seriously be able to fairly consider both possible punishments as options, sir?

A. I believe I could fairly consider both possible punishments.

Q. And ultimately, sir, should you be on a jury that finds this defendant guilty and concludes unanimously and beyond a reasonable doubt that the death penalty is the appropriate punishment in this case -- that would happen if and only if all 12 jurors agreed and signed off on a verdict to that effect -- you'd have to sign a verdict to that effect in order to carry out that. Do you feel you could place your signature on such a verdict form, sir?

A. If I -- if my conscience was clear and all the facts were stated, I would have to take the responsibility that -- to do that because it's my duty as a citizen.

Q. And you feel you can carry out that duty in the appropriate

2078

case, sir.

A. Yes, I could.

THE COURT: Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q. How are you doing so far, sir?

A. Pretty good.

Q. Great. I wonder if you would give me permission to ask you about a matter we probably otherwise wouldn't, and that is some medication that you mentioned in your questionnaire.

A. I'll answer your questions.

Q. I appreciate that. You indicated in the questionnaire that you might be concerned about seeing some of these graphic

Page 143

photographs because I don't like violence and it may disturb me; I have had paranoid thoughts in the past, and then you followed that up with a question that's near the end of the questionnaire. And I bet it's been a while since you filled this out; am I right?

A. I'm listening to you.

Q. This was number 99. It says, In your opinion is there anything about this case, the issues, and/or the people involved in this case that might hinder you even slightly from being an impartial juror? And you had checked yes and said, I don't watch TV because of the violence, and I try to stay away from conflict. I also get paranoid thoughts. The medicine I'm on

2079

helps me in that area. Does that sound about right?

A. It sounds like what I wrote. What I mean is in the past I had to go on the medication because I was having paranoid thoughts. We're talking 15, 20 years ago.

Q. I see.

A. And I've been on the medication for 20 years now. It helps slow my thoughts down so I can grasp them, and the medication works real good for me.

Q. Great. There's really two things -- one you've answered I think. The medication helps you with the paranoid thoughts. The other area, though, I just want to be clear about is that you've expressed a real concern about being exposed to violence, that that's something you really try to avoid.

A. That's true.

Q. And here we have a situation where the government's alleging that there were five intentional murders; okay? And then they're also alleging that these murders were substantially

Page 144

planned and premeditated murders and that of the five victims they allege that two of them were what we call vulnerable victims, that of these five people there was a mother killed and her two daughters. They were ten and six years of age. And I suspect that almost any -- under anybody's definition of violence that's violence.

And so because of the questionnaire, I wanted to ask you about that because of your concern about this exposure.

2080

There's nothing we could possibly do if you were a juror to prevent that type of evidence from being presented. You understand?

A.    Yes, I do.

Q.    Okay. So what do you think?

A.    Well, I think I'm not applying for a job here. You know, I will do my duty as a citizen, and if it causes me some uncomfort, I'm willing to bear that.

Q.    Is that -- and we can only ask people to use their best judgment. You've made it -- you've said more than once now you want to do your duty as a citizen, but as the judge pointed out, you do that either way. I mean, you're right. It isn't a test for a job. That's exactly right. If we brought people in here and the only question the judge asked them was would you follow the instructions, everybody would raise their hand, and we could be done. I'm sure there are times he's thinking about that.

But what we are trying to do is to kind of fit our jurors to the case. And some people have expressed concerns in different areas. Sometimes penalty, sometimes the fact that children are involved makes it difficult for people. And I just want to make sure this violence thing is not going to trouble

Page 145

you so much that it might in the least really detract from your full ability to be the juror you'd like to be. Do you perceive any possibility of that?

A. Well, I wouldn't enjoy it, but it's up to you to decide who

2081

the jurors are, not up to me to try to get you to take me as a juror.

Q. That's right. You're right. And so we have to -- we ask these questions, and we hope people answer openly and honestly, and then we have to make our judgments. You're right about that. But you tell us. I mean, I don't know how much this violence might bother you. We don't know each other obviously. But the fact that you've indicated it is a potential source of concern concerns me. If it concerns you enough to write it down that this might keep you from being an impartial juror, you can see why we might be concerned about it; right?

A. Yes, sir.

Q. Are you okay with me asking you about it?

A. You bet I am.

Q. So what's your best judgment? And I realize that's somewhat unfair. You have no idea what the evidence is going to be in this case other than we're going to have at least evidence that five people were intentionally killed after premeditation and planning and two of them are kids. That's about all we can tell you. Does that alone, do those facts cause you any concern in your own mind and heart about your ability to sit on the case?

A. I think I could do a good job on the case, and, you know, it wouldn't be something I would enjoy doing, but I would do it, and I have a lot of excuses not to be on the case, but I'll

Page 146

waive those, and if you want me to -- you know, if I get picked as a juror, I'll do a fine job.

Q. And we have no doubt about that. We're just interested in some of your views about these things. There's no question you'd do the best job I'm sure that you possibly could.

A. Okay.

Q. Nobody's questioning that.

A. Ask me a question, and I'll answer it the way I feel.

Q. Okay. Let me ask you about the death penalty.

A. Okay.

Q. Okay? In the questionnaire, you were asked a question already answered. You thought the death penalty was okay. You said it's only fair. You said it was used too seldom. And there's a question that says do you believe in an eye for an eye, and you checked yes. There were two possibilities, yes and no. And so I'm interested in what that means.

A. When I filled out the questionnaire, I had a lot of reasons not to come on the jury. You know, I believe there's a place for it. I would be 99 percent not having the death penalty, but I would not be against it as a . . .

Q. Okay.

A. You know, but 99 percent of the time, I'd choose life for me. That's my opinion.

Q. Okay. I appreciate that very much. Can I ask you then -- because I think I'm either -- I might be just misreading this;

okay?

A. Very possible.

Q. Sometimes folks come in here and they check that box eye for an eye. Sometimes what they mean is if you take a life then you forfeit your life. It's kind of like the Old Testament, you know, Biblical eye for an eye, limb for a limb, life for life. That's not always true. That isn't what always everybody means.

And I don't know what you understood the question to ask you, but it's important that I be able to understand what you thought it meant when you checked yes for eye for an eye. How did you read that question?

A. Well, let's look at -- if it isn't an eye for an eye, then, you know, it isn't really fair.

Q. If it is or isn't?

A. If it is not. It's like if I do something wrong, why -- I think eye for an eye is somewhat fair. You know, why shouldn't it be?

Q. Okay. I'm not arguing with you about it. I hope I don't give you that perception. We respect your views. They're views. You know, everybody has different views.

Let me ask you, how does that apply to murder then? You were talking about if you did something wrong. How does eye for an eye apply to murder in your view, particularly intentional murder?

A. I would have to see some facts to prove it that it was

2084

intentional, you know, without a doubt.

Q. Okay. The government has a burden. They have to prove it beyond a reasonable doubt. Is that a fair burden?

A. I think it is.

Q. Would you make them prove it more than that?

A. I think that's a fair statement.

Page 148

Q.    Beyond a reasonable doubt's okay.

A.    Yes, I do.

Q.    Okay.

MR. STOWERS:  Two minutes.

Q.    So here's our situation.  If you're selected as a juror, you would hear all the facts; okay?  You said you'd want to do it.  You would.  And we're asking you to imagine just for purposes of this questioning process that's happened; okay?

A.    Okay.

Q.    And you have a situation where you've determined beyond a reasonable doubt intentional murder; okay?  You with me?

A.    Yes.

Q.    If your view is an eye for an eye, if it is, and you found the facts to be intentional murder beyond a reasonable doubt, would you consider the death penalty as the appropriate punishment?

A.    I'd have to say no.

Q.    Why not?

A.    Because I believe in mercy too.

2085

Q.    Okay.  And how does that -- and I think my time's about up, so I'm going to ask you this last question.  How would you determine -- what factors I guess would you apply in making a determination about mercy?

A.    Well, I think living with the guilt is penalty enough in my opinion.  You know, how much worse can it get?

Q.    Living with the guilt of the crime.

A.    Yes.

MR. BERRIGAN:  Okay.  Well, my time is up, sir.  Thank you for your patience and candor.  Appreciate it.
Page 149

THE COURT: You guys already asked questions; right?

MR. WILLIAMS: Yes.

THE COURT: Yeah, okay. Having a bad day.

Juror 458, let me just ask you this one question. If you were selected to serve as a juror on this case and the jury unanimously found the defendant guilty in the first phase and found the eligibility factor and an aggravating factor in the second phase and you wound up in the third phase, the penalty phase, do you believe you would be able to give fair consideration to both a life sentence and a death sentence in this case?

PROSPECTIVE JUROR 458: I would have a hard time giving the death sentence.

THE COURT: Let me try and ask it a different way. Some of the lawyers have used, in asking some of the jurors, a

2086

football analogy. Are you generally familiar with what a football field looks like?

PROSPECTIVE JUROR 458: Yes.

THE COURT: Okay. The assumption is that an individual who is equally open to both punishments in this case would put themselves on the 50-yard line. Some jurors when we ask the question, well, they're all over the place. Some are in the end zone of death. Some are in the end zone of life. Some are, you know, down by the 10-yard line. Some are at the 25-yard line towards the death penalty, towards a life sentence. Where would you put yourself in the football field as it relates to the penalty?

PROSPECTIVE JUROR 458: Well, I'd have to be on the life side, pro life imprisonment, and I'd probably be about on

Page 150

the 5-yard line.

THE COURT: And that'd be just five yards away from the end zone labelled life imprisonment.

PROSPECTIVE JUROR 458: Yes, rather than the death penalty. I would be away from the death penalty.

THE COURT: Okay. Thank you. If you'd just step out, I'm going to talk to the lawyers, and I'll let you know.

(Prospective Juror 458 exited the courtroom.)

THE COURT: Mr. Miller?

MR. MILLER: Your Honor, the government challenges for cause on the basis of substantial impairment. He did indicate

2087

that he would have a hard time giving the death sentence. He indicated that he was 99 percent for life even though he was able to go all the way out to the 5 yard line.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: The defense is opposed to striking Juror 458 for cause, Your Honor, because when asked very directly -- I think I asked him after giving him the scenario of intentional murders, premeditated, planned, five people, children, would he be able to consider the death penalty. My recollection is he said yes. It was an unqualified yes. Now, admittedly, he favors life apparently, and we've used the football field analogy quite a bit. I'm never confident whether the --

THE COURT: Well, you're the one that started it.

MR. BERRIGAN: No, I know it, and you might notice I've kind of abandoned it.

THE COURT: I noticed, but I hadn't.

MR. BERRIGAN: I think the problem is -- and I don't

Page 151

know how to remedy it -- is that we can't always include the factors in there when we're asking it. And so I do believe he has a predisposition for life, but he's also a man who told me repeatedly eye for an eye, and he said that was fair. I just think it depends on what the murder is for this guy as to whether or not he's going to be life or death, and that's perfectly appropriate. He's willing to consider both

2088

punishments, and that's the test, and we certainly don't think he's substantially impaired based on the record so far. So we'd oppose his removal for cause.

MR. MILLER: May it please Court.

THE COURT: Yes.

MR. MILLER: Your Honor, I believe his actual question and answer was given those facts, do you consider the death penalty an appropriate punishment, and to that question he said no. And when asked why, he indicated because he believes in mercy too, and again, I think that also shows substantial impairment in his ability to consider both punishments.

THE COURT: He did say twice that he was 99 percent of not having the death penalty.

MR. BERRIGAN: I guess I misspoke. I think he told Mr. Miller, Your Honor, that he could consider both punishments.

THE COURT: Well, I'm looking at your examination. Well, you said, If your view is an eye for an eye, if it is, and you found the facts to be intentional murder beyond a reasonable doubt, would you consider the death penalty as the appropriate punishment? I'd have to say no.

Well, I think the juror's substantially impaired. He repeatedly gave the opinion that he was 99 percent opposed to

Page 152

the death penalty, and he put himself on the 5-yard line, and I thought you -- maybe I misunderstood you, Mr. Berrigan, but I thought I asked you this question a day or two ago about where

2089

on the football field you would think someone was substantially impaired. And I thought you told me inside the red zone which was the 20-yard line.

MR. BERRIGAN: Yeah, we did have that discussion, but it --

THE COURT: Well, I'm finding that that was an accurate answer.

MR. BERRIGAN: That's fine. As I already pointed out -- and I don't want to belabor it -- I think the problem with the football field analogy is if it's not put in the context of the case, I'm not sure how clear it is in terms of if he's on the football field in this case or it's just how do you feel about life versus death, period. That's my concern about the football field analogy.

THE COURT: Well, I understand your concern, but I think this juror's substantially impaired in this case because he couldn't fairly consider both penalties. So I'm going to sustain the government's challenge for cause. So let's bring Juror 458 in.

(Prospective Juror 458 entered the courtroom.)

THE COURT: Sir, we're going to go ahead and excuse you as a juror in this case. Thank you so much for participating in jury selection today, filling out the questionnaire. I think you'd make a great juror but probably not in this case. And we'd appreciate it if you wouldn't

2090

Page 153

discuss jury selection with anybody until after we get the jury impaneled and the trial underway which will be at least a week because you might say something to somebody and that person might say something to somebody else and then we've got them on the jury here and they've already heard from a potential juror. So that's why we ask you not to say anything for another week or so. Thank you. Good luck to you.

(Prospective Juror 458 exited the courtroom.)

THE COURT: Okay. Ready for 769?

MR. MILLER: Yes, Your Honor.

THE COURT: Our last chance of the day.

(Prospective Juror 769 entered the courtroom.)

THE COURT: If you'd just please grab any chair there in the front row, and we're going to start with Mr. Berrigan.

Mr. Berrigan?

MR. BERRIGAN: May it please the Court.

EXAMINATION

BY MR. BERRIGAN:

Q. Hi. How are you? Have a seat, ma'am. You didn't pick the lucky seat that got you out of jury service. Last but not least. Thank you for your patience. We have a chance to ask you some questions about two different areas in the brief time we have together, and one of them is about pretrial publicity, what kind of media exposure you might have had to the case through television, radio, newspapers, or just talking to

2091

people. So let me just ask you that. What kind of exposure have you had through the media about the case?

Page 154

A. Not really very much at all. I think I heard a blurb about the trial going to be here in Sioux City, but that's about all.

Q. Okay. You mention in the questionnaire that you had heard that the bodies were found recently even though the deaths were seven years ago, that it happened in Mason City. I've heard the name Dustin Honken associated with the murders. Does that sound right?

A. Yeah, that was before I got -- yeah, before I got the paperwork to come here.

Q. Sure. Well, these questionnaires were filled out most of the times -- this is back in February.

A. Yes.

Q. And you said that these accounts you had received from television and radio. Does that sound about right?

A. Yeah.

Q. Okay. Had you had occasion to talk to anybody or hear anybody talking about the case?

A. No.

Q. Okay. All right. Let me ask you a few questions about the other topic we're going to talk about, and that has to do with punishment or the two penalties that are potentially involved. And it is somewhat artificial to be talking about punishment, and this woman hasn't been convicted of anything. But our

2092

problem is we can't bring you back if she's convicted and say, What do you think about punishments? We have to do it now; okay?

A. Okay.

Q. So let me just ask you. If you and I had known each other for a while and we were sitting in a coffee shop and there was a

Page 155

newspaper article about somebody got the death penalty and I turned to you and said, Well, Juror 769 -- I probably wouldn't call you Juror 769, but Juror 769, what do you think about the death penalty; we've never really talked about it, what would your answer be?

A.   Probably that if the person that got the death penalty had killed somebody himself or herself that it was probably justified.

Q.   What about in terms of your conception of when the death penalty might be an appropriate punishment?  Do you have any scenarios or cases in your mind about that?

A.   I was thinking about the family of the children that were killed a couple years ago in Sioux City, and I know at that time I thought that person, you know, should probably be put to death.

Q.   What was it about the case that you thought the death penalty was appropriate there?

A.   That he just went in and killed, you know, children in their sleep, you know, and they were defenseless.

2093

Q.   And is that a state prosecution?  You probably don't know. I guess if it was and Iowa doesn't have the death penalty -- are you aware of that?

A.   Uh-huh.

        THE COURT:  It was, and you're right.  Iowa doesn't have the death penalty.  It was brought in Woodbury County court.

Q.   Were you unhappy with this result assuming this man got a life sentence?  I don't know the case, but assuming that's what happened, is that what your understanding was?

Page 156

A.   I assume.  I don't remember now.  I know he didn't get the death penalty.

Q.   Okay.  Let's assume if he got a life sentence -- I don't know -- let's assume that.  What about that displeased you?

A.   Well, I would think that's, you know, better than nothing.

Q.   Oh, sure.

A.   That's pretty severe too so . . .

Q.   Do you think a life term of imprisonment without possibility of parole is a severe punishment?

A.   Yeah, yes.

Q.   Let me ask you a little bit about our situation.  You mentioned in your questionnaire when you were asked why you had these views about the death penalty, what are the reasons for your beliefs, you said that that person took a life, so why should he or she not be punished to the extent of the law?  Does

2094

that sound right?

A.   Yes.

Q.   Okay.  Well, we have a situation here where the government's alleged that Angela Johnson took not one but five lives, and they have alleged that it was done intentionally, intentional murder; okay?

A.   Okay.

Q.   That green book is going to be intentional five murders.  And then they further allege that these murders were done after substantial planning and premeditation.  You know what I mean by premeditation?

A.   Uh-huh.

Q.   And they're further alleging that of these five people who were killed intentionally one was a mother and two were

Page 157

children, two little girls ten and six years old. And you're a teacher; right?

A. Yes.

Q. And the government alleges these children were vulnerable victims. I'll use your phrase of children. They're defenseless; right? Now, we could probably agree that's pretty serious stuff, isn't it?

A. Yes.

Q. All right. And I'm wondering based on what you told me just a minute ago about this other fellow a couple years ago and the fact that these are defenseless children, as a juror you

2095

could find yourself in a situation where you're having to determine punishment in this case. It's possible. And we're asking people to kind of fast forward in their minds to that point in the trial which we may never get to; okay? We might never get to it. The judge has mentioned that. But we might. I mean, it's possible. And we need to know whether or not people could, you know, realistically consider these punishments. I'm guessing based on what you told me about the fellow in Sioux City a couple years ago in this kind of a situation, do you feel that you could consider the death penalty as an appropriate punishment?

A. Yeah, I think so.

Q. Okay. The converse question is in this situation, even in this situation with five people intentionally killed, premeditated murders and two children, could you realistically consider a life sentence as a sufficient punishment for that kind of a crime?

A. Yeah.

Page 158

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1826 of 3245

Q.    Okay.  You're kind of like giving me a face there.  I mean . . .

A.    I don't know.

Q.    What don't you know?

A.    I mean, I would consider that too I guess.

Q.    Do you have some hesitancy about that as to whether that's enough punishment for that type of a crime as far as considering

2096

it?

A.    I just think that, you know, there's always that chance that the person -- you know, if that person isn't guilty and you -- you know, they get the death penalty, that's always the fine line.

Q.    Yeah.  We've had a lot of people express some concern about the death penalty, the finality of it in terms of we've all learned from media that folks have been on death row and gotten off when DNA results have indicated they weren't even guilty after all.  But, you know, this is a situation where you would have heard the evidence personally, not read about it in the paper, and you would have had to have been convinced beyond a reasonable doubt that these things occurred; right?

A.    Right.

Q.    And, of course, one of the things obviously right at the bottom of the intentional murder, you would have had to have been persuaded beyond any reasonable doubt, not just you but you and your fellow jurors this is a case of intentional murder, guilty.  This person's responsible, Angela Johnson.  So that part about do we have the right person kind of thing is probably out of the equation at least -- maybe, maybe not, but you've certainly come to a determination there's no reasonable doubt

Page 159

about that.

A.    Okay.

Q.    You with me?

2097

A.    Uh-huh.

Q.    And then we have this other stuff, the premeditation and the kids.  I suppose out of the things you're most concerned about is it's the kids that's the big factor?

A.    Yeah, that's -- yeah, and premeditation.  That's -- yeah, and when it comes to kids, that's pretty bad.

Q.    Okay.  Well, we ask these questions.  You know, people come in.  They tell us different things.  Some folks have said, Hey, there's no way.  We've had folks come in and say intentional at the bottom is enough.  If you intentionally take somebody's life, that's kind of a life for a life.  You made the choice.  You chose to kill somebody.  You forfeit your life.  Sometimes it's the kids.  Sometimes it's not a problem.  And we have to rely on what people tell us largely.  But, you know, both parties are entitled to people that could fairly consider both punishments.

A.    Okay.

Q.    And so we're really relying on you because we won't have this chance to ask this question again after you hear the evidence, do you still feel that way -- come back and say, 769, what do you feel like now?  That isn't going to happen, so you just kinda gotta search your heart and mind right now.

        MR. STOWERS:  Two minutes.

Q.    And let me just ask that last question again.  If -- and it's a big if, but if the situation were that you were on a jury

2098

Page 160

and found those things that we've talked about now including the kids and you found beyond a reasonable doubt that was the situation, would you realistically be able to consider a punishment other than the death penalty?

A. Yeah.

Q. Okay. You could consider a life-without-parole punishment?

A. Yeah, I do.

Q. Okay. There's that eye movement. You really could.

A. Yeah.

Q. And you would.

A. Yeah.

MR. BERRIGAN: Okay. Thank you, ma'am.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

EXAMINATION

BY MR. MILLER:

Q. Good afternoon.

A. Hello.

Q. How you holding up?

A. Pretty good.

Q. You're in the home stretch. I just want to follow up on a couple of these questions and then sit down, and I only want to visit with you about the death penalty issue. You answered the question from Mr. Berrigan just a couple minutes ago which is really kind of the ultimate question, and only you can answer it

2099

by looking inside yourself.

Understanding what this case is about -- and you've had a little thumbnail sketch in the questionnaire -- an
Page 161

allegation that Ms. Johnson participated in the killings of five people including two children during a conspiracy to manufacture or deliver drugs, given that and assuming that those are the findings of the jury, at a penalty stage, if you were ever to get there, do you feel you could give fair consideration to both possible punishments?

A.    Yes.

Q.    Very good.  And I trust you would never, ever want to impose the death penalty on anyone without first fully and fairly considering the possibility that life in prison might be a more appropriate punishment.  That's a serious matter; fair statement?

A.    Yes.

Q.    Let me just ask you a couple questions.  You mentioned in your written questionnaire response on the thoughts about the death penalty, you stated -- and I'll read it back to you -- If it is proven or the person confesses that he or she intentionally murdered someone.  And I'm assuming -- but please correct me if I'm wrong -- that you're not telling us that you would require a confession.  You'd require proof, and a confession would be, of course, a form of proof, but you indicated if it is proven or the person confesses.  And I'm

2100

wondering if you feel you would have to have a confession in order to make a finding of fact beyond a reasonable doubt.

A.    No.

Q.    Very good.  The other question on one of the pages, you were given a list of possible factors that might be weighed in punishment such as multiple deaths, the killings of children, things like that.  You did indicate in your answer that more

Page 162

severe punishment was appropriate for the killing of children because they couldn't defend themselves. And if you were on a jury in which -- if you're on a jury in this case and if it comes to deciding punishment, I take it it's fair to say that if instructed by the Court that the killing of vulnerable victims such as children is an aggravating factor that that makes sense to you and you would consider that; fair statement?

A. Yes.

Q. You also indicated with regard to the question of the guilty person assisted or encouraged the murder but was not the person who pulled the trigger and you indicated there probably not the death penalty, and so I think if I'm understanding you correctly, you're indicating that you would consider that a mitigating factor.

A. Yes.

Q. Okay. And you heard the judge give a little summary about how this works. He indicated that if it came to that stage the jurors would have to consider and weigh all of the factors,

2101

mitigating and aggravating, before coming to a conclusion as to the appropriate punishment.

A. Yes.

Q. Would either of those factors dictate what your decision would be, or would you weigh both of those?

A. I don't know if I understand.

Q. Okay. And it was poorly phrased. Let me put it to you this way. If the evidence were to show that children were intentionally killed, would you automatically impose the death penalty without considering both possible punishments?

A. I don't know.

Page 163

Q. Conversely, if the evidence in this case were to show that Angela Johnson participated in these crimes but was not the person who actually squeezed the trigger on these, would you automatically impose life as opposed to the death penalty?

A. Yeah, at least, yeah.

Q. Okay. So there's a couple competing factors, and I'm just trying to figure out. You would be expected to weigh these. You understand some crimes are committed jointly by more than one person.

A. Uh-huh.

Q. If the evidence in this case shows that Angela Johnson was an intentional participant in these crimes, in these killings, including the killings of two children but, in fact, it was not she but rather her partner in crime who squeezed the trigger on

2102

each of those occasions, would that automatically result in a life punishment rather than the death penalty in your opinion?

A. Yes.

Q. You don't feel that you could fairly consider the death penalty under those circumstances.

A. I don't know. I honestly don't know.

Q. Okay. Well, let me put it to you one step further, and I realize this is unusual. You've not been put in a spot like this before, but if you were serving on this jury, the judge is going to give you the benefit of instructions on how to do your job, and I trust you'll want to follow those instructions, but we also have to ask people whether they really feel they can.

If you're told that you would have to consider both life and death and that you would have to consider giving it whatever weight you deem appropriate but consider all of these

Page 164

factors including whether a person was an aider and abettor as opposed to one who squeezed the trigger and if it was proven that she was an aider and abettor and not one who actually physically squeezed the trigger on the gun, could you still consider imposing the death penalty, or would that be foreclosed for you?

A.   I could still consider it.

Q.   Can you see a situation where a person who encourages and participates in a crime is every bit as responsible for the results as the person who actually squeezes the trigger?

2103

A.   Yes, I can.

Q.   Such as someone -- the killer would not have done it without the encouragement and assistance?

A.   Sure.

Q.   And that it could not have been -- happened without more than one people -- person?

A.   Oh, sure.

Q.   Ultimately if you're on a jury that were to find Ms. Johnson guilty beyond a reasonable doubt and pass through the second and third phases and decide unanimously that the appropriate punishment in this case is death, under those circumstances, you understand that that verdict could not be reflected unless each of the 12 members of the jury were to sign his or her name to the verdict form -- you understand that -- and that signing your name on that verdict form would have the practical effect of imposing that punishment.  Do you feel that you could do that in the appropriate case?

A.   I don't know.

Q.   It's a difficult question, isn't it?  I trust nobody would

Page 165

ever take lightly that responsibility. But you understand that that punishment cannot be imposed unless a unanimous jury imposes it. And so in a sense it's each person's verdict. Each person has to decide that, and without each person's decision, it can't be imposed. If you were to return such a verdict, that verdict could not be imposed unless you were to sign off on it.

2104

If you feel it's appropriate, you and your 12 jurors, do you feel that you can honestly assure us that you would be able to sign under those circumstances?

MR. WILLIAMS: Two minutes.

A.   Do I?

Q.   Yes.

A.   I don't know.

Q.   And I can tell you're struggling with this, and I apologize for putting you under this. And it's only a question -- and there's no wrong answer. The only answer is what's in your heart, ma'am, and we appreciate the fact that you're struggling with this. Do you feel you'd have substantial difficulty in carrying out that job if it were to come to that?

A.   Yes.

Q.   And in fairness just so that we're sure we know where we stand here, do you feel that, in fairness, you really can't assure us here today that you would be able to --

A.   Right.

Q.   -- to do that, to fairly and fully consider imposing either punishment because you can't do both?

A.   Either?

Q.   The death penalty.

A.   Right, that one.

Page 166

Q. You feel you can't.

A. Yeah, right.

2105

Q. You can't fairly consider imposing that given the responsibility that there would be in signing a verdict.

A. Right.

MR. MILLER: Thank you, ma'am. And again, I apologize for subjecting you to this, but it is a difficult issue, and we appreciate the fact that you struggled with it.

THE COURT: Juror 769, I'm very confused by your answers. I'll just be candid with you, and maybe that's because you're confused. And you know what? It's okay to be confused, and it's okay to be upset. I'm not being critical in any way, but I am confused, and let me try and explain why, and then we'll see if you can help me, and maybe you can, and maybe you can't, and either way is going to be fine with me.

In response to a question about the intentional killing of two children and whether you would automatically impose the death penalty, you said you don't know. And then a lot of your answers seemed kind of leaning towards the death penalty in this case. And then when it comes to signing the verdict form, it sounds like maybe you couldn't sign a verdict form if it was your vote for death and all 11 jurors agreed with you. Can you explain the --

PROSPECTIVE JUROR 769: I know. When you're sitting here and you get all those questions, it makes you think.

THE COURT: Yes, and you prob -- you haven't had to think about it like we've asked you to do today; right?

2106

Page 167

PROSPECTIVE JUROR 769:  Yeah.

THE COURT:  So -- and let me reenforce what the lawyers I believe have said and what I said at the beginning. There are no right or wrong answers.  These are difficult questions.  Nobody's here to criticize you for any belief that you have.  There's not a right or wrong answer to any of the questions and certainly not to the question I'm about to ask you.

But here's what I need to know.  Based on everything you've heard about this case so far, do you think if it ever got to the phase 3, the penalty phase, that you could listen to all of the evidence and fairly consider both a life sentence and a death sentence?

PROSPECTIVE JUROR 769:  Yes, if that's the scenario, yes.

THE COURT:  And in that penalty phase, if there ever is one, if there ever is a penalty phase, the government would introduce evidence of aggravating factors.  The defense doesn't have to introduce any evidence, but they may choose to introduce evidence of mitigating factors, and then you would be required to weigh those factors.  And nobody, nobody, is going to tell you how to weigh them.  That's for you to decide.  If you find something's an aggravating factor and you find something's a mitigating factor -- and there could be 15 mitigating factors and 1 aggravating factor or 2 aggravating factors or whatever --

2107

you'll have to weigh all of the factors, put them in the mix, and then look at all the factors.  You get to decide what weight you want to give each factor, and then you have to decide life

or death.  Do you think you could fairly do that?

PROSPECTIVE JUROR 769:  I would try.  I mean, I would try to be fair about it, yes.  If that's the question, yeah.

THE COURT:  Well, the question is do you think you could fairly consider both life and death?  Only you know the answer.

PROSPECTIVE JUROR 769:  Yes, I guess I can.

THE COURT:  That sounds like you have a lot of reservation, I guess I can.  Guessing is okay in some areas, but it's -- we can't -- it's not good enough in this kind of situation.  It's not good enough to guess.  And some people know themselves well enough to know, and I guess maybe other people don't, and it's okay not to know.

PROSPECTIVE JUROR 769:  Right.

THE COURT:  And because we're asking you about a very hypothetical situation that may never happen in this case, may never get there, but if we do get there, we need to have your most honest answer about whether you think you could fairly consider both penalties.

PROSPECTIVE JUROR 769:  Well, I don't know what you want me to say.

THE COURT:  I don't want you to say anything.

2108

PROSPECTIVE JUROR 769:  I've tried to answer it. I'm -- I don't -- I'm just really confused now.

THE COURT:  Okay.  What confuses you?

PROSPECTIVE JUROR 769:  That the penalties -- it's not either/or.  It's both.

THE COURT:  Well, it's either/or and it's both.

PROSPECTIVE JUROR 769:  Right.

Page 169

THE COURT: The jury can't give both penalties. You can't give somebody a life sentence and a death sentence; right?

PROSPECTIVE JUROR 769: Right.

THE COURT: So in that sense you get to consider both.

PROSPECTIVE JUROR 769: Okay.

THE COURT: The consideration is of both, so in that sense, both, yes, it's both. If we get to the third phase, it's both. You'd have to consider both. But you have to choose one or the other.

PROSPECTIVE JUROR 769: Right.

THE COURT: And the question is can you fairly consider both.

PROSPECTIVE JUROR 769: Yes. If we're told that, yes, then I think yes.

THE COURT: Okay. If you'd step outside, we'll let you know your status in a minute. Thank you.

(Prospective Juror 769 exited the courtroom.)

THE COURT: Mr. Berrigan?

2109

MR. BERRIGAN: The defense has no motion respecting Juror Number 769, sir.

THE COURT: Mr. Miller.

MR. MILLER: Your Honor, the government challenges for cause, and we would suggest to the Court respectfully that this juror is substantially impaired. She repeatedly indicated, Yes, I can consider both, but she also made it clear that she could impose only one, and that's life in prison. And when asked if she could -- after arriving at a unanimous conclusion that death was the appropriate verdict, if she could sign a verdict to that effect, she said, I don't know. And at that point she began

Page 170

weeping, not openly and audibly, but her eyes teared up.

THE COURT: No, I saw that.

MR. MILLER: And I asked her if she would have substantial difficulty carrying it out, she said yes. And I asked her, because I felt it was what we were entitled to, if she could assure us that she could fairly consider it, and she indicated in the negative, and I felt that that indicated a substantial impairment which is the basis for our challenge, Your Honor.

THE COURT: Okay. I'm going to bring her back in and question her about signing the verdict form. Anybody have any objection to me doing that?

MR. BERRIGAN: None by the defendant, sir.

THE COURT: Okay.

2110

(Prospective Juror 769 entered the courtroom.)

THE COURT: Juror 769, I'm going to ask you to sit down, and I apologize in advance for this. I've discussed the matter with the lawyers, and I felt I needed to ask you a couple more questions before I ultimately decide. And it centers around whether or not after you've fairly considered both penalties if you and the other 11 jurors unanimously -- that means all 12 of you -- voted for the death penalty, it's a requirement that you actually sign the verdict form indicating each individually that you have voted for a sentence of death. And do you think you could do that?

PROSPECTIVE JUROR 769: I think it would be very hard to do, I mean, just to live with that. I don't know, you know, the rest of your life. But I know that, you know, this whole thing is really bad too, so, you know, they have to be punished.

Page 171

THE COURT: And I would hope that the decision to impose the death penalty would be a difficult one. I mean, it's the ultimate penalty. It shouldn't come easy I would think.

PROSPECTIVE JUROR 769: Right.

THE COURT: But if you reach that opinion, do you think you can take that final step and actually sign your name to the verdict form indicating that you voted for death?

PROSPECTIVE JUROR 769: I guess if I had to I would.

THE COURT: Do you think the fact that if you voted

2111

for death you would have to sign the verdict --

PROSPECTIVE JUROR 769: Right.

THE COURT: -- would affect your ability to vote for death?

PROSPECTIVE JUROR 769: It could.

THE COURT: Okay. Thank you. If you'd just step outside, it will just be a brief moment with the lawyers.

(Prospective Juror 769 exited the courtroom.)

THE COURT: Argument?

MR. MILLER: We reiterate. I think that did clarify to some degree, as best we can hope anyway, her feelings. And they aren't clearcut, but her answer remains that the act of signing her name to a verdict would influence her ability to return a verdict of death. She clearly is impaired by the requirement that she would have to do that in order to -- in order to return such a verdict.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: We're opposed to the motion, Your Honor. The fact that -- that last answer and question, could it

Page 172

affect her decision about the death penalty, I think that's part of the decision. It's not a divorced process. What this woman expressed, as I'm sure what a lot of people feel, is that's an irrevocable position and it has finality and consequences and she would, in signing that piece of paper, take that into account in making a decision about whether that was the

2112

appropriate verdict. At least that's my view.

THE COURT: That isn't how I took her answer at all. Her answer was if she voted for death she didn't think she could sign it and that would affect her decision. And the signing of a verdict form should have no impact on the factors because that is not a factor to consider, the fact that you have to sign the verdict form.

MR. BERRIGAN: Well, the reason the prosecution keeps asking that question is because they believe it is, that that's a test of how committed the juror is to whether or not they could render that decision. That's why they're asked these questions about signing the verdict form, because they believe that is a test.

THE COURT: Well, some people could vote for the death penalty but not sign the verdict form.

MR. BERRIGAN: Right.

THE COURT: I don't think that would be a permissible juror.

MR. BERRIGAN: A permissible juror, right.

THE COURT: Yeah, you couldn't put somebody on the jury who says, Yeah, I could weigh all the factors; I'm firmly convinced the death sentence is appropriate, but I'm just not going to sign a verdict form.

Page 173

MR. BERRIGAN:  No, I hear you on that, Your Honor.

THE COURT:  Yeah.

2113

MR. BERRIGAN:  What I heard this woman say -- and you obviously have the record before you --

THE COURT:  Same record you have.

MR. BERRIGAN:  Yeah.  Would the decision to sign the verdict form affect your decision on death, and she said it could.  That's what I understood the question and answer to be.  My only point is what's wrong with that?  I mean, signing that form carries out that decision.  Those are part of the same equation.  She should be taking that decision of signing the form as part of her decision about death.  They're not in my view divorced prospects.  Somebody signs that verdict form, that's it.  That means death with 12 other jurors, and she struggled with that.  I'll admit that.  No question about it.  But she never said she wouldn't or couldn't do it.  She said it would be very hard, and the whole thing is bad.  They need to be punished.  She never said, I'm not going to do it; I won't do it.  It will be hard.  I'll think about it.  It's going to be tough, but we believe this is a juror qualified under the Witt standard.

THE COURT:  Well, I don't.  Any other argument from the government?

MR. MILLER:  Not without reiterating, Your Honor.

THE COURT:  Okay.  I think she's substantially impaired in several regards.  She's given very inconsistent answers.  I took her answer with regard to automatically

2114

Page 174

imposing the death penalty that she might automatically impose the death penalty. Then when we get to the verdict form, because she said she didn't know whether she'd automatically impose the death penalty or not, she was leaning so strongly towards death in that part of her answer. She's given, I think, dramatically inconsistent answers. She was very emotional, and I don't think that she would be able to fairly consider both punishments.

In response to a question, You don't feel that you could fairly consider the death penalty under those circumstances, I don't know. I honestly don't know. She has been all over the board. Her answers have been incredibly inconsistent. And I have no confidence -- and I'm making a finding of fact -- that I don't believe the juror could fairly consider both penalties in the case, and because I don't believe she could fairly consider either penalty -- I mean, I think she's substantially impaired both ways. It's not just that -- I don't view her as a pro-death juror or a pro-life juror. I view her as a juror whose thoughts and answers are so inconclusive that she's substantially impaired because I don't think she could fairly consider either penalty in the case.

So that's my ruling. So I'm going to sustain the challenge for cause, and we'll bring her in and let her know she won't be on the jury.

(Prospective Juror 769 entered the courtroom.)

2115

THE COURT: We wanted to thank you for participating in jury selection today, but you're excused from service. And I'd ask you to do us a favor, and that is not discuss this with anybody else at least until we're done with jury selection

Page 175

hopefully at the end of next week. The reason why, that northwest Iowa is pretty small population-wise, and if you were to say something about it to somebody and that somebody repeated it to somebody else, that somebody else might very well be sitting here one day next week. So you're excused. Thank you very much.

(Prospective Juror 769 exited the courtroom.)

THE COURT: Please be seated. No jurors today? Challenges for cause, each side used one?

MR. WILLIAMS: Meaning peremptories.

THE COURT: I'm sorry, yes.

MR. WILLIAMS: Yes.

THE COURT: Each side used one. What's the total left?

THE CLERK: The government has ten, and the defendant has two.

THE COURT: And how many jurors are in the pool?

THE CLERK: Fifteen.

THE COURT: Fifteen. How many do we have coming in tomorrow?

THE CLERK: Nine.

2116

THE COURT: Well, you know, Mr. Berrigan, I'm going to go back to something, and I know you're thinking I'm beating a dead horse, but one of the reasons this is taking so long is you didn't do what I told you to do with regard to the jurors because we really should be having 14 or 15 jurors in here every day. And it's adding at least 30 percent to the length of the process because we're unable to bring in that many jurors. And I'm really unhappy about that. And I thought you were going to

be making progress so we wouldn't be in situations like this. That's what you made the commitment last Tuesday or last Monday when we first found out that you didn't do what I had thought you had done when you sent in the list of jurors. And it doesn't seem like we're making any progress. We have nine jurors coming in tomorrow which is I think the same we had last Tuesday. So have you gone through the entire week next week? I mean, where are you on that?

MR. STOWERS: Your Honor, I think I can answer that because that's something that Ms. Dahl and I have been working on, and I think we're up to M which if we're on H now, that would be -- I think that's through next week. Is L next Friday if I've got my alphabet --

THE COURT: I don't know. Not something I'm keeping track of. Why would I keep track of it?

MR. STOWERS: Okay. I think we're on Friday's panel for next week.

2117

THE COURT: So you haven't even told the clerk's office yet who's being excused for Friday's panel next week? I thought you were going to do that last week.

MR. STOWERS: We have exchanged items with the government. It takes them time to respond to ours, and this is a back-and-forth process of proposals and counterproposals. But I believe that we have --

THE COURT: All of which was supposed to have been done 30 days before trial so we could have 14 and 15 jurors come in every day.

MR. STOWERS: I absolutely agree with you on that, exactly, yeah, and we're going to work on that. I had really

Page 177

thought that today would be a great day, and today we wound up with zero for twelve.

THE COURT: And I'm not unhappy about that because that's just the way the marbles rolled today. There's nothing wrong with the process. That's just how it worked out. What I'm unhappy about is that we only had 12 and that we didn't have 15 and we only have 9 tomorrow and we've never had a full complement of 15. I think maybe one day or something. And that's literally added multiple days on to this process.

MR. STOWERS: It undoubtedly has added some days, and it's a frustration for us as well. We'd like to be seating jurors ourselves. Maybe we can visit amongst ourselves and figure something out, Your Honor.

2118

THE COURT: Well, that's fine. I encourage you to try. But the only thing I know to do would have been to give the clerk's office greater notice so that they could try and get people in here.

Okay. I do have one other issue I wanted to raise with you, and it's the issue of this contact visit. I've been informed by Duane Walhof -- he checked with the general counsel for the marshal's office, and their position is that they will not allow a contact visit and that if I order a contact visit they will request -- because I don't think they can instruct, but the marshal's service will request the U.S. Attorney's Office to file a mandamus action.

My position is I've been mandamused before, I'll be mandamused in the future. I'm not the least bit concerned about being mandamused, but this is probably not an issue I feel strongly enough to do anything about. So that's kind of where I

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1846 of 3245

sit. And I don't really want to put the parties in a position of having parallel litigation going on.

On the other hand, I'll have to give some thought about whether I'm willing to hold an evidentiary hearing because my own view is the marshal's service -- I realize the case law is that there's no constitutional right to a contact visit. I understand that. And that's clear. The Supreme Court said that. But I'm confident that if I ordered it that the marshal's service could easily satisfy any security concerns raised by a

2119

contact visit.

So maybe both sides should talk to the marshals and see but -- and I guess you might want to make a motion if you feel strongly about it. I might just say no or I might say -- I mean, I have to dig back into the case law and take a look at it.

I mean, I understand that as a general rule there are security concerns raised by contact visitation. That's obvious. But I think a limited contact visitation in this case we could overcome any potential security concerns. I have every faith that the marshal's office tackles much more difficult tasks every day. But I have to take a look at the standard. You'd probably wind up having to brief it and all, so I'm just going to kind of dump it back to the lawyers.

So anything else we need to take up before tomorrow?

MR. WILLIAMS: Nothing on behalf of the United States, Your Honor.

MR. BERRIGAN: Nothing by the --

MR. WILLIAMS: I'm sorry.

MR. BERRIGAN: Nothing by the defense, sir.

Page 179

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1847 of 3245

THE COURT: Okay. Thank you.

MR. WILLIAMS: Just the one thing, I think given the timing on this, I think you were wise I think earlier today when you were talking about the duration of the trial, you kind of amended it back to possibly going into July.

2120

THE COURT: Right.

MR. WILLIAMS: And I think that's appropriate. I was fairly confident we could finish it by the end of June. This has taken at least a week longer than what I was anticipating.

THE COURT: Well, didn't you anticipate it would take three weeks, or did you think two weeks?

MR. WILLIAMS: I thought it was going to be more like two weeks to pick a jury based upon we came up with a system that was supposed to go faster and everything else. Now, could we still get done with it by the end of June? Yes, it's a real possibility, but I still think it's wise to alert the jurors that there's a possibility there it could go into July. That's all I have.

THE COURT: And I guess we only have four days next week.

MR. WILLIAMS: Right.

MR. BERRIGAN: The defense only has two peremptory challenges left, Your Honor. I feel we probably will finish next week, frankly.

THE COURT: I think we could or, you know, at most it's going to go a day or two into the following week.

MR. BERRIGAN: At most.

THE COURT: And, you know, we'll probably start -- we might have one day off or something just to make sure we can get

Page 180

everybody here. Then we'll be ready to start which means we're

2121

going to have to start talking about the instructions, at least the preliminary instructions, and probably plan on doing that Monday night; okay?

MR. BERRIGAN: I just misunderstood. We're not having court Monday, but would you like us here --

THE COURT: Oh, I'm sorry. That's right. I'm not going to be here Monday night. Actually I will be back, but I don't get in until 10:20.

MR. BERRIGAN: We'll be here, sir, if you want us.

THE COURT: If you want to meet at 10:45, don't tempt me.

MR. BERRIGAN: I thought you meant Tuesday, but I wanted to be sure.

THE COURT: No, I said Monday, but I meant Tuesday. You're absolutely right, Mr. Berrigan. Yeah, I forgot I'm going to be in D.C. But I do get in on the 10:20 flight, so if you all want to meet -- I think we'll have enough time Tuesday night. So I appreciate you pointing that out.

Anything else?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Okay.

MR. STOWERS: Just the one thing, Your Honor. Early last week you had inquired about this exhibit list issue.

THE COURT: Yes.

MR. STOWERS: And I had promised it to you by tomorrow

2122

Page 181

which is Friday which was in anticipation of us being in a better posture on this jury selection.

THE COURT: What would that have to do with preparing the witness list?

MR. STOWERS: Well, it has to do with the time matter, and the fact is is that I've been helping every night prepare for the next day of jury selection and going through these out panels that we haven't gotten to yet. My anticipation was we'd be, you know, finishing with the selection of the alternates for the -- Wednesday or Thursday of next week is what I thought at the beginning of this week. What I'm asking for is if I could have till Tuesday to get you that information, and then I can use this wonderful three-day time period.

THE COURT: That's fine.

MR. STOWERS: Thank you, Judge.

THE COURT: Tuesday's fine. Thank you. Anything else?

MR. WILLIAMS: No.

THE COURT: Okay. We'll be in recess. See you tomorrow morning.

(The foregoing trial was adjourned at 2:23 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                    1-18-06
                                             Date

2123

INDEX

WITNESS:                                              PAGE:

Prospective Juror 628
        MR. MILLER                                    2007
        MR. BERRIGAN                                  2013

Page 182

Prospective Juror 71
                    MR. BERRIGAN                                    2018
                    MR. MILLER                                      2027


Prospective Juror 755
                    MR. MILLER                                      2035
                    MR. BERRIGAN                                    2044


Prospective Juror 800
                    MR. BERRIGAN                                    2061
                    MR. MILLER                                      2069


Prospective Juror 458
                    MR. MILLER                                      2074
                    MR. BERRIGAN                                    2078


Prospective Juror 769
                    MR. BERRIGAN                                    2090
                    MR. MILLER                                      2098


                              *****

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1851 of 3245

2124

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CRO1-3046 |
| Plaintiff, | Sioux City, Iowa<br>April 22, 2005<br>8:30 a.m. |
| vs. | |
| ANGELA JANE JOHNSON, | VOIR DIRE OF<br>PANEL I |
| Defendant. | |
| / | |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

2125

APPEARANCES:

For the Plaintiff:  C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA  52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA  50319

For the Defendant:  PATRICK J. BERRIGAN, ESQ.
Watson & Dameron
2500 Holmes
Kansas City, MO  64108

DEAN STOWERS, ESQ.
Rosenberg, Stowers & Morse
1010 Insurance Exchange Building
505 Fifth Avenue
Des Moines, IA  50309

ALFRED E. WILLETT, ESQ.
Terpstra, Epping & Willett
Higley Building - Suite 500
118 Third Avenue Southeast
Cedar Rapids, IA  52401

Also present:  Bill Basler

Page 1

Case 3:09-cv-03064-MWB-LTS  Document 284-70  Filed 06/23/11  Page 1852 of 3245

PANEL I, 4-22-05
Court Reporter:                  Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA  51101
(712) 233-3846

2126

(Proceedings reconvened outside the presence of the jury venire.)

THE COURT:  Morning.  Please be seated.  We have two no-shows.  I'm not very happy.  One is from Sioux City, so we're trying to find out.  We're going to wait a few minutes.  We're trying to find out why that person isn't here.

591 and 623 did not show.  They will be dealt with, but I don't want to hold things up, so let's bring the rest in if that's okay.

MR. WILLIAMS:  Yes, Your Honor.

(Panel I entered the courtroom.)

THE COURT:  Good morning.  If you'd all raise your right hand, I'm going to swear you in.

(Panel I was sworn.)

THE COURT:  Okay.  Please be seated.  Good morning. Don't look so glum.  There we got a couple smiles.  I like to remind prospective jurors that while this is a very, very serious matter there is no federal law against smiling.  So good morning.

I'm sure when all of you went to bed last night you were just so excited about the prospect of coming to Sioux City this morning that you had a hard time falling asleep and when you got up early this morning you could hardly contain yourself with the excitement.  So we're glad you're here.

My name is Mark Bennett.  I'm the chief judge of the

2127

Page 2

United States District Court for the Northern District of Iowa. And I'm the trial judge in the case. And you all know a little bit about the case from the packet of information in the questionnaires that you all filled out. It's United States of America versus Angela Johnson, but I wanted to introduce you to who the participants are and then tell you a little bit about the process we're going to use today.

So at the table seated closest to you would be -- I'm just going to have them raise their hand, and then you'll meet them in a few minutes -- C.J. Williams. Mr. Williams is an assistant United States attorney from Cedar Rapids, a federal prosecutor.

Seated next to him is Thomas Miller. Thomas Miller is a special assistant United States attorney assigned to this case. In his regular life he is a -- works with the Iowa Attorney General's Office as an area prosecutor or a special prosecutor. And for those of you who read the news, the attorney general of Iowa is also named Thomas Miller. It's not the same Thomas Miller. This Thomas Miller works for the attorney general of Iowa also with the same name, and they're not related.

Seated next to Tom Miller is Special Agent Bill Basler. He's what's called the case agent.

Moving over to the defense side, seated closest to you would be Dean Stowers. Mr. Stowers is a lawyer who specializes

2128

in criminal defense from Des Moines.

Seated next to Mr. Stowers is the defendant in the case, Angela Johnson.

Page 3

Seated next to Miss Johnson is Patrick Berrigan. Mr. Berrigan is a lawyer from Kansas City, Missouri, who specializes in criminal defense.

And then at the very back table is Al Willett. Al Willett is a lawyer from Cedar Rapids who also specializes in criminal defense work. And you'll meet the rest of the people that I didn't introduce in a bit.

We have certain rules you must follow, so I kind -- I have reduced it to writing, and I wanted to go over it with you.

Conduct of potential jurors during jury selection and trial. To ensure fairness, you as potential jurors must obey the following rules until the end of the case if you are selected for the jury or until you are excused from serving on the jury in this case. These rules apply whether you are in the courtroom, in the courthouse, at home, or anywhere else until you are excused from further service in this case.

First, do not talk among yourselves about this case or about anyone involved with it.

Second, do not talk with anyone else about this case or about anyone involved with it.

Third, when you are outside the courtroom, do not let anyone tell you anything about the case. If someone should try

2129

to talk to you about the case during jury selection or the trial, please report it to me.

Fourth, do not talk with or speak to any of the parties, lawyers, or witnesses involved in this case. You should not even pass the time of day with any of them. It is important that you not only do justice in this case but that you also give the appearance of doing justice. If a person from one

Page 4

side of the case sees you talking to a person from the other side, even if it is simply to pass the time of day, an unwarranted and unnecessary suspicion about your fairness might be aroused. If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or the like, it is because they are not supposed to talk or visit with you.

Fifth, do not read any news stories or articles about this case or about anyone involved with it or listen to any radio or television reports about the case or about anyone involved with it. If you want, you can have your spouse or friend clip out any stories and set them aside to give you after the trial is over or you are excused from serving on the jury in this case. I can assure you, however, that if you are selected for the jury in this case, by the time you have heard the evidence, you will know more about this case than anyone will learn through the news media.

Sixth, do not do any research on the Internet, in libraries, in the newspapers, or in any other way or make any

2130

investigation about this case on your own. If you are selected for the jury, you must decide this case based on the evidence presented in court.

Seventh, if you are not excused from serving on the jury today, please take this instruction with you so that you can refer to it if you have any questions between now and the date you are required to return for the trial.

Dated this 22nd day of April, 2005, signed by me, Mark Bennett, chief judge.

Now, how many of you have ever been to this third-floor courtroom before? Anybody? Okay. Just one person.

Page 5

Okay. We'll find out a little bit later why that is or how that was. But I wanted to try and explain -- try and make you feel a little bit more comfortable with what's going on today so you'll know who all the participants are seated in the courtroom.

Seated to my left is one of my law clerks, Carey. Carey's a -- in the second year of a federal clerkship with me. She's an honors graduate from the Drake University Law School, and she'll be finishing up her clerkship later this summer and then moving to Seattle to move on to her next career.

Seated in front of me is our court reporter Shelly. Shelly has what may very well be the most difficult job in every trial. She has to take down every single thing that everybody says. And while the rest of us can occasionally maybe tune out or look up at the ceiling and daydream for a little bit, Shelly

2131

doesn't have the luxury of doing that because she has to take everything down all the time.

We have some United States marshals in the courtroom, and we always do that in criminal cases. The number will vary depending upon actually where we are in the trial and what's going on. But that's typical. It happens in every case.

And then we have court security officers. They're pretty easy to spot because they have the blue blazer and the badge and the earpiece. I guess today it's talk radio. Yesterday was rock but -- no, I'm just kidding. And they have a lot of duties in the courthouse. One of their very important functions is to make sure the jurors get down to the jury room, back to court on time. And we're very appreciative of their efforts.

We have the lawyers who you've met, the parties. Then

Page 6

I wanted to talk a little bit about the role of the jury and the judge. I'm going to take myself first.

As you might guess, this is a pretty complicated criminal case. The parties have filed lots and lots of pretrial motions which I fully expected, and they certainly met my expectations in this case. And I've ruled on all the pretrial motions, so we're all current in our work.

I had the responsibility of setting up our system for jury selection. I'm going to talk to you about that in a little bit. And I'll be the presiding judge in the trial. I know

2132

these lawyers, so I know there will be a lot of objections and things for me to rule on during the trial. And that's their job. Both sides, there are excellent lawyers on both sides. They're very zealous, and that's what we want. We want lawyers to represent their respective sides as zealously as they can. So I'll have a lot of responsibilities for ruling on matters during trial.

This book contains the Federal Rules of Evidence. The Federal Rules of Evidence are fairly complicated. There are a few other things in this book as well, but I'm sure there will be objections on the admissibility of various evidentiary matters on both sides, and that's again their job, and I'll have to rule on those, and I'm comfortable doing that. But that's part of my responsibility in this case.

Another major responsibility is to define for you what the nature of the crimes are that Miss Johnson is charged with. She's charged with ten separate crimes. And once the trial gets underway right before opening statements, I'll be giving the 18 jurors who are selected to serve in this case a very detailed

Page 7

set of preliminary instructions defining the nature of the ten crimes, defining things like reasonable doubt and presumption of innocence, and giving you a lot of guidance in how to conduct yourselves during the trial and things like that.

And then towards the end of the first part of the trial, the not-guilty/guilty part of the trial, I'll have the

2133

responsibility of giving a set of more detailed instructions to assist in your initial deliberations.

Now, you notice -- I'm going to go back to the jury's responsibility. You notice I never said anything about it's my obligation to figure out what actually happened or what the facts are because that's not really my job in the trial. That's the job of the jury. So jurors in a very real sense, you're the judges of the facts.

What do I mean by that? Well, there's our witness box over there. I anticipate in this case there could be in excess of a hundred different witnesses testifying in the case. And there will probably be more than 500 exhibits that will be admitted into evidence, so there will be a lot of evidence in this case.

Your job as jurors is to listen to the evidence very carefully and in a very real sense decide with regard to every witness are they telling the whole truth, just some of the truth, or maybe none of the truth, and that's what you have to decide. You have to judge what we call the credibility of the witnesses, and you have to ultimately decide what actually happened.

Once you think you figured out what happened, then you take the facts as you understand it, apply it to the law in my

Page 8

written instructions, and in that way it would assist you in arriving at your verdict, so that's the jury's role in the case.

2134

Now, today I think we'll be done probably mid-afternoon. We're going to be engaged in this ongoing process that we have of jury selection. The French term for jury selection is voir dire. That's what the lawyers frequently call it. I believe we're in what? Our -- I haven't kept track. Is this our ninth day?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: We're in our ninth day of jury selection. We started last week on Tuesday, went four days last week. We're in our fifth day this week. We're optimistic that we'll have a jury selected by the end of next week, but it might not happen then. We might spill into the following week.

But, you know, we spent a lot of time figuring out the process for jury selection, and I'm very comfortable with the process. I think we came up with a very good process.

It's interesting. There's no one way to do jury selection. There are about 600 federal district court judges in the country, and there's probably 650 or more ways to do it. There's more ways to do it than the number of judges because I've done it a number of ways. I'm not tied to any specific way.

And just right before we started jury selection in this case, I was reading the New York Times, and there was an article about a federal judge -- and I can't remember where -- who was starting jury selection in a high-profile case, and they

2135

Page 9

were starting with 400 jurors. We actually started with 800 in our case total. But that judge decided to bring all 400 in, so they had to rent like a convention center in the city they were in, and they started jury selection in this convention center. But what it meant was all 400 jurors would have to come and stay pretty much throughout the process.

And, you know, my time is very valuable to me. And I've always assumed that others' time is just as valuable to them. And I kind of thought it would be very insensitive to your needs to expect you to come every day for maybe a month.

So I got together with the lawyers, and they shared that view, and we came up with a system where you just come in one day, and today's your day.

And at the end of the day you'll know whether you're into our jury pool -- and I'm going to explain that in a little bit -- or whether you're not and, therefore, dismissed. So you really only have to come to court one time, one day.

Now, the interesting thing is my secretary who's also a lawyer, she got called for jury duty over in state court right across the street this month. And she's gone -- she's had to go now I think three times, and she's never been questioned by a judge or the lawyers yet. And she still has several more times that she has to go over there, and that's just kind of how they do it.

Her sister, interestingly enough, who lives in

2136

Minneapolis got called for federal jury duty this week -- I mean this month, and she wound up last week going three days in a row all day every day, sat in the basement of the federal courthouse, and never actually got called up to a courtroom,

Page 10

never got questioned by anybody but sat there every day for three days. So as much as I'm sure you're not happy having to come today, the good news is it's one day, so I hope you appreciate that.

Now, in jury selection, we're going to ask you lots of questions, and I'm sure some of you are a little bit nervous or apprehensive, a little anxious maybe. I know I would be if somebody sent me a summons and said I had to go somewhere in a room full of strangers or these people I didn't know were going to question me. I'd be nervous about that, and I don't get nervous about a whole lot of things, but I'd be nervous about that.

I want you to try and relax because it's not going to be difficult. We're not going to ask you a bunch of trick questions. It's not a civics quiz. We're not here to grade your answers.

And the other thing is our goal is to find 18 jurors, 6 of whom will be alternates. There are no right or wrong answers to any of the questions we ask you because -- and the lawyers are going to do most of the questioning. They're going to ask you about your attitudes and beliefs on things including

2137

your attitudes and beliefs about the death penalty. There's no right or wrong answer to any of those questions. Your answer isn't any better or any worse than any answer these lawyers could give or any answer that I could give. And so we're not here to pass judgment and say we don't like that answer and try and talk you into a different view. That's not what this is about at all. We're just trying to get at honestly what your views are.

Page 11

Now, for our system to work, you have to answer as openly and honestly as you can. And I've just been so impressed by how -- how hard every potential juror has tried to answer the questions. Sometimes it's a struggle because they've never had to think about their views, for example, on the death penalty. And so we've seen people literally struggle sometimes to tears, not because the lawyers were mean in the way they questioned them but because for some people these questions cause such soul searching and examination that it's really hard. And, you know, that's good. That's not a bad thing. That's a good thing. So don't worry about being judged. Nobody's here to judge you. We just need to know.

Now, you may find it a little bit odd that you each have a number, and I just wanted to explain that to you. That was my decision and my decision alone, and here's why I decided that.

In most cases I use names, and so during jury

2138

selection we'd refer to you by name, and if there's members of the press which they have a right to be here because it's open to the public, your names could be printed in the Sioux City Journal or the Des Moines Register or the Omaha World-Herald or the Sioux Falls Argus Leader.

And I made a decision that I thought it'd be tough enough to serve on a jury of this length potentially involving what could be the most difficult decision anybody would ever have to make I think in a lifetime, and that is whether you would sentence somebody to death or life imprisonment -- that may never happen in this case if the defendant's found not guilty. And there's a second phase which I'm going to talk

about. But potentially in this case you could have to make that decision.

I wanted to protect your privacy, and I didn't want your names to get out in the public because I didn't want every idle curiosity seeker, oh, that person's on the jury? Gee, I'll look them up on the Internet or in the phone book, and I'll just drop by their house. And people do that, I guarantee you. I get letters and calls and e-mails from people all the time reading about cases. And I'm a public servant. I get paid to deal with that, and I don't mind dealing with it. But I didn't want to expose you all to that, so that's why I decided to use numbers in this case, solely to protect your privacy.

Now, I do want to tell you about the process. When we

2139

started, we anticipated jury selection would take two to three weeks. We're now at the end of our second week, and to be quite candid, it hasn't gone quite as quickly as I thought it would, but that's okay. I'm not unhappy about that. It's just the nature of the process. So we hope to be done next week, but it could spill over into the following week as I indicated.

We're bringing in small groups of potential jurors each day. After my introduction and a few questions by me, then I turn it over to the lawyers. There will be some group questioning which means each side gets to question you as a group, and I've given each side 30 minutes to question you as a group.

After the group questioning, we're going to send you down to the jury room, and then we're going to bring you back each individually one at a time, and we're going to ask you to just sit anywhere in the front row. The lawyers will be at the

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1864 of 3245

podium there, and they've got 12 minutes on each side to question you.  Sometimes it runs a little bit longer than that, but we try to keep it to 12 minutes.  I'll occasionally ask some questions, but sometimes I do; sometimes I don't.

And then at the end of your individual questioning, we'll ask you to just step outside for a minute, and then I meet with the lawyers, and we decide whether you make it into our jury pool or whether you'll be dismissed from the case.  So at the end of the individual questioning, you get to go home, and

2140

you'll know one of two things:  Either you're totally dismissed from the case or you've made it into the jury pool.

And that's just what I indicated there.  If you make it into the jury pool, you have about a 50 percent chance of actually being selected to serve.  And here's how it works out.  We're getting a jury pool of 34 potential jurors.  And of those 34, 18 will then be selected to serve on this jury.  I'm really bad at math, so I just rounded it off to 50 percent.  I guess technically you have an 18/34 chance of serving on this jury if at the end of the day we tell you you're still in the jury pool.

So when we get to this 34, we'll have the clerk's office -- we'll call each of you.  If you make it into the pool when we finally reach the 34, the clerk's office will call you and let you know that you're either on the jury or you're not, and then we'll start the jury trial as soon as we can and try and give you as much notice of that, but there won't be a whole lot of notice.

Once we start the trial if you are selected to serve on the jury, we're going to run the trial four days per week.  Almost always that will be Monday through Thursday.  We will

Page 14

take the week of June 10 through June 17 off.  We think the trial will go to the end of June.  Do you think now maybe that it might go into July?

MR. WILLIAMS:  There's a possibility of it, Your Honor.

2141

THE COURT:  Okay.  There's a possibility it may go into early July.

Now, Mr. Williams, why don't you introduce yourself and everybody else, and we'll find out if anybody knows anybody.

MR. WILLIAMS:  Thank you, Your Honor.  Good morning, ladies and gentlemen.  My name is C.J. Williams.  I'm with the U.S. Attorney's Office, and I office over in Cedar Rapids, Iowa.  I live over there and come over here and try cases periodically.

You've been introduced to Tom Miller.  He is from the area prosecutions office.  He actually heads that office in Des Moines.  He lives and works in Des Moines and appears in court all over the state.

MR. MILLER:  Good morning.

MR. WILLIAMS:  Bill Basler is the special agent-in-charge of the Iowa Division of Criminal Investigation office in Mason City, Iowa.  As the judge indicated, he's what we call our case agent.  He's the lead investigator in this case, and he'll be sitting at counsel table with us throughout trial.

Back here is Sali Van Weelden.  She's a legal assistant in our office, and she'll also be assisting us throughout trial.

The U.S. Attorney's Office is headed by Chuck Larson Senior who lives and offices in Cedar Rapids, although for the

Page 15

past year he's been in Baghdad.

2142

We have an office here in Sioux City that has a number of attorneys and staff members, and since you all are from this area, you might have more likely -- be more likely to know some people out here than Cedar Rapids. So I'm going to go through a list of the people in our office out here in case you know any of them.

Forde Fairchild, Martha Fagg, Kevin Fletcher, Mike Hobart, Jack Lammers, Janet Petersen, and Shawn Wehde are all assistant United States attorneys here in Sioux City.

We also have -- Shayne Mayer, Del Tompkins, Penny Schlotman, Michelle Schwebach, Michelle Hatting, Carol McEntaffer, and Pat Calhoun are all administrative and staff folks that work in our office in Sioux City here.

THE COURT: Thank you, Mr. Williams.

Now, do any of the seven of you know Mr. Williams, Mr. Miller, Mr. Basler, or anybody else, anybody who works in the U.S. Attorney's Office, or let me add anybody who works at the federal courthouse here in Sioux City? Does anybody think you know anyone?

Okay. We're going to switch over to the defense side. I thought it was going to be Mr. Willett, but I think it's probably Mr. Stowers.

MR. STOWERS: Fine, Your Honor. We're fungible over here. My name's Dean Stowers. I'm an attorney from Des Moines. And I practice law with two partners, Brent Rosenberg and David

2143

Page 16

Morse, and then we have an associate attorney who's employed by us named Heather Wood. Just keep those names in mind because I think at the end we're going to ask you if you've heard any of those names; okay?

Seated over here to my right is Angela Johnson. She's from Clear Lake, Iowa, 41-year-old woman.

THE DEFENDANT: Thanks.

THE COURT: Mr. Stowers, could I get you to pull that microphone a little bit closer?

MR. STOWERS: Oh, I'm sorry. That'd be great.

THE COURT: Thank you.

MR. STOWERS: I have to turn it on also to make it work. I'm oh for two. I didn't have it close enough, and I didn't have it on.

Seated to my far right over here is Pat Berrigan from Kansas City.

MR. BERRIGAN: Good morning.

MR. STOWERS: He practices law in Kansas City with the law firm named Watson and Dameron.

Seated back here with the colorful tie is Mr. Al Willett from Cedar Rapids. He practices law with Ray Terpstra and Greg Epping.

And seated back here is Lisa Dahl. Lisa will be assisting all the lawyers and Angela in this case.

THE COURT: Okay. Thank you. Now, does anybody know

2144

any folks on the defense side? Anybody? Okay. Good.

Now, our estimated length of trial is three months. It looks like -- we hope it will be done by the end of June. It may spill over a little bit into July. It's always hard to

estimate the length of a trial. Particularly the longer we think the trial it is, it's pretty hard, but that's our best estimate. And I want to talk to you about whether it'd be a severe or extraordinary hardship for anybody to serve. And I'm going to ask you each individually, but I want to give you some background information.

I don't think many people look at it this way, but jury service in my view -- and it's just my opinion, not right or wrong. It's just how I view it. Jury service in my view is a unique opportunity to serve your country. Others serve the country in various ways. I feel very privileged. Matter of fact, I've been doing this job since September 6, 1994. And I just love public service. And every day, every day -- I haven't missed a single day since September 6, 1994 -- I wake up very early in the morning, and I reach over and I pinch myself, and I do that because I feel so incredibly lucky to be able to have this job and to be able to do public service every day. To me it's just the most rewarding thing imaginable.

But I get paid to do that obviously. That's my job, and I understand that, and that's a big difference. But I think jury service is very important.

2145

And one of the things that really has touched me so deeply in the jury selection in this case is the incredible sacrifice that people are willing to make. And when I read through the questionnaires, you know, if you made a list of every excuse somebody put in the questionnaire about why they couldn't serve as a juror, you could write a book about it. I mean, I've heard things that are unbelievable. But when they actually come into court, very, very, very few people have ever

Page 18

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 1869 of 3245

asked to get off. And the sacrifice that people are willing to make is truly unbelievable.

I had a trial last year that went over two months. And in jury selection, I'll never forget it because on one day we had two farmers, and it couldn't come at a worse time. The trial started in August, and it went through October I think. And so it was right in the middle of harvest season.

And we had one day we were doing jury selection. We had these two farmers, and they both farmed and work full time which isn't unusual anymore because it's tough on the family farm. And neither one were going to get paid if they took off for jury service from their manufacturing jobs, and they certainly weren't going to get -- nobody's there to pay them when they're not on the family farm, and they were both willing to do that. Incredible sacrifice.

We also had an individual who wasn't going to get paid by his employer during jury service, but he had talked it over

2146

with his wife, and they made a decision that it was so important that they were willing to deplete their entire life savings to support themselves for three months while he served on jury duty. Now, I could never ask anybody to do that, but that was the decision that this individual made.

So I only tell you that because people are willing to make incredibly significant and impressive sacrifices to serve. But everybody's situation is a little bit different, and I understand that.

And so we're going to take this microphone which is now on. The acoustics in this courtroom are great as long as you use the microphone. But you have to hold the microphone up

Page 19

pretty close and speak into it. Otherwise Shelly won't be able to take everything down. And if you do that, I won't put up any karaoke and make you all sing in public. How's that?

So we're going to start with Juror 82. And I'm going to ask you the question. Are you willing to serve as a juror in this case if you're selected?

PROSPECTIVE JUROR 82: Yes.

THE COURT: Okay. Thank you.

Juror 788.

PROSPECTIVE JUROR 788: Yes.

THE COURT: Thank you very much.

Juror 255.

PROSPECTIVE JUROR 255: Yes.

2147

THE COURT: Thank you. Pass it back, please, to Juror 54 behind you.

Juror 54, are you willing to serve if you're selected?

PROSPECTIVE JUROR 54: Yes.

THE COURT: Thank you so much.

Juror 479.

PROSPECTIVE JUROR 479: Yes.

THE COURT: Thank you so much.

Juror 325.

PROSPECTIVE JUROR 325: Yes.

THE COURT: Thank you.

Juror 787.

PROSPECTIVE JUROR 787: Yes.

THE COURT: Thank you all very much. We've had several days like this where everybody has been willing to serve. And you know what? It's going to be a sacrifice for

Page 20

everybody, and I understand that. I mean, even if you're a multimillionaire and, you know, you have more money in the bank than you could ever spend -- and I hope you're all in that situation, but I doubt it -- it'd still be a sacrifice to serve because we're taking you away from your daily life and your daily routine.

But it's also a sacrifice on all the lawyers in this case too. Not a single lawyer comes from Sioux City. Two of them come from Des Moines, 200 miles away. Two come from Cedar

2148

Rapids, 330 miles door to door. And one comes from Kansas City, and I haven't figured out how far that is, but it always takes me five hours when I drive down there. So they all come from a great distance, and they're all going to be away from their families. So we appreciate it very much that you're all willing to serve.

Now, I also wanted to talk to you about your duty not to serve. Thirty seconds ago I was harping on your duty to serve. Now I'm flipping sides on you. But here's what I mean by that. If you have certain opinions or beliefs that would prevent you from being suited to serve on this jury, then you have a duty not to serve, and it's our decision to make that call. But we need you to answer the questions openly and honestly so that we can make that decision.

And so I want to make sure you understand I don't want you to answer questions like you think that, well, I bet the judge wants me to answer it this way or I bet when Mr. Williams or Mr. Miller asks the question or Mr. Berrigan or Mr. Stowers or Mr. Willett, I'm going to answer how I think they want me to answer. That isn't how it works. We don't want you to answer

Page 21

any specific way other than a hundred percent truthfully.

And if you do that and we ultimately decide that you're not going to serve on this case, that's what I mean by your duty not to serve by answering honestly. And in my view if you're truly honest and you give us honest answers and we make

2149

the decision that maybe this case isn't the case for you, that some other case would be, you serve your country just as well by being open and honest in this process and not serving as you do for those of the folks who get selected.

Now, I wanted to tell you a little bit about the trial process because this is a unique case. This case potentially, potentially, has three phases to it. The first phase is what I'll call the merits or not-guilty/guilty phase. And in that sense it's like every other trial I've ever had because in 99.99999999 percent of the trials I've had, there's just one phase, and that's the guilty/not-guilty phase. And the jurors do the same thing. They listen to the witnesses. They see the evidence that gets admitted. They evaluate it. They go back in the jury room, and the bottom line is they decide one thing: Is the defendant not guilty or guilty of one or more of the charges brought in the case? That's the decision that the jury has to make.

And so the first phase of this trial will be like every other trial. But in the other trials -- and then when I say every other trial, I mean cases where the death penalty is not an issue in the case. And -- so we'll have the merits, not-guilty phase.

And then there will be a second phase of the case but only, only, only if there is a unanimous finding by all 12

Page 22

jurors beyond a reasonable doubt that Angela Johnson is guilty

2150

of one or more of the ten counts in the first phase do we even have a second phase.  And in that sense it's different than nondeath penalty-type cases because in nondeath penalty-type cases, the jurors make the decision guilty or not guilty.  If the defendant's found not guilty, fine.  That's good.  We have a lot of not-guilty verdicts.  Then the jurors go home, and the defendant goes home, and that's the end of the case.

But in the typical case, if the jury were to make a finding of guilty, then you all would go home, and then it would be my job to determine the sentencing.  I have the exclusive right under federal law to determine what the sentence would be.

That's not this case.  In this case I will not be involved in the sentencing, in actually deciding what the sentence is.  So that's one of the things that makes it different.

Now, if the defendant, Angela Johnson, is found guilty of one or more of the ten counts beyond a reasonable doubt and the jury's unanimous, then we'll have a second phase, and we call that the eligibility or gateway phase.  That would be only if the defendant is found guilty of one or more counts.  In that phase there won't be any evidence presented, but there will be arguments by the lawyers just like the closing arguments.  There will be a separate set of written instructions from me, and the jury will go back and deliberate.

Well, what will you be deliberating on?  You will be

2151

deliberating on what we call -- the eligibility or gateway phase
Page 23

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1874 of 3245

is where you will decide if the prosecution has proved what I call a gateway or eligibility factor and one or more statutory aggravating factors beyond a reasonable doubt.

If the jury unanimously agrees that the prosecution has proved this, then and only then would we reach the third phase. And the third phase is what we call the penalty phase. And in that phase, if we ever get there, you would be required to consider and weigh aggravating and mitigating factors that I will instruct you on to determine whether Miss Johnson should receive life imprisonment or the death penalty.

And the way that stage works is there will be evidence presented. It's almost like a second mini trial. There will be evidence presented. The prosecution will present evidence of what they call aggravating factors. The defense team has the right but no obligation or duty to put on any evidence, but if they want to, they can put on evidence of what is called mitigating evidence or mitigating factors.

I will then give you a separate set of instructions on what is a mitigating factor, what is an aggravating factor. And then it will be up to you to decide whether each side has established -- the government has established aggravating factors, whether the defense has established mitigating factors, or whether you find any mitigating factors are in the case.

And then in that stage you'll go back and deliberate,

2152

and you'll be instructed by me to consider the aggravating factors and the mitigating factors that you find and weigh all of those factors together. And the weight to be given any particular factor will be for each individual juror.

And then at the end of that weighing process, you will
Page 24

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1875 of 3245

decide whether the defendant should be sentenced to life or given the death penalty. You will never, ever -- even in this third phase, you will never, ever be required to impose the death penalty, but the jury could impose the death penalty but only if all 12 jurors unanimously agree that the defendant should receive the death sentence. Then it would be my job to then impose the death penalty but only if the 12 jurors unanimously agreed.

So the bottom line is if we ever get to a penalty phase, you'll have to decide one of two things, because there's only two possible sentences in this case if the defendant is found guilty of one or more charges: Life imprisonment without parole -- and we mean life imprisonment without parole; there's no parole; there's no good-time release; there's nothing like that; it's life imprisonment -- or the death penalty.

Okay. Now we're going to turn it over to questioning. And who's starting for the government today? Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

Good morning, ladies and gentlemen. I'm going to spend a few minutes, about a half an hour, maybe a little bit

2153

less, talking with you. My goal is to get to know each of you a little bit better and then cover some general concepts that we deal with in every criminal case and explore your thoughts on some of those.

Gary, if I could have the microphone passed down, I'm just going to start in the left-hand corner with Juror Number 54, and I'm going to proceed down the row. And just so everybody knows what's going to happen, I'm going to go down the back row, talk to each of you, and come around the front row.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1876 of 3245

And when I'm done with Mr. 82, I'll be done talking with you.

So good morning this morning, Miss 54. How are you doing this morning?

PROSPECTIVE JUROR 54: Fine.

MR. WILLIAMS: Good. I understand you're a retired nurse.

PROSPECTIVE JUROR 54: Yes.

MR. WILLIAMS: What kind of nursing were you involved in?

PROSPECTIVE JUROR 54: After I finished school, I taught one year, and then I did a little private-duty nursing, and then I got married, and I quit working.

MR. WILLIAMS: You had a number of children I see. Now you have a number of grandchildren as well.

PROSPECTIVE JUROR 54: Yes.

MR. WILLIAMS: You indicated in your questionnaire

2154

that one of the things you liked best to do was to spend time with your grandchildren?

PROSPECTIVE JUROR 54: Yes.

MR. WILLIAMS: How many grandchildren do you have?

PROSPECTIVE JUROR 54: Nine.

MR. WILLIAMS: That's a handful. Do you get them all together at one time very often?

PROSPECTIVE JUROR 54: Not very often.

MR. WILLIAMS: That's probably for the best. I want to talk to you -- you've actually served on a jury before; is that right?

PROSPECTIVE JUROR 54: Yes.

MR. WILLIAMS: How did you find that experience?

Page 26

PROSPECTIVE JUROR 54: It was interesting. It wasn't -- it wasn't that involved that I felt that, you know, it was -- but no, I enjoyed it. I was glad to do it.

MR. WILLIAMS: I trust in that case that you understood your duties are very similar to here, and that is that the job as the judge has described already of a juror is to wait to hear all the evidence before they make up their mind. They're supposed to, you know, consider the different options, the possibilities that the evidence points to one way or the other, and ultimately make up their mind in the end on what they thought the evidence showed or didn't show. Is that how you saw your duty before when you served on a jury?

2155

PROSPECTIVE JUROR 54: Yes.

MR. WILLIAMS: Did you find it a very difficult process to do that?

PROSPECTIVE JUROR 54: It wasn't that difficult a case. I mean, I didn't -- I mean, it took a lot of thought, but, I mean, I didn't feel it was that difficult.

MR. WILLIAMS: It wasn't a very long case I trust.

PROSPECTIVE JUROR 54: No.

MR. WILLIAMS: It wasn't three months.

PROSPECTIVE JUROR 54: No, no.

MR. WILLIAMS: In this case it is going to take a little bit longer. As the judge indicated, we may have upwards of a hundred witnesses testifying in this case. It takes I think a lot of endurance and attention by jurors in every case, particularly in this case, to do that. Do you feel you're up to that kind of a task?

PROSPECTIVE JUROR 54: I'd like to think so.

Page 27

MR. WILLIAMS: Sure. Thank you very much. Why don't you pass the microphone down if you would to the gentleman next to you, Mr. 479.

PROSPECTIVE JUROR 54: Thank you.

MR. WILLIAMS: You're from LeMars; is that right?

PROSPECTIVE JUROR 479: Yes.

MR. WILLIAMS: And you work in feed supply. You're assistant manager there. Been there for 24 years.

2156

PROSPECTIVE JUROR 479: Yes.

MR. WILLIAMS: That's a long time to be in the same job. I hope you really enjoy it.

PROSPECTIVE JUROR 479: I do.

MR. WILLIAMS: What's the best part about your job?

PROSPECTIVE JUROR 479: Deal with the public, just people we work with, things we do.

MR. WILLIAMS: Do you have a number of people underneath you working for you?

PROSPECTIVE JUROR 479: Yes.

MR. WILLIAMS: How many?

PROSPECTIVE JUROR 479: At the store there's four beneath me, and then I also take care of -- oh, we have a large hog operation, and I oversee most of that and deal with all the guys that take care of the individual buildings and units.

MR. WILLIAMS: The hog operation, is that part of the feed supply business?

PROSPECTIVE JUROR 479: Yes.

MR. WILLIAMS: How's that work?

PROSPECTIVE JUROR 479: About ten years ago hog prices really went to crap, best way to put it. We had the situation

Page 28

of either closing the store or getting involved in production. So we talked to several of our other former customers, got them involved. They nursery pigs in some situations, finish in others, and we built some units to help get this thing going and

2157

just kind of went from there.

MR. WILLIAMS: Wow. So you kind of diversified a little bit.

PROSPECTIVE JUROR 479: Yes.

MR. WILLIAMS: Interesting. I want to talk with you also about how this jury system's going to work. As the judge indicated, we're going to have lots of witnesses, and they're going to come from all walks of life. We're going to have everybody from people who are in law enforcement, law enforcement officers. We have experts. There's going to be people who are actually in prison at this time doing time and everything in between.

The job of a juror is going to be, as the judge indicated, to listen to the testimony of every witness and judge their credibility. And the judge will ultimately instruct you in some ways to aid you in that task. But they're things you would think. I assume in everyday life when you're dealing with customers and so forth you have to judge credibility of different people from time to time.

PROSPECTIVE JUROR 479: Yep.

MR. WILLIAMS: What are some of the things you use to judge the credibility of people you deal with?

PROSPECTIVE JUROR 479: The way they act, how they talk, the answers you get from the questions you ask.

MR. WILLIAMS: Sure. And you probably want to compare

Page 29

it sometimes to what other people say and whether it's consistent with other things you know and so forth; is that fair?

PROSPECTIVE JUROR 479:  Yeah.

MR. WILLIAMS:  In this case we are going to have, as I indicated, law enforcement officers.  I saw on your questionnaire that you were a police officer yourself for a short period of time.

PROSPECTIVE JUROR 479:  Yep.

MR. WILLIAMS:  The judge will instruct you in this case ultimately that law enforcement officers are not entitled to any greater credibility simply because of their title.  Now, sure, you can take into account their experience, their training, and so forth and the degree to which that may impact their ability to do their job.  But the title -- the fact that somebody is a public servant, somebody who's a peace officer doesn't in and of itself give them more credibility than anybody else.  Given your involvement as a police officer years ago, do you think it's going to be any trouble for you to follow an instruction like that from the judge?

PROSPECTIVE JUROR 479:  No.

MR. WILLIAMS:  Anybody else on the jury think they're going to have any trouble following an instruction from the judge if the judge says you can't give any more credibility to a police officer than you do to anybody else?  Anybody think

they're going to have trouble with that?  Don't see any hands.

Page 30

If you could, why don't you go ahead and pass the microphone down.

Mr. 2 -- I'm sorry, 325, I see you farm right now; is that right?

PROSPECTIVE JUROR 325:  Yeah.

MR. WILLIAMS:  What kind of a farming operation you working in?

PROSPECTIVE JUROR 325:  We got cattle and grain, and then I help on a hog farm too.

MR. WILLIAMS:  Is that a family farm?

PROSPECTIVE JUROR 325:  I help with my parents' family farm, but I actually work as a hired man for my future fiancée's dad, so it's kind of a . . .

MR. WILLIAMS:  Hopefully he pays you well.  I also saw that you like to golf on the side.

PROSPECTIVE JUROR 325:  Yeah.

MR. WILLIAMS:  Do you get out much?

PROSPECTIVE JUROR 325:  Nope.

MR. WILLIAMS:  Especially this time of year I'm guessing.

PROSPECTIVE JUROR 325:  Don't have much time.

MR. WILLIAMS:  Yeah.  Everybody appreciates every juror's willingness to serve during this time period and particularly somebody like you, sir, who's involved in farming.

2160

This time of year is a tough time of year to do that.  I just want to make sure you're going to still be able to pay attention to the evidence and listen to the evidence and not be thinking about the work that you should be doing or could be doing out in the field.

Page 31

PROSPECTIVE JUROR 325: Yeah.

MR. WILLIAMS: Do you think your fiancée's father will let you get by with this if you do this?

PROSPECTIVE JUROR 325: I'm sure he would.

MR. WILLIAMS: Yeah, I expect so. Let me talk to you a little bit about the evidence we're going to have in this case. The judge indicated that there are charges involving murder, and this is a murder case. The murders occurred, the government alleges, back in 1993. The bodies ultimately were discovered in 19 -- I'm sorry, in 2000, some 7 years later. There's going to be in this case photographs of skeletal remains. There's going to be testimony of how these people died, and some of it is going to be difficult for I think anybody to listen to.

You know, for our criminal justice system to work, for us ever to be able to prosecute murder cases, we need to be able to find citizens who can shoulder the responsibility of listening to evidence like that and viewing evidence like that that may not sit well with them, that may be difficult to view. Nonetheless, if we don't have citizens willing and able to do

2161

that, our system would break down.

Now, some people honestly can do that, and some people can't. Do you feel comfortable, sir -- do you think you could sit through a case like this given the description I've provided to you?

PROSPECTIVE JUROR 325: I could. Would it be the best? Probably not.

MR. WILLIAMS: It would be hard I think for everybody. And what's going to be particularly important is I think there's

Page 32

always a tendency in a case like that to have an emotional response to that type of evidence. But this is a court of law. And we are trying a defendant on not whether are you upset about what happened. I think any juror looking at these photographs or contemplating the crime will say, Yeah, I'm upset about what happened here. But the verdict form will never ask you are you upset about the fact that these murders occurred. This case is about whether this defendant committed the crime.

And so what we're going to need are jurors to be able to set aside their emotional responses to the evidence and recognize their task is not to be upset about the crime but to determine who committed the crime and whether, in fact, this defendant committed the crime as alleged by the government. Do you think you can do that, sir?

PROSPECTIVE JUROR 325: I honestly -- I wouldn't -- I'm not going to say yes because I honestly don't know if I

2162

could do it, so I -- I don't want to say yes and . . .

MR. WILLIAMS: Sure. What do you think would be the hardest part about that for you?

PROSPECTIVE JUROR 325: I don't really know right off the top of my head. I just don't deal with it good I guess. I don't know.

MR. WILLIAMS: Let me try to put it to you a different way. If somebody that you knew and cared for was on trial for a crime that maybe involved something like this or something with difficult evidence to look at, would you agree that it would be important for the jurors not to base their verdict just on an emotional reaction to the evidence but on whether the government proved beyond a reasonable doubt that your friend or your loved

Page 33

one actually committed the crime?  You see the importance of being able to set that aside.

PROSPECTIVE JUROR 325:  Yeah.

MR. WILLIAMS:  And I trust you recognize that that would be absolutely necessary for jurors to be able to do that in order to afford any defendant a fair trial.  And we need to have assurances from the jurors if they can give us those assurances that they're going to be able to set aside any emotional reaction they have to the evidence and evaluate the evidence based on whether we've met the elements of the crime, whether we proved our case beyond a reasonable doubt, and not just be upset about the crime itself.  Can you do that, sir?

2163

PROSPECTIVE JUROR 325:  Yeah.

MR. WILLIAMS:  Why don't you pass the microphone if you would to the gentleman next to you, Mr. 787.

I see that you work at a waste water treatment plant.

PROSPECTIVE JUROR 787:  Yes.

MR. WILLIAMS:  You've been doing that for a while.

PROSPECTIVE JUROR 787:  Yes.

MR. WILLIAMS:  A lot of regulations I trust in that business.

PROSPECTIVE JUROR 787:  Yes.

MR. WILLIAMS:  How do you find those regulations?

PROSPECTIVE JUROR 787:  Well, some are all right. Some I don't like.

MR. WILLIAMS:  I anticipated that.  In this case the judge is going to instruct you about what the regulations, if you will, are that regulate this case.  He's going to give you the law.  And I think it will be helpful to jurors because he's

Page 34

going to help explain things to you and what you need to be looking at and what the elements of the crimes are and so forth. It's going to be important in this case that every juror recognizes they have to follow the law as instructed by the Court, and I trust you could do that.

PROSPECTIVE JUROR 787:  Yes.

MR. WILLIAMS:  The -- I want to go back to the witnesses in this case for a moment.  I indicated that there's

2164

going to be lots of witnesses from all walks of life, and included in there is going to be some inmates and some former inmates, people who have either done time or are currently doing time and the government will allege has information that may be helpful to the jury.  And we asked jurors about their thoughts about that in the questionnaire that we all appreciate you filled out.  One of the answers I think that we got from you, sir, is if it helps, it's okay with you.  Do you remember saying something like that in your questionnaire?

PROSPECTIVE JUROR 787:  Yes, I do.

MR. WILLIAMS:  And jurors have different views about cooperators.  Some think it's brave or courageous for somebody to come forward in that situation and talk.  Other people distrust immediately any testimony coming from somebody that's an inmate.  Just like every other witness, it's going to be up to individual jurors to assess the credibility, to put whatever credibility they think is proper for each witness.

With regard to people who have cooperated with the government, who are in prison, the judge is actually going to give you a special instruction, and that special instruction will go something to the effect that you should treat with

Page 35

special care and caution the testimony of somebody who is incarcerated.  It makes sense, doesn't it, because they may be testifying hoping to get something in return?

PROSPECTIVE JUROR 787:  Yes.

2165

MR. WILLIAMS:  Would that make sense to you?

PROSPECTIVE JUROR 787:  Yes.

MR. WILLIAMS:  And so as a juror, would you want to make sure that their testimony was credible and take that into account in the back of your mind as you're listening to their testimony?

PROSPECTIVE JUROR 787:  Yes.

MR. WILLIAMS:  Very good.  Why don't you go if you could and pass the microphone down to the front row, and I'm going to have it sent all the way over here to Juror 255.

Ma'am, I see you have a houseful of children.  You have six children total?

PROSPECTIVE JUROR 255:  Yes.

MR. WILLIAMS:  And four still at home with you.

PROSPECTIVE JUROR 255:  Correct.

MR. WILLIAMS:  That's quite a crew there you got.  You got it all under control?

PROSPECTIVE JUROR 255:  Most of the time.

MR. WILLIAMS:  I assume that raising a family like that is a fair amount of responsibility.

PROSPECTIVE JUROR 255:  Yes.

MR. WILLIAMS:  You're no stranger to responsibility just from your day-to-day life then.

PROSPECTIVE JUROR 255:  No.

MR. WILLIAMS:  Do you see jury service as a form of

Page 36

responsibility as well?

PROSPECTIVE JUROR 255: Yes, I do.

MR. WILLIAMS: Is it the type of responsibility you feel comfortable shouldering in this case?

PROSPECTIVE JUROR 255: Yes, I do.

MR. WILLIAMS: And just like anybody else, you're prepared to listen to the testimony and judge credibility of witnesses as they testify.

PROSPECTIVE JUROR 255: Yes, I am.

MR. WILLIAMS: You indicated in your questionnaire that you like to watch your daughter in sports a lot. What sports is she involved in?

PROSPECTIVE JUROR 255: Volleyball and basketball.

MR. WILLIAMS: Volleyball, they didn't have that when I was a kid growing up, at least in my town. Does she travel a lot in competition?

PROSPECTIVE JUROR 255: Just to small schools around our area.

MR. WILLIAMS: There's a lot more of an art to it than anything I've ever done. When I played volleyball, it's just trying to keep the ball up in the air. Does she have a position on the volleyball team that she plays?

PROSPECTIVE JUROR 255: Yeah, she's the spiker.

MR. WILLIAMS: That's the fun spot.

PROSPECTIVE JUROR 255: Yeah.

2167

MR. WILLIAMS: I want to talk to you about the rights that defendants have in every criminal case, this one included.
Page 37

The defendant, as I indicated earlier, was charged with ten crimes, and that was done by a federal grand jury after hearing some evidence, but I want to emphasize this to you.

The federal grand jury is a body of citizens whose task is not to determine whether the defendant's guilty or not guilty. Their task is simply to determine if there's probable cause to believe that the person committed the crime. They hear some of the evidence, by no means all of the evidence, and they don't hear cross-examination. They don't hear from defense counsel. It is a constitutional protection that in federal court exists to require the government to pass by some citizens some evidence to determine if they agree if there's probable cause to believe charges -- or a crime has been committed. It's not evidence of anything.

And what we are concerned about sometimes is that jurors will come in and they'll reach an assumption that simply because we're in court and the defendant has been charged with something, therefore, she must be guilty or otherwise why would we be here; right? We don't just pull people off the street and charge them with a federal offense. And so there's always a concern the jurors are going to come in and assume the defendant guilty.

But just the opposite actually applies. Each juror --

2168

or I'm sorry, each defendant is presumed to be innocent, and that presumption stays with them throughout the trial and is overcome only by the government if we can prove our case beyond a reasonable doubt. Do you understand that?

PROSPECTIVE JUROR 255: Yes, I do.

MR. WILLIAMS: Is that something that you think you

Page 38

can afford this defendant, the presumption of innocence?

PROSPECTIVE JUROR 255: Yes, I can.

MR. WILLIAMS: It doesn't mean that you can't have some thoughts in the back of your mind thinking, boy, there's gotta be something here or else we wouldn't be in court. But what's critically important is even if you think that in the back of your mind that you be able to set that aside and recognize that means nothing, that a charge is simply a charge. It's an accusation. It's an allegation. And it's incumbent upon the government to prove its case beyond a reasonable doubt and hold us to that burden. And can you do that?

PROSPECTIVE JUROR 255: Yes, I can.

MR. WILLIAMS: Can every juror on this panel do that in this case? Let me do it this way. Does anybody feel they can't do that? If so raise your hand, please. Okay. I don't see anybody raising their hand. Thank you. If you could pass the microphone down to Juror 788.

Sir, you're also from LeMars as well; is that right?

PROSPECTIVE JUROR 788: Yes.

2169

MR. WILLIAMS: Do you know Juror 787?

PROSPECTIVE JUROR 788: I don't know. I'm gone a lot.

MR. WILLIAMS: I grew up in Mount Pleasant, Iowa, and still I don't know people that I run into. What's going to be important is if you are on the jury with anybody else from your hometown -- this goes for everybody -- that each of you are going to have to make decisions based on your own judgment to not be influenced other than by logic and persuasion by your neighbor or somebody else you may know and not decide the case based on something like that. I trust you could do that, sir.

Page 39

PROSPECTIVE JUROR 788: Yeah.

MR. WILLIAMS: I saw on your questionnaire that you like woodworking as a hobby.

PROSPECTIVE JUROR 788: Little bit.

MR. WILLIAMS: What kind of woodworking do you do?

PROSPECTIVE JUROR 788: Build some rocking horses for grandchildren.

MR. WILLIAMS: That's gotta be fun.

PROSPECTIVE JUROR 788: Yeah.

MR. WILLIAMS: How many grandchildren do you have?

PROSPECTIVE JUROR 788: Nine, a tenth close.

MR. WILLIAMS: Ten is on its way? That's great. Let me talk to you, sir, about a couple topics. One is methamphetamine. While the defendant is charged here with five murders, participating in the murder of five people, the

2170

underlying current to this case is methamphetamine, methamphetamine manufacturing and methamphetamine trafficking.

The allegation is that the defendant committed and assisted in committing these murders in furtherance of a drug conspiracy, a methamphetamine conspiracy, and in furtherance of a continuing criminal enterprise which is another form, if you will, of an organization involved in trafficking in methamphetamine.

And so there's ten charges. It's five murders in furtherance of the conspiracy, and the same five murders also the government alleges violated another statute that involves continuing criminal enterprises. But there are just the five murders at issue there.

But what's important is methamphetamine's at the base

Page 40

of this and it's important in this respect.  A number of
jurors -- and it's a frequent response we get in the
questionnaire -- are upset about drugs, upset about drugs in our
society.  They're upset about methamphetamine in particular.

Just as this case is not a trial about whether we're
upset about the murders in this case, it's not a trial about
whether the killing of five people including two little girls is
a bad thing.  The trial is about whether the defendant did it as
the government alleges.

Likewise, this is not a trial about whether drugs are
bad.  The verdict form will never have on there, Do you dislike

2171

drugs or do you like drugs?

And so it's going to be important for jurors to be
able to set aside their thoughts about drugs being bad and be
able to base their verdict on the evidence in this case and not
use this as a referendum about drugs, in other words, not find
one way on the verdict:  Simply because you dislike drugs,
therefore, I'm going to find against the defendant because I
think this may help the war on drugs or something like that.

I trust you could follow an instruction like that that
said -- or follow the instructions, period, and not base your
judgment on whether you like or dislike drugs.

PROSPECTIVE JUROR 788:  Correct.

MR. WILLIAMS:  Very good.  Likewise, I spoke with
Juror 255 about the presumption of innocence as well and the
defendant's presumed innocent, and you can follow that
instruction as well.

PROSPECTIVE JUROR 788:  Correct.

MR. WILLIAMS:  You yourself, you served on a jury one

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1892 of 3245

time.

PROSPECTIVE JUROR 788:  Yes.

MR. WILLIAMS:  And in this courtroom.

PROSPECTIVE JUROR 788:  Yes.

MR. WILLIAMS:  And it resulted in an acquittal.

PROSPECTIVE JUROR 788:  Yes.

MR. WILLIAMS:  And so you know how to evaluate

2172

evidence and that people should be presumed innocent.  In your case you and the rest of your jurors found the defendant not guilty; is that right?

PROSPECTIVE JUROR 788:  Correct.

MR. WILLIAMS:  Very good.  Anything about that jury service that you thought was negative at all?

PROSPECTIVE JUROR 788:  No.  I enjoyed the food.

MR. WILLIAMS:  Good.  I suspect they'll feed you well at this one as well.  If you could pass the microphone on if you would to Juror 82.

Juror 82, I see -- one thing that struck me more than anything else when I looked at your questionnaire is your interests:  Singing, computers, movies, insects, rocks, fishing, hunting, art, and card playing.

PROSPECTIVE JUROR 82:  Correct.

MR. WILLIAMS:  On top of your job.

PROSPECTIVE JUROR 82:  Yes.

MR. WILLIAMS:  You're one busy man.

PROSPECTIVE JUROR 82:  Yes.

MR. WILLIAMS:  Any one of those interests stand out more than any other with you?

PROSPECTIVE JUROR 82:  Probably computers.

Page 42

MR. WILLIAMS: And what about computers do you like the best?

PROSPECTIVE JUROR 82: Working on them, just being

2173

able to help other people, you know, learn how to use them.

MR. WILLIAMS: Oh. So it's more helping other people understand the programs and so forth.

PROSPECTIVE JUROR 82: Correct.

MR. WILLIAMS: I could certainly use some help in that area. That's for sure.

Let me talk with you about one last concept, and that is the burden of proof. I referred to it earlier, and the judge did too. The government has a burden that we willingly accept every time we bring a criminal case anywhere in any court in America, and that is to prove our case beyond a reasonable doubt. It's not beyond all possible doubt, and the judge will ultimately instruct you what beyond a reasonable doubt means. But it's a burden that's higher than exists in a civil case. If there's a car accident and one person's suing the other person over the car accident, that's just preponderance of the evidence, you know, more likely than not true or not true.

Proof beyond a reasonable doubt is a significantly higher burden and, again, one the government willingly undertakes any time it files criminal charges.

What's going to be important is that the jury and each member of the jury holds the government to that burden of proof beyond a reasonable doubt. Is that something you could do, sir?

PROSPECTIVE JUROR 82: Yes.

MR. WILLIAMS: And if you sat through this trial and

2174

Page 43

at the end of the merits phase or the not-guilty/guilty phase you and the other jurors went back there and you reviewed all the evidence and in your mind you thought the government didn't prove its case beyond a reasonable doubt, what would your verdict have to be at that point?

PROSPECTIVE JUROR 82:  Not guilty.

MR. WILLIAMS:  And likewise, if at the end of that process you looked at the evidence and you concluded that the government proved its case beyond a reasonable doubt, how would you vote?

PROSPECTIVE JUROR 82:  Guilty.

MR. WILLIAMS:  Thank you very much.

I don't have any further questions.  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Williams.

Mr. Stowers?

MR. STOWERS:  Thank you.

Morning, everybody.  How are you?  Anybody want to stand up and stretch yet?  I wanted to start off by thanking everybody for filling out the 18-page questionnaire that Judge Bennett sent out to you all in the last several months.  Some of you write more than others which is fine.  We have taken all of your questionnaires and entered them, typed them in, so that we can read them.  We had to have some people interpret your handwriting, though, so we had to employ a team of handwriting

2175

experts to get that done.

But I wanted to -- I wanted to thank you all for doing

Page 44

that on behalf of everybody here and the Court because I know that's quite a process, and it probably took quite a bit of time to go through those and do that and get that job done for us. So thank you.

Has everybody had a chance, first of all, to go through the list of witnesses that the Court would have provided you I believe first thing this morning? Is everybody nodding their heads? Okay.

Has anybody identified any names on there that they think look familiar to them? If so, raise a hand. Anybody at all? Don't be shy. Okay. Nobody's indicating that they saw anything.

As I've indicated, I've had the opportunity with Mr. Berrigan and Mr. Willett to work with Angela Johnson for the past several years on this matter and her family. And I want to make sure just to be clear that you are not familiar with any of these folks who are related to her because we don't want to have any problems in that regard.

Her mother's Pearl Johnson, Pearl Jean. Her sisters are Wendy Jacobson of Dallas, Texas, and Holly Dirksen of Klemme or Klemme I think it is -- I always get that one wrong -- and Jamie Jo Hays of Faribault, Minnesota, and her brother Jim Johnson of Chicago. And you're not aware of, I take it, her two

2176

daughters, Alyssa or Marvea Johnson.

Now, can you hand that microphone off to 787 behind you? I'll try to start off with a little bit of -- loosen you folks up a little bit. I see you're from LeMars is it?

PROSPECTIVE JUROR 787: Yes.

MR. STOWERS: And you don't work at the ice cream

Page 45

plant.

PROSPECTIVE JUROR 787:  No.

MR. STOWERS:  Okay.  But I can still ask you what's your favorite flavor of ice cream.

PROSPECTIVE JUROR 787:  Chocolate chip.

MR. STOWERS:  Okay.  And what about you, Mr. 325?  What's your favorite flavor of ice cream?

PROSPECTIVE JUROR 325:  Not much of an ice cream eater, so probably just vanilla.

MR. STOWERS:  Okay.  You're just a vanilla.  Okay.

And what about you, Mr. 479.

PROSPECTIVE JUROR 479:  Chocolate.

MR. STOWERS:  Okay.  You're a chocolate.

And what about you, Ms. 54?

PROSPECTIVE JUROR 54:  I'm not much of an ice cream eater, but I'll take vanilla soft.

MR. STOWERS:  Soft vanilla, okay, soft serve.

And up here to 255.

PROSPECTIVE JUROR 255:  Mint bonbon.

2177

MR. STOWERS:  Okay.  Mint bonbon.  A little something --

PROSPECTIVE JUROR 788:  Tin roof.

MR. STOWERS:  I'm sorry?

PROSPECTIVE JUROR 788:  Tin roof.

MR. STOWERS:  Okay.

PROSPECTIVE JUROR 82:  Rocky road.

MR. STOWERS:  And you don't work at the ice cream plant in LeMars.

PROSPECTIVE JUROR 82:  No.

Page 46

MR. STOWERS: Know people that do?

PROSPECTIVE JUROR 82: No.

MR. STOWERS: I'm glad we got that out of the way. Now, one of the things that Mr. Williams started to talk to you about a little bit -- and as long as you got the microphone, Mr. 82, we'll talk to you about this topic -- is witnesses. They'll be testifying from across the courtroom. And if you wind up being one of the jurors in this case, you'll have to evaluate what they're saying and put it together in this multi-week trial where there will be a lot of witnesses testifying as to different things.

And some of the witnesses may be testifying about the same subject matters, the same topics, the same events, and they may all say some different things. And I wanted to ask you if you've encountered the experience in your life of having to sort

2178

of sort through different people telling you different things about the same event. Have you had that experience?

PROSPECTIVE JUROR 82: Yes.

MR. STOWERS: Okay. And can you kind of explain how you've gone about trying to figure that out?

PROSPECTIVE JUROR 82: You know, you -- I'm an intern funeral director, so when we're working with families that are making arrangements, sometimes the families don't always get along, and when different situations occur, the credibility of that person, you know, sure, comes out when they're under that scrutiny and that -- when they're speaking to us. And their credibility I can, you know, sort of tell because, you know, they're looking in your eye and if they're not looking away from you and if they're talking about it in a calm and collected

Page 47

manner.

MR. STOWERS: Okay. So one way you try to figure it out is by evaluating what they're telling you, their demeanor, their appearance, their conduct as they explain their story; is that correct?

PROSPECTIVE JUROR 82: Correct.

MR. STOWERS: Anything else that you would look for?

PROSPECTIVE JUROR 82: No.

MR. STOWERS: Would you talk to other people to find out what other people were saying about the same thing?

PROSPECTIVE JUROR 82: Yes.

2179

MR. STOWERS: You'd want to evaluate them in the same way; is that correct?

PROSPECTIVE JUROR 82: Correct.

MR. STOWERS: Would you want to ask them any questions? I mean, you wouldn't want to just have them tell your story directly and let it sit there. Would you want to ask them some follow-up questions?

PROSPECTIVE JUROR 82: Correct.

MR. STOWERS: And would you want to ask them some questions in detail about things?

PROSPECTIVE JUROR 82: Yes.

MR. STOWERS: And what about you, Mr. 788?

PROSPECTIVE JUROR 788: Would I be interested in their questions or what their responses were?

MR. STOWERS: Both.

PROSPECTIVE JUROR 788: Yes.

MR. STOWERS: Okay. You've encountered this situation. I think you said you had how many grandkids?

Page 48

PROSPECTIVE JUROR 788:  I have nine, one more coming.

MR. STOWERS:  I bet you've had some conflicts that you've had to resolve.

PROSPECTIVE JUROR 788:  Did he hit him with a stick or not?

MR. STOWERS:  Exactly.  And you gotta sort through that when you're taking care of those grandkids; right?

2180

PROSPECTIVE JUROR 788:  Yep.

MR. STOWERS:  So you gotta get them both off in the corners and check it out, right, see what they're saying; is that true?

PROSPECTIVE JUROR 788:  That's true.  Try to avoid that situation, prefer to have the parents do it.

MR. STOWERS:  Well, you're in the luxurious position, but when you were a parent yourself of your own children, you probably had that situation; right?

PROSPECTIVE JUROR 788:  Yes.

MR. STOWERS:  And did you find it important to question them very closely, your children, about things?

PROSPECTIVE JUROR 788:  No.  I was fortunate.  My kids didn't give me a lot of trouble.

MR. STOWERS:  They just fessed right up.

PROSPECTIVE JUROR 788:  Yep.

MR. STOWERS:  Didn't want to mess with Dad; right?

PROSPECTIVE JUROR 788:  That's right.

MR. STOWERS:  Okay.  What about you, ma'am, 255?  You ever encounter the situation where you've had to sort through different people telling you different things about the same event?

Page 49

PROSPECTIVE JUROR 255: All the time.

MR. STOWERS: All the time. In what capacity?

PROSPECTIVE JUROR 255: At work, at home.

2181

MR. STOWERS: What type of work do you do again?

PROSPECTIVE JUROR 255: I'm a bookkeeper.

MR. STOWERS: Okay. And one of the things you're going to probably encounter in this case is the need to employ those skills of sorting through what different people say.

PROSPECTIVE JUROR 255: Correct.

MR. STOWERS: And you don't think you're going to have any difficulty doing that from your perspective.

PROSPECTIVE JUROR 255: Well, everybody's going to have difficulty.

MR. STOWERS: Right. And in the situation where you've encountered that, you've probably had the occasion yourself to be able to question people; is that correct?

PROSPECTIVE JUROR 255: Correct.

MR. STOWERS: And you try to question them in a good deal of detail.

PROSPECTIVE JUROR 255: Yes.

MR. STOWERS: Why do you find that important?

PROSPECTIVE JUROR 255: Because most of the time at work situations you want to get along with everybody and not make enemies with anybody because you gotta work with these people every day, so you try and get both sides and take it from there.

MR. STOWERS: And if you got a question about somebody maybe isn't telling you the whole truth, is it important to

2182

Page 50

question them in detail?

PROSPECTIVE JUROR 255:  Yes.

MR. STOWERS:  Can you pass it back to Ms. 54?  We don't want to leave her out of the mix sitting back there so brightly dressed today.

We don't want to ignore you.  Have you had the situation that we're talking about here arise in your life?

PROSPECTIVE JUROR 54:  Oh, I think everyone has.

MR. STOWERS:  Okay.  Do you think it's important to probe witnesses and people, detailed questions to find out what it is that the facts are?

PROSPECTIVE JUROR 54:  Oh, I think so if you're the one called upon to resolve the problem.

MR. STOWERS:  Everybody in the back row -- we don't need to pass the microphone down -- agree to that?

Do you want to add anything, Mr. 479?

PROSPECTIVE JUROR 479:   (Shook head.)

MR. STOWERS:  Anything else, Mr. 325 or 787?

Well, one of the challenges in this case for the jury is you folks don't really get to ask questions of these witnesses.  Do you understand that, Miss 54?

PROSPECTIVE JUROR 54:  Yes.

MR. STOWERS:  How do you feel about that?

PROSPECTIVE JUROR 54:  Well, I really think that both sides will ask all the questions given and we'll have a big

2183

picture.

MR. STOWERS:  And Mr. 479?  Can you hand him the -- I'm sorry.  Mr. 479, would you expect the 3 lawyers over here

Page 51

working with Ms. Johnson, Angela, to ask a lot of detailed questions of the witnesses?

PROSPECTIVE JUROR 479: Yes.

MR. STOWERS: And do you think that would be helpful to you as a juror in this case in evaluating their testimony?

PROSPECTIVE JUROR 479: Yeah, it's what we have to have.

MR. STOWERS: Would you expect us to ask those witnesses questions about things they'd said in the past?

PROSPECTIVE JUROR 479: Yes.

MR. STOWERS: If they were different in particular?

PROSPECTIVE JUROR 479: Yes.

MR. STOWERS: And would you expect us to expose those witnesses and all of their imperfections to the extent we're allowed to by the Court under the rules of evidence that we have to go by here? Would you expect that of us as lawyers?

PROSPECTIVE JUROR 479: Yep.

MR. STOWERS: Do you expect that to be done on behalf of Ms. Johnson?

PROSPECTIVE JUROR 479: Yes.

MR. STOWERS: How do you feel about that, Mr. 325?

PROSPECTIVE JUROR 325: I feel the same way. I think

2184

you would, you know, have to ask the questions so we could -- I think you would ask the questions so we could answer them, you know, so we knew.

MR. STOWERS: And you'd want us to do that.

PROSPECTIVE JUROR 325: Yeah.

MR. STOWERS: And would you expect that of us?

PROSPECTIVE JUROR 325: Yep.

Page 52

MR. STOWERS: We'll try not to disappoint you.

And what about you, Mr. 787?

PROSPECTIVE JUROR 787: Well, I think the questions need to be answered correctly, nothing half ass. I get a lot of that at work. I try and sort it out, and finally you just give up and say, you know, I think you two better get it worked out or something's not going to get done.

MR. STOWERS: So you've been through this before.

PROSPECTIVE JUROR 787: Yes.

MR. STOWERS: How do you feel about what I've been saying here, Mr. 82? How do you feel about these concepts?

PROSPECTIVE JUROR 82: Yes, we def -- you have to be able to understand what you're asking and what you're saying to them and what they're saying back.

MR. STOWERS: And would you expect that the lawyers working with Ms. Johnson here on her behalf are going to ask these witnesses a whole lot of questions to show you jurors who these folks are, what they're all about so you can evaluate them

2185

in their testimony?

PROSPECTIVE JUROR 82: Yes.

MR. STOWERS: Now, if you were Mr. -- well, let's pass it over to Mr. 788.

PROSPECTIVE JUROR 788: Hello.

MR. STOWERS: If you were -- in a perfect world, in a perfect world, okay, if you were trying to get to the bottom of what happened in a particular situation, you'd want to talk to everybody, wouldn't you?

PROSPECTIVE JUROR 788: All the people that were involved that saw what happened or something like that. Have to

Page 53

do that with the grandchildren.

MR. STOWERS: And I bet in a case where somebody is charged with a crime you'd sure want to know what their position was on it, wouldn't you?

PROSPECTIVE JUROR 788: Uh-huh.

MR. STOWERS: And you'd want them to tell you what their position was.

PROSPECTIVE JUROR 788: Right.

MR. STOWERS: And anybody else feel that way as well, that you'd want to know what a person's position was; you'd want to hear from them in a case where, for example, they're charged with a crime? You'd want to know what their position is. Would you feel the same way, Miss 255?

PROSPECTIVE JUROR 255: Yes.

2186

MR. STOWERS: And how about you, Miss 54? I see you're nodding your head.

PROSPECTIVE JUROR 54: Yes.

MR. STOWERS: She said yes. And, Mr. 479, do you feel the same way?

PROSPECTIVE JUROR 479: Yes.

MR. STOWERS: Okay. And, of course, everybody would feel that way. That would be natural; is that right? Miss 255?

PROSPECTIVE JUROR 255: Yes, yes.

MR. STOWERS: Now, how are you going to feel, Miss 255, if, for example, in this case Ms. Johnson didn't testify?

PROSPECTIVE JUROR 255: That's her right.

MR. STOWERS: That's her right. And how would you feel about that, Mr. 788?

PROSPECTIVE JUROR 788: That's her right.

Page 54

MR. STOWERS:  What would be the first thing that popped into your mind if she didn't testify?

PROSPECTIVE JUROR 255:  That's her right.

MR. STOWERS:  That's all?

PROSPECTIVE JUROR 255:  There's no right or wrong.

MR. STOWERS:  And what would be the first thing that would pop into your mind?

PROSPECTIVE JUROR 255:  She'd be like me and she'd probably have a little trouble talking, and she might not present herself as well as you do.

2187

MR. STOWERS:  Thank you.  Appreciate that.  You think I present myself well, Mr. 788?

PROSPECTIVE JUROR 788:  Better than I would.

MR. STOWERS:  You're doing really well.

How about you, Mr. 82?

PROSPECTIVE JUROR 82:  That's correct.  I am the same way.

MR. STOWERS:  Let's go to the back row, Mr. 787?  How do you feel about it?  I just told you the scenario.  Let's say Miss Johnson did not testify in this case.  How would you feel about that?

PROSPECTIVE JUROR 787:  I got kind of mixed emotions on that.  I feel she's the one that's charged.  She should have something to say.

MR. STOWERS:  Right.  Do you feel that way?  Let's go down to the end of the row.

Miss 54, do you feel that way, that she ought to get forward and say something?

PROSPECTIVE JUROR 54:  Not necessarily.  I just
Page 55

feel -- I mean, there must be a reason why she isn't testifying.

MR. STOWERS: What reason --

PROSPECTIVE JUROR 54: Well, maybe her attorneys have thought this would be a better way to present the case.

MR. STOWERS: Any other reasons?

PROSPECTIVE JUROR 54: No. I think it's her choice.

2188

MR. STOWERS: And how do you feel, Mr. 479, about this?

PROSPECTIVE JUROR 479: My first feeling is she's got something to hide.

MR. STOWERS: And she's probably guilty; is that right?

PROSPECTIVE JUROR 479: That I don't know, but if she doesn't want to testify, my first thought is she's got something to hide.

MR. STOWERS: Okay. Anybody else feel that way to some degree? Mr. 788?

PROSPECTIVE JUROR 788: It's always a possibility.

MR. STOWERS: If you could pass -- do you feel that way, Ms. 255, that she's probably got something to hide if she doesn't testify?

PROSPECTIVE JUROR 255: No.

MR. STOWERS: Now, let's go back then to you, Mr. 479, and talk about that a little bit. How strongly do you feel about that, that if she doesn't testify or if a person charged with a crime doesn't testify just generally that they must have something to hide?

PROSPECTIVE JUROR 479: I kind of feel if you've got something to say you should say it.

Page 56

THE COURT: Could you hold the microphone up a little?

PROSPECTIVE JUROR 479: Sorry.

2189

THE COURT: Thanks.

PROSPECTIVE JUROR 479: If you got something to say in your defense, I think you should say it. That's my opinion.

MR. STOWERS: How strongly do you hold that view?

PROSPECTIVE JUROR 479: Pretty strong I guess.

MR. STOWERS: I suppose you've probably seen many cases talked about in the news media or on TV where people have been charged with crimes and they never did testify in their own defense like maybe O.J. Simpson, for example; right?

PROSPECTIVE JUROR 479: Uh-huh, right.

MR. STOWERS: You probably thought he had something to hide.

PROSPECTIVE JUROR 479: Pretty sure he did, yeah.

MR. STOWERS: And you probably made that comment to others that when somebody doesn't testify in a criminal case they probably got something to hide.

PROSPECTIVE JUROR 479: It's not something that comes up a lot, but yeah, I might have. I don't know.

MR. STOWERS: Is it going to be hard for you to put that thought out of your mind, that is, your thought that somebody who doesn't testify probably has something to hide? Is that going to be a hard thing for you to put out of your mind?

PROSPECTIVE JUROR 479: Yes.

MR. STOWERS: Even if the judge told you, hey, you shouldn't have that thought in your head; you should not even

2190

Page 57

think about that at all.

PROSPECTIVE JUROR 479: Honestly, yes.

MR. STOWERS: And the reason you'd have a hard time putting that out of your mind is because you do hold that perception quite strongly; is that right?

PROSPECTIVE JUROR 479: Right.

MR. STOWERS: And how do you feel about that, Miss 54?

PROSPECTIVE JUROR 54: Exactly what's your question?

MR. STOWERS: How do you feel about the concept that somebody who doesn't testify probably has something to hide?

PROSPECTIVE JUROR 54: Well, I don't necessarily feel that way. I just feel there's some reason they're not testifying, and I'm sure it's on the advice of their lawyers.

MR. STOWERS: So you blame the lawyers.

PROSPECTIVE JUROR 54: Well, wouldn't you listen to their advice, I mean, if you were in such a position?

MR. STOWERS: Well, I'm kind of an independent thinker, and I'd be the wrong one to ask that question to but -- and I'm a lawyer myself, so if a lawyer told me something, I'd probably have to evaluate it myself as a lawyer, and I don't think I'd probably give myself very good counsel.

So what you're saying is your thought would be that if somebody chose not to testify in a case where they're represented by lawyers that they would probably be not testifying based on the advice of their lawyers; is that

2191

correct?

PROSPECTIVE JUROR 54: True.

MR. STOWERS: Would you think the lawyers had made a

Page 58

decision then that they wanted to hide something?

PROSPECTIVE JUROR 54: No, no.

MR. STOWERS: Just that they thought that was the best way to present the case.

PROSPECTIVE JUROR 54: Yes.

MR. STOWERS: Okay. I think I started at 20 till, didn't I?

THE COURT: You did.

MR. STOWERS: Okay. Thank you. Let me finish up here with the following preface to where you're going to be for the rest of the day, and the judge has kind of given you a highlight of that. Where you all are going to be is waiting, some longer than others, and the judge will explain that to you.

But what we're going to do after we break here in a few minutes is we're going to separate you folks out and bring you back in one by one to talk to you about two separate issues, and those are the penalty that's available in this case and your views on that, your views on the punishment, and then also what you may have heard, read, or seen about this case prior to your coming here today or perhaps on your way here today. If you had a drive, maybe there was something on the radio or something. I don't know that there was but could have been as recently as

2192

today.

And when you come back, Mr. Berrigan is going to be talking to you and probably Mr. Miller will be talking to you on behalf of the attorney general's office. And we all really appreciate your willingness to stick around and be very patient with us as we work through each one of you on that process. And we'll appreciate you coming up here and giving us your full and

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1910 of 3245

complete cooperation and honesty during that time just like you did when you told me your favorite flavors of ice cream; okay? Thank you.

THE COURT: Thank you, Mr. Stowers. Before I let you go, I've got a few questions for a few of you. Juror 479 -- yeah, 54, could you pass it to 479 -- your view that a defendant who doesn't testify might have something to hide, that's essentially what you're saying; right?

PROSPECTIVE JUROR 479: Yes, sir.

THE COURT: Okay. If I had a dollar for every time I've heard that view in jury selection in my ten and a half years as a district court judge, I'd have a good pile of money, so I want you to know you're certainly not alone in that view. And I'm not trying to talk you out of the view, but I want to explain to you what the law is just to make sure you understand that.

Under the Fifth Amendment of the United States Constitution -- and every individual has the right not to

2193

testify. And for my money just based on my 17 years in private practice and 2 1/2 years as a United States magistrate judge and 10 1/2 years as a United States District Court judge, I hold the view that that's the most precious right that all of us have. I think it's an incredibly important right. It belongs to each of us. And there are fascinating historical reasons why the founders of the country put that in the Fifth Amendment of the United States Constitution. But that's just my own view, and I don't expect other people to necessarily agree with it.

But I just wanted you to know that is my view. And in every criminal case a defendant has an absolute right under the

Page 60

United States Constitution not to testify. And I'll share an inside secret with you. I'm a curious person, so when a defendant exercises their right not to testify, I'm always curious about it, and we're entitled to be curious. But I never, ever, never, ever hold it against a defendant in any way because they're exercising a constitutional right.

And the law is that a juror cannot hold it against a defendant who does not testify. And there may be lots of reasons why somebody might not testify. One might be they want to hide something. One might be that they don't make a particularly good witness. And can you imagine being in that witness box, having a highly trained set of lawyers on the other side, might be pretty intimidating to a lot of people? Can you imagine that might be the case?

2194

PROSPECTIVE JUROR 479: Yep.

THE COURT: And sitting in that witness box might not be the most comfortable place to be. Can you imagine that?

PROSPECTIVE JUROR 479: Yes.

THE COURT: And I used to actually teach a class about this, and we used to -- back then they'd have blackboards and chalk, not computers, and we used to be able to fill up an entire blackboard coming up with all kinds of reasons why a particular individual might not want to testify. And I just want to make -- well, I want to find out if I tell you that you cannot hold it against the defendant in any way and that you cannot consider it in jury deliberations or even discuss what the reason might be -- that's the curiosity -- do you think you'd be able to do that?

PROSPECTIVE JUROR 479: I'm not sure. I'm not sure.

Page 61

THE COURT: Okay. Okay. And I guess what I'm asking you is it's okay to have your personal view. That's fine. I don't have a problem with that. But we need you to set that personal view aside and give the defendant the full benefit of the presumption of innocence which means you can't hold it against her in any way if she doesn't testify. And if I instructed you to do that, I hear you say you're not sure you could follow that instruction.

PROSPECTIVE JUROR 479: Right.

THE COURT: Can you hold that microphone a little

2195

close? No, you're just being as honest as you can.

PROSPECTIVE JUROR 479: Yep.

THE COURT: Yeah. Why do you think you might not be able to follow that instruction?

PROSPECTIVE JUROR 479: I -- I just really feel that you got a situation like this where your life's on the line, you're gonna -- you should say something in your defense. That's my . . .

THE COURT: Okay. And I understand -- am I correct in this observation, that if the -- if you were in her shoes you'd want to get in that witness stand and testify if you were in her shoes?

PROSPECTIVE JUROR 479: I would think that I would, yeah.

THE COURT: Okay. Are you open to the possibility that not everybody sees it the same way you do?

PROSPECTIVE JUROR 479: Yes.

THE COURT: Okay. So you're open to that possibility that others might think they don't want to testify; right?

Page 62

PROSPECTIVE JUROR 479:  Yep.

THE COURT:  And for whatever reason you just -- you couldn't follow the law in my instructions.  I guess that's what it comes down to.

PROSPECTIVE JUROR 479:  I -- it'd be in the back of my mind.  Honestly it would be.  I don't know.

2196

THE COURT:  And when you say it would be in the back of your mind, how do you think -- how do you think that might affect your duty as a juror?

PROSPECTIVE JUROR 479:  I'd try to be, you know, as fair and honest as I could be, but like I say, I just -- I don't know that I could be.

THE COURT:  Okay.  You know, in some things close counts like horseshoes; right?  But when we're talking about giving an individual the full benefit of the presumption of innocence, close isn't good enough for me.  Can you appreciate that?

PROSPECTIVE JUROR 479:  Yes.

THE COURT:  And I don't think anything less of you or anything, but -- well, let me see.  Does anybody else feel the same way as Juror 479?  Let me -- okay.

Juror 325, can we pass the microphone down?  What's your view?

PROSPECTIVE JUROR 325:  I just -- I guess my view's always been, you know, if my life was on the line like he said, I would want to get up and say something.

THE COURT:  Okay.  And that's okay.  You have a right to want to get up and say something.  But you have an equal right not to want to get up and say something.  And so the

Page 63

question becomes -- it's fine that you would do it that way, but are you willing to have Miss Johnson not testify and then not be

2197

able to hold it against her? Do you think you can do that, or do you think because you'd want to testify that means you'd hold it against her in some way?

PROSPECTIVE JUROR 325: I don't know if I'd hold -- I guess it'd be -- I guess I don't think I would, but I guess it would always be there. I think I could tune it out.

THE COURT: Yeah. Of course it would always be there.

PROSPECTIVE JUROR 325: Correct.

THE COURT: You know, it's kind of nonsense in some respects when I say if that's your view -- there's always going to be a part of you that's your view, and I'm not even trying to change it. I'm not trying to convince you otherwise. So you're entitled to have that view.

But what I'm asking to you do is -- and it's kinda hard to articulate -- can you hold that view which is a perfectly fine view but still not apply that view to Miss Johnson, in other words, say, Okay, I'd testify, but I'm not the one on trial; she doesn't want to testify; the judge is telling me she has an absolute right not to testify; the judge is telling me I can't hold that against her in any way, and then the question becomes can you follow that instruction or not? Some people can. Others can't. And I understand that. If I tell you you can't hold it against her, would you be able to not hold it against her?

PROSPECTIVE JUROR 325: I would say no because that's

2198

Page 64

just my personal view I guess.

THE COURT: Okay. That's fine.

PROSPECTIVE JUROR 325: I'm not going to say yes and then down the road change my . . .

THE COURT: Yeah, we wouldn't want you to do that at all. That wouldn't be fair, would it?

PROSPECTIVE JUROR 325: No.

THE COURT: And I imagine you're a pretty fair guy; right?

PROSPECTIVE JUROR 325: Yeah.

THE COURT: Okay. And you're being very fair by telling us that's your view; right?

PROSPECTIVE JUROR 325: Yeah.

THE COURT: Okay. So so far we have Juror 479 and Juror 325 who have told me that they are not able to not hold it against the defendant, and that's fine. That's fine. Anybody else in that camp or with that position? Raise your hand if you are.

Okay. Juror 787, why don't you grab the microphone. What's your take on it?

PROSPECTIVE JUROR 787: Well, I wouldn't necessarily hold it against her. It's just I've been in -- not in a courtroom situation like this. I for one would rather speak up for myself than have other people do it for me.

THE COURT: And I understand that completely. That's

2199

how I am. I'm not shy about speaking up. I'm not shy at all. So I understand that. But do you think if I told you the law is she has an absolute right not to testify and what that means is you can't hold it against her in any way if she exercises her

Page 65

right not to testify, do you think you could follow that law and not hold it against her?

PROSPECTIVE JUROR 787: I don't think I would hold it against her, no.

THE COURT: Now, the government always has the burden of proof in the case. Do you understand that?

PROSPECTIVE JUROR 787: Yes.

THE COURT: And the defense never, ever has any obligation to put on any evidence. Do you understand that?

PROSPECTIVE JUROR 787: Yes.

THE COURT: So if I told you that you couldn't hold it against the defendant, you're telling me you'd be able to follow that.

PROSPECTIVE JUROR 787: I think so, yes.

THE COURT: Well, why don't you think about it a little more because now's the only time we get to ask you about these things.

PROSPECTIVE JUROR 787: Right.

THE COURT: And we can't -- in the middle of trial if all of a sudden you change your mind, it's a little too late to do anything about it. So I'll tell you what. Why don't you

2200

take -- why don't you think about it a little bit, and we're going to get to that with you in individual questioning. I'll probably raise it again, and I'd just like you to think about it a little more. And if you can't promise us that you won't be able to hold it against her, that's okay too. That's okay. But we'll come back to that later.

Could I see the lawyers just at a sidebar for a second here?

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1917 of 3245

(At sidebar on the record.)

THE COURT: What do you want me to do? You want me to let them go, or do you want to come back in individual questioning and try and rehabilitate them?

MR. WILLIAMS: I don't think, frankly, either one of them can be rehabilitated.

THE COURT: Yeah, I don't think so either.

MR. STOWERS: That's fine.

MR. WILLIAMS: That'd be a waste of time.

THE COURT: Do you have any objection if I let them go?

MR. STOWERS: No.

THE COURT: Okay. Great.

(The sidebar was concluded.)

THE COURT: Okay. Juror 479, Juror 325, you're going to be dismissed from jury service. I just wanted to thank you both very much. I'm very impressed by the fact that you gave us

2201

very honest answers to the questions. Your opinions are just as valid as any that I hold or any that anybody else in the courtroom holds. Nobody's here to pass judgment and say you shouldn't have those opinions or try and change your mind. But having said that, we're not going to let you serve on the jury, so I think you can understand that. So you're free to leave.

And would you do us a favor -- because jury selection will at least go into next week, maybe a little more than that -- not talk to anybody about this process? And here's why. Northwest Iowa's very small. You could easily say something to somebody who then repeats it to somebody else, and then that somebody else shows up here next week in one of those chairs,

Page 67

and that would create a problem for us. And it's a very small world, believe me.

So here's what we're going to do. We're going to send you down to the jury room. And then actually Juror -- we're going to take a break, about a 20-, 25-minute break. Then we're going to start with Juror 54 back in the corner. And then Jurors 479, 325, they're going home. So then we're going to bring Juror 787 back. And then we're going to start with 255 and then go to 788 and 82. We should be out of here pretty early this afternoon I would think. Takes about 25 minutes per juror.

So you can figure it out. We're going to take a 25-minute break now, and then we'll go till about noon. So I

2202

suspect that we'll get through Juror 54, 787 and maybe 255, but it will be after 1:00 before we get to 788 and 82. But you should be out of here by two o'clock at the latest I would think. I'm just trying to give you a little estimate.

And certainly 788 and 82, there's no possibility we're going to get to you before lunch, so if you want to leave and walk around downtown or go have lunch or take a nap on a park bench, be my guest.

So please remember my cautionary instructions about not discussing this case or letting anybody else talk to you about the case. And 479 and 325 are excused, and we'll see Juror 54 back up here in about 25 minutes; okay? Thank you.

(Panel I exited the courtroom.)

THE COURT: Anything we need to talk about?

MR. BERRIGAN: Very briefly, Your Honor.

THE COURT: Yeah.

Page 68

MR. BERRIGAN: If we added 3 minutes per juror for each side, that would be 6 minutes times 5 only adding 30 minutes to the entire process, and I respectfully make that request, that we go from 12 to 15 minutes today. I understand we've addressed this on at least one previous occasion, but I wanted to see if you might reconsider in light of the few jurors that we have today in our available time.

THE COURT: What's the government's position?

MR. MILLER: Your Honor, I don't really have a

2203

position. I think sometimes we can get it done in substantially less than 12 minutes, and then there's the occasional juror who requires more time. I guess I don't have a strong feeling one way or the other on the limit as long as we do have a limit so we can get out of here expeditiously. Twelve seems to work, but I certainly don't mind if in those occasions where there's additional grilling needed to be done that it could go over that.

THE COURT: Well, be seated. But the problem is, you know, you just -- you get -- you just keep leading and leading and leading and hammering the wit -- the jurors and, you know, I think 12 minutes is sufficient. So I'm just going to stick with my 12 minutes.

MR. BERRIGAN: Thank you, Your Honor.

THE COURT: I really do think it is sufficient. If there's some exceptional reason why you need more time on a specific witness, I would always grant that.

MR. BERRIGAN: Okay.

THE COURT: If I've interrupted -- I try not to -- my time doesn't count on your 12 minutes, and if there's some

Page 69

obvious reason why, of course I'm going to go over, but in general I'd like to stay to the 12 minutes.

MR. BERRIGAN:  I just wanted to make the request.

THE COURT:  No.  That's fine.  You don't get anything in life without asking.

2204

MR. BERRIGAN:  That's right.

THE COURT:  Thank you.

(Recess at 10:21 a.m.)

THE COURT:  Ready for Juror 54?

MR. MILLER:  Yes.

THE COURT:  Who's starting?

MR. MILLER:  I am.

THE COURT:  Okay.  Thanks.

MR. MILLER:  I assume.

MR. STOWERS:  Yeah.  You start every day.

THE COURT:  Actually we're going to let Mr. Basler do it today.

SPECIAL AGENT BASLER  I'd be happy to do it.

THE COURT:  He's been dying to do something.

MR. MILLER:  He has.  He's been critiquing.

THE COURT:  And Lisa Dahl can do it on Monday -- Tuesday.

MR. BERRIGAN:  We'll be happy with that.

(Prospective Juror 54 entered the courtroom.)

THE COURT:  Ma'am, anywhere in the front row.  Thank you.

Everybody please be seated.  We're going to start with questioning from one of the prosecutors, Mr. Miller, first.

EXAMINATION
Page 70

BY MR. MILLER:

Q.  Good morning, Juror 54.

A.  Good morning.

Q.  How you doing so far?

A.  Fine.

Q.  Good, good.  I just want to ask you questions on two subjects this morning.  Then I'm going to sit down, and Mr. Berrigan will have an opportunity as well.

The first subject is any exposure to pretrial publicity, and the other question is the death penalty.  We appreciate you filling out the questionnaire, and I noted you said you're not at all familiar with the case.

A.  No.

Q.  And aside from what was in that questionnaire, do you have any information at all?

A.  I don't know anything.

Q.  Very good.  And I trust you formed no opinions about this case before coming in here.

A.  No.

Q.  Very good.  We also noted your answers on the issue of the death penalty, and I noted just to kind of summarize it you indicated, well, if that's the law, so be it; fair statement?

A.  You know, I've thought about this.

Q.  That's what I was wondering.  You've given it some more thought.

A.  And I was thinking when I filled out the questionnaire.  I

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1922 of 3245

was leaving in just a day or two, and I did it hurriedly, and then, you know, the more I thought about some of those questions, then you keep thinking about them over and over. And it's difficult to say a yes or a no for me. I mean, I feel that in some instances you might think yes. In other instances I might say no. So I'm wishy washy.

Q. Well, that's exactly what I was getting to. I was assuming that getting the questionnaire might have got you thinking, and all I wanted to do is ask you to share your thoughts, and you've just done that with us. Let me -- or just go ahead.

A. It's very difficult to say yes or no for me.

Q. Okay. Very good. This morning you had probably about a full hour of general introductory information to this system from Judge Bennett, but a part of that time was spent explaining how the third phase of this trial will work if we ever get to that phase which is the penalty phase. Do you remember Judge Bennett discussing that a little bit?

A. Yes.

Q. Okay. And he talked about the fact that the jurors, if it comes to that stage of the trial, would be required to weigh and consider factors on both sides of the issue in relation to this defendant. Did that make sense to you? Does that sound like an appropriate way of proceeding in a case like this?

A. Yes.

Q. Okay. We need to -- and I appreciate the fact that you've

2207

given this some thought. We obviously need to find jurors who can assure us that they can fairly consider both possible options, and that's what I'm wanting to inquire about with you.

You understand a little bit about the allegations of

Page 72

this case. The government accuses Ms. Johnson of having participated in the killings of five people in connection with a conspiracy to manufacture or deliver drugs and that two of those five are particularly vulnerable victims, namely, children. Do you understand those are the allegations?

A. I read that in the paper, uh-huh.

Q. Should the evidence show that beyond a reasonable doubt, would those facts and the serious nature of those facts cause you to feel that you would have to return a verdict one way or the other, or would both possible punishments still be under consideration for Juror 54?

A. I think that maybe when you first start on something and then when you're presented all these different ideas and all the different facts and everything that happens, I think you really couldn't make up your mind until you'd heard what you need to know. I mean, I can't.

Q. Right. You want to keep an open mind.

A. I would.

Q. And if it were your duty to keep an open mind not only -- again, I'm assuming we get to the penalty phase now. But assuming we get to that point and you as a jury have unanimously

2208

concluded that the defendant is guilty of this conduct, do you feel you could still keep an open mind and be open to considering factors on both sides of the issue as to whether the death penalty or life imprisonment is the more appropriate punishment? Do you feel you could do that?

A. I would like to think I could.

Q. Okay. Do you have some reservations? And if so, please share them with us, any thoughts, concerns along those lines.

Page 73

A. No, because I'm -- you know, I'm trying to -- you try to weigh that both ways, which is best. I don't know which is best.

Q. And you can't until you've heard the evidence. I understand that. Some people tell us, I simply couldn't consider one or the other, but I take it you're telling us that you would very definitely want to consider both possible options.

A. I would -- I don't want to say I wouldn't.

Q. Well, we just -- we want you to just tell us what's in your heart.

A. Yeah. Well, I don't know which is best, and I -- so I'm unsure of what to say.

Q. Very -- no, you're doing fine. I'm just -- you may not have an opinion about some of the questions I'm asking. I just need to ask a couple more, and then I'll sit down.

One of the allegations is the fact that two of the

2209

victims were particularly vulnerable, namely, children. And it will be the government's claim that this is an aggravating factor. You would be -- it would be up to each juror to decide how much weight to give any particular factor, but would it at least make sense to you that that would be an aggravating factor, the killing of children, that that's something that makes it more serious?

A. I have difficulty handling that, but -- I mean, sometimes things happened.

Q. And the reason I ask that, I noted in your response you indicated that the killing of children was something that would be unbelievable to consider. It's a very serious matter. And I

Page 74

trust you would consider that to be a very serious aggravating factor, something that makes a crime more serious as opposed to making it less serious.

A.    It's something you don't want to consider.  I mean, I don't want -- I don't like the thought of thinking that that happens, but I know it does.

Q.    Would that prevent you from considering life imprisonment as a possible penalty?  Would you still be able to consider both possible penalty options?

A.    As I stand on whether I think the death penalty is right or life in prison is right, I'm not sure that would play a part because, I mean, a life is a life.  I don't care how old you are.

2210

Q.    Let me put it to you this way.  If you were instructed by the Court that the killing of vulnerable victims such as children if proven beyond a reasonable doubt is an aggravating factor, in other words, something that may make the crime more serious, would you be able to follow that instruction?

A.    I don't know.  To me a life is a life.  Sorry.

Q.    No, that's fine.

A.    That's just the way I feel.

Q.    Don't apologize for any of your answers, please.

A.    No, I just -- I understand what you're saying because it's a child, but if you're 15 or if you're 10 or if you're 25, it's not a good thing.  That's all I'm saying.

Q.    Certainly, certainly.  What I'm trying to suggest to you is that the Court, if you ever get to that punishment phase, will instruct you -- you won't have to be completely on your own. You'll have instructions on how to go about determining the

Page 75

appropriate punishment. And you will be instructed to weigh aggravating and mitigating factors.

A. I see.

Q. For example, as a mitigating factor, the level of involvement may be such that the evidence would show that the defendant did not pull the trigger but merely assisted in the killings and that that might be a mitigating or lessening of seriousness. Does that make sense, and is that something you could follow?

2211

A. I understand what you're saying.

Q. Do you feel you could follow that instruction, to consider mitigating and aggravating factors as the Court outlines them to you?

A. I'd like to think I could.

Q. The judge will tell you how much weight you give to each factor is strictly up to you. For example, the fact that a victim is a child may not be as important to you as the number of victims or other possible aggravating or mitigating factors. But you would be asked and instructed to weigh and consider all factors mitigating and aggravating. Do you feel you could do that, ma'am?

A. I'd like to think I could. I don't know.

Q. You've never been asked to do that.

A. I don't know until presented things. I don't know anything about it, and so I have no idea.

Q. And that's fair because you've not been put in this position before. How can you know ahead of time? All we can do is ask you your best feelings about your ability to follow that as you understand the Court's description of the process. To

Page 76

the best of your knowledge and your understanding of what Judge Bennett described this morning, do you feel that you could follow that instruction and perform that function in fairly considering both life imprisonment and the death penalty as a possible punishment in this case?

2212

A.   Well, I'd like to think I could.  I don't know.  You know, as you think about these things, it weighs on your mind.  That's a pretty heavy question.

Q.   Certainly it is, and it's good that it should.  I only have one other question for you, ma'am, and that's this.  If you and your fellow jurors were to decide unanimously that -- not only that this defendant is guilty but also that the appropriate punishment is the death penalty, under those circumstances, you could not pass that verdict without each and every one of you signing a verdict form to that effect.  Under those circumstances if you felt that the death penalty was the appropriate punishment, do you, Juror 54, feel that you could put your signature to that verdict finding for the death penalty with the effect that that would have?

A.   I don't know.

Q.   We need to find jurors who can assure us that they can seriously consider both possible options.  Do you feel that you cannot assure us that you'd be able to sign a verdict form for the death penalty even if you felt it was the appropriate punishment?

A.   I don't know.

Q.   And that's -- again, all we can ask for is your best judgment on that.  Your best judgment is you simply don't know whether you could give us that assurance.

Page 77

A. No, because I think you have to -- I mean, I don't know

2213

anything about the case. I don't know -- and I really think I could come to a more definite conclusion if I knew more, but I don't. And I'm wishy washy on the death penalty, so I -- I don't want to give you -- I don't want to give you a yes-or-no answer.

Q. I understand that.

MR. WILLIAMS: Time.

Q. Some people can't.

THE COURT: Now you are going to be questioned by Mr. Berrigan from the defense. You're going to be questioned by him. Thank you.

EXAMINATION

BY MR. BERRIGAN:

Q. It's not as bad as getting your tooth pulled, is it? Listen, one thing I wanted to say before I started asking questions is that we notice from your questionnaire that you're a very busy young lady and sacrificing quite a bit to be here, not only your activities with your grandchildren, but you're involved in your church, P.E.O., Questers, Tuesday Club, Trojan Booster Club, Rainbow Girls Board, O.E.S., Sac County Tourism Development. That's a lot of stuff.

A. Uh-huh.

Q. And you drove three hours round trip to be here with us.

A. Yeah.

Q. Wow. Well, thank you for being here. These are difficult

2214

questions, and part of the problem as you've repeated over and
Page 78

over again is you don't know enough about the case. Let me tell you what we can tell you about the charges and see if that's helpful to you; okay?

Angela's charged with committing or participating in the commission of five murders, intentional murders. So this book is going to stand for the five murders; okay? And the government has also alleged that these murders were committed after premeditation and substantial planning. That will be the green book; okay? You with me so far?

A. Yes.

Q. And then finally they've alleged that of the five, of the five victims, there's a mother and her two children that were murdered, a ten-year-old girl -- her name was Kandi Duncan -- and the six-year-old sister. Her name was Amber Duncan. Those are the allegations against Angela Johnson; okay?

A. (Nodded head.)

Q. That's about as much as we can tell you. I know it's not nearly enough. But that's as much as we can tell you about what we expect the government's evidence to be, that that's what they're going to try to prove; okay? And so then there's -- the question that we're asking is for jurors to kind of fast forward themselves very artificially. I mean, Angela Johnson's sitting over there. She hasn't been convicted of anything. I don't want you to get the impression for a minute that as her lawyer

2215

questioning you about punishment that suggests that I think she's in any way guilty of anything; okay?

But we don't have a chance to come back like after you heard all the evidence and say, Well, Miss Juror 54, what do you think about punishments? We only have this one chance. And as

Page 79

difficult as it is, we can only ask you to do your best; okay? That's all we can ask of anybody. There are not right or wrong answers. It's exactly like the judge said. People come into this courtroom with views on these issues all over the board. And in America we cherish the right to have our own opinions about different things. And this is an area where people have opinions about the death penalty and life in prison.

And, in fact, you keep talking about being wishy washy. Wishy washy's okay. There's nothing wrong with being wishy washy. We're actually looking for people that could consider both punishments, both life imprisonment and the death penalty, because the government, of course, is entitled to people that could impose that punishment under the law if the circumstances warranted it; okay? And we, of course, are entitled to people who could consider a life sentence. So we need people that can go both ways. You with me?

A.   I know what you're saying, yes.

Q.   Okay. So let me ask you this. You mention in your questionnaire you were okay with the death penalty if the law provided for it. It wasn't something you were, I guess, at

2216

least religiously or conscientiously opposed to. Would that be fair? Well, you tell me. How about if I ask it this way? How about if I said, Well, you know, we've been in the Sac County Tourism Board together for 20 years, and I've never asked you about the death penalty -- isn't that strange -- and we were having a conversation one day and I turned to you and said, Fellow Board Member Juror 54, what do you think about the death penalty, what would you tell me?

A.   Just what I've said. I really am not -- I just haven't set

Page 80

aside my mind either way.

Q. Let me ask you the other --

A. And I've been thinking about it.

Q. I can tell that. You've been struggling with it.

A. Yes. And I just have not come to a conclusion. I mean, I don't feel this way or I don't feel that way.

Q. That's okay. Let me ask you about the other punishment, life without parole, because that's --

A. That -- to me that is not good either.

Q. That's a pretty severe punishment, isn't it?

A. Yes, it is.

Q. To spend the rest of your life in prison.

A. Yes, it is.

Q. Not get out. I did want to ask you one question about the questionnaire, and this is some -- and I understand you filled it out on your way out of town.

2217

A. I did it hurriedly.

Q. Okay. Well, let me ask you about this one because this was really the only thing that I was in the least concerned about, and it was question number 84. I'm going to read it to you. And it's not a test. Looks like you filled this thing out way back in January, so it's been a while.

A. Yes.

Q. But this question was, Do you think that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder? And you checked -- there were two boxes, one yes, one no, and you checked the no box, and you wrote, It all depends on the circumstances, the crime, the intent,

Page 81

planning. Does that sound about right?

A. You know, I wished if I'd taken the time. I wished I would have made a copy of what I wrote.

Q. I got it.

A. I know, but I don't.

Q. Well, I mean, I --

A. And then I could have gone over that while I was gone and considered some things.

Q. We're not testing to see if people remember exactly what they wrote, but if you'd like to read it, you're certainly welcome to.

A. That's all right.

2218

Q. Here's the reason I'm interested in that, ma'am. Sometimes when people talk to us about I want to hear all the circumstances, I want to hear all the facts, they're talking about the circumstances and facts of the crime; okay? They want to know is this an accidental death or was this a case of self-defense or maybe these people were in a fight and in the heat of passion one killed the other, and they're thinking about those things while we're asking them questions about the death penalty. And they're thinking, well, why would I give the death penalty or life imprisonment to somebody who got into a fight in a bar or who accidentally killed somebody or kills somebody in self-defense, because they don't have enough information about the facts when they're answering these questions; okay?

And what I want to try to be clear about is when we're asking these questions about could you consider life imprisonment as a punishment, we're talking about these facts; okay? You with me?

Page 82

A. Uh-huh.

Q. Five people are dead. They were intentionally murdered. They were murdered after premeditation and substantial planning, and two of them are children. Those are the facts we're talking about. Those are the facts the government's going to try to prove. And if they're able to -- and I grant you that may be a big, big if. We may never get to that point. But if they're able to, there's this potential where the death penalty and life

2219

imprisonment are possible options. And the judge doesn't make that decision. He's told you already this is your call as jurors. Each one of you have to make this decision. It's not even a group process. You yourself in your heart and conscience, you have to decide which is the appropriate punishment.

So I was a little concerned when I saw that answer no life imprisonment, Berrigan, for premeditated, intentional murder, okay, because that's what we have here; okay? And again, I know you've been thinking about this, and maybe your thinking's different; maybe it's not. But we really need to know that. If this is what we're talking about, five people, two kids, intentionally planned, premeditated murder, how do you feel about the possibility of a life sentence? I mean, is that something you could realistically consider as an appropriate and just punishment for that kind of a crime?

A. I don't know. That's difficult.

Q. It's hard. Why is it hard?

A. I guess it's just the idea that it's a human life and whether we're the person to make that judgment.

Q. You mean the person, the juror?

Page 83

A. Well, it's difficult -- it would be difficult I think for me to decide that someone should be put to death. I don't know. And yet I know you should consider the crime. But I just -- see, I'm having trouble with that.

2220

Q. Let me see if I can address that --

MR. WILLETT: Mr. Berrigan, two minutes.

Q. Let me see if I can address that part of it because let me tell you there are a lot of protections and safeguards that the law puts in place, and you've heard many of those already from the judge. This trial, it doesn't go like one section, we find this woman guilty and we're talking about punishment. It doesn't work that way; okay? It's going to take place in three distinct parts, and it's only in that third part we're talking about the penalty. And I've given you the bad stuff; okay?

But there's going to be other stuff that's going to be presented by the defense, things that we're going to ask you to consider in asking for a life sentence, that Angela has no significant criminal history, that as a child she suffered physical, emotional, sexual abuse, that her role in this offense even though she's responsible if she's found guilty is much less than other people that were involved and that that should be considered in assessing the punishment. You with me?

A. Yes.

Q. And then you weigh these things. You weigh these aggravating circumstances, and you weigh the mitigating circumstances, and you don't add them up. You weigh them, whatever they mean to you. You could have one mitigating circumstance that's more important than all the aggravating circumstances or two aggravating circumstances more important

Page 84

than six mitigating circumstances.  Whatever that decision is, it's yours.  It's not the other 11 people's, just you.  Obviously if you found a life sentence, then that is something that you'd vote if you thought that that was appropriate.

What the prosecutor was asking you about is the death penalty.  And you're never forced to do that.  But if you found death was more appropriate and everybody else agreed -- and they might not.  If they don't agree, it's life.  But if everybody else agreed with you, people have to sign a form that says, This is our verdict.  They have to do it.  I mean, that's how you tell the judge it's death, and then he has to impose it.  He has no discretion about that.  But that's a requirement of jury service; okay?  And to do your duty you have to do that, and we need to know whether you can do it?

MR. WILLETT:  Mr. Berrigan, time.

MR. BERRIGAN:  Can she answer that last question?

THE COURT:  Yes, of course.

BY MR. BERRIGAN:

Q.   Could you do that?

A.   I don't know.  I'm sorry.

MR. BERRIGAN:  Thank you.

THE COURT:  Ma'am, why is it that you don't know? It's okay not to know, but I'm curious about why it is you don't know.

PROSPECTIVE JUROR 54:  I just -- I don't know.  I just

think -- I don't know if I'd feel guilty about passing that

judgment on to someone.  I don't know.

THE COURT:  Well, if it's any help, you might want to know how you're potentially in this situation.  The United States Congress decided that in a case where a defendant in federal court faces the death penalty, it's the jury that should make the decision rather than the judge.  So that's something that Congress believed.  Of course, there aren't any Congress people on the jury that have to make that decision.  It's one thing to pass the law.  It's another thing to enforce the law.

And what we're looking for is to find out if you think you could fairly consider both a life sentence and a death sentence, fairly consider both.  And then whatever you decide, if all the other jurors agree and you agree that it should be the death sentence, then you have to sign your name to a verdict form saying that that's your verdict, the death sentence.

If the jurors don't unanimously agree on a death sentence, then it automatically becomes a life sentence, but you still have to sign your name to the verdict form.  Ultimately you have to sign your name to what you have decided.  And I want to know if you think you can do that.

PROSPECTIVE JUROR 54:  I could sign my name, but I don't know if I could --

THE COURT:  If you could --

PROSPECTIVE JUROR 54:  I don't know how I would lean.

2223

THE COURT:  You know, that's okay.  That's okay.  It's okay -- I'm not interested really in which way you lean.  I just -- I'm interested in if you could fairly consider both and then, if you decide on one or the other, follow through with it.

PROSPECTIVE JUROR 54:  Oh, I think I can follow

through.

THE COURT: Okay. And do you think you could fairly consider both penalties, life imprisonment and the death penalty? Do you think you could give fair consideration to both?

PROSPECTIVE JUROR 54: If those are the only choices, that isn't much of a choice, is it?

THE COURT: Well, no, because some people could say, I couldn't consider the death penalty. Or some people will say -- we've had them -- I'd only consider the death penalty in this case; I couldn't consider life imprisonment. And I'm not interested in how you're going to vote. That's solely up to you, and I don't need to know. I don't want to know. I don't know how you can know without hearing all the evidence how you would vote. But we gotta know if after having heard all the evidence could you fairly consider both. That's what I'm looking for. Can you fairly consider both penalties?

PROSPECTIVE JUROR 54: I would hope I could.

THE COURT: Do you have any reservations about your ability to do it? Nobody knows you as well as you do, Juror 54.

2224

PROSPECTIVE JUROR 54: I think it would all hang very heavy with me.

THE COURT: Of course it would.

PROSPECTIVE JUROR 54: But I would --

THE COURT: Ma'am --

PROSPECTIVE JUROR 54: I'd like to think I could carry through.

THE COURT: I would want it to hang very heavy with you. This is going to be, if you're selected to serve on the

Page 87

jury -- I'll tell you something. I've made a lot of tough decisions in my life, lots of them. I've never made a decision as difficult as the one you're going to have to make.

PROSPECTIVE JUROR 54: That's what I'm thinking about.

THE COURT: It's a very heavy decision. And I don't exactly know what the lawyers are looking for for jurors because everybody's kind of looking for a different thing, but I'm looking for people who would take their responsibility very seriously, that it would be a very heavy obligation, and that you would fairly consider both sides and then ultimately give the best decision you're capable of giving after you've looked at both options and fairly considered both. Do you think you could do that? I know it would be difficult, but do you think you could do it?

PROSPECTIVE JUROR 54: I don't know. I don't know if I'm strong enough for that.

2225

THE COURT: And what do you mean by that?

PROSPECTIVE JUROR 54: I think maybe I'm -- I'd get awfully tired. I mean, we're talking about a long session, and I think, could I hold up to that? I don't know. I keep thinking, I wonder if I'm capable of comprehending everything that is going to be presented.

THE COURT: I'm confident you are, but tell me if you have reservations about your ability to comprehend it.

PROSPECTIVE JUROR 54: No, I don't, but, you know, I think am I strong enough to do this.

THE COURT: And what do you mean by that?

PROSPECTIVE JUROR 54: Well --

THE COURT: Physically, emotionally, both?

Page 88

PROSPECTIVE JUROR 54:  Well, I'm thinking emotionally to go through this.  How much wear and tear is that on your emotions?  I think there's a lot.

THE COURT:  You're right.

PROSPECTIVE JUROR 54:  And I'd like to think that I'd be strong enough to handle it, but I think it'd be very wearing.  I don't know what else to tell you.

THE COURT:  No, I hear you.  I think it will be wearing for the 18 people who got selected to serve, but the bottom line is can you fairly consider both punishments?

PROSPECTIVE JUROR 54:  I'd like to think I could.

THE COURT:  Okay.  Okay.  We're going to ask you to

2226

step outside, and I'll let you know your status.  Thank you so much.

(Prospective Juror 54 exited the courtroom.)

THE COURT:  Any challenge for cause by the government?

MR. MILLER:  Yes, Your Honor.  Your Honor, this juror is substantially impaired.  She's struggling with this, and I think she's given us very sincere responses, but several times when asked the specific ultimate question, can you consider fairly both possible punishments, she stated and stated repeatedly, I don't know.  The closest she came to an affirmative response was, I would like to think so.  However, that also follows repeatedly saying, I don't know.

The one time she opened up and gave a response in her own words was when she commented in response I think to Your Honor's question:  It would be difficult I think for me to decide that someone should be put to death.  And that by itself does not disqualify her, but it tells us where she's having a

Page 89

problem, and that combined with the fact that both to my question and Mr. Berrigan's question as to whether or not she could put her signature to a finding of death, she stated that she could not give us the assurance that she could do so. And accordingly, I urge the Court that she is substantially impaired.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Your Honor, we respectfully oppose the

2227

motion by the government. This is a very bright and active 72-year-old woman who has a real genuine concern not about -- in my view not about the punishment so much but the turmoil it's going to cause her to get there. I mean, I think that's what she's trying to tell you. She keeps saying she's concerned, but at the end of the day, I mean, she did say, you know, I could sign my name. One of the responses was quite interesting. I could sign my name, but I don't know which way I would lean. It's not a punishment issue in my view for her. It's just whether she'd get through the emotional turmoil.

If she's a strike, it's a hardship strike. It's not about her views on the death penalty, and I respectfully disagree with my colleague Mr. Miller. I think she's perfectly qualified in terms of her substantial impairment. She's not substantially impaired in my view.

THE COURT: What about her answers to whether she could fairly consider both sides? She said really repeatedly, I don't know. What's your take on that?

MR. BERRIGAN: What she told you -- I think at the very end she finally got to what was really bothering her -- is it's the turmoil of the process, the emotional turmoil. She's

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1941 of 3245

worried about it, and she should be. That's not unreasonable. She's never been through anything like this in her life. She's had a good healthy life it appears. But that doesn't disqualify her from jury service in our view. She never said she was

2228

unwilling to do it, never. She drove an hour and a half each way to be here. This is a woman who values I think her responsibility as a juror quite seriously, and she's expressing concern, genuine concern.

THE COURT: What do you think she meant when in response repeatedly to my questions about whether she could fairly consider both punishments she would say, I don't know?

MR. BERRIGAN: My view of it was that you got to the point where she told you what her concern was which was this is going to be very hard for me, Your Honor. I'm not sure emotionally how I'm going to deal with it. She certainly has never had any experience in this regard, and it will be a tough emotional experience.

THE COURT: But even if it's emotionally driven and she can't fairly consider both penalties, why isn't she substantially impaired?

MR. BERRIGAN: And I think if your view -- if your view is she can't consider both penalties, fine. I didn't hear that. I thought it was very disclosing, frankly, when she said, I could sign my name, but I don't know which way I would lean. How does that work? I can't tell you which way I'm going to go? That doesn't to me even disclose a bias either way, and she said that repeatedly. I really truly believe she's concerned just about the strain of this process on her well being, and that's a legitimate concern, but it's not a death penalty strike in our

Page 91

humble view.

THE COURT: Okay. Thank you.

Mr. Miller, you want to respond?

MR. MILLER: Your Honor, I would urge the Court that if her uncertainty was about what she was ultimately going to do, that would be no problem whatsoever. Her sincere uncertainty is about her ability to do what she's charged with which is to fairly consider both punishments.

I do also cite the Court that we'd have some authority from the U.S. Supreme Court on ambiguous answers expressing reservations in United States versus Tipton where the response was, I don't know if I could make an objective, reasoned, and fair decision about imposing the death penalty, and that's at -- excuse me. I apologize. That's not a United States Supreme Court decision. That's a Fourth Circuit decision from '96 at 90 Fed. 3d 861 at pages 880 to 881. But that's -- other than reiterating what I've urged earlier, I have nothing else to add, Your Honor.

THE COURT: Wow, this is a close one. Well, I've gotta rule. I have -- I can't keep you waiting forever, and I don't have the level of confidence I would like to have in a ruling on such a serious matter, but I tend to see it more Mr. Berrigan's way, although it's a very, very close call. And so my ruling is that I don't believe she's substantially impaired. So would the government like to exercise a peremptory

challenge?

MR. MILLER: Yes, Your Honor.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1943 of 3245

THE COURT: Okay. Thank you. Let's bring Juror 54 in.

(Prospective Juror 54 entered the courtroom.)

THE COURT: Ma'am, thank you so much. We're going to let you go from jury service in this case. But let me just add that I and I know the lawyers were incredibly impressed by how thoughtful you've been and how much thought you gave this. And while I made the decision to let you go, a huge part of me thinks you'd be an absolutely terrific juror. You're absolutely what I'm looking for. I think you'd be incredibly fair. I also think it would be very, very, very hard on you as it should be, maybe too hard. And so we'd love to have you back here maybe on a shorter case.

PROSPECTIVE JUROR 54: I'd appreciate that.

THE COURT: I think you'd be a great juror, and thank you so much for coming in, and thank you so much for really working so hard to give us such honest, albeit struggling, answers that you gave us.

PROSPECTIVE JUROR 54: I think it is a struggle.

THE COURT: Well, it is a struggle. It's not going to be an easy decision.

PROSPECTIVE JUROR 54: No.

THE COURT: Could you do us a favor? Northwest Iowa's

2231

kind of small populationwise, so we'd appreciate you not talking about this to any of your friends because they might say something to somebody else, and that somebody else might be in this jury box next week for us to interview. Once we get the trial underway the week after next, you can talk as much as you want; okay?

Page 93

PROSPECTIVE JUROR 54:  All I would say is I've been dismissed.

THE COURT:  Yeah, you can say that.  You bet.  You can say -- and you can say the judge was --

PROSPECTIVE JUROR 54:  And I'll say whew.

THE COURT:  You can say the judge was kind of mean, but those lawyers were really friendly; how's that?

PROSPECTIVE JUROR 54:  Okay.  I appreciate it.  I appreciate it all.  Thank you.

THE COURT:  Thank you so much, ma'am.

(Prospective Juror 54 exited the courtroom.)

THE COURT:  You ready for 787?

MR. BERRIGAN:  Yes.

MR. MILLER:  Yes, Your Honor.

(Prospective Juror 787 entered the courtroom.)

THE COURT:  Sir, if you'd please take any chair in the front row.

Everybody can be seated.  And you're going to be questioned first by Mr. Berrigan.

2232

PROSPECTIVE JUROR 787:  Okay.  Sit?

THE COURT:  Yeah, anywhere.  Any chair you want.  Thanks.

                    EXAMINATION

BY MR. BERRIGAN:

Q.   How are you this morning, sir?

A.   Good.

Q.   Good.  It's not quite as bad as a root canal, so hope you relax.  We're only going to talk to you about a couple of issues for a few minutes, and they're both, we hope, pretty easy things

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1945 of 3245

for you to talk about. One has to do with publicity and your exposure to media coverage about this case. And we saw in your questionnaire that that didn't seem to be a problem. You said you didn't know anything about this case, hadn't heard anything, you were not at all familiar with it, and hadn't formed any opinions about it as a result. That sound right?

A. Yeah, until lately on TV I seen a little bit of it.

Q. Okay. I wonder if you could tell us a little bit about that.

A. It's just what he was sentenced for, and that basically is about it.

Q. And when you say when he was sentenced, could you elaborate on that a little bit?

A. It was the punishment that he was receiving for his crime.

Q. And who are you talking about?

2233

A. I couldn't even tell you the name.

Q. Was that the other -- the Mr. Honken mentioned in the --

A. Yes.

Q. Okay. Where did you see that by any chance?

A. It was on the news channel. I don't remember what channel, but I've seen it probably four times now.

Q. You mean you've seen the same piece four times or four different things?

A. No, it's basically the same thing on different channels.

Q. Okay. Was there any other information given other than something about the conviction?

A. No, no.

Q. Did you say you heard something about the sentencing?

A. Yes, that he was sentenced to death.

Page 95

Q.   Okay.  Was there any mention made in these TV pieces about Angela?

A.   It showed a picture of her.

Q.   Picture of her?

A.   Showed her walking from I don't know what building to a -- I believe a squad car of some kind.

Q.   Was she dressed as nicely as she is today?

A.   No.

Q.   I don't imagine.  What did she look like in the picture?

A.   Quite a bit different.

Q.   Could you tell us?

2234

A.   I don't believe she was wearing glasses, and looks like hair was all messed up, wearing orange if I remember right.

Q.   Did you happen to notice whether or not she appeared to be in handcuffs?

A.   Pardon me?

Q.   Could you tell us whether you noticed in the picture whether she appeared to be in handcuffs?

A.   I believe she was.

Q.   Did you have an impression or not as to whether she was in custody in this picture?  You know what I mean by that?

A.   Well, to me it appeared she was in custody, yes.

Q.   Were there law enforcement people with her?

A.   Yes.

Q.   And how many times did you happen to see that picture?

A.   I've seen that one twice.

Q.   Twice?

A.   Yeah.

Q.   Has it been on the news both times?

Page 96

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1947 of 3245

A.    On the news, yes.

Q.    Have you seen anything in the newspaper recently?

A.    No.

Q.    Just the television news.

A.    Yeah.

Q.    What news channel do you watch?

A.    Either 9 or 4.

2235

Q.    And how often do you watch the news?

A.    Not very often.  I'm not home all that much.

Q.    Those news accounts, did you happen to discuss them with anybody?

A.    There's been a few people that have talked to me about it, but, I mean -- that they had their opinions.  I have mine.

Q.    What did they tell you in terms of their opinions?

A.    Well, they just -- I guess they just feel the people that are involved in it, yes, they should pay the price.

Q.    And what did you -- were those the words they used, pay the price, or are those your words?

A.    Well, they used some very harsh words.

Q.    Would you mind relating that to us, sir?  They're their words, not yours.

A.    Right.  They basically said that the bitch should be killed also.

Q.    Okay.  You said they had their opinions and you have yours. And so obviously I need to know what your views are.  We all do.

A.    I guess, you know, whether or not she was involved one way or another, I have no idea, but I guess my opinion is when one is arrested for a crime, apparently there is some involvement there one way or another.

Page 97

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1948 of 3245

Q. These folks that were talking to you about Miss Johnson's -- their view or their opinion about her punishment and guilt, are these friends of yours or people you work with,

2236

or how do you know them?

A. People I work with.

Q. Okay. And, you know, usually in these discussions it's a give-and-take situation. I mean, you're not all ears. Did you not tell them how you felt, and if you did, what did you say to those folks?

A. I didn't say nothing to them.

Q. Nothing at all.

A. I walked away.

Q. Okay. And how long ago would you estimate this was that these conversations took place?

A. Probably three weeks ago.

Q. Okay. Let me ask you a little bit about the last thing you said, you know, and I don't want to put words in your mouth, but that kind of sounds like a guilt by association kind of a deal; right? Have you heard that term before?

A. Yes.

Q. Is that how you feel about Miss Johnson's situation?

A. No.

Q. Tell us how you feel.

A. Well, to me everybody's innocent until proven guilty, but, you know, I guess you're arrested for a crime. Apparently there's something to it. I don't, you know . . .

Q. Well, this isn't like a parking ticket either, you know; right?

2237

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1949 of 3245

A.  Right.

Q.  And you have some people you work with expressing their views, and I guess you didn't say anything to them, but you didn't indicate that you disagreed with them.

A.  Right.  I just walked away from them.

Q.  Okay.  Sometimes we've had folks frankly come in and say, Look, I've had this exposure; I read this in the paper or saw this on television or heard this on the radio, and I have an opinion about the case.  You know, I read the paper, and I rely on it, and that opinion is just, you know, inconsistent with their ability to be the fair and impartial juror they need to be in order to sit as jurors; okay?

A.  Uh-huh.

Q.  And, you know, 99 percent of the time somebody sitting at that table is a criminal defendant, and they're charged with bank robbery or stealing a car or whatever it is.  Folks come in.  They've never heard of the case.  They don't know that person from Adam.  You know what I mean?

A.  Yeah.

Q.  Then we have some situations like this case where because of exposure in the press we have more problems.

A.  Uh-huh.

Q.  It's really critical because of this issue, this idea that Miss Johnson's entitled to the presumption of innocence.  I mean, you already voiced that.  You understand that concept;

2238

right?

A.  Yes.

Page 99

Q.   And if you didn't know anything about her, I dare say you'd be sitting there saying, Hey, no problem for me, Berrigan, because I don't know anything about this case.  I never talked to anybody, never heard anybody talk about it, et cetera.  But I do have a little concern that what you do know, what little you know, may raise an issue with your ability to fully give her the complete presumption of innocence that the law entitles her to.

A.   Right.

Q.   Yeah.  So how -- what could you tell me about that?  Is that something you have a concern with yourself?  I mean, we can't read your mind, but we have to rely on your honest and truthfulness in answering these questions.

A.   Well, I do, yes, you know, I mean.  I guess, you know, like I told you before, if you're arrested for something, whether -- you know, you're innocent until proven guilty, but apparently there's something to it.  Otherwise you would have never been arrested to start with, you know.  And what other people have told me like I told you just a little bit ago, that kind of sticks with me, you know.  There's a lot of different things.  And a lot of times people that I work with, they -- they got strong opinions, you know, and it's hard for me to deal with them.

Q.   You know, and some of this stuff is beyond our control, and

2239

some of it isn't, but what's important is that the judge -- and he's, I think, already mentioned it to you, but just to be clear, there's really no question that this presumption of innocence that we're talking about, that's the law.

A.   Right.

Q.   And it has to apply not just now but throughout the course

Page 100

of the trial. And if a juror has a problem with that and even if they have some doubt in their own mind about whether or not they're going to be able to do that, they just need to tell us. And I'm sort of hearing you saying you think that's going to be a problem for you.

A. I believe so, yes.

Q. Okay. Even if you were told you had to put all that stuff completely and utterly out of your mind and presume Miss Johnson to be innocent, completely innocent, you think you would be unable to do that.

A. Yeah, I believe it'd be a problem for me to be able to do that.

MR. BERRIGAN: Well, I appreciate your candor, sir.

I don't have any other questions, Your Honor.

THE COURT: Mr. Miller?

MR. MILLER: No questions, Your Honor.

THE COURT: Would you join in the defendant's motion if they would make one?

MR. MILLER: Certainly.

2240

MR. BERRIGAN: Defendant will move for cause on Juror Number 787, sir.

THE COURT: Okay. Thank you. Sir, we're going to go ahead and excuse you from jury service. Thank you very much for participating and filling out the questionnaire and answering all our questions. I was very impressed by how honestly you answered everything.

Could you do us a favor and not talk about this at least for another week until we get the jury selected, because you might say something to somebody; they might say something to

Page 101

somebody else, and that somebody else might be sitting here next week being questioned; okay?

PROSPECTIVE JUROR 787: Okay.

THE COURT: Thank you so much. Good luck to you.

(Prospective Juror 787 exited the courtroom.)

THE COURT: Want to do one more?

MR. BERRIGAN: Sure. Might as well.

THE COURT: 255.

Get you on the road earlier.

(Prospective Juror 255 entered the courtroom.)

THE COURT: Juror 255, any chair you like. Thank you. We're going to start with Mr. Miller from the prosecution.

EXAMINATION

BY MR. MILLER:

Q. Good morning, Juror 255.

2241

A. Morning.

Q. How you doing so far?

A. Good.

Q. We just want to visit with you about two matters. First we want to just visit briefly about any information you may have about this case other than what was in the questionnaire and secondly visit with you briefly about the death penalty; okay?

A. Okay.

Q. Let me just look in here. Did you recall having heard about this case before you received the questionnaire?

A. No.

Q. And since you received the questionnaire, have you heard anything further through the news media or any other source?

A. No.

Page 102

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1953 of 3245

Q. And finally I take it -- correct me if I'm wrong -- I'm assuming that you haven't formed any fixed opinions about the merits of the case.

A. I have not.

Q. Very good. We appreciate you filling out the questionnaire. I noted that you were willing to express your thoughts about these matters and indicated that you felt both the death penalty and life in prison were appropriate options.

A. Correct.

Q. Now, you've never been on a death penalty trial before I'm sure nor had any other particular reason to focus on the issue

2242

as much as you've had in the last few weeks. I'm just wondering if you've given this any more thought and if you could share any more fully with us what your feelings about the death penalty are if you have any other or additional feelings about it.

A. I really put it out of my mind because I didn't know what would happen, so I just kind of left it alone.

Q. Okay. So what you put down in paper is your freshest thoughts because you haven't been thinking about it a lot since then.

A. Correct.

Q. Very good. Let me just remind you then, what you wrote and as I read it says -- and you have good-enough penmanship for me to read.

A. I hope.

Q. It says, If the defendant did do this, then the death penalty or prison for life is what she deserves. Can you just go ahead and tell us, expand on that at all? Were you just basing that upon what the questionnaire told you the accusations

Page 103

were in this case?

A.   Correct.  I just went with, okay, what if she was guilty; how would I feel if I had to sentence her?  And so I just kind of played that scenario through my head.

Q.   And you felt comfortable with both possible options.

A.   Yes.

Q.   Very good.  Now, this morning for about an hour Judge

2243

Bennett described the process for you, and a portion of his explanation was a description of what your job would be, at least a summary of what your job would be in the third phase of the trial if it ever comes to that, in other words, a little overview about how that third phase works and that jurors would be asked to consider and weigh any factors in evidence going in either direction, both factors that might be aggravating or tending toward a death penalty and factors that might be mitigating or tending toward life in prison.  Did you follow along?  Do you recall the judge's description of that process?

A.   Yes, I do.

Q.   Did that make sense to you, ma'am?

A.   Yes, it did.

Q.   Do you feel that's something you could do?

A.   Yes.

Q.   Okay.  Very good.  Let me ask you this.  You understand the allegations are that Ms. Johnson participated in the killing of five people in connection with a drug conspiracy.

A.   Correct.

Q.   And the government further alleges that two of those five victims were particularly vulnerable people, specifically children.  You understand those are the allegations.

Page 104

A. I do.

Q. Those are very serious allegations; fair statement?

A. Yes.

2244

Q. If the government proves those allegations beyond a reasonable doubt, this third phase might ultimately land in your lap, so to speak, as a juror with the responsibility of passing judgment. With those facts, do you still feel you could fairly consider both possible options and give such weight as you deem appropriate to all the factors the judge instructs you to consider?

A. I do believe I could.

Q. Life in prison would be a potential option for you at that point.

A. Yes, it would.

Q. And the death penalty would be a potential option for you at that point.

A. Yes.

Q. One of -- a possible mitigating factor might be the level of involvement. If, for example, it is someone else who pulled the trigger in connection with this case and the defendant here assisted and participated but did not actually squeeze the trigger on the gun that took the life of the individuals, could you still fairly and reasonably consider the death penalty as a possible option?

A. I think I could.

Q. Ultimately should you be on a jury that finds Ms. Johnson guilty beyond a reasonable doubt and all the way through the third phase ultimately decides that the appropriate punishment

2245

Page 105

is the death penalty in this case, under those circumstances, ma'am, you could not reflect that verdict without each one of you signing your names, your signatures, to a verdict form that would have the real effect of imposing the death penalty on the defendant.  Do you feel that you could do so under those circumstances, ma'am?

A.    Yes.

MR. MILLER:  Thank you very much.

THE COURT:  Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q.    Not so bad, is it?

A.    I feel like I'm on trial.

Q.    Well, we don't mean for you to feel that way.  But it's obviously an important thing that we're doing to try to fit maybe the most appropriate jurors to this particular case.  And we appreciate your openness and your honesty in that process, ma'am.

I had a chance to look through your questionnaire, and one of the things that struck me is that you are a person who seems to believe in the concept that if people make choices in life that there are consequences to those choices.  Did I kind of read that right?

A.    That's correct.

Q.    Could you expound on that a little bit for us?

2246

A.    Consequences, we all have consequences.  No matter what we choose, pick, or do every day, there's a consequence good or bad, heavy or light.  There's always a consequence.

Page 106

Q.   Sure.  What about a person's background affecting their decision making in regards to those choices?  Do you believe that that really has any effect or not?  In other words -- oh, go ahead.

A.   No, go ahead.

Q.   I was going to give you sort of a scenario if you would --

A.   Okay.

Q.   -- where you're a judge and you're up on the bench with the black robe making the big money and two defendants come in front of you and they've committed exactly the same crime not together but exactly the same crime.  And it happens that one of the defendants is a person, you know, who had a normal childhood, lived with loving parents, had every opportunity, went to school, got a good education, really no problems or anything special in any traumatic way.  And the other person really had quite a different life experience as a younger person and perhaps lived in a single-parent household.  There may have been physical, sexual abuse, certainly neglect, a lot of problems with education.

But here they are, and they've committed this same crime, and you have the discretion in terms of punishment in terms of what to do.  What would your view be in terms of how to

2247

treat those people in terms of punishment I mean?

A.   If they both did exactly the same thing?

Q.   Yes, ma'am.

A.   They'd both get the same consequence.

Q.   Okay.  Why would you do that?

A.   Because they both did the same thing.  It doesn't matter how you were brought up.  You did the act.  There's a

Page 107

consequence.

Q. Okay. And I sort of saw that in the questionnaire. It seems like that was how you felt. In fact, you said -- in the death penalty response that Mr. Miller referenced, how do you feel about the death penalty, you said, Life is full of choices, and we all have to make them daily, right or wrong. Does that reflect it?

A. (Nodded head.)

Q. You were asked why you felt that way. You said, Every choice has a consequence, and this is the worst thing one person can do to another, and I suspect you meant murder.

A. Correct.

Q. I also saw that your criminal justice -- there's a question about what do you think the problems are with the criminal justice system. Let me tell you, we've had answers all over the board, and I think one of them on today's panel was accusing judges of taking bribes.

A. Oh, dear.

2248

Q. Yes, there was one. I don't know if we've gotten to him yet. Slow to come to trial; the accused has more rights than the victims; not stiff-enough penalties. Those were things that you thought were of concern to you, and those are -- you're not alone in that regard. But I'm interested in that because one of the questions that you answered regarding the death penalty had to do with this proposition of an eye for an eye. Let me see if I can find it here real quickly. It's question 78, Do you believe in an eye for an eye? And there were two boxes there, one yes, one no. And I know you filled this out in January. I'm not trying to test your responses, but you checked yes, and

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1959 of 3245

you said, The victims didn't, did not, get a choice. And I've certainly heard that many times expressed before. But what do you mean by that?

A. An eye for an eye?

Q. Yeah, an eye -- do you believe in an eye for an eye? Yes, the victims didn't get a choice. It's the latter part that I'm really interested in.

A. I guess I really don't know how to answer that right now.

Q. Okay.

A. At the time -- yeah, you're kind of in the middle of that -- yeah.

Q. I'll tell you how some folks answer. Let me see if this helps you. It may not. Some people tell us, Hey, look, this is the deal. If you make a choice to kill somebody, okay, you're

2249

going to intentionally murder somebody -- and let me be clear. That's the allegation in this case, five people intentionally murdered. Not only that, but the murders were committed after premeditation and substantial planning; okay? Many people have said, Look, if you're going to make a choice to do that, you made two choices there. You made the choice to kill somebody. You made the choice to forfeit your own life because that's a consequence of your first choice. Those two things are inseparable which is fine. I don't know if that's your view. You're kind of nodding with me.

A. Yes.

Q. Is that how you feel?

A. That's how I feel.

Q. Okay. And you reflect that in the questionnaire in question 84 which says, Do you think that life in prison without

Page 109

the possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder? And on that question you said, No. They took a life, and a life they must give. There has to be justice and closure for all the families involved. Does that sound right?

A. That's correct.

Q. Is that how you feel?

A. That's how I feel.

Q. Okay. So here we have this scenario where we're asking you to do something. I know that's difficult for most people, and

2250

that is to fast forward yourself where you've heard this evidence in the case. And what it has persuaded you beyond a reasonable doubt is that five intentional murders have been committed, and they've been done with premeditation and substantial planning, okay, and that of those five victims, one's a mother and her two children, Kandi Duncan, ten years of age, her sister Amber, six years of age.

Now, if this is your view -- and I'm not quarrelling with it. Please, I'm not trying to get you to change your mind. We have people come in and tell us all kinds of things. You're entitled to your opinion, more than entitled to it. We respect it. But if that's your view, okay, look, Berrigan, life for a life, you take somebody's life, your consequence is your life, then I'm wondering that if you found that situation -- and I know that's a big if. But if you decided beyond a reasonable doubt this is the case of premeditated murder of five people and two children, I mean, realistically would you be able to consider a life sentence in such a case as that?

A. I think I could, yes.

Page 110

Q.    How does that square with this stuff you're telling us, life for a life?

A.    Well, you asked me to fast forward.  And how can you -- there's no way of knowing what I will do until it gets there.

Q.    Yeah, that's our dilemma.  You know what would be great is you listen to all the evidence and we're going to take a break

2251

and then we question the jurors, well, what do you think now, but that's not going to happen.  There's just no way we can do that.

A.    No.

Q.    We'd need a hundred people in the room listening to the case just to be able to get rid of the people that would say, Hey, forget about it.  So we have to rely on what you're going to be able to tell us now, and we're relying a lot on what you're telling us in these questionnaires because when people fill this out at the kitchen table, there aren't any lawyers there; there's no judge there.  And for the most part when the people sign on the -- they sign on the dotted line where it says, I declare under penalty of law I've answered truthfully and completely all questions in this questionnaire, most people mean it.  They mean it.  And they took a lot of time to fill these out, and I can tell you did.  And it's okay if how you feel is different than what the law requires of jurors.  There's no penalty for that.  It's just like the judge told you.  You know, you serve your country just as well by telling us, Hey, maybe this isn't my case.

        But it's critically important.  I mean, I don't want you to even imagine yourself as Angela Johnson.  But you could see if you were any criminal defendant how much you'd want to

know about the 12 people that were judging your fate much less your life.  So we have to just rely on what you're telling us;

2252

okay?

I'm sensing that for the death penalty given these views certainly that's not a problem.  You'd certainly be able to consider that.

A.    (Nodded head.)

Q.    But for this kind of a case if your view's as you've expressed, how would that work?  How would you be able to consider a life sentence on five intentional, premeditated murders including two children?

MR. WILLETT:  Two minutes, Mr. Berrigan.

A.    I can't answer that.

Q.    Okay.  Let me ask you this -- are you a football fan by any chance?

A.    Kind of.

Q.    Okay.  You know what the field looks like; right?

A.    Right.

Q.    Let's imagine the 50-yard line is somebody who walked in the door and said, you know, I've never given one second's worth of thought to life imprisonment, the death penalty, or anything else.  I've got absolutely no preference either way.  And then we're going to have you; okay?  And I said to you, Okay, listen. Let's take this off.  Five intentional murders.  One end zone's death.  One end zone's life.  That's all you have.  Five intentional murders, where are you on the football field?

A.    Probably death.

2253

Page 112

Q.   Death.   You're in the end zone?

A.   (Nodded head.)

Q.   Well, if I put on substantial planning and premeditation, are you with the cheerleaders and the band?

A.   Probably.

Q.   And I've got the kids now.   You're up in the -- you're up in the Bob Uecker seats; right?

A.   (Nodded head.)

MR. BERRIGAN:   Well, listen, I appreciate your candor. Thank you for your time.

THE COURT:   I just want to make sure I understand.   In this case based on what you know so far -- and I know you don't know a whole lot about the case other than what the lawyers have told you and what you read about in the questionnaire.   But in this case, five murders, two children ages six and ten, little girls, if you sat as a juror in this case and you got to the penalty phase, do you think you could fairly consider life imprisonment as a sentence?   And I don't mean just give it a wink and a nod and then impose the death penalty.   I mean give it every fair consideration, look at all of the factors that you'll be allowed to look at and then make your decision.   Do you think you can fairly consider a life sentence?

PROSPECTIVE JUROR 255:   Fairly consider, yes, I could.

THE COURT:   Well, how does that -- how is that consistent with your answer to Mr. Berrigan's question about

2254

where you are on the football field?

PROSPECTIVE JUROR 255:   I -- it's hard to fast forward.   You can't --

Page 113

THE COURT: Well --

PROSPECTIVE JUROR 255: I feel like I'm on trial.

THE COURT: Why do you feel that way?

PROSPECTIVE JUROR 255: Because you're asking me to make a decision --

THE COURT: Nope, nope.

PROSPECTIVE JUROR 255: No, but you're playing the scenario.

THE COURT: You're not understanding my question. I'm not asking you to make a decision. It's the exact opposite. I'm asking if you could fairly consider two alternatives. That's not making --

PROSPECTIVE JUROR 255: And I said yes, and now you're --

THE COURT: Okay. You did say yes, but in response to Mr. Berrigan's question, you said you were in the end zone of the death penalty. So which is it? Well, I'm sorry you feel the way you do, ma'am, but I'm not going to allow somebody to sit on a jury who doesn't answer our questions. It's not that simple, and if you can't accept that, fine, and I'm sorry you feel on trial, but I have an obligation to make sure this defendant gets a fair trial.

2255


PROSPECTIVE JUROR 255: Correct.

THE COURT: And the only way we can do that is to ask jurors questions.

PROSPECTIVE JUROR 255: Sure.

THE COURT: And I know it's an unusual situation to be in this big federal courtroom sitting all by yourself in the jury box and having all of us staring at you and putting you

Page 114

under the limelight and grilling you. I understand that. That's not a comfortable thing, and I apologize for that. But I hope you understand it has to be done.

PROSPECTIVE JUROR 255: Yes.

THE COURT: And I'm just trying to figure out if you could fairly consider a life sentence in this case.

PROSPECTIVE JUROR 255: Probably not.

THE COURT: Okay. And that's fine. We've had people come in and say, Are you kidding me? Consider a life sentence? Absolutely not. They're not even open to the possibility of it. I think you've given it a lot of thought, and it's not easy. But the reason why we have to get the answers from you is we can't read your mind. And, Juror 255, you know yourself better than any of us ever could or would. And so I appreciate it. I apologize if I've offended you or if this has been -- I know it's hard. This is hard stuff.

PROSPECTIVE JUROR 255: It's a life.

THE COURT: It is. It's a life at stake. It's very

2256

hard stuff. And I'm impressed by the fact that you don't come in here and give us some flippant answer. You've given it a ton of thought. It's obvious that you've given it a ton of thought. So I want to thank you for that. If you'd step outside, we'll let you know; okay? Thank you.

(Prospective Juror 255 exited the courtroom.)

THE COURT: Isn't it the government's turn?

MR. BERRIGAN: Yes, sir.

THE COURT: Yeah.

MR. MILLER: I have no motion.

THE COURT: Okay. But I always -- I'm just trying to

Page 115

give you the opportunity.

MR. MILLER: I appreciate that.

THE COURT: I didn't expect that you would.

MR. BERRIGAN: And I'm not going to answer any more questions before I should, Your Honor. I fouled up a peremptory the other day, but we move to strike Juror Number 255 because we believe her views about the death penalty substantially impair her ability to consider a life sentence as a fair option.

THE COURT: And I agree. She's substantially impaired. She could not fairly consider a life sentence in this case. Let's bring her in.

(Prospective Juror 255 entered the courtroom.)

THE COURT: Juror 255, we're going to let you go from jury service in this case. Thank you so much for your

2257

participation today, and I know it's been a struggle for you. I know that's been hard, but we really appreciate you're very, very conscientious, and we're all very impressed by how conscientious, how seriously you've taken this. And on one hand, I think you'd make a terrific juror. On the other hand, I think it would be a huge toll on you personally. And so we'd like to have you back here maybe on another case that's maybe not so long and maybe not so difficult. So good luck to you.

Could you do us a favor? Because we're going to be doing jury selection all next week, we'd appreciate it if you wouldn't say anything about the process. I mean, you can tell your spouse or something, but if you just talk to everybody about it, that might be repeated to somebody else, and that somebody else might be here next week.

Okay. Good luck to you. And thank you so much.

Page 116

(Prospective Juror 255 exited the courtroom.)

THE COURT:   45-minute recess?

MR. BERRIGAN:   Yes.

MR. WILLIAMS:   Very good.

THE COURT:   Well, we're down to two.   Thank you.

(Lunch recess at 12:03 p.m.)

THE COURT:   Okay.   Ready for 788?

MR. BERRIGAN:   Yes, sir.

MR. MILLER:   Yes, sir.

THE COURT:   Okay.   Thanks.

2258

(Prospective Juror 788 entered the courtroom.)

THE COURT:   Sir, anywhere you want to sit in that front row will be fine.

Everybody can be seated.   And we're going to start with Mr. Berrigan.

EXAMINATION

BY MR. BERRIGAN:

Q.   How are you, sir?

A.   I'm doing fine.   Thanks.

Q.   You've been really patient.   We really appreciate it. We're not going to be too long with you.   There are just two areas, one of which might be really short, and that has to do with publicity or your exposure to media coverage about the case either through television, radio, or perhaps the newspapers. And, of course, we have the benefit of your questionnaire, and on behalf of everybody, let me thank you for filling that out. But your questionnaire indicated that you had only just heard about the case on television.

A.   Right.   I don't subscribe to the Journal.

Page 117

Q. Do you get any paper regularly?

A. No. Darn.

Q. You don't seem terribly upset about it. Tell us what you've seen on television about the case, please.

A. Not too much. I just remembered that I'd seen something about something happening and that there was -- I picked up more

2259

of it around here I think just today from you guys talking than I'd heard.

Q. And, of course, there was some information in the questionnaire.

A. Yeah, that information also.

Q. Okay. If I suggest --

A. I didn't have that much.

Q. You didn't have that much, okay. Did you hear anything about anybody else being on trial for these crimes other than Miss Johnson?

A. No.

Q. Your questionnaire made it clear that you had not formed an opinion regarding at least Miss Johnson's guilt or innocence.

A. No.

Q. Is that right? Let me see if I've got that -- yeah. You did have an opinion about punishment if she were found guilty, and I know that was based on very limited information.

A. Right.

Q. She should be locked up for life. Does that sound right?

A. Yeah.

Q. Okay. All right. Well, let's switch over to that subject.

A. Okay.

Q. Because we're going to give you a little more information

Page 118

today so you can kind of tell us where you are. And I hope you'll kind of put these questions in the context in which

2260

they're meant --

A.    Okay.

Q.    -- which is we are trying to do something that's very hard, and that is to ask jurors to put themselves cart before the horse in a situation where they really haven't heard any of the evidence in the case. And we're asking them to pretend they have; okay?

A.    Uh-huh.

Q.    And many people have expressed some real concern about that process, but unfortunately, the way this trial process works -- and I know you've had some jury experiences -- we don't get to question the jurors after the trial starts. So we can't go through and wait and see whether the jury finds Miss Johnson guilty and then ask questions about punishment. It would be pretty impractical, don't you think?

A.    Yep.

Q.    So here we are. And I don't want you to get the impression -- and I hope I won't convey this -- that I think Angela Johnson's guilty or anybody on her defense team does because I'm asking you questions about punishments; okay?

A.    Okay.

Q.    Okay. You see the reason we have to do this.

A.    (Nodded head.)

Q.    Okay. Well, here's the situation that I'd like you to imagine yourself in, that you've actually heard the evidence;

2261

Page 119

okay?

A. Okay.

Q. And by that I mean the government has presented weeks worth of testimony that has to do with every aspect of the crime, who, what, where, why, and when. You with me?

A. Uh-huh.

Q. And the allegations have been Miss Johnson either participated in or herself intentionally killed five people; okay? That's the nature of the allegation here. And now the jurors, of course, are going to have to make that determination, and the government has to prove it beyond a reasonable doubt. For the purposes of our discussion about punishment, I'm going to ask you to assume that that's occurred; okay?

A. Okay.

Q. You sat on the jury. You listened to the evidence. You and your 11 fellow jurors talked to each other, deliberated, and that's the decision you came to, proven beyond any reasonable doubt.

A. Okay.

Q. Then the government's going to try to prove that these murders were committed after premeditation and substantial planning; okay? The record won't reflect your eyebrows going up about two inches, so I should mention it. But yeah, that's pretty serious stuff; right?

A. Yes.

2262

Q. I mean, we're kind of kidding about it, but, I mean, obviously that's pretty serious allegations. Not only were these intentional murders, they're premeditated and substantially planned murders; all right?

Page 120

A.   Okay.

Q.   Now again we're asking you to, for this exercise, presume that's been proven beyond a reasonable doubt to all 12 jurors because that's what the government would have to do; okay?  And then it gets worse, that of these five, one's a mother and two of them are children, her children, Kandi Duncan, ten years of age, Amber Duncan, six years old; okay?  The government would attempt to show those children were vulnerable victims.  That's what the reference is under the law.

A.   Yes.

Q.   And so that is the scenario that we find ourselves in when we start to talk about punishment; okay?  And as the judge explained to you, there's a process involved, these three steps. But we're asking you to kind of cut to the chase and here we are.  And I know from your questionnaire that the children part is something that's of particular concern to you.  Am I right?

A.   Yeah.

Q.   Tell us.

A.   Well, we just had recently in the news -- I don't know any specs on those cases, but I think there's three or four kids that have been abducted and they were taken out and tortured and

2263

then raped, and I think one was buried alive.  See, those I don't have any trouble with at all.

Q.   Sure, sure.  I think everybody is sensitive to children.  I mean, you have grandchildren, almost ten.  And some people are more sensitive about that issue than others to be honest.  I know your wife takes care of your grandchildren.

A.   Sometimes occasionally.

Q.   You mentioned that in your questionnaire, and you wrote to

Page 121

us and said, Hey, look -- and I know you probably did this a long time ago, so I'm going to help you, see if this rings a bell.

A.    Okay.

Q.    Question 99, In your opinion is there anything about this case, the issues, and/or the people involved in this case that might hinder you even slightly from being an impartial juror? And then there were two boxes, a yes box and a no box, and you checked the yes.  And you said, If they are proven to have killed children, then I feel they should die also.

A.    If they tortured them and killed them.

Q.    Okay.  I don't want to suggest to you there's going to be evidence of torture when I don't truly believe there will be any evidence of torture, but I don't know what your definition of torture is, so why don't you tell us what that means to you.

A.    Well, I don't know other than I think the ones that have been in the news recently have been.

2264

Q.    Okay.  And I -- as the judge might have mentioned, I don't live around here.

A.    Yeah.

Q.    I guess I'm almost glad to say I'm not familiar with those cases, so I don't know what happened there.  But when you're talking about torture, are you talking about physically tortured, mentally?

A.    Killed and raped.

Q.    Killed and raped, okay.  Well, there's no allegation here certainly of any sexual assaults of any nature.  I don't know if that's --

A.    That's part of it, yeah.
Page 122

Q. But we do have children killed.

A. That's not good.

Q. No. That's right. It's not good. And you can understand why I'm asking these questions; right? I mean, if you were in a situation, God forbid, where you were ever charged with a crime, one of the things you'd want your lawyer to know is who are those people that are going to decide my fate.

A. Uh-huh.

Q. And the judge pointed out earlier, I mean, it's part of your duty to serve, and it's part of your duty not to serve because there are some cases we don't fit -- we don't fit into them. And that's why I'm interested in your views about kids because I don't know if this is one of those cases for you.

2265

A. That's one of those tender points for me.

Q. Yeah, yeah. See, in this situation even as bad as that is, the law doesn't dictate the punishment.

A. No.

Q. It doesn't do that.

A. No.

Q. And yet some people have quite candidly said to us, Hey, okay, maybe not, Berrigan, but let me tell you something. In fact, they don't need anything more than that. They've come in and said, That's enough for me. You kill some people intentionally, five of them, what are you talking about, life? And then we have this, premeditation, kids. The game's over. And that's okay. I mean, those views are perfectly acceptable. Everybody has views about this. We just kind of need to know about them. So you tell us if your concern about kids is such that if they're proven to have killed children I feel they

Page 123

should die also. And again, perfectly --

A. In cold-blood murder, children, that's pretty bad.

Q. Yeah. We're not -- nobody's saying otherwise.

A. Okay.

Q. But is that --

A. Beyond a reasonable doubt you're talking all the way down, there isn't any shadow of a doubt --

Q. Well, we don't use shadow of a doubt in the law. We use beyond a reasonable doubt, whatever that is to you. The judge

2266

will give you a definition. But if it's proven to your satisfaction beyond a reasonable doubt, that's where we are. And then I'm wondering whether or not in that type of a circumstance -- and I give you that's a big if. But if we got to that point, okay, and you feel this way, would you realistically ever consider a sentence of life imprisonment as sufficiently just punishment for that kind of a crime?

    MR. WILLETT: Mr. Berrigan, two minutes.

A. The only thing is you'd have to be sure that it wasn't one with parole because right now South Dakota's got one where the gal was put in for life in prison.

Q. Yeah.

A. And they are up for parole.

Q. Well, it's like the judge told you. When he said it, he meant it. Parole, no parole. This is, you know, that's it. You're finished. You never get out; okay? But I -- it's this language here, if you kill children, I feel they should die also. That doesn't say parole. That doesn't say prison. It says you kill --

A. Cold blooded kill children.

Page 124

Q.    Yeah, that's it.  We're okay with that.  But what that suggests is that I couldn't really consider life imprisonment.  That's death.  If you took the lives of kids, then you forfeited your life.

A.    In cold blood, premeditated.

2267

Q.    You tell me.

A.    Yeah, that's -- I don't have -- I feel that way.  If you cold bloodedly planned ahead, killed children, that's . . .

Q.    That's how we should --

A.    If they're proved that they cold bloodedly planned to kill two kids.

Q.    Yeah.  In that circumstance is the death penalty the only appropriate punishment that you'd consider?

A.    No.  Well, if you're working with a group of 12, the life sentence might be what you'd have to work with but --

Q.    This is just you.

A.    Me, I would feel that the death penalty would be appropriate if you cold bloodedly planned to kill two kids.

Q.    And what about a life sentence?  Do you think that would be appropriate, something you'd really consider in that kind of a situation?  Would you really consider it, not just kind of wink and a nod on the way to death?

A.    Preference would be the death sentence, but life would be something that would be a back-up as long as it was absolutely no parole.  We just had this one that has been -- I listen to the Sioux Falls radio station up there, and I haven't heard anything about this one, but they just have got a girl that killed --

Q.    Are you --

Page 125

MR. WILLETT:  Mr. Berrigan, time.

2268

MR. BERRIGAN:  Thanks.  Thank you, sir.

THE COURT:  You can finish up your question.

MR. BERRIGAN:  I'm going to do the football field and sit down.

THE COURT:  That's fine.  But let me just emphasize once again there is no parole in the federal system.  If somebody gets a life sentence, there is no parole.  There's no possibility of parole.  Parole doesn't exist.

PROSPECTIVE JUROR 788:  You've heard about that one too then.

THE COURT:  I know it happens in a lot of states.  In a lot of states somebody gets a life sentence and they can be paroled in 6 years or 8 years or 10 years or 12 years.  Federal system, read my lips, no parole, no parole, doesn't exist.  It was abolished in November 1, 1987, as I recall.

PROSPECTIVE JUROR 788:  Okay.

THE COURT:  Does not exist.

PROSPECTIVE JUROR 788:  Governor Mickelson per -- changed the life sentence to 100 years or governor, whatever he was, guy that was the governor of South Dakota.

THE COURT:  That'd be a pretty long sentence for most people, hundred years.

PROSPECTIVE JUROR 788:  As soon as he did that, she was up for parole.

THE COURT:  Well, that's not the way the federal

2269

Page 126

system works, so I just wanted to assure you of that.

MR. BERRIGAN:   Thank you, sir.

BY MR. BERRIGAN:

Q.   Are you a football fan by any chance, sir?

A.   A little bit.

Q.   Well, you know what the field looks like; right?

A.   (Nodded head.)

Q.   Let me envision this scenario for you; okay?

A.   Okay.

Q.   I want you to imagine some person who walked in here that literally just fell off the apple cart yesterday and they haven't given one iota thought about the death penalty or life in prison and we asked them some questions about punishment, and they were -- and I mean exactly -- on the line.  I could go either way, 50-yard line of a football field; okay?  On one end zone we have the death penalty; the other end zone, life imprisonment without parole; all right?  And now I'm going to get rid of the apple cart guy and have you come in and say to you this.  What if you found intentional murders, five of them?  Where do you place yourself kind of on the football field of penalty?

A.   Probably on the 50-yard line if you didn't put the fact that there are two little kids.

Q.   Okay.  I'm going to put them in.

A.   You keep doing that.

2270

Q.   Yeah.  Let me ask you this, though.  This is -- the next step is they're premeditated murders, substantial planned.  Does that change your position on the field at all?

A.   No.

Page 127

Q.    Okay.  Still at the 50.

A.    (Nodded head.)

Q.    But now this is the problem.  There are two children.

A.    Two little kids.

Q.    Yeah.

A.    You said six and nine?

Q.    Six and ten.

A.    Six and ten.  Six-year-old didn't do much to deserve --

Q.    No, no, there's not much disagreement they're innocent victims; right?  And now we're back to our football field, and we need to know where you are.

A.    More towards the death sentence side than this other side.

Q.    There's 50 yards there to play with.

A.    Okay.  I'd be probably 30- or 40-yard line than all the way over, but, I mean, I would be leaning that way.

Q.    But only to the 30 or the 40.

A.    Yeah.

Q.    You sure?

A.    Because we've had cases where the guys have been innocent that have come up.

Q.    Yeah.  I want to take that out of the equation.  We're not

2271

talking about innocent people being penalized.

A.    I know, but you can't bring them back after they're dead.

Q.    Right, and I understand that.  You told about that in the questionnaire, but can you put that out of the equation; okay? This is somebody guilty beyond a reasonable doubt, kids; okay? And we're trying to find out where you are on the football field.

A.    I'd be more -- I wouldn't be in the end zone, but I'd be

Page 128

more that way.

Q. Can you give us a yard line?

A. You're getting a lot harder.

Q. I know it. It's hard, but these are important issues to us.

A. It wouldn't be a touchdown, but it'd be closer to the end zone.

Q. Within the 20 or outside the 20?

A. Probably at the 10.

Q. Inside the 10 or outside the 10?

A. I don't know. I don't know.

MR. BERRIGAN: Okay. Well, that's fair enough. Thank you very much.

Thank you, Your Honor, for that extension.

THE COURT: Mr. Miller?

EXAMINATION

BY MR. MILLER:

2272

Q. Good afternoon.

A. Hello.

Q. How you doing so far?

A. Doing all right. You gonna play football?

Q. No, I don't.

THE COURT: If he doesn't play football with you, I will.

PROSPECTIVE JUROR 788: Okay.

THE COURT: You're not done yet with football. How's that?

PROSPECTIVE JUROR 788: Oh.

BY MR. MILLER:

Page 129

Q.   I'll let Judge Bennett play football with you.  I just want to ask you this, sir.  You've sat here for an hour this morning, and you listened to Judge Bennett describe the process which included a description of the third phase if you should ever get to the third phase which is the penalty phase of this trial.  And do you recall -- well, you tell me.  What do you remember of his -- and I realize you weren't taking notes, so this isn't a test for your memory, but what do you recall of his description of that process?

A.   Just that it was there.  I don't remember the details on that.

Q.   Does it refresh your recollection at all if I would suggest to you that he mentioned that you would be required as a juror

2273

to weigh and consider both aggravating and mitigating circumstances and to consider both possible punishments?

A.   Yes, I . . .

Q.   And that's my question to you, because we can't have a trial in this case unless we can have jurors who can all fairly and realistically assure us that they can realistically consider both possible punishments in this case.

A.   Yeah.

Q.   Fair enough?  And from what you understand about this case which is that it involves an allegation of five killings involving planning and premeditation and that among those five victims were two children age six and ten, given that set of facts, can you still fairly and realistically consider both possible penalty options?

A.   If you prove beyond a reasonable doubt, I would be leaning towards the death penalty, though, I mean.

Page 130

Q. I understand, and I'm not asking you whether you're leaning one way or the other. That's fine. What I'm asking you is whether you can realistically consider both punishment options.

A. Yeah, I can look both ways. It's just that I've got that tendency.

Q. Once we throw those children in, that moves it toward the death penalty goal.

A. Yeah.

Q. And that's fair enough. We appreciate your candor. That's

2274

exactly what we want is your open and candid opinion on these matters. In the event -- and let me add in that the government isn't alleging -- well, let me back up again. Mitigating and aggravating factors, at the third stage, if we get to that point, you'd be expected to consider all mitigating and all aggravating factors as the Court instructs you. I trust that if you are instructed that the killing of children is an aggravating factor that that would make sense to you.

A. Right.

Q. And you could follow an instruction.

A. I've followed instructions.

Q. Conversely, if the judge instructed you that the role in the offense, example, if it was other than the principal, in other words, someone who assisted in the killings rather than one who pulled the trigger or one's background, if it involved being a victim of abuse, that these things should be considered as mitigating factors, could you follow that instruction?

A. If the judge presents it.

Q. And ultimately it's for you to assign whatever weight you deem appropriate to each of those factors, but you would be

Page 131

required to consider each of those factors. Do you feel you could do that, sir?

A.   That part of it, yeah.

Q.   Could you do that even though this is the case that involves the killing of two children?

2275

A.   Weighing that, yes, I can do that, but I still feel that way. I mean, it's harder when you've got two kids that are killed in cold blood if that's proven.

Q.   Fair enough. And I'm not suggesting that the killings of the children was necessarily as -- well --

A.   Heinous?

Q.   No. Let me back up. If you're required to serve on this jury, sir, you would have the obligation of giving actual realistic consideration to both possible punishments, and some people can do that, and some people can't. Can you tell us that you feel that you could give realistic consideration to life in prison for someone where these facts are proven?

A.   Yeah.

Q.   And conversely, do you feel that with this set of facts you could sign your name to a death penalty verdict should that be the unanimous verdict of the jury?

A.   Yes.

MR. MILLER:   Thank you, sir. I have no further questions.

THE COURT:   Well, I promised I'd play a little football with you. So, of course, you know -- you don't know a whole lot about the evidence yet, and that's -- we're glad you don't; okay? But if we ever get to this third phase, the penalty phase, if there was evidence of what we call

Page 132

mitigation -- and that could be a very broad category of

2276

evidence. It could be things about Angela Johnson's background or childhood. It could be psychological testimony. It could be a lot of different things. I don't know what that evidence is going to be, but there could be a lot of different areas of what we call mitigation. My question is do you think you would be able to at least consider mitigation evidence that was introduced in the courtroom?

PROSPECTIVE JUROR 788: Yes.

THE COURT: And when I instruct you, the instruction would be -- I'm going to define for you what are the mitigating factors in the case. And then I'll define for you what the aggravating factors in the case are. And the government's going to try and put on evidence of aggravating factors, and then it will be your job to weigh those -- any aggravating and mitigating factors that you find as a juror. Do you understand that, that that would be your job?

PROSPECTIVE JUROR 788: Weigh the two to figure out what the balance is, yeah.

THE COURT: When I say 2, there could be 30 mitigating factors, and there could be 3 or 4 aggravating factors. I don't know how many there are going to be, but I'm confident of this. If we do get to the phase 3, there will be some aggravating factors, and there will be some mitigating factors. I'm absolutely confident of that. And then you'll be able to -- you know, then you'll have to weigh that. There will at least be

2277

evidence of that, and you'll have to weigh that. Do you think

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1984 of 3245

you'll be able to weigh that?

PROSPECTIVE JUROR 788: Yeah, to the best of my ability.

THE COURT: Okay. Now, are you open to the possibility that in looking at any mitigating factors that are in the case that that might move you from the 20-yard line? I'm not saying that it would. Are you just open to the possibility that it could? Let's use could. That's a better word.

PROSPECTIVE JUROR 788: Yeah, either way depending on what was going on.

THE COURT: And I want to correct something that I said. I'm confident that the government is going to try and introduce evidence of aggravating factors. Whether or not it's an aggravating factor or not is going to be entirely for you and the other jurors to decide. Do you understand that? Well, here's what's going to happen. They're going to try and introduce evidence.

PROSPECTIVE JUROR 788: Okay.

THE COURT: And then you're going to have to decide whether any of that evidence is an aggravating factor, and I'll tell you what the aggravating factors are.

PROSPECTIVE JUROR 788: Okay.

THE COURT: But it's your job as jurors to decide whether the evidence that the government presents in the case

2278

satisfies you, and in that case it has to be beyond a reasonable doubt that they've proven an aggravating factor. That's going to be totally for you to decide. Do you understand that?

PROSPECTIVE JUROR 788: I think so.

THE COURT: Well, let's back up. It's kind of
Page 134

important because I kind of misspoke a while back when I was talking to you, and I didn't want to imply that there are going to be aggravating factors in the case. What I wanted to inform you of is the government believes that there will be aggravating factors. They're going to introduce evidence, but it's going to be totally up to you to decide whether you think there are aggravating factors in the case and whether or not the government has proved aggravating factors beyond a reasonable doubt. Do you understand that?

PROSPECTIVE JUROR 788: Yeah.

THE COURT: Okay. And if you find that the government has proved an aggravating factor -- and they may not. But if you find that they have, then you'll be entitled to weigh that along with any mitigating factors that you find. Do you understand that?

PROSPECTIVE JUROR 788: Yeah.

THE COURT: And do you think you'd be able to do that fairly? Do you think you'd give fair consideration to aggravating factors and fair consideration to mitigating factors?

2279

PROSPECTIVE JUROR 788: I think so.

THE COURT: And ultimately the weight that you give any particular factor, that's for you to decide. In other words, I'm not going to tell you, oh, this one factor is really, really important and you ought to give that some extra bonus points and, oh, this other factor, that's not very important. You ought to subtract some bonus points. It doesn't work that way at all. I'm just going to tell you what the mitigating factors are, what the aggravating factors are, and then you have

to decide whether those have been established by the evidence. You with me on that?

PROSPECTIVE JUROR 788:  Yeah.

THE COURT:  Okay.  And then any factors you find that have been established by the evidence, then you have to weigh those and in that way try and reach a verdict of life sentence or a verdict of the death sentence.  Do you understand that?

PROSPECTIVE JUROR 788:  (Nodded head.)

THE COURT:  You have to answer out loud for our court reporter.

PROSPECTIVE JUROR 788:  Yes.

THE COURT:  Okay.  And do you think you can fairly consider both aggravating and mitigating factors?

PROSPECTIVE JUROR 788:  Yes.

THE COURT:  If you'd step outside, we're going to let you know your status.

2280

PROSPECTIVE JUROR 788:  Thank you.

(Prospective Juror 788 exited the courtroom.)

MR. BERRIGAN:  The defense moves to challenge Juror Number 788 for cause, sir.

THE COURT:  Okay.

MR. BERRIGAN:  Basically because we believe that his views respecting children as victims substantially impair his ability to follow the instructions of the Court and his oath as a juror and to realistically consider a life sentence.  And I largely rely on two things.

The statement in his questionnaire on 99 -- and this is a question where he's asked to evaluate his own partiality -- he says he is concerned that he would be hindered from being an

Page 136

impartial juror. If they are proven to have killed children, they should die also is his feeling.

Then he placed himself on the 10-yard line at the very conclusion of my questioning, and I'm looking at 13:09:24 and thereafter. And I know we aren't using any particular yard line as a basis for a strike, but the 10-yard line is pretty far down the field from a life verdict. It's 90 yards away, and we think that's evidence of his substantial impairment as well.

So we'd ask this juror -- ask the Court to remove Juror 788 under the Witherspoon and Witt standard as being substantially impaired.

THE COURT: Well, except, you know, you're the one

2281

that's pointed this out, so I'm just going to point it out back to you. When he gave that response about the 10-yard line, he wasn't asked about his ability to consider mitigating factors. Is that fair?

MR. BERRIGAN: I thought I was already over time.

THE COURT: Well --

MR. BERRIGAN: You were kind enough to give me the time to do the football analogy. I wasn't going to press it any further. No. Obviously you questioned him about mitigating circumstances, and he isn't asked that in the questionnaire. I'll concede that. All I'm trying to point out is he has very strong views about children. He never backed off of that.

THE COURT: No, that's right. He never did.

MR. BERRIGAN: And I think that because there are children involved is the only reason this man wouldn't be a fine juror. That's all.

THE COURT: Okay. Thank you so much.
Page 137

Mr. Miller?

MR. MILLER: Your Honor, the government disagrees. This juror's candor I think was noteworthy. He very openly admitted that the factor of the deaths of these two grade school age children places him toward the death penalty side.

But that's not the issue, and I don't think it constitutes substantial impairment. The question is whether or not he can assure us that he can seriously and realistically

2282

still consider both possibilities, and I believe that was not merely what he said but the totality of his assurance to us taking into effect his openness and candor throughout, so I would respectfully disagree.

THE COURT: Well, let me ask you this. It seemed to me he moved faster from the 30- and 40-yard line down to the 10-yard line, pardon the pun, than O.J. Simpson ever did when he was playing football. How do you explain that movement?

MR. MILLER: I heard him say the 20 and then in response to a leading question suggest the 10-yard line. He may or may not have adopted that. I would urge the Court that the 20-yard line more reflects his view of the seriousness of the situation given the response to an open-ended question asking him to put himself on one yard line than another.

THE COURT: Okay. I agree he would give significant weight to the fact that two children were killed, but I don't believe he's substantially impaired in his ability to follow the instructions in the case because he's entitled to give that some weight, and I think he would fairly consider both penalties, although he's clearly leaning towards the death penalty, but that does not preclude him in this case.

Page 138

And with regard to his answer on going down to the 10-yard line, that hypothetical did not assume that there would be the potential for mitigating factors and what consideration, if any, he'd be able to give mitigating factors, and I think in

2283

response to my questions, he would be able to consider mitigating factors. And I find him moving in the right direction on the football field. I don't know what yard line he ultimately wound up on. But I don't think it was down to the 10 when we were considering mitigating factors. You know, Mr. Berrigan, you started with this football analogy, and it's kind of stuck.

MR. BERRIGAN: Well, I brought it back because I knew the Court liked it.

THE COURT: And sometimes --

MR. BERRIGAN: I was willing to abandon it, but I think in some cases it is very helpful.

THE COURT: I think it is because I think it's something they can easily understand and give us kind of a snapshot. But as you pointed out on many occasions, no one has asked that question, including me, including all of the possible variables. And to the extent that variables are in it or not in it, it has a greater or lesser effect at least on me as the ultimate decision maker.

MR. BERRIGAN: Sure.

THE COURT: But I certainly understand why you're challenging this juror for cause, but I'm going to go ahead and overrule it because I find he's not substantially impaired. Would you like to exercise . . .

MR. BERRIGAN: Yes, sir. We would exercise our 14th

Page 139

of our 15 peremptory challenges on Juror Number 788.

THE COURT: Okay. We'll bring him in and let him know his status. Thanks.

(Prospective Juror 788 entered the courtroom.)

THE COURT: Juror 788, you engendered a lively debate for us the last few minutes, and I appreciate that. We think you'd be a terrific juror but probably not in this case. So we're going to let you go. And we appreciate very much -- I think you did a terrific job answering the questions, and I hope we get to see you back here on another case, maybe of shorter duration and maybe not so difficult. But we appreciate it very much. I'd ask that you do us a favor.

Because we're still going to be in jury selection all of next week and maybe into that following week, we'd ask that you not discuss this with anybody else until we've actually got a jury selected and the trial underway because northwest Iowa's pretty small. And if you said something to somebody, they could say something to somebody else, and that somebody else could very easily be in one of these chairs next week.

So thank you very much. And good luck to you. Thank you.

(Prospective Juror 788 exited the courtroom.)

THE COURT: Ready for Juror 82?

MR. MILLER: Yes, Your Honor.

(Prospective Juror 82 entered the courtroom.)

THE COURT: Sir, thanks for being so patient. Any

chair in the front row.

PROSPECTIVE JUROR 82:  Okay.

THE COURT:  Thank you.  Please be seated.  You know, you picked the wrong chair.  Under each chair there's a free pass under one chair and you get out of jury service, but you didn't pick that chair, so you're still in the ballgame.

PROSPECTIVE JUROR 82:  All right.

THE COURT:  So we're going to start with questions from one of the prosecutors, Mr. Miller.  Thank you.

EXAMINATION

BY MR. MILLER:

Q.    Good afternoon.  How you doing?

A.    Good.  How are you?

Q.    Real well.  Thanks.  The judge was just kidding about that free pass, by the way.

A.    All right.

Q.    You knew that.

A.    Yes.

Q.    Thank you for your patience.  Thank you for your time, and thank you for filling out this questionnaire.  We're going to cover two subjects with you.  One is the issue of any exposure to pretrial publicity, and I think that should be quick.  The other is your opinions on the death penalty; okay?

A.    Okay.

2286

Q.    I noted that you indicated that you were not at all familiar with this case at the time you filled out the questionnaire.

A.    That is correct.

Q.    Aside from the information in the questionnaire, have you

Page 141

had any exposure to any information about the case at all?

A.   No.

Q.   And I trust you've formed no opinions about the matter as far as the guilt or innocence.

A.   No.

Q.   And on that subject you are, I think you already indicated, prepared to follow your obligation to presume the defendant innocent.

A.   Yes.

Q.   Very good.  I want to visit with you then about the subject of the death penalty.  Again, you were kind enough to be fairly open and detailed in your response.  This was some weeks ago when you filled this out, and it's an unusual situation to be in, called in for a jury of this nature.  Have you given the matter any more thought in the weeks since you filled out the questionnaire?

A.   As weeks went on, the matter that -- of the death penalty, is that your question?

Q.   Yeah, on the subject of the death penalty itself.

A.   As I'm thinking, you know, it's an ongoing process.  You're

2287

always thinking about it.

Q.   Can you just share your thoughts with us if you've given this matter any other thought, your thoughts about the death penalty as an appropriate punishment or not?

A.   Okay.  The death penalty is needed, you know, if the court says that's what the punishment should be, if that's an option. You know, I'd have to talk more about it and about the trial.  I don't have any other information that needs to come out I guess.

Q.   Very good.  Very good.  Again, you were kind enough to fill

Page 142

out the questionnaire, and just let me read back to you some of the stuff that you wrote because I just want to visit with you briefly about that. You indicated in response to question 75, I believe the death penalty for a person who is guilty of intentional murder can be used as punishment. If the person intentionally murdered someone, they should be punished. Depends on the situation, person, and crime.

A. Correct.

Q. Okay. And that remains your feeling about the matter.

A. Yes, it does.

Q. And you went on. When asked to explain your reasons, you indicated, I feel this way because the death penalty should be used if the crime, person, and situation are looked at closely and the punishment could be used. Still remains your opinion?

A. Correct.

Q. This morning you sat through about an hour in which Chief

2288

Judge Bennett described the process, and a portion of that was the description of the third phase if we ever get to that. You recall him describing about how it would be the jury's job to weigh and to consider mitigating and aggravating factors?

A. Correct.

Q. Okay. Did that make sense and sound like a sensible way of going about it?

A. Yes, it did.

Q. And I assume you're happy about the thought that the judge would be giving you instructions on how to do your job.

A. That is correct.

Q. Very good. This case involves allegations by the government that the defendant in this case participated in the

Page 143

killings of five people in connection with drug dealing and that two of those five people were children. Given that set of facts and assuming that you're sitting on a jury that finds beyond a reasonable doubt that those facts are proven, you would then be in a penalty phase. Could you still, given those sets of facts, give fair consideration to both possible options as being viable at that point, both the possibility of life in prison and the possibility of a death penalty?

A.    Yes, I could.

Q.    Now, there was a question that asked you about various factors such as if there were multiple victims and whether children were involved and the like. Do you recall that?

2289

A.    Yes.

Q.    One question -- and this is in 87 -- asked you to describe what effect, if any, each of these factors might have. The first question was the guilty person killed more than one person at the same time. Your response was, A life is a life no matter how many. It is still killing. I took from that that it's serious even if there's only one.

A.    That's right.

Q.    If you were on a jury that had already found the defendant guilty of one or more killings and if you were instructed during the penalty phase that multiple killings should be considered as an aggravating factor, would you be able to follow that instruction, sir?

A.    I would be able to follow those instructions.

Q.    Likewise, if you were instructed that vulnerable victims such as children -- and in this case we're talking about two children ages 6 and 10 -- the killing of vulnerable victims is

Page 144

an aggravating factor if proven, could you follow that instruction?

A.    If instructed.

Q.    Conversely, you would be instructed to consider any mitigating factors proven.  And the defendant has no requirement of proving anything in this case.  But if the defense were to prove a mitigating factor, it would only have to be proven by a preponderance of the evidence.  If you were instructed that, for

2290

example, being a victim herself of an abusive childhood or being an aider and abettor as opposed to being the person who actually pulled the trigger are mitigating factors, could you consider those?

A.    Yes.

Q.    And would you do so if so instructed?

A.    Yes.

Q.    If the evidence in this case shows she assisted in the killings of these five people but was not herself the one who pulled the trigger, would you automatically impose life in prison, or would you still be able to consider the death penalty as an appropriate punishment?

A.    On that question, it would take more time to think about it and to ask questions of -- you know, to see what questions come out and what information is there at that time.  And I can't say anything before that, but, you know, those two options, if need be, are there.  And if we get to that, then yes, there's -- you know, that is correct.

Q.    What I'm wondering about is whether the killing of the children, aiding and abetting, abusive childhood, multiple victims, if any of these factors that we've talked about so far,

Page 145

would that fact alone automatically cause you to say death or life?

A.    No.

Q.    Do you understand you'd be instructed to weigh and consider

2291

all factors?

A.    Yes, all factors would be taken into consideration at that time.

Q.    And at least from what you've been told about the allegations in this case, you feel that you could consider both possible punishments.

A.    Yes.

Q.    Now, should you be on this jury, sir -- and I apologize for the length of this, but I'm just about done.  Should you be on a jury that unanimously concludes that the death penalty is the appropriate punishment in this case, the jury could not return that verdict without each and every one of you on the jury signing off on the verdict that would have the practical effect of imposing death upon the defendant.  Under those circumstances, do you feel you could do that?

A.    To sign and to --

Q.    Could you sign a death penalty verdict?

A.    Yes.

Q.    And conversely, could you find for life in prison?

A.    Yes.

        MR. WILLIAMS:  Two minutes.

Q.    Understanding, sir, that we're talking about a case that involves allegations of killing five people, allegations that this involved premeditation and substantial planning and allegations that two of the victims were grade school age

Page 146

children, six and ten years of age, even given those facts, you still can assure us that you would consider life in prison, seriously, realistically consider that as a possible punishment in the case.

A.    Yes.

Q.    As well as the death penalty.

A.    That is correct.

MR. MILLER:  Thank you, sir.

PROSPECTIVE JUROR 82:  You're welcome.

THE COURT:  Juror 82, we're now going to have some questions from Mr. Berrigan from the defense team.

Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q.    Not so bad so far, is it?

A.    Not so far.

Q.    Let me echo my colleague's appreciation for you hanging around and waiting so long for us.

A.    You're welcome.

Q.    I see that you're going to be a funeral director relatively soon.

A.    Yes.

Q.    Okay.  How much more internship do you have to go?

A.    I have -- with Iowa Board of Mortuary Science Examiners, I'm under their direction this year.  I started September 6 of

2004 and going till September 6 of 2005.

Q.    So you started this process when you were 19?

A. Well, last May, so I was 21.

Q. Okay. And it just seems like an incredible amount of responsibility for somebody of your age.

A. Yes. It's something that you can do that helps someone, and it's very rewarding. During high school after my high school career was over, I went to the local funeral home and asked them if I could just be around to set up chairs and be around when family did come in and help make copies in the office, and so I was just there. And again, it's something that is very rewarding, and you go home with a good feeling when you get done with a funeral and the funeral service is over.

Q. And it's not a family business. You're not inheriting it.

A. No, no. They welcomed me with open arms and very nice people. So not knowing how the internship would affect being on the jury would have to be contacted to the Department of Health and the Board of Mortuary Science Examiners. I did give them a call notifying them of a possibility.

Q. One question I had about that work, and maybe you haven't had this experience yet of dealing with children who have died. If you have, I was interested in hearing about that experience, whether that's been more difficult for you than adults.

A. My first embalming in mortuary school in Kansas City, Kansas -- I lived at a funeral home there, and the first night

2294

that we had to do on-call embalming, it was an infant, six months, that the mother had left the child in the bathtub there. She was giving the child a bath. The telephone rang. She went to answer the telephone, and when she came back, the baby had drowned. And to see that and to go through that, I knew that if I could get through that I could pretty much withstand anything

Page 148

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 1999 of 3245

else that needed to be completed at that time and throughout the whole career.

Q. So far has that been your only experience with a child?

A. Yes.

Q. Okay. Well, you've heard I think by now that two of the victims in this case are young girls ten and six years of age.

A. Yes.

Q. You understand that?

A. Yes.

Q. The government's alleged that they and three other people were intentionally murdered by our client either by herself or that she participated in those murders, okay, and they've also alleged that these murders were committed after premeditation and substantial planning; all right?

A. Yes.

Q. And that they involved what the law calls vulnerable victims. The government's alleging that these six- and ten-year-old girls were vulnerable victims. So that's the nature of the allegations. Pretty serious stuff, don't you

2295

think?

A. Yes, very serious.

Q. Okay. We could have this process where the judge just came in and asked people if they could follow the instructions of the Court and the law that he gave them, but it would be pretty artificial without people knowing what those instructions would be and what issues they'd be dealing with. And one of our goals in this process is to kind of get just people's opinions about things to see if we can fit the best 12 people to this case. And your discussion about the death penalty and life

Page 149

imprisonment kind of suggests that maybe you don't have an opinion, I mean, no indication you're kind of leaning one way or the other about it. And I was wondering if that's really true.

A. That in my opinion I'm not really opinionated in that matter or . . .

Q. Well, it's not a bad thing, you know. Many of us are at least twice as old as you are. We have opinions about all kinds of things.

A. Right.

Q. And a lot of that comes from just our normal everyday experiences in life. You know, we always like to tell people we don't believe anything in the paper. That's not true. We read the paper all the time, pay good money for a yearly subscription to the newspaper, watch television, watch CNN. We rely on these folks to give us information about what's going on in the world,

2296

and we have opinions about a lot of that stuff. And some -- the death penalty's kind of one of those issues, kind of like abortion. I mean, there's some social issues that a lot of folks have views about. And I just -- I don't know what yours are. I haven't got a sense of that from the questionnaire, and I was wondering if you'd be willing to, you know, talk a little bit about that.

A. About both the death penalty and life imprisonment?

Q. Yeah, yeah. Usually life imprisonment doesn't come up as an issue. Most folks talk about the death penalty, but how ever you're comfortable in discussing it.

A. Okay. As my process goes throughout the day, I'm always learning, so it's a learning stage. The internship is a learning stage and -- when I did have mortuary law class in

Page 150

mortuary school. And throughout that process, it was a learning process, and when you form an opinion about a subject, sometimes opinions change but not necessarily the overall factor that determines that.

Q. Sure.

A. So about the death penalty, if need be and we're instructed, you know, through those -- the judge's words, if need be if we get to that phase, the death penalty to me is available because the law makes it available. It's one of the options that is right from the government.

Q. Yeah, and I know that. But that doesn't tell me how you

2297

feel about it. I know it's an option. That's why we're here, because it's an option. But that doesn't give us any information about how you feel about it as the penalty. I mean, it's an option.

A. Okay.

Q. But how do you feel about it?

A. If need -- if need be if that person has committed those crimes and there's a choice between those one -- the life imprisonment and the death sentence, it would depend on the factor. If there was an example you could give me or something like that, you know, that would be okay. But not seeing a case or not having any ties, you know, just -- that's my opinion about it. I'd have to see what goes on. And that's why we do have the death penalty.

Q. Well, if you and I had been mortuary school classmates let's say.

A. Okay.

Q. Or maybe we work together in that funeral home in Kansas

Page 151

City, Kansas, which is really pretty close to where I live and we had been having a cup of coffee one morning before the beginning of the day and I had just turned over to you and said, Juror Number 82, what do you think about the death penalty; do you favor the death penalty; are you opposed to the death penalty; without more than that, what would you tell me?

A.   Okay.  In certain situations where it's needed and the

2298

certain evidence is brought forth, then yes, I believe that the death penalty is okay to have.

Q.   How about -- why don't we talk about the situations then in the little time we have left.

A.   Okay.

Q.   Do you have in your mind situations when you say in certain situations it's needed?  What are you thinking about?

A.   On various factors determining whether death -- the death sentence is needed, whether it's a mass murderer or whether it's someone that's killing one person, it's still an important factor that the government has available.  I do favor the death penalty.  And not knowing what this case and all the evidence it has or my past experiences, you know, from hearing about the death penalty, yes, it's one of those things that is available. And I think if -- like an example would be like if someone intentionally and deliberately and -- murdered someone, it would depend on a lot of factors and not -- I don't know all the factors that it would depend on, but it's hard -- it's hard to understand sometimes.

Q.   Sure.

A.   But --

Q.   Well, those factors, we have those factors in this case;

Page 152

okay? That's -- the government's alleged that anyway. And we're asking people to do something that some folks find very hard, and that is to zoom fast forward way ahead, put the cart

2299

before the horse, and imagine yourself in the third stage of this trial, okay, and you've already made a decision you know what? We've already made that determination. We've got those intentional murders that you wanted. There they are, five of them. That premeditation you thought was an important factor, substantial planning, we've got that too beyond any reasonable doubt. And on top of that --

MR. WILLETT: Mr. Berrigan, two minutes.

Q. -- we have children, ten- and six-year-old girls; okay? Certainly the law allows for consideration of the death penalty. You with me?

A. Yes.

Q. It also allows for consideration of life in prison without the possibility of parole even for that.

A. Yes.

Q. And some folks have come in and quite candidly said, You know what? That might be, but in my heart of hearts, I know that that's all I need right there. You kill five people intentionally and you want to talk about life in prison? I don't think so. Other folks have come in and said, Premeditated murders, is that what you're talking about? That's it. We're done. They couldn't consider a punishment other than death. And then children, more than either of those combined, people have said -- it's not everybody, but some have said, Hey, that's it, you know, case closed. So let me ask you, you favor the

2300

Page 153

death penalty, at least to some extent.

A.    Yes.

Q.    Even in that case, even in that one, realistically in your heart of hearts would you consider, would you be able to consider, a sentence of life imprisonment, not just, you know, wink at it on the way to death but really realistically consider that as appropriate and just as a punishment for that type of crime?

A.    Yes.  It's -- you know, they're put away for life, and they're not living out on the streets, and they're not hurting anyone inside so yes.

Q.    Now, I've asked you could you do it.  Would you do it?

          MR. MILLER:  Objection.

Q.    If you got to that point would you --

          THE COURT:  I think he's asking would you consider.

          MR. BERRIGAN:  Right, yes.

Q.    Would you consider -- to be clear, I asked the question would you do it, and now I'm asking you would you.  Would you -- even if you saw that beyond any reasonable doubt, would you consider life imprisonment as an appropriate penalty even for that kind of a consider?

          MR. WILLETT:  Time, Mr. Berrigan.

          THE COURT:  You can finish up.

A.    On that question, I think it would -- even on that type of case, I would consider it, but there's also the death penalty I

2301

would consider too.

Q.    Yeah, I'm not asking you to exclude it.

Page 154

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2005 of 3245

A.    Right.

Q.    Yeah, I understand because you favor the death penalty. I've already met your factors; right?

A.    Right.

Q.    I'm not worried about that.  I hear you.  But the other side is what I'm worried about.  I'm representing that woman over here.  She deserves to have people that can fairly consider life in prison.  You can see that.

A.    Uh-huh.

Q.    Some folks can't do it.  You said you could, and I'm asking you would you.  Would you realistically consider a sentence of life in prison even, even if beyond any reasonable doubt that was the case?

A.    Yes.

        MR. BERRIGAN:  Okay.  We'll take you at your word. Thank you, sir.

        PROSPECTIVE JUROR 82:  Thank you.

        THE COURT:  Juror 82, if you'd step outside, we'll let you know your status.

        (Prospective Juror 82 exited the courtroom.)

        THE COURT:  Any challenge for cause by the government?

        MR. MILLER:  No, Your Honor.

        THE COURT:  Any challenge for cause by the defense?

                                                            2302

        MR. BERRIGAN:  No, sir.

        THE COURT:  Any peremptory strike by the government?

        MR. MILLER:  No, Your Honor.

        THE COURT:  By the defense?

        MR. BERRIGAN:  Yes, sir, we're going to use our last of our 15 peremptory challenges, and I'm sorry to blow another

        Page 155

panel.

THE COURT:  Oh, don't worry about that.

MR. BERRIGAN:  But we are going to ask the Court to excuse this juror with our last peremptory challenge.

THE COURT:  Okay.  Juror 82 is stricken with your last peremptory challenge.

(Prospective Juror 82 entered the courtroom.)

THE COURT:  Juror 82, we think you'd make a great juror, but the way the system works, we've got to let some people go, and we're letting you go.  Thanks so much for participating in the process today, for doing such a conscientious job in answering the questionnaire, and for willingness to let yourself be grilled.  I'd like to see you back here on another case.

And I'd ask you to do us a favor.  Because we're going to be in jury selection I'm pretty sure all four days next week, maybe even the week after that, we'd ask you not to talk about this to anybody because you might talk to somebody, and that somebody would talk to yet another somebody, and that somebody

2303

could be sitting in one of those chairs next week or the week after.  So wait till we get a jury empanelled, and then you can talk about it all you want; okay?

PROSPECTIVE JUROR 82:  Thank you.

THE COURT:  Good luck to you.  Thank you very much.

(Prospective Juror 82 exited the courtroom.)

THE COURT:  Okay.  Please be seated.  Another day, no jurors in the pool.  So that leaves us with 15 jurors in the pool.  The defense is now out of their 15 peremptory challenges, and the government -- Carey, how many does the government have

Page 156

left?

THE CLERK: Nine.

THE COURT: Nine. We won't be in court on Monday. We'll start Tuesday morning. I've got the draft of the preliminary instructions for everybody with a pretty detailed letter setting forth my rationale, and I know you're all anxious to get on the road. It should take me about two minutes to go into chambers and grab it because it's ready to go, sign it, and bring it out here. Is there anything else we need to take up between now and when we'll see each other Tuesday morning?

MR. WILLIAMS: Your Honor, on behalf of the United States, I would ask you to maybe consider again the possibility of limiting the attorneys to nonleading questions during this voir dire. I just think we're going to have a much better chance of actually getting candid responses from these jurors

2304

than we are getting when both sides come at them with leading questions and attempt to sway them one way or the other.

As much as we pay lip service that we're not trying to change their mind, the gamesmanship involved in this process with leading questions just makes it very difficult to really ever get a feel for what a juror thinks. And so we'd be in favor of restriction along those lines. We just ask you to think about it some more.

THE COURT: I'll certainly give it some thought. I assume, Mr. Berrigan, you're as adamantly opposed to it today as you were yesterday.

MR. BERRIGAN: I am, and I ask Mr. Williams to cite a single person who in his view was not a true strike for cause because I didn't see any. I thought everybody that was excused

Page 157

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2008 of 3245

today was a clear, very clear, strike for cause. And so we debate some of these issues.

THE COURT: But you also think everybody who wasn't excused that I should have excused was a clear strike for cause too, so I'm not sure that gets us anywhere, Mr. Berrigan.

MR. BERRIGAN: I suppose that's a different issue, Your Honor. You know, we are discussing -- I just want you to know this because I know you have some concern, but we're discussing even to the point of thinking about waiving some of our peremptories in order to speed up this process. We've had some very serious discussions along those lines that are going

2305

to hopefully continue. The defense has certainly made proposals to that effect, so I don't want you to think we're insensitive to this issue, but we are now out of peremptory challenges. I suspect more people are going to start to pile up pretty quickly.

THE COURT: I would think so. If history is a good lesson over the last nine days, you're now out -- I'm not worried about the speed of the process.

MR. BERRIGAN: I think we'll be done next week.

THE COURT: My concern is the fairness of the process.

MR. BERRIGAN: I understand, sir.

THE COURT: And I think we put together a process that is actually more than fair. It certainly greatly exceeds the constitutional minimums that you're entitled to. And I think you would agree with that.

MR. BERRIGAN: Other than my very specific objections, without waiving those, sir.

THE COURT: I'm not trying to get you to ever waive.

Page 158

MR. BERRIGAN: I know you're not, and I just want to make sure the Eighth Circuit isn't either.

THE COURT: Absolutely.

MR. BERRIGAN: Yeah, I'm not complaining about the process, sir, other than the specific objections. I just -- to the extent everybody's concerned about the time -- and you've said repeatedly you're not -- I still feel very confident we're

2306

going to finish the process next week.

THE COURT: I'll give it some thought because the government has asked me to give it some thought, and I'll let you know Tuesday but -- well, I'll give it some thought. I'm the one that raised it initially. Anything else?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. BERRIGAN: Have a nice weekend, sir. That's all we have.

THE COURT: Okay. You too. And we'll be in recess. Thank you.

(The foregoing trial was adjourned at 1:57 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Page 159

PANEL I, 4-22-05

Shelly Semmler, RMR, CRR          1-29-06
                                    Date

♀

INDEX

PROSPECTIVE JUROR:                                    PAGE:

 Prospective Juror 54
          MR. MILLER                                  2204
          MR. BERRIGAN                                2213

 Prospective Juror 787
          MR. BERRIGAN                                2232

 Prospective Juror 255
          MR. MILLER                                  2240
          MR. BERRIGAN                                2245

 Prospective Juror 788
          MR. BERRIGAN                                2258
          MR. MILLER                                  2271

 Prospective Juror 82
          MR. MILLER                                  2285
          MR. BERRIGAN                                2292

* * * * *


Page 160


Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2011 of 3245

2308

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CR01-3046

        Plaintiff,                           Sioux City, Iowa
                                             April 26, 2005
   vs.                                       8:24 a.m.

ANGELA JANE JOHNSON,                         VOIR DIRE OF
                                             PANEL J
      Defendant.
                                     /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

2309

APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                          Assistant United States Attorney
                          Suite 400 - Hach Building
                          401 First Street Southeast
                          Cedar Rapids, IA  52401

                          THOMAS HENRY MILLER, ESQ.
                          Iowa Attorney General's Office
                          Area Prosecutions Division
                          Hoover State Office Building
                          Des Moines, IA  50319

For the Defendant:        PATRICK J. BERRIGAN, ESQ.
                          Watson & Dameron
                          2500 Holmes
                          Kansas City, MO  64108

                          DEAN STOWERS, ESQ.
                          Rosenberg, Stowers & Morse
                          1010 Insurance Exchange Building
                          505 Fifth Avenue
                          Des Moines, IA  50309

                          ALFRED E. WILLETT, ESQ.
                          Terpstra, Epping & Willett
                          Higley Building - Suite 500
                          118 Third Avenue Southeast
                          Cedar Rapids, IA  52401

Also present:             Bill Basler

Page 1

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2012 of 3245

PANEL J, 4-26-05
Court Reporter:          Shelly Semmler, RMR, CRR
                         320 Sixth Street
                         Sioux City, IA  51101
                         (712) 233-3846

                                                    2310

(Proceedings reconvened outside the presence of the jury venire.)

THE COURT:  Ready to have the jurors brought in?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Thanks.

(Panel J entered the courtroom.)

THE COURT:  Okay.  Good morning.  If you'd all raise your right hand, we're going to swear you in.

(Panel J was sworn.)

THE COURT:  Please be seated.  I think we've got a little seating problem here, so we'll get everybody in the right order.  There we go.

Okay.  I wanted to welcome all of you to the United States District Court for the Northern District of Iowa.  How many of you have ever been to this third-floor courtroom before?  Anybody?  Okay.  Well, I'm Mark Bennett.  I'm the chief judge of the United States District Court for the Northern District of Iowa, and I'll be the presiding judge in this trial.

I assume that when you all went to bed last night you were just so excited and when you got up this morning you were just so excited about the prospect of coming to this courtroom and your opportunity to be selected as a juror in this case that you just couldn't contain yourself, so I'm glad you're all here.  I do like to remind the jurors that there is no federal law against smiling in the courtroom.  So it's not going to be as

2311

Page 2

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2013 of 3245

bad as you think it's going to be, so just bear with us.

We've set up a very unique system for jury selection in this case. I'll just tell you about that, a little bit about it. I'm going to explain it in more detail. But you just have to come this one day. And that's very unusual.

My secretary, for example, was called to jury duty this month across the street in state court, Woodbury County. And she's had to go over there three different times and spend most of the day there, and she's yet to be questioned by a judge or the lawyers in a case.

Her sister, interestingly enough, was summoned for jury duty in federal court in Minnesota this month, and she went on three consecutive days to the federal courthouse in Minneapolis, sat in a roomful of prospective jurors all day for three days, never even made it up into a courtroom to be questioned by anybody. So considering the magnitude of this case, it's good for everybody that each potential juror just has to come in one day, and you'll know at the end of today what your status is. But I'm going to explain that to you in more detail.

I wanted to introduce you to everybody. You all know the case is United States versus Angela Johnson. Seated at the table closest to the jury box -- and I'm just going to have the folks raise their hand -- C.J. Williams. Mr. Williams is an assistant United States attorney, federal prosecutor, from Cedar

2312

Rapids.

Seated next to Mr. Williams would be Mr. Tom Miller. Tom Miller is a special assistant United States attorney

Page 3

appointed for this case. In his other activities he's actually an assistant attorney general for the state of Iowa. The attorney general of Iowa is also named Tom Miller, but they're no relation. This Tom Miller works for the other Tom Miller who's the attorney general of Iowa. This Tom Miller in our courtroom is an assistant attorney general in charge of area prosecutions for the state. He's been specially assigned as a federal prosecutor in this case.

Seated next to the two prosecutors is Special Agent Bill Basler. He's what's called the case agent in the case.

Now, going to the farthest table from the jury box -- I'll just go in order -- closest to you would be Mr. Al Willett. Mr. Willett is a lawyer who specializes in the defense of the accused, and he practices in Cedar Rapids, Iowa.

Seated next to Mr. Willett is the defendant in the case, Angela Johnson.

And then farthest from you at that table is Patrick Berrigan. Mr. Berrigan is a lawyer who specializes in criminal defense from Kansas City.

And then at the back table is Dean Stowers. Mr. Stowers is a lawyer who specializes in criminal defense work from Des Moines, Iowa. And you'll be meeting them in more

2313

detail in a little bit.

There are some rules you need to follow, and I've reduced them to writing, and I want to go over them with you this morning.

Conduct of potential jurors during jury selection and trial. To ensure fairness, you as potential jurors must obey the following rules until the end of the case if you are

Page 4

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2015 of 3245

selected for the jury or until you are excused from serving on the jury in this case.  These rules apply whether you are in the courtroom, in the courthouse, at home, or anywhere else until you are excused from further service in this case.

First, do not talk among yourselves about this case or about anyone involved with it.

Second, do not talk with anyone else about this case or about anyone involved with it.

Third, when you're outside the courtroom, do not let anyone tell you anything about this case.  If someone should try to talk to you about the case during jury selection or the trial, please report it to me.

Fourth, do not talk with or speak to any of the parties, lawyers, or witnesses involved in this case.  You should not even pass the time of day with any of them.  It is important that you not only do justice in this case but that you also give the appearance of doing justice.  If a person from one side of the case sees you talking to a person from the other

2314

side, even if it is simply to pass the time of day, an unwarranted and unnecessary suspicion about your fairness might be aroused.  If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or the like, it is because they are not supposed to talk or visit with you.

Fifth, do not read any news stories or articles about the case or about anyone involved with it or listen to any radio or television reports about the case or about anyone involved with it.  If you want, you can have your spouse or a friend clip out any stories and set them aside to give you after the trial is over or you are excused from serving on the jury in this

Page 5

case. I can assure you, however, that if you are selected for the jury in this case, by the time you have heard the evidence, you will know more about this case than anyone will learn through the news media.

Sixth, do not do any research on the Internet, in libraries, in the newspapers, or in any other way or make any investigation about this case on your own. If you are selected for the jury, you must decide this case based on the evidence presented in court.

Seventh, if you are not excused from serving on the jury today, please take this instruction with you so that you can refer to it if you have any questions between now and the date you are required to return for the trial.

Dated this 26th day of April, 2005, signed by me, Mark

2315

Bennett, chief judge.

Now, I wanted to explain who the people are in the courtroom just to help put you at ease a little bit. There shouldn't be a whole lot of mysteries, and I want to try and demystify everything for you.

Seated to my far left is Carey, one of my three and a half law clerks. Carey will be in the courtroom throughout the trial. She's in a second year of a federal clerkship with me. She's an honors graduate from the Drake University Law School and will be headed to Seattle at the end of the summer.

In front of me is our court reporter Shelly. Shelly has what I think is the toughest job in the courtroom because she's got to take down everything that's said by everyone at all times, and she does a terrific job of doing that.

We'll have various United States marshals in the

Page 6

courtroom. That's very typical in any criminal case. At some points in the trial we'll have more marshals than at other times depending on what's going on and who's testifying and the like.

We also have some court security officers, what we call CSOs, and there are a number of them in the building. There will usually be two in the courtroom, and one of their main responsibilities as it relates to you is to make sure you get back and forth from the jury room on time, and they do a terrific job.

We have the lawyers and the parties they represent.

2316

Of course, we'll have a jury in this case and then a judge. And I'll just take my responsibilities first, and then I'll talk about the jurors' responsibilities.

I've already had a lot of responsibility in this case. As you might expect, in a case where a defendant is facing the death penalty, there would be a lot of motions or legal issues that arise in the case, and I've been working for a long time on all of the motions that were filed by both sides. And I'm current now. I've ruled on all the pending motions.

I'll have -- I have the responsibility for conducting the trial, for figuring out the system for jury selection. We have a lot of flexibility in how we design jury selection. We pretty much got it down to a science in our routine cases, but this is obviously not a routine case.

I did read in the newspaper just a couple of weeks ago about a big case that was going to trial where they started with 400 prospective jurors in federal court, and they actually rented a convention center, and they brought all the jurors in, and they were going to do jury selection for as long as it took

Page 7

with all 400 jurors there every day. I imagine it could take several weeks or a month.

My time is very valuable to me, and I assume that your time is just as valuable to each of you. And so I tried to come up with a system that doesn't waste anybody's time, just requires you to come in one day.

2317

Once the trial gets underway, it will be my responsibility to instruct you on each of the ten charges against the defendant and define those charges for you and give you written instructions on things like the burden of proof -- government has the burden of proof beyond a reasonable doubt -- the presumption of innocence, defining all of those concepts, giving you instructions on how to help you gauge the credibility of witnesses and the like. So that's an important part of my job.

It's going to be a lengthy trial. I know all of these lawyers quite well by now, and there will be a lot of objections to various evidentiary matters, so there will be lots of things for me to rule on during the course of the trial. And I look forward to doing that. That's part of my job.

I meet with the lawyers early in the morning each morning and then at the end of each trial day, and we try and get as much stuff resolved as we can so that during the actual trial day from 8:30 to 4:30, 4:45 or so, you're in the jury box virtually all of the time. We try and keep disruptions to a minimum, and that's my responsibility to make sure I give both the United States government and the defendant, Angela Johnson, the fairest trial I can but also to try and do it in a very efficient way as to not waste your time. So I'll have lots of

Page 8

responsibilities during the trial.

But let me talk about your role now.  What's the

2318

jury's role?  Well, you'll notice that I didn't say anything about my responsibility in terms of judging the credibility of the witnesses or making findings as to what actually happened because that's not my job in a jury trial.  That's the job of the jury.  And in a very real sense you are the judges of the facts.  What do I mean by that?  Well, there's our witness box right there.  I anticipate in this case there could be in excess of a hundred witnesses that testify.  And I believe there may be in excess of 500 exhibits that get admitted into evidence.

And it will be your job if you're selected to serve on the jury to listen very carefully to the witnesses, look at and examine the evidence.  And we have a high-tech courtroom so that whenever a lawyer is talking about an exhibit with a witness, if the lawyer chooses to have you see it, then they can put it up on the big screen, and you can follow the evidence as the witness is testifying about it.  And your job is to review the evidence and figure out what actually happened.

And then once you figure out what happened, you'll take my jury instructions, and you'll apply the facts to the law, and then you'll have to decide what happened.

And in the first part of this trial, it's like any other trial.  You'll have to decide whether Angela Johnson is guilty or not guilty of one or more of the ten charges against her.  You have to actually make that finding with regard to each of the ten charges.  Is she not guilty or guilty of the charges?

2319

Page 9

So that's essentially what you'll be doing.

Because this is a death penalty -- potentially a death penalty case -- we may never reach that part of the case because if the jury does not find Angela Johnson guilty of one or more of the ten charges beyond a reasonable doubt unanimously, then we never reach the penalty phase.

But if there is a penalty phase, one of the things that makes this case unique is that you rather than me would decide the penalty in the case. And if we ever get that far and there is a penalty phase, you would have only two choices, life imprisonment without the possibility of parole. There is no parole in the federal system. It was abolished on November 1, 1987. There is no parole, so it'd be life in prison or the death penalty, and that's a decision that the jury makes. Congress decided in cases where the death penalty is at issue which is a very, very, very small percentage of federal cases that the jury rather than the judge should make that decision. In all other cases I make the decision as to the penalty. But in this case it will be up to the jury.

Okay. We're about to start what lawyers call voir dire. We use it interchangeably for the term jury selection. Literally translated, voir dire does not mean jury selection. It actually means to speak the truth. And what we mean by that is that I'm looking for 18 jurors. We're going to have 12 trial jurors and 6 alternate jurors for this case.

2320

And in order to do that, we have to ask you a bunch of questions today, and I wanted to remind you there are no right or wrong answers to the questions. I imagine that if I got a notice that I had to appear in a courtroom and appear in front

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2021 of 3245

of a bunch of strangers and have a mean old judge up on the bench and five lawyers sitting in the courtroom and I knew they were going to ask me a lot of questions that I'd be kind of nervous, and I would be.

But I'm here to tell you you really don't have anything to be nervous about because it's not like we're going to give you a quiz on which amendment in the United States Constitution gives Angela Johnson the right to a fair trial. It'd be the Sixth Amendment, but we're not going to ask you stuff like that.

We're going to ask you about your life experiences and your views and your opinions on things like the death penalty, for example. And your opinion, whatever that may be, is just as valid, just as important as any opinion that I might have, any opinion that anybody in the courtroom has. It's just as important as any opinion the President of the United States might have because everybody in this country is entitled to their opinion.

And nobody is here to try and talk you out of your opinion or to make a judgment that you're somehow not a good citizen because you hold a particular view. One of the great

2321

freedoms of citizenship is you have the right to think anything you want. But we do have to try and figure out what it is that you think and what your beliefs are.

And so for our system to work, you have to answer the questions that I ask -- and for the most part the lawyers are going to be asking the questions -- openly and honestly.

Now, you will notice that you each have a number, and we will refer to you all by number, and I wanted to explain why

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2022 of 3245

that is. I made the decision in this case that I thought we should use numbers in the courtroom. We all know your names because we have your questionnaires, but here's the deal. I didn't want the press to pick up on the names of the jurors. And here's why.

It's going to be a long and difficult trial. It's going to be a very tough task for the 18 of you who get selected to serve. I didn't want to add any stress and invade your personal privacy by having your names printed in the newspaper or disclosed on the radio or television, and that way any idle curiosity seeker could seek you out, knock on your door, call you up, interview you about what it's like to be a juror in a death penalty case. I just didn't think you should be exposed to that. So I and I alone made the decision to use numbers solely for the reason of protecting your personal privacy.

Now, I just want to go kind of through the jury selection process so you understand what we're doing. We are in

2322

our tenth day if I'm correct of jury selection. This would actually be the start of our third week. We went four days the first week, five days last week I think, and I was in Washington, D.C., at a meeting I had to be at yesterday, and so we'll go four days this week. We hope to be done either at the end of this week or early next week.

We're bringing in small groups of potential jurors each day. Today we have ten. And after my introduction and a few questions by me, then there will be group questioning of you by both sides. What I mean by both sides, the government has 30 -- I've given them time limits, so the government has 30 minutes, the defense has 30 minutes to question you as a group.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2023 of 3245

Then when we're done with group questioning, we're going to send you down to the jury room, and then we're going to bring you back here individually to question you individually.

And when we have you come back, you'll just come through that very door, and you'll just go to any seat you want in the front row, and the lawyers have 12 minutes per side, and you'll be questioned by the defense and by the government, and they alternate, but you'll be questioned for about 12 minutes by each side, and I may have a few questions for you.

You will know at the end of the questioning whether or not you're still in the jury pool or whether you're dismissed. So what will happen is when we're done questioning you individually, we'll ask you to step outside. It takes anywhere

2323

usually from 30 seconds to a couple of minutes. We'll then bring you back in, and we'll tell you you're either dismissed from jury service which means you can go home, you have no chance of being on the jury or you're still in the jury pool.

If you are told that you're in the jury pool at the end of the day today or at the end of your individual questioning, you have about a 50 percent chance of being selected to serve as a juror. My math isn't good. You actually have 18/34 of a chance. I just rounded that off to 50 percent. That's good enough for me.

And then what will happen is when we manage to get 34 jurors into our jury pool -- we hope it will be the end of this week or early next week, then of those 34, we'll let 18 of you know that you're going to be trial jurors, and the rest will then be dismissed from the case.

Once we get the trial underway, we're going to run it

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2024 of 3245

four days a week. It will almost always be Monday through Thursday. And at the beginning of the trial I'm going to give you a schedule going out probably two full months, but for the most part it will be Monday through Thursday, and we are taking the week of June 10 through June 17 off.

We'll run our trial from about 8:30 in the morning. We'll start -- and we start promptly at 8:30, and we'll run till about 4:30, maybe go to a quarter to 5 or so. If we can finish up a witness who's maybe from out of town and we can get that

2324

witness on the road by going an extra 5 or 10 or 15 minutes, we'll go to 4:45. I don't like going beyond that because a lot of you have major travel going back and forth.

Just in terms of the travel, you know, I understand what an inconvenience it is, and these lawyers all understand it. None of the lawyers are from Sioux City. The closest lawyer is from 200 -- two of the lawyers are from 200 miles away from Des Moines. Two of the lawyers are from 330 miles away from Cedar Rapids, and one of the lawyers is from Kansas City, so they all travel a long ways to get here.

Last year I made 16 trips to hold court over in Cedar Rapids 660 miles round trip. In the mid '90s, latter part of the '90s, I tried an 11-week trial in Cedar Rapids. So I was gone from my family for 11 weeks. I would get home very late Friday night and have to leave on Sunday. And in the middle of the trial, I was back on a weekend, and I was running errands with my daughter who was about seven years old at the time, and we were just driving somewhere, and just out of the blue she goes, Daddy, have you moved to Cedar Rapids? So I felt about this big, of course. So I know what it's like to take you away

Page 14

from your families. And, you know, we apologize for that, but it has to be done.

Now, we're going to have the lawyers introduce themselves. Mr. Williams? We're going to find out if you know anybody too.

2325

MR. WILLIAMS: Thank you, Your Honor. Good morning, ladies and gentlemen. As the judge indicated, my name is C.J. Williams. I office and live over in Cedar Rapids and come over here to Sioux City and appear in front of Judge Bennett on a regular basis for the United States.

Also at counsel table you were introduced to Tom Miller.

MR. MILLER: Good morning.

MR. WILLIAMS: Mr. Miller is from Des Moines as the judge indicated, and he's the head of the area prosecution office for the attorney general's office.

Also at counsel table you were introduced to Bill Basler. He's a special agent-in-charge. He's from Mason City, Iowa. He's with the Iowa Division of Criminal Investigation. As the judge indicated, he's the case agent which means he's the lead investigator in this case. And he'll be sitting at counsel table with us throughout this trial assisting us.

At this back table is Sali Van Weelden. She's a legal assistant from our office also from Cedar Rapids and will also be assisting us throughout the trial.

The U.S. Attorney's Office in the Northern District of Iowa is headed by Chuck Larson Senior. He's been in Baghdad for the past year. He'll be coming back some time this summer. We have an office in Cedar Rapids, Iowa.

Page 15

We also have an office here in Sioux City.  Because

2326

you might be more likely to know people out here than over in Cedar Rapids, I'm going to go through the list of the attorneys and the staff people out here in case you know somebody.  We have seven attorneys and seven members of our staff.

Forde Fairchild, Martha Fagg, Kevin Fletcher, Mike Hobart, Jack Lammers, Janet Petersen, and Shawn Wehde are all the attorneys out here in Sioux City.

Shayne Mayer, Del Tompkins, Penny Schlotman, Michelle Schwebach, Michelle Hatting, Carol McEntaffer, and Pat Calhoun are all the administrative support staff that we have in the Sioux City office.

THE COURT:  Thank you, Mr. Williams.

Now, do any of you know anybody at the government's table, any members of the U.S. Attorney's Office?  Or let me broaden that to anybody who you think might work here at the federal courthouse in Sioux City.  If you know anybody, raise your hand.

Okay.  Good.  We'll go over now to the defense side. And Mr. Willett, would you introduce yourself and everybody else.

MR. WILLETT:  Your Honor, if it please the Court, I'd like to introduce the jury to my client, Angela Johnson.  Miss Johnson was born in the decade of the '60s.  She is from the Mason City/Clear Lake, Iowa, area.  I'm going to assume that's a familiar area of the state for you, but if not, it's in north

2327

Page 16

central Iowa just below the Minnesota border. Miss Johnson went to Forest City High School. She finished her formal education after the ninth grade, but she obtained her GED certificate since then. Angela has three sisters, one brother. Both of her parents are still living. She has two daughters and one granddaughter. Do any of you think you recognize my client, Angela Johnson?

Now then, let me introduce myself. My name is Al Willett. I practice in Cedar Rapids, Iowa. And I practice with the firm of Terpstra, Epping, and Willett. We sort of have the tongue twister firm in my city. I practice law with Ray Terpstra and Greg Epping.

I have two co-counsel with me. Mr. Patrick Berrigan from the Watson and Dameron firm in Kansas City, Missouri. Associated with Mr. Berrigan and assisting us is Miss Lisa Dahl.

And then my other co-counsel is Mr. Dean Stowers from the law firm of Rosenberg, Stowers, and Morse in Des Moines, Iowa. Dean practices law with Brent Rosenberg, David Morse, and Heather Wood.

Now, do any of you recognize myself or Mr. Berrigan or Mr. Stowers?

And, Your Honor, I see no nods of affirmation.

THE COURT: Okay. Thank you, Mr. Willett.

Now, I need to talk to you about the estimated length of the trial. It is always hard to estimate the length of a

2328

trial. It's a little bit easier when we have a two- or three-day trial. We know it's going to probably run two or three days. When we have this many witnesses and this many exhibits, it's very difficult to estimate the length, but the

Page 17

lawyers have worked very hard to try and give me the best judgment they can.

We think including jury selection which we're now starting our third week the trial will be about three months. Best-case scenario, it will be done some time in June. Worst-case scenario, it will be done some time in early July. That's our best judgment.

And I'm telling you this because I need to know whether it would be a severe or extraordinary hardship for each of you to serve, and I'm going to ask you each individually, and we're going to pass the microphone. But before we get to that, I wanted to talk to you about jury service.

I think that jury service is a very unique opportunity to serve your country, and I don't know that -- many people when they get their notice of jury service, that's probably not the first reaction that comes to mind: This is great. I now have a unique opportunity to serve my country. Probably not many people think that way.

But I find once they come to the courtroom they do think about it that way, and it's really been -- one of the most rewarding parts of jury selection in this case has been the

2329

sacrifice that people are willing to make to serve as jurors. And I've only had two really long trials. By long trials I mean two months plus. And in each of those cases I was astounded by the willingness of jurors to serve.

And in one case last year one day we had two farmers -- this was jury selection going on in August. The trial was going to go through October. And two farmers, both of whom farmed full time, worked full time, they weren't going to

Page 18

get paid in their manufacturing jobs except for the first two weeks. And they both said it would not be an undue hardship to serve. Can you imagine that? They lost all that income, and they were willing to serve. I don't remember whether they were actually selected or not because we went through so many jurors.

And in that same case on another day we had an individual who wasn't going to get paid for jury service when he was away from his job, but he had talked with his spouse, and they were willing to deplete their entire life savings because he felt it was so important to serve as a juror.

And I was just at a meeting yesterday in Washington, D.C., with three other federal district court judges from around the country. And they were asking me how difficult it was in a lengthy trial like this because none of them have ever had a lengthy trial, did everybody want to try and get off jury duty, and I said not at all. I said a lot of days we're bringing 10 or 12 jurors and nobody, no matter what you said in your

2330

questionnaire -- and by the way, reading the questionnaires, I could come with a list of every imaginable excuse to get off jury service. But when people actually come into the courtroom -- and I was telling them this -- that hardly anybody ever asked to get off, and when they do, they have a really true reason. And the judge sitting next to me was from New Orleans, and he said, If I ever had a trial of that length, he said 95 percent of the jurors would try and get off, and they would come up with every excuse. And I said, Well, that's just kind of the difference between a major metropolitan area and northern Iowa. So it's been very gratifying for me. And I think I speak for the lawyers too about people's willingness to serve.

Page 19

So before you say it would be a severe or extraordinary hardship, I want you to think about it. And for some people it is. I understand that. But very -- not very many people have asked.

So, Rick, turn that microphone on. I'll make a deal with all of you. We'll start with Juror 193. If each juror holds that microphone up and answers into it, then I won't put up any karaoke music for you to sing on the screen. Is that a deal, Juror 193?

PROSPECTIVE JUROR 193: Yeah.

THE COURT: Okay. Would you be willing to serve as a juror in this case if you're selected?

PROSPECTIVE JUROR 193: Yes.

2331

THE COURT: Okay. Thank you very much.

Juror 100, would you be willing to serve if you were selected?

PROSPECTIVE JUROR 100: If I was forced to, I would.

THE COURT: Well, what do you mean by forced to?

PROSPECTIVE JUROR 100: I am a nervous person. Oh, boy, here I go.

THE COURT: That's okay.

PROSPECTIVE JUROR 100: I'm a very nervous person, and stress really affects me. I have a heart arrhythmia, and considering the magnitude of this case and the supposed duration, I think that the stress would really get to me.

THE COURT: Okay. Let me ask you this. Well, would you rather -- are you comfortable talking about it now or not in front of everybody? I'm not going to ask you a bunch of detailed questions, but I've got a couple questions I'd like to

Page 20

PANEL J, 4-26-05

ask you.

PROSPECTIVE JUROR 100: Go right ahead. I'm sorry I'm --

THE COURT: That's okay. That's okay.

PROSPECTIVE JUROR 100: -- nervous.

THE COURT: You know what? Juror 100 -- I'm sorry we're calling you by numbers because probably nobody's ever called you Juror 100 before; right?

PROSPECTIVE JUROR 100: No.

2332

THE COURT: Okay. It's okay to be a little bit nervous, and it's okay to be upset. That's understandable. You're not the first juror who's been both nervous and upset.

PROSPECTIVE JUROR 100: But I'm not on trial.

THE COURT: I know you're not on trial. I know you're not, but it's a very important matter. Here's what I want to know. Have you talked with your doctor at all about whether your doctor, he or she, thought you could serve as a juror?

PROSPECTIVE JUROR 100: No, I haven't.

THE COURT: Okay. And that's okay because you know what? You know yourself better than any doctor would ever know you, and you know yourself better than I'll ever be able to know you or that the lawyers would. And I understand that for some people this could be very stressful because there are enormously important decisions that have to be made. And the weight of those decisions can -- they affect each of us differently. Doesn't make you good or bad. Just it affects people differently. Do you think you'd be able to do it or not?

PROSPECTIVE JUROR 100: I think I'm capable, but I think I'd suffer as a result.

Page 21

THE COURT: Okay. Okay. Now, because only you know the answer to this question, I don't exactly know what you mean by suffering. Some suffering is probably good because it means you're taking it very seriously. And we want all the jurors to take it very seriously. At some point it's simply too much to

2333

ask of someone, that someone would just suffer too much that it would be just unfair for me, for example, to expect you to serve. But only you know the answer to that question.

So if you think that your suffering would be unfair or it's asking too much of you, then I'm going to let you go as a juror. If you think it's something you'd be able to handle and that it wouldn't be unfair, even though it might affect you more than it might affect somebody else, then I'd ask you to serve.

But it's okay if you think it's too much for you. Takes a lot of courage to actually say that, and I understand that. So if you think it'd be too much, I'm going to let you go. Have you thought about it since you got the packet and filled out the questionnaire and then found out you were going to actually have to come? Have you thought about whether you could do it?

PROSPECTIVE JUROR 100: I think I could but . . .

THE COURT: But you don't want to.

PROSPECTIVE JUROR 100: I didn't sleep all night just worrying about coming today.

THE COURT: You didn't sleep all night?

PROSPECTIVE JUROR 100: No.

THE COURT: Really?

PROSPECTIVE JUROR 100: And this is not -- I mean, I'm an adult, and I can handle situations, but just -- I'm -- I

Page 22

don't know why I'm overreacting here.

2334

THE COURT:  You're not overreacting.  Everybody reacts differently.  A lot of people would react the same way you do. But look, I don't want you to go through, you know, if you do get selected to serve, for two months of trial or so and not be able to sleep at night because, you know, it's not -- I'm not -- I don't want to adversely affect your health.  Let me ask you this way.  Do you think it could affect -- adversely affect your health?

PROSPECTIVE JUROR 100:  Yes, I do.

THE COURT:  Okay.  Do you think you'd maybe be better off on a trial that lasts two or three days -- we have a lot of those.

PROSPECTIVE JUROR 100:  Yes.

THE COURT:  -- than a trial of this length?

PROSPECTIVE JUROR 100:  Yes, I think I'd be perfectly willing to offer my services right now to something that's shorter.

THE COURT:  Okay.  I'm going to go ahead and exercise my discretion and let you go.

Any objection from counsel?  I don't believe there will be any.

MR. WILLIAMS:  Not at all, Your Honor.

MR. BERRIGAN:  No, sir.

THE COURT:  Okay.  Thank you very much.

PROSPECTIVE JUROR 100:  Thank you.

2335

THE COURT:  Thank you.  Good luck to you.  Will you
Page 23

promise me one thing? Will you go home and take a nap?

PROSPECTIVE JUROR 100: I'm afraid to fall asleep driving.

THE COURT: Well, you're free to leave now. Thank you.

PROSPECTIVE JUROR 100: Thank you.

THE COURT: Okay. Juror 591, are you willing to serve if you're selected?

PROSPECTIVE JUROR 591: Yes, I am.

THE COURT: Okay. Thank you.

Juror 600.

PROSPECTIVE JUROR 600: Yes, I am.

THE COURT: Thank you very much.

Juror 539.

PROSPECTIVE JUROR 539: Yes, I am.

THE COURT: Thank you very, very much.

Juror 703, are you willing to serve?

PROSPECTIVE JUROR 703: Yes, I am.

THE COURT: Thank you.

Juror 392.

PROSPECTIVE JUROR 392: Yes, I am.

THE COURT: Thank you.

Juror 125.

PROSPECTIVE JUROR 125: Due to the length of this

2336

trial, I did -- it's in my car. I forgot it. I thought I had it in my purse. I do have an excuse from my doctor because I get blood clots in my legs, and she said due to the length of this trial she didn't think I would make it through without blood clots.

Page 24

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2035 of 3245

THE COURT: And you actually have that note in your car.

PROSPECTIVE JUROR 125: Yes, yes.

THE COURT: I take you -- I believe that.

PROSPECTIVE JUROR 125: I also feel this would be very, very stressful. I have granddaughters, and I've thought about this a great deal since I got the papers.

THE COURT: Yeah. You know, I'm just going to stop you right there because that's not something I want to get into in group questioning, but, you know, virtually all of us and virtually every juror either has children or grandchildren, so that in and of itself, if that were the test, there would never be a trial. But you actually have a note from your doctor.

PROSPECTIVE JUROR 125: Yes, I do.

THE COURT: Okay. Any objection from counsel?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: None by the defense, sir.

THE COURT: Okay. Then we're going to go ahead and let you go. Thank you.

PROSPECTIVE JUROR 125: Thank you.

2337

THE COURT: Thanks. Juror 300.

PROSPECTIVE JUROR 300: Yes, I would give up my golf games for it.

THE COURT: Well, you know what? Maybe if you lay off for a while, when you get back to it you just might --

PROSPECTIVE JUROR 300: I might improve.

THE COURT: You might improve. That's our hope anyway.

Juror 617, are you willing to serve?

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2036 of 3245

PROSPECTIVE JUROR 617: Yes.

THE COURT: Okay. Thank you all very much. Now, I wanted to talk to you for a moment, because I just got done talking about your duty to serve, that you have an equal duty not to serve, and I know that probably sounds strange. I just was talking about how much I believe in your duty to serve, but here's what I mean by that.

It's very important that you answer all of the questions that I ask and that the lawyers ask as honestly as you can. And if there's a decision that's ultimately made that you're not suited to serve on this jury and that maybe you'd be better off in another case, then that's what I mean by a duty not to serve.

So I wouldn't want any of you to answer any questions thinking that, gee, if I say that, they might think I'm trying to get out of jury service because if you hold certain beliefs

2338

or views that would indicate that you're probably not a good juror for this case, then you have a duty not to serve in this case, and that's what I mean by that.

So it's just another way of saying you really have to answer our questions, particularly that the lawyers ask, as openly and as honestly as you can.

Now, I wanted to explain to you a little bit about the trial process because in federal court a case where the death penalty is a potential penalty in the case is relatively unique, and the process is quite a bit different.

So potentially this case has three phases to it, and I'm just going to try and describe, give you the big picture of what the phases could be, and I say potentially because the

first phase is what we call the merits phase. Another way of looking at it is that's the phase where you decide whether Angela Johnson is not guilty or guilty of each of the ten charges against her. And in that sense the first phase is like every other trial I have, a little longer than most, but it's really like every other trial because the decision at the end of the first phase is is the defendant not guilty or guilty of each of the ten charges. Has the government proved her guilty beyond a reasonable doubt, that's the question. And that's the same question in every trial.

The difference is if you find the defendant guilty in my regular trials, then you're done with jury service, and you

2339

go home, and then it's up to me to determine the sentence. And we have a process that we go through, and about 80 days from the jury verdict I have a sentencing hearing, and evidence can be presented. I apply the United States Sentencing Guideline Manual, this book, and I ultimately arrive at a sentence.

But in this case because the death penalty is a potential penalty, that's not how it works. So there could be a second phase in this case, and that would be -- only if there is a unanimous finding by all 12 jurors beyond a reasonable doubt that Angela Johnson is guilty of one or more of the ten counts in the first phase do we even have a second phase.

And the second phase -- actually Mr. Berrigan, I'm going to give him credit for it, one of the defense lawyers. He described it that it's kind of like a -- this process is kind of like a basketball game if you think about it. The first half is like the merits phase, not guilty/guilty. That takes a pretty good chunk of time. Then in a basketball game there's an

Page 27

intermission. That doesn't take very long compared to the first half and the second half.

And the second phase which I'll call the eligibility or gateway phase is kind of like the intermission in this sense. The first part of the trial we hear all these witnesses, have all these exhibits. You have to decide guilty/not guilty. If the jury decides not guilty, case is over. If the jury decides guilty on any one or -- on any one or all or some combination of

2340

the ten counts, then we have a second phase.

And in that second phase there won't be any evidence presented, but there will just be arguments from the lawyers, a new set of jury instructions from me, and then you'll have to decide whether the prosecution has proved what we call a gateway or eligibility factor and one or more statutory aggravating factors beyond a reasonable doubt.

If the jury unanimously agrees that the prosecution has proved this, then and only then would we reach the third phase. So the second phase, there won't be evidence presented, but you'll just have a new set of deliberations. And if the jury decides that the government has proved a gateway factor and an aggravating factor -- and you don't need to know what those are at this time -- then we would have the third phase.

And the third phase, the penalty phase, would be like the second half of the basketball game. In that phase the government will present evidence of what the government believes would be aggravating factors. The defense has no obligation to present any evidence because the burden is never on Angela Johnson to produce any evidence. But if she wants to, then they can put on evidence of what is called mitigating factors.

Page 28

And then in this penalty phase at the end of it I'll give you a set of very detailed jury instructions, and you'll have to consider and then weigh any aggravating factors that you find and any mitigating factors that you find in the evidence

2341

and weigh those factors and in that way decide what you think the penalty would be.

Now, in the penalty phase, only if each juror unanimously votes for the death penalty will Miss Johnson be sentenced to death by me. In other words, all 12 jurors have to unanimously agree that the death sentence is appropriate. If any one or more juror believes that after considering and weighing the aggravating factors and the mitigating factors that a life sentence is a sentence that would be appropriate, then the defendant would receive a life sentence.

So that's in a summary of how the trial process will go. And now I'm going to turn it over to the lawyers. Why don't you just all stand and take a stretch break.

Okay. Please be seated. We're going to hear first from Mr. Williams. And again, each side will have 30 minutes of general questions, and then we'll send you down to the jury room and bring you back one at a time.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

Good morning, ladies and gentlemen. My task right now is pretty simple. It's one, just to get to know each of you a little bit better than we do right now, and then I want to cover some general topics about issues that arise in every criminal case, things like witness credibility, presumption of innocence, and so forth.

Page 29

And so what I'm going to do, if you could, sir, Mr. 617, pass that microphone down to the end, and I'm just going to go down -- so everybody knows what I'm doing, I'm going to go down one at a time and just talk to each of you, and I'm going to then come over to this row, go down to the end so when I get to Miss 193 I'll sit down; all right?

So let's start off with Miss 703. You indicate in your questionnaire that you're a homemaker and at one point you worked in a greenhouse; is that right?

PROSPECTIVE JUROR 703: Yes.

MR. WILLIAMS: Do you still work in the greenhouse or not?

PROSPECTIVE JUROR 703: No, I do not.

MR. WILLIAMS: Where was the greenhouse at?

PROSPECTIVE JUROR 703: Sioux Center, Iowa.

MR. WILLIAMS: And how'd you like that?

PROSPECTIVE JUROR 703: I liked it.

MR. WILLIAMS: Sitting next to you is somebody who gardens a lot. She may have to come up to your old employment and get some plants. Do you also garden as well?

PROSPECTIVE JUROR 703: Yes.

MR. WILLIAMS: What kind of gardening do you do?

PROSPECTIVE JUROR 703: Vegetable and flowers.

MR. WILLIAMS: Got anything in yet?

PROSPECTIVE JUROR 703: No.

MR. WILLIAMS: It's just a little bit too early. I

went for a walk this morning, and it was pretty cold out there yet. I notice from your jury questionnaire that you had actually served on a jury before.

PROSPECTIVE JUROR 703: Yes.

MR. WILLIAMS: The judge discussed with you all the role of jurors, and that is you find out and determine what happened in a case. That's not the judge's job. It's your job. Is that something, Miss 703, that you found aptly described your job when you were on a jury before?

PROSPECTIVE JUROR 703: I found it very interesting to serve on a county jury.

MR. WILLIAMS: Was it a criminal case or a civil case? In other words, was somebody asking for money damages or a job back or something, or was it a criminal case?

PROSPECTIVE JUROR 703: It's been a long time ago, but it was a criminal case which involved a drunk driver.

MR. WILLIAMS: Was it important for you and the rest of the jurors to wait to hear all the evidence before you made up your mind rather than make up your mind after you hear the first witness in the box?

PROSPECTIVE JUROR 703: Yeah, it was important to hear everything.

MR. WILLIAMS: Did you find yourself considering in your mind different options, different scenarios, different

2344

things that may have happened in the case?

PROSPECTIVE JUROR 703: Yes.

MR. WILLIAMS: Is that important in your view as a juror to keep your mind open like that to the different possibilities of what happened?

Page 31

PROSPECTIVE JUROR 703:  Yes.

MR. WILLIAMS:  And were you able to do that when you served as a juror?

PROSPECTIVE JUROR 703:  Yes, I was.

MR. WILLIAMS:  Great.  Thank you very much, Miss 703. If you could pass the microphone down to Miss 392.

You're in gardening.  What kind of gardening do you do?

PROSPECTIVE JUROR 392:  Flowers, mostly.

MR. WILLIAMS:   Perennials or annuals?

PROSPECTIVE JUROR 392:  Both.

MR. WILLIAMS:  Both.  How long you been gardening?

PROSPECTIVE JUROR 392:  Well, we've owned a home, several homes, for -- since 1983, so since then.  I used to do vegetable gardening too but . . .

MR. WILLIAMS:  Gave that up.

PROSPECTIVE JUROR 392:  Gave that up.

MR. WILLIAMS:  Why is that?

PROSPECTIVE JUROR 392:  A lot of work.

MR. WILLIAMS:  It is a lot of work.  Our vegetable

2345

garden gets smaller and smaller every year.  It may disappear very soon.  You also served on a jury I saw from your questionnaire.

PROSPECTIVE JUROR 392:  Yes, just this past October.

MR. WILLIAMS:  And how did you find that experience?

PROSPECTIVE JUROR 392:  Interesting.

MR. WILLIAMS:  What was the most interesting thing about it?

PROSPECTIVE JUROR 392:  I had never done it before.

Page 32

That was my first time, so the whole process was a learning experience I would say.

MR. WILLIAMS: Did you -- like Juror 703, was it important for you to keep an open mind throughout the process to what the facts were and what the facts showed to you?

PROSPECTIVE JUROR 392: Absolutely.

MR. WILLIAMS: And did you work well with the other jurors?

PROSPECTIVE JUROR 392: Yes.

MR. WILLIAMS: The judge indicated in this case that we're going to have a lot of witnesses, perhaps more than a hundred witnesses in this case, and they're going to be from every walk of life. They're going to be law enforcement officers, a number of those, agents from the FBI, DEA, so forth. We're going to have witnesses that are actually on the other side. They're actually incarcerated, doing time now or people

2346

who have previously served in jail or prison. And there's going to be everybody in between, people just from the community and experts and things like that. Do you think that as a juror you would be able to sit and listen and consider all that testimony?

PROSPECTIVE JUROR 392: Yes, I would be able to do that fairly.

MR. WILLIAMS: As I indicated, some of the witnesses are going to be law enforcement officers. And while jurors can certainly take into account the law enforcement officers' training and experience in determining whether the witness knows what they're talking about, the judge ultimately will instruct you in this case that you should not give more credibility to a law enforcement officer than you would any other witness simply

Page 33

because of the title.

Now, some people understand that, and they can follow that instruction, and some people have a difficulty with that instruction. How about you?

PROSPECTIVE JUROR 392: In the last case that I was in, there -- it wasn't per se law enforcement, but it was something like that. And they had a doctor on there, and so we listened to all of them, and as well they had kids on there too, you know, and we listened to all of them and just took it all in, and that's how we made our judgment.

MR. WILLIAMS: And you didn't automatically give the doctor, I assume, more credibility simply because he had a title

2347

or she had a title as a doctor?

PROSPECTIVE JUROR 392: No, we didn't.

MR. WILLIAMS: And likewise in this case if the judge instructed you that you should not give more credibility to a law enforcement officer simply because of the title, could you follow that instruction?

PROSPECTIVE JUROR 392: Yes, I could.

MR. WILLIAMS: How about the rest of the jurors? Is there anybody in the jury panel that would have difficulty following such an instruction from the Court? I see no hands going up indicating.

Thank you very much, Miss 392. If you could pass it down to Miss 300.

Let's see. I have down, interestingly enough, golf for you.

PROSPECTIVE JUROR 300: Yeah.

MR. WILLIAMS: And you brought it up yourself. Tell

Page 34

us about that.

PROSPECTIVE JUROR 300:  Oh, I've just been playing golf since 1961, and we play as much as we can every week now that I'm retired especially.

MR. WILLIAMS:  Yeah.  Gives you a lot of freedom.

PROSPECTIVE JUROR 300:  Right.

MR. WILLIAMS:  Well, the judge indicated Fridays will be off, and you have your weekends off, so you can still

2348

maintain your game hopefully if you're chosen as a juror in this case.

PROSPECTIVE JUROR 300:  Okay.

MR. WILLIAMS:  Will that work okay?

PROSPECTIVE JUROR 300:  That will work fine.

MR. WILLIAMS:  Do you give mulligans in your game?

PROSPECTIVE JUROR 300:  Sometimes.

MR. WILLIAMS:  Sometimes?

PROSPECTIVE JUROR 300:  Sometimes we kick it out of the rough and just have a good time.

MR. WILLIAMS:  Probably depends on who's ahead and who's behind I'm guessing.

PROSPECTIVE JUROR 300:  Right.  We're not too serious.

MR. WILLIAMS:  Let me talk to you about these witnesses.  As I indicated, we're going to have witnesses who are going to have been either currently in jail or prison or formerly have been in prison.  The -- and jurors approach the credibility of witnesses different ways.  I assume in your daily life you have to sometimes judge the credibility of people around you and the things they tell you and so forth or you have in the past, in your past.  Is that fair to say?

Page 35

PROSPECTIVE JUROR 300: Right.

MR. WILLIAMS: What are some of the things that you use to judge whether somebody's being truthful with you or not?

PROSPECTIVE JUROR 300: Oh, golly, I don't know. I

2349

don't know how to answer that.

MR. WILLIAMS: Well, how about -- let me throw out some ideas. How about facial expressions or how they talk?

PROSPECTIVE JUROR 300: Eye contact basically.

MR. WILLIAMS: Eye contact, things like that. I mean, we're all built humanly to kind of decipher things like that and pick up on different signals. And certainly that's something that you can do with every witness who appears. Somebody who's incarcerated and is now cooperating with the government, is testifying on behalf of the government, is in a little bit different position, and that is because jurors can look at it a couple different ways. Some jurors look at somebody who's doing that as courageous to be able to come in and testify against somebody else who's incarcerated. Other jurors look at somebody like that and say, Oh, I don't trust that person because they're doing this for a reason. They want to get some time off and so forth.

And I think in your questionnaire, ma'am, you'd indicated in response to a question asking you what do you think about somebody who's been incarcerated testifying, you said the sentence should not be reduced, so I trust that was one of your thoughts immediately was they're in there testifying because they want to get their sentence reduced.

PROSPECTIVE JUROR 300: Right.

MR. WILLIAMS: And that's absolutely fair and

Page 36

appropriate for you to be considering that. The judge again will help you on this. The judge will instruct you, I anticipate, that when you are dealing with somebody who's cooperating with the government and is incarcerated that you should treat that testimony with special care and caution precisely because of the potential that they could be testifying in a certain way hoping to get a reduction or something like that. And I trust you could follow that instruction.

PROSPECTIVE JUROR 300: Right.

MR. WILLIAMS: Would you still look at that witness and still consider their testimony and look at the other things that you talked about that help you as a human judge credibility?

PROSPECTIVE JUROR 300: Right, yeah.

MR. WILLIAMS: Would you just automatically reject that testimony simply because somebody's incarcerated or had been incarcerated in the past?

PROSPECTIVE JUROR 300: No. We'd look it over, yeah.

MR. WILLIAMS: You could? Does anybody on the jury panel feel any differently than that? Does anybody feel, jeez, if somebody's incarcerated, number one, I'm not going to be able to follow the judge's instruction to use special care or caution with that witness? Anybody feel they couldn't follow that instruction? I don't see any hands.

How about the other way? Does anybody feel, jeez, if

the government puts somebody up as a witness who may get some reduction in their sentence, I'm sorry, I'm just not even going

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2048 of 3245

to listen to that testimony; I'm just not even going to consider it because I just don't agree with that kind of a system? Does anybody feel that way at all? And again, as the judge indicated, it's fine how ever anybody feels. Don't ever feel like you have to answer a question a certain way because anybody's looking for a right answer here. But if anybody feels that way just let us know. I don't see any hands there. Thank you very much, Miss 300. If you could pass it to Mr. 617.

The judge indicated in this case and you know from the questionnaire that came out that we are dealing with a murder case. The defendant in this case is charged with five murders, charged -- those five murders, the government alleges, violated two different crimes, so there's ten counts total, but there's five murders that are the basis of this prosecution.

Now, you know, in every murder case obviously there's going to be some evidence that's going to be difficult for people to deal with, for citizens that don't have to deal with that type of stuff as part of their job. In this case the government alleges the murders occurred back in 1993, and the bodies were not found until the year 2000, and so these aren't going to be graphic photographs of blood and gore, but they are going to be photographs of skeletal remains. There's going to be descriptions perhaps about how the murders occurred, and some

2352

people have difficulties handling that type of evidence.

I hope all you recognize that -- I think the judge even indicated -- without the ability of jurors to view things like that and deal with the fact that in this case children were murdered, we wouldn't be able to have criminal trials. We need to be able to find citizens who can shoulder that type of

Page 38

responsibility and be able to view that type of evidence dispassionately and base their decisions on the evidence and not on their emotional response.

Mr. 617, in your questionnaire when you were asked about that issue, you had checked the box that you did not think that was going to overly concern you or make it difficult for you to serve as a juror. Is that fair to say?

PROSPECTIVE JUROR 617: Yes.

MR. WILLIAMS: I want to talk to you just a minute. You indicated in your questionnaire that you're retired but you also work part time now.

PROSPECTIVE JUROR 617: Yes.

MR. WILLIAMS: What do you do in part-time work?

PROSPECTIVE JUROR 617: Drive truck.

MR. WILLIAMS: And what did you do when you were working full time, sir?

PROSPECTIVE JUROR 617: I was a licensed mechanical engineer.

MR. WILLIAMS: For a special -- or a specific company?

2353

PROSPECTIVE JUROR 617: No. I was with Briar Cliff and Creighton University.

MR. WILLIAMS: Oh. As a professor there?

PROSPECTIVE JUROR 617: No, engineer.

MR. WILLIAMS: As an engineer, okay. I see. How long were you with them?

PROSPECTIVE JUROR 617: I was with Briar Cliff about ten years and about eight years. Then I went to work at Master Manufacturing, stayed there 15, then retired.

MR. WILLIAMS: I see. In this case as I was saying,

Page 39

you know, we have this difficult evidence. And you said you didn't think that was going to bother you very much. Are you the type of juror that you think that, you know, if you see the photographs of skeletons of children that while that might evoke an emotional response from you, do you think that's something you could set aside and still look at the evidence to determine what the evidence showed in this case?

PROSPECTIVE JUROR 617: Yes, I've seen them when I was in Korea laying all over so . . .

MR. WILLIAMS: Very good. Does the rest of the jury recognize that this is not going to be the case about whether murdering children is bad? I don't think anybody is going to say, Yeah, I think that's a good idea. But this is not a trial about whether murdering children is good or bad. You will get a verdict form if you serve on this jury, but nowhere on the

2354

verdict form will there be a box to check whether you disagree with the murder of children.

Rather, what this case is about is whether the government can prove beyond a reasonable doubt that this defendant was involved with the murders, and it's going to be critically important for everybody here to be able to set aside their emotional response to that type of evidence and dispassionately decide this case based on the evidence, not based on their emotional response.

Is there anybody among the jurors who think they would have difficulty doing that in this case? Mr. -- okay. So a number of hands went up, 703, I think 392, 300, and 591. And I think it is understandable that everybody is going to have difficulty with that type of evidence.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2051 of 3245

What's going to be important for you is to be able to recognize those emotions for what they are, that they are an emotional reaction to what is in anybody's judgment a horrible thing that happened but recognize that's not the question here. The question that you all would have to decide as jurors is whether the government's proved its case beyond a reasonable doubt. And can everybody set that aside, set their emotional response aside, and require the government to prove its case beyond a reasonable doubt as the Court will instruct you is our duty? Can everybody do that?

Okay. Let me talk -- thank you very much, sir. If

2355

you could pass that microphone down, and let's go to the end of the line here, 539, and go the same order you ultimately will probably be questioned individually here.

I just got done talking about the fact this was a murder case, but underlying the murders in this case is a methamphetamine conspiracy. The defendant is charged with engaging in a drug conspiracy involving the manufacturing and distribution of methamphetamine and a continuing criminal enterprise and, in conjunction with those crimes, was involved in the murder of five people. Continuing criminal enterprise is a form of drug conspiracy with additional requirements that ultimately the judge will instruct you on if you serve as a juror in this case. Some people have difficulties with drugs in our culture. I noted that you're a high school teacher. At this point you teach English; is that correct?

PROSPECTIVE JUROR 539: That's correct.

MR. WILLIAMS: And how long have you been doing that, sir?

Page 41

PROSPECTIVE JUROR 539:  Twenty-one years.

MR. WILLIAMS:  I periodically go out and speak to different schools, and I'm aware that even in high schools we have methamphetamine problems throughout Iowa.  I assume --

PROSPECTIVE JUROR 539:  Especially Iowa.

MR. WILLIAMS:  -- you do that, you have some problems even in your school I suspect.

2356

PROSPECTIVE JUROR 539:  Yes.

MR. WILLIAMS:  Hopefully not too much.  Just like this case is not a referendum about whether killing children is bad, this is not a case to determine whether drugs are bad.  And what we wouldn't want to have is a juror who is so angry about drugs, so angry about the meth, methamphetamine, in our society that they're going to base their judgment as -- on that emotional response as kind of a way of their own war on drugs, you know, disregard the evidence and find the defendant guilty because they believe drugs are bad.  What are your thoughts on that, sir?

PROSPECTIVE JUROR 539:  I don't have a personal war on drugs, and recently two families that I respected a lot in the community, I found out they're producing methamphetamines in their house.  And when they were busted, it was just shock.  I couldn't believe that people that I knew so well -- one was only a block from my house.  And I tried to understand how that -- they got involved with something like that.  And the students that -- some of my best students were taken away because the family was broken up.  The father had to go away.  And I lost my students, and I thought -- there's a lot that I don't understand, but I don't see it as something that I'm -- I don't

Page 42

have like a crusade against drugs. I'm more just aware that it's here.

MR. WILLIAMS: Yeah, you mentioned in your

2357

questionnaire -- I didn't realize they were also your students, but you talked about in your questionnaire the fact that it had split up a family and they ended up going to foster care and so forth. And drugs can have devastating --

PROSPECTIVE JUROR 539: Right after the questionnaire it happened again.

MR. WILLIAMS: Oh, wow.

PROSPECTIVE JUROR 539: Yeah. I just got one of those students back.

MR. WILLIAMS: Is -- I mean, it's obviously affected you, at least in your teaching and so forth. But is that something that in your view you can set aside, recognize this is not going to be a case about whether drugs are good or bad? This is going to be a case about whether the government can prove its --

PROSPECTIVE JUROR 539: Right, yeah, I can set that aside.

MR. WILLIAMS: Very good. Does any juror on the panel feel otherwise? Anybody have maybe a more -- closer connection to adverse consequences of the drug trade that they just feel they couldn't set those feelings aside and base their decision on the evidence in this case? If you do, that's fine. Just let me know, and we'll talk about it for a little bit. Does anybody feel that way? I don't see any hands. Okay. Thank you very much, sir. If you could pass that to the gentleman next to you.

2358

Page 43

Mr. 600, you are a professor at Iowa Lakes Community College in the area of agriculture?

PROSPECTIVE JUROR 600: Yes, that's true.

MR. WILLIAMS: Can you tell us a little about that?

PROSPECTIVE JUROR 600: I teach classes I guess fall, spring, and a short summer term in agriculture, mainly in animal sciences.

MR. WILLIAMS: And how long you been doing that?

PROSPECTIVE JUROR 600: Eleven years.

MR. WILLIAMS: Do you like it?

PROSPECTIVE JUROR 600: Yes.

MR. WILLIAMS: What's the best part of that job?

PROSPECTIVE JUROR 600: Oh, I think it's the satisfaction of seeing a student obtain employment following completion. The majority of our students return to the home farm and can maintain and work with Dad and Grandfather in those cases.

MR. WILLIAMS: I'm kind of curious. Is there any group of the student population that don't come from a family farm that are going into family -- or into farming for the first time?

PROSPECTIVE JUROR 600: We do have some that are seeking employment in that area, yes.

MR. WILLIAMS: And don't come from a background from that?

2359

PROSPECTIVE JUROR 600: Right, that's true.

MR. WILLIAMS: Interesting. You hear just the

Page 44

opposite about family farms disappearing. You don't hear very often about people getting into farming.

PROSPECTIVE JUROR 600: Right.

MR. WILLIAMS: I want to talk with you, sir, for a little bit about the presumption of innocence. It's a bedrock principle of our system, criminal justice system, in America, whether it's federal court or state court, that criminal defendants are presumed to be innocent until and unless proven guilty beyond a reasonable doubt.

The defendant is here obviously charged with a crime, and the way it works in the federal system is a federal grand jury convenes and reviews some evidence, and their job is to determine whether there's probable cause to believe a crime has been committed. The grand jury process is actually a guarantee under the Constitution. In state court our county attorney can charge somebody with a felony offense without running it by any citizens. The federal system's a little different. We have to run it by a group of citizens. We show them some evidence, and they help determine whether there's probable cause to believe a crime has been committed.

What's very important about that, though, is the determination is probable cause whether a crime has been committed. So the fact that the defendant has been indicted is

2360

simply a determination of probable cause. Some evidence exists. It's not evidence -- the fact of indictment is not evidence of anything. The defendant is presumed to be innocent. It's simply a way to charge somebody with a crime.

Now, obviously we don't just pull people off the street and bring them in and say, Okay, we need a defendant this

Page 45

week, and so, Mr. 600, you're going to be our defendant this week. We don't have any evidence, but we thought we're kinda busy and we don't want the judge to do nothing this week. It doesn't work that way.

And so what happens sometimes is jurors come in, and they see the defendant sitting there, and they think, boy, she must be guilty because she's sitting there, and obviously the government had something or else they wouldn't have her in here. And so they start thinking that way, and they can't afford the defendant the presumption of innocence which is absolutely necessary for our system to work. And if people feel that way, that's fine. We just need to talk about it here for a little bit.

How about you, sir, Mr. 600? What are your thoughts? Can you presume the defendant innocent?

PROSPECTIVE JUROR 600: Yes, I believe I can.

MR. WILLIAMS: We may all have in the back of our minds some thought, well, there must be something there, but can you recognize that's something that you need to set aside and

2361

require the government to prove if we can the defendant's guilt beyond a reasonable doubt? Can you do that?

PROSPECTIVE JUROR 600: Yes, I can.

MR. WILLIAMS: Does anybody on this jury think that they couldn't do that, that they could not give the defendant the full presumption of innocence? Okay. I don't see any hands. Thank you very much. If you could, why don't you pass it down if you would to Mr. 591.

I want to talk to you for a moment on that same topic. The defendant is presumed innocent and has no burden to prove

Page 46

her innocence in this case. The only burden of proof in this case rests on the government, and it's proof beyond a reasonable doubt. And the defendant doesn't have to present any evidence, doesn't have to cross-examine any of our witnesses, doesn't have to even participate if they don't want to in the voir dire process that we're undertaking right now. Is that something that you recognize as a right of the defendant?

PROSPECTIVE JUROR 591: Yeah.

MR. WILLIAMS: Is that something that you could follow in this case, that the defendant's presumed innocent, has no burden of proving anything in this case?

PROSPECTIVE JUROR 591: Yeah, I believe so.

MR. WILLIAMS: The job of a juror is a tough one. You have to listen in this case to, you know, perhaps a hundred witnesses. You have to evaluate the credibility of different

2362

witnesses. You have to look at evidence and tangible things, read documents. And in the end you're going to have to do a lot of weighing and considering of different things.

The important thing as you go through there is to recognize that throughout it's the government's burden to prove its case beyond a reasonable doubt and to hold the government to that burden. Do you think you can do that, Mr. 591?

PROSPECTIVE JUROR 591: Yes, sir.

MR. WILLIAMS: Do you think you can base your judgment in this case on the evidence itself and after hearing the judge's instructions determine whether the defendant's guilty or not guilty based on the evidence and the judge's instructions?

PROSPECTIVE JUROR 591: I believe so.

MR. WILLIAMS: I saw that you work at Tyson Retail

Page 47

Deli; is that right?

PROSPECTIVE JUROR 591:  Yep.

MR. WILLIAMS:  As a powerhouse engineer.

PROSPECTIVE JUROR 591:  Yeah.

MR. WILLIAMS:  What are your duties as a powerhouse engineer?

PROSPECTIVE JUROR 591:  Deal with ammonia refrigerant and powerhouse steam.

MR. WILLIAMS:  Now, I'm familiar with Tyson's.  They have a number of manufacturing plants and so forth.  I didn't realize they had a retail deli.  What is -- can you tell me

2363

about that?

PROSPECTIVE JUROR 591:  It's just case-ready products that everything's processed.

MR. MILLER:  Three minutes, Mr. Williams.

MR. WILLIAMS:  Thank you.

Do they have a number of those stores?

PROSPECTIVE JUROR 591:  It's mostly stuff that is brought right to the supermarket, prepriced, ready to go.

MR. WILLIAMS:  Interesting.  I wasn't even aware of those until I read your questionnaire.

PROSPECTIVE JUROR 591:  I think they just acquired that.

MR. WILLIAMS:  Oh, I see.

PROSPECTIVE JUROR 591:  Yeah.

MR. WILLIAMS:  Thank you very much, Mr. 591.  If you could pass the microphone down to our last juror, Miss 193.

I see you're assistant manager at a Casey's in Storm Lake and you love your job.

Page 48

PROSPECTIVE JUROR 193:  Yes.

MR. WILLIAMS:  What's the best part about your job?

PROSPECTIVE JUROR 193:  Probably greeting and meeting all the people every day.

MR. WILLIAMS:  Do you have a lot of regular customers that come in?

PROSPECTIVE JUROR 193:  Oh, definitely.

2364

MR. WILLIAMS:  And are you one of those that can remember what different people want and what they eat and what they like?

PROSPECTIVE JUROR 193:  That's part of my job.

MR. WILLIAMS:  Always amazes me when people can do that.  I've been talking with these other jurors, prospective jurors, about this burden of proof, and I want to just cover that with you for a minute.  The burden of proof is for the government to prove its case beyond a reasonable doubt.  Now, ultimately the judge will instruct you what that means, but proof beyond a reasonable doubt doesn't mean proof beyond all doubt.  It's proof beyond a reasonable doubt.  And the decision will ultimately be for the jury to make.

Now, I noted in your questionnaire when asked about that you said that -- something to the effect that you think that the evidence should be proven beyond all doubt.  And sometimes we use those terms freely.  Sometimes people say beyond a shadow of a doubt.  Some people say beyond all possible doubt.

What I wanted to explore with you in this case is when you say beyond all doubt, is that in your mind a standard higher than beyond a reasonable doubt, or did you mean beyond a

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2060 of 3245

reasonable doubt?  Can you --

PROSPECTIVE JUROR 193:  Reasonable doubt, reasonable.

MR. WILLIAMS:  Okay.  And in this case if you served

as a juror and at the end of deliberations you listened to all the government's evidence and you determined the government didn't prove its case beyond a reasonable doubt on one of the elements, what would your verdict have to be in that case?  We failed to prove our case beyond a reasonable doubt.

PROSPECTIVE JUROR 193:  I think you'd have to have your evidence.

MR. WILLIAMS:  Right.  But let's say you've listened to the evidence and we've gone through the trial and your conclusion is we didn't prove our case beyond a reasonable doubt.  How would you have to vote in that circumstance?

PROSPECTIVE JUROR 193:  Probably hung jury.

MR. WILLIAMS:  What would your personal vote be?  If you thought we didn't prove our case beyond a reasonable doubt, what would your personal vote be?

PROSPECTIVE JUROR 193:  Not guilty.

MR. WILLIAMS:  Not guilty.  And what if at the conclusion of the case you determined that we proved our case beyond a reasonable doubt?

PROSPECTIVE JUROR 193:  Guilty.

MR. WILLIAMS:  Thank you very much.  I have no further questions.

THE COURT:  Thank you, Mr. Williams.

Mr. Willett?

MR. WILLETT:  Thank you, Judge.  Chief Judge Bennett,

if it please the Court. Counsel for government, counsel for the defense, Miss Johnson.

Ladies and gentlemen of the jury, I wanted to start off with one concept that I don't believe Mr. Williams covered. Did all of you have the chance to review a witness list that may have been handed to you by either one of the CSOs or one of the judge's clerks before you came in? Did you all have a chance to review that list before you walked in today? Did anyone recognize a name on that witness list to the best of your knowledge?

Let me go one more specific question further on that issue. There are several witnesses who will testify who are related to Angela, and I want to go through those names with you, because not all of the last names are Johnson, just to make sure. Angela's mother is Pearl Johnson. Her sisters are Wendy Jacobson, Holly Dirksen, and Jamie Jo Hays. Her brother is Jim Johnson. And her daughters are Alyssa Johnson and Marvea Johnson. Were any of those names familiar to any member of the panel? No. I see no nods of affirmation.

I'm going to do this just a little differently. I'm going to skip around from juror to juror. So, Ms. 193, if you'd pass the microphone back to Ms. 392, the lady with the dark jacket and the blue top.

Now then, Miss 392, I was reviewing everyone's questionnaire, and I was intrigued by your answer to problems

2367

facing our criminal justice system, and you were asked in question 58, What are three of the biggest problems facing our criminal justice system today? You stated, Too many lawsuits,

Page 51

which is the civil side of the coin; no respect for the law; and overcrowding of prisons. And I wanted to make sure I understood what you meant by no respect for the law.

PROSPECTIVE JUROR 392: I think there is a huge lack of respect for the law going on. It has been going on for a long time. It's worsening. I'm just -- I'm not talking just about here in Sioux City or here in Iowa. I'm talking about all over the country. Just with -- since this has to do with drugs partially -- people think that they can get away with it, and they do it. They do it in neighborhoods. You know, they're manufacturing the meth in neighborhoods and stuff like that. The law is written for people to abide by the law, and you're supposed to do that. And when you don't abide by the law, you have no respect for the law. That's what I mean by that.

MR. WILLETT: I see. Thank you. That helped me a lot. And we'll come back to this later, but you mentioned the fact that people are making drugs. You know, when we mention the word methamphetamine in this state, in Iowa, I think everybody has an opinion, and I take it methamphetamine is something that concerns you.

PROSPECTIVE JUROR 392: Yes. In fact, it's -- we moved here from Colorado, and they're having a problem with that

2368

there too. And we lived in a smaller town in Colorado, and there was a problem with that there. I know it's -- it's going on all over. I'm from Wisconsin. I know it's going on there so . . .

MR. WILLETT: You mentioned respect for the law, and one of the things that's always present in any trial is some of our constitutional principles. Judge Bennett mentioned in

Page 52

passing the Sixth Amendment. One of the amendments that I like to discuss with each panel is the Fifth Amendment, and I'm assuming maybe you've heard that either in TV or movies or your reading, the right of a criminal defendant to decide whether or not to take the stand in her own defense. And are you familiar with that principle?

PROSPECTIVE JUROR 392: Yes, I am.

MR. WILLETT: That a defendant has that right to make that choice?

PROSPECTIVE JUROR 392: Right.

MR. WILLETT: Okay. Now then, I'm speaking to you directly, but this conversation is for the benefit of all of your peers sitting in the box. Angela Johnson will not take the stand in her own defense. She will exercise her Fifth Amendment privilege in that regard. And you'll be instructed at the appropriate time by Judge Bennett that, you know, that's her right, that's her choice, and you can't even take a negative inference from that.

2369

Now then, when I tell you, Miss 392, Angela Johnson will not take the stand in her own defense, what's the first thing that comes to your mind?

PROSPECTIVE JUROR 392: It's her right.

MR. WILLETT: Do you have a problem with her exercising that right?

PROSPECTIVE JUROR 392: No.

MR. WILLETT: Do you have any problem that since this is a murder case and the underlying current, as Mr. Williams explained, involves methamphetamine -- and you've shared your candid opinions with me -- is this going to be a problem that

Page 53

she doesn't take the stand in her own defense?

PROSPECTIVE JUROR 392: Good question.

MR. WILLETT: Thank you.

PROSPECTIVE JUROR 392: I'm taking -- see, I don't know the whole case or anything like that.

MR. WILLETT: I understand.

PROSPECTIVE JUROR 392: There's -- she has her reason not to, and I'm sure different things will come out in the trial too.

MR. WILLETT: Would you take her reason as a negative in your mind?

PROSPECTIVE JUROR 392: No.

MR. WILLETT: Okay.

PROSPECTIVE JUROR 392: Not necessary -- no, I

2370

wouldn't.

MR. WILLETT: Okay.

PROSPECTIVE JUROR 392: It's her prerogative. It's her right, so that has to -- it's just that so . . .

MR. WILLETT: Does anybody have a problem with what I've just told you? Angela Johnson will not take the stand in her own defense. Is anybody sitting here going, oh, Mr. Willett, I mean, if I was sitting over next to you, I'd be knocking people down trying to get to the witness stand; I'd want people to hear what I have to say? Does anyone think that this is something that's just going to stick in the back of their mind? Why isn't Angela Johnson going to take the stand, or if she isn't, boy, this must be a problem? Could you pass the microphone down to Mr. 617?

Mr. 617, this conversation about the Fifth Amendment,

Page 54

Angela Johnson's decision not to take the stand, is this a problem for you, sir?

PROSPECTIVE JUROR 617: No.

MR. WILLETT: Okay.

PROSPECTIVE JUROR 617: She has a mind of her own, you know.

MR. WILLETT: Okay. And I appreciate that. And could you maybe consider or think that there might be some very legitimate reasons not to take the stand?

PROSPECTIVE JUROR 617: Not a one.

2371

MR. WILLETT: Pardon me?

PROSPECTIVE JUROR 617: No. I don't think she has a reason. You know, if she did, she'd bring it out.

MR. WILLETT: Okay. But you're willing to respect her decision on that.

PROSPECTIVE JUROR 617: Oh, yeah.

MR. WILLETT: So you're not going to think necessarily, well, if she doesn't take the stand, she's got something to hide.

PROSPECTIVE JUROR 617: No.

MR. WILLETT: Or if she doesn't take the stand, maybe she's already a little guilty or anything like that.

PROSPECTIVE JUROR 617: Never entered my mind.

MR. WILLETT: Okay. Okay. Judge Bennett pointed out to you the witness box early this morning.

PROSPECTIVE JUROR 617: Yes.

MR. WILLETT: Do you think this would be the easiest place to sit and talk from if you were charged with a crime?

PROSPECTIVE JUROR 617: I hope I don't get charged,
Page 55

but I wouldn't want to sit there all the time.

MR. WILLETT: And I have great confidence I'll never see you sitting next to me, but do you think this would be the easiest place to sit?

PROSPECTIVE JUROR 617: No.

MR. WILLETT: Think it might make you a little

2372

nervous?

PROSPECTIVE JUROR 617: Sure, it would.

MR. WILLETT: Okay. Do me just one favor. Pass the microphone down to Mr. 600, the gentleman with the mustache and the eyeglasses.

I get the feeling you've been listening very intently to me during the last few minutes on this discussion of the Fifth Amendment.

PROSPECTIVE JUROR 600: Yes.

MR. WILLETT: How do you feel about this, Mr. 600?

PROSPECTIVE JUROR 600: Well, I'm in agreement that she has her reasons for not entering the witness box. I can understand that.

MR. WILLETT: Okay. Does it pose a problem to you?

PROSPECTIVE JUROR 600: No, it does not.

MR. WILLETT: Okay. Let's pass the microphone to Mr. 591, the gentleman sitting right next to you.

Now, sir, I was reviewing your questionnaire, and I think this is a good time to broach this again, although we touched on it just a little bit. You were asked in the questionnaire your opinion about drugs. Question 41, The accused in this case -- there are allegations that the accused in this case used and distributed illegal drugs. Do you have

Page 56

any opinions about controlled substances or drug laws that might affect how you decide this case? And you checked yes. You were

2373

asked to please explain, and your answer was, I think drugs in this area of the country have gotten out of hand. I think that's a pretty self-evident answer, but I'd ask you just to elaborate on that if you will. What were you thinking of when you penned down this answer?

PROSPECTIVE JUROR 591: Well, I've got some family members that have gotten into the drugs and got picked up for manufacturing, and one of them did some harm to my family, and I suppose that's where I developed that thought. And he, as far as I'm concerned, got off a lot easier than what he should have to begin with.

MR. WILLETT: If I may ask, was -- the drug in that situation, was it methamphetamine?

PROSPECTIVE JUROR 591: Yes, it was.

MR. WILLETT: Is it going to be hard for you in this case to be fair and impartial towards Angela Johnson based upon the fact that you have this --

PROSPECTIVE JUROR 591: I'm sure that's going to be in the back of my mind.

MR. WILLETT: Okay. Is it something you can set aside?

PROSPECTIVE JUROR 591: I would think I could but, you know, that's . . .

MR. WILLETT: So as we sit here right now at this moment -- and I know I'm asking you a lot of questions. You're

2374

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2068 of 3245

saying, Mr. Willett, I haven't heard any evidence, but the allegation by the government is that Angela was involved in a criminal agreement to make and distribute methamphetamine and that she was also involved in a continuing criminal enterprise.

Now, the definition of that is pretty intense, and I'm not going to do that at this moment, but assume, if you will, that the continuing criminal enterprise also involved the allegation of methamphetamine, that that was part of that business, for lack of a better word, if you will. Is that going to color your judgment in any way?

PROSPECTIVE JUROR 591: I don't think it will. I just know I've had quite a bit of personal -- my stepson got involved in it because of the one I was just talking about.

MR. WILLETT: Sure. And maybe it's just my concern, but that's absolutely where I'm coming from. Your knowledge and exposure to this is pretty -- pretty immediate.

PROSPECTIVE JUROR 591: Yeah.

MR. WILLETT: And I just want to make sure -- I mean, if it's just my concern, that's fine. But if it's your concern also --

PROSPECTIVE JUROR 591: I deal with it with my job being around ammonia. I've had people approach me trying to gather that ingredient for them, you know.

MR. WILLETT: Yes, because anhydrous ammonia can be one of the catalysts, I mean, depending upon the chemical

2375

process you use.

PROSPECTIVE JUROR 591: That's what I understand.

MR. WILLETT: And you may very well hear that chemical

Page 58

mentioned in this case. Is that going to pose a problem for you in any way?

PROSPECTIVE JUROR 591: No, it shouldn't. We've been well educated on it there in our jobs.

MR. WILLETT: Let me ask you one other question about your questionnaire. In question 58 you were asked, What are three of the biggest problems facing our criminal justice system today? Too busy to handle the cases, too much media coverage, judges that take payoffs. Now then, too busy to handle the cases, did you mean there's like too many charges, the system doesn't have enough resources? Where were you going there?

PROSPECTIVE JUROR 591: Well, it probably leads back to this there's so many people disobeying the laws now that our courts can't handle.

MR. WILLETT: Sort of the thought that Miss 392 echoed earlier this morning about no respect for the law.

PROSPECTIVE JUROR 591: Yes.

MR. WILLETT: Now, too much media coverage I'm not even going to touch with you. My co-counsel Mr. Berrigan will address that with you. Judges that take payoffs, did you have like something you'd seen on the media that you had in mind or a specific --

2376

PROSPECTIVE JUROR 591: Just a personal thing with my employment we had go on a few years back that we couldn't never prove it as a union. We could never prove it.

MR. WILLETT: And I take it that was either in a courtroom or a legal proceeding completely removed from where we are today.

PROSPECTIVE JUROR 591: Right, right.

Page 59

MR. WILLETT: But you'll be able to follow the instructions given to you I take it.

PROSPECTIVE JUROR 591: Uh-huh.

MR. WILLETT: Let's see. If we could pass the microphone, please, to Miss 703, our lady in the back corner.

How are you doing?

PROSPECTIVE JUROR 703: All right.

MR. WILLETT: Good. Now, you had the answer that -- to question 58 that I have enjoyed the most in all questionnaires I've read since I got here. What are three of the biggest problems facing our criminal justice system today? The only thing I can think of is there are too many crimes, not enough lawyers. Now, I've had a lot of things said to me about being a lawyer but the concept that there aren't enough of us, I just -- that answer made me smile. So what were you thinking of when you said there are too many crimes, not enough lawyers just so we can take your whole answer in context, ma'am?

PROSPECTIVE JUROR 703: I think probably it's just the

2377

fact that, you know, there's just too many cases going on and it's just -- it's hard to keep up with everything, and that stems back to the fact that there's definitely just too many -- too many crimes. People are not obeying the laws.

MR. WILLETT: Now -- and obviously this is a concept that we've already heard before we got to you today. Is it going to be hard for you in any way to be a fair and impartial juror in Angela Johnson's case? And here's where I'm coming from. Here's my concern. Mr. Willett, it's another drug case. It's methamphetamine. There's too many crimes. You know, I'm sitting here for three months listening to this. I'd rather be

Page 60

gardening or tending my flowers or, you know, I don't want to be here; why am I listening?

PROSPECTIVE JUROR 703:  Yeah, I think that's a little bit of my -- how I feel to be very honest.

MR. WILLETT:  Well, and that's what I'm seeking is your honesty, and I appreciate your honesty.  What part of that is how you're feeling?  I sort of rattled off a number of things.

PROSPECTIVE JUROR 703:  I think the time factor is the biggest thing for me.  It sounds like it's going to be a very lengthy trial.

MR. WILLETT:  Well, and to the extent I can apologize for that, I will.  It's just, you know, you can imagine with allegations of this nature and allegations of this breadth, it's

2378

going to take a while for both sides to present their evidence.  I mean, you can understand that, can't you, ma'am?

PROSPECTIVE JUROR 703:  Yes.

MR. WILLETT:  And obviously we have the most serious type of situation here where the penalty is, you know, the ultimate penalty.  So do you understand why this type of case might take this length of time?

PROSPECTIVE JUROR 703:  Yes, I understand that it's going to take a long time, but I just have a difficult time dealing with that because I feel there's more important things in my life to do.

MR. WILLETT:  And I understand, and I realize it's a sacrifice.  Now, the hard part for some people is the fact that, you know, the government always gets to go first because they have the burden of proof.  And what the defense gets to do when

Page 61

the government presents a witness is we get to cross-examine the witness. We get to ask them questions. But you may not hear from us -- in terms of our evidence, you may not hear from us until Memorial Day, to be quite honest with you. Can you keep an open mind until we finally get a chance to present our defense?

PROSPECTIVE JUROR 703: Yes.

MR. WILLETT: Okay. So the length of time won't be a disadvantage to you in that aspect. You'll be just as fair and impartial when the government's putting on their case as you

2379

will when the defense is putting on their case.

PROSPECTIVE JUROR 703: Yes.

MR. WILLETT: Okay. Thank you so much.

Mr. 539 -- right down in front of you if you will.

And, Mr. 539, it seems like a lot of people, the interesting answer in their questionnaire was what are three of the biggest problems facing our criminal justice system today. And once again, your answer got my attention. Question 58, What are three of the biggest problems facing our criminal justice system today? I believe it works fine, no problems. The, quote, dissatisfying, unquote, parts are necessary. No change, exclamation point. What were you thinking of when you were talking about the dissatisfying parts are necessary?

PROSPECTIVE JUROR 539: Sometimes people perceive that people who are guilty of crimes get off or people who are innocent sometimes go through a long period when their privacy's been violated, their lives have been put on, you know, public display, the press gets involved. I don't think that you can do away with any of those. I think that it's a difficult process

Page 62

for everybody that it affects and touches and there's not a way to make it pleasant. That's the way it's going to be.

MR. WILLETT: So obviously it's a very difficult position for Angela to be sitting in right now.

PROSPECTIVE JUROR 539: Yes.

MR. WILLETT: But you understand the difficulties of

2380

it, and I take it from what you're telling me you respect the process that we're going through.

PROSPECTIVE JUROR 539: Yes.

MR. WILLETT: That the burden of proof is always on the government.

PROSPECTIVE JUROR 539: Yep. I believe that it will be a lot of stress for the people who have to be on the jury. It will be stress for people who know members of her family and for her community and for, you know, anybody who comes in contact with it at all and that the public will form opinions and they'll have judged this before it ever comes to its completion, but that's the way it goes.

MR. WILLETT: Any of those things that you just articulated to me, do you foresee those as problems for yourself?

PROSPECTIVE JUROR 539: I think that it will be difficult because of the number of things that have to get set aside for me personally, people wanting to know what's going on, and I can't tell them, I can't talk about it.

MR. WILLETT: Sure, sure.

PROSPECTIVE JUROR 539: But I don't think that those are extraordinary burdens. I just think that it's something that has to be done.

Page 63

MR. WILLETT: Okay. Great. If you would pass the microphone to Miss 300, the lady with the glasses in the back

2381

row.

Miss 300, I note from your questionnaire that you have a nephew who is with -- a police officer with the city of Sioux City. Did I --

PROSPECTIVE JUROR 300: Right.

MR. WILLETT: And I read that correctly.

PROSPECTIVE JUROR 300: Right.

MR. WILLETT: Is that going to impact your ability at all in terms of discerning the testimony of a police officer?

PROSPECTIVE JUROR 300: No.

MR. WILLETT: And to be specific where I'm coming from is there's going to be a lot of law enforcement agents in this case as you could well imagine.

PROSPECTIVE JUROR 300: Right.

MR. WILLETT: FBI; Alcohol, Tobacco and Firearms; Drug Enforcement Administration; Cerro Gordo county sheriff which is the county where Mason City and Clear Lake is located; city of Clear Lake police officers quite possibly; city of Mason City police officers quite possibly; Division of Criminal Investigation agents such as Mr. Basler who's sitting here. And should I be concerned that since your nephew is a longstanding member of the Sioux City Police Department that maybe if a law enforcement officer comes in he or she gets a little leg up in terms of their credibility with you?

PROSPECTIVE JUROR 300: I don't think so.

2382

Page 64

MR. WILLETT: Okay. Great. Now then, question 42 dealt with controlled substances in your questionnaire. Do you believe that the possession or sale of drugs should be a crime? You answered yes. And when you were asked why, your answer was, It's ruining the youth of our country.

PROSPECTIVE JUROR 300: I believe it is.

MR. WILLETT: And I understand where you're coming from. This once again is my concern, and I just need to figure out if this is your questionnaire or not. We've already touched upon the fact that the heavy undercurrent to this case is a criminal agreement and a criminal business to make and deliver methamphetamine. And we've already spoken with some of your peers about the impact methamphetamine has in this state. It's certainly a very appropriate opinion that you've shared with us.

What I need to find out is do I need to be concerned about you being a potential juror in this case being fair and impartial to Angela Johnson knowing that the heavy -- I mean, the murders are obviously driving this case. That's why we're here in federal court, but the heavy undercurrent being methamphetamine, do I need to be concerned about your viewpoints and potentially sitting on this jury as it may affect Angela Johnson?

PROSPECTIVE JUROR 300: Would you repeat that again?

MR. WILLETT: Yes, ma'am. Yes, ma'am. Based upon the opinions that you hold about drugs --

2383

PROSPECTIVE JUROR 300: Right.

MR. WILLETT: -- and the fact that it's ruining the youth of our country and knowing that this case will have a heavy, heavy discussion about criminal agreements to make and

Page 65

deliver methamphetamine or criminal business to facilitate that, do you think you can be a fair and impartial juror to Angela Johnson?

PROSPECTIVE JUROR 300: I think I can, yeah.

MR. WILLETT: Is there any doubt in your mind about that --

PROSPECTIVE JUROR 300: No.

MR. WILLETT: -- based upon your opinions about drugs and what they're doing to the youth of our country?

PROSPECTIVE JUROR 300: No, there's none, no.

MR. WILLETT: So you think you can set that aside.

PROSPECTIVE JUROR 300: I can set it aside.

MR. WILLETT: Okay. Mr. 600 -- if we can pass the microphone back down to Mr. 600 -- woops, I knew I was going to do that before this jury selection was over -- the question that I -- excuse me for taking a moment to pick this up.

The question I want to discuss with you, sir, was question 51. As compared to other witnesses, what would you think of a witness who is or was in jail or prison who agreed to cooperate with the government by testifying against a person charged with a crime? And Mr. Williams broached this issue with

2384

you with the issue of what are referred to in a politically correct manner as a cooperating individual or a cooperating witness. You may hear them referred to in more of a disparaging tone as snitches, but your answer was, If the information is necessary to provide clarity in case either for or against the person being charged, I have no problem with that. But if that witness is doing this to reduce their sentence, then I might have a concern. What's their motivation? To help themselves or

Page 66

others?  Do you remember giving that answer?

PROSPECTIVE JUROR 600:  Yes, I do.

MR. WILLETT:  Now then, I would suggest to you that's a perfectly appropriate answer because the judge will give you an instruction on how to discern the credibility of witnesses, and I would want you to consider their motivation, and I take it you're willing to do that if you hear about somebody who says, Well, I was in jail, and I heard this, and I'm here hoping to get a benefit in exchange for my testimony.  Would you be willing to factor that in to your decision about how am I going to treat this witness whether or not I believe all of what the witness says, part of it, or none of it?

PROSPECTIVE JUROR 600:  That's difficult.  I think I believe that the credibility is -- it depends on if it's pertinent to the case, but yet you're not going to bring someone in that is not pertinent to the case.  I would think that they would offer their honesty and their ability to help in whatever

2385

way they can.

MR. WILLETT:  But would you want to know if that person is hoping to reduce their jail sentence by testifying against Angela?

PROSPECTIVE JUROR 600:  No, I would not want to know that.

MR. WILLETT:  If it comes out, is that something you'd factor into the mix, whether or not I can believe this person?  I mean, I'm looking at their motivation, and they're saying, Well, I know this, but I'm also hoping I can cut five years into two.

PROSPECTIVE JUROR 600:  I would think I would be able

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2078 of 3245

to put that aside, yes.

MR. WILLETT: So is it something you don't even care to know about in judging the credibility of a witness? Mr. Willett, I just don't care if they're trying to get a benefit?

PROSPECTIVE JUROR 600: I don't know if I would want to know that during the time in which they're testifying, yes.

MR. WILLETT: Okay. Assume with me a hypothetical if you will for just a second, and I'm sure being a professor you discuss hypotheticals with your students. Assume that if I'm cross-examining one of these cooperating witnesses I bring that out in my cross-examination. You know, isn't part of your agreement that you hope, you know, maybe -- it hasn't been

2386

promised to you yet. There's no guarantees in life as my father used to say to me, but this person may hope to get a sentence reduction, and that comes out while I'm cross-examining a witness. Would you factor that in to your equation to say, Okay, this is what the witness says he knows about Angela Johnson, but now I know that this person has a sentence and he or she's hoping to reduce it? Mr. Willett brought this out on cross-examination. Will you factor that in?

PROSPECTIVE JUROR 600: I don't believe I would.

MR. WILLETT: Okay. One other question, and I'm going to add just one more layer to it. Some cooperating individuals might have sentences that are longer than others; okay? Some people may say, Well, I just got a couple years left; I'm just trying to get by. Some people may say, Well, I'm in for decades, and I'm really hoping to get cut. I mean, man, I don't want it to be decades. I want it to be time where I can get

Page 68

out; okay? Is that something that you'd factor in if I brought that out on cross-examination? Well, not only is the person here testifying, but the person has a sentence; the person hopes to receive a benefit, and on top of that he's got a really long sentence. Might you look at that person's motivation?

PROSPECTIVE JUROR 600: I might slightly, yes.

MR. STOWERS: Three minutes.

MR. WILLETT: Thank you, Mr. Stowers.

But you're still not sure I take it.

2387

PROSPECTIVE JUROR 600: I'm not sure.

MR. WILLETT: Now then, I have just enough time to talk to Ms. 193 if you'd please pass the microphone down.

And it's probably not going to surprise you I'm going to talk to you about the very same subject I was just discussing with Mr. 600 because it's an easy segue. Question 51, What would you think of a witness who is or was in jail or prison who agreed to cooperate with the government by testifying against a person charged with a crime? Not sure what the situation, but I really don't think anyone should be shown special treatment for turning on someone else. That don't make them a better person. Did I -- does that answer sound familiar to you, ma'am?

PROSPECTIVE JUROR 193: Was that not -- I lost you.

MR. WILLETT: Yes. You answered the question, What would you think of a witness who is or was in jail or prison who agreed to cooperate with the government by testifying against a person charged with a crime? And your answer, Not sure what the situation, but I really don't think anyone should be shown special treatment for turning on someone else. That don't make

Page 69

them a better person. Now, did I fairly summarize your answer?

PROSPECTIVE JUROR 193: Yes.

MR. WILLETT: I think I understood how you meant it, but can you just elaborate a little bit for me? What were you thinking of when you penned down this answer?

2388

PROSPECTIVE JUROR 193: They probably wasn't going to release them to the wide world to us as a better person if they serve less time or more time.

MR. WILLETT: Okay. So you're -- and correct me if I'm wrong, but you're sort of in this camp that, Mr. Willett, just because these jailhouse people come in here and testify against Angela, you're not going to really look at it that the door should automatically open for them and they should walk out.

PROSPECTIVE JUROR 193: They should probably still have some correctional after they are released.

MR. WILLETT: Certainly. And obviously you realize that decision is left to many people besides yourself.

PROSPECTIVE JUROR 193: Exactly.

MR. WILLETT: But would you be -- are you willing to assess that in determining their credibility --

PROSPECTIVE JUROR 193: Yes.

MR. WILLETT: -- the fact that they're maybe sitting here trying to get a benefit and trying to reduce their sentence? Are you going to sit here and go, Well, can I believe that person, or maybe do they have a different agenda beside just supposedly saying --

PROSPECTIVE JUROR 193: I can believe them. I can believe them.

Page 70

MR. WILLETT: And are you also willing to take their

2389

testimony with a grain of salt?

PROSPECTIVE JUROR 193: Exactly.

MR. WILLETT: In other words, sitting there going, Can I believe them?

PROSPECTIVE JUROR 193: I would believe them.

MR. WILLETT: Are you willing to disbelieve them if you think it's appropriate?

PROSPECTIVE JUROR 193: Exactly, yes, yes.

MR. WILLETT: Thank you. Just a little bit of time to spare. Thank you, Your Honor.

Thank you, ladies and gentlemen.

THE COURT: Okay, members of the jury. It is 10:15. We're going to take about a 25-minute recess, and then we're going to start bringing you back individually. There's no magic to our system here. We're going to start with Juror 703 in the back and go to 392. So, Juror 193, you're going to be the last juror we talk to. Somebody's gotta be last, and there are only -- what are we down to? Eight I think. So, you know, we'll get to you probably -- it will certainly be after lunch, so you don't even have to come back to the courthouse until after one o'clock if you want to take off.

So, you know, we'll be taking about a half an hour or so with each juror, so you can just kind of judge yourself accordingly. If you want to go out and get a cup of coffee, we're just going to go down the back row and then when we finish

2390

Page 71

start with 593 (sic) and come down the front row. We're going to take a 25-minute recess now which will take us to 20 minutes to 11, and then we're going to take an hour off for lunch.

But the good news is when we're done talking to you individually, you'll know your status. So you won't have to come back every day for the next couple weeks.

Please remember my cautionary instruction about not discussing this case among yourselves and don't let anybody talk to you about the case. And, Juror 703, we'll see you back here in about 25 minutes. Thank you.

(Panel J exited the courtroom.)

THE COURT: Is there anything we need to take up?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. See you back here in 25 minutes.

MR. WILLETT: Judge, I apologize. Maybe I missed the timing of it. If I have a motion for cause at this time, do I need to make it at this time with you as far as now that I've completed my part of the voir dire, or do you just want to take those at the end?

THE COURT: We'll take them up at the end.

MR. WILLETT: Okay. Thank you.

(Recess at 10:15 a.m.)

THE COURT: Can you close the door for a minute? Please be seated. I'm pretty convinced that the jurors didn't understand the questioning. I mean, you can go ahead and

2391

challenge them for cause all you want. I don't think they understood the questions with regard to the -- not that they weren't good questions, and you wonder how this guy could be a teacher and not understand it, but I just don't think he was

Page 72

understanding it.

So if you want to get into -- if anybody wants to get into -- plus he doesn't have to give it any weight. He doesn't have to consider it. There's no requirement that he considers it. But I don't think he understood the question. I don't think he understood the situation. I'm pretty confident of that. But you can go ahead and challenge them for cause.

MR. WILLETT: Do you wish me to make that record now, Judge?

THE COURT: Yeah, if you want to, you can make whatever record you want.

MR. WILLETT: At this point the defense would move to strike Juror 600 for cause. Juror 600 is the gentleman who I questioned regarding the testimony of cooperating individuals or snitches, if you will, and my understanding of his answers to me is that in regards to whether or not they were trying to achieve a benefit, a reduction of sentence, for example, by testifying, that given that exchange that he would not look at that as affecting their motivation. He would not look at that as a factor of trying to discern their credibility, and he wasn't interested in knowing that.

2392

I did go one step further and talked about an example -- I think I described it as a hypothetical. Assume that we have a cooperating individual who is testifying pursuant to a lengthy -- who was testifying and is serving a lengthy sentence and is hoping to receive a reduction in exchange for testimony, and he seemed ambivalent that he might consider that, but he wasn't even sure. Your Honor, I believe Juror 600 should be struck for cause.

Page 73

THE COURT: I don't. One, you didn't ask him if he would follow my instruction. You didn't ask him if he'd follow the law.

MR. WILLETT: I did not ask that question, Your Honor.

THE COURT: Well, until you do, then I don't think he's challengeable for cause, but I'll give you an opportunity to ask him that question if you want to. But anyway, you've challenged him for cause. Your challenge is premature because we haven't finished questioning him, but it's denied. He has a right not to give it any weight if he wants to.

MR. WILLETT: Judge, since we're past my time for group voir dire, will Mr. Berrigan be allowed to follow up on that issue with him?

THE COURT: Either side can follow up on it. I'll give you extra -- I'll give you a little extra time to follow up on it too. At some point I may be convinced, but I'm not convinced now. One, I'm not really sure he got it, and I'm not

2393

sure he has to give it any weight. You want him to give it weight, and it's something I say that they can consider. But I'm not sure he even has to consider it.

MR. WILLETT: Well, obviously, Judge, the record we've made at this point speaks for itself. We are asking that the Court --

THE COURT: Well, it's premature. We're not taking challenges for cause until we're done with all the questioning of the jurors.

MR. WILLETT: Thank you.

THE COURT: Okay? Ready for 703?

MR. MILLER: Yes, Your Honor.

Page 74

(Prospective Juror 703 entered the courtroom.)

THE COURT: Anywhere in the front row you like. Just pick your seat.

Everybody can be seated, and we're going to start first with the government. Mr. Miller will ask you some questions first, and then we'll -- you can be seated -- and then we'll hear from the defense.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

EXAMINATION

BY MR. MILLER:

Q.    Good morning, Juror 703.

A.    Good morning.

2394

Q.    Feel like you're being grilled here?

A.    Yes, I do.

Q.    I apologize for that, but you're doing just fine, and we just need to visit with each juror about a couple issues, one of which is exposure to pretrial publicity -- and I know that you had none -- your opinions and thoughts about the death penalty. And before we get to either of those other two, I wanted to raise one other matter. You were good enough, as were your fellow jurors that are still with us, to indicate a willingness to serve on this jury despite the hardships that all of you folks have. But I think in fairness not only to you but to everyone here, we need to be sure we have a full understanding of what that hardship is and any effect it may have on your ability to concentrate fully on the evidence.

You're a farm wife and a grandmother, and I think you indicated that both of those are concerns, particularly during

Page 75

planting season. Can you expand on that at all for us, ma'am?

A. Well, we farm a lot of acres, and I've been helping with the farm work, so if I'm sitting here every day, obviously we'll probably have to hire someone else to help get the crop in.

Q. And like most farm wives, it isn't just the husband that's out there working. You work as well --

A. Yes.

Q. -- physically. Thank you. And I just want to be sure we had an understanding of what your situation was. Despite that,

2395

if you happen to be required to serve on this jury through a period of weeks and up to three months or so, would you be able to give us your full concentration?

A. Yes, I think I would.

Q. Thank you so much. On the issue of exposure to pretrial publicity, am I correct in recalling that you were not at all familiar with the case?

A. No, I'm not.

Q. And aside from what was in the jurors' questionnaire that got mailed out to you, do you have any additional information?

A. No. I just read the couple articles in the Sioux City Journal a week or so ago or two weeks ago.

Q. What do you recall reading in there?

A. Just about that the jury selection started and the process of jury selection.

Q. Do you recall reading any facts at all or any accusations beyond what's already in the questionnaire?

A. No, not really.

Q. And ultimately anything that you may have read, whether it came from the questionnaire or these other articles, did it

Page 76

cause you to form any opinion as to what the true facts are in this case one way or the other?

A.    No.

Q.    Very good.   Now, on the death penalty, you were kind enough to fill out the question there as well as all of the questions,

2396

and we thank you for that.   Did the process of answering questions about the death penalty and the prospect of possibly being on a death penalty jury cause you to give that a little more thought over the last couple months?

A.    Yes, I did think about that, and I guess my honest opinion would be that I would not be one that would want to put someone on death row.

Q.    And I understand that, and I appreciate your candor.   We need to go just a little bit further with you because, of course, wanting to do such a thing is one thing.   It's the question about whether you feel you could do so or not.

The judge indicated during the introductory hour a little overview of what the process is including that third step where the jurors who were required to serve on this jury would be instructed to consider and weigh both aggravating and mitigating factors and that we also need to find 12 jurors each of whom can assure us that they would be able to do so not only as to life imprisonment but also fairly and realistically as to the possibility of returning a death penalty verdict as well. Do you feel you can do that or not?

A.    No, I don't think so.   I cannot put someone's life -- take someone's life.

Q.    And again, recalling the judge's description of the process, you still don't feel that you could do that even as

Page 77

part of this process as you understand that process to be.

2397

A.    No, I don't think I want that on my conscience, that I have taken someone's life.

Q.    We appreciate your candor, and as the judge indicated earlier on, this is not a process of having right answers or wrong answers as long as they're your honest answers and what's in your heart.  That's all we can ask you tell us, and we appreciate your candor.

Ultimately if you were required to serve on this jury, you'd be in a situation where you'd be under your oath to follow the Court's instructions and to fairly and realistically consider not only the life penalty but also the death penalty.  Do you feel you simply would be unable to do that?

A.    My choice would be life.

Q.    Knowing what you know about this case, it's fair to say that that would be your only choice given your own personal opinions and feelings about the issue.

A.    Yes.

MR. MILLER:  Thank you, ma'am.  And again, I appreciate your candor.  Thank you so much.

THE COURT:  Thank you, Mr. Miller.

Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q.    How you doing so far?

A.    All right.

2398

Q.    It's not so bad, is it?
Page 78

A.    Little nervous.

Q.    Not as bad as the dentist.  You know, it's kind of strange. I'm going to ask you some questions about your views about the death penalty after you've told us that's not a punishment you would favor, and I don't want to sound like I'm being critical of your views; okay?  But you'll recall the prosecutor earlier asking people about the photographs.  Do you remember that discussion?

A.    Yes, yes.

Q.    And nobody wants to look at these pictures.  That's the truth.  They're going to be bodies of children, skeletal remains, all kinds of stuff none of us want to look at.  And if that were the test, we'd have a hard time, frankly, getting 12 people to sit up there as jurors.  You know what I mean?

A.    Yes.

Q.    We need to find people that are willing, if they can -- some people can't.  They just can't do it.  But there are some people that have very strong views about these subjects including the death penalty that are willing to put those aside to serve their country in this case as jurors.  They're willing to do it, at least for the time that they're involved in the case.  And other people have a problem with that, and I just want to find out where you are by giving you just a little description of what might happen in the case; okay?  You with

2399

me?

A.    Yes.

Q.    The first part of the trial probably is fairly simple to understand.  The government has made these allegations there were five intentional murders, and they're going to try to prove

Page 79

that beyond a reasonable doubt. You understand that.

A. Yes.

Q. And that's kind of like any trial you would participate in. I don't know. Have you been in a trial? You were twice a juror.

A. Yes.

Q. Yeah, so you remember how that worked and that one of the important things that you had to do was follow the instructions of the court, listen to all the evidence, make determinations about the facts, confer with your other jurors, and make a decision; right?

A. Yes.

Q. And there's not much question you could do that, at least in terms of being able to listen to the evidence, guilty or not guilty. Is that --

A. I can do that.

Q. Okay. And then the judge pointed out we sort of have this intermission stage where you're not going to listen to any more evidence but you're going to have to make a determination based on what you've heard so far whether there are these gateway

2400

factors and aggravating factors that the judge is going to talk to you about. Is that something you could probably do as a juror, just make a determination, hey, this evidence meets this instruction?

A. Yes, I think I could.

Q. Okay. And so the more difficult part would be the end if we got that far.

A. Yes.

Q. And that's the part of the trial where you'd have to weigh,

Page 80

you personally would have to weigh, what the government alleges are aggravating circumstances or reasons to vote for death: There are children involved, that these murders were committed after substantial planning and premeditation, that there are five of them.

The defense might give you evidence to weigh the other way for life: No significant criminal history, an abused childhood and background, maybe a minor role in this offense compared to other people. And you'd have to weigh those things yourself as to which was more important to you. Is that something you think you could do, weigh the evidence?

A. Yes, I think I could.

Q. Okay. The tough part comes in what happens after the weighing because the jurors have to make a personal decision about what's most important to them; okay? Do these reasons to vote for life outweigh the reasons to vote for death or vice

2401

versa? That's what the juror has to be able to do in order to follow the instructions; okay?

A. Yes.

Q. You with me? And the death penalty is never required. The judge is never going to tell you you have to vote for the death penalty under any circumstances. That's never an instruction from the Court. You with me?

A. Yes.

Q. But to be fair to the government, they have to have jurors who are willing to consider the death penalty as an option in the appropriate circumstances. That is, that has to be at least something that's on the table if they do all the things they're supposed to do in terms of their proof; okay?

Page 81

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2092 of 3245

And, of course, the defense, we're entitled to the opposite. We're entitled to jurors that could consider a life sentence as appropriate under some circumstances if, you know, the juror's persuaded that that's appropriate, that we have to have jurors that could at least consider both options fairly and would not automatically preclude one or the other even if they felt strongly one way or the other.

We've had people feel strongly both ways on this issue. But if their feelings are so strong that they -- realistically, you know, they just couldn't consider one option or the other, then that's a problem, okay, because the instructions say, hey, look, you have to be able to consider

2402

both; all right?

So I hear you saying you're a person that really has some problems with the death penalty and life in prison would be something you'd strongly, very strongly favor.

A. Yes.

Q. But this issue about being able to consider the death penalty, is that something you could do if you were instructed to do that as a juror?

A. I just don't know if I could -- could do that.

Q. You've got some real reservations about it.

A. I just don't think that taking someone's life is the answer.

Q. Well, a lot of folks have told us that would be an awfully hard decision. And we would expect it to be hard for anybody to make that decision. But if it's impossible, that's a different thing altogether, okay, and so we just kind of need to know to be sure. Are you telling us, look, there's no circumstances,

Page 82

Mr. Berrigan, where I could envision I could ever do that; it's just not going to be possible that I could ever -- no matter what the circumstances, I could never consider the death penalty?

A.   I think that'd be a fair statement.  I could not.

MR. BERRIGAN:  Well, we very much appreciate your candor on this matter, ma'am, and thank you for coming in.

That's all I had, sir.

2403

THE COURT:  Ma'am, if you'd just step outside for a minute, we'll let you know your status.  Thank you very much.

(Prospective Juror 703 exited the courtroom.)

THE COURT:  Mr. Miller?

MR. MILLER:  Your Honor, the government challenges for cause.  The juror is substantially impaired.

MR. BERRIGAN:  The defense has no position with respect to this juror, sir.

THE COURT:  Okay.  I find that the juror is substantially impaired in her performance of her duties.  She would not be able to fairly consider the death penalty and fairly consider whether it should be imposed in this particular case.  And, therefore, the challenge for cause by the government is sustained.  Let's bring her in.

(Prospective Juror 703 entered the courtroom.)

THE COURT:  Juror 703, we're going to go ahead and dismiss you as a juror in this case.  Thank you very much for participating in the process.

We'd appreciate it if you wouldn't talk about this process until we get the trial underway which would be, you know, sometime next week hopefully because you might say

Page 83

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2094 of 3245

something to one of your friends that might say something to somebody else, and that somebody else could wind up here in jury selection. So you're dismissed. Thank you very much, and good luck to you. Thanks.

2404

(Prospective Juror 703 exited the courtroom.)

THE COURT: 392.

(Prospective Juror 392 entered the courtroom.)

THE COURT: Anywhere you'd like in the front row, ma'am.

Everybody can be seated. And we're going to start first with questions from Mr. Berrigan. Thank you.

EXAMINATION

BY MR. BERRIGAN:

Q. Good morning, ma'am. How are you?

A. Good morning. Fine. Thank you.

Q. I hope you'll forgive us with the numbers, but we'll just kind of do the best we can; okay? We have two areas that we'd like to cover with you this morning. One has to do with your exposure to pretrial publicity in the case, you know, things we've heard about in the media. And the other one has to do with your views about the death penalty or life in prison without possibility of parole. Okay?

A. Okay.

Q. And I'm going to take them in that order.

A. Okay.

Q. We have the benefit of your questionnaire. And on behalf of both parties and I'm sure the Court, we want to thank you for taking the time to fill that out. You were very conscientious and filled out all the questions which isn't true of everybody.

Page 84

You indicated in response to questions about what you had heard about the case that this was a matter you were very familiar with.  You watched the TV news, read newspapers.  I know about the Dustin Honken case and that he was found guilty and sentenced to death.  Is that right?

A.    That's true.  Can I explain why?

Q.    Yeah, sure, sure.

A.    The reason why I had an interest in it was because that was going on when I was on jury duty across the street.

Q.    Ah.

A.    And I was on jury duty for the month of October.

Q.    That's right.  And Mr. Honken's case --

A.    So I would see the reporters here and everything like that, so naturally my curiosity would -- well, I read newspapers all the time anyway, and I read news on the Internet.  So that's my nature.  It piqued my interest.

Q.    So nobody was paying attention to your case I suspect.

A.    Oh, no, that was just a small thing.

Q.    You indicated that at least amongst the sources you had read stuff in the newspaper and on television.

A.    Right.

Q.    What papers do you get?

A.    We get the Sioux City Journal.

Q.    Okay.  And then you indicated that you had had some discussions about the case.  I agreed with the guilty verdict of

Dustin Honken, talked with my husband, neighbors, and sister.

Page 85

Is that right?

A.    That's correct.

Q.    And then you said you had heard other people talking about the case.  Yes, about the same as I said.  Your husband, neighbors, family members.

A.    Correct.

Q.    Essentially what was the gist of the discussions that you had with those folks?

A.    Basically it was -- it was kind of a surprise about the death penalty for him, but guilty was basically everybody thought -- believed in the guilt.

Q.    Okay.  And, I mean, at that time you certainly -- you were already on a jury.  You weren't expecting to get any kind of summons for yet another jury case just a few months later, were you?

A.    Right.

Q.    I mean, and so there's no prohibition on you expressing your opinions.  Were you in agreement with these other folks that were talking about Mr. Honken's case?

A.    Yes, I was.

Q.    Do you still feel that way?

A.    Yes.

Q.    And you said there was something about you thought it was somewhat of a surprise regarding the death penalty.  Why do you

2407

say that?

A.    Not really a surprise.  I guess we don't have the death penalty in Iowa, so you just don't think that -- about the death penalty here.

Q.    Sure.

Page 86

A.   That's why.

Q.   Did you know or have you learned that Mr. Honken's case was a federal prosecution as well?

A.   Right.

Q.   Okay.  And you were asked, Have you read, seen, or heard any information relating to a possible motive for the alleged crimes, and you said yes.  Basically it involved drugs and money.  Is that right?

A.   Correct, uh-huh.

Q.   You know, my recollection when Mr. Honken's case was actually going on is that it got pretty widespread coverage in the local papers.  Is that your recollection as well?

A.   Yes, it did and then on the news, on TV too.

Q.   On the news as well.  Pretty much everyday was it?

A.   I would think, yeah, basically.

Q.   And the newspaper situation at your house, do you get a subscription --

A.   Yes.

Q.   -- or do you buy it?

A.   We get it every morning delivered.

2408

Q.   Do you read that usually?

A.   Yes, every morning.

Q.   You were asked this question, number 72.  No matter what you've read, seen, or heard, do you now have any beliefs or opinions about the guilt or innocence of Angela Johnson?  You said you were unsure, haven't heard her side yet, but she was with Honken at the time of the crimes.  It's hard to believe she didn't know about it at least.  Does that sound right?

A.   I guess that's what I wrote, yeah.

Page 87

Q. And I want to reiterate I think something you've already heard at least twice, and that is we're not here to criticize people. A lot of folks were in your position. Months ago they weren't expecting to get a summons from the judge to come into court on this. A lot of folks watched the news, read the papers, and we do rely on those things as the basis of a lot of information we get about what's going on in our community, what's going on in the world. So a lot of folks have told us they've had opinions about what they read or saw on the television. You're not the only one. There's nothing wrong with it; okay? We just need to know what they are obviously for the obvious reasons.

So let me ask you this question. You have this opinion about Angela, if she's with Mr. Honken at the time of the crimes, hard to believe she didn't know about it at least. You could see why that would be a little bit of a concern to me,

2409

would you?

A. Yes, I could see that.

Q. And let me ask this, and we have to rely on your honest assessment of your own situation. The law affords her this presumption of innocence which has been discussed.

A. Uh-huh.

Q. And I bet when you had your trial -- was that a criminal case across the street that you had?

A. Yes, it was.

Q. I bet you didn't know that fellow from Adam, didn't know anything about his case when you walked in there, and when they asked you questions about presumption of innocence and burden of proof and so on, you were fine with that.

Page 88

A. Right.

Q. Okay. Well, you know, Angela's entitled to the same presumption of innocence that fella was.

A. I agree.

Q. Even though this case has gotten a lot of media attention as a result, that's made it hard. You know, one of the reasons we're doing this individually like this is to try not to contaminate other people that might not have read about the case; okay? The judge is taking great caution to try to limit the damage that has already been done. So what about this idea that she's entitled to this presumption of innocence and you have this information? You've talked about it with your

2410

relatives. You have an opinion about Mr. Honken's guilt. You know what his punishment was. You think their association is going to be a problem in terms of her responsibility?

A. I consider myself a fair person. I am a good listener. Anybody will tell you that. You have to realize I wrote that out after I had just had jury duty. I wasn't in good humor to receive that. And I do -- I'm human, you know. She was associated with him, and so I -- that's just my opinion. She must have known something.

Q. Okay. And again, there's nothing wrong with that; okay? So here we have this conflict obviously. You have an opinion. You're entitled to it. Nobody's trying to, you know, criticize you for that. But she has the presumption of innocence.

A. Absolutely.

Q. Or she's supposed to have it. And sometimes those things can be in such conflict that you can't have both. And so we sort of need to know that. I mean, based on the information you

got about Mr. Honken's case and the opinion you formed as a result, do you have any question in your own mind, you know, looking at yourself, as to whether or not you could give her the full presumption, the complete presumption of innocence that she's entitled to under the law?

A.   I must be totally honest with you.  Although I pride myself on being fair and everything, I can't say full.

Q.   Okay.

2411

A.   I'm sure it has me somewhat . . .

Q.   It's there.

A.   It's there.

Q.   Yeah.  And that's the other thing we -- I don't know how people -- we ask people this all the time.  Could you completely set that out of your mind as if it was a garbage can that we can empty?  But I'm going to ask you that anyway.  Do you think there's any possibility that you could completely set that view out of your mind and completely presume her innocent if you were selected as a juror, or is there going to be a problem?

A.   I would hope I could.  That's all I can tell you right now. I would hope I could.

Q.   Do you have any doubt about your ability to do that based on the extensive knowledge you have about Mr. Honken's case?

A.   You know, I do, and because it is such a serious case.  I mean, we're talking -- we're talking the death penalty here too, you know.

Q.   Sure.

A.   And that's a lot, you know.  So I'm not going to lead you on or anything.

Q.   No, I appreciate that very much.

Page 90

A.    I'm going to be totally honest with you.

Q.    We very much appreciate that.  Thank you.

A.    You're welcome.

Q.    Let me ask you a little about the death penalty, though, if

2412

we could in my remaining couple of minutes.  You indicated that even though you were brought up Catholic your personal opinions in some cases of such hideous crimes the death penalty is appropriate.  When a person intentionally kills multiple people, that shows the person has no concern for another life.  And I just wanted to ask you -- I know these questionnaires were filled out in most cases -- yeah, yours too -- back in January. Is that a view that you still hold?

A.    Yes.  I'm not one that says gung-ho death penalty.  I am not, absolutely not.  But in certain crimes, I do believe that it is appropriate.  It is.

            MR. STOWERS:   Two minutes.

Q.    So that's a punishment in an appropriate case you could certainly consider.

A.    Yes.

Q.    Let me ask you the flip side of the coin, and that's life imprisonment without parole.  The judge mentioned that earlier as the alternative punishment.  And when he says life without parole, he means life without parole just so there's no question about that; okay?

A.    Uh-huh.

Q.    Do you think that that's a just punishment for even a crime such as intentional murder?

A.    You know, I do.  Actually that's probably worse because that person has to live day after day after day year after year,

Page 91

you know, with no foresight, I mean, nothing -- nothing in the future. That's it. So it's almost like a death penalty in a way.

Q. And you mentioned that too in the questionnaire that you felt that way, but you did have one little answer I want to ask you about because I'm on my last minute. You were asked about why do you feel this way respecting life imprisonment, and you said, The people who were killed do not have the possibility for life, which sort of suggested to me -- I might have misread your previous answer -- obviously the people who are dead, they're not afforded the same consideration.

A. Right.

Q. And I wonder if that in your view makes that penalty unfair, that here we have these people that are dead and now we're --

A. No, that's -- no. It's just in certain -- that's what I'm saying. In cer -- every case is different. Every situation is different, and that's how it has to be weighed. Sure, life isn't fair, you know.

Q. Yeah, I agree with you.

A. So I don't know what else to say about that.

MR. BERRIGAN: Okay. Well, I'm sure I'm out of time. Thank you, ma'am. Appreciate it.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, ma'am.

2414

I have no questions, Your Honor.

THE COURT: Ma'am, if you'd just step outside, we'll

be with you in a minute.

(Prospective Juror 392 exited the courtroom.)

THE COURT: Mr. Berrigan?

MR. BERRIGAN: I guess I should have looked over at Mr. Miller much earlier, Your Honor. The defense will move for cause on Juror Number 392 based on her responses to the questions regarding the presumption of innocence.

THE COURT: Mr. Miller?

MR. MILLER: That's clearly the problem, and we cannot resist that motion.

THE COURT: Okay. The challenge for cause to Juror 392 is sustained.

(Prospective Juror 392 entered the courtroom.)

THE COURT: Ma'am, thank you very much. We're going to go ahead and dismiss you as a potential juror in this case. We really appreciate how honest you were in your responses which were totally understandable.

And we'd just ask you to do us a favor, and that is not to discuss this with anybody until we get the trial underway. You'll know because you're an avid newspaper reader, and we just don't want you to say something to somebody and that somebody might repeat it, and then we get somebody who's heard your comments on the jury later this week or next week; okay?

2415

Thank you, and good luck to you. Thanks.

(Prospective Juror 392 exited the courtroom.)

THE COURT: Ready for 300?

MR. MILLER: Yes, Your Honor.

(Prospective Juror 300 entered the courtroom.)

THE COURT: Juror 300, anywhere in the first row.
Page 93

Everybody can be seated, and we're going to first have questions from Mr. Miller and then from Mr. Berrigan. Good morning.

EXAMINATION

BY MR. MILLER:

Q. Good morning.

A. Morning.

Q. How you doing so far?

A. Cold.

Q. Cold.

A. Cold.

Q. If that's the worst of it, I think we're doing okay. Feel like we're putting you on trial here?

A. Yeah.

Q. Okay. Well, I apologize for that. It's the process. But I'm only going to put you on trial for the next 12 minutes, and I'm hoping I can get 'er done quicker than that; okay?

A. Okay.

Q. And I'm not really putting you on trial. I'm simply, as

2416

the judge indicated earlier, trying to make sure we have an understanding about where you're coming from on some of these issues; okay?

A. Okay.

Q. And whatever is in your heart and in your mind is the exact right answer. There are no wrong answers as long as you're being perfectly open with us, and we appreciate that.

The two questions I want to ask you about are pretrial publicity and opinions on the death penalty. And as to the first question, I note that you indicate that you at least at

Page 94

the time you filled out this questionnaire were not at all familiar with this case.

A.    No, I'm not.

Q.    Have you become any more familiar other than what was in the questionnaire?

A.    Somewhat, not much, but somewhat.

Q.    Is that mostly from the questionnaire or any other source?

A.    Just what was in the paper and on the TV a little bit.

Q.    Tell us about any newspaper accounts or TV reports that you've watched or read since you got the questionnaire, if any.

A.    One thing I have a question about is does Iowa have the death penalty?

Q.    No, Iowa doesn't.  The federal government, however, does, and we're in federal court, so it's . . .

A.    Okay.  Then that's the reason for his . . .

2417

Q.    This is not an Iowa trial.

A.    Right, okay.

Q.    Even though it's in Iowa, it's the federal government.

A.    It's in Iowa, but it's federal, okay.

Q.    Did you hear anything else about this case through any of the news accounts since you got the questionnaire?

A.    No, nothing.

Q.    And ultimately did what was in the questionnaire or anything you've heard outside the courtroom cause you to form any opinions about what the facts are in this case?

A.    No.

Q.    Okay.  Very good.  We need to visit with you a little bit about thoughts and opinions about the death penalty, and again, I appreciate your filling out the questionnaire.  That helps us

Page 95

a lot. You've indicated Iowa to your recollection doesn't have the death penalty, and that's true of Iowa and some other jurisdictions. There may be on the other end of the scale some societies in our world where a death penalty is imposed automatically in the case of certain crimes.

But in this case there is a procedure that allows for the possibility of either punishment in the event that the defendant is found guilty in a case where the crime allows the death penalty. The judge explained that process this morning in what he called the third phase. Do you remember him describing that third phase?

2418

A.   Right, right.

Q.   Can you tell us what you recall about him describing that? And I realize you weren't taking notes at the time, so this isn't a test.

A.   The third case was after they'd been found guilty or nonguilty or innocent I should say, then that's the punishment; right?

Q.   Right. If she is found guilty --

A.   If she's found guilty.

Q.   -- there's a possible third phase which would be the punishment phase. Do you remember anything about what the judge indicated the process was and how that third phase works?

A.   No.

Q.   Again, I'm not surprised. You weren't taking notes, and there was a lot of ground covered this morning. Let me try to refresh your recollection. I believe the Court indicated that if you came to the third phase, if you went to a punishment phase after finding the defendant guilty, it would be your job

Page 96

and you would be instructed to consider and weigh aggravating and mitigating factors before coming to a conclusion about whether the proper punishment should be life in prison or the death sentence. Did that make sense to you when you were hearing that from the Court?

A. Right, right.

Q. Now, does that sound like a sensible way of going about

2419

doing it?

A. Uh-huh, right.

Q. One thing I'm going to have to ask you to do -- and I realize this is different from what you would be doing if you and I were sitting down over a cup of coffee -- our court reporter has to -- it's her job and her duty to make a record of everything that's indicated. And if you can give me a verbal response instead of nodding your head which is what we'd ordinarily do often --

A. Okay.

Q. -- that will help her.

A. Can I do both?

Q. You can do both.

A. Okay.

Q. Very good. You've -- well, let me just ask you this. You filled this out some weeks ago, and I assume it'd be natural -- you may have even given the matter some thought in the last few weeks about the death penalty knowing that you might be called in here on this type of a case.

A. Yes, I've been thinking about it a lot.

Q. Go ahead and just share with us if you would your thoughts on the matter and any feelings that you have on the subject.

Page 97

A.    I really never have been in favor of the death penalty.  I don't know why.  I just -- I just feel like that if they're proved to be guilty there should be a punishment of some kind,

2420

but I just don't believe in the death penalty.

Q.    I assume until -- or maybe I'm wrong.  Have you ever really given it a lot of thought before you received the questionnaire one way or the other?

A.    No, no, I never had.

Q.    So it's something that's caused you a little bit more thought since you got the questionnaire.

A.    Yes.

Q.    And that's natural because all of a sudden for the first time in your life you're put in a situation of possibly being involved in a serious matter like this involving the death penalty.  Fair statement?

A.    Yes.

Q.    In filling out the questionnaire you indicated that you thought -- you said -- and I'm just going to read this back to you, and it's perfectly okay if you have different thoughts than what you wrote down at the time because I understand it's a matter of something perhaps you've given more thought in the meantime.  But you indicated -- and I'm reading your response -- I believe the death penalty should -- I apologize.  I read it wrong.  I'll start over.  I believe the guilty person should have the same type of death that they did to the person they killed.  Any thoughts about what you were thinking of when you wrote that down, and any thoughts about how your position has changed if at all?

2421

Page 98

A.   Well, you know, when I filled out that questionnaire, I was really stressed out because there was so many questions.  I didn't understand half of them, and I don't know.  I just -- I just feel like they should probably get the same punishment, but yet truthfully in my mind I just don't think I believe in the death penalty.  I probably answered that wrong on your questionnaire, but I -- I don't know.

Q.   Again, there's really no right or wrong as long as we ultimately have a full understanding of where you are on these issues; okay?

A.   Yeah, right.

Q.   And we appreciate your candor.  You're being very open.  I much appreciate that.  Again, what we must do is seat 12 jurors each and every one of whom can assure us that he or she can give fair and full and realistic consideration to both possible punishments in the event that they decide punishment in this case.  Some people feel that they can do so.  Other people feel that either on one end or the other because of the nature of the case or because of personal feelings on the subject of the death penalty they simply don't feel that they can fairly consider both possible punishments.  Any thoughts at this point on where you are on that?

A.   No, I don't believe I have any other thoughts.

Q.   Okay.  Let me just try to push you just a little bit further then; okay?

2422

A.   Okay.

Q.   You're doing fine.  You've indicated that -- when you were

Page 99

asked about a number of factors, multiple deaths or the killing of children, you wrote in -- what effect that might have on you, you wrote the words death penalty. And on other factors such as the guilty person being pregnant, past drug use, or being a parent that life in prison was your reaction to that. And finally ultimately as to whether the person was -- if the person was not the one who actually pulled the trigger that you felt prison with possible parole. Were any of those factors one that you felt would control your opinion, or were those simply factors that you would weigh in making a decision about death or life in prison?

A. I believe just factors that I would weigh in making the decision.

Q. Very good. And you understand from this morning's explanation that that would be your job. You'd have to consider every mitigating and aggravating factor proven and weigh those in your own mind.

A. Right.

MR. WILLIAMS: Two minutes.

Q. In the event that -- and this case involves allegations that the defendant was involved in a drug conspiracy and that in connection with that drug conspiracy she participated in the killings of five people including two children. Despite the

2423

nature of that case -- and obviously that's very serious accusations. Would you agree with that?

A. Right.

Q. -- some people feel that despite those very serious accusations they simply do not feel that they could seriously and honestly fairly consider returning the death penalty,

Page 100

sitting in judgment on another human being as far as their life being at stake. Where are you? Do you feel that you could do that, or do you feel that you would have difficulty in passing judgment on another person's life?

A. I feel like I would have difficulty.

Q. And that's -- I would hope no one would take this duty lightly. And having difficulty simply isn't enough. Do you feel that you could do that? Nevertheless despite the fact that it would be difficult, do you feel that you could in the appropriate case impose the death penalty on another human being, or do you feel you simply could not do so?

A. I feel like I just couldn't.

Q. Ultimately if you were on a jury that unanimously concluded that death penalty is appropriate in this case after weighing the aggravating and mitigating factors, that verdict could not be returned unless each of the 12 members of the jury were to sign the verdict form including your own signature which would have the practical effect of causing the death of Ms. Johnson. Do you feel under those circumstances that you would honestly be

2424

able to sign such a verdict?

A. Probably if it was a majority.

Q. But you understand it would have to be the verdict of each and every member of the jury.

A. Right, uh-huh.

Q. And it's not a majority. The death penalty cannot be returned unless each and every single juror signs guilty.

A. Okay.

Q. Do you feel you could actually do that, ma'am?

A. Yes.

Page 101

Q. Do you feel you could sign a verdict that would have the practical effect of sentencing another human being to death?

A. Yes.

Q. I'm not trying to talk you in to one thing or the other, ma'am.

A. No.

Q. If your honest opinion is you don't feel you could carry out the death penalty, we need to know that because that would be putting you in a terrible position to be on a jury where you really couldn't carry out that duty.

A. I'm confused.

Q. I realize you are, and it's my fault, ma'am.

A. Yeah.

Q. It's a little complicated, and I apologize for that. Your feelings -- are your feelings about the death penalty such that

2425

you simply feel you could not?

A. I could not, no.

Q. You could not return a verdict.

A. Could not return a verdict.

Q. Sentencing someone else to death.

A. Right.

MR. MILLER: Thank you, ma'am. Again, we appreciate your candor, and I apologize for any confusion.

PROSPECTIVE JUROR 300: That's okay.

MR. MILLER: This is a complicated situation.

THE COURT: Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, ma'am? Not so bad so far, is it?

Page 102

A.    Not so bad so far.

Q.    I'm going to ask you just a couple of questions.  You know, sometimes what happens is we get these questionnaires -- and yours was filled out way back in January -- and folks have changed their views about some things.

A.    Right.

Q.    And I gotta tell you, it sounds like maybe that's the situation here.  I just want to make sure because when I read this questionnaire, I felt maybe a life sentence wouldn't be anything you'd consider.  Let me refresh your recollection about a couple of these matters; okay?

2426

A.    Okay.

Q.    There's a question that asks you basically what your views are, your thoughts and opinions about the death penalty as a punishment for a person guilty of intentional murder.  You said, I believe the guilty person should have the same type of death that they did to the person they killed.  Then the next question asks, Why do you feel this way, or what are some of the reasons for your beliefs?  You say, So the guilty person knows how the person felt when he was tortured.  Does that sound right?

A.    Right.

Q.    Okay.  So what does that mean?

A.    Well, at that time when I filled it out, like I said before, I just felt like they should have the same punishment.  But then as I get to thinking the death penalty, I don't know.  Life imprisonment, I don't know.  I think that's a pretty good punishment for something they are guilty of doing.

Q.    You were asked some questions about life imprisonment as well.  What are your thoughts and opinions about life in prison

Page 103

as a punishment for a person who's guilty of intentional murder? This is question 82. You said, I've never visited a prison, but sometimes I feel maybe that it's too easy for them. They need to be punished with hard work and no TV or new prisons with all the modern living. And then you're asked, Why do you feel this way, and you said, Sometimes I feel a person has such a hard life that he does a crime just so he can go to prison and live

2427

in warmth and good food; right?

A. Yep.

Q. Do you believe that?

A. I have -- no, I don't believe that anymore. I don't think I wrote that up to stride, but I don't think that the prisons are giving them that good of a life.

Q. Okay. Let me ask you about this last question here. Do you think that life in prison without the possibility of parole -- this is number 84 -- is a severe-enough punishment for a person convicted of intentional and premeditated murder? And you said no, that's not severe enough which is a little different than I think what I'm hearing today, so I wanted to just ask you about that. Do you feel that life in prison, that that isn't enough?

A. I think it's enough.

Q. Okay. You did mention you have some problems with nervousness and headaches and you thought especially with children involved. I'll read you the question and answer directly. This trial will last about 12 weeks. Please describe any extreme hardships that would prevent you from serving for this time. I don't feel I would be a good person to have on the jury because of my nervousness. I get headaches often and get

Page 104

teary eyed very easily, especially with children involved. And obviously you know the allegations involve --

A. Right.

2428

Q. -- the killing of two children.

A. Right.

Q. Is this something still of concern for you, or have you changed your --

A. No, it's still a concern. I have several grandchildren, and I dearly love them all, and I'd hate to have this happen to them, and if it did, I don't know. And I don't think I could stand to watch or see something like this.

Q. You mean you're not sure you could listen to the evidence?

A. Listen to it, right.

MR. BERRIGAN: Okay. All right. Well, listen, I appreciate your candor, ma'am. Thank you very much.

PROSPECTIVE JUROR 300: Thank you.

THE COURT: Ma'am, I've got a couple questions for you. What does that mean when you say you're not sure you could listen to all the evidence? What do you mean by that?

PROSPECTIVE JUROR 300: You mean regarding the children?

THE COURT: Yeah.

PROSPECTIVE JUROR 300: I didn't mean listen -- well, listen to how they were murdered and why and all this and that.

THE COURT: Yeah, but, see, if you were a juror, you'd have to.

PROSPECTIVE JUROR 300: Right.

THE COURT: It's not -- I just want to make sure you

2429

Page 105

understand. It's not like each juror gets to decide what evidence they're going to listen to and you can kind of leave the room when it's something you don't really want to hear. It doesn't work that way for obvious reasons; right?

PROSPECTIVE JUROR 300: Right.

THE COURT: So how do you think it might affect you if there was -- there were, for example, pictures of a six-year-old and ten-year-old girl's skeleton?

PROSPECTIVE JUROR 300: I'm afraid I'd have to close my eyes and not watch it. I have a hard time watching anything like that on TV and stuff so . . .

THE COURT: Do you think you could fairly consider -- if we ever got that far, if the defendant is found guilty of one or more of the ten charges, do you think you could fairly consider both punishment, life imprisonment and the death penalty, or not?

PROSPECTIVE JUROR 300: I think I could.

THE COURT: You think you could?

PROSPECTIVE JUROR 300: Uh-huh.

THE COURT: Well, you told one of the lawyers you couldn't consider the death penalty. Isn't that what you said?

PROSPECTIVE JUROR 300: Yeah, I did.

THE COURT: Yeah. And I'm just -- and, you know, everybody can change their mind. That's actually not a bad thing to be able to change your mind. But I kind of have to

2430

know whether you can -- here's what I want to know. Can you fairly consider both penalties if we ever got that far in the case? If we got to the penalty phase, would you give fair

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2117 of 3245

consideration to a life sentence and fair consideration to a death sentence?

PROSPECTIVE JUROR 300: Yes, I could.

THE COURT: And do you think you're the type of person that if all 12 members of the jury voted unanimously for the death penalty that you'd then be able to sign your name to a verdict that would have the effect of ending Angela Johnson's life?

PROSPECTIVE JUROR 300: Yes, I suppose.

THE COURT: I'm not trying to be difficult with you, but "I suppose" sends a message to me that you have some reservation. Do you have some reservation if you voted for a death -- if you voted for the death penalty and the other 11 jurors voted for the death penalty -- it's okay to have reservations about it, but would you ultimately be able to sign your name to the verdict form?

PROSPECTIVE JUROR 300: Yes.

THE COURT: Okay. Now, do you know of any reason why you would not be a good juror in this case?

PROSPECTIVE JUROR 300: Well, yes, I do because I am not -- I am a senior citizen. I have senior citizen moments, and I have a hard time concentrating. I don't know. I just

2431

don't understand a lot about the law and all that either so -- but I could -- I don't know. I'd hate to -- I just feel like I would not be a good jury person.

THE COURT: Okay. And I just want to make sure I understand why you feel you wouldn't be a good jury person.

PROSPECTIVE JUROR 300: Just because I don't understand the law and -- that much like I feel like I should

Page 107

have an opinion, and like I say, I have a hard time concentrating and remembering.

THE COURT: Would it help if you'd be able to take notes and write things down?

PROSPECTIVE JUROR 300: Right.

THE COURT: Okay. Well, you're going to be allowed to take notes and write things down if you want to.

PROSPECTIVE JUROR 300: Okay.

THE COURT: But do you think you could fairly consider all of the evidence in the trial?

PROSPECTIVE JUROR 300: I think so.

THE COURT: Okay. Are you familiar with football?

PROSPECTIVE JUROR 300: Oh, yes.

THE COURT: Okay. So you know what a football field looks like; right?

PROSPECTIVE JUROR 300: Oh, yes.

THE COURT: Here's what I want to know. Some people who we've interviewed as jurors are totally undecided and have

2432

no leaning one way or the other about penalty. You know, they could equally consider the death penalty and equally consider life imprisonment. And when I've asked them this question or the lawyers sometimes ask this question, those type of people often put themselves right in the middle of the field which would be the 50-yard line. Other people are right down on the end zone or maybe even in the end zone of the death penalty or in the end zone of life imprisonment. In other words, they really couldn't consider the other option. Where would you put yourself on the football field?

PROSPECTIVE JUROR 300: On the 50-yard line.
Page 108

THE COURT: You're one of those on the 50-yard line.

PROSPECTIVE JUROR 300: Right.

THE COURT: Okay. Ma'am, if you'd just step outside, we're going to let you know your status in a little bit. Thank you so much.

(Prospective Juror 300 exited the courtroom.)

THE COURT: Who started?

MR. MILLER: I believe I did, Your Honor.

THE COURT: Yeah.

MR. MILLER: Your Honor, the government does challenge the juror for cause. And you want my argument?

THE COURT: Sure.

MR. MILLER: First of all, she's substantially impaired. I had to do a double take when she told us in

2433

response to an open-ended question about her feelings about the death penalty because it was very starkly in contrast to what she had written down. But in response to open-ended questions, she stated that she has never been in favor of the death penalty, just doesn't believe in the death penalty, thinks the defendant or anyone guilty should get some penalty but just doesn't think she believes in the death penalty. I feel that I just couldn't, stated I believe specifically I could not return a verdict sentencing someone else to death; again, I could not, no, in the negative and could not sign a verdict that would have that effect. Again, I would urge that these all support substantial impairment.

It's interesting to note that she did very directly state that she could fairly consider both punishments and that she puts herself on the 50-yard line, but I would take that in

context with her volunteered observations that she has difficulty concentrating, she has senior moments. And I think looking at both the answers to her questionnaire and her responses here today we have to believe her in that regard as well.

Her suggestion ultimately to Mr. Berrigan's question about her ability to listen to all of the evidence including that which would be distasteful or unpleasant was that she -- or perhaps it was even the Court's question -- would close her eyes during that portion of it. And for those reasons in addition to

2434

the substantial impairment on her ability to consider death as a possible punishment, we urge that she is not qualified, and we challenge for cause.

THE COURT: Okay. Thank you.

Mr. Berrigan?

MR. BERRIGAN: The defense would object to Juror 300 being removed for cause, Your Honor, but I'll be the first to admit that I was struck about the change in her position regarding the death penalty from her questionnaire to her responses today. But when I asked her questions about life imprisonment, that more put it in context for me. She almost says jokingly in these questionnaire responses people want to get into prison for three meals a day. And we've had some people, frankly, take the questionnaire responsibility more seriously than others.

But when she's put to the test today, she certainly came down both ways. She had no problem considering the death penalty in the questionnaire. When the Court actually talked to her, she seemed to be stronger as the questioning went on. It

Page 110

ends up at the 50-yard line, and God knows that's not where she started. In my view she started --

THE COURT: The question is where will she end?

MR. BERRIGAN: Well, yeah, we don't know. And that's what makes her qualified, frankly, is we don't know. We have no idea. So I don't -- this is clearly not a woman who would

2435

completely avoid either punishment. She's going to have some problems looking at the pictures. A lot of jurors will. She's indicated that. And if she can take notes, she's fine. She is very, I think, articulate in her responses both today and in the questionnaire. She's not one of these jurors that has obvious Alzheimer's problems or something of that nature, so we do not think there's a basis for cause for Juror Number 300 to be removed, and we object to her removal.

THE COURT: Well, she's all over the place, but, you know, I've gotta go with what she ultimately told me in both open-ended questions and the football analogy. And while I have severe reservations about the juror and I think she's just very indecisive, that doesn't disqualify her, so I don't believe she's substantially impaired.

So would the government like to exercise a peremptory challenge on Juror 300?

MR. MILLER: Yes, Your Honor.

THE COURT: Okay.

(Prospective Juror 300 entered the courtroom.)

THE COURT: Ma'am, we're going to go ahead and excuse you from jury service. Okay.

So please do us a favor, and don't discuss this with anybody else until we get the trial underway which hopefully

Page 111

will be some time next week because if you would talk to somebody, that somebody might talk to somebody else, and then

2436

that person might wind up being interviewed by us as a potential juror.  Okay.  Thank you for your participation, and good luck.

PROSPECTIVE JUROR 300:   Thank you.

(Prospective Juror 300 exited the courtroom.)

THE COURT:   Shall we do one more, 617?

MR. BERRIGAN:   Sure.

THE COURT:   Okay.

(Prospective Juror 617 entered the courtroom.)

THE COURT:   Juror 617, anywhere in the front row; okay?  Your choice.  Okay.

Everybody be seated.  We're going to start first with Mr. Berrigan on the defense, and then the government lawyers will have a chance to ask you some questions.

EXAMINATION

BY MR. BERRIGAN:

Q.   How are you doing so far, sir?

A.   Good.

Q.   Good.  We have a chance to ask you questions about two different areas and -- or more, but one of them has to do with pretrial publicity.  And by that I mean what you might have seen in the newspaper or heard on the radio or on television about this case before today.  And I was wondering if you could tell us about that.

A.   I haven't heard anything, and we don't get the newspaper.

Q.   Okay.  And do you watch the television news?

2437

Page 112

A.    No.

Q.    And this might just be a mistake, so let me just ask you about it.  I noticed in a lot of these questions in the questionnaire that you left blank, and I was wondering if there was any particular reason for that.

A.    No.

Q.    Okay.  You did check television.  What sources have provided you with information about this case, the crime, or the people involved?  There's a little check beside television, but maybe that's a mistake.

A.    No, I very seldom watch TV news.  You hear that all day anyway.

Q.    Okay.

A.    You know, from other people.

Q.    Okay.  And you haven't seen anything recently in the newspaper because you don't --

A.    We don't take it.

Q.    Gotcha.  So let's turn our attention to these other two things that are issues regarding the death penalty and life in prison without parole; okay?

A.    (Nodded head.)

Q.    And one of the questions in the questionnaire says, What are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of intentional murder?  And you left that one blank, and I was wondering what the answer to

2438

that was?

A.    Well, it depends on the crime I think.  If they could -- you know, guilty or not guilty.  But I -- you know, that was

Page 113

about it.

Q. Okay. Well, we're presuming -- when we're asking you these questions about punishment, we're presuming the person's been found guilty; okay?

A. All right.

Q. Let me ask it this way. Maybe this is more helpful. If you and I had known each other for 20 years or so and we were in a coffee shop one morning having a cup of coffee together and there was an article in the paper, something the death penalty -- and I know you don't usually read the paper but I was and I turned over to you and I said, Hey, Juror Number 617, you know, we've never talked about this death penalty thing; what do you think about the death penalty, what would you tell me?

A. Depending on what it was.

Q. And I'd say, What do you mean when you say that?

A. And I'd say, I don't know nothing about it anyway, so why ask me?

Q. Okay. Well, let me tell you the crimes we're talking about; okay? They're pretty serious. The government has alleged that Angela Johnson participated in or aided and abetted in five intentional murders; all right? And they've made a further allegation these are premeditated murders, they were

2439

committed after substantial planning. And they're alleging that amongst these five people that were killed, one was a mother, and there were two children, her children, ten-year-old Kandi Duncan and six-year-old Amber Duncan, two little girls; okay? And the government's alleging they were vulnerable -- what we call vulnerable victims because of their age.

So when we're talking about the punishment options,

Page 114

that's the allegations that we're talking about if the

government proved those things beyond a reasonable doubt; okay?

You did -- you did say you thought the death penalty was used an

appropriate amount.

A.   Yes.

Q.   And there's a question that says, Do you believe in an eye

for an eye, and you checked yes.   And then it says, Please

explain, and you didn't write anything there.   So let me ask you

about that, an eye for an eye.   What does that mean to you?

A.   Well, it means if they're found guilty or not.   If they're

not, why should it have been brought up?

Q.   If they're found guilty what --

A.   But if they're guilty, they should pay for what they've

done.

Q.   And when you say paying for what they've done, what does

that mean?

A.   Well, prison sentence or what the judge has to say.

Q.   Some people tell us -- and I just want to make sure we're

2440

on the same page.   Some people tell us an eye for an eye, that's

kind of like an eye for an eye, tooth for a tooth, limb for a

limb literally.   It's kind of the Old Testament Biblical thing

where you steal, you cut off somebody's hand; you take

somebody's life, you forfeit your life.   We've had people tell

us that, that that's what they believe.   If you intentionally

commit murder much less five, but if you intentionally took

somebody's life, then you forfeit your right to live.   You know

what I mean?   Life for a life.

A.   Yeah, but I don't mean it that way.

Q.   Good.   Tell me what --

Page 115

A. They can go to prison for life or stuff like that. I didn't mean that the guy should be committed to the electric chair or anything else.

Q. All right. The idea of a life sentence in prison without parole, in your mind is that a severe punishment?

A. Pretty bad.

Q. You can't get out now.

A. Yeah.

Q. You understand that's what the judge told you; right?

A. Right.

Q. Is that a severe-enough punishment for intentional murder?

A. Yes.

Q. If you were asked to consider that as a punishment for even something as bad as this, okay, five people, intentional,

2441

premeditated murder, including two little girls, is that a punishment that you could consider as an appropriate, just punishment for somebody that committed those types of crimes?

A. Well, I'd have to think on that all the way through the trial.

Q. Sure, you would. And, you know, part of this is unfair because you haven't heard all the facts. We know that.

A. I don't know nothing.

Q. Right. Well, I bet you know more than you're letting on.

A. No, I don't.

Q. But what I mean by that is you have to kind of imagine -- and I know this is hard. You have to imagine you've already sort of heard all the evidence; okay? And you've never been on a jury before, have you?

A. Oh, yeah, this is my third time.

Page 116

Q.   Your third time.

A.   Yeah.

Q.   What were the other cases like?

A.   Criminal.

Q.   Criminal.

A.   County.

Q.   And were you the foreperson on either one of those cases?

A.   No, I didn't want that.

Q.   Okay.  I didn't see anything.  I must have missed that in the questionnaire.

2442

A.   Probably didn't put it down.

Q.   Okay.  How long ago was that?

A.   About a year and a half ago.

Q.   Okay.  And how did you find that experience to be?

A.   Interesting.

Q.   Okay.  Well, I don't know if you remember, but, you know, those jurors are told wait and listen to all the evidence, and then you make your decision; right?  We're asking you to imagine you've already listened to all the evidence about how the crime was committed, where, who did it, why, when; okay?  And you're in this third part of the trial.  That's what the judge was talking about earlier.  You remember the three stages, and the third one's the penalty stage.  And we're just asking you to imagine you're there; okay?  We're not trying to put you there. I don't want you to think just because we're asking you these questions that means I think Angela Johnson's guilty of anything; okay?

A.   Uh-huh.

Q.   But we have to know about people's views about these issues

Page 117

because we won't have a chance to ask you later on what you think. So imagine yourself in the situation. You have found out about the crime. It's not self-defense, and it's not, you know, some defense she didn't do it or something like that. You found guilty, okay, five intentional murders, premeditated, substantially planned, two kids. And now we're in the situation

2443

where we've got these two potential punishments. One's the death penalty. The other one's life without parole; okay? And that's where we are when I'm asking if you could consider these two punishments.

A. I think I could.

Q. Okay. And even that sentence of life without parole, without possibility of parole, is that a sentence that you'd consider as a just punishment for that type of crime, five murders?

A. Yeah, it'd give her a long time to figure out what she did wrong.

Q. Yeah, sure would. One of the things you need to know is that unlike your trials you were in the past where remember the decision was made as a group?

A. Right.

Q. This decision about penalty is yours. And by that I mean your individual decision. You gotta live with it the rest of your life. So you've gotta weigh aggravating circumstances, and the judge is going to tell you what those are, but those are reasons that would go towards death, the fact that children were involved, for example.

A. Yeah.

Q. And then you're going to have to weigh what are called

Page 118

mitigating circumstances, and those are things that would go towards life, no prior criminal record, things like a minor role

2444

in the offense compared to other people that were involved, and you gotta make a decision about which is more important to you, okay, not numbers, how many of these or how many of these but what to you's important. Can you do that?

A. I think I could.

Q. Would you expect your other jurors to respect your opinion about what you determined to be most important?

A. I would hope.

Q. Okay.

MR. STOWERS: Two minutes.

Q. Would you be willing to do the same for your fellow jurors? That is, if there were people that disagreed with you --

A. I'd sit down and talk about it.

Q. It's an individual decision. You don't have to come back as a group on penalty; okay?

A. Okay.

Q. That's a lot different than what you've done.

A. Yeah.

Q. This case here, if the people disagree about the penalty, some say -- maybe one or two people say life and the others say death, that's life. That is a verdict. It's not a hung jury or anything like that; okay? Are you comfortable with that?

A. Yeah, that's their opinion.

Q. Okay. And you'd be willing to respect them.

A. Yeah, whether I go with it or not.

2445

Page 119

Q. Right, because you gotta make your own determination.

A. That's right. I have a mind of my own I think.

Q. Yeah, I think you do too.

A. A little bit of one left.

Q. Let me ask you about one last thing. I got about a minute left. You know, part of the evidence you might hear from the defense is evidence about this young lady's background when she was a child, some of the things that happened to her, some abuse that took place, and that's going to be offered to you as a reason -- one of those reasons for life, a mitigating circumstance. Some people have told us, I wouldn't even consider that. It doesn't make any difference to me, not at all. And other people would consider it, and I need to know whether you'd consider that kind of evidence in your decision about punishment if it was presented to you.

A. That's kind of a hard question.

Q. Why is it hard?

A. Well, you know, some people or kids growing up do have a bad time.

Q. Sure.

A. They don't like it at home. They might get abused or anything else so they take it out on somebody else. But . . .

Q. Well, let me be clear. It's not a defense to the crime. It's just like not having a prior criminal record doesn't mean you can go out and kill somebody. We're talking about the

2446

punishment. Do you think it's important if somebody doesn't have a prior criminal record that that should be taken into consideration?

A. No.

Page 120

Q.   You wouldn't consider that at all?

A.   No.

Q.   Not at all?

A.   (Shook head.)

Q.   Why not?

A.   She did it if she's accused of it.

Q.   So something like -- let me ask you this.  Even if you were instructed you had to consider something like a prior criminal record, no prior criminal record or substantial criminal record, you're sort of suggesting that's something that would be very difficult for you to do.

A.   In a way, yes, because, you know, she did it or if she did it, you know, she's gotta pay whether it's life or death penalty.

        MR. STOWERS:  Time.

        MR. BERRIGAN:  Thank you, sir.

        THE COURT:  Mr. Miller?

        MR. MILLER:  Thank you, Your Honor.

                        EXAMINATION

BY MR. MILLER:

Q.   Good morning, Mr. 617.

2447

A.   Morning.

Q.   How you doing?

A.   Pretty good.  I'm getting hungry.

Q.   You're less than 12 minutes away from lunch.  Just a couple questions, sir, that weren't answered on your questionnaire.  Do you have children or grandchildren, sir?

A.   Oh, yeah.

Q.   How many children?

Page 121

A. I got what? Four girls and two boys.

Q. And grandchildren?

A. About 22.

Q. Very good. You also told us -- told Mr. Berrigan a few minutes ago that you've three times been on a jury before.

A. Right.

Q. Across the street?

A. Yeah, this is the third one.

Q. What were the accusations in those three cases, sir, or those two cases before this one?

A. Breaking and entering in a car. That was the last one. The other two I -- don't ring a bell, can't come up with it right now.

Q. Do you recall the verdicts in any of those three cases?

A. Guilty.

Q. Sir, Mr. Berrigan asked you about the death penalty, and that's the only other subject I want to cover with you. Have

2448

you given it any more thought other than what you've shared with us here today as far as appropriateness of the death penalty?

A. No, not here.

Q. Now, you indicated to Mr. Berrigan that you feel that life in prison would be a just punishment for what the accusations are in this case. Do you recall telling Mr. Berrigan that?

A. Yes.

Q. Do you also feel that it's possible that the death penalty would be a just punishment?

A. Right.

Q. In other words, either one would be something you would consider.

Page 122

A.   Right.

Q.   And you understand we need to find 12 jurors who can assure us that they will give fair consideration to both possible punishments?

A.   Uh-huh.

Q.   Would you be able to do that for us, sir?

A.   Yes.

Q.   You can assure us you would give fair consideration to both possible punishments?

A.   I'd have to hear it all and, you know, come out with a . . .

Q.   Very good.  Let me just cover one last subject with you, sir.  If you get to that point, if you're on a jury that finds

2449

this defendant guilty, then and only then would it be possible that you'd have to assess the punishment.  Do you understand that?

A.   Yes.

Q.   And things that are not a defense to the crime such as one's background, being a victim of abuse, that sort of thing, they're not relevant at the guilt stage but at the punishment stage become factors.  The judge said that you would have to consider and weigh aggravating and mitigating factors.  You understand that.

A.   Yes.

Q.   And if you're instructed as to what those factors are, would you follow that instruction and consider all aggravating and mitigating factors?

A.   Yes.

Q.   And if you're instructed that -- and again, it's up to you

Page 123

how much weight you give each of these factors, but if you are instructed that you must consider every mitigating and aggravating factor that you find including the possible background of a person or the lack of a person's criminal history, on the punishment issue, would you follow that instruction?

A.   Yes.

MR. MILLER:   Thank you, sir.

THE COURT:   Sir, if you'd just step outside, we'll let

2450

you know in a minute.

(Prospective Juror 617 exited the courtroom.)

THE COURT:   Mr. Berrigan, any challenge for cause?

MR. BERRIGAN:   Before I make a challenge, sir, I was going to ask the Court if I might have some additional time with this juror for this reason.   He did not answer any of the narrative portion of any of the questions respecting punishment at all.   Asked about his views about the death penalty, it's completely blank.   Reasons why are blank.   Asked about his views about life in prison --

THE COURT:   Why did you wait until after you were done questioning after the government questioned --

MR. BERRIGAN:   I didn't want to have this discussion in front of him was the reason.

THE COURT:   Why didn't you ask me before we brought him up?

MR. BERRIGAN:   Well, because I thought maybe we could flesh it out during the questioning, and I was unsuccessful in that endeavor.   I thought maybe he'd be a little more elucidating in his questioning, but in my view he was not until

Page 124

the very end when we started talking about mitigating circumstances and particularly giving no consideration to a lack of prior criminal record.

So I was going -- I will make a motion if you want me to, but I was going to at least ask for maybe three more minutes

2451

with this juror given we had really no indication from his questionnaire kind of where he was on these issues.

THE COURT: Why don't we bring the juror back in, but I wish you would have asked me before we sent him out. I mean, you knew --

(Prospective Juror 617 entered the courtroom.)

THE COURT: Juror 617, one of the lawyers and maybe both of them -- everybody can be seated -- has some more questions for you. So we won't keep you from lunch for very long, but I'm going to give them a couple more minutes to ask you some follow-up questions, so thanks for being patient with us.

PROSPECTIVE JUROR 617: That's all right.

MR. BERRIGAN: Thank you.

EXAMINATION

BY MR. BERRIGAN:

Q. I wanted to ask you about one particular area that was on the questionnaire that you did check, and we talked a little bit about this, and it was in your opinion should the punishment for a crime be based on, and then there's a number of choices. One's the crime. One's the person. One's both or something else all together. And you checked the crime. Is that right?

A. Right.

Q. How do you feel about that?

Page 125

A.    About what I put on there?

2452

Q.    Yeah.

A.    Well, it's gotta be proven right or wrong.

Q.    The crime.

A.    The crime, yes.

Q.    Okay.  The reason I'm asking you that, sir, is because the jurors are going to be asked to take into consideration things other than the crime in making a determination about punishment; okay?

A.    Uh-huh.

Q.    And some folks think that's appropriate, but other folks don't.  Some folks have come in and told us flat out, Look, you punish people based on what they did, not what their background is, you know, not what happened to them 20 years ago.  It's what they did.  You hear me?

A.    Yes.

Q.    I had a sort of sense that's what you were telling me, but I want to be sure about it.

A.    No, it's just for the crime that they committed.

Q.    Can I ask you this example?

A.    Uh-huh.

Q.    If you were a judge, two people came before you that had committed exactly the same crime, exactly, not together but exactly the same thing, and one fellow had a kind of typical background maybe like me, had his parents at home, loving family, had a good chance for education, never missed any meals,

2453

Page 126

and the other guy was a whole different ballgame, single-parent family, some physical or emotional abuse, maybe sexual abuse growing up, not such a good home life, not a good educational environment, not a lot of love and support; okay?

Now here they are, and they've done these -- this crime, and you're the judge up there in the black robe. You're making the big money. And so it comes before you what happens; what are you going to do with those people?

A. Treat them both the same.

Q. Why?

A. What's good for one should be good for the other.

Q. Does it matter at all what the background was?

A. No way.

Q. Not at all.

A. No.

Q. So let me analogize that to where we are; okay? If you're presented evidence about the background and stuff we just talked about, this abuse, sexual abuse, the difficult home environment, some bad stuff happening, would you really consider that in assessing punishment if really you're punishing somebody for the crime?

A. What happened 10, 15 years ago shouldn't have no bearing on what she's doing today.

Q. Well, in your mind would it have any bearing?

A. No.

2454

Q. None at all.

A. (Shook head.)

Q. Okay. Can I ask you one other thing? Are you a football fan?

Page 127

A. Never watch baseball, football, basketball, nothing.

Q. Okay. So a football field, would that -- if I asked you questions about a football field, would you even know what I was talking about?

A. No way.

MR. BERRIGAN: Okay. Well, listen, you've been very patient. Thanks for coming back.

PROSPECTIVE JUROR 617: All right. Thanks.

THE COURT: Well, just a second.

Mr. Miller, would you like to ask some follow-up questions?

MR. MILLER: Yes, Your Honor, briefly if I may.

EXAMINATION

BY MR. MILLER:

Q. Just a couple more questions along that line about the punishment; okay, sir?

A. Uh-huh.

Q. You recall when you and I visited about it we talked about these other factors that don't go into whether you're guilty or not.

A. Right.

2455

Q. In other words, whether a person has a prior criminal record or not doesn't make any difference as to whether they're guilty of a crime. Fair statement?

A. Right.

Q. Now, in this case as you indicated to us a few minutes ago when you were in here the first time, you understand that if the defendant's found guilty there will be a second phase; okay? And only under those circumstances in that second phase it would

Page 128

be your job to weigh mitigating and aggravating factors you understand only after you found the person guilty. If you are instructed by the Court that you have to consider every mitigating and aggravating factor that's proven such as whether a person has a long criminal record or things like that, would you consider those things as instructed?

A.    Oh, yeah.

Q.    And if you were instructed that you needed to at least consider whether or not -- and again, this is not when you're finding them guilty or not guilty. But in the punishment stage on what's appropriate for punishment, if you are instructed you'd have to consider, assuming it's proven, that a person suffered more abuse as opposed to a person who maybe had no such, would you consider those things as instructed?

A.    I would after the trial was over.

Q.    Yes, and you would have to during the punishment phase if instructed to consider that in weighing the punishment.

2456

A.    Yeah.

Q.    Now, it's up to you as to how much, and you have every right to say, That isn't worth much, if any, weight to me, but would you consider every factor the judge ordered you to consider?

A.    Whatever he says, yes.

        MR. MILLER:  Thank you, sir.

        THE COURT:  Juror 617, if you'd step outside for a moment, we'll let you know your status.  Thank you.

        (Prospective Juror 617 exited the courtroom.)

        THE COURT:  Mr. Berrigan?

        MR. BERRIGAN:  The defense will move to strike Juror

Page 129

Number 617 for cause, Your Honor, on the basis that we believe he is substantially impaired regarding particularly the consideration of mitigating circumstances as reasons to vote for life. He's one of the few jurors, at least in my recollection, that came right out and said, you know, if you didn't have a criminal history, that wouldn't make any difference to me. There are people that have had problems with the idea that physical or emotional abuse in childhood might not be worth anything to them. But we haven't had hardly anybody in my recollection say, you know, No criminal history, that's not something I'd consider. That's what this man said.

THE COURT: Well, but you asked him in the context of if he were the judge. That was the context of your question.

2457

MR. BERRIGAN: Well, he will be. In my view he's the judge of the punishment.

THE COURT: Well, that isn't what he's thinking. You didn't give it to him in the context of whether there would be an instruction on it and whether he would follow the instruction. He just said he wouldn't consider it if he were the judge. That doesn't preclude him from being a juror in this case.

MR. BERRIGAN: And I don't want to argue with the Court, but my recollection is my last questions not the second time up but the first I did ask him that if he had an instruction that said you had to consider lack of significant prior criminal history would that be difficult for you to follow. I believe he gave an affirmative response to that.

THE COURT: Well, in response to the last question by Mr. Miller he said he could follow the law in the instructions.

Page 130

MR. BERRIGAN: That's right. He'll say he can follow the law in the instructions no matter what they are. I truly believe that's his answer. I don't think that's reflective of his true feelings, so we believe under Eddings versus Oklahoma this is not a juror who'd consider mitigating circumstances as reasons to vote for life and that he is substantially impaired under the Witt standard because of that and would move to strike Juror 617 for cause.

THE COURT: Thank you.

2458

Mr. Miller?

MR. MILLER: Your Honor, we resist. The question isn't whether or not he has an opinion about whether people who do the same crime should serve the same punishment. It's whether or not that opinion can be set aside and follow the Court's instructions. He clearly indicated that he could do so.

THE COURT: Yeah, I don't believe 617 -- actually I don't know why anybody would want him as a juror in this case, but that's another question. But he's not substantially impaired within the meaning of the law because he said he could follow the instructions and that he could fairly consider mitigation evidence in the case. So the defense challenge for cause is denied. You have no more peremptory strikes. Does the government want to strike him?

MR. MILLER: No, Your Honor.

THE COURT: Okay. Then 617's in the jury pool.

MR. BERRIGAN: Your Honor, before he comes in, I think for the record I think I need to at least ask the Court if you'd consider additional peremptory challenges for the defense.

THE COURT: No, because you agreed to the system that

Page 131

we have.

(Prospective Juror 617 entered the courtroom.)

THE COURT:  Sir, you're still in the jury pool.  So hopefully by the end of this week or maybe some time next week we'll let you know.  You have about a 50 percent chance of

2459

winding up on the jury.  But it's very important that you follow my instruction about not reading any newspaper articles or listening to any radio or television reports about the case or talking to anybody about this case.  Do you understand that?

PROSPECTIVE JUROR 617:  Yes.

THE COURT:  Okay.  Our clerk's office will let you know as soon as we know whether or not you're actually going to be on the jury or not; okay?

PROSPECTIVE JUROR 617:  All righty.  Thanks.

THE COURT:  Thank you.  Good luck to you now.

(Prospective Juror 617 exited the courtroom.)

THE COURT:  Anything we need to take up before we break?

MR. WILLIAMS:  No, Your Honor.

MR. BERRIGAN:  Nothing by the defense, sir.

THE COURT:  Okay.  Why don't we see you back here at 1:10.  Thank you.

(Lunch recess at 12:10 p.m.)

THE COURT:  Ready for Juror 539?

MR. MILLER:  Yes, sir.

THE COURT:  Thanks.

(Prospective Juror 539 entered the courtroom.)

THE COURT:  Hi, sir.  Come on in.  Any chair you like, please be seated.

Page 132

Everybody else can be seated. You're going to be

questioned first by Mr. Miller, one of the prosecutors.

PROSPECTIVE JUROR 539: Okay.

EXAMINATION

BY MR. MILLER:

Q. Good afternoon.

A. Afternoon.

Q. How you doing?

A. Good.

Q. Did you have lunch?

A. Yes.

Q. Good. We need to visit with you about just a couple matters, pretrial publicity and issues or opinions about the death penalty. Your exposure to pretrial publicity, if any, is what, sir?

A. Nothing. I don't -- I've never heard of this.

Q. Very good.

A. Except what came in the questionnaire.

Q. And that caused you no opinions as to the merits of the case I take it.

A. No.

Q. The death penalty, I notice you do have some feelings about the death penalty.

A. Yes.

Q. Would you just go ahead and share them with us, sir?

A. I think I would find it very difficult to sit on a jury

that sentenced somebody to death, and I tried to figure out if I
Page 133

would be opposed to it always, and I can't think of a case that's ever been before the public -- for instance, when President Bush was after, say, Osama bin Laden, I wouldn't have even been for the death penalty in those cases. To me it's sort of like if somebody threw a brick through my windshield, for justice, I wouldn't want the opportunity to throw a brick through their windshield. I'd want some kind of restitution for mine. To take somebody's life because they were involved in the taking of another life, I don't see that as justice. I don't know what the purpose is it serves. I know that that's a minority opinion, but I can't think of a time I would want to have been or shared in the responsibility for putting somebody to death.

Q. Even in an Osama bin Laden-type case.

A. No.

Q. And that's a no?

A. That's no, right.

Q. I apologize. This is an unusual setting, but we have a court reporter whose obligation it is to take down everything that's said.

A. Okay.

Q. Shake of the head, you and I do that all the time, but it doesn't help her record. Thank you so much, sir.

I took that to be your opinion. You were very open

2462

about your opinions in response to the questionnaire indicating there that for religious reasons you feel you cannot participate in a decision to execute a human being.

A. That's correct.

Q. Is that still a fair statement of your feelings about the

Page 134

matter?

A.   Yes.

Q.   And you do not believe government should kill criminals for any reason.

A.   Correct, not so long after the fact.  If it were to be like, you know, in the case of to prevent a death or injury to somebody, I could understand why government would move in and stop somebody like to raid a building or something but not so long after the fact.

Q.   Defending the nation in time of war, for example.

A.   Correct.

Q.   But that's a different situation.  After the fact when justice is being meted out, it's not an appropriate punishment.

A.   I don't think so, no.

Q.   And just to wrap it up, you feel that capital punishment, just to be blunt about it -- and it's your sincere feeling, and everyone's entitled to their feelings -- is barbaric.

A.   Yes.

      MR. MILLER:  And, sir, you know, it may be a minority opinion, but there are opinions all over the board, and

2463

everyone's entitled to their opinion, and all we can do is ask that you share them, and you've been good enough to do that, and I thank you for that, sir.

      PROSPECTIVE JUROR 539:  Thank you.

      THE COURT:  Mr. Berrigan?

      MR. BERRIGAN:  Thank you, Your Honor.

                    EXAMINATION

BY MR. BERRIGAN:

Q.   How are you, sir?

Page 135

A.    Very good, thank you.

Q.    I'm sure the fact that I'm even up here asking you questions must be strange given that you're a person opposed to the death penalty and I'm going to work very hard to keep my client from facing the death penalty this week, so we should be on the same page.  But this is not a referendum on the death penalty, this questioning process; okay?

A.    Yes.

Q.    Something that you said earlier in the general voir dire struck me, and I just want to bring you back to it.

A.    Okay.

Q.    Because it's really the test of what we're here about.  The prosecutor, Mr. Williams, was asking you questions about how stressful this participation in this jury would be given the nature of these charges and the potential decisions they're facing, and you said you thought -- you believed it would be a

2464

lot of stress for all the people involved in the case, and you were asked whether it would be a problem for you personally, and you said sure, but not extraordinary burdens.  It's something that needs to be done.  As Mr. Miller alluded to, we've talked to people that have really widely varying views about the death penalty.

A.    Uh-huh.

Q.    And that's okay.  The real question becomes not whether or not people lean very strongly one way or the other but whether or not they have the ability to set aside their personal beliefs in deference to the rule of law that the Court's going to give you in this case; okay?

A.    Yes.

Page 136

Q. That's the real kind of test. And I don't recollect. I don't see here that you've been on a jury before. Have you?

A. No.

Q. We ask these questions at this point in the process because we won't have a chance to come back later. I mean, it would be really nice if we could have a bunch of people listen to the evidence in this case, wait until there's a determination made -- this woman may not even be guilty; we may not even have to address this issue -- but if she was found guilty, then ask people, Well, what are your views about punishment, but we can't do that.

A. Right.

2465

Q. So we rely on people at this point, and you're a real bright, articulate guy, and so let me just ask you this question. Are your feelings so strong about the death penalty that even if you were instructed that jurors had to consider both punishments -- not that you were ever required to vote for the death penalty, but you'd have to consider it. The government has the right to have jurors that could consider that as a possible punishment no matter how much they disfavored it. The law would require that of you. Some folks are able to set aside their personal beliefs in deference to the instructions of the Court, and some are not, and that's okay. It's like the judge said. Hey, look, no right or wrong answers here. We just kind of need to know. So what about that?

A. Well, if you mean to set them aside like can I make a decision in spite of personal abhorrence --

Q. Yeah, that's exactly what we mean, right. And I'm not saying --

Page 137

A.   I could -- when I was sitting there and we were first talking about it -- in fact, when the questionnaire came out, I didn't know a lot about court proceedings, and I thought it was just maybe a generic questionnaire because I thought Iowa doesn't have a death penalty.  Iowa doesn't; right?

Q.   Right, that's right.

A.   But this was a federal case.  I'd never put those things together, and I thought my answer won't matter because it's a

2466

moot point here.  So when it was being addressed today, I was looking at the judge, and I thought, I bet at no time does the jury get to know whether the judge is for or against it personally.

Q.   Right.

A.   He just has to do what he's been asked to do.  And I thought the jury in this case as he explained earlier would be acting as the judge, so anybody who stands on the jury is going to have to do the same thing.  And although it'd make me want to vomit, I would have to go by whatever the law said.

Q.   Let me tell you just a little bit more about the process because that's kind of an important aspect to this whole thing. It's not, you know, well, we decide guilty or not guilty; if guilty, then we do the punishment.

A.   Yeah, yeah, when it gets to sentencing, yeah.

Q.   Yeah, it's that three-part process.  The government has already alleged in this case that our client participated in or committed five intentional murders.  That's the allegation.

A.   Uh-huh.

Q.   It's charged in ten counts, but there are five people dead. They've alleged additionally that these are premeditated

Page 138

murders.

A.    Uh-huh.

Q.    And they've alleged that amongst the victims are a mother and two children, two little girls ten and six years of age.

2467

A.    I remember that.

Q.    They're alleging that they're vulnerable, particularly vulnerable, victims because of their age.  Those are things that the government's going to ask the jurors to consider towards the death penalty if we get to that point where we're arguing about it.

The defense doesn't have to present any evidence really to counterbalance that.  But, of course, we will.  And some of the things that we hope to present is that our client does not have a substantial criminal history.  She has no criminal history.  And we're going to ask the jurors to take into account that she has -- a relative to other people involved in this case, a minor -- relatively minor role in the offense, and we're going to ask the jurors to take into account that she had an abused childhood, traumatic childhood involving physical, sexual abuse, neglect, you name it.  And then there's a weighing that has to be done.

And unlike most jury situations where the jurors kind of do that as a group, in this process they do it individually.  And that's kind of the test, the difficult part, is that it's not a numbers game.  The jurors have to make an individual determination what factors are most important to them in the weighing, and you could give one aggravating circumstance that there are children, for example, more weight than all the mitigating circumstances combined.  You could choose to weigh

Page 139

two mitigators more than four aggravators. It doesn't matter. It's what you determine yourself the result to be.

If each juror engages in that process and each reached an individual determination that the aggravating circumstances outweighed the mitigating circumstances and they all came to that conclusion as a result of their independent weighing, they don't even have to agree on the mitigating circumstances. They do on the aggravating, but one juror could say, I don't think -- that childhood thing, I don't have any weight to that, but no record, minor role in the offense, that's a big deal. It's only if they all 12 agree then that the death penalty's the punishment. And any one, two, three, any jurors that choose to vote for life, the effect of that is a verdict for life. It's not a situation where a unanimous verdict's required at all. The law absolutely says if you don't agree, we're not going to sentence this woman to death. So that's kind of the process.

A. I believe what you're getting at is if even one person knows in his mind that I can sit through the whole thing and at the end I can object and that changes the sentencing --

Q. Yeah, that's right, because you have to live with this decision.

A. Right.

Q. You do as a juror the rest of your life also. You can't hold the state to proof beyond a reasonable doubt. But you can be a hundred percent comfortable in that final decision when

you're doing the weighing; okay?

A.    Yeah, I understand that if I were on the jury I would have the power by myself in spite of whatever was presented to prevent an execution.

Q.    Right.

A.    And I would be reminding myself as much as I could -- I don't know what will happen for so many months because even in spite of all the stuff you said, I'm not really predisposed yet one way or another.  I would have to just remind myself I'm not here to change law or the process, only to apply it.

Q.    Right.

A.    And I could do that.

Q.    That's the thing is it's not Juror 539's law.

A.    Right.

Q.    I mean, it's not even the judge's law.  He doesn't come up with these statutes.  Congress has said this is the process, but, you know, to be fair, jurors have to be willing and able to engage in that process.

A.    Yes.

Q.    And it's okay if they can't.  I mean, it's perfectly okay.  We've had many jurors both ways.  Some jurors have come in and said, Are you kidding me?  Two kids?  There's no way I'd be able to consider a life sentence.  We've had other folks with very conscientious scruples, frequently religious against the death penalty would say, It doesn't matter; I couldn't honestly engage

2470

in that process fairly; I couldn't tell the government that I could consider a punishment of the death penalty; okay?

A.    Uh-huh.

Q.    And we take people at their word.  I mean, that's what we have to do; okay?  So --

Page 141

MR. STOWERS: Two minutes.

Q. -- I'm hearing you say you could do that.

A. I could.

Q. Would you do it if you were selected as a juror? That is, would you follow those instructions?

A. I would follow the instructions.

Q. Okay. It could be a situation -- and certainly we're not predicting this, but you could in this process have a situation just as I mentioned where all 12 of the jurors said those aggravating circumstances outweigh the mitigating circumstances.

A. I know that you can't knowingly seat a juror that if it got to that potential, even not knowing that it would get there, if it's a possibility you couldn't put a juror on here who would say, I'm going to throw that when it gets to that time.

Q. That's exactly right. You can't fix the thing by saying, I've already decided this.

A. And I'm also aware I can get out of the decision -- I can get out of the jury by saying that I would do that.

Q. Well, that would be the judge's decision, but I got a fair guess you're right.

2471

THE COURT: Yeah.

A. So it's already nerve racking to say I know that I could follow the process.

Q. It's supposed to be hard to sentence somebody to death.

A. Yes, because as he said earlier, if everybody who said "I would find that difficult" got off, there wouldn't be a jury.

Q. Exactly, right. Part of that process if it came to that involved signing -- either way, if you sign a verdict form for life you sign it. If you sign a verdict form for death, you

Page 142

have to indicate your vote by signing a verdict form.  Would you be able to do that either way depending on how you felt?

A.    Yes.

MR. BERRIGAN:  Okay.  That's it.  Thank you, sir.  I appreciate it.

THE COURT:  We're going to have -- we may have some more questions.

Mr. Miller, do you want to ask any additional questions?

MR. MILLER:  Yes, Your Honor.

EXAMINATION

BY MR. MILLER:

Q.    Juror 539, when I asked you to share with us your thoughts about the death penalty, you told us that you'd been giving it some thought.

A.    Yes.

2472

Q.    And had thought even about the case of Osama bin Laden whose actions caused the deaths of over 3,000 people, and you felt that even in that situation you could not impose the death penalty; correct?

A.    Was not opposed to the death penalty?

Q.    Could not impose it.

A.    Could not impose it, yeah.

Q.    And that's a fair statement?  That's still a fair statement, sir?

A.    Yes, but the difference there would be that I look upon that as if I had a chance to affect the decisions of the United States on whether to do that or not, I would actively oppose executing Osama bin Laden or anybody else we've gone after

Page 143

because of what it would mean for the country. But if it were my job to put Osama bin Laden on trial and those were the existing laws of the country, I would follow the law.

Q. You understand the law is never going to require that you execute anyone. You'll never be required to vote in favor of the death penalty on anyone. You understand that, sir, or is that new information for you?

A. I haven't heard that that way. I know that there would be rules that I would have to follow and that there was and that one of the penalties is capital punishment.

Q. And you would be told that you're required to consider and weigh all of the factors, mitigating and aggravating.

2473

A. Yes.

Q. But how much weight you give to each factor is up to you.

A. Right.

Q. And in fairness, the weight that you would give to these terrible aggravating factors, as terrible as they are, are not sufficient for you to sign your name to a verdict that would cause the death of Angela Johnson. Fair statement, sir?

A. I'm not sure I was -- I was kind of fuzzing out when you were talking because I'm thinking about what it means -- what this process means. And at the time when I would have to sign the verdict, I would be telling myself what my opinion is about the punishment can't affect the decision to say this is the correct -- this is the correct verdict by the rules that I was given.

Q. Sir, you wrote -- again, in a very, very straightforward response you stated -- and I quote -- I cannot participate in a decision to execute a human being. What did you mean by that

Page 144

when you wrote that for us, sir?

A.   I actually hoped it would be strong enough that I wouldn't be called to show up today.

Q.   But was that your sincere feeling when you wrote it down, sir?  You were sincere when you answered these questions I trust.

A.   Yeah.

Q.   And when you wrote, I do not believe that government should

2474

kill criminals for any reason, were you sincere in --

A.   Yes, I was.

Q.   And when you wrote that the basis for those opinions was religion, you, I trust, were being sincere.

A.   Yeah.

Q.   And when you stated that you cannot take life this way, were you being sincere?

A.   Yes.

Q.   And when you wrote that capital punishment in your opinion is barbaric, were you sincere about that?

A.   Yes.

Q.   In fairness, you understand that there are people who tell us that given this set of facts they can't fairly and realistically consider imposing life in prison because they feel those facts are so terrible.

A.   Right.

Q.   And for that reason they simply cannot fairly and realistically consider both punishments.  You understand that?

A.   Right.

Q.   Conversely, there are folks who tell us that their feelings about the death penalty are such that they cannot realistically

Page 145

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2156 of 3245

assure us that they can consider the death penalty. And that fits you I take it, doesn't it, sir?

A. Yes. It's a -- it's a difficult thing to answer because so much relies upon how I'm looking at what's happening. If I'm

2475

the one saying that a person has to be put to death for a crime --

Q. And you would be --

A. -- I can't support that. I can't -- I would never vote for a law to support that. I would work against a government that tried to do that.

Q. Could you sign your name to a verdict that would impose death?

A. It would be a very difficult thing to do. At this time I believe I could do that.

Q. How difficult would it be for you, sir, given your religious feelings?

A. It would make me ill. It would make me sick.

Q. It would make you vomit.

A. (Nodded head.)

Q. Fair statement?

A. Yes.

            MR. MILLER: Thank you, sir.

            THE COURT: I've just got a few questions for you. Here's what I'm understanding. I'm going to kind of repeat it back to you, and you tell me if I've paraphrased it correctly. I'm not trying to put words in your mouth, but I want to make sure that I'm understanding what you're saying.

            PROSPECTIVE JUROR 539: Yes.

            THE COURT: I understand you to say that you are very

Page 146

strongly opposed to the death penalty for all kinds of personal --

PROSPECTIVE JUROR 539: Yes.

THE COURT: -- personal and religious reasons but that if it is an option in this case because that's the law that you believe even though it would be very difficult for you that you would fairly consider both penalties in making a decision that you could do that.

PROSPECTIVE JUROR 539: Yes. And I would think that isn't that true of judges themselves? Don't they do -- sometimes have to apply a law --

THE COURT: All the time.

PROSPECTIVE JUROR 539: -- that they personally abhor?

THE COURT: I'm in that situation at least once a week. I'm in that situation at least once a week, frequently more often than that. And it is really hard, but I understand that. I took an oath to uphold the laws of the United States whether I agree with them or not, and I'm not shy about stating my disagreement with them. But I always follow them to the best of my ability.

PROSPECTIVE JUROR 539: Sure.

THE COURT: And that's essentially -- and some people can do that. It's actually not very hard for me to do that.

PROSPECTIVE JUROR 539: Oh.

2477

THE COURT: Even though I feel very strongly opposed to some laws. I know it's my job to follow the law, and I
Page 147

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2158 of 3245

wouldn't be a good judge if I imposed my personal opinion, and I can do that. I don't think a lot of other people could do that. And that's what we're trying to find out from you.

PROSPECTIVE JUROR 539: If I could do that.

THE COURT: If you could do that.

PROSPECTIVE JUROR 539: I can only say that I would try to do that. And if I'm not on the jury, I understand why, and there's other things I can do then.

THE COURT: Absolutely.

PROSPECTIVE JUROR 539: My summer will be spent doing something else.

THE COURT: Yes, and I'm sure your family will be much happier.

PROSPECTIVE JUROR 539: Yes.

THE COURT: But I want to get back to this last thing that you said about trying. Sometimes trying is good enough, and I always tell my daughter in school, I don't care if you get straight A's. She does. But all I want you to do is try hard. If you try hard and all you get is a C, that's fine. I'm not going to be the least bit unhappy. But trying hard isn't good enough in this situation. You have to know yourself well enough to know that if you fairly considered both punishments and you decided the aggravating factors outweighed the mitigating

2478

factors, could you impose the death penalty?

But I want to ask it a different way. Can you fairly consider both penalties, because I don't want to ask what you'd ultimately do because nobody knows. You wouldn't know what you'd ultimately do unless you were a juror and it came time to vote and then you might not want to do what you wanted to do,

Page 148

but you certainly wouldn't know today what you would do because you haven't heard all the evidence.

PROSPECTIVE JUROR 539: How much latitude does somebody have to decide whether it's death penalty or life imprisonment? Is there a definition that you go by? Is there an outline?

THE COURT: Here's actually what happens, and it's -- and you have a lot of latitude. Let me answer the short question. The long version is I will define for you what are aggravating factors, and I will define for you what the law considers to be mitigating factors. But I will not tell you whether there are aggravating factors or mitigating factors. That's for you to decide. I'll just tell you what they are.

Then you have to decide based on your view of the evidence do these facts constitute aggravating factors and do these facts constitute mitigating factors. And then it gets a little more complicated, but you're a bright guy, so I'll explain it to you.

PROSPECTIVE JUROR 539: Okay.

2479

THE COURT: The government has to prove aggravating factors beyond a reasonable doubt. The burden on mitigating factors is just by a preponderance of the evidence. It's a much lower standard. And you can actually find mitigating factors that I don't instruct you on and that the defense doesn't even argue. You have the right to find your own mitigating factors.

But in the end you have to fairly consider the aggravating factors and the mitigating factors, and you weigh them. But how you weigh them, that's up to you. My instructions don't tell you how much weight to give each factor.

Page 149

You have to decide do I find aggravating factors, do I find mitigating factors, and if so, you have to weigh them. But I don't tell you how much weight to give any of the factors. That's for you to decide.

And then you have to decide based on your view of the aggravating factors and the mitigating factors is the appropriate sentence life imprisonment or the death penalty. That's how it works.

And what I want to know is do you think you could fairly consider the aggravating factors, fairly consider mitigating factors, and fairly consider what the appropriate penalty should be?

PROSPECTIVE JUROR 539: I can and would, and I know that if I had to make that decision that it was the death penalty that I would be very upset for a very long time, but I

2480

would live with that.

THE COURT: Let me -- okay. And that's okay. But would that affect your ability to make the judgment, the fact that you would be --

PROSPECTIVE JUROR 539: No.

THE COURT: -- very upset and I'll use the word haunt you? Would that affect your ability to make the judgment?

PROSPECTIVE JUROR 539: No, because it's going to haunt me either way because I'll either have to go home and say, I did that based on my personal bias and not on the job I was given to do or I will go home and say, I did what I needed to do.

THE COURT: I followed the law whether I agree with it or not.

Page 150

PROSPECTIVE JUROR 539: But then I took part in a process that I don't like, that I abhor.

THE COURT: But do you think you can take part in the process that you abhor and fairly consider both punishments?

PROSPECTIVE JUROR 539: Yes.

THE COURT: Okay.

PROSPECTIVE JUROR 539: But I don't know that anybody will believe that, and I understand that there would be other people maybe less risky to put on the jury, but yes, I think I could do that.

THE COURT: Well, for whatever it's worth to you, I

2481

believe you.

PROSPECTIVE JUROR 539: Thank you.

THE COURT: I don't know whether you're going to wind up on the jury or not, but I think you're someone of great -- you've done a lot of soul searching. You've given it a lot of thought. You've been incredibly honest and candid with us, and I'd be willing to bet everybody in the room has nothing but the utmost respect for you and your views regardless of whether you serve on the jury or not, but I think you'd be a terrific juror.

PROSPECTIVE JUROR 539: Thank you.

THE COURT: Because you understand the difference between your own personal view and following the law. And most people don't have the ability to either understand it, and they certainly couldn't do it. You do in my view, but we'll see what our discussion takes place here. So thank you. If you'd just step outside for a minute or so, we'll let you know.

(Prospective Juror 539 exited the courtroom.)

THE COURT: Okay. Juror 539. Who went first?
Page 151

MR. MILLER: The government did, Your Honor.

THE COURT: You did, yeah.

MR. MILLER: Your Honor, very briefly -- and we do challenge this witness as substantially impaired -- I would urge the Court that while clearly he is a very bright man and a very understanding man and understands the process that the Court explained to him I think better than any that we've heard yet

2482

and I am pleased to see that in the man, his answers taken a whole -- as a whole I would urge the Court should place the emphasis on his response to open-ended questions.

Yes, when educated as to the process, he's able to analyze it and reiterate for us what the process is and state that he can fairly consider both punishments.

However, in response to open-ended questions, the very first one of which is please explain to us your feelings about the death penalty, he stated he has given it more thought even since filling out this questionnaire and that he has thought about the comments made by our President in a visit and he's thought about the situation with Osama bin Laden and considered even those it was not appropriate, the death penalty not appropriate even in a case such as extreme as that and would further urge the Court that when he filled out --

THE COURT: How is that inconsistent with his later statements that even though it'd be difficult he could fairly consider it?

MR. MILLER: It is inconsistent. It is inconsistent. And asking a witness if he can fairly consider both virtually invites the affirmative response. However, he did state in a narrative fashion in response to the question about his thoughts

Page 152

about the death penalty, understanding that he was being questioned about a death penalty case that he was being called in to serve on, stated, I cannot participate in a decision to

2483

execute a human being, close quote, and also indicated not once but a couple times that it would make him physically ill to the point of vomiting should he do so, and that I would urge the Court does very eloquently express substantial impairment.

THE COURT: I hear you. I don't agree with you.

Mr. Berrigan?

MR. BERRIGAN: Your Honor, I'm not going to belabor the response, Your Honor, other than I think it was -- maybe the best example was the one Mr. Miller asked him about Osama bin Laden where this man said, I would fight with all my being to prevent the government from going after him and seeking death, but if I'm a juror, that's a whole different ballgame. And it's ironic in this instance they want to ignore what he says in response to the process --

THE COURT: Well, you're both equally guilty of that.

MR. BERRIGAN: Right. But the process means something to him. I don't think any of us could disagree with that. He's certainly qualified.

THE COURT: I think so. I understand what you're saying, Mr. Miller, but -- and while I think it would be difficult, I think this juror perhaps more than any juror we've questioned would fairly consider the evidence and make the judgment. And is he personally opposed to the death penalty? Absolutely. Could he set that personal opinion aside and fairly consider both? I absolutely believe that he could, so in my

2484

Page 153

view he is not substantially impaired.

I'm assuming you'd like to exercise one of your remaining --

MR. MILLER: Yes, Your Honor.

THE COURT: -- peremptory challenges. Thank you.

Okay. Let's bring Juror 539 in.

(Prospective Juror 539 entered the courtroom.)

THE COURT: Sir, I regret to inform you that we're going to let you go. I think you -- I know it's a great relief to you. My own personal view is I think you would have been a terrific juror in this case or any other case. So I hope we get you back here to serve on one of our other trials. You're extremely articulate, very, very thoughtful. And you in my view totally understand the distinction between your own personal beliefs and following the law. Very, very, very few people understand that. So good luck to you.

We'll just ask you one favor. Because we think it's going to take probably into next week to get a jury selected, we'd just ask you not to talk to anybody about this because you might talk to somebody, and they might say something to somebody else, and that somebody else may be sitting in here later this week or next week. After we get the jury selected, you can talk about it as much as you want to anybody you want; okay?

PROSPECTIVE JUROR 539: Thank you.

THE COURT: Thank you so much for coming in today.

2485

(Prospective Juror 539 exited the courtroom.)

THE COURT: Okay. Ready for 600. You can have some

Page 154

extra time on this one if you want to revisit that one issue.

MR. BERRIGAN:  Thank you, sir.

(Prospective Juror 600 entered the courtroom.)

THE COURT:  Juror 600, good afternoon.  Any seat you'd like in that front row.  Everybody else can be seated, and we're going to start first with questions from the defense, Mr. Berrigan, and then from the government and Mr. Miller; okay?

PROSPECTIVE JUROR 600:  Okay.

EXAMINATION

BY MR. BERRIGAN:

Q.    How are you, sir?

A.    Good.

Q.    It's not going to be nearly as bad as getting a root canal.

First I wanted to thank you for filling out your questionnaire.  You obviously took some time, and we all appreciate that.  It helps us to shorten this process quite a bit.  We're going to really talk about maybe two or three areas with you.

A.    Okay.

Q.    And then we'll be done.  One is the area of pretrial publicity or your exposure to media coverage in the case, be that radio, television, or newspapers or word of mouth for that matter.  And we do have the benefit of your questionnaire, of

2486

course, and you said you were not at all familiar with the case, that the descriptions contained in this letter is my first exposure to this case.  Does that sound right?

A.    That is correct.

Q.    I'll tell you from experience that sometimes in the few months that intervene between the questionnaire being filled

Page 155

out -- this was January 20 -- and us coming here we've certainly had some jurors who that situation's changed for whatever reason, so we try to be cautious. And let me just ask you, has that changed? Have you heard anything about the case since you filled out the questionnaire?

A.    Not a great deal. Maybe some very quick six o'clock news-type items that are not very detailed at this point in time.

Q.    Could you tell us what you can recall about any of those items?

A.    Well, the first one was the potential to be moved -- that was one item that I did hear -- and then also jury selection was beginning, and that was about it.

Q.    Okay. And are these kind of -- you know, I know sometimes you're sitting down to the news and they sort of have these blurbs at the beginning where this is what we're going to talk about tonight as opposed to the actual two- or three-minute segment. Are these one or the other, or do you remember?

A.    I don't believe they were any of the big -- big blurbs at

2487

the beginning. It's just more or less just a very quick little maybe 20-second item that has come up.

Q.    Those are kind of procedural, what we call procedural things. You know, we have -- as the judge mentioned, there have been a lot of motions in this case that he's had to rule on, and we've had hearings, and this case has gone on literally for years now. And we don't worry about that too much.

What we are concerned about, though, is if you got any information, factual type of stuff, you know, this happened or that happened or I heard this or that about the actual case.

Page 156

Anything like that?

A.    No, no.

Q.    Okay.  Great, great.

THE COURT:  Could I amend that to alleged factual stuff?

MR. BERRIGAN:  Yes, sir, alleged, right, yeah.  I'll be the last one to suggest that it's factual.  I apologize.

Q.    And since you haven't heard it, that's good.  So let's talk a little bit about the death penalty and life without parole; okay?

A.    Uh-huh.

Q.    And I want to put this in context for you because I think it's important that you have a context when you're being asked these questions.  The government, as you know by now, has alleged some very serious charges against Angela Johnson.  And

2488

those charges, although they're in ten counts, they really involve the intentional murders of five people; okay?  And I want to do this visually for you if it helps, although you have a master's degree and I'm sure this isn't necessary.

But they've alleged that these five murders were committed either during a drug conspiracy and/or a continuing criminal enterprise which is merely a criminal organization.  And they've also alleged that the murders were committed after substantial planning or premeditation, and you know what premeditation means.

A.    Uh-huh.

Q.    And then they are also alleging that of these five people one is a mother with her two children, Kandi Duncan who's ten years old and Amber Duncan who's six.  The government alleges

Page 157

because of their age those are what we call vulnerable, particularly vulnerable, victims; okay?

And what we're asking people to do is this very artificial scenario where we're asking you to kind of fast forward in your mind and pretend -- and that's all it is is pretend -- that we're at a point in the trial as the judge described it where we're in that third phase.

Now, we may never get there, and, you know, I need to tell you we're going to fight hard, the defense is, not to get there. And I don't want you to hear me saying that I believe my client's guilty of anything because we're asking questions about

2489

punishment. That's not what this is about. But in order to get people's views about punishment, we have to pretend we are at a situation where it's being considered; okay? You with me?

A. Uh-huh.

Q. All right. And so the question then becomes kind of whether or not jurors can fairly consider both punishments even in a case such as this and the two punishments, as the judge has already pointed out.

If we're at this point, again, a big if, and there's going to be other evidence to be considered I'm going to talk about in a minute, could people consider both the death penalty and life imprisonment without the possibility of parole; okay?

So as a prefatory matter, even though you've talked about it a little bit in your questionnaire, let me just ask you to answer this question. You and I are chit chatting, and I'm down there at Iowa Lakes Community College. Maybe we've been colleagues for a decade and we're having a cup of coffee in the teachers' lounge and there's an article in the paper about the

Page 158

death penalty and I turn to you and I say, Juror Number 600, we've never talked about the death penalty.  You know, what do you think about that?  What would you tell me?

A.    In my opinion I believe that under certain circumstances I do believe in the death penalty.  However, those circumstances would have to be very, very severe.

Q.    Okay.  I mean, we could agree that these are pretty severe

2490

circumstances, aren't they?

A.    Yes.

Q.    Okay.  The flip side of the coin is the alternative punishment which is life without parole.  Is that a punishment that you would consider a severe punishment?

A.    Yes.

Q.    Is it severe enough that you'd consider it as an appropriate punishment even for circumstances such as this?

A.    Yes.

Q.    One thing that came out through your questionnaire in several answers was a very deep-seated concern about the victims' family.

A.    Yes.

Q.    Do you remember talking about that?

A.    Uh-huh.

Q.    You mentioned it on several occasions.  You were asked a question about -- let me see if I can get it directly.  Do you believe in an eye for an eye?  And you checked yes.  But then you explained.  You said, The closer the crime is to an individual or family, the more firmly they believe in this.  If someone took the life of one of my children, I would seek the same for them.  Does that sound about right?

Page 159

A.    Yes.

Q.    People have talked about this eye for an eye concept in a lot of different ways.  Some have a Biblical interpretation, you

2491

take a life, you give your life, and that doesn't seem like what you're suggesting, but I need to be sure.

A.    Yeah, that's correct.

Q.    What's correct?

A.    The -- would you restate that again, please.

Q.    Yeah.  Sometimes folks have said, When I say an eye for an eye, I'm talking about the Old Testament.

A.    Right.

Q.    If you take somebody's life, you forfeit your life.  Other people have defined it differently.  I mean, it has different meanings for different people, and I need to know what your view of that is.

A.    My view would be that justice be served to that individual. It may not necessarily be to the extent of a life, but yet justice must be met in order for the victim's family to find closure.

Q.    Let me tell you a little bit about the role of the victim's family in the case.  They are permitted to testify and indeed expect they would about how the deaths of their loved ones have impacted their lives; okay?

A.    Uh-huh.

Q.    They're not going to be asked their views about punishment because that's not their job.  The job of the jurors is to determine punishment.  And you're not the victims' family members; right?

2492

Page 160

A.    That's correct.

Q.    We could agree that it would not really be justice for the victims' family members to determine the punishment of somebody accused of killing one of their relatives, don't you think?

A.    Right.

Q.    One concern I have is -- because you're sensitive to this issue is to whether you could listen to this testimony like other testimony, you know, kind of evaluate it the same way you would other testimony, or is this going to have such an impact on you that perhaps you'd be unduly swayed by the emotional nature of that kind of testimony?  What do you think about that?

A.    I would like to think I would have an open mind towards that testimony.  I'm not sure it would completely sway me.  But yet I would like to hear that type of testimony also.

Q.    Okay.  Would that testimony be determinative in your view?

A.    Not necessarily.

Q.    Okay.  And maybe you're not struggling with it, but I'm sort of getting that impression.  Are you?

A.    Somewhat.  That is somewhat of an issue, but yet once again on the justice side, we must look at the facts and understand the facts.

Q.    Well, the -- wouldn't you expect no matter what the circumstances -- I mean, I've been involved in cases where drunk drivers have killed people and mothers have come into court and testified they lost their eight-year-old boy.  Frankly it

2493

doesn't matter to them whether some drunk driver ran him down accidentally or shot him with a bullet.  He's dead.  They want justice, and their view of justice is colored, if you'll allow

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2172 of 3245

me that term, by their relationship with the deceased. You know what I mean?

A. Yes.

Q. They couldn't be a juror. That person could never be in your shoes.

A. Right.

Q. So my concern is that maybe you're placing those people in your shoes. You know what I'm saying?

A. Yeah. That's a possibility, yes.

MR. STOWERS: You've used 11 minutes.

Q. Is there anything we can do to keep that from happening?

A. I'm not sure. Once again, I would like to think that it's not going to affect my decision-making skills, that I can have an open mind towards the events that occur. But there is a possibility that -- I have children, and that may potentially affect my decision-making skills.

Q. Does the fact that there are children involved here as alleged victims, does that make you feel in any way that your impartiality of being a juror is hindered in any fashion?

A. Possibly.

Q. In what way?

A. Well, I just see the -- we're responsible for taking care

2494

of our children and watching out for them, and we must do so by potentially keeping others from hurting them. That's just the father in me talking I guess.

Q. Sure. Well, I think we're all protective of children, and that's an appropriate consideration to take into account. But on -- the other side of the coin I guess is if that's determinative for you, that sort of settles it basically, that

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2173 of 3245

that might be a potential problem. So does it? If there are children involved, does that really settle the issue for you in terms of punishment?

A. I would say no, no. I -- as far as the sentencing and the punishment, no. I think the facts will come out as the facts.

Q. Okay. I'm going to switch gears. The judge has given us one extra minute to ask you about some questions that happened earlier. You were asked a series of questions about factors you'd be willing to consider or not concerning what the government calls cooperating witnesses and what we call snitches; okay? And these are folks, to be honest, they may be incarcerated and they come into this courtroom and they may be hoping for some break in terms of their own predicament in return for their testimony for the government. You know, there may be a tit-for-tat situation in their eyes.

And when you were asked questions by my colleague, Mr. Willett, whether you'd have any interest in hearing, you know, things like whether they were going to get a benefit or

2495

expected to get a benefit as a result of their testimony, we heard you repeatedly say that wouldn't be anything you'd be interested in.

A. Uh-huh.

Q. And, frankly, you could take that position. But the law certainly allows you to take into consideration the motive for somebody testifying. If somebody comes into court and they're serving a long prison sentence and if they say X and it helps the government and they're going to get their sentence cut in half, most folks want to know that because they're looking at that guy with kind of a -- with a grain of salt, you know, maybe

some skepticism.

Your answers were sort of the opposite of that all together, and we were wondering whether you were confused by the questioning or that is your position or how you could kind of explain your view of that kind of evidence?

A. My view of that would be that I would hope that the individual would be doing that service in order that justice can be served in whatever way possible. If they are receiving a lighter sentence because of that, I'm not sure that I would take that into consideration with the testimony.

Q. Why not?

A. Well, I guess I believe in the system that hopefully we would have individuals that would be doing -- to serve justice and, of course, they're going to do it for their own personal

2496

gain, but yet as far as the testimony itself, I'm not sure it should be a problem with myself.

Q. Could you envision the possibility that people might not do what you're suggesting?

A. Oh, yeah.

Q. And that is come in here gratuitously and tell us the truth because that's what they feel is right?

A. Yeah, I'm an idealist. I know there are individuals that would take advantage of the situation as most -- best possible way that they could.

Q. These are largely convicted felons we're talking about, okay, which is another factor that you'd be allowed to take into consideration concerning their credibility. Would that make any difference to you, whether somebody had a felony conviction in assessing the credibility of their testimony?

Page 164

A.   It's a possibility, yes.

Q.   What do you mean it's a possibility?

A.   That I could see their point, that they are looking out for themselves.  Most individuals in that situation are more concerned about themselves than others.

Q.   And could you envision the possibility that they would lie under oath as a result of the benefit that they perceive they're getting for telling the story that they're giving?

A.   There's always that possibility, yes.

Q.   Do you think that's a real possibility in your mind?

2497

A.   Yes.

Q.   I mean, obviously you'd have to see them testify; right?

A.   Right.

Q.   But you wouldn't preclude that, would you, necessarily?

A.   No, no.

      MR. BERRIGAN:  Okay.  Thank you, sir.  I think I'm straightened out.  Thank you, sir.

      THE COURT:  Okay.  Mr. Miller?

      MR. MILLER:  Thank you, Your Honor.

                    EXAMINATION

BY MR. MILLER:

Q.   Good afternoon, sir.

A.   Good afternoon.

Q.   How are you holding up?

A.   Good.

Q.   Good.  I just want to cover the issue of the death penalty with you, and then I'm going to sit down and we'll let you go.

A.   Okay.

Q.   The answer that you gave in response to the question about
Page 165

your feelings about the death penalty, this was several months ago you filled it out.

A.    Right.

Q.    You didn't keep a copy and study it over before coming in here.

A.    No, I did not.

2498

Q.    Let me just remind you of what you said.  You stated -- and I'm quoting you now -- It somewhat saddens me that it is necessary to end the life of another, but my opinion would be greatly affected by the attitude of the convicted, did she show remorse when found guilty.  Can you give us -- expand on that what you were feeling and thinking when you gave us that response in the questionnaire?

A.    Well, if there was some feeling of -- that what was happening was wrong, you know, I think that might -- there's always a possibility for rehabilitation, and even though it's a potential life sentence, you can't take back the lives that were lost, but yet I think you can correct it yourself with a higher being and possibly show some concern, asking for forgiveness and that type of thing.  That's important in my life.

Q.    And if there's a showing of remorse, then that would to you be an appropriate thing to think about and consider.

A.    Yes.

Q.    Well, do you recall the judge indicating during a portion of this morning's explanation about how that third phase would go if the jury gets to that point?

A.    (Witness nodded head.)

Q.    Indicating that, you know, we have -- the state of Iowa as opposed to the federal government has no death penalty.

Page 166

A.    Right.

Q.    And I believe there have been and may yet be some societies

2499

that automatically impose the death penalty in case of certain crimes.  But we have something different in this federal government in that a limited number of crimes death penalty is eligible if after finding the defendant guilty the jury after weighing both mitigating and aggravating circumstances decides which is the appropriate punishment.  Does that system make sense to you, at least in the way we've summarized it so far?

A.    Yes.

Q.    Does it seem appropriate to you?

A.    Yes, even though it seems fairly difficult to come to a consensus.

Q.    It's quite a responsibility.

A.    Right, right.

Q.    But you've indicated that you feel in some cases the death penalty is appropriate.

A.    Yes.

Q.    And you also feel that even in serious cases life in prison may be appropriate.

A.    Yes.

Q.    The killing of children, we've talked about that to some degree.  If you were on this jury and you were instructed that the killing of children would be -- if shown would be an aggravating circumstance that you could consider and weigh and give what weight you deem appropriate, is that something that makes sense to you?

2500

Page 167

A.    Yes.

Q.    And conversely, if you were instructed that among possible mitigating factors if you found remorse, for example, was a mitigating factor, would that make sense, and is that something you would follow and consider?

A.    Yes.

Q.    And I take it in your own opinion you would feel that would be deserving of some weight.

A.    Yes.

Q.    The showing of remorse.

A.    (Witness nodded head.)

Q.    And there may be any number of others, and the Court will instruct you -- I assume you'd be happy to know that the Court will be giving instructions on how you do your job; fair statement?

A.    Yes.

Q.    Do you -- let me ask you this.  Would it be your objective sincerely to follow the Court's instruction about weighing and considering both aggravating and mitigating circumstances?

A.    Oh, yes.

Q.    And do you feel that you could consider -- from what you know about this case, from what you already know about this case, do you feel in the event that you're required to serve on this jury and in the event that it comes to a penalty phase that you could fairly and realistically consider both possible

2501

punishments?

A.    Yes.

Q.    And in the event, sir, that you and all 11 of your fellow

jurors unanimously decided that the death penalty is the appropriate punishment in this case, sir, do you feel that you could sign your name to a verdict that would have that effect of imposing that punishment?

A.    Yes.

MR. MILLER:  Thank you, sir.  I have no further questions.

THE COURT:  Juror 600, I want to return to this issue about witness credibility -- that's the general category -- and ask you a few questions about it.  And, you know, I don't know who the witnesses are going to be.  I've got a list, but I don't know what they're going to testify to.  But in a lot of criminal cases that I have, there are witnesses who come in to testify, and either when they're examined by the government on what we call direct examination or if the defense chooses to cross-examine them it comes out -- sometimes it comes out on direct and cross -- that the witness is hoping to get a reduction in their sentence based upon their cooperation.  And if that should happen, I would give you an instruction at the end of the case about that.

And I'm just going to kind of paraphrase for you what I would say.  And it goes something like this.  You should treat

2502

the testimony of certain witnesses with greater caution and care than that of other witnesses.  You have heard testimony that one or more witnesses are testifying and hope to receive reductions in their sentences in return for their cooperation with the government in this case.  You may give the testimony of such witness such weight as you think it deserves.  Whether or not the testimony of a witness may have been influenced by the

Page 169

witness's hope of receiving a reduction in sentence is for you to decide. Do you understand that's how I would instruct you?

PROSPECTIVE JUROR 600: Yes.

THE COURT: Okay. Do you think that whether or not a witness hoped to get a personal benefit, meaning a reduction in their sentence, is something that, one, jurors ought to know about and is important to help you evaluate the credibility of the witness?

PROSPECTIVE JUROR 600: Yes, I -- when stated that way, yes.

THE COURT: And you're entitled to give it whatever weight you think it deserves. But would you agree with me that knowing as much as you can about a witness's motivation is helpful in assessing their credibility?

PROSPECTIVE JUROR 600: Yes, I would.

THE COURT: And I'm not trying to put words in your mouth, but I understood you to say when it first came up this morning that that really wasn't something you'd be interested

2503

in, whether or not they were hoping to get a reduction in their sentence and maybe how much of a reduction they might hope for. You weren't really interested in that, and I guess I'm asking you do you think maybe you're a little more interested in that now than you were this morning or not?

PROSPECTIVE JUROR 600: I believe so, yes, yes.

THE COURT: Okay. And it's totally for you to decide. I'm just going to give you an example; okay? I had a sentencing years ago, and a couple of the government witnesses had -- they had been given huge sentences by me, but they had a chance now to get their sentence reduced if they cooperated. They came in,

Page 170

and they testified in a sentencing against a defendant that they bought huge quantities of crack cocaine from him at a car wash that he owned, and they said the year, and I don't remember the year, 1996, and they were absolutely positive that year was 1996.  You with me so far?

PROSPECTIVE JUROR 600:  Uh-huh.

THE COURT:  Well, it turned out later in the sentencing -- and the defendant said he'd never seen these guys in his life.  He didn't even know who they were, but some information about his case was circulating in the jail where these guys were.  And they brought out that they had the contractor who -- or some way to prove it.  I don't remember exactly now -- to prove that the car wash where these guys claimed they'd bought the crack from this guy, it wasn't even

2504

built until two or three years later after they'd testified they had been at this car wash and bought crack from him.  It hadn't even been built yet.

So when I was judging their credibility, I thought, hey, wait a minute, I don't believe these guys because they had a huge -- they had something huge to gain, and it was something I really needed to know, you know, what they were hoping.  They were hoping to get a big reduction.  So in that particular case I said they were lying, that they made it all up just to get a reduction in their own sentence.

In other cases people cooperate, they hope to get a reduction.  I listen to all their testimony, and I believe them.  Sometimes I believe them.  Sometimes I don't.  But I make an individual judgment in each case based upon all of the information I have before me.

Page 171

And that's what I want to ask you. Do you think you can make an individual judgment about each witness as to what their motivation is and how, if at all, that motivation might be affecting their testimony?

PROSPECTIVE JUROR 600: Yes.

THE COURT: Okay. And does it make kind of common sense to you that that's the type of thing that what I call the trier of fact, the person who is trying to decide what's happened -- sometimes I'm the trier of fact; sometimes the jury is. But if you're the juror and you're the trier of fact, you'd

2505

want to know what the motivation of various witnesses were to the extent it came out in the evidence. Do you agree with that?

PROSPECTIVE JUROR 600: I would agree, yes.

THE COURT: If you'd just step outside, we'll let you know what your status is in a minute or so. Thank you.

(Prospective Juror 600 exited the courtroom.)

THE COURT: Okay. Juror 600?

MR. MILLER: I've forgotten who went first.

THE COURT: So did I. Mr. Berrigan claims he did.

MR. BERRIGAN: Yes, sir. I'm pretty sure I did. I reluctantly have to move for cause on this one issue, Your Honor, and that is that this juror has evidenced I think an unusual tendency to put himself in the shoes of the victims' family members respecting evaluating their testimony, and he was asked about that through several questions. One of them actually was, Are you placing yourself in their shoes, and he said that that was a possibility. And my notes, admittedly poor, reflect that he thought that that might potentially affect his decision-making skills. "I do have children" was the last

Page 172

thing he said about that.

That's in our view inappropriate in that although that testimony's certainly allowed, it's not given any more weight than the testimony of other witnesses and should be evaluated the same as the testimony of other witnesses that will testify in both -- either phase of the case. And this gentleman

2506

expressed a particular concern about that in his questionnaire, and he's reiterated that here.

And we think that his inability to weigh that testimony as the same, that is, victim impact testimony as the same, as other evidence in the case makes him substantially impaired as a juror.

THE COURT: Well, first of all, did he say that he wouldn't weigh it the same, because you didn't ask him about other types of evidence?

MR. BERRIGAN: You know, frankly I don't remember specifically what the question was. I thought I did mention that that would have to be weighed the same as other testimony. I think that was part of the question and that my notes reflect that that was a difficult thing, that he was going to have difficulty doing that because of his concern about the victims' family members and putting himself in their shoes and the fact that he had children. And that's in our view inappropriate. Certainly the jurors are entitled to consider that testimony but not give it any greater or less weight just because of the nature --

THE COURT: He's entitled to give it greater weight than other evidence if he wants to.

MR. BERRIGAN: Well, I think he's saying he's doing

Page 173

that as a matter of course. That is, he wouldn't evaluate it by the same standards that he would respecting other testimony. I

2507

understand --

THE COURT: I don't think you asked him that question.

MR. BERRIGAN: Well, and if I didn't, then I'm incorrect. I thought that I did ask him at least a question about evaluating that the same as other testimony that would be presented and that his response indicated that that would be difficult for him to do.

THE COURT: Well, even if he said it was difficult for him to do, you think that means he's substantially impaired?

MR. BERRIGAN: Only because of the other answers regarding --

THE COURT: Well, how come it doesn't substantially impair a potential juror when they say it would be difficult to impose the death penalty? That doesn't substantially impair them in your view. You've repeatedly fought tooth and nail for potential jurors who have said that. Why would this substantially impair a juror?

MR. BERRIGAN: I think that's true if -- just as we had the example here a few minutes ago of Juror 539 if they then go on to say he could follow the instructions no matter what. But this is a man who's actually placing himself in the position of the victims' family members which is not an objective position by any stretch to be in in deciding punishment, and that seemed to me based on his answers to be a real problem for him. Admittedly, it was the only problem I thought in his

2508

Page 174

entire sequence of questions, but it's a serious problem from the defense perspective.

THE COURT: Anything else?

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. Mr. Miller?

MR. MILLER: Your Honor, the government opposes. As far as the victims and potential identification with the victims, it was counsel putting him in that position. He didn't volunteer it himself. And I think asking him to put himself in that position is no more appropriate than asking him to put himself in the position of the defendant.

What he did say when asked specifically about whether or not it would be determinative stated not necessarily determinative, must still look at the facts. And more importantly, when asked -- and again by defense counsel -- whether the involvement of children would settle the issue for him, he stated, No, I would say no. As far as sentencing and punishment, no. I think the facts will come out as the facts, close quote.

Your Honor, when asked about his understanding of the system and the obligation to consider and weigh both mitigating and aggravating factors, he expressed I believe an understanding of that and very clearly indicated a willingness to consider and weigh all aggravating and mitigating factors and even volunteered the fact that remorse as a mitigating factor would

2509

be among those that weigh heavily with him. He's a man who understands he has the right to express -- put what weight he wants on these factors. He has an obligation to consider them all and in doing so could reasonably fairly consider both

Page 175

possible sentencing options. And accordingly, I would urge he is not impaired at all.

THE COURT: Mr. Berrigan, anything else you want to add on this?

MR. BERRIGAN: Nothing further, sir.

THE COURT: Okay. I do not believe Juror 600 is substantially impaired, and so the defense motion to challenge him for cause is denied.

You have no more preemptory strikes. Does the government want to exercise a preemptory strike?

MR. MILLER: No, Your Honor.

THE COURT: Okay. Then Juror 600's in the pool. Let's bring Juror 600 in.

(Prospective Juror 600 entered the courtroom.)

THE COURT: Sir, you made it into our jury pool, and so we're going to let you know as soon as we have the 34 jurors selected whether or not you're one of the 18 jurors who will serve in this case. We think that may happen either the end of this week or early next week, but we'll let you know as soon as we can.

I'd ask you to pay very careful attention to my

2510

cautionary instructions. It's very important that you not read anything about this case in the newspapers, listen to anything about it on the radio or television, or do any research on your own about this case. Do you understand that?

PROSPECTIVE JUROR 600: Yes.

THE COURT: Okay. We'll let you know as soon as we can. Thank you.

(Prospective Juror 600 exited the courtroom.)
Page 176

THE COURT: You ready for 591?

MR. MILLER: Yes, sir.

THE COURT: Okay.

(Prospective Juror 591 entered the courtroom.)

THE COURT: Juror 591, any seat in the front row that you like.

Everybody else can be seated, and we're going to start first with questions from one of the prosecutors, Mr. Miller.

MR. MILLER: Thank you, Your Honor.

EXAMINATION

BY MR. MILLER:

Q. Good afternoon, sir. How you doing?

A. Good.

Q. I'm going to ask you at most 12 minutes worth of questions and then sit down. Appreciate you bearing with us, sir.

A. All right.

Q. Only thing I want to ask you about is any exposure to

2511

information about this case you may have outside of this questionnaire and then ask you about some thoughts about the death penalty; okay?

A. Okay.

Q. What, if anything, aside from the information in the questionnaire do you know about this case?

A. I know very little. I've avoided everything I could in media coverage.

Q. Very good. And I trust you formed no fixed opinions about the merits of the case one way or the other.

A. Nope.

Q. Very good. That leaves the issue of the death penalty.
Page 177

It's been a couple months. I assume you didn't keep a copy of it and review it. Have you given it any more thought since you filled out this questionnaire?

A. Not really.

Q. Just go ahead and tell us in your own words how you feel about the death penalty, sir, if you would.

A. Well, I feel if the crime justifies it it's probably not a bad thing, but I think it should be no doubt, you know, that it's a guilty person.

Q. And I take it you feel that it is only in some cases where the death penalty would be appropriate.

A. Yes.

Q. You stated in response to the questionnaire, I think the

2512

death penalty is proper in some cases. You didn't give us any thoughts about life imprisonment when you were asked for any opinions about that. Do you think that life imprisonment without the possibility of parole is a severe punishment as well, sir?

A. Yeah, I believe that's severe punishment, yes.

Q. What we need is jurors who can assure us that they'll consider both possible punishments should they come to the point of having the responsibility of passing judgment of punishment in this case. You understand that's a big if.

A. Uh-huh.

Q. That puts the cart ahead of the horse a little bit because it's only if the jury finds Ms. Johnson guilty that one would ever get to that. But in the event we came to that, again, attitudes differ, and they vary over the full spectrum, and there's a whole lot of people at either end of the spectrum that

Page 178

can simply not honestly assure us in this case that they would be able to consider both possible punishments. From what you know about this case, sir, what's your feeling?

A. I think I could weigh it either direction. I don't think the death penalty's too severe for anything but that if the crime fits it . . .

Q. You understand the death penalty isn't even a possibility unless the crime itself proven beyond a reasonable doubt fits a certain limited category of crimes.

2513

A. Uh-huh.

Q. In the event that would fit this case and in the event that you would be part of a jury that unanimously found Ms. Johnson guilty, under those and only those circumstances would it come possibly to the ultimate third stage where you'd be asked to pass sentence one way or the other; okay? You with me?

A. Yep.

Q. Okay. Now, Judge Bennett described this morning that under our system you would be given instructions as to how that works and that you would be charged with the responsibility of considering both mitigating and aggravating factors and weighing them before coming to a decision. Does that make sense to you, sir?

A. Yeah.

Q. This case you understand involves an accusation that Ms. Johnson in connection with a drug-dealing conspiracy participated in the killings of five people including two little grade school age children. You understand those are the accusations.

A. Yeah.

Page 179

Q. And when I asked you before if even understanding those accusations you feel you could still give fair consideration to both possible punishments, does that remain the case, sir?

A. Yeah, I believe so.

Q. Do you have some reservation about that?

2514

A. Well, yeah. I'm really impartial (sic) to children, but I guess that's besides the point. It still has to be proven.

Q. Well, I'm going to visit with you a little about that. We're talking about the third phase which is the penalty phase, and that asks you to assume it's been proven in this case, and again, that does put the cart before the horse, but we can't cover this subject without asking you to make that assumption.

So let's assume that you're sitting on a jury and that you and your 11 fellow jurors have unanimously concluded beyond any reasonable doubt that Angela Johnson is guilty of these crimes as described. You understand under those circumstances, sir, you'd be asked to consider and weigh both aggravating and mitigating circumstances --

A. Uh-huh.

Q. -- before arriving at a sentence. Okay?

A. Uh-huh.

Q. If you were told that if you find the government has proved beyond a reasonable doubt that vulnerable victims, specifically children, were killed, that if proven you should consider that an aggravating circumstance, does that make sense, sir?

A. Yeah.

Q. And I take it from what you told us before that you would give that considerable weight.

A. Yeah.

Page 180

Q. You understand you're entitled to give it what weight you

2515

wanted. But you would have to consider all factors that are proven. For example -- and the defense has no obligation to prove any mitigating factors but may do so. And if there are mitigating factors that are shown as well such as lack of prior criminal history or a lesser role in the offense, that someone else actually pulled the trigger, that her participation in it was at a lower level than that of someone else, if you were -- if you found those and were instructed by the Court that these are mitigating factors that you must consider, would you consider those, sir?

A. Yeah, probably.

Q. Well, we need 12 jurors who can assure us that they will, in fact, follow the Court's instruction. And if you can't do it, that's something we need to know. And again, we don't criticize anyone for their feelings here.

A. Uh-huh.

Q. We absolutely have to have openness, and if you feel in your heart that you cannot seriously consider all of the aggravating and mitigating factors that the Court instructs you to consider even though it's up to you how much weight to give every factor, you still have to consider all those factors, can you do that?

A. Well, I think I can.

Q. And maybe that's the best you can tell us. I don't know. But I have to press you just a little bit further, sir, because

2516

Page 181

both sides in this case are entitled to have 12 jurors who can

assure us to the extent that that's possible --

A.    I would say that with my close relationship with my

grandchildren and children that it's probably going to -- it may

weigh my decision, yeah.

Q.    Okay.  Well, I understand you would give great weight to

the killing of children as being an aggravating factor.

A.    Uh-huh, yes, I would.

Q.    And in fairness, sir, don't you suppose most people would

do so?

A.    Yeah.

Q.    I mean, we have a lot -- we're all, most of us, not all of

us by any means, but most of us are parents, and many of us are

grandparents.

A.    Uh-huh.

Q.    And that's natural to have feelings about those matters.

A.    Uh-huh.

Q.    And if you're told that you can consider that and should

consider that as an aggravating factor if it's proven beyond a

reasonable doubt, does that make sense and that's something you

would weigh heavily?

A.    Yeah.

Q.    I'm trying to find out whether that would be the end of the

ballgame there, that's enough, that's all I need to hear, it's

all over and done with, and it's the death penalty or if you

2517

could follow the Court's instruction and consider all of the

factors that are proven, whether those are mitigating factors or

aggravating factors, before assigning final weight and coming up

to a final conclusion.

Page 182

A. I think I could follow them.

Q. And ultimately you're the only one who can tell us this. But assuming the case in this case -- the evidence in this case shows that Angela Johnson participated in the killings of five people including two little girls ages six and ten years of age, despite -- would that automatically cause you to return a verdict of death, or could you still fairly consider both possible punishments and all aggravating and mitigating factors proved before returning your verdict one way or the other?

A. I could still consider both.

Q. And let me ask you this, sir. Would you ever, ever, impose the death penalty on anyone without first fully and fairly considering the possibility that life in prison is an appropriate punishment?

A. No.

MR. MILLER: Thank you, sir.

THE COURT: Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q. Not so bad, is it?

A. Oh, I'm having a bad day, but that's okay.

2518

Q. Oh, I'm sorry. I hope that's not because of us.

A. No, I just got a 17-year-old girl up in the hospital I know dying, and I just came from there.

Q. Is that one of your grandchildren?

A. No, no, it's just a relation.

Q. I wonder if I could revisit the publicity situation, sir, just for a second. Your questionnaire indicated that you learned more from this letter than you knew before.

Page 183

A.   Uh-huh.

Q.   But you did see something on television.  At least you had checked television.  And I wanted to just ask you about that. What did you see on television about the case?

A.   All I ever seen was whatever his name was, that he was convicted.  And other than that, I didn't -- I didn't even know anybody else's name or what the circumstances was behind it.  I watch very little TV anyway.

Q.   Okay.  Was that a television news account?

A.   I recall that, yeah.

Q.   About how long ago would you say that was?

A.   I suppose it's three or four months ago, five months ago maybe.

Q.   Have you seen anything on the news since that time?

A.   No.

Q.   Do you get the paper?

A.   Yes, I do.

2519

Q.   Which one?

A.   The local here.

Q.   Sioux City Journal?

A.   Uh-huh.

Q.   Anything in the paper about the case?

A.   If I see anything on there, I just ignore it.

Q.   You avoid it, okay.  All right.  Let's talk a little bit then about this issue regarding punishment; okay?

A.   Uh-huh.

Q.   You've talked about you have a close relationship with your grandchildren.

A.   Yep.

Page 184

Q. How many grandchildren do you have?

A. Six.

Q. And what are their ages?

A. Oh, anywhere from seven to six months.

Q. Seven is the oldest.

A. Yep.

Q. Boy or a girl?

A. Pardon?

Q. Boy or a girl?

A. Boy.

Q. I want to be clear that when we're asking you questions about punishment you know what it is we're really talking about; okay?

2520

A. Uh-huh.

Q. The government has alleged that Angela committed -- either participated or committed herself five intentional murders, five people were killed, and that those were done either during a drug conspiracy -- and I know you've got some strong feelings about drugs -- or a continuing criminal enterprise, okay, one or the other or both. And they're also alleging that these are premeditated murders committed after substantial planning and premeditation.

A. Uh-huh.

Q. And of the five victims, one was a mother and her two daughters, Kandi Duncan, ten years old; Amber Duncan, six years old; okay?

A. Uh-huh.

Q. And you expressed some concern about the fact that children were involved here in your questionnaire, and I wanted to ask

Page 185

you about that; okay?

A. Okay.

Q. There's a question near the end; it's question number 99, and I know you don't remember these numbers.

A. No, I don't.

Q. But I'm going to read it back to you because I think you will remember this answer. In your opinion is there anything about this case, the issues, and/or the people involved in this case that might hinder you even slightly from being an impartial

2521

juror? And there were two boxes, a yes box and a no box, and you checked yes. My love of children, that's what you wrote.

A. Uh-huh, yep. I remember that.

Q. Has anything changed since you wrote that answer three months ago?

A. Absolutely not.

Q. So tell me what it is that you mean by that. How would it hinder your impartiality?

A. I guess the fact that I've kind of raised about four of my grandchildren myself, and then I don't know. Maybe I shouldn't use it that way, but I do as a -- I guess it makes your feelings towards children a little stronger.

Q. Yeah. I -- it's been a long time since you heard this this morning, but I want to impress upon you -- something the judge told you this morning is this isn't some kind of test for right or wrong answers, you know.

A. Uh-huh.

Q. I mean, if all we wanted was to ask people if they could follow the law, the judge could have done that this morning. We would have been done. Most people would have raised their hand,

Page 186

and they would have had no idea what the law is we're asking them to follow.  And now we're talking about kids and, hey, you've raised some of your own grandchildren.

A.    Uh-huh.

Q.    You're expressing concern, and you're evaluating your own

2522

ability to be a juror.

A.    Uh-huh.

Q.    And we've asked people to try to imagine -- I mean, not that you'd ever want to be in Angela Johnson's shoes, but if you were ever a criminal defendant and you're evaluating the jurors that were judging you, what would you want to know about them, okay, that's kind of the spirit in which these questions are being asked.  We're not critical of people.  We're not going -- everybody here respects your views.  They're your views.  You're entitled to respect.  But we have had jurors because of their situations in life or their views about things that this might not be a case that best fits them of all the cases that are available.  You know what I mean?

A.    Right.

Q.    And so I see this thing in the questionnaire.  Listen, I love kids.  You've talked about it here in response to these questions.  There's this whole other thing going on with drugs.

A.    Uh-huh.

Q.    And I'm wondering whether or not in your view, kind of your own heart of hearts when you're looking at yourself as a juror, whether you think that this kind of a case might be one in which it would be difficult for you to be the most fair, impartial juror you'd like to be.

A.    I'm probably going to have the scale going one way.  I'm

Page 187

sure it's going to lean that direction just from my life

2523

experiences.

Q.   Let me ask you, are you a football fan?

A.   Yeah.

Q.   Okay.  We've used this analogy.  Sometimes it's helpful and sometimes not.  But let's imagine this situation.  Somebody walks in here.  They literally just fell off the apple cart, okay, and they don't really have any views about the death penalty or life without parole one way or the other, and we put them on the football field or ask them to put themselves on the football field in this case, and they say to us, I'm on the 50-yard line, Berrigan.  I just -- you know, I'm really not even one way or the other; okay?  And then we have you, okay, and we're going to ask you to put yourself on the football field, and here's our situation.  Five intentional murders; okay?

A.   Uh-huh.

Q.   Can you put yourself on the football field based on those allegations if one end zone is the death penalty and the opposite end zone all the way down at the other end of the field is life without any possibility of parole and the 50 is like exactly in the middle?

A.   I don't know.  That's a tough decision.  I guess you wouldn't really know until the writing was all on the wall.

Q.   Well, in a -- I think Mr. Miller tried to make this clear, but to be clear --

A.   Right, I understand what you're saying.

2524

Q.   -- at this point, you know, we're imagining -- we're asking

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2199 of 3245

you to envision you've heard all the evidence.

A.   Uh-huh.

Q.   You heard all the evidence as to how, why, where, when, what happened, everything.  You heard the defenses, you know, whatever it was:  I didn't do it or it was a fight, a sudden passion.  That's all been rejected.  And you've determined yeah, this is what happened beyond any reasonable doubt, not just you, all 12 jurors; okay?  That's kind of where we are when we're asking you to put yourself on the football field.  So you're not in a position -- at least as to the crime, you've already made a determination; okay?

A.   Okay.

Q.   Does that help you?

A.   Yeah.  I'm sure I'm going to lean towards a harsher penalty then.

Q.   What is a lean?  What yard line -- I'm presuming that's between the 50 and the goal line.

A.   Yeah.

Q.   I don't know where in there you might be.

A.   I don't know that either without -- I'm sure it would be on the harsher side of the penalty.  That's about all I can tell you.

Q.   Can you tell me if that's closer to the 10 than the 40 or vice versa?

                                                        2525


A.   Nope.

Q.   What if we add in the fact that these are premeditated, substantially planned murders?  Does that move you at all?

A.   Yes, it would.

Q.   Where does it move you?
                            Page 189

A.    It would move me closer to the goal line.

Q.    And can you tell us now what yard line you might envision yourself at?

A.    Now you're saying that you're assuming that they're premeditated when my decision --

Q.    Again, we're asking you for purposes of the discussion it's happened.  You already decided that; okay?

A.    Okay.  No, I don't -- I really don't know.  I'm sure that's going to be a big decision.

Q.    Still don't know where you are on the football field?

A.    Huh-uh.

Q.    Well, how about the children, six and ten years old, two little girls?  Can you tell us now where you might be on the football field?

A.    Yeah.  Something that's gotta be weighed in.  I'm sure every little thing's going to make my decision closer to the end zone.

Q.    Well, I'm wondering how close.  I guess that's the issue because you've said several times, you know, I'm leaning this way, leaning this way, and leaning towards the death penalty.

2526

How much are you leaning towards the death penalty?

A.    I don't know.  I don't know that I could make that proper decision without hearing everything that was . . .

        MR. STOWERS:  Two minutes.

Q.    Even this -- we're asking you to assume you have; okay?

A.    Uh-huh.

Q.    You've made a determination now that we got kids killed.

A.    Well, I think my questionnaire kind of hinted that I was in favor of the death penalty if it was suitable for the crime.
        Page 190

Q.   Yeah, yeah, and your questionnaire says you think you have a problem being impartial if kids were involved.

A.   Yep.

Q.   So I'm trying to find out what that means, you know, how impartial are you?  And again, it's not anything wrong with being impartial, believe me.  We have dozens of people quite honestly say, Hey, look, that's it for me.  What?  Are you kidding me, Berrigan?  I'm in the end zone.

A.   I would not have any problem giving somebody the death penalty, no.

Q.   Yeah.  But on the football field here, can you help us?

A.   Oh, you're probably on the 10-yard line.

Q.   That's 90 yards away from life without parole.

A.   Uh-huh.

Q.   Right?

A.   Yeah.

2527

Q.   And some of the stuff Mr. Miller asked you about, other considerations include things like the defendant not having a criminal history, is that anything that would move you back towards life?

A.   No.

Q.   What about abusive background, childhood experiences involving abuse, neglect, physical or sexual?  Does that move you anywhere?

A.   No.

Q.   You tell me, but is your determination going to be based on the crime, what happened, or are there other factors that you think are important?

A.   Oh, I think it's going to be on the crime itself.

Page 191

MR. BERRIGAN: All right, sir. Thank you very much for your candor. That's all I have.

THE COURT: Juror 591, I've got some questions for you. The defense will have an opportunity if we get to a penalty phase to put on evidence of what's called mitigation.

PROSPECTIVE JUROR 591: Yeah.

THE COURT: And that can take a whole variety of forms about Angela Johnson's background and life experiences. It can include things, for example, such as psychological testing. It's so varied that I wouldn't even begin to know at this point what type of evidence could be presented, although they have no obligation to present any evidence. But there's a lot of

2528

different types of evidence that could be presented.

And then if something met the legal definition of mitigation, I would then in the penalty phase give you a jury instruction that would say A, B, C, D, E, F, G, these are mitigating factors. And if you find that they exist in this case, you can then weigh those mitigating factors with any aggravating factors that you find. For example, the two kids could be an aggravating factor. It might not be, but it could be. You'd be able to weigh it. Do you think you could fairly consider mitigation evidence as well as aggravating evidence in the penalty phase?

PROSPECTIVE JUROR 591: I can't honestly say I could fairly consider it, no.

THE COURT: Okay. That's fine. And I'm not saying now how much weight to give it because that's for you to decide.

PROSPECTIVE JUROR 591: Uh-huh.

THE COURT: But you have to be able to fairly consider

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2203 of 3245

it.

PROSPECTIVE JUROR 591: Right.

THE COURT: You know, how much weight -- if you want to say two kids, the death of two kids and if you find they're vulnerable victims and that could outweigh any and all mitigating evidence, that's for you to decide, but you have to at least fairly look at mitigating evidence.

PROSPECTIVE JUROR 591: Right.

2529

THE COURT: You have to be able to fairly consider it.

PROSPECTIVE JUROR 591: Right.

THE COURT: And you don't think you could fairly consider it.

PROSPECTIVE JUROR 591: No, I don't really think I could, no.

THE COURT: Okay. That's fine. Okay. If you'd just step outside, we're going to let you know in a minute.

PROSPECTIVE JUROR 591: Thank you.

THE COURT: Thank you.

(Prospective Juror 591 exited the courtroom.)

THE COURT: I think you went first, Mr. Miller.

MR. MILLER: Your Honor, I think he indicated within the last minute that he did not think he could fairly consider mitigating evidence, and if I understood him correctly there, then I think he's substantially impaired.

MR. BERRIGAN: I don't know if Mr. Miller's making a motion, but if not, we certainly would move to exclude this juror as substantially impaired, sir.

THE COURT: Okay. I think both sides actually agree that he's substantially impaired; and, therefore, the challenge

Page 193

for cause did -- did somebody actually formally make it?

MR. BERRIGAN:  Yes, I thought I did.  I apologize.
The defense would move for cause on Juror 591, sir.

THE COURT:  Okay.  Challenge for cause is sustained.

2530

Thanks.

(Prospective Juror 591 entered the courtroom. )

THE COURT:  Sir, we're going to go ahead and release you from jury service.  Thank you very much for participating today.

I'd ask that you do us a favor, and that is not talk about this process until after we get a jury selected hopefully the end of this week or next week because you might talk to somebody, and they might talk to somebody else, and that somebody else might be sitting in one of those chairs later this week or next week.  So thank you very much for your service, and we hope to see you back on another case.  Thank you.

(Prospective Juror 591 exited the courtroom.)

THE COURT:  If there's no objection, we'll go ahead and do the last juror.

MR. BERRIGAN:  None at all, sir.

THE COURT:  193.

(Prospective Juror 193 entered the courtroom.)

THE COURT:  Juror 193, any seat in the front row will be fine.  You can be seated.

Everybody else can be seated, and we're going to start first with questions from Mr. Berrigan.

EXAMINATION

BY MR. BERRIGAN:

Q.   Last but not least, how are you?

Page 194

A.    I'm fine.

Q.    Okay.  It's not going to be nearly as bad as going to the dentist; okay?

A.    Okay.

Q.    We're really interested in just two areas largely in this process, ma'am, and one has to do with what exposure that you've had to media coverage, something you saw in the newspaper or saw on television or heard on the radio about the case or heard people talking about; okay?

A.    Absolutely none.

Q.    Okay.  And you said that in your questionnaire.  You're not at all familiar with it.  I have not seen, read, heard anything about this case or the people.  I'm not home to hear the news and don't read the papers.

A.    I work.

Q.    Okay.  I bet as a manager of Casey's you work very, very hard.

A.    Thank you.

Q.    Sometimes we've had people come in since the questionnaire and say, Well, I did see something on the news recently or, you know, this or that.  Is that the situation with you at all?

A.    I haven't seen anything, no.

Q.    Nothing.

A.    No.

Q.    Okay.  That's it.  That was easy.  The other issue we want

to talk about just a little bit has to do with your views about

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2206 of 3245

punishment; okay?

A.    Uh-huh.

Q.    And I gotta tell you this is sort of a cart before the horse process.

A.    Uh-huh.

Q.    As the judge has already indicated, you know, Miss Johnson's just charged with crimes.  She hasn't been found guilty of anything.  And you mention in your questionnaire when you were asked if you have an opinion about her guilt, I don't know if she's guilty, so I can't prejudge; right?

A.    Right.

Q.    So we understand that and appreciate the fact that you're not going to prejudge her.  But for purposes of punishment, questions about punishment and what your views are, we have to ask you to assume that you're in a situation where we've been through these stages and we're in the last one; okay?

A.    Okay.

Q.    And I need to tell you what that means, all right, because these are very serious charges.

A.    Right.

Q.    She's charged with the intentional murder of five people, participating in these murders or killing these people herself.

A.    Uh-huh.

Q.    Five intentional murders.  The government's also alleged

2533

that these murders were committed after substantial planning, with premeditation.  Do you understand what I mean?

A.    Yeah.

Q.    And they've also alleged that of these five victims one is a mother and her two children, two daughters ten and six years

Page 196

old, Kandi and Amber Duncan; okay?

A.    Uh-huh.

Q.    And so we're asking people -- because that's what the government would be attempting to prove if we got to this penalty part of the trial.

A.    Uh-huh.

Q.    Or this third stage; okay?  And so we're asking people to kind of imagine fast forwarding, if you will, to that place even though you haven't heard the evidence.  You with me?

A.    Okay.

Q.    Okay.  I should ask you this question kind of before we start.  If I were one of your regular customers at Casey's and I'd been coming in every morning for years to get a cup of coffee and the paper before I went to work and I turn to you one morning because there was something in the paper and I said, Juror Number 193, what do you think about the death penalty; we never talked about it, what would you tell me?

A.    I'm not sure that I believe in it.

Q.    Okay.  Why not?

A.    I guess probably that I would have a problem if someone was

2534

put to death and down the road a ways they discovered new evidence and they really weren't guilty.

Q.    We hear about that now and then, don't we?

A.    Yes, yes.

Q.    And you're not the only one that's expressed some concern about that.

A.    I think my beliefs and my church would say that was wrong.

Q.    Sure.  Well, I don't think any of us would want to see an innocent person put to death.

Page 197

A.    Right.

Q.    But let's see if we can take that out of the equation for a moment.  There is always that concern.  It's a final punishment. You can't turn back the clock on that.  But let's take that out of the equation for just a minute and just as a proposition as a punishment, the death penalty, is that an appropriate punishment that we have in your view, or do you not even like the concept of the death penalty?

A.    I'm not sure I like the concept of it.

Q.    Okay.  What is it that troubles you about it?

A.    Mainly because of the fear that maybe there would be evidence later.

Q.    Okay.

A.    And then the person was already dead.

Q.    This is that innocence part of it.

A.    Exactly.  That bothered me.

2535

Q.    Okay.  What about life imprisonment without parole?  What do you think about that as a punishment for premeditated, intentional murder?

A.    I don't have a problem with that.

Q.    Okay.  I asked you that question not to trick you, but there is a question on the questionnaire -- I know you don't remember the hundred and some questions on there.

A.    No, I don't.

Q.    But let me read you this question and see if this refreshes your recollection.  You filled it out in what?  January I bet. Yeah, January 17.

A.    Could be.

Q.    It's a while.

Page 198

A.    It's a while.

Q.    This question appears way back on page 13 it starts, and it says, Do you think that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated murder?  That's that; right?  And there are two boxes.  You can check yes or no, and you checked the no, and you said not if the person is cruel enough to premeditate, plan it, and have no remorse.  Does that sound right?

A.    I don't remember, but it could be.

Q.    Okay.  Well, you know, it's less important to us what's here as to how you feel now and how you articulate your position

2536

now.

A.    Okay.

Q.    And so I need to ask you this question; okay?

A.    Okay.

Q.    That question had to do with those two books, whether even in that situation you thought life without parole would be an appropriate punishment for your consideration; okay?

A.    Okay.

Q.    And now we have -- on top of that, we have children; all right?

A.    Uh-huh.

Q.    And so obviously that's very serious, and what I need to know is whether even in that case as horrible as that is would you be able to consider a life sentence of life -- and we mean life without parole -- as sufficiently appropriate punishment, a just punishment?  Would you be able to consider life without parole as a just punishment even for that?

Page 199

A.    Yes.

Q.    Why do you think it would be a just punishment for that kind of a crime?

A.    I guess going back to the death penalty, I would have -- I guess I have my doubts on it or something.

Q.    Well, and you talked about that innocence thing.

A.    Right.

Q.    But let me try to dispel that concern in this way.

2537

A.    Okay.

Q.    That if you were ever at this point in the trial, you know, it's not like we read in the papers.  You personally would have heard all the evidence.  You know what I mean?

A.    Right.

Q.    The government would have presented the who, what, where, when, how did it happen.  You would have said there weren't any defenses that you believed, and so you would have been at least satisfied beyond a reasonable doubt that the crime occurred, this is the person, and this is what happened.

A.    Uh-huh.

Q.    Five intentional, premeditated murders including two children; okay?

A.    Uh-huh.

Q.    So I know your concern about the prospect or the possibility of innocent people suffering the death penalty, but if I could ask you to take that out of the equation so at least you're persuaded beyond a reasonable doubt it's a guilty person we're talking about -- and that's a big if -- but is life in prison appropriate?  Is it a punishment you would consider as appropriate for even that type of a crime?

Page 200

A. Yes.

Q. Okay. You think it's a severe punishment?

A. It's pretty severe, yes. I wouldn't want it.

Q. Me neither. You talked a little bit about life

2538

imprisonment in the questionnaire. You said, I'm more in favor of this unless the person is vicious and cruel and likely to cause harm to other prisoners. That's a concern you have.

A. That too, uh-huh.

Q. You'd be worried about whether this person might harm some other people.

A. Yes.

Q. And you also mentioned you thought it was a good punishment so they have time to think about what they did and feel guilt if possible.

A. Yes.

Q. Okay. And what about the death penalty as appropriate for this type of crime? Do you think that that's a punishment that you could consider as an appropriate punishment?

A. I could consider it, yes.

Q. Okay. Are you a football fan? You're too busy working to watch football games I suspect.

A. I gotta admit I went to Nebraska last year.

Q. Okay. Okay. So you're a Cornhusker fan?

A. I have to because of my family.

Q. I was wondering if you could admit in Iowa that you are a Cornhusker fan. Is that legal?

A. I have to be. I have a grandson and a son-in-law that love them.

Q. Very good. Well, on the football field of penalties, okay,

Page 201

where one end zone we have the death penalty, on the other end zone we have life without possibility of parole and you're placing yourself on the football field on a very serious matter such as this, where would you put yourself on the football field?

A. You mean which way I would --

Q. Yeah, a person on the 50-yard line is somebody who's just like really literally right on the razor's edge. They just -- you know, they don't favor one or the other even to the smallest degree, and obviously as you go down the field towards one goal line, that means you're stronger towards that goal; and you go the other way, you're stronger towards that goal.

A. I don't think I favor either one either way.

Q. Okay. So you think you're a 50-yard liner.

A. Pretty much.

MR. STOWERS: Two minutes.

Q. Let me switch gears here for just a second. Let me ask you this. I don't usually try to get off the subject too much, but your questionnaire, you have a grandson who's in -- I guess now the highway patrol, huh?

A. No. He graduates Saturday.

Q. Saturday, okay. He hopes to be in the highway patrol?

A. Yes, he's got four years behind him.

Q. You said that police officers, yes, I have all the faith and trust in law enforcement and would lean towards police

2540

officer's testimony first. You need to know that in a court of law police officers are supposed to be judged just like any

Page 202

other witness.

A.    Exactly.

Q.    We look beyond the uniform and their badge.  It's almost like they're almost naked sitting there just like everybody else and we judge their testimony with the same criteria.

A.    Right.

Q.    At least in terms of their credibility; okay?

A.    Uh-huh.

Q.    Would you be able to do that?

A.    Yes.

Q.    You confident of it?

A.    Yes.

        MR. BERRIGAN:  Okay.  I think my time is up, and you've been very patient.  Thank you very much.

        PROSPECTIVE JUROR 193:  Thank you.

        THE COURT:  Mr. Miller?

        MR. MILLER:  Thank you, Your Honor.

                    EXAMINATION

BY MR. MILLER:

Q.    Good afternoon, Juror 193.  How you holding up?

A.    I'm okay.

Q.    Good.  Thank you so much for your patience.  You are now less than 12 minutes away from having to talk to lawyers about

                                        2541

this for today anyway; okay?

A.    Okay.

Q.    Thanks again for your time.  When you were visiting with Mr. Berrigan about your feelings about the death penalty, I recall you mentioning not only concern about the finality of it as compared with the certainty of the verdict but also your

Page 203

church and your religious upbringing.

A.    Uh-huh.

Q.    Can you share that with us a little bit?

A.    I'm Catholic, and I don't -- I guess that explains it.

Q.    Well, I'll bet you got a lot of members at St. Joseph's congregation?

A.    In Schaller, yes.

Q.    Okay.  And I bet they don't all go at least once a week and sometimes more; right?

A.    I do.

Q.    Okay.  I notice that you do.  You go to mass other than just Sunday sometimes.

A.    Oh, yes.

Q.    Very good.  So you're a person who -- in all frankness, some people take their religion far more seriously than others do, and they're to be commended, those who do.

A.    Thank you.

Q.    And you're one who does very much so.

A.    Yes.

2542

Q.    And, heavens, nobody's criticizing that.  That's wonderful that you do.  Can you share with us your understanding of church teaching and how that affects your view of the death penalty and, most importantly, how it affects your feeling of what your responsibility would be if you ended up being required to serve on this jury?

A.    You mean like I said before with the -- if they would be put to death?

Q.    Yes.

A.    And then later there would be evidence arise that --

Page 204

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2215 of 3245

Q. Well, I'm not concerned about that so much right now. I'm just concerned about the issue of imposing the death penalty on a fellow human being even if that person is guilty, you know, even if -- disregarding any qualms about discovering otherwise later. If there's no conceivable doubt in the world whatsoever, absolutely positively no conceivable doubt in the world, is there still a problem in your church teaching about imposing death?

A. No, no.

Q. There isn't?

A. No.

Q. As you understand it, Pope Benedict XVI wouldn't say that it's wrong to put someone to death in a court of law?

A. I don't think he'd strike me down.

Q. Okay. Good enough. You taught CCD, and your understanding

2543

of the Catholic church teaching doesn't interfere with your imposing the death penalty.

A. No.

Q. Very good. The next question is that of your concern about finding out later that your verdict was wrong; okay?

A. Uh-huh.

Q. That's a real concern --

A. I guess everybody would have that feeling.

Q. Sure. If you are required to serve on this case, not only the merits phase where you find the defendant either guilty or not guilty but the punishment phase as well, if you ever get to that point, never imposes any greater burden on the government than proof beyond a reasonable doubt. And there are some who share with us the feeling that where the life of another human

Page 205

being is at stake, where the death penalty is an issue, it really honestly requires more than proof beyond a reasonable doubt for them to feel that they could sign a death verdict.

A.    Uh-huh.

Q.    How do you feel about that?

A.    What'd you want me to answer?

Q.    Well, I'm wondering if you feel it would require more than just proof beyond a reasonable doubt for you to feel that you could honestly sign a --

A.    No, if there was reasonable doubt or proof beyond, I would be okay with it.

2544

Q.    Okay.  In other words, you feel that you can -- not that you would.  Nobody can ask you what your penalty -- what your verdict will be if we come to the penalty phase, but could you --

A.    Yes.

Q.    -- find for the death penalty?

A.    Yes.

Q.    Should you be required to serve on this jury and should this jury go all the way through to a punishment phase and if -- bearing in mind this is a hypothetical question, if you all unanimously conclude beyond any reasonable doubt and to your own satisfaction based upon the Court's instructions that the death penalty is the appropriate punishment in this case, under those circumstances, ma'am, you could not return a verdict reflecting that unless each and every one of you signed off on the verdict form which would have the practical effect of taking the life of another human being.  Do you feel you can do so?

A.    Yes.

Page 206

MR. MILLER: Thank you, ma'am.

THE COURT: Ma'am, if you'd step outside, we'll let you know what your status is. Thank you.

(Prospective juror 193 exited the courtroom.)

THE COURT: Mr. Berrigan?

MR. BERRIGAN: The defense has no motion respecting Juror 193, sir.

2545

THE COURT: Mr. Miller, any challenge for cause?

MR. MILLER: No, Your Honor.

THE COURT: Any peremptory strike?

MR. MILLER: No, Your Honor.

THE COURT: So she's in the jury pool. Let's bring her in and let her know.

(Prospective Juror 193 entered the courtroom.)

THE COURT: Ma'am, you made it into our jury pool, so you have about a 50 percent chance of being selected to serve as a juror in this case. We hope to let you know either at the end of this week or pretty early next week whether or not you'll be a trial juror in this case and when the trial portion is actually going to start.

And I'd just remind you to take very seriously my discussion earlier this morning when we first started about the various rules. It's very important that you not talk to anybody about this case, let anybody talk to you about the case, read anything in the newspapers or listen to anything on the radio or television about this case or do any research on your own about this case. Do you understand that?

PROSPECTIVE JUROR 193: Yes.

THE COURT: Okay. And we'll let you know as soon as

Page 207

we know whether or not you'll be serving on the jury; okay?

PROSPECTIVE JUROR 193: Thank you.

THE COURT: Thank you very much.

2546

(Prospective Juror 193 exited the courtroom. )

THE COURT: Okay. Please be seated. We added three jurors to the jury pool, 617, 600, and 193. Does everybody agree with that?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: And the government used two of their peremptory strikes; is that correct?

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: And, Carey, you're keeping the running total? They are now down to?

THE CLERK: They have seven remaining.

THE COURT: They have seven left. Okay. Now, why don't we take a recess, and when we come back, we actually haven't talked about how we're going to do this. You know, when we get to 22, are we going to stop and then have you exercise the strikes, or what are we going to do and exactly how we're going to do the alternates, so I think we need to have a little clearer understanding of that.

I know at one point there was a mention that the parties were discussing something with regard to alternates that might speed up the process, and I don't know if the parties have agreed to anything or not, but we can talk about that. And then we can talk about the preliminary instructions too, but why don't we take a 25-minute break until 3:30.

(Recess at 3:05 p.m.)

2547

Page 208

THE COURT: Okay. Please be seated. Okay. Here's what I have in mind. On the day we get to 22 jurors, whenever we get 22 qualified, I don't think we'll stop in the middle of the proceeding and have you exercise your 5 strikes each, but we'll just wait till the end of that day and we're done with the last jurors, and then I'll have you do it that way. Then you'll know who the ten (sic) trial jurors are.

Then my thought is just kind of repeat the process. Once we get to 22, then we'll be looking at alternate jurors, and we'll do the same thing. We'll interview jurors, do it exactly the same way, do the challenges for cause, and then each side has three peremptory strikes, and we'll do the same pattern. You exercise your strikes or not exercise them. And when we get six alternates, whether all the peremptory strikes have been used or not, we're done. Anybody have a problem with that?

MR. BERRIGAN: No, sir. We did have one question about notification.

THE COURT: Okay.

MR. BERRIGAN: That is, I guess our concern would be that if the first 12 were notified as of the time they were selected --

THE COURT: We're not going to do that. We're not going to notify them until we have all 18. Otherwise it would tip the hand as to who was an alternate which I think is the

2548

point you were going to make. We'll know, but we won't notify them until we have all 18, and then we'll just tell them, You're

Page 209

a juror. They won't know whether they're an alternate or not. We'll know. They won't know. Anybody have any questions about that?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: We understand that the strikes will be -- that is, the five remaining peremptories would be alternative.

THE COURT: Yes, yeah.

MR. BERRIGAN: And that would be true of the alternates as well.

THE COURT: Well, the alternates, we're just going to do it exactly like we've been doing it. So it will be true in the sense that whoever started questioning that potential juror, they would challenge for cause first. If there are no challenges for cause, they would exercise a peremptory first. We're just going to do it exactly the same way.

MR. BERRIGAN: We did not understand that, Your Honor, but now I'm clear. We're going to do strike as you go on the alternate panel.

THE COURT: Yep.

MR. BERRIGAN: Gotcha. Okay.

THE COURT: Any objection to that?

MR. BERRIGAN: It's not our preference, but we don't

2549

have any objection.

THE COURT: Okay.

MR. BERRIGAN: How's that?

THE COURT: That's fine. It's fine if you do have an objection. Does the government have any objection to doing it that way?

Page 210

MR. WILLIAMS: No, Your Honor.

THE COURT: Now, when it comes time to exercise your 5 peremptory strikes on the first 22 jurors selected, how much time are you going to need?

MR. BERRIGAN: Very little, Your Honor. I mean, obviously we're analyzing this process -- I'm sure the government is as well -- as we go, and we've spent a good deal of time trying to select the likely candidates, but if you gave us a half an hour, I bet we'd be done.

THE COURT: Okay. That's fine. Yeah. Anything else we need to talk about on jury selection?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. Now, on the jury instructions, have you had a chance to look them over?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Does the government have -- we're not making our formal record now, but we're going to do that pretty soon. I just wanted to know -- I mean, we're making a

2550

record, but I'll give you another opportunity, but I just wanted to -- what I like to do is I'd like to have counsel point out any areas where they think they're going to have an objection so I can give it one last final thought before I ultimately say this is my final set of proposed preliminary instructions.

MR. WILLIAMS: With regard to preliminary instruction number 6 on page 10, under the first element where it identifies the persons involved in the conspiracy, somehow Terry Olson's name remained in there, although that was requested to be deleted.

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2222 of 3245

THE COURT: Okay. So Terry Olson goes out on page 10.

MR. WILLIAMS: And it was taken out back on the CCE which is fine.

THE COURT: Yeah, I think that was just an error.

MR. WILLIAMS: Just a typo.

THE COURT: Yeah.

MR. WILLIAMS: The only other concern I have at this point -- and frankly, Your Honor, I've not had enough time to analyze this completely, but going to instruction number 8 which is the CCE instruction -- and I understand the changes the Court made at the request of the defense to put in Dustin Honken's name -- I think generally it's appropriate.

Where I have a concern perhaps is on page 21 on the third element. It says, Dustin Honken undertook the series of related violations in concert with five or more other persons,

2551

and here's my concern. As long as some member of the CCE engages in any one of the violations in furtherance of the CCE, it counts as a violation regardless of whether Dustin Honken himself had any involvement in that actual violation.

For example, we have listed down as item number 9 on page 19 or violation number 9 this defendant's possession of chemicals used in the manufacture of methamphetamine. That is an act that is in furtherance of the CCE in which Dustin Honken had no -- you know, at least to the possession, no personal involvement, and so I'm just concerned about --

THE COURT: So what do you think the appropriate language there should be?

MR. WILLIAMS: We have used "participants" before, and I think on the third elements, one or more of the participants

Page 212

undertook the series of related violations in concert with five or more other persons.

THE COURT: What's the defense view on that proposed request for change?

MR. STOWERS: I guess I don't have one at this moment. I used the wordage I hope out of Eighth Circuit uniform instruction. I understand I think what their concern is. I'm not sure their concern is correctly stating what the law is, so I guess I can look at that, though, and see if I agree with that or not.

My belief is that the person who is committing the

2552

continuing criminal enterprise offense has to be doing so in concert with five or more other persons, and I think that's why the wordage is as it is, but I could very well be wrong about that, and Mr. Williams might be right.

THE COURT: Well, why don't we talk about it tomorrow.

MR. STOWERS: That's fine.

THE COURT: Okay. Any other proposed changes from the government?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. What about from the defense?

MR. STOWERS: I've got the Court's instructions from Friday as well as those from today.

THE COURT: Well, today's supersedes them.

MR. STOWERS: Right, but I've marked up those from Friday, and most of those are relatively unchanged. There was -- well, let me ask you this question, Judge. I'm not sure how these were used, and that might impact on my thinking. Is it your practice to read these at the beginning of the --

Page 213

THE COURT: I'm going to read it before opening statements. Each juror will have a set throughout the entire first phase.

MR. STOWERS: Okay.

THE COURT: I give a separate set to each juror, and each juror retains the set to use throughout the first phase of the trial.

2553

MR. STOWERS: Okay. I just -- this is a comment on page 5 in the italics portion. And I know your idea on these preliminary instructions might be different than mine because I saw in the Honken case I think you ultimately referenced back to the preliminary instructions in your final instructions.

THE COURT: But that we ought to just save that for the finals? Is that what you're suggesting?

MR. STOWERS: I don't have a problem with the first sentence, but the second one about their verdicts and everything sort of is getting their head into returning verdicts before they even hear the case. It says, Therefore, you must return a separate, unanimous verdict. I was just thinking maybe that sentence could be reserved for later. The idea that they have to consider each charge separately is fine to tell them I suppose or if you wanted to remove them both. That's just a fairly minor point.

THE COURT: Okay.

MR. STOWERS: But it was food for thought.

THE COURT: Yep.

MR. STOWERS: On the preliminary number 5 which is the conspiracy murder elements, this is my concern with the way this is worded. Murders are alleged to have occurred in 1993, and

Page 214

the offense requires that the prosecution prove the -- as far as the conspiracy murder charge goes that the defendant was engaged in the charged conspiracy at the time of the intentional

2554

killings. And the way element number 1 reads when you couple it with the description of the conspiracy in the subsequent instruction, it might lead one to believe that it would be permissible, for example, to join the conspiracy after the homicides occurred and nevertheless satisfy element number 1 or, for example, that the conspiracy didn't come into existence until after the homicides.

And I guess our position is is that the government would have to prove that -- this was why we worded it differently in our proposal -- that there was -- that the conspiracy had come into existence between 1992 and not later than the time of the killing or killings in question on a particular count that's under consideration. And so that's why our verbiage is different.

THE COURT: Okay.

MR. STOWERS: I know that the conspiracy they've alleged is a 1992-to-1998 conspiracy, but it seems to us that part of the conspiracy that matters to the charge is the part that existed by not later than the date of the alleged killings.

And we've got a similar concern with the instruction on the so-called CCE murder, that the CCE has to have --

THE COURT: Why don't you give me a page number.

MR. STOWERS: I'm sorry. It's the one on the elements for that which I believe is number 7. Yes, preliminary number 7. I think that it -- when we -- it'd be really the element

2555

Page 215

number 1 there, and then the description that is set out separately of the CCE that would have to be proven, and the CCE that would have to be proven is number 8.

And there again, the description might allow for the jury to find that the CCE that had to be proven on element 1 didn't come into existence until after the intentional killings. But the way I read the statute, the defendant had to be working in furtherance of a continuing criminal enterprise at the time of the killings; and, therefore, the continuing criminal enterprise would have had to exist by not later than that time of the killings or killing in question depending on the particular count they're looking at.

THE COURT: Okay. What else?

MR. STOWERS: So that's just a . . .

Can I go backwards to the definition of the conspiracy which is number 6?

THE COURT: Sure.

MR. STOWERS: One of the other problems with this instruction that may exist depending on what the evidence is, in order to commit the conspiracy murder, it has to be that the murder -- or I should say the killing -- that the person was engaged in an offense punishable under 841(b)(1)(A) at the time of the killing. In order to be an offense that was punishable under 841(b)(1)(A), it had to involve the requisite amount of drugs as alleged in the indictment. In this case, of course,

2556

it's methamphetamine.

And our position is that that requisite amount of drugs had to have been part of the conspiracy by not later than
Page 216

the date of the killings and that subsequent amounts following the date of the killings would not bear in or weigh in, if you will, under -- on the determination of whether the requisite amount of drugs had been established for the purpose of determining whether the conspiracy was punishable under -- because otherwise you could have the scenario -- I think you might be following me.

THE COURT:  I am following you, yeah.

MR. STOWERS:  Then I don't need to explain it.

THE COURT:  What's your authority for that?

MR. STOWERS:  Well, just a reading of the statute is that the killing has to have occurred while the defendant was engaging in an offense punishable under, and it seems to me the essence of this offense is the killing.  And if you committed the offense on or about the date of the killing, you either commit that offense on that date or you don't, and it really doesn't matter if you engaged in subsequent drug transactions following the date of the alleged murder as to whether or not you're subject to prosecution for your activity involved in the intentional killing on the occasion that the killing occurred.

It would just seem so odd to me that you could sort of wind up being subject to a prosecution under that statute based

2557

on subsequent activity that follows the murder.  It would seem to me you'd either be liable under the statute for the killing or you wouldn't be at the time of the killing and subsequent activity would have no bearing on that even though generally conspiracy law says you take everything into account to determine what the penalty would be for the conspiracy.

THE COURT:  Do you have any case law that supports

Page 217

your view?

MR. STOWERS: None.

THE COURT: But it's a reading of the statute.

MR. STOWERS: Yeah. It just seems to me -- these are kind of odd -- this is odd verbiage in the statute sort of. It just says -- offense punishable under 841(b)(1)(A) is the language, and that's the offense that the defendant would have to be proven to have been engaging in at the time of the killing which was then related, substantively connected to that offense.

THE COURT: I'm tracking you. Let me just stop you for a minute.

Mr. Williams, do you have a position on this?

MR. WILLIAMS: I don't think that's an appropriate understanding of the law, and I think it makes sense that it could be the other way around.

Imagine if you would a scenario where I'm going to take over the drug business here in Sioux City and to do that I kill off Tom and Bill who are my competitors and as a result of

2558

killing those off in furtherance of my conspiracy, I take over the entire market and I'm now a major drug dealer. I should be punished under this even though my drug quantities didn't come out because I killed them for the purpose of gaining that position. So legally I think it's wrong.

Factually I think it's irrelevant. We know from the evidence in this case having tried it once before and the Court knows that they never successfully made any methamphetamine after the 1993 events. And so as a factual and practical matter, I don't think that's going to be an issue that's going to arise. The government's evidence is going to be that the
Page 218

drug quantity we're talking about arose and existed prior to the murders in 1993.

THE COURT: Back to you, Mr. Stowers. Anything else in the instructions?

MR. STOWERS: I guess maybe here's the position that the law is actually against us on which is -- but I think we need to -- you're going to overrule this position. I guess I shouldn't predict what you're going to do, but I think our position has to be since I don't think the Eighth Circuit has squarely addressed the issue that 18 United States Code section 2 does not apply, the liability for aider and abettor to Title 21, section 848(e)(1)(A). There's a couple of circuit cases that you may have reviewed in your many opportunities to look at these issues on this case that I'd be happy to provide the

2559

Court.

THE COURT: Did you raise this at all in a pretrial motion?

MR. STOWERS: No, because, frankly, they were pleading it in the alternative and now -- which is the next thing we might talk about. Now they've -- apparently they're going to abandon the theory that she, in fact, was the principal, but the statute, 848(e), says, Intentionally kills, counsels, commands, maybe induces or procures or maybe even causes. But it doesn't have the word "aid and abet" in it which is kind of curious because all those other words are in 18 U.S.C. 2. But 18 U.S.C. 2 also has the words "aid and abet."

The case law that's out there from a couple of circuits has held nevertheless that 18 U.S.C. 2 does apply to subsection (e) of 848 even though it doesn't apply in I think

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2230 of 3245

the majority of circuits to 848(c) so -- which is the kingpin situation. But that's an objection just for the record that we would make.

And then the final thing I think maybe we can talk about is the bill of particulars and the impact of the government's desire to abandon a theory that they have.

THE COURT: Okay.

MR. STOWERS: There's a lot of work done both by us, by the government, by the Court on these motions for bills of particulars over the years on this case which in many respects

2560

were granted by the Court, in some respects not.

But in the end we addressed those issues just recently after they filed their latest indictment and the government reaffirmed their bills of particulars specifically identifying not only -- and again saying we've already filed a bill of particulars, these are our alleged co-conspirators, these are our alleged supervisees, these are all the people that we're alleging were either supervisees or co-conspirators, and they provided two lists that are on file.

And apparently they are desiring to jump out of those bills of particulars, narrow them down for whatever purposes they've decided here of late, but at this point those bills of particulars are on file. They're unamended. They've made no motion to amend them.

And, you know, in the absence of that we think the jury ought to be told what it is that they have alleged because I think in understanding a conspiracy it's important -- the case law is tremendously confusing on what a conspiracy is or isn't, but one of the key things that determines a conspiracy is who

Page 220

its members are.  That's one of the things that all the cases seem to agree on, although they then turn around and say if members change, if people come and go, then that doesn't matter.  So the case law is not particularly helpful.

But I think identifying who the alleged members of the conspiracy are as the government has done in the bill of

2561

particulars is something that I think would be greatly helpful to a jury to understand.

THE COURT:  Well, I'm not quite understanding what relevance that -- the bill of particulars have to objections you might have about the current intention to instruct in preliminary instructions, so you kind of lost me.

MR. STOWERS:  Okay.  All right.  Well, you've described in the -- certain of the instructions -- let me get the numbers out for you -- who the alleged co-conspirators were, and I think that is instruction number --

THE COURT:  On page 10, for example, requirements for proof, conspiracy defined?

MR. STOWERS:  Yes.

THE COURT:  So what is it that you're saying?

MR. STOWERS:  Well, I'm saying that the persons they alleged to be co-conspirators within the scope of the conspiracy should be named in the instruction.  That's all.  I mean, maybe we shouldn't get into that level of detail in the preliminary instructions which, you know, is a whole other question.

THE COURT:  Are there individuals named in the bill of particulars that aren't named in the instruction?  Is that what you're saying?

MR. STOWERS:  Correct.
                Page 221

THE COURT: And you're saying you somehow have a right to insist that the government put more members that they allege

2562

are in the conspiracy than what they've agreed to put in this instruction? That's what you're saying?

MR. STOWERS: Yeah. There's about 17 other people.

THE COURT: And what authority is there for that proposition?

MR. STOWERS: Okay.

THE COURT: I can understand that they couldn't include anybody in this list that they didn't include in the bill of particulars, but what's the authority for the proposition that they have to include everybody when it comes time for trial that they list in the bill of particulars?

MR. STOWERS: Well, the whole point of the bill of particulars was to give us notice of what the allegations were.

THE COURT: I understand that.

MR. STOWERS: To define the allegations.

THE COURT: But they can define it broader than what they choose to go to trial on. They can't define it more narrowly. That's the purpose of a bill of particulars is to give you notice.

MR. STOWERS: Yeah. I mean, they could give us notice of the whole universe of drug dealers in the Northern District of Iowa and then pick five or ten when you get to the trial day after two weeks of jury selection and then say, We gave you notice, but that's not notice. And the bill of particulars once they file it, it is essentially, as I indicated, in some of the

2563

Page 222

cases that I sent you in an e-mail part of the charging allegations in the case, and it helps to define the indictment.

THE COURT: But what authority do you have that the government can't choose to narrow the allegations?

MR. STOWERS: Well, I think if they wanted to come in and make a motion which would be the proper way for them to do this to amend their bill of particulars, get leave of Court to do that, that'd be fine. I just don't think it should be done through a letter that they send to the Court over the weekend, you know, because we might have some objections to that.

And the fact that they're changing their allegations, particularly, you know, on this aider and abettor thing even after some of these jurors in jury selection were told that the indictment alleges an intentional killing by Angela Johnson, that she did it, I mean, that -- I think the jury needs to know what they've alleged. And at this point what they've alleged is in their bills of particulars. And until that's changed, we think the jury ought to know what the allegations are.

THE COURT: So now you're saying the jury should be instructed on the bill of particulars?

MR. STOWERS: I think that's part of the charging instrument. Just like they're advised of what the indictment allegations are, the bill of particulars --

THE COURT: I don't advise them of what the indictment allegations are other than in the preliminary instructions.

2564

MR. STOWERS: Generally in most cases there's a description of the charge instruction that's given that essentially recites the material nonsurplus allegations of the

Page 223

indictment for the jury.

THE COURT: What you see here is what the jury is going to get. I don't allow the government to read the indictment. I don't allow them to summarize the indictment. I just give them the instructions.

MR. STOWERS: Okay. Well, I guess --

THE COURT: But how are you prejudiced by it?

MR. STOWERS: I think this goes to the issue of whether or not they're going to be able to prove what they've alleged. Apparently they're taking the position they either don't want to prove what they've alleged or they can't.

THE COURT: Well, they don't have to. There's nothing that requires them to. There's nothing that requires them to prove everything they allege in the bill of particulars.

MR. STOWERS: Well, I guess I don't agree with that position. It doesn't require them to prove everything they've alleged but . . .

THE COURT: Well, where's your authority, you know? Do you have any authority?

MR. STOWERS: It's the cases I provided you.

THE COURT: Well, that isn't authority for the proposition you're now urging. Anyway, anything else?

2565

MR. STOWERS: That's fine. But we would like that information included in there. And then on the aider and abettor, I guess we can deal with that later, but apparently they're abandoning the theory that there was --

THE COURT: Yeah, but that you could have raised earlier.

MR. STOWERS: I'm talking about in a different

Page 224

context.

THE COURT: No, you're not. You could have -- you could have raised that at any time earlier than the deadline for pretrial motions ran.

MR. STOWERS: I'm talking about something different now.

THE COURT: Okay.

MR. STOWERS: What I'm talking about now, Judge, is -- and I don't know how we should address it, and maybe it's not in the preliminary instructions, but we have done jury selection for two weeks, and Mr. Berrigan's stood up in front of the jury and told them that the government is alleging that our client was the trigger person -- he's used phrases like that -- to some people who are seated I think in the first 15 people. And now the government after two weeks -- and some of these people are going to wind up on our jury, and now the government's going to change that around and say that's no longer one of our allegations that we're going forward on.

2566

I just throw that out there for everybody to think about. I'm not exactly sure at this moment how to address it, and we've talked about it amongst ourselves and don't have a clear answer yet either, but it seems to me --

THE COURT: How do you think that affects the jury instructions?

MR. STOWERS: Well, somewhere along the line I think perhaps the Court should instruct the jury or tell them that the government is no longer alleging that Angela Johnson was the person who personally killed any one of these five people.

THE COURT: That would be obvious from a reading of

Page 225

the instructions.

MR. STOWERS: It might be, but it might not also be obvious that that was their allegation before, and we've told them that, and Mr. Berrigan's gone forward and told them that and now -- and I think on some occasions the government objected saying that he was wrong in saying that to the jury and now the jurors may be under the impression that Mr. Berrigan was attempting to manipulate them in some way during jury selection, and we don't want to have that impression left out there.

THE COURT: So what are you asking me to do?

MR. STOWERS: I think it would be probably appropriate to tell the jury that --

THE COURT: No, you propose some -- are you talking about in a jury instruction?

2567

MR. STOWERS: I think they should be told that that is not an allegation anymore and that it's been withdrawn if you want to call it that by the government.

THE COURT: And are you asking me to do that in a preliminary instruction?

MR. STOWERS: Well, that might be the easiest and most innocuous way to do it.

THE COURT: Okay. What's the government's position on that?

MR. WILLIAMS: I just don't see where it's necessary or where any prejudice has been done. I mean, to the extent that Mr. Berrigan has suggested to jurors that we've charged her with actually pulling the trigger, if there's such a juror on this panel and then we proceed without any evidence she pulled the trigger, if anything it's a prejudice to us that, you know,

Page 226

they clearly have been told that we were going to allege that, and, boy, we didn't show it. I guess I just don't see the harm, and I think it's a lot more concern over nothing.

Bottom line is I don't think the jurors are going to remember squat from the jury selection other than they're now on the jury, and they're going to be overwhelmed with the evidence, and they're going to start a process --

THE COURT: I think they'll remember where they were on the football field but not much else.

MR. WILLIAMS: Yeah. Beyond that I don't think so.

2568

So I think it's much ado about nothing frankly. That's my view on it.

THE COURT: Okay. Anything else, Mr. Stowers?

MR. STOWERS: There's one item I believe that Mr. Berrigan had noted last night on the nature of the proceedings.

THE COURT: Okay.

MR. STOWERS: Which I think it's instruction number 2.

THE COURT: Mr. Berrigan, you want to just address that?

MR. STOWERS: Let me give him his notes.

MR. BERRIGAN: Yes, sir. I want to first apologize if I make a mistake, Your Honor, because I used the Friday copy. And if the Court's changed this, I'm going to screw this up.

THE COURT: Okay. Yeah, I don't think we've changed instruction number 2.

MR. BERRIGAN: All right. On the second page of instruction number 2, at the top of the page, statutory aggravating factors which would make the defendant eligible for

Page 227

the death penalty, comma, are present in this case?

THE COURT:  Yes.

MR. BERRIGAN:  I would ask the Court to consider changing that language to "have also been proven beyond a reasonable doubt."

THE COURT:  Yeah, I think that's a much better way to

2569

phrase it.

MR. BERRIGAN:  All right, sir.  And then if I might --

THE COURT:  Let me just stop you there.  Does the government have any objection to that change?

MR. WILLIAMS:  No.

THE COURT:  Yeah, it's much better phraseology.

MR. BERRIGAN:  Then the very next sentence says, If you find, and I'd ask the Court to put "unanimously" in between "you" and "find."

THE COURT:  Yep.

MR. BERRIGAN:  That those factors, presently says, Are present --

THE COURT:  Yeah, we'd say, Are proved beyond a reasonable doubt.

MR. BERRIGAN:  Yes, exactly right, have been proven beyond a reasonable doubt.  Yes, sir.

THE COURT:  Yep.

MR. BERRIGAN:  And then the next sentence, the one that begins in the --

THE COURT:  Penalty phase, right.

MR. BERRIGAN:  Yes, sir, and I would ask the Court to change that -- actually, Your Honor, just before that, I'd ask the Court to consider inserting a sentence that's not present.

Page 228

THE COURT: Okay.

MR. BERRIGAN: And it would read, If not, comma, then

2570

the trial is over, and the Court will determine the punishment. And I'm asking that because there's no direction in terms of what happens if the jurors do not find the gateway factors.

THE COURT: Okay.

MR. BERRIGAN: And then the very next sentence that currently says, In the penalty phase, I'd ask the Court to change that to, If there is a penalty phase, and perhaps that should start a new paragraph. I'd leave that to your judgment.

THE COURT: Okay.

MR. BERRIGAN: And that's all, sir.

THE COURT: Government have any objection to any of those suggested changes by Mr. Berrigan?

MR. WILLIAMS: Just a moment, Your Honor.

THE COURT: Sure.

MR. WILLIAMS: No.

THE COURT: Okay. And you'll have another opportunity once we get it reduced to writing and see it again because, again, this is just preliminary. Anything else about the preliminary instructions? Mr. Willett, you don't want to triple team me and you weigh in too?

MR. WILLETT: No. Thank you, Your Honor. I'm blessed with co-counsel whose academic ability is greater than my own, so I will remain quietly here.

THE COURT: Okay.

MR. STOWERS: I don't have any --

2571

Page 229

THE COURT: Did you have anything else, Mr. Stowers?

MR. STOWERS: No thanks.

THE COURT: Okay. Anything else we need to talk about?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. BERRIGAN: Nothing by the defendant, sir.

THE COURT: Was -- am I imagining things that I believe it was Mr. Berrigan who told me one day last week that there was some discussion and I think you had said -- here's my paraphrase -- that you had made a proposal but the government hadn't responded yet about the alternate jurors?

MR. BERRIGAN: Actually it was actually about the panel, the first 22, Your Honor.

THE COURT: Oh.

MR. BERRIGAN: We were contemplating reducing our number of peremptory challenges from the five we had in reserve, and the government, you know, for whatever reasons they didn't share with us -- and they're not obligated to -- decided that wasn't in their best interest, so we weren't able to reach an agreement.

THE COURT: I see. So we wouldn't have to get to 22. We might get to 20 or something.

MR. BERRIGAN: Right, because at that point we were at 15, and we were all a little discouraged. We were two days in a

2572

row where we didn't have any jurors, and obviously they weren't under any obligation to do that, and I can understand why they chose not to, but that was actually the discussion.

THE COURT: I see.

Page 230

MR. BERRIGAN: We never got to the point of talking about alternates, but I'm certainly open to that, and we'll talk to the prosecutors about that, but we haven't included that in our discussions yet.

THE COURT: Yeah. You know, at the rate we're going, picking the alternate jurors should just take 2 to 3 days I think, and we could be at 22 tomorrow or the next day; right?

MR. BERRIGAN: Yes, sir. We think we will be certainly by the day after tomorrow, and the strike as you go is going to speed that alternate process up also as you undoubtedly determined in deciding to use that process.

THE COURT: Yes, I did, Mr. Berrigan.

MR. BERRIGAN: Yes, sir.

THE COURT: I think I've been most patient with jury selection.

MR. BERRIGAN: I'm not being critical, Your Honor.

THE COURT: No.

MR. BERRIGAN: I'm just making an observation.

THE COURT: Which is absolutely accurate.

MR. BERRIGAN: Right.

THE COURT: Absolutely accurate. No question,

2573

challenges on the fly speed things up. I rather like the system. Matter of fact, I think I may incorporate it into regular trials. I'm not sure. I'm just figuring out a way to do that. It makes the strategy so much more entertaining.

Anything else?

MR. BERRIGAN: Nothing by the defense, sir.

MR. MILLER: No, Your Honor.

THE COURT: Okay. We'll see you tomorrow morning.

Page 231

MR. WILLIAMS: Just -- I'm sorry to keep everybody here, but can you share with us just some of your thoughts on let's assume we get a jury picked --

THE COURT: How much time?

MR. WILLIAMS: When do we need to start getting witnesses in? How much time do you anticipate between --

THE COURT: A day.

MR. WILLIAMS: Okay. So let me ask you this. If we got -- let's say we got into Monday; we don't have a jury this week; we're going to have to come back on Monday and finish up our jury selection. You would anticipate a 24-hour period where we could make sure we get our witnesses in?

THE COURT: Sure. Let's say at the end of the day Monday or sometime on Monday we get our six alternates.

MR. WILLIAMS: Right.

THE COURT: Yeah, I'm not talking about starting Tuesday. I'm talking about taking a day off and starting

2574

Wednesday, and remember we still have to do preliminary instructions which are very lengthy, opening statements. We haven't even gotten to the question of how much time you want, but --

MR. WILLIAMS: Four hours would be plenty for me, Judge. Thank you. For the record, I was joking.

THE COURT: Yes, although I'm inclined to give you as much time as you want. You know, my view is you give lawyers all the time they want, they hang themselves, so that's fine.

MR. WILLIAMS: No. I'll use the same amount of time I used --

THE COURT: Our local rule is 15 minutes. Who's

Page 232

giving the opening statement?

MR. WILLETT: I am, Your Honor.

THE COURT: Okay.

MR. WILLETT: How much time --

THE COURT: Is 14 enough?

MR. WILLETT: No, it is not, Your Honor.

THE COURT: How about 15? How about our local rule?

MR. WILLETT: My question in attempting to respond to the Court's question of me is how much time was given to the parties in U.S. versus Honken for opening statement?

THE COURT: I don't know. How much time would you like? I'm not going to give you a time limit. You can take all the time you need to give your opening statement. How's that?

2575

MR. WILLETT: I won't be up there for four hours, Judge. I promise you that.

THE COURT: If you want to, you can. But, you know, I'm not imposing time limits on openings. I make the same mistake I do in every case. I waive our local rule on opening statement. I think it's a huge mistake in every case. Obviously in this case, you know, you would need more than 15 minutes. I understand that. But I won't impose any time limits. So you think you can work with a day?

MR. WILLIAMS: Oh, certainly, Your Honor. I just wanted to get a rough idea because we're going to be contacting witnesses this week, and so we want to give some idea of what the process was going to be, but that would be more than enough. That will be fine.

THE COURT: Okay. I'll give you an extra day to start if you waive your peremptory challenges on alternate jurors.

Page 233

MR. WILLIAMS: We'll take it under consideration.

THE COURT: I wouldn't give it a whole lot of consideration. Anything else? Okay.

MR. BERRIGAN: No, sir.

THE COURT: Thank you. We'll be in recess.

(The foregoing trial was adjourned at 4:09 p.m.)

CERTIFICATE
I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                    1-30-06
                                            Date

2576


INDEX

PROSPECTIVE JUROR:                                          PAGE:

Prospective Juror 703
        MR. MILLER                                          2393
        MR. BERRIGAN                                        2397

Prospective Juror 392
        MR. BERRIGAN                                        2404

Prospective Juror 300
        MR. MILLER                                          2415
        MR. BERRIGAN                                        2425

Prospective Juror 617
        MR. BERRIGAN                                        2436
        MR. MILLER                                          2446
        MR. BERRIGAN                                        2451
        MR. MILLER                                          2454

Prospective Juror 539
        MR. MILLER                                          2460
        MR. BERRIGAN                                        2463
        MR. MILLER                                          2471

Prospective Juror 600
        MR. BERRIGAN                                        2485
        MR. MILLER                                          2497

Prospective Juror 591
        MR. MILLER                                          2510
        MR. BERRIGAN                                        2517

Prospective Juror 193
        MR. BERRIGAN                                        2530
        MR. MILLER                                          2540

*****

Page 234

2577

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR01-3046 |
| Plaintiff, | Sioux City, Iowa |
| | April 27, 2005 |
| vs. | 8:23 a.m. |
| ANGELA JANE JOHNSON, | VOIR DIRE OF |
| | PANEL K |
| Defendant. | |
| / | |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

2578

APPEARANCES:

For the Plaintiff:      C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:      PATRICK J. BERRIGAN, ESQ.
Watson & Dameron
2500 Holmes
Kansas City, MO 64108

DEAN STOWERS, ESQ.
Rosenberg, Stowers & Morse
1010 Insurance Exchange Building
505 Fifth Avenue
Des Moines, IA 50309

ALFRED E. WILLETT, ESQ.
Terpstra, Epping & Willett
Higley Building - Suite 500
118 Third Avenue Southeast
Cedar Rapids, IA 52401

Also present:      Bill Basler

Page 1

Case 3:09-cv-03064-MWB-LTS     Document 284-70     Filed 06/23/11     Page 2246 of 3245

PANEL K, 4-27-05
Court Reporter:                    Shelly Semmler, RMR, CRR
                                   320 Sixth Street
                                   Sioux City, IA  51101
                                   (712) 233-3846

2579

(Proceedings reconvened outside the presence of the jury venire.)

THE COURT:  Please be seated.  Anything we need to take up this morning on the record?

MR. WILLIAMS:  No, Your Honor.

MR. BERRIGAN:  Nothing by the defense, sir.

THE COURT:  Before you were here, Mr. Williams, but while Mr. Miller was here and without a court reporter at my invitation if there was anything I needed to be aware of, Mr. Berrigan pointed out that the first juror in the questionnaire apparently is an INS agent and claims to know me and you so . . .

MR. WILLIAMS:  Yeah, Mr. Miller brought that to my attention when I got up here.

THE COURT:  Okay.  And the other thing is the defense asked whenever we get to the 22, rather than just taking a half an hour break, they wanted an overnight break, and I didn't really see a problem with it because I don't think it's going to hold anything up because what happens is we'll just keep going with the same process, and it will be alternates, and I can't imagine we're going to get six alternates done in one day, so it's just not going to slow it up at all.

MR. WILLIAMS:  Sure.  That's no problem, and Mr. Miller again made me aware of that.

THE COURT:  Okay.

2580

Page 2

MR. WILLIAMS:  Thank you, though.

THE COURT:  Are they ready?

CSO SAUNDERS:  He's lining them up down there.

THE COURT:  You ready to start a little early then?

MR. WILLIAMS:  Certainly.

MR. BERRIGAN:  Yes.

(Panel K entered the courtroom.)

THE COURT:  Good morning, everybody.  If you'd raise your right hand, I'm going to swear you all in.

(Panel K was sworn.)

THE COURT:  Okay.  Please be seated.  Good morning.  I wanted to welcome you all to the United States District Court for the Northern District of Iowa.  I know at least one of you have been in this courtroom before.  How many of you have actually been in this third-floor courtroom?  Raise your hand.  Anybody?  Just one, okay.

I'm Mark Bennett.  I'm the chief judge of the United States District Court for the Northern District of Iowa, and I'm the trial judge in this case, and it's my pleasure to welcome all of you this morning.

I assume that when each of you went to bed last night you were just so excited about the prospect of coming into your federal court today and even more thrilled about the prospect of being selected as a juror in a case that may run into July, so I understand that.

2581

I like to remind jurors that while every matter we have here in federal court is a serious matter and, of course, this case is the most serious case that we could ever have there

is no federal law against smiling in the courtroom. So I hope you will keep that in mind.

You all know the case is United States versus Angela Johnson, but I wanted to introduce you to who all the participants are, and I'll start with the table that's closest to the jury box. You'll be meeting them in a few minutes in a little more detail. But just so you know who everybody is, I'm just going to have them raise their hand.

C.J. Williams, Mr. Williams is an assistant United States attorney from Cedar Rapids, one of the prosecutors in the case.

Next to him is Tom Miller. Tom Miller, Mr. Miller, is a special assistant United States attorney. Normally he's employed by the attorney general of Iowa who has the same name as he does. They're both Tom Miller. This is not the attorney general, and they're not related. This Tom Miller works for the attorney general of Iowa and is in charge of what they call area prosecutions, but he's been specially appointed as an assistant United States attorney in this case.

Seated next to the two prosecutors would be Special Agent Bill Basler. He's what's called the case agent.

Now, moving over to the far table, the closest person

2582

to you with the red striped tie is Al Willett. Mr. Willett is a lawyer from Cedar Rapids who specializes in criminal defense work.

Seated next to Mr. Willett is the defendant in the case, Angela Johnson.

And then seated next to Angela Johnson is Patrick Berrigan. Mr. Berrigan specializes in criminal defense work and

Page 4

is a lawyer from Kansas City, Missouri.

And then at the back table is Dean Stowers. Mr. Stowers also specializes in criminal defense and is a lawyer practicing in Des Moines, Iowa.

Now, there are certain rules you need to follow, and I want to go over those with you. I've reduced them to writing, and we'll just take a moment to go over them this morning.

To ensure fairness, you as potential jurors must obey the following rules until the end of the case if you are selected for the jury or until you are excused from serving on the jury in this case. These rules apply whether you are in the courtroom, in the courthouse, at home, or anywhere else until you are excused from further service in this case.

First, do not talk among yourselves about this case or about anyone involved with it.

Second, do not talk with anyone else about this case or about anyone involved with it.

Third, when you're outside the courtroom, do not let

2583

anyone tell you anything about the case. If someone should try to talk to you about the case during jury selection or the trial, please report it to me.

Fourth, do not talk with or speak to any of the parties, lawyers, or witnesses involved in this case. You should not even pass the time of day with any of them. It is important that you not only do justice in this case but that you also give the appearance of doing justice. If a person from one side of the case sees you talking to a person from the other side even if it is simply to pass the time of day, an unwarranted and unnecessary suspicion about your fairness might

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2250 of 3245

be aroused. If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or the like, it is because they are not supposed to talk or visit with you.

Fifth, do not read any news stories or articles about this case or about anyone involved with it or listen to any radio or television reports about the case or about anyone involved with it. If you want, you can have your spouse or friend clip out any stories and set them aside to give you after the trial is over or you are excused from serving on the jury in this case. I can assure you, however, that if you are selected for the jury in this case by the time you have heard the evidence you will know more about the case than anyone will learn through the news media.

Sixth, do not do any research on the Internet, in

2584

libraries, in the newspapers, or in any other way or make any investigation about this case on your own. If you are selected for the jury, you must decide this case based on the evidence presented in court.

Seventh, if you are not excused from serving on the jury today, please take this instruction with you so that you can refer to it if you have any questions between now and the date you are required to return for the trial.

Dated this 27th day of April, 2005, signed by me, Mark Bennett, chief judge.

Now, because most of you are kind of unfamiliar with courtrooms and legal proceedings, I wanted to try and explain to you who everybody is in the courtroom. And I'll start first with one of my law clerks, Carey, who's seated to my far left in the corner there. Carey will be with us throughout the day

Page 6

today and throughout the trial. I have three and a half law clerks. Carey is one of them. She's in her second year of a federal clerkship with me. She's an honors graduate of the Drake University Law School, and at the end of the summer she'll be moving to Seattle to start her new career.

Seated directly in front of me is Shelly, our court reporter. Shelly comes to us from Naples, Florida. She's been with us now for a number of years. She does a superb job. She has really the hardest job in the courtroom because while the rest of us can on occasion maybe daydream, look up at the

2585

ceiling, Shelly has to take down everything that's said, and she does a terrific job of doing that.

Because this is a criminal case, we'll have some United States marshals in the courtroom at all times. We do that in every criminal case. Depending upon what's going on in the trial, there may be more or fewer United States marshals in the courtroom. But that's just very typical.

We'll also have court security officers. They're easy to spot because they have the blue blazers and the big badge and the earpiece, and I think today it's talk radio. Yesterday it was rock that they're listening to. Just kidding.

And they have a lot of responsibilities in the building, but one of their main responsibilities is when we have jury trials make sure all the jurors get checked in downstairs in the morning and get you up to the courtroom on time.

We have the lawyers and the parties they represent. And you've met them, and you'll meet them in more detail.

And then I want to talk a little bit about what the different function is between the jury and the judge

Page 7

particularly in this case. I'll start with myself first.

As you can imagine, this is a high-profile case. You know, it's the ultimate potential penalty in the case, the death penalty. Death penalty prosecutions are pretty rare and unique in federal court. So I've had a lot of pretrial motions to work on. That would be expected. And the parties did not disappoint

2586

me in that expectation. Both sides filed lots of motions. There were lots of things for me to rule on. I'm current now in all the motions, but as the trial gets underway, there will be a lot of objections to evidentiary matters and lots more motions filed I'm sure, and I'll have a lot of things to do during the trial.

One of my critical functions is to tell you what the law is, and I do that in written jury instructions. And we've been working on the jury instructions for quite some time actually in the case. We met last night with the lawyers in making some refinements in them, so once we get a jury selected and the trial gets underway right before the opening statements of the lawyers, I'm going to give the 18 people who are selected to serve as jurors in the case a very detailed set of instructions. In those instructions I'll define each of the ten counts or crimes that the defendant is charged with. I'll give you instructions on reasonable doubt and the government's burden of proof, the presumption of innocence, credibility of witnesses, and just kind of give you a road map for the trial.

Now, one of my -- one of the things you'll note that I did not say is that I'm the judge of the facts because in a jury trial I'm not. It's not my job to figure out what happened. That's the jury's job. And that's a huge job in any case. It's

Page 8

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2253 of 3245

a big job in this case too.  And so you are really the judges of the facts.

2587

Well, how do you do that?  Well, there's our witness box.  I anticipate in this case that there could well be over a hundred witnesses that testify, so you'll have to pay pretty careful attention to the testimony of lots of witnesses.  I anticipate that there will be in excess of 500 exhibits that will be admitted into evidence.  And to the extent that the lawyers choose to show you any exhibit that gets admitted into evidence, they'll show it up on the big screen often while a witness is testifying about an exhibit, so there will be a lot of exhibits for you to see and examine.

And then at the end of at least the first phase of this case -- and there may only be one phase, and we're going to talk about that in a little bit.  But the first phase of the case is what I call the merits phase.  You have to decide whether Angela Johnson is not guilty or guilty of each of the ten charges.

And what you'll do is you'll listen to all of the evidence, look at all of the evidence that's been admitted, take my written jury instructions, figure out what happened, apply the facts as you find it to the jury instructions, and in that way that will help you decide whether the government has met its burden of proof beyond a reasonable doubt to prove Angela Johnson guilty of one or more of the ten charges against her.

Now, in doing that, you are the judges of the credibility of the witnesses, and what I mean by that is each

2588

Page 9

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2254 of 3245

juror has to decide for himself or herself whether a witness is telling the whole truth, just some of the truth, or maybe none of the truth, and that's a huge job as a juror. You have to listen to the witnesses and decide what's truthful and what's not truthful. So that in a nutshell is your job.

Now, because this is a death penalty case, you'll have to decide what the penalty is if the defendant is found guilty of one or more of the ten charges. In every other type of case in federal court, all the other criminal cases that I've handled -- and I've handled more than a thousand criminal cases, quite a bit more than a thousand -- in each of those cases, the sentencing responsibility has been mine and mine alone. The jury is not involved in sentencing. Congress decided when they passed the death penalty law that the jury should decide the penalty.

So if we ever get that far in this case, if we ever have a penalty phase, that is, if the defendant is found guilty of one or more of the ten charges and then there's a second set of deliberations which we call eligibility -- and we'll talk about that in a little more detail -- but if we ever get to the penalty phase, my point is it's up to the jury to decide the penalty.

In this case there are two possible penalties if the defendant is convicted. One is the death penalty. The other is life imprisonment without parole. There is no parole in the

2589

federal system. So you might read about some states where somebody gets a life sentence maybe over in South Dakota and in 7 years they're eligible for parole or 10 years or 20 years or whatever. Doesn't work that way in the federal system. You get

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2255 of 3245

a life sentence, it's a life sentence. There is no parole.

We're about to start what we call voir dire. It's a French term. It's used interchangeably for jury selection. The literal translation of voir dire means to speak the truth.

Well, here's what I'm talking about. Our goal is to find 18 jurors -- 12 of you will be trial jurors; 6 of you will be alternates -- and we're looking for folks who, based on their answers, would be suitable to serve as jurors in this case.

So I'm going to be asking you some questions, but most of the questioning is going to be done by the lawyers today. And there are no right or wrong answers to any of your questions. I assume that some of you are pretty anxious about coming into this courtroom, sitting in front of a bunch of strangers, and having a judge and potentially five lawyers ask you questions. I think I'd be a little bit anxious too, and I've been at this for a long time.

I want to try and reassure you that there aren't any trick questions. We're not asking you -- we're not going to have you go back into your high school civics and ask you what amendment guarantees the defendant the right to a fair trial. It's the Sixth Amendment, but we're not going to be asking you

2590

questions. It's not a pass/fail. It's not a test.

The lawyers for the most part are going to be asking you questions about your opinions and your beliefs. How do you feel about the death penalty? Could you fairly impose both a life sentence and a death sentence in this case if we ever get to the penalty phase? There are no right or wrong answers to questions like that. They're simply your beliefs. You have a right to whatever belief you have. Your belief is no better

Page 11

than my belief or Mr. Berrigan's belief or Mr. Miller's belief. They're just beliefs. But we have to know what they are. And so you have to answer openly and honestly to our questions.

And we are now in our, if I'm correct, eleventh day of jury selection. And we have seen lots of jurors really struggle because these are tough questions. And a lot of people are uncertain as to what their views are, and that's okay. We're not really here to pass judgment. Nobody's going to think you're a bad person based on any answer you give, but we're just looking for people who we think would be suitable jurors in this case.

And some of you would be great jurors but maybe not in this case. You know, not every person is a really good juror for the particular case. Some people would be great jurors in another type of case but maybe not in this case, and that's really what we're trying to find out.

Now, you'll notice that each of you have numbers. And

2591

the lawyers and I will refer to you by number. We do have your names. I've got a bookful of your questionnaires right here. We know your names, but I made the decision -- and it was my decision alone -- to use numbers in this case, and here's why I did it.

This is going to be a very high-profile case. What do I mean by that? There will be a lot of interest in the news media and a lot of articles about the case, a lot of interest in the population, in the citizenry about the case, and I thought it was such a sacrifice for anybody who gets selected to serve that the last thing I wanted was your name to be out in the public domain, have reporters use it in the newspaper so that

Page 12

what I call idle curiosity seekers -- and believe me, they're out there. You wouldn't believe the number of letters and phone calls and e-mails that I get. I wanted to spare you that because it's tough enough to be a juror without having somebody knocking on your door at 7:30 at night saying, Oh, I read in the paper you're on that Johnson jury; I just wanted to see how it was going. And people will do that type of thing, I guarantee it. So I made the decision to use numbers, and that's why we're using numbers.

Now, I wanted to try and explain the jury selection process to you. I have a lot of discretion or latitude in exercising my judgment about how to conduct jury selection, and the bottom line is most of our cases in terms of selecting a

2592

jury are pretty routine. We start at 8:30 in the morning. I have a jury selected between 11:30 and 11:45 90 percent of the time. I don't tinker with how I do it. I don't even give it a second thought. I just do it.

When you have a case of this magnitude, it causes you to rethink how you're going to do things. And I looked at a lot of different systems and methods, and I consulted the lawyers on several occasions to get their input. And my number one -- my number-one concern as a judge is to give the parties a fair trial. That's number one. So my number-one concern is always to make sure that in this case Angela Johnson gets a fair trial and the United States of America gets a fair trial.

My second concern is to run the trial as efficiently as possible so as to not waste your time. My time is extremely valuable to me, and I assume that your time is just as valuable to you. And I consider it to be very valuable to you. So that

Page 13

helped shape how I was going to do jury selection.

Let me give you an example. I was reading in the paper -- right about when this case started or maybe a couple days before, I was reading the New York Times, and there was an article about a high-profile case in federal court where they were going to start with 400 jurors for jury selection. We actually started with 800, so there was nothing too shocking with starting with 400. But that particular judge decided to bring them all into one place. Well, no courtroom in the United

2593

States is big enough for 400 jurors, so they rented like a civic center, and they brought the jurors in, and I think jury selection was going to take about a month, and everybody was going to have to come every day.

I didn't think that was a very good idea, all due respect to the other judge who thought about doing it that way. Maybe there's reasons I'm unaware of where that's what they need to do.

My secretary, for example, who's also a lawyer was called for jury duty this month over in state court right across the street, Woodbury County. And she's now been three different times for most of a day, and she's never actually been questioned by a judge or lawyers yet.

Her sister, interestingly enough, who lives in Minneapolis was called for jury duty in federal court in Minnesota and this month went for three days to the federal courthouse down in the basement, big room with tons of jurors, was there all day every day for three days and never actually even got called up to a courtroom, never got questioned by a judge or lawyers.

Page 14

We came up with a system where you come in one day. So today will be your only day for jury selection. So that's a very positive -- that should be good news to everybody. When we started, we anticipated that jury selection would take two to three weeks. Friday will be three weeks, although we started on

2594

a Tuesday the first week. And I think there's a chance we'll have a jury selected by Friday, if not, maybe Monday or Tuesday. It's going maybe a little bit slower, but I think the process has worked remarkably well, so I'm not so concerned about the speed as I am the fairness of it. So it's working pretty well.

Each day we bring in a small group of potential jurors. That varies. Today we have 11 of you. After I introduce the lawyers and there's a few questions by me, then I'm going to turn it over to the lawyers, and there will be group questioning for about half an hour.

What I mean by group is the government lawyers will get to question all of you in a group like this. Then the defense lawyers will question you in the group like this, and that will be about 30 minutes per side.

Then when we're done with the group questioning, we're going to send you down to the jury room, and you'll be free to leave the building because you'll know approximately when we're going to bring you up, and we're going to bring you each up individually one at a time.

You'll come in that door. The CSO will hand you a microphone. You'll just pick any seat in the front row you want to. One of the seats has underneath it a free pass where if you pick that seat you're automatically off jury duty. Just kidding. No free passes today. And then the lawyers will stand

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2260 of 3245

at the podium, and they're going to question you for about 12

2595

minutes. I've given them time lines. So it's about 12 minutes per side. And I'm getting a little bit ahead of myself here.

And then when we're done questioning you individually, we'll ask you to step outside, and then I'll conference with the lawyers, and we'll make a decision, and it will only be one of two things: You're dismissed from jury service -- and we'll bring you right back in after your individual questioning. You'll know your status, and I'll say one of two things. You're dismissed, thanks, and good-bye, or I'll say, You're in our jury pool.

And if you're in the jury pool, what does that mean? Well, that means that you have about a 50 percent chance of serving as a juror in the case. I'm not very good at math. If you make it into the jury pool, you actually have an 18/34 chance of being on the jury, but I rounded that off to 50 percent.

And then what will happen is whenever we get to this magic number of 34 which we think will be the end of this week or early next week, then our clerk's office will call all 34 people, 18 of which will be on the jury, and those 18 will be told they're on the jury, and the trial will start probably the next day or the day after we call you. So we don't exactly know when you'll be called. I think it will be early next week, and the trial hopefully will get underway early next week.

Yeah, that just explains when we manage to empanel the

2596

Page 16

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2261 of 3245

number of jurors we need, we'll notify each juror by telephone whether they're selected or not.

Once we get the trial underway, we're going to run the trial four days a week usually Monday through Thursdays. And we're taking the week of June 10 through the 17th off.

Why are we running the trial four days a week? For a lot of reasons. None of the lawyers are from Sioux City. Matter of fact, the closest lawyer is from 200 miles away. One lawyer from the prosecution and one from the defense side are each from Des Moines. One each are from Cedar Rapids which is 330 miles away. And then one of the defense lawyers, Mr. Berrigan, is from Kansas City. They need to get back and work on other cases. I have approximately 600 other cases that I need to be concerned about, that I'm very concerned about, and I'm going to be working on Fridays on my other cases.

Matter of fact, I've actually worked some trials in where I'm going to be trying cases Friday, Saturday, and Sunday. We'll be pretty much working seven days a week which I do anyway, but I'll be making lawyers come in. Actually not making them. They actually want to come in and do it because they want to get their cases heard, and that's the only time I have available.

So -- and the trial day -- we'll start -- you'll find I'm very prompt. Matter of fact, we started a few minutes early today. We will start every trial day as far as I know right now

2597

at 8:30 in the morning, and there won't be any waiting. At 8:30 we'll bring you up. And we'll go generally from 8:30 to right around 4:30, maybe a quarter to 5. I'm going to try and end at 4:30 because I'm going to be scheduling other sentencings and

Page 17

hearings in the late afternoons and early evenings. So you can pretty much count on Monday through Thursday 8:30 to 4:30.

Now, we're going to start with Mr. Williams, and we're going to have him introduce everybody at the defense -- I'm sorry, at the prosecution table, and we'll find out if you know any of the folks. Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

Good morning, ladies and gentlemen. My name is C.J. Williams. As the judge indicated, I live and office over in Cedar Rapids, Iowa.

At counsel table with me you were introduced to Tom Miller.

MR. MILLER: Good morning.

MR. WILLIAMS: He's the head of the area prosecutions for the attorney general's office. He lives in Des Moines and generally works there and in courtrooms all around Iowa.

Also at counsel table is Special Agent-in-Charge Bill Basler. He's with the Iowa Division of Criminal Investigation. He's the -- what we call the case agent. He's the lead investigator of this case. He'll be sitting at counsel table with us throughout this trial assisting us.

2598

Back at this table is our assistant, Sali Van Weelden. She's a legal assistant in our office, and she'll also be assisting us throughout this trial.

The U.S. Attorney's Office for the Northern District of Iowa is headed up by Chuck Larson Senior. He's currently in Baghdad. He's been there for a year. He'll hopefully be back soon. We have two offices, one in Cedar Rapids where I generally office, and then we also have one here in Sioux City.

Page 18

Since it's more likely you'll know people from the Sioux City area, I'm going to go through the list of people out here. We have seven attorneys, seven prosecutors or doing civil work, and then seven staff people. So let me read off their names for you. Forde Fairchild, Martha Fagg, Kevin Fletcher, Mike Hobart, Jack Lammers, Janet Petersen, and Shawn Wehde are all assistant United States attorneys officed here in Sioux City.

Shayne Mayer, Del Tompkins, Penny Schlotman, Michelle Schwebach, Michelle Hatting, Carol McEntaffer, and Pat Calhoun are all administrative or support folks living here and working in Sioux City.

THE COURT: Thank you, Mr. Williams.

Now, do any of you know Mr. Williams, Mr. Miller, Mr. Basler, or any members of the U.S. Attorney's Office or I'll add anybody that works at the federal courthouse here? Okay. One hand goes up. Actually we're going to talk to you, Juror

2599

174, individually. Juror 174 is a federal law enforcement officer, so he obviously knows some folks, but we're going to talk to you when we bring you back individually about that.

Anybody else think you know anybody?

Okay. Then we'll switch over to the defense. Mr. Willett?

MR. WILLETT: Thank you, Your Honor. If it please the Court, ladies and gentlemen of the jury, I'd like to introduce you to my client, Angela Johnson. Miss Johnson is a lady who was born in the decade of the '60s. She is from the Mason City/Clear Lake area of Iowa. If for any reason that's unfamiliar territory to you, that's north central Iowa right

Page 19

below the Minnesota border. Angela obtained or went to Forest City High School through -- the ninth grade was the limits of her formal education, but she obtained her GED certificate since then. Angela's parents are still surviving. She has three sisters, one brother, two daughters, and one granddaughter. Now, does anybody think they know my client, Angela Johnson?

In terms of the rest of the introductions, my name is Al Willett. I practice law in Cedar Rapids, Iowa. I practice with the firm of Terpstra, Epping, and Willett. I practice law with Ray Terpstra and Greg Epping.

I have co-counsel with me, Mr. Patrick Berrigan --

MR. BERRIGAN: Morning.

MR. WILLETT: -- from the Watson and Dameron firm in

2600

Kansas City, Missouri. Associated with Mr. Berrigan is Miss Lisa Dahl who is assisting us during this phase of the trial.

And then my other co-counsel is Mr. Dean Stowers. Mr. Stowers practices law with the firm of Rosenberg, Stowers, and Morse in Des Moines, Iowa. And he practices law with Brent Rosenberg, David Morse, and Miss Heather Wood.

Now, do any of you recognize myself or my co-counsel or anyone associated with us?

And, Your Honor, I see no nods of affirmation.

THE COURT: Okay. Thank you, Mr. Willett. Now, the estimated length of this trial including the jury selection process is three months. Let me tell you this. It's very hard to estimate the length of a trial. When they're two- or three-day trials, it's pretty easy. You know it's either going to be two or three. As there are more and more witnesses and more and more exhibits, it's really pretty difficult, but the

Page 20

lawyers have worked really hard to try and come up with a fair estimate. We think the trial could end in June, towards the end of June. It might spill over into July, but that's just our best guess.

And I'm telling you this because I'm going to ask each of you individually whether it would be a severe or extraordinary hardship for you to serve as a juror. But before I ask you that question, I want to give you a little bit of background.

2601

One of the most rewarding things about this job is the willingness of citizens to serve as jurors. And even in a case like this -- it's going to be a very difficult case, very difficult decisions, very lengthy trial -- I have been overwhelmed by the willingness of individuals to serve as jurors.

And notwithstanding what you say in the questionnaires -- I mean, I've read more excuses about why people couldn't serve in these questionnaires. It's really almost -- some of them are very serious. Some are kind of amusing actually. People come up with all kinds of reasons why they shouldn't have to be a juror, and I understand that.

But there's another way of looking at it. Jury service is for most of you a very unique opportunity to serve your country, and I don't think many people look at it that way, but that's exactly what it is. It's an opportunity to serve your country. And I've been overwhelmed by the willingness of people to serve.

I had a case last year that lasted over two months, and in jury selection in one day we had two farmers, and this

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2266 of 3245

case was tried during harvest season, and in jury selection we had these two farmers on the same day, and they both farmed full time and worked -- had manufacturing jobs. And they weren't going to get paid on their manufacturing jobs except for the first two weeks of jury service. And they were both willing to

2602

serve, and it was just remarkable.

And in that trial we had another juror who wasn't going to get paid at all, was the sole livelihood for his family, but he and his wife had talked about it, and they were willing to deplete their family savings because he thought it was so important to serve if he was selected.

And in the first ten days of jury selection, we've had individual after individual after individual willing to make huge personal sacrifices to serve.

Now, ultimately it's my call. I have to decide whether, if you're trying to get off the trial -- and very few people have actually tried to get off. Most days maybe one or two even ask to get off. People are just really willing to rise to the occasion and serve their country as jurors in this case.

So before you ask to get off, I want you to think long and hard about why other folks ought to have to serve and you don't have to.

Now, there are reasons why some people can't serve. I understand that. And we had a gentleman who was on narcotic medication with a pain pump who couldn't stay awake. Well, obviously he couldn't serve as a juror.

We had another individual whose sole income was derived from self-employment, and he couldn't bear the financial sacrifice, and so he was excused. Everybody's situation is

Page 22

different, but I hope you'll focus on the opportunity to serve

2603

your country if there's any way that you can do it.

Rick, is the microphone on? I'll make a deal. We're going to start with Juror 596, and I'm going to make a deal with you, and I'll make the same deal with all the other jurors. If you hold that microphone up close and speak into it, I won't put up any karaoke music and require you to sing in front of --

PROSPECTIVE JUROR 596: Sounds good.

THE COURT: How's that?

PROSPECTIVE JUROR 596: Great.

THE COURT: Are you willing to serve as a juror in this case if you're selected?

PROSPECTIVE JUROR 596: Yes, sir.

THE COURT: Thank you.

Juror 13, are you willing to serve if selected?

PROSPECTIVE JUROR 13: I guess.

THE COURT: Why do you say you guess?

PROSPECTIVE JUROR 13: I guess because I -- I don't have no tolerance for drugs, and I -- even though I just read this case, when that comes up, my daughter works in a --

THE COURT: That doesn't go to a severe or extraordinary hardship. That just goes to an opinion that you have.

PROSPECTIVE JUROR 13: That's an opinion.

THE COURT: And we're going to take up that opinion later on. You'll have an opportunity to express that opinion.

2604

PROSPECTIVE JUROR 13: Okay.
Page 23

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2268 of 3245

THE COURT: That goes to whether you should serve or not. That doesn't go to whether it's a severe or extraordinary hardship for you to serve; right?

PROSPECTIVE JUROR 13: Right.

THE COURT: Okay. Next juror, please, 213. Are you willing to serve if selected?

PROSPECTIVE JUROR 213: No, I am not.

THE COURT: Why is that?

PROSPECTIVE JUROR 213: I have an upcoming wedding, and I have a nonrefundable trip to Europe that if selected for this jury I would have to cancel.

THE COURT: Is it your wedding?

PROSPECTIVE JUROR 213: Yes.

THE COURT: When is that?

PROSPECTIVE JUROR 213: The end of May.

THE COURT: What day of the week is the wedding?

PROSPECTIVE JUROR 213: It is a Saturday.

THE COURT: Where is the wedding?

PROSPECTIVE JUROR 213: Here in Sioux City.

THE COURT: When is the nonrefundable ticket for?

PROSPECTIVE JUROR 213: June, the third week of June.

THE COURT: Where are you going?

PROSPECTIVE JUROR 213: London.

THE COURT: What's the purpose of the trip?

2605

PROSPECTIVE JUROR 213: It is our honeymoon.

THE COURT: Well, I'm not going to let you off. First of all, nonrefundable tickets are not nonrefundable. They can be reused for another trip. And I'm just not going to let you off. That's not a severe or extraordinary hardship. It'd be an

Page 24

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2269 of 3245

inconvenience. You may not get selected anyway but -- next juror please, 296, are you willing to serve if selected?

PROSPECTIVE JUROR 296: Yes.

THE COURT: Thank you.

Juror 495, are you willing to serve if selected?

PROSPECTIVE JUROR 495: Yes, sir.

THE COURT: Thank you very much.

Juror 174.

PROSPECTIVE JUROR 174: Yes, sir.

THE COURT: Okay. Thank you.

Juror 620.

PROSPECTIVE JUROR 620: No.

THE COURT: Why is that?

PROSPECTIVE JUROR 620: I'm the main bread winner in my family.

THE COURT: And what do you do? I don't remember all the questionnaires.

PROSPECTIVE JUROR 620: I'm a sheet metal worker.

THE COURT: And who do you work for?

PROSPECTIVE JUROR 620: Interstate Mechanical.

2606

THE COURT: What's their policy on paying jurors?

PROSPECTIVE JUROR 620: They don't have one. They don't pay you.

THE COURT: You sure?

PROSPECTIVE JUROR 620: Yeah.

THE COURT: Did you check?

PROSPECTIVE JUROR 620: Yes.

THE COURT: You did?

PROSPECTIVE JUROR 620: Yep.

Page 25

THE COURT: They don't pay you at all?

PROSPECTIVE JUROR 620: Nothing.

THE COURT: Nothing.

PROSPECTIVE JUROR 620: Nothing.

THE COURT: That's not very civic minded of them, is it?

PROSPECTIVE JUROR 620: No.

THE COURT: Okay. Any objection from either side?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: None by the defense, sir.

THE COURT: Okay. Thank you. You're excused. You're free to leave. Thank you.

Juror 228?

PROSPECTIVE JUROR 228: Yes, Your Honor, I'm willing.

THE COURT: Okay. Thank you very much.

Juror 740?

2607

PROSPECTIVE JUROR 740: Yes, I am.

THE COURT: Thank you.

Juror 242.

PROSPECTIVE JUROR 242: Yes.

THE COURT: Thank you.

And Juror 341.

PROSPECTIVE JUROR 341: Yes, I will.

THE COURT: Okay. Thank you. Okay. Now, I've talked about your duty to serve, and, you know, the vast majority of you have indicated a willingness to serve, but you also have a duty not to serve, and here's what I mean by that.

You can't let this notion about your duty to serve interfere with your honest responses to the questions that the

Page 26

lawyers ask you or that I ask you. And if your honest response to the questions that the lawyers and I ask you indicate that you're probably not well suited to be a juror on this case, then you have a duty not to serve.

So it's important to serve if you can, but it's just as important to give honest answers to the questions so that we can make a determination whether you'd be a suitable juror, and that's what I mean by your duty not to serve.

I wanted to explain to you the trial process a little bit because this case is complicated conceptually. It's not like most trials. And what I mean by that, most trials have one phase that the jury's involved with. You listen to the

2608

evidence, and then you decide is the defendant guilty or not guilty of each of the crimes charged. Regardless of how you decide it, guilty or not guilty, that's it. You go home. If it's not guilty, the defendant goes home too. If it's guilty, then I have to sentence the defendant. And it's usually about 80 days down the road.

That's not how it's going to work in this case. So the first phase is just like any other trial. It's what we call the merits phase. We've talked about that. Your decision is whether the defendant is not guilty or guilty of each of the ten charges.

But then there will be a second phase, but the second phase is -- only if there's a unanimous finding by all 12 jurors beyond a reasonable doubt that Angela Johnson is guilty of one or more of the 10 counts in the first phase do we even have a second phase.

And one of the lawyers has suggested that these three

Page 27

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2272 of 3245

phases are kind of like a basketball game with a first half, a much shorter intermission, and then a second half. The first half is the first phase. That's the merits phase, not guilty/guilty. If the jury unanimously finds the defendant, Angela Johnson, guilty of one or more of the ten charges, then there will be a second phase.

The second phase is what I call the eligibility or gateway phase. And in that phase there won't be any new

2609

evidence presented. You'll simply hear arguments from the lawyers. You'll have a new set of instructions from me, and you'll have to decide what we call eligibility or gateway factors. And in that phase, the eligibility or gateway phase, is where you will decide if the prosecution has proved a gateway eligibility factor and one or more statutory aggravating factors. I'm not going to define for you now what they are but just to let you know that that would be in the second phase.

And if you decide beyond a reasonable doubt, if the jury unanimously agrees that the prosecution has proved this, then and only then would we reach the third phase.

So the second phase is like the intermission in the sense that it's going to be pretty short. There's not going to be any evidence presented. It will just be arguments from the lawyers, new instructions from me. You'll go back and deliberate, and the deliberations will be based on all the evidence you heard in the first part of the trial, has the government proved this eligibility factor and statutory aggravating factors? And when we say eligibility or gateway, that's the gateway to the third phase.

If the jury unanimously agrees that the prosecution

Page 28

has proved an eligibility factor and one or more statutory aggravating factors, then we have a third phase. And the third phase is like the second half of the basketball game. It's really like another trial. There will be instructions. There

2610

will be opening statements. There will be evidence presented by the government to try and prove the aggravating factors. The defense has the opportunity if they want to but they're under no obligation to put on any evidence of what we call mitigating factors.

And so the third phase of the trial will be a trial on the penalty where the government puts on evidence of aggravating factors and the defense has no obligation to but has the right to put on evidence if they want to of mitigating factors. Then I will instruct you on what the aggravating factors are, what the mitigating factors are.

You're required to consider aggravating factors that the government proves, mitigating factors that the defense establishes, and then you weigh those factors. And each juror gets to weigh those factors for themselves. And by weighing the aggravating factors and the mitigating factors, you have to come to a determination whether you believe Angela Johnson should receive life imprisonment or the death penalty.

Now, in the penalty phase, only if each juror unanimously votes for the death penalty will Miss Johnson be sentenced to death by me. In other words, in the penalty phase, it requires all 12 jurors to reach a unanimous agreement on the death penalty. If for whatever reason that doesn't happen, then the sentence will be life imprisonment.

Okay. Now is the opportunity for the lawyers to
Page 29

question you.  We're going to start first with the government and first with Mr. Williams.

MR. WILLIAMS:  Good morning again, ladies and gentlemen.  My role right now is to do a couple things.  One is to get to know each of you a little bit better, and then I want to talk with you about some general concepts of items or theories and problems that we deal with in every criminal case, things like presumption of innocence, burden of proof, and so forth.

So what I'm going to do so you know how I'm doing this, I'm going to start with the microphone down in the front row with Miss 596, and I'm just going to go down the row and start back there and come back down the row and talk to each one of you for just a little bit.  I have 30 minutes and my co-counsel's going to give me a 3-minute warning when I get close to that.  So when I get to 341, I'll be done -- I'm sorry, 174, I'll be done, and I'll sit down.

So, Miss 596, I see that you have training in photography.

PROSPECTIVE JUROR 596:  That's true.

MR. WILLIAMS:  Tell us about that.  What kind of training did you receive in that area?

PROSPECTIVE JUROR 596:  I just worked for a studio for about 12, 13 years, family photo-type situations.

MR. WILLIAMS:  What got you into that area?

PROSPECTIVE JUROR 596:  Just kind of fell into it,

enjoyed it.  The owner of the studio took me under her wing.  We worked together, had a lot of fun and made a few -- made a little money I should say and really enjoyed it.

MR. WILLIAMS:  And you're not in that anymore.

PROSPECTIVE JUROR 596:  No.  I got married.  My husband, we discussed it and decided I should be a stay-at-home mother which I am.

MR. WILLIAMS:  And those are priorities as well.

PROSPECTIVE JUROR 596:  Definitely.

MR. WILLIAMS:  I noticed from the questionnaire it didn't appear that you'd ever served as a juror before.

PROSPECTIVE JUROR 596:  No.

MR. WILLIAMS:  So this is kind of a new experience for you then.

PROSPECTIVE JUROR 596:  Uh-huh.

MR. WILLIAMS:  You heard the judge describe that the job of the jurors is ultimately to decide the facts of the case.  Does that sound like something that you would feel comfortable doing?

PROSPECTIVE JUROR 596:  Most definitely.

MR. WILLIAMS:  Do you think it would be important as a juror to wait to hear all the evidence before you start to make up your mind in a case?

PROSPECTIVE JUROR 596:  Most certainly.

2613

MR. WILLIAMS:  Would it be important for you as a juror do you think to keep an open mind to different possibilities of what was going on all the way through the trial?

PROSPECTIVE JUROR 596:  Yes, I believe I could do

Page 31

that, uh-huh.

MR. WILLIAMS: You are a mother.

PROSPECTIVE JUROR 596: That's correct.

MR. WILLIAMS: That's a fair amount of responsibility, isn't it?

PROSPECTIVE JUROR 596: Yes, teenagers.

MR. WILLIAMS: It gets -- yeah, it gets very difficult at that point sometimes.

PROSPECTIVE JUROR 596: Yes.

MR. WILLIAMS: What do you think about the responsibility of being a juror? Do you think that would be a difficult responsibility?

PROSPECTIVE JUROR 596: Difficult, a challenge, you know, as far as the life out -- you know, but to be honest, I would really enjoy -- not enjoy it, but I think I could do it. Just sitting here looking at the flag and the seal up there, I think I could do it.

MR. WILLIAMS: Very good. Thank you very much. If you could pass the microphone to Mr. 13.

I see, sir, you're in the cattle industry and you were

2614

born in Montana. Is there a connection with that?

PROSPECTIVE JUROR 13: I was born in eastern Montana, and now I feed cattle for Bar-K Farms in Sioux Center.

MR. WILLIAMS: How long did you live in Montana?

PROSPECTIVE JUROR 13: Till '86, so 52 years. No, 42 years.

MR. WILLIAMS: What brought you to Iowa ultimately?

PROSPECTIVE JUROR 13: Montana was about -- there was no jobs at that time. It was the lean years they say.

Page 32

MR. WILLIAMS: Sure. How have you liked Iowa in the years you've been here?

PROSPECTIVE JUROR 13: It's been very productive and very good for our children.

MR. WILLIAMS: Good, good. I want to talk to you a little bit as well about this case. If you were picked as a juror, you understand what your role would be, to decide the facts, to decide what ultimately happened in the case. You understand that would be your role, sir.

PROSPECTIVE JUROR 13: I understand it, yes.

MR. WILLIAMS: Okay. The judge indicated that there's going to be a lot of witnesses called in this case, maybe perhaps as many as a hundred witnesses, and they're going to be, frankly, from all walks of life. There are going to be a number of law enforcement officers, federal agents, state agents, local police officers. There's going to be experts of different

2615

sorts. There is going to be people from the opposite end of the spectrum from law enforcement, and those people either are in jail or prison or have been in jail or prison as well.

It's going to be the task of the jurors to listen to all that evidence from all those witnesses and to consider that testimony in making up their mind on what happened. Is that something you think you could do, sir?

PROSPECTIVE JUROR 13: In all honesty I don't because I don't have a good -- my mind don't -- has a tendency to wander sometimes, and so I'm not sure I could keep myself on track, and that's an honest answer.

MR. WILLIAMS: Appreciate that. And that's all we're looking for from every juror. In this case the judge is going

Page 33

to allow the jurors to take notes throughout the trial if they want to. You don't have an obligation to do that, but each of you will be supplied with a note pad, and you can take notes as the trial progresses. Do you think that would assist you in your task if you were chosen as a juror?

PROSPECTIVE JUROR 13: I failed in school, and so I don't think I would do any better here.

MR. WILLIAMS: Let me ask you about law enforcement officers. The judge ultimately will give you some instructions among which are going to be that law enforcement officers should be viewed like every other witness, that simply because of their title they should not be given any greater weight of credibility

2616

than any other witness. Certainly you can take into account their training and their background and experience in determining and judging their testimony, but simply because of their title, it doesn't give them any more weight of credibility than any other witness. Do you think you could follow an instruction like that, sir?

PROSPECTIVE JUROR 13: I don't know.

MR. WILLIAMS: Very good. How about the rest of the jurors? Anybody on the jury think that they would have difficulty following an instruction from the judge indicating that simply because of the person's title as a law enforcement officer that you should not automatically give more credibility to that person simply because of their title? Anybody else think they'd have difficulty with that concept or following that instruction? I see no hands. Thank you very much, sir. If you could pass the microphone to 213.

You're a music teacher I saw from your questionnaire.

Page 34

PROSPECTIVE JUROR 213:  Yes.

MR. WILLIAMS:  What type of music?

PROSPECTIVE JUROR 213:  Everything.  I teach band, choir, and elementary.

MR. WILLIAMS:  And how do you like that?

PROSPECTIVE JUROR 213:  It's a lot of work, but it's good.

MR. WILLIAMS:  What's the best part of it?

2617

PROSPECTIVE JUROR 213:  Getting to be with the kids all day.

MR. WILLIAMS:  And what are the ages of the kids you work with?

PROSPECTIVE JUROR 213:  I teach K-12, so everybody.

MR. WILLIAMS:  Wow.  So you get a big range in there too.

PROSPECTIVE JUROR 213:  Right.

MR. WILLIAMS:  Including the voices changing midstream I'm sure.

PROSPECTIVE JUROR 213:  Yes.

MR. WILLIAMS:  Let me talk to you about these jurors -- or I'm sorry, these witnesses as well.  As I indicated, we're going to have law enforcement officers, and we're going to have people from the other side of the spectrum, and that is people who have either done time in prison or are currently in prison testifying.  And it's interesting.  Jurors have a very wide range of views concerning people who are -- who have decided to cooperate with law enforcement and testify in a case.

Some view those people as courageous to be able to do

Page 35

something like that.  Other people recognize they may be doing it because they want something out of it, they want some benefit, they want to get a reduction in their sentence or something like that.

2618

The judge again will ultimately assist the jury in this regard, and the judge will give you an instruction something to the effect that if somebody's testifying, cooperating with law enforcement and they're currently incarcerated that you should weigh their testimony with certain or special care and caution because they may be testifying in order to get some benefit from that.  It doesn't mean you necessarily have to disregard their testimony all together.  You can still use your other faculties to determine whether they're telling the truth and compare their testimony with other people and so forth, but you'll be instructed that you should be treating their testimony with special care and caution.  Is that an instruction you think you could follow?

PROSPECTIVE JUROR 213:  Yes.  I think I would have a harder time believing the testimony of someone like that, but I would follow the instructions.

MR. WILLIAMS:  I think in your questionnaire you said difficult to trust a witness in jail.

PROSPECTIVE JUROR 213:  Yes.

MR. WILLIAMS:  Yeah.  And that's exactly why the Court instructs the jury, because you should be a little cautious with that kind of testimony.  Let me ask you, when you're dealing with your students on a daily basis, are there times where you have to judge the credibility of students?

PROSPECTIVE JUROR 213:  Oh, absolutely, every day.

Page 36

MR. WILLIAMS: What do you use to judge whether somebody's telling you the truth or not?

PROSPECTIVE JUROR 213: Basically knowing the person. You spend enough time with them and you know whether or not they're telling the truth.

MR. WILLIAMS: What about somebody you don't know? What would you use to determine if they're telling the truth or not?

PROSPECTIVE JUROR 213: Kind of their mannerisms and how they react to certain questions.

MR. WILLIAMS: Things that we're all equipped with just naturally to be able to judge whether somebody's telling the truth or not, just looking at them and seeing whether they hesitate and things like that.

PROSPECTIVE JUROR 213: Yes.

MR. WILLIAMS: And that would be your task as a juror is to do that with every witness, every witness that appears, to judge their credibility. Is that a task that you feel yourself up to?

PROSPECTIVE JUROR 213: I think so.

MR. WILLIAMS: Thank you very much. If you could pass the microphone next to you.

Miss 296, 18 years at a bank there; is that right?

PROSPECTIVE JUROR 296: Yes.

MR. WILLIAMS: That's a long time at a job. Anymore

2620

in society we see people flip from job to job to job often. What's kept you there for 18 years?

Page 37

PROSPECTIVE JUROR 296:  I love my job.  I love the people I work with.  I'm also in human resources and like my supervisor, like the team I work with.  I have also been secretary for the president and his family for the 18 years, and I like them as well.

MR. WILLIAMS:  So it's largely coworkers that are keeping you there all that time.

PROSPECTIVE JUROR 296:  Coworkers and my job duties.  I like what I do.

MR. WILLIAMS:  What's the best part about your job?

PROSPECTIVE JUROR 296:  In human resources I like -- we have 150 employees with the bank.  I like working with them on benefits, payroll, just assisting them, helping them to like their job, answer their questions.

MR. WILLIAMS:  I talked with Juror 596 about responsibility, and that's a fair amount of responsibility too.

PROSPECTIVE JUROR 296:  Right.

MR. WILLIAMS:  Think that you feel comfortable with the responsibility of being a juror in a case like this?

PROSPECTIVE JUROR 296:  I think so.

MR. WILLIAMS:  Let me talk to you a little bit about the charges and the evidence in this case in that regard.  Judge indicated there are ten charges.  The defendant's charged

2621

ultimately with five murders, the murders of five people, three adults, one of whom was a young mother and her two little girls ages six and ten.  There are ten charges because the government alleges in the indictment that those five murders violated two different federal laws, and so there's ten charges, but there are five murders that are at issue here.

Page 38

Obviously in a murder case there's going to be some graphic evidence. We couldn't ever try a criminal murder case without presenting typically graphic evidence of some sort. In this case the government alleges that the murders occurred back in 1993, and the bodies were not discovered until 1997. And as a result, there's no photographs of blood and gore and things like that, but there are going to be some photographs that will probably be difficult for most people to look at dealing with skeletal remains of the victims in this case. And there may be some testimony about how they were killed and so forth.

Each of you were asked in the questionnaire your thoughts on how difficult that might be for you to deal with it. You checked the box I think that said no, that you didn't at least think up front that you were going to have a lot of difficulty dealing with that type of evidence; is that right?

PROSPECTIVE JUROR 296: No, no, not at all.

MR. WILLIAMS: Very good. Thank you very much. If you could pass the microphone down to 495.

To the same question, sir, I think you said not your

2622

favorite activity. Is that fair to say?

PROSPECTIVE JUROR 495: That's correct.

MR. WILLIAMS: Yeah. And I wouldn't anticipate it would be a favorite activity by anybody to deal with evidence like that. What's going to be critically important in this case for every juror to understand is that this case is not about whether killing people, including a young mother and children, is a bad thing. You will have a verdict form in this case, and on the verdict form there will be a lot of things for you all to decide as a jury. But nowhere on there is there going to be a

Page 39

box to check whether you think killing people is a bad thing or not.

And what's going to be important is for the jurors to be able to set aside any emotional response they have to the evidence, to the murders, and recognize that for an emotional response, a natural reaction, a natural abhorrence, if you will, about the crime that occurred but recognize that's not their job and their job is not to use this trial as a referendum on whether murder is bad but rather to make sure the government proves its allegations, and that is that this defendant was involved in those murders and prove it beyond a reasonable doubt.

Do you think in your case you could separate out your emotional reaction to such evidence and recognize your duty would be to decide this case on the evidence and whether we

2623

proved our case beyond a reasonable doubt?

PROSPECTIVE JUROR 495:  I believe so.

MR. WILLIAMS:  Have you ever had to deal with things like that before, sir, ever looking at photographs or things of that nature?

PROSPECTIVE JUROR 495:  No.

MR. WILLIAMS:  And so with you and probably with most jurors, we're asking you in a way to predict how you're going to react, and we recognize that.  What's important here is, as the judge indicated earlier, we're looking for your honest opinions and your honest thoughts on these things.  And we appreciate that.

I noted that in your questionnaire you've been working as a warehouse manager at Slumberland for a number of years; is

Page 40

that right?

PROSPECTIVE JUROR 495: That's correct.

MR. WILLIAMS: How do you like that job?

PROSPECTIVE JUROR 495: I like the gentleman that owns the store.

MR. WILLIAMS: And does that make it worthwhile going to work then?

PROSPECTIVE JUROR 495: Oh, yeah, yeah. I was --

MR. WILLIAMS: I -- I'm sorry.

PROSPECTIVE JUROR 495: No. I was in sales and management prior to this, and then through a series of events

2624

it's caused me to work part time, so we make the best of it.

MR. WILLIAMS: I noted in your questionnaire too that among other things you like to do you have kids in sporting events and you like to watch your kids in sporting events.

Again, kind of going back if I can to the evidence in this case, obviously we're dealing with kids that were murdered in this case. It's going to be tough. Most people are parents or grandparents. And it's fair to say that it would be tough I think for most people to deal with evidence of children being murdered.

Again, it's critically important that every juror understands that this is not a decision about whether the murder of kids is a bad thing or not but rather whether the government has proven its case beyond a reasonable doubt. As a father, do you think that's still something that you can set aside, your emotional reaction to the murder of children, and hold the government to its burden of proving its case beyond a reasonable doubt?

Page 41

PROSPECTIVE JUROR 495: I believe so.

MR. WILLIAMS: Thank you. If you could pass that microphone, I'm going to go up to the corner to 341.

How are you doing this morning, ma'am?

PROSPECTIVE JUROR 341: I'm fine. Thank you.

MR. WILLIAMS: Good. I note that you are a pastor and so is your husband.

2625

PROSPECTIVE JUROR 341: That's right.

MR. WILLIAMS: And how long you been doing that?

PROSPECTIVE JUROR 341: Twenty-five years.

MR. WILLIAMS: How do you like that work?

PROSPECTIVE JUROR 341: Very much.

MR. WILLIAMS: It's interesting. My pastor really enjoyed -- and it's interesting; he's new to our church about three years ago and very different in what he likes about the -- being a pastor than the predecessor, very different interests and tastes. What do you like best about being a pastor?

PROSPECTIVE JUROR 341: Well, my job is as an interim, so I come in between the permanent pastors, and so I like having an agenda, checking it out with them, and then doing my work and then getting out.

MR. WILLIAMS: Have you always done that? You've always come in --

PROSPECTIVE JUROR 341: No, I've done it for the last five years, and I expect to continue.

MR. WILLIAMS: And why do you like -- is that better than being a permanent pastor?

PROSPECTIVE JUROR 341: I think -- for me it is because of the gifts I have, yeah.

Page 42

MR. WILLIAMS: And what do you mean the gifts you have? Can you share those with us?

PROSPECTIVE JUROR 341: Because I would be truthful

2626

and honest and say what needs to be said, and then the people don't have the residue of -- you know, of hearing something that they didn't want to hear from their pastor, hopefully making way for the next pastor to come. That's my job.

MR. WILLIAMS: I see. How many churches in the last -- you say five and a half years?

PROSPECTIVE JUROR 341: Five years. Four.

MR. WILLIAMS: Do you have to travel much with that?

PROSPECTIVE JUROR 341: No. Our home is here, and I've been only a hundred miles away for one of my calls. Otherwise it's been in this area.

MR. WILLIAMS: Let me talk to you about another aspect of this case if I can. This case, as I indicated, involves murder, but kind of below the five murders as an undercurrent to the five murders is methamphetamine. The government alleges that these five murders were committed in furtherance of a methamphetamine conspiracy, a conspiracy to manufacture and distribute methamphetamine in violation of what's called a continuing criminal enterprise which is a different type of drug organization, if you will, and the judge will ultimately explain all this to the jury in instructions. But suffice it to say methamphetamine was -- is the undercurrent, if you will, to this case.

Some people in our society have a very strong view about drugs and a hatred of drugs, if you will, that will cloud

2627

Page 43

or can cloud their ability to be a fair and impartial juror. Just like this case is not a referendum about whether the murder of children or the murder of anybody is a good or bad thing, this case is not about whether drugs are bad. We do not want a jury to decide the defendant's guilty because they hate drugs, not because the government proved its case beyond a reasonable doubt. Do you understand what I'm saying there?

PROSPECTIVE JUROR 341: Yes.

MR. WILLIAMS: What are your thoughts along those lines?

PROSPECTIVE JUROR 341: Well, I've seen that often the drugs are a factor in many different crimes, in many different imprisonments. I'm not sure that's what you're asking, though.

MR. WILLIAMS: Do you think -- and I appreciate that. I think you said in your questionnaire you said you know drugs are involved in most violent crimes was I think a response in your questionnaire on this issue. My question for you at this point is with those feelings, are those something you can set aside and recognize that's not an issue here, whether drugs are good or bad, that the issue here is whether the defendant, as the government alleged, committed these crimes and whether we've proven our case beyond a reasonable doubt?

PROSPECTIVE JUROR 341: Yes, I think I can do that.

MR. WILLIAMS: Very good. Thank you very much. If you could pass the microphone over next to you.

2628

Sir, I saw that you're retired from United Fuel for some time.

Page 44

PROSPECTIVE JUROR 242: United Parcels.

MR. WILLIAMS: I'm sorry. United Parcels. I wrote that down wrong. How many years did you work there, sir?

PROSPECTIVE JUROR 242: Thirty.

MR. WILLIAMS: And did you like that job?

PROSPECTIVE JUROR 242: Yep.

MR. WILLIAMS: Did you retire directly from that job or --

PROSPECTIVE JUROR 242: Yes.

MR. WILLIAMS: What do you do with your free time now?

PROSPECTIVE JUROR 242: Fish. You're cutting into my time.

MR. WILLIAMS: So let me ask you the same question then. You noted in answer to your questionnaire that your granddaughter had a problem with some drugs.

PROSPECTIVE JUROR 242: She still has it.

MR. WILLIAMS: Okay. And this is precisely the point that sometimes this issue hits closer to home for some jurors than others. Some jurors, the drug problem, the meth problem is something they read about in the paper, they recognize as a difficulty, but it doesn't hit home as close as it does for other jurors. For you, sir, it's hitting home pretty close. What's your ability to set aside any views you have about drugs

2629

and decide this case not on whether you dislike drugs but on whether the government proved its case beyond a reasonable doubt?

PROSPECTIVE JUROR 242: Be pretty difficult.

MR. WILLIAMS: And why is that, sir?

PROSPECTIVE JUROR 242: I just believe what I believe,

Page 45

and that's it.

MR. WILLIAMS:  Okay.

PROSPECTIVE JUROR 242:  I won't change.

MR. WILLIAMS:  If the judge instructed you that you need to set aside your views --

PROSPECTIVE JUROR 242:  Won't happen.

THE COURT:  Well, let me jump in here, Juror 242. Everybody is opposed to drugs that serves on the jury.  I mean, do you think we actually get people in here who think, gee, everybody ought to use drugs?  That doesn't happen.  Everybody's opposed to drugs.  That's not the issue.  I mean, I can't imagine finding jurors who aren't opposed to drugs.  So no matter how strongly your beliefs are anti-drug, what would that have to do with your ability to follow the instructions and make the government prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR 242:  Well, it'd be pretty hard for me to lay that aside I'm afraid.

THE COURT:  Why do you even have to lay it aside? That's not the issue in this case.

2630

PROSPECTIVE JUROR 242:  It would be with me.  I won't change.

THE COURT:  I'm not asking you to change.

PROSPECTIVE JUROR 242:  I understand that.  I'm just saying I will not.

THE COURT:  You won't be fair.

PROSPECTIVE JUROR 242:  That's right.

THE COURT:  Okay.  You're excused.

MR. WILLIAMS:  Let me open that question to the rest of the jurors.  Are there any other jurors on here, as the judge

Page 46

indicated --

THE COURT: You just don't want to serve?

PROSPECTIVE JUROR 242: What?

THE COURT: I said you just don't want to serve.

PROSPECTIVE JUROR 242: Basically.

THE COURT: Well, we'll be seeing you later, sir.

PROSPECTIVE JUROR 242: Okay.

MR. WILLIAMS: As the judge indicated, this is not a case about whether drugs are good or bad just like it's not a case about whether murder's good or bad. Nowhere on the verdict form will there be a box for anybody to check about whether I dislike drugs or I like drugs. So let me ask the group here. Is there anybody on this panel who feels so strongly about drugs that they don't think they can be fair and impartial to this defendant and decide this case just on the evidence and not on

2631

your views on drugs? Anybody else feel that way? Okay. Don't see any hands.

Miss 740, you ended up with the microphone. Very good. Let me talk to you for a few minutes then. Another concept I want to talk to you about is the presumption of innocence. And it's a very important concept. It's kind of a bedrock principle of our criminal justice system whether it's federal court like this or in state court, and that is that defendants are presumed to be innocent unless and until proven guilty beyond a reasonable doubt by the government.

The defendant obviously is here in court, and obviously the government doesn't just go down the street, pull somebody off the street, and say, You are now a criminal defendant.

Page 47

And so we always have a concern with jurors when they come into a courtroom, they look over, they see the defendant, and they think there must be some evidence there; there must be something there or else why would she be in court, and so therefore, boy, she must be guilty. Otherwise they wouldn't be here in court. And we need to dispel that concept for a little bit. So let me tell you about how a criminal defendant gets into federal court.

The Constitution requires the federal government, unlike the state governments, that before they can be charged they have to be indicted by a federal grand jury. A federal

2632

grand jury is made up of citizens like you, but their job is very, very different than the job of a jury deciding guilt or not guilty.

MR. MILLER: Three minutes.

MR. WILLIAMS: Thank you. Their job is to determine whether there's probable cause to believe somebody's committed a crime which is very, very different than proof beyond a reasonable doubt that the defendant actually committed the crime. The fact the defendant's indicted is not evidence of anything. It is simply a charge. It's a way of alleging that somebody's committed a crime. Juror 740, do you -- can you recognize that that's all that an indictment is?

PROSPECTIVE JUROR 740: Yeah, I can.

MR. WILLIAMS: Do you think you're able to set aside the fact the defendant is here in court and set aside any assumptions or presumptions you have from that and actually presume the defendant not guilty, presume her innocent, until and unless the government proves its case beyond a reasonable

Page 48

doubt?

PROSPECTIVE JUROR 740:  Every criminal comes into court innocent until proven guilty.  Yeah, I could do that.

MR. WILLIAMS:  And that's a principle you very much believe in.

PROSPECTIVE JUROR 740:  Yeah.

MR. WILLIAMS:  Very good.  If you could pass the

2633

microphone to the gentleman next to you.

Sir, let me talk to you about the burden of proof. The government alone has the burden of proof in a federal -- in a criminal case, federal or state.  The defendant never has the burden of proving anything, and the government's burden of proof is proof beyond a reasonable doubt, not proof beyond all doubt but proof beyond a reasonable doubt.  And ultimately the judge will instruct you as to what that means, and it will be up to the jurors to decide whether the government proved its case beyond a reasonable doubt.  First of all, what's your reaction to that burden of proof?

PROSPECTIVE JUROR 228:  I believe that I could listen, and I'm glad I could take notes, and I believe I could help come to a decision.

MR. WILLIAMS:  Do you think you'd ever impose on the defendant any burden of proving anything in this case?

PROSPECTIVE JUROR 228:  I understand they don't have to prove that they're innocent.  You know, possibly dispel what the accusations might be.

MR. WILLIAMS:  If the judge tells you that the defendant has no burden to do anything, doesn't even have to get up here and question you today, doesn't have to do opening

Page 49

statement or closing argument, doesn't have to question any witness, can you continue to presume the defendant innocent until and unless the government proves its case beyond a

2634

reasonable doubt?

PROSPECTIVE JUROR 228: Yes.

MR. WILLIAMS: Thank you very much. And if you could pass the microphone to 174.

Sir, you are, as the judge indicated, a federal law enforcement officer; is that right?

PROSPECTIVE JUROR 174: Yes, sir.

MR. WILLIAMS: What are your thoughts about the presumption of innocence and the burden of proof?

PROSPECTIVE JUROR 174: Well, the government's gotta prove their case. The person is innocent until the government can show that they did what they alleged that they did.

MR. WILLIAMS: Now, given the fact that you're a federal law enforcement officer, shouldn't the defendant in this case think there's no way, no way you can be a fair juror in this case? What's your reaction to that?

PROSPECTIVE JUROR 174: They would probably think that, but I could probably be one.

MR. WILLIAMS: And why do you say that?

PROSPECTIVE JUROR 174: I'm fairly open minded. We have to look in the cases we present at both sides, so we -- you know, to prove the case for us, like I said, we have to, you know, look at both sides if we have enough or don't have enough. So, you know, I think I could be fair.

MR. WILLIAMS: Do you think you could afford this

2635

Page 50

defendant the full presumption of innocence, sir?

PROSPECTIVE JUROR 174: I believe so.

MR. WILLIAMS: Thank you. I have no further questions.

THE COURT: Thank you, Mr. Williams.

Mr. Willett?

MR. WILLETT: Thank you, Judge.

THE COURT: Members of the jury, why don't you stand and take a stretch break while Mr. Willett's getting organized.

MR. WILLETT: Thank you, Your Honor. I'm ready. If it please the Court. Counsel for the government, counsel for the defense, Angela, ladies and gentlemen of the jury.

My name is Al Willett. I'm one of the attorneys defending Angela Johnson in this matter, and this is my opportunity in group voir dire to attempt to talk to each and every one of you within 30 minutes. There's two issues I need to take care of that arose or did not arise out of Mr. Williams' discussion with you.

Miss 296, I want to correct one minor misstatement that Mr. Williams unintentionally articulated to you. These murders did occur in 1993 as he stated to you in his discussion with you, but he unintentionally stated that the bodies were discovered in 1997. That's not the case. The bodies were discovered in the year 2000, and I just didn't want you to be sitting there if you were picked as a juror -- would you please

2636

pass the microphone down to her, please? I could see you mouthing a response back to me.

PROSPECTIVE JUROR 296: I knew that he misstated that.

Page 51

MR. WILLETT: I just wanted to clear up that confusion. I didn't want you to think, well, if you're sitting on the jury a week from now, you're rubbing your head going, What's up?

And then Mr. -- no, excuse me. Let's start with this issue. Witnesses, did everyone have a chance to review the witness list before you came upstairs today? I'm going to start narrow, and then I'm going to expand. There are several people who are family members related to Angela who will testify. And I want to start with those names just to make sure there's no recognition. Pearl Johnson, Angela's mother; Wendy Jacobson, Holly Dirksen, Jamie Jo Hays, her sisters; Jim Johnson, her brother; and her daughters, Alyssa Johnson and Marvea Johnson. Now, are any of those names familiar to anybody seated here? And I see no nods of affirmation.

Now then, let me expand to the entire list. Did anyone see a name on the list -- and we've already discussed these family members, but did anyone see a name on the list they recognized? Mr. 174, may I -- would you please pass the microphone back to Mr. 174? Let me see if I can do this summarily. Would it be fair for me to assume you recognize names of law enforcement agents?

2637

PROSPECTIVE JUROR 174: Yes, sir.

MR. WILLETT: Here's how I'd like to handle this. I don't want you to think I'm professionally slighting you by not talking to you during my 30 minutes, but I think if Mr. Berrigan addresses the issue of which law enforcement agents you know -- and then I know that when Judge Bennett asked you about government employees you rose your hand early on -- I think

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2297 of 3245

that'd be the most expedient way to handle that. So if you'll forgive me, I'm not going to talk to you, but Mr. Berrigan is certainly going to make a note to talk to you about the witnesses you know and the government employees you know. Is that fair?

PROSPECTIVE JUROR 174: Yes, sir.

MR. WILLETT: Okay. Thank you so very much for your kindness. If you would, please, direct the microphone down to Ms. 596.

Now, I am going to jump around a little bit. I'm not going to go in a line, but in reviewing the questionnaires, I thought Miss 596 and I should start our discussion first. You answered question 99 in your questionnaire, and it got my attention because you talked about -- you talked about the fact that you have strong opinions. Do you remember giving that answer?

PROSPECTIVE JUROR 596: What was the question?

MR. WILLETT: Certainly. I will give that to you in

2638

just a second. Here we go. 99, In your opinion is there anything about this case, the issues, and/or the people involved in this case that might hinder you or -- even slightly from being an impartial juror, and you checked yes. And your answer was, I have strong opinions, but at times with groups of people I do feel I'm influenced quite easily. Do you remember that answer?

PROSPECTIVE JUROR 596: Yes, I do.

MR. WILLETT: Now then, here's what we're going to do. I'm going to start off with a topic that usually gets people to say, I have strong opinions about this issue one way or the

Page 53

other, and that's fine, but I figured you were the perfect person to start with. There's an amendment to the United States Constitution called the Fifth Amendment.

PROSPECTIVE JUROR 596: Correct.

MR. WILLETT: And you're familiar with that.

PROSPECTIVE JUROR 596: Yes, I am.

MR. WILLETT: Either through TV or movies.

PROSPECTIVE JUROR 596: Sure.

MR. WILLETT: Very quickly, that amendment gives Angela Johnson the right to decide whether or not to take the stand in her own defense. And if she chooses not to take the stand in her own defense, that can't be held against her by any of the jurors. Judge Bennett will instruct you at the appropriate time you can't even take a negative inference from

2639

that.

Now then, we've met lots of people who have opinions both ways. We've met people who understand and could understand the decision not to. We have people who say, Mr. Willett, if I'm charged with ten crimes, five murders, I'm knocking people down trying to get to the witness stand.

Now then, I'm having this discussion with you directly, but what I'm about to say is for the benefit of all of your peers sitting in the box. Angela Johnson will not take the stand in her own defense. How do you feel about that?

PROSPECTIVE JUROR 596: My first reaction might be shocked.

MR. WILLETT: Okay. Why are you shocked?

PROSPECTIVE JUROR 596: I would hope -- how personal can I get as far as she's concerned? I would hope she would

Page 54

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2299 of 3245

take the stand in her own defense.

MR. WILLETT: Okay.

PROSPECTIVE JUROR 596: You know, so we would have the opportunity to hear in her own words.

MR. WILLETT: Okay. Do you take a negative inference from the decision that she will not take the stand?

PROSPECTIVE JUROR 596: No, I would -- no, I don't think I would do that.

MR. WILLETT: And let me give you the courtesy of being direct. Would you be sitting there worrying, well,

2640

Mr. Willett, isn't she a little guilty of something if she doesn't want to talk to me?

PROSPECTIVE JUROR 596: No. Hopefully both parties will do a good-enough job that we'll be able to reach, you know, a decision and -- based on the information we receive.

MR. WILLETT: So even though you're initially shocked, even though in a perfect world you'd like to hear from her to hear her side --

PROSPECTIVE JUROR 596: Right.

MR. WILLETT: -- you're willing to set that aside.

PROSPECTIVE JUROR 596: Yes, you know, as a jury, you know, discussing it and everything, yeah.

MR. WILLETT: Judge Bennett pointed out to you earlier this morning that this is the witness box. This is where all the witnesses will come sit. Do you think this would be the easiest place in the world to sit?

PROSPECTIVE JUROR 596: No.

MR. WILLETT: Even if it was you sitting here and you were completely innocent of all charges.

Page 55

PROSPECTIVE JUROR 596:  No, I think this would be the, you know . . .

MR. WILLETT:  Pardon me?

PROSPECTIVE JUROR 596:  This would probably be the hardest place to sit here.

MR. WILLETT:  Well, I may not disagree with you.

2641

PROSPECTIVE JUROR 596:  Or his.

MR. WILLETT:  Suffice it to say that maybe all the seats in this room are difficult places to sit.  Would that be a fair way to describe it?

PROSPECTIVE JUROR 596:  That is probably true.  That is probably true.

MR. WILLETT:  But do you think somebody might exhibit nervousness sitting here?

PROSPECTIVE JUROR 596:  I'm sure.

MR. WILLETT:  Do you think somebody might be concerned about I want to make sure I don't make any mistakes in answering a question?

PROSPECTIVE JUROR 596:  Possibly, uh-huh.

MR. WILLETT:  If somebody didn't have a lot of formal education, do you think they might be reluctant to sit in this seat to explain their position?

PROSPECTIVE JUROR 596:  Sure.

MR. WILLETT:  Do you think it would be easy sitting here if the attorney who is asking you questions might have a great deal of formal education and be very good at what he does?

PROSPECTIVE JUROR 596:  (Nodded head.)

MR. WILLETT:  Do you think it'd be an easy place to sit then?

Page 56

PROSPECTIVE JUROR 596:  Probably not.

MR. WILLETT:  Okay.  Thank you.  Now then, hang on.

2642

We'll figure out if anybody has a problem.  Miss 596 and I have had this discussion about the Fifth Amendment, but it was for all of your benefit.

Now then, the flip side of the coin, does anybody sitting here in this box have a problem with what I'm telling you?  And you can rely on this representation:  Angela Johnson will not take the stand in her own defense.  Does this pose a problem for anyone?  And Miss 596 has very graciously articulated some of the concerns that we've heard in the past. But is there anyone who has a problem with that, can't get that out of their mind?  Okay.  I see no nods of affirmation.  Thank you very much for starting us off with that.

Let me turn my attention to Ms. 213.  Now then, Ms. 213, I always enjoy talking to teachers because we always have good discussions.  But I just want to make sure because it's a concern I have any time I have a case where a client doesn't take the stand.  You're not going to hold it against Angela Johnson if she doesn't step into that witness box?

PROSPECTIVE JUROR 213:  No.

MR. WILLETT:  And you won't take any negative inference from it.

PROSPECTIVE JUROR 213:  No.

MR. WILLETT:  And being a teacher and even a music teacher having to show different parts of a song or different scores in a piece of instrumental music, you can understand

2643

Page 57

there's different parts to every story.

PROSPECTIVE JUROR 213: Yes.

MR. WILLETT: And maybe some parts are more reserved and some parts are more out front.

PROSPECTIVE JUROR 213: Right.

MR. WILLETT: And there's different ways to tell a story; correct?

PROSPECTIVE JUROR 213: Yes.

MR. WILLETT: Just as there's different ways to sing a song.

PROSPECTIVE JUROR 213: Yes.

MR. WILLETT: And different ways to play a score of music.

PROSPECTIVE JUROR 213: Uh-huh.

MR. WILLETT: Is that a yes?

PROSPECTIVE JUROR 213: Yes.

MR. WILLETT: Okay. Great. Thank you so much.

Miss 296, if you will, you gave an interesting answer on cooperating witnesses which was a subject Mr. Williams was discussing. Question 51, As compared to other witnesses, what would you think of a witness who is or was in jail or prison who agreed to cooperate with the government by testifying against a person charged with a crime? And your answer was, I'm okay with it. Can you elaborate on that for me, please?

PROSPECTIVE JUROR 296: Can you repeat the question?

2644

MR. WILLETT: Yes, ma'am. As compared to other witnesses, what would you think of a witness who is or was in jail or prison who agreed to cooperate with the government by

Page 58

testifying against a person charged with a crime?  Now, Mr. Williams described these people as cooperating individuals, cooperating witnesses.  The defense at times has a less politically correct label for these individuals:  Snitches.  And there's going to be numerous cooperating individuals who are or were in jail who are attempting to receive some type of benefit, usually a reduction in their sentence, in the hope that if they testify here, in the hope that their benefit will be a reduction in their sentence.  Now, your answer, I'm okay with it, I don't know how to --

PROSPECTIVE JUROR 296:  Right.

MR. WILLETT:  -- how to go with that.

PROSPECTIVE JUROR 296:  All I can say is I would try to determine if they were speaking the honest truth.

MR. WILLETT:  Good.

PROSPECTIVE JUROR 296:  Keep an open mind about it but just try to do my best to decide if they're telling the truth.

MR. WILLETT:  Sure.  And how would you try to decide if they were telling the honest truth?  What would --

PROSPECTIVE JUROR 296:  Their mannerisms, eye contact, do they seem nervous.

MR. WILLETT:  Okay.  Would you want to know if they

2645

were incarcerated and they were trying to hopefully reduce their sentence by testifying in this court against Angela?

PROSPECTIVE JUROR 296:  Would I want to know that?

MR. WILLETT:  Yeah.  Would that factor into --

PROSPECTIVE JUROR 296:  Probably.

MR. WILLETT:  -- what's this person's motivation?

PROSPECTIVE JUROR 296:  Probably.

Page 59

MR. WILLETT: Okay. And let me add on one more layer. Let's assume that one of these cooperating individuals has a lengthy prison sentence. Maybe it's decades long. Would that knowledge factor into your discernment as to their motivation?

PROSPECTIVE JUROR 296: I'm not sure.

MR. WILLETT: Okay. Okay. Well, that's fair. What else might you want to know about these cooperating individuals? Anything you can think of off the top of your head?

PROSPECTIVE JUROR 296: No.

MR. WILLETT: But you would want to know these things to factor them in into your own perception of their credibility.

PROSPECTIVE JUROR 296: Probably. I don't . . .

MR. WILLETT: Is there anybody who doesn't want to know that? Mr. Willett, I don't care. I don't care if they're incarcerated. I don't care if they're serving 2 years, 20 years. I don't care what their motivation is. If they got something to say against Angela Johnson, I just want to hear it. I don't care what their motivation may be. Does anybody feel

2646

that way? Pass the microphone back to our friend Number 228.

PROSPECTIVE JUROR 228: Yes.

MR. WILLETT: You were looking very intently at me, and that's why I picked up on that. How do you feel about that?

PROSPECTIVE JUROR 228: Yes. I wanted to comment.

MR. WILLETT: Yeah, please.

PROSPECTIVE JUROR 228: Your Honor, may I ask you a question?

THE COURT: Sure.

PROSPECTIVE JUROR 228: Is this -- is this right that those that are incarcerated can receive a reduction in their

Page 60

sentence if they take the stand?

THE COURT: There are certain situations where they can, and that usually gets fully explored by the lawyers on either direct examination or cross-examination. So if there's a possibility that the particular witness might be eligible for a sentence reduction, that will come out in the testimony, and then I'll give you an instruction, a written instruction, that says you should judge -- I'm going to paraphrase it for you -- that you should judge those witnesses with greater caution and care, that it's up -- that it's up to you to decide whether their testimony is being influenced by the hope of getting a sentencing reduction and that that's something that you can consider in judging the credibility of the witness and then it's for each juror to decide whether that particular witness is --

2647

their testimony is being influenced by their hope of getting a reduction in their sentence. So that's how it's handled. It happens in almost every criminal trial.

PROSPECTIVE JUROR 228: If I may say so -- and it's my own personal opinion -- it smacks of bribery.

THE COURT: Well, that's for you to decide in each particular case. That's for you to decide in each particular case. I gave this example yesterday. I'll give it again today. And I'm frequently in the situation of having to decide whether that particular witness who testifies -- if they've been sentenced by me and they're trying to get a reduction in their sentence, then after their testimony and after the trial, their testifying is over, their lawyer and the prosecutor then come back in front of me, and it's up to me to decide whether or not to reduce their sentence. And sometimes I reduce it if I think

Page 61

they've been a hundred percent truthful, and if I don't think they've been a hundred percent truthful, I don't reduce it. And it just depends on my judgment call.

So in a sense you're in that same situation judging their credibility. You have to decide whether they're being truthful and whether they're not. Sometimes they are being truthful, and sometimes they're not, but that's for you to decide. Is that helpful?

PROSPECTIVE JUROR 228: Yes.

THE COURT: Okay. But it's just part of the process.

2648

MR. WILLETT: May I resume, Your Honor?

THE COURT: You may.

MR. WILLETT: Thank you very much. Mr. 228, I guess why don't we just sort of follow this conversation to its logical end. Now that Judge Bennett has given you more information about how this process works and how a cooperating individual might seek a benefit in exchange for his or her testimony, I know you said it smacks of bribery, and I appreciate your candor in that. Would you want to know about their -- I take it you'd want to know about their motivation.

PROSPECTIVE JUROR 228: Yes.

MR. WILLETT: And I take it that maybe if a person was serving a much longer sentence that might affect your judgment of their credibility. In other words, if somebody was coming in here and saying, Well, I got two years left; I'm almost done, but I know something about Angela Johnson as opposed to the person who says, I got 30 years or 20 years left, but I know something about Angela Johnson, might that make you look at a person differently?

Page 62

PROSPECTIVE JUROR 228: Our job is to try to determine what is truth.

MR. WILLETT: Okay.

PROSPECTIVE JUROR 228: And so, you know, it may be truth or it may not be truth whether it's 2 years or 20.

MR. WILLETT: But I take it you certainly don't sit in

2649

the camp of people who say, Mr. Willett, I don't care what their situation is or I don't care what their motivation is. I mean, you do want to know these things.

PROSPECTIVE JUROR 228: I want to know what's truth.

MR. WILLETT: And what other things do you think you would look for to try to decide what is truth if a witness comes to the stand? What things might you be paying attention to, sir?

PROSPECTIVE JUROR 228: Well, to see if their story matches other people's stories.

MR. WILLETT: Very good. Or if possibly there's inconsistencies within their own testimony?

PROSPECTIVE JUROR 228: Uh-huh.

MR. WILLETT: Is that something you might look for?

PROSPECTIVE JUROR 228: Right.

MR. WILLETT: If you would be so kind as to hand the microphone down to our gentleman from Montana, Number 13 in the light-colored western Blazer.

Good morning, sir. How are you?

PROSPECTIVE JUROR 13: Fine.

MR. WILLETT: Good. I tried to take very good notes before I got up here during the time that you were speaking with Judge Bennett and the time that Mr. Williams was speaking, and I

Page 63

remember during the point in time when Judge Bennett was

discussing hardship you articulated your opinion about drugs.

2650

And Judge Bennett said that was probably better suited for later in the discussion, and I'm going to take that opportunity to discuss that with you now if that's okay. Is that okay, sir?

PROSPECTIVE JUROR 13: Yes, sir.

MR. WILLETT: Great. I have in my notes that you stated initially, I don't have the tolerance for drugs. Did I capture your initial statement correctly?

PROSPECTIVE JUROR 13: Yes, sir.

MR. WILLETT: Okay. What we've got in this case as Mr. Williams described, this case is certainly driven by the five murders. No doubt about it. I mean, that's why we're in federal court is because of these five murders. But the charges, if you will, the ten crimes that Judge Bennett mentioned to you, five of them have to do with a criminal conspiracy. Now, that's a big lawyer word, but basically it's a criminal agreement. You and I hypothetically would voluntarily, knowingly, intentionally enter into an agreement or an understanding to achieve an illegal purpose. Okay?

The other five counts deal with what's called a continuing criminal enterprise. Now, that's a lot of legalese, if you will, but a continuing criminal enterprise is in essence a criminal business; okay?

Now, the allegation, the heavy, heavy undercurrent in this case is that the criminal conspiracy dealt with the making of and the distributing of methamphetamine, okay, and that the

2651

Page 64

criminal enterprise or the criminal business, if you will, dealt with the business of methamphetamine. And you will hear ample evidence about this by the government, and their allegations are that my client Angela was knee deep in a criminal agreement to make and distribute meth. And they're going to say that she was facilitating or a part of this criminal enterprise that dealt with meth. And you will probably hear some people testify that she used meth. Are you with me so far, sir?

PROSPECTIVE JUROR 13: Yes, sir.

MR. WILLETT: Okay. Now then, my concern is -- in defending Angela is when you very honestly and openly say, I don't have the tolerance for drugs, now that I've told you the rest or given you at least a glimpse into the rest of this, how do you feel about methamphetamine, because that's certainly a word we've heard in the state of Iowa? You know, methamphetamine is certainly something that's been discussed. How do you feel about methamphetamine?

PROSPECTIVE JUROR 13: I guess I -- because of the fact that I have -- one of my nephews that was on it and the fact that my daughter works in a rehab center with drugs and I've seen other things happen around me that involve drugs, I seen what it does, and I just -- I formed an opinion. I don't like it. I don't want to be involved with it.

MR. WILLETT: Certainly, and that's -- there's nothing wrong with that opinion that you dislike it. There's nothing

2652

wrong with that at all. Your question -- one of the questions you answered in your questionnaire, 99, Is there anything about this case, the issues, and/or the people involved in this case that might hinder you even slightly from being an impartial

Page 65

juror, and you checked yes. You were asked to describe, and you stated, I have no use for drugs or anyone who uses them. Is that --

PROSPECTIVE JUROR 13: This is correct.

MR. WILLETT: Okay. Now then, obviously you know -- I touched a moment ago on what my concern is, all of these allegations against Angela. You're even going to hear allegations that Angela may have used methamphetamine herself. Should I be concerned if you were a juror on this case?

PROSPECTIVE JUROR 13: Yes, I believe you should.

MR. WILLETT: Okay. And why should I be concerned, sir?

PROSPECTIVE JUROR 13: Because of my strong feelings on it.

MR. WILLETT: Do you think you can set aside those strong feelings if the Court talked to you about fair -- you know, being a fair and impartial juror? Do you think you can set that aside, or do you have a concern about that, sir?

PROSPECTIVE JUROR 13: I guess I would try, but I don't really know if I could.

MR. WILLETT: Okay. Thank you so very much. I

2653

appreciate your candor. Why don't we turn -- let's hand the microphone back to Number 228 for just a second.

If I may, sir, I think you expressed some opinions about drugs in your questionnaire.

PROSPECTIVE JUROR 228: Yes, sir.

MR. WILLETT: Now then, should I be -- and without getting into it full tilt, you had some personal knowledge I think would be a good way to describe it or at least --

Page 66

PROSPECTIVE JUROR 228: Yes, yes.

MR. WILLETT: Should I be concerned if you were selected to be on my jury now that you've heard me discuss the allegations and what some of the evidence may be against Angela Johnson? Will you have a problem?

PROSPECTIVE JUROR 228: No, no. While I hate the drug, I do not hate the druggie because I have -- I have close relatives who have, you know, struggled with that.

MR. WILLETT: I understand. I think one of my friends said to me one time we may hate the message, but we don't hate the messenger. Is that sort of where you're at, sir?

PROSPECTIVE JUROR 228: Yes.

MR. WILLETT: So in terms of selecting who should be on this jury, you're telling me, Mr. Willett, you don't need to be concerned about me and my views on drugs? I could still listen to the evidence and assess it and weigh it against Miss Johnson notwithstanding the personal knowledge or personal

2654

histories I've had with other people I know.

PROSPECTIVE JUROR 228: Definitely.

MR. WILLETT: Okay. Okay. Would you be so kind to hand the microphone to Miss 740.

Miss 740, you answered the question on cooperating individuals in an interesting way, and I wanted to discuss that with you if I may if I can get to that question quickly. Question 51, What would you think of a witness who is or was in jail or prison who agreed to cooperate with the government by testifying against a person charged with a crime? It would be okay, but they still need to be punished for these crimes -- or excuse me, for their crime. A crime is a crime, and it should

Page 67

not be overlooked.

You sort of heard how this process works, that there may be people coming in here looking for a benefit, and the benefit is very basic: I want to get out of jail as soon as possible; okay? Now then, is this going to be a problem for you in listening to these witnesses knowing that they're here to strike a bargain?

PROSPECTIVE JUROR 740: Criminals that are in jail, you know, they're going to try their best to try and get out quicker than they are. No, I don't think it's going to be a problem to set aside.

MR. WILLETT: Are you willing to listen to those types of factors, though, in assessing their credibility?

2655

PROSPECTIVE JUROR 740: Yeah.

MR. WILLETT: You'd like to know what their situation is and maybe what they're hoping to achieve by being here in this courtroom.

PROSPECTIVE JUROR 740: Exactly, yes.

MR. WILLETT: You're willing to take their testimony with a grain of salt, if you will.

PROSPECTIVE JUROR 740: (Nodded head.)

MR. WILLETT: Is that a yes?

PROSPECTIVE JUROR 740: Yes.

MR. WILLETT: Would you please pass the microphone to Mr. 495?

How you doing?

PROSPECTIVE JUROR 495: Good.

MR. WILLETT: Good. Now then, you answered a question on controlled substances that I found very interesting.

Page 68

Question 42, Do you believe that the possession or sale of drugs should be a crime? And you checked yes. And you were asked why. Amateurs should not be selling drugs they know little about. Now then, I did not know what you meant by amateurs. And that's my question. What were you trying to tell me, Mr. 495?

PROSPECTIVE JUROR 495: The youth. It gets in the hands of people that have no idea what it does. I mean, it shouldn't be done in the first place, but my feeling is that

2656

it's amateurs out for a profit and they have no idea what it will do to the recipient.

MR. WILLETT: Okay. Now, you mentioned youth a second ago. Are you equating amateurs with youth? I mean, we've had people come into this courtroom and say drugs are ruining the youth of our country.

MR. STOWERS: Three minutes.

MR. WILLETT: Thank you very much, Mr. Stowers.

Is that where -- I mean, are you equating amateurs with drugs being in the hands of youths?

PROSPECTIVE JUROR 495: It covers a wide range. Anybody --

MR. WILLETT: Do you think you could give me a little more definition what you mean by amateurs? And if I'm being thick headed, I apologize. It's just I've never seen it described in that way. And I'm not saying it's a bad way. I just want to make sure I understand where you're --

PROSPECTIVE JUROR 495: No, I think it's youth and people my age that honestly don't know what drugs will do but they know for them it will be a profit.

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2314 of 3245

MR. WILLETT: Okay. Well, I'm sure you will certainly hear evidence from the government that the goal of this conspiracy, the goal of this continuing criminal enterprise was to make a huge profit. Now, when I say huge, my definition of huge is six figures with a decimal point being clearly over to

2657

the far right side, so we're talking hundreds of thousands of dollars. Are your opinions in any way going to make it difficult for you to be a juror in this case?

PROSPECTIVE JUROR 495: No, I believe it's -- it boils down to weighing the facts one way or the other.

MR. WILLETT: What do you think about methamphetamine, sir?

PROSPECTIVE JUROR 495: All's I know is it's bad for you.

MR. WILLETT: Okay. Okay.

PROSPECTIVE JUROR 495: I know little about it.

MR. WILLETT: But are you willing to set aside what little you do know and try to consider all of the evidence and listen to all of it?

PROSPECTIVE JUROR 495: Yeah.

MR. WILLETT: Okay. So if you hear evidence that my client is allegedly involved in a six-figure operation trying to make and deliver methamphetamine, should I be concerned that you're sitting on this jury?

PROSPECTIVE JUROR 495: Innocent till proven guilty.

MR. WILLETT: Okay. Your Honor, I have just one more person. I know I'm getting near the end of my time.

THE COURT: No, that's fine. Go ahead.

MR. WILLETT: If you'd be so kind as to pass it up to

our pastor, Number 341.

2658

Just a couple quick questions.  I noticed in your questionnaire that you said you know many people in the judicial system.

PROSPECTIVE JUROR 341:  I think I listed the people that I know.

MR. WILLETT:  And I don't think any of them are -- they were state court people if I remember right.

PROSPECTIVE JUROR 341:  Yes.

MR. WILLETT:  So that's not a concern.  Your answer regarding cooperating individuals, question 51, What would you think of a witness who is or was in jail or prison who agreed to cooperate with the government by testifying against a person charged with a crime, has more at stake.  Getting out of jail you had in parentheses.  I take it you would want to know what the respective cooperating individual's situation is.

PROSPECTIVE JUROR 341:  Yeah, I think it'd help to understand their motivation.

MR. WILLETT:  And you would be concerned about their motivation.

PROSPECTIVE JUROR 341:  In order to hear what they're saying, yeah, I think that'd be part of my understanding.

MR. WILLETT:  What else would you rely on in terms of trying to understand and discern and decide whether you agree or disagree with a cooperating individual's testimony?

PROSPECTIVE JUROR 341:  Well, all I could rely on is

2659

Page 71

what you all present, what you bring to us.

MR. WILLETT: Certainly. But are there factors that are important to you? I mean, being a member of the cloth, you work with people daily and have to understand them and assess their personalities and be a tremendous listener.

PROSPECTIVE JUROR 341: Uh-huh.

MR. WILLETT: So what are some things that you'd want to know or at least hope to know about these cooperating individuals besides maybe are they trying to get out of jail?

PROSPECTIVE JUROR 341: Well, I can't think of any other additional things that I'd need to know because I need to make the judgment based on what is present in the courtroom.

MR. WILLETT: Are there things you'd look for in trying to judge a person's credibility?

PROSPECTIVE JUROR 341: Yeah, the same as I've heard earlier, their demeanor, their eye contact. Everybody I think would be nervous in that place.

MR. WILLETT: Certainly.

PROSPECTIVE JUROR 341: But it has a lot to do with how they carry themselves.

MR. WILLETT: Okay. Sort of their physical presentation.

PROSPECTIVE JUROR 341: Yes.

MR. WILLETT: If they look you in the eye as opposed to maybe --

2660

PROSPECTIVE JUROR 341: Not always. That's not always fair, no.

MR. WILLETT: That's not a situation you look for.

PROSPECTIVE JUROR 341: No. You have to look deeper

Page 72

than in the eye, yeah.

MR. WILLETT: Okay. Well, now I'm curious. When you say you have to look deeper than in the eye, what are you thinking of?

PROSPECTIVE JUROR 341: Well, yeah. It's the whole demeanor, the face, uh-huh, body language.

MR. WILLETT: I'm with you now.

Judge, thank you very much for allowing me a little extra time. I appreciate it. I'm now concluded.

Ladies and gentlemen, thank you very much.

THE COURT: Okay. Here's what we're going to do. We're going to take a 25-minute break primarily to give our court reporter a rest. Then we're going to come back, and we'll start -- we'll just start in the back corner. That's what we've done. And we'll bring you up one at a time. We'll start with Juror 174, go to 228, 740, and 341. And unfortunately, Juror 596, you're going to be last today. You're free to leave the building.

Here's the deal. We'll have a 25-minute recess, and then it will take us about 25 to 30 minutes per person. We're going to take a lunch break for an hour at one (sic), and so I

2661

can't imagine like Juror 13 and 596, we're not going to get to you till, I'm guessing, probably somewhere around two o'clock would be my guess. You can just kind of gauge. You can count how many jurors are in front of you and just make sure you're here in time figuring our breaks and about 25 minutes per juror. But generally we finish right around three o'clock or so this afternoon.

And then when we bring you back individually after

Page 73

we're done questioning you individually, we'll let you know what your status is, whether you're dismissed from jury service or whether you're still in the jury pool.

So please remember my cautionary instruction about not discussing this case among yourselves or with anyone else. And we'll see Juror 174 back here in 25 minutes. And the rest of you can hang around in the jury room, or you're free to leave as long as you're back there in time for when we need you. Thank you.

(Panel K exited the courtroom.)

THE COURT: Anything we need to take up, Mr. Berrigan?

MR. BERRIGAN: I wanted to ask the Court if you'd entertain a motion on Juror 13 rather than bring him back, Your Honor.

THE COURT: Nope.

MR. BERRIGAN: The other request I wanted to make is given the very unique circumstances of Juror 174 whether you'd

2662

permit me to question him first this morning as opposed to the government.

THE COURT: No. I'll give each of you more time to question him because we have more issues to question, but I don't see why I should -- what's the rationale between switching order?

MR. BERRIGAN: Well, because I think there's a tendency sometimes, particularly a fellow like this who's connected with the prosecution, to kind of be educated in the process of the questioning. And he's a bright guy, and I fear that's going to happen with him in the individual questioning.

THE COURT: Well, I see it exactly the opposite.

Page 74

There's less likelihood that he could be educated precisely because he's so much more knowledgeable than the average layperson who doesn't know anything about it. So if that's your rationale, it's denied. Anything else?

MR. MILLER: Your Honor, in the nature of self-disclosure, this morning shortly before eight o'clock I went for a walk to see if I could get my shoes shined over at the Commerce Building. Vince wasn't in yet, so I turned around and walked back. When I was across the street approaching the street crossing back here, I was approached by a motorist asking for directions for parking somewhere in the vicinity, and I directed them to the parking ramp at Pearl and Fifth. If there was more to the conversation, I think perhaps he said, Thank

2663

you, in which case I must have said, You're welcome.

THE COURT: And which juror is it?

MR. MILLER: I believe I recognized him when he entered as Juror 495. I doubt that he considers that to be in the nature of an acquaintance, so I'm not surprised when he said he didn't know me. He may not have even recognized me, but I just wanted to disclose that.

THE COURT: Okay. Either side's free to raise it if you want to. Anything else?

MR. BERRIGAN: Nothing by the defense.

MR. WILLIAMS: No.

THE COURT: Okay. Thanks.

(Recess at 10:16 a.m.)

THE COURT: Ready for 174?

MR. MILLER: Yes, Your Honor.

THE COURT: Okay.

Page 75

(Prospective Juror 174 entered the courtroom.)

THE COURT:  Sir, anywhere in the front row.

Please be seated, everybody.  And we'll start with Mr. Miller.

EXAMINATION

BY MR. MILLER:

Q.   Good morning, sir.

A.   Good morning.

Q.   How you doing so far?

2664

A.   Okay.

Q.   Okay.  We want to talk to everybody about a couple things, and in your case I want to talk to you about maybe three things including your experience as a law enforcement officer and how that affects your ability to serve as a juror; okay?

A.   Okay.

Q.   The other two issues are exposure to pretrial publicity about this case and opinions about the death penalty.  So that's the three subjects we need to cover.

First, you indicated that you recognized some names on the list of witnesses.

A.   Yes, sir.

Q.   And before I get into that, I want to just break this down into two subjects.  First I want to visit with you briefly about serving as a juror in which other peace officers are witnesses in general and then secondly about serving as a juror in a case in which peace officers whom you might recognize are witnesses; okay?

A.   Yes, sir.

Q.   First of all as to the first question, you've been a peace

Page 76

officer for 16 years yourself, and I'd like you to simply tell us in your own words, sir, how you would go about the task of serving as a juror and evaluating the testimony of peace officers should you be required to serve as a juror in this case.

2665

A.    Just listen to what everybody had to say.  You know, I'm sure my training and feeling, you know, would -- of telling the truth or not telling the truth or whatever would probably come into play a little bit but just listen to what everybody had to say.

Q.    How, if at all, would your feelings about telling the truth or not telling the truth come into play with regard to listening to peace officers testify?

A.    Well, I would try and treat them just like everybody else, no better, no worse, give them no more credence, no less credence to what they had to say.

Q.    Now, you heard the attorneys visit earlier this morning about the fact that you'll be -- should you be required to serve on this jury you'll get instructions about doing just that, that you're not to afford extra credibility to a witness merely because of the fact he is a peace officer.  Do you sincerely believe you can follow that instruction, sir?

A.    I think so.

Q.    Any reservations whatsoever?

A.    I don't know.  It's hard to say right now.  Like I said, I've been, you know, in law enforcement for 16 years, you know, been involved in many cases, so it's -- it's hard to say right now.

Q.    Well, we just appreciate your candor and your best opinion

Page 77

on that.  Let me ask you this.  As a peace officer for nearly 17

years, have you ever worked -- I'm sure you've worked with many other peace officers.

A.    Yes, sir.

Q.    Have you ever worked with any that weren't human?

A.    No, sir.

Q.    Have you ever worked with any that -- let me take this as a group.  Do you feel that peace officers as a group don't have the same full range of human qualities that everyone else does?

A.    They're just like everybody else.  You know, they have the same hopes and fears and stuff like that as everybody else.

Q.    Broad range of levels of intelligence?

A.    Yes, sir.

Q.    Broad range of, frankly, personal integrity.

A.    Yes, sir.

Q.    Just because a person wears a uniform and carries a badge doesn't mean that he doesn't have or is subject to the same human frailties as people of every other walk of life.

A.    No, sir.

Q.    And it would be your obligation to follow the Court's instruction basically and the fact -- and I'm paraphrasing it -- to recognize that fact and not to afford to a peace officer extra credibility by virtue of his profession, and we just want your best feeling as to whether or not you feel you can carry out that responsibility in following that instruction.

A.    I would try not to, you know, give them special -- anything

special.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2323 of 3245

Q.    And in your best opinion do you feel you can follow that instruction if so instructed?

A.    I think I probably could.

Q.    You say you think, and that's fair enough, but we need to have assurances from everybody.  If you have any reservations, just feel free to go and share them with us if you do.

A.    Okay.

Q.    Any reservations about your ability to do that, sir?

A.    No, sir.

Q.    Let's get into now the issue of specific witnesses.  Who on that list did you recognize?

A.    Steve Badger, Ray Fiedler, Alyssa Nelson.

Q.    And one by one, how and how well do you know those three people?

A.    Steve Badger's with the AUSA's office in Cedar Rapids, I believe.  I've seen him at some U.S. attorney's conferences. Ray Fiedler works for the Iowa Department of Criminal Investigations, and he was my training officer when I was in LEIN school last year.  And Alyssa Nelson, she works for Dakota county probation, and I have talked to her before on several different cases.

Q.    Have you ever visited with any of those three about this case?

A.    No, sir.

2668

Q.    Have you other than a professional relationship with any of those three?

A.    No, sir.

Q.    Let me just ask you to explain in your own words how if at all their testimony, should any or all three of them testify

Page 79

here, affect your ability to be fair and impartial to the defendant in this case.

A. I know who Mr. Badger is. I've never had any -- you know, just at a conference when he's spoken. But Ray and Alyssa in the dealings I've had have been professional, and I've always found them to be straightforward.

Q. Would you -- well, let me put it to you this way. They're not just totally new fresh witnesses' faces on the stand to you. They're somebody that you have at least some past dealings with. Would that, do you feel, affect your ability to listen impartially to the testimony that they have?

A. I would hope not.

Q. In the event that you were required to serve on this jury and would return a verdict of any sort, would you feel in any way obliged to explain your verdict to any of those three people should you run into them in the future?

A. No. It would be my decision, and that would be it.

Q. You understand that while you are a fellow peace officer when you're sitting on that jury you are not in that role but rather in a totally different role. Do you feel that your

2669

carrying out that role would in any way be colored by the fact you're a peace officer, or can you divorce that and sit strictly as a judge of the facts?

A. I would try to judge the facts on their merit, but I don't know if there would be situations where I might be thinking something else about what was going on.

Q. Such as?

A. Oh, maybe why they did this or why he didn't do this or maybe could have done this or something like that. I'm not

Page 80

sure, but, you know, I'm just . . .

Q. Second guessing the work of the peace officers, in other words?

A. Not necessarily second guessing them but just thinking in your mind if I had a case like that, you know, what would be my steps or something. I don't know if I would or not, but I'm not sure.

Q. If -- and that would be human nature to do so. In fact, perhaps anyone on a jury might wonder whether or not there might have been a different way for peace officers to go about doing their job in a particular case. Your job, however, is whatever -- like any other juror, to set aside any feelings, emotions, or speculations about what is not evidence, set that aside, and focus your attention strictly on the evidence and returning a verdict that fairly reflects the facts as you find them. Do you feel you can do that, sir?

2670

A. Yes, sir.

Q. Let me ask you -- move on to the other two issues then. What, if anything, do you know about this case beyond what was contained in the jury questionnaire?

A. This specific case, not much. Just some of the stuff I've read in the paper.

Q. And tell us what you've read in the paper if you recall.

A. About her being indicted and being involved with Mr. Hoeken (sic) I believe it was.

Q. Anything other than that that you can recall?

A. No, sir, not right off the top of my head.

Q. And would your exposure to pretrial publicity, what few facts you've heard, cause you to have formed any opinions about

the merits of this case one way or the other?

A.   No, sir.

Q.   Let me just go back for one minute to the question about evaluating peace officer testimony.  You did answer a question on your questionnaire -- and again, thank you for filling that out -- which asked -- and I quote -- In your opinion is there anything in your background, experience, or personal views that might affect how you would consider the testimony of a police officer or possibly cause you to give a police officer's testimony more or less weight?  You checked the box no and when asked to explain stated -- and I quote -- I am a law enforcement officer, and we are all required to give the true facts.  I

2671

expect everyone on the stand to tell the truth, close quote.

That reflect the way you felt and still reflect the way you feel?

A.   Yes, sir.  Everyone on the stand is by law required to tell the truth, and I expect everybody to.

Q.   We certainly hope they all do.

A.   Yes, sir.

Q.   On occasion, however, understanding it's your job to judge credibility of every witness, law enforcement or otherwise, do you feel you can do that impartially, sir?

A.   Yes, sir.

Q.   Thank you.  Finally on the subject of the death penalty, if you would just in your own words tell us about your feelings about the death penalty.

A.   The death penalty depends what type of case it is.  You know, for capital murder, crimes against children might be one example that it might be against.  It's very serious.  You have

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2327 of 3245

to weigh it very seriously. The death penalty, if other evidence comes to light, you can't reverse it, so you really have to take it seriously.

Q. And we would hope no juror would ever take that responsibility lightly. I trust that includes yourself.

A. Yes, sir.

Q. You indicated in response to question 73 about your opinion about an appropriate punishment in this case from what you

2672

understand of the facts stated -- and I quote -- If she is found guilty in the murder of five people including children, she should be sentenced to the rest of her life in prison or the death penalty.

At least as you understand the facts of this case, at least the allegations in this case -- I'm not saying facts -- allegations that she participated in the killings of five people including two children with premeditation and substantial planning, do you feel that both of those penalties are penalties that you can seriously consider as a juror should you come to the point of being on a punishment phase?

A. Yes, sir.

Q. You understand those are the allegations and very serious ones, five deaths, substantial planning, premeditation, and the fact that two of them are children. Given that set of facts, would the fact that there are children, for example, automatically cause you to impose the death penalty, or could you still realistically consider both possible punishments if called upon to serve in the punishment phase, sir?

A. If found guilty, you would have to look at the total circumstances of the case I would believe for me, you know, how

Page 83

it happened and things like that. It would be difficult to say right now.

Q. Let me call your attention and not by number because you don't have a copy of it but for counsel's benefit, question 80,

you wrote -- and I quote -- The death penalty depends on a lot of things. Has that person had numerous arrests and convictions before? How was the crime committed? Is there a chance for some type of rehabilitation, close quote? Can you tell us what you were thinking when you expressed those thoughts?

A. Yes. It would, you know, depend, you know. If they've had several convictions for, you know, assault, child molestation, other kind of crimes, it would be different than if it was a first-time thing and the circumstances, were they the main person, were they -- get involved in it somehow, and then you'd have to look at, like I said, the totality of the person and the case to determine is there some type that prison would be able to help them, or would there be no hope for that person at all?

Q. In other words, you feel there are a variety of factors you'd want to consider.

A. Yes, it's not just a cut-and-dried thing that you committed this crime, you get this punishment, like I said, especially when it comes to the death penalty.

Q. During the first hour that we were here this morning, the judge gave you at least a summary of how the third phase would be -- how it would work if we ever got to that third and final phase of punishment and that it would be your duty to consider and weigh both aggravating and mitigating factors that you find. Did that make sense to you, sir?

A. Yes, sir.

Q. Do you feel that that would be how you'd want to go about doing that job?

A. Yes, sir. You'd have to look at everything. You know, that's just the way I would kind of look at it.

Q. It would be up to you to give to each factor what weight you considered it deserved such as the killing of children. If you are instructed that that, if found beyond a reasonable doubt, is an aggravating factor, is that something that makes sense to you that that would be an aggravating factor, the fact that the victims are vulnerable?

A. Yes, and especially in children they can't defend themselves, you know. Adults do foolish things, but children are -- you know, that's what we're there for is to protect them and stuff. So, you know, they a lot of times don't have a choice or say in a lot of the crimes that are committed against them.

Q. Would that completely dictate your outcome, that you would have to return a death verdict, or would you also consider mitigating and other factors before arriving at a final conclusion on punishment?

A. I think it would probably be high on the list. It wouldn't be the only thing I would look at, but it would be high on the list of circumstances of whether someone deserved the death penalty or not.

Q. And I mentioned to you it would be up to each juror to

decide how much weight to give each factor, but it would be your

obligation to consider every factor proven, whether it's a mitigating or aggravating factor. You brought up for yourself to us the fact that a person's criminal history or lack of a prior criminal history would be a factor that you might want to weigh as well. If it were shown that a person does not have a substantial prior criminal history and if that's proven and you're instructed that that is a mitigating factor, does that make sense to you? Is that something you would also want to weigh?

A. Yes, sir.

Q. And would you, in fact, consider and weigh all factors proven, mitigating and aggravating, before deciding which is the appropriate punishment in this case?

A. Yes, sir.

Q. Ultimately do you feel you can assure us -- and by us I mean both sides in this case -- that if you're required to serve on this jury and if the case goes all the way to a punishment phase that you can fairly and realistically consider the appropriateness of both possible punishments before returning your verdict?

A. I would do my best. I guess that's -- you know, I would take it seriously and do the best job that I could.

Q. We understand you've never been in this exact position before, but we need to seek people who can assure us that they

2676

would follow the Court's instruction to weigh both aggravating and mitigating factors and to do so fairly considering both possible punishments. Do you feel you can do that, sir, and follow that instruction?

A. Yes, sir.

Page 86

MR. MILLER: Thank you, sir. I have no further questions.

THE COURT: Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q. Not so bad so far, huh? I bet you've been cross-examined much harder than this.

I want to reiterate before I even ask you any questions, Mr. 174, the purpose of this process, and it is not to get people to come in here and tell us, I can follow the instructions; I can follow the law; I can be fair. There are very few people that walk through that door to where you're sitting now that wouldn't be as fair as they possibly could be.

But the truth is, as you well know, we bring different life experiences into this courtroom. Yours happens to be that you've spent a good part of your career as a federal law enforcement officer. And I was a law enforcement officer at one time. Many people find that hard to believe. But my recollection of my views then, we were a special corps. It wasn't unlike the Marine Corps. The people I hung around with

2677

24 hours a day were law enforcement officers. All my friends were law enforcement officers. I thought like law enforcement officers. I liked law enforcement officers. And if somebody had asked me at that point, frankly, do you have a high regard for law enforcement officers, I would absolutely have no hesitation, say absolutely. I trust my life to them every single day which you do I take it as well. And you can see how that might cause us some concern being where we are; okay? You with me?

Page 87

A. Yes, sir.

Q. And I try not to make this a real heavy deal, but if you could ever imagine yourself in a situation where you were charged with a crime and your lawyer's trying to find out about the jurors who are going to judge your fate and in this case your life how important it would be to find out as much information from those people as you could and how important it would be to get those people to self-disclose about how they feel about different things. Are we on the same page?

A. Yes, sir.

Q. So let me go back and ask you a little bit more factually about your law enforcement experience. I understood from the questionnaire you've been a law enforcement officer at least on the federal level for 16 1/2 years. Is that right?

A. Yes, sir.

Q. Could you kind of break that down for us and tell us what

2678

kind of jobs that you've had?

A. I started in 1988 with the United States Border Patrol in Sacramento, California, and I was with the border patrol until about 1997 when I went over to immigration investigations in Sacramento, California. And in 1998 I moved to -- I transferred to Sioux City as an investigator with Immigration and Customs Enforcement -- immigration, and in 2003 customs and immigration merged, and I became a special agent with homeland security, Immigration and Customs Enforcement.

Q. Okay. So you've been in this area since 1998.

A. Yes, sir.

Q. And I'm just going to assume that before 1998 -- but you tell me if I'm wrong -- you'd never heard anything about Dustin

Page 88

Honken, Angela Johnson, or any of the folks involved in this case.

A.    No, sir.

Q.    Is that true?

A.    That's true.

Q.    Okay.  And you also indicated in your questionnaire that you know Judge Bennett.

A.    Yes, sir.

Q.    How do you know him?

A.    We've had cases before the judge here that we present in federal court.

Q.    Could you tell me what kind of cases those are?

2679

A.    We do mostly immigration reentry cases, entry after deportation, false document cases, smuggling cases.  Those are the main kind of that we've presented before the Court.

Q.    When you say "we presented," is that in conjunction with the United States Attorney's Office or some other agency?

A.    No, the United States Attorney's Office and the Immigration and Customs Enforcement office and along with help from the drug enforcement agency and other federal agencies.

Q.    Have you ever been in position where you've served as a case agent kind of sitting in the chair where Mr. Basler sits now?

A.    Yes, sir, I have.

Q.    Have you done that in this courtroom?

A.    Yes, sir.

Q.    How many times would you say?

A.    Quite a few.

Q.    And the U.S. Attorney's Office that's bringing those

Page 89

prosecutions, is that the same U.S. Attorney's Office that Mr. Williams works in?

A. We work out of the one here in Sioux City, and he works out of Cedar Rapids, but yes, sir, it's the same U.S. Attorney's Office.

Q. It's the U.S. Attorney's Office for the Northern District of Iowa.

A. Yes, sir.

2680

Q. Okay. And you know some of the other members of that office besides Mr. Williams?

A. Yes, sir, here in Sioux City mostly.

Q. I know we kind of shortcut you this morning when the list was being read because we anticipated you might take a long time to answer these questions, so why don't you tell us who do you know in the U.S. Attorney's Office here in Sioux City?

A. Mike Hobart presents most of our cases, but I've helped Kevin Fletcher with some cases that he's prosecuted for narcotics and reentry. Janet Petersen.

Q. These are folks you've worked with?

A. Yes, sir.

Q. Okay.

A. Shawn Wehde. Most of them there I can't remember the names.

Q. That's okay. I didn't mean to test you in that way. I'm not trying to embarrass you. What about testifying as a witness? About how many times have you done that in federal court?

A. Several times on various cases.

Q. And what about in this courtroom?

Page 90

A. Not so much here. A lot of our cases don't go to trial, so we don't get to testify too much, but at detention hearings and stuff like that we might once in a while.

Q. And you mentioned in your questionnaire that you know

2681

Mr. Williams as well, and I'm referring to C.J. Williams, the prosecutor over there.

A. Yes, I've seen him at U.S. attorney's conferences. He's given talks on various subjects.

Q. And what kind of subjects has he talked to you about?

A. Law subjects, probably amendment rights and search and seizure, stuff like that. I can't recall exactly what it was.

Q. I understand he does some presentation on meth labs occasionally. Have you heard that?

A. No, sir. I haven't had that one from him yet.

Q. These talks we're talking about, to be more precise, are these training seminars if you will?

A. Yes, training seminars.

Q. Where Mr. Williams is training you in whatever the topic is that he's presenting to the audience?

A. Yes, sir.

Q. You're there to learn from him, in other words.

A. Yes, sir.

Q. And about how many times have you done that?

A. One time I believe it was over in Amana.

Q. Okay. I gotta ask you kind of a hard question because he's sitting there at the table, but recognizing your obligation to be open and honest, what do you think about Mr. Williams?

A. The presentation he gave I thought was fairly good. He was very knowledgeable.

Page 91

Q.    Did he seem like a pretty credible, believable guy?

A.    Yes, sir.

Q.    Knows what he's talking about?

A.    Yes, sir.  He knew what he was talking about.

Q.    Has that been your experience with him up so far?

A.    Yes, sir.

Q.    Okay.  And I don't know what your experiences were with Judge Bennett, but I can at least ask if any of them were adverse meaning did you have any bad experiences with him that you'd be willing to talk about?

A.    Not yet.

Q.    Okay.  Has your communication with Judge Bennett been strictly in the confines of the courtroom?  That is, is that the only contact you've had with him is as he is now, sitting on the bench, or have you had any contact outside of the courtroom?

A.    No, just in the courtroom.

Q.    Okay.  You mention in the questionnaire you've worked with the DEA both in California and in Iowa, and I wanted to ask you a little bit about that.  I'm not so much interested in California for obvious reasons, but tell us about what your experience has been with the DEA in Iowa.

A.    When I first got here in 1998, the immigration service didn't have an office, so me and another agent worked out of the DEA office in the basement here for a year till they got an office for us.

2683

Q.    And you were working I guess right alongside the -- at least physically you were with the DEA agents here in this
Page 92

region of the state?

A.    Yes, and we would help them with the search warrants and whatever else they needed us for along with whatever --

Q.    You went out with them you mean.

A.    Yes, sir.

Q.    And participated in search warrants involving narcotics?

A.    Yes, sir.

Q.    Okay.  And how long did you do that?

A.    I was in the office for a year in the basement here, and then we moved up to our new office on Pierce Street, but we still work with the DEA and help them with their cases.

Q.    Even after you moved into your new office.

A.    Correct.  A lot of the people they deal with we deal with also so . . .

Q.    And does that include you continuing to help them with things like search warrants regarding narcotics?

A.    Not so much anymore.  But we have an agent that does once in a while.

Q.    But you don't do it so much yourself.

A.    No.

Q.    But you have an agent that you work with that does.

A.    Yes.

Q.    What is the area, if you know this, geographically that

2684

that DEA office covers?

A.    I believe it's most of northern Iowa here probably up to Interstate 35, down towards like 80.  Kind of we're up in this upper square here I believe.  I'm not exactly sure what their area is.  It's a little bit different than what ours is.

Q.    Do you know where Mason City and Clear Lake, Iowa, are?

Page 93

A.    Yes, sir.

Q.    And is that within the region of the DEA's responsibilities?

A.    I believe so.

Q.    These folks that you work with in the DEA here, you shared an office with them for a year and you still work with them on occasion, are those folks friends of yours?

A.    Yes, sir.

Q.    What do you think about the type of work that they do?

A.    It's hard, dangerous work.

Q.    These folks that you were specifically asked about, Steve Bocker -- I hope I'm -- is that how you pronounce it?

A.    Badger.

Q.    Badger, I'm sorry.  And Ray Fiedler and Alyssa Nelson, as I understood it, of the three, Mr. Badger's the one that you've had the least amount of contact with.

A.    Yes, sir.  I know who he is in the U.S. Attorney's Office, and like I said, I've seen him at some of the U.S. attorney's conference.  I don't know him personally.

2685

Q.    You don't feel you have a relationship with him.

A.    No, sir.

Q.    But that's really not true of the other two, is it?  That is, the people you described as Ray and Alyssa, these are folks that you know.

A.    Yes, sir.

Q.    How long have you known Ray Fiedler?

A.    I just met him last year.  I went to LEIN training in Des Moines, and he was the -- our I guess lead -- lead training officer there.

Page 94

Q.   So he's an individual that trained you in a certain area or subject.

A.   Yes, sir.

Q.   What was that?

A.   It was law enforcement intelligence.

Q.   How long of a session was that?

A.   It was two weeks' worth.

Q.   Two weeks.

A.   Two-week course, yeah, in Des Moines, Iowa.

Q.   He was the lead trainer for this activity?

A.   Yeah.  We had several groups, and each group had an agent that was like a training officer to take the groups out and show them different scenarios and stuff like that, and he happened to be the head of our group.

Q.   And how many people were in your group?

2686

A.   Five or six.

Q.   Okay.  So five or six of you were being trained by Mr. Fiedler for this two-week period of time.

A.   Yes, we had class -- about the first three, four days we had classroom presentations and stuff like that.  And the second week was practical exercises out in the field, you know, doing surveillance and stuff like that.

Q.   Mr. Fiedler was the one that supervised your group.

A.   Yes, sir.

Q.   And have you had any contact with him since that time?

A.   No, sir.

Q.   What about Alyssa Nelson, the Dakota City probation officer -- Dakota County, I'm sorry.

A.   Yeah, she's had cases that we've talked about, just looking

Page 95

for different information on different people and stuff like that.

Q. About how many cases have you worked with her?

A. Two, three, four.

Q. And how have your experiences been with Miss Nelson?

A. Good.

Q. And Mr. Fiedler, was that a good experience, your training and experience with him?

A. It was good. He was okay.

Q. You know, as you already know, they're potential witnesses in this case, and they could come in here, testify. The

2687

government's listed them as government witnesses. And they're going to come in just like everybody else, raise their right hand, swear to tell the truth and start answering questions; okay? And one -- frankly, one concern that we have is given your relationship with these folks, it's really going to be difficult for you to assess them as you would any other witness, that is, kind of put aside your relationship with them and how you feel about them as people and really assess their testimony like somebody you didn't know. You understand?

A. Yes, sir. It would be a little bit different.

Q. Mr. Miller asked you several questions about that.

THE COURT: You know, I'd like you to speed things up. I gave you a little bit of extra time, but you haven't even gotten to the death penalty. You're just leading, leading, leading. I get the point. You need to wrap it up.

MR. BERRIGAN: Okay. Thank you, Judge.

THE COURT: Okay?

BY MR. BERRIGAN:

Page 96

Q. Mr. Miller asked you some questions about that, and at least I detected some concern on your part to judge them the same as every -- any other witness, and I wanted to just ask you that. Do you have some concern in your own mind and heart about whether you could actually look at the testimony of Ray Fiedler and Alyssa Nelson, for example, like you would any other witness?

2688

A. I would try to judge them impartially. You know, I would do my best, and it's just -- when they were up there testifying, it would be hard to say how you would feel, but you'd try your best to do it.

Q. And I understand that, and we tell some people sometimes trying your best is good, that's as good as we could hope for. And other times it isn't quite enough. I mean, are you certain that you'd look at them and assess their credibility like any other witness?

A. I think I could.

Q. You think so.

A. Uh-huh.

Q. You don't have any doubt about it.

A. No.

Q. And that's true of police officers as well despite your 16 years in federal law enforcement?

A. I would hope I could. Like I said, it's -- it would be -- sometimes, you know, it would be tough to think, but I would -- I think I could.

Q. Let me switch gears very quickly, and I'm not even going to ask you questions about the death penalty, but I am very interested in your publicity answers because Mr. Miller had

Page 97

asked you some questions about that, and you said you only knew very little about Miss Johnson, she had been indicted, involved with Mr. Honken.

2689

A.    Yes, sir.

Q.    And I have the questionnaire where you talk about that case actually for quite a long time, and I just wanted to see if we could reconcile those two things.  I know it's been a while since you filled out the questionnaire.  But you indicated you were somewhat familiar with this case.  The Honken case was tried here in Sioux City.  He was found guilty.  In our office we've talked about the case, how drugs affect a lot of people, not just the ones taking narcotics.  Is that right?

A.    Yes, sir.

Q.    And you checked sources for information newspaper, television, radio, word of mouth; indicated you had talked to other people about this case, other special agents in your office, how one juror said her boss influenced her, said you'd heard other people talking about the case.  I've heard about the case, heard how the victims were put in a grave and shot.  Some still had their night clothes on, knew the motive was Mr. Honken was a drug dealer who killed the victims because he didn't want them to snitch on him.

A.    Yes.

Q.    Is that accurate?

A.    Yeah, that was in the newspaper.

Q.    I'm really interested in this discussion that you had with people in your office.  I was wondering if you could enlighten us about that.

2690

Page 98

A.   Well, I mean, we're in law enforcement, so, you know, we talk about it.

Q.   Sure.

A.   You know, discuss, you know, think he did it, is he guilty, you know, what -- you know, what would be the penalty or stuff like that.

Q.   Well, do people express their views about those issues?

A.   Yes, sir.

Q.   Okay.  And were you amongst them?

A.   Yes, sir.

Q.   Okay.  What are your views?

A.   Well, he was found guilty, so he received the death penalty.  You know, I wasn't in on the case or anything like that, and I just got whatever information from the newspapers.

Q.   Well, his case was tried here in Sioux City; right?

A.   Yes, sir.

Q.   And you were working here at the time last fall.

A.   Yes, sir.

Q.   And during the two and a half months or so that his trial was going on, weren't you having any discussions about the case at that time?

A.   Probably.

Q.   Okay.

A.   Well, they had most of the courthouse blocked off for stuff like that.

2691

Q.   Sure, but I mean in your office with the law enforcement officers you work with.

Page 99

A.  Yes, sir.

Q.  And people weren't expressing any opinions at that time?

A.  We didn't have a lot of information, but it's -- like I said, we didn't know anything about the case, just whatever they had in the paper.

Q.  Do you recollect that the Sioux City Journal had articles every day in the paper about the case?

A.  Yeah, they had quite a few.

Q.  Did you read those?

A.  Usually.

Q.  And on the nightly news, Mr. Honken's case was a regular topic of discussion, was it not?

A.  Yes, sir.

Q.  Did you see those TV accounts?

A.  Yes, sir.

Q.  And were there other people you talked to other than the other law enforcement officers in your office about Mr. Honken's case while it was going on?

A.  No, sir, not really.

Q.  What about after the case was over?  You said that there was some discussion about the fact that Mr. Honken had been convicted and got the death penalty.  What was the discussion?

A.  Well, if I remember correctly, I don't believe they've had

2692

a federal death penalty here in Iowa for a long time, so it's kind of something out of the ordinary.

Q.  Well, was there any views expressed as to the appropriateness of the findings of the jury in his case?

A.  He was found guilty of the crimes that he committed, and everybody probably thought it was fairly appropriate.

Page 100

Q. Okay. What about you?

A. I did too.

Q. Based on what you had seen in the paper.

A. Right.

Q. And on the television news.

A. Right.

Q. Don't you recollect during that coverage Miss Johnson's name being discussed in the paper and on the news?

A. Not right off the top of my head, but I might have read it.

Q. How'd you get this information that she was involved with Mr. Honken?

A. That was in the newspaper too I believe.

Q. At the time of Mr. Honken's trial, wasn't it?

A. I think so.

Q. And you indicate on your questionnaire you were unsure whether or not you had formed any beliefs or opinions about Miss Johnson's guilt or innocence.

A. Didn't -- don't -- didn't know anything about her.

Q. Yeah. You said, I don't know all the specifics of the

2693

case, and I guess you're talking about her case specifically. Is that what you're trying to do is distinguish her case from Mr. Honken's?

A. Right. Yeah. I don't know, you know, if she was involved or wasn't involved or anything.

Q. There were -- and again, I'm not testing you to remember exactly what's on the questionnaire, but there were three boxes to this question. No matter what you've read, seen, or heard, do you now have any beliefs or opinions about the guilt or innocence of Angela Johnson? There's a box for yes, a box for

Page 101

no, and a box for unsure.

A.    Uh-huh.

Q.    And the unsure box is the one you checked.

A.    Uh-huh.

Q.    Are you unsure about Miss Johnson's guilt or innocence?

A.    I guess I don't know.

Q.    I'm asking you that, Number 174, because, you know, you know this.  She's entitled to the full presumption of innocence that the law affords her just as if you didn't know her from Adam; okay?

A.    Yes.

Q.    We have had a large, fairly good number of people come in and tell us because of what they've heard in the media they already have some view about the case where they can't do that as much as they'd like.  They can't wholly and completely

2694

presume her innocent.  You following me?

A.    Yes, sir.

Q.    And I'm wanting to ask you that question given your discussions with your fellow officers, your newspaper, radio, television, word-of-mouth sources, and information you've gotten about the case and your admitted uncertainty about how you feel about her presumption of innocence whether or not you can assure us with confidence that that's not going to be an issue for you.

A.    Like I said, I'm not sure, you know.  We've talked about it and, you know, seen the stuff in the newspaper and that.  I don't know Miss Johnson or anything like that, but it's -- you know, the people she's been associated with were already convicted so . . .

Q.    And I know you're not a DEA agent, but some of these folks

Page 102

that you're physically with at least in the office are DEA agents; right?

A.    They're immigration agents, but they work with the task force.

Q.    Okay.  And that's a little different.  We've had people come in that work for Tyson Foods, and they're talking about their coworkers.  Isn't quite the same as you talking about law enforcement officers who work with the DEA.  Do you see my point?

A.    Yes, sir, yes, sir.

Q.    Would you consider those folks more reliable sources of

2695

information than somebody you met on the street that worked for Tyson Foods talking about Mr. Honken's case?

A.    Probably because I -- you know, I've worked with them before and have a trust with them.

Q.    Okay.  Well, let me finish up then just to see if we're clear.  As you sit here right now and doing the best you can -- I know you would do the best -- do you still have some concern in your own mind and heart that you might not be able to give Miss Johnson the complete, full, utter presumption of innocence that she would be entitled to?

A.    Like I said, I would try to do the best I can.  But being in law enforcement for so many years, you know, you think of things of, you know, what about this or what about that.  And I don't know right now, but I would try to do the best that I could.

Q.    Okay.  There's still at least some uncertainty about it.

A.    Yes, sir.

        MR. BERRIGAN:  Okay.  Appreciate your honesty, sir.

Page 103

That's all I had, Your Honor.

THE COURT: Okay. Thank you. If you'd step out, Juror 174, we'll let you know your status.

(Prospective Juror 174 exited the courtroom.)

THE COURT: Mr. Miller?

MR. MILLER: No motion.

THE COURT: Mr. Berrigan?

2696

MR. BERRIGAN: The defense would move to strike Juror 174, Your Honor, essentially for two reasons. He is uncertain about whether he could give Miss Johnson the full presumption of innocence the law accords her as a result of both his information he's received about the case and what he's received in the media.

And we also believe that he's impaired in terms of his ability to treat at least specifically the police officers that he knows as other witnesses. And I'd admit his answers are somewhat inconsistent in that respect. But we think it's a huge problem particularly given his 16 1/2 years as a law enforcement officer.

THE COURT: Mr. Miller?

MR. MILLER: Your Honor, I think actually to some degree I concur with counsel. His comment in response to the question to his knowledge about pretrial publicity was less than equivocal in his ability to assure us he could set that aside in giving a fair trial. That was the only thing he told us that I felt might support a challenge for cause, but I certainly recognize that and feel it's well within the Court's discretion under those circumstances.

THE COURT: What about his alleged inability to treat

Page 104

law enforcement officer testimony just like any other witness?

MR. MILLER: Your Honor, that's two issues, first in general and, secondly, specifically the ones he knows. I don't

2697

think the record that he made supports a motion for cause, but I did detect some hesitancy with regard to the level of his acquaintance with Mr. Fiedler and Alyssa Johnson (sic), and again, I don't think the record supports a challenge for cause but I --

THE COURT: Just out of curiosity, are they testifying about anything that you have reason to believe would be contested?

MR. MILLER: I don't believe so. And I believe Nelson is a defense witness actually, Your Honor. I apologize. I stand corrected. I guess the other two are defense witnesses and Alyssa Nelson is ours. I don't think there's anything in the record that would specifically -- it's more a matter of appearances than anything and within the Court's discretion. I don't think the record supports a challenge for cause on that.

I do disagree that his general approach to law enforcement in general is a problem. My personal feeling -- and I apologize for injecting those, Your Honor, but I'm a law enforcement agent myself, and I take with all due respect and no insult intended a bit of umbrage at any suggestion that that very fact makes me less rather than more open minded and fair minded toward people. But no, I don't feel that either of those are a serious issue.

I do recognize, however, that the Court has to keep in mind appearances as well as actuality and the record. I'm more

2698

Page 105

concerned about the people he's actually met than the fact that there may be other law enforcement officers testifying. I don't think his record reflects a bias or an inability to be fair and impartial. On the contrary, I think his answer open ended -- his answer to open-ended questions on that indicates a fairness. I'm more concerned with the very last point that was made which was with regard to the presumption of innocence. I do, however, resist the motion.

THE COURT: Well, the only thing that causes me any real concern was his very last response to the very last question where he did have some hesitancy about his ability to give Angela Johnson the full benefit of the presumption of innocence. So on the basis of that question and that answer and that question and that answer only, I'm going to sustain the challenge for cause by the defense. Everything else, you know, there were some things of interest and all, but I don't think there was a challenge for cause there. But his inability to commit to giving the defendant the full benefit of the presumption of innocence disqualifies him in my view, so we'll let him know. I'm not sure it took 25 minutes to do that, Mr. Berrigan, but . . .

(Prospective Juror 174 entered the courtroom.)

THE COURT: Juror 174, we're going to let you go. You're dismissed from this case. Thank you very much for participating in the process.

2699

And we'd ask that you do us a favor. Because we're still involved in jury selection, we don't think the trial will get underway until next week some time, we'd ask you not to

Page 106

discuss jury selection with anybody else because that somebody
else might say something to yet a different somebody else, and
one of those somebody elses might wind up in those chairs being
questioned by us; okay?

PROSPECTIVE JUROR 174:  Yes, Your Honor.

THE COURT:  Thank you very much.  Good luck to you.
And by the way, I think you'd be a terrific juror.

PROSPECTIVE JUROR 174:  Thank you.

THE COURT:  Thanks.

(Prospective Juror 174 exited the courtroom.)

THE COURT:  Ready for 628?

MR. BERRIGAN:  228, sir?

THE COURT:  I'm sorry, 228.

(Prospective Juror 228 entered the courtroom.)

THE COURT:  Sir, anywhere in the front row.  Please be
seated.  We're going to start first with questions from
Mr. Berrigan and then hear from the government lawyers.  Thanks.

MR. BERRIGAN:  Thank you, sir.

EXAMINATION

BY MR. BERRIGAN:

Q.   How are you, sir?

A.   Fine.  Thank you.

2700

Q.   Good.  I hope you'll forgive us with these numbers, but
obviously we have good reason.

A.   Yes.

Q.   It's a little awkward.

A.   It's all right.

Q.   We're going to ask you really limited questions about two
different areas.  One has to do with your exposure to pretrial
Page 107

publicity, and essentially what I mean by that is media coverage about the case, be it television, radio, or newspaper, before today. And we have the benefit -- and I don't want to give you the impression we've ignored the answers you've given us in the questionnaire.

A. Sure, sure.

Q. That's been extremely helpful. I'm sure it took a good deal of time, and we appreciate it, and I speak for all the parties and the Court on that. And at the time you filled out this questionnaire, you'd indicated you'd only just heard about it, couldn't recall any details. And I just want to revisit that with you if I could.

A. Yes.

Q. Have you come to any more information about the case since the questionnaire?

A. There was -- shortly after -- and I believe it was after I filled out that questionnaire -- when I had the news on and they started talking about it, and I turned it off immediately, but

2701

what I did hear was that the -- if my memory serves me correct that the boyfriend of the defendant had already been convicted.

Q. Okay. And this was a television account?

A. Yes, sir.

Q. Was there any discussion on this newscast about his sentence?

A. I don't recall any. You know, I knew immediately I had to get the TV off.

Q. Sure, sure. What about -- you mentioned that you had a discussion about your wife -- I told my wife it was about five people who were murdered before we came. The bodies were

Page 108

discovered since we came. She said she remembered hearing about it. That was all. When was that discussion relative to the -- it looks like it was certainly before the questionnaire; is that right?

A.   Right.

Q.   How did you know that? You told your wife it was about five people who were murdered before you came. How did you have that information?

A.   The packet that was sent to us, that was the information that was in there.

Q.   I gotcha. So that was out of the questionnaire itself.

A.   Yes.

Q.   Okay. Not something you had read or anything.

A.   No.

2702

Q.   Gotcha. I follow you. Thank you. Have you had any other discussions with your wife about this situation?

A.   No.

Q.   Okay. And you indicated that you had not formed any opinions about the case or punishment or anything of that nature.

A.   That's right.

Q.   Is that still the case?

A.   Yes, sir.

Q.   So why don't we talk about -- a little bit about these punishment options; okay?

A.   Sure.

Q.   And I gotta tell you, it's hard to do this from my perspective because we're going to -- not just me but Mr. Willett and Mr. Stowers, we're going to be fighting hard for

Page 109

Miss Johnson. I don't want to give you the impression we're talking about punishment that anybody on her defense team thinks she's guilty of anything. But the process is such that we only have one opportunity to ask questions of jurors. And so we have to even ask questions about punishment even though we're a long way from there and might never get there as the judge has pointed out repeatedly. But I need to tell you what the charges are so we can kind of put this in context. The government's alleged that five people were intentionally murdered.

A. Yes.

2703

Q. And they've alleged that these murders took place during a drug conspiracy or continuing criminal enterprise or both; okay? They've further made allegations that these five murders were committed after premeditation and substantial planning; okay? You following me?

A. Yes.

Q. And they've also made allegations that amongst the five victims was a mother and her two children, two little girls, Kandi and Amber Duncan. They were ten and six years of age; okay? So those are pretty serious allegations; would you agree?

A. Yes, sir.

Q. And I noticed from your questionnaire you have three children including two young children. Well, I would consider them young. I've got a 13-year-old. I still like to think he's young. But you have a 13-year-old daughter.

A. Yes, she's now 14.

Q. Fourteen, okay. And a six-year-old son.

A. Yes.

Q. Maybe seven. No?

Page 110

A.    Almost.

Q.    Not yet.  And so that I think for some of us that can hit a little closer to home than others, although we all love children obviously, and that's a concern for all of us I'm sure.  But when I'm asking you these questions about penalties, these penalties, that's the context in which we're talking about.

2704

It's not, you know, this was a bar fight and two people got angry or somebody ran somebody down with a car after drinking too much.  That's the crime.  No defense.  If we're at the point we're talking about penalties, the jury's already made that determination beyond a reasonable doubt.  They've already rejected any defense that, oh, I didn't do it or, you know, it was in the heat of passion or whatever.  They've already heard all the evidence.  They've heard all the facts, and they've made that decision.  When we're assessing penalties, that's kind of where we are in this stage; okay?

And you indicated in your questionnaire that you thought the death penalty was appropriate in certain circumstances.  Question 75 says, What are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of intentional murder?  And you said, I believe the death penalty is appropriate.  If they took a life, they can forfeit their life.  Some don't agree because of the possibility of condemning an innocent person.  If I had any question about that person's guilt, I wouldn't, would not, vote for the death penalty.  Does that sound accurate?

A.    Yes, sir.

Q.    And you were asked, Why do you feel this way, or what are some of the reasons for your beliefs?  And you said, The Bible

Page 111

uses the death penalty. And, of course, I noted, as we all have, that you are a very religious man. You attend church two

2705

to three times a week it looks like from your questionnaire, that you're the deacon in the church which I'm sure was a position of leadership and some responsibility. And so I don't know if this view about the death penalty is a religious thing with you or not, but I wanted to ask you about that.

A. Sure.

Q. So tell me, this view if they took a life they can forfeit their life, where is that generating from? Where's that come from?

A. Well, the Old Testament, of course, talks a lot about that.

Q. Sure.

A. And, of course, we know in the New Testament Jesus brought a lot of grace and mercy, thank God.

Q. Sure.

A. I do believe there's a statement made I believe from Isaiah that says because the -- I can't quote it verbatim, but because discipline is not speedily given that the hearts of men are prone more to do evil. So, you know, I know one of the things that our country is based on is speedy trial.

Q. Sure.

A. And so -- and what you mentioned when a life is taken and if it's taken, you know, by an accident, that's one thing, you know. If it's taken out of self-defense, you know, that's another. So there's many reasons why a life is taken. And I don't believe that a life should be given for every life that's

2706

Page 112

taken, of course.

Q. Okay. And I appreciate that response because you've anticipated a couple of areas that sometimes people -- I don't make clear to them. We're not talking about an accidental murder; okay?

A. Right.

Q. We're talking about intentional, premeditated, planned murders. And self-defense could be a defense. That's something that the defense could raise in a trial as a potential defense, and if the jury found that defense, then that would really be a not guilty verdict; okay? Wouldn't even be a punishment because that person, if the jury made that decision, would be not guilty. But we've kind of put those aside. That is, to the extent they've been raised and considered, they've been rejected at the point where we're talking about these two punishments, the death penalty and life without parole; okay? So when I hear that language when they took a life they can forfeit a life -- and I can tell you that's not the first time I heard that.

A. Sure.

Q. And it's just like the judge said, this isn't a test to give right or wrong answers. People have come in here, and they've told us all kinds of things about punishment all over the spectrum. They're perfectly entitled to those views. They're acceptable. We respect them. We're just trying to find out what they are so we can make our decisions about the people

2707

who might be best suited for this particular case. And I'm just wondering if that means, when you say they took a life they can forfeit a life, we're talking in the context of intentional

Page 113

murder.

I've had people tell me, you know, you make a choice if you kill somebody intentionally, and really there are two choices, the death of that other person, but you've also chosen to forfeit your life because that's a consequence of your action. And I don't know if you're of that view or not, but this language if they took a life they can forfeit the life sounds a little like that. It sounds a little bit like the eye for an eye question that we see a little later on. So I wanted to see if you could expound on that particularly for me.

MR. STOWERS: Two minutes.

A. Sure.

MR. STOWERS: Two minutes.

A. If -- the only way that I would support the death penalty is if I knew beyond a shadow of a reasonable doubt that that individual was directly responsible for the premeditated death of an individual.

Q. Okay. Well, let me ask you about the alternative punishment because I can hear you. The death penalty would certainly be an appropriate consideration for you on this kind of a case.

A. Yes, sir.

2708

Q. The alternative, life without parole, you indicated in your questionnaire that -- what are your thoughts and opinions of life in prison as a punishment? The death penalty is a stronger deterrent to murder than life imprisonment. Also life imprisonment is a financial drain on the society this individual has already stolen a life from. Asked why you felt that way, you said, All taxpayers feel the weight of rising taxes. I know

Page 114

there's wasted money in such large operation as our government. This could be one of those holes. You were asked this question about do you think life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder, and you said, No. Prison is easier than jail. They have air time, television, library, exercise rooms, and the hope of being pardoned which at least sounds like if -- and again, I realize it's a big if. But if we're talking about a case of premeditated, intentional murder, life without parole wouldn't be a sufficient punishment that you'd be willing to consider. That's what the questionnaire sounds like. Is that true?

A. That is true provided it is, you know, very clear. You know, if there is any question, any, any inkling of a question, that maybe just possibly I might be in error on this, I would go with life in prison because I know that there have been individuals that have been executed or, you know, whatever, terminated, and later they were found to be innocent. I know

2709

that has happened, and I don't want that.

Q. But if we could exclude that potential of an innocent person -- you know, the government only has to prove their case proof beyond a reasonable doubt.

A. Right.

Q. If that were found -- that's what the law says. If proved beyond a reasonable doubt this type of crime, given your responses in the questionnaire, would you realistically be able to consider a sentence other than death as appropriate for that type of crime?

A. Right now at this point I don't think so.

Page 115

MR. BERRIGAN:  Appreciate your answers, sir.

PROSPECTIVE JUROR 228:  All right.

MR. BERRIGAN:  My time is up.

PROSPECTIVE JUROR 228:  Okay.

THE COURT:  Mr. Miller?

EXAMINATION

BY MR. MILLER:

Q.    Good morning, sir.

A.    Good morning.

Q.    How you doing so far?

A.    Fine.

Q.    Okay.  I'm going to grill you for 12 minutes, and then you'll be done with us; okay?

A.    All right, sure.

2710

Q.    Just want to cover the issue of the death penalty, and you've been good enough to fill out that questionnaire and share with us your thoughts.  You recall this morning when Judge Bennett was describing the whole procedure, he spent pretty close to an hour discussing a whole lot of things about being a juror in this courtroom, but a portion of that was spent discussing how this third phase punishment process would go if it ever comes to that point.  Now, you weren't taking notes, and I realize that, and I apologize if this sounds a little bit more like the civics quiz that the judge promised I wouldn't be subjecting you to --

A.    All right.

Q.    -- but can you tell us your understanding of what the judge explained to you this morning about how that third step would work if you recall?

Page 116

A.   What I remember about that was that if -- if all 12 members of the jury were to bring forth a guilty verdict that then there would be the -- that that is the only way that there could be a possible death penalty.  How am I doing?

Q.   You're doing real good.  Did he indicate that at that point the death penalty would automatic --

A.   No.

Q.   -- or that there would be an additional --

A.   No, no.  That whole third process, that whole second half of the ballgame, is about whether it would be life imprisonment

2711

without parole or the death penalty.

Q.   Very good.  Do you remember anything about what Judge Bennett told you would have to be considered in arriving at this conclusion in the third phase if there ever is a third phase?

A.   I need you to repeat that, please.

Q.   I probably didn't make myself clear, but do you recall the judge talking about the fact that the jurors would be instructed and called upon to consider and weigh both aggravating and mitigating factors before they arrived at a conclusion as to what the best punishment --

A.   Yes, and he stated, I believe, those were the terms that he said he wasn't going to take time right at that point to talk about, and I do not know, you know, the precise meanings of those.

Q.   And you really couldn't because, as Mr. Berrigan said, we do have the cart before the horse here a little bit.  We're asking you about a stage that you may never get to if you were on this jury.

A.   Right.

Page 117

Q.   But we have to visit with you.  Assuming for a second, sir, that you serve on this jury and assuming that this jury finds beyond a reasonable doubt that this defendant is guilty as charged of one or more of those counts specifically involving the premeditated killings of five people including two children, if the evidence shows that and shows that beyond a reasonable

2712

doubt, would your third step automatically in your opinion, sir, result in the death penalty, or would you be able to give consideration to both possible punishments?  We just want your honest opinion on that.

A.   I would give consideration for life imprisonment as long as there was a little, just even a little inkling of a thought that maybe, just maybe we were wrong about this individual.  If it was -- if it was -- if it was in my opinion very clear that this individual was immediately involved in the death of any of these, then I would say the death penalty would be appropriate.

Q.   Okay.  And I'm going to have to push you just for a little step further because we need to find people who can assure us that they would give fair and full and realistic consideration not only to the death penalty but also to life imprisonment. Could you give also fair consideration to life imprisonment under those circumstances, or do you feel in fairness that your opinion would have to be for the death penalty if you were firmly convinced beyond a reasonable doubt that these allegations are proven, five deaths, two of them children, and the defendant was involved in those killings?  Do you feel you could still consider life imprisonment, or do you feel that your -- under those circumstances your verdict would only be death?

Page 118

A. Okay. I think you're asking the same question, or aren't you? I'm just trying to think in my mind because to me it

2713

sounds -- I mean, the answer that I gave to you before I believe would be the same, that, you know, I do believe in the death penalty, and I only believe in it if -- you know, if there is just no possibility -- and I do have an open mind. If there is -- if there is any -- for instance --

THE COURT: Can I interrupt you for a second because I think we're kind of on the wrong track here? The issue of guilt has to be determined beyond a reasonable doubt. If you find the defendant guilty beyond a reasonable doubt and the jury also unanimously finds that and they unanimously find an eligibility or gateway factor and an aggravating factor, then we're in the penalty phase. In the penalty phase, the government would present evidence of aggravating factors. The defense doesn't have to present any evidence, but they would have the right to present evidence of mitigating factors. I would then define for you what's an aggravating factor, what's a mitigating factor. As a juror you would have to decide whether the government proved the aggravating factors, and that's actually beyond a reasonable doubt. The defense only has to prove mitigating factors by a preponderance of the evidence, so that's a lesser standard. And then as a juror you would weigh -- you would consider and weigh any mitigating factors in the case and any aggravating factors. Are you with me so far?

PROSPECTIVE JUROR 228: So if -- I still don't know the meanings.

2714

Page 119

Case 3:09-cv-03064-MWB-LTS Document 284-70 Filed 06/23/11 Page 2364 of 3245

THE COURT: That's fine.

PROSPECTIVE JUROR 228: If --

THE COURT: Let me give you an example of mitigation. Mitigation can be -- it's a very broadly defined term. It can be anything about the defendant's background. It could be psychological testimony. It could be testimony that she had a terrible childhood, that she was abused emotionally, physically as a child. It's just so broad it's hard to know what the mitigation testimony in any given case --

PROSPECTIVE JUROR 228: Okay. But that helps me understand. In other words, yes, this individual did this, but here are the circumstances or background reasoning or whatever that produced this.

THE COURT: And it doesn't excuse the crime. It's not a defense to the crime. That's why you wouldn't hear about it until we got to the penalty phase if we ever get there.

PROSPECTIVE JUROR 228: Right.

THE COURT: But it is evidence that jurors can consider to help them determine whether or not there are any mitigating factors in the case. Are you with me on that?

PROSPECTIVE JUROR 228: Yes. And I believe I could -- I know I would. I am a compassionate man, and I believe I would take into account those mitigating factors.

THE COURT: Okay. Now, my view of the law is that -- and I'm going to instruct you that you have to consider any

2715

mitigating factors that you find as well as any aggravating factors. But the weight that you give those factors is entirely for you to decide. In other words, one juror might say, gee, there are these three aggravating factors that I find and

Page 120

there's only one mitigator, and I find that the mitigating factors, when they balance them, outweighs the aggravating factors. Therefore, that juror might vote for life. Another juror might say, Gee, I don't see it that way; I think the aggravating factors outweigh.

And the point is that the weight to be given any factor is for each individual juror to decide. And we're not going to ask you how much weight you would give any of those factors. But what I need to know is do you think you could fairly consider any mitigating evidence that was established in the case, and do you think you would be willing to give that fair consideration?

PROSPECTIVE JUROR 228: Yes, I will. That is the law.

THE COURT: Okay. And would you follow the law if that's how I instructed you?

PROSPECTIVE JUROR 228: Yes, I would.

THE COURT: And do you think in this case you could fairly consider both a life sentence and a death sentence if we ever got to the penalty phase?

PROSPECTIVE JUROR 228: Yes.

THE COURT: Now -- and you're not the first juror to

2716

say this by any stretch of the imagination about you'd have to be absolutely convinced beyond all possible doubt.

PROSPECTIVE JUROR 228: Sure.

THE COURT: That's not really the test when we get to the penalty phase. And so I just want to know even if you were convinced beyond all possible doubt -- and that's higher than beyond a reasonable doubt. But even if you were convinced beyond all possible doubt that the defendant was guilty of one

Page 121

or more of the crimes, would you still be able to fairly consider the mitigation evidence, and would you fairly consider a life sentence before you would impose a death sentence?

PROSPECTIVE JUROR 228: I would consider that.

THE COURT: Okay. I'm sorry to interrupt.

MR. MILLER: No. And thank you, Your Honor.

BY MR. MILLER:

Q. Just very briefly sir, as Judge Bennett just mentioned, the only burden of proof that the government has at any stage is proof beyond a reasonable doubt, and that is a high standard. Would you -- and I'm not expecting you to necessarily know exactly how the law defines that. You will receive a definition of proof beyond a reasonable doubt. But if you and your 12 -- excuse me, 11 fellow jurors were convinced of the guilt of the defendant beyond any reasonable doubt and found her guilty, would you require any higher level of doubt than what the Court instructs at the penalty phase? In other words, if told that

2717

the government need only prove its case beyond a reasonable doubt, would you require something higher than proof beyond a reasonable doubt?

A. I will do the best I can to follow the rules, the laws of the land. So to impose the death penalty to me it would need to be a higher standard than a reasonable doubt.

Q. In other words, here's my issue, sir, and I just want to be sure that I'm not misunderstanding you. If the Court instructs you that aggravating circumstances have to be proven beyond a reasonable doubt, in other words, if there's a doubt but it's not a reasonable doubt, it's not to be considered. Only a reasonable doubt would reject the government's assertion.

Page 122

A.   Right.

Q.   Are you telling us that because of the seriousness of the issue, namely, the death penalty, you would impose a higher burden than what the Court instructs you to impose?

A.   No, no, no, no.  There -- no.  I could -- I believe I could listen to the mitigating circumstances and follow the Court's instructions.

Q.   And fairly consider both possible punishments --

A.   Yes.

Q.   -- before returning a verdict on either.

A.   Yes.

          MR. MILLER:  Thank you, sir.  I have no further questions.

2718

          THE COURT:  Sir, if you'd step outside, it will take us perhaps a couple minutes, and we'll let you know your status. Thank you.

          (Prospective Juror 228 exited the courtroom.)

          THE COURT:  Mr. Berrigan, I think you went first.

          MR. BERRIGAN:  Yes, Your Honor.  The defense moves to strike Juror Number 228 because he is substantially impaired. He believes that if you take a life intentionally you forfeit your life.  He uses the Bible as his source of information, and this is a man who attends church two to three times a week and is a deacon.  He's never come off of that position.  He rejected life without parole as a potential punishment for premeditated murder.  He has some real problems with the waste of taxpayers' monies, but that's really not it.  It's a life for a life.  And that didn't change either.

          The only thing that happened when the Court questioned
Page 123

him is he said he'd consider mitigating and aggravating factors, and I think the transcript's going to reflect that when you're talking about that he's talking about the crime. He wants to know if there's mitigation for why this crime was committed or how it was committed. His own words earlier when I talked to him was accident and self-defense. He's not talking about post-crime evidence, evidence of the defendant's background that doesn't directly affect the offense.

So our view based on his questionnaire responses and

2719

his answers today is that this is a substantially impaired juror under Witherspoon versus Witt and that he should be stricken for cause.

THE COURT: Well, he did say that he would fairly consider both a life sentence and a death sentence if we ever got to the penalty phase.

MR. BERRIGAN: Yeah, he will as long as it's still undecided as to whether that's intentional, premeditated murder, but that's the test for him. And he's looking at these -- and he talks about it, the Old Testament, the Bible, take a life, forfeit a life.

THE COURT: Well, we never get to the penalty phase if we don't find it's an intentional murder, so what's your point?

MR. BERRIGAN: You and I know that.

THE COURT: So what's your point?

MR. BERRIGAN: Because he thinks the mitigating circumstances have to do with the crime, as to how the crime was committed or whether that's a defense to the crime.

THE COURT: I don't think he thinks that at all. We talked about her background. Anyway, fine. Anything else?
Page 124

MR. BERRIGAN: Nothing else by the defense.

THE COURT: Okay. What's the government's position?

MR. MILLER: We oppose the motion, Your Honor. I think the explanation as to what mitigating factors are was very clear, and he expressed an understanding of them and a

2720

willingness to consider them.

THE COURT: Yeah, I don't think the juror's substantially impaired, so you're out of strikes. Do you want to exercise any of your strikes?

MR. MILLER: No, Your Honor.

THE COURT: Okay. 228 is in the jury pool.

(Prospective Juror 228 entered the courtroom.)

THE COURT: Sir, you're in our jury pool, and that means you have about a 50 percent chance of actually being selected as a juror in this case. We'll hopefully know either at the end of this week or the first few days of next week. When we arrive at the right amount of jurors, our clerk's office will let you know at that point whether you're -- because you have a second chance of actually being dismissed or not. So hopefully by early next week you'll know whether you're actually going to be a trial juror or not.

Because you're still in the jury pool, I'd strongly urge you to follow my instruction earlier this morning. Don't read or listen to anything about the case. Don't talk to anybody about the case. And don't let anybody talk to you about the case; okay?

PROSPECTIVE JUROR 228: Will do.

THE COURT: Okay. Thank you very much.

(Prospective Juror 228 exited the courtroom.)
Page 125

THE COURT: Please be seated. Why don't we just take

2721

45 minutes for lunch because we're kind of running behind.
Anything else from the government?

MR. WILLIAMS: No, Your Honor.

THE COURT: Anything from the defense, Mr. Berrigan?

MR. BERRIGAN: No, sir.

THE COURT: Okay. Thank you.

(Lunch recess at 11:59 a.m.)

THE COURT: Okay. Please be seated. Okay. I was
just given a note from Juror 228, and has everybody had a chance
to read it?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. What would you like me to do,
Mr. Williams?

MR. WILLIAMS: Nothing, Your Honor. He says, I will
be biased when listening, and that's basically what your
instruction's going to tell him to do is to be biased in
listening to testimony of a cooperator and to be careful of it.
He says, I know they may be telling the truth or they may be
conjuring up stories. Only if the stories are the same as those
of other witnesses who are not incarcerated would I take them as
truth, that's fine. I think that's what they should be doing,
so I don't have a problem with it.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: We already moved to strike this juror
for cause on unrelated reasons, Your Honor, but now he's telling

2722

Page 126

the Court that he's not going to consider the testimony of incarcerated witnesses unless they have some back-up essentially. It's kind of like the old brig rule where you had to have a witness. It wasn't sufficient that the prosecutor itself claimed the offense. That's not the law. It's not even close to the instructions.

THE COURT: So now you're looking out for government's interest? That's interesting.

MR. BERRIGAN: No, Your Honor.

THE COURT: Well, it's pretty disingenuous for you.

MR. BERRIGAN: I don't think this juror's qualified for other reasons.

THE COURT: I understand that. But this is a pretty disingenuous argument.

MR. BERRIGAN: This is just another example of a juror who's not willing to follow the law in my view. It happens to be a different instruction. But it's still a problem.

THE COURT: What's the prejudice to the defendant?

MR. BERRIGAN: I don't know. It's a possibility these witnesses could be helpful to us and he's not going to pay any attention to them unless we have some kind of a back-up. These witnesses -- just because the government's calling them doesn't mean they're exclusively the property of the government. There's going to be cross-examination on points the defense thinks are favorable to us, and this fellow is saying, I'm not

2723

going to pay any attention unless somebody else comes in who's not incarcerated to back up that testimony. That's not the instruction the Court's going to give him.

THE COURT: Well, I'm going to bring him back up and

Page 127

question him, and then we can have a separate round of challenges for cause.

(Prospective Juror 228 entered the courtroom.)

THE COURT: Juror 228, why don't you have a seat in the front row. Thank you for sending us this note. I have shared it with the lawyers, and we're going to make it part of the record in the case. And better to get the note now than in the middle of trial. So I appreciate it.

I have some questions and explanations for you. I give a standard instruction in every criminal case where witnesses testify who have some hope of getting a reduction in their sentence, and I just wanted to tell you what the law is in that regard and what I would instruct. And it may not be exactly like this, but it would be something pretty close.

You should treat the testimony of certain witnesses with greater caution and care than that of other witnesses. You have heard evidence that one or more witnesses are testifying in the hope to receive reductions in their sentences in return for their cooperation with the government in this case. You may give the testimony of such witnesses such weight as you think it deserves. Whether or not testimony of a witness may have been

2724

influenced by the witness's hope of receiving a reduction in sentence is for you to decide.

Now, do you think you could follow that instruction?

PROSPECTIVE JUROR 228: Those are very clear, and yes, yes, I believe that would -- coincides with the note I gave you. I am not trying to get out of jury duty, sir.

THE COURT: I didn't assume that you were.

PROSPECTIVE JUROR 228: Okay.

Page 128

THE COURT: You had all kinds of opportunities to do that, and you're a very bright and articulate person, and it's not rocket science to figure out what answers you could give us that we wouldn't let you serve. And so I didn't for a minute think you were trying to get out. That wasn't even on my radar screen.

But I want to make sure that you could follow what the law is with regard to these witnesses. And the law is essentially that you should judge their testimony with greater caution and care and it's for you to decide how much weight to give each witness who's in this situation, and I just want to make sure you could follow that instruction.

PROSPECTIVE JUROR 228: Yes. And to reiterate, what I said in the note is that if their testimony is confirmed with that of another that does not have that, then I say, okay, then they add some extra weight to the other person who already said that.

2725

THE COURT: I know you said that, and let me just talk to you about that for a little bit, because I submit that that may or may not be an important factor, and here's why. I've had cases where I've had multiple witnesses testify to the same thing, but they got together and made up the testimony. So the fact that two people testified to the same thing doesn't really prove that it's any more reliable than one person. Now, it may. It all depends upon the situation. But are you open to the possibility that just because two or more people testify to the same thing that doesn't necessarily make it true; right?

PROSPECTIVE JUROR 228: Right.

THE COURT: It's a factor that you might want to

Page 129

consider in judging the credibility of a witness; is that right?

PROSPECTIVE JUROR 228: Correct.

THE COURT: And then there are times where no one else knows anything about it and you only have the one witness, and so there won't be any what we call corroboration, and the law doesn't require corroboration. Are you with me on that?

PROSPECTIVE JUROR 228: Yes, sir.

THE COURT: So sometimes you have a witness and nobody else testifies to either support it or to undermine it but you still have to judge that witness's credibility like you would any other witness. You have to make your best judgment is that witness telling the whole truth, some of the truth, or none of the truth. Do you understand that?

2726

PROSPECTIVE JUROR 228: Yes.

THE COURT: So I'm kind of disagreeing a little bit about what you said in your note, but I'm just trying to share my experience with you that sometimes multiple witnesses testify to the same thing and they're not telling the truth, and sometimes a single witness will testify to something and at least in my opinion I believed they've been telling the truth.

So I don't think it would be fair to either side to have this kind of litmus test that you would only believe a witness who was testifying in the hope of getting a reduction if somebody else corroborated their testimony. That's certainly a factor you could consider. But you couldn't have a preconceived notion ahead of time about who's telling the truth and not telling the truth based on some kind of rules that you've come up with on your own. That kind of makes sense, but there's so many exceptions that it's probably not a very accurate rule. Do

Page 130

you understand what I'm saying?

PROSPECTIVE JUROR 228: I stand corrected in that. You are the expert.

THE COURT: Well, but you're entitled to your own beliefs, and I'm not trying to change your beliefs. It's just that this is what I do all day long. I listen to witnesses. I have to make judgments about who's telling the truth and who's not telling the truth. The bottom line is do you think you could follow my instruction?

2727

PROSPECTIVE JUROR 228: Yes, sir.

THE COURT: Okay. Let me just take one more second and re-read your note. I'm going to give an opportunity for follow-up questions. Would the government like any follow-up questions just related to this issue with Juror 228?

MR. MILLER: Your Honor, I believe the defense went first on this.

THE COURT: Okay. Mr. Berrigan?

MR. BERRIGAN: Very briefly, sir. Shall I approach?

THE COURT: I guess so.

MR. BERRIGAN: Thank you.

EXAMINATION

BY MR. BERRIGAN:

Q. I just want to ask you about this last paragraph, sir. In other words, I will be biased when listening to the testimony of an inmate. I know they may be telling the truth or they may be conjuring up stories. Only if their stories are the same as those of other witnesses who are not incarcerated would I take them as truth. Is that still your position?

A. After listening to the judge, I realize that just because

Page 131

two corroborate does not necessarily mean it's the truth.

Q.   And the sort of flip side that he dealt with with you was the thing that you mention here.  That is, there isn't a corroborating witness.  In other words, an inmate comes in and says X, Y, Z.  Nobody comes in to say X, Y, Z.

2728

A.   And it may still be the truth.

Q.   Yeah.  Your note suggests that --

A.   Right, right.

Q.   -- that's going to be determinative.  I just want to see if that's changed.

A.   Right, yes, yes.  It is changed.  I still have, you know, that real reservation about, you know, the motive and that averting the truth.

            MR. BERRIGAN:  Sure.  Okay.  Thank you.  That's all, sir.

            THE COURT:  Okay.  Mr. Miller?

            MR. MILLER:  No further questions, Your Honor.  Thank you.

            THE COURT:  Okay.  If you'd just step outside again, I'll let you know.  Thank you so much.

            PROSPECTIVE JUROR 228:  Sure.

            (Prospective Juror 228 exited the courtroom.)

            THE COURT:  Mr. Berrigan?

            MR. BERRIGAN:  Our position respecting Juror 228 is unchanged, sir.  We'd ask you to remove him for cause.

            THE COURT:  Well, what cause?  We're not revisiting the prior ruling on for cause.

            MR. BERRIGAN:  Okay.  We're asking he be removed for cause on the basis of the note that he sent to the Court which

Page 132

we think is a rather extraordinary step, frankly.

2729

THE COURT: Mr. Miller?

MR. MILLER: Your Honor, we resist. Naturally we have some concern about his -- any indication that he might totally disregard any witness. However, that's not this man's position. He's indicated a willingness to listen to all witnesses and to apply to them the Court's instructions on credibility.

THE COURT: Okay. Defense motion to strike Juror 228 for cause is denied. Let's bring him back in, and I'll explain his status to him again.

(Prospective Juror 228 entered the courtroom.)

THE COURT: You're still in the jury pool; okay? Okay? So everything else I told you about being in the jury pool still applies; okay? Thank you very much. You're free to go now. Thank you.

(Prospective Juror 228 exited the courtroom.)

THE COURT: Could we have Juror 740, please.

(Prospective Juror 740 entered the courtroom.)

THE COURT: Anywhere in the front row you'd like, 740. We're going to start with Mr. Miller.

EXAMINATION

BY MR. MILLER:

Q. Good afternoon.

A. Hi.

Q. How you doing?

A. Nervous.

2730

Q. Did you bother grabbing any lunch?
Page 133

A.    Huh?

Q.    Did you bother grabbing any lunch?

A.    Yeah, I got lunch, yes.

Q.    I know this is easy for me to say and a lot harder for you to do, but please don't be nervous, and one thing I think you'll find is after you've started answering a few of our questions you'll quit thinking about being nervous and start thinking about the answers and it will be over before you know it; okay?

A.    Okay.

Q.    Okay.  You don't believe me, but I'll try anyway.  We need to visit with you about just two subjects, ma'am.  We need to visit with each of the jurors about the question of pretrial publicity, and we know that you've had some exposure to that.

A.    A lot of exposure.

Q.    And that's perfectly fine.  We expect that from any number of people, and we also need to visit with jurors about their opinions on the death penalty.  And again, as to both subjects, there isn't any such thing as a wrong answer as long as it's sincere and open and tells us what you know; okay?

A.    Okay.

Q.    You did mention you've had a lot of exposure, and I'd just like you to go ahead and summarize for the Court in your own words how you happen to have had exposure and what information you've received in the course of the Honken trial.

2731

A.    I work for a cable company, and so we're required to have news on all the time, and so I know the whole -- you know, I know pretty much the -- you know, the Dustin Honken case, and I know that she -- you know, she's -- the background of her also.

Q.    So obviously simply because you have to do your job you've

Page 134

been exposed to more information about this case than most people would have.

A. Exactly, and with the Internet also, you know, we have Internet service, and so it's on our Internet websites also, so yeah.

Q. Very good. And we appreciate you sharing that information with us. That's exactly why we issued the questionnaire. The question arises -- some people can do this, and some people can't, and all we can do is ask you for your best opinion on this. Would that information, do you feel, color your ability to sit as an impartial juror?

A. With reading as much as I have read, it would be very hard for me to be impartial, yes.

Q. Simply because you read so much about it.

A. Right, you know, being in the media and, you know, just, you know, so many newspapers that I've read and, like I said, being with the communications, yeah.

Q. And I don't mean to beat this dead horse, but let me just follow up with a couple of questions. You understand it would be your obligation when you're on this jury -- and some people

2732

absolutely cannot do it, and maybe you're saying that to us too -- to set aside the information you had and decide the case only on what came in out here. Are you telling us you'd have some difficulty over the course of a three-month trial being absolutely sure that you were remembering only what comes in here as opposed to what you may have heard elsewhere?

A. That is correct. With me reading so much and trying to separate what I've read and what is actually in here, I don't want them to have to be crossed, you know, because I do know so

Page 135

much about this.

Q.   Okay.  And again, we appreciate that sentiment because we have to find jurors who can assure us there wouldn't be a cross, and we appreciate your sensitivity to that concern.  Bottom line, in your own honest opinion, do you feel that your exposure to the publicity which was very significant as compared to most folks is such that it would possibly impair your ability to give --

A.   Yes.

Q.   -- the defendant a fair trial?

A.   Yes.

MR. MILLER:  Well, very good.  I'm going to ask you nothing further, but I thank you so much for your candor without which we simply can't go through this process, so thank you for your time.

I have no further questions, Your Honor.

2733

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  I have no questions, sir.

THE COURT:  Okay.  Any objection from either lawyer if I excuse this juror?

MR. MILLER:  No, Your Honor.

MR. BERRIGAN:  None by the defense, sir.

THE COURT:  Okay.  Juror 740, thank you so much for sharing that with us, and we're going to go ahead and excuse you from this case.

I'd ask you a favor, not to discuss jury selection with anybody else until we get the jury empanelled hopefully next week because you might say something to somebody, and that somebody might say something to somebody else, and that somebody

Page 136

else could wind up here next week being questioned by us; okay?

PROSPECTIVE JUROR 740:  Okay.

THE COURT:  Thank you very much.

PROSPECTIVE JUROR 740:  Thank you.

THE COURT:  Bye now.

(Prospective Juror 740 exited the courtroom.)

THE COURT:  341.

CSO BREMER:  Just came in the front door, Judge.

THE COURT:  Pardon me?

CSO BREMER:  341 just came in the front door.

THE COURT:  Well, give us a heads-up when 341's coming up.

2734

(Prospective Juror 341 entered the courtroom.)

THE COURT:  Juror 341, anywhere in the front row.

Everybody can be seated, and you'll be questioned first by Mr. Berrigan.  Thank you.

EXAMINATION

BY MR. BERRIGAN:

Q.   How are you, ma'am?

A.   Fine, thanks.

Q.   We have a chance to question you about two areas that are of interest to us.  One has to do with your exposure to pretrial publicity, things that you might have heard through the media about the case, television, radio, newspaper, or just word of mouth in talking to people or hearing other people talk about the case; okay?  So let me ask you that first, I suppose.  We have the benefit of your questionnaire.  And looks like that was way back in January.

A.   (Nodded head.)

Page 137

Q.   And at that time you said you'd only just heard about the case, the guilty verdict against Dustin Honken, one juror's boss saying fry him or something like that which was investigated as jury tampering.  Does that sound about right?

A.   I think that's what I wrote, yes.

Q.   Okay.  Have you heard anything else about the case?

A.   No.  I had been reading in the newspaper, and then I stopped.

2735

Q.   Okay.  You mean after -- you stopped after you filled out --

A.   After I received the questionnaire.

Q.   Sure, good.  That's what you're supposed to do.  Not everybody has.  In the newspapers is this the kind of stuff you were reading about?

A.   Whatever the Sioux City Journal reported.

Q.   Okay.  I don't know if you remember when Mr. Honken's trial was, but if I suggested to you it was last fall, you know, September, October, would you have been getting the Sioux City newspaper at that time?

A.   Yes.

Q.   And are you a regular subscriber?

A.   Yes.

Q.   Okay.  And is it a kind of thing where you read it every day?

A.   Yes.

Q.   Do you remember anything else about Mr. Honken's case as a result of reading the paper at that time?

A.   I don't think there's anything fresh, just the location of the discovery of the bodies.  No, I don't think anything else

Page 138

new.

Q. What about Miss Johnson? Did you read anything about her in these accounts?

A. No, I don't remember anything about that.

2736

Q. Okay. And you indicated in your questionnaire in spite of anything you've read or seen, there's a question about whether you have an opinion about her guilt or innocence, and you checked no. Is that still true?

A. Yes, that's true.

Q. And does that mean that you could afford her the full presumption of innocence that the law affords her?

A. I would do that, yes.

Q. You could do that, thank you. Let's talk a little bit about punishment, and the judge has already explained that there are really two potential punishments here, and one happens to be the death penalty, and the other is life imprisonment without parole which, as he mentioned, is without parole.

A. Uh-huh.

Q. And you've indicated in your questionnaire that you have some problems with the death penalty as a concept in punishment, and I wonder if you could share those with us.

A. I have a strong belief that life in prison without parole would be suitable punishment, but I'm not the one to hand over a death sentence. And I don't think any jury should be.

Q. Well, of course, the Congress disagrees with you.

A. That's their problem.

Q. Well, and that's what we're trying to find out.

A. Right.

Q. Because some folks come in here, frankly, with very strong

Page 139

views either way that they're able to set aside because their role as a juror would require them to do that. And other folks aren't able to do that. Despite instructions, they just couldn't do it; okay? And so we need to know which of the camps that you might classify yourself.

In order to be a juror, you'd have to listen to all the evidence in the case and make a determination first about guilt or innocence, guilty or not guilty, and it was only if we were at the stage as the judge explained where that had been made, a determination about guilt, five premeditated murders, the government would then put on evidence that had to do with aggravating factors, and those are things like the fact that the murders were committed after premeditation and substantial planning. That's an allegation they have is an aggravating factor. Another is that they involved children, okay, six- and ten-year-old girls.

The defense would have an opportunity -- although we're not required to, we have an opportunity to put on evidence of what we call mitigation evidence or reasons to vote for life. Some of the things that we might provide evidence of are Angela's lack of significant criminal history, no criminal history. We might preside evidence -- present evidence that her role in this offense vis-a-vis other people that participated was relatively minor. There might be --

THE COURT: Mr. Berrigan, I'm going to cut you off for

a minute. I want to ask the juror a question. Juror 341, do

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2385 of 3245

you think there's any circumstance in this case that if we got to the death penalty and you were a juror you could fairly consider the imposition of the death penalty?

PROSPECTIVE JUROR 341: No, I'd have to oppose the law that is in existence. I know it is, but I don't agree with it, so I couldn't support it.

THE COURT: And you couldn't follow the law even if I told you you had to.

PROSPECTIVE JUROR 341: No. You could put me in jail, sir.

THE COURT: Right. I understand. I understand. And I respect your position.

MR. BERRIGAN: Well, in light of the Court's questioning, I think I'm done.

THE COURT: Okay. I would think so.

Mr. Miller, do you want a chance to question the witness -- the juror, excuse me?

MR. MILLER: No, Your Honor.

THE COURT: Okay. We're going to let you go.

PROSPECTIVE JUROR 341: Thank you.

THE COURT: Thank you very much. Thank you.

(Prospective Juror 341 exited the courtroom.)

THE COURT: I guess that's one of the problems I have with the way you question people. It was so frickin' obvious,

2739

why don't you just go to the bottom line?

MR. BERRIGAN: Well, I humbly respectfully disagree with your view, and I think we had a perfect example yesterday of a juror who had some very strong reservations about the death penalty who nonetheless was willing to put those aside in

Page 141

deference to the rule of law and his requirements to follow the instructions --

THE COURT: Well, you could have gone right to that issue and asked her if she could do it. Instead you want to lead her for 20 minutes first before you get to that point and you don't get an honest answer.

MR. BERRIGAN: I thought I had 12 minutes to conduct the questioning as I saw fit. I see the rules are changing today. And that's fine. I have no control over that, but I'd like to at least lodge my objection that at this point in the game the rules are changing. As respecting the last juror, Number 228, the Court interrupted Mr. Miller's questioning to, in my view, correct some of the responses the juror had given that I thought indicated --

THE COURT: I'm not trying to correct anything. I'm just trying to not lead the jurors like you all do and find out what their honest answers are, and I reserve the right to do that. I didn't have to let you question at all.

MR. BERRIGAN: I'm just trying to make a record, sir.

THE COURT: Well, you make whatever record you want to

2740

make.

MR. BERRIGAN: My perception was the Court interrupted Mr. Miller's questioning because that questioning was indicating that juror was not going to be able to follow the instructions of the Court. The Court then interrupted and asked him questions and in my view saved the juror from certain destruction.

Now I'm asking questions. The Court's decided they're going to interrupt me as well even though I'm nowhere near

Page 142

having used my 12 minutes. That is a change in the Court's position. I don't think the Court's done that, frankly, up until today on any occasion that I can recollect. You've not interrupted Mr. Miller or I in that fashion. You've certainly asked questions, but I think that's a procedure that's detrimental to both sides, and I want to at least object to it and note for the record that I object to Juror 341 being excused for cause in the way in which that was done.

THE COURT: Fine. Let's bring in Juror 495.

(Prospective Juror 495 entered the courtroom.)

THE COURT: Sir, any chair you'd like right in the front row, front row. Thank you. You're going to first hear from Mr. Miller.

EXAMINATION

BY MR. MILLER:

Q. Good afternoon, sir.

2741

A. Good afternoon.

Q. Did you find that parking ramp okay?

A. Yes, sir.

Q. Okay.

A. Finally.

Q. I don't know if you even recognized me, but I was approached by a motorist this morning at about a quarter to eight wanting directions --

A. Okay. That was you. Okay.

Q. That was me, and we probably didn't spend more than 15 seconds exchanging directions, but I just wanted to be sure that that didn't -- you will if you serve on this jury, sir, receive an instruction that attorneys are not to be communicating about

Page 143

anything no matter how minor or innocuous with jurors. Of course, I didn't know that you were going to be on this jury panel at the time, but nevertheless, I trust that in no way affects your view of the case, the fact that you and I spent 15 seconds talking about directions to a parking ramp.

A. No, sir.

Q. Okay. Very good. Very good. And that may seem silly to you, sir, but I just wanted to be sure our record was clear; okay?

A. Sure.

Q. Thank you so much. You wrote answers to a questionnaire, and we appreciate that. We need to talk with you about two

2742

subjects. Number one is knowledge about the case, and number two is opinions on the death penalty; okay?

A. Sure.

Q. And I'm going to try to do that within less than 12 minutes. You noted you were not at all familiar with this case. Have you received any information about this case other than what was in the Court's mailing?

A. No.

Q. And I assume you have no opinions about the merits of the case one way or the other.

A. That's correct.

Q. Thank you, sir. On the subject of the death penalty, I'd like you simply to explain to us in your own words if you would, please, how you feel about the death penalty.

A. My opinion is if the crime is serious enough and if they're proven guilty beyond a shadow of a doubt, then it's just.

Q. You feel it can be an appropriate punishment.

Page 144

A. Yes.

Q. In the appropriate case.

A. Yep.

Q. Let me ask you this: In this case the accusations are that this defendant participated in the killings of five people with substantial planning and that two of those people were particularly vulnerable, namely, children. If those -- if the evidence shows that, sir, beyond a reasonable doubt under the

2743

evidence in this case, would you automatically impose a sentence of death, or do you feel that you could consider both possible punishments still?

A. I would consider both.

Q. Well, let's explore that just a little bit. During the -- well, let me ask you this. You gave us, again, the benefit of some answers to a series of factors and how they might affect, and you indicated as to both the killing of multiple people and as to the killing of children that the death sentence was your indication on paper. Do you recall that?

A. Yeah, I agree with that.

Q. Okay. You also indicated in response to the factor describing that the person -- the guilty person assisted or encouraged the murders, you wrote down life in prison. Would it -- if you're required, sir, to serve on this jury, the Court instructed you this morning that it would be your job -- and this is a summary in shorthand -- but it would be your job to weigh and to consider both aggravating and mitigating factors, in other words, both factors that might make the crime more severe and factors that might show that the defendant is deserving of leniency. Are you following me?

Page 145

A.   Yep.

Q.   If you get to that point, if you're on a jury that has found this defendant guilty beyond a reasonable doubt, do you feel that you could perform that function?  Do you feel you

2744

could still consider both life and the death penalty as possible punishments in this case?

A.   Yes.

Q.   I take it that you would consider assisting rather than being one who pulls the trigger to be a mitigating factor, in other words, one that you might consider to be deserving of some leniency?

A.   Yes.

Q.   Okay.  And the killing of multiple people or the killing of children is a factor that you would reasonably consider, if instructed to do so, as aggravating factors, ones that you may weigh as making it serious as opposed to less serious.  Does that make sense to you, sir?

A.   Yes.

Q.   Ultimately if we get to that stage and only if the jury determines that the defendant is guilty beyond any reasonable doubt of one or more of these crimes and if and only if the jury reaches that third stage where it considers punishment, you would be required to follow the Court's instructions and weigh and consider everything that the Court instructs you as an aggravating or mitigating factor if those factors are proven.  Are you with me, sir?  Can you assure us that you would do that, consider all mitigating and aggravating factors giving them such weight as you consider appropriate -- that's up to you -- but still at least consider, realistically consider, all factors

Page 146

that the Court instructs you as aggravating and mitigating before deciding which of those two potentially appropriate punishments is the more appropriate?

A.    Sure.

MR. MILLER:  Thank you, sir.  I have no further questions.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  Thank you, sir.

EXAMINATION

BY MR. BERRIGAN:

Q.    How are you, sir?

A.    Great.

Q.    Great.  I noticed that in the questionnaire you said on several times -- there's a question, What are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of intentional murder?  Punishment should fit the crime, and it was underlined.  If convicted beyond a reasonable doubt, then so be it.  Does that sound about right?

A.    Yep.

Q.    There's a question that asks you if you believe in an eye for an eye.  You checked yes, and you said, The punishment shall -- should fit the crime.  That sound right?

A.    That's correct.

Q.    And then there's even a question that asks you in your opinion should the punishment for a crime be based on -- and you

have several choices.  One is the crime, the person, both, or something else all together, and you checked the crime.  Is that

right?

A.   Yes.

Q.   Okay.  And I just want to see if I understand what you mean by that.  What does that mean, the punishment should fit the crime?

A.   If proven guilty beyond a shadow of a doubt, I feel that just punishment should be served.

Q.   When you say just punishment, do you have something in mind in terms of what that is?

A.   No, I don't, depending upon what the options are.

Q.   Okay.  And I wonder then if I could ask you this question.  The nature of the case that the government has brought here, as you already know, is pretty serious.  It concerns five intentional murders.  That's what the government's alleged our client did.  She participated in them or she did them herself.  They've alleged that they're premeditated murder committed after substantial planning, and they've alleged also that of the five people that were killed intentionally one was a mother and two children, and the significance of the two children is that the government alleges they're vulnerable, particularly vulnerable, victims; okay?  That's the crime we're talking about.  When the prosecutor was asking you about considering mitigating circumstances and aggravating circumstances, those are the

2747

aggravating circumstances, premeditated murder, children included.

The mitigating circumstances, they don't necessarily have anything to do with the crime; okay?  That's stuff like the defendant not having a prior criminal history.  Might be evidence that she has an abused background, she suffered from

Page 148

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2393 of 3245

physical or sexual abuse when she was a child.   Some folks think that that's relevant in their sentencing decision, and some people don't.

And again, we're just looking for your views.   They're your views, and they're entitled to our respect, and they'll get them.   This punishment-should-fit-the-crime scenario is different than looking at somebody's background, and I'm wondering whether that background stuff has any relevance for you in terms of sentencing.

A.   I think the key that you said is alleged charges.

Q.   Right.

A.   So all factors would have to be weighed.

Q.   And I think that's where maybe there's a little confusion because I don't know that we're able to do this clearly.   At the point that a juror is deciding sentencing, they've already heard all the facts.   They've already decided who, when, what, where.   All that stuff's been proved, and they made a determination this person's guilty.   There wasn't any defense.   These are the crimes, five intentional murders, premeditated, children; okay?

2748

So that issue that you're worried about, that's really not something -- when you're at the point of sentencing, there's no issue about did the crimes happen, is this the person, okay, was there a defense?   All that's been taken care of.   You with me?

A.   So you're saying hands down it's guilty.

Q.   Well, if we're at sentencing, yeah, hands down, you're right, yeah.   If we're talking about sentencing, that was decided in the first phase in terms of the murders.   And then the second -- third phase of the trial you're going to be asked to consider this premeditated murder.   Actually you'll be

Page 149

considering that in the second part of the trial. But those factors that we're talking about, they've already been decided proven beyond a reasonable doubt in terms of the government's aggravation evidence; okay? You with me?

A.  Uh-huh.

Q.  That's happened. And then we have this mitigation evidence which isn't -- it's like I pointed out. That's after the fact. Whether somebody has a prior criminal record, would you agree with me that doesn't have anything to do with whether they committed murder, premeditated murder?

A.  Correct.

Q.  You could do that whether you got a prior criminal record or not; right?

A.  Yep.

Q.  Somebody has an abused childhood, same thing. People can

2749

do that also without, you know. What I'm wondering about is when we're talking about considering the mitigating factors, okay -- those are the things I'm talking about as reasons for life -- if -- and you tell me. If your view is we're going to punish the crime, I'm wondering how those things make any difference to you.

A.  I don't know if this is -- if I'm on track here or not. I feel that if that was the past history, then life imprisonment is not going to change that person. So if they are found guilty, then guilty is guilty regardless of what happened prior to.

Q.  Well, how does that affect your views about punishment?

A.  It doesn't.

Q.  Okay. So what we need to know is if evidence like what

Page 150

we're talking about, you know, abused childhood, physical, sexual abuse, the fact that this person might not have a criminal record, is that stuff that you're going to really consider in making a decision about punishment, what the appropriate punishment is for that crime?

A.   Are you talking about insanity, along those lines?

Q.   No, no.  That's a defense.  I mean, way back in the first part of the trial when you're trying to decide whether the government's proven its case, we could offer all kinds of defenses.  Insanity could be one.  We didn't do it.  This was a fight.  It was in sudden passion.  It wasn't intentional.  It

2750

wasn't premeditated.  Who knows?  But when we're at the point of sentencing, insanity's gone; okay?  That's out the window.  So you can cross that off the list.

          And I'm just wondering if this is -- what you're saying is, you know, in the questionnaire and what you're telling us here is we're going to punish the crime.  What difference does this other stuff make to you, the stuff about the background, stuff about no prior criminal record?  What does that have to do with the crime is what I'm wondering; okay?

A.   If the crime was committed and there's proof beyond a reasonable doubt, then that won't change anything.  Life imprisonment won't change that.  So consequently, then I feel the death penalty would be just.

Q.   Let me see if I can ask it this way; okay?  If you found that kind of a crime, I'm hearing you say at least you'd certainly consider the death penalty as an appropriate punishment --

A.   Correct.

Page 151

Q.    -- for that kind of a crime.  The flip side of that coin is would you fairly consider a life sentence, life without parole?  And again, if we're talking about punish the crime, okay, would you really consider life without parole as an appropriate punishment for that kind of crime if that's what you found -- I know that's a big if -- but if that's what you found?

A.    Oh, yeah, I would consider it, absolutely.

2751

Q.    Why?

A.    I guess I can't answer why without going through the process to arrive at that decision.

Q.    Well, then this idea that we're going to punish the crime -- I guess maybe I'm just confused about it -- do you think a life sentence, life in prison without parole, is a sufficiently severe punishment for that kind of a crime?

A.    Yes.

Q.    Do you?

A.    (Nodded head.)

Q.    Okay.  And could you tell me why you think that?

A.    Your freedom's gone.

MR. STOWERS:  Two minutes.

Q.    All right.  And it's gone forever; right?

A.    Right.

Q.    Okay.  And so that means that you could consider life even in that circumstance, even if we had that.

A.    Yes.

Q.    Okay.  I want to get back to this other stuff very briefly before I have to sit down.  We got these time things, and we hold to them.  This mitigation evidence that the prosecutor was talking to you about, this stuff like background information

Page 152

about the defendant and lack of prior criminal record, is that anything you would consider in assessing the punishment? Does that have any relevance to the decision about punishment for

2752

you?

A.   My thought is the crime is committed regardless of the background.

Q.   That's suggesting to me that that stuff really doesn't matter.

A.   Right.

Q.   Is that true?

A.   Yes.

          MR. BERRIGAN:  Okay.  I appreciate your candor.  Thank you, sir.

          THE COURT:  Well, when you say the stuff doesn't really matter, are you talking about in the guilt phase or the penalty phase, the background?

          PROSPECTIVE JUROR 495:  The guilt phase.

          THE COURT:  Okay.  And in the punishment phase if we ever got there in this case, you understand that the government would be able to put on evidence of aggravating factors.  The defense, although they have no burden to put on any evidence, could put on evidence of mitigating factors.  Do you understand that?

          PROSPECTIVE JUROR 495:  Could you say that again, please?

          THE COURT:  Yeah, the government would put on -- aggravating factors are factors that would support the death penalty.  Mitigating factors are factors that would support a

2753

Page 153

life sentence.  And the government's going to put on evidence of aggravating factors.  The defense has the right to put on evidence of mitigating factors if they want to.  Do you understand that?

PROSPECTIVE JUROR 495:  Yes.

THE COURT:  And then I would instruct you on what is a mitigating factor and what is an aggravating factor, and then you'd have to decide whether the evidence supported a mitigating factor or aggravating factor.  And then you would have to consider any mitigating factors in the case, any aggravating factors in the case, and you would be allowed to weigh those factors.  Do you understand that?

PROSPECTIVE JUROR 495:  Yes.

THE COURT:  And nobody would tell you how you have to weigh it.  In other words, there may be only one aggravating factor, and there may be 32 mitigating factors, and you would decide the weight, whether the one aggravating factor outweighs the 32 mitigating factors or how ever many there are.  You would decide that for yourself.  Do you understand that?

PROSPECTIVE JUROR 495:  Yes.

THE COURT:  And what I'm trying to find out is could you fairly consider both aggravating factors and mitigating factors?

PROSPECTIVE JUROR 495:  I believe so.

THE COURT:  Okay.  And do you think based on what you

2754

know about this case if we ever got to a penalty phase that you would be able to fairly consider both a life sentence and a

Page 154

death sentence in this case?

PROSPECTIVE JUROR 495: It would be very tough, but I guess it's your responsibility.

THE COURT: And just tell us what you mean by it would be tough.

PROSPECTIVE JUROR 495: Well, to sentence somebody to lose their life --

THE COURT: Would be a very hard thing to do.

PROSPECTIVE JUROR 495: Yeah. I mean . . .

THE COURT: It should be a very hard thing to do.

PROSPECTIVE JUROR 495: Yeah. That's what I mean I guess.

THE COURT: I thought you meant it that way. I just wanted to make sure. But the bottom line is you think you could fairly consider both penalties in this case if we ever have a penalty phase.

PROSPECTIVE JUROR 495: Sure.

THE COURT: If you'd just step outside, we'll let you know your status.

(Prospective Juror 495 exited the courtroom.)

THE COURT: Mr. Miller?

MR. MILLER: No motion, Your Honor.

THE COURT: Mr. Berrigan?

2755

MR. BERRIGAN: The defense moves to strike Juror 495 for cause based on our view that he's substantially impaired being able to consider and weigh mitigating circumstances. He repeatedly says in his questionnaire the punishment should fit the crime. He believes in an eye for an eye for that purpose and said guilty person's past history of drug abuse, parent of

Page 155

two children, mental, emotional, physical abuse, death penalty, death penalty, death penalty which my belief is he reflected in his answers to my questioning that that really doesn't have anything to do with punishment. It's what happened, what's the crime.

So pursuant to Witherspoon, Witt standard, we believe he's substantially impaired and would move to strike Juror Number 495 for that reason and, in addition, the case law under Eddings versus Oklahoma.

THE COURT: Mr. Miller, any reply?

MR. MILLER: Your Honor, just with reference to the questionnaire, he also indicated a reference for life in prison as to at least one of the hypotheticals. Ultimately his responses I believe to all three counsels were that he could -- excuse me, all three questioners were that he could fairly consider and would consider both mitigating and aggravating factors. He responded to the question of whether the background stuff has any relevance when it comes to punishment, he said all factors would have to be weighed. He responded to defense

2756

counsel regarding his ability to consider both possible punishments. Specifically if he could realistically consider life in prison, he answered -- and I believe was word for word -- Oh, yeah, I would consider it absolutely.

And finally when it was I believe most carefully described to him what aggravating and mitigating factors are, he expressed an understanding of those factors and an ability to consider them in accordance with the Court's instructions.

THE COURT: Yeah, I don't find any basis that he's substantially impaired. The reason why I give very little

Page 156

weight to the responses to your questions, Mr. Berrigan, is that I don't think they're fair questions because they don't inquire whether -- they don't tell him what the law is and find out if he has to follow the law. You just ask him questions about mitigation in total abstract, and there's nothing abstract about how it's going to be done in this case. There's a very specific set of legal principles, and the question is can the juror follow those legal principles, not how they view the crime versus the person, and so I just don't give a whole lot of weight to those type of questions because I don't think they properly explain it to the potential jurors.

But in any event, I find no basis for disqualifying the juror, and I specifically find that Juror 495 is not substantially impaired. So Juror 495 is in the jury pool.

(Prospective Juror 495 entered the courtroom.)

2757

THE COURT: Juror 495, you are in the jury pool which means you have about a 50 percent chance of being selected. We hope to let you know some time early next week as to whether or not you're going to be in the final group of 18 and when the trial starts.

I'd ask you to follow those rules that we talked about earlier this morning. Don't listen to any radio or television reports about the case. Don't let anybody talk to you about the case. Don't do any research on your own, and don't talk about this case with anyone else; okay?

And we'll have our clerk's office let you know as soon as we know whether or not you're going to be one of the 18 trial jurors in the case; okay?

PROSPECTIVE JUROR 495: Either way.

Page 157

THE COURT:  Either way you'll find out; okay?  Thank you very much.

PROSPECTIVE JUROR 495:  Thank you very much.

(Prospective Juror 495 exited the courtroom.)

THE COURT:  Ready for 296?

(Prospective Juror 296 entered the courtroom.)

THE COURT:  Juror 296, anywhere you'd like in the front row.  Thank you.  Please be seated.  We're going to start first with questions from Mr. Berrigan and then from Mr. Miller.

PROSPECTIVE JUROR 296:  Okay.

EXAMINATION

2758

BY MR. BERRIGAN:

Q.  How are you, ma'am?

A.  Fine.  Thank you.

Q.  It's not nearly as bad as going to the dentist, so don't worry.  We're really just going to talk to you I suspect about two different things.  One has to do with your exposure to pretrial publicity or media.

A.  Sure.

Q.  And the other has to do with your views about punishment options; okay?

A.  Okay.

Q.  Let me start with the first which is the media situation. What have you learned through the media about this case, if anything?

A.  Virtually nothing.  I was in a store shopping in Okoboji a few weeks ago, and it came on the radio briefly, and all I heard was they wanted her to turn over her medical records.  Other than that, I've had no exposure to it other than the information

Page 158

I received on the case in the mail.

Q. In the questionnaire.

A. Right.

Q. And you mention that your spouse had said something to you, vaguely remembered hearing something about the case on the news within the last couple of months, but you hadn't heard anything.

A. Right.

2759

Q. Does that sound right?

A. Right.

Q. And as a result, you indicated that you had not formed any opinions about the guilt or innocence of Miss Johnson.

A. Right, right.

Q. Okay. And so why don't we talk about punishment then.

A. Okay.

Q. It's kind of awkward we're talking about punishment because Angela hasn't been convicted of anything. But we don't have a chance to come back after you've heard the evidence and then ask you, oh, what do you think about these options, so we have to do it now; okay?

And for purposes of the discussion, we have to ask jurors to kind of assume -- even though it's not true, they kind of have to assume we're kind of in the third part of the trial as Judge Bennett was describing it if you'll remember, the first part having to do with the government, whether they could prove these charges beyond a reasonable doubt. The second part, the half time, intermission part of the basketball game, is going to involve the jurors answering a couple of legal questions without really hearing any additional evidence. But this third part's where the punishment's going to be decided; okay?

Page 159

A. Uh-huh.

Q. I want you to kind of fast forward yourself till we're there. If we are there, then that means the government has

2760

proven that beyond any reasonable doubt five intentional murders were committed; okay?

A. Uh-huh.

Q. And they've proven that Miss Johnson committed them or participated in the commission of them in some way. And the government is also alleging other facts which they are going to attempt to prove beyond a reasonable doubt, that these murders were committed after substantial planning or premeditation; okay?

A. Okay.

Q. Which is more than just an intentional killing. Are you with me?

A. Uh-huh.

Q. And then the other allegation that they have is that of these five victims there was a mother and her two children, two little girls ten and six years old, Kandi and Amber Duncan; okay?

A. Uh-huh, uh-huh.

Q. And that at least that situation there at least is the government's evidence as we're in this penalty part of the trial; okay?

The defense is going to have an opportunity to present some evidence to you as well, although we're not required to, and it could be information about Angela's background, perhaps that she was abused, neglected as a child. There might be

2761

Page 160

evidence of physical or sexual abuse. There might be evidence that she had no prior criminal history and even that her role in the offense was less than other people that might be involved; okay?

A. Uh-huh.

Q. And then you're going to be asked to weigh basically these things, the aggravating and mitigating circumstance, and you need to understand it's an individual decision. Up until this point in the other two other parts of the trial, you made decisions as a group, but in this part of the trial, the penalty, you have to make this decision yourself.

A. Okay.

Q. And so do your other jurors.

A. Uh-huh.

Q. And, you know, you're going to be the ones to live with that, so you have to be very comfortable in that decision. That doesn't mean the government has any higher burden of proof than beyond a reasonable doubt, but you make the decision which of these means more to me; all right? You indicated in your questionnaire that you believe the death penalty is appropriate in certain cases.

A. Uh-huh.

Q. Is that true?

A. Uh-huh, probably.

Q. And one of the questions that we need to know is whether in

2762

this kind of a case you could consider the death penalty as an appropriate punishment, whether that would be in your view a punishment that you'd realistically consider.

Page 161

A.    I probably could consider it, not that I would, but I probably could consider it.

Q.    Okay.  And you make a good point.  You have some concerns about whether you would even though you could.

A.    Right.

Q.    Okay.  You probably have gleaned by now that the judge is going to give instructions to the jurors about, you know, what they sort of need to do in terms of the procedure that's involved.  It doesn't tell them how to vote.  We need to be clear.  The judge is never going to say and the instructions don't say -- no matter what the aggravating and mitigating circumstances are, you're never required to impose the death penalty.  And, in fact, if the jurors disagree about the punishment and one or two jurors say life and nine or ten say death, that is a life sentence.  That's a verdict; okay?  But the instructions require people to be able to engage in this process and then realistically be able to consider both punishments.

Some folks have said they could do that and kind of put aside their personal preferences either way because a lot of people do have preferences.

A.    Right.

2763

Q.    And other folks have said, I can't put aside my views even if you instructed me to; okay?  I don't know if that's helpful to you, but if you were -- I guess I should ask you this.  Could you consider life imprisonment without possibility of parole as an appropriate punishment for even that kind of a crime?

A.    Yes.

Q.    Okay.  And so what is your reservation then about this
Page 162

process?

A.    About imposing the death penalty, it would be -- I think I would have a harder time making that decision if the person was not actually the trigger person, maybe someone who was there, happened to be there, go along with it, was part of it but didn't actually pull the trigger.  I think I would have a harder time imposing the death penalty.  But again, I'd have to hear the case and know all the information.

Q.    Yeah.  I mean, one of the things we -- the defense would argue in our mitigation evidence to try to balance out this, we might argue that -- and present evidence that Miss Johnson's role in this offense was different than the other person. Perhaps she wasn't the person that pulled the trigger.

A.    And I'm not saying I couldn't impose the death penalty. I'm just saying I would probably need to think -- you know, need to think about it a little more, give it more consideration if they weren't the trigger person.

Q.    Well, that might be a factor that leans you towards life.

2764

A.    Uh-huh.

Q.    Yeah.

A.    Might be.

Q.    That's perfectly appropriate.  We would hope that that might be something people would consider towards a life sentence.

A.    Uh-huh.

Q.    It's okay to be leaning.  We've had people leaning both ways in terms of the punishment.  That's all right.  But they can't be leaning so far that they can't consider the other one. Does that make any sense?

Page 163

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2408 of 3245

A. Uh-huh.

Q. You can't be so far for the death penalty.

A. Right, and I'm not.

Q. Okay.

A. I'm not.

Q. So let me -- you're not so far for the death penalty you wouldn't consider life.

A. Right. I'm not too far either way.

Q. All right. Let me ask -- let me tell you one more thing about the process then; okay? In order to inform the judge in terms of what their verdict is, the jurors are going to sign a form, a verdict form, actually sign it, and it's whatever your verdict is, okay, whatever you've come to in your judgment about the penalty if you're at that point. That could be life

2765

imprisonment, and it could be the death penalty. I mean, whatever it is that you determine, we have no way of knowing that, I mean, obviously.

A. Right.

Q. We have had some jurors say, Oh, you know, I couldn't do that. I mean, I can even make the decision they've said, but I'm having trouble signing the form for whatever reason, and I don't know if that's a problem for you or not, but I'm hearing you say you could make a decision.

A. (Nodded head.)

Q. Would you have any -- and you're nodding. Would you say yes?

A. I would not have trouble signing the form.

Q. Okay. No trouble signing the form either.

A. Sitting here today telling you now, I believe I would not

Page 164

have trouble signing the form.

Q. Okay. Well, I wanted to ask you that because you said -- a question in your questionnaire, you honestly were unsure if you could vote for someone to be put to death. I'm only saying I'm unsure. If I heard the case evidence, then I could possibly vote death.

A. Right.

Q. I've never had any strong opinions about being for or against the death penalty.

A. Right. I don't have any strong opinions either way.

2766

Q. Okay. There's one other issue I'm going to ask you about before I sit down, and that has to do with, you know, the government's made allegations that Miss Johnson did do the killing or that she aided and abetted somebody else in doing these murders; okay? And it's kind of like if we robbed a bank together and you were the driver and I went in and robbed the bank. It's not much defense for you that you were the driver when we get charged with bank robbery because we're both guilty if we participated in that activity. It's appropriate to consider your role in terms of the punishment, however. You following me?

A. Yes.

Q. And so there's this issue about if you're not the trigger person but you still aided and abetted somebody, encouraged them to commit murder whether or not you could still be eligible for the death penalty, and the law says you can be. I mean, there are some cases in which you can envision perhaps where somebody wouldn't have been killed at all but for the nontrigger person encouraging the other person to kill them or paying them or

Page 165

whatever the circumstances were.

MR. STOWERS: Two minutes.

Q. Do you follow me?

A. Uh-huh.

Q. So that's an issue that I wanted to explore with you briefly is it's okay to take into account who's the trigger

2767

person in assessing the punishment. But even if the situation were that this person's not the trigger person, they can certainly still be guilty of the offense. Do you understand that? You with me?

A. (Nodded head.)

Q. And if they're guilty, then they're still eligible for both punishments. You're eligible. You understand?

A. Uh-huh.

Q. Would you consider them both eligible? That is, even if you found, hey, I don't think this is the trigger person or this is a case of aiding and abetting, encouraging the deaths, could you still consider fairly both punishments?

A. I believe I could.

Q. Okay. You pretty confident in that?

A. I think so.

MR. BERRIGAN: All right. Well, you've been very patient with me.

PROSPECTIVE JUROR 296: Thank you.

MR. BERRIGAN: Thank you, ma'am.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

EXAMINATION

BY MR. MILLER:

Page 166

Q. Good afternoon, ma'am.

A. Hi.

2768

Q. This is going to be very quick. Mr. Berrigan was very thorough, and I appreciate your thoughtful responses. I gather from you not only what you've told us here today but from your answers in the questionnaire that you feel that you could give serious consideration to both possible punishments and that these questions about the killing of children and the question of whether a person was a trigger man or not are factors that are appropriate for you to consider in the punishment, but none of those factors would dictate what you're going to do. They're merely factors that you would weigh.

A. Right.

Q. And I think you'll be pleased to know that that's what you'll be instructed, that you must consider all mitigating and aggravating factors proven by the evidence, and there may be an assortment of other ones that we haven't even discovered or discussed. But whatever they are, you would consider them all with an open mind to both possible punishments before deciding. Fair statement?

A. Fair statement.

Q. Thank you so much, ma'am. I only have one other question, and Mr. Berrigan's already put this to you, and I want to just be sure I can put it to you one more time because in the event that the jury decides that the appropriate punishment in this case -- again, assuming we get to the punishment phase, should the jury unanimously decide that the appropriate punishment is

2769

Page 167

death and you understand that that is a most serious decision and you wouldn't take it lightly, they cannot return that verdict unless every last one of those 12 signs a verdict, and that signature on that verdict form would, in fact, you understand have the practical effect of taking a human life. Do you feel that you could do that under those circumstances?

A. I don't know.

Q. And you expressed that. You weren't sure. And you've never been in that position before. I understand.

A. Right. I have to be honest and say I don't know.

Q. And we appreciate that, and we thank you for your candor. And never having been in that position is part of the dilemma here. All we can do -- and I realize this is difficult -- is ask jurors to try to imagine whether or not deep inside themselves they feel that they would have the fortitude to do that if they felt that was the appropriate punishment knowing what the results would be.

A. And I'm not sure if I could honestly so . . .

Q. And we appreciate you bringing that to our attention. Can you just expand on that and tell us why you have those concerns?

A. The death penalty, that's very, very serious. That's something I would have with me the rest of my life, and I'm not God, and would I ever -- I'm just saying I don't know. I'm not saying I couldn't. I'm just saying sitting here today I just am not sure. It's a very serious thing to me to impose the death

2770

penalty on someone.

Q. And it should be.

A. And I think that I'd have to hear the case, know more

Page 168

information, and be able to make a decision, and that's why I can only say I'm just not sure.

Q. Okay. And perhaps that's the best you can do.

A. It is.

Q. And I apologize for pressing you on this, but I just need to try --

A. That's okay.

Q. -- to be sure I have an understanding of where you are. Are you telling us that if you were on this jury and you get to the penalty phase after you and all 11 fellow jurors conclude beyond a reasonable doubt that Angela Johnson is guilty of these crimes, including the intentional killings of five people which include two vulnerable victims, grade school age children, if after listening to all that and if after going through the punishment phase and weighing the mitigating and aggravating factors in accordance with the Court's instructions you unanimously conclude that in this case the death penalty is the appropriate punishment, there would still be the responsibility of placing your names on a verdict that would have, as you clearly understand --

A. So that would be if I said yes --

Q. Yes.

2771

A. -- would I be able to sign --

Q. Sign a verdict that would have the effect --

A. If I decided yes, the death penalty, would I be able to sign my name? I would say yes.

Q. Even understanding that that would have the practical effect of imposing the death penalty on another human being.

A. (Nodded head.) If I came to the decision that I was in

Page 169

agreement with the death penalty.

Q. Yes, ma'am.

A. I would hope I would be able to sign the form because I would be making the decision. I would have made the decision. It would just be signing.

Q. Very good, very good. And I understand that. And I appreciate the fact that you would take that responsibility very seriously, and, of course, you should. My question is merely one of the willingness and assurance that you feel that you can shoulder that very, very serious responsibility.

A. I hope I could. I just . . .

Q. And without belaboring it, I know from experience that some people tell us that as much as they understand the concept and do not disagree with the concept that the death penalty can be appropriate, they tell us that they simply cannot assure us that they would be able to sign their names to such a form simply because they have personal qualms about their own --

A. I may have. I don't -- I'm just -- I'm not being of much

2772

help here. I'm just not sure.

Q. You're doing just fine, and, ma'am, these are difficult questions, and I'm asking you to envision something --

A. Well, but it helps me to really think about it, you know. And I just can't give a definite answer so . . .

Q. And that's fine. Not everybody can. Give us your best thought. Do you think -- if you are required to be in this position, what's your best feeling as to whether or not you would be able to actually sign such a form should you and your fellow jurors come to that conclusion? And I apologize if I've asked this question.

Page 170

A. I don't know. Sorry.

Q. Don't apologize.

A. Okay.

MR. MILLER: Again, what's in your heart is all we can ask for, and we appreciate your sincerity and candor.

I have no further questions, Your Honor.

THE COURT: I have a few questions for you. And first I wanted to thank you for struggling as hard as you are with answering our questions because it's not easy.

PROSPECTIVE JUROR 296: It's not.

THE COURT: And we can all see that you're being incredibly conscientious in answering our questions, and I know I speak for the lawyers in telling you how much we appreciate that.

2773

I'm a little bit confused about a couple of things.

PROSPECTIVE JUROR 296: Okay.

THE COURT: One is I thought you said if you could vote for the death penalty, then you'd be able to sign the verdict form, and then I understood you to say, well, you weren't sure you really could sign the verdict form. And so what do you think about that?

PROSPECTIVE JUROR 296: Well, he explained it a little differently, kind of like signing the contract, signing the dotted line, you know.

THE COURT: Well, in this case as in every other --

PROSPECTIVE JUROR 296: So it made me think about it a little bit more.

THE COURT: Sure, it does.

PROSPECTIVE JUROR 296: I would like to think that if

Page 171

I came to the decision to impose the death penalty that I could sign the form, but I can't say that I can for sure.

THE COURT:  And can you tell us what your reservation is in signing the form?  Is it because that's the final act that records your judgment?

PROSPECTIVE JUROR 296:  Well, possibly.

THE COURT:  Or is it something else?

PROSPECTIVE JUROR 296:  I'm not sure how I feel about the death penalty.  I just -- but if I . . .

THE COURT:  Isn't that a different question?

2774

PROSPECTIVE JUROR 296:  Yes.

THE COURT:  And just so that you know, in every case that I have -- and I'm different because I don't know another federal judge in the country that does it this way, but very early about nine years ago I decided that whether it's a guilty verdict or not-guilty verdict, every juror should sign the verdict form, so in every case that I have, every juror signs the verdict form.  I just -- that's how I've always done it.  In death penalty cases they're actually required to do it.

PROSPECTIVE JUROR 296:  Yes.

THE COURT:  In other cases I made the decision to require every juror to sign the verdict form so that I know that they've at least thought about it enough that they'll sign their name to it.

PROSPECTIVE JUROR 296:  If I came to the decision that I was for the death penalty, I would want to be certain enough before I made that decision that I really believed it.  So then I believe I could sign the form.  I mean, I would know that then I would need to take that next step and be able to do it.

Page 172

THE COURT: And that's kind of why we tell you up front so that you know that.

PROSPECTIVE JUROR 296: Right. But I would want to make sure if I'm going to come to that decision that I'm able to do that.

THE COURT: I understand.

2775

PROSPECTIVE JUROR 296: It's the first decision that would be the toughest.

THE COURT: Of course.

PROSPECTIVE JUROR 296: If you're going to impose the death -- vote for that.

THE COURT: Right.

PROSPECTIVE JUROR 296: That would be the toughest decision. But if I do that, then I would believe I could sign the form.

THE COURT: Okay. Now I want to talk to you about that first decision.

PROSPECTIVE JUROR 296: Okay.

THE COURT: And I want to read to you -- we have what's called realtime, so I actually have the transcript of the earlier questioning of you.

PROSPECTIVE JUROR 296: Sure.

THE COURT: And I just want to read a question that Mr. Berrigan asked you, and then I'm going to read your answer, and then I want to dialogue with you a little bit about it; okay? So pardon me for not looking at you when I turn to my screen.

PROSPECTIVE JUROR 296: That's okay.

THE COURT: Mr. Berrigan asked you, And one of the

Page 173

questions that we need to know is whether in this kind of case you could consider the death penalty as an appropriate

punishment, whether that would be in your view a punishment that you'd realistically consider. And then your answer, I probably could consider it, not that I would, but I probably could consider it. And I just want to clarify a few things.

When you said "not that I would," I think I know what you meant by that, but I want to hear you tell us.

PROSPECTIVE JUROR 296: If I could consider the death penalty?

THE COURT: Yeah. What you answered was, I probably could consider it, not that I would, but I probably could consider it.

PROSPECTIVE JUROR 296: Well, what I think I was saying was I would keep an open mind to it and try to come to a fair decision based on the evidence.

THE COURT: Okay. And that ties into my next question. And that is you said, I probably could consider it.

PROSPECTIVE JUROR 296: I could consider it.

THE COURT: Okay.

PROSPECTIVE JUROR 296: The death penalty, yes.

THE COURT: Okay. And I'm just going to add one other word to it.

PROSPECTIVE JUROR 296: Okay.

THE COURT: Can you fairly consider it?

PROSPECTIVE JUROR 296: Yes.

THE COURT: And you know what I mean by fairly? Just

not that you -- Mr. Berrigan uses a phrase a wink and a nod. Oh, yeah, I considered that, and then you move to life imprisonment or the other way around. I want to find out if you think you could fairly consider both punishments. Could you give fair consideration to life imprisonment and also give fair consideration to the death penalty if there ever was a penalty phase in this case and you were a juror on the jury? Could you fairly consider both?

PROSPECTIVE JUROR 296: I -- yes. I'm not sure how I feel about the death penalty. I just am not sure how I feel about it, especially when -- depends on the involvement of the person. I mean, I just am honest in saying I don't know.

THE COURT: And that's why nobody's asking you how you would ultimately vote because you haven't heard the evidence.

PROSPECTIVE JUROR 296: That's right. Thank you for saying that.

THE COURT: That's a good point, isn't it? Well, that's a big point. And hopefully -- I mean, I hope we have 18 people who if we ever get to a penalty phase would have no idea how they'd vote because they haven't heard the evidence, so that's what I hope. It's okay not to know how you'd vote. I don't want to know how you think you might even vote. I just want to know could you fairly consider both --

PROSPECTIVE JUROR 296: Yes.

THE COURT: -- if you think you can fairly consider

2778

both, and not everybody can, and not everybody can. And, you know, the fact -- it should be incredibly difficult to impose the death penalty.

PROSPECTIVE JUROR 296: And I would have a hard time

Page 175

making that decision.

THE COURT: Of course you would. It's probably -- that would be a tougher decision than any I've ever had to make in my life, and I have to make tough decisions every week, but that's the ultimate tough decision I would think. And so all I want to know is do you think you can fairly consider both?

PROSPECTIVE JUROR 296: I think I could.

THE COURT: Okay. Good. Thank you. You know what? We're going to ask you to step outside. And we'll let you know your status.

(Prospective Juror 296 exited the courtroom.)

THE COURT: Who started? I think Mr. Berrigan did.

MR. BERRIGAN: Yeah. No motion by the defense, sir.

THE COURT: Okay. Any motion by the government?

MR. MILLER: Yes, Your Honor. If I may very briefly.

THE COURT: Sure.

MR. MILLER: This juror is clearly a very thoughtful woman and just may be as fair a juror as we could possibly hope for.

THE COURT: But there's a big but coming.

MR. MILLER: Yes, I stress the word may be. We simply

2779

don't know. I would urge that she is substantially impaired, and here very briefly is my argument, Your Honor.

She did on occasion say that she could fairly consider both punishments and said so repeatedly, and I think she was sincere whenever she made that comment, but I also think she was sincere when she said, I can't say that I can do so when asked if she could consider the death penalty verdict. And I think I would urge the Court simply that just as the defendant must have

Page 176

people who are not equivocal but can absolutely assure us that they can give her the presumption of innocence so both sides are entitled not just to someone who equivocally thinks they can probably do so but who nonetheless can unequivocally assure us that they feel in their hearts that they can fairly consider both punishments and return either verdict that they deem is appropriate.  And I think this woman has clearly indicated that she cannot give us that assurance, so that's the basis for my motion, Your Honor.

THE COURT:  Mr. Berrigan, any reply?

MR. BERRIGAN:  Very briefly.  This is an instance where the Court cleared up what I thought was a misconception she had all along, is we're asking her how she's going to vote. And when you said, That's not what we're asking you, she said, Thank you with a big exclamation mark, and I think that's what was going on with Mr. Miller and I both, frankly.

So I think once that was cleared up it was very clear

2780

she could go either way, so we do not think there's grounds for a strike for cause on Juror 296 and would respectfully object to it.

THE COURT:  Yeah.  I don't think there's grounds for cause.  I mean, I think she's very thoughtful.  I think she struggled with it, but I'm convinced in the sincerity of her answer that she could fairly consider both.  Is she an individual who's leaning towards the death penalty?  Obviously not.  She's not.  But I think she can fairly consider both, and because I believe that she can fairly consider both, she's not substantially impaired.

Would you like to exercise one of your remaining

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2422 of 3245

peremptory strikes?

MR. MILLER: Yes, Your Honor.

THE COURT: Okay. Then Juror 296 is stricken.

(Prospective Juror 296 entered the courtroom.)

THE COURT: Well, we're going to dismiss you from service in this case. I personally think you'd be an absolutely terrific juror, and hopefully we'll get you back on another case. But you're not going to be able to serve in this case. I'm sure you're greatly relieved by that news.

PROSPECTIVE JUROR 296: It was a learning experience for me.

THE COURT: Well, good. I'm glad that it was. Would you do us a favor, because we're going to be engaged in jury

2781

selection probably through this week and maybe a day or two next week, not to discuss this experience with anybody because whoever you discuss it with might talk to somebody else, and that somebody else might wind up in one of those chairs later this week or next week.

PROSPECTIVE JUROR 296: I understand that.

THE COURT: But once we get the trial underway, you can talk about it as much as you want; okay? Good luck to you. And thank you so much for coming in today.

(Prospective Juror 296 exited the courtroom.)

THE COURT: Okay. 213, the wedding juror. I don't think I'll be presiding.

(Prospective Juror 213 entered the courtroom.)

THE COURT: Juror 213, thank you. Please take any chair you'd like, and we're going to start first with questions from Mr. Miller, and then you'll hear from Mr. Berrigan.
Page 178

EXAMINATION

BY MR. MILLER:

Q.    Good afternoon, ma'am.  How you doing?

A.    Good.  Thank you.

Q.    Good.  We need to visit with you about two topics.  Number one is any information you may have about this case.  Secondly, we want to visit with you briefly about the death penalty; okay?

A.    Okay.

Q.    Before we get to either of those, I simply wanted to ask

2782

you briefly about your situation.  We heard from you this morning, and that's fine, and that's already been ruled on, but I think also in fairness not just to yourself but to those of us who are involved in this case, we would appreciate having a full understanding of the effect that serving for three months on this jury might have on you.  I trust with this very important day for you coming up in your life you're expecting to be giving a lot of attention to preparations.

A.    Yes.

Q.    And not merely for the wedding but for the honeymoon and the life to come.

A.    Right.

Q.    If you are required to serve on this jury -- and again, we understand that some people must make more hardship sacrifices than others, and we understand that is necessary.  Nevertheless we are concerned about the effect it may have on one's ability to concentrate and give us your full attention.  Is there any reason for concern in that regard with regard to what this will be doing to your personal life for the next several weeks?

A.    I think it would be difficult for me to concentrate on

Page 179

what's happening here with everything that's happening at home and everything that's happening in my life, and what's going to happen in the next couple of months is pretty big.

Q.   And without inviting you to spend too terribly much time describing it, can you just give me some sense for what it is

2783

you're planning on doing in preparation and what's going to be going on with you in preparation for the wedding and the honeymoon?

A.   My mother and I are doing most of the work because my fiancé's parents live out of town.  So most of what has to happen, I mean, with prep -- everything leading up to the actual wedding is pretty much my responsibility.

Q.   Okay.  You're a school teacher, so I assume you'll be done with those responsibilities here in a few weeks.

A.   I do have a few -- a couple of summer obligations, but yes.

Q.   I was wondering if you were planning on taking any time away from those in order to be focusing on preparations for the wedding.

A.   Yes, I do have a couple personal days taken.

Q.   Moving on to the issue of pretrial publicity, you -- let me just ask you, what, if anything, do you recall hearing about this case other than what came in the packet from the Court?

A.   I remember hearing about it on the news, but I don't recall any of the details or anything like that.

Q.   And I trust you've formed no opinions one way or the other about the merits of the case.

A.   No, I have no opinions.

Q.   Death penalty is the final issue, and I just want to go ahead and invite you to share with us in your own words how you

Page 180

feel about that subject.

2784

A.   I don't have strong opinions one way or the other.  I think I would have a very difficult time trying to decide what someone's fate would be.  I think I would be very uncomfortable with that situation, but I don't have strong opinions either way.

Q.   Well, let's get to that then.  How do you feel about the prospects of being in a situation of shouldering the responsibility of passing judgment on another human life?

A.   I'm not comfortable with that.

Q.   And, frankly, we would hope that that responsibility would not be something that rests easily with anyone; okay?

A.   Right.

Q.   Fair statement?

A.   Yes.

Q.   So I'm just wondering whether you feel your own concerns about that as a responsibility are any more than what you would expect anyone to have or if you have what you feel are more serious qualms about that responsibility.

A.   I would say they're probably pretty average for most people.

Q.   Fair enough.  And we would expect anyone to take that responsibility very seriously.  You have no strong feelings one way or the other about the death penalty as a policy.

A.   No.

Q.   In this case -- and you recall the judge describing briefly

2785

Page 181

how the process works. In the event that you would come to a third stage of the proceeding, should you and your fellow jurors unanimously conclude that this defendant is guilty beyond any reasonable doubt of one or more of these crimes charged, it may ultimately come to you to decide what the punishment may be, and the process would involve following instructions requiring you to consider and weigh both aggravating and mitigating factors before coming to a final conclusion. Do you recall the judge describing that process?

A.    Yes.

Q.    Did that make sense to you?

A.    Yes.

Q.    And do you feel that's something that you could do?

A.    I believe so.

Q.    You'd want to do that. And do you see any problems about your ability to follow such instructions?

A.    No.

Q.    Okay. Now, let's just get a little more specific. This case involves accusations that this defendant participated in the killings of five people including two what we would allege are vulnerable victims, namely, two grade school age children. You deal with grade school age children every day.

A.    Yes.

Q.    If you are instructed that if proven that that should be considered as an aggravating factor, I assume that makes sense

2786

to you and that's something you would be able to consider as an aggravating factor?

A.    Yes.

Q.    Conversely, you would be instructed that any mitigating

Page 182

factors proven -- and, of course, the defense has no obligation to prove any mitigating factors, but if there are any mitigating factors proven which would be the flip side of the coin, factors that might lessen the seriousness of the involvement of the defendant or at least in some way tend to argue for leniency as opposed to harshness in punishment, that you must consider each of those mitigating factors that you find, does that make sense to you?

A. Yes.

Q. And can you think of anything that you think might be -- and this, again, isn't a civics test but anything that pops to your mind about things that might be mitigating factors when considering whether or not someone should have harsher or less harsh punishment?

A. I'm not sure.

Q. How about a lack of prior criminal history? Is that something that would fairly be considered if you were instructed to consider that? If it's proven, is that something you feel you could consider?

A. Yes.

Q. And would consider if instructed?

2787

A. Yes.

Q. What we need to do is find 12 jurors who can assure us that in this case as you understand the allegations to be and assuming those allegations are proven, can you still fairly and realistically consider both possible punishments, both the possibility of the death penalty and the possibility of life in prison?

A. I think so.

Page 183

Q. Any -- you know, people say "I think so" all the time. I do it myself. But whenever we hear that from a prospective juror, we lawyers get squeamish and say, Yeah, but we want an assurance at least to the extent that you can. Do you feel that you can assure us that you can do that?

A. Yes.

Q. Thank you so much, ma'am. Ultimately, ultimately, if you would be required to serve on this jury and if this jury would find beyond a reasonable doubt that Angela Johnson is guilty of these crimes and if after listening to the penalty phase evidence and weighing all that evidence you and your 11 fellow jurors unanimously decided that the death penalty is the appropriate punishment, under those circumstances, ma'am, you could not return a verdict finding that punishment unless each member of the jury were to sign his or her name to a verdict form that would have that very practical effect of taking a human life. Now, that is an awesome responsibility, and I'm

2788

sure you wouldn't take it lightly. But some people simply feel that given the gravity and the consequences of that act that they simply could not do that. Do you feel that you could do that?

A. I think I might have a hard time doing that.

Q. And we would expect that anybody would pause and think about that. You'd think about the consequences. The question is would that affect your ability to return a guilty verdict, concern about the fact that what you are doing is your verdict and would have the effect of taking a human life?

A. I don't know.

Q. And, you know, maybe that's the best you can tell us, but

Page 184

if I can back up -- and these are difficult questions, and we understand we're asking you to imagine yourself in a situation that, number one, may never happen. And, number two, it's looking into the future, and you don't know what all the facts are going to be. But all I can do is ask you if you can assume for the sake of argument, assume that you're sitting here weeks from now and the jury has unanimously concluded that beyond a reasonable doubt the defendant is guilty of participating in five intentional murders including the killings of two grade school age children. And assume that after weighing all of the aggravating and mitigating factors you unanimously conclude that the death penalty is appropriate in this case --

MR. WILLIAMS: Two minutes.

2789

Q. -- your best opinion -- and it's all we can ask for, and I know not everybody can tell us for sure. But in your own best opinion, do you feel that you would be able to carry out what you and your fellow jurors had decided, namely, to impose that admittedly very serious punishment?

A. Yeah, I think so.

Q. And that's all we can ask is for your best opinion as to what's in your own heart and your own ability. Conversely, you understand that should you or anyone else on that jury decide otherwise, the result would be and your verdict would be life rather than death. And do you feel you could do that under these circumstances and fairly consider that as a possible punishment as well?

A. Yes.

MR. MILLER: Thank you, ma'am. I have no further questions.

Page 185

THE COURT: Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q. How are you doing so far?

A. Fine. Thank you.

Q. I hope you'll take some comfort in that if you're selected as a juror that you will undoubtedly join the two farmers and the couple that gave up their life savings in the future discussions that Judge Bennett will have with other jurors in

2790

the future. I have little doubt of that. I don't know if that comforts you in any way, but --

THE COURT: The difference is they volunteered to give it up. She did not.

Q. Well, she certainly hasn't volunteered off, and we appreciate your honesty. I guess I need to address that very briefly. The judge has told you what our schedule is. You have Fridays off. There are going to be regular breaks every single day, and there's going -- I don't think you are going to have any problem falling asleep in this case. I mean, this is a pretty dramatically serious matter. I think that's probably painfully obvious.

A. Yes.

Q. All right? And we need people that are going to pay attention, frankly, and listen to the evidence, and you certainly seem to be doing that so far, and the judge is even going to let you take notes. But we really need your assurance that you'd do that if you were selected as a juror, you know, listen carefully to these witnesses, pay attention to what they're saying, and make an assessment about what you think

Page 186

about the testimony and the evidence that's presented.  Is that something that you're willing to do for us?

A.    Yes.

Q.    Okay.  Then I'm going to put that to bed; okay?  You mention a couple of things in your questionnaire about the death

2791

penalty, and I just want to ask you about them just to see if I understand.  You were asked this really kind of general question about your views on the death penalty.  It's number 75.  It says, What are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of intentional murder?  And you said there should be an option for a person who's found guilty of murder, however, only if the crime was brutal.  And it's hard for us not to think like lawyers sometimes because I'm thinking -- I'm trying to imagine what would not be a brutal murder in that it's because of the murder part.  I mean, we have all kinds of different murders.  People drive drunk and they crash into other people, and I know that's probably not what you're talking about, but I wanted to ask you what that brutal murder meant if you had some scenario in mind.

A.    I guess what I was thinking was multiple people involved or, I mean, just like some of the things that you see on TV all the time.  That's what I had in my brain.

Q.    All right.  I got that.  And then you indicated that, you know, children -- this was in the section just before you were asked questions about your views based on the media, and I know you didn't see much about this case, and really you didn't form any opinions about Angela's guilt.  Am I right?

A.    Right.

Q.    But you did say in response to this question, Do you have

Page 187

any beliefs or opinions as to the appropriate punishment for

Angela Johnson if she were found guilty of intentionally killing five people including two children? You said, Yes. I believe if someone intentionally kills five people, especially children, should receive the death penalty or spend the rest of their life in prison. Is that right?

A. Right.

Q. And in your response to Mr. Miller, I think I understood this, but it's so important I want to be clear. What the allegations are here are the type of things that you're talking about when you talk about brutal murders; okay?

A. Yes.

Q. You got that?

A. Yes.

Q. I've been using these books because sometimes it helps visually. I know you teachers are big on that kind of stuff. Five intentional murders, that's what they're alleging our client did or participated in. They're alleging that they were premeditated, you know, meaning they were substantially planned and that -- as you know now, that amongst the five victims were a mother and two children, her children, ten- and six-year-old girls, Kandi and Amber Duncan. And what we really need to know is if jurors found themselves -- and that's a huge if, and I want to be clear. You know, myself and the other defense lawyers are going to fight very hard for Miss Johnson. I don't want you to get the impression we think she's guilty of anything

because we're asking these questions; okay?

A.    Uh-huh.

Q.    But if we were in a situation as the judge described where we got to the third phase -- and we might never be in that position -- but if we were there, that's what we're talking about, you know, that scenario, pretty -- very -- I think we could all agree that's a brutal murder.  And then we have to know whether people can consider both punishments fairly even then.  And so far you've been saying, Yes, I could consider both of those.  Is that true?

A.    Yes.

Q.    Okay.  Then I want to ask you just a couple of questions about the process, and then I'm going to sit down, and you're going to be done.

A.    Okay.

Q.    Because you've never sat on a jury before; right?

A.    No.

Q.    I need to tell you that this third part of the trial if we get there is going to be a lot different than the first part of the trial or anything you've seen on television because on television and in most trials the jurors act as a single unit in making decisions.  They confer with each other, and they discuss their views and opinions, but when it comes time to make a verdict, they have to vote as one, one body.  And so on the issue of whether the government's proven guilt beyond a

2794

reasonable doubt, the jury comes back and they say either yes, you've proven that, guilty or no, you haven't proven that, not guilty.  Are you with me?

A.    Yes.

Q.    On this issue about punishment when you're going to be
Page 189

weighing these factors, these things that we've talked about for the government -- the defense is going to present reasons, what we call mitigating factors, that we'd ask you to consider to vote for life, things like the defendant doesn't have a criminal history, her role in the offense is minor compared to other people involved, that she was abused physically, sexually as a child, and we're going to ask you to weigh these things and come to a decision that in your heart and mind is true and just; okay?

A.    Okay.

Q.    And that weighing process, the numbers don't mean anything. It doesn't matter if there's ten mitigating circumstances and two aggravating circumstances or vice versa because you give these circumstances whatever weight you desire.  You understand?

A.    Yes.

Q.    You could decide that one aggravating circumstance outweighs six mitigating circumstances or the other way around. That's up to you.  It's your decision; okay?

A.    Okay.

Q.    And the jurors don't even have to agree on these mitigating

2795

circumstances.  You could find I think this is important to me. I want to weigh it and consider it.  Somebody else might say, Well, that's not important to me, but this is.  And they'd be each entitled to weigh whatever they wanted to in terms of those mitigating circumstances.  You with me?

A.    Yes.

Q.    Okay.  And then the decision after the weighing is this. You have to decide which of these outweighs the other for me in terms of the punishment; all right?

Page 190

A.    Uh-huh.

Q.    The judge isn't going to tell you you ever have to vote for death because the law doesn't require that.  But you do have to come to that determination yourself as to which is appropriate; okay?

A.    Yes.

Q.    And again, I mean, I know you haven't heard any of the evidence, and we're not asking you how you would vote.  We just need to make sure you could do that.  If you were in that situation and you came to a decision, is that -- and again, you're going to have to -- as you pointed out, you have to live with that decision the rest of your life.  Is that a decision you'd expect other people to respect?

A.    Yes.

Q.    And would you be willing to respect the views of your other jurors if they came to a different decision than you?

2796

A.    Yes.

Q.    Because the law doesn't require in the penalty part that the jurors agree; okay?  It does earlier on the guilt part or innocent part but not on the penalty.  If you disagree, the sentence is life.  You with me?

A.    Yes.

Q.    Okay.  Are you comfortable with that?

A.    Yes.

     MR. BERRIGAN:  That's it.  Thank you very much.  I appreciate your patience.

     PROSPECTIVE JUROR 213:  Thank you.

     THE COURT:  Juror 213, I've got a couple questions for you.  When did you say your honeymoon was planned for?  What

Page 191

days in June?

PROSPECTIVE JUROR 213: It's the 18th -- we leave on the 18th of June, and we're gone for 10 days.

THE COURT: What is your ability to reschedule that?

PROSPECTIVE JUROR 213: It's not very good. We both have summer teaching obligations in July and August.

THE COURT: So if you don't go on June 18, you're not going to get to go?

PROSPECTIVE JUROR 213: Right.

THE COURT: Okay. And you're pretty sure of that.

PROSPECTIVE JUROR 213: Yes.

THE COURT: I just wanted to let you know I'm

2797

rethinking about whether I think that's a severe or extraordinary hardship. One of the reasons why I was kind of tough on you is my experience is if I give in to too many requests it just feeds other jurors to request things, and I always knew I had the ability to come back individually and reconsider it, you know. And so I am going to reconsider it. But if I decide that you're still in the jury pool, it's okay for you to be mad at me because I'm not letting you go on your honeymoon, and I understand that, and I would expect you to be, and in my job I make so many people mad at me so often that I'm just used to it, and it just rolls off my back. But here's what I want to make sure. If you were mad at me because I didn't let you out, would you take that out in any way on either side in the case?

PROSPECTIVE JUROR 213: No.

THE COURT: Okay. I don't think that you would, but I just wanted to ask you that. If you'd step outside, we'll let

Page 192

you know the decision; okay? Thank you.

(Prospective Juror 213 exited the courtroom.)

THE COURT: Knowing that she can't reschedule it because of other teaching obligations, I'm inclined to grant her a hardship excuse. Anybody object to that?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: No, sir.

THE COURT: Okay.

2798

(Prospective Juror 213 entered the courtroom. )

THE COURT: Have a great honeymoon.

PROSPECTIVE JUROR 213: Thank you.

THE COURT: Okay? And do us a favor. Because we're still in jury selection for this week and probably will be into next week, we don't want you to talk about this because you might say something very innocently to somebody; they might then repeat it to somebody else, and that somebody else might wind up in one of these chairs. But congratulations on your wedding, and have a wonderful time in London; okay?

PROSPECTIVE JUROR 213: Thank you.

THE COURT: Thank you. Bye now.

(Prospective Juror 213 exited the courtroom.)

THE COURT: Why don't we take a 20-minute recess and come back and finish up 13 and 15 (sic).

(Recess at 2:28 p.m.)

THE COURT: Ready for 13?

MR. BERRIGAN: Your Honor, yes, sir, but before we bring this juror in, I just wanted to bring to your attention, this is the man that in the general voir dire indicated that he had some problems with his mind wandering, some drug problems,

Page 193

and also following police instructions. But most importantly to me, he failed to answer question 72 through 76 in his questionnaire and 81 through 87. And for the Court's edification, although you undoubtedly know, those are questions

2799

having to do with his opinions about publicity and an opinion about guilt and all of the death penalty questions. He doesn't give any answers which may be explained by what he told us this morning. But if I needed more time, I wanted to --

THE COURT: You can certainly --

MR. BERRIGAN: -- put you on notice that I might ask for it.

THE COURT: You bet. You can have more time if you need it.

MR. BERRIGAN: Appreciate it.

THE COURT: Yeah.

(Prospective Juror 13 entered the courtroom.)

THE COURT: Juror 13, anywhere in the front row.

Everybody please be seated.

Juror 13, thank you for being patient with us today. And we're going to start first with questions from Mr. Berrigan.

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, sir?

A. Fine.

Q. Good, good. Thanks again for waiting for us. We're really interested in questioning you about two areas this afternoon. One has to do with your exposure to media coverage and the other one, your views about the penalties that are potentially involved in this case.

Page 194

But before I did that, I wonder if I could revisit with you briefly some answers that you gave this morning just for clarification purposes. I thought I heard you mention that you had some difficulties with your mind wandering, and I wonder if you could tell us a little more about that.

A.    I lose concentration.  If I'm asked or even visiting with people and it -- for an ex -- if they talk quite an extended period of time, I don't remember exactly what they started out -- what the conversation started out with.

Q.    Okay.  And is this a condition that has been medically diagnosed for you?

A.    I guess as I get older it's just one of these things that's happening.

Q.    I think it's happening to me too frequently.

A.    I can remember things that happened a long time ago, but things that happened yesterday is . . .

Q.    One concern we might have about that is that jurors would have to listen to witnesses testify during the trial.  Some of the witnesses may be on the witness stand for substantial periods of time, and it would be very important that not only did you listen to the testimony but that you could concentrate on it, absorb it, and analyze it as any other juror would be. And the judge has pointed out that you could take notes to help you with that, and you indicated maybe that that wouldn't be so helpful.  And I just wanted to know why that wouldn't help you.

A.    I can't write fast enough for one thing, and basically when

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2440 of 3245

I do write, if it's in numbers. I'm fine. But to write words,
I have a problem.

Q. Okay. You did -- I see you graduated from high school?

A. Yes, sir.

Q. And there were several portions of your questionnaire that
you did not answer, questions about your views about punishment
and the death penalty and life without parole, and I was
wondering if that had anything to do with this issue, or was
that something else?

A. I guess I didn't understand completely how I was supposed
to answer that or what really the question was.

Q. Okay.

A. So rather than write down something that I didn't
understand, I just left it blank.

Q. Okay. Great. I appreciate that explanation. There was a
couple real quick things. You told us that you really had some
problems with drugs or people involved with drugs if I heard
that correctly because of your experiences with your nephew and
your daughter who works in a drug rehab center; is that right?

A. Yes, sir.

Q. And is that -- could you explain why -- what the particular
problem is there? I mean, we all don't like drugs. Let me
rephrase that. None of us like drugs, illegal drugs, infecting
our communities. I mean, you understand that; right?

2802

A. Well, I have worked with some people that had drug
problems, and I seen how it affected them, and I knew that they
had a choice of being on them or not. And I could not
understand why they would want anything to do with them, and
I -- I just don't feel comfortable in that situation, you know.

Page 196

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2441 of 3245

Q.   In your questionnaire, this was one of the questions you answered.  It's a question about is there anything that might hinder your ability even slightly from being an impartial juror.  You said, Yes, I have no use for drugs or anyone who uses them.

A.   This is true.

Q.   Okay.  Well, I guess part of the issue I guess I'm wondering about is the government's made these allegations, but that doesn't mean they're true.  You know, they're alleging that Miss Johnson committed these murders during the course of a drug conspiracy or continuing criminal enterprise, but those are just charges.  You understand that?

A.   Yes, sir.

Q.   Okay.  And you -- in the second part of the questionnaire that asks about what you know about this case from the media attention, you indicated that you'd only just heard about it.

A.   This is true.

Q.   And you don't write anything in about what you heard about.  You know, there's no -- I guess what I don't know is what you heard about it.

A.   I never heard nothing about it.

2803

Q.   Okay.

A.   Until I received the notice, that was the first I'd heard about that -- or first time that I was aware of that case.  If I did hear something about it, I don't remember it.

Q.   There was a question that says, No matter what you have read, seen, or heard, do you now have any beliefs or opinions about the guilt or innocence of Angela Johnson, and there were really three choices, yes, no, and unsure and then please explain, and you left that question blank.  Did you understand

Page 197

that question?

A.    No, sir.

Q.    Okay.  Do you understand it now that I've read it or . . .

A.    Yes, sir.

Q.    It's asking whether you have kind of a preformed opinion.  Do you have any kind of preformed opinion about Miss Johnson's guilt or innocence?

A.    That's a tough one.  What I would -- in my own feelings I would have to say that maybe I do.

Q.    Could you tell us why?

A.    Feelings.

Q.    Is it -- can you tell me anything more about it than that, what those feelings are?

A.    I guess not.  I don't know, sir.

Q.    That's important to us because Miss Johnson, even though her case was in the media and you didn't even see it, but she's

2804

entitled to jurors that can presume her innocent.  You know what I mean by that, presumption of innocence?  Anybody who comes into a courtroom on trial for anything -- I mean, a traffic ticket -- they get the presumption of innocence that, you know, they're not -- nobody should think they're guilty just because they're charged or there's any guilt at all in connection with them as a defendant.  That's what we're talking about in terms of presumption of innocence.  Are you with me on that?

A.    Yes, sir.

Q.    Okay.  Was that what you understood presumption of innocence to be?

A.    Yes.

Q.    Okay.  And are you telling us you have some problem with

Page 198

that?

A.    All I'm saying is that I -- I don't know.  I try to be very fair in my judgment, but when I have these inner feelings, I -- they -- I can't let them go.

Q.    Okay.  Well, and I'm not trying to get you to do anything you don't want to do.  It's like the judge said earlier, you know, when he was talking about your duty to serve and your duty not to serve.  We just need to know kind of what these feelings and views are so we can try to make an assessment about whether you might be a good fit as a juror for this case; okay?  I hope I'm not sounding critical of what you're telling us.  I don't mean to be.  But this is really a pretty important concept to be

2805

honest.  And so we need to be able to know absolutely really without much question at all that if you're selected as a juror this isn't going to be a problem.  You know what I mean?  That we're not going to have to have any doubt in our minds that you're going to presume this woman innocent.  And if you have some doubt about that, then we need to know about that.  You follow me?

A.    (Nodded head.)

Q.    So what can you tell me about that?

A.    I guess if I was part of the jury, I would have to look at everything and be as fair as I possibly could, but, you know, I just -- I guess the question is whether I can do it or not.

Q.    Well, that's a little different issue, not to try to confuse you.  Looking at the evidence, I'm sure you would be fair just as you've indicated.  This is before we even get to that point.  This is like right now.  And it's a question of whether you can tell us without any equivocation, without any

Page 199

holding back, I can presume that woman -- you can look at her, right -- look her right in the eye and say without question, I can presume that you are innocent. And if you can't do that, if that's going to be some kind of a problem, we just need to know about that.

A.   I don't know if I could do it or not.

Q.   Okay. And I can see you're sort of struggling with it, and I appreciate you giving us your response about that. Can I

2806

visit with you about two other things, and then I'm going to stop questioning if . . .

One has to do with police officers. You told Mr. Willett this morning -- he asked you, you know, police officers are going to testify in this case. The judge is going to have an instruction that says the jurors cannot give more credibility to police officers merely because they're police officers than they would to other people. In other words, jurors are supposed to assess police officers' truthfulness the same as they would anybody else. You understand?

A.   (Nodded head.)

Q.   And you were asked about that, and you said you didn't know if you could follow that instruction. Did I hear that correctly?

A.   I don't think I said it. If I did, no. I think that they should be held just the same as anybody else.

Q.   Very good. So you would look at their testimony as you would any other witness.

A.   Yes, sir.

Q.   Okay. All right. And then I wanted to ask you about the death penalty and life imprisonment because you didn't answer

Page 200

any questions about that at all. And there's a question about what are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of intentional murder.

A. I agree with it.

2807

Q. Okay. And it's a question why do you feel this way or what are some of the reasons for your beliefs.

A. I don't know if this is going to sound right, but if I word it cowboy code or something, it's the way I grew up. You are held accountable for your deeds.

Q. Okay. How about this question? The other side of the coin is this life without parole penalty. Did you hear the judge say that meant life without parole?

A. (Nodded head.)

Q. And there's a question here that asks you what are your thoughts and opinions about life in prison as a punishment for a person who's guilty of intentional murder, and you left that blank. I wonder if you could tell us what the answer is to that.

A. I guess I really don't feel that that's adequate punishment.

Q. Why not?

A. Eye for an eye, tooth for a tooth.

Q. When you say an eye for an eye, tooth for tooth, I sort of think I know what you mean, but I wonder if you could just explain that for us.

A. If you take a life, your life should be taken.

Q. Okay. So let me ask you this question here. This is number 84 in the questionnaire. It says, Do you think that life in prison without the possibility of parole is a severe-enough

Page 201

punishment for a person convicted of an intentional and premeditated first-degree murder?

A. No.

Q. No? Why not?

A. Because I believe their life should be given for the life they took.

Q. Okay. You understand the charges in this case, sir, are that the government's alleged Miss Johnson did commit five intentional murders? You understand that's what she's charged with?

A. Yes, sir.

Q. The government is also alleging that the murders were premeditated, they were done after substantial planning. You with me?

A. Yes, sir.

Q. And they've also alleged that two of these five victims were children, two little girls ten and six years of age; okay? You with me?

A. Yes, sir.

Q. All right. And those things the jurors are going to be asked to take into consideration in assessing punishment as what we call aggravating factors. They're things the government would argue warrants a sentence of death; okay? You with me?

A. Yes, sir.

Q. The defense might present evidence on the other side of the

coin like Miss Johnson doesn't have any criminal history or that she was abused as a child, physical or sexual abuse or both,

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2447 of 3245

things like that; okay? You following me so far?

A. Yeah.

Q. Okay. What we need to know is that if your view is a life for a life, if you take a life, you forfeit your life, and this is the kind of crime we have, intentional five murders, premeditated, children, okay, if -- and I know it's a big if -- but if you were at the point where you made a determination as a juror that's what happened, would you be able to consider a sentence of death as an appropriate punishment in that case?

A. Yes, sir.

Q. The other side of that coin is this thing about life imprisonment that I asked you earlier. The law provides life imprisonment as a possible punishment for that type of crime. Some people don't -- they don't think that's appropriate. And I need to know what your thoughts about that are. In that kind of a crime, premeditated murder, five people, two children, would you consider life without parole as an appropriate punishment?

A. Possibly.

Q. Well, when you say possibly, what do you mean?

A. I guess it'd depend on what the rest of the jurors done.

Q. Well, this would be -- and I didn't explain that, so that's a good answer. This would just be you making this determination about punishment. You'd have to make a decision yourself; okay?

2810

That's a little different than a lot of -- how the jury system works, but on the issue of punishment, you as a juror would have to make a decision about life or death; okay? You with me?

A. Then I'd have to say possibly, but I probably wouldn't agree with it.

Q. Why not?

Page 203

A. Because I just don't feel that it's punishment enough.

Q. Does that go back to your view about if you take a life you forfeit a life?

A. Yes.

MR. BERRIGAN: All right. I think that's all I have. Thank you for your patience, sir.

THE COURT: Mr. Miller, do you have any questions for this potential juror?

MR. MILLER: No, Your Honor.

THE COURT: Do you have any --

MR. BERRIGAN: I looked over. I looked over twice.

THE COURT: I understand. I understand. Do you have --

MR. BERRIGAN: Yes, sir. The defense would move for cause on Juror Number 13.

THE COURT: Okay.

MR. MILLER: And I think that's fair, and we appreciate his . . .

THE COURT: Okay. Thank you, gentlemen.

2811

Juror 13, we're going to let you go. We appreciate you answering the questions today, and sorry for keeping you around all day. That's just the way the system works. But you just wouldn't be a suitable juror in this case. I'm sure you'd be terrific in some other case where the death penalty wasn't an issue, but we really appreciate you answering the questions.

We'd ask that you do us a favor and not talk about this process until at least the end of next week when we have a jury selected because you might talk to somebody who might talk to somebody else, and that somebody else could wind up in one of

Page 204

these chairs later this week or next week. So thank you. You're free to go.

PROSPECTIVE JUROR 13: Thank you. I'm sure my cows ain't going to say nothing to anybody.

THE COURT: Stranger things have happened, but you never know.

(Prospective Juror 13 exited the courtroom.)

THE COURT: Ready for 596?

MR. MILLER: Yes, Your Honor.

MR. BERRIGAN: Yes, sir.

(Prospective Juror 596 entered the courtroom.)

THE COURT: Anywhere in the front row you like.

Everybody can be seated, and we're going to start first with Mr. Miller. Thank you.

EXAMINATION

2812

BY MR. MILLER:

Q. Good afternoon.

A. Hi.

Q. How you doing?

A. Just fine.

Q. Thank you so much for your patience. It's been a long day, I'm sure.

A. No problem. Glad to do it.

THE COURT: Okay. Now, what karaoke song do you want?

PROSPECTIVE JUROR 596: Okay.

THE COURT: There you go.

PROSPECTIVE JUROR 596: Sorry.

BY MR. MILLER:

Q. That's something you're not accustomed to, and most folks
Page 205

aren't.

A.    Definitely.

Q.    But we have a court reporter who needs to keep a record, so thank you so much for keeping that up by your mouth and speaking clearly for us.

Two questions -- well, I should say two issues.  There might be more than one question per issue.

A.    Okay.

Q.    Issue number one is exposure to pretrial publicity, and issue two is opinions on the death penalty; okay?

A.    Correct, okay.

2813

Q.    On issue number one, please just go ahead and share with us what information you have.  You indicated you're somewhat familiar.  Aside from the questionnaire and the information that came out from the Court, what have you heard about this case and from what sources if you could just describe?

A.    Miss Johnson's case particularly?

Q.    Yes, please, or any connected case.

A.    Well, the first trial, I kind of paid a bit of attention to that being it was on the local, you know, TV, whatever.  So I know a little bit about that.  Not really much pertaining to Miss Johnson at all, just a few clips.  Maybe I'd see something on the local news TV channel.

Q.    Well, you understand the Honken case is related, so any information you might have from that case would be something that we'd be interested in knowing.  Can you describe what you know of the case?

A.    Just like some of the details of the court proceedings that were here, the outcome, of course.

Page 206

Q.   When you filled out the questionnaire on the question about whether or not it may in any way have influenced you as to any beliefs or opinions about this case, you didn't check yes and you didn't check no.  You said you weren't sure.  And I'm just wondering if you could share your thoughts with us now because you've had a couple more months to think about it.  What's your feeling about whether or not you'd be able to put that aside and

2814

base your opinion solely on the evidence in this case or whether or not that might possibly be a concern for yourself as far as --

A.   Pertaining to the death penalty?

Q.   No, I'm talking, first of all, pertaining about guilt, pertaining any opinions about what actually happened.

A.   I think I could put -- yeah, put that all aside and just whatever the information comes out here with a clear mind.

Q.   Very good.  Let me just remind you when the judge described the role of the jury, you're our judges, and you're judges of what actually happened.

A.   Uh-huh.

Q.   And if -- of course, you know, nobody expects you to not be interested in what goes on in your community.

A.   Correct, uh-huh.

Q.   It's very natural to read news accounts, and then you find yourself a few weeks later or months later on a jury, and the question is simply do you feel that you can set aside what you've heard elsewhere, recognize that as being news accounts, and focus solely on the evidence that comes in here in making a decision?

A.   I think so, being that I'm put in this position now maybe
Page 207

and reading the jurors' code in the jury room.

Q.   Yes.

A.   Whereas it says as a juror I am a seeker of the truth which

2815

I think would help me a lot to decide, and pertaining to that, it would be difficult maybe to put a lot of the things, you know, aside, you know, of things that I probably did see on TV, maybe recalling them as it goes on maybe.  I don't know.

Q.   You recognize that what came through news accounts is news accounts and not evidence.

A.   That's correct.  I understand that.

Q.   And obviously it's not subject to rules of evidence.  It's not subject to cross-examination, and it's not under oath.

A.   Correct.  That's true.

Q.   It's important that if we have jurors who may recall reading things that they recognize that for being news accounts and focus only on what comes into the courtroom.  And some people simply say, Well, you know, I simply can't distinguish the two.  But if you feel you honestly can set aside those and recognize that as news accounts and focus only on what comes in in the courtroom, that's something else again.  I'm just wondering if you can tell us where you are on that.

A.   I think I could separate the two as far as, you know . . .

Q.   You told us about reading the jurors' code.

A.   Yes.

Q.   I take it you take that very seriously.

A.   Yeah.  After I -- you know, that's the first time I had the opportunity to read it, and yeah, it was . . .

Q.   You volunteered the comment this morning about coming in

2816

Page 208

here and seeing the flag and seal and that that kind of had an effect on you.

A. Yeah, definitely, yeah.

Q. This is quite a surrounding to be in, isn't it?

A. Yes, uh-huh.

Q. Let's move on to the question about the death penalty, and would you please just share with us in your own words your thoughts about the subject?

A. My own words would probably be very tough decision if a person would have to make that. As far as both sides, hopefully the information that would come out would be a big help in maybe deciding. It would be very difficult, but as far as personally voting one way or another?

Q. Okay. I want to make it clear. I'm not asking you how you're going to vote obviously. It may not even come to that.

A. Okay. All right.

Q. But the question ultimately is do you feel that your frame of mind is such that you could give fair consideration to both possible punishments?

A. Yes, I could, uh-huh.

Q. And you indicated that in the questionnaire. You stated -- and I'm quoting now from question 75 or rather your answer to that question, and it isn't penmanship on your part. It's my 55-year-old eyes.

A. It's probably my penmanship.

2817

Q. -- the fact if there are innocent victims involved death or life would be appropriate. Am I reading that correctly at least

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2454 of 3245

as you recall it?

A.    I couldn't -- I don't really recall word for word, no.

Q.    I apologize.  Let me just ask you this.  Do you feel that either death or life would be appropriate?

A.    Fair, yes, uh-huh.

Q.    In other words, you would seriously give full and fair consideration to both possible punishments.

A.    To both, correct.

Q.    And would you do that even understanding the nature of these allegations?  Ms. Johnson is accused of being involved in a drug conspiracy which involved five deaths including those of two grade school age children.

A.    Uh-huh.

Q.    Despite that extremely serious nature of the case, do you still feel that you could give consideration to both possible punishments if called upon to serve on this jury at a penalty stage?

A.    Yes, I think so, with other fellow jurors, yes.

Q.    Now, you may recall that among the many things Judge Bennett instructed you on this morning was a little bit of a description about how that third process will work if this jury ever gets to that stage.

A.    Uh-huh.

2818

Q.    You would be required to consider and weigh any mitigating factors that are proved and any aggravating factors that are proved, in other words, factors weighing one way or the other before arriving at your conclusion.  Did that make sense to you, ma'am?

A.    Uh-huh.

Page 210

Q. And is that the way you'd want to do it?

A. Yes.

Q. Now, the killing of children, the killing of multiple victims, if you are instructed that the killing of vulnerable victims or the killing of multiple people would be aggravating factors that you should consider if they're proven, does that make sense to you?

A. Uh-huh.

Q. And conversely, there may be -- and again, the defense has no obligation at any time to prove anything in any criminal case including this one. But if there are mitigating factors alleged, in other words, factors that would be in favor of the defendant on the issue of punishment -- and they could be a variety of things but just as an example -- and I'm not saying these would necessarily be the ones or they would be even beginning to list all of them, but there might be factors such as the claim that she lacks any prior criminal history, that her personal background is such that it bears consideration as far as having been victimized herself, that her involvement in the

2819

crime may have been less than that of another person. If instructed to consider those as mitigating factors if they're proven, could you follow that instruction and also consider those factors?

A. And consider them all, yes.

Q. And ultimately, could you follow an instruction that would require you as jurors to weigh all of the mitigating and aggravating factors proven to you before arriving at a decision as to which is the more appropriate punishment?

A. I would hope so, yes.

Page 211

MR. WILLIAMS: Two minutes.

Q. That would be your obligation.

A. Uh-huh.

Q. Ultimately in the event that you would be required to serve on this jury and assuming, assuming -- and I realize this asks you to look ahead to something that may never happen, but assuming you and your fellow jurors would unanimously conclude that Angela Johnson is guilty as charged and assuming that after a death penalty punishment trial you unanimously agreed that the appropriate punishment is death, under those circumstances you could not actually return that verdict and have that verdict enforced without signing, each and every one of you, your name to a verdict that would have that actual practical effect which is asking you again to shoulder a lot of responsibility. Do you feel under those circumstances, ma'am, that you could carry that

2820

out, that you could do that and sign your name to such a verdict?

A. After a lot of prayer, I would hope I would reach the right decision, right.

Q. And if you felt that that was your decision, that that was your decision unanimously, do you feel you could sign your name to a verdict that would have that effect?

A. I believe I could.

Q. And conversely, would you have any hesitation in signing a verdict that would say the contrary if you feel that life in prison is the appropriate punishment?

A. Yeah, I have no problem, uh-huh.

Q. Very good. I trust you would never impose the death penalty without first fully and fairly considering the

Page 212

possibility that life in prison is the more appropriate

punishment.

A.    Uh-huh.

Q.    Fair statement?

A.    Yes, sir.

MR. MILLER:  Thank you, ma'am, and thank you for your time.

PROSPECTIVE JUROR 596:  Uh-huh.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  Thank you, Your Honor.

EXAMINATION

2821

BY MR. BERRIGAN:

Q.    Not so bad, is it?

A.    No, no, not at all.

Q.    Thanks for your patience.  You're last but certainly not least in our eyes.  I noticed that you have two children, a boy 16 and a girl 15.

A.    Correct.

Q.    I wanted to revisit the media exposure that you had, ma'am, if I might.

A.    Okay.

Q.    Do you get a subscription to the paper?

A.    Yes.

Q.    Which paper is that?

A.    Sioux City Journal.

Q.    And last fall when Mr. Honken's case was being tried, did you follow that in the paper?

A.    Oh, a little bit.  I really don't read the paper most every day, you know, on a regular basis.

Page 213

Q. I ask you that because you said you were somewhat familiar with the case from the newspaper and television accounts of the case. Honken, in Sioux City, and before it was moved to Woodbury County.

A. Before it was moved to Woodbury County?

Q. If I'm reading that correctly, yeah, and before it was moved to Woodbury County. I'm not -- I was going to ask you

2822

what that meant. Were you --

A. While it was moved to Woodbury County maybe or when it was moved? I don't know.

Q. You said you talked to your husband about the case in casual conversation.

A. Uh-huh.

Q. And as you watched it on television and reading the paper.

A. Yeah.

Q. And what were those discussions about?

A. Oh, usually just, like I said, the local news, television, the little clips that they would have on it, whatnot, just casual, you know, when we would be watching it together maybe or something I guess thinking back, how hard maybe it would be to be on a decision like that, you know, was his comment maybe, you know, just casual, you know, talking about news I guess.

Q. Some folks have told us when they've had these discussions that sometimes the discussions concern their opinions about the case. That is, people when they're reading the news and talking about current events, they also give their views about it. Do you know what I mean?

A. Yes.

Q. And I was wondering if you had any views about Mr. Honken's

Page 214

case at the time you were following it.

A.    Probably my first thought was probably how tragic, you know.

♀

                                                                2823

Q.    What did you think after you learned about -- and maybe I should be sure.  Did you learn the verdict in Mr. Honken's case?

A.    Yes, I saw it on the news.

Q.    And what about his sentence?

A.    What my thoughts were on the verdict?

Q.    Yeah.

A.    I would say I assumed it was just.

Q.    Based on the information you'd seen?

A.    Just, yeah, off the news, yes.

Q.    And you mentioned that you were unsure whether you had any opinion about Angela Johnson's guilt or innocence.

A.    Uh-huh.

Q.    And you specifically wrote in "possible involvement."

A.    Uh-huh.

Q.    And I wanted to know why you wrote that in.

A.    I guess just, you know, on the fact that the possibility that she was charged or something in that sense.

Q.    Well, don't you --

A.    If she was involved in it, you know.  I assumed I heard her name in the trial or somewhere.

Q.    Yeah, that's what I wanted to know is that during the coverage of Mr. Honken's case do you remember hearing about Miss Johnson?

A.    I probably did, you know.  When I got this -- the notice and the jury questionnaire, you know, I recognized the name.

♀

                                                                2824

                            Page 215

Q.   I wanted to ask you a slightly different question than the one that Mr. Miller asked you.  He asked you about setting aside any opinions you have.

A.   Okay.

Q.   This might be a little harder, maybe not.

A.   Okay.

Q.   You know, Miss Johnson, she's entitled to the presumption of innocence.  But, you know, a lot of people have come in and said, Look, I read about this stuff in the paper, the newspaper.  And some folks, even if they haven't formed an opinion, that's a real different concept for them.  It's one thing to make a judgment about whether somebody's guilty based on what they've heard, but they aren't able to say that I could completely presume her innocent.

A.   Uh-huh.

Q.   You understand the difference?

A.   Yes, uh-huh.

Q.   And I need to ask you about that.

A.   Okay.

Q.   You know, if this was a regular case and some guy charged with selling drugs or even a bank robbery and there wasn't anything in the paper and you hadn't talked to your husband, I'm sure you could come in and say, Hey, no problem.  Mr. Berrigan, I don't know this person from Adam.  But that's sort of not the situation we kind of find ourselves in; okay?

2825

A.   Uh-huh.

Q.   And we have to rely on what you tell us.  It's like the judge said earlier, you know.  You have an obligation to serve

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2461 of 3245

if you can, but you also have an obligation not to serve if it turns out that that doesn't work.

A.   Uh-huh.

Q.   So about this presumption of innocence issue, okay --

A.   Uh-huh.

Q.   -- given what you told us already and this uncertainty about Miss Johnson's possible involvement, do you have any doubt about your ability to completely and utterly presume that she's innocent?

A.   I guess reading the jurors' creed back there, there was a phrase in there where it said as the golden rule to be impartial, basically what it said to be impartial because a person would never know if they would be in the same position as the defendant would be in.

Q.   Sure.

A.   And . . .

Q.   And I have little doubt in terms of what you told us earlier about wanting to fairly assess the evidence and keep an open mind and so on.  This is something that really starts now before you hear any of the evidence.

A.   Okay.

Q.   And it's not a right or wrong answer.  I mean, it isn't

2826

sort of a test.

A.   Right.

Q.   Nobody's going to criticize you.  It's happened a lot. People come in and say, Hey, I would try, but I got some real reservations about my ability to completely presume her innocent based upon what I've seen in the news; okay?  Some folks have admitted that to us, quite frankly.  When they do, we appreciate

Page 217

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2462 of 3245

it.

A.    Yeah.

Q.    Other folks absolutely know nothing -- I mean nothing -- about this case.  It's not a big deal.

A.    Correct.

Q.    But you have information about the case.  It sounds like you followed Mr. Honken's case in the newspaper at least to some extent, television, talked to your husband.  You're uncertain about Angela's possible involvement.

A.    Uh-huh.

Q.    So I have some concern about your ability to completely presume her innocent; okay?

A.    All right.

Q.    And so what about that? Is that an issue?  Do you have any doubt at all about your ability to completely -- and I mean completely -- and utterly presume that she's innocent as she sits here?

A.    Until you know as a jury we'd hear the information and both

2827

sides, you know, it would, you know . . .

Q.    Yeah, and I'm not -- again, I'm not trying to advance you into the future, but we're -- right now we're sitting here; okay?

A.    Okay.

Q.    This woman's on trial.  Right now she has -- the law says she gets to be presumed innocent.

A.    Uh-huh.

Q.    And I'm not asking you what you're going to do later when you assess the evidence.

A.    Okay.

Page 218

Q. But right now when you say, Hey, I think there's this possible involvement; I'm following Mr. Honken's trial, talking to my husband; I'm unsure about my view about whether she's guilty or innocent.

A. Yeah, that wasn't real extensive as far as totally involved in, you know, his trial or whatever. It's not -- it wasn't something that I looked -- you know, was interested in to find out exactly what happened every day. There was something to look for every day.

Q. I understand. Again, I'm not trying to debate you, but you told me, Hey, I know what happened to him; I thought it was just.

A. I knew the outcome, yes. As far as the things that preceded that, I really didn't follow much too, just, you

2828

know . . .

Q. Well, here we have this situation where here's a fellow, you know he's guilty, and you felt that was appropriate based on what information you have, and you're telling us possible involvement, this woman and this guy.

A. Uh-huh.

Q. And, I mean, we're talking about these five murders.

A. I guess not knowing the facts of her situation and just knowing that their names, you know, came up together evidently, you know, whether it was on, you know, a local news or in the paper.

Q. What about the presumption of innocence?

A. Yes.

Q. Now, right now.

A. Uh-huh. I really don't know. I couldn't give you, you

Page 219

know, a fair, you know, answer as far as until I guess there was more details that I could go . . .

Q.   That is sort of an answer; okay?

A.   Okay.

Q.   Because we need a real -- we don't need it because the truth is if you can't do it that's okay.

A.   Right.

Q.   But we are interested in whether you can right now fully presume that this woman's innocent based upon your views and what you have learned about Mr. Honken and this possible

2829

involvement.  Is there some question in your mind about whether you can do that, give her a full, complete presumption of innocence?

A.   I really don't know, I guess, to be very, very fair.  I really don't know I guess at this point.

Q.   That's good enough.  I'm going to leave you with that; okay?

          MR. STOWERS:  Two minutes.

Q.   Let me -- I'm going to switch gears very quickly here.  You indicated you could consider life without the possibility of parole as an appropriate punishment.  Did I hear that right?

A.   Yes, uh-huh.

Q.   In your questionnaire you were asked what your thoughts were about that sentence, and you said -- what are your thoughts and opinions about life in prison as a punishment for a person guilty of intentional murder?  You said, At times the same punishment should be the same crime, and you put in parentheses, the way the victims were.

A.   Yes.

Page 220

Q. What does that mean?

A. I guess a lot of times when I think about things, whether seeing on national news or any type of news stories, any type of tragic -- you know, where maybe a victim has been truly, you know, violated and killed, you know, sometimes I think the punishment, you know, fits the crime.

2830

Q. You said -- do you think life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional, premeditated first-degree murder? And you said no. Is that how you feel?

A. Can you repeat that?

Q. Yeah. Do you think that life imprisonment, life in prison without the possibility of parole, is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder? There were two boxes, a yes and a no, and you checked no, and I was wondering if that accurately reflects your view.

A. Probably not.

Q. You were asked this --

A. I don't --

Q. Let me ask you about this question before I sit down.

A. Okay.

Q. Eighty-seven, Please review each of the situations listed below. After each situation describe what effect, if any, each have on your thoughts and opinions about an appropriate punishment for a person guilty of intentional murder. And the first one is the guilty person killed more than one person at the same time, and you said, Unthinkable anyone could, full punishment. Does that sound right?

Page 221

A.    Yeah, probably.

Q.    There's one the guilty person was pregnant at the time of

2831

committing murder.  You put, Thinking only for one's self.  Does that sound accurate?

A.    Yes.

Q.    The guilty person participated in the killing of children, and you put down "unthinkable" and put "punish," and you underlined that.

A.    Yeah.

Q.    Well, that's what the government's alleging.

A.    Okay.

Q.    And I'm wondering if you're saying to us it's unthinkable that somebody could do that, could you realistically consider a sentence of life imprisonment in such a case as the intentional, premeditated killing of five people including two children?

A.    Yes.

Q.    You could.

A.    Yeah, I think so.  Yes, I could.

MR. BERRIGAN:  Okay.  Thank you, ma'am.

PROSPECTIVE JUROR 596:  Uh-huh.

THE COURT:  Juror 596, I just have a couple questions for you.

PROSPECTIVE JUROR 596:  Okay.

THE COURT:  Yep, that's you.  I got the right number.

PROSPECTIVE JUROR 596:  Yes.

THE COURT:  What's your understanding of the presumption of innocence?

2832

Page 222

PROSPECTIVE JUROR 596:   The presumption of innocence?

THE COURT:   Yeah, what does that phrase mean to you?

PROSPECTIVE JUROR 596:   That a person is innocent until proven guilty.

THE COURT:   Okay.  And do you understand that that's true in every trial in every criminal case in federal court and state court in the United States?  Do you understand that?

PROSPECTIVE JUROR 596:   Yes, sir.

THE COURT:   We always presume that the person on trial is absolutely innocent unless and until the government can prove them guilty beyond a reasonable doubt.  Do you understand that?

PROSPECTIVE JUROR 596:   Yes.

THE COURT:   Now, do you believe you're able to give Miss Johnson the full benefit of the presumption of innocence?

PROSPECTIVE JUROR 596:   I think yes, you know, you know, hearing both parties --

THE COURT:   Well, you may never hear the other side.

PROSPECTIVE JUROR 596:   Yeah, that's true.  I'm putting myself ahead --

THE COURT:   Miss Johnson has no obligation to put on any evidence whatsoever.

PROSPECTIVE JUROR 596:   Okay.  Putting everything aside, it would be very, very difficult.  It would take a lot of praying and -- internally, searching, yes.

THE COURT:   Just out of curiosity, why would you have

2833

to pray in order to give Miss Johnson the full benefit of the presumption of innocence?

PROSPECTIVE JUROR 596:   Not for her, just for myself,

Page 223

you know.

THE COURT: You wouldn't be able to give her the full benefit of the presumption of innocence without praying about it?

PROSPECTIVE JUROR 596: Just praying for my own ability.

THE COURT: To do that.

PROSPECTIVE JUROR 596: To do, yeah. Does that make sense?

THE COURT: Sure. Okay. Why don't you step outside, and we'll let you know your status.

(Prospective Juror 596 exited the courtroom.)

THE COURT: Mr. Miller, I believe you went first.

MR. MILLER: No record, Your Honor, no motion.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Yes, sir. We would move to strike Juror 596 on the proposition that she shouldn't have to pray -- and you made that clear -- to give our client the presumption of innocence. We would hope no juror would have to do that.

THE COURT: Yeah, I don't think she can give Miss Johnson the full benefit of the presumption of innocence regardless of how she answered my questions. I was just seeing

2834

if I could rehabilitate her.

MR. BERRIGAN: Well, you're usually very good at it, Your Honor.

THE COURT: Yeah, but I didn't have any faith -- I mean, I think I did -- for appellate purposes I rehabilitated her plenty.

MR. BERRIGAN: Even I would like to think the Eighth

Page 224

Circuit would have a problem with praying to get the presumption of innocence, but who knows?

THE COURT: Well, we won't have to find out. How's that?

MR. BERRIGAN: I hope not.

THE COURT: Because I'm going to sustain your challenge for cause.

(Prospective Juror 596 entered the courtroom.)

THE COURT: Juror 596, we're going to let you go; okay? Thank you very much. You did a really good job of answering our questions.

PROSPECTIVE JUROR 596: It's been a good experience.

THE COURT: And we appreciate it very much, and good luck to you. You live in Early; is that right?

PROSPECTIVE JUROR 596: Correct.

THE COURT: Okay. Well, good luck to you. And do us a favor about not talking about jury selection to anybody until we get the trial underway next week because --

2835

PROSPECTIVE JUROR 596: Most definitely, okay.

THE COURT: Here's why. It could be very harmless conversation that you have with somebody. Then that somebody could repeat it to somebody else, and that somebody else could wind up here tomorrow or Friday or some time next week. That's why. Okay. Thank you. Bye now.

(Prospective Juror 596 exited the courtroom.)

THE COURT: That'd be a good law school exam, the praying juror.

Okay. You were standing up, Mr. Willett. Did you have something you wanted to say or move or . . .

Page 225

MR. WILLETT: No thank you, Your Honor. I was just slow to sit down, so I apologize.

THE COURT: No. I thought you were going to make some motion or something.

MR. WILLETT: No, Your Honor, but thank you.

THE COURT: Okay. My notes reflect we have two jurors in the pool, 228 and 495. And I believe the government exercised one peremptory strike --

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: -- on 296, and so what's their total? What are they down to?

THE CLERK: They have six left.

THE COURT: Six. And we now have 20 jurors; is that correct?

2836

THE CLERK: Yes.

THE COURT: And how many do we have coming in tomorrow?

THE CLERK: Ten.

THE COURT: Ten? Anything else we need to take up today?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. BERRIGAN: Nothing by the defendant, sir.

THE COURT: Okay. We'll see you tomorrow about 8:15 and get underway at 8:30.

MR. MILLER: May it --

THE COURT: I do have one issue, so if you'd bear with me on this, and it involves the indictment, the relationship between the indictment, the jury instruction conference we had

Page 226

this morning or whenever we had it, yesterday, and Mr. Berrigan's reference twice in jury selection today about the government alleging that Miss Johnson did the killing which is technically correct, technically correct, I think in light of the jury instruction conference a little gray area maybe, a little shaky. But I thought maybe we ought to not so -- I'm not trying to say you can't say it. I'm just saying we ought to flesh it out a little I think. Do you understand where I'm going with this?

MR. BERRIGAN: Yes, sir.

2837

THE COURT: Yeah. They're either going to allege it or not. Technically they've alleged it in the indictment. They haven't superseded the indictment or withdrawn it or whatever, but do we need to take care of that issue so it's not floating around there?

MR. BERRIGAN: We do if you think we do. I thought they could just amend, and I want to confess my ignorance about this process. I thought the government could amend to delete that. Certainly I don't know how we'd be --

THE COURT: Prejudiced by it.

MR. BERRIGAN: Exactly, yeah. I wouldn't object to it. But I don't know why they haven't done it.

THE COURT: I don't know why they haven't done it either.

MR. BERRIGAN: But they haven't, so I'm merely proceeding on I guess what we have before us.

THE COURT: Right. And that's one way of looking at it. The other way of looking at is they conceded in the jury conference they've withdrawn it, but then that wasn't a final

Page 227

jury instruction conference, and they're free to change their mind so . . .

MR. BERRIGAN: I'm happy to not allege that, Your Honor. It's not a big deal to me. If that's what they're going to do, that's fine. They've certainly indicated that.

THE COURT: But we ought to lock them in one way or

2838

the other.

MR. BERRIGAN: I think they're locked in apparently.

MR. WILLIAMS: I'm willing to be locked in, and if it takes a motion from the government to make it clear what our position is, we're glad to do that, but we are not going to be pursuing now or at any other time an allegation that she intentionally committed the murders, simply that she aided and abetted in the killings.

THE COURT: What took you so long?

MR. WILLIAMS: Frankly it's --

THE COURT: You don't have to answer that question.

MR. BERRIGAN: Well, on that representation I'll happily modify my questioning.

THE COURT: Okay. Can you orally move to amend the indictment if there's no objection?

MR. WILLIAMS: I believe the case law supports that.

THE COURT: I would think you could, particularly if there's no objection.

MR. BERRIGAN: That's what I thought, so I was wondering why they haven't done it. I'm not casting any aspersions because they're clearly on top of it. We got an e-mail over the weekend, so I don't know what's going on.

THE COURT: Right. So you are now orally moving to

Page 228

amend the indictment to?

MR. WILLIAMS: To allege only aiding and abetting the

2839

murders and not to allege intentional killing.

THE COURT: Okay.

MR. BERRIGAN: We have no objection to that, Your Honor, and I say that not abandoning our position that there might be an instruction that we might request from the Court as Mr. Stowers mentioned. We haven't even formulated that.

THE COURT: Right, yep.

MR. BERRIGAN: But we don't object to the amendment.

THE COURT: Okay. Now, Mr. Stowers, why are you on your feet?

MR. STOWERS: Well, I was just going to suggest maybe the proper motion is just to strike out the allegation out of those counts where it says, Intentionally killed and, those three words, "intentionally killed and," which appears I think in all -- I think, yes, it appears in all ten counts right after her name which is in all caps, and then that would be stricken out of the indictment, and then the remainder of the indictment would remain sufficient.

THE COURT: Are you familiar enough with the indictment from memory to agree to that, Mr. Williams, or do you want to at least look at it?

MR. WILLIAMS: I've got it right here, and I'll just take a quick look. I think it's fine.

MR. STOWERS: I've got it here also.

MR. WILLIAMS: It would take more than that. It would

2840

Page 229

take -- for example, Count 1 says, Intentionally killed, counseled, commanded, induced, procured, and caused and aided and abetted the intentional killings, so we would need to be striking intentionally -- I'm sorry, we'd have to strike "killed" and "counseled, commanded, induced, procured, and caused." So it'd just read, Intentionally aided and abetted the intentional killing of.

THE COURT: You know what?

MR. WILLIAMS: This is so complicated. Would you like me to do this in a written motion, Your Honor?

THE COURT: That's just what I was going to suggest.

MR. WILLIAMS: That will make it more clear for everybody, and I'll be glad to do it. And I apologize I haven't made the election before. As you know, things sometimes change. We have some evidence that she intentionally killed some people, and I didn't want to elect until the last possible moment in the event that I suddenly learned something on the eve of trial.

THE COURT: Right, and nobody's making you elect.

MR. WILLIAMS: But we're choosing to.

THE COURT: Yeah, you're choosing to because you could wait till it went to the jury.

MR. WILLIAMS: Sure, but it's difficult for everybody, for us until then to do that, so we're choosing to elect, and I'd be glad to draft up a motion to strike the extra language from the indictment.

2841

THE COURT: Okay. I think it'd be better to proceed that way.

MR. WILLIAMS: Will do.

THE COURT: Okay. Then we'll see you at 8:15 tomorrow

Page 230

morning.  Thank you.  We're in recess.

(The foregoing trial was

adjourned at 3:41 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

2-4-06
Shelly Semmler, RMR, CRR                    Date

2842

INDEX

PROSPECTIVE JUROR:                                         PAGE:

Prospective Juror 174
              MR. MILLER                                   2663
              MR. BERRIGAN                                 2676

Prospective Juror 228
              MR. BERRIGAN                                 2699
              MR. MILLER                                   2709
              MR. BERRIGAN                                 2727

Prospective Juror 740
              MR. MILLER                                   2729

Page 231

```
Prospective Juror 341
          MR.  BERRIGAN                                    2734

Prospective Juror 495
          MR.  MILLER                                      2740
          MR.  BERRIGAN                                    2745

Prospective Juror 296
          MR.  BERRIGAN                                    2758
          MR.  MILLER                                      2767

Prospective Juror 213
          MR.  MILLER                                      2781
          MR.  BERRIGAN                                    2789

Prospective Juror 13
          MR.  BERRIGAN                                    2799


Prospective Juror 596
          MR.  MILLER                                      2812
          MR.  BERRIGAN                                    2821
```

* * * * *

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2477 of 3245

2843

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,   No. CRO1-3046

      Plaintiff,   Sioux City, Iowa
April 28, 2005
   vs.   8:10 a.m.

ANGELA JANE JOHNSON,   VOIR DIRE OF
PANEL L

     Defendant.
                /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

2844

APPEARANCES:

For the Plaintiff:   C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA  52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA  50319

For the Defendant:   PATRICK J. BERRIGAN, ESQ.
Watson & Dameron
2500 Holmes
Kansas City, MO  64108

DEAN STOWERS, ESQ.
Rosenberg, Stowers & Morse
1010 Insurance Exchange Building
505 Fifth Avenue
Des Moines, IA  50309

ALFRED E. WILLETT, ESQ.
Terpstra, Epping & Willett
Higley Building - Suite 500
118 Third Avenue Southeast
Cedar Rapids, IA  52401

Also present:   Bill Basler

Page 1

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2478 of 3245

PANEL L, 4-28-05
Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

2845

(Proceedings reconvened outside the presence of the jury venire.)

THE COURT: Good morning. Anything we need to take up, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: We wanted to know if we could informally discuss or at least inform the Court about discussions the parties have had related to the exhibits. We know you've received the list and the objections.

THE COURT: Yeah.

MR. BERRIGAN: But you may not be aware of what our anticipated plan is, and I think you might like to know that.

THE COURT: That's fine, and then I'll tell you my plan.

MR. BERRIGAN: Okay. Great.

THE COURT: Why don't you tell me yours.

MR. BERRIGAN: Mr. Stowers is going to handle it if you don't mind, sir.

THE COURT: Okay.

MR. BERRIGAN: Thank you.

MR. STOWERS: Under the procedure that we discussed with the Court I think in the beginning of the first week of the trial, jury selection, the Court had indicated that it wanted us to provide it with this list of objections to the government's

exhibit list and that any exhibits that we did not object to on that list would be considered to be admitted at the commencement of the trial and part of the record in the evidence in the case which after we visited about that amongst ourselves we decided that that was a procedure that made us at least nervous and uncomfortable.

And so what we have done is discussed with the government a process whereby the exhibits that are going to be admitted actually by the government which is going to be, as we understand it, a good deal less than the exhibits identified on their exhibit list because they've overincluded on their exhibit list understandably out of an abundance of caution, as they get to those points during the trial where they have large groups of exhibits -- for example, they have I think about 150 or more photographs of the remains from the autopsy, et cetera -- what we're going to do is the parties are going to get together either over the weekend or on the morning before trial or -- of that day as they decide on what exhibits they actually want to use. We'll go over those, decide where we are on those, if we really do have any objections which I don't think we're going to to many, many of these exhibits, and then they can be introduced in a very quick process merely by having them identified by the witness, offered, and not objected to and allowed into the record.

Now, there's a good -- frankly, that's probably going

2847

to be -- the vast majority of exhibits will be handled in such a manner as the parties continue to meet and discuss those things on an ongoing basis throughout the trial. I think this will

Page 3

allow the exhibits to come in, come in through a witness, be the subject of some explanation for the jury as well as for the record rather than having them simply introduced in bulk, if you will, at the beginning of the trial. And I think it will make a better -- from our perspective a better and cleaner and more streamlined process because --

THE COURT: Well, I totally disagree with you, and I'm not willing to do it your way.

MR. STOWERS: Well, that's fine.

THE COURT: You just object to any exhibit you want to object to.

MR. STOWERS: I understand what your position is.

THE COURT: I mean, you even objected to exhibits they're not going to use. 616, not used, you have an objection to it.

MR. STOWERS: It may be a typo that it was put on the wrong line in the list. There's a lot of exhibits.

THE COURT: I don't even understand what you're telling me. I gave you a chance pretrial. You want to object to every exhibit, object to every exhibit. That's fine.

MR. STOWERS: Okay. I don't anticipate that. I just want you to know that that's not what we're anticipating doing.

2848

It's just a question --

THE COURT: Well, it's going to -- if you think I'm going to meet with you every day to determine what objections (sic) are admitted or not, I'm not going to do it.

MR. STOWERS: No, we weren't planning to meet with the Court. That would be just counsel for both parties discussing, conferring. Then the government would know, hey, we don't

Page 4

really need to worry about foundation on these 20 exhibits today. Then they just identify them with the witness. They're offered and received into evidence at that point without objection. That's nothing the Court has to be involved in. Obviously those exhibits --

THE COURT: Well, if you know you don't have an objection to them, why are you going through the process? You either have an objection to them or you don't.

MR. STOWERS: The point of the process is --

THE COURT: Yeah, what is the point of the process?

MR. STOWERS: The Court has indicated if we don't identify an objection on this list then they come in at the beginning of the trial as part of the trial record.

THE COURT: Yes.

MR. STOWERS: And that's the way you would want to do it which I've said we're not comfortable with, and we're very nervous about doing it that way because then they're in the record other than through a witness, and they're just there as

2849

exhibits with no explanation or anything about what the exhibits are for the jury. And we think they ought to come in through a witness. That's the only issue, frankly, on many, many of these exhibits.

THE COURT: Well, I've done it that way in every trial I've ever had. I've always done it that way. You don't want to do it, that's fine. Just object every time.

MR. STOWERS: That's fine. We're not going to object every time. I just want you to know that. We're going to meet unless the government doesn't want to meet, and we're going to streamline it, so I don't want to have the Court upset with us

Page 5

for doing --

THE COURT: Well, I am upset because I think you're being totally unreasonable.

MR. STOWERS: Well, and that's understandable, but I've never done a trial where you just go ahead at the beginning of the trial and admit all the exhibits.

THE COURT: Well, I've done a lot more trials than you have, and I've done it every time, and there's never been a problem.

MR. STOWERS: Okay.

THE COURT: Never once had a problem with it in over a hundred trials.

MR. STOWERS: And that's fine, but I haven't done it that way, and I'm not comfortable with it, and, you know, we're

2850

not going to object to all the exhibits. We don't have objection to all the exhibits. We're very uncomfortable with the process where the exhibits are introduced into the record at the commencement of the trial without some explanation.

THE COURT: Why?

MR. STOWERS: Because there's no explanation for what the exhibits are, what they show, what they don't show. A jury might very well interpret the exhibit one way or a different way than what the record would show if it were offered through a witness and explained. And so we just think out of an abundance of care and caution we feel we have to go that way on this particular case. It might not be the case in every case. It's just we're not comfortable with that. And, frankly, you know, we've been told by the government also that they don't intend to use all their exhibits including many of which we wouldn't

Page 6

object to, and then they'd be in the record, and then we might have to deal with them --

THE COURT: Then they can just be withdrawn.

MR. STOWERS: Well, they might be, and then we'd have to deal with identifying those that weren't identified or explained and withdrawing them at the end, and that would be another --

THE COURT: That's a very easy process to do when you have a complete exhibit list. It's done in virtually every trial I have, but that's fine.

2851

MR. STOWERS: Thank you.

MR. BERRIGAN: That's all we had, sir.

MR. WILLIAMS: Your Honor, the -- I did take a look at the defense exhibit list. I spoke with Mr. Willett last night, and I, frankly, should have told him earlier the government does not have any objections to any of the listed exhibits listed by the defendant at this time.

THE COURT: Okay. But what's good for the goose is good for the gander. They can offer each one at the time, just slow things down, but that's fine.

MR. WILLIAMS: Certainly. We have no objection to them, so how ever the Court wants to work it.

THE COURT: No, I'm going to be reciprocal, treat both sides evenly.

Any heads-up on any of the potential jurors this morning?

MR. BERRIGAN: No, sir.

THE COURT: Okay. Then we'll see you at 8:30.

(Recess at 8:19 a.m.)

Page 7

THE COURT: Ready to have the jurors brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. BERRIGAN: Yes, sir.

(Panel L entered the courtroom.)

THE COURT: Good morning, everybody. Would you please raise your right hand. I'm going to swear you in.

2852

(Panel L was sworn.)

THE COURT: Okay. Please be seated. I wanted to welcome you all to the United States District Court for the Northern District of Iowa. How many of you have been to this third-floor courtroom before? Raise your hand. Anybody? Okay.

Well, I'm Mark Bennett. I'm the chief judge of the district, and I'm the trial judge in this case. And on behalf of the judges and employees, I wanted to welcome you. It's a very glum-looking group. You don't need to be so glum. There is no federal law against smiling in the courtroom. It's a very serious matter that we have before us, but you don't need to be so glum about it.

I imagine when you all went to bed last night you were all just real excited and thrilled about the prospect of coming to this courtroom today and even more excited about the opportunity that presents you to be a juror in the case that could last through the end of June or early July. But that's why we're here, and we're going to try and make the most of it this morning.

Let me introduce you to who the folks are. We're going to start with the table closest to the jury box. And I'm just going to have them raise their hand because you're going to actually meet them in a little more detail in a few minutes.

Page 8

Mr. C.J. Williams, Mr. Williams is an assistant United States attorney. In other words, he's a federal prosecutor. He

2853

offers -- he offices out of the Cedar Rapids office in our district.

And seated next to him is Tom Miller. Mr. Miller has the same name as the attorney general of Iowa, Tom Miller. And he actually works for the attorney general of Iowa, but he's not the Tom Miller who's the attorney general. He's one of his top assistants in charge of area prosecutions. And Tom Miller has been designated as a special assistant United States attorney, as a federal prosecutor, to assist Mr. Williams in the prosecution of this case.

Seated next to them is Special Agent Bill Basler. And he's what's called the case agent, so he'll be sitting at counsel table throughout.

Switching over to the table farthest from the jury box is the defense team. Seated closest to you is Dean Stowers. Mr. Stowers is a lawyer who specializes in criminal defense work from Des Moines, Iowa.

Seated next to Mr. Stowers is the defendant, Angela Johnson in the case.

And seated next to Angela Johnson is one of her attorneys, Patrick Berrigan. Mr. Berrigan is a lawyer from Kansas City who specializes in criminal defense work as well.

And then at the back table, last but not least, is Mr. Al Willett from Cedar Rapids. And Mr. Willett specializes in criminal defense work.

2854

Page 9

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2486 of 3245

Now, there are certain rules that you need to follow during jury selection, and I've reduced those to writing, and they should have been on your chair.  And I need to go over those with you this morning.

To ensure fairness, you as potential jurors must obey the following rules until the end of the case if you are selected for the jury or until you are excused from serving on the jury in this case.  These rules apply whether you are in the courtroom, in the courthouse, at home, or anywhere else until you are excused from further service in the case.

First, do not talk among yourselves about this case or about anyone involved with it.

Second, do not talk with anyone else about this case or about anyone involved with it.

Third, when you're outside the courtroom, do not let anyone tell you anything about the case.  If someone should try to talk to you about the case during jury selection or the trial, please report it to me.

Fourth, do not talk with or speak to any of the parties, lawyers, or witnesses involved in the case.  You should not even pass the time of day with any of them.  It is important that you not only do justice in this case but that you also give the appearance of doing justice.  If a person from one side of the case sees you talking to a person from the other side, even if it is simply to pass the time of day, an unwarranted and

2855

unnecessary suspicion about your fairness might be aroused.  If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or the like, it is because they are not supposed to talk or visit with you.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2487 of 3245

Fifth, do not read any news stories or articles about the case or about anyone involved with it or listen to any radio or television reports about the case or about anyone involved with it. If you want, you can have your spouse or a friend clip out any stories and set them aside to give you after the trial is over or you are excused from serving on the jury in this case. I can assure you, however, that if you are selected for the jury in this case by the time you have heard the evidence you will know more about this case than anyone will learn through the news media.

Sixth, do not do any research on the Internet, in libraries, in the newspapers, or in any other way or make any investigation about this case on your own. If you are selected for the jury, you must decide this case based on the evidence presented in court.

Seventh, if you are not excused from serving on the jury today, please take this instruction with you so that you can refer to it if you have any questions between now and the date you are requested to return for the trial.

Dated the 28th day of April, 2005, signed by me, Mark Bennett, chief judge.

2856

Now, I wanted to kind of tell you all who everybody else in the courtroom is because I imagine for those of you who aren't courtroom savvy you might have some curiosity about who everybody is.

Seated to my far left is one of my three and a half law clerks, Carey. Carey is an honors graduate of the Drake University Law School, and she's finishing up her second year of a two-year federal clerkship with me, and at the end of the

Page 11

summer she'll be moving to Seattle to start her legal career.

Seated directly in front of me is our court reporter Shelly. Shelly comes to us from Naples, Florida, but she's been with us now for a number of years. She's very highly skilled at what she does, and I think she's got the most difficult job in the courtroom because she has to always pay attention every single second and take down everything that everyone says to make a complete and thorough record. And we're very lucky to have her.

Because this is a criminal case, we will have United States marshals in the courtroom. We do in every criminal case. Depending upon where we're at in the trial with certain witnesses and all, there may be greater or fewer U.S. marshals in the courtroom.

We also have court security officers. They're the easiest to spot because they have the blue blazers, the badge, and the earpiece. And they'll be in the courtroom -- whenever

2857

I'm in the courtroom, they're in the courtroom. And civil or criminal, they're always in the courtroom, and they'll be of great assistance to the jury in making sure you get down to the jury room, back up to court on time because I think you'll find that we run a very efficient courtroom.

There are 94 federal district courts. The Northern District of Iowa has led the nation three out of the last four years in numbers of trials per judge. In the year that we weren't first in the nation, we were second. So I think we have a lot of experience about how to conduct trials. Hopefully I've learned from that experience, and I think you will agree not only through jury selection but if you are seated as a juror in

Page 12

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2489 of 3245

the trial that we run trials very efficiently. That's very important to me because my time is very valuable to me, and so I assume that your time is just as valuable to each one of you. And we've tried to create procedures to try and always keep in mind that jurors' time is extremely valuable. Let me just give you an example.

We have a lot of discretion -- I should say I have a lot of discretion in setting up jury selection. There's no one way to do it. There are about 600 federal district court judges, and there's probably 650 ways or more to do jury selection because I don't always do it the same in every case.

In this case I met with the lawyers on several occasions, and we gave a lot of thought of how to do jury

2858

selection, and we came up with a system where you only have to come in one day. And that is very unusual. I'll give you an example. My secretary who's also a lawyer was called for jury duty right across the street at the county court, Woodbury County court, this month. And I was hoping that she would be selected because I think it would be a great experience for her to serve as a juror. She hasn't been selected, but she's gone over there three different days for most of a day each day, and she's never actually been questioned by a judge or lawyers yet.

And interestingly enough, her sister was called for jury duty up in Minnesota, in Minneapolis, in federal court this month. And her sister went for three full days all day every day in the basement of the federal courthouse in Minneapolis, and she never even made it up into a courtroom let alone was she ever questioned by a judge or any lawyers. And she had to go for three days in a row.

Page 13

The system we devised, you just come in this one day, so I hope you appreciate that. The lawyers were concerned about not wasting your time, and that's obviously a big concern of mine. My number-one concern is to make sure I can give the defendant, Angela Johnson, and the United States government the fairest trial I can give them. And sometimes fairness and efficiency butt heads, and I always opt for fairness, but efficiency is right behind fairness.

And so I think you'll find that we know what we're

2859

doing in terms of running trials. We do things very efficiently, and there won't be a lot of time of yours that's wasted, not if I have anything to say about it. And guess what? I have a lot to say about it.

Okay. You've met the lawyers, and you're going to meet them in more detail and Angela Johnson. And I wanted to talk about what our roles were -- what my role is as judge and what your role is as a jury.

I'll start with my job first. I've had the responsibility to manage this case from the time it was filed, and you might well imagine that in a federal death penalty case where the death penalty is potentially at issue there's a lot at stake.

So the lawyers on each side have filed lots and lots of motions. And I expected that they would do that because there are lots of legal issues that arise during pretrial matters in a case, and they haven't disappointed me. They have, in fact, filed lots and lots of motions. I've ruled on all their motions. There will be lots of objections during trial, and I'll have to rule on all of those objections. There will be

Page 14

lots of new motions based on things that we can't even anticipate are going to happen because that happens in every long trial. You just can't anticipate everything.

We work very hard. We meet every morning. We meet every afternoon even during jury selection trying to anticipate

2860

things that are going to happen in trial and try and solve them ahead of time. But no matter how hard we work and no matter how hard the lawyers work to anticipate problems that develop, we're not perfect, and nobody can anticipate all the problems. So when problems arise, it's my job to try and solve them to the best of my ability.

I will also have the responsibility of instructing you in this case, and that means once we get the jury selected and we start the trial, I will give you a very detailed set of instructions, and I've been working on those instructions for quite some time. I met with the lawyers on several occasions. We're still meeting about them. But I will give you a very detailed set of instructions where I will define for you everything you need to know in the trial. I will define for you what the elements are of each one of the ten charges against Angela Johnson. I will give you instructions on reasonable doubt and burden of proof, credibility of witnesses, the trial process to help assist you in your work as jurors.

Now, you'll notice that when I talked about my duties one thing I did not say is I don't decide what actually happened. That's the jury's job. And your number-one job if you look at it this way, you're the judges of the facts. And there are going to be a lot of facts in this case. The witness box is right there. We have kind of an unusual setup. The

Page 15

witness will sit directly opposite the jury. And in this case I

2861

anticipate that there could be over a hundred witnesses testifying. You never know exactly how many witnesses. Could be quite a bit less than that, but it could be quite a bit more than that too, so there will be a lot -- by any standard there will be a lot of witnesses.

There will be many hundreds of exhibits that are ultimately admitted into evidence, and those exhibits to the extent that the lawyers want to show it to you at the time, they can put them up on the big screen. We have an electronic courtroom, and as the witness is talking about an exhibit, you'll get to see it. So there will be a lot of evidence in this case. And the reason why this case I think will take so long is there's simply going to be a lot of evidence.

So what's your job as a juror? If you're selected to serve as a juror in this case, you'll have to listen carefully to all of the witnesses. You'll be able to take notes if you want to take notes, but you don't have to take notes. And at the end of the first phase of the trial, what we call the merits phase or the guilty/not-guilty phase, you'll have to decide what actually happened based on your review and understanding of the witnesses' testimony and the exhibits. You'll have to decide whether each witness is telling the whole truth, just some of the truth, or maybe nothing the witness testifies is truthful. That's your job. That's not my job. I don't judge the credibility of the witnesses. I'll give you an instruction that

2862

Page 16

will lay out kind of some factors that you can consider. But ultimately each juror for himself or herself, you have to decide who's telling the truth and who's not telling the truth and figure out what happened.

You'll have my detailed set of instructions that I'll give you at the beginning, and then I'll give you an even more detailed set at the end of the first phase when you go back to deliberate to determine whether Angela Johnson is not guilty or guilty of each of the ten charges in the case. So that's essentially your job.

Now, if this were what I call a typical case, your job would be over at that point because in 99.999999 percent of the cases I've had, sentencing is my responsibility. After we have a trial, the defendant's found not guilty, they go home. If they're found guilty, they may get to go home, but they have to come back for sentencing, usually about 80 days, and then I have to determine the sentence, and we have a very complicated system to do that in federal court. It's called the United States Sentencing Guidelines. It's in this book. It's about 524 pages long. And I've had sentencings last anywhere from 10 minutes to 6 days. It just depends on what's involved in the sentencing.

This case, sentencing will not be my responsibility. If the defendant is found guilty of one or more of the ten charges, there will be a second phase -- and I'm kind of jumping ahead -- where you'll decide whether or not the defendant is

2863

eligible for the death penalty.

And if she is, then there will be a third phase where evidence will be presented, and the jury will have to decide between one of two punishments, and that would be life

Page 17

imprisonment without parole -- there is no parole in the federal system; that was abolished I believe on November 1, 1987 -- or the death penalty, and those will be the two choices, and that will be the jury's responsibility.

So that makes this case very different than the typical case that we have in federal court, and it also means that the jury will have a tremendous responsibility in deciding what the appropriate punishment in the case will be. There will be evidence about it. There will be written instructions about it. But ultimately that's the decision that each juror will have to make in this case.

Now, we're about to start what we call voir dire. It's a French term we use for jury selection. Literally translated it just means to speak the truth. And what do we mean by that? Here's what we mean. I'm going to be asking you some questions, but the way we've set it up, primarily the lawyers are going to be doing the bulk of the questioning today. And so whether I'm asking you the question or one of the 5 lawyers is asking you a question, our goal is to find 18 jurors -- we're going to use 12 trial jurors and then 6 alternate jurors. Those of you who make it on the jury if any

2864

of you do, you won't know whether you're a regular juror or an alternate, but we'll start with 18 jurors. And we're going to ask you a lot of questions today, particularly the lawyers.

And I want to assure you that there are no right or wrong answers to the question. I would imagine that if I got a summons to appear in a federal court and I showed up and there was a judge sitting up there and a bunch of lawyers in this strange courtroom and I knew they were going to be asking me

Page 18

questions pretty soon I'd be a little nervous, and I suspect that some of you are a little anxious or a little bit nervous about the type of questions that are going to be asked. Is that a good guess? I think so. I see some folks nodding.

I want to try and put you at ease because the questions -- you can answer all of the questions. They're not tough questions. We're not asking you like civics -- it's not like a civics quiz, what amendment gives the defendant the right to a fair trial. It's the Sixth Amendment, but we're not going to ask you questions like that.

We're going to ask you questions about your background and experience, and then the lawyers are going to ask you some questions about what you know about the case because some of you have read or heard something about the case other than what you received from the Court. And they're going to ask you questions about your views on the death penalty. And everybody is going to respect your views because you know what?

2865

Your view on the death penalty is just as important as any view that I might have or any view that anybody else might have including the President of the United States. Everybody in this country is entitled to their own view. And neither I nor the lawyers are here to talk you in to any view. We just want to know what your views are.

And so in order to find that out, you have to answer the questions openly and honestly. But nobody's going to think you're a bad person if you believe A or B or C. Believe me -- this is now our 12th day of jury selection -- we've heard virtually every view on the death penalty that I could have ever imagined, and I've heard some that I couldn't even imagine. And

Page 19

nobody is right or wrong, good or bad. But we just need to know what the views are.

And here's why we need to know. Not everybody is suitable to be a juror in every case. If everybody was, we wouldn't have to go through the process. We'd just call 18 people, put you in the box. Nobody would ask you a question. We'd be underway, and this trial would now be in its 12th day. And we don't work that way, and there's a good reason we don't work that way. And the reason is some people would be terrific jurors in some other type of case, but they might not be a terrific juror in this case. And that's why we have to ask you so many questions to try and find that out.

Now, you will note that each of you have a number, and

2866

I just want to explain that to you. In most cases I don't use numbers, but I made the decision -- it was my decision alone -- to use numbers in this case. And there was only one reason why I used it. We all know what your names are because I've got a copy of each one of your questionnaires every day in the notebook here. The lawyers have them.

I did not want the press to know the names of the jurors, and here's why. This is a high-profile case. There's a lot of interest. There will be lots of newspaper articles, radio and television reports about this case. I think it's tough enough to be a juror on a long case without having your name out in the public domain so that any idle curiosity seeker could see your name, figure out where you're from, figure out your address, drive by your house, and at seven o'clock at night when you've just finished the dishes knock on your door and say, Hey, I'd like to talk to you about what it's like to be a juror

Page 20

on that case down there in Sioux City. And I just didn't want to have your privacy invaded that way.

So I have the discretion, and I exercised it. So if you're curious about the numbers, that's why. Nothing more to it than that.

Now, I want to try and explain this jury selection process to you. When we started 12 days ago or actually more than that because we had the weekends, we thought jury selection would take two to three weeks. Tomorrow will be the end of

2867

three weeks. It may take a little longer than that. We're probably going to go into next week for a couple of days, but, you know, that's okay because I think the process has worked really, really well.

And here's what we do. We bring in a small group of potential jurors just like yourselves every day. After I introduce the lawyers and there's just a couple of questions by me, then I turn it over to the lawyers. And we have what I call group questioning where you're all together. And each side gets 30 minutes, so we'll have about an hour of group questioning.

Then at the end of group questioning, we're going to send you down to the jury room, and we're going to bring you back up one at a time, talk to you individually. And when we do that, you'll just come through this door. The CSO sitting there will hand you the microphone. And then you just sit in any seat in the front row you want, any seat in the front row. One of the seats underneath it has a "get out of jury service" sticker, so if you happen to sit in the right seat, then you're done; you don't get questioned individually. I'm just kidding about that. But you can sit in any seat you want.

Page 21

And then each side will question you.  And we rotate. One juror the defense starts; the next one the government starts.  We just rotate.  And they get about 12 minutes to question you.

Then at the end of the individual questioning, we'll

2868

send you back out into the hallway.  I'll meet with the lawyers, and we'll confer about whether or not -- really we make two decisions:  Are you dismissed from jury service, or are you still going to be in the jury pool?

I'm getting a little bit ahead of myself here.  And then at the end of the -- we'll just send you out.  It usually takes a minute or less, sometimes a couple of minutes, sometimes 10 seconds, but, you know, it averages less than a minute.  We bring you back in, and I tell you one of two things:  Thank you very much, you can go home now, you're dismissed; or I tell you that you're still in the jury pool, you're still in the jury pool.

Now, if you're still in the jury pool, that means you have about a 50 percent chance of being selected.  Technically you have about an 18/34 chance of being selected.  I'm bad at math.  I just rounded it off to 50 percent.  And then when we get the entire number of jurors that we need, only about half of you will actually then wind up on the jury, and our clerk's office will call you and let you know that you actually are on the jury or you're dismissed.

So you actually have two chances to get dismissed, one at the end of the day today.  And then if you make it in the jury pool, you have a chance to be dismissed as well.  And then we'll start the trial as soon as we can after we get the 18

Page 22

jurors selected.

Once we start the trial -- and I'm hopeful the trial will start next week; I think it will start next week -- we're going to run the trial four days per week. There are a lot of reasons why I'm running it four days per week. I'll just tell you what they are.

I have 600 other cases to be worried about, and I am concerned about them. And so I need those Fridays to do work on my other cases. I'm going to have several trials that I'm going to do Friday, Saturday, and Sunday during the course of this trial just to keep the docket moving.

The lawyers are not from Sioux City. Two of the lawyers, one from the government and one from the prosecution, are from Des Moines 200 miles away. One each on each side are from Cedar Rapids 330 miles away, and one's from Kansas City, Missouri. They need to get back to their offices and work on their other cases too because life doesn't stand still for them either. They have a lot of other responsibilities. So they really need a day to do that.

And, you know, it's pretty intense being on a jury, particularly in a case like this. I think it's better for your mental health if you all get a day off too. So those are the reasons why.

We will be taking the week of June 10 through the 17th off, and then our typical trial day will be 8:30 -- and when I say 8:30, I don't mean 8:32 or 8:34. You'll find that we really

do start on time unless there's a super emergency that we
Page 23

couldn't have anticipated, but we'll start right at 8:30, and we'll generally go till 4:30.

We'll probably take -- I haven't decided yet whether I'm going to have lunch brought in to the jury which I think we probably will in which case we'll only probably take a 45-minute lunch break. And then we'll take two 20-, 25-minutes breaks, one in the morning around 10 and one in the afternoon between 2:30 and 3:00. And we'll try and get you out of here every day at 4:30. It may go a few minutes over that. If we have a witness we can finish up by going 5 or 10 minutes more and get that witness on the road somewhere, we'll probably do that, but we won't go beyond 4:45, so that will be our trial schedule.

Now, I want you to meet the lawyers in a little more detail. So, Mr. Williams, would you introduce everybody at your table, and then we'll find out if you know any of the folks. Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. Good morning, ladies and gentlemen. Again, my name is C.J. Williams. I office over in Cedar Rapids, Iowa, at our U.S. Attorney's Office over there, an assistant United States attorney.

With me at counsel table, you were introduced to Tom Miller. He's the head of the regional prosecutor's office for the attorney general of the state of Iowa and has been designated, as the judge said, as a special assistant United

2871

States attorney here.

MR. MILLER: Good morning.

MR. WILLIAMS: Also at counsel table you were introduced to Special Agent-in-Charge Bill Basler. He is, as the judge said, a case agent. He is the lead investigator in

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2501 of 3245

this case. He offices out of Mason City, Iowa. And he's with the Iowa Division of Criminal Investigation. He will be sitting at counsel table with us throughout trial assisting us as well.

At this table back here is Sali Van Weelden. Sali is a legal assistant in our office, and she'll be sitting throughout this trial back here going in and out of court and helping us as well.

The United States Attorney's Office for the Northern District of Iowa has two offices, one in Cedar Rapids where I usually work, although I'm out here quite a bit appearing in front of Judge Bennett, and then we have an office out here in Sioux City. Our office is headed by Chuck Larson Senior who happens to be in Baghdad right now and hopefully will be back some time in the next month or so.

Since it's more likely you will know people from our office out here in Sioux City, I want to go through the list of those attorneys and staff people out here in case you know somebody out here. We have seven assistant United States attorneys like myself, and we have seven staff people. So I'm going to read that list hopefully slow enough for everybody to

2872

catch the names. Forde Fairchild, Martha Fagg, Kevin Fletcher, Mike Hobart, Jack Lammers, Janet Petersen, and Shawn Wehde are all the assistant United States attorneys.

Shayne Mayer, Del Tompkins, Penny Schlotman, Michelle Schwebach, Michelle Hatting, Carol McEntaffer, and Pat Calhoun are all the staff folks that work with us in the Sioux City office.

THE COURT: And here's the question. Do any of you know any of the folks at the prosecution table, any of the

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2502 of 3245

assistant U.S. attorneys who work at the -- well, actually they work at the courthouse here.  They used to office here.  Just within the last month or so they moved their offices.  But do you know any of the folks in the U.S. attorney's office or anybody else that works at the federal courthouse here?  Raise your hand if you know anybody.  Okay.  Doesn't look like anybody does.

We'll switch over to the defense.  It was Mr. Willett yesterday, but Mr. Stowers is going to take the lead today, and I neglected to change my slide, so I apologize for that.

Mr. Stowers?

MR. STOWERS:  That's okay, Your Honor.  We're rotating every once in a while.  First of all, folks, my name is Dean Stowers.  I'm an attorney in Des Moines.

Seated here to my right is Angela Johnson from Clear Lake, Iowa.  She's got two daughters who she raised in that

2873

area.

And Patrick Berrigan --

MR. BERRIGAN:  Good morning.

MR. STOWERS:  -- from Kansas City, he's an attorney in Kansas City, practices law with the law firm called Watson and Dameron.

Am I coming through all right?

THE COURT:  Yeah, I think you're coming through fine.

MR. STOWERS:  Okay.  And seated back here in the blue shirt is Mr. Alfred Willett --

MR. WILLETT:  Good morning.

MR. STOWERS:  -- from Cedar Rapids.  He practices law with the law firm of Terpstra, Epping, and Willett, and the

Page 26

attorneys there I believe are Ray Terpstra and Greg Epping. Thank you, Al.

And then myself, I practice law in Des Moines, as Judge Bennett indicated, with three other attorneys. I almost forgot how many other attorneys are in the office. It changes periodically. Brent Rosenberg is one of the other attorneys, and David Morse is the other partner in the law firm with me. And then we have another attorney who works for us by the name of Heather Wood. Does anybody recognize any of our names?

THE COURT: Could you introduce Miss Dahl too?

MR. STOWERS: Oh, I'm sorry.

THE COURT: That's okay.

2874

MR. STOWERS: Last but certainly not least is the -- we'll call her the Vanna White of the defense team, Lisa Dahl. She'll be here at least for the next week or two, so that's Lisa Dahl, and she's helping all the attorneys and Angela on the case. Thank you.

THE COURT: Thank you. Now, do any of you know any of the attorneys, think you know Angela Johnson or any of her relatives? Okay. Good.

Now, I need to talk to you about the length of the trial. Our three-month estimate really includes jury selection. We hope the trial will get underway next week. I'm pretty confident that it will, and we think it will -- it could be over the end of June, but it may spill a little bit into July.

It's very hard to estimate the length of trial. You can tell -- if it's a case with six or seven witnesses, we know it's probably going to be a one- to two-day trial. When we get so many witnesses and so many exhibits, it's very hard to

Page 27

estimate, but the lawyers have worked very hard. You know, it's going to be a lengthy trial by any stretch of the imagination, and that's just our best guess.

So I have to talk to you about whether it would be a severe or extraordinary hardship to serve, and I know many of you have had some very interesting answers in the questionnaires. I've seen more excuses than I ever could have imagined with my own imagination about reasons why people ought

2875

to get off jury duty.

But here's the bottom line that's been so interesting to me. Very few people have actually asked to be let go from jury service in this case no matter what they said in their questionnaires. And that's very rewarding to me. It is very rewarding. Matter of fact, some days everyone has said they're willing to serve.

And I know that serving on a jury trial of this length is a huge sacrifice in the best case for everybody. It's huge. I've only had two really long trials, and those I consider to be two months or long -- or longer. And in each of those trials during jury selection, I was struck by the willingness of people to serve their country. And I don't think many people -- when you were driving to Sioux City today, I don't think many of you people thought, gee, I hope I get selected because this is a unique opportunity to serve my country. I bet that didn't cross many folks' minds, but it really is. I mean, that's exactly what jury service is. It's an opportunity to serve your country.

And we have had people make enormous sacrifices who are willing to serve. And I don't like to use examples from my

Page 28

current trial, so I'll use one from one I had last year, very lengthy trial, in excess of two months.  And I remember one day in particular because we did jury selection in August, and the trial was going to go into the fall.  And that's a tough time

2876

for farmers to serve, you know.  This is a tough time because it's planting season and harvest season.  And we had two farmers.  Not only did they farm full time, but they worked full time in manufacturing jobs.  And neither one was going to get paid by the company they worked for, the manufacturing job, if they were on jury service.  I think they might have been paid for the first week or something.  And I just fully expected that they'd say it's a severe or extraordinary hardship.  Both of them said they were willing to do it.

And another day in that case we had a juror who wasn't going to get paid, was the sole source of income for his family, was in a job where he wasn't making a ton of money, but he said that he had talked to his wife and they had a heart-to-heart talk the night before and they thought it was so important to serve that he was willing to deplete his life savings.

Now, I would never ask anybody to do that because to me that is -- that's exactly what a severe or extraordinary hardship is.  I wouldn't expect somebody to deplete their life savings.  If they're willing to do it, more power to them.  But, you know, that is a severe or extraordinary hardship.

On the other hand -- I'll just use one example from this case.  We had a woman who had a part-time job on the side baking cakes, and she estimated that during the course of the trial she'd have ten cakes that she might have to bake.  And she wanted to know if that qualified as a severe or extraordinary

Page 29

hardship. I think you can all predict what my answer was. Now, that woman was so passionate about making cakes, I think she'd be fabulous. She didn't make it on the jury, but I took her name down, and, you know, some day I'm going to call her and ask her to make a cake because I think she'd be terrific at it, but that's an example. And then, of course, we have so many in between.

So I just want you to think about it. We know it's a huge sacrifice. But, you know, a lot of people make huge sacrifices for this country, and we're asking you to do that if you can do it in good faith in this case.

Gene, would you -- is the microphone on? Could you pass it to Juror 548, our first juror? And, Juror 548, I'll make you a deal. If you speak directly into the microphone --

PROSPECTIVE JUROR 548: Yes.

THE COURT: Very good. If you keep doing it that well and if the others do it that well, I won't put up any karaoke music for you to sing. How's that?

PROSPECTIVE JUROR 548: Thank you.

THE COURT: Okay. Would you be willing to serve as a juror in this case?

PROSPECTIVE JUROR 548: Yes, I would.

THE COURT: Okay. Thank you very much.

Juror 78. We're just going to pass it down the row. You should be 78. Are you?

PROSPECTIVE JUROR 78: Uh-huh.

Page 30

THE COURT: Okay. Are you willing to serve if selected?

PROSPECTIVE JUROR 78: Yes.

THE COURT: Okay. Thank you very much.

Juror 165.

PROSPECTIVE JUROR 165: I'd really rather not.

THE COURT: Okay.

PROSPECTIVE JUROR 165: I'm one of those farmers you were talking about.

THE COURT: You're one of the farmers, okay. And everybody's situation is different.

PROSPECTIVE JUROR 165: Next winter would be a nice time.

THE COURT: Yeah. Winter is good for farmers for serving on jury. I noticed that. I picked that up in ten years. Now comes at a very bad time for you?

PROSPECTIVE JUROR 165: Yes, it does, really does.

THE COURT: And, you know, I don't want to get into the details of your farming operation because I know every farming operation is different. It's just a judgment call. In your view would it be a severe or extraordinary hardship for you to have to serve?

PROSPECTIVE JUROR 165: I think it would be. I really do.

2879

THE COURT: Okay. Okay. Then I'm going to go ahead -- I guess I'll ask the lawyers, but I'm sure they don't have any objection.

MR. WILLIAMS: No objection, Your Honor.

MR. BERRIGAN: No objection by the defense, sir.

Page 31

THE COURT: Hope we see you back here in the winter.

PROSPECTIVE JUROR 165: Okay. Thank you.

THE COURT: You're free to leave. Thank you.

Juror 780, are you willing to serve?

PROSPECTIVE JUROR 780: Yes.

THE COURT: Okay. Thank you very much.

Juror 167.

PROSPECTIVE JUROR 167: Yes.

THE COURT: Thank you.

Juror 723.

PROSPECTIVE JUROR 723: Prefer not to due to hardship situations that I'm in at this time, will be going into.

THE COURT: Okay. What's the hardship?

PROSPECTIVE JUROR 723: Number one, I'm going to be going into a job situation that's a new job that I would be losing. It's a limited job where it's a driver education position. I would lose all the money of that.

Two, I'm retiring.

Three, I'm coaching right now also in the high school level, but I would lose --

2880

THE COURT: Well, let's take them one at a time. You're a high school teacher?

PROSPECTIVE JUROR 723: Yes, sir.

THE COURT: Well, I don't think it's a hardship for a high school teacher to serve.

PROSPECTIVE JUROR 723: No, that is not. The coaching bothers me, but no.

THE COURT: I just don't. And the driver ed. position, tell us about that.

Page 32

PROSPECTIVE JUROR 723: It's a position over at Okoboji. It starts -- I start a night class on the end of May, and then I'll be teaching straight through till the latter part of July every day, and it is a limited period of time where it's like a six-week, seven-week period of time.

THE COURT: Is that a new position for you?

PROSPECTIVE JUROR 723: It's under new management, yes. I've taught the position a year ago, but they changed to a new company that's running it this year. It would be the first year I'd be working in it.

THE COURT: Have you talked to them about -- once you got this notice, did you talk to them and find out what their position was?

PROSPECTIVE JUROR 723: At this time they did not make a statement in relation to the position, but it's -- I either would have to give the position up to do it, to do this.

2881

THE COURT: So basically you'd be out how much income?

PROSPECTIVE JUROR 723: About $6,000.

THE COURT: And you feel you can't -- you can't serve because of that.

PROSPECTIVE JUROR 723: Yes, sir, that's correct.

THE COURT: Well, how many years -- how many years have you done the driver's ed.? Just one other year?

PROSPECTIVE JUROR 723: I have taught driver's ed. in different places. This will be my -- at this facility it'd be the fourth year, but it'd be the first year under the new employment.

THE COURT: So you're kind of used to having this income to supplement your teaching income?

Page 33

PROSPECTIVE JUROR 723:  Yes.

THE COURT:  And you're telling me in your view that would be a severe or extraordinary hardship if you had to forgo this income.

PROSPECTIVE JUROR 723:  Yes, sir.

THE COURT:  Okay.  Any objection from the lawyers?

MR. WILLIAMS:  No, Your Honor.

MR. BERRIGAN:  No, Your Honor.

THE COURT:  Okay.  I'm going to go ahead and let you go.  Thank you.

Juror 211.

PROSPECTIVE JUROR 211:  Yes.  I'd like to be excused

because I've got a business that I gotta run, a garbage business, and there ain't nobody that knows the routes and stuff.  That's the only reason, and that's every day.

THE COURT:  Well, do you own the business or work --

PROSPECTIVE JUROR 211:  Yes, I do.  I own the business.

THE COURT:  How many employees do you have?

PROSPECTIVE JUROR 211:  I got one.

THE COURT:  So there's just the two of you?

PROSPECTIVE JUROR 211:  There's two of us, but it takes all day long.

THE COURT:  For both of you.

PROSPECTIVE JUROR 211:  Right.

THE COURT:  And so if you were serving on jury duty, who would --

PROSPECTIVE JUROR 211:  I'd have to hire somebody else and learn them the route and stuff.

Page 34

THE COURT: You'd have a few days to do that.

PROSPECTIVE JUROR 211: It takes longer than a few days. This is a busy time of the year for everybody.

THE COURT: There's more garbage this time of year?

PROSPECTIVE JUROR 211: A lot more garbage this time of the year.

THE COURT: Really. How's that now? Spring cleaning?

PROSPECTIVE JUROR 211: Everybody's cleaning up. We

2883

go through it every year, same thing.

THE COURT: What's the longest time you've ever been away from your job?

PROSPECTIVE JUROR 211: Week, and I gotta hire somebody to do it, and it's hard with all the new customers and stuff. It's hard to go out, tell them what to do unless you got somebody that's been there for years.

THE COURT: Sure you wouldn't rather serve on this jury? I'll tell you this. I have great respect for people who -- sanitation engineers. I'll use the politically correct name.

PROSPECTIVE JUROR 211: There you go.

THE COURT: I have great respect for them. And, you know, in some ways it's probably fascinating to take a peek at what some people throw away. But I'm fairly confident this trial would be more interesting.

PROSPECTIVE JUROR 211: It probably would.

THE COURT: Because you've done that route so often, not that it's not important and not that it's not interesting, but I think this trial would be a lot more interesting for you.

PROSPECTIVE JUROR 211: It probably would, but who's

Page 35

going to do the work?  That's my big problem.  I've done it for 35 years.

THE COURT:  How about this?  We have five lawyers. Why don't you serve on the jury.  You can pick one of the five

2884

to go do the route.

PROSPECTIVE JUROR 211:  If they want to do it, I'd be happy to do it.

THE COURT:  They'd probably all volunteer actually. You know what?  That's a legitimate hardship, so we're going to go ahead -- any objection?

MR. WILLIAMS:  No, Your Honor.

MR. BERRIGAN:  No, sir.

THE COURT:  Okay.  We're going to go ahead and let you go.  Thank you.

PROSPECTIVE JUROR 211:  Thank you.

THE COURT:  Actually we've lost more today than any other day.

459.

PROSPECTIVE JUROR 459:  I have a four-year-old son at home.  As long as I had daycare for him, then I would be willing.

THE COURT:  Okay.  Tell us about that.

PROSPECTIVE JUROR 459:  My husband, he's one of those farmers, so he has a hard time watching him, and during the summer when school gets out, daycare probably won't be too much of a problem.

THE COURT:  So if we start the trial next week, would you be able to -- and you get selected to serve, would you be able to make arrangements and find daycare?  I mean, you must

have given this some thought after you got the packet and filled out the questionnaire. You knew you had a chance of being selected; right?

PROSPECTIVE JUROR 459: Uh-huh.

THE COURT: You must have come up with some kind of plan. No?

PROSPECTIVE JUROR 459: Well, I started working nights at my job, and we've been having a hard time finding a baby-sitter for the day. If I was selected, I could check into the possibility of going to Sheldon for daycare for my son.

THE COURT: Okay. Well, I'm confident you can figure out a way to do it.

PROSPECTIVE JUROR 459: Okay.

THE COURT: Okay? Thanks.

109, are you willing to serve?

PROSPECTIVE JUROR 109: I am willing to serve.

THE COURT: Thank you.

PROSPECTIVE JUROR 109: My boss probably wouldn't like it so much, but I'm willing to serve.

THE COURT: I'll tell you what, we won't tell him you said that; okay?

PROSPECTIVE JUROR 109: Yeah.

THE COURT: Juror 396, are you willing to serve?

PROSPECTIVE JUROR 396: My job makes it difficult for me because I'm the only one that works for this general surgeon.

2886

I do his dictation, his coding, his billing. And it would be very difficult for him to find someone to do all those things.
Page 37

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2514 of 3245

THE COURT: What city are you from? I don't remember.

PROSPECTIVE JUROR 396: Storm Lake.

THE COURT: Storm Lake. I mean, you would at least be able to work Fridays.

PROSPECTIVE JUROR 396: Right, uh-huh.

THE COURT: I understand, but he can find a way to work around it.

PROSPECTIVE JUROR 396: Okay.

THE COURT: Okay? But you can tell him you tried everything you could, but the mean judge wouldn't let you off.

PROSPECTIVE JUROR 396: Okay.

THE COURT: So you'll be fully protected from your boss there. Is that a deal?

PROSPECTIVE JUROR 396: Yes.

THE COURT: Okay.

Now, I want to talk to you about your duty not to serve. We just talked about your duty to serve, but here's what I mean by that. You have an equal duty not to serve only in this respect. We're not interested in you answering our questions the way you think we want you to answer them because we have no preconceived notion of how anybody should answer any of the questions. The only preconceived notion we have is that you'll answer them openly and honestly and then let us be the

2887

judge of whether or not we think you would be an appropriate juror in this case. So it's very important that you answer everything openly and honestly.

I wanted to go through the trial process because this is a complicated case conceptually. In most trials there's just one phase, the guilty/not-guilty phase. Jurors come in. We

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2515 of 3245

hear evidence. You go back and you vote, guilty, not guilty. Then you go home, and you're done. This case has the potential to be more complicated than that. And there are potentially three phases in this case.

The first phase is what I just talked about, the merits phase, the not-guilty/guilty phase. And in that sense this case is like every other trial I have except it's going to be much longer than most. But the first phase, that's the job: Hear all the evidence. Take the instructions. Is Angela Johnson not guilty or guilty of each of the ten crimes she's charged with? That's your job. And if you decide she's not guilty, the case is over at that point. There is only one phase.

But there could be a second phase. And that would be only if there is a unanimous finding by all 12 jurors beyond a reasonable doubt that Angela Johnson is guilty of one or more of the ten counts in the first phase do we even have a second phase.

But if the jurors unanimously found her guilty of one

2888

or more of the counts, then there's a second phase. And that phase, let me use this analogy. Mr. Berrigan, one of the defense lawyers, used it. This trial in some respects is kind of like a basketball game. The first half is that first phase, the guilty/not-guilty phase. That's going to take a while. The second phase if we ever get there, this eligibility or gateway phase, that's kind of like the intermission. There won't be any evidence presented.

But once -- if the jury comes back with a verdict and that verdict is guilty on one or more of the ten counts, then

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2516 of 3245

there will be a second phase, and in that second phase, no evidence will be presented. You'll just get a new set of instructions. The lawyers will give arguments, and then you'll go back and deliberate in the second phase, and you'll have to decide whether an eligibility or gateway -- this is the eligibility or gateway phase, and you will decide if the prosecution has proved a gateway or eligibility factor and one or more statutory aggravating factors beyond a reasonable doubt.

If the jury unanimously agrees that the prosecution has proved this, then and only then would we reach the third phase. I'm not going to take the time now to describe for you what a gateway factor is or what a statutory aggravating factor is. It's enough that you know that you at least have to decide that before there's a penalty phase.

And then if the jury unanimously agrees that the

2889

prosecution has proved both a gateway factor and a statutory aggravating factor, then there will be a third phase. The third phase is like the second half of the basketball game. There will be evidence presented. The government would have the obligation to present evidence in support of what are called aggravating factors.

And then the defense would have the opportunity and the right to put on evidence. But, of course, because the defendant is presumed innocent, the defense never has an obligation to ever put on any evidence. Even in the penalty phase, they have no obligation to put on evidence. But they could put on evidence if they wanted to, and that would be evidence of what we call mitigating factors.

And then in my written instructions, I would define
Page 40

for you what the law considers to be an aggravating factor, what the law considers to be a mitigating factor, and then you'd have to decide -- each juror would decide for themselves whether the government proved any aggravating factors and whether the defense proved any mitigating factors.

Gets a little bit more complicated than that because there's a different burden of proof. The government has to prove aggravating factors beyond a reasonable doubt. The defense has to prove mitigating factors only by what's called a preponderance of the evidence. It's not as high of a burden.

In any event, I would instruct you to consider any

2890

mitigating factors established by the evidence and any aggravating factors established by the evidence. And then each juror would weigh those factors that they find. You may find one or more aggravating factors. You may find 10 or 15 or more mitigating factors. Nobody's going to tell you how much weight to give each factor. That's for the individual jurors to decide.

But you have to consider any mitigating evidence, consider any aggravating evidence, make a decision whether the government proved an aggravating factor, make a decision whether the defense established or proved a mitigating factor, weigh those, and then in that way determine whether or not Miss Johnson should receive life imprisonment or the death penalty.

In that penalty phase, only if each juror unanimously votes for the death penalty will Miss Johnson be sentenced to death by me. In other words, if it's 11 to 1 in favor of the death penalty, that's it. Then she gets a life sentence. So you never -- no juror ever, ever has to impose the death

Page 41

penalty. It's simply an option that can be considered in the third phase.

Okay. Now we're going to turn it over to the lawyers. And Mr. Williams from the prosecution is going to start first. Why don't you all stand and take a stretch break.

Mr. Williams, whenever you're ready.

MR. WILLIAMS: Thank you, Your Honor.

2891

Good morning. My task this morning is going to be to spend a half an hour or less with you all with two things in mind: One, to get to know each of you just a little bit better, and then also I want to cover some general concepts that we deal with in any criminal case, things like, as the judge said, the burden of proof and presumption of innocence, and talk with you about those concepts for a little bit.

And what I'm going to do is I'm just going to start -- I think, 396, you have the microphone. Congratulations. I'm going to start with you, just go down the row, and then switch to the front row and go down. And when I get to 167, I'll be done, and I'll sit down here.

So, Miss 396, you just indicated with the judge you work for a surgeon at this point?

PROSPECTIVE JUROR 396: Right.

MR. WILLIAMS: And what type of surgery -- is it a male or female surgeon?

PROSPECTIVE JUROR 396: A male and general surgery.

MR. WILLIAMS: How long have you worked there?

PROSPECTIVE JUROR 396: Three years.

MR. WILLIAMS: How do you like the job?

PROSPECTIVE JUROR 396: Oh, I love it.
Page 42

MR. WILLIAMS: Why?

PROSPECTIVE JUROR 396: Oh, it's challenging, the coding, and I've learned a lot of new things with it and learned

2892

to be an office manager so . . .

MR. WILLIAMS: Do you have other people that work with you there?

PROSPECTIVE JUROR 396: A nurse.

MR. WILLIAMS: I saw that one of your past times is reading.

PROSPECTIVE JUROR 396: Yes.

MR. WILLIAMS: What do you like to read?

PROSPECTIVE JUROR 396: Oh, just light fiction.

MR. WILLIAMS: You've never been a juror before I don't think from looking at your questionnaire.

PROSPECTIVE JUROR 396: No.

MR. WILLIAMS: The judge described for you all what the task is of a juror, particularly during the guilt or not-guilt phase, merits phase if you will. The job of a juror is to ultimately decide the facts, what happened in the case. You understand that would be your job as a juror if you were chosen.

PROSPECTIVE JUROR 396: Yes.

MR. WILLIAMS: Do you think it'd be important as a juror to keep an open mind throughout the evidence?

PROSPECTIVE JUROR 396: Yes.

MR. WILLIAMS: What else do you think would be important for a juror?

PROSPECTIVE JUROR 396: Well, to be -- yeah, to be

2893

Page 43

open minded and try and look at all the facts as carefully as you can and to make a good judgment, fair judgment.

MR. WILLIAMS: Do you think it would be appropriate to weigh all the options of what happened, what didn't happen, and consider different potential -- potentialities?

PROSPECTIVE JUROR 396: Yes, uh-huh.

MR. WILLIAMS: Do you think that's a hard job?

PROSPECTIVE JUROR 396: Oh, yes.

MR. WILLIAMS: Do you envision it to be a hard job?

PROSPECTIVE JUROR 396: Yes.

MR. WILLIAMS: Carry a fair amount of responsibility; would you agree?

PROSPECTIVE JUROR 396: Uh-huh.

MR. WILLIAMS: What do you think about that? Do you feel you're up to that type of responsibility?

PROSPECTIVE JUROR 396: Oh, I'm not sure. I'd do my best.

MR. WILLIAMS: Well, I take it in your day-to-day work you have a fair amount of responsibility as well.

PROSPECTIVE JUROR 396: Right.

MR. WILLIAMS: And apparently you've shouldered that for a number of years and have done well at that. We'd be looking for you to shoulder some responsibility in this case, and can you assure us that you could do that?

PROSPECTIVE JUROR 396: Yes, uh-huh.

2894

MR. WILLIAMS: Thank you very much. Why don't you pass the microphone, if you would, to 109.

Page 44

I'd like to know a little bit more about your work. You say you're a team leader at some type of construction company. Can you describe for us what you do?

PROSPECTIVE JUROR 109: I work for Interstates in Sioux Center, and it's an electrical construction company, and I'm basically the office manager, the team lead for the administrative assistants in that company. I have three admins who also work alongside of me, but I'm their supervisor. I am the -- I super -- or I help assist the president, our operations manager, and our director of regional operations, so I -- my job is basically helping our office run as smoothly as possible.

MR. WILLIAMS: Sounds like a fair amount of responsibility as well.

PROSPECTIVE JUROR 109: Yes.

MR. WILLIAMS: Are they going to be able to do okay without you?

PROSPECTIVE JUROR 109: It would be a struggle. I had -- I was on maternity leave just under a year and a half ago and -- for about eight weeks. And when they heard this trial might go for 12, they were a little -- it made them a little nervous. I know it's not an extreme hardship. It would be -- it would be difficult for them but . . .

MR. WILLIAMS: But you're willing to serve.

2895

PROSPECTIVE JUROR 109: I know it's part of my responsibility, and I know that it's something that I need to do if I'm chosen, and it won't be easy on the other side of things, but I know that it's something I need to do. It's my responsibility so . . .

MR. WILLIAMS: Sure. The one thing that we always

Page 45

have concern about is when somebody has something like that in the background is that they wouldn't be so distracted by a concern over what's happening at work that they're not able to concentrate on what happens here in the courtroom when you're in the courtroom. What do you think about that?

PROSPECTIVE JUROR 109: It's something that I'll have to -- if I was chosen, you know, I just need to make sure that I'm -- I'd have my work there and do my job here. It's one of those things I just -- I take that as it comes, and I would, you know, go to work on Fridays and do what I need to do there. And I know it will work. They'll be fine without -- I mean, they managed through my maternity leave without me but . . .

MR. WILLIAMS: They may not like it but --

PROSPECTIVE JUROR 109: Exactly. They may not like it, and it may not be their first choice, but they also know that it's part of, you know, our responsibility so . . .

MR. WILLIAMS: Sure. Let me talk to you about the witnesses in this case for a few minutes. The judge indicated we're going to have a lot of witnesses in this case. And it's

2896

going to be something where every juror's going to have to listen to the witnesses, watch their demeanor, that kind of thing, and make a judgment call, as the judge said, about their credibility. You'll perhaps be happy to know that you will have a notebook and the judge will allow you to take notes during the evidence to help you along that line.

The witnesses are going to range from law enforcement officers -- and there's going to be a large number of law enforcement officers, FBI agents, DEA agents, local law enforcement officers -- to the other side of the spectrum, if

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2523 of 3245

you will. There's going to be some people who are either in prison right now or have been in prison and then everything in between. There's going to be various experts, forensic experts, and people from just common walks of life testifying.

If you are a juror and you're watching this large number of witnesses come in from different walks of life, do you have in your mind what you might use in your own skills that you've acquired over the years to judge credibility of a witness?

PROSPECTIVE JUROR 109: Oh, gosh. I think that it's just going to take -- the ability to write notes as we go I think is going to be huge, at least for me. I need to just kind of keep that kind of stuff in front of me, the things that I see. Like you're talking about the demeanor of someone and how they respond and their expressions, it's just something that --

2897

I don't know. I don't know if I have any one skill that's going to help me.

MR. WILLIAMS: Sure.

PROSPECTIVE JUROR 109: But it's just something I'm glad that we can take notes on that stuff because I'm not going to remember.

MR. WILLIAMS: Let me talk to you about some of the particular witnesses who may testify. Law enforcement officers, for example, now, jurors are obviously able to take into account the officer's background, experience, training, and so forth in determining whether the witness knows what they're talking about and so forth.

But the judge will ultimately instruct you in this case, I anticipate, that you're not to give a law enforcement

Page 47

officer more credibility simply because of the label. The law enforcement officers come from every walk of life as well, and they're human. And simply because of the label of their title, you shouldn't give them more credibility than any other witness. Is that an instruction you think you could follow?

PROSPECTIVE JUROR 109: Yes.

MR. WILLIAMS: On the other extreme, there is going to be people who have decided to cooperate with the government, people either in prison or have been in prison, decided to cooperate with the government and -- perhaps in order to get a reduction, they're hoping to get their sentence reduced. And

2898

the judge will ultimately instruct you with them as well on how to read their credibility.

It's interesting. Some jurors look at that, and they say, you know, that's a pretty brave person to do that. On the other end, they are hoping in some cases at least to get a reduction in their sentence, and the judge will ultimately instruct you something along the lines that you should use care and caution in evaluating the testimony of somebody who comes in here to testify with the hope of getting some reduction in their sentence. Does that make sense to you?

PROSPECTIVE JUROR 109: Yes, it does.

MR. WILLIAMS: And is that an instruction you think you could follow?

PROSPECTIVE JUROR 109: Yes.

MR. WILLIAMS: The rest of the jurors on this panel, do any of the rest of you think you'd have any difficulty following any instructions that you should not treat a law enforcement officer as more credible simply because of the title

Page 48

or that you should use some care and caution in listening to the testimony of somebody who's cooperated with the government? If so, raise your hand if you think you'd have trouble following those instructions. I don't see any hands. Okay. If you could pass the microphone if you would to 459.

Miss 459, you're a nurse. Is that -- Country View Manor, is that a nursing home-type situation?

2899

PROSPECTIVE JUROR 459: Yeah.

MR. WILLIAMS: How long have you worked there?

PROSPECTIVE JUROR 459: About a year and a half.

MR. WILLIAMS: And do you enjoy your job at this point?

PROSPECTIVE JUROR 459: Oh, it's all right.

MR. WILLIAMS: It's gotta be some hard days and some good days I imagine.

PROSPECTIVE JUROR 459: Yeah, and I'm working nights too, and I really don't care for nights.

MR. WILLIAMS: Yeah, that's tough to adjust to those kind of hours. What's the hardest part of your job other than working nights maybe?

PROSPECTIVE JUROR 459: Probably dealing with some of the residents that have Alzheimer's.

MR. WILLIAMS: Difficult and sad cases in many situations.

PROSPECTIVE JUROR 459: Uh-huh.

MR. WILLIAMS: Let me talk to you a little bit about the charges in this case. The judge indicated that there are ten charges. Let me explain that a little bit more to you. There's five murders that are at issue in this case. Five

Page 49

people were murdered, the government alleges, back in 1993. And the government has alleged that the murders occurred -- in conducting those murders the defendant violated two federal

2900

crimes, murder in furtherance of a drug conspiracy, and those same murders violated a crime of continuing criminal enterprise which is another type of drug conspiracy. But at base is five murders involved in this case.

The government has alleged in the indictment that in 1993 five people including a young mother and her two daughters, Kandi, age 10, and Amber, age 6, were murdered in Mason City, Iowa.

As you would imagine, in any murder case, there's going to be evidence that could be difficult for jurors to look at. The government alleged that the bodies were discovered in the year 2000. So this is seven years after the alleged murders occurred. And in this case, therefore, you will not be seeing photographs of blood and gore, but we would anticipate you're going to be seeing photographs of skeletal remains. You may hear testimony about how the murders occurred. And some of that testimony may be difficult for jurors to deal with. But I trust you would all recognize that if we didn't have jurors able to view that type of evidence and recognize that type of evidence as an emotional evidence but put it aside we wouldn't be able to conduct criminal cases.

Now, I noted, Miss 459, in your questionnaire when asked about this topic you indicated that you didn't think you'd have trouble dealing with that, and, in fact, you referenced your own work; is that right?

2901

Page 50

PROSPECTIVE JUROR 459: Yeah, I've watched surgeries, and I've seen all sorts of things so . . .

MR. WILLIAMS: So to you in particular that type of evidence would not be difficult.

PROSPECTIVE JUROR 459: No.

MR. WILLIAMS: And that's good. The concern we all have in a case like this is that jurors would have an emotional reaction to this type of evidence and that emotional reaction would interfere with their ability to determine if the government's really proved its case beyond a reasonable doubt. You will, if you serve as a juror, have a long verdict form and a lot of things to answer on that verdict form. But nowhere on that verdict form will there be a question, Do you think the killing of young children is a bad thing? That's not what this case is about. This isn't a referendum about whether the crime itself was bad.

Rather, the task of the jury is going to be did the government prove beyond a reasonable doubt what it's alleged here, and that is that this defendant was involved in those murders.

And so it's going to be important for jurors to be able to recognize they can have these emotional responses to the evidence, but they can't let that interfere with their judgment about whether the government's proved its case beyond a reasonable doubt. I trust from your answer that you don't think

2902

that's going to affect your ability to hold the government to its burden.

PROSPECTIVE JUROR 459: No.
Page 51

MR. WILLIAMS: Now, not all the rest of you have had that type of background, experience where you've been exposed to this type of stuff as Juror 459 has. Does any of the rest of you think they would have difficulty setting aside any emotional response they might have to the evidence and requiring the government to prove its case beyond a reasonable doubt? And if you do, that's fine. We just need to talk about it for a little bit. And if you do, if you'd raise your hand. There's a couple there. Okay. Let me go back if I could -- could you pass the microphone back to 396.

Share with us your thoughts on that if you would, ma'am.

PROSPECTIVE JUROR 396: Well, I guess I just have found in other circumstances where I get really emotionally involved and maybe I'll have a real strong opinion and it's hard to sway me one way or the other, and I know, like you said, there are children involved and that that isn't really going to be the issue, but I think that that would affect me.

MR. WILLIAMS: As I did say, the important thing is -- and no one's going to say, Well, jeez, you can't have an emotional reaction to this type of evidence.

PROSPECTIVE JUROR 396: Right, right.

2903

MR. WILLIAMS: You may have an emotional reaction, and that would be natural. What's going to be important is that you recognize it as such and recognize that's not the question in this case. The question in this case is not whether we're upset about what happened. The question in the case is not whether what happened was a tragic incident. The question is whether the government proved its case that this defendant was involved

in that crime.

What the judge will instruct you you have to find are the elements of the offense, and none of them have to do with whether you think what happened was bad or not. If the judge gave you instructions about what you had to find, do you think you could follow those instructions?

PROSPECTIVE JUROR 396: Yes, uh-huh.

MR. WILLIAMS: And do you think while it might be hard, could you assure us that you could put aside an emotional reaction to this and recognize that the defendant's not on trial here about whether the murders were bad? The defendant's on trial about whether she committed the murders or was involved in committing the murders, and that's what the question is here.

PROSPECTIVE JUROR 396: Uh-huh.

MR. WILLIAMS: Can you assure us that you can carry out that task if you're picked as a juror here?

PROSPECTIVE JUROR 396: Yes, uh-huh.

MR. WILLIAMS: Thank you. And if you would pass it

2904

down to 780, I would ask you the same questions that I did Juror 396. Despite the fact that you think you might have some difficulty with it, could you follow the instructions from the court?

PROSPECTIVE JUROR 780: Yes, I think I can. I just -- if you don't mind a few tears now and then because I'm kind of soft hearted.

MR. WILLIAMS: And that's going to be a natural or may be a natural reaction by jurors. And that's okay. But the important thing is that you not be so influenced by that that you deny the defendant a fair trial. Do you recognize the need

Page 53

for that?

PROSPECTIVE JUROR 780: Yes.

MR. WILLIAMS: Thank you very much. If you could pass the microphone back to -- actually if you would, why don't we go down the line here to 548, keep my order here.

I see that reading is kind of a past time for you too.

PROSPECTIVE JUROR 548: Yes, it is.

MR. WILLIAMS: What type of books do you like to read?

PROSPECTIVE JUROR 548: I like to read fiction.

MR. WILLIAMS: Any favorite authors you have?

PROSPECTIVE JUROR 548: Well, right now I've been reading Karen Kingsbury. I don't know if you know --

MR. WILLIAMS: No, I don't.

PROSPECTIVE JUROR 548: Anyway, I also buy books for

2905

our church library, so I have access to buying whatever I want, and I get to read them, so that's kind of fun.

MR. WILLIAMS: Yeah, that's good. I'm a book addict myself. Love to read.

Let me talk to you a little bit about what's underlying this case. I told you this case is about five murders that occurred back in 1993, and I told you it was in relation to drug conspiracy.

PROSPECTIVE JUROR 548: Uh-huh.

MR. WILLIAMS: Underlying the crimes in this case is an allegation by the government that the defendant was involved in a drug conspiracy and in a continuing criminal enterprise, another type of drug conspiracy, and that involved methamphetamine.

Now, a lot of people, particularly in Iowa, have

Page 54

strong feelings about drugs, strong feelings about methamphetamine and the effect. I think in answer to a question in the questionnaire you indicated something to the effect of what would society be like without laws, drug laws, in this area, and do you have strong feelings yourself about the drugs?

PROSPECTIVE JUROR 548: Well, yes. It's, you know, ruined so many people's lives and the ones that people are in prison now because of drugs. People are dead. I don't know. It's just -- it's a tragedy, you know, in so many cases.

MR. WILLIAMS: It is. Let me take this back to the

conversation I just had with some of the other jurors. This case is not about whether drugs are bad.

PROSPECTIVE JUROR 548: Right.

MR. WILLIAMS: We never have a jury that thinks, yeah, we're in favor of drugs.

PROSPECTIVE JUROR 548: I hope not.

MR. WILLIAMS: Yeah. It's a natural consequence of that. And again, the verdict form's never going to have anything on there about do you hate drugs, and so it's going to be -- just as it's equally important the jurors recognize this case is not about whether the murders are bad or not, it's going to be equally important the jurors don't use this trial as a way of showing their hatred for drugs and finding the defendant guilty simply out of anger at drugs generally. You have to hold the government to its burden to prove its case beyond a reasonable doubt and not let your concern about drugs, legitimate concern about drugs, influence your decision in this case.

Now, some jurors can do that, and some jurors, you

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2532 of 3245

know, maybe the drug problem has hit home closer for them, and they can't put that aside somehow. What do you think, ma'am?

PROSPECTIVE JUROR 548: I understand what you're saying. That's not a problem for me. I don't know anybody who's been involved in drugs. It hasn't affected me personally, so I don't think I'd have a problem in that regard.

2907

MR. WILLIAMS: Very good. How about the rest of the jurors? Anybody on the jury at this point think that maybe the drug problem has hit home so close that it's going to influence your ability to hold the government to its burden of proving its case beyond a reasonable doubt? If so, just raise your hand. Okay. I don't see any hands. If you could pass the microphone over to 78, please.

You're a retired bookkeeper?

PROSPECTIVE JUROR 78: Yes.

MR. WILLIAMS: And I saw one thing I noted interesting here, you're in a gem and mineral society.

PROSPECTIVE JUROR 78: Yes.

MR. WILLIAMS: Is that right? Tell me about that.

PROSPECTIVE JUROR 78: Just rock hounds, you know. It's fun. I'm always walking and looking down to find rocks.

MR. WILLIAMS: Are there particular areas around northwest Iowa that are better than others for that?

PROSPECTIVE JUROR 78: Different things in different places, you know. We do find a lot of agate around here.

MR. WILLIAMS: Has this been kind of a lifelong passion of yours?

PROSPECTIVE JUROR 78: Uh-huh, yes.

MR. WILLIAMS: That's interesting. My son likes to

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2533 of 3245

collect rocks as well.  I'm sure it's not as sophisticated a search as yours is at this point.

2908

PROSPECTIVE JUROR 78:  We have a show once a year. You ought to bring him.

MR. WILLIAMS:  I should.  Let me talk to you about another topic here the judge brought up earlier, and that's the presumption of innocence.  The defendant is clearly in court here, and there's always a concern that we have that a jury's going to come in and draw a conclusion from the fact that somebody has been charged with a crime, so let me cover that with you a little bit.

In the federal system, for somebody to be charged with a felony offense, it has to be brought before a grand jury. It's a guarantee in the Constitution that's required that the government present it before some citizens before they can be charged.

But what's important for you to know is that the grand jury does not determine guilt at all.  Their task is simply to determine whether there's probable cause to believe that a crime has been committed and whether the defendant's committed that crime.  And so they are not a jury deciding guilt or not guilt. They are a jury deciding whether there's some evidence to indicate whether the defendant committed the crime sufficient to bring a charge against her.  An indictment, therefore, is not evidence of anything.  It's not evidence of a crime.  It is simply a way to charge somebody in federal court.

In state court, a county attorney can do the same

2909

Page 57

thing simply by talking to the police officer, reaching a conclusion that somebody committed a crime, and writing up a criminal charge. In federal court we have to run it before a grand jury to assist us in investigating the case and making that decision.

Obviously we don't just go out on the street, grab somebody, put them in a chair, and say, Now you're going to be the defendant this week. And so we do have a concern that when jurors come in they're going to look over there and come to the conclusion, boy, she must be guilty because she's sitting here and she's been charged.

And what we need to know is whether jurors can, while you might have that initial thought, recognize that that is not evidence. The fact the defendant has been charged is not evidence, and you need to put aside any assumptions or conclusions you've reached from that and recognize the government has the burden of proving her guilt. And until and unless the government proves her guilt beyond a reasonable doubt, she is presumed innocent. As she sits here today, she is presumed innocent.

Now, some people can recognize that and give her the presumption of innocence, and some people can't. What about you, ma'am?

PROSPECTIVE JUROR 78: I think it's very important that a person considers them innocent until proven guilty.

2910

MR. WILLIAMS: And I think in answer to this question on the questionnaire, you said something to the effect of it's supposed to be the way the system works when you were asked

Page 58

about the presumption of innocence and the burden of proof and so forth. So I take it that's something that you strongly believe in.

PROSPECTIVE JUROR 78: Yes.

MR. WILLIAMS: Is there any juror here that thinks it would be difficult for them to afford this defendant the full presumption of innocence in this case and set aside any conclusions you might have reached from the fact that she's in court and recognize the government has the burden of proving her guilt? And if you do, that's fine. Again, we just need to talk about it, and if you could raise your hand. Okay. I don't see any hands raised. If you could pass the microphone down one more to 780.

Let me talk to you about this burden of proof. I've referenced it a couple times. The government has the burden of proving its case beyond a reasonable doubt. So let me talk about that. And the judge referenced it earlier.

A defendant in a criminal case has no burden of proving anything. They have no burden of proof. They have no burden to put on evidence. The government alone has the burden of proving its case beyond a reasonable doubt.

Now, the judge ultimately will instruct you about what

2911

that means. Proof beyond a reasonable doubt doesn't mean proof beyond all doubt. But it will be ultimately up to the jury to decide whether the government's proved its case beyond a reasonable doubt.

What's important obviously is for every juror to be able to recognize that the defendant has no burden and that the government alone has the burden of proof in this case. Is that

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2536 of 3245

something that you think you feel comfortable with?

PROSPECTIVE JUROR 780: Yeah. Some of your terms are a little above me, but if there's good explanation behind some of it, you know, then I can get, you know, what I need to.

MR. WILLIAMS: Sure. And the judge will help. He will give you written instructions in the case that will help you with these concepts. But the important thing at this point that I want to make sure you're comfortable with and that is that table over there, the defense table, has no burden to do anything. They don't even have to get up here and talk to you today. They have no burden of proof at all. The only people in this courtroom who has a burden to do anything is our table, and we have the burden of proving our case beyond a reasonable doubt. Do you recognize that?

PROSPECTIVE JUROR 780: Yes. Is what you're saying to me is that I need to know the facts before I can make a decision?

MR. WILLIAMS: Well, what's important -- the concept I

2912

want to get across right now is that it's our burden, the government's burden, of proving those facts, and the defense doesn't have any burden at all. Are you comfortable with that concept?

PROSPECTIVE JUROR 780: Yes.

MR. WILLIAMS: Okay. And the reason I bring that up, some people think, jeez, the defendant has -- should be putting on their side of the story. I mean, they've gotta put on their side of the story, and if they don't, I'm going to hold it against them. And in our system of justice, they don't have that burden. And if jurors come in with that concept that they

Page 60

need to hear the other side of the story, they have to set that aside and recognize that the defense has no burden at all to put on a case. And I want to make sure every juror feels comfortable with that. And do you?

PROSPECTIVE JUROR 780: I'm still confused a little bit but -- because this is all new to me.

THE COURT: Let me try and jump in and try and explain it. In every criminal case whether it's in federal court in this district, in any other of the 94 districts, or in state court, whether it's a death penalty case or even a traffic ticket, the prosecution always has the burden of proof. In other words, the defendant comes into court. They're presumed innocent.

And because they're presumed innocent, the government

2913

has to try and prove them guilty. And it's the government's -- what we call the burden of proof beyond a reasonable doubt. The defendant never, ever has to put on any evidence. Matter of fact, the defendant never has to do anything in a criminal case. Their lawyers don't have to ask any questions during selection. They don't have to give an opening statement. They don't have to cross-examine any of the government witnesses. They don't have to put on any evidence. They don't have to give a closing argument. The defense doesn't have to do anything because the burden never, ever shifts from the government to the defendant. The government always has to prove a defendant guilty beyond a reasonable doubt. Do you understand that?

PROSPECTIVE JUROR 780: Yes.

THE COURT: Okay.

MR. WILLIAMS: Thank you very much. If you could pass

Page 61

the microphone down to 167, and I'll finish up here.

Let me ask you that same question. Do you feel comfortable with that burden of proof being on the government?

PROSPECTIVE JUROR 167: Yes.

MR. WILLIAMS: And, you know, some people come in thinking, jeez, that's too high of a burden on the government. The government shouldn't have to prove it beyond a reasonable doubt. It's enough if they just kind of prove it happened. If I have a gut feeling it happened that way, that should be enough.

2914

Other jurors come in; they think, no, jeez, you know, if the government's going to prove something, they have to prove it beyond any possible doubt. I mean, it's gotta be absolute, no question about it at all. Proof beyond a reasonable doubt's not high enough. What are your thoughts on that?

PROSPECTIVE JUROR 167: I agree. I think they should have to prove beyond a reasonable doubt.

MR. WILLIAMS: If you served as a juror in this case and you had decided -- you listened to all the evidence in the case and you talked about it with the other jurors back there and you just ultimately decided at the end of your deliberations that you don't think the government proved its case beyond a reasonable doubt, how would you have to vote then?

PROSPECTIVE JUROR 167: I would have to vote -- I would have to be honest with myself, and if they all voted for it, then if I decided it was against, I would have to vote against.

MR. WILLIAMS: Right, not guilty. If we didn't prove our case beyond a reasonable doubt, your obligation would be to

Page 62

vote not guilty. Is that fair?

PROSPECTIVE JUROR 167: That's fair.

MR. WILLIAMS: Now, you'd want to listen to the other jurors and discuss things out and so forth. But if ultimately your conclusion was we didn't prove our case, your obligation would be to vote not guilty.

2915

PROSPECTIVE JUROR 167: That's correct.

MR. WILLIAMS: Fair? And on the other end, if at the conclusion of all the evidence you determined that the government did prove its case beyond a reasonable doubt, how would you have to vote then?

PROSPECTIVE JUROR 167: I would feel comfortable making my decision not based on what they decide.

MR. WILLIAMS: And if we proved our case beyond a reasonable doubt, your vote would be what?

PROSPECTIVE JUROR 167: Would you repeat that, please?

MR. WILLIAMS: Yeah. If we proved our case beyond a reasonable doubt, you talked with the other jurors, you looked at the evidence, and you concluded, yep, the government proved its case beyond a reasonable doubt, my verdict is what, what would your verdict have to be if we proved our case beyond a reasonable doubt? Guilty or not guilty? Does it make sense?

PROSPECTIVE JUROR 167: Yes, but I'm not sure if -- I don't know. I don't know at this point.

MR. WILLIAMS: Sure. And yeah, don't -- I don't want to mislead you in any way, and I'm sorry if I did. I'm not asking you how you're going to vote. You haven't seen any evidence at all. I just want to make sure everybody understands the concept that if the government proves its case beyond a

Page 63

reasonable doubt that leads to a guilty verdict. If we fail to prove our case beyond a reasonable doubt, that leads to a

2916

not-guilty verdict. And you understand that concept.

PROSPECTIVE JUROR 167: Yes, if you prove your case, it will be guilty. If you don't prove your case, then it will be not guilty.

MR. WILLIAMS: Great. That's all I wanted to get across. I wasn't by any means trying to get you to vote before you saw the evidence. Thank you for your time.

THE COURT: Mr. Stowers?

MR. STOWERS: Morning, everybody. I'm Dean Stowers. I'm one of the attorneys working with Angela Johnson, and I wanted to thank you all for coming in this morning. I know some of you had quite a drive early in the morning on a Thursday.

I also wanted to thank you all for filling out those questionnaires whenever you got to them. Some of you probably filled them out in the last month or so, and some of you probably filled them out two, three months ago. I know that was a lot of work, but it was very important for us to be able to go through those questionnaires and look at your answers and help ourselves prepare so that we can keep this process moving along as quickly as possible. So thank you all for that.

One thing I think that Mr. Williams didn't cover with you is the witness list. And did everybody get a witness list this morning before they came up? And did everybody get a chance to look through that? I'm seeing a lot of nodding. Does anybody recognize any of the names on that list?

2917

Page 64

Okay. And you are Number 548. What name or names did you recognize?

THE COURT: Well, we need the microphone.

MR. STOWERS: Oh, I'm sorry.

THE COURT: We can't have jurors talking without the microphone because you know what happens? Shelly can't hear, and then she jumps up and smacks me, and it's just self-preservation on my part.

PROSPECTIVE JUROR 548: That's not good.

THE COURT: So we're going to ask you to use the microphone. I'd appreciate it.

PROSPECTIVE JUROR 548: I just recognized somebody whether it's somebody -- Robert Riepma, and I don't know whether he grew up with somebody. He's from Sheldon originally, and if that's the same person, I have no idea. So I just recognize the name.

MR. STOWERS: How well do you know this person?

PROSPECTIVE JUROR 548: Not very well. But you said did you recognize a name. I did recognize a name.

MR. STOWERS: In what capacity?

PROSPECTIVE JUROR 548: Well, he was a couple years older than me, went to school with me a couple years ahead of me, and that's it, so that's my recognition.

MR. STOWERS: How long has it been since you last had any contact with this person?

2918

PROSPECTIVE JUROR 548: I hate to tell you. This has been since I was in high school.

MR. STOWERS: Years and years ago.

PROSPECTIVE JUROR 548: Yeah, it's been a while.
Page 65

THE COURT: Just a couple years ago.

MR. STOWERS: Within the last five years then.

PROSPECTIVE JUROR 548: Yeah, that's right. So that's the only thing. I just recognized the name. It may not even be the same person.

MR. STOWERS: And if he walks in the courtroom --

PROSPECTIVE JUROR 548: I might not even recognize him.

MR. STOWERS: So the fact that you know him from within the last five years would not affect you at all if he were to testify.

PROSPECTIVE JUROR 548: No.

MR. STOWERS: And you need to hold the microphone up.

PROSPECTIVE JUROR 548: No, it would not, no.

MR. STOWERS: Anybody else recognize any other names? I think I indicated earlier that Angie who me and the other lawyers have had a chance to work with for the last four years has some relatives who are on the witness list, and I want to make sure you're aware of who they are because sometimes people don't realize who other people are, and they've been identified on the list.

2919

One of them is her mother, Pearl Jean Johnson, and then her sisters Wendy Jacobson and Holly Dirksen and Jamie Jo Hays -- every one of them has a different last name -- and then her brother, Jim Johnson. Anybody recognize any of those names or her daughters Alyssa and Marvea?

Okay. Now, I've got a question for Number 459 that's been bothering me. It bothered me the other day when I saw a juror from your area as well. What county are you from?

Page 66

PROSPECTIVE JUROR 459:  Sioux.

MR. STOWERS:  Sioux County?  What town are you from?

PROSPECTIVE JUROR 459:  Boyden.

MR. STOWERS:  Okay.  Is somebody from Osceola County?  Okay.  No?  All right.  Maybe that was misidentification on our part.  I'm sorry.  459, what town are you from?

PROSPECTIVE JUROR 459:  Boyden.  I did live with my mom for a while in Harris.

MR. STOWERS:  Oh, in Osceola County.

PROSPECTIVE JUROR 459:  Yes.

MR. STOWERS:  Okay.  I wasn't totally out of it, was I?  Okay.  I wanted to ask you a question because I'm confused by this, and I've always wanted to know.  Is there a reason that Osceola, Iowa, isn't in Osceola County?  And if you know, what is it?

PROSPECTIVE JUROR 459:  I don't know.

MR. STOWERS:  Okay.  All right.  Now, let's try to

2920

talk about a few of the issues --

THE COURT:  Same reason Des Moines isn't in Des Moines County.

MR. STOWERS:  I never understand that, but I'm from Wisconsin, so I don't understand a lot of things about Iowa even though I've lived here for 17 years, but I'm learning.

Let's talk about a couple of things that you folks are going to have to grapple with in this case if you wind up on the jury.  Now, how many of you have ever had the situation where you've had an occurrence, something happened, and you couldn't quite figure out who did something?  You're trying to resolve an issue.  You had a dispute over what had happened, maybe a car

Page 67

crash. Maybe an item was missing from your home. Maybe something was broken at the home, and nobody would say that they had broken it. How many have had that type of a scenario? Everybody, okay.

And what type of a situation, Ms. 459, did you have? What comes to your mind?

PROSPECTIVE JUROR 459: I had some coins -- I saved up the state coins, and my half-sister stayed over, and they were missing, and, I mean, I don't know that she took it or anything but . . .

MR. STOWERS: Your sister was there.

PROSPECTIVE JUROR 459: Yeah.

MR. STOWERS: And did you try to figure out how those

2921

coins had gone missing? Pretty awkward with your sister I suppose.

PROSPECTIVE JUROR 459: Yeah.

MR. STOWERS: Not really.

PROSPECTIVE JUROR 459: I assumed it was her, but, I mean, I -- I mean, I didn't look like into her stuff or anything, and I noticed that like after she wasn't there so . . .

MR. STOWERS: Who's got an example of a situation where they had different people that they had to talk to about a same situation, conflicts between people? What about you, 109?

PROSPECTIVE JUROR 109: I've been sitting here trying to think. I know that I've had it happen, but I can't think off the top of my head of a specific example with multiple people.

MR. STOWERS: We're going to try you, 396. None. What about you down here in the front row? And can you pass it

Page 68

up to Juror Number 78? Do you have an idea what I'm talking about?

PROSPECTIVE JUROR 78: Yeah, yes. I had a -- I was broadsided in a wreck, and the people were from Canada. They wouldn't give me any information. They wouldn't talk to me at all, and, you know, they tried to say that it was not their fault, you know, and I said, well, it was really difficult for my car to go sideways into them.

MR. STOWERS: Were there any witnesses?

2922

PROSPECTIVE JUROR 78: Not that anybody would admit. I made a report with the state patrol, and I kept copies of all the reports. And when I didn't hear from their insurance company for about six months, I got hold of them and read to them over the phone -- they taped it, read to them everything that was on the report, and got my money.

MR. STOWERS: I'm sure you've encountered in addition to that situation other times when you've had things arise in your life where you've had different people saying different things about the same event; is that right? People see things differently. They remember things differently.

PROSPECTIVE JUROR 78: Yes.

MR. STOWERS: Might just explain them differently.

PROSPECTIVE JUROR 78: Even families remembering things of their youth don't remember things the same.

MR. STOWERS: Right. And one of the things you're going to have in this case if you wind up being a juror is you're going to have to deal with situations sort of similar to that because you're going to have different folks coming in here testifying from the witness stand trying to explain to you what

Page 69

it is that they remember. And you might have three, four, five, ten witnesses testifying about the same basic event or events. And you're going to have to try and figure that out. You know, maybe they're not all saying the same thing. Maybe they're saying different things. How you going to go about thinking

2923

about that?

PROSPECTIVE JUROR 78: Just weigh the evidence. I've been a witness.

MR. STOWERS: What type of case?

PROSPECTIVE JUROR 78: One was where a young man grabbed this girl on the street inappropriately, and the other one was a man who walked off a porch, a deck, and broke his back.

MR. STOWERS: So you were a witness to some of those events?

PROSPECTIVE JUROR 78: (Nodded head.)

MR. STOWERS: Is that right?

PROSPECTIVE JUROR 78: I was witness to one. The other one I knew one of the individuals involved. I knew two of the individuals involved.

MR. STOWERS: So you know a little bit about testifying.

PROSPECTIVE JUROR 78: (Nodded head.)

MR. STOWERS: Is that right?

PROSPECTIVE JUROR 78: (Nodded head.)

MR. STOWERS: Ms. 548, let's say that you have a situation that arises and, oh, you're in your kitchen of your beautiful home and you're baking a cake let's say. We'll use the example that the judge was talking about from a different

Page 70

juror who actually was in the cake baking business I guess. But

2924

in any event, you're baking a cake in your kitchen. You're having a wonderful afternoon on the weekend, and a baseball crashes through the window; okay? And you look out, and you see a group of six kids running across your yard with baseball gloves and bats and whatnot, and you go out, and you encounter them out there, and you're going to now have to figure out who broke your window; okay? How would you go about doing that?

PROSPECTIVE JUROR 548: If they don't run away, I guess I would ask them and see what response I get.

MR. STOWERS: And are you going to want to talk to all the children?

PROSPECTIVE JUROR 548: Uh-huh.

MR. STOWERS: You gonna want to ask them questions?

PROSPECTIVE JUROR 548: Right.

MR. STOWERS: And are you going to want to talk to them all just together as a group, or are you going to want to talk to them separately maybe?

PROSPECTIVE JUROR 548: Well, if they're not forthcoming, you want to talk to them separately.

MR. STOWERS: And you know -- why would it be important to talk to them separately?

PROSPECTIVE JUROR 548: Well, because it's harder to -- when you have support around you, it's easier to say no, and when you're alone or if someone even knows who did it, they're willing to say perhaps instead of when they're with

2925

Page 71

everybody else.

MR. STOWERS: And what are you going to be looking for when you talk to them other than just what they say?

PROSPECTIVE JUROR 548: How they say it, how they act. Guilty people sometimes act a little differently than someone who's not.

MR. STOWERS: So you'd be looking for some clues.

PROSPECTIVE JUROR 548: Mannerisms, you know, things like this.

MR. STOWERS: Anybody have anything they want to add to that? What about you folks down here? I don't want to leave you out of the mix. Number 167, how are you going to resolve this situation? You're baking a cake -- I'm sure you bake cakes all the time -- and a ball comes crashing through the window, and there you are with a half a dozen kids or so that you've got as your suspects; okay?

PROSPECTIVE JUROR 167: I'm probably just going to visit with them, tell them they should play further away from the house. Accidents happen.

MR. STOWERS: Are you going to want to know who did that?

PROSPECTIVE JUROR 167: I don't know if it really makes any difference. They know when the ball went through the window they're in trouble already, so by the time you get to them . . .

2926

MR. STOWERS: Okay. Would you want to talk to them all separately?

PROSPECTIVE JUROR 167: No, not necessarily. If they run probably.

Page 72

MR. STOWERS: What if it was a rock through your window, not a baseball?

PROSPECTIVE JUROR 167: Same thing. Accidents happen. I would go out and visit with them, tell them, you know -- see if they have a problem, if they threw it on purpose, if it was an accident.

MR. STOWERS: What about you, Number 780?

PROSPECTIVE JUROR 780: I'd probably question them.

MR. STOWERS: Okay. You think it was a lot easier to hide when there was ten of you up here. Now there's only seven of you left, so there isn't going to be any hiding anymore; okay?

PROSPECTIVE JUROR 780: Just because I'm short I mean.

MR. STOWERS: No, you're dwindling down. This is kind of like the game show Survivor. You've seen that; right?

PROSPECTIVE JUROR 780: Yes.

MR. STOWERS: So if you're a survivor on the end of the case and you're on the jury, you're going to be asked to look across the courtroom and evaluate some of these folks that come in and testify about things. And how are you going to go about doing that?

2927

PROSPECTIVE JUROR 780: By listening and catching the views and stuff, yeah.

MR. STOWERS: Are you going to want to ask them questions?

PROSPECTIVE JUROR 780: Well, we can't, can we?

MR. STOWERS: No. But let's say we're talking about your ideal world. Maybe you'd want to ask people questions if you were on a jury.

Page 73

PROSPECTIVE JUROR 780:  Oh, yeah, I would.  Then I would, yeah.  I usually ask lots of questions sometimes.

MR. STOWERS:  You know, we've got all these lawyers in a courtroom, and we got a judge up there, and hopefully between all of us we're going to ask all the questions that you might want to ask of a witness.  That's kind of what our job is.  You understand that?

PROSPECTIVE JUROR 780:  (Nodded head.)

MR. STOWERS:  And would you expect the lawyers for Angela to ask questions of the witnesses who testify --

PROSPECTIVE JUROR 780:  Yes.

MR. STOWERS:  -- that the government calls?  Do you have an understanding of how that works?  They call the witnesses in their part of the case first.

PROSPECTIVE JUROR 780:  Uh-huh.

MR. STOWERS:  You have to answer, of course.

PROSPECTIVE JUROR 780:  Oh, yes.

2928

MR. STOWERS:  And they get to ask them questions first.  You understand that.

PROSPECTIVE JUROR 780:  Yes.

MR. STOWERS:  Okay.  And then after they're done asking questions, do you understand that the defense attorneys get to ask questions?

PROSPECTIVE JUROR 780:  Yes.

MR. STOWERS:  Okay.  And you'd expect us to do what when we ask questions?

PROSPECTIVE JUROR 780:  Get an answer.

MR. STOWERS:  Okay.  Would you expect us to test the witness a little bit?

Page 74

PROSPECTIVE JUROR 780:  Oh, yes, yes.

MR. STOWERS:  To probe their questions?

PROSPECTIVE JUROR 780:  Yes.

MR. STOWERS:  Would you want to know a little about their background?

PROSPECTIVE JUROR 780:  Yes.

MR. STOWERS:  Would you want to know if they were expecting to gain anything out of the trial, the testimony that they're giving?

PROSPECTIVE JUROR 780:  Yes.

MR. STOWERS:  Might be important to know.

PROSPECTIVE JUROR 780:  Uh-huh.

MR. STOWERS:  And let's put this in the back row here.

2929

Number 459, would you expect Angela's attorneys to question the government's witnesses in some detail?

PROSPECTIVE JUROR 459:  Yeah.

MR. STOWERS:  And why would that be important to you?

PROSPECTIVE JUROR 459:  So you don't just get one side.  So you can get the other side as well.

MR. STOWERS:  And do you think it's important sometimes for different people to ask a person about the same thing in different ways?

PROSPECTIVE JUROR 459:  Yeah.

MR. STOWERS:  Would it be important to know who these people are that are testifying, know a little bit about them?

PROSPECTIVE JUROR 459:  Uh-huh.

MR. STOWERS:  Know what they had at stake maybe in this case.

PROSPECTIVE JUROR 459:  Yeah.

Page 75

MR. STOWERS: Know what kind of backgrounds they had as far as their prior involvement with the court system if they had any?

PROSPECTIVE JUROR 459: Yeah.

MR. STOWERS: And how do you feel about that, Ms. 396?

PROSPECTIVE JUROR 396: Are you asking would I be judgmental if they had a background or . . .

MR. STOWERS: Well, let me ask you this. Do you understand the process that we've been talking about here?

2930

We've got witnesses who are going to come into the courtroom and testify basically one by one, and they're going to be questioned. You understand that much.

PROSPECTIVE JUROR 396: Yes.

MR. STOWERS: Okay. And that's the only way we can do it. We can't get a whole group of people in here and just have them start talking to you; right?

PROSPECTIVE JUROR 396: Right.

MR. STOWERS: Okay. And that's the process of a trial. And they start off, and they're questioned by one side, and then they're questioned by the other side, and it may Ping-Pong back and forth just a little bit before the witness is done testifying. Do you understand that?

PROSPECTIVE JUROR 396: Yes.

MR. STOWERS: And that's a way that we try to do things in a courtroom to get to what the jury might need to know about the witness in a case. You understand that?

PROSPECTIVE JUROR 396: Yes, I do.

MR. STOWERS: It's kind of like the situation we've been talking about in real life, okay, where you've got a

Page 76

situation, the baseball through the window or whatever.  You bake cakes, do you?

PROSPECTIVE JUROR 396:  What's that?

MR. STOWERS:  Do you ever bake cakes?

PROSPECTIVE JUROR 396:  Yes.

2931

MR. STOWERS:  Okay.  You're a cake baker, so you know exactly what I'm talking about with the window being broken while you're baking a cake.  I'm sure that's happened many times in your life; right?

PROSPECTIVE JUROR 396:  Not exactly.

MR. STOWERS:  Okay.  Well, in any event, you're going to be called upon as a juror to sit there quietly up in this jury box while we do all the talking and the witnesses do all the talking out here in the courtroom.  Is that going to be frustrating in any way for you?  Are you going to want to jump up and ask questions?

PROSPECTIVE JUROR 396:  Not if you cover everything.

MR. STOWERS:  I think in some locations across the country they are experimenting with juries being able to ask witnesses questions.  That may be one experiment we haven't tried and aren't going to try in this trial.  That will be up to Judge Bennett.  But in any event, you probably won't be able to ask questions.  Is that going to be frustrating for you to sit on the sidelines?

PROSPECTIVE JUROR 396:  I don't think so.

MR. STOWERS:  Now, do you think it'd be important in a situation where you were trying to get to the bottom of a situation that you talk to all the people that know about it?

PROSPECTIVE JUROR 396:  Right, yes.

Page 77

MR. STOWERS: Be very important, wouldn't it? You'd

2932

want to hear from everybody.

PROSPECTIVE JUROR 396: Yes.

MR. STOWERS: Is that right? Does everybody feel that way? Okay. And if it was a situation you were encountering and you couldn't talk to everybody because everybody wouldn't talk to you as in the situation Juror 78 was describing with the broadsiding, how would you feel about that if you couldn't talk to somebody because they wouldn't talk to you?

PROSPECTIVE JUROR 396: If they're not answering your questions or --

MR. STOWERS: They wouldn't even talk to you. They wouldn't say anything.

PROSPECTIVE JUROR 396: I might be suspicious.

MR. STOWERS: And why would you be suspicious?

PROSPECTIVE JUROR 396: Well, if they didn't have anything to hide, it seems to me they would talk.

MR. STOWERS: How do you feel about that, Juror 109?

PROSPECTIVE JUROR 109: I would also agree it would make you a little suspicious, but then if there is someone who doesn't talk, then I think in a situation like this, then you need to take the information you've been given.

MR. STOWERS: Right. And how do you feel about that, Juror 459? Somebody didn't talk to you about something. You're trying to get to the bottom of it.

PROSPECTIVE JUROR 459: You just have to take into

2933

effect like their background and why they would be hiding

Page 78

something, the possibility.

MR. STOWERS: You'd be thinking in your mind they might be hiding something; is that right?

PROSPECTIVE JUROR 459: Possibly.

MR. STOWERS: How would you feel about that, Juror 548, somebody who didn't talk to you about a situation?

PROSPECTIVE JUROR 548: Well, it would be frustrating because there's a gap there, you know, that you wouldn't have in the information you felt I needed to know in the whole situation.

MR. STOWERS: And if you went to them and you really wanted to ask them something about that situation and they wouldn't talk to you, how would you feel?

PROSPECTIVE JUROR 548: Like I said, it would be frustrating, but then you can't make somebody do it so you just have to go from there.

MR. STOWERS: And, Juror 78, how would you feel about that, somebody doesn't tell you something? I guess you were frustrated with that driver who broadsided you.

PROSPECTIVE JUROR 78: Very. But the patrolman believed me. Yeah, I get -- I would be a little angry I think.

MR. STOWERS: Okay. And how do you feel about that, Juror 780?

PROSPECTIVE JUROR 780: You also have to look to see

2934

if there's a language/communication barrier too or why, you know, other than the fact that you might be suspicious, you know, if there's some communication barrier. Depends on, you know, do they speak English or not or the same language.

MR. STOWERS: Okay. And how do you feel about that,

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2556 of 3245

167, if somebody doesn't talk to you, they don't tell you their side of the story?

PROSPECTIVE JUROR 167: I'd be a little frustrated. I'd also be suspicious.

MR. STOWERS: Now, let's go back to where we started on this question. I think 396 -- I guess pass it down and up I guess -- you indicated you might be suspicious in that scenario that we just talked about where somebody was believed to be knowledgeable about a situation and they wouldn't talk to you.

PROSPECTIVE JUROR 396: Yes.

MR. STOWERS: Is that right?

PROSPECTIVE JUROR 396: Uh-huh.

MR. STOWERS: And do you feel pretty strongly about that, that that's the way you'd feel in that situation?

PROSPECTIVE JUROR 396: I think so, uh-huh.

MR. STOWERS: In this case one of the things that the government is claiming is that Angela Johnson knows some things. What if I were to tell you that in the trial you may never --

THE COURT: They're not claiming that. That's not accurate. You need to rephrase that.

2935

MR. STOWERS: What if I were to tell you that -- excuse me. What if I were to tell you that you may never hear from Angela Johnson in this trial from the witness stand?

PROSPECTIVE JUROR 396: You mean she'd never be put up and you would never ask her any questions. I think that's different than --

MR. STOWERS: Why is it different to you?

PROSPECTIVE JUROR 396: -- than to be on the stand and asked and then not answering to me would be more suspicious.

Page 80

Hmm. I guess we'd have to base everything then on what witnesses say.

MR. STOWERS: The judge may tell you if that situation arises that if Angela does not testify that you can't consider that in any way.

PROSPECTIVE JUROR 396: Right.

MR. STOWERS: And would you have a difficult time not considering that in any way if she didn't testify?

PROSPECTIVE JUROR 396: No.

MR. STOWERS: You'd be able to put that out of your mind?

PROSPECTIVE JUROR 396: Uh-huh.

MR. STOWERS: What about -- I think you, Juror 459, indicated you might have some suspicions if somebody didn't tell you something about a situation. And now we're kind of turning that into the situation where you might be a juror in the case

2936

and you might be in a situation where you'd like to hear from the witness stand, hear from the defendant. How would you feel about that?

PROSPECTIVE JUROR 459: Well, that's her right, and I'd have to set aside that and listen to the facts.

MR. STOWERS: And if the judge told you don't give that any consideration or thought whatsoever --

PROSPECTIVE JUROR 459: I wouldn't have a problem with that.

MR. STOWERS: And you'd be able to do that.

PROSPECTIVE JUROR 459: Yeah.

MR. STOWERS: And how about you? You could do that, Number 109?

Page 81

PROSPECTIVE JUROR 109:  Sure.  It would be probably frustrating, but I know that if the judge says that you need to consider it, then uh-huh.

MR. STOWERS:  Okay.  And how about you, Juror 548?  Would that be something that you could look at, understand, and deal with even though you might have some suspicions?

PROSPECTIVE JUROR 548:  Sure.

MR. STOWERS:  And how would you go about putting that out of your mind?

PROSPECTIVE JUROR 548:  Well, first of all, you have all these other witnesses.  You have the facts, and you just go with that.  That's what you go with.  I know it's probably not

2937

unusual that a defendant does not go on the stand, so I wouldn't be surprised.

MR. STOWERS:  And so from your perspective that would be something that wouldn't surprise you.

PROSPECTIVE JUROR 548:  No, it wouldn't surprise me.

MR. STOWERS:  And if the judge told you don't think about that at all, don't consider it at all if that's what happens in this case, you could do that.

PROSPECTIVE JUROR 548:  Yes, I could.

MR. STOWERS:  And you can give us your assurance that you could do that.

PROSPECTIVE JUROR 548:  Uh-huh.

MR. STOWERS:  And, Juror 78, feel the same way?

PROSPECTIVE JUROR 78:  Yes.  I think sometimes people aren't put on the stand because they would not make -- they don't do well on the stand.

MR. STOWERS:  Right.  There could be a lot of reasons.
Page 82

PROSPECTIVE JUROR 78: They might be innocent, but they don't do well.

MR. STOWERS: Right. There can be a lot of reasons why somebody wouldn't testify in a case; right?

PROSPECTIVE JUROR 78: You bet.

MR. STOWERS: I've got a couple minutes, I think, left. Let me finish up here. Juror -- I think it was 548, I had a question for you. I saw on your questionnaire that you

2938

indicated you were in a choir, church choir, and you've gone to a prison I think in South Dakota, was it?

PROSPECTIVE JUROR 548: Yeah, right.

MR. STOWERS: And did some --

PROSPECTIVE JUROR 548: I did a morning service there.

MR. STOWERS: And how long -- have you done that more than once?

PROSPECTIVE JUROR 548: I did that twice. It's been some years ago. We don't do that currently.

MR. STOWERS: And what was your experience there? How'd you feel about that?

PROSPECTIVE JUROR 548: Well, it was very interesting. It wasn't -- you know, it wasn't in front of a large group, but it was a good thing to do.

MR. STOWERS: What drew you to get involved in singing in a prison?

PROSPECTIVE JUROR 548: I don't -- well, it wasn't my decision. I guess I don't know how that worked. The choir director was the one who I suppose arranged that, so that's all -- I don't know. I just know it was an early morning start, and yeah, it was -- it was a good experience.

Page 83

MR. STOWERS: Was that something that you volunteered to do?

PROSPECTIVE JUROR 548: Right. We didn't have to go if we didn't want to.

2939

MR. STOWERS: What was good about the experience from your point of view?

PROSPECTIVE JUROR 548: Well, you know, when you're in prison, I think those few people that were there appreciated someone from the outside coming, and then we sang, and someone gave a little message, and it was -- I'm sure it was a break in the week for them. It was good for us to go there and see what that was like, go through the security. It's kind of a -- you feel a little funny, but it was a good thing to do.

MR. STOWERS: And I bet you had a lot of nervousness before you went in.

PROSPECTIVE JUROR 548: Well, it was -- I don't know about nervousness, but it was just a little -- I don't know. Just was different. We're not used to going through security to go somewhere, and you just don't walk in, you know. It was . . .

MR. STOWERS: Kind of gives you a little appreciation what it might be like.

PROSPECTIVE JUROR 548: Well, that's -- well, yeah.

MR. STOWERS: Pretty restrictive and confining.

PROSPECTIVE JUROR 548: Very.

MR. STOWERS: Inmates don't -- was this a high-security prison or a low security?

PROSPECTIVE JUROR 548: This was the South Dakota state pen, so it's high security I guess.

Page 84

MR. STOWERS: So this would be the big deal.

PROSPECTIVE JUROR 548: Yes.

MR. STOWERS: All right. And you got a concept of what that was all about. Did you get a tour of the prison, or did you just go in --

PROSPECTIVE JUROR 548: No, no, we did not. We just went through security and went right up to the place where they had, you know, the service. That was it.

MR. STOWERS: Anybody else here on the jury been to a prison before? Okay, Juror 78.

PROSPECTIVE JUROR 78: I was a child when I went. It was -- our school went in North Dakota. I was in grade school.

MR. STOWERS: Do you have a pretty vivid memory of that?

PROSPECTIVE JUROR 78: Not a lot of it, you know. It was interesting. I thought it was neat.

MR. STOWERS: What do you remember about it?

PROSPECTIVE JUROR 78: That I wouldn't want to be there.

MR. STOWERS: Pretty harsh, huh?

PROSPECTIVE JUROR 78: Yes.

MR. STOWERS: Well, I wanted to thank everybody for their time, and the judge is going to excuse you now and give you some instructions about coming back at which time two of the lawyers are going to question each one of you individually, and

2941

the judge I think will explain a little bit about the process to

Page 85

you before you leave.

Thank you, Judge Bennett.

THE COURT: Thank you, Mr. Stowers. Appreciate it. Here's what we're going to do now. We're going to take a 25-minute recess, and then we're going to come back at 5 to 11, and we're going to talk to you individually. And there's no secret to how we do it. We're going to start with 459, go to 109, 396, and then go down the front row. So it takes about on the average about 25 minutes per juror or so, maybe a few minutes more than that, sometimes a little bit less.

So we will reach -- we'll start with 459 at 5 to 11. And then we'll be able to do 109, and we may be able to get in 396 before lunch but probably not. We're going to take probably a 45-minute lunch break, and then we'll come back at -- or an hour lunch break. We'll come back at 1.

So, Juror 167, 780, 78, and 548, we're not going to get to you before lunch, so you're free -- when you go down to the jury room, you can just -- if you want to go shopping, go have an early lunch, whatever you want to do, you're on your own time. You don't need to be back here till one o'clock.

And obviously, 78 and 548, we're not going to reach you at one o'clock because we've got several other jurors to talk to first. So I don't want you to keep all of us waiting, but I don't want to waste your time either. So you can just

2942

kind of figure it out. We're going to take a 25-minute break. We'll take an hour for lunch. And we average about 25 minutes per juror, so you can go from there. Math is not my forte.

Please remember my cautionary instruction about not discussing this case among yourselves and don't let anybody talk

Page 86

to you about the case. And we will see you -- we'll see at least Juror 459 -- you'll be the first one -- back here in 25 minutes. And then after the lawyers are done questioning you, then, you know, you'll know what your status is. So then you're free to leave for the day. So that's how we'll operate. We'll see you all back here at some point today. Thank you very much.

(Panel L exited the courtroom.)

THE COURT: Anything else?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: No, sir.

THE COURT: Okay.

(Recess at 10:31 a.m.)

THE COURT: I have two matters I want to take up. The defense lawyers have all in turn referred to the defendant by her first name. I just don't think that's appropriate. I mean, I try not to run a super formal courtroom, but I would no more refer to a lawyer by their first name in front of the jury. I might do it in private. And what you call Angela Johnson in private is obviously between you. I just don't think it's appropriate in the courtroom.

2943

The other thing is maybe I'm missing something here, but I don't understand why you go through her relatives three different times. You do it at the time you introduce the client, and that's fine. I understand that those names are also on the witness list? So you ask them if there are any names on the witness list that they know, and then you specifically repeat them again after you ask the question about on the witness list. What's -- why would you do that, or why do you need to do that? If they're on the witness list, you ask

Page 87

them --

MR. BERRIGAN: Well, we don't, Your Honor. I think arguably we want to make sure -- and we can do it by doing it once, frankly. We want to make sure that people don't know her relatives particularly because they're such essential witnesses in the penalty phase of the trial. But we can do that once. We don't need to do it twice plus the witness list, and we'll modify our questioning accordingly.

THE COURT: Yeah, you can do it maybe twice if you want. That's fine.

MR. BERRIGAN: You're right. It's in the witness list. And if you let us bring it up one more time, that will be it.

THE COURT: You can do it a second time. I don't see the need for three. I don't see the need for two, but I'm willing to let you do it twice.

2944

MR. BERRIGAN: I agree we don't need to do it three times.

THE COURT: Right.

MR. BERRIGAN: And we will henceforth refer to Miss Johnson as Miss Johnson.

THE COURT: Oh, you can call her Angela Johnson.

MR. BERRIGAN: Okay.

THE COURT: Yeah, I don't have any problem with doing it that way, but I think just to use a first name, nobody else is ever referred to that way in a courtroom.

MR. BERRIGAN: It's a local rule in many jurisdictions.

THE COURT: It is, and I've never made it a local

rule, but I just think it'd be more appropriate.  I don't have super strong feelings about it.  I just think it'd be a little more appropriate.

MR. BERRIGAN:  It's not a problem, sir.

THE COURT:  Okay.  We ready for -- who's up first now?

MR. BERRIGAN:  The government.

THE COURT:  Okay.  And we're going to start with 459. We ready for 459?

MR. MILLER:  Yes, sir.

THE COURT:  Okay.

(Prospective Juror 459 entered the courtroom.)

THE COURT:  Hi.  Anywhere in the front row would be

2945

great, Juror 459.  You can be seated.

Everybody else can be seated, and we're going to start first with Mr. Miller from the prosecution team.  I'm sorry, my microphone was not on.  And then we're going to start with -- after Mr. Miller asks you some questions, it will probably be Mr. Berrigan, but one of the defense lawyers will talk to you; okay?

PROSPECTIVE JUROR 459:  Okay.

THE COURT:  Are you nervous?

PROSPECTIVE JUROR 459:  Little bit.

THE COURT:  Little bit, that's okay.

Mr. Miller?

MR. MILLER:  Thank you, Your Honor.

EXAMINATION

BY MR. MILLER:

Q.   Good morning, Juror 459.

A.   Morning.

Page 89

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2566 of 3245

Q.   I can assure you the fact that you're nervous means at least one thing.  It means you're human, because pretty much everybody has that same feeling.  And I can also assure you that most of that feeling will probably go away in a couple minutes.

Thank you so much for your time this morning.  We need to cover two subjects with you, and we're going to do so in 12 minutes or less per side, and then we'll get you on your way.  One of the issues is pretrial publicity, and that should not

2946

take long judging from your answers in the questionnaire.  And the other's the death penalty; okay?

A.   Okay.

Q.   And before I get into those, let me just say I think I speak for everyone here, the attorneys on both sides, in thanking you for the time and care you spent in filling out the questionnaire.  Everyone did so, some in more detail than others.  We cannot in a few minutes get as well acquainted with you as we'd like to, of course, but your candor and openness and fully setting forth all of the information that you did, including the personal challenges that you've had to overcome, helps us be acquainted with you, and we appreciate the care and the time and the candor that you took in doing that.

And I have no questions at all to ask you about that other than to ask you if you feel at this point, despite obviously the child care concerns and everything else going on in your life, if you're required to serve on this jury, do you feel that you can give it your full attention?

A.   Yeah.

Q.   Thank you so much, ma'am.  Again, your response on the issue of pretrial publicity was that you didn't recall having

Page 90

heard anything about this case at all before you got the questionnaire.

A.    No.

Q.    Since that time have you heard anything more?

2947

A.    I heard from where I work, and one of the other nurses knew more about it.

Q.    Did she engage you in conversation about it at all?

A.    She told me about it.

Q.    Okay.  Well, tell us what you recall hearing about the case.

A.    She said the defendant's husband killed two of the witnesses, and that's about all she said.

Q.    You recall nothing more from what she told you about it?

A.    No, that's it.

Q.    You got more information than that from the Court's questionnaire that got mailed out.

A.    Uh-huh.

Q.    I'm just wondering from everything that you've heard about this case, both the comment that a coworker mentioned -- I assume you weren't asking her about the case.

A.    No.

Q.    She volunteered that information.  Between that and what came to you in the questionnaire, did that cause you to form any fixed opinions about the merits of the case?

A.    No.

Q.    And you understand that we have to -- most cases come in here without any extensive pretrial publicity, and so because this is one that does, we need to make sure that those who've heard about the case can recognize that information outside the

Page 91

courtroom is just that -- it's not evidence -- and assure us that you would return your verdict based only on the evidence in the case. Do you feel you can do that, ma'am?

A. Yeah.

Q. Very good. That leaves the subject of the death penalty, and I just want to visit with you a few minutes about that. Now, when you received this questionnaire, I am assuming -- I could be wrong, but I'm assuming this is the first time in your life that you've really been asked to sit down and give serious thought to your feelings about the death penalty.

A. Yeah.

Q. Okay. And again, thank you so much for setting those feelings down in writing. We appreciate that. That helps us move it along. That was a number of weeks ago, though, and I'm just wondering if in the succeeding weeks it's caused you to think about it anymore and if you have any additional thoughts that you could share with us about the subject.

A. No.

Q. You indicated on your questionnaire, Juror 459, that, again, based upon your understanding of the allegations as they were summarized in the questionnaire -- you were asked -- and I'm quoting -- Do you have any beliefs or opinions as to the appropriate punishment for Angela Johnson if she were found guilty of the intentional killing of five people including two children? Your answer, put a check in the check box yes, and

when asked to explain, you stated -- and I quote -- She would be responsible for what she did, so I believe she should get the

death penalty or life in prison, close quote. Any further thoughts other than that about what you felt was appropriate based upon your understanding of the allegations?

A. No.

Q. You did, when you filled this out, understand that the government alleges -- and, of course, it's our burden to prove beyond a reasonable doubt, but we allege that Ms. Johnson participated in the intentional killings of five people including two whom we would claim are vulnerable victims, two grade school age children. You understand those are the allegations.

A. Uh-huh.

Q. If the evidence establishes that, do you feel, as you indicated in your questionnaire, that both life in prison and the death penalty are punishments that are appropriate and should be considered?

A. Yeah.

Q. You did indicate that you have strong feelings in favor of the death penalty for first-degree murder.

A. Yes.

Q. Do you feel that that is an appropriate punishment?

A. Yeah.

Q. But your response also indicated that life in prison would

2950

be an appropriate punishment, and I just wondered if you could share with us any more how that factors in, how your feelings are that both would be possibly appropriate punishments in a case such as this.

A. Some of it would depend on if it's premeditated, if it was planned out or if it just happened.

Page 93

Q.    Circumstances surrounding the event?

A.    Yeah.

Q.    Okay.  Would the level of involvement of the person, if there were more than one participant, be something you'd want to consider?

A.    Yeah.

Q.    Bearing in mind that this is not something that would go into the question of guilt, but if instructed to consider it, it might be an appropriate thing that you would be required to consider for punishment, would the person's prior criminal history or lack of prior criminal history be something that you would consider?

A.    I guess depending on how severe it is, if they had like drug -- a bunch of drug charges or something that was a felony. If it was a misdemeanor, then no, I probably wouldn't.

Q.    Okay.  And conversely, the lack of any prior criminal history, is that something that would appropriately be considered in favor of leniency?

A.    If they didn't have any prior history?

2951

Q.    Yes.

A.    I wouldn't -- I mean, I wouldn't hold that against them.

Q.    Well, let me just back up and go over one thing that the judge talked about, and both not only the judge but Mr. Williams and Mr. Stowers both talked about a lot of things this morning; right?

A.    Uh-huh.

Q.    One of the things you heard briefly from Judge Bennett was a description of how the third step in this trial will proceed if the jury ever gets to the third step which is the punishment

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2571 of 3245

step; okay?

A.   Okay.

Q.   Do you recall him putting up a slide where he said in that third step that the jury would be required to consider and weigh both mitigating and aggravating factors if those factors are proven?  Do you recall that description?

A.   Yeah.

Q.   And how it would be up to you as a juror to decide for yourself how much weight to give to each of those factors, but you would have to consider each factor that you're instructed to consider if those factors are proven.

A.   Yeah.

Q.   Does that make sense to you, ma'am?

A.   Yes.

Q.   For example, it's alleged there were multiple victims.  If

2952

instructed that, if proven, that is an aggravating factor, does that make sense to you, and is that something you would consider?

A.   Yeah.

Q.   Conversely, if you were instructed that having a lesser role, in other words, encouraging or assisting this crime rather than personally squeezing the trigger, or having a clean criminal record, no prior criminal background, or even having a personal history that involves being victimized by others, that these are things that, if proven, should be at least considered and weighed by each of the jurors as possible -- as mitigating or things that should be considered in connection with punishment in favor of the defendant, things to be weighed.

A.   Yeah.

Page 95

Q.    And would you do so?

A.    Yes.

Q.    In other words, I trust you would be pleased to know that you would be receiving guidance from the Court as to what you must do in going about that third stage.

A.    Yeah.

Q.    Not everybody can do this.  Not everyone can give us an assurance that they'd be able to follow an instruction that would require them to consider both kinds of things, both aggravating and mitigating factors.  Can you give us that assurance that you'd be able to do that?

2953

A.    Yes.

Q.    And ultimately -- and again, understanding -- and we appreciate the openness that you've provided in your questionnaire.  But here in court we need that as well.  Can you be one who can assure us that if you find yourself in that situation after finding the defendant guilty of crimes for which the death penalty is a qualified punishment that in that situation and if it gets to that point you will fairly, fully, and seriously consider both possible punishments before arriving at your verdict on punishment?

A.    Yes.

        MR. WILLIAMS:  Two minutes.

Q.    Even understanding the very serious nature of these -- the accusation that there were five intentional deaths including those of two children, you can seriously and honestly assure us that you would consider life imprisonment as a possible appropriate punishment before arriving at a verdict on punishment?

Page 96

A.     Yeah.

Q.     And conversely, that you can fairly and fully consider the death penalty as an appropriate punishment should that be your jury's finding.

A.     Yeah.

Q.     Ultimately should you be required -- excuse me.  If you're required to serve on this jury and if you and 11 fellow jurors

2954

unanimously conclude that the death penalty is the appropriate punishment, you can't return that verdict without each of you signing your names to such a verdict form that would have the practical effect of imposing that punishment on a fellow human being.  Do you feel that you could do so under those circumstances, ma'am?

A.     Yes.

        MR. MILLER:  Thank you, ma'am.  I appreciate your time.

        THE COURT:  Mr. Berrigan?

        MR. BERRIGAN:  Thank you, Your Honor.

                    EXAMINATION

BY MR. BERRIGAN:

Q.     Not so bad so far, is it?

A.     No.

Q.     I see that your son has turned four since you filled out the questionnaire.  Is that right?

A.     (Nodded head.)

Q.     You mention, ma'am, that you work the nightshift at the nursing home?

A.     Yeah, I've been working more the nightshift lately.

Q.     Can you tell us what hours that involves in terms of your

Page 97

work schedule?

A.   They're starting to do some 12-hour shifts, so it would be 7 p.m. to 7 a.m. or 11 p.m. to 7 a.m.

2955

Q.   And last night did you have to work?

A.   No.  I worked 3 to 11 last night.

Q.   If you're selected as a juror, will you have to work in the evenings?

A.   I'm not sure.

Q.   I ask you that for the obvious reasons I suppose.  I would think that would be extraordinarily difficult.  I've not ever worked the nightshift, but I would think it would be hard to be up all night working in a nursing home and then come in and listen all day as a juror.  Is there a chance you could not work, that is, that you could take off of work if you're selected as a juror?

A.   Yeah.

Q.   And would they pay you if you did that?

A.   Yes.

Q.   Great, okay.  Let me ask you just a couple of questions about this conversation you had with one of the nurses at work. About how long ago was that?

A.   Yesterday.

Q.   And how did it come up?

A.   I was just saying that I had to switch because I was on 11 to 7 to work last night, and I switched.

Q.   To 3 to 11.

A.   Yes, and I said, I have to go to Sioux City for possible jury duty.

2956

Page 98

Q. And then --

A. I asked her where the building was at for sure because she always had been to Sioux City, and she basically told me what I told you about the case. Otherwise I had no idea of anything about this.

Q. And my recollection is that she told you that Miss Johnson's husband had killed two of the witnesses. Is that your understanding?

A. Yeah.

Q. Was there anything else about it she said?

A. No.

Q. Did she tell you how she had gained that information or purportedly knew those facts or allegations?

A. No.

Q. And is this somebody that you work with regularly?

A. No, not really.

Q. Would you consider yourselves friends?

A. No.

Q. Do you know how reliable that information is, or I guess I should ask you how reliable this person is?

A. I don't know.

Q. Okay. Let me ask you this question. You know -- and I'm sure you probably know this, but anybody who's sitting where Miss Johnson's sitting, they're entitled under the law to the presumption of innocence.

2957


A. Uh-huh.

Q. And it's a presumption that lasts not just now, but it goes

Page 99

with them through the trial until the jurors have listened to all the evidence and come to a conclusion whether the state's overridden that presumption of innocence by proof beyond a reasonable doubt. Do you follow me?

A. Yes.

Q. And what I'm interested in knowing is whether or not because of this conversation you have any concerns that you might not be able to do that for Miss Johnson.

A. No. That was her husband, not her so . . .

Q. Okay. All right. And you would not -- you know, some folks have told us they use this guilt by association kind of a term. You know, well, they got this relationship. If he did, then she must have done that or at least known about it, so they got a problem. I want to make sure you're not in that camp.

A. No.

Q. Okay. So you would presume her innocent now and if selected until you heard all the evidence?

A. Yes.

Q. Okay. Thank you. And then let me ask you a little bit about the death penalty and life without parole. One of the things I noted in your response to the question about how you thought about the death penalty is I think the death penalty's a reasonable punishment. And then you were asked why, and you

2958

said, Because how can a person take someone else's life and live their own, and I just wanted to ask you what you meant by that.

A. Just because it's not really fair for someone to take a life and put it in their hands.

Q. Okay. And I think we'd all agree murder obviously is a very, very serious crime. But I'm wondering about how that

Page 100

affects your views about the punishment. Does that make any sense?

A. It would depend on how involved they were.

Q. Okay. Let me see if I can explain to you exactly what the government's alleging in this case to see if it helps you at all. They are alleging that Angela Johnson aided and abetted in the intentional murders of five people, okay, five different people and that these murders were not only intentional but they were committed after substantial planning or premeditation which is a word you used earlier.

And furthermore, they're alleging that amongst the five victims was a mother and two of her daughters, her only two daughters. They were ten and six years of age, Kamber -- Amber and Kandi Duncan. And so that's the crime that we're talking about when we're asking you questions about what punishments you could consider; okay?

A. Uh-huh.

Q. Does that help?

A. (Nodded head.)

2959

Q. You mentioned that you've never had a different view about the death penalty. People should be punished for the acts that they have committed. What does that mean?

A. Just like if you commit something you should be held accountable for what you've done.

Q. And do you have in your mind a vision of what that means in terms of an intentional, premeditated murder?

A. I guess it'd depend on how involved the person was.

Q. Okay. Are there any other factors that you think are important?

Page 101

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2578 of 3245

A.   I can't think of any right now.

Q.   One of the -- couple that the prosecutor mentioned, Mr. Miller, is, you know, this is going to be the evidence the government's going to be asking you to consider for a sentence of death; okay?

A.   Uh-huh.

Q.   Did you follow that --

A.   Yeah.

Q.   -- that those are what we call aggravating factors?  These things, premeditated murder and the killing of children, might be determined that that could be an aggravating factor in the case.  And then the defense has an opportunity -- as the judge pointed out, we have no obligation, but we can and we probably will offer what we call mitigating factors.  And these would be things that we'd ask the jury to consider as reasons to vote for

2960

life; okay?

A.   (Nodded head.)

Q.   You with me?

A.   Yes.

Q.   And there's kind of a weighing process that the jurors are supposed to be engaged in then when they hear all this stuff, and one of the mitigating circumstances that Mr. Miller mentioned to you was our contention will be that Angela Johnson had no criminal history.  Did you hear him mention that?

A.   I didn't remember that.

Q.   Okay.  Well, now that I've said it, in your mind is that an appropriate consideration in deciding punishment even for a crime such as that?

A.   It's probably a factor that could be weighed in there.

Page 102

Q.   What about background of abuse?  I noticed from your questionnaire -- are you comfortable with me mentioning your stepsister?

A.   That's fine.

Q.   You talk about having witnessed some abuse that occurred with her.  Is that right?

A.   Yeah.

Q.   And you were very -- in fact, more than anybody I think we've seen of all these people, you talked about what effect childhood abuse has on people.  And could I read your response?

A.   Yeah, that's fine.

2961

Q.   Are you all right with that?

A.   (Nodded head.)

Q.   You sure?

A.   (Nodded head.)

     MR. WILLETT:  Two minutes, Mr. Berrigan.

Q.   You said, I believe that a negative childhood would lead the person as an adult to make not-so-wise choices as an adult. For instance, in order to gain approval from friends and peers, they would be more likely to do drugs to gain acceptance.  A child that never has love and attention would be more likely to seek that relationship that they never had.  An example is a girl that never had her father give the love and attention she needed.  She'd seek that from any guy she could and would be promiscuous to fill in that empty space that her father left. Lastly, a person that was abused is more than likely going to pass that characteristic from generation to generation.

     Are you okay, ma'am?  I'm sorry.

A.   Yeah, I'm fine.  I just cry real easy.  That's all.

Page 103

Q. I'm not trying to cause you any pain. The reason that's so important is I want to suggest to you that the defense might present evidence like that; okay?

A. Uh-huh.

Q. And I don't know whether or not -- obviously this is something that you've -- firsthand you've seen this. But we need to know whether you consider it as a factor in assessing

2962

punishment.

A. Yeah.

Q. Do you think it's appropriate?

A. Yes.

Q. Why?

A. Just because of like -- I'm sorry if I can't . . .

Q. It's okay.

A. I guess I just know firsthand how it affected me and, you know, like just the way my dad was with treating women, how it can affect a person. I know that my sisters have a low self-esteem, and it did affect me at one point in my life too.

MR. WILLETT: Mr. Berrigan, time.

MR. BERRIGAN: Could I have one minute, sir?

THE COURT: You may.

MR. BERRIGAN: Thank you.

BY MR. BERRIGAN:

Q. You know, your reaction just to us talking about this causes me to raise this question; okay? Nobody wants to make you suffer unnecessarily if you're selected as a juror. And if you heard this evidence, I'm just kind of concerned based on your reaction here in the courtroom as to whether or not you'd be able to listen to it without really having some problems.

Page 104

You understand our concern?

A.   Yes.

Q.   Because of your own experiences we don't want -- nobody's

2963

trying to overwhelm you with this, but it's very important
evidence for us to present to the jury, and we're going to ask
people to look at it very carefully; okay?

A.   Uh-huh.

Q.   Is it something you think you could do, listen to that kind
of evidence, even though you've had such a difficult history
yourself?

A.   I think -- I think I could.

Q.   Okay.  And weigh it.

A.   What?

Q.   And weigh it in your decision.  You'd weigh it?

A.   Yes.

Q.   Consider it?

A.   (Nodded head.)

        MR. BERRIGAN:  Thank you, ma'am.  That's all I had.
Thank you.

        THE COURT:  Okay.  Juror 459, I've just got a couple
of questions for you.

        PROSPECTIVE JUROR 459:  Okay.

        THE COURT:  I'm pretty sure you understand this
process.  If we ever have a penalty phase in the case, there
will be evidence that the government will offer of aggravation
and evidence that the defendant may offer of mitigation.  And
then you have to weigh that.  Do you understand that?

        PROSPECTIVE JUROR 459:  Yes.

2964

Page 105

THE COURT: Yes. And here's what I'm curious about. If the defendant does offer mitigation evidence about her childhood and her background and that triggers a lot of emotion in you, could you still fairly consider both life imprisonment and the death penalty in this case?

PROSPECTIVE JUROR 459: I think so.

THE COURT: Okay. Thank you very much. If you'll just step outside, I'm going to chat with the lawyers, and we'll let you know your status. Thank you.

(Prospective Juror 459 exited the courtroom.)

THE COURT: Mr. Miller, you're first.

MR. MILLER: No motion, Your Honor.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: No motion, sir.

THE COURT: Are you going to exercise a peremptory strike?

MR. MILLER: No, Your Honor.

THE COURT: Okay. Then she's in the jury pool.

(Prospective Juror 459 entered the courtroom.)

THE COURT: You're still in the jury pool, so you have about a 50 percent chance of being selected. And I wish I could tell you when we would know. It could be as early as tomorrow, probably won't be. It might be Monday or Tuesday, but we'll let you know as soon as we know. And you'll either find out that you're actually going to be a juror in the case or that even

2965

though you made it into the jury pool you will not be a juror in the case. I wish I could tell you more, but that's all I can.

I'd like to remind you of a couple of things, not to

Page 106

read or listen to any TV or radio, news reports about the case. And you ought to at least let your employee -- coemployees know that you are a potential juror in this case and they're not to talk to you about this case in any way; okay?

And good luck to you. I know it was difficult for you today. On behalf of all five lawyers and Angela Johnson, we just wanted to thank you. You've just been incredible in being as open and honest as you can be in response to our questions, and we know it's been difficult for you, so thank you very much.

(Prospective Juror 459 exited the courtroom.)

THE COURT: Ready for 109?

MR. BERRIGAN: Yes.

(Prospective Juror 109 entered the courtroom.)

THE COURT: Juror 109, any seat you'd like in the front row.

Everybody else can be seated. That's fine.

EXAMINATION

BY MR. BERRIGAN:

Q. Hi. How are you, Miss 109?

A. Fine.

Q. I hope you'll forgive us the numbers, but I think the judge explained that, and we're going to just kind of struggle through

2966

it; okay?

A. (Nodded head.)

Q. We're going to ask you questions really about two fairly limited areas. One has to do with your exposure to pretrial publicity or media coverage through the newspaper, radio, television, or word of mouth about the case.

A. Okay.

Page 107

Q. And the others have to do with your views about the punishment options if we were ever -- and that's a big if, but if we were ever in a position where jurors were assessing punishment, we need to know kind of what their views are about those things; okay?

A. Okay.

Q. And I guess we'll deal with the media thing first because it looks like that should be pretty easy. What information have you gleaned from any media sources about this case before today?

A. None.

Q. Okay.

A. I think it's been on the news, but I hadn't paid attention to it so . . .

Q. Okay. And you mentioned that in the questionnaire. What we've discovered through this process is that on occasion -- because yours was filled out back at the end of January, on occasion we've had folks who didn't really know much back when they filled out the questionnaire, and then other information

2967

has kind of come to light. And I don't know if that's the situation with you or not.

A. No. I noticed it on TV one night when I was cooking supper, and I said to my husband, I think that's the case, and I was busy in the other room, so I didn't listen to what was on TV.

Q. Well, you said that. You said you're not at all familiar. I recognize the name Dustin Honken, but I'm not sure why it seems familiar. Most likely heard the name on TV. Otherwise nothing else is familiar about the above statement.

A. Yeah.

Page 108

Q.    That's still the case.

A.    Yeah.

Q.    All right.  So that's it.  We're done.  Then the other thing we want to talk to you about is your views about the two penalty options if we're in that position; okay?  And I gotta tell you how big an "if" that is.  The government has alleged some very serious allegations in this case against Miss Johnson, and they are essentially that she aided and abetted in five intentional murders, five different people.

A.    Okay.

Q.    And they have ten counts because they've alleged that these murders were committed during the course of a drug conspiracy and during the course of a continuing criminal enterprise.  But they're the same five people; okay?

2968

A.    Okay.

Q.    And they're also alleging in addition to those being intentional that they were committed after substantial planning and premeditation.

A.    Okay.

Q.    Which you know what premeditation means.

A.    Uh-huh.

Q.    And in addition to that, they've alleged that amongst the five victims who were intentionally killed there's a mother and her two children, Kandi and Amber Duncan.  They're ten- and six-year-old girls; okay?  So that's the government's case that they're going to be attempting to prove by the time we're in this third part of the trial talking about penalty; okay?

And one of the things we ask jurors to do even though it seems very cart before the horse-like because Miss Johnson

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2586 of 3245

hasn't been convicted of anything -- she's presumed to be innocent. You've already told us you're going to do that. But we can't logically stop the trial if the jurors came back and if they found her guilty and say, Well, what do you think about punishment? So we have to do it now; okay?

And so what we're asking people to do as unrealistic as it is is to kind of fast forward in your mind to this point where perhaps this has been shown. Twelve jurors have decided, yeah, that's been proven beyond any reasonable doubt; okay? And so that means that all the defenses have been done away with if

2969

there were any: You know, I'm not the person, self-defense, it was an accident, whatever. Rejected; okay? And so the jurors have come to this determination as a group guilty beyond a reasonable doubt. And you're at the stage where you're talking about punishment.

And what we're trying to find out is whether folks can consider both of the punishment options that are available. And to be quite honest, as the judge mentioned earlier, we've had people's views about these issues all over the spectrum of the human spectrum. We've talked to over a hundred people, and I bet we've had a hundred different points of views at least to varying degrees which is fine. We're quite comfortable with that. We just kind of need to know where people are.

So let me just ask you. If we had known each other for 20 years or so and we're having a cup of coffee one morning at the local doughnut shop and I turn over to you and say, well, Juror 109, there's an article in the paper about the death penalty; maybe it's coming back in Iowa; I've never asked you about that; what do you think about the death penalty, what

Page 110

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2587 of 3245

would you say to me?

A.    I can honestly sit here and tell you that I -- I'm not sure how I feel about it.

Q.    Okay.

A.    And the reason I'm not sure how I feel about it is probably because I haven't sat and thought about it or had to be in a

2970

situation where I've needed to consider a situation like this, the possibility of the death penalty.

Q.    Okay.

A.    And no reason other than that.  I have no strong opinions one way or the other.  It's only because -- and I don't know how I, you know -- which is probably not what you wanted to hear.

Q.    Yeah, you said that in your questionnaire.

A.    Uh-huh.

Q.    Some folks, that's kind of jarred them.  They get this questionnaire in the mail.  All of a sudden, wow.

A.    Yeah.

Q.    I better think about this because they're going to ask me to come in and maybe be a juror in a case that involves the potential punishment.

A.    Yes.

Q.    And I don't know if that's happened to you.

A.    I've had to think -- you know, I realized that I was probably going to be in this position, you know, after I filled that out.  And sometimes I chose not to think about it, and a lot of times I thought, you know, I honestly don't know what I -- you know, without being presented with everything, I don't know how I feel.

Q.    Okay.  Let me ask you just a little bit about the other

Page 111

side of the coin; okay?

A.    Okay.

2971

Q.    The death penalty is one option, certainly not the option that the defense is going to be arguing for obviously.  But the other option is life imprisonment without possibility of parole.  It's just like the judge said.  That means without parole.

A.    Yes.

Q.    You do not get out of prison.  And you were asked some questions about that in the questionnaire.  What are your thoughts and opinions about life in prison as a punishment for a person who's guilty of intentional murder, question 82.  And you said, It's a deservable punishment.  Sometimes I think it's the least they can do for murdering somebody.  Does that sound right?

A.    Probably.  It was a long -- I don't -- I was trying to remember what I wrote.

Q.    Yeah, and it's not like a test to remember every single word.  The truth is --

A.    I know, but I think yeah, I would a -- I mean, if there's going to be some sort of punishment, I think life in prison is at least one -- if it's one of the options, it's at least something.

Q.    And do you think it's a severe punishment?  Do you think that that's a severe punishment for a crime such as the type of crime we're talking about?

A.    I think it's a severe punishment.  I mean, some people may say it's not, but I mean, I would think that it is, I mean,

2972

Page 112

there's a lot that happens when you spend the rest of your life in prison.

Q. Yeah. And you do spend the rest of your life in prison.

A. Uh-huh.

Q. And the reason I ask you that question, not to trick you too much here, but the questionnaire asked you a similar question, and it says, Do you think that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder, and there are two boxes there. You can check either one. It says, Please explain. And you checked the no box.

A. Oh, that it's not? Did I check no, it wasn't?

Q. Yeah, yeah, which, of course, you would expect me to notice that, wouldn't you?

A. Sure.

Q. And so I did. And so obviously, I mean, I'm concerned about that, right, because that's exactly what the government's saying. They're saying, Well, wait a second, Berrigan. Five intentional murders, premeditated, substantial planning, two children, that seems to qualify for the question; okay? And so if you felt that way, that is okay, believe me. This is not a right or wrong answer.

A. Right.

Q. The judge has told you that a couple of times.

A. Uh-huh.

2973

Q. So that's okay. If you don't feel that way, that's okay too.

A. Uh-huh. I guess I -- like I said, I don't remember what I

Page 113

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2590 of 3245

wrote before, and I guess -- I don't know.  It's hard to -- it's -- you know, I'm really -- here I am in the position of needing to make that decision.

Q.    Yeah, we kind of put you on the spot.

A.    Well, and that's a hard position to be in and not that I couldn't make that decision.  I don't know.  I don't have -- I'm one of those people that doesn't have a lot of strong opinions one way or the other until I've kind of been given information.  And . . .

Q.    Let me give you this information, because you may not have known it when the questionnaire came out, in fairness.  I mean, now you know that's an option, life in prison without parole, okay, even for a crime as severe as that.  We've had plenty of people come in here and tell us very sincerely that's not enough.  Life without parole is not enough.  If that's all you're talking about, forget it; I'm not going to do that; I couldn't consider it because I don't think that's enough punishment; that's not severe enough.  And again, that's perfectly fine.

A.    Sure.

Q.    And I don't know, you know -- I don't know that that's where you are.  But if it is, could you tell us?

2974

MR. WILLETT:  Two minutes, Mr. Berrigan.

A.    I think it can be.

Q.    Okay.  Good.  I'm going to take you at your word on that and ask you in my remaining 100 seconds, one of the things you talk about -- there's a question in the questionnaire -- and I know you don't remember all these, but it asks about what effect a bad childhood might have on a person, and you said, It has a

Page 114

huge effect on people's behavior and choices. I don't think that gives them the right to make poor choices and behave wrongly. Okay?

A. (Nodded head.)

Q. There's no disagreement about that.

A. Uh-huh.

Q. But I want to suggest to you that the defense has an option and probably will do this, put on evidence about Miss Johnson's background which her childhood was a fairly traumatic one.

A. Okay.

Q. And we're going to ask jurors to consider that in assessing punishment, and obviously we're going to ask them to take that into account to vote for life. Some jurors have said, Look, that just doesn't count, and we're not offering it as an excuse for the crime; okay? Let's be really clear about that.

A. Okay.

Q. We're asking people to consider it just like you would the fact that she doesn't have any criminal record. It's a

2975

punishment consideration. It doesn't have anything to do with whether the crime was committed. It has to do with if it happens, if it's proven, is that something you'd consider in making a determination about punishment; okay? And I wanted to ask you that based on that answer. I hear you it's not an excuse.

A. Sure.

Q. But would you consider it in assessing what you thought would be the appropriate punishment?

MR. WILLETT: Time, Mr. Berrigan.

A. I would take it into consideration and lay it out there

Page 115

with the rest of the facts that were given to me.

MR. BERRIGAN: Okay. Thank you very much. Thanks.

THE COURT: Thank you, Mr. Berrigan.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

EXAMINATION

BY MR. MILLER:

Q. Good morning.

A. Hi.

Q. How you doing so far?

A. Not too bad.

Q. You only got 12 minutes to go.

A. Okay.

Q. And it may be less than that. Ma'am, I just wanted to

2976

visit with you about one thing, and that's opinions on the death penalty. And I realize that you're not one who's given this a terrible amount of thought before you got the questionnaire and don't have any strong feelings one way or the other.

A. Yes.

Q. What I want to talk to you about is not so much your feelings about the appropriateness of the death penalty or the appropriateness of life in prison because I think you've told us you feel that both are appropriate under the appropriate circumstances. It's how you feel about the possibility of being the one shouldered with the responsibility of making that decision. Go ahead and share with us any thoughts you have about that.

A. I have thought about the fact that, you know, if I were to be chosen as a juror that is a decision that I would have to

Page 116

participate in making, and it's not one that I would take lightly because I want to make sure that the best decision is made. Honestly I would probably pray about it and given the information and the facts go with -- you know, go with what I feel is best given the information. And I really feel that I would probably pray about it and really just seek guidance in making -- that I make the right decision.

Q. And that's perfectly appropriate. And let me add that you certainly should never take such a decision lightly, and we appreciate the fact that you've made it quite clear that you

2977

would not do so. I just want to read back to you a couple statements you made and just want to be sure I explore that matter with you just a little bit more, and then I'll leave it alone; okay?

You stated in response to question 75 which you wouldn't necessarily remember the numbers but I mentioned it for counsel and everyone here, quote, I think there is a place for the death penalty, close quote. And you've already expressed the opinion that you feel both penalties have a place. But you also stated -- and I quote -- I do know that I could probably not be able to handle it on my conscience that I had a part in handing down the death penalty, close quote.

Are your feelings -- and I realize you have had some opportunity to think about this, and because of the situation you find yourself, I realize you've given it more thought. Any further thoughts or any feeling that that shifted at all as far as your thinking?

A. I think it's something that would weigh on my conscience. But I would like to think that I'm a person of integrity and

Page 117

would make the right decision not based on the fact that I would -- it would be weighing on my conscience for the rest of my life that I would put this -- to say send someone -- you know, give someone the death penalty. But I do know it's something that would weigh on my conscience, but I would -- I would like to say that I am not going to not do that based on me

2978

being selfish. Does that make sense?

Q. Yeah, it does. And that's perfectly appropriate, perfectly appropriate. Let me say it's not being selfish to express concerns about your own feelings because, frankly, that's exactly what we're getting into. There are people who cover the entire spectrum of feelings about this, and that's what we want to know is feelings.

A. Yeah.

Q. Some people feel so strongly about the allegations in this case that they feel if those allegations are proven they wouldn't even be able to consider life in prison given the allegations, two children dead and what have you.

A. Sure.

Q. Conversely, some people simply feel that they themselves would not be able to live with the decision should they feel it had to be the death penalty even if they felt that was the appropriate decision. And so it's okay to have feelings. I'm just wondering if you feel those feelings would interfere with your ability to give full and fair consideration to imposing the death penalty if that's the appropriate punishment.

A. I don't think that those would interfere at all.

Q. And let me just put it to you one other way, and it's really just the same question put in different terms. If you

Page 118

were required to serve on this jury, ma'am, and if after listening to the evidence you and your fellow jurors unanimously

2979

concluded that Angela Johnson is guilty of these crimes, these five -- participation in these five murders including the killings of two grade school age children and if after going through a second and third phase should you do so and considering all of the mitigating and the aggravating evidence in this case you -- and again, this is a hypothetical, an assumption. If that all were to happen and you and your 11 fellow jurors unanimously concluded that the death penalty is the appropriate punishment in this case, under those circumstances, ma'am, you could not return a verdict that reflected that fact unless each and every one of you were to sign the verdict knowing that your signature would have the real effect of causing the death of a fellow human being. Do you feel you could do so?

A.   Yes, yes.

MR. MILLER:  Thank you, ma'am.

THE COURT:  Juror 109, I'm going to ask you to step out for a minute because I may have some questions for you, but I want to talk to the lawyers first before I ask any of my questions; okay?  Thank you.

(Prospective Juror 109 exited the courtroom.)

THE COURT:  I'm a little bit concerned about this prayer issue, and I want to tread very lightly on it, so I wanted to talk to the lawyers before I jump in here, and I may not jump in.  It seems to me that -- I'm not sure I understand

2980

Page 119

the role of prayer in jury deliberations, but I think it has some potential pitfalls, and I think, for example, a juror could not substitute prayer for following the instructions. That I'm very confident of.

On the other hand, I think I would violate a juror's First Amendment rights by saying that they can't pray about their deliberations, but I don't think they can do it in the jury room. So it's a very touchy area. I think I understand the general parameters of it, I think. I mean, it's a real murky area. But I feel I need to probably say something about it to her, but I didn't want to do it before I talked to the lawyers to see if we can even agree on what the parameters are or what I should say or if you just want me to leave it alone.

MR. BERRIGAN: I think what you just said would be fine, Your Honor. I mean, you well know there's a bunch of these cases where jurors bring Bibles into the deliberation rooms. I've had one. It's going to cause a reversal in a death penalty case in Kansas, and it happens regularly. I think any opportunity we have to tell the jurors that you can pray all you want at home but when you're deliberating about the case with your fellow jurors prayer's not part of the equation, I think we should take advantage of that.

THE COURT: And I don't think prayer can override the jury instructions.

MR. BERRIGAN: Right. That's the problem with the

2981

Bibles obviously.

THE COURT: Right. Do you have any -- I'll do the best I can, and if I screw it up, we'll -- I don't know what we'll do, but I'll try not to screw it up. It's a very

Page 120

sensitive area, but I felt compelled to say something about it. And so does the government agree I should weigh in and do it as delicately as I'm capable of doing which may not be good enough but I'll try?

MR. MILLER: I think it's perfectly appropriate. I got the sense from her that she was indicating that she felt she should pray for the strength to do the right thing, and I think anyone who's on the jury who's a person of faith should have that feeling, but I have certainly no problem with the Court making sure that that is.

THE COURT: Okay. Okay.

(Prospective Juror 109 entered the courtroom.)

THE COURT: Please be seated. Here's what I wanted to talk to you about. The relationship between government and law and religion is often very murky, and it's often a very gray area. And you brought up several times the role that personal prayer may play in your life. And I wanted to dialogue with you a little bit about that.

PROSPECTIVE JUROR 109: Okay.

THE COURT: Okay? Let me talk about -- I said some prayers this morning as I frequently do before I came to work.

2982

But when I make my legal judgments, my view of religion never comes into play. That's just me personally.

PROSPECTIVE JUROR 109: Sure.

THE COURT: And you have an absolute right to prayer, but you don't have a right, for example, to pray in the jury room.

PROSPECTIVE JUROR 109: Okay.

THE COURT: Okay?

Page 121

PROSPECTIVE JUROR 109:  Uh-huh.

THE COURT:  And if you're talking about kind of prayer to give you the personal strength to do the right thing, that's fabulous.  But if you're looking for some kind of divine inspiration as to how you ought to vote that would require you to not follow my jury instructions, that would be inappropriate.

PROSPECTIVE JUROR 109:  Yes.

THE COURT:  Do you understand?

PROSPECTIVE JUROR 109:  Oh, yes.  I -- may I --

THE COURT:  Yes, yes.

PROSPECTIVE JUROR 109:  I know that for me I would need that, you know -- I wasn't expecting, okay, let's go in the jury room and all hold hands and pray.

THE COURT:  It's happened, and then it usually results in a huge problem.

PROSPECTIVE JUROR 109:  Sure.  That's for me knowing that I need that strength from God in order to, if this is -- if

2983

it was meant for me to be on this case, it's something that I would -- I need personally, and I don't try and impose that on anyone else.  It's for me to -- like you said, for strength to make it through, and I want to be able to have a clear head coming into this and as we go through the -- if I were to be on here, go through the trial maintaining a clear head and maintaining just an open mind about all of the facts that are given to me.

THE COURT:  Okay.  Good.

PROSPECTIVE JUROR 109:  Not a -- not a Bible beater let's try and -- yeah, just for myself prayer.

THE COURT:  Do you see any potential problem with

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2599 of 3245

prayer interfering with your ability to follow and apply the legal instructions that I give you?

PROSPECTIVE JUROR 109: No, no, not at all. You give me instructions, and I -- I need those instructions, and I need to follow those instructions, and that's not an issue at all.

THE COURT: And with regard to the death penalty, do you believe you could fairly consider both penalties in this case, life imprisonment and the death penalty?

PROSPECTIVE JUROR 109: Yes.

THE COURT: And give fair consideration to each one.

PROSPECTIVE JUROR 109: To each one.

THE COURT: Okay. If you'll just step outside for a minute, we'll let you know. Thank you so much.

2984

(Prospective Juror 109 exited the courtroom.)

THE COURT: Okay. Mr. Berrigan, any challenge for cause by the defense?

MR. BERRIGAN: None by the defense, sir.

THE COURT: Mr. Miller.

MR. MILLER: No, Your Honor.

THE COURT: Any peremptory strikes by the government?

MR. MILLER: No, sir.

THE COURT: Okay. We'll bring Juror 109 in and let her know she's in the jury pool.

(Prospective Juror 109 entered the courtroom.)

THE COURT: Juror 109, you are in our jury pool, so we hope to have a jury selected -- tomorrow would be maybe unduly optimistic. It could happen. Might be Monday, might be Tuesday. Not sure exactly when. We'll let you know as soon as we know. And then we'll let you know whether you're in that 50

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2600 of 3245

percent group that kind of gets dismissed again or whether you're actually going to be a trial juror in this case; okay?

I remind you to follow my instructions this morning about not talking about this case with anyone.  Don't let anybody talk to you about the case.  Don't read any news reports about the case or listen to anything on the radio or TV, and don't do any independent research on your own through the Internet or anywhere else; okay?  Thank you very much.  You're free to go today.  Thank you.

2985

(Prospective Juror 109 exited the courtroom.)

THE COURT:  Anything we need to take up before we take our lunch break?

MR. WILLIAMS:  No, Your Honor.

MR. BERRIGAN:  No, Your Honor.

THE COURT:  Okay.  So now we're into --

MR. BERRIGAN:  Alternates.

THE COURT:  -- alternates, okay.  And we'll just proceed the same way.  Each side has three strikes they can exercise.

MR. BERRIGAN:  Yes, sir.

MR. WILLIAMS:  And, Judge, just a clarification on this, and I think it goes without saying, but the alternates will be substituted into the regular jury in the order that we seat them.

THE COURT:  Yes.

MR. WILLIAMS:  That's what I assumed.

THE COURT:  Yeah.

(Lunch recess at 11:50 a.m.)

THE COURT:  Ready for the next juror?

Page 124

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. 396.

(Prospective Juror 396 entered the courtroom.)

THE COURT: Juror 396, anywhere in the front row, please.

2986

Everybody can be seated, and you're going to be questioned first by Mr. Miller and then by Mr. Berrigan.

PROSPECTIVE JUROR 396: Okay.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

EXAMINATION

BY MR. MILLER:

Q.   Good afternoon.

A.   Hi.

Q.   How you doing?

A.   Good.  Nervous.

Q.   Did you -- well, let me tell you what I've told some others.  That's an indication that you're human; okay?

A.   Good.

Q.   Because pretty much everybody feels the same way.  One other thing I hope you'll find is that after you start answering a few of the questions you think about answering questions and not think so much about being nervous; okay?

A.   Uh-huh.

Q.   I'm going to visit with you for 12 minutes or less about two things.  One is the question about your exposure to pretrial publicity -- and that should be pretty quick judging from your questionnaire -- and also thoughts and feelings about the death penalty; okay?

Page 125

A.     Okay.

2987

Q.     You indicated that you're not at all familiar with the case.  Some months or at least weeks have passed since you filled this out.  Is that still the case, or have you heard anything more about this case?

A.     No, that's still the case.

Q.     And I assume that just from reading the questionnaire itself you haven't formed any fixed opinions about the merits of the case one way or the other.

A.     Well, no.

Q.     You hesitate about that.  You've been made familiar with some serious allegations you understand.

A.     Right.

Q.     And I assume that gives you pause, but as was explained to you this morning by Mr. Stowers and Mr. Williams, those are merely allegations, not facts, and the defendant in every criminal case, not just this one, is entitled to the presumption of innocence.  Do you feel that's at all any problem with you?

A.     No.

Q.     Thank you so much.  I want to visit with you now briefly about the death penalty and your views on it.  You were kind enough to fill out a questionnaire.  We have the benefit of that.  But rather than just jumping into that, am I guessing correctly in saying that when you got that questionnaire it was the first time you've had it actually dropped in your lap that you had to give serious thought to this issue?

2988

Page 126

A.    Yes, uh-huh.

Q.    And am I further correct in assuming that maybe over the last several weeks you've thought about it some more, or am I not?

A.    Yeah, I have.

Q.    Would you just go ahead and share with us any thoughts, feelings about the subject?

A.    Well, of course, you'd want to be as sure as possible before you would ever convict anyone with the death penalty.

Q.    Absolutely.

A.    And I guess to me, I guess I would do it if I thought the crime was serious enough and had enough evidence.

Q.    Do you recall Judge Bennett describing this morning -- you spent quite a bit of time listening not only to the Court but also to Mr. Williams and Mr. Stowers talking about a lot of different subjects, but a portion of that morning was at least a brief explanation or summary about how the process works presented to you by the judge talking about the third phase or penalty phase if this jury would ever get to that penalty phase. Do you remember him talking about how that would go?

A.    Uh-huh.

Q.    And I realize you weren't sitting there taking notes; okay? So I apologize if this sounds a little bit like the civics examination that the judge promised you I wouldn't subject you to, but can you share with us what you recall about that, how

2989

that procedure works?

A.    I guess I wasn't real clear on understanding how all that works except that it -- you bring the jury back; is that correct?

Page 127

Q.   Yes.

A.   Yeah, to determine -- so it just pretty much extends your time, the involvement.

Q.   Okay.  That phase, of course, obviously would not happen unless and until the defendant was proven guilty and unanimously to the satisfaction of a jury beyond a reasonable doubt.  If it ever came to the third phase where it would be your responsibility to return a verdict of punishment one way or the other, you'd have two options which is the death penalty or life imprisonment without the possibility of parole.  Do you recall the judge explaining that to you?

A.   Uh-huh.

Q.   Do you recall the judge indicating to you that it would be your job to consider and weigh what are called aggravating circumstances and what are called mitigating circumstances, any that are proven of either nature in deciding what would be the appropriate punishment?

A.   Uh-huh.

Q.   Does that make sense to you as an appropriate way to proceed?

A.   Sure, yes.

2990

Q.   Now, you indicated in your response to the questionnaire that you are for the death penalty depending on the circumstances.

A.   Uh-huh.

Q.   And can you just tell me what you mean by that when you say depending on the circumstances?  Any --

A.   Or the seriousness of the crime I guess is probably what I meant.

Page 128

Q.   Very good.  In talking about life imprisonment, you did express some concern about the expense of that.

A.   Uh-huh.

Q.   Now --

THE COURT:  Ma'am, I'm just going to interrupt you. You have to answer out loud.  When you go uh-huh, it's very hard for the court reporter to take that down.

PROSPECTIVE JUROR 396:  Okay.

THE COURT:  Okay?

PROSPECTIVE JUROR 396:  (Nodded head.)

THE COURT:  I know we all do it.

PROSPECTIVE JUROR 396:  Okay.

THE COURT:  But try to answer out loud with a full answer.  Thank you.

BY MR. MILLER:

Q.   And I apologize.  That's my fault.  As lawyers we should be responsible for helping to make sure we have a clear record, and

2991

our court reporter has that responsibility to make a clear record.  Okay works.

A.   Okay.

Q.   If we can all agree ahead of time that's an affirmative response.

Should you ever get to that stage in the proceedings where you were charged with the responsibility of deciding punishment, the judge would give you the benefit of instructions on what you may consider to be mitigating factors and aggravating factors.  For example, you understand this case involves an accusation of killing more than one person.

A.   Yes.

Page 129

Q.  If the Court were to explain that multiple killings is an aggravating factor, would that make sense to you?

A.  Yes.

Q.  And you feel you could follow that instruction?

A.  Uh-huh.

Q.  Likewise, the killing of particularly vulnerable victims such as grade school age children, I would expect you'd be instructed that, if you find beyond a reasonable doubt that that happened, is an aggravating factor.

A.  Yes, okay.

Q.  There can be any number of possible -- and I don't want to suggest that I'm telling you all possible mitigating factors. But there may be things such as level of involvement in the

2992

case -- excuse me, in the crime, if it's a lesser level of involvement, that that is a mitigating factor as opposed to aggravating.  Does that make sense?

A.  Yes.

Q.  And if given an instruction to that effect, do you feel you could follow that and weigh that as a factor?

A.  Yes.

Q.  One of the things I expect you will never be told as a factor in either direction is the expense.  In other words, the cost of a particular punishment is not among those things that are weighed in considering what is the more appropriate punishment in this case if you ever come to that stage.  Are you okay with that?

A.  I understand, yes, uh-huh.

Q.  And you're okay with that.

A.  Yes.

Page 130

Q. You indicated that to you the killing of innocent children deserves the death penalty, and I can assure you that it's hardly a unique feeling on your part that the killing of innocent children is something that one would consider an aggravating factor. And I've already told you that if you sit on this jury you might expect that you will be given such an instruction, and that makes sense to you that that would be an aggravating factor.

A. Yes.

2993

Q. What I want to know, however, is would that be the end of it? In other words, if the evidence in this case shows that innocent children were killed, would your verdict automatically be the death penalty, or would you still be able to give fair consideration to both possible punishments in this case considering --

A. I'd say death penalty.

Q. And again, we appreciate your candor. We have a full range of opinions. And some people simply share with us that they honestly don't feel that they can consider both under the circumstances. It would be your responsibility and it's our duty to find 12 jurors who can assure us that even given the serious nature of this case they can assure us that they would be able to give realistic consideration to both possible punishments.

A. I see.

Q. You feel you'd have difficulty doing that --

A. Yes, uh-huh.

Q. -- given the killing of children? And I just want to take this one step further. If you were in a situation of being on a

Page 131

jury like this, the judge would instruct you that it's entirely up to you how much weight you give to each factor. In other words, the fact that vulnerable victims, children, were killed, it's entirely within your province as a juror, should you see fit to do so, to attach tremendous weight to that factor.

2994

A.   Yes, uh-huh.

Q.   But you have to be able to tell us that you would consider all factors including factors that would be in favor of leniency. Do you feel that the killing of children would eliminate your ability to consider mitigating factors as well?

A.   Yes, I think so.

MR. MILLER:  Ma'am, all we can do is ask you for your sincere thoughts on this, and I trust you shared them with us, and I thank you so much for doing so. I have no further questions.

MR. BERRIGAN:  No questions of 396, sir.

THE COURT:  Okay. Juror 396, would you automatically impose the death penalty without hearing or considering any other evidence in the penalty phase?

PROSPECTIVE JUROR 396:  Did you say would I oppose it?

THE COURT:  Would you automatically impose the death penalty --

PROSPECTIVE JUROR 396:  Oh, impose it?

THE COURT:  -- if you got to the death penalty stage?

PROSPECTIVE JUROR 396:  Well, he was asking me with the involvement of children, correct, if children were killed in this case?

THE COURT:  Right.

PROSPECTIVE JUROR 396:  And that's something that I'm

Page 132

very emotional about.

2995

THE COURT:  Well, I understand that.  Who wouldn't --
do you know anybody that wouldn't be emotional about the killing
of children?  Do you know such a person?

PROSPECTIVE JUROR 396:  No.

THE COURT:  Okay.  So everybody is; right?

PROSPECTIVE JUROR 396:  I guess, yes.

THE COURT:  Okay.  So why would that prevent you from
being able to consider all of the evidence presented in a
penalty phase portion of the trial, the fact that two children
were killed?

PROSPECTIVE JUROR 396:  I guess I need more of an
example.  Are you saying that I should weigh my decision, say,
based on the circumstances of when the crime was carried out?
Is that what you're implying?

THE COURT:  Well, that would be one thing.  You'd be
able to consider all of the circumstances surrounding the
commission of the crime.  And then there may be evidence of
mitigating factors, and that can be broad-ranging evidence, and
there could be very many mitigating factors in the case.  And I
just want to know if you'd be able to consider evidence
presented of mitigating factors.

PROSPECTIVE JUROR 396:  I realize that, you know,
there could be a lot of factors, how a person is raised or
whatever.  But I would have a very difficult time not imposing
the death penalty no matter what the circumstances were.

2996

THE COURT:  And no matter what the evidence was that
Page 133

was presented?  Wouldn't you -- let me ask you this.  Wouldn't you want to hear all the evidence before you made up your mind what an appropriate punishment should be?

PROSPECTIVE JUROR 396:  If the bottom line was that a person killed the children, to me it doesn't matter what the reason was.  If they were influenced by whatever, I don't think that makes a difference.

THE COURT:  It might not make a difference --

PROSPECTIVE JUROR 396:  So am I not understanding what you're --

THE COURT:  Well, I don't know.  I agree with you that those things might not make a difference on the question of whether somebody was guilty or not guilty.  But in terms of looking at what the appropriate punishment would be --

PROSPECTIVE JUROR 396:  I see.

THE COURT:  -- wouldn't you want to consider all of the evidence that would be legally admissible on the issue of punishment before you made up your mind?

PROSPECTIVE JUROR 396:  Yes, but it would be difficult for me.

THE COURT:  But would you be willing to consider other evidence?

PROSPECTIVE JUROR 396: I guess I don't know.  I'd have to hear the case.

2997

THE COURT:  Well, I'm not asking you how you would ultimately vote.

PROSPECTIVE JUROR 396:  I know.

THE COURT:  I'm asking you whether you are a fair-minded individual who would be willing to consider all of

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2611 of 3245

the evidence that's legally admissible before you would decide what the appropriate punishment should be. Some people are, and some people aren't, and we just want to find out where you are.

PROSPECTIVE JUROR 396: I guess -- then I guess I'd have to say I wouldn't be fair in that situation.

THE COURT: Okay. You couldn't fairly consider all of the evidence.

PROSPECTIVE JUROR 396: Yeah.

THE COURT: Okay. I think I'll save you the time of leaving the room.

MR. BERRIGAN: The defense will make the motion, Your Honor.

THE COURT: Okay.

MR. BERRIGAN: I know it's the government's turn to go first.

THE COURT: Yeah, that's fine. You don't resist it, I assume.

MR. MILLER: No resistance. We appreciate the lady's candor.

THE COURT: Yeah.

2998

PROSPECTIVE JUROR 396: Thank you.

THE COURT: We're going to go ahead and let you go.

PROSPECTIVE JUROR 396: Okay.

THE COURT: Okay. And we appreciate it very much. Thanks for your honest and truthful responses.

PROSPECTIVE JUROR 396: Thank you.

THE COURT: And we'd just ask that you do us a favor. It will probably take us into next week before we have a jury selected, so we'd ask you not to talk about this process to

Page 135

anybody because northwest Iowa's pretty small populationwise, and you could discuss it with somebody, and that somebody else might tell somebody else, and that somebody else might be winding up on the jury tomorrow or next week for us to interview.  So we'd ask you to hold off till maybe the middle of next week before you discuss it; okay?

PROSPECTIVE JUROR 396:  Yes, I will.

THE COURT:  Okay.  Thank you very much.

PROSPECTIVE JUROR 396:  Thank you.

THE COURT:  Thank you.  Good luck to you.

(Prospective Juror 396 exited the courtroom.)

THE COURT:  Ready for 167?

MR. MILLER:  Yes, sir.

MR. BERRIGAN:  Yes, sir.

(Prospective Juror 167 entered the courtroom.)

THE COURT:  167, anywhere you'd like to sit in the

2999

front row would be fine.  Thank you.  We're going to start first with questions from Mr. Berrigan.  And then after he's done, Mr. Miller will have an opportunity to question you; okay?

PROSPECTIVE JUROR 167:  (Nodded head.)

MR. BERRIGAN:  Thank you, Your Honor.

EXAMINATION

BY MR. BERRIGAN:

Q.   Hi.  How are you, Miss 167?

A.   Just great.

Q.   It's not as bad as going to the dentist, so don't worry. We're really just going to ask you questions in two different areas.  One is pretty easy.  It has to do with what you might have heard about the case before coming in here today, you know,

Page 136

through the usual sources, television, radio, newspaper, or people talking. So what can you tell us about that?

A. I only know what I received in the mail.

Q. Okay. And that's what you told us in your questionnaire.

A. (Nodded head.)

Q. Some folks have heard stuff since that time inadvertently most of the time. Nothing for you.

A. No.

Q. Okay. Then we can go to the other issue, and that has to do with the potential punishments involved. I couldn't emphasize potential too strongly because, as the judge pointed out, Miss Johnson sits there presumed to be an innocent woman,

3000

and there's going to be a big trial to see whether or not the government can overcome that presumption with evidence beyond any reasonable doubt. And because we're going to be talking about the subject of punishment, I don't want to give you the impression that I or any member of her defense team for a moment think she's guilty of anything; okay? But we can't kind of stop the trial if she were convicted and then ask questions of people, Hey, what do you think about these punishments, so we have to kind of do it now, cart before the horse, if you will; all right?

If we had known each other for 20 years and were sitting in a coffee shop one morning and there was some article that Iowa's thinking about bringing back the death penalty and I turned to you and said, you know, We've known each other a long time, Juror 167; I've never asked you about the death penalty; what do you think about it, what would you tell me?

A. I don't know because I don't really know how I would feel.

Page 137

Every situation is different.

Q.   Okay.

A.   I can go either way.

Q.   Okay.

A.   I just -- I don't have an opinion one way or the other.

Q.   You're kind of -- we've been using a football analogy, and I don't know if you are a football fan, but you know what a football field looks like.

3001

A.   (Nodded head.)

Q.   And some folks have come in here just like you, and they've said, you know, I'm kind of on the 50-yard line.  If the end zones are death and life imprisonment without parole, here I am in the middle.  Is that kind of where you are?

A.   Yes.

Q.   Okay.  I'm going to throw some factors into the mix to see if that changes; okay?  And they are essentially what the government's alleging in this case.  The government's claimed in their charges that Angela Johnson aided and abetted in the commission of five intentional murders -- these are my visual aids -- five people.  And they're alleging furthermore that these murders were committed after premeditation and substantial planning; okay?  And then they're further alleging that these murders, the five people involved, the victims, included a mother and her two children, two little girls ten and six years old, Kandi and Amber Duncan; all right?  So that's the kind of case that we're talking about here.

        And I did note in your questionnaire that that third book, the children, is something that you have some concern about, so let me just ask you about that.  You mentioned that

Page 138

you had no opinion about Miss Johnson's guilt or innocence.  You did have an opinion about punishment.  You said, My heart tells me if you kill five people and two children you should get the death penalty if you're guilty of the crimes; okay?  And at the

3002

point we're talking about punishment, obviously that's happened.  You don't get to this point in the trial if the jury says not guilty; right?  So tell me about that.  How strong do you feel about the issue of the children?

A.   I just think that they were innocent, they didn't have a choice in the matter as to if you're an adult you should know your choices, and I think sometimes children don't know that.

Q.   Obviously they're innocent if they're ten and six years old.  Whatever activity's going on, they're not part of that.  We're on the same page.

But the issue kind of becomes how that affects you in terms of your punishment views; okay?  So you kind of came in on the 50-yard line, and I don't know where that puts you.  Some people, they kind of move down the field one way or the other when we start adding this stuff in.  They might have been on the 50 with intentional murders.  Then we say premeditated murder, and now they're moving.  And then we put in children, and they've moved again.  And that's okay.  I mean, as the judge pointed out, this whole process, this isn't right or wrong test, you got the right answer.  We're just trying to figure out how people feel about these things.  And we have talked to well over a hundred people, and we've had almost a hundred different views, all of which are entitled and deserve our respect and yours as well.  I just kind of need to know on this football field how much the children kind of gets you off the 50 if at

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2616 of 3245

all; okay?

A.   I don't think it gets me off at all.  I would still want to hear all the evidence before I would make any move.

Q.   And when you say all the evidence, what are you thinking about?

A.   Anything they have to offer that would sway me one way or the other.

Q.   Okay.  Let me -- let's talk a little bit about that, okay, because some folks tell us, I want to hear all the evidence, and what they're really talking about, they're talking about the evidence of the murders.  You know, well, was this the person?  Was she insane?  Was it self-defense?  What was going on?  And we're at the penalty portion.  That means that's all gone.  If there was a defense that I wasn't the person or this was an accidental murder or whatever it was, it's been rejected; okay?  So I just want to make sure we're on the same page on that; okay?  When you're saying all the factors, are you talking about stuff other than the crime?

A.   No, whatever comes out here.

Q.   Okay.  Well, let me give you an example.  You know, this is what the government's going to be talking about.  This is why they're going to be asking for the death penalty.  The defense has an opportunity -- we don't have to.  Just like the judge said, we don't even have to ask questions.  I mean, it'd be ridiculous if we didn't, but we're going to have an opportunity

to present evidence to the jury of what are called mitigating

Page 140

factors or things that we think should hopefully persuade a jury to go the other way towards the life end zone. And they're going to include things that have nothing at all to do with the crime; okay? And I need to be clear that they're not going to be offered to you as an excuse for why that happened, and that's already happened at this point. The jury's made that decision. You following me?

But these are things like a lack of criminal history; all right? Some folks have said, you know, I couldn't care a wink whether a person had a big criminal history, little criminal history, no criminal history. I wouldn't even consider it because that's the only thing that's important to me.

But the law says these are things that jurors are obligated to consider. You can give them whatever weight you want, but you've got to consider them, and it's okay if you can't, but I'm curious about that. So tell me, is that a thing that would be at all important to you in your weighing decision about life or death?

A.   No, I would keep an open mind.

Q.   Okay. And keeping an open mind when we're talking about these mitigating circumstances, I want to make sure I don't misunderstand you. Does that mean that you would consider stuff about Angela Johnson's background in making a decision about punishment?

3005

A.   It would depend on what that was.

Q.   Okay. Well, how about something like no previous criminal history?

A.   I would take that into consideration.

Q.   What about background information? We have an opportunity

Page 141

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2618 of 3245

to present information to the jury about her background, childhood experiences that were fairly traumatic, abuse, some sexual abuse, physical abuse. Some folks have told us, Berrigan, you know, you make choices in life. I wouldn't even take that into account in punishment. I know it's not an excuse for the crime, but I don't even think I'd consider it in punishment, and I want to know what you think about that.

A. I would -- I would listen to it, and I would -- I would take it into account.

Q. Okay. And how -- can I ask you how you would take it into account?

A. I would listen to see what -- you know, how she grew up, what factors she thinks weighs upon what's happened.

Q. Okay. And there's a listening, really listening, in "I'm going to really consider this," and we've had some jurors, what I -- my description is they kind of give it a wink and a nod kind of like, Oh, yeah, okay, I'll look at that, but I'm not really going to consider that, Mr. Berrigan, in determining the punishment because I don't think it's important. I want to make sure you're in the former category and not the latter; okay?

3006

A. (Nodded head.)

Q. Because we won't be able to come back later and say, What do you think; okay?

MR. WILLETT: Two minutes, Mr. Berrigan.

A. (Nodded head.)

Q. And you're nodding.

A. I think I would be -- I would be open to it. I would listen to it. I don't feel like I would use that against her, no.

Page 142

Q. Okay. Okay. You answered this one question. I'm only going to ask you about this one. There's a question on the questionnaire that asks whether or not you think life without parole is a severe-enough punishment for premeditated, intentional murder, and you were unsure. You said you weren't sure about it; okay? And what you know now is that is a punishment even for not just intentional, premeditated but even children; okay? And we need to be sure that you would realistically consider life imprisonment without the possibility of parole as a severe-enough punishment even for this crime. What do you say to that?

A. In this crime I think that that would be appropriate. In some other cases, I would say no.

Q. Okay. And just to be clear, I know you're concerned about the taxpayer money, and there's certainly a debate about what's more expensive, the death penalty or life without parole. But

3007

that's not a consideration in punishment. Are you okay with that?

A. Yes.

Q. None of us have any control over what the prisons are like, not even Judge Bennett; okay?

A. That's correct.

Q. So that's something we need you to kind of factor out all together, shouldn't even be part of your process at all. Are you okay with that?

A. Yes.

MR. BERRIGAN: Okay. I very much appreciate your patience, ma'am. Thank you.

THE COURT: Mr. Miller?

Page 143

MR. MILLER: Thank you, Your Honor.

EXAMINATION

BY MR. MILLER:

Q. Good afternoon, Juror 167.

A. Hi.

Q. How you doing?

A. Good.

Q. You're doing just fine. I'm going to finish this up in a minute. Just two very brief things I wanted to cover with you.

I take it from your responses when you listened to the judge this morning and he explained how that third process works if it ever comes to that that you would have the responsibility

3008

of weighing aggravating and mitigating factors, that that made sense to you and you feel you can follow that instruction.

A. Yes.

Q. And just to be perfectly clear, you will be told if it ever comes to that that it's up to you to decide how much weight to give each factor. In other words, the killing of children, if that is very weighty with you, that's fine. But you have to consider all of the proven mitigating and aggravating factors that the Court instructs you. You feel you would do so in accordance with the Court's instructions?

A. Yes.

Q. And finally, the only other thing I wanted to ask you about, when asked about the death penalty, you wrote, Not sure, and I'm wondering if you were -- you've indicated that you feel that both death and life imprisonment are possible appropriate punishments. If by not sure were you expressing some feelings about your own personal ability to render such a decision?

Page 144

A.   I just am not sure.  It depends on what the crime is, what the situation is.  You know, I don't know if it was someone in my family I would feel differently than if it was someone I didn't know.

Q.   And obviously the reason we have jurors come in is so that we have people who are not looking at it as their own family but being impartial.  And that would be the way you would look at it, ma'am?

3009

A.   Correct.

Q.   Okay.  Fine.  And I just want to be sure that if -- in the event that you are required to serve on this jury, if you and your fellow jurors unanimously conclude that Angela Johnson is guilty of these crimes and if after going through a second and third phase you unanimously conclude that the death penalty in this case is the appropriate punishment, you couldn't impose that without putting your signatures on a verdict to that effect that would have that very dire effect on her.  Do you feel you could sign such a verdict if you and your fellow jurors unanimously felt that that was the appropriate punishment?

A.   Yes.

MR. MILLER:   Thank you, ma'am.  I have no further questions.

THE COURT:   Juror 167, if you'd just step outside for a minute, we'll let you know what your status is.  Thank you.

(Prospective Juror 167 exited the courtroom.)

THE COURT:   Any challenge for cause by the defense?

MR. BERRIGAN:   No, sir.

THE COURT:   By the government?

MR. MILLER:   No, Your Honor.

Page 145

THE COURT:  Any exercise of peremptory strike?

MR. BERRIGAN:  None by the defendant.

THE COURT:  By the government.

MR. MILLER:  No, Your Honor.

3010

THE COURT:  Okay.  She's in our jury pool.

(Prospective Juror 167 entered the courtroom.)

THE COURT: Juror 167, you are in our jury pool, so that means you still have, you know, about a 50 percent chance of being selected to serve.  I don't know when we'll know.  It should be -- you know, tomorrow might be lucky, but maybe Monday or Tuesday.  We'll let you know as soon as we know whether you've made it into the jury finally or not; okay?

I'd ask you to follow very carefully those rules that I talked to you about this morning.  It's very important that you not talk to anybody about the case or let anybody talk to you, do any research on the case or listen to any news reports or read any news reports about the case; okay?

PROSPECTIVE JUROR 167:   (Nodded head.)

THE COURT:  Our clerk's office will get back to you as soon as we can.  Thank you very much.  Have a good day.

(Prospective Juror 167 exited the courtroom.)

THE COURT:  Ready for 780?

MR. BERRIGAN:  Yes, sir.

MR. MILLER:  Yes, sir.

(Prospective Juror 780 entered the courtroom.)

THE COURT:  Hi, Juror 780.  Any chair you'd like. Please be seated.  We're going to first have questions from Mr. Miller, and then Mr. Berrigan on the defense team will have an opportunity to question you; okay?

Page 146

EXAMINATION

BY MR. MILLER:

Q.   Good afternoon, Juror 780.

A.   Hi.

Q.   How you doing?

A.   Nervous.

Q.   Okay.

A.   Very nervous.

Q.   I can tell you are, and what's unique about that is absolutely nothing.  Everybody in your situation has felt the same way.  What it means is that you're human; okay?  And I hope you'll find that after you start answering a couple of these questions it's going to be over before you know it.  You'll find the nervousness mostly went away; okay?  Easy for me to say.

A.   Yeah.

Q.   We need to visit with you about just two subjects.  Number one, we need to visit with everybody about what they may have heard about this case other than what came in the questionnaire, and we also need to visit about the subject of feelings about the death penalty; okay?

A.   (Nodded head.)

Q.   Those two subjects.  First I notice that you marked that you are somewhat familiar with this case.  And I'd just ask that you go ahead and even include information you may have heard about this case, if any, since you filled out the questionnaire.

Tell us everything you feel or know about this case the best you can.

A. Probably not in detail too much or anything just other than what has been on the TV, newspapers because I like to watch the news and read the newspaper.

Q. Sure.

A. I guess the last time I seen it was when they last had it on TV and said, oh, they're starting to pick the jurors, and I'm like, oh, where's my paperwork? So that's -- I just know, you know, like, you know, about the case, that -- you know, from the paperwork and the TV that there was a family killed-type stuff.

Q. When was it that you last saw a news account about it?

A. Probably the day before or the night before or the morning of -- that you guys were going to start picking the jurors.

Q. About two weeks ago?

A. Yeah.

Q. Three weeks ago maybe? Did you watch that news story then?

A. They just showed her coming down the steps and saying they were going to start picking the jury. I have like four TVs on in the morning, go from room to room.

Q. You enjoy watching the news.

A. I do. Yep, I do.

Q. Very good. And I think we have a feel for what you've been exposed to because we know what's been in the news. I'm just kind of wondering how much of that you can tell us that you

3013

recall?

A. As far as making decisions on the case or anything, none.

Q. Okay.

A. I'm the type of person that there's two sides to every story, that I kind of need to know facts before I make any decision I guess.

Page 148

Q. I take it you feel you have a clear understanding of the responsibility of a juror is to render a decision based not on what they've heard outside the courtroom but only on the evidence that comes in here. Fair statement?

A. Yeah.

Q. And the next statement -- next question will be my last one on that subject. Some people feel they can divorce those two, and other people honestly feel that they can't get out of their minds the information they've heard on the news in trying to weigh the facts of the case. Where are you on that?

A. I'm not that minded for making that type -- you know, for making that -- I'm not getting this out right.

Q. You're doing fine.

A. You know, for making that bottom-line decision, you know, because, you know, several times it's not always reported correctly type, you know. It's news media, and it's what they make it to be; let's make news.

Q. Sure. They have a job to do.

A. Yeah, and sometimes it's not always the . . .

3014

Q. The information they give you is not under oath. It's not subject to cross-examination, and it's limited by the amount of time they have to present a 20-second spot, what have you.

A. Uh-huh.

Q. Fair statement?

A. Yeah.

Q. And if you happen to find yourself on this jury and charged with the responsibility of serving as a juror, I take it you're telling us you can base your verdict only on what you hear in this courtroom and not upon anything you've read or heard

Page 149

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2626 of 3245

elsewhere.

A.    True.

Q.    Very good.  Thank you, ma'am.  On the subject of the death penalty, am I fair in assuming that when you received that questionnaire it was probably the first time you've ever had that subject dropped in your lap as seriously as it was on that occasion?

A.    Yes.

Q.    Okay.  And am I also fair in guessing that maybe you've given it some thought since then?

A.    Not really because I have a lot going on.

Q.    You have a lot going on, and maybe this isn't the most fun thing to think about either; right?

A.    Well, I just have a busy life.

Q.    Very good.

3015

A.    So it's go, go.

Q.    There's many other things you to have to attend to, aren't there?

A.    Yeah.

Q.    You indicated that -- and I'm paraphrasing here, but you indicated that you felt that in an appropriate case the death penalty would be appropriate, but you also indicated -- and here I am quoting from your answer to question 75 -- But in the back of my mind, am I the right person for judgment, close quote. Can you share with us what your feelings were when you expressed that?

A.    Probably more related to religion as far as giving someone the death penalty but not knowing facts, you know, just taking an open look, I guess -- and I know that, you know, some people

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2627 of 3245

can do that decision where I'm not sure I -- of course, I've never had to do it before, and sometimes I think it's, you know, God's choice to make those sometimes. But not ever doing this, I -- you know, I can't honestly say yes, no, whatever, you know.

Q. Do you have either religious feelings or an understanding of what your religious teachings are in the area of the death penalty?

A. Well, I'm pretty much, you know, okay, I gotta hear both sides of the story. And making that final decision, I guess I'm the type of person when it comes head-on, then I can kind of cross that path, but -- and I don't know if my religion at that

3016

point would have, you know, some effect on it or if the facts will override it. You know, to me I like to hear both sides of the story in every situation that, you know, you possibly can including your child, you know. Okay. You know, you need to look at the other side of the fence, too, when they complain about something is usually what I say to her. But -- and I know you need an answer.

Q. No, no, you're doing just fine. Some of these questions are awful difficult to answer.

A. Yeah. I mean, how do you know? How do you know, I mean . . .

Q. Let me try to ask you a more specific question. What does your religion teach you about the appropriateness of the death penalty?

A. My religion doesn't really teach me anything. It's just my belief that -- you know, I have a deep down inside -- I talk to God all the time type thing.

Q. Very good.

Page 151

A.   You know, try to believe and have -- I think he's carried me on some days, you know, so . . .

Q.   Let me put it to you this way then perhaps.  What are your spiritual feelings about the appropriateness of the death penalty and, more importantly, on your ability should you be shouldered with the responsibility of making that decision?

A.   Well, like I said, after I heard the facts, you know,

3017

between religion and science, I guess if the facts and my peace with God could -- you know, and if I felt that way, I might go that way.  If I don't think the facts, my peace with God, I wouldn't go that way.

Q.   Am I correct in concluding that your religious feelings do not by themselves prevent you --

A.   No.

Q.   -- from imposing the death penalty?

A.   No.

Q.   Okay.  Very good.  Let me just try to summarize a few things for you and see if you feel you can agree, and please feel free to disagree with me if you think you have any concerns about these.  We must find 12 jurors who can assure us -- and many people cannot assure us, but we need 12 people who can assure us even given the facts -- excuse me, the allegations as you understand them in this case, assuming that they find those allegations to be the case that they can still fairly and realistically consider both possible punishments, both the possibility of imposing life imprisonment and the possibility of imposing the death penalty.

A.   Well, I'd like to give you the fairness that I think I could do that, but I can't assure you of that till it crosses

Page 152

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2629 of 3245

me. You know, I mean, till I -- and I'm sorry. That's just kind of the way I am.

Q. You're giving --

3018

A. You know, it's just like sometimes when something's thrown in your face, then you just make that decision, and that's probably more me than I, you know, have to think about them sometimes.

MR. WILLIAMS: Two minutes.

MR. MILLER: Thank you, Counselor.

Q. I realize you've given us your best, and please don't think I'm pushing you for one answer or another. We simply want to know what's in your heart, and I appreciate your efforts to share that with us.

Let me just try to put it to you in this one final form. In the event that you're required to serve on this jury, ma'am, the first job would be to determine the question of guilt, whether or not the government has proved her guilty beyond any reasonable doubt. Otherwise you would find her not guilty.

But assuming, assuming, with me that you are required to sit on this jury and that you and your fellow 11 jurors unanimously agree that the government's accusations are proven and you find her guilty beyond any reasonable doubt and assume with me further that you go through a second and ultimately a third phase of this trial as the Court instructed -- advised you about that and you and your 11 jurors unanimously conclude that under all of the facts, aggravating and mitigating, that the death penalty is the appropriate punishment in this case given

3019

Page 153

the facts that you've found, under those circumstances, ma'am, you understand you could not return a verdict that would impose that penalty unless each and every one of you were to place your own signature on a verdict form that would have the effect of sentencing a fellow human being to death. Some people, when you put it in those terms, simply say that I honestly cannot say that I could do that. Other people feel that they could do so.

A. And I guess I don't have enough maybe confidence in myself to honestly think that I could be your best person.

Q. I'm not interested in whether you're my best person or not. That's not important.

A. I know. But you're assuming, and I don't like that word.

Q. I know, and I apologize for that. But we have to ask people to look ahead even knowing that it may never come to that. But if you were in the position of sitting on a jury where you found the defendant guilty and if you're in a position where you and your fellow jurors conclude that the death penalty is appropriate, despite that fact, some people feel that they simply could not in their own conscience sign a verdict form sentencing another human being to death. Do you feel that that describes you, or do you feel that you could sign such a verdict if that were your verdict?

A. Be very hard for me to sign it.

Q. And I apologize for the pressure. We wouldn't expect anyone to do so lightly.

3020

MR. WILLIAMS: Time.

Q. But do you feel that you would have substantial difficulty

Page 154

in realistically being able to sign such a verdict given your feelings?

A.   I might, yes.

Q.   And it's your best guess that you would have such difficulty; is that correct?

A.   Yes.

MR. MILLER:  Thank you, ma'am.  And again, I apologize for all the grilling, but all we can do is ask for your feelings, and I appreciate your effort to share them with us.

THE COURT:  Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q.   How are you, ma'am?  Not as bad as going to the dentist, is it?

A.   Oh, you don't know.  I have seven root canals.

Q.   Okay.  Well, if this is as bad as a root canal, let me be the first to apologize.

A.   I can say they're about even.

Q.   Well, we don't mean for it to be that bad.  I wanted to revisit with you the publicity issue because of some of the things you mentioned about liking to watch the news, and I got the impression certainly this is something you've done for some time, that is, watch the television news as opposed to a recent

3021

habit that you've developed.

A.   You don't always like what you hear, but, you know, to me it's knowledge.

Q.   Yeah.  I'm always puzzled when people say, Oh, I can't believe anything in the paper, and then they get their bill for the annual subscription, and they pay hundreds of dollars to get

Page 155

the paper, and we pay for cable news, and I think a lot of us rely on that for information we get in our daily lives.

But the thing that's interesting about that is, you know, last fall there was a trial here in Sioux City, a gentleman who was also on trial for his life, and it got a lot of news coverage. And so when you told Mr. Miller -- he said, How much do you recall about the case and you said, As far as making a decision, none, I was puzzled by that response, frankly.

A. Probably because I read more titles and maybe not full articles unless, of course, they totally, totally interest me if that's clarifying it.

Q. A little bit. There is a description that came with the questionnaire to kind of help people jog their memories perhaps. Did you read that?

A. Probably.

Q. Angela Johnson is charged with participating with her former boyfriend, Dustin Honken, in the murders of five people, and it goes on and on. Does that name ring any bells with you?

3022

A. Yep.

Q. Could you tell us what it is that you -- maybe you were just thinking of Miss Johnson, but can you tell us what you remember from Mr. Honken's case?

A. Not any more than I do from her other than the fact that they had done this and moved the trial to the city and, you know, I'm sorry.

Q. No, you have nothing to apologize for. We're just trying to get information. It isn't a test to see what you re -- well, you know, we give you 98 because you remembered. But when you

Page 156

say, They had done this, could you tell me what you mean by that?

A.   That they had killed the family.

Q.   And I don't want to assume too much, but when I hear you say they, that's more than Mr. Honken.  Is that right?

A.   Just like -- you know, like just grabbing short term off of the article.

Q.   Sure.

A.   Not detail reading it.

Q.   Okay.  But is that true, that is, that Mr. Honken was not the only person implicated in the killing of the family?

A.   I don't know that that's true.  I didn't --

Q.   So what did you mean by they, if anything?

A.   That's kind of, you know, what I grasped out of the news, you know.

3023

Q.   That it was Mr. Honken and somebody else.

A.   (Nodded head.)

Q.   And you're kind of nodding.

A.   (Nodded head.)

Q.   Was the other person mentioned in the news Miss Johnson?

A.   Yeah.

Q.   Okay.  And the other thing you mention in the questionnaire is that you had heard some conversation about the case.  Have you heard other people talking about this case, the crime, or any of the people involved, and you checked yes and said, General conversation.

A.   Yeah, just at work, people will say a line or something, you know, about stuff.

Q.   Sure.

Page 157

A.    And I may have said it too or something not knowing that I was going to be here.

Q.    Yeah.  There's nothing wrong with that.  The judge hadn't sent you any subpoena saying you're coming in on jury service last fall.  And you were here in Sioux City.  You live here; right?

A.    Yeah, just north.

Q.    Yeah, and so I suspect -- my recollection is that Mr. Honken's case was extensively covered in the local media, that there were articles in the paper almost every single day in the Sioux City Journal.  Is that the paper that you get?

3024

A.    Yeah.

Q.    And there were articles on the -- or newscasts on the evening news about his case pretty much on a daily basis as well.  Is that your recollection?

A.    You know, like I said, that part of it, I just didn't really -- it was not one of the things that I totally grasped.  We talk -- we watch Fox News or MSNBC at noon at work and stuff too, and we'll catch headlines and may say a line or two or something and then go from there.  So it's not an extensive downright, you know, discussion.

Q.    Sure, sure.  Just kind of the news of the day kind of talk.

A.    (Nodded head.)

Q.    The reason that that information is important, there's a couple of reasons.  One is something that the prosecutor asked you about in terms of forming an opinion about Miss Johnson's guilt, and I heard you say you had not.

A.    No.

Q.    There's another reason, though, that it's important.  It's

Page 158

a little bit different but equally important, and that is that Miss Johnson under the law, she has the right to have 12 jurors, in this case, maybe more, that are going to be able to accord her the full presumption of innocence. That is, they have to have the ability to look her in the eye and say, I believe that you're innocent.

Some folks have told us through no fault of their

3025

own -- I mean, they were not summoned last fall to be jurors for this case -- Look, Mr. Berrigan, I'd love to do that. Most cases I could if I didn't know all this stuff, I hadn't read this stuff, hadn't talked to people, hadn't heard people talking about it. I'd come in here, and I could absolutely give Miss Johnson the presumption of innocence. And some folks have said, I can't; in my heart of hearts I can't really do that. And we just need to know, because it sounds like you're at least a person who's interested in current events in the news with your four televisions, whether that might be an issue for you.

A. No.

Q. Okay.

A. Because I would want to be innocent myself until proven guilty.

Q. Sure.

A. And I just -- if I would be sitting here listening to facts, I would not make a decision until then.

Q. Yeah, and that's just a little different. I mean, I hear you on that. You're not going to make a decision about something you read in the news even if it comes back to you later; right?

A. (Nodded head.)

Page 159

Q.    But this is right now here and now.

A.    Yes.

Q.    Looking across the table -- you can see her from here.

3026

Take a good look at her, and in your mind and heart, is she an innocent woman?

A.    Yes.

Q.    Okay.  We're going to take that as Gospel.  And then we have this thing about the death penalty, and it sounds like there might be a little bit of a problem -- I want to explore it with you very briefly -- about this issue of signing a verdict form; okay?  The truth is that no matter which way you come down on the issue of penalty, life or death, you sign a form.  And the judge has told us he has jurors do it in every trial, that every single trial he has he has jurors sign a form.  And part of that I think is a commitment from the juror that that's the verdict, that I'm willing to say before anybody that this is the decision that I've rendered.  We expect that to be difficult; okay?  We really do.  I can't imagine a more difficult decision than having to do what jurors are going to do in this case, and I've certainly never done it.

So we understand hard, we understand difficult, very difficult, extremely difficult.  But some folks can't do it at all no matter what.  Other people can because that's their obligation as a juror and they're okay with it.  And I just want to kind of find out where you are, and I wonder if you could explain to us kind of how you feel about that and what, if any, problems you have with that prospect.

A.    I don't know how to explain it.  I just think it would be a

3027

Page 160

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2637 of 3245

very, very tough thing for me to do.

Q.   Okay.   And --

A.   And I know it's, you know, part of the job if you do it.  I understand that.

Q.   Right.  And we're not going to criticize you.  This is your view.  I mean, and you're not alone.  I mean, you're perfectly entitled to this.  Some folks seem to be okay with the idea of making a decision.  That is, they could actually decide between these two very severe punishments.  And then for some reason they don't think they could sign.  You know what I'm saying?  The signature is evidence of a decision having been made.  It isn't any more or any less than that.

A.   No.

Q.   But if you make a decision, then you have to sign.  And some folks say, It's the fact that I'd have to sign it would affect my ability to make a decision.  I couldn't -- if I had to sign a form saying the death penalty, then I couldn't make a decision for the death penalty.  And I don't know if you're in one of those camps or the other.  Is it something that you think would really affect your decision, or could you make a decision and you have some reluctance to sign?

A.   No, I don't think it would affect my decision.  It would just be, you know, a very tough decision.

Q.   Okay.  Let me explain one -- I've only got a couple minutes.  Let me explain one thing.  It may or may not be

3028

comforting to you.  This decision about the punishment in the penalty phase -- and I know you're a basketball fan, so you remember the judge's analogy about the basketball game, or at

Page 161

least I thought I saw that in your questionnaire.

A.    Oh, yeah.

MR. WILLETT:  Two minutes, Mr. Berrigan.

Q.    Do you like basketball?  Yeah.  Iowa Public Television and basketball.  Well, he talked about how, you know, this part is different, and one of the real differences is the jurors have to make an individual decision about the penalty.  It's not done as a group; okay?  So when the prosecutor's talking about that responsibility being a heavy one, it is a heavy one because it's on you, and you have to live with that decision obviously the rest of your life.

But you're never forced to vote for the death penalty, and you don't have to agree on the death penalty.  That is, one or two jurors could say they feel the death penalty's appropriate, and the others don't.  That's a verdict for life.  That is a verdict for life.  One or two jurors could say life and the others disagree, and that's a verdict for life.  But you have to be able to fairly consider both possible punishments.  That's what the government's entitled to, and that's what we're entitled to; okay?

A.    Uh-huh.

Q.    It's okay if you can't.  But if you can't, that's what we

3029

need to know.  So that's kind of the bottom line.  If you were selected as a juror and you went through this process of weighing the evidence and, as you say, listening to all the facts and considering all the evidence and you got to the point where you had to make a decision -- and we're not asking which way you'd go, but could you fairly consider both of the alternatives that would be present at that point?

Page 162

A.    This is so hard.  I would hope that I could fairly be -- you know, I want to be a fair person.

Q.    When I mean fair, I don't mean equally; okay?

A.    No.

Q.    But you have to not just a wink and a nod.  You have to be able to fairly consider both; right?

A.    Right.

Q.    That's what we mean.  We don't need you on the middle line; okay?

A.    No.  I just --

MR. WILLETT:  Time, Mr. Berrigan.

A.    -- would want to make sure I understand everything before I -- I'm just hoping I could be the right person to understand everything.

MR. BERRIGAN:  Okay.  Well, you've been very patient with me.  Thank you, ma'am.

THE COURT:  I appreciate your last answer, but that's actually not the answer to the question.  The question is can

3030

you fairly consider in the penalty phase if we ever got that far a life sentence and a death sentence?

PROSPECTIVE JUROR 780:  Yes.

THE COURT:  Are you sure you could fairly consider both?

PROSPECTIVE JUROR 780:  Yeah.  You're above my head. I'm sorry.

THE COURT:  You mean I'm sitting above you?

PROSPECTIVE JUROR 780:  No.

THE COURT:  That's true, but I'm not above you in any other respect.  But it's -- I just want you to think about it.

Page 163

I think it's a pretty simple concept, so I don't think it's above you at all. If we ever get to a penalty phase in this case, can you fairly consider both penalties, life imprisonment and the death sentence?

PROSPECTIVE JUROR 780: And you're saying that after I hear all the terms type thing, yes.

THE COURT: Yeah, after you hear all the evidence.

PROSPECTIVE JUROR 780: Okay. Yes.

THE COURT: And let me explain why we're asking the question. Some people -- doesn't make them good or bad, but some people are what I call predisposed. They think that they would impose one penalty or -- you know, they're real sure if they got to the penalty phase I'd impose the death penalty, doesn't make any difference what the evidence would be. Other

3031

people -- we had a woman yesterday who said that she'd rather go to jail than have to impose -- she just couldn't impose the death penalty. There's just no way she could ever do it. And I have great respect for that view. But obviously that's not a person who could sit on the jury in this case because we're looking for people who can fairly consider both. You with me?

PROSPECTIVE JUROR 780: Yes, yep. I hear you. It's just a hard answer because, you know, I guess I'm . . .

THE COURT: I'm not asking for how you would vote.

PROSPECTIVE JUROR 780: No.

THE COURT: Because we're not entitled to know that. And you know what? I would hope that none of the 18 jurors would know how they were going to vote.

PROSPECTIVE JUROR 780: No.

THE COURT: Until they've heard all the evidence in

Page 164

the case; right?

PROSPECTIVE JUROR 780: Right.

THE COURT: So I'm not asking you how you would vote. I'm asking if you would fairly consider all the evidence and fairly consider both penalties.

PROSPECTIVE JUROR 780: I could fairly, you know, consider both of them, but, you know, when it comes to the signing, I guess that makes me full fledged that's it, you know, and then I have to live with the decision.

THE COURT: Right. And you've got to sign either way

3032

because that's how I do it. Jurors when they reach a verdict, they have to sign either way.

PROSPECTIVE JUROR 780: Okay.

THE COURT: And actually in this case the law requires you that you sign a verdict. So if you decided to vote for the death penalty and all 11 other jurors agreed with you, could you sign your name to a verdict form that gave a sentence, the death penalty, to Angela Johnson?

PROSPECTIVE JUROR 780: Yeah.

THE COURT: And if you came to the conclusion that a life sentence was appropriate, could you sign your name to a verdict form for that conclusion?

PROSPECTIVE JUROR 780: Yes.

THE COURT: And Mr. Berrigan was right on the money. The signing just records how you vote.

PROSPECTIVE JUROR 780: Yeah.

THE COURT: But for some people, I suspect it's an emotional response. I don't know that, but I suspect it is because it doesn't seem to be a logical response. If you could

Page 165

vote either way and not have a problem doing it, you ought to be able to sign it.  But some people can't, and I respect that.

PROSPECTIVE JUROR 780:  I won't say that I can't, but I won't say that it wouldn't be harder for me to do one over the other.

THE COURT:  And that's okay.  That's okay.  I think it

3033

would be hard to do either, and I think one's probably a little harder for most people, and that's perfectly okay.  It's okay for it to be hard.  But the question is if you truly believe in either penalty at the very end after you've heard all the evidence, can you sign your name to a verdict form?

PROSPECTIVE JUROR 780:  Yeah.

THE COURT:  Okay.  Thank you.  We're going to ask you to step outside, and then we'll let you know your status.  Thank you so much.

(Prospective Juror 780 exited the courtroom.)

THE COURT:  Any challenge for cause by the government?

MR. MILLER:  Yes, Your Honor, the government challenges for cause on the basis of substantial impairment to return a death penalty verdict.

THE COURT:  Given her reluctance?  Is that your --

MR. MILLER:  Yes, Your Honor.  Basically ultimately after more than a half an hour she was finally able to give an unambiguous response, but it followed I think more than a half an hour in which she was unable to give an unambiguous response and an assurance, not just a possibility of what both sides were entitled to.  She in answer to open-ended questions indicated that it would be very difficult, and obviously that isn't the test.  She in open-ended response to the questionnaire indicated

Page 166

some question in her own mind whether she's the right person for the judgment, and that's not enough to say that she's

3034

substantially impaired. But that's -- these were her open-ended responses.

And then when pressed by both of us, it was still a situation where she could not give us an unequivocal assurance that she could do so. And so I think given the totality of her responses it's a fair conclusion that she's substantially impaired.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: We'd respectfully object, Your Honor. She said it would be hard. There's no question this woman would struggle with that decision as we would expect many people to do, but she never even told Mr. Miller she wouldn't do it. And she made it, I thought, very clear with the Court that she could do it and would do it. In fact, if she came to that very difficult decision, she'd live with it. So I don't think she's close to being substantially impaired, and we'd ask the Court to overrule this objection.

THE COURT: She may be impaired but not substantially impaired. I'm just kidding. I don't think she was substantially impaired. I mean, I think it would be a huge struggle for her, but I think she could do it, and I understand your arguments, but I'm going to overrule the government's objection with regard to Juror 780. And would you like to exercise one of your three strikes?

MR. MILLER: Yes, Your Honor.

3035

Page 167

THE COURT: Okay. Then Juror 780 is stricken.

(Prospective Juror 780 entered the courtroom.)

THE COURT: We're going to go ahead and dismiss you, but thank you so much. We were all very impressed by how much effort you gave to the process today and how conscientious you were and worked so hard, kind of a struggle, but it should be a struggle, and we appreciate that. Thank you so much. And hope to see you back here on another case; okay?

Can you do us a favor? We think we'll have a jury selected maybe -- could happen tomorrow, but I kind of doubt it, probably more likely be Monday or Tuesday next week. So not to say anything to anybody until we get the trial underway because it's a small population base in northwest Iowa, and you'd talk to somebody; they could say something to somebody else, and that somebody else could be here tomorrow or next week as a potential juror; okay? Thank you very much. Good luck to you.

(Prospective Juror 780 exited the courtroom.)

THE COURT: Okay. Ready for 78?

MR. BERRIGAN: Yes, sir.

THE COURT: Could you close the door for one second? There is one thing I want to raise.

Mr. Berrigan, I think I asked you this before, but I might not have made myself clear. I think it is inappropriate for you to give your personal opinion about your client being not guilty.

3036

MR. BERRIGAN: Okay, sir.

THE COURT: And you phrased it that way. I wrote it down exactly. Neither I nor any member of the defense team

Page 168

think she's guilty.  Can you phrase it a different way?

MR. BERRIGAN:  Yeah, and maybe you could give me a suggestion.  I have no problem with that principle.  The concern I have, you know, the process has me up here arguing that you could give death to my client.

THE COURT:  Yes.

MR. BERRIGAN:  I mean, it's a ridiculous idea, and I know I have to do it, but I don't know how to convey that message to them.

THE COURT:  No, that's fair.

MR. BERRIGAN:  Okay.

THE COURT:  How about -- how about just talking about your client's not conceding anything or phrase it in terms of your client or the defense position.

MR. BERRIGAN:  Okay.

THE COURT:  Or something without --

MR. BERRIGAN:  Me personally.

THE COURT:  Without making it personal to you.

MR. BERRIGAN:  I'll try that, sir.

THE COURT:  Do you want a little bit of time to think about it?

MR. BERRIGAN:  I'll say something like that.  You

3037

know, it's the defense position -- I don't like that phrasing because it sounds artificial but --

THE COURT:  Yeah, but there's a purpose behind the rule.

MR. BERRIGAN:  Right.  No, no, I understand.

THE COURT:  And I think you can say the defense position, but I don't think you can say me personally.

Page 169

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2646 of 3245

MR. BERRIGAN:  Other than capital cases, this is never an issue, but because of this weird questioning process, I think the jurors are wondering what the heck are you doing trying to advocate me to consider the death penalty?

THE COURT:  Well, you can say the defense team isn't conceding it, something a little broader maybe or something.

MR. BERRIGAN:  All right.

THE COURT:  But there's a real sound rationale behind that personal opinion thing, and I've certainly got on the government lawyers on more than one occasion for giving their personal opinion about things, and I feel I need to be reciprocal about it.

MR. BERRIGAN:  That's fine, sir.

THE COURT:  Okay.  And I know you haven't been intentionally doing it.  I know that.

MR. BERRIGAN:  I just haven't figured out any other way to do it.  I'm going to give it some thought tonight.

MR. STOWERS:  Can I whisper in Mr. Berrigan's ear?

3038

THE COURT:  Sure.

(Prospective Juror 78 entered the courtroom.)

THE COURT:  Juror 78, how you doing?

PROSPECTIVE JUROR 78:  Just fine, thank you.

THE COURT:  Good.  Anyplace in the front row you'd like.

Everybody can be seated.  We're going to start first with Mr. Berrigan.  And then after he's had a chance to question you, we'll hear from Mr. Miller; okay?

PROSPECTIVE JUROR 78:  Yes.

EXAMINATION

Page 170

BY MR. BERRIGAN:

Q. Are you nervous?

A. A little bit.

Q. Yeah. Well, you join the majority of the people we've talked to. It's really not going to be nearly as bad as going to the dentist. We just have a few questions, and we'll let you go; okay?

A. You bet.

Q. We're only going to really ask you about two different areas, and one has to do with pretrial publicity. You know, as the judge mentioned, this is one of those cases that's gotten some publicity. And we're interested in what people might know about the case or have learned through the media, television, radio, newspaper about the case before they came in today. So

3039

let me just ask you that.

A. I remember when the young man was convicted. I don't remember his name. I don't remember --

Q. Honken, Dustin Honken?

A. I don't know. I mean, the name doesn't ring a bell.

Q. Okay.

A. But I just remember he was convicted, and that's all I know about it really.

Q. Okay. And you mentioned that in your questionnaire. Let me thank you for filling this out. I know it was a long questionnaire. But way back in January you said you were somewhat familiar with the case. I heard Dustin Honken was found guilty. Does that sound right?

A. (Nodded head.)

Q. And you checked as sources of information newspaper and

Page 171

television.  Do you get the newspaper regularly, ma'am?

A.    Yes, I do.

Q.    Which one do you get?

A.    Sioux City Journal.

Q.    Sioux City Journal, okay.  Do you remember Mr. Honken's case being in the Sioux City Journal last fall?

A.    Like I said, I just -- all I can remember is that he was convicted.  I don't even remember what his punishment was.

Q.    Punishment was?

A.    Yeah, to tell you the truth.

3040

Q.    And the television, is this television news that you watch?

A.    (Nodded head.)

Q.    Have you heard anything about the case since January?

A.    No, not until I got your questionnaire.

Q.    Not until you got the questionnaire, right.  I guess I mean since the questionnaire.  I should be more precise.

A.    No.

Q.    Good, great.  And you indicated that you had not formed any opinion about Miss Johnson's guilt or innocence; is that right?

A.    Right.

Q.    And one of the concepts that was discussed today was this idea that she's presumed innocent, that is, that right now you look her in the eyes and be able to say, I believe that you're innocent; I'm willing to presume that you're innocent.  Is that something you could do?

A.    Yes.

Q.    Okay.  So the other issue we're going to talk about -- you've done so well so far -- is the issue about the potential punishments if we got to the third part of the trial that the

Page 172

judge described earlier today; okay? And I want to convey to you that that's a really big if. We don't want any of the jurors thinking because we're asking questions about punishment that it's the defense team's position our client's guilty of anything; okay? I really want to be crystal clear about that; all right?

3041

But we can't bring people back after they've heard all the evidence and ask them questions about, well, what do you think about punishments? We kind of have to do it cart before the horse now; okay?

A.    Yes.

Q.    And I want to put it in a little bit of context for you. The government has charged that Angela Johnson aided and abetted in the commission of five intentional murders; okay?

A.    Uh-huh, yes.

Q.    I'm going to use these books as kind of visual aids. And they've also alleged that the murders were committed after substantial planning and premeditation, and then they've alleged that the murders involved at least five victims, a mother and her two children, ten-year-old girl Kandi Duncan and her six-year-old sister Amber Duncan. And so when the jurors, if we're at a stage where we're talking about punishment, those are the allegations that the government has proven or attempted to prove. And obviously that's pretty serious stuff. Would you agree?

A.    Yes.

Q.    Okay. You indicated in your questionnaire -- there's a question that says, What are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of

Page 173

intentional murder? And you said, I'm not really sure, and I wanted to kind of explore that with you a little bit because

3042

we've had people with opinions kind of all over the spectrum of human opinion about this issue. And not everybody's come to a conclusion one way or the other, but I was wondering if you could kind of share your thoughts about the death penalty as a punishment.

A. Well, when I thought about it, I think that for a long time I've said, well, I don't really agree with the death penalty, but then again, if it was my daughter, my husband, my sister, my brother, then I think I would have a little different opinion about it.

Q. Sure, yeah.

A. So, you know, the answer is is I have to say yes, I probably believe in it.

Q. Okay. A lot of people make a distinction between, I mean, members of their own family being killed and how they might look at the issue respecting other people. And that's perfectly okay. I mean, you understand as a juror you're not related to any of these people involved, and we're not asking you to pretend like you were; right?

A. No, but they are somebody's --

Q. Right.

A. -- daughter or son.

Q. You bet.

A. Right.

Q. You bet. But would you agree with me it would be pretty

3043

Page 174

unfair to have a relative of a murder victim sitting on the jury deciding the fate of the person who was accused?

A.   Oh, yeah.

Q.   Yeah.  For obvious reasons; right?

A.   Right, right.

Q.   So one thing we're not asking you to do and I don't know that you're even talking about that, we're not asking you to put yourself in the place of a murder victim in deciding what's appropriate.  You've gotta be an impartial juror; okay?  This -- you know, the alternative punishment that might -- we might be at a point where the jurors are looking at life in prison without any possibility of parole, and you heard the judge talk about that also, and that means without parole; right?

A.   Right.

Q.   You understand that means you don't get out of prison.

A.   Right.

Q.   Do you think that that's a severe-enough punishment for a crime such as intentional, premeditated murder of children?

A.   I think it's -- it can be a good alternative, you know, but I don't know.  Premeditated, maybe not.

Q.   Okay.  And what is your reservation about that?

A.   Well, I think it's just very different than, you know, maybe killing somebody in a wreck.

Q.   Sure.

A.   It's very different from a crime of passion perhaps.

3044

Q.   Of course, yeah.

A.   And premeditation is a whole 'nother story.

Q.   Yeah, that's right.  And we have different punishments for those other types of crimes you've talked about where somebody

Page 175

might be in an accident and kill somebody or even a drunk driver or somebody gets into a fight, something arises suddenly and somebody kills somebody else. It is different. Premeditated, intentional murder, clearly different.

The law provides, however, that even in this kind of a case even with premeditated murder, even with intentional murder, even with children that the law never says, Oh, this is the penalty, okay, because as the judge pointed out, that's going to be the function of the jurors, and there are these two options.

A.    Right.

Q.    And sometimes people have views about either one, either the death penalty or life without parole, that they can't really consider as an appropriate punishment for this kind of a crime, one or the other. They may be so strongly in favor of the death penalty that they wouldn't be able to realistically consider life sentence as severe-enough punishment for this type of offense, or they could be the other way around. And I was wondering kind of where you see yourself there. Do you believe -- a life sentence without possibility of parole, is that something that you could realistically consider as

3045

sufficiently severe punishment for even intentional, premeditated murder including the murders of children?

A.    Well, I think murder is murder, you know, whatever a person's age is.

Q.    Okay.

A.    I think -- yeah, I think they can both be viable.

Q.    Okay. You don't have any problem -- do you have any struggle with the death penalty as an appropriate punishment

Page 176

that you'd be willing to consider for premeditated murder?

MR. WILLETT: Two minutes, Mr. Berrigan.

Q. That's two minutes for me. You don't have to worry. You're okay with the death penalty as a punishment you could consider?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Okay. This life imprisonment thing, is that a struggle for you to consider that, or is that something you can realistically do, you know, really consider it?

A. I could really consider it.

Q. Okay. I'm going to sit down in just a minute. But one of the things I noted from your questionnaire is that you feel people make choices in life and that they have consequences; okay?

A. Yes.

3046

Q. And a lot of people say that. But we have an opportunity to present some evidence to you if you're a juror about Angela Johnson's background, things like abuse in her childhood that we're not offering as an excuse for the murders, but we are asking jurors to consider that on the punishment part, you know, in determining which of these punishments is most appropriate. Would you be willing to do that?

A. Yes.

Q. Okay. Would that matter to you what her background was?

A. I think sometimes it enters into what a person does in their life.

MR. BERRIGAN: Okay. Great. Well, my time's expired.

Page 177

You've been very patient. Thank you, ma'am.

PROSPECTIVE JUROR 78: Thank you.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

EXAMINATION

BY MR. MILLER:

Q. Good afternoon.

A. Hi.

Q. How you holding up?

A. I'm doing okay.

Q. Very good. We're just only about 12 minutes or less away from getting this moved along. And thank you for sharing your thoughts. In your questionnaire you really put things like you

3047

weren't sure, but I take it you've given this some more thought in the last couple months.

A. (Nodded head.)

Q. And you've shared those thoughts with Mr. Berrigan so far this afternoon. We appreciate that.

A. Yes.

Q. That a fair statement?

A. Yes.

Q. Now, in this case Mr. Berrigan has used these books as props, and I just want to be sure that I'm on the same page with you, so to speak. If the evidence in this case shows that this defendant participated in the killings, intentional, premeditated killings, of five people including two children, do you feel -- I take it you feel that the death penalty is an appropriate, possibly an appropriate, punishment.

A. Possibly, yes.

Page 178

Q.   And that the life imprisonment is possibly an appropriate punishment as well.

A.   Yes.

Q.   Okay.  It would be your job and your responsibility to consider both punishments before returning a verdict.  Do you feel you could do that?

A.   Yes.

Q.   And it would be up to you as to how much weight to give any of these factors.  I take it that the fact that killings in

3048

which one participates or intentional killings is something to which you would attach considerable weight.

A.   Yes.

Q.   And the fact that there were multiple killings, is that something to which you would attach substantial weight as well?

A.   Be another thing.

Q.   And these are all for you to decide as to how much weight to give to each factor, and the Court will instruct you as to what factors you must consider if proven as either aggravating or mitigating factors.  I just want to be sure you feel you could follow the Court's instruction and consider not only the aggravating factors, the intentional killings of multiple people including children, but also any mitigating factors that the Court might instruct you would weigh against the death penalty.

A.   Yes.

Q.   Do you feel you could do that?

A.   Yes.

Q.   In this case it's asking a great deal of people to sit in a jury which ultimately may have that awesome responsibility of life and death, and I take it you appreciate that

Page 179

responsibility.

A. Definitely.

Q. Should you be on this jury, in the event that you're on this jury, if you are on this jury, in other words, and this jury convicts Angela Johnson of killing five people with

3049

premeditation including vulnerable victims, first let me ask you this. If the Court instructs you that the killing of vulnerable victims such as grade school age children is something that if proven should be considered as an aggravating factor, does that make sense to you?

A. Yes.

Q. If you're on a jury that gets to that stage, that third stage where you decide punishment, and if after weighing all of the aggravating and mitigating factors you and all 11 of your fellow jurors decide that the death penalty is the appropriate punishment, under those circumstances, ma'am, you can only return that verdict unless each and every one of you signs off on a verdict form that would have that practical and real effect of taking another life. Under those circumstances, ma'am, do you feel that you can do that?

A. Yes.

MR. MILLER: Thank you so much. I have no further questions, Your Honor.

THE COURT: Juror 78, if you'll just step outside for a minute, I'll chat with the lawyers, and we'll let you know your status. Thank you.

(Prospective Juror 78 exited the courtroom.)

THE COURT: Any challenge for cause?

MR. BERRIGAN: No, sir.

Page 180

THE COURT: Any challenge for cause?

3050

MR. MILLER: No, Your Honor.

THE COURT: Any peremptory strike?

MR. BERRIGAN: No, Your Honor.

THE COURT: Any peremptory strike?

MR. MILLER: No, Your Honor.

THE COURT: Okay. She's in the jury pool.

(Prospective Juror 78 entered the courtroom.)

THE COURT: Ma'am, you are in our jury pool, so we hope to have a jury selected possibly tomorrow but probably more likely on Monday or so, and we'll let you know as soon as we know whether you're actually going to be serving on the jury or not; okay?

PROSPECTIVE JUROR 78: Thank you.

THE COURT: And please follow my cautionary instruction this morning, not listening to any radio or television reports. Don't read anything in the newspaper about this case. Don't talk to anybody about the case, and don't let anybody talk to you about the case, and don't do any research on your own; okay?

PROSPECTIVE JUROR 78: Yes.

THE COURT: Okay. We'll get back to you as soon as we can. Thank you very much.

(Prospective Juror 78 exited the courtroom.)

THE COURT: Ready for Juror 548?

MR. MILLER: Yes, sir.

3051

Page 181

THE COURT: Okay.

(Prospective Juror 548 entered the courtroom.)

THE COURT: Juror 548, any seat you'd like in the front row.

Everybody can be seated.

That's been a popular one. You know, nobody's gone down to the very end.

PROSPECTIVE JUROR 548: You want me to do that?

THE COURT: No, no, that's fine. The one next to you is probably the most popular because it's in the middle.

PROSPECTIVE JUROR 548: It's probably warm. That's why.

THE COURT: We're going to start first with questions from Mr. Miller, and after Mr. Miller's had an opportunity to question you, Mr. Berrigan will have the same opportunity; okay? Thank you. Are you a little nervous?

PROSPECTIVE JUROR 548: Yeah. It's a little odd.

THE COURT: Let me ask you something. Is it because you're sitting there all by yourself?

PROSPECTIVE JUROR 548: Probably.

THE COURT: Are you more nervous now than you were this morning in the group?

PROSPECTIVE JUROR 548: Yes.

THE COURT: What do you think we could do to make you any less nervous?

3052

PROSPECTIVE JUROR 548: Just get started.

THE COURT: Okay. We will.

Mr. Miller, that's your queue.

MR. MILLER: Thank you, Your Honor.

Page 182

EXAMINATION

BY MR. MILLER:

Q.    Good afternoon.  How you doing?

A.    Fine.

Q.    And I don't blame you at all.  Nobody really wants to sit too close to Agent Basler.

We have just two matters to cover with you this afternoon and under 12 minutes apiece to do it, so we're going to get this over with at least expeditiously.  One question is your knowledge about the case, and the other question is thoughts and feelings about the death penalty; okay?

A.    All right.

Q.    Okay.  Item one, you indicated you are somewhat familiar with the facts of this case, and I'll just let you give it to us in your own words.  What do you recall having heard about this case?

A.    You know, I don't know a lot.  I remember on the news, in the paper about five people being murdered, drugs, and I didn't pay much attention to it really.  You know, I kind of glanced at the -- I get the paper secondhand from my parents, and I don't read it that close, but I did know about that.  And, of course,

3053

you listen to the news at night.  It will be on sometimes.

Q.    Sure.

A.    So that's about it.

Q.    Did you follow the case last fall?  You mentioned you remembered the conviction that occurred.

A.    Yeah, I remember -- you know, it was on the news, but I can't say I made a special effort to follow it, but I was aware of it.

Page 183

Q. Let me ask you this. Did you pay any more attention to that than you would other crime news stories that happen on TV all the time?

A. Not really, no.

Q. And how about since you filled out the questionnaire? Have you been exposed to any media accounts about it at all?

A. No. And if there was anything in the paper, I don't know how much, but it said not to read. I did not then.

Q. Very good. And finally, as was discussed this morning, it's your duty to return a verdict based only on the evidence in this case. Some people simply cannot do so if they've had enough exposure to where they've formed opinions, and all we want is your honest opinion. Do you feel that you could do so, base a verdict solely on the evidence in this case?

A. Sure.

Q. I'll move on then to the issue of the death penalty. You were good enough to share those thoughts with us. You indicated

3054

that you feel that the death penalty is an appropriate punishment in some cases.

A. Yes, I do.

Q. In response to question 87 which listed a number of factors that might be involved in a case, you wrote death penalty beside a number of those factors, and on the one asking your opinion about any effect of aiding and abetting or assisting and encouraging rather than being a trigger person, you wrote the words "life in prison." I take it you understand that there may be factors that would weigh one way or the other in trying to make such a decision as to the death penalty or life imprisonment.

Page 184

A.    Yes.

Q.    Okay.  Can you just go ahead and give us your thoughts on that subject about -- you've given this some thought over the last couple months I suppose.

A.    Yeah.  It's difficult because I have never been involved in -- you know, in a case, and so I've never been confronted with it before.  It would depend on the circumstances.  Yeah, it's hard -- it's hard to know for sure, but I am -- I really do believe in the death penalty, and if the person I guess that was involved knew -- with the person that did the murder and maybe didn't do the murder themselves but was really a willing participant, I would not rule out giving the death penalty, saying death penalty.

3055

Q.    Okay.  But you would lean in favor of life under those circumstances.

A.    I could, yeah.

Q.    You indicated it would depend on the circumstances.  I assume you're telling us that you would want to weigh any number of factors that the Court would tell you are appropriate to weigh.

A.    Well, sure.

Q.    In other words, frankly, just to be perfectly honest with you, some people come in here and say, We're familiar with the allegations; there are accusations that this person participated in the killings of not one but five people premeditatedly and that two of those were children --

A.    Uh-huh.

Q.    -- and under all those circumstances there's really just one possible outcome for me as a juror, and that's the death

Page 185

penalty.  Are you --

A.    I'm pretty -- I lean that way quite strongly.

Q.    Yes.

A.    I mean, that was five people.

Q.    Yes.

A.    And, you know, children, I don't want to distinguish between children or adult.  They're both important, but that's five people, and that's, you know -- and to me life, you know, is precious, and we don't take it away from somebody, and a

3056

punishment to me has to be, you know, quite severe for that so . . .

Q.    And those are serious consequences that you would consider very seriously.  Fair statement?

A.    Yes.

Q.    And I'm going to interrupt you now, and I'm not -- please don't think I'm scolding you because you're not usually in this position, are you?

A.    No, that's true.

Q.    It's a lawyer's responsibility to make sure that the witness -- and if I can call you that, you are in a sense that you're answering questions.  You're a juror actually, but it's the lawyer's responsibility to make sure that the record is clear, and this lady cannot make a clear record unless you speak instead of merely nodding.

A.    Okay.

Q.    Nodding is okay too.

A.    Sorry.

Q.    No, don't apol -- nodding is okay too.  It's just you need to also give us a verbal response.

Page 186

A.   All right.

Q.   Thank you very much.  Do you recall listening to Judge Bennett describe the third and the penalty phase process this morning when he was describing that in the event the jury gets to that point?

3057

A.   Yes.

Q.   And I'll just -- I realize you weren't taking notes, but without making this too much of a civics exam, can you just tell us what you recall him describing about how that process works?

A.   If she's found guilty, then we'd have to -- you mean after that?

Q.   Yes.

A.   Yeah, then we'd have to decide the penalty, and if even just 1 -- if 11 said death penalty and 1 said not, then it would not be death penalty.

Q.   And do you recall anything about how he said the deliberations would have to proceed as far as what you would be instructed to do in that third phase?

A.   I don't.

Q.   That's quite all right.  I'd be surprised really if very many people did.  You had a lot of information this morning; right?

A.   I did pay attention, but no, I'm not sure.

Q.   I was just curious, and you were told this wasn't going to be a civics exam, so really it's my fault.  But if I can remind you, you may recall the judge indicated it would be the jury's responsibility in giving fair consideration to both possible punishments to consider and weigh both aggravating and mitigating factors, aggravating being factors that would make it

Page 187

more serious and mitigating being factors that might argue in

3058

favor of some leniency in someone in the defendant's position;
right?

A.    Uh-huh.

Q.    Did you follow that?

A.    Yes.

Q.    Did that make sense to you?

A.    Yeah, it did.

Q.    And if so instructed, do you feel you would, in fact,
follow that instruction and perform that function?

A.    Sure.

Q.    Okay.  Now, just to be perfectly clear, how much weight you
give to any one of those factors is legitimately and properly
for you as jurors.  In other words, if the fact that there were
multiple deaths is proven beyond a reasonable doubt, I would
expect you would be instructed that that is an aggravating
factor, and it would be up to you if you choose to give it
considerable weight; okay?

A.    Yes.

Q.    And there's nothing wrong with that.  Whatever you consider
to be where you would place the most weight on the various
factors is up to you to decide.  But we have to be sure that the
jurors would, in fact, assure us that they would seriously
consider both aggravating and mitigating factors that are proven
in connection with this case.

A.    Right.

3059

Q.    Whatever those might be.
                    Page 188

A.    Yes.

Q.    Even given the serious nature of these allegations if they are proven, would you also seriously and realistically consider any mitigating factors such as an absence of any prior criminal history or a lesser involvement in the crime, things such as that?

A.    I don't know.  Absence of prior criminal history, I don't think that would make any difference to me because of the seriousness of the situation of this.  I don't think it makes any difference to me what a person did before that.

Q.    Okay.  How much, if any, weight you give to any factor is for you to decide.  But if the Court were to instruct you that the fact that a person had no prior criminal history is something that you must at least consider as a mitigating factor, would you be able to follow that instruction and give it realistic consideration?

A.    Well, yeah, I feel I'd have to.  I mean, that's a part of the instructions, so that would be what I would do then.

Q.    And whatever -- and I'm not even going to try to give you a list of what might possibly be either mitigating or aggravating factors.  We've discussed a few aggravating factors, multiple deaths and such.  But there may be any number of either. Whatever they may be, the Court would give you the benefit of instructions on if proven you need to consider this as an

3060

aggravating or you need to consider this as a mitigating factor. Would you follow that instruction, and do you feel you could honestly and realistically be able to follow such an instruction?

A.    Yes.

Page 189

Q.   Considering the actual possibility of the appropriateness of both possible punishments?

A.   Right, yes.

MR. WILLIAMS:  Two minutes.

Q.   Realizing ahead of time that you consider multiple intentional deaths as a very serious thing.

A.   Yes, I do.

Q.   And you're entitled to such consideration and such weight, but we have to find 12 jurors who can assure us even given the nature of the allegations and even assuming that they are proven that they can still fairly and realistically consider the appropriateness of both possible punishments.  Can you give us that assurance, ma'am?

A.   I think so.  It's hard to -- I haven't heard -- yeah, I don't know.  I guess so.  It's tough to say.

Q.   And I'm asking you to put yourself in a position where you don't even know whether you're ever going to be there.

A.   Yeah, that's true.

Q.   And I realize how artificial this process is, but it's the only way we can go about doing it.  Let me put it in different

3061

terms to you, ma'am.  Would you ever, ever impose the death penalty on another human being without first fully and fairly considering the possibility that life imprisonment is a more appropriate punishment?

A.   Say that again.  Phrase it again.

Q.   Would you ever impose the death penalty on another person without fully and fairly considering the alternative possibility?

A.   I don't think I would.  Death penalty to me, you'd have to

Page 190

have -- have to be really a sure fact that the person is guilty, and it is not anything to be done lightly, of course.

Q.   Absolutely.

A.   So all these factors would certainly be considered, yes.

Q.   And would you ever impose the death penalty without giving full and fair consideration to every mitigating factor that the Court instructs you to consider?

A.   I would consider it all.

Q.   Understanding that that would be your duty to give -- not just say, Okay, I'm considering them, but I'm not going to give them any weight whatsoever but to fully consider everything that the Court instructs you to consider, mitigating as well as aggravating circumstances.

A.   Yes, I would.

Q.   And that you would fairly consider both possible punishments in the event that you find the defendant guilty.

3062

A.   Yes.

MR. MILLER:  Thank you, ma'am.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  Thank you.

EXAMINATION

BY MR. BERRIGAN:

Q.   It's not so bad, is it?  I want to -- I know you did these questionnaires a long time ago.

A.   Yeah.

Q.   It's not really a test, but I do want to read back a couple of questions and answers to you and see if this accurately reflects your position; okay?

A.   Okay.

Page 191

Q. This is question 75. What are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of intentional murder? You said, I believe in it and think it should be used more. I do not look at it as a deterrent but as justice. Life is precious, and we take it too lightly in our society. When somebody intentionally takes someone's life, there must be severe consequences.

A. Yes.

Q. Is that how you feel?

A. Yeah, that's right.

Q. Okay. And then you were asked, Why do you feel this way, or what are some of the reasons for your beliefs? And you said,

3063

God took and takes murder very seriously because life comes from him.

A. Correct.

Q. And I noticed in your questionnaire you're a very religious lady.

A. Yes.

Q. You work in a church.

A. Uh-huh.

Q. You're in the church choir. You're the secretary/treasurer, belong to Bible study. You're very active --

A. Correct, yes.

Q. -- in your church.

A. Uh-huh.

Q. Is this view in any part a religious position?

A. I suppose. That's my whole -- that's who I am, so I suppose, yeah.

Page 192

Q. Okay. And then you were asked some questions about life in prison as an alternative punishment. Question 82, What are your thoughts and opinions about life in prison as a punishment for a person who's guilty of intentional murder? You said, It seems to me to be a matter of space and money. If there isn't a death penalty or one that is not agreed upon, then life in prison is appropriate. Is that accurate?

A. Yes.

3064

Q. Okay. And there's a question that asks you, Do you think that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder? And you checked the box that said no and said, We are talking about premeditated or, as stated earlier, intentional murder.

A. Right.

Q. And that's a big factor for you.

A. Of course.

Q. Okay. And I've heard you say that a couple of times.

A. Uh-huh.

Q. That if it's premeditated, intentional murder, that really is very, very significant.

A. Yes, it is.

Q. Okay. And, in fact, there's a series of factors that you're asked to consider down in question 87: Guilty person killed more than one person at a time, the person guilty was pregnant at the time, guilty person participated in the killing of children. And you wrote death penalty, death penalty, death penalty all the way down to the end where it says, Person assisted or encouraged the murders, not the person who pulled

Page 193

the trigger. You put life in prison. And do those things accurately reflect your view?

A.    Pretty much, yes, yeah.

Q.    And I wanted to kind of put this in context, ma'am, because

3065

it is a very difficult process. It's hard for us lawyers to get this thing down. But the allegations the government's brought in here are exactly what you're talking about. They have alleged that Angela Johnson aided and abetted in the murders of five people. I've been using these books to kind of help us visually. And they've further alleged and they intend to prove beyond a reasonable doubt that these are premeditated murders committed after substantial planning.

A.    Uh-huh, okay.

Q.    And on top of that, they've alleged that there are vulnerable victims that were intentionally killed including two children, ten- and six-year-old girls, Kandi and Amber Duncan.

A.    Right.

Q.    So those are the allegations the government's brought. And when we're talking about the penalty, as the judge talked about it earlier in describing sort of the basketball game scenario, we're in the second half; okay? And that means that the government has proven those things. Those things have been found beyond a reasonable doubt; all right?

A.    Okay.

Q.    The defense can present evidence if we choose -- we're not under any obligation, but we could present evidence as the prosecutor mentioned that Angela Johnson doesn't have any criminal history or evidence that she had an abused childhood, physical and sexual abuse, and ask jurors to take those into

Page 194

account in deciding the punishment. That's our option for us.

But we have had some jurors tell us -- and they've been -- you know, opinions have been all over the board on this thing really. We've had over a hundred people, and we've had a hundred different opinions, but we've certainly had some people saying, Wait a second. If you're talking about intentional murder, that's enough for me. And then if you're talking about premeditated murders, forget about it. I have a view about what the appropriate punishment is in that case. And then we've had other folks, children's made the difference for them.

The responses in the questionnaire and some of the things I've heard today suggest to me -- you tell me -- that the most important consideration for you is going to be what was the crime that was committed.

A. That's very important, yes.

Q. Okay. And I thought you told Mr. Miller when he asked about whether or not Angela Johnson had a -- no criminal history, absence of prior criminal history doesn't make any difference.

A. No, because of the seriousness of the situation.

Q. Okay. All right. And then so this stuff about childhood history, abuse, maybe physical or sexual abuse, I mean, unless that impacted the crime, I mean, unless there was a connection there -- but let's assume there's not a connection that A caused B -- is that anything that you really think's important in

making a sentencing decision?

MR. MILLER: Objection.

THE COURT: I'm going to sustain the objection. You can rephrase the question.

BY MR. BERRIGAN:

Q. Well, in your view of the sentencing, appropriate sentencing, how would that factor in if at all?

A. I don't know if it would. I mean, people have to be responsible too for their behavior. I mean, there are a lot of people who have situations in their lives but they don't end up involved in murder.

Q. Right, right.

A. I guess that's the way I look at it.

Q. Yeah, and there's nothing wrong with that; okay? But what that suggests is that in the decision about punishment these things that we're talking about, these mitigating circumstances, that's not going to be part of your weighing process which is okay. I mean, if your view is, hey, look, are you kidding me? That's what we're talking about --

A. Yes.

Q. -- that's determinative for me --

A. Uh-huh.

Q. -- that's a perfectly acceptable position; okay?

A. Right, okay. Yeah. That's -- you got that right. You read that right, yes.

3068

Q. So this other stuff, this mitigating circumstances stuff, does that affect your punishment decision at all?

A. I don't know if -- I don't think it would.

Q. Okay. Well, that's all we can ask is your honest assessment of the situation. And I hear you saying it's the

Page 196

Case 3:09-cv-03064-MWB-LTS Document 284-70 Filed 06/23/11 Page 2673 of 3245

intentional, premeditated murder, if that's shown --

A.   Yes.

Q.   -- you have a view about the appropriate punishment that you'd be willing to consider.

A.   I do.

Q.   And that punishment that you'd be willing to consider is what?

A.   Is death.

Q.   Okay.  And as to the alternative, life imprisonment, would it be fair to say that in that situation realistically that's not a punishment that's severe enough for you to consider?

A.   No.

Q.   Okay.  It's not one you'd consider.

A.   No, I -- no, because I think -- yeah, like you say, those situations to me, that was what I would determine is appropriate for a death sentence.

Q.   Okay.  Not life without parole.

A.   No.

        MR. BERRIGAN:  Okay.  I appreciate your candor, ma'am. Thank you very much.

                                                    3069

        PROSPECTIVE JUROR 548:  Thank you.

        THE COURT:  Okay.  Juror 548, I have some questions for you.  We haven't really told you what the law is, but we've told you a little bit.  But if we ever get to the penalty phase, I'm going to instruct you on what the law is, and I'm going to tell you, for example, that you can consider as a mitigating factor if the defense proves it the fact that Angela Johnson does not have a significant criminal history.  I don't know whether she has a significant criminal history or not.  I don't

Page 197

know because I haven't heard any evidence on it. But if there is evidence about that, then I will give you an instruction that if you find that that's a mitigating factor that you can consider. Do you understand that?

PROSPECTIVE JUROR 548: Yes.

THE COURT: Okay. Now, even though that's not something you would have considered on your own, if I instruct you that that's what the law is, that you can consider that as a mitigating factor, will you be able to do that?

PROSPECTIVE JUROR 548: I don't know.

THE COURT: Well, that's an honest answer.

PROSPECTIVE JUROR 548: You know, this is a very serious situation, and, boy, I don't know.

THE COURT: You don't think you could follow what the law is.

PROSPECTIVE JUROR 548: Well, yeah, I --

3070

THE COURT: Well, I don't know. Some people can't. I'm not saying how much weight you have to give it. I'm just saying if I tell you that absence of a substantial criminal history is a mitigating factor and you were to find that the defendant did not have a substantial criminal history, then my instruction would be that you have to consider that as a mitigating factor. Would you be able to do that?

PROSPECTIVE JUROR 548: I suppose, yeah.

THE COURT: What about her background? Let's suppose there was evidence in the record that she was abused physically, mentally, maybe even sexually as a child and I -- if there was evidence like that, I might instruct you that those are mitigating factors that you must consider in weighing whether or

Page 198

not the appropriate sentence is life or death. Do you think you could do that?

PROSPECTIVE JUROR 548: I don't know if I would -- I still think I would say that doesn't make sense to me. You know what I mean? That how you grew -- your experience, that's tough, and a lot of people go through tough things.

THE COURT: Remember now we're not talking about guilt or innocence because that really has nothing to do with guilt or innocence; right?

PROSPECTIVE JUROR 548: Right, right.

THE COURT: Right. But in punishment, Congress and the United States Supreme Court has said that mitigation is

3071

something that jurors must consider. So it's my job to decide what's a mitigating factor and give you instructions on those. Then it's your job to figure out whether the evidence supports any mitigating factors. And if you find that there are any mitigating factors, then you have to consider those mitigating factors and weigh that with any aggravating factors that you find.

PROSPECTIVE JUROR 548: Uh-huh, yes.

THE COURT: For example, multiple murders. If you were to find that the death of a six-year-old and a ten-year-old made them vulnerable victims and if you found that beyond a reasonable doubt, if you found multiple murders beyond a reasonable doubt, you could consider that as aggravating factors and weigh any aggravating factors that you find with mitigating factors. You understand that.

PROSPECTIVE JUROR 548: Yes, yes. I could do that. Yes, I could do that.

Page 199

THE COURT: Well, are you sure you could do it?

PROSPECTIVE JUROR 548: Well, yeah.

THE COURT: See, here's what I'm asking. I understand that your personal opinion is that those things probably shouldn't make any difference.

PROSPECTIVE JUROR 548: Right.

THE COURT: But Congress and the United States Supreme Court think otherwise, and that's the law of the land.

3072

PROSPECTIVE JUROR 548: Uh-huh.

THE COURT: And we have to find 18 jurors who can follow the law of the land. You may be one of them. You may not be one of them. I don't know. But I think it's only fair for you to know a little bit about what the law is because your own personal views might vary with what the law is. That happens in my job almost every day.

PROSPECTIVE JUROR 548: Uh-huh.

THE COURT: I don't necessarily agree with the law, but I took an oath to uphold it, and I do that to the best of my ability whether I agree with the law or not. Now, I'm trained to be able to do that. That's what part of a legal education does for us. You don't have the benefit of that, and I understand that.

But I want to make sure if I instructed you on what mitigating factors were that you would fairly consider those mitigating factors. I'm not telling you how much weight. You could decide -- if there are -- let's say you find 35 mitigating factors and you only find 1 aggravating factor. You're entitled to say that aggravating factor outweighs all 35 mitigating factors. That's the weight to be given it, and nobody, nobody,

Page 200

can tell you how much weight to give it.  That's for you to decide.

But it's my job to make sure that you would consider any mitigating factors that you find in the case even if

3073

personally you wouldn't have thought of those to have been mitigating without my instruction.  Are you with me?

PROSPECTIVE JUROR 548:  Yes, I am.  I understand.

THE COURT:  Okay.  And the question is can you kind of -- even if you say, Well, gee, that doesn't make sense that that's a mitigating factor, I don't know why Judge Bennett would say that's a mitigating factor because I don't really think it is, but that's the law, when I say it in my instructions that's the law of the case, would you be able to follow the law in my instructions?

PROSPECTIVE JUROR 548:  Yes, I'd be able to follow the law.  Yes, I would.

THE COURT:  And would you be able to -- I'm going to add a word.  Would you be able to fairly consider mitigating evidence and mitigating factors that you find and then give it whatever weight you think it deserves when you weigh mitigating factors and aggravating factors?  Would you be able to do that?

PROSPECTIVE JUROR 548:  I would sure try.  I think I can.

THE COURT:  Well, sometimes trying --

PROSPECTIVE JUROR 548:  I've never done this before.

THE COURT:  I know that.  We're asking you to predict how you would act in a situation you've never been in.  And in a sense that's maybe unfair of us, but that's -- like Mr. Berrigan said, it's the only chance we get now.  So I want to know if you

Page 201

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2678 of 3245

think you could fairly consider mitigating factors. I will tell you what the law considers to be a mitigating factor, what the law considers to be an aggravating factor. And you have to find whether those factors exist in this case. And I want to know if you think you could fairly do that.

PROSPECTIVE JUROR 548: Yeah, I think I can.

THE COURT: Do you think it makes sense that I'm the one that gets to decide under the law what a mitigating factor is and what an aggravating factor is?

PROSPECTIVE JUROR 548: Yes.

THE COURT: Somebody's gotta decide that; right?

PROSPECTIVE JUROR 548: Yes, exactly.

THE COURT: And rather than asking somebody who's sitting out in the back row what they think, maybe I'm in the better position to do that because of my background, training, and experience.

PROSPECTIVE JUROR 548: Precisely, yes.

THE COURT: And do you think you'd be able to follow my instructions whether you agreed with them or not?

PROSPECTIVE JUROR 548: Yes.

THE COURT: Okay. Thank you very much. We're going to ask you to step outside, and we'll let you know your status.

(Prospective Juror 548 exited the courtroom.)

THE COURT: Mr. Miller?

MR. MILLER: No motion, Your Honor.

3075

THE COURT: Mr. Berrigan?

MR. BERRIGAN: The defense moves to strike Juror 548

Page 202

pursuant to Eddings versus Oklahoma and Wainwright versus Witt in that she is substantially impaired in her ability to consider mitigating circumstances. She told Mr. Miller that she wouldn't consider even a statutory mitigating circumstance of lack of criminal record. She told me that, and she initially told the Court that.

THE COURT: Yeah, but she doesn't know what the law is. It's really unfair to ask them to substitute their own judgment for what the law is without telling them what the law is and find out if they can follow the law. You know, aggravating and mitigating factors are not intuitive to nonlawyers, and you ask all your hypotheticals without letting them know what the law is in the area.

MR. BERRIGAN: My position would be that particularly in this case where Mr. Miller went first, he said over and over again the jurors are required to do this, this is what's required under the law. And even then this woman wasn't going to give any consideration to even a statutory much less a nonstatutory mitigating circumstance. She reiterated that position to me. It's in her questionnaire, and she initially told the Court that. And if it's a test if you can spend eight minutes to get her to say at the end I'm going -- you're going to follow my instructions, well, I mean, in my view that

3076

shouldn't be the test.

THE COURT: Well, that's exactly what you do with your 12 minutes. You rehabilitate every juror that you want to try and get on.

MR. BERRIGAN: It's a little different me, Your Honor, representing my client than the Court trying to get this woman

Page 203

to change her position.

THE COURT: I'm not trying to get her to change her position. I'm trying to get her to see if she'll follow the law, and that's not something you're willing to ask. You ask nothing but nonleading questions out of context with regard to what the law is. You always want to ask questions with no context of what the law is, and I don't put a lot of stock in those answers, and I told you that repeatedly.

MR. BERRIGAN: Well, I -- again, one of my obligations here is to make a record. I don't think that is the test if it's going to be at the very end if she says in response to eight minutes of questioning can you follow the law after she said repeatedly over and over again I don't think that has anything to do with the sentence and if this is premeditated intentional murder --

THE COURT: Because you're asking her her personal opinion about what the sentencing factors are. Why would a layperson know that? They wouldn't know what aggravating and mitigating factors are.

3077

MR. BERRIGAN: They were discussed. Both Mr. Miller and I discussed aggravating and mitigating circumstances. I discussed them with her before asking her whether or not she'd be able to consider them. There's no question at least in my view -- obviously the Court disagrees -- that this woman's substantially impaired. That's the test, not --

THE COURT: I do disagree. I don't think she is substantially impaired.

MR. BERRIGAN: Okay. Well, I'm making a motion she be removed for cause. It's in our view not even a close call as to

her substantial impairment, and we respectfully ask the Court to strike her for cause.

THE COURT: Mr. Miller?

MR. MILLER: Your Honor, the government resists. This juror at the very worst is a mirror image of Juror 780 for whom a motion was rejected. She ultimately not only ultimately but very initially even with her questionnaire volunteered the opinion that aiding and abetting as opposed to being a principle is a mitigating factor. She'd give life in prison rather than death to that. When discussing these issues and these factors with me and I think with Mr. Berrigan, she was discussing very honestly the weight that she would be giving to the various factors, not whether or not she would be able to follow the Court's instruction to give fair consideration to them. And when that was put to her, she stated not once but repeatedly,

3078

Yes, I could do that, yes, I could do that, yes, I'd be able to follow the law, yes, I could.

THE COURT: I don't think she's substantially impaired. So the defense motion for cause is denied. Would you like to exercise a peremptory strike?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. Juror 548 is stricken by the defense, and we'll let her know that, not that, but we'll let her know she's not in the jury pool.

(Prospective Juror 548 entered the courtroom.)

THE COURT: Juror 548, we're going to let you go. You're going to be dismissed from service in this case with the thanks of all of the lawyers and the parties in this case.

We'd ask that you do us a favor, because jury

selection will probably go at least -- well, for sure into tomorrow, maybe Monday or Tuesday, not to mention it to anybody else until we get a jury empanelled which we think will be by the middle of the week; okay?  Good luck to you, and thank you very much for participating.

PROSPECTIVE JUROR 548:  Thank you very much.

(Prospective Juror 548 exited the courtroom.)

THE COURT:  Okay.  Please be seated.

Carey, you want to pass out the list of the 22 jurors?

Tomorrow morning at eight o'clock I would like to meet and have the parties exercise, and I think what we'll do is I'll

3079

just start with the government first, have them exercise their first strike.  They can just announce it out loud.  Everybody can cross it off their own sheet, go to the defense, and we'll just go back and forth until all ten strikes are exercised. Anybody have any objection to doing it that way?

MR. WILLIAMS:  Not at all, Your Honor.

MR. BERRIGAN:  No, sir.

THE COURT:  Okay.  Just to review, Juror 459 and 109 from today made it into the jury pool, the top 22 jurors.  And Juror 167 is our first alternate.  Juror 78 is our second alternate.  Each side has exercised one of their two peremptory strikes with regard to the alternates.

MR. WILLIAMS:  One of three or one of two?

THE COURT:  I'm sorry.  One of -- did I say --

MR. WILLIAMS:  You said one of two.

THE COURT:  I'm sorry, one of three.

MR. WILLIAMS:  Thank you.

THE COURT:  Yeah.  Yeah, I did say two.  Each side has

Page 206

exercised one of their three. Of course, I may change my mind and only go with four alternates, and then you'll just have two.

MR. WILLIAMS: Well, what I was thinking is since the defense was audacious enough to ask for more strikes after they used their 15 -- we had 6 left. We're thinking can we just lop over and --

THE COURT: I was waiting for you to ask. You want to

3080

ask?

MR. WILLIAMS: No, I don't want to ask.

THE COURT: Because you know what the answer is.

MR. WILLIAMS: I do.

THE COURT: Okay. You know, let me just tell you, Mr. Berrigan, I'm going to tell you right on the record. I normally do not rehabilitate jurors. I don't have a history of doing it. But I also think your questions are incredibly misleading and they don't put it in the context of what the law is. And that's -- I just want you to know that's why I'm doing it. And when I've -- I've rehabilitated a juror and decided that I didn't think the juror was telling the truth, and I've gone ahead and sustained the challenge for cause even after I fully rehabilitated them, and there was more than ample evidence in the record to easily support the denial of the challenge for cause.

But I just think, you know, you don't make it clear the difference between their personal opinion and what the law is. And there's a huge difference. It's fine to find out what their personal opinion is, and you've spent a lot of time doing it, and you do it very well. But if you don't ever apply that to what the law is, then to me it's just totally out of context,

Page 207

and I'm going to sustain challenges for cause based on just personal opinions that don't put it in the context of the case. And that's just my view, so I just wanted you to understand it

3081

in case you didn't understand it.

Anything -- well, and then we have to take up the jury instructions because there's a chance, although I think it's somewhat remote, that we would have four additional alternates selected tomorrow, but if we do, then we take Monday off -- or I'm not even sure we'd take -- yeah, I guess we'd take Monday off because we'd need to give the jurors notice. I'm actually not sure why we can't -- why we can't notify the jurors tomorrow. Once you exercise the strikes, I don't see a huge -- I mean, I haven't decided yet, but I don't see a huge downside in notifying the 12 -- they'll just be notified on one day and the others might be notified another day, or we could notify at least as many alternates as we have to give as many jurors advance notice as we can.

Now, we're not exactly going to know what day we're going to start. We'll just wait and see how far we get tomorrow.

And we do have the matter of final instructions. We -- I mean the final -- the final instruction conference with regard to the preliminary instructions. I've given you a number of sets. I know I said in my letter this morning that you have until tomorrow, but I need to get those wrapped up. So I think we'll have our instruction conference at 7:30 tomorrow morning, and anybody can make any record they want on the instructions. But I'm pretty much ready to go, and I've given everybody ample

3082

Page 208

opportunity, and we'll just start at 7:30 with the instruction conference; okay?

MR. WILLIAMS:  Very good.

THE COURT:  Anything further from the government?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  No, sir.

THE COURT:  Okay.  See you all tomorrow.

(The foregoing trial was

adjourned at 2:57 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

2-11-06
Shelly Semmler, RMR, CRR                  Date

3083

INDEX

PROSPECTIVE JUROR:                                      PAGE:

Page 209

Prospective Juror 459
          MR. MILLER                            2945
          MR. BERRIGAN                        2954

Prospective Juror 109
          MR. BERRIGAN                        2965
          MR. MILLER                            2975

Prospective Juror 396
          MR. MILLER                            2986

Prospective Juror 167
          MR. BERRIGAN                        2999
          MR. MILLER                            3007

Prospective Juror 780
          MR. MILLER                            3011
          MR. BERRIGAN                        3020

Prospective Juror 78
          MR. BERRIGAN                        3038
          MR. MILLER                            3046

Prospective Juror 548
          MR. MILLER                            3052
          MR. BERRIGAN                        3062

* * * * *

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2687 of 3245

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CRO1-3046 |
| Plaintiff, | Sioux City, Iowa |
| | April 29, 2005 |
| vs. | 7:37 a.m. |
| ANGELA JANE JOHNSON, | VOIR DIRE OF |
| | PANEL M |
| Defendant. | |

/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

3085

APPEARANCES:

For the Plaintiff:       C. J. WILLIAMS, ESQ.
                         Assistant United States Attorney
                         Suite 400 - Hach Building
                         401 First Street Southeast
                         Cedar Rapids, IA  52401

                         THOMAS HENRY MILLER, ESQ.
                         Iowa Attorney General's Office
                         Area Prosecutions Division
                         Hoover State Office Building
                         Des Moines, IA  50319

For the Defendant:       PATRICK J. BERRIGAN, ESQ.
                         Watson & Dameron
                         2500 Holmes
                         Kansas City, MO  64108

                         DEAN STOWERS, ESQ.
                         Rosenberg, Stowers & Morse
                         1010 Insurance Exchange Building
                         505 Fifth Avenue
                         Des Moines, IA  50309

                         ALFRED E. WILLETT, ESQ.
                         Terpstra, Epping & Willett
                         Higley Building - Suite 500
                         118 Third Avenue Southeast
                         Cedar Rapids, IA  52401

Also present:            Bill Basler

Page 1

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2688 of 3245

PANEL M, 4-29-05
Court Reporter:           Shelly Semmler, RMR, CRR
                          320 Sixth Street
                          Sioux City, IA  51101
                          (712) 233-3846

3086

(Proceedings reconvened outside the presence of the jury venire.)

THE COURT:  Okay.  Now is our instruction conference on the preliminary instructions, and I'd like to take up first the kind of general suggestion that Mr. Stowers had in his e-mail at 10:49 p.m. last night about doing away with the definitions in the key kind of marshalling instructions and just having a general kind of shell defining the elements but with no explanation because that's the biggest change substantively of what the defense raised in their 10:49 p.m., 4-28, 2005, e-mail. And anything you want to add to that, Mr. Stowers?  I mean, I understand what you're suggesting.

MR. STOWERS:  No.  I just think --

THE COURT:  Where have you been all week, though?  I guess that would be one -- was this just a revelation that came to you after dinner last night?  I didn't hear you raise -- you didn't raise a peep about it.  I mean, I've actually done it that way in some cases, so I'm familiar with doing it that way, but you never seemed to -- you never raised it earlier.

MR. STOWERS:  Well --

THE COURT:  And it's a pretty fundamental conceptual differing approach.

MR. STOWERS:  Yeah.  I've been wrestling with -- mentally with how these preliminary instructions would be used by the Court.  I've had some cases where there have been

3087

Page 2

preliminary instructions before and then these went sort of into a lot more detail. Then I was wrestling in my mind with whether or not that's really a good idea, and then you add the other stuff later, and then what if some stuff that we settle upon later is different than this? And I know these say that those will supersede, and, boy, it's a lot to keep track of.

So I was wrestling with that over the past couple days as these drafts have come in. So as I wrestled, I ultimately wrestled to some mental conclusion which was at 10:59 last night or whatever it was.

THE COURT: Okay. Why don't we see what the government's reaction is.

MR. WILLIAMS: Your Honor, my thought is that it's always better to give more information than less. Seems to me that if you're taxing a jury with the responsibility in this case of understanding some complex issues, give them some general elements but don't attempt to define those elements for them, you're essentially sending them into this trial without helpful information for them to pick up the evidence and to put it already into context and to try to digest it all.

And given the complexity of this case and the number of witnesses and the amount of evidence, it seems to me the more information you provide the jury up front about what should be important to them and what's going to be important to them to be looking at, I think it's the better.

3088

The opposite thought is that somehow ignorance is bliss and that the less they know somehow we're going to be better off. And I just -- I don't follow how a less-informed

Page 3

jury is somehow going to be a better jury for us.

THE COURT:  Yeah.

MR. STOWERS:  Well, I guess I -- we're not talking about keeping the jury ignorant.  We're talking about when do you inform them on the details of these things that they're actually going to have to be deliberating over at the end of the case versus sort of giving them a broader outline of what the allegations are and what the government would have to prove versus sort of getting them into the details.

It seem -- I guess the issue I have with it as I think about it and thought about it is that these instructions sort of invite them into the details of thinking about the evidence as it's coming in --

THE COURT:  That's exactly what it does.

MR. STOWERS:  -- a little bit more than -- I kind of feel like it's contrary to the concept that they should listen to the evidence first and then at the end of the case receive some detailed instructions on the law on how they're to evaluate the evidence and then apply it to the law.  And it seems like it's sort of inviting them into a deliberative process at the beginning earlier on in the case.

And the other thing is I'm not sure that all these

3089

things that are included in here are really going to be matters that ultimately, as the record comes in and the evidence comes in, are going to be matters that they need to be concerning themselves about.

THE COURT:  Give me one example.

MR. STOWERS:  Well, for example, there's a litany of 9 or -- well, 13 paragraphs in there on pages 17 through 19

Page 4

describing allegations in the indictment which may or may not be the subject of proof at trial.

THE COURT: Well, do you have any reason to believe that there won't be proof on these?

MR. STOWERS: Well, I've got a real concern that some of this evidence isn't admissible.

THE COURT: Well, that -- you know, the easy way to handle that is then you withdraw it from the final instruction and you tell them it's been withdrawn.

MR. STOWERS: Well, that's true, but then they've had this in their hands and it's been out there as an allegation. That's all. I just think it's a -- if what we're trying to do with the preliminaries is sort of give them an outline, then we could give them an outline. If we're trying to get into these details including things about multiple conspiracies and all that which may not be particularly important in the final instructions, then we do that.

THE COURT: Well, you're the one that wanted the

3090

multiple conspiracy instruction.

MR. STOWERS: Well, the instructions I submitted were for at the end of the case, though, and I just wanted to get those on file so the Court was aware --

THE COURT: Well, I'll be glad to take out the multiple conspiracy instruction, but I'm not taking out the rest of it because I think it's helpful for the jury to know what the allegations are so they can follow the evidence.

MR. STOWERS: Okay. Then that's --

THE COURT: I'm not -- for example, I'm not going to take out -- in instruction number 8, I'm not going to take out

Page 5

those 13 paragraphs because I think it's helpful to the jury. There's just a lot of evidence, and it helps them to understand what the government has to prove. But if you want to take out the multiple conspiracy theory and save that for the end, that's fine.

MR. STOWERS: Okay.

THE COURT: You want to take it out?

MR. STOWERS: We're back on 6? Is that --

THE COURT: Well, we'll see if the government has any objection. Do you have any objection to -- well, why don't we find out what language you want to take out, and I assume it would then go in the final instruction.

MR. STOWERS: Well --

THE COURT: I think it would be on page 11, first full

3091

paragraph.

MR. STOWERS: Right.

THE COURT: Take out those two paragraphs. That's fine. Does the government have any objection to that?

MR. WILLIAMS: Let's see if I'm on the right page here, Judge.

THE COURT: Am I in the right place, page 11, the first full paragraph starting, The prosecution must prove?

MR. WILLIAMS: Yeah. I mean, the government doesn't care one way or the other on this.

MR. STOWERS: Actually I'd just leave it alone.

THE COURT: Okay.

MR. STOWERS: Sorry.

THE COURT: That's fine. That's fine. I'm going to go ahead and tell you the changes I'm going to make. On page 8,

Page 6

the very last paragraph, I'm just going to take that out because we already -- it's really redundant. We already tell them in the second paragraph of the instruction that the government has to prove all the following essential elements. So I'm just going to take the last paragraph on page 8 out.

And I'm going to do the last thing -- the same thing on page 14, the last sentence, If the prosecution fails to prove any of these, because we've already told them the government has to prove -- just to be consistent, that's redundant, so we'll take that sentence out.

3092

And also in rereading these, right above it where it says, Because the first element of Counts 1 through 5, there should be a cross reference there because we're really talking about prior instruction number 5, the first element of prior instruction number 5. Are you tracking me?

MR. WILLIAMS: Yes.

THE COURT: This is instruction number 6. There needs to be a cross reference that that's what we're talking about, the first element of instruction number 5. I've talked to Roger. We'll have the cross references done in just a little bit this morning. And there's another place where I want to do it too.

Then on page 16, just to be consistent, we take out the last paragraph.

Page 21, there would be a cross -- in the last paragraph that's on the bottom of page 21, because of the first element of Counts 6 through 10, it will be something like, As defined in element number 1 of instruction number whatever it is, 7. There would be the cross reference there.

Page 7

And then at the very last sentence that starts on the bottom of page 21 and goes to page 22, that just gets deleted because we've already told them the government has to prove every element.

And then in instruction number 13, you want me to take out if the defendant testifies. I don't have any problem taking

3093

it out because we could -- if for whatever reason you might change your mind. I mean, I know you've already committed, but stranger things have happened -- we can always then put it in in the final instruction and just say the defendant, Angela Johnson, testified, and you should judge her credibility like you do any other witness. There's no reason why we would have to have that in here, particularly because she's probably not going to testify. So I don't have any problem taking that out.

So those are my proposed changes, and we'll get those to you certainly by our mid-morning break or lunch break. But assuming those changes are made and you don't have objection to the wording of the changes, does the government have any objections to the proposed -- they're no longer proposed. This is my final set of preliminary instructions.

MR. WILLIAMS: No objections.

THE COURT: Okay. Does the defense?

MR. STOWERS: I think they're no different than what I said the other day in our initial conference which I think was reported. But first I know we've talked a little bit about the indictment and the fact that there was discussion of the government filing some motion to amend it, and I don't think they've done that yet.

MR. WILLIAMS: That's going to be filed, if it's not

Page 8

filed already -- it's filed this morning.

THE COURT: Yeah, but whether they've done it or

not -- you go ahead and make whatever record you want. They have a right to withdraw it for purposes of the instruction.

MR. STOWERS: Okay. I just want to make sure they're doing what they said they'd do.

THE COURT: Right.

MR. STOWERS: Then I agree with the instruction on that point. The other issue was the bill of particulars which as filed includes a whole lot more names both for the alleged co-conspirators and the alleged supervisees of the continuing criminal enterprise. And I know the Court made the one change which identified this as sort of the Honken CCE, but we would ask that the Court include the names of all of the conspirators that the government included in its bill of particulars which has not been amended and all the alleged supervisees who they've alleged in their filings in this case in the instructions.

With regard to instruction number -- preliminary instruction number 8, on page 21 under italicized element number 4, there's a single-spaced paragraph. The second single-spaced paragraph under element 4 starts with the word "however." The second sentence of that paragraph reads, It is also not necessary that Dustin Honken have been the only person who organized, managed, or supervised the five or more other persons, and it goes onwards.

The government did file a bill of particulars. They were ordered by the Court to identify all the persons who they

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2696 of 3245

were claiming were supervisors, organizers, or managers, and they did that. And the only person that they identified in their bill of particulars was, in fact, Dustin Honken. And then they further in their bill of particulars identified the persons who were not believed to be managers, organizers, supervisors, and who were supervisees, and those persons included all of the persons who they identified as supervisees in that long bill of particulars.

So we believe that this instruction would constitute a judicial amendment of the bill of particulars which we think would be improper even though it would be a correct statement of the law generally that he need not be the only one, but because they filed this bill of particulars, we think it's contrary to the allegation. So we would ask that that be changed.

I don't know if you want to address these one by one.

THE COURT: Yeah, why don't we do it one by one. What's the government's response?

MR. WILLIAMS: Your Honor, this is a correct statement of the law in this case. The government has clearly made its allegation that Dustin Honken was the organizer of this CCE, but it's also the case that as a practical matter other people can have engaged in organizing, managing, or supervisory activities while still part of the CCE. And I think this instruction makes it clear.

So, for example, if in this case the jury concluded

3096

that Jeff Honken somehow had some supervisory role in the sense that he funded this thing, that's fine. It doesn't mean that he is the organizer, and we clearly have put ourselves out. We've gotta show that Dustin Honken was the organizer, leader,

Page 10

manager, and that doesn't change, and they've got to find that as an element. But that doesn't preclude other people from having roles in that area.

THE COURT: But did you limit yourself in any way in your bill of particulars?

MR. WILLIAMS: I don't think so only in the sense that we only alleged Dustin Honken as the organizer, leader. But that doesn't mean that other people can't occupy leadership positions within the organization. The bottom line is, you know, the jury has to find or we lose that Dustin Honken was the organizer, manager, supervisor. All this instruction is telling them is what a correct statement of the law is that other people can have roles like that in an organization as well.

THE COURT: Why is it necessary to you? I mean . . .

MR. WILLIAMS: My only concern would be this, is that each -- there may be some evidence in this case that other people like Jeff Honken, for example, funded part of this. And so I wouldn't want the jury to think that somehow the government's burden is to show that there was only one person who ever exercised any control or organization or management of this CCE and that if anybody else had anything to do with

3097

calling the shots on any aspect of it somehow we've failed in our proof.

THE COURT: Okay. Your next objection?

MR. STOWERS: That's fine. I'd just point out that I'm referring to the December 4, 2002, bill of particulars on that where they said specifically that the 26 people named therein although participants are not believed to have occupied any position as organizer, supervisor, or manager in a
Page 11

continuing criminal enterprise.  And then they reaffirmed that most recently in December or maybe January of this year.

THE COURT:  Do you have any more objections to the preliminary instructions?

MR. STOWERS:  I'm thumbing.  Sorry.  We would object generally to the Court providing the jurors with these preliminary instructions to retain and keep with them during the course of the --

THE COURT:  You never told me you were objecting to that.  Why do you think we have this discussion for a week?  You know, that's sandbagging.

MR. STOWERS:  No, I -- no, that's not the issue.

THE COURT:  Well, that's sandbagging.  You never objected to --

MR. STOWERS:  To providing them with them, not to reading them.

THE COURT:  What's your basis for that?  Well, you

3098

never did object to that.

MR. STOWERS:  Well, that's true, but I didn't think --

THE COURT:  And that's been my practice in every case for 11 years to give preliminary instructions and let the jurors keep the preliminary instructions.  So you are sandbagging because I've asked you before if you have any objections to it, and you never raised that, but go ahead and sandbag me.  That's fine.

MR. STOWERS:  I thought we were talking about the text of what was going to be in them, not what was going to be done with them.

THE COURT:  Yeah, right.  So what's your objection?

Page 12

MR. STOWERS: Well, the objection is is that we don't believe that the jury should have a copy what in essence amounts to the government's allegations in certain respects as a checklist, if you will, to go through and --

THE COURT: Well, what's your basis for the objection?

MR. STOWERS: We don't believe that it's a fair process for the jury to be in a position of reviewing the allegations, taking the allegations home with them, and considering and evaluating --

THE COURT: I didn't say they were taking the instructions home with them.

MR. STOWERS: Okay. That's fine. I don't know what they're going to do with them, but in any event, our concern is

3099

is that this process of providing them these puts them in a position not -- I can see reading all this stuff to them, but it puts them in the position of almost starting the deliberations at the beginning of the evidence which is not a proper process, and I know the instructions tell them not to do that. But we just think it goes beyond what in fairness the preliminary instructions should do consistent with due process, and that's all.

THE COURT: Do you have any authority for your proposition?

MR. STOWERS: No.

THE COURT: Okay. Any other objections you'd like to make?

MR. STOWERS: No, sir.

THE COURT: You know, that's something you should have told me up front.

Page 13

MR. STOWERS: Well, I could have. I guess my thinking is you're either going to give them to them at the beginning of the case or you're not. And whether you do that isn't something that, you know, is requiring advance notice of the Court. I mean, you're either going to give them to them when they come in next week or you're not going to do that which is something you'll either do or not do next week. Whether we brought it up on Monday of this week or --

THE COURT: Wouldn't it have been nice for me to think

3100

about your objecting to the entire way I do something that I've done for 11 years, or you're not willing to give me that courtesy? I guess I could have just surprised you with the instructions today and given you a half an hour to read them like most judges do rather than starting more than a week ahead of time giving you multiple versions. So I guess I just expect a little fairness. If you want me to do, you know, the same courtesy I extend to you, I'd like about half as much back. That's all I ask, half as much back.

MR. STOWERS: I appreciate that, Judge, and I apologize for not bringing that to your attention earlier. I'm not familiar with your procedures as far as --

THE COURT: Well, Mr. Willett is, and he's tried I think by his admission five cases in front of me, and I did it exactly the same way in those five cases.

MR. STOWERS: Right. And it seems to me it'd be a little different in this case because of the nature of the charges in part and the complexity of them. That's all. And you'll make your decision on that.

THE COURT: Yeah, I already have.

Page 14

MR. STOWERS:  Thank you.

THE COURT:  Does the government have any view?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Do you know of any support for -- any authority for their position?

3101

MR. WILLIAMS:  None, Your Honor.

THE COURT:  So is it you don't have a problem if I -- you want me to just read it to them and they don't each have a copy to follow along?  Is that what you're suggesting?

MR. STOWERS:  No, I think having a copy when you read it to them is fine.  I just --

THE COURT:  And so if they actually have a copy so that they can use it during the trial and refer to it, that's the problem.

MR. STOWERS:  Yeah.

THE COURT:  We're supposed to tell it to them and what?  Hope they forget it or that they don't understand it or not let them use it in any way by collecting them?  Is that it?  Is that what you're suggesting?

MR. STOWERS:  Yeah.  It's like a playbook for the jury is the way I see it, and that's the concern, that they would have sort of a playbook and a case outline of the government as they were receiving the evidence, and that's kind of my perception of it in part I guess.  And I think the preliminary instructions are a great idea, but I just think to have them with a playbook sort of of the case and the allegations as the evidence comes in kind of goes beyond what I envision as an appropriate thing to do.  That's all.

MR. WILLIAMS:  Your Honor, if I could just say a

Page 15

couple words on this, if we're talking about the indictment

3102

going back to the jury, sure. But contrary to the defense position, this is not a copy of the government's allegations against the defendant. It's a copy of the Court's instructions. The defendant has --

THE COURT: Which could include any defenses that the defense wanted to offer to have in the instructions.

MR. WILLIAMS: And it includes such fundamental things as the instruction on the presumption of innocence and the concept that -- you know, unless they can point to something that's wrong in these instructions, the idea that we can tell the jury what are in the instructions and then somehow take it away from them and hope they forget it, it can only aid them in understanding this case, and I can't see any harm in having them retain a copy of this and reference it. If anything else, it will just help them understand the case and remind them of their obligations.

THE COURT: Okay. The defense objections are overruled. Anything else before we start at 8:30? Any heads-up on any of the seven potential jurors this morning?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: No, sir.

THE COURT: Okay. We'll see you at 8:30.

(Recess at 8:02 a.m.)

THE COURT: Ready to have the jurors brought in?

MR. WILLIAMS: Yes, Your Honor.

3103

Page 16

(Panel M entered the courtroom.)

THE COURT: Please remain standing, because I need to swear you all in.

(Panel M was sworn.)

THE COURT: Okay. Good morning. Please be seated. I wanted to welcome all of you to the United States District Court for the Northern District of Iowa. And, you know, this is a very serious matter, but you don't have to be so glum. There's no federal law against smiling in the courtroom. It's really not that bad.

I'm Mark Bennett. I'm the chief judge of the district and the trial judge in this case. You all know the case is United States versus Angela Johnson. I wanted to introduce you to everybody in the courtroom.

Seated at the counsel table closest to the jury box is kind of the prosecution table. The other table farthest away is the defense table. You'll be meeting the lawyers and the other folks in more detail in just a few minutes. But just so you know who they are, I'm just going to ask them to raise their hands.

C.J. Williams, Mr. Williams is a federal prosecutor, what we call an assistant United States attorney. He offices over in Cedar Rapids but frequently appears in our Sioux City division to try cases.

Seated next to him is Tom Miller. Mr. Miller is a

3104

special assistant United States attorney who's been assigned to this case, but he's actually a state court prosecutor. He works for the attorney general of Iowa also by the same name, Tom Miller. It's not the same Tom Miller. But he's one of the

Page 17

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2704 of 3245

attorney general's assistants who heads the area prosecution office.

Seated next to the two prosecutors is Special Agent Bill Basler. He's what's called the case agent in the case.

At the far table is Mr. Dean Stowers. Mr. Stowers practices criminal defense law, and he's from Des Moines.

Seated next to Mr. Stowers is the defendant in the case, Angela Johnson.

And seated next to Angela Johnson is Patrick Berrigan, and Mr. Berrigan is a criminal defense lawyer from Kansas City.

And at the back table is Al Willett. Mr. Willett specializes in criminal defense and is from Cedar Rapids, Iowa.

Now, there are certain rules you have to follow. I've reduced those to writing. They're on your seat, so I want to go over them with you this morning.

Conduct of potential jurors during jury selection and trial. To ensure fairness, you as potential jurors must obey the following rules until the end of the case if you are selected for the jury or until you are excused from serving on the jury in this case. These rules apply whether you are in the courtroom, in the courthouse, at home or anywhere else until you

3105

are excused from further service in this case.

First, do not talk among yourselves about this case or about anyone involved with it.

Second, do not talk with anyone else about this case or about anyone involved with it.

Third, when you're outside the courtroom, do not let anyone tell you anything about the case. If somebody should try to talk to you about the case during jury selection or the

trial, please report it to me.

Fourth, do not talk with or speak to any of the parties, lawyers, or witnesses involved in this case. You should not even pass the time of day with any of them. It is important that you not only do justice in this case but that you also give the appearance of doing justice. If a person from one side of the case sees you talking to a person from the other side, even if it is simply to pass the time of day, an unwarranted and unnecessary suspicion about your fairness might be aroused. If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or the like, it is because they are not supposed to talk or visit with you.

Fifth, do not read any news stories or articles about the case or about anyone involved with it or listen to any radio or television reports about the case or about anyone involved with it. If you want, you can have your spouse or friend clip out any stories and set them aside to give you after the trial

3106

is over or you are excused from serving on the jury in this case. I can assure you, however, that if you are selected for the jury in this case, by the time you have heard the evidence, you will know more about this case than anyone will learn through the news media.

Sixth, do not do any research on the Internet, in libraries, in the newspapers, or in any other way or make any investigation about this case on your own. If you are selected for the jury, you must decide this case based on the evidence presented in court.

Seventh, if you are not excused from serving on the jury today, please take this instruction with you so that you

Page 19

can refer to it if you have any questions between now and the date you are required to return for the trial.

Dated this 29th day of April, 2005, signed by me, Mark Bennett, chief judge.

Now, how many of you have ever been to this third-floor courtroom before? Anybody? Raise your hand. Nope? Okay.

Just wanted to explain to you who all the folks are in the courtroom. Seated to my far left is Carey, one of my three and a half law clerks. She's an honors graduate of the Drake University Law School in her second year of a federal clerkship, and she'll be moving to Seattle at the end of the summer.

Seated in front of me is our court reporter Shelly.

3107

Shelly comes to us from Naples, Florida. She's been with us a number of years. She has I think the toughest job in the courtroom because she has to take down everything that everyone says, and she can never have a mental lapse or look up at the ceiling and daydream like everybody else can and probably will.

We also have United States marshals in the courtroom. We have that in every criminal case. And depending upon where we'll be in this trial and who's testifying and all, there may be greater or fewer United States marshals in the courtroom.

We have court security officers. They're easy to spot. They have the blue blazers and the badge and the earpiece, and they have a lot of responsibilities in the courthouse, but one of their primary responsibilities is making sure the jurors get back and forth to the courtroom on time.

We have the lawyers and the parties they represent. And you've met them, and you'll meet them in more detail.

Page 20

Then I want to talk about the role of the jury and what my role is in this case. I'll start with myself and then go back to the potential jurors.

My role in this case -- I've had a lot of pretrial motions to rule on. You might imagine in a case of this magnitude where the federal death penalty is a potential penalty in this case that this case required a lot of pretrial work. The lawyers on both sides have worked very hard. They filed lots and lots and lots of motions. I've ruled on all of their

3108

motions, and I'm current in the rulings.

It was my responsibility in consultation with the lawyers to come up with a system for jury selection, and we came up with a system unlike most systems that only require potential jurors to come to the courthouse one day. Under other systems you might have been here for three solid weeks every day all day, and we came up with a system that only required you to come one day because we know that our time is important to us, and we know that your time is important to you, and we tried to come up with a system that was the most efficient system possible under the law.

Once the trial gets underway next week hopefully, I'll have the responsibility of giving you a set of preliminary instructions which will define each of the ten crimes the defendant is charged with, give definitions of the burden of proof in the case -- the government has the burden beyond a reasonable doubt -- the presumption of innocence of the defendant. It will discuss matters involving the credibility of the witnesses and just give you an overview of the trial process.

Page 21

Then towards the end of the trial I'll have the responsibility of giving you a more detailed set of instructions. I'll also have the responsibility to rule on any objections that occur during trial. I know these lawyers, and I know there will be lots of objections during trial. And that's

3109

my job to rule on them, and it's their job to object. When they think that something is improperly being admitted under the rules of evidence, they have a duty and an obligation to their client to go ahead and object. So I'm fairly confident you'll see some of that during the trial.

Now, let's go back to the jury's job. You'll notice that when I was describing my duties I didn't talk about my job being to decide what actually happened because that's not actually my job. That's the job of the jury. And I like to say that jurors are the judges of the facts, and that's your primary responsibility in a trial. You're the judges of the facts.

Now, what does it mean? What does it mean to be the judge of the facts? Well, in this case I anticipate that there could be more than a hundred witnesses that testify. There might be fewer than that, but there easily could be a hundred or more witnesses. Each witness will get in the witness box right there, take the oath, and testify.

And additionally, there could be in excess of 500 exhibits that get admitted into the evidence. We have this high-tech courtroom, so if the lawyers who are conducting the examination of the witness about a particular exhibit want to show you that exhibit, then they just show it to you on the big screen, and you'll be able to actually see the exhibit that a witness is talking about.

Page 22

So your job will be to listen very carefully to all of

3110

the witnesses, all of the exhibits that get admitted into evidence, to review them, and then decide what actually happened.

And then once you figure out what the facts are, you apply the facts to the law in my instruction, and at least in the first part of the trial your obligation will be the same as it is in any criminal trial: Is the defendant not guilty or is the defendant guilty of each of the charges against the defendant? In this case there are ten charges.

Now, in doing that, you have to decide the credibility of the witnesses. So you're not only the judge of the evidence, but you're the judges of the credibility of the witnesses. What do I mean by credibility? Cut to the bottom line, is the witness telling the whole truth, just some of the truth, or maybe none of the truth? That's for each juror to decide, how credible is each witness, how believable is their testimony?

We're about to start what we call voir dire which is just the French term. We just refer to jury selection as voir dire. But actual -- the literal translation is to speak the truth. And what do we mean by that? Well, our goal is to find 18 jurors for this case, 6 of whom will be alternates, and in order to find the 18 jurors, we're going to have to have potential jurors and we have asked now -- we're in our third week of jury selection -- lots of questions.

And I assume some of you might be a little bit anxious

3111

or nervous about coming into a big courtroom like this in front
Page 23

of a bunch of strangers and potentially having a United States District Court judge and five different lawyers question you. I know if I got a summons asking me to do that, even with my background and training, I'd be a little bit nervous too because we're usually afraid of the unknown. And for most of you this is probably the first time or unique experience.

I want to try and put you at ease a little bit because while you will be asked a lot of questions today primarily by the lawyers, there are no right or wrong answers to any of the questions. We're here to find out what your opinions and beliefs are on a number of issues including your views on the death penalty. Everybody is entitled to their own opinion, and nobody's opinion is any better than anybody else's. Any opinion that Juror 124 may have is just as important as any opinion that I might have or the lawyers or the President of the United States or United States congressman or senator.

And we're not here to pass judgment on your opinions, and we're certainly not here to try to talk you out of any opinions that you have because the great thing about America is you're entitled to believe any way you want, and that's a right that we all have. But we do want to find out what those opinions and beliefs are. So in order to do that, you're going to have to answer the questions as openly and honestly as you can.

3112

You will note that you each have a number, and I just wanted to explain that to you. Because this is a high-profile case -- by that I mean it's a case that the media will have a lot of interest in once it gets underway, and I expect there will be kind of a lot of news stories about the case -- I

Page 24

decided -- and it was my decision alone -- to give each juror a number.

Now, we all know your names. I've got a notebook with your juror questionnaires in it, and the lawyers have the same info. But we didn't want your names to get out into the public domain. And if we used them in open court, they would be in the public domain.

And here's why. I was concerned that because this is a high-profile case that if your names got out any idle curiosity seeker could look you up if they knew your name and knock on your door at 7:30 at night and want to chit chat with you about how the trial's going. And it's going to be a tough-enough job if you get selected to serve on this trial; you don't need to have your privacy invaded in that way. So that's the reason why we have numbers in this case.

I want to try and explain to you the jury selection process. When we started, we anticipated that jury selection would take two to three weeks. We're I believe in our 13th day. I may have that wrong by a day or so, but I think we're in our 13th day. The first week we only went four days. Last week we

3113

went all five, and this week we were -- we didn't start till Tuesday because I was in Washington, D.C., on Monday. And it's gone along very well. We hope to have a jury selected maybe today, maybe if not today Monday, maybe Tuesday at the latest, but we're pretty much on track.

And I did want to explain this to you. I told you that we came up with a system where you'd each come in one day, and that's what we've been doing. We've been bringing in small groups of potential jurors each day. And we could have set it

Page 25

up another way like I said.

I was reading -- right before this trial started, I was reading an article -- I believe it was in the New York Times -- about a case going to trial in federal court where they had 400 prospective jurors. And we actually started with 800, but that particular judge -- and we have a lot of discretion how to do jury selection. There's no one way to do it. There's a zillion different ways to do it. But this particular judge brought all 400 jurors into a -- they rented like a civic center in the particular city the case was going to trial in, and I know the first day they spent the whole day just filling out the questionnaire, and then I think they were all going to be there for about a month. And so the good news is you just come in for one day.

So we bring a small group of you in. After I introduce the lawyers and ask a few questions, I'm going to turn

3114

it over to the lawyers. We have time limits, so each side will question the entire group of you for about half an hour, each side, and then after that, we're going to take a break, and then we're going to bring you back for individual questioning. And what happens is each juror will just -- we'll start in the back row with Juror 463, and then we'll just go down the list. We'll probably be done about 1:30 or 2:00 this afternoon would be my guess with 7 of you.

We'll bring you in. Our CSO will hand you the microphone. You can sit anywhere in the front row. And then the lawyers, each side has 12 minutes to question each potential juror. And sometimes the government starts first, sometimes the defense. They just rotate back and forth. I may jump in with a

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2713 of 3245

few questions.

But the advantage of this system is that you will know at the end of the questioning today whether or not you're still in the jury pool or whether or not you're dismissed from jury service. If you're still in the jury pool, you have about a 50 percent chance of being selected to serve as a juror in the case. And when we manage to empanel the number of jurors we need which could be today -- it could be Monday or Tuesday -- then our clerk's office will let any of you know who we've sent home today telling you you're in the jury pool. They'll let you know whether you're in that 50 percent that made it as a trial juror or not, in other words, whether you're dismissed or

3115

whether you're actually going to be on the jury. We think we'll know that -- could be as early as today or Monday or Tuesday.

Once we get the trial underway, the trial will run four days per week, almost always Monday through Thursday. We'll take the week of June 10 through the 17th off.

Our trial day will start at 8:30 every morning. We'll start exactly at 8:30. I think you'll find we start very promptly. We'll take a 20- to 25-minute break around 10:00 or so, another break in the afternoon between 2:30 and 3. And then I will try and get you out of here every day -- between 4:30 and 4:45 will be the end of the trial day.

Now I'm going to have -- you'll meet the lawyers in more detail, and we're going to start with Mr. Williams, and we want to find out if you know any of the lawyers or participants in the trial. Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. Good morning, ladies and gentlemen. As the judge said, my name is C.J.

Page 27

Williams. I'm a federal prosecutor. I live over in Cedar Rapids and office there, but I have the privilege of appearing before Judge Bennett repeatedly over in this area.

At counsel table with me is Tom Miller. You were introduced to him, no relation to his boss Tom Miller. He is, as the judge said, the head of the regional prosecutor's office for the state of Iowa attorney general's office and has been designated to be co-counsel on this trial.

3116

MR. MILLER: Good morning.

MR. WILLIAMS: Also at the table you were introduced to Bill Basler. He's a Special Agent-In-Charge of the Iowa Division of Criminal Investigation office in Mason City, Iowa. He is what we call the case agent, the lead investigator in the case. He'll be sitting at counsel table and assisting us throughout this trial.

Back at this table is Sali Van Weelden. She's a legal assistant in our office from Cedar Rapids, and she also came out here to Sioux City and will be assisting us throughout this trial.

The United States Attorney's Office for the Northern District of Iowa is headed by Chuck Larson Senior who has been in Baghdad for about a year and hopefully will be back soon. He offices over in Cedar Rapids. We have two offices, one in Cedar Rapids, Iowa, one here in Sioux City.

Since it's much more likely you're going to know people from out here in Sioux City, I want to run through a list of the names of the people in our office out here in case you know somebody from our office. We have seven prosecutors and seven staff members, and so I'll just read their names: Forde

Page 28

Fairchild, Martha Fagg, Kevin Fletcher, Mike Hobart, Jack Lammers, Janet Petersen, and Shawn Wehde are all assistant United States attorneys.

Shayne Mayer, Del Tompkins, Penny Schlotman, Michelle

3117

Schwebach, Michelle Hatting, Carol McEntaffer, and Pat Calhoun are all of our staff people here in Sioux City.

THE COURT: Okay. Thank you, Mr. Williams. Now, do any of you know any of the folks at the prosecution table, any of the assistant United States attorneys or staff people that Mr. Williams indicated or anybody that works at the federal courthouse here? Raise your hand if you do.

Okay. Juror 124, we're going to pass this microphone down. And I'll make you a deal, and I'm going to make the same deal with the other six folks. If you speak directly into the microphone so that we can all hear you, I won't put up any karaoke for you to sing. How's that?

PROSPECTIVE JUROR 124: That's a deal.

THE COURT: That's a deal, all right. Who do you know?

PROSPECTIVE JUROR 124: Mike Hobart.

THE COURT: And Mr. Hobart is an assistant United States attorney. How do you know Mr. Hobart?

PROSPECTIVE JUROR 124: I know him more from his wife because she is a teacher in the district here in Sioux City, and I am as well.

THE COURT: Okay. And how well do you know Mrs. Hobart?

PROSPECTIVE JUROR 124: Personally by name. She knows me by name, yes.

Page 29

THE COURT: Have you ever been in their home, for example?

PROSPECTIVE JUROR 124: No.

THE COURT: Have they ever been in your home?

PROSPECTIVE JUROR 124: No.

THE COURT: Do you go out and socialize together?

PROSPECTIVE JUROR 124: No.

THE COURT: Anything about the fact that Mr. Hobart is an assistant United States attorney that might affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 124: No.

THE COURT: Okay. Thank you very much. Anybody else know anybody? Okay. Why don't we switch over to the defense. And they've actually been rotating, and I didn't change it this morning. Instead of Mr. Willett, it's going to be Mr. Stowers that starts.

MR. STOWERS: Good morning, everybody. Am I coming through up there? My name's Dean Stowers, and I am an attorney in Des Moines, Iowa, and I practice law in a law firm there with two partners, Brent Rosenberg and David Morse, and we have an attorney that we employ as well. Her name is Heather Wood.

Seated to my right is Angela Johnson, and Angela is from the Clear Lake, Iowa, area where she raised her two daughters Marvea and Alyssa. Angela's recently a grandmother of a two and a half-year-old granddaughter. Thank you, Angie.

Patrick Berrigan is an attorney from Kansas City where

Page 30

he practices law.

Seated back here is Mr. Al Willett. He's from Cedar Rapids, Iowa, where he practices laws with Ray Terpstra and Greg Epping.

Seated in between Mr. Berrigan and Mr. Willett is Lisa Dahl, and Lisa Dahl is assisting all of us working on this case, and she'll be here at least for the next week or so.

Does anybody recognize any of the names or the people that I've just mentioned? Thank you.

THE COURT: Okay. Thank you, Mr. Stowers. Okay. Now, our estimated length of the trial including jury selection is about three months. It's very hard to estimate the length of a trial. It's easier with a two- to three-day trial. You know you have six to eight witnesses. You figure the typical case is going to take two to three days. The greater number of witnesses and exhibits, it's very difficult to know exactly how long this trial will be. The lawyers have worked very hard to give me an accurate estimate. And so we think it's going to be about three months, but that includes jury selection. So, you know, best-case scenario, case might be done towards the end of June. It might spill over into July for a little bit. That's just the best we can do.

I want to talk to each of you about whether it would be a severe or extraordinary hardship to serve, and I'm going to

3120

ask you that question, each of you individually. But I wanted to give you a little bit of background information.

I understand that when people get summoned to appear for jury duty, not too many people are too excited about it. I imagine when you went to bed last night, your last thought

Page 31

before you fell asleep was probably not, gee, I hope I get selected tomorrow when I go into the courthouse to serve on this case.

And while I understand that, one of the rewarding parts of this job has been in major cases that I've had that have taken a couple months to try, I've always been incredibly touched by the willingness of people to serve their country as jurors. And I don't think many people think of it that way.

Every once in a while I get -- well, fairly often a friend calls me, oh, I just got called for jury duty, either federal court or state court; can you get me out of it? And I always say, No, I can't get you out of it. It's your obligation as a citizen to serve your country, and I really believe that. And I think -- I would hope that after at least today or this morning many of you would rethink your position about jury service and understand that it's not often we have the opportunity to serve our country. It's not very often.

Now, I get to do it every day. That's why I love my job so much. I get to do public service every single day. And while it's a great job in many respects, I made a lot of

3121

personal sacrifices when I took this job including financial, and lots of people make sacrifices.

None of these lawyers are from Sioux City. They're going to be away from their families. Matter of fact, they're all from greater distances than any of you. Two of the lawyers, one on each side, come from 330 miles away in Cedar Rapids. Two, one on each side, come from 200 miles away in Des Moines. And one comes all the way from Kansas City. And they're making a huge sacrifice to participate in this case.

Page 32

And during jury selection in this case, we've had people who when you read the questionnaires -- I mean, I've heard every excuse in the world about why somebody should get out of jury service including somebody who had ten cakes they had to bake over the next three months. Now, why they couldn't bake them on the Fridays we have off or on the weekends or in the evenings escape me a little bit, but we've had people make extraordinary sacrifices in order to serve their country. And it's very rewarding.

In a case that I had last year that was a very lengthy case, I'll never forget one particular day because we had two farmers both of whom farmed full time and had manufacturing jobs. They farmed full time, worked full time, pretty busy folk. And the trial was going to run into harvest season. And neither one of them were going to get paid on their manufacturing jobs if they served on the jury. And both of them

3122

were willing to serve on the jury even though it would make a huge personal sacrifice for them.

We had another individual who was the sole bread winner for his family and did not have a very high-paying job, and his company was only going to pay for the first week or two of -- I don't remember, but it was some very short period of time while he was on jury service. And he told us in that case when we asked him about his willingness to serve that he had talked to his spouse the night before and they were willing to use their entire life savings so he could serve his country as a juror in the case.

And so people do make extraordinary sacrifices to serve. And before you ask to get off this case, I want you to

Page 33

do some soul searching and ask yourself why those other folks should serve and you ought to be excused.

So let's see. We have 124. Why don't you pass it down just to the end of the row to 251, and I'm going to ask you, Juror 251, are you willing to serve if you're selected as a juror in this case?

PROSPECTIVE JUROR 251: I would have been had the case not been set back all the time. I am going to be celebrating my 50th wedding anniversary. I should say we are. My family has not been together, five children, for three years. We've planned the celebration the first part of July. And we're having family pictures taken. The photograph -- photographer's

3123

been asked for; the hall has been rented.

THE COURT: Where is the family celebration?

PROSPECTIVE JUROR 251: Little Rock, Iowa.

THE COURT: Okay. And what day is it?

PROSPECTIVE JUROR 251: The celebration will be on the 10th. My son from Ohio is coming on the first part of July and will be staying through the 12th or 13th.

THE COURT: Okay. What day of the week is the 10th?

PROSPECTIVE JUROR 251: The 10th is on a Sunday.

THE COURT: Okay. Well, how would that interfere with jury service because we're not having to have jury service on Sunday?

PROSPECTIVE JUROR 251: On the 11th we are having family pictures taken. That cannot be changed. Photographers have -- you just can't do that so -- plus I would like to spend some time with my family. I'm sorry.

THE COURT: Well, I'm sorry too because I'm not going

Page 34

to let you off.

PROSPECTIVE JUROR 251: Okay.

THE COURT: Okay.

PROSPECTIVE JUROR 251: Okay. Something -- and I'm --

THE COURT: That's all we're talking about right now is --

PROSPECTIVE JUROR 251: Not that I have a mother that's in the hospital and I'm her sole caregiver, and I didn't

3124

get the letter from the doctor because it was his day off yesterday, so he couldn't get it.

THE COURT: Okay. So why don't you tell us about that.

PROSPECTIVE JUROR 251: She has been in the hospital for three weeks. She is going to be dismissed to go to a care center somewhere for rehabilitation. There are many doctors' appointments that I will be having to take her to. I am the only child. My brother died. So I'm the only child.

THE COURT: So it's really your responsibility.

PROSPECTIVE JUROR 251: It's my responsibility.

THE COURT: And how much time do you anticipate that that will take?

PROSPECTIVE JUROR 251: Well, right now I have two appointments that I know of in May that I have to be taking her to. She -- I have got her set to be going to the nursing home. That is going to be done.

THE COURT: Do you know when that's going to happen?

PROSPECTIVE JUROR 251: I think that will be done tomorrow.

THE COURT: And I'm sure you'll want to get her

Page 35

settled in and all.

PROSPECTIVE JUROR 251: I want to get her settled in, and I also will be having to take her to those appointments.

THE COURT: Where is the nursing home?

3125

PROSPECTIVE JUROR 251: In George, Iowa.

THE COURT: And where are the doctors' appointments?

PROSPECTIVE JUROR 251: Sioux Falls. One is in Sioux Falls; one is in -- Rock Rapids are the ones that I know of right now.

THE COURT: And do you anticipate there may be other doctors' appointments, or you don't know?

PROSPECTIVE JUROR 251: I really couldn't say for sure, Your Honor. I really don't know.

THE COURT: It's much more important that you --

PROSPECTIVE JUROR 251: I did not plan on this.

THE COURT: No, I understand that.

PROSPECTIVE JUROR 251: Yeah.

THE COURT: Yeah. I think we could have worked around the picture taking and all.

PROSPECTIVE JUROR 251: Okay.

THE COURT: But I don't think we can work around your mother's illness, and it's more important that you be there for your mother. I totally understand that.

PROSPECTIVE JUROR 251: Okay. Thank you.

THE COURT: Okay.

PROSPECTIVE JUROR 251: Thank you very much.

THE COURT: And I just want to ask the lawyers if there's any objection.

MR. WILLIAMS: No, Your Honor.

Page 36

MR. BERRIGAN: No, sir.

THE COURT: Okay.

PROSPECTIVE JUROR 251: Thank you.

THE COURT: Good luck to you and your mother.

PROSPECTIVE JUROR 251: Thank you very much.

THE COURT: Thank you. Thank you for coming in today. That's our jinx, you know. Must be because it's the 13th day because I've always started with the 13th juror, and they've been always willing to serve.

PROSPECTIVE JUROR 251: I'm sorry.

THE COURT: That's okay. Somebody had to break the streak. That's what it's for. And enjoy your family reunion. Sounds like a wonderful event for your family.

Juror 766, are you willing to serve?

PROSPECTIVE JUROR 766: Yes.

THE COURT: Thank you.

Juror 124.

PROSPECTIVE JUROR 124: Yes.

THE COURT: But with some reluctance; right?

PROSPECTIVE JUROR 124: Well, I don't want to look at my four children being an extraordinary thing that I can't take care of this summer. I mean, it would be --

THE COURT: It's a sacrifice.

PROSPECTIVE JUROR 124: It would be a sacrifice, and many activities would go parentless because of the nature of my

husband's work. He can't make it to them all. Two are teenagers and two young girls, and that's the reason why I chose
Page 37

my profession is to be with my children in the summer.  And we all know that even though that they're somewhat independent, when you're a teenager, you need a parent with you just as much as you do if you're a small child.

THE COURT:  I understand that being the parent of a teenager.

PROSPECTIVE JUROR 124:  Teenagers.

THE COURT:  Yeah, right, yours is plural, I understand that.  But that's the sacrifice we ask people to make.

PROSPECTIVE JUROR 124:  That's right.

THE COURT:  And so I appreciate it.  Thank you.  Could you pass it back to 463, please.

Are you willing to serve?

PROSPECTIVE JUROR 463:  Yes, but maybe just for today. I have health problems.  I don't know if to be nervous can affect these.

THE COURT:  Are you concerned that it might be too stressful to be a juror?

PROSPECTIVE JUROR 463:  Yes.

THE COURT:  Let me ask you this.  Would you rather talk about your health problems when we bring you back up here individually, or do you have any problem talking about it now?

PROSPECTIVE JUROR 463:  About now I think.

3128

THE COURT:  Okay.  Can you explain to us what the health problems are?

PROSPECTIVE JUROR 463:  I have diabetes.

THE COURT:  Well, how do you think that would affect your ability to be a juror?

PROSPECTIVE JUROR 463:  I don't know, but every time

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2725 of 3245

when I feel nervous or something like that, it raise my blood sugar.

THE COURT: Are you nervous right now?

PROSPECTIVE JUROR 463: Yes.

THE COURT: Well, and I understand that. I think almost everybody their first time here is nervous. Do you think that once the trial got underway and we got into kind of a routine and you were used to coming in every day that you wouldn't be so nervous?

PROSPECTIVE JUROR 463: And also hard for me to be here every day because I have to support my family. If I have not to work every day, you know, we not get enough pay here, you know.

THE COURT: Well, I'm getting the idea that you just don't want to be on the jury. Is that accurate?

PROSPECTIVE JUROR 463: Not really I don't want to. I like to but, you know . . .

THE COURT: Okay. Well, tell me about your -- what financial difficulty would be created by you serving on the

3129

jury? I don't remember your questionnaire. Where do you work?

PROSPECTIVE JUROR 463: I work at Curly's Food.

THE COURT: Well, are they going to pay you while you're on jury service?

PROSPECTIVE JUROR 463: I don't know for how many days. I'm not sure. I never asked.

THE COURT: Well, why didn't you ask? You knew you were coming in here, and you knew --

PROSPECTIVE JUROR 463: Because I don't know this was going to take a long time or something like that. I know they

can pay for one or two days, but I don't know if they can pay for, you know, weeks or something like that.

THE COURT: Well, I'm not going to let you go. We can talk more about it when we talk to you individually.

PROSPECTIVE JUROR 463: Fine.

THE COURT: Thank you.

Juror 402?

PROSPECTIVE JUROR 402: Thank you, sir. I'm more than willing to serve as long as you promise me the dates in June that we have off that we have. That is written in stone?

THE COURT: The 10th through the 17th?

PROSPECTIVE JUROR 402: Yes.

THE COURT: That is written in stone.

PROSPECTIVE JUROR 402: Here. Can you have him give this to you? This would explain why.

3130

THE COURT: Okay. Would you be able to serve if it's written in stone that we're taking the 10th through the 17th off?

PROSPECTIVE JUROR 402: Sure would.

THE COURT: Okay. Thank you.

PROSPECTIVE JUROR 402: That is my son. He's five years old.

THE COURT: And this would actually give you some time both before and after the surgery.

PROSPECTIVE JUROR 402: Yeah, because we gotta go down the day before, and that's Monday he has surgery. He's out by Thursday or Friday, and I have a wife that will take care of him the next -- you know, see for him the next week.

THE COURT: Yeah, and so you'd actually be able to be

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2727 of 3245

home with him for several days because I think when I say the 10th through the 17th and we actually have -- I think the 17th is a Friday. So we actually have a couple of more days.

PROSPECTIVE JUROR 402: Yes.

THE COURT: Well, I appreciate it very much. Thank you. Thank you.

Juror 587, are you willing to serve?

PROSPECTIVE JUROR 587: Yes, Your Honor, I am.

THE COURT: Okay. Thank you very much. Thank you.

Juror 412.

PROSPECTIVE JUROR 412: I would like to, but I have a

3131

doctor's appointment -- or doctor's excuse. I have fibromyalgia and osteoporosis, and the sitting is very painful. Other than that, I would like to.

THE COURT: How about we put you in the back row and you stand all day?

PROSPECTIVE JUROR 412: It would be difficult. I mean, I'm just -- I'm in pain all the time but -- and I do take --

THE COURT: Whether you're sitting or standing?

PROSPECTIVE JUROR 412: I do take pain -- I'm always in pain. The pain relievers help some, but the sitting does bother me a lot.

THE COURT: Let me just ask you a little bit about that if I may. What's the longest you can really sit for at any given time?

PROSPECTIVE JUROR 412: I mean, just driving to my daughter's in Sloan, I mean, it bothers me a lot. By the time I get there, then I have difficulty walking.

Page 41

THE COURT: Without looking at your questionnaire, I don't remember. Do you work during the day outside the home?

PROSPECTIVE JUROR 412: Yes, but I stand.

THE COURT: Okay. What's --

PROSPECTIVE JUROR 412: And we take breaks. I usually -- it doesn't bother me to sit for 15, 20 minutes or a half -- even an hour, but to sit all day would be --

3132

THE COURT: Okay. Well, let me explain another thing to you, and then, you know, you can tell me how you feel about it. I know it's hard to sit for a long period of time. And so I never have jurors sit for more than 40 minutes.

PROSPECTIVE JUROR 412: Okay.

THE COURT: And here's what happens. Every time we change witnesses, the jurors stand and stretch. Sometimes it can be a couple of minutes while the witness leaves and we get a new witness in. And if we're on a particularly long witness that goes more than 40 minutes, I just stop the lawyers about every 40, 45 minutes, and I give the jury what I call a stretch break, and you get to stand and stretch.

PROSPECTIVE JUROR 412: Okay.

THE COURT: So you'd never really be sitting for more than 40 or 45 minutes. On the other hand, you know, it's not like you're going -- and the other thing is you could -- if you felt you needed to just stand up and take a stretch, you could do that.

PROSPECTIVE JUROR 412: Okay.

THE COURT: We'd maybe put you in the back row so you wouldn't distract anybody. You know, if you were in the front row, you'd distract somebody. And you'd be free to stand up and
Page 42

stretch whenever you wanted to.

PROSPECTIVE JUROR 412: Okay.

THE COURT: Now, would that help you?

3133

PROSPECTIVE JUROR 412: Uh-huh.

THE COURT: Do you think you'd be able to be a juror if you were allowed to -- if we had all those stretch breaks and you could take a stretch any time you needed one?

PROSPECTIVE JUROR 412: I could sure try.

THE COURT: Okay. Good. Well, thank you. Now, I wanted to talk to you for a minute -- this is in preparation for the lawyers asking you questions -- about your -- you know, it's obviously important to me that you have a duty to serve, but you have an equal duty not to serve, and here's what I mean by that. You need to answer the questions that the lawyers and I ask you as openly and honestly as you can. And we're not here to pass any judgment on your beliefs. You're entitled to believe whatever you want.

But not every potential juror is a suitable juror for the case that we have jury selection for. Some of you might not be a good juror in this case, but you'd be a terrific juror in some other case. And that's why we need you to answer the questions honestly. And when you do that, even if you're not selected, you serve your country just as well by being honest as you would in being on the jury. So I just want to encourage each of you to answer as honestly as you can to the questions that get asked.

I want to explain the trial process because this is an unusual case because it's a federal death penalty case. And

3134

Page 43

what makes this case unusual is that there are potentially three different phases to this trial. And let me distinguish this case from almost every other case that I've had in 11 years, coming up on 11 years. In most trials -- well, in all criminal trials except if the death penalty is at issue, there's one phase, and that's called the guilty/not-guilty phase. The jurors listen to the evidence, take my instructions. At the end you deliberate, and you determine whether the defendant is not guilty or guilty of each of the charges against the defendant.

But in a typical case, if you decide that the defendant is guilty, you go home, and you're not concerned at all about punishment. Punishment is my responsibility. And, in fact, I've sentenced well in excess of a thousand individuals.

That isn't true in this case. The first phase is just like every other case. We call it the merits or not-guilty/guilty phase, and that is like every other case. But there's a potential for a second phase that we don't have in other types of criminal trials. And the second phase would be only if there is a unanimous finding by all 12 jurors beyond a reasonable doubt that Angela Johnson is guilty of one or more of the ten counts in the first phase do we even have a second phase.

And Mr. Berrigan who you're going to meet today, one of the defense lawyers, early in the jury selection process he made an analogy that I thought was a pretty good one. He

3135

analogized the trial to like a basketball game where you have a first half, an intermission, and then a second half. The only

Page 44

difference is in a basketball game you always have an intermission and a second half. In this case there may only be the first half, and that would be the merits phase because the jury may find the defendant not guilty of all ten counts. And if that happens, then there is no second phase.

But if the jury were to unanimously find Angela Johnson guilty of one or more of the ten counts, there would be the second phase. And the second phase is what I call the eligibility or gateway phase. And this phase is kind of like the intermission because it's not going to last nearly as long as the merits phase. In fact, in the second phase, I don't anticipate that evidence will be presented.

But if the jury were to come back after the first phase and find the defendant, Angela Johnson, guilty beyond a reasonable doubt of one or more of the ten charges, then there would be a second phase, and no evidence would be presented, but you'd have a separate set of instructions, and you'd hear closing arguments from the lawyers. And then in the second phase you would have to decide whether the government proved an eligibility or gateway factor and one or more statutory aggravating factors beyond a reasonable doubt. If the jury unanimously agrees that the prosecution has proved this, then and only then would we reach the third phase.

3136

Now, it gets kind of complicated, so I'm not going to define for you what a gateway or eligibility factor is or what an aggravating factor is. But suffice it to say that unless the jury unanimously finds that, we don't have the third phase.

And the third phase is the penalty phase. And in this phase if we ever get there, you would be required to consider

Page 45

and weigh aggravating and mitigating factors that I instruct you on to determine whether Miss Johnson should receive life imprisonment or the death penalty.

Aggravating factors are factors that the government would put on evidence of that would tend to try and persuade a juror to vote for the death penalty. Mitigating factors are factors that the defense can put evidence on -- of course, the defense has no obligation to ever put on any evidence. But if they choose to, the defense could put on evidence of mitigating factors.

I would define for you in the penalty phase in my written instructions what is legally sufficient for an aggravating factor and what is legally sufficient for a mitigating factor. And then you would have to decide if there was evidence that established either an aggravating factor or a mitigating factor.

If you found there was evidence that established aggravating factors and mitigating factors, then each juror would weigh those after they considered them. They would weigh

3137

the aggravating factors and the mitigating factors. An aggravating factor, for example, could be what's called a vulnerable victim. I would give you an instruction on what is a vulnerable victim, and you would have to decide whether there were any vulnerable victims in the case. And if you decided that the government proved that factor beyond a reasonable doubt, you would have to weigh that against any mitigating factors that you would find.

Mitigating factors could be so broad, they're really hard to know ahead of time. But it can include a lot of things

Page 46

about the defendant's background and life experiences. It could be things like mental, physical, or sexual abuse as a child, any mental health issues, and a whole variety of other factors including lack of a substantial criminal record.

And then you would take any mitigating factors that the evidence establishes, any aggravating factors, and then you get to weigh those, and nobody, nobody, gets to tell you how much weight to give each factor. The weight to be given any aggravating factor or any mitigating factor is for each of you to decide.

And in that way, in weighing the aggravating factors and mitigating factors, you would determine whether -- individually as each juror you would determine whether or not you would vote for life imprisonment or the death penalty, and you are never, ever required to vote for the death penalty.

3138

Now, in the penalty phase, only if each juror unanimously votes for the death penalty will Miss Johnson be sentenced to death by me. And I gave you this overview just to try and explain to you what the trial process will be like in this case.

Why don't we take a stretch break, and then we're going to start -- who's going to go first today? Mr. Miller? And then we're going to have some general questioning by Mr. Miller, and then we'll have some general questioning by Mr. Stowers.

Okay. Please be seated.

MR. MILLER: May it please the Court.

THE COURT: Mr. Miller, thank you.

MR. MILLER: Counsel, Ms. Johnson, counsel.

Page 47

Good morning, folks. Everybody having fun so far? Juror 587, if you would take the microphone -- do we have a microphone? Thank you, ma'am.

PROSPECTIVE JUROR 587: Yeah.

MR. MILLER: Here's what I want to try to do. As Judge Bennett already indicated, the person with the most difficult job here right at the moment, you probably think it's you because you're holding that microphone, but actually it's our court reporter, Mrs. Semmler, who has to take down everything. And of all the responsibilities in taking down what everyone says, probably the most difficult aspect of that job is

3139

during jury selection when we have not just one lawyer and one responder but a group of people.

So what I'm going to ask you folks to do is to pass that microphone among you as I address you by number so that our court reporter can keep a clear record; okay?

And the other thing I'm going to do is this, and it's the lawyer's responsibility to make sure that there's a clear record. It's not your responsibility. But when you do what you just now did, it's a very human, natural thing. I do it all the time too. If I feel like saying yes, a lot of times I'll just nod my head, and everybody knows what I'm saying, but there's no clear record of that. So please speak out loud for us, and that will help the record too; okay?

PROSPECTIVE JUROR 587: Yes.

MR. MILLER: Very good. Very good. Juror 587, I noticed -- and I think we have a couple folks on this jury who have previously served on a jury before, but I noted that you did in a criminal case. Do you remember that?

Page 48

PROSPECTIVE JUROR 587: It was in the other courthouse on a state level.

MR. MILLER: Woodbury County Courthouse.

PROSPECTIVE JUROR 587: Yes.

MR. MILLER: A criminal case.

PROSPECTIVE JUROR 587: I served on a drunk driving charge.

3140

MR. MILLER: Okay. And that is a criminal case. You came to a conclusion finding the defendant guilty or not guilty in that case.

PROSPECTIVE JUROR 587: Yes, sir.

MR. MILLER: And if you're required to serve on this jury, you'll find that the procedure is very similar. There will be differences. This will undoubtedly be a much longer trial, and, of course, the issues are different ultimately, but there will be many similarities as well.

But the reason I wanted to visit with you first is because some of your fellow jurors have never been in this situation before. I just wanted you to share with them how you felt about jury duty when you had that experience if you would, sir. Just give us a few thoughts about how you felt about it when you were done with it.

PROSPECTIVE JUROR 587: I felt good about the decision. In this particular case the defendant was found not guilty. We followed the judge's instructions, proof beyond a reasonable doubt, and we didn't feel that the prosecution had really done that. I felt good about the duty. I feel serving on a jury is -- I heard something on television once, a man who tries to escape jury duty escapes active duty, and I'm a firm

Page 49

believer in that.

MR. MILLER: You've been in active duty too.

PROSPECTIVE JUROR 587: Yeah, four and a half years.

3141

MR. MILLER: Very good. Was that your first experience on a jury before?

PROSPECTIVE JUROR 587: Yes. I had been summonsed maybe three, four times. I don't remember. That was the first time that I was actually on a jury. In all the other cases, I either knew somebody in the courtroom.

MR. MILLER: I'm just guessing when you first went in for jury duty you probably felt a little apprehensive about what on earth am I getting into?

PROSPECTIVE JUROR 587: Just about like right now, yeah.

MR. MILLER: Okay. Well, when you got done with it, did you feel more comfortable with the responsibilities?

PROSPECTIVE JUROR 587: Yes, I did.

MR. MILLER: And did you feel that it was something that you and your 11 fellow jurors were perfectly capable of doing and maybe even found a little bit interesting as part of participating in our system of government?

PROSPECTIVE JUROR 587: Yes, I did.

MR. MILLER: And the reason I ask you these things is because your fellow jurors, those of them that haven't been through this before, are very naturally a little apprehensive, and I just wanted to know if you can assure them that they're probably going to live through the experience.

PROSPECTIVE JUROR 587: Oh, yes. We'll get through it

3142

Page 50

okay.

MR. MILLER: Okay. It's a responsibility.

PROSPECTIVE JUROR 587: Yes, sir.

MR. MILLER: Okay. And responsibility's not always pleasant, but it's something we have to shoulder as adults, and this is one of them from time to time is jury duty. Fair statement?

PROSPECTIVE JUROR 587: That's a very fair statement, yes.

MR. MILLER: And before I ask you to pass the microphone, in that case did you find the responsibility to be simply that of trying to figure out from the evidence just what happened?

PROSPECTIVE JUROR 587: That would be correct, yes.

MR. MILLER: And would that be your goal as a juror in this case as it was in the case across the street in Woodbury County?

PROSPECTIVE JUROR 587: Yes, it would.

MR. MILLER: Simply to determine the facts from the evidence. In other words, this is not an elaborate ritual. This is a very practical business of determining the truth. Fair enough?

PROSPECTIVE JUROR 587: That'd be correct, yes.

MR. MILLER: Very good. And I'll quit picking on you for a minute, and you can pass that -- why don't you pass it

3143

forward to my juror in the front row, 766.

Ma'am, if you could take that. Thank you so much.

How about yourself? Does that make sense to you as far as that
Page 51

being what jury duty's all about, ma'am?

PROSPECTIVE JUROR 766: Yes.

MR. MILLER: And you're an adult and a mother.

PROSPECTIVE JUROR 766: Yes.

MR. MILLER: These --

PROSPECTIVE JUROR 766: And grandmother.

MR. MILLER: And grandmother. The juror we just spoke to -- I'm not going to ask you to pass it back to him, but he's a foreman on a crew, and I assume he has some supervisory responsibilities. His opinion may even involve whether or not people keep their job or not if that becomes an issue. That's a job responsibility that can give a person broad shoulders, but there's probably no greater responsibility than being a parent. Would you agree with me there?

PROSPECTIVE JUROR 766: Yes.

MR. MILLER: So I just wanted to assure myself that Juror 766 is someone who is not a stranger to responsibility, someone who's carried that herself and feels comfortable with the idea; even though it's a different responsibility and a new responsibility, that you can view jury responsibility as yet just one more as an adult that we have to shoulder from time to time.

3144

PROSPECTIVE JUROR 766: Yes, I do.

MR. MILLER: Fair statement?

PROSPECTIVE JUROR 766: Uh-huh, yes.

MR. MILLER: You indicated among the things you like to do is to play with your daughter and grandchildren. Can you just give us any idea of what sort of activities you enjoy along those lines?

Page 52

PROSPECTIVE JUROR 766:  They like to go to the park, paint, just be with them.  My daughter is 22 months, and my grandkids are 2 and 3.  Go figure that one out.  They're just wonderful kids, and I just love being around them.

MR. MILLER:  And that's your favorite thing to do I assume is to spend time with them.

PROSPECTIVE JUROR 766:  Yes.

MR. MILLER:  And what they take an interest in sort of dictates what you take an interest in to a large degree.

PROSPECTIVE JUROR 766:  It's pretty much what they want is what we do.

MR. MILLER:  I think all of us as parents, our interests change as we find out what our children are interested in.

PROSPECTIVE JUROR 766:  Yes.

MR. MILLER:  Thank you, ma'am.  I'll ask you to pass it to your neighbor, Juror 124.

You're a first grade teacher.

3145

PROSPECTIVE JUROR 124:  Correct.

MR. MILLER:  And have been for a number of years.

PROSPECTIVE JUROR 124:  Eighteen.

MR. MILLER:  You've told us that one of the reasons for choosing that was because that particular choice of an opportunity offers you the opportunity to spend time with your children in the summer, and we appreciate that.  And even though -- and this goes for everyone here.  Even though we appreciate your expression of willingness to serve despite the sacrifice and what you've mentioned to us as far as the sacrifices that you're making, it's important to us that we know

Page 53

that because obviously we want to get a little bit better acquainted with you folks and understand who it is that we're asking to serve on this jury.

You have some children in the teen years. What sort of activities do they enjoy and do you enjoy them watching in?

PROSPECTIVE JUROR 124: Our two teenage sons are heavily into sports, and so the sport now is baseball. And our daughters are also doing softball and dance and things like that.

MR. MILLER: Okay. Many of which would be during the daytime hours.

PROSPECTIVE JUROR 124: Correct.

MR. MILLER: Very good. Tell us -- and I think from personal experience that those years can be challenging on a

3146

parent as well and that that is a heavy responsibility. Would you agree with me?

PROSPECTIVE JUROR 124: Very much so.

MR. MILLER: One that may help ready you for a new but still very important responsibility of serving as a juror.

PROSPECTIVE JUROR 124: Correct.

MR. MILLER: Likewise your job, can you tell me just a little bit about that? I mean, I think each of us has a different job, and over time we become maybe comfortable in our own job to some degree, and we look at other people's jobs and say, My goodness, how can they do that? And I'll have to confess, being an elementary school teacher particularly of first graders is one that strikes me as being quite a challenge. Can you tell us a little bit about that?

PROSPECTIVE JUROR 124: It is an extreme challenge,
Page 54

but it is a very rewarding job. I'm blessed to be a mother of four which is my primary profession and then to be a school teacher. Have to set a good example for kids, and basically it goes beyond reading, writing, and arithmetic. It's teaching right and wrong every day.

MR. MILLER: Those children are five and six years of age.

PROSPECTIVE JUROR 124: Six and seven.

MR. MILLER: Six and seven now?

PROSPECTIVE JUROR 124: Uh-huh.

3147

MR. MILLER: An age at which children are particularly in need of guidance and --

PROSPECTIVE JUROR 124: Guidance, good role models, a friend, and also someone that's strict with them as well.

MR. MILLER: Certainly. That's all part of protecting them is raising them right, isn't it?

PROSPECTIVE JUROR 124: Right.

MR. MILLER: Thank you so much. I'll allow you the opportunity to pass that microphone back. Thank you, Juror 124.

Juror 463, is that right?

PROSPECTIVE JUROR 463: Yes.

MR. MILLER: How are you today, ma'am?

PROSPECTIVE JUROR 463: So-so.

MR. MILLER: Okay. Well, believe me, that feeling of nervousness is one that six people sitting there together including yourself are all experiencing, and what it means more than anything else is that you are human because this is the -- as the judge mentioned, absolutely to be expected, and I want to try to put you at ease as much as possible, but I realize that's

Page 55

easy for me to say and not necessarily that easy for you to do. I notice that you're married. Have any children?

PROSPECTIVE JUROR 463: Yes.

MR. MILLER: How many children do you have?

PROSPECTIVE JUROR 463: Two.

MR. MILLER: And their ages?

3148

PROSPECTIVE JUROR 463: Twenty-two and twelve.

MR. MILLER: Can you tell me about their activities? Is the 22-year-old outside of the home now?

PROSPECTIVE JUROR 463: Do I have to or --

MR. MILLER: I'm just curious what they're doing. Do you have activities with your 12-year-old?

PROSPECTIVE JUROR 463: Yes, go to school, spending time with her. My older daughter work, and we like to stay together on the weekends.

MR. MILLER: Are you a close family?

PROSPECTIVE JUROR 463: Yes.

MR. MILLER: And you've spent 20 plus years of your life raising children and doing your very best you can to provide the best life possible and to raise them the best you can. Fair statement?

PROSPECTIVE JUROR 463: Yes.

MR. MILLER: And you're still doing that; right?

PROSPECTIVE JUROR 463: Yes.

MR. MILLER: I assume you take that as a serious responsibility.

PROSPECTIVE JUROR 463: Yes, it is.

MR. MILLER: You've never been in a jury duty situation before.

Page 56

PROSPECTIVE JUROR 463:  No.  I been afraid of these places.

3149

MR. MILLER:  Pardon me?

PROSPECTIVE JUROR 463:  I been afraid of these places.

MR. MILLER:  Well, let me tell you, to some degree these places are supposed to be -- I guess being afraid of them isn't a bad thing to some degree.  You walk into a room anywhere in our country -- it isn't usually a room that has 30-foot-high ceilings and magnificent paneling and the trappings of real grandeur that you see here in this room.  But can you agree with me that that maybe is for a good reason that this room is such an awe-inspiring place?

PROSPECTIVE JUROR 463:  Yes, but when you never been in a place like this, you feel like -- I don't know.

MR. MILLER:  You walk in here, and you think, my goodness, what an awe-inspiring place.  Well, I would suggest to you that it's supposed to be that way.  And yes, while that does make us feel nervous, especially the first time we walk in here, it's that way for a reason because it's important that the business that goes on here be taken very seriously by everybody. But it also can't function unless we have 12 jurors willing to say, okay, this is a place where this business gets done, and I can help do that business.

Now, you're a grown woman, an adult, a woman who's raised and raising children.  You're no stranger to responsibility.  We'll visit later with you about any physical issues that you may have of serving on the jury, but do you feel

3150

Page 57

that as an adult, as a woman who has shouldered the responsibility of raising children that you're no stranger to responsibility and could participate with your 11 fellow jurors in carrying out that job together?

PROSPECTIVE JUROR 463: Yes.

MR. MILLER: Very good. And again, two things. Number one, do hold that microphone just a little closer so I can hear your answers and, more importantly, so Mrs. Semmler can hear those answers.

I was in this courtroom in another case before Judge Bennett some time ago in which he mentioned the karaoke, and we had a juror say I would gladly sing karaoke rather than answer questions of those lawyers. So I understand that, but we still need to hear you clearly; okay?

PROSPECTIVE JUROR 463: (Nodded head.)

MR. MILLER: Bottom line, do you feel if you're required to do so -- and I realize this isn't something that anybody necessarily looks forward to. It is something that will call upon jurors to make decisions that they might not necessarily find pleasant, but do you realize we cannot have a system of justice that functions unless we can ask 12 citizens at a time to come in and participate in making these decisions? You agree with that, ma'am?

PROSPECTIVE JUROR 463: Yes.

MR. MILLER: And you understand that.

3151

PROSPECTIVE JUROR 463: Yes.

MR. MILLER: And I don't want to be putting words in anybody's mouth. If you have any reservations about your

Page 58

ability to do that, any of you, feel free to share them with us. But we need a cross-section of our society willing, all 12, to get together and share your views and thoughts on these things so that we can have these issues decided. Do you feel that you would be maybe after a couple of days of participating a little more comfortable with that role and after you're better acquainted with your fellow jurors participate in making these decisions, deciding what happened, in other words?

PROSPECTIVE JUROR 463: I don't know if I can say that.

MR. MILLER: I can assure you you're not the only one sitting here who doesn't like that. That isn't the question. The question is if we force you to do it -- and it's as simple as that. If we force you to do it, do you feel you can call upon that experience you have, the responsibility that you've already shouldered as a parent, and decide that this job of being a juror is just one more responsibility, not always the most pleasant but still one more responsibility that as an adult sharing with 11 other adults you can carry and take on even though you may not want the job? And I realize there are financial issues in your case too, and perhaps we can visit more about those when we take you in individual. But that aside,

3152

you're an adult. You're a parent. You're someone who's no stranger to responsibility. Do you feel you can look at jury duty as a similar responsibility as that?

PROSPECTIVE JUROR 463: Yes.

MR. MILLER: Feel you can do that? Thank you so much, ma'am. You can pass that dreaded microphone.

And it's Juror 402. You and the fellow to your left

Page 59

are a couple avid outdoorsmen.

PROSPECTIVE JUROR 402:  Yes, I am.

MR. MILLER:  Very good, sir.  Can you tell me just briefly what you do each spring?  What are you going to be missing if you're here instead of taking a vacation day?

PROSPECTIVE JUROR 402:  Work.

MR. MILLER:  Okay.  You're not planning on getting out doing any spring fishing?

PROSPECTIVE JUROR 402:  Fishing and hunting, but that's weekends mainly.

MR. MILLER:  Very good.  We handed out this morning a list, a fairly long list of names of people each of whom may be a witness in this case.  Did you have an opportunity to look at that?

PROSPECTIVE JUROR 402:  Yes, I did.

MR. MILLER:  And while I'm going to be picking directly on Juror 402, I'd like each of you to think about this as I ask this question.  Did you recognize any of the names on

3153

that list?

PROSPECTIVE JUROR 402:  No, I didn't.

MR. MILLER:  Very good.  Is there anyone here who did recognize a name as a possible acquaintance?  And if so, please raise your hand.

Juror 124, which name did you --

PROSPECTIVE JUROR 124:  Not as an acquaintance but as a last name.

MR. MILLER:  Hold on just a second.

PROSPECTIVE JUROR 124:  Sorry.  Not as an acquaintance but a last name.  Being in the teaching profession for 18 years,

Page 60

I run across a lot of names. And a particular last name does ring a bell of a family that offered a lot of concern years ago.

MR. MILLER: What is that name?

PROSPECTIVE JUROR 124: Jill Mannion.

MR. MILLER: Mannion? Okay. Jill Mannion is not someone you're personally acquainted with, but you recognize the last name.

PROSPECTIVE JUROR 124: Correct, the family name.

MR. MILLER: If you are required to serve on this jury and Jill Mannion or anyone with the last name Mannion takes the witness stand and testifies, it would be your job with her, as with every other witness in this case, to sit in judgment upon the credibility of her as a witness, judge her testimony in context with all the other witnesses and any evidence that may

3154

support it or contradict it. Do you feel that your acquaintance with the name would impair your ability to listen to her testimony and treat it fairly and impartially as you do all of the witnesses in this case?

PROSPECTIVE JUROR 124: If I knew that there was a relation to the story of the Mannions that I had years ago teaching, I would have a hard time with that.

MR. MILLER: There were some difficulties.

PROSPECTIVE JUROR 124: Correct, possibly child abuse.

MR. MILLER: But you're not telling us that Jill Mannion is someone. It's just the name.

PROSPECTIVE JUROR 124: Right. And I cannot remember all the names either. I mean, when I'm thinking of students that I've had and their parents and things like that, but I also know it was somewhat of a large family as well.

Page 61

MR. MILLER: And perhaps we can get into that in more detail later, but at least at the moment, aside from what you've shared with us, would the fact that anyone who has that name in and of itself affect your ability to be a fair juror in your opinion?

PROSPECTIVE JUROR 124: No.

MR. MILLER: Anyone else recognize any of the names on that list? And if so, please raise your hand. I don't see any. You can pass that microphone, and we'll pick on Juror 766.

No, that's you.

3155

PROSPECTIVE JUROR 766: That's me.

MR. MILLER: We're talking about witnesses. You've -- in this case we're going to have witnesses from a -- if we have close to a hundred witnesses, you can expect that they would come from a number of different walks of life. One set of witnesses, we may hear from one or more individuals who are incarcerated or were formerly incarcerated, convicts, people who've been convicted of crimes. If they testify as cooperators, in other words, people who, despite the fact that they had been convicted of a crime, are nevertheless cooperating with the government in providing information to the jury, I trust that their position as convicts is something that might cause you to look with at least some natural skepticism upon their testimony. Fair statement?

PROSPECTIVE JUROR 766: Yes.

MR. MILLER: Okay. And that's fair enough. That's fair enough. What I want to know is this. I expect if you are serving on this jury at the conclusion of the case you'll receive the benefit of a lot of instructions from the judge that

Page 62

will help you understand exactly what your job is. And, in fact, you'll receive some instructions even before beginning that task. But one of those instructions I expect will advise you that it's appropriate to consider any possible motives that a witness, particularly a witness in that situation, might have. In other words, if they have any hope of receiving leniency in

3156

exchange for cooperation, that's something that's perfectly appropriate for you to consider and that you should consider such testimony with care and caution. Do you feel you could follow that instruction, Juror 766?

PROSPECTIVE JUROR 766: Yes.

MR. MILLER: Okay. Does that make sense to you?

PROSPECTIVE JUROR 766: Yes.

MR. MILLER: Okay. But by the same token, would you listen to that as you do all other testimony, in other words, listen to the witness, to every witness that testifies in this case?

PROSPECTIVE JUROR 766: Yes.

MR. MILLER: And judge their credibility on all of the factors that might affect whether or not they're believable including whether it's corroborated by other testimony and the like?

PROSPECTIVE JUROR 766: Yes.

MR. MILLER: Thank you very much. You can pass that microphone to the back row now, and let's send it all the way over to your left.

Juror 412, how are you today?

PROSPECTIVE JUROR 412: I'm just fine.

MR. MILLER: Good. Now, you've raised children as

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2750 of 3245

well.

PROSPECTIVE JUROR 412:  Uh-huh, and grandchildren.

3157


MR. MILLER:  And grandchildren.  And I notice you enjoy watching grandchildren activities.

PROSPECTIVE JUROR 412:  Yes.

MR. MILLER:  What sort of activities?

PROSPECTIVE JUROR 412:  I have a granddaughter that plays soccer and grandson that plays baseball.

MR. MILLER:  Very good.  And again, as a parent -- I think everybody on this jury is a parent -- you're no stranger to responsibility.

PROSPECTIVE JUROR 412:  True.

MR. MILLER:  Do you feel you can share that kind of responsibility when serving as a juror in the case?

PROSPECTIVE JUROR 412:  I can.

MR. MILLER:  Very good.  I notice that one of your three children is someone who actually has had some involvement in law enforcement as a member of the drug task force; is that correct?

PROSPECTIVE JUROR 412:  Yes.

MR. MILLER:  And actually has -- am I correct in recalling that she worked with the United States Attorney's Office?

PROSPECTIVE JUROR 412:  Yes.

MR. MILLER:  Is that the U.S. Attorney's Office here in Sioux City?

PROSPECTIVE JUROR 412:  Yes.

3158


Page 64

MR. MILLER: Despite that fact, you're not personally acquainted with any of those folks.

PROSPECTIVE JUROR 412: No.

MR. MILLER: Would that fact cause you any concerns or difficulty in being fair and impartial as a juror in this case?

PROSPECTIVE JUROR 412: No.

MR. MILLER: And let me just add one thing. I expect that if you serve on this jury you will be instructed by the judge that the testimony of a peace officer, a law enforcement officer, a cop, is not to be afforded any extra credibility merely by virtue of the title or employment. Does that seem fair to you?

PROSPECTIVE JUROR 412: Yes.

MR. MILLER: And is that an instruction you feel you can follow?

PROSPECTIVE JUROR 412: Yes.

MR. MILLER: And just so we can just cover that a little bit more, police officers are human beings; right?

PROSPECTIVE JUROR 412: True.

MR. MILLER: Okay. We certainly hope that they are fair and honest. We hope that of all of our witnesses as well and all humans make mistakes, and all humans are subject to all of the full range of human frailties and qualities; fair statement?

PROSPECTIVE JUROR 412: Yes.

3159

MR. MILLER: Very good. Why don't you pass that just to your right, and I'll visit briefly with -- well, move it over two to Juror 402.

I think you indicated some concern about peace officer

Page 65

testimony along those same lines. Can you agree with that as being an appropriate way to look at things, that you don't -- you don't judge a cop as being somebody that's automatically credible because he wears a badge? You have to look at him individually and decide his credibility as you would any witness.

PROSPECTIVE JUROR 402: Yes, I agree.

MR. MILLER: And you pointed that out I think in your questionnaire.

PROSPECTIVE JUROR 402: Yes.

MR. MILLER: One thing you indicated -- and here's where we need to go over a subject -- you've never been a juror before, sir?

PROSPECTIVE JUROR 402: No, I haven't.

MR. MILLER: You have?

PROSPECTIVE JUROR 402: No.

MR. MILLER: Okay. Now, even though you've never been a juror before, you've heard the phrase presumption of innocence; right?

PROSPECTIVE JUROR 402: Yes.

MR. MILLER: Okay. And what's that mean to you, sir?

3160

PROSPECTIVE JUROR 402: Like any law, you're not guilty until proven innocent -- or proven guilty.

MR. MILLER: You don't have to be a lawyer or a judge or even anybody who's been on a jury before to know that. That's just common knowledge in our society.

PROSPECTIVE JUROR 402: Yes.

MR. MILLER: And that's a part of a fabric of our society that I think we all value. I trust you value that,

Page 66

innocent until proven guilty.

PROSPECTIVE JUROR 402: Yes.

MR. MILLER: Now, in -- and I realize you weren't trying to give an answer to a civics test, but when we talked about that and in your questionnaire you talked about both sides proving up whatever points they wanted to make, and that's fair enough and a common understanding, and everyone should have an opportunity to prove whatever they want or they claim to prove. But you understand our system cannot work in this country, we really can't have a presumption of innocence unless the burden of proof is on the government and on the government alone. Does that make sense to you, sir?

PROSPECTIVE JUROR 402: Yes.

MR. MILLER: In other words -- well, let me just put it this way. At this point of the proceedings when you have heard nothing whatsoever, what is Angela Johnson's status?

PROSPECTIVE JUROR 402: Not guilty.

3161

MR. MILLER: Very good, sir. It's not a matter of, hey, I don't know her status. Her status is not guilty because she's not been proven guilty. Fair enough?

PROSPECTIVE JUROR 402: Yes.

MR. MILLER: And you understand that that's a presumption that protects not just Angela Johnson, but it protects all of us in this American society of ours.

PROSPECTIVE JUROR 402: Yes, sir.

MR. MILLER: And if it doesn't protect a single defendant, then we have to wonder whether it protects anybody at all. It's important that it protect everybody in every case. Fair enough?

Page 67

PROSPECTIVE JUROR 402: Yes.

MR. MILLER: Anybody here have any concerns about that? And I'm not trying to be facetious because I know that some people seriously do have concerns about presuming a defendant innocent. Does anybody have such a concern? Very good. I see no hands.

MR. WILLIAMS: Three minutes.

MR. MILLER: Likewise, the burden of proof is part of that. Do you understand that the government in any criminal case in this country willingly assumes the burden of proving the defendant guilty beyond any reasonable doubt whenever it brings criminal charges, sir? You understand and agree with that?

PROSPECTIVE JUROR 402: Yes.

3162

MR. MILLER: Thank you, Mr. 402. There are in this case, the judge indicated, ten charges. The government alleges that there are five people including two children who were killed. The ten charges exist because there are two different federal laws that the government accused were violated, accuses that the law against killing in connection with a drug conspiracy is five counts and that those same five killings also violated a law against killing in connection with a continuing criminal enterprise. I just want to be sure that there was no confusion about why there are ten counts instead of five. You understand that, sir.

PROSPECTIVE JUROR 402: Yes.

MR. MILLER: And if you can pass that to your left, I just have one more question of Juror 587, and I probably only have a minute left or so, but you're a tournament walleye fisherman.

Page 68

PROSPECTIVE JUROR 587:  Yes, that's true.

MR. MILLER:  Can you tell us just very briefly how you happened to get into that and what that involves and whether you're missing any tournaments during the coming . . .

PROSPECTIVE JUROR 587:  It depends on you folks I guess if I miss any.  A week from -- actually a week from today I'm supposed to go to Bull Shoals, Arkansas, for a week.  And at the end of July I have a pro am in North Dakota, and it's just worked out well because with things being changed around, I just

3163

got back from Lake Erie Saturday, so the tournament officials all know about what's going on with me here, so it's not a problem, you know, missing a tournament.

MR. MILLER:  You'll get --

PROSPECTIVE JUROR 587:  I got a lot of money into it, but under the circumstances, I'll get my money back.

MR. MILLER:  And you can get back into the tour.

PROSPECTIVE JUROR 587:  Yes, I've already made arrangements.  We only do three west division tournaments a year and three east, and I'm doing the three west this year.  And under the circumstances, they'll still allow me to go ahead next year if I end up here.

MR. MILLER:  Very good.  And am I correct in taking it that you're a professional?

PROSPECTIVE JUROR 587:  I am fishing on the amateur side right now, and I'm going into professional this summer.  That was the reason I needed to get to the -- to one of these tournaments this summer, and it looks like I will make one, and then I will qualify and be professional next spring.

MR. MILLER:  I assume you got into it because you

Page 69

enjoy walleye fishing.

PROSPECTIVE JUROR 587: Yes, I do, yeah. It's what's happening.

MR. MILLER: Even competitively, not just for the fun of it.

3164

PROSPECTIVE JUROR 587: Competitively is the fun of it.

MR. MILLER: For you, sir, and I congratulate you. For me I'm just as happy being out there on the water because I never catch too many of them.

PROSPECTIVE JUROR 587: I do a little guiding too, so maybe when it's all done, give me a call. We can work it out.

MR. MILLER: I'm sure I could use that. I go if I can once a year to northwest Ontario with my two boys, and Agent Basler who's a much more avid and experienced fisherman than I am always laughs at me. He says, Do you have any idea how many walleye you drive past on your way to Canada?

PROSPECTIVE JUROR 587: That's correct, especially if you drive by Lake Erie.

MR. MILLER: Thank you so much. And thank all of you.

THE COURT: Why don't you all take a stretch break and then we'll hear from Mr. Stowers.

Okay. Please be seated.

Mr. Stowers, whenever you're ready.

MR. STOWERS: Thank you. Thanks, Judge Bennett.

My name is Dean Stowers, and I am one of Angela Johnson's attorneys.

Anyway, I'm one of Angela Johnson's attorneys together with the other gentlemen over here, and I already mentioned to

Page 70

you a few things about Ms. Johnson, but I wanted to make sure

3165

that you were aware of some of the other people on the list and their relation to her. I know you've all gone through the witness list already, but there's a few people on there that I want to touch upon sort of specially.

One is Pearl Jean Johnson who's her mother; Wendy Jacobson who is one of her sisters; Holly Dirksen, another sister from Klemme; Jamie Jo Hays from Faribault, Minnesota; and her brother Jim Johnson. Does anybody recognize any of those folks?

All the parties and the Court have gone through and looked at these very lengthy questionnaires that you all were asked to fill out, and I wanted to thank you all for doing that because I know that was probably a pretty big project, but it's very helpful to us and has probably resulted in this time that you have here in the courthouse being shortened somewhat because we already have a good deal of information about you all and don't need to cover a lot of the things that many folks in jury selection would ordinarily talk to potential jurors about.

So we don't have to go over all that stuff in a great deal of detail. And we can talk to you a little bit more generally to some extent rather than talking about who you are, finding out who you are. We've got a lot of that information in the questionnaire, so thank you for doing that.

The other thing is there's nothing wrong in jury selection I think as the judge pointed out in his excellent

3166

Page 71

slide presentation -- some day I hope to be competent enough with a computer to be able to do those kind of slides and change them around on a moment's notice, but I don't have those kind of skills that the judge has.

But in any event, one of the things you need to know is we're just here to find out what you folks think, what's on your mind, what your opinions are. So don't be afraid to share those with me or with Mr. Berrigan later or with Mr. Williams when he talks to you later when you're invited back in; okay? So just feel free to talk to us.

One thing that's always the case in any situation when you're dealing with lawyers -- and I'm sure you know about this, Juror 124, if you can hand her the microphone -- and I'm at least as guilty of this as many lawyers if not more than most is that we tend to talk a lot. Did you ever notice that with your two brother-in-laws?

PROSPECTIVE JUROR 124: Yes.

MR. STOWERS: Two brother-in-laws are attorneys; is that right?

PROSPECTIVE JUROR 124: Uh-huh, yes.

MR. STOWERS: And do you find that they a lot of times don't listen that well?

PROSPECTIVE JUROR 124: Yes.

MR. STOWERS: Like to hear themselves talk?

PROSPECTIVE JUROR 124: It just simply runs in that

3167


family.

MR. STOWERS: That's why they call them the in-laws; right?

PROSPECTIVE JUROR 124: There's no lawyers on my side

Page 72

of the family.

MR. STOWERS:  Is that by choice?

PROSPECTIVE JUROR 124:  No.

MR. STOWERS:  Well, you married into a family with some lawyers in it.  What type of law do those attorneys practice if you know?

PROSPECTIVE JUROR 124:  I think one handles more divorce cases possibly.  To be quite honest, I think one does a lot of depositions, not really a court lawyer.

MR. STOWERS:  A lot of lawyers, the last place they want to get is anywhere in one of these courthouses in front of a judge, particularly in federal court.  A lot of lawyers willfully avoid coming to federal court because it's such a rigorous experience.  Do they do any stuff in federal court that you know of?

PROSPECTIVE JUROR 124:  Not that I know of.

MR. STOWERS:  And I guess the point I was going to make is I'm trying to do this process where I give you a chance to talk and the other six people as well as well as I can, and we've frequently been accused over the last two weeks of not doing enough of that, and that criticism is probably well placed

3168

on us as it is on all the lawyers in the courtroom.  So I just wanted to start off that way.

I assume you've talked to a number of -- or I guess to your brother-in-laws about their situations and things that they deal with in connection with their legal work; is that correct?

PROSPECTIVE JUROR 124:  Not really, no.

MR. STOWERS:  Not really?

PROSPECTIVE JUROR 124:  Number one, I don't see them

Page 73

that frequently. And number two, when I do, I don't talk about their lawyer jobs.

MR. STOWERS: Don't talk about shop.

PROSPECTIVE JUROR 124: No.

MR. STOWERS: Last thing you want to know about; right?

PROSPECTIVE JUROR 124: Pretty much.

MR. STOWERS: Okay. You're a teacher; is that right?

PROSPECTIVE JUROR 124: Correct.

MR. STOWERS: You probably as a teacher have encountered on many, many occasions the experience where you had disputes with students; is that right?

PROSPECTIVE JUROR 124: Daily.

MR. STOWERS: Daily? So you're perfect for this line of questioning. We're going to have in this case, as you probably know just from life experience, witnesses coming into court and testifying from this witness stand right across from

3169

the jury box which is a good place to have a witness stand because you can face them, they can face you, and the parties are kind of on the side and the judge is on the side because it's really about your evaluation of the witness. Do you understand that --

PROSPECTIVE JUROR 124: Yes.

MR. STOWERS: -- that's how the trial will work? And they'll come in one by one, and they'll be questioned about things; right?

PROSPECTIVE JUROR 124: Right.

MR. STOWERS: And probably like you've had experience with in the school, there will be disputes at times about

Page 74

matters that have happened in the past. Do you understand that?

PROSPECTIVE JUROR 124: Yes.

MR. STOWERS: To some extent this case is a big dispute about things that happened in the past, and the jurors are going to be asked to analyze that dispute and the information that they receive from that witness stand to try and answer some questions that the Court is going to present to you about that. Do you understand that?

PROSPECTIVE JUROR 124: Yes.

MR. STOWERS: And how equipped are you -- with your vast experience in dispute resolution in the school district, do you feel that you're pretty well equipped to deal with those kinds of things?

3170

PROSPECTIVE JUROR 124: On the level of handling six- and seven-year-olds who kick somebody or took the ball away or didn't play fair, yes.

MR. STOWERS: Sometimes you have to resolve what happened; right?

PROSPECTIVE JUROR 124: Correct.

MR. STOWERS: And that's kind of what you're going to be asked to do in this case is to try and evaluate what happened with regard to various events in the past. You understand that's what a jury kind of does; right?

PROSPECTIVE JUROR 124: Yes.

MR. STOWERS: Now, in doing that, ma'am, I assume you know that sometimes you kind of have to evaluate the information that you're receiving.

PROSPECTIVE JUROR 124: Yes, I'm very well aware of that.

Page 75

MR. STOWERS: All right. You do that every day in your job; is that correct?

PROSPECTIVE JUROR 124: Correct.

MR. STOWERS: And as part of that evaluation, you try to talk to everybody who knows everything about a situation.

PROSPECTIVE JUROR 124: Correct. There's always two sides to a story.

MR. STOWERS: And do you understand what we're talking about, Juror 766, if you could hand her the microphone?

3171

PROSPECTIVE JUROR 766: Yes.

MR. STOWERS: And you've kind of been through this dispute resolution process in your own life; is that right?

PROSPECTIVE JUROR 766: Oh, yeah. I have four brothers, and I have two older sons. Oh, yeah.

MR. STOWERS: And you've probably had many disputes between your brothers and your sons.

PROSPECTIVE JUROR 766: Oh, yes.

MR. STOWERS: Over various issues.

PROSPECTIVE JUROR 766: Yes.

MR. STOWERS: Who broke this, who did that, where's the remote for the TV, who's got it; right?

PROSPECTIVE JUROR 766: Yes.

MR. STOWERS: And more important things.

PROSPECTIVE JUROR 766: Oh, yeah.

MR. STOWERS: And sometimes you just gotta get to the bottom of those issues; is that right?

PROSPECTIVE JUROR 766: Tried.

MR. STOWERS: You understand what we're talking about, Mr. 587?

Page 76

PROSPECTIVE JUROR 587: Yes, I do.

MR. STOWERS: It's a little different than walleye fishing; right?

PROSPECTIVE JUROR 587: Very different.

MR. STOWERS: Walleye fishing's mostly a solo sport;

3172

is that right?

PROSPECTIVE JUROR 587: Yes and no.

MR. STOWERS: Yes and no? Well, in any event, you sat through a trial as a juror before, and you were asked to resolve some disputes I assume.

PROSPECTIVE JUROR 587: Yes, I was.

MR. STOWERS: It was a drunk driving case.

PROSPECTIVE JUROR 587: That's correct.

MR. STOWERS: And you and your 11 other jurors were called upon to evaluate witnesses, evaluate the evidence, and then decide whether or not certain things had been proven beyond a reasonable doubt or not; is that right?

PROSPECTIVE JUROR 587: That is correct.

MR. STOWERS: Now, in the case that you had, did the defendant testify?

PROSPECTIVE JUROR 587: Yes, he did.

MR. STOWERS: And was that something that you were able to weigh into the process, their testimony, their credibility, what they had to say about this drunk driving episode?

PROSPECTIVE JUROR 587: It wasn't so much what he had to say. It's been a few years now, and I'm trying to remember. But I do remember that it was the patrolmen and the way that they handled the case and some things that should have been done

Page 77

that weren't done according to the judge in this type of an

3173

arrest that weren't done that weighed real heavy on the case.

MR. STOWERS: Well, I assume you wanted to hear as much information as you could get access to as a juror; is that right?

PROSPECTIVE JUROR 587: That's correct.

MR. STOWERS: And did you feel that you were able to get access to everything that you wanted to have access to?

PROSPECTIVE JUROR 587: No, I wasn't. Part of the decision we made -- like with the patrols, there was a lot of -- they just didn't prove the case. There was a lot of things that were missing there I felt, and they failed to do some things that at least to my understanding it's usually done in an arrest like that. And they did provide a -- I remember a movie of whatever, the person walking, and he seemed to be possibly be intoxicated, but I know people who don't drink that walk bad so -- and that didn't hold any water with us.

MR. STOWERS: Okay. Well, would it trouble you if you as a juror in this case weren't able to hear from all the people that you might want to hear from? If you wound up sitting as a juror in this case, would that trouble you at all?

PROSPECTIVE JUROR 587: I don't believe it would. That's a -- I'd have to think about that for a minute. I mean, it's to my -- that you folks will have what you need here to present to us.

MR. STOWERS: Let me ask you specifically. How would

3174

you feel about that, Juror 412, if you weren't able to hear all
Page 78

of the information about a situation that you really wanted to hear?

PROSPECTIVE JUROR 412:  I believe we should hear all sides of the story to determine a verdict, but you're the one that puts the information forth so . . .

MR. STOWERS:  And what if, for example, in a case, criminal case, you weren't able to hear testimony from the defendant him or herself?  How would you feel about that?

PROSPECTIVE JUROR 412:  I think I'd want to hear that testimony.

MR. STOWERS:  How would you feel about the fact that you couldn't?

PROSPECTIVE JUROR 412:  I don't know if I could make a good decision not hearing both sides.  You mean having the defendant testify on her own behalf and --

MR. STOWERS:  Yeah, what if you weren't able to hear from the defendant?  What if the defendant didn't testify?  How would that make you feel?

PROSPECTIVE JUROR 412:  I don't think I could make a true judgment.

MR. STOWERS:  How would you feel about the fact that they didn't testify?

PROSPECTIVE JUROR 412:  I can't really answer that. I'd feel maybe they were hiding something or not being . . .

3175

MR. STOWERS:  Is that the first thing that comes to your mind?

PROSPECTIVE JUROR 412:  What?  That they're hiding something?

MR. STOWERS:  Yeah.
Page 79

PROSPECTIVE JUROR 412: That they don't want to profess their guilt or not guilt.

MR. STOWERS: Anybody else feel that way? A person doesn't testify in their own defense, for example, they're probably hiding something as Juror 412 told us?

How do you feel about that, sir, Number 587?

PROSPECTIVE JUROR 587: I don't -- I always felt -- I don't know too much about these type -- what's going on here, but, you know, you watch the television shows, and you always hear that anymore. But I think if a person is being charged with something that that person should have the right or should stand up and have -- you know, and tell them what went on, you know.

MR. STOWERS: They should have the right to testify.

PROSPECTIVE JUROR 587: They should have the right to testify.

MR. STOWERS: What if they chose not to testify? How would you feel about that?

PROSPECTIVE JUROR 587: I have much the same feelings about it. There would probably be an awful good reason if that

3176

person's attorneys didn't want her to testify or the person would testify. There would have to be a reason for it.

MR. STOWERS: What's the first reason that pops to your mind?

PROSPECTIVE JUROR 587: That she wouldn't be very convincing on the stand, that she would maybe undercut -- that individual would undercut her case, him or her, whoever.

MR. STOWERS: So you're kind of saying it maybe the same way differently that maybe the defendant would have

Page 80

something to hide in a case where they didn't testify? Or is it not saying the same thing?

PROSPECTIVE JUROR 587: I think the attorneys maybe in this type of case would be able to bring out everything that the jurors would need to know.

MR. STOWERS: And in a case where a defendant didn't testify, how would you feel about that, though?

PROSPECTIVE JUROR 587: It may leave some room for a little self-doubt.

MR. STOWERS: About?

PROSPECTIVE JUROR 587: The guilt or the innocence of that person.

MR. STOWERS: Because you'd really like to have them testify.

PROSPECTIVE JUROR 587: Yes, I would. I believe they should testify, yes.

3177

MR. STOWERS: Do you feel strongly about that?

PROSPECTIVE JUROR 587: Very strongly.

MR. STOWERS: Okay. And if the judge told you, Hey, look, it's the defendant's right not to testify and you can't consider that at all in evaluating what you've heard in this case or in deciding any of the issues in this case, would you really, given your strong feelings on that, be able to set those sentiments aside that you think probably they have something to hide?

PROSPECTIVE JUROR 587: I believe I would. I would have to take the facts that this presented me and weigh them and come up with my own conclusion.

MR. STOWERS: How would you go about -- given your
Page 81

strong feelings about a defendant not getting up and testifying and what that means to you, how would you go about setting aside those personal feelings that you have about that if the judge told you to do that?

PROSPECTIVE JUROR 587: I'm really not too sure I fully understand what you mean, but, you know, I believe in the judicial system, and I've been asked to be a juror. You and the prosecution have presented all of the facts that you could, and, you know, the judge chooses not -- it's best in her interest or whoever not to testify, then I would be okay in sorting out with the rest of the jurors what needs to be sorted out.

MR. STOWERS: Okay. And how would you take into

3178

account, though, the fact that the defendant in a case, for example, chose not to testify? How would you feel about that even if the judge told you, Hey, don't think about that; put that out of your mind; don't consider it at all? Would you really be able to take that and put it out of your mind, or would you really be troubled by the fact that they didn't testify and be unable to put it out of your mind?

PROSPECTIVE JUROR 587: I believe I would be somewhat troubled by it.

MR. STOWERS: Even if the judge told you not to be.

PROSPECTIVE JUROR 587: That would be correct. It would be a thought that would be there.

MR. STOWERS: And you really wouldn't be able to get that thought out of your head.

PROSPECTIVE JUROR 587: I -- it might be kinda hard, yes.

MR. STOWERS: Anybody else feel like Juror 587? I see

Page 82

you're raising your hand, Juror 412. If you can hand the microphone to her.

You were able to follow the questioning I just had of Juror 587 about this whole topic of, for example, wanting to hear from the defendant; is that right?

PROSPECTIVE JUROR 412: Yes.

MR. STOWERS: And you've raised your hand indicating that you feel the same way as Juror 587 about that?

3179

PROSPECTIVE JUROR 412: Yes, I would have some doubt.

MR. STOWERS: And even if the judge told you that you gotta put that out of your mind, don't even think about that, don't let that enter into your processes of evaluating the evidence in the case or the lack of evidence in the case, would you be able to put that out of your mind even if he told you that in an instruction?

PROSPECTIVE JUROR 412: I would try, but I don't -- I would still have doubts.

MR. STOWERS: You'd find that very, very difficult to put that out of your mind, and you're not sure that you could.

PROSPECTIVE JUROR 412: I'm not sure that I could put it completely out.

MR. STOWERS: Anybody else feel the same way as 587 and 412? Juror 124?

THE COURT: I'm going to jump in here, Mr. Stowers, because there's some information you haven't provided the jurors, and I'm going to go ahead and do it.

MR. STOWERS: Okay.

THE COURT: Under the Fifth Amendment of the United States Constitution, every defendant has an absolute right not

Page 83

to testify in any criminal case. And it's been part of our United States Constitution for over 200 years. That right applies in every criminal case in every federal court, in every state, county, and municipal court whether somebody's being

3180

charged with a traffic ticket or somebody's being charged with murder. Everyone has a Fifth Amendment right not to testify.

For my money it's the most important right that everyone in the United States, including me, has. We have an absolute right not to testify. And it's important to know that that right comes from the United States Constitution. It's that important that the folks who founded the country thought it was so important that they put it in the Bill of Rights, in the Fifth Amendment of the United States Constitution.

And Mr. Stowers is absolutely right. If the defendant does not testify, you cannot hold it against the defendant in any way. You can't discuss it in jury deliberations. And while there's kind of a natural curiosity -- I've been at this for a long time. We do a lot of trials in our court. And most of the time defendants don't testify. Am I a little bit curious about what some of the reasons might be? Of course, because I'm human. Would I ever hold it against a defendant in any way because they exercised such an incredibly precious constitutional right? Absolutely not.

So it's okay to be a little bit curious maybe, and there are lots of reasons why people choose not to testify. You can't really consider that or discuss it, and you certainly can't hold it against the defendant.

And almost every juror in this process -- so you're not alone -- has talked about, well, they want to hear the

Page 84

evidence from both sides. But here's another important fact. The defendant is presumed innocent. She is absolutely not guilty. And the government has the burden of proof in the case beyond a reasonable doubt. And Angela Johnson and her three lawyers never, ever, never, ever, have an obligation to put on any evidence. They don't have to do anything. They don't have to stand up here and ask you questions in jury selection. They don't have to give an opening statement. They don't have to cross-examine any of the government witnesses. They don't have to put on any evidence. They don't have to do anything.

They can rely solely on the presumption of innocence, and the presumption of innocence all by itself could be enough to find someone not guilty because it's the government that has to prove a defendant's guilt beyond a reasonable doubt.

So, you know, I mean, we're trained in the law, and we understand these things, so it's, you know, very typical that jurors come in and they say, well, I want to hear all of the evidence and I want to hear every side of it, and people talk about two sides. Sometimes there are three or four or five sides to an issue.

But the bottom line is the defendant never, ever has to put on any evidence of any kind whatsoever. And so sometimes you have to make your judgment based solely on the government's evidence because they have the burden of proof. There may never be any evidence from the defendant. If there is, you can

consider that evidence. But if there isn't, you can't hold it

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2772 of 3245

against them in any way.  And the Constitution requires that. The Constitution absolutely requires that.

Now, some people can provide the defendant, in this case Angela Johnson, with the full benefit of the presumption of innocence, and other people can't.  Other people, no matter what I would instruct them, would say, Well, gee I'm going to hold it against her for not testifying.  You would violate her constitutional right, so obviously I wouldn't let you sit on the jury.

So I'm looking for people who can say Angela Johnson is absolutely not guilty, she has the presumption of innocence, that presumption of innocence can be overcome only if the government can prove its case beyond a reasonable doubt.

And if she doesn't testify, while I may be curious or while you may be curious, you can't hold it against her in any way because she has an absolute right as each and every one of you do if you were ever charged with a crime not to testify. And I want to make sure you understand that.

So I'm going to go ahead and ask Juror 412, do you think you would be able to honor Angela Johnson's right not to testify if she exercises that right and not hold it against her in any way knowing that that's what the law is?

PROSPECTIVE JUROR 412:  Yes.  I -- if that's what the law provides, yes.

3183

THE COURT:  Well, that is --

PROSPECTIVE JUROR 412:  I mean, there --

THE COURT:  That is absolutely what the law provides. There's no ifs, ands, or buts about it.  A lot of the law is gray.  This is absolutely crystal clear.  There's no question

Page 86

about it. She has an absolute right not to testify.

PROSPECTIVE JUROR 412: Okay.

THE COURT: And you cannot hold it against her in any way if she exercises that right.

PROSPECTIVE JUROR 412: Okay.

THE COURT: Now, do you think you can do that? Some people can, and others can't. And if you can't, you know what? That's fine. If you can't give her the full benefit of the presumption of innocence and if you can't honor her Fifth Amendment right, a right that belongs to all of us, that's okay. It doesn't make you a bad person, but we just need to know.

PROSPECTIVE JUROR 412: I just feel I would have doubts but . . .

THE COURT: Well, can you set aside those doubts, because you're not allowed to have doubts about the fact that somebody doesn't testify?

PROSPECTIVE JUROR 412: I would try, yes.

THE COURT: Well, trying counts in a lot of things, but it's not good enough in this proceeding. Do you understand why? We have to have jurors who know themselves well enough to

3184

say, I will not hold it against her if she doesn't testify. I might be curious. Do you understand there are lots of reasons why people might not want to testify?

PROSPECTIVE JUROR 412: I do.

THE COURT: I think you came up with one: They're trying to hide something. That could be one. I used to teach a class in criminal procedure, and when we talked about this subject, it was -- I'm so old that we actually had blackboards and chalk. I could fill up the entire blackboard with reasons

Page 87

about why people might not want to testify. Some things are pretty obvious. You think sitting in that witness box is an easy deal?

PROSPECTIVE JUROR 412: No.

THE COURT: You think some people might not be a very good witness, particularly maybe if they don't have a lot of education?

PROSPECTIVE JUROR 412: True.

THE COURT: Do you think some people might not want to face one of these highly skilled prosecutors?

PROSPECTIVE JUROR 412: I've had some experience with my son with the judges and the lawyers and stuff, and I guess I just find it difficult.

THE COURT: What's difficult about it?

PROSPECTIVE JUROR 412: Well, not really difficult. I mean, I just -- I don't know how to explain it. Just . . .

3185

THE COURT: Well, you know, it's okay if you can't do it, but I just want you to understand.

PROSPECTIVE JUROR 412: Uh-huh, I do understand.

THE COURT: Well, I don't think you would knowingly want to violate somebody's constitutional rights, would you?

PROSPECTIVE JUROR 412: No.

THE COURT: Well, if you're unable to give Miss Johnson the full benefit of the presumption of innocence and if you're unable not to hold it against her if she doesn't testify, then you would actually be violating her constitutional rights.

PROSPECTIVE JUROR 412: I'm not saying I'm holding it against her. I just -- like I said, I have my doubts.

THE COURT: Okay. And why don't you try and explain

Page 88

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2775 of 3245

that for us. What do you mean you have your doubts?

PROSPECTIVE JUROR 412: I don't know. I feel if they don't testify they're -- I know they have their rights not to testify, but I feel if they don't there's more that we should know. It's hard for me to explain it. It's just . . .

THE COURT: Okay. But you understand that's not the law.

PROSPECTIVE JUROR 412: Yeah. I guess I perceive things differently. I just assumed that there would be both --

THE COURT: That every defendant would testify in a case. You assumed that they would.

PROSPECTIVE JUROR 412: Yes.

3186

THE COURT: Well, I'm telling you they have an absolute right not to, and now we want to find out how you feel about that.

PROSPECTIVE JUROR 412: If that's their right, yes, that's -- I would feel the same way if it was my right not to testify, so yes.

THE COURT: Well, maybe you're the type of person that would want to testify, and that's fine. But are you the type of person you think you'd want to testify?

PROSPECTIVE JUROR 412: Yeah, yes.

THE COURT: Well, are you open to the possibility that not everybody sees it the way you do?

PROSPECTIVE JUROR 412: Yes, I am.

THE COURT: Yeah. It sounds like you are.

PROSPECTIVE JUROR 412: It's just my opinion.

THE COURT: Right. But I want to make sure you wouldn't impose your -- how you would do it on someone else, and

Page 89

the particular someone else that I'm concerned about in this case is Angela Johnson.

PROSPECTIVE JUROR 412: No, I think I could be -- I think I could make a right decision without her testifying.

THE COURT: Okay. Juror 587, do you think you're able to completely honor a defendant's decision not to testify and not hold it against her in any way if I instruct you that that's the law? And I assure you that is the law.

3187

PROSPECTIVE JUROR 587: Yes, I do.

THE COURT: Okay. Would you pass it down to 124, please?

Now, Juror 124, knowing what the law is, the question now becomes do you think you can follow the law? Some people can follow it. Others can't. And it's okay not to be able to follow the law. We're not going to hold it against you. It doesn't make you a bad person, but it makes you somebody not qualified to serve as a juror obviously. So what do you think?

PROSPECTIVE JUROR 124: Yes, I think I could after your explanation.

THE COURT: Okay.

PROSPECTIVE JUROR 124: Understanding it in greater depth.

THE COURT: Okay. And do you think that it's important to protect an individual's Fifth Amendment right not to testify?

PROSPECTIVE JUROR 124: Definitely, yes.

THE COURT: And if you were on trial for whatever reason and you and your lawyers made a decision not to testify, would you want the jurors to honor that decision?

Page 90

PROSPECTIVE JUROR 124: Yes, but I would probably be one that I would testify.

THE COURT: Yeah, and a lot of people -- you know, I hear that fairly often. A lot of people are that way. But a

3188

lot of people aren't that way, and I just want to make sure you can respect whatever decision is made in this case.

PROSPECTIVE JUROR 124: Definitely.

THE COURT: Can you do that?

PROSPECTIVE JUROR 124: Yes.

THE COURT: And can you definitely say that you would not hold it against Angela Johnson in any way if she decides not to testify?

PROSPECTIVE JUROR 124: Yes. I think then the evidence -- I would have to pay much more closer attention to the evidence and the other people testifying.

THE COURT: Excuse me for interrupting you, Mr. Stowers. And you can add whatever time -- Mr. Willett's the time keeper. You add whatever time you need to Mr. Stowers' time. They have 30 minutes, and I don't want my questioning to detract from their time.

MR. STOWERS: I think I might have somewhere around eight minutes. Does that sound about right? Okay. Thank you.

Okay. Let's talk about a few other issues. Juror 463, did you have the opportunity to listen to what the judge was explaining to you all --

PROSPECTIVE JUROR 463: Yes.

MR. STOWERS: -- over the past few minutes? Did you understand what he was saying?

PROSPECTIVE JUROR 463: Yes.

Page 91

MR. STOWERS: Okay. And you have been sitting quietly up there in the corner all morning as much as you can -- as much as you can; right?

PROSPECTIVE JUROR 463: Yes.

MR. STOWERS: Okay. And do you agree with the concepts that Judge Bennett was explaining to you?

PROSPECTIVE JUROR 463: (Nodded head.)

MR. STOWERS: And you, Juror 402, did you follow what Judge Bennett was explaining?

PROSPECTIVE JUROR 402: Yes, I did.

MR. STOWERS: Okay. And do you agree with those concepts?

PROSPECTIVE JUROR 402: Yes.

MR. STOWERS: And you understand that those concepts are constitutional rights that every citizen has?

PROSPECTIVE JUROR 402: Yes.

MR. STOWERS: And you can certainly follow any instruction that the judge gives you whether or not the defendant testified in this case.

PROSPECTIVE JUROR 402: Yes.

MR. STOWERS: And you, Juror 587, as I understood it earlier when I talked to you, I had asked you if you had feelings about this issue that were strong, and you said that you did have strong feelings, that you felt that this may be some indication of guilt if a defendant did not testify.

Remember that?

PROSPECTIVE JUROR 587: Yes, I do.

MR. STOWERS: And then I asked you I think something along the lines of what if Judge Bennett told you in an instruction that, hey, you gotta put that out of your mind; you can't consider that? You remember those line of questions?

PROSPECTIVE JUROR 587: Yes, I do.

MR. STOWERS: Okay. And when I asked you those questions, it was my understanding of your response that you said you would find that difficult or something to this effect, you didn't know if you could do that.

PROSPECTIVE JUROR 587: Yes, I did, and I believe Judge Bennett in -- it made me more at ease in myself and made me maybe think a little more indepth some things you forget about in being nervous here in the first place. But the rules are the rules here. But in your mind in my business I do work too, you know. I always -- a person's gotta stand up for himself. That's the way I was raised I guess. I don't know. But there's a little something there.

MR. STOWERS: What do you mean by a little something there?

PROSPECTIVE JUROR 587: Am I a hundred percent comfortable in saying yes, beyond a reasonable doubt yes, I could make a fair judgment? There's just that little feather there that still weighs. I guess that's the way I am. I don't

3191

know. I feel that I would be fair and if that person did not testify and like he said, the Constitution, that I can make a fair judgment.

MR. STOWERS: All right. We're kind of talking about something a little different than whether or not you can make a fair judgment. We're talking about a specific thing which is

Page 93

assume for this scenario that we're talking about that the defendant did not testify. Your position in this case would be having to evaluate the evidence you heard, but you know in your mind the defendant did not testify. You kind of expressed --

PROSPECTIVE JUROR 587: At this point right now I don't believe that if the defendant did not testify that it would interfere with what my duty is or what I have to do to make a fair judgment.

MR. STOWERS: Would you give it any thought in your mind at all that she didn't testify if that were the case?

PROSPECTIVE JUROR 587: I do not believe I would. I'd have to say no. It's hard to say about something you're not there until the trial I guess would begin, but I'm at a point right now saying no, that doesn't interfere with it.

MR. STOWERS: And ten minutes ago you were saying you didn't think you probably could set it aside.

PROSPECTIVE JUROR 587: That's correct.

MR. STOWERS: Let me ask it this way.

PROSPECTIVE JUROR 587: That doubt is still there.

3192

You know that.

MR. STOWERS: Okay. So you still have doubts in your mind about whether or not you could set it aside and give it no consideration at all. Is that where you are?

PROSPECTIVE JUROR 587: That would be correct.

MR. STOWERS: Okay. And where are you on that, 412?

PROSPECTIVE JUROR 412: I still have the doubt, but I think that I could put that aside and be a fair -- without her testimony after the judge explaining.

MR. STOWERS: Okay. But you've still got doubt about

Page 94

whether you could really do that. You just conceptually kind of understand.

PROSPECTIVE JUROR 412: That doubt, yes.

MR. STOWERS: You know what your obligation would be; right?

PROSPECTIVE JUROR 412: Uh-huh.

MR. STOWERS: The judge has explained that to you.

PROSPECTIVE JUROR 412: Uh-huh.

MR. STOWERS: And I assume if you wound up on this jury you'd sure want to live up to the expectations of a juror; right?

PROSPECTIVE JUROR 412: Yes.

MR. STOWERS: And can you assure us as we sit here today and, most importantly, to some extent assure Angela Johnson that you definitely could do that, that you could give

3193

that no consideration at all if she chose not to testify?

PROSPECTIVE JUROR 412: I think so, yes.

MR. STOWERS: Okay. And how do you feel about that, Juror 124? We'll get the microphone to you here.

PROSPECTIVE JUROR 124: I think like I said before. I would pay very close attention to the evidence that is presented and the other witnesses. I mean, that's . . .

MR. STOWERS: Right. And now we're talking about evidence kind of that isn't presented which would be testimony if that's where we wind up in this case. If the defendant chooses not to testify which, as the judge has explained, is her right, now you've got this hole if you want to call it that. How would you feel about that in your mind knowing that the judge is going to tell you give that no consideration at all?

Page 95

PROSPECTIVE JUROR 124:  Then like I said, I'm going to look very, very closely and very seriously at the evidence that the prosecution presents and what the witnesses say.

MR. STOWERS:  How you going to feel about this fact that the defendant, for example, in this scenario did not testify?

PROSPECTIVE JUROR 124:  Well, that that is her constitutional right.

MR. STOWERS:  Okay.  And so you're going to give it no consideration; is that correct?

PROSPECTIVE JUROR 124:  Well, like the other jurors

3194

have said, I'm not going to place a lot of consideration on it, but there is just a small fraction of it.  I mean, I don't know if it's humanly possible not to have a small fraction of that in the back of your mind.

MR. STOWERS:  Well, maybe you're the perfect one to say this to.  You know, sometimes lawyers and judges like to think that we can force people to sort of put things out of their mind that are in their minds.  You know what I'm saying? We call that setting things aside.  And that's not something we ordinarily think about doing as people walking on the street. Would you agree with that?

PROSPECTIVE JUROR 124:  Uh-huh, yes.

MR. STOWERS:  And once you got something in your mind, there's no way you can kind of delete it; is that right?

PROSPECTIVE JUROR 124:  Well, depends on how severe it is or how serious the matter it is.

MR. STOWERS:  Okay.  And would you be able to delete from your mind and give no consideration to the fact that the

Page 96

defendant didn't testify if that's what happens in this case?

THE COURT: Well, I'm going to interrupt you for a second. Nobody's asking you to delete from your mind the fact that a defendant does not testify. And all due respect to Mr. Stowers, that's not what the law requires. If she doesn't testify, it's obvious to everybody in the room that she does not testify. I'm not expecting you to delete that from your mind

3195

and trick yourself, oh, she actually testified. If she doesn't testify, she doesn't testify. You don't have to delete that from your mind.

What you have to be able to do is say to yourself, I understand she has an absolute right not to testify, and I'm not going to hold it against her in any way. So it's not that you forget about the fact that she didn't testify. We can't ask you to forget about something that happens.

PROSPECTIVE JUROR 124: Right.

THE COURT: But we can make sure that you wouldn't hold it against her in any way because she has an absolute right not to testify.

PROSPECTIVE JUROR 124: Right. I honestly feel I wouldn't hold it against her. That's what I'm saying for the third time.

MR. STOWERS: Okay.

PROSPECTIVE JUROR 124: I would very strongly look at the evidence and the witnesses.

MR. STOWERS: Okay. That's good. Thank you.

And you feel the same way, Juror 766? You'd be able to set that aside?

PROSPECTIVE JUROR 766: I think I could, yes.

Page 97

MR. STOWERS: Okay. And I think that will wrap it up, but I wanted to thank you for your time this morning and appreciate your efforts. Thank you all.

3196

THE COURT: I just have a couple of more questions for 587 and 412, and I want to make sure you understand something. It is fine, it is okay, if you are not able to set it aside and not hold it against the defendant. That doesn't make you a good or bad person. That's fine.

But we need to know, and I'm a little bit uncertain. And I want to know if you can promise me, the prosecutors, the three defense lawyers and, most importantly, Angela Johnson that you would not hold it against her in any way if she does not testify. And if you can't make that promise, that's okay. There's nothing wrong with not being able to make that promise. And you two know yourselves better than any of us ever would be able to. So you have to do some soul searching. And it's an absolutely acceptable answer. It's okay. Nobody's going to be mad at you. But it's something that we really need to know.

And in some situations close is good enough. In this situation it's not good enough. I'm not willing to seat a juror who has any doubt about their ability to honor the defendant's Fifth Amendment right not to testify. And so it's kind of a tough question, but I really need to know. And it's not a question of putting it out of your mind because it's going to be obvious if the time comes and the defense rests and the defendant doesn't testify. How can you ever put that out of your mind? Of course she didn't testify. That's not the question. The question isn't are you thinking about it. The

3197

Page 98

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2785 of 3245

question is do you promise not to hold it against her in any way? And so, 587, do you think you can do that or not?

PROSPECTIVE JUROR 587: Yes, I do, and I think the word I was looking for is that word delete. There's no way that I can delete that from my mind, but could I come into this courtroom and be fair? I know that I could, yes.

THE COURT: Well, it's more than just being fair because although -- you know, that's a minimum. Every juror we want to be fair. But it's really more than just being fair. It's being able to say, I will not consider the fact that Angela Johnson did not testify in any way in arriving at my decision of whether she's guilty or not guilty.

PROSPECTIVE JUROR 587: Yes, I can say that.

THE COURT: Okay. Are you sure?

PROSPECTIVE JUROR 587: Yes, I am.

THE COURT: And I don't want you to say it to make me happy because I'm going to be happy either way. Doesn't make any difference. I have no personal stake in the outcome of this question.

PROSPECTIVE JUROR 587: Yes, I understand that, Your Honor, and yes, I can make that decision based on what's been said here this morning.

THE COURT: Okay. How about Juror 412?

PROSPECTIVE JUROR 412: No.

THE COURT: Okay. Okay. That's fine. If you're

3198

going to talk more, we need the microphone.

PROSPECTIVE JUROR 412: I'm real big on honesty, and

Page 99

honestly I don't think I could.

THE COURT: Well, we appreciate that very much.

PROSPECTIVE JUROR 412: It makes me feel bad, though.

THE COURT: It shouldn't make you feel bad. It shouldn't make you feel bad. And I hope you understand this. You serve your country exceptionally well, exceptionally well, by giving an honest answer to that question. I'm very proud of you. You are very civic minded. You're exactly the type of person that we hope we have in jury selection because you've been so honest, and only you know yourself well enough. I have great respect for you because it takes a lot of courage to say that, but that's how you believe, and I have tremendous respect for you as a person and for your belief. Do you understand that?

PROSPECTIVE JUROR 412: Uh-huh, yes.

THE COURT: Why are you upset?

PROSPECTIVE JUROR 412: I just don't feel like I'm doing the right thing.

THE COURT: You are doing the right thing. You're absolutely doing the right thing. You are for all of us, for all of us, a shining example of a citizen who's doing the right thing. Do you understand that?

PROSPECTIVE JUROR 412: (Nodded head.)

3199

THE COURT: These lawyers will tell you I don't say things to make people feel good. It's not my style. Matter of fact, it's quite the opposite. But I have -- I have -- I have enormous respect for you, enormous respect for you.

PROSPECTIVE JUROR 412: Thank you.

THE COURT: Okay. Could I see the lawyers at sidebar

Page 100

just for a second?

This should just take a second, ladies and gentlemen.

(At sidebar on the record.)

THE COURT: You know, you can challenge them for cause all you want. When we get to the individual questioning, you can question them some more about it, but 412 we ought to just let go now.

MR. STOWERS: That's fine.

MR. WILLIAMS: One other thing while we're at sidebar, the very first juror indicated financial hardship and also said she hadn't bothered to check. During the half hour or so there, if we could tell her to check --

THE COURT: Right. I'm going to do that. Thank you.

(The sidebar was concluded.)

THE COURT: Okay. Here's what's going to happen next. We are -- everybody's in need of a break, so we are going to take a 25-minute break. And I want you to remember my cautionary instruction about not discussing this case among yourselves, don't let anybody talk to you about the case.

3200

Now, Juror 412, I'm going to let you go. So you're free to go home now. I'd ask you to do us a favor. Because jury selection is probably going to go into next week, we'd ask you not to talk about this process to anybody until we get the jury selected which hopefully will be by next Tuesday or so. But after you go down to the jury room, you're free to leave, and I just want to emphasize again on behalf of the lawyers and Angela Johnson, we appreciate very much -- I know it hasn't been easy for you, but you've been just a superb, just a superb juror. I'm very proud of you personally. I have great respect

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2788 of 3245

for your opinions and your views and for the personal courage that you displayed this morning.

Juror 463, I'm going to give you an assignment. When we're on break, I want you to go into the clerk's office. My law clerk Carey will escort you there, and I want you to call your employer and find out about this issue of whether they're going to pay you or not pay you for jury service because that's an important thing we need to know. Are you willing to do that?

PROSPECTIVE JUROR 463: I know they pay today but --

THE COURT: I'm not talking about today, ma'am. I'm talking about the three months or two months that the trial will last. If you get selected to serve as a juror, if they pay you, it would not be a financial hardship. If they don't pay you, that could very well be, probably will be a huge financial hardship. I was hoping that all the jurors would have found

3201

that out ahead of time. But for whatever reason, you didn't do that. That's fine. But we need to know the answer to that when you come back individually.

So we're going to take a 25-minute recess, and then when we come back, we're going to start with Juror 766. We're going to start with you first, and then we're going to do Juror 124. And then Juror 412 will be gone, 587, 402, and Juror 463 will be the last juror. We're going to talk to each of you individually.

When we bring you back into the courtroom, the lawyers will have some more questions, and I may very well have some more questions for each of you.

Now, after our break -- that will take us till about 11:15 -- we should probably be able to do two jurors, 766 and

Page 102

124. And then we're going to take a lunch break, so we're not going to get to 587, 402, and 463 until after our lunch break at one o'clock. And then we'll just take you in order. We should be done by 2:30 I would think at the latest; okay?

And, Juror 412, you can -- you'll be on your way after you leave, after you leave the courtroom, and the rest of you, we'll see you back here for individual questioning starting in 25 minutes with 766, then going to 124, 587, then 402, and then last is 463. Thank you.

(Panel M exited the courtroom.)

THE COURT: Anything we need to take up?

3202

MR. BERRIGAN: Your Honor, could we inquire? I don't know if you did it intentionally or not, but you changed the order obviously.

THE COURT: Yeah, I did.

MR. BERRIGAN: And I wanted to know if there was any explanation other than 463 needed some time to contact --

THE COURT: That was the only explanation.

MR. BERRIGAN: And in terms of the strikes, are we also now reversing the order? That is, are we going in the order that you put the jurors in?

THE COURT: I don't understand your question.

MR. BERRIGAN: Well, our practice has been that we make our motions for cause and our peremptories right after the juror testifies.

THE COURT: Right.

MR. BERRIGAN: Now with the order reversed, I'm presuming that that process is going to follow the jurors.

THE COURT: Right.

Page 103

MR. BERRIGAN: Okay. I guess we do have some concern because 463 who's as far as I can tell one of the very few minority jurors -- she's from Guatemala -- could be at the end of the list, and I don't know whether or not we're going to be at the point where she's not eligible for service because we've already met our quota. That's probably unlikely. But to the extent that that issue might arise, I didn't want to sandbag the

3203

Court or wait until that became a problem. Our strong preference would be that we go in the order in which we've gone every single day.

THE COURT: You have no right to go in any particular order.

MR. BERRIGAN: No, I --

THE COURT: And the only reason I was changing the order was to make sure if they couldn't contact the person they need to talk to before lunch that she'd have an opportunity to do it after lunch, and I didn't want to hold anything up.

MR. BERRIGAN: And I think you're respecting her. We're absolutely fine with that. She may need some more time, and perhaps she should be separated out in some fashion from the rest of the jurors.

THE COURT: You know, I'm not going to treat her any differently than any other juror because that wouldn't be permissible.

MR. BERRIGAN: Well, I understand that, sir, and that's -- and I'm not alleging that, but the change in the order does treat her differently. She was --

THE COURT: You have no right to any particular order, so it doesn't treat her any differently.

Page 104

MR. BERRIGAN: I know we don't, sir. We have we believe some right to consistency, and that's not what's happening here.

♀

3204

THE COURT: Fine.

(Recess at 10:49 a.m.)

THE COURT: Ready for 766?

MR. WILLIAMS: Yes, Your Honor.

MR. BERRIGAN: Yes, sir.

THE COURT: Who's going first today?

MR. WILLIAMS: I think the government's arrangement is the government's going first on each day.

THE COURT: I thought you were flip flopping.

MR. WILLIAMS: We always start, and then we flip flop, but the government always starts.

(Prospective Juror 766 entered the courtroom.)

THE COURT: Juror 766, any chair you'd like in the front row. Please be seated.

Everybody else can be seated. We're going to start first with Mr. Williams, and then Mr. Berrigan will have an opportunity to question you afterwards.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

EXAMINATION

BY MR. WILLIAMS:

Q. Good morning, ma'am. How you doing?

A. Morning. I'm fine.

Q. Good. We're only going to cover a couple areas with you here today, publicity, what you may have heard about this case,

♀

3205

Page 105

and what impact that may have on you, and then the penalty and your thoughts on the penalty.

But before I get started on that, I just want to touch base with you on one other question you had in your questionnaire. You had on question 60 -- I don't expect you to remember the number -- but it was something about what your thoughts on the fact the defendant's presumed innocent and the government's burden of proof, and you wrote something to the effect of I think unless there was someone that actually witnessed the crime they are innocent until proven guilty. Do you remember writing that down?

A. Yes.

Q. Okay. Now, that was obviously before you had the benefit of any instruction from the judge about the presumption of innocence and so forth. You understand that regardless of whether somebody witnessed a crime or not the defendant's always presumed innocent, and are you comfortable with that now?

A. Yes, I am.

Q. And conversely, you know, some people come into court, and their legitimate views -- they're entitled to them, but some people come into court thinking the only evidence that counts for anything is if there was an eyewitness to a crime. And if there's not an eyewitness, then in their view there's no way of proving the crime. What are your thoughts about that?

A. Boy, I believe that people are innocent until proven

3206

guilty, and if -- I guess if I were to see something happen and I was the eyewitness that saw it, other people don't know that that's actually what I saw.

Page 106

Q.    Sure.

A.    And I guess you'd have to take the testimony or whatever to decide whether they're telling the truth or not.  So, you know, if somebody saw it and they said that they saw it, I guess you couldn't really go by that.  You'd have to listen to more or whatever.

Q.    Sure.  Let me ask it this way.  The judge ultimately I think will instruct you in this case if you're a juror that there are two things that -- terms that people sometimes hear, direct evidence and circumstantial evidence.  Direct evidence might be that maybe I saw Special Agent Basler take my pen, and so I have direct evidence of seeing him take my pen.  Circumstantial evidence might be that I put my pen down on the table.  The next time I come back, he's got my pen in his hands.  I never saw him take it, but there's circumstantial evidence that he must have taken my pen even though I don't have direct evidence of it.

The Judge will instruct the jurors there's no real difference between direct evidence and circumstantial evidence.  It's all evidence, and jurors assign whatever weight to it they think it deserves.  Do you, first of all, recognize those terms, direct evidence and circumstantial evidence?

3207

A.    Yes.

Q.    And do you think you'd require direct evidence before you could ever determine if a crime was committed, or do you recognize that circumstantial evidence would be sufficient as well?

A.    I think I'd have to go by direct evidence.

Q.    And let me ask it to you this way then.  If you were called

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2794 of 3245

as a juror in this case and there was no eyewitness to the crime that was going to testify in this courtroom and the evidence the government presented was circumstantial evidence, no eyewitness but circumstantial evidence, do you think in your view that there's no way you could ever find a defendant guilty based on circumstantial evidence?

A.   I don't know how to answer these questions.

Q.   There's no right or wrong answer.

A.   I know.  Yes, I could decide on the circumstance, but I don't.

Q.   And there's no right or wrong answer.  I'm really looking just for your thoughts on this.  I mean, is this something that direct evidence would be more important to you?  I mean, if there was an eyewitness to the crime, it'd be more important, but it's not something you're going to absolutely require for you to determine if somebody's guilty or not guilty?

A.   Yeah.

Q.   Okay.

3208

A.   Right.

Q.   All right.  That's fine.  I just wanted to cover that very quickly.  I thought that's where you were at, but I just wanted --

THE COURT:  Mr. Williams, I just want to jump in here and try and clarify it for Juror 766.  I want to give you an example of the difference between direct and circumstantial evidence.  If you were up till midnight one night and you looked outside and you saw it snowing and you woke up in the morning and there was snow on the ground, you'd have direct evidence because you actually saw it snow.  Do you understand that?

Page 108

PROSPECTIVE JUROR 766: Yes.

THE COURT: Now, if you went to bed at eight o'clock at night and there was no snow on the ground and it started snowing after you went to bed and you woke up in the morning and there was a foot of snow on the ground, would there be any question in your mind that there was snow on the ground?

PROSPECTIVE JUROR 766: No.

THE COURT: And do you understand that that would be circumstantial evidence? You never actually saw it snow.

PROSPECTIVE JUROR 766: Yeah.

THE COURT: But when you went to bed, there wasn't any, and when you looked out the next day, there was some.

PROSPECTIVE JUROR 766: Yes.

THE COURT: So does it make a whole lot of difference

3209

between direct or circumstantial evidence?

PROSPECTIVE JUROR 766: Not really.

THE COURT: And the instructions that I'm going to give the jurors is the law makes no distinction between direct and circumstantial evidence, but the weight of the evidence, in other words, in this case did the government prove its case beyond a reasonable doubt, that's for you to decide. The weight to be given any particular type of evidence is for you to decide, but we don't make any distinction between direct and circumstantial evidence. Do you understand that?

PROSPECTIVE JUROR 766: Yes.

THE COURT: And do you think you could follow that instruction?

PROSPECTIVE JUROR 766: Yes.

THE COURT: Okay. Thank you. Excuse me for
Page 109

interrupting.

MR. WILLIAMS: No. Thank you, Your Honor.

BY MR. WILLIAMS:

Q. I want to turn to publicity here, and you indicated on the questionnaire that you'd only just heard about this case maybe a little bit on TV. Can you share with us what, if anything, you recall about this case that you may have heard on TV?

A. I really didn't -- I don't watch much TV. I guess I remember something a long time ago, but I'm not a news person. I don't watch the news very often. I watch the weather, and

3210

that's about it. A few people -- my mother I think had said something about it a long time ago, but I didn't follow up on anything. I don't -- I remember glimpses of it, but that's it. I didn't --

Q. Doesn't sound like you remember very many details if any of this.

A. I really don't because . . .

Q. You filled out this questionnaire back in February of this year. Since that time have you picked up anything else about this case at all on TV or elsewhere?

A. Actually last week I went to pick my daughter up, and the only thing I heard about it was on the news that they said that they had 15 jurors and they needed 40 or something, and that was it.

Q. All right.

A. Other than that, I haven't seen or read nothing.

Q. Let me just ask you this then. Anything you have heard about this case, do you think in any way that's going to impact your ability to be a fair and impartial juror in this case?

Page 110

A.   Like I said, I haven't really heard a lot.  Most of what I know of this is what you folks have sent me in the mail.  That's pretty much all -- that's where I got most of my information about it.

Q.   Very good.  Let me turn then to the penalty issue in this case.  The judge indicated to you earlier this morning that

3211

there were really two possible penalties.  If the defendant's found guilty and if we get to that third stage, the jury would be trying to figure out which of two penalties to impose.  First is life in prison without parole, and the other is the death penalty.  What are your thoughts about life in prison just as a general matter?  Do you view that as a harsh sentence, a not harsh sentence?

A.   I think it's okay for the people that -- I don't think that they should be put in life forever.  I think that something else should be done.

Q.   And why do you think that?  What are your thoughts along those lines?

A.   I think -- I mean, I don't want them out walking the streets, no way.  But I think that they -- depending on the crime, I don't think that they should be able to live whether it be in prison or wherever.

Q.   Well, let's talk about that for a minute.  The death penalty is another option.  I assume -- and I may be wrong on this -- but I assume that this questionnaire was probably the first time you ever had to put down on paper your thoughts about the death penalty.  Is that fair to say?

A.   Yes.

Q.   And have you given it more thought since you filled out

Page 111

this questionnaire back in February?

A.    No.

3212

Q.    Okay.  Let me just ask you, if I was to ask you right now to share with us what are your thoughts on the death penalty, what would you say?

A.    I'm for it depending on the crime.

Q.    All right.

A.    If someone were to kill someone, they shouldn't be allowed to live.  If -- I just -- I don't -- I don't think that we should -- the taxpayers should pay for them to be living, to be able to breathe.

Q.    Let me ask you -- explain something to you and then follow up with some questions.  The judge indicated earlier that if we get to that third phase in the trial he's going to instruct the jury about what we call mitigating and aggravating factors.  An aggravating factor is something that would make a juror maybe lean toward the death penalty.  In this case the government's alleged that among the victims was a young mother and two little children.  And would you agree that that might be an aggravating factor, something that'd make you lean toward the death penalty as opposed to life imprisonment?

A.    Yes.

Q.    Okay.  And on the other end of that, the defense may -- they have no obligation to, but the defense may present evidence of what's called mitigating factors, or the jury may find mitigating factors in the circumstances of the crime, so, for example, whether the defendant was actually the person who

3213

Page 112

pulled the trigger or somebody who aided and abetted, whether this is the first time they were in any legal trouble, criminal trouble, or whether they have a long criminal history. But if they've never been in trouble with the law before, that might be a mitigating factor or something that might make you lean toward life in prison. Does that make sense to you?

A. Yes.

Q. Okay. And so the way that Congress set this up is rather than just have a flat-out penalty, any time you kill somebody you get the death penalty, Congress thought it best that we empanel a jury and allow a jury to weigh a number of factors and not just base the punishment on the crime -- you know, you kill somebody; therefore, you get executed -- but rather empanel a jury, present evidence to them of all these things, things that make you lean toward the death penalty, things that may make you lean toward life in prison, and have a jury weigh those factors against each other.

Now, as the judge indicated, the amount of weight you give any of those factors is completely up to you to determine, but we're looking for a jury to make that weighing decision, and Congress thought it best that a jury do that as a group but also individually. As a juror you will be making your own weighing decision.

MR. MILLER: Two minutes.

Q. Do you think you're capable of making that type of weighing

3214

decision?

A. Yes, I do.

Q. And it sounds very much like you are leaning toward the

Page 113

death penalty. It's something that you think if somebody's murdered you think -- your gut reaction is the appropriate punishment's the death penalty. Am I seeing that right or not?

A.     You know, I can say all this right here and now.

Q.     Right.

A.     But I don't know what I would do -- I mean, my whole thoughts might change on that after going through everything. I mean, I might think right now, oh, he or she should die because of this, but after the fact or after going through everything, it might all change. I can't -- you know, no, she shouldn't die or he shouldn't die, so I don't know.

Q.     And please understand, nobody's asking you to predict how you'd vote today because that's not fair. You've not seen any evidence. And what we're looking for is precisely that, somebody who's willing to wait and look at all the evidence, consider all the evidence, not just the crime itself but other things about the defendant's background, the circumstances of the crime, and come in willing to realistically consider both possible options.

          Now, some people can do that, and some people can't. Some people come in and say, Jeez, you killed two little kids; I don't care if you were the aider and abettor; I don't care if

3215

you had no criminal history; I don't care what your background is; that's the death penalty; I'm not even going to consider life imprisonment as an option; I've closed my mind to that. Other people are willing to consider both options and realistically consider both options. Can you share with us what you feel about that?

A.     I would hope that I could do it that way. My two sons,

Page 114

they used to fight all the time, and I couldn't pick on one or say, Oh, well, it's the older one's fault. You have to figure out what's going on and try to get to the bottom of it. I don't even know if I'm answering that right. I know there ain't no right or wrong answers but . . .

Q. No, no, no, that's right, and I understand where you're coming from.

MR. MILLER: Time.

THE COURT: Did you add my -- I took some of the 15 minutes or 12 minutes.

MR. MILLER: Your Honor, I did a very poor job. I didn't even note the time when he started. I'm guesstimating.

THE COURT: Okay. Why don't you just take another minute because I took some time.

BY MR. WILLIAMS:

Q. I'll just have really one more question of you, ma'am, and it's really this. We need to know whether you can assure the judge, the defendant, and the government in this case if you

3216

were called as a juror could you realistically and fairly consider both life in prison and the death penalty as potential penalties in this case?

A. Yes, I think I could.

MR. WILLIAMS: Thank you very much. I have no further questions.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Thank you, Your Honor.

EXAMINATION

BY MR. BERRIGAN:

Q. It's not so bad, is it?

Page 115

A.   It's not over yet either.

Q.   I wanted to revisit with you, ma'am, just briefly something you said about the publicity.  And as I understood it, you didn't really hear too much about the case, watched a little on TV but did not follow up on it.  Does that sound right?

A.   Right.

Q.   Do you remember the name Dustin Honken?

A.   Dustin what?

Q.   Honken, H-o-n-k-e-n, Honken.

A.   No.

Q.   And so when you were talking about you'd watched a little bit on TV, were you talking about Miss Johnson's case?

A.   This is what I do.  I walk by the TV.  I hear something.  I stop for a second, and I keep going.  Yes, last week it was --

3217

and I can't even remember a long time ago.  But last week it was I was walking by the TV, and it said that they had 15 jurors, whatever, and they needed 40 is what I thought I heard, but that's -- and I kept going.

Q.   Well, the questionnaire, looks like you filled that out the end of February, February 28 it looks like.  Does that sound about right?

A.   Yeah.

Q.   You indicated -- there's a question that says, No matter what you have read, seen, or heard, do you now have any beliefs or opinions about the guilt or innocence of Angela Johnson?  And then there are two boxes, a yes -- three actually, yes, no, and unsure.  And you checked the unsure box.  Do you recollect that?

A.   Sort of.

Q.   Are you unsure?

Page 116

A.    I'm unsure of her guilt or innocence?

Q.    Yes, ma'am.

A.    Well, of course I am.

Q.    Why are you unsure?

A.    Because I don't know -- the only thing that I know about it is what I've read.  And, of course, you know, somebody that has killed two children, I have a real problem with that, but I don't know if she did or not.

Q.    When you say the only thing I know is what I've read, what are you talking about specifically?

3218

A.    What I got from the courts to -- along with the questionnaire to fill out.  That's the most I know about this case.

Q.    Okay.  The information that's in this questionnaire.

A.    Right.

Q.    Okay.  And that caused you some uncertainty in this area?

A.    Pardon me?

Q.    In terms of assuming whether she was guilty or not guilty.

A.    When I first read it, I mean, why would she be here if it didn't happen?

Q.    Okay.  Well, she is here obviously.

A.    Right.

Q.    And the judge has talked about this, and I don't want to belabor it too much because I think he was pretty clear about it, frankly.  But Miss Johnson, you know, is entitled to a full presumption of innocence.  You heard his explanation about that.

A.    Right, yes.

Q.    And the reason that this has been a concern to us is because some jurors have heard about the case and have

Page 117

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2804 of 3245

information that they just can't do that. I mean, they're fair people, and if they hadn't read or talked about the case or seen something on television, they'd come in, and there wouldn't be any problem. And I'm wondering if you -- because we have to rely on you. Do you think you have any doubt about your ability to give Angela Johnson the full presumption of innocence?

3219

A. No, I have no doubt that I can do that.

Q. Okay. Great. Appreciate that. So let me ask you some questions about the death penalty. One thing that you did say is that you had an opinion -- let me read the question specifically. It says, Do you have any beliefs or opinions as to the appropriate punishment for Angela Johnson if she were found guilty of the intentional killing of five people including two children? And you said, Yes. She doesn't deserve to be free. She should have to suffer as the people and families she has hurt, and I was wondering what you meant by that.

A. Well, if -- you know, and that's all written out as if she were guilty. See, I've never --

Q. Right.

A. And that's what --

Q. Yeah, obviously if we were talking about punishment, then -- and that's what the question says. If she were found guilty, what are your views?

A. Right.

Q. And I was interested in that she should have to suffer as the people and families she has hurt. What does that mean?

A. An eye for an eye.

Q. Okay. And we've heard that term before. We've talked to over a hundred people easily. What does an eye for an eye mean

Page 118

to you?

A.    You know, that -- I can't really say that because -- I

3220

don't know.  If somebody were to hurt one of my children or my grandchildren, an eye for an eye to me means then I'm going to go to that person and I'm going to hurt their child.  I couldn't do that.  So I guess that's not really a fair statement or I couldn't -- that wouldn't work.

Q.    Okay.  Well, it sounds close to this answer.  You tell me. What are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of intentional murder? That was the question, 75.  And you said, I am for it.  Why should that person be able to live and breathe and the taxpayers have to pay for him or her to live?  The victims do not have that privilege.  Is that how you feel?

A.    Yeah.

Q.    Okay.  And there were some questions about life imprisonment as an alternative punishment.  What are your thoughts and opinions about life in prison as a punishment for a person who's guilty of intentional murder?  Not sure.  Sometimes I think if the person has to stay in prison all their life hopefully they suffer every day versus the death penalty.  Then they're put out of their misery.  Is that how you feel about life in prison?

A.    I visited a friend of mine, her husband, in jail.  He was in prison, and I don't -- to some of them, I don't think -- I mean, they get to watch TV.  They get to do this.  They get to do that.  That person that they hurt doesn't have that.

3221

Page 119

Q. Right. They're dead.

A. Right. And they get to keep on breathing.

Q. Right. Again, I know you've heard this before, but that's a perfectly acceptable view. I mean, it really is. I don't agree with Mr. Williams at all when he says we're trying to find people this or that. That's not what's going on right now. We're trying to find out what your views are, your open and honest views, not can you fit in a box that we want you to fit in; okay? We've had plenty of people come in, believe me, and say, You know what? I feel strongly that if you kill somebody intentionally, you take somebody else's life, you have forfeited your life. That's what you've done. You made a choice to kill somebody, and you've made another choice, and that is to forfeit your life; okay? I don't know if that's where you are or not. It sort of sounds like that to me. So you tell me.

A. Yeah, that is the way I feel.

Q. Let me tell you what the government's charged here; okay? They've alleged there are five people that were intentionally murdered, five different people. And they're also alleging that these murders are not only intentional but they're committed after substantial planning and premeditation. And they're also alleging that amongst these five victims was a mother and what the government alleges were two particularly vulnerable victims, two little girls ten and six years of age; okay? And so when Mr. Williams is talking about aggravating factors and weighing

3222

the aggravating factors and mitigating factors, that substantial planning, premeditated murder, children, those are the aggravating factors he's talking about; okay? Is that pretty serious stuff to you?

Page 120

A. Very serious.

Q. Are you a football fan by any chance?

A. When my sons were playing, yeah.

Q. Okay. Well, you know what the field looks like; right?

A. (Nodded head.)

Q. Let me ask you a question. I'm going to ask you to put yourself on a football field under certain circumstances; okay? The middle of the football field, the 50-yard line, is a person who almost fell off the apple cart yesterday and they don't have a view about the death penalty one way or another. They don't -- never even gave it a thought. And then in one end zone is the death penalty, and the other end zone is life in prison without parole; okay? If I asked you put yourself on the football field for five --

THE COURT: Well, I'm going to ask you to rephrase the question because the apple cart is pejorative.

MR. BERRIGAN: I didn't mean it that way.

THE COURT: Well, but somebody who has given a great deal of thought to this issue isn't somebody who fell off the apple cart.

MR. BERRIGAN: You're right.

3223

THE COURT: And they could be on the 50-yard line.

MR. BERRIGAN: You're right. And we've had some of those people. It's okay to be on the 50-yard line.

THE COURT: Because not many people are going to admit to just having fallen off the apple cart.

MR. BERRIGAN: You're right. You're right.

THE COURT: Although they've admitted to stranger things.

Page 121

BY MR. BERRIGAN:

Q.    I don't mean to be suggesting somebody who doesn't have an opinion is on the 50-yard line.  It's a bad thing.  We've had some of those folks.  But what I've heard so far, I'm --

MR. WILLETT:  Two minutes, Mr. Berrigan.

Q.    -- sort of sure not there.  And that's okay.  We aren't looking for people on the 50-yard line.  We're just trying to get people -- kind of find out where they are.  So you're on the football field, okay, and here's the situation.  Five intentional murders.  They've been proven beyond any reasonable doubt, no defense, you know, I didn't do it or it was an accident.  All that stuff's out the window because if you're at sentencing, just like you said, if you're at a point in sentencing, that means it's happened; okay?  So we're asking you to kind of assume that if you would.  You with me?

A.    Uh-huh.

Q.    Okay.  There we have it.  We've got five intentional

3224

murders.  Where are you on the football field?

A.    On the 50-yard line.

Q.    Are you?

A.    I don't know if she did it.

Q.    No, I know -- yeah, that's -- yeah, and I guess I'm not being clear.  If we're here at the sentencing stage that the judge is talking about, yeah, it's happened; okay?

A.    Okay.

Q.    You are certain now.  You've been proven beyond a reasonable doubt; okay?  So --

A.    I'm on the death penalty.

Q.    You're already in the death penalty.

Page 122

A.    Uh-huh.

Q.    If I add on this substantial planning and premeditation, has that got you out of the end zone in the stands?

A.    Death penalty.

Q.    Death penalty.  Children?

A.    Death penalty.

Q.    Now, realistically, if that's what you found, would whether or not she had a prior criminal history really be anything that you would take into consideration in offsetting a guilty murderer like that?

A.    No.

Q.    And if she had some evidence of abuse in her background when she was a child, physical abuse or sexual abuse, in your

3225

view -- and again, it's your view just like the judge said. You're entitled to it.  But is that really going to be anything you'd consider in offsetting a guilty murderer who had committed five intentional murders, premeditated, children?

MR. WILLETT:  Time, Mr. Berrigan.

A.    No.

MR. BERRIGAN:  Appreciate your honesty.

THE COURT:  If you have any follow-up, you can --

MR. BERRIGAN:  No, that's okay.  Thank you very much, ma'am.  Well, I guess I should.  Can I?

THE COURT:  Sure.

BY MR. BERRIGAN:

Q.    The law says you have to be able to consider those things; okay?  That's the law.  You gotta be able to consider these statutory mitigating circumstances, this thing about no prior criminal history.  That's fine, but some people feel strongly

Page 123

enough that they're not -- you know, they're not going to be able to honestly tell us, Look, I'm going to do that, and it's not a wink and a nod. When we say consider, we mean really consider it, not, oh, I'll look at it, fine, see you.

So let me just ask you that. I mean, if that's what you feel, this stuff isn't stuff you'd really consider in your scheme of things. If you were told, well, you have to consider that, is that really going to be something you're going to consider to get out of the end zone all the way down the other

3226

field? Is there any chance of that happening?

A. Oh, there's a chance. There's always a chance, but right now . . .

Q. What's the chance?

A. Half.

Q. Half?

A. (Nodded head.)

Q. To get out of the end zone?

A. Half a chance, yeah.

Q. To --

A. Yeah.

Q. To life?

A. Uh-huh.

Q. To be clear now, are you telling me that if you found this beyond a reasonable doubt, intentional, premeditated murders of five people and two kids that if you were told to consider evidence about no prior criminal record that that could get you out of the end zone after what you've told me earlier?

A. There's always a chance, but I guess I can't say what the chance would be.

Page 124

MR. BERRIGAN: Okay. Well, thank you, ma'am. I appreciate it.

THE COURT: Juror 766, I've just got a couple of questions for you. Given what you've told us, do you think that if we got to a penalty phase in this case that you would be able

3227

to fairly consider life imprisonment as a potential penalty as well as fairly consider the death penalty? It's pretty clear you'd fairly consider the death penalty, so I'm really more interested in the other one. Do you think you could fairly consider life imprisonment?

PROSPECTIVE JUROR 766: I know I keep contradicting myself, but yes, I think I could. See, I guess I'm not thinking further into the future or whatever. I'm just thinking of what -- you know, I'm just saying what I would do right now.

THE COURT: Yeah, because nobody knows about the future.

PROSPECTIVE JUROR 766: Right. But I have no idea what I would -- I think -- I honestly do think that I could later, but, I mean, not knowing anything and just knowing what I know from the papers that the death penalty is higher up there than life in prison.

THE COURT: Now, you know, we're putting you in a difficult position because we have to ask you -- first of all, it's always good to remember Angela Johnson hasn't been convicted of anything, absolutely nothing.

PROSPECTIVE JUROR 766: Right.

THE COURT: You with me on that?

PROSPECTIVE JUROR 766: Yes, definitely.

THE COURT: Okay. So we're just talking about a

Page 125

hypothetical down the road. If the jury were to find her guilty

3228

unanimously beyond a reasonable doubt and if they were to find an eligibility or aggravating factor, then we'd be in the penalty phase. So we're talking about a hypothetical situation that's down the road that may, in fact, never, ever happen in this case. You understand that.

PROSPECTIVE JUROR 766: Right.

THE COURT: Okay. But we do have to ask you if you got there and if we did have a penalty phase, do you think you could consider the evidence presented and fairly consider life imprisonment?

PROSPECTIVE JUROR 766: Yes, I could consider it, yes, yes, but . . .

THE COURT: Here's the thing. You're using the word "could" and probably because it's a hypothetical situation. But I want to know if we ever got to this hypothetical situation not could you do it --

PROSPECTIVE JUROR 766: I would.

THE COURT: -- would you do it. And do you understand the difference between could and would?

PROSPECTIVE JUROR 766: Oh, yes.

THE COURT: It's huge, isn't it?

PROSPECTIVE JUROR 766: Yes.

THE COURT: And what I want to know is would you fairly consider life imprisonment?

PROSPECTIVE JUROR 766: Yes, I would consider it.

3229

Page 126

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2813 of 3245

THE COURT: Okay. Now, I used the word "fairly," and you used the word "consider," and that's okay. And here's what I think the difference is. Mr. Berrigan uses this phrase which I like and that's give it a wink and a nod. In other words, oh, yeah, I've considered it; now I'll vote the death penalty. That's not what I'm talking about. I'm talking about would you take a serious, hard look at life imprisonment. Would you fairly consider it? Would you look at that as a realistic penalty in the case weighing all of the evidence? Would you be able to do that? I'm not saying you'd ultimately vote that way. I'm saying -- because we can't ask you that. I'm asking do you think you're the type of person who would fairly consider it?

PROSPECTIVE JUROR 766: Yes, I would, yes.

THE COURT: How sure are you of your ability to fairly consider life imprisonment in this case?

PROSPECTIVE JUROR 766: Like I said, when I answered those questionnaires, it was -- I mean, she was already guilty in my mind, but that's not the way you can think. That's just what I'm reading. I'm reading one side of it. I'm reading allegedly. This is a person we're talking about. This isn't -- yes, I would be able to consider it, yes.

THE COURT: Would you be able to fairly consider it?

PROSPECTIVE JUROR 766: Yes, I think I could. I am . . .

THE COURT: Now, if you hang on for one second, I'm

3230

going to -- I want to go back and look at some transcript that I marked here. Okay. There was a question. The question was, In terms of assuming whether she was guilty or not guilty. Then you answered, When I first read it, I mean, why would she be

Page 127

here if it didn't happen?  And I think you were talking about the packet that we sent you.

PROSPECTIVE JUROR 766:  Yes.

THE COURT:  Okay.  But that caught my interest when you said that.  And, I mean, why would she be here if it didn't happen, what'd you mean by that?

PROSPECTIVE JUROR 766:  I guess I'm presuming she's guilty already.  Why would she be here if she didn't do it?

THE COURT:  Well, how do you feel about your ability to give Angela Johnson the full benefit of the presumption of innocence?

PROSPECTIVE JUROR 766:  See, I -- the more I talk, the more I keep thinking that maybe I might not be able to do that.

THE COURT:  Maybe you're not absolutely convinced she's not guilty?

PROSPECTIVE JUROR 766:  Right.

THE COURT:  You think maybe because she's here that must mean something about her guilt.  Do you think that or not?

PROSPECTIVE JUROR 766:  Yeah, I think I do.

THE COURT:  Do you think everybody that's charged with a crime is guilty of it?

3231

PROSPECTIVE JUROR 766:  No, no, and that's a crazy thing here.  I'm going around in circles in my head, and I'm just -- I say one thing, and then I turn around and say another, and I don't -- I'm confused.  I'm . . .

THE COURT:  Well, I apologize.

PROSPECTIVE JUROR 766:  I really honestly think that she is innocent until she's proven guilty, but then I'm thinking also I read this stuff and -- I mean, she wouldn't be here if

Page 128

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2815 of 3245

she wasn't -- if she -- if it didn't happen.

THE COURT:  Well, that's true.  If it didn't happen, you know what?  I'd be here, but nobody else would be because I'd be on another case.  But you're right.  If it didn't happen, the prosecutors wouldn't be here.  The defense lawyers wouldn't be here.  Angela Johnson wouldn't be here.  That's true.  Everybody I think agrees to that.  But that doesn't mean she's guilty because it did happen; right?

PROSPECTIVE JUROR 766:  Right.  And how -- I don't know that she did it, that she was the one.  Maybe she's being framed.  Maybe she -- I don't know.

THE COURT:  Well, just because the government charges somebody with a crime doesn't mean they're guilty of it, does it?

PROSPECTIVE JUROR 766:  Right.

THE COURT:  And the only way we would ever know if she's guilty would be if the government could prove it beyond a

3232

reasonable doubt.

PROSPECTIVE JUROR 766:  Right.

THE COURT:  You with me on that?

PROSPECTIVE JUROR 766:  Yes.

THE COURT:  But the flip side of that is she is absolutely not guilty, and she's entitled to the full benefit of the presumption of innocence.  And when I look over and see Angela Johnson, I see somebody who is absolutely not guilty of these charges.  And the only way she could ever become guilty would be if, if, the government could prove her guilty of one or more charges beyond a reasonable doubt.

Now, are you able to look at Angela Johnson and see

Page 129

somebody who's absolutely not guilty?  Some people are, but a lot of folks aren't, you know, so it doesn't -- there's no right or wrong answer.

PROSPECTIVE JUROR 766:  Yeah, I think that she is innocent right now.

THE COURT:  And do you absolutely believe that?

PROSPECTIVE JUROR 766:  Yes, I do, and the reason -- I don't know her.  Just to look at her, you'd never . . .

THE COURT:  Well, you'd have no way of knowing by looking at somebody, would you?

PROSPECTIVE JUROR 766:  No, no.

THE COURT:  Right.

PROSPECTIVE JUROR 766:  And if I were to walk up to

3233

her on the street, I would never even think anything like that. Like I said, what I read, that's the only reason why I even know.

THE COURT:  And the reason why we did this questionnaire is because the government did charge her with some crimes, but even when she gets charged with a crime, she still has the full benefit of the presumption of innocence.  Do you understand that?

PROSPECTIVE JUROR 766:  Yes.

THE COURT:  And as she sits there right now, she is absolutely not guilty.  She is entitled to the full benefit of the presumption of innocence.  Do you understand that?

PROSPECTIVE JUROR 766:  Yes.

THE COURT:  And that presumption of innocence stays with her throughout the trial.  Do you understand that?

PROSPECTIVE JUROR 766:  Yes.

Page 130

THE COURT: And the only way it can be overcome is if the government can convince the jury unanimously beyond a reasonable doubt that she's guilty of one or more of the charges. Do you understand that?

PROSPECTIVE JUROR 766: Yes.

THE COURT: Now, having had our discussion, how confident are you in your ability to give Angela Johnson the full benefit of the presumption of innocence?

PROSPECTIVE JUROR 766: I have -- a hundred percent

3234

think that I can do that, know that I can do that. It's when we get to the death penalty and the life imprisonment that I'm having a problem with. It's not whether she's -- you know, I believe she's innocent right now. It's when we get up that high, you know, to that next stage.

THE COURT: If we ever get there.

PROSPECTIVE JUROR 766: Yes.

THE COURT: Yeah.

PROSPECTIVE JUROR 766: That's where I'm having the problem.

THE COURT: Sure, and I could sense some of that. And so I just want to come back to that one more time, and then we'll let you go because I'm sure you're real tired of us asking you questions. But do you believe you could fairly consider both penalties if we ever have a penalty phase?

PROSPECTIVE JUROR 766: Yes.

THE COURT: And how sure of you -- how sure are you of that, that you could fairly consider both life imprisonment and the death penalty?

PROSPECTIVE JUROR 766: Eighty-five percent. You

Page 131

know, if I could go home and think about this and really think about it and I could come back and tell you a hundred percent, but I know I don't have that option. So not a hundred percent.

THE COURT: Okay. We're going to ask you to step outside, and then we'll let you know your status; okay?

3235

PROSPECTIVE JUROR 766: Okay.

(Prospective Juror 766 exited the courtroom.)

THE COURT: Mr. Miller?

MR. WILLIAMS: Mr. Williams, no motion.

THE COURT: I'm sorry.

MR. WILLIAMS: That's fine.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Your Honor, the defense would move to strike Juror Number 766 for cause.

THE COURT: Would you start with your most principle -- your first reason? Then you can elaborate all you want.

MR. BERRIGAN: It's her death penalty views, sir. And they're on both the death penalty and life which I think is somewhat important. She really rejects life in prison as an option and said that not only in the questionnaire but even today why should we be paying for these people to breathe and live because the victims don't get to do that. And then on the death penalty she has herself in the end zone of death on the intentional murder and never really got out of there.

Now, I agree with the Court. She said, Well, I can consider life imprisonment. You might remember I asked her about that too, and she had herself back on the 50-yard line which in the text of her responses is just hard to fathom. And

Page 132

so I think she could consider it from a hundred yards away, but

3236

in terms of really being able to do that, I think she's substantially impaired. And she puts that in terms of now 15 percent, but I think the Court, if you view the answers in the total context given, that this woman is so far in the end zone of the death penalty that she is substantially impaired in terms of being able to give real consideration to life imprisonment as an available alternative, and we would move to strike her for cause for those reasons.

She -- and finally -- and I'll be very brief -- she said when I actually gave her the mitigating circumstances wasn't going to consider those, no consideration. It was only when we got to the point if that's the law, and in my view that was a wink and a nod.

So anyway, without belaboring it, we think she's Witherspoon/Witt impaired and would ask the Court to strike her for cause.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. You know, her only real problem was lack of eloquence. When she was trying to articulate where she was at, she was obviously having a very hard time doing it. In fact, she never said once that she was in the end zone of the death penalty. That's Mr. Berrigan's words. When he asked her, Where are you at, she says, I'm at the death penalty. That could mean she's leaning to the death penalty. It was not clear where she was on this football

3237

analogy because it wasn't clarified.

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2820 of 3245

Contrary to the defense assertion that in her questionnaire she's rejecting life in prison, in answer to question 87 when she's asked a number of factors, she says death to the first three. So you kill more than one person, she says death; pregnant at the time, she says death; killed a child, she says death. To all the rest of them she says prison. She says prison to a history of drug abuse, prison if the person is a parent of two children, prison if the person had mental, emotional, physical abuse, and prison if the person was not the trigger person.

So if you look at her questionnaire as a whole and you look at what she said when she is told that it's her obligation to look at all the options and is given more than just the aggravating factors at that point as a whole and told can you consider both, she says, Yes, I can. So we don't think she's substantially impaired and don't think she should be struck for cause.

THE COURT: I'm going to bring her back in and give her the football analogy in as even handed a way as I can, and then I'll make a decision. Let's have her come in.

(Prospective Juror 766 entered the courtroom.)

THE COURT: You know, if you'd just have a seat.

Everybody can be seated. I've just got a couple more questions for you. Is that okay?

3238

PROSPECTIVE JUROR 766: Uh-huh.

THE COURT: I'm sure you're tired of having been questioned. I want to return to this football field and what we call an analogy. And I want to make sure you understand it. At one end would be -- one end zone would be life imprisonment.

Page 134

The other end zone would be the death penalty. And I'm asking you where do you place yourself on that football field in terms of the penalty phase if there ever was one and your ability to fairly consider both penalties, life imprisonment and the death penalty? Where do you put yourself on the football field?

PROSPECTIVE JUROR 766: On the 50-yard line.

THE COURT: Okay. If you'd step outside for a minute, we'll bring you back in one more time. Sorry about this.

(Prospective Juror 766 exited the courtroom.)

THE COURT: Please be seated.

Mr. Berrigan, what's your spin on that?

MR. BERRIGAN: That she's going to tell you that she can be fair and impartial when you ask her. I asked her the same question in the context of intentional murders, and I hope you'll recall she had herself in the death penalty end zone without the aggravating circumstances. She never changed that position.

THE COURT: Well, I'm not sure she had her -- you're the one that put her in the end zone. What she said was death penalty. Wasn't clear to me that she put herself in the end

3239

zone. You then put herself in the end zone, but she actually never mouthed the words, I'm in the end zone.

MR. BERRIGAN: We can read it back, sir, but the question is what yard line would you put yourself on? Where would you put yourself on the football field? She said she's familiar with the field. I mean, the death penalty is the answer --

THE COURT: All you had to do was ask a follow-up question, where are you on the football field? It wasn't clear

Page 135

to me it was in the end zone, and it certainly wasn't clear to Mr. Williams.

MR. BERRIGAN: Well, it was certainly I believe clear in the context of her responses. She says people -- the taxpayers shouldn't be allowed to support these people.

THE COURT: I'm overruling the objection. I don't think she's substantially impaired, and I take her at her last answer that she could put herself in the 50-yard line. I realize she has waffled. I think she's doing a lot of soul searching, but she's not the type of juror in my view that would automatically impose the death penalty, and she's the type of juror who said she could fairly consider both sides.

So would you like to exercise -- whose turn -- would you like to exercise a peremptory strike?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. 766 is gone.

3240

(Prospective Juror 766 entered the courtroom.)

THE COURT: Juror 766, we're going to go ahead and let you go. Thank you very much for participating.

We'd ask that you do us a favor, because we're still involved in jury selection and we'll probably be involved in it next week, not to discuss it with anybody else because they might say something to somebody else, and that somebody else might wind up here in one of those chairs. Okay. Good luck to you, and thank you so much.

(Prospective Juror 766 exited the courtroom.)

THE COURT: Have any objection if we do 124?

MR. BERRIGAN: None by the defense.

THE COURT: Because I think I said we'd do two before

Page 136

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2823 of 3245

lunch.

MR. WILLIAMS: Sure. No problem at all.

THE COURT: I want to fulfill what I said, and then we can take our lunch break. Thank you.

(Prospective Juror 124 entered the courtroom.)

THE COURT: Thank you. If you'd like to sit -- anywhere you'd like in the front row would be fine. And we're going to start first with questions from Mr. Berrigan. And then after he's done, we'll have some questioning from the government lawyers. Thank you.

EXAMINATION

BY MR. BERRIGAN:

3241

Q. How are you, Miss 124?

A. Fine, thank you.

Q. This isn't going to be nearly as bad as having a tooth pulled. Listen, we're just going to ask you questions about two areas really. One has to do with your exposure to pretrial publicity, news accounts, newspaper, radio, television, word of mouth, information about the case before today. And then we're going to ask you some questions about the two penalties that are possible penalties in the case; okay?

A. Uh-huh.

Q. So let me ask you about the publicity stuff first.

A. Okay.

Q. What have you heard about this case before coming in today?

A. Heard about that there was a possible change of venue because of a related trial with Mr. Hawkin (sic), that they felt that maybe they couldn't get enough of a jury pool, so did hear about that. When the jury selection did start, you know, I

Page 137

always have the TV on when I'm making dinner.

Q.   Sure.

A.   And it came up, and I, of course, was instructed not to listen to anything, so I would change it quickly.  So just -- that's . . .

Q.   What about Mr. Honken's trial?  Did you follow that at all last fall?

A.   No, not really.  I mean, things pop in my head about it.

3242

Not like I followed it.  I didn't read the articles on it.  I, you know, don't have a whole lot of recollection of it.

Q.   Do you get the local newspaper?

A.   Yes, I do.

Q.   Sioux City Journal?

A.   Uh-huh.

Q.   I don't live up here, but I did follow Mr. Honken's case, you know, for obvious reasons, and it looked like that was reported pretty regularly in the Sioux City Journal.

A.   I'm sure it -- and on TV every night just because this is a big city but not that big of a city.

Q.   Sure, okay.  But you weren't really paying much attention to it at the time.

A.   No.

Q.   Have you ever had occasion to talk to anybody about either Mr. Honken's case or Miss Johnson's case?

A.   Something came up with -- I have a brother that lives in Marshalltown who is a juvenile probation officer, and I don't know my geography, but I think Mason City is near -- and just saying that, you know, I might be on a jury.  And so, you know, he had spoke a few words about the Hawkin trial.

Page 138

Q. What did he say to you?

A. Well, just that he was convicted and that he was from that area. I can't really remember anything -- I mean, nothing that really stands out. It's not like we had a half-hour

3243

conversation about it or anything.

Q. Did he mention to you or did you learn otherwise what type of a sentence Mr. Honken received?

A. I think he was guilty.

Q. He was convicted.

A. He was convicted.

Q. What about in terms of his punishment? Did you get any information about that?

A. I don't remember.

Q. Okay. You know, the reason we're interested in this is probably pretty obvious, but in most cases this isn't an issue at all because the folks don't know the person that's on trial, so they know little, if anything, about the case, and they can come in and say, Hey, you know what? I don't know this person from Adam. I really don't have any problems presuming him or her innocent. We're fine. And we've had certainly some instances in this case where people have known quite a lot about the case, but we usually ask people the same question, and so I'll ask it of you. Based on the information that you've had -- and I know you've said it's pretty limited -- do you have any doubt in your own mind about your ability to presume Angela Johnson completely innocent?

A. From the letter that I received as to what this trial is about, the fact that it has something to do with illegal drugs and drug dealing possibly, but probably more the most troubling

Page 139

thing that stands out with me is that two innocent children were killed. I don't know anything about the other three and their involvement and their guilt in anything, but two innocent children.

Q. Okay. And you mention that in the questionnaire.

A. Yes, I did.

Q. Let me see if I can find it here real quick. If she is guilty, I feel a very strong punishment for killing one person let alone five and children. And you put children in capital letters and an exclamation mark, and obviously you're a teacher.

A. And a mother.

Q. And a mother, right. That's a little different question, but it might be a little different issue, and it might not, so let me see if I'm clear; okay? Some folks have certainly told us in terms of the punishment options because children are involved their feelings are so strong that they might not be able to consider both of the punishments. What we're talking about now just so I don't -- I don't want to mix apples and oranges. What we're talking about now is this idea that Miss Johnson has the right to be presumed innocent; okay?

A. Uh-huh.

Q. And I don't know if you're telling me, well, that -- you know, Mr. Berrigan, that impacts on my ability on the presumption of innocence. Is that part of the presumption -- do you have a presumption of innocence problem, or is this

something about punishment or both?

A. Well, not necessarily presumption of innocence. These are the charges that are filed against her.

Q. Right.

A. So just knowing that, I guess more -- I guess I would -- like I had said prior, that the evidence is going to have to be pretty cut and dried for me.

Q. What do you mean by that?

A. For her innocence. I mean, it's really going to have to be very -- very clear.

Q. Okay. Well, that's a little different issue but related, and I'm glad you told me that. You know, she doesn't have to present any evidence much less of innocence; okay? We don't have to.

A. Right, she doesn't.

Q. Right. So obviously the government's not going to try to do that; right? They're not going to come in here and try to prove Angela Johnson's innocent; right?

A. Right.

Q. You're following me. That's obvious.

A. Yes.

Q. So I'm wondering how that's going to work. If we don't have any obligation, the defense doesn't have any obligation to prove she's innocent and you're certainly not going to hear that from the government, then from what you're telling me that we

3246

have a problem, that is, the defense, we're going to have a little problem perhaps with you being able to be the fair and impartial juror that you might ordinarily be.

A. Based on what this trial is about and about what the allegations are, what the crimes . . .

Page 141

Q.   Do you view the allegations so strongly, the nature of the allegations, that you think that that must be some evidence that Miss Johnson committed the crime?

A.   No, not necessarily, but it's murder, and it isn't just one murder; it's five.

Q.   Okay.  Does that mean the government doesn't have to prove their case beyond a reasonable doubt?

A.   No.

Q.   Okay.  So when you're talking to me about this I'm going to need some clearcut evidence of innocence, could you explain to me then what you mean?

A.   Clearcut -- well, I mean there's going to have to be some real question then in whatever the prosecution comes up with the evidence that she was involved in these crimes.

Q.   Okay.  Well, they have a standard that they have to meet.  It's proof beyond a reasonable doubt.  And the truth is it's not any different than the standard that applies in criminal courts across America every day no matter what people are charged with from me getting a parking ticket next door to somebody charged with drunk driving to more serious crimes.  The standard of

3247

proof is the same, and I'm not trying to compare a parking ticket to murder, but that's all the government -- I shouldn't say all.  That's the highest burden of proof there is in our legal system, proof beyond a reasonable doubt.  There's nothing higher that we recognize.  And I'm sort of hearing -- and you tell me, but are they kind of on their way there already, I mean, as we're sitting here because of the nature of the charges?  Is that some evidence for them?

A.   Well, I'm just going by what the letters have told me what

Page 142

this whole trial is about.

Q.   Okay.  Well, the law says --

A.   No, I'm not saying that I've already chosen my side.

Q.   No, I hear that.

A.   Okay.

Q.   I hear that all together.

A.   Okay.

Q.   I understand you haven't made a decision.  The law says they get zero credit for the charges; okay?  On this scale of proof beyond a reasonable doubt, this high scale they have to meet, they get not one iota, not a single ounce, not a fraction of a weight, not anything because of the nature of the charges that are brought against this woman, okay, not a thing, not a feather's worth of weight.  And I'm not sure that's kind of where you are because of your concern about children being murdered.  So what about that?

3248

A.   Well, that is my concern.

Q.   Okay.

     MR. WILLETT:  Two minutes, Mr. Berrigan.

Q.   Is that because of the nature of the charges?

A.   Because of what murder is.

Q.   Well, I'm going to run out of time in a second here, but let me switch gears very quickly.  This concern you have about children being murdered, if that were proven to you, okay -- and I understand that could be a big if, but if that were proven to you, the law still has two available punishments even for five people dead, intentionally murdered including children, premeditated murder.  One's life imprisonment.  One's the death penalty.

Page 143

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2830 of 3245

A.   Uh-huh.

Q.   And some folks have said, Well, that's fine and dandy, but you know what? If you kill children, that's it for me. Other folks have less of a problem with that. And I'm wondering about your feelings about that. Would you be able to consider a sentence of death if you found beyond any reasonable doubt the intentional murder of five people including two children?

A.   No, because my religious beliefs are I am not for the death penalty. Humans are not allowed to take other humans' life away. That is the creator and only their creator that can end their life.

Q.   And the prosecution I think is going to probably explore

3249

that with you. I feel pretty confident about that. But let me ask you about the flip side of the coin then. Life imprisonment, is that a sentence that you'd consider for the intentional, premeditated murder of five people including two children?

A.   Yes, definitely.

        MR. BERRIGAN:  All right.  Thank you, ma'am.  I appreciate your time.

        THE COURT:  Mr. Williams?

        MR. WILLIAMS:  Thank you, Your Honor.

                        EXAMINATION

BY MR. WILLIAMS:

Q.   Morning, ma'am.

A.   Morning.

Q.   I want to just explore a couple quick items with you. One of them is this issue you were struggling with on the nature of the charges here.

Page 144

A.    Uh-huh.

Q.    And let me see how to explain it.  Some people can come in -- and clearly you're a well-educated woman.  You understand what the judge's instructions were.  You understand the concept of presumption of innocence and burden of proof, and conceptually you understand all that.  But sometimes despite our ability to intellectually understand something, there's something emotional in us that overrides that.

3250

A.    Uh-huh.

Q.    And nobody knows you better than yourself here, and I guess the bottom-line question I have for you is knowing yourself and knowing the effect that the murder of innocent children has on you, do you have questions yourself about whether you can afford this defendant a fair trial?  Can you be a fair juror in your own mind given those thoughts?  And if you can't, you know, that's perfectly fine.  If you think you can, then we want to hear that.  But we don't want to hear one answer or the other. We want to hear what you really feel.

A.    Right.  I hate to say that about myself that I would be unfair because as you know, my job, I have to be fair in many things that I do, but I'm human, and I'm not perfect.  And yes, I feel very strongly about this.  Murder, whether it be one or five, like I've said, but children in particular, and I think that with evidence, with photographs that the questionnaire said, I might have -- I would probably be swayed.

Q.    And you think you'd be swayed in large part because of an emotional reaction to the --

A.    Correct.

Q.    -- crime itself rather than the evidence necessarily.

Page 145

A. Possibly so, yes.

Q. And it's not -- it is hard to say, I'm not going to be a fair and impartial juror, okay, and nobody's being judgmental on you if you say, Gee, I don't think I can be fair. It's not a

3251

case of I'm a bad person because I can't be fair. In fact, it is a great thing if a juror is honest enough to say, I want to be fair, but I don't think I can.

A. Uh-huh.

Q. And --

A. Well, I'm educated enough to know that in my beliefs as being extremely pro life, there are many people out there that do not respect life the way that I feel that I do in my heart and that people -- if somebody's killed or murdered, it doesn't bother them. I don't care if it's the war that's going on. I don't care anything. Any time that a life is lost or a person dying of cancer -- a very close friend of mine is dying of cancer. I don't care what the reason that the life is lost. It troubles me.

Q. Sure. And to some of us it's more troubling than to others.

A. Definitely.

Q. And so you tell us. Do you think your views on this then would impact your ability to be a fair and impartial juror?

A. Yes, I do.

Q. As much as you'd like to, you just think it's going to impact?

A. Right.

Q. And then just I want to touch base very quickly on this death penalty issue. And again, we've had the spectrum of views

Page 146

on the death penalty, and everybody's absolutely entitled to their own views on that.

A. Uh-huh.

Q. This is in particular an area where there's no right or wrong answers. Because of your belief system, can you envision yourself in any case ever imposing the death penalty no matter what the facts are?

A. That's very tough, and I think just things that have gone on in our country and in the world when heinous crimes have been committed and people have just done absolute, you know, terrible things, you think, okay, they should be put to death. But like I say, that is not our choice. That is God's choice. And whether that person is put to death, they're still going to get their just reward.

Q. So as a personal viewpoint from your standpoint, as much as you may think there may be cases where conceptually you might think the death penalty might be appropriate, can you yourself because of your own personal beliefs ever impose a death sentence on another human being?

A. No.

MR. WILLIAMS: Thank you very much for your honesty and your time.

MR. BERRIGAN: The defense would move to excuse Juror 124, sir.

MR. WILLIAMS: With thanks to the juror, we'd agree,

Your Honor.

THE COURT: Okay. Juror 124, we're going to go ahead

Page 147

and excuse you from jury service in this case. Thank you very much for participating today.

Would you do us a favor, because we're still going to be involved in jury selection most likely early part of next week, not to discuss it with anybody else? I mean, you can discuss it with your husband because he's not apt to be in the jury next week, but don't disseminate it widely because we wouldn't want your views -- you tell somebody else, your neighbor, and then she tells somebody else, and by Monday eight other people have heard about your experience, and one of those eight may be a potential juror.

PROSPECTIVE JUROR 124: Yes, I understand.

THE COURT: Okay. We should have the trial underway hopefully next week, so at that point you can talk to anybody you want to; okay?

PROSPECTIVE JUROR 124: Thank you.

THE COURT: Thank you so much. Good luck to you.

PROSPECTIVE JUROR 124: Thanks.

(Prospective Juror 124 exited the courtroom.)

THE COURT: How much of a lunch break would you like?

MR. WILLIAMS: Whatever you want, Judge.

THE COURT: Whatever you all want.

MR. STOWERS: What about 40, 45 minutes?

3254

THE COURT: Okay. Why don't we take 45 minutes.

MR. BERRIGAN: Your Honor, for the benefit of the Eighth Circuit, I know you understood, but that motion by the defense was made on the basis of the juror's responses to questions concerning her inability to be fair as a result of children being involved --

Page 148

THE COURT: What difference does it make? She's excused.

MR. BERRIGAN: I think the difference might be that some appellate court might contend that we waived previous objections to previous jurors because we moved for cause on this juror.

THE COURT: Make whatever record you want.

MR. BERRIGAN: I understand that, Judge. It's a waiver issue. I'm not complaining she's excused.

THE COURT: Okay. What other record would you like to make?

MR. BERRIGAN: That's all I had, sir. Thank you.

(Lunch recess at 12:23 p.m.)

THE COURT: Okay. Are we ready for 587?

MR. BERRIGAN: Yes, sir.

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 587 entered the courtroom.)

THE COURT: Sir, anywhere you'd like to sit in the front row would be fine. Thank you very much. We're going to

3255

start first with questions from Mr. Williams and then from Mr. Berrigan.

EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, sir. How you doing today?

A. Just fine. Thank you.

Q. Good. We have just a few minutes on each side to cover a couple topics with you, and then we're going to sit down and be done with this. The first topic is publicity and what you may know about this case, and the second one is we're going to talk

Page 149

to you a little bit about your views on the possible punishments that may come into play in this case.

So let me start, first of all, with publicity. You answered our questionnaire -- and thank you very much for spending the time on this -- back in January that you'd only just heard about this case and you had read some articles in the Sioux City Journal, maybe caught a little bit on TV, that kind of thing. Can you share with us what generally you recall about this case from those sources?

A. It was last -- the end of last summer sometime when I started hearing about they're finding some bodies around Mason City. I'm particularly interested in it because I had a relative living in Mason City at the time that had nothing to do with the case. It's just I paid attention.

And as time kind of went along -- I work for the power

3256

company here -- we was doing some work out in the country, and there was some deputy sheriffs working out there, and one of them knew me, and this case at that time had came up. It was before the trial of the gentleman last fall. And he had told me something about it was a high-profile case and that he had -- it was bigger than what normal people around here really thought about, you know, how big a case this really was, and then I started watching a little bit and reading what was in the paper and followed it a little bit. But other than that, I knew nothing about the case.

Q. And the deputy you spoke with, did he intimate in any way that he had any personal knowledge of the investigation, or is this just something that he had heard about as well?

A. No, he did not. The only thing he had said at the time was
Page 150

that there would possibly be some bodyguards possibly involved, that it was that -- this guy was a bad guy. That's the way I remember it and there could possibly be bodyguards maybe for the judge or whatever, that it was that high profile a case. It was a short conversation, but that was the first time I really took a look at it and was interested in the severity of it.

Q. Sure. And then you followed it a little bit in the newspaper when it occurred last fall.

A. Right, in the newspaper when I had a chance to. It didn't become a priority with me but -- and I really don't know that many facts of the case other than what little bit I did read in

3257

the paper. I'm not even sure if I even heard anything on television about it. I don't watch a lot of television so . . .

Q. Do you recall what the outcome of that trial was?

A. There's a reason behind this, but yes, I do.

Q. Okay. And what's the reason behind it?

A. At this particular time this trial was going on, I was fishing with a close friend of mine who -- out of Omaha at Lewis and Clark Lake. We were quite close. We were relatives, but we were heavy into the fishing world, and he fell out of the boat fishing up there and lost his life. I had a lot of respect for this man and stuff, and I -- I was there with him. I was a little ways away, and I was more or less in charge of the rescue, et cetera, but I remember I read a lot of stuff or, you know, you see stuff in the paper. This trial was going on. It was drawing towards the end of hearing facts, and I remember making the statement that this guy in Sioux City on trial will probably escape the death penalty and Kevin had to die, and it was only a couple days later that I heard that he had got the

Page 151

death penalty.

Q. What's obviously important and the whole reason we're talking about this subject is what we brought up this morning, and that is something that's kind of a fundamental bedrock in our criminal justice system, and that is that a defendant is presumed guilty. Now, obviously, you know, we're concerned --

MR. BERRIGAN: I'm sorry to interrupt, and I know that

3258

was a misstatement.

THE COURT: Yeah. You said the defendant is presumed guilty.

MR. WILLIAMS: Ooh, yeah, total misstatement, presumed innocent.

A. I caught that.

Q. Presumed not guilty. You followed me. Yeah, thank you. But you can understand our concern is that the publicity not impact a potential juror's ability to pay attention to the evidence itself, and you were asked a question in your questionnaire concerning, you know, no matter what you've read or heard about this case do you have any opinions, and you answered, My opinion is that I would not be filling this questionnaire out if she wasn't somehow connected. Do you remember writing something like that down?

A. Yes, I do.

Q. Now, you're kind of in a unique position, sir, having served on a jury before that acquitted a defendant perhaps to understand better than anybody, certainly any juror, the whole idea of the presumption of innocence. In that case that person was certainly charged, and presumably when you sat as a juror, you thought, I wouldn't be here but for the fact that this

Page 152

person's been charged. Is that a fair assumption?

A. That's very fair.

Q. And yet in that case you found the person not guilty.

3259

A. That's correct.

Q. Do you recognize that simply because somebody has been charged is not any indication that they are, in fact, guilty of the crimes charged against them?

A. That is correct. That's the way I feel.

Q. And so it really comes down to this question. How confident are you that even though you've heard about this case, you followed the other guy's case, you know what -- the outcome of that case, how confident are you in your own ability to be able to set aside that information, recognize that that's not evidence in this case and that the government still has a burden to prove the defendant guilty beyond a reasonable doubt based solely and completely on the evidence presented in this case?

A. I'm very confident that I can do that.

Q. And do you think in any way that what you know about the other case is going to influence your ability to give this defendant a fair trial?

A. Could you repeat that, please?

Q. Yeah. Do you think that in any way what you knew about the other case is going to influence your ability to give this defendant a fair trial?

A. I didn't even know who Angela Johnson was until in January, and the way I feel now, this is like a total separate thing. That other is -- you know, in a layman's words, it's been taken care of. As far as I'm concerned, that trial's over. This is a

3260

Page 153

different scenario. She's a different person than him. It's about whatever took place. Whatever reason we're here to me has nothing to do with him.

Q. Let me turn if I can then to the issue of potential punishments. And you understand we only get there -- we only get to the issue of punishment with the jury if, in fact, the jury would find the defendant guilty beyond a reasonable doubt.

A. I understand that.

Q. Okay. But for the purpose of talking about the punishment, we have to assume that we're there just to explore some people's views about punishment, so just assume with me if you will that the defendant's been found guilty of these crimes only for the purpose of our discussion here today.

First of all, is it fair to say that -- and maybe not, but is it fair to say that the first time you ever had to write down your thoughts on the death penalty was when you got a questionnaire in this case?

A. That is correct.

Q. And since you filled this out back in January, have you thought any more about your views on the death penalty?

A. My views have not changed, but this is probably the first time in my life that it slowly had become a reality and you think about it a little bit more, about the death penalty. My views of the death penalty are still the same.

Q. And can you just share in your own words with us today what

3261

are your views about the death penalty?

A. I'm in favor of the death penalty.

Page 154

Q.   And in your mind do you have a set of facts where the death penalty is always called for, a set of facts where the death penalty is never called for, or do you have your mind made up in that way?  Does that make sense?  Or maybe that was a bad question.

A.   I'll try to answer that the way that you asked it.  The death penalty to me is not -- because a person takes another man's life does not -- I don't -- I'm not so much with the eye for an eye.  It doesn't -- what are the circumstances involved? You know, I think I wrote in there too my feelings on death penalty situations, that, you know, if it's a planned-out, programmed situation where somebody takes somebody's life, I do have the shooting of police officers or the judges, things that's been happening lately and stuff.  But, you know, police officers, I've always felt that way, that that should be, you know, a capital crime.  And the willful shooting of children, I put that in there, defenseless people.

Q.   So from what I understand, there are certain factors that kind of weigh in your view on when the death penalty might be appropriate, but you don't have an absolute sense of when it's appropriate necessarily?

A.   Yeah, that'd be a good way.  I feel people can lose their temper and things happen.  I've been around in my younger days

3262

in rough areas, and tempers fly, people who didn't really mean to hurt somebody and they could have died.  But if one calculates it and plans it out and executes it and -- then it's an eye for an eye.

Q.   Well, let's talk about that for a little bit in this case. The judge indicated earlier that he will ultimately give

Page 155

instructions to the jurors to consider a number of factors, some factors that may weigh in favor of the death penalty and some factors that may weigh against the death penalty in favor of life in prison.

MR. MILLER: Two minutes.

Q. Do you recall him talking to you about that this morning?

A. Yes.

Q. And some of those factors might be some of the things you just said, you know, a planned killing. Does it make sense to you something like that would be an aggravating factor, something pointing toward the death penalty?

A. Yes, it would.

Q. And the killing of children is something -- do you see that as something that might be weighing in your mind in favor of the death penalty over the murder of an adult, say?

A. Yes, I do.

Q. And in this case there may be other factors that the judge will instruct you to consider that suggest you should look the other way at life in prison. The defense has no burden of

3263

putting on any evidence. They may put on evidence of mitigating factors or things that might suggest leniency would be appropriate, things about the defendant's background. Perhaps she has no criminal history. Or you may find things from the circumstances of the offense itself, for example, the defendant aided and abetted in the murders versus was the actual one who pulled the trigger. And the judge at some point may instruct you, will instruct you if you're on the jury, as to what factors the jury is to consider.

Now, what weight you give to those factors is going to

Page 156

be completely up to you. So you may say, boy, you know, killing children weighs very heavily with me, or you may say this is the first time she ever got in trouble or this is aiding and abetting, she never pulled the trigger, that weighs real heavy with me. But how much weight you give to those factors is completely up to you.

What the jurors are going to have to do, though, is realistically consider the different factors in making a determination which punishment is most appropriate in this case. Is that something you think you could do?

A. Yes, I do.

Q. And in this case the government has alleged the defendant was involved, aided and abetted, the intentional, premeditated, planned-out murder of five people including two children. Now, there may be other factors that come into play that may weigh,

3264

as I said, toward leniency, and you haven't heard any of that stuff yet.

MR. MILLER: Time.

MR. WILLIAMS: Can I finish my question?

THE COURT: You may.

BY MR. WILLIAMS:

Q. But given what you know about this case, can you realistically and fairly still consider both possible punishments, life in prison and the death penalty, and be able to consider both of those equally? You can lean one way or the other, but are you willing -- as a juror are you willing to realistically consider both possible options before you make up your mind?

A. Yes, I am. I think I know the point that you're trying to

Page 157

make, other things involved and everything. It's just not like cut and dried --

Q. Well, and realistically --

A. -- situation, because they aided and abetted and it was there but that person themself, who they are and where they've been and other things that play into it.

Q. Precisely. And honestly, sir, some potential jurors come in, and it is cut and dried to them. They aren't willing to look at any other factors. They aren't willing to consider anything else, and that's fine. They're entitled to their viewpoints, and we'll always respect that. But other people are

3265

willing to look at different factors, and we're just trying to figure out where you are, and I take it your description, you're willing to look at all the factors and realistically consider both options?

A. Yes, I believe I am. I believe I indicated that a little bit in the questionnaire too that I've been places myself that, you know, life is -- I'm a recovering alcoholic myself. I was in treatment 25 years ago. I've heard a lot of stories and a lot of things in people's lives, and things are not just always as they look when you look at them.

MR. WILLIAMS: That's right. Thank you very much. Thank you for the extra time, Judge.

THE COURT: Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q. You're doing great so far, Number 587.

A. Thank you.

Q. Listen, I wanted to revisit with you briefly this media

Page 158

issue, okay, because I noticed in your questionnaire that you said, The only facts that I know about the whole case came out of the Sioux City Journal, saw very little of the case on TV, nor do I know anyone that knows much about this case. Do you remember that answer?

A. Yes.

Q. And then you are asked, Have you heard other people talking

3266

about this case, the crime, or any of the people involved? And you said, Yes, only in the workplace. People have their opinions about such matters. Does that sound right?

A. That would be correct.

Q. And I know you filled this out back in January, but this conversation with the deputy sheriff, is that what you were talking about?

A. Yes.

Q. Okay. And where is it that you talked to this deputy sheriff? Physically where were you?

A. I was out at the -- we call it the county home. I don't know. It's out on Lakeport south of town. It's where the minimum security I believe is out there.

Q. And what relationship or what was your understanding of how the deputy sheriff knew anything about Dustin Honken's case?

A. I don't know if I can really answer that, and I don't even know how the conversation came up. Actually he approached me because of, back to the fishing thing, he knew I fished, and he did, and we were putting some new electric into the facility out there, and we were just -- we had coffee there for a few minutes, and we were talking.

And this case -- I can't even remember what month it

Page 159

was. I know it was there, and he was talking -- I had a couple of guys at work that had been picked up for OMVI, had spent a couple days in the hotel out there they call it, whatever it

3267

was, and it kind of came up to that, and I don't even know how the trial deal came up, and they said -- except that it was -- like I say, he started talking about bodyguards and that this guy -- he was just talking about the guy -- was a high-profile criminal or drug dealer I guess it was.

Q. I got the impression this conversation was before Mr. Honken's trial took place.

A. Yes, it was.

Q. And that stuff about the bodyguards, that too you heard before Mr. Honken's trial took place.

A. Yes, I did.

Q. And then you followed it you said. You started reading it in the paper and following the case.

A. I don't want to make it sound like that I waited for the Journal to come every morning, but when the opportunity arose or I had the time and there was an article about it, you know, I would read up on it, but I did not follow it or pay much -- I choose to read a lot of depressing facts in the paper. That's what it was. I skimmed over it and read it. I never really discussed it with people. You hear some talk about it, but it wasn't a priority I should say when I read the paper to find out what's happening yesterday.

Q. But it was a big case; right?

A. Yes, it was.

Q. And here your buddy's talking to you about the case and how

3268

Page 160

bad a fellow this is and talking about bodyguards for the judge, and at least you followed it to some extent. I guess you weren't waiting with bated breath for the paper, but you read the articles when you saw them.

A. Yes.

Q. And then your friend has this tragic accident at the lake, and do you remember specifically when that was?

A. Yes, it was in what's that? Second week of October.

Q. And you said something to somebody about this guy on trial in Sioux City will probably escape the death penalty and Kevin had to die. Did I get that right?

A. It was a conversation that we had at that time, yes.

Q. Okay. Well, was it -- was that your conversation? Is that what you told this other person you were talking to?

A. I remember making -- it was quite emotional at the time, and there was brothers and cousins there. We have campers up there, and we was at the camper talking.

Q. Sure.

A. And I remember making a statement such as that.

Q. I've never had an experience like that. I would have just envisioned it would be horribly emotional if this was a good friend of yours and you're there at the time this happens. It's the part about Mr. Honken that I'm really interested in, okay, because to be honest with you, when you say this fellow's going to probably escape the death penalty, that sort of suggests that

3269

maybe you weren't too crazy about that idea, that that wasn't something you thought should happen. Is that true?

A. That he should escape it?

Page 161

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2848 of 3245

Q. Yeah.

A. I believe you'd probably be right there.

Q. You're kind of contrasting your friend's situation -- this poor guy is fishing and he's dead -- with this guy who you've already learned is a bad actor and he's got the judge with bodyguards and all this stuff going on and he is going to escape the death penalty. You weren't happy about that.

A. I never even thought about it that way whether I was not happy about it or not. You know, I just remember making the statement because it was at the time. What I knew, the facts of the case, what little bit I read about it and the children, I didn't -- I don't know. I made the statement. I remember making that statement, so I'll never forget it.

Q. Well, in the articles in the Sioux City Journal, do you remember Mr. Honken's case being in the paper about every single day that the trial was taking place?

A. No, I don't.

Q. Do you remember any discussion about Angela Johnson in the Sioux City Journal?

A. No, I don't. And at the time articles I'd read in the paper confused me because there was so many names, I couldn't figure out who was what, and I never really pursued that. I

3270

just wasn't sure who Angela Johnson was. Maybe later on in the case I did. I understood it was his girlfriend, but I couldn't figure out who was -- who was the children and what relationship anybody was to anybody.

Q. Okay. Well, then you get this questionnaire in January it looks like, and the part that talks about the knowledge and opinions of the case, the very first sentence in the second

Page 162

paragraph says, Angela Johnson is charged with participating with her former boyfriend, Dustin Honken, in the murders of five people including two children ages six and ten years old back in July and November of '93. That surely caused some recollection about Mr. Honken's case, did it not?

A. Yes, it did.

Q. Okay. And then you were asked this question: No matter what you've read, seen, or heard, do you now have any beliefs or opinions about the guilt or innocence of Angela Johnson? And you said, Unsure. My opinion is that I would not be filling this questionnaire out if she wasn't somehow connected. Is that right?

A. That'd be correct.

Q. Now, if I understood correctly, your prior jury service, when was that?

A. Ten years ago.

Q. It's quite a while back.

A. (Nodded head.)

3271

Q. And we've kind of beat this dead horse quite a bit, this presumption of innocence, but could you understand why I might be concerned a little bit about that --

A. Yes, I can.

Q. -- given your responses today about your knowledge about Mr. Honken's case, so I hope you'll forgive me for asking you one more time, okay --

A. Okay.

Q. -- but given what you told us about Mr. Honken's case and your comments at the time your friend passed away -- and I appreciate the fact that was an emotional response, okay, not

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2850 of 3245

that you were intelligently comparing these fellows in any fashion.  But sometimes what we say in the heat of the moment sometimes is very revealing, to be honest.  And what I'm really interested in is given your apparent dissatisfaction with Mr. Honken's proceedings and at least what you did follow in your conversations with the deputy, knowing he's a bad character and here's this association if you will -- I won't use any stronger term than that -- with our client, Angela Johnson, I'm very concerned that you're going to have some kernel of -- in your mind that, look, Berrigan, that guy was a bad character, and if she's hanging around with him and this is the kind of stuff she's charged with here, then I may have a little problem with presuming her to be completely innocent.  And I know you've been asked that question before, and we're going to have to just

3272

take your response again, okay, if you'll forgive me, but as you analyze yourself -- and we can't read your mind -- do you have any question in your own mind about Angela Johnson being connected with Dustin Honken to the point you can't presume her innocent?

A.    No, I don't.

Q.    Okay.

A.    I sit here looking at Angela Johnson.  Like I said in the questionnaire, she wouldn't be here if something wasn't going on, but that's why she's here.  That's the way I look at it.

Q.    Yeah, that's a little different --

A.    I'm not judging her, and I don't know any facts of the case other than what little bit I've read, and do I automatically think that she was with this guy that she is guilty?  No, absolutely not.

Page 164

MR. WILLETT: Two minutes, Mr. Berrigan.

Q. I'm not asking you -- I know you don't automatically think she's guilty based on what you read in the paper. I thought the judge was pretty clear about this presumption of innocence. It's not automatically anything. She's entitled really to start with a clean slate, if you will; okay? I mean a completely clean slate on innocence. And some folks just can't do that. I mean, they've been real forthcoming about it, and there's nothing wrong with it. And if you're telling us she's got a clean slate, then that's what we're going to have to take to the

3273

bank; okay? That's what you're telling us?

A. I think that's a fair way of putting it.

Q. Okay. All right. This eye for an eye thing, you know, I just want to be clear what the government's alleging this woman did is participate, aided and abetted in the killing of five people intentionally, premeditated murders involving children, two children, ten- and six-year-old girls; okay? And you told us you're a believer in the death penalty. I need to ask you the flip side of the coin, okay, because the law says there's two possible punishments. One's life in prison without possibility of parole.

Could you -- in your heart of hearts, could you realistically consider a sentence of life imprisonment without parole after you found -- after hearing all the evidence in finding that type of a case, five intentional murders, premeditated, children, could you realistically consider a sentence of life imprisonment as a sufficiently severe punishment for that kind of a guilty murderer?

MR. WILLETT: Time, Mr. Berrigan.
Page 165

A.    If I heard the facts of the case depending on what they are -- like I said, I know nothing about it -- yes, I could see life in prison, but I don't know what the facts are.  I don't know if that's a fair way of putting it or not.

MR. BERRIGAN:  Follow up with just one question?

THE COURT:  You can have more than one.

3274

MR. BERRIGAN:  Okay.

THE COURT:  You took a little time on the other matter, and so you can have a fair amount of time to cover this matter.

MR. BERRIGAN:  Thank you, Your Honor.  Thank you.

BY MR. BERRIGAN:

Q.    And I'm sometimes not clear with people in this area, and I can tell I'm not being clear now.  By the time we're talking about penalties, okay, you've heard the facts of the case; all right?  That's like the judge told you this morning.  Remember the basketball game analogy?  We're finished with the first half which is when you said guilty; beyond any reasonable doubt you're guilty, five intentional murders.  If we're in the second half, the government's going to prove, if they can, premeditated murder.  These were premeditated, substantially planned murders and that children were involved; okay?  Those are the facts of the case as the government alleges; all right?

MR. WILLIAMS:  I object, Your Honor.  That isn't clear that that's all the facts in the case.

Q.    Well, there may be more, yeah.  I don't mean to suggest that's all, but it's at least that; okay?  You with me?  You've heard them.

A.    Yes.

Page 166

Q.   And now we're talking about punishment, all right, and you've been described this weighing of aggravating and

3275

mitigating circumstances.  Those are the aggravating circumstances; all right?  And given your views about the death penalty and your discussion here about an eye for an eye, in question 84 you say you wouldn't consider life without parole for premeditated murder, wouldn't do it; right?

A.   (Nodded head.)

Q.   Well, here we are, and I'm asking you that same question. I mean, would you realistically consider life without parole as an appropriately severe punishment for a guilty murderer who committed those types of crimes?

A.   The way you put it now, sir, I may find it hard to have life in prison instead of the death penalty the way that you just explained it to me.

Q.   Well, I'll tell you what offsets that, and maybe it won't in your mind.  These mitigating circumstances are things like no prior criminal history.  You know, that doesn't have anything to do with the crime.  You and I would agree; all right?

A.   (Nodded head.)

Q.   That this woman might have had an abused background and childhood, sexually or physically abused, those would be reasons to ask you to consider life without parole.  Some people say, Okay, I think that's fair.  I think I would consider life without parole because those are important to me.  Other people, you know what?  It's the crime.  It's about the crime.  Punish the crime.  I don't really care about that stuff, and I really

3276

Page 167

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2854 of 3245

wouldn't consider it to be honest. And I just want to know where you are before we sit down.

A. I believe your past history has a lot to do with -- I'm not saying it makes anything right.

Q. Right. It's not an excuse.

A. There's a piece of me in there that says you have to look at that.

Q. Okay. And by have to look at it, here's what I'm -- just to be precise because the judge has gotta rely on these answers, too, to make a decision --

A. Right.

Q. -- when you say you have to look at it, we mean really look at it, not like a wink and a nod on the way to the death penalty; right?

A. That's right.

Q. That you would realistically, realistically, promise us right now not only could I, I would look at the mitigating circumstances that you're talking about and weigh that in my decision.

A. I already know that I would. I do it in everyday life because of where I've been.

MR. BERRIGAN: Thank you, sir. I appreciate your candor and your patience with us. Thanks.

Thank you, Your Honor.

THE COURT: I wanted to ask you a couple of questions,

3277

sir, if I may.

PROSPECTIVE JUROR 587: Yes, Your Honor.

THE COURT: This comment that some deputy sheriff

Page 168

apparently made about bodyguards, do you know whether that was true or not?

PROSPECTIVE JUROR 587: I do not.

THE COURT: Okay. Would it make any difference to your ability to be fair and impartial in this case if it was true or untrue?

PROSPECTIVE JUROR 587: No, it'd make no difference at all. The only reason that I even remembered it was I didn't even know how -- anything about this trial, and when they had mentioned something in the casual statements about bodyguards, I remember kind of reading up on a little bit thinking who is this guy, you know? He must be bad news for Sioux City. That's why I remember it.

THE COURT: Well, let me tell you this. If you're selected to serve as a juror in this case and over the lunch hour you'd see me walking to have lunch and I was with a pretty burly guy, that'd be Magistrate Judge Zoss because somebody might confuse him for a bodyguard, but he's not who I would ever pick for a bodyguard if I ever needed one, but I have lunch with him a couple of times a week. So do you understand that?

PROSPECTIVE JUROR 587: Yes, I do, sir.

THE COURT: I want to talk to you a little bit about

3278

this death penalty issue. And Mr. Berrigan touched on it. He did a very fine job. It's pretty confusing even to us, and we're trained in the area, but I just want to kind of go through it with you.

If there is a penalty phase, if there's a penalty phase, then the government would have a chance to put on evidence of aggravating factors, and the defense would have an

Page 169

opportunity to put on evidence of mitigating factors, although they never, ever have any obligation to put on any evidence, but they'd have the opportunity to do it if they wanted to. I would then instruct you on what the law is, how the law defines an aggravating factor and what they are. And then I would instruct you on what mitigating factors are. And then you would have to decide whether the evidence supports either any mitigating factors, any aggravating factors, or both. Do you understand that?

PROSPECTIVE JUROR 587: Yes, sir.

THE COURT: And if you found one or more aggravating factors and one or more mitigating factors, I would instruct you to consider those and weigh them in helping you reach a decision about the appropriate penalty. Do you understand that?

PROSPECTIVE JUROR 587: Yes, I do.

THE COURT: And there may be only one or two aggravating factors. There may be 30 mitigating factors. I don't know how many there will be. But let's just suppose there

3279

are 2 aggravating factors and 30 mitigating factors that you find as a juror. Do you understand that it's not the number of factors on each side but it's how ever you decide to give more weight to one versus the other? Do you understand that? In other words, you get to decide how much weight you want to give an aggravating factor and how much weight you want to give any mitigating factors. Do you understand that?

PROSPECTIVE JUROR 587: Yes, I believe I do, sir.

THE COURT: And 1 mitigating factor could outweigh 5 aggravating factors, or 1 aggravating factor could outweigh 10 or 15 or 20 mitigating factors, but that's for you to decide as

Page 170

a juror. Do you understand that?

PROSPECTIVE JUROR 587: Yes, sir.

THE COURT: Now, do you think you could follow my instruction to consider aggravating factors and mitigating factors in the case?

PROSPECTIVE JUROR 587: Yes, I do.

THE COURT: And do you think if you were a juror and we ever got to the penalty phase that you would be able to give serious consideration to both penalties, a life sentence and a death sentence? Do you think you could give serious consideration to both penalties in the case?

PROSPECTIVE JUROR 587: I definitely believe I could, sir, yes.

THE COURT: Okay. If you'd step outside, we'll let

3280

you know your status; okay? Thank you very much.

And you know what's interesting? Nobody asked you to give up any of your fishing spots.

PROSPECTIVE JUROR 587: So far it's worked out well.

(Prospective Juror 587 exited the courtroom.)

THE COURT: Who goes first now?

MR. WILLIAMS: The United States on this one, Your Honor. We have no motion for cause.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: No motion for cause by the defense, sir.

THE COURT: Does the government exercise a peremptory strike?

MR. WILLIAMS: No, Your Honor.

THE COURT: Does the defense?

Page 171

MR. BERRIGAN:  The defense does, sir.

THE COURT:  Okay.  That is your third and final.  Would that be correct?

MR. BERRIGAN:  Yes, sir.

THE COURT:  So 587 is going fishing.

(Prospective Juror 587 entered the courtroom.)

THE COURT:  Juror 587, I got good news for your professional fishing career.  You can go fishing.  We're going to let you go.  Think you'd be a terrific juror in this case.  Thank you so much for participating in the process.  Good luck

3281

with your pro fishing career.

And I'd ask you to do us a favor.  It may take us into next week for a couple days to get a jury selected in this case.  So we'd ask you not to talk about this to anybody so that we don't wind up in a situation where somebody you've talked to has repeated something you said to somebody else and that somebody else is sitting in the chair.  Okay.  Good luck to you.  Thank you very much.

(Prospective Juror 587 exited the courtroom.)

THE COURT:  Okay.  Are we ready for 402?

MR. BERRIGAN:  Yes.

MR. WILLIAMS:  Yes.

(Prospective Juror 402 entered the courtroom.)

THE COURT:  Juror 402, any chair you like in that front row will be fine.  Everybody can be seated.  And we're going to start with Mr. Berrigan, and then after he's had an opportunity to question you, Mr. Williams will have an opportunity.

EXAMINATION

Page 172

BY MR. BERRIGAN:

Q.   How you doing, sir?

A.   Fine.

Q.   Thanks for being so patient with us.  We're just going to ask you questions in two areas.  One has to do with what you might have read in the paper, saw on television, radio, talked

3282

to people about the case before coming in today.  Then we're going to ask you a few questions about your views about the potential punishments; okay?  And, of course, we have the benefit of your questionnaire and having you fill that out, and thank you for doing that.  It's been helpful to all of us; okay?

Your questionnaire said you were somewhat familiar about the case, and I wanted to know what you could tell us in terms of what you know about this case.

A.   Well, I just remembered back when they found the bodies or something -- found -- they were missing and stuff about that, but that's basically --

Q.   Anything else?

A.   No.

Q.   Do you remember where the bodies were or how many bodies?

A.   Like the deal said.  What?  Five or something?

Q.   You saw that in the questionnaire?

A.   Yeah, right.

Q.   What about any other individuals being involved in this case in terms of did you hear anything about a trial of a fellow last fall by the name of Honken?

A.   No.

Q.   Not at all?

A.   (Shook head.)

Page 173

Q.  Do you get the paper regularly?

A.  No.

3283

Q.  Okay.  And your questionnaire said that you had heard some folks talking about the case, coworkers?

A.  Yeah, brought up at work.

Q.  What was the discussion?

A.  I think we discussed about when this other guy was -- I don't know -- whatever he got convicted of and stuff.  Usually we talk about current events before we start work and stuff, and that's basically where I heard about most of it.

Q.  Do you recollect what the discussion was about that fella that got convicted?

A.  He was guilty.  That's all I remember right off.  It's been quite a while ago.

Q.  Hear anything about his sentence or punishment?

A.  He got life or he got death penalty.  I don't remember which.

Q.  Not sure, okay, all right.  Your questionnaire indicated that whatever it is that you had seen or heard it didn't cause you to form any opinions about Miss Johnson's guilt or innocence.  Is that still true?

A.  Yes.

Q.  Okay.  Great.  So far so good.  Let's talk a little bit about the punishments involved; okay?  And I want to try to put this in context for you because it's awfully strange for us to be talking about punishment and this woman hasn't been convicted of anything.  And we don't want you to get the wrong impression

3284

Page 174

that the defense team thinks that she's guilty of anything. But we have to ask these questions of you now because we won't have a chance to talk to you later; okay? And if she got convicted, we are interested in what jurors think about these two potential punishments. One's the death penalty, and one's life without parole. So let me ask you to assume this question first. Let's say I worked with you up in -- is it Galva? Is that where you work, or is that where you live?

A. I live in Galva.

Q. Okay. Where do you work at?

A. Ida Grove.

Q. Okay. Up in Ida Grove and you and I have known each other. I've been a maintenance worker with you for quite a while. We're having a cup of coffee together. There's something in the newspaper Iowa's going to bring back the death penalty or something like that. I turn to you and I say, Well, Juror Number 402, what do you think about the death penalty? We never talked about it.

A. Well, in some incidents it's probably okay, it's a good deal but what -- like anybody would say, it takes a long process to even get there.

Q. Sure.

A. You know, so . . .

Q. Does that trouble you at all that it's a long process?

A. No, because it's gotta be justified.

3285

Q. Sure. When you say in certain instances, do you have like specific examples in mind where you think, oh, I think in certain instances?

A. If it's done outright, you know, murder -- you intend on
Page 175

doing it like, you know, take somebody else's life like if you're driving a car and you pulled out in front of somebody, you know, an accident, you might not have intended it, but if you, you know, knowingly went and did it, that's just -- I don't know what you want to call it but you intend on doing it.

Q.    Okay.  What about life in prison without possibility of parole?  What do you think about that as a potential punishment for something like murder?

A.    Takes away all your rights most, you know, generally. You're there.  You know you're going to be there.

Q.    Did you hear the judge this morning?  He was describing life without parole in the federal system means life without parole?

A.    Yes.

Q.    Yeah.  You don't get out.  Is that -- are you comfortable with that?  Some folks have this idea that you can get out in 7 years or 15 or 20 or 25 or you get parole.  They mean no parole.

A.    Yes, I understand that.

Q.    Okay.  Well, let me kind of put this in context and ask you a couple questions; okay?  The government has alleged -- in these ten charges that they've brought against Angela Johnson,

3286

they've alleged that she aided and abetted in the commission of five intentional murders; okay?  Going to be that green book. That's what they've charged her with.  Now, they have ten counts because they've charged these murders as being committed during the course of a drug conspiracy, and they've charged them as being committed during the course of a continuing criminal enterprise, but they're five dead people, and they're alleging that our client aided and abetted intentional murder; okay?  And

Page 176

that would be what would be presented to the jury. The government would try to prove that in the first stage of the trial or the first half of the basketball game as the judge described it this morning. Does that make any sense to you?

A. Yes.

Q. Okay. That part of the case is like every other trial to be honest, and I don't know. You haven't been on a jury before, have you?

A. No, I haven't.

Q. Okay. Well, it's just like television, frankly. I mean, you know, they have to prove their case beyond a reasonable doubt. They present all this evidence. The jurors listen to it, pay attention to the witnesses, go back and confer amongst themselves, and they have to make a decision did the government prove the case beyond a reasonable doubt or not. And if the answer's no, then the defendant is found not guilty and goes home. And if the answer's yes, then that means guilty, and most

3287

of the time what happens is the judge does the sentencing just like he said over a thousand times.

In this case if the jury, if -- and that might be a big if -- but if the jury found five intentional murders, then we're not going to stop then. We go on in the process; okay? And there's going to be a middle part where the jurors aren't going to hear any evidence. They're going to be asked to answer some legal questions based on what they've heard. The judge is going to tell you what those questions are. And if they answer those questions yes, then we're going to have this third part or the second half of the basketball game that has to do with the penalty; okay?

Page 177

And at that time the government's going to attempt to prove, amongst other things, that not only are these intentional murders but that they were committed after premeditation and planning, substantial planning. And they're also going to allege that of those five people that were killed that there's a mother and her two children, two little girls, ten- and six-year-old girls; okay? So at the point we're talking about punishment, these are the kind of things that the government's going to have been proving to the jury if they can. Are you with me?

A.    Yes, I am.

Q.    I see you have a five-year-old son.

A.    Yes.

3288

Q.    And I've got children too. A lot of us do. And the murders of children trouble all of us. But we need to know whether or not even in a case such as this, okay, whether jurors can consider both of the punishments that the law says are available. You following me?

A.    Yes.

Q.    And one's the death penalty, of course. So we need to know whether you could fairly consider the death penalty as a punishment option in a case such as this if -- and if that was proven, could you do that?

A.    Yeah, I . . .

Q.    Okay. We're not asking you to vote now; okay? You haven't heard anything. I don't want to say, Well, are you looking at that time? Okay, I'll sign up. Just consider it. The other is life without parole. Would you be able to consider that as a severe-enough punishment for even this type of a case?

Page 178

A.    Well, life without parole, like I said, takes all their rights away, and they got a long time to sit there and think about what's what, I mean, yeah.

Q.    So that --

A.    Yeah, some people, that's worse off than giving them death penalty.

Q.    I think probably for some people you're right.  Let me tell you that this process involves -- that's going to be the government's evidence, and maybe they'll have more evidence?

3289

MR. WILLETT:  Two minutes, Mr. Berrigan.

Q.    The defense, we have a chance to present evidence in this part of the trial, the second half too; okay?  It's going to be stuff that we call mitigating factors, and I know you don't know that from Adam, but let me tell you as an example, no criminal history, okay, no prior record or what we call prior record.  That's something we'd ask jurors to take into account in making a decision about these two punishments.  Is that something you'd consider in making a decision?

A.    Explain that a little more.  What do you mean past history?  You mean you're talking her -- the way she lived her lifestyle and everything or whatever, something in that aspect?

Q.    Yeah, it could be.  I'll tell you what, it could be that broad.  It could be any aspect of her background and character, any aspect that the juror thought, hey, you know what?  That I think is a circumstance that would make me lean towards life.

A.    I'm just going to base it on what you put forward.

Q.    Okay.  And that's kind of what I'm trying to ask you is if this evidence was put forward, would you consider it?  You know what I'm saying?

Page 179

A.    I'll definitely look at it.

Q.    Okay.  Some folks tell us -- to be honest with you, they say, You know what?  I don't really care one hoot if the person has a prior criminal record or they had an abused background because that doesn't really matter to me.  It's the crime, and

3290

I'm going to punish somebody for the crime, and I don't really care about your background, and don't even bother me with that. They wouldn't consider it; okay?  And other folks have said, Yeah, I would consider that.  I think that's something that I would weigh in this decision about life or death.  You following me?

A.    Yes, I do.

Q.    Which -- I don't know if those are the only two possible camps, but would you consider that kind of stuff, that background information, in making a decision about punishment?

A.    Well, yes, because it matters on -- you know, might relate to what happened here.  I do not know until you present the case.

Q.    It might not.  It could be you know what?

A.    Nothing to do with it.

Q.    Nothing to do with it, and you'd still be asked -- in terms of related to the case, you'd still be asked to consider it, that somebody didn't have a criminal record, no convictions I mean.

        MR. WILLETT:  Time, Mr. Berrigan.

Q.    Is that something that you'd be willing to consider?

A.    Yeah, if it's presented as evidence.

        MR. BERRIGAN:  Yeah, if it's presented.  You got it. Okay.  You've been great, very patient.  Thank you, sir.
Page 180

PROSPECTIVE JUROR 402:   Uh-huh.

3291

THE COURT:   Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Q.   Good afternoon, sir.   I'm going to be very quick with you. I just want to follow up on the possible punishment issues with you.   Mr. Berrigan just explained to you that your job would be to, you know, take a look, a careful look, and really consider all these different factors.   Some may weigh in favor of the death penalty.   Some factors may weigh in favor of life in prison or some type of leniency in that area.   And your job as a juror would be to do precisely what you just said you would, and that is say I'd consider everything you put up and I'd look at everything.   It sounds to me like you're willing to do that.

A.   Yes.

Q.   You understand the weight you give any factor's going to be completely up to you.   I think the judge explained that to you this morning.   Do you understand that?

A.   Yes.

Q.   So, for example, you could decide that an aggravating factor like the killing of children weighs really heavily with you, whereas you may also then think that there's some mitigating factor like --

A.   A life is a life really.

Q.   Yeah, on -- in your view a life is a life, so in your view children doesn't weigh that heavily with you.

3292

Page 181

A.   Well, a life is a life, you know.  Whether you take one or five, you're taking somebody's life.

Q.   Sure.  And does -- the killing of children, is that -- in your view is that an aggravating factor?  I mean, if all other things are equal and you're trying to figure out between two penalties here and in one case the person killed children and in another case they didn't kill children, does -- the killing of children versus adults, is that something that factors into you --

A.   I've been raised that a life -- one human life is just as valuable as the next one.  You don't -- you know, you take somebody's life, you take somebody's life.

Q.   Sure.

A.   You know.  I don't know.

Q.   So let me just ask you kind of an open-ended question.  You know, if you're looking at the issue of punishment in a murder, you found the defendant guilty of murdering some people and now you're back there and you're thinking to yourself what punishment fits this crime of murder, do you have in your own mind what factors would be important to you that may make you lean toward the death penalty versus life in prison if you're trying to struggle between those?

A.   I'd say the way it was committed, the harshness of it.  Like I said, you're driving a car down the road and, I mean, it just happens in a split second is different than -- they call

3293

that I think premedi -- you walk out; you make a decision I don't like that guy, walk back, get something, walk up and kill him.  That's -- you know, that's harsh.

Q.   Yeah.  So the way the crime is committed is going to be a

Page 182

big factor in your view in trying to weigh these issues.

A.    Yeah, the way -- if it was planned out and stuff.

Q.    Well, the bottom line is the judge will instruct any juror that sits in this case if we get to this penalty phase, if we get that far, that their job is going to be to consider any aggravating factors and any mitigating factors he says are factors you're to look at.  Now, it's up to you, the jury, to determine if we've proven those factors.

So, for example, if we allege that an aggravating factor is that this crime was planned, substantially planned and premeditated, the judge may instruct you that's an aggravating factor.  But then it's up to you to determine if we proved it beyond a reasonable doubt, and then if we proved it beyond a reasonable doubt, then it'd be up to you to put whatever weight you want to to that factor.  Do you understand that would be your task?

A.    Yes, I do.

Q.    Is that something that sounds like you're willing to do in this case?

A.    Yeah.

Q.    Now, if you get to the point of determining yourself after

3294

hearing all the evidence, looking at all these factors, and doing your weighing that the death penalty is the appropriate punishment for this crime, then you would want to discuss it with all the rest of the jurors and so forth, but if you did that and everybody else agreed and they all decided the death penalty is the appropriate punishment for this crime, to reflect that verdict, the judge will require every juror to sign their name to a verdict form that would have the real and practical

Page 183

effect of causing the execution of the defendant in this case.

Now, some people are kind of yeah, I support the death penalty, but I really couldn't sign a piece of paper that would actually cause somebody to be executed. Other people say, Yeah, I support the death penalty, and in the appropriate case, if I felt it was appropriate, I could sign a verdict form that would cause the execution. Where do you see yourself, sir?

A.   I've never been put in that situation so . . .

Q.   Sure.

A.   That's right up front. Well, I don't know. There's other jurors, and, you know, according to what they all state and stuff and we all come to that conclusion in the end, I guess, you know, you volunteer to be up here, and that'd be part of your obligation just like somebody to go over to fight your -- you know, there you go again. They're shooting somebody else taking their life, but that was justified because they're trying to shoot them. So in this case if we all come to the verdict,

3295

that'd be a tough one. I know you gotta live with it, but yeah, I think I could.

Q.   And I want to be perfectly clear with you as well on this. It's interesting the way this works in the penalty phase like this if we get there. It's actually every juror's individual decision. So for the death penalty to ever be imposed, every juror would have to agree on it. But if any single juror says, I think life in prison is the appropriate punishment, then the verdict is life in prison. It has to be a unanimous decision by all the jurors to impose the death penalty. But if a single juror says life in prison, then the verdict is life in prison. Do you understand that's how that would work?

Page 184

A.    Yes.

Q.    So in a way it's going to be a group decision.  It's certainly going to be something you talk about and discuss and you want to interact as a jury, but when it comes down to the bottom line, it's going to be your own individual decision what you think is the appropriate punishment.  In that case if you knew that perhaps the other 11 are all for the death penalty and now it's your turn to vote, if you know that you say, Yeah, I believe the death penalty is the appropriate punishment knowing that that could be the final deciding factor in causing another person's execution, do you think -- if you thought it was the appropriate punishment, do you think you could do that?

A.    I'm just hoping I ain't last to vote.  I mean, I'm hoping

3296

the foreman would do that, be the last to vote because that'd be tough.  Yeah, it would be tough.

Q.    And it should be tough.

A.    And I'd have to really weigh back and sit back and think a while about the, you know, imprisonment without parole, life, before I'd do that especially putting me, yeah, if I was last.  That's a tough spot to put you.  But if they all prove their points and it was proven in court, yeah, I more than likely would.  But I'd have to really want to talk -- if I'm last, I'd actually talk about the life imprisonment before the death penalty and just bring it up one last time because you put me as the last person.  That'd be -- I don't see myself being last.

Q.    Well, perhaps not.  But, you know, it sounds to me like if you were in that spot you'd want somebody to struggle hard thinking about what to do.

A.    I'd ask them all first again my personal opinion, you all

Page 185

said that, you know.  I'd ask the foreman to actually have them all raise their hands again if I'd have to be the last one. That's the toughest spot to be in.

MR. WILLIAMS:  Yeah, it is.  Thank you very much for your time.

THE COURT:  Juror 402, if you'd just step outside a minute, we'll let you know your status.  Thank you.

(Prospective Juror 402 exited the courtroom.)

THE COURT:  Any challenge for cause by the defense?

3297

MR. BERRIGAN:  None by the defense, sir.

THE COURT:  By the government?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Any peremptory strike by the government?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Okay.  Thanks.

(Prospective Juror 402 entered the courtroom.)

THE COURT:  Juror 402, you're in our jury pool, so we will let you know as soon as we can what your status is.  We'll probably let you know some time early next week; okay?

PROSPECTIVE JUROR 402:  Uh-huh.

THE COURT:  We'll give you as much notice as we can, but it probably won't be a whole lot of notice; okay?

PROSPECTIVE JUROR 402:  Okay.

MR. BERRIGAN:  Sir, did you want to give him an admonition?

THE COURT:  Oh, yeah.  Sir, one more thing for you, yeah, and it involves that sheet that you have.  That's right. I just want to make sure that you understand how important it is not to talk to anybody about this case, not to let anybody talk

Page 186

to you about the case, not to read anything in the newspaper about it or listen to any radio or television reports and not to do any independent research on your own; okay? I think you understand how serious this is. Okay. Thank you.

(Prospective Juror 402 exited the courtroom.)

3298

THE COURT: Ready for 463?

MR. WILLIAMS: Yes, Your Honor.

Were you going to discuss with her the employment?

THE COURT: Yeah, what she found out? You bet.

(Prospective Juror 463 entered the courtroom.)

THE COURT: Ma'am, if you just want to sit anywhere in the front row is fine.

Everybody can be seated.

Juror 463, before we have questions from the lawyers, I wanted to ask you if you had an opportunity to find out from your employer where you stand on being paid if you're selected to be on the jury.

PROSPECTIVE JUROR 463: Yes, they say they pay for.

THE COURT: They pay for it, okay.

PROSPECTIVE JUROR 463: Uh-huh.

THE COURT: So there wouldn't be any money or economic hardship for you if you served on the jury.

PROSPECTIVE JUROR 463: Not a problem for that. Just for my health.

THE COURT: Okay. And why don't we just go over your health concerns a little more because I think sometimes that's hard to talk about in front of so many strangers.

PROSPECTIVE JUROR 463: I know.

THE COURT: Yeah. But you understand we have to ask

Page 187

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2874 of 3245

you these questions.  I'm sorry we have to ask you the

questions, but we do.  What's your big concern about your health?

PROSPECTIVE JUROR 463:  That's because all the time when I feel nervous or something like that, my blood sugar's going, you know, raise so bad.

THE COURT:  And do you have diabetes?

PROSPECTIVE JUROR 463:  Uh-huh.

THE COURT:  How do you think this trial might affect your condition of diabetes?

PROSPECTIVE JUROR 463:  Because I not the kind of type of person that like to a lot of questions and all this stuff.  I feel like I'm doing something wrong.  That's why they make me answer these questions and stuff like that.

THE COURT:  Once you start as a juror if you are selected, nobody's going to be asking you any questions.  You'll just be sitting there listening to the evidence.

PROSPECTIVE JUROR 463:  Yes.

THE COURT:  So it won't be as stressful as it maybe has been today with myself asking you questions and the lawyers asking you questions.  After today hopefully there won't be many more questions or any more questions.  Did you ever have a chance to talk to your doctor about how being a juror in a trial of this importance might affect your diabetes?

PROSPECTIVE JUROR 463:  No, I don't.

THE COURT:  What's your best judgment about how it

might affect your diabetes?
Page 188

PROSPECTIVE JUROR 463: Because I feel right away when I, you know, I know -- I don't know what you guys talking about, exactly what's going on in here.

THE COURT: Let me ask you about that. Your English seems very good. Have you had a hard time understanding what we've been talking about?

PROSPECTIVE JUROR 463: Sometimes.

THE COURT: Because sometimes we're not the best -- we don't ask the best questions I think.

PROSPECTIVE JUROR 463: And then you guys talk too low and --

THE COURT: I think that just went off. The battery might have run out.

PROSPECTIVE JUROR 463: Yeah, it did.

THE COURT: Okay. If you'd just sit tight, we're going to see if the other microphone is working. Let's do a test. Let's try that.

PROSPECTIVE JUROR 463: Okay.

THE COURT: Okay. I think that's working.

PROSPECTIVE JUROR 463: Okay.

THE COURT: I want to know how you think it might affect your health and -- oh, and I guess we were talking about your understanding.

PROSPECTIVE JUROR 463: I understand some, but

3301

sometime you guys use different words, you know, that I have a hard time to understand.

THE COURT: How often has it happened that either I or the lawyers have used words that you don't understand?

PROSPECTIVE JUROR 463: When they speak too fast and
Page 189

then they make a question too small maybe is easy for me.

THE COURT: Okay. Well, I'm going to turn it over to the lawyers now, and they're going to ask you some more questions. Thank you very much.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, Miss 463. We have two topics that we want to talk with you about. One is what you may know about this case from the media, and the other one is what your views are concerning possible punishments that may come into play in this case. So let me talk to you first about your familiarity with this case. You filled out the questionnaire, and we appreciate that. You filled that out back in January. And at that time you said you didn't know -- you were not at all familiar with this case.

A. No, I don't -- I don't know exactly what's going on.

Q. Okay. Have you learned anything about this case from the media since you filled this out?

3302

A. No.

Q. And other than what you've learned from the questionnaire itself that was sent to you, do you know anything about the defendant in this case or anything about her charges?

A. No.

Q. Let me talk to you then a little bit about your views on the possible punishments that may come into play. And before I get there, if you pardon me asking you this as well, the judge asked about how well you were understanding what we were saying

Page 190

here in court. How is your reading of English? Do you have difficulty with that at all?

A.   It's easy for me reading than spoke.

Q.   One reason I ask that is I want to see if perhaps you may have misread one of the questions here from looking at this, but we'll just ask. First of all, have you ever really thought about the death penalty before this case came up, before you were asked to fill out this questionnaire?

A.   No, I don't -- well, I don't really know exactly what's going on, but I heard something about things, but I don't know about this case. I never heard nothing about this case.

Q.   Have you ever thought about the death penalty itself regardless of this case?

A.   What I think is if somebody guilty I believe in death penalty.

Q.   All right. Let's talk about that for a little bit. The

3303

judge put up a slide that kind of described how this process may work if we ever get to the third stage of this trial. To get there, we don't get there unless the jury has found the defendant already guilty of intentionally aiding and abetting somebody in the intentional murder of another person. Do you understand that's the only way we get to penalty, of course, is if the defendant's been found guilty of being involved in aiding and abetting somebody killing another?

A.   Uh-huh.

Q.   All right. That's a yes?

A.   Yes.

Q.   Okay. That's for Shelly's benefit.

A.   I forgot.

Page 191

Q.    Let me ask you this then.  The way that this whole trial is set up and the whole penalty phase is set up was designed by Congress because Congress decided that if somebody's guilty of intentionally murdering somebody else or aiding and abetting intentional murder in a situation like what we have here, that the decision of the penalty, whether it should be the death penalty or life in prison, is one that's proper for a jury to make a decision on.  There isn't an automatic sentence.  So if somebody's found guilty of this crime, they aren't automatically sentenced to death.  Rather there's two options, and Congress decided that it ought to be citizens who make that decision looking at a number of factors.  Do you understand that?

3304

A.    No.  Can you repeat it again?

Q.    Sure.  This is not a case where if the defendant is found guilty there's already a sentence in mind.  Okay?  It's not as if you're found guilty you get the death sentence.  Rather if the defendant's found guilty, the jurors have two options, death penalty or life in prison.  Do you understand that?

A.    Uh-huh.

Q.    That's a yes?

A.    If it's guilty, yes, I got it, yeah, death penalty.

Q.    And nobody's asking you how you would vote at this point --

A.    Oh, okay.

Q.    Because you don't know any facts.

A.    Okay.  Yes.

Q.    The question is this.  You know, some people have the views that anybody convicted of murder just automatically ought to get the death penalty.  It doesn't really matter what other facts are involved.  It doesn't matter whether the person who's guilty

Page 192

pulled the trigger or is an aider and abettor. It doesn't matter to them whether the murderer had a past criminal record or not. It doesn't matter whether the murderer had some past history of abuse or something like that. In their view it's black and white. You kill somebody, and you automatically get the death penalty.

Other jurors don't have that view and may have a different view. And some jurors actually come in, and they feel

3305

nobody should ever be put to death, period. Can you share with us what your views are about that?

A. I don't really understand that point what you're talking about right now.

Q. Okay. Let me see if I can rephrase it.

A. Maybe you can figure out something a different way.

Q. Sure. If you were a juror in this case and the defendant was found guilty of aiding and abetting the murders of five people including two little girls, could you realistically consider both death penalty and life in prison as possible punishments to fit that crime?

A. I think it's life for life.

Q. In your view if you kill somebody it's the death penalty.

A. Yes.

Q. Let me ask you, let's say that the person who aided and abetted this murder has no criminal record, has never been convicted of a crime before. Let's say that person was abused as a child in some way, or let's say there's other things about the background of that person that is different from maybe somebody who had a bigger role, maybe the person who actually pulled the trigger and so forth. Would you be able to take into

Page 193

account any of this other information, her background, whether she had a criminal record, whether she was abused? Would that be something you would consider in determining whether life in prison might be a more appropriate punishment in this case?

3306

A. Depend on the case. If it's a child abuse, I think maybe stay in jail for the rest of their life is good enough other than . . .

Q. So there might be some factors that in your view even though you believe a life for a life --

A. Yes.

Q. Are there some factors in your view that might make you think, well, perhaps in this case it isn't appropriate to have a life for a life; maybe there's something about this defendant that would make me want to be lenient on her? Do you think that way at all, or do you not?

A. Almost I think that way.

Q. Almost you think that way?

A. (Nodded head.)

Q. And can you share -- when you say almost I think that way, what do you mean?

A. Well, like you say, if this person have a, you know, like a clean record before but if the court have all the evidence this person is guilty, it's a life for life for me. If it's child abuse, I think they can pay with a life too but if they have enough proof.

Q. So in your view, even if they're guilty of participating in another murder, in your view it doesn't matter what their past history is. Doesn't matter whether they were abused as a child or anything else. In your view it's just a life for a life.

Page 194

A.   Participating is kind of like the same as I did it or something.  You help anyway.

Q.   And that's all the same to you.

A.   Yes.

MR. MILLER:  Two minutes.

MR. WILLIAMS:  Thank you very much.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  May we approach?

THE COURT:  Sure.  If you'll just stay right there, I'm going to talk to the lawyers for a second.

PROSPECTIVE JUROR 463:  Okay.

(At sidebar on the record.)

MR. BERRIGAN:  Knowing how precious your time is, Your Honor, I didn't want to waste 12 minutes with this one unless you thought I needed too.  The two real problems, she really is having, in my view, a real hard time understanding the questions.  And if you had a chance to look at her questionnaire, that would be even more apparent.  And the second thing is I think she's made it pretty clear a life for a life for her and the death penalty is her view.

THE COURT:  I'm confident you can rehabilitate her.

MR. BERRIGAN:  I probably could.  I'm sure you could.

THE COURT:  Well, maybe I should try.

MR. BERRIGAN:  I don't want to.

THE COURT:  I have grave reservations about her

ability to understand it.  I think she does a pretty good job,

but that's just not good enough. But I wanted to check with your views before I made a decision.

MR. BERRIGAN: Well, I just wanted to make a motion to excuse her for cause.

MR. WILLIAMS: We join in the motion.

THE COURT: Okay. Thanks.

(The sidebar was concluded.)

THE COURT: Juror 463, thank you very much for participating today, but we're going to dismiss you from jury service in this case. So you won't be a juror in this case. You excited about that?

PROSPECTIVE JUROR 463: Yes. Thank you.

THE COURT: Okay. Well, thank you so much for spending the day with us and for checking with your employer and for filling out the questionnaire and for answering the questions that we all asked you. Thank you and good luck to you.

PROSPECTIVE JUROR 463: Thank you.

THE COURT: Thank you.

(Prospective Juror 463 exited the courtroom.)

THE COURT: Okay. Juror 402 is our third alternate?

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: The defense has no peremptory strikes left, and the government has two left?

3309

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Everybody agree with that?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. So I guess we'll be here on Monday, see if we can get three jurors.

Page 196

MR. BERRIGAN: Did you want to go ahead and make the strikes on the 22 this afternoon, Your Honor? We're prepared to do that. It's completely up to you.

THE COURT: Do you see any downside in doing it today?

MR. WILLIAMS: I could go either way. Here's what I'm also wondering. If we go on Monday and we go through the whole day Monday and only get one, we may want to revisit, you know, the proposal you came up with, and it's certainly acceptable to the government. Frankly, we'll do whatever you want to do.

THE COURT: What's your view, Mr. Berrigan?

MR. BERRIGAN: I only suggested that because I knew you had some desire to notify people.

THE COURT: But we really can't notify them now because we don't --

MR. BERRIGAN: Right, exactly.

THE COURT: We can take a guess -- here's one thing I'm thinking about doing.

MR. BERRIGAN: Okay.

THE COURT: Taking a guess that between Monday and Tuesday we could qualify three more alternates and then just

3310

calling everybody now who we know is either a trial juror or an alternate and telling them trial's going to start Wednesday at 8:30 in the morning and then we hope Monday and Tuesday we get three more alternates. You know, it's a little risky. I just think we're asking so much of the people that, you know, it's just unfair to call them one day and say, Oh, by the way, the trial's starting tomorrow, and I'm just not willing to put it off.

MR. BERRIGAN: We're fine with that, sir. And I feel

Page 197

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2884 of 3245

confident we will have three. I think we have pretty good-sized panels.

THE COURT: How many do we have coming in?

THE CLERK: On Monday we have 12.

THE COURT: How about Tuesday? Do you know?

THE CLERK: I'm not positive.

THE COURT: Could you go check?

THE CLERK: Yeah, I can look it up right now.

THE COURT: Okay. You're more confident than I am.

THE CLERK: On Tuesday so far there are nine.

THE COURT: Your thoughts?

MR. BERRIGAN: That's 21 jurors, Your Honor. We have no peremptory challenges. The government only has 2, so that would be 19 jurors that would have to go for cause in order for us to have none, and 16 could go for cause, and we'd still have three. I think that's extremely unlikely. So I feel

3311

confident -- of course, I've told you confidently we'd be done in three weeks.

THE COURT: You're close enough.

MR. BERRIGAN: But I think those numbers look pretty good, frankly, and I can't envision us not having a jury by Tuesday at the latest.

THE COURT: We could always call them back and tell them we goofed. Okay. Why don't we go ahead and exercise the strikes. Each side has -- let's just review the ground rules. Each side has five. We're going to start with the government going first and just alternate; is that correct?

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Okay. Who would the government like to

Page 198

strike first?

MR. WILLIAMS: 717.

THE COURT: Who would the defense like to strike first?

MR. BERRIGAN: 228.

THE COURT: Who would the government like to strike second?

MR. WILLIAMS: 685.

THE COURT: And the defense second.

MR. BERRIGAN: 495.

THE COURT: Who would the government like to strike third?

3312

MR. WILLIAMS: 311.

THE COURT: And the defense third.

MR. BERRIGAN: 617.

THE COURT: Who would the government like to strike fourth?

MR. WILLIAMS: 193.

THE COURT: And how about the defense fourth?

MR. BERRIGAN: 109.

THE COURT: Who would the government like to strike fifth?

MR. WILLIAMS: 459.

THE COURT: And who would the defense like to strike fifth?

MR. BERRIGAN: 293.

THE COURT: So the remaining 12 would be our trial jurors; is that correct?

MR. WILLIAMS: That's correct, Your Honor.

Page 199

MR. BERRIGAN: That's correct, sir.

THE COURT: And then, Carey, have you kept a list of the alternate jurors that we've selected so far?

THE CLERK: Yes. Would you like me to read them?

THE COURT: Yeah, why don't you just read them so everybody can double-check and make sure we have the right folks.

THE CLERK: 167, 78, and 402.

3313

MR. BERRIGAN: That comports with the defense's records, sir.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. And so the plan will be to call these folks and let them know that the trial will start at 8:30 on Wednesday morning, and the hope would be that we will get three jurors, the other three alternates selected, Monday and Tuesday; correct?

MR. BERRIGAN: Yes, sir. Does the Court -- would you be willing to read the list of the final 12 just to make sure we have it right? Or I'll be happy to do it.

THE COURT: Sure. No, no, no, that's fine. You know, I'm keeping track of it, but Carey's kind of the official keeper of the records as my designee, so why don't we have Carey do it.

THE CLERK: These are the jurors that are on the trial jury: 513, 55, 504, 797, 621, 489, 170, 147, 727, 108, 509, and 600.

THE COURT: And it adds up to 12. That's the good news. Any disagreement there, Mr. Berrigan?

MR. BERRIGAN: No, sir.

MR. WILLIAMS: No, Your Honor.

Page 200

THE COURT: Okay. Anything else we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Mr. Stowers, just a reminder, you got a

3314

free pass. You twice referred to Angela Johnson by her first name in your introductions.

MR. STOWERS: Did I really?

THE COURT: Yep, you really did, so just work on it. That's all.

MR. STOWERS: Yeah, I think now that you mention that I think I said Angela, and then I said -- "you can sit down, Angela," might have been the phrase now that you mention that. I don't remember that one. I don't remember the second time, though.

But the only thing, I saw that the government did file a motion relating to striking the allegations in the indictment. If you want us to file something formally, we can do that; otherwise I'd just say on the record we don't have any objection to your granting the motion.

THE COURT: I don't believe in needless paperwork.

MR. STOWERS: Okay. Fine.

THE COURT: Matter of fact, I think my ruling's either been filed or awaiting my signature to be filed. Wasn't one of the more difficult rulings.

MR. STOWERS: Once again, you're ahead of me.

THE COURT: Well, I don't know about that, but that was a pretty easy call.

MR. STOWERS: Thanks.

THE COURT: Anything else you can think of? Anything

Page 201

we need to be talking about for the start of trial or anything?

MR. WILLIAMS: Not that I can think of at this point, Your Honor.

THE COURT: Just so you're clear, when we bring them in on Wednesday morning assuming that's the morning we're going to bring them in on when we have 18, I'll swear them in. I'll go over the preliminary instructions, and then we'll just go directly to opening statements.

MR. WILLETT: Judge, may I ask one question?

THE COURT: Sure.

MR. WILLETT: Assuming we got our other three alternates placed on Monday, the Court would still give a day off and we'd start on Wednesday, or is the Court thinking now that we need to pick up the pace, or is it a product of do we get done on Monday or Tuesday as to when we start in terms of . . .

THE COURT: You know, here's probably the deal. If we -- I'm thinking that once we get -- if we were to get 3 selected among the 12 that we should just stop. There's no point interviewing anybody else.

MR. WILLETT: I agree.

THE COURT: And I think we'd still start Wednesday because I don't want to call everybody back after having just called them and said we're starting Wednesday and start Tuesday. You know, I guess the other -- we could wait, but then we're

3316

giving them virtually no notice because the earliest we would know would be probably noon or one o'clock on Monday, and then

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2889 of 3245

to call -- some of them we wouldn't reach till Monday evening, and they wouldn't have a chance to tell their employer. I just don't think that's fair. So I think we'll have a Wednesday start date at 8:30 and no matter where we -- the only thing that would be is if we didn't get three alternates on Monday and Tuesday.

MR. WILLETT: Certainly. If we finished on Tuesday, then it would just be understood that we're going to pull up our boots and be in court on Wednesday morning.

THE COURT: Right.

MR. WILLETT: Okay.

THE COURT: And admittedly, one, two, or three alternates would not have a whole lot of notice, but everybody else would.

MR. WILLETT: Thank you, Judge.

THE COURT: Okay. You see a problem with doing it that way?

MR. WILLETT: No, I just wanted to make sure I was on the same page you were.

THE COURT: Sure. You bet.

MR. WILLETT: Thank you.

MR. WILLIAMS: Along those same lines, Your Honor, of being on the same page, just for scheduling purposes, would you

3317

anticipate us going on Friday then next week, or would that Friday start the Friday off?

THE COURT: Well, I think I told the jurors we're not going on Fridays.

MR. WILLIAMS: That was my understanding. I just wanted to make sure I was on the same page.

Page 203

THE COURT: You know, I'd love to go on Friday, but I told them we weren't going Fridays, so I don't like to go back on what I tell people.

MR. WILLIAMS: And we're perfectly fine. I just wanted to make sure I was on the same page.

THE COURT: No. For scheduling purposes we won't be going on Friday. There is one matter I'm not sure we have an agreement on or maybe we'll never get an agreement, and that is the photographs of witnesses.

MR. WILLIAMS: Oh, certainly. My --

THE COURT: What's your understanding?

MR. WILLIAMS: My understanding is that the Court was going to take those photographs and put them in binders for the jurors to keep as we went through the trial. My only request along those lines, having thought about it, is as we've talked during this jury selection, that box is an intimidating place to be. It's even more intimidating to have somebody come up and take your photograph in front of the jury sitting in that box. And so my only request would be that the photograph be taken by

3318

the court staff after the person testifies. They go straight over to the clerk's office; they snap the picture; and that goes in the book just for the sake of the witnesses. Now, obviously law enforcement officers, they can handle it. But some of the civilian witnesses --

THE COURT: But I want to treat everybody the same particularly in front of the jury.

MR. WILLIAMS: Right.

THE COURT: What's the defense view?

MR. BERRIGAN: I'm not sure, Your Honor, but I thought

Page 204

we had litigated this on the record. We've been consistently opposed to the idea, our concern being that the government's going to have, as you point out, a lot of witnesses and that the jury's --

THE COURT: Well, you may have more witnesses in the end. I don't know.

MR. BERRIGAN: Well, the thing is that it's not about the number of witnesses, and this process we think --

THE COURT: Well, I'm not reconsidering my ruling.

MR. BERRIGAN: Okay.

THE COURT: I'm asking about the procedure.

MR. BERRIGAN: Okay. Well, we have no objection to the procedure given the Court's ruling. We just didn't want to be -- if you've already made a ruling, then the procedure is up to the Court. We're fine with that if you want the witnesses to

3319

be photographed in the clerk's office. Whatever the procedure is we'll abide by it. I don't really have any feelings about the procedure one way or the other.

THE COURT: See, the problem with doing it that way -- the nice thing about if we swear them in, I have them seated and I can just say we're going to take your picture right now, we know it always gets done, and then we don't have to rely on somebody across the hall where none of us are present to make sure that it gets done. And --

MR. BERRIGAN: Do you mean in front of the jurors, sir?

THE COURT: What difference does it make?

MR. BERRIGAN: Well, I don't know. I'm just curious.

THE COURT: No, I am not sending the jury out to get a

Page 205

picture taken. That's true. It would be in front of the jury. Now, do you have some objection to that?

MR. BERRIGAN: Well, I'm opposed to the whole procedure, so I don't know --

THE COURT: I wasn't asking you about that, and you know what? You don't have to remind me every time.

MR. BERRIGAN: Okay, sir.

THE COURT: We're talking about procedure.

MR. BERRIGAN: Well, then I favor --

THE COURT: And you just said it was up to me, and now I told you what we were going to do, and now you want to beef

3320

about that. So go ahead and complain about it. What's your complaint?

MR. BERRIGAN: I'd prefer Mr. Williams' procedure to the jurors --

THE COURT: Well, then why did you say it was up to me?

MR. BERRIGAN: Because you've already made a ruling. I'm not even sure why the defense is engaged in this discussion. The Court's made a ruling. How it's done isn't up to us, but if you're asking for our view, I favor Mr. Williams' procedure. I think taking pictures of the witnesses in front of the jurors --

THE COURT: What's the harm there?

MR. BERRIGAN: I agree with Mr. Williams. That's a very intimidating procedure, and I'm not sure the defense witnesses at least are going to be all that keen about the idea. I certainly haven't spoken to them about it.

THE COURT: If you don't want to have pictures taken of your witnesses, you don't have to.

Page 206

MR. BERRIGAN:  Okay.

THE COURT:  But you have the right to have them taken if you want to.  Well, it'll -- I mean, there are some logistical problems.  I'm not willing to have somebody from the clerk's office sit in here to monitor when a witness is done.  We are short -- we really only have two people in the clerk's office.  We're short two or one's out on medical leave.  One's

3321

about to go out on Thursday on medical leave.  That just leaves two nonsupervisory employees in the clerk's office.  But we'll just have to make sure if that's --

MR. WILLIAMS:  Your Honor, we'll take the onus of making sure that it's done with all of our witnesses.  We'll make darn sure that they don't leave the building till their photograph is taken.  If anything, this procedure might make it easier for the clerk's office because rather than them having to run over here at our beck and call --

THE COURT:  I was going to have Carey just snap it.  That was what I was going to do, but the defense objects to it, so even though they said it was up to me, we'll do it your way.

MR. WILLIAMS:  We'll make sure it gets done.  I'll guarantee you that.

THE COURT:  Okay.  That's fine.  As long as it's -- if somebody doesn't get their photo taken, they won't go in the book.  I guess we might as well discuss now when the photos go into the book because I'm sure you'll want to argue about that too, so would you like to argue about when the photos go in the book?

MR. BERRIGAN:  No, sir.

THE COURT:  Well, there are several ways it can be

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2894 of 3245

done. You can come up with some arguments about, you know, we'll wait till the very end; we do it at the end of each day; we do it, you know, in the morning following when the witness

3322

has testified; we just hand the photograph to them. Should the photograph then have the name on it? Who's going to put the name on it? I mean, we have lots of things we can argue about. I think we can actually be here through tomorrow discussing this. So we might as well get them all out on the table now.

MR. WILLIAMS: The government's position is we don't care how it's done. Off the top of my head, I would say have the names on them and put it in their books at the beginning of each day.

THE COURT: Who's going to put the name on the photograph? Clerk's office I guess; right?

MR. WILLIAMS: Or we can. I mean, we're certainly capable of doing that too. If you want us to provide names or if they take the photograph and give us the digital image, we could then download it, put a name on there, print it off, and get it to the Court easily enough. We'd be glad to do that, or the clerk's office. We really don't care.

THE COURT: Let me ask you this. I just want to make sure all witnesses get treated equally and that we don't have big blow-ups of the government witnesses and some little teeny photograph of the defense witnesses.

MR. WILLIAMS: We would do everything exactly the same if it was assigned to us.

THE COURT: Are you -- we're just really shorthanded.

MR. WILLIAMS: We can do it.

3323

Page 208

THE COURT: And so who -- do you know who from your office would be taking the picture?

MR. WILLIAMS: Yeah, Shari Konarske, our witness coordinator.

THE COURT: Okay. And then will she -- will you all make the copies?

MR. WILLIAMS: Yep.

THE COURT: Or you want to give them to the clerk's office?

MR. WILLIAMS: We can make the copies. We'll have her take the photograph, put a label of the name of the witness above it or below it, how ever it works on the page. We'll print them all off on 8 1/2-by-11 sheets just like we had in the last trial.

THE COURT: And then can we the first thing in the morning pass those out to the jurors from the witnesses who testified the previous day who had had their photographs taken?

MR. WILLIAMS: Certainly.

MR. BERRIGAN: I understood the purpose of the photographs to be that after a long trial jurors might need to have recollections about who testified and what they looked like. I certainly didn't envision that they're going to be passed the photographs every day, and I fail to see the purpose for that, frankly. At the end of the trial is one thing to look back over the course of perhaps a month of evidence and try to

3324

recall what different witnesses look like. But to be keeping a scrapbook as we go is objectionable, sir.

Page 209

THE COURT: What's the objection?

MR. BERRIGAN: Well, because it's -- what's the purpose of it?

THE COURT: The purpose of it is so that they can try and recall the evidence with regard to the witnesses who testified because there are so many witnesses who are going to testify, and people often -- when they see the picture of the witness, it helps them recollect the evidence, and they have an obligation to recollect the evidence during the trial, not just at the end of the trial. So it assists the jurors' ability to comprehend and recollect the evidence.

MR. BERRIGAN: Well, I guess we just respectfully disagree.

THE COURT: Well, what do you disagree about?

MR. BERRIGAN: Well, this is -- they already have their -- as Mr. Stowers described it, their playbook for the government's charges, and now we're --

THE COURT: Well, I resent the fact that you call my instructions a playbook.

MR. BERRIGAN: Well, in our view they're a checklist for the jurors.

THE COURT: Well, that's ridiculous to call the Court's jury instructions a playbook for the government. You

3325

know, I take personal offense at that.

MR. BERRIGAN: I'm sorry you do, sir.

THE COURT: Well, that's ridiculous to call my jury instructions a playbook for the government. You really think that the jury instructions are a playbook for government?

MR. BERRIGAN: I think if you give them to them during

Page 210

the trial that's exactly what they are. It's a checklist they can go through as they check down the evidence, and now they're going to have the pictures to help them out every day to make sure they've got the right testimony to check off. Yes, that's exactly what I think it is.

THE COURT: Mr. Williams?

MR. WILLIAMS: We have no objection -- if they're that concerned about that, we have no objection to waiting till the very end to give the photographs to the jury. I agree with the Court. I think it's helpful to the jury throughout, but if it's that big of a deal to the defense, we don't object to just waiting and then putting together one book and handing it to them before closing arguments or, you know, whatever. We're amenable to whatever the Court wants to do here.

THE COURT: Well, if we just give them it at the end, then it's superfluous to the chart that I'm allowing you all to use to show a photograph of a witness when you talk about the witness's testimony in closing argument. What's the whole point of it at that point?

3326

MR. WILLIAMS: Well, it is and it is not actually. I mean, my thought is right now that I doubt that we would use -- if they're going to have a book of all the photographs, I doubt that we would use the big chart. What we will more likely do is in a PowerPoint presentation say, you know, now I want to talk to you about the evidence of this, and we would have up on the chart, you know, how ever many witnesses talked about this issue, when they talked about, and then we go on to the next issue and do it that way.

So if they have this book of photographs, it actually

Page 211

eliminates our need to then mount them on boards and do all that kind of stuff, so I don't think we're going to be doing that if they have the photographs in front of them. It would still aid them back in the jury room then as they're deliberating and recalling testimony to thumb back through and say, Oh, yeah, now I remember what this person said and so forth. And so I think it'd still be helpful to them. Is it as helpful as having it throughout the trial? Probably not. But as I said, I mean, we're amenable to whatever. If the defense has a big objection to it, we're not fighting that objection, and we'll do whatever the Court wants to do on this.

THE COURT: I'll just take it under advisement.

Mr. Berrigan, were your defense proposed instructions a playbook for the government?

MR. BERRIGAN: I'm not sure which instructions you're

3327

referring to.

THE COURT: Your instructions on the merits phase.

MR. BERRIGAN: Well, we never contemplated the jurors would have those during the trial.

THE COURT: Well, I'm asking you were they a playbook for the government.

MR. BERRIGAN: Not if the jurors don't have them during the trial, they're not, no. That makes all the difference.

THE COURT: What difference does it make?

MR. BERRIGAN: Well, because the jurors are listening to evidence with these instructions in front of them.

THE COURT: That's the purpose of the instructions, to help guide them.

Page 212

MR. BERRIGAN: Yeah, and I object to that, Your Honor, for the reasons I've already stated. It's like a little checklist for the government here's what you need to show.

THE COURT: We can have any defense you want in the playbook.

MR. BERRIGAN: Well, that's -- we don't need a defense. We don't have to have a defense. They have the burden of proof as we told the jurors all day.

THE COURT: You know what, Mr. Berrigan?

MR. BERRIGAN: Yes, sir.

THE COURT: You don't need to remind me of that.

3328

MR. BERRIGAN: Well, that's our position, sir. I'm trying to make a record. You're asking me a question. That's my response. You may not agree with it. I respect that we can disagree.

THE COURT: I most certainly don't agree with it.

MR. BERRIGAN: But I should at least -- if you're asking me to answer, I should at least get to answer.

THE COURT: Well, you did get to answer.

MR. BERRIGAN: Okay. Then I'm done.

THE COURT: Now, when are you going to have your list of mitigation -- your mitigation instruction to me?

MR. BERRIGAN: When would the Court need it?

THE COURT: Well, substantially in advance of the penalty phase trial if there is one so that I have an opportunity to consider it. So when do you think you'd be in a position to give that to me?

MR. BERRIGAN: I think probably within a couple of weeks.

Page 213

THE COURT:  That would be more than sufficient. Anything else?

MR. WILLIAMS:  No, Your Honor.

MR. BERRIGAN:  Nothing by the defense, sir.

THE COURT:  Okay.  Thank you.

(The foregoing trial was adjourned at 2:50 p.m.)

3329

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                2-15-06
                                        Date

INDEX

PROSPECTIVE JUROR:                                PAGE:

Prospective Juror 766
    MR. WILLIAMS                                  3204
    MR. BERRIGAN                                  3216

Prospective Juror 124
    MR. BERRIGAN                                  3240
    MR. WILLIAMS                                  3249

Prospective Juror 587
    MR. WILLIAMS                                  3255
    MR. BERRIGAN                                  3265

Prospective Juror 402
    MR. BERRIGAN                                  3281
    MR. WILLIAMS                                  3291

Prospective Juror 463
    MR. WILLIAMS                                  3301

*****

Page 214

Case 3:09-cv-03064-MWB-LTS     Document 284-70     Filed 06/23/11     Page 2902 of 3245

3330

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,   No. CR01-3046

   Plaintiff,     Sioux City, Iowa
             May 2, 2005
  vs.         7:59 a.m.

ANGELA JANE JOHNSON,    VOIR DIRE OF
            PANEL N
   Defendant.
         /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

3331

APPEARANCES:

For the Plaintiff:   C. J. WILLIAMS, ESQ.
          Assistant United States Attorney
          Suite 400 - Hach Building
          401 First Street Southeast
          Cedar Rapids, IA  52401

          THOMAS HENRY MILLER, ESQ.
          Iowa Attorney General's Office
          Area Prosecutions Division
          Hoover State Office Building
          Des Moines, IA  50319

For the Defendant:   PATRICK J. BERRIGAN, ESQ.
          Watson & Dameron
          2500 Holmes
          Kansas City, MO  64108

          DEAN STOWERS, ESQ.
          Rosenberg, Stowers & Morse
          1010 Insurance Exchange Building
          505 Fifth Avenue
          Des Moines, IA  50309

          ALFRED E. WILLETT, ESQ.
          Terpstra, Epping & Willett
          Higley Building - Suite 500
          118 Third Avenue Southeast
          Cedar Rapids, IA  52401

Also present:     Bill Basler

Case 3:09-cv-03064-MWB-LTS Document 284-70 Filed 06/23/11 Page 2903 of 3245

PANEL N, 5-2-05
Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

3332

(Proceedings reconvened outside the presence of the jury venire.)

THE COURT: Okay. Good morning. I'd like to take up a couple of issues. With regard to the PowerPoint presentation, I did make a minor change this morning. I really didn't feel comfortable telling the jurors the last day or two that they have a 50 percent chance of being in the jury pool because that's not true, and I didn't change the slide. I've now changed the slide, and here's what I've said. I've really conflated two paragraphs. I've taken out a paragraph, but what I'm telling them is if you're told you're in the jury pool at the end of your questioning today, you will report Wednesday at 8 a.m. for the start of the trial at 8:30. Anybody have a problem with that?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: No, sir.

THE COURT: Okay. Now, before we get to this juror issue, anything else we need to talk about?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. BERRIGAN: Just to alert you, we do have one lip-reading juror this morning. It's the first one, Your Honor. Obviously we'll go through the process, but I just wanted you to know.

THE COURT: Which one?

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2904 of 3245

MR. BERRIGAN: Number 420, the first one.

THE COURT: Did you learn that by virtue of the questionnaire answer?

MR. BERRIGAN: Yes, sir.

THE COURT: What does she say?

MR. BERRIGAN: She says she's very, very hard of hearing, wears hearing aids, would have to sit in the front row in order to read lips in order to understand the testimony. We could do the same sort of experiment that we tried the other day. Obviously she may be more or less affected than our other lady, but it just happens to be an issue I thought you might want to know about.

THE COURT: Well --

MR. BERRIGAN: I don't know how lip-reading people could participate in the process, and I say that wishing they could.

THE COURT: Is there any sense that you want to just agree and strike her ahead of time or not? I'm comfortable either way.

MR. BERRIGAN: Well --

THE COURT: I'm not going to dismiss her without agreement obviously.

MR. BERRIGAN: I understand, Your Honor. I'm just very uncertain that a lip-reading juror would be able to catch not only all of the testimony, but the deliberations in the jury

3334

room would really be a problematically -- well, I would move to excuse her for cause. If the government has no problem with that, we could dispose of it now.

Page 3

THE COURT: Does the government have a problem?

MR. WILLIAMS: No, we have no problem with that.

THE COURT: Okay. Carey, would you have Suzanne just let Juror 420 know that she's excused?

Okay. Now, on the juror issue that we have, I understand you have an agreement as to if the juror's excused that the first alternate becomes the 12th trial juror, but then that movement has generated another issue upon which there is not agreement; is that correct?

MR. WILLIAMS: That's correct, Your Honor.

MR. BERRIGAN: Yes, sir.

THE COURT: And just to make a record on this, I first learned of this Thursday late afternoon. An e-mail was sent to me at 4:23 p.m. from my law clerk Carey who had had a conversation with Suzanne, our jury clerk, and I didn't read the e-mail right at 4:23 because I was busy doing something else. But by the time I read it, I had asked my secretary if the lawyers were still in the building, and she said no, so I waited until Saturday morning to then send the e-mail to everybody, and we'll make that e-mail part of the record as well. So what's the dispute?

MR. WILLIAMS: Your Honor, I think there's a couple

3335

different ways to approach this. The government's view is let's assume that at noon today we get this juror in and the juror has to be struck for cause, we move one up. Now we gotta pick a new alternate. The government's view is that we continue with the status quo, continue to pick jurors until we get our next three that we need, and then we basically start over to pick that last one.

Page 4

There's a couple different ways of doing the last one. One is neither side could have any peremptory strikes. We just question till we get the first one that passes for cause, and then they're in. Another way is for both sides to get another strike each and then we question till we've used our peremptory strike and/or cause, and then we get the person in. We can live with either one of those ideas.

THE COURT: Well, is there an agreement that if this juror is stricken and we need an extra alternate that the extra alternate would become the last alternate, hopefully the sixth alternate? But actually there's no guarantee we'll have six by Wednesday morning. But is there at least agreement on that proposition?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. So then the question of kind of peremptories, while not unimportant, is less of a concern because we're now -- it wouldn't ever -- we wouldn't ever need this juror unless we lost our first five alternates.

3336

MR. WILLIAMS: Right.

THE COURT: So okay. And then the disagreement is whether you ought to get --

MR. WILLIAMS: No, the disagreement is the defense wants a peremptory starting this morning, wants an additional peremptory starting this morning, and I guess I won't object if the government gets an extra peremptory as well. In my view we ought to keep our status quo until we get through the next three and then start over. The defense wants to, starting this morning, get another peremptory.

THE COURT: Okay. Why don't I hear from Mr. Berrigan.

Page 5

MR. BERRIGAN: Our position, Your Honor, is that we expended our three peremptory challenges in an effort to get what we viewed as the most attractive first four alternates of six into the pool.

THE COURT: I'm lost on that, the first four of six?

MR. BERRIGAN: There's I think a lot of different ways to look at the alternate panel strategically. One way would be let's try to find six people that are relatively agreeable. Our position was let's try to get the first four -- these are the most likely replacements -- to be the most advantageous jurors to the defense.

THE COURT: I understand.

MR. BERRIGAN: And that's what we did. We used our three peremptories pretty quick until that endeavor. We weren't

3337

as concerned about five or six honestly, and now our position is that we've used those three and we have three instead of four, and so that strategy by virtue of nobody's fault, frankly, has now failed us.

THE COURT: Well, it hasn't failed you in the sense that there's an agreement that if we need an extra alternate that will be alternate number 6.

MR. BERRIGAN: No, that's true. It's just a matter of the exercise of the peremptories. We've expended all our peremptories now, and we're faced with the prospect essentially of not having another one if the government's position was to be followed until alternate number 6 which is in our view pretty meaningless, frankly. If we got to alternate number 6, it would not be meaningless. It'd be very important. But we're certainly hoping alternate number 6 never sits on the jury.

Page 6

So we certainly understand the Court's concern why we need six alternates.  But our goal was to have the best first four that we could muster with the available alternates that we had, the alternate strikes that we had.  And now that position's virtually impossible because we're out of the peremptory challenges.

So we're asking the Court to restore one peremptory challenge given the change in position of alternate number 1 on to the jury and that the government also get an additional peremptory challenge.

3338

THE COURT:  And you want me to do that ahead of time before we even know whether we lose the juror or not.

MR. BERRIGAN:  No.  Well, I think that decision, yeah, should be made irrespective of whether we lose the juror.  That is, obviously if we don't lose the juror this is a nonissue.  We're not asking for an extra peremptory if we don't lose the juror.

THE COURT:  Yeah, but we're not going to know until noon.

MR. BERRIGAN:  Right.

THE COURT:  But there are jurors that we're going to be interviewing probably this morning that --

MR. BERRIGAN:  Yeah.

THE COURT:  So I would have to make the decision now, and it would apply even though we might never lose the juror.

MR. BERRIGAN:  That is the potential problem is that we might interview maybe three jurors this morning individually.  And if we had a peremptory, we could exercise it, and if we don't, we won't.  And we wouldn't know that until afternoon.

Page 7

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2909 of 3245

You're right.

THE COURT: Yeah.

MR. BERRIGAN: So I know you've been telling jurors they can leave immediately after their individual questioning, and this would -- our proposal would sort of put a wrench in the works respecting that.

3339

THE COURT: Well, what's the argument that either side is entitled to an extra peremptory challenge in any event?

MR. WILLIAMS: There really isn't one. It's something we can live with. If both sides want to get an extra one, it's equal, we can live with it. But as a practical matter, in my view neither side has a right to an extra peremptory strike, and, frankly, we are going to be much less likely to be able to pick a jury today and possibly even tomorrow if we both get another peremptory strike whereas if we go without any peremptory strikes I think it's pretty likely we'll get a juror.

THE COURT: While that's true, that's actually not going to enter into my judgment because if I thought either side was entitled to an extra peremptory challenge I'd give it to you and -- if we had to call all the jurors and say we're not going to start till Thursday or Friday or next Monday, so I understand what you're saying, but it's actually not going to be part of my calculus because --

MR. WILLIAMS: Sure.

THE COURT: -- to me that would be interjecting a factor that I shouldn't consider. I just don't see the basis for giving anybody an extra peremptory.

MR. WILLIAMS: Yeah. I mean, there really isn't one.

THE COURT: Other than you want one. I understand

Page 8

that. I'd be asking for the same thing if I were in your shoes, Mr. Berrigan.

3340

MR. BERRIGAN: Yes, sir.

THE COURT: So I totally understand the request.

MR. BERRIGAN: Yes, sir.

THE COURT: I'm not going to give an extra peremptory. I'm fairly confident we're not going to lose the juror. You want me now to explain what the issue is with the juror?

MR. BERRIGAN: Well, we would like to know, sir, yeah. I mean, I understand you're going to do the questioning, but just for our own self-edification.

THE COURT: Yeah. Here's what happened. I actually just checked into it this morning. I went and talked to Suzanne, our jury clerk. When she called one of the jurors -- I'm actually not going to tell you which number because I think that would add extra posturing, but I'll tell you what the juror said. You'll obviously know when the juror comes in who he or she may be when we question that juror at noon.

At the end of the conversation with Suzanne, our jury clerk, the juror said, Oh, by -- something like this. I'm paraphrasing now. Oh, by the way, I thought you should know that my father is a litigant in a civil case that's pending in front of me, and that's all he said.

And so I asked Suzanne this morning, Did you get the impression that it was a problem for him? And she said, Oh, no, not at all. It's just it was kind of an afterthought, and he thought that was something that I should know.

3341

Page 9

So I've checked the docket sheet. And his father is a litigant. It's a business dispute of some substance. The status of it is many motions have been filed. I haven't ruled -- they've been like going through different lawyers and replacement of counsel, extension of times to file briefs. I think the magistrate judge has ruled on everything. I think I ruled on one motion granting an extension of time for one of the parties -- I don't remember which party -- on an overlength brief on -- it's actually a motion to dismiss. There is a motion to dismiss pending in front of me in the civil litigation.

The juror's father is a plaintiff along with some corporations, and it's a business dispute between the corporations, maybe some individual plaintiffs and former banks and accounting companies. And it's like a 20-count RICO civil fraud. You know, it's your typical business fraud commercial dispute.

I would not assume that the juror does not have a financial interest in it. I wouldn't assume that. It's the father involved in the litigation, but very likely by virtue of maybe a closely held family corporation or just a father-son or daughter-father relationship the juror could have a financial stake in the outcome of the litigation.

And I think we can question the juror about that, but I would assume that, that either it's a direct financial

3342

interest or through a will or something would have some financial interest in the litigation. I mean, I think we have to assume that, either directly or indirectly.

Here's my solution: To assign this case to a judge

from another district.

Now -- and this is something I would prefer that you not tell the juror. My preference is for the lawyers who know me, I never, ever dump my work on anybody else. Matter of fact, I have a reputation of taking other judges' cases. So it would be very hard for me to assign this case to another judge because that's hard for me to do. I would do that, but I would probably take the case back as soon as this case is over, but I would not tell the juror that. But I feel I need to tell the lawyers that.

And, in fact, I would probably tell the judge from another district, Don't do anything for two months, and when this case is over, I'll take it back. I don't see the conflict even if I do nothing, but I think to the extent that there's a conflict I can't perceive or that it's some kind of subtle -- that the juror's trying to please me somehow -- and, you know, there's always a remote possibility, but I think it's alleviated by assigning it to a judge from outside the district. So that would be my solution. I'd just like any response to it.

MR. WILLIAMS: On behalf of the government, we think that's a fine idea.

3343

MR. BERRIGAN: Yeah, as do we. Assuming that's the only issue, we've got no problem with that.

THE COURT: Yeah, that's the only issue I know of, but we'll find that out. Now, how do you want to work the questioning? I'd just as soon not -- and I made that kind of clear in my e-mail. I'd just as soon not -- maybe it's worse to be questioned by me. I don't know, you know. But I'd just as soon not subject the potential juror to any additional

Page 11

questioning by the lawyers. Here's what I thought I would do. Well, let me ask you, do you have a problem with me doing the questioning?

MR. BERRIGAN: No, sir. Again, if that's the only issue, not at all, sir. If it was something else obviously --

THE COURT: And before I would let the juror go, I'd have a sidebar with the lawyers and say, What else do you want me to ask, but I just think out of kind of fairness to the juror that being questioned by three different folks is probably -- given this issue -- if it was a different issue, I'd get the lawyers involved in the questioning.

MR. BERRIGAN: Yeah, the defense is fine with that position, sir.

THE COURT: And I'm probably just going to ask him even though I don't -- I know you don't like the question -- well, I'll probably ask it this way: Is -- the fact that your father has pending litigation before me, do you think that would

3344

affect your ability as a juror in this case? I'll leave out the fair and impartial because nobody wants to admit to being -- although some people do, but most people don't. So I'd probably just ask a general question that way. And then I'd say -- and then I'd tell him that just out of an abundance of caution I'm going to be reassigning the case to a judge from outside the district. And we'll see what the juror says; okay?

MR. WILLIAMS: That sounds great.

MR. BERRIGAN: That's fine with the defense, sir.

THE COURT: Okay. And we should take that up right at noon, and the juror was very, as I understand it -- of course, it's either first- or second-level hearsay from my law clerk

Page 12

through Suzanne, our jury clerk, that the juror was more than willing to come in today and was, you know, not put out in any way, shape, or form about it.

Okay. Anything else we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. Then you'll let -- oh, have you e-mailed about 420?

THE CLERK: Yep. It's already taken care of.

THE COURT: Okay. 420 is out. And what do we have then? Eleven?

THE CLERK: Yep.

THE COURT: Okay. Great. Thank you. We'll see you

3345

back at 8:30.

(Recess at 8:17 a.m.)

THE COURT: I think we've lost one other juror, 498, who appears to be an 80-year old juror from Sioux Center I think, didn't show up. We don't know why. We're going to try and see if we can get her here tomorrow, but we're going to go ahead and start without her. Any objection to that?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: No, Your Honor.

THE COURT: Okay. Thank you. Let's bring up the jurors then.

(Panel N entered the courtroom.)

THE COURT: Good morning, everybody. If you'd please raise your right hand, I'm going to swear you all in.

(Panel N was sworn.)

THE COURT: Okay. Please be seated. It's nice to see

Page 13

PANEL N,  5-2-05

all of you here this morning.  I wanted to welcome you to the United States District Court for the Northern District of Iowa. I'm Mark Bennett.  I'm the chief judge of the United States District Court for the Northern District of Iowa, and I know when each of you went to bed last night you were so excited about the prospect of waking up this morning, coming to Sioux City, and being selected to serve on this jury that you just couldn't contain yourselves with all of the anticipation.  But it's really not going to be that bad today, so I want to try and

3346

put you at ease a little bit.

You know a little bit about the case from the questionnaires, but I wanted to introduce you to who the participants are.  And I'll start with the table closest to the jury box.  And you're going to meet the lawyers in a little bit in more detail, but just so you know who they are, I'm just going to ask them to raise their hand.

C.J. Williams.  Mr. Williams is what's called an assistant United States attorney.  That's a federal prosecutor. He offices over in Cedar Rapids where about maybe 18 or 20 other assistant U.S. attorneys are.  And he's prosecuting this case.

And seated next to him is Tom Miller.  Mr. Miller is a special assistant United States attorney assigned to prosecute this case.  But in his other life he works for the attorney general of Iowa who's also named Tom Miller, but it's not the same Tom Miller.  His boss is the attorney general of Iowa. This Mr. Miller is an assistant Iowa attorney general in charge of area prosecutions, but he's been appointed as a special prosecutor for this case.

Seated next to the two prosecutors is Special Agent

Page 14

Bill Basler. And he's what's called the case agent, kind of the investigative agent in charge of the case working with the two prosecutors.

Now, across the room in the table farthest from you but the individual closest to you is Mr. Al Willett.

3347

Mr. Willett is a lawyer from Cedar Rapids, Iowa, who specializes in criminal defense work.

Seated next to Mr. Willett is the defendant in the case, Angela Johnson.

Seated next to Angela Johnson is Pat Berrigan. Mr. Berrigan is a lawyer from Kansas City, Missouri, who specializes in criminal defense law.

And seated next to Mr. Berrigan is Mr. Dean Stowers. Mr. Stowers is a lawyer from Des Moines who specializes in criminal defense law.

Now, there are certain rules that you need to follow, and I've reduced those to writing, and you should have a copy that was on your chair this morning. I want to go over it with you.

Conduct of potential jurors during jury selection and trial. To ensure fairness, you as potential jurors must obey the following rules until the end of the case if you are selected for the jury or until you are excused from serving on the jury in this case. These rules apply whether you are in the courtroom, in the courthouse, at home or anywhere else until you are excused from further service in this case.

First, do not talk among yourselves about this case or about anyone involved with it.

Second, do not talk with anyone else about this case

Page 15

or about anyone involved with it.

3348

Third, when you are outside the courtroom, do not let anyone tell you anything about the case.  If someone should try to talk to you about the case during jury selection or the trial, please report it to me.

Fourth, do not talk with or speak to any of the parties, lawyers, or witnesses involved in this case.  You should not even pass the time of day with any of them.  It is important that you not only do justice in this case but that you also give the appearance of doing justice.  If a person from one side of the case sees you talking to a person from the other side, even if it is simply to pass the time of day, an unwarranted and unnecessary suspicion about your fairness might be aroused.  If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or the like, it is because they are not supposed to talk or visit with you.

Fifth, do not read any news stories or articles about the case or about anyone involved with it or listen to any radio or television reports about the case or about anyone involved with it.  If you want, you can have your spouse or friend clip out any stories and set them aside to give you after the trial is over or you are excused from serving on the jury in this case.  I can assure you, however, that if you are selected for the jury in this case by the time you have heard the evidence you will know more about this case than anyone will learn through the news media.

3349

Page 16

Sixth, do not do any research on the Internet, in libraries, or in the newspapers or in any other way or make any investigation about this case on your own. If you are selected for the jury, you must decide this case based on the evidence presented in court.

Seventh, if you are not excused from serving on the jury today, please take this instruction with you so that you can refer to it if you have any questions between now and the date you are required to return for the trial.

Dated this 2nd day of May, 2005, signed by me, Mark Bennett, chief judge.

Now, I wanted to explain to you who everybody else in the courtroom is. How many of you have ever been to this third-floor courtroom for any reason? Anybody? Okay.

PROSPECTIVE JUROR 675: I might have been.

THE COURT: Okay. You know, we're going to wait -- all I wanted to know is if you've been here, and we'll talk to that in a minute when we get to some questioning because when the jurors speak, we need to have a microphone because the acoustics aren't very good here, and we've got a microphone, and we'll pass it down. But thank you very much, Juror 675, for raising your hand.

Seated to my far left is one of my three and a half law clerks Carey. Carey is an honors graduate of the Drake University Law School, and she's in her second year of a federal

3350

clerkship with me, and at the end of the summer she's moving on and moving to Seattle where she's going to start her legal career.

Seated right in front of me is our court reporter

Page 17

Shelly. Shelly comes to us from Florida, but she's been here a number of years. She does a terrific job. She has a very difficult job because she has to take down everything that everybody says. So unlike the rest of us who can occasionally look up at the ceiling and maybe daydream a little bit, Shelly's gotta take down everything, and that's a very tough job, and she does it very well.

Because this is a criminal case, we'll have United States marshals in the courtroom, and depending upon what's going on in the trial, there may be more or fewer United States marshals. But we have United States marshals in the courtroom in every criminal case. So there's nothing in that respect that would be unusual.

We'll also have court security officers. They're the easiest to spot because they have the blue blazers, the badge, and then the earpiece. I never quite know what they're listening to. I think it's talk radio today. I'm not sure. Just kidding. But they have a lot of responsibilities throughout the courthouse, and one of their major responsibilities is when we have a jury trial going on they make sure the jury gets up to the courtroom on time and back down to

3351

the jury room and nobody gets lost.

We obviously have the lawyers and the parties they represent, and you'll be meeting them in more detail, and then I want to talk to you about what the role is of the jury and what the role is of the judge.

As the trial judge in this case, I've had a lot of responsibility even before we got to jury selection. I've had to rule on lots and lots and lots of pretrial motions. This is

Page 18

an important case, and the lawyers on both sides are exceptionally good lawyers, and so they met my expectations. They filed lots of motions, and I've ruled on most of them, and we're in really good shape in that regard.

I had the responsibility for coming up with a system for jury selection. And believe it or not, there's no one way to do jury selection. We have a lot, a lot of discretion. There are about six hundred federal district court judges in the country, and there's probably seven or eight hundred ways of doing jury selection because I don't always do it the same in every case, although I've got a pretty typical way of doing it. This is not a typical case, so I had to come up with kind of a unique system. I think you'll like the system because it only requires you to be at the courthouse one day, and I'll talk about that a little bit more.

During the course of the trial, there will be lots of objections I think for me to rule on. That's the obligation of

3352

the parties. When they think evidence, for example, is not being offered or admissible under the Federal Rules of Evidence, they have a duty, they have a duty, to go ahead and object to that evidence, and then I'll have to rule on the evidence. So I'll have that responsibility.

I will have the responsibility once the trial gets underway to give you a detailed set of preliminary instructions defining for you each of the ten crimes that the defendant, Angela Johnson, is charged with and giving you definitions of some of the concepts like proof beyond a reasonable doubt and the presumption of innocence, credibility of witnesses, and the like.

Page 19

And then towards the end of the case I'll have the responsibility of giving you a more detailed set of jury instructions.

And let's talk about now what the jury's obligation is. You'll notice that when I was discussing what my job responsibilities are, I did not say that it was my job to listen very carefully to all the evidence and make findings of fact as to what actually happened, but actually that's not my job. That's the jury's job, and that's your number-one job, and in that sense I like to look at it this way. Jurors are the judges of the facts. You're the judges of the facts. What do I mean by that? I mean that you have to listen to all of the evidence and decide what actually happened.

3353

Well, how do you do that? Well, there's our witness box right there, and then up above it you'll notice we have a big screen. I anticipate in this case that there could be in excess of a hundred witnesses that testify. And so your job will be to listen very carefully to all of the witnesses. You'll be able to take notes. You'll have a note pad and a pen so you can take notes if you want to, but you don't have to take notes.

And I anticipate that there may be 500 or more exhibits that get introduced into evidence. There may not be that many, but there could be a lot of exhibits. To the extent that the lawyers want to show you the exhibits, they can, and you'll be able to see them up on the big screen and listen to the witnesses discussing the evidence if that's what the lawyers choose to do.

And so you'll have to listen very carefully to all of

Page 20

the testimony in the case, examine the exhibits that are admitted into evidence, and figure out what actually happened. And then you'll take my written jury instructions that define each of the ten crimes and apply the facts that you find to the instructions and then ultimately come up with a verdict in the first phase of the case which would be either not guilty or guilty of each of the ten charges. So that would be your responsibility.

Now, in that sense it's like every other case that I

3354

have, every other criminal case, although this case will be longer obviously than most cases because most of our cases do not have a hundred plus witnesses. My typical criminal trial is maybe two to three days. We have a lot of two- to three-day trials, week-long trials, et cetera. So this one's going to be longer.

Another thing that makes this case different than the typical case is that if, if, the defendant is found guilty by the jury of one or more of the ten charges, then there may be what's called a penalty phase. There's actually a second stage, and I'm going to talk about that in a little bit, but then there may be a third stage, and the third stage would be the penalty phase.

And if there is a penalty phase, then the jury will have to decide the punishment in this case. And if the defendant is found guilty and there's a third phase, the penalty phase, the penalties are one of two things: Life imprisonment without the possibility of parole -- there is no parole in the federal system. Parole was abolished on -- I believe it was November 1, 1987. There is no parole. So it's life

Page 21

imprisonment without the possibility of parole or the death penalty. And in that sense this case is different than most of my cases because in most cases the jury's involved in just the first phase, not guilty or guilty. If the defendant's found guilty, then it's my responsibility to sentence the defendant,

3355

and we have a separate sentencing procedure and all.

But in this case because the death penalty is potentially at issue, Congress has decided that juries should decide whether the defendant should receive life imprisonment or the death penalty. So that's just a little bit of an overview of our jobs.

We're about to start what lawyers often call voir dire. It's just the French term for jury selection. Literally translated, voir dire means to speak the truth. What do we mean by that? Well, we're going to be asking you lots of questions today. And I start off, and then I'm going to turn it over to the lawyers in a little bit, and the lawyers will be asking most of the questions, but I'll be jumping in every once in a while to ask a question. And I'm looking for 18 jurors, 6 of whom will be alternates, to sit in this case.

And there are no right or wrong answers to any of our questions. I imagine that some of you were a little bit nervous or anxious about coming into court in a roomful of strangers and having a federal judge and all these lawyers potentially ask you a bunch of questions. I know if I received a notice that that was going to happen, even though it's what I do all day long, I'd be pretty nervous too. So I want to try and put you at ease.

The questions are not difficult. They're not trick

Page 22

questions. It's not like a civics quiz. We're not going to be

asking you what amendment gives the defendant the right not to testify in a criminal case. The answer's the Fifth Amendment, but we're not going to ask you questions like that.

We're going to ask you questions about your attitudes and views on a number of things, for example, including the death penalty. And here's what I want to say about that. Everybody's view and opinion is entitled to respect. My opinion, whatever it might be, which you will never know, is no more important than any one of your opinions or any opinions that the lawyers have or any opinions that members of the public may have who come and sit and watch the trial.

The great thing about America is everybody's entitled to believe what they want to, and everyone in this courtroom will respect your opinion, whatever it is. And believe me, we've questioned now over a hundred jurors. We've heard about every opinion on the death penalty that I ever could have imagined and you know what? Some that I never even could have imagined. It just runs the whole cross-section, and nobody's right, and nobody's wrong. And everybody's entitled to your own opinion.

But we need to know what those opinions are to evaluate whether or not you'd be an appropriate juror in this case. Some jurors would be terrific in another type of case but not so good in this case. Others might be terrific in this case but not so good in another type of case, so that's what we're

trying to find out.

For our system to work, you have to answer openly and honestly.  And believe me, nobody's here to pass judgment on your opinions.

Now, we are not going to be using your names, and I just wanted to explain that to you.  I made the decision and I alone made the decision to use numbers, and here's why.  I had discretion to use numbers instead of names.  I actually know what all your names are, because I've got your questionnaires in my little notebook that you filled out, and the lawyers have that information too.

But because this is a public trial and everybody has the right to come in and watch, I didn't want to use the jurors' names because I wanted to protect your privacy.  It's tough enough to ask you to serve on a jury where the issues are so difficult and tough to make like they will be in this case, and in a jury trial that will be as long as this, I didn't want to subject the jurors to what I call idle curiosity seekers. People would read your names in the newspapers, read your towns where you come from, and look you up on the Internet or get your phone number and either knock on your door at 7:30 at night or call you up and say, Hey, what's it like being on a jury?  And believe me, that might happen if your names were out in the public, so I just wanted to protect your privacy.  So that's why we're using numbers.

3358

Now, I want to explain to you the jury selection process.  When we started, we thought jury selection would take two to three weeks.  We're now in our fourth week of jury selection.  We're not too bad.  We're just running a couple of days beyond what we estimated.  It's very hard to estimate.  It

Page 24

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2926 of 3245

was just kind of a ballpark estimate. I never really thought two weeks was going to do it. Three weeks, I thought there was maybe a chance we'd get it done. We're just running a day or two over that. But we're getting close to having the jury selected.

So each day we bring in a small group of potential jurors like you all. After I introduce the lawyers and there's a few questions by me, then I turn it over to the lawyers, and each side will question you for about 30 minutes in the group. Then we send you down to the jury room, and we bring you back up one at a time and question you 12 minutes per side, so that's not too bad.

And then you'll know at the end of the questioning today whether or not you're still in the jury pool or dismissed from jury service for this trial.

So when we're done with the individual questioning, what we do is we send you back out. Well, let me explain what we do. For the individual questioning, we bring you in one at a time. Our court security officer will hand you the microphone. We'll ask you to sit anywhere in the front row. There will be

3359

nobody in the jury box because you'll be coming in one at a time. You can sit anywhere in the first row, and the lawyers will ask you questions 12 minutes per side.

When we're done questioning you, we'll send you out just into the hallway. And I'll chat with the lawyers, and we'll decide whether or not you're going to be a juror in the case or whether or not you're going to be dismissed.

So if you're told that you are in the jury pool at the end of your individual questioning today, then you'll report

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2927 of 3245

Wednesday, this week Wednesday, at 8 a.m. for the start of the trial which is going to start Wednesday at 8:30 a.m. assuming we get enough jurors selected today and tomorrow. I hope we will. There's a very, very small chance we might have to delay the trial for a day or so, but right now we're planning on starting Wednesday at 8:30, and we'd just bring you to the courthouse at 8 a.m. to get situated in the jury room before we bring you back up.

Once the trial gets underway, we're going to run the trial four days per week almost always Mondays through Thursdays, and we're going to be taking the week of June 10 through June 17 off.

Let me tell you about why we're running the trial four days per week. I have about 600 cases to be concerned about, and I'm concerned about them. And I obviously don't work on all of them at the same time. That would be impossible. So I'm

3360

taking Fridays off so that I can -- off from this trial, not taking Fridays off. And, in fact, I'm going to be having some trials over the weekends Friday, Saturday, and Sunday to kind of keep my cases moving and having hearings on the weekends and the like.

The lawyers, none of them are from Sioux City, and so they have other cases they need to be concerned about. So I'm giving them Fridays off. It's pretty common in federal court for trials that go more than two or three weeks to only run them four days a week, and that's what we're doing.

Our typical trial day will look like this. We'll start at 8:30 in the morning, and you'll find that I start very promptly because I meet with the lawyers much earlier in the

Page 26

morning to try and anticipate any potential problems, and then at the end of the day we'll run till about 4:30 in the afternoon, maybe 4:45. Most days it will be between 4:30 and 4:45 depending on where we are with a witness. And we'll probably only be taking 45 minutes for lunch. We're going to have lunch served to you in the jury room each day so you won't have to go out. You won't have to bring your food. That old adage, there's no such thing as a free lunch, well, there is in this case, and we'll be taking usually about a 20- to 25-minute break about 10 in the morning and then at about 2:30 to 3 in the afternoon. That will be our typical day.

Now, I'd like you to meet the lawyers in some more

3361

detail, so, Mr. Williams, would you please introduce everybody at the government table.

MR. WILLIAMS: Yes. Thank you, Your Honor. Good morning, ladies and gentlemen. Again, my name is C.J. Williams as the judge said, an assistant United States attorney. I live and office in Cedar Rapids, come out here and appear in front of Judge Bennett a fair amount.

At counsel table with me is Tom Miller. He is, as the judge said, the head of the regional prosecutor's office for the attorney general, also Tom Miller, no relation, and he's not the attorney general, but he'll be serving in this case as co-counsel.

MR. MILLER: Good morning.

MR. WILLIAMS: Bill Basler is a special agent-in-charge of this investigation. He is with the Iowa Division of Criminal Investigation. He offices out of Mason City, Iowa, and he's the lead investigator in this case and will

Page 27

be assisting us throughout the trial.

Back here at this table is Sali Van Weelden.  She's a legal assistant in the U.S. Attorney's Office and will be assisting us throughout the trial as well.

The United States Attorney's Office for the Northern District of Iowa is headed by Chuck Larson Senior.  He's been in Baghdad for the last year.  Hopefully he'll be home at the end of this month.

3362

We have two offices, as the judge said.  We have an office in Cedar Rapids, and we have an office out here in Sioux City.  Since it's more likely you may know somebody out in this area, I'm going to go through the list of people we have in the Sioux City office.  We have seven attorneys, seven assistant United States attorneys like myself, and seven administrative and support people.  So let me read through those names and see if any of you recognize them.

Forde Fairchild, Martha Fagg, Kevin Fletcher, Mike Hobart, Jack Lammers, Janet Petersen, and Shawn Wehde are the assistant United States attorneys.

Shayne Mayer, Del Tompkins, Penny Schlotman, Michelle Schwebach, Michelle Hatting, Carol McEntaffer, and Pat Calhoun are the administrative and support people.

THE COURT:  Thank you, Mr. Williams.

Now, do any of you know Mr. Williams, Mr. Miller, Mr. Basler, any members of the U.S. Attorney's Office, or let me add anybody that works at the federal courthouse here?  Anybody?  Raise your hand if you know anybody, and we'll pass you a microphone.

Okay.  Let's switch over to the defense table, and

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2930 of 3245

we'll start with Mr. Al Willett.  Mr. Willett?

MR. WILLETT:  Thank you, Your Honor.  If it please the Court, ladies and gentlemen, I'd like to introduce you to my client, Angela Johnson.  Miss Johnson is from the Mason

City/Clear Lake area of Iowa.  I'm assuming that you're familiar with that area, but if you're not, that's in north central Iowa just below the Minnesota border.  She attended Forest City High School and finished her formal education after the ninth grade, but she obtained her GED certificate later in life.

Now, she has several family members who are potential witnesses in this trial, but I'm going to discuss that with you when I have my 30-minute discussion with you at a later time, so thank you, Miss Johnson.

My name is Al Willett.  I practice law with Terpstra, Epping, and Willett in Cedar Rapids, Iowa.  We sort of have the tongue twister law firm there.  I practice law with Ray Terpstra and Greg Epping.

My co-counsel in this case, Mr. Patrick Berrigan from Kansas City, Missouri.

MR. BERRIGAN:  Morning.

MR. WILLETT:  He practices law with the law firm of Watson and Dameron.

And then my other co-counsel is Mr. Dean Stowers from Rosenberg, Stowers, and Morse in Des Moines, Iowa.  He practices law with Brent Rosenberg, David Morse, and Miss Heather Wood.

Now, do any of you think you recognize my client, myself, Mr. Berrigan, or Mr. Stowers?

And, Your Honor, I see no nods of affirmation.  Thank you.

Page 29

THE COURT: Okay. Thank you, Mr. Willett. Now, our estimated length of trial is three months, but that includes jury selection, and so it's always hard to estimate the length of a trial. When you have, you know, six witnesses and you know it's either going to be two days or three days, it's pretty easy to say it's going to be a two- or three-day trial. When you have as many witnesses and exhibits as we have here, it's pretty hard to know when the trial's going to be over. We just don't know that. There are too many things that can happen, but the lawyers worked hard to come up with an estimate, and we think, you know, it could be over at the end of June; it might go into July a little bit. That's just our best estimate.

So I tell you that because I'm going to ask each one of you individually whether or not you think it would be a severe or extraordinary hardship to serve, but I want to talk to you about that a little bit.

It is always -- in the best-case scenario, it's an inconvenience to take you out of your daily lives and have you come to Sioux City and serve on a jury even if it's a one- or two- or three-day trial. Obviously the longer the trial gets, the greater not only the inconvenience is, but it can rise to a level of severe or extraordinary hardship.

One of the things that's been most gratifying to me in jury selection in this case -- and I've only had two other trials that went more than two months including jury selection,

and in each of those trials and in this trial I've been really

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2932 of 3245

deeply touched by how few people ask to get off jury service. I mean, it's really been amazing. And no matter what they say in the questionnaires and if I added up everybody's excuse that they wrote in the questionnaire of the hundred jurors we've talked to, it's amazing how many reasons people came up with not to serve on the jury. But when they come to court and I explain it to them, it's really interesting. Very, very, very few people have asked to get off. And people have made extraordinary sacrifices because of their willingness to serve.

In a long trial I had last year, I'll never forget this because it happened on the same day. That was a trial that was -- started in August, went into the fall, and one day I had two farmers. And the interesting thing was it's tough on the family farm, so not only were they farming, but they both worked full time, farmed full time and worked full time. And neither one was going to get paid for their jury service on their manufacturing jobs. And they were both willing to serve as jurors even though they were forgoing that income.

Another day in that trial we had an individual who was the sole bread winner for his family, but he had talked to his wife the night before, and they had made the decision that he thought jury service was so important that he was willing to deplete their life savings in order to be on the jury.

Now, I wouldn't ask anybody to do that because I think

3366

that is a severe or extraordinary hardship. I just tell you that because people have been willing to make extraordinary sacrifices to serve as jurors.

And I think here's why. While most of you probably when you were driving in today weren't thinking about jury

Page 31

service as an opportunity to serve your country, that's exactly what it is. That's what jury service is. It's an opportunity to serve your country.

And I think it's really interesting to note that when new democracies are formed around the world from dictatorships or totalitarian countries, one of the first things the citizens of the new democracies ask to be put in their constitution is the right to trial by jury. We take it for granted in this country. But for those of you who have traveled around the world, you know the right to trial by jury is something that is revered by others, particularly people who have lived in less than free countries. We all take it for granted.

And so I hope before you ask to get off this case you'll take a hard look at why others should have to serve and why it would truly be a severe or extraordinary hardship for you not to serve.

Do you have the microphone, Gene? Why don't you pass it all the way down to Juror 23. We'll start with her in the back row. And I'll make you a deal, Juror 23, and the same deal goes for all the other potential jurors. If you speak directly

3367

into the microphone so that we can hear you, I won't put up any karaoke and make you sing it on the big screen. Is that a deal?

PROSPECTIVE JUROR 23: That's a deal.

THE COURT: Okay. Now here's my question for you. If you are selected, are you willing to serve as a juror in this case?

PROSPECTIVE JUROR 23: Yes.

THE COURT: Thank you very much.

Juror 9 -- just pass it down -- are you willing to

serve if you're selected?

PROSPECTIVE JUROR 9:  Yes.

THE COURT:  Thank you very, very much.

Juror 376.

PROSPECTIVE JUROR 376:  No.

THE COURT:  Why?

PROSPECTIVE JUROR 376:  It will be a severe financial hardship.

THE COURT:  Okay.  Tell me about that.

PROSPECTIVE JUROR 376:  I work at a school.  Normally I would get paid, but the course of this trial, I have a summer job, and I will not get paid.

THE COURT:  Okay.  So the school district would pay you but --

PROSPECTIVE JUROR 376:  I will be done with my -- for the -- you know, it's done in May.

3368

THE COURT:  When's your last day of employment with the school district?

PROSPECTIVE JUROR 376:  The beginning of June.

THE COURT:  So you'd have to go probably four or five weeks without pay.

PROSPECTIVE JUROR 376:  Yes.  We live paycheck to paycheck already, and then my daughter would also have to go live with her father, and I know she won't come back because it happened with my son.

THE COURT:  How old is your daughter?

PROSPECTIVE JUROR 376:  She is 14.

THE COURT:  And I'm not quite exactly understanding why she would have to go --

Page 33

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2935 of 3245

PROSPECTIVE JUROR 376: I'm divorced.

THE COURT: Yeah. Well, if you're working all day, what would be the difference -- other than the financial which I understand --

PROSPECTIVE JUROR 376: She is with me at my summer job.

THE COURT: Oh, she's actually with you on your job?

PROSPECTIVE JUROR 376: Yes, yes.

THE COURT: Wow. What is that summer job?

PROSPECTIVE JUROR 376: I manage a swimming pool.

THE COURT: And she's able to go to the pool every day.

3369

PROSPECTIVE JUROR 376: Yes.

THE COURT: That's a good deal for her, isn't it?

PROSPECTIVE JUROR 376: Yes.

THE COURT: And without this summer -- and you've checked with your summer employer?

PROSPECTIVE JUROR 376: Yes, I have.

THE COURT: Okay. And they don't pay for jury service.

PROSPECTIVE JUROR 376: They will not pay for it because it's seasonal.

THE COURT: Yeah, I understand that. And for you -- and, you know, everybody's situation is different. Somebody might be in the identical situation you're in with a summer job but maybe they won the Powerball last week, and you know, it's not a big deal. I take --

PROSPECTIVE JUROR 376: We don't have savings. Like I said, we live paycheck to paycheck already.

Page 34

THE COURT: So it'd be a financial hardship.

PROSPECTIVE JUROR 376: Very much so.

THE COURT: Okay. Do the lawyers have any objection to me excusing Juror 376?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: None by the defense, sir.

THE COURT: Okay. Ma'am, you're excused. Well, you know what we'll be doing this summer, and we know you'll be at

3370

the pool, so I hope you enjoy yourself. It's a lot of responsibility managing a pool.

PROSPECTIVE JUROR 376: Yes, it is.

THE COURT: Yeah. Juror 214, are you willing to serve if selected?

PROSPECTIVE JUROR 214: Yes.

THE COURT: Okay. Thank you. Can you pass it down to the gentleman in front of you?

Juror 697, are you willing to serve if selected?

PROSPECTIVE JUROR 697: No.

THE COURT: Okay. Why is that?

PROSPECTIVE JUROR 697: Financially it wouldn't work out. My employer will pay me, but in the -- I work for the Iowa DOT.

THE COURT: Yeah.

PROSPECTIVE JUROR 697: And in the wintertime I work maintenance, and in the summertime I go to construction, and they give me 6 percent raise when I do that in the summer, all summer long, and also pay my meals, and also in the summertime I race a 360 sprint car all around the country, and I have $25,000 worth of sponsors devoted to my car that are locked in for the

Page 35

year, so I would miss all the season.

THE COURT: Well, how is it that you're able to do the sprint cars and work full time for the state?

PROSPECTIVE JUROR 697: Well, the sprint car racing is

3371

all at night, and I'm usually done by 2:30 or 3 in the afternoon so -- I race Friday, Saturday, and Sunday, and then sometimes there's weekly specials.

THE COURT: Well, you'd be able to race Friday, Saturday, and Sunday because we're not holding court on Friday, Saturday, and Sunday.

PROSPECTIVE JUROR 697: But it's not as simple as just taking the car there. I have to work on it. I work on it three nights a week.

THE COURT: Well, where do you live?

PROSPECTIVE JUROR 697: Harris, Iowa.

THE COURT: How far is that from here?

PROSPECTIVE JUROR 697: Two hours.

THE COURT: Well, you'd get home by 6:30 most nights.

PROSPECTIVE JUROR 697: And then have to work on the car till midnight or one in the morning and come back here?

THE COURT: Yeah. What do you think I do at night? I'm working every day. I'm not asking any more of you than what I do.

PROSPECTIVE JUROR 697: No, I didn't mean anything by it.

THE COURT: No, that's exactly what I meant. So I don't see where the race car would be -- I mean, I understand it'd be a problem because you'd have to work longer days than you're used to. So what's the financial hardship? The DOT pays

Page 36

for jury service.

PROSPECTIVE JUROR 697:  Yes, but they won't pay me -- give me my maintenance wage.  They won't give me the 7 percent I would on the construction end of it.

THE COURT:  It just went up a percent in less than a minute.  You told me 6 percent.

PROSPECTIVE JUROR 697:  It's 6 percent.  Sorry.

THE COURT:  So you'd lose 6 percent of your salary.

PROSPECTIVE JUROR 697:  Yeah, and whatever the meals are, 30 bucks a week, I think.

THE COURT:  How many meals a day do they provide you?

PROSPECTIVE JUROR 697:  Just one.

THE COURT:  You get a free meal here, so that's a wash; right?

PROSPECTIVE JUROR 697:  Yes.

THE COURT:  So we're really talking about -- when it comes down to it, we're really talking about you'd lose 6 percent of your salary; right?

PROSPECTIVE JUROR 697:  Yes.

THE COURT:  Well, everybody's financial situation is different, but I guess the question I have for you is -- I mean, I realize you don't want to serve.  I understand that.  Not many people want to do it.  But are you saying that you're unwilling for two months -- when do you start the construction job?

PROSPECTIVE JUROR 697:  I've already -- we already

have.  We're on Highway 60 here.

THE COURT:  I see, okay.  So for approximately two

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2939 of 3245

months, maybe a week or two longer, for 8 weeks -- 6 weeks, say, you're unwilling to give up 6 percent of your income to serve on the jury. Is that what you're saying?

PROSPECTIVE JUROR 697: It's nice having that extra 6 percent, helps us out a lot. I would probably miss -- oh, I would say I have at least a dozen shows, specials, during the week that I'd miss.

THE COURT: Related to your race car?

PROSPECTIVE JUROR 697: Yes.

THE COURT: Yeah. And I don't know much about race cars. I should know more about it. What's a show?

PROSPECTIVE JUROR 697: A night of racing.

THE COURT: Oh, I see.

PROSPECTIVE JUROR 697: Special events.

THE COURT: And are those tracks in northwest Iowa and South Dakota?

PROSPECTIVE JUROR 697: Yeah, Hartford, Brandon, Omaha, Nebraska.

THE COURT: Do you derive some income from that?

PROSPECTIVE JUROR 697: Well, some.

THE COURT: Depends on if you win or not; right?

PROSPECTIVE JUROR 697: Yeah, yeah.

THE COURT: Hopefully you'll derive some income from

3374

it; right?

PROSPECTIVE JUROR 697: Yeah.

THE COURT: Okay. Well, ultimately when we get to these financial situations, it's difficult for me to make the call. So you're telling me you're unable or unwilling to give up that income to serve as a juror. Is that what you're saying?

Page 38

PROSPECTIVE JUROR 697: Yes.

THE COURT: Okay. Any objection from counsel?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: None by the defense, sir.

THE COURT: Okay, Juror 697. You're excused.

Juror 344, are you willing to serve?

PROSPECTIVE JUROR 344: Yes.

THE COURT: Thank you.

Juror 531.

PROSPECTIVE JUROR 531: Yes, with reservations.

THE COURT: Okay.

PROSPECTIVE JUROR 531: I was just told last Friday I need to have a biopsy of -- my thyroid has a growth.

THE COURT: Okay.

PROSPECTIVE JUROR 531: And I don't know the outcome at this time. I mean, I'd be willing if I knew it didn't involve any malignancy or anything.

THE COURT: Sure. Do you have an appointment yet for the biopsy?

3375

PROSPECTIVE JUROR 531: No. See, Friday I was gone all day, and that's when the message came when I got home.

THE COURT: I see, okay. Well, we're going to leave you on for now, but thank you.

Juror 331.

PROSPECTIVE JUROR 331: I do not have a problem serving, but I do know a couple people helping with the case. I don't know if that affects me.

THE COURT: Okay. Why don't you tell us who those people are that you know.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2941 of 3245

PROSPECTIVE JUROR 331:  I know I know this guy back here by association.  He's, as far as I know, helping transport her.  My brother-in-law, he's a jailer.  He's also trans -- helping the marshals transport.

THE COURT:  Okay.

PROSPECTIVE JUROR 331:  That's who I know.

THE COURT:  We'll talk about that with you individually when we get to individual questioning.  Thank you very much.

Juror 477, are you willing to serve if selected?

PROSPECTIVE JUROR 477:  Yes.

THE COURT:  Okay.  Thank you.

Juror 675.

PROSPECTIVE JUROR 675:  A financial problem, but I'm willing to serve.

3376

THE COURT:  Okay.  Well, I appreciate that because some people make huge financial sacrifices, and others aren't able to, and we appreciate that very much.  Okay.  Let's go on.

Now, I've talked about your duty to serve, but you also have a duty not to serve, and let me talk about that for a minute, and here's what I mean by that.  I've said it before, and I'll say it again.  Some of you might be terrific jurors in another case but maybe not in this case.  And so we want you to just answer the questions as openly and honestly as you can and then let us make the decisions that we need to make about whether you'd be suited to serve in this case.  But we don't want you to answer a question in such a way that would let you get on the jury if it's not an honest and open response to the questions that we ask.

Page 40

I want to explain to you a little bit about the trial process because the death penalty is potentially an issue in this case, so it makes for a different type of trial process.

This case is potentially a three-phase case. And my typical criminal case is a one-phase case, what we call the merits phase, guilty or not guilty. The jurors listen to the evidence, get the instructions. You decide whether the defendant is guilty or not guilty. Either way the juror's done at that point. If the defendant is not guilty, end of case. If the defendant is found guilty, the jurors are done. You go home, and sentencing is my responsibility and my responsibility

3377

alone.

This case is a little bit different. But the first phase, the merits or the not-guilty/guilty phase, that's the same as in any other trial. It's just going to be a little longer than in most trials.

Now, there's a potential for a second phase in this case. And that would be only if there is a unanimous finding by all 12 jurors beyond a reasonable doubt that Angela Johnson is guilty of one or more of the ten counts in the first phase do we even have a second phase.

And in the second phase we call that the eligibility or gateway phase. One of the lawyers -- it's Mr. Berrigan -- early in jury selection came up with an analogy that this case, the three phases, is kind of like a basketball game. And here's why. The first phase, we could consider that the first half. That's the not-guilty/guilty phase. Then in every basketball game there's a pretty short intermission, and then you have a second half.

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2943 of 3245

Well, in this case the short intermission could be this eligibility or gateway phase. And I'm going to explain it to you, but I'm not going to explain everything to you about it. In the second phase the jury would have to decide what I'm calling -- an eligibility or gateway phase is where you will decide if the prosecution has proved a gateway or eligibility factor and one or more statutory aggravating factors beyond a

3378

reasonable doubt.

If the jury unanimously agrees that the prosecution has proved this, then and only then would we have the third phase. I'm not going to take the time to explain what a gateway factor or eligibility factor is and what statutory aggravating factors are, but here's how it will work.

If Angela Johnson is found guilty of any one or more of the ten counts in the merits phase, the guilty/not-guilty phase, then there will be a second phase. There won't be any evidence presented in that phase, but we'll have arguments from the lawyers, a new set of instructions. The jury then will go back to deliberate to determine whether in the first phase the government had sufficient evidence to establish this gateway factor and what's called the statutory aggravating factor or factors.

If the jury unanimously decides that the government established that, then there will be a third phase. And we're calling that the penalty phase. And that's kind of like the -- that's the second half of the basketball game. And we use the basketball analogy because in the penalty phase it's almost like a second trial. Evidence will be presented. There will be a new set of jury instructions. The prosecution would have the

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2944 of 3245

burden of proving beyond a reasonable doubt additional aggravating factors.

And then the defense will have the opportunity -- but

3379

they don't have to present evidence if they don't want to, but they'll have the opportunity to present evidence of what we call mitigating factors. Those are factors that would help sway a jury towards a life sentence and away from a death sentence.

And then at the end of the penalty phase when all the evidence is in, you'll get a set of final instructions. You'll hear closing arguments from the lawyers, and then I will define for you what constitutes an aggravating factor, what constitutes a mitigating factor.

You will then be charged with considering the evidence and deciding whether or not the government proved their aggravating factors, whether or not the defense proved any mitigating factors, whether or not you find any other mitigating factors, and then you'll be required to weigh any aggravating factors that you find and any mitigating factors that you find.

And whatever weight you give each factor is for each individual juror to decide. In other words, one juror could say one aggravating factor outweighs 30 mitigating factors, or a juror could say any one mitigating factor could outweigh any and all aggravating factors. Whatever weight you give the factors, that's for you to decide. Nobody is going to tell you how much weight to give any of the factors. But you'll be instructed to consider any evidence of aggravating factors and mitigating factors.

Then in the penalty phase only if each juror

3380

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2945 of 3245

unanimously votes for the death penalty will Miss Johnson be sentenced to death by me.

So that's really the three phases of the trial.  Of course, there may never be a second or third phase because the only way we would have a second and third phase would be if in the first phase, the not-guilty/guilty phase, the jury would unanimously agree that Angela Johnson is guilty of one or more of the ten counts, and then there would be the second phase. You'd have to find a gateway factor, eligibility factor, and a statutory aggravating factor unanimously, and that's the only way we would ever even reach the third phase.  But if we do reach the third phase, then the jury would be charged with the decision of deciding the penalty, life imprisonment without parole or the death penalty.

So now I'm going to turn it over to the lawyers.  And they're each going to have -- each side's going to have about 30 minutes to question you.  And who are we starting with today? Mr. Miller?

MR. MILLER:  I'll begin.

THE COURT:  Okay.  Whenever you're ready.

MR. MILLER:  Testing.

THE REPORTER:  Thank you.  Perfect.

MR. MILLER:  Good morning, folks.  Who has the microphone?

PROSPECTIVE JUROR 675:  I do.

3381

MR. MILLER:  Juror 675, aren't you happy you have the microphone?

Page 44

PROSPECTIVE JUROR 675: Yes, I am.

MR. MILLER: Now, let's be honest.

PROSPECTIVE JUROR 675: Okay.

MR. MILLER: Okay. I noticed on your questionnaire that you actually served on a jury before.

PROSPECTIVE JUROR 675: That's correct.

MR. MILLER: And you raised your hand when the judge asked if anybody had been in this room before, and I assume from that maybe that that was the reason you were in this room before possibly.

PROSPECTIVE JUROR 675: Yeah. Things are a little different than the last time I been here. If I remember right, I think the jury was over on that side of the wall if I remember right.

THE COURT: Very good, yes. That's been a while.

PROSPECTIVE JUROR 675: So it's been probably -- I'm not -- I'm just taking a guess -- maybe about ten years ago because my kids were very young then, and it was during -- right around Christmastime.

MR. MILLER: Very good, very good. And it is interesting that you observed the change. This courtroom has been remodeled I believe at about that time. In any event, during the past ten years, and it was remodeled for a number of

3382

purposes. It's -- you ever been in a room quite this magnificent as far as having --

PROSPECTIVE JUROR 675: No, I can't say I have.

MR. MILLER: How'd that feel the first time?

PROSPECTIVE JUROR 675: I was very nervous. It was -- you know, I was away from home and had two small kids, so it was

Page 45

not a very good time, but I was willing to serve at that time.

MR. MILLER:  And that very first day you probably were apprehensive about the -- what you were getting into.

PROSPECTIVE JUROR 675:  Yes, yes, I was.

MR. MILLER:  You worked on that case all the way through to a verdict as I note.

PROSPECTIVE JUROR 675:  Yes, that's correct.

MR. MILLER:  And can you just tell us after having gone through the experience how you feel about it or any observations about the process that you might share with your fellow jurors here?

PROSPECTIVE JUROR 675:  I think it was fairly how we decided on that case, and I -- I don't know how much more I can say about that.

MR. MILLER:  How did you feel in general?  Was it a positive, negative experience?

PROSPECTIVE JUROR 675:  It was a positive experience.

MR. MILLER:  And was it a better experience than what you thought it might be, or was it a worse experience than what

3383

you expected when you began?

PROSPECTIVE JUROR 675:  There's something to be learned from, keep your nose clean and keep out of trouble and try not to land yourself on that other side of the fence.

MR. MILLER:  You learned something, in other words, about the system and how it works.

PROSPECTIVE JUROR 675:  Yes, I did.

MR. MILLER:  What'd you learn about how jury duty works?

PROSPECTIVE JUROR 675:  It was very interesting how 12

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2948 of 3245

or 13 of us just sat around in that room and whether found guilty or not guilty.

MR. MILLER: Let me ask you this. Once you got into the job of being a juror -- and correct me if I'm wrong -- but did you become more comfortable with the process and with your role and responsibility as a juror once you got into it?

PROSPECTIVE JUROR 675: Yes, I believe so.

MR. MILLER: Okay. And the reason I'm asking you this, all except for maybe one of your fellow jurors, I think most of the folks are here for the first time and find yourselves in the same situation you were when you came in on day one.

PROSPECTIVE JUROR 675: Yeah.

MR. MILLER: Not that you maybe don't feel some anxiety today.

3384

PROSPECTIVE JUROR 675: I'm kind of nervous today too.

MR. MILLER: But I would hope not as much as when you were on that first jury.

PROSPECTIVE JUROR 675: No.

MR. MILLER: And I'm just hoping you can join me in assuring your fellow jurors that they're probably going to live through the experience; okay?

PROSPECTIVE JUROR 675: Okay.

MR. MILLER: If you can pass that down all the way to the left down to the first row.

And if I'm not mistaken, I believe, Juror 344, you've served on a jury before as well.

PROSPECTIVE JUROR 344: In a county, county jury, uh-huh.

Page 47

MR. MILLER: What -- and this is my responsibility, not yours. It's my job to make sure for the benefit of our court reporter that she can hear everybody's answer loud and clear, so be sure to keep that microphone up close.

PROSPECTIVE JUROR 344: Okay.

MR. MILLER: And that karaoke threat, I was in Judge Bennett's courtroom some time ago, and we actually had a juror say, Go ahead and put it up there; I'd much rather sing for you folks than answer questions from lawyers. But again, you've been through this process in a county criminal case.

PROSPECTIVE JUROR 344: Uh-huh.

3385

MR. MILLER: OWI as I recall.

PROSPECTIVE JUROR 344: Uh-huh, uh-huh.

MR. MILLER: What county was that?

PROSPECTIVE JUROR 344: Woodbury County.

MR. MILLER: So it was just right across the street.

PROSPECTIVE JUROR 344: Right, uh-huh.

MR. MILLER: And that's another magnificent old building.

PROSPECTIVE JUROR 344: Right.

MR. MILLER: How'd you feel about jury duty?

PROSPECTIVE JUROR 344: I was kind of nervous about it and probably preferred not to, but it was an interesting experience.

MR. MILLER: That nervousness I assume was at its worst on day one.

PROSPECTIVE JUROR 344: Right, uh-huh.

MR. MILLER: Got better as it went along.

PROSPECTIVE JUROR 344: A little bit.

Page 48

MR. MILLER: Become somewhat more comfortable with the responsibilities.

PROSPECTIVE JUROR 344: Uh-huh.

MR. MILLER: Very good. Let me ask you this. You did arrive at a verdict in that case.

PROSPECTIVE JUROR 344: Uh-huh.

MR. MILLER: And did you view it as your job simply to

3386

decide what the facts are from the evidence the best you could?

PROSPECTIVE JUROR 344: Right, yeah. We -- yeah, it took a while, uh-huh.

MR. MILLER: Okay. There was some -- and I think I noted that you indicated that it's important to speak up and be heard.

PROSPECTIVE JUROR 344: Uh-huh.

MR. MILLER: Fair statement?

PROSPECTIVE JUROR 344: Right, uh-huh.

MR. MILLER: So I'm guessing maybe there was some discussion, some debate back there in the jury room.

PROSPECTIVE JUROR 344: There was, uh-huh.

MR. MILLER: Ultimately all 12 came to the same conclusion.

PROSPECTIVE JUROR 344: Eventually. Took a while.

MR. MILLER: And that's part of the process. I'm sure sometimes it requires more debate than others, but that's part of the process. Everyone needs to be willing to speak up and share their thoughts and listen to others; okay?

PROSPECTIVE JUROR 344: Right.

MR. MILLER: But ultimately the job is simply to try to determine what the facts are from the evidence, listen

Page 49

carefully to the evidence, decide in your own mind what the evidence proves as to what happened.

PROSPECTIVE JUROR 344: Right.

3387

MR. MILLER: In other words, this is not some elaborate ritual. It's a very practical business of us settling disputes by trying to find out what happened from the evidence. Fair statement?

PROSPECTIVE JUROR 344: Right, uh-huh.

MR. MILLER: Good enough. And I just have one other question for you and I'll pass on. But I noted in your case that as in your case, sir, there was an acquittal.

PROSPECTIVE JUROR 344: Uh-huh.

MR. MILLER: And that's fine. Unless there's a hung jury, there are two possible outcomes in criminal cases ordinarily, either guilty or not guilty. Everyone here, even those who have not served on a jury before, have heard the term presumption of innocence. Is that something that you applied in that case?

PROSPECTIVE JUROR 344: We did, uh-huh.

MR. MILLER: And that was an important part of your job I take it; right?

PROSPECTIVE JUROR 344: Uh-huh.

MR. MILLER: And in that case that presumption prevailed because you felt apparently that there was not enough evidence to overcome that presumption of innocence. Am I --

PROSPECTIVE JUROR 344: Right. I think it surprised us going in knowing what it was about. I think it did surprise us as that's what it ended up to be.

3388

Page 50

MR. MILLER: Fair statement. You probably went in thinking, well, he's charged, he must be guilty, something along those facts.

PROSPECTIVE JUROR 344: Probably.

MR. MILLER: Just kind of human nature.

PROSPECTIVE JUROR 344: Yeah, right.

MR. MILLER: But you had some instructions on what your job as a juror is.

PROSPECTIVE JUROR 344: Uh-huh.

MR. MILLER: And you felt you could carry those out and did, in fact, carry out a presumption of innocence as the Court explained that role to you. Fair statement?

PROSPECTIVE JUROR 344: Right, uh-huh.

MR. MILLER: And I just wanted to be sure we had an understanding on that because that's what we're doing here this morning among other things is visiting about a couple general concepts and being sure that we don't have any serious issues on there. And if we do, please feel free to bring them up because we need to cover these things. We're going to do it here in the first part of this morning. And then on some of the more specific issues such as exposure to information about this case and opinions about the death penalty, we're going to visit with you individually.

If you would just pass that to your right, Juror 531, you've not served on a jury before.

3389

PROSPECTIVE JUROR 531: No, I have not.

MR. MILLER: Are you comforted at all from what your fellow jurors have told you about the fact you're probably going

to live through the experience?

PROSPECTIVE JUROR 531: Not exactly.

MR. MILLER: Easy for us to say; okay? Well, let us assure you that you and millions of your fellow citizens have carried out this duty well. You've heard -- even though you've not been a juror before, you've heard the term presumption of innocence.

PROSPECTIVE JUROR 531: Right.

MR. MILLER: What does that mean to you, ma'am?

PROSPECTIVE JUROR 531: Like you said, if all the evidence looks like they are, I thought in a lot -- especially the case she talked about, there's a lot of things that are put in place now that there isn't so much doubt.

MR. MILLER: Well, in -- and again, you're going to be getting the benefit -- one thing you may not know as well not having been a juror before is that you will never be asked to return a decision without first receiving instructions from the Court as to what your responsibilities are and what the law is as it applies to the case. But one thing in every criminal case that a juror's always instructed about is the presumption of innocence. Angela Johnson as she sits here is presumed innocent, and that is -- it's not something that tells us what

3390

the facts are. It's something the law tells us that protects not only Angela Johnson but all of us in our society. Even though you've not been a juror before, you understand that innocent until proven guilty --

PROSPECTIVE JUROR 531: Right.

MR. MILLER: -- is a part of our fabric of society in this country. You agree with that, ma'am?

Page 52

PROSPECTIVE JUROR 531: Right, right.

MR. MILLER: And you understand that if we didn't have that and if we didn't have jurors in each case willing to afford the defendant the presumption of innocence we simply couldn't have fair trials.

PROSPECTIVE JUROR 531: That's right.

MR. MILLER: And not only for the defendant in that specific case but, frankly, for all of us we would be without one of our important freedoms if we didn't have a uniform application of that to everyone in our society. Would you agree with that?

PROSPECTIVE JUROR 531: Right.

MR. MILLER: Good enough. I'll let you pass that to your right.

Juror 331, are we on the same page here?

PROSPECTIVE JUROR 331: Yep.

MR. MILLER: Do you agree with the presumption of innocence?

3391

PROSPECTIVE JUROR 331: Yes.

MR. MILLER: And feel you can apply it to the defendant in this case?

PROSPECTIVE JUROR 331: Yes.

MR. MILLER: Thank you, ma'am. Let me just look here. I took a couple notes. Oh, yeah. You mentioned you are acquainted with and have a brother-in-law --

PROSPECTIVE JUROR 331: Yes.

MR. MILLER: -- who may be involved in transporting prisoners to federal court.

PROSPECTIVE JUROR 331: Yes.

Page 53

MR. MILLER: And he's a deputy Clay County sheriff. He does that on part time I assume.

PROSPECTIVE JUROR 331: He does it on part time, but he is a jailer here in Woodbury County.

MR. MILLER: Very good. Have you -- and we will visit with you in more detail about any information you may have about this particular case. I don't need to get into that now. But just in general have you spoken with your brother-in-law or anyone else involved in the movement of prisoners as to what the facts may be in this case?

PROSPECTIVE JUROR 331: No. I think he's just basically said he's helping transport her, and I really know nothing about it honestly.

MR. MILLER: Okay. So that relationship hasn't

3392

exposed you to any information that may claim that --

PROSPECTIVE JUROR 331: No, he doesn't talk about it.

MR. MILLER: Very good. Very good. I noticed among other things as well that one of your hobbies -- and you have a number of them -- is attending car shows.

PROSPECTIVE JUROR 331: Yeah.

MR. MILLER: Can you give me just a couple seconds about that, what you do there in that regard?

PROSPECTIVE JUROR 331: My husband's got a couple old cars, so I'm a tag-along.

MR. MILLER: He has a couple old cars?

PROSPECTIVE JUROR 331: Uh-huh.

MR. MILLER: Does he restore them?

PROSPECTIVE JUROR 331: Uh-huh.

MR. MILLER: Is he in the process of a project at the

Page 54

moment?

PROSPECTIVE JUROR 331:  It's been a project for about 10, 15 years now.

MR. MILLER:  That's not unusual.  What make and model?

PROSPECTIVE JUROR 331:  He's got a '70 Chevy Chevelle and a '69 Camaro.

MR. MILLER:  He's got two projects going.

PROSPECTIVE JUROR 331:  One's finished.  The other one is -- it'll sit there.

MR. MILLER:  Very interesting.  You can pass that

3393

dreaded microphone, and I'll pick on Juror 477 for a minute.

Any disagreement with what we've heard so far about the role of a juror?

PROSPECTIVE JUROR 477:  No.

MR. MILLER:  Is that as you understand it?  Even though you've not been a juror before, I assume you understand your job simply to be to find the true facts from the evidence.

PROSPECTIVE JUROR 477:  Yes.

MR. MILLER:  To the best of your ability.  I noticed also that you're a retired teacher and much of your responsibilities as a teacher was teaching foreign languages.

PROSPECTIVE JUROR 477:  Uh-huh.

MR. MILLER:  I'm just curious what foreign languages have you taught, sir?

PROSPECTIVE JUROR 477:  German.

MR. MILLER:  Did that for how many years?

PROSPECTIVE JUROR 477:  I taught that for ten years in Minnesota and one year in Iowa.

MR. MILLER:  Sir, do you happen to have any children?

PROSPECTIVE JUROR 477: Do I have any children?

MR. MILLER: Yes.

PROSPECTIVE JUROR 477: Yes, I have two.

MR. MILLER: And they're grown.

PROSPECTIVE JUROR 477: They're grown, yes.

MR. MILLER: Did you look upon the responsibility of

3394

educating youngsters and the responsibility of raising your children to be good citizens as being a very serious responsibility? I trust you did.

PROSPECTIVE JUROR 477: Yes, I did.

MR. MILLER: And I trust you would view jury duty as the same sort of thing.

PROSPECTIVE JUROR 477: Yes.

MR. MILLER: As an important responsibility. And I simply wanted to assure myself -- and I don't think there's any question about it -- you're a man who has had a life of shouldering responsibility, and I trust you feel you could do that in the role as a juror.

PROSPECTIVE JUROR 477: Yes, I could.

MR. MILLER: Thank you, sir. If you can pass -- well, let me just ask you one more question. I notice you're a golfer too.

PROSPECTIVE JUROR 477: What was that?

MR. MILLER: Golf, do you play golf?

PROSPECTIVE JUROR 477: Yes, I play a lot of golf.

MR. MILLER: Since retirement do you play a lot of that?

PROSPECTIVE JUROR 477: Yes, I'm retired from the school system, but my wife and I also have a painting and
Page 56

decorating business, and I work a little bit at that.

MR. MILLER: And she insists that you work a little

3395

bit at that I assume.

PROSPECTIVE JUROR 477: Right.

MR. MILLER: I'm just curious how serious a golfer are you, sir?

PROSPECTIVE JUROR 477: Well, I have a 9 handicap for 9 holes, so --

MR. MILLER: Oh, for nine holes.

PROSPECTIVE JUROR 477: Yeah.

MR. MILLER: Enjoy the game?

PROSPECTIVE JUROR 477: Right.

MR. MILLER: Very good. Let's just pass it one over again, and I'll just keep moving the microphone around. I just want to visit briefly with you folks.

We've already talked about your jury experience, sir. And I think I noticed that you're another one who has a hobby about old cars. Am I right in recalling that?

PROSPECTIVE JUROR 675: That's correct.

MR. MILLER: And can you tell us what you do in that regard?

PROSPECTIVE JUROR 675: I restored a '72 Pontiac LeMans about five years ago, and I go -- also I go to a lot of car shows and stuff around my -- where I live. I got a friend that's into older cars than that, '29 Model A, and I'm helping him restoring a '37 four-door at this moment. We've been working on that for about two years.

3396

Page 57

MR. MILLER: How long did it take you to do that Pontiac?

PROSPECTIVE JUROR 675: It took me two years.

MR. MILLER: That's actually moving right along.

PROSPECTIVE JUROR 675: That's moving right along. It takes -- you save up for a while. Then you find the car you want to restore, and then you just kind of go hog wild over it till you get it done.

MR. MILLER: Very good. I noticed in your case as well that you and your fellow jurors were able to agree on a verdict and it was an acquittal in that case.

PROSPECTIVE JUROR 675: Uh-huh, that's correct.

MR. MILLER: And I trust from that you acquired a little better understanding of how the court instructs on presumption of innocence.

PROSPECTIVE JUROR 675: Yes, that's correct.

MR. MILLER: You were able to carry it out and apparently had a good feel for the concept.

PROSPECTIVE JUROR 675: Yes.

MR. MILLER: Thank you, sir. I'll ask you to go ahead and move that microphone to the back row and the first lady who was threatened with the prospect of singing karaoke.

Juror 23, how are you doing today?

PROSPECTIVE JUROR 23: Good.

MR. MILLER: You're a lab tech at Polaris.

3397

PROSPECTIVE JUROR 23: Correct.

MR. MILLER: Can you just tell me a little bit about that job?

Page 58

PROSPECTIVE JUROR 23: Sure. After the parts are welded, they are sent through a five-stage washer system which I keep the chemicals balanced, check the titration and pH balances and then make sure the water that leaves our plant that goes to the city is within balance.

MR. MILLER: And this -- what product is being -- at that plant, what product is it?

PROSPECTIVE JUROR 23: We build ATVs, Victory motorcycles.

MR. MILLER: Did you, Juror 23, receive a list of prospective witnesses in this case?

PROSPECTIVE JUROR 23: Yes.

MR. MILLER: And I'll ask you this question, but it's for everybody here, and please raise your hand if the answer for any of you is in the affirmative. Did you recognize any of the names on that list?

PROSPECTIVE JUROR 23: No, I did not.

MR. MILLER: Is there anyone here who did? Very good. You're a mother.

PROSPECTIVE JUROR 23: Correct.

MR. MILLER: And I visited with one of your fellow jurors about the fact that being a juror is a responsibility,

3398

but it isn't the first time you've been shouldered with some serious responsibility, is it?

PROSPECTIVE JUROR 23: Correct.

MR. MILLER: Okay. And maybe there have been many other things other than being a mother, but I assume that's one of the biggest ones that you've been shouldered with in your life.

Page 59

PROSPECTIVE JUROR 23: Yes, it is, but wonderful.

MR. MILLER: It's a wonderful responsibility.

PROSPECTIVE JUROR 23: Uh-huh.

MR. MILLER: It's a joyful responsibility.

PROSPECTIVE JUROR 23: That it is.

MR. MILLER: And if you're very lucky, there won't be too many occasions over the next 18 or 20 years when it isn't also a painful and struggling responsibility, but you realize sometimes there are difficult and unpleasant choices that have to be made as a parent too.

PROSPECTIVE JUROR 23: Yes, unfortunately.

MR. MILLER: Okay. But you willingly take them on and feel that you can handle those.

PROSPECTIVE JUROR 23: Yes.

MR. MILLER: Very good. May have done so already to some degree I'm sure.

PROSPECTIVE JUROR 23: Yes.

MR. MILLER: Thank you, ma'am. You can pass the

3399

microphone.

And, Juror Number 9, how are you today?

PROSPECTIVE JUROR 9: I'm good.

MR. MILLER: Good. Don't recognize any of the names on that jury list?

PROSPECTIVE JUROR 9: No, I do not.

MR. MILLER: Couple things we do need to visit with you about jurors -- excuse me, about witnesses is the fact that we have, as the judge indicated, a large number of witnesses. One class of witnesses, if you will, is peace officers. There will be one or more individuals who are employed in law

Page 60

enforcement who will be called as witnesses to testify in this case. And you will be asked to evaluate every witness's credibility based not only upon their apparent integrity and truthfulness but also their memory, their ability to recount, their ability to observe and remember, so these all go into this. And I expect if you are required to serve on this jury one of the instructions you will get is that peace officers, law enforcement officers, are not to be given extra credibility simply by virtue of their job title or their job. They're human, subject to all of the same range of human qualities as everyone else. Can you follow that instruction?

PROSPECTIVE JUROR 9: Yes, I can.

MR. MILLER: Very good. Is there anyone here who feels for any reason they might not? Some of you have

3400

relatives, in-laws, acquaintances in law enforcement. Is there anyone who would have a problem following the Court's instruction as to the viewing of law enforcement testimony?

Very good.

I'll stay with you, Juror 9. One of the other instructions I expect -- and you'll get a whole bunch of instructions, and that's, I assume, as you would want to be receiving guidance from the Court as to how you do your job. Fair statement?

PROSPECTIVE JUROR 9: Yes.

MR. MILLER: Okay. Another instruction I expect you will receive is that people who are incarcerated as prisoners sometimes appear as witnesses who cooperate with the government sharing information they may have as having acquired either as prisoners or members of criminal activity. As with all other

Page 61

witnesses, it will be your job to assess credibility; okay? And again, as with peace officers, you will have some guidance from the Court. I trust you would want to know, for example, whether or not this person happens to have any particular motive for testifying.

PROSPECTIVE JUROR 9: Yes.

MR. MILLER: Whether he feels that it may be of some other benefit to him simply than doing his responsibility as a citizen, whether he may receive any benefit or not from his testimony.

3401

PROSPECTIVE JUROR 9: Yes.

MR. MILLER: As well as any other circumstances that may affect his credibility and whether he's risking any danger, for example, for testifying. These are all things that you would want to understand about him and it would be fair for you to consider in assessing his credibility. One of the things the judge will give you I expect is an instruction that in those circumstances you should listen with care and caution to any such testimony and to consider such things as motives for testifying. Does that make sense to you, and is that something that you would follow?

PROSPECTIVE JUROR 9: I would definitely listen to what the judge had to present to us, uh-huh.

MR. MILLER: And I'm paraphrasing. Obviously the exact instruction will come from -- it comes from the Court, but at least as you understand my summary of the instruction, does that make sense to you, and is it something you think you can follow?

PROSPECTIVE JUROR 9: Yes.

Page 62

MR. MILLER: Let me ask you this. Whether it's a convicted criminal, a member of law enforcement, a physician, a forensic scientist, or anyone from any walk of life, would you view it as your duty to at least listen carefully to all of their testimony?

PROSPECTIVE JUROR 9: Yes, I will.

3402

MR. MILLER: Thank you, ma'am. And again, in your case having four children, I trust you're no stranger to responsibility either.

PROSPECTIVE JUROR 9: No, I'm not.

MR. MILLER: I don't think there is anyone here -- we're all adults, and most of you folks have children. I noted your husband owns a restaurant.

PROSPECTIVE JUROR 9: Yes, he does.

MR. MILLER: Okay. And I don't want to violate the anonymity as far as numbers and that, but go ahead and give us a plug if you want to.

PROSPECTIVE JUROR 9: A plug for it?

MR. MILLER: Sure.

PROSPECTIVE JUROR 9: The only place to eat pizza is at The Pizza Ranch.

MR. MILLER: Very good. I'll let you pass that microphone then.

Juror 214, how are you doing, sir?

PROSPECTIVE JUROR 214: Fine. Thank you.

MR. MILLER: How do you feel about jury duty after what we've discussed about it so far?

PROSPECTIVE JUROR 214: It's a little less intimidating.

Page 63

MR. MILLER: I hope so. Do you agree that it would be your job simply to try to find the truth -- find out what the

3403

true facts are from listening to the evidence?

PROSPECTIVE JUROR 214: Yes.

MR. MILLER: And would that be your goal if you serve on this jury, sir?

PROSPECTIVE JUROR 214: Yes, it would.

MR. MILLER: The job of returning a decision in a case such as this, indeed in any case, is one that does require you to shoulder responsibility. I trust it's not always a pleasant responsibility, but you understand we have to ask citizens to do that.

PROSPECTIVE JUROR 214: Uh-huh.

MR. MILLER: Fair statement?

PROSPECTIVE JUROR 214: Yes, it is.

MR. MILLER: Do you agree with that whole concept, sir?

PROSPECTIVE JUROR 214: Yes.

MR. MILLER: And you feel you can do your share in shouldering such responsibility.

PROSPECTIVE JUROR 214: I believe so.

MR. MILLER: Very good. I would also point out to you -- and this is a question for everybody -- and I don't mean to be at all facetious. This very probably doesn't apply to anybody, but it's too late to ask you if you ultimately get in the jury and it becomes a problem. I know from personal experience that there are some folks in our society who simply

3404

Page 64

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 2966 of 3245

do not feel because of their own feelings, whether moral, religious, or whatever, that they don't feel that they can sit in judgment on a fellow citizen, fellow human being. Is there anyone who feels that would be a serious problem? I don't mean to embarrass anyone, but now is the time to find out if it would be. Very good. I see no hands.

Likewise, this is a murder case, sir, and you understand that we cannot have a case involving a crime of violence where you're expected to find out what really happened without presenting some testimony that I expect you would find unpleasant. You understand that.

PROSPECTIVE JUROR 214: Yes, I do.

MR. MILLER: By the same token, we cannot have a system that works in cases like this unless we find citizens who are willing to come in here and listen to such evidence as dispassionately as possible. Do you feel you can do that, sir?

PROSPECTIVE JUROR 214: Yes, I do.

MR. MILLER: Again, I don't mean to embarrass anyone here. This -- no one finds this particularly pleasant. Let me say in advance that this is not a case where you're going to be subjected to photographs of blood and gore, but it does involve serious allegations of violence including the deaths of two small children, and it would only be natural that folks would have emotional reactions to that. The question is can you recognize that for what it is and still look at the evidence and

3405

base your decision on the evidence in this case and not on any natural emotional reaction that would --

PROSPECTIVE JUROR 214: Yes, sir.

MR. MILLER: Anybody seriously feel they would have

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2967 of 3245

any serious difficulty with that? Let me know if you do.

Thank you, sir. I noticed that you restore old cars too.

PROSPECTIVE JUROR 214: Yeah.

MR. MILLER: Okay. We got quite a bit of that on this jury. Can you tell us what your current project is if you have one?

PROSPECTIVE JUROR 214: I have a '79 Ford super cab that I'm in the process of restoring.

MR. MILLER: How long have you been working on that, sir?

PROSPECTIVE JUROR 214: It's probably going on 12 years or so.

MR. MILLER: That's never an overnight project, is it?

PROSPECTIVE JUROR 214: No.

MR. MILLER: And you gotta find the free time to do it. It takes a while.

PROSPECTIVE JUROR 214: That's correct.

MR. MILLER: You're still working at it, though.

PROSPECTIVE JUROR 214: Yes.

MR. MILLER: That's a lot of persistence, 12 years

3406

working on a vehicle.

PROSPECTIVE JUROR 214: I messed with others in between time.

MR. MILLER: But you enjoy that.

PROSPECTIVE JUROR 214: Oh, yes.

MR. MILLER: I have an 18-year-old who started a restoration project, and he got as far as completely disassembling the car, but that's where it stands at the moment.

Page 66

But a year isn't long. It generally takes a matter of years for anyone to complete a project. Fair statement?

PROSPECTIVE JUROR 214: Yes.

MR. MILLER: So he shouldn't be discouraged this early.

PROSPECTIVE JUROR 214: No.

MR. MILLER: Very good. Let me ask you this, sir, final question for you, and I'd ask this of everyone if you'd join in. Juror 214, you've not served as a juror before, but we've talked a little bit about the responsibilities of a juror including the presumption of innocence. The burden of proof is a phrase I'm sure you've heard before as well, and that kind of goes along with the presumption of innocence.

The government willingly assumes the burden of proof in any criminal case in this country whenever it's brought to court. Do you have any problem with the fact that there's the burden of proof beyond a reasonable doubt?

3407

PROSPECTIVE JUROR 214: No.

MR. MILLER: And that concept will be explained for you by the Court as well, but if you are required to serve on this jury, sir, and if after listening to all of the evidence you and your fellow 11 jurors cannot unanimously conclude that the government has proven its case beyond a reasonable doubt, indeed if that's your decision, sir, under those circumstances, under circumstances where you feel the government has not proven its case beyond a reasonable doubt, what would your verdict be, sir?

PROSPECTIVE JUROR 214: Not guilty.

MR. MILLER: It would have to be, wouldn't it?

Page 67

PROSPECTIVE JUROR 214: Yes, it would.

MR. MILLER: And that would be the only way that you could do your job. Fair statement?

PROSPECTIVE JUROR 214: That's correct.

MR. MILLER: Conversely, sir, if you are required to serve on this jury and if after listening to all of the evidence you and your fellow jurors conclude to your own satisfaction and beyond any reasonable doubt that this defendant is guilty as charged, under those circumstances, sir, what would your verdict be?

PROSPECTIVE JUROR 214: It would be a guilty verdict.

MR. MILLER: Again, that would be what your duty called for.

3408

PROSPECTIVE JUROR 214: Yes.

MR. MILLER: Fair statement? Is there anyone here who feels they would have any problem answering those two questions the same way? Thank you, folks.

THE COURT: Why don't you stand and take a little stretch break, and then we'll hear from the defense, Mr. Willett.

Please be seated.

MR. WILLETT: Chief Judge Bennett, if it please the Court. Counsel for government, counsel for the defense, Miss Johnson.

Good morning, ladies and gentlemen. My name is Al Willett. I'm one of the attorneys defending Miss Johnson in this case.

Very quickly, Mr. Miller asked you a very broad question regarding witnesses, and I just want to narrow it just

Page 68

to be precise to make sure that there's no name on the witness list that you all have reviewed that might spark recognition later.  My client's parents are still living.  Angela Johnson's mother is Pearl Johnson who's on the witness list.  The other members of her family who are on the witness are her three sisters, Wendy Jacobson, Holly Dirksen, and Jamie Jo Hays.  Miss Johnson has a brother, Jim Johnson, who is on this witness list, and she has two daughters, Alyssa Johnson and Marvea Johnson who are on this witness list.  Now then, do any of those names spark

3409

any familiarity with any of you?

Mr. 214, you ended up with the microphone.  Do those names mean anything to you?

PROSPECTIVE JUROR 214:  No, they don't.

MR. WILLETT:  And even though I just addressed that to Mr. 214, as far as the remaining panelists, are any of the names I just articulated for you familiar?  I see no nods of affirmation.  Mr. 214, could you pass the microphone down to the first row?  We're going to work it all the way over to Mr. 675.

Mr. 675, the reason I did that is I reviewed all the questionnaires, and it was one of your answers that gained my attention right away, and I thought, well, I'll start with Mr. 675.

PROSPECTIVE JUROR 675:  Okay.

MR. WILLETT:  You were asked a question in the survey about listing three issues that you think are of the biggest concern to you or the biggest problems regarding the criminal justice system.  Do you remember that question just in general to list three problems?

PROSPECTIVE JUROR 675:  It's been a while since I

Page 69

filled that out.

MR. WILLETT: Okay. The answers you listed were repeat offenders, no respect of the law, and very slow process, time consuming. That was your answer.

PROSPECTIVE JUROR 675: Yes.

3410

MR. WILLETT: Now, I got the first one and the third one. I thought I was with you there. But I wanted to make sure I knew what you meant by no respect of the law.

PROSPECTIVE JUROR 675: Well, the third -- if they're breaking the law more than once and their third defense and then they land up in this -- what we're doing here, I don't believe in that.

MR. WILLETT: Okay. So you have a problem with what lawyers and judges refer to as recidivists, repeat offenders.

PROSPECTIVE JUROR 675: Yes.

MR. WILLETT: Let me go to sort of a broader legal concept with you, and it was touched upon by Chief Judge Bennett in his opening remarks. When I say the Fifth Amendment of the United States Constitution, what do you think of?

PROSPECTIVE JUROR 675: That's hard to say.

MR. WILLETT: Let me help you out just a little bit. I don't want to leave you out on a branch very long because it's not a pop quiz. The Fifth Amendment to the United States Constitution is the amendment that gives a defendant in any criminal case the right to decide whether or not to take the stand in her own defense. You may have heard of it in books, movies, television, I'm taking the Fifth, I assert my Fifth Amendment right. Are you familiar with that right now?

PROSPECTIVE JUROR 675: Yeah, I'm familiar with that.

Page 70

MR. WILLETT: Now then, I'm going to address this to

3411

you, but I want -- and obviously all your other panelists are listening to me right now as I discuss this with you.

PROSPECTIVE JUROR 675: Okay.

MR. WILLETT: Here's what you need to know about how the Fifth Amendment impacts this case. Angela Johnson has an absolute right to decide whether or not to take the stand in her own defense, and you're familiar with that.

PROSPECTIVE JUROR 675: Yes.

MR. WILLETT: Now then, I'm telling you right now she won't.

PROSPECTIVE JUROR 675: Okay.

MR. WILLETT: She will not take the stand in her own defense, and that's her decision, and that -- at the appropriate time in this case, Chief Judge Bennett will instruct you that that decision is hers and hers alone; you can't hold it against her, can't even take a negative inference from it back to the jury room with you.

Now then, I have no idea in your federal case ten years ago if the defendant took the stand or not. But I wanted to broach this subject with you because you talked about respect of the law.

PROSPECTIVE JUROR 675: Uh-huh.

MR. WILLETT: Now then, how do you feel when I tell you Angela Johnson's not taking the stand in her own defense?

PROSPECTIVE JUROR 675: It bugs me. I'd like to hear

3412

Page 71

her side of the story.

MR. WILLETT: Okay.

PROSPECTIVE JUROR 675: And it's -- and the deal with two small children, I have a big problem with that. And anybody murders any kids or anybody, it just -- I don't believe in that. That just -- it just bugs me. It bugs me, and it probably bugs everybody else that sits on the jury.

MR. WILLETT: Well, we're going to find out pretty quickly; okay? Do me this favor. Mr. Berrigan I know would like to talk to you about your philosophy about the fact that two of these victims are children, and I'm going to reserve that part of your answer for when Mr. Berrigan, my co-counsel, stands up to talk to you. Is that fair?

PROSPECTIVE JUROR 675: That's fair.

MR. WILLETT: What you initially told me was it bugs you, you want to hear the other side of the story, and it's the old axiom there are two sides to every story.

PROSPECTIVE JUROR 675: Yeah.

MR. WILLETT: Well, we're going to present a defense where you will certainly hear our side of it, but you will just not hear Angela Johnson speak herself. Okay? Do you understand that?

PROSPECTIVE JUROR 675: Yes and no.

MR. WILLETT: Tell me why yes, and then tell me why no.

3413

PROSPECTIVE JUROR 675: Well, I think she's speaking through the lawyers through her instead of going up on the witness stand speaking for herself.

MR. WILLETT: And Judge Bennett told you earlier this

Page 72

is the witness stand.

PROSPECTIVE JUROR 675: Yes, yes, I'm aware of that.

MR. WILLETT: Do you think this is the easiest place to sit?

PROSPECTIVE JUROR 675: No, and this isn't an easy place to sit either.

MR. WILLETT: Great. And we had this discussion last week and assured a potential juror last week that none of the seats in this courtroom are easy places to sit.

PROSPECTIVE JUROR 675: No, they're not.

MR. WILLETT: But can you imagine it might be hard for a person to come here and express their thoughts and do it perfectly? Do you think it might make you nervous if you were sitting here?

PROSPECTIVE JUROR 675: Oh, yes, yes, it would.

MR. WILLETT: Do you think you might be concerned about stepping on yourself verbally or misstating something if you were sitting here?

PROSPECTIVE JUROR 675: That's the way I feel sitting here too.

MR. WILLETT: And I don't mean to press you. If I am

3414

you tell me; okay? But we seem to be having a good discussion so far.

PROSPECTIVE JUROR 675: Okay.

MR. WILLETT: Would you understand if a person didn't have a lot of formal education they might not run to the forefront to be in this box to testify?

PROSPECTIVE JUROR 675: Yeah.

MR. WILLETT: And if you couple that with the fact

Page 73

that the person asking them questions is a very talented, very accomplished attorney representing the other side, do you think that might add to the person's lack of comfort about wanting to get into this box?

PROSPECTIVE JUROR 675: It probably does.

MR. WILLETT: Now then, you told me just a couple minutes ago yes and no, yes and no, but I didn't give you a chance to say the no part. I didn't mean to cut you off from that. What was the no part you were thinking of?

PROSPECTIVE JUROR 675: Of sitting up there?

MR. WILLETT: Yeah.

PROSPECTIVE JUROR 675: It's kinda hard to say.

MR. WILLETT: Okay.

PROSPECTIVE JUROR 675: You know, it's -- I can understand not wanting to sit up there and not sit up here either.

MR. WILLETT: Okay.

3415

PROSPECTIVE JUROR 675: It's just -- it's lawyers, you know, getting in front of everybody and speaking your mind.

MR. WILLETT: Sure. In front of a bunch of lawyers.

PROSPECTIVE JUROR 675: Yeah, yeah, and sitting in the witness -- you know, I don't know. It's just very nervous, you know, just -- it's a different -- this is really different.

MR. WILLETT: This is different than being out on the street exchanging views, isn't it?

PROSPECTIVE JUROR 675: Yes, it is. Yes, it is.

MR. WILLETT: Well, let me ask you what I consider to be the important question because here's my concern. You've been very candid with me about your feelings about this issue,

Page 74

and it's a very important issue in this case because I'm not doing this as just a test balloon. I'm telling you she won't take the stand. Take it to the bank. Put the mortgage down. There are very few things that are certain in life, but in this case that's one of them; okay?

PROSPECTIVE JUROR 675: Okay.

MR. WILLETT: Can you set it aside?

PROSPECTIVE JUROR 675: Yeah.

MR. WILLETT: Okay. So if the judge tells you don't take anything from this, don't take any negative thing, you're telling me you can set this aside notwithstanding your frustration, notwithstanding your concern, notwithstanding the fact that you connect this in some way to the fact that two

3416

victims are children.

PROSPECTIVE JUROR 675: That's the big one I have right there is the victims are children.

MR. WILLETT: I'm going to let Mr. Berrigan talk to you about that. Is that fair?

PROSPECTIVE JUROR 675: That's fair.

MR. WILLETT: Would you be so kind as to pass the microphone up to Ms. 23?

PROSPECTIVE JUROR 23: Hello.

MR. WILLETT: Good morning. How are you, ma'am?

PROSPECTIVE JUROR 23: Good.

MR. WILLETT: Fine. Thank you. Miss 23, you got to hear Mr. 675. We had a pretty good discussion about the Fifth Amendment, both sides of it.

PROSPECTIVE JUROR 23: Yes.

MR. WILLETT: Did you understand everything we've

Page 75

discussed so far?

PROSPECTIVE JUROR 23: Yes.

MR. WILLETT: So how do you feel about it?

PROSPECTIVE JUROR 23: The fact that she's not taking the stand does bother me.

MR. WILLETT: And why does it bother you, ma'am?

PROSPECTIVE JUROR 23: If she feels that she's innocent, then I think she needs to speak her part.

MR. WILLETT: Okay. And that's certainly an

3417

appropriate reaction. I've had people tell me, Mr. Willett, if I'm there, I'm knocking you down trying to get to the witness stand.

PROSPECTIVE JUROR 23: Yes.

MR. WILLETT: Okay? Notwithstanding what the facts may be, notwithstanding what the advice of counsel may be pursuant to the Sixth Amendment, I'm going to the stand. But just as in your situation you would tell me, Mr. Willett, I'm getting into that stand, can you imagine that there might be situations where a criminal defendant just doesn't feel comfortable getting into the stand?

PROSPECTIVE JUROR 23: Yeah. I can see that part, but my thing is she put herself in this predicament.

MR. WILLETT: Well, how do you know that, ma'am? I mean -- and I don't mean to be an advocate at this moment, but you haven't heard any evidence, have you?

PROSPECTIVE JUROR 23: No. I guess the way I look at things is that I'm a firm believer that, you know, you are who you hang out with, therefore stating that, you know, if she knew that he was doing these sorts of things, kind of guilt by

Page 76

association.

MR. WILLETT: Well, and you just took the next few words right out of my mouth because I thought that's where you were going. This concept of what we call in the legal community guilt by association, I take it you feel that my client has a

3418

problem -- Miss Johnson has a problem with you just because she's sitting here charged? Is that what you're saying, or is the guilt by association more, well, Mr. Willett if she doesn't want to get up and talk to me, that figures into my guilt by association concern?

PROSPECTIVE JUROR 23: Just I guess the fact that she's here.

MR. WILLETT: Just here, just charged.

PROSPECTIVE JUROR 23: Yes.

MR. WILLETT: Sitting in this courtroom.

PROSPECTIVE JUROR 23: Uh-huh.

MR. WILLETT: And that's a yes.

PROSPECTIVE JUROR 23: Yes.

MR. WILLETT: Okay. I didn't say this earlier, and I should have. Miss Semmler is an excellent court reporter. But no court reporter can record accurately a smile, a frown, a shrug, a nod, an uh-huh or huh-uh, so I don't want to be singing karaoke either. My singing days are long gone. So if you'll just remember to respond verbally, we'll all be fine; okay?

PROSPECTIVE JUROR 23: Okay.

MR. WILLETT: So between your concerns that she's here, between your concerns about guilt by association, are you telling me that this is only magnified by the fact that now you're hearing me tell you, Miss 23, Angela Johnson won't take

Page 77

the stand? Is it just sort of fanning the flames in your mind?

3419

PROSPECTIVE JUROR 23: Yes.

MR. WILLETT: And is there -- I could say why right now. Is there anything else you haven't told me about your concerns that you want me to know?

PROSPECTIVE JUROR 23: The children is an issue as well.

MR. WILLETT: Okay.

PROSPECTIVE JUROR 23: And I think not to speak for anybody else here, but, you know, when you're a mom, the fact that you have little children, to think of two little kids going through --

MR. WILLETT: Absolutely. And that's certainly an appropriate answer. And believe me, we've heard it.

PROSPECTIVE JUROR 23: Yes.

MR. WILLETT: I can fairly represent to you that in the last three weeks that issue has been a great concern to many panelists, so that's not a -- it's certainly an appropriate comment to make to me. I'm going to ask you for the same courtesy I asked of Mr. 675. Mr. Berrigan I'm sure would like to talk to you about that issue of children. Would you be willing to give him your thoughts on that when he has a chance to talk to you individually?

PROSPECTIVE JUROR 23: Yes.

MR. WILLETT: Okay. Now then, back to my $64,000 question with Mr. 675, you've heard me tell you that at the

3420

appropriate time Chief Judge Bennett will tell you what my
Page 78

client's Fifth Amendment rights are and that when she exercises that right and that decision not to take the stand you shouldn't hold it against her, can't even take a negative inference with you back to the jury room. You can't be saying, Gee, I wish she would have, gee, she didn't, now I got a problem. Should I be concerned about how you feel about this even after the judge's instructions?

PROSPECTIVE JUROR 23: It's hard to -- you know, yes, the judge can sit here and tell you not to feel that way.

MR. WILLETT: Absolutely.

PROSPECTIVE JUROR 23: But for your feelings towards that inside, I guess I still have an issue with you.

MR. WILLETT: Okay. So you --

THE COURT: Mr. Willett, I'm going to jump in here and do a little bit of explaining if I may.

MR. WILLETT: Thank you, Judge.

THE COURT: I just wanted to explain to you all a little bit about the Fifth Amendment. For my money -- and I've been at this for a long time -- it's the most important constitutional right that we all have, that we all have. And it was so important that the folks who founded the country over 200 years ago put it in the Bill of Rights, and it's in the Fifth Amendment.

And it applies in every single criminal case tried in

3421

this court, tried in any of the 94 federal district courts in the country. It also applies -- it's so important that it applies in any state court from the highest court down to the teeniest court. It applies in traffic court. Every defendant -- there are no exceptions, and there are very few

Page 79

things in the law for which there are no exceptions.  Every defendant has an absolute right not to testify.

I used to teach a course in criminal procedure, and when we got to the Fifth Amendment -- I'm so old they had blackboards and chalk -- and I could fill up -- I don't care how big the blackboard was in the room.  I could fill it up with reasons why a defendant might not want to testify because they're unlimited by our imagination.  There are so many reasons why a defendant might not want to testify.  The bottom line is every defendant has an absolute right not to testify.

Now, it defies human nature if I didn't expect that we would all be curious about the fact that a defendant does not testify.  And, in fact, I often wonder because in a lot of cases I don't know.  In this case the lawyers have told you the defendant's not going to testify, and that happens sometimes.  In other cases I find out at the end of the case the same time the jury does.  Either the defendant gets up and testifies or the defendant doesn't, and that's when I find out.

Regardless of when I find out or when the jurors find out, the bottom line is it would be human nature to be curious

3422

about whether the defendant's going to testify.  And if Mr. Willett hadn't told you in no uncertain terms that Angela Johnson is not testifying, I assume that all of us, myself included, would be curious about that, and that's okay.  It's okay to be curious.

But here's what's not okay.  It's not okay to hold it against the defendant if they exercise this precious constitutional right.  And some people can do that, and others can't.  And that's what I want to find out, who can -- and you

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2982 of 3245

need to promise me, Mr. Willett, Angela Johnson, Mr. Berrigan, Mr. Stowers, and the two prosecutors, Mr. Williams and Mr. Miller, because nobody, nobody, not even the prosecutors, would want a juror on this jury who would hold it against the defendant in any way.

And like I said, some people can do it, and others can't. It's not a right or wrong deal. Doesn't make you a good person; doesn't make you a bad person. But it's very important. So it's okay to be curious, but you just can't let that curiosity affect your judgment in the case. Do you understand what I'm saying?

PROSPECTIVE JUROR 23: (Nodded head.)

THE COURT: Now, Juror 23, do you think you could give Angela Johnson the full benefit of the presumption of innocence and not hold it against her in any way if she does not testify in this case? Do you think you can give her the full benefit of

3423

the presumption of innocence?

PROSPECTIVE JUROR 23: I will say yes since I haven't heard both side of the stories, since I have not heard from the defense and I have not heard from the prosecutors.

THE COURT: Well, here's another thing I want to try and clear up. You know, people say there are two sides to a story. Sometimes there are three or four or five or six sides. But in a criminal trial you may only hear -- I don't -- you may only hear evidence from one side, and that's the government because they have what's called the burden of proof. Do you understand that?

PROSPECTIVE JUROR 23: Uh-huh.

THE COURT: In other words, the government has to

Page 81

prove Angela Johnson guilty beyond a reasonable doubt. Do you understand that?

PROSPECTIVE JUROR 23: Yes.

THE COURT: Okay. The defense never, ever -- and I want to make that real clear -- never, ever has any obligation or duty to put on any evidence of any kind. They just don't have to do it. They may, but they don't have to. Do you understand that?

PROSPECTIVE JUROR 23: Yes.

THE COURT: So in a lot of criminal cases, the only evidence the jury hears is evidence that's put on by the government. Do you understand that?

3424

PROSPECTIVE JUROR 23: Yes.

THE COURT: So the bottom line is while you may want to hear two sides or three sides or seven sides, sometimes -- and I don't know what's going to happen in this case just like I don't know in any other case. Sometimes the only evidence that you hear is evidence put on by the government because they have to prove the defendant guilty beyond a reasonable doubt. Do you understand that?

PROSPECTIVE JUROR 23: Yes.

THE COURT: And the presumption of innocence means that Angela Johnson has no obligation to put on any evidence of any kind at any time in this trial. Do you understand that?

PROSPECTIVE JUROR 23: Yes.

THE COURT: And being able to give Angela Johnson the full benefit of the presumption of innocence means that you're not going to hold it against her or Mr. Willett or Mr. Berrigan or Mr. Stowers in any way if they choose for whatever reason not

Page 82

to put on any evidence whatsoever. Do you understand that?

PROSPECTIVE JUROR 23: Yes.

THE COURT: Okay. Now, do you think you can give Angela Johnson the full benefit of the presumption of innocence?

PROSPECTIVE JUROR 23: Yes.

THE COURT: And if she doesn't testify in the case, while it would be natural to be curious about that, you can't hold it against her in any way. You can't discuss it with the

3425

other jurors during deliberation, and you simply can't draw what Mr. Willett has said, draw a negative inference -- I say hold it against her. You can't hold it against her in any way. Do you think you could do that?

PROSPECTIVE JUROR 23: Yes.

THE COURT: Okay. Excuse me for interrupting.

MR. WILLETT: That's okay, Judge.

THE COURT: Take my time out and add it back on to your 30 minutes.

MR. WILLETT: I appreciate it, Judge.

Miss 23, will you hand the microphone down to Miss 331, lady in the denim jacket?

Good morning.

PROSPECTIVE JUROR 331: Good morning.

MR. WILLETT: You're the only other person I'm going to talk to about the Fifth Amendment, but you knew something early on that you disclosed to us that adds a little wrinkle, and it was fine that you knew this. I don't want you to think you've let some great big part of this case out of the bag. But because of the fact you know a deputy who's a jailer at the Woodbury County Jail and because of the fact you know a deputy

Page 83

who's in charge with the marshal's service of transporting people from the jail, you made the comment that you knew people who were helping transport her meaning Angela Johnson.

Now then, this isn't some big secret that's been let

3426

out. If you're on this jury, there will certainly be evidence from people who take this stand that, well, I gained certain information because I was in this correctional setting and so was Angela Johnson, okay, so don't take anything that I'm saying as a criticism. It wasn't.

But here's my concern. The only label that Miss Johnson has at this moment is one of defendant; okay? She hasn't been convicted of a thing. She's not a prisoner. She's not an inmate. Another judge, a judge different than Judge Bennett, made a decision that Miss Johnson should be detained, okay, and in the federal system we have a label called pretrial detainee; okay?

PROSPECTIVE JUROR 331: (Nodded head.)

MR. WILLETT: Here's what I want to make sure of. Now you've heard me tell you she's not taking the stand, but now I know that you know that during the course of this trial she'll be across the street in the Woodbury County Jail. She won't be going to a hotel. She won't be going to her home, and I want to make sure that should I have any concerns -- is the fact that you know, well, Mr. Willett, I know she's in jail because I know the people who are taking care of her --

PROSPECTIVE JUROR 331: Isn't that where most people go?

MR. WILLETT: Well, it depends on the case. Some people are out before trial. Some people are in before trial;

Page 84

okay?

PROSPECTIVE JUROR 331: Okay.

MR. WILLETT: I want to make sure you're not taking a negative inference from that, especially when I layer on top of the fact that she's not testifying because Judge Bennett will instruct you that, you know, she is presumed innocent. You shouldn't take any negative inference from the charges, the number of charges, the fact she was placed under arrest, the fact she's sitting here in this courtroom, okay, and some people come in and very candidly say, Well, Mr. Willett, if she's here, doesn't she have a problem; okay? So I want to make sure that you don't have a problem.

PROSPECTIVE JUROR 331: No.

MR. WILLETT: Okay. Okay. So it's not a negative for you because you know individuals who are employed with the Woodbury County Sheriff's Office and that you know that Angela's being brought by them here every day for trial. That's not a negative that's going to be a disadvantage.

PROSPECTIVE JUROR 331: No, no, not a negative to me. I just didn't think I'd be sitting here because I do know people in the law enforcement.

MR. WILLETT: Okay. Well, and let me clear this up. I think it was, but just to be precise let me clear this up real quickly. We have individuals who come into this courtroom who, you know, are very close to people in law enforcement. You

know, very few people come in and say, My best friend's a

criminal defense lawyer. People don't want to say that.

PROSPECTIVE JUROR 331: No.

MR. WILLETT: But people will come in and say, Well, Mr. Willett, I've known Officer So-and-So since I was a small child. Now, the question is there will be lots of law enforcement agents testifying in this case. We're going to have FBI. We're going to have Alcohol, Tobacco and Firearms. We're going to have Drug Enforcement Administration. We're going to have the Iowa Department of Criminal Investigation. We're going to have the Cerro Gordo County Sheriff's Office. We'll probably have Mason City PD. There's probably going to be days when the only government witnesses will be law enforcement agents.

Now then, my concern is do those people automatically get a leg up in terms of credibility because you know Woodbury County sheriff's deputies and they may be very fine people and well, if a cop takes the stand, must be true automatically, presume it is, wouldn't look for any inconsistencies, wouldn't look to see if they made an assumption that turned out to be wrong, wouldn't look to see if they made a mistake, must be true?

PROSPECTIVE JUROR 331: Anybody who takes the stand's supposed to speak the truth.

MR. WILLETT: Okay. I know that. But it doesn't always happen that way.

3429

PROSPECTIVE JUROR 331: No.

MR. WILLETT: And what I'm asking you, Miss 331, is are you going to make a blanket assumption that if a law enforcement agent takes the stand he or she is telling the truth, or are you willing to listen to their testimony and say

Page 86

does it make sense, was it consistent, maybe they're biased, maybe they have so much emotion invested in this case that they didn't see the clues for who they really were?

PROSPECTIVE JUROR 331: I'll listen. I'm very willing to listen.

MR. WILLETT: And you'll keep an open mind.

PROSPECTIVE JUROR 331: Yes.

MR. WILLETT: So the fact that a person who steps up here is a law enforcement agent, they don't get a free pass on their testimony with you.

PROSPECTIVE JUROR 331: Just because they're a law enforcement agent, no.

MR. WILLETT: Bingo. Please pass the microphone to our friend Mr. 477 with the Minnesota jacket.

I notice that even though you're a retired German teacher that if you could have done something else in your career you wanted to be a lawyer.

PROSPECTIVE JUROR 477: Yes, I did.

MR. WILLETT: Now, why would you want to ruin a perfectly good life as a foreign language teacher to be a

3430

lawyer?

PROSPECTIVE JUROR 477: Well, I just think it'd be very challenging, very interesting.

MR. WILLETT: Now then, I also saw from your questionnaire I believe you have a nephew who practices law in eastern Iowa.

PROSPECTIVE JUROR 477: Yes, I do.

MR. WILLETT: I believe I know your nephew by reputation, okay, and I mean that as a -- in a positive way;

Page 87

okay?

PROSPECTIVE JUROR 477: (Nodded head.)

MR. WILLETT: But I'm going to try very hard not to say his name because your names are the same and then I'm going to violate the rule on juror numbers, so I'm going to skip over that.

Heavy undercurrent to this case -- we're here because of five murders; okay? That's why we're in federal court. But the heavy undercurrent to this case is a conspiracy or a criminal agreement and a continuing criminal enterprise or in essence a criminal business to make methamphetamine and to distribute methamphetamine.

Now then, there's a lot of stuff in the news in the state of Iowa about methamphetamine, and when I say methamphetamine to you, Mr. 477, what do you think of?

PROSPECTIVE JUROR 477: Well, it's a drug that, you

3431

know, they -- more or less a drug. They get high on it. You know, that's -- they make -- they usually make it at home or in desolated places.

MR. WILLETT: You will certainly hear evidence from the government that they believe that my client was involved in a criminal agreement to manufacture methamphetamine, that she was involved in a criminal agreement to distribute methamphetamine, that she was involved in assisting a criminal business, if you will, and the job of that business was not to make ATVs, but the job of that business was to make and distribute meth; okay? Is that going to be hard for you to be a fair and impartial juror to Angela Johnson now that you know not only are we here because of five murders but the heavy

Page 88

undercurrent to this case is methamphetamine?

PROSPECTIVE JUROR 477: Well, like you said, it's the presumption of innocence. I think you have to listen to the evidence and base your decision on that.

MR. WILLETT: Okay. Quick golf question: Par 4, 400 plus yards, straight shot. You're on the tee. Do you take your 3 wood out for accuracy, or do you take your driver out for distance?

PROSPECTIVE JUROR 477: Driver for distance.

MR. WILLETT: Thank you.

Number 9, our lady in the back, it was mentioned that there are going to be individuals who come to this trial who are

3432

incarcerated, okay, who have been convicted, who will tell you that they have information about my client and they wish to share that information or that testimony. Now then, the politically correct label for these individuals is cooperating individuals; okay?

PROSPECTIVE JUROR 9: Okay.

MR. WILLETT: The less politically correct nickname that the defense uses at times is jailhouse snitches.

PROSPECTIVE JUROR 9: Okay.

MR. WILLETT: Do you have sort of an idea of who we're talking about here?

PROSPECTIVE JUROR 9: Yes.

MR. WILLETT: Now then, some of these cooperating individuals will be very up front with you about the fact that they're here sharing what they say is their knowledge about Angela Johnson in the hope that eventually they'll receive a reduction in sentence, okay, and they may be serving 2 years;

Page 89

they may be serving more than 20 years. But I think it's fair to say that almost all of them will have that hope, and that might be part of their motivation. Is that something you want to know when a cooperating individual takes the stand against Angela Johnson?

PROSPECTIVE JUROR 9: Do I want to know that? Is that the question?

MR. WILLETT: Yes.

3433

PROSPECTIVE JUROR 9: If their sentence will be reduced? No, I do not need to know that.

MR. WILLETT: Do you think it would affect their motivation in testifying?

PROSPECTIVE JUROR 9: Possibly.

MR. WILLETT: Okay. And if it did, is that something you'd factor into your deliberations about do I believe this person or not?

PROSPECTIVE JUROR 9: I would look at it the same way as, you know, the law enforcement person. I would not place them on any different level, but I would want to listen to what they had to say and glean the truth from that.

MR. WILLETT: Might you take their testimony with a grain of salt knowing that they're coming in here hoping to receive a sentence reduction in exchange for their testimony?

PROSPECTIVE JUROR 9: I think I can honestly say no because I do know some individuals who have been incarcerated.

MR. WILLETT: Okay.

PROSPECTIVE JUROR 9: And . . .

MR. WILLETT: And how does that affect your judgment?

PROSPECTIVE JUROR 9: I would really listen carefully

Page 90

to what they had to say and how they were saying it and how it was being presented.

MR. WILLETT: But the fact that they're maybe trying to strike a deal is not something you think is important in

3434

terms of trying to decide their credibility.

PROSPECTIVE JUROR 9: Can you say that again?

MR. WILLETT: Yes, ma'am. I'm sorry. There was a lot of legalese there. You'll be given an instruction by Judge Bennett at the appropriate time regarding these types of witnesses.

PROSPECTIVE JUROR 9: Uh-huh.

MR. WILLETT: And I think one -- you know, I use, you know, would you take it with a grain of salt about what their motivation is. The phrase may be, you know, judge them with care and caution.

THE COURT: Greater caution and care.

MR. WILLETT: Thank you, Judge. Thank you. It was there. I just couldn't get it to the front of my tongue. Thank you. Greater caution and care. And so believe me, when these people come to the stand as government witnesses, on cross-examination, I'm going to be -- if it's not brought out on direct by the government attorneys, I'm going to be telling what their situation is because the defense believes that's an important thing for you to weigh in trying to judge their credibility --

PROSPECTIVE JUROR 9: I agree.

MR. WILLETT: -- what is a person's motivation. And do you agree with me on that?

PROSPECTIVE JUROR 9: Yes.

Page 91

MR. WILLETT:  So in that sense would you then be willing to say, Okay, Mr. Willett, I get it; if they got a really long sentence and they want to get out sooner, maybe they're not telling the whole truth to me?

PROSPECTIVE JUROR 9:  That could be.

MR. WILLETT:  Okay.  And you're willing to keep an open mind about that?

PROSPECTIVE JUROR 9:  Yes, I am.

MR. WILLETT:  So now do you see why I believe that's -- or why the defense believes that's important?

PROSPECTIVE JUROR 9:  Yes.

MR. WILLETT:  Be so kind as to pass it to Mr. 214.

You had a very interesting answer to list three problems in the criminal justice system.  Bad people get away with things and innocent people get hung up.  Bad seem to know how to work around the system.  Innocent are not as well versed.  It sometimes takes a long time before police can do anything.  One tiny mistake in procedure can get a known criminal free.  Now, that last part was especially captivating for me.  One tiny mistake in procedure can get a known criminal free, what did you mean by that, Mr. 214?

PROSPECTIVE JUROR 214:  Technicality in procedure or the way something was presented could get it thrown out.

MR. WILLETT:  Okay.  Do you understand that it's a defense lawyer's job -- well, as well as the government lawyer's

job -- to make objections when they think something might be coming in that for a legal reason or evidentiary reason is
Page 92

improper or shouldn't be part of the case?

PROSPECTIVE JUROR 214: Yes.

MR. WILLETT: So you're not going to hold it against myself or Mr. Berrigan or Mr. Stowers if we defend Miss Johnson as zealously and as effectively as we can.

PROSPECTIVE JUROR 214: No, I would want the same for myself.

MR. WILLETT: And if that means challenging the evidence or challenging a witness or asking the judge for a conference so we can make a better record with the judge, is that a situation that one tiny mistake in procedure could get a known criminal free, or do you understand that that's part of the process?

PROSPECTIVE JUROR 214: That's part of the process.

MR. WILLETT: Now then, Angela Johnson's sitting here right now in front of you. Is she a known criminal in your eyes, sir, at this moment?

PROSPECTIVE JUROR 214: No.

MR. STOWERS: Three minutes.

MR. WILLETT: Thank you, Mr. Stowers. Bad people get away with things, and innocent people get hung up. What were you thinking of?

PROSPECTIVE JUROR 214: Somebody that hasn't been

3437

exposed to the court system may not know how things work and could end up making problems for themselves.

MR. WILLETT: So it's important to have a lawyer, isn't it?

PROSPECTIVE JUROR 214: Yes.

MR. WILLETT: And you understand that that's the role

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 2995 of 3245

that myself and Mr. Berrigan and Mr. Stowers are fulfilling in this case.

PROSPECTIVE JUROR 214: Yes.

MR. WILLETT: The Sixth Amendment to the Constitution, that an accused in a criminal case shall have the right to counsel.

PROSPECTIVE JUROR 214: Yes.

MR. WILLETT: And for this case we are the living, breathing definition of the Sixth Amendment.

PROSPECTIVE JUROR 214: Yes.

MR. WILLETT: So you won't have any problem with the defense team if we're doing our job to the best of our ability?

PROSPECTIVE JUROR 214: No.

MR. WILLETT: Because obviously the stakes are the ultimate stakes in this case. You would agree with me on that.

PROSPECTIVE JUROR 214: Yes, they are. Yes.

MR. WILLETT: I've got two people to talk to. I think I can get it done. If you'd pass the microphone down to Miss 344, I'll revisit the issue of cooperating individuals with you

3438

for just a moment.

PROSPECTIVE JUROR 344: Okay.

MR. WILLETT: Your answer was -- I would question how trustworthy this witness would be was your answer to how would you, you know, take the testimony of a person who was cooperating with the government in exchange for a potential benefit. Now, I think I know what that answer means, but why don't you tell me real quick.

PROSPECTIVE JUROR 344: Well, I think if -- yeah, wondering what they were going to get out of it by testifying.

Page 94

MR. WILLETT: Would you question their motivation?

PROSPECTIVE JUROR 344: I might, uh-huh.

MR. WILLETT: Would you question their credibility if you think their testimony was being affected by their motive to get out of jail as soon as possible?

PROSPECTIVE JUROR 344: I might, uh-huh.

MR. WILLETT: Okay. You wouldn't ignore it, would you?

PROSPECTIVE JUROR 344: No.

MR. WILLETT: Okay. Let's add one more layer to it. Would you want to know if a person was serving 2 years as opposed to 20-plus in terms of trying to make up your mind about their credibility?

PROSPECTIVE JUROR 344: I think it would make a difference, but I guess if I had to be -- tried to be fair with

3439

what they were conveying, I guess I think that I should know.

MR. WILLETT: Great. If you'd please pass the microphone to Miss 531. And real quick question, you were very candid that you have a son who's in law enforcement?

PROSPECTIVE JUROR 531: Right.

MR. WILLETT: Back to our question about law enforcement agents and their credibilities. I'm sure you're very proud of your son.

PROSPECTIVE JUROR 531: Yes, I hope I taught him well.

MR. WILLETT: And I'm sure you did. There's no doubt in my mind about that. I just want to make sure that if law enforcement agents come to the stand the fact that you taught your son well and that he's representing law enforcement -- it appears to be in your home county that you're not going to give

Page 95

law enforcement agents a leg up in terms of --

PROSPECTIVE JUROR 531: No.

MR. WILLETT: -- well, if Mr. Basler comes to the stand, must be true.

PROSPECTIVE JUROR 531: No. We're all human. That's for sure.

MR. WILLETT: Great. And you're going right where I was hoping you would take me. It's possible that even a law enforcement agent could make a mistake; would you agree with me?

PROSPECTIVE JUROR 531: That's right. Absolutely.

MR. WILLETT: I haven't had much of a chance to talk

3440

to you. We've really discussed sort of three subjects. We discussed the Fifth Amendment. We've discussed methamphetamine. We've discussed witnesses, both sides of the coin, law enforcement versus cooperators. Is there anything that you've heard either from me or your fellow peers during the last 30 odd minutes that maybe if I would have been talking to you you would have raised your hand and said, Mr. Willett, you better know what I think about this?

PROSPECTIVE JUROR 531: I don't believe so.

MR. WILLETT: Okay. Okay. So you were understanding of the different points of view and willing to understand about my client's Fifth Amendment rights?

PROSPECTIVE JUROR 531: Right.

MR. WILLETT: And regardless of where she wakes up in the morning, nothing's happened to her yet in this case.

PROSPECTIVE JUROR 531: Right.

MR. WILLETT: And you'd be judging a law enforcement agent's credibility just as you would a person who is a

Page 96

cooperating individual.

PROSPECTIVE JUROR 531: Right. My son still has to answer to me too.

MR. WILLETT: Pardon me?

PROSPECTIVE JUROR 531: My son still has to answer to me too sometimes.

MR. WILLETT: Amen, and I think that's a good place to

3441

stop. Thank you, ma'am.

Thank you, Judge Bennett.

THE COURT: Thank you, Mr. Willett.

Members of the jury, here's what we're going to do. We're going to take a 25-minute recess, a few minutes maybe beyond that, until 5 to 11. And then when we come back, we're going to bring you back individually, and I just want to explain again how that's going to work.

We're going to start in the back row with Juror 23 and just go Juror 23, Juror 9, Juror 214. Then we're going to start with 675 and then go all the way down. 344, somebody's gotta be last. Today you are. And we're going to spend about 25 to 30 minutes with each potential juror. Sometimes it could take less than that. So we're not going to start till 11, and then we're going to go for an hour, and then we're going to break at noon for an hour, so we'll start back in at 1.

So I imagine in that first hour we're only going to get to 23, 9, maybe 214. The rest of you, 675, in other words, the whole front row, there's no way we're going to get to you before one o'clock this afternoon. So you're free to leave as long as you come back at one o'clock, and obviously if we get to 675 right when we start at 1, 344, we're not going to get to you

Page 97

till -- do the math -- 230, 3:00, but we'd like you back here a little bit early so we don't keep everybody waiting in case it does go a little bit faster. I tell you that so that you just

3442

don't have to sit down in the jury room and wait.

And the other thing I didn't mention to this group -- I mentioned to every other group -- I hope you appreciate that the lawyers worked hard with me to come up with a system for jury selection in this case because we have so much discretion. And one of the systems would be -- we started with 800 potential jurors. We could have had all 800 come every day. Now, this courtroom obviously isn't big enough to do that.

Right before we started jury selection in this case, I was flying in from Washington, D.C., or somewhere. I don't even remember where I was now. I was reading the New York Times, and there was an article about a case starting in federal court somewhere elsewhere. They started with 400 jurors, and the article made it sound like, well, that was a big deal, and I just kind of chuckled because we started with 800.

That particular judge brought all 400 in, and what they did is they rented like a civic center, had the jurors come in, and they actually had to fill out their questionnaire at the civic center, and then all the jurors had to hang around during the entire jury selection process which was estimated to take a month.

And so we didn't do that. We came up with a process where you come in one day and you know, and I just hope you appreciate that because not everybody does it that way.

In fact, my secretary who is also a lawyer got called

3443

Page 98

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 3000 of 3245

for jury duty in the month of April across the street at the county courthouse. And she went every day three different times, and she never actually even made it up into a courtroom to be -- I guess she made it into a courtroom, but she never got questioned by a judge or the lawyers.

And her sister was called for jury duty in federal court in Minnesota. And she went during the month of April for three days in a row all day every day, sat in the basement of the courthouse, never even got called into a courtroom.

So the bad news is it's going to be all day today, but the good news is it could have been a lot worse. So please remember my cautionary instruction about not discussing this case among yourselves or with anyone else. Don't let anybody talk to you about the case. And, Juror 23, you'll be the first one back up here, and we'll see you at 5 minutes to 11. Thank you.

(Panel N exited the courtroom.)

THE COURT: Please be seated for one minute. With regard to Juror 498 who did not show up today, I received the following e-mail from Suzanne Carlson, our jury clerk. I just got off the phone with Juror 498. I asked her why she was not here today, and she responded, quote, Oh, am I supposed to be there today, question mark, quote. She went on to explain that she doesn't think she'll be able to serve because I live 45 miles away. We have one car. I will be 80 in two months. I

3444

tire easily. And then Suzanne goes on to say, Although she works, question mark. I don't get that I guess. I told her I

Page 99

would call her at home or work when I receive your response. What should my response be, Counsel? What I thought we'd do is bring her in tomorrow. I don't know whether we'll need her tomorrow or not. She's 80 years old.

MR. WILLIAMS: Could go either way, Judge. I really don't have a commitment.

MR. MILLER: My thought, Your Honor, is she apparently not only tires easily but confuses easily as well.

THE COURT: I guess because she didn't think she had to come.

MR. BERRIGAN: She does mention that in her questionnaire, Your Honor. She was a hardship request under question 88 for exactly the same reason she mentioned this morning.

THE COURT: So at least she's consistent.

MR. BERRIGAN: Yes, she's very consistent, right.

THE COURT: What's your view as to what we should do with her?

MR. BERRIGAN: Well, I'm hopeful we won't need her. And if you want to excuse her, I think age has some prerogatives, and this might be one.

MR. WILLIAMS: No objection here.

THE COURT: Mr. Miller, you look like you're

3445

uncertain.

MR. MILLER: No. I just hope it's academic.

THE COURT: Yeah, well, I'm not so sure. You know what? I'm going to hold off and make a decision at the end of the day depending on how we do today. I'd like to be able to dismiss her. On the other hand, if we make -- if we don't make

Page 100

a whole lot of progress, one extra body might be helpful.

Okay. We'll see you back here -- anything else we need to take up? I don't think so.

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. Thank you.

(Recess at 10:32 a.m.)

THE COURT: Ready for Juror 23?

MR. WILLIAMS: Yes, Your Honor.

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. Thank you.

(Prospective Juror 23 entered the courtroom.)

THE COURT: Juror 23, anywhere in the front row you'd like; okay?

PROSPECTIVE JUROR 23: Okay.

THE COURT: Thank you. Please be seated. We're going to start first with questioning from Mr. Williams, and then you'll hear from Mr. Berrigan.

PROSPECTIVE JUROR 23: Okay.

3446

EXAMINATION

BY MR. WILLIAMS:

Q. Good morning, ma'am. How you doing?

A. Good morning. Good. Nervous.

Q. Well, it's natural for you to be nervous. Most people are in this situation. I think as we start to talk for a little bit, hopefully some of those nerves will go away. As the judge said, there's no right or wrong answers. You're not going to get graded on your performance here today.

A. Okay.

Page 101

Q. We just need to talk about a few things including publicity, what you know about the case, maybe your views about the possible punishments in this case, and then another issue that you had raised a little bit when you were being questioned by Mr. Willett. And I'm just going to start off with that, and that is the impact that the fact that there are children involved in this case and what that does for you, and I just want to come back and talk about that for a few minutes.

Mr. Miller had said during his questioning of the jury this morning that in murder cases obviously there is always going to be some evidence that is going to be difficult for jurors to view, to struggle with. And yet our criminal justice system wouldn't work if we didn't have jurors willing to recognize you have an emotional response to that kind of evidence and yet also recognize you have a duty to make the

3447

government prove its case beyond a reasonable doubt and look at the evidence and make sure that we can do that. Do you remember Mr. Miller covering that with you all this morning?

A. Yes.

Q. Okay. And the same concept applies to children here. If you're chosen to be a juror in this case, there will be a verdict form that you'll have to fill out at some point, and there's going to be a bunch of things you're probably going to find as part of that verdict.

But nowhere on that verdict form is there going to be a place where the jurors are asked, Are you upset about the fact that children were murdered in this case? We assume everybody is upset about that. And yet, you know, our criminal justice system in this case wouldn't work if we didn't have jurors who

Page 102

could recognize that they can have that emotional response, be upset about the facts of the case, and yet recognize that's not what this case is about. The case is about whether the government could prove the defendant had some role in those murders.

And do you think you could do that in this case, recognizing that you're going to have an emotional response, it's a natural response, that your job will be to set that aside, not ignore it -- it's not a feeling you can just ignore -- but not let it impact your ability to hold the government to its burden of proving its case beyond a reasonable

3448

doubt? Do you think you can do that?

A. Yeah. I think you put a good key word in there is proving the fact that she had anything to do with it. I mean, that kind of makes me look at it at a different aspect.

Q. Sure, because that's what this case is really about. The fact that two children were murdered is not what's at issue. It's whether we can prove she had a role in it, and everybody may be upset about what happened. That's not the question before us, and it sounds like you've recognized that now and you can follow the Court's instructions in this case?

A. Yes.

Q. Let me turn to publicity. The publicity issues here you were asked about in the questionnaire. Thank you for filling this out. We appreciate it. I know it's long.

A. Very long.

Q. It actually speeds up the process here a little bit. You said you'd only just heard about this. You heard that Dustin Honken was charged as guilty. And question on the next page,

Page 103

72, Do you have an opinion about whether she's guilty or not guilty, and you said, I'm not sure till I've heard all the facts. And you had no opinion on the appropriate punishment if she was found guilty. Do you remember those answers to the questionnaire?

A. It's been a while since I filled that out.

Q. Sure. I think back in January.

3449

A. Yeah.

Q. February actually. Does that all sound about right for you, though, about what you know about this case and about whether you made up your mind about whether she's guilty or not guilty at this point?

A. Yes.

Q. Since you filled this out in February, did you learn anything else about this case through the news media?

A. There was an article in the Des Moines Register about the fact of her being able to wear makeup or not. Otherwise that is the only thing that I have read.

Q. Let me ask you this bottom-line question. Anything you may have heard about this case through the media, read about or anything like that or even the fact of what happened with Dustin Honken, do you recognize again this trial is about whether the government can prove the defendant's involvement in this case and whatever you may have heard in the media and so forth has nothing to do with whether we can prove our case?

A. Yes.

Q. All right. And will you hold us to our burden of proving the case with the evidence in this courtroom and not allow what you may have heard about this case to influence your decision

Page 104

from another source?

A.   Yes.

Q.   Thank you.  Let me go to the penalty issue in this case.

3450

The judge instructed the jury this morning that in the event that -- and only in the event the defendant's found guilty of one of the ten charges beyond a reasonable doubt will we get to potentially this penalty phase, this third phase, and he kind of described what the role of the jury would be at that point.  Do you remember him telling you there were going to be aggravating factors and mitigating factors?  Do you remember him talking about those?

A.   Briefly.

Q.   And some weighing stuff?

A.   Yes.

Q.   Let me talk about those for a minute.  An aggravating factor is simply a fact, if you will, that the government asserts makes this crime worse and, therefore, calls for the death penalty.  A mitigating factor is a fact that either the defendant proves if they want to -- they have no obligation to prove anything, but perhaps they may put on evidence of a fact or you may find as a jury facts from the evidence the government presented that would suggest that some form of leniency ought to be provided to the defendant.  And that's what aggravating and mitigating means in this case.  Does that make sense to you?

A.   Yes.

Q.   Okay.  The judge indicated Congress set up this system in a unique way.  If Congress simply wanted to have a flat-out penalty for anybody involved in murdering people in connection

3451

Page 105

with a drug case, we wouldn't need a jury to make the decision on whether it's death penalty or life in prison.  They'd say if that's the crime, this is the punishment, end of story, no jury needed.

Instead Congress made a determination that it's uniquely the role of citizens from our community to weigh these things, to look at whether there's perhaps some reasons to be lenient to the defendant or some reasons to impose the death penalty and to do this kind of individual weighing process and as a group make a decision -- ultimately individually make a decision, and then the group decision would reflect it in the verdict.  That's the way the system's set up.  You understand that that would be your role as a juror in the penalty phase if you got to that point?

A.    Yes.

Q.    Now, candidly, some people come in here when we're talking to them as potential jurors and they say, You know what?  I can't do that weighing process.  You know, from what I know about this case, you know, the killing of children, I don't care what the judge instructs me as to what my duties are as a juror; I just can't do it; that influences me too much, and I just can't be fair; I can't really consider both possible punishments.  I just -- it would automatically be the death penalty for me.

Other jurors, despite being upset about children or

3452

the facts of the case, can come in and say, I can weigh -- I can do this weighing process, and I'm open that perhaps either penalty might be appropriate in this case.  Can you share with
Page 106

us what your thoughts are?

A. I -- I want to say that I'm a judgmental person, but yet I can have an open mind in different situations. I guess the fact that like you said earlier, the role that we're going to do here is to see if Angela Johnson was involved, I could have more of an open mind towards that.

Q. And let's talk about that for a minute. Can you imagine that maybe the degree of her involvement in this crime might be something you'd want to take into account in determining what kind of punishment's appropriate in the case? In other words, if she was, you know, really involved a lot in it, maybe not so lenient, but if she wasn't very involved at all in it, maybe she deserves some leniency? Does that make sense that her role in the offense might be something you'd want to take into account in determining death penalty or life in prison?

A. Yes.

Q. And is that something you'd be willing to take into account?

A. Yes.

Q. Can you imagine there might be other factors? Maybe this is the first time she'd ever been in trouble with the law, or maybe she had some background problems growing up or something

3453

like that. Now, as the judge said, you can put whatever weight you want to to the different factors that may be presented, but at some point the judge is going to instruct the jury these are, if you find them, mitigating factors that you are to consider. The weight you give to any one of those factors is completely up to you individually to make. But you have to be willing to consider them. And by consider, means realistically look at

Page 107

them and think about whether that might impact whether the death penalty or life in prison's appropriate.

MR. MILLER: Two minutes.

Q. Could you follow an instruction like that?

A. Yes.

Q. In the questionnaire when we got to the issue of the death penalty, you said an eye for an eye, and you said for you to take someone's life, I feel you have no right to live yourself, and yet when we got to the life in prison, you said -- what do you think about that, and you said, Whatever works, and then is life in prison sufficiently severe penalty for intentional and premeditated first-degree murder, and you said yes in this case. Are you open to the idea that in this case either possible punishment might be appropriate, death penalty or life in prison?

A. Yes.

Q. Would you be willing to engage in that weighing process as the judge described it and keep an open mind that despite how

3454

ever much facts you might pile up concerning the crime itself that there may be other factors present in the circumstances of the crime or in the defendant's background or something that may call for less than the death penalty? Are you open to the idea that maybe life in prison is appropriately severe punishment in this case?

A. Yes.

Q. If you got to the point where you and the other jurors decided after doing this individual weighing that the death penalty was called for, you've talked, you've looked at the evidence, you've weighed all the factors both for leniency and

Page 108

for the death penalty, and you've come to a conclusion the death penalty's called for and you've talked with your other jurors and all the rest of them have agreed with you, to reflect that verdict, you would ultimately have to sign a verdict form indicating your verdict that would have the practical effect of causing the death of another human being.  Some people, when you put it in those terms, say, Hey, can't do that.  Other people can look inside themselves and determine that if they thought that was the appropriate punishment they could do that.  How about you, ma'am?

A.    Yes, I feel if it was an appropriate punishment, yes.

MR. WILLIAMS:  Thank you for your time.

PROSPECTIVE JUROR 23:  Uh-huh.

THE COURT:  Mr. Berrigan?

3455

                          EXAMINATION

BY MR. BERRIGAN:

Q.    Not so bad so far, is it?

A.    I'm calming down a little bit.

Q.    I bet you've had worse trips to the dentist.  Come on.

A.    Well, no, not really.

Q.    I want to revisit with you a couple of areas that we've already talked about just to see -- to be clear; okay?

A.    Okay.

Q.    One thing that you mentioned to Mr. Willett during his questioning struck me, and I want to go back to it for just a second.  You said at one point, I'm a firm believer you are who you hang out with.  If she knew he was doing these things, then she's guilty by association.  Does that sound right?

A.    That is correct.

Page 109

Q. And then he had asked you something about -- and this isn't verbatim; I can't write as fast as Shelly can type -- but something about if she didn't testify, is that going to fan the flames of those feelings, that is, this problem with her not getting on the stand exacerbate the problems you already had with this association, and you said yes to that, and then you brought up the children. And I wanted to revisit that with you.

A. Certainly.

Q. What did you mean when you were talking about, you know, this guilt by association? What does that mean?

3456

A. I feel you have a choice in life in who you can hang out with and who -- how should I explain this? Like if I feel if you want to hang out with people that do drugs, that's your choice to do that, and you put your life in that association. If you don't want to be known as hanging out with that type of people, then you have a choice of not to do that.

Q. And how does that apply to this situation?

A. I guess I feel that Angela had the choice. Obviously she was aware of what Dustin was involved with, and if she didn't want to be involved with that, she could have left.

Q. Okay. And if she was obviously aware of that and she could have left, what does that mean to you?

A. That she would have made a choice that she didn't want to be involved with those -- that type of lifestyle or association with those type of people.

Q. That would be one alternative. She'd have to get away from that or get out.

A. Correct.

Q. And your perception of things based on the answer to

Page 110

Mr. Willett is that that didn't happen.

A.    Correct.

Q.    Okay.  And you mention it in your questionnaire.  There's a question that says, How do you feel about the proposition that a defendant is presumed to be innocent of the charges against her, a presumption that can be overcome only if the government is

3457

able to prove guilt to each juror unanimously and beyond a reasonable doubt?  And you said you were not sure about that. And I wanted to ask you about that too.  What were you unsure about?

A.    I guess there's so many things going through your mind when you're going through that questionnaire just like today we've digested so much info.  I guess the fact that you need to hear the prosecution side and the defense side.  She may -- or the defense may have something to say to, you know, defend towards her I guess.

Q.    Sure.  Well, here's the situation.  The judge kind of alluded to that this morning, and I'll tell you that he is extraordinarily good at getting people to answer questions and in my experience has frequently gotten people to say things that I could never in a million years could get them to say.   But this is an area that has caused some people some problems. Right now, right at this very moment, Angela Johnson is presumed to be innocent.  That's what the law says.  And if a person came in here and this was a bank robbery case or a drug case or something of that nature and you never heard anything about this case in your life, I dare say you'd say, Hey, no problem, Mr. Berrigan.  Hell, I don't know this person from Adam.

        But it doesn't seem like that's the case.  You're

Page 111

talking about this guilt by association; she made a choice; she didn't get out. She had a responsibility to do that. And this

3458

Q. is your feeling now. I mean, we haven't heard any evidence; right?

A. Correct.

Q. And so I need to ask you about that. I mean, you know, as has been mentioned, that presumption of innocence, it's an all-or-nothing kind of a deal. You either can do it or you can't. It's not I would sure try, do my best, you know, which is great in horseshoes and hand grenades but not here.

A. Right.

Q. And we have to rely on people to tell us the truth about these things. Just like the judge said, it's open and honest. Sometimes you have a duty not to serve. And I'm concerned, to be honest with you, and you can understand why I would be.

A. Yes.

Q. You're telling me, Hey, look, I'm a firm believer who you hang out with. She knew he's doing these things. She didn't get out. She's guilty by association. That doesn't sound like the response of a person who would be able to give her a complete, full presumption of innocence and look her right in the eye and say, I think you're innocent. Do you hear where I'm coming from?

A. Yes.

Q. So what do you think? I mean, as you kind of analyze this in your heart of hearts, do you have some doubt about your own ability to look her in the eye and say, Hey, Miss Johnson, I

3459

Page 112

think you're 100 percent innocent?

A. I'm going to be honest with you. Yes, I do.

Q. Okay. And what do you view as the source of that problem? I shouldn't even say it's a problem because it's just like the judge said. I mean, we've had a lot of people tell us this is an issue. What's the source of that issue? What's the concern that you have yourself?

A. I guess the fact -- the way I look at it is that when I was younger, I hung out with inappropriate people as I would call it. In hanging out with those people, I found it was not acceptable and it was not the way of life I wanted, and I had that decision. I can continue to hang out with these people and live this lifestyle, or I can better myself.

Q. And you have made a decision to get out of that situation.

A. And better myself, yes.

Q. And this idea about guilty by association, I guess the underlying presumption there is that Mr. Honken committed these murders. At least that sort of sounds like it. Do you have some information about that from something you heard about the case?

A. No. Actually I hadn't even heard about the case until I was sent the information.

Q. Okay.

A. In the mail for the jury selection.

Q. Then the article about the makeup I guess.

3460

A. And the makeup, yes, and that was just flipping through the newspaper and came across that.

Q. But this idea that if she knew he was doing these things,

Page 113

are we talking about the murders of children? Is that what you're talking about?

A. I'm talking the fact of the drugs and yes, the murder, not just the children but of the family, the whole fact of what happened.

Q. You know, we ask people this question all the time, can you put that out of your mind as if it was a blackboard we're going to erase. But the truth is that that would be a concern we might have is that the judge would give you an instruction, look, she's entitled to the full presumption of innocence. You have to be able to do that in order to be a juror, you know, and she's entitled to that just like anybody else. Do you have some concern in your own mind that in this particular case that's something you might not be able to completely and utterly do?

A. Honestly, yes.

Q. Okay. I appreciate your candor about that, ma'am. Let me ask you questions about the death penalty very briefly. You said on your response to question 75 which is an open-ended question -- it says, What are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of intentional murder? And you said an eye for an eye, et cetera. And there actually was a question about an eye for an eye, but

3461

it comes later in the questionnaire.

A. Yeah, I remember that.

Q. Yeah. It's about like three later. It says, Do you believe in an eye for an eye? Yes, no, and you checked the yes box. But what I was really more interested in is the follow-up question to an eye for an eye question that you gave. It says, Why do you feel this way, or what are some of the reasons for

Page 114

your beliefs? And you said, For you to take someone's life, I feel you have no right to live yourself. And I wanted to explore that with you. Is that how you feel?

A.   Yeah, but knowing the fact now that Angela does have children of her own, I'd have an issue with feeling that that wouldn't be fair to the children.

Q.   Okay. One of the things that you mention in the questionnaire is an issue that might arise in this trial, and that has to do with a couple of things the prosecutor was talking about when he was discussing mitigating and aggravating circumstances, and I know that's a pretty confusing concept and you're hearing it for the first time today.

A.   Yes.

Q.   But one of the things that the defense has an opportunity to do is if we want, we can present evidence about Angela's background and ask the jury to take that into consideration in making an assessment about which punishment might be most appropriate; okay?

3462

A.   (Nodded head.)

Q.   And that would include things like childhood abuse, whether that be physical abuse or sexual abuse, neglect, psychological abuse. And some folks have said to us, Look, unless you can show that's like connected to the crime, that because of that she did that, some folks have said, Hey, look, you know, I appreciate that, but people make choices in life, and just because you've had an abused background, that's not going to be any reason for me to really give that consideration about sentencing.

A.   That's how I feel.

Page 115

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 3017 of 3245

Q. And I sort of gleaned that because there's a question about what do you think about abuse as a factor in punishment. It's question 87. The guilty person was mentally, emotionally, physically abused, neglected as a child, and you said, So was I, but I didn't grow up to do drugs and kill people. That's just an excuse. Is that how you feel?

A. Yes.

Q. Okay. So let me put this question to you then.

MR. STOWERS: Two minutes.

Q. It's not going to be offered as an excuse. I don't want to suggest to you for a moment that whatever background you have, whether that be a lack of prior criminal record or you were abused as a child, gives you any right to kill people; okay? We're on the same page there.

3463

A. Yes.

Q. But you're not being asked to assess that for that purpose. It's being put before you for purposes of punishment, okay, not are you guilty or not but is it proper to consider that in punishment; okay?

A. Okay.

Q. The law says the jurors can consider that type of stuff for punishment, and some folks say, Well, that's fine, but my own experience is that that doesn't count, and I'm not going to consider it as to punishment. And based on your answers, I was kind of wondering how you feel about that. Would you consider that type of evidence in your analysis in terms of the appropriate punishment or not?

A. Can you rephrase the question, please?

Q. Yeah, sure. That sexual abuse history from childhood,

Page 116

would you consider that as a mitigating factor in your assessment of what would be the appropriate punishment or not?

A.  No.

Q.  You would not.  Even if you were told you had to?

A.  Well, if you're told you have to.

Q.  Well, let me put it this way.  Even if you were told you had to, would it be difficult for you to give that meaningful consideration?

A.  Yes.

MR. BERRIGAN:  Okay.  Thank you, ma'am.

3464

PROSPECTIVE JUROR 23:  Thank you.

MR. BERRIGAN:  Appreciate your time.

THE COURT:  I just have a couple questions for you. You seem to kind of view everything through your own experience like because you had some friends and you were able to walk away from them, that means everybody else should be able to do it too.  Is that what you're telling us?

PROSPECTIVE JUROR 23:  I know each individual person has their own individual strength in life, but I feel it can be done.

THE COURT:  Okay.

PROSPECTIVE JUROR 23:  It may not be easy, but it can be done.

THE COURT:  Now, did you ever have any friends that you were talking about with -- who, for example, used drugs illegally?

PROSPECTIVE JUROR 23:  Yes.

THE COURT:  And did you know that they were using drugs illegally?

Page 117

PROSPECTIVE JUROR 23: Not right away.

THE COURT: But eventually you did.

PROSPECTIVE JUROR 23: Eventually I did, yes, and that's why I decided --

THE COURT: Now, I want to ask you a question about that. Did that make you guilty of anything?

3465

PROSPECTIVE JUROR 23: No.

THE COURT: Well, then why is it that you would say Angela Johnson's guilty of something if she knew Dustin Honken, for example, was doing something illegal?

PROSPECTIVE JUROR 23: The fact that she decided to stay. Like you asked the question did that make me guilty, well, I -- once I found out about those friends, I decided to disregard myself with them. I moved, did something -- I didn't want to be associated with that, so I left that situation where with her I guess I feel she stayed.

THE COURT: So that makes her guilty if she knew somebody else was doing something illegal.

PROSPECTIVE JUROR 23: I guess I don't want to say -- I know I say guilt by association, but I know -- I feel that it doesn't make her guilty, but I feel that she has a choice.

THE COURT: Well, I understand that, but what does a choice have to do with being able to give Angela Johnson the full benefit of the presumption of innocence?

PROSPECTIVE JUROR 23: I mean, you do have a point, yes. I guess I'm not sure how to answer that question.

THE COURT: Tell you what, why don't you step outside, and we'll let you know your status.

PROSPECTIVE JUROR 23: Okay.

Page 118

THE COURT: Okay? Thank you.

(Prospective Juror 23 exited the courtroom.)

3466

THE COURT: Government have a motion?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Yes, sir, the defense would move to strike Juror Number 23 for two reasons most prevalent. One is her concern that Miss Johnson must be guilty of something because she knew Dustin Honken was engaged in illegal activity, and I know she told you at one point --

THE COURT: Don't worry about it. I could have totally rehabilitated her, but I have no confidence --

MR. BERRIGAN: I have no doubt of that, sir.

THE COURT: And I have no confidence that she would be anything less but a totally judgmental juror incapable of giving the defendant the benefit of the presumption of innocence regardless of what words she mouthed to anybody. So I'm going to go ahead and sustain the objection. Let's bring her in.

(Prospective Juror 23 entered the courtroom.)

THE COURT: Ma'am, we're going to go ahead and excuse you as a juror in this case; okay? Thank you.

MR. BERRIGAN: Your Honor?

THE COURT: Well, I'm not going to.

MR. BERRIGAN: Admonition?

THE COURT: I don't think it's necessary. Thanks.

(Prospective Juror 23 exited the courtroom.)

THE COURT: Ready for Juror 9?

3467

Page 119

MR. WILLIAMS: Yes, Your Honor.

MR. BERRIGAN: Yes, sir.

(Prospective Juror 9 entered the courtroom.)

THE COURT: Juror 9, anywhere in the front row you'd like to sit would be fine. Thank you.

Please be seated, everybody.

We're going to start with Mr. Berrigan, and then we'll hear from Mr. Williams after Mr. Berrigan's done questioning you.

EXAMINATION

BY MR. BERRIGAN:

Q. Good morning, ma'am. How are you?

A. Good morning. I'm fine.

Q. I'm sure you're probably nervous, but this isn't going to be nearly as bad as you might imagine. We're really interested in just two areas --

A. Okay.

Q. -- primarily in this questioning process. One has to do with your exposure to pretrial publicity, and by that I mean media coverage typically, newspaper, radio, television, or sometimes, you know, word of mouth, conversations you might have overheard about the case before today; okay?

A. Okay.

Q. And then the other area we'll cover in a minute has to do with two potential punishments that could be in play in this

3468

case if the government were able to prove its case beyond a reasonable doubt; okay?

A. Okay.

Q. And, of course, we have the benefit of your questionnaire.

Page 120

We know it was long, it took a long time. And on behalf of the parties and the Court, thank you for doing that for us. Your questionnaire indicated you had only just heard about the case. I remember Dustin Honken's name, maybe would recall a picture. I read the Sioux City Journal and recall this was in the paper but never really read any of it. Also know two children were killed, and that always hits me since I have children that age at home. We're going to chat with you about that as well.

A.   Okay.

Q.   Have you heard anything else about the case since you filled out the questionnaire?

A.   No, I have not.

Q.   Okay. And you indicated that the information you had gotten was primarily from radio and television, and -- I'm sorry, newspaper and television.

A.   Newspaper, yes.

Q.   And was the Sioux City Journal the only paper that you read?

A.   Yes, that's the only paper we get.

Q.   You got a regular subscription?

A.   A daily, yes.

3469

Q.   Daily.

A.   Uh-huh.

Q.   Mr. Honken's case, our recollection is that it was in the paper quite a lot last fall, kind of late last summer, last fall, but I'm hearing you say you didn't really follow it all that closely.

A.   I did not.

Q.   And then you said you had no opinion about the guilt or

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3023 of 3245

innocence of Angela Johnson and until now didn't even know there was an Angela Johnson.

A.   That's true.

Q.   Okay.  Now obviously you can see her and you see who she is.

A.   Yes.

Q.   So I'm presuming but you tell us is there anything about the media attention, the stuff that you read that would cause you any difficulty sitting as a fair and impartial juror in this case?

A.   No.

Q.   It is important that you be able to keep out separate what might have been in the paper.  And I understand right now that you don't recall hardly much --

A.   I really do not, no.

Q.   I'll tell you, sometimes what happens is people will hear the evidence as they're sitting as jurors and they'll say, Oh, I

3470

remember that now.  We get jogged which is okay, but the big deal is that even if that were to happen, that can't be any evidence that you would consider or discuss with other jurors. Do you know what I mean?

A.   Yes, I do.

Q.   Do you think that's fair?

A.   Yes.

Q.   And then we have this issue regarding punishment.  And one way I've asked folks this question is this way, that if you and I had known each other a long time and I lived in Orange City, Iowa, and we were chatting one morning at a coffee shop and there was an article that Iowa's bringing back the death

Page 122

penalty, there's something about that, and I turned to you over coffee and said, Juror Number 9, what do you think about the death penalty; we've never really talked about that, what would you tell me?

A.   You know, I've thought about that, you know, and that's a really difficult question, and, you know, and I've been searching my heart because I thought, I wonder if that might be a question, and I cannot honestly say yes, I believe in it or no.

Q.   Well, that's okay.  This is just like the judge said earlier.  You are not the first person to tell us that.  I mean, many folks go through their whole lives and never have to really address this issue.  You know, it just isn't relevant to their

3471

day-to-day existence.  And now all of a sudden we drag you in here and say, Hey, you know, what do you think about this?  What the law says is that jurors sitting on this case have to be able to consider both of those alternatives --

A.   Yes.

Q.   -- as appropriate in certain circumstances; okay?

A.   Uh-huh.

Q.   And so it's quite a process as the judge mentioned this morning.

A.   Yes.

Q.   It's just not, you know, I listen to the evidence and then we decide.

A.   Right.

Q.   It's this three stages, and the first stage is probably like any other trial you've ever watched on television.  The government's made these allegations.  They say, Hey, this woman

is charged with participating, aiding and abetting, aiding and abetting, in the intentional murders of five people.  That's the allegation.  They have ten charges because they've charged it two different ways, that these were killed -- these folks were killed during the commission of a drug conspiracy and a continuing criminal enterprise which is kind of like a drug organization.  But there are five people that are dead.  If the government were able to prove that beyond a reasonable doubt, then we'd be in this middle stage of the proceedings or kind of

3472

the halftime of the basketball game.

A.    Okay.

Q.    The gateway part of the trial.  And the judge at that point would present the jurors with these legal issues, specific questions, have these things been proven, and you wouldn't hear additional evidence, but you'd have to deliberate with your fellow jurors.  The lawyers would have a chance to make argument on this issue, and you'd have to decide, well, are these factors present beyond a reasonable doubt; okay?

A.    Okay.

Q.    We're not expecting that process to last too long because there's not going to be more evidence, so we don't know how long it's going to take but probably not that long, but it was if only we got through that part, the gateway halftime part, do we get into this penalty part of the trial; okay?

A.    Okay.

Q.    And at that point now we're in the second half, and I don't want to suggest to you that we're going to get there.

A.    Okay.

Q.    The defense team is going to, you know, do our best to

Page 124

zealously represent Angela Johnson, and we're going to be advocating a position that the government hasn't met their burden of proof; okay?

A.    Uh-huh.

Q.    But we have to anticipate the possibility we're only going

3473

to have a chance to ask you questions this one time which I'm sure you're happy about.

A.    Right, right.

Q.    So we have to ask people questions about the potential punishments; okay?  So let's put ourselves -- kind of fast forward, if you will.  Just for purposes of this questioning we're going to be in this third part of the trial; right?  And then what happens is the government's going to present evidence, and they may have already done this.  They're going to present evidence that there are aggravating factors which is kind of a term that says these factors are things to be considered towards the death penalty; okay?

A.    Okay.

Q.    And here they have at least two, they may have more, but they are alleging that the murders were committed after premeditation and substantial planning.  And they're alleging that the murders include, these five, a mother and her two children, ten- and six-year-old little girls, Kandi and Amber Duncan, and the government alleges they're particularly vulnerable victims because of their age; okay?

A.    Uh-huh.

Q.    And those would be factors that the jurors might weigh on the aggravation part of a scale.  And if you could picture Lady Justice, the blindfolded Lady Justice holding the scale, it's

Page 125

not unlike that; okay?  That's the government's side, and they

3474

may have more or less.  We don't know what's going to happen.
The defense has an opportunity -- we don't have to, but we have
an opportunity to present mitigating factors, things that we
think might be reasons to vote for life; okay?

A.    Okay.

Q.    One might be that Angela Johnson doesn't have any criminal
history, no substantial criminal history at all.

A.    And is that a fact?

Q.    Well, that's something we'd have to prove; okay?

A.    Okay.  That's what you're saying?

Q.    Yeah.  For purposes of our discussion -- you haven't heard
any evidence, and we're artificially asking you to jump ahead
like you have.

A.    Okay.

Q.    No, we'd have to show that.

A.    Okay.

Q.    There is one important caveat to that that is important.
The government has to show their factors beyond a reasonable
doubt.  They have to prove them, and they have to prove them to
all 12 of the jurors.

A.    Uh-huh.

Q.    The defense, we don't have that obligation.  We only have
to show our factors to a preponderance of the evidence which is
more likely true than not; okay?  And the jurors don't have to
agree on our factors.  So if you found no substantial criminal

3475

Page 126

history, you could take that into account as a mitigating factor; okay?

A. Okay.

Q. We might present evidence that Miss Johnson's role in this offense was reduced or minor compared to other people that were involved; all right?

A. Okay.

Q. We might ask you to take that into account as well. We might have evidence that she suffered from a very abusive background as a child, physical, sexual abuse. And we might ask you to take that into account. I'm out of props, so you'll have to imagine that box there. But then it's a weighing process; okay?

A. Uh-huh.

Q. And the thing is that's really different than the other part of the trial because you have to do it yourself. Each juror has to engage in this weighing. And then they have to reach a decision. If the aggravating circumstances in their view outweigh the mitigating circumstances, then the death penalty has to be a punishment they'd be willing to consider. And they're never told you ever have to give the death penalty; okay? The judge will tell you you're never obligated to do that. If the mitigating circumstances outweigh the aggravating circumstances for you as a juror, then life in prison would be the punishment you'd be obligated to consider. Are you with me?

3476

A. Yes.

Q. As the judge mentioned earlier, the jurors don't have to agree in this weighing process because you're each doing it yourself.

Page 127

A. Okay.

Q. So if one or two jurors decided the mitigating circumstances outweigh the aggravating circumstances and they said life, that is a life. That's a decision for the whole jury.

A. Okay.

Q. That's life. It's only if all 12 of the jurors, when they do this weighing in their hearts and consciences, make a decision -- if they all 12 said the death penalty, then that's the death penalty.

A. Okay.

Q. And the judge has to impose that. He has no discretion about that. Some people seem to think he can override the decision, and he cannot; okay?

A. Uh-huh.

Q. You with me?

A. Yes.

Q. So having that explanation, we need to know whether your views about the death penalty and life imprisonment are such that you couldn't engage in the process or you couldn't consider both punishments as in your view appropriate options even for a

3477

crime such as this, the five intentional, premeditated murders involving children; okay?

A. So the question is could I look at both views? Yes, I could.

Q. And consider both punishments, fairly consider them.

A. Yes.

Q. When we say fairly consider, we don't mean like a wink and a nod and I'm going one way or the other.

Page 128

A.   I'm hoping you're saying that, yes.

Q.   We mean it truthfully, I would really look at both.

A.   Yes.

Q.   Let me tell you one other thing that happens is if you were a juror and you did that process and you came to a decision, whatever it was, you have the right to be a hundred percent confident in your decision because you're going to live with that the rest of your life; right?

A.   Right, right.

Q.   That doesn't mean that you can force the government to a higher burden of proof than what they have which is proof beyond a reasonable doubt.  All these things that they have to prove, that's what they have to prove them, beyond a reasonable doubt. Does that make sense?

A.   Yes.

Q.   The other thing is that you have to sign a form once you make your decision, after everybody's made their decision, and

3478

that form is going to reflect your verdict be it life or death; okay?

A.   Uh-huh.

Q.   We've had some folks tell us, Look, I'm sort of okay with it up until the point where I gotta tell you what I decided, and then they tell us, I don't think I could do that.  They particularly have problems with death, that if -- well, if I actually had to sign a form that said I had made that decision about death, I'm not sure I could do that; okay?  And the law requires that they do, and the judge in every case has people sign their jury verdict form, but here it's required.  If you went for life, you'd have to sign a verdict form that said life.

Page 129

If you went for death, you'd have to sign a verdict form that said death; okay?

A. I understand.

Q. Okay. And obviously that's a pretty serious decision; right?

A. Yes.

Q. We expect that would be hard; okay? None of us ever have. The lawyers, even the judge, we've never been in that position, and we never will be. In our whole lives we're never going to be where you are probably. So the magnitude of that decision's never going to be one we're going to have to address. But we recognize how hard it could be for anybody to make that determination. It's an issue -- the issue is can you do it;

3479

okay? Could you do it?

A. Like you said, it would be extremely difficult and would not be taken lightly.

Q. And we're not asking you how you'd vote; okay? Let's be clear because --

A. I think yes, I could sign that.

Q. Okay. Whichever decision you came to.

A. Yes.

Q. Okay. I want to address the thing with the kids briefly before I sit down. I think I have --

MR. STOWERS: Actually I think your time's up.

MR. BERRIGAN: Oh. I guess my time is up. My time keeper failed me, so I'm done. Thank you, ma'am.

PROSPECTIVE JUROR 9: Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

Page 130

BY MR. WILLIAMS:

Q. I was wondering if I was going to get up here. How you doing this afternoon?

A. It's morning yet.

Q. Morning, sorry, yes. It's afternoon to me. How you doing this morning?

A. Doing fine.

Q. Good. I'm not going to be long with you. I just want to

3480

talk to you, follow up on some of the questions Mr. Berrigan had on the possible penalties involved in this case, and he went through the process with you already on how this is going to work. Do you think you have a pretty good understanding of how the process would go if we got to that penalty phase?

A. I think it's becoming more clear.

Q. And it will become more and more clear if you're on the jury because the judge will give you instructions that will detail for you the job you have as a juror in doing this weighing process as Mr. Berrigan described it. One important thing for you to understand -- and I think Mr. Berrigan touched on it -- was that the weighing, how much weight you give to each of these factors, is completely up to the juror --

A. Right.

Q. -- to decide.

A. Okay.

Q. And can you imagine -- can you see yourself having a difference of opinion with other jurors back there that in one person's view this factor weighs a whole bunch but somebody else might think, oh, that doesn't really matter very much with me?

Page 131

Can you see that?

A. I can see that happening, yes.

Q. Let me ask you about your views on some of these factors. In this case the government has alleged that among the victims was a young mother and her two little daughters, Kandi, age ten,

3481

and Amber, age six. The government will assert that that is an aggravating factor on the children because of their vulnerable age. Now, we'll have to prove to you beyond a reasonable doubt their ages, and it will be up for the jury to decide whether that makes them vulnerable victims or not. But as a concept does that seem to you to make sense that that would be an aggravating factor pointing toward the death penalty being an appropriate punishment?

A. Yes.

Q. And let's go to some of the factors perhaps on the other side I think Mr. Berrigan touched with you about the role in the offense that a person might have. The defense might assert that the defendant's role was less than that of other participants I think is the way Mr. Berrigan brought it up. Does that make sense to you that might be a mitigating factor or factor suggesting more leniency than the death penalty?

A. Yes. I think I'm following you.

Q. Okay. And I'm just trying to explore some of these different factors with you. On this issue of aiding and abetting, you know, some jurors candidly say to us, If the government's only charged her with aiding and abetting, in other words, she didn't actually pull the trigger, in my view, death penalty is not appropriate for somebody in that role. The death penalty should be reserved only for the person who pulls the

Page 132

trigger. And if you're saying all she did was aid and abet in

3482

this case, there's no way I could realistically consider the death penalty as a possible punishment when you tell me that. Other jurors don't necessarily feel that way. And as the Court said, there's no right or wrong answers. We're just trying to explore with each individual juror what their views are of those things, and what do you think about that?

A. To say that the person was aiding and abetting and not actually the person that committed the crime?

Q. Right. Could you -- if those are the facts, if the evidence showed that she didn't actually pull the trigger on any of the victims, could you realistically consider the possibility of the death penalty under those circumstances, or in your mind would -- is the death penalty reserved for the person who actually pulls the trigger?

A. No, I would not say it was only reserved for the person who actually committed the crime.

Q. Okay. It'd be a factor you would take into account.

A. It'd be a factor I would take into consideration.

Q. And can you imagine a situation where sometimes perhaps the person who aided and abetted might be in some ways more responsible than the person who pulled the trigger? I mean, perhaps the person who pulled the trigger wouldn't have done it but for the other person encouraging them or aiding them.

A. I agree with that.

Q. And so you're willing, from what I understand, to look at

3483

all these different factors and to assign weight to them that
Page 133

you think's appropriate.

A. Yes, yes.

Q. All right. Last thing I'm going to talk to you about is something that Mr. Berrigan already covered, and I just want to touch base with you because your answers to the questionnaire gave me some pause for concern. And I just want to see where you're at on this. When asked about your thoughts on the death penalty on question 75, you said, Personally I go around and around on this myself. I believe the person deserves death for causing death. Yet as a Christian, I struggle with this. Is this really what God would want? Who am I to cause another person's death? Do you remember writing something along those lines?

A. Yes, I do.

Q. And that's a response we get fairly regularly in here, and we always want to explore that a little bit. I have a very good friend I work with, another prosecutor, and he believes in the death penalty in the sense that he believes it's appropriate to be out there. He believes it's an appropriate punishment in some cases but because of his own personal belief system knows he could never impose the death penalty on another person. He knows it's something he'd have to live with for the rest of his life. He knows it's something that just goes against his personal belief system. As much as he thinks it's in concept a

3484

good thing to have the death penalty, he knows he could never actually serve on a jury, he could never impose the death penalty on another person.

Everybody's entitled to their views. We're just trying to explore with each juror the extent to which their

Page 134

personal belief systems might interfere with their ability to realistically consider the death penalty, not just as a concept but as a reality in this case. Can you share with us your thoughts on that?

A. I know what your question is. And I've given that a lot of thought. And as difficult as it would probably -- it would be if that would be, you know, a decision that would be made, I think I could -- you know, if it was the death penalty and we had a -- we don't have to, but if it is to sign a name, I would be able to sign my name.

Q. And --

A. And I don't -- I would know in my heart and have the peace of that conviction before that that's what I -- my spirit was letting me -- was saying that I would go with that.

Q. And we would expect it to be a hard decision as it should be; wouldn't you agree with that?

A. Definitely.

Q. Yes. And no one would ever suggest otherwise. It's -- what I hear from you is that in the appropriate case if you thought it was appropriate you feel confident in your own

3485

ability to impose the death penalty if you thought that was the penalty that was called for.

A. I hate to say yes, but that's what my heart says is yes.

Q. Sure.

A. If that makes sense.

Q. No, it does. It does very much.

MR. WILLIAMS: Thank you very much for your time.

PROSPECTIVE JUROR 9: Thank you.

THE COURT: Juror Number 9, if you'd just step

Page 135

outside, we'll let you know your status in a minute or so. Thank you.

(Prospective Juror 9 exited the courtroom.)

THE COURT: Mr. Berrigan, any challenge for cause?

MR. BERRIGAN: No, sir.

THE COURT: Mr. Williams, any challenge for cause?

MR. WILLIAMS: No, Your Honor.

THE COURT: Any -- how many peremptory strikes do you have left?

MR. WILLIAMS: We have two left, Your Honor.

THE COURT: Okay. Are you going to exercise one?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Juror Number 9 -- just one second. So I'm telling her she is on the jury and to report at eight o'clock Wednesday morning.

MR. WILLIAMS: That's correct.

3486

MR. STOWERS: Right.

(Prospective Juror 9 entered the courtroom.)

THE COURT: Juror Number 9, you're on our jury, so we'll see you this Wednesday, two days from now, asking you to report at 8:00, and we'll get started at 8:30. And I want to emphasize my cautionary instruction this morning about not reading anything in the newspapers about this case, not listening to any radio or television reports about this case. Don't talk to anybody about this case. Don't let anybody talk to you about this case. Don't do any independent research on your own about this case. And we will see you at 8:30, but you're to report at 8:00 along with the other jurors who've been selected; okay?

Page 136

PROSPECTIVE JUROR 9: Okay.

THE COURT: Okay. Good luck to you. Thank you.

(Prospective Juror 9 exited the courtroom.)

THE COURT: Okay. Through the wonders of e-mail, I've been notified that our juror got here early and is patiently waiting. It's Juror 621. So we'll bring Juror 621 in. I'll question Juror 621, and then I'll have a sidebar if there's some area the parties want me to pursue. I think he's just outside the courtroom. Carey will go find Juror 621. He's not down in the jury room. I didn't want to mix them.

(Prospective Juror 621 entered the courtroom.)

THE COURT: Please be seated. And Rick will hand you

3487

the microphone. Juror 621, thank you so much for coming in today. Sorry about the inconvenience. I just want to review for you what happened. I received an e-mail at 4:23 on Friday from my law clerk who had talked to our jury clerk, Suzanne, and Suzanne was the one responsible for calling everybody to let them know that we're starting the trial on Wednesday.

And in the course of that conversation between you and Suzanne, Suzanne then reported to Carey who then reported it to me that you wanted us to be aware of the fact that your father is presently involved in some civil litigation, docket number 04-4089 because we looked it up, and that matter is pending not only in this court but I'm the judge assigned to it, and there's what's called a motion to dismiss which has been filed by the defense that is now ripe. Is that the information you told Suzanne Carlson essentially?

PROSPECTIVE JUROR 621: That's correct.

THE COURT: Okay. Now, what I want to know is do you
Page 137

think that would have any effect on your ability to be a juror in this case?

PROSPECTIVE JUROR 621: No, no, it doesn't have any effect on my ability. I just -- you know, you hear of people getting -- if all of a sudden there was a verdict and they found something with the jury, things more minor than that things have gotten reversed, and nobody asked me the question, you know, about --

3488

THE COURT: Nobody did.

PROSPECTIVE JUROR 621: No.

THE COURT: In a questionnaire with 91 questions or whatever, and I don't think anybody asked you a question like that.

PROSPECTIVE JUROR 621: They asked if I knew any other witnesses or any of the attorneys. Nobody asked me if I knew you. All the attorneys just say just answer the questions you get asked. Don't volunteer any information. And I just didn't think I would get picked. But now that I have been, I want everybody to know that this is out there, and I don't want any influence -- or not influence, but I don't want anything that would jeopardize my father's case.

THE COURT: Correct. Now, I don't think there's any potential for that, but out of abundance of caution, I'm probably -- I'm the chief judge of the district, so I -- one of the few powers I actually have other than the power of persuasion but a statutory power that I have is to reassign any case that I want to any other judge, and so just to make sure that there's no problem that anybody could ever second guess down the road, I am going to reassign that case to another

Page 138

judge.

PROSPECTIVE JUROR 621: Okay. We don't really want that.

THE COURT: Oh, it will be a lot smarter judge. How's

3489

that?

PROSPECTIVE JUROR 621: I guess I just didn't want anything to get messed up on his stuff.

THE COURT: No, nothing will be messed up. And I just think to avoid any potential problem I'm going to reassign it to another judge. And it will be a superb judge. And I'm probably not going to assign it to one of our judges in this district, probably going to assign it to a judge outside our district.

PROSPECTIVE JUROR 621: Even though we started everything?

THE COURT: No, it will be here. The case will remain here. The case will remain here, but we'll just bring in a judge from outside the district, and that's done on occasion. That's not all that unusual. But you let me worry about that.

PROSPECTIVE JUROR 621: Okay.

THE COURT: I guarantee you it will be a judge -- it's so easy to find a judge smarter than I am, it just won't be a struggle at all. And I just wanted to make sure that you don't think this is going to be a potential problem.

PROSPECTIVE JUROR 621: No.

THE COURT: Okay. Anything else you'd like to add about it?

PROSPECTIVE JUROR 621: I'm a very busy guy.

THE COURT: I know that. We know that. And we know it's going to be a big sacrifice for you.

PROSPECTIVE JUROR 621:  Okay.  All right.

THE COURT:  Let me just talk to the lawyers for a second.

PROSPECTIVE JUROR 621:  Sure.

THE COURT:  And I'll get back with you.  Thank you. You can just step out for a minute.  We'll get you back in.

(Prospective Juror 621 exited the courtroom.)

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  I think the questioning's sufficient. I just wanted to maybe ask you if you're willing to ask him one more thing, and that is given your proposal does that seem acceptable to him.  He did voice some concern that you being off the case -- maybe I took it this way -- he wasn't too crazy about that idea, and he didn't elaborate, Your Honor, and he seemed okay with it, frankly, when you told him he didn't say anything.

THE COURT:  Yeah, I don't think he's thrilled about it, and it'd be pure speculation, but I have a reputation in complex cases of getting to the nut of the matter quickly and keeping the case moving.

MR. BERRIGAN:  Sure.

THE COURT:  And that would be my guess as to that's why lawyers like me in complex cases.

MR. BERRIGAN:  I wasn't arguing the merits of his position.

THE COURT:  No, I understand, but that's pure

Page 140

speculation.

MR. BERRIGAN: Right.

THE COURT: Now --

MR. BERRIGAN: And I don't know that there's anything else we can do for him, frankly. I think that's a perfectly reasonable solution, what the Court's proposed, and he hasn't voiced any objection to it. I was just wondering if -- and I don't know that his input makes any difference, frankly.

THE COURT: The only thing that -- and this is a double-edged sword -- would be to tell him that after the case is over I could reassign it back to myself without making any promise to do it.

MR. BERRIGAN: Yeah, I don't think -- I certainly don't think we could do that because then it sort of negates the entire change in circumstance. I think our goal is that he not be concerned that one case is going to affect the other. He voiced that himself.

THE COURT: Yeah. So you want me to -- well, what if he comes back and says, you know, I'd rather not be on the jury and have you sit on my father's case?

MR. BERRIGAN: Well, maybe you could just preface the question with we'd really like you to sit on this jury. I've given you our proposal, and if you have any serious problems with it, this would be your chance to voice those. Otherwise

3492

that's what we're going to do. And if he has no real serious concerns, we're perfectly happy with it. I just don't have a sense of where he stands after the proposal.

THE COURT: Okay. What's government's position?

MR. MILLER: Your Honor, I think the only question is

Page 141

whether or not he's impaired. He's obviously not impaired. I do think -- and I agree with Mr. Berrigan to this point -- that his concern about a change of judge may be some legitimate concern about his father, and I think it would be appropriate for the Court to assure him that that procedure would not cause any delay in his father's litigation.

THE COURT: Yeah. Okay.

MR. MILLER: I'm not suggesting any additional questioning.

THE COURT: Okay. Let's bring him back in.

(Prospective Juror 621 entered the courtroom.)

THE COURT: If you'd just have a seat for a moment, please, Juror 621, I really think the best thing to do under the circumstances is to reassign the case to a judge from another district.

PROSPECTIVE JUROR 621: Okay.

THE COURT: And it will probably be a judge from Des Moines which is in the Southern District of Iowa.

PROSPECTIVE JUROR 621: Okay.

THE COURT: And I just want to make sure that you're

3493

comfortable with that decision. It won't -- and let me add this. It will be a judge who -- it won't cause any delay in the case.

PROSPECTIVE JUROR 621: Okay.

THE COURT: That's one thing that I would absolutely insist on, that there be no delay because of a change of judge. And I get -- I pick up cases from other judges on a -- I wouldn't say on a regular basis but fairly often. I picked up a dozen class action lawsuits that I'm going to be involved in for

Page 142

the next decade of my life because another judge's spouse had some stock in one of the corporations, and so I took on all of those cases, and we just kind of trade back and forth when the need arises, so that's really nothing unusual about that.

PROSPECTIVE JUROR 621: Okay.

THE COURT: I just want to make sure you're comfortable with it.

PROSPECTIVE JUROR 621: That's gotta be answered by our attorney.

THE COURT: Well, let me ask it this way. I mean, I have a right to reassign any case I'm on for any reason or for no reason at any time. I just want you to know I do have that right.

PROSPECTIVE JUROR 621: Sure.

THE COURT: And what I guess I'm wanting to find out is not so much what your -- will the lawyers for your father and

3494

his business prefer me or some other judge, but will the fact that I'm going to transfer the case to another judge affect your ability to serve as a juror in this case in any way?

PROSPECTIVE JUROR 621: No. That's not going to do that. I just have more -- my priorities are my father.

THE COURT: Well, I understand that.

PROSPECTIVE JUROR 621: His case. So I just want to make sure everything's okay with that.

THE COURT: Yeah.

PROSPECTIVE JUROR 621: And, you know, we just -- our attorneys said we were fortunate to get Judge Bennett on this case and everything.

THE COURT: Well, you've heard this phrase you

Page 143

shouldn't believe everything the lawyers tell you. Haven't you heard that before?

PROSPECTIVE JUROR 621: Oh, yeah.

THE COURT: Well, that's very kind of them to say that, but there's an equal number who would say just the opposite I'm sure.

PROSPECTIVE JUROR 621: Sure.

THE COURT: But right now I'm not worried about your father's case because I know it will be handled efficiently and fairly by another judge. And believe me, there's lots of judges I wouldn't ask to sit on a complex case like that.

PROSPECTIVE JUROR 621: Yeah.

3495

THE COURT: There are other judges who I know by virtue of experience and background and training, and I've known all of the federal judges in the Southern District for more than 25 years, so I have great faith in each of them.

PROSPECTIVE JUROR 621: All right.

THE COURT: But, you know, it may be that your father's lawyers aren't the happiest with the situation, but we don't know that. We won't know that. There isn't time to figure that out. I'm just concerned about whether a change in judges in your father's case would in any way affect your ability to be the best juror you can be in this case.

PROSPECTIVE JUROR 621: No.

THE COURT: Okay. Is there any other follow-up questions the lawyers would like me to ask?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. We will see you at eight o'clock

Page 144

Wednesday morning.

PROSPECTIVE JUROR 621: Okay.

THE COURT: We're asking the jurors to assemble at 8:00. We'll actually start trial at 8:30 Wednesday morning.

PROSPECTIVE JUROR 621: All right.

THE COURT: Thank you very much for raising it, and sorry to drag you back down here one extra time.

PROSPECTIVE JUROR 621: That's all right.

3496

THE COURT: Thank you.

(Prospective Juror 621 exited the courtroom.)

THE COURT: Okay. Please be seated. We now have four alternates?

MR. BERRIGAN: Yes, sir.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. And we still have one, two, three, four, five, six to go today. Is the feeling that if we reach our six today we'll call off jury selection tomorrow? I mean, there's no point to it, is there?

MR. BERRIGAN: That's right, sir.

MR. WILLIAMS: That's correct.

THE COURT: And we can spare the 80-year-old woman from coming in.

MR. BERRIGAN: Yeah, we'd like to quit as soon as we hit number 6 today, frankly.

THE COURT: Right. There's no point in going on beyond that, is there?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. If we hit number 6 today, we'll quit.

Page 145

MR. BERRIGAN: If we do, right.

THE COURT: That's one of the first things we'll agree on today. We'll see you at one.

MR. BERRIGAN: Your Honor, now that we've talked to

3497

621, did you want to put that to bed, or have you?

THE COURT: I have.

MR. BERRIGAN: I don't have any motion for cause. I didn't know if you were going to ask us for cause or not. There's nothing about his responses that in any way indicate he'd have a problem being a juror.

THE COURT: I should have asked. I assumed it. I also assumed you wouldn't be shy if you thought there was a motion for cause.

MR. BERRIGAN: That's right.

THE COURT: Would that be a good assumption on my behalf?

MR. BERRIGAN: That's right, sir.

THE COURT: So the defense has no challenge for cause for Juror 621.

MR. BERRIGAN: That's correct, sir.

MR. WILLIAMS: Nor does the government.

THE COURT: Anything else we have to take up?

MR. BERRIGAN: No, Your Honor.

MR. WILLIAMS: No.

MR. WILLETT: Your Honor, are we resuming at one?

THE COURT: At one. Thanks.

(Lunch recess at 12:03 p.m.)

THE COURT: 214 is next?

MR. WILLIAMS: Yes, Your Honor.

Page 146

MR. BERRIGAN:  Yes, sir.

THE COURT:  Okay.

(Prospective Juror 214 entered the courtroom.)

THE COURT:  Sir, anywhere in the front row you feel comfortable.  Thank you.

Everybody please be seated.  And we're going to start with questions from Mr. Williams, and then we'll hear from Mr. Berrigan.

Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

EXAMINATION

BY MR. WILLIAMS:

Q.    Good afternoon, sir.

A.    Good afternoon.

Q.    Thank you for being patient with us.  Thank you also for filling out this questionnaire.  It actually speeds up the process quite a bit.  We know it was a laborious task.

What we're going to do is just talk with you about a couple issues here this afternoon and then send you on your way one way or the other.  The first one is publicity, what you may have heard about this case, how it might impact you, and then your views on the possible punishments that might come into play in this case, so let me just address the first one.

Publicity, at the time that you filled out the questionnaire, you indicated that you'd only just heard about

the case, and I think when asked to explain, you said, I haven't really heard anything more than what was written in the
Page 147

statement.  If there are more details, they've not come to mind at the time I filled this out, and you had never heard about who Angela Johnson is.  Does that all ring a bell with you that that's your answers at the time?

A.    That's correct.

Q.    Let me just ask you this.  Sometimes we run into this. Since the time the people filled out the questionnaires -- in your case you filled out the questionnaire back in January -- they've intentionally or unintentionally been exposed to additional media coverage about the case.  Has that happened with you, sir, at all?

A.    No, no, I haven't.

Q.    You indicated on the next page of the questionnaire that based on what you had heard through the media that you had no opinion about the defendant's guilt or innocence, and is that still the case today?

A.    That's correct.

Q.    Very good.  Let me just ask you a broad question.  In your view, anything you may have heard about this case through the media, do you think that's going to impact in any way upon your ability to give the defendant a fair trial in this case?

A.    No, it would not.

Q.    Let me just talk to you then about the possible

3500

punishments.  The judge explained this morning that in the event that the defendant's found guilty of one or more of the charges against her we could find ourselves in this third phase of the trial, the penalty phase, in which the two options would be death penalty and life in prison.  And I think it's probably a fair assumption with most of the jurors we brought in here that

Page 148

until they got this questionnaire they've never had to struggle with the idea of their thoughts on the death penalty, and is that fair to say that's where you're at?

A. I agree with that, yes.

Q. And you kind of gave us your thoughts at the time you filled this out on the death penalty. Have you thought about it since you filled out the questionnaire?

A. No, I haven't.

Q. So just generally what are your thoughts on the death penalty?

A. If the crime warrants the death penalty, then it should be applied.

Q. The judge explained this morning the process by which the jury will make that very determination, whether the crime in this case will warrant the death penalty. I don't know if you recall the judge this morning, he talked about some things. He talked about aggravating factors and mitigating factors and the weighing process and so forth. And let me just go back over and talk about those things for a little bit.

3501

If we get to the penalty phase, the government's going to be alleging that there are certain aggravating factors that exist among which is substantial planning and premeditation. In other words, this wasn't just a crime that occurred on the spur of the moment, but it was planned and thought out in advance and so forth. And we're going to assert that that's an aggravating factor. And it will be up to the jury to determine if we proved it. But we're going to be asserting that that's an aggravating factor. The fact that children were murdered we're going to assert is an aggravating factor. And there may be other

Page 149

aggravating factors we'll be asserting at the time.

Does -- that concept of aggravating that is something that are -- some facts about the case that the death penalty ought to be applied, does that make sense to you there may be factors like that that we would argue would be aggravating?

A. Yes, it does.

Q. On the converse of that, there may be mitigating factors. Now, the defense has no obligation to put on any evidence, not even in the penalty phase if we get there, but they could put on evidence of mitigating factors, things about the defendant's background, whether she has a criminal history, so forth. Or the jurors on their own may determine that there's something about the facts of the case itself, perhaps her role in the offense, that the jurors consider should weigh in favor of leniency given -- despite the facts of her involvement in the

3502

murders of five people including two kids. There are other facts that may suggest leniency might be appropriate for her. Does that make sense to you?

A. Yes, it does.

Q. Okay. And we would just refer to those generally as mitigating factors. The role of the jury's going to be to weigh all those things and to consider both aggravating factors and mitigating factors. Now, how much weight a juror determines to give any one of those factors is going to be completely up to the individual juror. And so one juror may think this factor weighs really heavily. Another one may think this factor weighs real heavily. What we're trying to figure out are jurors' ability to be open to weighing all those factors.

Some jurors' views on the death penalty are such that
Page 150

they know coming in here I just can't weigh all those factors. In my view one factor just takes the decision for me, makes it for me.  What are your thoughts on that?  Is there anything coming in here today that you think, boy, if this one fact is proven, it's either life in prison or it's the death penalty and I've kind of got my mind made up along those lines?

A.    I don't feel anything I know at this point would determine that.

Q.    Okay.  You know, the government's going to allege in this case that the defendant or does allege in this case that the defendant was involved in aiding and abetting the murder of five

3503

people including a young mother and her two little girls, Kandi, age ten and Amber, age six.  Do those facts alone by themselves in your view just automatically call for one penalty or the other?

A.    No.

Q.    The -- I indicated that the government's alleging that this defendant aided and abetted in the murders.  Now, some jurors candidly have the view, wait a second, if you're telling me she didn't actually pull the triggers on any of these murders that in my view the death penalty doesn't apply to somebody like that, the death penalty being as harsh as it is should only apply to the person who pulls the trigger and that I couldn't really consider the death penalty for somebody who didn't pull the trigger in the murders.  And some jurors have that view, and some don't.  What do you think about that?

A.    It depends on the person's role in the outcome of the situation I would say.

Q.    And what do you mean by that?

Page 151

A.   If the person helped orchestrate the whole incident, she's just as much to blame as anyone else, as the actual person that did the murder I would say if she helped orchestrate the final outcome.

Q.   So in your view aiding and abetting by itself isn't a cut-and-dried issue.  It really depends on how she aided and abetted.

3504

A.   Correct.

Q.   I see.  Let's imagine if you would that at some point in this case you were on this jury.  You've gone through the guilt phase.  We're at the penalty phase.  You've heard all the additional evidence.  You and the rest of the jurors have gone back, and you've looked at these factors, and you weighed all these things in your mind.  And you after doing that process conclude that the death penalty is the appropriate punishment in this case, and you talk to the rest of your jurors, and they all agree that the death penalty's appropriate.

In order to actually carry out that verdict, the Court will require every juror to sign their name to a verdict form, and if the choice is death penalty, by signing the verdict form, it has the real and practical effect of causing the execution of another human being.

Now, some people are comfortable with the concept of if I get to that point and I think that's the appropriate punishment I can do it, I can sign it, not that it's going to be an easy decision, but I can sign it if that's an appropriate punishment.

Other people when we put it in those terms say, Wait a second, if I'm actually going to cause the death of another

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 3054 of 3245

person, that bothers me to the point that at that point I really can't consider the death penalty if I'm going to be the one having to sign an execution basically.   Can you share with us

3505

what your thoughts are on that?

A.   If it's a unanimous decision, I believe I can sign that.

Q.   The decision in some sense is not going to be unanimous in this sense.   Each individual juror gets to decide on their own whether the death penalty's called for or not.   And only if all the jurors believe that the death penalty is called for does the death penalty become a reality at that point.   In other words, if 11 of the 12 jurors say death penalty but one juror says, No, life in prison is my vote and I've talked with you guys, we've talked it out, but I'm not going to change my mind, life in prison is my vote, then the verdict is life in prison, and there is no death penalty.   So in that sense it's kind of an individual decision too.

And that kind of weighs heavily with some people if they realize that, you know, what if I've gone around the room and everybody says death, death, death, death, death but I'm the last one and what I say could make the difference in the outcome of what happens in this case.

MR. MILLER:   Two minutes.

Q.   When you put it to me in those terms, I don't know if I'm comfortable if I could really do that or not, and what do you think about that?

A.   If that's the way I felt, that's the way I would sign it.

Q.   One of the things that you indicated in your questionnaire -- I just want to touch on this last subject.

3506

Page 153

Then I'll sit down.  You were asked a question on question 84, Do you think life in prison without the possibility of parole is severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder?  There's a box yes or no.  And you checked no, and you said, It depends on the brutality of the murder.  Torture, agonizing death caused by convicted should initiate a more severe punishment.  Do you recall writing something to that effect?

A.    Yes, I do.

Q.    And here's the concern obviously that that might raise is one of the two options here is life in prison.  The government's alleged intentional, premeditated murder in this case.  And if you have found that which by necessity you would have had to have if you ever got to the penalty point of this case, we might take a look at an answer like that and say he's rejected the idea of life in prison as a realistic possibility.  Can you respond to that?

A.    Life in prison -- I'm not exactly sure what you're asking me.

Q.    Well, my concern would be this, that when you said, No, I don't think life in prison is a sufficiently severe penalty for somebody convicted of premeditated murder, that's ultimately what you're going to have to have found for us to even get to the penalty phase, and so that could concern everybody in this room that this particular person may not be open to

3507

realistically considering life in prison as a possible punishment.  And that's what I'd like to have you respond to.

Page 154

Should anybody here be concerned that you're not going to be open to that idea?

A.   No, I would be open to life in prison if that's what the evidence presented.

MR. WILLIAMS:  Very good.  Thank you very much for your time.

THE COURT:  Mr. Berrigan?

EXAMINATION

BY MR. BERRIGAN:

Q.   It's not so bad, is it?

A.   No.

Q.   Good.  You're doing great so far.  I'm going to go back and touch on publicity only very briefly, and it's because of something that was near the end of the questionnaire, way near the end, question 102.  I bet you were beat up by then.  It says, Are you familiar with any of the above individuals?  And then there's the list of us, the lawyers and the judge, and then this list here.  I'm going to read it for you here real quick. Terry DeGeus, Amber Duncan, Kandi Duncan, Lori Duncan, Dustin Honken, Angela Johnson, Gregory Nicholson.  And you said, I've heard of the accused from TV reports and may know more than my current memory permits.  I tend to remember more details.  I think that says, As run over again or something to that effect.

3508

A.   Uh-huh.

Q.   And I wanted to know if that's happened.

A.   I don't recall any more from the time I filled the questionnaire out.

Q.   Let me tell you why this is important, Number 214, if you'll forgive me the numbers deal, and it's pretty obvious I

Page 155

think. The jurors who are going to sit on this case, they're going to have this kind of a decision to make, have to decide the case solely and completely from the evidence that's presented in this courtroom, and that means that witness stand right there and any exhibits or other evidence that you might be shown; okay?

A. Okay.

Q. It's critically important that they not rely on outside sources such as television and newspaper or any of that other stuff, even stuff they might have heard people talking about. And sometimes what happens, not always, but sometimes what happens in a case like this where there was sort of a lot of publicity for a period of time and then nothing for quite a while, there will be publicity again, of course, but you're going to be listening to the evidence in the courtroom, and a lot of this stuff might be similar to what you might have heard about a long time ago, months ago. And certainly some folks, they remember then. Oh, I do remember that now. It was in the Sioux City Journal, and I remember this, this, this, this.

3509

Well, we can't help that from happening obviously, but if it did happen, could you see how important it would be that that not enter the picture in terms of your decision about the case?

A. Yes, I do.

Q. Okay. And I mean if you were ever -- God forbid you were ever in a position where you were charged as a defendant, you'd want the people relying on solely the evidence presented in your case and not what some reporter said in the Sioux City Journal; right?

A. Yes, I would.

Page 156

Q. Okay. And that's a matter that TV coverage or newspaper, whatever it is, that really even shouldn't be discussed amongst the jurors when they're at the point of discussing what the evidence is. Would you agree with me?

A. I would agree.

Q. Okay. I want to put that to bed all together. And I want to come back to something the prosecutor finished with because I really think I did understand this question 84. It's a little tricky because it's -- let me read it to you. It says, Do you think that life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional and premeditated first-degree murder? And there were two boxes, a yes and a no, and you checked the no, and you said, It depends on the brutality of the murder. Torture, agonizing death caused by the convicted should initiate a more

3510

severe punishment. And first I guess a more severe punishment we're talking about is death; right?

A. Right.

Q. Okay. But the flip side of the coin is that life without parole, it is a punishment that's available for even intentional, premeditated murder; okay?

A. Okay.

Q. You with me?

A. Yep.

Q. Let me put this in context for you. The government has alleged that Angela Johnson aided and abetted in the commission of five intentional murders; okay? And they're going to try to prove that to the jury beyond a reasonable doubt. And that's what the first part of this trial's going to be all about, that

Page 157

first half of the basketball game the judge described. The defense is going to argue vigorously that that didn't happen; okay? And, of course, you haven't heard the facts yet. We recognize that. But we have to ask you to assume for purposes of the questioning about the penalty that you have heard the facts and you've made that decision. Otherwise we're not going to get to the penalty. You with me?

A. Yes.

Q. And I don't recollect. I think you haven't been on a jury before, but you know how it works on television. The jurors listen to all the evidence. They talk amongst themselves about,

3511

you know, what the facts are, and they come to a conclusion, has the government proven the case beyond a reasonable doubt? If so, as you pointed out earlier when you were asked, that's guilty. If not, not guilty; okay?

A. Okay.

Q. Before we can ever get to that penalty phase, that issue's been decided, five intentional murders, aided and abetted, guilty. All defenses have been rejected; okay? And then the government's going to attempt to prove that the murders were committed, as the prosecutor's mentioned, after substantial planning and premeditation; okay? They've also alleged as an aggravating factor a factor that the government would argue goes towards the death sentence that the murders were committed, these five murders, two of them involved two little girls, Kandi and Amber Duncan. They were ten and six years of age, and the government alleges they're vulnerable victims, particularly vulnerable victims, because of their age; okay?

A. Okay.

Page 158

Case 3:09-cv-03064-MWB-LTS  Document 284-70  Filed 06/23/11  Page 3060 of 3245

Q. And they're going to try to prove that as well. So at the point that we're even talking about punishments, that kind of stuff has happened. They may have additional aggravating factors, but they're hoping to prove at least that; okay? So that easily qualifies for question 84, premeditated, intentional murder. And at that point even with children there's two punishments available. The law doesn't say what the punishment

3512

is; okay?

A. Okay.

Q. You following me?

A. Uh-huh.

Q. And as the judge pointed out, this case is fairly unique in that the jury decides the punishment, not the Court. You're going to be in that position yourself; okay?

A. Okay.

Q. Let me tell you about the kind of flip side to this. The defense has an opportunity to present evidence to you as well. We call it mitigating factors. And as you might expect, they're the opposite. These are reasons that the defense would ask you to take into consideration for a life sentence. No criminal history is one; okay? We would ask you to take that into consideration in assessing punishment. Do you think that's a fair circumstance to take into consideration regarding punishment?

A. Yes, it is.

Q. Okay. The other thing is we can present any evidence, almost anything at all, about our client's background or character that we could argue should be taken into account by the jurors as a reason to vote for life. And just as an

Page 159

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3061 of 3245

example, we might present evidence that Angela Johnson was physically, sexually abused as a child and that that may have caused her to make some decisions later in life.

3513

Some jurors have said, Hey, you know, I appreciate that; I hear you, Mr. Berrigan, but I don't really think that's something I'm willing to consider. You know, we get choices to make later in life, and I don't really think that's something I'd consider at all in terms of punishment. And it's not an excuse; okay? You gotta hear me loud and clear. The fact that you're physically abused as a child doesn't excuse your later conduct of committing murder any more than the fact that you didn't have a prior criminal record. What does that have to do with whether you committed murder? But in assessing punishment, okay, not guilt but in assessing punishment, that's a factor the law says that you can consider; okay?

A. Okay.

Q. Do you think that's an appropriate area to be considered as a mitigating factor, background of traumatic childhood?

A. I would say yes.

Q. Okay. And the last thing I wanted to mention to you -- and the prosecutor mentioned this, and I think sometimes it's a little confusing. He was talking about Miss Johnson's role in the offense. You know, if you and I decided to go rob a bank and you were out in the car and I went in and did the hold-up, it's not going to be much help to you later that you were out in the car if we both get arrested and charged because if you aided me and abetted me in the commission of the offense and we agreed to do it together, you're as guilty as I am; okay?

3514

Page 160

A. Yep.

Q. Does that make sense to you?

A. I agree with that.

Q. But when you and I come before the judge for punishment -- and we would be before a judge for punishment -- the court may look at us quite differently because your role in that offense relative to mine going in with the machine gun threatening everybody in the bank to blow their heads off and take their money and you sitting out in the car, our roles were different, and your role might be viewed as compared to mine as being something that would warrant a lesser punishment. Does that make sense?

A. Yes, it does.

Q. So it doesn't mean you're less guilty. But it does mean that you might face a different punishment than I did, that that would be an appropriate consideration in assessing punishment. Does that seem fair to you?

A. Yes, it does seem fair.

Q. Good. All right. There was something else I wanted to ask you about, and I think Mr. Williams covered this, but just to be sure, there's a question about do you think the death penalty sentence really means the death penalty, and you said no. That is the way it's supposed to work, so it is not one person's choice to put someone to death. The total agreement of the jury is what it is supposed to require. And you're exactly right on

3515

that; okay? And the judge has already mentioned this in his presentation on the PowerPoint, but it's worth repeating briefly just to make sure.

Page 161

The decision about life or death is an individual decision for each juror. You personally have to weigh the aggravating circumstances you find beyond a reasonable doubt with the mitigating circumstances; okay? And you don't even have to agree. The jurors don't even have to agree about these mitigating circumstances. You could decide, you know what? I think these are mitigating circumstances. And you're going to have a whole list of things to choose from, and you're also going to be able to find stuff that's not on the list that you think's important. That's a mitigating circumstance for me. But the weighing process and the decision about which comes out heavier, that's yours; okay?

A. Okay.

Q. You have to make it because you gotta live with it. And then if everybody agrees, that's one thing. If everybody came to a conclusion, you know what? I decided death penalty was the most appropriate punishment here, then as the judge pointed out, that would be the death penalty; okay? He can't change that. That's your decision. If even one juror said life imprisonment, that is a decision by the jury. That's life imprisonment; okay?

A. Okay.

Q. So let me kind of ask you the flip side of the question

3516

that the prosecutor asked you. Let's say you're the last one. You're at the table with 12, and you've come to the decision in your heart and conscience life imprisonment you think is the appropriate punishment after listening to all the evidence; okay? And everybody goes death, death, death, death, death, death, death, and here you are, and 11 people have said death, and now it's to you, and you've made that determination life.

Page 162

Is that something you'd be able to do, to stand up -- you know, if that was your determination, would you be able to stand up to your fellow jurors and kind of hold your principles in that determination?

A.    If that's the way I felt, that's what I would do.

Q.    And we're not asking you how -- because we have no idea. It'd be completely inappropriate for us to ask you to guess how you're going to come down on this.

MR. STOWERS:  One minute.

Q.    But we are interested in whether you would be able to respect that decision of your fellow jurors and expect them to respect your decision.  Do you see any problems there?

A.    No, I don't.

MR. BERRIGAN:  All right.  You've been very patient. Thank you, sir.

THE COURT:  Juror 214, if you'd just wait outside, we'll let you know your status in a minute or so; okay?  Thank you.

3517

(Prospective Juror 214 exited the courtroom.)

THE COURT:  Any challenge for cause by the government?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Challenge for cause by the defense?

MR. BERRIGAN:  No, sir.

THE COURT:  Peremptory challenge by the government?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  So 214 is our fifth alternate juror; correct?

MR. WILLIAMS:  That's correct, Your Honor.

THE COURT:  Okay.  We'll let him know to show up
Page 163

Wednesday morning at eight o'clock.

(Prospective Juror 214 entered the courtroom.)

THE COURT: Juror 214, you are on this jury, so we're asking you to show up at eight o'clock Wednesday morning, not tomorrow but the day after tomorrow. And we're asking all the jurors to come at eight o'clock. We'll actually start at 8:30, but we'll get you assembled in the jury room.

It's very important that you both remember and follow throughout the trial my cautionary instruction about not talking to anybody about this case, not letting anybody talk to you about the case. Don't read anything in the newspapers about the case, listen to anything on the radio or television report or do any independent research on your own; okay? Okay. We'll see you back here Wednesday morning. Thank you very much.

3518

(Prospective Juror 214 exited the courtroom.)

THE COURT: Okay. Ready for 675?

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 675 entered the courtroom.)

THE COURT: Anywhere in the front row you'd like, Juror 675.

PROSPECTIVE JUROR 675: Thank you.

THE COURT: Thank you. Everybody please be seated. We're going to start first with questions from Mr. Berrigan, and then we'll have some questions from Mr. Williams; okay?

PROSPECTIVE JUROR 675: Okay.

THE COURT: Thank you.

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, sir?

Page 164

A.    Good.   How are you?

Q.    Good.   So far so good.   We're interested in two specific areas during this individual questioning process.

A.    Okay.

Q.    And one has to do with your exposure to pretrial publicity, stuff in the media about the case up till today.   And the other one has to do with your views about the two potential punishments that could be in play in this case; okay?

A.    Okay.

Q.    So let's talk about publicity first if we could.   And let

3519

me just ask you what you've seen or heard about the case before coming in today.

A.    I haven't heard much at all about the case.   I don't pay too much attention to the local news because I haven't had a satellite dish for a while, and we don't get -- my local networks don't come in very well, so I had dish satellite service for a long time, so I didn't get local news up until about three, four months ago.

Q.    Okay.

A.    So that's about all I -- I don't know too much about the case at all.

Q.    Do you get a subscription to the newspaper?

A.    No, I don't.

Q.    Okay.   Some folks don't get a subscription but they pick it up or they read their coworkers' papers in the morning together. Do you even look at the paper much?

A.    I -- just my local news in my surrounding area in Spencer and stuff like that.

Q.    Okay.   And I don't know how far Spencer is from here.   How

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 3067 of 3245

far away is it?

A. I live about seven miles from Spencer.

Q. How far is Spencer from Sioux City?

A. It's roughly right around two hours.

Q. Okay. That's quite a ways away.

A. Yeah, right around there.

3520

Q. We appreciate you driving in.

A. Yeah, no problem.

Q. And you mention that in the questionnaire, and thank you for filling that out. We know this is a long, tedious process, but it is important, and it's really helpful to us.

A. Okay.

Q. You said you'd only just heard about the case. What reminded me of the case was what was written in this, otherwise had not heard about it in a long time. Does that sound about right?

A. Yeah, that's about right.

Q. Okay. You said you had no opinion about Miss Johnson's guilt or innocence as a result of anything you'd seen.

A. Huh-uh.

Q. Has anything that's happened in the -- I bet it's been three months -- two months at least since you filled out the questionnaire?

A. Yes, it's been a while, so it's kind of -- I can't remember right off what I wrote in there, so it's been a little while.

Q. Yeah. Well, you -- basically you said you hadn't talked to anybody about the case. You weren't aware of hearing other people talking about the case. You had heard that kids were murdered and innocent lives lost and that it was drug related.

Page 166

A.   Yes.

Q.   Okay.  Have you gotten any additional information since

3521

February the 27th?

A.   Not that I can recall, no.  I haven't received any more packets in the mail or anything like that.  Just getting called up to serve a little earlier than my scheduled time.

Q.   Okay.  Yeah, I bet you had to get up early to be here.

A.   Yeah.

Q.   So let's talk a little bit about the death penalty; okay?

A.   Okay.

Q.   And if I lived in Spencer and you and I had known each other for a long time and if we were having a cup of coffee one morning and I turned to you -- there was an article in the paper that Iowa's bringing back the death penalty and I turned to you and said, Hey, Juror, 675, what do you think about the death penalty, what would you tell me?

A.   Death pen -- it'd be -- it'd be -- let me start over.  It all depends on the case.  I think it probably should be something that should be done about the death penalty.  You know, I don't see no problem with it.  It depends on the case.  Like this one here, you know, it'd probably be something I'd be looking into.

Q.   Your questionnaire asked a bunch of questions about this, and you probably -- I know you might not remember it specifically, but let me read a couple back to you.

A.   Okay.

Q.   Question 75, What are your thoughts and opinions about the

3522

Page 167

death penalty as a punishment for a person who's guilty of intentional murder? You said, I think they should get the death penalty. Then the next question says, Why do you feel this way, or what are some of the reasons for your beliefs? And you say, An eye for an eye.

A. Eye for an eye. I do remember that now. I do remember an eye for an eye.

Q. Some people have a different meaning of an eye for an eye than different folks. What do you feel about that?

A. An eye for an eye, I feel the same thing that happened to those kids should happen to that person that did the crime.

Q. And obviously they're dead; right?

A. Right.

Q. I don't want --

A. I don't want to go any more further than that, but that's just -- I'm sorry to feel that way, but that's just the way --

Q. You know, I think the judge was really clear on this, but just to reiterate what he said, there's nothing wrong with your opinion whatsoever, and we respect it very much. And one of the big goals of this process is to get people not afraid to come in and tell us, Hey, this is how I feel as opposed to telling us what we want to hear, what they think we want to hear; okay?

A. That's right.

Q. And you know I guess probably from at least the questionnaire if not what's transpired this morning that the

3523

government is alleging there were five intentional murders and that Angela Johnson aided and abetted in the commission of these intentional murders. Do you understand that?

Page 168

A. Yes, I do.

Q. And then they're also alleging that the murders were premeditated after substantial planning.

A. Okay.

Q. And then they're alleging that of the five victims two of them were children, ten- and six-year-old girls, Kandi and Amber Duncan, and the government alleges they were particularly vulnerable victims because of their age obviously. So that's the situation -- if we're ever in a penalty phase, that's at least the government's evidence, and they may have other evidence, more evidence, but at least that is what they're hoping to have shown the jury beyond any reasonable doubt; okay?

A. Okay.

Q. You are asked this question, question 78: Do you believe in an eye for an eye? You say, Yes, the same thing should happen to him as what he did. Is that what you just told me about?

A. Yes.

Q. Okay. And then there are some questions about life imprisonment starting at 82. What are your thoughts and opinions about life in prison as a punishment for a person guilty of intentional murder? And you said, No, it's a drain on

3524

our economy. Why do you feel this way? The taxpayers pay the bill for these people who have it better than most law-abiding taxpayers.

A. Yes, that's true. That's what I wrote, yeah.

Q. And then there's a question that says, Do you think life in prison without the possibility of parole is a severe-enough punishment for a person convicted of an intentional and

Page 169

premeditated first-degree murder? And you checked no. If you kill someone, you should pay for it with your life.

A. That's -- yep.

Q. I don't want to talk you or even try to talk you out of your position; okay?

A. Okay.

Q. But I do want to tell you that the law provides that even in a case such as this with five premeditated, substantially planned murders including children that there are still two punishments.

A. Okay.

Q. And it even gives the defense an opportunity to try to counteract that type of evidence with what we call mitigating circumstances, and these are things that the defense would argue should be taken into account towards life, a lack of a criminal history, for example, or childhood abuse, physical or sexual, that occurred some time ago. We've had some folks tell us quite honestly, I appreciate that, Mr. Berrigan, but I feel so

3525

strongly about this issue that I really only have one view as to a punishment that I would consider appropriate.

A. Okay.

Q. Other folks have said, Well, I guess I could consider really both of those punishments I suppose, and some folks are I wouldn't consider the death penalty at all because I have religious convictions against it or they just don't, you know, believe in it for one reason or another. Your questionnaire and your answers in court sort of suggest to me that you would be a death penalty proponent, eye-for-an-eye, life-for-a-life person.

A. Yes, I would.

Page 170

Q. Okay. So let me just ask you these couple of questions.

A. Okay.

Q. In a case such as that, would you be able to consider the death penalty as an appropriate punishment?

A. Yes, I think the death penalty would be one I probably would consider.

Q. And the flip side of that coin is life imprisonment without parole which you seem to reject in the questionnaire.

A. Yeah, I -- no, I don't see anything about that. It should be just death penalty all the way, and it's just a drain on our economy.

Q. And how strongly do you feel about that?

A. I'm pretty -- pretty strongly.

Q. You sound pretty strong.

3526

A. Yeah, I'm pretty strong for that.

Q. And again, I'm not trying to talk you out of your position, but if you were told, Hey, look, we have this weighing process, and you have to weigh this, and you have to weigh these other things like no prior criminal history or abusive background, these mitigating circumstances, given your views about life for a life, eye for an eye, is that anything that you'd really do? That is, would you realistically consider these things over here as going across that over there?

A. Can you rephrase that again?

Q. Yeah, sure. This is the government's --

A. Government's, okay.

Q. -- the government's evidence, the aggravating factors that they're going to attempt to prove.

A. Okay.

Page 171

Q. And then the defense has an opportunity -- and we don't have to, but we could present evidence of what we call these mitigating factors. I've mentioned a couple of those. The, you know, no prior criminal history, abusive, sexually or physically abusive, childhood, and the jurors are obligated to weigh those things.

MR. STOWERS: Two minutes.

Q. One against the other. Are you with me?

A. No, I am not really with you on this part. It's really kind of confusing the way you're explaining it. To me I think

3527

probably -- guilty is probably where I'd go right away because I look at it's two young lives. I know it's two kids and plus the other adults that were involved in it. I don't -- that's just the way I feel.

Q. Okay.

A. I just feel that it's just guilt all the way and there's no way out of it.

Q. Well, it's the punishment part -- I hear you on the guilt part. The punishment part?

A. Punishment part?

Q. Yeah. Would you realistically consider anything other than the death penalty as an appropriate punishment where two children were --

A. No.

Q. No.

A. (Shook head.)

Q. And no matter what kind of evidence was presented by the defense.

A. No, it'd be more guilty than anything.

Page 172

Q. It's the punishment again.

A. Punishment, yeah.

Q. Does that mean the death penalty when you say guilty?

A. Yeah.

Q. And you're pretty firm on that?

A. I'm pretty firm on that.

3528

MR. BERRIGAN: Appreciate your candor. Thanks for your time.

THE COURT: Mr. Williams?

EXAMINATION

BY MR. WILLIAMS:

Q. Very, very briefly. And just like Mr. Berrigan, I'm not here to try to talk you into a view or out of any view at all. I just want to explore something with you.

A. Okay.

Q. The government's allegation in this case is that the defendant aided and abetted these murders, that she is not the one who pulled the trigger but hers was a role of aiding and abetting. Now, to some people that makes a difference. In fact, some people say, Wait a second; if it's aiding and abetting, I'm not even going to consider the death penalty as an option. The death penalty should be reserved only for those people who actually pull the trigger. Other people, it doesn't make a big difference to them one way or the other. Can you share with us your thoughts if told that the allegation at this point -- let's just assume the evidence showed that her role was that of aiding and abetting, not pulling the trigger. What impact does that have on your views about whether life in prison under those conditions might be an appropriate punishment?

Page 173

A. Life imprisonment, it would still be a drain on our economy because she's aiding and abetting the felon that did it. I

3529

still think death penalty should be still part of it because she -- they knew about it. She was involved in it somehow or another. That's just the way I feel.

Q. Sure. So where you're at the point you've concluded she's guilty of this, if it's aiding and abetting, you still wouldn't be able to realistically consider life in prison.

A. No.

MR. WILLIAMS: Thank you very much.

THE COURT: I just have a couple questions for you, Juror 675.

PROSPECTIVE JUROR 675: Yes.

THE COURT: The way I understand it, you're just ready to impose the death penalty right now.

PROSPECTIVE JUROR 675: Under con -- yes, I think so.

THE COURT: Would you want to hear any evidence to determine whether the defendant is not guilty or guilty, or shall we just go ahead and impose the death penalty now?

PROSPECTIVE JUROR 675: No, we can -- it's up to -- it's not up to me to decide. I'm just a juror sitting in on the case.

THE COURT: Yeah.

PROSPECTIVE JUROR 675: And I'm just hearing the lawyers tell me what's going on. And it's kinda hard to understand all this -- all this lawyer talk because it's --

THE COURT: But what I heard you say --

3530

Page 174

PROSPECTIVE JUROR 675: Is the death penalty is a big factor the way I feel about murdering kids. That's a big problem with me. Kids being murdered and adults being murdered, that's a big problem with me.

THE COURT: Yeah, I heard you, but would you want to find out whether the defendant was not guilty first?

PROSPECTIVE JUROR 675: Yes, I think so.

THE COURT: You think so, okay.

PROSPECTIVE JUROR 675: Yeah, I think so.

THE COURT: Well, I'll tell you what, Juror 675. You need to step out for a min -- well, why don't you just sit right there.

MR. BERRIGAN: The defense will move for cause for Juror 675.

MR. WILLIAMS: No objection.

THE COURT: Okay. We appreciate you filling out the questionnaire. We appreciate you coming in. Most importantly, we appreciate the honest answers that you've given.

PROSPECTIVE JUROR 675: Okay.

THE COURT: And we're going to let you go. So thank you for participating in the process, and good luck to you.

PROSPECTIVE JUROR 675: Thank you.

THE COURT: Thank you.

(Prospective Juror 675 exited the courtroom.)

THE COURT: Whoa.

3531

MR. BERRIGAN: Going to be a short trial.

THE COURT: Not sure there's a need for one in his view.

MR. BERRIGAN: No. We could go right to the third

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3077 of 3245

stage.

THE COURT: Ready for 477?

MR. WILLIAMS: Yes, Your Honor.

MR. STOWERS: Had to bite my lip on that one.

THE COURT: I was unable to.

(Prospective Juror 477 entered the courtroom.)

THE COURT: Sir, anywhere in the front row. You can take your choice of seats.

Everybody can be seated, and we're first going to hear questioning from Mr. Williams and then from Mr. Berrigan. How you doing this afternoon?

PROSPECTIVE JUROR 477: Good.

THE COURT: Okay. Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Thank you for your patience today. Thank you also for filling out this questionnaire. I know it was laborious, but it actually aids us significantly in helping us pick a jury. We're

3532

only going to talk to you about two subjects this afternoon. My 12 minutes I'm going to talk to you about publicity, what you may have heard about this case from outside of the courtroom, and what impact that might have on your ability to be a fair juror in this case. And then I'm going to talk to you a little bit about your views on the possible punishments that may come into play in this case.

First of all, on the publicity, you filled out this

Page 176

questionnaire, and there were some questions in here about your knowledge of the case. You indicated in the questionnaire that you'd only just heard about the case. And when asked to explain, you said, I recall the Honken trial, but I have not heard or remembered anything about the accomplice just briefly in the paper. Can you share with us what you've heard about the Honken case, first of all?

A. Well, it's kind of hard to remember. That's been a few years ago if I'm correct, but I know that it involved two children, and I'm not too sure if there was -- his wife was involved or -- and I remember seeing pictures of them on TV, but in all honesty, I can't remember a lot about it. I followed it a little bit in the Des Moines Register, but he was found guilty. That I know.

Q. All right. And you also indicated in your questionnaire that people at coffee mentioned it briefly as well. Can you share with us kind of what your conversation was if you recall

3533

over coffee concerning the case?

A. Well, I discussed it with -- not in any long discussion or anything, but just briefly I'd ask people, you know, if they had read about the trial over in Mason City, and it was just coffee talk, you know, small talk.

Q. Sure, sure. What's -- and you can probably imagine why we're asking you these questions. Ultimately we asked you in the questionnaire, No matter what you've read, seen, or heard about this, do you have any beliefs today about the defendant's -- whether she's not guilty or guilty? In the questionnaire you said no. Despite what you may have heard or read in the newspaper or what you talked about over coffee,

Page 177

you've not formulated any opinions about whether this defendant was guilty or not guilty. Is that still the case today?

A. Yes.

Q. And if you were to be called as a juror in this case and you were sitting here as a juror and you hear evidence come up and all of a sudden you may think to yourself, oh, now I remember reading about that in the paper, I remember that coming up in Honken's case, it's going to be critically important for jurors, because this case did get some publicity, to recognize that that is not evidence. The only evidence is what comes in to court here. Newspaper people try hard, but what they put in the newspaper oftentimes is not accurate, not because they didn't try but because they're getting it secondhand and so

3534

forth.

A. I understand that. Like I said, I cannot recall anything real specific about the case. I would just read it in the paper, and that was about it and, you know, maybe over coffee a little bit but nothing in great detail.

Q. Great. Can you assure us and the judge and the parties in this case that you can set aside and not allow any of that stuff to influence you even if you later recall facts from the newspaper or from TV? Can you set that aside and make sure your decision's based only on the evidence in this case?

A. Yes, I could.

Q. Thank you very much. I want to talk to you now just a little bit about the possible punishments in this case. The judge this morning explained that if we got to that point in the case, if after the evidence was presented the jury found the defendant guilty of one or more of the ten counts against her

Page 178

and we got to the third stage of the trial, the penalty phase, it'd be up to the jury to ultimately decide between two options, life imprisonment and the death penalty. Do you remember him telling you about that this morning?

A. Uh-huh, yes, I do.

Q. And the unique thing about the way this is set up is that Congress decided, as the judge indicated this morning, that it was uniquely the role of citizens in our community to make that ultimate judgment, that if Congress had decided that the killing

3535

of five people was grounds for the death penalty and that was just the absolute penalty no matter what, we wouldn't need a jury.

Rather what Congress did was determine that even under the facts alleged in this case -- and that is the intentional, premeditated murder of five people including two little girls -- there's still two options, life in prison and the death penalty, and that we should call upon citizens from our community to ultimately weigh the factors that could come into play to make the determination what penalty's most appropriate. Do you think you'd feel comfortable in that role?

A. Yes.

Q. The government is going to be alleging certain facts that we called aggravating factors. The judge talked about that this morning, aggravating factors, mitigating factors, and the weighing process. Do you remember him talking about that?

A. Uh-huh, yes.

Q. And you probably know what that means, but just to make sure that you know, aggravating factors are going to be things that the government says this should weigh in favor of the death

Page 179

penalty. And mitigating factors may be things that the defense puts on if they choose to -- they have no obligation to -- or things that the jury finds from the facts of the crime itself that the jury determines would weigh in favor of some leniency toward life in prison and that the role of the jurors is to look

3536

at all those factors, assign whatever weight they think appropriate to them, and ultimately weigh them to determine what the appropriate penalty should be. Do you feel comfortable with that concept?

A. Yes, I do.

Q. In this case the government has alleged that the defendant aided and abetted the murders of these five people. Some people we talk to say that in that case when you're talking about an aider and abettor, not the person who actually pulled the trigger, I couldn't realistically consider the death penalty because in my view the death penalty's only reserved for those people who actually pull the trigger on somebody and murder them, and aiders and abettors shouldn't fall in that category of somebody I could really consider the death penalty for. Can you share with us what your thoughts are on that?

A. My personal opinion on that is if that person that aided and abetted had an opportunity to prevent it, she should have, and that's what the evidence for my personal self would have to show. If she tried to prevent that or whoever the person is, if they tried to prevent it but they didn't accomplish that goal, if they really tried, then no, I do not think she should get the death penalty, he or she. I would have to let the evidence speak for itself.

Q. Sure. And I guess the bottom line is on that, what I'm

Case 3:09-cv-03064-MWB-LTS Document 284-70 Filed 06/23/11 Page 3082 of 3245

hearing from you is that aiding and abetting by itself isn't

3537

determinative for you.  It really depends on what the under -- I mean how she aided and abetted.

A.    Right, correct.

Q.    You would still be willing to consider as a possible punishment the death penalty for somebody who aided and abetted.

A.    Yeah, yes.

Q.    I see.  Now, let's go the other way on that topic.  You indicated, you know, if she tried to talk the person out of it, then the death penalty would not be appropriate.  Is that something that before you'd realistically consider life in prison you'd have to have some showing that she tried to talk the person out of it?

A.    Okay.

Q.    Let me talk to you about some other possibilities here. Let's say in this case that -- assume the evidence shows that she aided and abetted in the murders in this case, and let's just assume the evidence showed that she didn't try to talk the person out of the murders but didn't pull the trigger herself; okay?  Now, you got those facts.

On the other end, there may be other facts that you don't know about yet, something in the defendant's background or, you know, whether she had a criminal history or whether she was physically abused or something as a child.  There may be other facts that could lean a person toward leniency in the case despite these other facts that we've assumed at this point.

3538

Page 181

Would you be willing to consider life imprisonment as a possible punishment even assuming these facts as I've outlined them and wait to see if there's other reasons that might indicate there's a reason to be lenient?

A.    Well, that's kind of hard for me -- I have to make a snap judgment here.  If --

Q.    Let me interrupt this much just to make sure you understand.  I'm not asking you to predict how you'd vote at all.  The only question we're interested in is whether you'd have an open mind to consider both punishments, and candidly some people can't.  Some people come in and hear these facts and say, Boy, no way could I really consider life in prison as a possible punishment.  So I just want to make sure you understand I'm not asking you how you would vote.  The question is would you be willing to consider both possible punishments?

A.    Yes, I would.

Q.    And despite how ever many facts may weigh up in favor of the death penalty at this point, are you willing to consider the possibility no matter what that life in prison may still be an appropriate punishment before you ever voted for the death penalty?

A.    Yes.

Q.    The question in the questionnaire asks you at one point are you -- what are your thoughts and opinions about life in prison as a punishment for a person who's guilty of intentional murder,

3539

and you said, I think if you have two choices, the penalty should be death, and then on the next page, though, interestingly, when you were asked about a number of factors that could weigh in on your thinking about punishment, you

Page 182

indicated death for a number of things, so, for example, the killing of children, the killing of more than one person.

When it got to the defendant's mental, emotional, physical abuse, if something like that was shown or what her role was in the offense, you had circled -- or you had written life down as a possible punishment on that. Can you share with us what your thoughts are? I mean, is life in prison a realistic possible punishment for somebody who's been accused of aiding and abetting murder of five people including two little girls?

A. Well, if there's something -- I mean, if she's incompetent in any way, I mean, I think you have to weigh all the factors.

Q. Let's assume --

A. You know, if you took -- for an example, if there was a mentally retarded person that helped a competent person kill a person, I'm not -- I don't think you can hold that mentally retarded person responsible.

Q. Makes sense.

A. That's my thinking on that.

Q. Yeah, makes sense. Makes sense. Let's assume in this case there's no question of mental competency, but let's assume that

3540

the defendant's competent for purposes of this argument. Are there still other factors in your view, for example, the mental and emotional, physical abuse as a child, could you see where that might impact on your decision making about whether the death penalty's called for or not?

A. I don't think so.

Q. So let me just come back to that question to you that I've asked you before. And some jurors just can't do this, and some

Page 183

jurors can. We just need to know where you're at. There's no right or wrong answer to this.

A. Okay.

Q. In the event that the government proves -- just assume the evidence shows the defendant aided and abetted the killing of five people including the two little girls in this case. Could you realistically consider the possibility of life in prison as a possible punishment?

A. No.

MR. WILLIAMS: All right. Thank you.

PROSPECTIVE JUROR 477: You're welcome.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: May we approach, or would you like me to question?

THE COURT: Sir, could you just step outside for a minute?

PROSPECTIVE JUROR 477: Sure.

3541

THE COURT: We'll find out if there's going to be any further questioning. Thank you.

(Prospective Juror 477 exited the courtroom.)

MR. BERRIGAN: I didn't want to waste my 12 minutes if it wasn't necessary.

THE COURT: Oh, I think you could rehabilitate him.

MR. BERRIGAN: That wouldn't be my goal.

THE COURT: Well, it's been your goal in other cases.

MR. BERRIGAN: Well, that's true. It depends on what he says. I'll admit to that. But I think in this instance the juror's made it very clear. I wanted to just make a motion, but if you want me to question him or if this is an issue, I'm happy

Page 184

to question him. I was going to just move to strike Juror 477 without questioning him based on his views regarding the death penalty as a substantially impaired juror.

THE COURT: Based on his answers so far.

MR. BERRIGAN: Right.

MR. WILLIAMS: Well, and I would hope to think that maybe I could rehabilitate him too if I had chosen to do that.

THE COURT: But you chose not to.

MR. WILLIAMS: I just don't think he sincerely could ever realistically consider life imprisonment, so we won't oppose it.

THE COURT: Okay. We'll let Juror 477 go for cause.

(Prospective Juror 477 entered the courtroom.)

3542

THE COURT: Sir, thank you very much for participating, but we're going to go ahead and dismiss you as a juror in this case; okay?

PROSPECTIVE JUROR 477: Sue me as a juror?

THE COURT: We're going to excuse you as a juror.

PROSPECTIVE JUROR 477: Okay.

THE COURT: Thank you.

(Prospective Juror 477 exited the courtroom.)

THE COURT: We ready for 331?

MR. BERRIGAN: Yes, sir.

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 331 entered the courtroom.)

THE COURT: 331, anywhere you'd like to sit in the front row. Thank you.

Everybody can be seated. We're going to start first with Mr. Berrigan, and then you'll be questioned by

Page 185

Mr. Williams.

EXAMINATION

BY MR. BERRIGAN:

Q. How are you, ma'am?

A. Fine. Fine.

Q. We're going to limit our questions to a couple areas that we're most interested in. One has to do with publicity or what you've heard about the case before coming here today, and the other one has to do about your views about the potential

3543

punishments that might be involved if we were ever at that stage in the trial; okay? So let me start with the publicity questions, and I was just going to ask you what you could tell us about what you've learned about the case from the news media before today.

A. I really haven't paid too much attention to any of it. I don't read the paper much, and just what I've seen on the news about her being -- you know, I've seen her transported. That's all I really heard.

Q. Okay. You indicated on your questionnaire you had only just heard about it recently. I've seen stuff on the news. The only thing I remember is that this guy Honken killed five people including children, and they just found these people buried. Does that sound right?

A. Yep.

Q. When you say recently, when are you talking about?

A. Just within the past few months, just when his case came to the city.

Q. Okay. And you checked television as the source of the information that you had gotten. Do you get a subscription to

Page 186

the local paper?

A.    Moville's.

Q.    I'm sorry?

A.    Not Sioux City Journal, local as in Moville.

Q.    Oh, I see, okay.  Was there anything in the Moville paper

3544

about Mr. Honken's case?

A.    Not that I know of, no.

Q.    So largely this information came to you by way of television?

A.    Yeah, just passing the news.

Q.    What about listening to people talk about the case?  Have you heard anybody talk about it?

A.    No, no, nothing that I can remember.

Q.    What about your brother-in-law, the jailer at the Woodbury County Jail?  Have you had occasion to talk to him at all about it?

A.    I'm sure we've had conversations about it but nothing -- he didn't ever really talk about it, and I just asked him what he was doing, and he said he was transporting so . . .

Q.    And that would have been Mr. Honken?

A.    Yes.

Q.    Did you have conversations with your brother-in-law while Mr. Honken's case was going on about it?

A.    He didn't really talk about it.

Q.    I'm not sure exactly what that means.

A.    He didn't talk about it.  He was just -- I knew what he was doing.  He was transporting, and he didn't talk about the case.

Q.    Okay.  I thought you mentioned you had had conversations with him.

Page 187

A. Just about him transporting. What are you doing? You

3545

know, he takes her back and forth and when do you do this because he has another job.

Q. I gotcha. And then your brother is an investigator for a private company that is contracted with the United States government?

A. He was.

Q. I see. Did he have any work to do on Mr. Honken's case?

A. No, no, that was as a privately owned company. He basically did background checks for people who were going to work for the government. He wasn't actually working with the government.

Q. I see. You indicated in your questionnaire -- and I know it's been a while since these things were filled out. Yours was way back in January. But there was a question about whether you'd formed an opinion about the guilt or innocence of Angela Johnson. This is what it reads. It says, No matter what you've read, seen, or heard, do you now have any beliefs or opinions about the guilt or innocence of Angela Johnson? And there are three boxes there, yes, no, unsure. You checked the no and unsure box, but then you said, I think she's related to the case so she wouldn't be here. She's probably guilty if her boyfriend was found guilty. Does that sound right?

A. Yep.

Q. And then there was a question near the end, question number 99, that asks this question: In your opinion, is there anything

3546

about this case, the issues, and/or the people involved in this
Page 188

case that might hinder you even slightly from being an impartial juror, and you checked the yes box, and you said, The murder of two innocent children. I don't know her or anything about the case, but I want to call her guilty already. I think it's because of the children. Does that sound correct?

A. Yep.

Q. Okay. And I wanted to know whether you still feel that way.

A. Yes.

Q. Okay. So let's address that for just a second. You know, a lot of folks who come in here have heard a lot about -- to various degrees information about the case, and I suspect that if you hadn't heard anything about the case and this was an auto theft case or a burglary case and I asked you if you could presume Angela Johnson innocent you'd probably have no problem with that. Am I right?

A. Yes.

Q. Okay. But that isn't our situation it doesn't sound like.

A. No.

Q. And I think you heard the judge talking about the presumption of innocence this morning.

A. Yeah.

Q. And kind of how important that is. And to be honest, we've had a lot of people that have had problems with this issue

3547

because of the media attention to the case, and we need to know if you're one of those folks; okay? And we have to rely on your open and honest responses on that because we can't read your mind.

A. Okay.

Page 189

Q. But Angela Johnson, as the judge mentioned this morning, she is absolutely 100 percent entitled to jurors who can look her right in the eye and say without equivocation or hesitation, I can presume that you are not, and I do. I appreciate that you're innocent of these charges. Some folks have told us, Look, I'd like to do that; I know that's what the law says; I just can't honestly tell you that that's not going to be a problem. For other folks who come in here, some of them with no idea what this case is about, it's not been an issue. But we kind of need to know where you are on that; okay?

Based on these responses here and what you told me you still feel this way, do you feel some doubt in your own mind as to whether you can look Angela Johnson in the eye and tell us unequivocally that you can presume her to be innocent?

A. Do I doubt it? Yes.

Q. Okay. And how strong is your feeling about that?

A. I'm mixed.

Q. Okay. You know, you know that's what's required; right?

A. Yeah.

Q. And so knowing that that's required, even knowing that, are

3548

you telling us that even -- hey, look, I know that's required, but I honestly don't know if I can do that?

A. Yes.

Q. Okay. Well, I appreciate your candor about that. Let me ask some questions about --

MR. BERRIGAN: Nothing else. I wonder if we might approach, Your Honor.

THE COURT: Well, I've got a couple questions for the juror, and then we'll see what happens.

Page 190

MR. BERRIGAN:  Stand by.

THE COURT:  Yes, stand by, thank you.  Here's what I don't understand about your answers actually, and there's nothing wrong with your answers.  I'm just having a hard time processing them.  What difference would the nature of the crime be?  I mean, why would it make any difference whether Angela Johnson is charged with a traffic ticket or a burglary or a bank robbery or a white-collar fraud case or a murder case involving children?  Those are the charges.  Why wouldn't you be able to give her the full benefit of the presumption of innocence?  What is it -- why does there being two kids involved have anything to do with giving someone the full benefit of the presumption of innocence?

PROSPECTIVE JUROR 331:  It's just something I can't get past.  I can't -- I believe we're here -- and I know there was children involved, and I believe we are here for -- we

3549

wouldn't be here unless -- if she wasn't involved in the case somehow, and I just can't get past that.

THE COURT:  So every defendant who comes into every courtroom charged with any crime is guilty.

PROSPECTIVE JUROR 331:  No.

THE COURT:  Well, what's different about this case?

PROSPECTIVE JUROR 331:  I don't know.  I don't know how to answer that.

THE COURT:  And you know what?  You don't have to know.

PROSPECTIVE JUROR 331:  I know.

THE COURT:  That's the beauty of it.

PROSPECTIVE JUROR 331:  I'm not saying she's guilty.
Page 191

I don't know. I can't get past there's children and we're here.

THE COURT: There's children; therefore, she's guilty.

PROSPECTIVE JUROR 331: I never said she was guilty.

THE COURT: Well, you can't give her the full benefit of the presumption of innocence.

PROSPECTIVE JUROR 331: No. I'm mixed. I just -- I can't say I believe she's a hundred percent innocent because she's involved somehow, but yet she's not guilty. I don't know where I sit.

THE COURT: Okay. You're making the motion?

MR. BERRIGAN: Yes, sir, the defense would.

THE COURT: Government doesn't resist it?

3550

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Okay. Juror 331, thank you for coming in. We're going to go ahead and dismiss you from this case. Thank you. Good luck to you.

PROSPECTIVE JUROR 331: Thanks.

(Prospective Juror 331 exited the courtroom.)

THE COURT: Ready for 531?

MR. BERRIGAN: Yes, sir.

MR. WILLIAMS: Yes, Your Honor.

(Prospective Juror 531 entered the courtroom.)

THE COURT: Juror 531, any seat in the front row.

Everybody can be seated. And first we're going to hear from Mr. Williams and then from Mr. Berrigan.

EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, ma'am.

A. Hello.

Page 192

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3094 of 3245

Q. Thank you for your patience today. I just want to talk to you about two different topics, one of which is what you might know about this case from the media or from the publicity, and the other thing is what your views are concerning the possible punishments that the jury may at some point have to deal with in this case; okay?

A. (Nodded head.)

Q. So let me just talk with you about publicity first. We

3551

asked you -- and thank you for filling out this questionnaire. We appreciate the time you took to fill this out. But we asked you in this questionnaire about publicity, and you had indicated you had just only heard about this case, and you indicated Honken -- Honken's found guilty, TV account, Honken's found guilty I believe. And you said -- you indicated that you may have spoken with your family briefly about the case. Can you share with us what you recall about the Honken case?

A. Just pretty much that he was found guilty for five I think it was.

Q. Did you follow the case when it was occurring very much?

A. No, not really.

Q. The -- and it probably makes sense why we're asking you these questions. What's going to be very important, critically important in this case, is for anybody who serves as a juror that they're able to base their decision in this case solely on the evidence that's presented in this case and not based on something they read in the newspaper or heard on TV or that some family member told them or something like that. Can you appreciate how important that is?

A. Right.

Page 193

Q. And candidly, some people can do that, and some people can't. Can you set aside what you may have heard on TV or read in the newspaper and recognize that your duty as a juror would be to decide the case based on the evidence?

3552

A. I believe so. I believe so.

Q. Do you have any doubt at all in your own ability to do that?

A. I don't think anything's a sure thing in life.

Q. Sure, sure. But can you foresee at this point any reason why you would have problems --

A. No, no.

Q. -- just deciding the case based on the evidence?

A. No.

Q. Thank you. Let me talk to you about the possible punishments in this case. The judge explained to you earlier this morning -- and since it's been some time, I want to kind of go back over -- how that might work. In the event that the defendant is found guilty beyond a reasonable doubt of one or more crimes she's charged with, we might get to the point where we're dealing with punishment issues. And if we get to that point, that third phase of the trial the judge talked about, the jury would have ultimately the job of deciding between two possible punishments, life in prison without any possibility of parole or the death penalty. Do you understand that would be your job if we got to that third stage of the trial?

A. Yes.

Q. And the judge explained this morning that Congress set it up in such a way that we give that decision to jurors. It's not the judge's decision, nor is it a decision that's just dictated

Page 194

by the crime. In other words, Congress could have passed a law that said if you kill five people you get the death penalty, no discussion, no other possible punishments, just automatically. But they didn't. Congress passed a law that said even if you kill five people, even if two of those are children, there's still two possible punishments that we're going to ask a jury to consider, and that's life in prison and the death penalty. And we want those jurors to look at a bunch of facts and weigh different factors -- remember the judge talking about aggravating factors and mitigating factors this morning -- to determine which is the appropriate punishment. Does that make sense to you?

A. Right.

Q. So let me just talk to you for a moment about these factors. The government's alleged aggravating factors or simply factors that suggest the death penalty's more appropriate, that this is somehow a worse crime than usual, and so, therefore, the jurors ought to impose the death penalty. And the government's alleged things like the killing of children or that this was, you know, substantially planned and premeditated, it wasn't just something that went -- you know, happened, but they thought it out in advance and other things. But the government's alleged that there are some facts over here that we want you to consider in weighing in favor of the death penalty.

Now, there may be other facts that the defense may

present if they choose to do so or that the jury may find from

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 3097 of 3245

the facts of how the crime occurred that would suggest that a more lenient sentence other than the death penalty ought to be imposed like life in prison.

So it's going to be up to the jurors to listen to the evidence that would be presented at this third phase and to look at all these factors and realistically consider all of them to determine what the appropriate punishment is. Do you understand that would be your role?

A. Right.

Q. Now, the important thing is for the jurors to be able to do that, and that is that they would be able to realistically consider all these different facts, both things that would weigh in favor of life imprisonment and things that would weigh in favor of the death penalty. And some people can do that, and some people can't. What do you think about yourself, ma'am?

A. It certainly would depend a lot on all the circumstances that are represented, you know.

Q. Sure.

A. As far as I'm concerned, life in prison for the rest of your life isn't much better than death. Some people would probably choose that.

Q. Yeah, it's a harsh penalty, isn't it?

A. (Nodded head.)

Q. And what's going to be the job of the jurors if we get to

3555

that third phase is to do just that, and that is to look at all these facts and consider both possible punishments, realistically consider both possible punishments.

A. Right.

Q. Now, some people candidly tell us, Boy, you tell me that

Page 196

they killed five people, I just couldn't consider life in prison without parole as a possible punishment for that kind of crime; I don't care what other facts you tell me about; I just couldn't.

Other people say, No, I think there might be other things that may make me think -- despite this crime, despite how ever many things the government's alleged here, I think I could still look at life in prison as a possible punishment; I'd want to consider that. And can you share with us what your thoughts are on that?

A. Well, I feel that way. I feel, you know, life in prison is not such a great choice either, you know. Some people would prefer the death penalty as to spend the rest of their life in prison I'm sure.

Q. Before you got this questionnaire, did you ever in your mind ever really think much about what you thought of the death penalty?

A. No.

Q. Can you share with us today? I mean, what do you think about the death penalty as a punishment?

3556

A. I imagine there are circumstances that it would be fitting.

Q. The questionnaire -- and I just want to cover one question you had in here, one answer you had. You were asked a question, Do you think that life in prison without the possibility of parole is a severe-enough punishment for somebody accused or convicted of the premeditated, intentional murder of five people, and you checked the box no. And I just want to talk to you about that for a minute. In other words, what -- and this may be a confusing question, and that's why I wanted to clear

Page 197

this up with you.

What this would suggest is that in your view if you intentionally murdered somebody else, life in prison is not a realistic option for you, it's not sufficiently severe, and that's kind of different from what you've told me today, and so I just want to make sure that we understood your answer to this question correctly.

A. Probably can't even remember that I marked it that way either.

Q. Sure. Let me just ask it to you this way. Do you think that even if the government proved intentionally premeditated murder that life in prison may be the appropriate punishment even in a case like that?

A. Possibly.

Q. And what makes it possible for you? Are there things that you'd want to look at?

3557

A. Yes. There would have to be evidence.

Q. Okay. Let me ask you -- or let me go down this line here. In the event that you were back there weighing this decision and you were looking at all these factors and you were leaning toward the death penalty, at this point you'd looked at everything. You'd done that weighing, and you thought, boy, I think the death penalty is probably appropriate. Would you still want to realistically consider, before you made that decision, looking at life in prison, that maybe that's more appropriate?

A. It's hard to say now.

Q. Sure. And please understand I'm not asking you how you would vote. The only question is do you think in your mind

Page 198

Q. whether you would always be open to the possibility that life in prison might be the more appropriate punishment?

A. I believe so.

Q. Let me go to the converse of that in a way. Imagine yourself on this jury if you would, ma'am, and let's assume kind of fast forwarding that you're at this final stage and you have done this weighing process and you have determined that the death penalty is appropriate. You've looked at all the factors. You've considered maybe the defendant's background, whether she had a criminal history. You've looked at these things that might suggest leniency might be appropriate.

MR. MILLER: Two minutes.

3558

Q. And you've looked at -- it's just a time warning for me. You've looked at the factors the government said weigh in favor of the death penalty, and you've done that weighing process, and you've decided I think the death penalty's appropriate in this case. Let's say you go around the room, you talk with the other jurors, and you talk it out, and it ends up everybody else agrees with you that the death penalty's appropriate. At that point to reflect your verdict, each juror would have to, by the Court's instruction, sign off on the verdict form, sign their name to the verdict form that would have the realistic and practical effect of causing another person to be executed.

Now, when I put it to people in those terms sometimes, they say, I support the death penalty in theory, but when you put it to me that I might be responsible ultimately for somebody else to be executed, I just know in my heart of hearts I can never really sign a piece of paper that would have that effect even if, you know, other jurors would have to sign with me

Page 199

because it could never be imposed unless it's unanimous; I just know I couldn't do that. Can you share with us your thoughts on that?

A.   No, I think I would feel through all the evidence and everything that's how it has to be.

Q.   Okay. And so in the appropriate case you think you could impose the death penalty.

A.   I believe so.

3559

Q.   And in the appropriate case even if the other 11 jurors thought death penalty, if you in your own mind thought life in prison was the appropriate punishment, would you be able to say life in prison?

A.   That's a hard thing.

Q.   Can you share with me why would that be a hard thing for you to say?

A.   Well, because I say it all has to depend on what I heard all the time.

Q.   Sure.

A.   I can't decide now what I haven't heard.

Q.   No, absolutely not, and maybe I stated that question wrong. I'm not asking you how you would ultimately vote. It's more along this line. If you thought life in prison was the appropriate punishment despite what everybody else on the jury thought, if that was your decision after hearing all the evidence, you thought life in prison was the appropriate punishment, could you vote that way?

A.   I guess.

Q.   Okay.

A.   I really don't know what you're getting at.

Page 200

Q.   Maybe it wasn't a very well-worded question.  I think I'm going to sit down, and I'll allow defense counsel to get up and ask.

THE COURT:  Mr. Berrigan?

3560

MR. BERRIGAN:  Thank you, sir.

EXAMINATION

BY MR. BERRIGAN:

Q.   How are you, ma'am?

A.   Nervous.

Q.   Not so bad, is it?

A.   Nervous.

Q.   Yeah.  Take a deep breath.  It's not going to get any worse than it's been so far.

A.   Promise?

Q.   Promise, absolutely.  I was interested only in one thing about the publicity thing that I saw in your questionnaire, so let me ask you about that just briefly before we talk about some other matters.  You indicated that you were unsure whether you had any opinion about the guilt or innocence of Angela Johnson.  I took that to mean you didn't really have a view either way.

A.   No, I don't think I did.

Q.   But then there's a question that follows.  It's question 73.  It says, Do you have any beliefs or opinions as to the appropriate punishment for Angela Johnson if she were found guilty of the intentional killing of five people including two children?  And you checked the yes box, and many people did, and then you wrote, Usually guilty by association, which I'm a little bit concerned about; okay?

A.   Uh-huh.

Page 201

Q.   Because you've learned I think by now that Miss Johnson is entitled to be presumed innocent.

A.   Right.  This is --

Q.   Go ahead.  I'm sorry.

A.   This is what we do at school, you know.  If one stays in, they all stay in.

Q.   It's kind of like a little test in that regard.

A.   Right.

Q.   You know Mr. Honken was found guilty from the television accounts.  You mentioned that in your questionnaire; right?

A.   (Nodded head.)

Q.   Is that true?

A.   Would you repeat that, please?

Q.   Yeah, your questionnaire indicates that -- it says, What have you read, seen, or heard about this case, the crime, or the people involved, and you wrote, TV accounts, Honken found guilty, I believe.

A.   Uh-huh.

Q.   You seem even unsure about that.

A.   Yeah, yeah.

Q.   So here's my concern that I want you to see if you can address for me.  This idea that Miss Johnson's guilty by association with Mr. Honken, that's not something that we can live with I guess for lack of a better term for jurors in her case.  You understand?

A.   Uh-huh.

Q.   It would not be fair at all --

Page 202

A. Right.

Q. -- for people to be sitting on her jury who haven't heard any evidence at all and already they're thinking, well, you know, there's this guilt by association. You understand?

A. Right.

Q. So what do you think about that? How big of a problem is that going to be for you?

A. I guess we'd just have to see what all that evidence was, you know. You could determine from that.

Q. Obviously if you heard the evidence you could make a determination.

A. Right.

Q. But here we are right now, 2:26 on Monday afternoon, and right now she's presumed innocent; right?

A. Right, uh-huh.

Q. Not only that, but that presumption of innocence is supposed to last through the trial until you've heard all the evidence; okay?

A. Okay.

Q. And so a couple of months ago when you filled out this questionnaire back in February you had this concern about guilt by association. And right now we can't really have that; okay?

A. Right, right.

3563

Q. Not at all.

A. Right.

Q. She needs to be presumed to be innocent, and that -- and the judge mentioned that this morning, and that means completely innocent. You have to be able to look her in the eye and say, I can presume that you're innocent, Miss Johnson, in order to be

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 3105 of 3245

able to sit on this jury and really believe it, really mean it; okay?

A.   Okay.

Q.   So should I have any concern about that given this guilt by association comment that you wrote down here?

A.   I don't know.  I don't know.  Like I said, I'd have to hear all the evidence.  That's where I would base my decisions on.

Q.   And I don't think I'm doing a real good job about being clear.  I hear you on the evidence.  But we're asking you without hearing the evidence.  I mean, she doesn't have to have people thinking already without hearing anything that she's guilty of anything because of some association that people think she has with Mr. Honken; okay?

A.   Uh-huh.

Q.   Could you understand --

A.   Uh-huh.

Q.   -- if you were in her position that would be unfair?

A.   (Nodded head.)

Q.   That people came into court not having heard a thing and I

3564

already think there's some guilt attached to you because of some association with somebody else?

A.   (Nodded head.)

Q.   You understand?

A.   Yep.

Q.   So --

THE COURT:  Could I jump in here just for a second?

MR. BERRIGAN:  Yes, absolutely.

THE COURT:  Juror 531, I hear this phrase all the time guilt by association, and I'm sure you've heard people use it.

Page 204

You maybe have used it. I've probably used it in my personal context in life, but the law doesn't really -- there is no such thing as guilt by association in the law. You're never guilty merely by associating with others who may be guilty of something. Do you understand that?

PROSPECTIVE JUROR 531: Right.

THE COURT: And so while we use this phrase guilt by association, that's never allowed in a courtroom. You can't think somebody might be guilty just because they associated with somebody else who may be guilty of something. Do you understand that?

PROSPECTIVE JUROR 531: Right.

THE COURT: And part of being able to give Angela Johnson the full benefit of the presumption of innocence is to make sure that no matter who she associated with that she isn't

3565

guilty simply because of any association. Do you think you can recognize that that doesn't make somebody guilty?

PROSPECTIVE JUROR 531: I guess in this case, you know, it's different than just a little school problem, you know.

THE COURT: Yeah, it is.

PROSPECTIVE JUROR 531: This is a much --

THE COURT: Because the law doesn't allow you to assume somebody might be guilty just because they associate with somebody else who maybe is or maybe isn't guilty. Do you understand what I mean?

PROSPECTIVE JUROR 531: Right.

THE COURT: And are you sure that you can give Angela Johnson the full benefit of the presumption of innocence?

Page 205

PROSPECTIVE JUROR 531: I think so.

THE COURT: And what does that mean to you, the full benefit of the presumption of innocence?

PROSPECTIVE JUROR 531: Open mind about it all.

THE COURT: Well, yeah, of course we'd want every juror to be open minded, but it's actually something other than open minded because open minded is I don't know whether she's guilty or not guilty. That's somebody that's open minded. They don't have an idea whether she's guilty or not guilty. Presumption of innocence is really much more than being open minded. It is she is absolutely not guilty. You start with the

3566

presumption that she is absolutely not guilty. And do you think you can do that, give her that presumption that she is absolutely not guilty?

PROSPECTIVE JUROR 531: Yes, I think I can.

THE COURT: Well, do you actually believe it?

PROSPECTIVE JUROR 531: Yeah, after the way you explained it, it's different.

THE COURT: Yeah, it may be different, but it's real important stuff.

PROSPECTIVE JUROR 531: Yeah.

THE COURT: Let me try and come at it a little bit different way. Now, you probably will never be on trial for anything, but if you were -- and it's hard for people to understand that sometimes they could be. If you were on trial, wouldn't you want every juror to presume that you were absolutely not guilty when the case started?

PROSPECTIVE JUROR 531: Right.

THE COURT: And, you know, another thing about the

presumption of innocence, that lasts throughout the trial. In other words, Angela Johnson is presumed not guilty, and that presumption stays with her throughout the trial unless and until the jurors when they go back to the jury room decide the government produced enough evidence beyond a reasonable doubt to prove her guilty. That presumption of innocence stays with her throughout the trial. Do you understand that?

3567

PROSPECTIVE JUROR 531: Right.

THE COURT: And can you give Angela Johnson the full benefit of the presumption of innocence?

PROSPECTIVE JUROR 531: I believe I can.

THE COURT: How sure are you that you can?

PROSPECTIVE JUROR 531: As sure as anything in life.

THE COURT: Right, because you made that point. Life is uncertain, isn't it?

PROSPECTIVE JUROR 531: Right.

THE COURT: But on these things we have to be as certain as we can be.

PROSPECTIVE JUROR 531: As certain as I can be.

THE COURT: That you can give her the full benefit of the presumption of innocence.

PROSPECTIVE JUROR 531: (Nodded head.)

THE COURT: Now, do you really truly believe that, that she's absolutely not guilty?

PROSPECTIVE JUROR 531: I guess so.

THE COURT: What do you mean by I guess so?

PROSPECTIVE JUROR 531: I don't know. There's been no evidence, so I can't say that she is, you know.

THE COURT: Well, we can say she's absolutely not
Page 207

guilty.

PROSPECTIVE JUROR 531: Right, okay.

THE COURT: You agree with that.

3568

PROSPECTIVE JUROR 531: Okay, uh-huh.

THE COURT: And she'll always be not guilty unless the government produces enough evidence to prove her guilty beyond a reasonable doubt.

PROSPECTIVE JUROR 531: That's right, that's right.

THE COURT: Okay. Excuse me for interrupting.

MR. BERRIGAN: No. Thank you, Your Honor.

BY MR. BERRIGAN:

Q. Okay. I'm going to leave that then.

A. Good.

Q. Because we're going to take you at your word, and we're going to talk a little bit about the potential punishments; okay? And you understand from the judge's explanation if we're at that point in the trial -- and that's -- you know, that's a big if; okay?

A. Uh-huh, uh-huh.

Q. The government's going to try to prove that these five intentional murders were committed and that Miss Johnson aided and abetted in the commission of those murders; okay? They're going to attempt to prove that the murders were premeditated, substantially planned murders, and they're going to attempt to prove that the murders included the deaths of two children, ten-year-old little girl named Kandi Duncan and her sister Amber Duncan who was six; all right?

A. (Nodded head.)

3569

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 3110 of 3245

Q. And then the jurors are going to have an opportunity to weigh against that evidence that the defense might present, and that might be evidence like no substantial criminal history or what we call, you know, a prior record of criminal activity, none of that, or maybe even things about Miss Johnson's background, that she was abused as a child, sexually and physical abuse. You with me?

A. Uh-huh.

Q. And then you weigh these things as a juror, individually weigh them, and try to make a determination of which is most important to me of these factors, you know, which do I consider most important in making my determination about life or death; okay?

A. (Nodded head.)

Q. There were a couple of things that you mentioned in the questionnaire that just gave me pause, and so let me just ask you about it. There's a question that says, What are your thoughts and opinions about the death penalty as a punishment for a person who's guilty of intentional murder? And you said, In some cases this is justified, and you used as an example Scott Peterson and the Nebraska bank robbers. And then there's a question right after that that says, Why do you feel this way, or what are some of the reasons for your beliefs? And you said, I feel the victims have not or did not have a choice nor -- let me see if I get that correct -- have or did not have a choice

3570

nor should the guilty. Does that sound right?

A. Guilty.

Page 209

Q.    Guilty?  Right.

A.    Yeah.

Q.    Well, obviously -- maybe not obviously, but if it's an intentional murder situation, we sort of presume that these people didn't choose to die; okay?  And this view about, look, the victims didn't have a choice, they're dead --

A.    Right.

Q.    -- nor should the guilty kind of suggests to me that they should be dead too.  Maybe that's not what you're saying.  I don't know what that means I guess, that phrase.  When you say the victims do not have a choice nor should the guilty, what does that mean?

A.    Well, pretty much what it says I think, you know.  They can't speak for themselves anymore, the victims.

Q.    Right, right.

A.    So I guess that's what we're here to do now.

Q.    That's I suppose one view of it.

A.    Right.

Q.    That people might think that this decision is about the victims and for the victims.  But the law doesn't put you in the place of the victims, you know.

A.    Uh-huh.

Q.    Do you think it would be fair if the victims' family

3571

members were eligible to serve on a jury?

A.    Probably not.

Q.    Right.  You're kind of an independent representative of the community as a juror and not aligned with the victims' families in the manner that the question or the answer suggests; okay?  Let me ask you this, ma'am.  And if this is your view -- and I'm

Page 210

not trying to argue with you or change your mind about it because we have views of people all over the board. But what we're talking about here, the government's certainly talking about, five people intentionally murdered; okay?

A.    Uh-huh.

Q.    After premeditation, substantial planning including two children, and as the prosecutor pointed out to you, even in that case, the law says these are the punishments. There's no death penalty that's required or life that's required. There's two options.

A.    Uh-huh.

Q.    And I'm just wondering how this factors into whether you'd consider both of the punishments. Would you realistically consider a life sentence as an appropriate punishment even for --

A.    I think so, yeah.

Q.    -- even for a case involving five intentional murders including two children?

A.    Yeah, because I find it hard to believe anybody would plan

3572

that.

Q.    Well, the jurors would have already made that decision; okay?

A.    At that point.

Q.    Yeah. By the time we're in this penalty phase, the government will have tried and attempted to have proven these things beyond a reasonable doubt.

        MR. STOWERS:  Two minutes.

Q.    So if you have some concern about is this the right person or did that happen, at least as to the crime, you've already

Page 211

made that determination; okay? And then the issue arises about the punishments and these two options that are available. You with me?

A. Uh-huh.

Q. And I'm just wondering about this response, you know, that these people are dead and they didn't have a choice. Does that mean we don't really have a choice as to the punishment, that your view is there is one punishment and you're not going to consider life because these people didn't have a choice and they're dead and so why does the defendant get a choice? Why do we get a choice for her?

A. Yeah. This is ideally the way it maybe should be, but it isn't that way.

Q. Which is the way it should be?

A. That life for life.

3573

Q. Yeah. That's not the way it is.

A. No, it isn't that way, no.

Q. Right, exactly. And what we really need to know -- it's okay to feel that way. But you have to be able to set that view aside in deference to the law. And we mean really set it aside. You have to be able to promise us you can consider both of the punishments realistically.

A. I'm sure I can do that.

Q. Not just a wink and a nod at life on the way to death. You hear me?

A. No, it's a serious thing.

Q. Seriously consider it. Could you do that?

A. Yes, I can.

Q. A life sentence even for that?

Page 212

A.   I believe I could.

Q.   I'm sure my time's going to expire in just a second.  I want to visit this last question the prosecutor asked you because I still wasn't clear when he asked you twice.  When you did all this weighing of evidence at the very end and all this stuff was proven and you personally came to a decision life is the appropriate punishment here, it would be your decision -- you understand each juror makes that decision.

A.   Right, right.

Q.   Eleven other jurors went ahead of you and said death, I think it's death, I think it's death, I think it's death, I

3574

think it's death, I think it's death, and here you are the lone person for life.  Would you really be able to cast your vote for life under that circumstance?

A.   I can't answer that.

Q.   I'm not asking -- just like the prosecutor, we're not asking you if you'd vote for life.  We're saying if you came to that decision, would the power of the other jurors get you to change your mind on such a decision as this?

A.   If they had some good evidence to persuade me.

Q.   They'd have to persuade you.

A.   Right.

Q.   And if they weren't able to do that, would you be able to hold your guns no matter what the numbers were?

A.   I think so.

        MR. BERRIGAN:  Okay.  All right.  Well, very good. Thank you, ma'am.  Appreciate your time.

        THE COURT:  Ma'am, I've just got a couple questions for you.  Up here.  Nope, looking in the wrong direction.  Here

Page 213

I am.

PROSPECTIVE JUROR 531:  I have one for you too.

THE COURT:  You have a question for me?

PROSPECTIVE JUROR 531:  I have a ticket for some time to go to New York July 7.  What happens to that airline ticket if I don't get to go?  You know, I've invested in that for a special occasion too.  It's just not something I can go --

3575

THE COURT:  What's the trip to New York about?

PROSPECTIVE JUROR 531:  Granddaughter's going to be performing.

THE COURT:  Oh.

PROSPECTIVE JUROR 531:  And then, of course, this biopsy thing, I've had cancer before, so if --

THE COURT:  Yeah, that's what I was going to ask you about actually, but let's try and resolve the question you raised because you raised that first.  You have a ticket to New York on July 7.

PROSPECTIVE JUROR 531:  Right.  I know we're all hoping it will be over with by then.

THE COURT:  We're hoping it will be done, but it might not be.

PROSPECTIVE JUROR 531:  Right.

THE COURT:  What day of the week is July 7?

PROSPECTIVE JUROR 531:  I think it's a Thursday.

THE COURT:  How long are you going to be gone?

PROSPECTIVE JUROR 531:  Till the next Thursday.

THE COURT:  Oh, you're going to be gone a week.

PROSPECTIVE JUROR 531:  (Nodded head.)

THE COURT:  I don't know what to tell you because I

Page 214

don't have a crystal ball. I don't know if we're going to be done or not.

PROSPECTIVE JUROR 531: No. Then I don't think -- you

3576

usually don't get your money back either when you buy a ticket.

THE COURT: Well, that's actually not true. This nonrefundable ticket --

PROSPECTIVE JUROR 531: But I mean I wouldn't be able to go for the event.

THE COURT: No, you might miss the event. If we weren't finished, you'd miss the event because we can't stop for a week for one person to go do that, right.

PROSPECTIVE JUROR 531: I understand that.

THE COURT: So that -- I don't know what to tell you. I'm unsure. So let's talk about this other issue, the health issue. What's your understanding as to what's going to happen next for you?

PROSPECTIVE JUROR 531: I had an ultrasound. On the ultrasound there is a growth or something on there that they want to take a biopsy of, and that's all I know at this point.

THE COURT: Did you have that done -- are you in Rock Rapids?

PROSPECTIVE JUROR 531: Rock Valley.

THE COURT: Excuse me. Are you going to have it done in Rock Valley, or are you going to have it done in Sioux Falls?

PROSPECTIVE JUROR 531: Sioux Falls.

THE COURT: Are you actually a little closer to Sioux Falls?

PROSPECTIVE JUROR 531: A little closer.

3577

Page 215

THE COURT:  And you don't know when that's going to be.

PROSPECTIVE JUROR 531:  No, nothing has been set up at this point because I wasn't home when the call came so -- and it may not amount to anything, but I don't know at this point.

THE COURT:  Yeah, but we don't know.

PROSPECTIVE JUROR 531:  I hope it doesn't.

THE COURT:  Whoa, whoa, we all hope it doesn't.

PROSPECTIVE JUROR 531:  But I had a mastectomy seven years ago, so, you know, that makes you a little more antsy about it.

THE COURT:  Of course it does.  Of course it does.  Do you have any sense of how soon this biopsy's going to be?

PROSPECTIVE JUROR 531:  Well, no.  It'd have to be done in Sioux Falls and have to be set up, so depends, you know, if they could take me within a week or I don't know.  Hopefully soon.

THE COURT:  That's an outpatient procedure, isn't it, usually?

PROSPECTIVE JUROR 531:  Right, and I could probably have it done on a Friday.  I don't know.

THE COURT:  Well, yeah, that'd be great, but, you know, I don't know.  I would hope that you could.  I hope the doctors would accommodate the fact that you're a juror and the only days we're taking off are on Fridays, but right now I'm

3578

more concerned about your health than I am about whether you sit as a juror in the case.

PROSPECTIVE JUROR 531:  Right.  Appreciate that.
Page 216

THE COURT: Why don't you step outside and let me talk to the lawyers, and we'll let you know what your status is; okay?

PROSPECTIVE JUROR 531: Thank you.

THE COURT: Okay. Thank you.

(Prospective Juror 531 exited the courtroom.)

THE COURT: Okay. First why don't we take up the challenge for cause issue. Is there a challenge -- let me -- why don't you be seated. Here's what my thinking is on this. It's just a tentative thought. Assuming that either there are no challenges for cause and no peremptory strike and that she gets empanelled, that it's a tentative empanelment. We see if the next juror qualifies. If the next juror qualifies, then the next juror becomes the sixth alternate and we let her go. If the next juror doesn't qualify -- I don't know. I'm just troubled about this medical condition. You know, I mean, I'm half tempted to just let her go. And if we qualify the next juror, fine. And if not, we come back tomorrow morning. I don't know what to do. That's my plan. I don't know what to do. So let me solicit the thoughts from the lawyers. Mr. Berrigan, what do you think?

MR. BERRIGAN: We certainly don't think other than her

3579

medical condition there's anything that remotely disqualifies her, Your Honor, but I know from some recent experience with my legal assistant in my office, this is a big deal.

THE COURT: It is a big deal.

MR. BERRIGAN: She's already had cancer, so I don't think we're in a position to keep her around with this pending if you have any concern about it. She certainly seems to.

Page 217

Hopefully the next candidate will qualify and we'll be fine, but I don't know that we're in a position to speak to this. Frankly, whatever your judgment is about this, we're fine with it.

THE COURT: I just -- you know, the doctors may cooperate about a Friday. They may not, you know. Generally doctors aren't very cooperative. If you think I do things on my time, they're worse. So I don't know. Mr. Williams, what are you thinking?

MR. WILLIAMS: I would agree with Mr. Berrigan that I think this juror qualifies and isn't struck for cause for any reason. And I guess I agree with Mr. Berrigan likewise. That's why they pay you the big bucks I guess.

THE COURT: You haven't checked the salary schedule lately.

MR. WILLIAMS: Yeah. No, this is a tough -- this is a tough issue, I agree, and I'm not sure that there's a right answer to it. I think we could -- you know, we could go either

3580

way. I can't imagine, frankly, that the doctors wouldn't work around the fact that she's a juror on this case. I mean, I recognize doctors are hard to get around, but I can't imagine given an explanation that she's on a jury that they wouldn't fit her in on Friday. So I'm not so concerned about that as --

THE COURT: But then if it tests positive, I don't think they're going to recommend waiting two months for the surgery.

MR. WILLIAMS: No, absolutely.

THE COURT: So -- well, it actually ties into -- there's another thing I'm thinking about that actually ties in
Page 218

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3120 of 3245

with what I might do with regard to this juror, and that is I can't make you do this, but I think it'd be a good idea and that would be to go ahead and qualify a seventh alternate -- just hear me out on this -- qualify a seventh alternate that nobody has a challenge for cause for and the government doesn't -- well, actually I would think I might say you don't even have a peremptory strike anymore. We qualify a seventh juror for this purpose only, to then bring in 19 people on Wednesday on the theory that something can happen between now and Wednesday and then if we get everybody sworn in without a problem, we'll just let the -- you know, we'll let the 19th person go home, just tell them we have one extra juror; Number So-and-So, you're in just in case a problem develops either tomorrow or Wednesday morning when they come in and all of a sudden somebody -- I've

3581

just had it happen, you know, and I don't think I have any authority to do it, but that way we would have an extra person to lose, and we would send them home at the time I would swear the jury in Wednesday morning.

But if something did develop when the jurors assembled between 8 and 8:30 and we get a note from somebody and somebody just remembered that their first cousin knows -- you know, is Angela Johnson's sister or something -- I don't know -- you know, we'd have something -- we'd have a little margin of error. What are you thinking? So if that's important -- maybe it isn't to anybody else -- then we'd have to go tomorrow anyway.

MR. WILLIAMS: Right.

THE COURT: Or use her as our sixth and then qualify -- if we could qualify 344 and then just send 531 home on Wednesday.

Page 219

MR. WILLIAMS: Sure. I guess my thought on that, Judge, is I'm much less concerned in this case now with the jurors who are going to be jurors have already been notified they're going to be jurors that something like that's going to arise. I think just like we heard from the gentleman here today, 621, I think we would have heard from somebody that they had a problem or suddenly remembered that they were related to the defendant.

THE COURT: You would think so.

MR. WILLIAMS: You would think so. I recognize

3582

anything's possible.

THE COURT: Right.

MR. WILLIAMS: But, frankly, as a practical matter and for the same reason with this juror, that's why we have six alternates, I mean, because something like that's always possible, and we can always strike them and substitute in alternates. There's just no guarantee on this stuff.

THE COURT: So you're saying you're not in favor of selecting a seventh alternate.

MR. WILLIAMS: I'm not opposed to it. I just don't know that it's necessary.

THE COURT: Mr. Berrigan, your view.

MR. BERRIGAN: I guess we're in the same camp. It's quite unusual now twice in a row to agree, but particularly if you kept this juror, sir, and we qualified the next one, we would hope that would be sufficient and then 531 could go. We certainly have no problem with that. We'd like the process to end today if it's at all possible. I know we all would. But if you think a seventh one is absolutely necessary --

Page 220

THE COURT:  No, I don't think it's absolutely necessary.

MR. BERRIGAN:  I kind of agree with Mr. Williams.  I think you'd know by now if there was going to be a problem, and I understand I'm saying that when you lost a juror the first day of Mr. Honken's case is my recollection.  But they, I

3583

understand, came in --

THE COURT:  Yes, it's a little different situation.

MR. BERRIGAN:  Right.

THE COURT:  And I think Mr. Williams is right.  There's less of a chance that that would happen here because everybody knows that they're jurors now.

MR. MILLER:  May it please the Court.

THE COURT:  Yes, Mr. Miller.

MR. MILLER:  If I can just double-team on this one.

THE COURT:  Get it out of your system now.

MR. MILLER:  I think that's a practical solution, and I'm fine with doing that.  It's just we've only talked about the biopsy, and, of course, we can hope that that's negative and she'll be an excellent alternate.  But my knowledge from my own elderly mother who isn't near as patient and pleasant as this lady is that if she were to miss her granddaughter's performance in New York it would cause her enormous stress and anxiety, so I think we need to address that with the lady too before we actually tell her she's been seated.

THE COURT:  And there's no guarantee about that.  So you know what?  I'm going to let her go if there's no objection.  If anybody objects because, I mean, we haven't gone through the challenge for cause dance, but I didn't hear anything.  But I'm

Page 221

only going to do it if everybody agrees to let her go.

MR. BERRIGAN:  Defense has no objection to that, Your

3584

Honor.

THE COURT:  Okay.  Mr. Williams?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Okay.  And it's because of the granddaughter.  Thank you, Mr. Miller.

(Prospective Juror 531 entered the courtroom.)

THE COURT:  Ma'am, we think you'd be a terrific juror. We really do.  But the lawyers reminded me that, you know, this is probably your opportunity to see your granddaughter in New York, and we'd like to think it would be over by then, but we can't guarantee it.  You've earned the right in life to see your granddaughter perform, and so we're going to let you go, and you're dismissed as a juror.  We think you would have been terrific, but it's important for you to be able to see your granddaughter.  Really good luck on your health issue too.

PROSPECTIVE JUROR 531:  Thank you very much.

THE COURT:  Thank you.

(Prospective Juror 531 exited the courtroom.)

THE COURT:  Okay.  Ready to do 331 -- I'm sorry, 344?

(Prospective Juror 344 entered the courtroom.)

THE COURT:  Juror 344, you've been so patient.  Thank you very much.  Any seat you'd like in the front row.

Everybody can be seated.  Thank you.  We're going to first have you questioned by Mr. Berrigan, and then after he's done, Mr. Williams will ask you some questions; okay?

3585

Page 222

PROSPECTIVE JUROR 344: Okay.

THE COURT: Thank you.

EXAMINATION

BY MR. BERRIGAN:

Q. Last but not least, thanks for being so patient. We're just going to ask you questions about two areas. One's pretty simple, and that's what exposure you've had to pretrial publicity about this case, you know, things in the television, newspaper, radio, or maybe conversations you've had or overheard, and you were kind enough to fill out your questionnaire, and I know that took a long time. But that's been very helpful to us, all of us, so thank you on behalf of the parties and the Court.

You indicated you were somewhat familiar with the case. I don't really know any of the details other than those mentioned in this questionnaire. Does that sound about right?

A. That's about right, uh-huh.

Q. And this was back in January, January 27, '05. Have you learned anything else since then?

A. No, I really haven't.

Q. Okay. Great. The source of information that you had were newspaper and television, and I wanted to ask you what newspaper you get.

A. It'd be the local Sioux City paper.

Q. Sioux City paper.

3586

A. Uh-huh.

Q. Okay. And then you indicated you had talked to your husband. My husband and I talked about the case but not to the

Page 223

extent that we discussed the depth of any of these questions, and I just wanted to ask you kind of when those conversations might have taken place and what you recall of them.

A. It was probably before -- you know, we discussed it before I got the questionnaire knowing when the other trial was going on. We talked about those things then.

Q. Do you recollect Mr. Honken's case going on last fall like September, October?

A. A little bit, uh-huh, uh-huh.

Q. There was a pretty regular accounting in the Sioux City paper is my recollection of things.

A. Uh-huh.

Q. Would that have been about the time you had these conversations with your husband?

A. Right, uh-huh.

Q. Did you learn what happened to Mr. Honken in terms of whether he was convicted or not?

A. I did.

Q. What did you learn?

A. What his sentence was?

Q. Yeah. Did you learn that he was convicted?

A. Right, right, uh-huh.

3587

Q. And then what about his sentence? What did you learn?

A. That he was given the death sentence, uh-huh.

Q. At the time that that happened, do you recall having any conversation with your husband in terms of expressing an opinion about it one way or the other?

A. I don't remember anything specific at that time, huh-uh, but thought about it different times, you know. I mean, it's a

Page 224

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3126 of 3245

topic of conversation from, you know, while it was going on, but I can't tell you that it was something specific that we . . .

Q. Okay. Gotcha. And then you indicated that you really had not formed any beliefs or opinions about the guilt or innocence of Angela Johnson.

A. Right, uh-huh.

Q. Is that still true?

A. Right, uh-huh.

Q. So let's talk a little bit about the two potential punishments; okay?

A. Okay.

Q. And when I say potential, we really mean potential. I mean, we're asking these questions about punishment, and Angela Johnson hasn't been convicted of anything.

A. Right, uh-huh.

Q. But the process is such we can't bring the jurors back later if she was convicted and then ask them, Well, what do you think about the death penalty or life in prison, so we have to

3588

do it now; okay?

A. Uh-huh, okay.

Q. So the allegations that the government has lodged in this case is that Angela Johnson aided and abetted in the intentional murders of five people; okay?

A. Okay.

Q. And I've been using these props or books to kind of demonstrate the government's allegations. In order to get past the first part of the trial, what the judge has described as the merits phase --

A. Right.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3127 of 3245

Q. -- the jury would have had to decide that that's true beyond any reasonable doubt. Does that make any sense?

A. Right, uh-huh.

Q. In that respect the trial is like any other trial you've seen on television or heard about. The jurors listen to all the evidence, and they consult with each other, listen to each other's views, and then they make a determination. If it's been proven beyond a reasonable doubt, that's guilty. If the government hasn't proven it beyond a reasonable doubt, that's not guilty; okay?

A. Okay.

Q. And they make that decision as a body, a joint body. In other words, it has to be unanimous. And they all have to agree one way or the other. And if they're not able to agree, then

3589

that's what we call a mistrial or a hung jury. You with me?

A. Right, uh-huh.

Q. If -- and again, it's a big if, but we're going to kind of ask you to kind of fast forward in your head -- the jury's made that determination beyond a reasonable doubt, then there's going to be a second part to the trial or a second stage that the judge has discussed already this morning as kind of like the halftime of the basketball game, and that's going to be the gateway stage of the trial, and the jurors aren't going to hear any more evidence at that point, but they are going to be asked to answer some questions, some legal questions, based on the evidence they've already heard.

A. Okay.

Q. We don't expect that to be long, and because you're not going to hear evidence, it's not going to be weeks' more

Page 226

deliberation. But how ever long that takes, that has to happen. The jurors have to find these things beyond a reasonable doubt, this gateway factor and these aggravating factors, before we get to the third part of the trial; okay?

A.   Okay.

Q.   So now I'm going to ask you to kind of put yourself in the third part of the trial. And the government's going to attempt to prove that these murders were committed after substantial planning and premeditation, the five murders. And furthermore, they've alleged that amongst the five victims was a mother and

3590

her two daughters, Kandi and Amber Duncan, ten and six years of age; okay?

A.   Okay.

Q.   The government may have more evidence that they intend to introduce, but certainly those are things that they're going to attempt to prove to the jury beyond a reasonable doubt. Okay?

A.   Okay.

Q.   And then the defense has an opportunity to present evidence in the third part of the trial as well, and we call those mitigating factors. And they're what you would expect. They're kind of like the opposite of aggravating factors. These are things that the defense would argue these are reasons to vote for life; okay?

A.   Okay.

Q.   So maybe we'd present evidence that the defendant, Angela Johnson, Miss Johnson, has no prior criminal history; okay?

A.   Okay.

Q.   And we ask the jurors to take that into account in assessing the punishment towards life. We might present

Page 227

evidence that her role in this offense, these offenses, is relatively minor compared to other individuals that may have been involved; okay?

A. Okay.

Q. Does that make sense?

A. Uh-huh.

3591

Q. And we would ask the jurors to take that into account in assessing punishment obviously towards life. We might present evidence about her background -- I'll borrow one of these -- that she was sexually, physically abused as a child and there was a very traumatic childhood that caused her to have problems later in life and ask people to assess that as well as on the mitigation side of the equation as a reason towards life; okay?

A. Okay.

Q. And then a juror kind of has to balance these things, and it's very much like scales of justice, you know, the blindfolded Lady Justice with the scales?

A. Uh-huh.

Q. Only thing is it's not a numbers thing. I mean, it's not like, well, two aggravating circumstances, six mitigating circumstances, so they win or vice versa because there may be certain mitigating circumstances that are very important to you. There could be aggravating circumstances that are very important. But the process is an individual one. That is, you personally as a juror, you do this weighing. It's not like the first part of the trial where you all did the decision together. This is individually done by each juror; okay?

A. Okay.

Q. One other important part about these mitigating

Page 228

circumstances. We don't have to prove these beyond a reasonable doubt. Government has to prove everything that they present

3592

beyond a reasonable doubt, but we just have to present this evidence to a preponderance of the evidence. It's more likely true than not true that these things exist.

And the other big thing about mitigating circumstances is the jurors don't have to agree on them. They have to agree on the aggravating evidence, but you could decide, you know, this is really important mitigating evidence to me, and somebody might decide, I don't think that's really worth that much to me, but this is; these two things are very important to me. It's an individual determination again about which mitigating circumstances that you're going to put in this equation; okay?

A. Okay.

Q. Now, that process that I've described is a process that all the jurors have to go through. And then when they've done that, they have to come to a determination, you know, what's the right verdict in their heart and conscience, what's the sentence that's most appropriate, and that obviously is something you're going to live with the rest of your life.

A. Uh-huh.

Q. So you can be a hundred percent confident in that decision because you're making it; okay?

A. Uh-huh.

Q. But the government, their burden of proof is still beyond a reasonable doubt. They don't have to prove stuff to a hundred percent; okay?

3593

Page 229

Case 3:09-cv-03064-MWB-LTS Document 284-70 Filed 06/23/11 Page 3131 of 3245

A.    Okay.

Q.    But we need to know a couple of things about what I've described.  One is can you do that?  That is, could you listen to all the evidence that's presented, the mitigating and aggravating evidence, and then make a decision about which carried more weight with you as to what the appropriate punishment would be?  Could you -- to do the weighing process?

A.    I think so.

Q.    And then there's a trickier question, and that has to do with the result of that; okay?

A.    Uh-huh.

Q.    Some folks have come in and told us, You know, let me tell you something; if we're talking about kids, I don't -- you don't need to worry about any of this mitigation stuff because I'm not going to consider that in assessing the punishment.  That's the death penalty for me.

      MR. STOWERS:  Two minutes.

Q.    Other folks have come in and said, I don't care what's over there.  I don't believe in the death penalty, never have, never will; I've got religious scruples about it; I could never consider it.  And those opinions are perfectly fine.  But the law says we have to have people who can consider both.

A.    Uh-huh.

Q.    And you can lean either way.  That's fine.  You can favor one much more strongly over the other one, but if you can't

                                              3594


really realistically consider each of them, then, you know, that's more of a problem, and it's an okay problem to have.  We just need to know about it; okay?  So what do you think?  Where would you be?  Are you a person that thinks you can really
Page 230

consider both of them?

A.   I think I could.  I think the death penalty's hard for me to say that yeah, I could -- would give someone that because it'd be like me killing someone maybe, you know, but I don't know the whole story, you know, either.

Q.   Well, you know, it's supposed to be hard.  I mean, I don't say that lightly.  You couldn't imagine a more difficult decision I bet, could you?

A.   No, and I'm not -- I don't know if I could be -- if maybe when I found out -- find out what happened if I would say, well, no, maybe I can go death penalty.  I mean, I don't know.

Q.   Yeah.  We're not asking you which way you'd vote; okay?  That would be ridiculous of us, and we're not trying to get you to commit one way or the other.  But if you have views that say, Hey, look, Mr. Berrigan, I feel so strongly about this or that, I don't think I really could realistically -- I couldn't tell you I could realistically consider both punishments because I don't think I could, okay, and if you're sort of in that camp, that's okay, but we need to know it, and if you could consider both, then we need to know that.

A.   I think I could consider both.

3595

MR. STOWERS:  That's your time.

MR. BERRIGAN:  That's my time.  Thank you for your time, ma'am.

PROSPECTIVE JUROR 344:  You're welcome.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

EXAMINATION

BY MR. WILLIAMS:

Page 231

Q.   Good afternoon, ma'am.  I only have 12 minutes.  Hopefully I'll use less than that and we'll be done.  I just want to follow up on a couple of the things that Mr. Berrigan covered with you and focus on the penalty issues.

A.   Okay.

Q.   The possible penalties.  Mr. Berrigan explained to you how this whole process worked, and as he explained to you, it's going to be up to you individually as a juror to attach whatever weight you want to to any of the factors the Court instructs you you should consider.

The important thing, number one, is that you agree to follow the Court's instruction.  If the Court says you are to consider these factors if they're found by you, that you'd be willing to comply with that instruction.  And from what I understand from your conversation with Mr. Berrigan, that's something that you're willing and think you're capable of doing.

A.   I think so.

3596

Q.   Sure.  The other thing to know is that how much weight you give to any one of these various factors is going to be completely up to you.  You can decide one factor weighs very heavy and outweighs all the rest of the factors on the other side or vice versa.  You understand that's going to be your decision to make.

A.   Okay, uh-huh.

Q.   Want to talk to you about two things, one of which is the charge in this case is that the defendant aided and abetted the murders of these five people; okay?  And assume the evidence shows that she did not actually pull the trigger, she aided and abetted.  Now, some people come in, and they talk to us when

Page 232

we're kind of exploring their views on the death penalty, and they tell us candidly, Wait a second, if you're telling me she didn't actually pull the trigger, then I could never realistically consider the death penalty; in my view the death penalty only belongs on somebody who actually pulls the trigger on a murder; and if her role was one of aiding and abetting, I just couldn't realistically consider the death penalty under those circumstances. What's your thoughts on that?

A. I might tend to agree with that. I'm kind of -- I don't know, you know. It's like you need time to think about some of these things, you know. I feel kind of wishy washy like I don't know what I would decide, you know.

Q. It's kind of hard, and these are hard issues to struggle

3597

with intentionally. Here's maybe another way of looking at it. Could you consider that the death penalty might be appropriate for somebody who didn't pull the trigger on a crime?

A. At this point, I don't think I could.

Q. And share with us why. What's your thinking along those lines?

A. I guess it'd just be hard for me at this point, you know, because I really don't know -- I know that there's people that died, you know.

Q. Sure.

A. But for me to give the death penalty to someone, I just don't think that I could do that.

Q. And why do you say that?

A. I think like previously, I just feel like I couldn't take someone's life from them regardless, I don't think, of what they may have done, although it's hard for me to even think about

Page 233

that. But I don't think that I would be comfortable giving the death sentence to someone.

Q. Sure. And please understand, your views are totally legitimate views, and no one's going to try to talk you in or out of any view. We appreciate the fact you're being candid with us about your thoughts on this issue. Let me ask you, Mr. Berrigan did talk about this a little bit. If you were on this jury and you got to the point where you had done all this weighing process and you'd intellectually weighed all these

3598

things and you said, Okay, boy, now looking at it, I think the death penalty's the more appropriate punishment and you go around the room and everybody else agrees with you, at that point in order to actually reflect your verdict, each of the jurors would be required by law to sign their name to a verdict form. And by signing your name to that verdict form, it would have the real effect of causing the execution of another person. And some people candidly tell us, I could never do that; I just -- my personal value system is such that I could never cause the death of another person; I don't care what the facts are; I just couldn't do it. What's your thoughts on it?

A. That's what I feel right now, that it would be hard for me to do that. I couldn't honestly --

Q. Well, there may be --

A. I don't know.

Q. I don't want to interrupt you. There may be a difference between hard to do it and the ability to do it at all. And some jurors say, I know I couldn't; I just know I couldn't sign -- I don't care what the facts are; I just couldn't sign a piece of paper that would cause somebody else to die.

Page 234

A.   I think that's -- yeah, I really couldn't.  I say I don't think I could, but I really don't feel like I could -- it would be hard for me to live with that if I did so . . .

Q.   And do you think that your views against causing somebody else's death are so strong that it would impair your ability to

3599

realistically consider the death penalty as an option?

A.   Probably.

Q.   If you knew you always had the choice between life imprisonment and the death penalty no matter what and you always could say life in prison, do you think no matter what the evidence was that you would ever choose the death penalty if life in prison was always an option for you?

A.   I would probably have to go with life in prison, uh-huh.

Q.   So going kind of back to the question that Mr. Berrigan had asked you earlier, kind of given your views about the death penalty at this point and your own struggle with your ability to actually cause somebody else to die, do you believe you could realistically consider the death penalty as a possible punishment if you were called upon to be a juror in this case?

A.   To realistically -- no, I really don't think I could.

            MR. WILLIAMS:  Thank you very much.  Appreciate it.

            THE COURT:  Juror 344, I'm just curious because I've kind of seen you evolve through the questioning.

            PROSPECTIVE JUROR 344:  I know.  I know.

            THE COURT:  There's nothing wrong with that.  That's okay.  I'm not being in any way critical of it because we've seen that time and time and time again, but it seems to me you started off as someone who could fairly consider both penalties.

            PROSPECTIVE JUROR 344:  Uh-huh.
                Page 235

THE COURT: And then as the questioning went on,

3600

you've gravitated toward somebody who just feels you could never impose the death penalty.

PROSPECTIVE JUROR 344: When I think he mentioned you'd actually have to sign your name and say you were responsible for this person being executed, that's a -- I don't think I could do that when it came right down to it. You know, I don't know -- it'd be different just saying, you know, like raise your hand if you agree with -- you know, but to actually come down and -- yeah, I do feel like it's a hard thing for me to even think about these things.

THE COURT: Sure.

PROSPECTIVE JUROR 344: As we're going through the process, I really -- I don't feel like I could give the death sentence to somebody.

THE COURT: Is that a philosophical, religious, economic, sociopolitical view? Can you clarify where that view comes from?

PROSPECTIVE JUROR 344: It's what my heart's telling me. I mean, even though I know that somebody else is dead because of a person or something, I think my heart's just telling me that no -- you know, and I think I'm learning as I'm going here, too, what I'm really feeling.

THE COURT: Sure.

PROSPECTIVE JUROR 344: And --

THE COURT: Well, let me ask you this. Do you

3601

Page 236

think -- I'm not a juror, so I don't know whether your heart would be the one that makes the decision. Under the law it doesn't talk about your heart making the decision. It talks about aggravating factors and mitigating factors and you have to consider evidence of both, and then you have to weigh them. And, for example, an aggravating factor could be the death of two children if the jurors found that the children are what are called vulnerable victims. That could be an aggravating factor. Are you telling me that you don't think you could weigh these factors?

PROSPECTIVE JUROR 344: I'm not saying that that's what --

THE COURT: Is it just signing the name to it that is the most troubling thing?

PROSPECTIVE JUROR 344: No, no, no. Honest -- it's just -- I guess I can't understand how someone could kill someone anyway, you know, so this whole process is hard for me to understand. And by me giving the death sentence to somebody, in a way it's not killing someone, but I think when it comes right down to it, I just don't feel like I could do that.

THE COURT: And you can't do it because?

PROSPECTIVE JUROR 344: I don't feel it's right.

THE COURT: You don't feel the death penalty is right in any case?

PROSPECTIVE JUROR 344: I guess at this point that's

3602

probably the way I feel, uh-huh. You know, I don't know how to say this, you know, other than to -- I guess I'd put myself in other people's shoes, you know, and if it was a family member, you know, I don't know how I'd -- I honestly don't know how I

Page 237

would feel, you know, to think if that was my child that had been killed.

THE COURT: Okay. But it's not, so that's a hypothetical situation we're not going to encounter in the courtroom here. But the question really is in this case can you fairly consider both penalties?

PROSPECTIVE JUROR 344: I thought I could.

THE COURT: But now you think you can't.

PROSPECTIVE JUROR 344: But I don't think I can.

THE COURT: Okay. That's fine. We're going to ask you to step outside, and I'm going to talk to the lawyers. Thank you.

(Prospective Juror 344 exited the courtroom.)

THE COURT: Looks like we'll be back here tomorrow morning despite everybody's best efforts.

MR. WILLIAMS: The United States just for the record would move for cause on this juror, Your Honor.

THE COURT: What's the defense position?

MR. BERRIGAN: We have no position respecting this juror, sir.

THE COURT: She's substantially impaired. She could

3603

not fairly consider the death penalty in this case. I think she could for a while. She's moved for whatever reason that may be. It may just be good soul searching. It may be the realization that she was inches away from being on the jury. Who knows what it is?

MR. WILLIAMS: Well, and just to her defense to some degree and the reason I was pushing that is she was somewhat like that in her questionnaire. She said, I'm afraid I might

Page 238

have to think about the death penalty, and she said, Who am I to be giving somebody else a sentence of death?

THE COURT: Yeah.

MR. WILLIAMS: So it wasn't just a transition today. I think this is kind of where she was to begin with.

THE COURT: Okay. Well, we'll let her know that she's excused.

(Prospective Juror 344 entered the courtroom.)

THE COURT: Juror 344, we're going to go ahead and excuse you from this case. Good luck to you, and thank you very much. Are you okay?

PROSPECTIVE JUROR 344: Yeah.

THE COURT: You look a little shaken, but good luck to you.

(Prospective Juror 344 exited the courtroom.)

THE COURT: Okay. Please be seated. We're going to try tomorrow but without the 80-year-old juror. I don't see any

3604

point in bringing her in.

MR. WILLIAMS: That's fine, Your Honor.

THE COURT: And was there another addition to tomorrow?

THE CLERK: Yes, there was one additional juror added.

THE COURT: Do you know what that juror number is?

THE CLERK: I think it was 449. I handed out a new seating chart to the parties.

THE COURT: Oh, so the parties would know what it is.

THE CLERK: Uh-huh.

THE COURT: As long as everybody knows. I'm usually the last to know. That's fine. I guess tomorrow we'll do our

Page 239

thing, and as soon as we get one selected --

MR. WILLIAMS: We'll quit.

THE COURT: Yeah, I think what we'll do is I'll just require them to go down to the jury room and stay in the jury room rather than like, you know, I let them go because some of them don't come back till after lunch. And if you all want to look at the questionnaire and if there's one you think you can agree on, we can put that person first.

MR. BERRIGAN: We're certainly amenable to that, Your Honor. Just give us ten minutes here, and we don't need to question them at all.

THE COURT: I'm actually serious. You know, when we send them back down, if there's one that you think has a better

3605

chance of qualifying and you all want to agree to that ahead of time, otherwise I'll just go in the same order unless there's a reason to deviate from the order, somebody's gotta call an employer or something. But if the parties agree to an order, far be it from me to stand in your way.

MR. WILLIAMS: Here's another thought. If, in fact, we think there's one, two, or three likely candidates, query whether we can just forgo the general questioning at the beginning period, you go through your questioning, and as soon as you're done, send them down; we just bring them up individual and handle all the issues.

THE COURT: Give you a little bit more time to do it.

MR. BERRIGAN: Sure. That'd be great. Great idea.

THE COURT: Yeah, I'd be happy to do it that way too. And if you agree on a sequence, if you want to sequence out of the randomness and say we're going to take them individually in

Page 240

the following order, as long as there's agreement, uniformity, I think it's a great idea.

MR. BERRIGAN: We'll certainly propose a sequence, Your Honor.

THE COURT: Okay. Well, we'll see you back here -- why don't we just meet at eight o'clock tomorrow morning and you can fill me in on a sequence if there is one.

Mr. Willett, you were going to say something.

MR. WILLETT: Just one thing if I may, Your Honor. I

3606

am assuming since we could not empanel our sixth alternate today that that idea of an off day tomorrow -- since it's being taken up by finding that last alternate, I'm assuming that the Court still wishes to start this trial on Wednesday and that we won't have an off day on Wednesday and then start Thursday.

THE COURT: You're absolutely right about that.

MR. WILLETT: Just wanted to make sure I was on the same page you are, Judge.

THE COURT: You are. The defense has filed two additional motions. I don't know if you're aware of that.

MR. WILLIAMS: I am, Your Honor. They've also filed another one over the weekend that I drafted a response to, the contact motion.

THE COURT: Oh, oh, right, right.

MR. WILLIAMS: I drafted a response, and it's either filed today -- not yet. It will be soon filed.

THE COURT: Yeah, that I don't have a need to take up before we start jury selection, but the other two I would like to.

MR. WILLIAMS: Sure.

Page 241

THE COURT: So we can either hear them later on today whether you filed a resistance or not. Doesn't make any difference to me, but I'd like to have them heard.

MR. WILLIAMS: Sure. I'm open to any time.

THE COURT: You want to take a half-an-hour break and

3607

then come back and hear argument on the motions?

MR. WILLIAMS: Sure.

THE COURT: Okay. Thank you.

(Recess at 3:22 p.m.)

THE COURT: Okay. Everybody ready? Please be seated. Why don't we take up the renewed motion to strike the death penalty first. Mr. Stowers, you want to --

MR. STOWERS: Yeah. Your Honor, I think we argued this motion it seems to me in December prior to the government most recently amending the indictment. At that time the indictment provided both that the allegation was that Angela Johnson had intentionally killed each of the five named victims or that she had aided and abetted in the killings of them.

And now, of course, as recently as Friday I think it was the indictment was amended to remove the allegation that she was the principal leaving only the allegation of aider and abettor.

Under the prior version of the indictment, the Court had in part relied upon the fact that she was indicted as a principal, although the Court also, of course, in its ruling indicated some desire to await the resolution of the evidence or a finding of what the evidence at trial would show.

But we believe that at this time the death penalty notice should be stricken particularly as to the counts

Page 242

involving the adult victims where Mr. Honken, of course, in the

3608

prior trial before you last fall was sentenced to life terms for his role as a principal in those killings, and it seems to us that it would be a violation of the Eighth Amendment to allow the death penalty to proceed against Angela Johnson when her role now is clearly and explicitly and solely alleged to be that and her liability is solely alleged to be that of an aider and abettor as indicated in the amended indictment.

We've also expanded the motion from the prior motion as it relates to the children, although Mr. Honken received a death penalty with respect to the children, that -- the killings of the children and the counts alleging the killings of the children. It's our position at this point that in light of the amended indictment we believe that under the circumstances the pursuit and imposition of the death penalty against Angela Johnson under these circumstances would violate the Eighth Amendment to the United States Constitution.

And we've relied on our prior brief and authorities which I know you've gone over and evaluated in your prior opinion and would not have anything further to say on that unless, of course, you wanted to ask some questions. Thank you.

THE COURT: I don't have any. Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. The prior authority cited by the defense as the government responded the last time was authority on state court decisions. Not a single

3609

federal case has held that it's the Court's role before the

Page 243

evidence is put on to determine whether under proportionality theory the defendant's Eighth Amendment rights have been violated.  And so there really isn't any authority to support the defendant's proposition.

The Court previously indicated that the basis, the initial basis, for the defendant's motion when they filed it before was that -- was mistaken in that the government did allege that she was a principal and noted that but then went on in its opinion to say the bottom line is that this is a issue that is contemplated by the statute.  It was contemplated that the jury would take into account what the role was of a defendant in determining whether it's appropriate for punishment.

The government noted and we've noted throughout the jury selection in this case that simply because somebody is termed an aider and abettor doesn't per se indicate they are less criminally culpable than the person who pulls the trigger, and that is for the jury to decide ultimately whether she is less criminally culpable than the defendant and to weigh those factors and to weigh whether her role in the offense is something that should suggest that she should receive less of a penalty.

And so the change from the government choosing to pursue only an aiding and abetting theory doesn't in any way

3610

undercut the basis for your prior decision or the analysis you engaged in, and it doesn't negate the response that the government previously made on that same issue.

THE COURT:  Why don't we turn to the other motion, motion in limine regarding evidence that defendant was a

Page 244

principal.

MR. STOWERS: Based upon the most recent filing of the government which sought to strike the allegation that Angela Johnson was the principal in any one of these killings, it's our position now after nearly five years of this case pending that the government at this point has at long last elected a single theory upon which they intend to proceed to trial in front of the jury, and they have adopted that theory, and that's really consistent with -- mostly with the way that the Honken case was tried wherein it's our view of the way that case was tried, although it's certainly open to some dispute, that they essentially tried that case on the theory that Mr. Honken was the principal in those killings, although that may be debatable to some extent.

It's our view of the way they went to trial in that case that was their view, that at this point the government should be limited in their comments to this jury and also in their presentation of evidence through witnesses and exhibits and that sort of thing to solely presenting evidence in support of the newly revised indictment which is that she was merely the

3611

aider and abettor.

I think there was some discussion maybe in the second week of jury selection and has been in prior filings and things by the government that there may be a couple of witnesses or suggestions that perhaps Angela Johnson may have been more than an aider and abettor with one or more of these persons. But they've apparently now abandoned that theory, and we believe having abandoned it now in the middle of jury selection, particularly in light of the way the Honken case was tried, they

Page 245

should be limited and precluded from arguing or suggesting that the evidence shows otherwise, particularly since that allegation is no longer part of the indictment and that it would be a violation of due process for them to argue a theory which in our view is inconsistent with the way they tried the Honken case and which at this point, frankly, would have an element of gamesmanship to it in light of the way the jury selection has gone on that issue of aider and abettor versus principal and changing theories in mid selection of the jury.

So we think the government should be limited in its presentation of evidence and arguments and statements to the jury consistent with its new revised indictment.

THE COURT:  Well, I didn't understand the government to change theories.  I understood the government to withdraw alternative theories.  There's a huge difference.

MR. STOWERS:  Well, I think it's a change if you go

3612

from having an alternative theory to just one of the two alternatives.

THE COURT:  Yeah, but what prevents them from doing -- you weren't prejudiced by that.

MR. STOWERS:  Well, no, I'm not saying that we were. What I'm saying is that they should be limited to the theory that they finally adopted in the indictment as amended -- that's what we're saying -- and that they shouldn't be allowed to now go back after having amended the indictment and now attempt to offer evidence or arguments or comments suggesting, for example, well, all we've charged her with is aider and abettor, but she really actually may have shot those people or such arguments as that which we really think really kind of crosses the line

Page 246

between what should be allowable and what is not allowable.

THE COURT: And your authority for the proposition that it crosses the line is Smith versus Groose?

MR. STOWERS: That case recites a lot of the general concepts on -- yeah, on what it really is appropriate for a prosecutor to do and not do in the context --

THE COURT: That case is quite different than the situation here. In that case the prosecutor had inconsistent statements from the same witness that they used in related prosecutions. That's not what's happening here.

MR. STOWERS: It may be factually distinct, but the concept of it is that -- I don't know that the underlying

3613

premise of it is really that different because here we have --

THE COURT: Well, there's nothing inconsistent about the prosecutorial theories here. One, they have only one theory, now aiding and abetting, but that was never inconsistent with the alternative theory that the defendant was a principal. That's a huge difference between this case and the Smith case.

MR. STOWERS: I guess I'm sort of on a different -- I understand your point. I'm not saying that their original was inconsistent necessarily, but now that they've amended it, they've amended it, and that's where we are is that's their theory.

THE COURT: Well, it seems to me the issue is not really what you frame. They can't argue it because it's no -- they can't argue she's a principal. I think the government would agree with that. The issue is notwithstanding the fact that their theory is aider and abettor, if they have evidence that she's a principal, can they be allowed to use that

Page 247

evidence, and if not, what theory prohibits it? That's the issue.

MR. STOWERS: Yeah, and if you frame it that way, that's fine. In part I think the reason that they should not be allowed to do that is that they have come out now and said, Our position is that Dustin Honken was the shooter, he was the killer. And my understanding in reading the Honken record, although it's not as explicit as certainly it might have been

3614

and maybe has been in some other cases, that their essential theory in that case was that he was the shooter. And then, secondly, they've now come out by amending our indictment and adopted that clearly and without equivocation really saying that he was the shooter and that she was merely the aider and abettor.

And I don't think that they can go back now and throw additional evidence into the record or offer additional evidence or argument in the record. To suggest that she may not have been the aider and abettor, she may have been the principal seems to me to be confusing to the jury. We think it's unfair, unfairly prejudicial to us to have that theory thrown back into the case, and we also think it implicates these due process concepts that are addressed in the Eighth Circuit case that we indicated in our brief and some of the other cases because they are really kind of involved in flip flopping around to fit the conveniences of the case and what evidence is available or not available to the point where it really smacks of violating the fair play concepts that the cases talk about. So that's really kind of the nut of the argument.

THE COURT: Okay. Mr. Williams?

Page 248

MR. WILLIAMS: Thank you, Your Honor. First, the defendant presumes in this motion, explicitly says the decision was made by the United States attorney consistent with his obligations as a prosecutor because the government believes the

3615

aiding and abetting theory is supported by credible evidence while the theory the defendant is a principal is not. That's a presumption without any basis.

The government made that election because we believe the evidence was far, far stronger that she was an aider and abettor but made no judgment by making that election that somehow we think the evidence of her being a principal is somehow incredible.

The defense then also in their motion says it would be improper for the government to introduce -- or to have made that election decision for purely strategic reasons citing no authority for that, and I fundamentally disagree. I could have a hundred counts and it's completely my choice as a strategy on which of those that I think I want to proceed to trial on as a matter of strategy, and there's absolutely nothing improper for me to decide to elect not to pursue a charge even though I think there's evidence to support it if I don't think that's the best way for me to try my case. So those two premises are wrong in the first instance.

With regard to the admissibility of the evidence of her being a principal, number one, it is admissible in this case. The jury's entitled to know all the facts. And while the government's theory is and shall be and will be that we believe the evidence points to her being an aider and abettor, that doesn't mean that somehow evidence suggesting that she may have
Page 249

been involved in the killing is somehow fundamentally inadmissible.  We will not argue to the jury that they should find that she was the principal shooter in this case.  But that's a far different argument or different issue than whether the evidence of her being a shooter or principal is admissible.

THE COURT:  Well, what's it admissible for?

MR. WILLIAMS:  Well, it's admissible for a couple things.  One is that it shows her knowledge of the case.  I mean, this will come in in context with her relating statements or admissions to other people.  And so for her to make statements to some people about how this crime went down shows her involvement in the crime, that she may have described her role differently --

THE COURT:  Well, it shows her knowledge.  Whether or not that means she was involved is for the jury to decide.

MR. WILLIAMS:  Yes, exactly.  I mean, it does show her knowledge.  I mean, how would she know how this happened?  And the very fact she's making that admission suggests she was involved, yeah, is ultimately for the jury to decide, but it's evidence that she was involved, that she's --

THE COURT:  Well, it's evidence upon which a juror might be able to find that if there's other evidence.  It's really just evidence that she has knowledge.  Not everybody who has knowledge is necessarily involved because somebody could tell you what happened and you wouldn't have any involvement at

all.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3152 of 3245

MR. WILLIAMS:  Certainly.

THE COURT:  And you could still know.

MR. WILLIAMS:  But this is where what she says is so important because she doesn't say, Boy, I know what happened. In some cases she is alleged to have said, I did it, and so in that instance it's not just "I have knowledge of what happened" but "I was involved in it, in the actual killing."  And so to that extent it shows that she was involved in the activity.  And so it's admissible there.

It's also somewhat inextricably intertwined with the rest of the evidence.  For example, Sara Bramow will be asked what did she tell you about this crime, and Sara Bramow is going to be relating what happened as she went into the house and Honken was there and what happened and Lori makes noise and she, you know, takes her out, quote, unquote, whatever that means at that point because she made noise and woke up the children.

It's hard for the jury -- for Sara Bramow to tell what she knows about this and leave out parts of it, and there is no reason, frankly, to deprive the jury from the knowledge of what the defendant told these people.

Now, there's not going to be a lot of evidence of her being involved as a principal in this case.  To my knowledge and my recollection of the evidence at this point, I think it's only going to come up with two witnesses, Sara Bramow and Robert

3618

McNeese.

THE COURT:  And with the first witness is the only evidence that falls in this category a statement that she took Lori Duncan out?

MR. WILLIAMS:  With regard to Sara Bramow, yes.

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3153 of 3245

THE COURT:  And that's ambiguous as to whether that's evidence of being a principal or evidence of being an aider and abettor.

MR. WILLIAMS:  And she's going to say she wasn't sure exactly what that meant is my understanding other than she took her out.  Now, that could mean shot her.  That could mean took her out of the house.  It could mean knocked her down, beat her up.  I mean, who -- put duct tape over her mouth.  Hard to say what that means.  And so that is an ambiguous statement.

The other one would be from Robert McNeese, and I believe he would testify that at one point in the conversations they had she indicated that she shot Terry DeGeus.  Now, I think he is also going to be testifying that she made inconsistent statements about what her role was and also said at other times that she didn't shoot anybody.

But I think, again, that's something the jury's entitled to know and take into consideration in determining what her role was in this case in that crime and what her involvement really was.

And there's just no authority in my view for keeping

3619

that evidence away from the jury or really fundamentally demonstrating how the defense is somehow prejudiced by it simply because we've elected between the two theories to pursue only one of the two theories.

THE COURT:  Anything else you'd like to add?

MR. WILLIAMS:  No.  Thank you, Your Honor.

THE COURT:  Mr. Stowers, anything else you'd like to add?

MR. STOWERS:  Well, I just find it really a troubling

Page 252

issue for the Court as well as the government counsel because what they're really saying is they wanted to remove the allegation from the indictment because they don't want to be in a position of having to argue that to the jury, but they still want to be able to offer all that same evidence for the jury to have in their laps so that they might get the impression that Angela Johnson actually was the principal and the shooter with respect to at least some of these people based upon their evidence.

THE COURT: The question is why is that impermissible?

MR. STOWERS: Because that's not the theory this case is being tried on at this point. It's not the theory of the indictment. Frankly, if they want to present evidence that she was the principal, I guess the Court could instruct if you find that she was the principal you should acquit her, I mean, because now that's not in the indictment. You know, I don't

3620

know where we're going with this evidence.

I think it really is kind of a little bit of a strategic gamesmanship on the part of the prosecution to go this way, and I think it does implicate these due process cases very directly because they don't believe these witnesses.

If you go back to the record from -- I think it was the second week of jury selection when they were complaining about some of Mr. Berrigan's assertions and the Court said at that point something to Mr. Berrigan there's no allegation in this case that she was the shooter, is there, and we relied on the indictment, then Mr. Williams stood up and said, Well, there's kind of a scintilla I think was the word he may have used of evidence to that effect. And that's kind of where it

Page 253

was left, and I think he kind of downplayed the evidence, almost suggested it wasn't believable or credible or that they were really adopting it. Now they want to put it into the record.

THE COURT: Well, I thought he's been pretty consistent. He said that there's very little evidence of direct evidence that she was a principal but it just comes up through two witnesses, and I think that's what he told me the time before.

MR. STOWERS: Right. But they also made comment on the quality of the evidence as well.

THE COURT: Well, let me ask you this. Have you read carefully the Smith versus Groose case?

3621

MR. STOWERS: Yeah. And I don't think that that case certainly is on all fours with where we are, but I do think that the concept of that case which is part of a very small little body of law in that area on inconsistent theories being argued, it's the best Eighth Circuit case there is on that point. How about that? And we're in the Eighth Circuit. There's some other circuits that have dealt with that issue I believe in different contexts but . . .

THE COURT: Do you have any case that's factually more on point than the Smith case that you're aware of?

MR. STOWERS: I don't.

THE COURT: Okay.

MR. STOWERS: I think the key is how did they present the Honken case, how did they argue that versus how are they attempting now to go forward in this case and what evidence and theories are they trying to put in front of this jury and whether or not there's some inconsistency that's so great that

Page 254

that causes some due process issue.

And then related to that and a little different aspect is this idea that they did change the indictment right at the last minute after four and a half to five years of this case pending and now they've said aider and abettor only, and that's where we are. And it seems to me that's where we are and that's where the evidence ought to be and that's where everybody ought to be trying this case and that's where the jury's heads ought

3622

to be. They shouldn't be getting confused with other stuff, and we shouldn't have to be worrying about defending sort of a straw man theory that's floated out through a witness or a ghost theory that they float into the jury box and then we have to kind of deal with that potentially because the jurors are going to be thinking about it once they hear about it even if counsel for the government says they aren't going to argue it. It ought to just be limited to the theories of the indictment at this point. Thank you.

THE COURT: Isn't the question framed another way is evidence that the defendant was a principal admissible in a case where the government has limited its theory to aiding and abetting? Isn't that the issue?

MR. STOWERS: That would be another way to look at the issue. I think you can look at a lot of issues from a lot of different ways as you probably do and often do in your opinions. That's another way to look at it. I think it would be extremely interesting if a defendant were charged with aiding and abetting and the government came in and proved that they were the principal, would the defendant in that case be entitled to an acquittal because they proved something that they weren't

Page 255

charged with?  I think probably so.

THE COURT:  Maybe, unless they also proved aiding and abetting.

MR. STOWERS:  That's right.

3623

THE COURT:  Because they're not mutually exclusive.

MR. STOWERS:  I'm not sure about that because you don't aid and abet a crime.  You aid and abet a person who commits a crime.  And so the only way she can commit the offense of aiding and abetting is by aiding and abetting Dustin Honken in committing the intentional killings.

THE COURT:  Couldn't she -- well, interesting.

MR. STOWERS:  You can't be an aider and abettor without having a principal by definition.

THE COURT:  You can have more than one principal.

MR. STOWERS:  Right, but if you're the aider and abettor, you gotta have at least one principal which would --

THE COURT:  Other than yourself.

MR. STOWERS:  Other than yourself, right.

THE COURT:  Right.

MR. STOWERS:  And in this case that other person would be and clearly the only other person in play is Mr. Honken.  And so he'd be the principal.  She'd be the aider and abettor to him in the commission of his intentional killings of these five people that we're talking about.  And that's the case theory right now that we're dealing with.

THE COURT:  Okay.  Anything else?

MR. STOWERS:  No.

THE COURT:  Mr. Williams, anything else you want to add?

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 3158 of 3245

MR. WILLIAMS:  No, Your Honor.  Thank you.

THE COURT:  Well, I'll have written opinions for you tomorrow.  I don't know when but before the end of business tomorrow.

I don't know what I'm going to do with your third motion on the contact visit.  I want to read the government's response.  You indicated you filed a response to that motion?

MR. WILLIAMS:  I gave it to Sali to get filed today.  I don't know if she's got it done yet or not.  Should get filed today.

THE COURT:  After I take a look at that, then I'll decide what I'm going to do, if anything.

Anything else we need to talk about?

MR. BERRIGAN:  Nothing by the defendant, sir.

THE COURT:  Anything else?

MR. MILLER:  No, Your Honor.  Just we have not yet met.  We've talked about meeting.  We're going to meet immediately about trying to prioritize these jurors.  Just as a heads-up, we got a lot of people who almost look on paper to be disqualifiable.  I just thought I'd forewarn the Court.

THE COURT:  Not many that look --

MR. MILLER:  Just at a glance, Your Honor, and obviously we need to chat about these people.

THE COURT:  Well, in that case, you know, it'd make even more sense to try and prioritize them, see if we can get

3625

the sixth juror.

Okay.  We'll see you tomorrow morning.  Shall we --
Page 257

why don't we meet at eight o'clock, and you can tell me what you've decided if you want to try and prioritize calling the jurors in for individual questioning.

MR. BERRIGAN:  If we could take up a collection, Your Honor, to offer one of the jurors perhaps to be the alternate, that may be the way to go.

THE COURT:  Well, maybe you could take up a collection from the jurors themselves to see which one -- see if they want to contribute.  Okay.  We'll see you tomorrow morning.  Thank you.

(The foregoing trial was

adjourned at 4:24 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

```
                                    2-17-06
    Shelly Semmler, RMR, CRR          Date
```

3626

INDEX

PROSPECTIVE JUROR:                                      PAGE:

Prospective Juror 23
            MR. WILLIAMS                                3446
            MR. BERRIGAN                                3455

Prospective Juror 9
            MR. BERRIGAN                                3467
            MR. WILLIAMS                                3479

Page 258

Prospective Juror 214
                  MR.  WILLIAMS                                    3498
                  MR.  BERRIGAN                                    3507

Prospective Juror 675
                  MR.  BERRIGAN                                    3518
                  MR.  WILLIAMS                                    3528

Prospective Juror 477
                  MR.  WILLIAMS                                    3531

Prospective Juror 331
                  MR.  BERRIGAN                                    3542

Prospective Juror 531
                  MR.  WILLIAMS                                    3550
                  MR.  BERRIGAN                                    3560

Prospective Juror 344
                  MR.  BERRIGAN                                    3585
                  MR.  WILLIAMS                                    3595

                              *****

3627

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,　　　　　　　No. CRO1-3046

　　　　　　Plaintiff,　　　　　　　　Sioux City, Iowa
　　　　　　　　　　　　　　　　　　May 3, 2005
　　　vs.　　　　　　　　　　　　8:28 a.m.

ANGELA JANE JOHNSON,　　　　　　　　VOIR DIRE OF
　　　　　　　　　　　　　　　　　　PANEL O
　　　　　　Defendant.
　　　　　　　　　　　　　　/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

3628

APPEARANCES:

For the Plaintiff:　　　　C. J. WILLIAMS, ESQ.
　　　　　　　　　　　　Assistant United States Attorney
　　　　　　　　　　　　Suite 400 - Hach Building
　　　　　　　　　　　　401 First Street Southeast
　　　　　　　　　　　　Cedar Rapids, IA  52401

　　　　　　　　　　　　THOMAS HENRY MILLER, ESQ.
　　　　　　　　　　　　Iowa Attorney General's Office
　　　　　　　　　　　　Area Prosecutions Division
　　　　　　　　　　　　Hoover State Office Building
　　　　　　　　　　　　Des Moines, IA  50319

For the Defendant:　　　PATRICK J. BERRIGAN, ESQ.
　　　　　　　　　　　　Watson & Dameron
　　　　　　　　　　　　2500 Holmes
　　　　　　　　　　　　Kansas City, MO  64108

　　　　　　　　　　　　DEAN STOWERS, ESQ.
　　　　　　　　　　　　Rosenberg, Stowers & Morse
　　　　　　　　　　　　1010 Insurance Exchange Building
　　　　　　　　　　　　505 Fifth Avenue
　　　　　　　　　　　　Des Moines, IA  50309

　　　　　　　　　　　　ALFRED E. WILLETT, ESQ.
　　　　　　　　　　　　Terpstra, Epping & Willett
　　　　　　　　　　　　Higley Building - Suite 500
　　　　　　　　　　　　118 Third Avenue Southeast
　　　　　　　　　　　　Cedar Rapids, IA  52401

Also present:　　　　　Bill Basler

Page 1

Case 3:09-cv-03064-MWB-LTS　　Document 284-70　　Filed 06/23/11　　Page 3162 of 3245

PANEL 0, 5-3-05
Court Reporter:         Shelly Semmler, RMR, CRR
                        320 Sixth Street
                        Sioux City, IA  51101
                        (712) 233-3846

3629

(Proceedings reconvened outside the presence of the jury venire.)

THE COURT:  Juror 702 is missing in action.  So I just thought I'd go ahead and make 702 the sixth alternate if nobody objects.

Why don't we go ahead.  Everybody ready?

MR. BERRIGAN:  Yes, sir.

THE COURT:  Okay.  Thank you.

(Panel 0 entered the courtroom.)

THE COURT:  Good morning.  If you'd all raise your right hand, I'm going to swear you in.  Would you all raise your right hand, please.

(Panel 0 was sworn.)

THE COURT:  Okay.  Please be seated.  Good morning, everybody.  Awfully glum-looking group.  There we go.  We have a very serious matter before us, but there is no federal law keeping anyone from smiling, so I wanted to welcome you all here.

I'm Mark Bennett.  I'm the chief judge of the United States District Court for the Northern District of Iowa.  And as you know, we're here for jury selection in United States versus Angela Johnson.

I wanted to introduce you to the participants.  You will meet them in a little more detail in a few moments, but I just wanted you to know who everybody is.  Seated at the table

3630

Page 2

closest to the jury box -- and I'll just have them raise their hands -- C.J. Williams. Mr. Williams is an assistant United States attorney from Cedar Rapids, and he's one of the two prosecutors in the case.

Seated next to Mr. Williams is Tom Miller. Mr. Miller is a special assistant U.S. attorney assigned to this case, but in his other life he actually works for the Iowa attorney general who has the same name, Tom Miller, but they're not one in the same. This Tom Miller is an assistant Iowa attorney general in charge of area prosecutions, and he's been appointed as a special prosecutor to try this case in federal court.

Seated next to the two prosecutors is Special Agent Bill Basler, and he's what's called the case agent, the chief law enforcement officer, working with the prosecutors in this case.

Going to the far table, seated closest to you is Al Willett. Mr. Willett is an attorney from Cedar Rapids who specializes in criminal defense work in federal court.

Seated next to Mr. Willett is the defendant in the case, Angela Johnson.

Seated next to Angela Johnson is Patrick Berrigan. Mr. Berrigan is a lawyer from Kansas City, Missouri, who specializes in criminal defense work.

And then seated I guess farthest from you is Dean Stowers. Mr. Stowers is a lawyer from Des Moines who

3631

specializes in criminal defense work.

Now, there are certain rules that we all need to follow. I've reduced those to writing, and I want to go over

them with you this morning.

Conduct of potential jurors during jury selection and trial. To ensure fairness, you as potential jurors must obey the following rules until the end of the case if you are selected for the jury or until you are excused from serving on the jury in this case. These rules apply whether you are in the courtroom, in the courthouse, at home, or anywhere else until you are excused from further service in the case.

First, do not talk among yourselves about this case or about anyone involved with it.

Second, do not talk with anyone else about this case or about anyone involved with it.

Third, when you're outside the courtroom, do not let anyone tell you anything about the case. If somebody should try to talk to you about the case during jury selection or the trial, please report it to me.

Fourth, do not talk with or speak to any of the parties, lawyers, or witnesses involved in this case. You should not even pass the time of day with any of them. It is important that you not only do justice in this case but that you also give the appearance of doing justice. If a person from one side of the case sees you talking to a person from the other

3632

side, even if it is simply to pass the time of day, an unwarranted and unnecessary suspicion about your fairness might be aroused. If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or the like, it is because they are not supposed to talk or visit with you.

Fifth, do not read any news stories or articles about the case or about anyone involved with it or listen to any radio

Page 4

or television reports about the case or about anyone involved with it. If you want, you can have your spouse or a friend clip out any stories and set them aside to give you after the trial is over or after you are excused from serving on the jury in this case. I can assure you, however, that if you are selected for the jury in this case, by the time you have heard the evidence, you will know more about the case than anyone will learn through the news media.

Sixth, do not do any research on the Internet, in libraries, in the newspapers, or in any other way or make any investigation about this case on your own. If you are selected for the jury, you must decide this case based on the evidence presented in court.

Seventh, if you are not excused from serving on the jury today, please take this instruction with you so that you can refer to it if you have any questions between now and the date you are required to return for the trial.

Dated this 3rd day of May, 2005, signed by me, Mark

3633

Bennett, chief judge.

Okay. How many of you -- just show by a raise of hands -- have ever been in this third-floor courtroom before? Okay. We have one individual who has, and we'll talk to you about that a little bit later. But for most of you you're pretty much unfamiliar with the court, so I just wanted to explain who everybody is seated in the courtroom.

Seated to my far left is one of my three and a half law clerks, Carey. Carey is an honors graduate of the Drake University Law School. She's in a second year of a federal clerkship with me. She'll be in the courtroom throughout the

Page 5

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3166 of 3245

trial. And then at the end of the summer she's moving to Seattle to start her legal career in her new position there.

Seated directly in front of me is our court reporter Shelly. Shelly comes to us from Naples, Florida. She's been with us a number of years. We're very lucky to have Shelly with us. She is a superb court reporter. I think she has the most difficult job in the courtroom because everybody else can daydream. I actually never get tired of looking at this ceiling. I've been looking at it for ten and a half years. I still find something new every time I look at it. Shelly doesn't have the luxury of daydreaming. She has to take down everything that's said, and she does a terrific job in doing that.

Because this is a criminal case, we will have some

3634

United States marshals in the courtroom. That's just standard procedure. And depending upon who's testifying and kind of where we are in the trial, we may have more or less United States marshals, and sometimes you can't even figure out who they are. Sometimes I'm not even sure I know who they are. Just kidding.

Then we also have some court security officers. They're easy to spot because they're usually seated in the same place. They wear the blue blazers. They have the badge, and they have an earpiece. I think today they're listening to rock music. Yesterday it was talk radio. Just kidding on that one.

We have the lawyers and the parties they represent, and then we have the jury and the judge, and I'm just going to take myself first, and I just want to explain to you what our kind of duties are and what the functions are.

Page 6

My responsibility in this case -- my responsibilities have been many.  I've had lots of pretrial motions to rule on.  It's a very serious case because the death penalty is potentially a penalty in the case.  And so the lawyers on both sides have filed lots and lots of pretrial motions.  I wouldn't have expected anything less, and they didn't disappoint me.  And so that's been a big task to try and rule on all of the pretrial motions.

I had the responsibility for designing the process for jury selection because we have great discretion in how to do

3635

jury selection.  There are about 600 federal district court judges like myself in the United States, and there are probably 800 different ways of doing jury selection.  We have a lot of discretion.  I like to partner with the lawyers and get their input, and so we came up with a system where each potential juror just comes in one day.

And I hope you appreciate that because right before we started jury selection in this case, I was reading the New York Times, and I was reading about a case in federal court.  I don't remember where but somewhere in the United States in another federal court.  It was a high-profile case, and they were starting with 400 jurors.  We actually started with 800, so there's nothing surprising that they started with 400.  But that judge decided to bring all 400 in and make them sit there every day during jury selection.  We're now in our fourth week of jury selection.  And they had to rent an auditorium and have all the jurors come, and then they did jury selection in a huge auditorium.

I didn't think it was fair to, you know, do that.  My

Page 7

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3168 of 3245

time is very valuable to me. I assume your time is equally or more valuable to you all, and I'm big on not wasting my time, and I didn't want to waste your time either, and neither did the lawyers, so we came up with a system where you each come in one day.

Interestingly, my secretary who happens to be a lawyer

3636

was called for jury duty last month over across the street in Woodbury County, and I was really glad that she did because I thought it would be a wonderful experience. As much as I need her every day, jury service is more important, and so I was hoping she got selected. She actually didn't get selected, and unfortunately she had to go three different days pretty much all day, and she never actually even got questioned by a judge or the lawyers.

And the irony is her sister up in Minneapolis also got called for jury duty but into federal court in Minneapolis, and she went last month three days in a row, sat in a large jury assembly room in the basement of the courthouse, and never even made it up into a courtroom to be questioned by a judge or a lawyer.

So as much as I'm sure when you went to bed last night you weren't thrilled about coming today, I hope you appreciate the fact that we designed a system, while it's going to take us longer, that it saves your valuable time.

Now, my other responsibilities in addition to figuring out how to do jury selection in the case, when we -- we're going to start the trial actually tomorrow. This is our last day of jury selection. And my responsibility tomorrow will be to give preliminary instructions to the jurors defining each of the ten

Page 8

crimes the defendant is charged with, instructing the jury on

the presumption of innocence and the government's burden of

3637

proof, proof beyond a reasonable doubt, credibility of witnesses, how to gauge the credibility of witnesses. I have a very detailed set of instructions. And at the end of the first phase of the trial, there will be an even more detailed set of instructions that I've started working on now.

I also anticipate that there will be a lot of objections during the trial, and it's the lawyers' duty, it's their absolute duty, to object to any evidence or any procedure that they think is not covered by the Federal Rules of Criminal Procedure or the Federal Rules of Evidence or is otherwise improper in their view. I know these lawyers well because we've been in this courtroom virtually every day for now in our fourth week, and there will be objections during the trial, but that's their job, and it's my job to rule on those objections.

Now, let's talk about what the jury's job is. You'll notice when I was describing my duties I didn't say anything about it's my responsibility to listen to the evidence and decide what happened. And while I'm going to do that, that's actually not my primary duty. That's the duty of the jury.

So I like to say that your job is you're the judges, but you're the judges of the facts. I decide what the law is and tell you that in my instructions, but you decide what happened. That's a very important responsibility, judges of the facts.

Now, how do you do that? Well, here's how you do it.

3638

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3170 of 3245

There's our witness box, and I anticipate in this case that there could be well in excess of a hundred witnesses that testify, maybe substantially more than that, maybe less. It's hard to know.

I also anticipate that there will be many hundreds of exhibits that the parties will offer into evidence. And the parties, the lawyers, will have a right to show any exhibit up on the big screen if they want to. So you'll have a chance to see the exhibits, listen to the testimony of the witnesses, and that's how you decide what happened. You listen to the witnesses' testimony. You look at the exhibits that get admitted into evidence, and then you decide what happened.

Now, in doing that, you have to judge what lawyers like to call the credibility of the witnesses. And that's pretty -- what that means is are the witnesses telling the whole truth, just some of the truth, or none of the truth. And you get to decide that for yourself. Each juror decides that for himself or herself based on your examination of the witness and listening carefully to what they have to say, and that's going to be your primary job.

Then at the very end of the first part of the trial, you'll -- it will be like any other criminal trial. You'll have to decide is the defendant, Angela Johnson, guilty or not guilty of one or more of the ten charges. Actually you have to decide each charge, so you'll decide whether Angela Johnson is not

3639

guilty or guilty of each of the ten charges against her.

Now, we're about to start what we call voir dire. It's a French term that's used for jury selection. Literally translated, it means to speak the truth. What do we mean by

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3171 of 3245

that? Well, our goal is to find 18 jurors, 6 of whom will be alternates in the case. And in order to find 18 jurors, we need to ask you a bunch of questions, and I want to emphasize that they're not trick questions. They're not questions like you'd see on a civics quiz. We're not going to ask you what amendment gives a defendant the right not to testify in a criminal case. Answer, Fifth Amendment. What amendment gives the defendant a right to a fair trial? Sixth Amendment. We're not going to ask you questions like that. And, in fact, I'm going to be doing very little of the questioning. Mostly the lawyers are. They're going to ask you questions about a lot of different areas but primarily about your views on the death penalty and your views and any knowledge of any pretrial publicity, what you've read or heard about this case.

Now, we have talked to well over a hundred potential jurors. And you can imagine that the views on the death penalty are from one extreme to the other, and so what I want to try and get across is that we're not here to try and change anybody's opinion on anything. The great thing about America is everybody, everybody, is entitled to an opinion, and your opinion, for example, on the death penalty is entitled to the

3640

same respect anybody else is. Your opinion is no better, no worse than the President of the United States, than any of the lawyers, or than any opinion that I might have which you'll never know what my opinion might be.

But my point is that the lawyers and I respect all the opinions that you have, but we need to know what they are, and so you need to answer as openly and honestly as you can.

Now, I just wanted to mention the fact that I decided

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3172 of 3245

and I alone decided to use numbers in this case rather than your names, and here's why.  This is going to be a high-profile case, and what I mean by that is there's going to be a lot of interest by the news media in this case.  And if we use your names publicly in open court, then the news media would have a right to use those names in the newspaper, on radio and television.  I thought it was going to be tough enough for anybody to serve on a jury where the decision you may have to make, if we ever get to a penalty phase, is one of the toughest decisions I could ever imagine somebody making in life, and that would be life imprisonment without parole or the death penalty.

And due to the length of the trial, I wanted to protect your privacy.  And I thought if your names got out in the media, you would be exposed to what I'm exposed to on this job every day, and that's what I call idle curiosity seekers, people who call or send e-mails or track you down, come knock on your door:  Hey, I hear you're on the Johnson jury.  What's that

3641

like?  And I don't think any of you need that.  So that's why we're using numbers in the case.

I wanted to tell you a little bit about the jury selection process.  This is the last day of jury selection.  We are starting the trial tomorrow at eight o'clock tomorrow morning.

We've been bringing in a small group of potential jurors each day.  This is now -- we're in our fourth week of jury selection.  It's gone just a day or two longer than we thought it would, but it was really impossible to tell, you know, how long it would take, but it's really gone I think remarkably well.

Page 12

And after I introduce the lawyers and there's a few questions by me, what we're going to do is send you down to the jury room, and then we're going to bring you back one at a time and interview you each individually. We're going to ask you to stay in the jury room at least till noon, and then we'll bring you back up here and let you know what's happening.

Each side will have about 20 minutes or so to question you individually. We've kind of scattered the numbers, and I'm going to give you the order that we're going to bring you back up in, and then once we bring you up, you just come through that door. Whatever CSO is seated in that chair will hand you a microphone. And then you just take that microphone. You can sit in any seat in the front row. One of the seats if you reach

3642

underneath it, it has a pass that you actually get out of jury duty for the next two years, but you have to figure out which seat it is. I'm kidding about that. You'll be questioned by both sides.

And then after you're questioned by both sides, we'll send you out of the room just for a minute, and then we'll bring you back in. Usually takes less than a minute. We'll bring you back in, and we'll let you know one of two things: Thank you; good-bye; you're dismissed from jury service or you're on the jury and we'll -- you'll report tomorrow at 8 a.m. and we'll start the trial at 8:30 in the morning.

Now, for any of you that do get selected to serve, we are going to run the trial four days per week. Almost always that will be Monday through Thursday, and we are taking the week of June 10 through June 17 off.

The trial day will generally be -- we'll start from --

Page 13

we will start at 8:30.  I'm very good about starting on time because I make the lawyers show up really early in the morning and stay late, and we try and solve all the problems that we anticipate we might have the next day.

So my goal in every trial is to start at 8:30 on time every single day.  Sometimes I achieve that goal.  Sometimes I don't depending upon outside factors that we have very little control over, but I think you'll find for the most part we'll be starting very promptly, and we'll be letting you go at 4:30, no

3643

later than quarter to 5.  Sometimes if we have a witness from out of town and we're real close to finishing that witness and we can just go a few more minutes, then as a convenience to that witness, I might keep you till 4:45, but I should never keep you later than 4:45.

We're running the trial 4 days per week for a lot of reasons, not the least of which is I have about 600 other cases that I have to be concerned about.  And I need Friday, Saturday, and Sundays to work on those cases.  In fact, I'm going to do some trials on Fridays, Saturdays, and Sundays during the course of this trial to try and stay as current as I can.

None of the lawyers are from Sioux City.  And they all have lots of other cases that they have to be concerned about.  And so while they get Fridays off from this trial, they'll be working I assume on this trial but on other matters that they all have too.

And I know it's an inconvenience to have you all come in and particularly for the length of this trial, but I just wanted to remind you that of the 5 lawyers, the closest one is from 200 miles away.  Two of them, one on each side, are from

Page 14

PANEL O, 5-3-05

Des Moines.  That's 200 miles away.  Two are from Cedar Rapids. That's 330 miles one way, 660 miles round trip.  I know about that because last year I was in Cedar Rapids 16 times, and several years back I tried a 10- or 11-week case in Cedar Rapids.  I was gone away from my family for that length of time.

3644

And then one of the lawyers, Mr. Berrigan, is from Kansas City, so they come from a long ways away.

And just as a matter of common courtesy, you can really only do the trial four days a week.  That's pretty typical for long trials.  Most judges do it that way.

Now you're going to meet the lawyers in a little more detail, so we'll start with Mr. Williams.

MR. WILLIAMS:  Thank you, Your Honor.  Good morning, ladies and gentlemen.  As the judge said, my name is C.J. Williams.  I'm an assistant United States attorney.  I live and office over in Cedar Rapids, although I spend a lot of time appearing in front of Judge Bennett.

At counsel table with me, you were introduced to Tom Miller.  He is -- works for Tom Miller, the attorney general, no relation, just a coincidence in names.  He is the head of the area prosecutions office, and he'll be co-counsel in this case with me.

MR. MILLER:  Good morning.

MR. WILLIAMS:  Also you were introduced to Special Agent-in-Charge Bill Basler.  He works for the Iowa Division of Criminal Investigation, offices out of Mason City.  As the judge said, he's what we call the case agent.  He's the lead investigator in this case, and he'll be sitting at counsel table and assisting us throughout the trial.

Page 15

The United States Attorney's Office for the Northern

3645

District of Iowa is headed by Chuck Larson Senior.  He offices in Cedar Rapids normally, although he's been in Baghdad for the last year, should be coming home soon.  We have two offices, one in Cedar Rapids and one here in Sioux City.

And since it's more likely you may know people out here in Sioux City, I'm going to go through the list of the names of the people in this office.  We have seven attorneys like myself, assistant United States attorneys, and seven support and staff folks that live out this way and office in Sioux City as well.  So let me go through their names and see if you happen to know any of them.

Forde Fairchild, Martha Fagg, Kevin Fletcher, Mike Hobart, Jack Lammers, Janet Petersen, and Shawn Wehde are all the assistant United States attorneys.

Shayne Mayer, Del Tompkins, Penny Schlotman, Michelle Schwebach, Michelle Hatting, Carol McEntaffer, and Pat Calhoun are all the administrative support staff in Sioux City.

THE COURT:  Thank you, Mr. Williams.  Now, do any of you know any of the people Mr. Williams identified?  Or let me add to it.  Do you think you know anybody who works at the federal courthouse here?  Raise your hand if you think you know anybody.

Okay.  Good.  Let's switch over, and we'll hear from the defense.  Mr. Willett?

MR. WILLETT:  Thank you, Your Honor.  If it please the

3646

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3177 of 3245

Court.  Ladies and gentlemen, I'd like to introduce you to Angela Johnson.  Miss Johnson is from the Mason City/Clear Lake, Iowa, area.  I'm assuming you're familiar with that area of the state, but if you're not, it's north central Iowa just south of the Minnesota border.  Ms. Johnson is in her 40s.  She attended high school at Forest City High School where her formal education stopped after the ninth grade, but she attained her GED certificate just within the last few years.  So thank you, if you'd like to sit down.

Ladies and gentlemen, my name is Al Willett.  I practice law with Terpstra, Epping, and Willett in Cedar Rapids.  We sort of have the tongue twister law firm.  The gentlemen I practice with are Ray Terpstra and Greg Epping.

But I have two co-counsel who are here with me for this trial.  First, Mr. Patrick Berrigan --

MR. BERRIGAN:  Good morning.

MR. WILLETT:  -- from the Watson and Dameron firm in Kansas City, Missouri.

And then my other co-counsel is Mr. Dean Stowers.

MR. STOWERS:  Good morning.

MR. WILLETT:  Mr. Stowers practices law with Rosenberg, Stowers, and Morse in Des Moines.  And he practices law with Brent Rosenberg, David Morse, and Heather Wood.

Now, do any of you believe that you know Ms. Johnson, myself, or my co-counsel or recognize any of the names that I've

3647

just discussed with you?

Your Honor, I see no nods of affirmation.  Thank you.

THE COURT:  Okay.  Thank you, Mr. Willett.

Now, I need to talk to you about the length of the

Page 17

trial. It is always difficult to estimate the length of the trial. When we have a case with six or seven witnesses, we generally know that's going to be a one-day or two-day trial, maybe spill over into the third day. A case with this many potential witnesses, it's very hard to estimate the length of the trial, but the lawyers have done a really good job trying to give me their best judgment. And when we started jury selection, we thought the whole trial would take about three months. We've used about a month of that now in jury selection. And so, you know, it could be over the end of June. It might spill into July some. That's about the best I can tell you.

So I'm telling you that because now I'm going to ask -- and I'm going to ask each one of you individually, and we're going to take the microphone and pass it around -- whether it would be an extreme or extraordinary hardship for any of you to serve, but I wanted to talk to you about that.

It is always at a minimum at least an inconvenience for people to serve on juries, and I understand that. Most of you I think when you got the questionnaire and you filled it out and when you went to bed last night and when you got up this morning and you were coming to the courthouse, I'm not sure many

3648

of you looked at jury service as a unique opportunity to serve your country, but that's exactly what it is.

And I'm very lucky in this job because I get to serve my country every single day by making decisions and by doing the best job I can to dispense justice, and I find that extremely fulfilling. And I think you will find if you're selected to serve as a juror on this case at a minimum it will be a life-altering experience. I think I can promise you that.

Page 18

But I think I can also promise you that if you are selected you will find it to be challenging, interesting, but, most importantly, a very fulfilling responsibility. And I know that because in all of the trials I've conducted -- and we're actually the busiest federal trial court in the nation of the 94 federal district courts. We've led the nation three out of the last four years in numbers of trials per judge. In the year we weren't number one, we fell to number two.

So we do a lot of trials, and in every trial at the end of the trial, I give the jurors a questionnaire to fill out, and you get to evaluate the kind of job the lawyers did, the kind of job I did. You get to evaluate were the instructions helpful, not helpful, the electronic courtroom. We get a lot of feedback from the jurors. We've actually changed a lot of the things -- the way we conduct business in our court based on what the jurors have told us. So it's very important to me.

But when I read those questionnaires, the thing that

3649

is overwhelmingly expressive to me is how jurors find jury service to be so much more fulfilling than they thought it would be than when they came in at the start of the case, and I would say over 95 percent of the jurors respond very favorably that it was a much more fulfilling experience than they thought it would be.

Now, we have had people make enormous sacrifices to serve in trials of this length. This is only my third trial of this anticipated length that I've had in ten and a half years. But I remember a case I had last year that went about this length, and in jury selection we had two farmers on one day, and we started jury selection in August. The trial was going to run

Page 19

through October, maybe into November, busy time for farmers just like this is. There were two farmers who farmed full time and worked full time, and they weren't going to get paid on their manufacturing jobs for jury service. They were both willing to serve. You know, that was amazing to me, but they were both willing to serve.

Another day in jury selection on that case, we had an individual who was the sole bread winner for his family, and he had talked to his wife, and they had agreed that they would go into their savings. Matter of fact, they anticipated that they would deplete their life savings, but he felt he had an obligation to serve.

Is that extraordinary? Of course it is. I actually

3650

tried to talk him out of jury service because I thought that was too much of a sacrifice.

But I tell you this because everybody makes a sacrifice to serve, some more than others, because everybody's situation is unique. And when I would go through the questionnaires, there were an amazing number of excuses that people came up with as to why they didn't have to serve.

One of my favorite ones was a woman who during the course of the estimated three months of trial had ten cakes that she had to bake, and she thought that was a severe or extraordinary hardship. When I pointed out to her that she could bake the cakes on Fridays or on the weekends or in the evenings, she decided it wasn't a severe or extraordinary hardship. And I don't mean to make light of her. Actually she was a very impressive individual, and I was incredibly impressed by the passion that she brought to her cake making. I would be

Page 20

lucky to have a cake that she made some day, and I intend to ask her to do one some day. But my point is everybody's situation is different.

And you may wonder, well, why didn't we just excuse you? Maybe you're a farmer and you think it's a hardship. Well, everybody's case is different. You know, we've had people who maybe have inherited a large sum of money who on the face of their questionnaire it would look like it's a financial hardship but, in fact, it's not a financial hardship to come in for two

3651

or three months. Other people it is. Everybody's case is different.

But before you claim that your situation is so unique or extraordinary that it's a severe financial hardship, I wanted you to know that other people are willing to serve and are making huge sacrifices to serve. Ultimately I have to make the judgment about whether to excuse somebody or not. It's been very rewarding because on most days not many people at all -- some days nobody's asked to get off.

And we took a break from jury selection. I was at a meeting in Washington, D.C. ,with three federal judges. We're serving on a budget committee. And they were asking me about how jury selection was going, and they were all from big cities, and they said, Well, everybody must try and get off. And I said not at all. It's just the opposite. Very few people. And a judge from New Orleans said, Gee, if I was trying that case in New Orleans, 90 percent of the people would try and get off. And I said it just hasn't been a problem. So that's one of the kind of rewarding things about this job, seeing the sacrifice that people in northwest Iowa are willing to make.

Page 21

Do we have the microphone ready?  The microphone is on, and why don't we start with Juror 449.  Oh, let's see. You're 401.  Hmm.  Well, my seating chart's a little different. That's okay.  We'll start with you, 401.  And I'll make you a deal on the microphone.

3652

PROSPECTIVE JUROR 401:  All right.

THE COURT:  This room does not have very good acoustics, but we have a great sound system, so if you speak directly into the microphone, we'll be able to hear you.  And if you speak directly into the microphone, I won't put up any karaoke for you to sing.  How's that?

PROSPECTIVE JUROR 401:  That sounds like a good deal.

THE COURT:  Is that a very good deal?

PROSPECTIVE JUROR 401:  Very good.

THE COURT:  Let me ask you, if selected, are you willing to serve as a juror in this case?

PROSPECTIVE JUROR 401:  Yes.

THE COURT:  Thank you very much.  Well, couldn't have been much more screwed up than that was.  I don't know what happened.  They've done a great job for four weeks, but somebody was asleep at the switch, so that will happen.  Now that we've got you in the correct order, let's see.  Let's just go down.

Juror 73, are you willing to serve if selected?

PROSPECTIVE JUROR 73:  I would -- I'd rather not.

THE COURT:  Okay.  And what does that mean?  I imagine everybody would rather not serve but . . .

PROSPECTIVE JUROR 73:  Well, I farm, and I do it all by myself, and this is the busiest time of the year.  I should be planting corn today but . . .

Page 22

THE COURT: Yeah, just comes at a bad time for you?

3653

PROSPECTIVE JUROR 73: Yeah. If it was in the wintertime, I'd be happy to serve.

THE COURT: We've heard that before.

PROSPECTIVE JUROR 73: I know.

THE COURT: Right. I understand that.

PROSPECTIVE JUROR 73: I have served -- I have never been picked on a county jury, but I've, you know, always been there.

THE COURT: And everybody's situation is different, and what you're telling me is it would be too big of a financial hardship for you.

PROSPECTIVE JUROR 73: I feel so, yes.

THE COURT: Okay. Well, I'm not going to second guess that judgment. Any objection from the lawyers?

MR. MILLER: No, Your Honor.

MR. BERRIGAN: None by the defense, sir.

THE COURT: Okay. Juror 73, you're excused.

Juror 794, are you willing to serve if selected?

PROSPECTIVE JUROR 794: Yes, I am.

THE COURT: Okay. Thank you very much.

Juror 771.

PROSPECTIVE JUROR 771: I will if I can.

THE COURT: Well, what does that mean?

PROSPECTIVE JUROR 771: Well, I have two total hips for one thing, and it could be hard for me to sit for that

3654

period of time.

Page 23

THE COURT: Well, you know what? I appreciate you raising that. You're actually never going to be sitting for more than 40 minutes without standing up and taking a stretch break.

PROSPECTIVE JUROR 771: That probably should be no problem.

THE COURT: Yeah, and the other thing is if you do get selected and your hips are bothering you and you need to stand up, you can just stand up.

PROSPECTIVE JUROR 771: Okay.

THE COURT: Okay? But I want to accommodate that, but I understand that. It's hard to sit for a long period of time even without replaced hips.

PROSPECTIVE JUROR 771: And I have served before, and I would serve. There would be no problem.

THE COURT: Okay. Well, that's great.

PROSPECTIVE JUROR 771: I do have an appointment with an orthopedic surgeon because of my shoulders now, so I don't know what's happening.

THE COURT: Well, when's that appointment?

PROSPECTIVE JUROR 73: It's not until June, but I'm trying to get in this week.

THE COURT: Okay.

PROSPECTIVE JUROR 771: So I don't know. I would if I

3655

can, you know. There's no --

THE COURT: Well, if you get selected you have to.

PROSPECTIVE JUROR 771: I know.

THE COURT: It's that simple. You understand that?

PROSPECTIVE JUROR 73: Yes, I do.
Page 24

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 3185 of 3245

THE COURT: Okay. Can you pass it down to Juror 449? Would you serve if selected?

PROSPECTIVE JUROR 449: Yes.

THE COURT: Thank you.

Juror 366.

PROSPECTIVE JUROR 366: I'd rather not.

THE COURT: Okay. And why is that?

PROSPECTIVE JUROR 366: This is the fourth time I've been called for this duty in the last ten years. The first time I served. The two -- other two times I got called and not had to serve. I'm 72. I have cancer. I'm a survivor. I have a hip problem too about sitting and diabetes which makes me go potty quite often. My wife is a COPD-handicapped individual. She only has 40 percent lung capacity. She's on oxygen 24 hours a day, and I am her support.

THE COURT: Okay. Do the lawyers have any objection to Juror 366?

MR. BERRIGAN: No, sir.

MR. MILLER: No, Your Honor.

THE COURT: Okay. You know what, sir? I'm going to

3656

make sure you actually get off our list. How's that?

PROSPECTIVE JUROR 366: Thank you.

THE COURT: Thanks for coming in. Could you pass it down to the next juror, please, 698.

Juror 698?

PROSPECTIVE JUROR 698: I would rather not for the simple reason my wife has been diagnosed with Alzheimer's three years ago. She is at a point right now that she cannot be left alone, and it would be a hardship for me to find somebody to

take care of her during the day.

THE COURT: And you're the sole pro --

PROSPECTIVE JUROR 698: At this point I'm the only one that can take care of her. My two daughters have jobs.

THE COURT: Did you give any thought -- Juror 366, you can actually leave now.

Juror 698, did you give any thought to coming up with creative alternative arrangements if you were selected?

PROSPECTIVE JUROR 698: No, I haven't.

THE COURT: Why is that?

PROSPECTIVE JUROR 698: Well, I really -- I really wouldn't know who to ask because she depends on me all the time. I was gone for a couple of days, and I had my sister take care of her, and she was just hopelessly mixed up. She just -- she's so attached to me that she cannot -- she cannot seem to get attached to anybody else.

3657

THE COURT: Okay. Okay. Any objection to Juror 698 being discharged?

MR. BERRIGAN: No, sir.

MR. MILLER: No, Your Honor.

THE COURT: Okay. You're excused. Okay.

558, are you willing to serve if selected?

PROSPECTIVE JUROR 558: Well, I would, but it'd be real difficult for me to do that.

THE COURT: Why is that now?

PROSPECTIVE JUROR 558: Because I am self-employed.

THE COURT: That would be -- that could be a problem. You didn't win the Powerball last week?

PROSPECTIVE JUROR 558: Well, not yet we haven't, but

Page 26

we're trying.

THE COURT: Not yet, okay. Well, you know, we do have some self-employed people who are willing to serve. But everybody's got a unique individual personal financial situation, and I don't want to delve into it. Is there any way that you could serve, or would it just be too big of an economic hardship for you?

PROSPECTIVE JUROR 558: Well, I'm a tree trimmer and tree removal business, and I deal with different people every day, and it's pretty hard to back them out and say, Well, I can't be there.

THE COURT: And is it the loss of income that would be

3658

the big problem for you?

PROSPECTIVE JUROR 558: Well, that wouldn't help matters any, but I'd have probably a lot of unsatisfied customers probably.

THE COURT: And you're afraid you might lose some business in the long run.

PROSPECTIVE JUROR 558: Absolutely.

THE COURT: Okay. I'm going to go ahead and let you go too. Any objection from the lawyers?

MR. MILLER: No, sir.

MR. BERRIGAN: No, sir.

THE COURT: Okay. Boy, we've lost more today than in almost any other day.

478.

PROSPECTIVE JUROR 478: Yes, I can serve.

THE COURT: You can serve? Okay. Let me just review my notes here. Okay. Now, we just spent some time on your duty

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3188 of 3245

to serve, but you also have a duty not to serve, and I know that might seem conflicting, but here's what I mean by that. It would be inappropriate for you to answer the questions that I ask or that the lawyers ask other than honestly. In other words, you just need to give us your honest answers and then let us be the judge of whether you're well suited to be a juror in this case.

Some people would be terrific as a juror but in

3659

another case and not this one. Some people are great in this case but wouldn't be a very good juror in a different type of case depending upon their attitudes and beliefs.

So what I mean by your duty not to serve is just answer the questions as honestly as you can and then let us decide. And if we decide that you're not going to be a juror in this case, you've fulfilled your obligation. You've done everything you can. You've served your country by coming in here and answering the questions as honestly as you can.

I do want to explain the trial process to you because it's a very unique trial process in a criminal case where the death penalty is a potential penalty. This is potentially a three-phase case, and let me contrast that to our typical case.

Our typical criminal case -- and by typical I mean 99.9999999 percent of the time in my criminal cases it's a one-phase case. What do I mean by that? Jurors come in; we do jury selection. We usually get a jury selected in three hours. We start the trial. We hear all of the evidence. And at the end of the trial, the jury decides is the defendant guilty or not guilty, and then they go home.

If they found the defendant guilty, my job's not done

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3189 of 3245

because then I have the job to sentence the defendant, and we take about 80 days to do that. We have an elaborate process, and that's the typical case. But the bottom line is when the jury reaches the merits verdict, what I call the merits phase,

3660

not guilty/guilty, they're done.

That isn't necessarily true in this case, and I'll try and explain why. The first phase of this case, the merits phase, the not-guilty/guilty phase, that's just like any other trial. Well, it's going to last a little bit longer than most trials, but essentially it's just like any other trial. There's nothing really different about the first phase. And at the end of the first phase, you have to decide the question is Angela Johnson not guilty or guilty of each of the ten charges against her.

Now, if there's a unanimous finding by all 12 jurors beyond a reasonable doubt that Angela Johnson is guilty of one or more of the 10 counts in the first phase, then we would have a second phase to the trial. And the second phase -- well, I'm going to use an analogy. Actually it was Mr. Berrigan's analogy, and I kind of liked it. He was talking to some jurors a couple weeks ago, and he said this case is kind of like a basketball game with two halves to it and an intermission. And I want to try and explain that to you.

In one respect it might not be like a basketball game because in the first phase if the jury comes back with not-guilty verdicts on each of the ten charges, the case is over, and in that respect it'd be like any other case.

But as I indicated, if the jury unanimously found Angela Johnson guilty of one or more of the ten charges, then we

Page 29

would have a second phase. And the second phase is kind of like the intermission of a basketball game.

What do I mean by that? Well, it's not going to take very long in all likelihood. There won't be evidence presented. But if the jury were to unanimously find Angela Johnson guilty of one or more of the ten charges, you'd come back. We'd have argument, a new set of instructions, but there wouldn't be any evidence presented, and you'd have to answer some very specific questions that I would pose to you. And that second phase I'm going to call the eligibility or gateway phase, and it's the eligibility or gateway to the third phase which would be the penalty phase if we ever get there.

So in the second phase, the eligibility or gateway phase, that's where you will have to decide if the prosecution has proved what I'm calling now a gateway or eligibility factor and one or more what are called statutory aggravating factors beyond a reasonable doubt. If the jury unanimously agrees that the prosecution has proved this, then and only then would we reach the third phase.

I'm not going to explain to you now what a gateway or eligibility factor is or what a statutory aggravating factor is because if we ever have a second phase, that will be explained in quite a bit of detail in the jury instructions, but I just want to try and give you the big picture.

So if in the second phase the jury were to unanimously

find that the government proved the gateway and aggravating --

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 3191 of 3245

statutory aggravating factor beyond a reasonable doubt, then we'd have the third phase.

And the third phase is like the second half of the basketball game. It's like another trial. In that third phase the government would have the obligation to present evidence of what they call aggravating factors. That would be a factor that would tend to move somebody towards the death penalty.

The defense would have the opportunity but they never have an obligation to put on any evidence. They never have to put on any evidence, but they would have the opportunity to put on evidence of what's called mitigation or mitigating factors. And mitigating evidence can be very broad and can be things like the defendant's background, experience as a child, any emotional, sexual, physical abuse. It can be things like no substantial prior criminal record. It can be -- it's so broad that it is impossible for me to tell you now what all of the possible mitigating evidence could be in a case involving the death penalty.

So the third phase would involve evidence that the government must present on aggravating factors and that the defense has the opportunity to present if they want to on mitigating factors.

Then at the end of all that evidence, I would give you yet a new set of jury instructions, and that would define for

3663

you what constitutes an aggravating factor and what constitutes a mitigating factor. You would then have to decide based on the evidence do you believe the government proved any aggravating factors.

The government has to prove aggravating factors by the

Page 31

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3192 of 3245

highest standard, what's called beyond a reasonable doubt. The defense, if they choose to put on evidence of mitigating factors, they don't have to prove mitigating factors beyond a reasonable doubt. They just have to prove mitigating factors by what I call the greater weight of the evidence, and that just means is the evidence more believable on that point or not. It's the lower standard of proof.

And then you would deliberate, and you get to decide for yourself how much weight you give any aggravating factor and how much weight you give any mitigating factors. And nobody, nobody, will tell you how much weight you should give any of those factors. That's entirely for each juror to decide.

So one juror could say, Gee, I think this aggravating factor was proved beyond a reasonable doubt, and even though I find 32 mitigating factors that the defense established by a preponderance of the evidence, when I weigh them, that aggravating factor outweighs all of the mitigating factors. Or a juror could say, I only find one mitigating factor, and I think the government proved three aggravating factors, but for me that one mitigating factor outweighs all of the aggravating

3664

factors.

And I will tell you in the instructions that you must consider the evidence of aggravating and mitigating factors, but the weight to be given the evidence is for you to decide. And then by weighing the aggravating and mitigating factors, you have to decide whether you would impose the death penalty or life imprisonment without parole because if we get to the penalty phase, those are the only two options: Life imprisonment without parole or the death penalty.

Page 32

And in federal court, life imprisonment without parole means exactly that. There is no parole in the federal system. It was abolished in 1987. And some of you may be familiar in some states somebody might get a life sentence but they're eligible for parole in 7 years or 9 years or 10 years or 20 years, whatever the state decides. That's not how the federal system works. There is no parole. I can't say it any clearer. There is no parole, period, end of story, no parole.

Now, in the penalty phase only if each juror unanimously votes for the death penalty will Miss Johnson be sentenced to death by me, and you never, ever have to vote for the death penalty. Life imprisonment is always an option that should be considered.

So that concludes our group presentation. And we're going to send you down to the jury room. And let's see. We've kind of preassigned an order that we're going to take up with.

3665

We're going to start with Juror 794 and then go to Juror 478 and then Juror 401, 771, and then 449. That's the order we're going to talk to you individually this morning. And so I think we should be done, you know, probably around noon or so. So we'd ask you all to just wait in the jury room, and we'll bring you back one at a time.

And, Juror 794, you might as well remain up here; okay? The rest of you can go down to the jury room, and we'll bring you back one at a time.

(Panel 0 exited the courtroom, Prospective Juror 794 remaining.)

THE COURT: And, Juror 794, why don't you come up to the front row, and we'll have Gary hand you that microphone.

Page 33

Anywhere you'd like in the front row.

Everybody can be seated. And we're going to start first with questions by Mr. Miller, one of the prosecutors. And then we'll hear from most likely Mr. Berrigan on the defense.

Whenever you're ready, Mr. Miller.

MR. MILLER: Thank you, Your Honor. Testing.

THE REPORTER: Perfect. Thank you.

MR. MILLER: Very good.

EXAMINATION

BY MR. MILLER:

Q. Good morning, Juror 794.

A. Good morning.

3666

Q. How are you doing?

A. Just fine. Thanks.

Q. I appreciate you speaking right into that microphone. You're doing great so far. Our court reporter needs to keep a record, and you're a little bit familiar with that having worked in the court system for a while.

A. Right.

Q. Across the street in that beautiful old art deco building; correct?

A. In Orange City.

Q. Oh, in Orange City, I apologize. You weren't in Woodbury.

A. No.

Q. That's Sioux County?

A. Right.

Q. Very good. What I want to do, Judge Bennett mentioned we need to cover two topics which is exposure to pretrial publicity on this case and also opinions on the death penalty. I'd like

Page 34

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 3195 of 3245

to cover just a couple other matters with you as well just to get a little better acquainted; okay?

A. (Nodded head.)

Q. I note that you're a mother of four.

A. Yes.

Q. And well on your way to getting them raised, but your youngest is still just barely into grade school.

A. Right.

3667

Q. Lot of responsibility.

A. (Nodded head.)

Q. One issue I want to visit with you about, did you get an opportunity to look at a list of juror -- excuse me, a list of witnesses this morning?

A. I did.

Q. We need to ask everyone if they happen to be familiar with any folks. Did you recognize any names on that?

A. I did not.

Q. Very good. A couple things about witnesses. In this case we're going to have -- if we have a hundred or so witnesses, naturally a few of them are going to be from a variety of different walks of life, some from law enforcement among other areas, and I notice you do have some connections, both friends and family, who are in the law enforcement field.

A. Yes.

Q. Now, you indicated to us -- and it's perfectly normal and natural -- nothing at all unusual about an indication that you would tend to believe the testimony and to trust the word of peace officers, and that's not at all unusual, and certainly we all would hope that fairness and honesty and integrity is the

Page 35

very first quality that any peace officer has.  But you understand also that police officers are human beings.  Fair statement?

A.    Correct.

3668

Q.    And I assume you know that as well as anyone having friends and relatives who are in the field.

A.    Right.

Q.    They as a broad group -- and I'm not talking about any one peace officer, but as a group of people like doctors, lawyers, plumbers, bakers, Indian chiefs, what have you, they have the full range of human qualities that we all do; fair statement?

A.    Uh-huh, fair.

Q.    And if in this case you are required to serve as a juror, I expect that among the things that you would -- you've actually never served on a jury before; is that correct?

A.    I was called in Sioux County one time, and when questioned, I was excused so . . .

Q.    So you know a little bit about how the process works, and, of course, having worked in the clerk of court's office, you have some acquaintance with it.

A.    Right.

Q.    You understand that no jury is ever going to be charged with deciding a case without having the benefit of guidance and instructions from the judge.

A.    Right.

Q.    And one of the many things that the judge will give guidance on is the assessment of the credibility of witnesses which, of course, is one of your most important jobs as a juror. One of the instructions I expect you will receive if you're on

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3197 of 3245

this jury is that the testimony of peace officers is not to be given extra credibility merely by virtue of their employment. Do you feel you can follow that instruction?

A.    Yes.

Q.    Okay.  And does that make sense to you?

A.    Uh-huh, yes.

Q.    Likewise and at least from one point of view at the opposite end of the scale, I expect you may hear the testimony of people who are themselves convicted criminals, people who may be or have served time and who have agreed to cooperate with the government in providing testimony.  If you hear such testimony and you're required to serve on this case, I expect you will be instructed by the judge that you are expected to look at any motives that may affect the person's testimony such as any expectation of leniency or reduction in sentence that might go along with cooperation.  And does that make sense you would want to consider those things if they do testify?

A.    Uh-huh.

Q.    What I ask, though, is would you at least listen to the testimony of everyone regardless of what their background may be?

A.    Yes.

Q.    And I trust you would consider all factors that might affect credibility, not only the possible motivation for testimony but whether they deliver their testimony in a fashion

that seems fair and whether their testimony makes sense or was corroborated by other evidence in the case.  Does that make

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3198 of 3245

sense to you?

A.    Yes.

Q.    I did notice that your husband had a problem at one point and that you -- he and, of course, because you're family members as a family needed to deal with it, and you did deal with it.

A.    Yes.

Q.    And I appreciate the time you spent and the candidness that you put into answering all these questions.  I trust that's no issue with you as far as your feeling on ability to be fair and impartial in any criminal proceeding that you might be asked to serve as a juror on.

A.    It will not affect that.

Q.    Very good.  One of the things the judge mentioned we'd be wanting to talk to you about and I do want to visit with you is any acquaintance that you would have with this case, and I believe you indicated that you had none at all; is that correct?

A.    With any parties you mean?

Q.    With the -- familiarity with the facts of the case from pretrial publicity.

A.    Yeah.  I don't watch the news.  I don't read the newspaper.

Q.    Very good.  And that shortcuts our conversation on that subject.  Since you filled out the questionnaire, have you seen any, been exposed to any other news accounts about this case?

3671

A.    The only thing I have heard is at work my radio or my telephone has a radio on it, and I've just heard that the jury selection has begun.

Q.    I assume that wasn't a news account that you sought out but one that just happened to be -- you were exposed to because of where you worked.

Page 38

A.    Yes.

Q.    Did that cause you or the information that came to you in the questionnaire cause you to form any fixed opinions about what the true facts are in this case?

A.    No.

Q.    You understand it would be your duty as a juror to base your decision only on what comes here in evidence.

A.    Yes.

Q.    Thank you, ma'am.

A.    You're welcome.

Q.    I don't have my bifocals on, so I'm going to have to put this right up to my nose.  The questionnaire asked about any feelings you might have about the presumption of innocence, and that's a phrase you've heard before, innocent until proven guilty.  Can you just give us your feelings about that as a concept?

A.    I know that you need to prove that someone is guilty of a charge, and that is why we have a jury.  However, I also feel that in order for a person to get to that point there has to be

3672

some form of evidence pointing fingers at that person.  So yes, they are innocent until proven guilty, but there's -- I always tell my kids guilty by association.  They were maybe at the wrong place at the wrong time.

Q.    That's fine.  We just want your feelings about these things.

A.    Right.

Q.    And I appreciate you sharing them with us, and that's something I wanted to visit with you about because you mentioned that in the questionnaire.  It is -- believe me, your response

Page 39

is nothing unusual. It's human nature to assume that there must be some evidence or the individual wouldn't be just brought in out of the blue and charged for no reason at all.

On the other hand, you understand that our system of government and one of the protections that we as citizens all enjoy in this country is protection against unreasonable behavior by our government because history and our world have shown too much of that for us not to try to feel it's important to have protections. And one of those protections and one which, frankly, protects not just Angela Johnson but protects all of us in this society is the presumption of innocence.

And while it is human nature to wonder why someone might be finding herself in the defendant's chair and to assume and hope that the government must have some basis for bringing charges, you understand that we can't have a system of justice

3673

that functions in this country to the protection of all citizens unless we can demand and ask that our jurors come in and assure us that they can give each defendant the presumption of innocence. Do you feel you can do that, ma'am?

A. Yes, I do.

Q. And you feel that's an important part of our court system.

A. Yes.

Q. The comment about guilt by association, again, that's not a phrase you invented. I think we've all heard the phrase. And as parents it's something we caution our children about. Fair statement?

A. Uh-huh.

Q. In criminal court, on the other hand, while your children or my children might come home and we learn they've associated

Page 40

with people who are likely to lead them into trouble, we can as parents impose some discipline on them and some regulation and requirements on what they do with their time. But you understand that we're not dealing with a defendant in a criminal court as parents. We're dealing as jurors.

A. Right.

Q. And that the idea of guilt by association isn't something that exists in the law. It's not against the law, and it is no crime to be with or associated with someone who commits a crime. It is only a crime to commit the crime one's self or to actively encourage or assist and aid and abet the crime. Does that make

3674

sense?

A. Uh-huh, uh-huh.

Q. So in other words, if from what little you know about this case from the questionnaire you have some understanding that the defendant in this case may have been associated with another person who was charged or convicted of a crime, you understand that that association is by itself not guilt.

A. Right.

Q. And, in fact, what information you have from the questionnaire is no evidence at all.

A. Right.

Q. Fair statement?

A. Uh-huh.

Q. And can you assure us that you would not hold anyone or find anyone or feel that anyone is guilty by association as a juror?

A. No, I will not.

Q. And again, this presumption of innocence -- and I hate to

Page 41

belabor the point, but you understand that it isn't just this defendant. It's all of us in our society who are protected by that, and unless we protect each defendant, this being a country of laws and not a country of people, unless we protect each defendant in the criminal court, we really protect no one.

A. Uh-huh, correct.

Q. You agree with that?

3675

A. Yeah.

Q. Thank you, ma'am. The final topic I'd like to cover with you is the death penalty, and I assume that -- and I could well be wrong, but am I correct in assuming that when you received this questionnaire it was the first time that you've really been challenged to sit down and confront your beliefs about the issue?

A. Yes.

Q. Or at least to this extent.

A. Yes.

Q. And since the weeks have passed since you filled it out and have known that you'd be coming in here one of these days, have you given it more thought?

A. Yes.

Q. And would you just go ahead and please share with us your feelings about the subject of the death penalty.

A. It would be extremely difficult for me to give someone the death penalty. Just -- I'm kind of tender hearted. However, I think I'm a pretty good judgment of character, and I think that I could, based on the facts -- a lot of the determination would come from the facts of the case and what involvement she had to what degree. Yeah, I would really have to -- but I think it's

Page 42

appropriate in some cases, the death penalty.

Q.    Very good.    And I just was interested in your feelings about it because we have a broad spectrum of feelings about it,

3676

and the best way for us to find out is just to ask you to tell us, and I appreciate you sharing your thoughts with us.    In some cases you feel it's appropriate.

A.    Yes.

Q.    You also feel that in your own particular case it would be a difficult thing to do.

A.    Yes.

Q.    And, frankly, we would hope it would be difficult.    We would at least in the sense that no one would ever take that responsibility lightly.    I trust you agree with me there.

A.    Yes.

Q.    We have to find jurors who can assure us that they can fairly and realistically consider both possible punishments.    Do you feel you can do that, ma'am?

A.    Yes, I do.

Q.    In this case and in talking about the death penalty understand that I'm talking hypothetically.    We're jumping ahead.

A.    Right.

Q.    If the defendant in this case is not found guilty of one or more of these charges, that's the end of the matter, and there's no punishment considered.

A.    Right.

Q.    Assuming, however, that we get to the point where there is consideration by the jury of punishment in this case, as with

3677

Page 43

the merits phase, you'll have the benefit of guidance and instruction from the Court as to what the law is.

A.    Right.

Q.    And if I can just very briefly summarize it for you, you'll be charged with the responsibility of giving fair and full consideration both to aggravating and mitigating factors proven by the evidence if any there are; okay?

A.    Okay.

Q.    And by aggravating I mean those that would tend to show that the crime is more serious.  Mitigating is any evidence of facts tending to show that the defendant is deserving of some leniency.  And do you feel that's appropriate?

A.    Yes.

Q.    That system make sense to you?

A.    Uh-huh.

Q.    And I noticed when you visited or talked about your own personal experience and that of your husband you felt that not just the crime itself but also the background of the individual and the total circumstances going -- surrounding the situation were things that were properly brought into consideration.

A.    Yes.

Q.    And you feel that's true in a case of this seriousness as well.

A.    Yes.

Q.    Very good.  You understand -- well, let me just ask you,

3678

what do you understand to be the general nature of the allegations against Ms. Johnson?

Page 44

A. From the information that we were sent, there were multiple murders by an individual, and Miss Johnson could or could not have been a part of that. And the bodies were buried and found several years later, children and adults both, for drug usage or drug trafficking, and the gentleman is already convicted.

Q. This is what you understand would be your understanding of the allegations in the case, what you've just summarized for us.

A. Basically, yeah.

Q. Very good. And just based upon that general description and that understanding of what the allegations are, do you still feel that you can give serious and fair consideration to both possible punishments?

A. Yes.

Q. Very good. The evidence in this case, you will never get to the punishment phase unless the jury unanimously concludes that one or more of these charges have been proven beyond a reasonable doubt, and the allegations are five deaths involved with drug dealing, substantial premeditation and planning, and that two of the victims are particularly vulnerable victims, namely children. Under all of those circumstances even given the very seriousness of those, do you still feel you could give fair and realistic consideration to both possible punishments?

A. Yes.

3679

MR. WILLIAMS: Two minutes.

Q. Conversely -- and the defense has no obligation to present mitigating evidence, but it can do so. And even from the evidence presented in this case from any source you may find and the Court may instruct you that certain things should be considered as mitigating factors such as personal background,

Page 45

lack of prior criminal history, prior victimization, level of involvement in the crime, and the like. If instructed that those, if found to be the facts, are mitigating factors that you must consider, would you be able to do that, and would you do so?

A. Yes.

Q. Do you understand that each -- it is up to you to decide how much weight to give each factor?

A. Uh-huh.

Q. You may give tremendous weight to the killing of children and only minor weight to history of being an abused victim or vice versa. It's up to you as to how much. But it would be your duty to give honest and fair consideration to each factor proven, whether a mitigating or aggravating factor, and do you feel you can and would do so, ma'am?

A. Yes.

Q. Finally, ultimately in the event that -- and this would be a heavy responsibility. But in the event that you serve on a jury that unanimously concludes that the death penalty is

3680

appropriate, the appropriate punishment in this case, you could not return a verdict finding that unless each and every one of you put your own signature to a verdict that would have that very real effect of causing the death of a fellow citizen. Do you feel under those circumstances that you could do that, ma'am?

A. Yes.

Q. And that would not be easy, I understand.

A. No.

Q. But you feel that you could do so under the circumstances.

Page 46

A.    Yes.

Q.    And, conversely, could and would vote even against opposition from your fellow jurors for life in prison rather than the death penalty if you felt that that was the appropriate punishment.

A.    Yes.

Q.    Again giving realistic fair consideration to both possible punishments.

A.    Right, yes.

        MR. MILLER:  Thank you so much, ma'am.  I appreciate your time.

        PROSPECTIVE JUROR 794:  You're welcome.

        THE COURT:  Mr. Berrigan?

                        EXAMINATION

BY MR. BERRIGAN:

3681

Q.    Good morning, Juror Number 794.

A.    Good morning.

Q.    I bet this is the first time you've been called Juror Number 794 before.

A.    That is correct.

Q.    First I wanted to thank you for being willing to serve.  I noticed in the questionnaire and I'm sure we all did that you're one of these folks that have children at home, three boys. You've got a daughter in college.

A.    Uh-huh.

Q.    You already feel like you're not seeing enough of them, and now we're talking about maybe seeing less.  You're worried about your job and the fact that it's a nonprofit and they'd have to pay you, and you're willing to sacrifice that to be here, and we

Page 47

very much appreciate that.

A.   Thank you.

Q.   I'm going to start on some questions that the prosecutor started on because, frankly, you are one of our more experienced jurors or potential jurors in terms of your familiarity with the system as a result of your work.

A.   Uh-huh.

Q.   And I wasn't real clear from the questionnaire, but were you the elected clerk in Sioux County?

A.   No, no.

Q.   Okay.  But you were employed there.

3682

A.   I was employed there, correct.

Q.   What was your job there?

A.   Well, I started out as the small claims clerk and went into the divorces, domestic abuse.  I did some juvenile court, some of the adoptions.

Q.   I saw you sat in on a -- or at least part of a murder case involving an infant.

A.   Uh-huh, right.

Q.   I can tell you that that experience far exceeds 99 percent of the people that we've been talking to even if it isn't directly involved with criminal law.  And some of these concepts that we're talking about sound like they might be familiar to you, but I'd like to go over them just briefly; okay?

A.   Uh-huh.

Q.   This presumption of innocence issue particularly is important to us.  There's a question about it in the questionnaire.  It says, How do you feel about the proposition that a defendant is presumed to be innocent of the charges

Page 48

against her, a presumption that can be overcome only if the government is able to prove guilt to each juror unanimously and beyond a reasonable doubt? And you said, I'm familiar with the phrase, but I also believe that a person is not charged with a crime without any evidence. However, I also know that in order to have a conviction there can be no doubt. And I wanted to discuss that with you and explore it a little bit; okay?

3683

A.    Sure.

Q.    I don't know how things work in Sioux County. Is that a jurisdiction where people are charged by a complaint, or is the case brought before a grand jury, or do you know?

A.    For a murder?

Q.    Or for any kind of a felony crime.

A.    Not a grand jury.

Q.    You don't have grand juries.

A.    Well, we have one, but as long as I worked there, a grand jury had never been called.

Q.    Okay. Well, that's important because in those kind of counties -- and that's kind of where I grew up was a place that doesn't use grand juries all that much -- we have something called a preliminary hearing. And if you get charged with a crime, there's a piece of paper. It's almost like getting a ticket only usually it's a couple of pages, and it says, Mr. Berrigan, this is what you've been charged with, this crime. And I would show up with a lawyer in court, and there would be a judge sitting up there, and I would have the right to have a preliminary hearing unless I chose not to.

A.    Uh-huh.

Q.    The government would actually present witnesses to testify,

Page 49

and I'd get to see them. I'd be there with the lawyer and get to see them. And the government's lawyer would ask them questions, and my lawyer would get to ask them questions, and it

3684

would be a little bit kind of like a mini trial except that the standard of proof required is just that the government would have to show there's probable cause that I committed the crime that was charged; okay? Is that how it worked in Sioux County?

A.    Right, uh-huh.

Q.    Let me tell you it's quite different here with federal court because they don't have preliminary hearings in federal court.

A.    Okay.

Q.    They have what they call a grand jury process; okay? And to be frank about it, it's really kind of a secret deal, not quite a star chamber, but there's no defendant there; okay? If I were being charged by a grand jury, I'd be clueless that that process was even going on most of the time. And I certainly wouldn't be listening to any witnesses. And, in fact, the people that testify, the witnesses that testify in front of a grand jury, they're not even bound by the rules of evidence.

If you sit as a juror in this case, as the judge mentioned to you, there's going to be a lot of objections back and forth about is this proper evidence and so on. Well, in a grand jury they don't really worry about those kind of things. There's no defense lawyer there to represent the defendant in front of a grand jury. It's an investigative tool that prosecutors use to gather information and bring charges; okay?

A.    Uh-huh.

3685

Page 50

Q.   That's what happened here.

A.   Okay.

Q.   You understand?

A.   Uh-huh.

Q.   Miss Johnson -- the grand jury proceedings against her are quite different than a preliminary hearing that you're used to; all right?

A.   Uh-huh.

Q.   And one really important concept that I want to make sure you understand is that whether you're charged by a grand jury or you're charged by an information as a result of having a preliminary hearing, that charge is absolutely zero evidence that you committed a crime; okay?  Are you with me on that?

A.   Uh-huh.

Q.   You get a clean slate; all right?  Really I mean just a white, clean, clean backboard when you come into court for your trial.  And we need to be able to be assured that even given your experience that you can do that, okay, and not consider the fact that Miss Johnson's been charged as any evidence that she committed any crime whatsoever, much less what she's been charged with.  Can you do that for us?

A.   I believe I can.

Q.   Okay.  Now, the presumption of innocence is a little different deal, okay, and it's equally if not more important. You've said, I'm not going to consider the fact that she's been

3686

charged as any evidence.  Well, the presumption of innocence says she's innocent.  Right now you look at Angela Johnson right there, look at her in the eye, and to be a juror, you have to be

Case 3:09-cv-03064-MWB-LTS   Document 284-70   Filed 06/23/11   Page 3212 of 3245

able to tell us, I can assure you that I presume her to be innocent. You hear me?

A. Yes.

Q. That's a whole different deal, isn't it? It's not, well, maybe she's guilty, maybe she's innocent. That presumption of innocence is something that not just Angela Johnson gets but anybody that would be sitting in that chair charged with any kind of crime. And I know because of your husband's experience you've had just a little bit of personal experience with this deal.

But just imagine that if you were ever in a predicament -- I'm sure you never will be, but if you were ever in the predicament that you were a defendant, don't you think you'd be entitled to have people coming into a jury to assess whether or not you've done anything wrong, people that would be able to look at you in the face and say, You know what, Juror Number 794? I presume you to be innocent. I do with all my heart; okay? That's what we need.

I don't know if your experience with your work in Sioux County makes that difficult for you. I noticed in your questionnaire you said -- question 99, In your opinion is there anything about this case, the issues, and/or the people involved

3687

in this case that might hinder you even slightly from being an impartial juror, and you said, Yes. I pride myself on being a fair and good judge of character, but one can't help being suspicious of individuals after working in the judicial system for 15 years. I've heard about every excuse there is and been called every name there is. And I can't even imagine why people would be calling you names in the clerk's office, but you can

understand why I'm just a little concerned about that; okay?

A. Uh-huh.

Q. We're going to take you at your word on this one way or the other, and as the judge pointed out, we're just looking for people to be honest. But are you going to be able to presume Angela Johnson innocent as the law requires you to do?

A. I think since my husband's ordeal, I think that I'm -- I can better do that.

Q. Okay.

A. Because I myself have been asked if I had any involvement in his case.

Q. Yeah. Well, that brings up an excellent point that you raised earlier, this kind of guilt by association thing, and I do want to talk with you about that, but let's see if we can put this to bed; okay? You know this is what's required, that you have to be able to tell us -- and if you can't, that's okay; all right?

A. Uh-huh.

3688

Q. We're really not trying to get people to tell us just the things we want to hear.

A. Sure.

Q. But we really need jurors that can say, I can presume Angela Johnson to be innocent and can give us that full assurance that they can do that, you know, 100 percent.

A. Yes, I can.

Q. Can you do that?

A. I can.

Q. Okay. So then let's talk about this other issue which you bring up which is very interesting. You already know from the

Page 53

description in the questionnaire that there's at least one other person allegedly involved in -- Mr. Honken, I think you told Mr. Miller you knew he was guilty of the murders; right?

A. Yes.

Q. So it's kind of an analogous situation here somewhat. Obviously these are quite different allegations from your husband's minor situation. But there is this sort of thing you're talking about where people are wondering about you. How did that make you feel, that people were asking you questions about whether you were involved in that activity?

A. Angry.

Q. Okay. Why were you angry?

A. Because I didn't have any involvement. I didn't have any knowledge.

3689

Q. Well, when they asked -- were asking those questions, did you get the feeling they assumed you must have?

A. Some.

Q. Why? Do you have any reason to understand why they would assume such a thing?

A. Because it went through our checkbook.

Q. How long -- do you mind me asking you how long you and your husband have been married?

A. Twenty-one years.

Q. Okay.

A. Excuse me. I better rethink that. Twenty-three years.

Q. We're not going to give him the transcript. Well, that's probably part of it too, don't you think, I mean, that your -- it's not like you were just buddies. I mean, you're married to this man. You've been married a long time. You've raised a

Page 54

family with him.

A.    Uh-huh.

Q.    And sometimes people assume quite wrongly that we know everything that our spouses are engaged in.

A.    Correct.

Q.    Do you feel that way?

A.    Uh-huh.

Q.    And I'm just assuming from your answers you had no idea this stuff was going on, this activity.

A.    No, I didn't.

3690

Q.    And did it go on for some period of time?

A.    Three or four years.

Q.    And I bet you were shocked to learn about it --

A.    I was.

Q.    -- when it was finally disclosed.  Okay.  So were people that approached you and presumed that because of your relationship with your husband or the fact that you were husband and wife for so long and it went through your joint -- was it a joint checking account?  -- they assumed that you were involved, did you think that was unfair?

A.    Yes.

Q.    Okay.  And you can see why we're concerned about that with Miss Johnson.

A.    Yes.

Q.    You're talking to your children, and, frankly, I tell my kids the same thing.  I got three boys.  You hang around with the wrong people, bad things are going to happen.  That's a little different, just a little, than this guilt by association; okay?  I mean, do you feel you're guilty of anything as a result

Page 55

of your husband's wrongdoing except you wish you had known?  I mean, you didn't do anything wrong, did you?

A.    No, no.

Q.    And yet you have this obvious association with him.  It's closer probably than any other person on the face of the earth.  So I just want to make sure if there's some association between

3691

Miss Johnson and this other fellow, I mean, because of that alone are you going to think that she's somehow responsible for criminal activity that this other fellow committed?

A.    No.

Q.    Okay.  Before I ask you questions about the death penalty, let me ask you one other thing that's been touched upon, and maybe not.  The government has the only burden in this case.  They have to prove their allegations beyond a reasonable doubt, and I'm sure you know that from your prior work; right?

A.    Correct.

Q.    We, the defense, we don't have to do anything, to be honest about it.  I don't even have to ask these questions.  Of course, we are going to vigorously defend Miss Johnson; all right?  But we have no legal obligation to do anything, and we don't have to prove anything.  You understand?

A.    Uh-huh.

Q.    That means we don't have to present any evidence.  And as part of that concept, Miss Johnson has a right not to testify.  You understand that.

A.    Yes.

Q.    Okay.  And I'm sure I'm not telling you anything you haven't heard before.  But I bring that up because I gotta tell you that some folks have some strong views about that.  They

Page 56

just feel that, look, Mr. Berrigan, if I'm charged with that serious of a crime, don't even stand in my way on the way to the

3692

witness stand. I'll bowl you over because I'm going to be up there telling these folks this is what the deal is; okay?

And so we tell them, Hey, look, you know, the law says you have the right, absolute right, under the Fifth Amendment that you don't have to testify and that the Fifth Amendment provides that if you exercise that right people can't hold that against you in any way. It can't be considered. No inference of any kind can be drawn from the fact that you chose not to testify; okay? You with me?

A.    Yes.

Q.    Can you imagine that there are a myriad of reasons that people might not take the witness stand?

A.    (Nodded head.)

Q.    Tell me some.

A.    I think it could do more harm than good.

Q.    Okay. In what way?

A.    Attorneys have a way of asking questions, be intimidating.

Q.    Yeah, yeah.

A.    And maybe making a witness say things that they really don't mean to say or just saying what they want to hear just so that they can get off the witness stand.

Q.    Sure. When you came in this morning and we started asking questions, were you nervous in the least?

A.    Yes.

Q.    Yeah. And I suspect that continued when we brought you

3693

Page 57

back all by yourself.

A.   Yes.

Q.   And you're not on trial for your life.

A.   Right.

Q.   Another thing is that sometimes it's hard to tell the difference between when people are nervous and some of the activities that they engage in physically, sweating or they're jittery, from the same types of things we look for when we're trying to find out if somebody's telling us the truth.  Do you know what I mean?

A.   Yes.

Q.   You've already heard Miss Johnson has a fairly limited education.  And obviously these are fine lawyers that the government has representing them.  They're quite skilled and experienced in what they do, and that might be a difficult confrontation for her.  Would you imagine that to be true?

A.   Uh-huh, yes.

Q.   And then she has this sad group of lawyers advising her.

        MR. MILLER:  Objection.

        THE COURT:  Were you serious?

        MR. MILLER:  No, Your Honor.

        THE COURT:  Okay.

        MR. BERRIGAN:  Oh, I thought he was joking too.

        THE COURT:  I wasn't sure, so I won't rule on it.

BY MR. BERRIGAN:

3694

Q.   But, of course, you know, some -- although this is her decision, sometimes lawyers are certainly free to give advice. You understand that.

Page 58

A.   Yes.

Q.   So let me just cut to the chase on this too just so we're real crystal clear; okay?

A.   Sure.

Q.   If she does not testify -- and, frankly, I really don't expect that she will -- will you be able to assure us that you would not hold that against her in any way, that it would not be a consideration in any decision that you'd reach and you certainly wouldn't give any kind of an adverse inference to that fact?  Could you do that for us?

A.   Yes.

Q.   Okay.  You know, that -- to the extent that the Fifth Amendment protects her, that's not even something that the jurors should really be discussing given it's an inappropriate consideration.  Do you agree with me?

A.   Yes.

Q.   Okay.

     MR. STOWERS:  Three minutes.

Q.   All right.  Three minutes, and I want to just explore your views about these punishments briefly; okay?  And to put this in context, these charges are very serious.  The government's alleging that Miss Johnson aided and abetted in the commission

3695

of five intentional murders; okay?  And if -- and the judge has explained the process, and that's a big if.  But if they're able to prove that beyond a reasonable doubt and if we get through this sort of intermission/halftime part of the trial, we could be in this penalty part of the trial; okay?

A.   Yes.

Q.   And the government is alleging also that these murders were

Page 59

committed with premeditation after substantial planning and that they involved the deaths of what the government alleges are vulnerable victims, and obviously we're talking about children, two little girls ten and six years of age; okay? That's at least, at least, what the government's going to try to prove in the penalty phase of the trial if not more.

And the defense has an opportunity -- and as I mentioned earlier, we're not obligated to, but we're going to present evidence of what we call mitigating factors that are reasons that we'd ask the jurors to consider to vote for life, okay, and those are things like no prior criminal history. And I know you know that's an important factor because of your own experience, right, with your husband?

A.    Right.

Q.    So that's something you'd be willing to consider in determining punishment?

A.    Yes.

Q.    Okay. And we might also present evidence that Miss

3696

Johnson's role -- and this has been brought up by Mr. Miller but that her role in this offense or these offenses relative to other participants was relatively minor. That doesn't mean she's not responsible, okay? If you and I robbed a bank together and you stayed out in the car and I went in and robbed the bank, well, that's unfortunate for you because we're both going down for bank robbery; all right?

A.    (Nodded head.)

Q.    But when we came up for sentencing, the judge might look at our roles quite differently if I'm the guy in there with the machine gun threatening everybody on earth and you're sitting

Page 60

out in the car. Do you think that's a fair consideration that our relative roles might be treated differently from punishment even though we're equally guilty? You understand the distinction?

A. Right.

Q. Do you think that's a consideration you'd be willing to undertake in your assessment of punishment?

A. Yeah, I -- yes.

Q. Punishment.

A. Uh-huh.

Q. And then there's this other thing that has to do with her childhood. We can present evidence that she suffered from a fairly traumatic childhood and that may have affected decisions later made in life. And some folks, frankly, are not willing to

3697

consider this at all because it doesn't directly tie into the crimes; okay? Other folks have told us, Yes, I think that is an appropriate consideration. And I want to know whether you'd be willing to consider that as evidence that you'd weigh in this process of aggravating and mitigating circumstances.

A. Yeah, yes.

Q. And the last thing I wanted to cover if I still have a minute is this decision that you're going to make after the weighing, it's different than anything that you've seen on trial or anything in Sioux County, Iowa, because I know Iowa doesn't have the death penalty. It is an individual decision. You personally have to decide in your heart and conscience what's the appropriate punishment; okay?

A. Right.

Q. And everybody else is doing that too. And you don't have

Page 61

to agree on what the mitigating circumstances are. You can disagree all over the board if you want on that. But this decision is your decision. If even one juror said life in prison is the punishment, that's the verdict. That's the verdict of the jury. It's not unanimous. It doesn't have to be unanimous. It can be. All people could say life, or all people could say death. It's only if all people, just like the judge said, said death that the death penalty's imposed. Do you understand that?

A.   Yes.

3698

Q.   Is this a process in which you think you can engage?

A.   Yes.

Q.   And as the prosecutor asked, depending upon what you found to be the circumstances that you thought had the most weight with you, could you reach either verdict?

A.   I believe I can.

MR. BERRIGAN:  Okay.  Thank you for your time, ma'am. You've been quite kind.  Thank you.

THE COURT:  If you'd just step outside for a moment, I'm going to meet with the lawyers, and we'll let you know your status.  Thank you.

(Prospective Juror 794 exited the courtroom.)

THE COURT:  Any challenge for cause by the government?

MR. MILLER:  No, Your Honor.  However, I do need to raise one, I hope, very minor matter.  Agent Basler handed me a note this morning before I got up, and I neglected to ask this witness about it, nor did I mention it to Mr. Berrigan.

As often happens, we cross paths with these people not knowing who they are.  He passed me a note that said, Juror 794

Page 62

asked me directions to the jury room this morning at approximately 8:15 a.m. I take it that was the extent of their conversation, but as with the self-disclosure I made the other day, I just out of an abundance of caution didn't want anybody not to be aware of that or to be found out about it or to be concerned. But no, I have no motion with regard to this

3699

witness, this juror.

MR. BERRIGAN: The defense does not believe additional questioning's necessary as a result of that disclosure, though we very much appreciate knowing that, and we have no motion for cause, Your Honor.

THE COURT: Isn't this a juror who claimed to have been in my house?

MR. BERRIGAN: She saw your house.

THE COURT: Oh, she saw it.

MR. BERRIGAN: Right. We could ask her about that, Your Honor. I didn't really -- wasn't terribly concerned about it about looking at the house.

THE COURT: Yeah. I don't know why, but that's interesting. I don't know her. I mean, it doesn't -- I read through her questionnaire. Nothing about her background rings a bell with me.

MR. BERRIGAN: She doesn't claim to know you. I don't know why she would know your house or think she did. Certainly if you feel --

THE COURT: It's got the neon sign on it. That's why. People come by to see the neon sign. I bet you don't even know what that neon sign says, do you?

MR. BERRIGAN: I have absolutely no idea, sir.

Page 63

THE COURT: Well, it will remain a mystery. Does the government have a peremptory strike?

3700

MR. MILLER: No, Your Honor.

THE COURT: So let me get this straight. Juror 794 is our last remaining juror, correct, number 6 alternate?

MR. BERRIGAN: That's correct, Your Honor.

THE COURT: Now, after we let her go, do you think we ought to bring everybody up and just tell them they're all dismissed from jury service?

MR. BERRIGAN: How ever you'd like to handle that, sir.

THE COURT: I'd like to wait a few minutes to let this juror leave the building before that just so there's no discussion.

MR. BERRIGAN: Sure.

THE COURT: We'll bring her in.

(Prospective Juror 794 entered the courtroom.)

THE COURT: Juror 794.

PROSPECTIVE JUROR 794: Yes.

THE COURT: You've been selected to serve on this jury. We start tomorrow morning at 8:30. We're asking all the jurors to assemble at 8:00 in the jury assembly room. And then we'll bring you up hopefully promptly at 8:30 to start the trial. Do you understand that?

PROSPECTIVE JUROR 794: Yes.

THE COURT: Okay. Now, I want to give you a cautionary instruction. It's very similar to what was in that

3701

Page 64

written material.  Because you're a trial juror in this case, it's very, very important that you not talk to anybody about this case.  Don't let anybody talk to you about the case.  Don't read anything.  I realize you said you don't read the newspapers.  Don't start now.  Try and avoid any radio or television news reports about the case.  Don't do any independent research or reading on your own on the Internet or anywhere else.  Keep an open mind till you've heard all of the evidence; okay?

PROSPECTIVE JUROR 794:  (Nodded head.)

THE COURT:  We'll see you back here tomorrow morning.

PROSPECTIVE JUROR 794:  Okay.

THE COURT:  Okay.  Thank you.  You're excused.  Thank you.  See you tomorrow.

PROSPECTIVE JUROR 794:  Thank you.

(Prospective Juror 794 exited the courtroom.)

THE COURT:  We're going to bring up all the jurors, but we're going to wait a couple minutes to do that.  Please be seated.  It was just brought to my attention that a new motion in limine was filed by the defense at 11:00 last night.  It's untimely by any standard.  Do you have an excuse as to why it wasn't filed by the deadline which was almost four months ago today?

MR. STOWERS:  Well, first of all, I think that -- first of all, I think that the way the indictment was changed in

3702

January when Counts 11 and 12 were dismissed bears in part on the admissibility of that material, and I think it was actually -- the indictment was -- they dropped 11 and 12 out of the December's -- I don't know what the return date on that
Page 65

indictment was, but the indictment was filed, the second superseding indictment, in early December of 2004. And then in January they elected to withdraw Counts 11 and 12 on their own motion which Counts 11 and 12 concern activities that stemmed into the mid to late '90s. Then those counts were withdrawn in January.

And so there was still some discussion on the government's part that they were still going to present that evidence after that. Then they ultimately elected they weren't going to. Then what remained at that point was the issue of certain activities subsequent to the time of the murders that were of a drug-related nature. And as our thinking's evolved on this, we are going to be objecting throughout the trial to the admissibility of that evidence that would concern drug activities alleged to have been engaged in by Angela Johnson but also by other persons who are alleged to either be co-conspirators or continuing criminal enterprise participants. And we thought the best way to make our position clear would be to file a motion so that the Court knew what our position was.

THE COURT: The day before the trial started?

MR. STOWERS: Well, it's filed -- this whole case has

3703

been an evolving process of changes and amendments and things of that nature. We think it's best to have our position stated in writing on the record. If the Court is not inclined to address it as a motion in limine, it's there so you know what our position is on it at this point so it's clear.

THE COURT: Well, it's untimely, and you didn't state good grounds in the motion to get around the timeliness issue.

MR. STOWERS: Well, as a motion in limine, you may

Page 66

want to say that, that it's untimely, and rule that way. It's not going to change the fact, though, that we're going to object to that evidence as it's attempted to be presented by the government. And so it will have to be ruled on in that fashion on an item-by-item basis at that point in any event. But we wanted to let you know about it. We think it's a meaningful issue that the Court will need to have a heads-up on, and that's why we presented it in writing to you albeit yesterday.

THE COURT: And why did you wait until 11:00 last night to file it?

MR. STOWERS: Well, it was being prepared over the last week. As we evaluated these preliminary jury instructions, thought about those issues, and then over the weekend put together some stuff, a draft was reviewed at the end of the day yesterday. It was worked on throughout the evening, and then it was filed last evening. I'd hoped to have it on file with the other stuff that we filed -- I guess it would have been Sunday

3704

night, but it wasn't ready yet so -- but we filed it in writing so that the matter's clear in the record as to what our thinking is on that issue.

THE COURT: Mr. Williams, I don't even think you know about this issue so . . .

MR. WILLIAMS: I don't, Your Honor. I'm afraid I've not seen this motion yet. So I don't know how to respond other than obviously on the timeliness, despite the assertions here, these are changes that we made back in January months and months and months ago, and this has been a case where we have literally provided the defense with almost our entire discovery file, their own copy of it. So this is in no way a case where this

defense team doesn't know exactly what our evidence is and where we're coming from. So just on the timeliness issue, I'm not sure. But other than that, I can't speak to the merits of it because I've not seen it yet.

THE COURT: How would you like to proceed? Obviously you'd like to review the motion.

MR. WILLIAMS: I could be in a position this afternoon to deal with it, Your Honor.

THE COURT: Why don't we have a hearing on the motion at 1:30.

MR. WILLIAMS: Very good.

THE COURT: Would that work for the defense?

MR. STOWERS: That's fine, Your Honor.

3705

THE COURT: Do you have any other last-minute motions that you're planning on filing that you've known about for a week and sandbagged by filing at 11:00 the night before the trial started? That is my definition of sandbagging. You knew about the motion. It's untimely. You would have had an obligation to at least tell me you're filing the motion, what the basis of it was so that I could get a head start on it. And I'd be a lot more sympathetic to an untimely motion if you had done it that way rather than filing it at 11:00 last night.

MR. STOWERS: I understand.

THE COURT: Okay. Well, my question is do you have any other motions you're planning on filing?

MR. STOWERS: Oh. Not at this time, no. And there are none in the works. I can tell you that.

THE COURT: Okay. That's fine.

MR. STOWERS: No.

Page 68

THE COURT: I assume there will be some during the course of the trial, and I understand that. But if you know you're going to be filing one, I'd appreciate a heads-up.

MR. STOWERS: I understand.

THE COURT: Because I don't spring surprises on you all.

MR. STOWERS: No, I understand.

THE COURT: I try and give you as much notice as possible.

3706

MR. STOWERS: That's true.

THE COURT: But it doesn't seem to be reciprocal.

MR. STOWERS: Well, it's a challenge for us.

THE COURT: Yeah, I understand that. I can appreciate that too.

MR. STOWERS: Thank you.

THE COURT: Okay. Why don't we bring all the jurors up, and I'll dismiss them.

(Panel O entered the courtroom.)

THE COURT: Anywhere, anywhere in the front row. Thank you. Please be seated. In this job I'm usually pretty good at making half the people unhappy all of the time. Sometimes I make everybody unhappy. I'm sorry to disappoint the four of you. I know how unhappy you'll be, but we have our jury selected now, and your services won't be needed. So I know how badly each of you wanted to serve on this jury, but you won't have that opportunity.

So we appreciated very much you coming in. This was just kind of unavoidable. But we reached the number that we needed, and at that point we made a decision to stop. We didn't

Page 69

know if we'd reach that number even today, but we did, and so there's no point in keeping you here any longer.

On behalf of the lawyers and the parties in this case and the judges and employees of our court, we thank you very much for going through the jury selection process. I'm sure

3707

you're glad you were spared the individual questioning by the lawyers. And you all are dismissed as jurors in this case. Thank you very much. Good luck to each of you.

(Panel 0 exited the courtroom.)

THE COURT: Anything else we need to talk about?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Regarding the 1:30 hearing, Your Honor.

THE COURT: Yeah.

MR. STOWERS: Mr. Willett and I have some responsibilities pertaining to the opening tomorrow morning, and we wanted to know if we could have an excused absence this afternoon. Mr. Stowers is perfectly capable of handling this matter in our view unless you'd like us here.

THE COURT: No. I think just any one lawyer is fine.

MR. BERRIGAN: And Miss Johnson is also requesting to be absent just for this specific hearing this afternoon at 1:30. She's been apprised of the issues. She knows it's a legal matter, that there won't be any evidence presented. She's comfortable with Mr. Stowers handling this matter and would like to go back and relax before the trial starts tomorrow, and that would be difficult for her if she had to come back for the hearing.

THE COURT: Sure. That's fine. Could we just have an affirmative response from her personally, and maybe you could

Page 70

ask the question.

3708

MR. BERRIGAN:  I will, sir.  Is everything that I've just said correct regarding your request to be excused from participating in the 1:30 hearing this afternoon, Miss Johnson?

THE DEFENDANT:  That is correct.

THE COURT:  Thank you.

MR. BERRIGAN:  Thank you, Your Honor.

THE COURT:  Then we'll see Mr. Stowers and whoever shows up for the government at 1:30 to take up the motion in limine, and we'll see the rest of you -- why don't we meet at 8:00.  I don't anticipate there are going to be any problems, but -- well, let me ask you this, and maybe it's something we should take up this afternoon.  Is either side going to be using any demonstrative exhibits in their opening statements?  And to the extent that there may be objections, we maybe need to talk about that.

MR. WILLETT:  Your Honor, if it please the Court, the defense is not, and Mr. Williams and I are meeting immediately after we're done today to discuss -- I think he's given me a list of five or six items, some of which I don't have great heartache on, one of which I think we've resolved.  And I think maybe I'm talking to him about one or two other items, but we're going to try and resolve that right now.

THE COURT:  Okay.  And --

MR. WILLIAMS:  If there's anything left, we can raise it with you, Judge, at 1:30.

3709

Page 71

THE COURT: Okay. Except that Mr. Willett's not going to be here at 1:30. Well, if you don't get it resolved, you will be here at 1:30, but we'll take that matter up first.

MR. WILLETT: Thank you, Judge.

THE COURT: Okay? So we can accommodate your schedule. It shouldn't take very long at all. Okay. Good. Thank you. We'll be in recess.

(Recess at 10:24 a.m.)

(Proceedings reconvened in the presence of the Court, Mr. Williams, and Mr. Stowers.)

THE COURT: Okay. Please be seated. This is the hearing on defendant's motion in limine regarding subsequent bad acts. Mr. Stowers, do you have anything else you'd like to add to your motion?

MR. STOWERS: As you can tell from the -- as you can tell from your motion -- or from the motion, there's two sort of parts of it. One is --

THE COURT: With regard to the defendant and one is with regard to co-conspirators.

MR. STOWERS: Correct, and co-participants in the CCE and -- who I think are the same people. And our position is that particularly with regard to the co-conspirators' subsequent acts, that is, the acts after the date of the alleged killings, that those acts are not admissible and have no relevancy or probative value on any specific issue pertinent to the charges

3710

in the case. Obviously some of those allegations are contained in the indictment as part of the events occurring in connection with the ongoing continuing criminal enterprise.

But our position on that is that what's required to be

Page 72

proven is that on the CCE murder counts that Angela Johnson has to have aided and abetted Mr. Honken in killing the named persons while she was working in furtherance of the Honken CCE which has to have existed at the time of the killings and that activities engaged in by the CCE members particularly other than herself after the date of the killings don't answer that question as to whether or not she was working in furtherance of it at the time of the killings, and they don't help answer that question.

Now, I think there's probably a little different analysis and a better argument for the government with regard to her own acts occurring after the dates of the killings that they would like to show in their evidence.

As the Eighth Circuit has indicated, Rule 404(b) allows for subsequent acts to be used just like prior bad acts under the same basic rationale. And as to those, we I guess would object on the grounds that those really aren't particularly probative of the core issues in this case. They have a strong unfairly prejudicial value, and we think they really aren't pertinent recognizing, however, that the case law isn't very favorable on that question or at a minimum that the

3711

Court has a good deal of latitude in ruling on that particular issue.

We believe that on that evidence that the Court should, if it's admitted, give a limiting instruction along the lines of the Eighth Circuit uniform instruction relating to 404(b)-type evidence when it's admitted for something other than identity and use the uniform instruction modified for subsequent bad acts rather than prior bad acts. And so that's our basic

Page 73

position.

THE COURT: Okay. Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. This is specifically charged conduct. I note in the defendant's brief in support of the motion in limine they seek to prohibit any evidence occurring after the charged conspiracy or charged conduct. Well, this is charged specifically in each of the counts. We charge the conspiracy or the CCE lasted from 1992 to 1998. So it's charged conduct that we obviously have an obligation and the right to put on evidence to support our charges.

I think the defense focus on the killing as somehow cutting off the existence of the CCE is misplaced. We have two things to prove here. Obviously the murders is the focus of the prosecution in this case, but as a practical matter, I have to prove the existence of a conspiracy and a CCE, and the fact that there continued to be ongoing coordinated conduct by these

3712

conspirators after the killing helps establish the existence of the CCE at the time of the killing and the existence of the conspiracy at the time of the killing. And so in that regard that evidence is properly admissible to show the existence of the CCE and the conspiracy throughout.

The fact that the killings in this case occurred relatively early during the time period of the CCE doesn't make somehow the subsequent evidence of the existence of the conspiracy somehow inadmissible, particularly when it's charged conduct, and we have the obligation to prove that there was a conspiracy that lasted for a period of time in which she was a knowing member.

Page 74

Yes, we have to prove that she was a member at the time of the killing, and the jury's going to be instructed that that's an element of the offense and they have to find that, and if we fail, we lose. But that doesn't somehow suddenly make all the other evidence of the ongoing conspiracy irrelevant in my obligation to prove that there was such a conspiracy in the first place.

THE COURT: Unless the defendant is right that the continuing series of three or more related felony violations have to occur prior to the murders.

MR. WILLIAMS: Even if that's the case, I don't think it shows -- it doesn't -- I think it -- even if he's right on that that it means I have to prove that these three -- that

3713

before the murders there were three or more violations, but that doesn't mean as a consequence of that that somehow evidence of subsequent conduct after that is somehow irrelevant to establishment of the CCE.

I mean, the first thing is I've got to show the CCE existed and a conspiracy existed for some period of time. And part of that I've got to show at some point during this life of this thing a murder occurred. And if they're right about my obligation to show three or more events occurred prior to the killing, then I have to do that in order to get to the point of seeking the death penalty against her or even holding her liable for the killings. But that doesn't translate suddenly to all the rest of the evidence is irrelevant and it's somehow inadmissible if, in fact, it shows a conspiracy.

Moreover, the evidence --

THE COURT: Well, let me ask you about that.

Page 75

MR. WILLIAMS:  Yeah.

THE COURT:  If the defendant is right that the CCE statutory scheme requires proof of the continuing series of three or more related felony violations prior to the murders, then what's the relevancy of post-murder CCE continuing series of three or more related violations?

MR. WILLIAMS:  To show that, in fact, the conspiracy existed.  Imagine, for example --

THE COURT:  What's the relevance of that if the

3714

requirement is that it exists prior to the murders?  I think what their argument is the post-murder stuff isn't part of any statutory requirement and, therefore -- matter of fact, it exceeds the statutory requirement and, therefore, it would be irrelevant.  Isn't that your argument?

MR. STOWERS:  That is our argument said succinctly.

MR. WILLIAMS:  The acts subsequent to the murders, though, aren't irrelevant if they help establish the existence of the conspiracy and the CCE before the murders occurred.

In other words, for example, in this case we're going to be putting on evidence that Cobeen was taken over to Angie Johnson's house to be vetted by Johnson before he was allowed to enter into transactions with Honken.  The jury should be allowed to know that there was that type of relationship that existed for them to help interpret the evidence of the conspiracy before the murders to help them understand whether, in fact, there was a relationship, whether there was a conspiracy between the parties.

And in the same vein, for example, the fact that when Honken had undercover tapes with Cutkomp and he's talking about

Page 76

the prior murders that occurred back in 1993 and the fact that he's not going to involve -- this time he's not going to involve her, referring to Angie Johnson, because she doesn't like to plan, she likes just to do things, yada, yada, that's evidence, again, tying back to the fact there was a conspiracy, there was

3715

an existence of an agreement back at the time of the murders.

And so all this evidence is intertwined to show that there was a continuing course of conduct by these people during the course of which some murders occurred to allow them to keep doing it, but it doesn't suddenly make the evidence irrelevant after the murders occurred.

It wouldn't be sufficient if their argument's right -- I mean, I couldn't rely on this to show a continuing series in theory if they're right, but that doesn't mean it's irrelevant if it helps establish the existence of the conspiracy.

THE COURT:  Anything else you'd like to add?

MR. WILLIAMS:  No, Your Honor.  Thank you.

THE COURT:  Anything else you'd like to add on this, Mr. Stowers?

MR. STOWERS:  I think the Court understands our argument.  I think it's a troubling part of their case I guess is all I'd say because they're kind of trying to really -- they've got more evidence post the murders than they do pre the murders as far as the underlying drug-related conduct over the whole time period.  And they're kind of trying to do their case kind of in a semi reverse which is to prove the post-killing conduct in order to prove the existence of the prior conduct.

But even if it's admissible to prove that in the way that they're arguing it, I'm just really mentally struggling

Page 77

with the concept that it's admissible under 403 and 404 because

3716

of the -- because of the nature of this particular statute and what the Court should actually be telling the jury if that evidence is admitted about what use can be made of it which is another interrelated problem. And that's why I think there has to be some type of limiting instruction at a minimum.

THE COURT: Okay. Well, I'm ready to rule. I'm just going to rule orally on this one. The motion's denied because it's untimely. You didn't even seek good cause to excuse the untimely nature of the motion.

Moreover, even if the motion wasn't untimely which it clearly is, it lacks sufficient specificity for me to rule on it. It doesn't identify what subsequent bad acts or alleged criminal conduct of the defendant. It doesn't allege what specific bad acts or alleged criminal conduct of the co-conspirators. It just talks about it generally. And without knowing specifically what the evidence is going to be, unlike the lawyers in this case -- it might come as a surprise to you -- I don't live in the discovery file. I don't even have access to the discovery file. I don't know what evidence you're talking about, and you didn't take the time to specify it in the motion, so the motion's too vague for me to rule on.

So I'm going to deny it both because it's untimely and because it's vague, although I do appreciate you filing it, and actually I think this is one of the few times I've appreciated the filing of an untimely motion because it does at least let me

3717

know a little bit more about what your theory is as the evidence
Page 78

comes in and you'll be objecting to it, and for that I do appreciate it.

With regard to a potential limiting instruction, I don't see the general applicability of Eighth Circuit 2.08 to this issue. And so you're going to have to have a proposed limiting instruction sufficiently in advance of when you think it needs to be used and have it submitted to me. If you can agree on one, then that would even be better. But given the inability of the parties to agree on virtually anything in this case, I will not be holding my breath.

So each side ought to submit a proposed limiting instruction when we get to this situation, and then you'll have to clearly object to it on the record so I understand the basis of your objection, and I'll rule and hopefully -- well, more than hopefully. You better have a proposed limiting instruction to me sufficiently in advance of having to rule on this evidence so that I can make a decision whether or not I'm going to give either one of the proposed limiting instructions or whether I'm going to give a limiting instruction that the parties have agreed upon.

Anything about that ruling that is unclear? Mr. Stowers?

MR. STOWERS: No. Thank you, Your Honor.

THE COURT: Okay. Thank you. And Mr. Williams?

3718

MR. WILLIAMS: No, nothing that's not clear, Your Honor. Just I'm not sure that I'm ever going to propose that a limiting instruction's appropriate in the case.

THE COURT: That's fine.

MR. WILLIAMS: But in the event the Court rules that
Page 79

way, I will put together language that will be helpful to the Court to use if you rule that direction.

THE COURT: Okay. That takes care of that matter. I think we had another matter with regard to demonstrative exhibits in opening statements that we were going to take up at this time?

MR. WILLIAMS: Yes, Your Honor. If I may approach?

THE COURT: You may.

MR. WILLIAMS: The government went through the demonstrative exhibits and actual exhibits that we're going to be using in opening statement, and the defense has had no objection to those with the exception of this exhibit.

Their first objection was to the photograph we had of Angela Johnson which was the only one that we had other than the newspaper photos, and that was the booking photo. At their request, we substituted in a more recent photo that the marshals were kind enough to take for us and substituted that in in place of the booking photo. So that objection we took care of.

The only other objection that I'm aware of -- and they might be able to articulate this better -- is that they think

3719

that the organizational chart ought to be drafted differently with different people up and different people down and so forth.

My position is this is my organizational chart. If they want to do one, they can put together their own organizational chart. And it's demonstrative, so for that purpose I think I should be able to use it. But as I understand it, that's the only objection they have to this at this point.

THE COURT: Mr. Stowers?

MR. STOWERS: That is correct. And I guess our

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3241 of 3245

position is on the chart which is identified as Government Exhibit 3 that the placement of Angela Johnson in sort of the upper tier of the organization adjacent to the Honken brothers places her in a location that is inconsistent with their allegations before trial or what the evidence will show. But Mr. Williams is right. It's their chart.

THE COURT: Yeah, I think it's their chart, and to me it's entirely consistent with the theory I heard in United States versus Honken. Who knows? This is a different trial. But regardless of what I thought about the theory or the evidence, it's the party's contention, and it's just a demonstrative exhibit reflecting what their contention is.

And you want to have your own chart with different lines or comment that you think the evidence will establish a different organizational pattern than what the government alleges in the chart, you're free to do that. But I think the

3720

government's got a right to argue their case within limits the way they see it, but this is within proper limits in my view.

So to the extent that there's an objection to what's been marked as Government Exhibit 3 as an organizational chart not adequately reflecting what the government's evidence in the case will be, that objection's overruled.

Anything else?

MR. WILLIAMS: No, Your Honor.

MR. STOWERS: No thank you.

THE COURT: Okay. How far are we going to get tomorrow? We'll do preliminary instructions, opening statements, and I assume get to at least one witness, couple witnesses?

Page 81

MR. WILLIAMS: I'm hoping we get through maybe even four or five, frankly.

THE COURT: Are you going to -- do you have -- is your witness list -- I assume I've got a witness list. Yeah, I do. I haven't looked at it. Are you going to follow the order of that?

MR. WILLIAMS: Yes, as best I can, and, you know, with the caveat that if -- and actually we're having trouble right now getting some people in, so Thursday's schedule may be different from the witness list, and as soon as we get those times finalized, I'll get a revised list to everybody. But as we can within the logistics, we're going to follow the list in

3721

the order we have it.

Just to give you one quick heads-up, tomorrow, Judge, so you know what we're doing, the defense has wanted us to lay some foundation through some court reporter to explain how grand jury transcripts are created. And so the way we're going to deal with that is on -- the first witness is Detective Stearns, and he's going to testify about the initial early investigation, then ultimately Greg Nicholson's testimony before the grand jury.

At that point I'm going to hand him the transcript from the grand jury testimony and move for its admissions. The defense may object to it at that point, and I would request at that point to be allowed to connect it up with my next witness who will be the court reporter. They're okay with that. And then I would have Detective Stearns then read through the transcript, the points we want to make.

And then my next witness will be the court reporter.

Page 82

We put her up, and then, again, to facilitate things, the defense has no objection if once I get her up I hand her not just only the transcript of Greg Nicholson but four other grand jury transcripts, have her say, Yep, these other people are court reporters that work with me at the grand jury; these were produced in the same manner that I produced this one; and they're true and accurate. At this point I'll move all those into evidence at that point.

3722

And I understand they're not going to have an objection as long as we provide some explanation for how they're produced. And we won't then use those transcripts again until later witnesses. But at least we'll move them into evidence at that point. So it's going to be kind of untraditional the way we do it, but I wanted to give you a heads-up that's what's happening.

THE COURT: Anything else I need to know about?

MR. STOWERS: No.

THE COURT: Okay. See you tomorrow morning at -- we'll meet at 8:00 and get started at 8:30.

MR. WILLIAMS: Very good. Thank you, Judge.

THE COURT: Thank you.

MR. STOWERS: Thank you, Judge.

(The foregoing trial was

adjourned at 1:50 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript

Page 83

from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                          2-17-06
                                                   Date

⚲

3723

INDEX

PROSPECTIVE JUROR:                                          PAGE:

Prospective Juror 794
            MR. MILLER                                      3665
            MR. BERRIGAN                                    3680

*****

Page 84

Case 3:09-cv-03064-MWB-LTS    Document 284-70    Filed 06/23/11    Page 3245 of 3245