5/4/05

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| FRANK STEARNS | | |
| | MR. WILLIAMS | 49 |
| | MR. WILLETT | 102 |
| PEGGY CHRISTENSEN | | |
| | MR. WILLIAMS | 112 |
| | MR. STOWERS | 125 |
| DEBRA DAVIS | | |
| | MR. WILLIAMS | 128 |
| | MR. STOWERS | 140 |
| | MR. WILLIAMS | 150 |
| DAVID MIZELL | | |
| | MR. WILLIAMS | 151 |
| | MR. WILLETT | 187 |
| LESLIE OLSON | | |
| | MR. WILLIAMS | 193 |
| | MR. BERRIGAN | 204 |
| DAVID THINNES | | |
| | MR. WILLIAMS | 219 |
| | MR. BERRIGAN | 234 |

*****

5/5/05

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| AARON RYERSON | | |
| | MR. WILLIAMS | 263 |
| | MR. BERRIGAN | 290 |
| | MR. WILLIAMS | 314 |
| | MR. BERRIGAN | 315 |
| JEFFREY HONKEN | | |
| | MR. WILLIAMS | 317 |
| | MR. STOWERS | 370 |
| | MR. WILLIAMS | 390 |
| KEVIN PALS | | |
| | MR. MILLER | 396 |
| | MR. STOWERS | 410 |
| LISA ASBE | | |
| | MR. MILLER | 416 |
| | MR. BERRIGAN | 432 |
| CINDY HICOK | | |
| | MR. MILLER | 434 |
| | MR. BERRIGAN | 443 |
| MARGE MILBRATH | | |
| | MR. MILLER | 448 |
| | MR. BERRIGAN | 471 |
| | MR. MILLER | 473 |
| | MR. BERRIGAN | 474 |
| | MR. MILLER | 474 |
| PAUL BUSH | | |
| | MR. MILLER | 475 |
| | MR. STOWERS | 487 |
| | MR. MILLER | 489 |
| JOANN DEGEUS | | |
| | MR. MILLER | 493 |
| | MR. BERRIGAN | 502 |
| ASHLEY DEGEUS | | |
| | MR. MILLER | 504 |
| | MR. BERRIGAN | 513 |
| WENDY JENSEN | | |
| | MR. MILLER | 517 |
| | MR. BERRIGAN | 523 |

*****

5/9/05

INDEX

WITNESS:                          PAGE:

ROBERT GERDES
        MR. WILLIAMS              534
        MR. BERRIGAN             548
        MR. WILLIAMS              555
        MR. BERRIGAN             556

CHRISTI GAUBATZ
        MR. MILLER               557
        MR. WILLETT              602
        MR. MILLER               603
        MR. WILLETT              618
        MR. MILLER               652

DANIEL COBEEN
        MR. WILLIAMS              658
        MR. WILLETT              710
        MR. WILLIAMS              730
        MR. WILLETT              733
        MR. WILLIAMS              735
        MR. WILLETT              735
JOHN GRAHAM
        MR. WILLIAMS              736

*****

5/10/05

INDEX

WITNESS:                          PAGE:

JOHN GRAHAM
        MR. WILLIAMS              773
        MR. WILLETT              811
        MR. WILLIAMS              823

TIMOTHY CUTKOMP
        MR. WILLIAMS              826
        MR. WILLETT              939
        MR. WILLIAMS              976
        MR. WILLETT              978

*****

5/11/05

INDEX

WITNESS:                          PAGE:

LORI LEWIS
        MR. WILLIAMS              987
        MR. STOWERS             1008
        MR. WILLIAMS             1021

NILA BREMER
        MR. WILLIAMS             1022
        MR. STOWERS             1031

RICK HELD
        MR. WILLIAMS             1036

| | |
|---|---|
| MR. STOWERS | 1047 |
| MR. WILLIAMS | 1048 |
| MR. STOWERS | 1053 |
| MR. WILLIAMS | 1063 |

WILLIAM BASLER

| | |
|---|---|
| MR. WILLIAMS | 1065 |
| MR. STOWERS | 1122 |
| MR. WILLIAMS | 1139 |

MICHAEL MERINO

| | |
|---|---|
| MR. WILLIAMS | 1141 |
| MR. STOWERS | 1160 |

ROBERT MCNEESE

| | |
|---|---|
| MR. MILLER | 1174 |
| MR. BERRIGAN | 1222 |

\*\*\*\*\*

5/12/05

WITNESS:                              PAGE:

ROBERT MCNEESE

| | |
|---|---|
| MR. BERRIGAN | 1256 |
| MR. MILLER | 1275 |
| MR. BERRIGAN | 1284 |

SARA BRAMOW

| | |
|---|---|
| MR. WILLIAMS | 1291 |
| MR. WILLETT | 1328 |
| MR. WILLIAMS | 1348 |
| MR. WILLETT | 1353 |

GARY LICHT

| | |
|---|---|
| MR. MILLER | 1355 |
| MR. STOWERS | 1381 |
| MR. MILLER | 1388 |

KEVIN BOLDT

| | |
|---|---|
| MR. WILLIAMS | 1388 |
| MR. BERRIGAN | 1403 |

PEGGY HOOVER

| | |
|---|---|
| MR. WILLIAMS | 1412 |
| MR. WILLETT | 1424 |

WILLIAM BASLER

| | |
|---|---|
| MR. WILLIAMS | 1426 |
| MR. BERRIGAN | 1427 |

\*\*\*\*\*

5/16/05

INDEX

WITNESS:                              PAGE:

PEGGY BACA

| | |
|---|---|
| MR. WILLIAMS | 1446 |
| MR. WILLETT | 1462 |
| MR. WILLIAMS | 1471 |
| MR. WILLETT | 1474 |

MICKIE YAGER

| | |
|---|---|
| MR. WILLIAMS | 1475 |
| MR. BERRIGAN | 1494 |
| MR. WILLIAMS | 1507 |
| MR. BERRIGAN | 1509 |

WENDY JACOBSON

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3 of 3592

|  |  |  |
|---|---|---|
| MR. WILLIAMS | 1514 | |
| MR. BERRIGAN | 1529 | |
| MR. WILLIAMS | 1532 | |
| MR. BERRIGAN | 1535 | |
| SHELLY JOHNSON | | |
| MR. WILLIAMS | 1537 | |
| MR. BERRIGAN | 1541 | |
| J.D. SMITH | | |
| MR. MILLER | 1546 | |
| MR. STOWERS | 1573 | |
| MICHAEL HOCHREIN | | |
| MR. MILLER | 1578 | |
| MR. STOWERS | 1666 | |
| MR. MILLER | 1674 | |
| MR. STOWERS | 1679 | |

5/17/05

INDEX

| WITNESS: | PAGE: |
|---|---|
| J.D. SMITH | |
| MR. MILLER | 1711 |
| MR. STOWERS | 1727 |
| MR. MILLER | 1729 |
| MARY BUCKLEY | |
| MR. MILLER | 1731 |
| MR. BERRIGAN | 1739 |
| JOHN FRASCO | |
| MR. MILLER | 1741 |
| MR. STOWERS | 1758 |
| JOHN KRAEMER | |
| MR. MILLER | 1760 |
| MR. STOWERS | 1777 |
| MR. MILLER | 1786 |
| DENNIS KLEIN | |
| MR. MILLER | 1788 |
| MR. BERRIGAN | 1853 |
| MR. MILLER | 1870 |
| MR. BERRIGAN | 1873 |
| MR. MILLER | 1874 |
| JULIA GOODIN | |
| MR. MILLER | 1875 |
| MR. STOWERS | 1890 |
| MR. MILLER | 1893 |
| WILLIAM BASLER | |
| MR. WILLIAMS | 1903 |
| MR. STOWERS | 1909 |
| FRANK TARASI | |
| MR. MILLER | 1913 |
| MR. STOWERS | 1934 |
| MR. MILLER | 1941 |
| MR. STOWERS | 1946 |

*****

5/18/05

INDEX

WITNESS:                          PAGE:

DAWNIE STEADMAN
    MR. MILLER                 1983
    MR. BERRIGAN               2059
    MR. MILLER                 2066

VICTOR MURILLO
    MR. MILLER                 2067
    MR. STOWERS                2103
    MR. MILLER                 2122

        *****

6/1/05

      INDEX

WITNESS:                          PAGE:


STEVE VEST
    MR. WILLIAMS               2550
    MR. BERRIGAN               2576
    MR. WILLIAMS               2618
    MR. BERRIGAN               2623

KATHY RICK
    MR. WILLIAMS               2627
    MR. BERRIGAN               2642
    MR. WILLIAMS               2668
    MR. BERRIGAN               2669

ALYSSA NELSON
    MR. WILLIAMS               2670
    MR. BERRIGAN               2684

JENNIFER RINDEN
    MR. WILLIAMS               2696
    MR. BERRIGAN               2698

MICHAEL MITTAN
    MR. WILLIAMS               2701
    MR. STOWERS                2744
    MR. WILLIAMS               2772

KYLA DAVIS
    MR. WILLIAMS               2774
    MR. STOWERS                2779
    MR. WILLIAMS               2790

LAURA SHELLEY
    MR. WILLIAMS               2791
    MR. STOWERS                2794

WILLIAM BASLER
    MR. WILLIAMS               2799
    MR. STOWERS                2810

        *****


6/2/05

      INDEX

WITNESS:                          PAGE:
WILLIAM BASLER
    MR. STOWERS                2835

RONDA FRANCIS
     MR. WILLIAMS     2874
     MR. BERRIGAN     2891

WENDY JENSEN
     MR. WILLIAMS     2894

ASHLEY DEGEUS
     MR. WILLIAMS     2907
     MR. BERRIGAN     2912

KATHY NICHOLSON
     MR. WILLIAMS     2913
     MR. BERRIGAN     2927

ROBERT MILBRATH
     MR. WILLIAMS     2931

MARGE MILBRATH
     MR. WILLIAMS     2951

PEARL JEAN JOHNSON
     MR. BERRIGAN     2966

6/6/05

INDEX

WITNESS:         PAGE:

PEARL JEAN JOHNSON
     MR. BERRIGAN     3041
     MR. WILLIAMS     3087

LEON SPIES
     MR. STOWERS     3091

JAMES JEFFREY JOHNSON
     MR. BERRIGAN     3094
     MR. WILLIAMS     3142

WENDY JACOBSON
     MR. BERRIGAN     3143

ARLYN JOHNSON
     MR. BERRIGAN     3187
     MR. WILLIAMS     3207
     MR. BERRIGAN     3211

EVA HANAWALT
     MR. BERRIGAN     3214
     MR. WILLIAMS     3241
     MR. BERRIGAN     3242

HOLLY DIRKSEN
     MR. BERRIGAN     3244
     MR. WILLIAMS     3271
     MR. BERRIGAN     3278

\*\*\*\*\*

6/7/05

INDEX

WITNESS:         PAGE:

WILLIAM LOGAN
     MR. BERRIGAN     3288
     MR. WILLIAMS     3344

|  |  |  |
|---|---|---|
| MR. BERRIGAN | 3355 | |

JAMIE HAYS
| MR. BERRIGAN | 3363 |

MARVEA JANE HONKEN
| MR. BERRIGAN | 3398 |

SHELLY JOHNSON
| MR. BERRIGAN | 3422 |

JAMES JOHNSON, JR.
| MR. BERRIGAN | 3434 |

CAROL MANN
| MR. STOWERS | 3459 |

HARVEY DESOTEL
| MR. STOWERS | 3480 |
| MR. WILLIAMS | 3510 |

\*\*\*\*\*

6/8/05

INDEX

WITNESS:              PAGE:

THERESA MILTON
| MR. BERRIGAN | 3533 |
| MR. WILLIAMS | 3549 |
| MR. BERRIGAN | 3550 |

DAVID NIEMAN
| MR. BERRIGAN | 3551 |
| MR. WILLIAMS | 3568 |
| MR. BERRIGAN | 3572 |

ROSWELL LEE EVANS
| MR. BERRIGAN | 3574 |
| MR. WILLIAMS | 3590 |
| MR. BERRIGAN | 3595 |

DOUGLAS BOOK
| MR. STOWERS | 3596 |
| MR. WILLIAMS | 3609 |
| MR. STOWERS | 3615 |

MARILYN HUTCHINSON
| MR. BERRIGAN | 3618 |
| MR. WILLIAMS | 3672 |
| MR. BERRIGAN | 3682 |

LOU ANN HARE
| MR. BERRIGAN | 3687 |

VERLEEN VANDERPOOL
| MR. BERRIGAN | 3706 |

REED CORSON
| MR. STOWERS | 3720 |

SUSAN MARSOLEK
| MR. BERRIGAN | 3727 |
| MR. WILLIAMS | 3741 |
| MR. BERRIGAN | 3747 |
| MR. WILLIAMS | 3750 |

BRANDY BYRD

    MR. BERRIGAN       3753

    MR. WILLIAMS       3770

          *****

6/9/05


INDEX

WITNESS:              PAGE:

MARK CUNNINGHAM

    MR. STOWERS       3780

ALYSSA JOHNSON

    MR. BERRIGAN       3903

          *****

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

       Plaintiff,                           Sioux City, Iowa
                                   May 4, 2005
   vs.                                       7:57 a.m.

ANGELA JANE JOHNSON,                          VOLUME 1 of 24

       Defendant.
                              /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

2

APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                        Assistant United States Attorney
                        Suite 400 - Hach Building
                        401 First Street Southeast
                        Cedar Rapids, IA  52401

                        THOMAS HENRY MILLER, ESQ.
                        Iowa Attorney General's Office
                        Area Prosecutions Division
                        Hoover State Office Building
                        Des Moines, IA  50319

For the Defendant:       PATRICK J. BERRIGAN, ESQ.
                        Watson & Dameron
                        2500 Holmes
                        Kansas City, MO  64108

                        DEAN STOWERS, ESQ.
                        Rosenberg, Stowers & Morse
                        1010 Insurance Exchange Building
                        505 Fifth Avenue
                        Des Moines, IA  50309

                        ALFRED E. WILLETT, ESQ.
                        Terpstra, Epping & Willett
                        Higley Building - Suite 500
                        118 Third Avenue Southeast
                        Cedar Rapids, IA  52401

Also present:           Bill Basler

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 9 of 3592

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Okay.  Good morning.  Everybody can be seated.  I just had a few matters I wanted to take up.  We really didn't make a record with regard to Juror -- I believe it would be 794 because I was away from the courthouse for much of the activity late yesterday afternoon.  My understanding is that both the juror and her employer faxed a letter.  That letter was then read to me over the telephone.  I dictated a response.  The letter claimed a hardship for the employer.  I didn't believe it's a hardship, and I wrote a response indicating that it was denied.

My understanding was that response was run by both sets of lawyers before it was actually faxed to the employer and that both sides signed off essentially on my response, but I just wanted to make any record that anybody wants to make on it. I don't know whether 794 is here this morning.  I assume she will be.

MR. WILLIAMS:  On behalf of the United States, I did review both the letters sent by her and her employer and your response, and they were acceptable to the government.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  That's true of the defense also, sir.

THE COURT:  Okay.  We'll just wait and see if 794 shows up and, if she doesn't, what we'll do about it.

4

Page 2

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 10 of 3592

I just have a very few matters to take up. I just wanted to advise you of the seating chart which you all have, and our thought would be to kind of rotate it every week just so that the two jurors in front get rotated, and I'm going to tell them that. I just wanted to make sure there wasn't any objection. Carey will just determine some rotation pattern.

MR. WILLIAMS: No objection, Your Honor.

MR. BERRIGAN: None by the defense, sir.

THE COURT: Okay. Am I correct in assuming that the government is going to present some 801(d)(2)(E) co-conspirator hearsay testimony in this case?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Well, we are required in this circuit to make a record prior to trial pursuant to United States versus Bell, the Eighth Circuit decision, and the United States Supreme Court decision subsequent to United States versus Bell called United States versus Bourjaily.

And the practice that I use is that if there is a hearsay objection by the defense, then if the government is relying on the co-conspirator hearsay exception pursuant to Federal Rule of Evidence 801(d)(2)(E), then the government has to specifically invoke that section by just indicating they're relying on 801(d)(2)(E).

I will admit the evidence, although the evidence is actually admitted conditionally. And then at the end of the

5

merits phase, the government needs to remind me -- I will keep track of all the 801(d)(2)(E) co-conspirator hearsay testimony that's admitted over the defense objection. And then at the end

Page 3

of the merits phase, we need to make a record to make sure that the evidence was properly admitted pursuant to the requirements of United States versus Bell and United States versus Bourjaily.

In the event that I rule that some or all of the evidence was not properly admitted as 801(d)(2)(E) co-conspirator hearsay evidence, then at that point I would take up with the lawyers whether or not a limiting instruction would be appropriate or whether or not a mistrial has to be declared. But that's the procedure.

Is there any question about the procedure, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: No, sir.

THE COURT: Okay. Now, is there kind of -- I don't mean to demean the other lawyers, but is there some -- I'm not going to ask all three of you every time I have a question, so, Mr. Berrigan, are you kind of considered the either lead counsel or whatever label you want to give it, the one that I should address to you'll be speaking?

MR. BERRIGAN: Actually no, Your Honor, although I admit that was my role during the voir dire. That will no

6

longer be the case. Mr. Willett will be lead lawyer from here on through certainly the merits phase of the trial.

THE COURT: Through the merits phrase. Then you're free to change.

MR. BERRIGAN: Then Mr. Stowers, as he has been all along, is going to handle a lot of the legal -- strictly sort of legal issues that come up. And if you think it's a legal issue

Page 4

you'd like to address, then probably Mr. Stowers will be the one to handle that.

THE COURT: Okay. And then if I guess wrong, you can pass it.

MR. BERRIGAN: It will be one of these two.

THE COURT: Okay. And what about the Williams/Miller prosecution team?

MR. WILLIAMS: We're very much co-counsel, but for lack of anybody else to call on, you're welcome to call on me, and we can go from there.

THE COURT: Okay.

MR. WILLIAMS: Your Honor, if I could, going back to the 801(d)(2)(E) --

THE COURT: Yes.

MR. WILLIAMS: -- recommend that we adopt the same procedure for the so-called forfeiture by wrongdoing under 804(b)(6), and we should probably up front make a record that we're adopting the same procedures with regard to those

7

statements as well with the same understanding.

THE COURT: I think that's a good point. I just want to review. Yep, it is 804(b)(6), and I previously ruled that the same procedure applies, so any objection to doing it that way, Mr. Stowers?

MR. STOWERS: No, Your Honor. I thought you actually went all the way and ruled that the statements that they wanted to introduce under that section were admissible, but maybe it was a conditional ruling. I guess I haven't read that ruling for a while.

THE COURT: Yeah, I haven't gone back and reread it,

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 13 of 3592

and I think I did rule that everything that was alleged to be 804(b)(6) evidence was admissible. But if it comes up and there's an objection and the government relies on 804(b)(6), we'll just use the same procedure as United States versus Bell.

MR. STOWERS: Right, and I think that's in a case from the Eighth Circuit that that's the way to do it.

THE COURT: Yes, I think that's right.

MR. STOWERS: There was one question --

THE COURT: And I don't think you have any need to object because it's in a written pretrial ruling, and there was a change in the Federal Rules of Criminal Procedure, but again, I take no position as to what any party ever needs to do to preserve their record. That's up to the party.

MR. STOWERS: Right. I assume that if there's

8

particularly a co-conspirator hearsay issue that is one that is particularly vexing that you might entertain that at eight o'clock in the morning to determine ahead of time whether or not it were admissible because, you know, we don't want to have a situation I guess where we wind up admitting something under the exception and it becomes quite apparent to everybody that it's probably not admissible.

THE COURT: Sure. Anything -- any time we can take up something in advance -- and Mr. Willett has been in front of me a number of times, but Mr. Berrigan and Mr. Stowers have not, so my number-one issue is I do not keep the jury waiting unless it's an absolute extraordinary emergency. I just won't do it because I made a pledge to them not to waste their time, and I'm not going to waste their time. And so what that means is that if you foresee a problem, if you don't raise it early, we're

Page 6

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 14 of 3592

probably not going to take up that problem except in the presence of the jury.

And so it's incumbent on you to try and anticipate problems, let me know because I very seldom will grant a request for a sidebar unless it's absolutely apparent to me what the reason is. I should have a big sign behind here, just say no to sidebars because that's my philosophy because my experience is when I just say no to sidebars it never comes up again so it was never very important.

Now, having said that, if there is something truly

9

worthy of a sidebar and sometimes it would be that I couldn't anticipate that or I don't know what the problem is, you need to let me know, but if you cry wolf and we have a couple unnecessary sidebars, that will be it in terms of sidebars. I just don't believe in them, and I think if we work hard we can avoid them. I think there is the rare situation where it's necessary to have one, but it should be the rare situation.

So the bottom line is if you can anticipate a problem, I'll be happy to come in any time you want as early as possible or stay as late as possible to take those up.

I'm trying to think if there's anything else on my list. I was thinking -- let -- we are going to serve the jury lunch in the courthouse each day. And we can take either 45 minutes or an hour for our lunch break. I don't really have a strong preference. I might lean a little bit towards 45 minutes, but I know you have a lot going on, and so maybe you need an hour lunch break. So I certainly don't need it nor do I really want it, but if you all do, I would be willing to accommodate that. Mr. Willett?

Page 7

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 15 of 3592

MR. WILLETT: Judge, I guess since I'm lead counsel, I'm going to vote for one hour.

MR. WILLIAMS: Wouldn't you know? I would vote for 45 minutes because we have a lot of work to do, and, you know, over the course of a week, 15 minutes here and there, we can get another witness on and off the stand. But that's my only

10

preference.

MR. WILLETT: Judge, the reason I suggest that is not for my own culinary satisfaction but just for the fact that you've already stated from the bench there may be a lot of things to talk about at the mid-day break for the defense, and it's important that we -- it may be important that we have that extra 15 minutes.

THE COURT: Why don't we do this. Why don't we start off with an hour, and then if we either don't have a lot of things that come up that we take up during the hour or we seem to be behind what the projected schedule is, we can go to 45 minutes, and I'll just tell the jury that. We're going to start off with an hour, but if we start getting behind, we may cut back to 45 minutes; okay?

MR. WILLETT: That's fine, Judge.

THE COURT: There isn't anything else on my list. Anything else on counsel's list?

MR. WILLIAMS: No, Your Honor.

MR. WILLETT: Not on behalf of the defense, Your Honor.

THE COURT: Okay. Why don't we find out the status -- maybe Carey knows already. What is --

THE CLERK: All -- I'm sorry. All the jurors are

Page 8

here.

THE COURT: Okay. All the jurors are here. So at

11

8:30 we'll bring the jury in. I will swear them in. I'm just going to remind them of kind of our schedule each day. I mean, I'll just go through the schedule that we'll be starting at 8:30. We'll take a 25-minute break mid-morning, take an hour for lunch; we may cut that back to 45 minutes. They'll have lunch brought in to them. We'll take a 25-minute break in the afternoon, and we'll try and be out of here at 4:30 each day, and I am going to advise them that -- because I do let jurors bring beverages into the jury box, I'm going to advise them of that. Then we'll do the preliminary instructions and probably take a stretch break and then start with opening statements. Okay?

MR. WILLIAMS: Very good.

THE COURT: Good. Thank you. See you back here at 8:30.

(Recess at 8:10 a.m.)

THE COURT: Good morning.

MR. WILLIAMS: Morning.

THE COURT: Ready to have the jurors brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. WILLETT: Yes, we are, Your Honor.

THE COURT: Thank you.

(The jury entered the courtroom.)

THE COURT: Get the front row, you guys. Good morning. If you'd each raise your right hand, I'm going to

12

Page 9

swear you in.

(The jury was sworn.)

THE COURT: Okay. Please be seated. You should each find on your chairs a set of preliminary jury instructions, and we're going to be going over those in just a minute before we hear the opening statements in the case. You should also have on your chair a note pad and a pen because you are allowed to take notes in the case, and, in fact, I do have a preliminary instruction that deals with note taking.

I just wanted to go over a few kind of housekeeping details with you this morning. We do have 2 jurors in front because the jury box isn't big enough to accommodate all 18 jurors. And what we'll be doing is we'll be rotating, so probably each week we'll change the seating chart so that the two gentlemen in front today will rotate back into the jury box and two of you at random will be selected to come out into the front row seating.

Our schedule, as I told you during jury selection, will be generally 8:30 to 4:30. We're going to start off taking an hour break for lunch, and we'll be having lunch brought into you here in the courthouse. We'll be taking two 25-minute breaks generally around 10:00 in the morning and then between 2:30 and 3 or so or maybe right at about 3:00 in the afternoon, somewhere between 2:30 and 3.

You can also bring beverages into the jury box if

13

you'll want something to drink. You'll notice that witnesses will have water and the lawyers and Angela Johnson and I, we all have water, so if you want to bring something in to drink, that's fine. The only rule is nonalcoholic. As long as it's

nonalcoholic, we'll be just fine.

And on the lunch break, we're going to start off with an hour, but if we find ourselves kind of getting behind on our trial schedule, then with some notice to the jurors we may cut it back to 45 minutes, but we're going to at least start off for an hour.

You should -- now I want to go to the preliminary instructions, and it's my obligation to go over these preliminary instructions with you. Let me just tell you a little bit about preliminary instructions, the concept.

When I graduated from law school a long time ago, more than a quarter of a century ago, judges did not use preliminary instructions, and, in fact, not all judges used preliminary instructions. But when I became a judge, it seemed to me that if you waited till the end of the case to give the jurors instructions, it was a little bit like telling somebody, Well, why don't you drive down to St. Louis, and when you get there, we'll give you a map and tell you what the best way it would have been to go. So I think preliminary instructions up front kind of help you, and that's exactly why I use them.

So if you would please turn the page, you'll notice we

14

have 17 preliminary instructions. Preliminary instruction number 1, preliminary instructions.

(The Court read preliminary instructions numbers 1 through 17 in open court.)

THE COURT: Members of the jury and everybody else, why don't we take a stretch break.

Okay. Please be seated.

Mr. Williams, are you ready to proceed with your

Page 11

opening statement at this time?

MR. WILLIAMS: I am, Your Honor.

THE COURT: Okay. You may.

MR. WILLIAMS: May it please the Court, counsel. Members of the jury, in 1993, Amber Duncan was a typical little girl living on a typical quiet street in a typical small town in Iowa, Mason City. In this instance -- Your Honor, we need to -- I'm not sure if this is -- there we go. Thank you.

In this instance Amber Duncan lived just down the street from her grandpa and grandma, Dave and Marge Milbrath. She was an energetic girl, very outgoing, rambunctious little girl. She would be entering the first grade as fall came.

She lived in that house with her older sister Kandi Duncan, ten years old. Kandi was a little bit more quiet. She was reserved, a little bit more shy of a girl, and they lived there in that house with their single mother, Lori Duncan. Lori was a Navy veteran. She had divorced from her husband and the

15

girls' father a couple years before, was now living back in her hometown down the street from her folks working full time at a factory to support her little girls.

July 25 of 1993 was a day like any other day for little Amber Duncan. It was summer, typical summer day, and she was playing. She lived -- right across the alley behind her house was one of her best friends, Brittany Asbe. They played together a lot, and on July 25 it was no different. They played together that day. Amber went over in the morning, and they played there. She actually ate lunch over at the Asbes' house which was common. They kind of ate lunch wherever the little girls were, whether it was at the Duncan house or at the Asbes'.

Page 12

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 20 of 3592

That day about three o'clock, Amber left the Asbes' house, and when she left, she told the Asbes she was going home and they were going to go on a picnic, her, her older sister Kandi, her mother Lori, and her mother's new boyfriend, Greg Nicholson, who had just moved into the house a couple weeks before this, and they were going to go on a picnic.

Some time later that night -- I don't know when -- a woman came to Amber's house and knocked on the door. Lori answered the door. The woman claimed to be a cosmetic sales lady, said she was lost and needed to borrow the phone.

Lori didn't know -- Lori Duncan did not know that woman who you will learn was the defendant in this case, Angela Johnson. Nor did Lori know the man who quickly followed Angela

16

Johnson into the house, Dustin Honken.

Greg Nicholson knew him. Greg Nicholson knew Dustin Honken because Greg Nicholson had been a drug dealer for Dustin Honken, had been caught some months before by the police, had cooperated with the police and actually testified against Dustin Honken. And when Dustin Honken entered that house, Greg Nicholson knew who it was.

A large black handgun was quickly produced, and before long, Greg Nicholson was forced to produce a videotape claiming that everything he had said about Dustin Honken was false, he had made it up and it wasn't true.

At some point Greg Nicholson and Lori Duncan are tied up. They're gagged. And all four of the family, Greg Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan, are taken from the house out to a secluded area near some woods. And there Dustin Honken shoots them.

Page 13

Greg Nicholson is shot in the back of the head. Lori Duncan is shot in the side of the face. Kandi Duncan is shot in the back of the head. The last thing that Amber Duncan feels is a bullet coming in the back of her little head.

About four months later, another little girl named Ashley DeGeus, ten years old, is looking forward to spending the weekend with her dad, Terry DeGeus. Terry DeGeus had split up with her mother, Wendy Jensen, some years before, but Terry was a very close father with his little girl Ashley, and they spent

17

every weekend together, without fail, every weekend. He'd pick her up on a Friday night, and they spent the entire weekend together.

And this particular week, November 5 of 1993, was to be no different from any other weekend. Terry picked up his daughter Ashley, and they were going to spend the weekend together. Only this night, this Friday night, November 5 of 1993, Terry said he was going to take Ashley over to his mother, JoAnn DeGeus's, house, told Ashley that he had gotten a call from his former girlfriend, the defendant, Angela Johnson. And he was going to go meet Angela Johnson because though they had split up by this point he was still in love with her, and she wanted to meet up with him.

So Terry took Ashley over to her grandma's house, and Ashley wanted to come along, but Terry said no. See, the defendant in this case also had a ten-year-old little girl, and they played together periodically, and Ashley wanted to go along and play. This time Terry said, No, you stay here with Grandma, but you can stay up late. You can stay up till I come home. I shouldn't be home any later than midnight.

Page 14

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 22 of 3592

So that night Ashley stayed up.  She stayed up till midnight.  Her dad didn't come home.  She stayed up past midnight.  Her dad didn't come home.  She woke her grandma, still no Dad.  Morning came.  Terry DeGeus did not come home. Days, weeks, months, finally years would pass before Ashley

18

DeGeus ever learned why it was her dad never came home.

For while Terry DeGeus knew that he was going to be meeting his former girlfriend, the defendant Angela Johnson, that night, what he also didn't know was that he was being lured to meet Dustin Honken; Dustin Honken, a man from whom Terry DeGeus also had been purchasing large quantities of methamphetamine; Dustin Honken, a man who if Terry DeGeus chose to cooperate like Greg Nicholson did with the police, Terry DeGeus could put him in prison.  Terry DeGeus was met at a remote abandoned farm, and there he was gunned down, his skull shattered and fragmented.

Ladies and gentlemen, this is a trial of a woman who made possible the murder of five people, the woman, this defendant, who purchased the large black handgun, the woman who with deception gained entry into the Duncan house and assisted Dustin Honken in wiping out an entire family, the defendant who lured her ex-boyfriend to his death, done for the purpose of evading justice and allowing Dustin Honken and the defendant to continue a methamphetamine operation and distribution.

Good morning, ladies and gentlemen.  My name again is C.J. Williams.  Along with Tom Miller on behalf of the United States, over the next several weeks we're going to be presenting a case to you about the murders, about a drug organization that lasted from 1992 into the mid 1990s.  For you to understand the

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 23 of 3592

context in which these murders took place and how and why they

19

occurred, it's first necessary to tell you a little something about the drug organization and what happened and how it developed.

In 1992 Dustin Honken was a man living in northern Iowa. He was actually originally from Britt, Iowa, a little town to the east of Mason City, Iowa. And he was at this point a small-time drug dealer, sold a little bit of marijuana, maybe some other drugs. But he was very smart, studious, always reading a book. And he decided he was going to go to college.

And so in Mason City he went to the North Iowa Area Community College, and there he studied chemistry, got very good grades. And he used that chemistry knowledge when he moved down in 1992 to Arizona where his older brother Jeff Honken lived. And when he got down there, he recruited his older brother Jeff to fund and finance an operation to manufacture methamphetamine.

He recruited his childhood friend, Tim Cutkomp, to move down from Mason City and move in with him down in Arizona and to assist in the manufacturing process. Dustin Honken knew how to manufacture methamphetamine, and this was quite an operation. This was not just some small operation, but it was very complex with lots of vials and tubes and chemicals.

And having set up this organization and set up how they were going to manufacture this, over the course of the next 11 months or so between 1992 and early 1993, Dustin Honken, Tim Cutkomp, and financed by Jeff Honken manufactured pounds,

20

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 24 of 3592

pounds, of methamphetamine, very high-quality, high-purity methamphetamine.

And Dustin Honken shipped them up -- shipped these pounds of methamphetamine up to Mason City where he sold to two people, Terry DeGeus and Greg Nicholson, his only two customers in Mason City. He would ship up these pounds of methamphetamine, and these two gentlemen, they would turn around, and they'd sell them. They had a number of other people. Among them Greg Nicholson sold to Scott Gahn and David Patrick. Terry DeGeus sold to Aaron Ryerson. And when they would sell, the people below them would sell to other people, and the money would flow back up, and the money would flow back up ultimately through Nicholson and DeGeus and to Dustin Honken.

And this meth operation continued into 1993 with these two men, Terry DeGeus and Greg Nicholson, being the only people that were selling for Dustin Honken.

Now, Terry DeGeus, as I mentioned earlier, had a girlfriend for a period of time, 1989, 1990, in that time period, by the name of Angela Johnson. And you're going to learn they had a sometimes stormy relationship. Frankly, Terry DeGeus would become violent sometimes with Angela Johnson.

By the early 1990s, they had split up, but Terry DeGeus was still in contact with Angela Johnson, in fact, was supplying Angela Johnson with quantities of methamphetamine.

In early 1993 Terry DeGeus made what turned out to be

21

a fatal mistake. On one of the trips that Dustin Honken made up to Mason City to collect drug money from his dealers up here, Terry DeGeus sent Angela Johnson over to meet up with Dustin Honken to deliver some of the cash that he owed. And when

Page 17

Angela Johnson met up with Dustin Honken, she told him that Terry was using most of the dope, he wasn't selling very much of it, she had better connections and she could do better. They immediately became romantically involved, and by July of 1993, she was pregnant with Dustin Honken's child.

Now, in March of 1993 law enforcement interrupts Honken's operation. David Patrick was selling to a guy named Gary Solland who lived up in Minnesota. Gary Solland, law enforcement in Minnesota was able to determine, was selling drugs, executed a search at his house. Gary Solland gave up his source, and that was David Patrick. David Patrick lived in Iowa.

Law enforcement again searched his house. David Patrick was caught. He admitted and said, My source is Greg Nicholson.

Using that information and using David Patrick to make a controlled buy, a controlled purchase where law enforcement wired David Patrick up and went in and made the purchase of drugs from Greg Nicholson, that leads ultimately to a search at Greg Nicholson's house, and Greg Nicholson is caught with large quantities of methamphetamine, large quantities of cash in his

22

house.

Now, at this point Greg Nicholson has a choice. He can either take the charges, or he can in turn like the other two people below him cooperate with law enforcement, and he chooses to cooperate with law enforcement. He tells the police who he gets his drugs from. He says it's Dustin Honken, tells them where he lives, says that he makes trips up delivering quantities of methamphetamine and that Greg Nicholson owes

Page 18

Dustin Honken large amounts of cash. And he says Dustin Honken is going to be coming up soon to pick up another delivery of money.

So Greg Nicholson agrees to cooperate just like the people below him, and he wears a wire. And when Dustin Honken shows up on March 21 of 1993 to pick up cash from Greg Nicholson, his dealer, the conversation is recorded, and you're going to hear that conversation.

And during that conversation, they talk about a future of quantities, kilos, kilograms of methamphetamine, that they're trying to set up. Greg Nicholson talks about having probably made Dustin Honken a hundred thousand dollars over the last year. And when Dustin Honken leaves Greg Nicholson's house, law enforcement officers are waiting for him, and he's arrested.

On March 21 of 1993, Dustin Honken is arrested on drug charges. He's appointed an attorney, guy by the name of David Thinnes, an attorney from Cedar Rapids, Iowa. Mr. Thinnes, as

23

he should, investigates the government's case. We have what we call an open file discovery, and defense attorneys can come to the U.S. Attorney's Office and look through the evidence we have, look through the evidence of the undercover tape, in this case look through the evidence of Dustin Honken -- I'm sorry, Greg Nicholson testifying in the grand jury against Dustin Honken.

And David Thinnes does that. He comes to the office, looks through, and he discovers that Greg Nicholson is the key to the government's case. And as he should, as an attorney should, he advises his client, Dustin Honken, of what the evidence holds against him.

Page 19

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 27 of 3592

David Thinnes on June 7 of 1993 files a notice with the Court, indicates that Dustin Honken intends to plead guilty to the charges. Dustin Honken is now facing ten-year mandatory minimum and possibility of life in prison based on the drug organization. And a plea is set for July 30 of 1993. Dustin Honken's going to plead guilty to the charges.

Now, at this point Dustin Honken has been released pending trial. He's not in jail, and he's released. And one of the conditions of release that he has is that he cannot possess a firearm. But at this point Angela Johnson is not in custody and has no restrictions.

So on June 30 of 1993, she applies for a permit from the Cerro Gordo County sheriff for permission to purchase a

24

firearm. And on July 7 of 1993, she purchases an Intratec Tec-9 semi-automatic handgun, fires 9-millimeter bullets.

Eighteen days -- I'm sorry, let me back up. On July 7 she purchases this handgun, and then in early July, the defendant and Dustin Honken hunt for Greg Nicholson. You see, after Greg Nicholson got caught in early March, he and his wife split up, and Greg Nicholson's no longer in the house with his wife. He for a period of time lives with his parents, and then he meets Lori Duncan. Just two weeks before July 25 of 1993, Greg Nicholson moves in with Lori Duncan into a house on this quiet street.

The defendant and Dustin Honken are looking for him. They don't know where he lives. They ask Christi Gaubatz, Lori -- I'm sorry, the defendant's best friend, then known as Christi Cole, several nights to babysit Angela Johnson's daughter and periodically borrow her car to go out for the

Page 20

purpose of looking for Greg Nicholson.

Then on July 25 of 1993, the day I told you about at the beginning, the Duncan family turns up missing 18 days, 18 days, after the defendant Angela Johnson purchases that Intratec Tec-9 semi-automatic handgun. The Duncan family and Greg Nicholson are never seen again.

When July 30 comes and Dustin Honken is supposed to plead guilty to the charges pending against him, he shows up, and he says, I'm not pleading guilty; I demand a trial. And his

25

attorney tells the government that he has a videotape of a Greg Nicholson saying that Dustin Honken was not involved in drug dealing, though the government would never see that videotape.

The government learns shortly thereafter that its key witness, Greg Nicholson, is missing. Government gets a warrant for his arrest as a material witness and looks for him, cannot find him.

And months go by. Months go by. July passes; August passes; September passes. Greg Nicholson can't be found.

Government doesn't stop its investigation. The other dealer for Dustin Honken isn't gone, Terry DeGeus. So the government concentrates its investigation on that part of the organization.

On October 27 of 1993, a number of witnesses are brought before the federal grand jury in Cedar Rapids, Iowa, including, among them, the defendant, Angela Johnson. And during her grand jury testimony, she is questioned about whether there is a drug connection between Dustin Honken and Terry DeGeus. Nine days, nine days after Angela Johnson's testimony in the grand jury questioning her in which she denies any

Page 21

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 29 of 3592

knowledge of any connection or drug activity between Dustin Honken and Terry DeGeus, nine days after that, is November 5 of 1993, the last day that Ashley DeGeus saw her father.

In the days following Terry DeGeus's disappearance on November 5, 1993, Angela Johnson is called up and questioned by

26

a number of people about Terry DeGeus. Have you seen Terry DeGeus? She gets called by JoAnn DeGeus, Terry's mother; by Wendy Jensen, Terry's ex-wife. She's talked to by law enforcement. She's even talked to by little Ashley DeGeus, Where's my dad? And you're going to hear that the defendant gave various answers to that question. Sometimes she says, I never saw Terry DeGeus on November 5, 1993. Other times she says, I saw him; he came out to the country club where I work, but he left.

Some time in late 1993 and early 1994, Christi Gaubatz, the defendant's best friend who had babysat for her in early July whenever the defendant and Dustin Honken wanted to go looking for Greg Nicholson, which, by the way, those babysitting requests ended after July 25 of 1993, Christi Cole who was very close with the defendant -- they have keys to each other's houses; they have belongings at each other's houses -- Christi Cole is cleaning out a closet in her house, and she discovers a cosmetic bag, and inside she discovers a large black gun. She calls up the defendant, and she says, What is this? And the defendant comes over to her house and says, I'm sorry; I'll take -- I'll get rid of it. Dustin will take care of it.

And shortly thereafter, Dustin Honken comes over to his best friend's house, Tim Cutkomp's house, outside Mason City, Iowa, and together they use a torch, and they cut up this

Page 22

gun into little pieces, melt it down, and they throw it into

27

ditches, melt it against a big piece of galvanized steel. They drive out in the country, and they throw the gun into ditches outside of Mason City.

Now, at this point the government's drug investigation and prosecution of Dustin Honken has gone on hold, don't have any witnesses. Investigation kind of languishes.

During this time period, Dustin Honken has not stopped. In July -- I'm sorry, in the summer of 1993, two times Honken sends Tim Cutkomp back down to Arizona to collect chemicals and equipment so they can continue the meth manufacturing operation.

In 1994 the defendant accompanies Dustin Honken down to Arizona to pick up chemicals and equipment so they can continue it. And they ultimately begin experimenting with manufacturing operations again, and this takes place, among other places, at Tim Cutkomp's house and at the defendant's house in Clear Lake. Now, ultimately March 21 of 1995, the charges against Dustin Honken are dismissed for lack of prosecution.

But you will learn that the drug organization and the drug activities don't cease. In 1994 and 1995 as they get the drug operation and the meth lab coming back up again, at this time Dustin Honken is still getting this thing set up. Tim Cutkomp's still involved. The defendant in this case is involved still, this time not only in the role of somebody who

28

will distribute the methamphetamine but also somebody who stores
Page 23

chemicals and equipment at her house and also finances the operation.

At this point Dustin Honken's working in a factory in Mason City, and he meets up with another guy he discovers had been a drug user, is a drug user, guy by the name of Dan Cobeen. And he recruits Dan Cobeen to be part of this organization. And you will hear Dan Cobeen testify that at one point he is taken over to the defendant's house in Clear Lake for a meeting to be introduced to the defendant, and they're there for a little while, and after they leave the defendant's house in Clear Lake, Dustin Honken says that Angie's approved of Dan Cobeen being part of this organization.

What Dustin Honken and the defendant don't know, though, is that Dan Cobeen instead of going forward with this operation goes to the police, and he tells the police what's going on, tells them about this operation. And Dan Cobeen begins to cooperate with law enforcement.

And based on the information he provides in January -- I'm sorry, on February 7 of 1996, law enforcement are able to execute a search warrant at Dustin Honken's house in Mason City, and there they seize a methamphetamine laboratory.

Dustin Honken and Tim Cutkomp at this point are arrested, and they're released on pretrial release. Dustin Honken has some limitations. He has to wear an ankle bracelet.

29

He can't leave his house, but there are no limitations on Tim Cutkomp. Honken immediately starts plotting more murders. He wants to figure out who in the government's chain of custody is key, who if he kills is going to jeopardize the government's case so that they can't prove the case against him. He wants to

Page 24

find out where Dan Cobeen's at. He wants to know the residences and addresses for the drug agents. He wants to find out where the chemicals and the equipment are stored that were seized out of his house on February 7 of 1996. And he has these conversations with Tim Cutkomp.

Tim Cutkomp decides to cooperate with law enforcement. He comes in. He tells the agents Dustin Honken is plotting; Dustin Honken is plotting to kill again; he's plotting to find out where you live; he's plotting to find out where Dan Cobeen lives to kill him. And Tim Cutkomp agrees to wear a wire and make recorded conversations with Dustin Honken and does so on several occasions.

And during these occasions he again talks with Tim Cutkomp. He wants Tim Cutkomp to find out where Dan Cobeen lives, to help him find out where the agents live, to find out where the drugs are stored. And among other things they start talking about things that happened back in 1993 because Tim Cutkomp is worried. He's worried that that's going to come back somehow and get him, and so Tim Cutkomp engages Dustin Honken in a conversation about 1993, and you're going to hear a portion of

one of these tapes in which Dustin Honken says, you know, 1993, I was in -- I was facing a lot more back then than I am now. I'm not worried about what I got coming against me now. I can take care of it. 1993 I was facing a lot more. But this time I'm going to act alone he says on this tape. This time I'm going to act alone. She -- she's too bold. She moves too quickly. She doesn't like to plan. And this time I need to plan more.

Tim Cutkomp, because of his cooperation and because of

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 33 of 3592

those tapes, provides this information to the government, and based on that information Dustin Honken is arrested from pretrial release and put in prison. This occurs on April 29 of 1996.

June 11, 1996, additional search is done, this time of the defendant's house. Meth chemicals are seized from her house. Dustin Honken ultimately pleads guilty to engaging in a drug conspiracy between the years of 1992 and 1996, conspiracy to manufacture and distribute methamphetamine, and is sentenced to federal prison for a number of years.

The investigation into the disappearances of Greg Nicholson, Lori Duncan, her two little girls, and Terry DeGeus does not end with Dustin Honken being sent to prison, though.

The government continues to investigate their disappearances. People are brought before the grand jury. And again, the defendant is brought before the grand jury. She

31

admits in the grand jury testimony to purchasing an Intratec Tec-9, claims she needed it for her own protection, claims that it was stolen from her house shortly thereafter, continues to deny any knowledge of Dustin Honken being involved in any type of drug activity and denies her own involvement in drug activity, denies knowledge of anything that happened to these missing people.

But you remember Christine Cole, now known as Christine Gaubatz, her best friend? Her best friend decides to cooperate with law enforcement, and she comes in, and she tells the government that the defendant admitted to her of her involvement in the murders.

In July of 2000, a grand jury indicts the defendant,

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 34 of 3592

Angela Johnson, for her involvement in the murders of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus. The defendant is arrested and placed in the Benton County Jail in Vinton, Iowa. And she's held there until about October of 2000.

And while there, she strikes up conversation and communication with a male inmate there by the name of Robert McNeese. Now, males and females are not allowed to actually communicate and be together in this jail, but you're going to learn from testimony from jailers that despite the efforts they make to keep inmates separate and stop the communication, it happens. They pass notes. They hide notes. They communicate

32

through windows and through walls.

And over the course of about a month or two, Robert McNeese and Angela Johnson communicate, and they communicate a lot. Robert McNeese convinces the defendant that he's connected to organized crime, to the mafia, and he knows what she's in prison for. She's accused of these murders, and he convinces her that he can arrange for some guy who's serving a life sentence, life without parole, in some federal prison to take responsibility for those murders. That guy has nothing to lose at this point. He can take responsibility for these murders. They can turn around and sue the federal government for false imprisonment and make a lot of money.

But he convinces the defendant, you know, for this to work, for this story to work, for another person to take responsibility for these five murders, we gotta have some evidence. We gotta have something for that person to come forward and show the government that he is, in fact, the

Page 27

murderer, and what better evidence would there be than where the bodies are located?

Robert McNeese is able to convince the defendant to draw maps, two maps, to the locations of the bodies from the 1993 murders. What the defendant does not know is that Robert McNeese is cooperating with the government. Robert McNeese provides those maps to the government.

And so in the fall of 2000, using the maps drawn by

33

the defendant, on October 12 of 2000, a search is conducted in a little wooded area outside of Mason City next to a stream. And there a shallow grave is discovered. Heaped in this grave one on top of the other are Greg Nicholson, Lori Duncan, Kandi, and Amber. Greg Nicholson's skeleton is on top. He's been shot once through the back of the head, at least one other bullet wound to his body.

Lori Duncan's skeleton's found next in the grave. She's been shot in the head, at least once to the body. Both Greg Nicholson and Lori Duncan had ligatures or ropes tied on ankles and hands. And inside each of their mouths they had a little girl's green sock stuffed in their mouths and duct tape wrapped around their heads.

Beneath Lori Duncan's skeleton is Kandi Duncan. And when her body, her skeleton, is removed from that grave, it's discovered that she has a single bullet hole in the back of the head.

And little Amber Duncan, still in her bathing suit, is found at the bottom of the pile. When her skeleton is removed from that grave, a single bullet hole is found in the back of her skull.

Page 28

About a month later, a search is conducted at a remote farm site outside Mason City, and the body of Terry DeGeus is discovered in a shallow grave just inside a cornfield. He has multiple gunshot wounds to his body and one to the back of his

34

head, and his skull is fragmented.

Ladies and gentlemen, as I said, this is a trial of a woman who made possible the murders of five people, the woman who assisted and aided Dustin Honken in wiping out the Duncan family, the woman who bought the weapon that was used in these murders, the woman who lured her ex-boyfriend to his death.

At the close of the next several weeks after we present evidence to you, Mr. Miller's going to have an opportunity to stand up before you in closing argument, and we will be asking you at that time to return a verdict of guilty, guilty on all ten counts, guilty that the defendant aided and abetted Dustin Honken in furtherance of a drug conspiracy in murdering five people, guilty of aiding and abetting Dustin Honken in killing five people in furtherance of a continuing criminal enterprise. Thank you. Thank you, Your Honor.

THE COURT: Members of the jury, it is now ten o'clock. We're going to take a -- our first recess until 10:25, and then we'll come back at 10:25 for the opening statement from the defense.

After we conclude the opening statement for the defense, then we'll start in with our first witnesses. Please remember my cautionary instruction. I won't give it to you every time, but it's very important that you not discuss this case among yourselves until you've heard all of the evidence and had a chance to go in to deliberate on the merits phase. Don't

let anybody talk to you about the case. And most importantly, keep an open mind until you've heard all of the evidence in the case. Thank you. We'll be in recess.

(The jury exited the courtroom.)

THE COURT: Mr. Williams, anything we need to take up?

MR. WILLIAMS: Your Honor, just to keep you and the defense advised, we have produced a revised witness list. We had some trouble with scheduling, and so the people coming in tomorrow are going to be slightly different from the order we had, and I'd be glad to provide you and the defense with a copy of that now.

THE COURT: Okay. That's fine. Thank you.

MR. WILLIAMS: Other than that, nothing.

THE COURT: Mr. Willett, anything we need to take up?

MR. WILLETT: No, Your Honor, not at this time.

THE COURT: Okay. We'll see you back here in 25 minutes. Thank you.

(Recess at 10 a.m.)

THE COURT: Ready to have the jury brought in, Mr. Willett?

MR. WILLETT: Yes, Your Honor, we are.

THE COURT: Mr. Williams?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Thank you.

(The jury entered the courtroom.)

THE COURT: Thank you all. Please be seated.

Mr. Willett, are you ready to proceed with your opening statement?

MR. WILLETT: The defense is ready to proceed, Your Honor.

THE COURT: Thank you.

MR. WILLETT: Thank you. Chief Judge Bennett, if it please this Honorable Court, counsel for the government, counsel for the defense, Angela Johnson.

Good morning, ladies and gentlemen of the jury. Guilt by association is unjust. It's legally wrong, and it violates Angela Johnson's presumption of innocence. And yet it's the government's principal evidence against Angela Johnson.

At best, the evidence in this case will be that on July 25, 1993, Angela Johnson was in love and very much involved with a man you will hear much about during this trial, Dustin Lee Honken. She was on July 25, 1993, two and a half months pregnant with Dustin Honken's child, a beautiful little girl named Marvea who is now 11.

Angela Johnson knew Dustin Honken was a drug dealer. She herself had used methamphetamine. Dustin Honken was facing federal charges for manufacturing methamphetamine in 1993 but not with Angela Johnson.

She knew there were witnesses against him, at least one, but she did not know Greg Nicholson, did not know him at

37

all. She did not know Lori Duncan, Mr. Nicholson's new girlfriend, or Lori Duncan's two children, Kandi and Amber Duncan. And she did not know before it actually happened that Dustin Honken had a plan to kill Greg Nicholson and any witnesses that were with Nicholson.

Page 31

Because Dustin Honken had decided that Greg Nicholson was going to put him in prison for many years, this was Dustin Honken's motive and plan. Angela Johnson would learn of this plan on July 25, 1993, but not in time to change it. When she did learn of Mr. Honken's guilt, she was not strong. It is a hard thing to do to send the father of your child to prison or possibly his death. It is tough to abandon all hope for a loved one, to ignore hearts that are breaking, yours and your child's, even when the right course is clear.

Angela Johnson thought she was strong, tough, resilient, but you will see from the evidence that she was scared, weak, and selfish. She repeatedly lied to people about what she knew about Dustin Honken and the four people that he killed in Mason City, Iowa, on July 25, 1993. She lied to her family, to her friends, to law enforcement, to grand jurors, but she lied to herself most importantly.

But lying about murder and knowing about murder is not murder, and it is not aiding and abetting murder. When Dustin Honken unexpectedly shot and killed Terry DeGeus on November 5, 1993, a man who had once been Angela Johnson's boyfriend, she

38

was six months pregnant with Marvea and that much deeper into the lies and cover-up of Dustin Honken's conduct.

Unlike Greg Nicholson who Honken knew wanted to put him in prison, Terry DeGeus had been a loyal but financially irresponsible fellow drug dealer. Mr. DeGeus had not worn a wire and secretly taped incriminating conversations with Dustin Honken as Greg Nicholson had done. Terry DeGeus owed Dustin Honken as much as $27,000 or more in methamphetamine profits that Terry DeGeus had snorted up his own nose. But that was an

Page 32

old debt and one not ever to be collected by killing Terry DeGeus.

Dustin Honken had asked Angela Johnson to call DeGeus on the night of his death to tell Terry DeGeus that Honken wanted to meet him. Dustin Honken had been ordered to stay away from Terry DeGeus and Greg Nicholson and Tim Cutkomp for that matter by the judge who had allowed Dustin Honken out on pretrial release.

But unbeknownst to anyone but himself, Dustin Honken had decided Terry DeGeus was too much of a potential threat to have hanging around. Dustin Honken shot Terry DeGeus several times on the edge of a cornfield just southwest of Mason City, Iowa, on the night of November 5, 1993.

There will be disputed evidence as to whether or not Angela Johnson was even there. She had called Terry DeGeus to arrange the meeting but no credible evidence that she shot Terry

39

DeGeus, participated in shooting him, or knew that Dustin Honken was going to shoot Terry DeGeus before it actually happened.

In fact, you will learn that all five of the homicide victims in this case were shot with the same gun and by the same person, Dustin Lee Honken. The gun was an Intratec Tec-9 9-millimeter semi-automatic pistol. Angela Johnson had purchased this gun from a pawn shop in Waterloo, Iowa, in early July of 1993. She suggested to grand jurors several years later that she bought the gun because she was afraid of an abusive ex-boyfriend, Terry DeGeus, Dustin Honken's drug partner who was well known in the Forest City and Clear Lake area as a ferocious, mean fighter who did not limit his beatings just to men.

Page 33

Angela Johnson didn't hide this gun purchase from anybody. She applied for a permit at the Cerro Gordo County Sheriff's Office on June 30, 1993, and she was given just such a permit. There was no effort to conceal anything about this transaction.

But, of course, Dustin Honken, Angela Johnson's new boyfriend, learned of the existence of this gun. After later taking it to kill these people, he and his other drug partner, Tim Cutkomp, melted down this gun into small unrecognizable pieces precisely so nobody could connect the murder weapon to Mr. Honken.

You will learn that Dustin Honken was very talented at

40

using people to advance his own often secret agenda including Tim Cutkomp and his other friends and certainly his lovers, Kathy Rick, Melissa Friesenborg, and Angela Johnson.

The undisputed evidence, there will be certain evidence in this case that you will hear that is not in dispute.

First, the five bodies that were found at the two different burial sites in October and November of 2000 are the murdered individuals named by the government in this indictment. The defense will not try to refute the proposition that the five skeletal remains are anybody but Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus.

Nor do we dispute how these people were killed. Greg Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan all were shot in the back of the head. Lori Duncan received another gunshot wound besides the fatal gunshot wound to her head. Terry DeGeus was also fatally shot at least four times in the head and torso of his body.

Page 34

Next you will hear evidence that the defense does not question that while she was detained in the Benton County Jail in Vinton, Iowa, Angela Johnson drew maps of the location of the burial sites of the victims and gave those maps to one Robert McNeese on September 26, 2000. Robert McNeese is an experienced participant in the criminal justice system. He is street smart. He is clever. And at one time he was a member of an organized crime family. Robert McNeese is serving a very lengthy federal

41

prison sentence. In 2000 Robert McNeese was a jailhouse snitch at the Benton County Jail.

Angela Johnson was particularly susceptible to his persuasive personality. Angela Johnson was like putty in the hands of Robert McNeese. In the span of several weeks, he easily led and manipulated her into doing what he wanted her to do, convey the knowledge that Angela Johnson had regarding these dead bodies to him. In an attempt to receive a reduction of his own sentence, he passed those maps on to law enforcement, and these maps led to the discovery of the bodies in the fall of 2000.

However, Robert McNeese's motives for his own freedom are less of an issue than the altering and exaggeration of the information Angela Johnson gave him and Mr. McNeese's techniques of persuasion in relation to Angela Johnson's vulnerabilities, her vulnerabilities that to a great extent parallel her experiences with Dustin Honken.

Robert McNeese took a jagged piece of coal from Angela, cut it to his liking, squeezed it, crushed it, polished it, refined it, and sold it to the government as a diamond, a story he fit with what evidence he had.

Page 35

You will have a chance to review the letters of Angela Johnson in this trial. You will see that she was unwilling to leave Dustin Honken because Dustin Honken is the father of Angela Johnson's youngest daughter. You will learn that Angela

Johnson could not separate herself from Dustin Honken because she thought she was still in love with him. In her letters to Robert McNeese, Angela Johnson does not say that she murdered any of the five victims in this case. She states in her letters to Robert McNeese the last time she saw Terry DeGeus he was alive in the parking lot of the Mason City Country Club. The defense asks you take those letters in the context of all of the evidence. Parts will be shown to be true. Other parts may not.

Finally, you will hear about Miss Johnson's conduct after these murders and her continuing relationship with Dustin Honken. You will hear about Angela Johnson's testimony to the federal grand jury in Cedar Rapids. You will hear that she lied to the grand jury about her knowledge and conduct in this case. Whether she told all of the truth, some of the truth, or none of the truth is for you to decide. Whether or not it is significant or relates to the issues in these charges will be for you to weigh and assess.

Remember, ladies and gentlemen of the jury, Angela Johnson is on trial only for the crimes charged against her which include aiding and abetting murder. She is not on trial for perjury. She is not on trial for obstruction of justice.

There will be five main categories of witnesses that the government will present: Law enforcement agents, citizens, cooperating individuals, family members, and scientific witnesses.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 44 of 3592

In regards to the law enforcement investigation in this case, the defense is asking you to look beneath the surface of the investigation made by law enforcement in this case. The reason that we ask you to do that is because there are no eyewitnesses to these five murders. The government has to rely on the testimony of the citizens and cooperating individuals who come before you to talk about what their knowledge may or very well may not be. The scientific witnesses in this case will not connect Angela Johnson physically or scientifically to the murder of these five individuals as there is no scientific evidence that she did anything.

The family members of the respective families that are involved in this case may well talk about their knowledge of the victims, but their testimony regarding Angela Johnson is not proof of her guilt of any of the crimes alleged in this indictment.

In regards to the law enforcement agents, we will ask you to focus your attention on just what -- on not just what they have been able to show in this case but more importantly what they will not be able to show in this case.

When the citizen witnesses testify in this case, I want you to ask yourself these questions: Do I believe this person? Is this person biased? Does this person have an ulterior motive for testifying? Is this person's story consistent? Does this person possess the knowledge to testify

accurately about what he or she is relating to the jury?

The question that you have to determine for yourself

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 45 of 3592

in regards to cooperating individuals is whether or not the testimony of certain witnesses have been influenced by the potential benefits of their agreements or their absolute willingness to please the government in return for a benefit. The issue is not just do you believe the government witnesses. The issue is not just do you believe them because they say it is so but rather based on the concept of reasonable doubt would you hesitate to rely and act upon what those witnesses have told you?

You will hear many witnesses in this trial testify about Dustin Lee Honken. Dustin Honken is the individual who was involved in the manufacturing and distribution of methamphetamine and the man responsible for the intentional killing of five individuals. Why would Dustin Honken resort to murder? In March of 1993, Dustin Honken was arrested on federal drug charges here in the Northern District of Iowa. Based on the quantity of methamphetamine charged in his 1993 case, Dustin Honken faced the very real probability of a lengthy prison sentence if he pled guilty or if he was convicted. Dustin Honken had no intention of willingly accepting that result.

Greg Nicholson and Terry DeGeus were two of his chief methamphetamine dealers. When he found out that these two men had been subpoenaed to testify before the federal grand jury in

45

Cedar Rapids and that they were potentially going to testify against him, Dustin Honken secretly decided that they had to be eliminated.

You will hear Dustin Honken described in many ways by the people who testify about him in this trial. You will hear evidence that he was manipulative, that he was intelligent, that

Page 38

he was secretive, and that he was deceptive. He caught many unsuspecting people up in his criminal web. But for Dustin Honken, Angela Johnson would never be sitting in that chair on trial for her life.

In regards to the events of July 25, 1993, the plan hatched by Dustin Honken was to find Greg Nicholson and get him to retract what Nicholson had told the government about Honken's drug dealing. Angela Johnson was with Dustin Honken on July 25, 1993. They had been looking for Greg Nicholson for several days. Angela Johnson had absolutely nothing against Greg Nicholson. She didn't even know him.

The same could certainly not be said for Dustin Honken and Greg Nicholson. Dustin Honken found out where Greg Nicholson was living. No one knew anything about Greg Nicholson having a girlfriend, Lori Duncan, or that Greg Nicholson was living with Lori Duncan and her two children.

Dustin Honken's stated plan was to seize Greg Nicholson and obstruct the investigation against him by compelling Greg Nicholson to make a videotape exonerating Dustin

46

Honken of any criminal conduct regarding methamphetamine. That's the plan that he convinces Angela Johnson to help him with. What Angela Johnson does not know is that Dustin Honken was not willing to take a chance on Greg Nicholson being a snitch later. Angela Johnson would learn this too late to be of help, too late to change the plan, and too late to get out.

As for Terry DeGeus, there is substantial evidence that he beat and physically abused Angela Johnson during the time they dated each other in the early 1990s on more than one occasion. She was afraid of him. She feared him. She was

Page 39

terrorized by him when he came around to look for her. However, she never hurt Terry DeGeus, and she certainly never shot him nor aided and abetted his murder.

Terry DeGeus had the same problem that Greg Nicholson had. He was a potential prison ticket for Dustin Honken. Terry DeGeus also owed Dustin Honken over $20,000 in drug profits, over $27,000 by Dustin Honken's own account. Dustin Honken was under indictment, and Terry DeGeus was an impediment to his freedom.

Of course, Dustin Honken wouldn't reveal his scheme to kill Terry DeGeus to anyone, particularly to Angela Johnson who had once been in love with Terry DeGeus. Dustin Honken got Angela Johnson to call Terry DeGeus on the phone to meet him, just another financial meeting between two drug dealers, Dustin Honken and Terry DeGeus.

47

Dustin Honken couldn't call Terry DeGeus directly without arising suspicion due to the court's no contact order. So Angela Johnson was his logical choice. Angela Johnson would tell relatives years later that she had lured Terry DeGeus to his death, albeit knowing absolutely nothing about Dustin Honken's plan to kill him. That murder was in the Honken style, one more example of leading people to believe A, planning B, and then sitting back waiting for others to naively do his bidding.

Only after Terry DeGeus was stone cold dead did Angela Johnson learn from Dustin Honken what he had done to Terry DeGeus. Dustin Honken shot him and beat him until he was dead.

The burden of proof is always upon the government in this case to establish beyond a reasonable doubt that Angela Johnson is guilty of the elements of the crimes for which she is

charged.  This burden is indeed heavy.  Angela Johnson is presumed innocent, and this presumption of innocence never leaves her.

She may rely upon your holding the government to its obligations.  There is no burden on the defense to prove that Angela Johnson is innocent.

What the evidence in this trial will clearly establish is that Angela Johnson and Dustin Honken had a personal relationship back in 1993; that they were both involved with methamphetamine; that they were romantically involved with each other and that they were having a child together; that only

48

Dustin Honken was facing federal drug manufacturing charges in 1993; that only Dustin Honken had been snared by investigators working with snitches desperate to avoid prison terms; that only Dustin Honken had any interest in killing these snitches; that Angela Johnson didn't know Greg Nicholson at all; that Angela Johnson had never heard of Lori Duncan, much less met her or Lori's two daughters, Kandi and Amber.

But Dustin Honken knew Greg Nicholson very well as his drug lieutenant in Iowa; that Angela Johnson, while afraid of Terry DeGeus, had no reason to want him dead.  But for Dustin Honken, Terry DeGeus was an uncashed ticket to prison, a problem Dustin Honken had finally decided to remedy; that there is not one shred of physical evidence tying Angela Johnson to any of these murders while the murder weapon, what's left of it, will be tied directly to the man who pulled the trigger over and over again, Dustin Lee Honken; that these murders were committed for the benefit of Dustin Honken pursuant to his own secret plan and by his own hand at the grip of a Tec-9 pistol.

Page 41

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 49 of 3592

Angela Johnson may be guilty of many things in this case from using methamphetamine to lying to grand jurors about what she knew. She may have even participated in schemes hatched by Dustin Honken which later turned out much differently than he ever led her to believe they would. But she did not assist nor aid Dustin Honken for the purpose of intentionally murdering anyone. She is not guilty of these charges. She is

49

not guilty by association. Ladies and gentlemen of the jury, thank you. Chief Judge Bennett, thank you.

THE COURT: We're going to move the podium. And then is the government ready to call its first witness?

MR. WILLIAMS: Yes, Your Honor. United States calls Frank Stearns.

FRANK STEARNS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Try and adjust the chair and the microphones so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Frank Stearns. Spelling of the last name's S-t-e-a-r-n-s.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Good morning, Mr. Stearns. How you doing?

A. Good.

Q. Good. Could you explain to the jury what do you do for a

Page 42

living, sir?

A. I'm a police officer for the city of Mason City.

Q. How long have you been a law enforcement officer?

50

A. Twenty years.

Q. And has it always been with the Mason City Police Department?

A. I had a couple years with Cerro Gordo County Sheriff's Department as -- for corrections.

Q. During the course of your time with the Mason City Police Department, can you share with the jury what type of positions had you held over that two-decade career with the police department?

A. Patrolman, investigator, and I'm currently a sergeant.

Q. And, Sergeant, if you'd explain what your duties are to the jury, please.

A. I supervise second detail patrol. Some of my other assignments and duties, I'm also coordinator for the domestic abuse response team, and I also supervise the narcotics enforcement team for the Mason City Police Department.

Q. Is it common for a career law enforcement officer to have different positions over the course of a long career?

A. Yes, sir, it is.

Q. I'd like to direct your attention if I could back to 1993 and have you explain to the jury what was your position with the police department at that time and what were your duties.

A. I was investigator back in 1993. I was assigned to criminal investigations division where I investigated burglaries, thefts, sexual assaults, homicides, and drug

51

Page 43

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 51 of 3592

investigations.

Q. In order to be a police officer with the Mason City Police Department, did you have to graduate from the academy?

A. Yes, sir, I did.

Q. And over the course of your career with the police department, did you receive additional training and education in various areas of law enforcement?

A. Yes, sir, I have.

Q. Could you explain to the jury, did you receive training in the area of narcotics enforcement in particular?

A. Yes, sir, I have.

Q. And can you just briefly describe for the jury the type of training you received in that training.

A. Drug identification, search and seizure laws, high-risk entries.

Q. And back when you were an investigator with the Mason City Police Department in 1993, did you work on a number of narcotics-related investigations?

A. Yes, sir, I did.

Q. And through the course of that and through the course of your formal education and training, did you come to understand how the drug market worked in the Mason City, Iowa, area in 1993?

A. Yes, sir, I did.

Q. In 1993 did you become involved in an investigation that

52

ultimately led to the arrest of Dustin Honken?

A. Yes, sir, I did.

Page 44

Q. Could you explain to the jury how did the investigation begin that ultimately led to his arrest?

A. There was a large -- what they call a drug round-up up in Freeborn, Minnesota, on March 16, and one of the defendants in that round-up became cooperative with law enforcement and gave up his supplier who was living in Carpenter, Iowa, by the name of David Patrick.

Q. And the person that was among those rounded up was Gary Solland?

A. That's correct.

Q. And you said he gave up his supplier by the name of David Patrick?

A. That's correct.

Q. At what point -- were you involved at all in the round-up up in Minnesota?

A. No, sir, I was not.

Q. At what point did you become involved in this investigation then?

A. A detective that worked with the task force out of Freeborn County contacted me by phone and relayed the information to me that his source was giving him up there. I then contacted a task force agent out of Mitchell County where Carpenter, Iowa, is located and passed that information along to him, and he

53

applied for a search warrant for the Carpenter, Iowa, residence.

Q. What happened after he applied for the search warrant?

A. Search warrant was granted, and the task force team executed the search warrant on that residence in Carpenter, Iowa.

Q. The residence of David Patrick.

Page 45

A. That's correct.

Q. And what was discovered during that search, sir?

A. Approximately an ounce and a half of methamphetamine.

Q. Was David Patrick present at the house during the search?

A. Yes, sir, he was.

Q. And did law enforcement approach him about whether he'd be willing to cooperate concerning his source for the methamphetamine?

A. Yes, sir, we did, and he was cooperative.

Q. And what did he say was his source for the methamphetamine?

A. He told us that his source was Greg Nicholson who resided in Mason City and that Mr. Nicholson was getting his meth from a guy out of Arizona who he believed to be the methamphetamine lab.

Q. Based on that information from David Patrick and his cooperation, what was the next step that you took in your investigation?

A. We did a controlled buy from Greg Nicholson using Dave Patrick.

54

Q. And when you say a controlled buy, can you explain to the jury -- they may not be familiar with that -- what happens in a controlled buy?

A. In this particular controlled buy, we had searched David Patrick prior to sending him into Greg Nicholson's residence. We had also put a body mike on him, and we had a surveillance team set up around the house.

Q. And when you say you searched him, why do you search him?

A. To make sure that he's not going in with any narcotics or more cash than what we're sending him in with.

Page 46

Q.   And a body mike, how does that work?

A.   At that time we were using a transmitter so that we could hear real time what was going on, and also I could record at the same time.

Q.   And so using David Patrick, were you able to make a controlled purchase of narcotics from Greg Nicholson on March 16 of 1993?

A.   Greg Nicholson did front David Patrick an ounce of meth. We sent him into the residence with no money.  It was too late at night to get any money rounded up, so we sent him in, and Mr. Nicholson fronted him an ounce of meth.

Q.   Now, fronting, that's a term that may be unfamiliar to this jury.  Could you explain to the jury when -- in the drug business what fronting means?

A.   Sure.  It's not uncommon.  When I say they fronted him an

55

ounce, that means they like loaned him an ounce hoping to get -- not hoping, expecting to get paid later on.

Q.   And the -- if the ounce is going to be fronted to David Patrick, how did Greg Nicholson hope or expect down the road he was going to get paid back?

A.   In cash.

Q.   And coming from what source?

A.   From David Patrick.

Q.   From the sale of the methamphetamine?

A.   Yes, sir.

Q.   After the controlled buy that was made using David Patrick from Greg Nicholson of the ounce of methamphetamine, what was the next step you took in your investigation, sir?

A.   I applied for and received a search warrant for Greg

Page 47

Nicholson's residence at 920 North Filmore.

Q.    Located in what city, sir?

A.    Mason City.

        MR. WILLIAMS:  Your Honor, may I approach?

        THE COURT:  You may.  And as long as you're approaching a witness with an exhibit, you don't need to ask permission.  Thank you.

        MR. WILLIAMS:  Thank you, Your Honor.

BY MR. WILLIAMS:

Q.    Showing you Exhibit 34, can you identify that for the jury, please?

                                                                56

A.    Yes, sir.  That's a picture of Greg Nicholson.

        MR. WILLIAMS:  United States would move to admit Exhibit 34, Your Honor.

                        *    *    *    *

        (Government Exhibit 34 was offered.)

                        *    *    *    *

        THE COURT:  Any objection to 34?

        MR. WILLETT:  None, Your Honor.

        THE COURT:  Thirty-four is received.

                        *    *    *    *

        (Government Exhibit 34 was admitted.)

                        *    *    *    *

        MR. WILLIAMS:  Permission to publish?

        THE COURT:  You may.

        MR. WILLIAMS:  Your Honor, if I could have you --

thank you.

BY MR. WILLIAMS:

Q.    Looking at the screen there, that is Greg Nicholson?

Page 48

A.    Yes, sir, it is.

Q.    You say you indicated -- or you indicated in your testimony that you executed a search warrant at his residence at 920 Filmore Street in Mason City.  Can you explain to the jury when you arrived to execute the search warrant along with the other task force officers who was present at the Nicholson residence?

A.    Just Greg himself.  His wife Leslie showed up for a few

57

minutes later on.

Q.    Leslie Nicholson at that time is now known by another name?

A.    Yes, sir, Leslie Olson.

Q.    When you showed up at the house to execute the search warrant, could you describe for the jury Mr. Nicholson's behavior?  Did he cooperate?  Did he resist arrest?  How did he behave?

A.    He was calm to begin with and in denial, but as the search went on, he became cooperative.

Q.    Did he ever fight the officers or resist or act violent in any way?

A.    No, sir, he did not.

Q.    And ultimately did he assist the officers in directing you to the location of different contraband in the house?

A.    Yes, sir, he did.

Q.    Showing you Exhibits 26A through 26T, can you identify what those are for the jury, please.

A.    Those are photos taken during the execution of the search warrant at Greg Nicholson's residence.

Q.    Could you explain this to the jury?  When you execute a search warrant, does a member of law enforcement team -- are photos generally taken during the search?

Page 49

A. Yes, sir, they are.

Q. And what's the purpose of that?

A. We take photos prior to the search, during the search, and

after the search. Prior to the search is to show the way that we came into the house, the way the house appears prior to our search. Photos during the search would be us photographing evidence and where it was located before we move it. And finally photographs after the search would be to show how we left the residence after executing the search warrant.

Q. The photographs in front of you marked as Government's Exhibit 26A through 26T, do those fairly and accurately reflect the photographs taken during the search of Greg Nicholson's house on March 17, 1993, before, during, and after the search?

A. Yes, sir, they do.

MR. WILLIAMS: United States would move to admit Exhibits 26A through T, Your Honor.

* * * *

(Government Exhibits 26A through 26T was offered.)

* * * *

THE COURT: Any objection?

MR. WILLETT: Your Honor, if it please the Court, relevance as to Government Exhibits 26A through T as it applies to this defendant, Angela Johnson.

THE COURT: Overruled. Government's Exhibits 26A through T are admitted.

* * * *

(Government Exhibits 26A through 26T were admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor.

THE COURT: You may.

BY MR. WILLIAMS:

Q. Detective, you have a number of photographs there. I'm going to show just a couple of them. Ultimately the jury will have access to all of them, but for today's purposes I want to just show you a couple of them. Could you explain, first of all, during the search what did you find in Greg Nicholson's house?

A. Found methamphetamine, marijuana, cash, 22-caliber handgun, and drug paraphernalia.

Q. When you say drug paraphernalia, can you explain to the jury what you mean by that term?

A. That could be packaging, scales, cutting agent.

Q. And a cutting agent is another term I need to have you explain. What's a cutting agent?

A. A cutting agent they use with methamphetamine. They'll add it to the methamphetamine to get a larger quantity of methamphetamine. A cutting agent has no purpose with the drug other than to make more of it. I mean, it has no effect on a person. It's like putting baking powder in with methamphetamine. It's purely for cut and to add to the quantity.

Q. And you found some of that in this search, and you said money as well.

60

A. That's correct.

Q. Approximately how much money do you recall finding during the search?

Page 51

A.     Approximately $4,700.

Q.     Showing you Exhibit 26L, can you explain to the jury what they're seeing there?

A.     That would be the cash that we located in the basement.  I believe it was in the back of a reel-to-reel player.

Q.     The back of a reel-to-reel player, what's that?

A.     That's the old-time tape recorders with the big tape reel.

Q.     And that's just a law enforcement officer that's participating in the search that's pictured there?

A.     That's correct.

Q.     You indicated that you also found some controlled substances during the search as well; is that correct?

A.     Yes, sir.

Q.     Showing you Exhibit 26R, can you explain to the jury what they're seeing in that photograph?

A.     That is a bottle of methamphetamine that we had located above the ceiling, fake ceiling, in the basement.

Q.     And were there one or more than one of those bottles containing methamphetamine?

A.     There was more than one.

Q.     Now, methamphetamine when it's actually distributed on the street and used by users, is it in a bottle form, or how does it

61

look when it's actually used on the street?

A.     It's normally in like a Ziplock baggie.

Q.     Is it a liquid or a powder or a solid?

A.     It's a powder substance.

Q.     In this case you found methamphetamine in brown bottles.  In your experience as a narcotics agent both before and after the search in 1993, have you ever found methamphetamine in brown

Page 52

bottles like that before?

A.   No, sir, I haven't.

Q.   Once you seized the methamphetamine from those brown bottles, what did you do with it?

A.   It was sent to the state crime lab, Division of Criminal Investigation's crime lab, for testing.

Q.   And that's located in Des Moines?

A.   Yes, sir, it is.

Q.   Explain to the jury, when you execute a search warrant at a place and you find something you suspect to be a controlled substance, is it in the normal course that you would send it then to a lab for testing?

A.   Yes, sir, we do.

Q.   And what's the purpose of the testing that you send it down for?

A.   To identify the drug, to get a quantity of the drug, and sometimes purity.

Q.   In this case you sent this to the DCI lab in Des Moines for

62

testing.

A.   Yes, sir, we did.

Q.   I'm showing you Exhibit 25.  Can you identify that for the jury, please.

A.   Yes, sir.  That's the report back from the DCI lab on the drugs I sent in.

Q.   And can you just explain that to the jury?  You know, after you seize something you believe to be a controlled substance and you send it down to the DCI lab, what do they do for you in response to your request for them to test the substance?

A.   They send back a report telling me -- on each exhibit that

Page 53

I sent down, they identify what it is and the weight.

Q.   And Exhibit 25 is a two-page report; is that correct?

A.   Yes, sir, it is.

Q.   And the front page shows the results of the analysis, and the second page shows what?

A.   It identifies what's in each exhibit.

Q.   That you had sent down for testing.

A.   That I had sent down, yes, sir.

        MR. WILLIAMS:  United States would move to admit Exhibit 25, Your Honor.

                        *   *   *   *

        (Government Exhibit 25 was offered.)

                        *   *   *   *

        THE COURT:  Any objection to 25?

                                                    63

        MR. WILLETT:  Your Honor, I will not lodge a foundation objection because it's my understanding there may be a later witness who ties this up.  I would, though, ask for a relevance objection as it pertains to this defendant, Angela Johnson.

        THE COURT:  Okay.  That relevancy objection is overruled.  You may proceed.

        MR. WILLIAMS:  Thank you, Your Honor.

BY MR. WILLIAMS:

Q.   The -- when you send the chemicals down and they produce this, at the lab -- there's actually a chemist at the lab that does the analysis on the substances?

A.   Yes, sir, there is.

Q.   And in this case who was the chemist who did the analysis on these substances?

Page 54

A.    Criminalist Debra Davis.

Q.    Very good.   And she would be the one that would be best in the position to testify about the results of her analysis?

A.    Yes, sir, she would.

Q.    Now, at this point in your testimony, we've covered the fact that a search warrant and a round-up in Minnesota that involved Gary Soll and led through David Patrick ultimately to Greg Nicholson and a search at his house.   You indicated he was cooperative ultimately at the search.   Did you approach Greg Nicholson and ask him about his willingness to provide further

64

information about where he was getting his methamphetamine from?

A.    Yes, sir, I did.

Q.    And did he agree to cooperate?

A.    Yes, sir, he did.

Q.    And pursuant to that, did he make statements to you concerning where he was getting his methamphetamine from?

A.    Yes, sir, he did.

Q.    And what did he tell you, sir?

A.    He told us he was getting his methamphetamine from a Dustin Honken who resided in Arizona.

Q.    Was Dustin Honken somebody that he had known from before in the Mason City, Iowa, area?

A.    Yes, sir.

Q.    At the time that he was providing you this information, did Greg Nicholson tell you during what time period it was that Dustin Honken was providing him with this methamphetamine from Arizona?

A.    Over the last 10 to 11 months.

Q.    So 10 or 11 months counting back from March of 1993?

Page 55

A.    That's correct.

Q.    Did he indicate to you the quantities or the amounts of methamphetamine that were being brought up to him by Dustin Honken?

A.    Yes, sir.  He told us that it differed but generally it was 6 to 10 ounces at a time and over the last -- the prior 10

65

months, 10 to 11 months, it was approximately 10 -- 6 to 10 ounces approximately 10 times.

Q.    If you added that all up, that would equal several pounds of methamphetamine?

A.    Yes, sir.

Q.    Did he tell you how he was getting -- how Dustin Honken was getting the methamphetamine up from Arizona and up to Greg Nicholson?

A.    Couple different ways:  Either via grand trans -- ground transport such as Fed Ex or UPS or Dustin Honken would drive it up himself.

Q.    And did he indicate whether it always came in these brown bottles as we see on Exhibit 26R?

A.    Yes, sir, he did.

Q.    Did Greg Nicholson indicate to you how he paid Dustin Honken for the methamphetamine?

A.    He paid him cash.

Q.    And did he explain to you how Dustin Honken got that cash back down to Arizona?

A.    Dustin would show up in person for the cash.

Q.    Did Greg Nicholson tell you over the course of this 11 months or so that he was getting these pounds of methamphetamine from Dustin Honken approximately how much money he had paid

Page 56

Dustin Honken during that time period?

A.    Yes, sir, approximately a hundred thousand dollars.

66

Q.    Did Greg Nicholson indicate to you whether he was aware of whether Dustin Honken had any other customers in the Mason City, Iowa, area for the methamphetamine?

A.    Yes, sir, he did.

Q.    And what did he tell you?

A.    He told us there was a guy by the name of Terry DeGeus out of Clear Lake that was also a customer of Dustin's.

Q.    Now, Greg Nicholson's up here in Iowa at this point in 1993, and he's getting supplied methamphetamine from Dustin Honken who has to make these trips up.  Did he indicate to you, Greg Nicholson indicate to you, how he and Dustin Honken would communicate to set up these trips and to arrange the timing of the trips?

A.    Yes, sir.  It was either via telephone or pager.

Q.    When you were talking with Greg Nicholson, did he explain to you what he did with the methamphetamine that he was supplied by Dustin Honken?

A.    Yes, sir.  He had customers of his own.

Q.    And who were his customers he identified for you?

A.    David Patrick in Carpenter, Iowa, Dennis Ferguson, and Brent Logan.

Q.    In the course of your investigation, in the course of what Greg Nicholson told you, his then wife, Leslie Nicholson, now known as Leslie Olson, did you indicate or did you discover in any way she was involved in this methamphetamine distribution

67

Page 57

operation?

A.    No, sir, we did not.

Q.    Did you ask Mr. Nicholson whether he would be willing to cooperate further by arranging a recorded meeting with Dustin Honken?

A.    Yes, sir, I did.

Q.    And did he agree to do so?

A.    Yes, sir, he did.

Q.    I'd like to direct your attention -- well, let me back up.

      At this point were you aware whether Dustin Honken was even in Iowa at the time that you were talking with Greg Nicholson on March 17 of 1993?

A.    No, sir, he wasn't.

Q.    Did you have conversations with Greg Nicholson about if he heard from Dustin Honken or some arrangements for how you were going to be able to do a controlled meeting with Dustin Honken?

A.    Yes.  Greg Nicholson's supposed to contact me when he heard from Dustin Honken.

Q.    So I want to direct your attention to March 21 of 1993. And did you receive a phone call from Greg Nicholson on that day?

A.    Yes, sir, I did.

Q.    And what did he tell you at that point?

A.    That Dustin was in town and he was coming over to his house to pick up cash for some of the drugs he dropped off recently.

68

Q.    When Mr. Nicholson told you that was what was happening, what did you do?

A.    I brought Greg Nicholson into the police station where

Page 58

again I wired him with a body transmitter, contacted members of the task force, set up a surveillance team on the house.

Q.   And so you sent Mr. Nicholson back to his house then to await the arrival of Dustin Honken?

A.   That's correct.  I also gave him $3,000 in cash that I'd recorded serial numbers on.

Q.   Now, when you say you gave him $3,000 cash with recorded serial numbers on it, why do you make mention of the recorded serial numbers?

A.   So that later on down the road we could identify that cash as coming from us and kind of have a money trail.

Q.   And so you send him back into his house.  He's got a wire on, wire transmitter.  Approximately what time of day did this occur?

A.   Approximately 1 p.m.

Q.   Who was present in Mr. Nicholson's house before Mr. Honken arrived?

A.   Greg Nicholson and his wife Leslie.

Q.   And where was law enforcement set up while -- or when Dustin Honken arrived?

A.   In a perimeter around the house but out of sight.

Q.   Now, explain to the jury again if you would, back in 1993

69

when you had a transmitter on him, were you able to actually listen in realtime as it was happening to what was happening in the house because of this transmitter on Greg Nicholson?

A.   Yes, we were.

Q.   Did you do anything to record the conversation that was taking place?

A.   Yes, sir, I did.  I had a recorder in my car, and I

Page 59

recorded the conversation as it was taking place.

Q. At some point did, in fact, Dustin Honken arrive at Greg Nicholson's house?

A. Yes, he did.

Q. And what kind of vehicle was he in?

A. A mid-'80s Pontiac 6000, brown in color.

Q. Who was that vehicle registered to?

A. Russell Miller.

Q. Was anybody else with him in the car at the time he arrived?

A. Yes, sir. Subject later identified as Timothy Cutkomp was a passenger in the front seat.

Q. Who all entered Greg Nicholson's house?

A. Just Dustin Honken.

Q. And Tim Cutkomp remained in the car outside?

A. Yes, sir, he did.

Q. Sir, I'm showing you Exhibit 20, and I ask you if you can identify that, please.

70

A. That would be the tape recording of the meeting that Greg Nicholson had with Dustin Honken on March 21.

Q. This is the tape recording of the conversation that you were able to overhear as it happened based on the transmitter that was on Greg Nicholson at the time?

A. Yes, sir, it is.

Q. And did you later listen to this tape?

A. Yes, sir, I did.

Q. And does that tape, Exhibit 20, fairly and accurately reflect the conversation that took place on March 21, 1993, between Greg Nicholson and Dustin Honken?

Page 60

A.   Yes, sir, it does.

Q.   At some point after this tape recording took place, did you have a transcript of the conversation that occurred during this controlled delivery of cash made that reflected the conversation that took place on that tape?

A.   Yes, sir, I did.

Q.   Showing you Exhibit 21, can you identify that for the jury, please?

A.   Yes, sir.  That's a transcript of the conversation of that meeting.

Q.   And did you listen to that tape and compare it to the transcript at some point?

A.   Yes, sir, I did.

Q.   And does that transcript fairly and accurately reflect the

71

conversation that's recorded on Exhibit 20?

A.   Yes, sir, it does.

          MR. WILLIAMS:  Your Honor, the United States would move for admission of Exhibit 20 into evidence and would seek permission to provide copies of Exhibit 21, the transcript of that, to the jury so that they can follow as we play the tape.

                    *   *   *   *

          (Government Exhibit 20 was offered.)

                    *   *   *   *

          THE COURT:  Any objection, Mr. Willett?

          MR. WILLETT:  Yes, Your Honor.  Objection as to hearsay as to Exhibit 20.  It also violates my client's Sixth Amendment right to confrontation, and we would make the same objection to the transcript also.

          THE COURT:  What hearsay exception is the government

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 69 of 3592

relying on?

MR. WILLIAMS: As to statements made by Dustin Honken, 801(d)(2)(E). As to statements made by Greg Nicholson, 804(b)(6), Your Honor.

THE COURT: Okay. Government's Exhibit 20 is admitted over the objection of the defendant.

* * * *

(Government Exhibit 20 was admitted.)

* * * *

MR. WILLETT: And, Your Honor, if I may, if the

72

government's done with Government Exhibit 26R, does this still need to be on the screen?

THE COURT: Does it need to be, Mr. Williams?

MR. WILLIAMS: It doesn't, Your Honor. It's off. I apologize. I wasn't paying attention.

THE COURT: Okay. And to the extent defendant's objected to Government's Exhibit 21, I understand you're just using that to aid the jury in listening to the tape. It's not actually a trial exhibit.

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Okay. The objection to Government's Exhibit 21 is overruled as well.

MR. WILLIAMS: Your Honor, your law clerk has been provided with copies of Exhibit 21 for the jury and request permission to pass those to the jury.

THE COURT: You may.

I just wanted to explain one thing to the jury. Occasionally you'll hear the lawyers and I refer to a series of numbers like 801(d)(2)(E), 804(b)(4), (b)(6). We're referring

Page 62

to various provisions of the Federal Rules of Evidence. We're not trying to talk in code, but it's just a shorthand way for lawyers and I to communicate with each other. You don't have to pay any attention to what the numbers mean.

MR. WILLIAMS: I believe all the jurors have their transcripts at this point. With permission of the Court, I

73

would play the tape?

THE COURT: Yes, you may.

(Government Exhibit 20 was played in open court.)

BY MR. WILLIAMS:

Q. Sergeant Stearns, I want to go back through this transcript and have you explain some things that the jury heard on this tape. Directing your attention to page 2 of the transcript -- and first of all, just for clarification, wherever the transcript says GN on the left-hand side, that refers to what?

A. Greg Nicholson.

Q. And DH stands for?

A. Dustin Honken.

Q. If you go about midway down the page on page 2, Dustin Honken is asking, "Did you hear anything about the big old bust up in Minnesota?" What bust are they referencing there?

A. That'd be the one in Freeborn County.

Q. The one that ultimately snared Gary Solland and led to David Patrick and ultimately to Greg Nicholson?

A. Yes, sir.

Q. If I could direct your attention to the next page, page 3 of the transcript, and if you could take a look at about three quarters of the way down the page, there's a reference there, "One of these I let go for three grand to cover those QP." This

Page 63

is Greg Nicholson talking. Can you explain to the jury when there's a reference to QP, what's that referencing?

74

A. Yes. First off I'd just like to say that the page you're referring to actually says page 4 in the top right-hand corner. It's actually page 3.

Q. Yeah, and page 3 in the upper left-hand corner of the transcript is --

A. Okay. I don't have -- okay. I see that. Yep. All right. That would be quarter pound.

Q. And is -- quarter pound, is that a standard quantity of amount of distribution at some level of distribution?

A. Yes, sir, it is.

Q. If you could go to the bottom of the next page, page 4 in the upper left-hand corner, page 5 in the right-hand corner, at the very bottom there there's a reference to an Angie, Angie knows all those people. Did you at some point discover who that Angie is that was being referenced there?

MR. WILLETT: Excuse me. Objection. Calls for speculation, lack of foundation, and possibly hearsay.

THE COURT: Can you lay a better foundation for it?

MR. WILLIAMS: I'll move on. Thank you, Your Honor.

BY MR. WILLIAMS:

Q. Let me just have you move to the next page if you would, Sergeant. If you would look three quarters of the way down the page on page 5, Greg Nicholson at some point says, "Same thing? This is just wetter this time evidently, huh?" And then they have a conversation about needing to dry it out and so forth.

75

Page 64

It's maybe a little confusing if you don't know something about this area for the jury, so could you explain to the jury when you manufacture methamphetamine when it's just out of the manufacturing process, is it already powder, dry powder, or what form does it come out?

A.   No, it's still wet, basically in a paste form, and Greg Nicholson was one step away from the lab, and you seen how it was packaged in his bottles and sealed, so it didn't have a chance to dry out.

Q.   So it was actually coming to Greg Nicholson straight from the lab still wet.

A.   Yes, sir.

Q.   And then it was up to Greg Nicholson then to dry it out and get it into the powder form?

A.   That's correct.

Q.   If you would turn to page 7, page 8 on the upper right-hand corner, and about three quarters of the way down the page there is talk about a possible kilo transaction or possible kilo transactions in the future, and Mr. Nicholson is talking about having it fronted to him.  That's the fronting you'd referred to earlier where he was trying to get Dustin Honken to loan him a kilo so he could turn around and sell it then?

A.   Yes, sir, it is.

Q.   And is there a reference there again to the amount of money that Greg Nicholson says he provided to Dustin Honken last year

76

in drug proceeds?

A.   Yes, sir, hundred thousand dollars.

Q.   If you would turn to the next page as well, page 8, 9 in the upper right-hand corner, about the fifth line down, Greg

Page 65

Nicholson says, "I hate to store it here." Did you have an opportunity to explore with Greg Nicholson whether he had another role in addition to simply getting drugs from Dustin Honken and then distributing it for himself? Did he store something for Dustin Honken?

A.   Yes, sir. Some of the methamphetamine that Dustin dropped off at Greg Nicholson's house was also stored there for Dustin.

Q.   And then how would Dustin then come back to get it from there?

A.   He would just come back to Greg's house and take some of it back.

Q.   But Greg Nicholson stored the rest of it for him.

A.   Excuse me?

Q.   So Greg Nicholson then stored it for him until he did that?

A.   Yes, sir.

Q.   Then finally if you'll turn to page 11, 12 in the upper right-hand corner, there's a conversation that starts toward the top talking about, "She said, well, I haven't been caught" and so forth. And the next line is, "How much that guy at the lake get rid of?" To whom is Greg Nicholson referring there?

A.   Terry DeGeus.

77

Q.   And there's a reference a few lines down about quantity. Do you see that? It starts off with the word "about the same"?

A.   Yes, sir.

Q.   And what is the nature of that conversation right there? What is Dustin Honken telling Greg Nicholson based on your debriefing of Greg Nicholson?

A.   How much product that Terry DeGeus was moving for Dustin Honken and how much he still owed him.

Page 66

Q. And at some point about halfway down the page they talk about owing him 20 grand; is that right?

A. Yes, sir.

Q. And just so we're clear, 20 grand is $20,000?

A. Yes, sir, it is.

Q. The next larger paragraph starts off, "Well, I'm stuck between a rock and a hard place," and then the next line down says, "So I'd bring the crank with me." Do you see that reference there, sir?

A. Yes, sir.

Q. What is crank?

A. Just a slang name for methamphetamine.

Q. Now, Mr. Stearns, after you had this recording made, at some point did you also have an opportunity to have Greg Nicholson write down in his own handwriting what transpired inside the house?

A. Yes, sir, I did.

78

Q. Handing you Exhibit 22, can you identify that, please?

A. That would be the copy of the handwritten statement that Greg Nicholson did regarding the transaction between him and Dustin Honken on March 21.

Q. And that was provided at your request?

A. Yes, sir, it was.

Q. And was it signed by Greg Nicholson?

A. Yes, sir, it was.

MR. WILLIAMS: United States would move to admit Exhibit 22 into evidence.

* * * *

(Government Exhibit 22 was offered.)
Page 67

* * * *

THE COURT: Any objection?

MR. WILLETT: Your Honor, the defense objects based upon hearsay and it violates my client's Sixth Amendment right to confrontation.

THE COURT: Are you relying on exception to the hearsay Rule?

MR. WILLIAMS: Yes, 804(b)(6), Your Honor.

THE COURT: Government Exhibit 22 is admitted.

* * * *

(Government Exhibit 22 was admitted.)

* * * *

BY MR. WILLIAMS:

79

Q. Exhibit 22, does it highlight basically the events that occurred that the jury's already listened to on this tape?

A. Yes, sir, it does.

Q. In Greg's own handwriting.

A. Yes, sir, it is.

Q. Now, we're at the point in this investigation that you had just had a recorded conversation take place between Dustin Honken and Greg Nicholson. And Greg Nicholson, did he, in fact, provide the cash, the $3,000 of preserialized money, to Dustin Honken during that meeting?

A. Yes, sir.

Q. And we hear on the tape that Dustin Honken leaves. Can you take the jury now from the point that Dustin Honken leaves the house to what happened next?

A. We had no intention of letting the $3,000 walk, so I advised the task force team, the surveillance team, to take him

Page 68

down at the end of the alley where it meets with Ninth
Northwest.

Q. When you say take him down, you mean arrest.

A. Arrest, that's correct.

Q. And so, in fact, did that happen?

A. Yes, sir, it did.

Q. And were you present and did you actually participate in
the arrest of Dustin Honken?

A. Yes, sir, I did.

80

Q. Showing you Exhibit 93, can you identify that for the jury,
please?

A. That'd be a photograph of Dustin Honken.

Q. And is that how Dustin Honken appeared in the spring of
1993?

A. Yes, sir.

MR. WILLIAMS: United States would move to admit
Exhibit 93 into evidence, Your Honor.

* * * *

(Government Exhibit 93 was offered.)

* * * *

THE COURT: Any objection?

MR. WILLETT: No objection, Your Honor.

THE COURT: Ninety-three is received.

* * * *

(Government Exhibit 93 was admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Page 69

Q.    When the car was stopped at the end of the alley as you indicated or at the end of the street there, who all was present in the car?

A.    Dustin Honken and Timothy Cutkomp.

Q.    Was Timothy Cutkomp also arrested along with Dustin Honken

81

at that time?

A.    Yes, sir, he was.

Q.    And was Tim Cutkomp searched at the time?

A.    Yes, sir, he was.

Q.    Was anything of evidentiary value to you found on Tim Cutkomp?

A.    A receipt was.

Q.    Handing you Exhibit 23, can you please identify that for the jury?

A.    That'd be a receipt from Hills Brothers Chemical Company that was found on Timothy Cutkomp.

Q.    It's actually kind of a multi-page receipt, sir?

A.    Yes, sir.

Q.    And you seized that from Tim Cutkomp on March 21, 1993?

A.    Yes, sir.

          MR. WILLIAMS:   United States would move to admit into evidence Exhibit 23, Your Honor.

                         *   *   *   *

          (Government Exhibit 23 was offered.)

                         *   *   *   *

          MR. WILLETT:   Hearsay and relevance as it pertains to this defendant, Your Honor.

          THE COURT:   Overruled.   23 is received.

                         *   *   *   *

Page 70

(Government Exhibit 23 was admitted.)

82

                                    *   *   *   *

BY MR. WILLIAMS:

Q.    Could you explain to the jury what Exhibit 23 is?

A.    That's a receipt from Hills Brothers Chemical Company showing the purchase of anhydrous ammonia.

Q.    And what I have on the screen right now, is that just the first page of the multi-page document marked as Government's Exhibit 23?

A.    Yes, sir, it is.

Q.    And the chemical company receipt in the upper middle of that indicates a name of a company.  What is that company name?

A.    Printed Circuits Technology.

Q.    And does it have a location where this was shipped to?

A.    Yes, 630 South Craycroft in Tucson, Arizona.

Q.    The top receipt there referenced anhydrous ammonia.  Do you see that, sir?

A.    Yes, sir.

Q.    And then on the subsequent receipts are there additional chemicals that are reflected being purchased under the name Printed Circuits Technology?

A.    Yes, sir.

Q.    Based on your training and experience in the area of narcotics enforcement, are you familiar with the chemicals being purchased being chemicals used in the manufacture of methamphetamine?

83

Page 71

A.    Yes, sir, they are.

Q.    You searched Tim Cutkomp, and you found those receipts marked as Government's Exhibit 23 on him.  Did you also search Dustin Honken?

A.    Yes, sir, we did.

Q.    First of all, did you find the cash, the $3,000, during your search?

A.    Yes, sir, we did.

Q.    And where was the $3,000?

A.    It was split up in $1,000 bundles and distributed in different pockets on him.

Q.    On Dustin Honken.

A.    Yes, sir.

Q.    And did you confirm from the serialized numbers that that was, in fact, the buy money that you had previously provided to Greg Nicholson?

A.    Yes, sir, we did.

Q.    Did you also find any other pieces of paper on Dustin Honken at that time?

A.    Yes, sir, we did.  We found a drug note.

Q.    I'm handing you Exhibit 33.  Can you identify that for the jury, please?

A.    Yes, sir.  That'd be the drug note that we found on Dustin Honken.

MR. WILLIAMS:  United States would move to admit

84

Exhibit 33 into evidence, Your Honor.

\* \* \* \*

(Government Exhibit 33 was offered.)

\* \* \* \*

Page 72

THE COURT: Mr. Willett, any objection to 33?

MR. WILLETT: Hearsay and relevance as it pertains to this defendant, Your Honor.

THE COURT: Overruled. 33 is admitted.

* * * *

(Government Exhibit 33 was admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Sir, you referred to this as a drug note. Could you explain to the jury what is it about those numbers and those markings on there that you as an experienced narcotics officer lead you to believe that's a drug note?

A. He abbreviated the names. For example, G Man would stand for Greg; T Man would stand for Terry and the running account of what's owed and what's paid for both the gentlemen.

Q. And based on your training and experience, is it common for you to have found notes like this that had running totals in connection with the drug trade?

A. Yes, sir.

85

Q. And when you have numbers and they're crossed off and there is numbers after it, what do those crossings and new numbers reflect?

A. Well, for example, under G Man over in the right-hand corner, the crossing out of the 2,000 and 1,000 would have been from that meeting on March 21, the $3,000 that Greg had paid Dustin. And the plus two is the reference that you heard in the tape and in the transcript of Dustin saying plus two.

Page 73

Q.   And the note down below, T Man, stands for Terry?

A.   That's correct.

Q.   And the number reflected there is how much money?

A.   27,725.

Q.   Also on Mr. Honken, did you find any other items that assisted you in the investigation?

A.   Yes, sir.  We found a key to a hotel room at the Highway Inn Hotel in Mason City.

Q.   To room 237?

A.   Yes, sir.

Q.   Did you search the car as well, sir?

A.   Yes, sir, we did.

Q.   And did you find anything of note during the search of the car?

A.   Found a UPS receipt from April of 1992 where a package had been sent from Dustin Honken in Arizona to Russell Miller in Mason City.

86

Q.   Now, Russell Miller was the same name as the person to whom this car was registered in which Dustin Honken and Tim Cutkomp were arrested?

A.   Yes, sir, it was.

Q.   Once you obtained the information from the hotel key, what did you do with that information?

A.   I applied for a search warrant for that hotel room.

Q.   And was that -- did a judge grant that search warrant?

A.   Yes, sir, he did.

Q.   And did you execute a search on that hotel room?

A.   Yes, sir, I did.

Q.   Did that also take place on March 21, 1993?

Page 74

A.    Yes, sir, it did.

Q.    Who was present in the hotel room when you executed the search warrant besides you and the other task force officers?

A.    Russell Miller was.

Q.    And was he searched at that time?

A.    Yes, sir, he was.

Q.    Was anything incriminating found on Russell Miller?

A.    No, sir.

Q.    Was he registered to that room?

A.    I believe it was -- Dustin Honken was registered to that room.

Q.    And did you search the room itself then?

A.    Yes, sir, we did.

87

Q.    Did you find anything of evidentiary value in the room?

A.    Yes, sir, we found methamphetamine, cash, and paraphernalia.

Q.    And when you say methamphetamine, are we talking large quantities of methamphetamine?

A.    No, sir, personal use, small amount.

Q.    And how much cash did you find?

A.    Approximately $700.

Q.    Did you search the bathroom in this hotel room?

A.    Yes, sir.

Q.    And did you see anything of evidentiary value in there?

A.    Yes, sir.

Q.    And what did you see?

A.    There was a large note that appeared to be written in red lipstick on the mirror.

Q.    What did it say?

Page 75

MR. WILLETT:  Objection, hearsay.

THE COURT:  Overruled.

MR. WILLETT:  Objection, relevance.

THE COURT:  Overruled.

MR. WILLETT:  Thank you.

BY MR. WILLIAMS:

Q.  What did it say, sir?

A.  Something to the effect of hope you had a happy birthday, love Angie.

88

Q.  At this point in the investigation, Greg Nicholson had provided you information as you testified earlier concerning Terry DeGeus as well.  Do you recall that?

A.  Yes, sir.

Q.  Based on what he had told you at this point, did you take any steps in your investigation to determine whether Terry DeGeus was, in fact, involved in drug trafficking with Greg Nicholson and Dustin Honken?

A.  Yes, sir, I did.

Q.  What did you do?

A.  I applied for a search warrant for Terry DeGeus's residence in rural Britt, Iowa.

Q.  And if you could explain to the jury, Britt, Iowa, is located where in reference to Mason City, Iowa?

A.  Approximately 40, 45 minutes due west of Mason City.

Q.  And did the judge grant your search warrant application?

A.  Yes, sir, he did.

Q.  Did you execute that search?

A.  Yes, sir, we did.

Q.  Was that also on March 21, 1993?

Page 76

A.   Yes, sir.

Q.   When you went to execute the search warrant, can you explain to the jury what happened?

A.   We had problems making entry into the house, so the team backed off and talked Terry DeGeus to come outside.

89

Q.   Did you ultimately talk Terry DeGeus into coming outside?

A.   Yes, sir, we did.

Q.   Did he fight with officers or resist arrest?

A.   No, sir, he did not.

Q.   Once you arrested Terry DeGeus, did you search him?

A.   Yes, sir, we did.

Q.   Did you find anything of evidentiary value on him?

A.   No, sir.

Q.   Did you search the house?

A.   Yes, sir.

Q.   And did you find any drugs or other items connected with the drug trade in the house?

A.   Found drug paraphernalia.

Q.   And again, when you say drug paraphernalia, just so we're clear, what are you talking about?

A.   Could be like a pipe to smoke drugs with or packaging or scales.

Q.   Did you find anybody else located in the house?

A.   Yes, sir.  An individual by the name of Aaron Ryerson was hiding in the attic.

Q.   And did you find anything on Aaron Ryerson?

A.   No, sir.

Q.   Now --

THE COURT:  Mr. Williams, would now be a good time to

Page 77

take our afternoon recess?

90

MR. WILLIAMS: Excellent, Your Honor.

THE COURT: Our lunch break? Okay. Members of the jury, it is noon. We'll be in recess until one o'clock. Please remember my cautionary instruction about not discussing this case among yourselves or discussing it with anybody else and, of course, keep an open mind until you've heard all of the evidence in the case. We'll see you back here at one o'clock. Thank you.

(The jury exited the courtroom.)

THE COURT: Mr. Williams, anything we need to take up?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Willett?

MR. WILLETT: Yes, Your Honor. I would like the Court --

THE COURT: Okay. Please be seated.

MR. WILLETT: Thank you. Your Honor, I would ask the Court to respectfully consider instituting some rules on the entry or exit of large groups of people while court is in session.

THE COURT: Well, that's up to the U.S. marshals.

MR. WILLETT: Thank you.

THE COURT: It's a public courtroom, and I'm not going to -- the U.S. marshals are in charge of people entering, and we have -- I don't exactly understand what you're wanting.

MR. WILLETT: Your Honor, if I may, I realize it's the

91

public's courtroom, this is the public's house. I realize the
Page 78

United States Marshal's Service is in control and for the security and well being of this courtroom. My point is it's distracting to be giving an opening statement and have a large group of individuals walk in and then before a break even occurs to have the same group of large individuals walk out in the middle of a witness.

I feel like I'm at a golf tournament watching the gallery proceed to the next hole. And my only experience for asking for this, Your Honor, is during the time that I participated in United States versus Sons of Silence motorcycle club trial, Judge Melloy in that case said that people could enter or exit during the breaks but during the time court was in session nobody could enter or exit the courtroom.

I realize your CSOs and your marshals have to enter and exit to take care of the business of this courtroom, but I would respectfully ask that the Court consider discussing with the marshal's service that some limitation be placed on large groups entering or exiting this courtroom while court's in session. I want this jury to be paying attention to what's going on in the well, not what's going on in the gallery. Thank you.

THE COURT: It's overruled. Anything else?

MR. WILLETT: Not on behalf of the defense, Your Honor. Thank you.

92

THE COURT: Okay. Thank you.

(Lunch recess at 12:02 p.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. WILLETT: Yes, Your Honor.

Page 79

THE COURT: Thank you.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams, you may resume your direct examination.

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. Mr. Stearns, when we left off at the lunch break, you had just finished telling the jury about the arrest of Dustin Honken, the search of his hotel room, and ultimately the search of Mr. DeGeus's house. Do you recall that's where we left off in your testimony, sir?

A. Yes, sir.

Q. What I'd like to do is direct your attention now to after these events took place, these searches took place, on March 21 of 1993, did Greg Nicholson continue to cooperate with law enforcement?

A. Yes, sir, he did.

Q. And at some point did he agree to testify before the grand jury concerning his knowledge of drug trafficking by Dustin Honken?

93

A. Yes, sir, he did.

Q. Sir, I'm showing you what's been marked as Government's Exhibit 27. Can you identify that for the jury, please?

A. That's a transcript of Greg Nicholson's testimony to the grand jury.

Q. That testimony was provided to the grand jury on April 20 of 1993?

A. Yes, sir.

Q. And that took place in Cedar Rapids, Iowa?

Page 80

A.    Yes, sir.

MR. WILLIAMS:  United States would move to admit Exhibit 27, Your Honor.

*   *   *   *

(Government Exhibit 27 was offered.)

*   *   *   *

THE COURT:  Any objection?

MR. WILLETT:  Your Honor, I will not object as to foundation because it's my understanding this exhibit will be tied up or connected with a later witness.  I will raise hearsay and violation of my client's Sixth Amendment right to confrontation.  Thank you.

THE COURT:  Okay.  Those are overruled.  Government's Exhibit 27 is received.

*   *   *   *

(Government Exhibit 27 was admitted.)

94

*   *   *   *

BY MR. WILLIAMS:

Q.    Mr. Stearns, what I'd like to do is have you go through the transcript for us, and I want to point out different parts of Greg Nicholson's testimony before the grand jury.  So we lay a foundation here, the prosecutor, the person that occupied my position at this time, was Pat Reinert?

A.    That's correct.

Q.    And so is he reflected as the person doing the questioning before the grand jury on April 20, 1993?

A.    Yes, sir, he is.

Q.    And the court reporter company that's listed there is Kool and Nygren?

Page 81

A.     That's correct.

Q.     And the actual court reporter reflected on the first page of this underneath the name -- or underneath the title Testimony of Greg Nicholson, that was Peggy S. Christensen?

A.     That's correct.

Q.     After Mr. Nicholson was sworn in before the grand jury to provide testimony, did he give some background to the grand jury concerning how it was that he and Dustin Honken first met?

A.     Yes, sir, he did.

Q.     Can I direct your attention, sir, to page 6 of the grand jury transcript and directing your attention to line 9 of that transcript on page 6, was -- did Pat Reinert ask Mr. Nicholson

95

the question of, "When did you meet Mr. Honken?"

A.     Yes, sir, he did.

Q.     And can you provide the jury what the answer was there?

A.     In 1991.

Q.     And then he was asked the question, "And who introduced you to Dustin Honken?"  What was Mr. Nicholson's reply?

A.     A friend of his, Scott Gahn, which was a friend of mine at that time too.

Q.     Further down on line 16, Mr. Nicholson was asked the question, "Now, why did Mr. Gahn introduce you to Greg Nicholson -- or I'm sorry, to Dustin Honken?"  And what was the reply that Mr. Nicholson made at that point?

A.     He had marijuana that he was trying to get rid of, and he knew that I could probably turn it for him.

Q.     Those are some terms there, get rid of and turn it for him. Can you explain those to the grand jury -- or to the jury, please?

Page 82

A.   Obviously to get rid of, to market, to sell the marijuana. Turn it means the same thing, to sell it, to turn it into cash.

Q.   And so does Greg Nicholson then go on in the grand jury to testify that, in fact, he did start selling marijuana for Dustin Honken?

A.   Yes, sir.

Q.   And if you turn to the next page, page 7 of Exhibit 27, down on lines 3, 4, and 5, does he indicate the time frame

96

during which he was selling marijuana for Dustin Honken?

A.   Yes, sir.

Q.   And what time frame was that?

A.   '91 through the summer of '92.

Q.   Did Greg Nicholson indicate during his testimony before the grand jury whether at some point his drug transactions with Dustin Honken evolved from marijuana to some other drug?

A.   Yes, sir, he did.

Q.   Could I direct your attention to page 8 of Exhibit 27?  At the bottom of that page at line 21, was Greg Nicholson asked this question:  "At some point in time did you get involved with Mr. Honken and other drugs?"  Was he asked that question?

A.   Yes, sir, he was.

Q.   And what was the answer that Mr. Nicholson provided?

A.   Methamphetamine.

Q.   Was he asked the question, "When did you first get methamphetamine from Dustin Honken?"

A.   Yes, sir, he was.

Q.   And what was his answer?

A.   Last summer.

Q.   And Mr. Reinert clarified that that would have been the

Page 83

summer of 1992?

A.    Correct.

Q.    And then follows on that page and subsequent pages a discussion of quantities?

97

A.    Yes, sir.

Q.    And how it was packaged when it came to him?

A.    Yes, sir.

Q.    And how did Greg Nicholson describe in the grand jury how the substances came to him?  I direct your attention again to page 9, lines 9 through 11.

A.    They would come in a -- do you want me to read those?  I'm sorry.

Q.    Just you can read them or you can just tell the grand (sic) jury the substance of what he said, whichever you're more comfortable with.

A.    The methamphetamine would come in brown laboratory jars.

Q.    At the bottom of the page, there is a conversation about some cut, and you recall during your testimony this morning you talked about cutting agents and so forth?

A.    Yes, sir.

Q.    Let's talk about that.  At some point on page 9 at line 21 Mr. Reinert asks the question, "Did you have any discussion with Mr. Honken about whether that methamphetamine had been cut or any cut being added to it?"  And what was the answer Mr. Nicholson provided?

A.    He sent inositol with me to cut it so it was supposed to be pure.

Q.    Explain to the grand jury (sic), inositol, what is that?

A.    It's just -- it's a cutting agent.  Again, it has no effect

Page 84

with the methamphetamine. Again, I use like my earlier example; baby powder's a common powder that has no effect on anything. Same thing with the inositol. Its only purpose in there is to cut the methamphetamine to make more product.

Q. So according to Mr. Nicholson's sworn testimony before the grand jury in 1993, he was indicating that when it came to him in these brown laboratory jars it was supposed to be pure methamphetamine, and he was supposed to add the cut to it himself.

A. That's correct.

Q. If you could turn to page 10 of the transcript, at line 10, Pat Reinert asks how much Honken charged him for the methamphetamine. Do you see that?

A. Yes, sir.

Q. And what was Mr. Nicholson's response?

A. Oh, that was -- he started at 16. Then as time progressed, towards the end, he brought it down to 1,200 for an ounce.

Q. And when we're talking about 16, we're talking about $16,000?

A. No, sir, 1,600.

Q. 1,600? And then he brought it down to 1,200 which would be $1,200 an ounce?

A. Yes, sir.

Q. If you'd turn with me to the next page, page 11 of the transcript, there's a discussion there about some subsequent

deliveries that takes place starting about 9 -- line 9?

A.    Yes, sir.

Q.    What I'd like to do is read through this, and I'll read the questions as asked by Mr. Reinert, and if you would respond as Mr. Nicholson did back in 1993.

A.    Okay.

Q.    Starting at line 9, the question was asked, "During the time of the summer of '92 until March of '93, how often would you see Mr. Honken?"

A.    Either every two weeks or once a month.

Q.    Do you have an estimate of the total number of times you would have seen him to get methamphetamine from him?

A.    Probably at least eight times would be my guess.

Q.    What's the quantity of methamphetamine that you would receive for you to resell from Mr. Honken on each of those eight occasions?

A.    Between four and eight ounces probably.  It would vary.

Q.    Okay.  Can you be a little more specific?  About how many times would you have gotten four ounces or five ounces or eight ounces?

A.    The first two or three times it was only like probably four to five ounces.  And the last two or three times, he'd get it up to around maybe eight to ten possibly.  I didn't know for sure how much he was dropping off.

Q.    And that eight to ten was all for you to resell.

100

A.    No.  He just stored it at my house.  He'd come back maybe a day later and pick up a couple ounces and take it somewhere.  It was just mainly a storage place for him.

Q.    Now, moving on to page 13, is there a discussion there about whether Greg Nicholson was aware of anybody else selling

Page 86

methamphetamine for Dustin Honken?

A.    Yes, sir.

Q.    And directing your attention to line 4 through 8 of that page, the question was asked, "Did you ever have any discussions with him about anyone else selling his methamphetamine for him?" And what was Greg's answer?

A.    He did mention a gentleman at Clear Lake.

Q.    And who was that?

A.    Terry DeGeus.

Q.    Direct your attention now to page 14 of the transcript. You recall earlier in your testimony, Mr. Stearns, you testified about Mr. Nicholson explaining to you how money was transported and who was involved in that?

A.    Yes, sir.

Q.    And is that also referenced on page 14 of Greg Nicholson's testimony in 1993?

A.    Yes, sir, it is.

Q.    Directing your attention to line 12, the question was asked, "We talked about Mr. Honken coming back to your house to pick up currency that you owed him for drug debts.  Was there

101

ever anyone else who picked up currency for Mr. Honken?"  What was Mr. Nicholson's answer?

A.    Tim came.  I met the guy three times.  The second time he came and collected an estimate between four and six thousand he collected.

Q.    Question was asked, "And that's Tim Cutkomp?"  And the answer was?

A.    Cutkomp, yes.

Q.    Was this the only time that Greg Nicholson had an

Page 87

opportunity to testify before the grand jury?

A.    Yes, sir, it was.

Q.    And you're aware was he even asked any questions in the grand jury at that time concerning whether he had any knowledge of Angela Johnson?

A.    Not to the best of my knowledge.

Q.    At this point when you're presenting this case to the grand jury, this was a federal grand jury; is that correct?

A.    That's correct.

Q.    Had you been in contact with federal agents concerning whether there was a federal interest in this case that you had started at the state level involving Dustin Honken?

A.    Yes, sir, I had.

Q.    And who were you in contact with?

A.    Agent Mizell.

Q.    And Agent Dave Mizell, what agency is he with?

102

A.    DEA.

Q.    The Drug Enforcement Administration?

A.    Yes, sir.

Q.    And was it -- as a result of talking with him, was a decision made of whether to take the case that you had started and have that become a federal case?

MR. WILLETT:  Objection, Your Honor.  To the extent that this officer's answer is based on hearsay, the defense would object.

THE COURT:  Overruled.  You may answer.

BY MR. WILLIAMS:

Q.    Was a decision made consulting with Agent Mizell to take this federal?

Page 88

A.    Yes, sir, it was.

Q.    And ultimately were federal charges brought against Dustin Honken?

A.    Yes, sir, there was.

MR. WILLIAMS:  Thank you.  I have no further questions.

THE COURT:  Mr. Willett?

MR. WILLETT:  Thank you, Judge.

CROSS-EXAMINATION

BY MR. WILLETT:

Q.    I apologize.  I forgot your rank, and I didn't want to misstate your title.

103

A.    It's sergeant.

Q.    Sergeant.  My name's Al Willett.  I defend Angela Johnson.

You have been with the Mason City Police Department how long, sir?

A.    Little over 20 years.

Q.    Okay.  And I want to make sure that when we talked about your knowledge about this case that we have a pretty good time frame of the dates.  My understanding is you really came into contact with this case somewhere around March 16 because of the drug round-up in Freeborn, Minnesota.  Did I understand that correctly?

A.    That's correct.

Q.    And a lot of these events that you testified to, the search warrant of David Patrick, David Patrick's controlled buy from Greg Nicholson, the search warrant of Greg Nicholson's residence, the search warrant of Terry DeGeus's residence, the search warrant of the hotel room, all of these transpire within

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 97 of 3592

just a matter of a few days; correct?

A.    That is correct.

Q.    And, in fact, if we put an ending date on those series of events that you testified to, that would be approximately March 21 of 1993; correct?

A.    That's correct.

Q.    Okay.  Thank you so much.

      You testified on direct that a search warrant was made

104

of David Patrick's home; correct?

A.    That's correct.

Q.    And he was questioned about his source for controlled substances; correct?

A.    Correct.

Q.    And he named Greg Nicholson; correct?

A.    That's correct.

Q.    Not Angela Johnson.

A.    No, sir.

Q.    Okay.  And then Mr. Patrick did a controlled buy with Greg Nicholson going one step up the ladder if you will.

A.    Yes, sir, he did.

Q.    Okay.  And after that controlled buy you did a search warrant of Greg Nicholson's residence; correct?

A.    That's correct.

Q.    Angela Johnson wasn't physically present during the search of Greg Nicholson's residence, was she?

A.    No, sir.

Q.    Okay.  And then based upon Greg Nicholson's subsequent cooperation, you were able to ask Greg Nicholson where he was getting his methamphetamine from; correct?

Page 90

A.    That's correct.

Q.    Okay.  And he responded -- you testified on direct that he responded that it was Dustin Honken who was residing in Arizona at the time; correct?

105

A.    That's correct.

Q.    Okay.  He didn't say Angela Johnson, did he?

A.    No, sir, he did not.

Q.    Okay.  And then you talked about the fact that based upon the information you received from Greg Nicholson you were able to uncover, if you will, that what you were investigating dated back 10 or 11 months, and that would be into the time period of April or May of 1992; correct?

A.    That's correct.

Q.    Okay.  And there was discussion about how cash was transported and things of that nature; correct?

A.    Yes, sir.

Q.    Okay.  And I believe you stated on direct that Nicholson paid Dustin Honken approximately $100,000 during that period of time; correct?

A.    That's correct.

Q.    Mr. Nicholson didn't tell you that he paid Angela Johnson a hundred thousand dollars, did he?

A.    No, sir.

Q.    Okay.  You also asked Mr. Nicholson I believe -- or you were able to uncover this information -- who his other customers were; correct?

A.    Yes, sir.

Q.    And he stated to you Terry DeGeus; correct?

A.    Yes, sir.

Page 91

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 99 of 3592

Q.    He didn't tell you Angela Johnson, did he?

A.    No, sir.

Q.    Okay.  And you were able to ask Greg Nicholson who some of his other customers were, and I think you detailed to Mr. Williams David Patrick, Dennis Ferguson, and Brent Logan; correct?

A.    Yes, sir.

Q.    He didn't mention Angela Johnson as a customer, did he?

A.    No, sir.

Q.    Okay.  And it's my understanding that on March 21, 1993, is where you set up this undercover situation where there was going to be a wire worn, there was going to be some money used by law enforcement in order to facilitate a buy; correct?

A.    That's correct.

Q.    Okay.  And did I understand your testimony correctly this morning that when Dustin Honken arrived he was in a car with Tim Cutkomp?

A.    That's correct.

Q.    Angela Johnson wasn't in that car, was she?

A.    No, sir.

Q.    Okay.  And I should have mentioned this.  During the time that this undercover wire was being worn by Mr. Nicholson, this was in his home; correct?

A.    Yes, sir.

Q.    And Angela Johnson was not there during the time of the

wearing of this wire, was she?

A.    No, sir.

Q.    Okay.  And if I may direct your attention to the screen in front of you, we see Government Exhibit 33 which is already in evidence; correct?

A.    Yes, sir.

Q.    And you detailed based upon your knowledge and training that you -- and investigation that you believe G Man and T Man refer to Greg Nicholson and Terry DeGeus; correct?

A.    That's correct.

Q.    Not Angela Johnson; correct?

A.    That's correct.

Q.    Now then, you did detail based upon the subsequent arrest of Mr. Honken and the location of a motel room key that you were able to go to a state judge there in Cerro Gordo County and obtain a search warrant for a motel room; correct?

A.    That's correct.

Q.    Okay.  And you articulated during direct what you remembered to be the message on that mirror that was written in red lipstick; correct?

A.    That's correct.

Q.    Okay.  Now, you issued a report on this very subject back in March of 1993, didn't you, sir?

A.    Yes, sir.

Q.    Okay.  And would it surprise you if I suggested to you that

108

your testimony in that report was different than what you testified here to today?

A.    No, sir, it wouldn't.  I'm trying to recall events that happened 12-plus years ago.

Q.    Certainly.  And would it refresh your memory, sir, if I presented you with that report?

Page 93

A.   Yes, sir.

          MR. WILLETT:   Your Honor, may I approach this witness?

          THE COURT:   You may.

          MR. WILLETT:   Thank you very much.

BY MR. WILLETT:

Q.   I'm going to direct your attention to this area right here, have you read that to yourself, and then I'll ask you a question.

A.   Okay.

Q.   Sir, did it refresh your memory to review that report to refresh your memory about what the message was on the mirror?

A.   Yes, sir.

Q.   Okay.  And that's different than what you testified here to this morning, isn't it?

A.   Little bit, yes, sir.

Q.   The message wasn't signed Angie, was it, sir?

A.   No, sir.

Q.   The message just had the initial or the letter A.

A.   That's correct.

                                                        109

Q.   Okay.  You also told me that based upon this information as it kept evolving you were able to get a search warrant for the home of Terry DeGeus in Britt, Iowa; correct?

A.   That's correct.

Q.   And that's still in between this time frame of starting with roughly March 16 and ending on March 21 of 1993?

A.   Yes, sir, it is.

Q.   Okay.  Now, you said something that struck me this morning.  My understanding is you had the search warrant but in executing it you waited for Mr. DeGeus to come out?  Did I understand that

Page 94

correctly?

A.   What I stated this morning was we had problems making entry.

Q.   Why did you have problems making the entry?

A.   The door was barricaded with something.  We couldn't get through the door.

Q.   Okay.  And did you have -- based upon your professional experience, did you have knowledge about Terry DeGeus prior to executing the search warrant on March 21, 1993?

A.   We had heard that he had made threats towards law enforcement.

Q.   And when you say threats, physical threats.

A.   Yes, sir.

Q.   Threats of violence.

A.   Yes, sir.

110

Q.   And were you concerned that Mr. DeGeus might be armed --

A.   Yes, sir.

Q.   -- in that residence?  Did you know Terry DeGeus professionally before March 21, 1993?

A.   Not that I recall.

Q.   Okay.  Did you have any knowledge about his reputation in the community?

A.   No, sir.

Q.   Okay.  Would you have had any knowledge as to what his reputation for violence was in the community prior to March 21 of 1993?

A.   No, sir.

Q.   Okay.  But my understanding is is the search warrant wasn't executed until Mr. DeGeus was -- came out; correct?

Page 95

A.    That's correct.

Q.    Now, it's fair to say he didn't come out right away, did he?

A.    No, sir.

Q.    For lack of a better label, this was a stand-off, wasn't it --

A.    Yes, sir.

Q.    -- that lasted several hours, wasn't it?

A.    I think it lasted approximately two hours.

Q.    Okay.  And based upon your testimony this afternoon, it was Scott Gahn who introduced Greg Nicholson to Dustin Honken;

111

correct?

A.    That's correct.

Q.    Not Angela Johnson.

A.    That's correct.

Q.    And that Mr. Nicholson also testified in his grand jury testimony it was Terry DeGeus who was selling methamphetamine for Dustin Honken; correct?

A.    That's correct.

Q.    Not Angela Johnson.

A.    That's correct.

Q.    Okay.  And based upon the testimony that was read out of his grand jury transcript, it was Tim Cutkomp who was picking up money for Dustin Honken; correct?

A.    Yes, sir.

Q.    Not Angela Johnson.

A.    That's correct.

        MR. WILLETT:  Judge, thank you.

        THE COURT:  Any redirect?
                Page 96

MR. WILLIAMS: None, Your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you.

THE COURT: Members of the jury, every time we change witnesses, you can automatically stand up and take a stretch break if you want, because the witnesses aren't allowed to be in the courtroom when other witnesses testify. The exception would

112

be Mr. Basler who's the case agent. He's allowed to be in the courtroom obviously because he is the case agent. But otherwise we have the witnesses separated.

Ready to call your next witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls Peggy Christensen.

THE COURT: Okay. Thank you.

PEGGY CHRISTENSEN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Thank you. Please be seated in the witness box. Make yourself comfortable. And please adjust the chair by scooting it up so you can speak directly into the microphones. And you can adjust those microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is Peggy Sue Christensen, C-h-r-i-s-t-e-n-s-e-n.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

                    DIRECT EXAMINATION

BY MR. WILLIAMS:

Q.   Good afternoon.

A.    Good afternoon.

Q.    Miss Christensen, I'd like you to share with the jury a little bit just about your background.   Where are you from now?

113

A.    I right now live in Madison, Wisconsin.

Q.    And do you have a job you're working now?

A.    I'm employed by the University of Wisconsin, and I'm a CART reporter which is Communication Access Realtime Reporter which is kind of like one-on-one closed captioning.  I also work with a couple of clients myself doing court reporting.

Q.    Let's talk about this court reporting, but before we get to that, have you always lived where you do now?

A.    I have not.

Q.    Where have you lived before?

A.    I was born in Albia, Iowa, raised there, went to school in Des Moines, and then I moved to Cedar -- well, moved to Illinois for a year and then Cedar Rapids, and then I moved to Madison.

Q.    During what period of time did you live in Cedar Rapids?

A.    1990 to 19 -- or to 2000.

Q.    And during that time period were you employed there?

A.    I was.

Q.    Doing what?

A.    I was a court reporter, a freelance court reporter.

Q.    And did you work with a particular company during some period of that time?

A.    I worked with an agency, Kool and Nygren, in Cedar Rapids.

Q.    Very good.  Let's talk a little bit then about how it is you became a court reporter and some of the training and education you had to go through.  First of all, what's your

114

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 106 of 3592

formal education if you could share that with the jury, please.

A.    Sure.    After high school I went to the American Institute of Business in Des Moines, and I went through their court reporting program.    It's a two- to three-year program, and I have an associate's degree in court reporting.

Q.    Could you explain to the jury what type of academic requirements go with learning how to be a court reporter?

A.    Sure.    The full two years -- and you actually go during the summer too, so you're going the full two years -- you take theory classes, learning how to translate the spoken word into a machine shorthand.    And then you work on another year to two years building up your speed.    You take legal courses, medical courses and -- mostly for terminology, psychology courses.

Q.    Does the formal training involve any hands-on training as well?

A.    It does.    There's an internship.    There's I believe two weeks with an official court reporter and two weeks with a freelance firm.

Q.    And you indicated in your testimony you graduated with a degree then in court reporting.

A.    Correct.

Q.    And then after that did you immediately go into that type of profession?

A.    I did.    I did my internship in Illinois, and that firm hired me out of school, so I worked there coming out of school.

115

Q.    Can you explain to the jury, is there some type of certification process that court reporters can go through to

Page 99

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 107 of 3592

establish that they actually know what they're doing and they're actually good at it?

A.    There is.  In Iowa there's a Certified Shorthand Reporter exam and a certification you must have to work in the state of Iowa.  We're certified at 225 words a minute for testimony and also for literary, 200 words, and 180 for jury charge.  There's also a national certification which is the same -- the same speed requirements, and also both have a written knowledge test.

Q.    And could you tell the jury, are you certified both in the state of Iowa or at least were you back in 1993 and are you certified at the national level?

A.    I am certified at both levels.

Q.    Let's, if we can at this point, kind of explain to the jury the process.  Miss Semmler is going through right now doing the same job you did.  Is that fair to say?

A.    That is.

Q.    So can you explain to the jury then how do you take spoken words like I'm doing right now and translate that into a shorthand?

A.    It is a machine shorthand.  It's -- a lot of it is based on phonics.  There's certain theories that you learn when you're in school.  And so instead of typing one letter at a time, you're typing words or phrases at a time to help you with the speed.

116

Q.    And when you're typing it, you're typing on to what?

A.    You have a machine that you use.

Q.    And when you're typing the stuff into the machine, what does it produce so you can go back later and see what it was you did?

A.    Sure.  The machines have a paper note that comes out, and

Page 100

everything that you type is on the paper note.  There's also a disk associated with most machines, so there's a disk backup also.  And so everything is in the ASCII form so that when you go back to the office you can put it into your laptop or into your computer, or sometimes you'll have your laptop right with you and do it right at the time.

Q.	When you say ASCII form, that's a type of software program?

A.	No.  It's just, you know . . .

Q.	Computer?

A.	Yes, computer.

Q.	I don't speak that language.

A.	Me neither.

Q.	Let me ask you this then.  If we walked up to Miss Semmler's machine right now and I grabbed that paper out of there, could I, somebody not trained in this area, just pick it up and read English?

A.	I highly doubt it, no.

Q.	What would appear on that paper document then?

A.	The shorthand briefs would appear, and like there would be

117

a designation for when he speaks.  Then there would be a designation for when I speak, and then every word would be on there in a shorthand format.

Q.	Sort of a code.

A.	Yes.

Q.	Then at some point if a lawyer down the road wants to then be able to read and they're not trained in shorthand what was said during a hearing --

A.	Sure.

Q.	-- what would you do?

Page 101

A. If I just had the disk format, I would put it back into the computer, and each court reporter has their own dictionary which is your theory that you've learned during school and things that you've added to it during the years. And so you put it in there, and there's court reporting software. It would translate it using your dictionary, and then you could go through. You read through everything and edit it all, and then you print it out, and you proofread it all.

Q. And is there some type of quality control effort you go through to make sure that you can be as accurate as possible?

A. That would be it. I'm sorry. After you read it on and you translate it, then you go back through and you edit all of it. You read it all on the computer screen. You print it all out. And then you proofread it all. You make the corrections, and then it's ready to go.

118

Q. Very good. And when you get done with the transcript, at some point do you certify the accuracy of the transcript that you've produced as a court reporter?

A. Correct.

Q. And that certification means what?

A. It means that the spoken word that was said during that time, that using computer-aided software -- it usually says that your transcript is a true and accurate copy of what was said during the proceedings.

Q. I want to direct your attention -- you indicated earlier that you worked for a period of time with an association known as Kool and Nygren.

A. Correct.

Q. And did any part of the work you did with Kool and Nygren

Page 102

involve you taking down testimony before a federal grand jury?

A. Yes.

Q. And for what period of time did you act as a court reporter for the federal grand jury?

A. I started with Kool and Nygren in 1990 -- 19 -- yeah, 1990. I believe probably in 1991 or 1992 I started taking grand jury testimony up until 1997.

Q. And were there other reporters associated with Kool and Nygren that did the same type of work you did?

A. Yes.

Q. And among them was Norman Kool?

119

A. Yes.

Q. Was he one of the owners of the company Kool and Nygren?

A. He is.

Q. Heidi Weston.

A. Yes.

Q. And Sarah Hyatt?

A. Yes.

Q. And were there others as well?

A. That did grand jury?

Q. Yes.

A. I believe one other one.

Q. Very good. Could you explain to this jury when you were taking the testimony as a court reporter in the grand jury who typically would be present in the grand jury room while you were taking down that testimony?

A. Sure. There would be a grand jury panel. And then there would be the U.S. attorney; myself, one of the court reporters; and then the witness.

Page 103

Q. And before the witness would testify, would the witness be sworn in?

A. Yes, they would, by the grand jury foreperson.

Q. And would that be reflected any time a transcript was produced about a witness's testimony before the grand jury that they were sworn in?

A. It would be.

120

Q. And then while that witness is before the grand jury, what was your job in relation to taking down the testimony of that witness before the grand jury?

A. My job was to take down the questions of the U.S. attorney and the answers verbatim and also any questions that the grand jury had. They could ask questions, and everything will be taken down verbatim.

Q. And after a grand jury testimony, would you produce transcripts then for the U.S. Attorney's Office of the testimony of witnesses before the grand jury?

A. If they requested certain witnesses, we would produce a transcript for those witnesses.

Q. In front of you if you look in the pile there, can you see Exhibit 27?

A. I do.

Q. Do you recognize that document, ma'am?

A. Yes.

Q. And what is that?

A. This is the testimony of -- it's a transcript of the testimony of Greg Nicholson.

Q. And is that testimony that you took as the court reporter?

A. I did.

Page 104

Q. And did you certify on the last page of that transcript that it's a true and accurate transcript of what Greg Nicholson said before the grand jury in April, on April 20, of 1993?

121

A. Yes.

MR. WILLIAMS: And in case there's any unclarity or lack of clarity on the record, I just would move formally for admission of Exhibit 27, Your Honor.

*   *   *   *

(Government Exhibit 27 was offered.)

*   *   *   *

THE COURT: Any further objection?

MR. STOWERS: None.

THE COURT: Twenty-seven is admitted. It was admitted, and now it's readmitted I should say.

*   *   *   *

(Government Exhibit 27 was readmitted.)

*   *   *   *

MR. WILLIAMS: Just wanted to make sure. I wasn't sure where we were at on that. Thank you, Judge.

THE COURT: It was somewhat confusing because of the nature of their objection.

BY MR. WILLIAMS:

Q. Miss Christensen, while you're on the stand, I want to take advantage of the fact you're here and have you take a look at some additional transcripts as well. Would that be okay?

A. Yes.

Q. Ma'am, I'm going to hand you what's been marked as Government's Exhibit 115. And can you identify that for the

122

Page 105

jury, please?

A.   This is the grand jury testimony of Angela Johnson taken by myself.

Q.   And again, was that certified by you as a true and accurate transcript of what she said before the grand jury?

A.   Yes, it was.

Q.   And on what day did she provide that testimony?

A.   October 27 of 1993.

Q.   Handing you Exhibit 116 and ask you if you can identify that, please.

A.   This is the grand jury testimony of Angela Johnson taken on March 5 of 1996.

Q.   Were you the court reporter who took that transcript?

A.   I was not.

Q.   And who was the court reporter on that one?

A.   Heidi Weston.

Q.   And Heidi Weston was another court reporter who is licensed to transcribe testimony before the grand jury on behalf of the United States?

A.   She was.

Q.   And that was certified as being accurate as well on the last page?

A.   Yes.

Q.   Handing you -- and just so we explain this to the jury if we could, this first exhibit and 27 as well, we have testimony

123

that fills up an entire page; is that right?

A.   That's right.

Q.   When we go to Exhibit 116, can you explain what the jury

might see there?

A.    Sure.  This is a software program that we utilized with our CAT software, the computer software, and it takes the one page per -- per page and breaks it down and puts four pages on a page to save -- save paper so you can read it faster.

Q.    Very good.  It's still the same transcript.  It's just four separate pages on a single page.

A.    Right.

Q.    Very good.  And if I can hand you 117 and have you identify that, please.

A.    This is the grand jury testimony of Angela Johnson from July 23 of 1996.

Q.    Who was the court reporter?

A.    Norman Kool.

Q.    And was that certified as being a true and accurate transcript as well?

A.    It was.

Q.    And did we give the date on that?

A.    July 23 of 1996.

Q.    Thank you.  I think you may have already testified to that. I'm sorry.  And showing you Exhibit 118, can you identify that, please?

124

A.    This is the grand jury testimony of Angela Johnson taken on April 11 of 2000.

Q.    And who was the court reporter?

A.    Sarah Hyatt.

Q.    And again, like Norman Kool and Heidi Weston, she was licensed to take down testimony before the grand jury?

A.    Yes.

Page 107

Q.   And was that certified as well?

A.   Yes, it was.

Q.   Thank you very much.

MR. WILLIAMS:  United States would move to admit into evidence, Your Honor, Exhibits 115, 116, 117, and 118.

*   *   *   *

(Government Exhibits 115 through 118 were offered.)

*   *   *   *

MR. STOWERS:  No objection.

THE COURT:  Okay.  Government's Exhibits 115, 116, 117, and 118 are admitted into evidence.

*   *   *   *

(Government Exhibits 115 through 118 were admitted.)

*   *   *   *

MR. WILLIAMS:  I have no further questions, Your Honor.

THE COURT:  Mr. Stowers?

CROSS-EXAMINATION

125

BY MR. STOWERS:

Q.   Hi.

A.   Hi.

Q.   My name's Dean Stowers, and I'm representing Angela Johnson.  How are you?

A.   Fine.  Thank you.

Q.   Can you tell the members of this jury here where the grand jury room is located?

A.   It's on the second floor of the federal courthouse in Cedar Rapids, Iowa.

Q.   Okay.  And can you describe the size of that room for them?

Page 108

MR. WILLIAMS: Objection, relevance, Your Honor.

THE COURT: What is the relevance of it?

MR. STOWERS: I'm trying to give the jury here an idea of the nature of the location where these proceedings were held.

THE COURT: I understand that, but what's the relevance of that?

MR. STOWERS: I think it goes to the nature of the testimony and the circumstances under which the testimony was given.

THE COURT: I don't see it, but go ahead.

THE WITNESS: Okay.

THE COURT: Yes, you can answer the question.

A. Measurements, if we cut the room right down in half here, I would say maybe this large.

126

Q. Okay. And approximately how many grand jurors would typically be present?

A. This was eight years ago. Maybe 15 or 20.

Q. And then there would be a court reporter and a prosecutor as you've indicated; is that correct?

A. Correct.

Q. Would there be a judge there?

A. No.

Q. Would there be an attorney for the person who was testifying present?

A. No.

Q. And in a grand jury room, I assume you reported on many, many witnesses; is that correct?

A. I did.

Q. And would you find that to be a situation where most

Page 109

witnesses would appear to be comfortable in that kind of a setting?

A.   I wouldn't be able to judge if they were comfortable.

Q.   You are not able to judge that?

MR. WILLIAMS:  Asked and answered, Your Honor.

Q.   That's fine.  You're not able to judge that?  I'm sorry? Is that what you said?

A.   Not if they're comfortable or not having an attorney.

Q.   Okay.  Have you noticed some people acting nervously when they testified in front of the grand jury?

127

A.   Yes.

Q.   And I assume you've reported in trial-type proceedings before as well?

A.   I have.

Q.   And I assume you're aware of the difference between leading questions and open-ended questions, is that correct, or nonleading questions?

A.   Correct.

Q.   Okay.  And in a grand jury, there's no rules, are there, about how a prosecutor can ask questions; is that right?

A.   I believe that's right.

Q.   And so if you were to read these transcripts, you'd see very many occasions where the prosecutor is leading the witness; is that correct?

A.   You would read what the question was and what the answer was.

Q.   Okay.  And the jury will have those transcripts with them.

A.   Correct.

MR. STOWERS:  That's all I have.  Thank you.
Page 110

THE WITNESS: Thank you.

THE COURT: Any redirect?

MR. WILLIAMS: No, Your Honor.

THE COURT: You may step down.

Members of the jury can take a stretch break.

You ready to call your next witness?

128

MR. WILLIAMS: United States calls Debra Davis.

DEBRA DAVIS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And please adjust the chair so you can speak directly into the microphones, and you can adjust those microphones as well, pull them both a little bit closer to you. There's another one right there. There we go. And would you state your full name, please, and spell your last name.

THE WITNESS: Debra J. Davis, D-a-v-i-s.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Davis, can you explain to the jury what do you do for a living, ma'am.

A. I work for the Iowa Division of Criminal Investigation crime laboratory in Des Moines.

Q. And how long have you worked at that agency?

A. I have worked for the Iowa crime lab for almost 16 years.

Q. And what is your position there?

A. I am a forensic scientist.

Q. And do you have a title for your position?

A. I have had two positions. Currently I'm a tox -- I am a

Page 111

toxicologist. Before that I analyzed drugs.

Q. Let me have you explain to the jury if you would a little

129

bit about your formal education that enabled you to ultimately occupy a position of that nature. Could you share with the jury how far did you go through school and what was your formal education?

A. I have a bachelor of science degree in chemistry from the University of Northern Iowa.

Q. And when did you obtain that degree?

A. 1987.

Q. And did you -- I think you said it was in chemistry?

A. Yes.

Q. And after you graduated from the University of Northern Iowa, did you obtain employment in the area of forensic analysis?

A. Yes, I did. I was hired by the Illinois State Police in their crime laboratory, and I received training from them in the area of drug analysis.

Q. And how long were you with the Illinois State Police?

A. I was with Illinois for two years.

Q. And during your time with them, what were your duties?

A. I performed drug analysis while I was employed with the Illinois State Police crime laboratory system.

Q. And you say you were with them for two years. Where did you go from there?

A. From there I was hired by the Iowa crime laboratory.

Q. And that's located in Des Moines, Iowa, or at least was up

130

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 120 of 3592

until just very recently?

A. Yes.

Q. And just so we're clear, that's the Iowa Division of Criminal Investigation laboratory?

A. Yes, it is.

Q. You began there in 1989; is that right?

A. That's correct.

Q. And if you could explain to the jury, did you receive any additional training and education in the area of testing of drugs after you arrived at the DCI laboratory in 1989?

A. Well, as I said before, initially I was trained by the Illinois State Police crime laboratory system in the area of drug analysis. While I was with the Illinois State Police, I received training from the Drug Enforcement Administration in Virginia.

Once I arrived at the Iowa crime laboratory, I received on-the-job training, and I have also received training in the area of solid phase extraction techniques from the Minnesota Bureau of Criminal Apprehension laboratory, and I have also received training in the area of toxicology from the National Forensic Science Technology Center in Largo, Florida.

Q. And as a result of your employment with both the Illinois State Police and the Iowa Division of Criminal Investigation laboratory, have you been called upon to render expert opinion concerning the analysis, your analysis, of suspected controlled

131

substances?

A. Yes, I have.

Q. And approximately how many times have you testified

Page 113

providing expert testimony in that area?

A.   Approximately 40 times.

Q.   I would like to direct your attention if I could to March of 1993 and ask if you were employed at that time with the Iowa Division of Criminal Investigation as a criminalist testing controlled -- suspected controlled substances at that time.

A.   Yes, I was.

Q.   And your position and duties there were the same as what you've described up to this point?

A.   Yes.

Q.   On March 25 of 1993, did you receive some suspected substances for testing?

A.   The laboratory received -- the evidence technicians received the evidence into the laboratory on that date.

Q.   And could you just outline for this jury the standard practice and protocol if you would for how the lab receives drugs in and how ultimately they would get to a criminalist like you for testing and then what happens to them afterwards?

A.   Yes, I will.  When a police officer submits evidence to be analyzed to the crime laboratory, it is, first of all, given a case number.  At that point the case number is assigned to whatever sections in the laboratory need to analyze that case,

132

and that could be possibly more than one section in the laboratory.

The criminalists in those areas are notified that they need to analyze the case.  And when they are able, they check the evidence out of the evidence room, analyze the evidence, write a report as to the findings of that analysis, and then they return the evidence to the evidence room.

Page 114

Q. In addition to the laboratory number that's assigned to the case, is there often a suspect name also attached to the suspected controlled substances that follows it through the chain of analysis?

A. Yes, there is.

Q. Could you explain to the jury if you receive in a substance that you suspect might be methamphetamine, what type of analysis do you perform to determine if, in fact, it was methamphetamine?

A. The analysis I perform is, first of all, a visual examination. I just visually look at it to see if it's a plant material, a powder, a tablet, or a capsule. And based on that, I determine how I proceed in the analysis. If there -- if I suspect the powder is methamphetamine, I would then perform chemical color tests. And after the chemical color tests -- these are screening tests in which drugs react with a chemical reagent to give a certain color, and that's just a screening test. It gives me an indication of what may possibly be there.

After the chemical color tests, I perform a thin layer

133

chromatography test, and that is simply a technique used to separate a mixture into its components. Therefore, if a white powder had more than one drug in it, it would separate the drugs.

The final test I perform is a gas chromatography mass spectrometry test, and for future reference I'll refer to that as GCMS. The GCMS, first of all, separates a mixture into its components so, therefore, if there's more than one drug, it will separate the drugs. Each component is then fragmented, and this fragmentation pattern is compared to a known drug standard fragmentation pattern. And each drug has its own unique

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 123 of 3592

fragmentation pattern.

Q.    As a result of the tests that you would perform on a suspected sample of methamphetamine, for example, if you conduct those tests, can you then determine if methamphetamine is, in fact, present in the substance?

A.    Yes, I can.

Q.    Can you determine what percentage of the substance is actually methamphetamine versus perhaps other drugs or other noncontrolled substances?

A.    Yes, I can.

Q.    And as a standard protocol, once you do a test like this, do you produce a report reflecting the results of your analysis?

A.    Yes, I do.

Q.    And what do you do with that report once you produce it?

134

A.    The report, once it is produced, is mailed -- well, at this time it was mailed back to the police officers.

Q.    Who actually submitted you the drugs or submitted the drugs to the laboratory in the first place.

A.    Yes.

Q.    Looking in front of you there, there's an exhibit marked Government's Exhibit 25.  Do you see that?

A.    Yes, I do.

Q.    Do you recognize that?

A.    Yes, I do.

Q.    And what is that?

A.    Government Exhibit 25 is a copy of the laboratory report form that I generated for this case.

Q.    It's a two-page document, is it not, ma'am?

A.    Yes, it is.

Page 116

Q.   And could you explain to the jury what is on the second page of that?

A.   The second page of the document simply states what was submitted to the laboratory originally.

Q.   And the -- is there a suspect name attached to that laboratory report marked as Government's Exhibit 25?

A.   Yes, there is.

Q.   And what's the name of the suspect listed?

A.   Greg Nicholson.

Q.   And that was a report that you did concerning suspected

135

controlled substances submitted by the Mason City Police Department?

A.   Yes, it is.

            MR. WILLIAMS:   United States would move to admit -- again, I'm not sure where I'm at given their objection, Your Honor, but in case it's not in, I'd move formally to admit Exhibit 25.

                          *   *   *   *

            (Government Exhibit 25 was offered.)

                          *   *   *   *

            MR. STOWERS:   No objection.

            THE COURT:   Any further objection to 25?

            MR. STOWERS:   No objection.

            THE COURT:   Twenty-five is received.

                          *   *   *   *

            (Government Exhibit 25 was admitted.)

                          *   *   *   *

             MR. WILLIAMS: Permission to publish, Your Honor?

            THE COURT:   You may.

Page 117

BY MR. WILLIAMS:

Q. Showing you on the screen right in front of you there, is that the first page of Exhibit 25, ma'am?

A. Yes, it is.

Q. And could you just walk the jury through the various portions of this without getting into what it says at this

136

point? What's the top part of the form reflect?

A. The top part of the form, if you look at the upper left-hand corner, it says L93-2360. That is the laboratory case number, and the evidence for this case contains that case number throughout the whole time it is in the laboratory.

Q. And that's what I've just highlighted there?

A. Yes, it is.

Q. Okay. If you could then explain the rest of the form, please, for the jury.

A. The date just below the laboratory case number is April 28, 1993. That is the date that I generated the report.

Below that you see the case name which is Greg Nicholson.

Q. That's listed as the suspect?

A. Yes. The "S" in the parentheses indicates that that is the suspect. A "V" in parentheses would indicate victim.

Q. Go on, please.

A. Below that it indicates it's a controlled substance investigation.

Q. And below that?

A. Below that is my name in print and then my signature beside that.

Q. And your name and signature reflects what, ma'am?

Page 118

A.    That I analyzed the exhibits in this case and that I write -- wrote the report.

137

Q.    And then below that is the results of your analysis?

A.    Yes, it is.

Q.    Okay.  So I'm going to take this.  And then if you could before we get to that point, at the very bottom of the screen or at the very bottom of Exhibit 25 there's another signature. Could you tell the jury what that is?

A.    That signature is Mike Rehberg's signature, and at that time he was the laboratory director, and he reviewed my report before it was sent out.

Q.    And what's the purpose of him reviewing your report?

A.    We just have a series of reviews, people that review -- we review each other's reports to make sure that everything is done correctly.

Q.    So let's go to the essence of your report then, ma'am, and that's the result of your analysis which I'm going to enlarge there.  First of all, could you explain to the jury on the left-hand side of that, we have a column with some letters and numbers.  Can you explain what that is for the jury, please.

A.    The letters and numbers in the left-hand column are simply the exhibit numbers.  They also correspond to the exhibits listed on the second page of this report.

Q.    Okay.  And then -- so, for example, if I wanted to find out what A1 was, I could look on the second page of your report and describe for me Exhibit A1 is something; is that correct?

A.    That is correct.  A1 and A2 simply mean that I found two

138

things in Exhibit A, and I designated them as Exhibit A1 and A2.

Q.    Very good.  What I want to do is really focus in on the bottom part there where we have Exhibit D.  Do you see that?

A.    Yes, I do.

Q.    I'm sorry.  Below Exhibit D where you have the exhibit number, net weight, and then percentage methamphetamine, do you see those columns there?

A.    Yes, I do.

Q.    And if you look at A1, A2, B, and C, you have some grams, and that's a net weight of substances; is that correct?

A.    That's correct.

Q.    And net weight means what?

A.    The net weight is the weight of the powder only.  Net weight means it does not include the weight of the plastic bag and the powder.  That would be gross weight.  So net weight is just the weight of the powder or the plant material.

Q.    And then over in the next column where it says percentage of methamphetamine, you have N, slash, A, as to each of the Exhibits A1, A2, B, C, and for that matter also F; is that right?

A.    That's correct.

Q.    And what does that mean?

A.    That means not applicable.  I did not perform a percentage analysis on those exhibits.

Q.    Was there methamphetamine found in Exhibits A1, A2, B, C,

139

and F?

A.    Methamphetamine was found in Exhibits A1 and E1 from that column.

Q.    And then directing your attention then to E1, you reflect

that you found in Exhibit E1 148.34 grams of net weight of methamphetamine?

A.   That's correct.

Q.   And over on the right-hand column on percentage of methamphetamine, you have a number.  And what is that number?

A.   97 percent.

Q.   And could you explain that to the jury then?  We have obviously in E1 some substance that weighs 148.34 grams.  What does 97 percent methamphetamine mean?

A.   97 percent is an indication of how pure the white powder in Exhibit E1 was.  This is called quantitation, and quantitation is a technique used to determine the amount of a drug, in this case methamphetamine, when it is in a white powder and it may have been mixed with something else.  This is expressed as a percentage with 100 percent being the highest possible percentage.  97 percent means that the 148.34 grams was 97 percent pure for methamphetamine.

Q.   And were you able to do a calculation to determine then how much of that 148.34 grams was pure methamphetamine, in other words, how many grams of that was actually pure methamphetamine?

A.   Yes, I did.

140

Q.   And did that, in fact, equal 143.8898 grams?

A.   Yes, it did.

Q.   Based on your experience as a chemist or criminalist with the Iowa Division of Criminal Investigation, is that percentage of purity of methamphetamine seized off the street as part of a law enforcement effort average, high, or low in percentage?

A.   This -- 97 percent pure is a high average.  We did not keep statistics back in 1993.  Currently we do.  But even in 1993

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 129 of 3592

this was a high percentage of methamphetamine. Currently what we see is approximately 30 percent pure.

Q. So the typical methamphetamine that you test in the Iowa Division of Criminal Investigation lab is a third as pure as what was seized apparently in this case.

A. Yes.

MR. WILLIAMS: Thank you very much. I have no further questions.

THE COURT: Mr. Stowers, you may cross-examine.

CROSS-EXAMINATION

BY MR. STOWERS:

Q. Good afternoon.

A. Good afternoon.

Q. You have been employed with the state of Iowa crime lab for approximately over ten years then I take it.

A. Yes, I have.

Q. So you're very familiar with the procedures and protocols

141

that exist for determining the purity level, what you call quantitation, of a controlled substance; is that correct?

A. Yes.

Q. And can you describe for the jury what it is that you do to determine when you have a quantity, as in this case 148 grams net weight of a mixture containing methamphetamine, what it is that you do to determine or estimate how much controlled substance is in that?

A. The procedure that I use?

Q. Correct.

A. Okay. What I do with the white powder when it comes in, in this case it was 148 grams, and that is quite a large amount.

Page 122

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 130 of 3592

So what I need to do initially is cone and quarter that sample. And what that means is I take the sample, and I make an X in the sample roughly of equal parts, and I take the opposing corners, two of the opposing corners of that sample, take that out, put it back in the original container. Then I would push the rest of that sample together again, and I would cone and quarter it again, and I would take the opposite two corners of that sample, take that portion out, put it back in the original container until I get a small-enough amount that I can put it in a mortar and pestle.

And you may have seen a mortar and pestle in a pharmacy. It's like a small round bowl with like a handle that you can put into the bowl to crush whatever you put in this

142

bowl. And the reason I want to crush the powder is to make it all homogeneous which is all the same. And I mix it up so that I have a representative sample that is consistent throughout.

Now, the reason I am doing this is so that if I have parts of the sample that are higher in concentration than others, I would be mixing that together to make sure that I have a good sample to use to do the quantitation.

Q.   Okay.  So you've talked about the process that you go through to obtain what you consider to be a representative sample out of this larger amount, in this case 148 grams; is that right?

A.   Yes.

Q.   And you actually don't have any specific recollection of doing this drug test.  What you really remember is what's in your report and your notes; is that correct?

A.   That's correct.

Page 123

Q. And you probably do hundreds of these a year; is that right?

A. That's correct.

Q. Okay. Well, after you go through this process, what you actually grind up in the end in the mortar and pestle is perhaps about what? Three grams or so or less?

A. I would say it's probably 25 grams.

Q. Okay. So you grind that up. And then after you've ground that up into this finer powder -- and the reason you've said

143

you're doing that is because you know from your experience that methamphetamine when it's manufactured is not consistent; is that right? It's not homogeneous I think you said.

A. It could be or it could not be. I'm just trying to make sure that I'm getting a representative sample.

Q. Was this methamphetamine wet or dry when you received it in this bottle?

A. It was dry.

Q. Do you remember that?

A. If it was wet, I would have indicated it in my report.

Q. Okay. And according to what is done with that amount then, you take that ground-up amount, and you do what with it?

A. I take a portion of the ground-up powder, and I dilute a certain amount which I have weighed out into a solvent, and I run this on the GCMS which I talked about before, and I run this along with a standard with a known amount, and I compare the amount that comes out with the sample against the 100 percent standard to get the results.

Q. Okay. Now, according to the protocol that the DCI has, the amount that you actually weigh out and dissolve as you've

described it is less than 20 milligrams; is that correct?

A.   I can't recall what I weighed out without my notes in front of me.

Q.   Okay.  Would you like to see your notes?

A.   Yes, I would.

144

MR. STOWERS:  May I show the witness, Your Honor?

THE COURT:  You may.

A.   What was your question again?

Q.   Well, actually my first question was the state of Iowa has a protocol for how it determines quantitation; is that correct?

A.   That's correct.

Q.   And it's published; right?  It's a published guideline. It's in writing.

A.   At this time it is, but in 1993 it was -- I don't know if it was.

Q.   Okay.  And the guideline would require you to weigh out just not more than 20 milligrams of this ground-up powdered methamphetamine and dissolve it into this liquid that you've described; is that right?

A.   Well, I weighed out 33.6 milligrams for this case.

Q.   Right.  And what I'm talking about is the guideline that the DCI has for doing this procedure.

A.   I don't believe there was a specific written guideline in 1993.  We've been accredited by ASCLD since then.

Q.   Okay.  So there was no protocol in 1993 for how you went about determining quantitation?

A.   Well, there was a protocol, but I don't know if it was written out at that time.

Q.   What was the protocol with regard to how much you were to

Page 125

weigh out before you dissolved it into this liquid?

A.    The protocol was to determine the amount that was weighed out.  I weighed out 33.6 milligrams, and I recorded that.  The protocol was to write down exactly what was weighed out, and that is what I did so that I could do the conversion.

Q.    Okay.  So in this case you weighed out 33.6 milligrams.  Is there a particular reason that you weighed out that amount and not any other amount?

A.    No.  At this point I can't remember why I weighed out 33.6 milligrams.  I haven't performed drug cases for ten years.

Q.    Oh, okay.  Was there -- after you weighed out this 33.6 milligrams, you dissolved it; is that correct?

A.    That's correct.

Q.    Did you dissolve only a portion of that, or did you dissolve it all?

A.    I dissolved all of the 33.6 milligrams into the solvent.

Q.    Okay.  And how many milligrams was the total weight of the sample that you were trying to determine the purity of?  This 148 point something grams is how many milligrams?

A.    Well, each gram equals 1,000 milligrams, so to get the milligrams of 148, you would have to multiply that by 1,000.

Q.    So it'd be over 148,000 milligrams was in this amount that you were trying to determine the purity of; is that right?

A.    Yes.  The 33.6 milligrams was a part of the 148,000 milligrams.

Q.    And so after you dissolved this 33.6 milligrams out of this

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 134 of 3592

148,000-milligram sample, you then put it into a solution; is that correct?

A. That's correct.

Q. And one of the things that you're required to do is to make sure that that solution is, in fact, a solution that does not contain any solids; is that correct?

A. The solution that the 33.6 milligrams from this Exhibit E1 was dissolved in contained internal standard, and the drug -- the methamphetamine drug standard that was run alongside the sample to determine the percentage was also dissolved in this internal standard. And the internal standard compensates for possible injection variances. We have an automated instrument that performs the injections with a needle. It's possible it could vary, but if you have the same internal standard in both your methamphetamine standard and your methamphetamine sample, this will compensate for any variances you may get in that respect to determine the quant -- the percentage.

Q. Well, how much of this 33.6 milligrams which was dissolved into this liquid was actually tested to determine the purity of this 148,000-milligram batch?

A. I believe two microliters is injected.

Q. And how many microliters in total would this 33.6 milligrams of finely ground-up powder have been dissolved into?

A. Well, the powder dissolves equally throughout the liquid, the solvent. It would be if you put sugar into -- a small

147

amount of sugar into water, it will dissolve. That's the same concept when I put this methamphetamine into the solvent. It dissolves.

Q. How much solvent would you have had to use to dissolve this

Page 127

33.6 milligrams of powder?

A. Well, at 97 percent pure, it wouldn't take very much at all to dissolve it.

Q. Do you have an estimate for us?

A. Again, it's been ten years since I've done specifically drug analysis for powders, but I believe we were either using 25 milliliter -- I believe it's 25 milliliter.

Q. 25 milliliters of liquid?

A. Yes.

Q. And then the 33.6 milligrams of powder which was finely ground up would have been dissolved into that.

A. Yes.

Q. And then the test on this machine, this GCMS, would actually involved did you say one milliliter or ten milliliters?

A. Two microliters.

Q. Two microliters. How many microliters go into a milliliter?

A. I believe there are -- I'm not very good at the conversions without a chart, but I believe there are 1,000 nanoliters in a milliliter and 1,000 microliters in a nanoliter, so that would be 100,000.

148

Q. 100,000 microliters are in 1 milliliter?

A. Well --

Q. Or is it --

A. No, in a microliter. I don't know. I would need to have the chart to do the conversion.

Q. But a microliter is smaller than a milliliter?

A. Yes, it is very much smaller than a milliliter.

Q. And so when you were actually performing this test using

Page 128

this machine, this gas chromatograph mass spectrometer, the GCMS machine, the machine was actually performing a function for you that it's designed to perform, is that right, and it was performing that function on this two milliliters of solution that you had put into the machine for the purpose of doing this testing.

A. Two microliters, yes.

Q. Two microliters, I'm sorry. And it is actually the analysis that the machine did of that 2 microliters of solution that you are reporting on in your report forms the basis for your belief that this 148,000-milligram sample was 97 percent pure.

A. That's correct.

Q. And there are many steps along the way to this process, some of which you've described, some of which you've only touched on, that can influence the outcome of the procedure; is that correct?

149

A. That's correct.

Q. And they can influence the accuracy of it.

A. Yes.

Q. And you'd like to think that whatever you did in connection with this testing procedure would have been completely in conformance with whatever the rules were at the time at the DCI crime lab; is that right?

A. The analysis that I did was based on my scientific training not only in Iowa but also in Illinois and in the chemistry classes I received in college. And what was performed was in accordance with what other laboratories at the time were doing.

Q. And so what we know I guess is that according to your

Page 129

analysis of this two-microliter sample run through the gas chromatograph mass spectrometer, that machine told you that the purity of that two-microliter sample was approximately 97 percent.

A.    I took an average of two runs.  One was 96 percent I believe and one was 98 percent, so the two microliters was injected two different times and came up with those two values, and those two values were averaged to come to 97 percent.

Q.    And the two times that you ran that through the machine, that was from the same solution that you had dissolved?

A.    Yes, it was.

Q.    Okay.  You didn't go back and resample.

A.    No.

150

Q.    And regrind and go through all those steps.

A.    No, I did not.

        MR. STOWERS:  Thank you.  That's all I have.

        THE COURT:  Any redirect, Mr. Williams?

        MR. WILLIAMS:  Briefly, Your Honor.

                        REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q.    Let's just put it this way.  Do you have any doubt whatsoever in your mind that based on your training and experience as a forensic scientist that to a reasonable degree of scientific certainty that that sample that the 148 grams of methamphetamine you tested contained more than 100 grams of pure methamphetamine?

A.    Based on my scientific training, I am confident to say that the report that I wrote, I am confident in that report.

        MR. WILLIAMS:  Thank you very much.  I have no further

Page 130

questions.

MR. STOWERS: Nothing further.

THE COURT: Okay. You may step down.

Members of the jury can take a stretch break.

And is the government ready to call its next witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls David Mizell.

DAVID MIZELL, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Make

151

yourself comfortable. Please adjust the chair and the microphones so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: It's David Mizell, M-i-z-e-l-l.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Mizell, could you share with the jury what do you do for a living, sir?

A. I am a supervisory special agent with the Drug Enforcement Administration.

Q. And how long have you been with the Drug Enforcement Administration?

A. Approximately 14 years.

Q. The Drug Enforcement Administration, just so we can cut down the number of words, goes by the acronym DEA?

A. Yes, sir.

Q. What positions have you held with the DEA?

Page 131

A. I was previously a special agent in the Cedar Rapids resident office, and then I was promoted to the supervisory position in May of 2000 to the Maryville resident office.

Q. And where is that located at? Maryville --

A. Indiana.

152

Q. And where is that in relation to a large city that the jury might be familiar with?

A. Chicago, Illinois. It's in the northwest corner of Indiana.

Q. It's, in fact, almost a suburb of Chicago itself; is that fair to say?

A. That's fair to say.

Q. Could you explain to the jury, first of all, what type of formal education did you receive before you got into law enforcement?

A. I was -- I attended Central Missouri State University and received a bachelor of science degree in criminal justice administration.

Q. And where did you go from there, sir?

A. I attended the greater St. Louis police academy for 16 weeks and graduated as a St. Louis County police officer.

Q. How long did you serve as a police officer, sir?

A. About ten years.

Q. At the conclusion of that ten years, what did you do with your career?

A. I then transferred to the Drug Enforcement Administration and attended their academy in Quantico, Virginia, and once I got out of that in April of 1991, I went to Cedar Rapids.

Q. How long was the academy, training that you received from

Page 132

the DEA?

A.    It's approximately 14 weeks.

Q.    And when you were a police officer in St. Louis basically before, did you have involvement in narcotics enforcement at that time?

A.    Yes, I was assigned to the DEA task force in St. Louis.

Q.    And did you receive training in the area of narcotics enforcement as a member of that task force?

A.    Yes, I did.

Q.    And when you joined the DEA, did you receive additional training in the area of narcotics enforcement?

A.    I've attended numerous schools throughout my career.

Q.    And could you give the jury some idea of the nature of the training you've received over these many years?

A.    I attended asset forfeiture-related schooling. I attended the clandestine laboratory enforcement team training, certified as a site safety officer for clandestine labs. I've been to supervisory in-service and supervisory school.

Q.    At this point as a supervisor, supervisory agent with the DEA, how many agents do you have working for you, sir?

A.    I currently have 12 special agents working for me, 38 task force officers, 3 group supervisors, and 3 diversion agents.

Q.    I'd like to direct your attention if I could to an earlier time in your career when you were in Cedar Rapids, Iowa, as an agent. Were you assigned to a task force at that time, sir?

A.    Yes.

Q.    And where was that located?

A.    In Cedar Rapids.

Q.    And what area, what part of the state of Iowa, did you cover as part of that task force?

A.    We covered basically the eastern half of Iowa running from Minnesota border down to the Missouri border and over to Illinois.

Q.    And would that have included the city of Mason City and the surrounding cities in that area?

A.    Yes.

Q.    During the time period that you were a DEA agent in Cedar Rapids, Iowa, generally could you describe for the jury what were your duties day to day?

A.    We would investigate federal drug crimes.

Q.    And what type of work would that involve?

A.    Interviewing witnesses, informants, talking with the local police officers or other officers on task forces and trying to identify drug dealers and targeting for arrest.

Q.    As a result of that, did you participate in the execution of search warrants in drug-related cases?

A.    Yes, I did.

Q.    Did you question and interview people who were involved in the drug trade?

A.    Yes, I did.

Q.    Did you also operate and control undercover operations

155

involving the purchase of narcotics or the delivery of narcotics money?

A.    Yes.

Q.    As a result of the formal training and education you received and also as a result of your experience in the area of

Page 134

narcotics enforcement, have you become knowledgeable about the market of methamphetamine trade in Iowa as it existed back in 1993?

A.    Yes.

Q.    And did you become familiar with a method of operation by drug dealers back in 1993, particularly in the area of methamphetamine?

A.    Yes.

Q.    Were you aware as a result of your training and education about how methamphetamine was made and where it was made?

A.    Yes.

Q.    And were you familiar with the various levels of sophistication of laboratories engaged in the manufacturing of methamphetamine in 1993?

A.    Yes, I was.

Q.    I'd like to ask you to share with the jury then some of your knowledge of the methamphetamine trade as it existed in 1993.  In the state of Iowa in 1993, methamphetamine could come from what different type of sources?

A.    There was numerous sources on the west coast, Arizona, and

156

there was people that would try to manufacture it within the state of Iowa.

Q.    And as a result of your education and experience in this area, was there a difference in the level of sophistication between the meth labs that -- the methamphetamine laboratories in Iowa versus some of these other out-of-state locations?

A.    Yes.

Q.    And could you explain that to the jury, please?

A.    Well, generally the west coast labs were more complex,

Page 135

involved bigger quantities of methamphetamine. And the smaller labs were located within the state of Iowa, commonly referred to as mom-and-pop labs. They were mainly used for their own use or to distribute among their friends or associates.

Q. So your experience was that the so-called mom-and-pop labs in Iowa would produce smaller amounts of methamphetamine?

A. Yes, usually ounce or less.

Q. And your experience was that those were typically done by people that would just use up the drugs, at least largely, that they manufactured for their own personal use?

A. Their own personal use or to give to their friends or associates.

Q. And compare that if you would then. You talked about these labs out of state being larger labs. Can you share with the jury what you mean by that?

A. Well, they generally involved a lot more equipment, a lot

157

more knowledge on how to manufacture from chemicals as opposed to from stuff that you can buy at the grocery store or at the drugstore. And they would involve a lot more quantities of dope, pound or multiple-pound quantities.

Q. Based on your experience, the purity levels of the methamphetamine manufactured in the so-called mom-and-pop methamphetamine labs in Iowa compared to these larger labs, how did they compare?

A. They were usually of inferior quality.

Q. And by that you mean what?

A. The larger labs were designed to have 90 to a hundred percent pure methamphetamine, whereas a mom-and-pop lab, they would try to get it done faster, and their purity levels would

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 144 of 3592

be a lot lower.

Q.    You indicated that the larger labs would actually make some of the base chemicals whereas the mom-and-pop labs would kind of go out and buy ingredients from different products and try to make the methamphetamine with those products?

A.    Yes.

Q.    And as a result of that, did the mom-and-pop labs lose their ability to create more pure methamphetamine in that manufacturing process?

A.    They could often, yes.

Q.    Let's focus for right now on methamphetamine that was produced out of state and made its way to Iowa.  Could you share

158

with the jury based on your knowledge of the drug-trafficking methods back in 1993 how were drugs, methamphetamine in particular, transferred from these out-of-state sources to the state of Iowa?

A.    There was many different ways.  Some were conveyed in cars, some packaged and shipped via U.S. Mail or Federal Express, UPS, some taken on airplanes or passengers on airplanes would transport them.

Q.    You indicated that these larger labs would produce pounds of methamphetamine.  And when they would be -- when the methamphetamine would be transported to Iowa, what type of quantities would typically be transported to Iowa for further distribution?

A.    Again, it would be pound or multiple-pound quantities.

Q.    Could you explain to the jury then, once it got to somebody in Iowa for further distribution in either pound or multiple-pound quantities, what would happen to it at that

Page 137

point?

A.    Usually a distributor would obtain it and redistribute it to retail dealers.

Q.    And what kind of quantities would that pound dealer then distribute it at?

A.    Well, he would -- sometimes he could dilute it so he could make additional amounts, hopefully make more money that way.  He could have multiple distributors, cut it up into -- from ounces

159

to quarter pounds to half pounds, whatever he -- his retail dealer could handle.

Q.    And as you went down the chain of distribution in the drug organization, would the quantities that would be distributed out to various customers get increasingly smaller?

A.    Yes.

Q.    What is the -- in 1993 what was the typical user amount of methamphetamine?  If I'm a user and I just want to go to somebody I know that sells methamphetamine and I want to get enough for my own personal use, what was that typical amount for personal use?

A.    Gram or less.

Q.    And can you compare a gram to something the jury might be familiar with from day-to-day experiences?  A gram of powder would be equivalent to anything that you can give them an idea of?

A.    A very small amount.  I can't think of anything off the top of my head.

Q.    The sugar packets you have in restaurants, do you know approximately how much those sugar packets have in them?

A.    They would approximately be a gram or less.

Page 138

Q. What type of money was attached to the drug trade at this point? For example, if I'm a dealer and I'm out of state and I've got a pound of methamphetamine and I'm transporting that to Iowa to a pound dealer at that point, what in 1993 was the going

160

rate for a pound of methamphetamine approximately?

A. Depending on your purity and how much you bought at a time, between five and nine thousand dollars.

Q. And then once it started going down to the street level, when it got to the point of a gram, how much would a gram of methamphetamine sell for on the street?

A. Usually about a hundred dollars a gram.

Q. And that dollar figure has stayed, frankly, fairly stable over the last decade.

A. Yes, it has.

Q. You talked about in your testimony that a dealer could actually stretch it out a little bit. Could you explain what you meant by that to the jury, please?

A. Well, if he had 90 percent pure methamphetamine, he would usually add an adulterant to enlarge it and to cut its purity, and then he would distribute it from there.

Q. Is that because the ultimate end user of methamphetamine can't really tell -- when they've got a gram of some type of powder, can they tell how much of that's actually methamphetamine and how much of it's baby powder or inositol or something like that typically?

A. Not usually.

Q. And so as a result of that, drug dealers do what to the quantities on each step of the distribution process typically?

A. Generally they dilute it.

Q. By the time it gets down to the street level and the user gets a gram of methamphetamine or what they believe to be a gram of methamphetamine, typically how pure is that gram of methamphetamine at that point?

A. I've seen anywhere from 2 percent to about 17, 18 percent.

Q. Could you tell the jury how methamphetamine is used? First of all, when it hits the street, what type of substance is it? Is it a powder, a solid, a liquid?

A. Generally it's a powder form.

Q. And how would an end user use methamphetamine?

A. They would either snort it, inject it, or they could smoke it.

Q. I'd like to direct your attention if I could to the spring of 1993 and ask you in your capacity as a DEA agent and a task force member, were you in contact with law enforcement officers in Mason City, Iowa, from time to time concerning drug investigations they were running up in Mason City?

A. Yes.

Q. And what was the purpose for you to be in contact with local law enforcement in northern Iowa?

A. They would hope to bring federal charges against a person they had identified as a larger distributor of drugs.

Q. And in the March period of 1993, did you receive contact by an investigator, Frank Stearns, concerning a possible federal case?

A. He was one of many that I talked to at the time, yes.

Page 140

Q.   And do you recall him talking to you about a possible target by the name of Dustin Honken?

A.   Yes.

Q.   Could you explain to the jury, how did you then get involved in the investigation?  At what point of Investigator Stearns' investigation did you get involved?

A.   Well, they had contacted me and advised me that they had executed a search warrant at a subject named Gregory Nicholson's residence where they found a substantial quantity of methamphetamine and that Mr. Nicholson was cooperating and identified his source as an out-of-state person, and they inquired if I'd be interested in trying to bring federal charges against this out-of-state person.

THE COURT:  Mr. Williams, could I interrupt you?  Would now be a good time to take our afternoon break?

MR. WILLIAMS:  Certainly, Your Honor.

THE COURT:  And before we do that, we neglected to pick up Exhibit 21 which was the transcript.

MR. WILLIAMS:  Yes.  I'm sorry.

THE COURT:  Did you need it for any further purpose today?

MR. WILLIAMS:  No, I didn't.  I wanted to leave it with the jury in case the defense wanted to reference it, but I should have picked it up after that witness.

163

THE COURT:  Why don't you just pass it all down to the CSO, and he can collect the transcripts, Exhibit 21.

Thank you, Gary.

And, members of the jury, we'll take a recess until three o'clock.  Please remember my prior cautionary instruction

Page 141

about not discussing this case among yourselves or with anybody else. And keep an open mind till you've heard all of the evidence. Thank you.

(The jury exited the courtroom.)

THE COURT: Mr. Williams, anything else we need to take up?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Mr. Willett?

MR. WILLETT: Not on behalf of the defense.

THE COURT: Thank you.

MR. WILLETT: Thank you.

(Recess at 2:38 p.m.)

THE COURT: Please be seated. I've got one matter to take up. One of our CSOs made a request to me from a juror unidentified but I would be willing to bet I know which juror it is. One of the jurors is requesting to be able to bring in their laptop with remote access just to do their personal and business e-mail on the breaks. I don't have an objection to it. I think it's an accommodation to somebody who's probably very busy. They could use their computer at home to -- you know,

164

with an admonition that they can't, you know, use it to research anything about the case, but that's exactly what I do on my break.

MR. WILLIAMS: I have no objection, Your Honor.

MR. BERRIGAN: We don't either, Your Honor, as long as there's a pretty strong admonition about how that's going to be used.

THE COURT: Yeah. And I think I'll just give that at the end of the day.

Page 142

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 150 of 3592

MR. BERRIGAN: Okay.

THE COURT: Okay? And I don't even know which -- do you have a need to know which juror because I don't know?

MR. BERRIGAN: No, it doesn't matter. It's just our obvious concern is, you know, there's going to be newspaper stuff throughout the trial.

THE COURT: Right.

MR. BERRIGAN: And if they're getting Internet access during the trial, that's disaster.

THE COURT: It absolutely could be, so we don't want anything coming up on the screen related to --

MR. BERRIGAN: Yeah, pop-ups. What if your local thing is CNN?

THE COURT: Exactly, or a local news station as your home screen.

MR. BERRIGAN: Right, exactly.

165

THE COURT: Okay.

MR. WILLIAMS: And just to alert you to possible change in order of the witnesses, to accommodate Mr. Thinnes's schedule, once I get through Miss Olson, my plan is to put Mr. Thinnes on now instead of Mr. Ryerson, and I alerted the defense to that.

THE COURT: That's fine. Mr. Thinnes is here today?

MR. WILLIAMS: Yes, sir.

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams, you may continue your direct examination.

Page 143

MR. WILLIAMS:  Thank you, Your Honor.

BY MR. WILLIAMS:

Q.    Mr. Mizell, when we left off, you had just explained that you had received contact from Frank Stearns from the Mason City Police Department in March of 1993 alerting you that they had seized a large quantity of methamphetamine from Greg Nicholson and had an out-of-state supplier.  Do you recall that's where we left off, sir?

A.    Yes.

Q.    Once you were alerted by Mr. Stearns concerning this development in his investigation, what did you do as a DEA agent as part of your investigation then?

166

A.    I inquired about the facts and circumstances surrounding the seizure and asked if they planned to pursue the out-of-state supplier.

Q.    As a result of your conversation with Mr. Stearns, did you reach a decision whether to bring federal charges against one of the suspects involved, that out-of-state supplier named Dustin Honken?

A.    I agreed to pursue -- I agreed on my end to pursue any federal charges on the out-of-state supplier if they had substantial evidence to warrant.

Q.    And based on your investigation at that point, did you, in fact, pursue federal charges against Dustin Honken?

A.    I did after he was arrested by the task force in Mason City.

Q.    Okay.  I see where I'm missing with you.  Your conversation with Mr. Stearns occurred even before the arrest of Dustin Honken?

Page 144

A. I don't believe I talked to Mr. Stearns at that time. It was another deputy who relayed the facts and circumstances surrounding the arrest of Mr. Nicholson. I talked to Mr. Stearns I believe after Dustin Honken was arrested.

Q. All right. And at some point you made the decision to take federal charges against Dustin Honken.

A. Yes.

Q. So directing your attention then to March 22 of 1993, did

167

you swear out a federal criminal complaint against Dustin Honken?

A. Yes, I did.

Q. Share with the jury, at this point in time had Dustin Honken already been arrested?

A. Yes, he was.

Q. And was he in state custody at that point then?

A. Yes, he was.

Q. When you indicate that you swore out a federal complaint, can you explain to the jury what a complaint, a federal criminal complaint, is?

A. It's basically a charging document in order to get somebody arrested federally and brought before the U.S. District Court judge.

Q. And how do you obtain a criminal complaint?

A. I work with the U.S. Attorney's Office. I author an affidavit in support of the criminal complaint. That is taken before a judge who determines if there's enough probable cause to seek an arrest warrant. And if he feels -- he or she feels there is, they will sign the warrant and the criminal complaint authorizing the charges.

Page 145

Q. Now, that's different from an indictment, sir?

A. Yes, it is.

Q. And can you explain to the jury how it's different than an indictment?

168

A. An indictment, you present evidence before a federal grand jury. That grand jury, if they decide that there's probable cause, they will issue a true bill or an indictment authorizing the arrest of a person.

Q. The level of evidence is the same in either case. It's the showing of probable cause, but in one case it's presented to a judge, and the other case is presented to a group of citizens called a grand jury.

A. Correct.

Q. Very good. So when you first got involved in this case on March 22 of 1993, you swore out a criminal complaint, and did you at some point take Dustin Honken into custody?

A. The following day.

Q. On March 23 of 1993?

A. Yes, sir.

Q. And where was he at when you took him into federal custody?

A. Cerro Gordo County Jail in Mason City.

Q. When you took him into custody, did you obtain at the same time any personal property that was in his possession at the jail?

A. Yes.

Q. And do you recall anything among the stuff that you seized at this point?

A. There was a birthday card addressed to Dustin Honken at the Cerro Gordo County Jail, and it was signed by a letter A.

Page 146

Q.    The note or the letter or card or whatever it was, do you recall what it said?

MR. WILLETT:  Objection, hearsay.

THE COURT:  What exception are you relying on?

MR. WILLIAMS:  It's not being introduced for the truth of the matter asserted.

THE COURT:  Okay.

MR. WILLETT:  Your Honor, in that case then I would object as to relevance.

THE COURT:  Overruled.  You may answer.

A.    Basically indicated that the person who signed it was with Dustin Honken during the previous -- or during the night he was arrested and that she had just missed the arrest of him, missed the excitement at the hotel.

Q.    Once you arrested Dustin Honken and took him into federal custody, what did you do with him?

A.    I brought him before a magistrate judge in Cedar Rapids, Iowa.

Q.    And was that on the same day that you took him into custody?

A.    That was on the 23rd, correct.

Q.    On March 26 of 1993, was there a hearing before a federal judge?

A.    Yes.

Q.    And what was the purpose for that hearing?

A.    To determine if he should be released on bail.

Q.    What did the judge decide at that point?

Page 147

A.   That he should be released.

Q.   Were there conditions placed on his release?

A.   Yes, there were.

Q.   And typically in this case as well when conditions are placed on the release, is a document generated by the court reflecting the conditions or limitations on somebody's release?

A.   Yes.

Q.   Sir, I'm handing you Exhibit 31, and can you identify that for the jury, please?

A.   It is an order setting conditions of release issued by the U.S. District Court, Northern District of Iowa.

Q.   And who does that reference?

A.   Dustin Honken.

Q.   And is it a certified copy of that document?

A.   Yes, it is.

          MR. WILLIAMS:   United States would move to admit Exhibit 31, Your Honor.

                    *   *   *   *

          (Government Exhibit 31 was offered.)

                    *   *   *   *

          THE COURT:   Any objection?

          MR. WILLETT:   None, Your Honor.

          THE COURT:   Thirty-one is received.

                                                  171


                    *   *   *   *

          (Government Exhibit 31 was admitted.)

                    *   *   *   *

          MR. WILLIAMS:   Permission to publish, Your Honor?

          THE COURT:   You may.

BY MR. WILLIAMS:
                    Page 148

Q.   Mr. Mizell, I want to direct your attention to the second page of Exhibit 31 and ask you if you could tell the jury what is on the second page of Exhibit 31 there.

A.   That would be the conditions allowing him to be released on bail.

Q.   I want to enlarge a section of this document so it's a little bit easier to read.  And can you read for the jury the portion concerning whether he had limitations on his ability to have contact with other people?

A.   Yes, he does.

Q.   And that's under subsection 7(d); is that correct?

A.   That is correct.

Q.   And who is he not to have any contact with?

A.   Dave Patrick, Greg Nicholson, Terry DeGeus, Russell Miller, Tim Cutkomp.

Q.   Is there any limitation on his ability to possess any type of firearm?

A.   Yes.  Under subsection (g) he should refrain from possessing a firearm, destructive device, or other dangerous

172

weapon.

Q.   At the time that Dustin Honken was placed on federal charges, what was the status of any charges against Tim Cutkomp?

A.   He had been charged in Cerro Gordo County court.

Q.   And did you take those charges federally against Mr. Cutkomp?

A.   Not at that time.

Q.   And what happened to his state charges even?

A.   They were eventually dismissed.

Q.   On April 9 of 1993?

Page 149

A.    That is correct.

Q.    Once you got a criminal complaint against Dustin Honken, did you in conjunction with the U.S. Attorney's Office proceed to seek an indictment against him before the federal grand jury?

A.    Yes, we did.

Q.    And did the grand jury return a true bill indicting Dustin Honken?

A.    Yes, they did.

Q.    Showing you Exhibit 30, can you identify that for the jury, please?

A.    That is a certified copy of the indictment which was returned on April 20, 1993.

        MR. WILLIAMS:  United States moves to admit Exhibit 30, Your Honor.

                        *   *   *   *

                                                    173


        (Government Exhibit 30 was offered.)

                        *   *   *   *

        THE COURT:  Any objection to 30?

        MR. WILLETT:  No, Your Honor.

        THE COURT:  Thirty's received.

                        *   *   *   *

        (Government Exhibit 30 was admitted.)

                        *   *   *   *

        MR. WILLIAMS:  Permission to publish, Your Honor?

        THE COURT:  Yes.

BY MR. WILLIAMS:

Q.    I've enlarged a section there, and if you can explain to the jury in nonlegal terms basically what is this grand jury indictment charging Dustin Honken with?

Page 150

A. One single violation of United States Code charging distribution of a thousand grams or more of a mixture or substance containing methamphetamine or a hundred grams or more of pure methamphetamine.

Q. Based on your position as a drug enforcement agent, were you familiar with the penalties that attach to that crime?

A. Yes.

Q. And what was Dustin Honken then facing as a possible punishment under that indictment, sir?

A. A minimum mandatory sentence of ten years to life.

Q. Now, as part of your involvement in this investigation, did

174

you -- were you aware of Terry DeGeus being a possible suspect involved with Dustin Honken?

A. Yes.

Q. At this point in the investigation, what was your understanding of his involvement?

A. He was a distributor of methamphetamine in Mason City, and Dustin Honken was his source of supply.

Q. Were you aware of Jeff Honken?

A. Yes.

Q. And how did you become aware of Jeff Honken?

A. Various documents related to purchase of chemicals in Arizona, also phone records.

Q. Was he considered a suspect at that time?

A. Yes and no. He was considered a suspect, but also we believed that Dustin Honken may have been using his name to further his drug conspir -- or drug trafficking.

Q. So at that point you weren't sure whether he was involved or not involved?

Page 151

A.    That's correct.

Q.    Did the name Angela Johnson arise in the investigation?

A.    Yes.

Q.    And what did you know about her at this point in the investigation?

A.    She was the girlfriend of Dustin Honken and a former girlfriend of Terry DeGeus.

175

Q.    And did you have any firm indication at this point of what, if any, role she had in drug trafficking with Dustin Honken?

A.    No, sir.

Q.    After the federal indictment was brought against Dustin Honken, did -- were you aware or made aware that he entered into discussions with the government about pleading guilty?

A.    Yes, he did.

Q.    And were you aware that on July 8 of 1993 they provided notice of an intent to plead guilty to the charges?

A.    I was informed of that, yes.

Q.    And were you informed whether a plea hearing was set for him to enter his guilty plea?

A.    Yes, it was.

Q.    And what date was that set for?

A.    July 30, 1993.

Q.    And did, in fact, Dustin Honken plead guilty on July 30, 1993?

A.    No, he did not.

Q.    What happened?

A.    They notified the U.S. Attorney's Office that they had changed their plea.

Q.    At some point after that, did you learn that Greg Nicholson

Page 152

was missing?

A.   Yes, I did.

Q.   How did you become aware that he was missing?

A.   I was contacted by authorities in Mason City and notified that he failed to appear in court.

Q.   Explain to the jury, at this point in time Greg Nicholson had cooperated with law enforcement.  What was the status of any charges he was facing, sir?

A.   He had charges pending in the Cerro Gordo County court.

Q.   And on -- did he have any hearings that he was supposed to appear at?  You indicated he failed to appear at one.  What type of hearing was that, sir?

MR. WILLETT:  Your Honor, excuse me.  I'm just going to interpose a foundation objection at this time.  I'm not sure there's been sufficient foundation laid that Agent Mizell knows the facts that he's testifying to.

THE COURT:  Overruled.

A.   He was supposed to appear in the Cerro Gordo County court on July 28, 1993.

Q.   Sir, I'm handing you what's been marked as Government Exhibit 28.  Can you identify that, please?

A.   It is a certified copy of the Iowa District Court for Cerro Gordo County charging documents for Mr. Nicholson.

MR. WILLIAMS:  The United States would move to admit Exhibit 28 into evidence, Your Honor.

* * * *

(Government Exhibit 28 was offered.)

* * * *

THE COURT: Any objection?

MR. WILLETT: Relevance as to this defendant, Your Honor.

THE COURT: Thank you. Overruled. Twenty-eight is admitted.

                              *   *   *   *

(Government Exhibit 28 was admitted.)

                              *   *   *   *

BY MR. WILLIAMS:

Q.   You had indicated in your testimony that he had a hearing on July 28.  Can you look at that file, Exhibit 28, and determine if, in fact, a hearing was scheduled for July 26 of 1993?

A.   Yes, it was July 26 he was supposed to appear in court for an arraignment.

Q.   And that was the hearing that he failed to appear for?

A.   Yes.

Q.   As a result of his failure to appear on July 26 of 1993, what happened?

A.   A warrant for his arrest was issued on July 28.

Q.   Showing you Exhibit 29, can you identify that for the jury, please?

A.   That is a bench warrant issued by the Cerro Gordo County court for Mr. James -- Gregory James Nicholson.

Q.   And the date on that is what, sir?

                                                            178

A.   The 28th day of July, 1993.

MR. WILLIAMS: United States would move to admit

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 162 of 3592

Exhibit 29, Your Honor.

* * * *

(Government Exhibit 29 was offered.)

* * * *

THE COURT: Any objection to 29?

MR. WILLETT: Relevance and hearsay as it relates to this client, Your Honor, to this defendant.

THE COURT: It's not certified?

BY MR. WILLIAMS:

Q. Can you take a look at it, sir, and determine if that's a certified copy of the document?

A. There is a stamp December 28, 2000, by the clerk of district court, Cerro Gordo County, Iowa. It says it was filed.

THE COURT: Well, I understand you don't have a foundation objection to it.

MR. WILLETT: Correct, Your Honor, just relevance and hearsay. I didn't see that it was certified.

MR. WILLIAMS: Yeah, I don't believe it is certified. I just checked it, Your Honor. It's not a certified document.

THE COURT: Well, it's not self-authenticating. What exception to the hearsay rule are you relying on?

MR. WILLIAMS: As a publicly filed document, Your Honor. They have not objected to the foundation. They've not

179

raised the foundation objection for it, so I didn't obtain the certified copy.

THE COURT: Okay. Objection's overruled. Twenty-nine is received.

* * * *

(Government Exhibit 29 was admitted.)

Page 155

* * * *

BY MR. WILLIAMS:

Q.    When did you, sir, learn that Greg Nicholson had failed to appear for his July 26, 1993, hearing?

A.    About August 2, 1993.

Q.    When you learned that he failed to show up in state court for his hearing on July 26, what did you do?

A.    I notified the U.S. Attorney's Office that he had failed to appear and also travelled to Mason City to see if I could gather some additional information.

Q.    And over the course of the next couple months, you learned early August -- over the course of August and September, did you and others continue to undertake efforts to locate Mr. Nicholson?

A.    Yes, we did.

Q.    Did you have any luck finding Mr. Nicholson during that time period?

A.    No, sir.

Q.    At this point were you still aware that Terry DeGeus was a

180

potential target of this investigation, somebody who had potentially knowledge of Dustin Honken?

A.    Yes.

Q.    And did you undertake any efforts to concentrate an investigation toward that possible link to Dustin Honken?

A.    Yes, we did.

Q.    Directing your attention to October 27 of 1993, was a grand jury in session on that day, sir?

A.    Yes, it was.

Q.    And were witnesses called before the grand jury concerning

Page 156

their knowledge of Dustin Honken?

A. Yes.

Q. Among those witnesses, was Angela Johnson one of them?

A. Yes.

Q. Directing your attention in front of you to Exhibit 115, you'll see that that is a grand jury transcript of Angela Johnson on October 27 of 1993 that's already been admitted into evidence. Do you recognize that document, sir?

A. Yes, I do.

Q. I'd like to go through that transcript with you concerning some of the testimony that was provided by Angela Johnson at that grand jury session. First of all, if I could direct your attention to page 5 of the transcript, if you look at lines 17 and 18, did she indicate in 1993 how old she was at that time?

A. Yes, on line 18 she answered 29.

181

Q. And did she indicate how she was employed at that time on page 5?

A. Yes, on line 20 she was -- indicated she was a waitress at the Mason City Country Club.

Q. Was she asked if she knew somebody by the name of Terry DeGeus?

A. Yes, she was.

Q. And was she aware?

A. She answered, Yes, I do.

Q. Did she describe what her relationship was with Mr. DeGeus?

A. She responded that they were boyfriend and girlfriend for a little over a year or so.

Q. And during what time period if you look over on page 6 of the transcript did she indicate she was boyfriend-girlfriend

Page 157

with Terry DeGeus?

A.   She indicated they met in 1989.

Q.   Was she further questioned on page 6 of the transcript during her grand jury appearance on October 27 concerning whether she was aware of any drug possession by Terry DeGeus, directing your attention to lines 12 through 17?

MR. WILLETT:  Excuse me, Your Honor.  I'm going to object to this line of questioning because it's evident from the grand jury transcript that the time frame is prior to any time frame alleged in this indictment against my client.

THE COURT:  Overruled.  You may answer.

182

A.   She was asked that question, and she answered, Not that I recall.

Q.   And the question she was asked was, "During the time period when you were dating him from 1989 through 1990 or any occasion, did you see Mr. DeGeus in possession of any controlled substance?  And by controlled substance, I mean methamphetamine, cocaine, marijuana, anything."

A.   That is correct.

Q.   Did she -- was she questioned about whether she ever obtained any controlled substances from Terry DeGeus?

A.   Yes, she was.

Q.   And that included cocaine, methamphetamine, marijuana?

A.   Yes.

Q.   And what was her answer when she was asked on each of those drugs whether she ever obtained any of those drugs from Terry DeGeus?

A.   She answered no.

Q.   Directing your attention to page 7, at the bottom of page

Page 158

7, was Angela Johnson asked the question about whether she knew somebody by the name of Dustin Honken?

A. Yes, she was.

Q. And what was her response on page 8 of the transcript?

A. Yes, I do.

Q. Did she indicate how she came to know Mr. Honken?

A. She indicated that she met him through mutual friends.

183

Q. Was she asked starting at line 5 on page 8, Did you ever see Mr. Honken and Mr. DeGeus together on any occasion?

A. Yes, she was.

Q. And what was her response?

A. She answered, "I've never seen them together ever."

Q. Was she asked regarding Mr. Honken, "Have you ever obtained any controlled substances from Mr. Honken?"

A. Yes.

Q. And what was her response?

A. Never.

Q. Was she asked, "Have you ever seen Mr. Honken possess any controlled substance?"

A. Yes, she was.

Q. And what was her response?

A. Never.

Q. At the bottom of that page, was she asked -- I'm sorry. Let's go on from line 14. The question was asked, "Have you ever heard him discuss the sale or use of any controlled substance?" And what was her response?

A. She was asked that, and her response was no.

Q. Was she asked, "So you would never have been present on any occasion when he possessed any controlled substance?"

Page 159

A.    She was asked that, yes.

Q.    And what was her response?

A.    No.

184

Q.    Was she asked at line 21, "Were you in the motel room that was searched by the police in which they found various records regarding controlled substance trafficking?"

A.    Yes.

Q.    And what was her response?

A.    No, I don't think so.

Q.    At the bottom of that page was she questioned about whether she knew Greg Nicholson?

A.    Yes.

Q.    And what was her response at the top of page 9?

A.    No, I don't.

Q.    Now, in addition to Angela Johnson, you indicated other witnesses also appeared in conjunction with the same case on October 27 of 1993?

A.    Yes.

Q.    And among them was Aaron Ryerson?

A.    Yes.

Q.    At some point in the fall of 1993, did you, therefore, consider Terry DeGeus as a potential target and potential witness against Dustin Honken?

A.    Yes, I did.

Q.    At some point did you learn that he too disappeared?

A.    Yes, I did.

Q.    Approximately when did you understand or learn that he disappeared as well?

185

Page 160

A.    December 8, 1993, I learned that he was missing.

Q.    And as a result of learning he was missing, did you undertake efforts to find out where he -- what happened to him?

A.    Yes.

Q.    And any success back in 1993 into 1994?  Have any success in finding out what happened to him?

A.    No.

Q.    Explain to the jury then at this point, by 1994, the status of the investigation against Dustin Honken.  Greg Nicholson is missing.  Terry DeGeus is missing.  Where are you at in your investigation at this point as far as your ability to pursue charges against Dustin Honken?

A.    We were basically at a stand-still.

Q.    And did the charges continue against Dustin Honken for a period of time?

A.    Yes.

Q.    And were they ultimately dismissed by court order?

A.    Yes, they were.

Q.    Handing you Exhibit 32, can you identify that for the jury, please?

A.    It is an opinion and order issued by the district court judge, Chief Judge Michael J. Melloy, on the 21st day of March, 1995.

Q.    Referencing Dustin Honken?

A.    Yes.

186

Q.    If you run your fingers over the front page of that document, lower right-hand side, do you recognize that's a certified copy of that document?
Page 161

A.   Yes, it is.

MR. WILLIAMS:  United States would move to admit Exhibit 32 into evidence, Your Honor.

                              *   *   *   *

(Government Exhibit 32 was offered.)

                              *   *   *   *

THE COURT:  Any objection?

MR. WILLETT:  Relevance as it pertains to this client, Your Honor.

THE COURT:  Overruled.  Government's Exhibit 32 is admitted.

                              *   *   *   *

(Government Exhibit 32 was admitted.)

                              *   *   *   *

BY MR. WILLIAMS:

Q.   And so again share with the jury on what date were the charges against Dustin Honken dismissed.

A.   It was ordered the 21st day of March, 1995.

Q.   At some point into 1996 did you become aware that the drug investigation had developed new leads against Dustin Honken?

A.   Yes.

Q.   And was there an agent from Mason City who was in charge of

                                                         187

the investigation at that time?

A.   Yes.

Q.   And who was that?

A.   John Graham.

MR. WILLIAMS:  Thank you.  I have no further questions.

THE COURT:  Would the defense like to cross-examine

                        Page 162

this witness?

MR. WILLETT: I will, Your Honor.

THE COURT: Thank you.

MR. WILLETT: If it please the Court, Your Honor.

CROSS-EXAMINATION

BY MR. WILLETT:

Q. Good afternoon. I'd introduce myself, but we know each other, don't we?

A. Yes, we do.

Q. Okay. You first came into contact with this investigation in the spring of 1993 based upon a call from Frank Stearns; correct?

A. Not originally from Mr. Stearns. It was from another deputy in Mason City.

Q. Okay. And it was your understanding that they had what was at least described as a large methamphetamine seizure; correct?

A. Yes.

Q. And what was your subsequent understanding of the amount of

188

meth that had been seized?

A. Oh, approximately 8 to 10 ounces of methamphetamine.

Q. And during your career in law enforcement with the DEA, have you seen larger seizures than that amount that you've just described?

A. Yes, sir.

Q. So that's certainly not the biggest amount or the largest amount you've ever dealt with, is it?

A. No, sir.

Q. Okay. So my understanding is when you first became involved in terms of the time line, it would have been right

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 171 of 3592

around March 22 of 1993 when you prepared paperwork in support of a federal criminal complaint.

A.    Yes, sir.

Q.    And you testified on direct in regards to a person who signed a birthday card that Mr. Honken had in his possession in the Cerro Gordo County Jail; correct?

A.    Yes, sir.

Q.    And that was signed by the letter A?

A.    Yes, sir.

Q.    Now, you testified on direct that the person who signed it left a message in essence that this person had been with him the night before and missed the excitement of the arrest.  Do you remember that testimony from direct?

A.    Yes.

189

Q.    Do you realize you said something different to the federal grand jury back in 1998?

A.    I believe I was referring to the excitement at the hotel.

Q.    Okay.  Would it help you to refresh your memory to know what you said to the federal grand jury in 1998?

A.    Certainly.

        MR. WILLETT:  May I approach the agent, Your Honor?

        THE COURT:  You may.

        MR. WILLETT:  Thank you.

BY MR. WILLETT:

Q.    If you'd read to yourself for just a moment, Agent Mizell, but I direct your attention to page 9 of your grand jury testimony of May 14, 1998, approximately lines 9 through 14.

A.    Yes, sir.

Q.    Have you had a chance to read that, sir?

Page 164

A.    Yes, sir.

Q.    Does it refresh your memory?

A.    Yes.

Q.    Your testimony to the federal grand jury back in 1998 doesn't indicate anything about the birthday message reading missing the excitement of the arrest, does it?

A.    No.  It refers to the hotel.

Q.    Okay.  And specifically what this says is that it indicated that she had just missed all the fun at the hotel.  Did I read that correctly, sir?

190

A.    Yes, you did.

Q.    I'm going to direct your attention back to Government Exhibit 31 which has been admitted into evidence and direct your attention to paragraph 7, subparagraph (d) which I believe will be enlarged for us in just a moment.  Do you remember your testimony with Mr. Williams during direct regarding the list of restrictions or restricted individuals based upon Mr. Honken's pretrial release?

A.    Yes, sir.

Q.    Okay.  And it appears that paragraph 7(d) indicates individuals that Mr. Honken should be separated from who are considered either alleged victims or potential witnesses.  Are your reading glasses working as well as mine, Agent?

A.    Yes, they are.

Q.    Okay.  Did I state that correctly?

A.    Yes, you did.

Q.    Now, none of the names that we see in paragraph 7(d), none of those names are the name of Angela Johnson; correct?

A.    That is correct.

Page 165

Q. Thank you. And you also mentioned that your investigation at that time -- and I'm assuming that we're still talking about this April time frame, April of '93, about the time of Mr. Honken's release. This is the time when you were able to gain investigative information from Terry DeGeus; correct?

A. No, I never spoke to Mr. DeGeus.

191

Q. Okay. Do you remember stating on direct that as far as the distribution of meth that for Terry DeGeus Dustin Honken was his source? Do you remember stating that on direct?

A. Yes, sir.

Q. And that was information that you came across during your investigation.

A. Yes, sir.

Q. Angela Johnson was not Terry DeGeus's source of meth. It was Dustin Honken; correct?

A. Correct.

Q. And at that time in the spring of 1993 -- and by spring I'm going to narrow my time frame to March and April of 1993 -- the only information that you possessed about Angela Johnson was that she was the girlfriend of Dustin Honken to the best of your knowledge and the former girlfriend of Terry DeGeus; correct?

A. That is correct.

Q. And you stated on direct that you had no indication of what her role was, if any; correct?

A. That's correct.

Q. Mr. Williams took you through several questions regarding pages 6 through 9 of Angela Johnson's grand jury transcript in I believe it was October of 1993?

A. Yes, sir.

Page 166

Q.   Those questions dealt with her knowledge of various individuals and her knowledge of drug activities; correct?

192

A.   That is correct.

Q.   None of those questions dealt with the disappearance, if you will, for lack of a better label, of Greg Nicholson or Terry DeGeus; correct?

A.   That's correct.

MR. WILLETT:  Thank you.  Thank you, Judge.

THE COURT:  Mr. Williams, anything further for this witness?

MR. WILLIAMS:  No, Your Honor.  Thank you.

THE COURT:  You may step down.

Jury can take a stretch break.

And are you ready to call your next witness?

MR. WILLIAMS:  United States calls Leslie Olson.

THE COURT:  I thought you were calling Mr. Thinnes?

MR. WILLIAMS:  I'm going to try to get him on as well today, but I wanted to take it in the right order I'm afraid, Your Honor.

THE COURT:  Okay.

LESLIE OLSON, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated in the witness box.  Would you please adjust the chair, kind of scoot it up so you can speak directly into the microphones.  Adjust the microphones, and then state your full name and spell your last name.

THE WITNESS:  Leslie Olson, O-l-s-o-n.

193

Page 167

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Olson, can you share with the jury if you would where are you from, ma'am?

A. Clear Lake, Iowa.

Q. And how long have you lived in the Clear Lake, Iowa, area?

A. About five years now.

Q. And before that where are you from?

A. Mason City, Iowa.

Q. And were you born and raised in Mason City?

A. Yes, I was.

Q. Did you attend school there?

A. Yes.

Q. And how far did you go through school?

A. Eleventh grade. Then I got my GED.

Q. And are you currently employed?

A. Yes, I am.

Q. What do you do for a living?

A. I'm a nursing assistant for the state of Iowa.

Q. And where do you work at?

A. I work in home care.

Q. And what type of job do you have? What kind of duties do you do daily?

194

A. I take care of elderly people in their homes.

Q. How long you been doing that?

A. About three years now.

Page 168

Q. Are you married, ma'am?

A. No, I'm not.

Q. And do you have children?

A. I have one daughter.

Q. I want to direct your attention to a person by the name of Greg Nicholson. Did you know him?

A. I was married to him.

Q. And can you share with the jury when you first met Greg Nicholson?

A. I first met him in the early '80s. I'm not sure what year.

Q. And did you date for a while?

A. No, not until the '90s.

Q. And so when you first met him in the 1980s, it was just a meeting, first time you met him. You didn't get romantically involved until the 1990s.

A. Correct.

Q. When in the 1990s did you become involved romantically with Mr. Nicholson?

A. It would have been about 1990.

Q. Now, did you have a child already through a prior marriage when -- by the time you met Mr. Nicholson?

A. Yes, I did.

195

Q. And did he have children from a prior marriage when you met him?

A. He had two daughters.

Q. Ultimately you indicated in your testimony you got married.

A. Excuse me?

Q. You indicated in your testimony you ultimately got married?

A. Yes, I did.

Page 169

Q. In what year?

A. '92.

Q. And how long did you stay together?

A. It was just a little over a year I believe.

Q. Did you have any children together?

A. No.

Q. Where did you live when you were married to Mr. Nicholson?

A. 920 North Filmore.

Q. And that's located in Mason City?

A. Correct.

Q. When you lived there, did you have either his children or your children living in the house?

A. My daughter lived with us. Then we had visitation with both his daughters.

Q. How old was your daughter in 1992 into 1993?

A. She was born in eighty -- four and five.

Q. In 1992 into the spring of 1993, was Greg Nicholson employed?

196

A. Yes, he was.

Q. What type of work did he do?

A. He worked at Curry's Manufacturing Company in Mason City.

Q. What does Curry's manufacture?

A. I think they make doors and windows. It's just a factory.

Q. How long had Greg been working there when you were married?

A. It would have been quite a few years. I'm not sure, but many years.

Q. That was long-term employment for him.

A. Exactly, yes.

Q. Now, at some point after you got married, did he lose that

Page 170

job?

A.   Yes, he did.

Q.   And was -- did he quit or was he fired from there?

A.   He was fired.

Q.   And do you know why he was fired?

A.   Because he was calling in sick to work and then still going and playing in his band at night.

Q.   When you indicate he was playing in a band, can you share with the jury what type of band did Greg Nicholson have?

A.   He was in multiple bands, country western, rock and roll, just -- when I first met him in the '80s, he was in country western, and then it was just a mix through the years.

Q.   What type of instrument did he play?

A.   He played the bass guitar.  He could play the drums.  I

197

think that was about it in the band.

Q.   At some point in the early 1990s, did you become aware of whether Greg Nicholson was using drugs?

A.   I knew when I met him that he smoked pot.

Q.   And by pot you mean marijuana.

A.   Yes.

Q.   At some point did you become aware that he was involved using any other type of drugs?

A.   Methamphetamine.

Q.   And how did you become aware of that?

A.   We did it on occasion when we were out with other people.

Q.   As far as you knew in the 1990s when you were married to Greg Nicholson, what did you understand to be his habit or involvement with methamphetamine?  In other words, was it daily?  Was it once in a while?

Page 171

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 179 of 3592

A. Occasional.

Q. Did you have any knowledge when you were married to him that he was involved in selling methamphetamine at all?

A. No, I didn't.

Q. Did you ever meet somebody by the name of Dustin Honken?

A. Yes, I did.

Q. Where did you meet him at?

A. He was brought to our house, and I met him through somebody I knew when I was a child.

Q. Who's that?

198

A. Scott Gahn.

Q. And Scott Gahn is somebody from the Mason City, Iowa, area then?

A. Yes.

Q. Do you know when he was brought -- when Dustin Honken was brought to your house by Scott Gahn why he came?

A. I just thought they were going to go down and talk about the band equipment.

Q. And when you say go down, can you explain to the jury what you mean by going down?

A. He had a full basement, and they had all their band equipment set up in the basement. That's where they practiced.

Q. And so that was kind of where Greg kind of hung out, down in the basement?

A. Right.

Q. And on this occasion do you recall approximately when this would have occurred that you first met Dustin Honken?

A. Not really. I really can't.

Q. You were married by then.

Page 172

A.    Yes.

Q.    You were living in your Filmore house.

A.    Yes.

Q.    And was it before Greg was arrested in March of 1993?

A.    Yes.

Q.    You just don't know when before.

199

A.    I can't remember for sure.

Q.    Did you meet Dustin Honken only on one occasion or more than one occasion?

A.    Well, I initially met him, and then he came there -- a couple other times after that I seen him come there.

Q.    Did you have any idea why he was there?

A.    I just assumed it was something to do with the band equipment.

Q.    When he would come, would he and Greg always go down to the basement together?

A.    Yes.

Q.    I want to direct your attention to March 17 of 1993 and ask you if you were aware of whether Greg Nicholson, your husband, was arrested at that time.

A.    Yes.

Q.    And can you explain to the jury were you present when officers came to the house to execute a search on your house?

A.    No, I wasn't.  I was out shopping.

Q.    Did you come home at some point while the search was underway?

A.    Yes, I did.

Q.    And did you have anybody with you?

A.    I had my daughter.

Page 173

Q. Did you stay around very long?

A. They searched my car, searched me, searched my purse. Then

200

they let me take my daughter to my sister's house.

Q. And after that search took place, did you have an opportunity after the police left to have a conversation with your husband, Greg Nicholson?

A. Yes, I did.

Q. Did you ask him what it was about?

A. We had -- they said within the hour to two hours we had to be to the police station.

MR. BERRIGAN: Sorry to interrupt. I apologize. I should have objected at the end of the question, but I'd like to object now. It's hearsay and confrontation clause violation.

THE COURT: What exception are you relying on?

MR. WILLIAMS: 804(b)(6).

THE COURT: Objection's overruled. You may answer.

BY MR. WILLIAMS:

Q. And let me rephrase this so we can kind of get back on track here. Did you have a conversation with Greg, your husband, concerning, you know, What's this all about? The police are at our house. What's going on?

MR. BERRIGAN: Can I have a continuing objection during this witness's testimony on the same basis, Your Honor?

THE COURT: You may.

MR. BERRIGAN: Thank you, sir.

BY MR. WILLIAMS:

Q. That means you can go ahead and answer that question.

201

Page 174

A.    Okay.  I kinda knew what was going on because I seen a lot of the stuff sitting in the living room.  But then we talked more in detail after everybody left, and they told us we could come up to the police station.

Q.    What did Greg tell you was going on?

A.    He said he was dealing large amounts of methamphetamine for Dustin Honken.

Q.    Was this news to you?

A.    Yeah.

Q.    And at some point in the conversation with Greg Nicholson, your husband, did he indicate to you whether he had made a decision whether to cooperate with law enforcement?

A.    On the way to the police station, he told me that he had a lot of decisions to make because he was going to tell them flat out I had nothing to do with it.  And then he said he would cooperate with them but he had a lot of concerns because he was previously told that if it ever came to that that 50 bucks could have him killed or have him relocated.

Q.    And who told him that?

A.    Dustin Honken.

Q.    Did Greg -- when you said he told you that he was moving large quantities, did Greg Nicholson tell you what kind of quantities of methamphetamine he was selling for Dustin Honken?

A.    He didn't tell me.

Q.    So you go down to the police station.  And does Greg

202

actually follow through then and provide information to the police?

A.    Yes, he did.

Q.    And after that, was he released and allowed to go back

Page 175

home?

A.    Yes.

Q.    And for a period of time did you continue to live with Greg Nicholson after his arrest on that day?

A.    For just about -- it was two or three weeks.

Q.    Can you explain to the jury -- during that two- or three-week period, can you describe Greg Nicholson's behavior during that time period?

A.    We fought.  He was paranoid.  We couldn't go outside during the day.  I had a little girl.  He wouldn't let me take her outside.  We had to keep all the curtains shut in our house.  He didn't want me to answer the phone.  It just -- it deteriorated, and I just couldn't take it anymore.

Q.    Did he indicate what he was afraid of?

A.    That someone was going to come by the window or come by the house and shoot us.

Q.    At some point when you say you couldn't take it anymore, did you end up splitting up with Greg Nicholson?

A.    Yes, I did.

Q.    And after you split up, did you send him out of the house?  Did you leave the house?  How'd that work?

203

A.    I took my daughter, and I just packed clothes for her and me, and I left during the day when he was gone.

Q.    And at some point did you come to find out whether he continued to live in the house or whether he left the house as well?

A.    He called me and told me he wasn't going to live there anymore, that he was too afraid to live there, he was going to go live with the parents; he was going to let the bank have the

Page 176

house.

Q.   And so at some point he went to live with his parents?

A.   Uh-huh.

Q.   That's a yes?

A.   Yes.  I'm sorry.

Q.   That's okay.  And at some point did you learn whether he went to live with anybody else after that?

MR. BERRIGAN:  Object to the foundation.  This is hearsay also.

MR. WILLIAMS:  I'd be glad to rephrase if there is some confusion, Your Honor.

THE COURT:  Okay.

BY MR. WILLIAMS:

Q.   Did your husband, Greg Nicholson, tell you at some point that he went to live with somebody else after he told you previously he had gone and lived with his parents for a while?

A.   Yes, he did.  He came to my mom's house.  She lived in a

204

security building.  I don't know how he got in.  But he came to her door and he said he wanted the keys to his vehicle because he was moving in with Lori Duncan.

Q.   Was that -- when was the last time you talked with Greg Nicholson then?

A.   It was that same day, and that was, he said, shortly before he was going to go to court.

Q.   Did you ever know anybody by the name of Angela Johnson?

A.   No.

MR. WILLIAMS:  I have no further questions.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  Thank you, Your Honor.

Page 177

CROSS-EXAMINATION

BY MR. BERRIGAN:

Q.    Hi, Miss Olson.

A.    Hi.

Q.    I know we haven't met.  My name is Pat Berrigan.  I'm one of the lawyers representing Angela Johnson.  I'm just going to ask you a few questions; okay?

A.    Okay.

Q.    Your former husband, Mr. Nicholson, he actually had this job at the Curry Manufacturing for quite a long time, didn't he?

A.    It was many years.

Q.    Twelve and a half years, does that sound about right?

A.    I'm not sure.

205

Q.    Okay.  And then you get married.  Wasn't it May 9, 1992?

A.    Correct.

Q.    And just a couple months later he's fired.

A.    He lost his job, yes.

Q.    And it's because he stopped showing up for work.

A.    Correct.

Q.    After all this long period of time.

A.    (Witness nodded head.)

Q.    Right?

A.    Correct.

Q.    And you noticed some changes in his behavior after you first got married too, didn't you?

A.    Not really.

Q.    Hadn't he used to stay home pretty much when you were first married and at night he was home with you regularly?

A.    I worked nights.

Page 178

Q. You worked a couple nights a week?

A. Yes.

Q. Okay. And then the other five nights were you home?

A. He was with me or I was with him with his band.

Q. Okay. And as I understand it, he played in a country band by the name of Whiskey Business and a rock band by the name of Relayer. Does that sound right?

A. Correct.

Q. And to be clear, even though you met him in the early '80s,

206

at that point he was married and you had no romantic interest in him at that time.

A. Correct.

Q. But by the time 1990 had rolled around, he had been divorced, and you were single at that time.

A. Correct.

Q. Okay. I wanted to ask you a little bit about the drugs; okay?

A. Okay.

Q. As I understand it, you knew when you were dating him obviously and when you married him that he liked to smoke a little marijuana now and then.

A. Correct.

Q. And you were not averse to that either. I mean, you did that?

A. As long as he didn't do it around my daughter.

Q. Of course. And the same with the meth. That was more of a social thing. You might see him do it at one of his concerts or when he was playing with the band.

A. Correct.

Page 179

Q. But didn't he over time sort of become moody during the course of your marriage, that he sort of developed a temper as time went on?

A. After he was arrested he did.

Q. Oh, was it after he was arrested?

207

A. Correct.

Q. And there were some changes in his behavior in terms of his temper being much more short and severe with you?

A. The short time I was there after his arrest.

Q. Okay. And you had some arguments because he could get set off pretty easily.

A. Yes.

Q. And he didn't hit you, though.

A. No.

Q. But he would throw things around the house, break things when he got angry.

A. Not that I remember.

Q. Okay. Do you remember him smashing windows, for example?

A. He never smashed any windows at our house.

Q. Windows?

A. No.

Q. Okay. I know it's been a long time for some of these things, and I don't recall -- I don't know if you recall having talked to some various police officers over the years about Greg's situation. Do you remember on occasion talking to police officers?

A. Through the years I have numerous times.

Q. Okay. I wanted to see if it might help to refresh your recollection if I gave you a report from one of the officers

Page 180

back from 1996.  Might that be helpful to you?

208

A.    1996?

Q.    Yes, ma'am.

A.    Okay.

MR. BERRIGAN:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. BERRIGAN:

Q.    And I don't know about you, but my memory back in 1996 of events occurring at that time is better than it is today.  And I wanted to direct your attention specifically to the third page of this report by Special Agent Richard Kemming that he prepared in June of 1996.  And the first paragraph there specifically to save you a little time, if you could just take a look at that for me.

A.    I read it.

Q.    Does that refresh your recollection about his anger, smashing windows and objects in the house?

A.    The only -- I don't know how this was worded, but the only thing I said about a window was after he was arrested he played I believe it was in Mitchell, and some people come up and talked to him then and was talking to him about being a narc and stuff, and on the way home he smashed the window in his pickup.

Q.    I see.

A.    But never in our house.

Q.    Not in your house.

A.    No.

209

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 189 of 3592

Q. So that information's not quite accurate.

A. No.

Q. Okay. I appreciate you straightening that out for me.

A. Sure.

Q. You knew that he used a little bit of methamphetamine, but you certainly didn't think that he was any kind of a methamphetamine dealer; is that right?

A. No. That's correct.

Q. Okay. In fact, I think you told the same officer you'd only seen him really do methamphetamine a couple of times at these band concerts; right?

A. Correct.

Q. So that wasn't even a regular kind of a deal for him.

A. No.

Q. At least as far as you knew.

A. Right.

Q. If he used it, he was keeping it from you.

A. Right.

Q. And, of course, you had a little daughter living at the house, and I would imagine that that would have been completely unacceptable behavior in front of your daughter.

A. Exactly.

Q. Okay. This thing about the basement is interesting. He had a bunch of band equipment down in the basement, didn't he?

A. Yes.

210

Q. And you've told us that when Mr. Honken would come over, these other people would come over, that frequently your husband took them to the basement.

A. Yes.

Page 182

Q. And they might introduce themselves to you or have some little chit chat, but then they disappeared.

A. Right.

Q. And that was a pretty regular thing, wasn't it?

A. He had a lot of band members that came over a lot because he had a pool table down there and a Foosball table and all the band equipment and a bar.

Q. And wasn't that sort of, that area, kind of off limits to you as far as your husband was concerned?

A. When he was down there with his friends, I stayed out of there.

Q. Okay. And he didn't really want you roaming around down there, did he?

A. No.

Q. Of course, now in hindsight I suppose that's probably more clear to you in terms of what the police discovered down there.

A. Yes.

Q. I'm sure. And I wanted to ask you about that too. When you came home that day on March the 17th, 1993, and found police officers at your house, I imagine that was quite a shock to you.

A. Yes, it was.

211

Q. You had been out buying a birthday present for your sister, intended to wrap it and give it to her.

A. Correct.

Q. Had your daughter with you.

A. Yeah.

Q. And police officers, armed police officers, not only stop you, but they search you.

A. Yeah, they met me at the door.

Page 183

Q. Yeah. You weren't going in without being searched.

A. No.

Q. They searched your purse.

A. Yes.

Q. They searched your car.

A. Yes.

Q. And the accommodation they made for you is they let you take your daughter out of that environment so you could get her somewhere else.

A. Correct.

Q. And then you came right back.

A. Correct.

Q. And the police officers, at least you know now, they found some things in your house I assume you didn't know were there.

A. No.

Q. Let me see if I can prevail upon the prosecutors to --

MR. BERRIGAN: Could I put up a couple of exhibits

212

that we saw earlier? 26R, please. Thank you very much.

Q. Can you see that on your screen, ma'am?

A. Yes, I can.

Q. We've already looked at this exhibit, and I want to suggest to you that that bottle that's in the man's hand is a bottle full of methamphetamine. Did you ever see anything like that in your basement?

A. I didn't -- no. Where they're at right there is in my daughter's playroom.

Q. That's your daughter's playroom.

A. That was her playroom.

Q. Okay. So that bottle of methamphetamine apparently is

Page 184

taken from the rafters in your daughter's playroom.

A.    Correct.

Q.    Did you have any idea that was there?

A.    No, I didn't.

Q.    And you lived -- I mean, Greg Nicholson was living with you while he was married with you; right?

A.    Correct.

MR. BERRIGAN:  Could we possibly see 26L, please?  Is that L?  No, that's I.

MR. WILLIAMS:  I'm sorry.

BY MR. BERRIGAN:

Q.    That pool table, does that look familiar?

A.    Yes, that was in our basement.

213

Q.    How about the $4,700 in cash on top of it?

A.    Never seen it.

Q.    Okay.  Did you know your husband kept money in that quantity in cash in your basement?

A.    No, I did not.

Q.    Okay.

MR. BERRIGAN:  And finally could I just see 26D, please?  Thanks again.

Q.    Okay.  This, do you recognize that couch there, ma'am?

A.    That was our couch.

Q.    Where is that couch?  Where was it in your house then?

A.    That would have been in the living room in front of the picture window.

Q.    Okay.  Do you see that gun on the couch?

A.    Yes, I do.

Q.    The police recovered that from your house.  Had you ever

Page 185

seen that before?

A.   I did see that.  He bought that at a swap meet that his mom and dad were at.

Q.   Did you know it was in your house?

A.   It was.  But it wasn't loaded I don't think.

Q.   Do you see that clip there that goes with it?

A.   Yes.

Q.   Had you seen that before?

A.   No.

214

Q.   Do you actually know whether there's bullets in there or not?

A.   I never seen that thing hooked to it before.

Q.   You never saw the clip with it.

A.   No.

Q.   Gotcha.  So all of that was a complete surprise to you, all this activity that your husband was engaged in?

A.   It was till I came home and seen it all in my living room.

Q.   Right.  That's what I mean.

A.   Yes.

Q.   You'd been living with this man every day, and you lived together shortly before you were married; right?

A.   Yes.

Q.   And you got married in May of the year before, and this is March of '93, so at least ten months or so.

A.   Correct.

Q.   And this stuff apparently's been going on completely behind your back?

A.   Well, he told me that he did his business when I was at work.

Page 186

Q. Okay. He told you that after he got arrested.

A. Correct.

Q. Right. But up until March the 17th, St. Patrick's Day, in 1993, you were oblivious to all of this.

A. Correct.

215

Q. And Lori Duncan, you actually met her at your house on at least one occasion; isn't that right?

A. Correct.

Q. You came home early and found her and your husband there?

A. Yes, I did.

Q. And you were still married to him at that point.

A. Yes, I was.

Q. I wanted to ask you about that because you mentioned that you thought you left your husband two weeks after this March the 17th.

A. I believe it was two to three weeks.

Q. Okay. Could you take a look at that report I have over there with you again, that -- page 6 of that report, please? And look at that first full paragraph there if you would.

A. I don't think that would have been June 1. I know I was out of there before then.

Q. Okay. Well, is it -- do you think that back in 1996, do you think you told the police officer that you didn't move out till June 1?

A. I'm sure I probably did.

Q. Okay. But you think it might have been a little earlier.

A. Yes.

Q. Well, obviously March 17 and June 1 would be a couple of months down the road; right?

Page 187

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 195 of 3592

A.    Correct.

216

Q.    So it might have been a little longer than two weeks
perhaps?

A.    It could have been.

Q.    Again, I know it's a long time ago, but what about the
circumstances surrounding your moving out?  Does this refresh
your recollection as to what happened to finally cause you to
get out of there?

A.    I know why I left, because I couldn't stay there and be
shut up in the house and not be allowed to go outside during the
day.  I worked nights, and I had a little girl.

Q.    Did Officer Stearns call you and tell you your husband was
still involved with drugs?

A.    Yes, he did.

Q.    And did you confront your husband about that?

A.    No, I didn't.  I didn't even give him the chance.

Q.    Did you find that marijuana pipe?

A.    Yes, I did.

Q.    And that was it.

A.    That was it.  I packed a grocery bag with my clothes and my
daughter's clothes, and I left.

Q.    Well, you also discovered too, did you not, that Miss
Duncan had been over at your house while you were gone on a
number of other occasions?

A.    No, I -- I know she was there one time.  I caught her there
one time.

217

Q.    Okay.  Could you take a look at page 8 of that report,
Page 188

please, ma'am? At the very top of the page, there's a -- did you have a neighbor by the name of Cindy Hitchcock?

A. Hicok.

Q. Hicok?

A. Yes, I did.

Q. And is it true she lived across the street from you at that time?

A. Yes, I did.

Q. And that she and Lori Duncan were best friends.

A. Yes, they were.

Q. And have you had a chance to look at that first couple of lines?

A. Yes.

Q. Does that refresh your recollection that you learned that Miss Duncan had been over at your house while you were gone?

A. With Lori -- or with Cindy Hicok.

Q. Oh, with Miss Hicok.

A. Right.

Q. The two of them.

A. Right. But I only seen Lori there alone once.

Q. I see. These were still while you were married to your husband.

A. Yes.

Q. The police told us a little bit about the search, and I

218

know you weren't here this morning, but they said your husband cooperated. Was that your understanding of what took place on March the 17th? He cooperated with the police investigation?

A. Yes.

Q. Is it true that there was still a pound of marijuana in

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 197 of 3592

your refrigerator after the police left?

A.    Yes, there was.

Q.    Okay.  And there were periods of time during the time you were married to your husband that you used methamphetamine on occasion at least.

A.    I did a few times.

Q.    And you were so uninformed as to your husband's methamphetamine activity, isn't it true that you were purchasing the methamphetamine from some other person?

A.    When we were out with his band.

Q.    Your husband has all this methamphetamine, and you're buying it from somebody else.

A.    Correct.

Q.    Okay.

MR. BERRIGAN:  Well, thank you very much.  Appreciate it.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  No questions, Your Honor.

THE COURT:  You may step down.

Jury can take a stretch break.

219

You ready to call your next witness?

MR. WILLIAMS:  I am, Your Honor.  The United States calls David Thinnes.

DAVID THINNES, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Please be seated.  Make yourself comfortable.  And please adjust the chair and the microphones. And when you're ready, would you please state your full name and spell your last name.

THE WITNESS:  My name is David Thinnes, T-h-i-n-n-e-s.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Thinnes, can you share with the jury what do you do for a living, sir?

A. I'm an attorney at law.

Q. And when did you obtain your law degree, sir?

A. 1987.

Q. And how long -- where have you practiced during the time period since 1987?

A. Cedar Rapids, Linn County.

Q. And what type of practice do you currently engage in in the practice of law?

A. General practice, primarily real estate and family law

220

matters.

Q. At some point earlier in your career, did you also do some criminal defense work as well?

A. That's true, correct.

Q. In particular in 1993, did you take some appointed cases? In other words, were you -- did you accept appointments from the court to represent indigent defendants?

A. Yes, I did.

Q. In that capacity in 1993, did you come to represent somebody by the name of Dustin Honken?

A. Yes, I did.

Q. Prior to being appointed by the court to represent him, did you know Dustin Honken at all?

Page 191

A.    No.

Q.    What did you understand was the charges against him when you began to represent him?

A.    Mr. Honken was charged with conspiracy to distribute methamphetamine.

Q.    And did you meet with Mr. Honken personally?

A.    On many occasions, yes.

Q.    At the time that you came to first represent him, was he already on pretrial release?

A.    I met him initially before his initial appearance at the courthouse, and he was able to obtain pretrial release, so I met him that day and helped him secure his release.  And then while

221

he was on pretrial release, we worked the case up together.

Q.    Now, can you explain to the jury, as a lawyer representing a defendant, what access did you have in 1993 to the government's discovery file to determine what evidence was pending against your client?

A.    Your office in the Northern District of Iowa has a fairly open door policy.  We're allowed to come in and look at the police reports, look at the FBI reports, look at lab reports if it's pertaining to a drug or drug quantity.  We can physically go in and look through records and things in your office.

Q.    And when a defendant is not in custody, is a defendant also allowed to come in and look through that discovery file as well?

A.    I don't recall, but I don't think Mr. Honken went there with me.  I think I would dictate my record with a tape machine, and I would go back and have my secretary type up what it is that I dictated that day from your discovery file.

Q.    Is part of the duties of an attorney then to share that

Page 192

kind of information with their client so that they're apprised of what the evidence is against them?

A.    Absolutely.

Q.    And did you carry out that duty as you're required to do to let Mr. Honken know what the evidence was against him?

A.    Yes.  I talked with Mr. Honken on several occasions about what was in the government's discovery file.

Q.    What did you understand at that point was the key evidence

222

against Mr. Honken at that time that you shared with him?

A.    Well, they had caught him I believe in a hotel room with some suspicious items and perhaps a quantity, and they also had obtained the assistance of a confidential informant who had made a buy from Mr. Honken.

Q.    And did you understand -- in the discovery file, did you learn the name of that person?

A.    His name was Greg Nicholson.

Q.    And did you alert Mr. Honken as to all this information?

A.    I did.

Q.    At some point without sharing with us any confidences you had as an attorney for Mr. Honken, was a decision made to enter a guilty plea to the government's charges?

A.    Initially, yes.

Q.    And did you alert the government of your client's intent to plead guilty?

A.    Yes, I did.

Q.    And did you do that in the form of a letter, sir?

A.    I believe so.

Q.    I'm going to hand you Exhibit 45 and ask you if you can identify that for the jury, please.

Page 193

A. Yes, I can. This is a letter that I would have received from Assistant U.S. Attorney Pat Reinert who was prosecuting Dustin Honken. Indicates that we had a conversation on July 8, and this letter, Exhibit 45, is Mr. Reinert's view of the case

223

against Mr. Honken. It's the government's view of their case. And in here he talks about drug quantities and so on and so forth.

MR. WILLIAMS: United States would move to admit Exhibit 45 into evidence, Your Honor.

* * * *

(Government Exhibit 45 was offered.)

* * * *

THE COURT: Any objection to 45?

MR. BERRIGAN: Yes, Your Honor. This is hearsay, and it deprives our client her Sixth Amendment right to confront Mr. Reinert.

THE COURT: Overruled. Government's Exhibit 45 is received.

* * * *

(Government Exhibit 45 was admitted.)

* * * *

BY MR. WILLIAMS:

Q. And so on July 8 of 1993, you had alerted Mr. Reinert by phone that your client, Mr. Honken, intended to plead guilty, and this was the follow-up to that conversation you had.

A. That's correct.

Q. And you understood that your client was facing potentially some serious time in prison.

A. Yes.

Page 194

Q.   Was a plea date -- was the court notified of this decision, by the way, to have your client plead guilty?

A.   Yes, and I think a hearing was set on perhaps July 30 of 1993.

Q.   And the intent at that point was to have your client plead guilty.

A.   That's correct.

Q.   At some point did you obtain a videotape from your client prior to that plea hearing date of July 30 of 1993?

A.   Actually I got a videotape from Dustin after July 30.

Q.   Did he tell you about the tape beforehand if you recall?

A.   I'm sorry.  I don't recall.

Q.   Then tell the jury, did, in fact, your client plead guilty on July 30, 1993?

A.   No, he didn't.  He was in my office, and we were discussing the case, and he advised me that there were courthouse rumors floating around that Mr. Nicholson had fled the country, and so I made some calls, and I was able to confirm with the clerk's office in -- I believe it was Cerro Gordo County that Mr. Nicholson had failed to appear for his proceedings and a warrant or warrants had issued.

Q.   And at that point the decision was made not to plead guilty then on July 30 of 1993?

A.   That's correct.

Q.   Let's talk about this tape then.  At some point -- it was

after this July 30 date you indicate you first learn there was

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 203 of 3592

some type of videotape?

A.    That's correct, and it would have had to have been very close in time because I went through my old bills, and I personally reviewed the tape for the first time on August 2.  So I may have gotten it August 2, August 1, or July 30.

Q.    And on July 30 -- that was the day that was set for the plea -- did, in fact, you and your client go to the courthouse to let the court know that he was not going to go through with the plea at that time?

A.    I think we did, yes.

Q.    And did you have a meeting with the prosecutor at that time, Pat Reinert?

A.    Yes.

Q.    And do you recall what statements, if any, you made to Mr. Reinert concerning why it was you were not having your client plead guilty?

A.    Just vaguely I remember telling Mr. Reinert that his case wasn't as good as he thought, that he had a missing witness, and we were changing our minds; we were going to go to trial instead of pleading guilty.

Q.    So this tape that you got either on that day, the day the plea was supposed to go forward, or between that day and the next couple days, can you describe for the jury this videotape?

A.    It was just a VCR tape, and it came in a plastic sleeve.

226

There weren't any markings on it of any sort.

Q.    Who provided you that tape?

A.    I believe it came directly from Dustin, although he may have dropped it off or put it in the mail for me.

Q.    And did you have any conversations with Dustin Honken about

Page 196

that tape?

A. I did.

Q. What did he tell you was the source of where that tape came from?

MR. BERRIGAN: Objection, Your Honor, hearsay and confrontation clause.

THE COURT: What exception are you relying on?

MR. WILLIAMS: 802(d)(1)(E) -- I'm sorry, 801(d)(2)(E).

THE COURT: Objection's overruled. You may answer.

MR. BERRIGAN: May I have a continuing objection on that basis during the witness's testimony?

THE COURT: You may. Thank you.

MR. BERRIGAN: Thank you, sir.

BY MR. WILLIAMS:

Q. What did he tell you about where that tape came from, sir?

A. He told me that persons unknown to him had put the tape on or in his car and he didn't know exactly who had provided him the tape, and he had some ideas, but he didn't share those with me.

227

Q. Did he tell you what was on the tape?

A. He did.

Q. And what did he say?

A. That it was a videotape of Greg Nicholson and he was -- he had made a tape to exonerate Dustin Honken before Greg Nicholson left town.

Q. Exonerate meaning that he was going to say that Dustin Honken was not guilty of the crimes that he's accused of?

A. Correct.

Page 197

Q.   Did he tell you anything else about the source of the tape or when he received it?

A.   No.  If he did -- it was quite a while ago.  If he did, I can't remember.  But the gist of it was that it appeared in or on his car and he wasn't exactly sure who gave it to him.  He had some ideas.  He didn't -- I don't recall if he shared any names with me.

Q.   Did he articulate to you or tell you why it was he was giving it to you?

A.   Well, sure.  I mean, this was evidence that we could use if we needed to in the case against Dustin.  It was pretty dynamite evidence to have a government witness change his mind and change his story and exonerate the defendant on tape.

Q.   So you indicated earlier in your testimony that you actually did review the tape yourself.

A.   I reviewed it several times on August 2 of '93.

228

Q.   I'm going to ask you what you saw on that tape in a minute, but after or before you reviewed that tape, did you have conversations with Dustin Honken about how that tape may be used?

A.   I did.  Dustin was a little hesitant to share the tape with me.  We had some discussions about whether or not I should turn it over or advise the government of its existence.  I felt pretty strongly that we ought to at least tell the government prosecutor that I had this tape and I was going to use it for rebuttal if we needed to use it at the trial against Dustin.  And so we agreed that I would not give it to the government but that I would tell them of its existence and we would use it if necessary.

Page 198

Q.  And did you, in fact, tell Pat Reinert that you had such a tape?

A.  I did, yes.

Q.  Did you have conversations with Dustin Honken about whether that tape could be used if, in fact, Greg Nicholson never did return?

A.  Well, in the event that Nicholson did not return, we didn't think the case was going to go to trial, and so we didn't think we would need the tape.  We talked about its admissibility, where did it come from.  We would have foundational problems: Who filmed this?  Where did it come from?  When was this filmed? Is this Nicholson?  All sorts of questions concerning this tape.

229

It was very interesting.

Q.  So let's go to the tape itself.  You said you reviewed it numerous times.  Why was it that you reviewed it numerous times if there was a reason?

A.  I just found it fascinating.  I'd never gotten a piece of evidence like that before where the government witness has changed his tune and is completely exonerating my client.  It's pretty unusual.  I watched the tape very carefully to make sure he wasn't bound or looked like he was speaking against his will. I just found the whole tape rather intriguing.

Q.  And so how long was the tape?

A.  It was pretty brief.  It was two to four minutes I would say, and it consisted of a man sitting down and just talking into the camera.

Q.  How far away was the camera did it appear to you to the man sitting in the chair?

A.  I would say ten feet.

Page 199

Q. And I kind of jumped a little bit there. He was sitting you said. What was he sitting on? A couch, a chair?

A. Either a large chair or a low couch. I don't really recall.

Q. Could you see this person's hands in the film?

A. Yes.

Q. And was he in any way bound or tied?

A. No, he wasn't.

230

Q. When you first watched the film, did the image come in closer or come back out, or was it always the same?

A. I think the camera was always the same. It never panned in or out.

Q. Was anybody else ever in vision or in view of this film?

A. No.

Q. When you saw this person sitting in this chair, did you see any type of device in their hands indicating they were operating the camera by remote?

A. No.

Q. When the film first came on and you saw the person in the chair, did it appear the camera came on and the person then sat down and started talking and then got up and turned it off, or did it start off right with the person talking?

A. When the film started, when the tape started, Nicholson was already seated in front of the camera.

Q. And was anybody else talking on the tape other than Nicholson?

A. No.

Q. What was his demeanor and expression at that time if you recall?

Page 200

A.   Very, very calm, very mellow, not anxious, not excited, very low key.

Q.   Anything unusual about his demeanor that you determined at all?

231

A.   The fact that he was very low key I think and very calm.

Q.   Was he asked any questions at all?

A.   No.

Q.   Just made a statement.

A.   Yes.

Q.   And what do you recall that he said during the statement?

A.   The state -- it was a little rambling because he did talk for a couple of minutes, but basically he said the government caught him and they wanted names from him and he was sorry but he kind of set up Dustin because the government wanted a name and he was sorry he set up Dustin and Dustin Honken had nothing to do with his case, and he was sorry for getting him entrapped into all this mess.

Q.   Could you hear any noises in the background while this tape was being played?

A.   No.

Q.   Did you see anything on the wall behind him?  Or if you could describe, he's sitting in a chair.  What is behind him during this?

A.   As I recall, it was kind of a solid color behind him.  It was not an office setting, and it was not a home setting.  Other than that, I really couldn't tell you what kind of setting it was.  Just kind a solid maybe red or green behind the chair or couch.

Q.   So you didn't see shelves or bric-a-brac or windows or

Page 201

anything like that in the background.

A. No.

Q. Did the person identify themselves on the tape?

A. Possibly, but I don't recall. I guess I was always under the impression that it was Greg Nicholson because Dustin said it was he.

Q. Do you recall today what type of clothing he had on during this conversation?

A. Dressed casually, maybe a short shirt or a dress shirt or a T-shirt and maybe some jeans or cut-off jeans.

Q. Now, after you viewed that tape the several times you did, did you have any other conversation with Dustin Honken about what you saw on that tape?

A. Well, we were pretty excited, you know. I told him that the tape was great and if we needed to use it we would use it at Dustin's trial.

Q. And did you ask him if he had any involvement in making the tape?

A. I did not.

Q. At some point did charges against Dustin Honken get dropped?

A. Eventually yes. The case was continued a couple times. Mr. Nicholson never reappeared. He was essentially the star witness for lack of a better word, the star witness against Dustin, and the case was dismissed.

233

Q. At any point did you provide the government with a copy of that tape or the tape itself?

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 210 of 3592

A.    I did not.  At the conclusion of the case as per my understanding with Dustin, I gave him the tape back.

Q.    And do you recall approximately when it was that you would have returned the tape to him?

A.    Perhaps March of '95 I was writing a wrap-up letter to the U.S. Attorney's Office, and while I had my Dictaphone going, I told my secretary to send Dustin his tape back along with a little cover letter.

Q.    While you had that tape, did you make any copies of the tape?

A.    No.

Q.    Are you aware of any other copies of the tape existing other than the one that Dustin Honken provided to you?

A.    No.

Q.    After you returned the -- well, let me break this up a little bit.

Between the time that you viewed the tape and maybe had a conversation with Dustin Honken about the tape and the time that you returned the tape to him, do you recall any other conversations with Dustin Honken about that tape?

A.    About the contents, no.  About perhaps admissibility or whether I was going to share it with the U.S. Attorney's Office, we might have had ongoing conversations about those issues.

234

Q.    Nothing of any note that you can recall today.

A.    No.  He didn't tell me -- he never really -- he never told me that he knew where it came from.  Most of the concern was what's going on with my case, is there a new trial date, are they going to bump it again, are they going to bump the trial date, are we going to have more resettings of the trial?  Those

Page 203

are really the conversations with he had.

Q. And after you returned the tape to Dustin Honken in March of 1995, did you have any other conversations with him about that tape?

A. Nothing that sticks out right now.

Q. Very good. Thank you very -- hang on just a second.

Going back to the tape for a moment, question, did the tape -- when you're viewing Mr. Nicholson, did it appear to waiver or move as if somebody's hanging on to it, or was it very still and stationary as if per chance it was on a tripod or something like that?

A. My assumption was that it was on a tripod. It was a very still camera shot.

MR. WILLIAMS: Very good. No further questions. Thank you.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: May it please the Court.

CROSS-EXAMINATION

BY MR. BERRIGAN:

235

Q. Mr. Thinnes, do you know this young lady?

A. I do.

Q. How do you know her?

A. She was in my office on one, maybe two occasions.

Q. Okay. How long ago was that?

A. Many years ago, maybe seven years ago.

Q. Seven years ago? It would have been after 1993?

A. Yes.

Q. When you were dealing with Dustin Honken, did you ever see her?

Page 204

A. I don't think so.

Q. And you saw Mr. Honken on many occasions you've pointed out.

A. Yes.

Q. In court and at your office.

A. Yes.

Q. Was Miss Johnson ever with him?

A. I don't think so.

Q. Okay. Let me ask you a few questions about the tape. First of all, you've been a lawyer for -- it looks like coming up on 18 years.

A. Uh-huh, yes.

Q. And I suspect there have been quite a number of times where you've had to evaluate people during the time that they've been testifying in front of you either as an adverse witness or maybe

236

one of your witnesses.

A. True.

Q. Would that be fair to say?

A. Yes, that's fair.

Q. One of the skills we kind of hope to develop as lawyers is some sense about whether or not people are being honest with us and telling the truth while they're under oath testifying.

A. That's true.

Q. This man that was on the tape, first of all, I'm not sure if you've described him, but he was a white man, was he not?

A. Yes.

Q. Balding?

A. Yes.

Q. Do you recall him wearing glasses?

Page 205

A.    I thought possibly so.

Q.    And he's sitting on some type of a chair or a couch?  Was that your impression?

A.    Yes.

Q.    Okay.  And it was really fairly impossible to tell the setting because the camera was pretty close up to him.

A.    That's true.

Q.    But you were able to see I guess at least his upper body and his hands.

A.    Yes.

Q.    That you've previously described on other occasions as

237

being resting on his lap.

A.    (Witness nodded head.)

Q.    Yes?

A.    Yes.

Q.    And I note today you mentioned that you thought you were uncertain as to whether he had identified himself.  And, you know, this has been so long ago, that doesn't surprise me.  But might it aid your recollection to look at a grand jury transcript you gave back in 1999?

A.    Sure.

Q.    Okay.

          MR. BERRIGAN:  May I approach, Your Honor?

          THE COURT:  You may.

          MR. BERRIGAN:  Thank you.

BY MR. BERRIGAN:

Q.    I want to apologize.  I know there's some water mark on there that maybe makes it fairly difficult to see, Mr. Thinnes, but let me refer you specifically to page 22.
          Page 206

A.    Okay.

Q.    And if you could take a look at that section, I may have even highlighted the portion.  Does that at all help you in terms of being able to recollect at least six years ago whether this man identified himself on the tape?

A.    No, it doesn't.  My recollection is that he did not, but I had always assumed it was Greg Nicholson.  In 1999 I didn't

238

testify that he identified himself either, so I just don't know at this point.

Q.    You're just not sure.

A.    Right.

Q.    Thank you, sir.  In any case, the man did explain on the tape why he was giving the tape, didn't he?

A.    Yes.

Q.    And he said that -- he was apologetic to Dustin Honken for having drug him into this criminal case.

A.    Yes.

Q.    And there was some indication this man was going to be leaving town.  I think you mentioned it on direct examination; is that right?

A.    Yes.

Q.    Did he give any specifics about where he was going?

A.    No.  That information may have been on the tape, or it may have been something I got from Dustin.

Q.    Okay.  But he indicated that he had set Dustin Honken up.

A.    If I could ask -- answer the last question --

Q.    Yeah, please.

A.    I think he did say he was going to blow town or head out or something.  I think there was something to that effect in there,

Page 207

that he was leaving and he wanted to leave this tape behind so that Dustin could use it to get himself off.

Q. Okay. But he didn't give any specifics about where he was

239

going.

A. No.

Q. And there was some discussion by this man about having set Dustin up or something to that effect. Do you recollect that?

A. Yes.

Q. And did you understand when you were listening to the tape what he was talking about in terms of setting him up?

A. Yes, that he was trying to tell whoever's watching the tape that Dustin was not involved, that he had given the government Dustin's name when really he shouldn't have and that Dustin was not a part of his conspiracy and basically apologetic.

Q. And did he indicate, in fact, that he thought he had needed to give the government somebody and Dustin Honken was the person he had chosen to give them?

A. I think that's pretty fair to say, yes.

Q. Okay. He might have said something about getting the tape to Dustin for purposes of helping Dustin get out of the situation he was in.

A. Yes.

Q. Okay. And it was a fairly short tape as you've described it, two, three, four minutes or so?

A. Yes, sir.

Q. Let's talk a little bit about the context or your view of this man based on your training and expertise as a lawyer and your dealing with witnesses. I would imagine that one of the

240

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 216 of 3592

things you would have been particularly interested in given the fairly unique circumstances -- have you ever had a client come to you with a tape of the chief witness for the prosecution who's saying, Hey, I lied and here it is on videotape? Has that ever happened in your career?

A.   Never happened before or since.

Q.   Okay.  And so I think one of the things you're worried about is the veracity of that statement; that is, is this true? Does the witness actually appear to be telling the truth?  Would that be fair?

A.   That's one of the things I looked at, certainly.

Q.   Because if it appeared that the statement was in any way coerced or forced, then that not only wouldn't be helpful, but that could be potentially disastrous.  Would you agree?

A.   That's true.

Q.   Okay.  And you've told the prosecutor this is a tape you watched several times.  Did you have any sense at all from looking at the tape that this man had a gun trained on him when he was giving this two- to four-minute rendition when he's apologizing for getting Dustin Honken involved in his criminal case?

A.    I watched that tape over and over for some sign that -- for anything, you know, were there handcuffs, was he drugged, was he intoxicated, was he happy about leaving town.  The man's speech was very flat, very even, wasn't too high, wasn't too low, very

241

conversationalist.  It was surprising.  And again, the thought is that somebody coerced him to make this tape.  And if he was

Page 209

coerced, the lack of reaction on his part was pretty impressive.

Q. It would have been a heck of an act.

A. Well, it just -- he may have had a gun pointed to his head. I don't know. But he was amazingly cool and calm.

Q. Okay. In his eyes when you were looking at him when he's giving this tape, was he looking right into the camera, or did you have some impression he was reading a script?

A. He was not reading. He was just talking conversationalist-wise off the top of his head.

Q. You've described him in the past, today even, as being very relaxed.

A. Yes.

Q. And you described him as being low key.

A. Yes.

Q. Did you have any sense that he was nervous or upset during the tape?

A. He was not upset. And I couldn't describe him as nervous either.

Q. Is it true that you've described him under oath before as in your view you thought he was genuine and apologetic and sincere?

A. Well, he was definitely apologetic. He appeared to be genuine, yes.

242

Q. This matter about the use of the tape if we could explore that for just a second, would you agree with me that's a fairly complicated legal morass there in terms of how you might be able to use such a tape, whether you could use it in your case in chief, what kind of foundation you'd be able to lay for that if you chose to, under what circumstances could you use it to

Page 210

impeach the witness?

A.    It raises a lot of serious legal questions about admissibility and foundation and when and how to use it.

Q.    Complicated for us.

A.    Yes.

Q.    Okay.  As lawyers.  And you discussed these matters with Mr. Honken, the potentialities I suppose of the use of the tape.

A.    Yes.

Q.    Did you have any sense at all, Mr. Thinnes, that this man was giving you some kind of a rehearsed speech?

A.    I don't think so.  I think it didn't appear rehearsed.  It appeared to be off the top of his head, slightly repetitive which led me to believe that he wasn't reading, but no, I wouldn't say so.

Q.    Okay.

MR. BERRIGAN:  That's all I have.  Thank you, sir.

THE COURT:  Mr. Williams, any redirect?

MR. WILLIAMS:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Mr. Thinnes, you're excused.

243

THE WITNESS:  Thank you, Your Honor.

THE COURT:  That was an example of what I told you earlier this morning where we would normally stop at 4:30 but we were able to accommodate a busy practicing lawyer 330 miles away by going an extra 10 minutes, so we did that.

That's going to conclude the testimony for today.  I have a few housekeeping details I want to take up with you.  We had a request -- I don't know from which juror, but I have an educated guess -- that one of the jurors would like to bring in a laptop computer with remote access for e-mail purposes, and

Page 211

I've talked to the lawyers on the break. And it wouldn't apply to just that one juror. It would apply to any of you.

We're going to allow it but with some very strict restrictions. For example, we want to make sure that you are the only individual looking at the screen on the laptop so that none of the other jurors do, so you have to situate yourself in the jury room so you're in a position that nobody else can see the laptop. You have to make sure that the home page that comes up is not a news page, and so we're going to allow it.

I'm going to allow it because it's ultimately my decision but only for the purpose of doing personal and professional e-mail and any other personal and professional business, but it goes without saying, but I better say it anyway that you cannot do any research on it relative to this case or expose yourself or other members of the jury to any news

244

websites because that would create a huge problem.

But to the extent that you can limit it solely for personal and business-related e-mail and other personal and business-related matters totally unrelated to this case and so that there would be no possibility of any news showing up on the computer that could be seen or discussed by any other juror, it will be allowed.

We will have obviously trial tomorrow, and we'll start again at 8:30, and we'll go till 4:30 or a quarter to 5 depending on where we are, and I just remind you that we will not have court on Friday. Next week we'll be going Monday through Thursday. And in the next day or perhaps on Monday I'll have a schedule for you for what I think is the remainder of the trial, but it's pretty much just what we said in jury selection,

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 220 of 3592

Monday through Thursday. We're taking the week of June 10 through the 17th off, but I'll have a very specific schedule for all of you.

Please remember my cautionary instruction about not discussing this case with anybody else and do not read anything about the case. Do not put yourself in a position to hear anything about the case in terms of the evening local news and all. And, most importantly, keep an open mind until you've heard all of the evidence in the case, received my final instructions, had an opportunity to hear the lawyers give their closing arguments, and, most importantly, go back to the jury

245

room and begin your deliberations.

We'll see you all tomorrow, and we'll start again promptly at 8:30. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. We'll see if we have anything to take up. I have two things on my list, but we'll see if the lawyers have anything we need to take up between now and when we start at 8:30 tomorrow morning. Mr. Williams?

MR. WILLIAMS: Your Honor, the defense had come to us earlier and requested permission to have family members of Angela Johnson be present during the testimony. Although we could invoke the rule to prevent that, we discussed it and decided that we had no objection to family members only being present during the trial regardless of whether they're going to testify or not so long that it's understood that it's strictly family members only. And I've been assured by defense counsel -- and I take them at their word fully -- that they are going to limit that to only family members. I just wanted to

Page 213

alert the Court to that fact.

THE COURT: Well, are any of those family members scheduled to testify in the merits phase?

MR. WILLIAMS: I've been told no, Your Honor, just during the penalty phase.

MR. BERRIGAN: That's right, Your Honor. These are penalty phase witnesses only, and obviously the victims' family

246

members are here, and we had asked the consent of the prosecution to have our family members present only if they're not testifying in the merits phase, and they're not.

THE COURT: Okay. That's fine. No problem there. Anything else?

MR. WILLIAMS: No, Your Honor.

THE COURT: Anything from the defense?

MR. BERRIGAN: No, sir.

THE COURT: Mr. Berrigan, I don't know how it happened, but I noticed that I had last year's edition of the federal criminal code and rules, so I asked my law clerk to make sure that I had the current edition, and I looked down, and it says Berrigan on it, so if you're missing one, it's because I have it, so I'm going to return it to you now. I don't know how that happened.

MR. BERRIGAN: Well, you're going to notice slight differences in mine than yours, Your Honor. That was intended, but you caught me. Thank you.

THE COURT: I was kind of shocked when I looked down and I saw your name on it, so I'll hand it back to Carey, and we'll make sure you get your book back, and hopefully the federal government has sufficient funds that we can find another

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 222 of 3592

one for me.

There's just one thing that I noticed, and the defense was doing it, but the government's just as likely to do it in

247

the course of the trial. It happens a lot in trials, and I guess it would be on one of my kind of trial -- not really a pet peeve, but it just may be a misunderstanding. And we're going to have it happen a lot in this case because there are so many -- there's so much prior testimony of so many witnesses in multiple formats.

I think it's impermissible to ask a witness, you have described this in the past referring to prior testimony, to just ask the question that way because that calls for a hearsay answer because what they testified, even if it's under oath, is generally hearsay unless it meets one of the exceptions. It can be used to impeach the witness, to refresh the recollection of the witness, but you can't generally be asking the witness about what they said in a prior -- in prior testimony without first laying the foundation to do that.

And it's just a friendly reminder to try and stay away from that unless you think I'm wrong, and then we can argue about that. But it's not a big deal. But it has the potential for being a big deal in this case simply because there are so many prior transcripts for many of the witnesses. And I just kind of wanted to alert everybody to that.

That's all we have. That's all I have. So why don't we meet at eight o'clock just out of an abundance of caution. And we have some CJA matters to take up, and I just don't know what would be best for scheduling talking about that. I'd

248

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 223 of 3592

really prefer to do it tomorrow at the end of the trial day, but if you're all anxious to get home, maybe we should do it today, or I could come back maybe in --

MR. BERRIGAN: Tomorrow's fine, sir. We can take it up at the end of the day tomorrow.

MR. WILLETT: Your Honor?

THE COURT: Yes.

MR. WILLETT: I'm going to speak for myself. I would prefer -- if that discussion includes me, I'd prefer to do it with you at any time besides at the end of the day tomorrow.

THE COURT: It doesn't really involve you.

MR. WILLETT: Okay.

THE COURT: Other than the one little matter we talked about.

MR. WILLETT: And I was fine with the Court's resolution of that, Your Honor.

THE COURT: Right. Yeah. It doesn't. Okay?

MR. WILLETT: Okay. Thank you.

THE COURT: Because I realize you have a very large distance to travel.

MR. WILLETT: Thank you, Judge.

THE COURT: Okay. Okay. We'll see --

MR. BERRIGAN: Your Honor, I just forgot this. I apologize.

THE COURT: That's okay.

249

MR. BERRIGAN: We still do have a pending motion regarding the visitation. I don't know if you want to take that up this afternoon given the hour, but I wanted to remind you

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 224 of 3592

about it.  I'd certainly like to take it up.

THE COURT:  Why don't we take it up tomorrow morning at eight o'clock.

MR. BERRIGAN:  Great.  Thanks.

THE COURT:  Thanks for reminding me of it.  I easily could have forgotten about it, but I did remember.  We'll take it up tomorrow at eight o'clock.  We'll be in recess.

(The foregoing trial was

adjourned at 4:48 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

8-21-05
Shelly Semmler, RMR, CRR                          Date

250

INDEX

WITNESS:                                                          PAGE:

FRANK STEARNS
      MR. WILLIAMS                                         49
      MR. WILLETT                                          102
PEGGY CHRISTENSEN
      MR. WILLIAMS                                         112
      MR. STOWERS                                          125
DEBRA DAVIS
      MR. WILLIAMS                                         128
      MR. STOWERS                                          140

Page 217

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 225 of 3592

VOLUME 1, 5-4-05

|  | MR. WILLIAMS | 150 |
| DAVID MIZELL | | |
|  | MR. WILLIAMS | 151 |
|  | MR. WILLETT | 187 |
| LESLIE OLSON | | |
|  | MR. WILLIAMS | 193 |
|  | MR. BERRIGAN | 204 |
| DAVID THINNES | | |
|  | MR. WILLIAMS | 219 |
|  | MR. BERRIGAN | 234 |

*****

EXHIBITS:

| 34 | 56 |
| 26A through 26T | 58 |
| 20 | 71 |
| 22 | 78 |
| 93 | 80 |
| 23 | 81 |
| 33 | 84 |
| 27 | 93 |
| 27 | 121 |
| 115 through 118 | 124 |
| 25 | 135 |
| 31 | 171 |
| 30 | 173 |
| 28 | 177 |
| 29 | 179 |
| 32 | 186 |
| 45 | 223 |

*****

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 226 of 3592

251

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | No. CRO1-3046 |
| | Plaintiff, | Sioux City, Iowa |
| | | May 5, 2005 |
| vs. | | 8:03 a.m. |
| ANGELA JANE JOHNSON, | | VOLUME 2 of 24 |
| | Defendant. | |

/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

252

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | C. J. WILLIAMS, ESQ. |
| | Assistant United States Attorney |
| | Suite 400 - Hach Building |
| | 401 First Street Southeast |
| | Cedar Rapids, IA 52401 |
| | |
| | THOMAS HENRY MILLER, ESQ. |
| | Iowa Attorney General's Office |
| | Area Prosecutions Division |
| | Hoover State Office Building |
| | Des Moines, IA 50319 |
| | |
| For the Defendant: | PATRICK J. BERRIGAN, ESQ. |
| | Watson & Dameron |
| | 2500 Holmes |
| | Kansas City, MO 64108 |
| | |
| | DEAN STOWERS, ESQ. |
| | Rosenberg, Stowers & Morse |
| | 1010 Insurance Exchange Building |
| | 505 Fifth Avenue |
| | Des Moines, IA 50309 |
| | |
| | ALFRED E. WILLETT, ESQ. |
| | Terpstra, Epping & Willett |
| | Higley Building - Suite 500 |
| | 118 Third Avenue Southeast |
| | Cedar Rapids, IA 52401 |
| | |
| Also present: | Bill Basler |

Page 1

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 227 of 3592

VOLUME 2, 5-5-05
Court Reporter:        Shelly Semmler, RMR, CRR
                       320 Sixth Street
                       Sioux City, IA  51101
                       (712) 233-3846

253

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Okay.  Please be seated.  Roger, we don't need you; okay?  Thanks.  Appreciate you coming in.

THE CLERK:  Thought it was better to be here and not be needed.

THE COURT:  Yes.  Thank you.

Okay.  What do we need to take up this morning?  I guess you have your motion for a contact visit?

MR. BERRIGAN:  Yes, sir.

MR. STOWERS:  And there's one matter with some testimony from the witness Jeff Honken that I wanted to address with the Court.

THE COURT:  Okay.  Why don't we take that up first.

MR. STOWERS:  Okay.

THE COURT:  Is he testifying today?

MR. STOWERS:  Yeah, I believe he's the second witness.

MR. WILLIAMS:  That's correct.

MR. STOWERS:  In testimony that he's given in the past -- this is in the way of a motion in limine.

THE COURT:  Well, the time for filing a motion in limine has passed.  It's untimely.

MR. STOWERS:  Well, raising the issue outside the presence of the jury so the Court can be aware of what the issue is, Mr. Honken claims that at one point in time following his

brother's sentencing -- his brother's sentencing was in February of 1998 -- he had a phone conversation with Angela Johnson. It was one of only three contacts he's had with her the whole time he's been aware of who she was, and in that call he says or I believe will claim, as he did at Honken's trial, that Angie was very upset in saying that we were not supporting Dustin in his problems and since Dustin was not going to be able to see his children she was going to make sure that we would never be able to see ours. He says he took that as a threat.

It's our position that that testimony should be excluded under Rule 403 and under Rule 402 as it's not relevant and it's certainly got highly unfairly prejudicial value, particularly in a case of this situation here where we have two of the victims are children, and that's all he would say about that conversation as he recalls it, but we believe that testimony should not be allowed in front of the jury.

THE COURT: Mr. Williams?

MR. WILLIAMS: We resist the oral motion in limine, Your Honor. We think it is relevant and admissible. This is a case where the defendant has been accused of participating in the murder of children, and to the extent that she threatens to remove children from yet another person against who she's angry that she didn't think gave adequate support to her boyfriend, Dustin Honken, it's relevant evidence for the jury to take into account to determine what that says about whether she was, in

255

fact, involved in 1993 when her boyfriend once again was in trouble and she is accused of assisting in eliminating a family for the purpose of protecting her boyfriend. I think it shows

Page 3

motive, and it shows her mind-set, and I think it's admissible.

In the alternative, it's admissible 404(b) evidence to show state of mind.

THE COURT: Run his testimony by me again.

MR. WILLIAMS: He's going to say that when Dustin Honken was sentenced in this court in 1998 he did not attend the sentencing, you know, during the whole time. He came up here. He testified.

THE COURT: We're talking about Jeff Honken?

MR. WILLIAMS: Jeff Honken.

THE COURT: Okay.

MR. WILLIAMS: That was deemed not to be supportive of Dustin Honken, nor did the defendant believe that Dustin Honken's mother was adequately supportive. When Jeff Honken went back down to Arizona, he received a phone call from a screaming, angry Angela Johnson screaming that he did not support Dustin and now Dustin's going to be separated from his children. If Dustin's going to be separated from his children, then Jeff's going to be separated from his children as well. At that point Jeff Honken --

THE COURT: Okay. I didn't understand that. So it was -- allegedly could be interpreted as a threat against Jeff

256

Honken and Jeff Honken's children.

MR. WILLIAMS: Right. Now, whether it was a threat "I'm going to kill you so you don't see your children" or "I'm going to kill your children so you can't see them," how ever that is, it's a threat -- Jeff Honken will testify he took that as a threat of physical harm against him or his children because he wasn't adequately supporting Dustin Honken.

Page 4

THE COURT: And you're saying that a statement in -- what are we talking? '97 or '98?

MR. WILLIAMS: 1998, Your Honor.

THE COURT: -- is probative of intent back in 1993?

MR. WILLIAMS: I think it's probative of state of mind. I mean, for example, let's just take it this way. Let's say that in 1993 a guy took a shot at the president of the United States. In 1998 in a conversation with somebody else he says, I'm going to shoot that president, different president, because he's mad at that president. Surely we would say somebody who's making statements about killing somebody, you know, a president years later, that's certainly indicative about whether he was involved or had knowledge of or intent or was capable of killing somebody or threatening to kill somebody in 1993.

It's the same -- it's the same motive there. I mean, again, in both situations it's a situation where she's upset because Dustin Honken, her boyfriend, is in trouble and needs

257

help. And the allegation obviously here is that when that happened in 1993 she helped kill people and when that happened in 1998, she wasn't above threatening to kill people.

THE COURT: And, Mr. Stowers, it's not -- and you're alleging it's 404(b) evidence.

MR. WILLIAMS: I'm alleging it's direct evidence but, in the alternative, 404(b) evidence regarding state of mind.

THE COURT: Well, state of mind isn't really one of the exceptions in 404(b). Intent is.

MR. WILLIAMS: Yeah. I guess state of mind is kind of a catch-all phrase I use for intent and absence of mistake and

Page 5

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 231 of 3592

motive.

THE COURT: Mr. Stowers?

MR. STOWERS: I don't think it fits under 404(b). It's too remote in time. It involves different people. It involves different circumstances, and it's not sufficiently similar in any way, shape, or form to the allegations from I think almost five years earlier that are made in this indictment. And, you know, I guess that's their evidence, but we certainly don't agree with it either. It's a single phone call made apparently in an upset state after Mr. Honken was sentenced according to their own evidence, and we don't think it's the type of thing that ought to be blown out of proportion in the evidence in this case. But in order to fit under 404(b), it's gotta have some degree of similarity, some kind of

258

proximity in time, perhaps involve some similar circumstances or people or players, and this doesn't.

THE COURT: Well, why didn't you file a timely motion in limine?

MR. STOWERS: Well, I didn't even know about this testimony until I read it again last night, and I didn't think about it. So I'm bringing it to the Court's attention.

THE COURT: Well, how long have you had a transcript?

MR. STOWERS: I don't know how long I've had the transcript. It's been maybe February, but in all candor, I didn't read the whole transcript, you know, in anticipation of examining all these witnesses. So there's different issues that arise with all these witnesses as you go through the details, and this is one that struck me between the eyes.

THE COURT: Was that statement in the discovery file?

Page 6

MR. WILLIAMS: Yes, it has been for years.

THE COURT: Do you dispute that?

MR. STOWERS: I don't dispute it or not dispute it. I don't know if it was or it wasn't. It's something that's noteworthy. It's something we're going to object to if it's brought up in the presence of the jury, and we just want to bring your attention to it ahead of time so that you're aware of the issue. And if you want to rule on it outside the presence of the jury, that's one thing. If you want to wait till he testifies and then we'll object when they get into that line of

259

questioning --

THE COURT: Yeah. Well, I appreciate you raising it. I mean, I do, but as a motion in limine it's clearly untimely. You didn't comply with the pretrial order for filing motions in limine, so it's, you know, about four months untimely. So to the extent that you've made a motion in limine, that's denied. You're obviously free to object to it at the time the evidence is admitted, and I'll rule on it accordingly.

Anything else other than this pending motion on the contact visit?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. BERRIGAN: No. That's all, sir.

THE COURT: Okay. And what are you asking me to do on the contact visit?

MR. BERRIGAN: We were asking for a short contact visit between Miss Johnson and her daughters and granddaughter right here in the courtroom in the presence of her counsel and whatever marshals might be deemed sufficient for security

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 233 of 3592

purposes.

THE COURT: And what's the government's position?

MR. WILLIAMS: We resist it, Your Honor. We set forth a brief. I'm not going to reiterate the grounds we set forth in the brief.

But the other thing I might just bring up is this.

260

This is five years. We're now in trial, and suddenly they want a contact visit. They could have been asking for a contact visit and briefing this for five years up to this point; or, frankly, we can brief this thing and deal with it after trial.

But to be dealing with a contact visit in the middle of a trial when there isn't an urgent need for it seems to me to be misplaced and unduly burdening the marshal's office and running a risk that we don't need to take. I mean, if, in fact, the Court decides that a contact visit's appropriate, why does it have to happen now? Why does it have to happen in trial? Certainly this is something that can be done later if, in fact, it's even appropriate.

But we're going to be bound -- if the Court enters the order, as you know, the marshals are going to request us to file the motion, so we'll end up having to do that. I don't want you to take offense at it.

THE COURT: I don't take offense at it.

MR. WILLIAMS: But obviously we're going to be having to go through that. So even if you entered the order, we'd ask you to stay implementation of the order long enough for us to take the appropriate measures after that.

MR. BERRIGAN: Just for the record, sir, I think the file's going to reflect that we filed at least three motions for

Page 8

contact visits. We've litigated these motions in front of Judge Zoss -- I'm quite certain of that -- going way back.

261

THE COURT: I don't know.

MR. BERRIGAN: I know. I'm surprised Mr. Williams doesn't know because we've been down this road many times at many different junctures. And the government's going to do what they want in terms of an appeal. They have more time on their hands than we do apparently.

THE COURT: And more resources too.

MR. BERRIGAN: Apparently.

THE COURT: Yeah.

MR. BERRIGAN: And we think this is a very reasonable request, and we'd ask the Court to give it serious consideration.

THE COURT: Well, I'll give it serious consideration. I don't know when I'm going to rule on it. And I think if I'm inclined to grant it, we'd have to have an evidentiary hearing so I could make findings of fact on the security question.

Okay. Anything else before we start at 8:30?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. Do you have a list of witnesses for today by any chance or not? That's fine if you don't.

MR. WILLIAMS: This is the order I numbered them there, Judge, one, two, so forth.

THE COURT: Oh, I see, okay.

MR. WILLIAMS: They're not necessarily in order on

262

Page 9

that page.

THE COURT: Does the defense have the same thing?

MR. WILLIAMS: We're going to give it to them. I had communication with them last night telling them some of these exhibits as well, and those will be the exhibits we'll be introducing with them as well.

THE COURT: Well, the handwriting in the blue ink is definitely better than the handwriting in the black ink. But as one who can't read my own handwriting, I'll -- this looks pretty doable.

Okay. We'll see you back here at 8:30. Thank you.

(Recess at 8:19 a.m.)

THE COURT: We ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: And do you have your first witness in here?

MR. WILLIAMS: First witness is in custody, and I understand he's ready to go.

THE COURT: That's fine.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated.

Mr. Williams, are you ready to call your next witness?

MR. WILLIAMS: We are, Your Honor. The United States calls Aaron Ryerson.

AARON RYERSON, PLAINTIFF'S WITNESS, SWORN

263

THE COURT: Please be seated in the witness box. Make yourself comfortable. Try and adjust the chair and the microphones so you can speak directly into the microphones. Could we get you to scoot that chair up a little bit?

Page 10

MR. WILLIAMS:  Can I ask the marshals maybe to just give a hand on this side?

THE COURT:  Would you state your full name, please, and spell your last name.

THE WITNESS:  Aaron Paul Ryerson, R-y-e-r-s-o-n.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q.   Mr. Ryerson, could you share with the jury a little bit about yourself?  How old are you, sir?

A.   Thirty-four years old.

Q.   And where are you from originally?

A.   Originally from -- born in Britt, Forest City.

Q.   And Britt and Forest City is kind of northwest and west of Mason City?

A.   Yes, sir.

Q.   You're currently in custody, and we're going to talk about that in a little bit.  But before you were in custody, did you have a trade or profession you practiced?

A.   Yeah, I was a carpenter and industrial mechanic.

264

Q.   And for how many years did you do that type of work, sir?

A.   Off and on for 14 years or so.

Q.   And it might be good too, Mr. Ryerson, if you can keep yourself sat up just a little bit in that chair.  Those microphones don't really pick it up unless you're just a couple inches away.  Thank you.

Let's talk about how far did you go through school, sir?

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 237 of 3592

A.    12th grade, graduation.

Q.    Graduated from high school?

A.    Uh-huh.

Q.    And after that you got into your trade.

A.    Right.

Q.    You are in custody right now.  Could you tell the jury what are you in custody for, what charges?

A.    I'm in custody for third-degree burglary, firearms violation, two assaults on a peace officer, and an eluding.

Q.    Let's talk about those charges.  You have over the years had a number of run-ins with the law?

A.    Yes, sir.

Q.    The burglary charge you received was in 2002?

A.    Yes.

Q.    And how long of a sentence did you get for that, sir?

A.    Five years.

Q.    And was it in connection with that that you had some

265

assaults on police officer charges as well?

A.    Yes.

Q.    Was that a felony offense?  In other words, were you sentenced to more than one year?

A.    Misdemeanor.

Q.    On the assault charges?

A.    Yes, sir.

Q.    The burglary charge, was that a felony?

A.    Felony.

Q.    And you were sentenced to how many years, sir?

A.    Seven.

Q.    And did you serve all of that?

Page 12

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 238 of 3592

A.   I'm not sure if I've discharged that sentence now or not, but I may have.

Q.   Let me ask it this way.  Was there a period of time when you served some time and then you were out on parole?

A.   Right.

Q.   And while you were out on parole, was your parole revoked?

A.   Yes.

Q.   And can you tell the jury what happened that caused your parole to be revoked?

A.   I had a firearms violation.

Q.   And how'd that occur?  What happened there?

A.   Had a firearm on me, got hurt at work, got my hand cut off. They found it at the hospital, went to prison.

266

Q.   So where were you working at the time?

A.   Mason City Recycling at the time.

Q.   The recycling center?

A.   Uh-huh.

Q.   And that's a yes?

A.   Yes, sir.

Q.   The court reporter has a hard time with uh-huhs and huh-uhs, so if I could just have you answer yes or no on these.

So you were working at the recycling center, and you say you almost or you had your hand cut off or almost cut off?

A.   Crushed and severed almost.

Q.   And which hand is that, sir?

A.   Left hand.

Q.   And is that -- have you had to have surgery for that hand, sir?

A.   Two surgeries.

Page 13

Q.    And after that happened on the job, you were taken to the hospital?

A.    Correct.

Q.    And they found a handgun on you?

A.    Correct.

Q.    And where did the handgun come from?

A.    Came from work.

Q.    What'd you have it for?

A.    Just picked it up at work.  Another guy had it.  I had it

267

on me.  I went into shock because of my hand.  I still had it on me at the hospital.  That's where they found it.

Q.    And you were a felon at the time, so that too was a felony offense to possess a firearm.

A.    That's correct.

Q.    In connection with this case, have you entered into any type of plea agreement or any other type of agreement with the federal government to get some reduction in the time you're serving in exchange for any cooperation you provided in this case?

A.    No, sir.

Q.    Have you up to this point received any reduction at all in any of your sentences for your cooperation in this case?

A.    No, sir, I haven't.

Q.    Has anybody promised you that you're going to get anything off for testifying here today?

A.    No.

Q.    Do you have any hope that you're going to get something off for testifying here today?

A.    No, I don't.  I don't want anything.

Page 14

Q.   I want to talk to you about some people you may have known in your past.  Did you know somebody by the name of Terry DeGeus?

A.   Yes, sir, I did.

Q.   How'd you come to know Terry DeGeus?

268

A.   Through Angela Johnson, Angela Johnson's house.

Q.   Angela Johnson, is that somebody you knew for some period of time?

A.   Yes, sir.

Q.   When did you first meet her?

A.   Maybe back in high school.  She had a bar in town, Forest City.

Q.   And could you describe for the jury approximately what year that would have been?

A.   '88, 1988, somewhere around there.

Q.   And from that point where you first met her until 1993, describe for the jury what was the nature of your relationship with Angela Johnson?

A.   Just acquaintances, you know.  I don't know if you -- friends.  I mean, I went over to her house a few times, seen her over at her house.  She lived in Leland.

Q.   Did you ever have a romantic relationship at all with her?

A.   No.

Q.   And it was in the course of at her house at some point that you met somebody named Terry DeGeus?

A.   Yes.

Q.   Approximately when was that that you met Terry DeGeus the first time if you recall?

A.   It was later than that.  I mean, maybe in '91, somewhere

Page 15

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 241 of 3592

around there.

269

Q.   And let's do it this way maybe.  It might be easier.  Do you recall at some point in 1993 Terry DeGeus disappearing?

A.   Yes, I do.

Q.   When in relation to that -- do you recall how many years maybe before that was it that you had first met him?

A.   Maybe I ran into him before that but really got to know him maybe a year or two before that.

Q.   And describe for the jury what was your relationship like with Terry DeGeus?

A.   Friends.

Q.   And over the course of the year or two that you knew him before he disappeared, did your friendship become closer?

A.   Yeah, we became friends, pretty good friends.

Q.   Sir, I'm going to show you two exhibits, one marked 38, the other one marked 92, and ask you if you can identify each of those, please.

A.   This is Angela Johnson, 92, and this is Terry DeGeus, 38 Exhibit.

          MR. WILLIAMS:   United States would move to admit Exhibits 38 and 92, Your Honor.

                    *   *   *   *

          (Government Exhibits 38 and 92 were offered.)

                    *   *   *   *

          THE COURT:   Any objection?

          MR. BERRIGAN:   No objection.

270

Page 16

THE COURT: Thirty-eight and ninety-two are received.

* * * *

(Government Exhibits 38 and 92 were admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Showing you Exhibit 92, that's the person you knew as Angela Johnson?

A. Yes, sir.

Q. And showing you Exhibit 38, who's that?

A. That's Terry DeGeus.

Q. In 1992 to 1993, was there a period of time where you ended up actually living with Terry DeGeus?

A. Yes, there is.

Q. Where was he living at the time?

A. In Britt, Iowa.

Q. And describe for the jury, was this a house in town? Was it an apartment? Was it -- where was it?

A. It was a house in the country.

Q. And was anybody else living with him at that point?

A. No, there wasn't.

Q. When you met him, was Terry married?

MR. BERRIGAN: I'm sorry to have to object, Your Honor, but I do object to 38 being up during the course of the

271

witness's testimony after he's already identified it and it's been admitted.

THE COURT: That's fine. He's taken it off. Thank you.

Page 17

BY MR. WILLIAMS:

Q.   Would you like a glass of water, sir?

A.   Yeah, please.

MR. WILLIAMS:  Your Honor, could I ask the --

THE COURT:  Sure.

BY MR. WILLIAMS:

Q.   I think my question to you was at the time that you knew Terry DeGeus, was he married?

A.   I don't believe so.

Q.   Did he have any children?

A.   Yes, he did.

Q.   And how many children did he have?

A.   Had a daughter.

Q.   And what was her name?

A.   Ashley.

Q.   How did you come to know that he had a daughter named Ashley?

A.   He had his daughter a lot at the house, weekends.

Q.   The -- in the time period that you really knew him, '92, '93 before he disappeared, what was the nature of the relationship, if any, between him and Angela Johnson?

272

A.   I know they were at one time seeing each other.  I know he still wanted to be with her, loved her.  I don't know if that was still a romantic relationship or not.  He talked of her often.

Q.   As far as you knew, they weren't living together.

A.   No.

Q.   And at the time you knew him, what I'm hearing is that you knew he still had an interest in her.

Page 18

A.    Yes.

        MR. BERRIGAN:  Object to the leading nature of the question, sir.

        THE COURT:  I'm sorry.  If you don't have your microphone on, we can't hear you.

        MR. BERRIGAN:  I apologize.  I object to the leading nature of the questions.

        THE COURT:  Can you rephrase the question?

        MR. WILLIAMS:  Certainly.

BY MR. WILLIAMS:

Q.    And I'm just trying to get you, sir, to give the jury the best idea you can.  What did you know, if anything, about whether they were seeing each other during this time period of 1992, 1993 romantically?

A.    I knew he saw her before that.  I know he -- you know, he told me he still loved her, still hoped they'd patch things out with her, had some falling outs with her that he told me about.

273

I know that he still wanted to be with her.

Q.    Did he have any other girlfriends during this time period?

A.    Yeah, off and on he did, yes.

Q.    In the fall of 1993, do you know where Angela Johnson was living?

A.    Yes, I do.

Q.    And where was that?

A.    Clear Lake, Iowa.

Q.    Despite -- and at that point Terry DeGeus was still living in Britt?

A.    Yes, sir.

Q.    Did you still see them together on occasion during that

Page 19

time period, 1992 to 1993?

A.   We went to the house a couple times, to her house.  For the most part she didn't want me around.  She didn't like me being around Terry.

Q.   Let me talk to you about the topic of drugs.  During the time period 1992 to 1993, were you aware that Terry DeGeus was involved with any type of controlled substances?

A.   Yes, I do.

Q.   And what was he involved with, sir?

A.   Methamphetamine.

Q.   And how did you know that?

A.   Because I was there involved.

Q.   In the house?

274

A.   In the house at the time, yes.

Q.   What kind of quantities of methamphetamine did you see Terry DeGeus with during that '92 to '93 time period?

A.   Jars full of meth, empty peanut butter jars full of methamphetamine.

Q.   And how do you know it was methamphetamine, sir?

A.   Because I've used meth before.

Q.   And did you use some of the meth that Terry had?

A.   Yes, sir.

Q.   Did you ever talk to him about where he was getting the methamphetamine from?

A.   No.

Q.   Did you ever have occasion to see anybody that --

A.   Well, excuse me.  Yeah.  I mean, he didn't tell me who, but we talked, you know.

Q.   What did he tell you about the meth?

Page 20

MR. BERRIGAN: Object, Your Honor, that this is hearsay and deprives our client of her Sixth Amendment right to confrontation.

MR. WILLIAMS: This would be 804(b)(6), Your Honor.

THE COURT: Objection's overruled. You may answer.

MR. BERRIGAN: May I have a continuing objection during this witness's testimony?

THE COURT: You may. Thank you.

MR. BERRIGAN: Thank you.

275

BY MR. WILLIAMS:

Q. You can answer that question. What did he tell you about his source of methamphetamine?

A. You know, only thing he really told me about -- he wouldn't -- you know, I wouldn't try to pry who it was or nothing like that, but I knew the relationship between him and Angie, and, you know, he said he made a mistake. Then the person he had getting the drugs -- he was getting the drugs from, he said he had Angie go drop off the money or pick up the drugs one day and then Angie was with the guy that he was getting his drugs from who I later found out to be Honken only through the paper.

Q. So let's talk about the person who was supplying Terry DeGeus with drugs. Was there occasion when you were at Terry DeGeus's house during that time period in 1992, 1993 where you saw somebody arrive that met up with Terry DeGeus?

A. Yes, sir, I did.

Q. And can you describe for the jury what he looked like?

A. Six foot tall, glasses, blond hair.

Q. What did he -- did he look stocky? Did he look -- I mean,

Page 21

how would you describe his appearance?

A.    Was thin, lengthy (sic).

Q.    Describe for the jury how many times did you see him come to Terry DeGeus's house?

A.    To the best of my knowledge, maybe two.

276

Q.    And what would happen when he came there?

A.    After he left, Terry would have a substantial amount of methamphetamine.

Q.    So before this guy would come, would Terry have any methamphetamine?

A.    Very little.

Q.    And what would happen when this guy would actually come to the house?  Did you sit around with them, or what happened?

A.    No.  He was really discreet with, you know, what he was doing.  He didn't want to involve me.  He didn't want me to be involved or know.  So he put me in a different room, you know, asked me, Would you please go hang out here for a second, be real quick, and he'd yell my name when the person would leave.

Q.    And when you'd come back out, there'd be substantial quantities of methamphetamine?

A.    Yes, sir.

Q.    Let's talk about what Terry told you, if anything, about how many other times he may have gotten methamphetamine from this source.  Did he tell you anything about that?  I mean, you saw a couple times.  Did he tell you about anything else?

A.    I mean, we talked about it.  I didn't really -- you know, I didn't really ask how many times you're picking it up.  I knew by the amounts when it got picked up, you know.  When the deliveries were made, you know, I knew because he had more meth.

Page 22

I assumed anyway.

277

Q. So there were other occasions where you didn't see this guy come to the house but Terry had substantial amounts of methamphetamine on other occasions as well?

A. Yes. It was the same meth.

Q. When you say it's the same meth, how do you know it was the same meth?

A. Because it was the same consistency and color, smell.

Q. And throughout the time period of 1992 to 1993, did Terry DeGeus generally have a supply of methamphetamine?

A. Generally, yes.

Q. And over that time period on occasion, did you use methamphetamine that he had?

A. Yes, I did.

Q. And did Terry use methamphetamine?

A. Yes, we used together.

Q. Did you ever help him line him up with anybody that you knew that was looking for methamphetamine not as a -- you know, to get money from him or something but help him connect up with people?

A. Yes, I did.

Q. And how many times did you do that?

A. Maybe a handful of times.

Q. And did you get anything for connecting him up with these people?

A. No, I didn't.

278

Q. Did he ever charge you for the methamphetamine you used?

Page 23

A.    No, he didn't.  Pretty -- he just didn't.

Q.    Is that more of a friendship thing in your view?

A.    I guess, yeah.

Q.    On the occasion -- the two occasions where you saw this six-foot-tall person come to the house and deliver methamphetamine, you said substantial quantities of methamphetamine.  Do you recall how much methamphetamine was there on those two occasions after this person left?

A.    Like I said, maybe a peanut butter jar full, Jiffy peanut butter jar full, uncut meth.

Q.    I want to go back to the statement you made about what Terry told you about Angela Johnson, and I want to broaden that topic a little bit.  During the time period in 1992 to 1993, did you see Angela Johnson ever pick up quantities of methamphetamine from Terry DeGeus?

A.    No, I didn't.

Q.    Did Terry ever tell you about what her involvement was with him in distributing methamphetamine?

A.    Yes, he did.

Q.    What did he tell you?

A.    Told me at first that -- he voiced to me that if something happened where the door would be kicked in at his place that the money would still be at her place.

Q.    And what money did you understand he was referring to?

279

A.    Money from the meth.

Q.    So when he said the money was at her place, the money he was making from selling the methamphetamine was stored at her place?

A.    Was in a safe place, yeah.

Page 24

Q.   Did he describe for you any further what her involvement was in the methamphetamine?

A.   Said he was a little upset that she bought a couch once without permission.

Q.   And explain to the jury what you mean.  What was the nature of the conversation?  Why was he upset about that?

A.   She was spending the money.

Q.   The drug money?

A.   Yeah.

Q.   When -- you indicated at some point he said he made a mistake, and describe for the jury again what Mr. DeGeus told you about that.

A.   He told me that he was being followed and that he had her go pick up the drugs one time and that him and -- the guy he was getting the drugs from was now seeing Angela.

Q.   And I want to go back to that for a second.  You say pick up the drugs or deliver money?  I can't remember what --

A.   Probably pick up -- probably both, you know.  I can't remember.  I know he told me pick up, so . . .

Q.   Okay.  And so after that time that he sent her over either

280

to pick up drugs or deliver money, she got hooked up with his source.

A.   Yeah, she did.

Q.   And what did you understand when he said she hooked up with that source?  Was that a romantic hook-up?  Was that she was now getting drugs from him and not from Terry?  What did you understand that to mean?

A.   He was upset because she was now seeing Dustin.

Q.   Did you ever have any conversations with Terry about any

Page 25

quantities of methamphetamine that Angela Johnson picked up from him?

A.   Yes.

Q.   And what was those -- what was the nature of those conversations?

A.   Well, one time he -- I was at his house, and he told me that he had her -- he gave her the key to go to the house to pick up an ounce of meth and that he had told me that she told him this ounce of meth, that she dropped it on the floor.  So when we went back to the house -- and that she only got an eight-ball back off the floor.  And when we went back to the house, he poured an ounce on the floor.  He scooped it back up, and he measured it, and he only lost like an eight-ball of crank.  So he knew she was, you know, lying to him.

Q.   And so explain that to the jury if you can a little bit more.  What did he suspect her of doing then?

281

A.   Stealing the drugs.

Q.   Did he ever describe for you whether he was charging her for drugs?  Was he giving drugs to her?  Did he give you any explanation of what the financial arrangement was there?

A.   Just that he had the money at her house.  I know that he told me one time -- he got a stalking charge from her, and it was -- he had fronted her some dope because they were going to set up a guy and -- with some drugs, and he saw -- he owed Terry money, and Terry stopped by Angie's, and the reason I can't forget is because he had some of my drugs in his car.  He had 5 grams of my cocaine in his car.  So he had gone to her house, and she immediately called the cops like he was stalking her which wasn't the case at all.  It was the guy that was in the

Page 26

house that owed Terry money, and she was protecting him, so she called him in, got him for stalking, had the cops come arrest him. Well, the guy ran out the back door, and then she moved his vehicle two blocks down the street and parked it on the side of the road.

Q.   She being Angela Johnson?

A.   Right.

Q.   And moved whose vehicle?

A.   Terry's. I think it was a Cadillac. I don't know if it was his parents' or not.

Q.   And that was the car that had your drugs in it?

A.   Yeah, and his probably.

282

Q.   Let's go back to quantities here for a minute. You've used methamphetamine in the past, and you know you helped Terry connect up with some people so he could move some methamphetamine. An ounce of methamphetamine, is that something that a typical user on the street would use, or is that something in your experience that would be divided up and sold off?

A.   It'd be sold off.

Q.   An ounce isn't something for a user.

A.   No. Something to sell, yeah. Take a while to use -- it would take -- that meth there, it would take a while to use an ounce of that meth.

Q.   Did -- during the time period that you were with Terry DeGeus, 1992, 1993, did you ever see him be abusive or physical with Angela Johnson?

A.   No, I didn't.

Q.   I want to direct your attention at this point to March 21

Page 27

of 1993. And were you at Terry's house on that day?

Maybe the date doesn't ring a bell with you. Let me do it this way. Do you recall being at Terry DeGeus's house when police came and searched the house?

A. Yes, I do.

Q. And would you have any reason to doubt that that was March 21 of 1993?

A. No, I wouldn't.

283

Q. What were you doing that day at Terry DeGeus's house?

A. When the cops came?

Q. Yes.

A. Sleeping I think.

Q. Was anything supposed to be happening that day with regard to any drug transaction that you recall?

A. Yes.

Q. And what was that?

A. Was supposed to go to Mason City to pick up the methamphetamine.

Q. And who was going to go to Mason City for that purpose?

A. Terry was.

Q. And did he tell you who he was going to be picking it up from?

A. No.

Q. At the time before the search took place, were you aware of whether there was any methamphetamine in the house?

A. Yes.

Q. And when the police came to search the house, what happened at that point?

A. We held them out.

Page 28

Q. And how'd that happen? Just describe that for the jury, please.

A. Police thought that -- thought that nobody was there and started ramming in the door. And Terry got up and started

284

yelling, really surprised them, and they went back to their vehicle because they didn't think that anyone was there. Took them by surprise and went back --

Q. So then what happened?

A. Then we were in the house and looked out the window, and there's this line of cars, police cars, outside the house.

Q. So what'd you guys do?

A. Took the meth -- took some of the meth that was there -- Terry burnt up the letters that Angela Johnson wrote him to protect her from any wrong -- you know, involvement.

Q. And what happened with the methamphetamine?

A. It got tossed out.

Q. What do you mean tossed out?

A. Flushed down.

Q. Flushed down the toilet?

A. (Witness nodded head.)

Q. And how long did this process take before it came to an end if you recall?

A. I don't recall.

Q. How did it end?

A. Ended with Terry walking out of the house.

Q. And what did you do at that point?

A. I had a warrant. I knew it. So I was trying to hide, way -- big house, way up in the attic.

Q. And were you found there?

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 255 of 3592

A.    I was found, went to jail.

Q.    That happened on March 21 of 1993.  And after that occurred up until the fall of 1993, what kind of happened with you and Terry DeGeus?  Did you continue to stay with him?  Did you move out elsewhere?  What happened there?

A.    My lawyer recommended me and him not hanging around anymore, but I was in jail for -- he got out right away.  He got out of jail I think the next day, and so most of that summer I was in jail for like 75, 80 days.  I was in jail, so when I got out of jail, you know, I talked to him, but -- I came over and I saw him and I talked to him, drank a couple beers once in a while.

Q.    Sure.  Didn't end up staying with him anymore after that.

A.    No.

Q.    I want to direct your attention to the fall of 1993, in particular October 27 of 1993.  Do you recall being subpoenaed to appear before a federal grand jury in Cedar Rapids, Iowa?

A.    Yes, I do.

Q.    And did you go down to appear in front of the grand jury?

A.    Yeah, I was called to the grand jury, yes.

Q.    And so you went down.

A.    Right.

Q.    And while you were waiting to appear in front of the grand jury, did you see other people you knew also waiting to appear before the grand jury?

A.    I saw two people I'd seen.  One I knew, and one person I'd

seen before but didn't know.

Q.   And who did you see that you knew?

A.   Angela Johnson.

Q.   And who was the other person you saw you didn't know?

A.   It was Dustin Honken.

Q.   And had you seen that person before?

A.   At Terry's and in Clear Lake, yeah.

Q.   Was that the six-foot-tall guy that you'd seen come to the house and after he left there was methamphetamine?

A.   Yes.

Q.   Did you notice anything about Angela Johnson's physical condition at that grand jury appearance in October of 1993?

A.   Pregnant.

Q.   Were you sitting together in a room, or what was the circumstances where you saw Angela Johnson and Dustin Honken?

A.   It was a small waiting room.

Q.   And during that time period, how long did you wait there before you testified before the grand jury?

A.   I didn't testify for the grand jury, but I waited there probably half an hour.

Q.   Anything happen during that half an hour that you were in the small room with Dustin Honken and Angela Johnson?  Anybody say anything to anybody?

A.   Got a snide look.

287

Q.   From who?

A.   From Angela Johnson, like I was going to testify or something, just a -- you know, an evil look.

Q.   Let's talk about it.  You said you didn't testify.  You actually were brought into the grand jury room and sworn in,

Page 31

were you not, sir?

A. Correct.

Q. And then what happened?

A. They granted me immunity first.

Q. And did you then testify?

A. No, I didn't.

Q. What'd you do?

A. Pled the Fifth.

Q. Invoked your Fifth Amendment right to remain silent?

A. Yes, I did.

Q. Did you give up any information at that point against Terry DeGeus or Angela Johnson or Dustin Honken?

A. No, I didn't.

Q. After you left the grand jury, what'd you do, sir?

A. I drove to Britt.

Q. And when you drove to Britt, did you meet up with anybody?

A. Yes, I did.

Q. Who was that?

A. Terry DeGeus.

Q. And what, if anything, did you tell Terry DeGeus about your

288

appearance before the grand jury?

A. I just told him that I didn't say -- you know, who I saw, that I saw Angela pregnant, that I didn't say -- that I didn't say anything.

Q. What did he do?

A. He was on the phone with Angie, called up Angie.

Q. After you told him what was going on?

A. Right.

Q. And how do you know he was on the phone with Angie?

Page 32

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 258 of 3592

A. He told me.

Q. And were you there while he was talking with Angela Johnson?

A. Yes.

Q. And did you hear his end of the conversation?

A. No, not really, not that I can recall of it but . . .

Q. And after he got -- I'm sorry?

A. I knew he was on the phone with her.

Q. After he got off the phone with her, did he tell you what he told her?

A. Just that she really hates me, apparently didn't believe me.

Q. Did he indicate whether he had told her what you had told him, that you had not testified against anybody?

A. I'm assuming he did.

Q. He didn't tell you one way or the other.

289

A. No.

Q. Sir, I'd like to talk to you about your last contact with Terry DeGeus. After that October 27 appearance before the grand jury, did you see Terry DeGeus again?

A. Yes, I did.

Q. And where at?

A. It was at his house.

Q. And where at?

A. Britt.

Q. Who all was at the house at Britt when you were there?

A. It was me, Terry's daughter, Terry's friend.

Q. And what happened?

A. He said he was going to Angela Johnson's house, and that

Page 33

was it.

Q.   Did you ever see Terry DeGeus again?

A.   No.

Q.   The Angela Johnson that you knew involved with Terry DeGeus, do you see her in the courtroom here today, sir?

A.   Yes, I do.

Q.   Can you identify for the jury where she's sitting and what she's wearing?

A.   Sitting over there in the brown.

Q.   To your left?

A.   Yes.

MR. WILLIAMS:   Thank you.  I have no further

290

questions.

THE COURT:   Mr. Berrigan?

MR. BERRIGAN:   Thank you, sir.

CROSS-EXAMINATION

BY MR. BERRIGAN:

Q.   Mr. Ryerson, you need a minute?

A.   No, I'm fine.

Q.   You okay?  My name is Pat Berrigan.  I'm one of Angela Johnson's lawyers; okay?  I'm going to ask you a few questions. You all right with that?

A.   Yes, sir.

Q.   I guess you don't have much choice, huh?  All right.  Well, I want to just be clear.  You're 34 years old?

A.   Yes, sir.

Q.   And you've known Terry DeGeus a year and a half out of your whole life; is that right?

A.   Maybe more.

Page 34

Q. Maybe more? I thought the prosecutor asked you that question. Did I hear you say, I knew him about a year, year and a half?

A. Maybe less too, yeah.

Q. Okay. Well, maybe around a year and a half you knew this guy.

A. That's correct.

Q. You got pretty tight apparently.

291

A. Yeah.

Q. And it's a long time ago now since he's been gone now, right, 12 years ago?

A. Right.

Q. You met Terry DeGeus through Angela; isn't that right? You knew her first?

A. Right.

Q. And you knew her because you used to go down to a bar that she owned in Forest City and you had some friends that played in a band down there; right? Isn't that right?

A. Uh-huh.

Q. And one day you were over at her house -- and you were friends at that time; right?

A. Correct.

Q. And you met this fellow Terry DeGeus, and you and he hit it off; isn't that right?

A. That's right.

Q. In fact, he invited you out. He had a new place out in the country. Invited you out to his new house?

A. Uh-huh.

Q. Yes?

Page 35

A.    Yes.

Q.    And you helped him move in some furniture or something?

A.    Yeah.

THE COURT:  Excuse me a second.  Could you pull those

292

microphones a little closer?

THE WITNESS:  You bet.

THE COURT:  There.  Thank you.  You're kind of soft spoken, and I want to make sure the jury hears everything. Thank you.  Excuse me for interrupting.

MR. BERRIGAN:  No, that's okay, sir.

BY MR. BERRIGAN:

Q.    And that relationship sort of developed, and you ended up living over there with Mr. DeGeus; isn't that right?

A.    Right.

Q.    For at least a period of a few months.

A.    Right.

Q.    And, of course, you knew because you were living with him that he was involved with methamphetamine.

A.    Yes, sir.

Q.    Okay.  Let me ask you something, Mr. Ryerson.  I mean, was that your first experience with methamphetamine, sir?

A.    No, it wasn't.

Q.    Okay.  When did you start using drugs yourself?

A.    In high school.

Q.    Okay.  And would that include methamphetamine?

A.    Yes, sir.

Q.    When did you graduate from high school?

A.    1989.

Q.    '89.

Page 36

A.   Uh-huh.

Q.   So you're really only a couple years out of high school, pretty young guy when you met up with Mr. DeGeus.

A.   That's right.

Q.   He was a bit older than you at the time; right?

A.   Little bit, yeah.

Q.   And the methamphetamine that you were using when you were with Mr. DeGeus, that was his methamphetamine, wasn't it?

A.   Yes.

Q.   In other words, you weren't bringing methamphetamine into this relationship yourself, were you?

A.   No.

Q.   Were you working at the time you were living with Mr. DeGeus?

A.   No.

Q.   Okay.  So you weren't paying him money for rent to stay at his house.

A.   No.

Q.   And you weren't paying him any money for these drugs.

A.   No.

Q.   Now, this methamphetamine, this was pretty good stuff, wasn't it, in terms of the quality of the methamphetamine Mr. DeGeus had?

A.   Yes.

Q.   And would it be fair to say that you and he at least over a

294

period of time got pretty heavily into using methamphetamine?

A.   Yes.

Page 37

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 263 of 3592

Q. Could you tell the jury how did you use it? What kind of method did you use to ingest this stuff?

A. Any method there was.

Q. Okay. Well, I'm going to have to confess that I'm not as familiar with methamphetamine ingestion as I might be, so what are the possibilities?

A. Injection, smoke, and snort.

Q. Okay.

A. Drink.

Q. And smoking seems pretty obvious. You would smoke it in a pipe of some fashion, would you?

A. (Witness nodded head.)

Q. Yes?

A. Yes.

Q. Okay. I can understand you when you nod, but as the judge pointed out, this court reporter's just trying to make sure we record everything accurately; okay? So you'll forgive me if I interrupt you if you nod; okay?

And then snorting, what would that involve?

A. Snorting through a tooter.

Q. I'm sorry?

A. Snorting meth through a tooter.

Q. What's a tooter?

295

A. A straw.

Q. A straw. And you just put it in your nose and sniff in?

A. Yes.

Q. Okay. And that's where you have to cut it like it's on a little line, don't you?

A. Yes.

Page 38

Q.    Usually on a piece of glass or a mirror?

A.    Yes.

Q.    And is there a certain amount that you do at one time when you do that snorting with the straw?

A.    Whatever amount you want to ingest.

Q.    Okay.  And then what were the other thing -- injection I think you said.

A.    Uh-huh.

Q.    How does that work?

A.    Syringe.

Q.    Syringe.  And how do you prepare the methamphetamine in order to shoot it into your body?

A.    Put it in a spoon, put it in water.

Q.    Do you heat it up?

A.    No.  Put it in a syringe and inject it.

Q.    Okay.  It dissolves in the water.

A.    Yes.

Q.    And you have to have some special syringes, you know, clean needles and all for that kind of stuff?

                                                    296


A.    Yes.

Q.    I would think that -- is that a more expensive way to use the methamphetamine?

A.    Yes.

Q.    And were there any other ways we haven't talked about?  Can you take it orally?

A.    Putting it in water and drinking it.

Q.    Drinking it, okay.  And did you have a preferable way that you liked to consume methamphetamine?

A.    Yes.

Q.   What did you do?

A.   Injection.

Q.   Injection.  What's preferable about that?

A.   It's faster.

Q.   Faster?  Does the methamphetamine act more quickly on you if you inject it?

A.   Yes.

Q.   And what about in terms of the amount of methamphetamine that you need to use?  Does one method consume more methamphetamine than another?

A.   I wouldn't think so, no.

Q.   Okay.  Let me ask you, when you were pretty heavily into this with Mr. DeGeus, what -- in an average day, how much methamphetamine would you think you might consume?

A.   I would consume at least a gram of pure meth a day.

297

Q.   Well, a gram's just a little bit, isn't it?

A.   Yeah.  You know, gram, yeah.

Q.   Wouldn't a gram be something you'd do at one using?

A.   No.

Q.   No?

A.   (Witness shook head.)

Q.   Okay.  So you could go all day with a gram of methamphetamine?

A.   Yeah.

Q.   Could you?

A.   Yeah.

     MR. WILLIAMS:  Asked and answered, Your Honor.

Q.   And what about Mr. DeGeus?  Would he use about the same as you?

Page 40

A.    Yes.

Q.    Okay.  And this is something you did together I presume.

A.    Yes.

Q.    Were other people present when you and Mr. DeGeus used to use this methamphetamine?

A.    No.

Q.    Is this a daily activity that you were engaged in when you were with Mr. DeGeus?

A.    Almost daily.

Q.    Okay.  And, you know, I guess part of the picture I suppose is what this drug does to you.  That is, is it a hard thing to

298

quit?

A.    It can be, yeah.

Q.    Okay.  What is it that's hard about it?

A.    I guess psychologically it's hard to quit.

Q.    Did you -- go ahead.  I'm sorry.

A.    Psychologically.

Q.    What about physically?  Did you feel a craving or a need to use methamphetamine once you started using it?

A.    I don't think it's as physically addictive --

Q.    You don't.

A.    -- as it is mentally.

Q.    Okay.  And what effect did it have on you once you took it?

A.    Euphoric feeling.

Q.    Euphoric.  How long would that last?

A.    I don't know, you know.  Sometimes all night, all day, all night.  Depends on how much we were doing.

Q.    Okay.  Well, how much did a gram last?

A.    All day and all night.

Page 41

Q.   You could stay up for 24 hours on a gram of
methamphetamine?

A.   Yeah.

Q.   And when you did that, when you were finished with the one
gram, would you use another one right away?

A.   Not a whole gram, no, but, you know, I would assume
probably a gram another 24-hour period of time.

299

Q.   Would you find yourself up awake for days at a time when
you were using methamphetamine?

A.   Yes, I would.

Q.   How many days at a time could you stay awake?

A.   The most was seven.

Q.   Seven days in a row without sleep.

A.   Right.

Q.   Okay.  What about when you weren't taking it?  Did that
cause some movement the other way in terms of --

A.   Yes, it did.

Q.   What would happen when you weren't taking the
methamphetamine?

A.   Tired, you know.  You been up for seven days, wore out.

Q.   So you sleep?

A.   Sleep and eat, get up and eat.

Q.   Would you be eating when you were doing the
methamphetamine?

A.   Believe it or not, yes.

Q.   Okay.  These problems that you've had in your life in terms
of a criminal nature, Mr. Ryerson, have they been largely
connected with drugs?

A.   Yes, they have.

Page 42

Q. You told the prosecutor you had a theft conviction that you got jail time in -- and I don't remember the date. When were you convicted of theft?

300

A. 2002.

Q. 2002? You had a burglary third-degree conviction in 2000? Does that sound right?

A. Theft, burglary I thought was the same thing basically, 2002. I thought you were talking about the same incident.

Q. Have you had more than one burglary conviction?

A. Yeah.

Q. Looks like you had a burglary conviction 2002 and a third-degree burglary in 2000. Does that sound at all right to you?

A. May sound correct, yeah.

Q. What about this terrorism with intent, 1997? What is that terrorism with intent?

A. Had a holdout at my house.

Q. A holdout?

A. Yeah.

Q. What's a holdout?

A. Police officer -- had a holdout with the police officers.

Q. I see. The intent, is that with intent to assault?

A. Yes.

Q. Okay. Were there guns involved in that?

A. Yes, there was.

Q. And then while you were on parole, you got in an accident at a recycling center and hurt your hand?

A. That's correct.

301

Q. And it just so happened you had a loaded pistol on you when you went to the hospital.

A. That's correct.

Q. And, of course, being a felon, that made you a felon in possession of a handgun.

A. That's why I'm in prison now.

Q. And how much time you serving now?

A. Five-year sentence.

Q. Okay. Do you have an out date?

A. I have a year to discharge.

Q. A year to discharge.

A. Next July, yes.

Q. When did you get that conviction?

A. Would have been in -- April 1, 2003 -- 2004.

Q. 2004?

A. Yeah.

Q. So you've been in jail I guess a little over a year on that case?

A. Right.

Q. And you're going to be out next year perhaps.

A. Well, that's when I discharge.

Q. Well, discharge, does that mean you're getting out of prison?

A. That means I've served my sentence, yes.

Q. Okay. All right. I wanted to ask you a little bit about

302

this grand jury testimony the prosecutor asked you about, and I know you probably don't remember the date, but October the 27th,

Page 44

1993, you were subpoenaed to testify in Cedar Rapids before the federal grand jury. You remember that?

A. Yes, I do.

Q. Okay. And you knew before you went down there that the feds were conducting an investigation that included investigating your buddy Terry DeGeus for drug activity.

A. Right.

Q. And so you're in this witness room or waiting room I guess it is, and you saw Angela Johnson there; right?

A. That's correct.

Q. And did you know she was going to be there?

A. I didn't know who was going to be there.

Q. You wouldn't have any way of knowing that; right?

A. (Witness shook head.)

Q. And is there any reason that you would know of that she would know that you were going to be there?

A. No, no. I know she knew I was staying at Terry's. I knew she didn't like me, but there was no way I could assume what somebody else knows.

Q. Okay. Well, did you think she was there to testify against Terry DeGeus?

A. I don't know what -- you know, I knew she'd be there for something, possibly to testify.

303

Q. Well, the investigation, did you know it concerned Terry DeGeus?

A. Yes, I did.

Q. Okay. So that's why you were there; right? You expected they were going to ask you questions about your friend Terry DeGeus and his use of drugs; right?

Page 45

A.    Right.

Q.    And so she's looking at you sideways because she knows that you're supposed to be his friend; right?

A.    Right.

Q.    Did you tell her, Oh, don't worry; I'm not going to say anything against Terry DeGeus?

A.    (Witness shook head.)

Q.    No?

A.    No, I never said anything to her.

Q.    Okay.  Well, you know, did you talk to her after she testified?

A.    After who testified?

Q.    After Miss Johnson testified, did you talk to her?

A.    After -- I didn't know she did testify.

Q.    In light of she said Terry DeGeus was never involved with any drugs, did you ever talk to her about that?

        MR. WILLIAMS:  Objection, Your Honor.

        MR. BERRIGAN:  I'll withdraw that question, Your Honor.

304

BY MR. BERRIGAN:

Q.    Did I hear you correctly?  Did I hear you saying Dustin Honken was in the room when you came in?

A.    He made his presence.

Q.    Isn't it true that what happened was you were already in the room with Angela Johnson and some guy from Ventura, Iowa, some big fellow, and Dustin Honken came in, popped his head in, looked at you, gave you a good hard look, and got out of there?  Isn't that how that went down?

A.    More or less, yeah.

Page 46

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 272 of 3592

Q. Yeah. He wasn't sitting there with Angela Johnson, was he?

A. No.

Q. They didn't have any conversation whatsoever in your presence on October the 27th, 1993, did they, Mr. Ryerson?

A. No, I don't think they did.

Q. Wasn't even a word exchanged.

A. No.

Q. And Dustin Honken when he gave somebody a look, it was you he was looking at, wasn't it?

A. Yeah.

Q. Yeah. You actually did go up before the grand jury that day, did you not?

A. Yes, I did.

Q. And when they asked you, Do you know an individual by the name of Terry DeGeus, that's when you took the Fifth Amendment;

305

right? That's when you pled the Fifth Amendment.

A. Yes, sir. I think so, yes.

Q. Would you like to see your transcript?

A. I believe you.

Q. Taking my word for it?

A. Yeah.

Q. Okay. You certainly weren't intending to implicate Terry DeGeus in any criminal activity that day, were you?

A. Repeat that.

Q. You would not have implicated your friend in any criminal activity that day.

A. I didn't, no.

Q. No matter what happened to you, you weren't going to say anything against Terry DeGeus, were you?

Page 47

A. No, I didn't.

Q. In fact, you went right over to visit him after that appearance in front of the grand jury.

A. Yes, I did.

Q. And he was over at his girlfriend's house, wasn't he?

A. I think he was seeing a girl at the time.

Q. Yeah. Not Angela Johnson.

A. Right.

Q. Right. And the truth is their relationship was pretty much on and off, wasn't it, during the time that you knew the two of them?

♀

306

A. Yes.

Q. Mr. DeGeus had girlfriends, did he not?

A. Yes, he had girlfriends.

Q. In fact, when you left his house, when you moved out after living with him, didn't some woman move into the house with him?

A. I believe so, yeah.

Q. Yeah. It wasn't Angela Johnson, was it?

A. No.

Q. She had her own place, didn't she?

A. Yeah.

Q. Can we talk a little bit about this search of Mr. DeGeus's residence on March the 21st? This is the one you were hiding in the attic. You remember that?

A. I remember that.

Q. Okay. Let me see if I understood what you said. Do you remember that this happened at night? It was about ten o'clock at night?

A. Yes, sir.

Page 48

Q.   And you and Mr. DeGeus were asleep in the living room at the time the police came?

A.   Yes.

Q.   Is this one of those periods where you'd been up for a few days and you've decided to get some sleep?

A.   I don't recall.

Q.   Okay.  And then there's this big pounding on the door or

307

what you described as a ramming on the door.  Is that your recollection?

A.   That's my recollection, yes.

Q.   And then you said that the police were surprised because they didn't know anybody was there?

A.   That is correct.

Q.   And so they backed off and went back and sat in their police cars?  Is that what you're telling us?

A.   Yes.

Q.   Did Terry DeGeus have a car at that time or a truck?

A.   Truck.

Q.   Where was it?

A.   Parked out front.

Q.   In front of his house.

A.   Pretty sure it was.  I'm not positive.

Q.   When the police came that day.

A.   Right.

Q.   And so how did that work?  Did the police say, Oh, we didn't know anybody was home, so they went back and sat in their cars or what?

A.   They were surprised I think when Terry was yelling.  I don't know what I did.  But I remember him yelling.

Page 49

Q. He was yelling he was going to shoot somebody if they came through the door. Wasn't that what he was yelling?

A. No, I don't think.

308

Q. Isn't it true, Mr. Ryerson, that the police were on the P.A. system for two hours every ten minutes demanding that the two -- or Mr. DeGeus come out?

A. You know, I remember it being a major snowstorm that day. I didn't even hear a P.A.

Q. The snow was keeping you from hearing the P.A. system?

A. It was a blizzard terrible that day.

Q. I see. And Mr. DeGeus in the meantime is flushing methamphetamine down the toilet.

A. Right.

Q. Right? Quite a lot of methamphetamine, in fact, wasn't it?

A. Substantial amount.

Q. You knew how much methamphetamine was there because you were using it with him every day; right?

A. Yes.

Q. Yeah. And then you say he burnt up some letters to protect Angela Johnson? Is that your claim?

A. That's my -- yeah.

Q. Did you read the letters?

A. I saw the heading of them.

Q. Is that while they were burning? Is that what you would do?

A. I was sitting right next to him when he lit them up.

Q. I see. And you decided at some point to run up into the attic.

309

Page 50

A.    Right.

Q.    Because the police wouldn't have any reason to believe you were there.

A.    Well, they may.

Q.    Because you were living there.

A.    Right.

Q.    Is that the only experience that you had had while you were with Mr. DeGeus where he was involved with the police?

A.    As far as?

Q.    The police interacting with Mr. DeGeus in your presence.

A.    Yes, that was the only time.

Q.    Okay.  Now, you knew Mr. DeGeus pretty well at that time.

A.    Right.

Q.    And he wasn't a really very large guy, was he?

A.    He was all muscle.

Q.    Yeah.  He was a strong fellow, wasn't he?

A.    Yes, he was.

Q.    And pretty tough character would you say?

A.    I guess he could be.

Q.    Could be.

A.    He wasn't with me.

Q.    Not with you.

A.    I didn't see him ever get in a fight or anything like that.

Q.    Never saw him in a fight at all.

A.    No.

310

Q.    And you said you never saw him beat up Angela Johnson either; is that right?

A.    No, I didn't.  That's right.
Page 51

Q.    And even though he was your friend, he never told you where he was getting his drugs; is that right?

A.    That's right.

Q.    You told the prosecutor repeatedly he never told you the name of the person who was selling him the drugs.

A.    I didn't ask, though, either.

Q.    He didn't volunteer it apparently.

A.    No.

Q.    He didn't trust you with that information, did he?

A.    No.

Q.    Mr. DeGeus had some guns at that house, did he not?

A.    Yes.

Q.    You never saw Mr. DeGeus actually give methamphetamine to anybody?

A.    He was really discreet about it.  I didn't see; I didn't know; I didn't need to, you know -- he was protecting all -- I guess protecting his friends or whatever he did.  I didn't need to see him make any transactions.  That was his . . .

Q.    I thought you told the prosecutor you brought people by, you set him up with people.

A.    I did.  He met people I knew.

Q.    Met them for what?

311

A.    Drugs.

Q.    Drugs, right.  He was selling them drugs; right?

A.    Right.

Q.    That's the whole purpose of you setting him up; right?

A.    Right.

Q.    Did you know that the prosecution has alleged that you're part of this drug conspiracy?  Are you aware of that?

Page 52

A.   Huh?

Q.   Were you aware that the prosecution's alleged that you're part of this drug conspiracy?

A.   Right.

Q.   Did you know that?

A.   Yes.

Q.   The prosecution alleges that the conspiracy included the following persons in addition to Angela Johnson:   Timothy Cutkomp, Terry DeGeus, Dustin Honken, Jeff Honken, Gregory Nicholson, David Patrick, Aaron Ryerson, and Gary Solland.   Do you know Gary Solland?

A.   No.

Q.   Do you know David Patrick?

A.   No.

Q.   How about Gregory Nicholson?

A.   Never met him.

Q.   Jeff Honken?

A.   Don't know him.

312

Q.   Mr. -- as you've pointed out, Mr. DeGeus did not require any payment from you for the methamphetamine; right?

A.   No, he didn't.

Q.   Now, he had to pay for it, didn't he?

A.   I assume so, yes.

Q.   How much was a gram of methamphetamine back then in 1993?

A.   Hundred dollars.

Q.   Hundred bucks a gram?

A.   (Witness nodded head.)

Q.   And you've described these peanut butter jar bottles full of methamphetamine?

Page 53

A.    Yes.

Q.    You and Mr. DeGeus are going through those over there in his house snorting them and injecting them or whatever way you're doing it.

A.    Yes, we were.

Q.    And he's obviously not getting any money from you, but he's paying somebody else for those drugs; right?

A.    I would assume so, yes.

Q.    And that's really what Angela Johnson was angry at you about because you were using all of the drugs.  Isn't that what this was about?

A.    Maybe.

Q.    She didn't want you hanging around with Terry DeGeus because all you did was use all his drugs and caused him to use

313

all his drugs.

A.    Maybe.

Q.    And he's getting into debt which is going to cause him problems; right?

A.    Never said he was in debt but . . .

Q.    Well, you didn't have any money to give him anyway; right?

A.    I wasn't.

Q.    Wasn't your concern because you weren't buying the methamphetamine; right?

A.    No, it wasn't his either as far as I know.

Q.    You never got any drugs from Angela Johnson.

A.    From Angela?

Q.    Yeah.

A.    Way back in high school.

Q.    Way back in high school before you knew Terry DeGeus.

Page 54

A.   Yeah.

Q.   Once you knew Terry DeGeus, you never got any methamphetamine at all from Angela Johnson, did you, Mr. Ryerson?

A.   No, I didn't.

Q.   Terry DeGeus was the man; right?

A.   Was the what?

Q.   He was the guy that was giving you the drugs.

A.   Right.

Q.   And you've already told us that Terry DeGeus is sending

314

Angela Johnson to go get money.  He's sending her to get drugs; right?

A.   Make the pick-up.

Q.   Yeah, she's not sending him anywhere, is she?

A.   No.

Q.   He's the boss of this deal; isn't that right, Mr. Ryerson?

A.   No, I . . .

Q.   People didn't tell Terry DeGeus what to do, did they?

A.   One person did.  Angela Johnson, she told him what to do, and he listened.

        MR. BERRIGAN:  Thank you, sir.  Those are all the questions I have.

        THE COURT:  Any redirect, Mr. Williams?

        MR. WILLIAMS:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q.   Explain that last part if you would, Mr. Ryerson.  You said something to the effect that Angela Johnson told Terry DeGeus what to do.  Explain that.  What do you mean by that?
                    Page 55

A.   Terry confided in me that, you know, if he had to go, Angie called, he went.  You know, that's what it was like when I first met him.  They were really, you know, close knit.  Towards the end before this all -- before the arrests were made and such and so forth, he would -- you know, he knew that -- he confided in me that she was with a -- you know, this other guy, and he would

315

blow her off.  You know, he was more apt to blow her off towards the end of me being with him and living there.  But pretty much if she called, he'd go, you know.

Q.   He was that in love with her.

A.   He was in love with her, yeah.

Q.   I want to go back to one other thing.  I don't want to leave some misconception.  There was a question asked about whether Terry DeGeus had some guns in the house during that search.

A.   Yes, sir.

Q.   What kind of guns were those?

A.   Hunting rifles.

Q.   They weren't assault rifles?

A.   No, no, no ammunition either.

Q.   Did he use them, point them at the police, do anything like that during this time period they were searching the house?

A.   No, and it wouldn't have done any good without ammunition.  They were up in the attic.

         MR. WILLIAMS:  Okay.  I have no further questions.

                    RECROSS-EXAMINATION

BY MR. BERRIGAN:

Q.   I'm just a little confused, Mr. Ryerson.  I thought you were hiding in the attic from the police.

Page 56

A.    Right.

Q.    When this search took place.

A.    Right.

Q.    How do you know whether Terry DeGeus had guns pointed at the police or not if you were hiding up there trying to avoid them?

A.    Because the guns were in the attic.

Q.    The guns were with you up in the attic?

A.    Way up in the attic.

Q.    I see.  So there weren't any guns available for Mr. DeGeus downstairs?  Is that your testimony?

A.    That's my assumption, yes.

Q.    You had the guns.

A.    Well, I didn't have them, but I knew where they were at.

Q.    I see.  And you're telling us that Terry DeGeus was in love with Angela Johnson.  Is that your contention?

A.    That's my assumption.

Q.    On October the 27th, 1993, minutes after you testified or failed to testify in front of the grand jury, where was Mr. DeGeus when you met up with him?

A.    In Britt.

Q.    In Britt at his girlfriend's house; isn't that right, Mr. Ryerson?

A.    Yes, sir.

Q.    Not Angela Johnson.  He was living with some other woman.

A.    Yes.

          MR. BERRIGAN:  Yeah.  Okay.  Thank you.

Page 57

THE COURT: Anything further for this witness, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: You're excused.

Members of the jury, why don't you take a stretch break.

Mr. Williams, are you ready to call your next witness?

MR. WILLIAMS: We are, Your Honor. United States calls Jeff Honken.

JEFFREY HONKEN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And please adjust the chair so you can speak directly into the microphones. And when you're ready, would you please spell -- state your full name and spell your last name.

THE WITNESS: Jeffrey Allen Honken, J-e-f-f-r-e-y A-l-l-e-n H-o-n-k-e-n.

THE COURT: Thank you.

Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Honken, I'd like to spend a few minutes at the beginning here of having you explain a little bit about yourself and your background. How old of a person are you, sir?

318

A. I am 43.

Q. And where do you currently live?

A. Mesa, Arizona.

Page 58

Q.   How long have you lived in Arizona?

A.   Since approximately 1981.

Q.   Where are you from originally?

A.   Britt, Iowa.

Q.   And were you born and raised in Britt, Iowa?

A.   I was born actually in Mason City, Iowa, but I primarily lived in Britt, Iowa.

Q.   And explain to the jury now your own family situation.  Are you a married man?

A.   Yes, I am.  I'm married with two sons.

Q.   And how old are your sons?

A.   Age eight and four.

Q.   What do you do for a living, sir?

A.   I'm the chief information officer for Omni Max International.

Q.   What does Omni Max International do?

A.   We produce a software.  It's a web portal that allows providers or doctors to submit claims to different insurance companies and also check patients' eligibility.

Q.   How long have you been in the software industry?

A.   Since -- the last ten years.

Q.   How far did you go through school?

319

A.   I have my bachelor's in management of information systems.

Q.   And where did you obtain that at?

A.   University of Phoenix.

Q.   The job you currently have in the software industry hasn't -- you haven't had that the entire time you've been down in Arizona.  Is that fair to say?

A.   That's correct.

Page 59

Q.   What other employment have you had down in Arizona?

A.   I was self-employed for quite some time.  I've also worked for various Fortune 500 companies.

Q.   I'd like to have you explain something about your extended family.  Are your mother and father still living?

A.   Yes, they are.

Q.   And where do they reside?

A.   My mother lives in Britt, Iowa.  My father lives in Steamboat Rock, I think, Iowa.

Q.   Your biological father and mother, are they still married?

A.   No, they are not.

Q.   At some point did they become divorced?

A.   That's correct.

Q.   And approximately when did that occur?

A.   I think I was approximately 13 years old.

Q.   Has your mother since remarried?

A.   Yes, she has.

Q.   Do you have any siblings?

320

A.   Yes, I do.

Q.   And who are they?

A.   Direct siblings, I have a younger brother and a younger sister.  I also have two -- I have an older stepbrother and a younger stepsister, and I have a half stepsister.

Q.   Let's talk about your biological siblings.  You have a younger brother and a younger sister.  Who are they?

A.   My younger brother is Dustin Honken.  My younger sister is Alyssa Honken now Nelson.

Q.   What does your sister do for a living?

A.   She's a probation officer.

Page 60

VOLUME 2, 5-5-05

Q. And living where?

A. Here in Sioux City.

Q. Let's talk a little bit about your brother Dustin Honken. How many years younger than you is Dustin Honken?

A. Approximately six.

Q. And when you were growing up, did you have -- why don't you describe for the jury what was your relationship like with your younger brother?

A. We never had much of a relationship. I was always in a different phase, in a different -- I was six years older.

Q. So it wasn't easy to be real close with a six-year spread between your ages.

A. That's correct. We've never been close.

Q. By the time you moved down to Arizona, where was Dustin

321

Honken at in his school year?

A. When I moved to Arizona, he was in -- he would have been just going into high school.

Q. And after you moved to Arizona, did you on occasion come back to Iowa and visit with your family?

A. I would come back for family events.

Q. And did your brother Dustin Honken ever come down -- while he was still in high school come down to visit you in Arizona?

A. Not that I recall.

Q. And after Dustin -- did Dustin Honken graduate from high school?

A. Yes, he did to my knowledge.

Q. And after he graduated from high school, did you continue to have contact with him over the years?

A. Yes, I did.

Page 61

Q. I'd like you to describe for the jury what Dustin Honken was like.

A. Dustin was -- Dustin's very intelligent. He -- I can't really say he was very social. He wasn't a very social individual. He always seemed to -- women were an important part of his life, and he never seemed to have a problem getting a date.

Q. What was he -- was he real athletic? Was he not athletic? Can you describe, you know, kind of what his personality was like?

322

A. He was never athletic to my knowledge. The only athletics I've ever known that he did is he did -- he took karate lessons.

Q. What about studies? Was he somebody who read a lot, didn't read a lot?

A. Dustin -- I didn't know during high school, but Dustin always seemed to be -- you know, Dustin was very sharp.

Q. And by the time that you had contact -- and we're going to get into this in a little bit. But when he ultimately came down to Arizona, was there a couple occasions where he lived in Arizona either with you or near you for periods of time in the 1980s, 1990s?

A. Yes, there was.

Q. And during that time period, did you see him reading very often?

A. Yes, he would read a lot.

Q. When you say a lot, what do you mean by that?

A. He would read -- he was always reading something. If he wasn't reading, he was watching TV.

Q. And what type of things did he read?

Page 62

A.    More nonfiction.

Q.    And what do you mean nonfiction?  What type of nonfiction?
How-to books?  History?  I mean, what kind of books?

A.    He enjoyed history.  He enjoyed -- we always had a battle
because I always liked fiction and I read fiction and he didn't.

Q.    Describe for the jury if you would, was Dustin Honken an

323

impulsive person?

A.    No.

Q.    What was he like?

A.    Dustin was very much of a thinker.  He was -- he just
wasn't impulsive.

Q.    And when he was -- when you say he was much of -- he was a
lot of a thinker, did he do a lot about the things he thought
about?

A.    He would think a lot before he would act upon something.

Q.    Did he have dreams and plans and things that he shared with
you over the years that he wanted to do?

A.    Not really, no.

Q.    What about his temper?  Was Dustin Honken short tempered?

A.    No, not at all.

Q.    Was he at all violent?

A.    No.

Q.    Did you ever see him engage in any violence toward anyone?

A.    No, not whatsoever.

Q.    Was he physical with people?  In other words, you know, did
he ever rough anybody up or slap anybody or anything like that?

A.    No.

Q.    You indicated earlier in your testimony that he never
seemed to have trouble getting a date.  Did you know him to have

Page 63

a number of girlfriends over the years?

A.    Yes, very much.

324

Q.    Did you ever see him together with some of these girlfriends of his?

A.    Later on, yes, but not during high school because I wasn't there.

Q.    And what was his relationship like with the women that he had in his life?

A.    Funny enough, it seemed to be okay to my knowledge.

Q.    When you say funny enough, what do you mean by that?

A.    He seemed to be able to parallel multiple -- multiple relationships at the same time.

Q.    When you saw him together with any of his girlfriends, did you ever see him abusive with the girlfriends?

A.    No, never.

Q.    Let's have you explain a little bit to the jury, was Dustin somebody who was easily manipulated, or was he somebody who manipulated other people or something in between?

A.    I wouldn't say Dustin was easily manipulated whatsoever.  I can't say -- I guess he would be in between.

Q.    Did you see him as a very manipulative person?

A.    I didn't have really that type of relationship that I saw how he would interact with other people.

Q.    Did you ever see him manipulating any of the women that he was with?

A.    No.

Q.    Let's talk about some of these women.  Who did you know

325

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 290 of 3592

Dustin Honken to have a relationship with? And I want to focus on the early 1990s.

A. My understanding was that he had -- in the early '90s he had basically three girlfriends.

Q. And who were they?

A. One was Angela Johnson. The other one was -- I believe her name was Melissa Friesenborg. I'm not sure of that, though. And the other one was Kathy, and I don't know Kathy's last name.

Q. And did he ultimately have children with any of these women?

A. Yes, he did.

Q. Which ones?

A. With Angela and with Kathy.

Q. You indicated earlier that Dustin Honken wasn't a real social person. Did he have many friends?

A. No, not that I ever saw.

Q. Of the friends that he had, did he have any real close friends?

A. Yeah, he had two close friends that I knew of.

Q. And who were they?

A. One was named Timothy Cutkomp. The other one was Todd Olson.

Q. And what was the relationship like that you observed between Dustin Honken and Tim Cutkomp?

A. The -- they were -- always did pretty much everything

326

together. Dustin was very sharp, and Tim didn't have that, wasn't as sharp as what Dustin was.

Q. Between the two of them, was there one that was more of a, you know, leader if there's going to be a decision? If they

Page 65

were going to do something some night, did one kind of come up with the ideas of what to do and the other one follow between the two of them?

A.    I wouldn't have that knowledge.

Q.    I want to kind of go back now in time and talk about some of the time periods where Dustin Honken lived in Arizona and the contact you had with him.  Let's go to the first time when Dustin Honken moved to Arizona.  You were already there at that point working?

A.    That's correct.

Q.    And what city in Arizona were you living in at that time?

A.    Tucson, Arizona.

Q.    And if you could explain to the jury, Tucson, how far is that from where you currently live, Mesa?

A.    It's approximately 120 miles.

Q.    And Mesa, is that a suburb of a larger city?

A.    Yes, it is.  It's a suburb of Phoenix.

Q.    And so at the time that Dustin first moved to Arizona, you were living in Tucson.

A.    That's correct.

Q.    What were you doing for a living at that time, sir?

327

A.    I was self-employed.

Q.    And for what company?

A.    A company called Cadtek Corporation.

Q.    Spelled C-a-d --

A.    C-a-d-t-e-k.

Q.    And at the point that Dustin Honken moved to Arizona, what was the arrangement for that?  Did he just show up?  Did he call you?  Was there a plan for him to move down there?

Page 66

A.    He called me.  He was stumbling coming out of high school, and he didn't really know what he wanted to do, so he wanted to come down to Arizona to go to school and also to work.

Q.    And so what happened?

A.    He moved down to Tucson.  He stayed with my wife and myself, and he went to school and took a job at Burger King.

Q.    And what type of school did he go to?

A.    It was the community college there.

Q.    Do you know what he studied there?

A.    No, I do not.

Q.    He worked at Burger King, and how long did he live in Tucson, Arizona, with you on this first occasion?

A.    I don't know the exact time frame.  It probably would have been about two years maybe.

Q.    And do you have a recollection today what years those would have been?

A.    He would have graduated I think in '86 time frame, so

328

probably '87, '88.

Q.    Somewhere in that time frame?

A.    Yeah.  I'm not sure of the exact time frames.

Q.    Did Dustin Honken continue to work at the Burger King the entire time he was living in Tucson?

A.    No, he came to work for myself.

Q.    And how did that happen?

A.    We were just expanding the business.  The business was growing by leaps and bounds, and we offered him a job.

Q.    What type of business was it that you had at that time?

A.    It was a company that engineered printed circuit boards, and later on we broke into the manufacturing of them.

Page 67

Q. What did you hire Dustin Honken to do?

A. Initially he was hired to do just all different odd jobs. There were several phases of man -- there's a lot of phases of manufacturing. We hired him for odd fill-in work.

Q. How many employees did you have with that company at that time?

A. At that time we probably had maybe 50.

Q. And how did Dustin Honken perform as an employee during the time period he worked for you?

A. Very good.

Q. Did he develop any specialties in that area while he worked for you?

A. Yes. He excelled with every aspect of what we called the

329

production floor.

Q. At some point you said he only -- he worked for you for a period of time. Approximately how much of that about two-year period he was in Tucson that first time did he work for you?

A. Probably about 75 percent of it.

Q. And so at some point that came to an end.

A. That's correct.

Q. Could you explain to the jury what happened that caused him to leave employment with you?

A. He said that he wasn't -- he didn't have the growth potential that he thought he needed, so he took another job.

Q. And where was that other job?

A. It was in either -- the company was in Clear Lake or Mason City.

Q. What was the name of that company if you recall?

A. I think it was called Wellborn Industries.

Page 68

Q. What type of company was that?

A. They manufactured printed circuit boards.

Q. Similar to what you did down in your company in Arizona?

A. That's correct.

Q. When Dustin Honken went to work at Wellborn, did anybody else leave your company and go with him?

A. Yes. He took one employee with him.

Q. And what did that employee do for you?

A. We had a process that was -- in the printed circuit board

330

manufacturing it was a process called screening boards which is putting a final epoxy on the board, and he was a very artistic person that could do that.

Q. Is that a highly skilled job in that industry?

A. Yes. We pursued that employee for a long time before we got him.

Q. Did you know ahead of time that he was going to be leaving to go up to the same company that Dustin Honken was working at, Wellborn?

A. No, I did not.

Q. How did you discover that?

A. It was through different contacts. I found out that he had moved also to this area or the Iowa area, that he started working with Dustin at Wellborn or he was working with Dustin at Wellborn.

Q. Did you have any understanding of whether Dustin Honken had anything to do with that employee leaving and going to that same company?

A. Yes. He hired him. He pulled him.

Q. What kind of position did Dustin Honken have then with this

Page 69

new company, Wellborn?

A.   I'm not sure what his position was.

Q.   Apparently high enough up that he could hire somebody else?

A.   That's correct.

Q.   During the time period that you and Dustin were both living

331

in Tucson, Arizona, did he live in your house that entire time period?

A.   Yes, he did.

Q.   And were you aware of him using or being involved in the distribution of any controlled substances at that time?

A.   No, I was not.

Q.   When you learned that he left and went back to Iowa and ultimately hired one of your employees, what effect, if any, did that have on your relationship with your younger brother, Dustin Honken?

A.   I got very upset at him.  I didn't think that he would -- I didn't think he would do that.  I didn't think he would pull a valuable employee from me like that.

Q.   And when you say you got very upset with him, did you and Dustin Honken maintain a relationship?  Did you stop talking?  How'd that work?

A.   We stopped talking all together.

Q.   And for how long did that last that you stopped talking to your brother?

A.   It was measured in years.

Q.   Do you know what Dustin did when he moved back to Iowa other than working with Wellborn Industries?

A.   Can you restate --

Q.   Yeah, that was a bad question.  How long did he work at
Page 70

Wellborn Industries if you know?

A.   I don't know.

Q.   At some point are you aware whether he went to college?

A.   Yes.

Q.   And at some point did you start communicating again with your brother?

A.   Yes.

Q.   Where did he attend college in Iowa?

A.   It was North Iowa Area Community College, Mason City.

Q.   What did he study there?

A.   The sciences, I believe.

Q.   And when you mean sciences, can you be more specific if you know?

A.   I think he was -- mostly chemistry.

Q.   And do you know how he performed in college there?

A.   No, I do not.

Q.   At this point do you know what girlfriend he was involved with when he was back in Iowa attending college?

A.   No, I do not.

Q.   Do you know whether he was attending college while he was still working at Wellborn, or had that job ended?

A.   I don't know.

Q.   While he's either working at Wellborn in Iowa or going to college at the North Iowa Area Community College, are you aware of any involvement he had at that point in any controlled substances?

Page 71

A.   No, I'm not.

Q.   So I want to direct your attention then to whether there was another time then that your brother Dustin Honken moved to Arizona.

A.   Yes.

Q.   And when was that approximately?

A.   Early '90s.

Q.   Would early 1992 sound about right?

A.   That'd be about right.

Q.   And what was the arrangement again?  Did he just show up down there, or did you have some communication with him about him moving back to Arizona?

A.   No.  He called me and said that he wanted to move back to Arizona.

Q.   And did he indicate to you why he wanted to move back?

A.   Yes, he did.  He said that he was -- wanted to continue settling down in Arizona and that he wanted to -- he was doing research on the synthesizing of different types of drugs and he wanted to experiment with that down there.

Q.   What did you understand from your conversation with him what type of drugs did he want to synthesize?

A.   Any type that -- he was really into body building and things like that, and he just wanted to synthesize different types of drugs.

Q.   And when you say synthesize drugs, what did you understand

334

him to mean by that?

A.   My interpretation of synthesizing drugs would be making drugs from a base chemical.

Q.   And are we talking controlled substances here?

Page 72

A. Yes.

Q. At this point in time in early 1992, are you still working for the same company?

A. We were in the process of probably closing it down at that time.

Q. And why was that?

A. I had a partner. She wanted to move back to California. And we were having financial issues and different problems with the EPA, things like that.

Q. Explain to the jury that a little bit if you would. What kind of financial issues were you having with the EPA? And just so I'm clear, the EPA, you mean the Environmental Protection Agency?

A. That's correct. We hired a consultant in the mid 1980s to -- we produced -- through the process we produced a by-product, and that by-product -- we hired a consultant in the mid '80s to analyze that by-product, and the company did an analysis. And they came back and said that the by-product was not hazardous and it could be taken out to the city landfill.

Q. So it was kind of a waste by-product.

A. That's correct.

335

Q. And you needed to find out how to dispose of it.

A. That's correct.

Q. So did you, in fact, follow your consultant's advice and have that disposed of at the city landfill?

A. Yes, we did.

Q. So how did that get you in trouble with the EPA?

A. We had quarterly inspections, and an inspector came out, and he was going through the records, and he asked me how -- you

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 299 of 3592

know, what we were doing with our waste, and I showed him the records and where it was approved and even the city landfill approved it, to take it out there. And they said, Well, according to your -- according to your standings within the EPA, you're not allowed to do that.

Q. And so what came of that?

A. They pursued civil penalties against the company and myself and my partner.

Q. And when you say civil penalties, was there -- are we talking a large amount of money that you may have been responsible for?

A. Yes.

Q. By the time that Dustin Honken moves to Arizona in early 1992, where in this process of dealing with the EPA were you at? Had they, for example, imposed a fine on you, or was that still in the discussion phase?

A. No. I'm pretty sure they had imposed the fine.

336

Q. And how much was the fine if you recall?

A. I don't remember.

Q. Was it a fine -- I think you indicated that potentially you could be liable, your partner could be liable, and the company could be liable. Were you imposed a fine yourself?

A. I don't recall. I don't know what phases it got into. Basically what happened was I hired a lawyer, and the lawyer -- since it was a civil penalty, it could be dismissed by bankruptcy, and that's the route I chose.

Q. And are we talking thousands of dollars, the fine?

A. Yes.

Q. As a result at the time that Dustin Honken comes down to

Page 74

Arizona, kind of what is your financial situation then when he arrives?

A. I had a job. By then I had started actually another company.

Q. And what was the other company that you'd starred?

A. It was a company called Printed Circuit Technologies.

Q. And what did Printed Circuit Technologies do?

A. We still had several contacts within the same industry, and we were purchasing the actual circuit boards from different -- actually competitors of ours at one time. We'd purchase those circuit boards, and we would do the quality inspection of them, and then we would sell them to the customers.

Q. And in that business, did you use chemicals? Did you do

337

any manufacturing yourself?

A. No.

Q. Did you still have contacts with companies from your prior business, chemical companies that you did use in the prior company?

A. Yes.

Q. So this wasn't -- Printed Circuit Technology wasn't a manufacturing company. It was more of an inspection of circuit boards?

A. Yeah, we looked at setting up a manufacturing facility, but it never really came to be.

Q. Now, at this point in early 1992, were you still living in Tucson?

A. Yes.

Q. And when Dustin Honken moved to Arizona, where did he live?

A. Initially I believe he lived with me.

Page 75

Q.   And how long did that last?

A.   Could be measured in a small amount of months.  Two, three months maybe.

Q.   When Dustin Honken arrived down in Arizona and moved in with you in Tucson, did he have a job?

A.   No, he did not.

Q.   What did he do during the day?

A.   He mostly did research on synthesizing chemicals -- or drugs.

338

Q.   And explain to the jury, when you say he did research, what type of research did he do?

A.   He would research on how different drugs were synthesized.

Q.   And research on computers, books?

A.   Books, always books.

Q.   Did you get a feel out of talking with him during this time period the extent of his knowledge of chemistry?

A.   Dustin was very knowledgeable at chemistry.

Q.   How about yourself?

A.   No, no.  I -- I had to drop chem 101 at the University of Iowa because I couldn't pass it.

Q.   You indicated you graduated from college in Arizona.  Was there a period where you attended college in Iowa as well?

A.   Yes, there was.

Q.   And didn't do very well in chemistry.

A.   No, I did not.

Q.   While Dustin Honken is living with you -- and you had a wife at that point?

A.   I did.

Q.   -- and your wife in Tucson, did he conduct any

Page 76

experimenting in the house?

A.   Yes, he did.

Q.   And describe that for the jury.  What type of experimenting did he do?

A.   He just had a very small chemical set-up that he would

339

experiment with.

Q.   And where was this at?  Was it in a room?  Was it --

A.   He would just set it up on a table.

Q.   And do you know what he was attempting to experiment making at that time?

A.   Yes, I did.

Q.   And what's that?

A.   He was trying to -- later on he focused in on trying to synthesize speed.  Well, he told me it was speed, but it's called methamphetamine I guess.

Q.   Now I want to direct your attention, at some point in 1998, were you approached by law enforcement officers, agents of the Drug Enforcement Administration, who wanted to ask you questions about your knowledge of drug activity by your brother Dustin Honken?

A.   Yes, I was.

Q.   And did they interview you on a couple occasions in 1998?

A.   Yes, they did.

Q.   When they first interviewed you, did you tell them everything you knew about Dustin Honken?

A.   No, I did not.

Q.   Why not?

A.   I just wasn't very cooperative.  I just didn't feel that I -- I just didn't cooperate with them.

Page 77

Q.   And was -- this first interview they had with you, did it

last a while?

A.   Not really, no.

Q.   And did you just -- did you intentionally lie to them during that first interview?

A.   No, I did not.

Q.   But you didn't tell them what you knew.

A.   No, I did not.

Q.   Did they come back the next day?

A.   Yes, they did.

Q.   And what happened the next day?

A.   I told them I chose to cooperate with them.

THE COURT:   Mr. Williams, before we get to that, would now be a good time to take our mid-morning break?

MR. WILLIAMS:   Certainly, Your Honor.

THE COURT:   Okay.   Members of the jury, we'll be in recess until 10:30.   Please remember my cautionary instruction about not discussing this case among yourselves or with anybody else.   Keep an open mind until you've heard all of the evidence in the case.   Thank you.

(The jury exited the courtroom.)

THE COURT:   Please be seated for one minute.   I wanted to return to this evidentiary issue raised by the motion in limine this morning, the oral motion in limine.

Mr. Williams, you have a theory other than 404(b) evidence as to its admissibility?

MR. WILLIAMS:   Just I think it is evidence of the

crime itself. The extent to which she is threatening another person involved in an ultimate conspiracy in this case, it shows a connection to the conspiracy. So I think it's direct evidence in that regard as well.

THE COURT: Under the 404(b) litany -- you know what I'm referring to?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: The litany of exceptions, which ones do you allege it would be admissible for?

MR. WILLIAMS: Knowledge, motive. Knowledge and motive.

THE COURT: Not intent?

MR. WILLIAMS: I don't know if I could -- see, I don't know if there's a big difference between intent and motive. That's what I was looking at myself. I suppose intent to some degree.

THE COURT: Well, but you're saying knowledge and motive?

MR. WILLIAMS: Pardon me?

THE COURT: But your argument is knowledge and motive.

MR. WILLIAMS: Well, I think I'm going to add intent. I don't know if that makes a big difference, frankly, because I see motive and intent very similar.

THE COURT: It's very hard -- you know, the circuit

342

has a lot of cases, and they very rarely ever point out what that difference would be.

MR. WILLIAMS: I know. And that's what's difficult. But I'll add intent in there as well.

THE COURT: I'm going to admit it, but do you want a

Page 79

limiting instruction under -- similar to the Eighth Circuit

model 2.08 or not? I'm not going to give a limiting instruction

unless you want it.

MR. STOWERS: I think it's probably going to emphasize

it by giving an instruction more than it's worth.

THE COURT: I think you're better off without it, but

if you want it, I'd be glad to give it.

MR. STOWERS: I understand.

THE COURT: So you do not want a limiting instruction.

MR. STOWERS: No, no.

THE COURT: Okay. Thank you. We'll see you back here

at 2:30 (sic).

(Recess at 10:08 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated. I notice in

the beverage wars it's Diet Coke, one, bottled water, one, among

the jurors.

Mr. Williams, you may continue your direct

343

examination.

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. Mr. Honken, when we left off before the break, we had

talked about the fact that when you were first approached by DEA

agents in Arizona you didn't tell them everything you knew and

when they came back the next day you did.

A. That's correct.

Q. Why is it you decided to tell them what you knew?

Page 80

A.   Well, it's really for the first time I really actually thought and was -- more came home to what was actually happening up here.  At the time I had a -- I still have -- I had a young son, and I would expect -- and I talked it over with my wife.  I said I would expect that anybody that would, you know, know anything about children missing would participate a hundred percent of what they could.

Q.   Now, when the agents came back the next day, did you tell them you were prepared to tell them what you knew?

A.   Yes, they (sic) did.

Q.   Did they talk to you about whether you might have any exposure to possible criminal charges?

A.   Not really.  They did offer me an immunity agreement later on.

Q.   And what did you understand that immunity agreement did for you?

344

A.   I really didn't understand it.  I understood that -- I assumed that it would -- if there was something that I can be prosecuted for that they wouldn't prosecute me.

Q.   Was there any discussion about statute of limitations?

A.   That was later on.  They just said that, you know, that the statute of limitations had already run out of everything that happened in that time frame anyway.

Q.   And what did you understand that meant?

A.   Approximately the same thing that the immunity agreement stated, that nothing could be prosecuted for that time frame from that far back.

Q.   Had you made the decision to talk to the agents before they gave you this immunity agreement?

Page 81

A.   Yes, I did.

Q.   And so did you, in fact, provide information to them at that point?

A.   Yes, I did.

Q.   Did anybody ever make any promises that you wouldn't be charged with any conduct or any of your involvement in the case?

A.   Not at that time, no.

Q.   Have you received any benefit from the government for providing information to the government about your knowledge of these operations?

A.   No, I have not.

Q.   Let's talk about that then a little bit.  You indicated

345

that in early 1992 Dustin Honken moved to Tucson, Arizona, and you knew the purpose that he was coming down for was to, as you say, synthesize drugs, in particular methamphetamine.

A.   That's correct.

Q.   Was there any discussion with him about what, if any, role you might have in his plans?

A.   The only role that was ever discussed, that if he ever actually did produce anything and actually made a revenue from it that he would assist in any financial problems that I might have had with the EPA.

Q.   And based on that, did you agree to provide him with money to assist him in manufacturing the methamphetamine?

A.   Yes, I did.

Q.   And at the time you provided him that money, did you know that, in fact, he was going to use that money to manufacture an illegal controlled substance?

A.   Yes, I did.

Page 82

Q.    So why did you do it?

A.    Just at the time, you know, he said that he was -- you know, he always called it speed, and back in the early '90s in Arizona, that was really -- you know, methamphetamine wasn't even really a word, so -- and what he was experimenting with was a very small basis.  He said he could make a small amount of money off of it.

Q.    So how much money did you initially provide to him for

346

this?

A.    He always borrowed money from me in increments.  So I don't -- there was no really initial chunk.  He just borrowed money.

Q.    Explain to the jury if you would, you had an understanding with your brother that you were going to provide some money to him so he could do this manufacturing of methamphetamine.  Was this a written contract that you sat down and put together, you and your brother?

A.    No.

Q.    What type of agreement was it?

A.    It was, I guess, just a verbal agreement.

Q.    Kind of an informal type of understanding?

A.    Yes, very informal.

Q.    And so did you keep like a register of how much money you were providing to Dustin Honken for this operation and keep a running tally or anything like that?

A.    I was very -- no, I was very used to Dustin always just borrowing money from me, and it all ended up into the same pot.

Q.    And so over the course from the time period in early 1992 when he moved down to Tucson, Arizona, through the time period

Page 83

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 309 of 3592

until March of 1993, did you on occasion provide him with cash when he requested it?

A.   Yes, I did.

Q.   And when you say you would hand it out to him in

347

increments, are we talking hundred dollars, thousands of dollars?

A.   It could be anywhere from, you know, a thousand dollars to "I need money for pizza tonight."

Q.   And over the course of that approximately one-year period, do you have a rough idea of how much money total you would have provided him?

A.   I would estimate in all probably somewhere between six to seven thousand dollars.

Q.   Now, you had a company called Printed Circuits Technology.

A.   That's correct.

Q.   Were you aware of whether Dustin was purchasing any chemicals under that company name?

A.   I don't really recall, but he very easily could have.

Q.   And why do you say he easily could have?  I mean, it's your company; right?

A.   (Witness nodded head.)

Q.   How could he have done that?

A.   With Cadtek which was my first company that I had, Dustin was in control of the lab, with our chemical lab.  Like I said, we dealt in a lot of chemicals, hundreds of chemicals, and he was in charge of that lab, and he managed the people that were in the lab.  He did all the purchasing for all the chemicals for the -- for that company, and he had the contacts to do that.

Q.   And would he have had access to paperwork from your

company, Printed Circuit Technology, if he needed to have contacted these chemical companies?

A.    Yes.

Q.    So just to be sure here, did your company, Printed Circuit Technology, use something like anhydrous ammonia in any way in your business?

A.    No.

Q.    So you provided money to Dustin Honken over this time period. What was his living arrangements? Did he continue to live with you and your wife in your home in Tucson?

A.    Like I said, he did initially, and then he ended up getting a house in southern Arizona.

Q.    And where at in southern Arizona if you recall?

A.    I don't know -- recall exactly. It was approximately 70 miles south of Tucson.

Q.    What were the arrangements for that house? In other words, was it rented or purchased, first of all?

A.    He rented it.

Q.    And under whose name if you know?

A.    I'm not sure.

Q.    How was the rent paid for?

A.    I assume that it was from money that I had borrowed him.

Q.    So the money you loaned him you assume went to, in part, the rent.

A.    Yeah.

Q.    Was Dustin Honken working at all during the time period

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 311 of 3592

that he was down in Arizona in early 1992 to 1993?

A.   No, he was not.

Q.   While he was living with you and your wife in Tucson and doing these experimenting and researching, was your wife at all knowledgeable of what was going on?

A.   No, she was not.

Q.   Did you alert her at all that this was possibly some illegal activity?

A.   Not that I recall, no.

Q.   Did his moving out of the house in Tucson have anything to do with the experimenting that was going on there?

A.   Yes.  He was -- like I said, he was eventually -- you know, he believed he was successful in producing, you know, what he called methamphetamine, and he wanted to -- you know, he wanted to expand what he was doing.

Q.   And he couldn't do that in your house?

A.   No.

Q.   You had mentioned earlier when we were discussing Dustin Honken that he had a good friend named Tim Cutkomp.

A.   That's correct.

Q.   Did Tim Cutkomp have anything to do with this methamphetamine operation down in Arizona in 1992?

A.   Dustin needed help, and he asked Tim Cutkomp to come down and help him.

350

Q.   And did Tim Cutkomp come down?

A.   Yes, he did.

Q.   Did you ever have conversations with Tim concerning what his involvement was in this operation assisting Dustin?

A.   Not really, no.

Page 86

Q. Did you have opportunities to observe their interactions in the process at all?

A. Yes.

Q. And did you talk to Dustin at all concerning what Tim's involvement was?

A. No.

Q. So based on your observations, what did you understand Tim's role was with this operation down there?

A. I think Dustin just wanted companionship and needed somebody to help him.

Q. During the time period of 1992, 1993, did -- you had indicated earlier that there was a period of time he experimented and researched at your house, and once apparently he figured out how to do it, he moved to this other location in southern Arizona.

A. That's correct.

Q. About 70 miles away from Tucson.

A. That's correct.

Q. Did he remain there?

A. No, he ended up moving from there.

351

Q. And where did they move after that?

A. Tim moved back to Iowa, and Dustin moved back in with his girlfriend in Tucson.

Q. And the girlfriend's name was what?

A. I think it's Melissa Friesenborg.

Q. And based on your knowledge, was she at all involved in any of the methamphetamine operation?

A. No.

Q. When Dustin Honken moved to this town in southern Arizona,

Page 87

did you remain in Tucson?

A.    Yes, I did.

Q.    And did you remain there throughout the time period of 1992 into 1993?

A.    I ended up, I -- towards the latter part I moved to Phoenix.

Q.    And, again, Phoenix is how far away from Tucson?

A.    It's a hundred miles north.

Q.    Now, over the course of this process from 1992 to 1993, did you become aware of whether, in fact, your brother Dustin Honken was able to manufacture quantities of methamphetamine?

A.    Yes, I -- he was able to produce quantities.

Q.    And how do you know he was able to do that?

A.    At one time I saw a quantity that he had produced.

Q.    And where did you see it at?

A.    It was down in his house in southern Arizona.

352

Q.    Did you actually see a laboratory set-up there that he was using to manufacture the methamphetamine?

A.    Yes, I did.

Q.    And can you describe what it was like when you saw it?

A.    He had it set up on one of -- what is it? -- 4-by-8 folding tables, so it was probably about twice the size of that desk that those two gentlemen are sitting at.

Q.    And what was on the table?

A.    Different types of chemical glassware, glass stuff.

Q.    Did it look sophisticated or unsophisticated to your eye?

A.    It looked sophisticated.

Q.    And when you say you saw some finished methamphetamine, do you remember what kind of quantity you saw?

Page 88

A. I don't know in size, but physical size was a couple good-sized cups full.

Q. And you're referring to a cup in front of you, just a water glass?

A. That's correct.

Q. Was that the only time you saw any of the finished methamphetamine?

A. It was the only time that I saw any size, yes.

Q. Now, did you use any of the methamphetamine during this time period?

A. No.

Q. Over the course of the time period 1992 to 1993, in

353

addition to what you saw, did Dustin Honken ever make any statements to you that he had been successful in making methamphetamine on other occasions?

A. No.

Q. Did he talk to you at all about what he was doing with the methamphetamine that he was producing?

A. He said he had two people in Iowa that he was distributing it to.

Q. And did he tell you who they were?

A. One was a person by the name of Terry DeGeus, and the other person he just said lived in Clear Lake or Mason City.

Q. And did you ever learn that person's name?

A. No, I did not.

Q. Terry DeGeus, is that somebody that you knew?

A. Yes, it is.

Q. And how did you know Terry DeGeus?

A. He was in my high school graduating class.

Page 89

Q.   What was your relationship, if any, with Terry DeGeus?

A.   I didn't have a relationship with Terry.  He was in a different crowd than I was.

Q.   Did it surprise you at all when your brother told you that one of his customers was Terry DeGeus?

A.   Yes.

Q.   Did you know of any relationship Terry DeGeus had with anybody at that time, any romantic relationship?

354

A.   No.

Q.   Other than these two individuals in Iowa, Terry DeGeus and the other person that he did not name for you, did he indicate that he was providing the methamphetamine to anybody else?

A.   No.

Q.   How was the methamphetamine getting from Arizona up to Iowa?

A.   I don't know.  I assume he was flying with it.

Q.   And did he -- how do you know he was flying, first of all?

A.   I don't.

Q.   Okay.  And so did you ever have any discussions with him about how he was getting the drugs up?

A.   No.

Q.   Okay.  Now, who was it that made the decision to manufacture the methamphetamine in the first place?

A.   It was Dustin's.

Q.   And who was the one who was able to organize the chemicals and the process for manufacturing the methamphetamine?

A.   Dustin was the only one with that knowledge.

Q.   Did you have anything approaching that knowledge?

A.   No.

Page 90

Q. How about Tim Cutkomp based on your interactions with him?

A. No.

Q. Did you instruct Dustin Honken on what to do, for example, how much quantity to manufacture or where to sell it or who to

355

sell it to?

A. No.

Q. Based on your knowledge being involved in this, who made the decision of who he was going to sell or who was going to buy the methamphetamine up here in Iowa?

A. Dustin.

Q. Did you ever assist in any way in transporting any of the methamphetamine to Iowa?

A. No.

Q. Did you have any discussions with Dustin concerning whether he was, in fact, successful in selling methamphetamine to these two individuals in Iowa?

A. He said he was successful, yes.

Q. And was it producing money for him?

A. Yes, it was.

Q. And how do you know that?

A. Because he paid me back some of the money that he had borrowed.

Q. And approximately how much money do you recall he paid you back?

A. Approximately somewhere around two-thirds of it.

Q. Not the full amount that he owed you.

A. That's correct.

Q. Did you get the impression that that was all the money he was making off of it, or did you get the impression from talking

Page 91

Q. with him that was he getting some of the money, was Tim Cutkomp getting some of the money?

A. My understanding was that they were -- you know, that they were receiving a small amount of income but he was just -- he said that his main priority was to pay me back.

Q. So your understanding, you were getting the bulk of the money back.

A. That's correct.

Q. Did -- in any of your discussions with Dustin Honken, did he tell you how many trips he would have made to Iowa to deliver methamphetamine?

A. No, no. He -- no, not whatsoever.

Q. Now, for a large part of this period you're living either 70 miles away while you were in Tucson and he was in this town in southern Iowa -- southern Arizona or even farther when you moved to Phoenix. Did you have much daily contact with him?

A. No.

Q. Do you know how many trips he made back to Iowa?

A. No, I do not.

Q. Did you have anything to do with making arrangements for any of those trips back to Iowa?

A. No, I did not.

Q. Were you aware, by the way, of whether Tim Cutkomp was working while he was living down in Arizona?

A. Not to my knowledge.

357

Q. Did you ever see either of them using any of the methamphetamine, either of them being Dustin Honken or Tim

Page 92

Cutkomp?

A.    Not that I recall.

Q.    What contact did Dustin Honken have, if you know, with Melissa Friesenborg during this time period that they have this house and they're manufacturing methamphetamine?

A.    She moved down in the early part of his move down there.  I didn't know her.  He just said he moved a girlfriend of his down from Iowa to Tucson.

Q.    And once she moved down to Tucson, do you know what kind of living arrangements they had?  Did they live together?

A.    They had an apartment.

Q.    So explain to the jury then how'd that work.  If he has an apartment and a girlfriend in Tucson, Arizona, and this house in southern Arizona, do you know where he was spending his time?

A.    I think the majority of his time he seemed like he would come in would be -- up into Tucson would be the weekend.  I think most of the majority of the weekday he probably spent down there.

Q.    How many trips did you make yourself down to this house in southern Arizona where the methamphetamine was manufactured?

A.    I don't exactly recall.  Two or three.

Q.    And did you see the lab on each of those occasions?

A.    When it initially was -- yeah, in different phases.

358

Q.    Now, at some point Dustin Honken was arrested in March of 1993.  Do you recall that?

A.    Yes, I do.

Q.    Okay.  I want to talk about a time period before that then just to make sure we've got the right time frame.  Prior to that occurrence, prior to the time he got arrested in 1993, did he

Page 93

Q. ever talk to you about a person named Angela Johnson?

A. Yes.

Q. And what did -- what -- in what context did her name come up?

A. He took me to meet her, to introduce me to her.

Q. Where at?

A. She was working in a restaurant in -- I believe it was Clear Lake, Iowa.

Q. This is at a time in 1992, 1993?

A. It would have been that time frame, yeah.

Q. So were both you and Dustin on a trip back to Iowa?

A. Yes. We had some family event back there.

Q. Did you travel back together?

A. I don't really recall.

Q. And to your knowledge was any methamphetamine brought back during that trip?

A. Not to my knowledge.

Q. And so you're both back for some family function back in Iowa, and what happens?

359

A. He wants me -- he wants to introduce me to Angela Johnson, and we go to eat at the restaurant that she's working at.

Q. And what restaurant was that?

A. I don't remember the name of it.

Q. And where was it located?

A. I think it was in Clear Lake, Iowa.

Q. What did he tell you about Angela Johnson?

A. He said that he very much cared for her. He said that she once had done some modeling. He said that she had once dated Terry DeGeus and that she had other drug connections in Iowa

Page 94

that he did not.

Q. That who did not?

A. That Dustin did not.

Q. Did he elaborate at all on what her role then was if she had other drug connections that Dustin did not? Did he elaborate on that at all?

A. No.

Q. I want to go to that arrest in March of 1993. By the way, was that the first time you had ever met Angela Johnson?

A. Yes, it was.

Q. And did you meet her on other occasions?

A. Two other occasions that I remember.

Q. And where would those have taken place at?

A. When we had another family event in Iowa, and I don't remember talking to her, but she was at that family event. And

360

the other time she called me on the phone.

Q. So let's talk about this drug arrest that occurred in March of 1993. First of all, were you aware -- how did you become aware that your brother had been arrested in March of '93?

A. Like I said, I was working in Phoenix, and my mother gave me a call at work.

Q. Was that the first you heard about it?

A. Yes, it was.

Q. Were you aware that Dustin was up in Iowa at that time?

A. No, I was not.

Q. Once you found out that he was arrested, did you have any contact from him or any -- or Tim Cutkomp at all?

A. No.

Q. Did you have any contact with Melissa Friesenborg?

Page 95

A.   Yes.

Q.   And what contact was that?

A.   She gave me a call shortly after my mother called me and said that she had been in contact with Dustin and that she reiterated that he got arrested, and she had a message -- she said that he asked me to come down to Tucson and to dispose of what he had placed in one of my storage sheds, and he also asked me to sell a stereo that he had at their apartment and not to be upset at what I would see.

Q.   So let's take each of those items one at a time.  You talked about him wanting you to get rid of some stuff in a

361

storage unit of yours.

A.   Correct.

Q.   Did you have one or more storage units in Tucson?

A.   Yes, I did.

Q.   And what did you have those storage units for?

A.   Mostly company records.  I had old equipment that I'd used in various businesses.

Q.   And did you provide Dustin Honken with access to those storage units?

A.   Yes, I did.

Q.   And why did you provide him access to the storage units?

A.   He asked me.  He always had access to them.

Q.   And were you aware of what, if anything, he had stored there?

A.   I assumed he had his lab equipment there and probably personal possessions.

Q.   And why did you assume he had lab equipment and personal possessions there?

Page 96

A.   He called me previously and said that he was closing down his house in Arizona, in southern Arizona, and asked if he could utilize one of my storage sheds to put some of his stuff in.

Q.   And so when you get this phone call from Melissa Friesenborg passing on this message from your brother, what did you do concerning the stuff in the storage unit?

A.   I took it out of the storage shed, and I threw it all in a

362

dumpster.

Q.   And what did you throw in the dumpster?

A.   Several boxes, cardboard boxes.

Q.   And did you look inside the cardboard boxes?

A.   No, I didn't.

Q.   When you threw them in the dumpster, did you hear anything?

A.   I heard all kinds of glass breaking.

Q.   Glass breaking?

A.   That's correct.

Q.   What did you understand was the purpose for why you were taking all this stuff in cardboard boxes and throwing it in the dumpster?

A.   I assumed he didn't want anybody to know that he had it.

Q.   And why not?

A.   Because he just had been arrested.

Q.   And in other words, did you understand that that could get him in further trouble?

A.   No, I didn't.

Q.   Did you understand that by throwing that away you were assisting him in any way?

A.   I was -- yeah, I was assisting, yeah.

Q.   In other words, you knew that was potential evidence that

you were throwing away at that point.

A.    Yes.

Q.    The other thing that Melissa Friesenborg asked you to do

was to go over to his apartment that he had with Melissa

Friesenborg?

A.    That's correct.

Q.    And you were supposed to get his stereo.

A.    That's correct.

Q.    And so did you do that?

A.    I did.

Q.    And what did you see when you went over to his apartment in

Tucson?

A.    I had never been in his apartment.  I was surprised at how

nice it was, the contents that were in that apartment.

Q.    Did you understand that those contents were -- belonged to

your brother?

A.    Melissa said they did.

Q.    And when you say you were surprised by them, what do you

mean by that?

A.    He had very nice furniture, very nice furniture, very

expensive furniture.  He had a very, very nice stereo.  He had

purchased an engagement ring or a down -- deposit on an

engagement ring for her that I didn't even know he was that

serious with her.  It came as a surprise.

Q.    He was not working during this time period he was in

Arizona?

A.    No.

Q.    And the sole source of income that you knew of was from

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 324 of 3592

what?

A.    His distribution of methamphetamine.

Q.    Did you, in fact, end up selling that stereo for him?

A.    Yes, I did.

Q.    And what'd you do with the proceeds from selling that stereo?

A.    I sent it to -- the majority of it I sent to -- it was either one of his girlfriends or Mom or somebody to help him out.

Q.    Now, this occurred in March of 1993.  And after that did Dustin Honken ever move back down to Arizona?

A.    No.

Q.    After March of 1993, did you have any further involvement with Dustin Honken in funding any other illegal activities?

A.    No.

Q.    I want to break off for just a minute and talk about a person by the name of Russell Miller.  Do you remember that name?

A.    No, I do not.

Q.    Do you remember ever receiving a wire transfer from a Russell Miller at all?

A.    No, I do not.

Q.    Let me put it this way.  To your knowledge based on what you knew about this, was Russell Miller involved in any way with illegal activity, the methamphetamine operation at all?

365

A.    No.

Q.    What did you know about what was going on with your

Page 99

brother's criminal charges then in Iowa in the spring of 1993?

A. It was my understanding that he got arrested for distributing methamphetamine.

Q. And did you have much contact with him after that?

A. No. I was very -- very upset with him.

Q. And why were you upset with him?

A. I was upset with him that -- what he had. I was very surprised what he had in his apartment, and it dawned on me that things were act -- that he'd been doing a little bit more than what he came across as doing.

Q. So he was keeping more of the drug profits than what he was handing off to you.

A. I believe that would be true, yeah.

Q. Did you have concerns about your own -- whether you were going to get in trouble out of all of this?

A. No, I didn't.

Q. And why not?

A. I just -- what I saw, it wasn't that -- to me it was not never that big of an operation. And like I said, back in the early '90s in Arizona, it was not really even heard of.

Q. Did you have a real full understanding of what you'd gotten yourself into?

A. No, I did not.

366

Q. At some point after March of 1993, did you ever see Dustin Honken back in Arizona again?

A. Yes.

Q. And do you remember approximately how long after his arrest in 1993 you saw him back in Arizona?

A. There was -- that I physically saw him?

Page 100

Q. Right.

A. Yeah. It was probably a couple years after the fact.

Q. And what was he doing down in Arizona a couple years later?

A. Him and Timothy Cutkomp came down.

Q. And what was the purpose of the trip if you knew?

A. I didn't know.

Q. Did Dustin ask you for any additional money at that point?

A. He asked me for some money for gas and that, yes.

Q. Did he ask you for any larger quantities of money?

A. No.

Q. Did you see or were you aware of any other trips of Dustin Honken down to Arizona?

A. It's my understanding he came down with Angela Johnson, yes.

Q. And do you know when that occurred?

A. I don't know the exact time frame, no.

Q. In relation to his arrest in March of 1993, approximately what time, if any?

A. A guess would be three, four years. I don't know.

367

Q. Don't have a very good recall at this point?

A. Not of -- well, they didn't come visit me.

Q. All right. So let me ask you this. You're aware that your brother gets arrested in March of 1993. You are upset with what you discovered in his apartment. Do you know what ends up happening with the rest of his charges then from that incident?

A. No, I do not.

Q. Did you ever have any conversations with him about his charges, whether he was going to prison or not going to prison or what he was going to do about it all?

Page 101

A.    No.

Q.    Describe for the jury what kind of contact did you have with your brother after March of 1993 up until, say, 1996?

A.    Really none, very, very little.

Q.    Was this -- I'm sorry?

A.    Very little to none.

Q.    And why was that?

A.    I was very upset with him.

Q.    During the time period of 1995 through 1996, did you have any involvement with any further manufacturing or distribution of methamphetamine with your brother?

A.    No.

Q.    I want to move on to 1998 then.  Did you become aware at some point that your brother was arrested again in 1996?

A.    Yes.

368

Q.    And what did you understand those charges to relate to?

A.    Distributing methamphetamine again.

Q.    Was he ultimately convicted of those charges to your knowledge?

A.    To my knowledge, yes, he was.

Q.    And was there a sentencing in 1998 where he was sentenced to prison?

A.    Yes, there was.

Q.    Did you participate in that sentencing at all?

A.    No.

Q.    Did you attend the sentencing?

A.    No.

Q.    Did you do anything to assist your brother in his legal troubles that he got into in 1996 up until his sentencing in

Page 102

1998?

A. No.

Q. And why not?

A. Like I said, I was very upset with him.

Q. So I want to direct your attention then to after his sentencing in 1998. Did you have any contact, further contact, with Angela Johnson after that?

A. She called me on the phone.

Q. And do you recall when in relation to your brother's sentencing in 1998 that that phone call occurred?

A. I believe it was actually during the sentencing that she

369

called. My mother was visiting, visiting me at the same time.

Q. You're living in Phoenix at this point?

A. That's correct.

Q. And when Angela Johnson called you, what was said during the phone conversation?

MR. STOWERS: I'm going to object for the reasons previously stated, Rule 402, Rule 403.

THE COURT: Thank you. Objection's overruled. You may answer.

A. It wasn't really said. It was yelled. She yelled over the phone very loudly that if Dustin wasn't going to be able to see his kids she was going to make sure we weren't going to be able to see ours.

Q. And Angela Johnson said that directly to you.

A. That's correct.

Q. And you said she was yelling on the phone.

A. That's correct.

Q. How did the conversation start off? I mean, was that the

Page 103

entire conversation with her?

A.   That was pretty much the entire conversation.  I ended up hanging up on her, yes.

Q.   How did you take that statement to you?

A.   I had never been -- I had never been threatened like that before, and it just really threw me back, so I took it very seriously.

370

Q.   What did you do about it?

A.   We talked to the local authorities, and we also talked to the FBI about it.

Q.   Were you concerned that that was a threat to your safety or the safety of your family?

A.   Yes, I was.

Q.   The Angela Johnson that your brother introduced you to who had better connections for him in Iowa, do you see her in the courtroom here today?

A.   Yes, I do.

Q.   And could you describe for the jury where she's sitting and what she's wearing?

A.   She's right there in a yellow blazer.

Q.   And to your left?

A.   That's correct.

          MR. WILLIAMS:  Thank you very much.  I have no further questions.

          THE COURT:  Members of the jury, why don't you stand and take a stretch break before we begin the cross-examination.

          Okay.  Please be seated.

          Mr. Stowers, whenever you're ready.

          MR. STOWERS:  Thank you.

Page 104

BY MR. STOWERS:

Q.   Hello, Mr. Honken.  My name's Dean Stowers, and I'm

371

representing Angela Johnson.

A.   Yes, Dean.

Q.   Good to meet you.  We haven't met before today, have we?

A.   We have not.

Q.   And I take it that you travelled up here from Arizona for the purpose of testifying in connection with this case; is that correct?

A.   That's correct.

Q.   And you -- as of today what is the nature of your relationship with your brother?

A.   We are back to not talking to each other again.

Q.   And this whole ordeal I'm sure has been quite difficult for you; is that correct?

A.   Yes, it has been.

Q.   And that might be an understatement to say the least.

A.   That's correct.

Q.   And I know you've been brought into this situation.  You were approached by the authorities back in April of 1998.  You talked about that with Mr. Williams; is that right?

A.   That's correct.

Q.   And they came down there from Iowa and out of the blue approached you; is that right?

A.   That's correct.

Q.   And they wanted to talk to you.

A.   That's correct.

372

Page 105

Q.   And they started asking you questions.  You weren't comfortable visiting with them; is that right?

A.   That's correct.

Q.   And I believe you probably minimized about what you knew about your brother's activities at that time initially.

A.   That's correct.

Q.   Then did you visit with a lawyer?

A.   No.

Q.   Okay.  But in any event, after you had been approached, you were then reapproached by the agents after they had spoken to their attorney supervisors; is that right?

A.   That's -- I don't know who they spoke to, but they came back the next day.

Q.   Okay.  They came back the next day.  And they told you in that April 1998 meeting, didn't they, that whatever you had done back in 1993 and 4 was really old news and was really too old to be pursuing against you; is that right?

A.   Yes.  Their main concern was trying to figure out where the missing people were.

Q.   And you had no information whatsoever about that.

A.   No.

Q.   Had you heard anything about any missing people prior to these questions being asked of you in April of 1998?

A.   My mother conveyed that to me, yes.

Q.   And had you heard any claim that your brother might have

373

been involved in some way or was suspected possibly of having been involved prior to this April 1998 meeting with these officers?

Page 106

A. Yeah, yes.

Q. And had you talked to your brother about that at all?

A. No.

Q. You'd heard that information, but you hadn't talked to your brother.

A. That's correct.

Q. And why would you not have talked to your brother about that?

A. Well, one, we weren't on a talking basis.

Q. Okay. So all the way from roughly March of 1993 all the way up until at least April of 1998, you and your brother really were not talking.

A. That's correct.

Q. And if you did talk, it was very, very limited; is that correct?

A. It would be at a family event, please pass the potatoes, yes.

Q. It was a forced type of a relationship brought on by the fact that you were brothers.

A. Correct.

Q. And so your knowledge of whatever he was doing between roughly March of 1993 and 1998 would be almost really nothing

374

other than what you heard through family contacts, connections; right?

A. That's very correct.

Q. Did you find out at some time that he had a child?

A. Yes.

Q. Okay. With Angela Johnson.

A. Yes.

Page 107

Q.   Did you find out he had a child with another person as well?

A.   Yes.

Q.   And what was her name?

A.   Kathy, and I'm sorry, I don't recall.  I don't know her last name.

Q.   Kathy Rick would it be?

A.   That sounds right.

Q.   Okay.  And do you remember if you knew when Angela Johnson had given birth to what would be your niece I guess?

A.   No, I don't.

Q.   Did you know -- did you know that that had happened at or about the time it happened?

A.   Yes, my mother said -- yes, my mother called when both the kids were born.

Q.   On this occasion when you would have been at this restaurant that Angela Johnson was working at, she was working at the restaurant that you were at with your brother?

375

A.   Yes.

Q.   When would that have been in relation to the birth of your niece?

A.   I'm not exactly sure because I'm not exactly -- when that birth -- like I said, I don't know the year that she was born.

Q.   Do you know if -- I guess what I'm asking is do you know if you would have been at this restaurant in Clear Lake with your brother before or after your niece -- and her name is Marvea --

A.   Yes, that's correct.

Q.   -- was born?

A.   I don't recall, no.

Page 108

Q.   And do you know -- we talked about the date of your brother's arrest up here in Iowa on the first occasion as having been in late March of 1993.  Maybe that would help you.  Do you remember if you would have met Angela Johnson or been introduced to her at this restaurant in Clear Lake before or after your brother's arrest in March of 1993?

A.   It was before his arrest.

Q.   And that's your best memory today?

A.   That's correct.

Q.   And do you know how long before his arrest?

A.   No, I do not.

Q.   And can you describe that time prior to March of 1993 as you now recall it when you would have met Ms. Johnson at a restaurant in Clear Lake?

376

A.   You mean --

Q.   Describe the event if you would.

A.   Describe the -- when I met her?

Q.   Yeah.

A.   Well, she was working very hard in a restaurant.  She had little to no time to talk.  She was very, very cordial, said hi, said she was glad to meet me.  She was very nice.

Q.   So you were there eating with your brother, and he thought that'd be a good time for you to meet Angela Johnson, while she was working.

A.   That's correct.

Q.   And I think she bought you dinner; is that correct?

A.   That's correct.

Q.   And you ate.  Was the food good?

A.   I don't remember.

Page 109

Q.    And then you left.

A.    Then we left, that's correct.

Q.    So you really didn't get to talk to her much.

A.    No, she was very busy.

Q.    Do you think you ever met her in person again after that?

A.    No, not that we ever had a conversation.

Q.    So you really laid eyes on Angela Johnson prior to coming into court today just that one time.

A.    Twice.  There was a time that she was at a family event, but I didn't talk to her.

377

Q.    Okay.  So you laid eyes on her twice, talked to her once when she waited on your table.

A.    That's correct.

Q.    And this family event, do you know approximately when that was?

A.    The middle one?  No, I don't.  It was some time between the two arrests of Dustin.

Q.    Between 1993 and 1996.

A.    Yeah.

Q.    How many times do you think that you laid eyes on or saw your brother between March of 1993 and let's say April of 1998 when you were approached by these law enforcement officers?

A.    Maybe twice.

Q.    So you saw him twice in five years.

A.    Yeah.  It wasn't very much.

Q.    And how many times during that same time period, that being March of 1993 and April of 1998 when you were approached by these law enforcement officers, did you talk to your brother on the phone approximately?

Page 110

A. I don't ever recall talking to him on the phone.

Q. So you don't think you talked to him at all during that five-year period on the phone.

A. Not that I recall, no.

Q. So during these two occasions that you saw your brother, I take it then between March of '93 and April of '98 that those

378

were family events.

A. Correct.

Q. And those would have been --

A. He did come down to -- one time to Arizona. I did see him at that time.

Q. So three times then.

A. Yeah, estimate. Very small amount of times.

Q. And when he came to Arizona, he said hello. Did you see him?

A. And he and I at the time -- I was remarried, and I introduced him to my wife.

Q. And that was a purely brother-to-brother visit?

A. Yes.

Q. So all the information that you've really gotten about what your brother's been up to between March of '93 and April of '98 has been through -- almost principally and almost exclusively through your family relations.

A. That's correct.

Q. Not through firsthand information.

A. No. That's correct.

Q. Now, you described that your brother -- and I think I was somewhat confused, so I want to make sure I understand just the broad brush of the time table. Your brother moved down and

Page 111

lived with you in Arizona -- I thought originally you said the late 1980s?

379

A.   It was after his graduation was -- you know, after he graduated from high school is the first time he came down.

Q.   Okay.  '90 or '91 was it then?

A.   No.  He initially came down -- it would have been probably '86, '87 time frame.

Q.   Okay.  You're talking about his graduation from high school.

A.   That's correct.

Q.   Okay.  And your brother is how old?

A.   I'm 43.  He's six years younger than I am, so he's what? Thirty-six, thirty-seven.

Q.   Do you know what year he graduated from high school?

A.   No, I do not.

Q.   Okay.  In any event, that first time that he was down in Arizona, there was no drug activity whatsoever that was going on at all.

A.   Not to my knowledge, no.

Q.   That's when he worked with you at the one company you've identified the name of which escapes me at this moment, but the name of that was?

A.   Cadtek Corporation.

Q.   Cadtek Corporation.

A.   Correct.

Q.   Okay.  Then he leaves, is that right, and he moves back to Iowa for a period of time.

380

Page 112

A. That's correct.

Q. Okay. And he was gone you think for how long in Iowa?

A. Three, four -- I don't know. Four years.

Q. Okay. And then he returns.

A. Then he returns.

Q. Okay. And now he's moved back to Arizona, and he moves back to live with you and your wife.

A. That's correct.

Q. And that'd be your first wife.

A. Yes.

Q. And then he lived in your home for how long?

A. For a few months.

Q. And best estimate that time was?

A. You know, early '90s.

Q. Okay. Early '90s.

A. I don't know.

Q. Well, let me ask this. Did he live down there in Arizona up until the time that you found out he was arrested in March of 1993?

A. Yes.

Q. Okay. And do you know approximately how long he had been living in Arizona prior to March of 1993 when he was arrested?

A. No, I don't.

Q. Okay. Was it more than a year?

A. Yes.

381

Q. Was it more than two years do you think?

A. I don't -- I don't know.

Q. Okay. And I think you said this, but he lived with you and

Page 113

your wife for a few months.

A.    For a while, yes.

Q.    And then -- and that was in what town?

A.    That was in Tucson, Arizona.

Q.    Okay.  Then you moved -- he moved out, and he moved south of Tucson closer to the border with Mexico.

A.    That's correct.

Q.    And Tucson's only about how far from Mexico if you drive south?

A.    A hundred miles.

Q.    How far was he down towards the border?

A.    Directly south, probably 60 and then probably another 10 miles west.

Q.    Do you remember the approximate -- the name of the town or anything?

A.    No, I don't.

Q.    Was he near Green Valley at all?

A.    Might have been south of Green Valley.

Q.    And you only had visited there -- I think you said a couple three times to that rented house.

A.    Yes.

Q.    Now, you described having lent him money for things

382

anywhere from pizza to anything else he wanted in increments up -- the way I understood it was up to a thousand dollars.

A.    I don't recall the exact amounts, but yes.

Q.    Do you think you ever lent him more than a thousand?

A.    Not to my recollection, no.

Q.    At a given time?

A.    Not to my recollection.

Page 114

Q.    Do you think you even lent him a thousand at any time?

A.    Pardon me?

Q.    Do you ever really think you ever lent him a thousand dollars on any single occasion?

A.    Probably not on any single occasion.

Q.    But your guesstimate, your estimate, is -- I think you said six to seven thousand dollars in total over the time period, but I'm not sure what the time period is.  So can you give the jury an idea what time period it is that you're recollecting that you loaned your brother six to seven thousand dollars?

A.    From the time period of when he was -- came down from Iowa from the time -- from the time he came down from Iowa for the second time.

Q.    So that'd be -- would that all be money lent to him prior to March of 1993 when he was arrested?

A.    Yes.

Q.    Or would it include -- okay.  And then you talked about his arrest, and you've said that following his arrest you were

383

contacted by his third girlfriend, or I don't know if they're ranked or anything but Melissa Friesenborg.

A.    That's correct.

Q.    And she told you that he wanted you to throw some things out for him.

A.    That's correct.

Q.    And I think you also said that you had had a conversation with your brother as well about the fact that he was wanting to just stop everything.

A.    That was prior to that, yes.

Q.    And prior --

Page 115

A.    Prior to his arrest.

Q.    Prior to his arrest he informed you that he was quitting.

A.    That's correct.

Q.    And he was going to stop making meth.

A.    That's correct.

Q.    And he was shutting down.

A.    That's correct.

Q.    And he was ceasing all of his illegal meth-making activities.

A.    That's correct.

Q.    Did he explain to you why he was doing that?

A.    He said that Tim -- Tim had kids in Iowa, Tim was going to go back to Iowa to spend time with his kids and wanted to live up around his kids and he was involved with this new girlfriend.

384

Q.    Which one?

A.    Melissa Friesenborg.

Q.    Okay.  And he apparently was getting serious with her because he'd apparently purchased her a ring as you later found out.

A.    As I later found out, that's correct.

Q.    And apparently an engagement ring?

A.    That's correct.

Q.    And how long before he was arrested in March of 1993 did your brother advise you that he was quitting the meth-making business, the meth-delivering business?

A.    I don't know.  Months.

Q.    Several months?

A.    Several months.

Q.    And when you went to this storage locker as you had been

Page 116

asked to go to, this storage facility, all of the items that he might have been using down at the location in southern Arizona to make meth had been packaged up in boxes.

A. I don't know that, but I assume that.

Q. All right. And you threw all those boxes out at his request to throw them out.

A. That's correct.

Q. And then you also I think said you went -- did you go down to the rental property, or had the rental property already been moved out of?

385

A. They had already moved out of.

Q. Okay. That was something I'm not sure was clear. So when did they move -- because the rental property Tim Cutkomp and Dustin were using; is that correct?

A. That's correct.

Q. Okay. Do you know when they moved out of that property?

A. No, I don't. I was working in Phoenix, and Dustin just called and said that him and Tim were going to be moving out of the house in southern Arizona and he wanted to know if he could use my storage shed to store some of his stuff.

Q. Was that around the same time that you had this conversation with your brother about shutting down all of his meth-making activities?

A. That was the same time.

Q. Several months before March.

A. Yes.

Q. Okay. And how long after your brother's arrest was it that you threw all of these items away from the storage locker?

A. Days.

Page 117

Q. Within a few days?

A. Yes.

Q. And that didn't concern you at all because you really thought, hey, I'm throwing away this stuff because he's not going to use it anymore. He's out of the business, and it's being disposed of. Is that fair to say?

386

A. Yes.

Q. And it was done.

A. To my understanding, yes, it was done.

Q. Kaput.

A. That's correct.

Q. You had nothing to do with it.

A. That's correct.

Q. And your brother had nothing to do with it from that point on as far as you know.

A. That was my understanding.

Q. And so it really didn't surprise you when you were approached in April of 1998 and the officers told you that whatever you'd been involved with back with your brother in 1992 when he had this house down in southern Arizona and for the few months when he was living at your house, didn't really surprise you that they said, Hey, that stuff's too old to be bothering you about.

A. It didn't surprise me. And like I said, you know, I thought it was on such a smaller scale that it didn't make too much difference.

Q. Now, your brother you know was subsequently charged in 1996 with a completely separate situation. You're aware of that.

A. That's my understanding, yeah.

Page 118

Q. Didn't have anything to do with what was going on down in Arizona in 1992.

387

A. That's my understanding.

Q. You didn't know somebody named Gary Solland, S-o-l-l-a-n-d, did you?

A. Never heard the name.

Q. Never had anything to do with him or Aaron Ryerson?

A. Never heard the name.

Q. Or David Patrick?

A. No.

Q. Or a Gregory Nicholson?

A. No.

Q. Were you -- in your limited involvement with your brother, was your brother supervising you in your activities that you were doing with him as far as this effort to make methamphetamine? Was he supervising you?

A. I can't say there was supervising or anything like that. I mean, he would --

Q. Was he managing you?

A. No.

Q. Was he telling you what to do and when to do it, bossing you around?

A. No.

Q. Now, did you know that the government in this case has alleged that you together with your brother and Mr. Cutkomp and Mr. Solland and Mr. Ryerson and Mr. Patrick and Mr. Nicholson and Angela Johnson were all engaged in a drug conspiracy from

388

1992 continuing up till about 1998 when you were interviewed by these officers?

A.    No, I've never heard that.

Q.    Would it be true that you were involved in a conspiracy in your mind from 1992 up until and including 1998?

A.    That would be completely false in my brain.

Q.    And you've made that clear to the people from the government who've interviewed you over these many years.

A.    That's correct.

Q.    Now, this conversation that you've described that you had with Angela Johnson when she called, where was the call made to?

A.    My home in Mesa, Arizona.

Q.    And this was at or about the time your brother was sentenced in 1998?

A.    That's correct.

Q.    And you knew at that time I take it that she had custody of your niece Marvea; is that correct?

A.    That's correct.

Q.    And you'd met Marvea; is that correct?

A.    Yes, that's correct.

Q.    And you met her through -- I guess through your mother allowing you to see her; is that correct?

A.    That's correct.

Q.    And was it also the case that you knew that Angela Johnson still had strong feelings and connections to Dustin Honken both

389

as a result of the fact that they had a child together and that she still cared for your brother?

A.    I don't have any personal information on that.

Q.    And were you aware that your brother was being sentenced in

late 1997 and I think there was another portion of that sentencing went on into 1998?

A.   Yes, I knew he was getting sentenced.

Q.   And did you attend that sentencing to lend your brother any kind of moral or family support?

A.   No, I did not.

Q.   And had you been asked to do that?

A.   No, I had not.

Q.   Was that something you had considered doing?

A.   It is not.

Q.   And Ms. Johnson was calling up in the middle of that sentencing which did not, fair to say, go well for your brother because he received a very long prison term; right?

A.   That's correct.

Q.   She was quite upset over the fact that Mr. Honken, your brother, was going to be unable to see his daughter Marvea and your niece Marvea for many, many years.  She was quite upset about that.  That was one of the things she expressed to you in this phone call that she was, as you call, yelling at you.

A.   It was a quick yelling.  I mean, yes, I mean, that's what she expressed.

390

Q.   Blew her top and said, you know, he's never going to be able to see her again; right?

A.   Well, I already said what she said.

Q.   Did she say that, though?

A.   No.  All she said is that Dustin isn't going to be able -- you guys -- you haven't been supporting Dustin in what he's been going through, and if Dustin's not going to be able to see his kids, I'm going to make sure you don't get to see yours.
Page 121

Q.    Okay.  And that's the way you remember it.

A.    That's the way I remember it.

Q.    You don't remember her saying, Dustin's not going to be able to see his kids, and you're not going to be able to see them either.  The way you remember it is it was directed at your kids.

A.    That's correct.

Q.    That's just the way you remember it.

A.    That's correct.

MR. STOWERS:  Thank you.  That's all I have.

THE COURT:  Mr. Williams, any redirect?

MR. WILLIAMS:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q.    I want to go back to this conspiracy thing for a moment. First of all, the indictment alleges that a conspiracy existed between 1992 and 1998 and among the people involved at some

391

point during that was, among others, you.  So I want to go back to that.  We talked early on in this that when Dustin Honken came down in early 1992 he told you he wanted to manufacture methamphetamine.

A.    Correct.

Q.    You knew he wanted to manufacture methamphetamine.

A.    Yes.

Q.    He asked you for money to manufacture methamphetamine.

A.    That's correct.

Q.    You loaned him money to manufacture methamphetamine.

A.    That's correct.

Q.    You knew the purpose of him using your money was to

Page 122

manufacture methamphetamine.

A. That's correct.

Q. And you knew the purpose of that was to sell the methamphetamine to other people in Iowa.

A. That's correct.

Q. So you had an understanding or agreement with your brother to assist him in the manufacturing of methamphetamine.

MR. STOWERS: I'm going to object to that as leading. I let the first six questions go as leading, but I was thinking the seventh one --

THE COURT: Overruled, and I don't need editorial comment from you. You made your objection. Objection's overruled.

392

A. Can I have the question one more time, please?

Q. Did you have an understanding with your brother to assist him in the manufacturing and distributing of methamphetamine during the time period 1992 to 1993?

A. The financial aspect, yes.

Q. And then after that you didn't have any further involvement, and if any other activity took place, you're telling the jury you weren't involved in that.

A. That's correct.

Q. And we covered that during your direct exam.

A. Yes.

Q. Let me talk to you for a moment about -- you were asked a series of questions about supervising your brother or managing your brother and so forth. First of all, going back to how this thing was set up, who was it who decided who to sell the methamphetamine to in Iowa?

Page 123

A.   Dustin's.

Q.   Who decided what drug to manufacture?

A.   Dustin.

Q.   Who decided where to manufacture the drug?

A.   Dustin.

Q.   Who decided what quantity of drug to manufacture?

A.   Dustin.

Q.   Who decided how much they were going to charge for the methamphetamine?

393

A.   I assume Dustin.

Q.   Who decided who was going to get what portion of the proceeds from the methamphetamine?

A.   Dustin.

Q.   When Dustin Honken asked you for money, did you comply?

A.   Yes, I did.

Q.   And knowing that that was going to be used for the manufacturing of methamphetamine?

A.   Some of the times, yes.

Q.   Going to the events that occurred about the time of your brother's arrest in March of 1993, you were asked a series of questions about the destruction of the -- of that property.  Do you recall that series of questions?  You were asked a series of questions about a conversation you had with your brother Dustin about he was quitting, he was done, he wasn't going to do anything more with the methamphetamine.

A.   That's correct.

Q.   Do you recall that series of questions?

A.   Yes.

Q.   Now, the boxes that you destroyed for him, they were boxed

Page 124

up, taped up, and stored in a storage unit.

A.   That's correct.

Q.   He didn't throw those away down in his other house down in southern Arizona.

A.   No, he did not.

394

Q.   He transported them and stored them in a locked storage unit in Tucson.

A.   I'm assuming so, yes.

Q.   You destroyed those based on your own direct testimony before or after he was arrested?

A.   After he was arrested.

Q.   So before he was arrested, those were safely stored in a storage locker in Tucson, Arizona.

A.   That's correct.

Q.   Are you aware of whether during his arrest -- during the undercover contact he had with a cooperator in March of 1993 that your brother was making further arrangements for future shipments of methamphetamine during that undercover operation?

A.   No.

MR. STOWERS:   I'm going to object to that, Your Honor, as a lack of foundation for him being aware of anything about that.

THE COURT:   Well, it's not really a foundation issue. If he knows, he knows.  If he doesn't, he doesn't.  So the objection's overruled.

Q.   Were you aware of that?

A.   No, I was not?

Q.   Were you aware that he was in Iowa to pick up cash from the drug operation?

Page 125

A.    No.

MR. STOWERS:  I'm going to object to that as assuming facts not in evidence, Your Honor.

THE COURT:  Overruled.  You may answer.

A.    Can you restate the question, please?

Q.    Were you aware that he was in Iowa for the purpose of picking up drug proceeds?

A.    No, I was not.

Q.    And you were asked a question about him pleading guilty in 1996 to charges that had nothing to do with what happened before.  Do you remember that question from the defense attorney?

A.    Yes, I do.

Q.    Were you aware that, in fact, when he pled guilty in 1996 to conspiracy that that conspiracy time frame included 1992 to 1996?

A.    I was not, no.

MR. WILLIAMS:  I have no further questions, Your Honor.

THE COURT:  Mr. Stowers, anything further for this witness?

MR. STOWERS:  No thank you.  Thank you, Mr. Honken.

THE COURT:  Okay.  You may step down.

MR. MILLER:  Your Honor, the government calls Kevin Pals.

THE COURT:  Okay.  Members of the jury, you can take a

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 352 of 3592

stretch break.

MR. MILLER: Sir, if you'll step forward and be sworn.

KEVIN PALS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. You can adjust the chair and the microphone to make yourself comfortable. And when you're ready, would you state your full name and spell your last name.

THE WITNESS: Kevin Pals, and the last name is P-a-l-s.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good morning, Sheriff.

A. Good morning.

Q. And your occupation is that of sheriff.

A. Correct.

Q. Of what county?

A. Cerro Gordo.

Q. I'd like you first briefly to summarize for the jury your professional career in law enforcement.

A. I've been in law enforcement 26 1/2 years approximately. I started in August of 1978. I worked two years at the Clear Lake Police Department, two years in Winona, Minnesota, Sheriff's

397

Office, 18 1/2 years with the Mason City Police Department, and then I was elected sheriff in November of 2000, took office January of 2001, and was reelected in 2004 in November, and I'm currently serving as the sheriff of Cerro Gordo County.

Page 127

Q.  So you have a total of about how many years in law enforcement, sir?

A.  About 26 1/2.

Q.  And that I assume includes time spent going through education, training, and certification as a peace officer in the state of Iowa?

A.  That's correct.  I have a two-year degree from a local community college, North Iowa Community College, a two-year degree in law enforcement.  I'm also a graduate of the Iowa law enforcement academy in 1983, and I have taken several educational courses on various topics in law enforcement over the last 26 1/2 years.

Q.  You've been sheriff of Cerro Gordo County again for how many years, sir?

A.  I'm starting my fifth year.

Q.  So you're on your second term then.

A.  That'd be correct.  We're elected every four years like the president of the United States.

Q.  You're on that same cycle.

A.  Same cycle, correct.

Q.  Cerro Gordo County is where, sir?

398

A.  Well, the county seat is Mason City, Iowa.

Q.  Can you give us just a brief description of Cerro Gordo County?

A.  Cerro Gordo County sits in the north central part of Iowa.  We're the second county down on Interstate I-35 just south of Minnesota.  County size, about 47,000 population.

Q.  Mason City, in addition to being the county seat, is the largest community there?

A.  largest community there?

Page 128

A.    That's correct.

Q.    What other communities are there just not to quiz you about every last one but the larger population communities in that county?

A.    The other larger ones are Clear Lake, Iowa, and Rockwell, and then there's Ventura that sits on the west side of Clear Lake, but there's several other small towns incorporated and unincorporated.

Q.    And you have a staff of approximately what size, sir?

A.    We have a staff of 53.

Q.    Sheriff, I want to visit with you a little bit about your responsibilities as sheriff.  I realize that there are a great many, but if you could summarize them briefly for the jury, would you do so, please?

A.    Yes.  Well, under the state code of Iowa, obviously there's several mandates that the sheriff has to fulfill, but kind of I break them down into four categories.  There's the jail.  We

399

operate a jail.  We operate a patrol function like a law enforcement function.  You'd see the marked cars out doing traffic stops and answering calls.  Then there's a civil process side of the department that serves all the civil papers in the county.  And then we have an administrative branch that kind of runs the operation of the bills and the budget.  And also we are the custodian of the records.  Every time a new sheriff takes office, he takes over the records from the previous sheriff and just continues on and on since 1855.

Q.    Are there a fair number of records and recordkeeping responsibilities that go along with being sheriff of a county?

A.    Yes.

Page 129

Q. I want to visit with you about one in particular, and that is as it pertains to the acquisition of firearms. What, if any, responsibilities does an Iowa sheriff have in that respect, sir?

A. Well, under the Iowa Code under chapter 724, we are mandated to receive applications for permits to acquire, to purchase firearms and also the permits that allow people to carry a concealed weapon also.

Q. Would you describe for the jury, please, what the procedure is in the state of Iowa to go about acquiring a firearm and a permit to purchase such?

A. Okay. If someone would want a permit to purchase or acquire a firearm, they would come to the sheriff's office. We have an application that is a front and back side of a sheet of

400

paper, and you have to sign it saying that you are telling the truth on the questions. There's various questions on whether you've been convicted of crimes or whether you're a convicted felon, whether you've been convicted of other crimes, I guess -- eliminators I guess is what I would call them, show a photo ID.

Then our staff would take that application, and they would do a records check on the person that's applying for them to make sure there's no disqualifiers, and then if they would pass the qualifications, then the staff would take it to the sheriff or a deputy to have that signed, and the permit would be issued.

There is a three-day waiting period in the state of Iowa. Once you apply for that permit, if you were to apply for it, there is a three-day waiting period before that permit is actually valid.

Q. Now, you've been sheriff for four-plus years.

Page 130

A.    Correct.

Q.    Are you familiar with the Iowa procedure regarding acquisition of a firearm as to whether it has changed in recent years or how long the procedure that you just described has been in effect?

A.    The procedure's basically been the same.  There have been a change in the questions that qualify a person to acquire, and basically those changes are domestic assault related and also hate crime related, but other than that, the qualifier's been

401

basically the same.

Q.    And if the answers are answered appropriately and the investigation doesn't dispute that, then a permit is issued?

A.    That's correct.

Q.    And go ahead and describe how one goes about completing that process of acquiring a firearm in Iowa.

A.    Okay.  Once we're done with that records check, then our staff would fill out the actual permit, and it's different color according to what type of permit you have.  And that permit is filled out with a number that is assigned to each permit so that we can keep track of that.  That permit's good for one year, and if you let it lapse past a year -- let's say you went 15 months -- when you come in to apply, it would be still considered a new permit.

Q.    So there is a time frame in which a permit is valid.

A.    That's correct, one year.

Q.    You've mentioned that this procedure in general except for some of the specific questions has been in effect since before you were sheriff.

A.    That's correct.

Page 131

Q. And I'd like to direct your attention specifically to the year of 1993. Were -- the procedures that you've described, were they in effect at that time as well?

A. Yes, they were.

Q. You've mentioned that your familiarity with this is in that

402

one of those four areas of your responsibility that you've described is the administrative duties.

A. Correct.

Q. Was the keeping of such records required back in 1993 as well as it is today?

A. Yes.

Q. And as sheriff of your county, are you the custodian of such records?

A. Correct.

Q. It is your responsibility to make sure that such records are kept.

A. Yes.

Q. And are they, in fact -- again, is that a statutory duty, a legal requirement of office?

A. Yes.

Q. And does your office keep such records in the regular course of its business?

A. Yes.

MR. MILLER: If I may approach the witness, Your Honor?

THE COURT: You may.

BY MR. MILLER:

Q. Sheriff, I've handed you what is marked as Exhibit 42. Do you recognize that document, sir?

Page 132

A. Yes.

403

Q. And what is Exhibit 42?

A. I do have a question. Are they both one exhibit?

Q. Yes, sir.

A. Okay. The larger 8 1/2-by-11 sheet of paper is the application that the person would fill out to get a permit, and then the green shorter one is the actual copy of the permit that was issued.

Q. And Exhibit 42 specifically, is that a copy of a document that's kept in your office?

A. That's correct.

Q. Again, a copy of a application and permit to acquire a firearm issued by the office of the Cerro Gordo County sheriff.

A. That's correct.

MR. MILLER: Your Honor, the state offers Exhibit 42 in evidence.

*   *   *   *

(Government Exhibit 42 was offered.)

*   *   *   *

MR. STOWERS: No objection.

THE COURT: Forty-two is received.

*   *   *   *

(Government Exhibit 42 was admitted.)

*   *   *   *

MR. MILLER: And with the Court's permission, I request the opportunity to publish it to the jury at this time?

404

THE COURT: You may.
Page 133

MR. MILLER: And if I could ask my co-counsel to one section at a time first zoom in on the top section.

BY MR. MILLER:

Q. If you would please describe for the jury what the top section of that document shows.

A. Well, this is the application for the permit, and it would include information, obviously the name, the address, Social Security Number, and the date of birth with the age included.

Q. And in this particular case it shows as an applicant whom, sir?

A. Angela J. Johnson of an address of 5 South 19th Street in Clear Lake which is in Cerro Gordo County, and it lists her Social Security Number, her age, and her date of birth.

Q. Thank you, sir. If we could continue down, the center section that includes the questions and responses, is that the qualifiers that you described before?

A. Yes, that's correct.

Q. And in this case they are all answered in the affirmative, and is that such as would be necessary to qualify the applicant for issuance of a permit?

A. Yes, that's correct.

Q. Thank you. We'll go down, and I'd like the --

MR. MILLER: Mr. Williams, if you would, please, focus on the bottom third of the document, I'll ask the witness to

405

please describe what that shows. And for the record, we are now showing as zoomed in the bottom third of the document.

Q. Can you tell us, please, what that shows?

A. Yes. That's showing us that at the time that is in view now it says NCIC, okay, that means that our staff actually ran a

records check on the computer to make sure that there was no criminal offenses that would prohibit the person from applying. It shows the date that the application was made which was June 30, 1993. Below that it has a permit number which starts with an A. And then below that it is signed by the person that actually -- it's a deputy sheriff at that time that actually signed the permit with the sheriff's name that is above him. All documents in the sheriff's office has to have the sheriff's name on the document, and then by us swearing in our deputies, they have authority to sign documents in my name, and then off to the right is the applicant's signature and the date of the application which was June 30, 1993.

Q. And is that the signature of the applicant, Angela Johnson, or at least appear to be?

A. It appears to be that applicant's signature, that's correct.

Q. Thank you. And if we're able to pull up the second section of that document which would be the permit. While we're waiting for this, the document itself, Exhibit 42, is two pieces of paper attached?

406

A. That's correct.

Q. We've already looked at the portion which is entitled Application For a Permit; is that correct?

A. That's correct.

Q. And the other portion of that document, the green colored sheet of paper, is entitled what, sir?

A. That's the actual permit to acquire pistols and revolvers in the state of Iowa.

Q. And would you just describe for the jury what they see now

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 361 of 3592

displayed on the visual presenter which is a portion of that exhibit?

A. Okay. Actually what you're seeing is actually the whole permit that that person would have a copy of. They would have the original. We would retain the copy in our office. Upper right-hand corner is that number of the permit again. Starts with an A. And below that then the applicant's name is listed, Angela J. Johnson again with her residence of 5 South 19th Street, Clear Lake, Iowa, and then it would list her Social Security Number. And then off to the right would have her age and her date of birth again, and then it's -- also below that it's hard to read on the copy of the overhead. It also tells that there's a three-day waiting period so this effect -- this permit takes effect July 3, 1993. And then once again, it is signed by the applicant, Angela J. Johnson, and it's dated in typewritten and then the deputy sheriff that signed the permit

407

with the sheriff's name above it again and lists Cerro Gordo County where the permit was issued.

Q. And then just to be perfectly clear, Exhibit 42 is actually two connected documents, one of which is the application and the other, the latter, being the permit itself.

A. That's correct.

Q. Application is dated what date?

A. June 30, 1993.

Q. And the effective date of the permit is?

A. July 3, 1993.

Q. Thank you, sir. Sheriff, I've now handed you what is marked as Exhibit 43. Can you identify that document for us, sir?

A.    Yes.   This is a certified copy of the ATF, Alcohol, Tobacco, and Firearms, firearms transaction record.

MR. MILLER:   Government offers Exhibit 43.

*   *   *   *

(Government Exhibit 43 was offered.)

*   *   *   *

MR. STOWERS:   No objection.

THE COURT:   Forty-three is received.

*   *   *   *

(Government Exhibit 43 was admitted.)

*   *   *   *

MR. MILLER:   And again request permission to publish

408

to the jury at this time, Your Honor?

THE COURT:   You may.

MR. MILLER:   And if we can go, Counselor, to that portion of the document which would show the date and details of the transaction.

Q.    There's a lot of ribbons and stamps and such.   Here we go. Page 3 of that document, and if we can focus in first on the top half of that, would you please describe for the jury what they see in the top portion of Exhibit 43, page 3?

A.    Well, this is letting us know that it's a firearms transaction record which is done -- if you were to go to purchase a revolver or pistol in the state of Iowa and you would have your little permit from the sheriff's office of the county you lived in, if you went to a firearms dealer, they would ask you for your permit to acquire.   You would show them to them. And then they would fill out this ATF record, and then they would take the information from the person and write this on the

Page 137

transaction report which is stating that Angela J. Johnson has her heighth, weight, her race, and her address again of 5 South Clear Lake -- or 5 South 19th Street in Clear Lake with her ZIP Code. And once again, it's her same date of birth and place of birth that's also placed on that document.

Q.    And specifically this is the record of a firearms transaction.

A.    That's correct.

409

Q.    And if we can now please zoom in on the bottom half of the document. Sheriff, I'd like you if you would, please, to describe what this shows in the way of information regarding the nature of this transaction.

A.    When you purchase a firearm, you have to obviously sign for it again. And at the top of this portion that's highlighted is Angela Johnson's signature again with the date of July 7, 1993. And it actually lists the same permit number on blank number 9 there. It says it's Iowa permit to acquire, and in blank number 10 there it has the number of the permit, that A321715 that we gave her from Cerro Gordo County, to purchase firearms. And again they listed her Social Security Number, and then in the lower portion it shows what weapon she purchased, and it was an Intratec Tec-9 nine-millimeter firearm.

Q.    Are you at all familiar with that type of weapon, sir?

A.    Yes, somewhat.

Q.    Can you just briefly describe its nature for us, please.

A.    Well, obviously it's a nine-millimeter size caliber weapon, and it is -- I guess we classify it in law enforcement as an assault weapon. I mean, there's no hunting value of a weapon like this.

Page 138

Q. It's a large handgun?

A. It's a large handgun, yeah. It's hard to conceal I guess would be a good way of saying it.

MR. MILLER: Thank you, sir. I have no further

410

direct, Your Honor. Excuse me.

BY MR. MILLER:

Q. Oh. Does that document show the location, not only the date but the location, where the firearm was purchased, sir?

A. Yes. In the lower left-hand corner, the part that is highlighted there in blank 16, it's Duee's Pawn Shop in Waterloo, Iowa.

Q. Where is Waterloo in relation to Cerro Gordo County?

A. Waterloo is located approximately 90 miles south and east of Cerro Gordo County.

Q. Would Waterloo be the closest location for firearms dealers to Mason City?

A. No. There's firearm dealers everywhere I guess.

Q. Even in Mason City I assume.

A. Yes, even in Mason City.

MR. MILLER: Thank you. I apologize, Your Honor. But I have no further questions.

THE COURT: Okay. Thank you. How much cross do you have, Mr. Stowers?

MR. STOWERS: Real quick.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. STOWERS:

Q. Sheriff Pals, how you been?

A. Good.

Page 139

Q.   Good to see you again.  Can you look at, first of all, this Exhibit Number 42?  There is on there some handwriting on the top portion of that exhibit; is that right?  Page 1?

A.   On the larger page?

Q.   Yeah.

A.   Yes.

Q.   Okay.  That would be the portion that the applicant would fill out?

A.   Correct.

Q.   And they check all the boxes.

A.   That's correct.

Q.   Right?  And this application was filled out on June the 30th, and it was approved on the 30th of June according to the lower third of that document.

A.   That's correct.

Q.   That would indicate to you that the application was filled out right there at the sheriff's office, wouldn't it?

A.   Yes.

Q.   So that the applicant in this case, Angela Johnson, would have come into the Cerro Gordo County Sheriff's Office and would have filled that out in person.

A.   Correct.

Q.   Would they have had to show some ID?

A.   Yes.

Q.   Okay.  So Angela Johnson would have gone into the Cerro

Gordo County Sheriff's Office and filled out this form right

there, given some ID identifying herself as, in fact, Angela
Johnson. The paperwork would have gone back for processing; is
that right?

A. That's correct.

Q. It says on the lower left corner NCIC, dash, okay.

A. Correct.

Q. NCIC stands for?

A. National Crime Institute Center.

Q. Okay.

A. Or close to that anyway. I'm not sure on the "I" but . . .

Q. And somebody would have run that through.

A. That's correct. Our staff would have done that.

Q. And there's a computer system that you can check anybody's
criminal history on.

A. That's correct.

Q. And it's called the NCIC.

A. Correct.

Q. And so somebody would have to do that to verify that the
information regarding criminal history of Angela Johnson was
accurate, and the fact that it says okay means it was.

A. According to the computer, that's correct.

Q. And then the sheriff at that time had designated -- sheriff
was Robert Balek at that time.

A. That's correct.

413

Q. And it designated Lieutenant, I think, Mason?

A. That's correct.

Q. As the person authorized to issue these permits in his
absence?

A. That's correct.

Page 141

Q.   Okay.  And that permit then is retained forever in your files there as a sheriff as required by law.  Maybe forever's too long of a time.

A.   Yeah, forever would be too long, but yes.

Q.   For a real long time.

A.   Yes, long time.

Q.   Years and years, okay.  And then the person would take that dollar bill-sized slip of paper which is the permit itself, and they'd go wherever they wanted in the state of Iowa I guess and use that permit to purchase a handgun.

A.   Correct.

Q.   And they'd have to show that to the gun dealer and produce that for them to be able to purchase a gun and for the gun dealer to sell them a gun; is that correct?

A.   Mostly.  You don't actually -- actually in Iowa you can go purchase another type of firearm without this permit by going to a gun dealer and making application right at the store, and then they would do what we call a NICS check which is they actually fax it to the ATF, and then they would run that same check that we did in our office, fax it back to the store, and then they

414

could also purchase that way too.  But this is the best way in the state of Iowa because showing that law enforcement has done -- taken some initiative to make this happen.

Q.   It's the best way for law enforcement.  It's probably the worst way somebody could do it if they were trying to hide the fact they were going to buy a gun.

A.   I'm not sure about that.

Q.   If somebody went to Waterloo and wanted to buy a gun in Waterloo, they could go to Waterloo and buy a handgun there from

Page 142

Duee's Pawn Shop without having gone to the Cerro Gordo County Sheriff's Office first; isn't that true?

A.   Correct.

Q.   And that's provided by law.

A.   Correct.

Q.   Federal law I think.

A.   Actually it is federal, that's correct.

Q.   So if --

MR. STOWERS:  Well, that's all I have.  Thank you.

THE COURT:  Mr. Miller, anything further for this gentleman?

MR. MILLER:  No, Your Honor.

THE COURT:  Okay.  You're excused.

Members of the jury, we'll take an hour recess.  We'll start back in at one o'clock.  Please remember not to discuss this case among yourselves or with anyone else.  Thank you.

415

(The jury exited the courtroom.)

THE COURT:  Mr. Williams, is there anything we need to take up?

MR. WILLIAMS:  No, Your Honor.

MR. STOWERS:  No, Your Honor.

THE COURT:  Anything from the defense?

MR. STOWERS:  No, Your Honor.

THE COURT:  I guess what do we have?  A note?  Let me see it.  108 chair needs oiled.  And it's dated 5-5-05.  Any objection?

MR. WILLIAMS:  No objection to oiling the chair, Your Honor.

THE COURT:  Thank you.

Page 143

VOLUME 2, 5-5-05

(Lunch recess at 12:04 p.m.)

THE COURT: Do you have your next witness ready to go?

MR. MILLER: Yes, Your Honor.

THE COURT: Okay. Ready to have the jury brought in?

MR. MILLER: Yes, sir.

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Ready with your next witness, Mr. Miller?

MR. MILLER: Yes, Your Honor. The United States calls Lisa Asbe.

LISA ASBE, PLAINTIFF'S WITNESS, SWORN

416

THE COURT: Okay. Please be seated in the witness box. And could we get you to scoot the chair up a little bit and adjust the two microphones so you can speak directly into them. And would you state your full name and spell your last name.

THE WITNESS: Lisa Ann Asbe, A-s-b-e.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good afternoon, Mrs. Asbe.

A. Good afternoon.

Q. Your residence, Mrs. Asbe?

A. 616 North Jackson Avenue, Mason City, Iowa.

Q. And your occupation, ma'am?

A. Surgical aide in surgery.

Page 144

Q.    And where do you work?

A.    Mercy Medical Center North Iowa in Mason City.

Q.    How long have you worked there, ma'am?

A.    Twenty-seven years.

Q.    And can you give us just a little bit of summary of your duties as a surgical assistant there?

A.    I assist in getting the room set up and prepared before they start surgeries and assist the nurses.

417

Q.    I assume you enjoy that work.  You've been doing it for --

A.    I do.

Q.    -- quite a number of years now.

A.    Yes.

Q.    Who do you live with there on North Jackson in Mason City, Iowa?

A.    My husband Brian of 22 years and then my son Jason who's 20 and my daughter Brittany who's going to be 17.

Q.    What year in school is Brittany?

A.    She's a junior this year.

Q.    You've lived in that neighbor for how long?

A.    Since June 30 of 1984.

Q.    The same home?

A.    Same home.

Q.    Would you describe that neighborhood for the jury, please, a little bit?

A.    The neighborhood is pretty quiet.  We've got very nice neighbors.  They're always watching out for us and kind of watch our house and everybody else's houses around there.

Q.    It's a family neighborhood?

A.    It is.

Page 145

Q.   Buildings there are single-family residence homes?

A.   Yes.

Q.   Brand new homes, older homes?  Can you give us some idea?

A.   Older homes probably built in the '40s, '50s.

418

Q.   You've mentioned that you live at an address in the 600 block of North Jackson Street?

A.   I do.

Q.   Can you tell us where that is in relation to North Van Buren Street in Mason City?

A.   It's a block east.

Q.   And are -- the block that you live on is bordered by what streets?

A.   The railroad track is on the east side, and then Van Buren's directly west of North Jackson.

Q.   I'm just wondering if you're on the side of the street of North Jackson that has Van Buren Street on the back of you.

A.   We are.

Q.   So your home would back up to homes that are on North Van Buren Street.

A.   Yes.

Q.   Okay.  And you've lived there again for 20-plus years.

A.   Correct.

Q.   I take it you moved there about the time that your first child was born then.

A.   About a year before.

Q.   So that's been your family home and where you've raised your children.

A.   It has been, yes.

Q.   And are continuing to raise your children.

Page 146

A.    We are.

Q.    What -- has that neighborhood had all the same residents over the years?  Or, like most neighborhoods, has it had a turnover of residents from time to time?

A.    There's been a few that have moved and kind of come and go, but most of them have been around there for at least, oh, probably 10 to 15 years.

Q.    Okay.  But over a 20-year period of time you see a turnover in a neighborhood.

A.    We have.

Q.    During the period of time that you've lived at that address, did you ever have neighbors, a family by the name of Duncan?

A.    We did.

Q.    Do you remember that family well?

A.    We do.

Q.    And where did they live in relation to your home?

A.    Directly behind us across the alleyway.

Q.    Do you remember when that was, Mrs. Asbe?

A.    Probably '90, '91 is when they probably moved into that residence.

Q.    And just so we have a clear description, would you describe how those two homes sat in relation or sit in relation to each other, your home and the home that the Duncans lived in back in the early '90s?

420

A.    Our house directly -- was right across the alleyway.  We could see their house from ours.
Page 147

Q.    And was there any particular reason why the Asbes and the Duncans or any members of those two families became acquainted?

A.    Through my daughter Brittany and my son Jason but more so Brittany.

Q.    Children in the neighborhood played together.

A.    They did.

Q.    Okay.  There any special relationship between either of your children and either of the Duncan children?

A.    Brittany and Amber were very close.  At the time there wasn't really many kids around that area, so they were close in age and became very good friends.  It was one of her best friends at that time.

Q.    They played together like little girls will.

A.    They did.

Q.    In addition to Amber, were there any other children in the Duncan household?

A.    There was Kandi, and she was a little bit older.

Q.    Mrs. Asbe, I've placed before you what is marked as Exhibit 36.  Do you recognize that, ma'am?

A.    I do.

Q.    What is Exhibit 36?

A.    It's a picture of Kandi.

Q.    Does that show Kandi Duncan as she appeared in life back in

421

those early '90 years?

A.    Yes.

        MR. MILLER:  Your Honor, the government offers Exhibit 36.

                        *   *   *   *

        (Government Exhibit 36 was offered.)
                        Page 148

* * * *

MR. BERRIGAN: No objection.

THE COURT: Thirty-six is received.

* * * *

(Government Exhibit 36 was admitted.)

* * * *

MR. MILLER: And request permission from the Court to publish at this time?

THE COURT: You may.

BY MR. MILLER:

Q. Mrs. Asbe, on the screen before you and on the large screen behind you is a photograph that you've described as a picture of Kandi Duncan. Could you just very briefly describe for us what this little girl was like?

MR. BERRIGAN: I'm going to object, Your Honor. This is improper victim impact evidence. It violates my client's due process rights under the 8th and 14th Amendment.

THE COURT: Overruled.

BY MR. MILLER:

422

Q. Go ahead. This was --

A. Amber was --

Q. Excuse me, this is Kandi.

A. Kandi, excuse me. Kandi was the older one of the two, and she basically was like a mother hen to Amber. She kind of over -- you know, oversaw Amber, and she was very sweet, shy, not as outgoing as Amber.

Q. Thank you, ma'am.

MR. MILLER: You can take that down now, Counselor.

Your Honor, I believe Exhibit 37 has already been

Page 149

received, but I would request permission to publish it at this time, photograph of Amber Duncan.

THE COURT:  Thirty-six is in evidence.  I don't see that 37 is in evidence.

MR. MILLER:  Your Honor, at this time we re-offer then State's Exhibit -- or we do offer Government's Exhibit 37.

*   *   *   *

(Government Exhibit 37 was offered.)

*   *   *   *

THE COURT:  Any objection to 37?

MR. BERRIGAN:  None to 37, sir.

THE COURT:  Thirty-seven's admitted.

*   *   *   *

(Government Exhibit 37 was admitted.)

*   *   *   *

423

MR. MILLER:  Request permission to publish that at this time.

THE COURT:  You may.

BY MR. MILLER:

Q.    What does Exhibit 37 show, please?

A.    That's Amber Duncan.

Q.    And this is the little girl that was the very close friend of your daughter Brittany.

A.    She was.

Q.    Does that show her as she appeared as you last knew her in life?

A.    Yes.

Q.    And would you again just very briefly for us describe for the jury this little girl.

Page 150

MR. BERRIGAN: Same objection, Your Honor, regarding victim impact evidence.

THE COURT: Overruled.

BY MR. MILLER:

Q. Tell us what this little girl was like and again just in a few words so we can have some understanding of who this little girl was.

A. Amber was very outgoing. She was very much like my daughter Brittany. They were kind of like two peas in a pod. What one didn't think of, the other one did. And they played a lot together. She came over to our house quite a bit,

424

sleepovers, played dolls.

Q. Summertime and wintertime both they'd spend time together?

A. Yes.

Q. This photograph shows her obviously in a swimsuit. Is that typical of how she would be seen in the summertime?

A. It was.

Q. They liked to engage in those sort of water activities?

A. They did.

Q. What other things did those two little girls do together?

MR. BERRIGAN: I'm going to renew my objection that this is victim impact evidence and has no relevance to the issues.

THE COURT: Overruled.

BY MR. MILLER:

Q. What other things did those two little girls, Brittany and Amber, do together?

A. They played in our sandbox in our backyard, swung on the swing set that we had, played on the Slip 'N Slide in our

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 377 of 3592

backyard because we had a little hill in our backyard.

Q.   And in the summertime in particular how much time did they spend together?

A.   All the time.  She was pretty much over at our house if not every day every other day.

Q.   Thank you.

        MR. MILLER:   You can take that down now, Counselor.

425

Thank you.

Q.   You mentioned sleepovers.  Can you give us some idea how often they did that together?

A.   At least --

        MR. BERRIGAN:   Sorry.  I apologize to interrupt, but I need to renew my objection on the same basis, sir, that it's victim impact evidence.

        THE COURT:   Well, it isn't victim impact testimony, so the objection's overruled.

        MR. BERRIGAN:   Okay.  Thank you.

BY MR. MILLER:

Q.   How often?

A.   At least twice a week.

Q.   You've mentioned your acquaintance with these two little girls.  Were you acquainted at all with their mother or any other adult members of that household?

A.   I knew Lori a little bit but not real well.  I did attend, you know, some parties and stuff over there, like candle parties and stuff in the past.

Q.   The members of that household that you knew the best were the children.

A.   Yes.

Page 152

Q. And that was because of the contacts through your own children.

A. Right.

426

Q. Mrs. Asbe, I want to call your attention specifically to the summer of 1993. Approximately how long if you recall had you and the Duncans been neighbors by then?

A. About two, three years.

Q. As of July of 1993, to your knowledge who was living in the Duncan household?

A. Lori and her two daughters.

Q. I specifically would like to address your attention to the date of July 25, 1993. Do you have reason to recall that date, Mrs. Asbe? That's just asking for a yes or no.

A. Yes.

Q. Okay. Thank you. And now I'll go ahead and ask you to please tell us what you do recall about that day.

A. That morning Amber came over to our house and asked if she could play with Brittany, and I said yeah. And we started to get ready for dinner, and she -- or I asked her if she wanted to stay, and I said she could stay for dinner, and we barbecued that day.

Q. I'm going to interrupt you just a second. Depending on what town or part of Iowa you live in, there's either breakfast, dinner, and supper or breakfast, lunch, and dinner. What are you referring to as dinner? Noontime meal?

A. Lunchtime, yes.

Q. And let me also ask you, do you recall what day of the week that was?

427

Page 153

A.    It was on a Sunday.

Q.    Okay.  Thank you.  Please continue.

A.    And after that -- they were playing while I fixed lunch for them.  They ate, and then they played some more.  And then about between three and four she took off because she said they were -- Amber said that she was going on a picnic and swimming down south by Rockwell and her mom would be home soon.

Q.    So she left saying she was going to a family activity?

A.    Yes.

Q.    Please go ahead.  Do you recall anything else about that afternoon and early evening?

A.    Well, shortly after that, then we went in and got ready to go to the races out at I-35 in Mason City which was usually our Sunday afternoon activity or Sunday night activity as a family.  And around four o'clock, between four and five, Lori came down the alleyway on a motorcycle with Greg Nicholson, and we didn't think anything of it and just proceeded to do what we did and went to -- left for the races.

Q.    Returning home from the family outing to the races at about what hour if you recall?

A.    It would have been probably around 10:30, 11:00 that night.

Q.    Bedtime for the members of your family on a Sunday evening?

A.    Especially when they're small, yes.

Q.    Would there have been any particular reason for you to make any observations about the Duncan household at that hour?

428

A.    No.

Q.    And at least to your recollection do you recall making any

Page 154

observations whatsoever at that hour?

A.    No.

Q.    About the Duncan household.

A.    No.

Q.    Family retired, and the next day was a Monday.

A.    Right.

Q.    Can you tell us, please, if you would anything in particular that you recall about that next day, Monday, the 26th of July, 1993.

A.    I do remember.  My daughter got up the next day and made a phone call to the Duncan residence to see if Amber could come over and play.  And she got the answering machine, and so she left a message.  And, of course, she never heard anything back from her, so she just thought, you know, they were still down on their picnic or outing, and that was -- that was it.

Q.    How was this brought to your attention?

A.    About two days later, a day --

Q.    I'm going to apologize.  I poorly asked the question.  You indicated that your daughter made a phone call and left a message.  Was she the one who informed you about this?

A.    Yes.

Q.    Okay.  And what was her reason for informing you?  Did she have any concerns?

429

MR. BERRIGAN:  I'm going to object as this is hearsay and deprives us of our Sixth Amendment right to confront the witnesses against us.

THE COURT:  You know, just state the basis for it which is 802.

MR. BERRIGAN:  Very good.

Page 155

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 381 of 3592

THE COURT: Okay?

MR. BERRIGAN: Thank you.

THE COURT: What exception are you relying on?

MR. MILLER: State of mind. It's not offered for the truth of the matter. I'm wondering what this child's state of mind was on Monday.

THE COURT: Overrule -- objection's overruled.

BY MR. MILLER:

Q. What was Brittany -- how was Brittany acting that next Monday when she was mentioning these things?

A. She was worried about her friend Amber and wondering why she wasn't there because after the phone call, she had gone over to the house.

Q. I just want to know what -- how Amber -- or excuse me, how Brittany reacted. She was concerned.

A. She was concerned, very concerned.

Q. And did that continue?

A. Yes.

Q. How long?

430

A. Till now. She's still . . .

Q. Never saw any members of that household again.

A. No.

Q. Mrs. Asbe, I've handed in front of you a photograph marked Exhibit 720. Do you recognize that, ma'am?

A. I do.

Q. And what is Exhibit 720?

A. It's the outfit that Kandi wore the last time I seen her.

MR. MILLER: State offers Exhibit 720 in evidence.

* * * *

Page 156

(Government Exhibit 720 was offered.)

* * * *

THE COURT: Any objection?

MR. BERRIGAN: No objection.

THE COURT: 720 is received.

* * * *

(Government Exhibit 720 was admitted.)

* * * *

MR. MILLER: And again, with the Court's permission, may I publish at this time?

THE COURT: You may.

BY MR. MILLER:

Q. And again, how do you recognize Exhibit 720, Mrs. Asbe?

A. Excuse me?

Q. That looks like the garment you saw Kandi wearing?

431

A. Yes.

Q. Thank you.

MR. MILLER: You can take that down now.

Q. On the desk in front of you is Exhibit 804. I'll ask if you recognize that, Mrs. Asbe.

A. I do.

Q. What is Exhibit 804?

A. It's the swimsuit that Amber had worn the last day I -- she was over at our house.

Q. And more specifically, it's a photograph of that swimsuit?

A. Yes.

MR. MILLER: State offers Exhibit 804 in evidence.

* * * *

(Government Exhibit 804 was offered.)

Page 157

* * * *

MR. BERRIGAN: No objection.

THE COURT: 804 is received.

* * * *

(Government Exhibit 804 was admitted.)

* * * *

MR. MILLER: And again with the Court's permission we'd like to publish at this time.

THE COURT: You may.

BY MR. MILLER:

Q. And if you would, please describe for us how it is you

432

happen to recognize that garment, Mrs. Asbe.

A. I recognize the pink background with the green. It's got a white belt and a black bottom and then polka dots.

Q. That was little Amber's swimsuit.

A. Yes.

MR. MILLER: Thank you, ma'am. I have no further direct.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Thank you, sir.

CROSS-EXAMINATION

BY MR. BERRIGAN:

Q. Miss Asbe, my name's Pat Berrigan. I can see this is difficult for you, but if you'll permit me just a couple of questions, okay, and we'll get you out of here; all right?

A. Okay.

Q. I heard you say to the prosecutor when he asked you who was living at the Duncan house that it was Lori and her two children, Kandi and Amber.

A.    Right.

Q.    And specifically I noticed that you did not say Greg Nicholson was living there.  Did you know whether or not Mr. Nicholson was living there in late July of 1993?

A.    No, we did not.

Q.    Okay.  You knew Greg Nicholson.  I mean you knew of him.  Your husband worked with him?

433

A.    Yes.

Q.    They were both at Curry Manufacturing, worked on the same shift?

A.    Same shift, different --

Q.    Different jobs.

A.    Jobs.

Q.    And isn't it true that your husband Brian's parents live just a couple houses from where Mr. Nicholson used to live on North Filmore?

A.    Correct.

Q.    And you and your husband were aware that he had been arrested for drug dealing.

A.    We had heard that.

Q.    Before you noticed that he was dating or seeing Lori Duncan.

A.    Yes.

Q.    Okay.  Had you ever had an opportunity to discuss that with Miss Duncan?

A.    No.

Q.    Okay.

        MR. BERRIGAN:  That's all I have.  Thank you, ma'am.

        MR. MILLER:  None, Your Honor.

        Page 159

THE COURT: You're excused.

MR. MILLER: Your Honor, the government calls Cindy Hicok.

434

CINDY HICOK, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Please adjust the chair and the microphones so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is Cindy Hicok, spelled H-i-c-o-k.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Your residence, ma'am?

A. Emporia, Kansas.

Q. And what do you do there in Emporia?

A. I work at a meat packing plant.

Q. What's the name of that meat packing plant?

A. Tyson Fresh Meats.

Q. How long have you worked there?

A. October will be three years.

Q. And how long have you lived in Emporia, Kansas, ma'am?

A. About three years.

Q. Before that where did you live?

A. Mason City, Iowa.

Q. And resided there for approximately how long if you can

435

recall?

A. Since '87 till 2003, 2002.

Q. I want to go back in time just a little bit earlier and ask you if you can just tell us where you were brought up, where you were raised.

A. I was raised in Osage, Iowa, and I was married in 1983, and my husband and I, we moved to Mason City and bought a house in 1987.

Q. You've since divorced.

A. Yes.

Q. And that was when?

A. 1994.

Q. Where is Osage, Iowa?

A. It's approximately 30 miles away from Mason City.

Q. To the north I believe?

A. Yeah, northeast kinda.

Q. Even closer to Minnesota.

A. Yes.

Q. About what population town is Osage if you can estimate for us?

A. Oh, I couldn't even tell you. I don't . . .

Q. Is it a county seat?

A. I don't know.

Q. Not sure about that.

A. Yeah, I think.

436

Q. It's a small town but one of the bigger ones in its county.

A. Yes.

Q. Fair statement?

Page 161

A.   Yes, yes.

Q.   Now, the reason I'm asking you about Osage is I'm wondering whether there was a fellow by the name of Greg Nicholson who also grew up in that town that you're aware of.

A.   Yes, he . . .

Q.   Go ahead and tell us how you happened to be acquainted with him and when and under what circumstances.

A.   His first wife, Kathy Nicholson, was in the same class as me, and Greg was a year older than Kathy, and me and Kathy were good friends all during school from like, say, seventh grade till senior year.

Q.   Was Kathy Nicholson the mother of Greg's children?

A.   Yes.

Q.   And you knew him from your days as a youth growing up in the town of Osage.

A.   Yes, and then in my senior year my boyfriend Michael Fryslie was in a band with Greg.

Q.   So you knew him better than just as some other guy that happened to live in the same town.

A.   Yes, his first wife was my good friend.

Q.   And apparently your husband was a good friend of his.

A.   No.  My first -- my boyfriend.

437

Q.   Your boyfriend, I apologize.  My mistake.  You indicated that you lived in Mason City from '87 to about '02?

A.   Uh-huh, yes.

Q.   What'd you do when you were living in Mason City?

A.   I worked at various factories.  One was at Northwood, Iowa, which was about 30 miles north of Mason City at a kitchen cabinet place, Field -- it's called -- Fieldstone Cabinetry it

Page 162

was called then. It has since closed.

Q. About what years did you work at Fieldstone if you recall?

A. I'm not sure.

Q. And I don't want you guessing about anything. I just -- if you recall.

A. I'm not sure. It's been so many years.

Q. That's just fine. That's just fine. Where in Mason City did you live back in the late '80s, early '90s?

A. 929 North Filmore Avenue.

Q. Anybody else live on the 900 block of North Filmore that you were acquainted with?

A. Yes.

Q. Who?

A. When we moved in, Kathy and Greg had -- they had purchased a house right across the street from where we purchased our house.

Q. During the time that you lived there, did that household change as far as who lived there?

438

A. Pardon?

Q. Who lived with Greg Nicholson during the time that you were neighbors?

A. Kathy and the two girls, their two daughters, Kristen and Jamie.

Q. Was that true throughout the entire period that you were neighbors?

A. No.

Q. Describe any changes for us.

A. They were divorced. I don't know what year. I'm not sure. And then he had -- he remarried to a Leslie.

Q. And they continued to live in that same home on North Filmore.

A. Yes.

Q. I want to shift for a second and ask you about a fellow by the name of Dustin Honken. Were you ever acquainted with Dustin Honken?

A. I had seen Dustin, but I did not know who he was.

Q. Where did you see him?

A. At Greg and -- at Greg and Leslie's.

Q. And under what circumstances?

A. He was just there. I didn't know who he was.

Q. But it was at Greg Nicholson's residence that you saw him on those occasions.

A. Yes, sir.

439

Q. Were you back in those days ever acquainted with a woman by the name of Lori Duncan?

A. Yes, I was.

Q. Describe how you became acquainted with Lori Duncan.

A. Excuse me. We both worked at Fieldstone Cabinetry, and we carpooled. One week she would drive, and the next week I would drive.

Q. About how long did that go on?

A. Six months maybe.

Q. What were your hours there at Fieldstone?

A. Pardon?

Q. Your hours of work.

A. Usually we started at 7:00 in the morning, and we got off at 3:30 in the afternoon.

Q. Is Fieldstone right there in Mason City?

Page 164

A.    No, it's 30 miles north.

Q.    So there was a drive.

A.    Yeah, and so one week I would drive, and the next week Kathy -- Lori would drive.

Q.    You had to be at work at seven o'clock?

A.    Yeah.

Q.    Go ahead and describe what the routine was as far as when and how you met and what you would do before work.

A.    One week when I would drive, I'd pick her up.  Oh, we'd go into the cafeteria and have coffee before work sometimes --

440

well, quite often, and I'd pick her up between quarter to six, six, give us a half hour to get there.  And then we'd have coffee, and then we'd go on the floor.

Q.    On the weeks when it was your turn to do the driving, Ms. Hicok, was Lori Duncan always punctual, or was she frequently late?

A.    Yes, she was always up and ready.  And the neighbor lady watched Kandi and Amber, so she was right next door.

Q.    And ordinarily Lori would be ready to go right at a quarter to six or whenever you picked her up?

A.    Yes, she was very -- she was always ready.

Q.    You were acquainted with Lori Duncan, and you were acquainted with Greg Nicholson.  I'd like to ask you if you were aware at any time of any relationship between these two people.

A.    Yes.  I introduced Lori to Greg.

Q.    Can you describe the circumstances and time that this occurred?

A.    Greg's wife Leslie had left him after he was charged for the drugs, and Greg lived right across the street from me and my

Page 165

husband, and Greg asked me if I had any single friends. Lori's boyfriend had just broken up with her a while before that. I'm sorry. And Greg asked me if I had any single friends, and I said yes, and I introduced -- I told Lori about Greg, and they -- then when they met, it's like they had fallen in love or something. They were together all the time after that for I'd

441

say approximately two weeks before everything happened to them.

Q. You introduced them.

A. Pardon?

Q. You introduced them. You introduced these two people to each other.

A. Yes, I did.

Q. And I apologize if this is disturbing, but is that the reason you're disturbed is --

A. Yeah, I feel partly to blame for . . .

Q. Well, ma'am, I just want to know the circumstances of the intro -- that was again after Leslie had left Greg?

A. Yes.

Q. When Greg Nicholson asked you if you knew any single ladies, you told him about Lori Duncan?

A. Yes. I said I had a friend, she was red two ways.

Q. She was red two ways?

A. Yes. It was kind of a -- because she didn't do drugs, so that was a term kind of, red necked, and because she had red hair, so I said she was red two ways, and he said, What? And I said, Well, she don't do drugs, and she has red hair. And once they met, it was like they had fallen in love. They were together all the time after that.

Q. But it wasn't long. I think you indicated only a couple

Page 166

weeks?

A.   Yeah, from what I remember then.

442

Q.   Were you still carpooling with Lori Duncan at this stage?

A.   Yes, I was.

Q.   I want to direct your attention to Monday morning, the 26th of July, 1993.  Do you recall that morning, Miss Hicok?

A.   Yes, yes.

Q.   Go ahead and describe that morning for us if you would, please.

A.   I went to pick her up in the morning, and she didn't come out.  First I think I honked, but it was early in the morning, so I didn't want to wake the neighbors.  So I went up and knocked on the front door, and nobody answered.  And I figured, well, instead of me being late to work too that I went on to work, and I figured when she woke up and she -- then she would come to work on her own, only she would be late.  And I went to work on time.

Q.   Even though she'd never failed to show up before.

A.   Huh-uh, no.

Q.   You knocked on the front door?

A.   Yes.

Q.   Any other doors?

A.   No.  We only used the front door when I was -- when I would go visit her and that.  I never went to the back door really.

Q.   This was the first occasion that Lori didn't show up when you came to pick her up?

A.   Yes.

443

Page 167

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 393 of 3592

Q. And the only occasion.

A. Yes.

Q. Did you ever see her again thereafter in life?

A. No.

MR. MILLER: Thank you, ma'am. I have no further direct.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Thank you, sir.

CROSS-EXAMINATION

BY MR. BERRIGAN:

Q. Miss Hicok, my name's Pat Berrigan. Can I ask you just a few questions?

A. Yes.

Q. I wanted to start by asking you if you happened to see a note on the door.

A. No, not that I remember.

Q. Okay. That's something you'd probably remember given this was such an unusual occurrence.

A. Right. No, not that I remember at all, no.

Q. You mentioned that you knew Greg Nicholson pretty well. You'd known him since seventh grade?

A. Yes.

Q. And it wasn't just that you knew him, but one of your best friends was his first wife.

A. Yes.

444

Q. Kathy Nicholson. And then I guess he moved to Mason City before you did, before you and your husband?

A. Yes, because they already owned that house, were buying

Page 168

that house when I --

Q. When you moved in '87.

A. Yes.

Q. So you already knew they were living on the same street that you were going to buy a house on.

A. When we bought the house, then I found out after that they had moved across the street.

Q. That was just good luck.

A. Yeah.

Q. And then as time went on, things changed over there. Your friend Kathy left Greg, took the children, got a divorce; right?

A. Uh-huh.

Q. And then did you know Leslie Olson, his second wife?

A. Yeah, I knew her.

Q. And did you happen to be home March 17, 1993, when the police were over there at Greg Nicholson's house?

A. Yes.

Q. And you sort of knew there was something going on over there before that, didn't you?

A. Yes, I did.

Q. That Greg Nicholson was involved in drug activity.

A. Yes, I did.

445

Q. That's a pretty small town, isn't it?

A. Mason City?

Q. Yeah. I guess it depends comparatively.

A. When you grew up in Osage, yeah, it was a bigger town to me.

Q. Okay. I grew up in Kansas City. It seems small to me.

A. Right.

Page 169

Q. So when the police came that day, you weren't terribly surprised that Greg Nicholson was being arrested.

A. No, I wasn't.

Q. And some time after that his second wife left him then; right?

A. Yes, when he was charged for the drugs.

Q. When he was charged, yeah. Do you remember specifically when Leslie Olson left Greg?

A. No.

Q. And are you sure that you introduced Lori Duncan after Leslie Olson had left him?

A. Yes.

Q. Okay. When you did that, I mean, obviously you knew Greg Nicholson had been involved in this drug activity.

A. And after he had been charged, he had quit -- to my knowledge he wasn't doing drugs or selling drugs at that point then.

Q. That's what he was telling you.

446

A. Yes.

Q. And I'm sure you explained to your friend, Lori Duncan, that he had been involved in drugs.

A. Yes, she was -- she had knowledge.

Q. She wasn't a drug person, was she?

A. No, she did not do any drugs.

Q. Did you know Greg Nicholson was living with Lori Duncan in late July? Were you aware of that?

A. I knew that he was staying with her at times, but I did not know that he was actually living there. No, I didn't know that.

Q. Well, every other week you were going by the house to pick

Page 170

her up; right?

A.    Uh-huh.

Q.    And didn't Greg Nicholson have a pickup truck?

A.    Yes, he had a red Dodge.

Q.    Well, when you went by there every morning, was his truck there?

A.    Yeah, but he still had -- to my knowledge I believe that he still had that house on Filmore Avenue.

Q.    Okay.

A.    And Lori lived on Van Buren which was I'd say five, six blocks away.

Q.    So he might have still had the house on North Filmore, but his truck was parked on Van Buren.

A.    Yes.  And like the week before I didn't drive, so Lori

447

would pick me up, and I wasn't at the house to know that, you know.

Q.    Well, apparently she didn't mention it to you then, huh?

A.    Well, yeah, I knew he was staying with her at times but not his residence.

Q.    I'm sorry?

A.    Not his -- I didn't think of that as his residence at all.

Q.    I see.

MR. BERRIGAN:  Okay.  That's all I had.  Thank you very much.

THE COURT:  Mr. Miller, anything further for this witness?

MR. MILLER:  No, Your Honor.

THE COURT:  You're excused.

Members of the jury, you can take a stretch break.

Page 171

Are you ready to call your next witness?

MR. MILLER:  Marge Milbrath.

MARGE MILBRATH, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated in the witness box.  You can adjust the chair and the microphones so you can speak directly into the microphones.  And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS:  Marge M. Milbrath, M-i-l-b-r-a-t-h.

THE COURT:  Thank you.

448

Mr. Miller?

DIRECT EXAMINATION

BY MR. MILLER:

Q.    Your residence, Mrs. Milbrath?

A.    I live at 714 North Van Buren in Mason City, Iowa.

Q.    And with whom do you live there?

A.    Pardon?

Q.    Who do you live there with?

A.    I live there with my husband David.

Q.    How long have you lived at that address on North Van Buren?

A.    We have lived there for 43 years.

Q.    Raise any children at that address?

A.    Yes, we did.  We had three children.

Q.    Their names?

A.    Lori, Robert, and Mary.

Q.    Lori was the first child?

A.    Lori was my first child.

Q.    How much older was she than Robert?

A.    About three years, two to three years.

Page 172

Q. And Mary's the baby.

A. Mary's the baby.

Q. How much later was that when she came along?

A. She was born in '66.

Q. Are you employed, Mrs. Milbrath?

A. Yes, I am.

449

Q. Where do you work?

A. I work at Metalcraft Incorporated.

Q. What do you do there?

A. I'm a photo imager.

Q. Can you tell us what those duties are, what a photo imager does?

A. I expose negatives to metal. We do bar codes.

Q. How long have you been doing that?

A. Just a little over 25 years.

Q. That full-time employment?

A. Yes, it is.

Q. What are your hours?

A. 7 to 3:30.

Q. You mentioned you live with your husband. What's his name?

A. David.

Q. He's been your husband all these years?

A. Yes, I have (sic).

Q. His occupation?

A. He is retired.

Q. And his former occupation then?

A. He worked for David Manufacturing for 19 years, and then after he more or less retired, he works part time down at Metalcraft.

Page 173

Q. You've told us about those three children, Lori, Robert, and Mary. Did they provide you with any grandchildren?

450

A. Yes, they did.

Q. Please go ahead and tell us who they are and were.

A. Lori had two girls, Kandi and Amber. Robert had one son named Brock, and Mary had -- has two boy -- or two children, I'm sorry, a boy named Brad and a girl named Jada.

Q. Brad's graduating high school this year.

A. Brad graduates this year.

Q. And Jada's the youngest of the grandchildren?

A. Jada's the youngest.

Q. Tell us about Brock, Robert's son.

A. Brock is 15 years old. He's still in school.

Q. Lori is deceased, of course.

A. Lori is deceased.

Q. I want to get a little bit of background on her. She was born when?

A. She was born November 22, 1961, in Mason City.

Q. Her entire childhood she was raised there in that town.

A. She was raised right there, yes.

Q. Graduated high school?

A. Graduated from high school.

Q. What year?

A. 1984.

Q. And what did your daughter Lori do after high school?

A. She worked at Fieldstone Cabinetry -- I'm sorry. She joined the service.

451

Page 174

Q.   And again, I realize this is a little bit difficult for you.  Are you sure what year she graduated high school?

A.   '82.  I'm sorry, 1982.

Q.   That's quite all right.  And what did she do after graduating high school?

A.   She joined the service.

Q.   What branch?

A.   The Navy.

Q.   And can you just tell us very briefly about her military career?

A.   Well, she spent four years in the Navy, and she was stationed at Beeville, Texas.

Q.   Did your daughter Lori ever marry?

A.   Yes, she did.

Q.   And to whom did she marry?

A.   She married a man named Jay Duncan.

Q.   Where was Mr. Duncan from?

A.   He was from Des Moines.

Q.   And Lori met him where?

A.   Lori met him in the service.  He was also in the Navy.

Q.   Lori got out of the service about when if you recall?

A.   Gee, I can't remember that for sure.

Q.   That's quite all right, and one thing I want you to be sure is let me know if -- I don't want you guessing about anything.

A.   I'm not positive on that.

452

Q.   Okay.  That's fine.  I assume sometime in the mid to late '80s she was --

A.   It would have been sometime in the late '80s, yes.

Q.   And where did the Duncan family reside then at that point?

Page 175

A.    They lived at 619 North Van Buren.

Q.    And I'm going to back up just a little bit.  When I'm talking about the Duncan family after your daughter got out of the service, I'm talking about when she was still married to Jay Duncan.  Did they make a home together, husband-wife?

A.    Yes, they did.  They lived in Des Moines.

Q.    And for approximately how long did they live in Des Moines together as husband and wife if you recall?

A.    That I'm not real sure of.

Q.    Were there any children born to that marriage?

A.    They had two girls.

Q.    And their names?

A.    Kandi and Amber.

Q.    Do you know about how old these two little girls were when their parents divorced?

A.    I'm not real positive.  Kandi probably was like about five or six, and Amber would have been maybe two.

Q.    I assume Kandi was more attached to her father than the infant Amber.

A.    Yes, she was.

Q.    Approximately when was the divorce if you recall?

453

A.    It would have been probably the late '80s, early '90s.

Q.    And what happened with your daughter and her children at that point?

A.    When she had called and told us that she was getting a divorce, then we -- she was leaving Des Moines, and we moved her up to Mason City.

Q.    Any particular address in Mason City?

A.    Well, she rented a house up on -- I believe it was North
Page 176

Delaware for a while, and then we found a house on our street that was available.

Q. Do you remember the address of that house?

A. 6 -- her house?

Q. Yes.

A. 619.

Q. North Van Buren?

A. North Van Buren.

Q. Now, you've told us that your own address was, I believe, 714 North Van Buren?

A. Yes.

Q. Pretty close?

A. Very close.

Q. Same street?

A. Same street.

Q. Can you give us some idea of how close these two homes were together?

454

A. Lori lived on the east side of the street, and we lived on the west side, and it was just like maybe four houses down.

Q. How did your daughter support herself?

A. She worked at Fieldstone Cabinetry.

Q. I want to just back up briefly. Her children's father, Jay Duncan, where was he living at this time?

A. He was living in Des Moines.

MR. BERRIGAN: I'm sorry to interrupt you, ma'am. Object to the relevancy of her ex-husband, Your Honor.

THE COURT: Overruled. You may answer.

A. He was living in Des Moines at the time.

Q. When they separated, your daughter took her two children

Page 177

from Des Moines to move to Mason City?

A.   Yes, she did.

Q.   And I'm just wondering about the current whereabouts and condition of Mr. Duncan.

MR. BERRIGAN:  I renew my objection as to the relevance of that.

THE COURT:  Sustained.

BY MR. MILLER:

Q.   Aside from the fact of their divorce, was there any reason that Jay Duncan did not continue as a member of that household?

MR. BERRIGAN:  Same objection, relevance, sir.

THE COURT:  What is the relevancy of it, Mr. Miller?

MR. MILLER:  Your Honor, I think it's important that

455

the jury have at least the most basic understanding of the nature of this family household which were the victims of this crime.

THE COURT:  Well, it's -- you know, you're entitled to some latitude on background information.

You can go ahead and answer this question.

MR. MILLER:  I can even put it in a leading question that would be very brief if that would be --

THE COURT:  That's fine.

MR. MILLER:  To cut to the chase.

BY MR. MILLER:

Q.   Is he disabled, ma'am?

A.   Yes, he is.

Q.   Thank you.  That's all I wanted to know.  Mrs. Milbrath, I want to visit with you about 1993 and the summer of 1993.  Do you remember that time period?

Page 178

A. Yes, I do.

Q. You have good reason to remember that, I assume.

A. Yes, I do.

Q. You mentioned that your daughter worked at Fieldstone. Was she working there that summer?

A. Yes, she was.

Q. As the only adult in that household, how, if at all, did she arrange for the care for those children during her work hours?

456

A. She had a next-door neighbor that would come over and take care of them when Lori went to work.

Q. As of the summer of 1993, can you tell us approximately the age and grade in school of Kandi Duncan?

A. Kandi Duncan was 10 years old and in fourth grade.

Q. And your granddaughter Amber Duncan?

A. She was five going on six. She had just finished kindergarten.

Q. Do you recall Amber's birthday?

A. July 16, 1987.

Q. And so you said going on six. Would she, in fact, as of -- well, I asked you for that summer. That summer she turned six?

A. That summer she turned six.

Q. On the 16th of July of that summer.

A. Right.

Q. And she was headed into what year in school?

A. She would have been first grade.

Q. Her attitude toward that prospect?

A. Excited.

Q. Mrs. Milbrath, we've described this as a household with one

Page 179

adult and two daughters in it.

A.    Yes.

Q.    Was there any time during that July when there was any change in that status to your knowledge?

A.    Well, we had noticed that there was a man hanging around

457

down there.

Q.    Did you take any measures to determine the identity of that man?

A.    We did find out about who he was.

Q.    And who did you learn that he was?

A.    Pardon?

Q.    And who was it?

A.    Greg Nicholson.

Q.    That cause you any concern?

A.    Yes, it did.

Q.    Please describe.

A.    We were concerned because we were informed that he was dealing with drugs, and we were very much against it.

Q.    As parents did you -- either you or your husband express such concern?

A.    Yes, we did.

Q.    And which of you did that?

A.    I did.

Q.    That fell on Mom's shoulders.

A.    That fell on Mom's shoulders.

Q.    Describe that, please.

A.    After I found out that this guy -- who this guy was and that he was dealing with drugs, I went to talk to Lori about this man, and she told me that he was a nice person.  My
Page 180

daughter could find no wrong in anybody, and she said he was

458

going through drug rehabilitation and that he was okay.  This is what she was told.

Q.   She's an adult.

A.   She's an adult.

Q.   And she chose to disagree with your advice.

A.   She chose to disagree with me, and she told me that she was a grown woman and that she would be okay.

Q.   Did you have any further contact with her in her life to your recollection?

A.   Not after that.

Q.   That was approximately when, Mrs. Milbrath?

A.   That was on Sunday the day before she disappeared.

Q.   Did you see her at all that weekend?

A.   Yes, I did.

Q.   Describe that.

A.   I saw her on Sunday afternoon.  I was out in my front yard, and she had stepped out on her porch, and every time she'd see me in the yard, she'd holler up, Hi, Mom.

Q.   You recall that happening that Sunday?

A.   I did see her that afternoon, yes, and she did say that.

Q.   But it was no further contact than that.

A.   No further contact.

Q.   And that was routine for you to wave to each other.

A.   That's just routine.

Q.   The next day was Monday, the 26th of July, 1993.  Do you

459

Page 181

recall that day, Mrs. Milbrath?

A.    Yes, I do.

Q.    Is that a workday for you?

A.    Yes, it is.

Q.    Please go ahead and describe for us the first thing you recall about that day.

A.    Well, when I got ready to leave for work -- I pass my daughter's house every day, and I noticed that it was all closed up and the curtains were still drawn.  I didn't think a lot of it at the time because I figured maybe she had the day off and they were just sleeping in late.

Q.    Let me just back up and clarify a second.  Your hours of work in the summer would be seven to --

A.    7:30 -- or 7 to 3:30.

Q.    So ordinarily when you'd be on your way to work she'd have already gone?

A.    She would have already left.

Q.    And what, if anything, did you notice about the home when you drove by?

A.    That it was still all closed up when I went to work.

Q.    Why would you make note of that?

A.    Because normally her curtains are open first thing in the morning and there's lights on, and there was nothing that morning.

Q.    She was one of these people that likes to bring the

460

sunshine into her home?

A.    You bet.

Q.    You worked that morning?

A.    Yes, I did.

Page 182

Q. What do you do on your noon breaks, Mrs. Milbrath?

A. I come home for lunch.

Q. Did you that day?

A. I did that day.

Q. Please describe any observations you recall on that day.

A. As I said, I go by her house every day. So when I came home for lunch, I went by her house, and it was -- the curtains and everything was still drawn and all shut up.

Q. Did that draw your attention any further than it had than earlier in the morning?

A. Yes, it did. When I got in the house, I told my husband that it seemed kind of funny that there was no activity down there.

Q. You returned to work after your noon break?

A. Yes, I went ahead and went back to work that afternoon.

Q. Getting off at 3:30?

A. Getting off at 3:30.

Q. Please describe for the jury what happened then, Mrs. Milbrath.

A. After I got off at 3:30, I came home, and I went by her house, and I went by her house on purpose just to see if the

461

curtains were still closed and opened up. And it was all dark and shut up yet. And I went in -- I went home and told my husband. I said, We're going to have to go down there and check it out. I said, There's no activity there, and there's something wrong.

Q. So what did you do, if anything?

A. So we went down to check out and see what was going on, and I had gone to the front door, and it was locked. So we went

Page 183

around to the back door.  And I didn't notice whether it was open for sure.  It just appeared to be locked.  So we didn't bother it.  We went back and called the landlord and asked him to come and open the door for us.

Q.    Now, this is the afternoon of Monday, July 26.

A.    Right.

Q.    Please go ahead and describe what happened next.

A.    Well, he went -- when he came down, he went to the front door also, and he didn't have a key for that one, so we went around to the back, and he was going to open that door, and it was already open a little bit.  It appeared to be closed, but it was still not latched.

Q.    You entered the home.

A.    He opened it up, and we went inside.

Q.    Mrs. Milbrath, I'm handing you a series of photographs that are marked Government's Exhibits 46A, 46B, 46C, 46D, 46E, and 46F.  And just as a collection of photographs, I wonder if you

462

can tell us what the general subject matter is of these six photographs.

A.    This is my daughter's house where she lived.  This is where my daughter lived.

Q.    And do those photographs show your daughter's residence as it appeared on North Van Buren?

A.    Yes, they do.

        MR. MILLER:  State offers Exhibits 46A through F inclusive.

                        *   *   *   *

        (Government Exhibits 46A through 46F were offered.)

                        *   *   *   *

        Page 184

MR. BERRIGAN: No objection to 46A through F, Your Honor.

THE COURT: Government's Exhibits 46A through F are admitted.

* * * *

(Government Exhibits 46A through 46F were admitted.)

* * * *

MR. MILLER: And request permission from the Court to publish them one at a time at this time?

THE COURT: You may.

MR. MILLER: And, Counselor, if you would begin with F.

BY MR. MILLER:

463

Q. I want to be sure we make the record clear on this, so what I want to do is make sure I'm identifying each photograph by the exhibit number that appears in the yellow box; okay, Mrs. Milbrath?

A. Yes.

Q. First looking at Exhibit 46F, would you tell us what that shows?

A. That shows my daughter's house.

Q. We have a very handy piece of equipment here which is a screen in front of you and a marker, and the jury will see what you circle or draw an arrow to if you do that for us. Would you please go ahead and either draw an arrow to it or a circle around your daughter's residence.

A. This is my daughter's house right here. This one, I'm sorry.

Q. That gray home?

Page 185

A.   Yes, the gray.

Q.   And this view is from where, ma'am?

A.   This is from my side of the street looking at her house.

Q.   Okay.  So this is approximately the view that you would have from your home to your daughter's home.

A.   Yes, it is.  Yes, it is.

Q.   And I want to be very clear if there are any changes in the appearance of the home in that photograph and what it looked like way back in '93.

464

A.   Yes, it is.  It has been painted since then.

Q.   So the gray color that it shows in Exhibit 46F is different from the color that it was back in '93.

A.   Yes, it is.

Q.   Other than that, it shows the neighborhood as it appeared then.

A.   Right.

Q.   And I just want to be very clear that the foam -- excuse me, the home that you've pointed to there, that gray home, was a different color back in '93.

A.   Yes, it was.

Q.   But obviously in the same relation to your home as it appears in that picture.

A.   Yes.

        MR. MILLER:  Now, you can take that down, Counselor, and I'll ask you beginning with A to go ahead and put up first 46A.

Q.   And you don't need to go through those photographs because they'll appear on the screen in front of you, Mrs. Milbrath.  Would you just go ahead and describe for the jury what

Page 186

Government's Exhibit 46A shows?

A.   This is my daughter's house back when it was -- it was a yellow color.

Q.   And that shows it from the street?

A.   That shows it from the street on her side.

465

Q.   And does the garage appear in that photograph as well?

A.   Yes, it does.

Q.   Can you just go ahead and point where that is?

A.   This is the garage right here.  It's hidden by the lilac bush.

Q.   Now, I've -- we have that in black, and I think it would show up a whole lot better if we change that to almost any other color.

A.   You want me to --

Q.   Now try it.

A.   This is --

Q.   There you go.  You can just circle that.

A.   Okay.  This is the garage.

Q.   Thank you.  I just want to be sure we knew where the relative buildings were.  Now if we can move on to Exhibit 46B, what does Exhibit 46B show, ma'am?

A.   This is the back door to my daughter's house.

Q.   Is that the door that you described ultimately making entrance to that afternoon?

A.   Yes, it is.

Q.   Thank you.  Please continuing on to Exhibit 46C, shows what, ma'am?

A.   This is the garage.

Q.   46D.  And what does that show, ma'am?

Page 187

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 413 of 3592

A.   This is the front of my daughter's house.

466

Q.   Again from a vantage point slightly south of what the first one was?

A.   Yes.

Q.   Okay.  And 46E, and what does that show, ma'am?

A.   This is also another view of her house.

Q.   It also shows the street in front of that residence?

A.   Yes, it does.

Q.   Mrs. Milbrath, recalling to Monday, the 26th of July, 1993, did you make any observations about the locations of any vehicles at the residence?

A.   Yes, I did.  I noticed that her car had been backed out of the driveway and parked on the street.

Q.   Did you notice anything unusual about the location or position of the vehicle?

A.   Well, it had been backed out not straight like you would normally park a car but at an angle.

Q.   It was parked crooked on the street?

A.   Yes, it was.

Q.   Can you with perhaps a rectangle mark show where you observed that vehicle?

A.   I saw it right in here, right along here.

Q.   And again parked crooked, not parallel to the curb?

A.   Right.  It was more with the front out this way backed up at an unusual angle for backing up a car.

Q.   Did you notice any other vehicles at the residence?

467

A.   There was a truck in the driveway.
Page 188

Case 3:09-cv-03064-MWB-LTS     Document 284-71    Filed 06/23/11    Page 414 of 3592

Q. Pickup truck?

A. A pickup truck.

Q. And where in the driveway was that?

A. That would have been back up in -- way back up in here by the garage.

Q. Thank you, ma'am.

MR. MILLER: You can take down those photographs now.

Q. Now, Mrs. Milbrath, you indicated that you ultimately got into that house after calling the landlord?

A. Yes.

Q. Describe how entrance to the home was made.

A. We went in the back door, and you take a left, and you go up two steps into the kitchen.

Q. What was the condition of the back door in order for you folks to get in? Was it necessary for the door to be unlocked?

A. Pardon?

Q. How'd you get in that back door?

A. We just opened the door and walked in.

Q. It was not locked?

A. It was not locked.

Q. I want you to go ahead and describe for the jury what observations, if any, you made upon entering your daughter's home that afternoon.

A. When we went into the house, it was -- the kitchen was

468

messy. We walked into the dining room, and there was food, plates all sitting around on the dining room table with food left on them and all dried.

Q. Did that strike you as unusual?

A. Yes, it did.

Page 189

Q. Why?

A. Because my daughter normally does not leave her house like that. She would fix their meal and immediately clean up after herself. She was a very good housekeeper.

Q. Aside from the kitchen area, did you make any observations throughout the house?

A. We decided to look around, and so we went upstairs, and we found that all the beds were still made. They had not slept in them. We thought that was very unusual.

Q. Anything else at all about the condition of the home that you observed that day?

A. Nothing quite that unusual. There was a dog in the house yet when we went upstairs, and he started barking. He had been in there long enough to have gone potty all over the house.

Q. Did Lori and the girls have a dog?

A. No, they didn't.

Q. So this was someone else's dog.

A. This was someone else's.

Q. Do you know for a fact whether or not Mr. Nicholson had a dog?

469

A. Well, I found out later that this was his dog. He called him Harley.

Q. What was your reaction after noting the condition of your daughter's home that afternoon?

A. Well, after I noticed that noth -- you know, nothing had been -- the beds hadn't been slept in, the dishes hadn't been done, I told my husband that we needed to go to the police.

Q. Did you do so?

A. Yes, we did.

Page 190

Q. Describe what, if anything, happened.

A. We went up and reported a missing person.

Q. Formally filed a missing persons report?

A. Yes, we did.

Q. Was that ever productive at least for the following seven years?

A. Well, supposedly they went ahead and they checked the -- they checked the situation out, and they always came up with nothing.

Q. In any event, did you ever again see your daughter or her two children again in life?

A. I never saw them after that day.

Q. Mrs. Milbrath, on the desk in front of you is a photograph marked Government's Exhibit 35. Do you recognize the subject of that photograph, ma'am?

A. That's my daughter Lori.

470

Q. And is that as she appeared in life?

A. That is.

        MR. MILLER:  Government offers Exhibit 35.

                      *   *   *   *

        (Government Exhibit 35 was offered.)

                      *   *   *   *

        THE COURT:  Any objection?

        MR. BERRIGAN:  None, sir.

        THE COURT:  Thirty-five is received.

                      *   *   *   *

        (Government Exhibit 35 was admitted.)

                      *   *   *   *

        MR. MILLER:  With the Court's permission, we'd like to

publish it at this time.

THE COURT: You may.

BY MR. MILLER:

Q.   This photograph would show her or does show her at approximately what time in relation to her disappearance?

A.   Pardon?

Q.   How long before her disappearance was this taken if you can just give us some idea?

A.   I'm not real positive on this picture.  I imagine some time during the summer or during last -- the summer before.

Q.   In any event, it was recent enough that it shows Lori Duncan as she appeared in life shortly before her disappearance.

471

A.   Yes.

MR. MILLER:  Thank you, ma'am.  I have no further questions, and you can take that down.

THE COURT:  Mr. Berrigan?

CROSS-EXAMINATION

BY MR. BERRIGAN:

Q.   Ma'am, my name is Pat Berrigan.  I'm just going to ask you a couple questions; okay?  I'd like to kind of go backwards. You said you called the police and you told them about what you knew?

A.   Yes, I did.

Q.   And obviously this was not just unusual.  These were unique circumstances, weren't they?

A.   Yes, it was.

Q.   Did you voice your very grave concern about the plight of your daughter and your grandchildren?

A.   Yes, I did.

Page 192

Q. Did police officers come out and take photographs of the inside of the house?

A. Yes, they did.

Q. And did they dust for fingerprints and do those kind of things?

A. Yes, they did.

Q. And pictures of the outside as well?

A. Yes, they did.

472

Q. Okay. This fellow Greg Nicholson, did you talk to the police about him?

A. No, I didn't, only to have mentioned that there was a man there.

Q. Did you know his name?

A. No, I did not know him.

Q. Okay. When you were talking a little earlier to Mr. Miller, I sort of had the impression that you had some information about this fellow you were concerned about.

A. I had heard through other people that knew him that he was dealing drugs. I didn't know it personally otherwise.

Q. I see. And you weren't even aware of his actual name.

A. No.

Q. Did you know that he was living or staying down there at your daughter's residence?

A. Well, I knew he was showing up. I didn't know that he was moving in.

Q. You certainly didn't know he had a dog apparently.

A. I didn't know he had a dog, no.

Q. Had he ever introduced himself to you or made your acquaintance?

Page 193

A. We never met him. We never met him.

Q. Did your daughter ever say anything to you before you approached her about this man?

A. No, she didn't.

473

Q. And your sense of things was he was only there for a short period of time, maybe a couple of weeks or so before this happened?

A. That is correct.

MR. BERRIGAN: Thank you, ma'am. That's all I have.

THE COURT: Mr. Miller, anything further?

MR. MILLER: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. Just a couple questions, Mrs. Milbrath. Mr. Berrigan asked you about the response by the Mason City Police Department. You indicated in response to his questions about photographing and fingerprints. Did you actually accompany them with any of their investigation?

A. No, I didn't.

Q. So that's an assumption on your part.

A. That's an assumption.

Q. Do you really know for a fact one way or the other whether they took any photographs or made any effort to look for fingerprints?

A. All I know is that they did go inside and look around while we were there.

Q. They looked around.

A. That's all.

Q. You have no knowledge of any photograph or fingerprint

Page 194

efforts.

A.    No.

MR. MILLER:  Thank you, ma'am.  I have no further redirect.

RECROSS-EXAMINATION

BY MR. BERRIGAN:

Q.    I don't want to belabor this point, ma'am, but how long were the police in your daughter's house?

A.    Actually they were only in there maybe for about half an hour.

Q.    Well, have you seen any photographs that they took of the inside of the house that day?

A.    I did not see them --

Q.    You've never --

A.    -- at that time.

Q.    Okay.  But you just figured that's what they would do.

A.    Normal routine, yes.

Q.    You would think.

MR. BERRIGAN:   Okay.  Thanks again.

THE COURT:  Anything further, Mr. Miller?

MR. MILLER:  Yeah.

FURTHER REDIRECT EXAMINATION

BY MR. MILLER:

Q.    I'm just going to have to ask, you were asked if you saw the photographs that they took.  Do you know, in fact, whether

they even took any photographs?

Page 195

A.   I'm sorry.   They took no photographs of the house that day that they were there.   They just observed and looked -- and went inside and looked around.

Q.   And I just want to be sure whether you know of any actual photographs.

A.   I don't know of any actual photographs that they took.

MR. MILLER:   Thank you.   I just wanted to make sure on that.   Thank you.   I have no further questions.

THE COURT:   Anything further?

MR. BERRIGAN:   No, sir.

THE COURT:   Okay.   You may step down.

Ready to call your next witness?

MR. MILLER:   Yes, Your Honor, Paul Bush.

PAUL BUSH, PLAINTIFF'S WITNESS, SWORN

THE COURT:   Please be seated.   Please adjust the chair and the microphones so you can speak directly into the microphones.   And when you're settled in, would you state your full name and spell your last name.

THE WITNESS:   My name is Paul J. Bush, spelled B-u-s-h.

THE COURT:   Mr. Miller?

DIRECT EXAMINATION

BY MR. MILLER:

Q.   Your occupation, sir?

476

A.   My occupation is a criminalist for the Iowa Division of Criminal Investigation in the state crime laboratory.

Q.   We have already heard from an employee there by the name of Debra Davis.   Is she a colleague of yours in that office?

A.   Yes, she is.

Page 196

Q.    Okay.  And I believe she is a criminalist as well?

A.    That's correct.

Q.    We didn't get an exact description of what that term refers to, and we don't always use it every day.  What does the word criminalist refer to as a job description in your laboratory, sir?

A.    My job as a criminalist involves the collection and preservation of physical evidence in criminal cases, the analysis of that evidence, the writing of reports as to that evidence, and finally testifying in court as to those results.

Q.    How long have you been doing this sort of work, sir?

A.    I've been doing this work as a criminalist for almost 23 years.

Q.    And would you summarize your formal education for us, sir, and your employment history prior to joining the DCI crime lab.

A.    My formal education consists of a bachelor of science degree in double majors in chemistry and biology from Morningside College here in Sioux City.  With that I also possess a secondary education teaching certificate and coaching endorsements.  I also possess a master of arts degree in biology

477

from Drake University.  That master's degree was a thesis program in the area of forensic DNA analysis.

Prior to my almost 23 years of work with the DCI crime lab, I worked two and a half years as a clinical chemist for the University of Iowa hygienic lab doing neonatal testing on newborn infants.

Q.    We understood from your colleague that she's worked in a couple different sections of the laboratory, drug analysis and toxicology.  Are there other sections in the DCI crime lab?

Page 197

A.   Yes, there are.

Q.   And would you just briefly describe for the jury where the laboratory is, what sort of work goes on there, and what sections there are there?

A.   We are -- have just moved to a brand new laboratory in the last six weeks in Ankeny.  We're actually just off the Des Moines Area Community College campus.  We are a full-service laboratory that does work for all law enforcement agencies in the state.  So again, any criminal case could have submissions to us again from local law enforcement agencies such as police departments, sheriff's departments, state agencies such as the DCI, fire marshal's office, state patrol, or narcotics enforcement.

Again, we have different areas of the laboratory depending upon types of evidence that is requested.  Those different areas of the laboratory would include the photography

478

section, the drug section, the toxicology section, the trace evidence section, the arson section, the firearms section, the DNA section, and also the crime scene section of the laboratory, and I believe I -- I don't know if I said also the handwriting and document sections.

Q.   Thank you, sir.  Which of these sections, if any, are you specially assigned to?

A.   My area of specialty is in the areas of trace evidence, DNA typing, and then also crime scene work.

Q.   First with regard to trace evidence and DNA, can you describe the sort of work that goes on there?

A.   Work in trace evidence would involve the analysis of such items as hairs, fibers, paints, soil, glass, any of these types

Page 198

of items that would be prevalent or of importance in a criminal
case.

Q.    And the DNA analysis, sir?

A.    DNA analysis involves the DNA typing of biological fluids
such as blood, seminal fluid, saliva, urine.  Any biological
tissue that would have nucleated cells in them such as hairs
also we can do DNA typing or DNA testing on to determine whether
or not they originated from a specific individual.

Q.    How long has the Iowa DCI crime lab been in the DNA
analysis business?

A.    We've been doing DNA since about 1995.

Q.    And prior to that time what was the means by which, if any,

479

that your laboratory would examine body fluids for
identification purposes?

A.    Prior to our coming on line with DNA analysis in the state
crime lab, we did what was called forensic serology where we
were looking at other portions of biological fluids such as your
A, B, O type from blood stains.  We looked at what some -- what
were called polymorphic protein or enzymes.  And in the short
time frame in the late eighties, early nineties, we actually
sent some items out to either private laboratories or the FBI
for DNA analysis.

Q.    And, Mr. Bush, whether it's the old-fashioned classical
serology or this newfangled DNA business we've heard so much
about in recent years, is there in either case at least an
initial step in trying to locate the presence of body fluids?

A.    The type of examinations that we do prior to DNA analysis
have not changed since the seventies or sixties when our lab
started.  Basically it involves the visual examination of an

Page 199

item looking for stains, for example, of blood stains. We would be looking for any, say, brownish-colored stain.

Once we would do a visual examination, we then do some screening tests to indicate to us whether or not, say, a biological fluid such as blood or seminal fluid is present. If those screening tests are positive, we will then do confirmatory testing and then go on to DNA analysis.

Q. And as with photography, fingerprints, or other areas of

480

the laboratory, is the search for body fluids one of the tasks that's performed during crime scene processing?

A. Yes, that can be very critical in crime scene processing when we're looking for biological evidence at crime scenes.

Q. When you were mentioning the sections of the laboratory, the last one you mentioned was the crime scene section. Can you tell us, is this a separate specialty? How is it -- how does that work in your laboratory?

A. Crime scene investigation is another section of the laboratory. It involves members of all of the crime lab, and what we have are two-person teams that go out and assist local law enforcement agencies with the processing of crime scenes.

And typically what we do is go out to smaller law enforcement agencies, local sheriff's departments or police departments, and help them with the processing of classically death investigations. Basically what we can do is come in with much more experience and expertise and obviously more personnel to assist these local law enforcement agencies in the collection of physical evidence at these crime scenes in an attempt to solve these cases.

Q. Among your resources I assume are more specialized

Page 200

equipment as well.

A.    Yes, we have additional specialized equipment, and then we have individuals with different areas of expertise that can come out and help process these scenes.

481

Q.    You've mentioned working years in the trace evidence analysis and DNA serology sections of the laboratory.  Have you any experience in working in the crime scene processing responsibilities of the laboratory as well?

A.    Yes.

Q.    And describe that for us if you will, please.

A.    Again, I've been doing crime scene for I would say almost 20 of the 23 years I've been there.  I have had course work in the areas of crime scene analysis, forensic microscopy, hairs and fibers analysis, basic forensic serology, biochemical methods, and blood stain analysis and numerous courses and conferences throughout the country over the last 23 years.

Q.    And as far as experience, you've been actually doing violent crime scene investigations for 20-plus years.

A.    Yes, that's correct.

Q.    Now, I'd like you to educate us just a little bit about how you go about the business of crime scene investigation.  Are there any general procedures, protocols, or standards that apply, and if so, what are the limitations of such?

A.    As far as crime scene investigations are concerned, we are typically called in at the request of a local law enforcement agency, a local sheriff's department or police department typically, and we will arrive there.  Again, we can go 24 hours a day, 7 days a week.  We will go to that law enforcement agency, be briefed as far as what information they have at that

Page 201

time in order for us to determine what types of physical evidence at the scene may or may not be important.

And so typically at this briefing we'll get the information, and from that we'll make assessments as to what we want to do as far as processing the scenes.

Now, every scene is different and can be different, but there are certain things that we typically will do at a crime scene, and that involves photography of the crime scene, taking notes, and making sketches of anything that's important or pertinent in the case. We also then will make a list or evidence log of any items that we would collect at the scenes.

Q. Mr. Bush, is time of the essence in crime scene investigation?

A. Time can be very critical in certain crime scenes as far as physical evidence is concerned. For example, if you have an outdoor scene and it's in the wintertime and it's getting ready to snow, obviously time could be a very important factor in your collection of evidence or you may lose it. So sometimes it is. Sometimes it isn't.

Q. And I assume there are varying degrees of significance to the passage of time as far as the evaporation or destruction of evidence.

A. That's correct. Again, there are a lot of environmental factors that can come into play. Again, you know, in Iowa it can snow or rain which can destroy, say, fingerprints,

footprints, tire tracks. All these different factors can come into play. Someone else can walk through your crime scene.

Animals can walk through the crime scene.  So many factors come into play here, so obviously the quicker we can get to a crime scene the better chance we have of getting good physical evidence.

Q.    Nevertheless, do you have any iron-clad limits beyond which you won't at least attempt to look for evidence in a crime scene?

A.    No, there's no limit.  Again, one of the things about, for example, DNA evidence is that it is very stable and we can get results 10 and 20 years later with no problem.  So it just depends on scene to scene.  We have to go and see what we can find.

Q.    And if you don't know -- if you don't look, you won't find.

A.    That's correct.

Q.    Did you at any point, Mr. Bush, ever respond to a request for work in connection with the Lori Duncan, Kandi Duncan, Amber Duncan, Greg Nicholson missing persons investigation?

A.    Yes.

Q.    And when did you do so?

A.    That was in March of the year 2000.

Q.    Please describe the nature of the request.

A.    I was requested to examine a house in Mason City for the presence of blood specifically looking in two upstairs bedrooms

484

and a living room area at this residence, and again I was informed that it was believed to be a residence where a homicide may have taken place, and so my job was to look for the presence of blood at this residence in Mason City.

Q.    This was in March of 2000?

A.    That's correct.  I believe it was March 28 of 2000.

Page 203

Q. And this was approximately how long after the suspected violence?

A. I believe the incident was thought to have taken place in 1993.

Q. Some seven years' delay.

A. Yes.

Q. Nevertheless, if you don't look, you can't find, so you made an effort some seven years later.

A. Yes.

Q. Please go ahead and describe what you did in response to that request.

A. Upon that request, I traveled up to Mason City, met with our Special Agent Bill Basler and two narcotics enforcement agents, and we proceeded to this residence which was at 619 Van Buren Street or North Van Buren Street in Mason City.

Once we arrived there -- again, this was a little after -- about 11:00 that morning -- we entered the residence and proceeded to process this house for the presence of blood. And again, I was specifically looking at the living room, dining

485

room area and then also the upstairs area for the presence of blood on the floor.

Q. Can you just very briefly describe the method used to look for blood?

A. My methodology used in this examination or crime scene processing involved both the visual examination of all these areas of carpet or floor area and then also using two chemical screening reagents to assist me with any stains that I thought may be significant or possibly blood.

Q. And what, if any, findings did you arrive at, sir?

Page 204

A.   As far as my findings with this residence, as far as the downstairs was concerned, what we chose to do -- there was a large piece of carpet that covered -- it was a single piece that covered both the living room and dining room area.  We chose to basically roll this piece of carpet up, take it out of the residence, and take it on a separate area or garage area where we could lay it out and examine it in a darkened area.

As far as the upstairs is concerned, I looked at the upstairs bathroom, detected no blood in that bathroom, looked at a northern bedroom, took that carpet, examined both the top side and back side of that carpet visually and with chemical screening reagents, found no blood there, and then looked at the southern bedroom in the upstairs and found one small blood stain in the one corner of that bedroom that did look like blood and screened positive for the presence of blood.

486

Q.   Did you do any further testings on that?

A.   I did.  I actually took that specimen back to the laboratory.  I cut some of the fibers off of that carpet, took it back to the laboratory, processed it for the presence of DNA. My results were negative, however.

Q.   And by negative, you mean specifically what?

A.   Again, screening tests indicated that blood was present on those carpet fibers.  However, any confirmatory testing to identify it as being human blood or as to whose human DNA was present, all those results were negative.  So all I could say was that my screening test indicated that I had a blood stain on that carpet in that southern bedroom.

Q.   But you can't even say it was human blood.

A.   No, I cannot.

Page 205

Q.   You mentioned -- and I just want to be clear about this. You mentioned removing some of this carpeting to a garage for closer examination.  Was that the garage at that residence or a separate location?

A.   No.  We took this carpet out, put it in a pickup, and took it to a separate garage at a business location in Mason City where they had like a double-wide garage area indoor.  You have to remember it's March, so it was pretty cold out.  And so we had a controlled environment where we could look at it and lay this carpet clear out as -- I would say as examining it as one piece.

487

Q.   And bottom line, your day spent there processing that scene in an examination for evidence of a crime of violence was negative.  It was unproductive.

A.   That's correct.  Again, I looked at this big piece of carpet.  My screening results were negative for the presence of blood.  So besides the one little spot of blood on the carpet which we could not make any more determination on, I did not find any other blood stains on any of the items in this case.

Q.   You spent approximately how many hours working on that task on that day?

A.   Again, I arrived in Mason City about 10 a.m., and I believe I left about 3 in the afternoon.

Q.   You found nothing of significance.

A.   That's correct.

Q.   Again, if you don't look, you can't find.

A.   That's correct.

          MR. MILLER:  Thank you, sir.  I have no further direct.

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 432 of 3592

THE COURT: Mr. Stowers?

CROSS-EXAMINATION

BY MR. STOWERS:

Q. Mr. Bush, was there any explanation provided to you prior to your departure or after as to why it was that nobody thought of requesting that the state crime lab come up and look through this house?

488

A. As far as timing-wise?

Q. Yeah.

A. I do not know. I was again only requested in March of 2000 to process this house. I don't know why or why not it wasn't done prior to this time.

Q. Are you familiar with the Mason City Police Department?

A. Yes.

Q. Probably done work for them before.

A. Yes.

Q. So they knew that the state crime lab was out there and available to come do these types of things that you describe that you do.

A. Yes.

Q. And Agent Basler with the criminal investigation, as you know, is the case agent on this case; right?

A. It is my understanding, yes.

Q. And he's very familiar with the services that you folks have available through the state crime lab; is that correct?

A. Yes.

Q. And you've probably worked on many, many, many cases where he's been involved.

A. Yes.

Page 207

Q. He didn't call you prior to March of 2000 and ask you to go up and take a look through the Duncan home, did he?

A. No, he did not.

489

MR. STOWERS: Thank you.

MR. MILLER: Brief if I may.

THE COURT: You may.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. Mr. Bush, does the DCI assume original jurisdiction of criminal investigations, or do they take cases on referral from local agencies?

A. Again, we cannot, as far as I'm aware, take jurisdiction. We have to be invited in by the local law enforcement agency to process or investigate cases.

Q. And do you know when it was that the DCI was first contacted and asked to involve themselves in the Kandi Duncan, Amber Duncan, Lori Duncan, Greg Nicholson missing persons investigation?

A. No, I do not.

MR. MILLER: Thank you, sir. No further direct.

MR. STOWERS: Nothing else.

THE COURT: You may step down.

Could I see the lawyers at sidebar for a minute?

Members of the jury, why don't you take a stretch break.

(At sidebar on the record.)

THE COURT: That's it for the witnesses you told me about. I don't care if we quit today or if you want to call

490

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 434 of 3592

some more.  What's the plan?

MR. MILLER:  At the noon hour I mentioned to defense counsel that assuming that I was going to pick up the pace I could ask the family members who are here which includes JoAnn DeGeus, Ashley DeGeus, and Wendy Jensen which would fill a large portion of the rest of the afternoon.

THE COURT:  Okay.  That's fine.

(The sidebar was concluded.)

THE COURT:  You ready to call your next witness?

MR. MILLER:  Yes, Your Honor.  United States calls JoAnn DeGeus.

THE COURT:  Okay.

MR. MILLER:  We just got a panicked look from the victim witness coordinator.  She's going to fetch her I assume.

THE COURT:  Okay.  That's fine.

MR. MILLER:  She may be out burning a cigarette or something.  I don't know.

THE COURT:  You know, why don't we just take our afternoon recess now.  Members of the jury, we'll be in recess until 3:05.  Please remember my cautionary instruction.  Thank you.  And if you want to set your clocks, this is actually an atomic clock.  It goes out and sets the time.  We used to have what I call federal time.  If there were 60 clocks in the building, every one was a different time.  So I kind of use this one because it's accurate.  So we'll see you back here at 3:05.

491

Thank you.

(The jury exited the courtroom.)

Page 209

THE COURT: Anything we need to talk about, Mr. Williams, Mr. Miller?

MR. MILLER: Just I apologize to the Court for not forewarning the Court about the pace. I did mention it to defense counsel at the noon break that I would have the three extra assuming we were moving along a little faster.

THE COURT: That's fine. Anything else from the defense?

MR. BERRIGAN: No, sir.

THE COURT: Okay. Thank you.

(Recess at 2:39 p.m.)

THE COURT: We had a request from the jurors. There were two requests, one I can take care of. They wanted those blinds closed. And the other was Dean Stowers, they wanted you to speak up a little more.

MR. STOWERS: Oh, really?

THE COURT: Yeah, I'm having a fairly hard time hearing you. You're kind of soft spoken.

MR. STOWERS: Okay. I thought this amplified me enough. Apparently not.

THE COURT: Maybe you could -- I don't know if you can adjust the podium to get the microphone closer to you. Did you know it's adjustable?

492

MR. STOWERS: It comes up? Yeah, I knew there was a button. Okay.

THE COURT: Okay. Ready to have the jurors brought in?

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Page 210

Members of the jury, I do try and be responsive to requests that we get. One was to oil a chair. I guess they've oiled that chair a number of times. They can't get the squeak out of it. I'll have our mechanical folks -- they seem to be able to run a complex set of boilers but don't seem to be able to get the squeak out of the chair. But we'll have at that again.

I have closed the blinds, and I have asked Mr. Stowers to speak up a little bit.

So is the government ready to call your next witness?

MR. MILLER: Yes, Your Honor. JoAnn DeGeus.

JOANN DEGEUS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Make yourself comfortable. Adjust the chair and the microphones so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: JoAnn DeGeus, D-e-G-e-u-s.

THE COURT: Mr. Miller?

493

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good afternoon, Mrs. DeGeus. Your residence, ma'am?

A. We live in the country at Britt.

Q. Where is Britt?

A. 35 miles west of Mason City.

Q. And approximately where in the country do you live from Britt?

A. North of town about five miles.

Page 211

Q. Very good. How long have you lived there?

A. Twenty-some years.

Q. That's the DeGeus family home.

A. We've lived there.

Q. Who do you live there with now?

A. My husband Ed.

Q. Husband of how many years?

A. I don't know. Forty-seven.

Q. And did you and Ed raise children at that home of yours?

A. Yes, we did.

Q. Tell us their names.

A. Our oldest one was Ronda, Ronda Francis now; Jeff DeGeus; Terry DeGeus; Brenda Stone; and Brian DeGeus.

Q. They provided you with some grandchildren over the years?

A. Yes. I don't know how many.

494

Q. How many?

A. Too many, and I even have great ones.

Q. Great ones now.

A. Yes.

Q. Very good. Congratulations. Now, you indicated you live about five miles from Britt. Do you live there year-round?

A. No, we go south in the wintertime to Arizona.

Q. About how many months do you spend in Arizona, Mrs. DeGeus?

A. Usually from December till March, middle of March, end of March. Depends on what the weather's doing in Iowa.

Q. Is your husband retired?

A. No, he runs heavy equipment.

Q. And that's a business that is active in the warmer months.

A. Right.

Page 212

Q. Can't be excavating when the ground is frozen.

A. Right.

Q. How long has he been doing that?

A. Probably 20-some years.

Q. You mentioned that your third child was Terry.

A. Right.

Q. I want a little bit of background on him. What was his birth date if you recall?

A. November 19, 1980.

Q. 1960?

A. '60, I'm sorry.

☿

495

Q. Where did he go to school?

A. Britt.

Q. Graduate there?

A. Yes.

Q. What'd he do after graduation, ma'am?

A. I think he started working for his dad right away.

Q. And most of his adult life did he work with his father?

A. Off and on.

Q. How'd they get along?

A. Well, that's why it was off and on. They didn't really fight or anything like that. It's just they -- two jug heads meet, and they had to get away from each other, and then they'd go back and work together again.

Q. Two jug heads?

A. Hmm?

Q. Two jug heads, is that what you said?

A. Right.

Q. Chip off the old block in his case apparently.

Page 213

A. Right.

Q. Both hard workers?

A. Yes.

Q. A little bit about his personal life, did he ever marry?

A. Yes.

Q. To whom did he marry, and when was this?

A. He married Wendy Buns I think in 1982, and then they had a

496

daughter, but I'm not sure what year she was born.

Q. Where was this Buns girl from?

A. Huh?

Q. Where was this Wendy Buns girl from?

A. Woden.

Q. Town near by?

A. Yeah, 12 miles I think it is.

Q. They got married and had a daughter named Ashley.

A. Right.

Q. And what year was Ashley born?

A. I think it was probably '85 or '86.  I'm not sure.

Q. Possibly even slightly before then?

A. Hmm?

Q. Never mind.  I don't want you to guess about anything.
Just let me know if you don't know for sure.

A. No, I just really can't think right now.

Q. That's fine.  She's a young woman now.

A. Yes.

Q. Your son Terry's marriage with Wendy Buns, then Wendy
DeGeus, lasted approximately how long if you know?

A. Boy, I don't remember anymore.

Q. They got divorced, though.

Page 214

A. Yes.

Q. And did you have any personal knowledge about the circumstances that led to the divorce?

497

A. Yes.

Q. And what were those?

A. Angela wanted him to get a divorce.

Q. Angela?

A. Yes, Angela Johnson.

Q. He had developed a relationship with her?

A. Yes.

Q. And so Terry and Wendy divorced.

A. Yes.

Q. Did he nevertheless continue to maintain a father-daughter relationship with his daughter Ashley?

A. Oh, yes, that was good. He seen her practically every weekend.

Q. And that was my next question. Could you just briefly describe that relationship for us?

A. They spent as much time together as they possibly could. She went to school down in Wesley, so mainly it was just the weekends.

Q. How many weekends?

A. How many weekends?

Q. Yeah.

A. Almost every one.

Q. Mrs. DeGeus, I'm going to direct your attention to the year of 1993, specifically the autumn of that year. Do you recall that time period, ma'am?

498

Page 215

A.   Yes.

Q.   How much contact did you have with your son Terry?  And let me begin by asking was he still living with you, or did he live elsewhere?

A.   He lived across the section from us.

Q.   Out in the country but near your farmstead?

A.   Yes.

Q.   How often did you see your son Terry DeGeus during that time period?

A.   He was working with his dad, so we probably seen him every day.

Q.   Was there anything to your observation out of the ordinary about his mood or demeanor that fall?

A.   Well, it was like in August I think it was he was in a real tizzy because his friend and his girlfriend and two little girls just -- he couldn't find them anywhere.

Q.   He was worried about some disappearances?

A.   Yes.  He just thought it was so funny that they'd just leave without no -- not saying anything.

Q.   Did he express any other concerns during that time period to you, Mrs. DeGeus?

A.   Yes, he kept asking me if he would get a subpoena in the mail, if he got one, and I kept saying no, no, and then finally one day it dawned on me.  I says, Well, they won't deliver it to me anyhow, Terry.  They will look you up and serve it to you

                                                              499

because it will be for you.

Q.   But he was nervous and worried about receiving a subpoena that period.

                    Page 216

A.    Right.

Q.    Something else happened in the fall of 1993.  Do you remember the weekend that your son disappeared?

A.    November 5, 1993.

Q.    What was the day of the week if you recall?

A.    Friday.

Q.    That would be during the school year.

A.    Right.

Q.    Was there to your recollection any plan with regard to your granddaughter Ashley that weekend?

A.    Ash was there when he come home from work.  I don't remember anymore how she arrived there because I went and got her sometimes; her mother brought her over sometimes, so I don't remember that.

Q.    That was yet another weekend for Ashley to spend with her father, however.

A.    Right.

Q.    And on those weekends, virtually every weekend that she did spend with her father, how much time did she spend with him?

A.    The whole weekend.  I usually picked her up from school on the weekend and had her all weekend and so when Terry got back he could take her home.

500

Q.    Did your son work with his father that day?

A.    Yes.

Q.    So you had Ashley before he got off work?

A.    Right.

Q.    When he got off work, did you see him?

A.    Yes, because he come to the house to take Ashley with him.

Q.    And at that time did you convey any messages to your son?

Page 217

A.   Yes.

Q.   What?

A.   Angela Johnson had called and told me to have him call her when he got home from work, and I told him that.

Q.   This was earlier that same day?

A.   Yes.

Q.   You'd received a phone call from Angela --

A.   Well, it was in the daytime sometime when she called and told me to tell him when he got off work to call her.

Q.   Why would she be calling you instead of calling him directly?

A.   She called all the time.

Q.   She called for you and asked you to convey that message to your son.  Did you, in fact, tell him that Angela Johnson wanted him to call her?

A.   Yes.

Q.   What happened next that evening if you recall?

A.   Well, Terry and Ash went home.  Then I don't recall what

501

time it was.  He brought her back.  He says, Mom, he says, Will you watch Ash?  He says, I'm going to go meet Angela over at the country club where she works over in Mason City, he says, And I shouldn't be gone very long.  And then he left, and he never come back.

Q.   When he left, at least according to his statement to you, he was headed where?

A.   To the -- Angie's place of work, and she was working at the country club in Mason City at that time.

Q.   He told you he was headed to meet Angela Johnson.

A.   Right.

Page 218

Q. Go ahead if you would. Please describe what, if anything, you recall about the rest of that weekend.

A. It was a nightmare. Well, the next day when Terry didn't come home, I called Angela and asked her where he was, and she said he never made it over there or she never seen him.

Q. You made a telephone call to Angela Johnson?

A. Yes, I did.

Q. Reached her on that first effort?

A. (Witness nodded head.)

Q. That very next day?

A. Yes.

Q. And when you asked her where your son was, she told you what?

A. He never -- she said she never -- hadn't seen him.

502

Q. He didn't show up.

A. Right.

MR. MILLER: Thank you. I have no further direct.

CROSS-EXAMINATION

BY MR. BERRIGAN:

Q. Mrs. DeGeus, my name's Pat Berrigan, and I'm just going to ask you a couple of questions; okay?

A. (Witness nodded head.)

Q. I was a little unclear about the timing of the conversation you had with your son the night of his disappearance.

A. I don't really remember the time.

Q. Okay.

A. I just -- you know, he got off work. He took Ash, and they went and ate and whatever they did, and later they -- he brought her back.

Page 219

Q. Okay.

A. I don't remember what hour it was.

Q. Not sure whether it was 9, 10, 11 or --

A. Well, it had to be fairly early because he told me Ash didn't have to go to bed, he'd be back within that hour so . . .

Q. Well, that's exactly what I wanted to know. You said he'd be back -- I won't be long.

A. Right.

Q. Are you sure he said he'd be back within an hour?

A. Well, he said he wouldn't be gone very long so Ash could

503

stay up.

Q. Okay. And if I understand it, isn't it true that your son didn't have a phone at his house at that time?

A. That's right.

Q. Which is why you'd get a lot of these calls.

A. Probably.

Q. Your son was asking you about a subpoena that fall.

A. Yes.

Q. And he was concerned about a subpoena coming for him; right?

A. Right.

Q. Did you know that that concerned a drug investigation?

A. Yes.

Q. Okay. Were you aware of your son's involvement in drug activity?

A. Not till lately.

Q. I mean, it seems like I'd certainly keep that from my mother.

A. Right.

Page 220

Q.  That isn't the kind of thing he confided in you about; isn't that true?

A.  Right.

Q.  There are parts of his life that were kind of not things that he shared with you; would that be fair?

A.  Right.

504

Q.  Okay.

MR. BERRIGAN:  Okay.  Thanks a lot, ma'am.  That's all I have.

THE COURT:  Mr. Miller, anything further?

MR. MILLER:  No redirect, Your Honor.

THE COURT:  You may step down.

MR. MILLER:  Your Honor, the government calls Ashley DeGeus.

ASHLEY DEGEUS, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated.  Thank you. Would you please state your full name and spell your last name.

THE WITNESS:  Ashley DeGeus, D-e-G-e-u-s.

THE COURT:  Mr. Miller?

DIRECT EXAMINATION

BY MR. MILLER:

Q.  Good afternoon, Miss DeGeus.

A.  Good afternoon.

Q.  Your residence is?

A.  Corwith, Iowa.

Q.  Your age.

A.  Twenty-one.

Q.  With whom do you live in Corwith?

A.  My mom.

Page 221

Q. And what's your mom's name?

A. Wendy Jensen.

505

Q. Your father was Terry DeGeus.

A. Yes.

Q. Approximately how old were you when your parents divorced?

A. When my parents divorced. Five, five and a half.

Q. That was your age at the time?

A. Yes.

Q. You lived at least during the week with your mom.

A. Correct.

Q. And where was that residence?

A. In Corwith.

Q. And that's the same place that you're living at now?

A. We lived in town then. My mom lives on a farm now.

Q. Same community, though.

A. Yes.

Q. And describe Corwith for us. Little town?

A. Yes, it's a little community.

Q. And where is that from Britt, Iowa?

A. It's a little to the west and a little to the south.

Q. And by a little, it's still in the same county?

A. Yes.

Q. Hancock County, Iowa.

A. Right.

Q. Your mom remarried?

A. Yes.

Q. And her name is Jensen now.

506

Page 222

A.   Yes.

Q.   And do you have any either step or half siblings?

A.   I've got three little brothers.

Q.   I want to go back to the time following your divorce.  Do you remember way back when your parents split up?

A.   Yes, I do.

Q.   What did that do as far as your relationship with your father?

A.   The only difference was is I could only see Dad on the weekends.

Q.   Did you see him on weekends?

A.   Every weekend.

Q.   Not just every other weekend or every other holiday.  You spent every weekend with your father?

A.   Yes.

Q.   And how much of those weekends did you spend with your father?  In other words, when you spent a weekend with him, did you stay at your grandparents' house, or did you actually spend time with your father?

A.   With my father.

Q.   What sort of things?

A.   It depended on the weekend.  When they first got divorced and he was dating Angela Johnson, we'd stay at Angie's house or Dad would take me to the lake.

Q.   If your dad was working on weekends, would he drop you off

507

with somebody else?

A.   I'd stay at Grandma's during the day.

Q.   Did he ever actually take you with him to work?

Page 223

A. There were times I rode in the truck with him, yes.

Q. He at least a portion of those years had a job as a -- doing some trucking?

A. Yes.

Q. And you'd ride along?

A. Yes.

Q. So for a little girl whose parents were divorced, you had a pretty close relationship with your father.

A. Yes, I did.

Q. During those first years following your parents' divorce, you mentioned that he spent some time with Angela Johnson.

A. Yes.

Q. How much time would you spend with the two of them?

A. When it first happened, we'd spend the whole weekend over at her house.

Q. Was there anyone else in the household beside yourself and your father and Angela Johnson?

A. Her daughter Alyssa.

Q. And what was her age in relation to your own?

A. She's a couple months older than I am.

Q. How'd you two little girls get along?

A. Got along as little girls I guess.

508

Q. How long did that go on as far as a relationship between your father and Angela Johnson where you were spending a fair amount of time in Angela Johnson's company?

A. Not a really long time. I really can't remember.

Q. That relationship changed, however.

A. Yes.

Q. At some point.

Page 224

A.    Yes.

Q.    You saw less of Angela Johnson.

A.    Yes.

Q.    And her daughter.

A.    Yes.

Q.    Miss DeGeus, I assume you recall the weekend of your father's disappearance.

A.    Yes, I do.

Q.    It's an important occasion in your life?

A.    Yes.

Q.    Do you recall that Friday?

A.    Yes, I do.

Q.    Please tell us what you remember about that Friday, Miss DeGeus.

A.    I remember coming home from school, and Dad told me he was going to go see Angela Johnson and that I couldn't go with him. And I asked Dad why because I usually got to go with him to see Angie, and he told me that I couldn't go this time but that I

509

could wait up for him and he'd be no later than midnight.

Q.    I'm going to interrupt you for just a second.   And please feel free -- that's some fresh water and Kleenex.   Important thing is that we get what information you can give us.   Take your time; okay?

A.    Okay.

Q.    You were how old at this time?

A.    I had just turned ten in September.

Q.    Were you disappointed that you weren't invited to go along?

A.    Yes.

Q.    Why?

Page 225

A. Because I usually got to go with Dad. I didn't understand why.

Q. He told you you could wait up, though.

A. Yes.

Q. And did he leave you with anyone to wait up, or did you have to wait up alone?

A. No, I was waiting at Grandma and Grandpa's.

Q. And he left.

A. Yes.

Q. And where was he going when he left?

A. To meet Angela Johnson and talk to her.

Q. Go ahead and describe the rest of your evening for us, please.

A. I waited up with Grandma and Grandpa. Grandpa went to bed.

510

Grandma went to bed, and I stayed up. Midnight came, and Dad wasn't there, so I woke up my grandma, and she told me not to worry and to go back to bed. And Dad never came back.

Q. You mentioned Grandpa went to bed first?

A. Yes.

Q. How do you know that?

A. Because Grandpa always went to bed at eight after he ate his ice cream.

Q. That was a routine?

A. Yes.

Q. He'd have his bowl of ice cream and then go to bed.

A. Yes.

Q. Eight o'clock's kind of early. Was he an early riser too?

A. Oh, yeah.

Q. But your grandma would stay up longer.

Page 226

A. Yes.

Q. You stayed up after she went to bed, though?

A. Yes.

Q. Approximately when were you expecting your father home that night?

A. Midnight, 12:00.

Q. That came and went without him arriving.

A. Yes.

Q. You stayed up?

A. Yes.

511

Q. How late?

A. I don't remember for sure how late it was, but right at midnight when Dad wasn't there, I woke Grandma up.

Q. Go ahead. Tell us what you recall of that night.

A. I woke Grandma up, and she told me not to worry. And then I got up early. I don't remember what time I woke up or anything the next day.

Q. What'd you do that next day?

A. Me and my grandma went to Clear Lake and Mason City to look for Dad's car or look for Dad.

Q. That was your activity that Saturday.

A. Yes.

Q. Trying to find your father.

A. Yes.

Q. Your grandma took you?

A. Yes.

Q. Where'd you look?

A. All the different houses that I could remember being my dad's friends' house.

Page 227

Q. Find anybody that could tell you where he was?

A. No.

Q. Spend the rest of that weekend with your grandparents?

A. I don't recall.

Q. But as you've indicated, you never again saw your father in life.

512

A. Right.

Q. Did you ever quit wondering or worrying about him?

A. No.

Q. What was your reaction or your thoughts as a little ten-year-old girl if you remember?

A. I didn't know what to think. I didn't understand why Dad never called me, and I was worried that he didn't have any shelter from the rain and the bad weather.

Q. And continued to worry for some years.

A. Yes.

Q. Until his remains were found in the year 2000.

A. Yes.

Q. Miss DeGeus, that evening when your father told you that he was on his way to meet Angela Johnson, are you sure about that?

A. Yes.

Q. He didn't say he was going to meet Dustin Honken?

A. No, I never heard that name before at that time.

Q. He said he was going to meet Angela Johnson.

A. Yes.

Q. Did he look you in the eye when he told you that?

A. Yes, he did, and he promised that he'd be there at midnight, and my dad never broke a promise.

MR. MILLER: Thank you. I have no further direct.

Page 228

Excuse me just a second. I apologize, Your Honor.

Q. I do have one other line of questions I needed to ask you

513

about. You were acquainted with your father's friend Angela

Johnson and her daughter from a couple years earlier.

A. Yes.

Q. Did you ever at any time after your father's disappearance make any effort to contact Angela Johnson inquiring about the whereabouts of your father?

A. Yes, I did.

Q. Please describe that.

A. Some time after that I asked my mom permission to call Angela Johnson, and my mom let me. So I called her, Angela Johnson's house, and Angela and Alyssa answered the phone at the same time. And at first Angie told Alyssa get off the phone and not talk to me. And then I talked to Angie, and I asked her where my dad was and if she seen him that night, and she told me that she never seen him that night, that he never made it there, he must have ran into friends before he got there.

Q. About when was this conversation if you recall?

A. What was that?

Q. About how long after your father's disappearance was that conversation?

A. A week.

MR. MILLER: Thank you, ma'am.

THE COURT: Mr. Berrigan?

CROSS-EXAMINATION

BY MR. BERRIGAN:

514

Page 229

Q. Miss DeGeus, my name's Pat Berrigan. I'm one of the lawyers representing Angela. I need to ask you just a couple of questions; okay?

A. Okay.

Q. You all right with that?

A. Yes.

Q. This name Dustin Honken --

A. Yes.

Q. -- you had never heard that name before in your life back in 1993, had you?

A. No, not as a ten-year-old girl.

Q. Yeah. But you've certainly heard it since that time.

A. Yes, I have.

Q. And you've heard it a lot, and you've learned that Mr. Honken was a drug dealer; right?

A. Yes.

Q. And I'm just imagining you've heard a lot of allegations about your dad being involved in drugs as a result of this process.

A. Yes.

Q. Have you?

A. Yes.

Q. But back when you were ten years old back in 1993, that wasn't anything that was in your life, was it?

A. No.

515

Q. Your dad didn't do drugs in front of you or deal drugs in front of you or deal with people that were doing drugs in front of you, did he?

A. No, he did not.

Page 230

Q.   That's something he kept out of your life.

A.   Yes.

Q.   So it's not terribly surprising, is it, that he might not have mentioned Dustin Honken to you?

A.   No.

Q.   Isn't it true that night that -- well, let me go back for just a second.  I had asked your grandmother some questions about the timing, and I know it's been a long time.  But do you know what time it is that your dad left and told you he'd be back around midnight?

A.   The only thing is is I know we ate supper with Grandma and Grandpa like we always did, so it was probably around seven o'clock.

Q.   So it was pretty early in the evening; right?

A.   Yes.

Q.   And most of the time if your dad was going to go over to Angie's, you asked him to go, you could go; right?

A.   Yes.

Q.   Because you and Alyssa, at least at that time you were friends.

A.   We played together because we were put in the same house

516

together.

Q.   Okay.  Fair enough.  You played together at least.

A.   Yes.

Q.   Right?  Did you notice Alyssa in the courtroom today?

A.   Yes.

Q.   But that night was different.  Your dad and you argued about whether you could go with him; right?

A.   Yes, I guess so.

Page 231

Q. And he wouldn't let you go.

A. No.

Q. And you've told Mr. Miller you couldn't understand that. You got no real explanation for that, did you?

A. Right.

Q. But didn't your dad tell you that in addition to going over to Angie's that he was going to pick up some stuff over there?

A. I don't recall.

Q. I know you've probably talked to a number of police officers during the course of this investigation. Do you remember talking to Mr. Basler on occasion?

A. Yes.

MR. BERRIGAN: May I approach the witness, Your Honor?

THE COURT: You may.

BY MR. BERRIGAN:

Q. What I have before you there, Miss DeGeus, is a report that Mr. Basler prepared back on February the 16th of 2000, and I

517

wonder if you'd be so kind as to just take a look at the top of the third page for me. And the very first paragraph, those two sentences, could you read those to yourself, please?

A. Okay.

Q. Did you tell Mr. Basler five years ago that in addition to talking to Angie your dad told you that he was going to pick up some stuff at Angie's as well?

A. I don't recall saying it, but I must have.

Q. He certainly didn't tell you what the stuff was.

A. No. I would assume it'd be some clothes or something from dating her.

Q. You really don't know what it was, do you?

Page 232

A.    No.

MR. BERRIGAN:  Okay.  Thank you.  That's all I have.

THE COURT:  Mr. Miller?

MR. MILLER:  No questions, Your Honor.

Wendy Jensen.

WENDY JENSEN, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated.  Would you state your full name, please, and spell your last name.

THE WITNESS:  Wendy Jensen, J-e-n-s-e-n.

DIRECT EXAMINATION

BY MR. MILLER:

Q.    Your residence?

A.    Corwith.

518

Q.    And who do you live with there, Mrs. Jensen?

A.    My husband, three boys, and daughter.

Q.    And your daughter is Ashley that we just heard from.

A.    Right.

Q.    She is a daughter by your marriage to Terry DeGeus.

A.    Right.

Q.    And I don't want to go into great detail, but if you could just summarize for us and give us just a little bit of background about how you met Terry DeGeus and how your relationship developed and proceeded through your marriage and divorce.

A.    I met him the summer out of my sophomore year, started dating.  That was in 1978.  And we got married June of 1982.

Q.    Where did you live after you got married?

A.    The first house is just a mile or so down from his mom and dad's in rural Britt.

Page 233

Q. You stayed married for about how long?

A. Seven years.

Q. To this marriage was born one child, Ashley.

A. Right.

Q. Did you ever live anywhere other than the general Britt, Iowa, or Hancock County vicinity during --

A. We lived over by Woden.

Q. Pardon me?

A. By Woden.

519

Q. Now, you're going to have to help me on Woden too.

A. It's that little town up north, northwest of Britt.

Q. Northwest of Britt?

A. (Witness nodded head.)

Q. So in Britt there's Corwith, there's Woden, but that's all in the general same Hancock County vicinity.

A. Right.

Q. What'd your husband Terry DeGeus do for a living to support his family during those years?

A. He worked for his dad. He drove semi for a while, and he worked at Holland Construction.

Q. You were divorced in what year?

A. 1990.

Q. And the cause of the breakup of the relationship was what?

A. Angie wanted us to get a divorce.

Q. Your husband had developed a relationship with Angela Johnson?

A. Right.

Q. So you divorced.

A. Right. We didn't get divorced until like a year after we

Page 234

broke up.

Q. There was the separation, and the divorce was finalized approximately a year later?

A. Right.

Q. During the period of separation and following the divorce,

520

we've already heard about Ashley's relationship with her father, and you've been here in the courtroom. Does that summarize it fairly from your standpoint as well?

A. Yes.

Q. They had a good relationship?

A. Yes, they did.

Q. I've not known divorce often to be a very easy experience for people, but apparently the relationship between father and daughter was maintained through those difficulties.

A. Yes.

Q. How about your relationship with the man? Were you able to work out things pertaining to the child and your relationship even after the divorce?

A. Yeah. The first few months, probably six months, were kind of rough, but we maintained a friendship.

Q. And your daughter Ashley spent time with her father how frequently?

A. Every weekend pretty much. My mom and dad got her every once in a while, but mainly Terry.

Q. They were close.

A. Yes.

Q. You remember the weekend of your ex-husband's disappearance.

A. Yeah.

Page 235

Q.    During the weeks leading up to that disappearance, in your

521

conversations and contact with Mr. DeGeus, had he expressed any
particular or unusual worries or concerns?

A.    Not to me.

Q.    The weekend of his disappearance, was that a weekend when
he again was scheduled to have his daughter Ashley?

A.    Yes.

Q.    Would you just go ahead and describe for us in your own
words what you recall of that weekend, Mrs. Jensen?

A.    I don't really remember how we arranged the meeting because
it happened almost every week, and usually JoAnn would pick her
up at the Wesley school.  Occasionally I took her over, but more
likely than not JoAnn picked her up from the school, so I don't
really remember the exact conversation because it was pretty
much weekly.

Q.    When -- after your daughter went to the DeGeus family that
Friday, when did you next have any contact with her if you
recall?

A.    I think she came home on Sunday.  I don't remember for
sure.

Q.    What kind of condition was your daughter in upon her
return?

A.    She was very, very upset.

Q.    About what?

A.    That her dad hadn't come home Friday night.

Q.    And in her upset condition, did she make any comments about

522

Page 236

the circumstances of his disappearance?

A.    She just said that her dad had taken her to Grandma and Grandpa's and went to see Angie and never came back.

Q.    And you never again saw your ex-husband.

A.    No.

Q.    I assume this was a matter of concern to your daughter.

A.    Yes.

Q.    And did that affect you as well out of your concern for your daughter's emotions?

A.    Yes.

Q.    Did you ever do anything on your own to try to seek an answer to this mystery?

A.    The following Friday I called Angela up.

Q.    You telephoned Angela Johnson?

A.    Yes.

Q.    Please describe that conversation.

A.    I asked her what she had done to Terry.  She said she hadn't seen him.  I told her that I knew that he had been there, so she finally said that he had been there but just a short time and that he'd gone on to Mason City to see other friends.

Q.    You were asking her about the night of your ex-husband's disappearance.

A.    Yes.

Q.    She first denied seeing him that night?

A.    Yes.

523

Q.    Then when you pressed her, she changed her story and admitted that she'd seen him.

A.    Right.

Q.    And again, you've not seen him in life since then.

Page 237

A.    No.

MR. MILLER:    Thank you, ma'am.  I have no further direct.

CROSS-EXAMINATION

BY MR. BERRIGAN:

Q.    Miss Jensen, my name's Pat Berrigan.  I'm just going to ask you a couple questions.  I know you've been sitting back there, so you know who I am by now.

A.    Right.

Q.    Unlike your daughter, you were aware of Terry's involvement with drugs back at that time, weren't you?

A.    Not his involvement in '92.  I was divorced from him.

Q.    Well, didn't you know as early as '89 that he was taking crank, coke, acid and that he and Dustin Honken were involved in drug deals together?

A.    I knew that Terry did drugs, but no, I did not know he was involved with Dustin Honken.

Q.    You mean you never knew he was involved with Dustin Honken?

A.    No.

Q.    Did you tell Special Agent Niles Van Dyke back in 1997, on April the 8th, 1997, that Dustin and DeGeus were involved in

524

drug deals together and you didn't know if Dustin -- if Terry was making -- helping Honken make the drugs or not?

A.    No, I don't recall that.  I don't know who Van Dyke is either.

Q.    I'm sorry?

A.    I don't know who the Van Dyke guy is that you're talking about.

Q.    Oh.  His name is Agent Niles Van Dyke and Deputy Dan Smith

of the Hancock County Sheriff's Office.

A.   Okay.  I remember being at the deputy sheriff's office, yeah.

Q.   Okay.  You just don't remember telling them that.

A.   No, I don't.

Q.   Did you know of Dustin Honken back at that time?

A.   I knew of Dustin since I started going out with Terry.  He was friends with his little brother.

Q.   Did you know he was involved with methamphetamine manufacturing?

A.   Not really since this trial as far as I remember, no.  I wasn't around Terry in the '90s.

Q.   I see.  Where was Terry DeGeus getting methamphetamine back at that time?

A.   I don't know.

Q.   You didn't know.  You and Angela Johnson weren't exactly friends --

525

A.   No.

Q.   -- after your divorce; right?

A.   No.

Q.   In fact, didn't you send her a card thanking her for her involvement with your husband?

A.   I don't believe I ever sent it.  I think I told people I thought about it.

Q.   Didn't you tell people that after your divorce you got as far away from your former husband as you could?

A.   What's that?

Q.   After your divorce that you got as far away from Terry DeGeus as you possibly could?

Page 239

A.     After divorce people are usually a little bitter at first, so I may have said that, yes.

Q.     And the truth is that was a two-way street.  He was involved with Angela Johnson.

A.     Right.

Q.     As well as she was involved with him; right?

A.     Right.

MR. BERRIGAN:  Okay.  That's all I have.  Thank you, ma'am.

THE COURT:  Mr. Miller, anything further?

MR. MILLER:  No, Your Honor.

THE COURT:  You may step down.

MR. MILLER:  May it please the Court.  Your Honor, our

526

next witness who will be substantially longer is subpoenaed to appear first thing Monday morning.

THE COURT:  That's fine.  Members of the jury, that concludes the testimony for today.  We will see you all back here Monday morning.  We will start right at 8:30.  Remember not to come tomorrow.  You can come if you want to.  I'll be working on other stuff.

And we'll -- just so you know, we should have a schedule for you early next week, but we'll be going all four days Monday through Thursday next week, same schedule starting at 8:30.  You're probably catching on to the routine.

So it's very important to remember the cautionary instruction not to discuss this case among yourselves, not to discuss it with anybody else, don't let anybody talk to you about this case, don't read any newspaper articles or listen to any radio or television reports about the case.  Don't do any

Page 240

independent research on the Internet or anywhere else about this case.  Most importantly, keep an open mind until you've heard all of the evidence, had a chance to receive my final instructions, hear the closing arguments of the lawyers, and, most importantly, go back to the jury room and discuss this case among yourselves at the appropriate time.

I hope everybody has a good weekend, and we'll see you back here at 8:30 Monday.  Thank you.

(The jury exited the courtroom.)

527

THE COURT:  Please be seated.  Anything we need to take up?

MR. WILLIAMS:  No, Your Honor.  Just to give a heads-up to the Court on timing here, if anything, we're a little bit ahead of schedule on this.  And based on getting in some of those transcripts and so forth, it's knocked off some of the foundation witnesses we didn't need.  So on Monday morning we'll provide the Court with a revised witness list that eliminates some of those foundation people to give you a best estimate of where we are.

THE COURT:  Okay.  Anything from the defense?

MR. BERRIGAN:  No, sir.  I understand we may have some matters to discuss with the Court.

THE COURT:  Yes.

MR. BERRIGAN:  I just wanted to remind you about that.

THE COURT:  Yes, on the CJA matters?

MR. BERRIGAN:  Yes.

THE COURT:  And we'll do that at four o'clock.  Just a couple very minor things.  I know it was unintentional Mr. Berrigan, but you did refer to your client when you were

Page 241

questioning Ashley DeGeus as Angela. I'm sure that was unintentional. And one of the defense lawyers thanked the witness. Those are the type of editorial comments that I don't allow, so it's just an idiosyncratic thing. I understand. I'm very idiosyncratic, and you wouldn't always know what my

528

idiosyncrasies are. But I just think editorial comments like thanking the witness just don't have any place by the lawyers, so I'd ask you not to do that by both sides.

Okay. We'll see everybody at -- why don't we meet at 8:15 Monday morning. And if something arises between now and then, then we can meet earlier, and you can give me a heads-up.

MR. WILLETT: Your Honor, if it please the Court, am I still correct you do not need to meet with me this afternoon?

THE COURT: I do not.

MR. WILLETT: Thank you, Judge.

THE COURT: Thank you.

(The foregoing trial was
adjourned at 3:50 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Page 242

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| AARON RYERSON | | |
| | MR. WILLIAMS | 263 |
| | MR. BERRIGAN | 290 |
| | MR. WILLIAMS | 314 |
| | MR. BERRIGAN | 315 |
| JEFFREY HONKEN | | |
| | MR. WILLIAMS | 317 |
| | MR. STOWERS | 370 |
| | MR. WILLIAMS | 390 |
| KEVIN PALS | | |
| | MR. MILLER | 396 |
| | MR. STOWERS | 410 |
| LISA ASBE | | |
| | MR. MILLER | 416 |
| | MR. BERRIGAN | 432 |
| CINDY HICOK | | |
| | MR. MILLER | 434 |
| | MR. BERRIGAN | 443 |
| MARGE MILBRATH | | |
| | MR. MILLER | 448 |
| | MR. BERRIGAN | 471 |
| | MR. MILLER | 473 |
| | MR. BERRIGAN | 474 |
| | MR. MILLER | 474 |
| PAUL BUSH | | |
| | MR. MILLER | 475 |
| | MR. STOWERS | 487 |
| | MR. MILLER | 489 |
| JOANN DEGEUS | | |
| | MR. MILLER | 493 |
| | MR. BERRIGAN | 502 |
| ASHLEY DEGEUS | | |
| | MR. MILLER | 504 |
| | MR. BERRIGAN | 513 |
| WENDY JENSEN | | |
| | MR. MILLER | 517 |
| | MR. BERRIGAN | 523 |

\*\*\*\*\*

530

| EXHIBITS: | |
|---|---|
| 38 and 92 | 270 |
| 42 | 403 |
| 43 | 407 |
| 36 | 421 |
| 37 | 422 |
| 720 | 430 |

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 469 of 3592

804                                                                                    431
46A through 46F                                                              462
35                                                                                       470

*****

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 470 of 3592

531

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

       Plaintiff,                        Sioux City, Iowa
                                     May 9, 2005
   vs.                                        8:13 a.m.

ANGELA JANE JOHNSON,                         VOLUME 3 of 24

       Defendant.
                          /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀                                            532

APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                          Assistant United States Attorney
                          Suite 400 - Hach Building
                          401 First Street Southeast
                          Cedar Rapids, IA  52401

                          THOMAS HENRY MILLER, ESQ.
                          Iowa Attorney General's Office
                          Area Prosecutions Division
                          Hoover State Office Building
                          Des Moines, IA  50319

For the Defendant:        PATRICK J. BERRIGAN, ESQ.
                          Watson & Dameron
                          2500 Holmes
                          Kansas City, MO  64108

                          DEAN STOWERS, ESQ.
                          Rosenberg, Stowers & Morse
                          1010 Insurance Exchange Building
                          505 Fifth Avenue
                          Des Moines, IA  50309

                          ALFRED E. WILLETT, ESQ.
                          Terpstra, Epping & Willett
                          Higley Building - Suite 500
                          118 Third Avenue Southeast
                          Cedar Rapids, IA  52401

Also present:             Bill Basler

Page 1

533

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Good morning.  Is there anything we need to take up before we bring the jury in at 8:30?

MR. WILLIAMS:  Not on behalf of the United States, Your Honor.

THE COURT:  Anything from the defense, Mr. Willett?

MR. WILLETT:  Not on behalf of the defense, Judge.

THE COURT:  Okay.  We'll see you at 8:30 then.  Thank you.

(Recess at 8:13 a.m.)

THE COURT:  Ready to have the jury brought in?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Do you have the first witness in the courtroom?

(The jury entered the courtroom.)

THE COURT:  Good morning.  Please be seated.  A belated happy Mother's Day to those mothers on the jury.  And I understand that jurors 509 and 513 in the very front row here have volunteered to stay there for the duration of the trial, so we won't be rotating.

Is the government ready to call its next witness?

MR. WILLIAMS:  We are, Your Honor.  The United States calls Robert Gerdes.

THE COURT:  Okay.

534

Page 2

ROBERT GERDES, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated in our witness box.  Adjust the chair and the microphones so you can speak directly into those microphones.  And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS:  Robert A. Gerdes, G-e-r-d-e-s.

THE COURT:  Thank you.

Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q.   Mr. Gerdes, could you explain to the jury what you do for a living, sir?

A.   I'm the sheriff in Hancock County.

Q.   How long have you been the sheriff in Hancock County?

A.   I was appointed sheriff in 1999.

Q.   How long have you been in law enforcement generally, sir?

A.   I started as a police officer in the fall of '74, went to the sheriff's department as a deputy in the fall of '76.

Q.   And you remained with the sheriff's department until the present day?

A.   That's correct.

Q.   Where were you a police officer at, sir?

A.   In the small town of Woden, Iowa.

Q.   I want to talk a little bit about Hancock County.  First of

535

all, could you give the jurors who may not be familiar with north central Iowa an idea where Hancock County is, first of all, in relation to the Minnesota border?

Page 3

A.    In relationship we are one county south so approximately 16 miles south of the Minnesota border.  It would be the north edge of our county.  And we're also approximately 15 miles west of Interstate 35.

Q.    The jury's heard some mention of Cerro Gordo County.  Where is that in relation to Hancock County?

A.    Cerro Gordo County is the county directly to the east of Hancock County.

Q.    What is the county seat of Hancock County?

A.    Garner.

Q.    And how large is Garner?

A.    Approximately 2,500 people.

Q.    We've heard some mention of Britt, Iowa.  Is that in Hancock County?

A.    That's correct.

Q.    And how large is Britt?

A.    Approximately 2,200 people.

Q.    Can you give the jury a sense, Hancock County, is it a fairly rural county?

A.    That's correct.  Right now the last census, we had approximately 12,000 people.

Q.    I'd like to direct your attention back to 1993, and at that

536

point you were still with the Hancock County Sheriff's Department?

A.    That's correct.

Q.    What was your position then?

A.    I was a deputy sheriff.

Q.    What were your duties as a deputy sheriff?

A.    Just overall things that -- everything that the county --

Page 4

any problems that we had. Whenever we were working, we'd take a call.

Q. How large of a force did the sheriff's office have back in 1993?

A. I think then there was a sheriff and four deputies.

Q. I want to direct your attention to November 10 of 1993 and ask you if you were contacted at that point concerning a missing person?

A. Yes, I was.

Q. Who contacted you, sir?

A. Ed DeGeus.

Q. And did you know Ed from before?

A. Yes, sir.

Q. What did he tell you at that point concerning his concerns?

A. His concerns were that his son Terry left on Friday, November 5, and he hadn't seen him since then.

Q. As a result of him having contacted you concerning his son Terry missing, what did you do as part of your investigation?

537

A. I think Ed had some concerns reference that Terry was being held as a witness or something, and he made some mentions of maybe in Cedar Rapids, Iowa, and I did make some checks that night to find out if, in fact, anyone knew about that, and I never did come up with anything on that. No one seemed to know where he was at.

Q. Did you have any initial concerns at that point that he was harmed, or did you believe that something else may have happened?

A. I had no idea.

Q. Did -- in your conversations with Ed DeGeus, did he give

Page 5

you any indication of who he thought Terry might have had some contact with prior to his disappearance?

A. Yes, he seemed to think that when Terry left on Friday evening that he went to see Angie Johnson.

Q. Now, you spoke with Mr. DeGeus on November 10 of 1993. I want to direct your attention to three days later and ask you if on November 13 of 1993 you received a phone call from a Wendy Jacobson?

A. Yes, I did.

Q. Who is Wendy Jacobson?

A. At the time I received the call, I didn't have an idea who she was other than she told me she was going to soon be the ex-wife of Vance Holland which I did know Vance Holland, but I didn't know her.

538

Q. And was this a phone call you were expecting from this Wendy Jacobson?

A. No, I had no idea why she even called.

Q. How long was the conversation you had with her?

A. I don't think it was very long. She appeared --

MR. BERRIGAN: Objection. Nonresponsive, hearsay, and deprives the defense of their right to cross-examine witnesses against them.

THE COURT: Overruled. You may answer.

A. I don't remember the length of it, but I don't think it was very long because I didn't have a whole lot I could tell her.

Q. And during the conversation you had with her, did you get a sense of whether she was somehow affected by anything during her phone call?

MR. BERRIGAN: Same objection, Your Honor.

Page 6

THE COURT: Overruled.

A. She appeared to me just the way she was talking that she was intoxicated.

Q. During this conversation with you, did she bring up the name Terry DeGeus?

MR. BERRIGAN: Excuse me. May I have a continuing objection based on hearsay and our right to confront and cross-examine the witnesses?

THE COURT: Well, I think you're going to have to make specific objections on this.

539

MR. BERRIGAN: Okay. I'll do that. I'll renew my objection once again.

THE COURT: Okay. The objection's overruled.

Q. Did she bring up the name Terry DeGeus?

A. I think that his name was brought up. No, it wasn't -- I can't remember for sure if she brought it up with me or not.

Q. Do you remember his name being discussed during this conversation with Wendy Jacobson?

MR. BERRIGAN: Same objection, and this is asked and answered.

THE COURT: Overruled.

A. No, I don't.

Q. Would it refresh your recollection if you had an opportunity to take a look at your report?

A. Yes.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. When you have an opportunity to read that, let me know.

Page 7

THE COURT: Now, Mr. Williams, before you ask your next question, to the extent that you're going to get into the substance of the conversation, what exception to the hearsay rule are you relying on?

MR. WILLIAMS: Not offering it for the truth of the matter asserted, Your Honor.

540

THE COURT: Okay. You may proceed.

MR. BERRIGAN: For the record, may I ask what purpose it's being offered for? There seems to be in my view no other purpose, Your Honor. This man didn't take any action based on this conversation.

MR. WILLIAMS: For the connection between this call and a follow-up interview with the defendant in this case.

THE COURT: Well, you may proceed.

BY MR. WILLIAMS:

Q. Going back to my question, did this Wendy Jacobson discuss with you Terry DeGeus?

A. No.

Q. After you had this conversation with Wendy Jacobson, directing your attention then to November 22 of 1993, did you have a conversation with Angela Johnson?

A. Yes, I did.

Q. And can you relate to the jury how did you have this conversation with her? Was it in person or over the phone?

A. It was over the phone.

Q. Had you talked with Angela Johnson before?

A. No, I haven't.

Q. Where did you get her number, or how did you reach her? How did you know how to reach her?

Page 8

A.   I think I received it from Ed DeGeus.

Q.   When you called her, did she acknowledge that she was

541

Angela Johnson?

A.   Yes.

Q.   And how long of a conversation, if you recall, did you have with her on November 22 of 1993?

A.   It wasn't a long one.  A couple minutes maybe.

Q.   And during the conversation, did you ask her about Terry DeGeus?

A.   Yes.

Q.   First of all, did she make any statements to you about testimony before a grand jury?

A.   Yes, she did.

Q.   What do you recall she told you about that?

A.   She mentioned it to me that she did speak to Terry the night or the night after she testified in front of the grand jury which I didn't know -- I had no knowledge that she had even testified, and after the testimony they met at McDonald's in Clear Lake, and they had a discussion, and it didn't last very long, and she -- he wanted to know what she testified about, and she didn't tell him much, and then they both left.

Q.   Now, this is what she's telling you occurred after she testified before the grand jury.

A.   That's correct.

Q.   Do you have any way of knowing whether, in fact, she talked to Terry DeGeus at McDonald's or not?

A.   No, I don't.

542

Case 3:09-cv-03064-MWB-LTS     Document 284-71     Filed 06/23/11     Page 479 of 3592

Q.   All right.  What did she, if anything, describe was Terry DeGeus's mood and behavior when she was talking to him at McDonald's?

A.   That he appeared to be moody or -- I don't know -- just asking her questions.

Q.   Did she relate to you that she was threatened in any way by Terry DeGeus?

A.   Not that I remember.

Q.   Did she indicate what she had told Terry DeGeus she said before the grand jury?

A.   As far as I can remember, she told me that she didn't tell him very much of anything.

Q.   Did she express to you at that point that she had concerns about Terry DeGeus?

A.   No, she didn't.

Q.   Did you continue to talk with her concerning when she last saw Terry DeGeus?

A.   Yes.

Q.   And in particular did you did you focus on November 5, 1993, the last day Terry DeGeus was seen?

A.   That's correct.

Q.   Did she indicate whether, in fact, she had seen Terry DeGeus that day?

A.   Yes, she stated that Terry came to the Mason City Country Club where she worked and that's where she visited with him.

543

Q.   Did she describe, first of all, what time of day or night it was that she would have met with him on November 5?

A.   I don't know that I actually wrote it down, but I was under the impression that it was after she was getting off work that

Page 10

evening.

Q. And just so you give the jury some idea, the country club is where in relation to the city of Mason City?

A. It'd be on the southwest part of the city.

Q. Did she indicate was Terry with somebody or by himself when he came to talk with her?

A. She told me that Terry was in his own car and was by himself.

Q. And what happened once she came out of the country club and saw Terry in his car?

A. At that point she stated that Terry slid over to the passenger side and that she got in on the driver's side, and that's where they sat when they had their conversation.

Q. Did that strike you as odd?

A. Yes.

Q. What did she indicate was talked about during this conversation she had with Terry DeGeus on November 5?

A. I think about testimony that she had previously made, and also she brought up the fact that she was pregnant.

Q. Did she indicate what his reaction was to the fact that she indicated she was pregnant?

544

A. I didn't write down any indication what she told me other than the fact she said that he appeared to be in one of his moods, and I didn't know what that meant.

Q. Did she describe what she meant by one of his moods?

A. No, she didn't.

Q. Did she indicate that his mood was angry or violent or something else?

A. There was nothing indicated to me that there was any anger

Page 11

going on.  It's just that they had a conversation for a while, and then they both left.

Q.    Did she indicate what ended the conversation at that point?

A.    I think she indicated to me that she was ready to leave and he said he had places to go and other people to see and they both left.

Q.    Did you question her about whether he had bags packed or anything else indicating that he was going to be leaving town?

A.    She did indicate that the car looked normal, that she didn't see any luggage or anything like that.

Q.    Did she ever indicate to you that at any point during the conversation he actually indicated he was leaving town or departing someplace?

A.    No.

Q.    During this conversation did the name Dustin Honken come up?

A.    Yes.

545

Q.    And how did it come up?

A.    I would imagine I brought it up and just for the fact that no one had seen Terry for a while and if she, Angie, knew if Dustin had seen him because they were friends, and I guess I left it with her that if she talked to Dustin could he call reference had he seen Terry anyplace since November 5.

Q.    Now, this conversation you had with Angela Johnson was over the phone; is that correct?

A.    That's correct.

Q.    Did you pick up anything from her tone of voice or anything else during her conversation that indicated to you what her mood was?

Page 12

MR. BERRIGAN: I'm going to object as speculation, opinion, and conjecture, Your Honor.

THE COURT: Overruled.

A. I never found by talking to her -- I didn't know what a mood she had before. I never visited with her before. I didn't see anything out of line the way we were talking.

Q. She wasn't crying on the phone?

A. No.

Q. Was she cooperative in talking to you?

A. Yes, she was.

Q. Or did she act angry at all?

A. No.

Q. Did she express any concern about Terry DeGeus?

546

A. Not that I remember.

Q. Did she indicate that after November 5 of 1993, that night that she spoke with Terry DeGeus in the parking lot of the country club in his car, whether she'd ever seen him again after that?

A. She never indicated to me that she had. She told me that she hadn't seen him since that night.

Q. After this conversation you had with Angela Johnson, did you, in fact, receive any phone call or have any conversation with Dustin Honken?

A. Yes, I did.

Q. And approximately when in relation to your conversation with Angela Johnson did this occur?

A. It was -- I don't know. It was some time later I received a phone call.

Q. And the person that called you, did they identify

Page 13

themselves?

A. Yes, they did.

Q. As who?

A. Dustin Honken.

Q. Had you ever talked to Dustin Honken before?

A. Yes.

Q. And did you recognize his voice?

A. As far as I was concerned, it was him.

Q. What did Dustin Honken tell you?

547

MR. BERRIGAN: I'm going to object, Your Honor. This is hearsay and deprives the defendant of her Sixth Amendment right to confront witnesses against her.

MR. WILLIAMS: Not being introduced for the truth of the matter asserted. To the extent that it is, which I don't believe it is, 801(d)(2)(E).

THE COURT: Objection's overruled. You may answer.

MR. BERRIGAN: May I have a continuing objection of this line of testimony?

THE COURT: You may.

MR. BERRIGAN: Thank you.

BY MR. WILLIAMS:

Q. What did Mr. Honken tell you he knew about Terry DeGeus?

A. That he hadn't seen him for quite some time.

Q. Did he indicate to you whether he had any idea what happened to Terry DeGeus?

A. No.

Q. Did he bring up any name of anybody that he thought might have had some connection to Terry DeGeus?

A. Yes.

Page 14

Q.   And who is that if you recall?

A.   I don't recall.

Q.   Would looking at your report refresh your recollection?

A.   Yes.

Q.   Did that refresh your recollection?

548

A.   Yes, it did.

Q.   And you were looking at a report you had done back in the time period that this all occurred?

A.   Correct.

Q.   What was the name that Dustin Honken brought up?

A.   Mike Billick.

Q.   Did you have any further conversation with Dustin Honken other than this one conversation?

A.   No, I didn't.

Q.   And what, if anything, did he tell you other than making a reference that maybe Mike Billick might know something?

A.   I think the only reference was that Mike Billick was one of Terry's friends and he might know where he's at or had seen him.

Q.   Did Dustin Honken give you any indication that he knew what happened to Terry DeGeus?

A.   No, he didn't.

Q.   And again, from talking with him, did you have any sense of what his mood was when he was talking with you?

A.   I didn't find anything unusual by talking to him.

         MR. WILLIAMS:   Thank you very much.   I have no further questions.

                          CROSS-EXAMINATION

BY MR. BERRIGAN:

Q.   Morning, Sheriff.

Page 15

A.    Good morning.

549

Q.    My name's Pat Berrigan.  I'm one of the lawyers for Miss
Johnson.  I just have a few questions.  First of all, when you
talked to Ed DeGeus on November the 10th, isn't it true that he
told you he thought that his son might be in jail?
A.    That's correct.
Q.    And he told you that he thought he might be in jail
specifically in Cedar Rapids, either in the municipal court,
municipal jail, or the Linn County Jail; isn't that true?
A.    That's correct.
Q.    Did Mr. DeGeus give you any explanation as to why his son
might be in jail in a city that's over two hours away from where
he lives?
A.    I think he was going on something to do with the witness
protection program or something.
Q.    Okay.  Did he mention to you, that is, did Mr. DeGeus
mention his son was under investigation by a federal grand jury
at that time?
A.    I don't know that Ed mentioned it.
Q.    Were you aware of it?
A.    I knew there was something going on with him, but what was
actually happening I wasn't aware of.
Q.    Was the grand jury sitting in Cedar Rapids, or did you
know?
A.    I didn't know.
Q.    Okay.  So Mr. DeGeus, Ed DeGeus, didn't connect his son to

550

Page 16

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 486 of 3592

a grand jury investigation in any fashion.

A. I don't know if he did or he didn't, but he's the one that brought up about reference being in Cedar Rapids in custody.

Q. Okay. He certainly didn't indicate to you he thought his son had been harmed or hurt in any fashion?

A. No.

Q. Or that he had been kidnapped or there was any kind of foul play at work.

A. Not at that time.

Q. And he didn't say anything to you about his son allegedly being involved in drug dealing.

A. No.

Q. Okay. Were you aware at all based on your own contact with Terry DeGeus of a reputation whether he had any connection to illegal drug activity in the area that you worked?

A. As far as I was concerned, he was.

Q. Okay. And then you had this conversation with him again on November the 22nd, 1993. This would have been 12 days later or a little over two weeks after Terry DeGeus had disappeared.

A. That's correct.

Q. And at that time you, in fact, assisted Mr. DeGeus in filing a missing persons report or missing person packet as you call them?

A. That's correct.

Q. Okay. When you talked to Angela Johnson on the phone, was

551

she at work at that time? Do you know?

A. I don't think she was at work.

Q. Was there any particular reason you talked to her on the phone as opposed to visiting her in person?

Page 17

A.    I got the phone number from the DeGeuses, and I think, you know, being as they said that was the last place she went, I thought I would just call her.  I didn't know where she lived at the time.

Q.    Based on your conversation with her, did you see any need for a follow-up visit in person?

A.    No.

Q.    Okay.  During the conversation you had with her, obviously you eventually reduced that to this report that you've been referring to; isn't that right?

A.    That's correct.

Q.    And Mr. DeGeus was interested -- according to Miss Johnson was interested in her testimony before a grand jury that took place on October the 27th, 1993.

A.    That's what Angie told me.

Q.    Had you had any personal knowledge of those proceedings going on yourself?

A.    I didn't.

Q.    Okay.  There was some discussion, though, that Miss Johnson and a fellow by the name of Aaron Ryerson had testified that day in the grand jury proceedings?

552

A.    That's correct.

Q.    And Mr. DeGeus was particularly interested in what they might have testified about.

A.    According -- that's what Angie told me, correct.

Q.    Okay.  Did you have any personal information from your knowledge of Mr. DeGeus about his relationship with Miss Johnson?

A.    No.

Page 18

Q. As a result of your working in Hancock County since -- I think you said 1976 -- were you aware of any ongoing domestic violence between Mr. DeGeus and Miss Johnson?

A. No.

Q. Okay. In any case, Miss Johnson told you she had not told Mr. DeGeus very much about what she had said with the grand jury.

A. That's correct.

Q. And apparently she didn't indicate whether she had exonerated him or implicated him in any illegal drug activities, did she?

A. Not that I know of.

Q. Okay. And then you also discussed with her a visit she had with Terry DeGeus on November the 5th.

A. That's correct.

Q. Now, that would have only been nine days after October the 27th. Does that sound about right?

553

A. Yes.

Q. Okay. And so according to Miss Johnson, she and Mr. DeGeus met on October the 27th or the day of the grand jury or the day after, and then they met again on November the 5th approximately eight or nine days later.

A. That's what Angie told me, correct.

Q. Okay. And she told you that there was a discussion about her pregnancy on November the 5th with Mr. DeGeus.

A. That's correct.

Q. Did she give you any indication whether or not she physically appeared to be pregnant at the time she had these meetings with Mr. DeGeus in late October, early November of

Page 19

1993?

A. She didn't give me any impression.

Q. And you not seeing her personally, obviously you couldn't tell one way or the other; right?

A. That's correct.

Q. She give you any indication that Mr. DeGeus was upset about this pregnancy or that he voiced any objections or any anger or anything like that?

A. No.

Q. Were you aware that Mr. DeGeus had a girlfriend at that time, lady by the name of Rhonda Hansen?

A. I know he'd been involved with a Rhonda Hansen. I don't know if it was that particular time or not.

554

Q. And what Miss Johnson told you is that this meeting she had with Mr. DeGeus was after her shift at the Mason City Country Club.

A. That's the way I understood it, yes.

Q. And that Mason City Country Club, isn't that located right along Highway 18 or Route 18?

A. It's 107 or 106. It's south of Highway 18.

Q. South of 18.

A. Right.

Q. And that's a pretty main drag there, isn't it, on that part of town?

A. I think in that area it's a four-lane.

Q. Four-lane highway.

A. I think.

Q. Okay. And the parking lot for the Mason City Country Club is out in front of the country club, isn't it, between the

Page 20

country club and the highway?

A.    That's correct.

Q.    It's the kind of thing where it's pretty out in the open, isn't it?

A.    Yes.

Q.    I mean, if you pulled in the parking lot, there aren't any trees or bushes that block people from being able to see folks in the parking lot, are there?

A.    I couldn't say.  I've drove by it.  I've never been there.

555

Q.    Okay.  Miss Johnson told you that her conversation with Mr. DeGeus ended because she got tired and he said he was going on to Mason City to see some other people.

A.    That's correct.

Q.    Okay.  This fellow, Mr. Billick, Mike Billick, the name that Dustin Honken gave you, did you pass that on to another law enforcement officer?

A.    I'm sure I did.

Q.    Didn't you, in fact, pass it on to Bill Basler over there?  Didn't he indicate he was going to follow up?

A.    I'm sure I did.

Q.    Okay.

        MR. BERRIGAN:  That's all I had.  Thank you.

        THE COURT:  Mr. Williams?

                REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q.    Mr. Gerdes, at any point during the conversation with Angela Johnson, did she admit to you that she was the one who arranged for the meeting with Terry DeGeus on November 5, 1993?

A.    No.

Page 21

Q.    Did she admit to you that she went for a ride with Terry DeGeus on November 5, 1993?

A.    No.

Q.    Did she admit to you that she met up with Dustin Honken on the night of November 5, 1993?

556

MR. BERRIGAN:   Object, Your Honor.   That assumes facts not in evidence.

THE COURT:   Overruled.

A.    No.

MR. WILLIAMS:   No further questions.

THE COURT:   Anything further, Mr. Berrigan, for this witness?

MR. BERRIGAN:   Could I have just a moment, sir?

THE COURT:   Sure.

RECROSS-EXAMINATION

BY MR. BERRIGAN:

Q.    You mentioned earlier you knew Dustin Honken or knew of him.

A.    Correct.

Q.    Did you know that he and Mr. DeGeus had a drug relationship together?

A.    Not factually, but that was sure our impression they did.

Q.    At this time.

A.    Correct.

MR. BERRIGAN:   Okay.   Thank you, sir.

THE COURT:   Mr. Williams, anything further for this witness?

MR. WILLIAMS:   No, Your Honor.   Thank you.

THE COURT:   You may step down.

Page 22

557

MR. MILLER: Yes, Your Honor. The United States calls Christi Gaubatz.

THE COURT: Okay. Everybody can take a stretch break.

CHRISTI GAUBATZ, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And would you pull up the chair so you can speak directly into the microphones, and when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Christi Marie Gaubatz, G-a-u-b-a-t-z.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good morning, Mrs. Gaubatz.

A. Good morning.

Q. Your residence, ma'am? Where do you live?

A. Is in Rockwell, Iowa.

Q. Where is Rockwell?

A. About 14 miles south of Mason City.

Q. About how long have you lived there, ma'am?

A. Nine years.

Q. And with whom do you live there?

A. My husband Scott.

Q. Are there any children still living at home?

A. Yes, my youngest daughter.

Q. And her age?

A. Fifteen.

558

Q. I take it you have other children?

Page 23

A.    I have an older daughter, 20.

Q.    And she lives out of the home already?

A.    Yes.

Q.    These two daughters, children of your current marriage?

A.    No, they are not.

Q.    They're children of prior marriages?

A.    Previous marriages.

Q.    How long have you and Mr. Gaubatz been married?

A.    Almost ten years.

Q.    And just by way of a summary of your personal background, ma'am, did you grow up in the Mason City area?

A.    I was born there.

Q.    Did you live all your life there?

A.    No, I didn't.  I lived in Nashua, Iowa.

Q.    And that's off to the east, further northeast Iowa community?

A.    Yes, it is.

Q.    Did you live in Iowa your entire life?

A.    No.  I lived in Florida for six years.

Q.    What years would those be?

A.    '82 -- I'm sorry.  '85, '85 until '92 I lived there.

Q.    What'd you do during your Florida years, ma'am?

A.    I worked at Disney World.

Q.    Did you enjoy the Orlando, Florida, area?

559

A.    No.

Q.    Ultimately you returned to Iowa City in 1992 -- excuse me, to the state of Iowa, specifically Mason City, in 1992; is that correct?

A.    Yes.

Page 24

Q. And the reason for returning?

A. Was to be closer to my mother, and I had shared custody with one of my daughters, and her father lives in Minnesota.

Q. Got back closer to family, and also visitation became much easier for your ex-husbands?

A. Yes.

Q. At that point I assume you were returning with -- well, let me ask you, describe your family unit as of 1992.

A. I was living with my second husband, Martin Cole. He's the father of my youngest daughter.

Q. You were living with Mr. Cole and your two daughters?

A. My youngest daughter, yes.

Q. Where in the Mason City area did you move to when you moved back in 1992 if you recall?

A. On 15th Street in Mason City on the north end of town.

Q. Did you participate in financially supporting your family, Mrs. Gaubatz?

A. Yes.

Q. And describe how did you that.

A. I was waitressing.

560

Q. Where?

A. At La Hacienda. It's a Mexican restaurant in Mason City.

Q. Moving forward to today, are you still participating in the financial support of your family?

A. Yes.

Q. And where are you working today?

A. I work at Good Shepherd Health Center. It's a nursing home.

Q. In Mason City?

Page 25

A.    Yes.

Q.    Full-time employment there, ma'am?

A.    Yes.

Q.    And the nature of the work that you do?

A.    I work in the laundry department right now.

Q.    Back in '92, though, however, you waitressed.

A.    Yes, I did.

Q.    Can you describe this establishment for us, please?

A.    It was a Mexican restaurant.

Q.    About how big?

A.    It sat maybe 50 people at the most.

Q.    Any idea about how many employees?

A.    Maybe ten all together.

Q.    And besides yourself, to the best of your recollection, who else worked there?

A.    A girl that I came to be friends with, Sheryl Conroy.

561

Q.    Anyone else?

A.    No.

Q.    How long did you work there if you recall?

A.    I worked there about five months, and I had also been working temporarily at a Country Kitchen in Clear Lake, Iowa. My husband at the time had been working there.

Q.    So you were working two jobs, this Mexican restaurant and also the Country Kitchen?

A.    I didn't work very long at Country Kitchen, though.

Q.    Your husband, Mr. Cole, was also working there at the time?

A.    Yes.

Q.    Was there anyone else working there with whom you became acquainted?

Page 26

A.    Angela Johnson.

Q.    That was your first acquaintance with Angela Johnson?

A.    Yes.

Q.    And by the time you met her, she was already a coworker with your husband Martin Cole.

A.    Yes.

Q.    Mrs. Gaubatz, during the period of 1992 after you met Angela Johnson, did there develop any sort of a relationship between yourself and her?  And if so, please describe.

A.    In the beginning it wasn't a very good relationship.  She had been seeing my husband at the time.

Q.    And you were not separated from Martin Cole at the time.

562

A.    No, I wasn't.

Q.    So there was a -- there was a difficulty there.

A.    Yes.

Q.    Did that ever come to a head?

A.    Yes, it did.

Q.    Did you and Mr. Cole separate and ultimately divorce?

A.    Yes, we did.

Q.    Your relationship with Angela Johnson, did it continue to be bitter or otherwise reflecting this problem between yourself and your husband?

A.    We ultimately became friends, her and I.

Q.    Despite the fact that she'd had a relationship with your then husband.

A.    It was -- yes, it was during that time.

Q.    How good of friends did you and Angela Johnson become during this period of time?

A.    We ended up being very good friends.
Page 27

Q. What about your relationship with Martin Cole? What happened to that?

A. That deteriorated.

Q. And terminated ultimately?

A. Yes, and he left the state.

Q. This was still in 1992, Mrs. Gaubatz?

A. Yes.

Q. After Martin Cole departed Iowa, did you continue to

563

maintain a friendship, a relationship of any sort, with the defendant in this case, Angela Johnson?

A. Yes, we did.

Q. Please describe that.

A. We were very close. We were like sisters. I would describe it as close as that.

Q. How much time did you spend together?

A. Quite a bit of time.

Q. If I could just back up briefly, Mrs. Gaubatz, this is a woman who at least many women in your situation would accuse of breaking up your marriage. Despite that fact, you actually developed a very close relationship between the two of you.

A. Yes, we did.

Q. And your feelings toward Angela Johnson at that period, how would you describe them?

A. At that period she was like a sister to me.

Q. And when we say that period, what period are you referring to?

A. After Martin Cole left the state.

Q. That was in '92?

A. The fall of '92. November actually he left.

Page 28

Q. Did your close friendship with Angela Johnson continue?

A. Yes, it did.

Q. Please describe that friendship not only in general terms but as to specifically how much time you and Mrs. Johnson spent

564

together and what you did with your shared time.

A. We did drugs together.

Q. Was that a major component of your relationship together?

A. I would say so.

Q. What kind of drugs, Mrs. Gaubatz?

A. Methamphetamine.

Q. And where did the two of you indulge in this?

A. Various places. Her house. I ultimately moved myself to Clear Lake. I lived across town from her, and we would also do them at my house.

Q. After you moved to Clear Lake, you would meet at either of your homes.

A. Yes.

Q. Before that I take it you lived in Mason City?

A. Yes.

Q. Approximately when did you make the move to Clear Lake, Mrs. Gaubatz?

A. I think it was about a month after Martin Cole left. It was some time in December.

Q. And at that point you had a household of how many? Yourself and?

A. And my youngest daughter.

Q. Who would at that time have been approximately how long -- how old if you recall?

A. She was about three or four.

Page 29

Q.    Your friend Angela Johnson was already residing in Clear Lake at that point?

A.    Yes.

Q.    I'm going to have to borrow one of these for a second. Mrs. Gaubatz, I'm showing you what is marked Government's Exhibit 1.  Do you recognize that, ma'am?

A.    Yes, yes, I do.

Q.    And what is Exhibit 1?

A.    This is a map of Clear Lake and also of Mason City.

Q.    Showing certain landmarks in red; is that correct?

A.    Yes.

Q.    Including the location of the Angela Johnson residence?

A.    Yes.

Q.    Thank you.

        MR. MILLER:  At this time, Your Honor, the government offers Exhibit 1.

                        *   *   *   *

        (Government Exhibit 1 was offered.)

                        *   *   *   *

        THE COURT:   Any objection?

        MR. WILLETT:  No objection, Your Honor.

        THE COURT:   Exhibit 1 is admitted.

                        *   *   *   *

        (Government Exhibit 1 was admitted.)

                        *   *   *   *

        MR. MILLER:  And with the Court's permission, I'd like

to publish it briefly.

THE COURT: You may.

BY MR. MILLER:

Q. Before I sit down, I'd like to just orient the jury on that. North would be at the top; is that correct?

A. Yes.

Q. Without amplification but hoping that I can be heard by everyone clearly, I'm pointing to an item on the left marked Number 5 19th Street South. Was that the location of Angela Johnson's residence at this time?

A. Yes, it was.

Q. Also circled in red with an arrow, Mason City Country Club, is that where that was located at the time?

A. Yes, it was.

Q. Thank you, ma'am. Tell us about your residence in Clear Lake.

A. I lived in an apartment across town. It took maybe eight to ten minutes to get there.

Q. And Angela Johnson's apartment, can you describe that for us, please?

A. Her house?

Q. Her house, I'm sorry.

A. It was a white ranch-style.

Q. Older? Newer?

567

A. It was newer, three bedrooms, full basement.

Q. Residential neighborhood --

A. Yes.

Q. Commercial, residential?

A. Yes, it was located on a cul-de-sac.

Page 31

Q. You've described as a significant activity shared between Mrs. Johnson and yourself as using methamphetamine.

A. Yes.

Q. Can you give us some idea of approximately how frequently the two of you engaged in that activity?

A. Several times a week I would say.

Q. Who was present?

A. Her and I.

Q. Just the two of you.

A. Just the two of us, yes.

Q. You've indicated this was an activity you enjoyed both at your residence and hers?

A. Yes.

Q. Who supplied this methamphetamine, Mrs. Gaubatz?

A. She did; Angela did.

Q. And did she indicate to you from whom she obtained that methamphetamine?

MR. WILLETT: Excuse me. Objection, hearsay.

MR. MILLER: 801(2)(4)(d) (sic), Your Honor, and admission by party opponent.

568

THE COURT: Objection's overruled. You may answer.

A. After she had met Dustin, I knew that's where it was coming from.

Q. And you knew that from Angela Johnson.

A. Yes.

Q. Did you make payment to her for this methamphetamine?

A. No, I did not.

Q. It was simply provided to you by her in friendship.

A. Yes.

Page 32

Q.   Several times per week.

A.   Yes.

Q.   As much time as you and your good friend Angela Johnson spent together back in this period of time, did you become well acquainted with her, Mrs. Gaubatz?

A.   I'm sorry?

Q.   Did you become close and well acquainted with Angela Johnson?

A.   Yes, I did.

Q.   And can you just give us any idea how close the relationship was between the two of you?

A.   It just grew into a best friends-type relationship.

Q.   During that period of time, she was the closest to you.

A.   Yes.

Q.   And you felt that you were very close to her as well.

A.   Yes.

569

Q.   As close friends, did you share with one another the trials and problems and challenges of your respective lives --

A.   Yes.

Q.   -- as good friends do?  Did the name Terry DeGeus come up in those conversations, Mrs. Gaubatz?

A.   Yes.

Q.   Please describe for us what you came to understand of the relationship between Terry DeGeus and his behavior toward Angela Johnson.

A.   She described it as a very volatile relationship.  She had dated him years before we had met, and he was described to me as stalker material.

Q.   What was her demeanor, her emotional response to Terry

Page 33

DeGeus to your observation?

A. Sometimes she was very afraid of him.

Q. Did Angela Johnson at any point in your relationship with her describe a man by the name of Dustin Honken?

A. Yes.

Q. Approximately when did this first arise as a subject?

A. I would say maybe January of '93 is when I first heard his name.

Q. I realize or at least I'm guessing -- correct me if I'm wrong -- you weren't keeping a dossier and a calendar documenting all of these things as they happened.

A. Correct.

570

Q. This is your recollection of the sequence and approximate times that these matters occurred back in '92 and '93; fair statement?

A. Yes.

Q. Describe for us, please, how you first heard of the existence of Dustin Honken and what, if anything, Angela Johnson shared with you about this man.

A. She had described him to me as someone that Terry DeGeus was involved with as far as the drugs. He was -- Dustin was living in Arizona at this time and apparently using Terry as a go-between, and that's how Angela was getting the drugs from Dustin.

Q. More specifically how was Angela getting the drugs from Dustin if she --

A. Through Terry DeGeus.

Q. Did she at any point indicate having made personal acquaintance with Dustin Honken?

Page 34

A.   Yes.

Q.   Describe that for us.

A.   She said that through the course of getting these drugs from Terry she was introduced to Dustin, and they started having personal meetings between Dustin and Angela without Terry.

Q.   And this was again approximately what time frame?

A.   Early '93 I believe.

Q.   Did you meet Dustin Honken at some point?

571

A.   Yes, I did.

Q.   And again, within the limits of your recollection, can you tell us approximately when that was?

A.   January or February of '93.  I don't remember exactly when.

Q.   Any -- let me ask you this.  Before you ever met the man in person, had he been described to you by Angela Johnson?

A.   She described him as being someone she was very interested in getting together with him, and she let me know in advance that he was not going to be like anyone I would think she was going to be with.

Q.   Can you elaborate?

A.   Terry DeGeus was a very muscular man.  Dustin was the complete opposite of that.

Q.   So Angela Johnson indicated to you that his appearance or character might be a change.

A.   Yes.

Q.   And did you find it so when you ultimately met --

A.   Yes.

Q.   -- Mr. Honken?

A.   Yes, I did.

Q.   Describe him for us, please.

Page 35

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 505 of 3592

A.    He looked like a nerd to me.  That's -- like nothing I would expect her to be with, and I didn't like him.  He didn't like me.

Q.    Physically how did he appear?

572

A.    Just like she described.  Just -- I can't say anything other than a nerd or a geek.

Q.    And out of character for the sort of man that Angela Johnson would ordinarily associate with.

A.    Very out of character, yes.

Q.    Do you recall the occasion of meeting Dustin Honken?

A.    I don't remember.  Just she wanted me to meet him, and we did, and I expressed my shock that she would be interested in him, and I said I did not get a very good first impression, and I could tell he did not get a good first impression of me so . . .

Q.    Despite that fact, did your paths continue to cross through Angela Johnson?

A.    Yes.

Q.    Under what circumstances would you see or meet or happen across Mr. Honken's paths the following period of time?

A.    He would be over at her house, over at her residence.  He was spending more time in Iowa with her.

Q.    He was from Arizona?

A.    Yes.

Q.    But spending more time in Iowa.

A.    I believe he was originally from the Britt area.

Q.    Did Arizona simply come out of the picture, or did he continue to frequent both places?

A.    I believe he continued to go back there.

Q.    And to your knowledge did he make frequent trips between Arizona and the state of Iowa?

A.    To my knowledge, yes, he did.

Q.    Through Dustin Honken did you make the acquaintance of any other individuals during this time frame, Miss Gaubatz?

A.    Yes, he had a very good friend, Tim Cutkomp.

Q.    Can you describe Tim Cutkomp for us?

A.    He was to me the opposite of Dustin.  He was a very nice -- nice man.

Q.    Can you describe for us the relationship between Dustin Honken and Tim Cutkomp to your observation?

A.    They were very close friends.

Q.    As between the two, was there one who showed more initiative or leadership than the other?

A.    Dustin very much so.

Q.    Into the spring of 1993, did it at any time come to your attention that Mr. Honken suddenly had serious legal difficulties?

A.    Angela described he was in difficulty with -- as far as being ratted out by somebody.

Q.    He was arrested.

A.    He was arrested, yes.

Q.    And you learned about this through whom?

A.    Through Angela.

Q.    Describe how that happened.  Was it in person or over the

phone if you recall?

A.    She had called me on the phone very upset.

Page 37

Q. Describe her and the conversation that you had to the best of your recollection.

A. She said to me that they had arrested him at a motel in Mason City. Apparently he had been staying there. And she was crying, and she didn't know what to do, and all I could tell her to do was be calm, it would be over soon I'm sure.

Q. She was very emotionally affected by his arrest.

A. Yes.

Q. Following Mr. Honken's arrest, did he remain behind bars?

A. No, he was released.

Q. Did you have any contact with Mr. Honken in the weeks following his pretrial release?

A. Through Angela, yes.

Q. Can you describe that for us, please, how often you saw him, where?

A. At her house. We didn't really have conversations between us, between Dustin and myself. It was more with Angela and myself.

Q. What you knew of Dustin's activities came to you largely through Angela?

A. Yes.

Q. Let me ask you during this period in the spring of 1993, did you take any actions or do any favors for anyone in

575

connection with Mr. Honken's wishes and business?

MR. WILLETT: Excuse me, Your Honor. To the extent the question is vague --

MR. MILLER: I can rephrase.

MR. WILLETT: -- I would object.

THE COURT: Well, if the witness can understand it,
Page 38

she can answer.

BY MR. MILLER:

Q.    Did you understand my very poorly and generally worded question?

A.    Yes.  He had wanted Tim Cutkomp to go make a trip to Arizona for him, and he wanted me to go along with.

Q.    Dustin Honken made that request?

A.    Angela Johnson did.

Q.    She forwarded it for --

A.    Yes.

Q.    -- for Dustin Honken?

A.    Yes.

Q.    And what specifically were you requested to do?

A.    We were to go to -- I believe it was a packaging company. They had parcels come in, and he wanted Tim to drive me there, and I was to go in and pick up a package which I ended up not having the authorization to do, so they didn't give it to me.

Q.    And you got just a little bit ahead of me, but you're doing fine.  I just wanted to talk about that subject matter.  This

576

was in the weeks following his arrest in spring of '93.

A.    Yes.

Q.    Through Mrs. Johnson, Dustin Honken asked you to make this trip to Arizona with Tim Cutkomp.

A.    Yes.

Q.    For the purpose of you picking some package up.

A.    Yes.

Q.    Were you told what the contents of the package consisted?

A.    No, I was not.

Q.    You were simply asked to pick something up in Arizona.
Page 39

A.   Right, yes.

Q.   You agreed to do this?

A.   Yes, I did.

Q.   And then just go ahead if you would, please, describe for us the trip that you and Mr. Tim Cutkomp made to Arizona that spring of '93.

A.   We drove down in his car, and we had checked into a motel, and we were -- as soon as we got to the motel, we were to go to the -- this parcel pick-up, and we did that same day.

Q.   And I think you've already described that because of your identification you were unable to obtain possession of the parcel?

A.   Yes.

Q.   What, if anything, was done further in connection with this errand?

☿

577

A.   We went back to the motel we had stayed in, and I left the room.  He was on the phone talking to Dustin about what had happened, and I left the room.

Q.   You didn't need to know.

A.   Correct.

Q.   You understood, however, that Dustin Honken stood accused of dealing drugs out of Arizona at that time.

A.   Yes.

Q.   And you made this trip with Mr. Cutkomp as a favor to Mrs. Johnson?

A.   Yes.

Q.   The two of you were still close.

A.   Yes, very.

Q.   And continued to be close through the summer of 1993?

Page 40

A.    Yes.

Q.    How often did you see one another?

A.    Almost every day.

Q.    Can you describe what your activities were through the summer of '93?

A.    We were still using meth between us and just being good friends.

Q.    Using several times a week?

A.    Yes.

Q.    It was not meth that you provided.

A.    No.

578

Q.    Meth that Angela Johnson provided to you?

A.    Right.

Q.    And again, did she indicate where she obtained that?

A.    It was through Dustin, but she was still at that point having not a relationship with Terry, but he was still in the picture.  He wouldn't -- he wouldn't leave the picture.

Q.    Let's talk about this briefly.  We're into spring and early summer of 1993.  Where was Dustin Honken living at that time if you recall?

A.    I think he was staying in Britt sometimes.  He stayed several places, not just one place all the time.

Q.    To your knowledge what places was he staying that period of time?

A.    I believe he was staying at his mother's house.  He would sometimes stay at Angela's house, and he also had a friend in Mason City he would stay with.

Q.    And who was that?

A.    Kathy Rick.

Page 41

Q. Were you aware of Kathy Rick at that time?

A. I believe it might have been May or June that I had heard her name for the first time.

Q. You became aware of that relationship.

A. Correct.

Q. I assume that information was shared between yourself and Angela Johnson.

579

A. Yes.

Q. And her reaction to that relationship, if any, was what?

A. Not very good. She found out that Dustin was seeing her at the same time as he was seeing her, so no, she did not like that.

Q. Did she terminate her relationship with Dustin Honken?

A. No.

Q. They continued to see each other as well?

A. Yes.

Q. And, of course, you've already described that Angela Johnson continued to spend a lot of time with you.

A. Yes.

Q. Were you still living in Clear Lake at this time?

A. Yes.

Q. And Angela Johnson still at that house on South 19th Street in Clear Lake?

A. Yes.

Q. In addition to using methamphetamine together as a pair of girlfriends, did you do any other things together or have any other . . .

A. We would babysit for each other while we were at our jobs.

Q. Did you -- either of you have free access to the other's

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 512 of 3592

residence?

A.   We both had a key to each other's place of residence.

Q.   Tell me about the babysitting a little bit.  You had living

580

with you at that time whom?

A.   My youngest daughter.

Q.   And she was about how old?

A.   Four.

Q.   Describe the members of Angela Johnson's household at this time.

A.   She had a daughter living with her, Alyssa.

Q.   And Alyssa's age in '93 if you recall was approximately what?

A.   I think she was nine or ten.

Q.   You mentioned babysitting.  Was that mutual?

A.   Yes, it was until my youngest daughter, the four-year-old, she refused to go over to Angela's house, so I would have to have my mother watch her.

Q.   How about yourself babysitting for Angela's daughter Alyssa?  Did that continue?

A.   Yes, it did.

Q.   And through the spring and early summer of 1993, how often, if at all, do you recall babysitting for Mrs. Johnson?

A.   Once every couple of weeks I think.

Q.   Did there become a specific purpose for your babysitting duties at Mrs. Johnson's residence in the summer of 1993?

A.   Other than her working?

Q.   Yes.

A.   Yes.

581

Page 43

Q. Ordinarily --

THE COURT: Mr. Miller, could I just interrupt and give the jury a stretch break?

MR. MILLER: Please.

THE COURT: Okay. Thank you.

MR. MILLER: And, Mrs. Gaubatz, you're free to do the same. We're going to stretch our legs here a little bit. You're not required to, but you certainly can if you wish.

THE COURT: Please be seated.

Mr. Miller, thank you.

MR. MILLER: Thank you, Your Honor.

BY MR. MILLER:

Q. Mrs. Gaubatz, you indicated that in addition to babysitting during Angela Johnson's work hours there also became a second purpose for babysitting. Would you describe that for us, please.

A. She and Dustin were going into Mason City to look for Greg Nicholson who was -- I had never met him, but he was an associate of Dustin's.

Q. Have you any idea how many occasions you babysat for Angela Johnson's daughter Alyssa when Dustin Honken and Angela Johnson were going out looking for Greg Nicholson?

A. About four or five for that reason.

Q. And how did you become aware that that was the reason?

A. She told me it was the reason.

582

Q. That she and Dustin Honken were looking for Greg Nicholson.

A. Yes.

Page 44

Q. Did she describe any failure or success in their efforts?

A. She described it as failing every time they had gone out because they could never find him alone.

Q. They didn't indicate not finding him but unable to find him alone.

A. Right.

Q. Did you notice them taking anything in particular with them on these trips to hunt for Greg Nicholson?

A. She had asked to use my car a couple of times to do this.

Q. Did she describe for you any particular reason she'd want to use your car?

A. So they wouldn't be seen in hers.

Q. So that she and Dustin Honken would not be seen?

A. Yes.

Q. By whom?

A. By --

MR. WILLETT: Excuse me, Your Honor. I object to the extent it calls for speculation from this witness.

MR. MILLER: I'll withdraw and ask another one.

THE COURT: Okay.

BY MR. MILLER:

Q. Did she indicate to you who it was she was trying to avoid being noticed by?

583

A. By Greg Nicholson.

Q. Aside from using your car, did they use any other equipment to your observation?

A. No.

Q. Mrs. Gaubatz, during the early summer of 1993, did you ever notice any video camera equipment in your friend Angela

Page 45

Johnson's residence?

A.   Yes.   She did have a video camera.

Q.   Did she ever describe it for you as to how she came about it and why she had it?

A.   It had come from Dustin who had originally got it from Kathy Rick, and she said the reason that she had it was that's why they wanted to find Greg Nicholson was to have him on tape exonerating Dustin of the charges he was up against.

Q.   Mrs. Gaubatz, you've indicated that on a number of occasions you did this babysitting so that Dustin Honken and Angela Johnson could go looking for Greg Nicholson.

A.   Yes.

Q.   Can you give us -- and, again, up to and excluding the final such occasion -- some idea of approximate hours of the day or night that they did these trips?

A.   One particular evening I had gone over, and I think it was about 4 or 4:30 in the afternoon.

Q.   I'm going to interrupt you, and I apologize.   I'm not talking about the last such occasion.   I'm talking about the

584

several occasions beforehand when you babysat for her.

A.   Okay.

Q.   Was there any particular pattern?   And if not, just that's fine too.   But if there was, I'm curious as to what approximate hours you would babysit on these occasions when they went looking for Mr. Nicholson.

A.   It was usually about four, between 4 and 5 I would say, and they would always be back between, I would say, 11 and 11:30. They were never usually late.

Q.   So these were evening trips.

Page 46

A.   Yes, they were.

Q.   Generally home by midnight.

A.   Yes.

Q.   Now I'd like to ask you about the last such occasion.  Do you recall the last occasion in which you babysat for Alyssa, Angela Johnson's daughter, when the purpose of the babysitting was so that Honken and Mrs. Johnson could go looking for Greg Nicholson?

A.   Yes, I do.  They left at the usual between 4 and 4:30.

Q.   Okay.  And this again was still in the summer of 1993?

A.   Yes, it was, yes.

Q.   And before they left, would you describe for us the best you can any conversations or activities that occurred between you and Angela Johnson and Dustin Honken before they left that evening.

585

A.   Nothing in particular, just they were going to try again.

Q.   You went over to their place to babysit.

A.   Yes.

Q.   You had a car?

A.   Yes.

Q.   Can you describe it for us?

A.   It was a 1985 Toyota Tercel.

Q.   Did they always borrow your car when they went on these trips looking for Mr. Nicholson?

A.   I would say the majority of the time, yes.

Q.   And did they on this occasion?

A.   Yes.

Q.   And did Mrs. Johnson or Mr. Honken, either one, express the purpose for the request to use your vehicle?

Page 47

A.    To go look for Greg again.

Q.    And again because that would help avoid being noticed?

A.    Correct.

Q.    How about the video camera?  Did you happen to notice whether or not they had the video camera with them on this occasion as well if you noticed?

A.    I don't recall.

Q.    That's fine.  I just want to know what you do recall. That's fine.  This has been some years ago.   This last babysitting chore when Johnson and Honken were looking for Greg Nicholson began at about what hour of the day?

586

A.    It ended?

Q.    It began at about what hour?

A.    About 4, 4:30 in the afternoon.

Q.    Were they home at the usual hour, 11:00 or 11:30?

A.    No, they weren't.

Q.    Did you continue babysitting nevertheless beyond the usual hour?

A.    Yes.

Q.    Go ahead and describe if you would what transpired into the evening and night.

A.    I ended up falling asleep on the couch because they were not home by midnight, and I fell asleep and was woke up, oh, about 5, 5 or so in the morning.

Q.    What woke you?

A.    My car pulling into the -- her driveway.

Q.    Where were you at that time?

A.    On the couch.

Q.    About what hour of the morning was it that you woke?

Page 48

A.    It was about 5 a.m.

Q.    And how do you place that hour?

A.    I'm sorry?

Q.    How -- did you look at your watch?  Did you notice in any fashion what hour of the morning or day it was?

A.    She had a clock on top of her entertainment center, above it.

587

Q.    And in mid summer in relation to dawn, was it approximately 5 a.m. as well?

A.    Yes.

Q.    Not yet quite dawn?

A.    Right.

Q.    What happened after you awoke hearing your car drive up?

A.    I just stayed on the couch and pretended to be asleep when they walked in.

Q.    Go ahead and describe for the jury any observations you made after Dustin Honken and Angela Johnson entered her house.

A.    They -- I could hear whispering when they shut the front door, and they continued -- they took their shoes off and continued down the hallway, and they both went into the bathroom.

Q.    Together?

A.    Yes.

Q.    The bathroom, is that on the same floor as the living room couch where you were lying?

A.    Yes.

Q.    And was it visible from where you were lying?

A.    Yes.

Q.    In fact, the entire route from the front door to the

Page 49

bathroom, was that visible from where you were lying?

A.     Yes, it was.

Q.     And did you observe their actions during that period?

588

A.     Yes.   They both walked down the hallway to the bathroom, and when they shut the door, I could hear the water in the shower turn on.

Q.     Aside from the whispering between Dustin Honken and Angela Johnson, did you observe any other interaction between them, any gestures or motions or anything whatsoever?

A.     No.

Q.     Approximately how long, if you recall, did you hear that shower running?

A.     It was just a few minutes.   I decided to get up and leave.

Q.     Go ahead and please continue.   Tell us what your activities were that morning.

A.     The shower was still running when I put my shoes on and walked out of the house.   And I got in my car, and I went to my own apartment.

Q.     And did you ever have a request to babysit for them looking for Greg Nicholson thereafter?

A.     Not for that particular reason.

Q.     Just the usual babysitting for work.

A.     Yes.

Q.     Never again asked to babysit while they went looking for Greg Nicholson.

A.     No, no.

Q.     Mrs. Gaubatz, I'd like to move ahead to the fall of 1993. Were you still spending considerable time with your best friend

589

Page 50

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 520 of 3592

Angela Johnson during those periods, those months?

A. Yes.

Q. Please describe if you would her relationship with Terry DeGeus as it changed, if at all, during those months late summer and into the fall of '93.

A. Her relationship with Terry grew worse.

Q. Specifically how?

A. He was upset because of her relationship with Dustin, and he didn't like it at all, and he would get very upset, and he would call me and express his -- his feelings of their relationship, hers and Dustin's.

Q. Well, now he was Angela Johnson's ex-boyfriend at this point; is that correct?

A. Yes, he was.

Q. So why was he making these comments or expressions if you know?

A. Because he just I guess didn't want to let her go.

Q. He was possessive toward her.

A. Yes.

Q. Even though she'd made it clear that she was with a different man now.

A. Yes.

Q. What was your friend Angela Johnson's physical condition by this time?

A. She was pregnant.

590

Q. By whom?

A. Dustin Honken.

Q. She shared that with you, I assume.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 521 of 3592

A.    Yes.

Q.    Expecting when if you knew?

A.    February I believe.

Q.    Did Terry DeGeus's possessiveness toward Angela Johnson cause Angela Johnson any concern to your observation?

A.    Yes, it did.

Q.    Before I get to that, when we're talking about the fall of '93, were there ever any occasions in which you crossed paths with Terry DeGeus personally just the two of you?

A.    Yes.

Q.    Can you give us any idea about when this was in relationship to his disappearance?

A.    The last time I actually saw him was maybe September or October of '93.

Q.    What were the circumstances?

A.    He was -- there's a road that connects Mason City to Clear Lake, and I was going one way, and he was going the other, and he saw me, and he was very upset.  I had pulled my car over, and he got in with me, and he was nervous, scared.

Q.    How did he express his nervousness and fear at that time?

A.    He had taken a piece of scratch paper and wrote Greg Nicholson's name on it and said did I ever meet this guy, and I

591

said no, and he said, Well, he's gone; he's gone, and I'm next.

Q.    And Mr. DeGeus's demeanor at that point?

A.    Very upset.

Q.    Worried?

A.    Yes.

Q.    That fall of 1993, was there ever any occasion when you saw Mr. DeGeus in the presence of the defendant in this case, Angela

Page 52

Johnson?

A.   Yes.

Q.   And to the best of your recollection, when was this in relation to his sudden disappearance?

A.   Probably just a few weeks before and --

Q.   How did -- I apologize.  How did this occur?

A.   She had set up a meeting with him.  He wanted to talk to her, and she said, Well, I'll talk to you at a public place, and she had relayed to me that she was afraid he would find out she was pregnant, and she didn't want that to happen.  He would have exploded.  So they -- she wanted me to ride along with her to this restaurant, and I did, and I stayed in the car while the two of them went inside.

Q.   Angela Johnson was fearful of Terry DeGeus at this point anyway.

A.   Yes.

Q.   But the fact that she was pregnant with another man's child heightened that fear.

592

A.   Yes, it did.

Q.   Her fear about Terry DeGeus's reaction.

A.   Yes.

Q.   So you rode along with her to this meeting.

A.   Yes, I did.

Q.   Where was this?

A.   At a Kentucky Fried Chicken in Clear Lake.

Q.   Where were you?

A.   In the car in the parking lot.

Q.   And what did you observe?

A.   I observed him flailing his arms in the restaurant and

Page 53

looking to me to be very upset.

Q. Now, you couldn't hear their conversation.

A. No.

Q. Who was engaged in this conversation?

A. The two of them, Angela and Terry.

Q. And you could see them through the glass window at the KFC?

A. Yes, yes, I could.

Q. Terry DeGeus flailing his arms.

A. Yes.

Q. Displaying anger?

A. Yes.

Q. Any reaction from Angela Johnson to your observation?

A. She left the restaurant and got in the car, and she was visibly shaken.

593

Q. Did she make any comments to you at that time, Miss Gaubatz?

        MR. WILLETT:  Excuse me, Your Honor.  Objection, hearsay.

        THE COURT:  Overruled.  You may answer.

A. She didn't exactly say what their conversation was about, only to say that he couldn't be around anymore.

Q. Meaning Terry DeGeus can't be around anymore.

A. Yes.

Q. And how did you take that comment?

        MR. WILLETT:  Excuse me, Your Honor.  To the extent it calls for speculation, we object.

        THE COURT:  Overruled.  You may answer.

A. I guess honestly I don't know what I thought that meant at the time.

Page 54

Q. What was Angela Johnson's mood and demeanor at the time that she made that comment "he can't be around anymore"?

A. She was scared.

Q. Emotional?

A. She wasn't crying. She was just visibly scared.

Q. Mrs. Gaubatz, people frequently make threats in anger or upset that we don't always take seriously. Was there anything in the nature of a threat in the comment that you heard from Angela Johnson that Terry DeGeus can't be around anymore?

MR. WILLETT: Excuse me, Your Honor. To the extent

594

that this question is leading, the defense objects.

THE COURT: Sus --

MR. WILLETT: And I apologize if I may. It may also be a misstatement of the record when Mr. Miller refers to this as threats. And we would object on that basis also.

THE COURT: I'll sustain the objection.

BY MR. MILLER:

Q. Mrs. Gaubatz, approximately how long after that meeting that you observed between Angela Johnson and Terry DeGeus did it become a matter of knowledge in your community that Terry DeGeus had suddenly disappeared?

A. I think a matter of just a few weeks.

Q. Later into the fall and ultimately into the winter of 1993, 1994, did you continue to maintain a close personal relationship with Angela Johnson?

A. Yes.

THE COURT: Mr. Miller, would now be a good time for our morning recess?

MR. MILLER: Certainly, Your Honor.

Page 55

THE COURT: Okay. Could I see the lawyers just for a small housekeeping matter up at a sidebar before I let the jury go for their recess?

(At sidebar on the record.)

THE COURT: We got this note. We got this note when the jury came in. I'm inclined to tell them nope because if we

595

start making an adjustment for this we're going to adjust for every haircut and every -- and I'll just give them notice now. He can call the city and have them reschedule the meeting to Friday or to 4:35 today.

MR. MILLER: It's a matter of trial management as far as I'm concerned, and I think you're certainly well within your --

THE COURT: I just think if I do it this time we'll just get a flood of them, so I'm not going to do it. Any objection?

MR. WILLETT: No objection, Your Honor.

THE COURT: Okay. Thanks.

(The sidebar was concluded.)

THE COURT: Okay. It's almost ten o'clock. We'll take a recess for 25 minutes. Please remember my cautionary instruction about not discussing the case and keeping an open mind.

I did receive a note from a juror, and they wanted to know if we could get out at four o'clock today to accommodate a meeting that this particular juror has, and I regret to tell you the answer is no. I would ask -- if I start doing it, then we'll be doing it every day for everybody, and I'm just not going to do it. I'm sure the city will reschedule it for you.

Page 56

JUROR NUMBER 55: No, they will not.

THE COURT: They wouldn't reschedule it for 30

596

minutes?

JUROR NUMBER 55: No, sir.

THE COURT: Did you try?

JUROR NUMBER 55: Yes, sir.

THE COURT: They wouldn't reschedule it to a Friday?

JUROR NUMBER 55: No, sir.

THE COURT: Well, you know, it just inconveniences everybody in the whole process.

JUROR NUMBER 55: Yeah, I know. I just asked.

THE COURT: Well, okay. Yeah, I'm not mad at you for asking. There's no harm in asking. Can we pass the microphone down to the juror? Have you tried everything you can?

JUROR NUMBER 55: I've been fighting with the city for ten years.

THE COURT: Okay. I don't want to get into the whole history of it.

JUROR NUMBER 55: I know that. I'm just saying I been -- and I finally got them to a point where they're admitting that I am right, but they will not -- we're trying to end it and get it all cleared out.

THE COURT: And they -- and did you tell them you were a juror in a case?

JUROR NUMBER 55: Yes, and they says the only thing that I can do is come in late. That's all they said.

THE COURT: Who's at this meeting?

597

Page 57

JUROR NUMBER 55: It'd be all the city council.

THE COURT: Oh, I see. It's a city council meeting.

JUROR NUMBER 55: Yes, sir.

THE COURT: And they weren't willing to put you towards the end of the meeting?

JUROR NUMBER 55: It's how they set up their agenda.

THE COURT: Well, I'm going to call over there on the break. We'll see if we can get it moved. If not, I'll reconsider letting you go; okay?

JUROR NUMBER 55: All right. Thanks.

THE COURT: Okay. Because I know you're making a big sacrifice to be on this jury.

JUROR NUMBER 55: Right.

THE COURT: And I didn't realize you already tried --

JUROR NUMBER 55: Right. I had tried. That's why I asked.

THE COURT: Sometimes I have some success. Sometimes I don't. I'll be glad -- you don't have any objection to me trying on your behalf.

JUROR NUMBER 55: No, no.

THE COURT: Okay.

JUROR NUMBER 55: And like I said, it's something that I couldn't -- that if you can do it, fine. If you can't, that's fine also.

THE COURT: But it's pretty important that you be at

598


this meeting.

JUROR NUMBER 55: Yeah.

THE COURT: Okay. Okay. Thank you so much. We'll

Page 58

see what we can do.  Thank you.  We'll be in recess.

(The jury exited the courtroom.)

(Recess at 10:02 a.m.)

THE COURT:  Ready to have the jury brought in?

MR. MILLER:  Yes, Your Honor.

MR. WILLETT:  Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT:  Thank you.  Please be seated.

Juror 55, I did personally speak with the city attorney.  Here's what he said.  He said he doubts that they'll get to it -- it's agenda item number 12 -- that he doubts if they'll get to it before 4:30.  He said it's very routine, it should be approved.  He said you don't need to be there.

Now, on the other hand, I'm not sure that's accurate or right, so what we'll do is we'll try and break a little early so you can get over there a little bit before 4:30, and you should be -- it should be okay.  Is that okay?

JUROR NUMBER 55:  Thank you.

THE COURT:  Sure.  My pleasure.  Thank you.

Mr. Miller?

MR. MILLER:  Thank you, Your Honor.

BY MR. MILLER:

599

Q.    Mrs. Gaubatz, before the break we were visiting about the weeks following the sudden disappearance of Terry DeGeus. During that period of time, did you continue your close relationship with the defendant in this case, Angela Johnson?

A.    Yes, I did.

Q.    You indicated to us earlier that you and Mrs. Johnson shared access to one another's residences by exchanging keys.

Page 59

Was that still the case in late autumn of 1993?

A.    Yes, it was.

Q.    Was there ever an occasion where that created a problem for you during this period of time, Mrs. Gaubatz?

A.    Yes, it did.  I was cleaning out an upstairs closet and found a cosmetics bag that I had seen over at Angela's house, and it was in my closet.

Q.    Angela's cosmetics bag in your closet.

A.    Yes.

Q.    And again, this was following the disappearance of Terry DeGeus.

A.    Yes.

Q.    What did you do when you observed your friend's bag in that closet?

A.    I took it out, and I opened it up because when I went to take it out of the closet, it was heavy, so I opened it up to see what was inside.

Q.    Describe what you found inside Angela Johnson's cosmetics

600

bag.

A.    I found a gun, a big black gun.

Q.    I want you to describe that gun, but before doing so, would you please describe that cosmetics bag?

A.    It was, I would say, about a foot long.  It was a hard case.  The top flipped open, and it was -- it was a pretty large over-the-shoulder bag.

Q.    Was it the sort of cosmetics bag a lady might use for personal use or rather for retail demonstration?

A.    Oh, no, for demonstration.

Q.    Such as a cosmetic salesperson might.

Page 60

A.    Yes.

Q.    Please describe the weapon you found inside that bag.

A.    It was a gun that had -- it had a silencer on it, and I knew it was from watching different TV programs.  I knew it was a silencer on the end of it.  And it was very big.  And I could hold the gun with two hands.  It had -- it was missing a clip on it.  There was a clip that went in the handle, and that was not on there, but it was a rather large gun.

Q.    What was your reaction on discovery of this gun inside that cosmetics bag?

A.    My initial reaction was anger, why it was in my -- the closet of my apartment.

Q.    An apartment you shared with your child.

A.    Yes.

601

Q.    Her age at the time?

A.    What age?

Q.    Yeah, your --

A.    She was about four.

Q.    After the discovery of this weapon, did you do anything, take any steps with regard to that weapon?

A.    I called Angela up and said, I found something; you have your cosmetics bag over here.  And she knew immediately what I must have been talking about.  She said she would be right over and for me not to worry, and she was over there in a matter of minutes.

Q.    She immediately came over.

A.    Yes.

Q.    What happened then?

A.    She told me to calm down and that Dustin would take care of

it.

Q.   Mrs. Gaubatz, I'm showing you two documents which are photographs marked Government's Exhibits 44A and 44B.  Can you tell me if you recognize the general subject matter of those two photographs?

A.   Yes, I do.

Q.   And what do these photographs show?

A.   It shows the style of gun that was in the bag except it was missing that clip.

Q.   Okay.  Other than missing the clip and I believe you

602

indicated also --

A.   It had a silencer screwed on the end of it.

Q.   Aside from those two explainable differences, the gun that you observed in your bag that day looks like the gun shown in these two photographs?

A.   Yes, it does.

        MR. MILLER:  Government offers Exhibits 44A and 44B.

                        *   *   *   *

        (Government Exhibits 44A and 44B were offered.)

                        *   *   *   *

        THE COURT:  Any objection?

        MR. WILLETT:  Your Honor, may I be allowed to voir dire Mrs. Gaubatz for just a moment in order to prepare an objection?

        THE COURT:  You may.

                    VOIR DIRE EXAMINATION

BY MR. WILLETT:

Q.   Mrs. Gaubatz, good morning.  My name is Al Willett.

A.   Good morning.

Page 62

Q.    I'm one of the attorneys defending Angela Johnson.  Your testimony is only that the item that you see portrayed in Government Exhibit 44A and 44B is similar to what you saw in your home on the day that Mr. Miller was examining you; correct?

A.    Yes, that's the style.

Q.    Okay.  It's certainly not your testimony that this is the

603

weapon that you saw in your home on the day that Mr. Miller's questioning you about; correct?

A.    Correct.

        MR. WILLETT:  Your Honor, if it please the Court, the defense would object based on Federal Rule of Evidence 402 and Federal Rule of Evidence 403.  Thank you.

        THE COURT:  Thank you.  Objection's overruled. Government's Exhibits 44A and 44B are admitted.

                        *   *   *   *

        (Government Exhibits 44A and 44B were admitted.)

                        *   *   *   *

                CONTINUED DIRECT EXAMINATION

BY MR. MILLER:

Q.    And just so we are again very clear, what you saw in the way of a gun is a gun that looked like the gun shown in those photographs.  You can't say it's the same gun obviously.

A.    Yes.

        MR. MILLER:  With the Court's permission, I'd like to show the jury these at this time and give the witness an opportunity to describe those and what the appearance was in relation to what the photographs show.

        THE COURT:  You may.

BY MR. MILLER:

Page 63

Q. Mrs. Gaubatz, on the screen before you is also on the screen behind you, Exhibit 44A, and you also have been shown how

604

to use a marker. Using that marker, I'd like you to go ahead and please describe for the jury what they see in Exhibit 44A and in what respects, if any, it differed at all from the gun that you observed in Angela Johnson's cosmetics bag discovered in your closet.

A. Okay. This was not --

Q. And speak right into the microphone, please.

A. This part was not there, and there was a silencer on the end -- on the end of the gun.

Q. With those two exceptions, what the jury sees in Exhibit 44A looks like the gun you found in that cosmetics bag.

A. Yes.

Q. Thank you, ma'am. Angela Johnson took that gun away?

A. Yes, she did.

Q. Saying that Dustin Honken would take care of it.

A. Yes.

Q. Did she ever thereafterwards indicate to you that he had done so if you recall?

A. I don't recall.

Q. Very good. Mrs. Gaubatz, late 1993 and into the winter, early months of 1994, did you continue to maintain a close personal relationship with your best friend Angela Johnson?

A. Yes.

Q. She was pregnant with Dustin Honken's child?

A. Yes, she was.

605

Page 64

Q.   And ultimately delivered approximately when if you know?

A.   Marvea was born on Valentine's Day of '94.

Q.   During the months leading up to that, you've already indicated some knowledge that she was being two-timed by her boyfriend Dustin Honken.

A.   Yes.

Q.   Was this the source of any concern, anxiety, or emotion?

A.   A lot of emotion for her, yes.

Q.   And are these emotions that were shared between you as a close personal friend?

A.   Yes.

Q.   You and Angela Johnson had on occasion conversations in the nature of closest friends, sisters, that sort of thing?

A.   Yes.

Q.   Did you ever during this period of time, winter of '93 and '94, ever have any conversations in which the sudden disappearances of Greg Nicholson and the members of the Duncan family was discussed?

A.   Yes.

Q.   And before we get into the substance of that conversation, I want to know for background how did this conversation have to come about as -- how did it come about that you even met that day if you can recall?

A.   She was upset because Dustin would not end his relationship with Kathy Rick, and she -- she was having a hard time dealing

606

with that.

Q.   This conversation occurred where, ma'am?

A.   At my house.

Q.   Are we talking -- and again, I want to be sure I visit with
Page 65

you about a conversation where there was any discussion about the disappearance of the Duncan family and Mr. Nicholson.

A.   It was during one of the occasions that she was upset about the Kathy Rick situation that she had something to get off of her chest.

Q.   She told you that?

A.   Yes.

Q.   When did she -- what were the circumstances when she first told you that she had something she wanted to get off her chest? Were you together? Were you apart? What was the situation?

A.   We were not together. I believe she called me on the phone and wanted to get together.

Q.   To get something off her chest.

A.   Yes.

Q.   And did you do so?

A.   Yes.

Q.   Where did you get together?

A.   I believe she had come over to my apartment.

Q.   This was winter of '93, '94?

A.   '94.

Q.   It was into '94.

607

A.   Yes.

Q.   Who was present during this conversation, Mrs. Gaubatz?

A.   Myself and Angela.

Q.   Would you please go ahead and relate to the jury what transpired in this conversation between Angela Johnson and yourself.

A.   She had brought up the time that her and Dustin had used my car to go look for Greg, and it was the last time that they'd

Page 66

used the car.

Q.    She reminded you of that occasion?

A.    Yes.

Q.    Go ahead.

A.    And she said that they did end up finding him that night and couldn't once again find him alone, so they just went ahead and were going to confront him with whoever he was with, and I had never heard Lori Duncan's name before this, and she said that Greg had been staying at this woman's house.

And she said that she had taken the cosmetics bag that night, and they went -- her and Dustin had gone to the house, to Lori Duncan's house.  And she described how she knocked on the door, and when Lori answered it, she said that she was supposed to be giving a demonstration but she couldn't find the address, didn't have the correct address, could she please use her -- look at her phone book.  And Lori let Angela in, and she said Dustin had followed her in.

608

Q.    So Angela Johnson described to you how she, Angela Johnson, managed to effect entrance to the Duncan home.

A.    Yes, yes.

Q.    With Honken following her inside.  Please continue.  Did she describe further what happened that evening?

A.    She described that it was very chaotic in the house.  The two -- I believe it was Lori's daughters were also there, and she had taken Lori and the girls upstairs, and Dustin had stayed -- I believe it was the living room with Greg, and the purpose was to make a videotape which she said that they did, and Greg had described on the videotape how Dustin was innocent and that was -- Angela had told me that was originally their

Page 67

purpose but things just had gotten out of hand.

They -- she went upstairs with the girls and had -- had them pack some things so -- to make it look like they were going to be gone for a few days.  I think the girls were led to believe that's why they were packing.

Q.   Led to believe by Angela Johnson.

A.   Yes.

Q.   Go ahead.

A.   And they -- I don't know what happened in between that --

Q.   I understand.  Just tell us what you do recall what Angela Johnson told you.

A.   They all left the house together.  All of them, Lori and her daughters and Greg and Angela and Dustin, left the house

609

together and went somewhere.  I didn't know at the time where it was they were going.

Q.   Did she describe anything about the character of the location where --

A.   It was a wooded area.

Q.   All six arriving in the same vehicle, or did she indicate?

A.   She didn't indicate.

Q.   But she indicated them going together to this wooded area.

A.   Yes.

Q.   Mrs. Gaubatz, during the description of these events that we've already heard you describe and are about to describe, what was Angela Johnson's demeanor?

A.   Very upset.

Q.   Please continue and describe for the jury what Angela Johnson told you about the rest of that night.

A.   She said that Dustin had taken Lori and Greg into the
Page 68

wooded area. I don't -- I don't know if she could see what was going on, but she was -- whatever vehicle they took, she was staying at the car, and the two little girls were with her.

Q. Did she indicate to you whether Dustin Honken took these two adults out together or one at a time, or do you recall?

A. I don't recall.

Q. Please go ahead and describe what you do recall of what Angela Johnson told you.

A. She said that Dustin ended up shooting both of them, both

610

of the adults, and he ultimately came back to the car and -- and took the little girls and did the same.

Q. Killed them.

A. Yes.

Q. Did Angela Johnson describe to you what happened throughout the rest of that night?

A. Just that there was a grave that was already dug and they were all put in that grave.

Q. All four victims.

A. Yes.

Q. Angela Johnson -- I just want to be sure I cover this. Angela Johnson indicated that Dustin Honken killed Greg Nicholson and Lori Duncan first?

A. Yes.

Q. Then came back to where Angela Johnson had these two little girls?

A. Yes.

Q. And took them and killed them.

A. Yes.

Q. Did she describe anything further about the occurrences of

Page 69

that night, Mrs. Gaubatz?

A.   She was very emotional while she was telling me about it, and I didn't know what to say, so I -- I don't recall really what the rest of that conversation was about.

Q.   How did you react?

611

A.   I was in shock.

Q.   Was that the last you saw of Angela Johnson?

A.   No.

Q.   You continued seeing each other frequently through that winter of 1994?

A.   Not as frequently, but she had -- she had told me that Dustin could never know that she told me what she did.

Q.   You were charged to keep this a secret.

A.   Yes.

Q.   By your very closest friend.

A.   Yes.

Q.   And did you do so?

A.   For a long time.

Q.   Did it affect -- did it nevertheless affect your relationship with Angela Johnson?

A.   Yes, it did.

Q.   In what way?

A.   It slowly started to deteriorate.

Q.   Before it deteriorated completely, Mrs. Gaubatz, did you happen to have any conversation with your friend Angela Johnson regarding the circumstances of the disappearance of Terry DeGeus?

A.   Yes.

Q.   And please first before describing in detail what was said
Page 70

tell us what you can recall of the circumstances of the

612

conversation.

A.   She had been having trouble sleeping, nightmares, thinking that there was people outside her house, somebody was coming to get her.  She was very, very paranoid.

Q.   She described that to you.

A.   Yes.

Q.   Go ahead.

A.   Once again, we had got together, and she just looked like she needed to again get something off of her chest.

Q.   And who was present?

A.   Just her and I.

Q.   And where was this to your recollection?

A.   I'm not sure where -- whose house it was at.

Q.   You had many conversations -- excuse me.  I apologize.  You had many conversations at either your house or hers?

A.   Yes.

Q.   During this conversation, Mrs. Gaubatz, did Angela Johnson share with you knowledge about the circumstances of the disappearance of Terry DeGeus?

A.   Yes, she did.

Q.   Please go ahead and describe for the jury what she told you.

A.   She said that she had -- she was working at the Mason City Country Club at this time, and she had called Terry up, and he -- I think he was at -- she said he was at his parents'

613

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 541 of 3592

house, and he was going to come over and meet her at the country club, and he did. And she -- the two of them had left in his car and went to where Dustin was already at. It was an abandoned farmhouse. And Dustin was there waiting, and Angela and Terry arrived, and I don't know of any conversation that took place. All I know is she said that Dustin had pointed the gun at him and --

Q.  Pointed the gun at Terry DeGeus?

A.  At Terry DeGeus and emptied an entire clip into him, and he still wasn't dead. And he -- Dustin went to the trunk, went to his car, and had gotten either a bat or something hard, and then he was beaten with it.

Q.  Terry DeGeus was beaten with it.

A.  Terry was being beaten with it, yes.

Q.  Because after repeatedly being shot he was still breathing.

A.  He was still -- he was -- she said he was making gargling noises and just not dying.

Q.  Did she make any comment about the manner in which he died as far as characterizing it?

A.  The manner in which --

Q.  Whether he died hard?

A.  He did.

MR. WILLETT:  Excuse me. Object, leading.

THE COURT:  Overruled.

BY MR. MILLER:

614

Q.  What, if any, comment to that effect did Angela Johnson make?

A.  She said that he went down hard just like she knew he would.

Page 72

Q.   And from your own knowledge of him, he was a tough guy.

A.   Yes, he was very tough.

Q.   She make any other description of the events of that night to your recollection, Mrs. Gaubatz?

A.   No.

Q.   Was she as emotional on this occasion as during the description of the killings of the Duncan family and Mr. Nicholson?

A.   Not as emotional.

Q.   What demeanor, if any, do you recall observing?

A.   Her demeanor was she -- she appeared to me she just wanted to keep herself together, her composure as she was telling me. She wanted to -- she told me she wanted the nightmares to end.

Q.   This was in early 1994?

A.   Yes.

Q.   You've indicated that your relationship with Angela Johnson had already begun to -- you'd begun to grow apart.

A.   Yes.

Q.   Following that first confession about --

A.   Yes.

Q.   Go ahead and describe the course of your relationship with

615

Angela Johnson thereafter.

A.   Well, for myself, I wanted to not completely break any ties with her because then Dustin would know what she had told me. She made it very clear that he could never know because then my life would be in danger and my family's life would be in danger.

Q.   Did you nevertheless grow apart from your friend Angela Johnson?

A.   Yes.

Page 73

Q. Over a period of about how long?

A. A year, year and a half, and then it was completely over.

Q. Mrs. Gaubatz, two or three years after you had these conversations with Angela Johnson about the killings of these five people, were you approached by any law enforcement officers seeking to investigate that subject?

A. Yes, there were two -- two agents that had come to my place of employment to question me.

Q. On how many occasions if you recall?

A. Just one time.

Q. They did question you about your knowledge about these disappearances, did they not?

A. Yes.

Q. And did you share with them what you knew?

A. No, I did not.

Q. Why not?

A. Because I was afraid.

616

Q. That was back in '97?

A. I believe, yes.

Q. Between then and the years following then, you remarried?

A. Yes.

Q. Your husband's name?

A. Is Scott Gaubatz.

Q. Did you at ever time -- at any time -- I apologize -- share -- well, let me just back up.

    Angela Johnson shared a burden with you.

A. Yes.

Q. How did you feel about carrying around this information?

A. Not very good.

Page 74

Q. And did you ever share it with others?

A. I shared it with a minister.

Q. And ultimately anyone else?

A. My husband Scott.

Q. And ultimately anyone else?

A. And the last person was someone that Angela and I mutually knew.

Q. So you got this off your chest at least to some degree to your spouse, your husband.

A. Yes.

Q. A minister.

A. (Witness nodded head.)

Q. And finally to a friend.

617

A. Uh-huh, yes.

Q. Calling your attention to spring of the year 2000, were you yet again approached by law enforcement and again interrogated about this matter?

A. Yes.

Q. And specifically in April of 2000 did you, in fact, finally unburden this load yourself and share it with authorities?

A. Yes, I did.

Q. In the previous years, had you been presented and questioned under oath before the federal grand jury?

A. Yes, I was.

Q. Had you been truthful with them?

A. No, I was not.

Q. Did you in the year 2000 again before -- appear before the grand jury to correct your prior false testimony on this subject?

Page 75

A.   Yes, I did.

Q.   Again after having finally been approached and finally sharing this information with law enforcement in April of 2000.

A.   Yes.

Q.   Mrs. Gaubatz, the individual who was your good friend back in those days who confessed to you her involvement in the killings of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus, is that individual present here in the courtroom?

618

MR. WILLETT:  Excuse me, Your Honor.  Just for purposes of the record, I object to the form of the question and Mr. Miller's use of the term involvement and object to the form of the question.

THE COURT:  Overruled.

BY MR. MILLER:

Q.   Is the Angela Johnson that you've been speaking about here today present?

A.   Yes, she is.

Q.   And would you please point her out for us?

A.   She's right there.

MR. MILLER:  Thank you.  I have no further direct, Your Honor.

THE COURT:  Members of the jury, why don't you stand and take a stretch break, and then we'll begin the cross-examination.

Okay.  Please be seated.

MR. WILLETT:  Thank you, Your Honor.  If it please the Court.

CROSS-EXAMINATION

Page 76

BY MR. WILLETT:

Q. Miss Gaubatz, I introduced myself a few minutes ago, but I'm Al Willett. I am one of the attorneys representing Miss Johnson.

My understanding is you testified to the federal grand

jury on two occasions in the year 1997; correct?

A. Yes.

Q. And then you repaired your testimony, for lack of a better word, in the year 2000; correct?

A. Yes.

Q. Wouldn't it be fair to say that there were certainly item -- or areas of testimony in your two prior grand jury testimonies that were truthful? It's just some of the bigger issues you were not truthful; correct?

A. Correct.

Q. And the bigger issues were what knowledge you had about what you're testifying to that Angela Johnson said to you in regards to these murders; correct?

A. Yes.

Q. That's what you held back, if you will, in the year 1997, and that's what you came forward with in the year 2000.

A. Yes.

Q. But we're not to take from your testimony that everything you said to the grand jury on two occasions in 1997 was a total and absolute lie; correct?

A. Correct.

Q. Okay. Now then, you met Dustin Honken in -- I believe it was 1992?

A. '93.

Page 77

Q. '93?

620

A. Uh-huh.

Q. And you testified on direct that you didn't like him and he didn't like you.

A. Correct.

Q. What was it about Dustin Honken that you didn't like? Would you describe that for us, please?

A. I didn't like his demeanor.

Q. And when you mean demeanor, ma'am, I mean, I know what that word means, but could you be more precise and tell us what was it about Dustin Honken's demeanor that you didn't like?

A. He came across as very arrogant.

Q. Did you find him to be secretive?

A. After meeting him several times, yes.

Q. Did you find that there were occasions where he'd want to talk to people outside of your presence and not include you in conversations?

A. He talked to Angela a lot outside of my presence, yes.

Q. And that bothered you, didn't it?

A. Sometimes.

Q. Okay. You described him -- you used that slang expression that when you first met him you were struck by the fact that he appeared to be a nerd to you.

A. Yes.

Q. Did you find him to be intelligent?

A. Yes.

621

Q. Was that a part of his arrogance that you also perceived?
Page 78

A.   Yes.

Q.   And he was certainly secretive in his relation -- in parts of his relationship with Angela Johnson, wasn't he?

A.   I'm not sure.

Q.   Let me give you a perfect example.  Kathy Rick would be an example of that, wouldn't she?

A.   Yes.

Q.   I mean, in essence Mr. Honken had two girlfriends at one time; correct?

A.   Yes.

Q.   And when did you find out that Angela was pregnant with Marvea?

A.   I think it was July sometime.

Q.   Some time in July of 1993?

A.   Of '93, yes.

Q.   And Marvea was born on Valentine's Day of 1994; correct?

A.   Correct.

Q.   So if my rough math is correct, July of 1993, Angela Johnson would have been roughly in the first trimester of her pregnancy?

A.   Yes.

Q.   And in November of 1993, Angela Johnson would have been roughly in the second or third trimester of her pregnancy.

A.   Correct.

622

Q.   And so during this period of time in 1993 when Mr. Honken was dating or dating in a relationship with Angela Johnson, he was also in a relationship with Kathy Rick; correct?

A.   I believe, yes.

Q.   Now, did you know that Kathy Rick was pregnant with a child

Page 79

fathered by Dustin Honken during that exact time -- during that similar time frame?

A.   I didn't know about that until some time I think in the fall.

Q.   In the fall of 1993.

A.   She had told me that -- Angela had told me that Kathy had given birth.

Q.   Okay.  One of the reasons Angela Johnson was upset -- I think you relayed a conversation during Mr. Miller's examination that Angela was upset at Dustin.

A.   Yes.

Q.   That would certainly be one of the reasons; correct?

A.   Yes.

Q.   And you knew Terry DeGeus.

A.   Yes, I did.

Q.   And you knew him for a longer period of time.

A.   Longer than I knew Dustin, yes.

Q.   Based upon your being raised in the area and, you know, that county probably being a smaller county, you'd known him for how many years?

623

A.   Only just under two years I think.

Q.   Okay.  But you knew about his prior relationship with Angela Johnson.

A.   Yes.

Q.   You knew about the issues between Terry DeGeus and Angela Johnson.

A.   Yes, I did.

Q.   Specifically the issues of abuse; correct?

A.   Yes.

Page 80

Q. And Mr. DeGeus was described in your testimony with Mr. Miller as being labelled a stalker; correct?

A. Yes.

Q. And Mr. DeGeus, although being described as not a physically large man, was a built man.

A. Very much so.

Q. A muscular man.

A. Very muscular.

Q. Who had a temper.

A. Yes.

Q. And you were in a car with Angela Johnson on one occasion where Mr. DeGeus was following Angela; correct?

A. Yes.

Q. And this wasn't just a normal drive down the road and Mr. DeGeus is following normally down the road behind, was it?

A. Right. He was chasing her.

624

Q. Yeah. And you were in that car.

A. Yes, I was.

Q. And it was a high-speed chase.

A. Yes, it was.

Q. And that chase ended up at the doorstep of the Clear Lake Police Department.

A. Yes.

Q. In order to seek sanctuary for lack of a better word.

A. Yes.

Q. So if you had to describe some of Terry DeGeus's more negative qualities, he had a temper.

A. Yes.

Q. He was violent.

Page 81

A.    Yes.

Q.    He was abusive.

A.    Yes.

Q.    Specifically towards Angela Johnson.

A.    Yes.

Q.    Let's in general talk about these conversations that Miss Johnson had with you regarding the disappearance of Mr. Nicholson and the Duncans.  And then is it my understanding on a separate occasion she shared with you her knowledge of Mr. DeGeus and what happened to him?

A.    Yes.

Q.    On direct exam you testified as to Miss Johnson's demeanor

625

as she was telling --

A.    Yes.

Q.    -- this to you; correct?

A.    Uh-huh.

Q.    That she was upset.

A.    Yes.

Q.    And she was very emotional.

A.    Yes.

Q.    And specifically now we're talking about Mr. Nicholson and the Duncan family.

A.    Yes.

Q.    She cried.

A.    Yes.

Q.    She had tears.

A.    Yes.

Q.    There was emotion in her voice.

A.    Yes, there was.

Page 82

Q. Did that emotion resonate through her body? Was she shaking? Was she hunched over?

A. She was sobbing.

Q. Sobbing.

A. Uh-huh.

Q. Loudly enough for you to hear.

A. Oh, yes, yes.

Q. And these emotions that you saw Miss Johnson present to you

626

were all during the time when she was depicting this story of what eventually happened to this family at the hand of Dustin Honken.

A. Yes.

Q. And then on another occasion there was this discussion of Terry DeGeus.

A. Yes.

Q. She was afraid of Terry DeGeus, wasn't she?

A. Yes, she was.

Q. She was afraid of Terry DeGeus for a long time before November of 1993, wasn't she?

A. A very long time.

Q. And she was afraid after her conversation with Terry DeGeus in the Kentucky Fried Chicken restaurant in Clear Lake, wasn't she?

A. Yes.

Q. Probably be fair to say that she was even more afraid because she was pregnant with Dustin Honken's child; wouldn't you agree?

A. Yes.

Q. And so when she's recounting to you this story about

Page 83

Mr. DeGeus, her demeanor at that time is also emotional, isn't it?

A. Yes.

Q. And you were able to see examples of fear as Angela was

627

telling you about this, didn't you?

A. She wasn't as emotional as she was describing the family.

Q. And you told Mr. Miller that she was trying to maintain her composure when she told you about Mr. DeGeus.

A. She was not crying. She was . . .

Q. Certainly emotion in her voice?

A. Yes.

Q. See examples of emotion in her body? Was she hunched? Was she . . .

A. No.

Q. Did her face express concern or emotion as she was telling this story to you even though she was trying to keep up her composure?

A. Her face did, yes.

Q. Certainly.

MR. WILLETT: Your Honor, if I may, may I approach the witness? We may or may not need some of these transcripts. I'd just like to put them on the witness stand.

THE COURT: That's fine. Thank you.

MR. WILLETT: And with the Court's permission, may I take down Government's Exhibit 1?

THE COURT: Sure.

MR. WILLETT: Thank you, Judge.

BY MR. WILLETT:

Q. And it struck me as curious, but it's my understanding that
Page 84

you first came to know Angela Johnson through her relationship, if you will, with your prior husband.

A.    Yes.

Q.    But notwithstanding the oddities of that relationship, you became good friends with her after that situation was done.

A.    Yes, we did.

Q.    And you talked about drug use during your testimony on direct.

A.    Yes.

Q.    And you talked about your use of methamphetamine.

A.    Yes.

Q.    Correct?  And as far as the frequency of that, how often were you using methamphetamine during this time frame?

A.    During the time frame . . .

Q.    Of 1992.

A.    Quite a bit.

Q.    And by quite a bit, ma'am, what's quite a bit?

A.    Several times a week.

Q.    Okay.  So -- and how many do you deem to be in the term several?  Five?  Six?  Seven?

A.    Five.

Q.    Five times a week, four weeks in a month, twenty times a month?

A.    (Witness nodded head.)

Q.    Is that a yes?

A.    Yes, it is.

Page 85

Q.    And this pattern of drug use by you went on for how many months, the use of methamphetamine for 20 times a month beginning in 1992?

A.    I would say it didn't really start until the middle of '92, the summer of '92, and then it went on from there.

Q.    Through the end of the calendar year 1992?

A.    Yes.

Q.    So would it be fair to say that you used methamphetamine 120 times approximately in the latter half of 1992?

A.    I'm not sure.

Q.    Well, if we took 20 times a month times 6 months, are we in the ballpark?

A.    You could be.

Q.    And what effect did methamphetamine have on you, ma'am?

A.    It affected my -- my work.

Q.    In what sense?

A.    In the sense that I was not tired a lot.

Q.    I've heard that to be a trait of the use of that substance. Did you find that it affected you mentally at all, your mental processes?

A.    I don't think so, no.

Q.    Okay. Did you smoke marijuana at all during that time period of the latter half of 1992?

A.    Not as much as the other.

630

Q.    Okay. Your drug of choice if I may use that label was methamphetamine.

A.    Yes.

Q.    You stated in prior grand jury testimony that one of the reasons you did not like Dustin Honken was that you didn't trust

Page 86

him.  Do you remember that, ma'am?

A.    Yes.

Q.    Do you remember stating that you didn't like Dustin being with Angela?

A.    Yes.

Q.    Do you remember stating that he was very, very -- secrety I believe is the word you used?

A.    Yes.

Q.    You gave the example to the federal grand jury that when we, you and Mr. Honken and Miss Johnson, ended up being together the three of us, he would take her into another room and talk to her and I was told to stay out.

A.    Yes.

Q.    Now, when you said that to the federal grand jury in 1997, that was the truth; correct?

A.    Yes, it was.

Q.    And you didn't have any knowledge in 1992 or 1993 that Angela Johnson -- or excuse me, in 1992 that she was involved with a methamphetamine lab, did you?

A.    In 1992?

631

Q.    1992.

A.    No.

Q.    And she was aware -- I believe you used the term with Mr. Miller on direct Angela Johnson was aware that Greg Nicholson had ratted Dustin out.  Do you remember that testimony?

A.    Yes.

Q.    Angela Johnson never expressed anger towards Mr. Nicholson over that issue, did she?

Page 87

A.   Yes, she was angry that he had done that.

Q.   Okay.  Do you remember testifying to the federal grand jury that she expressed disappointment more than anger?

A.   No, I don't.

Q.   Would it help you to refresh your memory to turn to that portion of your grand jury testimony?

MR. MILLER:  Objection, improper cross.  She's already described it as being an angry reaction.

MR. WILLETT:  Your Honor, if it please the Court, it was my understanding that Mrs. Gaubatz's memory could be refreshed, and I just wanted to point her to that area of testimony in her February --

THE COURT:  Well, why does it need refreshed?  She answered your question.

MR. WILLETT:  Okay.  I'll move on.

BY MR. WILLETT:

632

Q.   You had certainly never heard the name Greg Nicholson from Angela Johnson before it came up in 1993; correct?

A.   Correct.

Q.   To the best of your knowledge, Angela Johnson didn't know who Greg Nicholson was.

A.   To the best of my knowledge.

Q.   And the same could certainly be said for Lori Duncan and her two daughters, Kandi and Amber Duncan.

A.   Correct.

Q.   Angela Johnson didn't know who these people were, did she?

A.   Correct.

Q.   She didn't know that Lori Duncan was Greg Nicholson's girlfriend, did she?

Page 88

A.   No, she didn't.

Q.   And in terms of your methamphetamine use, Mrs. Gaubatz, did it continue into the year 1993?

A.   Yes.

Q.   At the same pace or frequency that we discussed for the last six months of 1992?

A.   About the same frequency, yes.

Q.   Five or so times a week, twenty or so times a month?

A.   Yes.

Q.   And did that continue through the entire year of 1993, that pace?

A.   I would say most of the year, yes.

633

Q.   And although it wasn't your drug of choice, did you continue to smoke marijuana during the year 1993?

A.   Yes.

Q.   My understanding is you testified on direct with Mr. Miller that you did go to Arizona on one occasion with Tim Cutkomp.

A.   Yes.

Q.   And what year again was that, ma'am?

A.   That was in '93.

Q.   And as far as the time of year, was it the first part of 1993?  Was it later in the year?  Do you remember a month or a season of the year?

A.   I think it was springtime.

Q.   And you never talked to Miss Johnson about what was in this package --

A.   No, I didn't.

Q.   -- that you were supposed to get, did you?

A.   No.

Page 89

Q.   And this was asked of you as a favor by Miss Johnson, but the request was being made by Mr. Honken.  Was that your understanding?

A.   Yes.

Q.   So you really didn't have any conversations with Miss Johnson about this favor, just would you do this, would you go with Mr. Cutkomp, and you were willing to do so.

A.   Yes, I was.

634

Q.   And what was it that prompted you to return to the grand jury in the year 2000 to repair your testimony?

A.   What prompted me?

Q.   Right.  Was it you just woke up one day and said, Now is the time; I've gotta take care of this; let me call somebody or --

A.   No.

Q.   -- did somebody reach out to you, ma'am?

A.   Bill Basler of the DCI had called me and wanted to ask me a few more questions about what had happened with the disappearances.  And I said okay, and I went in to meet with him and . . .

Q.   Were you advised that something could happen to you of a criminal nature if you did not come forward?

A.   No.

Q.   And it's my understanding that during both of these conversations -- and it's your memory that there were two separate conversations, one conversation about Mr. Nicholson and the Duncan family and one conversation about Mr. DeGeus.

A.   Yes.

Q.   And it's your memory that these conversations occurred,

Page 90

both of them, in your home, or is it possible that they were on
South 19th Street in Clear Lake, Miss Johnson's home?

A.   The first one was at my house.

Q.   Okay.

635

A.   And I'm not sure about where the second one took place.

Q.   Certainly.  What you are sure about is that no one besides
the two of you were present for either of these conversations.

A.   That's correct.

Q.   In the events leading up to this night, it was your
understanding that they were looking for Greg Nicholson;
correct?

A.   Leading up to the night --

Q.   Well, there had been other nights when you had babysat --

A.   Correct.

Q.   -- Miss Johnson's oldest daughter.

A.   Correct.

Q.   And they had borrowed your car.

A.   Uh-huh, yes.

Q.   And it was your understanding that they were looking for
Greg Nicholson.

A.   Yes.

Q.   And it was your further understanding that the purpose was
to talk to him; correct?

A.   Was to get him on video, on a video camera.

Q.   Yes.

A.   That was my understanding.

Q.   Hopefully giving some statement that would exonerate
Mr. Honken.

A.   Yes, yes.

Page 91

Q.   You were certainly never told by Angela Johnson at any time prior to July of 1993 when these acts occurred that we're looking for him so we can murder him.  You were never told that, were you, ma'am?

A.   No, I was not.

Q.   You were certainly never told by Angela Johnson that we know he has a girlfriend, Lori Nicholson (sic), and we know Lori Nicholson has two children.  You were certainly never told that by Angela Johnson, were you?

A.   I was never told that.

Q.   And so leading up to this event, it was your understanding from Angela Johnson as far as what Angela Johnson knew, we're looking for Greg Nicholson to talk to him, to get a videotape of him hopefully that will assist in Dustin's defense.

A.   Yes.

Q.   And to the best of your knowledge, Angela Johnson had never met Greg Nicholson or Lori Duncan or her children before this one night in question that you have talked to us about; correct?

A.   I'm not sure about Greg Nicholson, but I know she specifically told me she had never met Lori Duncan or the daughters.

Q.   And you had certainly never met Greg Nicholson in any setting with Angela Johnson before this event in question, had you?

A.   I had never met Greg Nicholson at all.

637

Q.   And Angela Johnson had never told you that, Well, I met Greg Nicholson before on this occasion or I knew Greg Nicholson

Page 92

from this setting.  She never told you that, did she?

A.  I don't recall that.

Q.  And the video camera came from Dustin; correct?

A.  Who had got it from Kathy Rick.

Q.  Okay.  And in that early morning around five in the morning when Mr. Honken and Angela returned, you simply got into your car and left; correct?

A.  After they went into the bathroom, yes, I did.

Q.  And you didn't notice anything unusual about your car.

A.  No.

Q.  After you got in it or the days and weeks following.

A.  No.

Q.  And when I say unusual, I mean you didn't see anything about the interior or the exterior of your car to make you think that it had somehow been involved in criminal conduct.

A.  There was nothing in my car that would make me think that.

Q.  And you testified on direct that in the fall of 1993 Angela Johnson's relationship, if we may call it that, grew worse.

A.  Her relationship with who?

Q.  Terry DeGeus.  I apologize.  Does that --

A.  Yes, it did grow . . .

Q.  Now, in Angela Johnson's mind, there was no more relationship; correct?

638

A.  Correct.

Q.  In the fall of 1993.

A.  Correct.

Q.  The same could not be said for Mr. DeGeus.

A.  That's correct.

Q.  He didn't like this forced separation, did he?

Page 93

A.    No, he did not.

Q.    And he was upset about it.

A.    Yes.

Q.    And he would share those feelings with you.

A.    On occasion, yes.

Q.    And you could tell based upon your conversations that he was upset.

A.    Yes.

Q.    And if we can be more specific, upset, he was angry.

A.    Yes.

Q.    Now, in October and November of 1993, if Miss Johnson was in her second trimester of pregnancy roughly, it'd be fair to say that she was physically showing that she was pregnant, wasn't she?

A.    If she wore big-enough sweaters, she could hide it.

Q.    And when you say a big-enough sweater, I want to make sure I understand what you're thinking of.  What do you mean by a big-enough sweater?

A.    Like an extra large sweater that just looked baggy.

639

Q.    Something that would not be appropriate for her size, for example.

A.    Correct.

Q.    Something excessively large.

A.    Yes.

Q.    And you testified on direct that after these conversations where Mr. DeGeus would express to you that he was upset, it was your belief that Mr. DeGeus was still very possessive of Angela.

A.    Yes.

Q.    And this trait of his possessiveness caused Angela Johnson

Page 94

concern, didn't it?

A.   Yes.

Q.   Caused her to be afraid.

A.   Yes.

Q.   And the last time you saw Mr. DeGeus was in either -- was in the fall of 1993, you believe in October?

A.   That's the last time I physically saw him is through the windows of the restaurant.

Q.   I apologize.  And that's an example of me asking a poor question.  There was one time when you had a conversation with Mr. DeGeus in person, and he had a slip of paper with Greg Nicholson's name on it.

A.   Yes.

Q.   Do you remember that conversation?

A.   Yes.

640

Q.   And you've testified in the past that on that occasion Mr. DeGeus really didn't look very well, did he?

A.   No, he didn't.

Q.   Looked like he'd been up for a very long time?

A.   He looked like he had not slept in days.

Q.   I believe you testified that he may not have even bathed or cleaned himself in days?

A.   Correct.

Q.   He had an odor about his person?

A.   Yes.

Q.   He looked unkempt, and by the mannerisms he was demonstrating to you, you thought that he might have been on methamphetamine at that time.

A.   Yes.

Page 95

Q. And he made this statement about Greg Nicholson, and then he says, He's gone, and I'm next.

A. Yes.

Q. And he doesn't elaborate one bit, does he?

A. He asked if I knew who Greg Nicholson was, and I said no, I did not, and that's when he said, Well, he's gone. I'm next.

Q. And he doesn't explain any further, does he?

A. No. He was -- he was very upset and not making a whole lot of sense.

Q. But upset about this Greg Nicholson issue.

A. Yes.

641

Q. He certainly didn't connect this statement, He's gone and I'm next, he never connected this to Angela Johnson, did he?

A. No, he didn't.

Q. And then just so I have the time frame correct -- and if I've mixed up these two events, please straighten me out -- then we have an event at the Kentucky Fried Chicken restaurant in Clear Lake; correct?

A. Yes.

Q. And does that occur before you see Mr. Nicholson (sic) in his unkempt appearance, or is this after?

A. My conversation with Terry was before I saw him at the Kentucky Fried Chicken.

Q. And then you're sitting in the parking lot observing what's being acted out in front of you if you will --

A. Yes.

Q. -- inside the restaurant between Mr. DeGeus and Miss Johnson.

A. Yes.

Page 96

Q. And at this time Angela Johnson was six months pregnant, roughly, six or seven.

A. Just about.

Q. And she was fearful of Terry DeGeus at this time.

A. Yes.

Q. And from what you could see from your vantage point in the car, although you couldn't hear anything, you could see

♀

642

Mr. DeGeus flailing his arms about.

A. Correct.

Q. And from what you could see, he appeared to you to be very upset.

A. Very upset with her.

Q. And you didn't find out -- once Angela Johnson left the restaurant, you didn't find out what the conversation was about, did you?

A. No, I didn't. All she said to me when she got into the car was he cannot be around anymore.

Q. And she didn't elaborate on that one bit, did she?

A. No.

Q. But you knew she was pregnant.

A. Yes.

Q. With Dustin Honken's child.

A. Yes.

Q. And that Terry DeGeus wanted this relationship back.

A. Yes.

Q. And that Terry DeGeus wouldn't be happy and wasn't happy to find out that Angela was pregnant by Dustin Honken.

A. I don't know at that point that he knew. She didn't elaborate to me that he found out in the restaurant. So I don't

Page 97

know if he knew she was pregnant or not.

Q.    Okay.  But there was no elaboration about this "he can't be around anymore."

643

A.    No.

Q.    But for weeks and months prior to that, Angela Johnson had been trying to separate herself from Terry DeGeus; correct?

A.    Yes.

Q.    If we could, let's return to that conversation that Miss Johnson had with you regarding Greg Nicholson and the Duncans and what happened at their home and the aftermath because there's some details we haven't spoken of yet.

As Miss Johnson described this event to you, she said it was chaotic inside the house.  I believe that's the term you used with Mr. Miller.

A.    Yes.

Q.    Now, did she ever explain what she meant by chaotic, or did you ask or . . .

A.    I didn't ask.  I was kind of getting a visual in my own mind.

Q.    Certainly.  And Miss Johnson told you during this conversation that the purpose was to make a videotape and then be done.  That's what you told Mr. Miller on direct; correct?

A.    Yes.

Q.    And that originally that was their purpose but then things got out of hand.

A.    (Witness nodded head.)

Q.    And you testified to that on direct.

A.    Yes.

644

Page 98

Q.    Now, you have no idea what she meant by that, do you?

A.    Things -- I am just --

Q.    Excuse me.  That's an example of a poor question.  She didn't tell you how things got out of hand, did she?

A.    No.

Q.    Okay.  But then there was a decision -- and at least the little girls and maybe even Lori Duncan -- that people were going to be gone for a few days.

A.    Yes.

Q.    And that's why these little girls had to pack.

A.    Yes.

Q.    And it's your understanding that once they arrive at the wooded area it's Dustin Honken who takes the adults into the wooded area first.

A.    Yes.

Q.    And from where Angela Johnson is with these two little girls, based upon what was told to you, you're not even sure if anybody can see what's going on inside that wooded area; correct?

A.    Right.  I'm not sure.

Q.    And it was your understanding that the adults were taken together; correct?

A.    That was my understanding, yes.

Q.    And then it was Dustin Honken who came back for these little girls.

645

A.    Yes.

Q.    And that it was Dustin Honken who actually did the physical

Page 99

act of pulling the trigger in regards to all four of these individuals.

A. Yes, yes, it was.

Q. And Angela Johnson never told you that this was the plan before they went to Lori Duncan's house.

A. No.

Q. And the reason you were afraid for those years in between being told this story and finally sharing it is you were afraid of Dustin Honken; correct?

A. Correct.

Q. Now, ma'am, you also corrected your testimony, if you will, in the year 2000 about your knowledge about Terry DeGeus; correct?

A. Correct.

Q. And you testified here on direct today that Miss Johnson was working at the Mason City Country Club.

A. Yes.

Q. And then it's your testimony today that the two of them had left in his car and went to where Dustin was already at.

A. Yes.

Q. Now, ma'am, you didn't say that to the federal grand jury in the year 2000, did you?

A. I didn't say that --

646

Q. That they left together and went to this wooded area where Dustin was at.

A. I don't know if I was asked that question.

Q. Well, you were certainly asked to describe the conversation, weren't you?

A. Yes.

Page 100

Q.   Okay.  Would it help to refresh your memory if you could see an excerpt of that grand jury testimony from the year 2000 as to what you did tell the federal grand jury?

A.   Yes.

MR. WILLETT:  May I give the witness some guidance, Judge?

THE COURT:  You may.  Mr. Willett, I don't know about guidance, but you can give her her grand jury transcript.

MR. WILLETT:  I will, and what I meant by guidance, Judge, is I'm going to show her how the grand jury page is formatted because if you're not familiar with that, you can get mixed up as to what page you're on.

THE COURT:  That would be helpful.  Thank you.

BY MR. WILLETT:

Q.   I'm going to ask you to turn to page 32, ma'am.  And the way this transcript works, it's 4 to a page, so when I say 32, it's right there.  You found the right place, and I'm going to ask you to read to yourself for just a second lines 7 through 15 on page 32, and I'll ask you the question.  Have you had a

647

chance to read that, Miss Gaubatz?

A.   Yes, I can.

Q.   You were asked the question, "Please describe that for us if you would, please."  Did I read that question correctly?

A.   Yes.

Q.   And then you gave this answer:  She had told me that Terry wasn't around anymore because he had been taken care of, and not wanting to hear any more, she still continued and said that -- she actually didn't describe it in detail like she did with the others as far as when Terry had disappeared or where he was met

Page 101

at.

And that's the testimony you gave to the federal grand jury in the year 2000 about the details of Mr. DeGeus's demise.

A. Correct.

Q. And that's not what you said today, is it, ma'am?

MR. MILLER: Objection, argument.

MR. WILLETT: Well, I can re --

THE COURT: No, the objection's overruled.

MR. WILLETT: Thank you.

A. Okay. But when you read further, it does say what I told the grand jury that day in detail.

Q. Yes, ma'am. But not about -- and I'll agree with you, but it doesn't say anything about Angela and Terry having left in his car and went to where Dustin was already at. It doesn't say one thing about that, does it, ma'am?

648

A. No, it doesn't.

Q. Okay. And just to be fair so the jury knows what you were referring to, the next paragraph talks about how Mr. DeGeus was murdered.

A. Yes.

Q. With Dustin emptying the gun into him and then taking some sort of blunt object so that Dustin could beat the remaining life out of him.

A. Correct.

Q. But your testimony, ma'am, in the year April 2000 where you came in to correct it before the federal grand jury says not one thing about Angela Johnson getting in a car with Terry DeGeus and driving to where Dustin was at, does it?

A. No, it doesn't.

Page 102

Q.   And, in fact, specifically you state she actually didn't describe it in detail like she did with the others; correct?

A.   Correct.

Q.   Let's turn our attention to the handgun you found in that home, and just refresh my memory on the time frame.   This was in 1994 when you discovered this handgun?

A.   Yes.

Q.   And winter, spring, summer, fall?

A.   It was sometime I think in the winter of '94.

Q.   Okay.   And, of course, when we say winter in Iowa, we could mean January, February, and March or we could mean October,

649

November, December.

A.   I would just be guessing.   I know it was in '94 and . . .

Q.   Okay.   You did ask her about this weapon when Angela Johnson came to get it, didn't you?

A.   When she came to get it, she told me that I just needed to calm down and she was going to have Dustin take care of it and . . .

Q.   And you asked her whose gun it was, didn't you?

A.   I'm not sure if I asked her exactly whose gun it was.

Q.   Would it refresh your memory to review your grand jury testimony from the year 2000 again?

A.   No.   I know what you're talking about.

Q.   Okay.   But it's your understanding you didn't -- it's your memory that you didn't ask whose gun it was?

A.   I don't think I asked, but I know that she ended up telling me that it was her gun.

Q.   And did she tell you why she had that weapon?   Well, she did tell you why she had that weapon, didn't she?

Page 103

A. Yes.

Q. And it was for protection, wasn't it?

A. Yes.

Q. And am I correct in my understanding that this weapon was found before the death of Mr. DeGeus?

A. No, this was -- it was after.

Q. Okay. When Miss Johnson told you that it was for her

650

protection, did you follow up on that and ask what she meant?

A. I asked, Why is it over at my house then?

Q. Excuse me, ma'am. That wasn't my question. My question was did you follow up and ask Miss Johnson why she had that gun for her protection?

A. Why she had it for her protection?

Q. Yeah. Did you ask her that question, ma'am?

A. I don't recall if I did.

Q. Okay. Thank you. Why didn't Dustin Honken like you?

A. I'm not sure exactly.

Q. You stated that you did not get a good first impression of Dustin Honken. I believe you said that to Mr. Miller this morning.

A. Yes.

Q. What happened on that first meeting that left you with less than a favorable impression?

A. He just came across with a very pompous attitude. When he -- when she introduced us, he looked at me like -- like I was less than he was.

Q. But it was your understanding that Tim Cutkomp and Dustin Honken were long-time friends.

A. Childhood friends, yes.

Page 104

Q.   Childhood.  And that in the pairing of those two individuals Dustin Honken was very much the leader.

A.   Yes.

651

Q.   And I take it on what you've told us about Mr. Honken this morning that was one of his attributes or traits.  He aspired to be the leader.

A.   Yes.

Q.   And my understanding is during this time frame that you've been speaking about with Dustin Honken and his relationship with Angela Johnson, the year -- and let's use the year 1993, my understanding is they were not living together.

A.   Not at that time, no.

THE COURT:  Mr. Willett, do you have any more questions?

MR. WILLETT:  I'm sorry, Judge.  I'm just virtually at the end.  I was going to ask for a moment to confer with my co-counsel.

THE COURT:  That's fine.

MR. WILLETT:  I've got a 52-page outline, Judge, but I think I'm most of the way through it.  I wanted to make sure I didn't leave anything on my table, so to speak.

THE COURT:  Okay.

MR. WILLETT:  Let me confer with my co-counsel for just a moment, and I'll give the Court a direct answer.

THE COURT:  Thank you.

MR. WILLETT:  Your Honor, thank you for allowing me the courtesy of conferring.  I'm done.

THE COURT:  Okay.  Why don't we come back for redirect

652

Page 105

after lunch. It's noon. We'll take an hour recess, start back up at one o'clock.

Please remember my cautionary instruction about not discussing this case among yourselves or with anyone else, keep an open mind till all the evidence. And we'll see everybody back at one o'clock. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. WILLETT: Not by the defense, Your Honor.

THE COURT: Thank you.

(Lunch recess at 12:02 p.m.)

THE COURT: Ready to have the jury brought in?

MR. MILLER: Yes, Your Honor.

MR. WILLETT: Yes, Judge.

THE COURT: Thank you.

(The jury entered the courtroom.)

THE COURT: Please be seated. Thank you.

Mr. Miller, you can do your redirect.

MR. MILLER: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. Mrs. Gaubatz, I wish to cover just a few points briefly with you. You discussed with Mr. Willett about coming forward and that it wasn't, I think you indicated, just a

653

spur-of-the-moment thing.

A. (Witness nodded head.)

Q. You had been interviewed and presented to the grand jury
Page 106

twice in 1997 and had not disclosed truthfully all you knew; fair statement?

A.   Correct.

Q.   Following your interview with peace officers in '97, did you receive any contact from the defendant, Angela Johnson, with regard to that issue?

A.   Yes, I did.

Q.   Please describe.

A.   She had called me and said she knew I had some visitors at my place of employment and wanted to know what I told them.

Q.   And what'd you tell her?

A.   I told her I said nothing to them.

Q.   And this was in '97.

A.   Yes.

Q.   And, in fact, you had said nothing of an incriminating nature.

A.   Correct.

Q.   And likewise your behavior before the grand jury in '97 was the same.

A.   Yes.

Q.   You've indicated that the weight of this knowledge on your shoulders led you to disclose to your husband?

654

A.   Yes.

Q.   And a member of the clergy.

A.   Yes.

Q.   Anyone else?

A.   A friend of mine.

Q.   Someone who would not be protected by any confidentiality.

A.   Correct.

Page 107

Q. And it was shortly after that last disclosure that you heard from Mr. Basler of the DCI?

A. Yes.

Q. And in 2000 did not at your urging but because he brought you in --

A. Yes.

Q. -- disclosed the information you knew.

A. Yes.

Q. About how long after that was it that you appeared before the grand jury for a third time if you know?

A. I believe it was within the week.

Q. The very next week.

A. Yes.

Q. And you visited with Mr. Willett briefly about your testimony to the grand jury in 2000, and among the matters discussed was your description of Angela Johnson's description to you of her knowledge of the circumstances of the death of Terry DeGeus.

655

A. Yes.

Q. Now, in fact, as was pointed out, you did not present as many details to the grand jury in 2000 as you've done here today.

A. Correct.

Q. Did you nevertheless answer every question that was put to you truthfully, ma'am?

A. Yes, I did.

Q. Do you have the transcript before you there on that desk?

A. Yes, I do.

MR. MILLER: I'm referring again to page 32, Counsel, Page 108

beginning at line 16.

Q. Mr. Willett read to the jury the first seven lines of your answer. I wonder if you would read to the jury the last six lines of that answer that you gave to the grand jury in nineteen ninety -- excuse me, the year 2000.

A. The last 6 lines of page 32?

Q. Yes, beginning at line 16 and going through line 21.

A. She just -- I remember her saying that she knew he would go down hard, and he did because Dustin had emptied the gun in him, and he was still not dying, so he took a club, baseball bat, or something and hit him over the head until he finally stopped breathing.

Q. Mrs. Gaubatz, did the prosecutor who handled the grand jury follow up with any request for any additional details?

656

A. No, he did not.

Q. But those details that you provided were accurate?

A. Yes.

Q. They simply didn't include the further detail of her going out there with him --

A. Correct.

Q. -- from Mason City. And finally, ma'am, you discussed with Mr. Willett your testimony to the grand jury regarding the circumstances or at least Angela Johnson's description to you of the circumstances of the killings of the five people in -- the Duncan family and Mr. Nicholson, and it was suggested to you and I believe you may have concurred that you weren't sure about the hearing of gunfire or her describing such or the exact sequence as far as whether the adults were together or separate?

A. Correct.

Page 109

Q. Having and again understanding that April of 2000 was some 5-plus years ago, would it be fair to suggest that your recollection at the time you gave your grand jury testimony then was fresher than it is today?

A. Yes.

MR. WILLETT: Excuse me, objection. To the extent that question is leading, Your Honor, the defense objects.

THE COURT: Can you rephrase the question?

BY MR. MILLER:

Q. Does reviewing your testimony before the grand jury in

657

April of 2000, specifically page 11, lines 15 through 22, refresh your recollection on that point raised by Mr. Willett on cross?

A. Yes.

Q. And I'd ask you now having refreshed that recollection as to what it is that Angela Johnson told you with regard to the precise sequence of killings and the existence of audible gunfire if any.

A. That while she was at the car near the woods that Dustin had taken Greg first, and she heard a gunshot. He came back for Lori and led her away from the car, and again Angela heard a gunshot. And then he came back for the girls, and there were more gunfire.

MR. MILLER: Thank you. I have no further redirect, Your Honor.

THE COURT: Mr. Willett, anything further for this witness?

MR. WILLETT: Just one moment, Judge.

Your Honor, no further cross-examination.
Page 110

THE COURT: Okay. You may step down.

Ready to call your next witness?

MR. WILLIAMS: Yes. The United States calls Dan Cobeen.

DANIEL COBEEN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness

658

box. Make yourself comfortable. And try and adjust the chair and the microphones so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Daniel Ross Cobeen, C-o-b-e-e-n.

THE COURT: Thank you.

Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Cobeen, can you share a little information with the jury about yourself? Where are you from?

A. Mason City/Clear Lake, Iowa, area.

Q. And how long have you been from that area, sir?

A. Born and raised.

Q. How old are you today?

A. Forty-three.

Q. And do you work at this point?

A. Yes, I do.

Q. What type of work do you do?

A. I'm a boat mechanic.

Q. And where do you work on boats at?

A. Darrell's Marine Repair, but we just got bought out, so

Page 111

it's Darrell's Crystal-Pierz Marina.

Q. And until you got bought out, was it a family business?

659

A. Yes.

Q. And where is that located at?

A. Right off the first interstate exit on I-35 going into Clear Lake.

Q. And over the years have you also done work at Clear Lake taking in and pulling out docks in the winter and putting them back in in the spring?

A. Yes, I've done that for about three years at one time.

Q. Are you a married man?

A. Yes, happily and faithfully married for -- I don't want to mess up, but about 18, 20 years, somewhere in there.

Q. And do you have any children?

A. Three.

Q. Before you got into this employment, family business, did you do some time in the military?

A. Yes, I did.

Q. And with what branch?

A. United States Army infantry.

Q. And during what years?

A. 1980 to 1983, May 5 to May 5.

Q. At some point in your past did you get in trouble with the law and end up with some felony charges?

A. Yes, I did.

Q. And approximately when did that occur?

A. Approximately one year before I got involved in all this,

660

Page 112

1994.

Q.   What was the nature of the charges?

A.   I was accused of stealing 32 sheets of plywood with my Ford Escort.

Q.   And were you convicted of that charge?

A.   Yes, I was.

Q.   What kind of sentence did you get?

A.   $500 restitution or fine, child support while I was in Beje Clark, 120 days in Beje Clark, and probation for 2 years, and that was it.

Q.   The 120 days in Beje Clark, what is Beje Clark, sir?

A.   To my knowledge, it's where you go if you have a drug problem or you're getting out of prison and you want to get back in the habit of working and paying rent and paying your bills and being part of the community like an adult.

Q.   Kind of a halfway house of a sort.

A.   Exactly.

Q.   Did you actually do any prison time?

A.   Fifty-nine days.

Q.   And was that in the local jail?

A.   County jail, yes.

Q.   When you were at Beje Clark, was that in 1995 time frame?

A.   19 -- the end of '94 going into 1995.

Q.   For a six-month period.

A.   Yes.

661

Q.   And while you were in there, were you one of these people in there that got out and worked outside of the Beje Clark house?

Page 113

A.    If you're not there for alcoholism, you can get -- you can go out and apply for a job after one week being there.  If you're on the alcoholics program, you gotta wait two weeks.  I was not an alcoholic, so after one week, I went out and found a job.

Q.    And where did you find a job at?

A.    I went through Manpower temporary placement agency, and they got me a job working at Kraft Foods in Mason City.

Q.    Where is Kraft Foods located at in Mason City?

A.    On 12th Street, south end -- or north end of Mason City on 12th Street.  I can't be specific.

Q.    That's fine.  I was just looking -- north part of Mason City?

A.    Yeah, northwest side of Mason City.

Q.    What does Kraft's Foods do in Mason City?  What do they manufacture there?

A.    When I was working there, it was just orange Jell-O, tapioca Jell-O, just Jell-O puddings.

Q.    And what was your job at the Kraft plant?

A.    I was designated and assigned to work as a case packer.  That's -- you got the six individual puddings wrapped in the cardboard that they sell in the stores.  Well, there's four and

662

four of them, so that'd be eight of them comes down.  Then the machine, the case packer, wraps them up in a cardboard box, glues them and sends them down, and they go on pallets.

Q.    And that was part of your job was taking them off and putting them on to pallets.

A.    Yes.

Q.    And during what time period did you work there?

Page 114

A.   Late 1994.

Q.   And did you work there the entire time you were in the Beje Clark center?

A.   I worked there the whole time I was in Beje Clark, 1,000 -- you're only allowed to work at Kraft Foods a thousand hours unless you're a full-time employee.

Q.   And did you then continue to work past the time you ultimately graduated, if you will, from the halfway house?

A.   I worked my thousand hours, and at the same time I was also out of the halfway house.  Basically about the same time they happened.

Q.   Very good.  And so your employment at Kraft was just part of your halfway house duties there.

A.   I was coughing.  I didn't hear the first part of that.  Say that again, please.

Q.   Sure.  Your employment at Kraft, that was not as a full-time employee.  That was only as this condition of your halfway house status.

663

A.   I got the job as -- it's an understanding of I can work there for a thousand hours, and after a thousand hours, I gotta apply to work there like a regular employee.

Q.   How large of a plant is this Kraft plant?

A.   Now it's real big, but back then it was pretty good size, but now it's twice as big.

Q.   About how many employees back in 1995 worked there just roughly?  Do you have any idea?

A.   I'd say probably about a hundred employees every shift, and there was three shifts.

Q.   What shift did you work?

Page 115

A.   Swing shift.

Q.   What's the swing shift?

A.   Four days on, four days off and then the four days on, then the four days off.  Then when you come back on duty the next four, it's the nightshift.  It just keeps, you know, flip-flopping, nights, days, nights, days, four days on, four days off.

Q.   Were there a number of people assigned to the so-called swing shift?  In other words, the same people work that swing shift with you over and over again?

A.   I was on C shift, and yeah, the same person that worked with me on that machine worked with me every -- the whole thousand hours.

Q.   Let me ask you if you met somebody while you were working

664

at Kraft Foods by the name of Dustin Honken.

A.   Yes, I did.

Q.   And how did you meet him at Kraft Foods?

A.   I was assigned to case packer I think it was 3, and being the case packer, I'm at the end of it all where it all gets bundled up in cardboards and put on the pallets, and then it goes back to cold storage.  And right in front of me was Dustin, and he's the one who just basically if there was a jam in the machine he would clean it up and keep the machine going smooth.

Q.   Did you know Dustin Honken before you started working at Kraft Foods?

A.   Never met the guy before.

Q.   Did you continue to work with him the entire time period you were at Kraft Foods?

A.   Yes, I did.

Page 116

Q. In the course of working with him, can you describe for the jury whether you and Dustin Honken developed any type of friendship over a period of time?

A. Well, I don't know -- can I just put this straight out the way I see it?

Q. Certainly.

A. I was in a halfway house. I had just got charged with 32 sheets of plywood that couldn't fit in my car or on top of my car, so I was sort of upset with the judicial system. And as soon as he confronted me about wanting to manufacture meth, I

665

went right to my public defender, and I thought I was being set up again. So next thing I know, I ended up meeting with a bunch of FBI, DCI, and U.S. marshals, and they said --

MR. WILLETT: Excuse me, Your Honor. I'm going to object. Mr. Cobeen is starting to vary from the question asked, and I would object to any hearsay information he's about to testify to.

A. Yes, we developed a friendship if that's what you want to know.

Q. Yeah. And let me just stop you there. We're going to get to that latter part in a minute, but at the beginning, did you and Dustin Honken become somewhat friends, somewhat acquaintances while you were working at Kraft Foods?

A. Yeah.

Q. And over the course of that time period, ultimately before you end up talking with the police -- I'm talking about the time period before that.

A. Yeah.

Q. -- did you and Dustin Honken share information with each

Page 117

other about things?

A.    He basically kept talking to me, and I sort of more or less ignored him because I didn't want to be involved in nothing.

Q.    Did you let him know at some point that you were working there as part of a halfway house program?

A.    I let him know that right away.

666

Q.    And at some point during the time period that you guys were talking, did Dustin Honken tell you stuff about his own personal life?

A.    Yes.

Q.    Did he tell you anything about whether he was married, for example, or had any children?

A.    Yes.

Q.    What did he tell you about that if you recall?

A.    He said he was married to a girl by the name of Kathy Rick I think, and I went to school with her, so I knew her real well and that he had a few kids with her.

Q.    Did he talk about any other girlfriends he had other than Kathy Rick?

A.    He was dating a different girl now.  He was -- he met her at Wellborn, another job.  I guess they had their whatever.  I don't know.  I never experienced a divorce or nothing, a separation, so I really don't know, but he said he was dating somebody else now and wasn't with her anymore.

Q.    That was Kathy Rick.

A.    Yes.

Q.    Did he say who he was with?

A.    Some Angie girl from Clear Lake.  He didn't say her last name at that particular time.

Page 118

Q. Dustin Honken tell you where he was living at the time that you were working with him at Kraft?

667

A. Yeah.

Q. And where was he living at least initially?

A. 16th Street I think on the north end of Mason City.

Q. Over the course of time, did you and Dustin Honken get into a conversation about the use of methamphetamine?

MR. WILLETT: Excuse me, Your Honor. At this point I'd like to interpose an objection. Pursuant to pretrial motions that we filed under Federal Rule 404(b), I would just like to renew that objection at this time, ask if I may have a continuing objection with Mr. Cobeen's testimony so I don't have to reassert it throughout his testimony, and also just reiterate that we object based on Federal Rules of Evidence 402, 403, and 404 to any line of questioning occurring after 1993.

THE COURT: Your objection's overruled, and you may have a continuing objection.

MR. WILLETT: Thank you, Judge.

BY MR. WILLIAMS:

Q. Did you and Dustin Honken have a conversation at some point about the use of methamphetamine?

A. Yeah.

Q. And did he indicate to you whether he had used methamphetamine in the past?

A. Yes.

Q. And in the course -- I mean, was this something he told you right away, or is this something that kind of came out as time

668

Page 119

went on?

A.    We would sit around, and he was always reading ammo magazines and gun magazines, and every so often when something would happen with the machine, I'd go to help him, and we'd start sitting -- a lot of times you just sit there and the machine does its own thing so there's -- you know, you just sit there and talk most of the time.  And yeah, we talked all the time about stuff like that.

Q.    Did you have your own past involvement with methamphetamine yourself?

A.    Not that particular drug, no.

Q.    Did you have other drugs that you used in the past?

A.    Yes, I've been in treatment for three different drugs at three different times.

Q.    And in the course of your conversations with Dustin Honken, did that kind of come out as, well, that you had used drugs yourself in the past?

A.    Oh, yes.

Q.    In fact, do you know somebody by the name of Greg Nicholson?

A.    Yes, I do.

Q.    Had you ever purchased any drugs from Greg Nicholson?

A.    Yes, I did.

Q.    And what kind of drugs did you buy from him?

A.    It was methamphetamine for somebody else.

669

Q.    And explain that.  When you say methamphetamine for somebody else, how'd that work?

A.    I got five brothers.  We're all a year apart.  I know everybody in my hometown, and a lot of them ain't good.  A lot

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 590 of 3592

of them are good.  And most of my friends were in bands, would go around to the local bars and play in bands.  And there was a bar in Clear Lake by the name of the Dugout, and Nicholson and his band was playing there that night, and just a select few were invited downstairs to where the partying was going on, and I just happened to know everybody, so I was one of them.  Well, I went down there and got a couple quarters for a friend upstairs.

Q.    One of your friends who wasn't invited downstairs.

A.    Exactly.

Q.    I see.  And had you known Greg Nicholson from before?

A.    I knew of him, and I knew of him from meeting him from -- through the band people.

Q.    Do you recall approximately when this was that you were able to get some methamphetamine from him on this occasion?

A.    Early '90s I would think.

Q.    And you handed that back off to the friend who had actually sent you down in the first place?

A.    I went downstairs, purchased it, and said thanks, gave him a big old smile and gave him -- you know, shook his hand and went upstairs and nodded my head for the guy to follow me, and

670

then I gave it to him.  Then I went back out on the dance floor and did my thing.

Q.    Now, in talking with Dustin Honken in 1995 -- you're working at the Kraft plant together -- does that come up?  Did you mention it to Dustin Honken whether you had knew a Greg Nicholson and bought any drugs from him?

A.    Yeah.

Q.    And can you explain to the jury what the conversation was

Page 121

you had with Dustin Honken about that?

MR. WILLETT: Excuse me, Your Honor. At this point I'd like to object to any hearsay that Mr. Cobeen is going to testify to regarding Dustin Honken and just ask that this be added to my previous objection and ask that if the Court allow that I have a continuing objection to any hearsay that Mr. Cobeen might testify to regarding Dustin Honken during his testimony.

THE COURT: What exception are you relying on?

MR. WILLIAMS: 801(d)(2)(E).

THE COURT: The evidence will be admitted subject to the defendant's objection, and you may have a continuing objection. Thank you.

MR. WILLETT: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. Could you relate to the jury what was the nature of the conversation that you had with Dustin Honken about your

671

knowledge and buying methamphetamine from Greg Nicholson?

A. Say that one more time.

Q. Yeah, that was a poorly worded question. What did Dustin Honken say about that when you said, I bought meth from Greg Nicholson? What was the nature of the conversation you had with him?

A. I kept, you know, avoiding the conversation all the time about it, and he kept wanting to talk to me about it, and finally he was talking about some stuff he had made and how good it was, and then he had brought up Nicholson's name about he was selling it for him, and I go, Wow, small world, and then I refreshed his memory on I think I had bought some of that.

Page 122

Q.    And so it was Dustin Honken who told you that he had supplied Greg Nicholson with meth?

A.    Exactly, yes.

Q.    Did he indicate anything to you, Dustin Honken indicate anything to you, about whether he ended up getting in trouble with any charges against him from his past dealings with methamphetamine?

A.    He had said that he got in trouble with that stuff that he had brought back.  I guess what he said, it was from Arizona. He had made it and brought it back here and was selling it.  And Nicholson was selling it for him, and he said that Nicholson had set him up and now it's all done and over with and he made him disappear.  Those were his exact words about it.

672

Q.    Dustin Honken made him, referring to Greg Nicholson --

A.    Yes.

Q.    -- disappear.

A.    Yes.

Q.    What did you understand he meant by that?

A.    Like I --

          MR. WILLETT:  Excuse me, Your Honor.  To the extent that this question is asking Mr. Cobeen to speculate on Mr. Honken's mental processes, the defense would object.

          THE COURT:  Overruled.  You may answer.

BY MR. WILLIAMS:

Q.    What did you understand?

A.    I -- basically about like he just said.  I really -- I don't take people -- I take people by their actions, not what they say, so I just -- in one ear and out the other.

Q.    Did -- at some point did Dustin Honken elaborate on the
Page 123

information he provided to you about his manufacturing? In other words, did he tell you more about his manufacturing that he was involved with in Arizona?

A. He was telling me about how good it was, it was 96 percent pure, about how he knew how to make it and just basically what I guess a lab guy would know. I don't know much about that part of it, and I didn't want to know much about that part of it.

Q. If you can recall for the jury, what did he tell you about his lab operation? For example, did he say where it was in

673

Arizona?

A. No. He just said him and his brother was -- had a real good thing going and his partner at the time was -- Tim too was involved in it. Tim Cutkomp is who I'm talking about. And they were doing it in Arizona, and then I guess he said it got a little warm there and they all grew up here in Britt, Iowa, so they came back here with it.

Q. What did he tell you was his brother Jeff's involvement with the manufacturing operation?

A. He really didn't get in -- he didn't get into much about talking about other people's involvement.

Q. At some point Dustin Honken told you that he got in trouble with the law because Greg Nicholson had turned him in?

A. Yes, exactly.

Q. Did he tell you whether his brother Jeff Honken did anything to help him out after he got in trouble?

A. I think he did, but I can't remember exactly what those words were.

Q. Would it refresh your recollection if you had a chance to take a look at an interview you provided with law enforcement

Page 124

about that?

A.   Yes, it would help.

Q.   Just take a look yourself at a moment about this, and when you're done reading that, let me know, and I'll take it back from you.

674

A.   This might sound stupid, but I forgot my reading glasses, and just this year I started needing reading glasses so I -- anybody have a magnifying glass or anything?

Q.   Can you just pull it up to your face?

A.   No, I just -- my mom gave me a dollar pair of reading glasses, and they do wonders.  Yeah, perfect, thank you.  Number 7?

Q.   Yes.  That refresh your recollection?

A.   Sure does.

THE WITNESS:  Thank you, sir.

MR. BERRIGAN:  You're welcome.

BY MR. WILLIAMS:

Q.   Having refreshed your recollection, do you recall now what Mr. Dustin Honken told you his brother did after he got caught in relation to this prior drug operation?

A.   He basically cleaned everything up.

Q.   What do you mean by --

A.   Destroyed all the evidence and cleaned everything up so there would be no trail.

Q.   When Dustin Honken's telling you about this meth operation he had before, did he give you a rough idea when this took place?

A.   Well, he was saying that they had started doing it and it was like experimenting, you know, you learn as you go.  So I

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 595 of 3592

guess in the late '80s is when they were first started from what

675

I -- if I remember correctly, and then in the early '90s is when it all came about.

Q.   Did he indicate to you what kind of quantities of methamphetamine he was able to produce?

A.   Two cookie sheets, you know, big cookie sheets like -- I don't know -- 13 by 9 or whatever, inch thick, two of them full about an inch thick of 96 percent pure meth.

Q.   Did -- you said earlier in your testimony he indicated to you that his friend Tim Cutkomp was involved?

A.   Yes.

Q.   Did he tell you what his friend's involvement was back in this time period in the early 1990s when he was manufacturing?

A.   He was helping him make it and helping him get rid of it.

Q.   And did he tell you where he was getting rid of it or selling it at?

A.   I don't remember.

Q.   He told you at some point Greg Nicholson.  You testified to that.

A.   Yeah.

Q.   Did he tell you whether he was selling to anybody other than Greg Nicholson?

A.   If I remember right, there was a couple bar people he was dealing to, and he had like four -- three or four people, and that was it, you know.

Q.   You'd indicated earlier that when Greg Nicholson's name

676

Page 126

came up Dustin Honken told you that he ultimately made him disappear. Do you recall saying that a few minutes ago?

A. Yes, I do.

Q. Did Dustin Honken in relation to that same conversation make any statements concerning a girlfriend of Nicholson's?

A. He said that everybody involved in the case, he made them quiet and made it disappear.

Q. At some point did Dustin Honken ever say anything to you that you took to be a threat?

A. Say that one more time.

Q. Did Dustin Honken ever say anything to you that you took as a threat to you?

A. Yeah, a few times. I can't remember -- the one thing I remember that I took as a threat was when I first met him, he came up to my apartment, and I went in the bathroom, and when I came out, me and him went downstairs to a bar and we were -- and Tim met us there, and we were all discussing what was going to go on. And when I was in the bathroom, he had threatened my wife, and to me that's more than threatening me.

Q. Now, at some point did Dustin Honken ask you to provide him with any drugs?

A. Yes, he did.

Q. And what did he ask you to do?

A. To see if I could find him some meth.

Q. And approximately when was this after you started working

677

at Kraft did your relationship with Dustin Honken get to the point where he asked you to do something like that?

A. I had gotten out of Beje Clark, and that's when I could finally go through and do what I was doing because I -- they --

Page 127

my counselor and them people wouldn't let me do nothing like that.

Q.  Let me stop you and see if I can ask you a better question on this.  You started working at Kraft Foods in late 1994, and you ended up working there for about six months, so you would have been out of Kraft in what?  June or July of 1995?

A.  Yes.

Q.  And during that time frame do you have a rough idea when it was that Dustin Honken asked you to get some drugs for him?

A.  I can't remember the exact date, but we were all supposed to meet at his house, me and everybody that was going to be involved in the operation, and he wanted to know if I could supply that and a little bit of pot.

Q.  And did you do that?

A.  I think I did.  I can't remember for sure.  I think I supplied both of them.

Q.  Pardon me?

A.  I think I supplied some pot and some meth for him.

Q.  Now, let's talk -- before you got to the point of talking with law enforcement, did Dustin Honken approach you about whether you would want to be involved in a new operation or in

678

an operation of manufacturing methamphetamine?

A.  Yes, several times, and I told him I -- I kept saying no, but then about a month and a half later I agreed to do it after I got done with all my problems, my probation, my Beje Clark, and all that stuff.

Q.  And before that happened, at some point did you go with Dustin Honken and Tim Cutkomp to set up a mailbox drop someplace?

Page 128

A.     I really didn't understand all of it, but they wanted me to go with them and use my name and everything and some -- I can't remember the -- Cytomex or some weird name they gave it.  But they gave me -- they wrote it all out on a piece of paper, and they made me go in like a mailbox drop thing in Des Moines, and I had to open up a mailbox thing.

Q.     And who gave you the directions to do that?

A.     Dustin.

Q.     And who all went on this trip down to Des Moines?

A.     Me, Dustin, and Tim Cutkomp.

Q.     And it was Dustin Honken who gave you the name of Cytomex to use in opening up this mailbox drop?

A.     He wrote it down on a piece of paper so I wouldn't mess it up.

Q.     Now, let's go to the topic that you had introduced earlier.  At some point in time did you have concerns about whether Dustin Honken was somehow setting you up in some illegal activity?

679

A.     Like I said earlier, I just -- personally I felt like I'd just got set up, so I -- no offense, guys, but I thought he was an FBI agent.  I thought he was a police officer.  He was just that clean-cut and that intelligent.  And I had just got my hand slapped like my dad put it, and I didn't want no more trouble.  I had a wife and a new kid born, and I just -- I wanted to be out of it all.

Q.     So I think you said earlier you contacted your defense attorney?

A.     I went up in the public defender there that represented me -- well, she didn't represent me too good I guess, but the public defender that was involved in that lumber case, I went

Page 129

right back to her, and I told her what was going on, and I just wanted -- I told her I wanted it written down and documented so -- because I thought I was being set up again, and she goes, I'll contact you tomorrow and let you know. Within 30 minutes I got a phone call from her saying to meet her in the district attorney's office which is in the basement of the courthouse in Mason City.

Q. And did you, in fact, meet with your lawyer there?

A. The next morning or -- within 30 minutes she called me back, and she said to meet her the next morning at 8:30 in the morning. I went down there and met her. We walked down there, and I walked in this room. And pardon my language, but I literally said, Holy fuck, what did I just walk into, because

680

there was FBI, sheriffs, police officers, cops, nothing but law officers all around this room, a camcorder in the corner and everything, and, you know, I pulled my pants up because I just -- you know, my heart just fell. It literally shocked me.

Q. Now, ultimately did you understand this wasn't being recorded, this meeting?

A. Yes, I was told that several times, and I didn't see the red light on on the VCR, camcorder, whatever it is.

Q. Bottom line, did you end up cooperating with law enforcement and telling them what you knew up to this point about your conversations with Dustin Honken?

A. Agent John Graham was the one that basically said, Come on in, because I was sort of like frozen in the doorway, and so I walked in there and sat down, and basically he's the one that I talked to.

Q. Let me stop you because what you guys said during this

Page 130

conversation's hearsay, so it doesn't really matter. Bottom line is did you agree to cooperate with law enforcement as a result of that meeting?

A.   I said I would do whatever I could, yes.

Q.   And was any promises made to you that somehow you were going to get some benefit from cooperating with law enforcement on this?

A.   Not a thing.

Q.   Since you cooperated with law enforcement in this case, did

681

that ultimately entail you wearing a recording device on occasion?

A.   Yes, it did.

Q.   Did it require you to testify before a grand jury?

A.   Yes, it did.

Q.   And in any of the cooperation you provided to the government, have you received any benefit other than financial? And we'll talk about that in a minute.

A.   No.

Q.   And then as a result of your involvement in this, did you receive some financial reimbursement for some items?

A.   Basically a few times I was given gas money, and I was given money to relocate at one time.

Q.   And when we're talking about the money for relocation, that was several thousand dollars?

A.   Seven thousand dollars to be exact.

Q.   Other than those financial benefits, have you received any other benefit for your cooperation in this investigation?

A.   No.

Q.   And are you receiving anything for testifying here today

other than a standard witness fee and your travel expenses?

A.   Self pride.

Q.   Let's talk about your cooperation then.  Once the decision was made to cooperate, was there a particular agent that you worked most closely with?

682

A.   Agent -- Special Agent John Graham.

Q.   And during the course of the next several months, did you maintain contact with Agent John Graham?

A.   The arrangement that we had was every time I got a call from Dustin I would contact him and let him know, and every time I got done with Dustin I would contact him and let him know everything that happened.

Q.   And there were at least a couple occasions when you wore a recording device with Dustin Honken.

A.   Yes, and one of them was when I went into my bathroom that I was talking about earlier.

Q.   All right.  So let's talk now at this point -- up to this point I think you indicated Dustin Honken had talked to you several times about wanting to have you involved in his meth operation.  You kind of kept some distance from him.  Did I summarize that accurately?

A.   Exactly right.

Q.   And once you decided to cooperate, did you at that point then tell Dustin Honken that you were willing to participate?

A.   I said, As soon as I'm out of Beje Clark, I'm game, and I'll do it with you.

Q.   Now, this is at the time you're cooperating with law enforcement.

A.   Yes.

Page 132

Q.    So you didn't actually intend to assist him in the

683

operation.  You were working for the government at that point.

A.    I was working for what I considered FBI Agent John Graham and whoever his officials were.

Q.    So let's go from that point forward then.  Mr. Cobeen, at this point you're cooperating.  You're in contact with Agent John Graham.  And you've told Dustin Honken that once you get out of Beje Clark you're willing to go forward with him.  Once you got out of Beje Clark, did you have conversations with Dustin Honken about what your role was going to be in assisting Dustin Honken?

A.    Because I knew everybody, he wanted me to set him up with some of the big people in town.

Q.    And what was the purpose for you setting him up with some of the big people in town?  What did that mean?

A.    He wanted to get rid of quantities.  He didn't want to fiddle -- he didn't want to just nickel and dime.  He wanted to just get rid of it all at one time.  I guess you'd call it less traffic.

Q.    So you were to be a connection for him to distribute the methamphetamine?

A.    I was going to set him up with some big names that would take all of it off his hands.

Q.    And what were some of the big names in Mason City back in 1995?

A.    Steve Gomez, Brian Beach, and I can't recall the other few.

684

Q.    Did he, Dustin Honken, describe for you whether other

Page 133

people were involved with him in this operation other than just you and him?

A.   It was me, him, and Tim, but Tim was never there when I was there.  But yet I knew he was there because Dustin told me he was involved in it.  And I couldn't be involved in it until I had the final approval from his girlfriend.

Q.   Whose girlfriend?

A.   Dustin's girlfriend.

Q.   And who was that?

A.   Now I knew her last name as Angela Johnson.

Q.   Before we get to that, did Dustin Honken tell you what Tim Cutkomp's role was in this operation?

A.   Not really.  He sort of kept me and Tim apart all the time.

Q.   So let's go to this.  At some point he indicated to you that you were to be approved by Angela Johnson?

A.   I had to be okayed and approved, yes.  That's about the exact words he put -- way he put it.

Q.   So what happened?

A.   We had met at Dustin's house once, and there was the people that were going to get rid of it, the people there that was going to -- it was all the people that had -- was going to be involved in different steps.  There was five people there including a couple which I count as one.  And they all had different assignments.

685

Q.   Now, at some point did you have a conversation with Dustin Honken about what these people's various assignments were?

A.   Yeah.

Q.   Okay.  Was this after they left you have a conversation with Dustin Honken about it?

Page 134

A.  Yeah.

Q.  Who else was present during this conversation with Dustin Honken about what everybody's role was going to be?

A.  Just Angie Johnson.

Q.  Where were you at when you had this conversation?

A.  At his house on 16th Street.

Q.  And what did he describe -- first of all, do you recall who the other people were that were present?

A.  Darla.  I can't remember her last name.  Sturgis.  I can't remember his first name.  And a biker couple, me, Dustin, and Angie and Tim, but he wasn't there at the time.

Q.  And what did Dustin Honken tell you was the roles of the various other people involved in this if you recall?

A.  I can't recall exactly what everybody's role was, but like Angie was financing it.  I was supposed to hook him up with some big people.  Darla was supposed to -- and Sturgis was supposed to get rid of it, and the biker couple, I can't remember nothing about them really.

Q.  Did Dustin Honken indicate to you whether Angela Johnson had any role in distributing the methamphetamine as well?

686

A.  I can't remember for sure or not.

Q.  When you say financing, what do you mean by that?

A.  He had told me that she had had $5,000 invested in that -- what we had had -- we were in the process of making the manufacturing.  Well, I guess she had had money, up to $5,000, invested in the so-called business.

Q.  Now, at some point after meeting with Dustin Honken and Angela Johnson, did Dustin Honken make any statements to you concerning this approval process?

Page 135

A.    He said that, well, that was just basically, you know, everybody meeting everybody, and you still got to be approved by my girlfriend Angie.

Q.    And after that meeting did he tell you whether, in fact, you'd been approved or not?

A.    No, I had to --

      MR. WILLETT:  Objection --

A.    -- go meet him at her house in Clear Lake.

Q.    And so did you have a meeting with her at her house in Clear Lake?

A.    Yes, I did.

Q.    And who all was present at that meeting?

A.    Her, Dustin, and I think her middle daughter -- one of her daughters had just left with her stepdad or her dad or something.

Q.    How long did this meeting take place?

                                                    687

A.    We sat there for maybe an hour and a half, two hours.

Q.    And after the meeting what, if anything, did Dustin Honken say to you?

A.    On the way back to Mason City, he said, You're in; you been approved.

Q.    Did Dustin Honken tell you anything about Angela Johnson just generally, anything about her background or anything like what she was like?

      MR. WILLETT:  Excuse me, Your Honor.  Just for purposes of the record, I would object to the form of the question as being vague and overbroad.

      THE COURT:  Overruled.

A.    I really can't remember about that that far back right now.
                    Page 136

Q. So let's go to the fall of 1995. You're no longer working at Kraft Foods, nor are you in Beje Clark; is that right?

A. Yes.

Q. Okay. And you're cooperating with Agent John Graham.

A. Yes.

Q. And are steps taken with Dustin Honken toward the manufacturing of methamphetamine?

A. Were we making methamphetamine? Is that what you were asking?

Q. Were you taking steps toward making methamphetamine?

A. That's exactly the way he called it. He said there was like nine steps to the finished product, and yes, we were

688

continuously going through step by step by step.

Q. And did this require you to get different types of equipment and chemicals and things like that?

A. I -- yeah, I had to go up to Minneapolis and get a catalyst. I had to do a few things like that, yeah.

Q. Now, when I say did you have to do this, did you know how to manufacture methamphetamine?

A. No. That was like -- only one thing I did is drove up to Minneapolis and got a thing of pills, but I had seen receipts where I had gotten a bunch of other stuff that I didn't know I had gotten.

Q. And were there times where Dustin Honken told you what to do and what to get and so forth?

A. He specifically wrote everything down to make sure I got it exactly right word for word.

Q. I want to direct your attention to October 17 of 1995 and ask you if you recall, did you at some point assist Dustin

Page 137

Honken in getting a hydrogen tank?

A.    Yes, I did.

Q.    And can you describe for the jury how did that come about?

A.    He shows up at my house, my apartment house, comes up knocking on the door.  He goes, Let's go.  And he had said he'd borrowed his dad's Ford four-by-four truck, and we took off, and he gave me some money, but first we had to stop by his ex-girlfriend's car at where she was working, Kathy Rick, and he

689

got like a card, like a money card from a bank or something.  He got that out from underneath the seat and went and got some money out, gave me the money, and then we went to Barclay -- they sell gases and everything, Barclay Chemical Company or whatever it's called.  And I purchased a certain size tank of gas or whatever it was.

Q.    How'd you know what size tank to buy?

A.    He specifically wrote everything down for me what to get and what to do.

Q.    And what did you use to purchase the tank with?

A.    The money he gave me.

Q.    Was it cash?

A.    Yes, it was.

Q.    Did you get a receipt after you purchased that tank?

A.    Yes, and I kept the receipt.

Q.    I'm handing you an exhibit here.  Do you recognize that?

A.    Yes, yes, that's the exact same one that I've seen three times now.

Q.    And what is that?

A.    That's the receipt that I had given to me that I had folded up and put in my pocket and hid it and then ended up giving it

Page 138

to John Graham.

MR. WILLIAMS:  United States would move to admit Exhibit 78 into evidence, Your Honor.

*   *   *   *

690

(Government Exhibit 78 was offered.)

*   *   *   *

THE COURT:  Any objection to 78?

MR. WILLETT:  Your Honor, if it please the Court, defense objects on the basis of Rule 802, Rule 402, Rule 403, and Rule 404.

THE COURT:  What exception to the hearsay rule are you relying on?

MR. WILLIAMS:  It's a business document, business record.

THE COURT:  Well, can you lay a better foundation for it under 803(6)?

MR. WILLIAMS:  Certainly, Your Honor.

THE COURT:  Thank you.

BY MR. WILLIAMS:

Q.  When you went in to make this purchase of the hydrogen tank, was this an ongoing business that existed in Mason City?

A.  Before we started the boat marina, me and my dad, we used to rebuild boat propellers, and we would have to buy a lot of grinding disks, and we used to have to buy gas for our heli-arc and Mig welder.  So yes, I know this place and Huber Supply Company.  They're the only two businesses that deal in gases, so yes, I knew them both.  They're both big businesses, yes.

Q.  And as a -- when you'd been there before, did you obtain receipts when you'd buy merchandise there?

Page 139

A.    I would just sign for them, and they'd get sent to my dad.

Q.    When you went on October 17 on this date to purchase this hydrogen tank, was that receipt handed to you by a clerk of that business?

A.    Yes, it was.

Q.    And did you specifically ask for them to create a receipt, or did they just do it in the normal course of the transaction?

A.    They created a receipt and gave it to me, and then I put it in my pocket and took the tank out to Dustin, and he --

Q.    Let me stop you before we get any further than that.

        MR. WILLIAMS:  United States would move to admit Exhibit 78, Your Honor.

                        *   *   *   *

        (Government Exhibit 78 was offered.)

                        *   *   *   *

        THE COURT:  Any objection I assume, Mr. Willett?

        MR. WILLETT:  Thank you, Judge.  Yes, on all four rules of evidence that I cited to the Court.

        THE COURT:  Objection's overruled.  Government's Exhibit 78 is admitted.

                        *   *   *   *

        (Government Exhibit 78 was admitted.)

                        *   *   *   *

        MR. WILLIAMS:  Permission to publish, Your Honor.

        THE COURT:  You may.

692

BY MR. WILLIAMS:

Page 140

Q. Looking at Exhibit 78 there, is that the receipt from the purchase of the hydrogen tank, sir?

A. Yes, it is. Yes, it is.

Q. And that was actually listed as you as the purchaser?

A. That's my signature.

Q. How much did it cost for you to purchase that hydrogen tank?

A. Without my read -- I know it's close to 200 bucks, but without reading glasses, I can't be specific.

Q. And that cash was provided to you by Dustin Honken?

A. Yes.

Q. And did you understand that this hydrogen tank was purchased for something to do with the manufacturing process?

A. Yes.

Q. What happened with the hydrogen tank once you and -- once you bought it, you went in, you got it, they gave you the receipt, you gave them the cash, did you bring it back out to the truck?

A. I was given the receipt, and I had to go in the back room to get the tank. Well, actually the guy met me at the back door because you -- people ain't allowed to go with gases or in the back room, so he just brings it out to the door, and I'm used to that from picking up ones for my -- when I used to get for a welder.

693

So I met him at the back door. I grabbed the tank. I grabbed the receipt and put it in my pocket, took the tank out to his truck. He hurried up and took me home, and I never seen the truck or the tank again.

Q. So you don't know what happened to it after that.

Page 141

A.    No.

Q.    Directing your attention to November 28 of 1995, do you remember taking a trip down to that drop box that you had been -- that you had set up at Dustin Honken's request down in Des Moines to pick up a package down there?

A.    I don't know exactly what it was, but I picked up some big huge thing that had some coil, and it was -- it looked like some weird laser cannon.  I don't know what it was.

Q.    Well, describe it for the jury.  How long was it to begin with?

A.    I'd say about three to four feet long, about twice the diameter circle of this glass which is about three inches in diameter, so I'd say it was about four inches in diameter, and it had like copper tubing coiled through it, and I -- I'm not really scientifically inclined.  All I know is it looked really wild.

Q.    Was it in a box when you picked it up?

A.    Yes, it was.

Q.    Now, tell the jury, how was it that you made this trip down to Des Moines to pick up this box?  Was it something you knew to

694

do, or were you told to do it by somebody?

A.    They drove me down there.

Q.    Who's they?

A.    Dustin.

Q.    Anybody else other than Dustin Honken with you that time if you recall?

A.    That time I don't remember if Tim was with us or not to be honest with you.

Q.    And did you go into the store to pick it up, or did Dustin

Page 142

Honken go into the drop box place to pick it up?

A.   I had to go in there I think to pick it up.  I can't recall for sure because it was put in my name, the box was.

Q.   I want to direct your attention now to January 22 of 1996. And do you remember making a trip to Minnesota with Tim Cutkomp to pick up something?

A.   Yes, I remember.  I was -- we were at Dustin's house on 16th Street.  Dustin said that I had to go pick up what he called a catalyst.  I still don't know what that is.  But I went up to this -- I took it as a glass company.  There was all kinds of big Pyrex glass all over out there in their showroom, and then I -- gave me this paper that Dustin wrote out again on this little -- like one of those little yellow Post note.  He wrote down exactly what to ask for and what to get and what size, and it was a bottle about this size and looked like ibuprofen bottle, and it had some little round pills in it, and he said it

695

was a catalyst.

Q.   And did you have to pay for that with some type of -- did you have to pay for it at that time?

A.   Yeah.  And when we got up there, Tim gave me -- I had the letter, and when we left the house, I gave it to Tim.  Tim held on to it until we got there, and then Tim gave me back the letter and gave me some money to go in there and get the stuff.

Q.   When you say letter --

A.   The little Post note saying exactly what to get from this place.

Q.   Did Tim give you cash, or did you pay with a check, or how did that happen?

A.   It wasn't that expensive.  I think it was cash.

Page 143

Q.   Did you get a receipt again on this occasion?

A.   I think I did.  I can't recall for sure.

Q.   Let me show you what's been marked as Government Exhibit 75.  Do you recognize that, sir?

A.   Yeah, BME, yes, I do.

Q.   And what is BME?

A.   That was the name on the company that we went to up there in Minneapolis, what I call a Pyrex glass company, because that's what the showroom had, all different kinds of tubes and bottles outside.

Q.   And Exhibit 75, is that the receipt that you were provided?

A.   Yes, it is.

696

Q.   And was that provided to you when you went up to make that purchase on January 22 of 1996?

A.   I went up there and gave -- put down the letter and said exactly what I needed by the letter word for word.  They said they'd be right back.  They went in the back room, brought out this bottle.  I think I had a 20-dollar bill, and they -- or I didn't have too much money is all I know, and they gave me the receipt after I purchased it.

Q.   And what'd you do with the receipt?

A.   I don't know if I give it to Tim or if I kept it.  I can't recall right now.

          MR. WILLIAMS:  United States would move to admit Exhibit 75, Your Honor.

                    *   *   *   *

          (Government Exhibit 75 was offered.)

                    *   *   *   *

          THE COURT:  Any objection to 75?

Page 144

MR. WILLETT: Your Honor, if it please the Court, same objections previously urged for Government Exhibit 78 which would be Federal Rules of Evidence 802, 402, 403, 404. Thank you.

THE COURT: Thank you. Objection's overruled. Seventy-five is admitted.

* * * *

(Government Exhibit 75 was admitted.)

697

* * * *

MR. WILLIAMS: Permission to publish, Your Honor.

THE COURT: You may.

BY MR. WILLIAMS:

Q. Again, this receipt is an invoice that has your name down; is that correct?

A. On my screen I can't read it. It's . . .

Q. Can you read it behind you there?

A. Yeah, I sure can.

Q. Is that your name up in the upper left-hand corner?

A. That is my name and my Social Security Number and my date of birth.

Q. And the description there, do you see that description of what was purchased?

A. Yeah. Now that I see the manganese, I know exactly what it was. It was manganese chloride.

Q. And did you understand that was going to be used in the manufacturing process?

A. He said -- his exact words was it was a catalyst and that was one of the steps involved in the manufacturing.

Q. Now, at some point you had indicated that you ultimately

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 615 of 3592

were going to hook up Dustin Honken maybe with some of the major players in the city of Mason City back then. Do you recall that testimony?

A. That I was going to introduce him to or hook -- set him up

698

with some of the big wigs to get rid of the stuff, yes.

Q. And you indicated one of them was Steve Gomez?

A. Yes.

Q. Do you remember whether Dustin Honken ever made any statements concerning whether he was concerned about the competition that Gomez would provide him in his business?

A. I do, but I don't remember exact words. But before you go on, I think he said he wanted to control everything.

MR. WILLETT: Excuse me, Mr. Cobeen. Judge, I apologize. I object -- if Mr. Cobeen's going to start speculating in response to this question, I object based on lack of foundation.

THE COURT: Overruled. You may answer.

BY MR. WILLIAMS:

Q. What do you recall?

A. He wanted to basically -- once he got him in on it, he basically would control everything.

Q. Did he express any concerns about what if Steve Gomez didn't want to go along with this? Did he have any plans in place for dealing with Steve Gomez?

A. He did, but I don't remember exactly what it was.

Q. Again, would it refresh your recollection if you had an opportunity to take a look at your interview?

A. Yes, it would.

Q. Can you read that?

Page 146

A. Right here?

Q. Yeah.

A. No.

MR. BERRIGAN: Keep them.

A. I brought some with me. I just left them.

Yeah, I remember.

Q. Mr. Cobeen, does that refresh your recollection about what Dustin Honken indicated to you he was going to do if he had trouble with Steve Gomez?

A. He -- I guess he had said that Angie had knew him and Angie was going to have a talk with him, and if that didn't work out, he was going to have -- he would deal with it his own way.

Q. And what did he say was his own way?

A. He would have him knocked off.

Q. Now, at some point in this continuing series of months leading up to early 1996, did you ever have a conversation with Angela Johnson where Angela Johnson was present and she made any statements about her prior involvement in selling methamphetamine supplied by Dustin Honken?

A. If I remember correctly, she was working in a bar, and she was getting rid of it for him in some bar in, I think, Forest City. I do not recollect if that's exactly right, but I'm pretty sure it is.

Q. And she was getting rid of it for who?

A. For Dustin.

Q. Did she make any indication or make any statements during this conversation about whether she thought she could sell any

more in the future?

A.    Yeah.

Q.    And what did she say?

A.    She could get rid of some more.

Q.    She say anything about the quality of the methamphetamine that she had previously been dealing with with Dustin Honken?

A.    It was the best.

Q.    I want to direct your attention now to January and February of 1996.  Up to this point, had you been keeping Agent John Graham up to date with everything that was happening between you and Dustin Honken and the other people involved?

A.    Every single time I got a call from Dustin or I met with Dustin or anybody involved in that, I would contact FBI Agent John Graham right away, and then he would have me contact him right after the meeting.

Q.    At some point by early 1996, January of 1996, did Dustin Honken get to the point where he actually had kind of a lab set up someplace?

A.    Yeah.

Q.    And where was that at?

A.    In his house on 16th Street in the garage.

Q.    And can you describe for the jury what the lab looked like?

A.    You go out into his garage, and he had like a little deck

701

and a set of steps going down.  It was a single-stall garage, and on that little deck and steps was like a real, real hot big huge flask with like peanut butter oil in it or something, and he had like what -- Grandma's old thermometer, real big thing, sticking in it, and then it was just one step and then some tubes and then another three-tube thing and then some big

Page 148

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 618 of 3592

plastic jugs and lines running -- it was -- I was impressed, to be honest with you. It was something I'd never seen before.

Q. At some point were you able to make a sketch of that lab for Agent Graham?

A. I was letting him know each and every step that we were doing, and every time something got added on to the maze of whatever you want to call it, I would keep writing everything down. And then finally I wrote it all down when it was about completely done and gave it to FBI Agent John Graham.

Q. Now, at some point, Mr. Cobeen, did you ever do anything at the lab, at Dustin Honken's house, to assist him in any of the steps of the manufacturing process?

A. A few times, yeah.

Q. And describe for the jury what type of stuff did Dustin Honken have -- I mean, first of all, did you know what to do on your own?

A. Well, first thing is he told me this stuff right here -- it looked like a big mayonnaise jar but twice the size, and it had white powder in it. He said that if you put it on your skin it

702

would kill you instantly because it does something to one of your blood cells. I mean, I'm not a doctor either. All I know is it was real dangerous stuff, and here he's got his kids running around because he's babysitting them all the time, so, you know, right off the bat I knew everything was dangerous.

Q. Did he actually have you do some steps in the process?

A. He was showing me each and every step as he was going because that's what he eventually wanted me to do.

Q. And did you ever see Tim Cutkomp there doing anything at the lab?

Page 149

A.    Never.

Q.    Did you ever see anybody else there doing anything with the lab other than Dustin Honken?

A.    To my knowledge, it was just me and Dustin every time.

Q.    Now, at any point when you were going over to Dustin Honken's house on any of these occasions, did you ever see Angela Johnson there?

A.    I can't recall for sure right now.

Q.    At some point by February of 1996, was Dustin Honken's lab raided by the police?

A.    He told me when we started this there was nine steps.  When I got to about the eighth or the ninth step and I told John this and I wrote down the whole lab and everything, next thing I know, I'm getting a call from FBI Agent John Graham saying, We're going to take him down; we're going to raid his house.

703

And I guess he was forewarning me in case something came up.  I don't know.  He was just letting me know.

Q.    After that happened, did you get contacted by Dustin Honken after his house was raided?

A.    Yes.  He came, and he told me what happened, and he said that -- keep everything quiet, not to say anything, and that Angie would be getting in touch with me on what to say at court or something like that.

Q.    So did you ever hear from Angie Johnson about what to do or what to say in court?

A.    When I was at the court building -- it wasn't here.  It was like Cedar Rapids or another place is where we all went and had to testify for the first time, and she met me in the stairwell and told me what everybody was saying and what for me to say and

Page 150

just keep like I was doing, keep quiet.

Q.   Up to that point had you had some other meeting with Dustin Honken in which he had kind of set up kind of what everybody was going to say to the police if they were questioned about it?

A.   Yeah.

Q.   In fact, on February 26, 1996, do you remember meeting with Dustin Honken and Tim Cutkomp at a bar in Mason City?

A.   Yes.

Q.   And was this one of the occasions where you were wearing a wire that recorded your conversation?

A.   Yes, it was.

704

Q.   And at that meeting what was the purpose of the meeting that you understood?

A.   The purpose of the meeting was he was going to have us all stick to a certain story.

Q.   And do you recall what that story was supposed to be?

A.   I can't really recall.

Q.   Do you recall whether it had anything to do with writing a book at all?

A.   Yes, he was -- that's what I was supposed to say, that he was making a book like a cookbook and to stick to that story that he was making a book.

Q.   And so did you, in fact, meet at a bar with Tim Cutkomp and Dustin Honken?

A.   He come up to my apartment house, and just before that when I met with him, John said this time he wanted -- John Graham said -- FBI Agent John Graham said he wanted me to wear a wire this time.  And my wife and my child was up in the front living room of the apartment, and he comes to my back door, and I

Page 151

answered the door. I said, Come in. He says, Tim's going to meet us in about ten minutes down in the bar down below two doors down. I said okay.

And my instincts are real gifted, and for some reason I just had a weird feeling he was going to search me, so I go in the bathroom, and I took the wire off. I come out of the bath -- and I hid it behind my toilet. And when I was walking

705

out of the bathroom door, I looked, and I could see the red light on the dumb thing behind my toilet. I'm like, oh, God, and I was already heading out the door, so I couldn't do nothing about it. And I go out there, and sure enough, he goes, I hate to do this, Dan, but I gotta search you. He had me pull up my shirt, and he frisked me and patted me down. I said, I can't believe it, and I just saw it happened, and my instincts caught on to it. Next thing I know, he says, I gotta use your bathroom.

Q. So you were concerned that he was going to see this wire behind the toilet.

A. Yeah, I was so stressed and just high strung at the time that I couldn't believe it, and all of a sudden about five minutes later he comes out, and he's wiping his hands, and nothing was said, and I'm like, whew, you know, how I got out of that one I don't know.

Q. Did you end up over at anyplace else that night other than the bar? Do you recall going over to Angela Johnson's house?

MR. WILLETT: Excuse me, Your Honor. I'm going to object to the question.

A. I can't remember for sure.

THE COURT: Just a second, Mr. Cobeen, so that counsel

Page 152

can interpose an objection.

          MR. WILLETT:  The question's leading, Your Honor, and I object.

706

          THE COURT:  Sustained.

BY MR. WILLIAMS:

Q.   Do you recall going anywhere else other than the bar that night?

A.   I don't recall for sure.

Q.   At any point did you have a conversation with Dustin Honken about what Angela Johnson was going to be -- whether she was going to remain in the Mason City, Iowa, area, whether she was going to move someplace else?

A.   I can't recall for sure right now.

Q.   You indicated that you were called before the grand jury. That would have been in May of -- I'm sorry, April of 1996.

A.   Yes.

Q.   Does that sound about right?

A.   Yes.

Q.   And you and a number of other people were called down there.

A.   Yes.

Q.   At that point did Dustin Honken know that you were cooperating with law enforcement?

A.   Nobody there knew besides the agents.

Q.   And that's the time when you had the contact with Angela Johnson in the hallway?

A.   She met me in a stairwell between the -- you know, going between the two floors.

707

Page 153

Q.    Now, after you had provided this cooperation, were you aware of whether, in fact, Dustin Honken was arrested on federal drug charges?

A.    At that time was I aware he was arrested?

Q.    Did you become aware at some point that he was arrested on federal charges?

A.    Yes, John Graham contacted me and told me that it was all going to happen, yeah.

Q.    And at some point is that when you relocated for a period of time?

A.    FBI Agent John Graham and another FBI agent or U.S. marshal showed up, and they said I'm going to have to relocate because my life is in danger.

Q.    At some point did you become aware that Dustin Honken was sentenced in federal court to prison for having involvement with drug -- a methamphetamine operation?

A.    Yeah, I read the paper.

Q.    And did you actually testify at his sentencing hearing?

A.    I testified at every hearing involved in this case I think, in both cases.

Q.    In particular, do you recall testifying at a sentencing hearing held in this court on Dustin Honken?

A.    Yes.

Q.    At some point after testifying in that hearing, did you have some observations of a traffic accident in Clear Lake,

708

Iowa?

A.    My wife works at a day care.  She's a day care school

Page 154

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 624 of 3592

teacher.

Q. Let me just stop you, though. Let me direct your questioning here or your answers. I just want to know were you involved or did you see a traffic accident in Clear Lake at some point?

A. In Mason City you mean?

Q. Was it Mason City?

A. Yes.

Q. Okay. And while you were in Mason City, did you help out at the scene of the traffic accident?

A. Yes. Accident happened right in front of me. Nobody behind me. Cars going -- you know, it's four lane, two lanes here, two lanes here, Highway 18 going through Mason City. And if you turn this way, you go right to the main part, so it's a real busy intersection, and, boom, a car went right underneath a flatbed pickup right in front of me. Nobody behind me, nobody around. I was the first one on the scene. And a girl, college girl, was trying to start her car. Her engine's in her front seat. And I -- I'm a mechanic, and I could see gas and, you know, oil and all kinds of fluid on the ground, so I jumped out of my van, and I'm cussing her out saying, What the F and F are you doing? Trying to kill us both?

Q. Bottom line, Mr. Cobeen --

709

A. Excuse me?

Q. -- did you assist at this traffic accident?

A. Yes, I helped them both.

Q. While you were assisting at the traffic accident, did you see anybody go by that you knew?

A. While I was guiding traffic after I got the two injured

Page 155

people sat down on the curb, nobody else was still there, so I was guiding traffic by then to go around us, and a little red Suzuki come driving by, and Miss Angela Johnson was hanging halfway out the door like that.

MR. WILLETT: Excuse me. I object. Excuse me, Mr. Cobeen. Your Honor, I object. First of all, I think Mr. Cobeen had answered the question that was posed to him. Second, in the matter he's about to testify to, the defense objects based on Federal Rule of Evidence 402, 403, and 404.

THE COURT: Overruled. You may answer.

BY MR. WILLIAMS:

Q. Let me take this one step at a time. You saw Angela Johnson drive by in a red Suzuki?

A. She was in the passenger seat, yes.

Q. And did she make any gesture at you?

A. (Witness demonstrated.)

Q. And you were doing what with your hand?

A. She was acting like she had a gun in her hand and was going to shoot me.

710

Q. And it was pointed at you?

A. And she had a big grin on her face.

Q. The Angela Johnson that you had met several times in 1995 involved in this operation with Dustin Honken, the woman who made the gesture at you at that traffic accident, do you see her in the courtroom here today?

A. Yes, right here.

Q. And she's sitting what direction from you, sir? On your left or on your right?

A. My left, straight to the east.

Page 156

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Mr. Willett? Why don't we give the jury a stretch break before you cross-examine.

MR. WILLETT: Thank you, Judge.

THE COURT: Okay. Please be seated.

MR. WILLETT: May I retrieve those exhibits, Your Honor?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. WILLETT:

Q. Mr. Cobeen, my name is Al Willett. I don't believe we've ever met.

A. Al what was that?

Q. Yeah, it's Al Willett. I don't think we've ever met yet?

A. Nice to meet you.

711

Q. I'm one of Angela Johnson's attorneys. Now then, you testified to Mr. Williams on direct that you had experience with three different controlled substances at different times in your life and you received treatment on three occasions. Did I hear that testimony correctly?

A. Yes, I turned myself in for three different drugs to three different treatments.

Q. And your drug of choice was crack cocaine, sir?

A. The first time and my first drug of choice in the first time I went to treatment, yes.

Q. And then I take it at some point in time your drug of choice was methamphetamine?

A. Never.

Q. Okay. Marijuana?

Page 157

A. Yes, that was one of them.

Q. Okay. Third one?

A. The third one was back to -- it was a relapse on crack cocaine, and this time I had my mom and my wife commit me so I had to stay in in treatment.

Q. Certainly. I understand. And you have a felony conviction out of Cerro Gordo County for the theft of the plywood sheets.

A. Yes.

Q. Okay. And my understanding is that occurred in 1994.

A. Somewheres around there, yes.

Q. And your sentence was 120 days at the halfway house.

712

A. Part of the sentence was that, yeah.

Q. I assume you were given credit for 59 days time served at the Cerro Gordo County Jail?

A. No.

Q. Okay. But you were also given two years' probation.

A. Yes.

Q. Which means you would have completed your probation some time in the year 1996?

A. I don't really remember exactly when I completed it.

Q. Okay. But it was two years from the date of the sentence.

A. Yes, I think so.

Q. Did you ever receive any type of allegation of probation violation or anything like that while you were on probation?

A. No.

Q. Okay. And you testified in the federal grand jury in April of 1996 and May of 1997; correct, sir?

A. Yes, I think so.

Q. Okay. And you testified that you were scared of Dustin

Page 158

Honken.

MR. WILLIAMS: Objection. It's hearsay, Your Honor.

THE COURT: Sustained.

BY MR. WILLETT:

Q. Were you scared of Dustin Honken?

A. I'm not afraid of many people. No.

Q. Okay. Do you remember saying something different to the

713

federal grand jury in April of 1996?

A. I was afraid of being set up again.

Q. Do you remember saying something different to the federal grand jury in April of 1997 about being scared of Dustin Honken?

A. I would -- you'd have to show me. I can't remember.

Q. Would it help to refresh your memory, sir, to see your grand jury testimony?

A. Yes, it would.

MR. WILLETT: May I approach the witness, Your Honor?

THE COURT: You may.

MR. WILLETT: Thank you, Judge.

BY MR. WILLETT:

Q. Mr. Cobeen, I'm going to hand you what appears to be your grand jury testimony before the federal grand jury in April of 1996. I want to give you just two areas of guidance. First of all, there's four pages to a sheet on these pieces of paper, so when I say a certain page, you need to look to the respective right-hand corner to find the page.

A. I understand.

Q. And on this particular occasion, I would ask you to turn your attention to page 7, line 19 and just for a second or as long as it takes you, sir, read down through page 18 -- page 8,

Page 159

line 1, page 8, line 1, and I would just ask --

THE COURT: Mr. Willett, why don't you pull that microphone away from -- there we go -- when you're using it, and

714

then you can return it for him.

Q. I would just ask that you read to yourself page 7, line 19, through page 8, line 1. And then I'll ask you a question.

A. Right here?

Q. Yes, sir, where it starts, Grand juror and the grand juror poses a question to you.

A. Grand juror, are you --

Q. Just read it to yourself for a second so you can refresh your memory, and then I'll ask you a question. Thank you.

A. Yeah.

Q. And did that refresh your memory, sir?

A. Yeah.

Q. Now, in response to a question from the grand juror, the grand juror asked you, "Are you scared of this Honken person yourself?" Did I read that question correctly, sir?

A. Yes.

Q. And then you gave your answer: I stated that to Graham several times, and that's what -- exactly what he told me several times, that he knew a guy he could pay 5,000 to; they'd knock on your door and blow your head off when you answered the door. Yes, to be honest with you, I am scared of him. Did I read that answer correctly, sir?

A. Yes, you read that correctly.

Q. Okay. And I believe you stated to Mr. Williams on direct that there was a time after you started cooperating with law

715

Page 160

enforcement that you acquired methamphetamine for Dustin Honken. Did I understand your testimony correctly?

A. Yes, I think you did.

Q. Okay. Now, that was without Agent Graham's knowledge or permission, wasn't it?

A. I got in trouble for that one. Yes, I did.

Q. Okay. And this would have been during the time frame of 1994 or 5?

A. Yes, I think somewhere in there.

Q. So this would have still been on the time when you were on your two-year sentence of state probation; correct?

A. I don't remember for sure.

Q. Well, if you received your felony sentence in 1994 and you told us on direct that you had a 2-year sentence of probation imposed as part of your sentence by the sentencing judge, if we're doing our math in round numbers here, it appears that you were still on probation.

A. If I remember correctly, when I got done with Beje Clark, I was done with probation.

Q. I see. And when was that?

A. The end or late of '95 I think.

Q. Okay. And was it my understanding that on this one occasion where you obtained methamphetamine for Dustin Honken this was in 1995?

A. I don't remember for sure.

716

Q. I see. While you were working in an undercover capacity, did you consume any controlled substances yourself?

A. To be honest with you, I took a few hits off a joint, and I

Page 161

was told never do that again.

Q. By Agent Graham.

A. Yes, sir.

Q. And that was a separate event from the time you hooked Mr. Honken up with some methamphetamine.

A. I think it was all at the same time, that meeting we all had in his house.

Q. The meeting that was had at Mr. Honken's house.

A. Yes.

Q. And do you remember when that was?

A. I don't remember the exact date.

Q. So there were occasions when you did things without Mr. Graham's -- Agent Graham's knowledge.

A. Just that one time.

Q. Now, this occasion when you had to meet with Angela Johnson, my client, was this around New Year's of '96 or New Year's Eve of '95? Is this when this occurred?

A. I don't really remember the exact date.

Q. Was there any card playing going on or anything like that? I mean, it was at a house. There were several people there. Was it a party?

A. What time are you talking about?

717

Q. The time when you had to meet with Angela Johnson. There was a time when Mr. Honken said, I'd like to you meet --

A. Where I got the final okay at her house or at the party at his house?

Q. Okay. That's what I was trying to figure out. So there were two events.

A. Where I met her, yes.

Page 162

Q. The first time you met her, this was just sort of a general session with people there, sort of a party.

A. We were all getting introduced to whose job was what involved in the manufacturing and distribution of the meth.

Q. Okay. And you were introduced to those people. I think you mentioned there was a -- biker couple is the label you gave them, a woman by the name of Darla, a gentleman who went by the first or nickname --

A. Last name of Sturgis.

Q. Last name of Sturgis, Tim Cutkomp, yourself.

A. Tim Cutkomp wasn't there.

Q. Tim couldn't be there. Dustin was there, and you were there, and later after everybody left you and Angela Johnson and Dustin Honken conversed.

A. We sat there and played cards and talked at the table.

Q. And that was more just sort of a social setting on that occasion when you were sitting there afterwards playing cards and stuff.

718

A. We were just all getting to know one another I think.

Q. Sure. And you testified to the federal grand jury in April of 1996 that --

MR. WILLIAMS: Objection, Your Honor. Calls for hearsay.

MR. WILLETT: I'll rephrase, Your Honor, if that's the problem. I apologize.

THE COURT: Yes.

BY MR. WILLETT:

Q. Isn't it true that you told the federal grand jury that when you were younger you were a really good liar?
Page 163

MR. WILLIAMS: Objection, Your Honor, hearsay.

THE COURT: Sustained. You can ask him the question, and then you can use the grand jury transcript --

MR. WILLETT: Thank you, Judge.

THE COURT: -- to impeach him if the answer is different than the question.

MR. WILLETT: Thank you.

THE COURT: But it's hearsay if you ask him what he testified to in the grand jury.

MR. WILLETT: Thank you. I'm clear now. Thank you, Judge.

THE COURT: You looked momentarily surprised, and I know you know the process so . . .

MR. WILLETT: Thank you again.

719

THE COURT: I appreciate it. Thank you.

BY MR. WILLETT:

Q. You did testify to the federal grand jury in April of 1996.

A. I think that's the right date, yeah.

Q. And you did testify that you were a real good liar.

MR. WILLIAMS: Objection again, Your Honor. Hearsay.

THE COURT: Sustained. I'll tell you what. Why don't we take our afternoon break. It is 2:35 almost, 2:34. So we'll be in recess until three o'clock. Thank you.

(The jury exited the courtroom.)

THE COURT: Okay. Please be seated. Here's the problem. You can ask him, When you were younger, were you a really good liar? He either says yes or he says no. If he says no, you can impeach him with the grand jury transcript, but you can't ask him what he testified to in the grand jury because

Page 164

that's hearsay.

MR. WILLETT: And, Judge, I apologize. I'm getting myself caught up in asking the preliminary question before I get to the heart of the matter, and that's what's causing me to false step so -- and I apologize.

THE COURT: That's okay. That's not a problem.

MR. WILLETT: Thank you for your tolerance of my limits.

THE COURT: That's no problem. We just got a note from Juror 78. I noticed that the -- handwriting is very bad.

720

I noticed that jury box cannot see Angela. We cannot see her reactions. Are we allowed to see her reactions? I think I'll just respond yes, you're allowed to see her reactions. To the extent that some jurors can see her, that's fine. To the extent that others can't, that's just the parameters we work in in the courtroom, something like that. Any objection to responding that way?

MR. WILLETT: No objection, Your Honor.

MR. WILLIAMS: No objection, Your Honor.

MR. BERRIGAN: And we'll give some thought to how we might be able to cure that problem.

THE COURT: Well, we're not going to be able to cure the problem.

MR. BERRIGAN: Okay.

THE COURT: And it's to your advantage probably not to cure the problem. But you could move Miss Johnson to the end and cure the problem that way.

MR. BERRIGAN: That's a potential.

THE COURT: Right.

Page 165

MR. BERRIGAN: Thanks.

THE COURT: Okay. We'll see you back here at three.

(Recess at 2:37 p.m.)

THE COURT: Hold off bringing the jury in for a second. Please be seated. As I was thinking about this note about Miss Johnson's reactions, technically her reactions are

721

not evidence, and so I wonder if I should remind them of that. Any views? If you all don't agree, I'll just remain silent about it. I don't believe --

MR. BERRIGAN: Would you let us think about it, Your Honor? Frankly we agree with you, and I'm just concerned it might cause more -- it's one of those instructions that might highlight the issue as opposed to alleviate it.

THE COURT: Okay. So at this point I'm not going to say anything about whether -- the evidentiary value, if any, of her reactions.

MR. BERRIGAN: Right.

THE COURT: I'm just going to address the note and just say that's the way the courtroom's set up.

MR. BERRIGAN: We're going to probably move and do some shuffling periodically because I noticed the jurors have not moved, and I understand they're going to stay that way for the week. Is that --

THE COURT: Pardon me?

MR. BERRIGAN: Are the jurors going to stay where they are for the week?

THE COURT: No, they're going to stay where they are for good because the two jurors in front volunteered to stay there. I would normally rotate. It's just because we had two

Page 166

jurors in front.

MR. BERRIGAN:  I understood those fellas had

volunteered for their permanent position.

THE COURT:  There's no point in rotating because the only reason I would rotate was because of the two in front.

Okay.  Thanks.  Let's have the jury brought in.

(The jury entered the courtroom.)

THE COURT:  Everybody please be seated.  I did want to respond.  I did get a juror note.  It basically talked about not every juror can see the defendant's reactions, and I'm just going to comment about it this way.  That's just one of the problems with the way the courtroom was designed, with the presentation of the evidence presentation cart, and so some of you can see better.  Some can't.  The tables really don't belong to the government and the defendant.  My position has always been anybody can sit at any table.  The early bird gets the worm.  But for whatever reason, the government always seems to have that table in criminal trials, and so that's the best I can tell you.

Ready to proceed?

MR. WILLETT:  Thank you, Your Honor.  Thank you.

BY MR. WILLETT:

Q.  Mr. Cobeen, I want to make sure that I've got the time frame of what your involvement was in this case.  My understanding is when you became a cooperating individual, if you will, was in 1995.  That's when you started working with Mr. -- Agent Graham; correct?

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 637 of 3592

A.   Yes, I'm pretty sure that was correct.

Q.   And it's my understanding the only thing that you did for Dustin Honken before joining Agent Graham's team, if you will, is that you went down to Des Moines on this mailbox expedition to try to retrieve something from a mailbox.

A.   I think that's right.

Q.   Okay.  So that's the only thing that you did with or for Mr. Honken before you started becoming a cooperating individual; correct?

A.   I would have to look at all the statements.  I can't keep track of everything.

Q.   But does that sound fair to you in terms of your memory of the sequence of events?

A.   Well, it's hard to answer that because I worked with him every day.  We talked about things every day.

Q.   But after you became a cooperating individual and started working with Agent Graham, you never made any actual methamphetamine, did you?  I mean, the steps and the process were clicking off, but no methamphetamine was ever made, was it?

A.   I don't know.  I'm not a chemist.  I don't know what the final product was when they raided the house.

Q.   I understand that, but there was never a situation where you were asked to sample a batch of anything that was being made or anything like that; correct?

A.   No.

724

Q.   And you were generally familiar with what methamphetamine was, weren't you?

A.   Yeah, I was familiar with it, yeah.

Page 168

Q.    Okay.  So you certainly would have known if you'd been asked to sample some meth; correct?

A.    That's a hard one to answer too because he was also saying he could -- when he could make it, he could make it in liquid form where one drop was ten times more potent than the powder form, so how do I answer that?

Q.    Well, here's another question for you.  Did you ever sample any liquid substances?

A.    No.

Q.    And, in fact, there was even an occasion that you testified about on direct and I think earlier in my cross-examination where you were asked by Mr. Honken to get methamphetamine for him; correct?

A.    Yes, at one time he had asked me to do that for him.

Q.    And he asked you that on that one occasion because Mr. Honken didn't have any methamphetamine, did he?

A.    He -- well, yeah, he wanted to see what it was like out there on the streets.

Q.    Okay.  And it was Dustin Honken who told you that Miss Johnson gave her approval to you being -- working with Dustin Honken; correct?

A.    Dustin said she had approved of me.  Is that what you're

725

saying?

Q.    Was that your understanding?

A.    Yes.

Q.    Angela Johnson didn't come up and say anything to you herself in this manner, did she?

A.    Not that I remember.

Q.    Okay.  Your understanding of why Mr. Honken wanted to work

Page 169

with you is at least one of your abilities that you could bring is that you knew people in Mason City that you could hook Dustin Honken up with in terms of the distribution of this product once it was manufactured; correct?

A.    Say that one more time.

Q.    Sure.  One of the reasons that you were -- that Mr. Honken wanted to associate with you is because you knew people who would be willing to take large quantities of the methamphetamine that he was attempting to manufacture.

A.    That's one of the reasons, correct.

Q.    I believe you mentioned a Brian Beach?

A.    That was one of the names.

Q.    And Steve Gomez.

A.    That was another name.

Q.    Okay.  But when you were talking about Steve Gomez and possibly -- you gave some testimony to Mr. Williams about the fact that if Mr. Honken got up and going he might be infringing on Dustin Honken's -- or excuse me, that Dustin Honken might be

726

infringing on Steven Gomez's market if you will or --

A.    Stepping on his toes, I understand.

Q.    Yeah, that's a great way to put it.

A.    Yes.

Q.    That Mr. Honken said, Well, I might have Angie talk to him if this didn't work.  Do you remember testifying about that?

A.    Yes, I do.

Q.    Okay.  Why does Mr. Honken need you to hook him up with Mr. Gomez if Miss Johnson supposedly knew Mr. Gomez?

        MR. WILLIAMS:  Objection, Your Honor.  Asking the witness to speculate.

Page 170

THE COURT:  Overruled.

A.    Is that an answer to that question?

Q.    You can answer that question.  Do you need it read back?

A.    Would you repeat it, please.

MR. WILLETT:  Madam Court Reporter, would you please read back the question.

(The requested portion of the record was read.)

A.    You'd have to ask Dustin that one.

Q.    Now, you also testified on direct that every single time you would contact Agent Graham.  You remember testifying to that with Mr. Williams?

A.    Are you calling me Mr. Williams?

Q.    No, this is Mr. Williams sitting next to me.  Do you remember telling Mr. Williams when he questioned you --

727

A.    Right.

Q.    -- that every single time Dustin Honken would contact you you would in turn contact Agent Graham?

A.    True.

Q.    Now, you didn't do that when you hooked Dustin Honken up with methamphetamine, did you?

A.    Yes, I did.  I just didn't tell him that I was getting an illegal drug, and then I heard about it later.

Q.    And you testified to Mr. Williams that when you were down testifying to the federal grand jury in Cedar Rapids that Angela Johnson came up to you during a break and said, Just keep quiet. Do you remember testifying to that here today?

A.    Yes, something in that line of words.

Q.    Now, that's not what you said in an earlier court proceeding, is it, sir?

Page 171

A. I don't remember exactly what I said, but I can take myself right back to that stairwell and her telling me to stick to the story.

Q. Okay. But you said something differently in a different court proceeding.

A. I'd have to see the -- 12 years ago. I'd have to see the paperwork.

Q. Sure, sure. Sir, if you'll put on the reading glasses that Mr. Berrigan has shared with you --

THE WITNESS: Thank you, by the way.

728

Q. -- and directly in front of you, sir, on your right hand, would you please turn to page 601? And that number will be in the upper right-hand corner.

A. 601?

Q. 601, sir.

A. I got fifty-six double zero and two five three. I don't have no 601.

MR. WILLETT: May I approach, Your Honor?

THE COURT: You may.

MR. WILLETT: Your Honor, I'll do it this way if you'll allow me to stand next to Mr. Cobeen.

THE COURT: Thank you.

BY MR. WILLETT:

Q. Mr. Cobeen, I'm going to show you your testimony from a prior court proceeding, and we're looking at page 601 and lines approximately 10 through 18. Line 10, question, "And this is down in Cedar Rapids, Iowa?" Did I read that question correctly, sir?

A. And this is down in Cedar Rapids, Iowa.

Page 172

Q.    Did I read that correctly?

A.    That's true.

Q.    Answer -- and excuse me.  I should reflect this is your testimony.  You see that indication there on page -- starting at page 570?

A.    Yes, true.

729

Q.    Now then, the answer to the previous question that we just read, "In the grand jury building, she walked over to me and asked me to come with her.  We went down one flight of steps.  That's when she said" -- and then we skip a line -- excuse me, did I read that portion of the answer correctly, sir, that I just read to you?  Did I read that correctly?

A.    We went down a flight of steps.  That's what she -- right.

Q.    And then we skip a line, and you finish your answer.  Dustin said not to worry about it.  Did I read that answer correctly, sir?

A.    Yes, you did.

Q.    And then we skip down to line 17, a question, "Any other instructions you were given at that point?"  And I read that question correctly, sir?

A.    Yes, you did.

Q.    And then your answer, "I can't really remember right now."

A.    True.

Q.    Okay.  And that's different than what you said here previously today, isn't it?

A.    Somewhat.  As I talk about it, I start remembering more things about it.

Q.    Sure.  And you were a pretty good liar as a young man, weren't you, sir?

Page 173

A.    I had five brothers and all a year apart.  Yeah, I'd have to say I lied a few times so I wouldn't get my butt spanked.

730

Q.    And then finally you related to Mr. Williams an incident where you testified that you saw Angela Johnson drive by in a red Suzuki; correct?

A.    Correct.

Q.    And you told Mr. Williams that she had a big grin on her face; correct?

A.    One of the things I told him.

         MR. WILLETT:  Thanks.

                    REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q.    Mr. Cobeen, I want to just talk with you about one thing. You were just questioned about your testimony at a prior proceeding concerning the conversation that Angela Johnson had with you at the federal building when you were testifying in the grand jury.  Do you remember that conversation?

A.    I remember it perfectly just like I'm right there right now.

Q.    And do you have 601 still in front of you or not?

A.    I never did have 601.

Q.    I'm sorry.  Do you still have the transcript in front of you?

A.    Not 601.  It was his.

Q.    Let me show this to you again.  At page 601 you were asked the question here -- I'm sorry, the bottom of page 600, the question was asked, "Did you have any contact with Dustin Honken

731

Page 174

Q. about your subpoena to the grand jury?" And you answered what, sir?

A. When I got down there, he had Angie Johnson come up to me and wanted me -- Don't worry, he -- don't worry, everything will be okay is what she said.

Q. Okay. And then there was some conversation between a lawyer and the Court, and then the question was, "And this was down in Cedar Rapids, Iowa?" Do you see that?

A. I see that.

Q. And what was your answer?

A. In the grand jury building, she walked over to me and asked me to come with her. We went down one flight of steps. That's when she said Dustin . . .

Q. And then there's an interruption here, but then you said Dustin --

A. Said not to worry about it.

Q. So she was repeating to you what instructions she got from Dustin Honken?

A. Exactly, yes.

Q. Is that right?

A. Or that's the way I took it.

Q. And to be clear on this too, you were asked about this -- do you recall being asked about this in your May 14, 1997, testimony before the grand jury?

A. Say that one more time.

732

Q. Do you remember talking about this very issue before the grand jury on May 17 -- I'm sorry, May 14 of 1997?

A. Yes.

Q. And this is before the proceeding we just talked about just

Page 175

now; is that correct?

A. Yeah.

Q. Okay. And in 1997 which would have been fairly close in time to when these events took place?

A. True.

Q. Okay. And you were asked questions there at page 11, Do you have any -- did you have any conversation with Angie Johnson outside the grand jury room on that day? Do you see that question?

A. Yes, I do.

Q. And what was your answer?

A. Yeah, Dustin, he kept his distance -- he kept his distance from me, and he always sat up by Angie and by everybody. He sent her down to let me know because I said he's -- he told her that I looked nervous.

Q. And the question was asked, "How do you know he told her that?" And the answer?

A. Because she came -- I was going down to have a cigarette or coming back from having a cigarette. All I know is she was heading into the woman's bathroom, and just before she did, that's when she met me in the hallway on the first floor, and

733

she came up to me and said, Dustin said you look nervous. He told me to tell you just to stick to your story and everything will be all right. I pursued on my way, and she went to the bathroom.

Q. Thank you.

A. You're welcome.

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Mr. Willett?
Page 176

MR. WILLETT:  Thank you, Your Honor.

RECROSS-EXAMINATION

BY MR. WILLETT:

Q.   Mr. Cobeen, in regards to this line of questioning that Mr. Williams just finished with you, you've given three different versions on three different occasions, haven't you?

MR. WILLIAMS:  Objection.  Argumentative, Your Honor.

THE COURT:  Overruled.

A.   She met me and told me not to worry about it and stick to the story.

Q.   But you said something on May 14, 1997, that was different from last fall that was different from today, haven't you, sir?

A.   How many years ago was that, sir?

Q.   Well, 2005 May, almost eight years ago, last fall, and today.  You've had three different opportunities, and you've said three different things.

A.   From what I understand, the words are basically all about

734

the same.  They're just not the exact same wording, sir.

Q.   So in your mind "just keep quiet" is the same as "Dustin said not to worry about it."

A.   Somewhat, yes.

Q.   And in your mind "just keep quiet" is the same as "don't worry; everything will be okay" is what she said.

MR. WILLIAMS:  Objection, Your Honor.  That's not all she's said, and that's not all he's testified she said.

THE COURT:  Sustained.  Can you rephrase the question?

MR. WILLETT:  Certainly.

BY MR. WILLETT:

Q.   You said today in testimony to Mr. Williams on direct that

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 647 of 3592

what Miss Johnson told you was just keep quiet.

A.    If that's what the paperwork says.

Q.    And in the prior court proceedings that we discussed, page 601, the answer was -- at least one of the answers was, "Dustin said not to worry about it"; correct?

A.    If that's what the words say.

Q.    And then Mr. Williams on redirect points out that in May of 1997 you say something that's different from these two incidents; correct?

A.    It's hard to keep it all together in my mind after eight years.  You can see my eyes are starting to go now.  All I know is she met me on the flight of stairwell and she told me not to worry about it.

735

Q.    Hang on, sir.  Would you agree with me that you've said different things about this same incident on different occasions?

A.    I would agree to you I've stated it differently, yes.

          MR. WILLETT:   Thanks.

               FURTHER REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q.    Mr. Cobeen, regardless of the exact words used, did you have any question in your mind that Angela Johnson was attempting to influence your testimony before the grand jury?

A.    She was telling me what to say or how to present myself, yes.

          MR. WILLIAMS:   No further questions.

          THE COURT:   Anything further, Mr. Willett?

               FURTHER RECROSS-EXAMINATION

BY MR. WILLETT:

Page 178

Q. She was relaying a message that Dustin Honken had given to her to give to you; correct?

A. That is another way to put it too, sir.

MR. WILLETT: Yeah.

THE COURT: Okay. You may step down.

THE WITNESS: Is that it?

THE COURT: Is the government ready to call its next witness?

MR. WILLIAMS: Yes, Your Honor. United States calls

736

John Graham.

JOHN GRAHAM, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated. Make yourself comfortable. Adjust the chair and the microphone. And when you're settled in, would you please tell us your full name and spell your last name.

THE WITNESS: John Phillip with two l's Graham, G-r-a-h-a-m.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Graham, can you share with the jury what you do for a living, sir?

A. I'm an agent with the Division of Narcotics Enforcement for the state of Iowa.

Q. Are you deputized as a special agent as well kind of with the FBI?

A. Yes, I am.

Q. How long have you been involved in law enforcement, sir?

Page 179

A.   With the state of Iowa since 1980.

Q.   And can you just relate for the jury kind of your background in law enforcement?

A.   After I graduated from Iowa State, I was hired by the state of Iowa.  I attended the Department of Public Safety's basic

737

academy which was approximately 12 weeks.  After completion of that, I was assigned to the capitol security division of public safety.  I was an officer with them until November of 1981 when I transferred to the Iowa State Patrol.  I was a trooper for one year, and in November of 1982 I transferred to the Division of Criminal Investigation and was assigned to narcotics.

In 1987 the Department of Public Safety split narcotics out of the DCI and formed a new division, the Division of Narcotics Enforcement.

Q.   And since that time have you been an agent with the Division of Narcotics Enforcement?

A.   Yes.

Q.   Were you -- when you joined the Division of Criminal Investigation before it split off the narcotics and since that time, have you been assigned to a specific post within the state of Iowa?

A.   Yes, I have.

Q.   And where has that been?

A.   Mason City, Iowa.

Q.   And how long have you officed out of Mason City, Iowa?

A.   For approximately 22 1/2 years.

Q.   Can you explain to the jury, first of all, by 1993, had the DCI been split off from the Division of Narcotics Enforcement?

A.   Yes.

Page 180

Q.    And so explain to the jury if you would what were the

738

divisions of duties then between the DCI and the Division of Narcotics Enforcement.

A.    After the split in 1987, essentially the Division of Narcotics Enforcement was responsible for investigating drug crimes here in Iowa, and the Division of Criminal Investigation continued to investigate homicide-related matters, assisting agencies with other type of general crim. investigations such as assault charges, bank robberies, and as well as they're charged with investigating or having involvement in the gaming industry here in Iowa.

Q.    So once that split occurred, your job was limited solely to narcotics enforcement.

A.    Yes.

Q.    And can you explain to the jury then as a special agent with the Iowa Division of Narcotics Enforcement what some of your duties have been since that occurred.

A.    Early in my career both with the DCI and then also with the DNE I was -- assumed an undercover role and would purchase drugs or controlled substances from individuals who were distributing them, also managed and controlled confidential informants, assisted other law enforcement agencies in the area of narcotic investigations.

Currently I serve as the operations coordinator for the North Central Iowa Narcotics Task Force that's located in Mason City.  I have served as an instructor at the Iowa Law

739

Page 181

Enforcement Academy as well as the Department of Public Safety's academy and finally go out into the public and educate them in the areas of drug enforcement and drugs in general.

Q.   Over the course of your career, have you received specialized training in the area of narcotics enforcement?

A.   Yes, I have.

Q.   Can you just generally summarize some of that training for this jury, please?

A.   In general I've received training in the areas of undercover drug investigation, financial investigations as they relate to narcotics, wire tapping school, clandestine laboratories where drugs -- that deal with how drugs are manufactured.

Q.   Let's talk about that last one while we're on that topic. The clandestine laboratories refers to what?

A.   The secret making of controlled substances.

Q.   And is there a particular controlled substance in Iowa that you've received specialized training in?

A.   Yes.

Q.   And what drug is that?

A.   Methamphetamine.

Q.   As a result of that, have you come to learn the different ways of manufacturing methamphetamine at least to some degree?

A.   Some ways, yes.

Q.   And have you become familiar with some of the chemicals and

740

some of the equipment used in the manufacturing of methamphetamine?

A.   Yes.

Q.   You mentioned earlier one of your duties was working with

Page 182

cooperating individuals. And can you just share with the jury to begin with how does that fit in with your role as a DNE agent working with cooperators?

A. People who provide us information can be in various forms. Some can be just that, they just supply information. Other individuals will take a more active role where they can introduce an undercover officer into a person who's selling drugs or else they actively purchase the drugs themselves for us acting in an undercover capacity.

Q. And what's in it for these cooperating individuals typically?

A. It ranges anywhere from nothing to consideration of charges, whether or not charges will be filed, consideration of sentences, and some people are monetarily rewarded.

Q. I want to direct your attention -- well, let me, before I get to that point, have you explain are other agencies within the state of Iowa involved in narcotics enforcement in addition to the Iowa Division of Narcotics Enforcement?

A. Yes.

Q. And what are some of those other agencies and entities?

A. Drug Enforcement Administration, the FBI, various -- just

741

about all local sheriffs' departments and police departments. The Iowa State Patrol in some fashions are.

Q. And over the course of time has there been a greater coordination of intelligence and sharing of information between these agencies?

A. Yes.

Q. Are there times, for example, where -- particularly in the early 1990s where a local law enforcement agency, some city

Page 183

might be operating some drug enforcement investigation and not completely keep everybody else up to speed on it?

A.   Yes.

Q.   So I want to direct your attention then to 1993 and ask you if you were aware at that point whether there was a narcotics investigation involving Dustin Honken.

A.   Yes, I was.

Q.   And what, if any, role did you have in 1993 in that investigation?

A.   I did not have an active role at that time.

Q.   Whose investigation was that at that point?

A.   It was primarily started with the Mason City Police Department.  Well, actually it started outside of the agency, but it centered then with Mason City, and then they sought and brought in other agencies to assist them in that.

Q.   Did you become aware at some point that charges were brought against Dustin Honken from that investigation?

742

A.   Yes.

Q.   And were you aware whether those were state or federal charges?

A.   Initially they were state, and then they changed and they were dismissed, and then he was indicted federally.

Q.   Did you become aware what happened with those federal charges then?

A.   Yes.

Q.   And what happened with those?

A.   They were dismissed in March of 1995.

Q.   At some point did you become aware of additional information that Dustin Honken was involved with manufacturing

Page 184

and possibly distributing methamphetamine in 1995?

A.    Yes.

Q.    Can you describe for the jury how you became involved in the investigation at that point?

MR. WILLETT:  Excuse me, Your Honor.  If I may interpose an objection at this time, we would just renew our objection based on previously filed motions, and we would cite the Court to Federal Rule of Evidence 402, 403, 404, and 802, and I would just ask for the courtesy of being allowed a continuing objection during Agent Graham's testimony so I don't interrupt.

THE COURT:  You may have a continuing objection, and the objections are overruled.

743

A.    A person, individual by the name of Daniel Cobeen, had through his attorney contacted the Cerro Gordo County Attorney's Office expressing that he had information concerning Mr. Honken.

Q.    Did you meet with Mr. Cobeen?

A.    Yes.

Q.    Had you ever worked with him before in any capacity?

A.    No.

Q.    Based on the information that Mr. Cobeen provided to you, what did you do?

A.    First thing we did was myself and Agent Mizell interviewed him and gained the information that he had and then just kind of -- was kind of a wait-and-see what happened after that.

Q.    You mentioned Agent Mizell.  What agency is he with?

A.    Drug Enforcement Administration.

Q.    And did he work with you in this investigation in 1995 then?

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 655 of 3592

A.    Yes.

Q.    As a result of the meeting with Mr. Cobeen, what, if anything, was provided to Mr. Cobeen for his cooperation with law enforcement in this investigation?

A.    At that point in time nothing.

Q.    At some point was he ever reimbursed or provided any money for any purpose?

A.    Yes, he was.

Q.    And what was he provided money for if you recall?

744

A.    He was given some minor expense money for traveling back and forth in the area as well as at the end of the investigation, his part of the investigation, he was given some relocation money.

Q.    At the time that you became involved with Mr. Cobeen, did you sign him up or then use him as a cooperator from that point forward?

A.    Yes.

Q.    What did you understand had occurred between him and Dustin Honken, if anything, at the point that you first -- you started having Mr. Cobeen cooperate with you?

A.    That he had been approached by Mr. Honken to assist him in the set-up and eventually in the manufacturing of methamphetamine.

Q.    By the time that he began cooperating with you, had he taken any steps with Mr. Honken in furtherance of the operation?

A.    Yes.

Q.    And what were those steps?

A.    They had travelled to the Des Moines area to set up a mailbox or a post office box, if you will, at a facility as well

Page 186

as ordered a hydrogen tank.

Q.   Did -- as part of the cooperation, did Mr. Cobeen ultimately provide you with receipts from purchases of items?

A.   Yes.

Q.   I'm handing you Exhibits 75 and 78 that have been admitted

745

into evidence and just ask you if those are receipts that Mr. Cobeen provided you as part of his cooperation.

A.   Yes, both Government's Exhibits 75 and 78 were provided to me by Mr. Cobeen.

Q.   Describe for the jury as part of this cooperation, did you have an arrangement with Mr. Cobeen for maintaining contact with you?

A.   Yes.

Q.   And what was that arrangement?

A.   If I did not make weekly contact with him, he was then instructed to contact me if he had some new or fresh information.

Q.   Based on the information that Mr. Cobeen provided to you when he first started cooperating with you, what did you understand the status of the methamphetamine laboratory to be at at that point in time?

A.   It was still kind of in the discussion stage and the set-up phase of it.

Q.   And how long did Mr. Cobeen continue to work with you as a cooperator before you stopped using him as a cooperator?

A.   In this investigation he continued until approximately May of 1996.

Q.   And at some point did you bring down or execute a search warrant at Dustin Honken's house?

Page 187

A. Yes.

746

Q. Had -- based on your information from Dan Cobeen, had they gotten to the point where they were manufacturing methamphetamine?

A. Not yet to that point.

Q. Based on what he had told you, where did you understand they were at in the process?

A. They were in the process of doing it in stages, and the next stage that Mr. Cobeen explained to me could potentially be dangerous to the neighborhood.

Q. So why -- what did you do at that point?

A. The decision was made for us to ex -- for law enforcement to execute a search warrant.

Q. And as a result of that, you searched before they actually manufactured any methamphetamine?

A. Yes.

Q. Did the search take place on February 1, 1996?

A. No, it was February 7, 1996.

Q. My fault. And did you obtain a search warrant for that purpose?

A. Yes.

Q. When you executed the search warrant, what location did you search?

A. Mr. Honken's residence at 1104 16th Street Northeast, Mason City, Iowa.

Q. I'm showing you what's been marked as Government's Exhibit

747

Q. 1, and using this, can you give the jury an idea of where on

Exhibit 1 the house was located?

A.    Mr. Honken's house was located in the northeast section of Mason City in approximately this area here.

Q.    You're pointing at the northeast corner, upper right-hand corner of Exhibit 1?

A.    Yes, I am.

Q.    Who was present at the house when you executed that search warrant?

A.    No one.

Q.    Did you make any attempts to locate Dustin Honken?

A.    Yes.

Q.    And why was that?

A.    To inform him that a search warrant was being executed at his residence.

Q.    Did you find him on the day of the search, on February 7, 1996?

A.    Yes.

Q.    And where did you find him at?

A.    Miss Angela Johnson's Clear Lake residence.

Q.    And who all was present at the house at the time you found him there?

A.    I don't know how many people were there.  I just recall that Mr. Honken came to the door.

Q.    And did you advise him that you were searching his house in

748

Mason City at that time?

A.    Yes.

Q.    And did you provide him with a copy of the warrant if you recall?

A.    I don't recall we left a copy with him at that time or if
Page 189

we left it at his residence when we had completed.

Q.    Taking you back then to Dustin Honken's house in Mason City, when you searched that house, can you just, first of all, describe for the jury the house itself?  Is it a two-story, single-story, so forth?

A.    It was a two-bedroom ranch with a single-stall garage attached.

Q.    Generally can you describe what you found in the house in very general terms to begin with?

A.    We found -- other than the personal items a normal household would have, we found some notes, some writings, some books pertaining to the production of drugs, specifically methamphetamine.  We found a scale and then other books and -- related to glassware or other things that can be ordered for a methamphetamine lab.

Q.    And did you, in fact, find the makings of a methamphetamine lab at some place in the house?

A.    Yes, we did.  We found that in the garage of the residence.

Q.    During the course of the search, did you take photographs of the various items that you found during the search?

749

A.    Yes, there were.

Q.    Handing you what's been marked as Government's Exhibits 51 through 64 with the exception of Exhibit 59 which is a photograph we're just not using, can you look through there and tell the jury what those are.

A.    Government's Exhibits Numbers 51 through 64 minus 59 are photographs that were taken at the Dustin Honken residence on February 7, 1996, when we executed the search warrant.

Q.    And do they fairly and accurately reflect the items that

Page 190

were seen at that time during the search on February 7, 1996?

A.    Yes.

MR. WILLIAMS:   United States would move to admit Exhibits 51 through 64 with the exception of 59, Your Honor.

*   *   *   *

(Government Exhibits 51 through 64, excluding 59, were offered.)

*   *   *   *

THE COURT:   Any objection?

MR. WILLETT:   Your Honor, as to all Government Exhibits 51 through 64 with the exception of 59, the defense would object based on Federal Rules of Evidence 402, 403, and 404.

THE COURT:   Overruled.   Government's Exhibits 51 through 64 with the exception of 59 are admitted into evidence.

*   *   *   *

750

(Government Exhibits 51 through 64, excluding 59, were admitted.)

*   *   *   *

MR. WILLIAMS:   And permission to publish, Your Honor?

THE COURT:   You may.

BY MR. WILLIAMS:

Q.   Before I start publishing these photographs, Mr. Graham, could you advise the jury when a search like this is done of chemicals and a meth lab like this, are there certain protocols that come into play with dealing with some of those things?

A.   In any clandestine laboratory in Iowa, with all the meth labs, law enforcement is charged and responsible to respond to that in a particular fashion and manner whereas people trained

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 661 of 3592

or officers trained in the area of clandestine labs have to make the entry. They have to make the assessment on whether or not the chemicals are there that are going to be actually needed in the process of manufacturing, and then they are also charged with the removal of those items, the dismantling of any apparatus that's set up as well as the sampling of any materials that are located there.

Q. Are certain of the chemicals and products provided to a laboratory for further analysis in some cases?

A. Yes, they can be.

Q. When there are chemicals present in containers that have some danger to them, what are done with those chemicals and

751

containers?

A. Those materials are set aside, and a hazardous waste material company then comes, responds to the site, and then they properly package them up so they can be disposed of.

Q. And they're ultimately destroyed by this hazardous waste company?

A. That's correct.

Q. Showing you Exhibit 51, first of all, can you identify for the jury what they're seeing in that photograph?

A. That is a photograph of the garage area of the residence, and we're looking into the northeast corner. That's where that pass door is located at.

Q. And are there items visible in this photograph that you know from your training and education are connected with the manufacturing of methamphetamine?

A. Yes.

Q. And can you point some of those out for the jury using that

Page 192

wand there, please.

A.   One of the items is this particular device down in this corner right here was set up with some tubing.  Sometimes compressed gas cylinders will be utilized, and then some type of glassware is oftentimes found, and there's some glassware located there just quickly.

Q.   Showing you Exhibit 52, can you identify that for the jury, please.

752

A.   Again, the photograph Number -- or Government's Exhibit Number 52 is looking at the east wall of the garage, and camera angle's just changed a little bit from the previous photograph.

Q.   Showing you Exhibit 53.

A.   Again, we're just moving to the right or to the south of the garage.  You can see in through -- into the house through the pass door in this area here.

Q.   Exhibit 54?

A.   Is again -- it's underneath the work bench area in the northeast corner of the garage.

Q.   And can you explain, is there -- what's the significance of the tubing and so forth coming out of that container down there in the lower right-hand corner?  Do you know?

A.   That is an area that was determined that there was some chemical reactions that took place.

Q.   Showing you Exhibit 55.

A.   Again, a picture of underneath the work bench and again showing the two plastic containers with the tubing where the chemical reactions took place.

Q.   Exhibit 56?

A.   Again, the work bench area showing the glass flask.
Page 193

Q.  Exhibit 57?

A.  Inside that pan, Exhibit Number 57, shows what was a three-neck flask that was used in the manufacturing process as well as a separatory funnel placed on top of it.  The pan is

753

seated on top of a heating mantle that could have been used during the manufacturing process.

Q.  And the triple-neck flask, is that a specialized piece of glassware used in chemical -- in chemistry-type applications?

A.  Yes.

Q.  Exhibit 58?

A.  Again, it's still in the step that leads into the kitchen area where you can see the three-neck flask as well as some rubber gloves, some garden hose.

Q.  And the garden hose, is that actually used in the manufacturing process?

A.  It can be.

Q.  Exhibit 60?

A.  Again, a different angle of the step area showing the three-neck flask as well as some glassware that may have been used in the manufacturing process.

Q.  And can you -- for the jury's assistance there on that three-neck flask, can you point out the three separate necks of that flask?

A.  (Witness indicated.)

Q.  Exhibit 61?

A.  Is a photograph that was taken inside the kitchen area that shows a scale that was seized.

Q.  Where in Exhibit 61 is there a photograph of a scale?

A.  In the right-hand portion of the cabinet above the stove.

Page 194

Q.    Handing you Exhibit 65.  Do you recognize that, sir?

A.    Yes.

Q.    And what is that?

A.    Exhibit Number 65 is the scale that's depicted in the picture which is Exhibit Number 61 and also the scale that was seized from the Honken residence on February 7, 1996.

MR. WILLIAMS:  United States moves to admit Exhibit 65, Your Honor.

*   *   *   *

(Government Exhibit 65 was offered.)

*   *   *   *

THE COURT:  Any objection to 65?

MR. WILLETT:  Federal Rule of Evidence 402 and 403 and 404 as it pertains to this defendant, Your Honor.

THE COURT:  Overruled.  Sixty-five is admitted.

*   *   *   *

(Government Exhibit 65 was admitted.)

*   *   *   *

BY MR. WILLIAMS:

Q.    Agent Graham, can you explain to the jury what significance, if any, does a scale like that have to do with narcotics trafficking?

A.    Sometimes scales like this can be utilized to weigh out any type of substance that they're going to sell whether it's marijuana, cocaine, methamphetamine.  It can be weighed out and

then distributed so they can get an accurate weighing or

Page 195

measurement of the drugs that they're selling. In a manufacturing case, it can also be used to weigh out any powders that are going to be used as an ingredient into the manufacturing process.

Q. On Exhibit 61, do you also see a brown bottle in that photograph as well?

A. Yes.

Q. And can you circle that, please.

A. (Witness complied.)

Q. Are you aware of whether brown bottles were used in 1993 in the drug operation by Dustin Honken?

A. Yes.

Q. Showing you Exhibit -- what's previously been admitted as Exhibit 26S. Do you see a brown bottle in that photograph as well?

A. Yes.

Q. Is that similar in kind to the bottle that was found in Dustin Honken's house in 1995 shown in Exhibit 61?

A. Yes, it appears to be other than the different color cap.

Q. Showing Exhibit 62, what is that, sir?

A. It's a close-up of the same cabinet that's located in the kitchen above the stove that Exhibit Number 61 showed.

Q. Including the triple-beam -- or the scale and the bottle?

A. Yes.

756

Q. Exhibit 63, can you explain what that is, sir?

A. It's a collection of the items that were deemed to be contaminated and that were set aside outside waiting the hazardous material company to come for proper disposal.

Q. And those would have been the items ultimately destroyed

Page 196

because they were hazardous?

A.    Yes.

Q.    And Exhibit 64?

A.    Is just another photograph of the same items but at a different angle.

Q.    Sir, as part of this investigation, we've talked and you've just described for the jury some of the items that were ultimately destroyed.  Was there some equipment that was not destroyed because it had not yet been contaminated by any chemicals?

A.    Yes.

Q.    We talked about one which is Exhibit 65, the scale.  Was there any glassware also retrieved that had not yet been contaminated?

A.    Yes.

Q.    Handing you Exhibit 66, can you please identify that, please?

A.    Government's Exhibit Number 66 is a distillation flask that was seized from the Dustin Honken residence on February 6, 1996 -- excuse me, February 7, 1996.

757

         MR. WILLIAMS:  United States moves to admit Exhibit 66, Your Honor.

                          *   *   *   *

         (Government Exhibit 66 was offered.)

                          *   *   *   *

         THE COURT:  Any objection?

         MR. WILLETT:  Federal Rule of Evidence 402, 403, and 404.

         THE COURT:  Overruled.  Sixty-six is admitted.

Page 197

* * * *

(Government Exhibit 66 was admitted.)

* * * *

BY MR. WILLIAMS:

Q.   Sir, during the search of Dustin Honken's house on February 7, 1996, did you also seize any type of paperwork or documentation?

A.   Yes, we did.

Q.   I've handed you Exhibit 67.  Can you identify that for the jury, please?

A.   Government's Exhibit Number 67 is an envelope that has some instructions or words written on it that was seized from the Honken residence on February 6, 1996 -- excuse me, February 7, 1996.

MR. WILLIAMS:   United States moves to admit Exhibit 67, Your Honor.

758

* * * *

(Government Exhibit 67 was offered.)

* * * *

THE COURT:   Any objection?

MR. WILLETT:   Federal Rule of Evidence 802, 402, 403, and 404, Your Honor.

THE COURT:   What exception to the hearsay rule are you relying on?

MR. WILLIAMS:   It's not being introduced for the truth of the matter asserted.

THE COURT:   Sixty-seven is admitted.

* * * *

(Government Exhibit 67 was admitted.)

Page 198

* * * *

MR. WILLIAMS: Permission to publish, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Can you -- in case the jury cannot read that, can you read that for the jury, please.

A. Tim, please set up for simple distillation. Set the hot plate on setting number 9. Dustin. Then on the flap there's some additional instructions. Please run the chlorine outside or dump it to go down -- so it don't fumigate the place.

Q. Do you recall where in the house this Exhibit 67 was seized?

759

A. It was seized in the living room area.

Q. I've handed you Exhibit 68. Can you identify that for the jury, please?

A. Government's Exhibit Number 68 is a piece of paper with writing on it that pertains to the changing of chemicals as it goes through the process and ultimately ends up with methamphetamine.

Q. And was that seized from the Dustin Honken residence on February 7, 1996?

A. Yes.

Q. And where at in the residence?

A. The kitchen.

MR. WILLIAMS: United States moves to admit Exhibit 68 into evidence, Your Honor.

* * * *

(Government Exhibit 68 was offered.)

* * * *

Page 199

THE COURT:  Any objection to 68?

MR. WILLETT:  Federal Rule of Evidence 802, 402, and 403, Your Honor.

THE COURT:  Overruled.

MR. WILLIAMS:  Permission to publish, Your Honor.

THE COURT:  You may.

BY MR. WILLIAMS:

Q.  Do you know anything about chemistry yourself, Agent

760

Graham?

A.  Very little.

Q.  Is there something that tells you that that is, in fact, designed for making of methamphetamine on that diagram, Exhibit 68?

A.  Exhibit Number 68 shows the changing of a molecular structure of a particular chemical starting out with benzene, and it goes through several other chemicals with a last chemical structure being methamphetamine.

Q.  And that's actually written out on that diagram as well?

A.  Yes, it is.

Q.  During the course of your search, did you find any correspondence between or from Angela Johnson to Dustin Honken?

A.  Yes.

Q.  I've handed you Exhibit 69.  Can you identify what that is for the jury, please?

A.  Yes.  Government's Exhibit 69 is a letter that was seized from the Dustin Honken residence on February 7, 1996, that was addressed to Dustin and was written by -- believed to be written by Angela Johnson.

Q.  Has it got some type of signature or ending to it

Page 200

indicating who authored it?

A.   It's written over, but on the return address portion of the envelope it says Angela Johnson.

MR. WILLIAMS:  United States moves to admit Exhibit 69

761

into evidence, Your Honor.

* * * *

(Government Exhibit 69 was offered.)

* * * *

THE COURT:  Any objection?

MR. WILLETT:  Your Honor, Federal Rule of Evidence 402 and also lack of foundation since Agent Graham's only able to testify that he believes this letter was written by Angela Johnson.

THE COURT:  Overruled.  Sixty-nine is received.

* * * *

(Government Exhibit 69 was admitted.)

* * * *

MR. WILLIAMS:  And permission to publish, Your Honor.

THE COURT:  You may.

BY MR. WILLIAMS:

Q.   First of all, Agent Graham, can you explain to the jury just generally what did this letter pertain to?

A.   Generally the letter just discusses Ms. Johnson and Mr. Honken's personal life, and then there is one section of the letter that pertains to a business agreement they had.

Q.   When you say personal life, is there any reference to Dustin Honken's other significant other in his life, Kathy Rick?

A.   Yes.

Q.   First of all, I'm showing you page 8 of that letter.  And

Page 201

first of all, is this a multi-page letter that you seized?

A.   Yes, it is.

Q.   And going to page 8 of this --

THE COURT:  Just a second.  We have a juror note.

Did Juror 55 pay you to write this note?  I'm just kidding.  I'm just kidding.  We have a note from a juror that she's feeling very sick, so in light of Juror 55's situation about the city council meeting and in light of a juror being sick, we'll call it a day.  You don't have any objection, do you, Mr. Williams?

MR. WILLIAMS:  Not at all, Your Honor.

THE COURT:  You weren't going to finish, and we wouldn't have been finished with cross-examination in any event today.  So we're going to send you home for the day.

Now let me just tell you something.  If -- you know, you have to make every effort to try and be here whether you're sick or not unless it's an absolute emergency.  But, you know, if you have an absolute emergency -- but we would lose you as a juror because we can't stop the trial.  So hope you're feeling better by tomorrow morning.  And we'll be in recess until 8:30 tomorrow morning.  And please remember my cautionary instruction.  Thank you.  Might have been that Hy-Vee lunch.

(The jury exited the courtroom.)

THE COURT:  Please be seated.  Mr. Willett, I did get an e-mail from my secretary Jennifer.  It says, I don't know if

you want to give Al Willett a heads-up, but we have a class scheduled to come into court tomorrow at 8:50 a.m., about 22

Case 3:09-cv-03064-MWB-LTS     Document 284-71     Filed 06/23/11     Page 672 of 3592

kids from Unity Christian. So just a heads-up there.

MR. WILLETT: Tell Jennifer I appreciate the courtesy, Judge.

THE COURT: She's always thinking of the lawyers in the case.

Anything else we need to take up?

MR. WILLIAMS: Your Honor, if I may, over the weekend I did some additional research in light of Booker in particular. It's my conclusion that it is not at all accurate to advise this jury that the only two alternatives is life in prison or the death penalty for this defendant in light of Booker. Under Title 18, statutorily it's my understanding there really are only two alternatives. Under Title 21, the statute provides for a 20-year mandatory minimum with a maximum of life in prison. The guidelines indicated that anybody convicted of such a crime should be -- receive life in prison. After Booker obviously the guidelines are not mandatory on the Court.

I don't -- I'm not advocating that this jury be instructed that anything that they were told during the jury selection was inaccurate, but I wanted to forewarn the Court that obviously this issue -- we're going to have to address -- if we get to a penalty phase, we're going to have to address in how we handle it at that point, and I wanted to raise it with

764

you and ask you if there's a particular way you want me to bring this before the Court.

There's some cases -- there are no post-Booker cases on point, but there are pre-Booker cases that talk about the effect that the guidelines are the only basis for the mandatory life aspect of it and only because the person will guideline out

Page 203

at a level 43 there. And I think in light of Booker, I don't think that's any longer the case that it's necessarily life. So is there -- I'd be glad to brief the issue --

THE COURT: Yeah, you might as well.

MR. WILLIAMS: -- if the Court would find that helpful.

THE COURT: Have you discussed this at all among yourselves?

MR. WILLIAMS: Not at all, Your Honor. I did the research this weekend. I didn't want to tax the Court with this today before we got into trial.

THE COURT: Any reaction, Mr. Sentencing Commission Man? Mr. Berrigan, you can comment first.

MR. BERRIGAN: Actually we were aware of this issue before the trial started, Your Honor, but we're not of the same view. I think it's best -- it's such a serious matter, it's best to address it in writing. I'd like to kind of reserve our position until we see the government's view of the matter.

THE COURT: Well, I guess your position didn't affect

765

what we've been telling the jury the whole time.

MR. BERRIGAN: Exactly. No, our strong feeling is what you've told these jurors so far is absolutely accurate, and that's our intent that that continue to be the instructions to the jury. We're not asking for a change. It's the government raising this issue. But I think we should address it probably in writing at some point.

THE COURT: So let me -- I'm just trying to understand your position. Is your position that post-United States versus Booker I wouldn't be bound by a jury finding of life

Page 204

imprisonment because the guidelines are now advisory and I could use the Title 18, 3553(a) factors to vary from the guideline sentence?

MR. WILLIAMS: Yes, Your Honor. In fact, my reading of this research over the weekend would indicate to me the jury would never be asked the question of what she should receive. Their question would only be does the defendant receive the death penalty. Absent them affirming unanimously she gets the death penalty, they have no other role in determining the sentence of the defendant. Then it comes back to the Court to determine where within the range of 20 years to life the defendant would be sentenced.

THE COURT: When do you think you can file your opening brief? I know you have a lot of other work that's ongoing.

766

MR. WILLIAMS: Yeah, a little bit. I could take a stab at trying to get you a draft of it by the end of this week.

THE COURT: How about this? How about just a letter with the case citations? It's all pre-Booker case law. You're really taking pre-Booker case law and then making an educated judgment about what effect Booker has on that preexisting case law.

MR. WILLIAMS: That's correct, Your Honor. At least I -- in my research over the weekend I did not come up with any post-Booker decisions on this issue. I'm not aware of any at this time.

THE COURT: I don't mean to intrude into your prosecutorial discretion, but have you run it by your whiz-bang group at DOJ?

Page 205

MR. WILLIAMS: That I have not --

THE COURT: Whatever title the whiz-bang folks have?

MR. WILLIAMS: I think you're referring to the capital crimes unit.

THE COURT: That'd be the one, that's right.

MR. WILLIAMS: I've not run it by them at this point because I did --

THE COURT: I would assume they've researched that and given that a lot of thought.

MR. WILLIAMS: I would hope so.

THE COURT: You would hope they would.

767

MR. WILLIAMS: I would hope so.

THE COURT: Or they should be here and you should be there.

MR. WILLIAMS: I did this on Saturday and a little bit on Sunday, though, so I didn't have an opportunity to contact them.

THE COURT: Well, I understand where you're going. I'd suggest just sending me either a letter or do it by e-mail.

MR. WILLIAMS: Very good, Your Honor.

THE COURT: Just with the citation and kind of just an outline of the argument and, you know, obviously then to opposing counsel, and then they can respond, and I can get cracking on it. I mean, I understand the issue quite well. Hadn't thought about it. I can't say I thought about it before, but I understand what you're raising.

MR. WILLIAMS: Yeah, and it bothered me throughout the jury selection that I was missing something there, and then in light of Booker and just -- frankly, this weekend's the first

Page 206

opportunity I had to spend some time on it. So I can certainly -- in that kind of context, I can certainly get you something within the next couple days that would set out the outline of the argument and some of the authorities.

THE COURT: When do you think you'll likely -- what week do you think you'll likely finish the government's evidence on the merits?

768

MR. WILLIAMS: Your Honor, at the pace we're moving, I would say it's not going to be the end of next week but it may be the beginning of that third week out, so whatever that -- if that's the 25th, 26th of May. I can see us at this point at this pace possibly concluding by that Monday or Tuesday. Part of it depends on the defense position with regard to chain of custody-type folks, and they've communicated with us that they're not going to have difficulties with some of that stuff that we thought we might have some difficulties with early on. If that happens, I might be able to actually take out over a dozen witnesses off of our witness list, and that would put us at that pace.

THE COURT: Well, do you really need -- I mean, I think you understand the government's position, Mr. Berrigan. Can't you respond within the next couple days and just do it simultaneously?

MR. BERRIGAN: I'm not sure we can, Your Honor. There are issues of collateral estoppel and other things we should probably take a look at. But as soon as we get their written response, we'll get to work on it right away, the written letter or whatever it is they're going to do. We'll certainly be thinking about it, working on it in the meantime.

Page 207

THE COURT: Collateral estoppel?

MR. BERRIGAN: Well, we've been telling the jury obviously since the start that there are two possible

769

punishments and only two. I'm not sure how their suggestion would impact --

THE COURT: Well, collateral estoppel requires -- yeah, well, I don't -- there may be an estoppel argument. It's not collateral estoppel.

MR. BERRIGAN: An estoppel issue in terms of waiver that they've raised this so late that it's too late to change the rules.

THE COURT: Okay. Well, you know, the faster the better.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Thank you. Anything else we need to take up?

MR. BERRIGAN: Your Honor, we have one ex parte matter that I'd like to take up with the Court. We can do it right now or whenever you're available.

THE COURT: Okay. Why don't we just go back in the conference room and do it with our court reporter.

MR. BERRIGAN: Okay. Thank you.

(The foregoing trial was adjourned at 4:12 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


Shelly Semmler, RMR, CRR   8-25-05
            Date

Page 208

Case 3:09-cv-03064-MWB-LTS Document 284-71 Filed 06/23/11 Page 678 of 3592

INDEX

WITNESS:                                                          PAGE:

ROBERT GERDES
            MR. WILLIAMS                                            534
            MR. BERRIGAN                                            548
            MR. WILLIAMS                                            555
            MR. BERRIGAN                                            556

CHRISTI GAUBATZ
            MR. MILLER                                              557
            MR. WILLETT                                             602
            MR. MILLER                                              603
            MR. WILLETT                                             618
            MR. MILLER                                              652

DANIEL COBEEN
            MR. WILLIAMS                                            658
            MR. WILLETT                                             710
            MR. WILLIAMS                                            730
            MR. WILLETT                                             733
            MR. WILLIAMS                                            735
            MR. WILLETT                                             735

JOHN GRAHAM
            MR. WILLIAMS                                            736

*****

EXHIBITS:

1                                                                  565
44A and 44B                                                        603
78                                                                 691
75                                                                 696
51 through 64, excluding 59                                        750
65                                                                 754
66                                                                 757
67                                                                 758
69                                                                 761

*****

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 679 of 3592

771

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

       Plaintiff,                        Sioux City, Iowa
                                        May 10, 2005
   vs.                                      8:31 a.m.

ANGELA JANE JOHNSON,                         VOLUME 4 of 24

       Defendant.
                          /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

772

APPEARANCES:

For the Plaintiff:      C. J. WILLIAMS, ESQ.
                        Assistant United States Attorney
                        Suite 400 - Hach Building
                        401 First Street Southeast
                        Cedar Rapids, IA  52401

                        THOMAS HENRY MILLER, ESQ.
                        Iowa Attorney General's Office
                        Area Prosecutions Division
                        Hoover State Office Building
                        Des Moines, IA  50319

For the Defendant:      DEAN STOWERS, ESQ.
                        Rosenberg, Stowers & Morse
                        1010 Insurance Exchange Building
                        505 Fifth Avenue
                        Des Moines, IA  50309

                        ALFRED E. WILLETT, ESQ.
                        Terpstra, Epping & Willett
                        Higley Building - Suite 500
                        118 Third Avenue Southeast
                        Cedar Rapids, IA  52401

Also present:           Bill Basler

Court Reporter:         Shelly Semmler, RMR, CRR
                        320 Sixth Street
                        Sioux City, IA  51101
                        (712) 233-3846

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 680 of 3592

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. WILLETT: Defense is ready.

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated. Juror 797, we're all very glad that you're back, more importantly, that you're good enough to be back. Everybody was quite concerned and worried about you, so it's good to have you back.

Let's see. We left off, Mr. Williams, you were on the direct examination of Agent Graham.

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Okay. You may proceed.

JOHN GRAHAM, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CONTINUED DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Agent Graham, could you just remind the jury what you do for a living?

A. I'm a state narcotics agent with the state of Iowa.

Q. And you became involved in the investigation in 1995 in relation to when Mr. Cobeen decided to cooperate. Is that what your testimony was yesterday?

A. That's correct.

Q. And so if you could explain again to the jury your job with respect to Mr. Cobeen was what?

Page 2

A.    I was Mr. Cobeen's contact point.  I was the person that supplied him with a tape recorder when there were some undercover recordings made with Mr. Honken.  I would surveil or follow Mr. Cobeen to Mr. Honken's residence as well as I would do surveillance on Mr. Honken's residence from time to time.

Q.    And during your surveillance of Mr. Honken's residence, did you ever see Angela Johnson at Mr. Honken's house?

A.    I saw her vehicle parked in front of Mr. Honken's residence.

Q.    We talked yesterday about a search that was conducted of the Honken residence on February 7 of 1996.  And remind the jury what stage of the manufacturing process was the lab at at the time you searched.

A.    They were in the process of making methamphetamine.  They were going by a step-by-step process, and they had just completed one of the steps, preparing to do the next step.

Q.    And why not wait until they actually made the meth?  Wouldn't that have been better evidence in the end?

A.    Perhaps, yes, but at the stage that they were ready to do, law enforcement, the people that had some expertise in meth labs, thought that it was potentially dangerous to the neighborhood if we would have allowed that to continue.

Q.    In what way would it have been dangerous to the

775

neighborhood?

A.    Potential for explosion, and some of the chemicals that they were going to use could have created some type of reaction that could have been airborne.

Q.    The lab, the meth lab in this case -- and just showing you Exhibit 51 -- again, remind the jury what they're seeing in

Page 3

Exhibit 51.

A.    I don't have a display.

Q.    I'm sorry.  My fault.

A.    Exhibit Number 51 shows the portion in the garage on the east wall where essentially most of the laboratory equipment was located.

Q.    And in relation to your training and experience in methamphetamine laboratories in Iowa, could you describe this particular methamphetamine laboratory?

A.    The particular process that was being utilized by Mr. Honken was a sophisticated method in relation to what we typically see here in Iowa.

Q.    More typical of where?

A.    Typical of California or Arizona labs.

Q.    And is there a name for those type of labs?

A.    They're referred to as super labs only in the essence of they're capable of producing more quantity than what the typical lab in Iowa is able to.

Q.    Now, when we left off yesterday, you had identified a

776

number of objects that were seized during the search on February 7 of 1996?

A.    Yes.

Q.    And in addition to that were some documents as well; is that correct?

A.    That's correct.

Q.    I believe, Agent Graham, we left off with Exhibit 69, and remind the jury what Exhibit 69 is.

A.    Exhibit Number 69 was a letter that was seized from the Honken residence on the date in February 1996, and it was a

Page 4

letter that was addressed to Dustin, and on the envelope it says Dustin Honken, and then the return portion, it says Angela Johnson.

Q. And what is the date, or is that letter dated?

A. Yes, it is.

Q. And what is the date on that letter?

A. October 26, 1995.

Q. And throughout the letter itself, are there references to other relatives or relationships between Dustin Honken and Angela Johnson?

A. Yes.

Q. In what way?

A. There's reference to their daughter. There's a reference on the envelope to Ms. Johnson's older daughter, and there's also references to another girlfriend of Mr. Honken, Kathy.

777

Q. And again, the general tenor of the letter is concerning what?

A. Their personal life.

Q. I want to walk through some of the pages of this letter with you. On the screen is Exhibit 69 and the first page of Exhibit 69. Do you see that, sir?

A. Yes.

Q. And the date is in the upper right-hand corner?

A. Yes, just underneath the exhibit sticker.

Q. You indicated that the date is October 26 of 1995; is that correct?

A. That's correct.

Q. Is there a reference in this letter to how long this relationship between them has existed?

Page 5

A.    Yes.

Q.    And could you read the highlighted or the enlarged portion for the jury, please?

A.    This has been a very long two and a half years, two years of frustration, distrust, promises, and heartache.

Q.    Taking two and a half years back from October 26 of 1995, that would take us to approximately when, sir?

A.    April of 1993.

Q.    You indicated in your testimony that there were references to Kathy Rick?

A.    Yes.

778

Q.    And remind the jury who Kathy Rick is.

A.    She was another girlfriend of Dustin Honken.

Q.    I'm directing your attention now to page 5 of Exhibit 69. And is there a reference to Kathy Rick in this paragraph?

A.    Yes.

Q.    Again, highlighting or enlarging a portion of that letter, could you explain that there's -- where the sentence says -- that starts off "what is even sadder." Do you see that line?

A.    Yes, I do.

Q.    Could you read that for the jury, please?

A.    What is even sadder yet is if I was to do something to get even or scare her off, parentheses, like the car thing, for example, parentheses, you would be right there by her side where she always turns to.

Q.    And is that a reference, from the context of the rest of the letter, to whom?

A.    That's in context to Kathy Rick.

Q.    Directing your attention to page 69 -- I'm sorry, Exhibit

69, page 8, at the top of that letter, is there a reference concerning loyalty by Angela Johnson to Dustin Honken?

A.    Yes.

Q.    Could you read that portion that starts off with the sentence "I would"?

A.    I would have to stood by your side until the end of time, but that is not really (sic) to me anymore.  It doesn't matter

779

to you I guess.

Q.    Do you see the enlarged portion there?

A.    Yes, I do.  I started at the wrong "but."

Q.    Yeah.  If you could read at the top of that line that says, I would have been.

A.    But you could have had that with me.  I would have been a good woman for you.  I would have gone the distance, done whatever it took to get there.  I would have stood by your side.

Q.    Until?

A.    Until the end of time.

Q.    Directing your attention to Exhibit 69, page 9, is there a reference both to Kathy again and to a business relationship?

A.    Yes.

Q.    I've highlighted a portion here.  If you would read from the point about halfway down that paragraph where it says, If I ever find out.  Do you see that line?

A.    Yes.

Q.    Could you read that, please, for the jury?

A.    If I ever find out that you subjected her to Kathy in any way, I can promise you this.  I will spend the rest of my life in prison for brutally killing her, and believe me when I say it will be brutal.

Page 7

Q. And when the line says -- based on the context of the letter it says, If I ever find out that you subjected her to Kathy, the "her" is in reference to whom?

780

A. Ms. Johnson and Mr. Honken's daughter.

Q. And Kathy again is who?

A. Kathy Rick, Mr. Honken's other girlfriend.

Q. Now, the next line down, do you see some arrows there on each side of that paragraph?

A. Yes.

Q. Were those arrows placed by the government or law enforcement?

A. They were not.

Q. Were the arrows there when you seized -- when law enforcement seized the note from Dustin Honken's house on February 7 of 1996?

A. Yes.

Q. And could you read that first sentence that has the arrows pointed toward it.

A. I expect you to keep your word about our business relationship and support our daughter the best you can and treat me with nothing less than respect from here on out.

Q. And then directing your attention to the next page, Exhibit 69, page 10, is there again a reference at the top of this page to business?

A. Yes.

Q. And can you read that for the jury, please.

A. It starts out, Will be needing to talk about is Marvea and business. Other than that, nothing else is necessary.

781

Page 8

Q.   And just so we put it in context, if you go back to the previous page, page 9, that sentence starts off with what words?

A.   The only thing we will.

Q.   And then it says, Be needing to talk about, and it goes on from there.

A.   Correct.

Q.   And again, page (sic) 69, page 10, is there another reference to Kathy in this letter?

A.   Yes, there is.

Q.   I've again enlarged a portion of this.  Could you read that for the jury.

A.   I can't promise I won't hurt Kathy.  I hope I will just be able to move on and put you both behind me, but I don't know. Some revenge on her would be very, very sweet.

Q.   In addition to seizing this letter from Angela Johnson, did you find any other documents in the Honken residence on February 7 of 1996 in reference to Angela Johnson?

A.   Yes.

Q.   Agent Graham, I've handed you what's been marked as Government's Exhibit 94.  Can you identify that for the jury, please.

A.   Yes, Exhibit Number 94 is a resume for Angela Johnson that was seized from the Dustin Honken residence on February 7, 1996.

Q.   When I handed you Exhibit 94, it was in a green folder. Was that the manner in which it was seized from the Honken

782

household on February 7, 1996?

A.   Yes, it was.

Page 9

Q.   And in addition to the one-page resume, was there anything else contained in that folder?

A.   Yes, there's an application for -- a job application for a company in Mason City as well as a floppy disc.

MR. WILLIAMS:   United States moves to admit Exhibit 94 into evidence, Your Honor.

*   *   *   *

(Government Exhibit 94 was offered.)

*   *   *   *

MR. WILLETT:   Objection, Your Honor.   Federal Rule of Evidence 402.

THE COURT:   Overruled.   Ninety-four is admitted.

*   *   *   *

(Government Exhibit 94 was admitted.)

*   *   *   *

MR. WILLIAMS:   Permission to publish, Your Honor?

THE COURT:   You may.

BY MR. WILLIAMS:

Q.   Showing on the screen what's marked as Government's Exhibit 94, is this the resume itself?

A.   Yes, it is.

Q.   And because of the distance, some of this is going to be hard to read.   First of all, what's the address provided by --

783

on this resume for Angela Johnson?

A.   5 South 19th Street, Clear Lake, Iowa.

Q.   And in particular I want to highlight a portion of this resume that deals with employment history.   Among the employment history, it indicates Waterfront Restaurant from May of 1995 to the present.   Do you see that?

Page 10

A. Yes.

Q. And then below it, can you read that for the jury?

A. Cytomex Corporation, May of 1986 to January of 1995. Duties included all facets of manufacturing athletic equipment with special emphasis on quality control of incoming machined parts and final inspection of assembled equipment. Special skills, team leader and QCD training, blueprint analyst, manual and automated inspection equipment, industrial presses and saws.

Q. Cytomex Corporation, Agent Graham, what is that?

A. It was a dummy corporation set up by Dustin Honken and was the name of the mailbox drop that was established in the Des Moines area which items were received for the meth lab.

Q. And right below the employment portion, there's an education section. Do you see that?

A. Yes.

Q. And does it reflect some assertion of training in that area?

A. Yes.

Q. And what does it say there?

784

A. Various seminars on manufacturing methods and quality control.

Q. During the search of Dustin Honken's house on February 7 of 1996, did you seize a number of catalogs and books of different sorts?

A. Yes.

Q. I've handed you Exhibit 70. Can you identify that for the jury, please.

A. Government's Exhibit Number 70 is a copy of the Anarchist Cookbook that was seized from the Dustin Honken residence on

Page 11

February 7, 1996.

Q.   And where was that located in the residence when it was seized if you recall?

A.   It was located in one of the bedrooms of the house.

MR. WILLIAMS:  United States moves to admit Exhibit 70 into evidence, Your Honor.

*   *   *   *

(Government Exhibit 70 was offered.)

*   *   *   *

MR. WILLETT:  Defense objects based on Federal Rule of Evidence 402, 403, and 404 as it pertains to this defendant, Your Honor.

THE COURT:  Overruled.  The exhibit's admitted.

*   *   *   *

(Government Exhibit 70 was admitted.)

785

*   *   *   *

MR. WILLIAMS:  Permission to publish, Your Honor?

THE COURT:  You may.

BY MR. WILLIAMS:

Q.   This is the front of the book; is that correct?

A.   That's correct.

Q.   In this Anarchist Cookbook, is there instructions on making homemade silencers for firearms?

A.   Yes.

Q.   Showing you what is page 98 of Exhibit 70, do you see a section there marked silencers?

A.   Yes, I do, in the lower right-hand portion.

Q.   And does the Anarchist Cookbook  then go on for several pages after that to describe manufacturing silencers for various

Page 12

firearms?

A.    Yes.

Q.    And does it also include diagrams --

A.    Yes, it does.

Q.    -- for that purpose?  And so, for example, Exhibit 70, page 102 is a drawing of what?

A.    A semi-automatic weapon that has a homemade silencer attached to the end.

Q.    Showing you Exhibit 71, can you identify that for the jury.

A.    Government's Exhibit Number 71 is a copy of the Secret Agent Headquarters magazine or catalog that was seized from the

786

Dustin Honken residence on February 7, 1996.

         MR. WILLIAMS:  United States moves to admit Exhibit 71.

                         *   *   *   *

         (Government Exhibit 71 was offered.)

                         *   *   *   *

         MR. WILLETT:  Same objections as for Government Exhibit 70, Your Honor, Federal Rules of Evidence 402, 403, and 404 as it pertains to this defendant.

         THE COURT:  Overruled.  Government's Exhibit 71 is received.

                         *   *   *   *

         (Government Exhibit 71 was admitted.)

                         *   *   *   *

         MR. WILLIAMS:  Permission to publish, Your Honor?

         THE COURT:  You may.

BY MR. WILLIAMS:

Q.    Agent Graham, what is the -- what is this Secret Agent's

Page 13

Headquarters catalog?

A.   It is a catalog that has different types of electronic equipment.  Some peep -- you can refer to it as kind of surveillance equipment that's available for sale and order.  It covers different types of countermeasures such as radios, video cameras, different types of frequency measuring devices.

Q.   During the search of the Honken residence on February 7 of

787

1996, you've already testified law enforcement seized a meth lab that had a number of sophisticated glassware and other type of equipment.  Did you find any magazines or catalogs within the residence for ordering that type of equipment?

A.   Yes.

Q.   I've handed you Exhibit 73.  Can you identify that for the jury, please.

A.   Yes, Exhibit Number 73 is a copy of the Ace Glass catalog that was seized from the Dustin Honken residence on February 7, 1996.

MR. WILLIAMS:  United States moves to admit Exhibit 73, Your Honor.

* * * *

(Government Exhibit 73 was offered.)

* * * *

MR. WILLETT:  Same objections as previously urged, Your Honor, Federal Rules of Evidence 402, 403, and 404.

THE COURT:  Those objections are overruled.  It's admitted into evidence, 73.

* * * *

(Government Exhibit 73 was admitted.)

* * * *

Page 14

MR. WILLIAMS: Permission to publish, Your Honor.

THE COURT: You may.

BY MR. WILLIAMS:

⚥

788

Q. And, Agent Graham, does that catalog contain the type of glassware that was found -- at least some of which was found during the search of the Honken residence on February 7 of 1996?

A. Yes. Some of the items were found in this catalog.

Q. I've handed you Exhibit 74. Can you identify that for the jury, please.

A. Yes. Exhibit Number 74 is the Spectrum Chemical and Safety Products catalog that was seized from the Dustin Honken residence on February 7, 1996.

MR. WILLIAMS: United States moves to admit Exhibit 74, Your Honor.

* * * *

(Government Exhibit 74 was offered.)

* * * *

MR. WILLETT: Same objections, Your Honor, Federal Rule of Evidence 402, 403, and 404 as it pertains to this defendant.

THE COURT: Objection's overruled. Seventy-four is admitted.

* * * *

(Government Exhibit 74 was admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor.

THE COURT: You may.

BY MR. WILLIAMS:

⚥

789

Page 15

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 694 of 3592

Q.   And what does this catalog have in it?  I mean, what could you order using this catalog?

A.   It's a breakdown of the different chemicals and some of the hazardous material properties in that.  It's kind of a safety catalog that can give how to handle the material.

Q.   I've handed you Exhibit 79.  Can you identify that for the jury, please.

A.   Yes.  Exhibit Number 79 is the Loompanics Unlimited catalog which was seized from the Dustin Honken residence on February 7, 1996.

MR. WILLIAMS:  United States moves to admit Exhibit 79.

* * * *

(Government Exhibit 79 was offered.)

* * * *

MR. WILLETT:  Same objections, Your Honor Federal Rule of Evidence 402, 403, and 404 and also 802.

THE COURT:  Overruled.  Seventy-nine's admitted.

* * * *

(Government Exhibit 79 was admitted.)

* * * *

MR. WILLIAMS:  Permission to publish, Your Honor.

THE COURT:  You may.

BY MR. WILLIAMS:

Q.   Agent Graham, could you explain to the jury what is a

790

Loompanics magazine?

A.   It is a catalog of -- what says on the inside cover, sellers of unusual books.  It's a place where you can order

Page 16

books and other materials.

Q.    And finally, Agent Graham, I've handed you Exhibit 80.    Can you identify that for the jury, please.

A.    Yes, Exhibit Number 80 is a copy of the Poor Man's James Bond book that was seized from the Dustin Honken residence on February 7, 1996.

MR. WILLIAMS:    United States moves to admit Exhibit 80.

*   *   *   *

(Government Exhibit 80 was offered.)

*   *   *   *

MR. WILLETT:    Objection based on Federal Rules of Evidence 402, 403, and 404.

THE COURT:    Overruled.    Government's Exhibit 80 is admitted.

*   *   *   *

(Government Exhibit 80 was admitted.)

*   *   *   *

MR. WILLIAMS:    And permission to publish, Your Honor.

THE COURT:    You may.

BY MR. WILLIAMS:

Q.    First of all, is that the cover of the magazine or the book

791

marked as Government's Exhibit 80?

A.    Yes.

Q.    Turning -- is there a copyright indication when this book was copyrighted?

A.    Yes, there is.

Q.    And turning to the inside cover, first page inside the book, does that indicate the copyright date on this publication?

Page 17

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 696 of 3592

A. Yes, it does, 1991.

Q. Does this book similarly contain portions dealing with the manufacturing of homemade silencers?

A. Yes.

Q. Turning to page 35, at the top it indicates 35, and is that the beginning of a section dealing with the manufacturing of homemade silencers?

A. Yes, it is.

Q. And does that then continue for a number of pages describing the manufacturing of homemade silencers?

A. Yes.

Q. Is there also a section of the Poor Man's James Bond that deals with securing prisoners?

A. Yes, it does.

Q. Turning to page 414 of Exhibit 80, does this -- is this the section where it begins talking about the securing of prisoners?

A. Yes.

Q. And does that continue for a few pages?

792

A. Yes, it does.

Q. So going to Exhibit (sic) 415, is that a continuation of how to tie up people?

A. Yes, it is.

Q. Does this also have a section on how to gag people?

A. Yes.

Q. In particular what I'd like to bring your attention to, is there a section on the use of adhesive tape for gagging people?

A. Yes.

Q. I'm going to try this again here. Agent Graham, I'm having difficulty highlighting that, so if you could explain to the

Page 18

jury and read to them in the upper right-hand corner right above the pictures of the man with tape over his face, what's the title of that section of the book?

A.    129., adhesive tape.

Q.    And can you read that paragraph right above those photographs?

A.    Place several strips of tape across the prisoner's mouth. The tape should be at least one inch wide and five inches long, parentheses, figure 115, parentheses.  Stuffing a handkerchief or strip of cloth into his mouth will make the gag much more efficient.

Q.    Now, Agent Graham, after the search of Dustin Honken's house on February 7 of 1996, did the investigation continue into his drug operation?

793

A.    Yes.

Q.    And pursuant to that, since you seized a number of papers from the house with handwriting on them, did you and other officers take any steps to determine the authorship of those -- of that handwriting?

A.    Yes, we did.

Q.    And what did you do toward that end?

A.    We subpoenaed individuals to the grand jury, and they were required to provide us a sample of their handwriting by filling out some handwriting exemplars.

Q.    And what do you mean by handwriting exemplar?

A.    There are several pages of printed -- printed pages where they have to write out whatever's on that page.  For example, they have to write out a particular word or like copy down and write out a paragraph as if they were writing a letter.  It's

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 698 of 3592

approximately six pages long in length I believe.

Q.   Who all was subpoenaed to the grand jury to provide handwriting exemplars?

A.   Ms. Angela Johnson, Mr. Dustin Honken, Mr. Timothy Cutkomp, and Mr. Daniel Cobeen.

Q.   Now, Mr. Cobeen was working as a confidential informant for you at the time.  Why would you subpoena him to the grand jury?

A.   At the time of the subpoena, the identity or the fact that Mr. Cobeen was cooperating with us was not made available or his identity had not been made available to Mr. Honken and the

794

others at that point in time, so the fact that he was a cooperator was not known to this group.

Q.   So by subpoenaing him down along with the other obvious suspects, if you will, was that intended to conceal his identity as a government informant?

A.   Yes.

Q.   So as a result of this, did you, in fact, obtain a handwriting exemplar from Angela Johnson?

A.   Yes.

Q.   And what did you do -- what happened ultimately with that handwriting exemplar?

A.   It was provided to the Division of Criminal Investigation's laboratory for analysis.

Q.   Now, again, as part of this investigation, did you attempt to -- I'm sorry.  As part of the investigation, was a number of individuals subpoenaed to provide testimony before the grand jury as well?

A.   Yes.

Q.   And among those people, was Angela Johnson subpoenaed to

Page 20

appear before the grand jury?

A.    Yes, she was.

Q.    And did she, in fact, appear on March 5, 1996?

A.    Yes.

Q.    I've just handed you Exhibit 116 that's already been admitted into evidence, but could you just tell the jury what

795

that is, please.

A.    This is a copy of Angela Johnson's grand jury testimony from March 5, 1996.

Q.    Pursuant to the procedures in front of the federal grand jury, when Angela Johnson appeared on March 5, 1996, was she sworn in by the foreman of the grand jury to provide truthful testimony?

A.    Yes, she was.

Q.    And did she, in fact, take that oath?

A.    Yes.

Q.    During the course of questioning -- the questioning, first of all, was conducted by whom?

A.    Assistant United States Attorney Patrick Reinert.

Q.    Directing your attention to page 4 of the grand jury transcript, did Angela Johnson acknowledge knowing Dustin Honken and the fact that she was the mother of one of his children?

A.    Yes.

Q.    During the course of the questioning, was she questioned about -- questioned about her knowledge of what was going on at the Honken residence in relation to the search that was conducted on February 7 of 1996?

A.    Yes.

Q.    And generally speaking, what was her response as to her

Page 21

knowledge of what was going on at that residence?

A.    Generally she did not know what was taking place in the

796

garage and that she limited her exposure in the house to the living portion, the kitchen, the bathroom, and the living room. When questioned further about what was taking place in the garage, she acknowledged that she was aware that Mr. Honken was doing a research project and that the research project involved precursors.

Q.    And in particular at page 7 of the transcript marked as Government's Exhibit 116, does she indicate what she understood he was conducting the research for, directing your attention to line 21 through line 24?

A.    Yes.  Miss Johnson answered that she was aware that Mr. Honken was writing a research book.

Q.    And at some point did she make reference to whether -- what she anticipated, if anything, of getting out of his work in the garage?

A.    Ms. Johnson indicated that she expected that the sales of the book would reap them millions.

Q.    Based on your knowledge of the case at this point on Mr. Cobeen's cooperation, did you have reason to believe that Angela Johnson had provided financial backing to this meth lab found in the defendant's garage?

A.    Yes.

Q.    Was she questioned in the grand jury on March 5, 1996, about whether she had provided any funds to Dustin Honken?

A.    Yes, she was questioned.

797

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 701 of 3592

Q. And directing your attention then to page 8, when she was asked about that, what was her response?

A. No.

Q. Was she questioned about whether she had received any glassware or other equipment at her house on behalf of Dustin Honken?

A. Yes.

Q. And directing your attention to page 13 of the transcript for March 5, 1996, was she specifically asked, Did you ever have any glassware delivered to your residence, line 15?

A. Her answer -- yes, she was.

Q. And what was the answer?

A. No.

Q. You indicated during your testimony that you had seized a scale from the Honken residence. Do you remember that part of your testimony yesterday?

A. Yes.

Q. Was Angela Johnson questioned about her knowledge of any scale in Mr. Honken's residence?

A. Yes.

Q. And directing your attention to page 16 of the transcript, was she asked the question at line 5, Have you ever seen a scale like that at Mr. Honken's residence or in his possession, and "like that" is a reference to a triple-beam scale?

A. Yes, it was.

798

Q. And what was her response?

A. No.

Q. Was she then asked, Have you ever seen Mr. Honken in

Page 23

possession of any methamphetamine?

A.    Yes, she was.

Q.    And what was her response?

A.    No.

Q.    Agent Graham, you had just a few minutes ago introduced an exhibit, 94.  Do you have that in front of you still?

A.    Yes.

Q.    And remind the jury what Exhibit 94 is.

A.    Exhibit Number 94 is the resume of Angela Johnson.

Q.    And we discussed Exhibit 94 previously and in particular about a reference to prior employment at a corporation, and what was the name of that corporation?

A.    Corporation's name was Cytomex Corporation.

Q.    Was Angela Johnson questioned in the grand jury on March 5, 1996, concerning any knowledge she might have of a company called Cytomex?

A.    Yes.

Q.    In particular directing your attention to page 17 of the transcript at line 18, was she asked the question, Have you ever heard of a business called Cytomex?

A.    She was asked that question.

Q.    And what was her response?

799

A.    No.

Q.    And then finally on page 18 of the transcript, was Angela Johnson asked if she had ever stored any items at -- let me rephrase this.  Was she asked, Has Mr. Honken ever stored any items at your residence?

A.    Yes, she was asked that.

Q.    And what was her response?

Page 24

A. No.

Q. After the grand jury conducted its further investigation and questioned witnesses, was there ultimately a grand jury indictment returned charging one or more people with narcotics violations arising from this investigation?

A. Yes.

Q. Was that indictment returned on April 9 of 1996?

A. Yes, it was.

Q. And pursuant to that indictment, were arrest warrants issued?

A. Yes.

Q. Who was indicted in that case at that time?

A. Mr. Dustin Honken and Mr. Timothy Cutkomp.

Q. And were, in fact, Dustin Honken and Timothy Cutkomp arrested pursuant to the warrants issued?

A. Yes.

Q. And when were they arrested if you recall?

A. April 29, 1996.

800

Q. Now, Agent Graham, could you explain this to the jury? You've testified yesterday and today about a search that was conducted on February 7 of 1996, and yet you've indicated that the ultimate indictment and arrest did not occur until April and late April of 1996. What was the reason for delay there?

A. We were continuing with some of our investigation such as obtaining the handwriting exemplars from the suspects in this case as well as allowing the DCI lab and the DEA lab to do some of their preliminary findings on some of the items seized from the meth lab.

Q. What were the actual charges against Dustin Honken and

Page 25

Timothy Cutkomp?

A.  They were charged with conspiracy to distribute methamphetamine and the attempted manufacture of methamphetamine as well as some indict -- charges of possession of some chemicals and laboratory equipment.

Q.  The conspiracy charge, did it have a date in which it alleged the conspiracy existed?

A.  Yes.

Q.  And what were those dates?

A.  Dates were from 1992 through February of 1996.

Q.  After Dustin Honken was arrested and Timothy Cutkomp was arrested, could you explain to the jury were either of them detained in jail pending trial?

A.  No, they were not.

801

Q.  And what happened?  I mean, just walk the jury through the procedure.  What occurred?

A.  The government attempted to detain Mr. Honken.  There was a detention hearing, and in the federal system that is a process. There is no bond.  So if the government wants to seek detention or keep somebody in jail until they go to trial, it goes through a hearing.  There was a hearing.  Mr. Honken was released and basically put on home confinement or electronic monitoring.  And Mr. Cobeen -- excuse me.  Mr. Cutkomp was not placed under any restrictions.

Q.  Were there restrictions on who Dustin Honken could have contact with?

A.  Yes.

Q.  And did that include barring him from having contact with Tim Cutkomp?

Page 26

A. Yes, it was.

Q. You indicated that Dustin Honken had electronic monitoring as part of conditions of his release. Could you explain what that is for the jury, please?

A. He wore an ankle bracelet, and it would send a signal if he vi -- violated or went through the boundary which is essentially his home and in his yard. He resided in his mother's home during this confinement period. He was allowed to go off the property during his work hours in Mason City as well as any court-scheduled events such as hearings or else meeting with his

802

attorney.

Q. And where was this electronic device on him?

A. On his ankle.

Q. And is this something that he could have just taken off and run with?

A. No, it was not.

Q. And could you explain that to the jury, please.

A. I'm not really sure. I know that it's fashioned, it's affixed on the person; or once that ankle bracelet is taken off, it emits a signal also to indicate that it had been played with.

Q. As a result of the investigation at this point, what was the status of the investigation against Angela Johnson and her involvement in this operation?

MR. WILLETT: Excuse me, Your Honor. At this time just out of an abundance of caution, I'd like to renew the objection that I made at the beginning of Agent Graham's testimony yesterday regarding the issues raised in our pretrial motion and just ask that I have a continuing objection once again. I don't know if I needed to renew that objection since

Page 27

we started a new --

THE COURT: I don't even think you need to object to it. Your pretrial motion covers it. But to the extent that you feel you need to object, that's fine.

MR. WILLETT: Thank you.

THE COURT: And to the extent that you want a

803

continuing objection, it's understood, and that's fine as well. Thank you.

MR. WILLETT: Thank you, Judge. I was just concerned that we were starting a new day, and that's what prompted me. Thank you.

THE COURT: Thank you.

BY MR. WILLIAMS:

Q. Do you remember the question?

A. No.

Q. At the time that you completed this stage of the investigation and indicted Dustin Honken and Timothy Cutkomp, what was the status of the investigation against Angela Johnson and her involvement in this operation?

A. It was continuing based on information we gathered during '95 and '96 and also based on some of the documents that we discovered from the Honken residence.

Q. After -- at some point after Timothy Cutkomp was arrested, did he choose to cooperate with law enforcement?

A. Yes, he did.

Q. Could you explain the initial stages of his cooperation? First of all, what did that entail when he first came in and decided to cooperate?

A. He and his attorney sat down with Agent Mizell and myself,

Page 28

and he provided what we refer to as a debriefing where we basically interviewed Mr. Cutkomp as far as his involvement, his

804

knowledge of the conspiracy that he had been charged with with Mr. Honken beginning in 1992 and continuing up until 1996.

Q.    As a result of what he told you and Agent Mizell during that debriefing, without indicating what that was, was there a security concern for agents including yourself?

A.    Yes.

Q.    And as a result of that, was an ongoing investigation conducted in which it was contemplated that Tim Cutkomp would wear a recording device with respect to Dustin Honken?

A.    Yes.

Q.    Was Dustin Honken represented by counsel at this point?

A.    Yes, he was.

Q.    Does that create a legal issue when you are having somebody wear a wire with regard to a defendant who's represented by counsel?

A.    Yes.

Q.    And as a result of that, were steps taken in the investigation to protect Dustin Honken's Sixth Amendment constitutional rights?

A.    Yes.

Q.    And what was that?

A.    We developed a taint team, if you will.  That's another set of investigators as well as a new prosecutor to handle any new information that was learned through Mr. Cutkomp's cooperation when he wore the wire in an undercover situation with

805

Page 29

Mr. Honken.

Q. As a result of creation of that taint team and concerns on security, what was the practical effect on your ability to continue and Agent Mizell's ability to continue the investigation?

A. It essentially stopped at that point in time by Agent Mizell and myself as we could no longer actively pursue the investigation.

Q. While you were not actually involved in the recording and the work with Tim Cutkomp, can you explain to the jury who was working with Tim Cutkomp on that?

A. There was agents from the FBI, DEA, and DCI and the Division of Narcotics Enforcement, and the primary people were Agent Lori Lewis with DNE and Agent Mark Hein with DEA.

Q. And Lori Lewis, is that a partner of yours that operates out of Mason City?

A. Yes.

Q. After the recordings were conducted with Tim Cutkomp and Dustin Honken, was Dustin Honken rearrested while he was on pretrial release?

A. Yes, he was.

Q. And did that occur on June 11 of 1996?

A. Yes.

Q. Was Dustin Honken released from jail after that occurred?

A. No, he was not.

806

Q. And could you explain that to the jury? You kind of explained part of it beforehand. Is there a possibility for him to have gotten bond at that point?

A. No, not in the federal system there is not.

Page 30

Q.    And where was he held pending trial then at that point?

A.    Ultimately he was placed in the Woodbury County Jail.

Q.    Now, did Dustin Honken ultimately plead guilty to one or more of the charges pending against him?

A.    Yes, he did.

Q.    And did that occur on June 2 of 1997?

A.    Yes.

Q.    And was a transcript of that plea hearing taken pursuant to the standard operating procedures of a court hearing?

A.    Yes.

Q.    I've handed you Exhibit 302.  Can you identify that for the jury, please.

A.    Government's Exhibit Number 302 is the original copy of the transcript of Dustin Honken's plea hearing on June 2, 1997.

          MR. WILLIAMS:  United States would move to admit Exhibit 302, Your Honor.

                         *   *   *   *

          (Government Exhibit 302 was offered.)

                         *   *   *   *

          MR. WILLETT:  Defense objects, Your Honor, based on Federal Rule of Evidence 802 and also that it violates this

807

defendant's right of confrontation under the Sixth Amendment.

          THE COURT:  Overruled.  Government's Exhibit 302 is received.

                         *   *   *   *

          (Government Exhibit 302 was admitted.)

                         *   *   *   *

BY MR. WILLIAMS:

Q.    Agent Graham, I'm not going to have you go through that
Page 31

transcript, but can you advise the jury with regard to that plea hearing what charge did Dustin Honken plead guilty to?

A. He pled to the conspiracy to distribute methamphetamine and the attempted man -- the attempt to manufacture methamphetamine.

Q. And again, the charge of the conspiracy was during what time frame?

A. 1992 through 1996.

Q. Was Dustin Honken ultimately sentenced based on those charges?

A. Yes.

Q. And can you explain to the jury, when somebody is sentenced in federal court, particularly during the time period of 1993 (sic), can there be what are called contested and uncontested sentencing hearings?

A. Yes.

Q. And when we use the term contested sentencing hearing, can you explain to the jury what that means?

808

A. In the federal system, there are base offense levels that assist the judge in determining the appropriate sentence for an individual. There are some factors that can either increase or decrease that base offense level. Sometimes those items end up being the contested items during a sentencing hearing.

Q. And when items are contested like that, different factors, is there sometimes an evidentiary hearing in which exhibits are admitted and witnesses testify to allow the judge to resolve some of those issues?

A. Yes.

Q. And in this case when Dustin Honken was sentenced, was there a hearing in which testimony was presented?

Page 32

A.   Yes.

Q.   And did that last over a course of several days both in 1997, late 1997, and into February of 1998?

A.   Yes, parts of several days.

Q.   Did you attend all or part of that sentencing hearing?

A.   Yes, I did.

Q.   Was Angela Johnson present during any part of that sentencing hearing?

A.   Yes.

Q.   And where did that take place at incidentally?

A.   If I recall correctly, there may have been a day or two in Cedar Rapids, and it was finished here in Sioux City.

Q.   When a defendant is ultimately sentenced, is there a legal

809

document that's generated by the court reflecting the sentence ultimately imposed?

A.   Yes.

Q.   And were one or more such documents created in this case?

A.   Yes, there were.

Q.   I've handed you Exhibits 303 and 304.  Can you identify those for the jury, please.

A.   Both Exhibits Number 303 and 304 are the judgment of conviction for Mr. Honken in this case.

MR. WILLIAMS:  United States moves to admit Exhibit 303 and 304, Your Honor.

* * * *

(Government Exhibits 303 and 304 were offered.)

* * * *

MR. WILLETT:  Your Honor, just renewing my objection based upon pretrial motions in regards to both of these

Page 33

exhibits, Exhibits 303 and 304, for all of the reasons previously stated.

THE COURT: Thank you. Government's Exhibits 303 and 304 are admitted over defendant's objections.

* * * *

(Government Exhibits 303 and 304 were admitted.)

* * * *

BY MR. WILLIAMS:

Q. Agent Graham, could you explain to the jury -- if there was

810

this one hearing that resulted ultimately in a sentence, can you explain why there are two judgments reflecting the sentence on a single individual?

A. After the first sentence was imposed, there was still an issue that upon further review required for Mr. Honken to be sentenced a second time.

Q. And ultimately after he was sentenced, where was Dustin Honken initially sent for incarceration?

A. After his classification, he was sent to the United States Penitentiary in Florence, Colorado.

Q. And what do you mean by classification?

A. All federal inmates go to a classification center where they look at the charge that they have been sentenced on, any other factors that may contribute to the placement of that, and then they are placed by the Bureau of Prisons.

Q. And the United States Penitentiary, Florence, is that a maximum security penitentiary if you know?

A. It's a high-level. It's not the most highly secure facility.

Q. And then at some point was he transferred to any other

Page 34

location?

A.    Yes, he was.

Q.    And where was that?

A.    That was in the United States Penitentiary in Marion,
Illinois.

811

Q.    And what is the classification of that facility if you
know?

A.    It was the same level as Florence, Colorado.

        MR. WILLIAMS:   Thank you.   I have no further
questions.

        THE COURT:   Why don't we give the jury and everybody
else a stretch break.   And then we'll come back and see if
there's any cross-examination of Agent Graham.

        Okay.   Thank you.   Please be seated.

        Mr. Willett.

        MR. WILLETT:   Thank you, Your Honor.

                        CROSS-EXAMINATION

BY MR. WILLETT:

Q.    I'd introduce myself, but we know each other, don't we?

A.    Yes, we do.

Q.    In trying to establish a time line of your knowledge of the
investigation and your active role in the investigation, my
understanding is based upon your knowledge the investigation of
Dustin Honken started in the year 1993.

A.    That's correct.

Q.    Your active -- you had no active role at that time.

A.    Correct.

Q.    And, in fact, your active role started in roughly 1995.

A.    That's correct.

Page 35

Q. And would it be fair to say that between 1993 and 1995

there was basically a lull, if you will, of any investigation based upon Mr. Honken's current situation between 1993 and 1995 in terms of his legal situation?

A. Yes, on the drug matters, yes.

Q. Okay. There really wasn't anything going on with Dustin Honken between late 1993 and March of 1995 based upon his legal situation, and then, of course, you weren't even involved at that time; correct?

A. Correct.

MR. WILLIAMS: Objection, Your Honor. That was a compound question.

THE COURT: Overruled.

BY MR. WILLETT:

Q. Now then, my understanding is it was in March of 1995 approximately when you first came into contact with Mr. Dan Cobeen.

A. No.

Q. Little earlier than that?

A. Later.

Q. Later, I apologize. What month in 1995?

A. October.

Q. October of 1995. And that was your first interaction with him ever; am I correct?

A. Yes.

Q. And he basically signed on to be a cooperating individual

with your investigative team; correct?

A.   Yes, he did.

Q.   Now, when you first enlist somebody, for lack of a better label, are there rules of conduct that you advise them on either orally or in writing or both?

A.   They can be both, yes.

Q.   Okay.  What was your practice back in the fall of 1995? Did you have oral rules of conduct that you discussed with the cooperating individual, or did you have written rules, or were they both?

A.   They were certainly oral, and that would have been about the time that we started with a signed document that they read and initialed and signed.  I don't know if that would have taken place on this or not.  It would have been about the time that the division started utilizing that.

Q.   Well, you anticipated one of my questions.  You don't have a memory as to whether Mr. Cobeen executed a written rules of agreement with your office or anything like that.

A.   No, I don't.

Q.   But I take it you certainly sat him down in the beginning and said, Listen, if you're going to work with me, this is how we conduct ourselves.

A.   Correct.

Q.   And you would have done that at the very beginning as soon as Mr. Cobeen indicated he was willing to work with you.

814

A.   Yes.  That October meeting was a point where Mr. Cobeen told us what had taken place up until that date in early October where we sat down and met with him.  Mr. Cobeen had not initially made the decision whether or not he was going to

Page 37

continue his cooperation. It was just providing information at that time. His actual cooperation would have started closer towards the end of November or early December of 1995.

Q. And am I correct in my understanding that the only information he detailed to you that he had acquired by associating with Dustin Honken prior to meeting you was a trip to Des Moines to set up a mailbox and the purchase of some hydrogen tanks?

A. They had -- in regards to the mailbox drop, they had completed that. In regards to the hydrogen tank, they had just ordered it, and it had not been delivered or picked up.

Q. Okay. Now, I take it your rules to people, cooperating individuals who are working with you, is that they are not to engage in criminal activity; correct?

A. They are not to initiate it, that's correct.

Q. So, for example, Dan Cobeen acquiring some methamphetamine for Dustin Honken would have been a violation of your rules; correct?

A. Yes.

Q. Dan Cobeen consuming controlled substances would have been a violation of your rules; correct?

815

A. Yes.

Q. And Dan Cobeen violated both of these rules once he began working on your investigative team; am I correct?

A. I'm not aware that he did.

Q. Okay. You don't have any recollection of Dan Cobeen calling you and telling you that he consumed a controlled substance after he began working for your investigative team?

A. I know that -- I don't recall that he consumed. I know

Page 38

that he was asked to obtain some.

Q.   Okay.   And you don't have a memory as to whether or not he did that.

A.   Which?

Q.   Let's start with obtaining the controlled substance for Mr. Honken.   Do you have a memory as to whether or not Dan Cobeen contacted you after the fact and advised you that he had obtained some controlled substance for Dustin Honken?

A.   He initially told us that he had prior to us meeting with him in October of 1995.

Q.   Okay.

A.   After that time he was requested or Mr. Honken requested that he obtain some methamphetamine.   I instructed him not to do so.

Q.   And Mr. Cobeen worked with your investigative team until May of 1996; correct?

A.   Correct.

816

Q.   And my understanding on the search warrant that was executed on February 7 of 1996 at the home of Dustin Honken, no one was present at the Dustin Honken home during the course of that search.

A.   That's correct.

Q.   Yesterday afternoon with Mr. Williams you discussed in a photograph, Government Exhibit 61, and then the -- what was portrayed in the photograph itself, Government Exhibit 65, the scale.   Do you remember that testimony, Agent Graham?

A.   Yes.

Q.   Many different types of scales; correct?

A.   Yes, there are.

Page 39

Q. Okay.

MR. WILLETT: May I place this up on the witness box?

THE COURT: Sure.

MR. WILLETT: Thank you.

BY MR. WILLETT:

Q. If you had to give that scale a label, what would you call it?

A. It's one of those that's kind of difficult to call because it's a combination -- it's a triple-beam because it has the three beams across where the weights can slide, but it also is a balance scale where the substances can be measured out. Some triple-beams just have the pan, this portion, on the end of the triple beam, and others are similar to this, but in -- a quick

817

reference is a triple-beam.

Q. It's not a digital scale.

A. No, it's not.

Q. And where the substance or product is measured is in that small, almost ashtray-looking, circular tray that's being suspended there from the triple beam; correct?

A. That's correct.

Q. And you'd agree with me that that's not the largest tray in the world.

A. No, it's not.

Q. Okay. And that could certainly be used to weigh personal use quantities as opposed to distribution use quantities; correct?

A. Yes.

Q. Do you still have Government Exhibit 69 there by you, Agent Graham? It's the letter.

Page 40

A.   Yes, I do.

Q.   Okay.  Now, yesterday afternoon when you started discussing this letter with Mr. Williams, you mentioned that in this multi-page letter that it certainly dealt with personal issues; correct?

A.   That's correct.

Q.   It's certainly fair to say that in reading the context of this letter Miss Johnson is wanting to end her relationship with Dustin Honken and leave him; correct?

818

A.   Their personal relationship, yes.

Q.   Yes.  And I'm going to switch gears on you for just a second.  In your testimony this morning with Mr. Williams, you talked about some of the surveillance activities that you were involved in, and I believe you mentioned that you saw my client's vehicle at Mr. Honken's residence on one occasion?

A.   Yes.

Q.   Did you ever see a vehicle attributed to Kathy Rick at Mr. Honken's residence?

A.   Yes.

Q.   And Ms. Rick is the woman being complained of in this letter, Government Exhibit 69; correct?

A.   Correct.

Q.   And for lack of a better label, Miss Rick was another one of Mr. Honken's girlfriends besides Miss Johnson; correct?

A.   Yes.

Q.   And Miss Rick had also had a child fathered by Dustin Honken.

A.   Correct.

Q.   At roughly the same time he fathered the child that was

Page 41

born by Angela Johnson.

A.    Yes, within a few months.

Q.    I'm sorry.  I didn't hear you.

A.    Within a few months.

Q.    Thank you so much.  And during your conversation of this

819

letter this morning with Mr. Williams, he started out by directing your attention to the second paragraph of page 1.  Do you have that in front of you, sir?

A.    Yes, I do.

Q.    That first sentence starts, This has been.  Do you see where I am, sir?

A.    Yes.

Q.    This has been a very long two and a half years, two years of frustration, distrust, promises, and heartache.  Did I read that correctly?

A.    Yes.

Q.    Certainly appears that Miss Johnson is having issues regarding trust with Mr. Honken, doesn't it?

A.    Yes.

Q.    I'd direct your attention to page 9 of Government Exhibit 69 and the middle paragraph, Agent Graham.  Do you have it, sir?

A.    Yes, sir.

Q.    You stated to Mr. Williams the sentence that starts, If I ever find out that you subjected her to Kathy in any way, and you discussed that on direct; correct?

A.    Yes, I did.

Q.    Now, there's a sentence that's the beginning of that paragraph that you did not testify to, isn't there?

A.    Correct.

Page 42

Q. I will ask that you keep her away from Kathy and Kathy away

from her. She is an unstable woman who will stop at nothing to have you to herself and her ends. I don't trust her. Did I read that correctly, sir?

A. I believe that it's probably herself and her kids.

Q. I apologize. I've got a faint copy. I would agree it's her kids.

A. But otherwise it's correct.

Q. Okay. And then on page 10 of Government Exhibit 69, you discussed on direct my client's feelings about Miss Rick there in the second full paragraph that's in the middle of the page. Do you see that?

A. Yes.

Q. In that first sentence, though, it says in part, I hope I will just be able to move on and put you both behind me. And that's what that sentence states in part, doesn't it, sir?

A. In part, yes.

Q. Government Exhibit 94 which is the resume pertaining to my client that you discussed with Mr. Williams -- I'm sorry. Go ahead. I'll let you get one exhibit put away before I start you on another. How's that?

A. Thank you.

Q. And one thing just before we turn away from this letter, my understanding is in terms of the documents seized from Mr. Honken's home, that was the only letter that you found pertaining to be from my client to Mr. Honken; correct? You

found magazines. You found books, all kinds of things but . . .
Page 43

A. I believe that's correct, yes.

Q. In regard to Government Exhibit 94 which is the resume, you don't know who prepared it, do you, sir?

A. No.

Q. If you don't know who prepared it, you don't know if Miss Johnson saw it.

A. That's correct.

Q. And if you don't know who prepared it and if you don't know if Miss Johnson ever saw it, you don't know if it was ever actually used in application for a job, do you, sir?

A. Correct.

Q. There were a series of books that you found at Mr. Honken's home, Government Exhibit 70, Government Exhibit -- which was the Anarchist Cookbook; Government Exhibit 71, the Admitted Secret -- or excuse me, the Secret Agent's Headquarters; Government Exhibit 73, a glass catalog by Ace Company I believe; Government Exhibit 74, Spectrum Chemical and Safety Products; Government Exhibit 79, a company dealing with the selling of unusual books; Government Exhibit 80, the Poor Man's James Bond. I believe we've covered all the books. You have no idea when Mr. Honken came into possession of these books, do you, sir?

A. Correct.

Q. For any one of the items I've just listed to you.

A. That's correct.

822

Q. So the fact that Mr. Williams pointed out to you that the Poor Man James Bond was copyrighted in 1991, although we know that from reviewing the exhibit, we still don't know when Mr. Honken came into possession of that book.

A. Correct.

Page 44

Q.   And you testified on direct this morning that Miss Johnson testified to the grand jury on approximately March 5 of 1996.

A.   That's correct.

Q.   And then it's my understanding that it was April of 1996 when Mr. Honken and Mr. Cutkomp were indicted.

A.   Yes.

Q.   Miss Johnson was not indicted at that time.

A.   Correct, she was not.

Q.   And in regards to Government Exhibit -- I'm sorry, the scale, Government Exhibit -- is that 65? -- 65 which is the actual of what's portrayed in Government Exhibit 61, when Government Exhibit 65 was found as is portrayed in Government Exhibit 61, it's in a cabinet above an oven; correct?

A.   Yes.

Q.   Fairly -- fairly high up.

A.   Yeah, arm's reach just as you're demonstrating.

Q.   You didn't find it out in plain view or anything like that.

A.   I don't recall if the cabinet door was open.  That would have been the only thing that would have allowed it to be in plain view.  If the cabinet door was shut, then no, it would not

823

have been in plain view.

Q.   And Miss Johnson testified to her -- during her grand jury testimony that she never saw the scale; correct?

A.   Correct.

MR. WILLETT:  Your Honor, may I have just a moment with co-counsel?  I think I'm wrapping up.

THE COURT:  You may.

MR. WILLETT:  Thank you.

Your Honor, thank you for indulging me.  That's the
Page 45

end of my cross-examination.

THE COURT: Okay. Any redirect, Mr. Williams?

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Agent Graham, early in the cross-examination you were asked a question, something to the effect of there really wasn't anything going on in 1993 to 1995 because of the legal situation and then, of course, you weren't really involved at that time, and you answered yes to that question. I'm going to break that down for you. You weren't involved in the period of 1993 until 1995 in October when Mr. Cobeen decided to cooperate. Is that accurate?

A. That's correct.

Q. Based on your knowledge of the investigation, was there, in fact, drug operations continuing by Dustin Honken between the time period of 1993 and 1995?

824

MR. WILLETT: Excuse me, objection. To the extent that Agent Graham would have to base his answer on hearsay, the defense would object.

THE COURT: Overruled. You may answer.

A. We learned later that there was.

Q. You were asked questions about Mr. Cobeen's use of drugs. And just to clarify, based on your interview of him, when did you understand that this use of the controlled substances occurred in relation to when you signed him up as a cooperator?

A. Took place prior to us meeting with him.

Q. And did you give him instructions that that would be prohibited once he began to cooperate?

A. Yes.

Page 46

Q. And then finally you were asked about the scale in front of you, Exhibit 65, and whether, in fact, that could be used for personal use, and I think you gave the answer yes?

A. Yeah, it could be.

Q. Okay. During the search of Dustin Honken's house, did you find any personal use quantities of controlled substances?

A. I believe we found a small amount of marijuana.

Q. And would that typically be used with a scale of that nature?

A. It could be.

MR. WILLIAMS: No further questions.

THE COURT: Anything further, Mr. Willett?

825

MR. WILLETT: No thank you, Judge.

THE COURT: Okay. You may step down.

Members of the jury, it is about ten to ten. We'll take a recess until 10:15. Please remember my prior cautionary instruction about not discussing this case among yourselves or with anybody else, keep an open mind until you've heard all of the evidence, had a chance to receive my final instructions, hear the closing arguments of the lawyers, and, most importantly, go back into the jury room to discuss this case among yourselves. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up on the break?

MR. WILLIAMS: No, Your Honor.

MR. WILLETT: Not on behalf of the defense, Your Honor.

THE COURT: Mr. Williams, is Mr. Cutkomp your next witness?

Page 47

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.  We'll be in recess.

(Recess at 9:48 a.m.)

THE COURT:  Ready to have the jury brought in?

MR. WILLIAMS:  Yes, Your Honor.

MR. WILLETT:  The defense is ready.

(The jury entered the courtroom.)

THE COURT:  Please be seated.

826

Mr. Williams, you ready to call your next witness?

MR. WILLIAMS:  Yes, Your Honor.  The United States calls Tim Cutkomp.

THE COURT:  Okay.  Mr. Cutkomp, please come forward and raise your right hand, and I'll swear you in.

TIMOTHY CUTKOMP, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated in the witness box.  Please adjust the chair and the microphones so you can speak directly into the microphones.  And when you're ready, would you state your full name and spell your last name, please.

THE WITNESS:  My name is Timothy Ken Cutkomp, and my last name's spelled C-u-t-k-o-m-p.

THE COURT:  Thank you.

Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q.   Mr. Cutkomp, I want to start off by having you share some just background information about yourself.  First of all, how old are you, sir?

A.   I'm 38.

Page 48

Q.    How far did you go through school?

A.    I graduated high school and taken some college and technical training.

Q.    Where did you grow up?

827

A.    In Britt, Iowa.

Q.    And did you live in the Britt, Iowa, area until you completed high school?

A.    Yes, I did.

Q.    Where are you living now?

A.    In Des Moines, Iowa.

Q.    And what type of -- are you employed?

A.    Yes, I am.

Q.    What type of work do you do?

A.    Sheet metal work.

Q.    How long have you done sheet metal work?

A.    Four, five years on and off.

Q.    And do you work for the same company throughout that time period, or have you shifted to other companies?

A.    I've worked for several different companies.

Q.    What type of sheet metal working do you do?

A.    Mostly industrial.

Q.    And doing what?

A.    Like heating and cooling.

Q.    The -- are you married, sir?

A.    No, I'm not.

Q.    Have you been married in the past?

A.    Yes, I have.

Q.    And do you have any children?

A.    Yes.

Page 49

Q.    And how many children do you have?

A.    I have three children.

Q.    And do you share custody of those children?

A.    Yes, I do.

Q.    I want to go back to your time in Britt, Iowa, and ask you if during the time you lived in Britt, Iowa, did you come to know somebody by the name of Dustin Honken?

A.    Yes, I did.

Q.    Could you explain to the jury, how did you come to know him?

A.    I attended grade school with him and later high school.

Q.    You guys both grew up in the same town of Britt, Iowa?

A.    Yes.

Q.    And is that a fairly small town?

A.    About 2,000.

Q.    During grade school, could you describe your relationship with Dustin Honken?

A.    I mostly just knew him.  I didn't really hang out with him much in grade school.

Q.    Did that change when you guys got to high school?

A.    Yeah, we became friends in high school.

Q.    Describe if you would your friendship with Dustin Honken in high school.

A.    We hung out quite a bit.  We pretty much were best friends in high school.

Q.    Can you give some description to the jury about your friend

Page 50

Dustin Honken in high school. What kind of a person was he?

A. He talked a lot. I don't know how he really rated in school. He did okay in school, in high school. I don't know.

Q. Was he kind of an outgoing guy with lots of friends or quiet, reserved? What was he like personality-wise?

A. He was -- I don't know if he was really outgoing. He talked a lot. He had some good friends.

Q. You were among them.

A. Yes.

Q. What was he like as far as activities he was involved in in high school? Was he athletic? Was he one of these high school popular guys? What was he like?

A. He wasn't really ath -- involved in the athletic part. He mostly just got involved in gym some as far as athletics went, but that was it.

Q. At some point you indicated you attended some college. Where was that at?

A. At North Iowa Area Community College.

Q. And we're going to get into that time frame at some point before too long in your testimony, but when you attended the North Iowa Area Community College -- and that goes by the acronym NIACC?

A. Yes.

Q. When you attended NIACC, did Dustin Honken also attend

830

college at the same school?

A. Yes, he did.

Q. And at the same time as you?

A. Yes.

Q. Did you guys remain friends while you attended college

Page 51

together?

A.    Yes, we did.

Q.    And were you aware of what course of study Dustin Honken pursued while at NIACC?

A.    He was pursuing a chemistry degree.

Q.    And were you familiar with what grades he received at that time?

A.    He did real good, mostly A's.

Q.    What were you studying in college at that time?

A.    Mostly liberal arts.

Q.    Do you have a chemistry background at all, sir?

A.    No, I took one class and didn't do very good.

Q.    Didn't do very well in that class?

A.    No.

Q.    At this point up until you're in college with Dustin Honken -- first of all, let's put a time frame on there.  When did you attend college at NIACC?

A.    The early '90s.

Q.    So from the time that you met Dustin Honken up until the early '90s, are you aware of him using violence against other

831

people at all?

A.    No.

Q.    Was he a physical person?  In other words, did he get in fights with people in high school or after high school?

A.    No.

Q.    Ever aware of him hurting anybody up to this point in your life with him?

A.    No.

Q.    At some point before you went to college in the early

Page 52

1990s -- and let's again try to put some time frames on this -- did -- were you and Dustin Honken in the same high school class together?

A.    Yes, we were.

Q.    Did you both graduate from high school in Britt, Iowa?

A.    Yes.

Q.    What year did you graduate?

A.    In '86.

Q.    And from 1986 until the early 1990s when you attended college at NIACC, what did you do with your life, sir?

A.    I got married, had some kids.

Q.    And were you living in the Britt, Iowa, area at that time?

A.    No, I lived in Des Moines.

Q.    At some point did your marriage come to an end?

A.    Yes.

Q.    And is that at that point that you moved back to the north

832

central Iowa area?

A.    Well, we were living up there.

Q.    Before that?

A.    Before that, yes.

Q.    Okay.  When did you move back to the Mason City, Iowa, area then?

A.    In late '88.

Q.    And it was up there that you ended up getting a divorce with your wife.

A.    We got divorced later on.

Q.    Okay.  While you were living in Mason City, though.

A.    It was when we were down in Arizona that . . .

Q.    Oh.

Page 53

A.    We were separated.

Q.    Separated by that time.

A.    Yeah.

Q.    All right.  So what I want to do is focus on the period after you got back up to the Mason City, Iowa, area in late 1988.  Describe for the jury what was the nature of your friendship and contact with Dustin Honken at that point.

A.    We both worked at Wellborn.  He was a manager there, and I worked on the line.

Q.    And what was the nature of your friendship with him?

A.    We hung out some but not a whole lot there during that time.

833

Q.    Not as close as you were in high school?

A.    No.

Q.    Now, at some point did that friendship -- did you become closer in the early 1990s?

A.    Yes, when we started school again.

Q.    At NIACC.

A.    Yes.

Q.    Now, prior to starting school at NIACC with Dustin Honken, were you aware, first of all, whether he used any controlled substances?

A.    I didn't know if he used any or not.

Q.    Okay.  And prior to starting college, were you aware of whether he was involved in selling or distributing any controlled substances?

A.    He told me that he sold some.

Q.    And do you remember what he told you he sold?

A.    Some cocaine.

Page 54

Q.   Did he indicate to whom he had sold the cocaine?

A.   Terry DeGeus.

Q.   Once you started college at NIACC in the early 1990s, you indicated that's when you and Dustin Honken became closer friends again?

A.   Yes.

Q.   At that point did you become aware of his involvement with any other drug distribution or selling?

834

A.   He was selling marijuana.

Q.   And do you know who he was selling the marijuana to?

A.   To Greg Nicholson and Chris Searcy.

Q.   And how were you familiar with him selling these drugs?

A.   Just from hanging out with him, and I'd seen them and met them before.

Q.   You had seen them what?

A.   I'd seen him on one occasion at least sell to Chris, and I believe I'd met Greg at that point.

Q.   Were you aware from anything he told you about whether he was selling any marijuana to anybody else other than Greg Nicholson and this Chris Searcy?

        MR. WILLETT:  Excuse me, Your Honor.  To the extent this calls for hearsay, the defense objects, also Federal Rule of Evidence 402.

        THE COURT:  Overruled.  You may answer.

A.   Could you repeat the question again?

Q.   Yeah.  Are you aware of whether he told you if he was selling to anybody else other than those two individuals, Greg Nicholson and Chris Searcy?

A.   At that time I don't remember.

Page 55

Q.    Now, while you were still in college, you were taking classes in liberal arts.  Dustin Honken you told us is taking classes in chemistry.  Did you have any discussion with Dustin Honken or did he have any discussion with you concerning a

835

desire to manufacture controlled substance?

A.    Yes.

        MR. WILLETT:  Excuse me, Your Honor.  I would object at this point based on hearsay.

        THE COURT:  Overruled.  You may answer.

        MR. WILLETT:  Your Honor, may I have a continuing hearsay objection to the conversations Mr. Cutkomp had with Mr. Honken?

        THE COURT:  You may.  Why don't you state your exception to the hearsay rule just so we have a clean record.

        MR. WILLIAMS:  Certainly, Your Honor.  It's 802(d)(2)(E).

        THE COURT:  801(d)(2)(E)?

        MR. WILLIAMS:  801(d)(2)(E).

        THE COURT:  Thank you.

        MR. WILLETT:  Thank you, Judge.

BY MR. WILLIAMS:

Q.    My question to you was while you were in college and he's attending chemistry classes, did he have a discussion with you concerning a desire to start to manufacture controlled substances?

A.    Yes, he did.

Q.    Can you just share with the jury, what was the nature of the conversation?  I mean, did it occur at one time?  Was it kind of a theme with him?  And what did he say?

        Page 56

A. He was -- as he was -- just started investigating how to make cocaine to start out with, and then he, through the investigation, decided that he -- it was pretty hard to make that. So he started investigating the methamphetamine, and he talked to me about it in the library one day.

Q. Were you aware at this point whether he was involved at all in trafficking of methamphetamine?

A. No.

Q. And so he talked to you about his desire to manufacture methamphetamine while you guys were in college.

A. Yes.

Q. At some point did he cease attending NIACC?

A. Yes.

Q. Was this after he graduated, or what occurred?

A. It was in the early part of '92 I believe.

Q. And had he gotten a degree or something, or did he just decide to quit?

A. He decided to move down to Arizona and keep going to school down there and then try to start trying to make the methamphetamine.

Q. What were you doing with your life at this point when in late 1992 he decided to move to Arizona?

A. I was still attending college.

Q. And I'm sorry. Late -- early -- was it early 1992? Is that what you said?

A. Yes.

Q. I'm sorry. I said late. So you continued to attend

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 736 of 3592

Q.   college up at NIACC?

A.   Yes, I did.

Q.   Before Dustin Honken moved to Arizona to, among other things, begin manufacturing methamphetamine, did he talk to you about whether you would join him in that effort?

A.   He'd asked if I wanted to help in the manufacturing, yes.

Q.   Did he share with you what his plans were for it?

A.   To sell it.

Q.   And did he indicate at that point what he wanted you to do or how he wanted you to help in this operation?

A.   He wanted me to help make the first batch, and he would give me some money from that.

Q.   And did you take him up on that offer at that time?

A.   At that time I did not.

Q.   So did, in fact, Dustin Honken then move to Arizona?

A.   Yes.

Q.   Why Arizona?

A.   His brother lived down there.

Q.   And what's his brother's name?

A.   Jeff Honken.

Q.   Did he then move down to Arizona in approximately January of 1992?

A.   Yes.

838

Q.   And over the course of the next few months, on occasion, did you have -- still have communication with Dustin Honken through May of 1992?

A.   Yes, I did.

Q.   And how would that occur?

A.   On the phone usually.  I believe he came back several --

Page 58

several times.

Q. He came back several times as well?

A. Yes.

Q. During these -- the time period from January of 1992 until about approximately May of 1992, did Dustin Honken renew his discussions with you about manufacturing methamphetamine and wanting you to participate?

A. He would ask if I wanted to come help.

Q. Did he let you know what the status of things were down in Arizona?

A. He had not made it yet.

Q. Did he tell you what, if anything, he was doing toward the process of manufacturing it?

A. At that time I don't remember.

Q. At some point did you ultimately agree to move to Arizona?

A. Yes.

Q. And when was that?

A. In May of '92.

Q. And what led you ultimately to decide to go to Arizona?

839

A. I was having some marital problems and needed money.

Q. And where did you go to in Arizona?

A. Tucson.

Q. And explain to the jury, when -- in Tucson, what's the living arrangements? Where is Dustin Honken staying? What's going on down there?

A. When I moved, I moved into his brother's house in Tucson. He was staying with him.

Q. And did he remain in Jeff Honken's house for very long?

A. Just a few weeks.

Page 59

Q.   And what happened at that point?

A.   We got an apartment in Tucson, Tamarack Apartments, and we moved into the Tamarack Apartments with the laboratory.

Q.   And when you say we moved in, who moved into those Tamarack Apartments?

A.   Dustin and I.

Q.   What, if anything, occurred in those just a few weeks that you were living at Jeff Honken's house with regard to the manufacturing of methamphetamine, if anything?

A.   The only thing that happened was that -- basically that Jeff's wife said we couldn't -- or they couldn't have the chemicals there anymore because it was making the house stink.

Q.   Based on your contact with Jeff Honken's wife, was she aware that there was an attempt to manufacture methamphetamine going on?

840

A.   No.

Q.   What was she told if you know?

A.   That they were trying to extract gold from some of the chemicals from the gold plating in Jeff's business.

Q.   So based on her complaints about the smell, ultimately you moved to an apartment.  Could you explain to the jury were you working at this point?

A.   When we got into the apartment, I started helping Dustin with the methamphetamine.

Q.   And let me -- that was a bad question, Mr. Cutkomp.  Let me ask it this way.  Did either you or Dustin Honken have any legitimate employment when you moved down to Arizona in May of 1992?

A.   No.

Page 60

Q.    The apartment presumably cost rent.

A.    Yes, it did.

Q.    Where did the money come from to pay the rent on that apartment?

A.    From Jeff.

Q.    Now, who made the arrangements for Jeff Honken to provide the money to pay for that apartment?

A.    Dustin had talked to him about it.

Q.    Paying for the apartment?

A.    Yes.

Q.    And was there an understanding at that point that he was

841

paying for the apartment for the purpose of manufacturing methamphetamine?

A.    Yes.

Q.    So let's talk about that.  You indicated earlier in your testimony that when you first got to that apartment in Tucson you actually started helping Dustin Honken manufacture the methamphetamine.

A.    Yes, I did.

Q.    Can you explain to the jury just what was going on in that apartment back in the -- what was this?  Probably May or June of 1992?

A.    We were -- set up the laboratory and started the process of making the methamphetamine.

Q.    And who decided, first of all, what drug was going to be manufactured?

A.    Dustin.

Q.    Who decided what chemicals would be used in the manufacturing process?

Page 61

A.    Dustin.

Q.    Who knew how to make methamphetamine?

A.    Dustin.

Q.    Was there special equipment used in the manufacturing process?

A.    Yes, there was.

Q.    And who chose what equipment to purchase?

842

A.    Dustin chose.

Q.    And at this point in this apartment, what was your role then?

A.    Basically I just helped set things up and wash the dishes. I was learning how to make the methamphetamine.

Q.    And who was teaching you how to make the methamphetamine?

A.    Dustin was.

Q.    And what was his role in this as well then?

A.    He was doing the research on it and showing me how to do it.

Q.    While you were in that apartment in Tucson, were you able to successfully manufacture any methamphetamine there?

A.    Yes, we were.

Q.    And let's talk -- in this process are there a number of steps that Dustin Honken designed to go through to ultimately manufacture the methamphetamine?

A.    Yes.

Q.    And if you got to the end of those steps, would you end up with a batch of methamphetamine?

A.    Yes.

Q.    What was the typical amount of meth that you would produce using the steps that Dustin Honken had designed?

Page 62

A.    The first one was a lot smaller than the others, but around ten ounces I suppose.

Q.    And just approximately if you recall how many batches, if

843

you will, of methamphetamine were you able to produce in that apartment in Tucson?

A.    I believe we did -- we only did one in that apartment.

Q.    At some point did you move the operation from that apartment?

A.    Yes.

Q.    And why was that?

A.    It was creating a smell from the chlorine that we were using, and we couldn't produce it very fast.

Q.    And why was the smell a concern in the apartment?

A.    We didn't want to draw attention to ourselves.

Q.    So what happened?

A.    We got a house out in the country down south of Tucson and set up the laboratory there.

Q.    And who decided that it was time to set up a house outside of this apartment to set up the laboratory there?

A.    Kind of a group thing.

Q.    And the group involved who?

A.    Dustin, myself, and Jeff.

Q.    How did you decide upon this house in southern Arizona?

A.    We just got a real estate book and started looking through it until we found something out in the country and went and looked at it.

Q.    And so approximately how long were you in this apartment in Tucson before you moved the operation to a town south of Tucson?

844

A. Two, three months.

Q. When you moved down to that house, was it a purchased house or a rental house?

A. A rental house.

Q. Financing, again, how was that rent paid for?

A. Jeff paid for it.

Q. And who arranged to have Jeff pay for it?

A. We discussed it with Dustin and --

Q. As a group?

A. Yeah, as a group.

Q. And then you said, And Dustin?

A. Talked to him about it.

Q. Did you ask Jeff Honken to pay for the apartment or pay for the house in southern Arizona?

A. No.

Q. Did you move the operation down there including all the equipment and chemicals and so forth?

A. Yes.

Q. And who all was involved in moving that operation down there?

A. Dustin and I.

Q. Once you went down to this house in southern Arizona, did you set the lab back up?

A. Yes, we did.

Q. And at this point did you know enough about the

845

manufacturing process to set up the lab yourself or not?

A. I could do a lot of it, but I still needed help on a lot of

Page 64

the things just to make sure I was doing it right.

Q.    And so who was the one involved in deciding how to set up the lab then in southern Arizona?

A.    Dustin.

Q.    In the process of manufacturing this methamphetamine, did you need specialized chemicals for that process?

A.    Yes.

Q.    And where were the chemicals obtained from?  I guess I'm not looking for names of companies but description of the types of companies that you would have purchased chemicals like this from.

A.    Chemical supply stores.

Q.    And did you just walk in as Tim Cutkomp off the street and say, I'd like to buy a batch of this chemical, or how was that done?

A.    I gave a false name of a company, and I used a false name for myself also.

Q.    And what was the false name of the company?

A.    PCI or PCT.

Q.    And what did that stand for if you recall?

A.    Printed Circuit Technologies.

Q.    And were you the only one involved in acquiring these chemicals?

846

A.    When I moved down I was.

Q.    And at whose direction or your own direction?  I mean, how was it decided what chemicals you needed and what company to go to and how much to get and so forth?

A.    I discussed it with Dustin, and he decided what we needed.

Q.    And so why didn't he go get the chemicals himself?

Page 65

A. That was part of the arrangement, that I would take care of those things.

Q. It was part of the understanding you had with him is your share of it was going to be based on, among other things, that kind of labor.

A. Yes.

Q. And at this point was there an understanding between you and Jeff Honken and Dustin Honken concerning once you manufactured the methamphetamine how the money would be split among you if it was sold?

A. In three ways.

Q. So evenly?

A. Yes, that was our arrangement.

Q. Now, once you got down to this house in southern Arizona, were you successful in manufacturing the methamphetamine?

A. Yes, we were.

Q. And did you continue to manufacture batches of methamphetamine for a period of time?

A. Yes.

847

Q. And how long did that last?

A. About six months probably.

Q. And during that six-month period, you indicated earlier in your testimony the average batch would be maybe ten ounces or something like that. Do you have a rough idea of the total quantity of methamphetamine manufactured during that time period?

A. Somewhere between five and six pounds I would imagine.

Q. What arrangement was made for selling this methamphetamine?

A. Dustin knew people in Iowa that he was selling it to.

Page 66

Q.    And who did he tell you he was selling it to?

A.    Greg Nicholson and Terry DeGeus.

Q.    Did he identify anybody else in Iowa he was selling the methamphetamine to?

A.    Not at that time.

Q.    How was the methamphetamine, once it was manufactured, packaged, if you will?

A.    In glass jars.

Q.    And then once it was put in the glass jars -- let me back up a little bit.

Once you went through the manufacturing process and you came up with a batch of methamphetamine, was anything added to it before it was put into the glass jars?

A.    Some of the batches we did, and some were just sent pure and Greg would mix it up.

848

Q.    Greg Nicholson?

A.    Yes.

Q.    So how was the methamphetamine then transported from Arizona where you were manufacturing the methamphetamine back to Iowa?

A.    Dustin would take it.

Q.    And how would he get it up to Iowa?

A.    I think he flew at least once and then drove most of the time.

Q.    Did anybody else to your knowledge participate in transporting the methamphetamine from Arizona up to Iowa?

A.    I did once.

Q.    And when you took it up one time, do you recall what kind of quantity you took up?

Page 67

A.    I don't remember exactly what it was.  Several -- around several pounds.  I'm not sure.

Q.    And where did you take it to?

A.    To Greg's house.

Q.    And how did you know to take it to Greg's house?

A.    Dustin told me to take it there.

Q.    When you took it to Greg's house, did you provide it directly to Greg Nicholson?

A.    Yes, I did.

Q.    And did you -- was it in those jars again?

A.    Yes.

849

Q.    Did he pay you for it at that time or pay for prior shipments at that time?

A.    I don't think he paid for anything at that time.

Q.    Was that the only time you transported any of the methamphetamine?

A.    That I remember, yes.

Q.    And how did you get it up to Iowa?  Did you fly or drive?

A.    I rode a bus.

Q.    Do you know what Dustin Honken was selling this methamphetamine to Greg Nicholson and Terry DeGeus for, how much per ounce or per pound?

A.    Around I think -- at least it started out with about 2,000 an ounce, but I'm not sure if that's what it was all the time.

Q.    Well, who decided how much it was going to be?

A.    Dustin.

Q.    Once the methamphetamine was transported back up to Iowa, was some of it sold to other people?

A.    Yes.

Page 68

Q.   And did it generate money?

A.   Yes.

Q.   Sales?

A.   Yes.

Q.   What happened with that money then?  How would that be ultimately returned to you and Dustin and Jeff Honken in Arizona?

850

A.   Dustin would go get it and bring it back.

Q.   Did you ever participate in obtaining any of the money that was generated from the sale of this methamphetamine?

A.   Yes, I did.

Q.   And how many times did you collect any of the money?

A.   Probably three times.

Q.   Again, how would you determine how much to get from whom?

A.   Well, Dustin would tell me I needed to go get it, and then what they gave me I guess is what dictated that.

Q.   So once you got up there, did you have any communication with the individuals up in Iowa saying you owe this much or you owe that much?

A.   No, just that I needed to go get some money, and whatever they had is what I would get.

Q.   Had that already been arranged by Dustin Honken?

A.   Yes.

Q.   And explain to the jury, I mean, you guys are down in Arizona.  These folks are up in Iowa.  How are you communicating with them in order to make these arrangements?

A.   On the phone.

Q.   When you delivered -- or I'm sorry.  When you picked up cash on a couple occasions up in Iowa, how did you get up here,

Page 69

first of all?

A.    Rode the bus that one time.  I rode the bus several times.
I don't remember.  Drove.  That's the only ways I . . .

851

Q.    That's the only way you got up to Iowa.

A.    Yes.

Q.    And who did you collect cash from?

A.    From Terry and from Greg.

Q.    And just so we're clear, Terry is Terry DeGeus?

A.    Yes.

Q.    And Greg is Greg Nicholson?

A.    Yes.

Q.    Do you recall today how much cash you would have picked up from those individuals?

A.    Several thousand.

Q.    From each?

A.    Yes.

Q.    You indicated when you took up methamphetamine that one time you took it to Greg Nicholson.  Was there an understanding that Greg Nicholson was then distributing the methamphetamine and getting money for it?

A.    Yes.

Q.    Was he doing anything else for Dustin Honken in addition to selling the methamphetamine that he got?

A.    He mixed it.

Q.    And how was Terry DeGeus getting methamphetamine then?

A.    Dustin would come back when Terry needed some and bring it to him.

Q.    Where would he get it from?  Dustin Honken, where would he

852

Page 70

get the meth from?

A.   He'd go get it from Greg.

Q.   So was he storing some of the methamphetamine at Greg Nicholson's?

A.   Yes.

Q.   Why wouldn't he just have Terry DeGeus go over to Greg Nicholson's to pick some up?

A.   He didn't want them to meet each other.

Q.   And did he indicate to you why not?

A.   Just that they'd be able to work together, and he didn't want them to do that.

Q.   At some point did you have any conversations with Dustin Honken about how he first hooked up with either one of these individuals, Greg Nicholson or Terry DeGeus?

A.   Yes.

Q.   And what did he tell you, for example, about Greg Nicholson?  How did he first meet him?

A.   There was a man at Wellborn that we had worked with that knew Greg, and he had introduced Dustin to Greg.

Q.   And how about Terry DeGeus?

A.   He grew up in Britt also.

Q.   During this time period about six months in -- well, actually going back to when you first went to the apartment and you started manufacturing methamphetamine in May or June of 1992 up until March of 1993, approximately how many trips or how

853

often would Dustin Honken make trips to Iowa to deliver methamphetamine?

A.   He would deliver -- get money about every two weeks.

Page 71

Q.    In addition to driving the methamphetamine up or driving up to obtain the methamphetamine, was courier services ever used like UPS, the U.S. Mail, or Fed Ex or anything like that?

A.    I believe he sent money back using one of those.

Q.    During the course of the time you were down in Arizona and this manufacturing process is going on, did you actually see any of the cash that was generated from the sale of the methamphetamine?

A.    Yes.

Q.    And did you actually receive any of it?

A.    I received some, yes.

Q.    And do you recall approximately how much cash you would have received?

A.    On one occasion I remember getting several thousand.

Q.    And a rough idea of how many total thousand you would have received over the course of this if you recall?

A.    Excluding having a place to live, three to four thousand.

Q.    How much -- did you ever see Dustin Honken with larger amounts of cash?

A.    Yes.

Q.    And what was the largest amount of cash you ever saw him with during this time period?

854

A.    20,000.

Q.    Is Dustin Honken to your knowledge selling to anybody else in Arizona while you're manufacturing this methamphetamine down there?

A.    Not to my knowledge.

Q.    Did you and Dustin Honken ever use any of the methamphetamine?

Page 72

A.    Yes.

Q.    Is this the first time you had used methamphetamine?

A.    Yes, it was.

Q.    While Dustin Honken is selling this methamphetamine to Greg Nicholson and Terry DeGeus up in Iowa, are you aware of whether he maintained any type of notes or anything to keep track of how much was owed to him for selling the methamphetamine?

A.    Yes, he did.

Q.    And just describe for the jury what type of notes would he use for that purpose.

A.    He had like just a note that had T Man and G Man written on it, said what they owed.

Q.    I'm going to show you on the screen there in front of you what's already been admitted into evidence as Exhibit 33 and ask you if you can identify this note.

A.    Yep.

Q.    And what is that?

A.    It's a note that says G Man on it and what he owed and what

855

he's -- I'm not sure what the lines are for but says what they -- what is owed.

Q.    And did you understand when you were involved with Dustin Honken in this operation what G Man -- who G Man referred to?

A.    That was Greg Nicholson.

Q.    And T Man?

A.    Terry DeGeus.

Q.    By the time of 1993, do you have an idea of the status of how much money either Greg Nicholson or Terry DeGeus owed to Dustin Honken?

A.    I believe it was around 30,000 each.  I'm not -- I'm not

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 752 of 3592

exactly sure how much it was.

Q.   Were you involved at all in this keeping track of the money and who owed who what?

A.   Not really.

Q.   Who was in charge of that?

A.   Dustin.

Q.   Did he to your knowledge decide how much money his brother was going to receive from any of the proceeds that came?

A.   Well, we were supposed to be giving him most of the money because he had provided the money for us to start out, but Dustin was keeping some -- wasn't telling him that we got as much as we did.

Q.   Now, did Dustin Honken have a girlfriend at some point down in Arizona?

856

A.   Yes.

Q.   And what was her name?

A.   Missy Friesenborg.

Q.   Was she originally from Iowa?

A.   Yes.

Q.   And during what time period was she living down in Arizona if you recall?

A.   Late -- probably late '92 or -- late '92 and then into '93 I know she was living there.

Q.   What, if any, involvement did she have in any of this methamphetamine manufacturing or distribution operation?

A.   She didn't have any.  She had no knowledge of it.

Q.   Now, up to this point -- and by this point I mean early 1993 -- you've now been down in Arizona for six to eight months manufacturing methamphetamine and repeatedly distributing pounds

Page 74

of the methamphetamine up to Iowa. And when I say you, I mean you, Dustin Honken, and Jeff Honken as part of this operation. Up to this point in early 1993, were you aware of Dustin Honken using any violence in connection with this distribution or manufacturing operation?

A. No.

Q. Was he carrying weapons with him when he went to Iowa to distribute methamphetamine?

A. No.

Q. Was he hurting anybody, any distributors or trying to hurt

857

any distributors involved in his operation?

A. No.

Q. Now, in early 1993, did you come to be aware that an Angela Johnson was involved with Dustin Honken?

A. Yes.

Q. And how did you first become involved -- aware of that?

A. Dustin had told me that he had met with her.

Q. Did he describe to you who she was?

A. She was -- at that time she was Terry DeGeus's girlfriend.

Q. Did Dustin Honken indicate to you whether she was involved at all in the distribution of methamphetamine that he had been sending up to Iowa, in particular to Terry DeGeus?

A. Yes, that Angie had been selling that methamphetamine.

Q. At some point did Dustin Honken ever tell you about whether Angela Johnson and Dustin Honken became involved in a romantic way?

A. Not long after that I believe they did.

Q. And we're talking about early 1993 now?

A. Yes.

Page 75

Q. Did Dustin Honken share with you at all about how it was that it went from the situation of being Terry DeGeus's girlfriend and distributing methamphetamine for Terry DeGeus to becoming involved with him?

A. When they first -- when they first met, she'd called and said that Terry was using most of the drugs and she's the one

858

that was selling it so it should just go through her and forget about Terry.

Q. And this is something Dustin Honken told you back in 1993?

A. Yes.

Q. Focusing on late 1992 and into the early months of 1993, what was going on in your life at this point as far as your desire to remain involved in this operation?

A. In early '93 I -- well, on and off I tried moving back, but I -- eventually in '93 I moved back for good.

Q. And why?

A. Just to get away from the whole thing.

Q. Now, you said several times you tried. Did you think about moving back and getting out of it before that?

A. Yes.

Q. And ultimately why didn't you on those prior occasions?

A. Dustin's my friend and I was involved with it. I don't know.

Q. Could you have?

A. I suppose I could have left.

Q. Did Dustin Honken threaten you with violence if you didn't remain as part of this operation?

A. No.

Q. Did he ever threaten to harm you or any of your family if

Page 76

you didn't participate in it?

A. No.

859

Q. So your decision to remain in it was more out of a friendship with Dustin Honken than anything else?

A. Yes.

Q. Now, ultimately as a result of your desire to get out of this and ultimately move back to Iowa, what happened with the methamphetamine operation that you guys had in the house in southern Arizona?

A. We cleaned up all the glassware and packaged it with the chemicals and moved it into a storage shed.

Q. Whose storage shed was that?

A. Jeff's.

Q. At the point that you were going to move back to Iowa, did Dustin Honken indicate to you that he was quitting the operation and was no longer going to be involved in manufacturing methamphetamine?

A. No.

Q. You packaged up this stuff. You didn't destroy the chemicals and the glassware?

A. No, we did not.

Q. What did you understand he was intending to do once you packaged up those materials and you moved back to Iowa?

A. He would eventually set it back up somewhere and continue manufacturing.

Q. Approximately when did you move back to Iowa then, sir?

A. Late February or early March of '93.

860

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 756 of 3592

Q. After you moved back to Iowa, did you see Dustin Honken back in -- I'm sorry. Let me back up.

Where back in Iowa did you move to, first of all?

A. In with my parents.

Q. And where do your parents live?

A. In Britt.

Q. And when you moved back to Iowa, did you have any occasion to see Dustin Honken again in March of 1993?

A. Yes.

Q. How many occasions did you see him?

A. I don't remember.

Q. Let me direct your attention to March 21 of 1993. Do you recall that Dustin Honken and you were arrested in a car outside Greg Nicholson's house?

A. Yes.

Q. So Dustin Honken was back in Iowa at least on that occasion.

A. Yes, he was.

Q. Do you remember any other occasions before that that he had been back in Iowa after you had moved back?

A. I don't remember then.

Q. Good enough. So let's go to that event then on March 21 of 1993. How was it that you got hooked up with Dustin Honken and ended up in a car with him on March 21, 1993?

A. The day before, he and another friend of ours and I, they

861

came and picked me up, and we all went out, partied all night.

Q. Are you aware of where or how Dustin Honken got back to Iowa on this trip in March of 1993?

Page 78

A. I don't recall.

Q. Who was the other friend that you hooked up with?

A. Russ Miller.

Q. Was Russ Miller involved in any of this methamphetamine manufacturing or distribution operation?

A. No.

Q. Was he just a childhood friend or a high school friend of yours and Dustin Honken's?

A. College friend.

Q. College. Once you hooked up with him, you indicated that you and Dustin and Russell Miller partied that night.

A. Yes.

Q. Did you run into anybody else that night that you're aware of?

A. Dustin had another room, and Angie stayed in the room with him.

Q. At what point in the night did Angela Johnson hook up with Dustin Honken?

A. It would have been after we had gotten back to the hotel.

Q. So take us then to the morning of March 21, 1993. At some point after you woke up that day, what did you, Dustin Honken, Russell Miller, Angela Johnson -- what happened that morning?

862

A. Dustin said it was time to go pick the money up at Greg's, and so we went to Greg's house, and I waited outside for him, and he picked up some money, came back out, and that's when they arrested us.

Q. What happened with Russell Miller?

A. He was back at the apartment -- or at the hotel.

Q. And was he aware that you and Dustin Honken were going over

Page 79

to pick up money from Greg Nicholson?

A.   I don't think so.

Q.   What about Angela Johnson?  Did you see her that next day?

A.   I didn't.

Q.   And are you aware where she went to or what she was doing that day when you went over to Greg Nicholson's to pick up money?

A.   As far as I know, she was in the -- just in the hotel room.

Q.   So when you went to pick up the money from Greg Nicholson, what kind of vehicle did you take to go there?

A.   I believe we took Russ's car.

Q.   And was there a reason to take his car versus your car?

A.   It was the one that we had been driving that night, the night before.

Q.   So when you went over to Greg Nicholson's house that day, did you know the purpose was to pick up drug proceeds?

A.   I did, yes.

Q.   And why did you participate in that if your thought at this

                                                     863


point is you kind of wanted to get out of this operation?

A.   I don't know.  I just was riding with Dustin.

Q.   So what happened over at that house, Greg Nicholson's house, on March 21 of 1993?

A.   Dustin went in for about a half an hour and got the money and came back out, and I guess Greg had been wearing a wire, and as we pulled away, the police stopped us and arrested us.

Q.   Did you and Dustin Honken both get taken to local jail?

A.   Yes, we did.

Q.   At some point either en route or at the local jail did Dustin Honken provide any instructions to you?

Page 80

A.    To call Missy.

Q.    And when did he provide those instructions to you if you recall?

A.    It was either in the car or at the jail.  I'm not sure which.

Q.    What were you to do when you called Missy?

A.    There was a box that had some chemical paraphernalia or some drug paraphernalia in it that I was to have her get rid of.

Q.    Was there anybody else that you were to have her get in contact with?

A.    Jeff I believe to let him know --

Q.    What was the -- I'm sorry?

A.    To let him know he should get rid of the chemicals in the storage shed.

864

Q.    And did you carry out those instructions provided to you by Dustin Honken?

A.    Yes, I did.

Q.    Now, how long did you stay in jail after your arrest on March 21 of 1993?

A.    It was either one night or a day and a night.

Q.    What ultimately happened to the charges that were brought against you arising from your arrest on March 21 of 1993?

A.    They were eventually dropped.

Q.    And do you recall they were dropped on April 9 of 1993?

A.    I don't remember the exact date, but that . . .

Q.    They didn't stay on you very long?

A.    No.

Q.    So at this point where is Dustin Honken after your arrest in March of 1993?

Page 81

A.    He was in the county jail in Cerro Gordo County for a while and later on was moved to Linn County.

Q.    And what happened after he got moved to Linn County?  Did he remain in jail down there?  Did he get released?

A.    He eventually got released.

Q.    Now, at some point, not necessarily while this was going on, but at some point down the road did you ever have a conversation with Angela Johnson concerning the time when Dustin Honken was in the Cerro Gordo County Jail after these charges were brought on March 21 of 1993?

865

A.    Yes.

Q.    And what, if anything, did she talk to you about with regard to Dustin Honken being in the jail?

        MR. WILLETT:  Excuse me.  Objection, Your Honor, hearsay.

        THE COURT:  Overruled.  You may answer.

A.    She jokingly had said that she had thought about breaking him out.

Q.    Now, at some point did you have contact with Dustin Honken after he was ultimately released on the charges?

A.    Yes.

Q.    Now, the charges are still pending against him, but he's free pending trial?

A.    Yes.

Q.    And during that time period, did you have any conversations with him concerning what the evidence was against him in this case?

A.    Yes.

Q.    What do you recall him saying that he understood was the

Page 82

reason he was charged in the case?

A.   Because Greg had cooperated with the authorities.

Q.   Were you present at any point where you had any conversations with Dustin Honken with Angela Johnson present?

A.   She was there when he would come and we would get together. I don't know what we talked about when she was there, though.

866

Q.   So on occasion she would be around when you and Dustin Honken would get together.

A.   Yes.

Q.   Did you ever have any conversation with Angela Johnson concerning what, if anything, you should do if you were contacted by the police and asked questions about the meth operation?

MR. WILLETT:  Excuse me, Your Honor.  Objection, hearsay.

MR. WILLIAMS:  It's an admission by a party opponent, Your Honor.

THE COURT:  Overruled.  You may answer.

A.   Could you repeat that again?

Q.   Sure.  Did you ever have any conversations with Angela Johnson concerning what you should do if you were contacted by the police and asked questions about the meth operation of Dustin Honken?

A.   Just not to say anything.

Q.   And who told you not to say anything?

A.   Angie.

Q.   Now, what was your relationship, for lack of a better word, with Angela Johnson during this time period in the spring of 1993?  Had you formed a friendship?  Were you acquaintances?  I

Page 83

mean, how would you describe your relationship with Angela

Johnson?

867

A.    Well, she was my friend's girlfriend, acquaintances, kind

of friends.

Q.    Were you aware that after Dustin Honken was indicted on

federal charges arising from this March 21, 1993, arrest,

whether he had any restrictions on who he could have contact

with while he was on release?

A.    He could not have contact with myself.

Q.    And did Dustin Honken find ways to get around those

limitations?

A.    Yes.

Q.    And would you guys meet in person?

A.    Yes.

Q.    And would you talk on the phone?

A.    Yes.

Q.    Was he concerned about -- did he ever express concerns to

you about if he called you directly that he might get caught

doing that?

A.    Yes.

Q.    And so was there a way that was found to get around that?

A.    Yes.

Q.    And what was that?

A.    Angie or Kathy would call, and then he would -- after I got

on the phone, then he would get on the phone.

Q.    So take the jury if you would then to this time period

after March of 1993 and into the summer of 1993.  Dustin Honken

868

Page 84

is facing charges, and your charges have been dropped.

A.    Yes.

Q.    Are there any conversations you have with Dustin Honken concerning efforts to continue manufacturing methamphetamine?

A.    Yes, he wanted me to go to Arizona and pick up more chemicals.

Q.    Did he indicate to you that there was any particular reason at this point for him needing to raise money by selling methamphetamine?

A.    To -- he would either use the money to take off or pay off Greg or Terry so they wouldn't say anything.

Q.    So he wanted you to take a trip to Arizona for what purpose again, sir?

A.    To pick up chemicals.

Q.    Did you comply with that request?

A.    I started to, but I didn't follow through with it.

Q.    Why don't you explain that to the jury.  First of all, approximately when did this occur in relation to the arrest on March 21, 1993?  Are we talking weeks, a month, couple months?

A.    It was within a couple months.

Q.    And how did that conversation go with Dustin Honken?  Did he give you specific instructions what he wanted you to do?

A.    He gave me instructions of what chemicals to get, where to go.  He gave me some money to go down to Arizona.

Q.    And do you recall approximately how much money he gave you

869

at that point?

A.    I don't remember exactly.  It was a thousand, two thousand.

Q.    So what did you do?

A.    I bought a car so I'd have transportation and started

Page 85

driving to Arizona and got to New Mexico, stayed overnight, and decided not to go the rest of the way and came back.

Q.   Why not?

A.   I was having second thoughts about doing it any -- being involved with it anymore.

Q.   So when you drove back to Iowa, did you meet back up at some point with Dustin Honken?

A.   Yes.

Q.   Did you explain to him what you had done?

A.   Yes.

Q.   What'd you tell him?

A.   I told him that I had gone down part way and stayed the night and someone had stolen the money so I had to come back.

Q.   And that wasn't the truth.

A.   No, it was not.

Q.   Why didn't you just tell him you had second thoughts and didn't want to do it anymore?

A.   I knew he'd be upset about it and give me a hard time.

Q.   When you made this trip down to Arizona, are you aware of whether Angela Johnson knew that you were making a trip down to Arizona to pick up chemicals?

870

A.   At that time?

Q.   Yes.

A.   I don't remember if she knew that time or not.

Q.   Do you remember her saying anything to either you or Honken concerning taking cash down to Arizona at that point?

        MR. WILLETT:  Excuse me, Your Honor.  I object.  I believe this has already been asked and answered.

        THE COURT:  Overruled.
                    Page 86

A.    I don't recall.

Q.    Would it refresh your recollection if you had an opportunity to look at an interview report that you provided before?

A.    Yes.

Q.    Mr. Honken (sic), I'd just direct your attention to the interview report on February 26, 1997, page 2, paragraph 4.  If you could just read that to yourself for a moment.  When you're done, let me know.

A.    Yes, I remember.

Q.    Did that refresh your recollection, sir?

A.    Yes.

Q.    And so did -- to your knowledge, did Angela Johnson -- was she aware you were making this trip to pick up chemicals?

A.    Yes.

Q.    And how do you know that?

A.    Because she had given Dustin a hard time about not being

871

able to manage money.

Q.    And in particular in specific reference on this trip down to Arizona?

A.    Yes.

Q.    Now, did you ultimately make another trip down to Arizona?

A.    Yes, I did.

Q.    And did you make that with anybody?

A.    Yes.

Q.    And who was that?

A.    Christi Cole.

Q.    And what was the purpose of that trip?

A.    To pick up chemicals.

Page 87

Q. And when in relation to the first trip was the second trip made?

A. Within a few months.

Q. Now, I want to direct your attention to late -- well, summer of 1993, June and July of 1993. Did you become aware at any point that Dustin Honken was looking for Greg Nicholson?

A. He had told me -- at some point he had told me that he was looking for him.

Q. And what did he tell you about that?

A. That Scott Gahn had told him where he was at.

Q. Did Dustin Honken tell you why it was he was trying to find Greg Nicholson?

A. To talk to him and see if he could talk him out of

872

testifying.

Q. Did Dustin Honken indicate to you that he had any difficulty finding Greg Nicholson?

A. Yes, he did indicate that he'd moved out of his house.

Q. Did Dustin Honken indicate to you whether anybody else was involved helping him look for Greg Nicholson at that point?

A. I don't recall.

Q. At some point did you learn that Greg Nicholson disappeared?

A. Yes.

Q. And how did you find out about that?

A. Dustin called me, and we got together, and when we got together, he told me that Greg didn't show up for his court appointment and that he and the lady he was with and a couple kids were all missing.

Q. At some point did Dustin Honken tell you kind of a
Page 88

hypothetical story about an individual coming up missing?

A.    Yes.

Q.    Explain that to the jury.  What was the nature of the conversation you had that this hypothetical kind of came up?

A.    Sort of was talking about if somebody wanted to get at some -- get somebody, that they'd have someone they didn't -- that person didn't know come up to the door in a pizza delivery outfit, and when they opened the door, they would take them hostage and take them somewhere and have them make a tape

873

exonerating the person.

Q.    And then what was to happen with this person after they made the tape?

A.    They would be killed.

Q.    And this is kind of a hypothetical that Dustin Honken is telling you about the time he tells you that Greg Nicholson, Lori Duncan, and the family came up missing?

A.    Yes.

Q.    What did you understand he was telling you by telling you this hypothetical?

A.    That that is the way that he got Terry -- or got Greg.

Q.    What was your reaction about this?

A.    I told him not to talk about it anymore.  I didn't want to know any more about it.

Q.    During this conversation in which he gives you this hypothetical, he had mentioned making a videotape in the hypothetical; is that right?

A.    Yes.

Q.    At any point did Dustin Honken share with you that he had a videotape?

Page 89

A.   He showed me on at least one occasion that he had a
videotape.   He showed -- he showed me the tape.

Q.   Didn't put it in a machine and play it for you.

A.   No.

Q.   But showed you the actual physical tape that he had.

874

A.   Yes.

Q.   What did he tell you about that tape?

A.   It was a tape -- he told me it was a tape exon -- that Greg
had made exonerating Dustin from the crime.

Q.   Did he tell you how it is he got ahold of this tape of Greg
Nicholson?

A.   I don't remember that part.

Q.   What did he tell you, if anything, he was going to do with
it?

A.   He wanted me to say that Greg had given it to me and that
way he'd be able to get it into court records.

Q.   And what did you say to that?

A.   I told him I wouldn't, I would not.

Q.   You chose not to go along with that plan.

A.   Yes.

Q.   In the fall of 1993, did you learn at some point that Terry
DeGeus came up missing?

A.   Yes, I did.

Q.   And how did you find out about that?

A.   Dustin told me.

Q.   What did Dustin tell you about Terry DeGeus's
disappearance?

A.   I don't remember exactly, but he had --

Q.   Just generally if you recall.
Page 90

A.   That he had been worried about Terry.

875

Q.   Worried about him in what way?

A.   Physically that he might do something or that he might testify, and then Terry had disappeared, and he didn't seem to be worried about it anymore.

Q.   After Terry DeGeus disappeared, did Dustin Honken make any statements to you that led you to believe that Terry DeGeus had been killed?

A.   He asked me to help melt down a gun.

Q.   Okay.  We'll get to that in a minute.  Did he ever talk to you about anything that led you to believe that somebody had been buried someplace?

A.   Yes.

Q.   And what do you recall him saying to you about that?

A.   That he was just wondering how deep frost would go.

Q.   Why was that important, how deep frost would go?

A.   Because the frost brings stuff up out of the ground.

Q.   Now, did you grow up on a farm, Mr. Cutkomp?

A.   Yes, yes, I did.

Q.   And are you used to plowing and turning the soil and so forth?

A.   Yes.

Q.   While you're having this conversation with Dustin Honken, are you at home?  Are you in a car?  What's the context in which he brings up this topic about how far down the frost goes?

A.   We were just out driving around and kind of looked at an

876

Page 91

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 770 of 3592

area and was talking about it.

Q.    And what particular area were you driving around that you recall?

A.    Southeast of Clear Lake someplace.

Q.    And while you were driving around is when -- it's while you're driving around -- is this out in the country?

A.    Yes.

Q.    -- that this topic comes up.

A.    Yes.

Q.    Did he talk to you anything about plowing?

A.    Yes, wanted to know about chisel plowing.

Q.    And what about a chisel plow?

A.    I believe that chisel plowing goes down a little deeper than most equipment, so he was worried about how far down that would go.

Q.    Were you able to answer some of his questions about frost and how far a chisel plow goes down into the ground?

A.    I answered them.  I don't know if I was right or not but . . .

Q.    Now, at some point was there any conversation about a backhoe?

A.    Yes.

Q.    And explain to the jury what was that conversation.

A.    He wanted to rent a backhoe to get rid of or to take care of loose ends or something.  I don't remember exactly what was

877

said.

Q.    You don't remember how he put it, but it was something to the effect of needing to take care of loose ends?

A.    Yes.

Page 92

Q.   Now, in the context of discussing the backhoe and renting one, did he talk about ways he would come up with the money to do that?

A.   Manufacturing methamphetamine.

Q.   And so share with the jury, you've told us that he started talking about manufacturing methamphetamine again after he was arrested, sends you down on at least two trips to Arizona to pick up chemicals.  At some point does his conversation about manufacturing continue throughout the summer and fall of 1993?

A.   Yes.

Q.   While you are talking with Dustin Honken during this time period after the disappearances of Greg Nicholson and Terry DeGeus, did the topic about whether they might show back up at some point to be witnesses against him come up?

A.   In our conversations that we'd have driving around and stuff.

Q.   And what, if anything, did Dustin Honken tell you about his concerns about whether Greg Nicholson or Terry DeGeus would show back up to testify against him?

A.   He wasn't very concerned about Greg showing back up, but he was a lot more concerned about Terry showing up.

878

Q.   And when you -- when he was talking about showing up, that these people might show up, how did you understand he was concerned about them showing up?

MR. WILLETT:  Excuse me, I object, Your Honor.  To the extent it calls for speculation, I object.

THE COURT:  Overruled.  You may answer.  And before he answers, why don't we give the jury a stretch break.

MR. WILLIAMS:  Very good.

Page 93

THE COURT: Thank you.

Okay. Please be seated. And we can find out if Shelly is really taking anything down, so I'll ask her to read back the last question.

(The requested portion of the record was read.)

A. That they would show up -- what I thought he meant was that they'd show up out of the ground.

Q. That their bodies would show up.

A. Yes.

Q. Now, earlier in your testimony, Mr. Cutkomp, you had mentioned that one of the things you did was assist him in melting down a gun.

A. Yes.

Q. Could you explain to the jury how did -- first of all, did this occur in the winter of 1993 to 1994?

A. Yes, it did.

Q. To this day do you remember exactly when during that time

879

period this would have occurred?

A. No, I don't.

Q. Explain to the jury, how did this topic, melting down a gun, come up?

A. Dustin called me up and wanted to know if he could come out to the house, and I don't know if he told me on the phone what he wanted to do, but when he got there, he had the gun and told me he wanted to melt it down.

Q. And the house you're talking about is the house you were living at with your folks?

A. Yes.

Q. And this is a farmhouse.

Page 94

A. Yes.

Q. On this farm do you have equipment used in the farming operation, heavy equipment, tractors and things like that?

A. Yes.

Q. And as a result of operating equipment like that on a regular basis, did your father and you on occasion have to do repairs on this type of equipment?

A. Yes.

Q. Did you have equipment for making repairs like that?

A. Yes, we did.

Q. And what type of equipment did you have that you could use to melt down a gun at the farm?

A. We had a torch, and we tried to saw it up with a band saw

880

to begin with, but that didn't work, so that's why we used the torch.

Q. Now, when Dustin Honken brings you -- comes out to the farm and has this gun with him, do you recall today what it was contained in? What did he pull it out of, or did he just have it in his hand when he got out of the car?

A. I don't recall.

Q. And where did you guys go on your farm then to do this?

A. My dad has a Morton building that has equipment in it.

Q. Was your dad around on this day?

A. No, he was not.

Q. Have you ever seen this gun before?

A. I had not.

Q. Did Dustin Honken tell you where he got the gun?

A. He told me that Angie had gotten it from somewhere around Cedar Falls I think or Waverly. I'm not sure.

Page 95

Q. Describe the gun that Dustin Honken asked you to help him melt down.

A. It was black. I don't know. About 12 inches long. Had something on the end of it that you could unscrew. I'm not sure what it was. I think it was a semi-automatic.

Q. Are you much of a gun person?

A. No.

Q. At some point after you began cooperating with law enforcement, did you make a drawing of the gun that you recalled

881

melting down on this occasion?

A. Yes, I did.

Q. And you did that based on your memory from what happened in nineteen ninety -- the winter of 1993, 1994?

A. Yes.

Q. Mr. Cutkomp, I've handed you what's been marked as Government's Exhibit 40. Can you identify that for the jury, please?

A. This is the picture of the gun that I drew.

Q. And that was the picture of the gun that you drew, the gun that you helped Dustin Honken melt down?

A. Yes.

MR. WILLIAMS: United States moves to admit Exhibit 40, Your Honor.

*  *  *  *

(Government Exhibit 40 was offered.)

*  *  *  *

MR. WILLETT: Objection, Your Honor, Federal Rule of Evidence 402.

THE COURT: Overruled. Exhibit 40 is admitted.

Page 96

* * * *

(Government Exhibit 40 was admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor.

THE COURT: You may.

882

BY MR. WILLIAMS:

Q. I put that up on the screen there. Do you see that in front of you, sir?

A. Yes, I do.

Q. Now, you indicated that there was something on the end that you could screw on. You didn't know what it was, but you could screw it on to the end. Is that something in addition to what you had drawn there?

A. I'm not sure what --

Q. Yeah, probably a poorly worded question. You have a picture of something drawn there. Was any portion of that the thing you're talking about that screwed on to the end, or was that something you just didn't draw on this particular picture?

A. That's all there was.

Q. I'm going to show you what's been marked as Government -- already admitted into evidence as Government's Exhibit 44. I'm showing you Government's Exhibit 44B next to your Exhibit 40. Does that appear to be the type of firearm that you assisted Dustin Honken in melting down in the winter of '93, 1994?

A. Yes.

Q. What was left of the gun after you melted it down?

A. Just pieces of metal.

Q. And you say you attempted to cut it up with something. What did you -- how did you attempt to cut it up?

Page 97

A. Put it in a band saw and tried cutting it with that, but it

883

was taking too long, so that's why we used the torch.

Q. When you used the torch to melt it down, did you just melt it down against the ground or against a table, or what did you do?

A. We put it on a piece of metal.

Q. And melted it against the piece of metal?

A. Yes.

Q. And what type of piece of metal was that? Just a scrap piece of something?

A. Scrap piece of galvanized metal.

Q. I've handed you Exhibit 48 there. Can you identify that for the jury, please.

A. It's the piece of metal that we used to cut the gun -- or to melt the gun on.

Q. And how do you know that?

A. We tried to cut it with . . .

Q. Is there a cut mark on this piece of metal?

A. Yes.

MR. WILLIAMS: United States moves to admit Exhibit 48 into evidence, Your Honor.

* * * *

(Government Exhibit 48 was offered.)

* * * *

MR. WILLETT: Defendant objects based on Federal Rule of Evidence 402 and 403.

884

THE COURT: Objections are overruled. Government's
Page 98

Exhibit 48 is admitted into evidence.

                              *   *   *   *

          (Government Exhibit 48 was admitted.)

                              *   *   *   *

BY MR. WILLIAMS:

Q.    Mr. Cutkomp, can you hold that piece of metal up and just point out to the jury where the cut mark is on it that you attempted to -- where you attempted to cut it?

A.    Right here.

Q.    And you're indicating, holding it upright, it's in the upper left-hand corner to the jury?

A.    To the jury, yes.

Q.    Thank you.  You can put it down.

          So I want to direct your attention at this point, Mr. Cutkomp, to the time period after the disappearances up until the time period of roughly 1995.  You'd indicated already that there was continuing discussions and attempts to obtain chemicals to use in the manufacturing process.  Did the efforts to continue the manufacturing process continue by Dustin Honken?

A.    Yes.

Q.    And did you continue to assist him from time to time in this operation?

A.    Yes, I did.

Q.    Are you aware of whether in addition to yourself Dustin

                                                              885


Honken ever took a trip to Arizona for the purpose of obtaining any chemicals?

A.    Yes, he did.

Q.    And how do you know about that trip, sir?

A.    He had told me, and he went to get some furniture, and I
Page 99

saw the furniture.

Q.   So what was the purpose of the trip down to Arizona?

A.   He was going to get furniture that he'd had at Missy's house and bring it back, and while he was down there, he was going to get some chemicals.

Q.   Did anybody make the trip with him?

A.   Yes.

Q.   And who was that?

A.   Angie.

Q.   Angela Johnson?

A.   Angela Johnson.

Q.   And when in relation if you recall to the disappearances was this trip made?

A.   I believe it was in the spring of '94.

Q.   Do you know -- did you actually see the chemicals after they got back from this trip to Arizona?

A.   Eventually I saw them, yes.

Q.   And where were they at when you saw them?

A.   I believe they were at Christi Cole's house.

Q.   Were they stored someplace at Christi Cole's house?

886

A.   Under the steps at Christi's, yes.

Q.   How was access gained to Christi Cole's house?

A.   We would get a key from Angie and go get the chemicals.

Q.   On this trip that Dustin Honken took down to Arizona with Angela Johnson in the spring of 1994, did you become aware at any point of how -- what money was used to purchase the chemicals on this trip?

A.   At some point Dustin told me that Angie had borrowed or gotten $5,000 from her credit cards.

Page 100

Q.   An advance on her credit cards?

A.   Yes.

Q.   And did Dustin Honken tell you that was for the purpose of actually being used to purchase some of the chemicals and equipment?

A.   Yes.

Q.   Now, explain to the jury, in early 1994 -- this is after the time period that you melted down the gun -- were attempts to continue to manufacture methamphetamine this time up in Iowa?

A.   Yes.

Q.   And where were some of those attempts -- where was this activity taking place during this time period?

A.   We were experimenting on some processes of it at Angie's house.

Q.   Angela Johnson's house?

A.   Angela Johnson's house, yes.

                                                        887

Q.   And where was that located at, sir?

A.   In Clear Lake.

Q.   Did you attempt to work on this at any other locations?

A.   We did some -- a little down at Jim Honken's.

Q.   Who's Jim Honken?

A.   Dustin's dad.

Q.   And where did he live?

A.   Steamboat Rock.

Q.   And did the attempts to manufacture the methamphetamine move to any other locations in the 1994, 1995 time frame?

A.   I -- yes.

Q.   And where was that?

A.   I had a house that we moved it to.
                              Page 101

Q.   And where was that house located, sir?

A.   In Mason City.

Q.   And approximately when did the attempts to manufacture methamphetamine move to your house that you rented in Mason City?

A.   I think it was in '95.

Q.   So let's go back to the time period before that that these attempts to manufacture had taken place at Angela Johnson's house in Clear Lake.  Where at in Angela Johnson's house were these activities taking place?

A.   In the basement.

Q.   And who was involved in the actual manufacturing process?

888

A.   Dustin and I.

Q.   Were you successful in manufacturing methamphetamine at Angela Johnson's house?

A.   No.

Q.   At any point were you aware of whether Angela Johnson knew of the methamphetamine manufacturing operation?

A.   I knew she knew that it was there, but she -- I didn't see her down there or anything.

Q.   And how do you know she knew that it was going on in her house?

A.   Just that it was in her house I guess.

Q.   Did she make any statements to you or any statements to Dustin Honken that he related to you concerning a desire for this process to get completed?

A.   That she would like to get it completed so that she'd get her money back.

Q.   And is this something that she said to you?

Page 102

A.    Mostly to Dustin.

Q.    And was this just on one occasion or on more than one occasion that she said that she wanted this thing to get completed so she could get her money back?

A.    On more than one occasion.

Q.    In this time period of 1994 and into 1995, where were you living at this time period before you got your house in Mason City?

889

A.    I had an apartment in Mason City.

Q.    And was any of the meth manufacturing operations taking place there?

A.    No.

Q.    Where was Dustin Honken living in this time period?

A.    In Clear Lake with Angie, Angela Johnson.

Q.    During this time period of 1994, 1995, did Angela Johnson ever make any statements to you concerning the disappearance of Terry DeGeus?

A.    She had said that she was the last one that had seen him.

Q.    Did she indicate where she saw him the last time she saw him?

A.    I don't recall.

Q.    Did she indicate to you anything more than that, that she was the last one to see him?

A.    No.

Q.    What was the context if you recall of the conversation where this came up?

A.    I'm not sure, just talking about -- probably talking about it and it had come up.

Q.    So let's go to the time period then in -- does it sound
Page 103

right, about the summer of 1995 that you got your house in Mason City?

A. Yes.

Q. And did the meth manufacturing operation then move to your

890

house?

A. Yes, it did.

Q. What stage were you all in in this operation when it moved to your house?

A. When it got to the house, we really pretty much started all over with the stuff.

Q. So you kind of dismantled what was set up at Angela Johnson's house, moved it to your house, and started it back up again?

A. Yeah.

Q. How long did it continue at your house in Mason City?

A. Several months.

Q. And was Angela Johnson ever present at your house while this manufacturing process was going on?

A. On one occasion.

Q. And did she participate in the manufacturing operation itself?

A. No.

Q. Was she present where she saw the manufacturing operation going on?

A. Yes.

Q. Any more statements during this time period concerning a desire for this process to be completed to get money?

A. Just that she -- hurry up and get done so -- get paid back.

Q. Did you have any conversations with Dustin Honken about

Page 104

once you were successful in manufacturing the methamphetamine how it was going to be distributed?

A.    We talked about it, but I'm not -- we talked about several different ways we'd do it I guess.

Q.    Did he -- at this point in the summer of 1995, did he have any firm plans on how he was going to distribute it once you successfully made the methamphetamine that you recall?

A.    At that point I believe Angie would have got some of the money at least and then he and I would distribute it between the two of us.

Q.    Did he indicate to you at any point whether Angela Johnson would have any role in distributing any of the methamphetamine if you're successful in making it?

A.    She -- he had told me that she knew some people that would be able to sell it.

Q.    Were any more trips made to Arizona to purchase chemicals then now into the 1995 time period?

A.    Yes.

Q.    And who made -- how many trips that you're aware of?

A.    One that I'm -- that I can remember.

Q.    And who made that trip?

A.    Dustin and I.

Q.    Dustin and you?

A.    Yes.

Q.    How did you get down to Arizona on this trip?

892

A.    We drove.

Page 105

Q. Whose car did you drive if you recall?

A. I don't remember.

Q. When you went down to Arizona, were you successful in purchasing any chemicals?

A. Yes.

Q. And what'd you do with the chemicals once you got those?

A. Brought them back to Iowa.

Q. And where did they go from there if you recall?

A. I don't remember for sure where we put them, stored them or if they were still at my house. I'm not positive.

Q. Explain to the jury if you would, Mr. Cutkomp, at this point you're aware Angela Johnson got a $5,000 advance on her credit card for contributing to this effort. Is money coming from anybody else that you're aware of?

A. Yes.

Q. And who is the money coming from?

A. Dustin got some from Jeff Honken, and then his stepbrother gave him some money.

Q. Dustin Honken's stepbrother.

A. Yes.

Q. And how are you aware that he got money from those two individuals?

A. I was there when he got the money from Jeff, and he told me he got money from his stepbrother.

893

Q. When he got money from Jeff Honken, did Dustin Honken explain to Jeff Honken that he needs some money because he's going to use it for the purpose of manufacturing methamphetamine?

A. I'm not sure. He may have talked to him about it ahead of

Page 106

time.

Q. While you were there, did you hear any explicit conversation where Jeff Honken was aware that the money was being used for that purpose?

A. I don't recall.

Q. And do you recall how much money Jeff provided at that point?

A. About a thousand dollars.

Q. And just tell the jury, was the borrowing of money by Dustin Honken from his brother Jeff Honken kind of an ongoing thing?

A. Well, Jeff had -- at least he had assumed that he had gotten most of the money from the sale of the drugs, so that's partly why I think he gave him the money.

Q. And how about this stepbrother? Was -- based on anything that Dustin Honken told you, do you know whether the stepbrother knew that he was contributing money for the purpose of manufacturing methamphetamine?

A. I know that he knew that Dustin had done it.

Q. In the past.

894

A. I'm not positive that he knew what was going on.

Q. Do you remember how much money he got from his stepbrother?

A. I think it was around a thousand also.

Q. Did -- based on the operation that you were working at this point, without the money that was provided by Angela Johnson, would it have been possible for you to have created the meth lab that you were creating in Iowa with Dustin Honken?

A. No.

Q. Now, at some point did this operation for manufacturing

Page 107

methamphetamine at your house ever result in the actual finished product being manufactured?

A. No.

Q. At some point did it get moved to another location?

A. Yes, it did.

Q. And where was that?

A. Eventually we moved it to a house that Dustin was renting in Mason City.

Q. Why did you move from your rented house to Dustin Honken's rented house?

A. I had moved out. I wasn't living there anymore.

Q. And before the manufacturing had taken place at Angela Johnson's house, was there some reason why Dustin Honken got his own house versus just moving the operation back to Angela Johnson's house?

A. Well, they weren't getting along real good then, and I

895

don't think that she really wanted it in the house either.

Q. Do you recall where Dustin Honken ended up renting a house?

A. I believe it was on 16th Street in . . .

Q. In Mason City.

A. In Mason City.

Q. At this point once he rented that house, did the meth lab get set back up there?

A. Yes, it did.

Q. Who all was involved then in setting up the meth lab and starting the manufacturing process again now at Dustin Honken's house?

A. Dustin and myself.

Q. Was anybody else recruited by Dustin Honken to participate

Page 108

in this process?

A.    Yes.

Q.    And who is that?

A.    Dan Cobeen.

Q.    Were you aware at the time that Dan Cobeen had agreed to cooperate with law enforcement?

A.    I was not.

Q.    What did Dustin Honken tell you, if anything, concerning what Dan Cobeen's role was to be in this process?

A.    Eventually he would help Dustin make the drugs, and whatever I had been doing, Dan would take over doing that.

Q.    Well, why would he need to take over you doing anything?

896

A.    Because I wasn't going to be involved in it anymore.

Q.    Why not?

A.    I just didn't want to be involved anymore I guess.

Q.    And so did you express to Dustin Honken that you wanted to get out of it?

A.    Yes.

Q.    Despite that, through the fall and winter of 1995, 1996, did you continue on occasion to assist Dustin Honken in the attempt to manufacture the methamphetamine at his house?

A.    Yes.

Q.    Where was the meth lab set up in Dustin Honken's house?

A.    In his garage.

Q.    And again, who made the decision of what drug to manufacture?

A.    Dustin.

Q.    Who made the decision of who to involve in the manufacturing process and what role people are going to play?

Page 109

A.   Dustin did.

Q.   Who made the decision of what chemicals and what process to be used in the manufacturing process?

A.   Dustin.

Q.   At some point did you make a trip with Dan Cobeen?

A.   Yes, I did.

Q.   And where was that to?

A.   To Minnesota.

897

Q.   And what was the purpose of that trip?

A.   To pick up some chemical that we needed for something.

Q.   And who made the arrangements?  Who decided that this trip needed to be made in the first place?

A.   Dustin did.

Q.   And who decided what was going to be purchased?

A.   Dustin.

Q.   And where did the money come from for the purchase?

A.   From Dustin.  I'm not sure where he got it.

Q.   Now, was Dustin Honken working at this time?

A.   Yes.

Q.   And where was he working at?

A.   At Kraft Foods.

Q.   When you ultimately got this meth lab up and going in Dustin Honken's house, did it involve sophisticated glassware and things like that?

A.   Yes.

Q.   Compare this to the operation that you had running down in Arizona back in 1993, 1992, 1993.  Was it similar, dissimilar?

A.   It was similar.  We were trying some different things on it, but it was similar.

Page 110

Q.   Was it a simple process or complex process?

A.   Complex.

Q.   And why was it so complex if you know?

A.   Well, some of it was dangerous, and the chemicals, if they

898

got too hot, they'd make something else.

Q.   You read in the newspaper periodically about people just going and getting cold pills and batteries and things like that and manufacturing methamphetamine.  Was that operation you guys had the type of operation that you just went and got cold medicine and things like that?

A.   No.

Q.   Was Dustin Honken attempting to create the base chemicals that existed in those products in his manufacturing process?

A.   Yes.

Q.   I want to show you what's been admitted into evidence already as Exhibit 60.  Do you recognize what's depicted in that photograph, sir?

A.   Yes, I do.

Q.   And what is that?

A.   The three-neck flask, distillation tube on there.

Q.   And the three-neck flask and the distillation tube, were those used in the manufacturing process?

A.   Yes, they were.

Q.   And the distillation tube, is that the long glass thing that goes up from the three-neck flask inside that container?

A.   Yes.

Q.   While this manufacturing process was going on at the Honken residence, did Dustin Honken provide you instructions from time to time on what to do next in the manufacturing process?

Page 111

A.    Yes.

Q.    And were those instructions oral or writing or both?

A.    Both.

Q.    I show you what's already been admitted into evidence as Exhibit 67 and ask you if you recognize that.

A.    Yes, I do.

Q.    Whose handwriting is that, first of all?

A.    Dustin's.

Q.    And do you recall today in particular receiving this specific note from Dustin Honken?

A.    I don't recall.

Q.    Is this typical of the type of notes that would be left for you from time to time with instructions from Dustin Honken on what to do in the manufacturing process?

A.    Yes.

Q.    And the hot plate that he's referring to, is that what we had seen in Exhibit 60?

A.    Yes.

Q.    On the right-hand side there?

A.    The yellow and white thing.

Q.    How far into the manufacturing process did you and Dustin Honken get at his house in 1995, 1996?

A.    We had almost completed the first batch there.

Q.    You intended to get out of this process.

A.    Yes, I did.

900

Q.    At some point did you become aware of if you got out what arrangement was going to be made then on where the money went

Page 112

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 791 of 3592

to?

A.    I would have gotten some to begin with, and then he would distribute it how ever he wanted I guess.

Q.    And did he indicate to you how he was going to distribute that money that you recall today?

A.    I don't recall.

Q.    Did he indicate to you why he wanted to -- I mean, he's got a job at this point.  Did he indicate to you that he had a need for additional money for some reason?

A.    Still had loose ends, but mostly because he needed money for Kathy and Angie.

Q.    And when he made reference to loose ends, what did you understand him to be referencing?

      MR. WILLETT:  Excuse me, Your Honor.  To the extent it calls for speculation, I object.  The question's also vague in terms of loose ends.  I object to the form.

      THE COURT:  Overruled.  The witness can answer if he knows.

A.    I believed that he was talking about the bodies of the people that had disappeared.

Q.    I want to direct your attention to February 7 of 1996.  Are you aware at some point that there was a search conducted by law enforcement officers of Dustin Honken's house in Mason City on

901

that day?

A.    Yes, I was.

Q.    And how did you learn of it?

A.    Dustin called me and told me that Angie -- or sorry, Kathy had seen it on the television or a friend of hers had seen it or something.

Page 113

Q. When he called you, did he have any request of you?

A. To go over to Kathy's and get rid of all the chemicals that we had there.

Q. Had some chemicals been stored over at Kathy's?

A. Yes, they had.

Q. And was she aware of those chemicals at her house if you know?

A. No, she was not.

Q. Did you, in fact, comply with that request?

A. Yes, I did.

Q. And what did you do?

A. I went to the house, and Kathy left, and I went in the house and dumped all the chemicals down the drain and then got rid of all the glassware and stuff that was there.

Q. How'd you get rid of the glassware and stuff?

A. I dumped it into a garbage bin at an apartment building.

Q. When you went there, was Kathy still at the house when you arrived?

A. Yes, she was.

902

Q. And did you tell her what you were there for?

A. I don't recall.

Q. Ultimately she left, and you did this without her being present.

A. Yes.

Q. Were you ultimately arrested on drug charges yourself?

A. Yes, I was.

Q. And did that occur on April 29 of 1996?

A. Yes.

Q. Between the search that occurred in February of 1996 and

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 793 of 3592

your arrest on April 29 of 1996, can you share with the jury, were you talking with Dustin Honken about the situation you were in at that point?

A.   Yes.

Q.   And what was the nature of the conversations you were having with Dustin Honken about what's going on at that point in your life?

A.   Where the chemicals might be being stored at, if Dan might have cooperated.

Q.   Dan Cobeen?

A.   Dan Cobeen, what we could do if charges were going to be brought on us or not, if there was really enough evidence, things like that.

Q.   Where did these conversations take place?

A.   At Kraft or just driving around.

903

Q.   Were you working at Kraft as well at this time?

A.   Yes, I was.

Q.   And did any of the conversations that you recall take place with Angela Johnson?

A.   I don't recall.

Q.   Now, after you were arrested in April -- on April 29 of 1996 -- I'm sorry.  Let me back up.

Before you were arrested -- and we're in this time period where you know you're in trouble.  Honken's house has been searched.  Did you anticipate you were going to be arrested at some point?

A.   Yes.

Q.   And you talked about what you could do toward getting out of the charges.  Were any steps actually taken to try to destroy

Page 115

any evidence?

A.    We -- Dustin had thought that the chemical evidence was stored at Bondurant, and we had looked at the building and trying to decide what best way to go in and get the chemicals and destroy them.

Q.    And so did you and -- when you say you looked at the building, how did you go about looking at the building?

A.    We got dark clothes on and stockings on our head and went up to the building and just looked at it to see what was there.

Q.    Is this at night or during the day?

A.    At night.

904

Q.    And did you do that to see if you could gain entrance to the building somehow?

A.    Yes.

Q.    And why was it that Dustin Honken if you know believed that the chemical evidence had been stored at the Bondurant building?

A.    He had called around several different places and had gotten ahold of somebody that he said was upset with the government for doing something, and that person had told him where he thought it would be at.

Q.    So when you went to look at this building, was this on one occasion or multiple occasions?

A.    Several different times.

Q.    And on any of those occasions when you dressed up in the dark clothing and stocking caps on your head and so forth, did any of that take place at Angela Johnson's house?

A.    We went to Angie's to get ready.

Q.    And did you get dressed in that garb in front of Angela Johnson?

Page 116

A.    Yes.

Q.    And did you have any discussions in front of her as to what you were doing at that time?

A.    I don't recall it.

Q.    Did you use any car belonging to Angela Johnson in this effort to try to figure out how to destroy the evidence?

A.    Yes, we did.

905

THE COURT:  Mr. Williams, would this be a good place to take our noon recess?

MR. WILLIAMS:  Certainly would, Your Honor.

THE COURT:  Okay.  Members of the jury, we'll be in recess until one o'clock.  Please remember my cautionary instruction about not discussing this case and keep an open mind until you've heard all of the evidence.  Thank you.

(The jury exited the courtroom.)

THE COURT:  Counsel, anything we need to take up before we take our recess?

MR. WILLIAMS:  Not on behalf of the United States, Your Honor.

MR. WILLETT:  Not on behalf of the defense.

THE COURT:  Okay.  Thank you.

(Lunch recess at 11:59 a.m.)

THE COURT:  Ready for the jury?

MR. WILLIAMS:  Your Honor, one quick issue.

THE COURT:  Yes.

MR. WILLIAMS:  The press has requested permission to review the transcripts of the tape we're going to play in this case while this is going on with the understanding we would then collect the transcript back from them.  I wanted to get your

Page 117

permission. I've talked to defense counsel. They have no objection.

THE COURT: I have no objection.

906

MR. WILLIAMS: Thank you, Your Honor. That's it.

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. Mr. Cutkomp, when we left off for the lunch break, we were at the point where in the sequence of events the search had been conducted at Dustin Honken's residence on February 7 of 1996. You had not yet been arrested in April of 1996, and there were, as you related before we took the break, discussions by Mr. Honken concerning what needed to be done to get out from underneath this problem. Do you recall that's about where we were in your testimony, sir?

A. Yes.

Q. And I think you had related that among other things you had done surveillance on a building that Dustin Honken believed contained the chemicals that were seized from his residence as part of the search warrant.

A. Yes.

Q. During the course of this time frame between the search and your arrest on April 29, did Dustin Honken discuss the need to do something about Dan Cobeen?

A. Between then and before we got arrested?

907

Page 118

Q.    Before you got arrested.

A.    He -- at that time he didn't -- was just wondering if Dan was the one that cooperated.

Q.    Because at that point you weren't sure.

A.    No.

Q.    Now, at some point on April 29, 1996, were you arrested along with Dustin Honken?

A.    Yes.

Q.    After you were arrested, were you allowed to be released pending trial?

A.    Yes.

Q.    Did you have any restrictions on you about where you could go, what you could do, anything like that?

A.    The only thing, I had to call in for UAs once a day.

Q.    Random urinalysis tests?

A.    Yes.

Q.    How about Dustin Honken?  Were any restrictions placed on him?

A.    Yes.

Q.    And what were those restrictions to your knowledge?

A.    He had to wear an ankle bracelet and had to be at home except for when he was at work or talking to his lawyer.

Q.    Once the charges were brought in April of 1996, were you and Dustin Honken either individually or through your attorneys allowed to view the government's discovery file to determine

908

what the nature of the evidence was against you?

A.    Yes.

Page 119

Q. And through that process did you and Dustin Honken learn that Dan Cobeen, in fact, had been cooperating with law enforcement?

A. Yes.

Q. After you learned that, were there discussions by Dustin Honken about what to do about Dan Cobeen?

A. Yes, there was.

Q. And can you share with the jury what did he say about that?

A. That Dan was the main witness and for me at least he was the only one that we -- that I needed to worry about testifying and that it'd be good for me if he disappeared.

Q. What did you understand he meant when he said disappeared?

A. Was killed.

Q. Did Angela Johnson have any views about what should be done about Dan Cobeen?

A. She had said once that take care of whatever needed to get done.

Q. And what did you understand she meant by that?

MR. WILLETT: Excuse me, Your Honor. I object. To the extent it calls for speculation of what my client's thinking, I object to the answer.

THE COURT: Overruled. You may answer.

A. That same thing that Dustin meant.

909

Q. Kill him.

A. Kill him.

Q. Did Dustin Honken express a view to you at any point about whether Angela Johnson -- about his thought about involving her in any effort to eliminate Dan Cobeen?

A. He didn't want to involve her.

Page 120

Q. And did he say why not?

A. Because she was too much of a hot head and just wanted to go do -- just do it.

Q. With regard to Dan Cobeen, you've related to us that Dustin Honken wanted to kill him. Was there a discussion about the desire to kill or eliminate any other potential witnesses against him?

A. Yes.

Q. And who did he discuss needed to be eliminated?

A. John Graham and several -- there was a chemist and I believe several other people.

Q. At the point that this is occurring after your arrest and Dustin Honken's talking about killing people again, what's your reaction to all this?

A. I guess I didn't know what to think. He was telling me what he wanted to do. I didn't like it.

Q. Did you take him seriously?

A. Yes.

Q. As a result of that, at some point did you determine to

910

contact law enforcement and cooperate against Dustin Honken?

A. Yes.

Q. Why?

A. Several reasons. One was that I had charges on me and to help myself get out of trouble.

Q. Sure.

A. And the fact that he was talking about killing people and telling me all about it, and I didn't want that to happen.

Q. And so did you ultimately sign a plea agreement with the United States agreeing to cooperate?

Page 121

A.   Yes.

Q.   Did your cooperation entail sitting down with law enforcement officers and telling them what you knew about events going all the way back to 1992 and up to the present day?

A.   Yes.

Q.   Did you ultimately plead guilty to a crime?

A.   Yes, I did.

Q.   And what did you plead guilty to?

A.   To -- I don't remember what the exact charges were but . . .

Q.   Was it a drug trafficking -- some type of drug crime?

A.   Yes.

Q.   And were you ultimately sentenced on that charge?

A.   Yes, I was.

Q.   Now, did you receive any reduction in your sentence as a

911

result of the cooperation that you had provided to law enforcement in the Dustin Honken investigation?

A.   Yes, I did.

Q.   And do you recall, first of all, what your sentence would have been without the reduction in your sentence?

A.   I believe it would have been about 14 years.

Q.   And what did you end up getting sentenced after the reduction was granted?

A.   Four and a half.

Q.   Explain to the jury how did that process work.  What was necessary, first of all, for you to receive a reduction in your sentence?

A.   I had to cooperate with the authorities.  I had to follow through with the UAs and stuff.  I had to plead guilty and -- I

Page 122

guess that's it.

Q. Prior to your sentencing, had anybody on behalf of the government promised you that you would, in fact, get a reduction in your sentence for cooperating?

A. There was no promise that I would.

Q. And then ultimately did the government file a motion to have your sentence reduced because of your cooperation?

A. Yes.

Q. And who ultimately had to make a decision on whether to grant or deny that motion?

A. The judge.

912

Q. And was the motion granted by the judge?

A. Yes, it was.

Q. Who ultimately determined what sentence you received?

A. The judge did.

Q. So I want to go back to the beginning of your cooperation in this case. Well, let me -- before I leave that subject, did you, in fact, serve time in federal prison then?

A. Yes, I did.

Q. And you served the four years approximately that you were sentenced to.

A. I served two and a half.

Q. And how was it two and a half if you got a sentence of four years?

A. I got less time for good behavior, and I took a year-long drug treatment program which gave me a year off.

Q. Were you successful in that drug treatment program, sir?

A. Yes.

Q. And have you used any controlled substances since you were

Page 123

released from prison?

A. No.

Q. Were you under some type of supervised release for a period of years after your prison sentence?

A. Yes, I was.

Q. And explain to the jury what supervised release required you.

913

A. It required me to call in once a day for the urinalysis. I had to not leave the state and other -- I don't remember all the restrictions but . . .

Q. Sure. Are you still on supervised release today?

A. I'm not.

Q. Did you successfully complete supervised release?

A. Yes, I did.

Q. So now I want to move back to the point where you had initially decided to cooperate and you came in and you provided a debriefing with some agents. Who did you talk to to begin with if you recall?

A. I don't recall exactly. I believe John Graham was there and . . .

Q. Maybe somebody else?

A. Yes.

Q. And when you were providing this information to the agents, again, you went back and explained everything from the beginning of 1992 and forward?

A. Yes.

Q. At least answered any questions they had of you of that time period.

A. Yes.

Page 124

Q. Now, at this point in time, Dustin Honken is on pretrial release, but he's got restrictions, and you're out, and you've just made the decision to cooperate against somebody who's

914

talking about killing people. What was your greatest concern at that point in time if you had one?

A. I guess I -- at that point I wasn't -- until he found out, I guess I wasn't concerned about him doing anything.

Q. Were you afraid of whether he would actually carry out the plans he had for killing other people?

A. Yes.

Q. And what were you the most afraid of in relation to that?

A. Dan, first of all.

Q. Were you concerned about whether anybody else was influencing Dustin Honken in the decision to carry out some of these plans?

A. I don't recall.

Q. Would it refresh your recollection if I showed you an interview report from that initial interview?

A. Yes.

Q. Mr. Cutkomp, I'm showing you an interview report that was done on May 14, 1996, page 9, and at paragraph 63, and if you could read that to yourself and when you're done, let me know.

A. Yes, I remember.

Q. Mr. Cutkomp, did that refresh your recollection?

A. Yes, it did.

Q. What were you most afraid of at that point, sir?

A. I was worried about Angie Johnson pushing Dustin to follow through of taking care of the things that needed to be taken

915

Page 125

care of.

Q.    Did you have a belief at that point that absent Angela Johnson pushing Dustin Honken that he might not go through with it?

A.    Yes.

Q.    Pursuant to your agreement to cooperate with the government, did you, in fact, participate in undercover operations where you wore a recording device and recorded conversations between you and Dustin Honken?

A.    Yes, I did.

Q.    Let's explain just a little bit of background on this.  You and Dustin Honken, while on pretrial release, did you remain working at Kraft Foods?

A.    Yes, we did.

Q.    And did you have contact with him at Kraft Foods?

A.    Yes.

Q.    Were there occasions when you attempted to record conversations with him at Kraft Food?

A.    Yes.

Q.    Did Dustin Honken take steps while at Kraft Foods when talking to you about this case and his attempts to do something about it to make sure that he wouldn't be heard?

A.    Yes.

Q.    And what was that?

A.    I lost track of my . . .

916

Q.    Yeah.  I was asking you if during that time period when you guys were at Kraft Foods did you occasionally talk about his desire about eliminating witnesses and doing something about the

Page 126

evidence against him?

A. Yes.

Q. And would he do that at certain places within the plant to make sure that he wouldn't be overheard or if there was a recording it wouldn't pick up what was said?

A. In the plant it was noisy. In the area I worked in it was real noisy, and we could talk back in the -- in that area. Anywhere in the plant was pretty noisy.

Q. And so did you attempt on a few occasions to record in the plant?

A. Yes.

Q. And were you successful at all in actually getting a recording where you could hear anything?

A. No.

Q. Were there other occasions and five occasions in particular where you actually recorded conversations with Dustin Honken at his residence?

A. Yes, I did.

Q. Now, the residence that was searched in February of 1996 was on 16th Street in Mason City. At the time in 1996 when you are recording conversations with Dustin Honken, where is he living then?

917

A. In Britt with his mother and stepfather.

Q. Was anybody else living there other than his mother and stepfather to your knowledge?

A. I'm not sure if there was or not.

Q. On occasion were there other people present in the house at least when you initially would get there to have conversations with him?

Page 127

A.    Yes.

Q.    Okay.  Let's turn to that time period then and ask you if -- directing your attention to May 16, 1996, was that the first time you successfully recorded a conversation with Dustin Honken at his house?

A.    Yes.

Q.    And explain to the jury what time of day or night did that take place if you recall.

A.    I don't recall what time I went.

Q.    Was it day, night?

A.    I believe it was day.

Q.    And who was present when you had this conversation with him?

A.    Just Dustin and myself.

Q.    We're not going to play the tape from that conversation, but can you share with the jury just generally what was the nature of the conversation you had with Dustin Honken on that occasion?

918

A.    Just how Dan could have set us up and things we needed to do to find loopholes in the case, and I guess that's all I . . .

Q.    Was there any conversation you recall about actually eliminating or killing Dan Cobeen?

A.    Yes, in a roundabout way.

Q.    And explain that.  When you say in a roundabout way, you're long-term friends with Dustin Honken at this point.  Does he come right out and tell you he wants to kill or shoot down or do anything else explicitly to Dan Cobeen?

A.    No.

Q.    So how does he talk about eliminating Dan Cobeen then?

Page 128

A. Talk about how it'd be good if he didn't show up to testify or if he took off that would be good.

Q. At this point, May 16 of 1996, this is pretty soon after you were arrested on April 29 of 1996; is that right?

A. Yes.

Q. Is there any discussion in this first conversation about Dustin Honken wanting to find some way to defeat or eliminate this ankle bracelet he had on?

A. Yes, there was some.

Q. And what were his plans along those lines?

A. He had been reading some electronics books to see how that would be possible.

Q. I want to turn your attention then to May 24 of 1996 and ask you if you had another occasion on May 24 to record a

919

conversation with Dustin Honken at his house.

A. Yes.

Q. And again, the conversation took place between who?

A. Dustin and myself.

Q. And where in the house do you recall this conversation taking place?

A. I believe it was in the living room.

Q. And nobody else was present on this occasion?

A. I don't recall if there were -- somebody might have passed through.

Q. Nobody participated in the conversation with you.

A. No.

Q. All right. And again, this conversation was recorded.

A. Yes.

Q. I'm showing you what's been marked as Government's Exhibit

Page 129

203. And do you recognize that?

A. Yes, I do.

Q. And what is that?

A. It's a CD of the conversation that we had.

Q. And has this got clips or basically portions of the conversation versus the whole thing that lasted for several hours?

A. Yes.

Q. How do you know that this disc here contains those recordings?

920

A. I initialed it and dated it.

Q. Did you actually listen to this recording then?

A. Yes, I did.

Q. And did it fairly and accurately reflect the conversation that you had with Dustin Honken on that day?

A. Yes.

MR. WILLIAMS: United States would move to admit Exhibit 202.

* * * *

(Government Exhibit 202 was offered.)

* * * *

THE COURT: Any objection to 202?

MR. WILLIAMS: I'm sorry, 203.

* * * *

(Government Exhibit 203 was offered.)

* * * *

MR. WILLETT: Your Honor, defense objects pursuant to Federal Rules of Evidence 802, 402, 403, and 404.

THE COURT: Well, just a second. 202 is the tape.
Page 130

203 is the transcript.

MR. WILLIAMS: I misidentified it. It's actually marked on this as 203, and the transcript is 203A, and I think we have a mistake in our exhibit list, Your Honor.

THE COURT: Okay. So it's -- actually 203 is the tape and 203A is the transcript.

921

MR. WILLIAMS: That's correct.

THE COURT: So we're talking about admitting 203 which is what you said, but I was relying on the exhibit list which indicates it's 202. Okay.

MR. WILLETT: And just so the record's clear, Your Honor, my objections pertain to Government Exhibit 203 which is the tape. And once again, those objections are Federal Rule of Evidence 802, 402, 403 and 404.

THE COURT: Objection's overruled. Government's Exhibit 203 is admitted into evidence.

* * * *

(Government Exhibit 203 was admitted.)

* * * *

BY MR. WILLIAMS:

Q. Mr. Cutkomp, in connection with this investigation, was a transcript typed up that reflected the conversation that was recorded on Government's Exhibit 203?

A. Yes.

Q. And did you compare the transcript to the recording to determine that it was accurate, as accurate as you could make it?

A. Yes.

Q. Handing you what's been marked as Exhibit 203A. Can you

Page 131

identify that for me, please?

A.    It's the transcript of the CD.

922

Q.    And you testified that fairly and accurately reflects the conversation you had that was recorded on Exhibit 203.

A.    Yes.

MR. WILLIAMS:  United States would move, Your Honor, for permission only as an aid to the jury to provide the jury with copies of Exhibit 203A so they can follow along with the recording.

MR. WILLETT:  With that understanding, Your Honor, there would be no objections by the defense.

THE COURT:  Okay.  203A will be used to assist the jury in understanding the tape recording.

MR. WILLIAMS:  And, Your Honor, with permission, those have been provided to your law clerk, and if we could have her hand those out.  And we also have headphones that may aid the jury in listening to this tape.  And we'd ask for permission of your staff to pass those out to the jurors as well.

THE COURT:  Okay.  Why don't you pass the transcripts out first and then the headphones.  And, Carey, you can instruct the jury on the use of the headphones.

BY MR. WILLIAMS:

Q.    Mr. Cutkomp, while these are being passed out, just so we are clear, when these were originally recorded, were they recorded on like a tape?

A.    Yes.

Q.    And then at some point through technology it was

923

Page 132

transferred to a CD.

A.   Yes, they were.

Q.   And so just so we're clear, the CD we've been referring to was 203.

A.   Yes.

THE CLERK:   You want to put these on with this label out like this.   Down here is your volume.   Don't move the other button.

Q.   Mr. Cutkomp, before we begin to play this tape, I'd like to have you explain just a few things to help this jury follow along.   First of all, there are references down the left-hand side of the transcript that refer to D colon and then T colon. The D refers to who?

A.   Dustin.

Q.   And the T refers to whom?

A.   Myself.

Q.   At the beginning of this transcript, there's a section that's saying portion of tape not transcribed.   Did you listen at some point to the entire tape recording in this case?

A.   Yes.

Q.   Now, this tape recording we're going to play lasts for about an hour.   Did the original complete tape last for substantially longer than that?

A.   Yes.

Q.   In the beginning portion of this tape that is not

924

transcribed here and we're not going to be playing here, can you share with the jury what's going on at the beginning portion of this before we even get to the point we're going to play today?

Page 133

A.   I walked in the house and said hello and just small talk stuff.

Q.   Was there a period of time that you and Dustin Honken just talked about, like you say, small talk, other things not having anything to do with this case at this point?

A.   Yes.

Q.   And then throughout this transcript as we go, there are other sections where it indicates that a portion of the transcript was not played.  Can you share with the jury, not that you're going to have a specific memory of what happened at each portion of those, but when there are sections cut out of this and not played, what's happening at those portions of the conversation with Dustin Honken just generally if you recall?

A.   I don't recall.

Q.   Are there -- let me put it this way.  Are there other times while you guys were sitting there talking about the case that the topic went off to other subjects?

A.   Yes.

Q.   At some point you talk about car racing, for example.

A.   Yes.

Q.   Is there another portion where you talk about some, I think, acquaintance or relative of Dustin Honken's who had some

925

medical problem or something along those lines?

A.   Yes.

Q.   And so those portions of the tape are the ones that aren't being played here today.

A.   Yes.

MR. WILLIAMS:  With that and with the Court's permission at this time, I would ask permission to play the

Page 134

tape.

THE COURT: You may.

MR. WILLIAMS: Thank you.

(Government Exhibit 203 was played in open court.)

BY MR. WILLIAMS:

Q. Just so we're clear, Mr. Cutkomp, at this portion of the transcript there is a portion that was taken out off on another subject.

A. Yes.

Q. I'm going to play the next section starting then at page 6.

(Continuation of Government Exhibit 203.)

Q. Mr. Cutkomp, before we play the next section of the tape at page 10, I want to back up and ask you some questions.

First of all, on page 10 itself at the top of that transcript, there's a reference he makes to a black guy. Were you aware that at some point Dustin Honken hired an African-American lawyer from Des Moines?

A. Yes.

926

Q. And is that the reference to the black guy?

A. Yes.

Q. And he's indicating he didn't quite tell his lawyer all the evidence against him?

A. Yes.

Q. Then I want to back up a little bit here and have you explain some additional portions here. You'd indicated earlier in your testimony that based on your conversations with Dustin Honken he had convinced you that there really was only one person that could get you in trouble and that was Dan Cobeen.

A. Yes.

Page 135

Q. And then throughout the portion that the jury just listened to, there's a number of references. For example, at the bottom of page 6, there's a reference there that said -- right at the beginning it says, You know, right now a hundred percent that one. That lowers you down to two to four at the most. And then you say, Do what now? How are you going to lower it two to four? And Dustin Honken replies, That one over there is 100 percent. Don't worry about that. Is that a reference to Dan Cobeen?

A. Yes, it is.

Q. And then the two to four is his thought that if Dan Cobeen is eliminated as a witness that your sentence might be reduced to two to four years?

A. I'm not sure if it was two to four or level two to four.

927

Q. Okay. So it may have been a level referencing the sentencing guidelines --

A. Yes.

Q. -- that would ultimately dictate your sentence?

A. Yes.

Q. And then going over to page 8 at the middle of that -- at the end of that middle large paragraph there that starts, And with obviously we'd tell Reinert. I'm sorry, just at the beginning of that paragraph there.

A. Okay.

Q. That middle paragraph says, And with obviously we'd tell Reinert. Do you see that line?

A. Yes.

Q. Reinert was who?

A. The prosecuting lawyer.

Page 136

Q. And then at the bottom of that same paragraph, there's a reference where he says at the last line, Well, I think if that one, there's nothing left, they'd be put in a hole for a long time. Is that another reference to Dan Cobeen?

A. Yes.

Q. And they'd be put in a hole for a long time, is that an indication that the government's case would be in some difficulty for a long time?

A. Yes.

Q. And then over on the next page, page 9, in the middle of

928

that page, you say something to the effect of, So for me it's all hanging on him. Do you see that line there, sir?

A. Yes.

Q. Who are you referring to?

A. To Dan.

Q. And then there's a discussion where he agrees with you, and then a few lines down it starts off with Dustin Honken speaking. There's an unintelligible notation at the beginning of that line and says, As long as this person don't vanish before then. That's why I was all fucking worried last week. Yeah, it'd be difficult now. Obviously.

When there's a reference to vanishing, did you have any conversation with Dustin Honken about whether Dan Cobeen might be whisked off or put in some type of protection or relocated someplace?

A. Yes.

Q. And is that what the reference to vanishing is?

A. Yes.

Q. And then the next line, you say, I don't know how to say

Page 137

this, but I don't want -- but I -- don't won't hurt any, and Dustin replies, I know, I understand. And you said, All right. And then Dustin says, One and one only. You don't want two, three, four. That's what you're telling me; right? And on the next page you say, Uh-huh. What are you referencing there?

A.    Just to kill one person and not anybody else.

929

Q.    Were you concerned that in addition to killing Cobeen he might kill other people?

A.    Any -- that he might go in and there might be other people there and he'd just kill everybody I guess.

Q.    Kill everybody in the house.

A.    Yes.

Q.    Then I want to keep going to page 10. I'm going to play -- start back up on the transcript at the middle of page 10.

(Continuation of Government Exhibit 203.)

Q.    Mr. Cutkomp, before we play that last portion of the tape -- and we may end up taking a break before that -- I want to go back through the portion the jury's just heard and ask you some questions and have you explain some of this.

       First of all, if you would turn with me to page 11 of the transcript, and at the top of that page, you have a discussion about having some dreams, and Dustin Honken replies, Yeah, I can't remember them, though. I mean, even the wires, how the wires work was Cobeen taped this tape for them, and then he went and handed it to Graham. Well, poof, poof, no wires. Do you see that reference there?

A.    Yes.

Q.    What did you understand he was referring to when he said, Poof, poof, no wires?

Page 138

A. Shooting them both.

Q. Shooting John Graham and shooting Dan Cobeen?

930

A. Yes.

Q. And then the government would be without the recordings that he was worried about.

A. Yes.

Q. And then at the bottom of that page about the fourth paragraph up it starts with Dustin Honken saying, I know that. Obviously. I can't do that -- I can't do shit right now but -- or I'm sorry, I can, but I don't have the money to. I already called a place they can do it. Said they can build it for me. And then the conversation continues on to the next page about a cell phone and a repeating thing and so forth. Can you tell the jury what's being discussed there that Dustin Honken was looking into having built for him?

A. Something that would fool the ankle bracelet, make the thing at his house think that he was still there.

Q. Turn if you would to page 13 for me. And about three quarters of the way down the page on page 13, you say, I'm worried about the other stuff still. And Dustin Honken replies, What does that have to do with you? Nothing. Nothing has anything to do with you. There's not -- there is no even -- there is no even possible remote way of anything connecting you to anything because you haven't done anything. When you said, I'm worried about the other stuff still, what were you referring to?

A. The -- Greg and Terry and the other people that were

931

Page 139

missing.

Q. And then on to the next page at the top of page 14, you continue with that conversation with Dustin Honken, and you say about the fourth line down, I'm worried that you took a little thing, threw in there or something. What were you talking about there, sir?

A. That if he buried the people that he threw something in there that would connect it to me.

Q. And you expressed a concern that he might be setting you up in connection with those murders.

A. Yes.

Q. Turning to page 17 if you would, if you look at page 17, there's a discussion about the rope, and Dustin Honken indicates he's at the end of the rope and you're in the middle and so forth. Do you see that reference kind of at the top?

A. Yes.

Q. And then into -- about the top third of that, you say, I would. Would anybody else? Are you referencing to assisting him in his efforts here?

A. Yes.

Q. And when you say, Would anybody else, Dustin Honken replies, Maybe. Probably, but it's so hard to get that person to do anything. They're all so bitchy about it. Well, hurry up. I ain't gonna fuck around all day. I'm going to do it right now, you know. You know, they will, they just want to go.

932

I don't want it like that. When Dustin Honken referred to that person, who was he referring to?

A. Angela Johnson.

Q. And you reply, So she'd just go up and right there at the

Page 140

door, huh?  Do you see that reference?

A.  Yes.

Q.  What were you making a reference to?

A.  Just going up to a door and shooting somebody.

Q.  And Dustin Honken replies, Yeah, yeah, that person probably would, but I'd be -- I'd be scared with that one.  And that -- that one's too bold, doesn't like to plan things out, doesn't like to take time.  Likes to hurry, everything right now. That's when you end up in bad shape.  You must be thinking you don't want to go to prison very bad.

First of all, again, the person he's saying that person would probably be too bold, the person he's referring to there?

A.  Angela Johnson.

Q.  And then when it says, You must be thinking you don't want to go to prison very bad, had you in the past expressed reluctance to participate in any violence with Dustin Honken?

A.  Yes.

Q.  And at this point in the undercover operation, you are suggesting to him you might be willing to go along with that.

A.  Yes.

933

Q.  And did that raise some concerns with Dustin Honken that you've kind of changed your point of view on the violence?

A.  Yes.

Q.  And is that what he's referring to there about you must not be wanting to go to prison very bad?

A.  Yes.

Q.  And then on the next page, on page 18, if you look about halfway down the page, Dustin Honken says, And then the other
Page 141

mode of thinking is they might think, fuck, and just back off. And then I'd get a chance to go other places. I don't know. That's why I haven't decided yet how I'm going to do it. My big question -- that's my big question in my mind. What order?

And up to that point he's talking about basically taking care of the one, the last one. Can you tell the jury what's he talking about in that area?

A.   In this paragraph?

Q.   Yes, sir.

A.   He wanted to get an order or wanted to see who the most important person in the case was and who the second most important person would be and to get an order on who to kill first.

Q.   Was he concerned that if he just went out and killed Dan Cobeen that the police would come down on him and immediately suspect him?

A.   Yes.

934

Q.   And so he was concerned about coming up with the right order and the right sequence to do as much as he could as quickly as he could.

A.   Yes.

Q.   And then finally on page 21, you guys are looking in a phone book for an address. Can you explain to the jury what's going on there?

A.   We were looking for Dan Cobeen's friend's address where he might be staying.

Q.   And that friend is referenced at the bottom of that page as Brian Beach?

A.   Yes.

Page 142

Q. And was that somebody who was involved in taking out docks over in Clear Lake?

A. Yes.

MR. WILLIAMS: Your Honor, I can either play the last portion of the tape which would take probably 10, 15 minutes, or we can take a break.

THE COURT: Why don't we do a stretch break now, play the last portion of the tape, and then we'll take our 25-minute recess.

MR. WILLIAMS: Very good, Your Honor.

THE COURT: Thanks. Please be seated.

BY MR. WILLIAMS:

Q. Okay. Mr. Cutkomp, this last portion of the tape begins at

935

page 22 of the transcript at the very top of the page, and I'll go ahead and play that now.

(Continuation of Government Exhibit 203.)

Q. Mr. Cutkomp, right before we take a break here, I just have a couple questions on the very last portion the jury listened to. It began at the top of page 22. And just so the jury's aware, at the top of page 22 in the middle of that first full paragraph, there's a reference -- he says, You gotta look at Ryan when I play with him and he tells me how much he loves me. Who's Ryan?

A. Dustin's son.

Q. And then if you refer to page 24, please, there's a reference to -- at the beginning of the third line down it says, No, nope, not at all. I mean, you gotta remember both those guys were skeptical. Who are the guys that Dustin Honken's referring to there.

Page 143

A.    Terry DeGeus and Greg.

Q.    And then about halfway down you say to Dustin Honken, How did you find him anyway?  And then there's a discussion that ultimately Dustin Honken says, The big guy, and you say, Oh, oh, yeah.  Who was the big guy who told Dustin Honken where Greg Nicholson was hiding?

A.    Scott Gahn.

Q.    And then the last question I have for you, on page 27 of the transcript, the middle of the page where Dustin Honken is

936

talking, it says, This has been a lone venture for me now this time.  What was the last time he was referring to?

A.    '93.

MR. WILLIAMS:  This would be a good time for a break, Your Honor?

THE COURT:  It would.  And I take it you're done with any tapes today.

MR. WILLIAMS:  I am.

THE COURT:  Okay.  Members of the jury, why don't you pass the headsets down towards our CSO, and Carey can collect them along with the transcript.

Okay.  Thank you.  Members of the jury, it's about 17 minutes to 3.  We'll be in recess until 10 minutes after 3. Please remember my prior cautionary instruction.  Thank you.

(The jury exited the courtroom.)

THE COURT:  Mr. Williams, anything we need to take up?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Mr. Willett?

MR. WILLETT:  Judge, could Mr. Cutkomp keep his copy of the transcript at the witness box?  I might have some

Page 144

questions for him.

THE COURT: Sure. Thank you.

MR. WILLETT: Thank you.

(Recess at 2:43 p.m.)

THE COURT: Well, Mr. Willett, let me ask you, was I

937

premature in collecting the transcripts? Didn't dawn on me that you might want to have them refer to it during cross-examination, so if you do, I'd be happy to have them passed out again.

MR. WILLETT: I won't use the word premature, Judge, but if you're going to offer to have them passed out for my cross-examination, I would appreciate it.

THE COURT: Okay. Yeah. Carey, can't we move it more -- just put it on the side?

THE CLERK: Oh, you want it put up here?

THE COURT: Yeah. Just move it -- yeah, just so the jurors can get a better view of the witness. That's fine. It will be gone tomorrow.

Okay. Let's bring the jurors in.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Williams, you may continue your direct examination of Mr. Cutkomp.

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. Mr. Cutkomp, when we left off, we had just gotten done playing a recording of a -- or a portion of a recording of a tape that you made on May 24 of 1996; is that correct?

A. Yes.

Page 145

Q.    And then over the course of the next couple weeks, once on

938

May 29, 1996, once on June 4, 1996, and again on June 6 of 1996, did you again record conversations with Dustin Honken?

A.    Yes.

Q.    Did those all occur at his residence in Britt, Iowa?

A.    Yes.

Q.    And the conversations that you recorded, were they similar in kind in the sense it was you and him sitting down talking about, among other things, the case that was pending against you?

A.    Yes.

Q.    Throughout these additional recorded conversations, did Dustin Honken continue to talk to you about plans he had for killing additional witnesses?

A.    Yes.

Q.    Did he continue to discuss plans for trying to figure out where the key evidence was that was against him, that if it was eliminated the charges would have to be dropped?

A.    Yes.

Q.    As in the tape that the jury heard, did Dustin Honken continue to suspect that you were cooperating with law enforcement and wearing a wire on him?

A.    Yes.

Q.    Now, at the conclusion of the last recording on June 6, 1996, was Dustin Honken's pretrial release revoked after that last recording?

939

Page 146

A.   Yes.

Q.   And was he then ultimately sent to federal prison after being sentenced on those drug charges?

A.   Yes, he was.

Q.   Mr. Cutkomp, the Angela Johnson that you have discussed in your testimony here today that participated in this effort to manufacture and distribute methamphetamine from 1993 through 1996, do you see her in the courtroom here today?

A.   Yes, I do.

Q.   Can you describe for the jury where she's sitting and what she's wearing?

A.   She's sitting here wearing a tan sweatshirt.

MR. WILLIAMS:   Thank you, Your Honor.   No further questions.

THE COURT:   Mr. Willett, you may cross-examine.   And members of the jury, I was premature in collecting the transcripts because I think Mr. Willett may want to use them in the cross-examination, so I'm going to ask Carey to pass them back out.

MR. WILLETT:   May it please the Court, Your Honor. Thank you.

CROSS-EXAMINATION

BY MR. WILLETT:

Q.   Mr. Cutkomp, I don't believe we've ever been introduced. I'm Al Willett.   I'm one of the attorneys defending Angela

940

Johnson.

My understanding is during this time period of 1992 to 1996 you were using controlled substances; correct?

A.   Correct.

Page 147

Q.   And you used methamphetamine?

A.   Yes.

Q.   And when did you use methamphetamine, sir?

A.   Between those dates.

Q.   And what was the frequency of your use?

A.   When I lived in Arizona, it was quite a bit.

Q.   And when you lived in Arizona was between the years 1992 and 1993.

A.   Yes.

Q.   And how would you define quite a bit?

A.   I used every other day.

Q.   And how much would you use every other day?

A.   It was about one line.

Q.   And one line would be approximately how much, sir?

A.   I'm not sure.

Q.   How many times would you use in a day?  Just the line?

A.   Yes.

Q.   Okay.  So you would use methamphetamine roughly -- if we're assuming a month is 30 days, you'd use roughly 15 times in a month.

A.   Yes.

941

Q.   And for how many months?

A.   Probably four real good months.

Q.   So you used methamphetamine approximately 60 times while you were in the state of Arizona?

A.   Probably.

Q.   And what effect did that have on you, sir?

A.   I'm not real sure what effect it had on me.

Q.   Physically what effect did it have on you?

Page 148

A.    I enjoyed it.

Q.    Okay.  Become addicted to it?

A.    I abused it.

Q.    Affected you mentally?

A.    To some extent probably, yes.

Q.    How did it affect you mentally?

A.    It increased my -- I was able to think quicker.

Q.    Now, that wasn't the only controlled substance that you used; correct?

A.    Correct.

Q.    You've used marijuana?

A.    Yes.

Q.    You've used powder cocaine?

A.    I have, yes.

Q.    You've used crack cocaine?

A.    Yes.

Q.    You've used certain hallucinogenic drugs?

942

A.    Yes.

Q.    Would that be LSD, or would that be something else?

A.    LSD, and I tried MDA once.

Q.    And what does MDA stand for, sir?

A.    I'm not real sure.

Q.    And were these during the years 1992 to 1996 when you used these drugs?

A.    Yes.

Q.    And did you use any or part of these drugs in combination with methamphetamine?

A.    Yes.

Q.    All of those drugs in combination with methamphetamine at

Page 149

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 828 of 3592

one time or another?

A.    No.

Q.    Which ones?

A.    Marijuana.

Q.    But your drug of choice was methamphetamine.

A.    Yes.

Q.    In regards to the sentence that you've now served, my understanding is at the time of your arrest in 1996, based upon the charges brought against you which were driven by the allegations of the quantity of methamphetamine, you were facing a ten-year mandatory minimum; correct?

A.    Yes.

Q.    And at the time of your sentencing, you were looking at a

943

guideline range of 168 to 210 months; correct?

A.    I don't remember the exact.

Q.    I think you told us on direct it was somewhere around the area of 14 years?

A.    Yes.

Q.    But then your sentence was a sentence of 54 months.

A.    Yes.

Q.    And that was based upon two things.  First of all, the government filing a motion for the reduction of your sentence.

A.    Yes.

Q.    And secondly, the Court granting that motion and exercising its discretion as it saw fit; correct?

A.    Yes.

Q.    So in essence you cut about two-thirds off of your sentence.

A.    Yes.

Page 150

Q.   And then you served your supervised release term of -- was it five years?

A.   I was released a little early on that also.

Q.   Okay.  You and Dustin Honken were best friends.

A.   Yes.

Q.   Known him since grade school?

A.   Yes.

Q.   Became close in high school?

A.   Yes.

944

Q.   You were sort of the athletic guy in high school, and he was sort of the brain in high school.

A.   Yes.

Q.   And he liked to talk a lot.

A.   Yes, he did.

Q.   And in the early '90s, in 1992 to 1993, you knew him very well.

A.   Yes.

Q.   You were still very close friends.

A.   Yes.

Q.   But you stated to Mr. Williams that you had no idea that Dustin could be violent during that time period of 1992 to 1993.

A.   That's correct.

Q.   And Dustin didn't tell you anything about any of his violent acts in 1993 prior to their occurrence, did he?

A.   No.

Q.   And it was in the early part of 1992 that you moved to Arizona in order to facilitate this plan of Mr. Honken's regarding manufacturing methamphetamine.

A.   Yes.

Page 151

Q. But once you arrived in Arizona, the decision maker was almost always Dustin Honken; correct?

A. Correct.

Q. Jeff Honken was sort of the money man?

A. Yes.

945

Q. And you were labor.

A. Yes.

Q. But Dustin Honken made the decisions in Arizona; correct?

A. Yes.

Q. And you did what Dustin told you to do.

A. Yes, I did.

Q. And Dustin would make decisions and then delegate responsibilities in regard to this meth operation; correct?

A. Yes.

Q. For example, if chemicals had to be purchased, Dustin would tell you to go get the chemicals.

A. Yes.

Q. Now, in regards to the financial agreement between you and Dustin Honken and Jeff Honken, the understanding is that money would be split evenly; correct?

A. Correct.

Q. Now, the sad truth of the matter is that's not what happened, is it?

A. No.

Q. You didn't receive a one-third of the profits of this operation, did you?

A. No, I didn't.

Q. In fact, by best estimates in terms of cash money, you received somewhere between a few thousand and several thousand

Page 152

total?

946

A.    Correct.

Q.    And significant money was made for a portion of time while this operation was in Arizona; correct?

A.    Yes.

Q.    How much money do you think was made?

A.    Over 100,000.

Q.    And out of over 100,000, you pulled in somewhere low five figures?

A.    Yes.

Q.    10,000 or so?

A.    If that.

Q.    If that.

A.    Yes.

Q.    And that's certainly not a third, is it?

A.    No.

Q.    So Dustin Honken certainly wasn't being equitable with you in terms of the agreement that you thought was in place, was he?

A.    No.

Q.    And in terms of the financial operations, not only just the split but in terms of the prices and what was being charged, Dustin was the decision maker; correct?

A.    Yes.

Q.    And in terms of the collection of money, that was another assignment that at times he delegated to you.

A.    Yes.

947

Q.    And once the money was recovered, it was in essence Dustin

Page 153

who was in charge of distributing it out, divvying it up.

A.   That's correct.

Q.   And you stated on direct that Dustin did not want Greg Nicholson to meet Terry DeGeus; correct?

A.   Correct.

Q.   And not only was Dustin Honken not being straight with you in terms of proceeds, he wasn't being straight with his brother Jeff, was he?

A.   No, he was not.

Q.   You stated on direct to Mr. Williams that Dustin wasn't telling Jeff that we had as much money as we did.  Remember that testimony?

A.   Yes.

Q.   And that was correct?

A.   Yes.

Q.   Now, you mentioned one of Mr. Honken's girlfriends during the Arizona period of time.  That was Melissa or Missy Friesenborg?

A.   Yes.

Q.   Mr. Honken had several girlfriends, didn't he?

A.   Yes, he did.

Q.   Some of those girlfriends overlapping in time.

A.   Yes.

Q.   More than one girlfriend at a time.

948

A.   Yes.

Q.   Trying to keep two women happy or maybe even three women happy at the same time.

A.   Yes.

Q.   And in the course of your observations between 1992 and

Page 154

1996, he delegated assignments to those women; correct? Let me ask a more precise question. Melissa Friesenborg, things were stored with her; correct?

A.   Yes.

Q.   Kathy Rick, things were stored with her; correct?

A.   Yes.

Q.   Christi Gaubatz Cole, things were stored with her; correct?

A.   Yes.

Q.   Now, I believe you know her as Christi Cole, but if I say Christi Gaubatz or Christi Gaubatz Cole, we're talking about the same woman, aren't we?

A.   I don't know that Gaubatz part, but yes.

Q.   Are you aware that Christi Cole has now become Christi Gaubatz?

A.   I knew she'd been married.

Q.   And if I represent that to you, are you willing to accept that representation?

A.   Yes, I am, yes.

Q.   And he would delegate that things be stored at Angela Johnson's.

949

A.   Yes.

Q.   And are you aware that there were things stored at Angela Johnson's residence in Clear Lake when she was no longer living there but was living in Des Moines?

A.   No, I did not know that.

Q.   And Dustin Honken was romantically involved with Melissa Friesenborg at one time, wasn't he?

A.   Yes.

Q.   Even went so far as to buy her an engagement ring, didn't

Page 155

he?

A.   I believe so.

Q.   Bought her a lot of nice furniture for the apartment he shared with her.

A.   Yes.

Q.   Money that arguably could have gone to you to be in compliance with the equal one-third split; correct?

A.   Yes.

Q.   And I believe you were asked on direct that up to the early point of 1993 you didn't know Dustin Honken to use violence; correct?

A.   That's correct.

Q.   But he wasn't telling you about anything, was he?

A.   No.

Q.   Even though you were his best friend.

A.   Correct.

950

Q.   And in the early part of 1993, it came to your attention that Angela Johnson was Terry DeGeus's girlfriend.

A.   Yes.

Q.   Now, did I understand correctly that based upon the fact that you were raised in Britt you knew who Terry DeGeus was?

A.   Yes.

Q.   And how long had you known Terry DeGeus?

A.   I --

Q.   Or is know of him a better way to put it?

A.   Yes.  I'd met him before, but I didn't really hang out with him or anything.

Q.   Did you know anything about him or his reputation?

A.   Yes.

Page 156

Q.   What did you know about Terry DeGeus?

A.   That he was a good fighter.

Q.   Okay.  Now, when you say a good fighter, was he golden gloves?  Was he state high school wrestler?  What context are you putting that in?

A.   He -- like street fighting.

Q.   So -- and when you say he was a good fighter, I take it you mean you wouldn't want to face him if you didn't have to.  Is that what you're telling us?

A.   Yes.

Q.   Even though you're a man of some physical presence yourself, I take it you wouldn't have gone out of your way to

951

volunteer for a fight with Terry DeGeus.

A.   No.

Q.   Now, you stated on direct that some time in early 1993 you thought about moving from Arizona.  You thought about, for lack of a better label, getting out; correct?

A.   Yes.

Q.   But you didn't do it.

A.   No.

Q.   And at least in some part because you still considered Dustin your friend.

A.   Yes.

Q.   Your best friend.

A.   Yes.

Q.   And were you aware by that time that he was shortchanging you on what your percentage should be in this situation?

A.   Yes.

Q.   And he was still calling the shots, and you were still

Page 157

labor.

A.    Yes.

Q.    But you were still willing to be involved with your best friend.

A.    Yes.

Q.    And on March 21 of 1993, you were arrested with your best friend.

A.    Yes.

952

Q.    And in terms of the evening before, all you knew about Angela Johnson is that you were aware that Dustin and Angela had a separate room where Angela had joined Dustin after you and Russ Miller and Dustin had gone out partying.

A.    Yes.

Q.    And you didn't see Angela the day of March 21.

A.    I don't believe I did, no.

Q.    Didn't see her before you and Dustin went over to Greg Nicholson's home.

A.    I don't -- no, I don't believe so.

Q.    So you really don't know if she was in the hotel room that day before you left or not, do you?

A.    Well, she had said that she had been.

Q.    Okay.  But that's all you're basing it on.

A.    Yes.

Q.    Okay.  Didn't actually see her.

A.    I don't recall if I did or not.

Q.    And after your arrest on March 21, you were given an assignment by Dustin Honken; correct?

A.    I don't remember.

Q.    You had to call Melissa Friesenborg, didn't you?
Page 158

A. Yes.

Q. And that was at Dustin Honken's direction, wasn't it?

A. Yes.

Q. And you had to call Melissa to get rid of chemical

953

paraphernalia that had been stored at her place; correct?

A. Yes.

Q. Another example of Mr. Honken recruiting his girlfriends for various purposes; correct?

A. Correct.

Q. And did Melissa Friesenborg know on that occasion that she had this material?

A. I don't know if she knew that it was there until I had called her.

Q. Okay. So there were times at least when Dustin involved girlfriends for various tasks and the girlfriends didn't know what Dustin was thinking. That would be fair, wouldn't it?

A. Yes.

Q. Now, you stated something on direct to Mr. Williams this morning, and I wasn't sure if I caught it correctly, so I wanted to make sure the record was as clear as it possibly could be. After the March arrest, you did sit in on discussions with Dustin where you'd talk about the government's case.

A. Yes.

Q. And in that first case, you had learned that Greg Nicholson had cooperated.

A. Yes.

Q. But is it my understanding that you weren't sure if Angela Johnson was there during those conversations or not? Was that your testimony on direct?

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 838 of 3592

A.   Yes.

Q.   Okay.  And your relationship with Miss Johnson at the time was you considered her to be your best friend's girlfriend.

A.   Yes.

Q.   Or based upon what you knew with Miss Friesenborg, maybe more accurate way to say it is one of my best friend's girlfriends.

A.   Yes.

Q.   Because Miss Friesenborg wasn't out of the picture yet, was she?

A.   I don't remember.

Q.   Was Miss Rick in the picture yet?

A.   Yes.

Q.   So depending upon the status, your best friend had either two or three girlfriends in the spring of 1993.

A.   Yes.

Q.   And then because of the conditions of Mr. Honken's pretrial release, he was not supposed to have direct contact with you; correct?

A.   Correct.

Q.   Or contact in any -- any type of way.

A.   That's correct.

Q.   Being here talking face to face was just as bad as being on the phone.

A.   Yes.

Q.   And you stated on direct that there were times when either

Page 160

Miss Rick or Miss Johnson were used to facilitate a three-way phone call.

A.   Yes.

Q.   And then based upon your conversations with Mr. Honken, you were asked to go to Arizona and pick up some chemicals.

A.   Yes.

Q.   And is my understanding correct, sir, that this was the occasion where Christi Cole or Christi Gaubatz Cole went with you?

A.   She went on one occasion, yes.

Q.   And chemicals were picked up, weren't they?

A.   Yes.

Q.   And Miss Cole would have known about this, wouldn't she?

A.   Yes.

Q.   And once you returned to Arizona -- or excuse me, returned to Iowa with Miss Cole, some or all of these chemicals were stored at Miss Cole's house; correct?

A.   Correct.

Q.   And she would have known about that; correct?

A.   Yes.

Q.   And then is it my understanding that the sequence of events is is after that you were once again asked to return to Arizona and you were given I think a car and a couple thousand dollars?

A.   That was before.

956

Q.   That was before the trip with Miss Cole?

A.   Yes.

Q.   So some time after March of 1993 -- some time after March 21 of 1993 after your arrest but before your trip to Arizona with Miss Cole, you made this trip to Arizona or planned trip to

Page 161

Arizona with a rental car and a couple thousand in cash.

A. I purchased a car and then -- yes.

Q. Pardon me. Purchased a car and a couple thousand in cash.

A. Yes.

Q. Got to the New Mexico border, decided against it.

A. Yes.

Q. Kept the cash.

A. Yes.

Q. Told Dustin it was stolen.

A. Yes.

Q. I take it you looked at this as payment on back wages?

A. To some extent, yes.

Q. And you stated to Mr. Williams on direct that you didn't tell Mr. Honken the truth because you knew he would be upset and give me a hard time.

A. Yes.

Q. Why did you care?

A. Because he was my best friend.

Q. Okay. Any other reason?

A. No.

957

Q. And in June or July of 1993, you testified on direct that Dustin told you he was looking for Greg Nicholson and was having difficulty finding him.

A. Yes.

Q. And that's all he told you.

A. Yes.

Q. Didn't tell you anything else.

A. No.

Q. Didn't tell you why he was looking for him or what his

Page 162

plans were if he could find him or anything like that.

A.   I don't recall.

Q.   Now, in June or July of 1993, you were still his best friend.

A.   Yes.

Q.   And later in the summer of 1993, you learned that Mr. Nicholson had disappeared.

A.   Yes.

Q.   And it was after that point in time that Mr. Honken told you this hypothetical story that you've related to the jury; correct?

A.   Yes.

Q.   Not before Mr. Nicholson's disappearance.

A.   Correct.

Q.   And you were shown a tape by Mr. Honken.

A.   At some point after that, yes.

958

Q.   A videotape.  But you never saw the contents of the videotape.  You just physically saw the item.

A.   Correct.

Q.   And notwithstanding this hypothetical that Dustin Honken shared with you, you kept that a secret as well, didn't you?

A.   Yes.

Q.   You didn't go to law enforcement and share that with anybody or --

A.   No, I did not.

Q.   -- say, Listen, you know, hey, Greg Nicholson's disappeared, and my best friend has told me this hypothetical story about Greg Nicholson and -- you didn't share that with anybody, did you?

Page 163

A.    No.

Q.    And why was that?

A.    Because Dustin was my best friend, and I didn't want him to get in trouble.

Q.    Okay. And then is it after this point in time that you're asked to help melt down a handgun?

A.    Yes.

Q.    And is it at this relative same point in time that there's discussion between and you Mr. Honken about the depth of something being buried and what impact frost has on that process of things raising up or lowering in the ground? Is that all sort of at the same time?

959

A.    It was kind of continuing. Every once in a while he'd say something.

Q.    Okay. And it was during this same time frame I believe of 1993 that Mr. Honken was telling you he still wanted to manufacture methamphetamine.

A.    Yes.

Q.    But the purpose of making the -- the purpose of manufacturing the methamphetamine was to either facilitate Mr. Honken's flight, for lack of a better word, or to give money to Greg Nicholson or Terry DeGeus in regards of affecting their testimony; correct?

A.    Yes.

Q.    Nothing was ever said about making meth to acquire money to facilitate murder, was it?

A.    No.

Q.    And the destruction of this handgun occurred in either the late months of 1993, the winter months, end of the year '93 or

Page 164

the winter months beginning of the year 1994; correct?

A.    Yes.

Q.    And where did Mr. Honken present this weapon to you at?

A.    At my parents' house.

Q.    And just the two of you there alone.

A.    Yes.

Q.    And what did this weapon look like?

A.    It was black and had something on the end.

960

Q.    When you say it had something on the end, I mean, we could look at this from a couple different ways.  We could be talking about something as an extension of the barrel, or we could be talking about something as an extension near the trigger area. What are you talking about, sir?

A.    Like an extension of the barrel.

Q.    And did he just present the gun to you, here it is, or was it in anything or just here's a gun?

A.    I don't recall.

Q.    Okay.  And the thing that you saw that was an extension of the barrel, can you describe that for us?

A.    I don't recall exactly what it was.

Q.    Okay.  Do you remember seeing any kind of an extension underneath the gun that would be, say, in front of the trigger area but before the barrel area?

A.    There was a clip there.

Q.    Okay.  So you remember seeing that.

A.    Yes.

Q.    Okay.  And you asked for some explanation about the gun, didn't you?

A.    He gave me an explanation.

Page 165

Q. And what was that explanation again, sir?

A. That Terry wasn't around anymore so he didn't need to worry about Terry anymore so he could get rid of it.

Q. And you were told that Angie had got the gun in Cedar Falls

961

or Waverly?

A. Yes.

Q. Didn't he also tell you that she got it for protection?

A. Yes.

Q. And it's my understanding that based upon growing up on the farm and some of your employment history you had talents with working with metal, sheet metal and things of that nature.

A. Yes.

Q. You knew how to run a torch, and you knew how to run power saws.

A. Yes.

Q. Did you ever help Mr. Honken make anything for this weapon?

A. No.

Q. Why did you help him melt it down?

A. He asked me to.

Q. And you just did it because he asked you to.

A. Yes.

Q. Did you have any thoughts about why are we melting down a perfectly good handgun?

A. Yes.

Q. What were you thinking?

A. That he probably used it and needed to get rid of it.

Q. Did you question him about it?

A. No.

Q. Why not?

Page 166

A.    Because I didn't want to know.

Q.    Did you know where this gun had been prior to Mr. Honken presenting it to you?

A.    No.

Q.    Did you ask?

A.    No.

Q.    You related to Mr. Williams and I believe it was still in the morning session that for a while there was a lab at Miss Johnson's home in her basement.  Do you remember that line of testimony?

A.    Yes.

Q.    And you were trying to make a controlled substance there for a while; correct?

A.    Yes.

Q.    Now, my understanding is this lab sort of moved.  I mean, it started out -- didn't it start out somewhere else before Miss Johnson's place?  Was it at his father's place?

A.    I believe we had some -- did some there.

Q.    Okay.  So started out at his father's place in Britt, moved to Miss Johnson's place --

A.    He didn't live in Britt.

Q.    Pardon me?

A.    Dustin's dad didn't live in Britt.

Q.    I apologize.  Steamboat Rock, isn't it?

A.    Yes.

Q.    Started out at Steamboat Rock at his father's place?

A.    Yes.

Page 167

Q.   Got moved over to Miss Johnson's place at that time which was in Clear Lake?

A.   Yes.

Q.   Then got moved to a place you had in Mason City?

A.   Yes.

Q.   And then was it Mr. Honken's place after that?

A.   Yeah.

Q.   Now, when this lab was at -- and Dustin's father's first name is Jim?

A.   Yes.

Q.   When this lab was at Jim Honken's residence in Steamboat Rock, you weren't trying to make methamphetamine there, were you, sir?

A.   No.

Q.   You were trying to make a halluc -- see if I can say this, a hallucinogenic drug; correct?

A.   Yes.

Q.   And when this lab was at Angela Johnson's house, you weren't trying to make methamphetamine there, were you, sir?

A.   I don't believe so.

Q.   Weren't you trying to make methcathinone?

A.   Yes.

Q.   If I'm pronouncing that correctly?

964

A.   Yes.

Q.   And that's not methamphetamine, is it?

A.   No.

Q.   And then when the lab was at your house and later Dustin's, that's when once again you were trying to make methamphetamine.

A.   Yes.

Page 168

Q. You weren't successful in making any hallucinogenic drug at Jim Honken's place, were you?

A. No.

Q. You weren't successful in making methcathinone at Miss Johnson's place, were you?

A. We made a little tiny bit, but no.

Q. Okay. When you say a little tiny bit, what are you thinking of, Mr. Honken -- or excuse me, Mr. Cutkomp?

A. An eyedrop maybe.

Q. An eyedrop, okay. Not even enough for personal use I take it --

A. No.

Q. -- from what you're implying. And weren't able to see -- excuse me, weren't able to make any meth at your apartment.

A. No.

Q. And you were stopped before the final process was done at Mr. Honken's home; correct?

A. Yes.

Q. And I believe you testified on direct to Mr. Williams that

965

while this lab was moving along to its progressive points you had a conversation with Angela Johnson about Terry DeGeus. Did I understand that testimony correctly?

A. I don't remember.

Q. Did you state on direct that Angela told me she was the last one to see him?

A. Yes.

Q. And was that in reference to Terry DeGeus?

A. Yes.

Q. But that's all she said.

Page 169

A. That's all I remember.

Q. And you didn't follow up.

A. No.

Q. You didn't ask where, when, what, why, how, who, anything like that.

A. No.

Q. Even though this was in 1995, even though this was after the hypothetical that Dustin Honken had given you.

A. Yes.

Q. And then it's at this point in time that you're talking about some of the finances, and you mentioned that Dustin Honken again got money from his brother Jeff Honken and a stepbrother.

A. Yes.

Q. And that Jeff Honken provided a thousand dollars.

A. Yes.

966

Q. And you stated on direct that he probably did this, Jeff Honken, because he assumed he had gotten most of the money from the sale of drugs back in 1992 and 1993; correct?

A. Yes.

Q. That certainly wasn't true, was it?

A. No.

Q. Just as Dustin Honken had not honored his agreement with you on this one-third split, he had not honored this one-third split with his own brother.

A. Correct.

Q. And the lab was moved out of Angela Johnson's house because you testified that she and Dustin weren't getting along real well then; correct?

A. Yes.

Page 170

Q.   And you didn't think she really wanted it in the house either.

A.   Correct.

Q.   And at this point you're sort of wanting to get out of it now.

A.   Yes.

Q.   Best friend or no.

A.   Yes.

Q.   And once the meth lab was at Dustin's home, Dustin Honken was still making the decisions and calling the shots.

A.   Yes.

967

Q.   And you were still labor.

A.   Yes.

Q.   Sir, isn't it fair to say that the last batch of methamphetamine that was actually made that you had any involvement with occurred back in Arizona?

A.   Yes.

Q.   And part of the purpose in trying to obtain money in 1995, trying to get whatever could be manufactured manufactured, was that one of the reasons Dustin Honken needed money for these babies that he was fathering.

A.   Yes.

Q.   Angela Johnson had a baby.  Kathy Rick had a baby.

A.   Yes.

Q.   And when you went to Kathy Rick's house on February 7 of 1996 to dump chemicals, she didn't know they were there, did she?

A.   No.

Q.   And you were questioned by Mr. Williams about what

Page 171

discussions occurred between you and Dustin Honken between the date of the search, February 7, 1996, and the date of your arrest, April 29, 1996, and you relayed what some of those issues were; correct?

A.    Yes.

Q.    But you don't recall having any conversations with Angie Johnson during that time period.

968

A.    No.

Q.    And in 1995 when you decided -- excuse me, in 1996 when you decided to cooperate, it was to help yourself get out of trouble.

A.    Yes.

Q.    And I take it one of Dustin's attributes is he liked to have things planned out; correct?

A.    Yes.

Q.    He liked plans.

A.    Yes.

Q.    He didn't like to fly by the seat of his pants as the old expression goes.

A.    No.

Q.    But he certainly didn't always share what he was thinking with you, did he?

A.    No.

Q.    Or others.

A.    No.

Q.    Do you still have Government Exhibit -- that partial transcript in front of you, sir?

A.    Yes.

Q.    And I believe the jury's been equipped again.   Okay.   Why

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 851 of 3592

don't we turn our attention to that.  Page 1, five lines down, Mr. Honken believed that Dan Cobeen was lying about some things; correct?

969

A.    Yes.

Q.    And then the bottom of page 3, the very bottom line, there was some discussion about whether or not you were wearing a wire.  Do you see that lead-in?

A.    Yeah.

Q.    And then Dustin states, Kathy told me not -- excuse me, Kathy told me to worry, watch out.  She's real paranoid about everybody.  And that Kathy references Kathy Rick, doesn't it, sir?

A.    Yes.

Q.    And then the bottom of page 6, there's the statement about three -- three to four lines up from the bottom, That lowers you down to two to four at the most.  Now, obviously since you've been through the federal criminal justice system, you have some understanding of the federal sentencing guidelines and offense levels and base offense levels and adjusted offense levels and total offense levels and enough levels to make your eyes spin. But was it your understanding that the conversation was about a two- to four-year prison sentence or an offense level of two to four?

A.    I don't recall for sure.

Q.    Okay.  Because at the time of your sentencing, you had a base offense level that was much higher than that, didn't you, sir?

A.    Yes.

970

Page 173

Q.    I mean, it was in the 30s I believe, wasn't it?

A.    Yes.

Q.    And at the time as high as you could go was a base offense level 38; correct?  Or at least that was the upper reaches of where you could go.

A.    I don't remember exactly.

Q.    And then in the middle of page 12 the discussion turns to finances again.  Are you there in the middle of page 12, sir?

A.    Yes.

Q.    How did you get the rest?  Mom and Ron and Kathy and one other person.  And what the conversation is is about Dustin Honken receiving money; correct?

A.    Yes.

Q.    But there's no direct reference to Angela Johnson, is it -- is there?

A.    No.

Q.    And then there's some reference at the bottom of page 12, They tried to get Angie on it.  Do you see that reference, sir?

A.    Yes.

Q.    Now, what that dealt with was the people that Mr. Honken was not allowed to have contact with; correct?

A.    Yes.

Q.    They usually don't separate people who have a child between them, do they?

A.    I don't think so.

971

Q.    And then we turn to the top of page 13.  Just a few lines down, He would have had me with Angie, I couldn't get nothing

Page 174

done. Been without. Do you see that, just a few lines down from the bottom of page 13? Dustin Honken is speaking.

A.   Yeah, yes.

Q.   And then within the next couple lines, Dustin is saying something, Me myself, I don't care about her. He was referencing Angela Johnson, wasn't he?

A.   Yes.

Q.   And in the middle -- or excuse me, about the upper third of page 14, Dustin's speaking. He says, Come on. And he says -- he takes the Lord's name in vain. You're the last person besides my kids on earth that I want to get into trouble. Do you see that?

A.   Yes.

Q.   Dustin still considered you to be his best friend; correct?

A.   Yes.

Q.   He didn't want to get you into trouble.

A.   No, he did not.

Q.   And just a general question just so I'm clear on something, Mr. Williams detailed with you not only this recorded conversation but the others you tried to record with Mr. Honken whether they were at the residence he was staying at which was his parents' residence, wasn't it?

A.   Yes.

972

Q.   Okay. That's where he was allowed to stay during his pretrial release in 1996.

A.   Yes.

Q.   And that was still in Steamboat Rock.

A.   No, that was in Britt.

Q.   That was in Britt by that time. Excuse me. I'm -- okay.

Page 175

And then you also tried to record conversations with Mr. Honken at Kraft Foods, but that was a less-than-ideal setting for an undercover wire.

A.   Yes.

Q.   Because of the manufacturing noise and things of that nature.

A.   Yes.

Q.   But you never recorded any conversations with Angela Johnson, did you, sir?

A.   No.

Q.   Now, in the middle of page 17, my understanding is you told Mr. Williams in regards to this sentence, Probably, but it's so hard to get that person to do anything.  They're all so bitchy about it.  I'm going to go do it right now, you know.  You know, they will -- they just want to go.  I don't want it like that, now, you referenced that you thought he was talking about Angela Johnson; correct?

A.   Yes.

Q.   No reference to Angela Johnson by name; correct?

973

A.   Correct.

Q.   No reference to she or a female or a woman or one of my three girlfriends or the mother of one of my children.  No reference to Angela Johnson; correct?

A.   Correct.

Q.   And then we go down just a few lines, and once again Dustin's talking, And that -- that one's too bold, doesn't like to plan things out, doesn't like to take time.  Likes to hurry, everything right now.  And was it your testimony that you were referencing that to Angela Johnson?

Page 176

A.   Where was that at again?

Q.   Just a few lines down, still on page 17.  Dustin's speaking.  The line starts by saying, Yeah, unintelligible, and then when you move into that paragraph, it says, And, you know, that -- that one's too bold, doesn't like to plan things out, doesn't like to take time.  And it's your testimony that you're referencing that to Angela Johnson.

A.   Yes.

Q.   No mention of her by name; correct?

A.   That's correct.

Q.   No reference to a female, a woman, she, one of my three girlfriends, the mother of one of my children, no reference; correct?

A.   Correct.

Q.   And even though you're sitting here in 1996, he still

974

hadn't told you what had happened in 1993, had he?

A.   No.

Q.   But we see from this reference -- once again, we see Dustin's philosophy that he likes to have a plan; correct?

A.   Yes.

MR. WILLETT:  Judge, if you would just allow me to confer with co-counsel for a moment, I think I'm in the home stretch.

THE COURT:  Thank you.

MR. WILLETT:  Thank you, Judge.  Just a few more topics.

BY MR. WILLETT:

Q.   Turning our attention back to this weapon for a moment, this handgun that we spoke of, did you know that that handgun

Page 177

had been stored somewhere before it was brought to you?

A.   No.

Q.   Did you know it had been stored at Christi Cole's house?

A.   No.

Q.   Now, at that time you had access to a key to Christi Cole's house; correct?

A.   I don't know if I did at that time.

Q.   Okay.  And in regards to how Mr. Honken, Mr. Dustin Honken, conducted his illegal activities, he didn't tell everybody everything all of the time, did he?

A.   No.

975

Q.   Sort of a need-to-know basis?

A.   Yes.

Q.   And his girlfriends certainly didn't know about all of his criminal activities all of the time, did they?

MR. WILLIAMS:  Objection, Your Honor.  Calling for speculation.

THE COURT:  Overruled.  He can answer if he knows.

A.   I don't think so.

Q.   And Dustin sort of preferred it that way, didn't he, that he was the decision maker and he sort of controlled what was going on?

A.   Yes.

Q.   Just one final thought in regards back to this issue of Christi Cole's house.  At an earlier time than 1994, did you have access to a key to Miss Cole's house?

A.   Not that I recall.

Q.   Well, here's my confusion.  Didn't you enjoy a dating relationship with Miss Cole for a certain period of time?

Page 178

A.     Yes.

Q.     And when was that, sir?

A.     In the early part of summer of '93.

Q.     Okay.  Did that dating relationship progress to where you were given a key to her home?

A.     I don't recall if I ever had a key to her home.

MR. WILLETT:  Thank you.  Thank you, Judge.

976

THE COURT:  Mr. Williams?

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q.     Mr. Cutkomp, I have just a few follow-up questions.  Do you recall you were questioned about the melting down of that gun that Dustin Honken brought to you?

A.     Yes.

Q.     Okay.  And what happened to the pieces of that gun and the galvanized piece of steel after that was melted down, sir?

A.     We threw them in a ditch south of Britt.

Q.     You were asked some questions about your knowledge of Dustin Honken's -- well, let me back up.

At some point do you recall you were questioned about your motivations for cooperating with the government?

A.     Yes.

Q.     And the question was posed to you that you cooperated in 1996 to help yourself get out of trouble, and I think you said yes to that.

A.     Yes.

Q.     And was there any other reasons why in 1996 you decided to go to the authorities?

A.     I didn't want anybody else to get killed.

Page 179

Q. You were asked a number of questions during cross-examination about why you did this and why you did that. You know, for example, you were asked why did you melt down the

977

gun.

A. Yes.

Q. And I think you indicated -- your response was because he asked you to, he was your friend.

A. Yes.

Q. Did you make choices yourself, sir, to do acts that were asked of you by Dustin Honken?

A. Yes, I did.

Q. And were there times when you refused to act --

A. Yes.

Q. -- when he requested you to?

A. Yes, I did.

Q. For example, on direct examination I think you testified he asked you to lie and claim that Greg Nicholson gave you the tape.

A. Yes.

Q. And did you go along with that?

A. No, I did not.

Q. Would you have participated in the murders of anybody --

A. No.

Q. -- had he requested you to do so?

A. No.

Q. And then finally you were asked questions about Dustin Honken's violence. Until Dustin Honken hooked up with Angela Johnson in 1993, were you aware of Dustin Honken engaging in any

978

Page 180

violence against any other person?

A.    No.

MR. WILLIAMS:  No further questions.

THE COURT:  Any recross, Mr. Willett?

MR. WILLETT:  Briefly, Your Honor.

RECROSS-EXAMINATION

BY MR. WILLETT:

Q.    Mr. Cutkomp, there were some choices you did make in behalf of your best friend; correct?

A.    Yes.

Q.    You manufactured an illegal substance?

A.    Yes.

Q.    You destroyed evidence?

A.    Yes.

Q.    You scouted out a building in Bondurant for the purpose of destroying evidence.

A.    Yes.

Q.    You destroyed lab evidence as well as a weapon; correct?

A.    Yes.

Q.    And you kept to yourself discussions that Dustin Honken had with you about hypotheticals that made you suspect him of being involved in violent acts.

A.    Yes.

MR. WILLETT:  Thank you, Judge.

THE COURT:  Anything further?

979

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Okay.  You may step down.

Who's your next witness, and how short is it?
Page 181

MR. WILLIAMS: The next witness, Your Honor, is Special Agent Lori Lewis. We're not going to finish in 15 minutes, but she's here, and she will stay here for tomorrow. If you want to get started with her, we can get her testimony started today, or we can continue till tomorrow.

THE COURT: Let's see a raise of hands. How many want to go home? Well, not that many actually. Oh, well. I think some of you are just shy today. I think we'll just start tomorrow, but I've been curious. Juror 55, without asking what happened, did you make it to the meeting on time?

JUROR NUMBER 55: Just.

THE COURT: Just, okay. Well, I'm glad that you did. That will conclude the evidence for today. Just to let you know, I haven't talked to the lawyers today about it, but we are kind of ahead of schedule. We're a little bit ahead of where we thought we would be, so the trial is progressing rather well at this point. And we will see you tomorrow at 8:30. Please remember my cautionary instruction. Oh, thanks. Yeah, why don't you just pass them all down, and Carey will collect the transcripts. Thank you. And we'll see you all tomorrow at 8:30. Thank you very much.

(The jury exited the courtroom.)

980

THE COURT: Please be seated. Anything else we need to take up? Anything we anticipate tomorrow?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. WILLETT: Not on behalf of the defense, Judge.

THE COURT: What's your best estimate about when Robert McNeese will be testifying?

Page 182

MR. WILLIAMS: I think there is an outside chance we could get him on the stand late tomorrow. More likely it's going to be Thursday morning.

THE COURT: Okay.

MR. WILLIAMS: He will be here prepared to go on the stand tomorrow.

THE COURT: And are you making any progress on the sentencing issue that we talked about yesterday in the post-Booker world?

MR. WILLIAMS: I have not had a -- I communicated with the capital crimes unit who is working on a response to me on what my marching orders are, what their position is. I'm hoping -- I have not had a chance to check my e-mail today or telephone, but hopefully I've gotten some feedback. I will have something to you, Your Honor, certainly by Thursday on it and hopefully sooner than that if things go well.

THE COURT: Mr. Stowers? Mr. Willett pointed towards you so . . .

981

MR. STOWERS: He did, didn't he?

THE COURT: Yeah.

MR. STOWERS: They're going to have something to us on Thursday, so then we'll have something to you first part of next week.

THE COURT: Okay. Well, and you might want to address -- I mean, it's interesting that Mr. Berrigan raised an estoppel argument. It seems to me the only estoppel would be if I were to continue with the proposed penalty phase instructions informing the jury that the only two possibilities are life imprisonment and the death penalty, that if the jury would give

Page 183

the defendant life imprisonment then the defense would be estopped from asserting anything else in the sentencing. I think that's the way the estoppel argument would work if it applies at all.

But, you know, I don't agree with Mr. Berrigan that I'm estopped from making the change in the instructions. It seems to me if you knew about the issue and you didn't raise it, then maybe you're estopped from it, not the Court, but that's a whole 'nother matter. But it casts estoppel in a little bit different trajectory than what the defense had suggested. So I just want to give you a heads-up that you can address that as well. Okay?

MR. WILLIAMS: Very good, Your Honor.

MR. STOWERS: Thank you.

982

THE COURT: Thank you. See you tomorrow morning. Why don't we meet at 8:15 just to see if anything arises; okay?

MR. WILLIAMS: Certainly.

THE COURT: Thank you very much.

MR. WILLETT: Thank you, Judge.

(The foregoing trial was
adjourned at 4:17 p.m.)

Page 184

VOLUME 4, 5-10-05

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

                                                    8-27-05
        Shelly Semmler, RMR, CRR                      Date

                                                         983

INDEX

WITNESS:                                              PAGE:

JOHN GRAHAM
        MR. WILLIAMS                                   773
        MR. WILLETT                                    811
        MR. WILLIAMS                                   823

TIMOTHY CUTKOMP
        MR. WILLIAMS                                   826
        MR. WILLETT                                    939
        MR. WILLIAMS                                   976
        MR. WILLETT                                    978

                          *****

EXHIBITS:

94                                                     782
70                                                     784
71                                                     786
73                                                     787
74                                                     788
79                                                     789
80                                                     790
302                                                    807
303 and 304                                            809
40                                                     881
48                                                     884
203                                                    921

                          *****

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 864 of 3592

984

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,               No. CR01-3046

      Plaintiff,                    Sioux City, Iowa
                                        May 11, 2005
  vs.                                   8:29 a.m.

ANGELA JANE JOHNSON,                    VOLUME 5 of 24

      Defendant.
                              /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

985

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | C. J. WILLIAMS, ESQ.<br>Assistant United States Attorney<br>Suite 400 - Hach Building<br>401 First Street Southeast<br>Cedar Rapids, IA  52401 |
| | THOMAS HENRY MILLER, ESQ.<br>Iowa Attorney General's Office<br>Area Prosecutions Division<br>Hoover State Office Building<br>Des Moines, IA  50319 |
| For the Defendant: | PATRICK J. BERRIGAN, ESQ.<br>Watson & Dameron<br>2500 Holmes<br>Kansas City, MO  64108 |
| | DEAN STOWERS, ESQ.<br>Rosenberg, Stowers & Morse<br>1010 Insurance Exchange Building<br>505 Fifth Avenue<br>Des Moines, IA  50309 |
| | ALFRED E. WILLETT, ESQ.<br>Terpstra, Epping & Willett<br>Higley Building - Suite 500<br>118 Third Avenue Southeast<br>Cedar Rapids, IA  52401 |
| Also present: | Bill Basler |

Page 1

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 865 of 3592

VOLUME 5, 5-11-05
Court Reporter:            Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

986

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: You have your next witness ready to go?

MR. WILLIAMS: Right here.

THE COURT: Okay. Thank you.

(The jury entered the courtroom.)

THE COURT: Morning. Please be seated. Members of the jury, I do have the trial schedule for you, and I know some of you have been asking for it. I've actually had it done for a while. I just haven't copied it and passed it out. But I'll pass it out before you take your break at noon.

Are you ready to call your next witness?

MR. WILLIAMS: We are, Your Honor.

THE COURT: Okay.

MR. WILLIAMS: The United States calls Lori Lewis.

THE COURT: Thank you.

LORI LEWIS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Make yourself comfortable. Please adjust the chair and the microphones so you can speak directly into the microphones. And when you're ready, would you state your full name and spell your last name, please.

THE WITNESS: Lori middle initial A. Lewis, L-e-w-i-s.

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 866 of 3592

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Lewis, could you share with the jury what you do for a living, ma'am?

A. I'm a special agent with the Iowa Division of Narcotics Enforcement.

Q. Why don't we start with a little bit of your background then. How far did you go through formal education?

A. I have a bachelor's degree.

Q. And from what institution?

A. The University of Northern Iowa.

Q. After you obtained your bachelor's degree, what did you do with your career?

A. I worked in the private sector for approximately a year and a half, then applied for and was accepted to the DPS academy and was hired as a special agent.

Q. DPS stands for?

A. The Department of Public Safety.

Q. Did you complete the academy training?

A. Yes, I did.

Q. After you completed the academy training, where did your career take you after that?

988

A. I was initially assigned to the Division of Criminal Investigation assigned to narcotics. I was assigned initially to the Mason City office and have resided there since.

Page 3

Q.   At some point did the Division of Criminal Investigation, the DCI, split off into a subsection or another section, if you will, the Division of Narcotics Enforcement?

A.   Yes, in 1987.

Q.   And are you currently then a member of the Division of Narcotics Enforcement?

A.   Yes.

Q.   All of which is part of the Iowa Department of Public Safety?

A.   Correct.

Q.   Have you continued to maintain your resident office in Mason City, Iowa?

A.   Yes, I have.

Q.   And do you have a partner up there?

A.   Yes.

Q.   And who is that?

A.   John Graham.

Q.   Could you explain just generally what your duties are as a special agent with the Iowa Division of Narcotics Enforcement?

A.   I conduct both covert and overt investigations relating to drug crimes.

Q.   And what do you mean by covert and overt?

989

A.   The covert would be managing CIs, actually doing hand-to-hand buys with individuals involved in the trafficking of controlled substances.

Q.   Overt would mean what?

A.   The conspiracy-type investigation as far as identifying other people that are involved in a whole network-type investigation.

Page 4

Q. Have you received specialized training in the areas of methamphetamine manufacturing and trafficking?

A. Yes.

Q. And in particular have you received training and education in the different techniques of manufacturing methamphetamine?

A. Yes.

Q. Are there numerous ways of manufacturing methamphetamine?

A. Yes.

Q. And is there a difference in the level of sophistication between laboratories, clandestine laboratories, manufacturing methamphetamine?

A. Absolutely.

Q. Not only in your training but in your actual experience, have you been involved in the seizures and searches of locations containing clandestine laboratories?

A. Yes.

Q. And as a result of that, have you become familiar with some of the tools and equipment and devices used to manufacture

990

methamphetamine under a variety of different methodologies?

A. Yes, I have.

Q. At some point did you become involved in the investigation of methamphetamine manufacturing and trafficking involving Dustin Honken and others?

A. Yes, I did.

Q. Could you explain to the jury how and why did you get involved?

A. I was aware of the investigation as far as the manufacturing case was going. I didn't actually become involved until May of 1996.

Page 5

Q. Now, in April of 1996, Dustin Honken and Tim Cutkomp were indicted by a federal grand jury on federal drug charges?

A. That's correct.

Q. And it's after that that you got involved.

A. Yes.

Q. Why did you get involved after the indictment?

A. I had been contacted by a member of the U.S. Attorney's Office indicating that they were putting together what's referred to as a taint team to continue the investigation into Dustin Honken and some other activities that had been uncovered, and so I became part of that taint team investigation.

Q. And what was your understanding of the purpose of the taint team?

A. It was actually twofold. As I understood it, there were

991

threats that were being made against some of the witnesses involved in the initial investigation concerning the laboratory. And also there was a concern that because of how we were going to attempt to conduct the investigation there may be opportunities that some information concerning Honken's case would be divulged to us, and we needed to protect -- I guess protect his rights as far as not letting the initial prosecution team have access to that information.

Q. And so as a result of this taint team process, was the original prosecution and investigation team basically taken out of the investigation for a period of time?

A. Yes. We had access to their information, but they didn't have access to ours.

Q. As a result of your involvement then, did you have other agents you worked with as part of this investigation as -- on

Page 6

the taint team?

A.    Yes.

Q.    And did you have actually even a separate prosecutor that you worked with separate from the original prosecutor involved in the prosecution of Tim Cutkomp and Dustin Honken?

A.    Yes, we did.

Q.    Could you describe then what was your role and the role of the taint team with regard to the undercover tapes that were made by Tim Cutkomp?

A.    We were attempting to verify the information that Dustin

992

Honken was attempting to eliminate witnesses and evidence in his manufacturing case.

Q.    And so it was the taint team who actually worked with Tim Cutkomp on these undercover tapes?

A.    That's correct.

Q.    As part of your investigation as a member of this taint team, did it also involve questioning Mr. Cutkomp further concerning his knowledge of the activities involved in the organization?

A.    Yes.

Q.    Without discussing what he told you as a result of that conversation with him, did he produce a drawing for you of a firearm?

A.    Yes, he did.

Q.    I'll show you what's already been admitted into evidence as Exhibit 40 and ask if you can identify that.

A.    That is the drawing that Tim Cutkomp made of the firearm that he indicated Honken had been in possession of.

Q.    And again, without relating what Mr. Cutkomp told you as a

Page 7

result of discussing the firearm with him, did you undertake any activities in relation to that firearm after that debriefing?

A.    Yes, I attempted to locate the firearm.

Q.    Where did you go to attempt to locate the firearm?

A.    There's a county blacktop that runs south of Britt called B40, and with the information that we had received, we searched

993

a mile section of that road in an attempt to locate the gun.

Q.    Explain to the jury what was the effort that you undertook to search that mile section of road.

A.    We had a team -- over several days we had a team of investigators, and we had also obtained metal detectors from the National Guard counter drug unit, and we had utilized those metal detectors to try and locate any metal in the ditch.  And we only searched the south side of the ditch because that was the information that we had received.

Q.    And you said you conducted this over a couple-day period?

A.    It was multiple days.  It actually probably was over a two-week period.

Q.    Did you have any success in finding anything that you tied to this investigation?

A.    Yes.

Q.    And what was that?

A.    We found a piece of metal that was approximately 20 by 18 that was similar to the information that we had received.  We had been told that the gun had been melted down on a piece of metal and then the remaining parts had been pitched into the ditch as well as the piece of metal, and I felt that the piece of metal we located was consistent with the information we had received.

Page 8

Q. Handing you what's already been admitted into evidence as Exhibit 48, can you identify that, please?

A. It is the piece of metal that we located in the ditch.

Q. And if you could explain -- at some point the jury will have this -- there's some writing on this piece of metal. Can you explain what that writing is, please?

A. Well, in what is the lower right-hand corner to me, it is my case number for this particular investigation, my initials, and the date that I located the piece of metal. And then there are circles with initials on it, and that was placed on there by the laboratory as they removed the melted pieces of metal as I understand it.

Q. You anticipated my next question. When you found this piece of metal, Exhibit 48, was it -- did it have anything on it that is not on that piece of metal at this time?

A. There were what appeared to be droplets of melted metal.

Q. After you found Exhibit 48, what did you do with it?

A. I first showed it to Tim Cutkomp to see if my recollection of the information was accurate.

Q. And after you showed it to him, did you submit that piece of metal or anything on it to any location?

A. I submitted it to the DCI laboratory in Des Moines.

Q. What purpose?

A. To attempt to identify the melted metal that was on the piece.

Q. Were tests performed on that -- on the pieces of metal, on the melted pieces of metal on that galvanized steel?

A. Yes.

Q. And was a report produced pursuant to your request reflecting the findings made by the analyst conducting the test?

A. Yes, there was.

Q. Miss Lewis, I've handed you what's been marked as Government Exhibit 49. Can you identify that, please?

A. It is a laboratory report prepared by Dennis Chapman from the DCI criminalistics laboratory.

Q. And is that a report reflecting findings regarding the melted piece of metal on the galvanized steel marked as Government's Exhibit 48?

A. Yes.

            MR. WILLIAMS: United States moves to admit Exhibit 49 into evidence, Your Honor.

                        *   *   *   *

            (Government Exhibit 49 was offered.)

                        *   *   *   *

            MR. STOWERS: No objection.

            THE COURT: Any objection?

            MR. STOWERS: None.

            THE COURT: Okay. Forty-nine is received.

                        *   *   *   *

            (Government Exhibit 49 was admitted.)

                        *   *   *   *

            MR. WILLIAMS: Permission to publish, Your Honor?

                                                        996

            THE COURT: You may.

BY MR. WILLIAMS:

Q. On the screen, Miss Lewis, is Exhibit 49. Do you see that?

A. Yes.

Page 10

Q.   I'm going to highlight a portion of this or enlarge a portion of it, but, first of all, what was the date on this lab report?

A.   July 29, 1996.

Q.   And looking at that piece of metal you said had your initials on it, when did you actually find that in the ditch?

A.   June 20, 1996.

Q.   I've highlighted a portion of that exhibit, and could you relate to the jury what was the findings by the analyst at the DCI lab?

A.   It says Exhibit A was found to contain a piece of galvanized steel with small melted beads of metal.  Examination of the beads found them to be made of iron.  Origin of the melted metal could not be determined.

Q.   Miss Lewis, in addition to conducting the search of the ditch for the piece of metal and the pieces of melted gun, did you ever find any pieces of melted steel or metal or iron or whatever it is that you felt was the melted weapon in the case?

A.   No, I did not.

Q.   After searching -- or in addition to searching that ditch for the weapon and the galvanized steel, did you conduct any

997

other search as part of your investigation as a member of the taint team?

A.   We conducted multiple searches, yes.

Q.   I want to direct your attention to June 11 of 1996 and ask you if on that occasion did you search a house belonging to Angela Johnson located in Clear Lake, Iowa.

A.   Yes, we did.

Q.   As with any other search conducted by law enforcement

Page 11

officers, is it typical for the officers to take photographs during the search of the items found during the search?

A.    Yes, it is.

Q.    And did that happen in this case?

A.    Yes.

Q.    Ma'am, I've handed you a number of photographs and another piece of paper there that are marked Government's Exhibits 76A through N.  Can you identify A through M first, please.

A.    These are the photographs that were taken at the search of the Johnson residence.

Q.    And do they truly reflect what was seen on the day of the search, June 11, 1996, of the Johnson residence?

A.    Yes, they do.

        MR. WILLIAMS:  United States would move to admit Exhibit 76A through M.

                    *   *   *   *

        (Government Exhibits 76A through 76M were offered.)

                                                    998

                    *   *   *   *

        MR. STOWERS:  We would object under Rule 402, 403, and 404 for the reasons previously urged in our motion that we filed with the Court.  And we'd just ask to have a continuing objection to this line of testimony.

        THE COURT:  You may.  The objection's overruled. Exhibit 76A through N (sic) are admitted, and you may have a continuing objection.

                    *   *   *   *

        (Government Exhibits 76A through 76N were admitted.)

                    *   *   *   *

BY MR. WILLIAMS:

Page 12

Q. And if you would now turn your attention to 76N, is that in front of you as well?

A. Yes.

Q. Can you describe for the jury what that is?

A. It is a floor plan of the main floor of the Johnson residence.

Q. And based on your knowledge of the investigation, is that the same house that Angela Johnson lived in in 1993 when Greg Nicholson and the Duncan family disappeared?

A. Yes.

Q. Is that a fair and accurate floor plan of the Johnson residence located in Clear Lake, Iowa?

A. Yes, it is.

999

Q. Is that absolutely to scale, or is that an approximate drawing of the relative sizes of the rooms and so forth?

A. No, it's an approximation.

Q. But fairly represents the floor plan.

A. Yes.

MR. WILLIAMS: United States moves to admit Exhibit 76N as in Navy.

* * * *

(Government Exhibit 76N was offered.)

* * * *

MR. STOWERS: Same objection.

THE COURT: I thought Exhibit -- I thought I admitted A through N.

MR. WILLIAMS: I think --

THE COURT: Is this M?

MR. WILLIAMS: No, this is N as in Navy. It was 76A

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 877 of 3592

through M as in Mary.

THE COURT: Oh, I'm sorry. I gotcha. Same objection, same ruling. 76N is admitted.

                        *  *  *  *

        (Government Exhibit 76N was admitted.)

                        *  *  *  *

        MR. WILLIAMS: Permission to publish, Your Honor.

        THE COURT: You may.

BY MR. WILLIAMS:

1000

Q.    Let me just start with 76N there. You indicated this is the main floor of the Johnson residence in Clear Lake, Iowa.

A.    Correct.

Q.    Describe the house for the jury. Is this a two-story, one-story?

A.    It's a one-story with a basement.

Q.    And during the search did you search both inside the first floor and the basement and the outside of the building?

A.    Yes, we did.

Q.    I'm showing what's been marked as Government's Exhibit 76A. Can you describe for the jury what they see in that photograph.

A.    It is a glass bottle of liquid that's marked acetic acid.

Q.    Where was this found?

A.    Along the outside north wall of the shed that was in the backyard of the residence.

Q.    And just so it's easier for the jury to see, I'm going to shift the direction of the photograph. Once you found that bottle, did it contain anything in it?

A.    It did contain a liquid.

Q.    And approximately what -- it's hard to tell with this

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 878 of 3592

photograph. Approximately what was the size of the bottle?

A. I believe it was about 12 inches in heighth and maybe 9 to 10 inches in diameter.

Q. And once you discovered that and seized it as part of this search, did you ultimately submit that anywhere for analysis?

1001

A. Yes, it was submitted to the DCI criminalistics laboratory.

Q. I've handed you Exhibit 77, and can you identify that for the jury, please?

A. Yes, it is the laboratory report that refers to the submission of this item.

Q. And that was submitted for analysis to the DCI laboratory, and then this is just a report that reflects the ultimate analysis by the lab.

A. Correct.

Q. During the search did you also find a box for some type of specialized glassware?

A. Yes.

Q. On the screen we have Exhibit 76B. And first of all, could you point out in using that -- whatever you want to call it -- pen there, can you mark on the screen and point out where in that photograph 76B the box for the glassware is located.

A. It would be here.

Q. Were there other things -- what is that -- what is that item on the lower left-hand side of that photograph there if you know?

A. The item here?

Q. Yes.

A. That is a two-burner hot plate.

Q. And can hot plates be used in the manufacturing of

Page 15

methamphetamine?

1002

A.    Yes, they can be.

Q.    Showing you Exhibit 76C, can you explain to the jury what they're seeing in that photograph.

A.    That is the inside of the box that was referred to in 76B.

Q.    And 76E, can you explain to the jury what that is?

A.    That is the shipping box that related to the item in 76B.

Q.    So this is a larger box that the smaller box came in?

A.    Correct.

Q.    I've handed you Exhibit 50, five zero.  Can you identify that for the jury, please?

A.    This is the item that's referred to in Exhibit 76B.  It is a cardboard box for a distillation column.

      MR. WILLIAMS:  United States moves to admit Exhibit 50 into evidence, Your Honor.

                    *   *   *   *

      (Government Exhibit 50 was offered.)

                    *   *   *   *

      MR. STOWERS:  Same objection.

      THE COURT:  Same ruling.  Fifty is admitted.

                    *   *   *   *

      (Government Exhibit 50 was admitted.)

                    *   *   *   *

BY MR. WILLIAMS:

Q.    First of all, is there a label on that box?

A.    Yes, there is.

1003

Page 16

Q.   And the label refers -- does it indicate what company that item came from?

A.   Yes.

Q.   And what company is listed there?

A.   It says Ace Glass Incorporated.

Q.   Showing you what's already been admitted into evidence as Exhibit 73, is that the same company reflected on the catalog marked as Exhibit 73?

A.   Yes, it is.

Q.   I have now put on the display here the box, and is that the label that is on the outside of this box?

A.   Yes, it is.

Q.   And it has Ace Glass Incorporated as the name.

A.   Correct.

Q.   And there's a date right above that.  What is the date on that?

A.   May 6 of 1993.

Q.   Handing you back Exhibit 50, can you open up that box, please?

A.   (Witness complied.)

Q.   Are there some items inside that box?

A.   Yes.

Q.   And are those items in the same condition as when you seized this box in June of 1996?

A.   They appear to be, yes.

1004

Q.   And other than the padding, if you will, the white padding there, was there anything else that was in that box as well?

A.   There is a -- it appears to be a rubber gasket and a glass fitting for an additional tube.

Page 17

Q.  Is there anything else inside that box?

A.  The thermometer.

Q.  And could you pull that out and show that to the jury?

A.  (Witness complied.)

Q.  Is that a thermometer based on your understanding that would be used for telling the temperature outside?

A.  Not -- it's not one I'm familiar with.

Q.  Certainly wouldn't be used to tell the temperature of a child's fever?

A.  No.

Q.  In your training and experience, where have you seen thermometers like that used, ma'am?

A.  In clandestine laboratories.

Q.  For the manufacturing of methamphetamine?

A.  Correct.

Q.  While conducting the search in Angela Johnson's residence in June of 1996, did you find any property belonging to or appearing to belong to Dustin Honken?

A.  Yes, we did.

Q.  Showing you Exhibit 76H, what is that?

A.  It is a work-type shirt with the name Dustin embroidered on

1005

it.

Q.  Where did you find, incidentally, the items that we've talked about so far, the box for the distillation column, the hot plates, the thermometer, and that kind of thing?

A.  Those were all found in the shed in the backyard of the residence.

Q.  Showing you 76J, can you explain what the jury's looking at in this photograph, please.

Page 18

A. It's a -- it's a metal -- I referred to it as a pressure tank.

Q. Is there anything attached to the pressure tank?

A. There was tubing that was attached to the outside.

Q. And based on your training and experience in the area of narcotics enforcement, what, if any, significance did the tubing attached to this pressure tank have for you?

A. It made me think that it had been used in the capacity of what we call a generator.

Q. And what is a generator?

A. It's a piece of equipment. It could be something as easy as a pop bottle or a plastic container of some sort. It could be as sophisticated as something like this that allows the chemicals used in the manufacturing of meth to cook, so to speak.

Q. As part of the investigation on behalf of the taint team, at some point were you involved at all in the subpoenaing of

1006

Angela Johnson to appear before the grand jury in 1996?

A. Yes.

Q. And what was the purpose of bringing Angela Johnson in on that particular date?

A. We wanted to obviously ask her questions, but we also wanted to obtain handwriting exemplars.

Q. I've handed you Exhibit 117. Can you identify that for the jury, please?

A. That is the transcript of the testimony given by Angela Johnson on July 23, 1996.

Q. And that has already been admitted into evidence, ma'am. The transcript, is that a fairly short transcript?

Page 19

A. Yes, it is.

Q. And during that questioning on July 23, 1996, did Angela Johnson indicate where she was living at that time?

A. She indicated she was living at 3257 86th Street, Apartment 710.

Q. In what town?

A. Urbandale, Iowa.

Q. And Urbandale is -- is that a suburb of some larger city?

A. That's a suburb of Des Moines.

Q. And during the grand jury, did she produce her driver's license?

A. Yes.

Q. What was the purpose of having her produce her driver's

1007

license?

A. That was a -- an example of a known handwriting sample that was suggested by the analyst in Des Moines that we obtain for the exemplars.

Q. Is that basically the signature on the license?

A. Correct.

Q. Now, as part of this ongoing investigation you conducted as a member of the taint team, did you have concerns that while on pretrial release Dustin Honken either had or was attempting to obtain firearms?

A. Yes.

Q. As a result of that information, did you interview any individuals concerning their knowledge about his attempt to acquire firearms?

A. We interviewed several individuals regarding that.

Q. And among those, was a person by the name of Rick Held

Page 20

interviewed?

A.    Yes.

Q.    And as a result of interviewing him, at some point did Mr. Held lead agents to the location of a firearm?

A.    Yes, he did.

        MR. WILLIAMS:  I have no further questions, Your Honor.

        THE COURT:  Mr. Stowers?

                        CROSS-EXAMINATION

1008

BY MR. STOWERS:

Q.    See if I can speak up here so everybody can hear me today.

        Agent Lewis, you indicated in the beginning of your testimony that you were a special agent with the DNE?

A.    Yes.

Q.    Are there different classifications of agents within the DNE?

A.    There are now, yes.

Q.    Okay.  And what are the different classifications?

A.    We have what's referred to as a special agent 1 and a special agent 2.

Q.    And those are basically pay grades, is that right, if you will?

A.    If you will, yes.

Q.    And does the fact that your title, if you will, and your position is special agent mean anything, or is that what all agents are with the DNE?  They're all special agents, just either special agent 1 or 2?

A.    All of the agents within the Division of Narcotics Enforcement are special agent 2s.

Page 21

Q. Okay. So you don't want this jury to get the impression that because your position identifies you as a special agent that that means anything other than you work for the DNE in the capacity of an investigator working on drug cases.

A. That's the title that we carry, correct.

1009

Q. What was your bachelor's in, ma'am?

A. Political science.

Q. And you said you worked in the private sector for about a year?

A. Approximately a year and a half.

Q. What was your line of work?

A. I worked for the university book store related to Drake University in Des Moines.

Q. What did you do there?

A. I was the department manager for the textbook department.

Q. And you decided that you wanted to get into law enforcement.

A. It had been a goal for some time, yes.

Q. And that's what you pursued after you obtained your political science degree and after you worked at the book store.

A. Correct.

Q. So your educational background really doesn't have anything to do with law enforcement in particular; is that correct?

A. As far as my bachelor's degree, I did take some law-related classes, but I have training post-academy. I'm not clear.

Q. Right. I was just going back to your credentials that you laid out for the jury. You have a political science degree.

A. Correct.

Q. Which is not anything to do really with law enforcement.

Page 22

Would you agree with that?

A.   That's true.

Q.   Now, when did you start work in law enforcement?

A.   I graduated from the academy in 1985.

Q.   Okay.  And is that when you first went to work for what was then the DCI?

A.   Yes.

Q.   Okay.  And it was in 1987 that the DCI split with the DNE.

A.   Correct.

Q.   Now, you indicated that you started work on this case with regard to Mr. Honken -- I believe your testimony was in May of 1996.

A.   That's correct.

Q.   All right.  And prior to that time your partner, Mr. Graham, had been involved; is that right?

A.   That's correct.

Q.   Now, when you say partner, I think of -- what's that old show that was on TV where they drive around in a squad car together?

A.   Hill Street Blues?

Q.   Okay.  That one.  Is that what you mean when you say you're partners with Mr. Graham?

A.   I suppose.  I mean, we oftentimes worked cases collectively.

Q.   And were you not working on the Dustin Honken case prior to May of 1996?

A.   No, I had not.

Page 23

Q.    But he was.

A.    Correct.

Q.    And then -- and did you share an office?

A.    Yes.

Q.    In the same building?

A.    Yes.

Q.    Adjacent to each other?

A.    It's in the -- we have one office that we share collectively.  There's two desks.

Q.    And you described something that you called a taint team which was designed to avoid some kind of a relaying of information back to Mr. Graham?

A.    Correct, to anyone on that side of the wall, so to speak.

Q.    But you shared an office.  You worked together on a daily basis.  You were partners.  And you were on a taint team separated from him; is that correct?

        MR. WILLIAMS:  Objection, Your Honor.  Compound question.

        THE COURT:  Sustained.

BY MR. STOWERS:

Q.    Okay.  You shared an office.

A.    Correct.

Q.    And you worked together on a daily basis; is that correct?

A.    No, that's not necessarily correct.

1012


Q.    You worked together routinely.

A.    If there was a case that required both of us to work on it, we worked on it.

Q.    Okay.  So when you say partners, you didn't work on cases together necessarily; is that correct?

Page 24

A.    Not every day, no.

Q.    Okay.  Occasionally you would work on cases together?

A.    Sure.

Q.    Sometimes you would work on separate cases.

A.    Absolutely.

Q.    Were there other agents in this office with the DNE?

A.    Not with the DNE.

Q.    Just the two of you.

A.    Correct.

Q.    So you were the whole office for Mason City.

A.    Yes.

Q.    And Mr. Graham was not allowed to see what you were doing on the case after you became a part of this one-person taint team; is that correct?

A.    Well, the taint team encompassed more than just me, but that's true.  He was not privy to the information that we were obtaining.

Q.    Now, I think you started to talk about a June -- and my notes show it was -- June 11, 1996, was the date that you searched this home in Clear Lake?

1013

A.    Yes.

Q.    Or was it Mason City?

A.    The residence is in Clear Lake.

Q.    What was the street address?  I'm not sure that I got that.

A.    Number 5 19th Street South.

Q.    Clear Lake.

A.    Clear Lake.

Q.    And prior to June 11, you had worked on this case for, I take it, what?  Several weeks, a month?

Page 25

A.   Approximately a month.

Q.   Were you aware during that month period of time that Angela Johnson was then residing in Urbandale, Iowa?

A.   We had learned that during the course of the investigation.

Q.   So she was not residing at 5 South 19th Street in Clear Lake on June 11, 1996, when you did this search.

A.   That's correct.

Q.   And yet you called that her home.

A.   That was the residence that she still had dominion and control of.

Q.   Can you identify a date prior to June 11, 1996, when you would have observed her at that location?

A.   I personally never observed her at that residence.

Q.   Now, was there any observation that you made of her there at that location on the 11th of June, 1996, during the time of the search?

1014

A.   No.

Q.   Did you leave paperwork at that residence at the time you completed the search?

A.   I did not leave it at the residence.  I sent it certified to her.

Q.   Where did you send it?

A.   To the address in Urbandale.

Q.   Okay.  So you knew fully then on the 11th of June, 1996, that she was, in fact, living in Urbandale, and you had a good address for her, and you sent her a certified letter.

A.   Correct.

Q.   Now, all the items that were seized from the Angela Johnson residence as you've now called it, 5 South 19th Street, were

Page 26

found in a shed; is that correct?

A.    Not all of the items, no.

Q.    That was something that I was a little unclear on.  What items in the photographs would have been found other than in the shed?  Just identify the photograph numbers if you would.

A.    You want just the items that were not found in the shed?

Q.    Correct.

A.    It would be Exhibit 76I as in Ida, 76J as in John, K as in king, L as in Lincoln, and M as in Mary.

Q.    Now --

A.    I'm sorry.

Q.    I'm sorry.  Go ahead.

1015

A.    And H as in Henry.

Q.    Now, there was a photograph in that series of photographs with what appeared to be a work shirt depicted?

A.    Yes.

Q.    And whose name appears on that work shirt?

A.    Dustin.

Q.    And you're aware Mr. Honken, Dustin Honken, had such a work shirt; is that correct?

A.    Yes.

Q.    Did you perform any surveillance prior to the June 11 search on that location that you searched?

A.    I did not personally, but we did have a vehicle that was surveilling the residence.

Q.    Do you know what the date was that Mr. Honken was rearrested in June of 1996 approximately?

A.    June 11, 1996.

Q.    So that was done at the same time?

Page 27

A. It was done the same day.

Q. And on that date do you know where Mr. Honken was staying?

A. I'm not -- you mean prior to his arrest?

Q. Yeah.

A. He was actually arrested leaving work.

Q. Do you know where he was residing?

A. He was residing with his mother and stepfather in Britt.

Q. Now, many of those photographs depict various items out

1016

sort of in display. Which of those items in the photographs were sort of placed in that position so that they could be photographed? Do you know what I'm saying?

A. I think so.

Q. That were moved before they were photographed I should say.

A. I want to be clear. If I understand it correctly, for instance, the shirt was taken out of the bag that it was located in and spread out.

Q. And then photographed?

A. To be photographed, correct.

Q. Okay. Any other items?

A. The shirt is Exhibit 76H if you need to know that.

Q. Yeah, I was going to ask you to refer to the exhibit numbers for the jury.

A. Exhibit 76G is the suitcase that was located, and that is photographed with the lid unzipped so the contents are open. Exhibit 76C as in Charles is the cardboard box that had the ther -- it's the distillation column box with the thermometer and the gasket. And Exhibit 76F as in Frank is a bag that has pipe fittings and that sort of thing in the bag.

Q. Any other items moved so that they could be better

Page 28

photographed?

A.   The pressure tank was pulled out from underneath the landing and photographed.

Q.   Which item is that?

1017

A.   I'm sorry.   There's multiple photographs of that, but 76J as in John.

Q.   Any other items?

A.   The shipping box in Exhibit 76E as in Edward.

Q.   Now, other than this search, were you involved in another search if I understood it correctly involving Mr. Rick Held?

A.   I was not actually at his search site.

Q.   This gun that we've talked about that you have this very tiny sketch of that Mr. Cutkomp made a drawing of, I wanted to talk to you about that for a minute.   You were looking for parts of that gun; is that correct?

A.   Yes.   We had been told that the gun had been melted into pieces using some kind of a metal plate as the base where they were torching the gun, and so we were looking both for a piece of metal and for melted parts of a gun.

Q.   And you weren't able to find any pieces of the gun, but you were able to find that plate.

A.   Correct.

Q.   Was Mr. Cutkomp with you folks when you were out there looking in that area?

A.   No, he was not present.

Q.   Now, as a law enforcement agent working in the drug area, you have a lot of different techniques that you can use in conducting an investigation; is that correct?

A.   That's true.

Page 29

Q. You can do visual surveillance of locations; right?

A. True.

Q. You can follow people by tailing them; right?

A. True.

Q. You did some of that, didn't you?

A. We did in this case, yes.

Q. You did it personally.

A. I'm not certain what you're referring to.

Q. Did you ever follow Angela Johnson?

A. I did not personally follow her, no.

Q. You're aware that happened.

A. Yes.

Q. And you can do --

A. I'm sorry. In a later part of the investigation, that is true.

Q. And you can do audio surveillance of people, right, listening in on conversations from remote locations?

A. Yes.

Q. You can tap their phones.

A. With a search warrant, that's true.

Q. With authority from a court.

A. Correct.

Q. You can listen in on phone calls they might have over jail telephones.

A. Yes.

Q. You can pay people to be informants.

Page 30

A. Certainly.

Q. And you can give informants devices whereby they can record conversations with suspects.

A. That's true.

Q. And those conversations can be recorded by the suspect when they're out -- recorded by your informant when they're out there meeting with somebody all on their own, or it can be transmitted, as we've heard from a prior witness, back to a location where law enforcement is recording it; right?

A. That's possible, yes.

Q. In other words, you could give somebody a little pocket recorder as an informant. They could go out, talk to a suspect, and record them.

A. Correct.

Q. Or it could be done through a remote-type transmitter.

A. Yes.

Q. Okay. And you can subpoena people to come in in front of federal grand juries or, for that matter, state grand juries.

A. That's true.

Q. And compel them to come in; right?

A. Yes.

Q. And if they choose to, they could testify under oath and answer questions posed to them by a prosecutor.

A. That's true.

1020

Q. And if need be and if it became a problem, you could do something called -- through the aid of the prosecutor grant somebody immunity.

A. Yes, that is a possibility.

Q. And that would allow a person then to testify without fear

Page 31

that anything that they might say could be used against them. Isn't that the idea of immunity?

A. As I understand it, you know, it would relate to that specific instance, but yes, that's my working knowledge of it.

Q. And somebody testifying without a grant of immunity might, in fact, be afraid that something they could say could incriminate them; right?

A. That's certainly possible.

Q. And they could either answer the questions and incriminate themselves, right, if they answered them truthfully?

A. It would depend on the circumstances, but I suppose that is possible, yes.

Q. Or they could lie.

A. That's possible.

Q. Or they could simply say, I'm not going to answer those questions; I'm going to remain silent.

A. Correct.

MR. STOWERS: Thank you. That's all I have.

THE COURT: Mr. Williams, any redirect?

MR. WILLIAMS: Moment, Your Honor?

1021

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Lewis, just so we're sure here, when you searched the residence in Clear Lake, Iowa, was anybody living in the residence at that time?

A. No, there was not.

Q. Had anybody moved furniture and stuff, personal belongings out of the house at that time?

A. It appeared to be virtually empty.

Page 32

Q. And when you indicated on cross-examination that the home that you searched still -- that Angela Johnson still had dominion and control over it, those are kind of legal terms. What does that mean?

A. It means that she still was the owner of record and still had access to the property.

MR. WILLIAMS: No further questions.

MR. STOWERS: No further questions.

THE COURT: You may step down.

Members of the jury, you can take a stretch break.

Are you ready to call your next witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls Nila Bremer.

NILA BREMER, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Please adjust the chair and the microphones so you can speak

1022

directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Nila Bremer, B-r-e-m-e-r.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Bremer, can you share with the jury what do you do for a living?

A. I am a criminalist.

Q. And who do you work for?

A. I work for the Iowa Division of Criminal Investigation

Page 33

criminalistics laboratory.

Q.   We've heard from other witnesses that there are a number of different type of forensic work done at the DCI criminalistics laboratory and a number of different types of criminalists. Could you explain to the jury what type of criminalist you are.

A.   I'm a drug identification criminalist that specializes in clandestine laboratory analysis.

Q.   Let's discuss a little bit about your formal education, ma'am.  Did you attend college?

A.   Yes, I did.

Q.   And where at?

A.   Mankato State College.

1023

Q.   And where is that located?

A.   Mankato, Minnesota.

Q.   Did you graduate from college?

A.   Yes, I did.

Q.   And what was your degree?

A.   I have a bachelor of science degree with a major in chemistry.

Q.   When did you graduate from college, ma'am?

A.   1973.

Q.   After you graduated with your bachelor's of science degree, did you obtain an advanced degree in the area of chemistry?

A.   Yes, I did.

Q.   And where was that from?

A.   The University of Wisconsin at Madison.

Q.   And what type of advanced degree was that?

A.   It was a master's degree in chemistry.

Q.   And when did you obtain that degree?

Page 34

A.     1975.

Q.     After your master's degree, could you share with the jury what was the course of your career after that?

A.     I first was employed as a faculty assistant at the University of Wisconsin at Oshkosh where I taught freshman chemistry laboratory.  I subsequently was employed by Appleton Papers Incorporated in Portage, Wisconsin, as a chemical technologist.

1024

Q.     You began that in 1997 -- I'm sorry, 1977?

A.     Yes.

Q.     Okay.  And after you worked for Appleton Papers in Wisconsin -- you did that for about two years; is that correct?

A.     It was less than two years, more than one year.

Q.     And in 1979 where did you go with your career?

A.     In 1979 I began my employment at the DCI laboratory.

Q.     And have you occupied essentially the same position or title anyway as a criminalist since 1979?

A.     Yes, I have.

Q.     Over the course of your career at the Iowa Division of Criminal Investigation criminalistics laboratory, have you worked in different areas other than your current specialty in clandestine laboratories?

A.     Yes, I have done a few fireworks cases and a few toxicology cases.

Q.     How long have you specialized in the area of drug identification?

A.     Twenty-five years.

Q.     And of those 25 years, at what point did you have kind of a subspecialty in the area of clandestine laboratories?

Page 35

A.   Starting about 1990 and then more conspiracies in 1992 and years after that.

Q.   Could you explain to the jury just briefly some of the training and education you received particularly in the area of

clandestine laboratories?

A.   On drug identification I received on-the-job training and also attended the forensic chemists' seminar.  Over the years I've attended meetings and workshops and seminars which have dealt with identification of controlled substances.  As far as the clandestine laboratory training, it included the clandestine laboratory certification school and the clandestine laboratory analysis and synthesis school for drug chemists; also have kept up to date with the literature on this area and have consulted with persons in the field.

Q.   Have you previously testified as an expert in the area of drug identification and clandestine laboratories?

A.   Yes, I have.

Q.   On approximately how many occasions have you done that?

A.   About approximately 135 times.

Q.   And of those how many times would it be that you testified in particular with regard to clandestine laboratories for the manufacturing of methamphetamine?

A.   Approximately 50 times.

Q.   I want to direct your attention to 1996 and ask if in early 1996 were you involved in the analysis of chemicals and equipment and the like seized from Dustin Honken's residence on February 7 of 1996?

A.   No, I did not conduct any analysis from that incident.

Q.   Directing your attention then to September -- I'm sorry,

Page 36

June 25 of 1996, did you conduct some analysis with regard to substances submitted to you by the Iowa Division of Narcotics Enforcement from Mason City?

A.    Yes.

Q.    And as a result of those items coming to you, did you conduct an analysis on those and ultimately produce a report?

A.    Yes, I did.

Q.    Ma'am, I've handed you what's been marked as Government's Exhibit 77, and can you identify that for the jury, please?

A.    Government Exhibit 77 is a copy of the official laboratory report for laboratory case L96-5340, and it bears my signature.

Q.    Was that the report that you authored, ma'am?

A.    Yes.

Q.    And the suspect names listed, is there a place on that report for the names of the suspects involved in the case?

A.    Yes, there is.

        MR. WILLIAMS:   United States moves to admit Exhibit 77, Your Honor.

                        *   *   *   *

        (Government Exhibit 77 was offered.)

                        *   *   *   *

        MR. STOWERS:   No objection.

        THE COURT:   Seventy-seven is received.

                        *   *   *   *

        (Government Exhibit 77 was admitted.)

1027

                        *   *   *   *

        MR. STOWERS:   I'm sorry, except for the continuing
                        Page 37

objection, Your Honor.

THE COURT: That's fine.

BY MR. WILLIAMS:

Q. Ma'am, I've put Exhibit 77 on the screen for the benefit of the jury. First of all, could you indicate to the jury what the suspect names were that were attached to this report?

A. Angela Johnson, Angela J. Johnson, and Dustin L. Honken.

Q. And what's the date of the report?

A. September 12, 1996.

Q. Can you relate to the jury what items were submitted to you for your analysis?

A. I received a Styrofoam cooler that contained a broken glass jar with beige material, test paper, filter paper, two bottles labelled peanut oil, a piece of tubing and dark substance.

Q. Can you explain to the jury what type of analysis did you perform on any substances submitted to you for analysis?

A. On visual examination, I chose to perform analysis on the dark substance and on the beige substance in the jar. On the dark substance I performed a thin layer chromatography procedure and an elemental analysis. On the beige substance I did one chemical color test, thin layer chromatography procedure, elemental analysis, and instrumental analysis using an infrared spectrophotometer. That was Laboratory Exhibit A.

1028

Also -- I may not have answered one of your previous questions correctly. You asked me what I received. And I only indicated what I received in Exhibit A.

Q. Okay. And what else did you receive other than the items you identified in Exhibit A?

A. I also received a bottle of clear liquid and two jugs of

Page 38

clear liquid.

Q. And with regard to bottle of clear liquid, did you, in fact, receive a quart of clear liquid in a bottle that had a label on it?

A. Yes.

Q. And what was the bottle labelled?

A. It was labelled Hunt acetic acid.

Q. And what analysis did you do on that particular bottle?

A. On this labelled bottle I first smelled it, and then taking a known sample of acetic acid at the laboratory, I compared the degree of acidity and the amount of base it took to neutralize it, and that's called titration. I also took a portion of that liquid, evaporated it, and did a thin layer chromatography on whatever residue was there.

Q. As a result of your analysis -- to summarize, you received basically three different exhibits that on your report you labelled as A, B, and C. Is that fair to say?

A. That's correct.

Q. And on A did you find any controlled substances or

1029

precursors of controlled substances in Exhibit A?

A. No, I did not.

Q. And on Exhibit C, did you find any controlled substances or precursors of controlled substances in liquids in Exhibit C?

A. No, I did not.

Q. Exhibit B, is that the exhibit that contained the bottles -- bottle labelled acetic acid?

A. Yes, it is.

Q. And that's the test that you just shared with the jury that you conducted on that particular bottle?

Page 39

A.    That's correct.

Q.    And the purpose of conducting those tests was to do what?

A.    To show that it was consistent with the label.

Q.    So you don't know, for instance, if you get a bottle labelled acetic acid it, in fact, has acetic acid in it.

A.    No, I would not assume that on faith, no.

Q.    And so you indicated when you were telling the jury what you did with that part of the items that were submitted to you the first thing you did was you smelled it.

A.    That's correct.

Q.    Why is that?

A.    Because acetic acid has a very strong, distinct, unique odor.

Q.    Going to your analysis ultimately on Exhibit 77, did you find that, in fact, the bottle labelled acetic acid, in fact,

1030

contained acetic acid?

A.    Yes.  On the basis of my examination, I concluded that it was concentrated acetic acid.

Q.    And in your report labelled Exhibit 77, do you have comments contained on that report in which you explain the significance of any -- if any, of finding a bottle of concentrated acetic acid?

A.    Yes.

Q.    I have enlarged a portion of Exhibit 77 for the jury. Could you read that to the jury, please?

A.    Concentrated acetic acid is a chemical found in most scientific laboratories but would not be found in the average household.  Concentrated acetic acid is used in one of the methods of manufacturing phenylacetone, parentheses, P-2-P, end

Page 40

parentheses.  Acetic acid is also a minor ingredient in other methods of manufacturing methamphetamine, amphetamine, methcathinone, and 4 -- 3,4-methylenedioxyamphetamine, parenthesis, MDA, end parentheses.

Q.   To be sure, Miss Bremer, are you able to determine for sure whether, in fact, this bottle of acetic acid was actually used in any attempt to manufacture a controlled substance?

A.   No.

Q.   Are there legitimate uses for acetic acid?

A.   Yes.

Q.   And what are some of the legitimate uses for acetic acid

1031

that you're familiar with with your knowledge of chemistry?

A.   Well, in my experience in college and in my present job, this substance is used as a solvent and as a reagent in testing and to do experiments and so forth.  In industry it has uses.

Q.   In a typical household, would concentrated acetic acid be something that would be used by a typical person for legitimate uses?

A.   None that I'm aware of in the concentrated form.

            MR. WILLIAMS:  No further questions.

            THE COURT:  Mr. Stowers?

                    CROSS-EXAMINATION

BY MR. STOWERS:

Q.   Hi.  My name's Dean Stowers, and I represent Angela Johnson.  How are you?

A.   Okay.

Q.   Sometimes you get items into the state crime lab where you work, and they're marked "process or handle for latent fingerprints"; is that right?

Page 41

A.    That's correct.

Q.    What does that mean?

A.    That means for me to wear gloves and to put the contents of the container in another container and then place the container in a paper sack for further iden -- processing by the latent fingerprint section.

Q.    And a latent fingerprint is what?

1032

A.    It's not my area of expertise, but that is ridge detail deposited by a person on a surface.

Q.    Like on a glass jar there might be prints from somebody handling the glass jar.

A.    That's correct.

Q.    Or some other item that would be a smooth surface on to which a fingerprint might be left; is that right?

A.    Yes, to my understanding.

Q.    Okay.  And you get items into your lab with a good degree of regularity that are marked "handle for latent fingerprints"; isn't that true?

A.    Yes, some of them are.

Q.    And these items weren't marked that way.

A.    That's correct.

Q.    And if they had been marked that way, you, of course, would have handled these items in such a way as to allow the fingerprint section which is a different section of the state crime lab to be able to determine who may have handled those particular items in the past; is that correct?

A.    That's correct.

Q.    They might have been able to lift fingerprints off those items.

Page 42

A.    They might have.  They might not have been.

Q.    Right, because sometimes there aren't fingerprints left on items even though you think there might be; right?

1033

A.    Yes, or too much time has passed or a number of reasons. It's not my area of expertise.

Q.    Sure.  There's been a number of witnesses who have testified that they have some experience and training in the area as law enforcement persons with making methamphetamine, but you're kind of in a unique position because you actually did make some methamphetamine in your career, haven't you?

A.    Yes, I've done research on it.

Q.    And you, with at least one other person at the state crime lab, actually manufactured meth.

A.    Yes, we did.

Q.    Okay.  And you made how many batches was it?  Couple dozen?

A.    For the project you are referring to, it was approximately 25 batches.  I've since done more batches.

Q.    Okay.  So you've made more meth since then.  And the original project that you worked on was when approximately?

A.    Nineteen ninety sev -- 19 . . .

Q.    I don't want to test your memory too badly.

A.    It was 1997 or 1998.

Q.    Okay.  And you've done some more experimenting in the area of making meth?

A.    Yes, in using one particular method.

Q.    Okay.  And what was the method that you used most recently?

A.    The lithium ammonia reduction method.

Q.    Okay.  And the old method that you used in the 1997, 1998

1034

Page 43

was?

A.    The same one.

Q.    Okay.  So you did two experiments in the area of making meth using various recipes; is that right?

A.    Yes, varying different components in the method.

Q.    Right.  And it's not that easy, is it, to make methamphetamine?

A.    Oh, with that method it's very easy.

Q.    All right.  Is it easy to make really good methamphetamine that way, really strong methamphetamine?

A.    Yes.

Q.    Okay.  Because in reading your reports from before, isn't it correct to say that you had a variety of outcomes in your efforts to make meth?

A.    That's correct.

Q.    And they were quite a broad spectrum of outcomes.

A.    That's correct.

Q.    Okay.  And some of them were very, very poor, and some of them were very good.

        MR. WILLIAMS:  Objection, Your Honor, on this line of questioning, just relevance, outside the direct -- or outside the scope of direct examination.

        THE COURT:  Overruled.

A.    Yes, some were -- it was a wide range, and I simply tried things and saw what happened.

1035

Q.    And that was when you were making meth right there in the state office building in Des Moines?  Is that where you did

Page 44

that?

A.    That's correct, where I had a safe area to do it in.

Q.    And under those laboratory-type conditions attempting to use the recipes that you had acquired from clandestine labs, you were experiencing a wide range of results; is that correct?

A.    That's correct, and that's -- that's correct.

        MR. STOWERS:  Thank you.

        THE COURT:  Mr. Williams, any redirect?

        MR. WILLIAMS:  No, Your Honor.

        THE COURT:  You may step down.

        Ready to call your next witness?

        Everybody can take a stretch break.

        MR. WILLIAMS:  United States calls Rick Held.

            RICK HELD, PLAINTIFF'S WITNESS, SWORN

        THE COURT:  Okay.  Please be seated in the witness box.  Please adjust the chair and the microphones so you can speak directly into the microphones.  And when you're ready, would you state your full name and spell your last name, please.

        THE WITNESS:  It's Rick Donald Held, H-e-l-d.

        THE COURT:  Thank you.

        Mr. Williams?

        MR. WILLIAMS:  Thank you, Your Honor.

                        DIRECT EXAMINATION

                                                    1036

BY MR. WILLIAMS:

Q.    Mr. Held, I'd like to have you share a little bit about yourself with the jury.  How old of a man are you, sir?

A.    Forty-seven.

Q.    Where are you from?

A.    I'm from Geneva, Iowa.

                        Page 45

Q. Where is Geneva, Iowa, in relation to, say, Des Moines or Mason City?

A. It's south of Mason City 40 miles.

Q. And how long have you lived in Geneva, Iowa, area?

A. All my life.

Q. What do you do there?

A. I farm and raise hogs, and I also work at Kraft Foods in Mason City.

Q. How far did you go through school, sir?

A. Through high school.

Q. And you say you do some farming as well. How large of an operation do you have, sir?

A. It's a 260-acre farm with 2 large hog confinement buildings.

Q. You indicate you also work at Kraft Foods. How long have you worked at Kraft Foods?

A. Over 14 years now.

Q. And have you been maintaining this dual employment of farming and Kraft Foods throughout that time period?

1037

A. Yes, I have.

Q. Do you work full time at Kraft Foods?

A. Yes, I work a four-by-four schedule. It's 4 days on, 4 days off, 4 nights on, 4 nights off, 12-hour shifts.

Q. What type of work do you do at Kraft?

A. Right now I work in the process end of it. This is what -- where we make -- actually mix the ingredients for the pudding.

Q. And have you held over the course of -- I think you said 14 years at Kraft different positions there?

A. Yes. I've been all over the plant working different --

Page 46

from putting it in the cup to packaging it, to making it, to loading it on a semi to ship it out.

Q. In the course of your employment at Kraft Foods, at some point did you come to know somebody by the name of Dustin Honken?

A. Yes, I did.

Q. How did you come to know him, sir?

A. He was hired on back in '95, '96, '94, right in that area, and at that time I was working a machine that we put the pudding in the cup, and it was conveyed down to him on a belt, a conveyor, to where he ran the machine that put the pudding in the sleeve, what you see at the store.

Q. Did you know him before he came to work for Kraft Foods?

A. No, I didn't.

Q. Once he came to work for Kraft Foods, can you describe for

1038

the jury what type of relationship did you develop with him?

A. Oh, I guess a worker relationship to where when you work that long of hours you visit a lot because our jobs we were able to talk to each other, and so he got to know about me, and I got to know about him.

Q. Did you socialize together outside the workplace?

A. No, I didn't.

Q. So this was really a work relationship only with him.

A. Yes, sir.

Q. What kind of a man was Dustin Honken in the time period you knew him, 1995, 1996?

A. He's very talkative, very inquisitive, always had stories to tell of what happened to him in his younger years, very intelligent person, knew a lot about a little bit of everything.

Page 47

Q.   Was he in your experience an aggressive or violent person?

A.   No.

Q.   Was he an outgoing -- I mean, did he have a lot of friends at Kraft Foods, or did he have just a few friends?  I mean, how would you describe that part of his relationship?

A.   I would say that he had a lot of friends there.  I never heard of many people ever say they didn't care for him.  He was able to talk to just about anybody and find a subject that you could have a conversation with with him.

Q.   During the course of working with him, did you learn at some point in the winter and spring of 1996 that there was a

1039

federal investigation pending against him?

A.   Yes, I did.

Q.   Did you learn that, in fact, in April of 1996 he was arrested on federal charges?

A.   Yes, I did.

Q.   After he was arrested on federal charges, did he return to work at Kraft Foods?

A.   Yes, he did.

Q.   During that time period that he came back to work at Kraft Foods, were you aware of whether he had any restrictions on him or any -- anything that limited his movement?

A.   I knew he had a monitor on his leg.

Q.   And how did you know that, sir?

A.   He showed me.

Q.   Now, at some point in June did he get arrested again by authorities?

A.   Yes.

Q.   And did he return to work after that second arrest?

Page 48

A.    No, he didn't.

Q.    So I want to focus on the time period at this point -- now that we've got those time frames in mind, I want to go back before his first arrest in April of 1996.  When you were first working with him, did you have conversations with him about controlled substances at all?

A.    Yes, I did.

1040

Q.    And can you share with the jury what was the nature of the conversations you had with him about controlled substances?

        MR. STOWERS:  I'm going to object to this as hearsay, Rule 402, 403, and 404.

        THE COURT:  Overruled.  You may answer.

A.    Would you please ask that again?

Q.    Just explain to the jury what was the nature of the conversations you had with Dustin Honken about controlled substances.

A.    We talked about methamphetamine and I guess all other drugs that are out there.  He seemed to be very knowledgeable about those.

Q.    At this point in your life, sir, you're farming full time?

A.    Yes, I am.

Q.    You're working full time?

A.    Yes, I am.

Q.    Were you having difficulties with your farming operation just because of the price of hogs and so forth?

A.    Yes, I was.

Q.    Were you having trouble staying awake in order to complete all the work you needed to complete?

A.    Yes, I was.  We do work 12 -- we have actually probably

Page 49

twelve and a quarter-hour shifts. Takes me an hour both ways to drive back and forth. And so that doesn't leave me a whole lot of time to take care of the animals the way they need to be

1041

taken care of and also get some sleep and try to have some sort of a family life.

Q. At some point in your conversations with Dustin Honken about methamphetamine, did you come to learn that methamphetamine -- one of the things it does is keeps you awake?

A. Yes, I learned that from him.

Q. At some point in 1995, early 1996, did you obtain any methamphetamine from Dustin Honken?

MR. STOWERS: I'm going to object to this, Your Honor, as 402, 403, and 404, and I'd just ask to have a continuing objection to this line of testimony.

THE COURT: You may have a continuing objection, and your objections are overruled.

That means you can answer the question. Thank you.

THE WITNESS: Thank you.

A. I'm sorry?

Q. That's fine. My question to you was did you, in fact, obtain some methamphetamine from Dustin Honken?

A. Yes, I did twice.

Q. And why did you get the methamphetamine? What were you using it for?

A. Well, at that time I -- if I can recall correctly, we had all kinds of things going on at home on the farm, and I was trying to stay alert at work to not make any mistakes, and so I was probably running on two and three hours of sleep. Dustin

1042

Page 50

had told me that if I would take this drug that it would help me stay alert so I could get my work done.

Q. And did you pay him for that methamphetamine?

A. No, I didn't.

Q. Do you know where he got it from?

A. No, I don't.

Q. And when you say you got it on two occasions, are we talking -- well, how much are we talking as far as quantity you got from him?

A. He told me it was called a line which is a -- maybe about the size of a -- smaller than a pencil, about a third of a pencil length.

Q. And how did he give it to you? I mean what form.

A. He told me that -- he told me where he left it, and he left it on a table on a line and told me where it was at and to go up and take it from there.

Q. So right there in the plant is where he provided it to you.

A. Correct.

Q. And you did this on two occasions.

A. Twice.

Q. You never took any methamphetamine with you out of the plant and gave it to anybody else.

A. Never.

Q. At some point in your discussions with Dustin Honken, did he ask you about whether you'd be willing to store things for

1043

him on your farm?

A. Yes, he did.

Q. And did he describe for you what he might want you to store

Page 51

on your farm?

MR. STOWERS: I'm going to object to this also as hearsay in addition to the prior objections and ask to have a continuing objection on hearsay grounds to any statements that he's attributing to Mr. Honken.

THE COURT: Are you relying on 801(d)(2)(E)?

MR. WILLIAMS: I am, Your Honor.

THE COURT: The objection's overruled. You may answer.

A. He asked me to store some plastic jugs and glass containers.

Q. Did you end up actually ever storing anything for him?

A. No.

Q. During the course of the time that you worked with Dustin Honken -- and I want to again focus on this time period 1995 up to April of 1996 before he's arrested the first time -- from your discussions with him and observations of him, did he have an interest in firearms?

A. Yes, he did.

Q. And how were you aware of that?

A. Well, like I said, when you're working late hours, you talk about anything and everything that you can to stay awake, and

1044

guns just happened to come up quite a few times because he knows I like to hunt and I'm interested in guns, probably not the same kind of guns he is, but they're still related, and so we would talk about guns.

Q. Now, after he was arrested in April of 1996, did he request a favor of you in regards to a firearm?

A. Yes, he did.

Page 52

Q.   Can you tell the jury what he asked you to do?

A.   He told me that he would be going away and probably -- he was worried about his girlfriend.  She was going to be moving to Des Moines, and he asked if I would buy a pistol for him -- or pistol for her for protection while she was in Des Moines because she was scared about going down there.

Q.   Did he say just go get me any pistol?

A.   No.  He told me he wanted a caliber called a 380 which is a small -- it's a small handgun.

Q.   Did he indicate why he didn't just go out and buy one himself?

A.   No, he never did.

Q.   Did he indicate why his girlfriend just didn't go out and buy one herself?

A.   No, he never did.

Q.   Did he indicate to you where you should get this firearm from?

A.   Yeah.  He told me that a friend of ours that kind of

1045

dabbles in guns, to talk to him, and that he knew that he had one for sale.

Q.   And who was this mutual friend of yours?

A.   Bob Riepma.

Q.   And how was he a mutual friend of both of yours?

A.   From work.

Q.   Also worked at Kraft Foods.

A.   Right, correct.

Q.   And so when Dustin Honken asked you to do this after he was arrested, what did you do?

A.   I talked to Bob about it, and Bob said sure, and Dustin

Page 53

give me the money that -- what he wanted for the gun, and I got the gun from Bob, partial box of shells. And then I had the gun and --

Q. And -- let me just stop you there. What type of gun was it if you recall?

A. It was a 380.

Q. And how much did Dustin Honken give you for the gun?

A. If I can recall, $180, hundred and -- $180 I suppose.

Q. Why did you do this for Dustin Honken?

A. Because he never proved to me that -- I never had caught him in a lie or he never deceived me, and he was always willing to help me if I was having trouble with work, you know, fixing. So I thought he was an honest person.

Q. And did you trust him at that point then?

1046

A. Yes, I did.

Q. And so when you got the firearm from Mr. Riepma, what did you do with it at that point?

A. Told him that I had it. He told --

Q. I'm sorry. Told who that you had it?

A. Dustin.

Q. All right.

A. And I just -- he informed -- or told me just to keep it behind my seat in my pickup and when he wanted it he would get it.

Q. And did you actually get the weapon from Mr. Riepma at work?

A. I believe so.

Q. And did you tell Dustin that you had the weapon while you were at work with Dustin Honken?

Page 54

A.    Yes.

Q.    Do you recall -- did you tell him the same day that you got the firearm from Bob Riepma that you had it, or was there --

A.    That I don't recall.

Q.    Fair enough.  So did Mr. Honken ever get the firearm from your truck?

A.    No, he didn't.

Q.    How long did you have it in your truck if you recall?

A.    Probably a couple weeks.

Q.    Direct your attention then to June 11 of 1996.  Were you

1047

aware that that was the day that Dustin Honken was arrested the second time?

A.    Correct.

Q.    And after he was arrested that second time, did you receive a phone call from anybody that you understood referenced that firearm?

A.    Yes, I did.

Q.    How long after Dustin Honken was arrested, how many days or hours or weeks, do you recall you received this phone call?

A.    I suppose a week or two.

Q.    And where did you receive the phone call at?

A.    I was at home.

Q.    Do you remember time of day or night?

A.    Yeah, it was in an afternoon, a Sunday afternoon.

Q.    And tell the jury about this phone call.

        MR. STOWERS:  I'm going to object to this, Your Honor, on the grounds of hearsay.  If I could question the witness, I might be able to further elaborate on that.

        THE COURT:  Okay.  You can voir dire the witness.
                            Page 55

VOIR DIRE EXAMINATION

BY MR. STOWERS:

Q. Mr. Held -- I'm sorry. Mr. Held, you don't know who the person was that called you on the phone, do you?

A. No.

Q. Okay.

1048

A. Only --

Q. You received a phone call. The person made a statement as to who they were, but you don't know who the person was; isn't that correct?

A. Correct.

MR. STOWERS: Thank you. That's all. Your Honor, I'd object to this testimony on the grounds that it's hearsay.

THE COURT: Mr. Williams?

MR. WILLIAMS: Your Honor, to the extent it's either an admission by a party opponent or it's 801(d)(2)(E).

THE COURT: The objection's overruled. You may answer. Why don't you form a new question because . . .

MR. WILLIAMS: I will.

CONTINUED DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. When you received this phone call to begin with in the afternoon, did the person who called you identify themselves?

A. They identified themselves as Dustin Honken's girlfriend.

Q. And was it a female voice?

A. Yes, it was.

Q. How did the conversation go once the person said, I'm Dustin Honken's girlfriend?

A. She said that Dustin does not want the pup anymore.

Page 56

Q. What else did she say?

A. And basically that's about it. I said okay.

1049

Q. And was that the end of the conversation?

A. Pretty much.

Q. What did you understand the pup to be referring to?

A. Well, I do sell dogs. And we did talk about dogs, but I never knew Dustin to want one, and at that time with everything happening the way it was, the only thing I had that Dustin might want would be that pistol.

Q. And that was the pistol that Dustin, in fact, asked you to go buy and gave you the money to buy.

A. Correct.

Q. Did you understand that to be referring to anything else other than that pistol?

A. That's the only thing I remember -- or that put my mind on it that that's what it was.

Q. After you got that call from Dustin Honken's -- the person identifying themselves as Dustin Honken's girlfriend, what did you do with the gun?

A. Waited a couple weeks, and then I took it off my farm and took it down to a place that I've hunted for years, and I hid the gun.

Q. And did you do anything with the gun before you hid it?

A. Yes. I kind of wiped it all down, wrapped it all up so moisture wouldn't get to it, and sealed it in a plastic bag and hid it.

Q. Why did you do that, sir?

1050

Page 57

**Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 921 of 3592**

A. Well, I guess I've always had a love for guns, and I didn't -- I guess at that time I was really confused with a lot of things, and I didn't know what I was going to do with it, and I thought the best thing to do is just to get rid of it off of my farm, and so I decided to hide it.

Q. And Dustin Honken had just been rearrested on drug charges.

A. Correct.

Q. There were some articles in the paper about it.

A. Correct.

Q. Did you have concerns that somehow that might -- your possession of that gun might get you in trouble somehow?

A. At that time I -- it came to me that I thought, What have I done now?

Q. Ultimately in December of 1996 did the police come to your house with a search warrant to look for a firearm?

A. Yes, they did.

Q. They didn't find the firearm then.

A. No, they didn't, no.

Q. Did they come and talk to you a second time about the firearm?

A. Yes.

Q. Did you tell them the truth about the firearm initially, sir?

A. When they first came?

Q. When they first came.

1051

A. No, I didn't.

Q. And why not?

A. Well, I was standing -- I just got done hunting. I was

Page 58

standing in the kitchen in my underwear, and I was doing some dishes to help warm up a little bit because it was such a cold day, and I seen them all pull in the yard. I went to the door. I knew the sheriff that was there, and I said, Larry, just a minute. I'm going to put my pants on. And they didn't even give me a chance to put my pants on. They come barging in, and I guess that really upset me. And at that time I wasn't going to be very cooperative when I felt that they couldn't even give me a chance to put my pants on. Why should I help them out?

Q. When approached again in less of an uncooperative mode by the police, did you then cooperate?

A. Yes, I did after that.

Q. And did you actually take them to the location where you hid the gun?

A. Yes, I did. I took them right to it and give it -- or give it to them.

Q. Sir, I'm handing you what's been marked as Government's Exhibit 226A through M as in Mary and ask you if you can identify those.

A. These are pictures of the pistol that I had purchased for Dustin with a clip and a few shells.

Q. And does it show it in the various stages? You had

1052

indicated before you had wrapped it up and everything. And in these photographs is the weapon ultimately unwrapped and photographs taken at various stages there?

A. Yes, it is.

MR. WILLIAMS: United States moves to admit Exhibit 226A through M as in Mary.

* * * *

Page 59

(Government Exhibits 226A through 226M were offered.)

                         *   *   *   *

MR. STOWERS:  Only the continuing objection, Your Honor.

THE COURT:  Government's Exhibits 226A through M are admitted.

                         *   *   *   *

(Government Exhibits 226A through 226M were admitted.)

                         *   *   *   *

MR. WILLIAMS:  Permission to publish, Your Honor?

THE COURT:  You may.

BY MR. WILLIAMS:

Q.   Showing you what's been marked as Exhibit 226A, can you just explain to the jury what are they seeing in that photograph there?

A.   What you're seeing right there is that pistol, that it's all wrapped up in duct tape and a plastic bag.

Q.   I'm going to move forward a ways here.  226F, what's the

                                                 1053

jury see in that photograph, sir?

A.   They're seeing the duct tape unrolled, the pistol, box of cartridges, and a rag.

Q.   And the rest of the photographs again just contain -- are various photographs of the weapon in various stages of being unwrapped along with the ammunition?

A.   Correct.

MR. WILLIAMS:  No further questions, Your Honor.

THE COURT:  Mr. Stowers?

                    CROSS-EXAMINATION

BY MR. STOWERS:

Page 60

Q.    Mr. Held, as I understand it, your primary occupation is that of a farmer; is that correct?

A.    That's correct.

Q.    And you've farmed for your whole life.

A.    Yes, I have.

Q.    But to supplement your farming income, you also worked at this pudding plant; right?

A.    Correct.

Q.    Kraft Foods; is that right?

A.    Correct.

Q.    K-r-a-f-t; right?

A.    Right.

Q.    They the same people that make what?  Kraft cheese?

A.    Yes, they are.

1054

Q.    Only this is a pudding plant.

A.    Uh-huh, yes.

Q.    And how many years in total have you worked at that plant?

A.    Little over 14 now.

Q.    So you started there in around '91?

A.    Correct.

Q.    And when you started there in '91, did Dustin Honken work there?

A.    No, he didn't.

Q.    When do you first recall him working there?

A.    Must have been '95, '96, right in that area.

Q.    To the best of your memory?

A.    Yes.

Q.    How long before this situation with this gun that you've been testifying about do you recall it was that Mr. Honken had

Page 61

worked there?

A.    Can you reask that question?

Q.    Well, we've been talking about this gun and Mr. Honken's arrest on June 11 of 1996.  You remember that?

A.    Yes.

Q.    What I'm trying to figure out is how long before June 11 of 1996 had you known Mr. Dustin Honken to be working at the pudding plant.

A.    From the first day he started.

Q.    Right.  And how long would that have been back prior to

1055

June 11, 1996?

A.    Must have been a year and a half.

Q.    Okay.  So he would have been there working at that plant since early 1995 then.

A.    Correct.

Q.    Or late '94.

A.    Right.

Q.    And the two of you, as I understand it, would look at magazines that dealt with hunting and firearms when you were on break; is that correct?

A.    Correct.

Q.    And what kind of magazines of that nature did the two of you like to view together?

A.    I basically looked at a lot of the hunting magazines.  I suppose there was a few guns and ammo which deal strictly with guns themselves.

Q.    Some people like guns.

A.    Yes, they do.

Q.    Some people can't stay far enough away from them.  Would

Page 62

you agree with that?

A.    I would agree.

Q.    There's two different views on guns at least.

A.    Correct.

Q.    And you're a gun lover.

A.    Yes, I am.

1056

Q.    And you understood Dustin Honken to be a person who enjoyed guns as well.

A.    Yes, I did.

Q.    And he had an interest in them.

A.    Correct.

Q.    And the two of you talked about that at work.

A.    Yes, we did.

Q.    And eventually you became aware, I take it, just from being a resident of that north central Iowa area that Dustin Honken was somebody who had a fair amount of attention drawn to him in the media; isn't that right?

A.    Yes.

Q.    And I assume that you had read articles about Mr. Honken in the paper; is that correct?

A.    Yes, I did.

Q.    Including articles which connected him to some degree in the killings of five people; right?

A.    Right.

Q.    And you were aware of that in '95 and '96.

A.    Yes, I was.

Q.    And yet that wasn't the Dustin Honken that you came to know through your year and a half with him at work; is that right?

A.    That's right.

Page 63

Q.   You didn't believe Dustin Honken was anybody in your

observation capable of such a thing, killing five people.

1057


A.   He never showed that kind of aggression.

Q.   Now, you, though, were aware that in April of 1996 he had

been arrested and that he was released by the court and that he

was required to wear what's called an ankle bracelet and

electronic monitor; right?

A.   Correct.

Q.   And I assume you discussed that with Mr. Honken?

A.   Yes, I did.

Q.   Did he tell you he wasn't allowed to have firearms while he

was on release?

A.   No, he didn't.

Q.   Did he tell you why it was that he wanted you to buy this

gun for him as opposed to buying it himself?

A.   No, he never did.

Q.   Did you find that a little unusual, that he wanted you to

buy it for him rather than buy it himself?

A.   Not at the time.

Q.   He had known Mr. Riepma, the person who you ultimately got

this gun from, though; isn't that correct?

A.   Yes.

Q.   And yet he didn't go to Mr. Riepma.  He had you go to him

for him; correct?

A.   Correct.

Q.   And then as I understand it, you acquired some money from

Mr. Honken, and you said I think it was $185 is your

1058


Page 64

recollection today?

A.    Yes, 180 or 190, right in there.

Q.    And -- but you only used $90 of that, I take it, to buy this gun.

A.    No, I used all of it but $10.

Q.    Remember being interviewed in the past, sir, and saying that you had only used $90 of the money that Mr. Honken gave you to buy --

A.    Yeah, and I was incorrect then.

Q.    Okay.  So you had made a mistake then.

A.    Uh-huh.

Q.    But it was 185 or $190 to your memory.

A.    Right.

Q.    And when you went and bought this gun for Mr. Honken, you had made an arrangement after you had bought it as to how you would deliver it to him; is that correct?

A.    Yep.  Yes, I did.

Q.    And your arrangement with him, as I understand it, is that you were to leave this gun in your car.  It was a truck I take it.

A.    Correct.

Q.    In your truck.  Was there a particular location in your truck where you were to leave it?

A.    Just behind the seat.

Q.    Behind the seat.  Was it in a box or packaged up in any

1059

way, this gun?

A.    That I don't recall.

Q.    Leave the gun behind your seat, and you did that, didn't you?  You left the gun behind your seat?

Page 65

A.    Yes, I did.

Q.    Was that before or after you test fired this gun to see if it was working right?

A.    Probably be after I fired it.

Q.    Why did you fire it?

A.    I never shot one before.

Q.    You wanted to try it out.

A.    Yep.

Q.    Sort of a test drive?

A.    Uh-huh, yes, I did.

Q.    And then you put the gun behind your seat, and if I heard you correctly -- and correct me if I'm wrong -- you had it there for almost two weeks before Mr. Honken was arrested.

A.    Correct.

Q.    And you brought it dutifully with you to work every day just like Mr. Honken had asked.

A.    Yes, I did.

Q.    What explanation did he give you for why it was that he wanted the gun left behind your seat in your truck?

A.    He told me that when he could pick it up that he would.

Q.    Did the two of you work the same shift?

1060

A.    Yes, we did.

Q.    Did you leave your truck unlocked?

A.    Yes, I did.

Q.    So you left your truck unlocked with a loaded gun in it?

A.    No.

Q.    You left your truck unlocked with a gun in it and a box of ammunition.

A.    Correct.

Page 66

Q.    But the ammunition was not in the gun.

A.    That's correct.

Q.    And then did you ever ask Mr. Honken during that two weeks, You haven't gotten your gun yet; it's still in my car?

A.    No, I don't -- no, I never did.  He told me that he'd get it when he was ready.

Q.    Did he tell you what he was trying to get ready for?

A.    No.  I understood when he was able to give it to his girlfriend.

Q.    Okay.  And you also then became aware that he was arrested on June the 11th, and you took that gun back to your house; is that correct?

A.    That's correct.

Q.    And you kept it there at your house after he was arrested.

A.    Correct.

Q.    For I think you said a couple weeks.

A.    Yes.

1061

Q.    Now, did you hide that gun before or after the police came to search your house looking for the gun?

A.    It was already hidden then.

Q.    Okay.  And did you know the police were going to come to your house before --

A.    No, I didn't.

Q.    And the reason you hid it was?

A.    I didn't know what I was going to do with it at the time.

Q.    Yeah.  Do you frequently hide guns that you have?

A.    No.

Q.    You seem to have gone to --

A.    Well, I put them away so my kids don't get at them.

Page 67

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 931 of 3592

Q.   Right, in a gun cabinet.  Do you have a gun cabinet?

A.   Yeah.

Q.   Why didn't you put the gun in the gun cabinet, sir?

A.   I don't know.

Q.   It seemed to me that according to the pictures that the jury will have later that this gun was carefully wrapped in duct tape.

A.   Yes.

Q.   That took some time, didn't it?

A.   No.

Q.   And then you put it in a plastic bag as well?

A.   Yes.

Q.   Were you holding that gun in the event that Mr. Honken ever

1062

recontacted you saying that he wanted it?

A.   No, I don't think I would -- I was waiting for that.  I just didn't know what I was going to do with it at the time.

Q.   But you knew you didn't want anybody to find it.

A.   Correct.

Q.   And you had some concerns about somebody finding that gun.

A.   Yes.

Q.   And the concerns you had were what, sir?

A.   Well, I guess the biggest issue was that I have children; I didn't want them to find it and -- this whole snowball started rolling down the hill before I really knew what was going on with understanding what was happening with Dustin Honken.

Q.   Okay.  And I take it then that you became concerned along this continuum here of time and contact with Mr. Honken that maybe Mr. Honken wasn't what he was appearing to be to you.

A.   Correct.

Page 68

Q.    But you'd already gone down that road and gotten yourself involved.

A.    Correct.

Q.    And it was really kind of too late for you to turn back; right?  You'd already bought that gun for him.

A.    Right.

Q.    And now you had to hide that gun so that you wouldn't get yourself in trouble.

A.    Correct.

1063

Q.    And that's what you were doing.

A.    Right.

Q.    Even though you didn't really know what really was going on with this gun and Mr. Honken and why he wanted it.

A.    At the beginning, no, I never did.

        MR. STOWERS:  Thank you.

        THE COURT:  Mr. Williams, anything further for Mr. Held?

                REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q.    To be fair, Mr. Held, you made the choice to hide the gun yourself.

A.    Yes, I did.

Q.    You could have chosen to go to law enforcement with it.

A.    Yes, I could have.

Q.    You could have told them where you got it.

A.    Right.

Q.    You could have told them what you got it for.

A.    Correct.

Q.    You made a choice, perhaps not the best choice, but you

Page 69

made a choice yourself to take the actions you did.

A.    Yes, I did.

MR. WILLIAMS:  No further questions.

MR. STOWERS:  Nothing else.

THE COURT:  Okay.  You may step down.

1064

Members of the jury, it is 10:20.  We'll be in recess for 25 minutes.  Please remember my cautionary instruction about not discussing the case among yourselves and keeping an open mind.  Thank you.

(The jury exited the courtroom.)

THE COURT:  Anything we need to take up?

MR. WILLIAMS:  No, Your Honor.

MR. STOWERS:  No.

THE COURT:  Okay.  Thank you.

(Recess at 10:21 a.m.)

THE COURT:  Who's next?

MR. WILLIAMS:  Mr. Basler.

THE COURT:  Okay.  Ready to have the jury brought in?

MR. WILLIAMS:  Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT:  Please be seated.

You ready to call your next witness?

MR. WILLIAMS:  Yes, Your Honor.  The United States calls Bill Basler.

WILLIAM BASLER, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Please be seated.  Make yourself comfortable.  And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS:  My full name is William Wayne Basler,

Page 70

B-a-s-l-e-r.

1065

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Basler, can you explain to the jury what do you do for a living, sir?

A. Yes. I'm employed by the state of Iowa. I am an agent with the Iowa Division of Criminal Investigation.

Q. I want to go over some of your background before we get to your current position and duties. Can you explain to the jury your educational background, sir.

A. I have a bachelor's degree in business management from the University of Northern Iowa.

Q. Either before or after going to college, did you serve in the armed forces?

A. Yes. Actually it was kind of in between. I attended college for two years, got my draft notice in 1968, and decided then to enlist in the United States Navy, spent four years in the Navy, and later went back and got my degree.

Q. What type of work did you do in the Navy, sir?

A. I was on an aircraft carrier for two years on the USS Roosevelt assigned to the Sixth Fleet, made two cruises on that ship.

Q. Not law enforcement-related work then.

A. No.

1066

Page 71

VOLUME 5, 5-11-05

Q. And once you completed your formal education after your stint in the Navy, what did you do for a career, sir?

A. I'd applied with the Division of Criminal Investigation while I was still in my senior year of college. That application process was ongoing when I graduated, so for a few months after my graduation I worked for Winnebago Industries in Forest City and shortly thereafter was hired by the state.

Q. And have you been with the Division of Criminal Investigation since that time?

A. Yes. I was hired by the state in 1975.

Q. And have you occupied more than one position with the DCI since that time?

A. Yes. I've had three.

Q. And could you explain those to the jury, please.

A. Yes. My first five years from approximately 1975 until 1980, I worked a narcotics assignment. In 1980 I transferred to a portion of the DCI that's called the general criminal investigative unit -- we call it general crim. for short -- and worked in that area from 1980 until 2003.

Q. What happened in 2003?

A. In 2003 I was promoted to a position of special agent in charge.

Q. And what does that mean?

A. That means that I am now a first-line supervisor supervising agents in a quadrant of the state that perform the

1067

duties that I did up until my promotion.

Q. We've heard some already from DCI criminalists. Could you give the jury an overview of what the DCI as an entity consists of and what it does?

Page 72

A. Yes, I can. We have a lot of entities within the DCI. The investigative part I've already mentioned and what I'm a part of. In addition to that, the DCI is charged with the investigative responsibilities at all of the gaming facilities in Iowa, both the tracks and the casinos. In addition, we have our laboratory which you're aware of. We also have the identification section which is the repository of all the fingerprint cards of people that have been arrested in the state of Iowa, and we're also in charge of the sexual offender registry.

Q. Could you compare the DCI and its role and duties with that of the FBI, maybe a term that some of the jurors are more familiar with?

A. Yes. I think that it's a similar organization with the exception that they're a federal agency and we, the DCI, work within the borders of the state of Iowa.

Q. Could you explain to the jury to the extent that some crime occurs in the state of Iowa -- and let's just give an idea. The type of crimes you've investigated in the course of your career span what?

A. Spans a lot. The general criminal section that I was

1068

assigned to that I mentioned earlier involves itself mostly in violent crimes, either deaths or sexual assaults, kidnappings, robberies, that type of thing. We also have some involvement with white collar-type embezzlement crimes.

Q. And where have you been stationed at during your time with the DCI?

A. I was hired in 1975, went through the academy, spent just a few months in Iowa City, and then was assigned in Mason City in

Page 73

1976, and I'm still there.

Q. Are there other DCI offices like yours in Mason City around the state?

A. Yes. As I mentioned, my first-line supervision involves what we call in the DCI zone 3 which encompasses agents in Mason City, Fort Dodge, Cedar Falls, and Dubuque. My agents handle any activity that we're requested to get involved with in that north central, northeast Iowa area.

Q. So going back to a question I started and didn't complete earlier, let's say a murder occurs within your area, zone 3. Could you explain to the jury, does the DCI just initially start rolling and go to the murder scene at that point?

A. No, we don't. The DCI is what's called an assist organization. And what that means is we can't get involved in any investigation unless we are requested by a local agency such as a police department or a sheriff's office or a local county attorney's office. One of those agencies have to request our

1069

assistance before we can get involved in any investigation.

Q. Could you explain to the jury in 19 -- the period 1992 to 1998 your position was what with the DCI?

A. I was a special agent with the DCI working those types of investigations that I talked about earlier.

Q. And this was prior to your promotion in 2003.

A. Yes.

Q. During the past ten years or so, have you had other duties outside of the DCI?

A. Other jobs?

Q. Other jobs, other teaching duties.

A. Yes.

Page 74

Q. And what are those?

A. For approximately the last ten years, I've taught two classes at the community college in Mason City, and I've also taken charge of the college's internship program for criminal justice students.

Q. And what are the classes that you've taught?

A. I teach criminal investigation in the fall, and I teach a patrol procedures class in the spring.

Q. Give the jury if you would some idea of the size of the DCI investigative arm. In other words, how many agents, special agents like yourself, were there in the time period of the mid-1990s?

A. The number varies, but the general criminal assignments

1070

that I talked about earlier, there's approximately 8 of those agents per zone in the state, and there's 4 zones, so there's somewhere between 30 and 35 agents doing what I did.

Q. And when a crime would occur in your zone, how would agents be assigned to the case if a request came in from local authorities requesting the aid of the DCI?

A. That's one of the jobs of the SAC, the job that I have now, to make those assignments to the agents. It's done basically on the location of where the request came from. Obviously if there's a request from the east, northeast part of the state, I'm going to try and assign an agent that's physically located near there. But also taken into account is the case load that an agent has at the time the request comes in.

Q. I'd like to direct your attention to the early 1990s and ask if at some point you had become aware that some time in July, particularly July 25, 1993, Greg Nicholson, Lori Duncan,

Page 75

Kandi Duncan, and Amber Duncan disappeared.

A.   I was aware of that, yes.

Q.   Did you become involved in the investigation of their disappearances in 1993?

A.   No.

Q.   Are you aware now as a part of your investigation whether there was a law enforcement agency in charge of investigating their disappearances?

A.   Yes, I am aware of that.   Again, we have to be requested to

1071

get involved in any investigation, and when Greg Nicholson, Lori Duncan, and her two daughters disappeared, that was handled by the Mason City Police Department, and they chose not to request our assistance at that time.

Q.   When was the first time the DCI was requested to assist in that investigation to your knowledge?

A.   The Mason City investigation?

Q.   Yes.

A.   Would have been in 1996.

Q.   Did you also become aware that on November 5 of 1993 Terry DeGeus disappeared?

A.   Yes, I was aware of that.

Q.   Did you become involved in his -- the investigation of his disappearance in 1993?

A.   Yes, I did.

Q.   Could you explain to the jury how you got involved and the nature of your involvement?

A.   Yes.   When Mr. DeGeus disappeared, that disappearance was reported to the Hancock County Sheriff's Office.   And the sheriff's office made the request for the DCI to become involved

Page 76

in that particular investigation.

Q.   And was that case assigned to you as a special agent out of the Mason City office?

A.   Yes, it was.

Q.   And what, if any, involvement or what steps did you take in

1072

the investigation at that point when you initially got involved?

A.   Other than visiting with then Deputy Sheriff Gerdes, one of the first things that I did in regard to Terry's disappearance was to do a search of his house.  At the time of his disappearance, Terry was living in the country north of Britt across the section from his parents in a rental house.

Q.   And once you did that, how did your investigation evolve from there, sir?

A.   I was hoping to get some indication from Terry's residence if he'd left voluntarily or if there had been foul play involved.  We really didn't know at that time, and the purpose of that search of Terry's house was to try and get some indicators as to just that, whether it was an act of foul play or if Terry had just decided to take off for some reason.

Q.   As a result of your search of Terry DeGeus's house, can you explain to the jury what, if anything, you found of significance during your search?

A.   We didn't find a lot, quite frankly, and I wasn't real sure when I started that search what I was looking for.  I was hoping to find something that would give me some signal yes, this is a bad thing that happened or there's another explanation as to what happened to him.

         I collected a variety of notes and maps and letters from the house that really didn't help me.  But one thing that I

Page 77

did find that I thought was helpful at the time was a grocery

receipt in Terry's house.

Q. What was the date of that grocery receipt?

A. That receipt was dated the same day that he disappeared, November 5 of 1993, and I had been told by the deputy sheriff that Terry usually had custody of his daughter Ashley on weekends, almost every weekend. I believe that Ashley was around ten years old at that time. On this grocery receipt that I found in the house dated November 5, Terry had been to the grocery store in Britt and had bought things like Fruity Pebbles cereal and candy and cookies, and that told me that he was planning to at least be at home and have his daughter for the weekend days.

Q. So on that receipt you found some items that would make sense that he would have purchased on behalf of his daughter for that weekend. Did you find anything else on that receipt indicating something that Terry would have purchased for himself?

A. Yes, I did.

Q. And what was that?

A. Terry was a smoker, and during that same visit to the grocery store on the day that he disappeared was listed a carton of Marlboro cigarettes.

Q. Did you find during your search of Terry DeGeus's house a carton of cigarettes?

A. I found on top of his refrigerator a carton of Marlboro

cigarettes that had been opened, and one pack of cigarettes had

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 942 of 3592

been taken from it.

Q. Not to pry too much, but in your past have you smoked cigarettes, sir?

A. I am an ex-smoker, and more than anything at that stage in my investigation, that told me that perhaps Terry had not left voluntarily, and the reason for that was being an ex-smoker, if I'm planning on going somewhere for an extended period of time, I am certainly going to take those cigarettes with me and not leave them behind.

Q. Did you find anything else of evidentiary value that assisted you in the investigation during the search of Terry DeGeus's house?

A. Not really, no.

Q. Where did your investigation go from there, sir?

A. I started trying to visit with people that had talked with Terry recently. I tried to talk to his friends. I was trying to get some indication as to what had happened to him.

Q. And did you have any success at that point in 1993 and into 1994 discovering what had happened to him?

A. No. The best that I could learn was that supposedly on the day that Terry had disappeared he had a meeting set up with Angela Johnson in Mason City at the country club.

Q. So in 1993, 1994, what -- can you explain to the jury where your investigation of Terry DeGeus's disappearance went from

1075

there?

A. We kept doing interviews and kept coming up against a brick wall. We just couldn't make very much progress trying to find out what had happened to him.

Q. Now, at some point in early nine -- I'm sorry, in the

Page 79

mid-1990s, did you become involved in another investigation that occupied a large amount of your time?

A.    Yes.

Q.    And what was the nature of that investigation?

A.    In 1996 as you've heard, there was a second drug investigation done in regards to Dustin Honken.  Dustin Honken was starting to produce methamphetamine at a laboratory located in his house and was arrested along with some of his associates before that methamphetamine laboratory became operational. Information was made subs -- excuse me, information was received subsequent to those arrests that Dustin Honken may have been involved with the -- not only the disappearance of Greg Nicholson, Lori Duncan, and her daughters and Terry DeGeus but, in fact, was probably involved in those individuals' murders.

Q.    You've been sitting in court here.  Did you hear the testimony of Special Agent Lewis regarding the creation of a taint team in using Tim Cutkomp for the purpose of undercover tapes?

A.    Yes.

Q.    And were you in the loop, so to speak, with regard to those

1076

developments in the investigation at least to some degree?

A.    I was in the loop but had a very minor role during that start-up of a new investigation in 1996.

Q.    Was it about this time that you'd indicated earlier in your testimony that the Mason City Police Department requested the DCI to become involved in the investigation of the disappearances of Greg Nicholson, Lori Duncan, and her daughters?

A.    Yes.

Page 80

Q. So where did the investigation go from there, sir?

A. Once we received the request in 1996, there was an agent assigned to that investigation and a homicide investigation was begun.

Q. Who was the agent assigned to that investigation?

A. That case at that time was assigned to Special Agent Richard Kemming who was then working out of our Cedar Falls office.

Q. Why was it assigned to him versus you?

A. That same time period in 1996 there had been a homicide in another town located near Mason City, and I was in charge of that particular investigation and didn't have the time to devote both to that current homicide and this new homicide investigation that was started in 1996.

Q. Can you then explain to the jury what, if any, developments occurred in the investigation between 1996? And I take it at

1077

some point you got reinvolved in this investigation.

A. Yes, I did.

Q. And when did that occur?

A. I became the case agent or the lead investigator on that particular investigation in 1999.

Q. So between the time period of 1996 when the DCI is asked to come in and lead up the investigation until 1999 when you took over as the case agent, do you have any firsthand knowledge of what occurred during the development of the investigation during those three years?

A. I had some firsthand knowledge. Some I learned secondhand. But eventually I think, I hope, that I learned everything that had been done.

Page 81

Q. And were there any significant developments in the investigation during that approximately three-year period between 1996 and 1999?

A. Well, the information from Mr. Cutkomp I would consider significant. I think that Special Agent Lewis's recovery of that piece of galvanized metal out of the ditch was significant but nothing that I would call case breaking.

Q. So what happened in 1999, and how was it that you got reinvolved in this case in 1999?

A. My schedule allowed me to take charge of that investigation, and I volunteered for that job mainly because I was living and working in Mason City where the investigation was

1078

centered. And as I mentioned, Agent Kemming was some 90 miles away.

One of the first things that I did that I felt needed to be done then was to consolidate a number of agencies that seemed to be doing separate investigations involving the same thing. By that I mean, as you've heard, the DEA had their own drug investigation that stemmed back to 1993. The state narcotics agents had their own investigation from the 1996 lab situation. Mason City Police Department had their own investigation in regards to their missing and murdered people. And the Hancock County Sheriff's Office had their own investigation regarding the disappearance and murder of Terry DeGeus. Everyone had a legitimate reason for being involved in these investigations, but there didn't seem to me to be a lot of coordination involved.

Q. As a result of your efforts, did you succeed in coordinating all the investigations and become the lead

Page 82

investigator of this coordinated effort?

A.   I certainly tried.  The same agencies remained involved, but there was one person that was basically in charge of the investigation, and the information seemed to flow much better then.

Q.   Once you became in charge of the investigation -- and do you recall when approximately in 1999 you became in --

A.   I'm not sure, but I think it was summer, early fall.

1079

Q.   Once you became involved, could you share with the jury what steps did you take in the investigation then?

A.   There were some things that hadn't been done that I felt needed to be done, and there was also some additional information that was starting to come in as far as other individuals that needed to be interviewed about what they had been told.

Q.   And let me ask you so we have some background here, based on your familiarity with these other agencies, does the DEA have any specialty in murder investigations?

A.   I don't believe so.

Q.   Does the Division of Narcotics Enforcement have any experience in murder investigations?

A.   They have some experience because they get involved with them at our request at times, but that's not their job to manage a murder investigation.

Q.   And I imagine that the Mason City Police Department and the Hancock County Sheriff's Department deal with murders on occasion, but do they have any great specialty in murder investigations?

A.   They may have some specialty.  I don't think that they have

Page 83

the amount of experience with those kind of cases that we do.

Q.   So once you have -- you became involved with that experience and specialties, please explain the steps you said you realized needed to be taken and what steps you took.

1080

A.   I started interviewing people that hadn't been interviewed before.  I started reinterviewing people that had been interviewed before to try and get additional information.  I started thinking in terms of was there anywhere that I might find physical evidence regarding what happened to these people, those types of tasks.

Q.   And when -- explain to the jury when you initiate an investigation like this, do you just immediately lock on to a suspect, or how does it work?

A.   No.  Always try and keep an open mind and, essentially until you know better, why anybody could be a potential suspect.  So you have to at least consider that anybody and everybody possibly could be a suspect in what you're investigating.

Q.   Did you consider the possibility that these people hadn't been murdered but just went to another state or another location?

A.   Absolutely.

Q.   And so did you undertake any investigation to determine if, for example, the Duncan family had relocated to another state?

A.   Yes, I did.

Q.   Did you -- did that involve financial investigation?

A.   Yeah, I made a number of attempts trying to find out if these people were, in fact, dead and the victims of a homicide or if they'd just taken off for whatever reason.  You mentioned the financial area.  I checked Lori Duncan's bank account.  She

Page 84

had a checking account at Liberty Bank in Mason City, and at the time of her disappearance in July of 1993, she had over $660 in that account, and still in 1999 when I got involved, that money remained untouched.

Q. Had there been any transactions postdating July 25 of 1993?

A. No.

Q. Did you check school records to see if the girls had transferred to another school, if there was any leads there?

A. Yes, I did. Kandi Duncan at the time of her murder was ten years old and Amber Duncan was six years old and had just finished kindergarten in Mason City. I checked with the school administrators at their particular school and was hoping that if they had taken off and relocated somewhere else that this new school where the children would have attended would have reached out to the Mason City school for old records, that type of thing, in attempt to find out where they might be.

The school administrator told me that they had had no contact and further told me that both of the little girls had minor learning difficulties that necessitated them being placed in special programs within the school, and they were very certain because of the special needs if the children had relocated somewhere that that new school would have certainly reached out to their old school to find out the programs and the extra help that they were getting.

Q. Did you search out any other public documents to determine

if there was any location that any of the victims went to?

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 949 of 3592

A.    Yes.

Q.    Could you explain what you did?

A.    Yes.  There's a computer system that is available to us that allows us to check all 50 states to see if a particular person has a driver's license in any of the 50 states.  That was done any number of times again trying to see if these people had taken off and had relocated somewhere else.  That was done, as I mentioned, numerous times and all with negative results.

Q.    The date when Greg Nicholson, Lori Duncan, and her girls were last seen was when, sir?

A.    That was July 25 of 1993.

Q.    Mr. Basler, I just handed you what's been marked as Government Exhibit 8.  Could you explain to the jury what that is?

A.    Yes.  It's a calendar for the year of 1993.

MR. WILLIAMS:  United States moves to admit Exhibit 8, Your Honor.

*   *   *   *

(Government Exhibit 8 was offered.)

*   *   *   *

MR. STOWERS:  No objection.

THE COURT:  Exhibit 8 is received.

*   *   *   *

(Government Exhibit 8 was admitted.)

1083

*   *   *   *

BY MR. WILLIAMS:

Q.    And just so we can assist the jury here, July 25, 1993, was what day of the week, sir?

A.    That was a Sunday.

Page 86

Q. What was the last day when Terry DeGeus was seen alive?

A. Terry DeGeus was last seen alive on November 5 of 1993 which was a Friday.

Q. Did you determine the age of the victims based on public records?

A. Yes, I did.

Q. And what were their age -- let's do them one at a time. Greg Nicholson's age if you recall?

A. Greg Nicholson was 34 years of age.

Q. And that is as of July 25, 1993?

A. Yes, as of the date of his disappearance as will all these ages.

Q. Lori Duncan?

A. Lori Duncan was 31 years old.

Q. I think you indicated already Kandi Duncan was ten years of age?

A. Yes.

Q. And Amber Duncan had just turned six.

A. Yes.

Q. Terry DeGeus?

1084

A. Was 32 years old.

Q. Are you familiar with the signs of the Zodiac?

A. To a varying degree. I'm more familiar now than I was before.

Q. Based on Terry DeGeus's date of birth, are you familiar with what sign of the Zodiac he would have had?

A. Yes, I am.

          MR. STOWERS: Object as not relevant, Your Honor.

          THE COURT: Overruled.

Page 87

BY MR. WILLIAMS:

Q.    What was his sign?

A.    Terry DeGeus was born on November 19 which I understand to be the sign of the Scorpio.

Q.    As part of this investigation you mentioned earlier Miss Lewis's discovery of part of a piece of metal that matched a description and Tim Cutkomp's identification of it as what they melted the gun against, in addition to -- you're aware, first of all, the testing that was done by the DCI with regard to the metal droplets on that piece of metal?

A.    Yes, I am.

Q.    In addition to that, did you undertake to have any other analysis done on the droplets of metal?

A.    Yes.

Q.    Can you explain what you did?

A.    I did two additional things.  As has been mentioned, on

1085

this piece of galvanized steel, there were melted drops attached to it which I consider probably possibly had come from the cutting of this gun.  The DCI laboratory was only able to tell us that it was iron in those melted droppings.  We had the same plate and metal droppings sent to the FBI laboratory in Washington for analysis.

Q.    What was the result of the analysis, if any?

A.    The same.  The best they could tell us was that they were iron droppings and could tell us nothing more than that.

Q.    You heard Criminalist Paul Bush testify earlier in this case?

A.    Yes.

Q.    Was it at his -- I'm sorry.  Was it at your request that

Page 88

Mr. Bush was involved in the trace evidence examination of the Duncan home?

A. Yes, it was.

Q. He indicated during his testimony that the carpet was removed from the home for further analysis. Do you recall that testimony?

A. Yes.

Q. Why was that?

A. During my investigation, I had learned from the owner of the house -- Lori Duncan and her daughters lived in a rental house on North Van Buren in Mason City. I had learned from the owner that the carpet in the living room and dining room

1086

presently in the year 2000 was the same carpet that had been in there during 1993 when Lori and her daughters disappeared. Because of that, it was decided to remove that carpet from the house and have it checked by Criminalist Bush for any forensic evidence that we might find on it.

Q. This was many years after the disappearances. Why go through the process that many years after the disappearances?

A. It had been seven years, but it's the old adage if you don't look you're not going to find it. And I was thinking -- and Mr. Bush agreed with me -- that if people had been murdered in that house and if there had been bleeding involved that the carpet might have maintained that blood even after all those years.

Q. And the result was negative for finding any remains of human blood on the carpet.

A. That's correct.

Q. As part of your investigation, did you conduct any

Page 89

excavations of any locations with the hope of finding bodies there?

A.    Yes, I did.

Q.    How many different locations, first of all, did you conduct digging?

A.    One location on two separate occasions.

Q.    And share with the jury if you would, first of all, what location did you search at?

1087

A.    We dug up a farmer's alfalfa field located near Kanawha, Iowa, which is west and south of Britt.

Q.    Why did you choose that location?

A.    We had received information that perhaps these people had been buried after they had been murdered, and we checked Terry DeGeus's work records during the time of that disappearance and found that Terry along with others had been involved in the demolition and excavation of some farm buildings at that site near Kanawha.

Q.    Terry DeGeus was working for his father Ed DeGeus in an excavation business.

A.    Yes, Terry's father Ed had and has still an excavation business, heavy equipment that oftentimes involves him with tearing down, knocking down buildings, taking up foundations and clearing that ground so it can be farmed.  And that was the situation that Mr. DeGeus and Terry were involved with during late July of 1993 when Lori Duncan, her daughters, and Greg Nicholson disappeared.

Q.    Did you consider Terry DeGeus a suspect in the disappearances of Nicholson and the Duncan family?

A.    Again, everyone's a suspect until you can prove

Page 90

differently, and we at least considered that possibly he had been involved or possibly the site that he was working on might have been involved somehow.

Q.   And the excavation of that site, did you find any evidence

1088

that linked -- was linked at all to the disappearances of Nicholson or the Duncan family?

A.   No, we didn't find anything during either excavation.

Q.   At some point in your investigation did you interview Christi Gaubatz formerly known as Christi Cole?

A.   Yes, I did.

Q.   At some point you heard her testimony that she ultimately provided information concerning her knowledge of the murders of these people.

A.   Yes, that was during an interview I had with her during April of 2000.

Q.   In April of 2000, was an indictment returned by the grand jury against Angela Johnson?

A.   I believe it was in July of 2000.

Q.   I'm sorry.  Prior to the indictment being returned, in April of 2000, was Angela Johnson subpoenaed to appear before the grand jury?

A.   Yes, she was.

Q.   And that was on April 11 of 2000?

A.   Yes.

Q.   In addition to having her subpoenaed before the grand jury for purposes of testimony, was there any other purpose to the grand jury subpoena?

A.   Yes, there was.

Q.   And what was that?

Page 91

A.    The grand jury subpoena also directed her to provide known fingerprints to us.

(Mr. Berrigan entered the courtroom.)

Q.    And just so we're clear, you said for her to provide known fingerprints to you.  What do you mean by known fingerprints to you?

A.    Those would be fingerprints that we could have on file at our laboratory that are marked as the fingerprints originating from Angela Johnson.

Q.    And so ones you knew were hers because you'd take them yourself.

A.    That's right.

Q.    I've handed you Exhibit 314.  Can you identify that for the jury, please?

A.    These are the fingerprints of Angela Johnson that were taken on April 11 of 2000 by myself and Special Agent Graham.

MR. WILLIAMS:  United States moves to admit Exhibit 314, Your Honor.

*    *    *    *

(Government Exhibit 314 was offered.)

*    *    *    *

MR. STOWERS:  No objection.

THE COURT:  314 is received.

*    *    *    *

(Government Exhibit 314 was admitted.)

1090

*    *    *    *

BY MR. WILLIAMS:

Page 92

Q.    Could you describe for the jury, are there more than one type and set of prints contained in Exhibit 314?

A.    Yes.

Q.    Could you explain to the jury what the different types of prints are?

A.    Yes, I can.  The two paper cards are what's commonly called ten-print cards which are commonly taken when a person is arrested that involves the capturing of the ridge detail on the tips of each of the fingers.  Those were taken and later submitted to our laboratory.

      Also on that date in April of 2000 we took what is commonly referred to as major case finger and palm prints from Miss Johnson.

Q.    What are -- what's the difference between those and the other prints you just identified?

A.    The difference is that, as I mentioned earlier, the ten-print cards involves only the tips of the ten fingers.  The major case prints is an attempt to capture all of the ridge detail on the fingers and hands.  There are identifiable ridge patterns not only on the tips but also on the remainder of the underside of the finger, on the sides, on the tips of the fingers, and the palms of the hand as well.  All of this surface can produce a print that is recognizable and identifiable to a

1091

particular person.

Q.    So can you explain to the jury what is the actual process you go through in order to get prints off of things like the side of the fingers and so forth?

A.    We use some lifting tape which is essentially overgrown Scotch tape, and the fingers are covered with a light film of

Page 93

fingerprint powder. And then this overgrown Scotch tape is placed over the finger and wrapped around the sides of the finger and over the tip to capture all that ridge detail, then straightened out and placed on a piece of clear plastic like we have here.

On the opposite side is the palm print. Sometimes it's done in one single sheet as it is here if you have a person with smaller hands. Sometimes a hand is larger than the tape and you have to do it in two sections. And again, with this palm print, we're catching that recognizable ridge detail on the palms, the sides of the palm, and the side of the hand.

Q. Does this process require you to work fairly close with the suspect over a period of time in order to apply and remove the powder, the tape, and all that stuff?

A. Yes, it does. It's fairly involved and fairly time consuming.

Q. Did you perform this function yourself on Angela Johnson on April 11 of 2000?

A. I did the actual capturing of the print detail, but as I

1092

mentioned, Special Agent Graham was there with me at all -- as well, and once I got the prints taken, I would hand them to him, and he would actually put them on the clear plastic sheets.

Q. As you were taking the prints, the major case prints of Angela Johnson, did you have an opportunity to observe her demeanor?

A. Yes, I did.

Q. And what was her demeanor at that time?

A. She had not said anything nor was she needing to say anything during this process, but at one point in time I looked

Page 94

at her, and she had tears streaming down her face.

Q. In addition to obtaining the prints on April 11 of 2000, did, in fact, Angela Johnson appear before the grand jury to provide testimony?

A. Yes.

Q. Mr. Basler, I've handed you what's already been admitted into evidence as Government's Exhibit 118. Could you explain to the jury what that is, though?

A. This is a transcript of the grand jury testimony taken from Angela Johnson on Tuesday, April 11, the year 2000.

Q. Was Angela Johnson placed under oath by the foreman of the grand jury to testify truthfully?

A. Yes, she was.

Q. I'd like to have you go through this grand jury transcript with me, and I'm going to talk about various topics, and we may

1093

move from page to page, so I'll identify what page I'm going to move to before we do that.

First thing I want to do is ask you was she questioned about her knowledge of drug distribution during this grand jury testimony?

A. Yes.

Q. I'd like to direct your attention to page 35 of the grand jury transcript and ask you starting at line 9, what I'd like to do is read through this, and I'm going to ask the questions, and I'd ask you to respond as Angela Johnson did on April 11 of 2000. All right?

A. That's fine.

Q. Question, We're going back now several years back into 1993, but at that time were you involved in the use or

Page 95

distribution of drugs?

A.   Her answer was, Now what?

Q.   Question was, Pardon me?

A.   And her answer was, What was that?

Q.   The question is, Back in 1993 were you involved either using or selling or distributing drugs?

A.   No.

Q.   Do you know whether or not Dustin Honken was involved at that time with drugs?

A.   No.

Q.   Do you know whether or not Terry DeGeus was involved at

1094

that time with drugs?

A.   I don't know.

Q.   Do you know whether or not Greg Nicholson was involved with drugs at that time?

A.   I don't know Greg Nicholson.

Q.   So do you know whether or not he was involved with drugs? Have you ever heard that he was?

A.   I've only read -- excuse me.  I've read in the paper he was.

Q.   Okay.  Other than --

A.   The only thing I know about Greg Nicholson or his girlfriend or her kids is what I've read in the paper, and that is all.

Q.   All right.  And what about Dustin Honken?  Have you ever talked about his involvement with Nicholson or DeGeus as far as drugs go at any time?

A.   I don't know.

Q.   You don't know or --

Page 96

A. I don't know if I have or not.

Q. Okay. Do you know what Dustin Honken was -- do you know that Dustin Honken was involved with drugs or not?

A. Do I what?

Q. Do you know that he was involved with drugs, selling drugs?

A. I know he was charged with that.

Q. Directing your attention now to page 38 to 39 of this

1095

transcript, was Angela Johnson questioned concerning her knowledge of a videotape?

A. Yes, she was.

Q. Starting at line 16, I'm going to ask the questions and ask that you respond in the manner that Angela Johnson responded on April 11 of 2000.

A. Which line? Excuse me?

Q. Sixteen.

A. On page 39?

Q. Thirty-eight, I'm sorry. Starts off, I am.

A. I'm struggling here. Could you show me where you're talking?

Q. Certainly. Are you with me now, Mr. Basler?

A. Yes. The "1" isn't visible. It just shows a "6".

Q. Yes, I realize it's a little confusing there. Question was, I am. I apologize for, in your view, my repetitive questions. Are you aware that Dustin Honken made a videotape with Greg Nicholson?

A. Her answer was no.

Q. Have you ever talked to Dustin about that?

A. I don't know, no -- probably. I don't know. I know there was a discussion of a videotape. I don't know anything about

Page 97

it.

Q.    And the videotape we're talking about is a videotape that he made with Mr. Nicholson where Mr. Nicholson was to exonerate

1096

Mr. Honken?

A.    I wouldn't know that.  I don't know anything about that videotape, nothing about that videotape.

Q.    During the questioning before the grand jury on April 11 of 2000, was Angela Johnson questioned concerning her knowledge and purchase of firearms?

A.    Yes.

Q.    I'd like to direct your attention to page 10 of the transcript and starting at line 1, I'm going to ask the questions and have you respond in the manner that Angela Johnson responded under oath on April 11 of 2000.

Miss Johnson, have you ever purchased a firearm?

A.    Her answer was, Yes, I have.

Q.    Would you describe that for us, please?

A.    Describe what?

Q.    The occasions in which you purchased a firearm, the occasion or occasions.

A.    I don't know how you want me to describe it.

Q.    What sort of a firearm or firearms have you purchased?

A.    I purchased two, a shotgun and also a nine-millimeter.

Q.    Where did you purchase the nine-millimeter?

A.    Either here in Cedar Rapids or in Waterloo.  I can't be for sure.

Q.    Can you tell us when that purchase was made?

A.    Well, several years ago.

1097

Page 98

Q. Do you still have that weapon?

A. No, I don't.

Q. What happened to the nine-millimeter?

A. It was stolen.

Q. When was it stolen?

A. Shortly after I bought it.

Q. Where was it when you last saw that nine-millimeter?

A. In a hiding place in my home.

Q. And that's your home on South 19th Street in Clear Lake, Iowa?

A. Right.

Q. Can you recall the make or model of that nine-millimeter?

A. It was black.

Q. And was it a semi-automatic weapon?

A. I don't know what semi-automatic is for sure.

Q. Just describe it for us as best you can, please, besides being black. Can you give any description?

A. You can hold it in one hand, and it fired more than one bullet.

Q. Okay. Where was it hidden in your home?

A. In my waterbed frame.

Q. Is that the Intratec 9 that you purchased at Duee's Pawn Shop in Waterloo, Iowa, of July of '93 -- I'm sorry, 1993?

A. Is it the what?

Q. The Tec-9 semi-automatic pistol that you purchased at

1098

Duee's Pawn Shop in July of 1993.

A. It would have to be because it's the only nine-millimeter

Page 99

that I ever bought.

Q. And you had a permit to acquire a weapon at that time?

A. Right.

Q. And that was issued by whom?

A. The clerk of court or whoever does the issuing of that in Mason City.

Q. Cerro Gordo County?

A. Right.

Q. Do you recall the approximate date on which you acquired that weapon?

A. I can't remember.

Q. Okay. If I would indicate to you that it was in the first week of July of 1993 --

A. It was summer. I know that it was summertime.

Q. Summer of 1993?

A. Yeah.

Q. You do recall that?

A. Right.

Q. What was the purpose of your purchase of that weapon?

A. Just for my own protection.

Q. How much did it cost? Do you recall?

A. It was a lot, but I don't know how much it was. I can't remember.

1099

Q. Whose money was used to purchase that weapon?

A. My money.

Q. Did anybody loan you any money to purchase that weapon?

A. No.

Q. Who was with you when you purchased that weapon?

A. Nobody.

Page 100

Q.    Did anyone advise you as to what sort of weapon you should purchase for your protection?

A.    No.

Q.    After you purchased that weapon at Duee's Pawn Shop in Waterloo, Iowa, in early July of 1993, what next did you do with that firearm?

A.    Took it home.

Q.    Go ahead.  And what else did you do with it then?

A.    Hid it.

Q.    In the frame of your waterbed?

A.    Right.

Q.    Did you ever take it out again?

A.    I'm sure I did.

Q.    Approximately when did you first find that it was missing?

A.    I can't say how long I had it before -- I don't even know how long it was gone when I discovered it was missing.  I was trying to think.  I would assume a month or so or two months maybe.  I just can't be sure.

Q.    Let's continue on to page 14 and continue the questioning

1100

there.  But some time in the summer of 1993 you believe?

A.    I don't know.

Q.    Okay.  Could it have been as much as four or five months after purchasing it?

A.    I don't think it was that long.

Q.    Okay.  Are you sure?

A.    No, I'm not sure.  I don't really remember.  It's been so long ago.  I just don't remember.

Q.    Okay.  I can appreciate that.  You did indicate, though, that it was stolen shortly after you purchased it, and I'm just

Page 101

wondering what you meant by --

A.    Sometime after I got it.

Q.    I just wondered --

A.    It wasn't like right after, the next day or the next week or something like that.

Q.    Okay.  But when you say shortly, I just wonder if you could give us some idea of it disappearing shortly after you purchased it.

A.    I know I didn't have it very long.  I never fired it, ever.

Q.    You anticipated my next question.  Did anybody ever fire that weapon?

A.    Never that I know of.

Q.    Was it ever in anyone's possession other than your own to your knowledge?

A.    I don't know what you mean by that.

1101

Q.    Okay.  Did you ever allow anyone else to handle that firearm?

A.    You mean like take it or --

Q.    Yes.

A.    Never.

Q.    To touch it?  Did you ever allow anyone else to touch it?

A.    I'm sure I showed it to somebody.

Q.    Who?

A.    I don't know.

Q.    Did you ever show it to Dustin Honken?

A.    I'm sure he saw it.

Q.    Did he ever handle it?

A.    I suppose he did.  I don't -- I don't really recall.  I don't really recall that.

Page 102

Q. Directing your attention to page 22 of the transcript, was questioning continued concerning the firearm at actually the bottom of page 21 and on to page 22?

A. Yes.

Q. I want to start on page 21 and go down through there. Let's start at the very top of that page and just read through there. Question, Is it possible you discussed that firearm with anyone else other than Mr. Honken?

A. It's possible. I can't say.

Q. Was there anything -- is there anything else you can tell us about what happened to that firearm?

1102

A. No.

Q. Was anyone with you when it was acquired?

A. What do you mean?

Q. How did you get to Waterloo, Iowa, to make the purchase of that firearm?

A. I drove there.

Q. By yourself or with anyone else?

A. No. I think I was by myself. I'm not sure if I was down here shopping or what, but I know I stumbled across that gun, and I don't think anybody was with me.

Q. Are you thinking it was an impulse purchase?

A. It was definitely an impulse purchase.

Q. But you had to acquire a permit to acquire that firearm some days earlier; isn't that true?

A. I had always had a gun permit.

Q. Okay. But you acquired one in late June of 1993; isn't that true?

A. I renewed it.

Page 103

Q. Shortly before acquiring this Tec-9 from Duee's Pawn Shop in Waterloo; isn't that true?

A. I'm not sure when the time -- when it was.

Q. Was Dustin Honken with you when you purchased that firearm?

A. I don't think so.

Q. Are you sure?

A. I'm not sure. It's been so long ago. I can't remember.

1103

It wasn't like an earth-moving -- it wasn't like when I had my kids. I can remember who was there when I did that. I just can't remember.

Q. One of the reasons I'm wondering about the firearm is you did have a small child living in the home with you at that time?

A. Right.

Q. I assume you had ammunition for that firearm as well?

A. Yep. I got bullets for it.

Q. From Duee's Pawn Shop?

A. No.

Q. Where did you get those bullets?

A. I think I got them at another store but not even the same day.

Q. Okay. Where was that store?

A. I can't -- I can't remember, probably Mason City.

Q. Does it -- the questioning continue on to page 23 concerning the assertion that she purchased it for her protection?

A. Yes.

Q. I want to continue starting with line 2 on page 23. And yet you're telling us that the gun disappeared, but you didn't make a report of it or do anything else out of concern for the

Page 104

safety of your own child or anyone else?

A.   I didn't believe my child was in any danger.

Q.   Even though you apparently did feel that someone was in

1104

your house and taking possession of a nine-millimeter pistol?

A.   Yes, that happened to me frequently.

Q.   What happened frequently -- I'm sorry, that happened frequently because you were being stalked by Terry DeGeus; is that true?  In fairness to you, wasn't he stalking you?

A.   Yes.

Q.   With regard to Angela Johnson's assertion that the firearm was stolen from her house, was she questioned concerning whether anything else was stolen at that time?

A.   Yes.

Q.   I direct your attention to page 18 and 19 of the transcript.  Focusing on starting at line 16 on page 18, question was asked, Is there anyone who can verify your claim that the gun was stolen?

A.   I don't know what you mean.

Q.   Did you complain to any authorities that you had had a theft at your home?

A.   No, I didn't.

Q.   Was anything else stolen at the time the gun was stolen?

A.   At the same time?

Q.   Yes.

A.   Not that I recall.

Q.   Was anything else stolen?

A.   I don't know when it was stolen.  I mean, things were taken out of my house frequently.  I mean, they had been in the past.

1105

Page 105

Q.  By whom?

A.  An ex-boyfriend of mine at the time.

Q.  And that would be Mr. DeGeus?

A.  Yes.

Q.  Was Mr. DeGeus aware of the fact that you had that Intratec?

A.  I don't think so, but he may have.

Q.  Based on your investigation, Agent Basler, prior to revealing in the grand jury testimony April 11 of 19 -- I'm sorry, of 2000 claiming at that time that the firearm was stolen, are you aware of any other report by Angela Johnson prior to that grand jury testimony that a firearm had been stolen from her house?

A.  No.

Q.  I want to move to a different topic of the grand jury questioning here.  Did Angela Johnson indicate whether or not she had a child with Dustin Honken?

A.  Yes.

Q.  And do you know whether she testified about when that child was born?

A.  Yes, she did.

Q.  Directing your attention to page 14 of the transcript, when was that child born?  I'm sorry, I'm giving you the wrong date, page -- wrong page number.  Page 42, line 12 and 13.

A.  She indicated that her child was born on February 14 of

1106

1994.

Q.  Was Angela Johnson questioned about her knowledge of the disappearance of Terry DeGeus during her questioning before the

Page 106

grand jury on April 11 of 2000?

A.   Yes.

Q.   Turning your attention to page 23 of the transcript and in particular focusing on line -- or beginning at line 19, I'd like to ask you some questions concerning testimony over the next few pages.  I'm going to go ahead and read the questions and if you would answer in the manner that Angela Johnson answered under oath on April 11 of 2000.

Question, When did you last see Terry DeGeus, Miss Johnson?

A.   I can't remember the last time I saw him.

Q.   Do you remember where you were when you last saw him?

A.   No, I don't.  I saw him a lot.

Q.   Do you remember the circumstances of that last occasion in which you saw Terry DeGeus?

A.   Well, every time I saw Terry DeGeus, it was pretty much the same.

Q.   How was that?

A.   Not pleasant.

Q.   Can you be more specific about how he was acting towards you?

A.   He was always very intimidating.

1107

Q.   Verbally?

A.   In every way.

Q.   Physically?

A.   In every way.

Q.   Did he threaten your life?

A.   Several occasions.

Q.   Do you recall the most recent occasion in which he

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 971 of 3592

threatened your life, Miss Johnson?

A. No, I don't.

Q. Those must have been frightening experiences for you, however.

A. Yes.

Q. I assume you recall at least one fairly vividly.

A. Recall one of the times that he threatened to kill me?

Q. Yes, ma'am.

A. Well, that would be -- the time that stands out in my mind would be the time that he beat me in broad daylight on Highway 9 outside of Forest City to the point where he ripped my shirt off me, got me back, threw me in the ditch, beat me, put me back in my car, my own car, took me behind a motel, and kept me there until someone who saw him beating me in the ditch called the police. And the police came there, and during that time he threatened to kill me several times, and then the police left me there with him.

Q. Do you recall when that occasion was?

1108

A. It was before I moved to Clear Lake, so like '89 or '90, something like that. That was probably the worst time.

Q. Okay. Miss Johnson, was he threatening toward you in the fall of 1993?

A. He was always threatening towards me.

Q. And did you have any contact with him in the fall of 1993?

A. What do you mean contact with him? Did I have contact with him?

Q. Did you meet with him in person or speak with him over the phone in October of 1993?

A. I avoided him at all costs at all time -- excuse me. Let

Page 108

me read that again. I avoided him at all costs all the time.

Q.   Did you succeed in avoiding him in October of 1993?

A.   I could never succeed in avoiding him.

Q.   What contact did you have with Mr. DeGeus in October of 1993?

A.   Whenever he decided, whenever he'd show up.

Q.   And he was still threatening toward you?

A.   He was always threatening towards me.

Q.   Did you have contact with Terry DeGeus on November 5, 1993?

A.   I don't know.

Q.   Do you recall visiting with Deputy Sheriff Robert Gerdes of the Hancock County Sheriff's Department in late 1993 regarding the disappearance of Terry DeGeus?

A.   I don't know -- even know who that is, and if I do, I don't

1109

remember him.

Q.   Do you remember speaking with anyone who was an officer of Hancock County in 1993 regarding the disappearance of Terry DeGeus?

A.   I don't remember ever talking to anybody from Hancock County.

Q.   Miss Johnson, did you have an appointment to meet with Terry DeGeus on the evening of November 5, 1993?

A.   No.

Q.   And did you meet with him on that evening?

A.   I never had a meeting to meet with Terry ever.

Q.   Just so I can help direct you to where I'm going on this, Terry DeGeus was last seen in life to our knowledge on November 5, 1993, on his way to meet with you. I am wondering if he, in fact, met with you the evening of November 5, 1993, as he

Page 109

indicated he was doing.

A.   I don't know if he saw me on that day or not.

Q.   Do you recall Terry DeGeus suddenly disappearing in the Britt, Iowa, area in late -- I'm sorry, yeah, do you recall Terry DeGeus suddenly disappearing in the Britt, Iowa, area in late 1993; correct?

A.   Terry would be gone a lot.  People would call my house a lot, Do you know where Terry is, do you know where Terry is?  I never knew where Terry was.

Q.   And many of the people who called you inquiring about the

1110

whereabouts of Terry DeGeus were close friends and family of his.

A.   Right.

Q.   Such as -- you tell me examples of people.

A.   His mom would call me or --

Q.   Okay.

A.   -- or Ashley because if he didn't pick her up when he was supposed to.

Q.   Ashley was his daughter?

A.   Right.

Q.   Directing -- moving to page 29 finishing up on the Terry DeGeus questions here, starting at the top -- or three quarters of the way to the top of the page with the words -- or question -- sentence that starts off, Okay.  Do you see that?

A.   Yes.

Q.   Okay.  Again, can you tell us whether or not you were working at the Mason City Country Club on the evening of November 5, 1993?

A.   I don't know.

Page 110

Q. That's fine. That's fine. Can you give us any explanation for why Terry DeGeus would claim that he was on his way to meet you on the evening of November 5, 1993?

A. Meet me or beat me?

Q. Meet you.

A. I don't know.

1111

Q. You had no conversations with him indicating a desire to meet with him on the evening of November 5, 1993.

A. No.

Q. Have you any knowledge of his whereabouts since that date?

A. No.

Q. Now, was Angela Johnson also questioned concerning her knowledge of the disappearances of Greg Nicholson and the Duncan family during her grand jury appearance on April 11 of 2000?

A. Yes, she was.

Q. Direct your attention to page 30, and we're going to start at the -- let's go ahead and start at the bottom of page 29 actually. The last question on page 29, Miss Johnson, have you ever met Kandi Duncan?

A. No.

Q. Have you ever met Amber Duncan?

A. No.

Q. Have you ever met Lori Duncan?

A. No.

Q. Have you ever met Greg Nicholson?

A. No.

Q. Have you ever been to Lori Duncan's residence on North Van Buren in Mason City, Iowa?

A. No.

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 975 of 3592

Q.   Is that true?

A.   That is true.  I have two daughters.  I would never hurt

1112

anyone else's daughters.  I would never hurt a child, let alone
two little girls.

Q.   One of those children is the daughter of Dustin Honken; is
that correct?

A.   Right.

Q.   Continuing on page 31, And just so we -- I'm sorry.  And
just so we're clear on that point, did you, in fact, take the
lives of those two children?

A.   No.

Q.   Pardon me?

A.   No, I did not.

Q.   Were you present when someone else did?

A.   No.

Q.   Do you know who took the lives of those children?

A.   No.

Q.   Do you know the whereabouts of Terry DeGeus?

A.   No.

Q.   Do you know where his body is located?

A.   No.

Q.   Do you know where the body of Greg Nicholson is located?

A.   No.

Q.   Do you know where the bodies of the Duncan children are
located?

A.   No.

Q.   Have you ever talked to anybody about the killings of

1113

Page 112

DeGeus, Nicholson, or the Duncan children?

A.   Just that I have made several comments and statements that I do not see how you can say these people are dead or murdered when as far as I know no one has ever been declared dead. They're gone, presumably missing.  I don't know that they're not gone because they want to be gone.  I don't know them.

Q.   And then at the bottom of page 32 was a question asked and then going on to page 33, Do you have any information at all concerning the disappearance, whereabouts, if they are not dead, of DeGeus, Nicholson, or the Duncan children?

A.   I wish that I did.

Q.   Agent Basler, directing your attention to the summer of 2000.  I think before in your testimony you indicated that Angela Johnson was, in fact, indicted by the grand jury.

A.   That's right.

Q.   And that occurred when, sir?

A.   The indictment was late in July.

Q.   And was she indicted in connection with the murders and for the murders of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus?

A.   Yes.

Q.   Was she arrested pursuant to a warrant issued after the grand jury returned the indictment?

A.   Yes, she was.

Q.   And who arrested her?

1114

A.   I arrested her accompanied by other law enforcement officers.

Q.   And after you arrested her, was she presented before a

Page 113

federal magistrate?

A.    After I arrested her, I took her to the Benton County Jail in Vinton, Iowa, at the directions of the United States Attorney's Office.

Q.    And after that was she then presented before a federal magistrate that day or the next day?

A.    Yes.

Q.    And as a result of hearings before the judge, was she released or held pending trial?

A.    No, she was held pending trial.

Q.    And where was she continued to be held at?

A.    For a period of time at that same jail in Vinton, the Benton County Jail.

Q.    Were directions provided to the Benton County Jail concerning the monitoring of Angela Johnson's mail and telephone calls?

A.    Yes.

Q.    And what were those directions, sir?

A.    The directions were that we requested that they copy any correspondence that she had, letters received, and also letters that she was writing while she was in the jail.  And we also requested that they record her telephone calls that she mailed

1115

from -- excuse me, that she made from the jail.

Q.    And pursuant to your request, was her outgoing mail copied and provided to you?

A.    Yes.

Q.    And did you ultimately provide that to the DCI lab in Des Moines?

A.    Yes, I did.

Page 114

Q.   And for what purpose?

A.   That was a large sample of what we call the known handwriting, writing that we can attribute to definitely being made by Angela Johnson.

Q.   Angela Johnson was arrested on what day, sir?

A.   July 30.

Q.   And by August of 2000, did you learn that Angela Johnson had had some contact with another inmate in the Benton County Jail?

A.   Yes.

Q.   And what was the name of the inmate with whom she was having contact?

A.   Robert McNeese.

Q.   Did you have -- did you know of Robert McNeese before learning of that contact in August of 2000?

A.   No.

Q.   Did you ever have any involvement in any other investigation with Robert McNeese?

1116

A.   No, I'd never heard of him, never met him before that time.

Q.   Ultimately did you receive maps purportedly drawn by the defendant regarding locations of the bodies of the victims?

A.   Yes, I did.

Q.   I've handed you Exhibits 310, 311, 312A, B, and C.  Could you identify those for the jury, please.

A.   Exhibit 310 is a piece of lined paper that appears to contain a hand-drawn map.

Exhibit 311 is also a portion of a page of lined paper that also appears to contain a hand-drawn map.

And Exhibit 312A, 312B, and 312C are all portions of

Page 115

lined paper that contains writing.

Q.   From whom did you receive those exhibits 310, 311, and 312A, B, and C?

A.   I received all these items from Special Agent Kevin Cavanaugh who is a DEA agent and also a member of a drug task force that operates in the Cedar Rapids, Iowa, area.

Q.   And at some point did you submit any of those exhibits for analysis by the DCI laboratory?

A.   I submitted all of these items to our laboratory.

Q.   And after the analysis was conducted on those items, were they returned to you?

A.   Yes.

Q.   And have they remained in your custody since then?

A.   Yes, sir.

1117

        MR. WILLIAMS:  United States would move to admit Exhibits 310, 311, and 312A, B, and C.

                              *   *   *   *

        (Government Exhibits 310, 311, and 312A, 312B, and 312C were offered.)

                              *   *   *   *

        MR. STOWERS:  I think this may be a good time to break, Your Honor.  Then we can visit.

        THE COURT:  Okay.  Yep.  Members of the jury, we're going to take our noon recess.  It's noon.  We'll be in recess till one o'clock.  Please remember my prior cautionary instruction about keeping an open mind till you've heard all the evidence and not discussing this case with anyone.  Thank you.  And can you pass out the -- here's your schedule.

        (The jury exited the courtroom.)

Page 116

THE COURT: Please be seated for a minute. The defense lodged a foundation objection in the pretrial order, and I don't think you've laid a sufficient foundation for them. All you've established is that Agent Basler got some maps from an FBI agent.

MR. WILLIAMS: Absolutely, Your Honor. It was my understanding that the defense was backing off the foundational objections, and that's why I moved it into evidence.

THE COURT: Oh, okay.

MR. WILLIAMS: We have everybody else to lay the

1118

foundation. We're willing to do that. But I understood they weren't really pushing that issue anymore.

THE COURT: Let's find out. Right.

MR. STOWERS: I think what I'd like to do is visit with Mr. Williams to see how far he's going to go with these exhibits with this witness because I don't want to slow it down.

THE COURT: Yeah, that's fine. Why don't you just -- we'll meet a minute before one and find out.

MR. STOWERS: That's fine, because I don't think we're going to have any objection to these because they're going to have other witnesses to lay the foundation for them.

THE COURT: Yeah, I wasn't doubting your ability to lay the foundation. I was just suggesting it hadn't been done yet. I didn't know you had kind of a side agreement with the defense on it.

MR. WILLIAMS: I'm sorry. I should have alerted you to that, Judge.

THE COURT: No, that's fine. Anything else we need to take up?

Page 117

MR. WILLIAMS: No, Your Honor.

MR. STOWERS: No, Your Honor.

THE COURT: Mr. Berrigan, can I see you for a minute about a CJA matter? We don't even need it reported. I can just talk to you up here about it.

(Lunch recess at 12:02 p.m.)

THE COURT: We got about two minutes before we bring the jury up. Did you have something, Mr. Stowers?

MR. STOWERS: Oh. Your Honor, at the break just before the jury was sent out for the lunch hour, the government had offered certain exhibits which are, of course, the Robert McNeese items from the Benton County Jail. We don't have any evidentiary objections that we're going to lodge at this time, but just out of an abundance of caution, we wanted to make clear that we're not waiving any of the issues we've raised in our pretrial motions to suppress that have previously been filed and much litigated in this case.

THE COURT: Yes, they have been.

MR. STOWERS: And we would like to just make that clear on the record, and that's obviously going to be an ongoing issue when Mr. McNeese appears maybe later yet this afternoon.

THE COURT: But I think the real question is, because the only objection that you actually reserved in the pretrial order on Exhibits 312A, B, and C, would be your foundation objection.

MR. STOWERS: Right.

THE COURT: The others are preserved by virtue of the pretrial order and by virtue of the objection you're now making.

MR. STOWERS: Right. So we're okay with them offering

Page 118

them now because they're going to be bringing all the other witnesses in to talk about whatever they need to talk about.

1120

THE COURT: But that would require you -- okay. So you don't have a foundation objection.

MR. STOWERS: Right. We don't have any evidentiary rules objection at this time, so we have no problem with them being admitted I guess.

THE COURT: Okay. Well, you have a problem with them being admitted. You don't have a foundation objection.

MR. STOWERS: Right.

THE COURT: Right. Okay.

MR. STOWERS: All right.

MR. WILLIAMS: And, Your Honor, just to alert you, I would, at the end of finishing my questioning with Mr. Basler, indicate that I have no further questions of him at this time. It's my intent to recall him at a later time on different subjects at the conclu -- at the end of the case, and I've talked with defense about that, and it's my understanding they don't have an objection to that.

THE COURT: Do you have an objection?

MR. STOWERS: No.

THE COURT: If you do, it'd be overruled. You don't have one. Thank you.

MR. STOWERS: I just want to make sure our objection on this suppression issue applies throughout the McNeese testimony as well.

THE COURT: Yes, you have a standing objection on all

1121

Page 119

of these exhibits.

MR. STOWERS:  Yes, I understand.  Thank you.

(The jury entered the courtroom.)

THE COURT:  Thank you.  Please be seated.

Mr. Williams, we left off at the noon hour with you offering some exhibits.

MR. WILLIAMS:  Yes, Your Honor.  We would renew our motion to admit Exhibits 310, 311, 312A, B, and C.

MR. STOWERS:  We have no objection subject to the record we just made.

THE COURT:  Okay.  Thank you.  Government's Exhibits 310, 311, 312A, B, and C are admitted.

* * * *

(Government Exhibits 310, 311, and 312A, B, and C were admitted.)

* * * *

MR. WILLIAMS:  Your Honor, I have no further questions of this witness at this time.  I would request permission to recall him later in the trial on different issues.

THE COURT:  Any objection?

MR. STOWERS:  No.

THE COURT:  Okay.  You may recall him.

Mr. Stowers, will you be doing the cross-examination?

MR. STOWERS:  Yes.

THE COURT:  Okay.  Thank you.

1122

CROSS-EXAMINATION

BY MR. STOWERS:

Q.   Good afternoon.

A.   Good afternoon.

Page 120

Q. Agent Basler, you've been with the Division of Criminal Investigation for over 30 years; is that correct?

A. Not quite. It will be 30 years this fall.

Q. And you're getting ready to retire and move on into your afterlife here; is that correct?

A. Yeah, depending how you describe afterlife.

Q. Well, it looks like you're in pretty good shape and you got some years yet on your watch.

A. I hope so.

Q. One of the things that you talked about in your testimony was when it was that you first actually became involved in investigating the disappearance of first the Nicholson and Duncans as well as the subsequent disappearance of Mr. DeGeus. Do you remember that?

A. Yes.

Q. And your testimony on that as I understand it now is that you actually did not start to work on this case until -- well, you started doing a little bit at the beginning in the fall of 1993 with reference to Mr. DeGeus; is that right?

A. Yes.

Q. And then you kind of dropped out of the case, and then you

1123

resurfaced, if you will, reinvolved yourself again, in 1999.

A. No, that's not quite right.

Q. All right. Can you explain to me where I've gone wrong?

A. Yes. As I mentioned this morning, the DCI was requested in 1996 given the new information that had been received. The DCI opened a case in 1996. Another agent had the case agent responsibilities for that, but I had some limited involvement from '96 until '99.

Page 121

Q.   Okay.  So you were involved as early as 1996.

A.   Yes.

Q.   And the other agent was an agent from Cedar Falls named Kemming; is that correct?

A.   Yes.

Q.   And your initial involvement with regard to Mr. DeGeus's disappearance concerned searching his house, was it?

A.   Yeah, that's one of the first things that I did.

Q.   And did you obtain a search warrant to do that?

A.   Yes.

Q.   And did you encounter any evidence of any criminal activity in your search of his house?

A.   No, I didn't.

Q.   Did you find any drugs?

A.   No.

Q.   Any drug paraphernalia?

A.   No.

1124

Q.   And had it appeared to you that somebody had cleaned his house up and removed items from it prior to your search?

A.   No.

Q.   But you were aware that Mr. Nicholson had disappeared at the same time as Ms. Duncan and her two children; is that correct?

A.   I was aware of it, yes, by reading the newspapers and talking to other cops.  In that sense I was aware.

Q.   And you were aware of that in the fall of 1993.

A.   Yes.

Q.   When you got assigned the task of looking into Mr. DeGeus's disappearance, you were aware of that.

Page 122

A.    Yes.

Q.    And had you at that time made any connection in your own mind at least between those two events, the Nicholson/Duncan situation and the DeGeus situation?

A.    Had I drawn any conclusions?

Q.    Any connection.

A.    Oh.  I think that I was aware of that, and it certainly was being considered, sure.

Q.    And so when you do an investigation and you find out that the specific thing that you're investigating might be related to another crime, then it becomes appropriate for you to take all that into your umbrella; isn't that correct?

A.    All what?

1125

Q.    All of that activity into your investigative sphere.

A.    Well, I didn't have all of that investigative material on the missing persons from Mason City available to me at that time.

Q.    Was there any prohibition on you obtaining that information from the Mason City Police Department?

A.    I didn't ask, so I don't know if there was a prohibition or not.

Q.    But in any event, I guess it was decided early on in the case of these two disappearances, that is, of the Nicholson/Duncan disappearance and the DeGeus disappearance, to not do any type of investigation other than attempt to talk to witnesses and that sort of thing on the initial phases and then to search Mr. DeGeus's home; is that right?

A.    I guess it is.

        MR. WILLIAMS:  Object.  I'm sorry.  I'm going to
                    Page 123

object just on the compound nature of that question.

THE COURT: Sustained.

MR. STOWERS: That's fine.

BY MR. STOWERS:

Q. Well, in any event, you made a decision not to involve yourself in the disappearance of Lori Duncan and her two daughters and Mr. Nicholson?

A. No, it wasn't a decision that I made. As I tried to explain this morning, I can't just interject myself into

1126

somebody else's investigation without a request coming from that investigation, and that request had not been made.

Q. And you hadn't made the request to become involved yourself.

A. We don't make requests. We get requests.

Q. Now, during the initial work that you did in connection with the disappearance of Nicholson and the Duncans, did you at any time interview any of the employees that would have been working at the Mason City Country Club on November -- I'm sorry, let me rephrase the question.

In connection with your work on the DeGeus disappearance -- I'm sorry. In connection with your work on the DeGeus disappearance, did you interview the employees that would have been working at the Mason City Country Club on November the 5th of 1993?

A. I'm not sure when you mean. They were interviewed.

Q. Did you interview any of them?

A. Personally?

Q. Yes.

A. No.

Page 124

Q.   Did you attempt to obtain any hours that would establish when Angela Johnson would have worked, if she worked at all, on the 5th of November, 1993?

A.   Yes, I did.

Q.   And did you obtain those records?

1127

A.   No.

Q.   And do they have such records at the country club?

A.   They said that they didn't, and I took them at their word.

Q.   Did you ascertain what her shift would have been on November the 5th of 1993 at the Mason City Country Club?

A.   Again, I requested those records from the country club, and they didn't have them, so they weren't able to tell me what shift.

Q.   Were you able to determine if she was working at all that day?

A.   From the country club?

Q.   Right.

A.   No.

Q.   When did you first start looking into that?

A.   Into those work records?

Q.   Right.

A.   I'm not certain.

Q.   Months and months later or years possibly?

A.   Later than what?

Q.   1993 November.

A.   Yes.

Q.   When you first got this case from the Hancock County Sheriff's Office, had they advised you that it was believed that Angela Johnson may have been the last person to see Mr. DeGeus

Page 125

alive?

1128

A.    Yes.

Q.    And are you telling the jury that you did not check out where she was on the 5th of November, 1993, yourself as the investigator in this case?

A.    I already knew.

Q.    She was at work.

A.    Yes.

Q.    Do you know when she got off work?

A.    The information that I had was what she shared with then Deputy Sheriff Gerdes.

Q.    What was your understanding?

A.    That Terry had come to the country club when she was getting off work during the evening and that they conversed.

Q.    Did you have an understanding as to when she got off work?

A.    Only that it was at the evening.

Q.    Now, when you were talking earlier, you indicated that you had determined at some point in time that you would as a local agent in Mason City become reinvolved in a bigger way as the lead agent in this investigation; right?

A.    Yes.

Q.    So you took this case sort of back over or it was given back to you in some respects by Mr. -- by the supervisor in the area; is that right?

A.    Yes.

Q.    And who was the supervisor at that time?

1129

Page 126

A.    John Lang.

Q.    And so it was assigned back to you in -- the time again?

A.    1999.

Q.    All right.  And that's when you became involved again in a bigger way; right?

A.    Yes.

Q.    And before that you were aware this investigation was ongoing, but your involvement was sort of limited in those middle years of the 1990s.

A.    That's right.  From '96 to '99, the case wasn't assigned to me, but I certainly helped whenever they needed help and whenever I was available to help.

Q.    Do you know when it was in 1999 that you got reinvolved approximately?

A.    No.  I think it was in the summer or the fall, but I'm not certain.

Q.    You'd agree that there's a large, large volume of paper that's been generated in this investigation over this last 12 years, 11, 12 years; right?

A.    Yes, I'd agree with that.

Q.    Tremendous number of reports and materials that have been gathered by you and the various other agencies; correct?

A.    Yes.

Q.    One of the things that you read in one of the excerpts from the April 2000 testimony of Angela Johnson was her testimony

1130

that she had had a gun permit at a prior time as well.  Do you remember that testimony?

A.    That's what she testified to, yes.

Q.    Could you find that gun permit at the Mason City Police

Page 127

Department, or did you look for it?

A. We looked, and it wasn't at the Mason City Police Department. It was at the sheriff's office. We went back as far as they kept their records which was a considerable distance into the past, and we only found one other year that she had made application for a permit.

Q. Okay. So you did determine that she had had a permit at a prior time.

A. I determined that she had a permit one time one year other than the one that we're talking about currently.

Q. Okay. I'm with you. Now, when she was brought into the grand jury in April of 2000, that would have been over in Cedar Rapids; right?

A. Yes.

Q. And you, of course, would have been there because you were involved in taking her prints; right?

A. Yes.

Q. And there was -- as there would be in any kind of major case like this, there would have been some discussion preceding that appearance between you and the attorneys that you were working with about strategy and things like that; is that

1131

correct?

A. No, I don't believe that is correct.

Q. Did you know that she'd be coming in prior to that date?

A. Certainly.

Q. Okay. So you knew she was going to be appearing, Angela Johnson, that is.

A. Yes.

Q. In front of the grand jury.

Page 128

A.    Yes.  I think you asked if I knew of any strategy or if we had any strategy meetings, and the answer to that was no.

Q.    What was your -- what was your hope when she appeared in Cedar Rapids in April of 2000 to not only get fingerprints but to be asked some questions about this situation?

        MR. WILLIAMS:  Objection as to relevance, Your Honor.

        THE COURT:  Overruled.

A.    What were my hopes?

Q.    Yes.

A.    I hoped that I'd get a good set of major case fingerprints, and I hope that had she'd tell the truth to the grand jury.

Q.    Right.  And what you were really doing at that point is you really wanted to get her testimony implicating Mr. Honken in these killings; isn't that correct?

A.    I don't believe that the decision to have her reappear at the grand jury was made by me.

Q.    Was that what you were hoping for?

1132

A.    Pardon me?

Q.    Was that what you were hoping for, that she'd implicate Mr. Honken in her testimony?

A.    No, I hoped that she would tell the truth to the grand jury.

Q.    Which you believed, based on what Gaubatz had told you or as she was then known, Cole, that she would implicate Mr. Honken in killing these five people.

A.    I hoped that she would tell the truth.

Q.    And you believed Gaubatz at that point; isn't that correct?

A.    Yes.

Q.    And you wanted her to confirm what Gaubatz was saying which

Page 129

was that Mr. Honken had killed these five people.

A.   Again, my only hope was that she would tell the grand jury the truth.

Q.   Now, you're aware of immunity; is that correct?  You know what that's all about?

A.   Yes.

Q.   Ms. Johnson was brought in front of the grand jury in April of 2000, and she was not given any assurance prior to her testifying that her testimony could not be used against her; isn't that correct, sir?

A.   I don't think she was given any immunity, no.

Q.   And the reason that immunity is given is so that a person who appears in front of the grand jury can feel free when they

1133

answer questions to tell the truth without fear to themselves; isn't that correct?

A.   That sounds right.

Q.   And you testified that Ms. Johnson had a young daughter in 2000 by Dustin Honken.  Her daughter would have been then I believe 6 years old having been born on February the 14th of 1994; is that right?

A.   Yes.

Q.   And her daughter's name I believe you know is Marvea; is that correct?

A.   Yes.

Q.   And she had an older daughter as well; is that right?

A.   Yes.

Q.   Alyssa.  I believe she's ten years older than Marvea, but I could be wrong.  Is that correct?

A.   Yes.

Page 130

Q. And were you aware when Ms. Johnson appeared in front of the grand jury in April of 2000 that she still believed that it was very important for her daughter and Dustin Honken's daughter Marvea to maintain some type of a parent-child relationship even though Mr. Honken at that time was in prison?

MR. WILLIAMS: Objection, Your Honor. Calls for speculation.

THE COURT: You can answer if you know.

A. I don't know.

1134

Q. Now, you described the fact that you took some fingerprints and they've been introduced as an exhibit as well as some hand prints, and you've described the process that you used to do that when she appeared in April of 2000 in the grand jury room. And I wanted to talk to you about that for a moment; okay?

A. Sure.

Q. Now, as I understand it, the purpose for taking fingerprints would be to compare those prints to some other prints that you would not know whose prints they were. So you'd have some questioned prints, right, and you'd compare the known prints to the questioned prints. Is that what that's all about?

A. I'm not real sure what you just asked.

Q. Well, if you had an item where a fingerprint had been lifted off of it, say, at a crime scene and you wanted to figure out whose fingerprint that was, you'd need to have some known prints to compare that unknown fingerprint to; is that right?

A. Yes, it is.

Q. So you gotta compare a known print to an unknown; is that right?

A. Yes.

Page 131

Q.   That's called fingerprint comparison; is that right?

A.   Yes, it is.

Q.   Now, did you have any fingerprints that you were trying to compare Angela Johnson's fingerprints to in April of 2000?

A.   No, we did not.

1135

Q.   Okay.  Can you tell the jury what was going on there then as to why you were putting her through a process tantamount to being arrested and having her fingerprints taken?

        MR. WILLIAMS:  Objection, Your Honor.  Argumentative.

        THE COURT:  Sustained.

BY MR. STOWERS:

Q.   What was the reason that you were taking her prints if you didn't want to have her prints compared to anything?

A.   I wanted to have her known fingerprints, those that I knew were hers, and her palm prints in case at some point in time we recovered evidence that had latent or unknown fingerprints so that we could make that comparison that you just talked about.

Q.   People who have been arrested in the past typically will have their prints taken; is that correct?

A.   Yes.

Q.   And you had no such prints relating to Angela Johnson because she had not been arrested in the past.

A.   That's right.

Q.   Do you think this would be something of an intimidating atmosphere for somebody not having been arrested before being compelled by subpoena to appear in front of a grand jury to then have somebody taking their prints in that manner?

A.   Are you asking my opinion?

Q.   Sure.

Page 132

A.   No, I don't think so.

1136

Q.   Nevertheless, she was quite upset at this time, and you described her crying as you were taking her prints.

A.   She was upset about something, yes.

Q.   Was this part of a plan that you worked out that you'd have Ms. Johnson appear pursuant to a subpoena, that you would have this situation set up for these prints to kind of shock her into cooperating with you?

A.   No.

Q.   That wasn't your purpose?

A.   No.

Q.   Do you have page 27 of the grand jury transcript in front of you?  I believe that's Exhibit 118.

A.   Yes.  Yes, I have it.

Q.   I think you were reading earlier that passage at the top of page 27 regarding whether or not -- there was a line of questions, a series of questions, about whether or not Ms. Johnson had ever met Terry DeGeus on November the 5th of 1993.  And at the top I think because it's partially stamped over, you might have misread or omitted a word in your answer. And I wanted to read you starting at line 1.  This is the line of questions where she was being asked about Mr. DeGeus. Question, And did you meet with him on that evening?  And she answered, I never had a set meeting to meet with Terry ever; isn't that right?  Was that her answer?

A.   Yes, it is.

1137

Q.   I think when you answered that you may have omitted the

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 997 of 3592

word set.

A.   If I did, it's inadvertent.  It's covered up by that stamp you talked about.

Q.   Yeah, it's kind of hard to read these sometimes.  And by the way, those are stamped "grand jury material, do not copy or redisseminate"; right?

A.   Yes.

Q.   And you're aware that federal grand jury proceedings are secret proceedings.

A.   Yes, I'm aware of that.

Q.   And only persons such as the prosecutor, the court reporter, the grand jurors, and investigators working directly with the prosecutor on the case are allowed to know what goes on in a grand jury room; isn't that right?

A.   Well, the witness obviously.

Q.   Right, and the witness.

A.   Yes.

Q.   And these transcripts of grand jury proceedings are maintained confidentially and stamped so just like this one is; right?

A.   Yes.

Q.   So when Angela Johnson appeared in front of the grand jury in April of 2000, it was your hope that she would testify truthfully; is that correct?

1138

A.   Yes.

Q.   And you don't believe she did that.  Fair to say?

A.   Asking my opinion again?

Q.   Sure.

A.   I don't believe she was truthful, no.
Page 134

Q.    Now, she was then indicted at the end of July of the year 2000; is that right?

A.    Yes.

Q.    And she was charged at that time with assisting in the commission of these murders; is that correct?

A.    Yes, it is.

Q.    And at that time she was charged alone in that indictment; isn't that correct?

A.    Yes.

Q.    And Mr. Honken had not up to that time been charged with committing those murders; isn't that correct?

A.    Yes, it is.

Q.    Now, wasn't that part of a strategy, sir, to indict Miss Johnson first and then use that indictment as a tool to get her to testify against Dustin Honken?

A.    No.

          MR. STOWERS:  That's all I have.  Thank you.

          THE COURT:  Any redirect, Mr. Williams?

          MR. WILLIAMS:  Very briefly, Your Honor.

                    REDIRECT EXAMINATION

1139

BY MR. WILLIAMS:

Q.    Just to go back to this grand jury proceeding, do you know why grand jury proceedings are conducted in secret?

A.    I think I do.

Q.    And could you relate to the jury your understanding.

A.    My understanding is that it's a secret proceeding so that the witness at the grand jury will have some security that everybody isn't going to know what they say and that they will come in and give honest answers.

Page 135

Q.   Are there occasions when conducting grand jury investigations the fact that a witness appeared and what they said before the grand jury could jeopardize the investigation itself?

A.   Absolutely.

Q.   Are there times that revealing that a person testified before the grand jury and what they said could jeopardize their very lives?

A.   Yes.

Q.   Are there times that the grand jury investigates cases and ultimately doesn't return an indictment against somebody?

A.   Yes, that's true.

Q.   In those cases if the grand jury proceedings were provided and made public, would that jeopardize innocent people's reputation and well being?

A.   Yes.

1140

Q.   When an indictment is ultimately brought against a defendant, are all the grand jury proceedings provided in the usual course to the defense attorney for them to understand exactly what happened before the grand jury?

A.   Certainly.

Q.   And one other thing.  You were asked about whether employees at the Mason City Country Club were interviewed concerning any knowledge they might have regarding the disappearance of Terry DeGeus.  Without getting into what any of the employees said there, as a result of any of those interviews, were you able to determine any additional leads or anything that assisted you in the investigation into the disappearance of Terry DeGeus?

Page 136

A.    No.

MR. WILLIAMS:  No further questions.

MR. STOWERS:  Nothing further.

THE COURT:  Okay.  You may step down, Agent Basler.

Is the government ready to call its next witness?

MR. WILLIAMS:  Your Honor, United States calls Mike Merino.

THE COURT:  Everybody can take a stretch break.

MICHAEL MERINO, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated in the witness box.  Make yourself comfortable.  Please adjust the chair and the microphones so you can speak directly into the microphones.

1141

And when you're ready, would you state your full name for us and spell your last name.

THE WITNESS:  Michael Joseph Merino, M-e-r-i-n-o.

THE COURT:  Thank you.

Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q.    Mr. Merino, can you tell the jury what do you do for a living, sir?

A.    I work for the Benton County Sheriff's Office.  I'm a jailer.

Q.    How long have you been a jailer at the Benton County Sheriff's Office?

A.    Seven years.

Q.    Can you -- have you had the same position the entire time you've been there?

Page 137

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1001 of 3592

A.   Yes.

Q.   Any prior experience in law enforcement before you took this position, sir?

A.   No.

Q.   What are the duties of a jailer at the Benton County Jail, sir?

A.   To keep the prisoners safe, for the most part happy, and feed them good.

1142

Q.   Let's talk about the Benton County Jail for a moment. First of all, where is it located at?

A.   Vinton, Iowa.

Q.   And can you give the jury an idea where in relation to Cedar Rapids is Vinton, Iowa?

A.   It's 30 miles north of Cedar Rapids.

Q.   How large of a jail is this?

A.   31-bed facility.

Q.   What type of inmates do you have on a regular basis staying at the Benton County Jail?

A.   It varies from juveniles to women inmates, federal inmates, and male inmates.

Q.   How old of a jail is it if you know?

A.   Fifteen years I believe.

Q.   Can you give the jury some idea of the size of the staff, of other jailers at the Benton County Jail?

A.   Right now we're running approximately eight jailers.

Q.   And in nineteen ninety -- I'm sorry, in the year 2000, what was the staff running at?

A.   I believe about the same.

Q.   Can you describe for the jury what are the various
Page 138

positions and duties of other members of the staff of the Benton County Jail?

A.   As far as jailers are concerned?

Q.   Sure.  Let's start with jailers.

1143

A.   Just like I said before, the safety and welfare of the inmates.

Q.   You have jailers on staff 24 hours a day there.

A.   Yes.

Q.   So you run multiple shifts?

A.   Correct.

Q.   Are there also dispatchers who work at the same facility where the Benton County Jail is located?

A.   Yes.

Q.   Do they end up having any involvement or duties with respect to the operation of the Benton County Jail as well?

A.   Yes.

Q.   Could you describe what they -- how they might get involved in the operation of the jail?

A.   They also monitor cameras that are in the control room.

Q.   Mr. Merino, I've just handed you what's been marked as Government's Exhibit 318.  Can you identify that?

A.   That is the layout floor plan for the Benton County Jail.

Q.   And does it fairly and accurately reflect what the layout of the Benton County Jail was in the year 2000?

A.   Yes.

         MR. WILLIAMS:  United States moves to admit Exhibit 318, Your Honor.

                          *   *   *   *

         (Government Exhibit 318 was offered.)
                          Page 139

* * * *

THE COURT: Any objection?

MR. STOWERS: No objection.

THE COURT: 318 is admitted.

* * * *

(Government Exhibit 318 was admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor.

THE COURT: You may.

BY MR. WILLIAMS:

Q. I put on the display there the layout of the Benton County Jail floor plan. Do you see that white kind of pencil-looking thing in front of you?

A. Yes.

Q. I'm going to ask you to use that on occasion as we go through this. Could you, first of all, just describe for the jury, is this jail connected to another -- connected to a larger part of a building?

A. Yes.

Q. And what is on the other side of the building from the jail itself?

A. That would be the sheriff's office and the administrative staff.

Q. Can you point out to the jury where the front entrance is to this jail?

A. Right here.

Page 140

Q. And the dispatchers you spoke about earlier, there's a label up there for dispatchers; is that correct?

A. Yes.

Q. Now, the lines are fairly hard to see on this exhibit when it's displayed up on the screen, but in front of cells 8, 7, 6, and 5, is there actually some walls in front of it? Those aren't open cells, I take it. Do you see -- if you look behind you, it's hard to see there's a line there, but is there, in fact, lines across --

A. Yes, there is.

Q. All right. Could you -- you've indicated before you had like a 31- or 32-bed facility?

A. Correct.

Q. Could you describe for the jury where -- I mean, how many beds in each cell and how does that work out there?

A. Okay. Starting from cell 4 and 8, these are all kind of a mirror image of each other until we get down to cell 1 and isolation. But 4 and 8, they house 5 people. 7 and 3, they house 3 people. 6 and 2, they house 2 people. And like I said, once we get down to cell 1, that's a 1-person cell. Isolation and cell 5 houses 2 people.

Q. There's an outdoor recreation area noted at the bottom of the screen. Do you see that?

A. Yes.

1146

Q. And could you explain to the jury what kind of access do inmates of the Benton County Jail typically have to the outdoor recreation area?

A. They have access to the outdoor rec. for two hours a week.

Q. And if you were going to be taking inmates from any of

Page 141

those cells, can you draw a line that would take them the route they would have to be taken? Let's just take cell 7. You've got some inmates in cell 7. You want to get them out in the outdoor recreation. Where would they walk?

A. First of all, they'd go down the main hallway in between the dispatcher and cell 5 and out that door. There's a door right there out into the outdoor rec.

Q. And can you indicate as well, is there any type of books or magazines or anything like that that inmates would have access to?

A. Yes, at the booking area.

Q. And the booking area's in the upper right-hand corner of Exhibit 318?

A. Correct.

Q. What kind of access do inmates have to those magazines and books? In other words, if I'm an inmate in cell 7, how would I -- if I wanted to go get one of those books or get a book from there, how does that happen?

A. They'd have to request it from one of us.

Q. Looking at that outdoor recreation area again, are there

1147

windows from those cells 5 through 8 that look out on to the outdoor recreation area?

A. Yes.

Q. And can you actually see through the windows?

A. No, they're frosted.

Q. Describe for the jury if you would the -- you indicated earlier that you have male and female inmates, you have juvenile inmates, and sometimes you have federal inmates, so I want to talk about each of those separately. First of all, federal

Page 142

inmates, when you say we have federal inmates, what are you referring to?

A. People that are held federally in the U.S. marshal's custody.

Q. And are there times over the years you've worked at the Benton County Jail that the marshals have temporarily housed federal inmates in your facility?

A. Yes.

Q. Is that a fairly regular occurrence?

A. It is.

Q. What about juveniles? Do you have a special room or a special cell that you house juveniles in?

A. No.

Q. What about the federal inmates? Are there special cells you keep the federal inmates in compared to non-federal inmates?

A. No.

1148

Q. You have male and female inmates. Are there cells designated for males and cells designated for females?

A. No.

Q. Do you have keep juvenile inmates separated from adult inmates?

A. Excuse me?

Q. Do you keep juvenile inmates separated from adult inmates?

A. Yes.

Q. And how do you go about doing that?

A. We try to do it through sight and sound. We get them as far apart as we can. Like it shows here, for example, we'd try and get the juveniles on one side of the hallway and maybe the adults on the other side so we don't have any contact with them.

Page 143

Q.    And let's talk about male and female inmates.  I take it you don't cell them in the same cell together.

A.    No, we don't.

Q.    Do you take steps to keep male and female inmates separated?

A.    Yes.

Q.    And can you describe what efforts you make to do that?

A.    It applies the same as the juveniles.  We try and split them up as far as we can apart.

Q.    Are they allowed to communicate, male and female inmates allowed to communicate, with each other from different cells?

A.    No.

1149

Q.    Does that go also from male to male inmates from different cells?  For example, if you got a male inmate in cell 5, are they allowed to communicate with an inmate in cell 1?

A.    No.

Q.    And are there ways that you attempt to prevent communication if they try?

A.    We try.

Q.    And despite your efforts, does communication take place regardless?

A.    Yes.

Q.    How is it that the communication would take place whether it's between male and male inmate or male and female inmate?  How have you found over the years they communicate despite the prohibition against it?

A.    They talk through the walls.  They send mail through the U.S. Mail.  They'll put notes in books and then store them back in the little library we have.  If their food slot's open, talk

Page 144

to them through that.

Q. Do you sometimes discover them actually doing this type of activity?

A. Yes.

Q. And when you discover them taking this kind of activity, do you take action against them?

A. Yes.

Q. And what kind of action can you take against inmates that

1150

would violate a rule, say, such as communicating with another inmate?

A. Well, that would probably be considered a major infraction, and we would write them up.

Q. Are there varying degrees of discipline that you can be -- that can be brought to bear against an inmate violating the Benton County Jail rules?

A. Yes.

Q. And what are some of the various degrees of discipline that can be brought?

A. From being talked to about it the first time all the way to receiving 30 days for the penalty.

Q. Mr. Merino, I've just handed you what's been marked as Government's Exhibits 318A through N as for Navy and ask if you can identify those exhibits.

A. Yes.

Q. And what are those?

A. Those are the Benton County Jail.

Q. Copies of photographs of the Benton County Jail?

A. Yes.

Q. And do they fairly and accurately reflect what the Benton

Page 145

County Jail looks like?

A. Yes.

Q. Now, some of those are taken outdoors of the recreation area?

1151

A. Yes.

Q. And is it fair to say at the time these were taken it was winter and there was snow on the ground?

A. Correct.

MR. WILLIAMS: United States moves to admit Exhibits 318A through N as in Navy.

* * * *

(Government Exhibits 318A through 318N were offered.)

* * * *

MR. STOWERS: No objection.

THE COURT: Okay. Government's Exhibits 318A through N are admitted.

* * * *

(Government Exhibits 318A through 318N were admitted.)

* * * *

BY MR. WILLIAMS:

Q. Just so we can aid the jury and have a better understanding of the Benton County Jail, I'm going to run through these photographs with you, sir.

A. Okay.

Q. I'm showing what's now marked as Government's Exhibit 318A, and can you describe for the jury what they're seeing on that first exhibit?

A. That is the main corridor of the jail going down the hallway.

Page 146

Q. And this view is looking either from the dispatcher's or toward the dispatcher's location?

A. That would be from the dispatcher's window.

Q. And can you describe the closest door on the right-hand side, is that a door to one of the cells?

A. That would be cell 1.

Q. And can you describe what type of door and security are involved in a door like that? In other words, is that a solid door?

A. That is a solid door.

Q. In this case there appeared to be something in the lower right-hand -- or in the lower part of the door.

A. The food slot.

Q. Food slot. On cell 1 there's a food slot. Are there food slots on the other cells in the Benton County Jail?

A. Not all of them.

Q. Is there a particular reason why some have food slots and some don't?

A. Because they don't have an inner door like some of the other cells have.

Q. Can an inmate control whether that food slot is open or shut?

A. No.

Q. So that's decided by the guards or the jailers there.

A. Correct.

1153

Q. Showing you Exhibit 318B, can you describe for the jury what they're seeing in that picture.

Page 147

A.    That's looking east down the hallway into the dispatcher's window.

Q.    And again, the dispatcher's window is at the end there?

A.    Correct.

Q.    318C, sir?

A.    That looks to be cell 7.

Q.    318D?

A.    That is a food slot.

Q.    318E?

A.    That is an inner door of a lockdown cell.

Q.    And can you explain what you mean by an inner door to the lockdown cell?  If there's an inner door, is there an outer door?

A.    Actually there's two outer doors.  That is when they get locked down for the night.  There's an additional door of bars and then another steel door.  It all depends on the cell configuration, but that's the way it works.

Q.    318F?

A.    That looks --

Q.    Just generally what --

A.    Basic cell that we have there at Benton County.

Q.    And 318G?

A.    That's the inner door -- or the two outer doors that I

1154

described just a while ago.

Q.    And so where -- is this picture, 318G, taken from inside the actual cell itself pointing back out toward the door?

A.    Yes.

Q.    And so the inmates don't actually stay or sleep inside that caged area.

Page 148

A.    No, no.  That is just for staff only there to feed meals and that kind of stuff.

Q.    318H?

A.    That's one of our many cameras.

Q.    And are there cameras located in each of the cells?

A.    Yes.

Q.    Now, do you record what goes on in the cells?

A.    Yes.

Q.    And are those used for -- can you monitor them as activity is occurring as well?

A.    Yes.

Q.    Now, do you typically always record and maintain and keep tapes of everything that occurs in the cells?

A.    We do.

Q.    318I?

A.    That's a typical set-up for a cell.

Q.    318J.

A.    Same thing.

Q.    318K.

1155

A.    That is our booking area, and those three cabinets right there are our little library.

Q.    And can inmates -- on occasion, are they allowed to go up there and look through the library and pick out their own books?

A.    Yes.

Q.    Going back to those tapes for just a minute, does -- the cameras that you have, do they have sound on the cameras themselves?

A.    We have an audio system throughout the jail.

Q.    That you can --

Page 149

A.     Intercoms.

Q.     -- push a button in order to communicate.

A.     Yes.

Q.     The cameras don't actually tape sound, though.

A.     No.

Q.     318L?

A.     That is the window looking out from outdoor rec.

Q.     Now, can inmates open the windows from inside?

A.     No.

Q.     Can they be opened from the outside?

A.     No.

Q.     And you say -- you said earlier they're frosted, and so you can't actually see through them?

A.     Right.  I imagine you could see a silhouette through them. That's about it.

1156

Q.     318M?

A.     That is looking towards the west in the outdoor rec. area.

Q.     And is that toward the door that the inmates would actually come out of or the other way around?

A.     It's the other way around.

Q.     And finally 318N.

A.     That's looking west again, and to the far right that's where the inmates would enter the outdoor rec. area.

Q.     Now, in the fall -- I'm sorry, in the spring of 2000, were you aware of an inmate, a federal inmate, being housed in the Benton County Jail by the name of Bobby McNeese?

A.     Yes.

Q.     And approximately when if you recall was he an inmate of the Benton County Jail?

Page 150

A.    It's been so long.  I couldn't say accurately.

Q.    Would it refresh your recollection if you looked at prior statements you made on this issue?

A.    Yes.

Q.    Directing your attention to a transcript that is dated April 11 of 2001 regarding testimony you provided and directing your attention in particular to page 84.  If you could just review that to yourself.  When you're done, let me know.

A.    Okay.

Q.    Mr. Merino, did that refresh your recollection of when Robert McNeese was an inmate at the Benton County Jail?

1157

A.    Yes.

Q.    And approximately when was that then?

A.    March 3 -- or I mean -- I'm sorry -- March 22.

Q.    Of 2000?

A.    2000.

Q.    And he remained there until October of 2000?

A.    Yes.

Q.    Was Robert McNeese housed -- do you recall in July of 2000 where in particular he might have been housed, in which cell?

A.    I don't right offhand.

Q.    At some point in July of 2000, in particular on July 30 of 2000, was Angela Johnson -- did she become an inmate at the Benton County Jail?

A.    I believe so.

Q.    And were you present when she was booked into the Benton County Jail?

A.    Yes.

Q.    Did you make the decision of what cell to put her into?

Page 151

A.    I did.

Q.    What did you base your decision on?

A.    Availability of space, if there was another female possibly in that cell.

Q.    And as a result -- I'm going to put 318 back on the screen there.  When Angela Johnson was admitted to the Benton County Jail, was she housed in cell 2?

1158

A.    Yes.

Q.    And why cell 2 in that case?

A.    It was just convenient at the time.

Q.    Was there another female inmate in the Benton County Jail at that time in cell 2?

A.    I believe so.

Q.    You made the decision where to place her?

A.    Yes.

Q.    Did you do that in consultation with any federal authorities?

A.    No.

Q.    Did you -- anybody consult you ahead of time when you made the decision where to put her?

A.    No.  That was my call.

Q.    Did anybody ask you to put her in any particular location?

A.    No.

Q.    Do you recall when she was admitted and put into the Benton County Jail where Robert McNeese was located?

A.    He would have been in cell 1.

Q.    Did you place Angela Johnson in cell 2 intentionally next to Robert McNeese in cell 1 for any purpose?

A.    No.

Page 152

Q.   Did you intend at all for any communication to occur between Robert McNeese and Angela Johnson?

A.   No.

1159

Q.   At some point in August of 2000, did you become aware nevertheless that there was communications occurring between the two of them?

A.   Yes.

Q.   If you could, Mr. Merino, just pull those microphones back down.  I think I pulled one of them up earlier.

When that was discovered, were any steps taken to separate Robert McNeese and Angela Johnson further?

A.   Yes.

Q.   And what step was taken?

A.   We moved her to a different cell.

Q.   And that would have been cell 7?

A.   Correct.

Q.   Now, at some point were you aware that communication continued between Robert McNeese and Angela Johnson?

A.   Yes.

Q.   And at some point were you advised to allow the communication to occur?

A.   Yes.

Q.   Directing your attention to September 26 of 2000.  Did you have a conversation with Robert McNeese on that day?

A.   Yes.

Q.   Did he indicate whether he had anything in his possession at that time?

A.   He did.

1160

Page 153

Q.  What did he say that he had at that point?

A.  He said he had a map to the bodies.

Q.  After September 26 of 2000, was Angela Johnson moved to another jail?

A.  Yes.

Q.  And do you know what jail she would have been moved to at that time?

A.  I don't.

MR. WILLIAMS:  I have no further questions.

THE COURT:  Mr. Stowers?

CROSS-EXAMINATION

BY MR. STOWERS:

Q.  Is it Officer Merino or -- are you still with the sheriff's office?

A.  Yes.

Q.  Okay.  I wasn't sure.  How would you like to be addressed?

A.  Mister's fine.

Q.  Okay.  Mr. Merino?  How long have you worked for the Benton County Sheriff's Office?

A.  Seven years.

Q.  And this would have been roughly -- when these events that you're talking about occurred would have been roughly then about two years into your term of service with the Benton County Sheriff's Office; right?

A.  I think that's accurate.

1161

Q.  And you worked in the jail on a daily basis full time; is that correct?

Page 154

A.    Correct.

Q.    Were you in charge kind of of the jail, or were you more just one of the people that worked there?

A.    I would say I was just one of the people that worked there.

Q.    So you were just a guard? Would that be your position?

A.    Just a guard.

Q.    Or one of the deputy sheriffs on jail duty?

A.    Exactly.

Q.    How ever you want to put it. And so how many deputies worked there in the jail on a typical day in the year 2000?

A.    I would say two per shift.

Q.    So you'd be one of two? And what was your shift?

A.    Eight o'clock in the morning to four in the afternoon.

Q.    And that'd be when the inmates would be awake; right?

A.    For the most part.

Q.    You'd be involved with two meals I suppose, breakfast and dinner -- or breakfast and lunch I guess it'd be?

A.    Just lunch usually.

Q.    Breakfast would be served before your shift?

A.    Yes.

Q.    So you only got stuck with serving one meal; right?

A.    Yep.

Q.    Is the meal time a hard time during the day for you?

1162

A.    Not necessarily.

Q.    Now, is the Benton County Jail kind of a celebrity jail? Is that where the celebrity inmates go?

A.    I don't know what you mean by celebrity jail.

Q.    Well, was McNeese a person of note in the legal circles over in that part of the state from his prior dealings in the

Page 155

court system?

A.    He may have been.  I wasn't aware of that.

Q.    Okay.  You're not aware of articles being written about him and that sort of thing?

A.    After the fact I think.

Q.    Okay.  Angela Johnson would be kind of a celebrity inmate, wouldn't she?

A.    I had never heard of her.

Q.    Once she got there, you heard of her, though; right?

A.    Yes.

Q.    Isn't too often you got an inmate that comes into your jail there I would assume who's charged with five murders.

A.    True.

Q.    So she would have been a celebrity inmate.

      MR. WILLIAMS:  Objection, Your Honor, to the term celebrity inmate.

      THE COURT:  Overruled.  You can answer if that's what you think she was.

A.    I don't think she was a celebrity.

1163

Q.    She was just another -- she was another inmate.

A.    Correct.

Q.    Just with a higher-profile case.

A.    Exactly.

Q.    So we'll call her a high-profile inmate.

A.    There we go.  I'll agree with that.

Q.    And Robert McNeese was a high-profile inmate.

A.    Yes.

Q.    And you knew that Mr. McNeese was an informant working for the U.S. Attorney's Office in Cedar Rapids throughout this whole

Page 156

time period.

A.   No.

Q.   You knew he was an informant for the U.S. Attorney's Office.

A.   I didn't know he was an informant.

Q.   Okay.  Did you know somebody named Detective Fischer?

A.   The name sounds familiar.

Q.   Okay.  And is he a local detective out there?

A.   I don't believe so.

Q.   And did you know him to visit Mr. McNeese?

A.   I can't recall.

Q.   Mr. McNeese did have visitors, didn't he?

A.   He did.

Q.   And they were law enforcement types that came and visited him.

1164

A.   Yes.

Q.   You're a smart fella, aren't you?

A.   Well, I'd like to think so.

Q.   You can put one and one together, can't you?

A.   Sure, I can.

Q.   Okay.  So he's getting visits from police.  He's being pulled out of his cell to go to the visiting area and visit with these law enforcement types; right?

A.   Correct.

Q.   Okay.  So he's working with the cops; right?  You knew that.

A.   I don't know that I did know that at the time.  There was a time that I did know that, yes, but maybe not at first.

Q.   Okay.  As the months went on while he was there --

Page 157

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1021 of 3592

A.    Sure.

Q.    Yeah.  And he wouldn't just go necessarily to the regular visiting room.  You were aware he'd go into a more private area where he wouldn't be seen talking to law enforcement by other inmates; right?

A.    Yes.

Q.    So they had a conference room of some type there in your jail facility.  I don't even know if it's depicted on the diagram.

A.    It's on the other side of the jail, but that's correct.

Q.    And that's not on the diagram which you don't have in front

1165

of you?

A.    I don't believe it was.

Q.    It's on the other side of the jail.

A.    Yes.

Q.    So he'd be taken out of the secure part of the jail to the nonsecure part of the jail where there's a conference room and meet with these police.

A.    Correct.

Q.    And detectives.

A.    Correct.

Q.    And one of the people he met with was also Pete Wright.

A.    Yes.

Q.    And Pete Wright is with what law enforcement agency?

A.    I think he's now retired.

Q.    What was he with at that time?

A.    He was with the Benton County Sheriff's.

Q.    Okay.  And do you recognize Mr. Basler over here seated at counsel table?

Page 158

A. Yes.

Q. Okay. And he's been out to your jail.

A. Sure, he has.

Q. Many a times.

A. Enough.

Q. Including to visit Mr. McNeese.

A. Yes, I believe so.

1166

Q. So Mr. Basler and Mr. McNeese were working together.

MR. WILLIAMS: Objection, Your Honor. Speculation.

THE COURT: Overruled. You can answer if you know.

A. I don't know.

Q. In any event, they were meeting in the private conference room that you've described.

A. Yes.

Q. And others including Mr. Williams as well, you met him out there at the Benton County Jail meeting Mr. McNeese; right?

A. Yes.

Q. Okay. And I think there was another prosecutor by the name of Reinert. Probably remember Pat Reinert being out there at the jail.

A. Sounds familiar.

Q. Closely shaven head most often, sort of a military look?

A. He could have been there. I don't remember right offhand.

Q. And how often would Mr. McNeese be meeting with these folks over this March-to-September time period?

A. Handful of times maybe.

Q. That you know of.

A. That I am aware of.

Q. Now, did you get along with Mr. McNeese when he was there?

Page 159

A. Yes.

Q. And was he an inmate who had any special privileges as far as you were concerned?

A. No.

Q. But if he treated you right, you were okay with him.

A. Yes.

Q. Now, these cells, they had these solid doors which were the closest to this center hallway; is that right?

A. Yes, the big steel doors.

Q. Right, solid steel doors.

A. Yes.

Q. And then on the inside, I think, if I understand it correct, of those solid steel doors there was another set of what I'd call the sort of traditional jail bars.

A. Correct.

Q. Okay. And the inmates were actually on the inside of those jail bars.

A. Yes.

Q. Away from the solid steel door.

A. Correct.

Q. And if an inmate wanted to communicate with another inmate, how would they get, for example, a written message out from the inside of their cell through those steel bars past the solid steel door and out to another inmate who was behind another solid steel door and behind a set of bars in their cell? How would that happen?

A. They could mail it.

Q. Okay. If it wasn't mailed, would they be able to pass

anything?

A.   I guess I don't understand your question because there's two different -- if you could ask it again.

Q.   Okay.  Well, you can finish your answer.

A.   No, no, go ahead.

Q.   Well, how would an inmate from one cell get a written communication to an inmate in another cell other than through the mail?

A.   Other than the mail.  Through books, slipping it underneath the door as they go out to outdoor rec. or go to the library.  That's possible.

Q.   And how would it be passed through books?

A.   They would put it in a book, I guess a predetermined book, and they'd put it back in the library, and the other inmate would pick it up.

Q.   Okay.  So this library which you have a photo of with the book shelves, there would be a book there.  Somebody might pass a note through that.  That'd be one way.

A.   Sure, yes.

Q.   Now, sometimes guards would distribute materials to inmates; is that correct?

A.   Yes.

Q.   All right.  And so they could also I assume if a guard were cooperative pass a note through a material, a magazine, a book, from their cell and have it delivered down to another inmate's

1169

cell.

A.   Maybe unknowingly.

Q.   And that would be another way it could be done, though,
Page 161

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1025 of 3592

would be through the aid of a guard delivering a message.

A.   It's possible.

Q.   And otherwise you described passing a note under the cell as an inmate walked down that center corridor.

A.   Yes.

Q.   Now, on the cells there's also a window as I understand it on many -- well, on some of the cells to this recreation yard area; is that right?  Do they have windows on the inside of their cells to the recreation area?

A.   Yes.

Q.   But those aren't typical windows; right?

A.   No.

Q.   But can you see through the windows, or can you not see through the windows?

A.   They're frosted.  You can see silhouettes.  That's all I can . . .

Q.   And they don't open.

A.   No.

Q.   You can't pass anything through those.

A.   No.

Q.   But you could talk through them.

A.   Yes.

1170

Q.   And that's been known to happen once or twice; right?

A.   Correct.

Q.   Can you describe the walls between the cells?

A.   I would say they're probably a cinder block or two in width in between the cells, I would assume.

Q.   Are they --

A.   I don't know the specifications of the building.

Page 162

Q. You didn't build it, did you?

A. No, I didn't.

Q. All right. Now, these walls, are they reenforced in any way as far as you know?

A. I would assume they would be.

Q. From your contact with Mr. McNeese, he was a person who knew prisons; right?

A. He seemed to have.

Q. And he knew how to get things done inside a prison.

A. I would have to agree with that.

Q. And he knew how to get people in the prison to help him do things; wouldn't that be fair to say?

A. I don't know how to answer that.

Q. He was kind of a charming character in some ways; wouldn't you agree?

A. I would agree.

Q. When he wanted to be.

A. When he wanted to be.

1171

Q. And he could be a foul character as well.

A. He could be.

Q. And there was a time when you had to deal with Mr. McNeese; isn't that right?

A. Yes.

Q. And that concerned this note.

A. Yes.

Q. This alleged map; right?

A. Yes.

Q. And can you describe -- you've talked about the fact that he told you -- I think it was the 26th of September; is that the

Page 163

right date? -- that he had a map.

A.   I believe so.

Q.   And what happened after he told you that he had a map with Mr. McNeese?

A.   What did Mr. McNeese say?

Q.   What happened with him after he told you he had a map?

A.   I don't think anything initially.  I think I probably shut the door and went to tell Detective Wright.

Q.   Because Detective Wright was kind of in charge of that aspect of Mr. McNeese's work, and you knew that.

A.   Yes.

Q.   And you knew that Mr. McNeese was working with Mr. Wright in helping Mr. Wright continue Agent Basler's investigation of Angela Johnson.

1172

A.   I would assume that's the way it was going.

Q.   And so when this all occurred, you were told there's a note.  You went and told Pete Wright.  And then there was an effort made to retrieve the note from Mr. McNeese.

A.   Yes.

Q.   Did he give it to you?

A.   No.

Q.   What happened?

A.   I believe initially we did a -- just a little comb-over search to see if we could see it right off the bat so we wouldn't go through his legal mail.  And then I believe they got a search warrant.  I wasn't privy to that.

Q.   Okay.  Are you aware he had to be extracted from his cell?

A.   I don't -- he didn't have to be extracted from cell 1.  I think he was put in cell 5 and then that was another time.

Page 164

Q. What is an extraction anyway? Can you tell the jury what that is?

A. An extraction is trying to get an inmate moved that doesn't want to be moved to another cell. That's what I would consider an extraction.

Q. What's an extraction team?

A. Well, our SERT team is like probably five or six people with SERT gear on with their pads and everything on and they go in and get him.

Q. So they get suited up in some protective gear with padding

1173

and maybe even helmets?

A. Yes.

Q. And they go into the cell -- these five or six people, when you have an inmate that will not comply with a demand of the jailers to come out of the cell, they go in and get them out of the cell forcibly.

A. Correct.

Q. And that's what had to be done with Mr. McNeese to get this map.

A. I'm not sure that that's the way it went down.

        MR. STOWERS: Thank you. Appreciate that. Thank you.

        THE COURT: Mr. Williams?

        MR. WILLIAMS: No questions.

        THE COURT: You may step down.

        Members of the jury, you can take a stretch break.

        MR. MILLER: Your Honor, United States calls Robert McNeese.

        ROBERT MCNEESE, PLAINTIFF'S WITNESS, SWORN

        THE COURT: Okay. Please be seated in the witness
                Page 165

box.  And, Mr. McNeese, try and adjust the chair with the assistance.  Scoot it up so you can speak directly into the microphones.  And you can adjust those microphones.  You can pull them up.  Would you state your full name, please, and spell your last name.

THE WITNESS:  Robert McNeese, M-c-N-e-e-s-e.

1174

THE COURT:  Thank you.

Mr. Miller.

DIRECT EXAMINATION

BY MR. MILLER:

Q.    Good afternoon, Mr. McNeese.

A.    Good afternoon.

Q.    I want you to be sure to sit as close to those microphones as you can or pull them closer to you, whatever you can do to make sure that everybody on this jury hears you loud and clear; okay?

A.    Yes.

Q.    You are -- you're in custody, sir.

A.    Yes.

Q.    I'd like you to tell us, please, how you happen to be in custody.  Are you currently serving a criminal sentence, sir?

A.    Yes, I am.

Q.    And would you describe that for the jury?

A.    I'm serving a life sentence.

Q.    Is that a state or federal life sentence?

A.    Federal.

Q.    And the implication of a federal life sentence is that you are scheduled to be released upon death?

A.    That's correct.

Page 166

Q.    What is that federal life sentence for, Mr. McNeese?

A.    Conspiracy and importation of drugs.

1175

Q.    Specifically what drugs, sir?

A.    Heroin.

Q.    And can you just briefly describe the circumstances under which that conspiracy was -- occurred?

A.    I attempted to import kilos of heroin into the United States.

Q.    And where were you at the time that you committed this crime, sir?

A.    I was in custody.

Q.    Federal custody?

A.    Yes.

Q.    And where if you recall?

A.    Talladega, Alabama.

Q.    There are a number of federal correctional institutions scattered around this country?

A.    Yes.

Q.    One of them is in Talladega?

A.    Yes.

Q.    Were you prosecuted in Alabama?

A.    No.

Q.    Where were you prosecuted for that charge, sir?

A.    Tampa, Florida.

Q.    And the reason for that venue?

A.    The narcotics were going to be in that area.

Q.    You were convicted and sentenced to life in prison in

1176

Page 167

connection with that.

A.   Yes.

Q.   Now, you indicated you were in federal prison at the time this crime occurred.  Can you relate to the jury how it is that you happened to be a federal inmate at the time?

A.   Bank robbery.

Q.   And the date of that conviction, sir?

A.   1988 I believe I was convicted.

Q.   Out of what jurisdiction?

A.   Northern District of Iowa.

Q.   You've been continuously incarcerated as a federal prisoner since 1988, Mr. McNeese?

A.   Yes.

Q.   What was the sentence that you received for the bank robbery charge, sir?

A.   105 months, I believe.

Q.   Since 1988, have you discharged that sentence?

A.   Yes, I have.

Q.   So currently are you serving anything other than that life sentence?

A.   No.

Q.   As to the bank robbery, just a couple background questions, sir.  You indicated 105 months.  Was -- and we've heard a little bit about the federal sentencing guidelines.  Was that strictly in line with those, or was there an upward or downward

1177

departure?

A.   I believe I received a two-point enhancement.

Q.   And enhancement would be an upward departure or an increase

Page 168

**Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1032 of 3592**

in the length of your sentence?

A.    Correct.

Q.    For what, sir?

A.    Obstruction of justice.

Q.    And can you just briefly tell us the nature of that obstruction in connection with that case?

A.    Yes.  During my grand jury, I told them that I had committed the robbery by myself, and later on I stated that, in fact, I had help.

Q.    You admitted that you had lied to the grand jury.

A.    Right.

Q.    During their investigation of that bank robbery.

A.    Correct.

Q.    And were you prosecuted for perjury?

A.    No.

Q.    Nevertheless, did you receive additional punishment because of that fact?

A.    Obstruction of justice, yes.

Q.    Which was an increase in the length of your bank robbery sentence.

A.    Yes.

Q.    And I'm just curious.  Are these the only blots on your

1178

record, or do you have other criminal convictions as well, Mr. McNeese?

A.    I have a lengthy criminal history.

Q.    Going all the way back to your youth as a juvenile delinquent; is that true?

A.    Yes.

Q.    In what community did you grow up, sir?

Page 169

A.    Cedar Rapids.

Q.    Your current age is what, sir?

A.    I'm 39.

Q.    And can you tell us about how long it is that you've been at least off and on behind bars in connection with juvenile and adult criminal convictions?

A.    Probably 24, 25 years total.

Q.    Since you were a youngster.

A.    Yes.

Q.    As a juvenile, you were convicted for theft and vandalism offenses?

A.    Yes.

Q.    Sentence -- sent to Eldora?

A.    Yes.

Q.    And as an adult, in addition to what we've already described, convicted for at least a couple other felonies in the nature of theft and forgery?

A.    Yes.

1179

Q.    And finally, just so we're not omitting anything, sir, while you were serving your -- well, you're still serving it, but after you began serving this life sentence for attempted importation of heroin, did you also receive an additional federal conviction?  And if so, what is that?

A.    Yes.

Q.    And what is that, sir?

A.    Money laundering.

Q.    And in what jurisdiction was that conviction?

A.    Northern District of Iowa.

Q.    And when was that, sir?

Page 170

A. 2001.

Q. Money laundering, is that a -- at least a drug-related charge?

A. Yes.

Q. It's not a drug charge per se, but you pled guilty and had drug charges dismissed in connection with your guilty plea to that charge; am I correct? Correct me if I'm wrong.

A. I don't -- I don't remember.

Q. Okay. And I don't want you guessing about anything, sir. Just tell us what you do remember; okay?

A. I don't remember.

Q. Have I fairly summarized your criminal history, Mr. McNeese?

A. Yes.

1180

Q. And as you've indicated, you are serving a life sentence in the federal system in connection with the conspiracy to import controlled substances into this country while serving as a federal prisoner.

A. Yes.

Q. Is either that or any of the other convictions from your juvenile history on forward in the nature of murder, attempted murder, armed robbery, or any other crimes of violence?

A. No.

Q. During the years since you first became a prisoner of the federal department of prisons, can you give us just some idea -- and this isn't a quiz to try to get you to name every single institution, but can you give us some idea in what various institutions around this country, federal institutions, you've served time in?

Page 171

A. How many of them?

Q. Yeah, and approximately where they are as you recall.

A. Wisconsin; Minnesota; Leavenworth, Kansas; Atlanta, Georgia; Terre Haute, Indiana.

Q. You mentioned Alabama once as well.

A. Talladega, Alabama.

THE COURT: Mr. McNeese, we've had a request from a juror for you to speak up a little bit; okay?

THE WITNESS: Yes.

BY MR. MILLER:

1181

Q. And you do have a soft voice. Those microphones are on flexible arms. You might pull that directly toward you. It may help.

A. Is that better?

Q. I believe that is. Thank you so much.

During the period of your incarceration, did you at any point agree to cooperate with federal investigators in connection with a pending federal investigation, and if so, when?

A. Yes, I did. In 1998.

Q. Please describe that for the jury, Mr. McNeese.

A. While I was incarcerated in the U.S. Penitentiary in Atlanta, I was approached by agents in regard to illegal activities in Northern District of Iowa.

Q. And the nature of those illegal activities were what, sir?

A. Drugs.

Q. You had information?

A. I was involved in illegal activities, and they wanted to question me about it.

Page 172

Q. And did you, in fact, agree to cooperate against others involved in the same criminal activity, sir?

A. Yes, I did.

Q. And can you describe the nature of the individuals against whom you agreed to cooperate?

A. I'm not sure I understand.

1182

Q. Were you -- well, let me jump ahead. Were you ultimately brought back to Iowa to give testimony before a grand jury in connection with this investigation?

A. Yes, I was.

Q. Were Iowa authorities the only ones with whom you cooperated?

A. No.

Q. With what other agencies or law enforcement authorities did you cooperate in 1998?

A. The FBI in Atlanta, Georgia; Philadelphia; New York City; San Diego, California.

Q. And just to move it along, is that in connection with an investigation of members of organized crime?

A. Yes, it is.

Q. In the year 2000, were you returned to Iowa to give grand jury testimony in connection with that case? Or let me back up. You've indicated this was a 1998 investigation that you became involved in at least at that point.

A. Yes.

Q. Were you at some point returned to Iowa to testify before the grand jury about that investigation?

A. Yes, I was.

Q. And following that, were you later and specifically in the

Page 173

year 2000 again returned to the state of Iowa for testimony at

sentencing in connection with those proceedings?

1183

A.    Yes, I was.

Q.    Do you recall approximately when in the year 2000 you

returned to Iowa?

A.    I believe it was March.

Q.    And do you recall where in Iowa you returned, sir?

A.    Cedar Rapids.

Q.    And did you so testify, sir?

A.    Yes, I did.

Q.    At that time were you in addition also personally facing

additional federal charges in the year 2000?

A.    I was, yes.

Q.    Okay.  And describe those for the jury, please, if you

would.

A.    Money laundering.

Q.    Your money laundering charges pending against you in

federal court in the Northern District of Iowa in the year 2000,

were they ultimately resolved, sir?

A.    Yes, they were.

Q.    Describe how they were resolved.

A.    I agreed to plead guilty and signed a plea agreement.

Q.    You pled guilty to money laundering.

A.    Yes.

Q.    What in the nature of either charging concessions or

sentencing concessions did you receive in connection with that

guilty plea, sir, if you recall, if any?

1184

Page 174

A.   I don't remember.

Q.   You had been chasing -- excuse me, facing some drug charges in addition to the money laundering charges; is that correct?

A.   I'm not sure.

Q.   Ultimately what you pled guilty to was money laundering.

A.   Correct.

Q.   Would you describe for us -- again, that was in connection with a plea agreement.

A.   Yes.

Q.   -- what you received as a result of that guilty plea in the nature of a sentence, sir.

A.   Three years.

Q.   You've mentioned that you entered into a plea agreement at that time?

A.   Yes.

Q.   And I'd like you just in your own words briefly to summarize for the jury your understanding of your obligations under that agreement.

A.   I agreed to continue to cooperate with local, state, and federal authorities, and that's the agreement.

Q.   Required to be truthful whenever subpoenaed to testify before any court proceedings by any party?

A.   Yes.

Q.   And to provide truthful information to investigators whenever asked for such.

1185


A.   Yes.

Q.   In return and in exchange and in connection with these obligations of yours, Mr. McNeese, did you have an understanding of any potential benefits to yourself?
                    Page 175

A.   Yes.

Q.   Okay.  And first of all, as to the term of your incarceration, did you receive some benefit?

A.   As of yet?  No.

Q.   No.  I mean as to the money laundering.  On the money laundering charge itself, did you receive any reduction in the expected term of your incarceration?

A.   Yes, I did.

Q.   And can you just describe briefly what that was, how many months or years you were sentenced to?

A.   Thirty-six months.

Q.   And you could have been sentenced to considerably longer I take it?

A.   Yes.

Q.   Such as how much to your understanding?

A.   I think 10 or 15 years.

Q.   Your agreement with the government entered into in the year 2000 remains in effect; is that true, Mr. McNeese?

A.   Yes, it does.

Q.   And are there any additional benefits which you -- well, let me put it to you this way.  You are currently serving a

1186

sentence of life imprisonment out of the federal court in Florida.

A.   Yes.

Q.   Is there a potential under the law to your understanding that you could receive potentially a sentence reduction?

A.   Yes.

Q.   Have you been given any promise of such?

A.   No.

Page 176

Q.    Would you tell us at least your understanding of the procedure in which sentencing reductions can be given to federal inmates?

A.    Upon the completion of cooperation, a motion can be filed with the courts requesting a reduction for cooperation.

Q.    That motion can be filed by whom?

A.    The U.S. Attorney's Office.

Q.    Not the defendant but the prosecutor?

A.    Yes.

Q.    And in this case since you're serving -- your current incarceration is out of the Florida federal court, that would have to be a federal prosecutor from where, sir?

A.    Tampa, Florida.

Q.    Not Iowa.

A.    No.

Q.    Tampa, Florida.

A.    Yes.

1187

Q.    And in the event that a federal prosecutor in Tampa, Florida, would see fit to file such a motion, what, if any, proceeding would follow?

A.    I believe the motion goes in front of my sentencing judge who reviews it and makes a determination if, in fact, I receive any reduction.

Q.    As to whether that would be appropriate or not.

A.    Correct.

Q.    In your case.

A.    Correct.

Q.    And again, you've received no promise of such.

A.    No.

Page 177

Q. And there's no one able to give you such a promise of such.

A. No.

Q. Nevertheless, in fairness, Mr. McNeese, you're a 35-year-old man?

A. Thirty-nine.

Q. Excuse me, 39. Currently scheduled to die in prison.

A. Correct.

Q. Do you have family?

A. Yes, I do.

Q. Wife, children?

A. Yes.

Q. I assume -- am I fair in assuming that you have hope?

A. Yes, I do.

1188

Q. One always has hope, I assume.

Mr. McNeese, you've indicated that you returned to Iowa twice in connection with an investigation regarding drugs and money laundering in 1998 and again in 2000, the latter time to testify at sentencing?

A. Correct.

Q. Where were you placed on the latter visit to Iowa in the year 2000 if you recall?

A. Linn County Jail.

Q. And how long did you stay there, sir?

A. Approximately five days.

Q. You were removed to a different facility?

A. Yes, I was.

Q. Where, sir?

A. Benton County.

Q. And the reason for that transfer was what to your

Page 178

knowledge, sir?

A.    Federal -- the FBI wanted to video and audio tape a discussion with myself and a private investigator.

Q.    And this was in what month of the year 2000?

A.    March.

Q.    Was this a discussion with someone who was under criminal investigation at the time?

A.    Yes.

Q.    And did that occur?

1189

A.    Yes, it did.

Q.    After conclusion of that monitored conversation, did they remove you from Benton County or leave you there?

A.    They left me there.

Q.    You remained in the Benton County Jail from March of the year 2000 until approximately when, sir?

A.    September or October of 2000.

Q.    Since that request for cooperation in the March 2000 investigation involving your monitored conversation in the Benton County Jail in March of 2000, have you received any requests from the federal government or others for cooperation in ongoing investigations?

A.    Yes.

Q.    And what would that be?  Was there a Dr. Shultice?

A.    Yes, Dr. Shultice, again wearing a listening device or recorder.

Q.    And when was that, sir?

A.    In 2000.

Q.    Do you recall what month?

A.    No, I don't.

Page 179

Q. Was it prior to ever meeting anyone by the name of Angela Johnson?

A. Yes, it was.

Q. And was that completed prior to your ever meeting anyone by the name of Angela Johnson?

1190

A. Yes, it was.

Q. And have you -- were you ever asked to obtain information in any such similar fashion from Angela Johnson, sir?

A. No.

Q. Nevertheless, you remained in the Benton County Jail for some months following your placement there in March of the year 2000; is that correct?

A. Yes.

Q. I want to visit with you a little bit about the Benton County Jail. We've heard briefly from a jailer by the name of Michael Merino. Is that man someone with whom you're acquainted?

A. Yes, he is.

Q. He was among your jailers there for a period of time.

A. Yes, he was.

Q. You stayed there from March of 2000 and ultimately till about when, Mr. McNeese?

A. I believe September or October of 2000.

Q. We've heard some description of that jail, the nature of its population. Do you, during the period of time that you were there, recall interacting at all with any female inmates?

A. Yes.

Q. Why did you do that?

A. I been in prison for a lot of years. I mean, I -- I mean,

Page 180

any chance you get to talk to a female, you know, you go for it

1191

I guess.

Q.    Natural human urge.

A.    Yeah.

Q.    And did you do so when you were in Benton County Jail?

A.    Yes, I did.

Q.    Any idea approximately how many women were there during the period of time that you were incarcerated?

A.    That I talked to?

Q.    How many women were there in all?

A.    Several.

Q.    And did you make an effort to talk to any of them?

A.    Yes.

Q.    All of them?

A.    Yes.

Q.    Let me just give you a name.  Sara Bramow, does that ring a bell?

A.    Yes, it does.

Q.    Who was Sara Bramow?

A.    She was a girl in the jail.

Q.    You were already there when she became an inmate?

A.    I believe so, yes.

Q.    Please describe any contact you had with Ms. Bramow after she arrived at the Benton County Jail.

A.    I believe we talked raising our voices talking through the walls, correspondence, and talking when I was out in -- outside.

1192

Page 181

Q.    Let's take those one at a time.  How do you communicate by raising your voices when you're in the Benton County Jail?

A.    It's a very small facility, and we were in adjoining cells.

Q.    You can hear each other speaking to each other in adjoining cells in that jail?

A.    If you raise your voice, yeah.

Q.    You mentioned passing notes.  Can you describe that for us, please?

A.    I believe she had written me through the regular mail system and also threw notes into my cell.

Q.    And did you also mention a third method of communication with female inmates?

A.    In the shelfs in front of the jail.

Q.    Describe that.

A.    I would leave notes there on the shelf where books were kept.

Q.    Can you be a little more specific about how that worked, Mr. McNeese?

A.    Well, when I would leave my cell or I would request to get a book exchanged, at the front of the jail there's a bookshelf, a bookcase.  And I would put a note inside there.  And then whoever the note was for, when they would come out, they would grab it.

Q.    Is this something you invented, or is that a trick of the trade as an inmate?

1193

A.    Probably a trick of the trade.

Q.    You got 24 hours a day to try to figure out how to manage as an inmate in there?

A.    Yes.

Page 182

Q.   And you've been doing it for 13-plus years, 15, 17 now.

A.   Yeah.

Q.   And was your motivation to contact Sara Bramow anything other than that what you've already described as far as contacting female inmates when you find yourself in a similar institution?

A.   No.

Q.   Did you at some time during the year 2000 also happen to make the acquaintance of an inmate by the name of Angela Johnson?

A.   Yes, I did.

Q.   Do you recall approximately when that was, sir?

A.   Some time in the middle of 2000.

Q.   And had you up to that point any prior knowledge about Angela Johnson or her legal difficulties?

A.   No.

MR. MILLER:   Your Honor, there's a bit further to go on the direct examination.  I suppose this might be an appropriate . . .

THE COURT:   Sure.  That's fine.  Members of the jury, it's about a quarter to three.  We'll be in recess until 3:10.

1194

Thank you.

(The jury exited the courtroom.)

THE COURT:   Could I see the lawyers for a sidebar?

(At sidebar on the record.)

THE COURT:   He's a wit. sec. witness, isn't he?

MR. MILLER:   I'm definitely going to avoid any reference to wit. sec. or his current placement.

THE COURT:   Well, I think you can -- either side can

Page 183

bring out the fact that he's in wit. sec.

MR. MILLER: They can certainly.

THE COURT: But you can't get into where he's located.

MR. MILLER: Right.

THE COURT: I just wanted to make sure we have an understanding about that.

MR. STOWERS: Pat's going to question him. I just wanted to make sure --

THE COURT: Oh, Pat's going to question him?

MR. STOWERS: He probably can read it.

THE COURT: I raised the issue about he's a wit. sec. witness.

MR. BERRIGAN: Right.

THE COURT: And my view is that either side can raise the fact that he's in the witness protection program, but you can't ask him where he's currently residing.

MR. BERRIGAN: Of course not.

1195

THE COURT: Yeah, but I just wanted to make sure we didn't have a problem in front of the jury.

MR. MILLER: I'm not going to get into it. Obviously if defense counsel wants to, I have no objection other than his current location.

MR. BERRIGAN: If it comes up, I think it will be come up.

THE COURT: I think it's fair game.

MR. WILLIAMS: Actually I think there's some case law suggesting if the government brings it out it could be error, and so we're not going to bring it out. The defense has a right to bring it out, and they can, and if they choose to do so, they

Page 184

can.

MR. MILLER:  My lawyer has woodshedded me.

THE COURT:  Sounds good.  Thank you.

(The sidebar was concluded.)

THE COURT:  Okay.  We'll be in recess.  Thank you.

MR. STOWERS:  Till when?

THE COURT:  Ten after.

(Recess at 2:45 p.m.)

THE COURT:  Ready to have the jury brought in?

MR. MILLER:  Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT:  Thank you.  Please be seated.

Mr. Miller?

1196

MR. MILLER:  Thank you, Your Honor.

BY MR. MILLER:

Q.   Mr. McNeese, before we begin again, I'll ask you once again be sure to speak up good and loud and right into those microphones; okay, sir?

A.   Yes.

Q.   Now, we were just getting to the point where in the summer of 2000 you for the first time made the acquaintance of Angela Johnson.  Would you please go ahead and describe for us how it is you happened to first make her acquaintance.

A.   I heard her next -- in the cell next door, and we started talking through the wall.

Q.   Do you recall what cell you were in at the time, sir, if you recall?

A.   Excuse me?

Q.   If you recall.

Page 185

A.    I believe it was the second cell.

Q.    But there was -- Angela Johnson was in the cell next to you?

A.    Next door, yes.

Q.    Was there anyone else in there with her if you recall?

A.    Yeah, another girl, Sara.

Q.    I believe we already mentioned Sara Bramow.  Is that the same Sara?

A.    Yes.

1197

Q.    About how long before you had any communication with Ms. Johnson after she moved in?

A.    I didn't know when she moved in, but, I mean, we started having communications after I learned that she was next door.

Q.    As soon as you knew there was a female next door.

A.    Yes.

Q.    Can you describe the nature of the initial conversations?

A.    Asked each other's names and what we were in for.

Q.    Did she indicate to you what she was currently being jailed for?

A.    Yes.

Q.    And what did she say?

A.    For the murder of five people.

Q.    That was the accusation against her.

A.    Yes.

Q.    Mr. McNeese, beginning at that point and over the following eight weeks or so, did you continue to communicate with Angela Johnson, your fellow inmate of the Benton County Jail?

A.    Yes, I did.

Q.    And just describe for us under what circumstances you

Page 186

managed to have communication with her.

A.   I would go out to the rec. yard and talk through the window, or we would pass notes to one another.

Q.   And in what manner would you pass notes to each other?

A.   Either when she would be going to rec. or to get a book

1198

she'd -- I'd either give her a note through my door or she'd give me one, throw one in or leave one up at the counter.

Q.   How would notes be passed through a door?

A.   There's a food slot on the door that was left open.

Q.   I believe you've already mentioned the use of the inmate library there?

A.   Yes.

Q.   Can you describe that any more specifically as to how that was used to pass notes between inmates?

A.   We would just put a note there on the shelf, certain part of the shelf, certain area.

Q.   Was your relationship with fellow inmate Angela Johnson any different or develop any closer than that that you had with other female inmates in that institution?

A.   Yes.

Q.   Please describe.

A.   I continued to -- I mean, I wrote her, and she wrote me more than normal, more than I did other people.

Q.   Just passing the time as fellow inmates or more personal than that, sir?

A.   I was passing time.

Q.   The nature of the conversations and communications, however, were they talking about the weather?

A.   No, they weren't.

Page 187

Q. What were you talking about?

A. Her case.

Q. She discussed her case with you?

A. Yes, she did.

Q. In your oral conversations with one another?

A. Orally and in -- written.

Q. And did the relationship that you developed with Angela Johnson develop and become closer during those weeks, sir?

A. Yes.

Q. I trust there was no opportunity for physical intimacy.

A. No.

Q. But was there emotional intimacy?

A. Yes.

Q. Mr. McNeese, we've already described you as being a Benton County Jail inmate with something of a reputation. Can you tell us your understanding of what that reputation was if you know?

A. I --

Q. Had you been in the news media a bit?

A. Yes.

Q. And did that tend to impress some of the fellow inmates?

A. Yes.

Q. Specifically Angela Johnson?

A. Yes.

Q. And specifically the fact that you were reputed to have Mafia connections.

A. Yes.

Q. And did you, in fact, have a relationship and trust and
Page 188

close communication between yourself and Mrs. Johnson based

upon --

A.    Yes.

Q.    -- that reputation?

A.    Yes.

Q.    You visited and developed this relationship over a period

of some weeks?

A.    Yes.

Q.    You were there together about eight weeks?  Were there

any -- well, you've already mentioned to us that during that

period of time she discussed her case with you.

A.    Yes.

Q.    And just in general terms at least for the moment, sir, I

want to talk to you about that.  Did -- the information provided

to you by Angela Johnson, was she perfectly open at the

beginning, or did that develop over time?

            MR. BERRIGAN:  Sorry.  I'm going to have to object to

the leading nature of the questions, Your Honor.

            THE COURT:  I'm sorry.  Your microphone's not on.

            MR. BERRIGAN:  Leading.  The question's leading.

            THE COURT:  Sustained.  Rephrase the question.

BY MR. MILLER:

Q.    Please describe for us the method in which discussions

developed over time between yourself and Angela Johnson

1201

regarding her case.  And I'm not asking at least at the moment

for any specifics but whether there was any change in the amount

of detail provided.

A.    Yes.  Over the course of our getting to know one another,

she was more open with me and more honest.

Page 189

Q. The information she provided, was it totally consistent throughout, or did it change as those weeks passed?

A. It changed.

Q. During those weeks, Mr. McNeese, Angela Johnson was a brand new inmate to a county jail and a woman in a stressful situation, I take it.

A. Yes.

Q. Did you and she discuss any schemes with regard to getting out of jail?

A. Yes.

Q. Please describe.

A. She wanted to escape.

MR. BERRIGAN: I'm going to object, 404(b), uncharged misconduct.

THE COURT: Members of the jury, I don't think we've had to do this or at least not very often, but I have a matter I want to take up with the lawyers, and so I'm going to send you down to the jury room, and we'll be -- have you come back as quick as we can get the matter resolved. Thank you.

(The jury exited the courtroom.)

1202

THE COURT: Please be seated. Was this the subject of a motion in limine?

MR. BERRIGAN: I don't believe so, Your Honor. The defense, frankly, didn't think the government would attempt to get into this area during the course of a murder trial.

THE COURT: Is your microphone actually on?

MR. BERRIGAN: It is, sir. Can you not hear me? I'll get closer to it.

THE COURT: Mr. Miller, what's the government's
Page 190

position?

MR. MILLER: Your Honor, this is part and parcel of a scheme that developed into an effort to build a lawsuit against the government which formed the basis for the scheme to have someone take credit for the crime in question.

THE COURT: What's the relationship between the alleged escape plot and the scheme about having somebody else take credit for the murders?

MR. MILLER: Your Honor, just simply putting it in context, they did not begin talking about a lawsuit scheme on day one. They developed into that. They abandoned any effort to even discuss an escape scheme, but the fact of the matter is that there were schemings and discussions between the two that developed ultimately into a discussion of thwarting the prosecution by having an innocent third party take credit for her -- for this criminal conduct and that thereby she would

1203

manage to not only gain her freedom but also gain a financial advantage. It's part and parcel to the relationship of the witness and the defendant in this case.

THE COURT: It's not really being offered as 404(b) evidence, or is it?

MR. MILLER: No, it's just -- it's part of the full story of their relationship during these eight weeks, Your Honor.

THE COURT: I don't see it as 404(b) evidence. I see it as, you know, I think we'd still have to do the balancing about whether the probative value is substantially outweighed by the danger of unfair prejudice.

MR. BERRIGAN: Your Honor, there's no relationship

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1055 of 3592

between the lawsuit Mr. Miller's talking about and this escape attempt. I believe Mr. McNeese is going to testify that the idea to have a lawsuit was his idea and it was based on the premise that if he could get the assistance of a fictitious third party who would confess to these crimes, then Miss Johnson would be set free because the case would be dismissed and she could file a lawsuit for essentially false imprisonment, nothing about escape. There was no connection there. During the course of these discussions, there are also discussions about escape, but they have nothing to do with the lawsuit, frankly. That was an independent effort to get out of jail.

THE COURT: And your theory is that they're

1204

intertwined in the sense that that helps Mr. McNeese get closer to Angela Johnson or something like that?

MR. MILLER: Yes, Your Honor.

MR. BERRIGAN: I guess our response to that, Your Honor, would be that the probative value of that given all the other evidence there's going to be about their relationship is far outweighed by the prejudicial effect. They're talking about guns coming into the jail and shooting their way out and all kinds of egregious behavior in connection with this escape attempt.

MR. MILLER: If I may, Your Honor, I will go absolutely no further into it, but I did want to convey to the jury the understanding that we had an emotionally and mentally intimate relationship with these two people and a very trusting one as fellow inmates.

MR. BERRIGAN: We're not going to argue that, sir. I mean, our contention is that's absolutely true. This was a very

Page 192

trusting relationship or Mr. McNeese never could have done as well as he did, but that didn't have anything to do with the escape.

THE COURT: Well, let me ask you something, though. It has marginal probative value in my view, but it's really -- what's the prejudice?

MR. BERRIGAN: Well, they're talking about shooting their way out of jail.

1205

THE COURT: Well, she's charged with killing five people. What's the prejudice of an escape plot?

MR. BERRIGAN: Well, because these are going to be law enforcement officers. They're going to have to kill guards to get out. Mr. McNeese talks about what kind of gun are you bringing in? A 25. No, that's not big enough. We're going to have to shoot our way out of there.

It's bad enough we have the five murder counts we have, and now we're talking about shooting police officers to get out of jail. And the truth is there were no steps taken to effectuate this plot, none whatsoever. It was just talk. So our contention is it's extremely prejudicial, and to the extent it has any probative value, it's really marginal.

MR. MILLER: Your Honor, the concern anticipates questions I'm not going to ask.

THE COURT: Okay.

MR. MILLER: I'm not going to go into the inquiry of importing any guns or the use of any law enforcement --

THE COURT: How much farther -- but for the motion, how much farther would you like to have gone?

MR. MILLER: Nowhere.

Page 193

THE COURT: And we actually have a problem with your objection that it was untimely.

MR. BERRIGAN: Yes, sir. He answered the question. That's right.

1206

THE COURT: Yeah, the answer's in the record.

MR. BERRIGAN: Right. If the motion's sustained, I'm going to ask the Court to strike the last answer and question.

THE COURT: I actually think you have to do that before I -- that has to precede your motion.

MR. BERRIGAN: Okay. Well, that would be part of my motion then, and I'll ask that as the relief at this point.

THE COURT: I'm going to sustain the defendant's objection. I think on balance the probative value is -- I mean, I think it's a close call.

MR. MILLER: May I be heard just briefly, Your Honor?

THE COURT: Yeah.

MR. MILLER: I don't know exactly how far defense counsel is going into the discussion of the specific discussions that occurred and admissions made between these two people over a period of eight months (sic), but the stage at which various comments were made by Angela Johnson to Robert McNeese can be identified more easily by knowing whether it's at a stage where she's suggesting that she believes that he can get her out of jail or at a stage where she believes that he can get this lawsuit accomplished, and I think for that purpose it helps lay a context as to the course of their conversations. And that was the reason I felt it was important.

I have no indication or implication or intention of getting into any claim that this shows a propensity for violence

Page 194

or that there was any plan to bring guns in. Even if there was, it's not where I'm going, but I do think it is important for the context of the conversations and the relationship between these two people.

THE COURT: But you told me you weren't going any farther than they talked about escape.

MR. MILLER: Yes, and that afterwards they talked about a lawsuit and arranging for a third party to take credit for the crimes. These are separate schemes, but the fact that -- their sequence helps us understand the sequence of the conversations that occurred between these two people.

THE COURT: Yeah, I understand that you think it helps you do that, but my ruling is that its probative value is outweighed by the danger of unfair prejudice, although, again, I think it's a close call.

So I'm going to grant your motion to have your objection precede the answer and strike it, but we have to -- I have to do that in front of the jury unless you just want me to leave it alone now. It's already in -- it is in the record, so but for me striking that last response about the escape plot . . .

MR. BERRIGAN: I think our preference would be that we not mention it to the jury for fear that we're only emphasizing the point.

THE COURT: Okay.

MR. BERRIGAN: Thank you.

Page 195

THE COURT: And the understanding is that --

MR. BERRIGAN: That it's stricken.

THE COURT: Well, no, it's not stricken.

MR. BERRIGAN: Oh, it's not, okay.

THE COURT: It can't be stricken because it has -- what good does it do to strike something if the jury's heard and they don't know it's stricken?

MR. BERRIGAN: You're right.

THE COURT: But the point is that Mr. Miller won't proceed along this line of questioning any further.

MR. BERRIGAN: Got it.

THE COURT: Okay. We all on the same page?

MR. BERRIGAN: Yes, sir.

THE COURT: Thank you. Let's have the jury brought in.

(The jury entered the courtroom.)

THE COURT: Extra exercise might help with those Hy-Vee lunches; right? Okay. Please be seated.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

BY MR. MILLER:

Q. And simply because we've had another brief recess, I will once again remind you to just speak as close to those microphones as possible, Mr. McNeese. Thank you very much.

1209

A. All right.

Q. During the approximately eight weeks that you shared residence in the Benton County Jail with Angela Johnson, did she at any point discuss with you or claim to you to understand why it was that she was arrested?

Page 196

A.    Yes.

Q.    And what was that?

A.    Why was she arrested?

Q.    Yes.

A.    For aiding and abetting the murders.

Q.    And did she indicate to you what it was in the way of investigative developments that led to her arrest if she said?

A.    Yes, her friend named Christi.

Q.    And what, if anything, did she express regarding this friend named Christi?

        MR. BERRIGAN:  Sorry to object, Your Honor.  I'm going to make the same objection to this testimony.  This is uncharged misconduct too, inadmissible under 404(b).

        THE COURT:  Well, I'm going to have to send the jury out again.  I don't know what you're talking about.  This would have been the subject of a motion in limine I would think.

        So I hate to do it to you, but I'm going to have to send you out.

        (The jury exited the courtroom.)

        THE COURT:  Okay.  You know, I don't live in the

                                                        1210

discovery file, so I have no idea what this testimony is about.

        MR. BERRIGAN:  No, I appreciate that.

        THE COURT:  So why didn't you file a motion in limine about it?

        MR. BERRIGAN:  Because I don't live in Mr. Miller's head.  I don't know what he's going to, do and now he's asking a witness to talk about how my client threatened to kill some woman because she had given testimony before the grand jury, and that's Christi Gaubatz.  We think that's inadmissible 404(b)

Page 197

evidence and its prejudicial value or prejudicial effect far outweighs its probative value under Rule 403, Your Honor.

THE COURT: Well, I guess why wasn't this subject to a motion in limine?

MR. BERRIGAN: Because we don't know that the government's going to take every little piece of prejudicial evidence and try to get it in front of the jury in an improper fashion.

THE COURT: Well, you have to assume that they're going to try.

MR. BERRIGAN: We'd like not to.

THE COURT: Mr. Miller?

MR. MILLER: Your Honor --

THE COURT: Tell me about what the evidence would be.

MR. MILLER: The evidence would be that, in fact, she did express a desire very specifically for the death of Christi

1211

Gaubatz, and it would be indicative of consciousness of guilt and was in the discovery file, Your Honor. Just to forewarn the Court and defense counsel --

THE COURT: Yeah, what else so we --

MR. MILLER: As has already been referred to that she indicated she's been accused of aiding and abetting, I will ask the witness about any conversation on responsibility of aider and abettor and the fact that she commented that she felt it was unfair that an aider and abettor, one who helped out in the killing, would also be subject to punishment for that murder. These are matters that are in the discovery file and I think show consciousness of guilt.

THE COURT: Mr. Berrigan?

Page 198

MR. BERRIGAN: Obviously the aiding and abetting is absolutely relevant because that pertains to the homicides for which she's charged, Your Honor. But the killing of Christi Gaubatz or the discussion about murdering her, we take the same position. To the extent that is consciousness of guilt, there's plenty of consciousness of guilt that's going to come through the evidence presented through this witness, and the prejudicial effect of that killing yet other witnesses from the jail with the help of Mr. McNeese far outweighs its probative value in this particular instance.

THE COURT: What's the probative value of it?

MR. MILLER: Consciousness of guilt, Your Honor. I

1212

think any effort to -- particularly in a case such as this where the very heart of the matter is the killing of witnesses, the expression of an intent to eliminate the key witness against her at that time is highly probative.

THE COURT: Certainly probative in the penalty phase if there is one. Would you agree with that, Mr. Berrigan?

MR. BERRIGAN: Yes, sir. I think there's going to be some -- the government's provided notice of future dangerousness, and I think this would arguably fall into that category. I might argue differently later.

THE COURT: Right, right.

MR. BERRIGAN: But I think right now that's certainly relevant to that issue.

MR. MILLER: In the alternative, 404(b), Your Honor.

THE COURT: And on 404(b), it would be probative of --

MR. MILLER: Motive and intent, not to mention common scheme or plan.

Page 199

THE COURT: Well, I'm going to admit it over the defense objection. I think it's evidence of consciousness of guilt, and it's also 404(b).

MR. MILLER: If I may, Your Honor, just looking at my notes, I'm, as an old state prosecutor, accustomed to providing minutes of expected testimony. And just to alert the Court and counsel, the other matters that appear on my notes before me are inquiry into her reaction to review of her discovery file and

1213

statements therein by Dustin Honken that appeared to be threatening toward her and her comments in response to that, that it was ungrateful on him as she had helped him with these murders. That would be an admission and a statement by a party opponent, but that is also upcoming. And I forewarn Court and counsel of that and, finally, that ultimately in connection with all of these matters she did admit to the witness her participation or indeed at least having participated in the killings of Nicholson, the Duncan family, and Terry DeGeus.

THE COURT: But that's all by way of admission.

MR. MILLER: Yes, Your Honor.

THE COURT: Right.

MR. MILLER: But I just wanted to forewarn Court and counsel of where I was going in case there was any need for additional in and out.

THE COURT: Thank you.

Mr. Berrigan?

MR. BERRIGAN: Well, the discovery file contains information that Miss Johnson threatened to kill Mr. Honken as well and that that was a discussion she had with Mr. McNeese.

Now, Mr. Miller hasn't specifically mentioned that.

Page 200

I'm not sure when he's talking about her reaction to Honken trying to kill her whether that's the discussion we're going to have during the testimony of the witness, Your Honor, but if that is, we are going to object to that under the same basis,

1214

that that's uncharged misconduct evidence under 404(b) and its prejudicial value far outweighs -- I mean its prejudicial effect far outweighs its probative value pursuant to Rule 403.

MR. MILLER:  And I'm not planning on going that far. The implication was in response to review of the discovery file she learned that and commented to the witness that this shocked her as having helped the man kill these people and having done whatever he told her to do which obviously cuts both ways and seems to fit to some degree what we hear from the defense as a theory.

THE COURT:  Right.

MR. BERRIGAN:  Those are apples and oranges.  Those are admissions.  I'm not having any problem with that.

THE COURT:  Right, but you're not going beyond that about any alleged threat that Angela Johnson made about killing Dustin Honken.

MR. MILLER:  That wasn't my intention, and I will ask the witness to please be careful not to volunteer that.

MR. BERRIGAN:  Then finally, Your Honor, if we could have a continuing objection respecting the testimony regarding the plan to kill Christi Gaubatz so as not to interrupt the flow of the testimony hereafter.

THE COURT:  Okay.  That's fine.  You may.  Okay.  We ready to have the jury brought back in?

MR. MILLER:  Yes, Your Honor.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1065 of 3592

THE COURT: Okay. It's good for them.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Miller, you may proceed.

BY MR. MILLER:

Q.   Mr. McNeese, please describe for the jury how Angela Johnson reacted to the knowledge that her friend Christi Gaubatz had provided information that implicated her in this case.

A.   She was very upset, very upset.

Q.   And did she describe any intentions or desires in connection with that being upset?

A.   Yes, she wanted Christi -- I believe she told me she was in Rockwell City, that she wanted her killed.

Q.   Now, during the course of those weeks, did Angela Johnson at least describe to you that she had access to her discovery file and learned about her case further?

A.   Yes, she did.

Q.   And did she mention anything with regard to any discoveries about the behavior of Dustin Honken toward her?

A.   Yes, she was upset. I guess the documents contained information that Dustin had attempted to have her killed.

Q.   And her reaction to that if you recall, sir?

A.   She was upset because she said that she had, you know, helped him in killing these people and she always helped him do, you know, whatever he wanted to have done.

Q.   Did you at any point discuss or answer any questions from her with regard to the subject of potential liability for aiding

Page 202

and abetting in the killing of others?

A.    Yes.

Q.    Please describe that.

A.    I explained that aiding -- if an individual had knowledge or was even there that they're just as guilty as if pulling the trigger.

Q.    And you mentioned if they had knowledge of what was going to happen?

A.    Yes.

Q.    And to that she responded how if you recall?

A.    I don't recall.

Q.    Mr. McNeese, did you, during this period of time, make any notes to help refresh your recollection should you later be questioned about it?

A.    Yes, I did.

Q.    And would a review of those refresh your recollection, sir?

A.    Yes.

Q.    And just reading silently to yourself, I'll direct your attention to the very bottom of the page dated August 20, 2000, 6:00 p.m.  Did you there document her response?

A.    Yes, I did.

Q.    And is your recollection refreshed by a review of your own notes?

1217

A.    Yes, it is.  She stated that that wasn't fair.

Q.    She didn't feel that was fair at all; is that right?

A.    Correct.

Q.    That one who would help out in the killing be held responsible.

A.    Yes.

Page 203

Q.   You were in that jail with Angela Johnson for a couple months, Mr. McNeese; is that right?

A.   Yes.

Q.   You've mentioned that the relationship grew in the amount of trust developed between her toward you?

A.   Yes.

Q.   And that her comments became more candid.

A.   Yes.

Q.   Toward the end of that time together, did she ultimately either admit or deny participation in the killing of Greg Nicholson and the Duncan family?

A.   Yes, she did.

Q.   And what did she do?

A.   She admitted in participating in it.

Q.   And ultimately did she either admit or deny to you participating in the killing of Terry DeGeus?

A.   Yes.

Q.   And what was that?

A.   She killed him.

1218

Q.   She admitted participating in that murder?

A.   Yes.

Q.   Mr. McNeese, over the latter portion of this relationship in the Benton County Jail that lasted some two months, was there between yourself and Angela Johnson any discussion of any scheme to thwart the prosecution against her?

A.   Yes, there was.

Q.   Please describe that for the jury.

A.   She had mentioned that Dustin was in some prison or something and that he had someone that would come forward and
Page 204

say that they had actually committed the crimes, but once she had learned that Dustin had wanted her killed, she didn't trust him any longer.

Q. So did you have discussions with her along that -- along that line?

A. Yes.

Q. Please describe that for the jury.

A. I told her that I could get someone to admit that they had done it instead.

Q. And how would you be able to do such a thing or at least persuade her that you would have such capacity?

A. Because of my -- just because I been in prison for a long time and knew a lot of people.

Q. Including a lot of people serving life sentences.

A. Correct.

1219

Q. With very little to lose.

A. Right.

Q. Was there any discussion about what, if anything, would need to be done in order to make such a scheme workable?

A. Yes, she would have to describe how the crimes were committed and where the bodies were located.

Q. Why would that be important, Mr. McNeese?

A. So I could give that information to an individual.

Q. Why would it be important for someone claiming responsibility to have such information?

A. So they would know all of the details of the bodies.

Q. So that a false confession would be credible?

A. Correct.

Q. Was there any discussion of any possible benefit to the

Page 205

both of you in the event that this scheme would work?

A. Yes. I told her that if we could get this individual to admit to it they would drop the charges on her and she could sue the government.

Q. For money.

A. Correct.

Q. For false imprisonment.

A. Correct.

Q. Her reaction to that?

A. She liked that.

Q. Through what means did you and Angela Johnson discuss this

1220

scheme?

A. Letter writing.

Q. And how were those letters passed?

A. As I had mentioned earlier, through the food slot or up by the reading books.

Q. You've also indicated that you occasionally had contact while passing through the rec. area?

A. Yes.

Q. Any conversations there as well?

A. Yes, we would talk through the window.

Q. Ultimately, Mr. McNeese, did this scheme come to any fruition?

A. Yes, it did.

Q. Please describe that for the jury.

A. I obtained information on how the individuals were killed, the type of clothing they were wearing, where they were killed at, where their bodies were buried at.

Q. Mr. McNeese, did she, by which I mean Angela Johnson,

Page 206

provide any of that information to you in writing?

A.    Yes, she did.

Q.    Did she also -- let me ask you this.  I think you've indicated that this was discussed that it would be important that anyone claiming -- falsely claiming responsibility for these killings be able to locate the bodies.

A.    Yes.

1221

Q.    And what, if anything, was done in that regard?

A.    She drew maps to the locations of the victims.

Q.    And provided those to you?

A.    Yes.

Q.    How?

A.    I can't recall how I received them.

Q.    You described already having passed notes back and forth in various manners in this place?

A.    Yeah.  I believe I got it through the food slot.

Q.    You also passed notes back and forth through the books that were distributed in the library.

A.    Correct.

Q.    In any event, you've told us now that you received written descriptions of the killings and written maps from Angela Johnson.

A.    That's correct.

Q.    I'm showing you what is marked Government's Exhibit 310 which has already been received in evidence.  Is that one such map?

A.    Yes, it is.

Q.    I show you Government's Exhibit 311 also already received in evidence.  Is that the second map locating a body or bodies?

Page 207

A.    Yes.

Q.    Provided to you by Angela Johnson.

A.    Yes.

1222

Q.    And finally, sir, showing you Government Exhibits 312A, 312B, and 312C, do you recognize those, sir?

A.    Yes, I do.

Q.    And what are they?

A.    The notes explaining the -- how the victims were shot and what they were wearing.

Q.    Government's Exhibits 310, 311, and 312, those maps and notes, were thereafter taken from you by local task force authorities in the Benton County Jail; is that correct?

A.    Yes.

Q.    Very shortly thereafter, in fact.

A.    Yes.

MR. MILLER:  Thank you.  I have no further direct.

CROSS-EXAMINATION

BY MR. BERRIGAN:

Q.    Mr. McNeese, how are you, sir?

A.    Fine.  Thank you.

Q.    It's been a long time.  We met once before.  Pat Berrigan. I'm going to ask you just a few questions; okay?

A.    Yes.

Q.    First of all, you're not here because you enjoy doing this, are you?

A.    No.

Q.    You made a decision some time ago to try to get yourself out of a very difficult predicament, that is, spending the rest

1223

Page 208

of your life in a federal penal institution; right?

A.    Correct.

Q.    And as you've already mentioned to us, you've been in jails or prisons for quite a long time now.

A.    Yes.

Q.    And you have a family including a son.

A.    Yes.

Q.    And I'm not going to identify your family, Mr. McNeese.  I hope -- don't be concerned about that.  You're in a special program as a result of your activities on behalf of the government, aren't you?

A.    Yes.

Q.    Okay.  I want to explore your prior record a little bit because there were some matters, frankly, I thought maybe we missed.  And I know it's probably been a long time, but if you could follow along with me, let me ask if this is correct.  At the age of 17, you were certified as an adult to be tried for burglary and theft; is that correct?

A.    Yes.

Q.    And you ended up pleading guilty to the theft charge and got a five-year sentence in the Iowa Department of Corrections; is that right?

A.    Yes.

Q.    And you had just turned 18 at that time.  It looks like you pled guilty February the 22nd, 1984.  Is that about right?

1224

A.    Yes.

Q.    What's your birthday, sir?

Page 209

A. 8-20-65.

Q. All right. And then the judge suspended your sentence a year after you were sent down, put you out on probation, and suspended the five-year sentence. Isn't that what happened?

A. No.

Q. It wasn't suspended.

A. No.

Q. Isn't it true that you were out between May the 18th, 1984, and July the 13th, 1984, when your probation was revoked and you were sent back to jail?

A. Yes.

Q. Okay. And so that 1984 getting out of jail, if you will, wasn't that a release that the judge granted you?

A. Yeah, I received -- I did 90 days, what they called back then shock.

Q. Shock time, sure.

A. Yeah, 90 days.

Q. Okay. And then something happened to cause you to lose your ability to stay on probation, and you had to go and serve your sentence.

A. Correct.

Q. And then August the 31st, 1983, you were arrested and charged with a number of offenses, carrying weapons,

1225

interference with official acts, operating a motor vehicle without the owner's consent, attempt to elude police officers. Does that sound familiar?

A. Yes.

Q. And, in fact, at that time, August the 31st, '83, this was just two months after you had been arrested for the burglary and

Page 210

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1074 of 3592

theft charges we spoke about earlier; right?

A. I believe so.

Q. You were out on bond on the first charges when you got arrested for the second group.

A. Yeah.

Q. It's been a long time.

A. Yeah.

Q. Anyway, you pled guilty to the carrying weapons charge and just got 80 days in jail on that.

A. Correct.

Q. That sound right?

A. Yes.

Q. And then July of '84 -- and this would have been the offense that caused you to lose your probation -- you got arrested and convicted for fraudulent use of a financial instrument.

A. Yes.

Q. And got a two-year sentence on that.

A. Yes.

1226

Q. Wasn't that run concurrent with the five years you already had on the theft case?

A. I don't recall.

Q. Anyway, you were 18 at the time of those offenses; does that sound right?

A. Yes.

Q. Then you got out of prison, and you were arrested September the 20th, '87, for theft in the third degree, pled guilty April the 14th, 1988. You were 22 years of age.

A. Yes.

Page 211

Q. Got a two-year sentence in the Iowa Department of Corrections. Does that sound right?

A. Yes.

Q. On that particular day, April the 14th, 1988, you actually pled guilty to a series of felony charges in Linn County, did you not?

A. Yes, I did.

Q. You pled guilty to forgery and theft and got ten-year sentences on each of those.

A. Yes.

Q. Pled guilty to another case of theft in the second degree, got a ten-year sentence on that as well.

A. Yes.

Q. And so these cases essentially were all combined into a ten-year sentence in the Iowa Department of Corrections.

1227

A. I believe so.

Q. But you had already been arrested for bank robbery in the Northern District of Iowa February the 22nd, 1988, and that's the sentence that you ended up doing time on; isn't that right?

A. Yes.

Q. 105 months' imprisonment which would be 8 years and 9 months. Does that sound right?

A. Yes.

Q. And as you pointed out yourself, that sentence was increased as a result of your lying under oath to a grand jury about the robbery.

A. Right.

Q. And then while you were in prison in Talladega, Alabama, you were arrested and charged with conspiracy to import heroin

Page 212

into the United States from Europe and the actual importation of heroin into the United States from Europe; isn't that right?

A.    Yes.

Q.    And in this case you went to trial.

A.    Yes, I did.

Q.    And you were convicted by a jury after the trial and sentenced by the court on both of those counts, were you not?

A.    Yes.

Q.    You got 20 years on the importation of heroin and life imprisonment on conspiracy to import heroin into the United States.

1228

A.    Correct.

Q.    And that was done while you were an inmate in a federal correctional center.

A.    Yes.

Q.    And then you were still a federal inmate in September of 2000 when you got charged with conspiracy to commit money laundering; is that right?

A.    Yes.

Q.    And Mr. Miller asked you some questions about that case in terms of drugs, but you didn't actually put your hands on any drugs or, deal with any drugs yourself, did you?

A.    No.

Q.    The conspiracy that was involved had to do with selling drugs and then laundering the money through some businesses. Wasn't that the deal?

A.    Yes.

Q.    And there were a number of people that were charged including your brother, Floyd McNeese.

Page 213

A.    Yes.

Q.    And in this particular case, the conspiracy to commit money laundering, you were eventually sentenced by Judge Melloy to three years in prison; is that right?

A.    Yes.

Q.    But you were looking at -- that is, the sentencing range was from 120 to 150 months which was 10 years to 12 years, 6

1229

months.  Does that ring a bell with you?

A.    Yes.

Q.    That would have been in your presentence report; right?

A.    Correct.

Q.    And Judge Melloy gave you three years and ran it concurrent with your life sentence in the Middle District of Florida case.

A.    Yes.

Q.    And so you're done with the conspiracy to commit money laundering case that you got just four years ago.  That's all finished for you; right?

A.    Yes.

Q.    But you are still serving not only the life sentence, but aren't you still serving this 20-year sentence on importation of heroin?

A.    Yeah, it was ran concurrent I believe.

Q.    Those are concurrent, and obviously they're still going on because you're sitting in a federal penal institution somewhere; right?

A.    What's that?

Q.    You're in jail because of these sentences.

A.    Right.

Q.    And you've been in a number of jails through your career,

Page 214

different federal institutions, haven't you?

A.    Yes.

Q.    And when you were being asked earlier -- let me just see if

1230

I have this list right.  Is it Federal Correctional Institution in Oxford, Wisconsin?  Is that one of your jails?

A.    Yes.

Q.    Federal Correctional Institution in Marianna -- is that in Florida?

A.    Yes, it is.

Q.    Federal Correctional Institution in Tallahassee, Florida, you been there?

A.    Yes.

Q.    Federal Correctional Institution in Sandstone, Minnesota, you've been there?

A.    Yes.

Q.    And United States Penitentiary in Atlanta, Georgia?

A.    Yes.

Q.    And United States Penitentiary in Leavenworth, Kansas.

A.    Yes.

Q.    Have you been in any other federal institutions?

A.    Yes.

          MR. MILLER:  Objection, Your Honor.

          THE COURT:  Overruled.

BY MR. BERRIGAN:

Q.    In your career have you been in any other federal institutions?

A.    USP, Terre Haute.

Q.    Terre Haute, Indiana.  And isn't that a maximum-security

1231

Page 215

Q.	institution?

A.	Yes, it is.

Q.	That's where the federal death row is, isn't it?

A.	Yes, it is.

Q.	And now your goal since 1998 has been to escape this prior criminal history and to somehow get back and enjoy your family with what time you're going to have left after whatever break you might get; right?

A.	I don't know about escaping it but . . .

Q.	No, not escape, I'm sorry. You want to get this life sentence set aside.

A.	Correct.

Q.	And have that changed.

A.	Yes.

Q.	And the motivation for that is not anything other than you want to spend time with your family; right?

A.	And do the right thing.

Q.	And do the right thing. So in 1998 is that when you decided to do the right thing?

A.	Yes.

Q.	Okay. And one of the reasons you decided to do the right thing in 1998 is because that's when Special Agent Fischer came down and visited you in the penitentiary?

A.	Yes.

Q.	And told you that he had you and your brother on tape

1232

discussing this conspiracy case, money laundering conspiracy; right?

A.	Yes.

Page 216

Q.   You've seen the transcripts of that, haven't you?

A.   No, I haven't.

Q.   You haven't.  And you realized that if you don't start doing something, you're just -- you're just never going to get out, and now your brother was in jeopardy; right?

A.   No.

Q.   No.  You weren't trying to help your brother out of this situation?

A.   At this time, yes.

Q.   You were.

A.   I was trying to help my brother, yes.

Q.   And you started to cooperate with the government really in a number of different areas, didn't you, not just in that case, but you really did have mob connections, didn't you?

A.   Yes.

Q.   When you were telling Angela Johnson years later that you were connected to the mob and there were these articles in the paper about you being connected to the mob, that was not a lie, was it?

A.   No.

Q.   You small-time boy from Iowa got in with some mobsters down in Atlanta; isn't that right?

1233

A.   Yes.

Q.   Guy named Vic Amuso.  Am I pronouncing that correctly?

A.   Yes.

Q.   And what is his connection to organized crime?

A.   He is a boss.

Q.   He's a boss.  And isn't it true you and he became friends?

A.   Yes.

Page 217

Q.   And didn't he, in fact, kind of take you into the organization, give you the Iowa territory for the mob gang that Mr. Amuso was running?

A.   Yes.

Q.   And, in fact, this whole thing, this conspiracy to commit money laundering case, that was a mob deal, wasn't it?

A.   Yes.

Q.   There's a guy named Jerry Gross out of New York that the mob got to come out to Iowa and participate in this deal?

A.   Yes.

Q.   And then behind their backs you started talking to the FBI and other law enforcement agents about these mobsters; right?

A.   Yes.

Q.   And you were brought back up here to Iowa to testify against some of the people that had participated in this money laundering scheme with you; isn't that right?

A.   Yes.

Q.   Scotter Clark, he was one of your codefendants.

1234

A.   Yes.

Q.   And wasn't it Scotter Clark's case that was going on that you were asked to testify in front of a grand jury in Iowa when you came back?

A.   Yes.

Q.   And then once you were back here, you started to get involved with all kinds of other people in your effort to provide the government with helpful information; isn't that right, Mr. McNeese?

A.   Yes.

Q.   And they didn't ask you to get involved with all these

folks, did they?

A.   No.

Q.   You were doing this of your own accord; isn't that right?

A.   Yes.

Q.   And some of these folks were pretty bright people that were confiding in you.  Steve Stefani, a lawyer, you got information against him involving some drug activity he was engaged in?

A.   Yes.

Q.   How long did you know Mr. Stefani before you were able to do that?

A.   He was involved in Scotter Clark money laundering conspiracy.

Q.   Okay.  And you got him involved in some drug conspiracy.

A.   No, I didn't.

1235

Q.   Oh, I'm sorry.  You provided information about his involvement with some drug activities, illegal drug activities?

A.   I believe so, yes.

Q.   Yeah.  And Jeff Garrett who's a private investigator in Cedar Rapids.

A.   Yes.

Q.   You got Mr. Garrett to confess some information to you regarding having broken into a law office; isn't that right?

A.   Yes.

Q.   In fact, it was Mr. Willett's law office, wasn't it?

A.   Yes, it was.

Q.   And Mr. Garrett confided in you some incriminating information respecting that.

A.   Yes.

Q.   There was a fellow by the name of Daniel Dice who was an

old childhood friend of yours; right?

A. Yes.

Q. And you went all the way out to San Diego to provide some information about Mr. Dice and get him to confide in you.

A. Yes.

Q. And provided grand jury testimony regarding some illegal drug activities that he was involved in regarding the importation of drugs from Mexico to the United States.

A. Correct.

Q. And a guy named Robert Shultice, psychiatrist. How long

1236

did you know Dr. Shultice?

A. A month or two months.

Q. And in two months you got him to confess his involvement in some very serious criminal activity involving his attempts to kill people.

A. Yes.

Q. And, in fact, wore a wire at the jail and got some incriminating information from Dr. Shultice.

A. Correct.

Q. Fella you knew less than two months.

A. Yes.

Q. And a guy named Andy Rich, you've been cooperating with the government respecting Mr. Rich?

A. Yes.

Q. In a murder investigation; right?

A. Yes.

Q. He gave you some information in the span of really just minutes, isn't it?

A. Yes.

Page 220

Q.    You're pretty good at this, aren't you?

A.    Good listener.

Q.    Good listener, I see.  Well, one of the things you have to be able to do in order to get these folks to kind of go along with you, Mr. McNeese, is you gotta be a good liar, don't you? That's kind of critically important, isn't it?

1237

A.    Yes.

Q.    Because you're lying to these people all the time telling them this or that to get them to confide very incriminating information that's going to damage them; right?

A.    Sometimes.

Q.    And they're doing this because you've persuaded them that you're something that you're not, that you're their friend or you're their confidant or that you're going to give them advice or help them; right?

A.    Yes.

Q.    When in truth none of that is true.  You're talking to those folks to get incriminating information so you can turn it over to the government to get out from under these horribly long sentences that you have from the Middle District of Florida for importing heroin into the United States.  That's the deal, isn't it?

A.    Yes.

Q.    And certainly that was the deal when you ran into Angie Johnson back in late July of 2000; right?

A.    No.

Q.    Hadn't you just finished with Dr. Shultice, incriminating him and wearing a wire, just before you met up with Miss Johnson?

Page 221

A.    Yes.

Q.    And nobody had asked you to do anything respecting

1238

Dr. Shultice, had they?

A.    No.

Q.    You just did that on your own.

A.    Yes.

Q.    Good samaritan that you are.  Is that what you want us to believe?

A.    Yes.

Q.    That you were acting out of not your own self-interest but that you were just being a good citizen.

A.    Both.

Q.    Is that what you want us to believe?

A.    Both.

Q.    Both.  You remember -- you took a lot of notes respecting your conversations with Miss Johnson, didn't you, Mr. McNeese?

A.    Yes.

Q.    And I'm going to just ask you if you remember this, and if you don't, we'll show you your notes.  But do you remember talking to her back in the middle of this thing on August the 20th, 2000 -- in fact, I think that was the note that Mr. Miller just showed you -- August the 20th, 2000, at about 6:00, and you were talking to her through the cell wall at the Benton County Jail in Vinton, Iowa, and you told her -- she was upset about some visit that didn't happen.  And you said to her, You need to calm down, do some heavy soul searching, and figure out what you're going to do.  You need to be out there with your kids.

1239

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1086 of 3592

Do you remember telling her that?

A.    No.

Q.    Let me see if I can show this to you.

MR. BERRIGAN:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. BERRIGAN:

Q.    Could you take a look at page 2, sir, of that document? First of all, are those your notes?

A.    Yes.

Q.    Do you recognize that as your handwriting?

A.    Yes.

Q.    And is the date August the 20th, 2000?

A.    Yes, it is.

Q.    Approximate time, 6 p.m.

A.    Yes.

Q.    And on the second page, would you take a look at that last paragraph there?

A.    Yes.

Q.    You have it in quotes:  You need to calm down and do some heavy soul searching and figure out what you're going to do, quotation marks; right?  Are those your quotation marks?

A.    Yeah, I was looking at the sentence before that.

Q.    Well, what about the sentence I just read?  Is it in quotation marks?

A.    Yes.

1240

Q.    And does that mean that that's supposed to be an exact representation of what you told Miss Johnson?  Is that what you're meaning to convey to us?

Page 223

A.    I can't remember.

Q.    What about the sentence that follows also in quotation marks?  You need to be out there with your kids.  Did you tell her that on August the 20th, 2000?

A.    Yes.

Q.    You really didn't care if she was out there with her kids or not, did you?

A.    Did I?

Q.    Yeah.

A.    No.

Q.    In fact, you knew she had kids.

A.    Yes.

Q.    Right?  She had talked about her kids quite a lot with you, hadn't she?

A.    Yes.

Q.    You knew they came for visits.  You knew she talked to them on the telephone.  You knew that she wrote to them regularly; right?

A.    Yes.

Q.    You knew that she loved her kids and that they were the main thing in her life; right?

A.    Right.

1241

Q.    And the reason you were telling her this, that she needed to be out there with her kids, was because you had already proposed a plan to her that you told her was going to get her out there with her kids; right?

A.    I don't remember the dates.

Q.    Don't remember the dates of your plan?

A.    No.

Page 224

Q.   I see.  Well, do you remember the plan?

A.   I remember our discussions, yes.

Q.   And you knew that this would be a pretty powerful motivating factor for her telling her, Hey, you follow my plan, we're going to get you out there with your kids.  You knew that was going to work, didn't you?

A.   I don't think I used them terms.

Q.   You didn't use what term?

A.   Follow the plan and be out there with your kids.

Q.   No, but you knew that was going to be a big motivator for her, didn't you, this idea that your plan was going to get her out there with her kids?

A.   I didn't really care.

Q.   You didn't care, right.

A.   No.

Q.   You didn't care in terms of whether she got out, but you cared whether she followed your plan, didn't you?

A.   I cared whether she was going to tell me where the bodies

1242

were buried.

Q.   Right, and that's the whole reason you had -- this plan was designed specifically for that purpose, to get her to give you incriminating information; right?  Isn't that right?

A.   Yes.

Q.   Now, let's talk a little about the plan.  She told you that Dustin Honken was working on getting some guy at the penitentiary at Florence ADX -- you know that to be a maximum-security institution, don't you?

A.   I don't believe he was at the ADX at the time.

Q.   Oh, you don't.  Where was he then?

Page 225

A.   In Florence, USP.

Q.   Okay.  So he was at the institution right next to the ADX that's part of the Florence, Colorado, prison complex; right?

A.   Right.

Q.   And he was trying to find some guy that would sort of take the rap for this deal; right?

A.   Yes.

Q.   And you decided that sounded like a pretty good idea to you.

A.   Yes.

Q.   The problem was that if Dustin Honken actually did that, that would be very little benefit to you in terms of your ability to get incriminating information from Angela Johnson; right?

1243

A.   No.

Q.   She'd have very little incentive to talk to you about these murders and bodies if there was some guy out in Florence that was going to take the rap for this; isn't that right, Mr. McNeese?

A.   No, she said she didn't trust Dustin.

Q.   She didn't trust him, yeah.  So you proposed a plan, a substitute plan.

A.   Yes.

Q.   You made up a plan, made up a name, guy named Long, Greg Long.

A.   Yes.

Q.   There wasn't really a Greg Long.

A.   No.

Q.   By the way, isn't it true, Mr. McNeese, that the very first

Page 226

day that Angie Johnson was in the jail she told you what the charges were that she was facing?

A. The first day she was in the jail?

Q. Yeah.

A. I don't believe so.

Q. Didn't you tell Bill Basler -- you know Mr. Basler over there.

A. Yes.

Q. You see him. You recognize him.

A. Sure.

1244

Q. Remember him coming out to see you for the first time visiting you at the jail on September the 6th, 2000, 10:52 in the morning?

A. No.

Q. Might it help your recollection of events if I showed you his report?

MR. BERRIGAN: May I approach?

THE COURT: You may.

BY MR. BERRIGAN:

Q. Let me direct your attention to the first sentence in the second paragraph, Mr. McNeese.

A. Yes.

Q. Did you tell Bill Basler that the very first day that Angie Johnson was in the Benton County Jail in Vinton, Iowa, you learned of her charges? Mr. McNeese?

A. No, I didn't -- it says here that I knew that she came into the jail.

Q. And did you tell Mr. Miller a little earlier that when she came into the jail that you exchanged pleasantries including

Page 227

what were you charged with?

A.   Not on the very first day.

Q.   Oh, I see.  Well, you found out pretty quickly what she was charged with, did you not?

A.   Yes.

Q.   And you were interested in that because, I mean, it wasn't

1245

like it was a parking ticket or DWI.  It was a very serious crime; right?

A.   At the time I really wasn't interested.

Q.   Weren't interested, just like you weren't interested in Dr. Shultice, I suspect; right?

A.   I met a lot of people that's killed people.

Q.   These people, they just kind of seem to fall into your lap, don't they, Steve Stefani, Jeff Garrett, Daniel Dice, Robert Shultice, Andy Rich; right?  They confess to you for no apparent reason; is that right?

A.   Yes.

Q.   Is that what you want us to believe?

A.   Well, I mean, they discussed with me.  They have their reasons for discussing it.

Q.   And you really have nothing to do with it.  You might as well be a chair sitting over there as far as your cooperation and participation in these confessions.  Is that what you want us to believe, Mr. McNeese?

        MR. MILLER:  Objection, argumentative.

        THE COURT:  Overruled.  You may answer.

A.   I don't know what you want to believe.

Q.   You learned that you could talk through the wall with Miss Johnson.  Well, you already knew that because you had been in

Page 228

the jail since March the 22nd; right?

A.    Right.

Q.    You knew about this ability to talk through the wall because you had done it with Dr. Shultice; right?

A.    No.

Q.    No.  You hadn't learned about how to talk through the wall.

A.    Shultice and I were cellies.

Q.    Oh, I see, that's right.  And you guys passed -- had notes back and forth to each other, didn't you?

A.    I don't recall.

Q.    Don't remember the notes.

A.    No.

Q.    And Miss Johnson learned about the -- your legal situation because you sent her a note with a copy of a newspaper article attached; isn't that right, Mr. McNeese?

A.    Yes.

Q.    You wanted her to know about you; right?

A.    Yes.

Q.    Big shot with the mob facing money laundering charges.  You wanted her to know all that stuff; right?

A.    Yes.

Q.    So when you could later claim that you could help her, you had evidence of that.  You were connected; right?

A.    Yes.

Q.    So you made up this story about this fellow Greg Long, and you said that Mr. Long was already serving a life sentence, and he was, in fact, at the Leavenworth penitentiary; right?

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1093 of 3592

A.    Yes.

Q.    Leavenworth, Kansas.  You know that.  You've been there.
You know the facility; right?

A.    Yes.

Q.    And your story to her was that this guy Greg Long was at
the penitentiary, had come across some informant, some snitch,
somebody much like yourself, and had killed them; right?

A.    I don't remember.

Q.    You don't remember that?

A.    No.

Q.    Hmm.  Why don't you take a look at your -- that same report
Mr. Basler prepared.  And let me refer you specifically to the
second page, the last full paragraph.  Why don't you take a look
through that to yourself, sir, and see if that helps you.

A.    Yeah, I've read it.

Q.    Sorry?

A.    Yes, I've read it.

Q.    You remember now.

A.    Yes.

Q.    Do you have a lot of stories about Mr. Long?  Do you use
him regularly?

A.    No.

Q.    Okay.  And so the deal was that because Mr. Long was
already serving a life sentence and you were connected you might
be able to persuade him to go ahead and kind of cop to this

1248

case; right?

A.    Yes.

Q.    And you added that if Miss Johnson went along with that
plan and Mr. Long actually got convicted of this offense and was
Page 230

charged with these murders that she could get out and then sue the government for false imprisonment; right?

A.   Yes.

Q.   That was part of the plan.

A.   Yes.

Q.   That was your idea, wasn't it?

A.   I believe so.

Q.   Well, you knew something about lawsuits.  You had a couple of them going on already, didn't you?

A.   I had one lawsuit.

Q.   You had a lawsuit where you were suing the penitentiary in Atlanta because you claim they lost some personal property of yours that they were supposed to send back to your wife.

A.   Correct.

Q.   Isn't that right?

A.   Yes.

Q.   Something to do with a bunch of purses?  Fifty new pocketbooks, three photo albums, a gold chain with a cross, and a St. Christopher medal.  Is that what you claimed the penitentiary lost?

A.   Yes.

1249

Q.   And for that you not only sued them, but you were claiming you had punitive damages in the amount of $1,200 from the penitentiary officials.

A.   Correct.

Q.   And you also sued the Des Moines Register, did you not, for a newspaper article about you calling you a snitch?

A.   No.

Q.   You didn't do that?

Page 231

A.    No, I did not.

Q.    You never did.

A.    No.

Q.    Mr. McNeese, did you remember giving a deposition in the case of State of Iowa versus Andrew Phillip Rich?

A.    Yes.

Q.    And you gave that deposition on the 27th, 28th days of August, 2002?

A.    Yes.

Q.    Is that right?

A.    Yes.

Q.    And you were sworn to testify truthfully just as you've been sworn today?

A.    Yes.

        MR. BERRIGAN:  May I approach the witness, Your Honor?

        THE COURT:  You may.

BY MR. BERRIGAN:

1250

Q.    I'm handing you a partial transcript for that deposition, Mr. McNeese.  If I could refer you specifically to page 29, line 4, I wonder if you could follow along with me, sir.  First of all, this deposition was given back in 2002, so just 3 years ago, less than that; right?

A.    Yes.

Q.    Okay.  Take a look at the following exchange if you would, sir.  Question on line 4, Okay.  And you have another lawsuit pending, and your answer, Uh, on file?  Yes, sir.  Is that what you said?

A.    Yes.

Q.    Next question, And who represents you on that?  Answer,

Page 232

Helen Wang. Is that what you said?

A. Yes.

Q. Okay. Tell me about that lawsuit. And your answer on line 9, Against the Des Moines Register. Line 10, question, Okay. Tell me about the Des Moines Register suit. Your answer on line 11, They had written an article claiming -- making some allegations that weren't true. Question, When was this? Six, eight months ago. Is that right?

A. Yes.

Q. And is that in relation to the Johnson case, or why was an article done on you six -- here six or eight months ago? Your answer, It was just a general article. Do you see that?

A. Yes.

1251

Q. Now, this goes on for another page where you discuss this lawsuit, that they had 32 erroneous statements about you that caused you to bring suit.

A. Right.

Q. Okay. Now I understand that that suit wasn't in 2000, was it?

A. Correct.

Q. But you did sue the Des Moines Register, did you not?

A. No. If you'll notice, it says, Do you know if she filed the suit yet? And I said, No, I haven't spoken to her for a few weeks.

Q. So what about this beginning part here where you say, And you have another lawsuit pending on file. Yes, sir.

A. Right.

Q. That wasn't true?

A. It was a mistake.

Page 233

Q.   I see.   So you only had one lawsuit going on at the time you were talking to Angela Johnson about how she could sue the government.

A.   Yes.

THE COURT:   Mr. Berrigan, would this be a logical place to break?

MR. BERRIGAN:   Yes, sir.   4:30's always a logical place.

THE COURT:   Okay.   Members of the jury, that will

1252

conclude the testimony for today.   We'll start again tomorrow at 8:30.   Please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence and your obligation not to discuss this case among yourselves or with anybody else.   And we'll see you tomorrow morning at 8:30. Thank you.

(The jury exited the courtroom.)

THE COURT:   Please be seated.   Counsel, anything we need to take up in anticipation of tomorrow's events?

MR. WILLIAMS:   No, Your Honor.

MR. BERRIGAN:   Nothing by the defense, sir.

THE COURT:   Okay.   We'll see you tomorrow morning. We'll meet at 8:15 just in case.

MR. WILLIAMS:   Certainly.

THE COURT:   Thank you.

(The foregoing trial was

adjourned at 4:31 p.m.)

CERTIFICATE
Page 234

VOLUME 5, 5-11-05

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR

8-29-05
Date

1253

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| LORI LEWIS | | |
| | MR. WILLIAMS | 987 |
| | MR. STOWERS | 1008 |
| | MR. WILLIAMS | 1021 |
| NILA BREMER | | |
| | MR. WILLIAMS | 1022 |
| | MR. STOWERS | 1031 |
| RICK HELD | | |
| | MR. WILLIAMS | 1036 |
| | MR. STOWERS | 1047 |
| | MR. WILLIAMS | 1048 |
| | MR. STOWERS | 1053 |
| | MR. WILLIAMS | 1063 |
| WILLIAM BASLER | | |
| | MR. WILLIAMS | 1065 |
| | MR. STOWERS | 1122 |
| | MR. WILLIAMS | 1139 |
| MICHAEL MERINO | | |
| | MR. WILLIAMS | 1141 |
| | MR. STOWERS | 1160 |
| ROBERT MCNEESE | | |
| | MR. MILLER | 1174 |
| | MR. BERRIGAN | 1222 |

*****

| EXHIBITS: | |
|---|---|
| 49 | 995 |
| 76A through 76N | 998 |
| 76N | 999 |
| 50 | 1002 |
| 77 | 1026 |
| 226A through 226M | 1052 |
| 8 | 1082 |
| 314 | 1089 |
| 310, 311, and 312A, B, and C | 1121 |
| 318 | 1144 |

Page 235

VOLUME 5, 5-11-O5

1151

*****

Page 236

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1100 of 3592

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR01-3046 |
| Plaintiff, | Sioux City, Iowa |
| | May 12, 2005 |
| vs. | 8:19 a.m. |
| ANGELA JANE JOHNSON, | VOLUME 6 of 24 |
| Defendant. | |

/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

1255

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | C. J. WILLIAMS, ESQ. |
| | Assistant United States Attorney |
| | Suite 400 - Hach Building |
| | 401 First Street Southeast |
| | Cedar Rapids, IA  52401 |
| | |
| | THOMAS HENRY MILLER, ESQ. |
| | Iowa Attorney General's Office |
| | Area Prosecutions Division |
| | Hoover State Office Building |
| | Des Moines, IA  50319 |
| | |
| For the Defendant: | PATRICK J. BERRIGAN, ESQ. |
| | Watson & Dameron |
| | 2500 Holmes |
| | Kansas City, MO  64108 |
| | |
| | DEAN STOWERS, ESQ. |
| | Rosenberg, Stowers & Morse |
| | 1010 Insurance Exchange Building |
| | 505 Fifth Avenue |
| | Des Moines, IA  50309 |
| | |
| | ALFRED E. WILLETT, ESQ. |
| | Terpstra, Epping & Willett |
| | Higley Building - Suite 500 |
| | 118 Third Avenue Southeast |
| | Cedar Rapids, IA  52401 |
| | |
| Also present: | Bill Basler |

Page 1

VOLUME 6, 5-12-05
Court Reporter:            Shelly Semmler, RMR, CRR
                           320 Sixth Street
                           Sioux City, IA  51101
                           (712) 233-3846

1256

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Is there anything I need to know about this morning?

MR. WILLIAMS:  Not on behalf of the United States, Your Honor.

MR. BERRIGAN:  Nothing by the defense, sir.

THE COURT:  Okay.  See you at 8:30 then.

(Recess at 8:19 a.m.)

THE COURT:  Ready to have the jury brought in?

MR. WILLIAMS:  Your Honor, just to alert the Court, the next witness we have will also be an inmate.  It may take the marshals some time to get that witness up.

THE COURT:  That's fine.  Thank you.

(The jury entered the courtroom.)

THE COURT:  Good morning.  Please be seated.

Mr. Berrigan, you may resume your cross-examination.

MR. BERRIGAN:  May it please the Court.

ROBERT MCNEESE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CONTINUED CROSS-EXAMINATION

BY MR. BERRIGAN:

Q.  Morning, Mr. McNeese.

A.  Morning.

Q.  Before we pick up where we left off yesterday, I wanted to ask you a quick question about something I thought you told

1257

Page 2

Mr. Miller yesterday. He asked you whether any of the prior crimes you had been convicted of were crimes of violence, and I thought I heard you say no.

A. That's correct.

Q. Well, not to quibble, but when did bank robbery become a crime other than a crime of violence?

A. I believe I pled guilty to an unarmed bank robbery.

Q. Unarmed.

A. Yeah.

Q. You went into the bank with your hand in your pocket very much pretending that you had a gun.

THE COURT: Well, you know, you can impeach him with a prior crime. You're not allowed to get into any of the underlying offense.

MR. BERRIGAN: I thought that door had been opened, Your Honor, but I'll abide by your ruling.

THE COURT: Explain to me why you thought it had been opened.

MR. BERRIGAN: Only because there was this discussion about crimes of violence and Mr. McNeese denying having participated in any crimes of violence when, in fact, he committed a bank robbery which at least --

THE COURT: Okay. You can pursue that.

MR. BERRIGAN: I'll be brief.

THE COURT: That's fine.

1258

BY MR. BERRIGAN:

Q. You at least pretended to everybody in the world that you had a gun in your pocket; right?

Page 3

A. Yeah.

Q. The bank gave you $18,000 because they thought you had a gun in your pocket.

A. Correct.

Q. And in your view that's not a crime of violence.

A. Yes, it is.

Q. If we could go back to the discussion about your fictitious friend in Leavenworth, Mr. Long, for just a moment, there was an important part of the plan that I don't think we discussed, and that had to do with what would happen to Mr. Long if, in fact, he volunteered to take this case for Angela Johnson. What did you tell Angela Johnson about that?

A. I can't remember.

Q. Well, didn't you tell her, in fact, Mr. McNeese, that there's no way that the death penalty would be applicable to this case based on the research that you had conducted?

A. Was that the question?

Q. Yes, sir.

A. Yes.

Q. You told her that.

A. I -- something like that, yes.

Q. In fact, didn't you write her a letter about it?

1259

A. Something like that, yes, I did.

Q. Would it refresh your recollection to see it?

A. No, I remember what you're referring to.

Q. You remember.

A. Yes.

Q. You told her that -- you asked her whether or not the murders were before September 1994; right?

Page 4

A.  Correct.

Q.  And you told her that in your legal opinion if that were true then there's no way that there could be a death penalty as a possible punishment; right?

A.  Yeah.  I was wrong, wasn't I?

Q.  Yeah, you were.  And you cited the Anti-Terrorism Crime Act of 1984?

A.  Yes.

Q.  Isn't that right?

A.  Yes.

Q.  Is that something you researched at the Benton County Jail in Vinton, Iowa?

A.  I don't recall.

Q.  Do they have some law books?  We didn't see any law books in the pictures of the library.

A.  I don't remember.

Q.  You told her that there was a five-year statute of limitations if the crimes weren't capital offenses; right?

1260

A.  I could have, yes.

Q.  And then you actually cited pages and sections as if this was a legal statute that you were talking about.

A.  Yeah.

Q.  You made up all that stuff.

A.  I don't believe I made it up.  I probably copied it from a book or something.

Q.  Where was the book?

A.  I don't know.  Probably at the Benton County Jail.

Q.  The Benton County Jail had some books about the statutes dealing with the death penalty?

Page 5

A. I'm sure they do. I mean, it's a jail. I'm sure they have a law library.

Q. Well, we saw a picture of a law library -- I mean a library, and you talked about passing notes through books in the library. Is there some other library at the Benton County Jail we haven't seen or that you know about?

A. Well, actually I was referring to the bookshelfs. That's not considered the library.

Q. Did you have some special access to legal books as a result of your status there at the Benton County Jail?

A. No.

Q. So it only made sense that you'd have to tell Angela Johnson that Greg Long couldn't face the death penalty. Otherwise the guy would be a nut to take the case, wouldn't he,

1261

when he was looking at the death penalty?

A. Yes.

Q. And in terms of her kind of quizzing you about this plan, did she ask you when it is that Greg Long was first convicted and put in the penitentiary?

A. I don't remember.

Q. Did she ask you questions about when he killed this alleged snitch down at the penitentiary in Leavenworth, Kansas?

A. I don't remember.

Q. Were there any questions from her about how it is that you would know being in prison for now 17 or 18 years, how would you have known where Greg Long was on July the 25th of 1993?

A. No.

Q. She didn't ask you that. What -- if she had asked you that, what would you have told her?

Page 6

A.    I don't know.

Q.    You'd have no clue, would you?

A.    No.

Q.    Did she ask you what motive would Greg Long possibly be able to assert for killing Greg Nicholson, Lori Duncan, Kandi and Amber Duncan?  Did she ever ask you that?

A.    No.

Q.    Or how Greg Long would be able to establish any ties whatsoever to these people?  How was that going to work?

A.    She was going to tell me things about them.

1262

Q.    About Greg Long?

A.    No, about the people that were killed.

Q.    There wasn't a person on the face of the earth that could put Greg Long with Greg Nicholson, is there?

A.    (Shrugged shoulders.)

Q.    There wasn't even such a character as Greg Long.  You've admitted that.

A.    Right.

Q.    What was going to happen -- what were you going to tell Miss Johnson when she asked you why Greg Long was killing Terry DeGeus?

A.    I don't know.

Q.    Well, what were you going to be able to say as to how you knew Greg Long would have been anywhere close to Mason City/Clear Lake, Iowa, on November the 5th, 1993?  How would you know that?

A.    I wouldn't.

Q.    What was going to happen when the DeGeus family said, "Well, you know, this Greg Long guy, we don't know him from

Page 7

Adam. We see our son almost every day, never heard of Greg Long"? She didn't ask you how you were going to fix that.

A. No, she didn't ask any of that.

Q. She didn't ask any of those questions.

A. No.

Q. And that's because, of course, she believed your story as

1263

you intended her to believe it; right?

A. Yes.

Q. This was a woman who hadn't been in jail before and was pretty naive about the con men that exist in county jails and prisons like you've been in; isn't that true, Mr. McNeese?

A. I don't believe so.

Q. You knew that this woman had never been in jail before, didn't you?

A. I think she's pretty bright.

Q. Yeah. Well, not bright enough to ask you any questions about this plan of yours; right?

In fact, what happened was that she over the course of a very short period of time seemed to fall in love with you; isn't that right?

A. I don't know.

Q. You don't know that from the letters that she sent you?

A. No.

Q. And, of course, you were telling her all along you were connected, you had these ties to this mob family. What was it? The Luccheses? Is that the name of the family?

A. Lucchese.

Q. Luccheses? And you could get all this stuff done, you were there to help her. That's what you were telling her.

Page 8

A.   Yes.

Q.   And that -- of course, that was a lie.

1264

A.   Yes.

Q.   When Bill Basler came to see you on September the 6th, do you remember giving him a letter that you had gotten from Angela Johnson?

A.   Yes.

Q.   And at that time you told him you had more letters; isn't that right?

A.   I believe so.

Q.   And these are letters you had collected, of course, over the month of August and the early part of September from Miss Johnson.

A.   Yes.

Q.   And Mr. Basler, being the fine investigator he is, asked you, Well, what's in the letters, because you were keeping them; right?

A.   Right.

Q.   And you said they were incriminating, she had made admissions to you in those letters; right?

A.   Right.

Q.   And, of course, he wanted to know, Well, where are they? I'd like to have those; right?

A.   Yeah.

Q.   You remember what you told him?

A.   No.

Q.   You said, My lawyer has them, right, your lawyer Mark

1265

Page 9

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1109 of 3592

Meyer?

A. I don't recall.

Q. Didn't you give the letters to Mr. Meyer?

A. I don't remember.

Q. Well, why don't you take a look at Mr. Basler's report and see if that will refresh your recollection on page 3, sir. And this would be the second paragraph from the bottom starting, McNeese stated he has the other letters. Do you see where I'm referring to?

A. Yes.

Q. All right. Did you give the letters to your lawyer, Mr. McNeese?

A. Not that I can -- I don't remember this, no.

Q. Even despite Mr. Basler saying you did, you don't remember that.

A. Right. I can't remember.

Q. Okay. Well, the fact is you were negotiating a plea agreement on your money laundering case at that same time, weren't you?

A. Yes.

Q. In fact, you signed a plea agreement the very next day on September the 7th -- well, actually it was dated September the 7th, but you signed it September the 12th, 2000. Do you remember that?

A. Yes.

1266

Q. So these letters that you had, certainly you didn't give them to Mr. Basler. We could agree on that.

A. Turned over all the letters that I had.

Q. Well, not on September 6 you didn't, did you?

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1110 of 3592

A.   I believe I did, yes.

Q.   He says you gave him one letter.  Is that all you had from July the 30th to September 6 is one letter from Angela Johnson?

A.   All letters I turned over to the jail people and to the authorities there.

Q.   On September the 6th how many letters did you give Bill Basler when he came over to the jail to see you, Mr. McNeese?

A.   That was three years ago.  I can't remember exactly.

Q.   Well, and you look at his report, and that doesn't help you.

A.   If it says one letter, then yes.

Q.   Okay.  And you had more, we could agree, than one letter.  You had collected more than one letter.

A.   That I had turned over, yes.

Q.   Turned over to who?

A.   Pete Wright at the Benton County Jail.

Q.   You hadn't turned any letters over to Pete Wright by this time, had you?

A.   Yes, I had.

Q.   And had you also kept some letters from Mr. Wright and given them to your lawyer as Mr. Basler accounts?

1267

A.   Not that I can remember.

Q.   I see.  On September the 26th, 2000, do you remember there being a visit from a group from the prosecutor's office over there at the jail to see you?

A.   I know that I had several visits from them, yes.

Q.   Well, this would have been a group that included Mr. Williams amongst others.

A.   Oh, yes.

Page 11

Q. You remember that, don't you?

A. Yes.

Q. Because they were over there asking you for additional papers and evidence that they claimed that you had; right?

A. No.

Q. They claim that you had told Mike Merino at the jail that very day that you had gotten evidence from Miss Johnson about where these bodies were buried; isn't that true, Mr. McNeese?

A. That they -- no, they never told me that.

Q. You never told Mike Merino on September the 26th, 2000, that you had gotten evidence from Miss Johnson about where these bodies were buried?

A. I believe I had a conversation with the jailer saying that I was going to get a map or something.

Q. And the people from the prosecutor's office came over to the jail because they wanted that stuff. They wanted your map of the bodies; right?

1268

A. Angie's map.

Q. Yeah, and they wanted to search your cell because you claimed you didn't have it; right?

A. They never -- never asked me for it.

Q. Didn't they ask you to search your cell and consent to a search of your cell voluntarily, Mr. McNeese?

A. Yes.

Q. They did, and you refused, did you not?

A. No, I believe I got upset and said, I'm in jail, and you don't need permission to go search my cell.

Q. Yeah, you said that after you refused, and they did go ahead and search your cell without permission; isn't that what

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1112 of 3592

happened, sir?

A.    When they took me to talk to me, they were in the process of searching the cell at that time.

Q.    After you had refused when they asked you voluntarily to search your cell.

A.    That's incorrect.

Q.    And then the jail searches your cell, and they look for stuff, and you've got all kinds of papers and envelopes marked legal mail; isn't that right?

A.    Yes.

Q.    Because you know that if it's in an envelope marked legal mail then the jailers can't legally search it.  You knew that from your umpteen years being in the penitentiary and county

1269

jails, didn't you, sir?

A.    That's incorrect.

Q.    And so they couldn't look in those envelopes and find these maps that you claimed you had had when you talked to Mr. Merino earlier in the day; isn't that right?

A.    No, it's not.

Q.    And so you got all angry that night because they had the audacity to show up at your cell and want to search your cell for maps of the bodies of people that had been buried for seven years, and you were angry about that; isn't that right, sir?

A.    I really don't even know what you're talking about.

Q.    And then you got thrown in the hole, lockdown, as a result for almost a week.

A.    I don't know what you're talking about.

Q.    You don't remember being in lockdown from September the 26th to October the 2nd, 2000, Mr. McNeese?

Page 13

A.    Yeah, but the scenario that you're saying is totally incorrect.

Q.    And then on October the 2nd, you call on the phone your buddy Mark Fischer, the detective with the Cedar Rapids Police Department.  Do you remember calling him in the morning at about ten o'clock collect?

A.    Yes.

Q.    And you said to Mr. Fischer that you had communications from Angela Johnson, pieces of paper talking about what these

1270

persons were wearing at the time of their death, where the bodies were located, and how they were killed.  You told Mr. Fischer that on October the 2nd; is that right?

A.    Yes.

Q.    And let me show you just so we're clear --

MR. BERRIGAN:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. BERRIGAN:

Q.    I'm handing you, sir, Government's Exhibits 310, 311, and 312A, B, and C.  Do you recognize what those are, Mr. McNeese?

A.    Yes.

Q.    What are they?

A.    The maps.

Q.    And which of those papers were you talking to Mr. Fischer about on the morning of October the 2nd, 2000?

A.    I believe on that morning I had all of them.

Q.    All of them.

MR. BERRIGAN:  I wonder if we could put those up for the jury, Mr. Williams.  Thank you.

Q.    We're going to show these just for the jury's benefit so

Page 14

they know what we're talking about, Mr. McNeese, and as they come up, I'll just ask you about them very quickly. Do you recognize 310 behind you?

A. Yes.

Q. What is that, sir?

1271

A. A map.

Q. It's a map. And 311, do you recognize that?

A. Yes.

Q. What is that?

A. Another map.

Q. And these maps are from Angela Johnson?

A. Yes.

Q. And they concern where these bodies, the bodies of the people killed in 1993, these are where these people are buried; right?

A. Correct.

Q. And you had them in your possession the morning of October the 2nd of 2000. Isn't that what you just told us?

A. Yes.

Q. Okay. And then 312, if we could look at that, please. Thank you. This is 312A. Do you recognize that, Mr. McNeese?

A. Yes.

Q. And what is that? Is that a note from Angela Johnson?

A. Yes, it is.

Q. And 312B, do you recognize that document?

A. Yes.

Q. That's also another note from Angela Johnson?

A. Yes.

Q. And then 312C, do you recognize that?

Page 15

A.    Yes.

1272

Q.    Another note from Angela Johnson.

A.    Yes.

Q.    And all these doc -- all these pieces of paper -- thank you very much -- all these pieces of paper are sort of torn into strips, aren't they?

A.    Yes.

Q.    Did you do that?

A.    No.

Q.    You didn't.

A.    No.

Q.    Well, you tell your buddy Detective Fischer on the morning of October 2 you have all these documents and they're small enough that you could destroy them by placing them in your mouth and swallowing them if any attempts were made by anybody to take those from you forcibly.  Isn't that what you told Mark Fischer on the morning of October the 2nd?

A.    No.

Q.    And you told him that because --

A.    I didn't tell him that.

Q.    Well, have you seen his report about this, Mr. McNeese?

A.    Yes, I have.

Q.    Okay.  Does he claim that that's what you told him?

A.    He alleges that, yes.

Q.    I see.  And so we should take your word over Mark Fischer's on this matter.

1273

Page 16

A.   No, but, I mean, if -- would you like me to explain it to you?

Q.   No, sir.  I'd like you to just answer the questions.

A.   Okay.

Q.   So you deny telling Mark Fischer that you were going to put these in your mouth and swallow them if anybody tried to come get them.

A.   Yes.

Q.   And you also told Mark Fischer you'd give over these documents if you could get out of the hole.  Isn't that what you told him?

A.   No.

Q.   You told Mr. Miller that you've got some hope that you're going to be rewarded for your work in this case; is that right?  Is that what you said, Mr. McNeese?

A.   For my entire cooperation.

Q.   Yeah, your cooperation, Dr. Shultice, Scotter Clark, Andy Rich, Steve Stefani, Jeff Garrett, Daniel Dice, and God knows how many other people you've implicated.  You expect a reward for what you've done, don't you?

A.   Yes.

Q.   And the reward that you expect is that your sentence, your life sentence out of the Middle District of Florida, that that's going to get cut in half.  Isn't that what you expect?

A.   Yes.

1274

Q.   You already got a 60 or 70 percent reduction on your money laundering sentence, didn't you?

A.   Yes.

Q.   You were looking at at least ten years to twelve and a

Page 17

half, and you end up getting three.

A.    Yes.

Q.    And now you are hopeful that as a result of all this cooperation that you're going to be out in 15 years on your Florida sentence; isn't that right?

A.    Yes.

Q.    And, of course, then you'll be able to see your son who was born six months before you went into prison for bank robbery; right?

A.    Yes.

Q.    And as far as Angela Johnson and her kids, you've made it pretty clear you really don't give a damn about that anyway, do you?

A.    She killed kids.  Why do I care?  No, I don't care.

Q.    Well, you didn't care before you knew that.  The whole plan was to get her to confess to something you had no idea whether she'd done or not.  Isn't that true, Mr. McNeese?

A.    No, that's not true.

Q.    You gave her this story about Greg Long long before she was talking to you about bodies or people being buried in the ground.

1275

A.    That's not true.

Q.    That was the whole plan from the very beginning just like it was with Dr. Shultice and Scotter Clark and Andy Rich and Steve Stefani and Jeff Garrett and all these other folks.  You were out there to try to get yourself out of jail so you could go home.

A.    That's not true.

Q.    And whatever happened to these people, hey, too bad; right?

Page 18

A.    That's not true.

MR. BERRIGAN:  That's all I have.

THE COURT:  Mr. Miller?

REDIRECT EXAMINATION

BY MR. MILLER:

Q.    Morning, Mr. McNeese.

A.    Good morning.

Q.    Just a few questions for you, sir.  First, you took issue with what you referred to as Mr. Berrigan's scenario regarding your lockdown in the late days of September of 2000.  Would you go ahead and explain if you would?

A.    Yes.  I was -- had been speaking with a different U.S. attorney, and all of a sudden they brought a different one up there and talking about doing certain things.  And I don't -- I mean, searching the cells and all that.  I didn't really have a -- I mean, I'm in jail.  I can't have any -- I can't tell anybody they can or can't search anything.  But I became upset

1276

because, you know, he was being pretty forceful.

Q.    You offered to explain about your conversation with Mark Fischer about the allegation that you would swallow these maps and notes.  I'll give you that opportunity.  Would you go ahead and explain if you wish?

A.    Yeah.  I had the notes and the maps, and I had told him earlier, and he never came and got them.  And, I mean, I wasn't serious.  I says, What do you want me to do?  Eat them or swallow them or -- but, I mean, I would have never destroyed any of the maps.  That's ridiculous.

Q.    They were pretty valuable.

A.    They showed where the kids were buried at.

Page 19

Q. Mr. McNeese, going back to the matter of your criminal history, it goes back well before 1988.

A. Yeah, I'm not a choir boy. I'm a crook.

Q. Back to your days as a juvenile.

A. Yes.

Q. But as far as your incarceration, you've been continuously behind bars since 1988.

A. Correct.

Q. And that was for bank robbery.

A. Yes.

Q. Unarmed.

A. Right.

Q. Having been incarcerated continuously since 1998 in the

1277

federal prison system, when did you first cooperate with any investigative authorities?

A. I believe 1998.

Q. And that was against whom?

A. Nicky Scarfo and Vic Amuso.

Q. Scarfo and Amuso, both members of the east coast Lucchese crime family?

A. Nicky Scarfo is the boss of the Philadelphia crime family.

Q. And Vic Amuso?

A. The boss of the Lucchese crime family.

Q. Where is the Lucchese family?

A. New York City.

Q. So you were informing against bosses of both the New York and Philadelphia organized crime families?

A. Yes.

Q. Any convictions result from your cooperation, sir?

Page 20

A.   No.

Q.   Any in those investigations beginning in '98?

A.   Were there any convictions?

Q.   Arising out of that particular investigation.

A.   Yes.

Q.   Who was convicted?

A.   Individuals that were planning a murder in Pennsylvania.

Q.   How about Vic Amuso himself?

A.   No.

1278

Q.   He knew you cooperated, however.

A.   He does now, yes.

Q.   And who was this fellow in the Lucchese family?  Scarfo?

A.   No, it's Vic Amuso.

Q.   But how about this Scarfo character?

A.   Nicky Scarfo.

Q.   Nicky Scarfo.  And he's aware that you cooperated.

A.   Yes, he is.

Q.   Mr. McNeese, it was mentioned to you that you lie to fellow inmates when you fail to suggest to them that you're an informant.  Is there any particular reason you wouldn't share that information with fellow federal inmates in federal prisons?

A.   Yes.

Q.   And what reason is that, sir?

A.   You can be killed.

Q.   Mr. McNeese, the federal prisons are full of criminals; fair statement?

A.   Yes.

Q.   Violent criminals?

A.   Yes.

Page 21

Q.     Murderers?

A.     Yes.

Q.     Armed robbers?

A.     Yes.

Q.     Drug dealers who use violence in connection with their

1279

dealings?

A.     Yes.

Q.     What is a snitch jacket, Mr. McNeese?

A.     A snitch jacket?

Q.     Yeah.

A.     One is where individuals go around and collect information on people who are cooperating.

Q.     Anybody who has a reputation as being a snitch, what sort of status does that person have in any prison system much less the federal prison?

A.     A pretty low status.

Q.     Is it a status that's of any danger to them physically?

A.     Yes.

Q.     I think you've already mentioned that our federal prisons are full of criminals.  Among the many things that are discussed, are their criminal activities, past and current, matters of discussion inside the bars of our federal prisons?

A.     Yes.

Q.     And is there any reason that all of the federal prisoners don't just immediately report to authorities what they hear inside those walls?

A.     Yes.

Q.     And what is that?

A.     They're not cooperating.

Page 22

Q. If it's learned that they've cooperated, what's likely to

1280

happen to them, Mr. McNeese?

A. Be killed.

Q. So concealing the fact that you're an informant, is that something you do for any particular reason if you are, in fact, informing on fellow prisoners?

A. For my safety.

Q. Safety from people like members of the Lucchese and Amuso crime families?

A. Yes.

Q. Mr. McNeese, it was mentioned to you yesterday that you're in a special program within prison. That's for your safety?

A. Yes, it is.

Q. The Bureau of Prisons -- and I don't want to get into the exact details because we can't, but the Bureau of Prisons does have a program for the safekeeping of individuals whose lives or personal welfare is at risk?

A. Yes.

Q. Is that program one that increases or decreases your freedom as a prisoner?

A. It's a lot worse.

Q. Your access to communication with friends and families, is it greater or considerably lesser as a member of such program?

A. A lot lesser.

Q. And you are in such a program.

A. Yes, I am.

1281

Q. Mr. McNeese, you've indicated, quite frankly, that the

Page 23

cooperation you hope might yield you some benefit.

A.   Yes.

Q.   And that cooperation I think very clearly did not begin in connection with the Honken and Johnson investigations.

A.   Yeah.  I mean, the attorneys got a misconception that -- I mean, my plea agreement was hashed out prior to the bodies being found or anything like that.  This was discussed with the U.S. Attorney's Office and my attorneys prior to any of this stuff.

Q.   Being based in part upon the cooperation you provided against the Amuso and Scarfo organizations?

A.   Yes.

Q.   Did your agreement say anything about your obligations if you should happen to come into any possession of any information of criminal activity, Mr. McNeese?

A.   Yes.  I had an obligation to continue to cooperate whenever I had learned of any information.

Q.   And have you attempted to do so, Mr. McNeese?

A.   I have, yes.

Q.   Have to do so to remain in compliance with that agreement; is that fair?

A.   Yes.

Q.   And not only Vic Amuso and Nicky Scarfo, but you mentioned also this Mr. Shultice.  What happened to him?  Was he convicted?

1282

A.   Yes, he was.

Q.   You mentioned Andrew Rich.  What happened to him?  Was he convicted?

A.   Yes, he was.

Q.   And that's cooperation that you've provided to the federal

Page 24

government over a period of some years going back to '98?

A.   Correct.

Q.   Have you to date to your knowledge received any motion for reduction if your sentence, sir?

A.   No, I haven't.

Q.   You hope some day to.

A.   Hopefully, yes.

Q.   But that's at the discretion of the prosecutor, a federal prosecutor, in the state of Florida, not Iowa.

A.   That's correct.

Q.   And, if so moved, up to the discretion of the federal judge in Florida, not Iowa.

A.   Correct.

Q.   I'm curious.  Are you even aware of any case in which anyone serving life has ever had their sentence commuted?

        MR. BERRIGAN:  Object as to the relevance and lack of foundation, Your Honor.

        THE COURT:  Overruled.  You may answer if you know.

A.   No, I don't.

Q.   You admitted to Mr. Berrigan yesterday that you're not here

                                                          1283

for the fun of it.

A.   That's correct.

Q.   You do, however, have a wife and children, sir.

A.   Yes.

Q.   You hope some day to be with them again.

A.   Yes.

Q.   And even among the most hardened criminals that you've spent the last 17 years with, many of them have children as well, sir.

Page 25

A.    That's correct.

Q.    Have feelings toward them.

A.    Yes.

Q.    Those maps that are on that desk in front of you, who drew those maps?

A.    Angie Johnson.

Q.    And is the fact that those maps lead to the discovery of two little children that were missing for seven years a factor at all in what led you to obtain them, sir?

A.    Yes.

Q.    And very frankly, you had to con this woman in order to get that; fair statement?

A.    Yes, it is.

      MR. MILLER:  Thank you.  I have no further redirect, Your Honor.

      THE COURT:  Mr. Berrigan?

1284

      MR. BERRIGAN:  Thank you.

                    RECROSS-EXAMINATION

BY MR. BERRIGAN:

Q.    You asked to be in the wit. sec. program, did you not, Mr. McNeese?

A.    Yes.

Q.    They didn't force you to go into that program.

A.    No.

Q.    No.  And you could have chosen not to go in if you chose not to.

A.    I would have been locked up.

Q.    Well, there was a period for a couple years where you couldn't get in and you were locked up; right?

Page 26

A. Yes.

Q. And you're right. People in prison look down upon people like you; right?

A. Yes.

Q. You know why, don't you?

A. Yes.

Q. Up until 1998 you were exactly the same way, weren't you?

A. Yes, I was.

Q. Then you had a big change of heart all of a sudden ten years into your prison term; right?

A. Yes.

Q. You weren't ratting anybody out up until 1998, were you?

1285

A. No.

Q. No, but in 1995 you got this life sentence out of the Middle District of Florida for importing heroin into the United States, and that changed everything, didn't it?

A. Yes.

Q. That made you a good citizen all of a sudden. Is that what you want us to believe?

A. No.

Q. You all of a sudden found in your heart that you were going to save the world and turn in all these criminals.

A. In 1995? No.

Q. 1998.

A. No.

Q. Did you have a religious conversion then or what?

A. No.

Q. Okay. You talk about your plea agreement being hashed out before these maps were recovered, but the plea agreement calls

Page 27

for you to get a letter from the Northern District of Iowa U.S. Attorney's Office based on your substantial cooperation; isn't that right?

A. Yes.

Q. And, of course, that's a pretty relative term, substantial cooperation. Could be a little cooperation, could be a lot of cooperation; right?

A. I had provided substantial cooperation at that point.

1286

Q. Well, isn't it true, Mr. McNeese, that the more cooperation you provide the more benefit that you would expect to derive as a result of your cooperation?

A. In a sense, yes.

Q. Yeah. And you were expecting 50 percent reduction in your sentence even before you got these maps, weren't you?

A. Well, I mean, it was discussed, yes.

Q. Well, Pat Reinert told you that he'd approve you for 50 percent reduction in your sentence. He'd send a letter to the U.S. Attorney's Office in the Middle District of Florida, did he not?

A. Yes.

Q. And Mr. Reinert, for those of us who might not know, is in the same U.S. Attorney's Office as Mr. Williams; isn't that right?

A. Yes.

Q. He's the prosecutor you were dealing with before Mr. Williams came over suddenly on September the 22nd and wanted to search your cell.

A. Right.

Q. And that's what you were upset about. You thought he was

being a little too vigorous; isn't that right?

A.    Yeah.

Q.    In fact, you later told people you don't want anything to do with Mr. Williams and if he was up here questioning you

1287

instead of Mr. Miller you wouldn't answer his questions; isn't that right?

A.    Totally incorrect.

Q.    You haven't told people that?

A.    No, not at all.

Q.    No?

MR. BERRIGAN:  May I approach, Your Honor?

THE COURT:  You may.

MR. BERRIGAN:  Thank you.

BY MR. BERRIGAN:

Q.    Let me show you a letter dated January the 30th, 2001, Mr. McNeese, to Pat Reinert.  Second page looks like it has your signature.  Do you recognize that letter?

A.    Yes.

Q.    And the third paragraph down there, is there a sentence about you and Mr. Williams?

A.    Yes.

Q.    There's an extreme conflict between Mr. Williams -- between Williams that I think has no remedy.

A.    Right, but it was resolved.

Q.    Next paragraph down, last sentence, I'm fully prepared to inform the Court and on the record that I will not answer any questions by Williams.  Isn't that what you said?

A.    Yes, but again, as I said, we resolved the situation.

Q.    You just told me a minute ago you never, never said to

Page 29

anybody I wouldn't answer C.J. Williams' questions.

A.   You had just stated that if he was standing up there that I said that I wouldn't answer any que -- I've never said that.

Q.   Right here. It would be a great mistake to have me appear in any court proceeding and allow Williams to represent the government. I'm fully prepared to inform the Court and on the record I will not answer any questions by Williams. Is that what you told Pat Reinert January 30, 2001?

A.   Yeah, four years ago.

Q.   I see. But now you've changed your mind.

A.   Well, we resolved the situation.

Q.   That wouldn't be very helpful to your substantial cooperation agreement if C.J. Williams stood up here and you kept your mouth shut when he started asking you questions, would it, Mr. McNeese? Wouldn't help you at all, would it?

A.   No, it wouldn't.

Q.   And let me see if I understand this story here. You're claiming that on October the 2nd you told somebody that you already had these maps or that you told some law enforcement officer or somebody from the U.S. Attorney's Office before October the 2nd that you already had these maps?

A.   I believe I did, yes.

Q.   Well, who did you tell?

A.   Pat Reinert.

Q.   When did you tell him?

A.   At my sentencing.

Page 30

Q. Your sentencing was on September the 29th; right?

A. Or at my plea where I pled guilty.

Q. Well, weren't you sentenced on September the 29th of 2000?

A. I believe it was a Friday.

Q. Friday, right.

A. Yes.

Q. And October the 2nd, 2000, is a Monday.

A. Correct.

Q. So are you telling us you told Pat Reinert on a Friday, the 29th of September, you had maps?

A. I told Pat Reinert and Mark Fischer, yes.

Q. And Mark Fischer you had maps.

A. I had one, yes.

Q. To bodies of people buried in the ground seven years.

A. Yes.

Q. And their response was, We'll get back to you?

A. Yes.

Q. Well, we'll wait over the weekend while you hold on to the maps?

A. Correct.

Q. Is that really what you expect us to believe, Mr. McNeese, that you told these gentlemen that you had maps to these dead people's bodies and they decided, hey, we'll get back to you on Monday, Mr. McNeese? Is that your story?

1290

A. That was the reason I was upset with what you referred to earlier about what do you want me to do? Swallow them, because I had had them.

Q. You were just joking.

A. Yes, I wouldn't have swallowed them.

Page 31

Q. No. You were just kidding; right?

A. Yes.

Q. Just lying basically.

A. I was kidding.

Q. You were lying to Mr. Fischer.

A. Yes, I was lying.

Q. You were lying.

THE COURT: Mr. Miller, anything further for Mr. McNeese?

MR. MILLER: No, Your Honor.

THE COURT: Okay. You may step down.

Members of the jury, why don't you take a stretch break.

And is the United States ready to call its next witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls Sara Bramow.

THE COURT: Okay.

MR. WILLIAMS: Your Honor, this is the one I mentioned is in custody.

1291

THE COURT: May take them another minute or two to get the witness here.

SARA BRAMOW, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And please adjust the chair so you can speak directly into the microphones. You're going to need to get closer than that, and you can pull those microphones closer to you. And would you state your full name and spell your full name, please.

THE WITNESS: Sara Ann Bramow, S-a-r-a A-n-n

Page 32

B-r-a-m-o-w.

THE COURT:  Thank you.

Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q.   Miss Bramow, I would like you to just share with the jury a little bit about your background, ma'am.  First of all, how old are you?

A.   I'm 40.

Q.   And where are you from originally?

A.   I'm originally from Vinton, Iowa.

Q.   And I'm going to have you just move up just a little bit closer and maybe move those microphones back if you can.  You have a soft voice, and it's a little difficult to hear; okay?  That's about as far as I think you can go.  Just try to speak up

1292

a little bit more if you can.

You're originally from where?

A.   Vinton, Iowa.

Q.   And Vinton is just north of Cedar Rapids a little ways?

A.   Yes.

Q.   How far did you go through school?

A.   I got my GED.

Q.   And you're incarcerated now, and we're going to talk about that in a minute.  But before that occurred, did you have a trade or employment?

A.   Before incarceration?

Q.   Before you got incarcerated, did you work?

A.   Yes, I worked at a hotel.

Page 33

Q. And what type of work did you do at a hotel?

A. Housekeeping.

Q. Do you have children?

A. Yes, I do.

Q. And how many?

A. Three.

Q. And are you a grandmother?

A. Not yet.

Q. Is there one on the way?

A. Yes.

Q. Let's talk a little bit about your current status. You are currently serving a prison sentence?

1293

A. Yes, I am.

Q. And for what charge?

A. For attempt to manufacture methamphetamine.

Q. Where was that charge out of?

A. Out of Cedar Rapids, Iowa.

Q. Was it a state or a federal charge?

A. Both.

Q. Did you plead guilty to both charges, or was the state charge dropped when the federal charge was brought?

A. No, I pled guilty to both ch -- both.

Q. What kind of sentence did you receive for that charge?

A. Six years, five months.

Q. And how many years or months into that sentence are you at this point?

A. I have 36 months left.

Q. Thirty-six more months to go?

A. Yes.

Page 34

Q.   Now, with regard to that charge, did you cooperate with the government and inform on other people involved in your group?

A.   No, I did not.

Q.   Did you get any reduction in your sentence at the time of your sentencing for any cooperation you'd provided?

A.   No, I did not.

Q.   Have you since you were incarcerated received any reduction in your sentence for any cooperation?

1294

A.   No, I have not.

Q.   In relation to your testimony here and your cooperation with respect to the Angela Johnson case, has anybody made any promises to you that you'd get any reduction for doing this?

A.   No, nobody's made any promises.

Q.   Are you hopeful that you'll get some kind of reduction?

A.   Well, either way, you know.  It's just -- it's something I have to do.

Q.   And when you say it's something you have to do, what do you mean by that?

A.   From what my life used to be to what it is now, I've learned a lot by being in prison, and the Lord being in my life, this is just -- I have to do it.

Q.   So it's kind of a sense of moral have to.

A.   Yes.

Q.   You've testified before the grand jury in connection with this investigation?

A.   Yes.

Q.   And you've sat down with investigators and talked to them on one or more occasions?

A.   Yes.

Page 35

Q. Was -- again, bottom line on this, was any promises made to you that you'd get anything for your cooperation, either what you've done up to this point or for testifying here today?

A. No.

1295

Q. Now, in addition to that manufacturing of methamphetamine charge that you're currently serving time for, do you have other felony convictions in your history?

A. Yes, I do.

Q. And for what crimes?

A. For drunk drivings, I think there was bad checks.

Q. Did you have any other felony drug charges?

A. No.

Q. In any of those other cases, did you cooperate with the police or testify against anybody else?

A. No, I have not.

Q. Have you received any reduction in any of those other cases before for any cooperation?

A. No.

Q. Now, when agents initially talked with you and when you initially provided information before the grand jury in this investigation, did you always reveal everything you knew about Angela Johnson?

A. No.

Q. Why not?

A. Because I really didn't want to be a part of this.

Q. And why didn't you want to be a part of it?

A. Being scared and I just -- I didn't want the involvement.

Q. You didn't have a history of being a cooperator?

A. No.

Page 36

Q.    Just something you didn't really want to get into.

A.    Yeah, I didn't.

Q.    Let me talk to you then about the time period that you were in the Benton County Jail.  And were you there for a period of time in 2000 to 2001?

A.    Yes.

Q.    And what were you -- what type of sentence or what were you in jail for in Benton County at that time?

A.    Driving on a suspended license.

Q.    What kind of a sentence were you serving at that time?

A.    Sixty days.

Q.    And so you began serving your sentence on August 6 of 2000?

A.    Yes.

Q.    And did you serve the full 60 days?

A.    Yes.

Q.    So you would have been released some time in October of 2000.

A.    Yes.

Q.    While you were there, were you a government informant?

A.    No, I was not.

Q.    Had anybody approached you to have you cooperate in any case?

A.    No.

Q.    Had you ever worked or cooperated with the government prior to that occasion?

A.    No, I have not.

Q.    While you were in the Benton County Jail, did you meet

somebody by the name of Angela Johnson?

A.    Yes, I did.

Q.    How did you meet her?

A.    We were put in the same cell together.

Q.    And was she there before you got there, or were you there before she got there?  How did that work?

A.    She was there before I got there.

Q.    And do you know how many days or weeks or months she had been there before you arrived?

A.    I think she'd been there like ten days.

Q.    Was there any -- was this a two-person cell or more inmates in that cell?

A.    Two-person cell.

Q.    Do you know from talking with Angela Johnson had there been any other females in the cell with her prior to your arrival?

A.    No.

Q.    You don't know?

A.    I don't know.

Q.    Did you know Angela Johnson before you became an inmate for those 60 days in the Benton County Jail?

A.    No, I did not.

Q.    Did you know anything about her case prior to being put in the Benton County Jail?

1298

A.    No, I did not.

Q.    Didn't read any newspapers or hear anything on TV about her case?

A.    No.

Q.    Nobody talked to you about her case?

A.    Not until after I'd been there like a week or after Angela

Page 38

and I had talked and my sister told me it was in the paper.

Q. So once you got in there, your sister told you after a little while something about the case?

A. Yeah.

Q. Did you have conversations with Angela Johnson about her case?

A. Yes, I did.

Q. And can you just explain to the jury -- I want to try to set up the atmosphere, if you will, of your relationship with Angela Johnson there. When you first came in on -- I think we established it was August 6 of 2000 -- did you guys immediately form a friendship, or was this something that developed over time? Can you explain kind of the situation to the jury?

A. We got along right from the beginning, and then we became friends more and more the more time we spent together. We spent a lot of time.

Q. You were only in there until early October. Did she leave before or after you?

A. Before I did.

1299

Q. And just a matter of days before you did.

A. Yeah.

Q. And so you were in there for roughly about eight weeks with her.

A. Yes.

Q. And during that time period did you form a close friendship with her?

A. Yes, we did.

Q. Over the course of that time, did you begin to share between each other more and more information about each other

Page 39

and about what was going on in each other's lives?

A. Yes.

Q. With respect to her criminal charges that she was facing, did you question her and quiz her about her criminal charges?

A. No.

Q. Did she talk about her criminal charges nevertheless?

A. Yes.

Q. And explain to the jury, was this something that she did often, did freely, or was this something that only came out once in a great while?

A. We did it when it came up, you know. It wasn't all the time.

Q. And who brought it up when it would come up?

A. Angela would talk about it.

Q. What did you learn, first of all, about her background

1300

during -- and let me just make a setting for this. I want to just talk generally about the entire time period you were in the Benton County Jail with her. And first of all, from your testimony, there was multiple conversations about her case and her criminal involvement?

A. Yes.

Q. Okay. And so what I want to do is just talk generally about the essence of all those conversations. Are you with me?

A. Okay.

Q. Okay. And please stop me if I'm at all confusing to you.

A. Yes.

Q. Just generally what did she tell you about her involvement, if anything, with controlled substances?

A. That her and her boyfriend manufactured methamphetamine and

Page 40

distributed it.

Q. And did she tell you the name of her boyfriend?

A. Yes, she did.

Q. And what was his name?

A. Justin?

Q. Justin?

A. Yes.

Q. Okay. And what did she tell you, if anything, about where this was done, the manufacturing? Did she give you that kind of detail?

A. No, she didn't really go into where it was. It was up in

1301

Mason City and where she lived, Klemme. I don't know where it was made.

Q. Did she give any idea of the quality of the methamphetamine? Was it good stuff, average stuff?

A. The best.

Q. Give you any idea of the quantity that they were manufacturing and distributing?

A. She didn't mention any quantities, just that it was enough to give her children everything they wanted.

Q. Did she tell you anything about this boyfriend of hers?

A. Eventually.

Q. And what did she tell you about the boyfriend?

A. That she was pregnant with his child and that they're being accused of murdering five people.

Q. Did she tell you anything about what his -- what he was like just in his personality?

A. She liked him. She was in love with him.

Q. Let's move on to these charges that she was in for. You

Page 41

indicated that she told you that her and her boyfriend were being accused of murdering five people.

A.   Yes.

Q.   Did she indicate to you what had led to her being arrested on these charges in her view?

A.   No.   Can you repeat the question?

Q.   Sure.   And perhaps it was a bad question.   Did she tell you

1302

about anybody informing on her?

A.   No.

Q.   Did she talk about any girlfriends that she had in the past?

A.   Yes.

Q.   And do you remember what she told you about any of her girlfriends in the past?

A.   There was one that she had an affair with her husband and that she helped her out -- helped her find where Dustin and his girlfriend lived.   I don't remember her name.   And they were really close, really, really close.

Q.   Did she indicate whether this friend had talked with the authorities or informed on her at all?

A.   No.

Q.   Over the course of time talking with Angela Johnson, did she at some point disclose to you information about the murders of these five people?

A.   Yes.

Q.   Where did you understand these people were from that were murdered?

A.   Mason City.

Q.   And did she tell you -- why don't you relate to the jury in

Page 42

just general terms what you recall generally that she told you about the murders.

A.    Well, at the beginning she denied it.  And then once she

1303

got going, it was more Dustin that did it, and it was supposed to be to get a videotape because they were testifying against her boyfriend in their drug manufacturing case he was going to trial for.  And they were narking on him.

Q.    They were narking on him?

A.    Yes.

Q.    Meaning informing on him?

A.    Yeah.

Q.    And did she describe to you, was there five murders on five different occasions, one occasion when all people -- all five were murdered?  How did she describe how the murders occurred at least in sequence?

A.    How they occurred?

Q.    Yeah.  In other words, were all five people killed at one time?

A.    No.

Q.    How was that -- how was it done according to what she told you?

A.    It was the four and then her ex-boyfriend separate.

Q.    All right.  And who -- the four and then the ex-boyfriend, were the four killed before the ex-boyfriend?

A.    Yes.

Q.    So let's talk about the four then.  Did she tell you who the four were that were killed?

A.    She said it was Dust -- or Dustin -- I can't think of his

1304

Page 43

last name.

Q. Her boyfriend?

A. No.

Q. Okay.

A. And her girlfriend, that Lori, and then she didn't really go into children because I didn't know anything about that at the time.

Q. Okay.

A. Being children involved.

Q. And so did she tell you how it came about -- let me back up.

Did she indicate to you that she was having any -- that there was any search or attempt to locate these people that were narking on her boyfriend?

A. Search to locate them?

Q. Yes.

A. Where they were living?

Q. Yes.

A. Yes.

Q. What did she tell you about that?

A. That they couldn't find where he was living, where he was staying. And they'd seen him, but he was never alone, you know, he was -- and they didn't see him very often. They couldn't find out where he lived or where he was staying. So her girlfriend found out where he was staying at and told her.

1305

Q. And this is all stuff that Angela Johnson's telling you.

A. Yes.

Page 44

Q.    Okay.  And so once they find out where this person's living that was informing on the boyfriend, did she tell you anything about where it was?

A.    He was living with another girl.

Q.    This Lori person?

A.    Yes.

Q.    Did she tell you anything about the house or apartment or whatever it was they were living in?

A.    A house.

Q.    Okay.  And did she tell you anything more about -- anything else more about the location?

A.    No.

Q.    Did she tell you what happened when they ultimately found out where this guy was living with this woman named Lori?

A.    Yes.

Q.    What did she tell you?

A.    That they rode around and waited for him to get home and they sat and waited for him to get home.  And then when they got home, they rushed 'em to get in the door.

Q.    They did what now?

A.    Rushed him.

Q.    Rushed him?

A.    You know, when you get somebody, their door open, then you

1306

rush in on them.

Q.    She say what happened at that point?

A.    No, not really.

Q.    Did they actually get into the house?

A.    Yes, they did.

Q.    And what happened at that point according to Angela

Page 45

Johnson?

A. Well, I asked her, I said -- she was supposed to be pregnant. Well, she was pregnant and that Lori didn't put up no fight or the other one didn't, the guy. And she said, Well, yes, there was a fight. And I told her, I says, Well, you being pregnant, and she said, Well, I took her out just like that. What do you think I am? A weakling?

Q. And what did you understand when she said, I took her out just like that, and she snapped her fingers?

A. Yeah.

Q. What did you understand she meant by that?

A. I took it as --

MR. WILLETT: Excuse me, Your Honor. I object to the extent it calls for speculation.

THE COURT: Well, she can give her understanding. You can answer the question.

A. My understanding was killing her.

Q. Did she tell you -- so this Lori put up a fight, and she said she took her out.

1307

A. Uh-huh, yes.

Q. When they made entry into this house, did she indicate whether they had any weapons of any type?

A. A gun.

Q. Did she tell you what type of gun it was?

A. I don't remember what it was.

Q. Did she say who had the gun?

A. Justin did.

Q. What happened after they came in the house with the gun and Lori put up a fight and she took her out? What happened at that

Page 46

point?

A.   Well, at another time, another conversation was that Lori was talking about taking a vacation, taking her kids on vacation, and so they went and packed up some stuff to make it look like they took off.

Q.   And that's on another occasion she told you that.

A.   Yes.

Q.   Did she ever tell you anything about tying up anybody?

A.   Yes.

Q.   What'd she tell you about that?

A.   She said when the cops went and arrested her, when the marshals did, that they were taking her extension cords and they were -- it was about duct tape and that she said that duct tape works really well when you wind it up and tie somebody up with it.

1308

Q.   Ma'am, I'm going to have to have you repeat that.  She said duct tape what?

A.   Works real well when you wind it up and to use it for tying somebody up.

Q.   Did she indicate who was tied up?

A.   No.

Q.   Did she indicate who was tying anybody up?

A.   No.

Q.   At some point you'd indicated at the beginning that she hadn't told you about any kids.  At some point did she tell you that there were children involved?

A.   Yes.

Q.   What'd she tell you about the children?

A.   She kept swearing that she didn't kill no children, she

Page 47

didn't murder no children.

Q. Did she -- did she ever say anything about this Lori person, about whether she was fit to raise children?

A. Yes. She said she didn't deserve them children anyway, she was a rotten mother leaving them home alone all the time.

Q. Did you ever confront her about her involvement in killing the children?

A. Yes.

Q. And what was her reaction?

A. She didn't do it.

Q. When Angela Johnson is telling you about her involvement in

1309

these murders, what's her demeanor? What's her face look like? How is she acting?

A. Calm, normal.

Q. Crying?

A. She would cry because she was arrested and she was worried about her children.

Q. But when she's telling you about the actual murders, she's calm and collected.

A. Yes.

Q. Did she tell you anything about a videotape being involved in this inside the house?

A. Yes. She was told that that's what they stopped for. They was going to make a videotape, and he was going to say that he had lied pretty much.

Q. The person would lie on the videotape?

A. No, the person that lied to the government about the drug trial.

Q. Okay. I'm not quite sure if I follow on that. What did

Page 48

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1148 of 3592

you understand was supposed to be done with the videotape?

A.   Turned over to authorities.

Q.   Okay.  And who was going to be on the videotape?

A.   The -- not -- I can't think of his name.  Dustin.

Q.   The informant?

A.   Yes.

Q.   Okay.  So whoever this person was informing on the

1310

government was supposed to be the one on the videotape.

A.   Yes.

Q.   And who took the videotape?

A.   There was no videotape.

Q.   There was no videotape.

A.   No.

Q.   Did she indicate to you whether, in fact, these people in the house, the informant, this woman Lori and her children -- by the way, did she indicate how many children there were?

A.   Two.

Q.   Did she indicate to you what happened with them ultimately?

A.   No, she didn't come right out and say anything about the children until -- it was later on when they were all killed they were all in one big area, you know.

Q.   When they were all killed --

A.   She never admitted to killing children.

Q.   Did she admit to killing anybody?

A.   In insinuations, yes.

Q.   What do you mean by that?

A.   When conversation gets going and they say certain things like -- I don't know how to answer that.

Q.   Like take her out?

Page 49

A.    Yeah, yes.

Q.    What -- did she ever indicate to you exactly how these people were killed?

1311

A.    With a gun, shot.

Q.    And did she say where they were shot?

A.    No.

Q.    Did she explicitly tell you who shot anybody?

A.    No.

Q.    Once they were shot -- well, did she tell you where they were shot?  I'm sorry.  That's a bad question.

          Did she tell you the location where they were shot?  Was it in the house?  Was it on the street?  Was it someplace else?

A.    It was someplace else.  It wasn't in the house.

Q.    Did she tell you where that other place was?

A.    No.

Q.    Did she describe -- give you any description where that other place was at all?

A.    When she was making a map.

Q.    And did you see her making a map?

A.    Not directly out.  It's when I walked into her cell and she was doing it, and I seen a glimpse and she hurried up and covered it up.

Q.    And so in relation to doing that, did she say something at that time that gave you some indication of where this happened at?

A.    Yes.

Q.    And what'd she tell you then?

1312

Page 50

A.   She didn't admit anything to me about where it was.

Q.   She give you any description of the location?  I mean, was it in town, out of town, anything like that?

A.   No.  Just what I seen, it was -- there was trees and a road.

Q.   Oh.  So when you walked by, you saw part of the map.

A.   Yes.

Q.   Okay.  And from that you saw some trees and a road.

A.   Yes.

Q.   Okay.  I'm with you now.  Did she tell you what happened with the victims after they were shot?

A.   They are buried.

Q.   Did she tell you how they were buried, in other words, in multiple graves, one grave?

A.   Just they were all buried in one spot, you know.  I didn't know it was one big grave.

Q.   She didn't give you any more details than just one spot?

A.   No.

Q.   Did she tell you who buried them?

A.   Well, she said the authorities said that, you know, they were -- both of them did it, and she couldn't shovel in no graves because she was pregnant, so I took it she didn't fill it in.

Q.   She give you any description at all on these four people, the informant, his girlfriend Lori, and the two children?  She

1313

give you any indication of where they were buried in relation to that map that she was drawing?

A.   No.

Page 51

Q. Do you recall today anything else that she told you about the killing of those four people that we haven't covered?

A. They deserved everything they got.

Q. Why did they deserve everything they got?

A. For narking on 'em. Every narc deserves it.

Q. And when she's telling you this, what's her demeanor like?

A. She's kinda agitated at that point.

Q. And by agitated, mad, angry? Is that what you mean, or do you mean something else by agitated?

A. No, just a little bit more voiceful.

Q. You indicated earlier in your testimony that she told you that she killed -- or she was involved in a murder of an ex-boyfriend?

A. Yes.

Q. What did she tell you, first of all, about the ex-boyfriend?

A. That he deserved what he got because he used to beat her.

Q. Because he used to beat her?

A. Yes.

Q. Did she indicate his name?

A. Yes.

Q. Do you recall it today?

1314

A. I cannot remember right now.

Q. Okay. Did she indicate whether her ex-boyfriend was involved at all in any of the drug activity?

A. Yes, he used to sell the drugs for 'em.

Q. Sold drugs for them as well?

A. Yes, her.

Q. For her?

Page 52

A.    Yes.

Q.    Did she indicate to you why her ex-boyfriend was killed?

A.    Because he was narking on 'em.

Q.    He was narking on them too?

A.    Yes.

Q.    What did she tell you about how her ex-boyfriend was killed?

A.    How it led up to it?

Q.    Yeah.

A.    She called him to meet her out at the country club in Mason City.

Q.    Why the country club?

A.    She worked out there.

Q.    What was the purpose of calling him up to meet her out there?

A.    There was never no purpose.  She didn't tell me it.

Q.    So what happened -- what'd she tell you happened after she called this ex-boyfriend up to meet her at the country club?

1315

A.    He would -- he would drop anything or anybody to come to see her and that he dropped his daughter off at his mom's and drove out there.  How did it -- I asked her, I said, Well -- she couldn't figure out why they would think that she killed him and that they met out there at the country club.  I asked her, I says, Well, probably because his car was left out there?  And she said no, his car wasn't left out there.  She drove it home, drove it to his home, drove it around and racked up miles on the little tripometer because he always reset that all the time. And I said, Well, was it gunshot?  And she said no, because it was that late at night -- that time of night and it was out far

Page 53

enough where nobody would care anyway.

Q.    So she had driven the car around because he always tripped the tripometer?

A.    Yes.

Q.    And so she intentionally drove the car around to put miles on it?

A.    Yes.

Q.    And then dropped the car off someplace.

A.    Yes.

Q.    Did she tell you who was involved other than herself in the killing of her ex-boyfriend?

A.    Yes, her boyfriend Justin.

Q.    Did she indicate to you how he was killed?

A.    Beaten and then shot.

1316

Q.    When he was -- when she told you he was beaten, did she tell you how he was beaten?  Was it a fist fight?  Was it with objects?

A.    No.

Q.    She didn't tell you.

A.    No.

Q.    Okay.  Did she tell you anything about the weapon that was used to shoot him?

A.    The same gun.

Q.    Same gun as used in the prior murders?

A.    Yes.

Q.    Did she tell you who actually did the shooting?

A.    No.  She said when he got there, and I took it as she had him at gunpoint.

Q.    You took it as what?

Page 54

A. She had him at gunpoint.

Q. And why did you take it that she had him at gunpoint?

A. Just by the way she talked about it, her and Justin had gotten into it, and he deserved what he got for beating her.

Q. And so you understood that she was holding the gun while Dustin or Justin, this other guy, her boyfriend, beat him up?

A. Yes.

Q. I want to go back for a moment about how this all came to be. You indicated that he called -- she called her ex-boyfriend up.

1317

A. Yes.

Q. And that he would drop anything for her.

A. Yes.

Q. That's what she told you.

A. Yes.

Q. Did she indicate whose idea it was to come up with this plan?

A. No.

Q. Did she -- when she's telling you about his murder, what's she acting like?

A. Normal as she always did.

Q. Did she show remorse?

A. No.

Q. Did she tell you where on his body this ex-boyfriend was shot?

A. No.

Q. Did she tell you whether he was shot once or multiple times?

A. No.

Page 55

Q.    Did she tell you where this murder took place at?

A.    Way out back of the country club out in the middle of nowhere where nobody would pay any attention, hear anything.

Q.    Did she ever indicate to you that she was ever questioned by the police concerning this ex-boyfriend's disappearance?

A.    No, she didn't.

1318

Q.    As a general matter talking with Angela Johnson in the Benton County Jail there, did she express any attitude about people who cooperated with the government or informed on other people?

A.    They all --

        MR. WILLETT:  Excuse me.  Objection, Your Honor.  To the extent this has already been asked, I'd object and on the basis of asked and answered.  And if my objection did not precede the answer, I would ask that it do so.  The answer was almost instantaneous if it did come in, and I would ask if the Court sustains my objection the answer be stricken.

        THE COURT:  Overruled.

BY MR. WILLIAMS:

Q.    Did she express -- that means you can answer, and let me just ask you again.  Did she express an opinion about people generally who cooperated or informed for the government?

A.    Yes, they all deserved to die.  Every one of them deserved to have their tongue cut out.

Q.    Could you say that again?

A.    They deserved to have their tongue cut out for narking.

Q.    I want to move to the maps for a moment.  At some point while you were in the Benton County Jail, you indicated you saw what appeared to you to be a map.

Page 56

A.    Yes.

Q.    Could you explain to the jury what you recall about that

1319

event?

A.    Bobby McNeese and her were talking at the window, and he wanted a map to where at least one of the bodies were and details only the murderer knew, and she turned around, looked at me, goes, What should I do?  Should I do it?  And I said, Well, I told you, you know, about Bobby McNeese.  And it's all up to you.  I said, I don't know what you should do, you know, what should you do, and she just did it, you know.

Q.    What did you tell her about Bobby McNeese?

A.    That he was a narc.

Q.    Why did you believe he was a narc?

A.    I had a friend that was in jail, and he was saying something about some guy wearing a wire on a doctor, and I called him and asked him if that was his name, and he said yes, it was.

Q.    And so you told Angela Johnson that this Bobby McNeese was a narc.

A.    Yes.

Q.    She's asking you, What do I do?

A.    What should I do?  What would you do, Sara?  And I don't know.

Q.    And when you say she went ahead and did it, what did you see her do?

A.    She was in her own cell, and she was trying to decide -- she was in there for quite a while.  And I went to -- I went to

1320

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1157 of 3592

ask her something, and that's when I seen her messing on the paper and hurried up and covered it up. And then when she --

Q. When she -- I'm sorry?

A. And then when she was done, she had an envelope, and she said that this would free her -- free her or set her free.

Q. It would do what now?

A. Free her or set her free.

Q. What did you understand she meant by saying it was going to free her or set her free?

A. That whole period was about a map to where one of the bodies -- one or more of the bodies were and details, and she did it, and she had it in the envelope, and she put it in her bars, and it was gone the next morning.

Q. Did she ever tell you what was in that envelope?

A. No.

Q. Now, after approximately this time period that you saw her with these -- what you understood to be a map or maps, how long after that was it that Angela Johnson was moved out of the Benton County Jail?

A. It was like immediately. It was -- I don't know. It was like two days, something like that, they rushed her out of there.

Q. Very shortly thereafter.

A. Yes.

Q. Okay. And did you continue to communicate with Angela

1321

Johnson after -- after that?

A. We had a couple contacts.

Q. And how would you have contact with her after that?

Page 58

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1158 of 3592

A.    She'd wrote me.  I wrote her just like a letter or two, and I went and seen her once.

THE COURT:  Mr. Williams, would now be a good time to take our recess?

MR. WILLIAMS:  Yes, it would, Your Honor.

THE COURT:  Members of the jury, please remember my cautionary instruction about not discussing the case and keeping an open mind until you've heard all of the evidence.  We'll be in recess until 10:25.  Thank you.

(The jury exited the courtroom.)

THE COURT:  Anything we need to take up, Mr. Williams?

MR. WILLIAMS:  No, Your Honor.

MR. WILLETT:  No.

THE COURT:  Okay.  Thank you.

(Recess at 9:58 a.m.)

THE COURT:  Ready to have the jury brought in?

MR. WILLIAMS:  Just to give you a heads-up on scheduling, Your Honor, we're not going to call Mark Fischer at this point.  The defense took less time than they predicted on Mr. McNeese, ahead of time, and then we're going to call Hoover after we go through the rest of our list, Peggy Hoover, but the long and short of it is, Judge, we may not be able to fill out

1322

the day because the rest of the witnesses after that are incarcerated 70 miles away.

THE COURT:  Okay.  I'm not even sure I have a current list of who you were calling.

MR. WILLIAMS:  Okay.  We'll get you one.

THE COURT:  That's fine.  So we may run out today.

MR. WILLIAMS:  We may run out a little bit early.

Page 59

THE COURT: That's fine. I have a few other things to do.

MR. WILLIAMS: Really.

THE COURT: I know it's surprising. Ready to have the jury brought in?

MR. WILLIAMS: Yes.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

I'd ask the witness to try and keep her voice up. A couple of the jurors said something to one of the CSOs that the jury's having a hard time hearing you, and you're very soft spoken. So try and get as close as you can to the microphones. Thank you.

THE WITNESS: Is that better?

BY MR. WILLIAMS:

Q. You may just want to when you testify just lean forward into those microphones. They actually don't pick much up unless you're kind of right in front of them; all right?

1323

A. Yes.

Q. All right. Miss Bramow, I want to go back over just a couple things with you. You indicated earlier that when you saw Angela Johnson with this -- you saw her drawing on something that had trees and a road and then she put it in an envelope. What did you understand -- I know she didn't describe to you, but what did you understand that stuff to be?

A. It was my understanding she was answering Bobby McNeese. She was filling out a map and details that he asked for.

Q. Details of what?

A. Of the murders, that only the murderer would know.

Page 60

Q. And you'd indicated earlier in your testimony that when she ultimately put it someplace she made a statement to you about being set free?

A. Yes.

Q. Okay. Now, this is the year 2005, and all this occurred back in late September of 2000?

A. Yes.

Q. Do you recall being interviewed on October 6 of 2000?

A. Yes.

Q. And that would have been, in fact, the day you would have been released from the Benton County Jail.

A. Yes.

Q. Was your memory a lot more fresh back then about what was said than it would be today?

1324

A. No.

Q. Would it -- I'd like to show you something from your interview on that day. Do you recall -- or talk to you about it. Do you recall being interviewed by Scott French and J.D. Smith, an FBI agent and a DCI agent, then?

A. Yes.

Q. And do you recall telling them that Johnson claimed that the information in the letter would set her free or prison for life?

MR. WILLETT: Excuse me. Objection, leading.

THE COURT: Overruled.

BY MR. WILLIAMS:

Q. Do you remember saying that?

A. Yes.

Q. And I understand this is a five-year time frame. Your best

Page 61

recollection today, is that more accurate of what she said, or is what you said today more accurate?

A. I'd say -- I don't know. It was more -- this will set me free but then again it will set me free when she got done with it.

Q. You talked about a gun and the same gun being used in all the murders. Did Angela Johnson ever talk to you about whose gun that was?

A. It was hers.

Q. Did she tell you where she got the gun?

1325

A. No. She said she bought it.

Q. Early in your testimony you talked about duct tape being used. Did Angela Johnson ever talk to you at all about whether any of the victims were duct taped on their mouths?

A. No.

Q. Do you recall being interviewed on April 2 of 2002 concerning all these events?

A. Yes.

Q. Do you recall at that time indicating during the interview that Lori had duct tape placed over her mouth so she wouldn't yell and wake up the children?

A. Uh-huh.

Q. You recall that?

A. I remember saying that.

Q. Okay. Do you recall today whether, in fact, Angela Johnson told you about putting duct tape on Lori's mouth?

A. She was silenced.

Q. And did she, Angela Johnson, indicate to you who was putting the duct tape on Lori's mouth?

Page 62

A. The way I took it it was her, Angela.

Q. Did Angela Johnson -- do you recall today whether Angela Johnson told you where the duct tape came from?

A. Do I remember where the duct tape came from?

Q. Do you remember today whether Angela Johnson told you where the duct tape came from?

1326

A. No.

Q. Would it refresh your recollection if you had an opportunity to look at your interview report from April of 2002?

A. Yes.

Q. Ma'am, I'm handing you what's an interview report of you on April 2 of 2002, and I'm directing your attention to page 3 of that interview report. And if you would just read this paragraph to yourself, and when you're done, just let me know.

A. Okay. Yes.

Q. Have you had an opportunity to read that?

A. Yes.

Q. Does that refresh your recollection about whether Angela Johnson told you about where the duct tape came from?

A. Yes, that's more in detail.

Q. And does that refresh your recollection having read your interview report from back then?

A. Yes.

Q. What did Angela Johnson tell you about where the duct tape came from?

A. I'm forgetting. I'm nervous right now.

Q. I'm sorry?

A. I'm nervous right now.

Q. Sure, and I understand. Do you need a moment to relax, or

Page 63

can you answer that question?

A.   Can I re-read that?

1327

Q.   Is this the first time you've testified in a trial like this, ma'am?

A.   Yes.

Q.   Do you recall now about what Angela Johnson told you about where the duct tape came from?

A.   That they had brought it.

Q.   Did she indicate that people were tied up in the house when these people -- before they were killed?

A.   Yes.

Q.   And did she indicate who tied them up?

A.   It was her and then Dustin or Justin I mean.

Q.   And did she indicate where the twine or rope came from that they used to tie them up with?

A.   They brought it.

Q.   Have you ever testified in a setting like this before, ma'am?

A.   No.

Q.   This is kind of nervous for you?

A.   Yes.

Q.   I have just one last question for you.  The woman who told you that she participated in the murders of five people including two little children, do you see her in the courtroom here today?

A.   Yes, I do.

Q.   Can you describe for the jury where she's sitting and what

1328

Page 64

she's wearing?

A.    She's sitting right over there with her lawyers.

MR. WILLIAMS:  No further questions, Your Honor.

THE COURT:  Mr. Willett?

MR. WILLETT:  Thank you, Judge.  Your Honor, if it please the Court.

CROSS-EXAMINATION

BY MR. WILLETT:

Q.    Miss Bramow, do you remember me?

A.    Yes, I do.

Q.    Just by way of reintroduction, my name is Al Willett.  I've acquired a lot of gray hair since the last time we met.  And to be quite honest, my hearing is not as good as the last time we met, so I was having a devil of a time hearing you; okay?

A.    Okay.

Q.    And with background noise, it's even worse for me.

A.    Yeah.

Q.    Now, I know I talk too fast, and if you keep your voice up, I'll try not to talk too fast.  Is that fair?

A.    Okay.

Q.    Okay.  How far did you go through school as far as your formal education?

A.    I went through the eighth grade, and then I got my GED.

Q.    Congratulations on that.  And you're currently serving a federal sentence.

1329

A.    Yes, I am.

Q.    But before that you had some state criminal history; correct?

A.    Yes.

Page 65

Q. And that was over in eastern Iowa?

A. Yes.

Q. You had a felony conviction for drunk driving.

A. Yes.

Q. And you mentioned on direct that you had a problem with writing bad checks?

A. Yes.

Q. Was that charged as a forgery or as a theft?

A. It was a theft of $50.

Q. Okay. And then at the time you picked up your federal charges, you had some state charges pending, didn't you?

A. No. I'd been sentenced for my state.

Q. Okay.

A. And then I -- they indicted me on my federal.

Q. Now, you had pending charges in Benton County and Johnson County at the same time, didn't you?

A. Yes.

Q. Were you sentenced on both of those state charges?

A. Yes.

Q. Now, what was the charge in Benton County?

A. The same as my federal.

1330

Q. Attempting to manufacture meth?

A. Yes.

Q. And what sentence did you get on that?

A. I got two years' probation.

Q. Okay. And then you were also charged in Johnson County.

A. Yes.

Q. With a methamphetamine crime.

A. (Witness nodded head.)

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1166 of 3592

Q.    Is that a yes?

A.    Yes.

Q.    And what charge was that?

A.    That was two years' probation.

Q.    Okay.  Didn't receive jail time on either one.

A.    Well, I did the jail time when I was -- when I was arrested, and then they gave me probation because federal was picking up.

Q.    I see.  So at the time of your state sentencings, this federal charge had already started.

A.    Yes, because they're the same charge.

Q.    And the state judge exercised his or her discretion and gave you credit for time served and probation knowing that you had this federal charge coming.

A.    Yes.

Q.    And what was the charge in Johnson County?  Was that attempt to manufacture, or was that possession of precursors?

1331

A.    Po -- yeah, possession of precursors with intent.

Q.    And possession of precursors means that you had the ingredients and the intent to make some meth.

A.    I had more than one ingredient.

Q.    Okay.  And there's several ingredients to making meth; correct?

A.    Yes.

Q.    And what method were you using back then?  Anhydrous ammonia or red phosphate?

A.    Anhydrous ammonia.

Q.    And, ma'am, you've had a problem with methamphetamine use before your incarceration, didn't you have?

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1167 of 3592

A.    No.

Q.    No problems with it at all?

A.    I've never been arrested for it.

Q.    Did you ever use methamphetamine?

A.    Yes, I did.

Q.    Okay.  Did you use any other drug besides methamphetamine?

A.    I've used lots of different drugs.

Q.    For example, what?

A.    Like acid.  I've used marijuana.

Q.    Okay.  Now, when you say acid --

A.    Cocaine.

Q.    I'm sorry.  Acid, marijuana, cocaine.  Would that be powder cocaine or crack cocaine?

1332

A.    Powder.

Q.    Methamphetamine.  Any other drugs besides that?

A.    I mean not all at one time.

Q.    Well, certainly, certainly.  I understand that.  Any other drugs besides what you've just listed for me?

A.    No, I don't . . .

Q.    Now, when you say acid, I know what you mean because I'm old enough, but are we talking LSD?

A.    Yes.

Q.    Did you have a drug of choice?  Did you have one you preferred over others?

A.    Alcohol.

Q.    Okay.  And did you have a problem abusing alcohol?

A.    Yes.

Q.    Did you consider yourself to be an alcoholic?

A.    Yes.

Page 68

Q.   And then you would use one or more of these drugs in combination with your alcohol use.

A.   Yes, all except for cocaine and meth.  I couldn't drink with them.

Q.   Those you just did without alcohol.

A.   Yes.

Q.   But you might mix marijuana and alcohol?

A.   Yes.

Q.   Might mix acid and alcohol?

1333

A.   Yes.

Q.   And you're -- currently on your 77-month federal prison sentence, you're 41 months down.

A.   Yes, and with the drug program as of this month I have 18 months left.

Q.   Okay.  So you participated in the Bureau of Prisons' drug program that if you successfully complete you knock 12 months off your sentence.

A.   Yes.

Q.   And have you done that?

A.   I put my app -- my application in for it this month.

Q.   So you're not enrolled in it yet, but you're trying to get enrolled.

A.   Well, I hurried up and put it in right before I left.

Q.   But you don't know what the status of your application is.

A.   No, not till I get back.

Q.   And you stated on direct that you had never done anything like cooperation up until now; correct?

A.   Correct.

Q.   Now, in your federal sentence you were represented by

Page 69

Mr. Roush from Cedar Rapids; correct?

A. Yes.

Q. And he was present during your April 2, 2002, interview, when you gave some information to Mr. Basler and Agent Graham about this case.

1334

A. Yes.

Q. Now, how did that work? How did that all come about? And strike that. Let me ask you a question.

Your federal case then was still pending; correct? It had not been completed.

A. No, it hadn't been completed.

Q. Okay. And you didn't know what your sentence was.

A. Well, yeah, within the guidelines.

Q. Mr. Roush had certainly sat you down with that federal guidelines book and said, Miss Bramow, this may be what you're looking at.

A. Yes.

Q. And what was your understanding then of what you were looking at?

A. Like 69 months to like 80, close to -- somewhere around there.

Q. Sixty-nine months to what, ma'am?

A. Like 80 months.

Q. Okay. And before you were sentenced is when you sat down on April 2, 2002, to cooperate.

A. Yes.

Q. And you were certainly hoping that that would have an impact on your yet-to-be-delivered federal sentence, didn't you?

A. Yeah, whatever -- you know, if I get it, I get it. If I

Page 70

don't, I don't.

1335

Q.   Okay.  But in a perfect world, you'd like to get home sooner to your children, wouldn't you?
A.   My children are grown.
Q.   Okay.  You'd like to get out of federal prison as soon as you can, wouldn't you?
A.   Well, yeah.
Q.   Okay.  And you testified about letting the Lord into your life.  Has that spiritual decision been made since your incarceration?
A.   Well, before, and then it's really strong now since I've been incarcerated.
Q.   Certainly.  And you testified on direct to Mr. Williams that you did testify to the federal grand jury back -- and I believe that was in 2001; correct?
A.   Correct.
Q.   And you certainly didn't testify -- you certainly didn't reveal everything you knew as you told Mr. Williams; correct?
A.   Correct.
Q.   And there were certainly things that you said differently to the grand jury than what you've said today; correct?
A.   Correct.
Q.   Okay.  And you were under oath in front of the grand jury, weren't you?
A.   I just didn't tell all I knew.
Q.   I see.  But you were under oath.

1336

A.   Yes, I was.

Q.   And when you initially arrived at the Benton County Jail, you were put in the same cell with the defendant; correct?

A.   Correct.

Q.   And that cell was adjacent to Bobby McNeese; correct?

A.   Yes.

Q.   Shared a common wall.

A.   Yes.

Q.   And you discussed Miss Johnson's relationship, if you will, with this boyfriend early on in your conversations; correct?

A.   Yes.

Q.   And you found out that she had been pregnant with his child; correct?

A.   Yes.

Q.   And you found out that she had been in love with him.

A.   Yes.

Q.   And in the beginning of these conversations, you were told that Dustin or Justin had committed these murders; correct?

A.   Yes.

Q.   And you were told that the whole purpose in trying to find this man who had testified against her boyfriend, the whole purpose was to acquire a videotape; correct?

A.   Correct.  This is what she told me.

Q.   And you told us this morning that on this night when this man was found that they got inside and that Dust -- that the

1337

boyfriend had the gun; correct?

A.   Yes.

Q.   Okay.  And then you told us that Miss Johnson took out this woman just like that I think is how you described it; correct?

Page 72

A.    Correct.

Q.    Well, how does that work if the boyfriend has the gun?

A.    I don't know.  I wasn't there.

Q.    Okay.  And then you stated there was another conversation where Lori and the children were to take a vacation and suitcases had been packed.

A.    Yes.

Q.    And she told you she didn't murder the children, didn't she?

A.    Yes.

Q.    And when she told you that, she was crying, wasn't she?

A.    Yes.

Q.    And you testified on direct that the mother didn't deserve these children.  You testified to that; correct?

A.    Correct.

Q.    That she was a rotten mother.

A.    Yes.

Q.    Now, you never stated that to the grand jury, did you?

A.    No.

Q.    And you testified on direct that there was no videotape.

A.    There wasn't.

1338

Q.    Isn't that what you said to Mr. Williams --

A.    Correct.

Q.    -- on direct earlier this morning?

A.    Yes.

Q.    That even though that was the purpose, that it was your understanding that there was no videotape.

A.    Yes.

Q.    And you testified on direct that my client supposedly told

Page 73

you -- well, she insinuated she killed people; correct?

A.    Correct.

Q.    But she never flat out told you she killed anybody, did she?

A.    No.

Q.    And although it was your understanding that people were killed with a handgun, Angela Johnson never told you who shot anyone, did she?

A.    No.

Q.    And Miss Johnson was pregnant during the time frame of these two separate events, wasn't she?

A.    Yes.

Q.    She would have been pregnant in regards to finding the man to get the videotape; correct?

A.    Correct.

Q.    And in regards to the ex-boyfriend later in the year, she would have been even further along in her pregnancy; correct?

1339

A.    What do you mean?

Q.    Well, just in terms of a sequence in time, if she was pregnant when the person was found that they wanted the videotape from, if the situation with the ex-boyfriend occurred later in time, she would have been further along in her pregnancy; wouldn't you agree with me?

A.    Was it later -- I don't know if it was later in time.

Q.    So you don't even know what the time frame is between these events.

A.    No, I don't know the time frame.

Q.    Okay.  And in regards to the ex-boyfriend, you testified that he deserved what he got because he used to beat her.

Page 74

A.    Yes.

Q.    And you testified to Mr. Williams on direct this morning that she called the ex-boyfriend to meet at the country club but there was no purpose for that call; correct?

A.    Yes.

Q.    Did she ever describe the boyfriend whose child she had, this Justin? Did she ever describe him to you? He's a tall guy; he's a short guy; he's a fat guy; he's a skinny guy?

A.    No.

Q.    But you're aware this other man, the ex-boyfriend, used to beat her.

A.    That's what she told me.

Q.    Okay.  He ever described to you?

1340

A.    No.

Q.    But it's your understanding that in regards to what happened to the ex-boyfriend, you testified here today that the boyfriend she had a child with was beating up the ex-boyfriend.

A.    Yes.

Q.    That Justin was beating up this ex-boyfriend.

A.    Beating him, yes.

Q.    Okay.  And you testified on direct that she never indicated to you whose idea it was to come up with these plans regarding these witnesses; correct?

A.    Justin had it all prearranged.

Q.    So the boyfriend whose child she had --

A.    Yes.

Q.    -- he had it all prearranged.

A.    Yes.

Q.    And then you testified on direct this morning that these

Page 75

Q. people deserved to die, to have their tongue cut out.

A. Yes.

Q. Remember stating that to Mr. Williams?

A. Yes, I do.

Q. Now, you never said this to the federal grand jury, did you?

A. No, I did not.

Q. And then you testified to Mr. Williams on direct that you would observe Bobby McNeese and Miss Johnson talking at a

1341

Q. window.

A. Yes.

Q. And that was one of the ways Bobby McNeese communicated with Miss Johnson; correct?

A. Correct.

Q. And he'd be the one to go to the window and knock or say, Hey, Angela, or . . .

A. Yes.

Q. Or, Hey, Sara, get Angela over here so I can talk to her.

A. Yes.

Q. And he always wanted to talk to her, didn't he?

A. Yes.

Q. And Mr. McNeese wanted details, didn't he?

A. Yes.

Q. Wanted a map, didn't he?

A. Yes.

Q. And you've testified today that it was your understanding based upon listening to these conversations that my client would insinuate certain things; correct?

A. Correct.

Page 76

Q.   Okay.  But she'd never flat out come out and tell you something direct, would she?

A.   No, she never came right out and told me.

Q.   And an example of this would be the duct tape because you stated to Mr. Williams on direct that in regards to the use of

1342

this duct tape you took it that Angela was helping in this.

A.   Yes.

Q.   But that's the way you took it; correct?

A.   Yes.

Q.   She never said that to you, did she?

A.   No.

Q.   And on this issue of people narking and deserving to die, even during your April 2002 interview with Mr. Basler, you never said anything about anybody getting -- their tongue getting cut out, did you?

A.   They deserved to.  That's what she said.

Q.   Okay.  But you never told Mr. Basler in April of 2002 that people should get their tongues cut out.

A.   No.

Q.   And if I asked you this question and forgotten already, I apologize, but when Angela would tell you about the killing of these children, she'd be crying and sobbing; correct?

A.   Yes.

Q.   Now, when you testified -- you stated here -- excuse me. Strike that.

You stated here today that they gained access into the house, they sort of rushed the house I believe is sort of how you described it earlier this morning.  Did I understand that right?

Page 77

A.    Well, yeah.

1343

Q.    But that's -- you didn't say that to the federal grand jury, did you?

A.    No.

Q.    In fact, you stated that you didn't know how they gained entry into the residence.

A.    I didn't even want to be a part of this.

Q.    One more time, ma'am?

A.    I said I did not want to be a part of this.

Q.    Okay.

A.    Or the grand jury.

Q.    But you became involved with it once you were charged and facing a federal sentence.  During that time frame is when you became involved; correct?

A.    Well, no -- correct.

Q.    And Ms. Johnson told you on more than one occasion that she didn't kill those children, didn't she?

A.    Yes.

Q.    And you've testified here today as to Ms. Johnson's involvement, if you will, with the murder of the ex-boyfriend. You've testified to that.

A.    Yes.

Q.    And it was your understanding she was involved.

A.    Yes, she was.

Q.    But you said something completely different to the federal grand jury back in 2001, didn't you?

1344

A.    Yes, I did.

Page 78

Q.   You stated that she denied involvement in his killing.

A.   Me and Angela had a lot of conversations in the time we were locked up.

Q.   Well, I understand that, ma'am, and in response to the question I asked --

A.   Yes.

Q.   -- you testified to the federal grand jury in 2001 --

A.   Yes.

Q.   -- that she denied involvement in the ex-boyfriend's murder.

A.   Yes.

Q.   And in relationship to the murder of the people involving those two little girls, Angela told you that she couldn't do that because she had daughters of her own; correct?

A.   Daughter of her own, correct, but at that time --

Q.   At that time.

A.   Uh-huh.

Q.   What?  One there, and, as we now know, one was on the way.

A.   Yes.

Q.   And is it -- I'm confused on one issue, ma'am.  Is it your testimony here today that Angela ever used a handgun in regards to this confrontation with the man they were trying to get the videotape from?  Was that your testimony, that Angela used a handgun?

1345

A.   I didn't test -- Angela used a handgun?

Q.   Yeah, or that she had it or used it?  Is that your testimony?

A.   No, I said it was hers.

Q.   It was hers, but it was Justin who was using that handgun.

Page 79

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1179 of 3592

A.    Yes.

Q.    And back to Bobby McNeese at the Benton County Jail for just a moment.  You told us that he was the one who was initiating conversations; correct?

A.    Correct.

Q.    He was always trying to talk to her.

A.    Yes.

Q.    Morning, noon, and night.

A.    Yes.

Q.    And there were times when Angela did not want to talk to him; correct?

A.    Correct.

Q.    And he'd get mad.

A.    Yes.

Q.    And he'd say, Sara, get her over here so I can talk to her.

A.    Yes.

Q.    Now, you testified this morning to Mr. Williams that you were scared.  Did I understand that correctly?

A.    Yes.

Q.    But you're not afraid of Angela -- you're not afraid of

1346

Angela Johnson, are you?

A.    No.

Q.    But at the time of your grand jury testimony, you were afraid of prosecution by the U.S. Attorney's Office, weren't you?

A.    No.  When I was in -- at the grand jury, I was still under my state.  I wasn't indicted on my federal yet.

Q.    So it's your testimony here today that you had no fear at the time of your federal grand jury testimony that the United

States Attorney's Office for the Northern District of Iowa was going to prosecute you.

A.   I didn't know they were going to prosecute me at that time.

Q.   Okay.  And you're stating that you had no fear at that time that the United States Attorney's Office was going to prosecute you.

A.   I knew they would.

Q.   Okay.  And are you telling me that at the time of your federal grand jury testimony you had no fear of that prospect?

A.   Not really, no.

Q.   Did you have any fear of that when you testified in pretrial hearings in this case previously, that the U.S. Attorney's Office was going to prosecute you?

A.   Yes, they were going to.

Q.   Were you afraid of it, or weren't you?

A.   It was just inevitable.  It was going to happen.

1347

Q.   But did you have some fear about it?

A.   Not really, no.

         MR. WILLETT:  May I approach the witness, Judge?

         THE COURT:  You may.

BY MR. WILLETT:

Q.   Miss Bramow, I'm going to hand you an excerpt of a transcript from a hearing we had prior to this trial that you testified at, and that was in Cedar Rapids, I believe, federal court in Cedar Rapids, back in July of '01.

A.   Yes.  I can't see that.

Q.   Pardon me?

A.   I can't see that.  They took my glasses away.

Q.   Took your glasses?

Page 81

A. Yes.

Q. Maybe I can alleviate that. Now, this has been done before in this trial, so don't be embarrassed; okay?

A. Okay.

Q. Let me know if that helps.

A. No.

Q. Doesn't help? Can you see where I'm pointing then?

A. Yes.

Q. Now then, do me this favor. We are at page -- let me get my bifocals working -- 840 and 841. I want you to read to yourself line 24, 25, and then go up and just read your answer which is line 1, but just read that to yourself. Then I'll ask

1348

you a question.

Now, at the time of that pretrial hearing, you did have some fear the United States Attorney's Office was going to prosecute you, didn't you, ma'am?

A. Yes, but I wasn't afraid of it. You know, it was going to happen to me regardless.

Q. Isn't the question stated to you -- and if you need to put those reading glasses on again, you may. The question was, And do you have some fear that the U.S. Attorney's Office here is going to prosecute you?

A. Yes.

Q. And your answer was yes; correct?

A. Yes.

MR. WILLETT: May I confer with my co-counsel for a moment, Judge? Thank you.

THE COURT: And you might want to pick up the reading glasses too.

Page 82

MR. WILLETT: Yes, I will.

Judge, thank you.

Miss Bramow, I'm done with my cross-examination.

THE COURT: Mr. Williams?

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Bramow, you were asked on cross-examination if you had any fear of Angela Johnson. Do you remember that question?

1349

A. Yes.

Q. Did you have an opportunity to observe Angela Johnson and whether she was violent while in the Benton County Jail?

A. Yes, I have.

Q. And was she violent?

A. Yes, she was.

Q. Did you see her act in violent ways while in the Benton County Jail?

A. Yes, I did.

Q. Do you have concerns about your safety?

A. If she was out on the streets, yes, I would.

Q. So it's because she's incarcerated that you don't have the fear now.

A. Yes.

Q. During the time that -- the many conversations you had with Angela Johnson, did she tell you things that appeared to you to be at times inconsistent with each other?

A. Yes.

Q. At some times did she tell you she had nothing to do with killing her ex-boyfriend?

A. Yes.

Page 83

Q.    And at other times she told you she was involved in killing him.

A.    Yes.  The more we got to know each other, the more she told me things.

1350

Q.    The more you got to know each other --

A.    Yes.

Q.    -- the more she revealed?

A.    Yes.

Q.    You were questioned about your testimony that at one point they rushed the victims into that house.  Do you remember that questioning?

A.    Yes.

Q.    At other times did she tell you other versions of how they got into the house?

A.    No.

Q.    Do you recall at some point her telling you at one point that they knocked on the door and Lori answered the door?

A.    Yes.

Q.    You were asked about the statement you made that there was no purpose for the call to the ex-boyfriend.  Do you recall that question on cross-examination?

A.    Yes.

Q.    And when you say there was no purpose for the call, was there a purpose for Angela Johnson getting together with her ex-boyfriend that night?

A.    Yes.

Q.    What was the purpose?

A.    She wanted to see him.

Q.    For what purpose?

Page 84

A.   I really don't know.  I mean, she wanted to see him her own personal self.

Q.   And this was the night he was killed.

A.   Yes.

Q.   You indicated at some point that -- on cross-examination you were asked about the beating that occurred out there.

A.   Yes.

Q.   And do you recall that line of questioning?

A.   Somewhat, yes.

Q.   Okay.  The attorney had asked you about if you knew what this boyfriend looked like, not the ex-boyfriend but the boyfriend.  You said no, and then he asked if it wasn't your testimony that the ex-boyfriend used to beat up Angela Johnson.

A.   Yes.

Q.   Okay.  When Angela Johnson told you that her current boyfriend then beat up her ex-boyfriend or beat --

A.   Yes.

Q.   -- her ex-boyfriend, had you indicated earlier in your testimony that she was holding the gun on her ex-boyfriend at that time?

A.   Yes.

Q.   You were asked some questions about the conversations that Angela Johnson had with Bobby McNeese and the fact that he initiated those and called her over to the window and so forth. I want to follow up with some questions along those lines.  Were

there other times that Angela Johnson freely talked with Bobby

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1185 of 3592

McNeese?

A.   Yes.

Q.   Were there times that she initiated some of the conversations with Bobby McNeese?

A.   Yes.

Q.   Were there times where you talked to her about it being a bad idea to talk to Bobby McNeese?

A.   Yes.

Q.   And did she do so anyway?

A.   Yes.

Q.   Now, with all the information that you've provided here today, did you have to pump Angela Johnson for information to get it out of her?

A.   No, I did not.

Q.   Did you question her or manipulate her in some way to get her to tell you these things?

A.   No, I did not.

Q.   And finally you were asked about how much time you have left and your hope to get out of prison --

A.   Yes.

Q.   -- sooner if possible.  Can you share with the jury why are you here testifying today?

A.   I am here because it's something that has to be done, that I have to do.  I've been holding this stuff in for a long time,

1353

and with God being in my life, I gotta correct my past.

MR. WILLIAMS:  No further questions, Your Honor.

THE COURT:  Mr. Willett, anything further for this witness?

MR. WILLETT:  Thank you, Judge.

Page 86

BY MR. WILLETT:

Q.   In regards to Mr. Williams' questions on redirect, you stated at a hearing prior to this trial that you had no fear of Angela Johnson; correct?

A.   Yes.

Q.   And Mr. Williams questioned you about inconsistencies and other versions; correct?

A.   Correct.

Q.   Ma'am, there have been inconsistencies in your testimony between what you testified to the federal grand jury and what you've said here today; correct?

A.   Correct.

Q.   And you've given other versions between what you've testified here today and what you've testified to to the federal grand jury; correct?

A.   Correct.

Q.   And you were incarcerated with Miss Johnson between August and October roughly of the year 2000.

A.   Yes.

1354

Q.   And you first divulged the information you had in April of 2002 to Mr. Basler and Agent Graham; correct?

A.   Correct.

Q.   So even though you acquired this information in the summer and fall months of 2000, you didn't feel it was something you had to do until April of 2000 when you were -- had a pending federal methamphetamine charge and you had not been -- not yet been sentenced; correct?

A.   Correct.

Page 87

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1187 of 3592

MR. WILLETT: Thank you, Judge.

THE COURT: Anything further?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. You may step down.

Everybody can take a stretch break.

And are you ready to call your next witness?

MR. MILLER: Your Honor, the United States calls Gary Licht.

GARY LICHT, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Make yourself comfortable. Adjust the chair so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is Gary Licht, L-i-c-h-t.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

1355

DIRECT EXAMINATION

BY MR. MILLER:

Q. Your occupation, sir.

A. I'm a questioned document examiner employed by the Iowa Division of Criminal Investigation laboratory located in Ankeny.

Q. And that's the same DCI lab at which Deb Davis, Paul Bush, and others work?

A. Yes, it is.

Q. How long have you been employed by that organization, sir?

A. Ten years.

Q. What is document examination, Mr. Licht?

A. Forensic examination of documents is a broad field that involves the genuineness of handwritten and machine-produced

Page 88

documents, the characterization of the sources of the things that comprise documents, and the identification of writers and machines.

Q. Before we get into your more specialized training and experience in that area, would you briefly summarize your formal education for the jury, sir.

A. Yes. I have a bachelor of science degree in zoology from Iowa State University and a master of science degree in biology from Florida State University.

Q. And more specifically in the area of document examination, Mr. Licht, would you please summarize for the jury your formal training in that specialty and a brief description of the

1356

experience you have in the field.

A. My training in questioned documents was over two and a half years full time on the job in an extensive training program. The training program was comprised of 64 units of study, and in those units of study I learned all of the analytical and instrumental techniques and methods that I would need to examine a very wide variety of documents. Some of those areas focused on handwriting, typewriting, copiers, office printers, professional print shops, ink and paper and writing instruments, photography, and the stabilization and reading of deteriorating documents.

I also attended specialized short courses and workshops. Some of those were difficult handwriting problems and signature problems taught in conjunction with meetings of the American Society of Questioned Document Examiners, a workshop on the comparison of ink taught by the IRS laboratory, printing processes taught by the FBI laboratory staff, and a

Page 89

number of other short courses and workshops.

In those two years I also spent two weeks with the document examiner trainer of the Illinois State Police at their training laboratory in Carbondale, and my training involved a tremendous amount of reading, practical exercises, testing, and supervised case work.

Q. In your job what types of evidence do you examine, sir?

A. I look at almost any substrate that has marks or symbols on

1357

it that convey thoughts about which a question has been raised. Most of the time I am looking at handwriting or office-produced typewriting, if you will, on paper. The types of cases are wide ranging from death investigations to harassment to extortion, embezzlement, various types of frauds and forgeries.

Q. What needs to be submitted to you in order for you to do a complete examination and comparison?

A. I always ask for the original questioned documents or the best possible images that exist. And in the case of handwriting, I ask for adequate known writing of whatever individuals are involved such that I can determine the range of variation of that writer.

And that writing needs to be freely and naturally written. In other words, what the person does from day to day when they're writing is free of distortion. And I need to be able to encompass the sort of letters and numbers as are found in the questioned material, in other words, cursive for cursive, upper case for upper case, lower case, and hopefully even complete words.

Q. Mr. Licht, what is it that makes handwriting identifiable?

A. We have to presume several things: One, that in nature

Page 90

uniqueness exists. And we know that no two writers write exactly alike. Even identical twins don't write exactly alike. There may be some remarkable similarities, but no two people are precisely alike in their handwriting. Everybody has a certain

1358

range of variation in their handwriting, and even though from day to day there are factors that are contributing factors to variation, but your handwriting is within a particular range.

What I need to see is can I determine that the questioned writing is freely and naturally written or at least some of it and is the range of variation that I find there found within the range of variation in the known.

Q. You mentioned that even identical twins have distinguishable handwriting. Have studies been done in this area?

A. Yes, there are a number of studies involving identical twins and fraternal twins.

Q. Would you please describe for us in general the procedures that are employed in your field in handwriting examination and comparison?

A. First thing to do is I look at the questioned material to see what it is. Is there something there that I need to compare, or do I need to ask for more? I look at the characteristics that are there to determine what it is that I'm going to be looking for.

Then I look at the known material from either one writer or a large number of writers. I look to see that I have writing that's free of distortion and hopefully original material, in other words, where I can look at the very subtle characteristics that are there.

Page 91

And once I determine that I have adequate material, I do a side-by-side comparison. Most of it is pattern recognition or looking at shapes and the subtleties. Some of the things that I look at would be the gross shapes of the letters, the shapes of the individual parts of letters such as the stems and the bowls or the lower parts of the letters, the ascending parts and the descending, the ratios of the heights of those various components, the beginning strokes and ending strokes, retraces, curves, the little embellishments or particulars that may be there including the "i" dots and the "t" crossings.

At some point I reach a conclusion as to whether or not the range of variation of the questioned material is or is not found in the known writing.

Q. Is there any standardization within your field as to the range of conclusions that are used to classify comparison findings?

A. There are standard guidelines and protocols generally accepted by well-trained questioned document examiners.

Q. What range of comparisons do you use?

A. I use a nine-point scale of conclusions regarding handwriting. Every case starts at inconclusive, and that is one of the steps on the scale.

From there I have four steps one way or the other. If we work toward an elimination, I have indications that it may not have been written by, probably not written by, highly

probably not written by, and not written by.

Likewise, on the other side of the scale towards an

Page 92

identification indications may have been, which, I should add, is a weak conclusion. In other words, there's more there than I would expect based just purely on coincidence, but it's very limited; then probably was written by. In other words, it's unlikely that it was someone else; highly probable that it was written by; and then an identification of the writer.

Q. Do you in your work, sir, ever eliminate suspects in criminal investigations?

A. Yes, I do eliminate a lot of people.

Q. Mr. Licht, I'm showing you what have already been received in evidence as Government's Exhibits 10 -- excuse me, Government's Exhibits 310, 311, and 312, the last of which consists of three documents, 312A, 312B, and 312C. I ask if you recognize those documents, sir.

A. Yes. These were submitted as questioned documents to me in this particular case.

Q. In connection with the Greg Nicholson, Lori Duncan, Christi -- excuse me, Kandi Duncan, Amber Duncan, and Terry DeGeus death investigations.

A. Correct.

Q. And in general what did you do in connection with your expertise as a document examiner?

A. The first thing that I did with these was to make them more

1361

readable, and I did that simply by scanning them in on a computer and changing the contrast such that they were easier to work with.

I then had known writings to compare these to in this particular case to see if I could identify the writer on these five different pieces of paper.

Page 93

Q.   And among the known writing submitted to you, were you provided with what was identified to you as known samples of the handwriting of the defendant in this case, Angela Johnson?

A.   Yes.

Q.   And from how many sources, sir?  Let me just ask you this. Were you --

A.   I think I had three sources for the known writings.

Q.   Did you receive submitted to you known handwriting that was filled out as an exemplar voluntarily at the request of Agent John Graham?

A.   Yes, I did.

Q.   And did you also have a set of documents provided as photocopies of correspondence collected from jail?

A.   Correct.

Q.   And did you, in fact, conduct in connection with your training and experience a comparison of the known handwriting of Angela Johnson collected from those sources and the handwriting that you observed on those documents before you, Government's Exhibits 310, 311, and 312?

1362

A.   Yes, I did.

Q.   First before we get into your examination and findings, sir, can you describe for us the known samples provided to you?

A.   The known handwriting of Angela Johnson had a wide range of variation in how many styles of handwriting there were.  There was very elaborate cursive writing, a little bit simpler cursive writing, and hand printing.  Some of the hand printing was done rather slowly and deliberately, and some of it was done with speed, so I had a number of styles of handwriting, and I had many pages of known writing.

Page 94

Q.   How about the handwriting that was submitted from Agent Graham as the voluntarily submitted exemplar handwriting?

A.   Some of that was very elaborate cursive writing, and there was a very limited amount of printing on that.

Q.   Before I get into the basis for your findings, I want to ask you, sir, just for your conclusion.  Did you reach any conclusion or conclusions about the source of the handwritings or the handwriting, rather, in Exhibits 310, 311, and 312?

A.   Yes, I did.

Q.   Now, you've mentioned to us that before getting very far into your work you made digitized copies of these documents?

A.   That's correct.

Q.   And the purpose for that was what, sir?

A.   The first purpose was to make them readable, easily readable, from a distance.

1363

Q.   And in addition to that, we've already heard previously in this trial that there are a number of different sections of the DCI crime laboratory in which a number of different examinations and processes are employed.  Are you the only one -- or excuse me, was the document examination section the only section that worked with these exhibits?

A.   No.

Q.   And would you just briefly describe for us how that works as far as the sequence of handling exhibits and the importance of reproducing them before passing them from one section to another?

A.   It depends on the case.  Oftentimes there's one section that has priority in looking at things.  Sometimes it's the photography section.  They photograph things before they go on

to anybody else. I generally get the document evidence then before it goes on anywhere else. Sometimes I have to work in conjunction with the DNA section if indeed there is -- if there are envelopes submitted.

I then complete my analyses before sending it on for any further examination which in this case involved the latent print section. And I always get the documents before they go to the latent print section.

Q. Is there a reason you receive them before the latent print section, sir?

A. Yes. Once latents conducts chemical work on the documents

1364

to look for latent impressions, the -- if there's ink on the documents, it may very well all run off. And also the documents start to take on color, sometimes gray and sometimes lavender or purple color, and it makes it more difficult to work with.

Q. In other words, work done by other sections of the laboratory, including the fingerprint examination section of the laboratory, can actually to some degree alter the appearance of the document?

A. Yes, very much.

Q. So it's important that you look at it before those sections do.

A. Yes.

Q. Okay. And it's also for that purpose that you reproduce it with digital photography?

A. Correct. The digital photographs then will be an accurate representation of the handwriting so that after latents is done there is still something to work with if further examinations are needed.

Page 96

Q.    Now, is the handwriting and the figures drawn on State's -- excuse me, Government's Exhibit 310, 311, and 312 legible even now?

A.    It's legible if I look closely.

Q.    Is it as legible as it was when first received by you?

A.    I can't tell if it's as legible.  It's certainly not more legible.

1365

Q.    Okay.  If there are any changes whatsoever that are observable, I want to be sure you make clear to the jury what changes, if any, there are on those documents.

A.    Well, the paper is no longer white, and that does also obscure some of the pencil writing that's on there.

Q.    So age has an effect on paper.

A.    Yes.

Q.    And on the handwriting in the form of pencil, I assume.

A.    Yes.

Q.    Pencil fades?

A.    Yes.

Q.    And again, you indicated that that went to the fingerprint latent print examination sections of the laboratory as well after you looked at it first?

A.    Correct.

Q.    And did that at least to your visual observation result in any discoloration or any markings on those documents?

A.    Yes, they are now discolored.

Q.    And are there -- and you can feel free to take a quick look -- any notations by fingerprint examiners on there as well?

A.    Yes, there are notations by the latent print examiner.

Q.    With the exception of those notations -- and I assume
Page 97

they're initialed?

A.    Correct.

Q.    With the exception of those notations initialed by the

1366

fingerprint examiner, the natural fading of the clarity of the pencil marking on that paper that has aged somewhat, and any discoloration that may have resulted from the latent print processing, are they substantially in the same condition as when received by you, sir?

A.    Yes.

Q.    With those exceptions.

A.    Yes.

Q.    And I've listed a few.  Nevertheless, you also told us that before all that was done you did latent -- excuse me, digital photography of it to preserve its clarity at the time that you received it.

A.    Correct.

Q.    Did you, sir, prepare enlargements of these exhibits, Government's Exhibits 310, 311, and 312A, B, and C, from that original digital photography that would be of assistance to you in describing your findings and assistance to the jury in understanding the basis for your findings?

A.    Yes.

        MR. MILLER:  And, Your Honor, strictly for demonstrative purposes, we do have those enlargements here. Again, they are for demonstrative purposes, but I would ask again with the Court's permission that the witness be allowed to don the portable microphone and use the easels and enlargements to describe for the jury the basis for his conclusions.

1367

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1198 of 3592

MR. STOWERS: No objection.

THE COURT: Okay. You may proceed.

BY MR. MILLER:

Q. Before you do so, we have five exhibits here, one for each of two maps and one for each of three notes; is that correct?

A. Yes.

Q. And also did you prepare -- in addition to those enlargements of the maps and notes, did you also prepare enlarged charts that showed the work that you did in comparing specific letters and phrases as they appeared between the questioned documents and the known handwriting of Angela Johnson?

A. Yes, I did prepare some comparison charts as a method of summarizing what I did and for demonstrative purposes.

Q. And I just wanted the record completely clear that that also is for demonstrative purposes, but that is a total of seven exhibits, no more than two of which would be necessary to place on easels at a time. Would that be fair?

A. That would be fine.

Q. I simply want to provide you an opportunity to explain the basis for your findings, but would that suffice, Mr. Licht?

A. I think that two at a time would be fine.

Q. Fine. Then if you would please with the Court's permission go to our law clerk, help her get that microphone on you, and I'll just leave it to you. Let me help you if you need some

1368

help, but I'll leave it to you to place those easels wherever it would be most suitable.

Page 99

THE COURT: And defense counsel's free to move wherever they want to.

A. Is there a particular placement in this courtroom that works best?

Q. Well, I'll direct you to the Court's attention, but the 18 people before you are the ones that most need to be able to see what you're showing, so put it close enough so that they can clearly see what you're about to show.

MR. MILLER: And again, Your Honor, with the Court's permission, I'll don one of those microphones myself and take a place where I can watch?

THE COURT: Yes. Thank you.

MR. MILLER: Thank you.

A. For the record, I have placed on the easels enlarged images of two of the notes, and this is after I did contrast adjustment to make them easier to read. And I do not have the government exhibit markings on the face. Each of these is just handwriting.

Q. Mr. Licht, I'm going to interrupt you briefly. There's a small yellow tag at the lower right-hand corner of each of those three that does have an exhibit number. And for the record, it's the same exhibit number as the original exhibit. It's not marked separately. But that which would appear before you as a

1369

large document marked 310 is actually an enlargement of the actual Exhibit 310.

A. Thank you.

Q. Et cetera. And just so we can be very clear, the first time you refer to each document, if it would help us identify which document is which the first time and the first time only,

Page 100

if you could read the contents of the writing, that would help us identify which document is which.

A.    Yes.    These are Government Exhibits 312A and 312B.    And if you'd like, I can read through them now if that would be of assistance.

Q.    Yes, please.

A.    In 312A, Everything is just the way the paper said it was. They are all together in one.  I don't know what they were wearing.  I'm sure the girls were in PJs, all shot in the head. I think the woman was shot more than once because she ran.  Hit somewhere from behind, then in the head.  And the last line on that one in parentheses, Buried, and then girls first, then him, then her.

And on Exhibit 312B, it reads, Oh, yeah, him and her were gagged with kid socks with gray tape around their mouths. At one time they had gray tape around their hands, feet too.  I think they still have the tape around their wrists but not the feet.  Remain gagged, not the kids.

In Government Exhibit 312C, also just handwriting, The

1370

one is buried on his knees like he would make me be when I would beg for my life and face down.  He is in a field next to -- and then a word that I can't read -- abandoned house on Killdeer Road, gravel road.  And that is State's Exhibits 312A, B, and C.

Government's Exhibit 311 is in the form of a map, hand-drawn map.  And for the record, I am pointing to the top of the map where it reads, House abandoned, lumber yard, then what appears to be the drawing of a road.  It says, Old 18.  And then for the purposes of the record, perpendicular to that particular road is another road.  There's another road then drawn at the

Page 101

lower portion of the map with a little bit of handwriting that says, To blacktop, and there's an arrow.

The handwriting at the lower portion of Government's Exhibit 311 is handwriting that says, Field, what appears to say, Aband or abandoned house, silo, gravel road, and in parentheses, Killdeer Road, and there are little arrows on the map which appear to point a direction of travel to the location near the abandoned house and the field.

Government Exhibit 310, once again, a hand-drawn map with what appears to be roads, railroad track, and locations. The handwriting, if we start at the top, we see, Highway 18 in abbreviated form, the word Mason, RR for railroad, the handwritten word field, lumber yard, abandoned green house, Old 18, and at the bottom, Under the tree with the two tires under, and then an arrow back to the two tires, and then it says, Are

1371

they -- are the four. I think it says, Are the four, not, Are they. Also on here are the directions of north, south, east, and west, once again with arrows that appear to be showing a direction of travel.

Q.   Mr. Licht, having now described the five enlargements of the documents contained in Government's Exhibits 310, 311, and 312A, B, and C, I'll ask you to go, please -- using those and the other exhibits to the extent that it will help you do so describe for the jury what findings you made and the basis for those findings.

A.   Yes. And before I put the comparison charts up, on Government Exhibit 310, the handwriting that's present on here is an example of writing that's not freely and naturally written. In other words, it's in a block form with a lot of

Page 102

straight lines instead of curves such that I can't use like the H-W-Y 18 and the word Mason, I can't use that particular type of writing as having been done freely and naturally.

Also on Government Exhibit 311, we have some writing that also falls into that category, and it limited the number of words that I could work with on that.

Q.   Mr. Licht, does that tell you if anything the fact that you have handwriting that is not freely and naturally made?

A.   I'm not sure that I follow your question.  It doesn't particularly tell me anything about the writer when it's not freely and naturally written.

1372

Q.   Are you ever asked to examine or compare handwriting which appears to you to have been disguised?

A.   Yes, very frequently.

Q.   And is that at least one reason on occasion where you see handwriting that's not freely drawn?

A.   Yes.

Q.   Please continue, sir.  And before you describe any document, I want to make sure that our record is clear.  Please before referring to the contents of any document, whichever of these seven it might be, make sure that our court reporter hears and that our record is clear as to what exhibit number you're talking about.

A.   Yes.  I have placed on the easel two items, 319B which is a letter comparison chart and 319A which is a full word comparison chart.

One of the first things that I have to do in the comparison process is look at individual letter forms to see if there's even anything similar between the questioned and the

Page 103

known writing. And these charts help to summarize a little bit of what I look for when I do this particular process.

On 319B, the letter comparison chart, on the -- what you'll see as your left side under the word "questioned" is individual letters taken from the questioned writing, and these are individual letters where it was determined that they were freely and naturally written. In other words, there's some

1373

speed there. They're not slow and drawn.

On the right side of the chart, likewise, individual letters cut out from the known writing also freely and naturally written. What I do with a comparison chart like this is show a range of variation in particular letter forms from the questioned writing and then a range of variation of those same letter forms in the known writing.

In this particular case, I'm summarizing for you an identification. In other words, I'm displaying on these charts the range of variation in the questioned and showing that it is found in the range of variation of the known writings.

If we look just briefly at the letter A -- and I know that this is a little bit difficult to see -- but what we have for the most part are two-stroke A's, very short and wide in appearance with the pencil making sometimes a short beginning stroke and then either one movement of the pencil up and then a sharp angle back down or, in a situation of some of these A's, a curve where the pencil moves up and down and it's not two straight lines; it's actually a curve. The second pencil stroke is the cross bar of the capital A. And on some of these capital A's, the appearance is almost that it begins to look like a distorted P. In other words, the right-hand side of the A is

Page 104

raised up off of the baseline.

Also found in the known writings, short A's, two strokes sometimes with a beginning stroke, and then the cross

1374

stroke is the second stroke. Sometimes it looks more like straight lines, sometimes more like a curve, oftentimes the A beginning to take on the form of a distorted P. In other words, the pencil is moving rather quickly. That particular -- the right-hand side of the A is raised up off of the baseline.

If we look down at the letter E -- I'm going to skip a few lines here -- for the most part two-stroke Es, sometimes a third stroke, but for the most part the top stroke for the E is missing or it's very abbreviated, a down stroke of the pencil curving to the right to form the bottom of the E, and then the center stroke of the E to complete it oftentimes with no top stroke.

In other words, for the record, we're looking at the printed E where there would be a stem on the left side and two horizontal strokes. One of those horizontal strokes is missing, that being the one at the top of the E, also found in the known writing with the same overall shapes to the E's.

Skipping down to the N, a single stroke to create the N. In other words, the pencil doesn't have to leave the paper. There's a down stroke, the pencil moves back up, and then the capital N's take on the appearance of being an inverted U, also found in the known material.

And I do that with each letter of the alphabet. This particular writing I'm dealing for the most part with capital letters. It was hand printed using capital letters.

1375

Page 105

Government Exhibit 319A is for words because I also look to see if the letters are constructed into words the same way. Is there the same sort of spacing between the letters? Is there the same sort of spacing between words? How are things placed on the paper? How is the line used?

And in this particular situation, the words are either on the baseline or slightly above it. And as we can see using just pattern recognition, the way that the word "every" is put together looks the same in the questioned material and in the known material.

I had also the word "thing" in the questioned and in the known. And something that we see when the letters are put together in words is that the top stroke of the capital T quite often continues on into the left stem of the capital H, in other words, a connecting stroke even though this is hand printed. And for the record, I'm pointing to one of those strokes where the top of the capital T follows into the capital H with a capital H leaning back to the left.

This also occurs with the center stroke of the capital E, and for the record, I am pointing at a capital E in the word "every" where the center stroke leads on over into the left-hand stem of the capital R.

There are times when the capital T, capital H combination is so distorted that if I didn't have the rest of the word I would not know what the two letters are, also found

1376

in the questioned and the known. And for the record, I'm pointing at T-H combinations in the word "the" and "they".

The way that "girls" is put together has another point

Page 106

that I use in the comparison in that the "I" does not have cross strokes. It looks like a lower case i, and the way that the words "girls" is put together is the same way, capital G, lower case i, capital R, capital L, capital S. The overall pattern of putting those together is the same between the questioned and the known.

I also look to see if the spacing between words holds true between the questioned and the known. In this particular case, I had comparable phrases to use in limited situations. One of those where I found something in the questioned material on one of the notes and in the knowns, combination of words "shot in the" and in another situation "in the head." And I look at the spacing between the words, the size of the words, and I find that also in the known material. Once again, the phrase "shot in the head" was found in the known material so that I can look to see that even the sentence construction or the phrase construction is the same between the questioned and the known material.

And if we look at the bottom of the chart which is marked as 319A, the ampersand even is compared, and that may be very difficult for the jurors to see, but I am pointing at the little ampersand that's used instead of the word "and" which was

1377

found in the questioned and the known material also. Difficult to see, barely readable, but it is a pencil stroke which is what looks to be like a little bit of a loop on a stick, very small in both the questioned and the known, constructed the same way.

That's a brief summary of what I go through when I do the comparison process.

In this particular situation I'm showing you an

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1207 of 3592

identification. I could have constructed a court chart for another case where I had set it up to show an elimination, in other words, fundamental differences. In this one I'm pointing out significant similarities between the questioned and the known.

Q. And your findings were what, sir?

A. My findings was that the freely and naturally written writing on four of the five notes was written by the writer of the knowns which were submitted as that of Angela Johnson. There were a few words on one of the maps where all I could say was there are indications that those few words may have been written by the writer of the knowns submitted as that from Angela Johnson. And then on one of the maps, I was not able to determine who did that writing on that particular map.

Q. Just so we can be perfectly clear about it, the three notes marked Government's Exhibits 312A, B, and C, what were your conclusions as to those three notes that had handwriting on them, the three notes as opposed to the two maps, sir?

1378

A. 312A, B, and C were freely and naturally written, and I was able to conclude that those were written by the writer of the knowns, in other words, the known writing of Angela Johnson.

Q. And as to 311 and 312, sir, what were your findings, if any -- excuse me, 310 and 311?

A. On 310, I was not able to reach a conclusion as to who did the writing on this particular note.

On 311, the phrase "to blacktop" was identified as by the writer of the knowns, and there were some words on that one -- I believe it was "field," "house," "silo," and "Killdeer Road" -- where I reached a lesser conclusion on those. In other

words, it wasn't an identification on everything that was on that particular map.

Q. But there was an identification of the one phrase as being --

A. Yes, "to blacktop" on Exhibit 311 I did identify as the same writer as the known writing.

Q. The known writing of Angela Johnson.

A. Correct.

Q. And finally, sir, did you happen to do any fracture matching? And first explain to us what fracture matching is.

A. The fracture comparison process is looking at the edges of items that have either been broken or torn. In this particular case as we can see, these are smaller components of larger pieces of lined paper, and I did have some fracture matches of

1379

notes to maps. And for the record, I'm looking to see if from this viewpoint I can pick that out.

And the first that I can see is 310 and 311, the tear contours at the base of 310 -- and for the record, let me hold this up over 311, and that might help the jury to see that -- a fracture match back to what is Government's Exhibit 311. In other words, they were at one time a single piece.

Now, these have been printed slightly different in size from each other, so there's a little bit of distortion in the printing process here. But Exhibits 310 and 311 were at one time a single piece.

I have a fracture match between two other pieces in this particular case, and right at the moment I'm not remembering which two those were.

Q. Putting 310 back up on the easel, sir, if you would,

Page 109

please -- no, on the other easel -- just so I'm perfectly clear, the two maps, 310 and 311, were in your opinion both at one time part of the same single piece of paper?

A.    That's correct.

Q.    And the handwriting or at least some of the handwriting on 311 is, in your opinion, the handwriting made by the same person who made the known handwriting of Angela Johnson?

A.    Correct.  I identified some of the words on 311 as the handwriting of Angela Johnson.

Q.    And all three of the notes contained in Government's

1380

Exhibits 312 contain, in your opinion, the known handwriting -- or excuse me, handwriting identified by you as being authored by the same person who wrote the known handwriting of Angela Johnson.

A.    Correct.

Q.    Thank you.  So in that sense all five documents are connected.

A.    Correct.

Q.    Either have the known handwriting in your opinion of Angela Johnson or were torn from the same piece of paper with such handwriting.

A.    Correct.

          MR. MILLER:  Thank you, sir.  I have no further direct.

          THE COURT:  Okay.  We'll take our noon break.  We'll start back up at 1:05.  Please remember my cautionary instruction about keeping an open mind and not discussing this case among yourselves.  Thank you.

          (The jury exited the courtroom.)
                    Page 110

THE COURT: Anything we need to take up?

MR. MILLER: No, Your Honor.

MR. STOWERS: No, Your Honor.

THE COURT: Okay. Thank you.

(Lunch recess at 12:03 p.m.)

THE COURT: Did I understand you to say you were

1381

finished?

MR. MILLER: Yes, sir.

THE COURT: Shall we take all this stuff down?

MR. STOWERS: I was going to use it.

THE COURT: Well, the jury can't see the witness.

MR. STOWERS: I was going to have him up there again once he testifies.

THE COURT: Okay.

MR. STOWERS: Yeah, so I wasn't going to have him testify from the stand.

THE COURT: Okay. Fine. Let's have the jury brought in.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Stowers, you're going to start your cross-examination, and I understand you're going to have Mr. Licht step down?

MR. STOWERS: Yes. Thank you.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. STOWERS:

Q. Mr. Licht, I wanted to make sure, first of all, that we understood your testimony -- is your microphone turned on, sir?

Page 111

A.    Yes, it is.

Q.    Okay -- that we understood your testimony about these

1382

pieces of paper.  There appears to be five pieces of -- unless my counting -- how many pieces of paper did you examine in total?

A.    There were five questioned pieces of paper.

Q.    Okay.  And these large blown-up exhibits are the digital photographs that have been enlarged for the purpose of helping you explain your testimony to the jury; right?

A.    Correct.

Q.    Okay.  And the smaller items that are up there in front of the court reporter, in front of the judge are those same items in their original form after they went through the fingerprint processing; is that correct?

A.    That's correct.

Q.    Now, can you show the jury the exhibits and identify them by number that match up together with regard to these fracture or tear lines that you've been describing?

A.    Yes.  Do you want me to do it with the originals, or shall I hold up the charted enlargements again?

Q.    Do it with the originals, and then if the enlargements will help you explain what you determined on that, use the enlargements.

A.    Okay.  Government Exhibits 310 and 311 were at one time joined and were a single piece, and I don't think that there's any way for the jurors to be able to see that using the original.  So if I may, 310 and 311 as the enlargements were two

1383

Page 112

pieces that were at one time joined together. And in this enlargement, one is printed a little bit larger than the other.

So I cannot show you the exact placement unless we look at just a portion at a time where the fracture contours are, and it may be difficult to see, the contours that I look at such as these larger contour curves as we see in the middle of the top of Exhibit 311 and the complex curvature there matching to the corresponding curvature on 310. The --

Q. I'm sorry. You're just illustrating that 310 --

A. And 311.

Q. The top of Exhibit 311 fits with the bottom of Exhibit 310.

A. Correct.

Q. The top of Exhibit 310 is also torn; is that correct?

A. Yes, it is.

Q. Okay. And if you looked at the originals -- would you go over there and grab the original 310 and 311 rather than the blow-ups? And that's a type of a paper that's commonly used that's three-hole-punch paper it appears to be; is that right?

A. Correct.

Q. With lines preprinted on the paper?

A. Correct.

Q. And the original color of that paper I take it was some shade of white.

A. It was white.

Q. And if you hold those two piece -- I'm going to give you a

1384

piece of white paper here to help you illustrate your testimony. If you have those two pieces of paper, Exhibit 310 and 311, and line them up, approximately how much of that original sheet of

Page 113

paper is missing?

A.   If it's a standard notebook size, about a quarter of the top is missing.

Q.   Because there's only -- when you put 310 and 311 together, you're missing one portion of the page where there's a hole.

A.   That is correct.

Q.   Were you ever given that portion of the page to examine?

A.   No.  I did not have the corresponding top piece for that piece of paper.

Q.   So the top quarter of the page which would have been the remainder of the original piece of paper for 310 and 311 was not given to you for examination.

A.   Correct.

Q.   Now, there was another fracture item where you encountered a similar situation, and I want to make sure the jury understands which exhibits are connected together there.

A.   Government Exhibits 312A and 312C.  And for the record, 312A and 312C as enlargements are on the easel.  I also have the originals in my hands, and there was a fracture match between those two items also.

Q.   And would it be correct to say that the Exhibit 312A is the top of an original -- is the top of a three-ring

1385

three-hole-punch piece of paper and that 312C would connect up to that torn piece of paper at the bottom?

A.   Yes.  312A appears to be the top, and 312C would be the middle of that sheet of paper.

Q.   Same type of paper as the preceding couple of exhibits we just talked about; is that correct?

A.   Yes, and I did not do a detailed paper comparison to see if

Page 114

they were out of the same batch of paper.

Q. Okay. There's another type of procedure you could do to figure out whether or not the paper's all from the same batch if you will; right?

A. Or at least manufactured to the same specifications.

Q. But in any event, did you find the bottom portion of 312A and C?

A. No, I did not have the bottom portion of that piece of paper either.

Q. Can you indicate for the jury how much of that sheet of paper, 312A and 312C, was missing?

A. It's about half of a piece of paper.

Q. Because there's only one hole of the three holes when you combine 312A and 312C, and it'd be the top hole.

A. Correct.

Q. So everything from approximately the middle hole on down was missing; is that right?

A. Correct.

1386

Q. Now, when you looked at these exhibits, you were attempting to determine the identity of the author; is that correct?

A. Correct.

Q. Or the writer. Is that how that works?

A. Yes.

Q. And you determined, of course, that these exhibits just as you've testified with the narrative writings, 312A, 312B, and 312C, appeared to have been written by Angela Johnson. Is that correct?

A. My report statement was that they were written by the writer of the known writing which was submitted as that of

Page 115

Angela Johnson.

Q.   Now, does the writer of these writings -- for example, in 312A, does the writer of the writings describe what the writer believed the girls to have been wearing?

A.   Are you referring to 312A?

Q.   312A.

A.   In 312A, there is reference to the girls were in PJs if that answers that question.

Q.   Pajamas; correct?

A.   Yes.

Q.   Although the abbreviation is used.

A.   Correct.

Q.   And the writer of 312A says, I think -- I think the woman was shot more than once because she ran.  Do you see that?

1387

A.   Yes, I do.

Q.   The writer of 312A does not indicate that she was the one that shot the woman.  She indicates that she thinks the woman was shot more than once because she ran.

A.   That's what is stated -- stated on 312 -- 312A, yes.

Q.   And it says, Hit somewhere from behind, then in the head.

A.   Yes, it does say that.

Q.   Indefinite with respect to the location of where they were hit from behind.

A.   Correct.

Q.   The writer indicates also "I do not know what they were wearing" prior to indicating that the girls were wearing or that the writer was sure that the girls were wearing PJs.

A.   Right.  The third line down is "I don't know what they were wearing," and then there's a period there, and the next sentence

Page 116

starts.

Q. Writer of Exhibit 312B who you've identified as Angela Johnson indicated the manner in which these persons were believed to have been taped and gagged; is that correct?

A. Yes, it does state that on 312B.

MR. STOWERS: That's all I have. Thank you.

THE COURT: Mr. Miller, any redirect? Where would you like the witness?

MR. MILLER: Just briefly. You can stand up there.

REDIRECT EXAMINATION

1388

BY MR. MILLER:

Q. Did the writer of those documents express certainty as to what was stuffed in the mouths of the adults?

A. I would have to read through them again to see.

In answer to your question, 312B begins with, Oh, yeah, him and her were gagged with kid socks with gray tape around their mouths.

MR. MILLER: No redirect, Your Honor.

MR. STOWERS: Nothing further.

THE COURT: Okay. Do you have any more witnesses?

MR. WILLIAMS: Yes, yes. United States calls Kevin Boldt.

KEVIN BOLDT, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Make yourself comfortable. And please adjust the chair and the microphones so you can speak directly into them. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: It's Kevin Boldt. Spelling of the last

Page 117

name is B-o-l-d-t.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

1389

Q. Mr. Boldt, could you please share with the jury what do you do for a living, sir?

A. I'm a sergeant with the Black Hawk County Sheriff's Office in Waterloo, Iowa.

Q. And what do you do as a sergeant with the Black Hawk County Sheriff's Department?

A. I'm currently assigned to third shift in the jail as a jail sergeant.

Q. And is that the Black Hawk County Jail?

A. Yes, it is.

Q. What city is that located in, sir?

A. Waterloo, Iowa.

Q. How long have you been in law enforcement, sir?

A. I believe my first job in law enforcement was in 1985.

Q. In what capacity?

A. I started out as a reserve officer for the Evansdale Police Department.

Q. And could you share with the jury how did your career in law enforcement evolve from that point forward?

A. Graduated from Hawkeye Community College with an AA degree in police science, went to Union County Sheriff's Office in southern Iowa, then went back to the Evansdale Police Department as -- hired on as an officer, and then moved on to Black Hawk

Page 118

County Sheriff's Office, and I started there in, I believe, September of 1986, and I've been with Black Hawk County since.

1390

Q. And at this point you achieved the rank of sergeant.

A. Yes, sir.

Q. Share with the jury if you would a little bit of information about the Black Hawk County Jail itself. How large of a jail is it?

A. We can hold, I believe, 272 inmates.

Q. And in this jail do you hold both male and female inmates?

A. Yes, we do.

Q. Do you allow contact to occur as a matter of policy between male and female inmates in the Black Hawk County Jail?

A. No, we try to prevent any contact that they could have, male and females.

Q. How long have you been working at the Black Hawk County Jail itself as part of your duties as a deputy sheriff?

A. I've been at this jail for about five and a half years now.

Q. In your experience at the Black Hawk County Jail, despite your best efforts, does contact still occur between male and female inmates at the Black Hawk County Jail?

A. Yes, it does.

Q. Could you describe for the jury, how is the jail itself physically set up?

A. It's called a pod setting or direct supervision jail where we'll have -- in the male pods, we'll have 50 -- up to 50 males in the pod and 1 deputy assigned to keeping an eye on them. In the female pods, there's 1 pod set up, and the maximum is 36

1391

Page 119

females that we can house.  And again, there's one deputy that watches over them or is in contact with those inmates.

Q.  I trust that this is a setting where you have 24-hour personnel there 24 hours a day.

A.  Yes, sir.

Q.  And so you're split into various shifts?  Is that fair to say?

A.  Yes, sir.

Q.  And what shift in 19 -- I'm sorry, in the year 2000 were you working?

A.  I was on second shift.  It was -- 3:30 p.m. to 11:30 p.m. was the shift.

Q.  Could you describe in particular how jailers are assigned to various roles in the Black Hawk County Jail?

A.  We have what we call the pod officers.  That particular officer again stays in the pod with the number of inmates that happen to be in there.  And then we also have what we call rovers, and the rovers will respond to any emergencies or any incidence or anything that the pod officers may have going on. We have them on each shift, and then we'll have a housing sergeant in the housing unit that will oversee all the pod officers and the rovers.

Q.  In October of 2000, what was your role, sir?

A.  I was a housing sergeant that particular day that we're here for.

1392

Q.  And could you describe for the jury what were your duties generally as the sergeant on duty?

A.  Housing sergeant, again, we oversee what the pod officers are doing and the rovers, make sure things run smoothly.  If
Page 120

there's any questions or anything that comes up that has to be handled, the pod officers will check with the housing sergeant and see how things need to be handled. We make sure that the policies are followed and, you know, average just making sure things run smoothly.

Q. In the event of an emergency, are you one of the people who would respond to a given pod to assist?

A. Yes, sir.

Q. You indicated in your testimony that there is one pod set aside for female inmates?

A. Yes, sir.

Q. And was that the case in October of 2000?

A. Yes, sir.

Q. And could you describe for the jury, is there, within that pod, a place for the females to eat?

A. Yes. The females eat -- there are -- is -- a day room it's called with tables in there where they're fed.

Q. So this is not a situation that some jurors might see on TV where there's some type of central eating hall that people would go to. Once the females are in that pod, they remain in the pod unless they're taken out for court or released?

1393

A. Yes, sir. The males is different. The males do have a central eating area, but the females eat within their pods.

Q. I want to direct your attention to October of 2000 and ask if in your capacity as a sergeant at the Black Hawk County Jail did you come to have an inmate staying at the Black Hawk County Jail by the name of Angela Johnson?

A. Yes, sir.

Q. And did you have much contact with her when she became an

Page 121

inmate at the Black Hawk County Jail?

A.    No.  I personally had little, if any, contact.

Q.    We're going to talk about an incident that occurred on October 13 of 2000.  Do you recall that incident?

A.    Yes, I do.

Q.    Prior to that incident occurring which we'll describe in a moment, how long if you know was Angela Johnson an inmate at the Black Hawk County Jail?

A.    I believe she'd been with us for a week or maybe two weeks, somewhere in that range, but I'm not positive when she came in.

Q.    And do you know where she was transferred from?

A.    I believe Benton County, but I -- again, I'm not positive on that either.

Q.    Does the Black Hawk County Jail hold inmates, at least in 2000, that were both facing state charges and local charges and federal charges?

A.    Yes, sir.

1394

Q.    What type of charge were you aware of that Angela Johnson was facing at that time?

A.    I was aware she was a federal inmate, but I wasn't aware of what the specific charges were at the time.

Q.    While she was in the Black Hawk County Jail, what pod was she held in?

A.    In F pod which is our female pod.

Q.    Could you describe the female pod for the jury, please?

A.    F pod's divided up into three sections.  F1 and F2 are for the general population.  And F3 are for maximum status inmates. And Angela Johnson happened to be in the F3 section of our -- of the F pod.

Page 122

Q.   Mr. Boldt, I've just handed you what's been marked Government Exhibit 322 and ask if you can identify that for the jury, please.

A.   That's a cutout of F3 and the pod officer work station, first floor and second floor of F3.

Q.   And is that a fair and accurate diagram of the F3 pod where Angela Johnson was housed on October 13 of 2000?

A.   Yes, sir.

MR. WILLIAMS:  United States moves to admit Exhibit 322.

                    *   *   *   *

(Government Exhibit 322 was offered.)

                    *   *   *   *

1395


THE COURT:  Any objection?

MR. BERRIGAN:  None other than our pretrial motion, Your Honor.

THE COURT:  322 is received.

                    *   *   *   *

(Government Exhibit 322 was admitted.)

                    *   *   *   *

MR. WILLIAMS:  Permission to publish, Your Honor.

THE COURT:  You may.

BY MR. WILLIAMS:

Q.   Showing on the diagram above and in front of you is the diagram for F3 pod; is that correct?

A.   Yes, sir.

Q.   I want to walk the jury through some of the indications on here.  First of all, you indicated there's a pod officer who is on duty within the pods.  And is that indicated there at the

Page 123

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1223 of 3592

lower part of this diagram right there?

A.   Yes, sir.

Q.   And can you describe for the jury what visible contact does the pod officer have with inmates in the F3 pod?

A.   In F3, where it says first floor, there's a glass barrier there, and again, just below where it shows the tables in F3, there's a glass barrier and the doorway there that the officer can observe the female inmates.

Q.   In addition, is there, in fact, also a video camera that is

1396

set up and marked as a symbol there?

A.   Yes, sir.

Q.   We have this drawing kind of split in two sections here, kind of divided up the middle if you will.  On the right-hand side, can you explain -- it looks like there's jagged lines there and there's jagged lines below.  Can you describe for the jury what that's intended to symbolize?

A.   Actually on the second floor on the top right where it says second floor, that would be directly over where it says first floor on your left.  So you have two separate floors within F3. The jagged lines to the right of the pod officer work station, that would be the opening to F2, the medium classification.  And where it says pod officer work station below that, those jagged lines would be to the F1 area of the pod.

Q.   Now, the jury can see on this diagram on the first floor then of the F3 pod there's a couple tables, there's a telephone symbol, and there's a shower and a toilet; is that correct?

A.   Yes, sir.

Q.   And then on the second floor which is to the right-hand side of Exhibit 322, if you overlaid that on top of the first

Page 124

floor, to get there there's some stairs that are symbolized on the right-hand side there?

A.    Yes, sir.

Q.    With the word "up"; is that correct?

A.    Yes, sir, yes.

1397

Q.    Is there a railing across the second floor walkway in front of the cells on the second floor?

A.    Yes, there is.

Q.    And is that marked on the right-hand side with the word "railing" there?

A.    Yes, sir.

Q.    Angela Johnson during the time period that she was celled at the Black Hawk County Jail, was she on the second floor of the F3 pod?

A.    Yes, she was.

Q.    And is her cell marked as AJ cell?

A.    Yes, it is.

Q.    Mr. Boldt, I've just handed you what's been marked as Government's Exhibit 315-1, 315-2, and 315-3.  Can you describe or identify those for the jury, please?

A.    315-1 would be the second floor of F3.  The door that's open would have been Angela Johnson's cell.  And you can see the railing there in front near the catwalk.

315-2, that would -- that is Angela Johnson's or would have been her cell.  You're standing in the doorway looking into her cell.  And 315-3 is where this diagram shows the toilet and the railing above that next to or just outside of Angela Johnson's cell.

MR. WILLIAMS:  United States moves to admit Exhibits
Page 125

315-1, 2, and 3.

                                    *   *   *   *

          (Government Exhibits 315-1, 315-2, and 315-3 were

offered.)

                                    *   *   *   *

          MR. BERRIGAN:  No objection other than our original

pretrial motion, sir.

          THE COURT:  315-1, 2, and 3 are admitted.

                                    *   *   *   *

          (Government Exhibits 315-1, 315-2, and 315-3 were

admitted.)

                                    *   *   *   *

BY MR. WILLIAMS:

Q.   So, Mr. Boldt, I want to walk the jury through then some of
these things we've talked about and show the photograph.  The
first thing we talked about was the upstairs and there's a
railing there.  I'm sorry.  What is the jury looking at there?
It's 315-2.

A.   This is the cell that Angela Johnson was housed in, and the
photo was taken from the doorway looking into the cell.

Q.   The view that they're seeing on 315-3?

A.   This is the second floor of -- or I guess I should say the
first floor of F3, and you can see the railing there towards the
top right.  That's the outside of her cell.

Q.   And then looking at 315-1.

A.   That's the -- her cell door that's open to the right, and

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1226 of 3592

that's the railing that you can see from 315-3 that's above the toilet.

Q.   Directing your attention then to October 13 of 2000, were you on duty that day, sir?

A.   Yes, I was.

Q.   And what shift were you working?

A.   Second shift.

Q.   Were you aware on that day when you came on duty that bodies had been found involving Angela Johnson's case and that she was aware of it?

A.   I had been told --

MR. BERRIGAN:   I'm going to have to object.   Lack of foundation for this testimony, Your Honor.   Certainly also calls for hearsay.

THE COURT:   Can you lay a better foundation?

MR. WILLIAMS:   First of all, it's not being entered for the truth of the matter asserted, but I'll lay a foundation for where it came from.

THE COURT:   Okay.

BY MR. WILLIAMS:

Q.   Prior to coming on duty on a regular basis, are you informed as to statuses of any inmates within the jail that you need to know about in order for you to make sure you can perform your duties?

A.   Yes, we are.

1400

Q.   And would that also include being advised of any developments in inmates' cases that may affect safety to themselves or safety to others?

A.   Yes, we are.

Page 127

Q.   In the normal course of your business, are you then advised by other members of the staff there if they're aware of inmates' knowledge of developments in their case so that you can be aware to take precautions if necessary?

A.   Yes.  Again, if it pertains to the safety or security of the jail or the inmates, we're made aware of it.

Q.   On October 13 of 2000 were you informed by other staff members of the status of Angela Johnson's knowledge of developments in her case?

MR. BERRIGAN:  I'm going to object to this as leading.

THE COURT:  It's foundational.  Overruled.

A.   I was made aware that evidence had been discovered in the Angela Johnson case that day, and we were to keep an eye on Angela in case she did anything or anything came up.

Q.   Directing your attention then to about 4:25 p.m. on October 13 of 2000.  Were you alerted that something was occurring in the women's pod, the F3 pod?

A.   I was in the sergeant's office which is down the hall, and I heard screaming coming from F pod, and at the same time I heard the screaming, I heard the pod officer on the radio request assistance.

1401

Q.   What did you do?

A.   Myself and a couple of the other deputies ran down to F pod, and we went in, and that's where we -- I was directed towards F3.  As I went around the corner to the door of F3, that's where I saw a female hanging.

Q.   And the female you saw hanging was who?

A.   It turned out to be Angela Johnson.  I wasn't aware who it was at that moment, but I later learned it was Angela Johnson.

Page 128

Q. And how was she hanging?

A. From -- with a bed sheet. She had tied it around the railings outside of her cell and was hanging over near the toilet from the first floor.

Q. We're looking at on the screen Exhibit 315-1. And you indicated earlier that open door toward the end was the door that went into Angela Johnson's cell?

A. Yes, sir.

Q. And where in relation to that door was the bed sheet tied to the railing?

A. It was pretty much directly out at the end of the railings, directly out --

Q. This area right in there?

A. Yes, right in that particular area.

Q. And then the bed sheet was over the railing, and she was hanging down from that location?

A. She had it tied to one of the bars, and yeah, she was

1402

hanging just below that.

Q. One end of the bed sheet is tied to the bar. Where is the other end of the bed sheet tied?

A. Around her neck.

Q. What did you do?

A. I grabbed Angela and tried to lift her up to get some weight off the sheet and off of her neck, and along with a couple of the other deputies, we raised her up and simultaneously were trying to untie the bed sheet to keep her from hanging.

Q. What occurred then?

A. At that moment we weren't able to get the sheet untied from

Page 129

around her neck. It was tied too tightly. I recall one of the deputies running up the stairs, and he was able to untie the sheet from around the bar.

Q. What happened once the sheet was untied?

A. We got her down, laid her on the floor, was able to get the sheet loosened from around her neck. She was breathing on her own. She was -- her heart was also beating, so we didn't have to perform any CPR or rescue breathing. And then as we were working on that, we were able to get the sheet actually cut off of her.

Q. Were paramedics also called to assist?

A. They were called.

Q. And did they ultimately arrive?

1403

A. Yes, they did.

Q. From the time period that you had her on the ground and she was then breathing again and her heart was beating until the paramedics arrived, can you describe her behavior?

A. She was thrashing around, kicking at the officers that were there to assist, pulling her arms away, moving her head around, resisting our efforts to keep her on the ground, to keep her still.

Q. And how did the behavior -- how did she behave once the paramedics arrived?

A. She continued that behavior as they put her on the gurney and wheeled her out.

Q. Did Angela Johnson remain after October 13, 2000, at the Black Hawk County Jail?

A. No, she never came back after she was wheeled out.

MR. WILLIAMS: No further questions.

Page 130

BY MR. BERRIGAN:

Q.    Sergeant, how are you, sir?

A.    Good.

Q.    My name is Pat Berrigan. I'm one of the attorneys representing Miss Johnson, and I just had a few questions for you; okay?

I guess the first one is in response to this information that you were supposed to be keeping an eye on Miss

1404

Johnson, what action did you take to do that?

A.    She -- my understanding is medical did not have her on a suicide watch, and so at that -- at that point we just keep an eye on them, a little closer eye.

Q.    Well, you weren't doing that.

A.    No, sir.

Q.    Did you have somebody under your control, one of these rovers or pod officers, that you specifically assigned to keep a close eye on her?

A.    Yes, sir. That would have been pod officers -- I believe it was Deputy Kemp that was assigned that night.

Q.    Deputy Kemp?

A.    Kemp, K-e-m-p.

Q.    And Deputy Kemp was the regular pod officer in that pod.

A.    For that particular evening, yes, sir.

Q.    So Deputy Kemp would normally have the responsibility of keeping an eye on everybody in the pod I suspect.

A.    Yes, sir.

Q.    Was there some special discussion that you had with Deputy Kemp about Miss Johnson particularly?

Page 131

A.    Just that he needed to keep an eye on her.  Apparently again they wanted to -- they believed that there was an issue going on and we needed to keep an eye on her.

Q.    Did you learn that she had access to cleaning solvent that day?

1405

A.    Yes, they have access to that.

Q.    And, in fact, that she had had the bottle of cleaning solvent in her very possession?

A.    I'd learned that after the incident, but prior to, no.

Q.    Took it up to her cell, didn't want to give it back to the officers?

A.    That's my understanding, yes, sir.

Q.    Deputy Kemp apparently missed that.

A.    That I don't know.

Q.    Okay.  And, in fact, you don't really know whether she ingested any of that cleaning solvent before the suicide attempt or not, do you?

A.    No, sir.

Q.    I suspect in the time that you've been with the sheriff's department, five and a half years at this jail -- and you said you've been with them since September of '86 -- have you seen other suicide attempts in jail?

A.    Yes, sir.

Q.    And would you classify this as a pretty serious effort?

A.    Yes, I would.

Q.    She had this knot around her neck so tight that you couldn't get it off, you and your fellow deputies, until you actually cut it off; right?

A.    Yes, sir.

Page 132

Q. And some deputy had to go up to the second floor in order

1406

to loosen that knot upstairs that was keeping her attached to the bed sheet.

A. Yes, sir.

Q. And by the time you got her down and you were able to loosen the bed sheet from her neck, did you notice she had some foam coming out of her mouth at that point?

A. Yes, she did.

Q. And not having actually seen the start of this suicide attempt, you personally I guess wouldn't have any knowledge as to how long she was hanging there presumably before somebody saw her.

A. Yeah. At the time, no, I wasn't aware how long she had been there. It was --

Q. After interviewing the other inmates.

A. Yes, sir.

Q. And there were a couple of other gals there in that pod, Susan Williams and Theresa Milton; is that right?

A. I know Milton was one of them. The other one I'm not sure of.

Q. Not so sure, okay. Well, Miss Milton was able to provide you with some information about this.

A. Yes, sir.

Q. And one of the things that we should mention I guess is that the security cameras that are directed into the pod, they don't have access to every place in the pod, do they?

1407

A. No, sir.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1233 of 3592

Q. And is it true that this is one of the places that the security cameras did not have access to?

A. That's correct.

Q. And that's the kind of thing that the inmates can kind of figure that out, can't they?

A. Yes, sir.

Q. So not only are these bed sheets tied awfully tight, but Miss Johnson chose to do this in an area of the pod where your pod officer wasn't able to monitor that activity on camera; is that right?

A. On camera, yes, sir.

Q. Right. The pod officer would have had to have got up and actually walked in there.

A. It could be seen from his station, but there are blind spots, yes.

Q. Okay. And was this one of the blind spots?

A. Had he walked -- as we look at the diagram, had he walked to the left of his officer work station, she would have been out of view. If he would have walked to the right, he would have had an angle to see it.

Q. Okay.

A. But yes, there would be a blind spot.

Q. But there's little question that Deputy Kemp did not see this suicide attempt. It was brought to the attention of the

1408


staff by these women inmates; isn't that right?

A. Whether it happened simultaneously or not, that I'm not sure.

Q. You're not sure, okay. Pretty clear to you her feet were off the ground when you got there.

Page 134

A.   Yes, sir.

Q.   Because you were trying to lift her up to take the tension off of the bed sheet.

A.   Yes, sir.

Q.   You learned she had been talking about suicide with one of the other inmates.

A.   Again, after the incident.

Q.   After the fact.  And there were suicide notes found in her cell.

A.   That I'm not aware of.

Q.   You're not aware of that.

A.   No, sir.

Q.   Were you in charge of the investigation subsequent to this incident?

A.   No, sir.

Q.   Okay.  Have you ever seen those suicide notes?

A.   I'm sorry?

Q.   Have you ever seen those suicide notes?

A.   No, I have not.

Q.   Okay.  I wanted to ask you a little bit about the reaction,

1409

this kind of combative reaction that you've described when she was kind of coming to.  Would that be a fair description, that she was combative?

A.   Yes, it would be.

Q.   Now, I don't know how much experience you've had with hanging victims, Sergeant, but were you aware that that's a very common reaction as a result of the cerebral hypoxia that takes place?

A.   No, I wasn't aware of that.

Page 135

Q.   Have you explored any medical literature on that?

A.   (Witness shook head.)

Q.   I guess you wouldn't have occasion to do that, have you?

A.   No, sir.

Q.   You're not a subscriber to the American Journal of Emergency Medicine by any chance.

A.   No, sir.

Q.   Okay.   Well, if I suggested that to you, I mean, are you claiming that this was some kind of a conscious combativeness as opposed to some kind of a reaction from having no oxygen to her brain for some period of time?

A.   It appeared to me as that it was a conscious action as she was kicking about and thrashing about.

Q.   Well, it continued for quite a while, didn't it?

A.   Yes, it did.

Q.   Despite your best efforts to kind of restrain her?

1410

A.   I'm sorry?

Q.   Despite your efforts to kind of restrain Miss Johnson.

A.   Yeah.   We were holding her down, holding her legs down.

Q.   It included things like her moving her head back and forth uncontrollably; right?

A.   Yes, sir.

Q.   And doing things like spitting and all kinds of bizarre movements.

A.   Yes, sir.

Q.   And again, would you have any knowledge, personal knowledge, that this kind of bizarre movements and behavior, whether or not that's a result of cerebral hypoxia?

A.   No, I'd have no knowledge of that.

Page 136

Q. You don't know.

A. No, sir.

Q. Okay.

MR. BERRIGAN: That's all I have. Thanks.

MR. WILLIAMS: No redirect, Your Honor.

THE COURT: Could I see the lawyers at sidebar for just a second?

(At sidebar on the record.)

THE COURT: Apparently you don't want to try and get into that area that he objected to? You never really went back to it.

MR. WILLIAMS: I'm sorry. I'm not . . .

1411

THE COURT: Oh, about Angela Johnson's knowledge at the time.

MR. WILLIAMS: I went back into it enough. I did actually go back into it enough that I felt I needed to get out.

MR. BERRIGAN: I thought he did too.

THE COURT: I didn't think you did, but I went back and read the transcript, but that's fine.

MR. WILLIAMS: I thought I did. Thank you.

(The sidebar was concluded.)

THE COURT: You may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you.

MR. WILLIAMS: United States calls Peggy Hoover. Your Honor, this witness is also in custody, so there may be a slight delay.

THE COURT: Okay. So everybody can take a stretch break.

Page 137

PEGGY HOOVER, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated. And could you please, when you're seated, adjust the chair and the microphones so you can speak directly into the microphones. That will require you to scoot the chair up a little bit. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Peggy Sue Hoover, H-o-o-v-e-r.

1412

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Hoover, these microphones are good, but you need to be kind of up close to them. You're fine. Just make sure you lean into them when you speak.

Miss Hoover, I'd like you just to share a little bit of information with the jury about yourself. First of all, how old are you, ma'am?

A. Twenty-nine.

Q. And where are you from originally?

A. Kansas City, Missouri.

Q. And where have you spent most of your life?

A. Mason City, Iowa.

Q. Could you tell the jury how far did you go through school?

A. Now I've had -- since being incarcerated I've got two years in college.

Q. What type of studying are you doing in college courses while you're incarcerated?

A. I have done building trades and computers.

Page 138

Q.  Prior to being incarcerated, did you have a trade or profession that you worked?

A.  Eighth grade education.

Q.  What type of jobs did you have before you became

1413

incarcerated with an eighth grade education?

A.  I was a photographer at Sears, APAC which is telemarketing.

Q.  I want to talk a little bit about your incarceration.  You are currently incarcerated for what charge, ma'am?

A.  Conspiracy to deliver methamphetamines and weapons being a felon.

Q.  Where did those charges arise out of?  Were they federal or state charges?

A.  Federal.

Q.  And did you plead guilty or go to trial on that charge?

A.  Pled guilty.

Q.  Was that pursuant to a cooperation plea agreement or noncooperation plea agreement if you recall?

A.  A cooperation plea agreement.

Q.  And can you just share with the jury what did you understand when you signed a cooperation plea agreement that requires you to do?  Just put it this way:  What does it mean?  What's a cooperation plea agreement?

A.  Just you're just pleading -- basically pleading guilty saying what I did do wrong is what I had done.

Q.  And in that plea agreement did you agree to cooperate and testify if necessary --

A.  Yes.

Q.  -- concerning your knowledge of other criminal activity?

A.  Yes.

Page 139

Q. What was your sentence?

A. 151 months.

Q. And at the time that you were sentenced, was your sentence reduced in any way at the time of the sentencing for any cooperation you had provided up to that point?

A. No.

Q. Were you resentenced at some point, Miss Hoover?

A. Yes, I was.

Q. And when was that?

A. I don't remember exactly when.

Q. Why were you resentenced? Can you just explain that to the jury, please?

A. I testified against somebody.

Q. In another case unrelated to this one.

A. Yes.

Q. Involving some of the same drug activity that you had been involved in that resulted in your own charges?

A. Yes.

Q. As a result of that, did the government file a motion for a reduction in your sentence?

A. Yes.

Q. And did the Court grant that motion?

A. Yes, he did.

Q. And who ultimately made the decision on what kind of reduction you got in your sentence?

A. The judge did.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1240 of 3592

Q. How much of a reduction did you get?

A. Fifty-one months.

Q. And so how much time do you currently have left on your sentence?

A. I have two years, seven months.

Q. And are you participating in the 100-hour drug treatment program as well?

A. I have done the 40-hour. The other one I cannot do because I have guns.

Q. So you're not going to be able to get any further reduction in your sentence like some inmates can for the drug treatment program.

A. No, I cannot.

Q. The prior cooperation that you provided in connection with your own case, did that have anything to do with Angela Johnson?

A. No.

Q. At some point were you called -- in particular were you called on January 14 of 2005 by Special Agent In Charge Bill Basler?

A. Yes, I was.

Q. And did he talk to you over the phone while you were incarcerated?

A. Yes, he did.

Q. Did he -- did you agree to answer the questions that he

1416

posed to you at that time?

A. Yes, I did.

Q. And did he ask you questions concerning your knowledge of Angela Johnson?

A. Yes, he did.

Page 141

Q.   Now, prior to that point, had you ever reached out to the government and said, Boy, I've got information on Angela Johnson; I want a reduction in my sentence?

A.   No.

Q.   Had you made any effort to try to get a reduction in your sentence based on the information you knew about Angela Johnson?

A.   No.

Q.   Nevertheless, when Agent Basler called you, you agreed to tell what you knew.

A.   Yes, I did.

Q.   Were any promises made to you that you would get a further reduction in your sentence?

A.   No, no, sir.

Q.   Has any promises by anybody been made to you you're going to get a further reduction in your sentence?

A.   No, sir.

Q.   Do you understand that there's a possibility you could get a reduction in your sentence?

A.   Yes.

Q.   And could you explain to the jury, what's your

1417

understanding about how that would work?  What would have to happen for you to get a reduction?

A.   I guess I don't really know what would have to happen.

Q.   Well, what happened last --

A.   Except for me telling the truth about what I know.

Q.   And what's the process you went through last time?  Did the government have to file a motion for you?

A.   Yes, sir.

Q.   And then the Court had to grant it.

Page 142

A.   Yes.

Q.   And if the Court doesn't grant the motion, you don't get a reduction?

A.   Right.

Q.   And if the government doesn't file the motion, you don't get a reduction.

A.   Right.

Q.   So let's talk about Angela Johnson for a moment.  First of all, I want to direct your attention, was there a time period in October of 2001 until January of 2002 in which you were incarcerated in the Linn County Jail?

A.   Yes, there was.

Q.   And were you at that time incarcerated there for cooperation in relation to that case that you had been involved in?

A.   Yes.

1418

Q.   Again, having nothing to do with Angela Johnson.

A.   No.

Q.   Nevertheless, did you, in fact, meet Angela Johnson while you were in the Linn County Jail?

A.   Yes.

Q.   And could you explain to the jury, how was it that you met Angela Johnson while there?

A.   We had church together a couple times.  She knew a couple girls that was in the same holding cell as me.  And we had gym once together.

Q.   Could you explain to the jury, the Linn County Jail, is that set up in different units for lack of a better word?

A.   Yeah, different holding little areas, yeah.

Page 143

VOLUME 6, 5-12-05

VOLUME 6, 5-12-05

Q. And do you recall they call those blocks at the Linn County Jail?

A. Yes.

Q. Some jails call them pods. This Linn County Jail calls them blocks?

A. Yes.

Q. Were you in the same block with Angela Johnson?

A. No, I was not.

Q. Nevertheless, do inmates from different blocks in the Linn County Jail have common areas where they can meet inmates from other blocks?

A. Basically just church, and once in a while they would put

1419

you together and take you to gym together.

Q. How many times during the roughly -- I guess it would be just slightly over a couple months that you spent in the Linn County Jail in late 2001 and early 2002. How many times did you have contact with Angela Johnson at that point?

A. Two, maybe three times.

Q. And could you then describe for the jury, did you develop -- the type of relationship, if any, you developed with Angela Johnson.

A. No. We didn't really develop any kind of relationship.

Q. From your contact with her, where would you have had contact with her? You said church I think earlier?

A. Church and at the gym, recreation.

Q. And did you become aware of whether she had any other close friends in the Linn County Jail?

A. Yes, she did.

Q. And who were they?

Page 144

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1244 of 3592

A. Girl's name was Valerie, Connie Gates, Eva Hanawalt.

Q. At some point while you were in the Linn County Jail with Angela Johnson, did you ever hear her discussing her case?

A. Once when we were at rec. together.

Q. Now, did you know prior to coming into the Linn County Jail what her charges were?

A. No.

Q. Did you find out while you were in the Linn County Jail

1420

what charges were pending against her?

A. Yes.

Q. And how did you learn about her charges?

A. Some of the girls had said something about them being friends with her and that she was looking at a lot of time and some murder cases, but they didn't really go into it.

Q. Kind of scuttlebutt within the jail itself?

A. Yeah.

Q. So take the jury if you would to this conversation you had with Angela Johnson you said at gym one time.

A. We were down at the gym, and we were saying something about -- I think it started out with the guns or something. Someone was saying something to her about them or something and --

Q. Let me stop you at this point, Miss Hoover. Who all was present if you recall?

A. It was me and -- there was quite a few of us, Valerie, Connie Gates, myself.

Q. And was everybody involved in this conversation?

A. No. I think it was just Angela, me, and Connie. Valerie was doing her workout.

Page 145

Q. And so the three of you then -- while this Valerie is doing her workout, the three of you are standing around having a conversation, you, Connie, and Angela Johnson.

A. Uh-huh.

1421

Q. And somehow the topic of guns came up.

A. Yes.

Q. Could you explain to the jury then what you recall about this conversation?

A. We were just talking about it basically, and I don't even know how it came about, but one thing was mentioned about fingerprints being on a gun, and Angela had said that if her fingerprints were on the gun it doesn't mean that she pulled the trigger.

Q. Did she make any statements about maps during this conversation with her?

A. We had said something about -- to the fact that somebody had said something about her drawing maps to where the bodies were found.

Q. And did she admit that she drew the maps to the bodies?

A. She admitted that she drew them, yes, but she didn't say if she had mailed them or not.

Q. I'm sorry?

A. She didn't say if she had mailed them or not. She just said that she had drawn it.

Q. Okay. So you don't know if she mailed them, but she admitted she drew them.

A. Yes.

Q. And was she asked or did she say how it was that she was able to know the location of the bodies?

Page 146

A.    No, she didn't say.

Q.    Did she make any statements concerning how the gun was used in the murders?

A.    The only reference that was made was that at one point the guns were used for intimidation or something to get the family out of the home.

Q.    So she mentioned there was a family in a home --

A.    Yeah.

Q.    -- that this took place at?

A.    Yes.

Q.    Did she indicate to you how entry was made into the home?

A.    No, she did not.

Q.    But she indicated it was used to get the family out of the home.

A.    Yes.

Q.    Any indication to you about whether she was doing this with anybody else or by herself?

A.    She didn't say.

Q.    Indicate to you what happened once the family was out of the house?

A.    Once the family was out of the house?

Q.    Yes.  Indicate to you what happened with the family?

A.    No.  There was no indication except for the only indication that was made was we had gotten them out of the house.  It was a reference of we so -- but . . .

Q.    But never told you who the "we" was.

A.    No.

Page 147

Q. Did the subject of the murder of children come up in this conversation at all?

A. No.

Q. When Angela Johnson's making these statements to you, can you describe for the jury what's her demeanor like at that time?

A. Like she was looking through you. It wasn't like she was really focused on talking to you. I don't know. It's hard to say. It was -- I don't know.

Q. Did it appear to you to be a remorseful discussion about what happened?

A. No. It was like she wasn't connected to it.

Q. How is it if you only met her three times --

A. Yes.

Q. -- that suddenly you're at a gym and the issue of her murder comes up and she makes statements to you about her knowledge of murders?

A. I don't know if I had a reference from where I was from or the person that was -- about Connie being with us or why she had started talking about it.

Q. Had you tried to ask her questions about it?

A. I didn't really ask many. I just said -- made a reference about her fingerprints being on the gun.

Q. The Angela Johnson who made these statements to you, do you

1424

see her in the courtroom here today?

A. Yes, I do.

Q. Can you describe for the jury where she's sitting and what she's wearing?

A. She's sitting right there with a black suit on.

MR. WILLIAMS: No further questions, Your Honor.
Page 148

MR. WILLETT:  May I confer with co-counsel for a moment, Judge?

THE COURT:  You may, Mr. Willett.

MR. WILLETT:  Thank you.

Thank you, Judge.

CROSS-EXAMINATION

BY MR. WILLETT:

Q.    Miss Hoover, my name is Al Willett.  I'm one of the attorneys defending Miss Johnson.

You spoke to Mr. Williams about your understanding of how the federal motion practice works when an inmate hopes to achieve a reduction in her sentence.  Do you remember that discussion?

A.    Yes.

Q.    And you had an initial sentence imposed upon you by the Court.

A.    Yes.

Q.    And based upon cooperation against people you were involved with in the crime you pled guilty to, you got a third knocked

1425

off of your sentence; correct?

A.    The person that I ended up having to testify against didn't have nothing to do with my charge.

Q.    Okay.  But my understanding is because of further cooperation you went from 151 months to a hundred months; correct?

A.    Yes, sir.

Q.    And now you're hoping, at least hoping, for the possibility of having this happen one more time for you.

A.    Well, you always hope, yeah.

Page 149

Q. Certainly, certainly. But it's your understanding that the entity that has to file the motion to bring whatever you've done to the Court's attention is the U.S. Attorney's Office; correct?

A. Yes.

Q. Okay. And your understanding is is what you have to do is you have to tell the truth; correct?

A. Yes, sir.

Q. But it's the United States Attorney's Office who decides if you've told the truth in response to getting that motion presented to the Court; correct?

A. Yeah, but ultimately wouldn't it be the judge's decision if I told the truth or not?

Q. Well, this is the question I was going to ask you. Do you understand that the Court can't react to your situation unless the U.S. Attorney's Office files that motion for reduction of

1426

sentence based upon substantial assistance?

A. Yes.

Q. Okay. So no matter what the judge may think about you in the past or currently or into the future, the judge has to wait for that motion to be filed before he can exercise his discretion, doesn't he?

A. Right.

Q. So it's the U.S. Attorney's Office who makes the ultimate decision to get this ball rolling; correct?

A. I suppose so.

MR. WILLETT: Just one more second, Judge.

Thank you, Judge.

THE COURT: Mr. Williams, any redirect?

MR. WILLIAMS: No redirect, Your Honor.
Page 150

THE COURT: Okay. You're excused.

Do you have another witness?

MR. WILLIAMS: Very briefly I would like to recall Bill Basler for one issue.

THE COURT: Okay.

WILLIAM BASLER, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Basler, I just want to ask you, so we have this in context, we had testimony this afternoon concerning attempted

1427

suicide by Angela Johnson on October 13 of 2000. Can you relate to the jury when in relation to that suicide attempt did it become public in the news that bodies were found in connection with the murders involved in this case?

A. I believe that information became public on October 13, year 2000.

Q. And it became public in what sense?

A. On the radio, on television, that type of publicity.

MR. WILLIAMS: No further questions.

THE COURT: Mr. Berrigan?

CROSS-EXAMINATION

BY MR. BERRIGAN:

Q. My first time getting to question you, Mr. Basler.

Did you recover these suicide notes?

A. No, I did not.

Q. You didn't, okay.

MR. BERRIGAN: Thanks a lot.

THE COURT: Any redirect?

Page 151

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Okay.  You may step down.

MR. WILLIAMS:  Good news and bad news, Your Honor. We're moving ahead of schedule.  Bad news is we've run out of witnesses for today.  The other ones are incarcerated and 70 miles away.

THE COURT:  Okay.  Members of the jury, that will

1428

conclude the testimony for the week.  We will see you back here Monday morning at 8:30.  Please remember my cautionary instruction about not discussing this case among yourselves. Don't discuss it with anybody else.  Most importantly, keep an open mind until you've heard all of the evidence in the case. Don't listen to any news media or reports about the case.  And we'll see you back here Monday at 8:30.  Thank you.

(The jury exited the courtroom.)

THE COURT:  Please be seated.  You know, I understand half an hour or an hour.  I don't really understand almost two and a half hours early.  So if we're in this situation again, I expect you to have the witnesses here, and they can put them in Woodbury County or whatever.

MR. WILLIAMS:  I apologize, Your Honor.

THE COURT:  Yeah.

MR. WILLIAMS:  Last night -- and I'm not blaming anybody -- Mr. Berrigan indicated he thought he was going to be an hour and a half with Mr. McNeese, and we somewhat banked on that.  And then as we got into witnesses today, it became apparent we didn't need -- because things came out that we didn't have to call some additional witnesses.  So not a good day on scheduling.  I apologize to the Court.  I'll try and make

Page 152

sure it doesn't happen.

THE COURT: I know it's very hard to schedule witnesses, but it's just -- this is quite a bit early.

1429

MR. WILLIAMS: It is.

THE COURT: And I've got seven sentencings tomorrow. I would have moved some into this afternoon.

Anything else we need to take up? I've got a proposed set of final merits phase instructions that I've been working on, so I will get those for you.

We do have a letter from Mr. Parrish, Mr. Honken's lawyer, indicating that they've discussed it with his client and he fully intends to invoke the Fifth Amendment. But he's cooperative in setting up a hearing so that we can make a full record on it indicating that he'll be called for jury duty next week but perhaps Mr. Spies, his co-counsel, will be available to do the telephonic hearing. I've had copies of that letter made, and so, Carey, why don't you go ahead and go back to chambers and get copies of the Parrish letter and my cover letter and the proposed set of merits instructions for the lawyers.

Let's just talk a little bit about the case scheduling. What's your best estimate now, Mr. Williams, as to when you think the government would rest?

MR. WILLIAMS: I think there's a remote chance we could rest as early as next Thursday. Thursday I know we're stopping early, and so it may lapse into Monday, but if it does, I think it's barely going to lapse into Monday.

THE COURT: Okay. And in looking at the defense witness list, at least four of the witnesses you listed have

1430

Page 153

already been called by the government.

MR. BERRIGAN: We also have called our witnesses in response to the government's case, Your Honor. I would suspect if we call anybody at all I'd be surprised if it's a half a day's testimony.

THE COURT: So we're looking at concluding the evidence probably a week from Monday?

MR. WILLIAMS: Yes, Your Honor, maybe at most Tuesday.

THE COURT: When would you be able to meet on the -- for a preliminary instruction conference on the proposed final merits instructions?

MR. WILLIAMS: Any time your pleasure, Your Honor.

THE COURT: Mr. Stowers, are you going to be handling that primarily for the defense?

MR. STOWERS: Were you asking about the instructions, Your Honor?

THE COURT: Yes.

MR. STOWERS: Yes. And I do have some instructions that will probably be filed yet today in light of the fact that you presented us with these dealing with some concepts on aider and abettor liability.

THE COURT: Okay. And you're going to be able to file those today?

MR. STOWERS: Actually, yeah. We've been reviewing them and going over a draft.

1431

THE COURT: Okay.

MR. STOWERS: I don't think there will be any grand

Page 154

surprises there, but I think there's some concepts that you may have already covered in these instructions.  I'm not sure.

THE COURT:  Maybe; maybe not.

MR. STOWERS:  We'll see.  Thank you.

THE COURT:  Are you all going to be here tomorrow or not?  Probably not?

MR. WILLIAMS:  Probably not, Your Honor.  Our plan was to leave today.

THE COURT:  Today?  Okay.  Why don't we plan on meeting Monday, at the end of the trial day on Monday, and try and start talking about the proposed finals.

Today, if my memory serves me correctly, Mr. Berrigan, your two weeks are up on something I asked you to do, and that would be to submit your proposed penalty phase mitigation instruction listing your mitigators.

MR. BERRIGAN:  You're exactly right, Your Honor.  Those are not ready.  Mr. Stowers and I are going to work on those this weekend.

THE COURT:  Okay.

MR. BERRIGAN:  And I'm hoping to have those to you -- I even have a typist coming Sunday -- hoping to have those to you on Monday.  That's our goal.

THE COURT:  That'd be fine.

1432

MR. BERRIGAN:  I had not forgotten that conversation.

THE COURT:  I assume you hadn't.  I assume you'd been working on it.  Just trying to keep things on track here so that we don't delay things.  If there is a second phase and then if there is a third phase, does the government know how many witnesses you intend to call in the penalty phase if there is

Page 155

one?

MR. WILLIAMS: Yes, Your Honor. Right now we have 30 witnesses listed. As we meet with some of those witnesses, my best guess would be that would be cut down to probably more like 20 realistically. I would think it would take approximately a day to -- well, probably a day and a half to two days for the government to present its initial penalty phase part of the case.

THE COURT: And have you -- do you have a witness list for the penalty phase?

MR. BERRIGAN: We do, Your Honor. I don't have it with me, but we've submitted it certainly to the government, and we'll go through the same process. I expect us to have probably two dozen to 30 witnesses.

THE COURT: How many days' worth of testimony do you think you have?

MR. BERRIGAN: A lot of that depends on whether there's going to be psychological testimony advanced. But if not, I think probably three days.

1433

THE COURT: And when are you going to know about the psychological testimony?

MR. BERRIGAN: Probably as soon as I see the government's 12.2 evaluation.

THE COURT: Do you anticipate any -- I know I've entered a number of rulings on the 12.2 psychological evidence issue, but I haven't heard anything from the parties. Do we anticipate some last-minute problems there?

MR. BERRIGAN: Not really. The government has conducted their --

Page 156

THE COURT: Remember the last time we heard "not really" from a prospective juror?

MR. BERRIGAN: Yes, I anticipate huge problems.

THE COURT: Do you seriously?

MR. BERRIGAN: No, sir, I really don't.

THE COURT: Okay.

MR. BERRIGAN: They've conducted their evaluation. I've spoken to the individuals involved. They've provided us with some material as a result although not obviously any reports, so I have some kind of idea I suppose as to where that's going. And if I had to guess at this point, I think the defense would submit and present mental health testimony, and I think if we did that, that that's going to extend the evidence at least a day.

THE COURT: At least a day, maybe longer.

1434

MR. BERRIGAN: Right, maybe longer because the government will undoubtedly put their rebuttal witnesses on.

THE COURT: And you would anticipate if the defense does offer psychological or psychiatric mitigation testimony that you would have some rebuttal testimony?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Probably a day's worth or something, less than that?

MR. WILLIAMS: I am so much in the dark.

THE COURT: Right.

MR. WILLIAMS: He knows more than I do. I'm guessing that's probably accurate, Your Honor. And I don't know if you saw this today, but we did today file -- I just -- I thought I would try to assist the Court a little bit more, and I filed

Page 157

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1257 of 3592

actually a memorandum concerning this issue on the possible penalties. I filed that today with service on the defense electronically.

THE COURT: When will you all be able to respond to that?

MR. BERRIGAN: We obviously haven't seen it. Well, maybe it's not obvious, but we have not seen that yet, Your Honor. Boy, hopefully I think the beginning of next week.

THE COURT: Anything else we need to talk about?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

1435

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. We'll be in recess. We'll see you all Monday morning. Why don't we meet at eight o'clock just to see where -- I suspect we may have some things to talk about based on filings that will be coming in over the weekend or pursuant to what the government just filed; okay? Thank you.

MR. WILLIAMS: Very good. Thank you.

(The foregoing trial was
adjourned at 2:20 p.m.)

Page 158

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR

9-1-05
Date

1436

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| ROBERT MCNEESE | | |
| | MR. BERRIGAN | 1256 |
| | MR. MILLER | 1275 |
| | MR. BERRIGAN | 1284 |
| SARA BRAMOW | | |
| | MR. WILLIAMS | 1291 |
| | MR. WILLETT | 1328 |
| | MR. WILLIAMS | 1348 |
| | MR. WILLETT | 1353 |
| GARY LICHT | | |
| | MR. MILLER | 1355 |
| | MR. STOWERS | 1381 |
| | MR. MILLER | 1388 |
| KEVIN BOLDT | | |
| | MR. WILLIAMS | 1388 |
| | MR. BERRIGAN | 1403 |
| PEGGY HOOVER | | |
| | MR. WILLIAMS | 1412 |
| | MR. WILLETT | 1424 |
| WILLIAM BASLER | | |
| | MR. WILLIAMS | 1426 |
| | MR. BERRIGAN | 1427 |

*****

| EXHIBITS: | |
|---|---|
| 322 | 1395 |
| 315-1, 315-2, and 315-3 | 1398 |

*****
Page 159

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CR01-3046

       Plaintiff,                         Sioux City, Iowa
                                             May 16, 2005
   vs.                                       8:28 a.m.

ANGELA JANE JOHNSON,                         VOLUME 7 of 24

       Defendant.
                                    /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

1438

APPEARANCES:

For the Plaintiff:       C. J. WILLIAMS, ESQ.
                         Assistant United States Attorney
                         Suite 400 - Hach Building
                         401 First Street Southeast
                         Cedar Rapids, IA  52401

                         THOMAS HENRY MILLER, ESQ.
                         Iowa Attorney General's Office
                         Area Prosecutions Division
                         Hoover State Office Building
                         Des Moines, IA  50319

For the Defendant:       PATRICK J. BERRIGAN, ESQ.
                         Watson & Dameron
                         2500 Holmes
                         Kansas City, MO  64108

                         DEAN STOWERS, ESQ.
                         Rosenberg, Stowers & Morse
                         1010 Insurance Exchange Building
                         505 Fifth Avenue
                         Des Moines, IA  50309

                         ALFRED E. WILLETT, ESQ.
                         Terpstra, Epping & Willett
                         Higley Building - Suite 500
                         118 Third Avenue Southeast
                         Cedar Rapids, IA  52401

Also present:            Bill Basler

Page 1

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1260 of 3592

VOLUME 7, 5-16-05
Court Reporter:              Shelly Semmler, RMR, CRR
                            320 Sixth Street
                            Sioux City, IA  51101
                            (712) 233-3846

1439

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Please be seated.  We just got a jury note.  You've read it almost as quickly as I have.  I've suggested that we bring this juror up here and find out what's going on.  I'd rather do it at the end of the day and not hold things up, but let's do it right now.  Can you get Juror 402?

(Juror 402 entered the courtroom.)

THE COURT:  Okay.  Rick, can you hand Juror 402 the microphone, please? Good morning.  Please be seated.  Thank you for sending us this note.  It says, Juror 402, and it says, Your Honor, Friday, the 13th, this employee outside of maintenance, abbreviated it looks like, confronted me about court, and I'm telling them to stop, don't talk about the case, double exclamation point.  Happened too many times, double exclamation point.  I have informed company to do something about it, exclamation point.  Is this the note that you sent us?

JUROR 402:  Yes, it is.

THE COURT:  Okay.  Can you tell us what's been happening?

JUROR 402:  Well, to make it clear, I got a call on Tuesday.  I started court on Wednesday.  I contact the upper management about I was leaving, that I was selected.  Well, that Friday -- I work in basically maintenance, but I stayed over in like we call the truck shop.  This last Friday I'm in

1440

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1261 of 3592

maintenance, so I can be in about any department. And what do you want to say? I get too many people -- in maintenance they know enough not to even talk to me, but in the rest of the plant, 300 people plus, roughly, right, people would come up to me and say, Oh, you're a juror. They know when you started. They kind of know what case you're on. I gotta cut them off like there and turn around and like I can't do my work and be doing this all at the same time.

And an incident that flipped me off is in the afternoon I -- you know, not trying to say anything bad, but he said, Oh, you're a juror on Johnson's case. And when he used the word "bitch," I turned to him and said, You gotta stop. I'm already trying to tell him to stop. I said, This ain't working. I contacted my foreman, told him they gotta do something or else I ain't going to be here Fridays and I don't care if you don't pay me because I felt like I'm obligated because they pay me, you know, and they said 8:30 this morning, every morning at 8:30 the department heads and some of the management get together and have a meeting. He's going to bring it up and see what they can do. And I told him directly that it's not my responsibility to control the rest of the employees.

THE COURT: That's right. And let me just say from my perspective, I think you've done a fabulous job of dealing with this situation, but I've got a few questions for you.

JUROR 402: Yes.

1441

THE COURT: Has anything been said to you by anyone at work that would affect your ability to be a fair and impartial juror in the case?

Page 3

JUROR 402: No. What went on in here was never mentioned. No, nothing's brought up. Mainly they said -- you know, it starts travelling through, and since I go to other departments which I'm never around some of them people for a whole week, you know, anyway, they just, Oh, I hear you're gone to be a juror. And then I say, You can't talk about it, this and that. I'm just tired of having to turn around every time and keep saying that.

THE COURT: Sure. That must be hard on you. But what I want to know is has anything been said that would affect your ability to sit as a juror in this case?

JUROR 402: No.

THE COURT: And you understand that you have to base your judgment solely on the evidence presented in the courtroom.

JUROR 402: Yes.

THE COURT: Is there anything else outside the courtroom that you think in any way could affect your judgment in the case?

JUROR 402: No, not that I know of.

THE COURT: I'm going to give the lawyers an opportunity to ask any follow-up questions.

Mr. Williams?

1442

MR. WILLIAMS: Your Honor, my only question would be whether anybody has attempted to tell the juror what they claim to be facts about the case.

JUROR 402: No, I cut them off. My -- my direct group I work with is maintenance, and who I have break with all understand, and even the current events we talk about isn't about this case. They don't bring it up. But what my trouble

is I'm maintenance. The kind of maintenance I do is forklifts, vehicles, trailers, semi tractors, so you're talking different groups in the factory that we get a call we gotta go see about something, I'm put in another group right away, you know, walk right in on them, you know. And they said they're going to do something, but I -- you know, I don't know yet what they're -- I put it in their ballpark. It's their deal. I still don't know what they are because they don't --

THE COURT: Yeah, no matter what they do, people might still say something to you.

JUROR 402: Yeah.

THE COURT: But it sounds like the company's going to take an affirmative response and try and talk to the employees about not discussing anything with you about the case.

JUROR 402: Yes.

THE COURT: Who would like -- Mr. Berrigan?

MR. BERRIGAN: Sir, other than the one gentleman referring to Miss Johnson derogatorily as a bitch, what else has

1443

been said to you about the case?

JUROR 402: Nothing. That's -- he just -- that was a word he used, you know, before I could -- I was speaking at the same time. You know, I mean, he got it out, and I just --

MR. BERRIGAN: No, we understand you have no control over those folks. I was just wondering if there was anything else anybody said to you.

JUROR 402: No, but I'm putting my foot -- what I'm saying, I'm trying to put an end to it right now. Either they're going to do something or I'm going to basically tell them I won't show up Fridays.

Page 5

MR. BERRIGAN: Is one of the options that's under consideration that you could be paid even though you're not working on Friday?

JUROR 402: I've done my research there already. Other people that's been on jury, they get paid for the full week, but usually they're going five days a week, you know. And they're -- I've not yet seen the policy, but they do pay you, but since I'm not on juror Friday, the payroll person, Dale, told me I had to report for work because they're paying me.

MR. BERRIGAN: I see. That's all I had, sir. Thank you, sir.

THE COURT: Have you spoken about this to any of the other jurors?

JUROR 402: No, Your Honor.

1444

THE COURT: Okay. I'm going to ask you not to -- no matter what happens, if anything further happens at work, not to ever reveal that to any of the other jurors in the case. And if anything else happens that you think we should be aware of, you just send us another note. And I want to congratulate you and commend you for sending the note. You've done exactly, just exactly, what we would hope jurors would do. And I'm sorry you have to go through this at work.

JUROR 402: I got a question.

THE COURT: Sure.

JUROR 402: I'm not legal minded, so what is their responsibility? Will you make it clear to me?

THE COURT: Well, their responsibility -- it's what I would call kind of a gray area. I'm not sure they have any responsibility technically, but I think what a good employer

Page 6

would try and do would be to get word out to every employee not to discuss in any way this case with you and not to ask you about the fact that you're a juror or talk to you in any way about it. I think that's what a good employer would do. I'm not sure they're legally obligated in a sense to do that, but that's what a good employer would want to do, I would think.

JUROR 402: Okay. Thanks.

THE COURT: Okay?

JUROR 402: Yep.

THE COURT: Okay. Well, you've done terrific, and we

1445

congratulate you for doing such a good job in bringing this to our attention. And if any further issues arise like this, you please bring it to my attention; okay?

JUROR 402: Okay.

THE COURT: Okay. Thank you. I guess you might as well just stay up here because we're going to bring the rest of the jurors in.

Let me ask the lawyers, is there anything else we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. Why don't we just bring the jury in. It's about a minute early, but they should be here. Thank you so much, Juror 402.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated.

Is the government ready to call your next witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls Peggy Baca.

Page 7

THE COURT: Please be seated in our witness box. And try and adjust the chair and those microphones. Can you scoot up as close as you can? And then adjust the microphones so you can speak directly into the microphones. And you can pull that other one over a little bit too, and state your full name and

1446

spell your last name.

THE WITNESS: Peggy Ann Baca. It's B-a-c-a.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Baca, you were formerly known as Peggy Weber?

A. Yes, sir.

Q. And if you would, try to make sure you speak into those microphones. They only pick up your voice if you're a couple inches away.

What I'd like to do for just a few minutes is have you share a little bit about yourself to this jury. How old of a woman are you, ma'am?

A. On April 8 I turned 51.

Q. And how far did you go through school?

A. I graduated high school and have two years of college.

Q. What type of study did you engage in in --

A. It was a business course.

Q. Where are you from?

A. I was born and raised in Dubuque, Iowa, but then moved to the Quad Cities, lived there for a few years, and then Maquoketa

Page 8

where I was a shelter administrator for 14 years, Humane Society.

1447

Q. Tell a little bit about that job. You were the shelter provider? Is that what you said?

A. Well, administrator.

Q. Administrator.

A. I actually did all kinds of things for the shelter. I did their public speaking, their fund raising, the daily operations of the shelter, the adoption of the pets, and, inevitably, if they had to be put down. I also had training that I was a certified euthanasia technician that I actually put the animals to sleep too.

Q. And how long did you do that? Fourteen years?

A. Fourteen years.

Q. And did you have any formal education other than your business classes that equipped you for that job?

A. No, I just -- I answered an ad in the Quad City Times that they were looking for a manager, and I talked to the then president of the Humane Society, and he hired me.

Q. Are you married, ma'am?

A. Yes, sir.

Q. And any children?

A. I have three.

Q. And what are their ages?

A. John is 27; Dan is 24; and Lindsey's 22.

Q. Currently you're incarcerated.

A. Yes, sir.

1448

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1268 of 3592

Q. And for what crime, ma'am?

A. A drug conspiracy charge.

Q. What type of drug were you involved with?

A. Both methamphetamines and cocaine.

Q. And did you -- was that state or federal charges?

A. It was a federal charge.

Q. Did you plead guilty, or did you go to trial on that charge?

A. No, I pled guilty.

Q. Was that pursuant to a cooperation plea agreement that required you to cooperate and provide information to the government?

A. In any criminal investigation, yes, sir.

Q. And did you, in fact, provide any cooperation to the government at the time that you were -- or before you were sentenced on your charge?

A. Yes.

Q. And did you get any reduction in your sentence?

A. No, no, sir.

Q. Since you've been incarcerated, have you received any reduction in your sentence?

A. No, sir.

Q. What type of sentence did you receive, ma'am?

A. 144 months, 12 years.

Q. And you were actually sentenced on July 6 of 2001?

1449

A. Yes, sir.

Q. So how much more time do you have left?

A. 72 months with good time.

Q. Do you have any other prior convictions, criminal

Page 10

convictions?

A.   No, sir.  I was never in any trouble before I made the worst mistake of my life when I got involved in what I did.  I'm truly sorry for it.

Q.   No other convictions whatsoever.

A.   No.

Q.   At some point did you provide some information to the government concerning your knowledge of Angela Johnson?

A.   Yes, sir.

Q.   Could you explain to the jury how did that work?  Did you alert the authorities that you had information?  Did they come to you?  How did that happen?

A.   It was after I had a conversation with my attorney on my own case, and he informed me that Judge Bennett had made a ruling on Angela Johnson's Massiah hearing or suppression hearing and that --

Q.   Ma'am, just at some point did you -- did you contact the authorities and indicate a desire to assist, or did they contact you?

A.   No.  We contacted them.

Q.   Okay.  And as a result of your contacting them, were you,

1450

in fact, interviewed at some point?

A.   Yes.

Q.   And did you testify before the grand jury?

A.   Yes, I did.

Q.   And again, at least up to this point you've not received any reduction in any sentence.

A.   No, sir.

Q.   So let me ask you this:  Do you understand that there's a

Page 11

possibility for a reduction in your sentence?

A.   Yes.

Q.   And could you explain to the jury what you understand how that would happen?

A.   Well, I was told that if and when the government decided that I was help to them or substantial assistance that they would -- through a phone conference that they would let me know what's going on.  I haven't been promised anything.

Q.   Who do you understand would ultimately make a decision on whether you get a reduction in your sentence?

A.   The government.

Q.   And would a judge be involved in this process at all?

A.   Yes, I believe that after the government makes a recommendation the judge decides is the way I understood it.

Q.   And has anybody promised that you're going to get a reduction?

A.   No, sir.

1451

Q.   At some point did you spend some time in the Linn County Jail in Cedar Rapids, Iowa?

A.   Yes.

Q.   And was that beginning in February, approximately February 15 of 2001?

A.   Yes.

Q.   And how long did you stay in the Linn County Jail?

A.   Until the middle of August of the same year, 2001.

Q.   Could you describe for the jury a little bit about the Linn County Jail setup?  Different jails have different units, and they call them different things.  What type of units -- what are they called in the Linn County Jail?

Page 12

A.   Well, I originally was in N block.

Q.   N as in Navy?

A.   Pardon me?

Q.   N as in Navy?

A.   Yes, sir.

Q.   Okay.  And so there are different blocks, and they go by letter designations?

A.   Yes.

Q.   And while you were in N block, approximately how long were you there if you recall?

A.   Until right after Memorial Day.  Then they moved me to M block.

Q.   M as in Mary?

1452

A.   Yes, sir.

Q.   During the time period that you were in N block, did you have contact with inmates from other blocks within the jail?

A.   Yes, all the time.  They would take us to the rec. area, the gym upstairs, or to Bible studies or any other kind of meetings there were, yes.

Q.   So through that process you could actually have contact with other inmates not even in your block.

A.   Yes.

Q.   Now, are male and female inmates kept separate?

A.   Yes, they are.

Q.   Just based on your own experience, ma'am, does communication occur between male and female inmates within the Linn County Jail regardless?

A.   Yes, it did.

Q.   As a result of being in N block but having access to these

Page 13

other things, the Bible study and the rec. and that kind of stuff, did you come into contact with Angela Johnson at any point while you were in N block?

A.    There were a few times when I was across the room in a small storage building -- not a building but a small closet storage area that they had that there was some conversation, very little because I didn't know her that well then.

Q.    And once you moved to M block, did you -- was Angela Johnson in M block?

1453

A.    Yes, she was.

Q.    And while you were in M block, had she been in M block?

A.    Yes.

Q.    And so once you got shifted over to M block after Memorial Day in 2001, did you have more contact with Angela Johnson?

A.    Every day, on a daily basis.

Q.    During the time period you were in M block with her, just explain to the jury what type of contact would you have had with her on a daily basis.

A.    Well, we -- naturally we -- unless we went out of the block for something, we were always there, so we watched television. We would visit.  We would talk about things.

Q.    And you were there in M block from Memorial Day of 2001 till the middle of August of 2001.

A.    Yes, sir.

Q.    During that time period, could you describe for the jury how did your relationship with Angela Johnson develop?

A.    Well, there was a spiritual connection between Angela and I, and we -- she would ask that I would pray for things for her, and we shared a daughter that was around the same age.  Her

Page 14

daughter, oldest daughter, and my daughter were the same age, so we had that in common. We talked about our families.

Q. By the time you hit mid August, would you say that you were friends with Angela Johnson?

A. Yes.

1454

Q. Did Angela Johnson have other friends within M block?

A. Yes. You know, she -- yes, she had a few others. I don't think there were a whole lot of them that she was close to, but yes.

Q. Who were some of the others that she was close to if you recall?

A. Well, I remember there was -- and she wasn't -- she was in the block for a while, Angela Euans. They were good friends. Valli Williams, they became good friends.

Q. What was Angela Johnson like there in the M block during that time period?

A. Angie could be like a chameleon. She could be very kind. She was very artistic, so she did artwork for a lot of people. She -- and on the other hand, she could be very cruel. She could fly off the handle about something somebody said or the way someone acted. So she -- you never really knew how Angie was going to be. She could be both kind and mean.

Q. You indicated during the time period you were in the M block with her that you shared information with each other about your past and about yourselves; is that right?

A. Yes.

Q. Did she tell you anything about her involvement in any criminal activity during that time period?

A. Well, normally we avoided those kind of conversations. I

Page 15

mean, I knew that she had been, in her past, involved with meth

1455

and that she had used it.

Q. She indicate to you anything about her involvement with dealing meth or selling meth?

A. Mostly to me she said she used it.

Q. Did she ever mention anybody by the name of Dustin Honken to you?

A. Yes, she did.

Q. And what did she tell you about Dustin Honken?

A. Well, that that was her boyfriend, that was the father of her youngest daughter Marvea, and that they -- the meth thing was theirs. They did that together.

Q. And when you say they did that together, what did she tell you that she and Dustin Honken did together if you recall?

A. Used the product.

Q. Do you recall her saying anything about dealing large amounts of methamphetamine?

A. Not to me she didn't, no.

Q. This has been many years since you had some contact with Angela Johnson. Do you recall being interviewed on August 22 of 2002 by some law enforcement officers about your knowledge of Angela Johnson?

A. Yes, I do.

Q. Do you recall telling the investigators at that point that Angela Johnson told you that she and Dustin Honken were dealing large quantities of methamphetamine but did not state where the

1456

Page 16

drugs were coming from? Does that sound familiar?

A. Yes.

Q. Did she tell you anything about the methamphetamine itself, whether it was good, bad, how it was made, anything like that?

A. Well, not how it was made, but yeah, she said it was good. She said she used it. She was a user and a heavy user.

Q. Did you ask her about the charges she was in for?

A. I tried to avoid talking to Angie about her case because that was something that -- you know, that was the first thing you heard about when you entered Linn County Jail. You were told about Angie, the baby killer and what had happened. So I was aware, you know, of her charges that way. I didn't know a whole lot about them but, you know, what they talked about in jail, and I believe I had at one time read an article too about her having been in Benton County Jail trying to commit suicide after drawing some maps to the bodies. I had read that.

Q. Did you have any conversations with her just generally about people who cooperated for the government and informed for the government?

A. Well, yeah. She -- at that time I believe Anthony Flowers was in the jail at the same time, and she wasn't -- she had nothing really good to say about anybody that cooperated with the government.

Q. Anthony Flowers was a bank robber?

A. Yes.

1457

Q. Did she ever have any terms she used for referring to people who cooperated for the government?

A. Snitch.

Q. Now, you indicated you were aware at some point through

Page 17

reading an article that there was some attempted suicide in Black Hawk County. While you were in Linn County with Angela Johnson, were you aware whether she had any type of special treatment -- and I don't mean beneficial treatment -- but different treatment from the other inmates as a result of any concern over suicide?

A. Yes, whenever -- we got razors twice a week in the cell block, and whenever they came in in the morning, Angela was taken out. She had to leave.

Q. And where was she taken to?

A. To that storage closet, that storage room that was directly across from M block. It had a desk and a radio in there.

Q. And during that -- and she would be kept in there as long as the other female inmates had razors in the M block.

A. Or until the correction officer decided to put -- you know, bring her back, yes.

Q. Now, during that time period did she have anybody else who would sit in that room with her with the desk and the radio?

A. Yes, she usually took somebody, and eventually it was me she asked that I spent several -- several Thursday mornings over there with her.

1458

Q. And on those mornings you would spend with her over there, is that when some of these conversations took place that you would share information about each other?

A. Yes.

Q. Now, you were sentenced on July 6 of 2001; is that correct?

A. Yes.

Q. You received no reduction for cooperation at that time.

A. No, sir.

Page 18

Q.    Were you actively doing anything to cooperate with the government at that point?

A.    No, sir.

Q.    At some point after your sentencing on July 6 of 2001, did you have one of these occasions when you were in this room with Angela Johnson when the topic of the murders came up?

A.    Yes.

Q.    And could you explain to the jury how did that topic come up?

A.    Well, as usual, when we were over there, Angela always asked that I would remember her in prayer and her situation and the fact then that --

Q.    Let's -- and that's enough at that point.  But she asked if you would keep her in prayer.

A.    Uh-huh.

Q.    And then at some point did the topic of the actual murders come up?

1459

A.    When I brought it up, yes.

Q.    And could you explain to the jury, first of all, it's just you and Angela Johnson in this room?

A.    Yes.

Q.    And how long were you in this room that day when the topic of the murders came up?

A.    It was at least an hour, an hour and a half.

Q.    And tell the jury, how did you bring up the topic of the murders?

A.    Well, when Angie had asked me to remember that because there hadn't been a decision in those Massiah hearings --

MR. WILLETT:  Objection, Your Honor.  Ask that the --

Page 19

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1278 of 3592

first of all, I ask that my objection precede the answer. The witness's answer was nonresponsive to the question. There was no way for me to interpose a timely objection, ask that my objection be allowed to precede the answer and that the answer be stricken.

THE COURT: Sustained. The jury's to disregard the last answer and . . .

MR. WILLIAMS: I'll reword the question.

THE COURT: Okay.

BY MR. WILLIAMS:

Q. In every case -- there's a bunch of motions in every case, and that's not important here, okay, so let's not refer to any of the motions or anything else that occurred, but I'm just

1460

going to ask you did you, in fact, ask her to tell you about the murders?

A. Yes. I asked Angie, I said, Angie, I need to ask you a question. And she was sitting there. And I didn't even know whether she was going to answer me or not, and then she said, What? And I said, Angie, did you do it? And she said that -- said, I was there. I helped tie them up. And I said, Well, how were they killed? She said, Shot execution style. I said, Angie, the kids too? And she said, Starting with the adults. And I said, I don't even want to hear anymore. I said, And if I were you, I would never repeat to anybody ever again because you never know who you might be talking to.

Q. Did you ask her any more questions --

A. No.

Q. -- about the murders at that point?

A. No, sir.

Page 20

Q. Did she attempt to volunteer any more information?

A. No, we never talked about it after that.

Q. During the time period that she made those few statements to you, did you have an opportunity to look at her face and see what kind of demeanor she had?

A. Yes.

Q. And could you explain to the jury, what did you observe?

A. Very little -- no remorse, very little -- very little emotion at all, just matter of fact answer your question. You

1461

know, I asked a short question. I got a short answer.

Q. Did you say anything else in response other than don't talk to any -- or don't say anything more and be careful who you talk to?

A. No, that was the end of that conversation.

Q. Now, this happened some time after your sentence in August -- I'm sorry, July 6 of 2001, and you left in mid August of 2001. Did you have much contact with Angela Johnson after that incident?

A. Every day.

Q. And how, if any -- what, if any, change occurred in the relationship you had with Angela Johnson at that point?

A. There really wasn't a change. I mean, maybe my prayer changed and content of the way I would pray about the situation knowing -- knowing what I knew then. Wasn't a case of will the truth come out? Well, I already knew the truth then. But still that -- you know, there would be some mercy, that there would be something, you know, some change in her.

Q. The Angela Johnson who told you that she was there, that she helped tie them up --

Page 21

A.    Yes.

Q.    -- and that they were all shot execution style, is she in the courtroom here today?

A.    Yes, she is.

Q.    Can you describe for the jury where she's sitting and what

1462

she's wearing?

A.    To my left, and she's got a blue jacket on.

        MR. WILLIAMS:  I have no further questions.

        MR. WILLETT:  Your Honor, if it please the Court.

                    CROSS-EXAMINATION

BY MR. WILLETT:

Q.    It's Ms. Baca now?

A.    Yes, sir.

Q.    Ms. Baca, my name is Al Willett.  I'm one of the attorneys who are representing Miss Johnson.  You stated to Mr. Williams on direct that you pled guilty to a drug conspiracy involving methamphetamine and cocaine; correct?

A.    Yes.

Q.    And prior to your incarceration, you used methamphetamine and cocaine; correct?

A.    Yes, sir.

Q.    Now, at the time of your guilty plea, you also pled guilty to another criminal charge besides conspiracy; correct?

A.    Yes.

Q.    You pled guilty to Count 4 of the indictment?

A.    I don't know what count it was.

Q.    Count 4 of the indictment dealt with utilizing a person under the age of 18, either employing them, hiring them, using them, to aid and abet the distribution of the drugs which were

Page 22

in question in your case?

1463

A. Yes, sir.

Q. And that person who was under the age of 18 at the time was your daughter Lindsey; correct?

A. Yes, sir.

Q. And you stated to Mr. Williams on direct that at the time of your guilty plea your plea agreement was a cooperation plea agreement; correct?

A. Yes.

Q. And that you did cooperate with the government either before or around the time of your sentencing in the hope to achieve a reduction?

A. Yes.

Q. But you weren't granted a reduction at that time.

A. No, sir.

Q. Why not?

A. Because the -- I -- that's a good question. Because I guess they didn't feel that the information I could give was substantial enough was what I understood.

Q. Okay. And so you were trying to reduce your potential sentence prior to the time of your sentencing, but the information you gave the government was to no avail.

A. You know, I -- more than looking for a sentence reduction at the time, I just wanted the truth to come out. I was ashamed of what I did, and I just wanted the truth out, so I told them anything that they asked including on myself.

1464

Q. Long and -- excuse me, ma'am. Were you finished?

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1282 of 3592

A.    Yes, sir.

Q.    Long and sort of it is you did not achieve a sentence reduction.

A.    That's true.

Q.    So you received a sentence in July of 2001 of 144 months.

A.    That's right.

Q.    And it was based upon the advice or at least based upon your conversations with your attorney that you decided to initiate contact with law enforcement to discuss what you state is your knowledge about Angela Johnson.

A.    Yes, sir.

Q.    And that was after the point in time where you had initially cooperated with the government to see if you could get a sentence reduction but you had already been told no thank you.

A.    Yes, sir.

Q.    And you stated on direct that your understanding of how the system works in regards to sentencing reduction is that the government has to make a motion for substantial assistance before the court can do anything; correct?

A.    Yes.

Q.    So the United States Attorney's Office for the Northern District of Iowa in your case is the initial filter to decide, A, if your assistance is substantial; correct?

A.    Yes.

1465

Q.    And, B, they have to make a judgment on your credibility; correct?

A.    Yes.

Q.    They have to decide if you're telling the truth; correct?

A.    Yes, sir.

Page 24

Q. And at least your understanding of why your initial cooperation was not accepted is it did not measure up to substantial assistance. That was your understanding.

A. They never told me why, but I assumed that. I told them what I knew. That's all I could do.

Q. So you don't know if the government had problems with your credibility or not in the first go-around.

A. They never said they did.

Q. And this storage area or storage closet area that you've described to the jury, this was a very small room; correct?

A. Yes, it wasn't very big.

Q. I mean, besides a table and a radio and a couple chairs, you weren't going to get many more people in there, were you?

A. Sometimes there was -- I've known them to take three people over there, yeah.

Q. But in terms of any of the conversations that you've stated that you had with Miss Johnson, it was you and Miss Johnson in the room, nobody else; correct?

A. That's correct.

Q. And you had a spiritual connection, and you prayed for her.

1466

A. Yes, sir.

Q. Prayed for her prior to this conversation that you've stated.

A. Yes.

Q. And you considered yourself to be a friend of the defendant.

A. Yes.

Q. And you said that she had some good qualities, that she could be very kind.

Page 25

A.    Yes.

Q.    That she was artistic.

A.    Yes.

Q.    That she could draw.

A.    Yes.

Q.    And then you testified that moods could change.

A.    Yes.

Q.    Wouldn't that be true of any of the ladies incarcerated in the jail? Couldn't their moods change, ma'am?

A.    Yes.

Q.    Okay. I assumed that there were days when you might have good days and you might have bad days.

A.    Yes.

Q.    And it was your understanding from what you told Mr. Williams on direct that in regards to methamphetamine your understanding was that Miss Johnson's involvement was mostly the

1467

use of methamphetamine.

A.    I understood it that way, yes.

Q.    And that was an experience that you two could share because my understanding is prior to your incarceration you used methamphetamine.

A.    Yes, I did.

Q.    But there was never any discussion regarding sources of methamphetamine, was there?

A.    No, sir.

Q.    And you stated to Mr. Williams on direct that you tried to avoid talking to Miss Johnson about her legal issues; correct?

A.    Yes.

Q.    But that the moment you walked in the Linn County Jail that

Page 26

was the first issue of gossip.

A. Usually, yes, it was.

Q. Everybody knew about Angela Johnson, and everybody knew what the charges were.

A. Well, I don't know that they knew what exactly her charges were, but they knew the involvement, and I'm -- yes, that was a . . .

Q. Then you -- excuse me, ma'am. I'm sorry.

A. Go ahead. I'm done.

Q. You were aware of general allegations.

A. Yes.

Q. General allegations involving murder.

1468

A. Yes.

Q. Murder involving children.

A. Yes.

Q. And that was known across the jail.

A. Yes.

Q. Okay. And I was confused for a second. I believe you said you knew something about Miss Johnson's attempted suicide and it was your knowledge that that happened in the Benton County Jail?

A. Yes.

Q. Okay. And she would ask you -- during this time after you moved into M block, she would ask you to keep her in your prayers; correct?

A. Yes.

Q. And you would do that.

A. Yes, I did.

Q. Okay. And so then we get to this conversation that you've related to Mr. Williams that occurred in this storage closet.

Page 27

A.    Yes.

Q.    And this was an occasion when it was just the two of you there.

A.    Yes.

Q.    No other witnesses.

A.    No, sir.

Q.    Nobody standing at the door listening to the conversation.

A.    No, sir.

1469

Q.    "I was there," she didn't tell you where there was, did she?

A.    No.

Q.    "I helped tie them up," she didn't say who she helped tie up, did she?

A.    No, she didn't.

Q.    She didn't say when she helped tie anybody up, did she?

A.    No, she didn't.

Q.    She didn't say where she helped tie anybody up, did she?

A.    No, she didn't.

Q.    Shot execution style.

A.    Yes, sir.

Q.    The adults first.

A.    Yes.

Q.    She never said that she pulled the trigger, did she?

A.    No, she didn't.

Q.    She never said that she killed any adults, did she?

A.    No, she didn't.

Q.    She never said she killed any children, did she?

A.    No, she didn't.

Q.    And then my notes reflect that on direct you told

Page 28

Mr. Williams that at the end of this conversation I'd never -- you said to Angela, I'd never say that again; you never know who you're talking to.

A. I said I would never repeat that to anybody ever again

1470

because you never know who you might be talking to, yes.

Q. Never know you might be talking to a cooperator; correct?

A. At that time that wasn't in my thoughts, no.

Q. But at that time you had already tried to cooperate once with the government and been rejected; correct?

A. Like I said, I was just telling them the truth in my situation, not even knowing it was cooperation for anything.

Q. Thank you, ma'am, but I'm not sure that was responsive to my question. At the time that you state that you had this conversation with Angela Johnson, you had already cooperated with the U.S. Attorney's Office for the Northern District of Iowa in your own case, and your cooperation did not measure up and had been rejected prior to this conversation; correct?

A. Yes.

Q. And you stated to Mr. Williams at the end of his direct, I already knew the truth then. All you know is what was relayed to you in this one conversation that you claim occurred; correct?

A. Yes.

Q. And based upon what you and I have discussed in the last few minutes, there's a lot that you don't know; correct?

A. I suppose there could be.

MR. WILLETT: Just a second, Your Honor.

Your Honor, thank you.

THE COURT: Mr. Williams?

Page 29

MR. WILLIAMS: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. You were asked some questions about how Angela Johnson behaved in the Linn County Jail. Do you remember that line of questioning from the attorney?

A. Yes.

Q. Can you explain to the jury, within that M block how many other female inmates were there just approximately?

A. Fifteen, sixteen.

Q. What was Angela Johnson's behavior as with regard to who was in control of that block?

A. Angela was always in control of the block. She sat where she always sat for meal time, and everybody knew that they didn't mess with her because she could be cruel.

Q. Didn't -- was she influenced easily by other people?

A. No.

Q. The attorney was asking you what you don't know about this case. Are you alleging that you know any more details than what you testified about here today?

A. No, sir.

Q. Without getting into the details of exactly why, at some point did you have concern about whether or not Angela Johnson would ultimately be held accountable for what she told you she did?

MR. WILLETT: Your Honor, I object. It's beyond the

scope of the cross-examination.

THE COURT: Overruled. You may answer.

A. Would you --

Q. Yeah, if you could -- and just try to answer that yes or no if you can. At some point as a motivating factor for you to come forward, did you have a concern that Angela Johnson might not be held accountable for what she told you she did?

A. Yes.

Q. Can you just --

A. Yes, sir.

Q. The cooperation you had provided before that the defense attorney had talked to you about, was that on your own case? In other words, was that on your own criminal involvement and what you did and what people did with you?

A. You're asking me --

Q. Yeah. That's a bad question. Let me rephrase.

The defense attorney was asking you about the fact that you had previously attempted to cooperate with the government and you ultimately didn't get a motion, and I just want to clarify, that prior cooperation, that have anything at all to do with Angela Johnson?

A. No, sir.

Q. Was that on your own charges?

A. Yes, sir.

1473

Q. And then ultimately you were asked the question by the defense attorney about whether it is the government who has to make the decision on whether you're credible or not. Do you remember that line of questioning?

A. Yes.

Page 31

Q.   Is it your understanding that ultimately the judge would have to make the determination about whether you were credible and deserving of a reduction in your sentence?

A.   Yes.

Q.   Ultimately, ma'am, is it fair to say you're hoping that you might get a reduction in your sentence here?

A.   Yes.

Q.   Are you motivated by any other reason for testifying here today?

A.   I think that for anybody to say that when they give cooperation in any kind of criminal investigation that they aren't hoping or at least praying for some kind of -- some kind of motion for a downward departure, and in my case I'm no different.  Yes, I hope so, but -- and I'll be very thankful if it happens.  But that wasn't the only reason that I came forward.  I felt like this was the right thing for me to do no matter what happened.

          MR. WILLIAMS:  Thank you.  No more questions.

          THE COURT:  Mr. Willett, any recross?

          MR. WILLETT:  Just briefly, Your Honor.

                                        1474


                    RECROSS-EXAMINATION
BY MR. WILLETT:

Q.   Ms. Baca, on redirect Mr. Williams talked to you just a moment ago about the decision process that goes into filing these motions for a reduction of sentence and the determination of credibility.  Do you remember that discussion with Mr. Williams?

A.   Yes.

Q.   And he discussed with you that ultimately the court has to

Page 32

make a decision on your credibility; correct?

A.    Yes.

Q.    But the court can't even make that decision if the motion's not filed; correct?

A.    That's my understanding.

Q.    And the only entity that can file that motion to get the process rolling is the United States Attorney's Office in this case for the Northern District of Iowa; correct?

A.    I think so, yes.

Q.    Okay.  So initially they have to make a determination regarding your credibility; correct?

A.    I think so.

        THE COURT:  Mr. Williams, anything further?

        MR. WILLIAMS:  No, Your Honor.

        THE COURT:  Okay.  You may step down.

        Why don't we take a stretch break.

1475

        Is the government ready to call its next witness?  And who might that be?

        MR. WILLIAMS:  United States calls Mickie Yager.  And, Your Honor, this is also another incarcerated witness, so it may take a few minutes for the marshals to transport.

        THE COURT:  Okay.

        MICKIE YAGER, PLAINTIFF'S WITNESS, SWORN

        THE COURT:  Okay.  Please be seated in the witness box.  Try and adjust the chair so you can speak directly into the microphones.  And you can move those microphones and scoot the chair up, pull the microphones a little closer.  And when you're ready, would you please state your full name, and would you spell your first name and your last name, please.

Page 33

THE WITNESS:  Mickie Yager, M-i-c-k-i-e Y-a-g-e-r.

THE COURT:  Thank you.

Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q.    Miss Yager, I'd like you to just start off by sharing a little bit of information about yourself with this jury.  How old are you, ma'am?

A.    I'm 32.

Q.    And how far did you go through school?

A.    I graduated high school, almost two years of college.

1476

Q.    Where did you attend college at?

A.    Northeast Iowa Community College, Tarrant County College.

Q.    Did you have a specific area of study while there?

A.    No.

Q.    Since that time have you received any additional training or education?

A.    Yeah, I've tooken college classes in -- while I was in Carswell, Texas.

Q.    And what type of study did you engage in there?

A.    I took a human relations class, business law, and accounting.

Q.    Prior to your incarceration, did you have a trade or employment that you engaged in?

A.    I was a chiropractic assistant.  I was going to school for X-ray.

Q.    How many years did you do that before you got incarcerated?

A.    Not quite a year.

Page 34

Q. Before that what type of work did you do?

A. Before the chiropractic assistant?

Q. Yes, ma'am.

A. I worked in a factory also.

Q. Where are you from?

A. Dubuque, Iowa.

Q. And did you -- born and raised there?

A. Yes.

1477

Q. Are you married, ma'am?

A. No.

Q. Any children?

A. No.

Q. Currently you're incarcerated, so let's talk about that for a moment. What are you currently incarcerated on, what charge?

A. Possession of pseudoephedrine.

Q. And was that a state or a federal charge?

A. Federal.

Q. Out of the Northern District of Iowa?

A. Yes.

Q. Did you go to trial or plead guilty to that charge?

A. I pled guilty.

Q. And what type of sentence did you receive?

A. 163 months.

Q. When you pled guilty, ma'am, was that pursuant to a cooperation or noncooperation plea agreement?

A. Noncooperation.

Q. So you did not choose to cooperate with the government on the criminal information you had at that point.

A. Correct.

Page 35

Q.    So is it fair to say you did not get a reduction in your sentence at the time of your sentence for any cooperation you had provided to law enforcement?
A.    True.

1478

Q.    And since you've been incarcerated, have you received any reduction in your sentence for any cooperation you provided?
A.    No.
Q.    Other than the current charge that you're doing time for which is a felony offense, you have a history of some other misdemeanor convictions in your past.  Is that fair to say?
A.    Yes.
Q.    Some alcohol-related, things like that.
A.    Yes.
Q.    Some thefts maybe?
A.    Uh-huh, yes.
Q.    Any other felony offenses?
A.    No.
Q.    How much time do you have left, ma'am?
A.    Well, I received a minor role reduction through an appeal, and that knocked me -- they resentenced me to 132 months.  My release date right now is 2012.
Q.    Do you recall on August 22 of 2002 you were called to the grand jury to provide information, if any, you knew about Angela Johnson?
A.    Yes.
Q.    Had you previously offered in any way to cooperate in the investigation against Angela Johnson?
A.    Yes, I think I talked to my attorney, and then I was questioned by the prosecutors right before the grand jury.

Page 36

Q.   And why is it -- I mean, did you reach out to the government and indicate, Hey, I've got information about Angela Johnson?  Did they come to you?  How'd that work?

MR. BERRIGAN:  I'm going to object to the leading nature of the questions, Your Honor.

THE COURT:  Overruled.  You may answer.

A.   What was the question?

Q.   Yeah.  How did it work?  Did you reach out to the government?  Did the government reach out to you?  How'd it come about that you ended up talking to the government?

A.   I talked to my lawyer, and the lawyer got in touch with Pat Reinert I believe.

Q.   What motivated you to talk to your lawyer?

A.   Probably hopefully a sentence reduction.  When I talked to my lawyer about it, he was there, you know, when they questioned me and everything, and they mentioned a sentence reduction. That was on my mind.

Q.   So let's explain that to the jury.  What's your understanding about how it could come about that you might get a reduction in your sentence for cooperation?

A.   Well, there was like no promises or no guarantees.  It's just I guess afterwards I can hopefully file a motion for a Rule 35.  They might give you some time off.  They might not. Repeatedly they told me there was no guarantees and no promises.

Q.   Who do you understand at least makes the initial decision

about whether this comes before a judge or not?

A.   I'm not sure.

Q.   Do you understand at some point that it comes before a judge or not?

A.   Yes.

Q.   And is it ultimately and based on your understanding up to the judge or up to somebody else to determine whether you get a reduction?

MR. BERRIGAN:  I'll object to that.  Lack of foundation, Your Honor.

THE COURT:  Overruled.  You may answer if you know.

A.   Up to the judge.

Q.   And that's your understanding.

A.   Yes.

Q.   Let's talk about Angela Johnson.  Could you indicate, first of all, was there a period of time that you were doing -- that you were actually incarcerated at the Linn County Jail in Cedar Rapids, Iowa?

A.   Yes.

Q.   And during what time period was that if you recall?

A.   Like the end of May.  May 26 I believe was the day I turned myself in there, and I think I was in that same cell block maybe three months.

Q.   And that was of 2001?

A.   2002.

1481

Q.   2002.  And you were there for about three months.  Were you assigned to a particular block within the Linn County Jail?

A.   Yes, I was assigned to N block.

Q.   N as in Nancy or Navy?

A.   Yes, Nancy.

Q.   And did you remain in that block throughout the time period

Page 38

you were in the Linn County Jail?

A.   I remained there for I think about three months, and then I was moved to M block as in Mary, and I remained there for like a month I think before I left for prison.

Q.   At some point while you were in N block, did you come to know Angela Johnson?

A.   Yes.

Q.   Was she in N block with you?

A.   Yes.

Q.   And did she remain in N block with you the entire time you were in N block?

A.   Yes.

Q.   When you moved to M block, did she move to M block as well?

A.   No, she stayed in N.

Q.   So your contact with her was during the time period you were in N block.

A.   Yes.

Q.   Could you describe for the jury how did your relationship or contact with Angela Johnson develop over the three months you

1482

were in N block with her?

A.   We got along.  We were friends.

Q.   Did you start off real close, or was this something that grew over time?  Did you grow apart?  Could you just kind of walk the jury through that a little bit?

A.   Well, we were in a real small block.  There was just three of us.  And you just get to know each other, I mean, through that.  I mean, it's the only other -- you know, there's three of us, and you're there all day together locked out, sleeping on the floor next to each other.  Just, you know, reading --
Page 39

watching the same TV shows. You're just there with each other, really close.

Q. We had heard earlier that M block has like 15 inmates in it, but N block only has 3?

A. It only had three at the time. I think it has the ability to hold -- there's like maybe five cells there, but there was just the three of us there.

Q. And the three of you, was it the same three people throughout the time period that you were there in N block?

A. Yeah. Occasionally someone might have came in, spent the night there, and then left; and maybe a couple inmates maybe came in and stayed -- I don't know -- a couple weeks or maybe a couple months -- I'm not sure -- came in and out.

Q. Who was the other person in N block with you and Angela Johnson?

1483

A. Brandy Byrd.

Q. Over the course of the three months that you were in N block with Angela Johnson, did you come to the point where you shared information with each other about your background, about your charges, things like that?

A. Yes.

Q. And by the time you got done with the three-month period in N block, how would you describe your relationship with Angela Johnson?

A. We were friends.

Q. At some point did she tell you about her background?

A. Not so much her, like, growing up or anything really.

Q. She didn't really confide in you anything about her growing up history or anything like that?

Page 40

A.    Not really.

Q.    Did she at any point -- let me ask it this way.  Did she tell you anything about her criminal background?

A.    Yeah.  There was an instance where we talked about her case for a while.

Q.    And I'm going to get to that in a moment.  Did she tell you anything just generally about her involvement with drug activity?

A.    Yes.

Q.    What do you recall she told you about her drug activity?

A.    Well, we were talking about methamphetamine and, you know,

1484

good dope, and she had talked about Dustin being able to manufacture two different kinds of dope, anhydrous and red phos.  She had talked about Dustin selling a recipe for meth in prison and that someone gave her $2,000 for it.

Q.    Did she tell you about when Dustin was involved in manufacturing this methamphetamine where it was taking place at?

A.    No.

Q.    Did she indicate to you what her involvement was with the methamphetamine once it was manufactured by Dustin?

A.    We talked about use, using it.  I know she talked about selling it.  Specifically one instance I guess she maybe fronted somebody, gave someone the dope without getting any money for it and was still owed this money.

Q.    Do you recall her telling you how much dope or meth she fronted on that occasion?

A.    I think it was two ounces maybe.

Q.    Did she give you any idea of, you know, the time period during which she was doing this selling involved with Dustin

Page 41

Honken?

A.    No.

Q.    She tell you actually who she ended up selling to at all?

A.    Not specifically, no.  I think she just talked about the -- it was a female.  I remember it was a female she was talking about owing her for it.

Q.    Did she indicate how much money she was owed for it?

1485

A.    No, I don't think so.

Q.    At some point when you were in the Linn County Jail, did you learn generally what the nature of the charges were against Angela Johnson?

A.    Yes.

Q.    And prior to coming to the Linn County Jail, did you know anything about her case?

A.    No.

Q.    Had you read anything about it in the papers or anything like that?

A.    No.

Q.    And did you go directly into N block?

A.    Yes.

Q.    Did you, while you were in the Linn County Jail, learn any information about her case from other inmates or other sources while there?

A.    No.

Q.    At some point while you were in the jail there you indicated that Brandy Byrd was another inmate with you in that N block; is that right?

A.    Yes.

Q.    What was the relationship like between Angela Johnson and

Page 42

Brandy Byrd?

A. They were friends.

Q. What was Brandy Byrd in for?

1486

A. Murder.

MR. BERRIGAN: Object as to the relevance of Brandy Byrd's prior record, Your Honor.

MR. WILLIAMS: It lays a foundation for how they came to share information.

THE COURT: Objection's overruled.

BY MR. WILLIAMS:

Q. Did there -- was there a friendship between Brandy Byrd and Angela Johnson?

A. Yes.

Q. During the course of that three-month time period in N block, do you recall there being a puppet show at some point?

A. I never saw the pup --

MR. BERRIGAN: I'm going to object to that, lack of foundation. This witness didn't observe any puppet show.

THE COURT: Well, we're entitled to find out whether she did or not. All he asked is if she knew about it, so the objection's overruled.

A. Yes, I knew about it.

Q. And how did you know about it?

A. Angela told me.

Q. And what did Angela tell you about the puppet show?

MR. BERRIGAN: Object as to the relevance of this puppet show, Your Honor.

THE COURT: Overruled. You may answer.

1487

Page 43

A.    Angela had told me that for entertainment one time her and Brandy and maybe another inmate or two before I was there had put on this puppet show where there was a do-gooder neighbor who was getting involved in all their business, so Brandy killed the do-gooder neighbor, and they got rid of the body properly this time by burning it and then just laughed.  It was like a -- you know, like a joke.  They did it to be funny.

Q.    The do-gooder neighbor, did Angela Johnson express comments to you generally about people who cooperate with the government?

A.    Not specifically, no.

Q.    Did she ever have any derogatory comments about or derogatory words for people who were informants?

A.    Besides like snitch or informant, that was about it.

Q.    Was there a time when Angela Johnson was in the -- in a shower and a comment was made concerning boyfriends?

A.    That --

Q.    If you can just say is that a yes or a no?

A.    Yes.

Q.    Okay.  And before we get into that, did Angela Johnson tell you about boyfriends she's had in the past?

MR. BERRIGAN:  Object as to the relevance, Your Honor, without any more specificity as to what boyfriends we're allegedly talking about.

THE COURT:  Overruled.  You may answer.

A.    What was the question?

1488

Q.    Did Angela Johnson tell you anything about boyfriends she had had in the past?

Page 44

A.    Yes.

Q.    And did she tell you who her boyfriends were?

A.    Yes.

Q.    And who was that?

A.    She talked of Dustin Honken.  She talked of a Rodney.  She talked of an ex-boyfriend that was giving her a hard time, maybe like stalking her.

Q.    Do you remember the name of that boyfriend?

A.    Terry.

Q.    So you and Angela Johnson had talked about boyfriends in the past.  I want to move now to this time when she's in the shower and she makes a comment about a boyfriend.  Who all was present at this point?

A.    I believe just me and her.

Q.    And where were you at?

A.    I was sitting out in the common area at a table watching the TV.

Q.    And could you explain for the jury who's never seen N block, were you -- where was the showers at in relation to where you were sitting?

A.    If I'm sitting here at like this big metal picnic table, it's a real small square area.  I'm sitting at a metal picnic table watching the TV right here, and the shower -- there's like

1489

a bathroom stool like right over here to the side right here and a shower right there just off to the side.

Q.    And while you're watching TV, are you and Angela Johnson talking about what's on TV?

A.    Yes.

Q.    Could you describe for the jury what you recall about that

Page 45

conversation?

A.   I was just relaying to her what was going on on this TV show that we were watching or that I was watching.  There was a guy on there, you know, being portrayed as like this wimpy guy.  And as I was telling her what was going on on the TV show, she commented she likes a man who can throw her around, she likes a man who would kill for her and laughed.  It was -- like it was a joke.

Q.   Now, at some point did you engage in some conversations with Angela Johnson about some details about the crimes with which she was charged?

A.   Yes.

Q.   Did the topic of maps ever come up?

A.   Yes.

Q.   What did she tell you about maps?

A.   She had told me that she had trusted somebody, that she drew the map because -- a map to where these bodies were because she trusted somebody in Benton County.

Q.   What did she tell you was going to happen with the maps,

1490

that she believed was going to happen with the maps?

A.   She believed that this guy knew somebody who was going to take the credit, the blame, for these murders and that they needed to know, you know, the details if they were going to take the blame.

Q.   Did she indicate -- this person that she had trusted in Benton County, did she tell you what the name of this person was?

A.   I believe she did.

Q.   Do you recall today?

Page 46

A.   No.  I know the name today, but I don't recall if she's the one who told me.

Q.   Did she indicate to you whether she was worried about the impact of these maps on her case?

A.   Actually at this time I guess she was not because --

Q.   Okay.  Well, then let me ask you this.  Did she indicate to you she was worried about anything else involved in the case?

A.   Yes.

Q.   And what did she tell you about?

A.   There was one witness.

Q.   What about that witness?

A.   There was one witness that she felt could possibly be a threat, but she had a way of discrediting her because she had slept with this girl's boyfriend or husband.

Q.   Did she -- Angela Johnson indicate to you why this witness

1491

might be a threat to her?

A.   It was the babysitter that actually had babysat her kids I guess while -- while this took place.

Q.   And let's talk about while this took place.  Did Angela Johnson tell you what happened when this babysitter was taking care of her child?

A.   She had told me that -- I don't think she specifically said, you know, this person was babysitting while I went and did this.  She just said at the time that it happened this was the babysitter.

Q.   Did she indicate whether she was aware of who was murdered in the case?

A.   Yes.

Q.   What'd she tell you about the victims?

Page 47

A. She told me one victim was an ex-boyfriend, the ex-boyfriend I guess that was stalking her, giving her a hard time. She told me one victim was someone who was going to testify against her or her boyfriend. She told me one victim was a female and her two kids that the witness that was going to testify just happened to be staying with for like a week. I guess the witness had been kicked out of his place with his wife or girlfriend and went to stay with this female that he'd known for a real short time, like a week, and her two kids.

Q. Did Angela Johnson describe for you in any way about how -- the timing between the killings, whether they were all killed at

1492

one time, were there five different killings? How'd that happen?

A. She said the ex-boyfriend was not killed at the same time the other four were.

Q. She indicate whether it occurred before or after the other four if you recall?

A. I don't think I recall.

Q. She tell you anything about on the four that were killed, the witness and the woman and her two kids, about where it happened at?

A. Actually I think she told me that the ex-boyfriend was killed at a different location and was remotely in the same area as the other four and the other four were killed at the same time.

Q. And did she indicate where that was that they were killed at?

A. No.

Q. She had indicated to you that the man was a witness against

Page 48

her and Dustin.  Did she indicate to you whether they had any difficulty in locating that witness?

A.    No.

Q.    Do you recall Angela Johnson providing you with any more details about how these people were killed?

A.    I believe, you know, she told me they were shot.

Q.    She indicate who shot them?

1493

A.    No.

Q.    She indicate anything about the weapon that was used in the shooting?

A.    No.

Q.    Now, is this -- the information that she provided to you about who the victims were and the sequence of the murders and that kind of thing, was this over the course of several conversations?  Was this in a single conversation that she sat down and told you this?  How'd that happen?

A.    I believe that came about in like one conversation.  I was in her cell.  She was showing me a study Bible, and I think the whole thing got started -- the whole conversation got started, I had asked her if Dustin was mad at her because of drawing these maps and getting them two into this predicament, and that kind of started the whole conversation that took place in her cell.

Q.    What did she say about whether Dustin was mad at her for drawing the maps?

A.    She said no.

Q.    Now, during the time period that Angela Johnson -- this time you're in her cell with her and you're talking about the maps and the information she provided to you about these murders, can you describe for the jury what's her behavior like?

Page 49

What's her demeanor like?

A.    What's her demeanor when she's telling me?

Q.    Yes.

1494

A.    Normal.  I don't really know.  The same, the same.  Not emotional or anything.

Q.    The Angela Johnson who told you that she drew the maps to the bodies and told you about her knowledge of the victims in this case, is she in the courtroom here today?

A.    Yes.

Q.    Can you describe for the jury where she's sitting and what she's wearing?

A.    She's sitting right here wearing a black jacket.

          MR. WILLIAMS:  No further questions.

          THE COURT:  Mr. Berrigan?

                    CROSS-EXAMINATION

BY MR. BERRIGAN:

Q.    How are you, Miss Yager?

A.    Fine.

Q.    I wanted to start kind of near the end of where the prosecutor left off, but let me just ask you, did Angela Johnson ever tell you she killed anybody?

A.    No.

Q.    She ever tell you she shot anybody or had a gun and pointed it at anybody?

A.    No.

Q.    Did she ever tell you she was even present when any of these people were killed?

A.    No.

1495

Page 50

Q. This was in 2002 that you had these conversations with her.

A. Yes.

Q. Do you know when these people were supposedly killed?

A. No.

Q. If I told you 1993, would that ring any bells with you?

A. Yes.

Q. If it was 1993, then these conversations you're having with her about these murders were almost nine years later; does that sound about right?

A. Yes.

Q. And she wasn't crying and breaking down when you were discussing this.

A. No.

Q. Okay. Did you know she was on antidepressants at the time?

A. Yes.

Q. Were you aware that Miss Johnson wasn't allowed to be around razor blades when she was in the Linn County Jail?

A. No.

Q. You and she were friends; is that right?

A. Yeah, we got along.

Q. And that was true of Miss Byrd as well, Brandy Byrd?

A. Yes.

Q. Okay. And Miss Byrd, she had not been in jail before, had she?

A. I don't know for sure.

1496

Q. Okay. You yourself had had at least some experience in county jails before the federal case; right?

A. Yes.

Page 51

Q.   You had a series of instances involving driving on suspended licenses.

A.   Yes.

Q.   At least six of those and some instances involving operating while intoxicated or in a drugged condition?

A.   Pardon me?

Q.   Had you had a conviction or more than one actually for driving while intoxicated, in a drugged condition?

A.   I had a driving under the influence of alcohol, one.

Q.   One, okay.  And then a few driving while barred.  I guess that means barred from driving.

A.   Yes.

Q.   Is that right?  And these look like they took place between the time that you were 18 up until 27.  Does that sound right?

A.   Yes.

Q.   Did you have your own substance abuse issues during that period in your life?

A.   Yes.

Q.   And as I understand it, the sentence for which you're serving -- did you say 132 months?

A.   Yes.

Q.   -- that is a drug-related offense involving possession of a

1497

precursor, what the government calls a precursor; right?

A.   Yes.

Q.   And just explain to us what a precursor is.

A.   It's an ingredient used to manufacture methamphetamine.

Q.   Okay.  And this one happened to be pseudoephedrine?

A.   Yes.

Q.   All right.  So when you and Miss Johnson are talking about

Page 52

methamphetamine, you've had some experience along those lines up at that point yourself.

A. Yes.

Q. And so this discussion about Dustin Honken being able to manufacture methamphetamine in two different ways, that was something you were familiar with, wasn't it?

A. Yes.

Q. Okay. None of this came as kind of new news to you.

A. No.

Q. Let me ask you just a couple of questions about some of these other things that we covered, the prosecutor covered with you. Miss Johnson told you about this fellow at the Benton County Jail that she had trusted; right?

A. Yes.

Q. And she admitted to you that that was a mistake obviously; right?

A. Yes.

Q. And she obviously trusted you in discussing these matters

1498

with you.

A. Yes.

Q. And is it true she had discussions with Brandy Byrd about her case as well?

A. I don't know.

Q. You weren't privy to those.

A. No.

Q. Okay. The time that you spent with Miss Johnson, did you -- she strike you as a pretty trusting person?

A. Did I trust her?

Q. No, did she trust you?

Page 53

A.    Oh.   Yeah, I guess so, yes.

Q.    Yeah.   You might have been a little more -- this was her first time in jail, wasn't it?

A.    I'm not sure.

Q.    Okay.   Were you aware I guess from your own perspective -- you probably didn't talk to people about your case, did you?

A.    No, I didn't.

Q.    Yeah.   Because that could have some adverse consequences for you; right?

A.    Sure.

Q.    And one of the things that could happen is that people could turn up later in court and claim that you had told them certain information that you may or may not have told them; right?

1499

A.    Sure.

Q.    And people facing particularly long federal sentences, they have some incentive to do that, don't they?

A.    Yes.

Q.    These questions about what the prosecutor calls cooperators, the term snitch, informant, those are pretty common terms in the penal system, aren't they?

A.    Yes.

Q.    And those people are generally looked down upon by the general population generally.

A.    Yes.

Q.    Nonetheless, you know from your own experience that it's common that there are a lot of people that are informing on other people in the federal prison system, are there not?

A.    Yes.

Page 54

Q.   Okay.  So your understanding today is that you've gotten one reduction already on your original sentence because of a mistake that you were actually a minor participant in the drug conspiracy that you were involved in?

A.   I won a minor role appeal.

Q.   Minor role, okay.  And there were other people that were involved in that drug conspiracy I take it that involved you getting the pseudoephedrine.

A.   I was the only involved.  I didn't have any codefendants.

Q.   Okay.  So when the prosecutor asked you about cooperating,

1500

I guess there wasn't anybody to cooperate against then.

A.   Yeah.  I wasn't -- yes.

Q.   All right.  Now, in terms of this Rule 35 reduction, you know what that is; right?

A.   Yes.

Q.   Rule 35?  And that's an opportunity for you to get yet another sentence reduction perhaps; right?

A.   Yes.

Q.   And that decision is made -- whether or not you're going to have any kind of chance at a Rule 35 reduction, that's made by the gentleman over here on the table to my left, is it not?

A.   Yes.

Q.   Yeah.  They're going to make that determination based on your testimony presumably.

A.   I believe so.

Q.   Okay.  So it certainly would be in your best interests to be as helpful to them as would be at all possible.

A.   Yes.

Q.   I know you said when you arrived at the jail you didn't

Page 55

hear anything about Miss Johnson's case; is that right?

A. I hadn't heard anything before that.

Q. Oh, okay. I misunderstood. I thought you said that even after you got there you hadn't heard anything about Miss Johnson's case or the charges against her.

A. No, just with -- between me and Angela. Occasionally if

1501

there was like an article in the Linn County paper. They did supply us with the paper there.

Q. Yeah. And there were articles occasionally when Miss Johnson might have a court appearance or something of that nature?

A. Yes, I believe so.

Q. And is it true the articles would often include kind of background information about the murders themselves?

A. I don't really remember what kind of detail they were going in at that time.

Q. Well, and you weren't in the Linn County Jail I suppose back in 2000 when these bodies were recovered, were you?

A. I don't believe so.

Q. Okay. And I guess a lot of the women in the Linn County Jail are really there just temporarily, aren't they?

A. I'm not real sure. I mean, there's federal people there waiting to be sentenced, waiting to go to prison, and then there's like local people coming in, doing their jail time.

Q. I guess there's at least a couple of categories of folks. That are folks that are waiting to go to court for sentencing or trial or what not, and there are some people that are actually serving sentences there; is that right?

A. Yes.

Page 56

Q. And because it's a county jail, these are people that would be serving sentences of a year or less. Is that your

1502

understanding?

A. Yes.

Q. And Miss Johnson by the time you arrived there, do you know how long she had been in Linn County?

A. Not exactly, but I know for a while.

Q. Quite a long time.

A. Yeah, maybe a year.

Q. Okay. So she had been there longer than most of the folks.

A. Yes.

Q. I wanted to ask you just a couple of questions about the puppet story. Did I hear you correctly -- let me just check my notes. Brandy Byrd made some of these puppets?

A. I'm not sure who made the puppets.

Q. Well, do you know whose idea it was to have a puppet show?

A. No.

Q. Okay. And did I hear you say Brandy killed the do-gooder puppet, the do-gooder neighbor puppet?

A. Yes.

Q. Okay. Were there any other puppets killed during the puppet show that you know of other than the do-good neighbor puppet?

A. I don't think so.

Q. And are you suggesting the do-good neighbor puppet, does that represent somebody in Angela Johnson's case?

A. I don't know.

1503

Page 57

Q.   You don't know what the puppet show has to do with Miss Johnson's case, if anything at all; isn't that true?

A.   Yes.

Q.   Okay.  And you weren't even there.

A.   Correct.

Q.   And apparently there were other women that were involved in this besides Miss Johnson and Miss Byrd.

A.   I believe so.  I believe she told me Brandy and maybe another inmate or two.  I'm not sure.

Q.   Okay.  And there was some laughing concerning the puppet show.

A.   I guess when it happened I guess it was for entertainment.

Q.   Yeah, the jail doesn't really provide a lot of entertainment for the inmates up there, do they?

A.   No.

Q.   Is that your experience?

A.   Yes.

Q.   The jail doesn't put on any puppet shows or any plays or anything like that, do they?

A.   No.

Q.   So you're kind of left to your own devices in terms of entertainment.

A.   Yes.

Q.   All right.  I wanted to ask you just a couple of questions about this drug situation.  You understood, of course,

1504

Mr. Honken was manufacturing methamphetamine.

A.   That's what she told me, yes.

Q.   At least he had been at one point; yes?

Page 58

A.     Yes.

Q.     And there was some discussion with the prosecutor that Miss Johnson had collected some money for Mr. Honken?

A.     Yes.

Q.     And you don't know when that was.

A.     No.

Q.     So that could have been years before your 2002 discussion.

A.     Yes.

Q.     Just a couple of questions, ma'am, about the alleged facts that Miss Johnson talked to you about regarding these murders. One of the victims was an ex-boyfriend of hers; is that right?

A.     Yes.

Q.     And did you learn his name to be Terry DeGeus?

A.     Yes.

Q.     Did Miss Johnson tell you who killed him or how she knew about that?

A.     No.

Q.     No.   Or anything about the circumstances regarding Mr. DeGeus's death?

A.     No.

Q.     And did you happen to notice in the newspaper that Mr. DeGeus was mentioned as an ex-boyfriend of Angela Johnson's?

1505

A.     I don't know if it was in the Linn County paper then or not.

Q.     You weren't collecting or clipping out the paper I guess at that time.

A.     No.

Q.     And then there was some testimony -- you were asked about the other victims.   There was a female and her two children, and

Page 59

then there was a gentleman who had been staying with them for only about a week. Apparently he'd been kicked out of his own house. Did I hear that correctly?

A. Yes.

Q. Was any of that information in the Cedar Rapids Gazette?

A. I don't know.

Q. You don't know. And you weren't given any information about when these people were killed?

A. No.

Q. Or where they were killed.

A. No.

Q. Or who killed them.

A. No.

Q. Oh, this lady Angie talked about that she claimed she was worried about, does the name Christi Gaubatz ring any bells with you?

A. I don't think I knew the name.

Q. But the story supposedly was that Angie wasn't so worried

1506

about this lady because she had slept -- Angie had slept with her husband?

A. Yes.

Q. Did Miss Johnson mention to you that she had slept with this woman's husband before they became friends?

A. No.

Q. Okay.

MR. BERRIGAN: Could I have just a minute, Your Honor?

THE COURT: You may.

MR. BERRIGAN: Thank you.

BY MR. BERRIGAN:

Page 60

Q.   When you talked to the police officers back in August of 2000, did you learn that the officers were talking to other women up there at the jail?

A.   No.   I believe it was 2002.

Q.   Oh, I'm sorry.   My apologies.   You're absolutely right. 2002, yes.   When you were going in for your interview with these law enforcement officers, did you learn that they were pulling all the other women out of the Linn County Jail that Angela Johnson had ever roomed with or been with?

A.   No.

Q.   Okay.   Finally, the prosecutor asked you if you knew anything about Miss Johnson's background, and I think you said not very much.

A.   Correct.

1507

Q.   Did you become aware that she had children?

A.   Yes.

Q.   How did you know that?

A.   She told me.

Q.   Okay.   Did she have any communications with her children while you were in jail together?

A.   Yes.

Q.   How often did that happen?

A.   Well, she would communicate on the phone frequently, and then I believe they would come and visit also.

Q.   Visit up at the jail.

A.   Yes.

Q.   Okay.

        MR. BERRIGAN:   All right.   That's all I had.   Thank you, ma'am.

Page 61

THE COURT:  Mr. Williams?

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q.    Miss Yager, I want to go back to your own charge and the cooperation or noncooperation at that point.  I was a little confused.  You indicated you got a role reduction.

A.    Correct.

Q.    To be sure, that means that your role was less than others involved in the same conduct?

A.    Correct.

1508

Q.    Okay.  So there were other people involved with you in that criminal conduct.

A.    Correct.

Q.    And you just chose not to cooperate at that point.

A.    Correct.

Q.    Okay.  You were asked about whether Angela Johnson was trusting while you knew her in that N block for that three-month period of time.  Do you recall that question?

A.    Yes.  If she was trusting?

Q.    Trusting of you.

A.    Yes.

Q.    What was she like in that N block during that three-month time period?

MR. BERRIGAN:  I'm going to object to this as beyond the scope of the cross-examination, Your Honor.  It's a search for bad act evidence.

THE COURT:  Overruled.  You may answer.

A.    What was she like?

Q.    Yes, ma'am.

Page 62

A.    In general?

Q.    In general.

A.    Like we communicated.  We talked.  She talked to her kids.  I mean, she laughed.  She didn't seem -- she seemed -- you know, she felt good about some stuff that was going on in her case like she had won the suppression hearing.

1509

Q.    Let me just talk to you for a minute about did she act pretty normal to you?

A.    Yes.

Q.    Was she easily influenced by you or Brandy Byrd?

A.    No.

Q.    Was she strong willed?

A.    Yes.

Q.    Did she -- was she controlled, or did she control other people?

        MR. BERRIGAN:  Same objection, Your Honor, far afield of the cross-examination.

        THE COURT:  Overruled.

A.    She was more controlling definitely than controlled.

        MR. WILLIAMS:  No further questions, Your Honor.

        THE COURT:  Any recross, Mr. Berrigan?

        MR. BERRIGAN:  I'll be brief.

                    RECROSS-EXAMINATION

BY MR. BERRIGAN:

Q.    Miss Yager, I'm presuming neither you nor Brandy Byrd ever threatened Angela Johnson with a weapon during the time you spent in the jail.

A.    Correct.

Q.    You never beat her up?

Page 63

A.    Correct.

Q.    You were never physically abusive to her.

1510

A.    Correct.

Q.    Okay.  You never tried to control her or push her around or tell her what to do, did you?

A.    No.

Q.    And in terms of the men in her life, you don't know any of those individuals, do you?

A.    No.

Q.    Or what they might have done to her when she was on the outside with them, do you?

A.    No.

Q.    Okay.  This cooperation thing, did the government offer you an opportunity to cooperate when you pled guilty?

A.    Yes.

Q.    Okay.  And so who were you supposed to cooperate against?

A.    Well, I got caught with pseudoephedrine, and they wanted to know where the pseudoephedrine was going.

Q.    And you chose not to tell them that.

A.    Correct.

Q.    Okay.

        MR. BERRIGAN:  Thanks, ma'am.  That's it.

        MR. WILLIAMS:  Nothing further, Your Honor.

        THE COURT:  Okay.  Would now be a good time to take our mid-morning recess?

        MR. WILLIAMS:  Certainly, Your Honor.

        THE COURT:  Okay.  It's about five minutes to ten.

1511

Page 64

We'll be in recess until 10:25. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. Thank you. See you back here at 10:25.

(Recess at 9:57 a.m.)

THE COURT: Please be seated. So now you want a limiting instruction?

MR. STOWERS: Your Honor, we visited at the break about this and drafted up a short --

THE COURT: Well, you waived your right to ask for a limiting instruction when I said, Is there anything to take up? We had finished the witness, and you said now --

MR. STOWERS: Well --

THE COURT: -- now you're telling me you want a limiting instruction. It's not timely.

MR. STOWERS: Well --

THE COURT: Did you ask for it when I said, Is there anything else?

MR. STOWERS: No, we took a break.

THE COURT: Then it's not timely.

MR. STOWERS: Well, I understand your position on that. We've written out a proposal. This was Mr. Berrigan's

1512

witness. And, you know, he finished his examination, and he responded in response to your question the way he did at the break. But in any event, we've drafted up a short proposal.

THE COURT: Okay. Does the government agree to the

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1324 of 3592

language?

MR. WILLIAMS: We don't have an objection to it, Your Honor.

MR. STOWERS: Our concern is that --

THE COURT: It's not exactly a true statement because I did grant some motion in limine which is fairly similar.

MR. WILLIAMS: I think technically -- and that's where I'm at. I think technically the use of the word suppression, I think it's accurate from that standpoint, and that's why I don't have an objection to it. My thought's the same. I mean, there is some stuff that they're not getting, but nothing's been technically suppressed in the case. And so our position, you know, we think it's -- it may draw more attention or not, but that's their judgment call to make.

THE COURT: Okay. So even though in my view it's not timely, you want me to give this limiting instruction.

MR. STOWERS: Yes, Your Honor.

THE COURT: Why didn't you ask for it in a timely fashion?

MR. STOWERS: Well, we think it was timely in the sense that it was the first opportunity we had to confer about

1513

it during the break, and this came up at the very end of this witness.

THE COURT: Well, you know, you don't make a record in a trial in criminal court by committee.

MR. STOWERS: Well, I --

THE COURT: You make it by making a timely objection when something happens. And when I give you an opportunity to do that, you need to seize the moment, make your objection, and

Page 66

do it in a timely fashion.

MR. STOWERS: I under --

THE COURT: This is untimely. I'm going to go ahead and give it anyway.

MR. STOWERS: Thank you.

THE COURT: Let's have the jury brought in.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Members of the jury, before we hear from the next witness, I have what I call an oral limiting instruction for you, and here it is: There has been reference to Angela Johnson winning a suppression ruling. You are instructed that no evidence has been suppressed from your consideration in this trial. You should disregard this testimony concerning a suppression ruling.

Are you ready to call your next witness?

MR. WILLIAMS: Yes, Your Honor.

1514


THE COURT: And who might that be?

MR. WILLIAMS: Wendy Jacobson.

THE COURT: Okay. If you'd please come forward, I'll swear you in. That's not your right hand.

WENDY JACOBSON, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Are you a little nervous?

THE WITNESS: Yes.

THE COURT: Okay. Please be seated in the witness box. And would you please adjust the chair and the microphones so you get nice and close to the microphones. You can scoot the chair up a little bit. And would you state your full name, please, and spell your last name.

Page 67

THE WITNESS:  Wendy Jacobson, J-a-c-o-b-s-o-n.

THE COURT:  Thank you.

Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q.    Miss Jacobson, these microphones only pick up your voice if you're kind of really close to them, so please try to speak into the microphone.  Could you tell a little bit about yourself to the jury, ma'am?  First of all, where are you from?

A.    I live in Texas.

Q.    And how long have you lived in Texas?

A.    Approximately ten years.

1515

Q.    Are you married, ma'am?

A.    Yes, I am.

Q.    And do you have children?

A.    Yes, I do.

Q.    Do you work outside the home?

A.    No, I work in the home.

Q.    And what type of work do you do?

A.    I'm a lingerie and costume designer.

Q.    And you run that business from your home?

A.    That's correct.

Q.    And how do you sell your work then?

A.    I have a web site, www.tabonique.com.

Q.    And how long have you been in this type of employment?

A.    Five years.

Q.    You're living in Texas now.  Where are you originally from?

A.    Iowa.

Page 68

Q. And where at in Iowa originally?

A. Forest City, Mason City.

Q. Let's just go through a little bit about your own background, ma'am. How far did you go through school?

A. I got a GED.

Q. And where did you complete your -- at least your formal education?

A. At different schools. I've gone --

Q. How far did you go through school formally to begin with?

1516

A. I think I have about a year and a half in college credits at different schools because, you know, we moved a lot.

Q. Where all have you lived just generally?

A. Chippewa Falls, Wisconsin; Fond du Lac, Wisconsin; Clear Lake; Mas -- no, not Mason City. Yeah, Mason City, Forest City.

Q. Then ultimately down in Texas?

A. Yeah.

Q. Could you tell the jury, do you have brothers and sisters?

A. Yes, I do.

Q. And how many?

A. I have three sisters and one brother.

Q. Who is the oldest of your siblings?

A. That would be me.

Q. And who is next in line?

A. Angie.

Q. Angela Johnson is your sister?

A. That's correct.

Q. The next in line is who?

A. Jamie.

Q. And then after that?

Page 69

A.    Jimmy.

Q.    And then after that?

A.    Holly.

Q.    Do you have all the same parents?

A.    No.

1517

Q.    Did you -- were you all raised in the same household?

A.    Yes.

Q.    Could you describe what your current relationship is with your sister Angela Johnson?

A.    Right now it's okay.

Q.    Have there been times in the past when -- has it always been that way?  Let me ask it that way.

A.    More of the time than less of it.

Q.    Have there been times in your history where you guys have been closer than other times?

A.    Yeah.

Q.    I'd like to direct your attention back to the early 1990s and ask you, first of all, in the early 1990s where were you living?

A.    In Fond du Lac.

Q.    Wisconsin.

A.    (Witness nodded head.)

Q.    Is that a yes?

A.    Yes.

Q.    Where was your sister Angela Johnson living during the, let's say, 1992 to 1993 time period?

A.    Clear Lake, Iowa.

Q.    And did she have a house there?

A.    Yes.

Page 70

Q. How often during the 1992, 1993 time frame would you have

1518

contact with your sister Angela Johnson?  How often?

A. On the phone?

Q. Any way.

A. Frequently I guess.

Q. And what to you -- frequently means how much, ma'am?

A. You know, we talked a lot on the phone, and we'd come to visit, you know, holidays and birthdays, and we kind of traded kids back and forth.

Q. How often would you come down to Clear Lake, Iowa, and visit with your sister in 1992, 1993 time frame?

A. Probably about six, seven, eight times, a lot.  It was only like four-and-a-half-hour drive.

Q. Was that one of the periods in your life when you and Angela Johnson, your sister, were closer than some other times?

A. Yeah.

Q. And at that point how would you describe your relationship with Angela Johnson, your sister?

A. Good.

Q. Were you aware of a boyfriend she had by the name of Terry DeGeus in the past?

A. Yes.

Q. By 1992, 1993, was she still in any romantic relationship with Terry DeGeus?

A. I can't remember.  I really cannot remember.

Q. In any statements that Angela Johnson made to you, did she

1519

Page 71

tell you how she and Terry DeGeus got along?

A.   She didn't have to tell me.  I saw it.

Q.   And you saw what, ma'am?

A.   He was physical --

Q.   Hang on.  Hang on just a second.

THE COURT:  There's a request that you speak up, speak more directly into the microphones.

THE WITNESS:  Both?

THE COURT:  Just try and speak up.

BY MR. WILLIAMS:

Q.   It might help, ma'am, if you turn your chair a little bit and pull it in a little bit closer to the bench.  As I said, these microphones only pick up sound if you're pretty close to them.

A.   Okay.

Q.   All right.  Were you aware from anything Angela Johnson ever told you about whether she and Terry DeGeus had arguments in the past?

A.   Oh, yeah, I have heard him say things, yeah.

Q.   And based on your personal knowledge, was -- either from what Angela Johnson told you or what you saw personally, was Terry DeGeus ever physical with Angela Johnson?

A.   Yes.

Q.   Now, would this have been prior to the time period of 1992, 1993 when you visited her in Clear Lake?

1520

A.   He was -- from the beginning of the relationship he was that way with her.

Q.   What I'm trying to figure out, though, in 1992, 1993, is Angela Johnson and Terry DeGeus living together?

Page 72

A.   I can't remember how -- back that far how -- I'm trying to think.  I have no landmark things to put it by, so I can't remember.

Q.   All right.  Well, let's move on to another topic then.  At some point did you come to find out that she had any relationship with somebody by the name of Dustin Honken?

A.   Yes.

Q.   And was this during this 1992, 1993 period?  Was it after that?  What do you recall on the timing?

A.   I found out about him when Angela was pregnant with Marvea when we went down to visit.

Q.   And when do you recall that to be?

A.   July 4th weekend.

Q.   Of 1993?

A.   I can't remember the dates.  It was the year Alyssa was in the fire -- in the parade.

Q.   And Marvea Johnson would have been born in February of 1994; is that correct?

A.   She's 14.  Her golden birthday's on the 14th.  Yeah, I'm going to say yes.

Q.   Did you have occasion to meet Dustin Honken?

1521

A.   Yes.

Q.   What was your impression of him?

A.   Highly intelligent individual that was kinda nerdy and preppy.

Q.   What was he like around Angela Johnson?

A.   He was still intelligent.  He always had his nose stuck in a chemical book, you know, chemistry.

Q.   Did -- unlike Terry DeGeus, did Dustin Honken ever engage

Page 73

in any physical mistreatment of your sister?

A.    Not that I'm aware of.

Q.    How did he treat her generally that you observed?

A.    He was a pretty quiet person.

Q.    In this 1992 to 1993 time period when you made these frequent visits from Wisconsin down to your sister's in Clear Lake, on any of those occasions, did you use any methamphetamine with your sister?

A.    Yes.

Q.    How many occasions do you recall that would have happened?

A.    Oh, not more than probably one or two times.

Q.    And where would that have occurred at?

A.    Her house.

Q.    And was this before or after Dustin Honken became involved with her to your knowledge?

A.    I'm going to say -- I'm thinking Dustin was in the picture then.

1522

Q.    And where did the methamphetamine come from that you used?

A.    A little envelope.

Q.    Who got the little envelope?

A.    I just remember seeing it on the table.

Q.    In your sister's house.

A.    Yeah.

Q.    Let me talk to you a little bit about -- or have you talk to the jury a little bit about your knowledge of any drug activity that existed between Terry DeGeus and Angela Johnson. Did Angela Johnson ever tell you anything about whether she was involved or whether Terry DeGeus was involved in any drugs?

A.    No.

Page 74

Q. Did she indicate to you at some point about how it was that she came to meet Dustin Honken?

A. I cannot remember the connection between the two. Somehow there was a connection between Dustin and Terry DeGeus, but I cannot remember how I came to know it. I can't remember.

Q. Well, what did you understand the relationship to be?

A. Terry was Angie's ex-boyfriend, and I cannot remember the connection between what or how I knew the connection between Terry and Dustin.

Q. Well, did Angela Johnson ever tell you how it was that she first met Dustin Honken?

A. Yeah, she went there.

Q. She went where?

1523

A. To his hotel.

Q. For what purpose?

A. I'm assuming she was trying to sidestep Terry DeGeus to get product.

Q. The product being methamphetamine.

A. Correct.

Q. And so you understood from this that Terry DeGeus was getting methamphetamine from Dustin Honken?

A. Yes.

Q. And your sister met Dustin Honken at a hotel room for the purpose of stepping past --

A. Sidestepping Terry.

Q. And going directly to the source.

A. Yeah.

Q. In the summer of 1993, did you ever become aware that a man named Greg Nicholson, a woman named Lori Duncan, and two little

Page 75

girls named Kandi Duncan and Amber Duncan disappeared?

A.   I read it in the paper.

Q.   Did you have any conversations with your sister about the disappearances?

A.   Huh-uh, not about them, huh-uh.

Q.   Were you aware at that time that Dustin Honken was under federal indictment for narcotics charges?

A.   No.  I think I found that out later.

Q.   Did your sister make any statements to you about whether

1524

anybody that disappeared was in any way involved in Dustin Honken's case as a witness?

A.   No.

Q.   In November of 1993, were you aware or did you become aware that Terry DeGeus disappeared?

A.   Yep.

Q.   Did you have any conversations with your sister about his disappearance?

A.   Yes.

Q.   And what was that?

A.   Well, one time we consulted a psychic to find out where he was on America Online, and they said he was living in Montana under an assumed name.

Q.   Any other conversations you had with Angela Johnson concerning Terry DeGeus's disappearance at that time back in 1993?

A.   Huh-uh, huh-uh.

Q.   Not that you recall?

A.   No, not that I recall.

Q.   Now, after 1993, at some point -- up to that point you were

Page 76

living in Wisconsin, and then ultimately you testified earlier in your testimony that you now live in Texas. When was it that you moved from Wisconsin to Texas?

A. In 1995.

Q. And after you moved to Texas, can you describe for the jury

1525

how did your contact with your sister Angela Johnson continue? As close as it was before when you lived in Wisconsin? Did it get less close? Just describe it for the jury if you would.

A. There wasn't a lot of contact.

Q. Was there a reason for that or just that's the way things just worked out?

A. Yep, things just kind of fizzled.

Q. So directing your attention then to the year 2000, did you learn at some point that your sister had been charged with involvement in some murders?

A. That was in the summer; right?

Q. Summer of 2000. What do you recall, ma'am?

A. In -- I recall getting a phone call in -- I'm thinking it was July that she was put in jail.

Q. And you're still in Texas at this point; is that correct?

A. Yes.

Q. After that did you make visits up to Iowa to visit your sister?

A. Yeah, couple times.

Q. And on one of those occasions in 19 -- I'm sorry, in the year 2000, in the fall of 2000, did you visit her in the Linn County Jail?

A. Is that in Cedar Rapids?

Q. Yes.

Page 77

A.    Yes.

1526

Q.    Was anybody with you on that visit?

A.    My sister-in-law, my brother.  We all went there at the -- to see her.

Q.    And your sister-in-law would be who?

A.    Shelly Johnson.

Q.    When you went to visit her, did you all go into the visiting room, or how'd that work?

A.    Well, we kind of switched off and on.  First it was -- let's see -- Jimmy and I, and then he went down and Shelly came up.

Q.    Could you explain to the jury the visiting room where you visited Angela Johnson in the fall of 2000 at the Linn County Jail?  What was that room like?

A.    It's like a little booth like this with glass and phones on either side.

Q.    And are you able to actually have any contact with --

A.    No, because there's glass going up.

Q.    How do you -- can you talk with anybody you're visiting there?

A.    Through the phones.

Q.    And so folks know the time period when you and your sister-in-law Shelly Johnson are visiting, are you both able to talk on the phone at the same time with Angela Johnson?

A.    She used the phone from this side.  I used the phone from this side.

1527

Q.    During that visit, did Angela Johnson make any statements
Page 78

to you concerning Terry DeGeus's disappearance?

A.   Did she say something or --

Q.   Did she communicate to you in any way anything she knew about the disappearance?

A.   Well, we were kinda telling her not to so -- but there was a little piece of paper.

Q.   Tell about that.

A.   It just said, I led -- I led Terry there or I led him there.  I can't remember the -- I led Terry there or lured -- I lured Terry there or I lured him there.  It was just written on a little piece of paper.  I can't even remember the exact words.

Q.   And explain to the jury how did that -- how'd that come up?

A.   We were just talking and visiting, and she just started crying, and we told her, Don't, don't tell us anything, but she just -- she showed us the little piece of paper.

Q.   And how did she show it to you?

A.   Through the glass window.

Q.   You couldn't actually have contact with the piece of paper?

A.   No.

Q.   Did she say anything to you when she showed you the piece of paper?

A.   She was crying.

Q.   So did she say anything to you about it?

A.   No.

1528


Q.   What did you do when she showed you the piece of paper that said, I lured him or I lured Terry there?

A.   Told her, Be quiet, be quiet.  We went like this (demonstrating), be quiet, be quiet, don't tell us anything else, because we didn't want to know anything else because we

Page 79

weren't supposed to talk about it.

Q.   Did she indicate to you at that point anything more about luring him there?

A.   No.

Q.   Did you ever have any other conversations with your sister Angela Johnson about her knowledge or involvement with Terry DeGeus's disappearance?

A.   Not that I can recall.

Q.   Did Angela Johnson ever make any statements to you concerning Dustin Honken's involvement with the disappearances of any of these people?

A.   No, not that I recall.

Q.   Did you -- and just to be sure here, did you ever attempt to really question your sister about what her involvement was in any of these disappearances or anything?

A.   No.

Q.   Now, at some point did you provide this information to a federal grand jury?

A.   Yeah.

Q.   And that was -- were you there voluntarily, or were you

1529

subpoenaed?

A.   I was subpoenaed.

Q.   And today are you here voluntarily, or were you subpoenaed?

A.   I am absolutely not here voluntarily.  I was subpoenaed.

          MR. WILLIAMS:  No further questions, Your Honor.

          THE COURT:  Mr. Berrigan?

                    CROSS-EXAMINATION

BY MR. BERRIGAN:

Q.   Mrs. Jacobson, I just have a couple of questions; okay?

Page 80

First of all, I wanted to go back for a moment to an issue the prosecutor talked to you about, and that would be what you knew about Dustin Honken back in the late spring and summer of 1993; okay? Could we get back to that for a second? You certainly learned that your sister was pregnant by this man?

A. Yes.

Q. Did you know a lady by the name of Kathy Rick?

A. Yes, I did.

Q. Did you know she was also pregnant by Dustin Honken at that time?

A. Yes, I did.

Q. What about a lady by the name of Melissa Friesenborg from Arizona? Did you know her at all?

A. I wasn't aware of her.

Q. Or that Mr. Honken was engaged to her at the same time he had these other two ladies pregnant? Did you know anything

1530

about that?

A. No.

Q. This information you found out about Miss Rick, that came later on, did it not?

A. No. That came while I was at Angie's house.

Q. Okay. So Angie was aware of it.

A. Yeah, when she -- because she called the house when I was there.

Q. She's the one that told you about Miss Rick being pregnant.

A. Yes.

Q. Okay. And then if we could fast forward a minute, you saw your sister. You came up from Texas to see her in November of 2000; is that right?

Page 81

A.    Yep, that's correct.

Q.    And this would have been just, I guess, a few months after her arrest.

A.    Yeah.

Q.    And you saw her over at the jail in Linn County?  Is that where you were?

A.    The Cedar Rapids town?

Q.    Yes.

A.    Right.

Q.    Cedar Rapids, right.  And you said that she was crying. And I wanted to know, was she crying throughout the visit, or was there a time where she started crying?

1531

A.    She was crying almost the whole visit.

Q.    Okay.  Did she seem to be emotionally upset?

A.    Yes, she was.

Q.    All right.  And this part where she showed you the paper that said, I led Terry or I lured him, was she crying then?

A.    Yes.

Q.    Did you ask her what she meant by that?

A.    Nope, because we weren't supposed to talk about it.

Q.    You weren't supposed to talk about her case.

A.    Not at all, but she just wanted to talk about it.

Q.    Okay.  And that's all she told you.

A.    Yes, because we kept -- we shut her off.  We just said, Quit, quit, be quiet, don't tell us anymore.

Q.    Well, I probably could guess the answer, but did she tell you that she found out after the fact that she had inadvertently led Terry DeGeus to Dustin Honken, or was there any discussion about that?

Page 82

A.    I believe later we did have conversations about that.

Q.    Later.

A.    Uh-huh.

Q.    Not during this November the 2nd situation.

A.    Huh-uh, huh-uh, because we weren't supposed -- we were trying to follow the lawyers' rules and were just trying to not talk about it.

Q.    Okay.  So she didn't tell that you that was a plan or

1532

anything she and Dustin Honken had.

A.    No, no.

Q.    In fact, later told you that was inadvertent.

A.    That's right.

Q.    All right.  She didn't know what was going to happen to Terry DeGeus.

A.    No, no.  She was -- she was afraid of him.

Q.    Afraid of Mr. DeGeus.

A.    Yeah.

        MR. BERRIGAN:  That's all I had.  Thanks.

        THE COURT:  Mr. Williams?

                    REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q.    Ma'am, I thought I just got done asking you during your direct examination if Angela Johnson had ever told you anything else about the disappearance of Terry DeGeus, and I think you answered no, didn't you?

A.    At the jail; right?

Q.    I think I asked you if at any point she'd ever told you anything else about the disappearance of Terry DeGeus, and I thought your answer to me was no.

Page 83

A.   At the jail -- well, I'm getting confused here because I don't know what the heck you're talking about.  I'm just trying to answer what I'm being asked.

Q.   On the piece of paper --

1533

A.   Yes.

Q.   -- which Angela Johnson said, I lured him there --

A.   Yes.

Q.   -- it didn't say, But I didn't know that I was luring him to his death, did it?

A.   No, it did not say that.

Q.   It didn't say, I lured him there, but I didn't know what was going to happen to him, did it?

A.   No.

Q.   It said, I lured him there.

A.   Yes.

Q.   And when was it that Angela Johnson allegedly made additional comments to you about what happened to Terry DeGeus?

A.   It was after, some time after that.  I don't know if it was on the phone because we talked a lot or if in a letter or if we went and visited her again because I went and visited her more than one time, and I remember you cut me off, you didn't let me finish, you know, but we were freaking out.  We were trying not to, you know . . .

Q.   What happened after you testified in the grand jury and revealed to the grand jury that your sister had put up a piece of paper that said, I lured him there?  What happened to the relationship to the rest of your family?

A.   I'm pretty much ousted.

Q.   There's anger over there, wasn't it?

Page 84

A.    Yeah.

Q.    Anger, angry that you revealed what you knew about the disappearance.

A.    Yeah.

Q.    And yet after that, you're indicating to this jury you had more communication with your sister in which she then told you, Well, I didn't really mean that; I didn't have a chance to finish.

A.    Well, I'm always trying to explain everything, so I'm like, you know, I don't know how to describe it.  I'm always trying to tell my point across to get the right message out there.

Q.    You recall meeting last night with me and Special Agent Bill Basler?

A.    Yes.

Q.    Do you remember talking last night about what you knew about the disappearance of Terry DeGeus?

A.    Yes.

Q.    Fair to say you didn't mention last night anything about being told by Angela Johnson that she later told you that she didn't know what was going to happen?

A.    Well, I didn't know I was supposed to.

Q.    You were asked questions, were you not?

A.    I didn't know I was supposed to say anything.

       MR. WILLIAMS:  I have no further questions, Your Honor.

RECROSS-EXAMINATION

Page 85

BY MR. BERRIGAN:

Q. Did -- these men last night, did they ask you to volunteer information to incriminate your sister? Did they ever do that?

A. Well, they asked me questions.

Q. And did you answer the questions honestly?

A. Yeah.

Q. Did they ever ask you if you had subsequent conversations after the November visit with Angie Johnson about what she meant about this lured Terry or led Terry?

A. No.

Q. All right. This point about being ousted from your family, how long did that last?

A. Well, I'm talking to Angie --

Q. You, in fact --

A. -- and Alyssa.

Q. -- communicate with most of your family, don't you?

A. My brother and, you know, my dad.

Q. Isn't it true you have issues within your family completely unrelated to your sister's situation, Miss Johnson?

A. I'll say yes.

Q. Some of these things go back a long time, don't they?

A. Yeah.

Q. And in terms of your relationship with your sister, how is your relationship with your sister Angela?

1536

A. Good.

Q. When she told you about lured him or led him, was she laughing or joking?

A. Crying.

Q. Crying. She wasn't kidding or making light of it.

Page 86

A.    No, she was crying.

Q.    She seemed to be upset.

A.    Yeah, and Shelly and I were trying to cut her off, you know, you know, be quiet, be quiet, be quiet, and she was like she had more to say, but we made her quit talking because we just didn't -- we didn't want her to get in worse trouble, and we didn't want to know and get in worse trouble, just . . .

Q.    She was upset.

A.    Yeah.

MR. BERRIGAN:  Thank you.

THE COURT:  Mr. Williams, anything further?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  You may step down.

Everybody can take a stretch break.

Is the government ready to call its next witness?

MR. WILLIAMS:  Yes, Your Honor.  Just a moment. United States calls Shelly Johnson, Your Honor.

SHELLY JOHNSON, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated in the witness box.  And can you adjust the chair and the microphone so you can

1537

speak directly into the microphones?

THE WITNESS:  Okay.

THE COURT:  And state your full name, and spell your last name, please.

THE WITNESS:  It's Shelly Johnson, J-o-h-n-s-o-n.

THE COURT:  Thank you.

Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

DIRECT EXAMINATION

Page 87

BY MR. WILLIAMS:

Q. Miss Johnson, you might pull that chair up just a little bit if you would. It's hard to hear unless you speak directly into the microphones.

Ma'am, can you just share with the jury just a little bit about yourself? Where are you from originally?

A. I'm from Iowa.

Q. And where are you living at now?

A. We're in the Chicagoland area.

Q. Are you married?

A. Yes.

Q. And who are you married to?

A. Jim Johnson, Angie's brother.

Q. And how long you been married to Jim Johnson?

A. Nearly 14 years.

Q. Is this the Jim Johnson who was the captain of the Iowa

1538

football team?

A. Yes, it is.

Q. Do you work outside the home?

A. Yes, I'm a substitute teacher.

Q. And do you have children?

A. Yes, two.

Q. You indicated that your husband is Angela Johnson's --

A. Brother.

Q. -- brother.

A. Yes.

Q. How long have you known Angela Johnson? In other words, before you got married to your husband, did you have contact with Angela Johnson even before that?

Page 88

A. Yes, for about 20 years now.

Q. And what type of contact have you been able to maintain with Angela Johnson during that time period?

A. At the beginning we saw each other frequently, and after her daughter's visit to Florida in 1993, we -- it was very sporadic after that, and then again recently we've been able to be in contact through letters and some calls and things.

Q. Were you involved -- were you aware at all of whether Angela Johnson was involved in the distribution of drugs in 1992, 1993?

A. No.

Q. At some point did you become familiar with somebody by the

1539

name of Dustin Honken?

A. Yes.

Q. And how did you come to meet him?

A. I met him for the first time -- it would have been in the summer of 1994 I believe when their daughter Marvea was little. They came to visit us when we made a trip home from Florida, so that was my first meeting of him. I knew his name before that but had not met him previous to that time.

Q. What was your impression of Dustin Honken when you met him?

A. He was very quiet. He didn't speak much. During that visit Angie did most of the talking. And I -- he didn't seem like what I envisioned him to be. He didn't seem like someone Angie would be with, so I was very surprised when I met him the first time.

Q. In what way did you not picture him as somebody Angela Johnson would be with?

A. He wasn't as dynamic as an individual as I would have

Page 89

expected. Just looked a little bit maybe clean cut, just didn't seem her type I guess, so I was surprised when I met him, and he didn't say very much, and Angie's a very dynamic, fun person, so it was -- we couldn't quite figure out the connection. They were -- seemed very different.

Q. Dustin Honken very assertive during the time period you saw him interact?

A. He was not assertive in his speaking. He didn't say much.

1540

But his presence, I mean, Angie was very conscious of him being there, and typically, you know, would look at him a lot when she talked to him and not nervous but just -- she just wasn't as dynamic as I would have envisioned her to be. With people I had seen before she was very relaxed and laid back, and she just had her hands on the baby a lot and, you know, would look at him to the side a lot, but he didn't say much, so I didn't have an impression of him as being a very, like I said, dynamic person. He was very quiet.

Q. I want to direct your attention to November of 2000. By this point did you learn that your sister-in-law Angela Johnson had been charged with involvement with some murders?

A. Yes, I had.

Q. And did you visit her in the Linn County Jail along with your sister-in-law Wendy Jacobson?

A. Yes, I did.

Q. While you were visiting in that visiting room, was there any communication you saw concerning Angela Johnson's knowledge of what happened with Terry DeGeus?

A. Yes.

Q. And what did you see?

Page 90

A.    We had been in the visiting area for just a few minutes, and it was very emotional, and Angie just mouthed the words that I lured him, I lured Terry, and she was very emotional, and her eyes -- she was very upset and scared, and she just mouthed

1541

those words and I believe wrote them on just a piece of paper, and then we just asked her to stop.

Q.    There was a glass partition between you and Angela Johnson?

A.    Yes.

Q.    Did she hold up the piece of paper so you could see it?

A.    Yes.

Q.    And what did the piece of paper say?

A.    I think it said, I lured him.  I believe that was what it said.

        MR. WILLIAMS:  I have no further questions.

        THE COURT:  Mr. Berrigan?

        MR. BERRIGAN:  Thank you, sir.

                        CROSS-EXAMINATION

BY MR. BERRIGAN:

Q.    Mrs. Johnson, you need a minute?

A.    (Witness shook head.)

Q.    You okay?

A.    (Witness nodded head.)

Q.    We have some tissues here.

        MR. BERRIGAN:  May I approach?

        THE COURT:  You may.

A.    Thank you very much.

Q.    I wanted to take you back a little bit and ask you some questions about Terry DeGeus --

A.    Okay.

Page 91

1542

Q.   -- who is one of the other significant people in Angela's life; is that right?

A.   Yes.

Q.   Did you know Mr. DeGeus?

A.   I met him twice.

Q.   And how is it that you met him?

A.   The first time Jim and I had come home from college, and we stayed with Angie, and he was there.

Q.   And the second time?

A.   The second time I met him was at another visit home from college shortly after we had been engaged, and we went home to visit Angie and her daughter and to stay with them, and he was around that night.

Q.   On either of the occasions where you saw Mr. DeGeus, how was he acting towards your sister-in-law?

A.   On the first time that I met him, he -- I don't recall how he was with Angie.  He left the house quite early that morning, and so I really only saw him in passing.

On the second visit -- I think that would have been in 1991 when we were there -- he -- they were not seeing each other, and Angie was, in fact, very scared of him, and that night he followed us around town, and it was very scary, so I didn't talk to him personally, but where we were, he was.

Q.   She had some discussions with you about Mr. DeGeus before that second visit?

1543

A.   Yes.

Q.   And based on those discussions, what was the status of

Page 92

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1351 of 3592

their relationship?

A.    They were not seeing each other.  I believe she had restraining orders against him.  She was fearful of him, and until that night I had not encountered any of that, but she was very scared of him and wanting him to leave her alone, and, you know, we were worried about that.

Q.    And Mr. DeGeus followed you around?

A.    Yes, he did that night.

Q.    You and --

A.    My husband and Angela and a gentleman that she was dating at that time who was a very nice man.  We went to dinner in Clear Lake, and when we got there, he was there.  When we got back to the house that evening, the phone rang and it rang, and Angela said not to answer the phone, but I just . . .

Q.    Did Mr. DeGeus approach you or Angela that night?

A.    He was -- his presence was very -- my husband was very aware of it.  He was my boyfriend at the time, my fiance.  And he did not approach us, but he made it very clear he was there, and within -- he was watching all the time.

Q.    Your husband, is he a pretty big fellow?

A.    Yes, he is.

Q.    How big is he?

A.    He's about six-three or six-four.  At the time he would

1544

have been about 200 and I don't know, 65 pounds maybe.

Q.    And he was playing football?

A.    Yes, he was.  He had just finished up his senior season.

Q.    And he was, in fact, as the prosecutor pointed out, not only a captain of the team but one of the Big Ten conference -- defensive conference players of the year.

Page 93

A.   Yes, yes.

Q.   Let's talk a little bit then about this visit.

A.   Okay.

Q.   Wait.  One more thing.  While you were at Miss Johnson's house, did you happen to notice whether she had any weapons in her house at this time you were visiting --

A.   Yes.

Q.   -- when Mr. DeGeus showed up?

A.   Yes.  She had a guard dog, very big German shepherd.  And I noticed a shotgun propped up in the corner, and I had asked her why, and she was scared.

Q.   What did she say as to why she had a shotgun sitting --

         MR. WILLIAMS:  Objection.  Hearsay, Your Honor.

         THE COURT:  Sustained.

BY MR. BERRIGAN:

Q.   Let's talk a little about the visit then in November of --

A.   Yes.

Q.   -- 2000 when you went to the jail.  You've described Angela as being very emotional, and I wonder if you could be a little

1545

more specific.

A.   When we first got there, I didn't want to go up.  I was scared to go visit and see her there.  But when we first got there, she was smiling and glad to see us.  And I think that we approached the glass and I got to kiss her through the glass and say hello, and there were tears, and it was very emotional.  It was just, you know, our eyes -- we looked at each other the entire time and couldn't stop looking at her, and it was just very emotional.

Q.   Did you ask her any questions about her case?

Page 94

A.   No.

Q.   But at some point she mouthed the words and wrote on a piece of paper she lured Terry?

A.   Yes.

Q.   And how was she behaving at that time in terms of her emotional situation?

A.   Very -- almost just like she couldn't contain herself.  She was very emotional, just, you know, again, maintaining eye contact the entire time, almost in a pleading way.

Q.   Did she give any explanation about what that meant --

A.   No.

Q.   -- or how she had lured him?

A.   No.

         MR. BERRIGAN:  That's all I have.

         THE WITNESS:  Okay.

                                                      1546


         THE COURT:  Mr. Williams, anything further?

         MR. WILLIAMS:  No, Your Honor.

         THE COURT:  You may step down.

         THE WITNESS:  Thank you.

         THE COURT:  Government have any additional witnesses?

         MR. MILLER:  Your Honor, the United States calls J.D. Smith.

         THE COURT:  Okay.  Everybody can take a stretch break if you'd like till we get J.D. Smith sworn in.

              J.D. SMITH, PLAINTIFF'S WITNESS, SWORN

         THE COURT:  Please be seated in the witness box. Please adjust the chair and the microphones so you can speak directly into the microphones.  And when you're settled in, would you state your full name, please, and spell your last

Page 95

name.

THE WITNESS: J.D. Smith, S-m-i-t-h.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Where do you live, Mr. Smith?

A. Pardon?

Q. Where do you live?

A. Live in Robins, Iowa.

Q. And can you give us an idea of where Robins, Iowa, is?

A. It's a little town of about 2,000 people on the north edge of Cedar Rapids.

1547

Q. How long have you lived in the Cedar Rapids area?

A. Since about 1974.

Q. Your current occupation, sir?

A. I'm retired.

Q. What was your career in, sir?

A. I was an agent with the Iowa Division of Criminal Investigation from 1968 to 1990, and then from 1990 to '96 I was public safety commissioner for the city of Cedar Rapids on leave of absence, and then I went back with the Division of Criminal Investigation and retired in February of '03.

Q. I'm going to just for the sake of being doubly sure ask you that you just get your chair as close as possible to those microphones and the microphones as close as possible to your chin.

You had 30-plus years in law enforcement, sir.

A. That's correct.

Q. Vast majority of it with the DCI.

A. Yes.

Page 96

Q.    In what capacity?

A.    I was an agent assigned to the general crim. unit and then also the intelligence unit.

Q.    A brief period of time interrupted your DCI career in which you were commissioner of public safety for the city of Cedar Rapids?

A.    Yes.

1548

Q.    Would you describe those responsibilities briefly, sir?

A.    The city of Cedar Rapids has a commission form of government.  And when you serve on the council, you are also a commissioner in charge of certain departments.  As public safety commissioner, I was in charge of the -- and oversight of the Cedar Rapids Police Department, Cedar Rapids Fire Department, employee safety, building and housing inspections.

Q.    That is an agency of approximately what size?

A.    The police department's about 200 individuals; fire department, about 160; rest of them, probably 40 people.

Q.    Would you compare and contrast for us briefly the responsibilities as commissioner of city police department and those of a DCI agent?

A.    As a commissioner it's more of an administrative position overseeing the budgets and that kind of thing.

Q.    And describe DCI as far as how does DCI get its cases, sir?

A.    Most of them, at least in the general crim., were on a request basis from local departments, sheriff's departments, PDs, state's attorney's office, federal agencies.

Q.    When there's a phone call from another law enforcement agency, DCI tries to respond.

A.    That's correct.

Page 97

Q.    Some agencies call more than others I take it.

A.    Yes.

Q.    Depending to some part upon the amount of resources the

1549

local agency has to handle its own criminal investigations.

A.    That's correct.

Q.    And during your years there, you actually headed an agency that at least as far as number of personnel had more resources than the entire state DCI.

A.    That's correct.

Q.    But you finished out your career -- after six years as commissioner of public safety with Cedar Rapids, finished your law enforcement career again as a special agent with your old outfit, the DCI.

A.    That's correct.

Q.    And retired when, sir?

A.    February of '03.

Q.    When did you return to the DCI from your period as the Cedar Rapids public safety commissioner?

A.    1996.

Q.    You were posted in Cedar Rapids since then?

A.    Yes.

Q.    Do your responsibilities as a DCI agent occasionally carry you outside your particular zone through other parts of the state of Iowa?

A.    Occasionally.

Q.    As the supervisors and job requires.

A.    Correct.

Q.    Okay.  I'm going to direct your attention to the fall of

1550

Page 98

the year 2000 and ask if such happened to you in or around the 1st of October of the year 2000.

A.    Yes, it did.

Q.    And would you just briefly describe how you first came involved in this case outside your ordinary geographic zone?

A.    During the first part of October, I was directed to meet with Detective Pete Wright with the Benton County Sheriff's Office who was assigned to DEA at the U.S. Attorney's Office in Cedar Rapids, Iowa, in regards to taking a couple of maps that had been supplied to him and to go up in the Mason City area and see if we could locate where those maps depicted some bodies may be buried around the Mason City, Iowa, area.

Q.    These were a couple of maps that had been obtained at the Benton County Jail?

A.    It was my understanding.

Q.    And can you just very briefly describe the nature of those maps?

A.    It was -- the maps were hand-drawn maps on I believe lined paper.  There were two of them, one depicting a site a little closer to Mason City than the other one, and one of the sites was down on Killdeer Avenue.

Q.    I've set before you, Agent Smith, two exhibits marked 310 and 311.  Do you recognize those, sir?

A.    Yes, those would be the maps in question.

Q.    Those are the maps you've just been describing?

1551

A.    Yes.

Q.    And aside from the fact that they are now encased in

Page 99

plastic, have an exhibit sticker on them, possibly a fingerprint examiner's notation, and the fading of pencil over time, do they appear substantially as you first received them around the 1st of October of the year 2000?

A.    Yes.

Q.    What, if anything, did you do with those two maps, sir?

A.    We had taken copies of these Exhibit 310 and 311 and Detective Pete Wright, myself drove to the Mason City, Iowa, area on October 3 of 2000 in attempt to try to locate these locations depicted on the map.

Q.    And you didn't take -- I think you just pointed out, you didn't take the originals but rather made a copy and took those copies with you?

A.    I had the copies at that time.  I think Detective Wright also had copies.

Q.    And with photocopies or copies anyway of Exhibits 310 and 311, in the Mason City area, describe, please, what you did.

A.    We drove to the Mason City, Iowa, area, and I'll divide these up if I can.  Exhibit 310 was a map showing an area which we later I think called site 2 closer to Mason City.  On the map is depicted -- it says Highway or H-W-Y 18 which we took to be old 18 and -- excuse me.  There's a Highway 18, the new 18, and then south of that is old 18.  Both of these are marked on the

1552

map.

Q.    And, Mr. Smith, I'm going to interrupt you.  We have here enlargements of Exhibits 310 and 311.  And placing those on an easel where the writing and drawing is easily visible to the jury, would that assist you in describing to the jury both what you saw on the maps and what efforts you made in locating the

Page 100

actual geographical location of the sites described?

A.   I'm sure it would.

MR. MILLER:  And again, with the Court's permission, what I would suggest is that Agent Smith be given a lavaliere microphone.  We can put the two easels up, and then I would invite him to demonstrate to the jury and describe to the jury how he went about the process of locating these two sites.

THE COURT:  That's fine.

MR. MILLER:  You can step down, and Chief Judge Bennett's law clerk will help mike you up, sir.

THE COURT:  And any of the defense lawyers who want can move to better see the examination of the witness.

BY MR. MILLER:

Q.   Agent Smith, the important thing is that everyone here, the jury and everyone else, be able to clearly hear and understand what you have to describe for us, but using -- and for the record, you have there an enlargement of Government Exhibit 310 and enlargement of Government's Exhibit 311 and also Government's Exhibits -- excuse me, Exhibit 1 which is the map

1553

of the central Cerro Gordo County area.  Using those three exhibits and the two easels, I'll ask you to go ahead and describe the process that you and Deputy Wright underwent in trying to locate those two positions.

I only ask that you do two things for me, please. Number one, keep your voice loud and clear so everybody can understand you, and also make reference -- if you ever make reference to an exhibit, our record will be much better if you mention it by exhibit number before describing what you're describing.

Page 101

A.    Okay.

Q.    Thank you.  Before you begin, can you just describe for me what your mission was in going to Mason City while you and Deputy Wright were up there and what your task was, sir.

A.    Our task on that particular day which would have been October 3 that we went to Mason City was to see if we could identify and locate these locations or locations that looked close to these as depicted on the map around the Mason City, Iowa, area and, if we would find those locations, try to find who the property owners were and then come back and report to the U.S. Attorney's Office and the FBI.

Q.    And if I can interrupt one more time, there are agents throughout the state, and I think we've met one named Agent Basler who lived rather much closer to the Mason City area than you.  Can you just in a few words give us the basis for this

1554

particular division of responsibility on the occasion?

A.    Yes.  I was advised when I arrived at the U.S. Attorney's Office because of what might be some legal aspect in this ongoing investigation they wanted somebody who knew nothing about the case and had no contact with anybody working the case to take these maps and go up and try to locate these places without contacting anybody in that area that had anything to do with the case.

Q.    If I can be so unkind then, you were nominated for your ignorance.

A.    Yes.

Q.    Thank you.  Please continue, sir.

A.    All right.  Again, starting with the maps, the first one is listed as Exhibit 310, and that would be what we called site

Page 102

number 2. And this is on lined paper. On the top of it it says H-W-Y 18 which we took to be Highway 18, the new Highway 18 that runs into Mason City. Down below it says Old 18 which we took to be the old U.S. 18 on the south side of Sioux City -- or excuse me, Mason City. There is depicted a road going north which we took to be north and south because there's -- looks like a 5 down here which we thought was either 5 or south on the map. We weren't sure. There's also depicted a railroad track running east and west between the two highways, both Highways 18. And then it shows a field with an X on it on the south side of the railroad tracks and an entrance to that field on the

1555

south side of the railroad tracks. It also says, Abandoned green house at the junction of where this north/south road is and a lumber yard on the east side of that road, again, right adjacent to old Highway 18 or Old 18 as it says.

We drove up into that area, and I'd have to say this map is a little bit off, but it's pretty close. We did find an abandoned green house at the corner of Lark -- which is this street, north and south, ended up being Lark Avenue. There is an abandoned green house. Across the road, across Lark Avenue to the east, was not a lumber yard but was a bulk plant. There is a lumber yard about a mile down the road at another intersection. I did stop in the bulk plant and just visit with the person who was there, and they advised that some time ago that had been a lumber yard and had burnt down and it had been a bulk plant for several years.

We did go north of the Old 18 as you can see on this map just before the railroad tracks, and there is no entrance into the field. There is an entrance just on the north side of

Page 103

this railroad tracks into the field.

We did check with a -- I believe it was a salvage yard that was here, and there used to be a street -- I think it was called Dike Street -- that ran in there, but there's no indication that street has been there for years. It's closed off now, and it doesn't show up when you go up and down here. Again, this was done in 2000, and we were talking about

1556

something that was done seven, eight, nine years before that.

But we did notice if you go just north of the railroad tracks there is a field entrance. There is a wooded area that runs parallel to Lark Avenue, and there's also a wooded area that's out to the east just parallel to the railroad tracks. So if we would take this where this field entrance is shown on the map and move it just to the north side of the railroad tracks, the X would be about in the location which was later a site of the digging.

Moving over to --

Q.   Before you do so -- and I'm just -- not just for the sake of giving you exercise, but would you please go ahead and take Exhibit 1 and put it on the easel next to the one where you just described, and I'll just ask you if Exhibit 1 shows the location of what you ultimately decided appeared to fit that described and located on Exhibit 310.

A.   Yes.  Again, in this Exhibit Number 1 showing a map with Mason City on it, this is Lark Avenue running north and south, Highway 18 running into Mason City, and then there's an old Highway 18 which I think is called 19th Street or something like that in Mason City now.  I think they took the name off.  And we were down on Lark Avenue just north of these railroad tracks

Page 104

here.  On this map it's depicted -- the old Highway 18 -- looks like it's depicted as 255th Street.

Q.    And the location that you ultimately concluded appeared to

1557

fit the description shown on the map, Exhibit 310, is that marked on Exhibit 1 somewhere, sir?

A.    The 1500 block of Lark Avenue.

Q.    And there's an arrow pointing to that exact location that you felt fit the map?

A.    Yes, with adjusting it just a little bit to put the driveway to the north side of the railroad tracks.

Q.    With some slight discrepancies, you were able in looking at 310, that hand-drawn map, to locate what is located on Exhibit 1 as 1500 Lark Avenue?

A.    Yes.

Q.    Thank you, sir.  And before you leave Exhibit 310, was there any notation on that map itself as to where the bodies would be found in this general location?

A.    Yes, there was an X just to the left of the entrance to the drive.

Q.    And was there any description drawing your attention toward the bottom of it as to any further location of interest?

A.    Printed underneath says, Under the tree with the two tires under are the four, which is an indication that there would probably be two tires or should be two tires or may have been two tires at some time over this grave.

Q.    Under the two tires are the four.  Under the two tires --

A.    Under the two tires would be the four.

Q.    Are the four.

1558

Page 105

A. Right.

Q. Thank you, sir. Now, in the same manner if you would please draw your attention to Exhibit 311, describe for the jury what they see in 311, and describe for us how you used 311 in attempting to locate a second possible burial site.

A. Exhibit 311 again is on lined paper, and it shows what we believe to be a north/south road because there is an east/west road that's marked Old 18. Again, it has the house, abandoned house, and the lumber yard, so we took that to mean it was probably Lark Avenue still going south. So we did go south on that road to a T and where a blacktop goes east and west and went over to a road that is marked Killdeer Road, and that is depicted on the map.

The location on the map then shows that you go back west from this north/south road to Killdeer Road which is also a north/south Road, but it is gravel. And it shows an indication on which would be a southwest corner of an abandoned house. Then it shows a drive and what looks to be marked as a silo with kind of a circle and an X out behind the abandoned house towards the end of the drive.

We drove around, and we thought we found this location, although there was a slight difference. This abandoned house was not there anymore. The remains of it were. But it's about a quarter mile south of this blacktop road. The silos and what appear to be the remains of an abandoned house

1559

were there. We did some checking and found out that this house had been burnt down I believe in about 1996. So the basement area of it was still there.
Page 106

And there was a drive that went back into a field with two grain bins back on that south side of the drive. That tended to match this map.

In addition, on both of these maps, Exhibit 310 and 311, we drove about a two- or three-mile area around these looking for any other locations that would fit these two maps. We did not find any.

Q. The two indications -- excuse me. The two sites located on Exhibit 1 are the only two sites that you and Deputy Wright felt substantially matched the locations described in these two maps.

A. That's correct.

Q. Would you again just very clearly point out to the jury where these two sites are on Exhibit 1?

A. In Exhibit 1, the first one is marked with the arrow just north of railroad tracks as 1500 hundred block of Lark Avenue. The second one is on Killdeer Avenue. And I forgot to mention when we checked on the map there, there was a 911 flag out in front of the house with the address of 11524 which is the Killdeer Avenue address.

Q. Approximately how much time did you and Deputy Wright spend out there searching -- trying to locate these two places?

A. We started on October 3 late in the afternoon and into the

1560

evening driving around this area, and we picked up these two pretty quick. We again went out there on October 4th, the next morning, drove around to make sure that there weren't any others that fit that. We then went to the county recorder and assessor's office to ascertain who the owners were of these properties and get aerial maps or photos of them and to see if there were any others that might match that around there.

Page 107

Q.    And those two locations were the two locations that you and the deputy felt matched the locations on the maps.

A.    That's correct.

Q.    Thank you.  You can set those down now for the moment at least, and I'll help you.

You've told us that by October 4 you and the deputy were satisfied that you located the two places noted on those two maps.

A.    Yes.

Q.    Did you start digging right then?

A.    No.

Q.    What did you do?

A.    We went back to Cedar Rapids and had a meeting at the U.S. Attorney's Office and set up the logistics for bringing in an FBI search team, a cadaver dog, and obtaining some metal detectors to search the area with.

Q.    Felt that this may be a substantial undertaking.

A.    Yes.

1561

Q.    And so efforts were made to organize that undertaking.

A.    That's correct.

Q.    And can you describe for us what plan was ultimately arrived on both as to personnel and procedure?

A.    At that time it was decided that since we had the names of the property owners, the DEA agent would handle obtaining the search warrants for both properties and serving those when we decided to do the search.  The FBI was to bring in a group out of St. Louis to handle the excavation of the areas along with some other agents and technicians to help, and then there were one or two other DCI agents involved and some local officers

Page 108

also involved, and that was --

Q.  When did the formal effort begin?

A.  Not till the next week.

Q.  Calling your attention, sir, to October 11, did you and other law enforcement personnel again proceed to the Mason City area?

A.  Yes.

Q.  And briefly describe for us what happened in the commencement of this location and recovery operation.

A.  On the 11th of October we met at the Mason City airport, and everybody was briefed on the two locations.  After that debriefing and dividing up who was going to be in charge of what, we went down to what we called -- I believe it was site number 1, the Killdeer Avenue address.  And at that time the

1562

search warrant was served on the property owners, and then the search of that area began.  That was done under the direction of Mike Hochrein with the FBI.

Q.  Approximately how much time was spent there on that date if you recall?

A.  The rest of that day; I believe we probably ended up there some time around four or five in the afternoon.

Q.  There were law enforcement personnel from approximately how many agencies if you have any idea?

A.  Probably three or four agencies there.

Q.  And any idea approximately how many law enforcement personnel in attendance?

A.  No.  Agent Hochrein may have that as they kept a log of who came and went and who was present during that search.

Q.  We're going to have an opportunity to visit with Agent

Page 109

Hochrein, and it was actually his responsibility to do the most detailed documentation of the procedure; fair statement?

A.    That's correct.

Q.    This was done under his supervision.

A.    That's correct.

Q.    I'd just like to get some general descriptions from you before we get to the more particular from Mr. Hochrein if we can.

Agent Smith, I've handed before you two photographs marked Government Exhibit 904 and Government Exhibit 403.   Do

1563

you recognize the subject of those two photographs, sir?

A.    Yes.

Q.    And what do they show?

A.    That would be the site 1 and site 2, are Exhibits, I believe, 3 --

Q.    And are those aerial photographs?

A.    Aerial photographs of the area where I think would be actually depicted on the maps, 310 and 11.

Q.    Taken approximately the time of this procedure?

A.    Yes, on -- I believe these were taken on either the 11th or the 12th of October.  The FBI had a pilot come up and take some aerial photos of this as I understand.

Q.    And first drawing your attention to Exhibit 904, that's the one of which site, sir?

A.    That would be -- Exhibit 904 would be the Killdeer Avenue location.

MR. MILLER:  The United States offers Exhibit 904, Your Honor.

                        *   *   *   *
                        Page 110

(Government Exhibit 904 was offered.)

* * * *

MR. STOWERS: No objection.

THE COURT: 904 is received.

* * * *

(Government Exhibit 904 was admitted.)

1564

* * * *

MR. MILLER: And with the Court's permission would like to publish it at this time?

THE COURT: You may.

BY MR. MILLER:

Q. Exhibit 904 is now being displayed to the jury, and if you would, please, sir, describe what they see in this photograph.

A. This would be the Killdeer Avenue area that was on the map. I believe the 911 number was 11524 on this. Actually the map is -- or the photo is sideways. The road that's depicted on the bottom part here is a north/south road.

Q. So that just we're properly oriented, north is on the right. Would it be helpful to you and, more importantly, helpful to the jury and everybody else here to have the standard orientation with north at the top?

A. Yes.

Q. We can do that.

MR. MILLER: Counselor?

Q. Okay. Now is north at the top?

A. Yes.

Q. And again I notice that you have used the telestrator. Please feel free to do so, and as you do so, describe for the jury what, if anything, you're pointing out as the nature of

Page 111

this location as you found it during the initial search on the 12th of October.

1565

A.   At that particular time this field was fully planted and had not been picked yet, so there was corn out there.  And the original search showing the -- from the X on the map would have been out in this area out in here.  Actually that should be over here a little closer.  I'm not getting my -- it seems to be off a little bit.

Q.   What sort of personnel and/or equipment were used on the initial search on the 12th of October?

A.   They were used -- cadaver dog that was brought out there that was brought in by the FBI.  There were two agents that ran a ground-penetrating radar system over this area.  Metal detectors were used out in that area, and also Mike Hochrein was using a -- for lack of a better term a grain probe-type instrument in the ground out there.

Q.   Was there any success in discovering any anomalies or areas of interest?

A.   There were some area of interest about where I've marked here, and that ended up being an area where I think they found some bones of animals, farm animals, that had been buried out there.

Q.   You found a grave, but it wasn't a human grave.

A.   That's correct.

Q.   Farm animals.  Just so we're clear, there's a pair of silos in that photograph?

A.   Actually these two right here are grain bins.

1566

Page 112

Q. Grain bins. For those of us not as familiar with the terms, it's a pair of grain bins. You mentioned that there was a description of abandoned house and when you were out there there was the remains of a burnt-down house out there. Can you show us where that is?

A. Yes. That would have been up in this area right in here.

Q. Thank you. You can go ahead and clear that screen if you would, please. Just touch the screen right where it says the "clear all" button. There we go. This is the area, some hours spent out there searching on the 12th of October.

A. Yes, and I might add that before we actually started this search because of some of the growth between the field and the curtilage area, I did have the county engineers send somebody out with a mower, and it was mowed down in this particular area right in here.

Q. And you used a word that I think sometimes officers and lawyers use that maybe the general public doesn't always. Curtilage, what do you refer to when you use that term, sir?

A. It's outside of the area where the house would be on a farm residence.

Q. Okay. Part of the real estate very close to the residence itself but not inside the residence?

A. That's correct.

Q. Okay. Ultimately was there any success in locating the site of buried human remains on the 12th of October?

1567

A. No.

Q. Was there additional work done at either of those two sites?

Page 113

A. Again, we started on this site on the 11th, and they went back out there on the morning of the 12th to finish up a little bit, and there was nothing found on that site.

Q. Other than buried animals.

A. Right.

Q. Did you, while all these people were still out there on the 12th of October, take a look at the other site, the site that was on Lark Avenue?

A. Yes.

MR. MILLER: And with the Court's permission, I'd like at this time to publish Exhibit 403.

THE COURT: You may.

BY MR. MILLER:

Q. And I'm reminded by counsel it may not be clear from the record. Is 403 an aerial photograph of the Lark Avenue site taken at about the same time?

A. Yes.

Q. And does that show it as it appeared the time you guys were out there doing the work?

A. It doesn't show us out there, but it's a picture of that site.

Q. It doesn't show you out there, but it shows the site as it

1568

appeared at the time.

A. Yes.

MR. MILLER: Thank you. Government offers Exhibit 403.

*   *   *   *

(Government Exhibit 403 was offered.)

*   *   *   *

Page 114

MR. STOWERS:  No objection.

THE COURT:  Any objection?

MR. STOWERS:  No objection.

THE COURT:  403 is received.

                        *   *   *   *

(Government Exhibit 403 was admitted.)

                        *   *   *   *

MR. MILLER:  And again with the Court's permission, I'd ask counsel to display that.

THE COURT:  You may.

BY MR. MILLER:

Q.   What does Exhibit 403 show, and first let me know does this have north at the top?

A.   I believe it does.

Q.   Very good.  Please describe for the jury what they see in Government Exhibit 403.

A.   Okay.  This would be Lark Avenue down here.  The aforementioned abandoned green house that I talked about would

1569

be down on this corner where old Highway 218 kind of comes across this way.  This is a railroad track that goes across. Again, I mentioned the hand-drawn map that we had had some discrepancies.  It showed a field entrance to the south of these railroad tracks going back into the field with an X marked here. Actually as you can see on the map, the field entrance is on the north side of it.  In reality there is no entrance to the field at all down here.

On the 12th we divided into two groups when we came up here because there is an area out here that is also wooded, and we wanted to check that, so that was checked and handled by the

Page 115

FBI. This area was also handled by the FBI. They did come in and check this area, and it was about -- I can't really see it through the trees here, but that was a location where two tires were found over a slight depression in the ground.

Q. The location of two tires was of interest why?

A. That was mentioned on the map that there would be two tires and then that would be the four.

Q. Was mentioned on that hand-drawn map?

A. That's correct.

Q. What was done at that point, sir?

A. At that point the area was sealed until Mike Hochrein who was still down at the other site could get up there and take charge of that area and start digging and checking that area out.

1570

Q. You mentioned that upon removal of the two tires some depression in the earth was noted?

A. That's correct.

Q. Agent Smith, I've handed before you two photographs marked Government Exhibit 405 and -- excuse me, Government Exhibit 404 and Government Exhibit 405. Generally what do those two photographs show, sir?

A. That would be approximately the area in 404 and 405 where the slight depression and the tires had been.

Q. The location of that slight depression after the two tires were removed.

A. Yes.

Q. And showing it as it appeared before any excavation occurred on the 12th of October, 2000?

A. Yes.

Page 116

Q.   Thank you, sir.

        MR. MILLER:  With the Court's permission, the government offers Exhibits 404 and 405.

                    *   *   *   *

        (Government Exhibits 404 and 405 were offered.)

                    *   *   *   *

        MR. STOWERS:  No objection.

        THE COURT:  404 and 405 are received.

                    *   *   *   *

        (Government Exhibits 404 and 405 were admitted.)

                                                    1571


                    *   *   *   *

        MR. MILLER:  And with the Court's permission, I'd ask that the witness be allowed to publish those to the jury.

BY MR. MILLER:

Q.   And describe for the jury what they see in those two photographs.  Exhibit 404 currently on the screen shows what, sir?

A.   That would actually be the location where the two tires had been.  They had been removed before this picture was taken.

Q.   And I know it's difficult to see, but as you've indicated, there was a slight depression in the ground there?

A.   Would be kind of in this area here, yes.  It's hard to see in the photograph.

Q.   And does that show the nature of the terrain and the vegetation as it appeared when you were out there on that day?

A.   Yes.

Q.   And again moving on to Exhibit 405, if you can just briefly describe for the jury what 405 shows.

A.   That'd be the same area, approximately right in here where

        Page 117

the tires were located on that.

Q.    And recalling that aerial photograph, these areas were in that clump of woods visible just to the east of Lark Avenue?

A.    Yes.

Q.    After those depressions were noticed after removal of the tires, what was done next, sir?

1572

A.    At that time the cadaver dog was run over the area and did not hit on anything, and also the two agents with the ground-penetrating radar went over that particular area.

Q.    Was a more sophisticated effort made to locate the graves under the supervision of Special Agent Michael Hochrein?

A.    Yes.

Q.    And when I mention that, does just the fact that he's an FBI agent give him more sophisticated abilities than some DCI agent?

A.    No.  He has some expertise in excavating of bodies.

Q.    He was a man who has special expertise in body recovery?

A.    Yes.

Q.    So I assume that was turned over in large part to his responsibility at this point?

A.    Yes, it was.

Q.    Thank you.

       MR. MILLER:  This would be an appropriate break time, Your Honor?

       THE COURT:  This would, Mr. Miller.  Thank you.

       Members of the jury, we'll be in recess till one o'clock.  Please remember my prior cautionary instruction about keeping an open mind until you've heard all of the evidence and not discuss this case among yourselves or with anybody else.

Page 118

Thank you.  We'll see you back here at one.

(The jury exited the courtroom.)

1573

THE COURT:  Could I see the lawyers just for a second about scheduling?

(At sidebar off the record.)

(Lunch recess at 11:59 a.m.)

THE COURT:  Ready to have the jury brought in?

MR. MILLER:  Almost, Your Honor.  Just informationally, I met with defense counsel over the noon hour, and they, in order to allow me to give as close as possible to a chronological presentation, graciously allowed me to interrupt Agent Smith's testimony with that of Agent Hochrein.  They will cross-examine Mr. Smith now over what he's testified so far.

THE COURT:  Then you'll recall him?

MR. MILLER:  I'll recall him after we finish with Mr. Hochrein.

THE COURT:  That's fine.  Okay.

(The jury entered the courtroom.)

THE COURT:  Please be seated.

Mr. Miller?

MR. MILLER:  Your Honor, subject to recalling the witness at a later date on a matter in later chronological order, I have no further questions for him at this time.

THE COURT:  Okay.

Mr. Stowers, you may cross-examine.

CROSS-EXAMINATION

BY MR. STOWERS:

1574

Page 119

Q.    Mr. Smith is it?

A.    Yes.

Q.    Okay.  You had testified that you had located this place that you thought was described on a map on a Killdeer Road?  Remember that?

A.    Yes.

Q.    And it was a farm property with some grain bins and what was at the time that you found it in October of 2000 a -- the remnants of what once was a residence; is that right?

A.    Yes.

Q.    And there was some investigation done in the area where the X appeared on that map to see if any indications of human remains being buried there could be found in that particular spot where the X appeared on this map that Angela Johnson had drawn; is that correct?

A.    Yes, but the X kind of gives you a pretty good-size piece of area to look at.

Q.    Right.  But the jury will have the exhibit, and the X appears to be more directly behind the home there; is that correct?

A.    It's my recollection, yes.

Q.    And the remains were not recovered in that particular location.

A.    That's correct.

Q.    Okay.  Now, that map, the map on the Killdeer Road area,

1575

would you agree was less detailed than the map of the Lark Avenue location where the four persons were unearthed?

A.    I don't know that I could agree to that.

Q.    Okay.  For example, on the Lark Avenue location, we've got

Page 120

two different roadways identified.  We've got the Lark Avenue indication.  We've got a railroad crossing, and we got a description that the remains would be under a couple of tires; is that correct?

A.    That's correct.

Q.    On the map.  And that's, in fact, where the remains, as you know, were recovered.  We're going to hear about that a little bit later; is that right?

A.    That's correct, but I did describe that the field entrance that was shown south of the railroad tracks, there were discrepancies in it.

Q.    There was a flip-flopping there of the entrance for the field; is that right?

A.    Yes.

Q.    Now, this Lark Avenue area where the four remains were found underneath or nearly underneath these tires would be a wooded area adjacent to a farm field; is that correct?

A.    Wooded and kind of grassy or brushy area, yes.

Q.    And the time of those photos that you took I believe you've indicated would have been the fall, obviously October being the fall; right?

1576

A.    That's the time the photos were taken.  I didn't personally take them.

Q.    Okay.  And you know that these homicides that are charged in this case with regard to those four individuals would have occurred at the end of July of the year 1993, and that would have been late summer.

A.    It was my understanding it was some time in '93.  I didn't have the dates.

Page 121

Q.    And the undergrowth underneath that wooded area would have been green and alive and grown up some; is that correct?

A.    I wouldn't know.

Q.    And this area where the two tires were located, there's no street lights or anything of that nature there; is that correct?

A.    Not that I observed.

Q.    No man-provided lighting, if you will.  There's no -- any kind of illumination at all other than natural light I should say.

A.    That would be correct.

Q.    And they were some distance from the roadway, Lark Avenue, into the woods; is that correct?

A.    It would be some distance if you came in the driveway and then drove north, but actually from Lark Avenue, I didn't measure that distance, but you can see Lark Avenue.  It's not very far away.

Q.    Right.  But to get to Lark Avenue from where the remains

1577

were buried, do you remember you would have had to cross a creek and then go back through the woods?  You remember that?

A.    Yes.

Q.    And so the entryway as it's depicted in those aerial photographs would be a short farm access road that runs perpendicular to Lark Avenue?

A.    That's correct, in Exhibit 403.

Q.    Yes.

A.    Yes.

Q.    And it heads in towards a farm field.

A.    Yes.

Q.    And from that access road, if you headed north, about how

Page 122

many yards north would the remains have been discovered from where that access road is?

A. I didn't measure it since I wasn't in charge of that. I would be guessing.

Q. Approximately.

A. Ninety-five to a hundred yards maybe, something like that.

Q. A goodly distance.

A. If 75 or a hundred yards is a goodly distance.

MR. STOWERS: That's all I have. Thank you, Your Honor.

THE COURT: Mr. Miller?

MR. MILLER: No redirect, Your Honor.

THE COURT: You may step down.

1578

Ready to call your next witness?

MR. MILLER: Yes, Your Honor. The government calls Michael Hochrein.

MICHAEL HOCHREIN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated. Make yourself comfortable. And please adjust the chair and the microphones so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is Michael J. Hochrein, and Hochrein is spelled H-o-c-h-r-e-i-n.

THE COURT: Thank you.

Mr. Miller?

DIRECT EXAMINATION

BY MR. MILLER:

Q. Your occupation, sir?

Page 123

A.    I'm a special agent with the Federal Bureau of Investigation.

Q.    How long have you been an FBI agent?

A.    For approximately 16 1/2 years.

Q.    Beginning approximately when?

A.    In approximately 1988.

Q.    What are your -- where are you currently assigned?  And briefly describe your duties for us, please.

A.    Currently I'm assigned to the Pittsburgh division of the

1579

FBI in Pennsylvania.  Within that division I'm assigned to a small three-man office in the -- what's called a resident agency of Johnstown, Pennsylvania, which is about 80 miles east of Pittsburgh.  My responsibilities include investigations of federal -- violations of federal statutes, and I'm also a member of the evidence response team.

Q.    What is the evidence response team?

A.    The evidence response team is a group of agents and, in some cases, nonagents such as photographers or clerks who are involved in the collection of evidence not only in federal crimes, federal crime scenes, but also in state and local crime scenes if we're requested to do so.

Q.    How long have you been working in the area of evidence response as a part of a special team, sir?

A.    Since their development in the early 1990s.  The concept of evidence response teams developed in, I believe, 1990 -- between 1990 and 1995.  We were collecting evidence before then, but when the team concept developed, I began with them.

Q.    Agent Hochrein, would it be fair to say that in recent years and decades law enforcement has sought more and more to

Page 124

enlist the expertise of science in recovering and analyzing physical evidence in connection with criminal investigations?

A. Yes, sir.

Q. And did that have anything whatsoever to do with your own employment with the FBI?

1580

A. Yes, sir.

Q. Please describe that, and in doing so give us a summary of your formal background educationally.

A. My involvement in the evidence response team was not only to recover evidence in general such as fingerprint evidence, blood evidence, but because of my background as an archaeologist, I worked more often in buried scenes of evidence, evidence which had been buried intentionally or accidentally, and on recovering and documenting that evidence.

My background consists of an undergraduate degree and graduate experience in anthropology. Now, anthropology in general is the study of man or mankind from both prehistory all the way up to current times. Within anthropology there are several subdisciplines or different areas that you can specialize in. One of those is archaeology, and that's what I chose to specialize in.

My undergraduate training was with the University of Pittsburgh between 1978 and 1982. And then from 1982 to 1988, I enrolled in the graduate program in anthropology specializing in archaeology at the same institution and also went on for another degree in criminal justice at the same institution.

In 1988 I was hired by the FBI, and so those graduate degrees are still pending. I have not completed those.

Q. Just going back and reviewing your formal education

Page 125

briefly, sir, you mentioned anthropology and archaeology, and I

1581

think archaeology was described by you nothing more than being a sub-branch of anthropology. Can you distinguish the two areas any more specifically?

A. Yes. As one of those subdisciplines or sub-branches, it's one of several. For example, anthropology is divided into physical anthropology which is the study of human remains and the bones themselves or man himself. Linguistics is the study of development of language by man. Archaeology or -- well, before that, cultural anthropology is the study of cultures, man's development given the region of the world he is in and the different culture that he's exposed to. And archaeology is the recovery of evidence left by man.

So as an archaeologist we have to be well versed in not only how to recover this evidence but also what it might mean and how to reconstruct where it was found. So we have to be -- have to have some knowledge of all the other disciplines, physical anthropology. We need to recognize the bones as human or not human. Linguistics, if we encounter artifacts that have writing on them or certain types of language, we need to understand linguistics. Cultural anthropology, we have to understand the people that we're excavating, these artifacts, what they were about, some idea of their background.

Q. I take it then your initial involvement in the fields of anthropology and archaeology in school at the University of Pittsburgh was purely academic as opposed to being focused on

1582

Page 126

law enforcement?

A.    Initially it started that way.

Q.    And what, if anything, caused it to focus on law enforcement applications?

A.    In 1986 or 1987, the archaeologists from the university were asked by the Pennsylvania State Police to assist in locating and recovering the remains of a homicide victim that had been missing for 22 years or a possible homicide victim.  We were involved in that, located the site with the assistance of the Pennsylvania State Police, excavated that site, and were able to recover those remains.  And that was my introduction to how archaeology could be practically adapted to law enforcement situations.

Q.    And I take it that interested you.

A.    Yes, sir.

Q.    That wasn't your first involvement in field work.

A.    No, sir.  Before that and after that I have been involved in numerous prehistoric sites and historic sites throughout Pennsylvania and the eastern United States.

Q.    The areas of anthropology, physical anthropology, that is, and archaeology both involves a lot of field work and digs as we refer to them; fair statement?

A.    Yes, sir.

Q.    But in about '88 you were exposed to such work in connection with law enforcement as well.

1583

A.    Yes, sir.

Q.    And describe for us what that did in connection with your continuing graduate studies in this area and your employment with law enforcement.

Page 127

A.	At that time then I enrolled in the master's program in criminal justice, and while going through that program and working on completing the anthropology degree, I was recruited by the FBI and joined the FBI.

Q.	And just so we have your credentials covered, prior to your employment with the FBI, were you employed to participate in any field work, teaching, or research in the general academic field of anthropology and archaeology?

A.	Yes, sir, both with the University of Pittsburgh and with Carnegie Museum of Natural History which is also in Pittsburgh.

Q.	In both research and teaching capacities, sir?

A.	Yes, sir, as a graduate student teacher and also as a teaching fellow at the University of Pittsburgh.

Q.	Getting back to 1988 when you made this career transition and became, through personal experience, interested in the application of archaeology and anthropology to the field of law enforcement, you went to work for the FBI.

A.	Yes, sir.

Q.	Are there a vast number of people with your academic background doing such work for the FBI?

A.	No, sir, not an archaeologist or formal archaeologists.

1584

Q.	How many are there roughly?

A.	I believe there may be two of us.

Q.	Has the Federal Bureau of Investigation limited your work in the -- in its employment strictly to recovery of human remains over the years of your work with the FBI?

A.	No, sir. As a member of the evidence response team, our responsibilities extend to the recovery of all evidence, so in that respect I also collect fingerprint evidence, blood

Page 128

evidence, evidence that's more typical of a crime scene.

Q.   And I think you've already indicated you also have some general criminal investigative responsibilities.

A.   Yes, sir.

Q.   FBI agents, whether they have particular expertise or not, are expected to be able to handle general law enforcement duties and investigative duties as well.

A.   Yes, sir.

Q.   And you are now a veteran of how many years with the FBI, sir?

A.   Approximately 16 1/2 years.

Q.   Many of those, however, were at least largely concentrated in the area of evidence recovery.

A.   Yes, sir.

Q.   And even today are.

A.   Yes, sir.

Q.   Can you give us some idea of the -- I think you've already

1585

told us to some degree about your formal education in archaeology.  Can you give us some idea about the less formal education, in other words, what sort of ongoing training you've done in the field?

A.   In addition to the formal academic training, I've also -- once you get into the FBI, you have the opportunity to attend various seminars or programs.  I have attended the FBI academy's training on body recovery.  I've also taught at that program. I've also attended and then later taught at the University of Tennessee's forensic anthropology facility which is more popularly known as the Body Farm in Knoxville, Tennessee. Additionally, I do research and have publications in the area of

Page 129

forensic archaeology and also in crime scene mapping.

Q.   This may seem just a little bit ghoulish or grizzly, but what is the Body Farm, and what research goes on there, sir?

A.   The Body Farm is a nickname, if you will, given to the forensic anthropology facility associated with the University of Tennessee at Knoxville.  And at that facility they analyze and look at human remains and the decomposition of human remains in different environmental settings.  And over the years they've been able to collect a wealth of information on what happens to a body given its disposal at a certain -- in a certain environment.

Q.   You've mentioned participation in teaching at that institution.  Have you also participated in research there as

1586

well?

A.   Not at that facility itself, but with colleagues outside of the teaching, the research is separate in the area of what's called geotaphonomy.

Q.   And have you personally done any research in this area in the years following leaving full-time employment with academia?

A.   Yes, sir.

Q.   And can you just very briefly summarize what sort of research you've done?

A.   That research involves, again, what is referred to as geotaphonomy which is just a fancy word basically of looking at the grave itself, not the remains but the situation that they were disposed of and trying to reconstruct the scene based on evidence left of that -- of that -- in the case of buried bodies, graves.

So in effect it's an autopsy of the grave.  We're

Page 130

looking for evidence such as tool marks, what may have been used to create the grave; the rate at which soils depress or compress to tell us approximately how long the grave has been there; evidence such as footprints, knee prints -- sometimes people will kneel down before they put a body in -- the layering of the soil within the grave and outside the grave; how it differs and how it tells us the history of that grave or the buried evidence.

Q. So there's a number of things you're looking for.

1587

A. Yes, sir.

Q. I trust you don't always find these things.

A. Oh, no, sir.

Q. But you're always looking.

A. Yes, sir.

Q. Can you give this jury some understanding of how you -- first of all, if there are any standard protocols for going about this task, how you locate hidden or clandestine graves?

A. In general we work from the least-intrusive technique to find where buried evidence might be to then the most intrusive. And what I mean by that is we'll use, if they're available, techniques that will help us discover a disturbance beneath the surface of the ground without actually having to dig it up or disturb the ground itself.

Some of the more sophisticated techniques we use are things like ground-penetrating radar which is sort of like sonar in the ocean where a signal is sent down and reflects off an item or the different layers in the soil itself back up to the machine, and then a qualified engineer can look at that and tell us if there is a disturbance below there worthy of being

Page 131

excavated. It can't tell us whether there's a body there or a gun there or other piece of evidence, but it can at least limit the area that we have to look for when we do the excavation.

Other sophisticated techniques like that include infrared thermography where now we're looking for the difference

1588

in the way heat is reflected back from the hole that's dug in the ground once it's filled in and the area that's not disturbed.

Other techniques use electric signals which are sent down through the soils and then reflected back up or collected by the machine to tell us where there might be a disturbance. Those are the most sophisticated techniques.

Less sophisticated but not intrusive, again, because we're not disturbing, are just visual examinations. We'll look for depressions where the grave has or the pit has settled because the soils are now of a different nature than the undisturbed soils next to them.

We'll also look for differences in vegetation. Sometimes the vegetation will grow differently over a pit with a body in it because of nutrients or the difference in moisture than it will outside the grave where there is no -- where it has not been disturbed.

So after we've exhausted -- and another technique -- I'm sorry -- is things like cadaver dogs, dogs that are specifically trained to smell the scent of human decomposition. So once we've exhausted all those nonintrusive techniques, the techniques that don't disturb what we're looking for, then we have to go to a next level which is a little more intrusive.

Q. If I can interrupt you briefly, you've mentioned a variety

Page 132

of methods used that are not intrusive in attempt to locate a

1589

grave.

A.    Yes, sir.

Q.    Are they all equally effective in getting results?

A.    It depends in different environments, especially when we talk about cadaver dogs especially.  We have to go by the handler to see how qualified the dog is, and sometimes I've seen dogs that have located bodies under several feet of water miss a body that's been on the surface of the ground, have walked by it.

So the techniques differ depending on the environment, the nature of the animal or the equipment being used, or the operator of the equipment, so it varies between sites.

Q.    Is that why you might employ a variety of techniques in a given search as well?

A.    Yes, sir.

Q.    Now, you've indicated that in addition to unintrusive there are more intrusive efforts to locate buried human remains.

A.    Yes, sir.

Q.    And if you'd just briefly summarize for the jury what those are and how you go about doing those in your field.

A.    Some of those techniques -- again, now we actually have to intrude into the ground and see if we find evidence of something below that.  One tool we use is called a soil core probe or a soil probe in which we will insert it and it will take out a plug of soil.  And there we're looking for a difference between

1590

the soils in the disturbed area of a pit or a grave versus the
Page 133

soil core from the undisturbed area.

Also we're looking for signs of fabric, bone, other pieces of things that may tell us that something is buried at that specific spot.

Q.   Once you feel you have located a clandestine grave -- and let me begin by asking you first if you could define the term because we may be using that.  What is a clandestine grave?

A.   A clandestine grave is a secreted grave, a grave where the individual's buried with the intention of someone not finding them versus a legitimate grave where we have a marker or some -- we're not -- the person who buried that individual is not necessarily worried that they might be found.

Q.   And in opening up a clandestine grave, do you in your field follow any particular procedures, and do you have any particular aims or objectives in following those procedures, sir?

A.   Our first objective is to do as little disturbance to the evidence that's underground as possible.  So after we've identified that there may be something buried there, then we'll open up what is called a test excavation or a very small hole down to the remains so that we can, number one, verify that we have remains, in some cases human remains, and the distance we'll have to excavate it, and that also provides us a starting point where we're going to expand our excavation toward the edges of the pit or grave that the remains are in.

1591

Q.   I take it that you're interested in trying to find as much as possible approximate date of burial?

A.   Yes, sir.  The evidence that's in that grave helps us to not only identify that there are remains there and what they might be but also how they got there and when they got there.

Page 134

So an important part of archaeology is documenting exactly where all the pieces of evidence associated or in that pit fall. So we take a tremendous amount of time in these excavations to plot in three dimensions the position of the evidence, photograph it, and to determine its relationship to the body or other pieces of evidence.

Q. I trust in hopes that if there is any evidence that might help uncover circumstances of the death that it won't be lost.

A. Yes, sir.

Q. Whether and to what degree you locate such evidence I take it varies from case to case.

A. Yes, sir.

Q. That's the nature of forensic science.

A. Yes, sir.

Q. I'm interested in the procedure of exhumation to the extent there is documentation of findings. Can you describe that for us briefly?

A. The way we document the findings is we try to be as redundant as possible. So not only do we do a written log or description of what we're finding, but we'll also back that up

1592

with diagrams that are measured diagrams, and we'll also photograph the evidence so that, for example, if I'm -- I do an excavation and for some reason a piece of evidence isn't clearly visible and is missed in the diagram, it may be picked up in the photograph or it may be picked up in the written description of the excavation.

Q. And vice versa.

A. Yes, sir.

Q. Reason for the redundancy of documentation.

Page 135

A.    Yes.

Q.    Now, ordinarily, sir, when you are involved in such human remains recovery projects if we can phrase it that way, is there one person in charge of the project?

A.    Normally we have a number of people.  I would typically be in charge of the excavation itself.

Q.    And briefly of whom would you be in charge, and what would their duties be?

A.    If the people are available to assist me, we would have myself doing the excavation with possibly one other person because you don't want to have too many people excavating it because archeological excavation is as much -- involves a sense of feel or touch as it does any other of the senses.  So if we're switching people in and out, what I feel as being the edge of the grave may be different than someone else feels; and, therefore, we lack that consistency.

1593

We also have a person called a scribe, a person just to take notes and help and assist in drawing the maps; the photographer we would have.  We would also have people assigned to scene security to document who is leaving or coming into the scene and then various other people involved in tasks like screening.  Once the fill is removed from a grave, it's then put through screening material so we can catch very small items that we may not have seen while we're doing the excavation.

Q.    Agent Hochrein, in the fall of the year 2000, were you involved in a project relating to the search for and ultimately recovery of human remains in the Mason City, Iowa, area?

A.    Yes, I was.

Q.    And were you -- at least beginning at the point where a

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1395 of 3592

grave was discovered, were you the person in charge of those recovery efforts?

A.   Once the excavation began, then I was in charge of that excavation.

Q.   Okay.  And as you've described the personnel, did you have such personnel at this site, photographers, scribes, and what have you?

A.   Yes, sir.

Q.   And did they act under your supervision?

A.   Yes, they did.

Q.   Tell us, please, how you first became involved in the Mason City death investigation or at that point missing persons

1594

investigation.

A.   On or around October 6 of 2000, we were actually putting a course on in St.  Louis involving training for human -- the recovery of human remains when I was notified by the Omaha division of the FBI that they had located possible sites of buried human remains in the Mason City area.

So we made arrangements to come to -- members of the St.  Louis team made arrangements to work with the Omaha evidence response team from the FBI and state and local investigators to get together and look for first and then, if we found them, excavate these graves in the Mason City area.

Q.   You arrived there approximately when if you recall, sir?

A.   On October 11 is when we came into Mason City.

Q.   Law enforcement personnel from other agencies also present?

A.   Yes, sir.

Q.   And off the top of your head, can you give me any idea the approximate number of law enforcement personnel and the number

Page 137

of agencies participating?

A.   Oh, I believe at times there may have been as many as 20 people involving Iowa's Division of Criminal Investigation, Mason City Police Department, the FBI from St. Louis and Omaha. Eventually the medical examiner's office from the state of Iowa was also at the excavations.

Q.   Without getting into the substance of what was said, I trust a briefing was among the first orders of business?

1595

A.   Yes, sir.  We had -- the first thing is that a group of -- DEA was also there, DEA, FBI, DCI, Mason City.  We had a briefing at the airport.

Q.   Regarding what information law enforcement had at that point.

A.   Yes, about these possible graves.

Q.   Were search warrants executed?

A.   Yes, sir.

Q.   And I believe we've already heard from Agent Smith -- you're acquainted with Agent Smith.

A.   Yes, sir.

Q.   -- as to the execution of two search warrants, one at a location on a burnt-down or abandoned farm site on Killdeer Avenue and another one by a stream up on Lark Avenue.  Do you recall those two locations, sir?

A.   Yes, I do.

Q.   Which of those two first involved your activities?

A.   The first site we visited was the site on Killdeer Avenue.

Q.   And that would have been when, sir?

A.   That would have been on October 11.

Q.   Please go ahead and describe for the jury what you did on

Page 138

that date at that location.

A.     On that date myself and members of the FBI's St.   Louis team, Omaha's team, and also the members of the technical assistance team from Quantico, Virginia, the FBI laboratory team

1596

that has sophisticated techniques that I spoke of such as ground-penetrating radar, we arrived at the Killdeer Avenue site.   And once we were given the search warrant, we began to search for, using the ground-penetrating radar and soil core sampling, the location of possible graves.

Q.     And were any possible graves located?

A.     The possible graves, we found a number of different features which could have been graves.   Our problem is that we found so many features that we had to select what looked like the most promising, so we used a soil core sample, and we came up with a site that had -- ground-penetrating radar told us there was a pit there, and we also took a soil core and came up with a piece of bone in the soil core.   So we began an excavation.   And after doing an excavation of approximately a three-foot-square area, we were able to determine that this was actually the burial of a calf or a cow.

Q.     I take it the problem was too many possible grave sites.

A.     Yes, sir.   Throughout the whole area, there were a number of features that could have possibly been graves, so we decided that what we would do is map in the area and then move on to the next location until we had better information about that site.

Q.     Understanding that the first opened grave held animal remains.

A.     Yes, sir.

Q.     And expecting that many others might as well.

Page 139

A.    Yes.

Q.    So after that time spent there at the Killdeer Avenue site, you moved on to the Lark Avenue site; is that correct?

A.    Yes.

Q.    Go ahead and please describe your first involvement or awareness of any productivity at the Lark Avenue site, sir.

A.    On October 12 we were finishing the mapping of the Killdeer site while other investigators were over at Lark Avenue, and we were notified they found what they believed might be a spot where the grave was situated based on a description that they had of two tires or some tires being put in the area of the grave.

So after we completed the mapping of the Killdeer Avenue site, we went over, and we began again that protocol of first using the most -- the least-intrusive techniques and then more intrusive to see if we did, in fact, have a grave.

The first technique we used was to use the cadaver dog.  The cadaver dog did not alert to any human remains.  So then we used ground-penetrating radar, and the ground-penetrating radar identified a possible pit in the area of a depression near a bush.

Q.    And purely for the sake of clarification, I don't know as there's any confusion at all, but with the Court's permission, I'll ask you to take an easel over to the jury and just make sure they have a clear understanding of what you've been

referring to as the Killdeer and Lark Avenue sites using Exhibit

1, the map of Cerro Gordo County with the Court's permission.

THE COURT: You may. Could we have the witness wear the mike too?

MR. MILLER: Yes, please.

BY MR. MILLER:

Q. And again just very briefly remind us what you did on the 11th and 12th as far as which site you looked at first and then which second.

A. Yes, sir. This is Exhibit 1 which is a map of the general Mason City/Clear Lake area. And on the 11th we began down at this location which is marked Killdeer Avenue. After we were unsuccessful in locating human remains at that site, we then finished the mapping on the morning of October 12 and moved immediately up to the Lark Avenue site which is marked here as 1500 block, Lark Avenue.

Q. Thank you, sir. Before you return to the witness chair, if you could just move that easel to make sure that everybody on the jury is able to see you from the jury box while you testify. It may be room enough okay. I just can't tell from my angle. And then go ahead and resume for the moment -- you can keep that lavaliere on. In a little bit I'm going to be asking you to show us some things on the easel, but for a little bit yet we can testify from the witness box.

THE COURT: Can all the jurors see the witness with

1599

the easel there? Okay. Thank you.

Q. Agent Hochrein, you've indicated that a depression in the earth was discovered under a pair of tires at the Lark Avenue site.

A. Well, the tires were not there at the point we reached the

Page 141

Lark Avenue site.

Q.    They'd been removed.

A.    Yes, but it was indicated to us where the tires were.

Q.    They'd been removed by other law enforcement personnel immediately prior to your arrival.

A.    That was my understanding, yes, sir.

Q.    And did you indeed observe a depression in the ground at that location?

A.    Yes, sir.

Q.    On the desk before you, sir, are two photographs marked Government's Exhibit 406A and Government's Exhibit 406B.  What do they show in general?

A.    In general these are both aerial photographs of the Lark Avenue site.  The 406A is a more distant view, aerial view, of the site.  And Exhibit 406B is a close-up or zoomed-in view of the site.

Q.    And would they assist you in describing the terrain and the area that you worked in those days?

A.    Yes, sir.

            MR. MILLER:   Government offers Exhibits 406A and B.

                                                              1600


                                *    *    *    *

            (Government Exhibits 406A and 406B were offered.)

                                *    *    *    *

            MR. STOWERS:   No objection.

            THE COURT:   406A and B are received.

                                *    *    *    *

            (Government Exhibits 406A and 406B were admitted.)

                                *    *    *    *

            MR. MILLER:   And with the Court's permission, I'd ask

                            Page 142

that they be published at this time.

THE COURT: You may.

BY MR. MILLER:

Q. Beginning with 406A, Counselor, and as it appears before you -- and feel free to use the telestrator if you wish to do so -- would you go ahead and describe for the jury what this location is and give us an understanding of the terrain as well.

A. 406A shows, again, the vicinity of the Lark Avenue excavation where we have the railroad right-of-way running south. The top of the picture is north. The railroad right-of-way is south of the site. And if you look closely, this area in the approximate center where we have a blue tarp, that's the actual area where we located a grave. Access to that site is off of Lark Avenue through this which was an existing road for access to this field, and the grave itself, as you can see, is among -- is in a wooded area off to the side of the

1601

field.

Q. The area that you have circled there, is that the area where this depression in the ground was found below a couple tires?

A. Yes, sir, it is.

Q. Thank you. Please continue if you have any further -- I see a bunch of vehicles in the area. Is this a photograph that was taken during the course of your work, sir?

A. Yes. This was taken during the course of the excavation. All these vehicles in the field are law enforcement vehicles, and then there would be security persons to monitor who would be coming in and out of the site.

Q. Why security?

Page 143

A.   Because there were media at the site, and there was -- to avoid contamination or any other issues, we always want to make sure we understand who's been to the site and leaves the site.

Q.   You've mentioned a blue tarp that is to be seen in that circle.  The purpose for that blue tarp was what, sir?

A.   Twofold.  It first served as protection from the elements in case it rained and also again to protect the site from being looked at from people who weren't authorized to be there, non-law enforcement people such as media.

Q.   And this was on October 12, year 2000?

A.   Yes, sir.

Q.   And I take it there was considerable media interest in the

1602

area once this major excavation project began.

A.   Yes, sir.

Q.   Please continue.  Show us 406B and describe for the jury what they see in that photograph.

A.   Okay.  On 406B, if we were to turn it 90 degrees clockwise -- I don't know if that's possible -- again now, the top of the page is north, and this is a more close-up view.  If we were to zoom in on this area, you would actually see the tarp again and the area where we identified the location of the grave.

Q.   Just a slightly closer aerial photo of the same general area?

A.   Yes, sir.

Q.   Thank you, sir.

         MR. MILLER:  We can put that down now.

Q.   What was the nature of that terrain as far as degree of vegetation or any other features that you noted?

Page 144

A. The vegetation was moderate to heavy. It was a flat area, a flood plain. If you noticed in those photographs, there was a tributary or a creek. That's Crane Creek that ran from the southwest to the northeast alongside the site. Consequently, it was a flooded area in which you had episodes of flooding that we could determine while we were doing the excavation. And it was also wooded and next to this cultivated field.

Q. You've already indicated that after retrieval of the tires

1603

and the discovery of the depressed soil you went to that area. What did you do at first, sir?

A. The first things we did are after we located the grave using our visual examination, our GPR, and without success, although we used it, the cadaver dog, we then took a soil core sample in the approximate center of this depression, and that soil core sample revealed not only a difference in the area where we took the sample but outside of that area in what we felt was undisturbed ground.

In addition to that, the soil core also had pieces of bone inside the soil core sample. So just as over at Killdeer, we knew that we had an area in which we needed now to open up and investigate to see what was buried underneath there.

Q. Did the test excavation yield any results, sir?

A. Yes, sir. After we took the soil core sample, then in that same area we opened up an approximately 15-inch-by-15-inch-square area in which we excavated basically a box or a window down to what was underneath the surface. And at about nine inches below surface, eight or nine inches, we discovered skeletal material or bone.

Q. Any particular kind of skeletal material, sir?

Page 145

A.   It was a mixture of both non-human bone and also human bone.

Q.   Before you, sir, is a document exhibit.  Am I correct in saying that's Exhibit 408?

1604

A.   Yes, sir.

Q.   And does that -- what is 408?

A.   408 is a diagram I prepared based on measurements using a surveyor's transit of the Lark Avenue scene.

        MR. MILLER:  Offer Exhibit 408.

                    *   *   *   *

        (Government Exhibit 408 was offered.)

                    *   *   *   *

        MR. STOWERS:  No objection.

        THE COURT:  408 is received.

                    *   *   *   *

        (Government Exhibit 408 was admitted.)

                    *   *   *   *

        MR. MILLER:  And if the Court would permit, I'd like to publish it at this time.

        THE COURT:  You may.

BY MR. MILLER:

Q.   It's entitled figure 7 but bears a government exhibit sticker of 408.  And can you just very briefly describe what that shows, sir?

A.   Yes, sir.  408 is figure 7 of my final report.  In the top half or everything above this line that I'm drawing is a plan view or a Byrd's eye view of the site, the Lark Avenue site in general.  Below that is an elevation view or a profile of what you might see, the change in elevation if you are standing on

Page 146

the south side of these tracks or on this road and looking across the site.

This where I'm marking now is the roadbed for Lark Avenue. And then it went -- elevation slightly went down until you had Crane Creek, and then this is the area, looking in profile again, where the actual excavation was.

Up on the top part of the diagram, this grid of squares is the grid that we put in place to do the measurement, mapping, and photography of the excavation of the grave as we went down through it.

To give you an idea of some scale, each of these small squares in this grid system, they're one-meter-by-one-meter squares because that's the convention we typically use in archaeology. That's approximately three feet per square. So you're looking at about a nine-foot-by-six-foot area in that grid system.

Q. Sir, I've handed you Government Exhibits 409, 410, and 411. And can you tell us just generally what the subject of those photographs is, sir?

A. Exhibit 409 is a close-up view of that approximately 15-inch-by-15-inch-square window or test excavation that we began with over top of where we thought the grave was.

Exhibit 410 is even a closer view of what we found at the bottom of that test excavation. And Exhibit 411 is a photograph standing on the east side of this grid system looking

westerly on in the excavation.

MR. MILLER: Government offers Exhibits 409, 410, and

411.

* * * *

(Government Exhibits 409, 410, and 411 were offered.)

* * * *

MR. STOWERS: No objection.

THE COURT: 409, 410, and 411 are admitted.

* * * *

(Government Exhibits 409, 410, and 411 were admitted.)

* * * *

BY MR. MILLER:

Q. And again, assuming the Court consents to doing so, I'll ask that you go ahead and display those to the jury through Mr. Williams' assistance and describe for the jury making clear the record as to which exhibit they're looking at as to what each shows.

A. Again, this is Exhibit 409 which shows a close-up view of the test excavation. Before we set up a grid system and to further confirm that we have possible remains buried at this site, we opened up this square. And you're looking -- you're looking from east to west across this square.

Q. Please continue. 410?

A. Now in Exhibit 410 we're looking down into the bottom of this 15-inch-by-15-inch-approximately-square excavation, about 8

1607

or 9 inches down below surface, and this is where we realized that we had bone consisting of animal bone. These smaller bones that I'm drawing around now are animal bones. And then I recognize these from my training and experience as the clavicles. That would be the end of one of your -- your clavicle or your collarbone, and the rest of these bones include

Page 148

basically the upper -- the neck region of a human individual.

Also in there you'll see pieces of leaf material and then threads or fibers which are consistent with the remains of clothing. It's not . . .

Q.   Before we go on --

MR. MILLER:  Your Honor --

THE COURT:  Looks like you broke it.

MR. MILLER:  I was going to suggest that Mr. Williams had broken it, Your Honor.  The "clear all" feature is having a little bit of difficulty.

BY MR. MILLER:

Q.   Let me just ask you a couple things about this photograph, and the fact that you've used the telestrator I don't think is going to impair us at this point.  You've indicated that you discovered both non-human and human remains during the initial digging.  Can you describe that and what your findings, if any, were as to the non-human remains?

A.   Initially we thought that because we had dug our test excavation right in this area of remains, we thought that

1608

perhaps we might have a small animal that was intentionally placed on top of the remains.  I thought, not being a mammalogist or a zoologist, that these might be a small dog or a cat.

Eventually we collected these remains, and they were sent to the Department of Interior, Fish and Wildlife forensic lab, and they were identified as a combination of possum bones and shrew bones.

So I don't know that much about possums, so I did some research, and I found out that possums, what they will do is

Page 149

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1408 of 3592

they won't hibernate during the winter, but they will winter -- over during particularly cold spells, they'll find an already-dug burrow of an animal, and they'll go in, and they'll line it with leaves, and then they'll hold out during the very cold weather in these burrows.

So this turned out to be entirely natural phenomena. This wasn't an intentional placement because eventually through the excavation we were able to locate the burrow entrance to what turned out eventually to be a chamber. This wasn't a pit dug into the grave already. This was a chamber that already existed from animals that burrowed in, possibly the shrew, and then once it was abandoned, the possum moved in and died in the burrow.

Q. So the --

THE COURT: Could we take just a short stretch break,

1609

and we'll see if our high-tech person who just arrived can fix the problem. Thank you. Everybody can take a stretch break. Thanks, Rick.

Thank you, Rick. Thanks so much. Really appreciate your help.

Q. Mr. Hochrein -- excuse me, Agent Hochrein, the process that you've described began on the 11th including the first efforts to locate a grave at the Killdeer site. You finished your work in Mason City area on approximately what date?

A. Late in the evening on October 13.

Q. And during this period of, what, 36, 40 hours, what have you, did you work continuously, or did you stop and take breaks?

A. Our protocol is to work continuously. We don't stop once we open up the ground to avoid any sort of contamination or

Page 150

possibility of animals or any other sort of effect on the grave.

Q.   Aren't you concerned about human fatigue?

A.   Not necessarily because when -- my experience has been that when you begin these excavations or examinations that your body, it does not seem as long as it is.  I had no problem with fatigue.

Q.   You work on adrenaline sometimes in your profession.

A.   Yes, sir.

Q.   And the fact that you stuck with the project from beginning to end actually has some scientific purpose?

A.   Yes, sir.  Again to avoid contamination and keep

1610

consistency, we're not changing personnel and to avoid any effect that weather, animals, or other environmental factors might have on the remains if we were to leave them overnight and come back.

Q.   I'm now handing you what I showed to Mr. Stowers as State's Exhibits -- excuse me, Government's Exhibit 412, 413, and 414. Do you recognize just the general subject of those three photographs, sir?

A.   Yes, sir.

Q.   And what's the general subject of those three photographs?

A.   Exhibit 412, 413, and 414 are all shots taken of me, photographs taken of me, while the excavation was ongoing.

Q.   And do they help illustrate the process of excavation that you used?

A.   Yes, sir.

         MR. MILLER:   The government offers Exhibits 412, 413, and 414.

                        *   *   *   *
                        Page 151

(Government Exhibits 412, 413, and 414 were offered.)

                              *   *   *   *

                MR. STOWERS:  No objection.

                MR. MILLER:  And with the Court's permission, we would publish Exhibit 412.

BY MR. MILLER:

Q.    And that now being before the jury, would you please go

                                                          1611

ahead and describe what they see in Exhibit 412 and continue on to 413 and 414.  You can direct Mr. Williams yourself as to the change.

A.    Yes, sir.  If we could orient it 90 degrees counterclockwise, in this photograph we're partway through the excavation of individual number 1 or the uppermost individual. In the last photograph that you saw, that was a close-up of the neck area or upper -- the thoracic area of that top-most individual, individual number 1.

          In this photograph what you're seeing is using small hand tools, in this case a trowel, to remove the fill and material around the remains or any other evidence without disturbing their original position because that position tells us a story about how those remains got there and what happened to them over time.

          You'll also see in many of the photographs that we took at the site a white line.  Those are typically the strings that represent a grid system around our excavation.  Those do a couple things.  They help us as an aid in mapping all the evidence that we find in the grave or at the scene, and they also help to represent as a scale.

          For example, if this was a wider shot and I saw this

Page 152

string attached to two pins at either end, I would know that that's a one-meter area or one-meter length of string or part of my grid system or about three feet, so now I have a scale to

1612

judge my photograph from.

In this photograph the north is in this direction. We're actually looking down from the east. The top is the west. And the bones that you're looking at that we're in the process of uncovering include the rib cage of individual number 1. This is the humerus or arm bone, the upper arm bone, his -- individual number 1's left arm bone.

Q. When you say this, I don't know as you indicated.

A. I'm sorry. This bone that I've circled or put a square around right now is the upper arm bone of individual number 1. This would include individual number 1's rib cage. And then these bones are that close-up you saw in the previous photograph of the neck area or thoracic area.

Q. Thank you. Please continue to the next slide which would be Exhibit 413 which shows what, sir?

A. In this -- in this photograph, Exhibit 413, we are continuing with the excavation of individual number 1 or that uppermost individual. And we're using in this case a vacuum to -- once we loosen that fill, we're removing it with a vacuum because in some cases -- and not in this situation but on some other graves we've found that by removing the fill once we've loosened it with a vacuum, we can remove and take it away from tool marks that are left inside the grave, and those tool marks can be cast. So that's why we're using the vacuum.

Now, all the fill that is being suctioned up in the

1613

Page 153

vacuum does not go through any fan blades or anything that would damage anything that may be vacuumed up. And all that fill is then taken over to screen mesh that is at least a quarter inch in size, sometimes a 16th inch in size, to recover any small items, things like very tiny finger bones, fingernails or other evidence that we miss in the grave.

Q. And that work including the screening was done under your supervision, sir?

A. Yes, sir.

Q. Please continue.

A. Now, in this photograph we see the jaw of individual number 1. This is the rib cage again of number 1. I'm circling -- or putting a box now around the hipbones of individual number 1, and this is again his -- that I'm putting the box around is the humerus or upper arm bone, left arm bone, of the individual number 1.

Q. Thank you. And again moving on to Exhibit 414.

A. And this is again a continuation of that excavation moving further down across individual number 1. And what we're trying to do is preserve the shape of the grave as best we can tell by using small tools. What I'm holding there is a small plastic implement that we scrape away the dirt from the bones so we do minimal amount of damage to them and, again, the vacuum, scissors and root clipper to remove roots.

This individual -- in those upper zones you have a lot

1614

of root activity. And the top-most individual took most of our time to excavate because he was -- this individual was literally

Page 154

sewn into the ground and to the other remains by all the roots that ran through him and over him.

Q. Now -- go ahead.

A. Just to get you oriented again, we're standing on the east side looking toward the west, and these are the hipbone or the hip of individual number 1. These items here of fabric are actually the pocket lining of pants that that individual wore.

You may notice that some of the -- in the other photographs what looked like a lot of root activity. Some of that was actually the synthetic fibers or the non-natural fibers that sewed together the shirts or the other garments worn by this individual.

So the cotton or the wool, the natural fibers, would decompose over a period of time, but those synthetic fibers, the polyester or whatever they may be made of, those will survive. So that gave us an indication that this individual was wearing a shirt and pants at the time of burial.

Q. In the last several photographs you've referred to bodies of someone you've identified as individual number 1. Were there more than one individual in this grave, sir?

A. Yes, sir.

Q. How many?

A. There were a total of four individuals.

1615

Q. And I want to ask you just a couple questions about the general grave and its contents before getting back to the four specific individuals and your findings with regard to them. Did you, sir, arrive at any professional opinion regarding the timing of the burial of these four remains with respect to one another?

Page 155

A.    We could tell based on the lack of soil in between the individuals and their relative position to each other they had been put into that grave contemporaneously or about the same time.  There was not a long delay as if one person was put in, covered up with soil, and then later on another individual placed on top.  From what I could tell and based on my experience, this was similar to a mass grave situation in which you had a number of people put into a grave at one time.

Q.    And have you had experience in dealing with mass graves?

A.    Mass disasters, and I've also worked with colleagues who have excavated mass graves.

Q.    Just digressing for a moment, what mass disasters, if any, that this jury might be familiar with have you worked on?

A.    Some of them, the World Trade Center bombing, 9-11, I was stationed to the Fresh Kills landfill where we recovered human remains.  I also worked at the Oklahoma City bombing to recover human remains and also the crash of Governor Carnahan's airplane which three individuals were killed in the crash of his aircraft in Missouri.

1616

Q.    Agent Hochrein, we've talked about the timing of these four burials in relation to one another.  Did you arrive at a professional opinion as to the timing in relation to the years or with respect to the time of exhumation?

A.    We got an approximate idea based on the plant activity through the grave.  In particular, there was a root that ran across the legs of individual number 1, and we were able to send that root to a botanist who was able to tell us approximately how long it took for that root to grow to that particular size based on the little rings like you would counting tree rings,

Page 156

how many growing seasons had gone by in order for that root to grow across the individual number 1's legs.

Q. And what was the finding?

A. She found that at least four growing seasons went by in order for the root to grow to that size.

Q. Is that an indication that it was no more than four growing seasons?

A. No, it meant that at least four seasons went by, possibly more because the plant from which that root was growing from was located further away from the grave, so it took additional time for the root to grow across and then to the size that it did across the remains.

Q. At least based upon your findings, was there anything whatsoever inconsistent with a date of burial approximately seven years prior to your exhumation?

1617

A. No, sir.

Q. Did you arrive at any opinion based upon your work and observations there as to the means by which these bodies were interred? And by that I mean employment of any tools.

A. As I spoke of earlier, one of the things we look for are tool marks. In this case the nature of the soils -- they were very disturbed. This was a flood plain which showed frequent episodes of flooding. It also appeared to be a dump site where different soils may have been brought in over time. So the soils were very mixed. It wasn't like typically we might find in an open field where we have the different layers or horizons of soil that once they're dug into we see a clear distinction between the inside and outside of the grave.

In this case we had to go by the position of the

Page 157

artifacts and the bodies within the grave, and we also had to look at the nature of the soils to determine how that grave may have been looked at.

And when I talk about nature of soils, what I'm speaking of is the layering within the grave. If a piece of heavy equipment was used to dig this grave, for example, we might expect to see that general mixed fill go back in basically one or two large episodes. It would be generally -- generally mixed.

In this case we were able to see different lenses or different episodes where a smaller amount of soil was thrown in

1618

each time.

So once we cross-sected this and looked at the soils, the grave fill and profile, we could see distinct shovelfuls, handfuls, small amounts of soil being put back in.

That led me to believe, based on the size of the grave only being about six and a half feet by two and a half feet long and wide and only being about two and a half feet deep, and the fact that we saw these small lenses filling it back in that heavy equipment wasn't used. Rather, probably a shovel or some other small device was used to fill in the grave and, if they were using that to fill in the grave, then the likelihood that it may have been excavated with the same implements.

Q. Small hand tools.

A. Yes, sir.

Q. Agent Hochrein, there are four matters I wish to discuss with you before I conclude my examination. You did, in fact, exhume four bodies during that project --

A. Yes, sir.

Page 158

Q.   -- over those many hours?  And what I'd like to do is go with you one by one what your findings were with regard to the skeletons recovered one by one as to each of these four.

THE COURT:  Mr. Miller, before you do that, I didn't formally admit 412, 413 and 414, although they came in without objection, so I want to make sure the record's clear that 412, 413, and 414 are admitted.

1619

                              *   *   *   *

(Government Exhibits 412, 413, and 414 were admitted.)

                              *   *   *   *

MR. MILLER:  Thank you, Your Honor.  The government does offer them, and I appreciate that they're entered.

This will take -- I trust we'll finish up today with any luck at all.  I could certainly cover the first victim before the break or whatever the Court prefers.

THE COURT:  Yeah, why don't we go a little longer. Thank you.

MR. MILLER:  Okay.

BY MR. MILLER:

Q.   You've indicated the first victim or individual number 1 I think you referred to him as, that took somewhat longer than the three subsequent exhumations; is that correct?

A.   Yes, sir.

Q.   And the reason for that was what?

A.   The reason was twofold.  Again, the nature of the soils containing a lot of root activity which made it -- didn't make it easy to dig through the soils, and also we were feeling out where the edges or borders of this grave might be, so that took a little longer.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1418 of 3592

Q. Did you, during the initial stages of exhumation, arrive at any findings as to the position and posture of individual number 1?

1620

A. Yes, sir.

Q. Please describe that for the jury.

A. Again, without referring to a diagram I created, my recollection is that the individual was facing with his head to the east in an east/west direction. He was the uppermost individual, and he was -- that individual was laying on its back with the chin slightly elevated up. The arm position for that individual had -- the left arm was extended down along the left side and then across the back with -- my recollection again is that the right arm was bent up and along the right side -- the left side, I'm sorry. His right arm was along his right side and behind his back, and then the left arm was along the left side and bent up toward his head -- toward the individual's head.

Q. You told us an hour ago or more that there was redundancy in the form of documentation, diagrams drawn, notes taken, and photographs taken; is that correct?

A. Yes, sir.

Q. Were all such three done in connection with these exhumations?

A. Yes, sir.

Q. And just so we're very clear, the photography was done by whom?

A. By the photographer for the Omaha division of the FBI, LaVone Tienken.

1621

Page 160

Q.   Now, the federal government I trust is at least somewhat like our state and local governments.  It doesn't have infinite resources.  Was she extremely careful and parsimonious about how many pictures she took, or did she run off quite a number of films?

A.   She took as many as we required.

Q.   And did you assist me in selecting just those few which would most assist you in describing what you did and what your findings were?

A.   Yes, I did.

Q.   So if I hand you just a dozen or so photographs, would that be at least representative and of assistance to you in describing what your findings were there?

A.   Yes, sir.

Q.   Agent Hochrein, I've placed before you a pile of exhibits which I believe -- and please check and verify for me so that our record is accurate that they are marked as Government Exhibits 416, 415, 418, 419, 420, 421, 422, 423, and 424.

A.   They are.

Q.   And do those photographs as a group document photographically the recovery of individual number 1 from this mass grave?

A.   Both the photographs and the diagram labeled as 415.

MR. MILLER:  Very good.  The government offers Exhibits 416, 415, 418, 419, 420, 421, 422, 423, and 424.

1622

*   *   *   *

(Government Exhibits 415, 416, 418, 419, 420, 421, 422, 423, and 424 were offered.)
Page 161

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1420 of 3592

* * * *

THE COURT: That would be 415 through 424 but not 417.

MR. MILLER: Yes, Your Honor.

THE COURT: Yes. Any objection?

MR. STOWERS: None.

THE COURT: They're admitted, 415, 416, 418, 419, 420, 421, 422, 423, and 424.

* * * *

(Government Exhibits 415, 416, 418, 419, 420, 421, 422, 423, and 424 were admitted.)

* * * *

BY MR. MILLER:

Q. Agent Hochrein, I am now showing you what is marked Government Exhibit 451. Do you recognize that, sir?

A. Yes, sir.

Q. What is it?

A. This is a profile map that I drew based on measurements taken at the Lark Avenue scene of the four individuals in the grave looking in profile or if you were to take a side view of them.

Q. Now, you've indicated that Exhibit 415 is a diagram of individual number 1. That's taken from what angle?

1623

A. That is a plan view or a bird's eye view if you will of the first individual.

Q. Okay. 451, on the other hand, is a profile view of not only the first individual but with acetate overlays each of the four that you exhumed?

A. Yes, each individual's on a separate acetate or transparency to show its position to the next.

Page 162

Q.   And again for the purpose of demonstrating to the jury the relative location of these bodies and the manner in which they were recovered, would Exhibit 451 assist you in describing your work?

A.   Yes, it would.

MR. MILLER:  Government offers Exhibit 451 as well.

*   *   *   *

(Government Exhibit 451 was offered.)

*   *   *   *

THE COURT:  Any objection?

MR. STOWERS:  No objection.

THE COURT:  451 is received.

*   *   *   *

(Government Exhibit 451 was admitted.)

*   *   *   *

BY MR. MILLER:

Q.   You've already described the posture and position of this victim.  Did you, during the course of your recovery, happen to

1624

note and recover any clothing or personal effects?

A.   Yes, sir.

Q.   And please describe.

A.   As I mentioned before, in addition to the pocket linings and the synthetic fibers, there were also rivets which gave us an indication that this individual was wearing a blue jean-type pants at the time of burial.  This individual also had synthetic fibers running across the area of his chest and upper body which would indicate that he had clothing on his upper body also, a shirt of some sort.

Individual number 1 also had a green -- a small green
Page 163

sock in his mouth, and that -- above that and wrapped around that was a piece of what I recognized as silver -- I call it duct tape.

Q. You've repeatedly mentioned the fact that you've observed synthetic fibers standing alone. What's the explanation for that, sir?

A. As I mentioned before, the natural fibers, the cotton or wool or whatever are natural material, tends to decompose much quicker than the synthetic material over time. So those had all rotted away and decomposed leaving only the polyester or synthetic threads that held them together.

Q. Here's what I'd like to do with the Court's permission and counsel, of course. I want you to explain to the jury what your findings were using these photographs and those two diagrams as

1625

aids to the jury's understanding of your findings. Would you be able to go through those photographs identifying very clearly for the record which photograph you are describing and relate each to the diagrams to the extent that that would be helpful in describing for us your findings in the recovery of the remains of individual number 1?

A. I would.

Q. And are you still wearing that lavaliere?

A. Yes, sir.

MR. MILLER: With the Court's permission?

THE COURT: You may.

BY MR. MILLER:

Q. Please do so. We'll ask Mr. Williams to take your cue as you direct us to any particular photograph.

A. Can I put the diagrams up at this point?

Page 164

Q.   Yes, please, with the Court's permission?

THE COURT:   Yes, and that lavaliere mike, you can put that in your coat pocket.   They didn't teach you that one in FBI school, huh?

THE WITNESS:   No, sir.

A.   If we could go to the first photograph.

MR. WILLIAMS:   I'm sorry.   What --

MR. MILLER:   You have to turn on the microphone.

THE WITNESS:   Is it on?   Testing.

A.   If we could have Exhibit 416, and if we could turn that --

1626

this is the direction in which this top individual was photographed.   What I'd like to do is turn that around 180 degrees so that it matches up with the diagram which we drew from the opposite side of the grave.

So to orient you, first on the diagram, let me explain some of the marks you may see here.   The solid black lines that are in a square, that's our grid system.   That on the photographs are the white strings that you see.   So each of these strings from this -- from these spots on Exhibit 415 we're looking at, each of these symbols, this quartered black and white circle, that's a convention we use to designate a survey pin or in the photographs what you might see as a red and white pin.

Attached to those is the lines which represent the lines of our grid system, and this distance from each pin is 1 meter or about 3 feet, 3.3 feet.   The other lines you'll see on this exhibit, the diagram, is a solid dashed line -- or I'm sorry, a dashed line.   That is our excavation, the actual pit that we dug in search of these remains and the grave.   And then

Page 165

the dotted line is our feeling of where -- my feeling of where the actual edge of the grave was as excavated by whoever dug it to place these bodies inside.

In diagram now you're looking at -- it matches up with the photograph. Exhibit 416 matches with 415 now. And some of the items that I may have mentioned before I'd like to point out

1627

is item 34. That's the root which ran across the upper leg of individual number 1 about 8 -- between 8, 10 inches below surface. That root eventually continued on to this. This solid circle is a symbol we have for a bush, and that root belongs to that bush, and it would have taken at least four years according to the botanist for this root to grow to the size it did at the point we collected it across the upper legs.

Position of the body again is with the head to the east. The top of the diagram is north. Body is slightly bent, and the chin is raised up, and inside the chin if you look at the photograph, inside the jaw you can see green material. That's the green sock that I referred to before. Individual -- these are the pocket liners or the inside of the pockets from the pants. He also had one shoe on his right foot or this individual's right foot, and this individual had two socks on.

Q. Please continue, sir. Well, let me ask you this. You just talked about the right -- he had one and only one shoe on?

A. Yes, sir.

Q. And that was on the right -- right shoe?

A. Yes, sir.

Q. Now, we can get to this later in other photographs, but you've already indicated that you incorporated redundancy in the documentation of your findings, photographs, diagrams, and

Page 166

notes.

A.   Yes, sir.

1628

Q.   And is the purpose so what might be missed in one might be caught in another?  Is this an example of where that redundancy was of some purpose?

A.   Yes, sir, and as we'll see in other photographs that we'll show you is -- in the diagram or while we were excavating it, we did not notice that there was a ligature or a piece of rope tied around one of the ankles possibly to the other one.  And the way we collect these remains is we collect them and we pick them up and we put them over on to a sterile cloth and wrap them in much the position they're in the grave so to disturb them as little as possible.  So that rope or that ligature was not immediately noticed during the excavation.  But in examining the photographs, we were able to see that later on.

Some of the other items that I'd like to point out, where you see this dashed circle on the diagram, those are the areas where the hand bones were collected.  We decided that instead of mapping each individual finger bone which would have added an enormous amount of time that we would collect them en masse and package them together.  So these areas where the circles are are individual number 1's hands where his hands were positioned.

You'll see here also this dashed line, this square. That is the extent of our test excavation, and that photograph you saw earlier was right in this area of the collarbones and neck area.

1629

Page 167

And then also you'll see on this diagram and in the photograph is a ligature or a rope, a clothesline-type rope wrapped around the forearm or the wrist area on the right hand or arm extending over to the wrist of the left arm which is behind this individual's back. So in effect individual number 1 is laying with this hand up, this hand behind his back, and the two are attached with a piece of clothesline or rope material.

Q. Clothesline running behind the victim's back.

A. Yes, sir.

Q. And I just want to point out two other things before we move on to a different slide. You've indicated the presence of duct tape and a green material. And since I'm near the telestrator instead of you, but correct me if I'm wrong -- and I know Rick got this so it's my fault -- the area that I'm circling, is that the area where the duct tape and the green cloth were found?

A. Yes, sir. You're looking -- if you were to view this, you are looking up underneath individual number 1's chin and out the side where the mouth would be is the green sock or green fabric.

Q. And for the record, I'm now circling a different portion with the telestrator. And can you tell me what object I'm circling there?

A. Those are the ligatures which are referred to here on the diagram or the clothesline-type rope attaching the right and left wrist areas.

1630

Q. Thank you, sir. You've also indicated Exhibit 451. What does that show with relation to this subject?

A. 451, if I had a sheet of blank paper, I could separate

Page 168

the . . .

THE COURT: Carey has some blank paper if you need it.

Q. We'd need something a little larger than 8 1/2 by 11; am I correct?

A. Yes, sir, but I can try and do it with this. Okay. Just so it's a little clearer, what I've done is I've inserted blank paper to separate the top individual, individual number 1, from the other individuals. And in this Exhibit 451, you're looking at a profile or side view based on the measurements we took of the grave of how that individual sat as the uppermost individual. Here again is the duct tape around the eye area, and this is the green material which I recognize as a small sock that was in the mouth area. These would be the pant pockets and the right shoe, socks, and general layout of the bones as we recorded them.

Q. Thank you, sir. Continuing on to Exhibit 418.

A. Okay. 418 is a close-up view next to the white scale, a photograph of what's depicted in Exhibits 415 and 451 as evidence item number 59, and that's a billfold or a wallet. That was found behind the right hip or where the rear pocket of the pants might be of this individual, and it also gave us an indication of where the side of the grave was because you'll see

1631

it's on an angle. It's not laying on a surface horizontal. It's sitting on an angle which means it must have been against the wall of the grave. And again, on the diagrams, this is the location of that piece of evidence, evidence item number 59, which is that wallet or billfold.

Q. Thank you, sir. And I have handed you a larger piece of paper if that will assist you in isolating the specific

Page 169

individuals in Exhibit 451.

Please continue with the next photograph, and describe for the jury what they see.

A. Okay. For Exhibit 419, this is a close-up view looking at individual number 1's feet as if you were standing down here -- looking at the bottom of the photograph would be the edge of the grave or the feet. You're looking at the right shoe, and then the ligatures you see that I referred to before that we could not clearly see while we were excavating are barely visible underneath the edge of the sock on the right foot.

Now, the other bones you see, these bones here, are of individual number 1. These remains are of individual number 2, and then here we see the bones that we eventually would relate to individual number 3.

Q. You've already indicated that these four victims were placed in that grave with no intervening material between them.

A. Yes, sir.

Q. What, if any, complications did this have on the recovery

1632

process and identification of the individuals?

A. Well, as I talked about before, we decided that we would collect the hand bones en masse in general and package those together. Well, what happens and what is typically in mass graves is that when you have multiple individuals, sometimes the hands of one are touching the hands of the other. So in this case I believe there was some commingling or mixing of some of the individuals' hands. So you might have some finger bones of individual number 2 mixed with individual number 3 because their hands were touching or close together.

Q. Moving on to Exhibit 420, sir.

Page 170

A. Okay. If we could turn that 90 degrees clockwise. In this photograph we're looking -- if I can refer to Exhibit 451, you're looking across the right shoe, and the bones in the background are actually of individual number 3. These would be the leg bones or the lower leg bones of individual number 3, and this is individual number 2 -- or number 1, I'm sorry.

In this photograph you also get an idea of some of the -- the edge of the grave because these bones were in an elevated position, not a natural position as if you would fall laying flat across the ground, so this was an indication to us that this is actually the wall of the grave or the edge of that grave in that direction.

Q. And just while we're looking at that photograph, that's a shoe with a sock on it?

1633

A. Yes, sir. This is the right shoe and the right sock of the individual number 1.

Q. And in fairness to your job as an excavator, does garments like socks and ropes tend to take on the color of the dirt surrounding them in which they are interred for years?

A. Yes, sir. That's another reason for the redundancy is in some of these photographs you may have -- and I have a difficult time sometimes in distinguishing between the fabric or the bones and the soil because they tend to take that color on. We call it soil staining of the bones.

Q. And distinguishing between a fold in the sock and an actual piece of rope is likewise difficult for the same reasons.

A. Yes, and especially in this case because, again, our idea is to uncover those remains, and then when we pick them up, we want to pick them up in the position that they were sitting in

Page 171

the grave so we don't want to disturb them that much.  So here where we had the feet so close together it was -- we missed that ligature, not seeing it because it was mixed in with the socks and appeared to be about the same color.

Q.    It was, however, packaged together and sent to the morgue.

A.    Yes, sir.

Q.    And the autopsy physician would be in a better position to separate and identify those separate pieces of clothing or ligatures.

A.    Yes, sir.  We do no examination of the remains like a

1634

forensic autopsy at the scene.

Q.    Thank you, sir.  Again feeling free to return to the easel, I'd like for you to describe for the jury what they see in Exhibit 421.

THE COURT:   Before we do that, why don't we take our mid-afternoon break.  Would that be okay?

MR. MILLER:   Very good.

THE COURT:   Members of the jury, it's about 20 to 3. We'll be in recess until 3:10.  Thank you.

(The jury exited the courtroom.)

THE COURT:   Anything we need to take up?

MR. MILLER:   No, sir.

MR. STOWERS:   No, Your Honor.

THE COURT:   Okay.

(Recess at 2:42 p.m.)

THE COURT:   Ready to have the jury brought in?

MR. MILLER:   Yes, sir.

(The jury entered the courtroom.)

THE COURT:   Please be seated.  Thank you.

Page 172

Mr. Miller, you may continue your direct examination.

MR. MILLER: Thank you, Your Honor.

BY MR. MILLER:

Q. Mr. Hochrein, before you do anything else, I'll ask that you return to the easels. I have a couple questions about some of the notations on the documents. I believe both 415 and 451

1635

there are numbers located at various locations. Can you just describe for the jury what those are in general so that they aren't left guessing as to any of the unexplained markings on those two diagrams?

A. Yes, sir. On Exhibit 415, next to each of the symbols which represent one of those survey pins, you'll see an alphanumeric number, numbering system for the grid system. That helps us identify on the packaging and as we excavate where we are within the grid system. Our starting point is always designated by this symbol, a triangle with a dot in it. At least that's the convention our team used on this site. And it's designated -- its value is 0-0 meaning that's the center of our little grid system universe. As we move to the west or the east, we add on a number and a letter to indicate how far we're going east or west.

So if we were to stay on this line and an item happened to be a meter directly north on the line, the value would remain at one -- it would change to 1, dash, 0, meaning it hasn't gone to the east or west. But as we move over, this intersection of the grid system is 0-W-1 meaning that we're -- we haven't moved north or south up or down from 0-0, our starting point, but we have moved 1 meter west. And so 0-W-2 means we've moved 2 meters west but not north and south, and a

Page 173

symbol such as 1-W-2 means that we're 1 meter north and 2 meters west of our starting point.

1636

And our whole idea is that when we map in these sites, we want to leave being able to reconstruct it based on one spot so that when I leave this site I'll leave a stake in the ground or some sort of thing that if I ever have to come back and map in additional evidence I can tie it back into this one point. And as long as I've oriented my grid system north-south, I can tie it into the location of all the evidence we found this first time. So that's the meaning of the numbers and letters.

Q. Are there similar landmarks on Exhibit 451?

A. Yes. Underneath the white paper you'll see this is west-3 because we're looking at if we're standing on the 0 line. So this means this point is 3 meters west of our starting point which is over here.

Q. And I ask you these questions, sir, not because it's necessarily all that important to an understanding of your findings but rather just so that we don't have any confusions. These are a portion of a scientific convention so that your work could be reviewed at a later date by anyone else in your field?

A. Yes, sir.

Q. Thank you, sir. Likewise as to various other items on these documents that have not been fully explained, there is a crosshatch grid at the bottom of Exhibit 415. What, if anything, does that designate, sir?

A. This item labelled -- it looks like another little grid system. This is actually a piece of wire fencing or, as was

1637

Page 174

explained to me, hog wire that was at the edge of the grave next to the bush which is designated by this symbol.

Q. And finally just so that we don't have a lot of miscellaneous markings that are unexplained that might lead to confusion or wonder on the part of any fact finder here, there is at some point on Exhibit 415 the word crotovina. I'd like you to point that out and explain again just briefly what that designates.

A. On Exhibit 415 in the area of this dashed line is the word crotovina. That's just another fancy geologist term for an infilled burrow. Once an animal abandons a burrow, you may have a flood occur and sediment builds up and fills in the burrow. The remnants, what we can see archeologically is we can see the outline of that burrow, and that's called a crotovina.

Q. And that again was a natural animal function following burial of these four bodies.

A. Yes, it is.

Q. Let's -- moving back then to the issue of items and findings of significance with regard to the burial of these four incidents, I asked right before the break that you describe for us the subject of photograph 421.

A. Okay. In 421, you're looking -- if I can refer you to diagram 415, in this photograph you're looking at the area of individual number 1's right arm or wrist area right here. Then we have this individual's spine, and what you don't see because

1638


they've been removed to get further down in the excavation are the ribs of the rib cage.

So again, this is individual number 1's spine, his right arm. This is the forearm, the two bones that make up our

Page 175

forearm, lower forearm, and then this is the humerus or our upper arm, this individual's right arm. And attached is that ligature I spoke of attached to the right area of the forearm or wrist, and this ligature went down behind the rib cage or behind the back and to the left -- area of the left wrist.

Q. Thank you, sir. Moving on to photograph Government Exhibit 423, what does this show, sir?

A. This is how we remove the remains and try and keep them in the context or position they were in the grave for packaging so that when the medical examiner or the physical anthropologist or whoever might examine these remains in the laboratory gets them as close to the position as we remove them from the grave. So what you're looking at in Exhibit 423 is a photograph of individual 1 removed from the grave with his right shoe, feet. His laid -- this individual's laid on its back with everything in the approximate position of where we recovered it from the grave.

Evidence that was collected en masse such as the finger bones, hand bones, or any evidence that came from the area, this level, from which we had individual 1 was then placed in these bags as they were recovered from the people doing the

1639

screening, and those were also packaged with individual number 1. And we packaged them in a white sheet that we get right from the store that's clean and as far as we know uncontaminated, and they'll then be wrapped in this white sheet for delivery to the medical examiner's office after they're labelled.

Q. Continuing to look at Exhibit 423 and specifically the right foot and ankle, understanding that there is some difficulty in distinguishing visually folds in sock from
Page 176

ligatures, is that the location where photographs revealed something not necessarily disclosed at the time by the naked eye?

A.   Yes.   In the area of the right ankle, there would have been -- the ligature was tied or around the right ankle in that area.

Q.   Those were not collected by you at the scene but rather sent with the body to the morgue?

A.   Yes, sir, because, again, we do as minimal examination of the body as possible.   Our idea is to get it and get it to the medical examiner as quickly as possible not disturbing it in any way.

Q.   You collect the body, document the location, collect any surrounding evidence, and transport what you've recovered to the morgue for further, more-detailed findings.

A.   Yes, sir.

Q.   Thank you.   Please continue on to Exhibit 424, sir.

1640

A.   Exhibit 424 is a photograph of individual number 1 completely wrapped, and inside is that white sheet that the remains are wrapped in again covered by plastic over that, and then we've labelled all of the collection information, the date, the time, who collected it, and its evidence number.

In some cases this packaging might be a single bag of bones or maybe fingernails or other small items that were collected on the screen.   What we do in that case is we will -- we don't know their exact position because we haven't plotted them by piece in the grave, but we know that they came from at least a three-foot-by-three-foot-square area at a certain level, and we'll mark that on the bag, and we'll designate it by the

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1436 of 3592

number in the southwest corner of the grid system that they came from, and that's a typical archeological convention.

Q. Agent Hochrein, I'm handing you what is marked Government Exhibit 400. Do you recognize that, sir?

A. Yes, sir.

Q. What is Exhibit 400?

A. This appears to be the billfold that I referred to in earlier exhibits and photographs and is represented on diagrams Exhibit 415 and 451 as evidence item number 59, and the package is labelled as 59, and these were the contents of that wallet.

Q. The wallet itself was collected at the scene by yourself or others under your supervision?

A. Yes, sir.

1641

Q. Okay. And the condition of that item is changed from the time of collection in what respect, if any?

A. When we collected it, we collected simply the wallet. The only item we removed from the wallet in an effort to identify this individual was the driver's license. All these other items remained as far as I'm aware inside the wallet.

Q. With that explanation and one change in its condition, is it present as found at the scene, sir?

A. Yes, sir.

MR. MILLER: And the state offers Exhibit -- excuse me, the government offers Exhibit 400.

* * * *

(Government Exhibit 400 was offered.)

* * * *

MR. STOWERS: No objection.

THE COURT: Any objection?

Page 178

MR. STOWERS:  No objection.

THE COURT:  400's received.

                    *   *   *   *

(Government Exhibit 400 was admitted.)

                    *   *   *   *

BY MR. MILLER:

Q.    And if you would briefly describe for the jury what they find in each compartment of Exhibit 400, and I'm specifically interested in the -- well, all of the compartments but

                                                    1642

specifically the driver's license.

A.    In addition to the comb, hair comb, that was found, some of the items that were apparently removed from this wallet included an emergency identification card, a Iowa driver's license card in the name of Gregory James Nicholson, and an Osage Farmers National Bank card of some sort.

Q.    There's also a paper bag that you used to package the item at the scene.

A.    Yes, sir.  This would have been a bag that we put this evidence in and then sealed with tamper-proof tape.

Q.    Thank you, sir.  You can set that down on the table before our court reporter perhaps.

       And before moving on from that subject, using Exhibit 415 and/or 451, would you describe for the jury where that wallet was located?

A.    The wallet or item 59, evidence item 59, was found behind the right hip of individual number 1, and this is its location in Exhibit 451.

Q.    Assuming he was buried in largely natural garments such as possibly denim, was that wallet at least found in the location

                    Page 179

of where a rear pocket to such a garment would be?

A. It was consistent with the wallet being in a rear pocket.

Q. And finally handing you Exhibit 501, please tell us if you recognize that document and what it is.

A. Item number 501 is the bag in which we collected what

1643

appears to me to be the ligature that was removed from the hands, the right and left wrists, of the individual number 1, and it's so marked on the packaging.

Q. And does that show that ligature, except for the fact obviously that it's been packaged up, in substantially the condition in which you recovered it from the wrists of the individual number 1 from this mass grave?

A. Yes, sir.

MR. MILLER: Government offers Exhibit 501.

* * * *

(Government Exhibit 501 was offered.)

* * * *

THE COURT: Any objection?

MR. STOWERS: No objection.

THE COURT: 501's received.

* * * *

(Government Exhibit 501 was admitted.)

* * * *

BY MR. MILLER:

Q. And place that down by Exhibit 400 if you would, sir. And it may be easier just to remain where you are rather than having you bouncing like a yo-yo between the witness chair and the exhibit, but feel free to do so if it will help you explain the photographs to the jury.

Page 180

Below individual number 1, did you recover the remains

1644

of someone identified to you at the time as individual number 2?

A.    Yes, sir.

Q.    Please describe the position and location of individual number 2.

A.    Individual number 2 appeared to me, based on my experience and training, to be another adult human skeleton that was underlied -- directly underlied individual number 1.  That means there was no soil between them.  There was no leaf material. They were directly on top -- number 1 was on top of number 2.

Q.    Agent Hochrein, I have handed you Government Exhibits 426, 427, 428, 429, 430, and 431.  Is that correct, sir?

A.    I also have 433, but all the other numbers are correct.

Q.    What do those exhibits, namely 426 -- excuse me, no -- yes, 426, 427, 428, 429, 430, and 431 as a general matter, what subject do they show?

A.    These all relate to individual number 2.

Q.    And were they photographs taken at the time that body was collected showing your work in collecting that body?

A.    Yes, sir.

      MR. MILLER:  Government offers Exhibits 426, 427, 428, 429, 430, and 431.

                        *   *   *   *

      (Government Exhibits 426 through 431 were offered.)

                        *   *   *   *

      MR. STOWERS:  No objection.

1645

Page 181

THE COURT:  426 through 431 are admitted.

* * * *

(Government Exhibits 426 through 431 were admitted.)

* * * *

BY MR. MILLER:

Q.   Sir, Exhibit 451 is still before you as an exhibit.  You've shown us one of a number of acetate overlays.  Are there others that show the relative locations from a horizontal view of each of the remaining victims that you recovered?

A.   Yes, sir.

Q.   Using 451 in addition to the 6 photographs I've just handed to you, I want to go through with you what your findings were. First, however, in general, what, if any, clothing or personal garments, personal items, did you find in relation to this body?

A.   Individual number 2 again showed evidence of those non-natural or synthetic fibers in the area of that individual's torso or chest area and back area indicating that that individual wore a shirt of some sort or an upper garment.  That individual also had what I recognized as a bra.  The individual also had pants that I recognized as sweat pants or athletic-type pants.  Both feet had socks, and this individual also had just the right shoe associated with it.

Q.   Now, 426 is a diagram of the body that you prepared?

A.   Yes, sir.

Q.   As it appeared in the grave.

1646

A.   Yes, sir.

Q.   And is there an enlargement of that as well that can be used for purposes of demonstrating to the jury what you were finding?

Page 182

A. There is, sir.

Q. Go ahead and with the Court's permission just set that on the easel. I think it's lying on the floor in front of the court reporter, 426.

THE COURT: You may.

Q. And please using Exhibit 426 and 451 with the subsequent overlays, I'd like you to describe for us as I go through these photographs what your findings were in such a fashion that the jury is properly oriented; okay?

A. Yes, sir.

Q. First of all, 426, what does that show us, sir?

A. Okay. 426 is again a bird's eye view or a plan view of individual number 1 as it would appear after -- individual number 2, I'm sorry, after individual number 1 had been removed.

MR. MILLER: And with the Court's permission, I'd like to now publish Exhibit 427.

THE COURT: You may.

BY MR. MILLER:

Q. And again, would it -- is this properly oriented? I guess perhaps it is.

A. Yes. In this case the body is oriented in the photograph,

1647

Exhibit 427, in the same direction as the diagram, so we don't have to turn that around. But this is a good example of how that discoloration from the soil makes it difficult to see the difference between the soil and the remains, and that's why we often combine the photograph with diagrams such as this that are based on measurements taken of each point in the grave.

Q. And again, orienting the jury as to the location of this body, would you show on Exhibit 451 where individual number 2

Page 183

was located and recovered?

A.   Exhibit 451 is a side view, again, of individual number 2 as she laid -- or as it laid beneath individual number 1 which was on the previous acetate.

Q.   Again, with no fill in between the two bodies.

A.   No fill was between the two.

Q.   Showing the jury Exhibit 428, please describe for the jury what they see in this photograph.

A.   In Exhibit 428 is a photograph as if you were standing between the legs of individual number 2 facing west.  So the top of the photograph is west.  This is north over on this side. And what you're looking at is a close-up of individual number 2's right and left feet.  Individual number 2 was laying on its belly with the face down and the head cocked slightly to the -- that individual's left side -- or right side, I'm sorry. Individual number 2's left arm was extended down and across and under that individual's body so across the belly or chest, lower

1648

chest, where the -- and the right arm was fully extended along that individual's right side with a rope connecting -- or not connecting but at least attached to the left wrist that we could tell and heading in the direction of the right wrist or hand.

Q.   Agent Hochrein, specifically directing your attention to Government Exhibit 428 on display before the jury, do you note there in that photograph anything in the nature of a ligature?

A.   Yes, sir.  This individual also had ligatures attaching the right and left ankles.  These are the ligatures as they -- as we exposed them through excavation around each ankle, and they're depicted on diagram or Exhibit 426 by this -- represented down here.

Page 184

Q.    Okay.  And I just want the record to be perfectly clear.
As with individual number 1, you to the best of your ability
recovered this body as nearly in one piece as possible and
returned it to the morgue for further and closer examination?

A.    Yes, sir.

Q.    As far as detailed examination of the ligatures on the
ankles itself, did you do any such other than simply removing it
and photographing it?

A.    No, sir.

Q.    So as to whether or not -- you indicated ligatures
connecting the two ankles.  Were -- the ligatures that were on
both those two ankles, do you know for sure whether they were
actually still connected at the time of the removal of the body

1649

or not?

A.    No, sir.  The only indication, what I mean is there was
evidence that one side of what appeared to be a ligature wrapped
around one ankle and the other side.  Whether they were actually
connected, that was something we didn't note right there.  That
would be determined by the laboratory.

Q.    Whether they were connected at the time of the removal of
the bodies.

A.    Yes, sir.

Q.    And again, that would be something for which the autopsy
physician would be better capable of answering.

A.    Yes, sir.

Q.    Moving on to Exhibit 429, sir, you've already described for
us a ligature extending from the area of one wrist to the other.
What does Exhibit 429 show?

A.    Exhibit 429 is a photograph, a close-up view, of individual

Page 185

number 2's -- I believe this is her -- this is this individual's left arm -- I'm sorry, right arm with the ligature as we found it around the two bones that make up the forearm of the individual. And then it's not in context here because we've removed this individual and put it on a sheet, a white sheet, but this would have extended across the body of individual number 2 underneath the belly or lower chest.

Q. And again, in site, before removal from the grave itself, the location of that ligature was what, sir?

1650

A. This ligature was again attached to the -- to individual number 2's right wrist area or forearm and then extended across or underneath that individual underneath the belly or lower chest.

MR. MILLER: Exhibit 430, please, Counselor.

Q. Shows us what?

A. This is individual number 2 removed from the grave and laid in approximately the same position as it would have been inside the grave with the exception of the skull has been turned around. This individual on that image is laying on the belly or on the front. And again, all the associated bones, be they finger bones or any other fingernails or other type of evidence, are packaged, collected, marked relative to where they came from the grave in general and then packaged with that individual.

Q. And you've indicated it's lying on its belly with the exception of its skull is face up.

A. Yes, sir.

Q. But in relative anatomical position before wrapping up.

A. Yes, sir. And in the previous photograph that you saw, it was a close-up of this area, of the left forearm and ligatures

Page 186

found in association with it.

Q. And finally Exhibit 431, please, shows us what?

A. This would be individual number 2 fully wrapped and ready to be delivered or taken to the medical examiner's office with all the identifying information of how that individual was found

1651

and by whom.

Q. Agent Hochrein, you've already discussed what was left of the clothing on the body of this victim. You've described a ligature on each ankle and one on the wrists, a shoe on her right ankle and a sock. Did there -- in the neighborhood of her head, was there any additional bindings?

A. Yes, sir.

Q. Describe.

A. Individual number 2, like individual number 1, had a piece of what I recognized as silver duct tape wrapped around the face area, and beneath that duct tape in the mouth area was a greenish material which appeared similar to the green sock that was in individual number 1's mouth.

Q. Large sock?

A. I'm sorry?

Q. Large sock or a small sock?

A. No, it was a small sock from what I could see.

Q. Possibly a child's sock?

A. Possibly, yes, sir.

Q. I've handed you Exhibit 601. Do you recognize that, sir?

A. Yes. This appears to be and is marked as the rope which was found around individual number 2's left wrist extending beneath her -- that individual's body.

Q. With the exception of the packaging and the placement in

Page 187

plastic, does it appear as it was when recovered by you on the

1652

12th or 13th of October, 2000?

A.    Yes, it does.

MR. MILLER:  State offers -- excuse me.  The government offers Exhibit 601.

*   *   *   *

(Government Exhibit 601 was offered.)

*   *   *   *

MR. STOWERS:  No objection.

THE COURT:  601 is received.

*   *   *   *

(Government Exhibit 601 was admitted.)

*   *   *   *

BY MR. MILLER:

Q.    And with the Court's permission, would you simply hold that up for the jury to see?

THE COURT:  You may.

A.    (Witness complied.)

Q.    Thank you, sir.  You can set that with the other physical exhibits.  And now I'd like to move on and discuss with you, I assume there was an individual number 3?

A.    Yes, there was.

Q.    And this was immediately -- well, you tell me.  Where was number 3 located, sir?

A.    Individual number 3 was immediately below individual number 2 meaning that was the third individual from the top of the

1653

grave.  Again, there was no soil or biological material -- not
Page 188

biological but leaf material between individual number 3 and 2 indicating to me that they had been put in about the same time.

Q. What was the position of this individual?

A. Individual number 3 was also laying on its belly. This individual was much smaller and, with my training and experience, I recognized as a child skeleton or juvenile.

Q. Did you indicate the posture?

A. I'm sorry, sir?

Q. Did you indicate the posture?

A. This individual in addition to laying on its belly or face down was extended in the same orientation as the rest of the bodies, east-west with the feet being at the west end of the grave and the head being toward the east end.

Q. Did you note any garments?

A. Yes, sir.

Q. Describe, please.

A. This individual had what appeared to me to be a sundress. I have two daughters, so I recognized it as a small child's sundress and also appeared to have panties on beneath the sundress.

Q. So there was an overgarment and an undergarment.

A. Yes, sir.

Q. Anything else?

A. No, sir.

1654

Q. No footwear.

A. No, sir.

Q. Were there any ligatures on this individual?

A. I don't recall any, sir, no.

Q. As you recovered the body from the grave, did you make any

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1448 of 3592

immediate observations as to apparent trauma on the person?

A.   This individual when we exposed the skull appeared to have a circular defect or a hole in the back of the skull which, based on my experience and training, appeared as a possible bullet hole.

Q.   Agent Hochrein, I'm handing you a series of photographs marked -- well, actually a series of photographs and one diagram marked Government's Exhibits 433, 434, 435, 439, and 440.  Do you recognize the general subject of those exhibits, sir?

A.   Yes, I do.

Q.   And what do they show in general, sir?

A.   These all relate to individual number 3 as we excavated it.

          MR. MILLER:  Government offers Exhibits 433, 434, 435, 439, and 440.

                         *   *   *   *

          (Government Exhibits 433, 434, 435, 439, and 440 were offered.)

                         *   *   *   *

          MR. STOWERS:  No objection.

          THE COURT:  Okay.  433, 434, 435, 439, and 440 are

                                                        1655

admitted.

                         *   *   *   *

          (Government Exhibits 433, 434, 435, 439, and 440 were admitted.)

                         *   *   *   *

BY MR. MILLER:

Q.   I'd like to go through them in that order if you would, please, sir, and before we do, noting again, 434 is a plan view or a diagram of the body as you documented it in that grave?

Page 190

A.   Yes, it is.

Q.   And for purposes of showing it to the jury only, would using the larger version of the same diagram assist you?

A.   Yes, it would.

Q.   So feeling free to use the large version of 434 -- and perhaps it'd be easiest to put that up on the easel now -- I'd like you to go through those photographs and describe for the jury what they see in this series of photographs.

A.   Now?

Q.   Yes, please.

A.   Okay.  In the first photograph, Exhibit 433, that's a --

MR. MILLER:  If we could show 433, please.

A.   433 is a photograph of our excavation down to the top of and exposing individual number 3.  Individual number 3 is extended with her -- facing down with this individual's left and right legs in this area, and the head of individual number 3 is

1656

in this area, and this is north.  You're facing east in this photograph.

Q.   Exhibit 435 shows us what, sir?

A.   435 is a composite, two photographs placed together to show you a more direct or plan view of individual number 3.  And this is the skull of number 3 facing down and slightly to the side, and this is the sundress I referred to or child's dress.  These are the -- this individual's right leg and left leg.  These are the two bones that make up our bottom part of our leg, and this would be the femur or the upper bone, the big bone in our leg.  This is the femur, and this is the lower leg on the left-hand side -- right-hand side, I'm sorry.

Q.   Thank you, sir.  Leaving Exhibit 435 up for the jury to

Page 191

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1450 of 3592

look at, would you place the larger diagram, 434, on the easel and orient the jury as to what they are seeing in the photograph in relation to the diagram.

MR. MILLER: And just so that we can have proper orientation, if we can have Exhibit 435 rotated 180 degrees. Thank you.

Q. Now, please continue.

A. Now 435 has been turned 180 degrees from the shot before, and you can see that here's the skull turned slightly to the left, to this individual, individual number 3's, left side. And I'm referring to Exhibit 434. The left arm of individual number 3 was extended up and then bent up by the head where the right

1657

arm was bent also, but the upper part of the arm was along her right side or this individual's right side. The left leg of individual number 3 was extended, fully extended, up and slightly elevated because it was at the edge of the grave. So that's why in some of the previous photographs you may have seen -- I may have referred to individual number 1 and then the bones of individual number 3. They were up at that because they extended up and almost up into individual number 1's area of the grave.

This individual's right leg is slightly bent with -- the bones of the feet and the hands again have been packaged and removed separately but with the heel toward the lower leg of the left leg.

Q. And referring to Exhibit 451, does your overlay show the relation of the third numbered individual with those that you've already described?

A. Yes, it does.

Page 192

Q.    Please show us that if you would, please.

A.    Okay.  In Exhibit 451, what you're looking at is separated from all the other individuals is individual number 3 or the -- a subadult or juvenile or child remains as they laid immediately under individual number 2 who was immediately under individual number 1.

Q.    And as you've indicated already, there was no fill between these three victims?

1658

A.    Yes, sir.

Q.    Did that cause any complications in the accurate recovery of small bones as to identification of which victim?

A.    Yes, sir.  As I mentioned before, because individual number 3's hands were in the vicinity of individual number 2's hands, some of those bones may have been commingled or mixed together when they were collected en masse.

        Exhibit Number 451 also shows what you might not see in plan view but how the elbow of 4 -- of individual number 3 is raised up.  So not only is it bent up toward the head, but it's slightly up, and that's because it was against the wall of the grave.  This individual was put into the grave.

Q.    Thank you.  Moving on to Exhibit 439, and what does Exhibit 439 show us, sir?

A.    As with the other individuals, this is individual number 3 removed from the grave in approximately the same position she was -- it was in the grave and laid out with the skull of the individual at the top of the photograph, the left and right legs, left and right arm bones, and then all of the other associated evidence or bones that came from the screens or that we collected en masse from the grave.

Page 193

Q.    And finally, Exhibit 440 shows us what, sir?

A.    This is another photograph of an individual completely wrapped.  This is individual number 3 wrapped in both the white sheet and then a plastic sheet and sealed and labelled for

1659

delivery to the medical examiner's office.

Q.    As with each of the other individuals collected from this mass grave, was this collection and packaging and sealing for any specific purpose?

A.    Yes, it was to identify when the individual was located, who did that location, who recovered it, who was involved in the excavation, recovery, and when that happened.

Q.    And also to maintain it in its integrity until such time as it was recovered or reviewed by the pathologist at the morgue?

A.    Yes, sir, to keep it in that position that it was found within the grave.

Q.    Thank you, sir.  You've described for us three individuals recovered from this mass grave.  Was there a fourth?

A.    Yes, there was.

Q.    Describe that, please.

A.    Individual number 4 laid immediately under individual number 3 meaning that this individual was the fourth human skeleton located in this grave from the top, and this was the last individual found in the grave, so this individual was at the bottommost portion of the grave.

Q.    The victim's posture and position?

A.    Individual number 4 was again a small skeleton which I recognized based on my experience and training as a child skeleton and also based on the type of clothing.  This individual wore a small child's swimsuit and was positioned so

Page 194

that the head like all the other individuals was oriented toward the east with the legs toward the west side, but individual number 4 was laying on its back versus on its belly.

Q.    Did you notice anything else remarkable about the positioning of the garments?

A.    This individual also had -- in addition to a swimsuit-type garment also had what appeared to be a T-shirt which was pulled up so that the arms were trapped in and covered the head so that -- if I could show the diagram, I could indicate it.

Q.    We'll get to that and give you an opportunity to do so. Before you mention anything else, you've discussed the garments you found on her.  Is that all of the garments you found, the swimsuit and the T-shirt?

A.    Yes, sir.  This individual number 4 did not have any footwear or socks on and had no other additional things like duct tape associated with it.

Q.    No ligatures.

A.    No ligatures either.

Q.    I'm going to hand you now what are marked Government's Exhibit 441, 442, 443, 445, and 446.  And again, there are missing numbers.  Your photographer took a great many photographs during the 36 to 40 hours of recovery work.

A.    Yes.

Q.    What you've done is selected a few that will help you explain what your findings were; is that correct?

A.    Yes, sir.

Q.   And do those exhibits, sir, Government Exhibits 441, 442, 443, 445, and 446, show in general a single subject matter?

A.   Yes, sir.

Q.   What do they show?

A.   These all relate to individual number 4 as excavated by us on October 12 or 13.

Q.   Exhibit 442 is a diagram, sir?

A.   Yes, sir.

MR. MILLER:   First of all, the government offers Exhibits 441, 442, 443, 445, and 446.

*   *   *   *

(Government Exhibits 441, 442, 443, 445, and 446 were offered.)

*   *   *   *

MR. STOWERS:   No objection.

THE COURT:   Exhibits 441, 442, 443, 445, and 446 are admitted.

*   *   *   *

(Government Exhibits 441, 442, 443, 445, and 446 were admitted.)

*   *   *   *

BY MR. MILLER:

Q.   And for purposes of demonstrating what is seen in each of those photographs, would it assist you to use the blow-up of

1662

Exhibit 442 rather than the 8-by-10 that's been received in evidence?

A.   It would.

Q.   So I'll ask you at this time again with the Court's permission to place the diagram, the enlargement of Exhibit 442,

Page 196

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1455 of 3592

on the easel and orient the jury as to that document as you

describe what they see in each of the photographs; okay?

A.    Yes, sir.

THE COURT:  You may.

A.    Okay.  Exhibit 442 is that plan view, bird's eye view,

diagram of the last individual found in this grave which just to

refresh our memories is the dotted line, and then our excavation

is this dashed line.

Individual number 4 was at the western edge of the

grave with the legs drawn up in a squatting or frog-like

position because, again, this individual was at the very edge of

the grave, so the legs could not be extended.  They were up

against the wall of the grave.  This individual was the smallest

of all the skeletons.  This individual had a bathing suit on.

In this diagram you can see the skeleton.  The head is facing or

oriented toward the east of the grave like all the other

individuals, and the right and left arms are drawn up above the

head, and both the hands and the head are covered by a

T-shirt-type garment that was -- appeared to be pulled up and

over this individual.

1663

Q.    Before you describe any further, with the Court's

permission, I'd like to show Exhibits 441, a photograph.  Does

that show the general same posture and outline of the victim as

it was found at the bottom of this grave?

A.    Yes, sir.  In the photograph represented by Exhibit 441,

you would be standing at the west edge of our excavation looking

across toward the east down into the grave.  This multi-colored

material is the swimsuit, the small swimsuit, that was worn by

this individual.  This white material you can see faintly is the

Page 197

T-shirt-type garment that was pulled up over the skull that had the hands trapped in it.

Q. Moving on to Exhibit 443, please, is this a better photograph of the same general subject matter?

A. This is slightly better. This is looking more directly down into the grave, and this is the -- if we refer to the diagram, you would be standing -- the bottom of the photograph is the eastern edge of the excavation.

Q. Interrupting again if we can rotate the photograph so that the diagram and the photograph are from the same angle. Thank you.

A. So here we have the -- this individual's laying on its back, and so we have the left leg drawn up in a squat-like position. The right leg is in a squat-like position at the very corner of the grave. They could not be extended out. Then we have the swimming suit, and this is the area of the skull, and

1664

the arms -- it's hard to see here -- but are drawn up into the garment, the T-shirt-type material, that trapped the hands.

Q. Over the head.

A. Over the head, yes, sir.

Q. And just so we're perfectly clear, the squat-like or frog-like position of those two legs was a function of its placement in the bottom of that grave as opposed to any particular other reason for that posture?

A. Yes, sir. If this individual had been further toward the center, there may have been room for those legs to extend out, but this individual's at the very end of the grave.

Q. The placement of the body in the grave in whatever fashion it was placed there caused the bottom portion of the torso and

Page 198

the legs to be pressed up against the west edge of the grave.

A.   Yes, sir.

Q.   Thank you.  If you would, please, as you did with the other three individuals orient the jury as to the profile referring to Exhibit 451.

A.   Okay.  On Exhibit 451 or that side view of the grave, based on our measurements, this is how individual number 4 would lay if we were looking at this individual in side view, the left and right legs drawn up because the edge of the grave and this wall, the back wall, of the grave are keeping them from being extended out and then the arms drawn up over the head and inside this T-shirt, this white T-shirt-type garment, that was pulled up

1665

over the skull.  This individual was directly underneath with her head underneath the belly of individual number 4, the other juvenile skeleton who just, again, to go back over, was directly underneath one of the adult individuals who was in turn directly underneath individual number 1, another adult individual.

Q.   Finally if we can look at Exhibit 445, a photograph, please, this shows what, sir?

A.   This is a photograph as with the other individuals of individual number 4 removed from the grave in about the same position it was recovered laid out on that white clean sheet and with any associated bones, small bones, or any other evidence bagged and wrapped with it.

Q.   And Exhibit 446?

A.   This is a photograph of individual number 4 wrapped and prepared for delivery to the medical examiner's office.

Q.   And again secured in the same fashion as the other three?

A.   Yes, sir, secured and labelled in the same fashion.

Page 199

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1458 of 3592

Q. Finally, sir, I hand you what is marked as Government Exhibit 800. Do you recognize this item, sir?

A. Yes, sir.

Q. What is Exhibit 800?

A. Exhibit 800 appears to be the same swimming suit that was on individual number 4, the same multi-colored swimming-type garment, and the bag that was used to package this as evidence.

Q. Except for the fact that it's been removed from the body of

1666

this young victim and placed in plastic, does it appear substantially as recovered by you, sir?

A. Yes, it does.

MR. MILLER: Government offers Exhibit 800.

* * * *

(Government Exhibit 800 was offered.)

* * * *

MR. STOWERS: I'd object to that under Rule 403, Your Honor.

THE COURT: Overruled. 800 is received.

* * * *

(Government Exhibit 800 was admitted.)

* * * *

MR. MILLER: I have no further direct, Your Honor.

You can set those down and resume the witness chair or wherever Mr. Stowers prefers for you to stand, and I would simply ask if the Court could inquire as to whether that obstructs anyone's view of the witness.

THE COURT: Can the jurors all see the witness fine? Okay. Thank you.

Mr. Stowers?

Page 200

BY MR. STOWERS:

Q.    Can you pronounce your name again for me?

A.    It's Hochrein.

1667

Q.    Okay.  H-o-c-h-r-e-i-n?

A.    Yes, sir.

Q.    Agent Hochrein, you've described the size of this grave as determined by your excavation work that you did there in October of 2000 as being about six and a half feet long by two and a half feet wide by about two, two and a half feet deep; is that correct?

A.    That's correct, yes, sir.

Q.    That's quite a significant-sized hole to have been dug; is that correct?

A.    Not necessarily.  My experience has been that that's about an average-size hole.

Q.    Okay.  And your testimony was that that would have been dug through the use of hand tools and refilled in that manner again I take it.

A.    To the best of our estimations, yes.

Q.    Based on your examination of the soil as it was removed from around the remains of these four persons, that's what you concluded.

A.    Yes, sir.

Q.    Now, you talked about, I think, some wire fencing.  That was on the ground above the grave site; is that correct?

A.    That was on the south side of the grave site near the -- where the heads were but off to the side.

Q.    But it was above ground.

Page 201

A.    Yes, sir.

Q.    And it was laying there --

A.    Yeah.

Q.    -- in the grass I guess.

A.    Yes, sir.

Q.    Now, you've referred to these four remains as individuals number 1, number 2, number 3, and number 4.  And just so it's clear, the defense agrees that individual number 1 was, in fact, Mr. Nicholson and that individual number 2 was, in fact, Lori Duncan and that individual number 3 was, in fact, Kandi Duncan and individual number 4 was, in fact, Amber Duncan.  You're subsequently aware of the identity of those remains; is that correct?

A.    Yes, afterwards we were advised of that.

Q.    And with regard to Mr. Nicholson's remains, you've described what appeared to you to be a rope that was around his right forearm and his left forearm; is that correct?

A.    Yes, sir.

Q.    Was that rope connected at the time that you recovered it?

A.    Yes, it was.

Q.    And was it connected behind what would be his -- the remains of, I guess, would be his spine?

A.    Yes, they were.

Q.    In other words, that rope was not in front across the belly.

1669

A.    To the best of what I could tell, no.

Q.    There was no rope around Mr. Nicholson's neck, was there?

Page 202

A. No, sir.

Q. And that rope appeared to be, according to the photographs, loose, if you will, and not tightly tied such that the wrists were actually tight together; would you agree with that?

A. Well, that's difficult to say because over time environment may have an effect on that rope, plus decomposition will remove the soft tissue, so it may appear they're loose around the wrists when, in fact, the soft tissue's just decomposed leaving them loose.

Q. I guess my question was there appeared to be a length of rope between the two limbs on the remains of Mr. Nicholson according to the photographs such that there was a distance in the rope, if you will, between -- is that correct?

A. That's correct, yes, sir.

Q. Then with regard to the remains of individual number 2, Lori Duncan, you had a similar rope, as I understand it, across her forearms, is that correct, that you found?

A. One appeared to be attached to a forearm and the other one in the direction of the forearm. I don't know that it was attached.

Q. And that rope was in the front of Lori Duncan; is that correct?

A. Yes, it appeared to be.

1670

Q. I think you said it would have been across the belly area.

A. Yes, sir.

Q. Now, one thing that I think should be made clear in your testimony is you're aware that when a person is killed their body essentially at least for a period of time becomes limp; is that correct?

Page 203

A.   At a point, yes, it does.

Q.   Yes.  And then you can't tell based upon the recovery that you made here from this grave site what order these individuals were killed in.  All you can see is they obviously were placed in the hole in the order of Amber Duncan, Kandi Duncan, Lori Duncan, and then Greg Nicholson on the top.  Would that be fair to say?

A.   That's fair to say, yes, sir.

Q.   And you very carefully and meticulously, as you've described it, over it sounds like a two-day time period unearthed these four remains of these people; is that correct?

A.   It was about a day and a half, yes, sir.

Q.   And this is very detailed work used small tools as you described it that you have in your trade to scrape out earth from around the remains and to very carefully remove items; is that correct?

A.   That's correct.

Q.   And as you do that, you begin to get a picture of what it is you're unearthing; is that right?

1671

A.   That's correct.

Q.   And the remains that you're removing, the soil, the human remains, in some instances are removed piece by piece and then reassembled on the sheet that you have acquired; is that right?

A.   We try to place them back on the sheet in the approximate position they were.

Q.   And then you've got photographs depicting that process where you've actually laid out the remains of each of these four individuals on these sheets that were purchased for the purpose of transporting these people's remains to the coroner I guess;

Page 204

is that correct?

A.    I believe it was the Iowa state medical examiner's office.

Q.    The medical examiner?

A.    Yes.

Q.    And so you have for the purpose of transporting these people handled their remains very delicately and very carefully in such a way so as not to mistreat their remains in any way; is that right?

A.    That's correct.

Q.    And you've also done so for the purpose of preserving any evidentiary value that might exist in those remains to the eyes of a trained coroner or autopsy person; is that correct?

A.    That's correct.

Q.    So that they could then on a more detailed basis examine these four remains and evaluate such things as cause of death

1672

and that sort of thing; is that correct?

A.    That's also correct.

Q.    And you were primarily attempting to unearth these remains for the purpose of determining what you could from that specific grave site of an evidentiary standpoint; is that right?

A.    That's correct.

Q.    And you've described those findings as you've testified here to this jury of 18 folks.

A.    Yes, I have.

Q.    Okay.  Now, these two young children, Kandi and Amber Duncan, as I understand it, according to what you found, were not in any way tied up; is that correct?

A.    Individuals number 3 and 4 did not have any ligatures or did not appear to be tied.

Page 205

Q.    And it's also true that those two children did not have any duct tape around their mouths or their heads in any way as far as you were able to determine during your excavation of their remains.

A.    Not that we could see.  Again, individual number 4 had a shirt pulled up over its head.

Q.    And neither one of those children were wearing any pajamas.

A.    Not that we saw, no.

Q.    According to your evaluation of what you found at the grave site.

A.    Right, they did not have pajamas.

1673

Q.    One question about the shoes.  I believe that you indicated that each of Mr. Nicholson and Lori Duncan were missing a shoe.

A.    Yes, sir.

Q.    Did you find those shoes in the grave?

A.    We did not, no, sir.

Q.    Did you find them nearby?

A.    Not that I know of.  No, we did not.

Q.    You've described there having been media at this location during the time that you were doing your very important work. Did you observe any media there with any television cameras?

A.    I did not.  I was told, though, that they were up on Lark Avenue.

Q.    Doing reports on the digging activity?

A.    I imagine.

Q.    The position of these remains as they were found in these -- in this grave with the hands in various positions, the legs in various positions would be an indication of the way that they were placed into the grave; is that correct?

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1465 of 3592

A.    It could be.  It could also be related to movement after the individual's in the grave.

Q.    And no way of telling from your field of expertise?

A.    Of what?

Q.    Why they were found in that position.  All you can say is they were there.

A.    That's right, and because of the position next to the wall

1674

of the grave, we can explain why an arm or leg may be elevated up.

MR. STOWERS:  That's all I have.  Thank you.

THE COURT:  Mr. Miller?

MR. MILLER:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. MILLER:

Q.    Just a few questions.  The wire fencing was discussed briefly.  Did you relate that to the grave in any forensic fashion, or is it just something that was found there in the vicinity?

A.    It was found basically in the vicinity.  It partially covered some of the grave, but there was no way of saying whether that came years after the grave was there or it was related to the actual disposal.

Q.    And the general character of this wooded area was what, sir?

A.    This was -- I would characterize it as a dump site.  Not only did you have Crane Creek running through it which through flooding could deposit trash and debris, but it also appeared as people intentionally brought their trash down there and some time deposited it.

Page 207

Q.  As to this grave itself, sir, the depth of the grave and dimensions were what to your recollection?

A.  The depth was about two and a half feet deep.  The length,

1675

as best we can estimate it, was approximately six and a half feet long, and it was about two to two and a half feet wide.

Q.  Now, using hand tools alone, I trust you would admit that that's a fair amount of hard work.

A.  It can be, yes.

Q.  Hours of hard work.

A.  Yes, sir.

Q.  Certainly work that would be easier performed by two persons rather than one.

A.  It's possible.

Q.  And in either event likely to take hours in duration.

A.  I would think so, yes, sir.

Q.  The actual -- well, let me put it to you this way.  You found a wallet.

A.  Yes, sir.

Q.  That had some identification papers in it.

A.  Yes, sir.

Q.  And, frankly, in fairness, you were there as the result of a criminal investigation and had been briefed about suspected findings that gave you some suspicion as to who you were unearthing at that time.

A.  Yes, sir.  We were aware of the victims' names.

Q.  You're a scientist, though, however, in addition to being a peace officer.

A.  Yes, sir.

1676

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1467 of 3592

Q.   And do you to the extent possible attempt to strictly follow the scientific protocol rather than simply basing your opinions upon what other people tell you even though it may be peace officers?

A.   Yes, sir.

Q.   And scientific finding as much as possible even where possible to corroborate circumstantial findings.

A.   Yes, sir.

Q.   Was -- let me ask you this.  To your knowledge was additional work done to make positive identifications of the remains of these four vehicles -- victims, or was it sufficient simply to say that you were pretty sure you knew who they were so that was the end of the search?

A.   Absolutely not.  Typical in these cases, we will have -- the medical examiner will ask a physical anthropologist who's forensically trained to examine the remains and determine the age, stature, and other indications that might relate to who this individual was and then also medical examiners will routinely use an odontologist or a forensic dentist to help identify remains.

Q.   As with your own background, sir, at least wherever possible, is it possible to try to enlist the aid of science in law enforcement?

A.   All the time, yes, sir.

Q.   You've mentioned that the rope connecting the wrists of

1677

Greg Nicholson was -- at least you were questioned about the subject that it was quite apparent from observation of the

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1468 of 3592

photographs that it was not taut, it was loose. Does the decomposition of soft tissue in any way explain that?

A. It explains the looseness of the ligature around the wrist areas because that would -- soft tissue would decompose, and then you would have a space between the rope and the bone. It does not explain the distance between the two wrists. That was a larger length, and those were not together from what we could tell. There was a distance between those.

Q. In fairness, there was a distance between the two wrist ligatures. The rope connecting the two wrists was some distance. It was not right next to each other.

A. Yes, sir.

Q. The looseness around the wrist itself was loose because it was around nothing but bone.

A. Exactly, yes, sir.

Q. The placement of these bodies, as has been very accurately pointed out by Mr. Stowers, was something that gives us no information as to the order in which they died; fair statement?

A. That's a fair statement.

Q. They were placed in that grave from the smallest to the largest.

A. Yes, sir.

Q. Is there an explanation just simply from the standpoint of

1678

amount of labor involved as to why that might be the order of placement?

A. That would go to the mind-set of whoever did this, and I'm --

Q. Pardon me?

A. Logically that can't be explained.

Page 210

Q. Let me just ask you this. Isn't it logical that you have to do less digging if the number of victims are placed with the smallest at the bottom and the largest at the top?

A. It's possible because as you dig any pit we tend to make it narrower at the bottom than at the top.

Q. And finally as to your efforts to recover all evidence at the scene, that solely is the objective of any crime scene work I trust.

A. Yes, sir.

Q. Now, forensic science is a matter that's been around for decades, many decades; fair statement?

A. That's a fair statement, yes, sir.

Q. Has it arrived to such a point now that it's -- we can be sure that every item of every possible physical evidence is always recovered from every crime scene along the orders of some popular TV series?

A. No, sir.

Q. Forensic crime scenes by their nature involve the attempt to recover evidence that's been intentionally concealed or

1679

destroyed.

A. Yes, typically, yes.

Q. And you do the best that you can.

A. Yes.

Q. In attempting to do the very best that you can, did you not only recover these bodies but do very fine screening and search for any possible physical evidence including firearms components?

A. Yes, sir.

Q. And found none.

Page 211

A.    None --

Q.    Other than what you've described in the way of physical evidence.

A.    Exactly, yes, sir.

Q.    And very specifically, you did not locate during your search any firearm components.

A.    No, we did not.

        MR. MILLER:  Thank you, sir.

        THE COURT:  Mr. Stowers?

                        RECROSS-EXAMINATION

BY MR. STOWERS:

Q.    You indicated digging this hole would be hours of hard work.  Would that be the kind of hard work you'd expect a woman three months pregnant to be doing in the middle of the night?

A.    I don't know, sir.  I know some tough women.

                                                1680

        MR. STOWERS:  Thank you.

        THE COURT:  Anything further, Mr. Miller?

        MR. MILLER:  No, Your Honor.

        THE COURT:  You may step down.

        Members of the jury, that will conclude the testimony for today.  Please remember my cautionary instruction about keeping an open mind till you've heard all of the evidence. Don't talk about the case among yourselves or let anybody talk to you about the case.  And don't talk to anybody else about the case.  And we'll see you tomorrow morning at 8:30.  Thank you.

        (The jury exited the courtroom.)

        THE COURT:  Please be seated.  With regard to the instructions, I have some matters I need to get to tonight, so I thought we'd meet, particularly in light of the fact that the

Page 212

defense -- I don't know when you submitted these, but your last round of instructions, when were these submitted?

MR. STOWERS: Sunday.

THE COURT: Okay.

MR. STOWERS: Although one of those was submitted earlier as a cautionary instruction or a limiting instruction during the course of trial.

THE COURT: Yeah. I've gone ahead and redone your organizer, manager, CCE instruction, so I'll give you that proposed one before you leave today. Your subsequent acts instruction, not only do I not understand it, I'm certainly not

1681

going to instruct on it because that's not my understanding of the law with regard to the time frame. If there are other acts that you think have been admitted and you want a subsequent act instruction on those, then I'm open to the possibility of doing that. But I think if you don't list the evidence, they haven't heard category of evidence called other acts. I mean, your first sentence doesn't make any sense. I've never referred to any other acts evidence, so to me it's nonsensical. And so I wouldn't give it on that grounds because it just -- it's incomprehensible.

I don't think your proposed instruction number 30 is a correct statement of the law. You don't have any authority for it other than that rule, and that rule doesn't say what you claim it says. Doesn't say it's admissible as substantive evidence. 801(d)(1)(A) does not say that prior statements are admissible as substantive evidence for the truth of the matter asserted. Now, they may be or they may not be, but your authority is not 801(d)(1)(A). 801(d)(1)(A) is simply an

Page 213

exception to the hearsay rule.

So if you -- and I don't even know what statements you're talking about. I think the instruction would be confusing. I doubt if it's an accurate statement of the law, and I'm certainly not going to give it as is. If you want to refer to certain statements and find some authority to support your proposition it's admissible as substantive evidence, I'll

1682

take a look at it, but I'm not giving that instruction as it.

And the conspiracy drug amount timing one I'm not giving because I don't think that states the law and the elements of CCE timing, I don't think that's an accurate statement of the law either, so I'm not going to give either one of those.

I will get you my incorporation into final instruction number 8 of the instruction that you proposed, instruction number 28, which I do not believe is an accurate statement of the law. You went through and culled from the cases everything that was favorable and left everything that was unfavorable. It's not a balanced instruction. It wouldn't be a correct statement of the law by any stretch of the imagination. So, you know, you can either try and come up with a correct statement of the law, or you can take pot shots at what I've come up with, but I'm not going to give an unbalanced instruction that in my view misstates the law completely which I believe yours does.

So I'd like to meet at 7:30 and make some tentative record on the jury instructions. I mean, we can finalize them later, but we're getting closer and closer to the point where we're going to need to have a final set of instructions. So anything else we need to take up?

Page 214

MR. WILLIAMS:  No, Your Honor.

MR. STOWERS:  No thank you.

THE COURT:  Okay.  Could I see the lawyers at sidebar 1683

for one second before you go home?

(At sidebar off the record.)

(The foregoing trial was

adjourned at 4:26 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR          9-4-05
                                  Date

1684

Page 215

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1474 of 3592

INDEX

WITNESS:                                                    PAGE:

 PEGGY BACA
                MR.  WILLIAMS                               1446
                MR.  WILLETT                                1462
                MR.  WILLIAMS                               1471
                MR.  WILLETT                                1474
 MICKIE YAGER
                MR.  WILLIAMS                               1475
                MR.  BERRIGAN                               1494
                MR.  WILLIAMS                               1507
                MR.  BERRIGAN                               1509
 WENDY JACOBSON
                MR.  WILLIAMS                               1514
                MR.  BERRIGAN                               1529
                MR.  WILLIAMS                               1532
                MR.  BERRIGAN                               1535
 SHELLY JOHNSON
                MR.  WILLIAMS                               1537
                MR.  BERRIGAN                               1541
 J.D.  SMITH
                MR.  MILLER                                 1546
                MR.  STOWERS                                1573
 MICHAEL HOCHREIN
                MR.  MILLER                                 1578
                MR.  STOWERS                                1666
                MR.  MILLER                                 1674
                MR.  STOWERS                                1679

                        * * * * *

EXHIBITS:

 904                                                        1563
 403                                                        1568
 404 and 405                                                1570
 406A and 406B                                              1600
 408                                                        1604
 409, 410, and 411                                          1606
 412, 413, and 414                                          1619
 415, 416, 418, 419, 420, 421, 422, 423, and 424           1622
 451                                                        1623
 400                                                        1641
 501                                                        1643
 426 through 431                                            1645
 601                                                        1652
 433, 434, 435, 439, and 440                                1655
 441, 442, 443, 445, and 446                                1661
 800                                                        1666

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1475 of 3592

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,　　　　　　　No. CRO1-3046

　　　　　Plaintiff,　　　　　　　　　Sioux City, Iowa
　　　　　　　　　　　　　　　　　　　May 17, 2005
　　vs.　　　　　　　　　　　　　　　7:35 a.m.

ANGELA JANE JOHNSON,　　　　　　　　VOLUME 8 of 24

　　　　　Defendant.
　　　　　　　　　　　　　　/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

1686

APPEARANCES:

For the Plaintiff:　　　　C. J. WILLIAMS, ESQ.
　　　　　　　　　　　　Assistant United States Attorney
　　　　　　　　　　　　Suite 400 - Hach Building
　　　　　　　　　　　　401 First Street Southeast
　　　　　　　　　　　　Cedar Rapids, IA  52401

　　　　　　　　　　　　THOMAS HENRY MILLER, ESQ.
　　　　　　　　　　　　Iowa Attorney General's Office
　　　　　　　　　　　　Area Prosecutions Division
　　　　　　　　　　　　Hoover State Office Building
　　　　　　　　　　　　Des Moines, IA  50319

For the Defendant:　　　PATRICK J. BERRIGAN, ESQ.
　　　　　　　　　　　　Watson & Dameron
　　　　　　　　　　　　2500 Holmes
　　　　　　　　　　　　Kansas City, MO  64108

　　　　　　　　　　　　DEAN STOWERS, ESQ.
　　　　　　　　　　　　Rosenberg, Stowers & Morse
　　　　　　　　　　　　1010 Insurance Exchange Building
　　　　　　　　　　　　505 Fifth Avenue
　　　　　　　　　　　　Des Moines, IA  50309

　　　　　　　　　　　　ALFRED E. WILLETT, ESQ.
　　　　　　　　　　　　Terpstra, Epping & Willett
　　　　　　　　　　　　Higley Building - Suite 500
　　　　　　　　　　　　118 Third Avenue Southeast
　　　　　　　　　　　　Cedar Rapids, IA  52401

Also present:　　　　　　Bill Basler

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1476 of 3592

VOLUME 8, 5-17-05
Court Reporter:          Shelly Semmler, RMR, CRR
                         320 Sixth Street
                         Sioux City, IA  51101
                         (712) 233-3846

1687

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  This is just a -- it's a formal instruction conference because we're on the record.  It's not necessarily our final instruction conference, and we've been working on the instructions for quite a while now.  We've had various drafts going back and forth to the lawyers with comments, and I just wanted to have an on-the-record discussion of where we are.  As we stand now, does the government have any objections to the proposed final merits instructions?

MR. WILLIAMS:  Yes, Your Honor.  Let me just go through those in order.  With regard to the final instructions on page 57 -- it's instruction number 9 on the issue of impeachment -- on page 57, subparagraph number 3, it says, "You've also heard evidence that one or more witnesses are testifying in the hope the government will not file charges against them."  There's nobody that falls into that category in this case that I'm aware of.

THE COURT:  Yeah.  This was just a general instruction --

MR. WILLIAMS:  Right.

THE COURT:  -- without knowing who was going to testify.

MR. WILLIAMS:  Yeah.

THE COURT:  Does the defense agree that that doesn't

1688

Page 2

apply to anybody?

MR. STOWERS: None that I can think of.

THE COURT: Okay. So we'll take paragraph 3 out on page 57.

MR. WILLIAMS: I had no other objections to the set that the Court provided us on 5-13, although I have some comments on the verdict form that we could either go to, or I could go to the Court's proposed insertion of instruction number 8.

THE COURT: Okay. Why don't we take up instruction number 8 first.

MR. WILLIAMS: Okay. With regard to instruction number 8, I guess, first of all, my position is this: The government would recommend that the Court adopt the Eighth Circuit pattern jury instruction on 848 which appears at 6.21.848A of the model instructions. And largely what it does there is it sets out some basic parameters of what is required, and it defines organizer and defines supervisor. My understanding of the case law is it doesn't ever define really manager because it gives kind of a common-sense definition to the word manager.

And here's my concern, Judge. I don't have a large problem with what you put together. I thought you made a tremendous effort trying to pull together a number of concepts.

But largely what's happened here on instruction number

1689

8 is you've looked at the case law, and there's a number of cases that say on these facts this doesn't equal manager, organizer, supervisor. Other cases say on these facts this does

Page 3

make supervisor, manager, organizer. And frankly, there's a myriad of different ways in which somebody can organize or manage or control or supervise other people. And we could attempt to define it or undefine it by example forever.

And I just -- I think it gets confusing to the jury. It gets to the point where now they're trying to figure out if it has to fit into these examples or those examples. And I think it's a simpler process just to define generally what a supervisor is, generally what an organizer is, and leave it at that as proposed by the Eighth Circuit conference.

That said, in the event that the Court adopts the final instruction 8 as proposed, I would suggest we adopt some of the language from the model instruction that doesn't appear in the Court's final instruction 8.

So, for example, on the second paragraph of the Court's instruction number 8 after the first sentence, I would suggest that we insert language from the -- about the middle of the page on the pattern instruction from the Eighth Circuit that says, To act in concert means to act pursuant to a common design or plan. The defendant must have organized, supervised, or managed either personally or through others five or more persons with whom he or she was in contact or concert while committing

1690

the series of offenses. And then the next sentence is, However, it's not necessary the defendant have managed all five at once or that the five persons have acted together at any one time or in the same place.

And I think that's a concept that is appropriately instructed. I think it's a correct statement of the law, and I think that would aid the jury in understanding what they need to

Page 4

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1479 of 3592

do here.

Then to the extent that we're going to go forward on this instruction number 8, I would suggest that at the -- either at the beginning or in between the second and third paragraphs that appear on the Court's instruction number 8 we insert the language from the Eighth Circuit pattern jury instruction that generally defines an organizer is a person who yada, yada, and the next line says, A supervisor is a person who manages, directs, so forth and so on and then go into the examples of what is and what isn't.

The only additional change I would make then if we're going to go forward with the Court's series of examples of what is and what isn't a manager or supervisor or organizer is to add another sentence perhaps at the end of the first partial paragraph on page 55 that says something to the effect that fronting drugs to another thereby placing the dealer in debt is also a form of control. And for authority on that I would cite the Court to United States versus Jasper, 169 Fed. 3d 1109,

1691

1110. It's an Eighth Circuit, 1999 per curiam decision.

And also as authority on that, although not directly on all fours, is the Possick case which the Court has already cited in its cover letter at 337 which indicates the quantity alone is indicative of a formal management relationship in that same sense. So those are my only comments on instruction number 8.

THE COURT: Okay. What about the verdict form?

MR. WILLIAMS: The verdict form, the only change I would have would be on the step 3, page 5 of the verdict form with regard to the last column which then also dictates some

Page 5

changes in the language up above, There is no requirement that the jury unanimously find who the defendant organized, managed, or supervised. The case law is very clear that the CCE statute is designed to go after a certain size of organization. The jury doesn't have to determine who actually organized and supervised and so forth.

So I don't think it's necessary that they go through that last column. And then obviously if that last column's taken off, it would require some changes in the language in the instruction portion up above on how to fill out the form.

Those are the only comments I have.

THE COURT: Okay. We'll take those under advisement. Thank you.

Mr. Stowers?

1692

MR. STOWERS: I think some of the language that Mr. Williams wants in relation to this "in concert" is already in the preliminary instructions on page 20 under element number 3. I think some of that language is there. I'm not sure it's all there from the uniform instruction. I'd just point that out for you.

As long as we're on instruction number 8 --

THE COURT: Is your microphone on, or could you at least pull it closer?

MR. STOWERS: Okay. There we go. As long as we're on instruction number 8, there's some language that appears on page 55 of that instruction at the top. It's the first sentence that starts with "such."

THE COURT: Such evidence may consist of?

MR. STOWERS: Right. My concern about that, I think

Page 6

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1481 of 3592

this is really confusing in the cases, number one. I mean, on the one hand, the Eighth Circuit has said buyer-seller isn't enough. And then they've got these other cases that say telling somebody how much to pay for the drugs almost is enough, so I don't know what they're talking about in the Eighth Circuit, to be quite honest with you. And the cases seem somewhat irreconcilable in their language. But maybe it's --

THE COURT: So maybe we're better off just using the pattern instructions that have less information --

MR. STOWERS: In some ways --

1693

THE COURT: -- and let the lawyers argue --

MR. STOWERS: Argue the law. But I understand the point. I mean, I think the cases don't -- I don't think they fully in the case law flushed out all these issues yet. But I think that what they're saying is to be an organizer, manager, or supervisor, you gotta do more than be a person who distributes controlled substances down a chain of distribution which is kind of what we were trying to get at in our proposal which was certainly imperfect. And I think this sentence kind of takes away what the Court gives in the earlier portion of this instruction.

And that's why we have concerns about it because it really kind of is -- the essence of a buyer-seller relationship is you're selling drugs for a price of a particular type that you choose. Presumably there's going to be some arrangements made in connection with the sale, and that kind of is a buyer-seller. And so we think that kind of gets into -- into that area.

And then at the bottom of page 55, there's a paragraph

Page 7

that starts "a person".

THE COURT: Yes.

MR. STOWERS: Unlike the other sentences where the Court indicated that the jury may conclude certain things from certain facts or they may conclude that there was organization, supervision, or management, this last paragraph here that starts

1694

on the bottom of page 55 and goes to 56 kind of directs the jury to make that conclusion rather than leaving it for the jury to conclude from those facts which is a concern for us that we're kind of transposing the element of management, supervision, or organization into proof of these subsidiary facts, but ultimately the jury has to make that conclusion. So I think those could be reworded to address that concern.

THE COURT: That's a good point.

MR. STOWERS: I know we went around on this at the very beginning of the trial, but -- and I think the Court addressed it in one of its letters, but I'm not sure we ever really made a formal record on it.

Our position is that aiding and abetting, the 18 U.S.C. section 2, does not apply to either of these offenses. I know the Court -- and we've acknowledged previously I think that the case law is against us on that, although there's no case law directly on point in the Eighth Circuit that I'm aware of, but that's a position that we're maintaining throughout the trial even though we've asked the Court to give some aider and abettor instructions, and I just want to make that clear because one of your responses was a letter where you recited all those cases --

THE COURT: Right.

MR. STOWERS: -- that say contrary.

Page 8

THE COURT: And I'm sure that will be one of the focal points of your Rule 29 motion.

1695

MR. STOWERS: It might be.

On final instruction number 7 -- this is the instruction on the offenses involved in the CCE.

THE COURT: Yes.

MR. STOWERS: -- we have before trial and just to be consistent with our position before trial objected to certain of the allegations in the CCE count on the grounds that they were not sufficiently specific and definite so that they could be known what the government was talking about. And the paragraphs I'm talking about are paragraphs 1, 2, and 4. And those paragraphs merely allege that there was -- merely allege that there was distribution of methamphetamine occurring over a 6- or 7-year time period from '92 to '98, that there was possession with intent to distribute during that same time period, and then use of phone and mail.

And our position is that those are so broad and vague that even if you got a response to the interrogatories that you've set out in the verdict forms that they would be meaningless.

One of the things that we're entitled to under the -- I think it's the Garrett case from the U.S. Supreme Court is unanimous determination from the jury on each of the three that constitute the series. And there's no way to know that a jury, based upon the way the indictment reads, would be unanimously agreeing on those items. So we think those aren't really

1696

Page 9

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1484 of 3592

submissible allegations.

With regard to subparagraphs 8, 9, 10, 11, 12, and 13, those offenses all occurred after the killings, and consistent with our position that the CCE had to exist at or before the time of the killings, we believe that those specifics don't bear upon the specific offense here. And if they were to prove a CCE that came into existence after the killings, that would not be sufficient proof for this offense.

THE COURT: But at least the way we've set it up is it allows you -- you know, you can argue that quite well on appeal I would think.

MR. STOWERS: Right.

THE COURT: And wouldn't necessarily have to have a retrial depending on how that issue comes out.

MR. STOWERS: I think the Court's tried to address that in the interrogatories which I think is a good idea in light of the way the Court's submitting the case.

I believe the Court gave us or at least your law clerk did a page of language dealing with prior statements under oath?

THE COURT: Yes, yeah.

MR. STOWERS: And I didn't know if that was something you were going to be adding to, for example, number 9 on impeachment.

THE COURT: Well, I think it'd probably be a stand-alone instruction.

1697

MR. STOWERS: Okay. And I have no problem with that language.

THE COURT: Are you comfortable with the language?

MR. STOWERS: Right.
Page 10

THE COURT: Yeah, I'm pretty sure it's a correct statement of the law.

MR. STOWERS: Yes, that's fine.

THE COURT: Well, let me just interrupt you for a second.

Have you had a chance to look at that, Mr. Williams?

MR. WILLIAMS: I have, Your Honor, and I believe it's a correct statement of the law as well.

THE COURT: Okay. Do you think it's better as a stand-alone, or where do you think it goes best?

MR. STOWERS: I think you could weave it in under number 9, paragraph 2 somewhere which is the impeachment instruction. Maybe I've got the wrong number now, Roger.

MR. MASTALIR: You're right. It will be 10, but it is 9 in the set now.

MR. STOWERS: Okay.

MR. WILLIAMS: And, Your Honor, I would agree with Mr. Stowers on this one that I think standing alone it may be confusing. I think it does belong in that impeachment instruction so they're clear that -- the context in which we're talking about prior statements.

1698

THE COURT: So we'll actually make that the second paragraph before a witness may be discredited or impeached?

MR. WILLIAMS: I think third paragraph perhaps.

THE COURT: Third paragraph?

MR. WILLIAMS: Yeah.

MR. STOWERS: Right. That'd be fine.

THE COURT: Okay. We'll put it in as the third paragraph.

Page 11

MR. STOWERS: We've asked for some other instructions that I know the Court isn't going to give. I don't know if we need to address those now or if you want to do those at the final.

THE COURT: You can go ahead and make your record on it now or when we have the final instruction conference or both.

MR. STOWERS: Well, let me first deal with this verdict form real quick.

THE COURT: Okay.

MR. STOWERS: I think there was a couple items on there that I had questions about. And maybe they're addressed with the way the Court set up the verdict form so that they don't need to be remedied. But there's two persons on page 5 under the CCE membership which would be David Patrick and Gary Solland, S-o-l-l-a-n-d for the court reporter. And those two persons it would seem to me there's absolutely no evidence to support submitting them as CCE members. Obviously the Court's

1699

got a verdict form there that will ask the jury that question, but I think we should at least have some basis to submit it to the jury.

THE COURT: What is the evidence in the record that would allow the submission of Patrick and Solland?

MR. WILLIAMS: Testimony by Stearns and the grand jury testimony by Mr. Nicholson that they supplied Patrick and Solland -- that Nicholson supplied them with drugs, that he was further members down the chain, he supplied them the quantities for redistribution. And it's not necessary again that there's any evidence that Honken controlled these people, simply that they're members of the conspiracy and the continuing criminal

Page 12

enterprise. And so there could be numerous members of the enterprise that Honken doesn't even know about let alone control. And I think there's sufficient evidence in the record for the jury to find that they are members.

If those happen to be the only two boxes that the jury checks as members of the conspiracy, then the defense has a good point on appeal and Rule 29 motion.

THE COURT: What else, Mr. Stowers?

MR. STOWERS: We had asked the Court to give in our second supplemental set of instructions an instruction dealing with the timing issue with regard to the CCE offense. It's our reading of the statute that the statute requires that the defendant be working in furtherance of a continuing criminal

1700

enterprise under the way it's charged in this case.

And in order to be able to do that and to satisfy that element, the government would have to establish that at the time of the killings the defendant was working in furtherance of a CCE, that she was knowingly aware of the existence of the CCE, and that obviously in order to be aware of a CCE a CCE has to exist at that time.

And so our position on that which I think we've made clear before is that the CCE had to exist at the time of the killing in question for each of the counts of the indictment for which that's the case theory of the government. So we'd except the Court not giving that instruction.

With regard to the conspiracy theory, the conspiracy murder theory, our position with reference to that is that the offense language in the statute says that the defendant had to have been engaging in an offense punishable under 841(b)(1)(A)

Page 13

at the time of the killings. And the only way that could occur is if the offense that the defendant was then engaging in at the time of the killings was one that had the requisite drug amount at the time of the killings.

And we've attempted to address that in one of our second supplemental instructions to tell the jury that the drug amount had to have existed on or before the time of the killings, and so we would except to the Court not giving that instruction.

1701

With regard to the instruction which is a limiting instruction actually that we submitted I believe last evening, that is, again, consistent with this timing issue which is that we believe that the acts and events occurring after the time of the killings that have been received into evidence which is a whole lot of evidence -- it's probably about half or more of their drug case primarily from a time period of 1995 and 1996 -- is not -- should be -- it should be subject to a limiting instruction along the lines of what we've proposed in our modified or initial preliminary instruction -- limiting instruction I should say on other acts which is modeled after the Eighth Circuit instruction.

It's our position that this evidence of activities occurring after the killings does nothing to -- does nothing to directly establish the killings, although it may bear on certain issues under 404(b) in this type of a case.

Those are all the exceptions and objections that we'd have at this time, and I know we're going to make a final record after the government closes their evidence. Thank you.

THE COURT: Okay. Thank you. Any other record

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1489 of 3592

anybody wants to make on the instructions at this time?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Let's move on to other matters. The government thinks it's going to rest on Thursday or possibly Monday?

1702

MR. WILLIAMS: Actually if anything, it's going to go the other direction, Your Honor.

MR. MILLER: Your Honor, Thursday is my best guess. I have people scheduled through tomorrow. If cross-examination is minimal and if I get moving at a rapid pace, we could finish conceivable as early as end of day tomorrow but more likely by Thursday. But I'm hoping by Thursday noon or whenever we were figuring on ending for the week I'll be able to rest.

THE COURT: Do you know yet how long the defense case is going to be?

MR. STOWERS: I think I would say that at this point our defense case is going to be almost nothing if not -- probably nothing.

THE COURT: Probably nothing?

MR. STOWERS: And so we'd probably be in a position to do closing arguments on Monday based on what they're advising. Rather than try to squeeze them in if we wound up in that situation on Thursday morning, it might make more sense to just do those on Monday.

THE COURT: Yeah, that's what I think. Regardless of when they rest on Thursday, that we would just start closing arguments Monday morning. Would that be okay?

MR. STOWERS: Yes. I was just thinking there's an outside chance they might even be done tomorrow.

Page 15

MR. WILLIAMS: And even if that happens, Your Honor,

1703

I --

THE COURT: We're not going to finish closings if --

MR. WILLIAMS: We've got an hour of jury instructions to read. Then we've got probably two hours maybe on each side unless you're going to impose the time limit.

THE COURT: I'm not.

MR. WILLIAMS: Yeah. So I just don't see as a practical matter we could actually get it submitted to the jury yet on Thursday even if we got done with our case tomorrow. We'd be prepared, if the Court wants to do that, obviously to present our closing argument, and we'd be glad to do it. I just don't know as a practical matter since we're having an early termination --

THE COURT: Who's closing for the government?

MR. WILLIAMS: Tom is.

THE COURT: Mr. Miller, how long do you think your closing will take?

MR. MILLER: Probably under two hours. The Honken closing was 167 Power slides, many of which were audio clips. I have at most one audio clip in this case, and the current draft has 50 slides. So just figuring that about a third roughly, it'd probably be over an hour but less than two.

THE COURT: Now, if my -- my memory may be off, but I think last time you told me two and I think it was closer to four. Would that be accurate?

1704

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1491 of 3592

MR. MILLER: That's exactly right, and the Court advised me that since you knew I was doing 167 slides you knew better than I did that it was likely to be 4 hours. I'm telling you my first draft of the PowerPoint has 50 slides in it.

THE COURT: So it's probably hour and a half to two hours at the outside.

MR. MILLER: I'd guess.

THE COURT: Yeah. What about on the defense?

MR. WILLETT: Your Honor, if it please the Court, I'm going to be giving the closing argument for the defense. At most 90 minutes. The longest closing I ever gave in my career was in the United States versus the Sons of Silence motorcycle club, and I went for an hour and 15 minutes, and so that's sort of my gauge as to what I'll need.

THE COURT: I don't want to submit it on Thursday because I'm taking a plane Thursday afternoon, and I don't want to be out of town when they start deliberations. So even if I guess the government were to rest tomorrow, we'd probably just start on Monday.

MR. WILLETT: Judge, that's fine with the defense. We're not objecting to that position at all. And even if the government does get done, say, the end of the day Wednesday, we still sort of have to assimilate whatever evidence they bring in Wednesday, you know, and get that into the closing.

THE COURT: Yeah, but I don't think it'd take you all

1705

weekend to do that.

MR. WILLETT: No, Judge, I agree, but knowing that Thursday was going to be an early day to begin with, knowing that the reading of the instructions even at a good pace will

Page 17

take some time, knowing that Mr. Miller thinks it's a two-hour proposition and we'll give him some latitude if he has more PowerPoints than we're aware of -- and I agree with the Court's philosophy that once this gets submitted to the jury it's probably beneficial to have the Court here -- we would certainly agree that starting off bright and fresh Monday at 8:30 is appropriate.

THE COURT: How long do you think your Rule 29 motion's going to take? Are you going to do it in writing or just orally?

MR. STOWERS: Orally.

THE COURT: Okay.

MR. STOWERS: I mean, three minutes, five minutes.

THE COURT: Oh, okay.

MR. STOWERS: Yeah, I'd just make a standard request. I'm not going to argue a great deal of details. I don't think it serves a particular purpose at this juncture. If we wind up in a position where we have to file something after trial, then I think we can get into that more. But now that I've said 5 minutes, can I ask for 15?

THE COURT: For the Rule 29 motion?

1706

MR. STOWERS: Yeah, because --

THE COURT: Absolutely. You can have as long as you need.

MR. STOWERS: Okay.

THE COURT: It's an important motion in every criminal case and more so in this case than most. So you'll have whatever time you need. I'm just trying to think of the timing of it. Sounds like we'll have time to do it on Thursday.

Page 18

MR. STOWERS:  Right.

THE COURT:  Probably after we send the jury home.  And if you're going to rest -- well, here's my preference.  If you're going to rest, then there will just be one Rule 29 motion.  If you're actually going to put on some evidence, even limited evidence, I would like to defer the making of the Rule 29 motion until whatever evidence you put on, but we'll make a record so that it would be deemed having been made at the close of all the evidence.  I do that almost in every case --

MR. STOWERS:  Right.

THE COURT:  -- just as a timing matter.  I don't want to send the jury out to take the motion, but we'll make a careful record so that any Rule 29 motion you want to make will be deemed having been made at the close of the evidence, then renewed after all of the evidence.

MR. STOWERS:  Right.

THE COURT:  If there is any evidence.

1707

MR. STOWERS:  And that's the way I've done it many, many times when we're in the middle of evidence and not at a convenient breaking point.

THE COURT:  Okay.  Sounds good.  We haven't given them the set of second phase instructions yet.

MR. MASTALIR:  No, we have not.

THE COURT:  Yeah.  We'll get you those today, the second phase, and then maybe tomorrow night we can take a look at those, give you some time to look at them.  They're not that extensive, but, you know, I obviously value and want your input on them before I make any final determination.  But we've got a draft set.

Page 19

And I think our draft set on the penalty phase, should there be one -- when's that looking to be done, Roger?

MR. MASTALIR: End of the day today if I'm lucky, possibly tomorrow morning.

THE COURT: Yeah. So we'll get that to you probably tomorrow and maybe -- we'll maybe take that up Monday, you know, after argument. When the jury goes out, we can start talking about the third phase instructions if we ever get there; okay? Is there anything else we need to take up this morning?

MR. WILLIAMS: No, Your Honor.

THE COURT: Anything from the defense?

MR. STOWERS: Just to alert you, I think today is the day they're going to call their forensic dental person.

1708

THE COURT: Yes.

MR. STOWERS: And we had before trial alerted the Court that our view was that in light of the fact that we're agreeing to the identity which we've now done in the presence of the jury both in opening statements and on the record yesterday in their presence that that testimony should either be eliminated or limited in a substantial way. So we'll be making some objections during that witness's testimony, and I just wanted to alert you to that.

THE COURT: You want to do that in the presence of the jury, or do you want to do it outside the presence of the jury?

MR. STOWERS: Well, what would -- I don't want to waste a lot of time, so I guess our view is that --

THE COURT: Well, if you want to do it outside the presence, we can do it right now.

MR. STOWERS: Okay. Well --

Page 20

THE COURT: If you want to do it in front of the jury, you can do it in front of the jury.

MR. STOWERS: We would object to this testimony which consists, as we understand it, of comparisons of the skulls of the remains, particularly of the children, to certain dental records and that sort of thing as part of testimony, the sole purpose of which is to identify the remains of who it is that was unearthed by Agent Hochrein and the team on Lark Avenue and then later on Killdeer Road.

1709

And it's our view that that testimony is so emotionally and prejudicially impacting and, frankly, at this point cumulative and unnecessary that the Court should exercise its discretion to exclude it under Rule 403, particularly in light of the fact that it's very, very clear that nobody is contesting or disputing -- in fact, we told the jury we agree in opening and then yesterday as well -- that this is not a question in this case. Thank you.

THE COURT: Any other -- anything else we need to talk about? Mr. Williams, anything else?

MR. WILLIAMS: No, Your Honor.

THE COURT: Anything else from the defense?

MR. STOWERS: If you were going to rule on that.

THE COURT: Yeah, I'll go ahead and deny it now or over -- it's an objection, so I need to overrule it. Thank you.

MR. STOWERS: Thank you.

THE COURT: Okay. Good. We'll see you back here at 8:30. Thank you very much.

(Recess at 8:10 a.m.)

THE COURT: Morning. Ready to have the jury brought

Page 21

in?

MR. MILLER: Yes.

THE COURT: Okay. Do you have your first witness ready to go?

MR. MILLER: Yes, Your Honor.

1710

THE COURT: Mr. Smith?

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated.

Members of the jury, I wanted to try and give you a status update. It's always tentative because things can happen that are unforeseen. I've been meeting with the lawyers since about 7:30 this morning. And we think the case will go to the jury on Monday on the merits phase, so just to give you a heads-up.

We anticipate all the evidence will be concluded by Thursday of this week, and then we'll come back on Monday for the final merits instructions and then closing arguments from the lawyers, and then the jury should get the case yet on Monday. That's the plan. Could go astray, but that's the plan as we know it today.

You ready to call your next witness?

MR. MILLER: Yes, Your Honor. The government calls, recalls, J.D. Smith. Mr. Smith?

THE COURT: Okay. Mr. Smith, please come forward. I'll reswear you in.

J.D. SMITH, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated. And would you just state your full name for us.

THE WITNESS: J.D. Smith.

Page 22

VOLUME 8, 5-17-05
THE COURT:  Mr. Miller?

1711

MR. MILLER:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q.   You are the same J.D. Smith who testified here yesterday regarding discovery of these two sites using those hand-drawn maps.

A.   Yes.

Q.   You indicated that once those -- excuse me, once that Lark Avenue burial site was located Special Agent Hochrein of the FBI took over charge of that project at that point at that location?

A.   That's correct.

Q.   Did you remain there nevertheless throughout that period of time?

A.   Yes.

Q.   This took, as I understand it, a day and a half or so. Following completion of the exhumation, recovery of those four remains, the grave was covered back in?

A.   Yes.

Q.   Did you abandon the site completely at that point, or did you personally do any further work at that site in connection with attempted evidence recovery?

A.   On that day it was abandoned.  I returned on October 17 which would have been the next week.

Q.   And for what purpose, sir?

A.   At that time I brought four other DCI agents, and we

1712

brought a weed whacker and metal-detecting devices back to that
Page 23

scene. When they were done with that scene, there was a wooden stake that was put in one corner of where the grave had been. And so we took a tape measure and made a 30-foot circle around that stake. Then we used a weed whacker and cut down a lot of the brush that was around there and then proceeded with metal detectors to see if we could find any bullets or anything like that.

Q. This work was all done under your supervision, sir?

A. Yes.

Q. Any success?

A. Not in finding any bullets. There were a lot of nails, bottle caps, pieces of metal like that probably to the depth of maybe 7 to 10 inches.

Q. This location has previously been described as a dump site. Would that be a fair description?

A. I would think so, yes.

Q. So there was a lot of miscellaneous metal uncovered.

A. Yes.

Q. But nothing in the nature of what you were specifically looking for which is firearms components.

A. That's correct.

Q. Agent Smith, did you abandon efforts to find a grave at the site that appeared to you to match the hand-drawn map for the other body, the site on Killdeer Avenue?

1713

A. There was some discussion about having the FBI team come back some time in November or December, and then that was changed. And I was asked to take a group up and try to do it before that.

Q. And the reason for not waiting until the FBI ERT team was

Page 24

available was what, sir?

A.    Mainly had to do with winter approaching and the terrain out there.  It's pretty cold and hard to work out in the Mason City area in December and January.

Q.    For Iowa, Mason City area's a cold climate.

A.    That's correct.

Q.    And I assume you felt that excavation could be a lot easier if the ground was not frozen.

A.    Either to do it before winter or wait till in the spring.

Q.    When did you return to the Killdeer Avenue site, sir?

A.    I believe I was back up there on November 3 and the 6th kind of setting things up.  Then we actually went back to the Killdeer Avenue site on the 7th, 8th, and 9th of November.

Q.    And when you say we, you mean whom beside yourself?

A.    There were some agents from the DCI, officers from the FBI, couple officers from Cerro Gordo County and Mason City PD, again all -- to my knowledge all people who had no knowledge of what transpired or no connection with this case other than to do -- work on these digs and then two lab personnel from the DCI lab in Des Moines.

1714

Q.    Would it assist you in describing the efforts that you made out there that week to have the photograph of -- the aerial photograph we've already seen of that site to discuss?

A.    Yes, I think it would.

        MR. MILLER:  With the Court's permission, I'll ask that Exhibit 904 be again displayed.

        THE COURT:  You may.

        MR. MILLER:  And I'm going to make one more request of co-counsel that we have north at the top.  Very good.

Page 25

BY MR. MILLER:

Q.   Showing you Exhibit 904, first of all, you've mentioned some of the personnel.  What equipment or other resources were available to you in this effort, sir?

A.   We set up on this one to hire a local contractor who has a backhoe and a Caterpillar and going to have him on site.  We also brought in some cadaver dogs.  And again, I think I mentioned we used some metal detectors on this area.

Q.   Go ahead and please describe the process that was undertaken at that point if you would, please, Agent Smith.

A.   Okay.  The picture is a little off in that the crops were out at this time, so the area that we looked at if I can draw this was probably inside that rectangle.  When we were out there earlier with the FBI team, some of their digging was done more in this -- I want to say in this area right up in here, and that's where they found the graves of the animals.

1715

Q.   Were there any more animal graves discovered during this process?

A.   Yes.  What we did this time, again, the crops were out, so when we first got there on the 7th of November, we did not bring the backhoe out at that time.  We took the cadaver dogs and worked the whole rectangular area and also started working this whole area with the metal detectors.

As there had been some digging up in this area where the animal graves had been, the dogs, cadaver dogs, did not really hit on those graves, but they seemed to be kind of interested in that area.

So during that day two or three of the officers involved did some hand-digging again up in this area, and I

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1501 of 3592

think that's where we found some more bones. We did not find any other thing of significant value on the 7th.

We came back on the 8th, and at this time we brought the backhoe into this location, and we first began by taking the backhoe up to this area and using it to dig deeper, and we could dig -- move a lot more dirt with this. That's when we kind of found some more animal bones that looked like they may have been a cow or horse or something like this buried in about the same area that they had found on the previous location.

Q. Up to that point all the bones that had been discovered were animal bones.

A. To my knowledge, yes.

1716

Q. Now, let's talk about this scene again. Obviously when this photograph was taken crops were still standing. Was that true in the 7th, 8th, and 9th of November in the year 2000?

A. No, they were not. They were out.

Q. Crops were already out.

A. Yes.

Q. So you didn't have to buy any corn in order to do that excavation.

A. No.

Q. Please continue describing the efforts that were made on November 8, 2000, if you would, please.

A. On November 8 after digging this area here, I had -- I believe it's Larry -- Leroy Navratil who was running the backhoe. We decided to take this whole area and start scraping off the top two or three inches of soil to get the -- any plant growth or anything else off of it so we could actually see the dirt.

Page 27

Q. The whole area, you're referring to that red triangle that you've drawn on 904?

A. Inside this red rectangle, yes.

Q. Thank you. Please continue.

A. He was clearing that area. At the same time some of the officers were then going back over it with the metal detectors. And two of the officers found a medallion of -- a Scorpio medallion approximately, oh, right in this area here. Woops,

1717

it's off a little bit but right about there where the second dot is. They also found a lot of pieces of rusted metal, pieces of barbwire, nails, staples, whatever -- things to do with farm. The metal kind of stood out because it didn't fit with the rest of the stuff that we were finding. The rest of it had to mostly do with farm stuff that you'd expect to find around a farm area. The metal just didn't seem to fit there.

Q. The Scorpio medal.

A. Yes.

Q. Before we go on to talk about that, you mentioned this work was done by a fellow named Joe Navratil. Who was he, and what was the reason for his participation?

A. I think it's Leroy Navratil.

Q. Leroy, I'm sorry.

A. He runs an excavation business I believe in the Mason City area. And one of the reasons we wanted to use him is in at least our knowledge he had quite a bit of experience in moving dirt, and one of the things you look for in backhoe operators is when they do a lot of digging they have to watch out for pipelines and things like that, so they're pretty good from being in the cab, being able to spot where soil has been moved

Page 28

before when you scrape it off and you get down to just where the dirt is. When you get the plant material off the top, you can see where soil has been moved or repacked in there.

In fact, in this area up here when they were done,

1718

some of the animal graves, there were a couple lines across that looked like field tile lines that he came across, and you could see where they were in the soil.

Q. In other words, to the experienced eye of a backhoe operator, disturbed soil has a slightly different appearance than undisturbed soil.

A. Yes.

Q. Sir, I'm handing you what is marked Government Exhibit 914 and ask if you recognize that, sir.

A. Yes, that would be the Scorpio medallion that was found out on the site.

MR. MILLER: Government offers Exhibit 914.

* * * *

(Government Exhibit 914 was offered.)

* * * *

MR. STOWERS: No objection.

THE COURT: 914 is received.

* * * *

(Government Exhibit 914 was admitted.)

* * * *

MR. MILLER: I'll ask Mr. Williams if he can just switch this over to the visual presenter, and with the Court's permission, I'd like to publish it to the jury at this time.

THE COURT: You may.

BY MR. MILLER:

Page 29

Q.   What the jury is looking at on the visual presenter is what's been received as Exhibit 914, the Scorpio medal that you've been referring to?

A.   That's correct.

Q.   Thank you, sir.  And again if you would simply by the placement of an X remind us where that was found.

A.   I believe it was a little closer to the fence line right in this -- about right there where the third mark is.

Q.   Close to the edge of the cultivated field.

A.   Yes.

Q.   And that was uncovered or discovered in what fashion, sir, if you recall?

A.   By two of the officers using metal detectors.

Q.   So it was beneath the surface of the ground.

A.   Yes.

Q.   After discovery of that medal or medallion, what was done, sir?

A.   Well, at that same time as I mentioned earlier, we were working this whole area here.  And we had Mr. Navratil come over and clear off in this area because, as I mentioned earlier, finding this medallion didn't really fit some of the rest of the things we were finding, and it was our understanding that the deceased in this case's birthday was some time in November, and I think that fits with that Scorpio medal.

So we cleared off -- he started scraping the -- off

taking two or three inches at a time, and then he noticed an

area where it had been disturbed in the ground there approximately a little over four foot long and couple feet wide.

Q. Agent, I'm handing you a series of photographs marked 917A, 917B, 917C, 917D, 917E, 917F, 917G, and 917H. Just collectively as a group of eight photographs, do they show a single subject, sir?

A. Yes, that would all be in the area of where we found the medallion and subsequently the grave site.

Q. And do those photographs document the work that was done out there that day on the 8th of November in the year 2000?

A. Some of the work, yes.

MR. MILLER: United States offers Exhibits 917A through H inclusive.

* * * *

(Government Exhibits 917A through 917H were offered.)

* * * *

THE COURT: Any objection?

MR. STOWERS: No objection.

THE COURT: 917 A through H is received.

* * * *

(Government Exhibits 917A through 917H were admitted.)

* * * *

MR. MILLER: And with the Court's permission, I would ask that we in series publish those to the jury at this time

1721

asking the witness to describe for the jury in each case what they are looking at.

THE COURT: You may.

BY MR. MILLER:

Q. Showing us first Government Exhibit 917A, please describe

Page 31

for the jury what they see in that photograph, Agent Smith.

A.    This photograph is taken from the southern part looking north, in that rectangle as I mentioned before.  If you look at the rear of the backhoe, the two mounds up there is about where we had been digging and found the animal graves.  During this process here is where we started scraping off the topsoil and the vegetation that was on the top so we could get a look to see if the -- there was any disturbed parts.  And it was in this area up here where we found a couple of -- or Mr. Navratil found a couple of tiles.

Q.    Agent Smith, if you're going to refer to this area here, the only way it's going to help the jury is if you actually mark with the telestrator.

A.    The tile areas were up in this area here.

Q.    And you can take that off by just touching the screen at the corner where it says "undo last" or "clear all."  Thank you, sir.

         Then continuing with Government Exhibit 918 -- excuse me, 917B which is now on display in the courtroom, would you please describe for the jury what they see in that photograph.

                                                          1722


A.    Again, this is a picture in the area of that rectangle where we were clearing off and looking for any changes in the soil out there.

Q.    And just judging by the garb, it was typical north Iowa November weather.

A.    It was cold, it was windy, yes.

Q.    Thank you.  Please continue with Exhibit 918 -- excuse me, 917C.  And what is shown by that photograph, sir, if you can describe it?

Page 32

A.    This is the area actually where we found the grave.  And you can see approximately this area here after scraping it off there's a discoloration in the soil.  It's a little different from the soil around it.  According to Mr. Navratil, indication that the soil has been changed or moved in that area.

Q.    Thank you, sir.  Clearing that and moving on to 917D, what does that show, sir?

A.    Again, this is a little closer photograph of the same soil disturbance that was observed.

Q.    Is there anything of particular evidentiary significance visible in that photograph aside from the discoloration of the soil itself?

A.    It was -- at this time as we were scraping this is -- if you look in this area right here, you'll see where the backhoe just nicked the top of a boot.

Q.    Apparently that experienced backhoe operator was more

1723

successful than either cadaver dogs or ground-penetrating radar and those sorts of sophisticated things.

A.    That's correct.

Q.    The guy with some decades of experience in doing excavation work?

A.    Yes.

Q.    Thank you.  Please continue on to 917E if you would, please.  And that shows what, sir?

A.    That shows a closer shot of the boot that was actually nicked with the backhoe as we were starting to scrape back and doesn't show up too well, but there is a bone in the boot that comes down this way.

Q.    Now, Agent Smith, this boot and the surrounding apparently

Page 33

disturbed soil was observed approximately where in relation to that Scorpio medal that you identified for us earlier.

A. It's my recollection it was about approximately three or four feet away.

Q. That general area close to the edge of that cultivated field?

A. Yes.

Q. Thank you. Moving on to Government's Exhibit 917F, what appears in that photograph, sir?

A. After we nicked the boot with the backhoe, we then took the backhoe away from it, and Agent Kisner who's in this photo and Linda Knittig from the DCI lab began with hand tools and started

1724

working the area and working down into the grave. And Exhibit 7 -- or excuse me, 917F shows them working, moving some of the dirt out of there with the brush and the hand tools.

Q. And the personnel who were involved in this body recovery process were Agent Kisner and Ms. Knittig? What's their employment, sir?

A. Those two were assigned to work right in the grave site, and as they -- I think the later picture shows, we put a tent up over this site. In fact, we put two tents up. And they would move the dirt from this area here around the body up on to the side of the grave site. And as they did that, there were other officers who were involved in this that would take the dirt that was moved up above the grave site and run it through screens sifting it out for any bones or metal fragments or anything else we could find.

Q. Agent Kisner and Ms. Knittig are employed by what agency?

A. Department of Public Safety, DCI.

Page 34

Q.   Who else was involved in processing this scene, and by which I mean not merely the exhumation of this grave but attempts to collect and document any evidence that might be recovered?

A.   Vic Murillo and Linda Knittig are both with the DCI laboratory, so they were actually in charge of taking the evidence, packaging it, and taking it back to the laboratory.

Q.   Do you know offhand what Mr. Murillo's particular area of

1725

expertise is?

A.   I believe he does do the crime scene work and also some firearms.

Q.   Firearms?

A.   That's correct.

Q.   Thank you.  Please continue moving on to Government Exhibit 917G.  Now being displayed to the jury, would you describe what that shows for us, please?

A.   That just shows how we put tents over the grave site and the area behind it so we could work in out of the weather.  It was pretty cold out there.

Q.   And finally Exhibit 917H, what --

A.   Nine --

Q.   Go ahead.

A.   917H is another picture where some of the dirt that was removed from the graves was kind of in clods.  So we brought a power washer down and tried to use it to put some of the material on the screen like we were doing in the tents but then used a power washer to clean it off so we could see if we could find any other evidence, bones, metal, anything.

Q.   Screening for physical evidence?

Page 35

A. That's correct.

Q. Including firearm components such as bullets or cartridges?

A. That's correct.

Q. Returning just briefly to the grave itself, did you remain

1726

there until the body was removed, sir?

A. Yes.

Q. And did you personally observe the position of the body inside that grave?

A. Yes.

Q. What was the approximate dimension of the grave?

A. As we measured it from probably Exhibit 917D, it looked to be a couple feet wide and about -- I believe we measured it about 4 foot, 11 inches long.

Q. Only 4 foot, 11 inches long.

A. Yes.

Q. What was the posture of the body that was discovered at the bottom of that grave?

A. The body was laying face down in the grave with the head towards the south to southwest direction, and the legs were bent at the knee back up over the body.

Q. Did any additional official personnel arrive to participate in completing the processing of this crime scene, sir?

A. Yes.

Q. Who was that?

A. Dr. Goodin and John Kraemer from her office.

Q. And who is Dr. Goodin?

A. The state medical examiner.

Q. Mr. Kraemer is an investigator from her office?

A. That's correct.

Page 36

Q.   And the handling and examination of violent deaths is -- in addition to the DCI's is also the state medical examiner's jurisdiction as well; is that correct?

A.   Yes.

Q.   Did you nevertheless remain at the scene and as well other agencies -- excuse me, other agents of DCI and personnel from DCI?

A.   Yes, we -- after we discovered the body some time -- I think it's close to three o'clock in the afternoon, we started digging down around the body actually leaving it in there, but what we wanted to do is dig around both sides and get down underneath it so we could raise it out as one piece, so that took us to about eight o'clock at night and again sifting the dirt that was taken out of the grave.  Dr. Goodin came around 9 p.m.

Q.   Dr. Goodin completed the exhumation?

A.   Yes.

Q.   And was the body packaged and sealed for transport to the morgue in Des Moines?

A.   Yes.

          MR. MILLER:  Thank you, sir.  I have no further direct.

          THE COURT:  Mr. Stowers?

                    CROSS-EXAMINATION

BY MR. STOWERS:

Q.   Hi, Mr. Smith.  How are you?

          One of the things that you indicated is that you
Page 37

originally started searching in an area that was to the north of this rectangle which you sketched in on your photograph out on this Killdeer Road area?

A.   It was an area on the northern part of the rectangle within the rectangle, yes.

Q.   And why did you start searching in that northern part?

A.   Because when we had been out there with the FBI team earlier, they had found the grave sites of some animals up there, and the K-9 dog that they -- or cadaver dog they had brought at that time showed some interest up there.  And I think I testified that we brought some separate cadaver dogs out on this case.  They didn't really hit on anything up there, but they seemed to be interested in that northern part, so we just decided to check it out first.

Q.   Plus you had the map, and the map showed an X up in that area apparently best as you could tell.

A.   It's really kind of a guesstimate.  The X could be, as far as I'm concerned, pretty close to anywhere in that area.

Q.   And I take it that Mr. -- I think it's Hockhein or is it Hochrein -- I don't remember what exactly the pronunciation -- the fella that was here yesterday that testified right after you --

A.   Yes.

1729

Q.   -- he didn't come back to assist in this excavation process.

A.   No.

Q.   Okay.  That was done by local people; is that right?

A.   Well, as I mentioned, Agent Kisner and Linda Knittig. Agent Kisner's from Cedar Rapids, and Linda Knittig's with the

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1513 of 3592

DCI lab in Des Moines.  So yes, if Iowa is local, yes.  There were a couple other officers that were from the Mason City/Cerro Gordo County area.

Q.    Did you find any cartridges in that area from any firearms?

A.    It's my recollection that Agent Kisner found one lead fragment underneath the body and Vic Murillo found two in the dirt that was taken dug out around the grave.

Q.    I'm talking about the cartridge, the part that remains of the bullet, not the lead fragment.

A.    No, we did not.

MR. STOWERS:  That's all I have.  Thank you.

THE COURT:  Mr. Miller, any redirect?

MR. MILLER:  Yes, Your Honor, two matters.

REDIRECT EXAMINATION

BY MR. MILLER:

Q.    Again, I just want to be perfectly clear, the reason that Agent Hochrein was not summoned back to the scene at this time was what, sir?

A.    It was my understanding they were unavailable to get back

1730

in November or December.

Q.    That ER team has responsibilities all over the country.

A.    That's my understanding, yes.

Q.    And you didn't want to wait for their availability because it likely would have been dealing with frozen ground at the time.

A.    It was cold enough when we were there let alone try it in December or January.

Q.    And getting back to the matter of firearm components, what was discovered at the scene at the time in the way of firearm

Page 39

components of any nature?

A.    It's my understanding Agent Kisner found one lead bullet underneath the body I believe.  Well, I don't want to misspeak, but I thought it was somewhere around the center of the body. And Vic Murillo retrieved two pieces or two lead fragments in the dirt that was taken out from around the grave that was sifted through the screens.

Q.    At least three chunks of lead recovered from this burial ground, burial area.

A.    Yes.

MR. MILLER:  Thank you, sir.  I have no further redirect.

MR. STOWERS:  Nothing further.

THE COURT:  You may step down.

Everybody can take a stretch break.

1731

And are you ready to call the next witness?

MR. MILLER:  Yes, Your Honor.  The government calls Mary Buckley.  Mrs. Buckley, if you'll please step forward and be sworn.

MARY BUCKLEY, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated in the witness box.  Please adjust the chair and the microphones so you can speak directly into them.  And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS:  Mary Buckley, B-u-c-k-l-e-y.

THE COURT:  Could I get you to scoot your chair up a little closer?  Thank you.

Mr. Miller?

MR. MILLER:  Thank you, Your Honor.

Page 40

DIRECT EXAMINATION

BY MR. MILLER:

Q.   Your residence, Mrs. Buckley?

A.   Mason City.

Q.   How long have you lived in that town?

A.   Thirty-nine years.

Q.   I was just going to say all your life.  Close enough; okay?
Who do you live with there in Mason City?

A.   My kids Brad and Jada.

Q.   Brad's the 18-year-old.

A.   Yeah, soon to be 19.

1732

Q.   When's commencement?

A.   Two weeks.

Q.   And Jada's age?

A.   Ten.

Q.   Those children of yours have cousins?

A.   Yes.

Q.   They have one live cousin.  That's their cousin Brock.

A.   Yes.

Q.   That's Robert's son?

A.   Yes.

Q.   And how old is Brock?

A.   Fifteen.

Q.   Mrs. Buckley, there were two other siblings, and what were
their names and ages at death?

A.   Kandi.

Q.   Her age at death?

A.   Ten.

Q.   And?

Page 41

A. Amber, six.

Q. And those were daughters of whom?

A. My sister Lori Duncan.

Q. Mrs. Buckley, you currently employed outside the home?

A. Yes.

Q. Where do you work?

A. Metalcraft.

1733

Q. What sort of work do you do there, ma'am?

A. Make screens.

Q. How long have you been working there?

A. Eight years.

Q. Before you went to work for Metalcraft, did you work outside the home at another location?

A. Yes.

Q. And where was that, ma'am?

A. Fieldstone.

Q. Is that Fieldstone Cabinetry?

A. Yes, in Northwood, Iowa.

Q. Tell us just a little bit about Fieldstone. What goes on there?

A. Make cabinets, kitchens.

Q. And where is Northwood in relation to Mason City?

A. North about 30 miles.

Q. When your older sister Lori returned to town with her two children late '80s or around '90, did you have anything to do with her employment there?

A. Yes.

Q. You got her that job?

A. Yes.

Page 42

Q.   And in those years after she moved back, did you have frequent contact with her and her children as well as your brother, Brock, and your parents, Marge and Dave?

1734

A.   Yes.

Q.   Everybody lived in the same town.

A.   Yeah.

Q.   About how much did you see of your nieces and nephews during that period of time?

A.   About every day.

Q.   Milbraths were a close family.

A.   Yes.

Q.   And had the benefit of living in the same town.

A.   Yeah.

Q.   I'm going to approach you with a few objects, ma'am, and I'm going to be very quick about this, but I need to show you a few things.  I'm showing you Exhibit 700.  Do you recognize that, ma'am?

A.   Yes.

Q.   And what is Exhibit 700?

A.   Kandi's outfit.

         MR. MILLER:  With permission I'll display it to the jury at this time.

         THE COURT:  You may.

         MR. MILLER:  I apologize.  First I would move it into evidence, Exhibit 700.

                       *   *   *   *

         (Government Exhibit 700 was offered.)

                       *   *   *   *

1735

Page 43

MR. BERRIGAN:  No objection.

THE COURT:  Exhibit admitted.

* * * *

(Government Exhibit 700 was admitted.)

* * * *

BY MR. MILLER:

Q.   Mrs. Buckley, about how long did your sister work at Fieldstone Cabinetry if you recall?

A.   I'm going to say four years.

Q.   And did Fieldstone have any particular practice as far as participation in community activities there in Mason City?

A.   Yes, they entered the parades for July 4th.

Q.   And was there any practice annually as far as party gifts, favors, or prizes for children from Fieldcraft (sic) families that would participate in the parade?

A.   Yes.  If you walked in the parade, they gave everybody that was walking or riding on the float a T-shirt.

Q.   I'm showing you what is marked as Government's Exhibit 816 and ask if you recognize that garment, ma'am.

A.   Yes.

Q.   There's some water in front of you, ma'am, that's not been used, so you can feel free to use that or the Kleenex.  And take your time.  I simply want to know, you've indicated you do recognize Exhibit 700, ma'am?

A.   Yes.

1736

Q.   Excuse me, 816.

A.   Yes.

Page 44

Q.   And what is Exhibit 816?

A.   Fieldstone.

Q.   Is it the sort of garment that was handed out to children of Fieldstone employees on 4th of July parades?

A.   Yes.

Q.   Did you know either of your nieces to have such a garment and to wear it?

A.   Yes.

Q.   Okay.  Including your niece Amber?

A.   Yes.

          MR. MILLER:  Government offers Exhibit 816 into evidence.

                         *   *   *   *

          (Government Exhibit 816 was offered.)

                         *   *   *   *

          MR. BERRIGAN:  No objection.

          THE COURT:  816 is received.

                         *   *   *   *

          (Government Exhibit 816 was admitted.)

                         *   *   *   *

          MR. MILLER:  And again with the Court's permission, I'd like to briefly publish it.

          THE COURT:  You may.

                                                        1737

BY MR. MILLER:

Q.   What sort of things did your niece Amber wear in the summertime, Miss Buckley?

A.   She lived in swimsuits.

Q.   She liked to play outside in the water?

A.   Yes.

Page 45

Q.   She was a playful child.

A.   Yeah.

Q.   Ma'am, I'm showing you Government Exhibit 800.  Do you recognize it?

A.   Yes.

Q.   What is Exhibit 800?

A.   Amber's swimsuit.

Q.   And how do you recognize it, Ms. Buckley?

A.   She always wore that polka dotted swimsuit.

Q.   She always wore?

A.   The polka dotted swimsuit.

        MR. MILLER:   Government offers Exhibit 800 into evidence.

                        *   *   *   *

        (Government Exhibit 800 was offered.)

                        *   *   *   *

        MR. BERRIGAN:   No objection.

        THE COURT:   It's received.   Thank you.

                        *   *   *   *

                                                 1738


        (Government Exhibit 800 was admitted.)

                        *   *   *   *

        MR. MILLER:   And again, if I may just briefly publish it to the jury at this time, Your Honor.

        THE COURT:   You may.

BY MR. MILLER:

Q.   Ma'am, your two nieces disappeared in the summer of 1993; is that correct?

A.   Yes.

Q.   I think you've already told us their ages at that time.

Page 46

Were there any photographs taken shortly before their death?

A.   Easter picture.

Q.   I'm showing you Government Exhibit 721.  Do you recognize that, ma'am?

A.   Yes.

Q.   What is Exhibit 721?

A.   Kandi and Amber.

Q.   Does 721 show your nieces 720 -- excuse me, your nieces Kandi and Amber as they appeared in life that Easter of 1993?

A.   Yes.

          MR. MILLER:  Government offers Exhibit 721.

                    *   *   *   *

          (Government Exhibit 721 was offered.)

                    *   *   *   *

          MR. BERRIGAN:  Objection.  These are cumulative, Your

1739

Honor.  There are already pictures of these girls in evidence.

          THE COURT:  Overruled.  721 is received.

                    *   *   *   *

          (Government Exhibit 721 was admitted.)

                    *   *   *   *

          MR. MILLER:  And via the electronic device request permission to publish them to the jury at this time.

          THE COURT:  You may.

BY MR. MILLER:

Q.   And is Exhibit 721 among the last photographs that would show them accurately as they appeared in life, Ms. Buckley?

A.   Yes.

          MR. MILLER:  Thank you, ma'am.  I have no further questions.

Page 47

BY MR. BERRIGAN:

Q. Mrs. Buckley, my name is Pat Berrigan. I need to ask you just a couple of questions; okay? You said that you and your sister were very close and you saw your nieces almost every day; is that right?

A. Yes.

Q. Did you become aware that your sister was living with a fellow by the name of Greg Nicholson?

A. Not living with him.

Q. Well, was she involved with him in some fashion?

1740

A. Yes.

Q. How were they involved?

A. All I knew is she was going to store his stuff in the garage.

Q. You didn't know he was spending time at her house?

A. No.

Q. Did you know anything about Mr. Nicholson or his involvement with methamphetamine?

A. No, didn't know the guy.

Q. Did you know anything about a fella by the name of Dustin Honken and any relationship Mr. Nicholson might have had to him?

A. No.

Q. These aren't matters your sister ever discussed with you.

A. No.

        MR. BERRIGAN: Thank you, ma'am.

        THE COURT: Mr. Miller, anything further?

        MR. MILLER: No, Your Honor.

        THE COURT: Thank you. You may step down.

                    Page 48

Ready to call your next witness?

MR. MILLER: Yes, Your Honor. We call Dr. John Frasco.

Dr. Frasco, if you'll please step forward and be sworn.

THE COURT: Sir, please step forward. I'll swear you in.

1741

JOHN FRASCO, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Please adjust the chair and the microphones so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is Dr. John F. Frasco, F-r-a-s-c-o.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Your occupation, sir.

A. I am a doctor of dental surgery.

Q. Where do you reside?

A. I reside in Mason City, Iowa.

Q. Your age, sir?

A. Fifty-seven years old.

Q. Are you still active in the general practice of dentistry?

A. I retired from the general practice of dentistry about four years ago, but I do maintain a very small limited practice on a one-day-a-week basis.

Page 49

Q. I'd like to go ahead and review your professional history if you would, please, beginning with your education.

A. I attended and graduated from St. Mary's College, now

1742

St. Mary's University, in Winona, Minnesota, in 1969. I attended and graduated from Loyola University of Chicago, the School of Dentistry, in Maywood, Illinois, in 1973. I've been in the private practice of dentistry for 20 years in Chicago.

Q. In addition to the general practice of dentistry, did you happen to develop any expertise in the area of forensic dentistry?

A. Yes, I did.

Q. What is forensic dentistry, Doctor?

A. Forensic dentistry is the application of the science of dentistry to the field of law. It incorporates four areas, primary areas, of interest, first being the identification of the unknown individual. Second is bite mark analysis and evaluation. The third is trauma in the oral tissues, and the fourth is cases of dental negligence or malpractice.

Q. And what training or experience do you have in this field?

A. I started working in the area of forensic dentistry with preliminary education at the Armed Forces Institute of Pathology in Bethesda, Maryland, in 1978. I have worked extensively with medical examiners, coroners, and law enforcement during my career while I was in Chicago and subsequent to -- subsequently in my move to northern Iowa.

Q. How did you happen to develop an interest in forensic dentistry, sir?

A. Shortly after graduating from dental school, I attended a

1743

Page 50

one-day class that was being held in the Chicago area, and it stimulated my interest. I wanted to -- I felt I wanted to pursue that further. It was a way that we can give back to our community for the wonderful things that we get by being a private practitioner of dentistry. So I did, like I said, enroll in the class at the Armed Forces Institute of Pathology, came back with that background information, and continued on serving the public.

Q. In the course of serving the public, have you participated at all in teaching in the field?

A. Yes, I did. I was asked -- I joined the faculty at Loyola's dental school in 1979 as a part-time faculty member. And in 1981 the university had asked me to come on full time. At that point in time in the late '70s, early '80s, we saw that there was a critical need to be able to cultivate an interest in forensic dentistry in dental students across the nation. At that time there was only one course being offered at the dental school level, and so we instituted a program and developed a course to train dental students in the practices of forensic dentistry, something that they might be able to carry on with them in their professional careers.

Q. And what was the basis for this need for development of professional expertise throughout the field?

A. At that time there were about -- oh, about a hundred individuals practicing forensic dentistry on a limited basis.

1744

Most all of us were involved in the private practice of dentistry, and we did this as the need arose to help law enforcement with identification, primarily identification and

Page 51

bite mark evaluation. We understood very early on that as the need grew as this became an accepted science and the talents were being utilized that we just couldn't do it alone and we needed to be bringing on the next generation.

Q. I think you've already mentioned this, but is identification of human remains among the contributions that forensic dentistry provides to medicine?

A. Yes, it is, and it's the one that the general public actually hears about the most as far as what we do.

Q. Please describe that for us in general terms.

A. The identification of an individual by use of dental information is a matter of comparisons. We collect information from the decedent. We do a visual examination. We take X-rays. We take photographs. We mark down and chart all of the findings that we see in the oral cavity on that individual.

We rely on law enforcement to provide us with the possibilities of who this particular individual might be. We can't just go to -- there is no national database that we can go to and search for this type of information. So we have to have a presumptive identification. We have to have some sort of a source to go to to determine who this particular individual might be.

1745

There are three scientific methods of determining someone's identity. One of them is fingerprint. One of them is DNA analysis, and the third one is dental comparison. Once we have information from the family of who this suspected individual may be from who their dentist might have treated them during life, we collect that information from their dental records, and we do a one-on-one comparison with what we have

there. It either is or isn't the individual.

Q. And this is a standard process in identifying skeletal remains, sir?

A. Yes, it is.

Q. And just roughly how much of such work do you do, sir?

A. Of late I've been doing considerably more. Obviously it's as the need arises. Fortunately it doesn't happen all of that often, but when there are victims that cannot be identified by other methods, I am pressed into service to try to seek some information.

Q. Are there any agencies or organizations through which you tend to be pressed into service from time to time?

A. I do work locally now with the Cerro Gordo County Medical Examiner's Office. We're very fortunate in Mason City to have a wonderful pathology department who work in close concert with our local Mercy Hospital. And those five pathologists are also our chief medical examiner and deputy medical examiners. I built a relationship with them when I first moved to Iowa in

1746

1993, and they have called me to assist in helping identify individuals on a number of cases.

Q. I'm going to digress just briefly. You mentioned you moved to Iowa in 1993 from the Chicago area.

A. Correct.

Q. You're now 57 years young. You were a man in your mid to early 40s at the time. What prompted the move?

A. Family. Both my parents passed away in the late '80s, early '90s. My wife is from Austin, Minnesota. Her parents were significantly younger than mine, and family brought us this way. It was tough to leave a busy practice and, of course, our

Page 53

friends in the Chicago area, but it was necessary for us to go. I married the oldest of three girls and took her away from her family a long time ago.

Q. Family obligations.

A. Yes.

Q. So as it happens, you brought some expertise in forensic odontology to the Mason City area that most small towns don't ordinarily enjoy.

A. Correct.

Q. You've told us that you work occasionally through the Cerro Gordo County Medical Examiner's Office. Are there any organizations or associations of wider scope with which you're affiliated and for which you do any such work?

A. After the plane crash here at Sioux City in 1989, Flight

1747

232, one thing that was learned from that was the critical need to have talented, dedicated, available individuals who can go in and assist in mass disasters. So in Chicago -- I was living there at the time. In Chicago we had decided that we needed to bring together the talents that we might have available on a local basis, individual local basis. And we created the Cook County -- Cook County is Chicago, Illinois -- Cook County Medical Examiner's Office dental identification team.

On moving here to Iowa, I was requested to become a consultant with the Iowa State Medical Examiner's Office in Des Moines, and I have served for them for the past four or five years.

Q. And beyond the state of Iowa, are there any organizations with which you participate in the field of forensics?

A. I have been an active member of the American Academy of

Page 54

Forensic Sciences which I joined in 1978, and that is a meeting and a joining of all of the forensic areas, not just forensic dentistry, and I've been an active participant in the odontology, the dental section, of the academy.

More recently I was appointed to an agency of the federal government which is involved in disaster response. Originally with the U.S. Public Health Service under the Department of Health and Human Services, the National Disaster Medical System was formed in the late '80s.

And then in the early '90s a subset of that agency was

1748

formed as the Disaster Mortuary Operational Response Teams. These are groups of individuals -- there's ten teams in the United States, and our original mission was to respond to identify victims of natural disasters. Subsequently there was a memorandum of understanding created between the NDMS, the DMORT organization, and the National Transportation Safety Board. And we then started responding to all air and rail mass fatalities.

We have since been moved over to the Department of Homeland Security in 2003, and our group is now directly responsible to the federal emergency management agency known as FEMA. I have been actively involved in that group. I've been deployed several times under their request to the island of Guam for a plane crash in 1997; Bourbonnais, Illinois, for a train crash in '99; World Trade Center, I spent three months there in 2001, 2002; and most recently the hurricanes in Florida this past August, September.

Q. You're a man whose earlier career in dentistry in Chicago allows you the luxury of being able to volunteer some time back to the rest of us.

Page 55

A.    Very true.  I was fortunate to have four other doctors working in the office for me and an absolutely wonderful staff working there.  So I did have the luxury to be able to respond on a moment's notice.

Q.    You've mentioned among your -- the duties that you've currently accepted some affiliation with the Iowa State Medical

1749

Examiner's Office.

A.    That is correct.

Q.    Did you do such work at their request in the months of October and November of the year 2000, sir?

A.    Yes, I did.

Q.    And specifically in connection with bodies exhumed in rural Mason City, Iowa.

A.    Correct.

Q.    In general terms, please describe for us how you went about responding to their request.

A.    When the remains were located in Cerro Gordo County, they had been transported to the medical examiner's facilities at Broadlawns Hospital in Des Moines where they maintain their mortuary operation.

I was requested by Dr. Dennis Klein, deputy state medical examiner, to review the dental information of those remains and see if we can determine identification of those individuals.

Q.    And how do you go about doing that, sir?

A.    We traveled to Des Moines.  We did what I had mentioned earlier as far as visual examination of the oral and dental structures.  We X-rayed those individuals.  We photographed those individuals and collected that information from those

Page 56

remains.

I was provided with suggested possibilities of who

1750

these individuals may be.  Their family dentists were contacted. We collected that dental information from those dentists.  We did a comparison of that information, and I was able to establish three dental identifications.

Q.    Were you provided with the known dental records of Greg Nicholson, sir?

A.    Yes, I was.

Q.    And were you able to make an identification?

A.    I evaluated -- and the number I believe is OOSME2000-115, 115, and that individual did correspond and is, in fact, Greg Nicholson.

Q.    Were you provided with the known dental records of Lori Duncan?

A.    Yes, I was.

Q.    And what, if anything, did you do with those records, and what, if any findings did you make, sir?

A.    Similarly, comparisons were made; evaluations were done, and a positive identification was recommended to the state medical examiner as Lori Duncan for case number 116.

Q.    SME00116 is Lori Duncan?

A.    Correct.

Q.    Were you provided with the known dental records of Terry DeGeus, sir?

A.    Yes, I was.  At a later date I was requested again to evaluate skeletal remains on behalf of the state medical

1751

Page 57

examiner's office. I was given or collected information from the family dentist, and I was able to favorably identify that particular individual as 135, SME00135.

Q. SME standing for state medical examiner number --

A. Correct.

Q. -- 135 is, in fact, the remains of Terry DeGeus?

A. Yes, it is.

Q. Were you provided with known dental records of either Kandi or Amber Duncan?

A. We were unable to locate any dental records antemortem, dental records from when they were living from any dentists in the general locale. We went through extensive efforts to try to locate by reason of location, where they lived, where Lori worked, through her employer if they had dental insurance, through the Title 19 and the WIC programs. Not knowing the background or the history, I just wanted to exhaust all avenues, even through school records, and we were unable to locate dental records from when the children were alive.

Q. Is that unusual in connection with young children?

A. Not necessarily. It's very frustrating from a forensic dentist perspective especially when you have some dental information from the -- on the decedent and you don't have anything to compare it to. But with young children in this day and age with the effects of good oral hygiene, good family behavior and practices, a little better nutrition and obviously

1752

fluoride in the water supplies, we see a reduction in the amount of dental care that's provided to young children.

Q. In connection with your work as a forensic odontologist --

Page 58

and odontologist, correct me if I'm wrong in suggesting that's a fancy word for dentist.

A. It's a scientific term for dentist. Odonto, tooth; ologist, one who studies. So yes, it is.

Q. As a forensic dentist, sir, are you qualified, trained, and experienced in estimating the age of persons based upon examination of their teeth?

A. Yes, I am.

Q. And did you do any such work in connection with these two children?

A. Yes, I did. When we found we were going to be unable to put together a dental match or dental identification with regards to the typical ways we would do that, an area that dental investigators can get into -- and it's -- it is with age estimation. There's a number of different methods that anthropologists use, the people who study the skeletal bones of the body.

In dentistry we're looking at the growth and development of the baby teeth and subsequently the growth and development of the adult teeth and the loss of those baby teeth. So from about age 2 until probably age 18, 19, 20 years of age, we in dentistry with the proper areas and structures of the jaws

1753

to be able to evaluate can actually come up with age estimations that are even more highly refined than what the anthropologists can do in that age category.

Over age 21, it becomes blurred because most of the teeth are developed and the growth has subsided considerably. And that's where the anthropologists after age 21 can actually narrow the age down a little better than we can as dentists.

Page 59

Q. What, if any, professional opinions regarding the estimated age of these two children did you arrive at?

A. If I might refer to my notes?

Q. Would that help you be more accurate in doing so?

A. Yes, it would.

Q. Then with the Court's permission I'll ask you to go ahead and do that.

A. Shari has my briefcase I believe. Thank you, sir. Just a moment.

I did an age assessment on the two children, the skeletal remains. On case 117 -- it was the larger of the two skeletal individuals -- I was able to establish a dental age at the time of death of 9 years, 9.98 years, plus or minus 30 months, so roughly 10 years of age.

On the smaller of the two skeletal remains, I did a dental analysis of the teeth that were remaining. Now, in this particular instance we had teeth in the lower jaw, but we only had a section of upper jaw that contained three teeth, so I was

1754

somewhat limited in my analysis. But I was able to come up with a dental age at the time of death of 6.025 years plus or minus 10 months, so roughly 10 -- 6 years of age.

Q. And the work that you did -- at least a portion of the work you did, was that done at the morgue in Des Moines, sir?

A. Yes, it was.

Q. With personal hands-on observation of the skeletal remains?

A. Yes. I was also working side by side with our anthropologist.

Q. Sir, I've set before you what is marked Government Exhibit 710. Do you recognize that item, sir?

Page 60

A.    Yes, I do.

Q.    What is that item?

A.    It is a photograph of the skull of the photograph of victim 117 that I had taken at the morgue at Broadlawns Hospital in October of 2000.

Q.    Sir, is it possible to draw any professional conclusions from an examination of the skeletal remains and a photograph of a victim taken recently in life?

A.    We can draw some conclusions, but I must state that it is impossible to make an identification from looking at skeletal remains and a photograph of an individual.  All we can do is see similarities, consistencies, and obviously inconsistencies should they exist.

Q.    Finding a significant inconsistency could rule out an

1755

identification, I take it.

A.    With comparison to the other photograph?

Q.    Yes.

A.    I found absolutely no inconsistencies with regard to the photograph.

Q.    Well, you're getting ahead of me.  I just wanted to ask in general if you were to have found such an inconsistency you could rule out an identification.

A.    Correct.

Q.    But by an examination you can tell us whether, in fact, there are consistencies or an absence of inconsistencies which would make an identification at least a possibility.

A.    Correct.

Q.    With the Court's permission, I would -- let me ask you this.  Would it assist you in explaining what findings you're

Page 61

able to make by displaying to the jury Exhibits 710 and 721?

A.    Yes, it would.

MR. MILLER:   Government offers Exhibit 710 at this time.

*   *   *   *

(Government Exhibit 710 was offered.)

*   *   *   *

THE COURT:   Any objection?

MR. STOWERS:   For the reasons previously indicated, Your Honor.   We believe this is unnecessary under Rule 403 and

1756

unfairly prejudicial and cumulative.

THE COURT:   Objection's overruled.   710 is admitted.

*   *   *   *

(Government Exhibit 710 was admitted.)

*   *   *   *

MR. MILLER:   And with the Court's permission, I will ask that the two be simultaneously published at this time?

THE COURT:   You may.

BY MR. MILLER:

Q.    Doctor, looking at what the jury is viewing as blow-ups of Exhibits 710 and 721, would you please describe for us what, if any, conclusions you can make?

A.    I'm looking at the two pictures, the two photographs, especially as they're blowing them up digitally.   In the picture on the left, you see the skeletal remains, and you can see the large space between the two central incisors, the two front teeth.   And similarly, you're going to see a space in the picture on the right between those same two front teeth.

In this particular instance in the photograph on the

Page 62

right, she has an open lip smile, so we're able to evaluate the teeth. We also have present the adult laterals and central incisors, the four front teeth, and no baby teeth present and no missing teeth there. So there are no inconsistencies with that.

In addition -- now, you have to -- when you're looking at the picture, it's going to be the reverse. So the tooth on

1757

the left on the skeleton, the front tooth on the left which is the right front tooth is slightly longer than the left front tooth. And when I evaluated this photograph of Kandace when it was presented to me and we did a similar magnification, in fact, her right front tooth or the left tooth as you're looking at it on the picture is longer than the tooth next to it. So from these observations I can say that these teeth and this skeletal remains are consistent with that particular individual, and there is no reason, no inconsistencies, to exclude the possibility that this is that individual.

Q. The absence of in-life known dental records, however, prevents your positive identification --

A. Correct.

Q. -- from a purely scientific odontological perspective.

A. Precisely.

Q. Okay. And taking down the two enlargements for the moment and looking only at Exhibit 721, what, if any, conclusions were you able to draw with regard to the younger child shown in that photograph?

A. Unfortunately I was unable to make any observations with regards to consistencies or inconsistencies from evaluating the photograph because I didn't have any upper front teeth on this particular individual in the postmortem specimen.

Page 63

Q. That portion of her face was missing.

A. That portion of her face was gone.

1758

MR. MILLER: Thank you, sir. I have no further direct examination.

THE COURT: Mr. Stowers, you may cross-examine.

CROSS-EXAMINATION

BY MR. STOWERS:

Q. Dr. -- is it Frasco?

A. Yes.

Q. Okay. You are a practicing dentist still in Mason City?

A. I practice in Northwood, Iowa.

Q. Just north of Mason City.

A. Correct.

Q. And are you testifying here pursuant to any agreement that you have with the government?

A. I'm sorry. I didn't --

Q. Are you being paid for your testimony?

A. Only my mileage.

Q. Only your mileage. So you are testifying as a person who has an interest in this field, but you're not charging a fee for your services.

A. Not to testify here in court, sir.

Q. Okay. Have you charged a fee for your services in connection with your work in this case at all?

A. Yes, I did. I'm on contract with the Iowa State Medical Examiner's Office, and I bill for my hours.

Q. Okay. So you bill the state of Iowa for your hours.

1759

Page 64

A.    Correct.

Q.    And how much is your hourly rate?

A.    At that time I believe my hourly rate was $110 an hour.

Q.    Okay.  Do you know how much you've billed?

A.    I really don't.

MR. STOWERS:  Okay.  Thank you.

THE COURT:  Mr. Miller, anything further?

MR. MILLER:  No, Your Honor.

THE COURT:  Thank you.  You're excused.

THE WITNESS:  Thank you.

THE COURT:  Would now be a good time to take our mid-morning break?

MR. MILLER:  Certainly.

THE COURT:  Okay.  Members of the jury, it is about 9:45.  We'll be in recess until 10:15.  Thank you.

(The jury exited the courtroom.)

THE COURT:  Any matters we need to take up?

MR. WILLIAMS:  No, Your Honor.

MR. STOWERS:  No, Your Honor.

THE COURT:  Okay.  Thank you.  See you back here at 10:15.

(Recess at 9:46 a.m.)

THE COURT:  Ready to have the jury brought in?

MR. MILLER:  Yes, Your Honor.

(The jury entered the courtroom.)

1760

THE COURT:  Thank you.  Please be seated.

Ready to call your next witness?

MR. WILLIAMS:  Yes, Your Honor.  The government calls John Kraemer.

Page 65

JOHN KRAEMER, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Make yourself comfortable. And try and scoot that chair up so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is John Charles Kraemer Junior. Last name is spelled K-r-a-e-m-e-r.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Your occupation, Mr. Kraemer?

A. My title is I'm the director of forensic operations for the Iowa State Medical Examiner's Office.

Q. And you're going to have to define a couple things for us. First tell us what the Iowa State Medical Examiner's Office is.

A. The Iowa State Medical Examiner's Office is a division within the Iowa Department of Public Health, and our goal and mission is to establish credibility in death investigation in the state of Iowa. Our main job functions are to determine the cause and manner of death of individuals who die within the

1761

jurisdiction of the medical examiner.

Q. Remind me again of your title.

A. Director of forensic operations.

Q. And what are your duties in connection with that position, sir?

A. My primary duties are to oversee and assist the county medical examiners in conducting death scene investigations. That involves travelling to the death scene and assisting local

Page 66

law enforcement and county medical examiner personnel in processing the death scene and assisting with the examination of the body at the scene.

Q. Where are you originally from, Mr. Kraemer?

A. I'm originally from Minnesota.

Q. Well, just so we can be sure that nobody's tripped up with the Minnesota accent, speak nice and slow and clear so the court reporter can get that. And there's a clean glass of water in front of you, so take your time.

I want to know for sure what your education is that allows you to do such work, Mr. Kraemer.

A. I have a bachelor of science degree from the University of Minnesota in mortuary science. I then went on to graduate school and earned a master's in health science as a physician assistant or a pathologist assistant.

Q. Where did you get that master's?

A. I got the master's degree from Quinnipiac University in

1762

Hamden, Connecticut.

Q. Did you pursue any other formal education, sir?

A. Negative.

Q. Your experience in the area of forensic science is what, sir?

A. I've been in the area of forensic science for five years.

Q. And how much of that time has been spent with the Iowa State Medical Examiner's Office?

A. Four and a half years.

Q. Would you just describe what's happened in the state medical examiner's office during the period of time that you have been there? As I understand, it's a time of some

Page 67

transition?

A.   Yes.  Dr. Julia Goodin who is our current chief state medical examiner has accepted -- when she accepted the position, her goal was to -- as stated previously in our mission statement, to establish credibility in death investigation. During this time we have been in the process and just completed construction of a brand new state-of-the-art medical examiner facility in Ankeny, Iowa.  And we have been operational in that new facility now for a little over a month.

During the time we have instructed county medical examiners, many of which are in the rural counties, and assisting them and training them to perform quality death investigations throughout the state.  Our primary goal is to

1763

educate and train our county medical examiner personnel.

Q.   We heard earlier from Forensic Scientist Paul Bush about a new laboratory up in Ankeny.  Is that in any way connected with your laboratory or your morgue, rather?

A.   The Iowa Division of Criminal Investigation crime lab is next door to our lab.  They are two separate offices, but we are right next door to one another now.

Q.   Both brand new facilities.

A.   That's correct.

Q.   For the purpose of bringing Iowa up to the state of the art in forensic science and criminal death investigation.

A.   That's correct.

Q.   Up until a month ago where were you doing your autopsies, sir?

A.   We were doing and performing our autopsies at Broadlawns Medical Center in Des Moines, Iowa.

Page 68

Q.    And had been, as I understand it, for many years.

A.    Yes, since our -- since Dr. Goodin's arrival we have been sharing that facility with the Polk County Medical Examiner's Office.  And that was an arrangement that was temporary until our new facility was completed.

Q.    Calling your attention to October of the year 2000, were you employed with the state medical examiner's office at that time, Mr. Kraemer?

A.    Yes, I was.

1764

Q.    Was your office involved in a number of death investigations that occurred that fall in the vicinity of Mason City, Iowa?

A.    Yes, we were.

Q.    And were you personally involved in that investigation?

A.    Yes, I was.

Q.    Please describe your first personal involvement in that matter.

A.    My first involvement was we received -- actually Dr. Dennis Klein, our deputy chief state medical examiner, had notified me in the early morning hours that a clandestine grave had been located and that skeletal remains were currently being recovered by the evidence response team from the Federal Bureau of Investigation.  The remains, four, were recovered in Cerro Gordo County, and we were asked to assist the local county medical examiner, and we were asked then to also perform the autopsy examinations of those individuals.

Dr. Dennis Klein, myself, and a former autopsy assistant proceeded immediately to the scene and were greeted by law enforcement personnel there and instructed on what has

Page 69

occurred since our notification or what had occurred, excuse me, between our notification and our arrival time. And we proceeded to observe the excavation of those first four remains.

Q. Okay. And again, without asking you for any of the specifics of what you were advised, I take it you were briefed

1765

upon the situation there upon your arrival at the scene.

A. That is correct.

Q. Go ahead and describe the scene for us if you would, please, and the nature of personnel, equipment, and procedures under -- that were being undertaken at the time of your arrival.

A. Would we be talking about the first clandestine grave or the second clandestine grave that we were notified of?

Q. I'm talking first about the first one.

A. Oh, sure. Upon our arrival, we were briefed as to the exact location of the clandestine grave. And Dr. Dennis Klein -- we were instructed to observe. The evidence response team and local authorities were in the process of excavating those remains. Dr. Hochrein who is the FBI archaeologist was in charge of recovering those remains, and basically Dr. Dennis Klein and myself and my autopsy -- we were mostly observers during that time.

The excavators from the evidence response team asked us how we would like the four remains recovered packaged and labelled, and then they asked us where they would like the remains sent for examination by Dr. Dennis Klein. We informed them that we wanted each of the remains when they were recovered to be separately bagged and toe tagged and the body bags sealed and then transported immediately to the Broadlawns morgue in Des Moines, Iowa.

Page 70

Q.    And that transpired on about October 12 of 2000?

1766

A.    That is correct.

Q.    The remains did ultimately arrive at the morgue for further processing by your office.

A.    Correct.

Q.    From that mass grave.

A.    Yes.

Q.    Jumping ahead briefly if we can, was there a subsequent crime scene human remains exhumation procedure in the following weeks in the same neighborhood?

A.    Yes, there was.

Q.    And describe for us when and how you were first involved in the process.

A.    I was actually in the office at the time, and it was in the late afternoon hours.  I was actually speaking to Assistant U.S. Attorney C.J. Williams regarding paperwork and other tests and updating him on the examinations of the first four individuals when his office received a telephone call from J.D. Smith, then the special agent in charge with the Iowa Division of Criminal Investigation, notifying them that they had located a second clandestine grave.

Assistant U.S. Attorney C.J. Williams then informed me, and then I then contacted J.D. Smith, and he asked that myself and Dr. Julia Goodin who was the forensic pathologist on call that day to arrive and come up and visit the clandestine grave and assist with the excavation and processing of that

1767

Page 71

second clandestine grave.

Q.   Did you do so?

A.   Yes, I did.

Q.   On what date?

A.   The remains were discovered on November 8, year 2000.

Q.   Did you proceed to the scene immediately?

A.   Yes, we did.

Q.   And upon arriving, what did you find in the way of personnel, resources, and procedures going on?

A.   We arrived in the evening hours.  It was dark.  We arrived at a very rural location.  The setting of the scene consisted of what appeared to be an abandoned and collapsed farmhouse with some metal silos.  There was a cornfield adjacent to where the clandestine grave was located.  The Division of Criminal Investigation and local authorities were on scene.  They had provided lighting and had covered the scene in a tent, and the DCI crime lab team had begun excavating the remains.

Dr. Goodin and myself were briefed upon our arrival as to what has happened since our notification, and we developed a plan of action as to how the remains were going to be excavated and then transported again to the Broadlawns Medical Center in Des Moines.

Dr. Goodin and I were first notified that the remains were actually discovered when a backhoe was grading the top surface and a boot and a partial leg bone were discovered, and

1768

that is how they located the grave.

Dr. Goodin and I then systematically in a layerwise dissection assisted the DCI crime lab team with removing the bones and skeletal remains from the grave into a body bag.  We

Page 72

toe tagged the remains, sealed the body bag, and then a local funeral home was instructed to transport those remains to the medical examiner facility in Des Moines.

Q. Mr. Kraemer, I'm showing you what's marked Government Exhibit 906 and ask if you recognize that document, sir.

A. Yes, I do.

Q. What is 906, sir?

A. Item 6 is a scene sketch or diagram where the second clandestine grave was located.

Q. And just so we're clear, perhaps you misspoke and perhaps that Minnesota accent of yours got in the way, but that was transcribed as item 6. It's 906; is that correct?

A. That's correct, 906.

Q. I like to make fun of Minnesota accents whenever I can.

A. That's okay.

Q. And what does -- excuse me.

MR. MILLER: If we can offer Exhibit 906 in evidence.

* * * *

(Government Exhibit 906 was offered.)

* * * *

MR. STOWERS: No objection.

1769

THE COURT: 906 is received.

* * * *

(Government Exhibit 906 was admitted.)

* * * *

MR. MILLER: And with the Court's permission, publish it to the jury at this time?

THE COURT: You may.

BY MR. MILLER:

Page 73

Q. Would you please describe for the jury what 906 shows and any pertinent features? You may use the telestrator.

A. Government Exhibit 906 accurately depicts the scene where the clandestine grave was located. Along this road here -- this is Killdeer Avenue. This was our primary means to access this rural farmstead and dilapidated farmstead. Upon arrival, we were greeted by local law enforcement, and in this general area here is where the skeletal remains were located.

Q. Excuse me. Is that where some animal remains were located, sir?

A. Negative. I apologize. New technology. The skeletal remains were located about approximately 25 feet from this fence line, probably more accurately in that location.

Q. Now, this was a document prepared by yourself or by Mr. Hochrein, sir?

A. This was a diagram prepared by Dr. Hochrein.

Q. And you just arrived here a few minutes before you were

1770

able to take the stand; is that correct?

A. That's correct.

Q. And I apologize. It's my fault, not yours, for not giving you an opportunity fully to prepare yourself for this diagram. But if you would refer to it and take your time in reviewing the documentation of the location of the grave, I'd like to be sure we're completely accurate.

A. I apologize to the Court. The actual remains are correct on this diagram, and they are located as illustrated behind me.

Q. Okay. Right there along that crop fence line?

A. That is correct.

Q. Almost straight to the west of a couple of grain bins

Page 74

there?

A.   That is correct.  These are the grain bins.

Q.   Thank you.  You can take that down now.

Mr. Kraemer, I've handed you something with which you might be a bit more familiar.  That's Exhibit 909; is that correct?

A.   Government Exhibit 909, correct.

Q.   And what is Exhibit 909?

A.   Exhibit 909 is my scene sketch and diagram that I drew following my return from this death scene.

Q.   Okay.  And that was prepared substantially before 906 that we just looked at; is that correct?

A.   Correct.

1771

Q.   And unlike 906, not completely to scale.

A.   That is correct.

Q.   Nevertheless, is it routine for you to prepare such or for any death examiner to prepare such sketches in order to help orient himself and others as to the particular findings at a crime scene?

A.   Yes, it is.

Q.   Okay.  And would that be of assistance to you as well in describing what your findings were there?

A.   Yes.  This scene diagram depicts the location of the skeletal remains as I recalled them during the evening of November 8, 2000.  It's very similar but not exact to the previous diagram or scene sketch that you had seen that was drawn by Dr. Hochrein.  This item depicts the location of the clandestine grave to the best of my knowledge during that evening and associated structures that were on that property to

give me an orientation or to help orient and give relationships where the clandestine grave was to other items at the scene.

This diagram also shows the position of the skeletal remains that we had discovered during the excavation of those remains.

MR. MILLER:  Government offers Exhibit 909.

* * * *

(Government Exhibit 909 was offered.)

* * * *

1772

MR. STOWERS:  No objection.

THE COURT:  It's received.

* * * *

(Government Exhibit 909 was admitted.)

* * * *

BY MR. MILLER:

Q.   And before we display it to the jury, it was again admittedly not to scale and drawn at the time just so you would be able to recall your findings at a later date?

A.   That is correct.

Q.   And in addition to the information shown in Exhibit 906, this one also shows, among other things, position of the body or not necessarily position by which I mean location but position by which I mean posture.

A.   That is correct.

MR. MILLER:  Okay.  With the Court's permission then, I would ask Mr. Williams to display that to the jury at this time.

THE COURT:  You may.

BY MR. MILLER:

Page 76

Q. And now referring to 909, your own work product and something with which you're a bit more familiar, would you describe for the jury what they see there, sir.

A. This is the diagram to which we were recently referring to. This is the scene sketch and diagram that I personally drew

1773

after my return from this scene in my office. This is a diagram that is drawn obviously not to scale, and this depicts as best as I can recollect that evening the location of the clandestine grave to other associated structures at this dilapidated farmstead.

If you notice, this is the location of the clandestine grave, and this stick figure within the rectangular shape depicts the position of the body in relationship to the compass. And the position of the body, when we were recovering the skeletal remains with the assistance of Dr. Goodin, we found the skeletal remains were located in a face-down position with the lower extremities -- particularly the lower extremities below the knees were bent up towards the pelvis or pelvic bone or what -- when individuals are not decomposed to the buttocks area.

Q. Now, Mr. Kraemer, approximately how long were you and Dr. Goodin at the site that day?

A. We were at the site a little bit more than an hour. I arrived on scene at 8:07 p.m., and Dr. Goodin and I left the scene at 9:10 p.m.

Q. Substantial actual location of the body itself and substantial excavation had already occurred prior to your arrival?

A. That is correct.

Page 77

Q. What was ultimately done with these bodies after removal or

1774

retrieval from that grave, sir?

A. When the skeletal remains were removed from the grave, they were actually placed into a clean body bag. The remains were put into the body bag in as close as a position to the normal anatomic locations that we could put them in, and we basically would transfer these remains in the exact position they were found into the body bag.

So the body bag was then sealed and transported to Broadlawns Medical Center, and when we received the remains there and opened the sealed body bag, the remains were in the approximate position as they were found.

Q. In other words, they were received at the morgue in substantially the same condition as when removed from the grave.

A. That is correct.

Q. Finally, sir, I've handed you two exhibits that are marked Exhibit 912 and Exhibit 913. Do you recognize those two documents, sir?

A. Yes, I do.

Q. What are they?

A. Exhibit 912 is a photograph of the remains near partial excavation. Exhibit 913 is a hand-drawn diagram of these remains which better depict how the remains were found within the clandestine grave.

Q. And do Exhibits 912 and 913 show the position of the body within that grave as it was found during the exhumation process?

1775

A. Yes, they do.

Page 78

MR. MILLER: Government offers Exhibits 912 and 913.

* * * *

(Government Exhibits 912 and 913 were offered.)

* * * *

THE COURT: Any objection?

MR. STOWERS: No objection.

THE COURT: 912 and 913 are received.

* * * *

(Government Exhibits 912 and 913 were admitted.)

* * * *

MR. MILLER: And again with the Court's permission, we'd like to publish those to the jury at this time.

THE COURT: You may.

MR. MILLER: And, Mr. Williams, if we can do so simultaneously one atop the other so that they are able to be described and compared.

BY MR. MILLER:

Q. For the record, the jury is now being displayed Exhibits 912 and -- on the top and 913 on the bottom. Mr. Kraemer, would you please describe for the jury and making very clear for the record as to which exhibit you are describing as you describe it tell us what they see on these two exhibits.

A. Exhibit 912 depicts the photograph that I had taken at the scene. This photograph is taken during the excavation process

1776

of the second clandestine grave off of Killdeer Avenue. This photograph on top shows the skeletal remains during what I would consider the middle and near completion of the excavation process. This is the underlying -- this is a tuft of hair with a ponytail, and then beneath that tuft of hair is a skull.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1554 of 3592

These portion -- the remains that are visible there depicts a boot and the lower extremity bones which were bent up to the pelvis which is not visible in this picture.

The below picture is a hand-drawn picture --

Q. Referring now to Exhibit 913?

A. Exhibit 913 -- depicts a hand-drawn diagram showing the remains during the full excavation process and the positioning of the bones in relationship to the grave, and this also depicts how the lower extremities were bent up towards the pelvic bone.

Q. The body face up or face down?

A. The body is face down.

Q. And the posture further described is what?

A. The posture would be face down. The remain -- it would appear that the remains were in what we would call in our profession a hog tie position, but there was no visible ligature that we could identify immediately at the scene. This is the head once again, and the remains were buried in approximately two and a half feet of earth.

Q. The knees -- the legs bent at the knees?

A. The legs were bent at the knees with the tibia and fibula,

1777

which are the two bones in your lower legs, bent up towards the pelvic bone.

Q. You've referred to a ponytail. Was that actually a tight braid there at the --

A. Yes, it is.

Q. But again, the legs extending straight down but bent at the knees with the feet back up toward the buttocks area?

A. That is correct. The head was towards the south, and the lower extremities were in the direction of the north.

Page 80

MR. MILLER: Thank you, sir. I have no further direct.

THE COURT: Mr. Stowers?

CROSS-EXAMINATION

BY MR. STOWERS:

Q. Mr. Kraemer, I'm showing you on the screen there what hopefully you can see is Exhibit 904; is that correct?

A. That is correct.

Q. And that has been previously admitted as an overview aerial shot of the Killdeer Avenue site? You recognize it?

A. Yes, I do.

Q. And I believe you've done some diagramming of that area; is that correct?

A. Yes, that is.

Q. Okay. And I want to zoom in a little bit so that we can have a little better view of what we're talking about. The

1778

bottom of Exhibit 904 as it's now being shown to the jury would be Killdeer Road or Killdeer Avenue, is it?

A. Yes.

Q. Okay. And then there's a little -- yes, you've indicated that with a red line. Thank you. And then can you show the jury where the drive would be in that area?

A. The driveway into the premises?

Q. Yes.

A. Yes. (Witness indicated.)

Q. And that very rapidly deteriorates into a very rough road; wouldn't you agree with that?

A. That is correct.

Q. It wouldn't be a very easy road to -- as you observed it in

Page 81

the year 2000 anyway, wouldn't be a very easy road to drive back on with a regular vehicle; is that correct?

A.   That is correct.

Q.   There's deep ruts and things that would have been caused by farm equipment and machinery of that sort; is that correct?

A.   Possibly, yes.

Q.   Was there a gate of any kind that you remember as you entered that driveway?

A.   I do not recall a gate.  The only gate I could recall was there was an officer positioned at the intersection of that that would allow entrance and exit of that premises.

Q.   Now, you talked about a fence line, and I wonder if you can

1779

show on that blown-up Exhibit 904 with your marker there where that fence line is.

A.   (Witness indicated.)

Q.   Okay.  And you've indicated that.  And can you describe what type of fence that was?

A.   The type of fence was an old fence.  I don't recall the exact construction or nature of it.  I just could tell that it was a fence of some nature.

Q.   And there's been talk about a burned-out or partially burned-out farmhouse.  Can you indicate where that would be?

A.   I believe it is in that location.

Q.   Okay.  And can you indicate on that to the best of your ability where it is that you believe the remains of Mr. DeGeus would have been located?

A.   In comparing my diagram to what is being displayed on the screen, roughly the remains were located in approximately that area.

Page 82

Q.    Okay.   And is there a difference between your diagram and the diagram of Mr. Hochrein?

A.    Yes.   This aerial photograph appears -- it was taken previously obviously during the day, and it also appeared to have occurred during obviously the excavation process during which the clandestine grave was being processed.

Q.    Right.   But I was asking you, there's another exhibit that you have in front of you which is a scale diagram of Agent

1780

Hochrein.   Does that place the grave actually in a little different location than what your diagram does?

A.    Slightly, yes.

Q.    Okay.   And where would the to-scale drawing place it in relation to where you've drawn it?

A.    The to-scale diagram drawn by Dr. Hochrein places the human remains in approximately that location.

Q.    Okay.   So do you disagree with Dr. Hochrein's drawing or . . .

A.    I wouldn't say I would disagree with it.   I would say that my diagram was drawn from my memory during the evening hours and that I did not get a chance to view the scene in the daylight which would have helped probably make my diagram more accurate.

Q.    Okay.

A.    But it's close.

Q.    Now looking -- I'm sorry.   I'm sorry.   I didn't mean to interrupt you.   Can you kind of give the jury an idea of the distance between the edge of Killdeer Road and the area where this grave site was located?

A.    I would have to -- without having actually measured that distance -- and are you looking for a guess or an approximation?

Page 83

Q. Approximately.

A. I'm very bad at guessing. I'd say approximately the length of maybe a football field or three-quarters of a football field.

Q. So 75 to a hundred yards?

1781

A. Approximately.

Q. And from the point where that driveway goes into an area where it really wouldn't be passable by a regular vehicle, can you indicate where that point would be?

A. Right there as illustrated on the picture behind me.

Q. Between the bins?

A. Correct.

Q. And so roughly halfway; is that correct?

A. Approximately, yes.

Q. Halfway from the road to the grave site; right?

A. Yes.

Q. Now, your testimony concerning these bones that were recovered of Mr. DeGeus, first of all, you weren't there for the entire time they were being recovered?

A. I was not present during the initial discovery and the initial excavation of those remains.

Q. There's been -- well, let me ask you this. Do you know the time that they were initially discovered approximately?

A. I do not have that in my report, nor can I recall that.

Q. Okay. But you arrived there -- what was the time again?

A. I arrived on scene at 8:07 p.m.

Q. On -- what was the date?

A. November 8 of 2000.

Q. And then you were done with the remains being recovered at what time?

Page 84

A.   Dr. Goodin and I left the scene at 9:10 p.m. that same evening.

Q.   So it was an hour and three minutes to be precise I guess.

A.   Correct.

Q.   Do you remember when you arrived there how much of Mr. DeGeus's remains had actually been recovered and removed from the grave?

A.   Approximately -- the initial photograph that we had seen, Exhibit 912, was the amount of excavation that was done prior to Dr. Goodin and I arrival on scene.

Q.   I think you've talked about the size of this grave or this hole in the ground; right?

A.   The depth.

Q.   Yeah.  And how deep did you estimate that to be?

A.   Two and a half feet.

Q.   And is that the depth before or after this, I guess, backhoe had removed some of the topsoil?

A.   That was the depth after the backhoe removed some of the topsoil.

Q.   And I think it's been described that there was a few inches of topsoil carefully removed by the backhoe.  You're aware of that?

A.   That's correct.

Q.   Now -- and you also described the size of the hole?

A.   I did not say the dimensions of the rectangular-shaped area

which we removed the remains from.

Page 85

Q.   That may have been another witness.  After a while they all run together in my head.  But do you remember the hole being about four and a half feet in length?

A.   To the best of my recollection, that would be approximately -- it would be close.  I certainly couldn't a hundred percent agree, nor could I dispute that.

Q.   Right.  In any event, based on what you had found, it appeared, first of all, that during the process of removing some of the topsoil that was over the top of the grave site one of the boots and feet of Mr. DeGeus had been disturbed in that process and uncovered; is that correct?

A.   That is correct.

Q.   And this was a farm -- was this a part of the field that apparently was being used to grow crops?

A.   To the best of my recollection, the actual location of where the skeletal remains were found were almost on the border or if not slightly into what appeared to be a cornfield.

Q.   Okay.  So this would have been an area where the farmer would have tilled and that sort of thing?

A.   Correct.

Q.   Okay.  And maybe this is something you can't answer, and if you can't, that's fine.  But were you able to tell whether or not during the time that this body had been in that location if it had in any way been disturbed by activity on the surface over

1784

the time other than just when it was uncovered by law enforcement?

A.   I could not tell that, no.

Q.   And what you've described is the legs.  I take it you're talking about the leg below the knee; is that correct?

Page 86

A.    That is correct.

Q.    Being bent back up towards the buttocks I guess it would be; is that correct?

A.    Yes.

Q.    And that would be consistent with -- and the body was face down; is that correct?

A.    That is correct.

Q.    So in a four-and-a-half-foot hole, if you had a person who was in excess of five feet tall and you were trying to fit them into the hole face down in their dead state, you would need to have the legs bent in some fashion so they would fit in the hole; is that correct?

A.    If you're describing what the original size of the hole was which I do not know, I couldn't tell you what the original size was, the hole that was dug, the hole that was dug around -- that we actually dug around the remains.  The hole that we actually dug does not in any way imply what the original size of the grave was.

Q.    And you made no effort to determine that yourself.

A.    That would be a little bit beyond the scope of my

1785

expertise.

Q.    Right.  Was there anybody there that could have done that, determine the size of this hole?

A.    I cannot recall each individual person's expertise, so I can't really answer that question, sir.

Q.    Now, there's been some testimony that was very interesting yesterday from Mr. Hochrein from the FBI who's a forensic archaeologist.  You're familiar with him.  I assume you got to know him a little bit in your work; is that right?

Page 87

A.    Yes.

Q.    You're not a forensic archaeologist.

A.    No, I am not.

Q.    And when you assisted other law enforcement in unearthing Mr. DeGeus's remains, it wasn't done up to the standards that Agent Hochrein who's specially trained as a forensic archaeologist would have employed.  Is that fair to say?

A.    Yes.  The techniques used during the first recovery process were different from the techniques used during this recovery process from which we're now speaking about.

Q.    Right.  And I'm not faulting you for that.  It's just something that he wasn't available; right?

A.    I do not know from my understanding that -- Dr. Hochrein had actually left the scene and returned back to his office. His availability, I cannot question as to why he was not asked to come back or why he left, so I don't know too much more about

1786

that conversation or the reasons that you had spoken about.

            MR. STOWERS:  That's all I have.  Thank you.

            THE COURT:  Mr. Miller?

            MR. MILLER:  Thank you, Your Honor.

                    REDIRECT EXAMINATION

BY MR. MILLER:

Q.    Just a couple matters, Mr. Kraemer.  First, any discrepancy between your diagram and that of Special Agent Hochrein would be based at least in part on the fact that his is to scale and yours is not; fair statement?

A.    That is correct.

Q.    Is there anything unusual or contrary to protocol about a crime scene examiner doing a not-to-scale diagram while they are

Page 88

present at a scene?

A.    No.  It's commonly done by most law enforcement agents just to recollect what you observed and sometimes even what you had done at that scene.  So when cases come up and you're asked to recollect this years down the line, it gives you a reference point to start from.

Q.    All forms of documentation, whether it's notes, diagrams, or photographs, are at least in part so that the crime scene examiner can accurately recall what he observed at the time.

A.    Correct.

Q.    And it was for that purpose that you did your own crime scene diagram?

1787

A.    That is correct.

Q.    Not even knowing that Mr. Hochrein was going to be preparing a to-scale one later.

A.    That is correct.

Q.    I assume you would defer to Agent Hochrein as to the precise location of various objects on his diagram.

A.    I would.

Q.    His diagram, however, does not actually show the posture of the body as it appeared in the grave, and yours does.  Is that a fair statement?

A.    That is correct.

Q.    And is that among the items that you were seeking to preserve in making your notes?

A.    Most importantly.  My primary responsibility is the body. The crime scene team, their primary responsibility is the body in addition to the surrounding area.  As working for the medical examiner's office, the human remains is my area or niche, if you

Page 89

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1564 of 3592

will, that I concentrate on primarily.

Q. And your document -- your diagram documents the position, by which I mean the posture of the body itself, as found in the grave.

A. That is correct.

Q. With the legs bent at the knee and the feet up toward the buttocks.

A. That is correct.

1788

Q. And the two exhibits that you've shown, the photograph, 912, and the diagram, 913, show that body as it was seen as it was discovered there at the exhumation.

A. That is correct.

MR. MILLER: Thank you. No further redirect.

MR. STOWERS: Nothing further.

THE COURT: You may step down.

Ready to call your next witness?

MR. MILLER: Your Honor, the government calls Dr. Dennis Klein.

THE COURT: If you'd like to take a stretch break, please do so.

DENNIS KLEIN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. When you're settled in, please adjust the chair so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is Dennis Klein. Last name is spelled K-l-e-i-n.

THE COURT: Thank you. Mr. Miller.

Page 90

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Your occupation, Dr. Klein?

1789

A. I'm a forensic pathologist. I'm deputy state medical examiner for the state of Iowa.

Q. We've already heard a little bit about the state medical examiner's office. Can you tell us more specifically what your duties are as deputy state medical examiner?

A. Yes. My duties are outlined under statute of state of Iowa in that my responsibilities are the investigation of suspicious deaths, deaths that fall under medical examiner jurisdiction. So any deaths that would be considered homicide, suspicious, or unknown, I would be involved in that investigation which may involve autopsy.

Q. You are a physician?

A. Yes.

Q. Specializing in what?

A. Forensic pathology.

Q. I want you to go through that one step at a time. First tell us just very briefly what pathology is and then more specifically forensic pathology.

A. Pathology is a subspecialty of medicine. It's the study of disease. Pathology involves the examination of tissue both with the naked eye in its gross state as well as looking at tissue under the microscope. Pathology also deals with the laboratory, so any blood tests or toxicology testing would also come under the purview of pathology.

Forensic pathology is a subspecialty of pathology

Page 91

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1566 of 3592

which deals with where medicine and the law intersect in being able to interpret injuries on the body, being able to formulate opinions as to cause and manner of death, and being able to describe those both in the written form and in venues such as court of law.

Q.   Thank you, sir.  Would you please summarize for the jury your formal education that brings you to this point in your career.

A.   After completing high school, I attended a four-year college at Bowdoin College in Maine.  I received a bachelor of arts degree in chemistry.  I then went to a four-year medical school at the University of Vermont where I received the M.D. degree.  I did one year of internal medicine at the Beth Israel Hospital in Boston.  Then I did five years postgraduate medical training in anatomical and clinical pathology.  I then did a subspecialty fellowship training in forensic pathology at the University of New Mexico.

Q.   Do you have professional licensure, sir?

A.   Yes, I do.  I have the license to practice medicine in the state of Iowa.  I'm also board certified in anatomical pathology, clinical pathology, as well as forensic pathology.

Q.   And what does board certification refer to, sir?

A.   Board certification is a board which certifies a person to practice in that subspecialty.  It requires that a person graduate from an approved program in that training area as well

as complete comprehensive and pass comprehensive exams.

Q.   And you have been board certified since when, sir?

A.   In anatomic pathology since 1999, in forensic pathology since 2000.

Q.   In the year 2000, were you then working for the Iowa State Medical Examiner's Office, sir?

A.   Yes, I was.

Q.   In the capacity as deputy state medical examiner.

A.   Yes.

Q.   You folks investigate sudden suspicious, unnatural deaths throughout the state of Iowa.

A.   That's correct.

Q.   Did you in connection with those responsibilities investigate five deaths discovered that fall in Cerro Gordo County, Iowa?

A.   Yes.  I was involved with four of those five deaths.

Q.   Your office was involved in all five.

A.   That's correct.

Q.   You handled the first four.

A.   That's correct.

Q.   Tell us about your first involvement with that matter, Dr. Klein.

A.   I received a telephone call that police were in the process of beginning the excavation of the remains of individuals in rural Mason City.  I was asked to at least come to the scene and

1792

receive preliminary information which I did.  I went to the scene which essentially was a rural area on the corner of a cornfield.  At that point excavation had begun.  There was at least one individual's remains which had been excavated, in the process of the second.  And at that time I was able to speak briefly with police officers who were involved with the case,

Page 93

and at that point I was able to begin arrangements that I needed to make back at the morgue in planning for the subsequent autopsies.

Q.   Very good.  And without asking you to relate any of the details that were told to you, were you briefed by law enforcement as to what they had in the way of information about that scene?

A.   Yes.

Q.   And you described that as being at the edge of a cornfield. I want to be as specific as possible in your description of the terrain where this exhumation was being undertaken.

A.   Certainly.  It was -- I don't remember the exact distance, but it was away from the roadway in which we had to travel across actual cornfields.  This was in October, so there was no grown corn at that time, and it was in a slight tree-covered area at the edge of the field.

Q.   A wooded area adjacent to a crop field?

A.   Yes.

Q.   What's the purpose of visiting a death scene from your

1793

standpoint as a forensic pathologist, Doctor?

A.   Right.  I think the most important is it gives a context in which to begin thinking about the case.  And when one comes across findings on the autopsy, it gives a better perspective of the way the body was found and also may help in interpretation of certain findings that may have been injuries or also interpretation of artifacts.

Q.   More information is better than less information.

A.   That's correct.

Q.   In any business.

Page 94

A.    Yes.

Q.    Is this visiting crime scenes something that's always done by forensic pathologists?

A.    No, it's not always done.

Q.    There simply isn't the luxury of time and resources, I assume, ordinarily.

A.    That's correct.

Q.    You did so in this case, however.

A.    Yes, I did.

Q.    And you've indicated that there was exhumation or body recovery being done with respect to a number of victims.  Were these separate graves, or was it a mass grave?

A.    Essentially all the bodies were in the same vertical plane, so they were stacked up one upon the other.

Q.    One grave.

1794

A.    That's correct.

Q.    About how long were you there, sir?

A.    Approximately an hour and a half.

Q.    And just if you would please briefly describe your observations as to personnel, resources, and procedures being undertaken while you were there.

A.    Certainly.  There were a number of different law enforcement agencies from -- local, county, state, and I think even federal agencies were there.  I spoke with various individuals also including the Cerro Gordo County medical examiner as well as other police individuals who gave me limited information that they knew at that time.

Q.    Did you as to the death investigation itself assume responsibility from the county medical examiner?

Page 95

A.    Yes.

Q.    And what further participation then did you have in connection with these death investigations from that site?

A.    From that --

Q.    And if I can interrupt you, is this the Lark Avenue site we're referring to, the site where the four bodies were?

A.    That's correct.

Q.    Thank you.

A.    My involvement really involved no physical excavation using my own hands.  I observed the site.  I observed the one body that had been removed at that time, and then I basically assumed

1795

my responsibility was going to be back at the morgue and allowed those individuals who were involved with the actual excavation to complete their work.

Q.    When they did so, what was your next contact, if any, with the bodies in question?

A.    My next contact was on October 14.  So I visited the scene on October 13.  On October 14 back at the Broadlawns Medical Center in Des Moines which was our morgue that we were using at that time, all four individuals individually wrapped and labelled as individuals 1 through 4 were then at the morgue ready for my examination.

Q.    We've learned this morning that you now have a beautiful new facility there in Ankeny.  You were working out of what sort of a facility back in October of 2000?

A.    It was the Polk County morgue which was within the Broadlawns Medical Center which is the Polk County hospital.  It was a single-room autopsy which had a two-station suite and a four-gurney cooler and one slide room for visualizing X-rays.

Page 96

Q. And in this case that four-gurney cooler was just barely sufficient for the task at hand.

A. That's correct.

Q. Because you had four bodies.

A. That's correct.

Q. Autopsy procedures began when and concluded when if you can tell us, sir?

1796

A. I began my initial observations on October 14, though the -- from start to finish actually took several days. I began the process on the 14th and realized that I did need the help and consultation of a forensic pathologist (sic). After doing my initial examination which included diagrams, pictures, and X-rays, I did then wait until October 24 at which time Dr. Steadman who's a forensic anthropologist would actually come and with her help and expertise then began the anthropological examination of the remains.

Q. That began on October 24?

A. That's correct.

Q. And lasted through when if you know?

A. October 28.

Q. Five days in all?

A. It was about four and a half days because she left about mid-day on October 28.

Q. But a portion if not all of each of those five days, and I assume some of them were long days.

A. Yes, they were.

Q. Now, this process that began on the 14th and ended on the 28th included what in the way of personnel and equipment, sir?

A. The primary people involved were myself, Dr. Steadman, and

Page 97

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1572 of 3592

Agent Basler from the DCI. Depending on the day, I did have technician staff. During every autopsy, we have personnel within the office who essentially help with cleaning utensils,

1797

holding certain material that I would need assistance with during the course of the autopsy.

Q. And I take it the autopsy of four remains is somewhat more time consuming and task intense than a mere single autopsy.

A. Yes, and the conditions of these remains actually requires considerable more time and a lot of actually tedious work in cleaning and close observation that would not necessarily be necessary in an individual who had not been decomposed to that degree.

Q. Please describe that tedious work.

A. Typically we have the soft tissue, the skin, to look at. In individuals who have decomposed to the point of being down to bone or skeleton, there's dirt material that covers the bones, and that dirt needs to be carefully removed and examined as that process goes on. And each individual bone has to be individually cleaned and examined and all the material around it examined.

Q. You've indicated that you enlisted the resources of a forensic pathologist. Who was that, sir?

A. It was a forensic anthropologist.

Q. I'm sorry, forensic anthropologist. You're a forensic pathologist.

A. That's correct. It's Dr. Dawnie Steadman, S-t-e-d-m-a-n.

Q. S-t-e-a perhaps?

A. S-t-e-a, yes.

1798

Page 98

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1573 of 3592

Q.    And what is a forensic anthropologist, sir?

A.    A forensic anthropologist is a person who has expertise in examining bones, and they have experience in forensic cases, so they're able to interpret injuries on bones that would have significance in courts of law.

Q.    And during the course of the autopsy, at least as it occurred between the 24th and 28th of October, 2000, you and Dr. Steadman worked as a team?

A.    That's correct.

Q.    Again, with the assistance of others including Agent Basler and other medical personnel from your office?

A.    That's correct, yes.

Q.    You've already described for us, Doctor, what I think was characterized as a tedious process of cleaning up the various bones, and what sort of tools and procedures were used in doing that?

A.    Essentially paintbrushes, toothbrushes, and water.

Q.    And by paintbrushes, I assume you weren't applying any paint.

A.    No, just the paintbrushes.  A dry brush is used to remove dirt from the bones.

Q.    Cleaning up all those bones.

A.    That's correct.

Q.    Okay.  And then what was done after the bones were cleaned?

A.    Then they were each individually examined and then placed

1799

in anatomical position much in the way one would see a medical anatomic specimen like a skeleton.  Instead of actually being on

Page 99

a rack, they're actually laid out on a table. The bones need to be identified which bone it is and which side of the body that bone belongs on.

Q. Was this placement of anatomical assembly on all four victims completed before the detailed analysis of injuries on these four?

A. Yes.

Q. And why is that?

A. Well, it's important to first account for and do an inventory of the bones that are present, and then it makes the job of describing where the injuries are much easier when it's already placed in the anatomical position.

Q. You have on the table in front of you a photograph, exhibit marked Exhibit 814. Do you recognize that, sir?

A. Yes, I do.

Q. What is Exhibit 814?

A. This is a picture of all four remains laid out in the anatomical position.

Q. And that's what was done prior to the detailed analysis of the trauma on the bodies?

A. That's correct.

MR. MILLER: Government offers Exhibit 814.

* * * *

1800

(Government Exhibit 814 was offered.)

* * * *

MR. BERRIGAN: No objection.

THE COURT: It's received.

* * * *

(Government Exhibit 814 was admitted.)

Page 100

* * * *

MR. MILLER: And with the Court's permission, I'd ask to publish it at this time.

THE COURT: You may.

BY MR. MILLER:

Q. Dr. Klein, please describe for the jury what they are now viewing in Government Exhibit 814.

A. This is the photograph that we were just discussing just a moment ago. These are all four individuals that had been examined and excavated from that single grave.

Q. Were they assigned numbers for purposes of recordkeeping at the state medical examiner's office?

A. Yes, they were.

Q. And what numbers were assigned?

A. They were assigned the prefix 00 for the year 2000, SME which stands for state medical examiner, and then they were ascension numbers 115, 116, 117, and 118.

Q. After cleaning and assembling these four skeletons, analysis then was undertaken to determine trauma and cause of

1801

death?

A. That's correct.

Q. Thank you. We can remove that exhibit now.

You've mentioned that there were four skeletons. The first one you mentioned was number state medical examiner 00115. Yourself and Dr. Steadman and others undertook that examination?

A. Yes.

Q. Okay. And just so we're prefacing this, you indicated that you sought and received the help and expertise of a forensic anthropologist, Dr. Steadman. Can you remind us a little bit as

Page 101

to why that's important in your field, and is that standard in forensic pathology to consult with subspecialty experts?

A.   Yes.   To answer the first part -- second part of your question first, yes, it is standard to consult with a forensic anthropologist when a medical examiner's faced with skeletal remains.

Why I consulted an anthropologist in this case is because a forensic anthropologist has expertise in the measurement and examination of bones, and they can formulate opinions about abnormalities on the bones.   And I rely upon her examination and her opinions in my determination of cause and manner of death as well as other conclusions drawn on the remains.

Q.   And is that standard within the field of forensic pathology to rely upon expertise in such subspecialties?

1802

A.   Yes.

Q.   In cooperation with Dr. Steadman and in partial reliance upon her work, you took it upon yourself to arrive at a diagnosis or finding as to cause and manner of death in each of these four cases?

A.   Yes.

Q.   And as distinguished from a forensic anthropologist, that's your responsibility; fair statement?

A.   That's correct, yes.

Q.   But you did bear in mind her findings in arriving at those conclusions?

A.   Yes.

Q.   We will hear from Dr. Steadman in more detail as to the specifics of some of the detailed findings about these injuries,

Page 102

but are you able, based upon the work that you did, to give us not only a description of some of the overall findings but also an opinion as to cause and manner of death in each of these four cases?

A.   Yes, I am.

Q.   First then referring to SME115 -- let me just jump ahead and indicate to you that we've already heard from a fellow by the name of Dr. John Frasco, and I'll ask you if you were able to arrive at an identification of identity of the victim known initially as SME115.

A.   Yes, I was.

1803

Q.   And how was that done?

A.   Through the help of consultation with a forensic odontologist or dentist by comparing known dental records with X-rays and examination of the teeth on the skeletal remains, we were able to make an identification.

Q.   And that forensic dentist was Dr. Frasco.

A.   That's correct.

Q.   Doctor, I've handed you what are marked Government Exhibits 505 and 506.  Do you recognize those, sir?

A.   Yes, I do.

Q.   What are they?

A.   They're both photographs of case number 115, and they're the -- both as 115 was received in the morgue in the initial steps before autopsy actually began.

Q.   And that's at least in part to document condition of receipt of the remains prior to the beginning of the autopsy?

A.   Yes.

            MR. MILLER:  Government offers Exhibits 505 and 506.

Page 103

* * * *

(Government Exhibits 505 and 506 were offered.)

* * * *

MR. BERRIGAN:  No objection.

THE COURT:  505 and 506 are admitted.

* * * *

(Government Exhibits 505 and 506 were admitted.)

1804

* * * *

MR. MILLER:  And first Exhibit 505 if the Court would permit, I'd like to publish at this time.

THE COURT:  Sure.

BY MR. MILLER:

Q.   What is Exhibit 505 that the jury is now looking at, sir?

A.   This is the wrapping material that within the wrapping material are the skeletal remains of case number 115.  The writing is all those that were placed by the individuals involved with the excavation of the remains.

Q.   And I note the name Hochrein at the top.  He among others?

A.   Yes.

Q.   Under his supervision.

A.   That's correct.

Q.   Please proceed to Exhibit 506 then.  And with the jury now viewing Exhibit 506, please tell us what that shows.

A.   These -- after the plastic wrapping and the sheets are splayed open before any work was commenced, these are the conditions of the remains.

Q.   Did you with Dr. Steadman arrive at an opinion as to the sex of this victim?

A.   Yes, we did.

Page 104

Q.   And what was that?

A.   Male.

          MR. MILLER:  You can remove that exhibit now, please.

1805

Q.   Was -- and I've noted that in addition to the body itself there were a number of plastic bags.  Or let me ask you first, what did they contain if you recall?

A.   A number of different items.  Some of them contained individual small bones, and some of them contained artifacts.

Q.   And what do you mean by artifacts, sir?

A.   It can mean anything from personal effects such as change to small pieces of cloth that may have been clothing.

Q.   Please describe for us if you would what in the nature of clothing arrived with the body 115, that of Greg Nicholson.

A.   Right.  The inventory of clothing included pants which had a remaining zipper on it, two white socks and the right tennis sneaker.

Q.   Just one shoe.

A.   That's correct.

Q.   Personal effects noted?

A.   There were three pennies and two quarters, and the condition was that they were corroded.

Q.   At least in the condition you observed them, were you able to ascertain a date?

A.   I could not at that time.

Q.   And finally on the subject of artifacts, were there any additional observed?

A.   Yes, there were.  They included binding which included a duct tape material and gray fabric over the skull and a

1806

Page 105

clothesline type of rope forming a ligature around the sock, and that sock was inside the right tennis shoe.

Q.   I've handed you Exhibit 511.   What is that, sir?

A.   This is what I just described, the right tennis shoe, sock, and the clothesline-type ligature around the sock.

Q.   Is that a photograph of that as received at autopsy, sir?

A.   Yes.

MR. MILLER:   Government offers Exhibit 511.

*   *   *   *

(Government Exhibit 511 was offered.)

*   *   *   *

MR. BERRIGAN:   No objection.

THE COURT:   511 is received.

*   *   *   *

(Government Exhibit 511 was admitted.)

*   *   *   *

MR. MILLER:   And again with the Court's permission, publish?

THE COURT:   You may.

BY MR. MILLER:

Q.   Please describe for the jury what they're looking at in Exhibit 511.

A.   Yes.   This is the right tennis shoe, and you can see there's a sock coming out of the top.   And then there's a white rope with a knot, and that is the ligature I described around

1807

the sock.

Q.   I think we're hearing you okay, but if you might pull those microphones just slightly closer to you.
Page 106

Are you familiar, I believe, with the use of the telestrator?

A. Yes.

Q. Would you go ahead and circle the ligature observed there in that photograph?

A. (Witness complied.)

Q. Dr. Klein, I've now set before you two items marked Government Exhibit 502 and Government Exhibit 503. Do you recognize those objects, sir?

A. Yes, I do.

Q. What are they?

A. 502 is the right tennis shoe, and 503 is the sock and ligature.

Q. And they appear here today somewhat packaged.

A. Yes.

Q. Aside from the fact that -- well, you go ahead and describe for us how they're packaged.

A. Essentially they are both encased in a clear plastic material along with a paper bag which I originally put these pieces of evidence in while I was doing the autopsy. My handwriting as well as those of my assistant are on the paper bags that accompany each of these pieces of evidence.

1808

Q. And that's to document your involvement.

A. Yes.

Q. And again, aside from the fact that there are plastic bags accompanying them and that they are encased in plastic, do they appear substantially as you removed them from Greg Nicholson, number 115?

A. Yes.

Page 107

MR. MILLER: Government offers Exhibits 502 and 503 in evidence.

* * * *

(Government Exhibits 502 and 503 were offered.)

* * * *

MR. BERRIGAN: No objection.

THE COURT: 502 and 503 are admitted.

* * * *

(Government Exhibits 502 and 503 were admitted.)

* * * *

MR. MILLER: And with the Court's permission at this time and since he's not wearing a lavaliere, I don't think there would be any necessity for him to describe it any further, but I would ask permission for the witness to publish them to the jury so the witness can walk close enough to the jury can see them.

THE COURT: That's fine.

BY MR. MILLER:

Q. Just step down and so the jury can see the contents of

1809

those packages, please, walk past the jury and allow them to see them.

A. (Witness complied.)

Q. Dr. Klein, before you on your left is an exhibit marked Government 515. Do you recognize that, sir?

A. Yes, I do.

Q. What is Exhibit 515.

A. This is a photograph taken at time of autopsy of the skull and a duct tape and green cloth that covered the face portion of the skull.

Q. And does that show the skull of 115, Greg Nicholson, as

Page 108

received at autopsy, sir?

A.    Yes.

Q.    Prior to any cleaning or further processing?

A.    That's correct.

MR. MILLER:  Government offers Exhibit 515.

*   *   *   *

(Government Exhibit 515 was offered.)

*   *   *   *

MR. BERRIGAN:  No objection to 515.

THE COURT:  515 is received.

*   *   *   *

(Government Exhibit 515 was admitted.)

*   *   *   *

MR. MILLER:  And once again, with the Court's

1810

permission to publish?

THE COURT:  You may.

MR. MILLER:  If you can rotate that 90 degrees?  Thank you very much.

BY MR. MILLER:

Q.    Mr. -- excuse me.  Dr. Klein, would you please describe for the jury what they see in Government Exhibit 515?

A.    Yes.  This is a skull.  This would be the top of the skull here.  This is the bottom of the skull or the chin.  Right here is a green cloth that covered the mouth area and then a gray duct tape which encircles the entire skull, but we see it covering right over the nose, eye areas of the skull.

Q.    And you can take that down now, sir.  The skull itself was cleaned up and further processed, I assume.

A.    Yes.

Page 109

Q. You've described it as having a cloth and duct tape on it. Were those removed, sir?

A. Yes.

Q. And on the table before you is an exhibit marked Number 500. Can you tell us what that is, sir?

A. Yes. Includes in this case three pieces of duct tape and a green cloth. The duct tape has some purplish material on it.

Q. And did it at the time that it was received by you?

A. No.

Q. Okay. So go ahead and please if you would describe any

1811

changes in the condition of the contents of Exhibit 500 now from how it appeared when first seen by you.

A. When it was first seen by me, the duct tape appeared in one continuous strip encircling the skull. Its presentation now includes that the duct tape has been unraveled, flattened, and then there's been ink material which most likely was from processing at the crime lab.

Q. Is it customary in autopsy for various artifacts, clothing, bindings, and the like to be transferred following your autopsy to the custody of the state crime laboratory for further forensic examination?

A. Yes, it is.

Q. And was that done in this case?

A. Yes.

Q. I've handed you Government Exhibit 520 and ask if you can identify that for us, sir.

A. Yes, I can.

Q. What is it?

A. This is a photograph of case number 115, and it is all the

Page 110

bones that have been cleaned and then laid out in anatomical position.

Q.    That was the work done by yourself in coordination with Dr. Steadman?

A.    Yes.

Q.    And again, understanding we're going to get more detailed

1812

discussion of the specific injuries from Dr. Steadman, would displaying this to the jury help you describe at least the various locations on the body in which trauma was discovered?

A.    Yes, it would.

          MR. MILLER:  Government offers Exhibit 520.

                    *   *   *   *

          (Government Exhibit 520 was offered.)

                    *   *   *   *

          MR. BERRIGAN:  No objection.

          THE COURT:  520 is received.

                    *   *   *   *

          (Government Exhibit 520 was admitted.)

                    *   *   *   *

          MR. MILLER:  And with the Court's permission would display it at this time.

          THE COURT:  You may.

BY MR. MILLER:

Q.    What does 520 show that the jury is looking at now, sir?

A.    This is a photograph of case number 115, the complete skeleton after it's been cleaned and placed in anatomical position.

Q.    And using the telestrator if you would, would you just generally using large circles describe for the jury the

Page 111

locations where trauma was observed that in any fashion went into your findings as to cause and manner of death.

1813

A.   Right.  In general the skull was involved with a gunshot wound.  There was hairline fractures in the cervical area which is right in this area, and then the fifth rib was also involved with trauma.

Q.   Did you document any trauma in the area of the neck as well, sir?

A.   Yes.  I tried to -- I'm sorry.  I was a little off with the telestrator.  But it would be underneath the chin area where the neck bone, the fourth cervical vertebrae, which had multiple fractures.

MR. MILLER:  And, Your Honor, my more perceptive co-counsel has pointed out to me that I've not moved Exhibit 500 in evidence.  I do so at this time.

* * * *

(Government Exhibit 500 was offered.)

* * * *

THE COURT:  Any objection to 500?

MR. BERRIGAN:  No objection, sir.

THE COURT:  500 is received.

* * * *

(Government Exhibit 500 was admitted.)

* * * *

MR. MILLER:  We'll publish that at a later time, Your Honor.

BY MR. MILLER:

1814

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1587 of 3592

Q.    Moving on just as to the head of the victim, was any specific work done --

MR. MILLER:  We can take that down now.

Q.    Was any specific work done during the early stages to investigate the nature of trauma to the head of this victim?

A.    Yes, there was.

Q.    Please describe that.

A.    An X-ray was taken both in the forward-backward position as well as the right-to-left direction.

Q.    Doctor, you have before you Government Exhibits 531 and 532.  Can you identify those for us, please?

A.    Yes, I can.

Q.    What are they?

A.    They're two photographs, each of X-rays.  One of the X-rays is in the front-to-back direction, one is from the side or right-to-left direction.

Q.    Would -- and I understand the viewing of X-rays is something of a specialty; is that a fair statement?

A.    Yes, it is.

Q.    Okay.  Is it a specialty in which you have some education?

A.    Yes.

Q.    Okay.  And would the showing of these two X-rays or at least photographs of X-rays 531 and 532 assist you in describing any findings you made of significance?

A.    Yes.

1815

MR. MILLER:  The Government offers 531 and 532.

*   *   *   *

(Government Exhibits 531 and 532 were offered.)

Page 113

* * * *

MR. BERRIGAN:  No objection.

THE COURT:  They are received.

* * * *

(Government Exhibits 531 and 532 were admitted.)

* * * *

MR. MILLER:  And perhaps it'd be simplest if we could put these up simultaneously.  I'll ask permission to publish at this time?

THE COURT:  You may.

BY MR. MILLER:

Q.   For the record, the jury is now viewing Government Exhibits 531 and 532 simultaneously on the visual presenter.  Being careful to make the record clear by telling us which exhibit number you are referring to as you do so, would you please describe for the jury anything of significance that they see in these two X-ray photographs.

A.   Yes.  In Government Exhibit 531, this is an X-ray of the head of case number 115.  And it's of a side view.  The front of the skull is to the left of the screen, and the back of the skull is to the right.  And the lower jaw is where I'm circling right now.  There is a white object right here which is dense to

1816

X-rays.  And we are able to confirm after recovering this object that this was a heavy metal, lead.

Q.   And by dense you mean d-e-n-s-e.

A.   That's correct.

Q.   And Government Exhibit 532, does that show anything along a similar manner?

A.   Yes, it does.  This is a front-to-back X-ray of case number

Page 114

115. The radiopaque object which is later described as lead is in the center right behind the nose area. Just for purposes, this would be one of the eye sockets seen here, and then these would be the teeth of the lower jaw.

Q. Did these X-rays lead you to any further specific work, sir?

A. Yes, it did.

Q. Please describe.

A. During the autopsy we removed most of the contents inside the skull which was basically dirt, but it also led us to recover the object that looked dense on X-ray, and that wound up being a bullet.

Q. And did you associate it with any wounds upon the head of this victim?

A. Yes, I did.

Q. Describe.

A. On the left back lower portion of the skull about here on myself was a bullet wound, and it was an entrance bullet wound

1817

through the skull.

Q. Was there any exit bullet wound?

A. No, there were not.

Q. I assume that explains the presence of lead still inside the skull.

A. Yes, it does.

Q. Handing you Exhibit 504, do you recognize that, sir?

A. Yes, I do.

Q. What is 504?

A. This is the piece of lead that we recovered from the skull and corresponds with the X-rays in Government Exhibits 531 and

Page 115

532.

Q.   That was recovered by whom, sir?

A.   That was recovered by myself.

Q.   And does it, aside from the fact that it's been packaged, appear substantially as recovered by you?

A.   Yes.

MR. MILLER:  Government offers Exhibit 504.

*   *   *   *

(Government Exhibit 504 was offered.)

*   *   *   *

MR. BERRIGAN:  No objection, sir.

THE COURT:  504 is received.

*   *   *   *

(Government Exhibit 504 was admitted.)

1818

*   *   *   *

BY MR. MILLER:

Q.   What was done with 504 after you recovered it, sir?

A.   It was placed in a container and then submitted along with the other evidence to the DCI crime laboratory.

Q.   For further examination?

A.   Yes.

Q.   Ultimately understanding that we've somewhat abbreviated the amount of work that was done by yourself and Dr. Steadman on this case, did you come to a professional opinion as to the cause of death of Greg Nicholson?

A.   Yes, I did.

Q.   And what is that opinion, sir?

A.   Gunshot wound of head.

Q.   And manner of death?

Page 116

A. Homicide.

Q. After completing the work --

MR. MILLER: And you can take down that photograph now, please.

Q. After completing the work on skeleton number 115 or autopsy number 115, did you proceed on to 116?

A. Yes, that's correct.

Q. Following similar protocol?

A. Yes.

Q. I have handed you two photographs marked Government

1819

Exhibits 605 and 608. Do you recognize the subject of those two photographs, sir?

A. Yes, I do.

Q. What do they show?

A. 605 is the wrapping as I received it of individual 116 with writing from the people who were involved with the excavation. 608 is with the wrapping unfolded and exposes the skeletal remains of 116 before any autopsy was begun.

MR. MILLER: Government offers Exhibits 605 and 608.

* * * *

(Government Exhibits 605 and 608 were offered.)

* * * *

MR. BERRIGAN: No objection.

THE COURT: 605 and 608 are received.

* * * *

(Government Exhibits 605 and 608 were admitted.)

* * * *

MR. MILLER: And again with the Court's permission, I would publish at this time?

Page 117

THE COURT: You may.

MR. MILLER: First 605.

BY MR. MILLER:

Q. Showing 605, what does that show, sir?

A. This is the wrapping that individual 116 came in, and then the handwritten information by those at the investigation --

1820

excavation.

Q. Moving on to 608, please, shows us what, sir?

A. This is with the wrapping removed and the skeletal remains along with other packages that were packed by excavators.

Q. While we're still looking at Exhibit 608, sir, first, did you ultimately arrive at an opinion regarding the sex of this victim?

A. Yes, we ultimately did.

Q. And that was what?

A. Female.

Q. Adult female?

A. Yes.

Q. You've mentioned as with Mr. Nicholson's remains that it's routine to remove and document clothing and personal effects?

A. Yes.

Q. Did you do so in this case?

A. Yes, I did.

Q. And with reference to Exhibit 608, are any observable that you documented?

A. What we can see here in Exhibit 608 is a shoe. There is some ligature and a sock there. There were some other clothing, but they're not clearly visible because they're covered by dirt.

Q. How about a lower body garment? Was she wearing sweatpants

Page 118

or something of that nature?

A.   She was.   She was wearing sweatpants, and there was the

1821

remnants of panties.

Q.   As to the head of the individual, were there -- and I'm referring not now to clothing but rather to other artifacts -- any observed?

A.   Yes, there was a binding material consisting of duct tape which is present in the picture, and there was also a cloth material, a green cloth material, that is not present in this particular photograph.

Q.   Not visible in the photograph.

A.   That's correct.

Q.   And that duct tape -- I just wanted to review it from this photograph -- is it apparent the position of that duct tape on the skull of the victim?

A.   Yes.   The position is such that it's at the bottom or lower portion of the skull covering the mouth and lower portion of the head.

Q.   Completely encircling the head.

A.   That's correct.

Q.   Thank you.   And you can remove that one.   You described some of the clothing and bindings discovered on the body, sir. Did you photographically document bindings located, any ligatures located on the ankles of the victim?

A.   Yes, I did.

Q.   Dr. Hochrein (sic), before I do anything more, it might help us to just clean this area up a little bit.

1822

Page 119

I'm handing you a series of photographs marked Government Exhibits 609, 610, 611, 612, 613, and 614, and I'll ask if those six photographs show a single subject matter.

A.   Yes, they do.

Q.   And what do they show, sir?

A.   They all show the ligatures both on the right and left ankles.

Q.   And do they show them as you found them on the date you did the autopsy of victim 116, Lori Duncan?

A.   Yes.

MR. MILLER:  And government offers Exhibits 609 through 614.

*   *   *   *

(Government Exhibits 609 through 614 were offered.)

*   *   *   *

MR. BERRIGAN:  No objection, Your Honor.

THE COURT:  609 through 614 are admitted into evidence.

*   *   *   *

(Government Exhibits 609 through 614 were admitted.)

*   *   *   *

MR. MILLER:  And again with the Court's permission, I would ask that they be published at this time.

THE COURT:  You may.

BY MR. MILLER:

1823

Q.   And going through these one at a time, I'd ask you to simply go ahead and describe for the jury what they see first with regard to Government Exhibit 609.  What does this show, sir?

Page 120

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1595 of 3592

A.    This is a photograph of case number 116, and the center of the photograph is focused on the right ankle area, and around that right ankle area is some sock material here and a ligature, and one can also see part of the sweatpants.

Q.    Okay.  I'm going to interrupt you and backtrack for just a bit.  Was one of the -- is one of the purposes of every autopsy an identification of the victim?

A.    Yes.

Q.    And that was done in this case by whom and in what manner?

A.    Similar to case number 115, using dental comparisons between those when the person was alive and X-rays and examination of the teeth of the remains by Forensic Odontologist Dr. Frasco identification was confirmed.

Q.    Of whom?

A.    For Lori Duncan.

Q.    Thank you.  Please continue looking at Exhibit 610 (sic).

A.    And then the other portion of the photograph is a portion of the lower leg bone of the left leg.

Q.    And that's where?

A.    (Witness indicated.)

Q.    And I apologize.  I want to make sure you have an

1824

opportunity to describe everything of significance.  Have you done so in Exhibit 609?

A.    Yes, I have.

Q.    Thank you, sir.  Now moving on to Exhibit 610, if you would please describe what's shown in Exhibit 610, sir.

A.    This is, again, case number 116.  It's a photograph of the ligature on the right ankle, and again, here's the ligature with its ends that encircles the right ankle area.
Page 121

Q.   Moving on to 611, and what does that show, sir?

A.   This is from case number 116.  It's a photograph of the left sock and a ligature around the left ankle area.  This would be the ligature here, and this would be the sock.

Q.   Did you happen to notice anything different between the ligature on the victim's left ankle as opposed to that on her right ankle?

A.   Yes.  The most obvious difference are the numbers of loose ends on the left versus the right.  The left had four loose ends.  The right had two loose ends.

Q.   Thank you, sir.  Please continue to the next photograph, 612.  And now for the record we are showing the jury Government Exhibit 612.  Please describe for them what they see in this photograph.

A.   This is a photograph in which the right shoe, the right sock, and the ligature around the right ankle are all depicted very early in the process of examination.  Here's the shoe, the

1825

sock, and then the ligature is right here.

Q.   And as with victim 115, there was only one shoe on the victim?

A.   That's correct.

Q.   Please move on to Exhibit 612 -- excuse me, 613 if you would now, please.  And this shows us what?

A.   This again is victim 116, and again, this is of the right ankle depicting a ligature and sock material, and then fuzzy in the background is the right shoe.

Q.   Thank you, sir.  And moving finally on to Exhibit 614.  And what does this show, sir?

A.   In this exhibit from case number 116, the sock and

Page 122

ligature, the sock and the ligature, are placed on a blue board and again depicting the ligature around the right ankle area.

Q.   Okay.  And again as opposed to the left, this only has two frayed ends.

A.   That's correct.

Q.   Thank you.  You can take that down now.

Before you, sir, is Exhibit marked Government's Exhibit 602.  Do you recognize that, sir?

A.   Yes, I do.

Q.   What is it?

A.   This is the shoe recovered during the autopsy on case number 116.

Q.   Except as packaged and the fact that it's now alone and not

1826

with a sock and ligature, is it substantially as received at autopsy?

A.   Yes.

MR. MILLER:  Government offers Exhibit 602.

*   *   *   *

(Government Exhibit 602 was offered.)

*   *   *   *

MR. BERRIGAN:  No objection.

THE COURT:  602 is received.

*   *   *   *

(Government Exhibit 602 was admitted.)

*   *   *   *

MR. MILLER:  And with the Court's permission, I would ask the witness be allowed to display it to the jury without commenting at all, merely walk it before the jury box.

THE COURT:  That's fine.  You may proceed.
Page 123

A.    (Witness complied.)

Q.    And finally, Dr. Klein, I'm going to hand to you two exhibits marked 603 and 604 and ask if you recognize them, sir.

A.    Yes, I do.

Q.    What are they?

A.    These are the left and right socks respective to 603 and 604 that were recovered during autopsy.

Q.    603 being the right sock, 604 being the left; is that correct?

1827

A.    That's correct.

Q.    And is there anything in addition to just the socks themselves contained in those exhibits?

A.    They include the sock and the respective ligatures that were around the ankles at the time of autopsy.

Q.    And again, as with the fact that they've been since packaged, are they in substantially the same condition as received at autopsy?

A.    Yes, they are.

          MR. MILLER:  Government offers Exhibit 603 and 604.

                    *   *   *   *

          (Government Exhibits 603 and 604 were offered.)

                    *   *   *   *

          MR. BERRIGAN:  No objection.

          THE COURT:  603 and 604 are received.

                    *   *   *   *

          (Government Exhibits 603 and 604 were admitted.)

                    *   *   *   *

          MR. MILLER:  And again with the Court's permission, I would ask that together the witness be allowed to display these

Page 124

to the jury.

THE COURT: You may.

BY MR. MILLER:

Q. And just so we're sure the jury knows which is which, you can hold the left one in your left hand and the right one in

1828

your right hand. How's that?

A. Sounds good to me. (Witness complied.)

Q. Dr. Klein, in addition to the ligatures observed removed from the ankles at autopsy, I think you've already described that other bindings were found on the body.

A. Yes.

Q. And remind us what those were.

A. The other bindings were over the face that encircled the entire skull. And they consisted of duct tape and a cloth material.

Q. I'm handing you a series of photographs marked Government's Exhibits 619 through 624 inclusive, that is to say, 619, 620, 621, 622, 623, and 624. I'm trying to be as careful as I can in making my record straight, Doctor. Do you recognize the subject of those six photographs?

A. Yes, I do.

Q. And in general what do those six photographs show, sir?

A. They show the ligature or binding that was around the skull on case 116.

Q. And do they show those in position before the skeleton was cleaned up and the items further processed?

A. Yes, it does.

MR. MILLER: Offer Exhibits 619 through 624 inclusive.

*   *   *   *

Page 125

(Government Exhibits 619 through 624 were offered.)

1829

* * * *

MR. BERRIGAN: No objection, Your Honor.

THE COURT: 619 through 624 are received.

* * * *

(Government Exhibits 619 through 624 were admitted.)

* * * *

THE COURT: Before you show those to the jury, would now be a good time to take our noon recess?

MR. MILLER: Certainly.

THE COURT: Okay. Members of the jury, we'll be in recess until one o'clock. Please remember my prior cautionary instruction about keeping an open mind until you've heard all of the evidence in the case, and don't discuss this case among yourselves or with anybody else. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up?

MR. MILLER: No, Your Honor.

MR. BERRIGAN: No, sir.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Thank you.

(Lunch recess at 12 p.m.)

THE COURT: Ready to have the jury brought in?

MR. MILLER: Your Honor, just for informational purposes, I have -- I'm about two-thirds of the way through Dr. Klein.

1830

Page 126

THE COURT: Okay.

MR. MILLER: Dr. Goodin is here, and we will present her immediately following, but she is a somewhat shorter witness than Dr. Klein. Mr. Tarasi has just arrived, and I'll put him on following Dr. Goodin. The only remaining witnesses are Dr. -- excuse me, Mr. Murillo who will be en route late this afternoon but unable to get here before the conclusion of the day and Dr. Steadman who is en route somewhere between New York City and here, so we'll finish up with those two tomorrow, but I do anticipate a short afternoon, and I apologize for that.

THE COURT: A short afternoon today?

MR. MILLER: Yes.

THE COURT: Yeah, that's fine.

MR. MILLER: And again tomorrow too, but we'll be concluding at that point.

THE COURT: Okay. So -- okay. Well, we'll talk at the end of the day today. So we're not going to go into Thursday.

MR. MILLER: Doesn't appear to be.

THE COURT: Okay. Ready to have the jury brought in?

MR. MILLER: Yes.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Miller, you may continue your direct exam.

BY MR. MILLER:

1831

Q.   Good afternoon, Dr. Klein.

A.   Good afternoon.

Q.   We had just concluded a discussion I believe of the bindings recovered from the head of number 116 identified as

Page 127

Lori Duncan; is that correct?

A.    Yes, it is.

Q.    Did you, following removing of the clothing and the bindings, as you've described earlier, wash and assemble the skeleton of this victim?

A.    Yes.

Q.    Showing you Exhibit 625, can you identify that for us, sir?

A.    Yes.  This is a photograph of case number 116, and it is of the cleaned and assembled bones.

Q.    And does that show the entire skeleton of Exhibit -- excuse me, of Lori Duncan?

A.    Yes, it does.

        MR. MILLER:  And the government offers Exhibit 625 at this time as well.

                    *   *   *   *

        (Government Exhibit 625 was offered.)

                    *   *   *   *

        MR. BERRIGAN:  No objection.

        THE COURT:  It's received.

                    *   *   *   *

        (Government Exhibit 625 was admitted.)

                                                1832

                    *   *   *   *

        MR. MILLER:  Your Honor, at this time I would ask permission to show the exhibits admitted 619 through 625 with the witness asked to make a record by describing for the jury what they see in each of these consecutive photographs.

        THE COURT:  You may.

BY MR. MILLER:

Q.    Beginning with 619 then, and what does 619 show?

Page 128

VOLUME 8, 5-17-05

A.    This is a photograph of the skeleton from case 116, and it is the side view of the skull and a duct tape binding on the lower portion of the skull that encircles the skull.

Q.    116 again being the body of -- who was later identified as Lori Duncan.

A.    Yes.

Q.    Before we go on, let me just ask you again as we discussed with Dr. Hochrein yesterday, I assume that in addition to diagrams and note taking, photography is an important part of the documentation conducted in your profession.

A.    Yes, it is.

Q.    Are you -- let me ask you this.  Is the taking of photographs one of both the most effective and the most economical ways of documenting findings at autopsy or other crime scene-related investigations?

A.    Yes, it is.

Q.    And so I assume a fair amount of photography is done.

1833

A.    Yes.

Q.    Have you any idea -- and I don't ask for an exact number if you don't have any -- but any idea how many rolls of tape or how many total photographs were taken in connection with these autopsies?

A.    Many.

Q.    And for purposes of presenting your findings and describing your findings to the jury, did you review those and narrow it down to a small fraction that would be sufficient to help you describe what your findings were?

A.    Yes, I did.

Q.    So what the jury is seeing here today is merely a small

Page 129

fraction of the total amount of photography that was done in connection with the autopsy.

A.    Yes.

Q.    Thank you.  Please, moving on to Exhibit 620, and this shows what, sir?

A.    This also, the skull of Lori Duncan, and the skull is encircled by duct tape at the lower portion of the skull.

Q.    That'd be the rear of the skull?

A.    That's correct.

Q.    Thank you.  Please continue, sir, with 621.  And what does 621 show?

A.    This would be the front portion of the skull of Lori Duncan and the duct tape here on the lower portion of the skull.  This

1834

would be the front.

Q.    And again, that's in relation to what portion of the skull?

A.    This would be the lower portion, jaw and mouth area.

Q.    And again, I'm assuming over the period of years, perhaps seven, you can't be sure that there hasn't been some slippage or sliding of these artifacts?

A.    That's correct.  I can only describe what was on the remains, not necessarily what was at the time that she died.

Q.    You're a scientist.  You describe what you found when you examined it.

A.    That's correct.

Q.    Thank you.  Please continue.  Exhibit 622 shows what, sir?

A.    This also is the skull of Lori Duncan, and this is the bottom portion of the skull.  This would be the hole in which the spinal cord connects to the brain, and this is the duct tape you can see that's encircling the lower portion of the skull.

Page 130

Q.  623 shows what, sir?

A.  This is a photograph of the duct tape and then a portion of green cloth that was in and around the mouth portion of the skull.  And the duct tape and cloth came out in one piece as it was removed from the skull and was placed on this blue backboard when the picture was taken.

Q.  And Exhibit 624, please, shows what?

A.  And this is similar to the previous photograph that we saw except it is a close-up of the green cloth that was in and

1835

around the mouth area and then the duct tape portion across here.  So the front of the skull would be up here, and the back would be in the direction of the arrow.

Q.  Thank you.

MR. MILLER:  You can take that down now, Counselor. I'll ask that we show the Exhibit 625 now.

Q.  And if you would in describing this with it oriented with the head at the top -- thank you very much -- what, if any, areas on this body now reassembled, cleaned, and the skeleton reassembled in anatomical position being shown to the jury in Exhibit 625, what areas of that body showed traumatic injury?

A.  Okay.  Foremost would be the skull.  The next would be the ulna on the left.  The next would be the right fourth rib.  Then the next would be the right seventh rib, eighth, and then the ninth was in the back on the right side right there, and then the -- one of the bones on the left hand over here and then on the right hip is over here.

Q.  Now, let's just be clear about one thing before we move on. We're going to be hearing from Dr. Steadman as to some of the more specifics of these findings on these traumatic injuries,

Page 131

and you rely in part upon her expertise as well; is that correct?

A.   That's correct.

Q.   Are you by any means suggesting that there were one, two three, three, four, five, six, seven, eight bullets that passed

1836

through the body of this victim?

A.   No.

Q.   Quite the contrary.

A.   That's correct.

Q.   As we'll hear from Dr. Steadman later.

A.   Yes.

Q.   But those are areas where there is some traumatic injury.

A.   Yes.

Q.   Thank you, sir.  Ultimately in your capacity as state medical examiner, did you arrive at a professional opinion as to cause of death in this case, sir?

A.   Yes, I did.

Q.   And what is that?

A.   Multiple gunshot wounds.

Q.   And manner of death, sir?

A.   Homicide.

        MR. MILLER:  You can take down that exhibit now, please, Counselor.

Q.   And when I say this death, I'm referring to that of state medical examiner number 116 identified as Lori Duncan; is that correct?

A.   That's correct.

Q.   You mentioned four skeletons.  There were two others.  Can you describe those two skeletons for us in general terms?

A.    Yes.   They were what would be described as subadult

skeletons of differing size relating to difference in ages. They also contained -- each had a gunshot wound to the head.

Q.    Are there any difficulties posed in autopsy in general and identification of remains in particular in dealing with small skeletons?

A.    Yes, there are.

Q.    Please describe.

A.    Before in humans adulthood is reached, the changes in the bone that one uses to determine sex are not present, so it's difficult to determine sex looking at the subadult skeleton. Identification is also difficult because often now with the advances in dental care and with primary teeth that are changed for permanent teeth, one doesn't have the dental work to compare to as one may have in the adults.

Q.    Nevertheless, was identification made in the case of these two little skeletons?

A.    Yes, it was.

Q.    And describe on what basis or bases such identification was made.

A.    A couple of different principles and techniques were used. The first technique used was a technique called mitochondrial DNA.   And what mitochondrial DNA allows one to do is determine if a particular person has the same mitochondrial DNA as that child's or that person's mother.   It does not have the same specificity as, say, the nuclear DNA that we often hear about

which is very, very specific for one particular person.   But it

does allow us to narrow down considerably having the same mother-to-child relationship. That was able to be determined using grandparent -- grandmother to mother to child to determine that they all had the same mitochondrial DNA.

Then using the help of an anthropologist who takes measurements, we're able to get an estimate of age and stature meaning how tall they were to differentiate between the two siblings: Kandace, the older, and Amber, the younger. And using also clothing artifacts that were known by relatives that were consistent with the clothing that were found on the individuals, using all these pieces of information together, the identification was made.

Q. And I believe we've heard that a dental examination can also aid in assessing an estimate of the age of the victim.

A. Those are other pieces of information that Dr. Frasco, though not able to confirm an identification, certainly showed -- had findings that were consistent with the identifications that we had determined by these other means.

Q. And so taking as a whole the dental findings, the mitochondrial DNA findings, the anthropological findings, and the circumstances in which the bodies were located and recovered, did you arrive at a professional opinion as to the identity of these two final victims?

A. Yes, I did.

1839

Q. And what was that opinion, sir?

A. Kandace Duncan and Amber Duncan.

Q. And they were identified initially as state medical examiner numbers what?

A. Kandace was identified as number 117, and Amber was

Page 134

identified as 118.

Q. Okay. And this may not be crucial, but I also want to make sure we don't have any misunderstanding. There's been a great deal in the public literature in recent years about DNA. Fair statement?

A. Yes.

Q. And when we hear the term DNA, it's common for many of us to think of a positive identification or at least an identification to extraordinary degree of probability. You've talked about mitochondrial DNA. How is that different and to what extent is that less determinative than what we hear about in the popular media about a DNA identification?

A. The difference between nuclear DNA and mitochondrial DNA is they're both made of basically of the same chemicals. The difference is is that in nuclear DNA there is one copy of an extremely unique sequence of chemicals put together to form the DNA fingerprint, if you will, of that particular individual.

Mitochondrial DNA is a much shorter series of chemicals put together that are in many, many copies in a single cell in a particular portion of the area of the cell called the

1840

mitochondria. These are not necessarily unique to each individual, but the mitochondrial DNA is passed on from the mother's egg on to that child, and it becomes part of all the cells of that particular person.

So there's considerable differences in the uniqueness of the two that allows in nuclear DNA to have a very high probability of ruling out two people having the exact same DNA. That probability, that high degree of probability of two people having the same mitochondrial DNA, is not nearly as high.

Page 135

Q. I don't want to dwell on this subject. Certainly it's over my head, but just so we can be sure we have no misunderstanding, except for identical twins, everybody's DNA for practical purposes is different.

A. That's correct.

Q. Mitochondrial DNA, however, is completely different because I have my mother's mitochondrial DNA.

A. That's correct.

Q. Each of us has the same mitochondrial DNA that our mother has.

A. That's right.

Q. So that following the maternal lineage, a child would have the same mitochondrial DNA as her maternal grandmother?

A. That's correct.

Q. And based upon an examination of Marge Milbrath and these two children, there was the same mitochondrial DNA?

1841

A. That's correct.

Q. So these two children, 118 and 117, were determined to be offspring, either direct or grandchildren, of Marge Milbrath?

A. That's correct.

Q. And that combined with the anthropological profile, dental profile, and circumstances of recovery confirmed to you that these are Kandi and Amber Duncan.

A. Yes.

Q. Thank you, sir. I want to go on and take these one at a time beginning with SME117, and that is I think you've indicated --

A. Kandace Duncan.

Q. -- Kandi Duncan.

Page 136

A.    Uh-huh.

Q.    You did an external examination?

A.    Yes.

Q.    Dr. Klein, Exhibit 701 and 702 are on the table before you. What do you recognize those as, sir, if anything?

A.    Exhibit Number 701 is the plastic packaging covering individual number 3, later numbered as 117 and then subsequently identified as Kandace Duncan.  On that package is the handwritten information of the people who excavated the body at the scene.  Also in the photo in the background also is individual number 1 as we had talked about before also in the packaged state.

1842

In Government Exhibit Number 702 is a picture of the remains of Kandi Duncan immediately prior to beginning the autopsy in which the wrapping has been unraveled and the sheets have been opened to display the remains as they were received.

MR. MILLER:  Government offers Exhibit 701 and 702.

* * * *

(Government Exhibits 701 and 702 were offered.)

* * * *

MR. BERRIGAN:  No objection, Your Honor.

THE COURT:  701 and 702 are received.

* * * *

(Government Exhibits 701 and 702 were admitted.)

* * * *

MR. MILLER:  And with the Court's permission, beginning with 701 request opportunity to publish.

THE COURT:  You may.

BY MR. MILLER:
            Page 137

Q.    What does Exhibit 701 show us, sir?

A.    As I previously described, this is the remains and plastic covering of Kandace Duncan and the handwritten information of those at the excavation site.

Q.    And moving on to Exhibit 702, sir?

A.    And these are the remains of Kandace Duncan immediately prior to autopsy in which the plastic covering and sheets are unraveled to expose the remains as they were received.

1843

Q.    With the clothing still in place.

A.    That's correct.

Q.    Doctor, I'm showing you what is marked 700, and I believe it's been received in evidence already as Exhibit 700.  Do you recognize that garment, sir?

A.    Yes, I do.

Q.    And what is 700?

A.    This is the -- a sleeveless dress that was removed from the remains that were subsequently identified as Kandace Duncan.

Q.    And you removed that yourself.

A.    Yes, I did.

MR. MILLER:  And, Your Honor, it's already been published, and I have no need to ask the witness to parade it in front of the jury again.  However, just so they are reminded of exactly what we're referring to, if he'd be allowed to stand up and show it to the jury from where he is.

THE COURT:  He may.

A.    (Witness complied.)

Q.    Thank you, sir.  What, if any, other clothing was removed from her person?

A.    Remnants of panties.

Page 138

Q.   And nothing more.

A.   That's correct.

Q.   No footwear?

A.   Pardon me?

1844

Q.   No footwear.

A.   No.

Q.   Did you, in processing this child's skeleton at autopsy, arrive at any findings as to locations of trauma?

A.   Yes, I did.

Q.   Where?

A.   Head.

Q.   Anywhere else?

A.   No.

Q.   I believe I may have already placed them in front of you. Do you have 704 and 706?

A.   Yes, I do, sir.

Q.   And what do they show, sir?

A.   They are both photographs of the skull at the time of autopsy.  706 shows an entrance bullet site, and 704 shows the skull with vegetation and dirt still surrounding the skull.

          MR. MILLER:   Government offers Exhibit 704 and 706.

                         *   *   *   *

          (Government Exhibits 704 and 706 were offered.)

                         *   *   *   *

          MR. BERRIGAN:   No objection.

          THE COURT:   704 and 706 are admitted.

                         *   *   *   *

          (Government Exhibits 704 and 706 were admitted.)

                         *   *   *   *
                         Page 139

BY MR. MILLER:

Q. First with regard to 704 with the Court's permission, I'd like you to publish that and describe for the jury what they see.

THE COURT: You may.

Q. What is Exhibit 704, sir?

A. This is the skull of Kandace Duncan. To orient you, this would be the front portion of the skull. This is the back portion of the skull, and we're looking at the left side of the skull, and one can see teeth here, and then the rest is covered by dirt, and one can see roots and other vegetation intertwining with the skull.

Q. And moving on to Exhibit 706, sir, what does 706 show?

A. This also is the skull of Kandace Duncan. The lower jaw is absent, but that would be here. This is the top of the -- top jaw, and this is the front of the skull. This is the back of the skull, and slightly right of midline in the back of the head, if I use my own skull, about here, this hole right here is an entrance bullet wound. There's fragments of bone that are not present or visible in this field. Those have fallen off.

Q. The circular hole you referred to?

A. The circular hole is an entrance gunshot wound.

Q. And would you just circle that in a larger circle so it's not obscured?

A. (Witness complied.)

1846

Q. Dr. Klein, did you arrive at a professional opinion as to

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1615 of 3592

the cause of death of Kandi Duncan?

A.   Yes, I did.

Q.   And what is that?

A.   Gunshot wound of head.

Q.   And manner of death?

A.   Homicide.

Q.   Finally, sir, you performed an autopsy with the assistance of Dr. Steadman and others upon the remains of state medical examiner case number 118.  Do you recall that, sir?

A.   Yes, I do.

Q.   This again was during that week of October 24 to 28?

A.   That's correct.

Q.   Personnel participating even late in that week were whom?

A.   The primary personnel were myself, Dr. Steadman, and Agent Basler.

Q.   Agent Basler's no physician, is he?

A.   No, he's not.  He was a DCI agent who was helping us with the -- with doing the autopsies and doing photo documentation.

Q.   Working entirely under your supervision.

A.   That's correct.

Q.   And that of Dr. Steadman.

A.   That's correct.

Q.   Anything unusual about that?

A.   No.  We quite routinely have police present during

1847

autopsies and assist us with evidence collection.

Q.   Sir, you have before you Government Exhibits 801 and 802.  Do you recognize those, sir?

A.   Yes, I do.

Q.   Please describe them.

Page 141

A. Government Exhibit 801 is the covering of individual number 4 subsequently identified as Amber Duncan. It is a plastic wrap that has handwritten information from -- written by those who did the excavation. Government Exhibit 802 are the remains of Amber Duncan. The plastic wrap and sheet have been unraveled and exposes the remains and clothing of Amber Duncan as they were received prior to autopsy.

MR. MILLER: Government offers Exhibits 801 and 802.

* * * *

(Government Exhibits 801 and 802 were offered.)

* * * *

MR. BERRIGAN: No objection.

THE COURT: 801 and 802 are received.

* * * *

(Government Exhibits 801 and 802 were admitted.)

* * * *

MR. MILLER: Again with the Court's permission, request opportunity to publish to the jury.

THE COURT: You may.

BY MR. MILLER:

1848

Q. First with regard to 801, please describe to the jury what they see in this photograph.

A. In this photograph is a plastic wrapping with handwritten information as described. That handwritten information is written by those doing the excavation. Within the wrappings are the remains of Amber Duncan.

Q. Thank you. Please moving on to 802, what is 802, sir?

A. These -- this is a picture of the remains of Amber Duncan. Present in the photo or visible in the photo are clothing and

Page 142

other skeletal remains.

Q. Doctor, I'm not sure it's terribly clear from the brightness of the photograph, but to the extent possible, using that photograph as an aid, would you describe for the jury the posture, position of the body of that little skeleton?

A. Yes. Going from the feet upward, the legs and feet would be down here. The pelvis region would be right around here. And then the chest area would be right here. And the arms are in this type of posture within a shirt such that they're pulled up over the head. And then not visible in the photograph but covered by this inverted shirt would be the skull.

Q. So her head is on the left as we see it in that photograph.

A. That's correct. Would be within this area.

Q. Okay. Covered by a T-shirt?

A. Yes.

Q. And I just want the record to be clear and the jury to have

1849

a better understanding of exactly how that was. Can you just show us the position of her arms and the T-shirt as you found the body?

A. Yes, as if one were to take off their own shirt in this type of position (demonstrating).

Q. With the neck area still around the neck?

A. That's correct.

Q. But inverted and pulled over the head with the arms up.

A. That's correct.

Q. Thank you, sir. We can take that down now.

Dr. Klein, I've handed you two photographs marked Government Exhibits 805 and 808. Do you recognize them, sir?

A. Yes, I do.

Page 143

Q.    What are they?

A.    Exhibit 805 is the back of the skull of Amber Duncan, and it shows the entrance gunshot wound to the back of the head. Exhibit 808 shows fragment of skull.  Most of them appear to be from facial bones.

Q.    They show them as they appeared at autopsy when first received by you, sir?

A.    Yes.

        MR. MILLER:  State offers 805 and 808.

                        *   *   *   *

        (Government Exhibits 805 and 808 were offered.)

                        *   *   *   *

                                            1850


        MR. BERRIGAN:  No objection.

        THE COURT:  805 and 808 are received.

                        *   *   *   *

        (Government Exhibits 805 and 808 were admitted.)

                        *   *   *   *

        MR. MILLER:  And again with the Court's permission, I would ask you to publish them to the jury at this time.

Q.    And referring specifically by exhibit number, describe to the jury what they see in these two photographs.

        THE COURT:  You may.

A.    This photograph, Government Exhibit 805, is a photograph of Amber Duncan at the time of autopsy.  The view is of the back of the skull, and in the back of the skull is a hole that I've encircled, and that hole is a gunshot entrance wound.

Q.    Moving on to 808, please.  And Exhibit 808 shows what, sir?

A.    Exhibit 808 shows fragments of bone.  The one that's most easily identified is the fragment I've encircled, and there are

Page 144

teeth present, so that is from the upper jaw or we call the maxilla. Then there are a number of other small fragments, small, tiny, thin fragments consistent with bone fragments from the face.

Q. So 808's what's left of Amber Duncan's face.

A. That's correct.

MR. MILLER: You can take that down now, please.

Q. Did you arrive at a professional opinion, sir, as to the

1851

cause of the death of Amber Duncan?

A. Yes, I did.

Q. And what is that opinion?

A. Gunshot wound of head.

Q. Did you arrive at a professional opinion regarding manner of death, sir, and if so, what?

A. Yes, I did. Manner of death is homicide.

Q. You've indicated that the body was received partially clothed.

A. Yes.

Q. And you've mentioned a T-shirt and a swimming garment I believe; is that true?

A. Yes.

Q. Anything else at all?

A. That's all.

Q. Okay. No footwear?

A. That's correct.

Q. Who removed those garments from that child's skeleton, sir?

A. Would be myself with the assistance of Agent Basler and Dr. Steadman.

Q. And I have handed you what has already been received I

Page 145

believe as Exhibit 816. Do you recognize that?

A. Yes, I do.

Q. And what is Exhibit 816?

A. This is the shirt that was removed from the remains of

1852

Amber Duncan at time of autopsy.

Q. And can you read any printing on the shirt?

A. Yes, there are portions of the writing on the front of the T-shirt. There's a picture of an apple and in larger letters read Fieldstone, heartland, and then some of the other writing is covered by stains.

Q. But that was the T-shirt that you found pulled over the head of that little child?

A. Yes.

MR. MILLER: Your Honor, again with the Court's permission and without asking the witness to step down from the witness stand, if we could simply remind the jury of what we're referring to by asking him to raise it.

THE COURT: You may.

A. (Witness complied.)

Q. Thank you, Doctor. And finally you have on the desk before you an exhibit that's already been received as Government's Exhibit 800, a swimsuit; is that correct?

A. Yes.

Q. Small child's swimsuit.

A. That's correct.

Q. Do you recall the first time you observed that, sir?

A. Yes. It was during the initial examination of the remains of Amber Duncan at time of autopsy.

Q. Who was it that removed that from this child's body?

Page 146

A.    Would be myself with the assistance of Agent Basler and Dr. Steadman.

Q.    And I assume you remember that quite well.

A.    Yes, I do.

MR. MILLER:  Your Honor, with the Court's permission, I would ask that he be allowed to simply hold it up so that the jury recalls what exhibit's being referred to.

THE COURT:  You may.

A.    (Witness complied.)

MR. MILLER:  Thank you, sir.  I have no further direct.

THE COURT:  Mr. Berrigan?

CROSS-EXAMINATION

BY MR. BERRIGAN:

Q.    Dr. Klein, how are you, sir?

A.    I'm doing fine.  Thank you.

Q.    I bet there are a few people outside of us transplanted New Englanders that know that your alma mater, Bowdoin College, is perennially in the top ten small private universities in the country; isn't that true?

A.    I think I've heard that, yes, thank you.

Q.    Yeah.  I think it takes pretty bright people to get in there, doesn't it?

A.    That's what I've heard, yes.

Q.    I want to start with the area you just finished, and that

is this T-shirt if we could revisit that for a moment, Amber Duncan's T-shirt.  Yeah.  816; is that correct?

Page 147

A.  That's correct.

Q.  Okay.  And if I understand you correctly, this T-shirt's pulled up over her head when you find it on her body.

A.  That's correct.

Q.  It's kind of like her arms are up like this and the T-shirt's on the arms and comes down over her head?

A.  That's correct.

Q.  Okay.  Of course, she's shot in the base of the skull; right?

A.  That's correct.

Q.  By the way, as an aside, these wounds to the base of the skull, those are fairly typically instantaneously fatal, are they not?

A.  Usually gunshot wounds that follow this path damage the base of the brain, so typically they are --

Q.  You're dead.

A.  That's correct.

Q.  There aren't any bullet holes in that T-shirt, are there?

A.  No.

Q.  Of course, you looked for that.

A.  That's right.

Q.  Okay.  And you're sure there aren't any.

A.  That's correct.

1855

Q.  And that would indicate to you that this shirt was pulled up over her head in moving her body into the grave or at some point after she's shot in the head.

A.  Yes.

Q.  Okay.  I wanted to visit a little bit with you about the duct tape on Greg Nicholson and Lori Duncan; okay?  And I think

Page 148

probably it would be helpful to look at the duct tape on Lori Duncan first which I believe is photographs that start with 619. Are they still up there?

A.   I believe the duct tape exhibits have been -- have been removed from this desk.

MR. BERRIGAN:   May I approach the witness, Your Honor?

THE COURT:   You may.

BY MR. BERRIGAN:

Q.   Here they are.

A.   Oh, sorry.

Q.   That's all right.  That's a lot of pictures.

A.   Here's one more.

Q.   Thank you.  The one that's behind you, if you don't mind turning -- oh, you can see it on your screen.  Of course.  This is Government Exhibit 622.  That is a photograph of the base of the skull of Lori Duncan, is it not?

A.   Yes.

Q.   Okay.  And that duct tape there is what I wanted to ask you about.  You'd used the term in describing the duct tape

1856

completely encircling the head, and I just wanted to make sure the jury was clear.  You're not meaning that their heads are wrapped up from top to bottom like a mummy with duct tape.

A.   No.

Q.   Okay.  But that duct tape obviously goes completely around the skull.

A.   That's correct.

Q.   And it's pretty clear in her case, Lori Duncan's case, that that duct tape was used to hold a gag or some cloth in her mouth; isn't that true?

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1624 of 3592

A.    Yes.

Q.    And that's the green material that you saw that was attached to this duct tape.

A.    Yes.

Q.    This is Government's Exhibit 623.  The green material we're talking about is at the top, kind of the 11:00 position there on the --

A.    (Witness indicated.)

Q.    Yes, exactly.  And that you testified was actually kind of right in front of the mouth area.

A.    That's correct.

Q.    Okay.  So I wanted to ask you about Mr. Nicholson then. Was his a similar situation with the duct tape?

A.    It was similar in that it went all the way around the head. The difference was it wasn't quite as low at the base of the

1857

head as --

Q.    Okay.

A.    -- Lori.

Q.    And the problem is we don't really know because the flesh is all, of course, deteriorated to the point where you just have bone largely; right?

A.    That's correct.

Q.    That the duct tape may have moved somewhat from its original position.

A.    Yes.

Q.    But there was also a green cloth with Mr. Nicholson's duct tape.

A.    Yes, there was.

Q.    And it was also wrapped completely around the skull but not

Page 150

from chin to top; right?

A.    That's correct.

Q.    Okay.  Well, assuming these were gags just for the sake of argument, that is, that the green cloth was used to put in the mouth, the duct tape held it in place, was it pretty clear to you that the duct tape would not have covered their eyes and nose?

A.    Just given the space and the dimensions, it would likely -- if it covered the mouth, it would probably be fairly close to the eyes.  I don't know if it would necessarily cover the eyes.

Q.    Okay.  All right.  And then I wanted to visit with you a

1858

little bit about the -- just to be clear -- I know you didn't say anything about it, but these -- neither of these two girls have any duct tape on them at all, do they?

A.    That's correct.

Q.    And there's no ligatures on these little girls either, is there?

A.    That's right.

Q.    But the adults have ligatures, at least on their ankles.

A.    Yes.

Q.    Did anybody tell you that there were some ligatures found on the arms?

A.    Yes.

Q.    You were out there at the scene; right?

A.    Right.  When I was at the scene, individual 1 had already been packaged, and they were in the process of getting individual 2.  I don't remember if I was told -- I know I wasn't told at that time about the ligatures, but I did subsequently hear about the ligatures on the arms.
Page 151

Q.    Well, we had the opportunity to hear this FBI archaeologist I suppose talk about these ropes being fairly loose tying the wrists of these two individuals together, that is, the right wrist and the left wrist, Mr. Nicholson's behind him, Miss Duncan's in front of her.  Were you made aware of that at some point?

A.    Subsequently but not at the time I was at the excavation.

1859

It wasn't till after I was done with the autopsies that I heard that.

Q.    Okay.  It was not until after the autopsies.

A.    That's true.

Q.    Because I was wondering if anybody ever took any effort to compare the ropes.  That is, did you take the ligatures from the ankles and submit them to the DCI lab to see if they matched the ligatures from the wrists?

A.    I submitted all the ligatures and all the clothing to the DCI laboratory, but I did not make any specific requests of them to make any comparisons with other ligatures that may have been recovered at the scene.

Q.    Okay.  So whatever they did they did.

A.    That's correct.

Q.    Now, these ligatures on the ankles, if we understand you correctly, Mr. Nicholson, he just has a ligature around his right ankle, more specifically I guess his right tennis shoe. Let me see if I can show that to you.  Do you have 511 in front of you there, Doctor, by any chance?  I've got it.

A.    Okay.

Q.    Okay.  Are you able to see that, sir?

A.    Yes, I am.

Page 152

Q. And I think you are -- obviously this is his right tennis shoe, and there's a ligature there going around his sock; right?

A. Yes.

1860

Q. Now, there's no corresponding ligature on his left ankle, at least none that you saw.

A. That's correct.

Q. Okay. And then Lori Duncan, she has ligatures around both ankles. This would be 609, 610, 611. Are those up there?

MR. BERRIGAN: May I approach, Your Honor?

THE COURT: You may.

A. Here's 614 that has . . .

Q. Here we go. Here's 609. Now, this is supposed to be the right ankle of Lori Duncan.

A. And that is correct. I'll --

Q. And can you -- right, exactly, thank you.

A. That's the ligature around the right ankle.

Q. And I have a closer picture that's already in evidence which is 610. Are you able to see that one, Doctor?

A. Yes. Again, the ligature is right there.

Q. All right. And this is the ligature, this one on the right ankle, is the one that has the two loose ends; right?

A. That's correct.

Q. Okay. And then on the opposite ankle, opposite leg -- I think this is 613 I'm going to show you -- do you recognize that as the ligature around what would be I guess her left ankle?

A. I believe that's correct.

Q. I'm sorry. I have on my notes close-up of right ankle and sock material. So let me get these straight here. Yes, that's

1861

Page 153

right. That's the close-up of the right --

A. Yes, because this only has two loose ends.

Q. That only has two, that's right. And I think I misspoke earlier. Let me show you 609 again because we want to have this right. Woops. Okay. 609, can you see there are four loose ends there?

A. This is actually of the right ankle, so this one only has two loose ends.

Q. Okay. Let me show you 611 then. Tell me if this is the right one.

A. Yes. This is from the left.

Q. Okay. That's from the left. Finally I've got it right.

A. Yes.

Q. Left.

A. Yes.

Q. Okay. So we have this kind of strange situation where on her right ankle there are two loose ends and then on her left ankle four loose ends and then Mr. Nicholson on his right ankle has two loose ends.

A. That's right.

Q. And I don't suppose if you know, but did anybody make any effort to try, even if it's even possible as far as you know, to match Mr. Nicholson's loose ends to Miss Duncan's loose ends?

A. I didn't attempt to do that myself, and I don't know if anyone else tried to do that.

1862

Q. Did the rope at least seem fairly consistent to you, you know, roughly the same type of material, diameter, composition,

Page 154

that kind of stuff?

A. Yes, it did.

Q. I know you're not a rope expert but . . .

A. Yes.

Q. All right. So we don't know whether these ligatures on Miss Duncan's ankles -- obviously we don't know if they were tied together at one point or not, do we?

A. That either.

Q. That's certainly a possibility.

A. Yes, it is.

Q. It would seem to make sense that if somebody took the time to put ligatures around their ankles it wasn't just to have them going free like that. That wouldn't restrain anybody; right?

A. That's correct.

Q. And it was pretty clear that at least when you saw the bodies that these ligatures aren't tied to anything; right?

A. That's correct.

Q. Now, you were out there at the scene.

MR. BERRIGAN: Could I borrow 406A and B, please?

Q. I'm going to show you some photographs if you can just give me one second, Doctor.

A. Okay.

Q. I'll tell you what, while they're looking for that, why

1863

don't we talk about something else, and we'll come back to it; right? And that is I want to discuss the gunshot wounds to the head. So far you've not said anything about any stippling or soot on the skull areas where these gunshot wounds took place; is that right?

A. That's correct.

Page 155

Q. And for the jury's edification, could you tell them what stippling and soot are?

A. Soot is some of the products of combustion after a gun is fired. The bullet comes out, and then all the gun powder burns, and that material can sometimes, if it's close enough to the person when they're shot, to leave this black soot material on the skin or whatever part of the body that the bullet is going through.

If the weapon is held a little further away from the skin, small pieces of partially burned gun powder can land on the skin, and it can leave a marking called stippling, and they look like little red pinpoint markings. And both these findings, soot deposition and stippling, give some indication of how far the muzzle was from the person when they were shot.

Q. And in some cases if the -- particularly if the gun's like right up contact wound to the head close to the bone, is it true that you can even have some effect of that stippling on the skull, on the bone itself?

A. Oftentimes you'll see soot deposition. Stippling tends to

1864

be a reaction of the skin to these hot partially burned gun powder particles falling out --

Q. So I misstated it. It's the soot that might be implanted on the skull, not the stippling.

A. That's correct.

Q. But you'd have to be pretty close; right?

A. Yes.

Q. There's a lot of factors, one of which would be, of course, whether there's any material in between the barrel of the gun and the person that's shot, what the distance is. Perhaps

Page 156

there's clothing that's in the way and so on; right?

A.   Yes.

Q.   Would one of the factors -- and you have to have some expertise, at least some, in terms of ballistics in order to do your job, don't you?

A.   Yes.

Q.   And how these guns work is they typically have -- in the barrel of the gun there's something called rifling, isn't there?

A.   Yes.

Q.   And what that is is there are lands and grooves that are dug into the barrel that have a twist usually to the right or to the left; right?

A.   Yes.

Q.   And the effect of that twisting in the barrel of the gun is to get the bullet to start to twist as it's coming out the

1865

projectile, coming out of the barrel of the gun; right?

A.   Yes.

Q.   And it's kind of like a quarterback throwing a football that if you didn't twist the ball, if it didn't spin, then it's going to tumble; right?

A.   That's right.

Q.   So, you know, if you're watching a Joe Montana pass, he typically is not going to have the ball tumbling end over end on its way to Jerry Rice.  There's going to be a nice little spin there; is that right?

A.   That's right.

Q.   And that's what the rifling's supposed to do; right?

A.   Yes.

Q.   I brought that up because I wanted to ask you about the

Page 157

effects of a silencer, particularly something that might be a homemade silencer. Might that have an effect on the trajectory of the bullet as it comes out the end of the gun?

A. Yes, it could.

Q. And that would -- the silencer might also have an effect on how much soot or stippling was available to come out the gun. That is, the presence of a silencer might greatly inhibit sort of stippling, would you agree?

A. It could, yes.

Q. And, of course, there are -- even some silencers are manufactured, but you've heard of homemade silencers, haven't

1866

you?

A. Yes.

Q. Okay. I'm going to show you two photographs that are in evidence already, sir. This one is 406. Dr. Klein, do you recognize this? I know it's been some time, but do you recognize this as an aerial view of the Lark Avenue burial site?

A. Yes, I recognize the area.

Q. Okay. Can you -- I don't know if you can see it on your monitor there, but there's a little blue tent in the middle of --

A. (Witness indicated.)

Q. That's it exactly. That's the area where these bodies are uncovered; right?

A. Yes.

Q. And so on that road, there's a road there immediately to the south. Do you see that, that access road where all those cars drove in?

A. Right here.

Page 158

Q.   Exactly, right.  So would it make sense to you that if these people are killed at or near that tent that they would have to be transported or walk perhaps from the road to the tent?

A.   I guess a lot would depend on, you know, how soft the soil was and how close they could get and what type of vehicles they would have, how far they could drive the vehicles.

1867

Q.   In terms of how far you could get into the woods you mean?

A.   That's correct.

Q.   Okay.  If you had your car on the road or even where those cars are, they look like they're on the edge of the field, those law enforcement cars.  Looks like there's some walking involved to get into where those bodies were.

A.   That's right.

Q.   You walked in there, didn't you?

A.   Yes, I did.

Q.   You didn't drive right up to the site.

A.   We actually drove into the edge of the cornfield and then walked from there.

Q.   And then you walked in.

A.   That's right.

Q.   And that'd be hard to do if your two ankles were bound together, wouldn't it?

A.   I think it would be more difficult.

Q.   You'd have to hop I suppose.

     All right.  Let me show you Government's Exhibit Number 80.  This is in evidence.  I just wanted to know if you were familiar with this book, the Poor Man's James Bond.

A.   No.  This is the first time I've seen it.

Page 159

Q. Or any of its teachings on silencers or binding people up.

A. No, I'm not familiar with these.

Q. Okay. I just had a couple of real quick questions about

1868

some of the injuries that you've described, particularly

respecting Mr. Nicholson and Miss Duncan. And I heard the

prosecutor mention several times Miss Steadman's coming in,

we're going to have a chance to talk to her, but particularly on

the injury to Greg Nicholson's rib, his right rib, did you not

determine that that was a gunshot wound?

A. We thought a probable gunshot wound.

Q. Probable? And from the back to the front; right?

A. Yes.

Q. He's shot in the back.

A. (Witness nodded head.)

Q. True?

A. That would be the first choice of what likely happened.

Q. Okay. And you already established that he's shot in the back of the head at the base of the skull slightly to the left; right?

A. That's correct.

Q. And is there any way to tell medically speaking, you know, which of those injuries preceded the other?

A. No.

Q. Okay. The fracture of the C4 cervical vertebrae in him, it's a hairline fracture?

A. That's correct.

Q. Any way to tell whether that was as a result of him being injured, put into the grave, or falling at the time he's shot in

1869

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1635 of 3592

the head or anything like that?

A.    I think all those scenarios are possible.

Q.    Possible?  Okay.

A.    Perhaps Dr. Steadman could be more specific.

Q.    Was it at least pretty clear that that wasn't a gunshot wound to his C4 vertebrae?

A.    That particular injury is of a blunt force type, but whether it was related to a gunshot wound from --

Q.    From the head?

A.    That's right.

Q.    Gotcha.  And then the injuries to Miss Duncan, there's several rib injuries, are there not?  And as you've already pointed out, that doesn't indicate necessarily that many bullet wounds or bullets were shot, but is it true that you believed that many of those injuries were caused by bullets passing through her rib cage?

A.    Yes.

Q.    And that these bullets may have hit one or more ribs at the same time.  That is, each bullet might have hit one or more ribs?

A.    That's correct.

Q.    And then the two girls, the only injuries they have are these injuries to their skulls, the shots at the base of their skulls.

A.    That's correct, yes.

1870

Q.    And those were very clearly not only fatal but very quickly fatal.

A.    Yes, likely.

Page 161

MR. BERRIGAN: That's all I had. Thank you, sir.

THE WITNESS: Thank you.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. Just a few questions, Dr. Klein. First of all, the stippling or soot, would you just describe for the jury the mechanism involved in the depositing of gunshot residue on a victim?

A. The mechanism is that once the weapon is fired, the bullet comes out the end of the muzzle, and then following that are the products of combustion. And if the weapon is held in contact with the person that's being shot or if it's held very close within, you know, an inch or two, black soot material is going to be deposited on that skin, and that's what it looks like. It looks like black charcoaly-type soot around the wound and can also sometimes be pushed in the wound a little bit and be found inside the wound.

When it's held a little bit further away, the soot particles do not make it to the wound. They sort of fall off, but some of the finer particles of partially burned gun powder

1871

can be projected out on to the skin, and they leave these little markings. And it's the person's skin that makes a reaction to these hot little particles that leaves those red marks known as stippling.

Q. Reaction to the skin.

A. That's right.

Q. And when the skin has all been decomposed, are you able to

Page 162

draw conclusions as to muzzle target distance?

A.   No.

Q.   So it would be sheer speculation on your part to say whether these were contact or near contact or distant shots.

A.   That's correct.

Q.   Scientifically speaking.

A.   That's right, and I don't comment on that in my report.

Q.   And that's important in your job is to not speculate but to draw what conclusions you can scientifically.

A.   That's correct.

Q.   Nevertheless, decomposition would be a serious effect on your ability to draw any conclusions one way or the other.

A.   Yes.

Q.   And these bodies were totally decomposed.

A.   Yes.

Q.   The ligatures are interesting; would you agree?

A.   Did you say they're interesting?

Q.   Yeah.

1872

A.   Yes, they're interesting.

Q.   We have a rope ligature on one and only one ankle of the adult male, rope ligatures unconnected on each of the two ankles of the female.  Are you able to -- well, let me ask you this.  I think most of us have seen CSI.  Can you look at stuff like that and reconstruct the crime?  Is that possible?

A.   Not from my understanding and training, no.

Q.   Okay.  And as much as they do employ some modern techniques, what we see on TV is unrealistic as to -- at least often as to what forensic science can actually conclude; fair statement?

Page 163

A.    Yes.

Q.    Nevertheless, the fact that one of the two ligatures on the ankles of Lori Duncan had not two but four loose ends, does that tell you anything, Doctor?

A.    I think it leads one to theorize that those other two ends likely went to other places, perhaps to other parts of her body or to another person.

Q.    Could be either.

A.    That's right.

Q.    Two of those loose ends could have looped around another person's ankle or another person's wrist or her own wrist.

A.    Those are all possibilities, yes.

Q.    Speculation speaking as a scientist.

A.    Right.   That'd be pure theory and speculation.

1873

Q.    What you can say is that from your findings of these four victims the two adults were bound and gagged.

A.    Yes.

Q.    And all four shot and killed.

A.    Yes.

          MR. MILLER:   Thank you.   I have no further redirect.

          THE COURT:   Mr. Berrigan, any recross?

          MR. BERRIGAN:   I'll be brief.

                    RECROSS-EXAMINATION

BY MR. BERRIGAN:

Q.    It is true that the duct tape was preserved for analysis by the DCI lab, was it not?

A.    Yes.

Q.    You're aware that they were going to try to match up the pieces, the ends of the pieces of the duct tape, to see if that

Page 164

came from a single roll; right?

A.   I would presume that they would likely do that.  I didn't specifically ask them to do that, though.

Q.   Okay.  But it was sent off for some type of testing purposes for the lab; right?

A.   That's right.

Q.   And as far as you know, no such thing was done with the rope.

A.   As far as I know, no.

MR. BERRIGAN:  Okay.  Thanks.

1874

THE COURT:  Mr. Miller, anything further?

MR. MILLER:  If I may, Your Honor, yes.

FURTHER REDIRECT EXAMINATION

BY MR. MILLER:

Q.   Just on that last subject, from -- are those ropes before you, sir?

A.   Yes, they are.

Q.   Okay.  And the conditions of the ends of those ropes is what, sir?

A.   They're frayed.

Q.   Badly frayed?

A.   Yes.

Q.   And show the considerable effects of time.

A.   That's correct.

MR. MILLER:  Thank you.  I have no further redirect, Your Honor.

THE COURT:  Mr. Berrigan, anything further?

MR. BERRIGAN:  No, nothing further, sir.

THE COURT:  Okay.  You may step down.
Page 165

Is the government ready to call its next witness, Your Honor?

MR. MILLER: Yes, Your Honor. Dr. Julia Goodin.

THE COURT: Everybody can take a stretch break.

JULIA GOODIN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Thank you. Please be seated. Make

1875

yourself comfortable. And please adjust the chair so that you can speak directly into the microphones. And you may adjust the microphones as well. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Julia Goodin, G-o-o-d-i-n.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Your occupation, Dr. Goodin?

A. I'm a forensic pathologist employed by the state of Iowa as the chief state medical examiner.

Q. You are Dr. Dennis Klein's superior.

A. Yes.

Q. And head of that office.

A. Yes.

Q. Would you briefly summarize for us your education and experience that brings you to the qualification to be Iowa's state medical examiner?

A. After going to college for four years in Kentucky, I went to the University of Kentucky Medical School. I received an M.D. degree.

Following that I did a residency in anatomic and

Page 166

clinical pathology at the University of -- or Vanderbilt Medical
Center in Nashville, Tennessee.

1876

Following that I did a fellowship in forensic
pathology at the Baltimore medical examiner's office. And I've
been practicing forensic pathology for about 15 or 16 years in
several states.
Q. We've heard about board certification. Are you board
certified as well?
A. I'm board certified in anatomic pathology, clinical
pathology, and forensic pathology.
Q. Would you just briefly describe your staff, your physical
plant, and the nature of the work that goes on there?
A. As the chief state medical examiner, I'm responsible for
the guidelines for 99 physician county medical examiners, and we
work in consultation with them. I run the central office where
we have a new facility in Ankeny right now, and I'm responsible
for the staffing and budgeting of that office. I have two other
forensic pathologists. Both Dennis Klein and Dr. Jerri McLemore
work with me, and then we have administrative persons, autopsy
technicians, and investigators.
Q. In addition to being head of that office and necessarily
something of an administrator, do you also do hands-on forensic
pathology, Doctor?
A. Yes, I also do autopsies as well.
Q. How many -- well, I won't ask you how many years, Doctor.
You've been -- you're an experienced forensic autopsy
pathologist; fair statement?

1877

Page 167

A.    Yes.

Q.    In the fall of the year 2000, was your office consulted by Cerro Gordo County to conduct a death investigation or, more specifically, five death investigations on skeletal remains recovered in that county?

A.    Yes.

Q.    The first involvement, as I understand it, was primarily through your deputy, Dr. Klein?

A.    Yes.

Q.    There was a fifth body recovered from a separate grave in November.  What was your first involvement in that matter, Doctor?

A.    My office received a call from the office in Cedar Rapids, the attorney general's office there, and spoke with John Kraemer, the director of forensic operations for my office.  And then he also spoke with J.D. Smith who was a DCI agent.  And they informed us that there was location of another body that had been partially found.  And we were invited to go to the scene and help with recovery of those remains and do a scene investigation.

Q.    We have already heard to some degree from Mr. Kraemer.  Was he the assistant that went with you and helped perform those functions at the scene?

A.    Yes, he was.

Q.    Following that, were the remains of the body recovered from

1878

that hole on Killdeer Avenue packaged, sealed, and sent to Des Moines for autopsy by yourself?

A.    We helped recover those remains at the scene, and then they

Page 168

were sealed by DCI agents, and then they were delivered to our office, and then once they were in our office, I performed the external examination of those remains.

Q.   Dr. Goodin, I'm handing you five photographs, and I've got them a little bit out of order, but they are marked Government Exhibits 1050, 1049, 1048, 1047, and 1007.  Do you recognize the general subject matter of those five photographs, ma'am?

A.   Yes.

Q.   What do they show in general?

A.   The photographs are -- there are two photographs of the body as it's still wrapped in sheets as it was received in the office and with paper bags and items.  The other photographs are of the items brought in with the body, part of the clothing and other items that were with and on the body at the time that we examined it.

Q.   You've described a few minutes ago the fact that you commenced with an external examination.  Perhaps you were referring to the body itself, but before even doing that, I assume you do some examination of the container and the clothing and personal effects that arrive with the body?

A.   In this particular case, it's a little different because the body's skeletonized and in pieces, and we had wrapped

1879

different sections of the body in sheets.  And so I examined those different pieces that came in that were wrapped up in sheets, and also part of them were contained in paper bags.

Q.   Okay.  And I may have been misspeaking a little bit.  In the examination autopsy per se, there's nothing but internal because there's nothing but skeleton; right?

A.   Right.  We usually refer to the internal examination when

Page 169

we dissect all the organs, but in this case there were no organs to dissect.

Q. Before doing an examination of the skeletal remains, did you examine the clothing, personal effects, and any other artifacts that were associated with the body?

A. Yes, and part of them were recovered within the same sheet that was wrapped around part of the bones because it was clothing and it was still about part of the bones.

Q. And you noted that at the scene itself, I trust.

A. Yes.

Q. We've already heard quite a bit about the scene. The contents of that grave were forwarded with the skeletal remains and examined by you further in Des Moines.

A. Yes.

Q. And as to the clothing and personal effects associated with this body, do the five photographs before you show them the way they appeared upon arrival at the morgue?

A. Part of them as they were on arrival, and some of the

1880

photographs also show them after we washed them and cleaned them up a little bit.

Q. And spread them out so that you could document them photographically.

A. Yes.

Q. And just to repeat, as a scientist, you do your documentation with notes, with diagrams, and with photographs.

A. Yes.

Q. Again, I assume in each case you don't spare the film but take as many photographs as will help you document everything possible in connection with the autopsy.

Page 170

A.   Yes.

Q.   What we have before you is a small fraction of the photography that was done at this autopsy; is that a fair statement?

A.   That's correct.

Q.   Okay.  But first with regard to the ones that are before you, do Exhibits 1050, 1049, 1048, 1047, and I believe it's 1007 show the clothing and personal effects that was recovered with this exhumation with the understanding that some of them had been cleaned up so that you can view them better?

A.   Yes.

       MR. MILLER:  Government offers in evidence Exhibits 1050, 1049, 1048, 1047, and 1007.

                            *   *   *   *

1881

       (Government Exhibits 1007, 1047, 1048, 1049, 1050 were offered.)

                            *   *   *   *

       MR. STOWERS:  No objection.

       THE COURT:  Government's Exhibits 1050, 1049, 1048, 1047, and 1007 are admitted.

                            *   *   *   *

       (Government Exhibits 1007, 1047, 1048, 1049, 1050 were admitted.)

                            *   *   *   *

       MR. MILLER:  I wanted to be sure I got those numbers right.  I was doing them backwards.  I think it will make more sense to the jury, however, if we display them in that order, and I'll ask the Court's permission and counsel's assistance in doing so.

Page 171

THE COURT: You may.

BY MR. MILLER:

Q.   Please describe for the jury first the -- what they observe in Exhibit 1050.

A.   1050 is a photograph that shows the -- as you can see, the sheet is still wrapped around the body parts, and there are two paper bags that contain part of the items, and you can see one of the boots in that photograph as well.

Q.   Moving on to 1049.

A.   In 1049, again you can see the two paper bags that came in

1882

with the body containing some of the items as well as the boot, and again you can see the sheets that's wrapped around part of the body parts.

Q.   1048?

A.   1048 is a photograph that shows the personal items once we've cleaned them up and sorted them and put them on a board for photographing.  And it shows the items of clothing that were on the body.  It includes the two boots, the underwear, socks, two plastic baggies that were with the body, and part of the jeans and part of the hair.

Q.   Okay.  Where is the hair in that photograph?

A.   This is the hair.

Q.   Was there anything in particular noted if you recall about the hair style?

A.   As I described in the autopsy report, there's a braid.  I think you can actually see it here.  There's a braid and it had a little green rubberband about it.

Q.   1047, please, shows what?

A.   1047 shows the cigarette -- the package of Marlboros, some

Page 172

of the butts that remained, the coins, the broken cigarette lighter, a pair of nail clippers, the belt buckle and belt and fragments of what look like the remains of a pair of blue jeans.

Q.   And describe for us again briefly how it happens that one ends up merely with the pockets and not the rest of the garment.

A.   I'm referring to this item, and you can see the two pockets

1883

and probably part of the zipper here.  Probably the blue jeans are made of cotton, and that would disintegrate much faster than something that might have been a little bit of synthetic to it, so I'm assuming those pockets might have some synthetic fiber to them that would last longer than the blue jeans themselves.

Q.   Natural fibers tend to disintegrate faster?

A.   Yes.

Q.   Are there coins also in the picture?

A.   Yes, there are.

Q.   What was their condition if you recall?

A.   They were starting to sort of corrode.  They were covered with some discoloration, some dirt.

Q.   A cigarette lighter in the photograph?

A.   The cigarette lighter is right here.

Q.   What was its condition?

A.   It's broken.

Q.   It was broken?

A.   Yes.

Q.   And finally Exhibit 1007?

A.   Photograph 1007 is a close-up that's taken of the pair of underwear, and in the band of the underwear the name of the deceased was actually written in ink, and that would be on this label right here, and it has "DeGeus, Terry" written there.

Page 173

MR. MILLER:  And I'll ask counsel to focus in on that so it's more easily visible to the jury.

1884

Q.    The word DeGeus appeared there or was visible to you upon examination?

A.    Yes.

Q.    Thank you.  Doctor, you've mentioned that some fibers, those that are natural, tend to disintegrate far faster than others.  Is it unusual in a situation like this to find some garments wholly preserved and others totally disintegrated and yet others partially?

A.    No, that's pretty common.

Q.    Having now just shown you an exhibit marked as Government Exhibit 1000, do you recognize that garment?

A.    Yes.

Q.    What is it?

A.    It's the -- I described it as either a dark blue or black sweatshirt that was found with the body up about the head and over the arms.

Q.    Now, is it the sweatshirt you recovered from the remains from state medical examiner case 115 -- 0011 -- 135?

A.    Yes, it is, 135.

Q.    And just so we can go ahead and jump ahead and make that clear, was a positive identification made of who 135 was?

A.    Yes, it was.

Q.    And through what means, and what was the identification?

A.    The identification was confirmed by comparing pre and postmortem dental X-rays and examination of the teeth by a

1885

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1649 of 3592

forensic odontologist, Dr. John Frasco.

Q.    And the identity was?

A.    That of Terry Scott DeGeus.

Q.    Now, the garment itself in Exhibit 1000 appears today mounted on a cardboard frame.  It has a brown paper bag with scientist notations or initials at least and case number on it and is totally encased in plastic.  With those changes noted, is it substantially in the condition as it was when you removed it from the body of Terry DeGeus?  I assume perhaps it's a little cleaner now as well.

A.    Well, we actually washed it, but yes, it's as it was.

MR. MILLER:  Government offers Exhibit 1000.

*   *   *   *

(Government Exhibit 1000 was offered.)

*   *   *   *

MR. STOWERS:  No objection.

THE COURT:  1000 is received.

*   *   *   *

(Government Exhibit 1000 was admitted.)

*   *   *   *

MR. MILLER:  And with the Court's permission, I would request permission to publish it to the jury at this time simply by walking it before the jury box.

THE COURT:  That's fine.

BY MR. MILLER:

1886

Q.    What was the general procedure at that point after removing the clothing and personal effects, Dr. Goodin?

A.    As I mentioned, we tried to clean all the items up, and then we took each of the bones and tried to clean the bones up

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1650 of 3592

and put them into anatomical position to sort through them and
see where the injuries were.

Q.   Did you ultimately arrive at some conclusion as to the
location of injury or injuries on the skeleton in question?

A.   Yes.

Q.   Please describe.

A.   There were several injuries.  There were gunshot wounds.
The skull was in multiple pieces and obviously had had a gunshot
wound to the skull which fragmented it.  There was another
injury to the anterior portion or the front portion of the third
thoracic vertebra.  That's one of the little bones that makes up
the vertebral column in the chest.  So there was an injury there
consistent with a gunshot wound.  There was also an injury to
the left ilium or the top part of the left hip again consistent
with a gunshot wound.  And the left humerus or the bone in your
left upper arm was fractured into three pieces.  Again, that was
consistent with a gunshot wound.

Q.   All four of the areas of trauma you've described were
consistent with gunshot wounds?

A.   Yes.

Q.   In the course of your examination, did you make any effort

1887

to locate any firearm components, any lead projectiles or
bullets?

A.   Yes.

Q.   Please describe what you did and what, if any, results you
had in those efforts.

A.   One of the things we did was we X-rayed the bones, and on
some of the bone fragments, especially in the arm, you could see
tiny little pieces of metal.  We couldn't really recover those.

Page 176

They're too small. But that was further proof it was due to a gunshot wound, the injury.

In addition to that, I found a piece of metal with some copper staining near the right temporal bone which was fractured, and then there was also a deformed copper jacket that I recovered from within the sweatshirt that was about the head and arms.

Q. The actual fragments of metal that you recovered were from inside the head and from where else, ma'am?

A. Inside the sweatshirt.

Q. And inside the sweatshirt. What was done with those? Did you recover them?

A. Yes, and they were given to the DCI agents.

Q. So they went from you to the possession of the DCI laboratory for further examination?

A. Yes.

Q. The process of analyzing skeletonized remains we understand

1888

is at least to some degree also an area of a subspecialty.

A. Correct.

Q. Known as forensic anthropology.

A. Correct.

Q. And explain to us -- I assume in your business and in running an office of a state medical examiner it's necessary for you to call upon many different fields of expertise to assist you in doing state-of-the-art death examinations.

A. That is correct.

Q. You've already mentioned forensic odontology.

A. Yes.

Q. Forensic anthropology is yet another one.

Page 177

A.   Yes.

Q.   And at the time in 2000 did the state medical examiner have a forensic anthropologist with whom it contracted for such services?

A.   Yes, we did.

Q.   And who was that?

A.   Dawnie Steadman was our forensic anthropologist who was on contract with us at the time.

Q.   She was particularly accessible to your office back in 2000; is that correct?

A.   That's correct.

Q.   And why was that so?

A.   She was in the state at the time.

1889

Q.   She was on the staff of Iowa State University?

A.   Yes, she was.

Q.   Since then has she had a change in her professional and academic career?

A.   Yes, she's moved on to New York.

Q.   She's teaching at a university in New York now.

A.   Yes.

Q.   Nevertheless, was it she to whom you referred questions involving forensic anthropology in the year 2000?

A.   Yes, we asked her to look at the skeletons in this case.

Q.   Not only the four that were examined by Dr. Steadman -- excuse me, by Dr. Klein but also SME00135 identified as Terry DeGeus that you autopsied.

A.   That's correct.

Q.   Okay.  Before we get to that, did you nevertheless independently also by consultation with Dr. Steadman arrive at a

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1653 of 3592

professional conclusion as to the cause and manner of death in this case?

A.   Yes, I did.

Q.   And what were those conclusions?

A.   The cause of death in this case is multiple gunshot wounds, and the manner of death is homicide.

          MR. MILLER:  Thank you, ma'am.  I have no further direct.

          THE COURT:  Mr. Stowers?

1890

                    CROSS-EXAMINATION

BY MR. STOWERS:

Q.   Good afternoon.  One of the items that you indicated you recovered was depicted in a photograph, and I was writing but not writing fast enough, and it was the spread of the items that you recovered from Mr. DeGeus.  Can you locate the photograph with the baggies if you would?

A.   The ones that have the baggies?

Q.   Yes.

A.   1048.

Q.   Okay.  Let me just show that to the jury.  Are those the baggies in the -- there we go.  Are those the baggies in the right portion of that picture there?

A.   Yes.

Q.   Okay.  Did you determine whether or not those baggies were open or closed at the time of your review of them?

A.   I'm afraid I didn't make notation.  I did describe what was inside them.

Q.   Okay.  And can you tell the jury what you observed on the inside of those baggies, if anything?
          Page 179

A.   I think I described it as green -- a green brown substance. It was like semi-solid at the time.

Q.   Was it analyzed in any way to your knowledge?

A.   I don't know that.

Q.   And are you familiar enough with controlled substances to

1891

know whether or not the way that contents of those baggies appeared that that may have been a controlled substance that had over the course of time decomposed into the form in which you found it?

A.   Yes.

Q.   Do you think it was a controlled substance?

A.   I don't know.

Q.   Just so that it's clear, with regard to the remains of Mr. DeGeus, there was no duct tape that you encountered during your review of those remains; is that correct?

A.   No duct tape was found.

Q.   And there was no rope or anything that appeared to have been used to restrain Mr. DeGeus?

A.   I did not identify any ligatures or rope that appeared to have been used as a restraint.

Q.   And you've identified the skull as having been fractured by a bullet, is that correct, one or more bullets?

A.   It's consistent with, yes, a gunshot wound.

Q.   And I take it that when a bullet enters a person's head from your experience that can cause not only a small hole, particularly at the entry point, but also a larger exit wound; is that correct?

A.   It can, yes.

Q.   And that can cause a fracturing of the skull in a much

Page 180

larger area than just the tiny bullet might itself create.

1892

A.    Yes.

Q.    And that's the nature of the human body that allows for that, and that's also the nature of the force of a bullet passing through a body; is that correct?

A.    Yes, it's the kinetic energy that causes the skull to break.

Q.    And the other thing that happens sometimes when a bullet strikes bone is the bullet will fracture itself and spread into more than one piece; is that correct?

A.    That is correct.

Q.    And then those individual pieces will pass through the individual who's been shot, and they will make contact perhaps with other bone; is that right?

A.    That can happen.

Q.    And were you able to determine based on your review whether Mr. DeGeus was shot once or more than once in the head?

A.    I could not tell that.

Q.    And you could say that he was shot one time for certain.

A.    Yes, one time for certain, but I'm not sure beyond that.

Q.    Is there any indications in your review of the remains of Mr. DeGeus that he'd been shot with a large clip of 9-millimeter bullets, perhaps 30 bullets, at close range?

A.    He has multiple gunshot wounds that we identified in the skeletal remains.  Of course, if he had additional soft tissue injuries, bullets that may have gone through parts of his body

1893

Page 181

without hitting skeletal or bones, he could have had other gunshot wounds. I certainly can't rule that out.

Q. Sure. But you had no indications based on what you were able to observe in your work that he'd been shot anywhere up to 30 times at close range, did you?

A. I couldn't -- I don't know about that. I mean, I have no evidence of that.

Q. Right. What you found is indications of four bullet-related injuries; is that correct?

A. That's correct.

MR. STOWERS: Thank you. That's all I have.

THE COURT: Mr. Miller, any redirect?

MR. MILLER: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. From an examination of skeletonized remains alone, can you come up with a maximum number of bullets that a person was struck with?

A. No. As I said, if he had soft tissue injury that just went through muscle or even through organs or through his abdominal cavity, I would have no evidence of those gunshots at this point.

Q. You can't know how many times for sure a person was shot viewing a skeleton alone.

A. No, not at all.

1894

Q. Other than being able to give possibly a minimum number.

A. Correct.

MR. MILLER: Thank you. I have no further redirect.

MR. STOWERS: Nothing further.

Page 182

THE COURT: You may step down. Thank you.

MR. MILLER: May it please Court. Your Honor, we have one additional witness who I believe has arrived.

THE COURT: How lengthy will that witness be?

MR. MILLER: Possibly half an hour.

THE COURT: Okay. Why don't we go ahead and take a recess until 3:10. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated for a minute. I want to try and make sure I understand the timing because I think maybe it's changed a little bit from what we talked about this morning even maybe. When does the government think that they're going to rest? Is it tomorrow now?

MR. MILLER: Tomorrow, yes. We have Dr. Steadman who took, as I recall, the better part of half a day, possibly less, and -- probably less, maybe a two-hour direct examination. And then we also have Mr. Murillo which is 30 to 45 minutes. So I should suspect before noon tomorrow we would be resting the government's case. And I do apologize for the lack of filling today up. The biggest part of that problem was the fact that Dr. Steadman unexpectedly had a sudden death of a grandparent

1895

and had to travel to Arizona and is working very hard to travel from there to New York back to here today.

THE COURT: Will Dr. Steadman be here for sure to testify tomorrow?

MR. MILLER: She's scheduled to be arriving at the airport this evening, and I will pick her up, meet with her, and make sure she's available first thing in the morning.

THE COURT: The reason -- here's the reason why I'm

Page 183

asking. If we're not going to be meeting on Thursday, I wanted to give the jurors a heads-up. On the other hand, I didn't want to false alarm and say we're not going to be meeting on Thursday and then tomorrow find out that we are going to be meeting on Thursday. Does the defense have any more information on whether or not you're going to be putting on any affirmative evidence? And if you do, how long it might take?

MR. BERRIGAN: If we have any evidence, it will be a single witness, Your Honor. Unfortunately, I won't know that until late this evening or early tomorrow morning. But we'll certainly know by tomorrow morning at 7:30 or 8:00.

THE COURT: Okay. Let me solicit the views from the lawyers on whether I should give the jury a heads-up that maybe it should be a qualified we may now finish tomorrow.

MR. BERRIGAN: I think it's -- even if we have this witness, there's no question that we'll finish tomorrow if the government's going to finish as soon as they think.

1896

THE COURT: Would you want to do preliminary instructions and we could probably get through the government's opening closing argument tomorrow and then come back Thursday for the defense closing argument and the government rebuttal? We've got the jury instructions pretty much ready to go.

MR. MILLER: Your Honor, we've done a first draft. It will be helpful in order to be prepared to do all of those things by --

THE COURT: Would you rather just stick with the plan of doing closing arguments on Monday?

MR. MILLER: That'd be my preference, although I certainly can do the other --

Page 184

MR. BERRIGAN: I think from a preparation standpoint, I know that the attorneys -- I know Mr. Willett would certainly appreciate the weekend. Mr. Miller might be ready to go, but we're not, and we're not embarrassed to say that. So if you're willing, Your Honor --

THE COURT: Oh, sure.

MR. BERRIGAN: Obviously if you want to do it on Thursday, we'll be ready.

THE COURT: No, I'm not going to rush you.

MR. BERRIGAN: Our very strong preference would be Monday.

THE COURT: It's too important to rush the lawyers. You've put in far too much time and energy to be rushed by my

1897

schedule.

MR. BERRIGAN: We are way ahead of where we thought would be even though we are wasting some time here.

THE COURT: It's not really that so much. Here's really my concern. It's not the delay at all. It's that things can happen with the jury, particularly if they go back to work on Thursdays which some of them may feel compelled to do, so I'm kind of caught in that conundrum and trying to avoid past problems, but that's my only concern.

MR. WILLIAMS: What I might suggest, Your Honor, particularly in light of the input from one of the jurors this week, is particularly strongly worded admonition to the jurors alerting them to the possibility that over an extended period of time they might get exposed to that and stay away from it.

THE COURT: Defense has any problem with that?

MR. BERRIGAN: Not at all, sir.

Page 185

THE COURT: Okay. So I think when we finish today, I will give them the heads-up that we will not be going on Thursday, and I can -- I'll probably just wait and give them the admonition tomorrow at the end of the day. Okay? But I would like to give them the heads-up because they have lives to plan too just like we all do; okay? Thank you.

MR. WILLIAMS: Very good.

THE COURT: We'll be in recess.

(Recess at 2:43 p.m.)

1898

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Your Honor, just to give you a heads-up, we are going to recall Mr. Basler next for a very short, minute issue.

THE COURT: Okay.

MR. WILLIAMS: And then we'll be ready to go with the next witness.

THE COURT: Okay. That's fine.

MR. STOWERS: Your Honor, I believe there is an issue with Mr. Basler's testimony.

THE COURT: What would that be? Why don't we be seated.

MR. STOWERS: I'm sorry.

THE COURT: You know, why didn't you tell me earlier if we've got an issue?

MR. STOWERS: Because I just found out five minutes ago --

THE COURT: What's the issue then? Well, we could have resolved it five minutes ago and I wouldn't have to keep the jury waiting. I've told you that time and time again.

Page 186

MR. STOWERS:  Right.

THE COURT:  Why do you say "right" with such a smart ass look on your face for?

MR. STOWERS:  I don't mean it that way.

THE COURT:  That's how it comes across.

1899

MR. STOWERS:  I don't mean it that way.

THE COURT:  Okay.  What's your objection?

MR. STOWERS:  The objection is apparently Agent Basler now is going to testify -- we were told they weren't going to recall him at all.

THE COURT:  Okay.

MR. STOWERS:  Okay.  He's apparently now going to testify that the location -- the Lark Avenue location was in a different condition particularly with regard to this access road back in 1993 than it appears in the 2000 photographs.  The basis for that is not any personal knowledge other than what he's gained through investigation in talking to the property owner. And one of the key things that's come out in the evidence is that this road went up, terminated or accessed the field and essentially terminated there.  Apparently he would testify that the road apparently in the past may have gone all the way down to the area where these bodies were found which we think is a substantial piece of evidence that we're not willing to allow in, but his basis for this is hearsay.  He doesn't have any personal knowledge.

THE COURT:  Yeah.  How is it that -- you know, you can call the property owner if you want, but how is it that Agent Basler has any personal knowledge?

MR. WILLIAMS:  He has personal knowledge from

Page 187

observation of the location itself, Your Honor.  We would not

1900

have him testify as to what the property owner told him.  But you -- when you walk there as Mr. Basler's done many, many times and closely examined the terrain where this occurred, you can tell both because of the location of the mature trees down a path and because of the dip in the ground and the old tracks going through there that there was another road that passed right by where the grave was.  And so he would testify from his own personal observations of the location that there is clearly an abandoned road that drove by the site.  He's not going to testify as to whether the other access road was there or not in '93, but he'll testify --

THE COURT:  But he can't testify as to what condition the road was in in '93.  He doesn't have any knowledge of that. Does he?

MR. WILLIAMS:  No, no.  I'm not suggesting he does. He can testify from the year 2000 when he looked at that site you can tell --

THE COURT:  That it appeared that there was --

MR. WILLIAMS:  An old road.  There's still tracks going back through this area, rudded tracks down this path.

THE COURT:  And he's testifying to his own observation.

MR. WILLIAMS:  Personal observations.

THE COURT:  But he's not going to give an opinion as to the condition of the road in 1993.

1901

MR. WILLIAMS:  He's going to say from his inspection
Page 188

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1663 of 3592

in the year 2000 he can tell that there used to be a road going through there.  There are still tracks there.  There are mature trees that go in a path, and from his personal observations there appears to be a road.  He doesn't know how long it's been there.  You know, obviously there's mature trees on either side of the path, but he can't say whether it was there in '93 or not.

THE COURT:  What's your objection now?

MR. STOWERS:  Well, to that I believe we're into an area of speculation at this point.

THE COURT:  I think a layperson can give their opinion about a road.

MR. STOWERS:  Right.  As to whether or not it was there in '93 based on looking at it in 2000.

THE COURT:  Yeah.  You can't give that opinion.

MR. STOWERS:  Right.

THE COURT:  Yeah.

MR. STOWERS:  Only thing I can say, I've been out there; I looked at the site.  It didn't look like a road to me.  I'm not a witness in this case, so what I have to say doesn't matter.

THE COURT:  Maybe you'll be called in rebuttal.

MR. STOWERS:  It doesn't look like a road to me.  It looks like an area in the woods that's a little bit clearer than

1902

other areas adjacent to the field.  But if he thinks there was a road there some time in the past unable to date that I think it's into an area of speculation at this point.

THE COURT:  I mean, you run into some relevancy problems because he's not able to say what the condition of the

Page 189

road was in '93.

MR. WILLIAMS: Yeah. I mean, frankly, we could call the farmer in and do that. It'd just -- I don't want to go to -- obviously I don't want to delay the trial any more. We're responding to speculation, frankly, that the defense had Dr. Klein engage in concerning whether they would have had to walk and so forth. And that's what invited this response.

As a practical matter, we do know from the farmer that that road that exists on these photographs was never there in 1993, and we do know from talking to the farmer that, in fact, the road -- the only road that existed in 1993 drove right by where the grave sites are. So -- but that obviously is hearsay, and that's not something that Mr. Basler can testify to from his own personal knowledge, and I wouldn't have him do that, but we have a factual -- a good-faith factual basis as a prosecutor to know that there's a basis for this testimony in addition to his own observations.

THE COURT: Well, they're really separate. I mean, his observations are totally separate from whether there's a factual basis that there was a road there in '93 or not.

1903

MR. WILLIAMS: They are.

THE COURT: You know that. I mean, you apparently know that from having had the farmer interviewed, but that's really a totally separate issue from whether or not he can give his opinion that he thinks there's the remnants of a road there.

MR. WILLIAMS: It is. And it's only for my own ethics that I'm not putting somebody up just to speculate about something.

THE COURT: Oh, I see what you mean. I understand

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1665 of 3592

now. I understand, right, right. Well, I'm going to allow it as long as he doesn't give his opinion about what the condition was in '93 based on what he knows from the farmer; okay?

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Ready to call your next witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls Bill Basler.

WILLIAM BASLER, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Basler, if you would just remind the jury your position in this case is what?

1904

A. I was assigned as the lead investigator, the case agent, representing the Division of Criminal Investigation.

Q. We've heard testimony from J.D. Smith that another team was actually assigned to recover the bodies from the Lark Avenue site, that being the bodies of Greg Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan. Were you part of any team that was involved in the recovery of the remains from that site?

A. No, I was not.

Q. Nevertheless, since the body recovery, have you become familiar with that Lark Avenue site?

A. I'm very familiar with it.

Q. And how many times have you been out to that Lark Avenue site?

Page 191

A.    Oh, many, many times.

Q.    As a result of your investigation, have you studied the terrain of that site on several occasions?

A.    Yes.

Q.    And based on your own personal observations of that site, what, if anything, have you noticed about the site concerning where other vehicles have passed or have travelled in the past?

A.    I noticed that near the site of the grave there was an area that appeared to have been driven on numerous times at some point in the past.

Q.    Mr. Basler, I've handed you two exhibits, one of which has already been admitted into evidence, Exhibit 406B.  Do you

1905

recognize that, sir?

A.    Yes, I do.

Q.    And what is that?

A.    This is an aerial photograph of the vicinity near Lark Avenue where the four bodies were recovered.

Q.    And using 406B, would that aid you in explaining to the jury based on your own personal observations of that location where there's evidence of vehicles traveling in the past?

A.    Yes.

        MR. WILLIAMS:  Permission to publish, Your Honor?

        THE COURT:  You may.

BY MR. WILLIAMS:

Q.    And, Mr. Basler, what I'm going to do is rotate this so the orientation is north at the top of the photograph.  And using the pen, could you explain to the jury based on your own observations of the terrain there where you have seen a location of a road?

Page 192

A.   There appeared to be not so much a road but a path where vehicles had travelled numerous times approximately in -- woops. I'm struggling here.  Bear with me.  I'm not quite sure why that mark on the right-hand side is there, but the area that starts nearest Lark Avenue and continues up past the grave site to the farm field.

Q.   Is there a -- we've already heard testimony that there's a number of trees in this area.  Are some of those mature trees,

1906

some of those immature trees and brush?

A.   Yes.

Q.   And was there a pattern that you also observed in your observations of that terrain indicating a location of mature trees and otherwise brush area?

A.   Yes.

Q.   I also have in front of you Exhibit 449.  Could you describe for the jury what that is.

A.   Yes, I can.

Q.   And what is that?

A.   I believe this is a panoramic view taken from the site of the grave that gives you a 360 view all around the grave shooting in all directions.

Q.   So we're clear, this is a panoramic view that was taken not in 1993 but in the year 2001?

A.   Yes, that's true.

        MR. WILLIAMS:  United States would move to admit Exhibit 449, Your Honor.

                            *   *   *   *

        (Government Exhibit 449 was offered.)

                            *   *   *   *
                        Page 193

MR. STOWERS: No objection.

THE COURT: 449 is received.

* * * *

(Government Exhibit 449 was admitted.)

1907

* * * *

MR. WILLIAMS: And permission to publish, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Showing, first of all, on the screen there -- and let me orient. Could you, first of all, describe what the jury's looking at there and orient them if you would.

A. Yes. We're looking from the approximate vicinity of the grave looking approximately southwest. You see a vehicle parked in the background. That vehicle is actually parked on Lark Avenue.

Q. And again, using this, could you describe for the jury what direction they're looking at now?

A. Looking approximately south, you can see the railroad tracks in the back portion of the photograph.

Q. And from this location based again on your observations of the terrain there, where was there indication of prior vehicle travel?

A. Again, we're standing near the grave site itself, and there was evidence that vehicles had travelled numerous times approximately through this area.

Q. Now, in this photograph it appears that there is tall grass back in the background but also very short grass. Could you explain how there happened to be short grass in that area?

A. Yes. When we first got there -- again, this is in the

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1669 of 3592

summer of 2001 -- the grass was all the size of the tall grass that you see in the background. We had the county engineers come in with a mower mounted on a tractor and mow that area down for us.

Q. So I want to go back and take the jury around to a different location. Could you explain what they're looking at at this point?

A. Yes. We're looking again from the area of the grave looking north.

Q. And in what direction then did you observe evidence of vehicle traffic in the past?

A. Well, you could see it throughout this area. The -- I won't call it a road but the pathway, if you will, where vehicles appeared to have driven in the past was most evident in that general vicinity of the grave. There was still ruts in the ground that were noticeable, and we also found that the ground in that particular area where it appeared that vehicles had driven was more compacted. It was harder to dig than the other ground in that area.

Q. Were there mature trees in the path of where you saw the ruts?

A. No, there weren't.

Q. Were there mature trees on either side of where you found the ruts indicating a prior path?

A. Yes.

Q. And just so we're very clear, Mr. Basler, are you able to

tell this jury what this site looked like in 1993?

A.   No, I had never been at that location in 1993.

Q.   Are you simply indicating what your observations were in the year 2001 as to evidence you observed of a path used some time in the past?

A.   Yes.

Q.   Could have been two years before; could have been ten years before, and you aren't in a position to really indicate to this jury one way or the other.

A.   No, I don't know when that driven path was made.  I just am stating that I observed it.

MR. WILLIAMS:  No further questions.

THE COURT:  Mr. Stowers?

CROSS-EXAMINATION

BY MR. STOWERS:

Q.   Agent Basler, I'm trying to put up in front of you here Exhibit Number 406B.  At the bottom of that, is that Lark Avenue?

A.   Yes, sir, it is.

Q.   I don't know what I've done here to --

THE COURT:  Does it have plastic over it?

MR. STOWERS:  Yeah.

THE COURT:  Yeah, I think -- can you take it out of the plastic?

1910

MR. STOWERS:  Yeah, that's it.

THE COURT:  I think it will work better -- I think the light reflects off the plastic.

MR. STOWERS:  Thank you, Your Honor.  I think that helps some.

Page 196

BY MR. STOWERS:

Q. All right. There we go. Exhibit 406B is now being displayed up there poorly, but can you see -- first of all, Exhibit 406B you know to be the photograph that would have been taken during the time that the remains of the four people were being recovered; isn't that true?

A. That's my understanding.

Q. And you can see at the top of that 406B which I'm scrolling to, you can see those vehicles there parked in the field that apparently had already been harvested; right?

A. Yes.

Q. And that tells you that's from October of 2000 when the remains were being recovered; right?

A. Yes.

Q. And do you see what appear to be tire tracks of vehicles all over that ground there, sir?

A. Yes, I do.

Q. Okay. All through the area that you're talking about; is that right? All through the area?

A. I'm not sure what area that I'm talking about.

1911

Q. Well, show the jury where you see some tire tracks in there.

A. I see tire tracks in this area, and it appears to be tire tracks in this area as well.

Q. Now, you weren't there in 2000, and now I've -- if you could clear that. You weren't there in the year 2000; is that correct? You weren't at that location.

A. No, that's not correct.

Q. Well, were you there at the time the remains were

Page 197

Q. recovered?

A. No. You asked if I was there in the year 2000, and I certainly was.

Q. Okay. You were there in the year 2000 after the remains were recovered.

A. That's right.

Q. Some point later in the year.

A. Yes, after the bodies were recovered was the first time that I actually was there.

Q. Now I'm showing you 449 which is what's been called a panoramic photograph. Do you know when that was taken?

A. I believe it was taken in 2001.

Q. Would that have been taken in connection with some follow-up investigation that you were doing at that location?

A. No. It was done as a follow-up for our ongoing investigation into these murders.

1912

Q. Well, that's what I'm saying. You were out there -- was that when you were looking for shell casings?

A. No.

Q. Okay. What were you looking for out there at that time?

A. We were out there to take this 360 panoramic view, I believe.

Q. Okay. And you can see there's a number of mature trees lining the edge of this field; is that correct?

A. I'm not certain which direction we're looking here, but there obviously are mature trees there, yes.

Q. And there's an area of the woods there if you go back -- let me go back to the other photograph. We're now looking again at 406B. And you can see Lark Avenue at the bottom; is that

Page 198

correct?

A. Yes. Is that back in the sleeve again?

Q. I'm sorry?

A. Is that back in the sleeve? There's a lot of reflection.

Q. No, actually it's not. So I don't know why we're having that problem.

A. I'm sorry. I don't remember what you asked me.

Q. Lark Avenue is at the bottom there.

A. Yes, it is.

Q. And you can see that there's a wide band of trees there adjacent to that creek that one of the other witnesses identified by a creek name. I'm not sure what the name of the

1913

creek was.

A. Yes, there are trees there.

Q. And that creek actually flows underneath Lark Avenue, and then it goes up and to the left in that photograph, although it's very difficult to see in that photo; isn't that right?

A. It is hard to see it, but it does generally flow underneath the road and kind of off in that direction.

MR. STOWERS: That's all I have. Thank you.

MR. WILLIAMS: Nothing else, Your Honor.

THE COURT: Okay. You may step down.

Ready to call your next witness?

MR. MILLER: Your Honor, the United States calls Frank Tarasi.

FRANK TARASI, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated. Make yourself comfortable. Please adjust the chair and the microphones so you can speak directly into the microphones. And when you're ready,

Page 199

would you state your full name, please, and spell your last name.

THE WITNESS: My name is Frank L. Tarasi the Third. Last name spelling, T-a-r-a-s-i.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

1914

Q. Your occupation, Mr. Tarasi?

A. I am employed as a criminalist by the DCI crime laboratory.

Q. Are you a colleague of Deb Davis, Paul Bush, and I forget who else we talked to earlier in this case?

A. Gary Licht, Dennis Chapman. Yes.

Q. Very good. And have been for how many years, sir?

A. I have been employed with the DCI crime laboratory since August of 1982.

Q. We've heard that it is divided into a number of different sections. With which section or sections are you affiliated, sir?

A. I am affiliated right now with the latent print, footwear, and tire track section as well as all criminalists in the laboratory are on rotational crime scene.

Q. Briefly describe your formal education for us, sir, before actually entering into this field.

A. I have a bachelor of science degree in chemistry that was received in May of 1980 from Clarion State College in Clarion, Pennsylvania. I have a master of science degree in the field of forensic chemistry which is the field of criminalistics. That was received from the University of Pittsburgh in Pittsburgh,

Page 200

Pennsylvania. That was received in August of 1981. I have received extensive training by the Division of Criminal Investigation as well as by the Federal Bureau of Investigation in various aspects of fingerprints, footwear, tire track, and

1915

crime scene examination.

Q. And that last area is your area of particular expertise, I take it.

A. That's my current area, yes.

Q. And how long have you been specializing in fingerprint and related work?

A. Over 20 years now.

Q. Is there a test certification procedure for qualifying as a fingerprint expert, sir?

A. Yes, there is.

Q. Have you gone through that procedure?

A. Yes, I have.

Q. And did you pass?

A. Yes, I did.

Q. You've been certified how long, sir?

A. Took the test in 1984 I believe it was, so over 20 years.

Q. Any idea approximately how many people worldwide are test certified?

A. There are approximately 700 test-certified latent print examiners in the world.

Q. Agent Tarasi, whether you're a member of the fingerprint section of the laboratory or any of a number of other sections of the laboratory, is there a task common to criminalists that goes by the general term fracture matching?

A. Yes, there is.

Page 201

Q. Please describe that for us.

A. Fracture match comparison is an attempt to place two items back together such as a jigsaw puzzle where you take the edges of -- if it's a piece of paper, a piece of glass, piece of wood, piece of plastic, whatever it may be, and you try to place the two objects back together as you would two pieces of a jigsaw puzzle to see if at one time these two items were, in fact, originally one piece.

Q. Did you do such work in connection with the Greg Nicholson, Lori Duncan, Kandi Duncan, and Lori (sic) Duncan and Terry DeGeus death investigation, sir?

A. I had some tape from the four individuals that I did a fracture match comparison on.

Q. I hope I didn't misspeak. Greg Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Greg Nicholson (sic). Five death investigations arising out of Cerro Gordo County in autumn of the year 2000?

A. Yes, sir.

Q. I've handed you two exhibits marked Government Exhibit 500 and Government Exhibit 600; is that correct?

A. Yes, you did.

Q. Do you recognize those, sir?

A. Yes, I do.

Q. What are they?

A. Government's Exhibit 500 is Laboratory Exhibit B as in boy,

B as in boy which is four pieces of what is called cloth tape, commonly referred to as duct tape. There is also a piece of

green material that was stuck to the tape when I originally examined it.

Government Exhibit 600 is Laboratory Exhibit B as in boy, C as in Charles which was originally two pieces of gray cloth tape also with a green piece of material stuck to the tape when it was originally received by me.

Q. What, if any, work in the nature of fracture matching did you attempt? And please describe any results that you arrived at.

A. The four pieces of gray cloth tape in Laboratory Exhibit BB, Government Exhibit 500, were -- I was able to fracture match two pieces back together to show that they had originally been connected. The other two pieces of the tape in Government Exhibit 500 I was also able to fracture match back to say that they had originally been connected. Whenever I made the comparison between ultimately these two pieces of two tape each, I was not able to come up with a source of commonality. However, the physical characteristics such as the color, the thread count, and the size of the tape were all consistent with each other.

With Government Exhibit 600, that was two pieces of tape that I was able to fracture match back to show that they at one time had been connected to each other. Once again, I made a

1918

comparison between what was ultimately this one piece from Government Exhibit 600 and the two pieces from Government Exhibit 500. They were alike in class characteristics, but I could not determine that they had originally ever been together at one time.

Q. What are class characteristics?

Page 203

A. Class characteristics are those types of characteristics that are manufactured into an item. A large group of individuals or a large group of items would have those types of characteristics. When we're dealing with cloth tape, some of the class characteristics that we would be dealing with would be the size, two-inch roll of tape versus a one-inch roll of tape, for example; the thread count or the way that the cloth in the tape is aligned and its orientation. The color of the glue is also another class characteristics -- class characteristic that is used when we're dealing with cloth tape.

Q. And I just want to be very clear. Referring to both exhibits and all of the various pieces of fabric tape contained within them, if you can summarize for us any conclusions you arrived at as to whether or not you can arrive at any conclusions as to whether any or all of them were ever a portion of the same strip of tape.

A. The two pieces of tape from Government Exhibit 600 were at one time originally one piece. Two of the pieces of tape from Government Exhibit 500 were originally one piece. The other two

1919

pieces of tape from Government Exhibit 500 were originally one piece. I cannot say whether all six of these pieces were ever at one time connected. But they were all consistent in their class characteristics.

Q. You cannot rule out their having come from a single roll of duct tape.

A. I cannot rule that out, no.

Q. And by, again, class characteristics, you're referring to the number of fibers, the color, and the other characteristics that you've described.

Page 204

A. That's correct.

Q. Now, you've told us about fingerprint examination, sir. This is an area where you've had considerable experience and training as well.

A. That's correct.

Q. Can you give us just a ballpark -- I don't know as you've actually kept a specific itemized number of cases or examinations you've done in your career, but can you give us just a ballpark of how many fingerprint examinations you've done in the course of your decades in the work?

A. Number of comparisons, no. In my career I've worked on over 5,000 different cases.

Q. Each one of which may include multiple comparisons of fingerprints.

A. Each one could have included hundreds of comparisons.

1920

Q. Some more, some less.

A. Some many more, some many less, yes.

Q. I don't want to go into great detail, sir. We need your conclusions other than anything else. But if you could educate us just for a few minutes about the process involved in developing latent fingerprints, in other words, making them visible for comparison purposes and how you go about doing the comparison work.

A. The skin that is present on your fingers, palms and toes and soles of your feet is unlike skin present in any other portion of your body. The skin is corrugated, gives rise -- the term is called friction ridges. It allows us to pick items up. But these friction ridges, if you were to look at your fingers, they would look perhaps you could say like corduroy or row of

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1680 of 3592

furrows down a cornfield. However, where the rows or furrows down a cornfield and the rows of corduroy are continuous, the friction ridges that are present on your skin are not always continuous.

Is this on? I'll find out real quick.

Q. Please go ahead and use that if that will help.

A. I've drawn a small model of a fingerprint on the telestrator here. The green lines would represent the ridges as they appear on your fingerprints. This would be in what's called a loop-type pattern. The ridges, most of them you will see, are continuous. However, in certain areas which I'm trying

1921

to draw some small dots around where the ridges end or divide, those ridges, where those ridges end and divide are individual characteristics that we use when we're making a comparison.

There are three basic types of characteristics: The ending ridge which is where, as it says, ridge will flow along and stop; the bifurcation where a ridge will divide into two ridges; the third characteristic is what is called a ridge dot which is nothing more than a ridge that's a small, very small segment. The location and relationship of those individual characteristics are unique to each area of friction ridge skin present on each and every individual. So the friction ridge arrangements on one finger are unique to another finger of my own as well as being unique from me to everybody else in the world, everybody else who's ever been.

When we are examining developed latent prints, we are looking for these reproductions of individual characteristics and will compare them to deliberate reproductions or known prints that we have had submitted.

Page 206

When I will touch an item as I touch the counter in front of me here, I left a reproduction of my friction ridge skin on the surface. The perspiration that is currently on my finger adhered to the ridges of my fingers so that when I touched the surface I left a very nice fingerprint.

If you've ever seen your children's fingerprints on the TV screen or on the windows, there's another example of

1922

where friction ridges can be deposited. On the TV screen, they're visible, but on the counter here they're invisible, latent, hidden. So some developing technique has to be applied to that to make it visible.

We have a multitude of developing techniques available to us depending upon what type of surface we're going to be working with. After we develop the latent prints, we will then compare them to the known prints. If we have agreement in characteristics, we can have an identification.

Q. Now, you did such work in connection with the duct tape that's on the desk in front of you, Exhibits 500 and 600, sir?

A. Yes, I did.

Q. And first before we get to any comparisons that you did, did you do any work in order to develop latent prints on those two items?

A. I processed all of these pieces of tape for latent prints.

Q. Did that result in any change in their appearance from how you first received them?

A. Yes. They were originally -- as I stated, they were originally gray cloth tape. They now appear purple. The reason they're purple is because of the processing techniques that I utilized.

Page 207

Q. Were they also originally wrapped in a loop?

A. They were originally -- as my notes will say, originally a mass of tape.

1923

Q. You separated them into lengthy strips so you could examine them more closely?

A. That's correct.

Q. And what's that purple stain there?

A. The purple stain is a stain that we use for processing the sticky side or the glue side of the tape for fingerprints. Whenever I'm processing that side, the material also gets on what we call the shiny side, and it stains that material too.

MR. MILLER: Your Honor, before proceeding any further, I just want to make sure my record is clear, and we offer or reoffer, if necessary, Exhibits 500 and 600.

* * * *

(Government Exhibits 500 and 600 were offered.)

* * * *

MR. STOWERS: No objection.

THE COURT: 500 has already been admitted as -- well, 600, I thought it was admitted, but there's some confusion, so we'll make sure it's admitted. No objection, 600 is admitted.

* * * *

(Government Exhibits 500 and 600 were admitted.)

* * * *

MR. MILLER: Thank you, Your Honor.

BY MR. MILLER:

Q. Now, bottom line, were you able to recover, raise any identifiable ridge detail in your examination of those strips of

1924

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1683 of 3592

duct tape in Exhibits 500 and 600?

A.    There were no developed latent prints suitable for identification on any of those exhibits.

Q.    Why did you make the effort?

A.    I was requested as well as it is a surface that we can develop latent prints on, so I tried.

Q.    There's a sticky surface on at least one side of every strip of tape.

A.    Yes, there is.

Q.    Is that something that often receives ridge detail?

A.    The sticky side as well as the shiny side has -- I've also -- I have had success developing latent prints from both sides of pieces of gray cloth tape like this.

Q.    And bottom line -- I think we visited with Mr. Bush about this -- if you don't look, you will never find.

A.    That's correct.

Q.    That's a motto in your business.

A.    100 percent of the time you don't look, you're not going to find.

Q.    So you look a lot of time when you don't find.

A.    Quite often.

Q.    And sometimes when you find, you eliminate suspects.

A.    If that's the way it goes, that's the way it goes.

Q.    Take the results as they appear.

A.    That's correct.

1925


Q.    But in this case there were no results.

A.    There were results.  There were no developed latent prints

Page 209

suitable for identification.

Q.    What do you mean by results?

A.    My results were there was nothing there.

Q.    Very good.  I just want to be clear about that.  You found no latent ridge detail suitable for identification on the tape contained in Exhibits 500 and 600.

A.    That's correct.

Q.    And their appearance today having been discolored and stretched out is a process of or a result of your process.  Otherwise they are as you received it.

A.    That's correct.

Q.    Now, just before we move on to any other exhibits, you mentioned that these came to you in a mass of duct tape and also some fabric with them?

A.    That's correct.

Q.    Please describe that fabric.

A.    Laboratory Exhibit BB which is Government Exhibit 500, stuck to the glue side of the tape is a piece of green material that appears to be a sock.  Laboratory Exhibit BC, Government Exhibit 600, also had a piece of green material stuck to the sticky side of the tape.  It is consistent in appearance to the sock from Government Exhibit 500.

Q.    Is that sock in Exhibit 500 a large sock?

1926

A.    It was a fairly small sock.

Q.    And one more thing before we move on to another subject.  You've been doing latent print examination work for decades, sir.

A.    Over 20 years, yes.

Q.    Do you always find ridge detail of evidentiary value when

Page 210

you process a crime scene, sir?

A.   No, we do not.

Q.   Approximately what percentage of the time do you do so?

A.   Approximately 20 percent of the time on pieces of evidence that I examine will I find latent prints that are suitable for identification.

Q.   Is that out of line with the national norm in the field of forensic science?

A.   No, it's not.

Q.   And I just -- again, I think we all know TV's one thing and real life is another, but I wanted to dispel any unreasonable expectations.  That's about in line with what science is able to do.

A.   Yes.

Q.   And again, would the passage of time and the burial underground for a period of years in any way likely affect your ability to recover valuable latent print evidence?

A.   Passage of time is one of the greatest detriments to us being able to recover latent prints.  The material that has been

1927

deposited on a surface is biological in nature for the most part, perspiration which is mostly water, and a minor chemical, minor group of chemical components.  With time, the water is going to evaporate.  The other chemical components can be decomposed and be lost.  So time is a very big factor in preventing us from being able to develop latent prints.

Q.   Despite the passage of time, you're willing to try because if you don't look, you can't find.

A.   Not only if I don't look I don't -- I won't find, I have had success at developing a latent print that I believe is over

Page 211

40 years old because of the packaging of the item and the protection of the item.

Q. But such things as the packaging, the protection, and the surface on which a fingerprint might be lodged are all factors among many others that might affect your ability to find evidence.

A. That's correct.

Q. And you have to be realistic in the possibilities that effort will be productive.

A. Like I said, in most instances, 20 percent of the time we develop latent prints suitable for identification. So that means 80 percent of the time I don't. I realize that, but I'm going to still look.

Q. You also have to prioritize your time. The DCI is not one of those agencies with unlimited resources.

1928

A. That is very correct, sir.

Q. There are none, I assume, to your knowledge.

A. Not in the state of Iowa am I aware of it.

Q. You did talk about efforts at fracture matching those tapes and some success. Were you asked by Agent Basler whether or not there would be anything fruitful in an attempt to fracture match rope ends that were submitted as evidence in connection with this case?

A. Mr. Basler and I did have a discussion regarding that.

Q. And what were your conclusions, sir?

A. After the discussion of Mr. Basler and I, the type of rope that he talked about is something that is going to -- whenever the end is cut, it splays out or spreads out very rapidly to a very large area. And to try and retighten that so that you

Page 212

could make a fracture match comparison is not generally possible. So after the discussion, Agent Basler and I decided that that would not be -- that would not be pursued.

Q. Referring specifically to Exhibit 604 which I will place on the visual presenter, the frayed edges from the rope on that exhibit, is that the sort of thing that you would have any reasonable likelihood of success in attempting to fracture match, sir?

A. I would not, no.

Q. Did you do any further work in the area of fingerprint examination, sir, in connection with this investigation?

1929

A. Yes, I did.

Q. I've handed you three exhibits marked Government Exhibits 312A, B, and C. Do you recognize those, sir?

A. Yes, I do.

Q. And what are they?

A. These are three pieces of paper that were submitted to the laboratory under Laboratory Exhibit B as in boy, U as in union.

Q. After they were processed by the document examination section, did you take a look at them, sir?

A. After document did their examination of it, I did examine these items.

Q. And we've already heard that it's important the order in which examinations are done. Your methods can be destructive as opposed to document examination.

A. That's correct.

Q. So you waited for document examination to be completed first.

A. That's the normal protocol at our laboratory.

Page 213

Q. Please just very briefly summarize what you did with those and what findings, if any, you made.

A. These items were examined using a number of different techniques available to us at the laboratory. And on one of these pieces of paper there was one developed latent print that was suitable for identification. This was a palm print. The only individual's known palm prints I had to compare in this

1930

were Angela Johnson's, and they were not made by her.

Q. Did you have Bobby McNeese's palm prints?

A. No, I did not.

Q. You had the fingerprints, however, of both Angela Johnson and Bobby McNeese?

A. Yes, I did.

Q. Using the visual presenter, sir, I'm going to show you what has been received in evidence as Exhibit 310. And changing my plans, I'm going to hand it to you.

THE COURT: Try it without the lights. I just shut the light off. Try it now.

MR. MILLER: There's a glare. It will work better just by handing it to him.

BY MR. MILLER:

Q. I'm going to hand you Exhibit 310 which has been identified as a hand-drawn map showing location to a Lark Avenue site. Do you recognize that document, sir?

A. Yes, I do.

Q. What is it?

A. This is part of what was submitted to the laboratory under laboratory Exhibit BS, B as in boy, S as in Sam. This piece of paper was processed by me for latent prints at the laboratory.

Page 214

Q. Before we get any further, I've explained before or I should say that Mr. Licht explained before that the work you did and the passage of time affects the legibility of the pencil

1931

marks that are available on that now.

A. Yes, it does.

Q. It is nevertheless still readable.

A. Yes, it is.

Q. Please describe what examinations you did and what findings, if any, you arrived at with regard to that exhibit.

A. Once again, this item was examined by me using various chemical techniques for developing latent prints. There was one developed latent print that was suitable for identification on this exhibit or on this piece of paper. This developed latent print was identified as being made by the right thumb of the individual's -- individual whose ink fingerprints appear on a card bearing the name Robert McNeese.

Q. And finally, sir, I've handed you what is marked Government Exhibit 311. Do you recognize that, sir?

A. Yes, I do.

Q. And what is Exhibit 311?

A. Exhibit 311 is a piece of paper that was originally part of laboratory Exhibit BT, boy Thomas.

MR. MILLER: And before asking the witness to describe his examinations and findings, I request the Court's permission simply to briefly display the blow-up of that exhibit so they'll know what exhibit we're referring to.

THE COURT: You may.

BY MR. MILLER:

1932

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1690 of 3592

Q.   As to Exhibit 311, please describe for the jury what, if any, examinations you did and what, if any, conclusions you arrived at.

A.   I examined this item using a number of various techniques available to us at the laboratory for processing pieces of paper.  After that there was one developed latent print suitable for identification, was marked in a photograph by me, later compared and identified to the inked impression mark left index finger that appeared on an ink fingerprint card bearing the name Angela Jane Johnson.

Q.   I'm going to try this just again briefly.  The marking there, this is a piece of paper that has -- I think we've agreed has already faded somewhat with time.

A.   This piece of paper has also faded as a result of the chemical processing that I did as well as with time.

Q.   There is nevertheless visible pencil markings on it and a map.

A.   There are actually pen mark -- original pencil markings as part of the document, yes, are still visible.

Q.   And pen markings, however, as well, would you point that out and describe what that is for us, please.

A.   Where should I go to point to?

Q.   There's a telestrator, a little white pencil, and if this is working right, you can draw a circle around it.

A.   (Witness indicated.)

1933

Q.   And what is that, sir?

A.   This is on the right side of that document.  If you'll notice, there are the initials BT-1 followed by what are the

Page 216

initials FLT3. All of that is above a semicircular line. These are my markings to say where on this item I found the first developed latent print that was suitable for identification. This was Laboratory Exhibit BT. The first latent print that was suitable for identification was marked BT-1. The examiner who did this analysis was me. The initials FLT3 are my initials.

Q. And the ridge date -- excuse me, the ridge detail itself, is that visible there now?

A. No, it's not.

Q. Why not?

A. Part of the process, as I stated, these are biological prints that fade with time as well as the chemicals that we use to process these items will also fade with time.

Q. You make a photographic record, however, of the work that you do.

A. We make a photograph of it so that we can compare them at a later time if necessary.

Q. Okay. And have your work checked at a later time if necessary.

A. Yes, that's correct.

Q. In summary, the fingerprint now too faded but encircled by that semicircle and the initials BT-1 FLT3 on Exhibit 311, the

1934

map to the Killdeer grave site, is in your opinion the fingerprint of whom, sir?

A. Was made by the individual whose ink fingerprints appeared on a card bearing the name Angela Jane Johnson, laboratory Exhibit BG, boy George.

MR. MILLER: Thank you, sir. I have no further direct.

Page 217

THE COURT: Mr. Stowers?

CROSS-EXAMINATION

BY MR. STOWERS:

Q. Mr. Tarasi, you're one witness we don't have to ask to speak up in this courtroom. Thank you.

You were asked some questions about this duct tape and your ability to compare tear lines on the duct tape which you call fracture marks; is that right?

A. Fracture matching.

Q. Fracture matching. You also were asked some questions about the ropes or the rope pieces that existed and which were recovered in connection with the unearthing of the remains at the Lark Avenue burial site. Remember that?

A. Yes, sir.

Q. And you talked about the fact you weren't asked to do any fracture matching on that rope. Were you asked to do any sort of evaluation of whether or not all that rope appeared to be of the same, as you call them, class characteristics?

1935

A. No, I was not.

Q. Okay. So -- and by class characteristics in the context of pieces of rope, what would we be talking about there?

A. Number of -- there would be a number of class characteristics that I could think of right quickly: The color of the rope, the diameter, the external material, number of types of rope or what you would call two-ply. And an inner portion is one material, an outer portion is another type of material. The weave, if there are any other types of material in the inner material or outer material, all of those would be things that you could look at.

Page 218

Q.    And you didn't do that.

A.    No, I did not.

Q.    Just looking at it, all the rope appears to be the same.

A.    I never looked at the rope.  There was a discussion between Special Agent Basler and myself about the possibility of doing that.  After the discussion, we decided that that was not going to be done.  Whether those ropes were ever submitted to the laboratory or not, I do not know.

Q.    Now, you were asked about fingerprints on these notes, and I think it's getting late in the afternoon, but I'm fading here, but I want to make sure I understand.  You found one fingerprint of Angela Johnson on one of the notes, is that correct, or am I wrong about that?

A.    No.  One developed latent print that was identified to

1936

Angela Johnson was on Laboratory Exhibit BT which is Government's Exhibit -- I want to make sure I have the right number.

Q.    Yeah, I just want to make sure because we've got 18 jurors over here taking careful notes, and they're probably more careful notes than I'm taking, so let me show you.

A.    Government Exhibit 311, the developed latent print on this item, and the left index finger that appeared on the ink fingerprint card bearing the name Angela Johnson were made by one and the same person.

Q.    Okay.  And did you also locate some fingerprints of Robert McNeese on some of those other notes?  Did I hear that correctly?

A.    Laboratory Exhibit BS which is Government Exhibit 310, there was one developed latent print suitable for identification

Page 219

that was identified to the inked impression marked right thumb that appeared on the ink fingerprint card bearing the name Robert McNeese.

Q. Did you find his prints on anything else?

A. I can't say for sure. I have a couple of latent prints that are developed latent palm prints from this area of the palm. I never got known palm prints from Mr. McNeese to compare to them.

Q. I mean, if somebody were to have a piece of paper 8 1/2 by 11 and they folded it, creased it, and wanted to tear it, they

1937

might leave a palm print on the paper; right?

A. It's possible that way or just somebody sitting down and writing on a piece of paper -- I'm left-handed, so I'm going to stick my hand out here holding like a left hand. This area of the palm that comes in contact with the piece of paper could leave a very good latent print that would be able to be developed.

Q. Do you have any recollection as to what area of the palm it was that you had an unidentifiable palm print of?

A. I did not make a determination as to what area of the palm I thought it was.

Q. That's fine. Now, were you asked to do any evaluation of a vehicle that was believed to belong to Terry DeGeus?

A. No, sir, I was not.

Q. For fingerprints.

A. No, sir, I was not.

Q. And do you have the ability to identify and locate latent fingerprints in vehicles?

A. You can process the interior of vehicles and the exterior
Page 220

of vehicles, and it's possible to develop latent prints from a number of surfaces.

Q. On a vehicle.

A. On the vehicle, from items in the vehicle, from the interior of the vehicle. Any of those areas are possible for developing latent prints.

1938

Q. Yeah, and you got some real good surfaces on a vehicle to get prints like the windows; you got the steering wheel.

A. I said possible. Steering wheels, while people think they may be a good surface, generally are not the best of surfaces for developing latent prints because they're generally a rough surface, but there are -- windows are possibly a surface. There are other surfaces in the interior of the vehicle as well as possibly the exterior of the vehicle that can be processed.

Q. Were you ever asked to process any plastic baggies that were found with the remains of Mr. DeGeus for latent prints?

A. I am -- I don't recall processing any plastic bags. No, sir, I did not process any plastic bags.

Q. Now, again, every surface is a candidate -- almost every surface is a candidate for a possible latent print; is that right?

A. That's a broad statement, but yes.

Q. Yeah, and a plastic bag would be a candidate for a surface that a latent print might be left on, although it might not be left on there.

A. Plastic bags of and by themself are a very good surface for depositing latent prints as I just demonstrated by placing my hand on the plastic bag that's packaging around Government's Exhibit Number 600. However, what happens to that plastic bag

Page 221

after the print is deposited affects whether we're able to develop them.

1939

Q.   And you've made some reference to the concept of developing a latent print that's suitable for identification, and that -- I think you need to explain that a little bit to the jury if you could.  Suitable for identification, what do you mean by that?

A.   Suitable for identification is a reproduction of the friction ridge skin that contains sufficient individual characteristics that I am able to make an identification.  There are many times where we will develop latent prints which are reproductions of friction ridges, but there is insufficient information there for us to be able to identify them.

So there is a difference between a developed latent print meaning a visible reproduction of friction ridge skin or a developed latent print that's suitable for identification which is a developed reproduction of friction ridge skin that contains sufficient individual characteristics that I can identify it.

Q.   Is that another -- is another way of looking at that as saying that it may be that you recover a partial print but there isn't enough there such that you can make an identification?

A.   I try to avoid using the term partial print, and the reason is every print, whether it is a known print or a latent print or a developed latent print, is, in fact, a partial print because it's not a complete reproduction of the friction ridge skin.  So the term partial is anything less than the whole.  But in the definition of incomplete for me to be able to make an identification, yes.

1940

Page 222

Q. And are there certain standards that you employ as a latent fingerprint examiner in determining when you have enough points of comparison?

A. It's based on the quality of the latent print as well as the quantity of the individual characteristics that are present.

Q. Some agencies require a certain number of points?

A. Some agencies do. The DCI laboratory does not. Most agencies in the United States will not have a set standard. The science of fingerprint identification has come up with studies that show there is no set number. It's based on the quality and the quantity of the individual characteristics that are present. So for me to say I need X number is -- I can't.

Q. Okay. And just another question I had for you was did you ever do any fingerprint work at a home or residence of a Lori Duncan?

A. No, sir, I did not.

Q. And when you have a crime scene such as -- or a potential crime scene such as a residence, is that something that you will do is go out to the residence and try to locate latent fingerprints?

A. If I am requested by submitting agencies, crime laboratory personnel are on call to assist them in the processing of a residence or the processing of a vehicle.

Q. And so if, for example, you from Des Moines, Iowa, had been summoned to Mason City, Iowa, in July of 1993, you were still

1941

employed by the DCI, you could have come up there, and you could have done your craft and tried to locate any latent prints within that residence that might some day assist in identifying

Page 223

what had potentially gone on in that residence.

A. Like I said, we do not have direct authority as laboratory civilians to go. We need to be requested by local agencies or our own agent personnel. But if we're requested, we'll go.

MR. STOWERS: That's all I have. Thank you.

THE COURT: Mr. Miller?

REDIRECT EXAMINATION

BY MR. MILLER:

Q. Just a couple questions, Mr. Tarasi. First, as far as the procedures employed by the fingerprint section of the DCI crime lab, indeed the entire crime lab and all of its sections, are they in accordance with guidelines set forth by any national organization?

A. Yes, they are.

Q. What organization is that?

A. The American Society of Crime Laboratory Directors has a voluntary accreditation process that crime laboratories can undergo. The DCI crime laboratory recently -- well, actually about three years ago completed the accreditation process and were accredited by the American Society of Crime Laboratory Directors.

Q. Does that include every section of the laboratory, sir?

1942

A. Yes, it does.

Q. Does that include the latent fingerprint examination section?

A. Yes, it does.

Q. And are the procedures employed there today substantially similar to those that were employed in years prior to certification?

Page 224

A. Yes, they are.

Q. Are you personally familiar with the current condition or whereabouts of the Buick once owned by Terry DeGeus?

A. No, sir, I am not.

Q. There's -- unlike on the TV CSI program, there's a demarcation between the responsibilities of a forensic scientist and a detective who interviews suspects.

A. I've -- yes, there is a big demarcation. I very rarely as a civilian crime scene personnel will ever have any contact with a suspect. If I do, it would probably be limited to taking known fingerprints or known footprints or obtaining a known buccal swab for DNA analysis. That would be the extent of my involvement. I would not be interviewing them or anything like that.

Q. And frankly, in all propriety, maintaining your scientific detachment is a good thing.

A. I think it is.

Q. Now, as to Mr. DeGeus's vehicle, assuming it's been crushed

1943

and disposed of, is there any likelihood that you could have any success in attempting to recover a fingerprint from that vehicle?

A. I would say it's highly unlikely that I would be able to develop any latent prints suitable for identification.

Q. Even assuming it could be located at this date.

A. Yes.

Q. Now, you do -- in addition to latent fingerprint examination in the laboratory, you do fingerprint work in the field whenever you participate in crime scene searching. Is that a fair statement?

Page 225

A. Yes, it is.

Q. And ordinarily you are summoned to a crime scene within approximately what period of time?

A. Normal protocol, an incident happens, whatever the type of incident. Local authorities are notified. How ever long it takes for the local authorities to make the decision that DCI personnel need to be involved. That can be an hour. That can be a couple of hours. Then they will contact and get our agent personnel requested. The agents will either make the determination at that time or they may wait until they get to the crime scene to find out we need laboratory personnel to assist us. There can be an additional one to three hours of delay time. Then I am notified.

Our laboratory, the crime scene vehicle, is currently

1944

maintained at the crime lab in Ankeny. Until a month ago when we were in Des Moines, it was located in Des Moines. Then we have travel time.

For example, coming to Sioux City area, even travelling in an emergency vehicle with emergency lights and siren, it still takes a good two hours to get from Des Moines to Sioux City. So from incident time to my arrival time, you're talking conservatively four to seven hours at best.

Q. All else being equal, sooner is better than later.

A. Sooner is much better than later.

Q. Physical evidence disappears?

A. Physical evidence is very fragile and can disappear or be destroyed very easily.

Q. In a matter of hours?

A. In a matter of seconds, for example, my latent prints that

Page 226

I deposited on the counter that I just wiped off.

Q.   And I think you've already discussed briefly, it is the hand itself and the surface that the hand contacts that are two variables that affect preservation or collection of a latent print.

A.   That can have a big effect on whether the individual can deposit a latent print that I am then able to recover.

Q.   And depending upon the nature of the surface, minutes, much less hours, much less years can affect preservation of such evidence.

1945

A.   All of those as well as what the environmental factors are too can affect me being able to develop a latent print.

Q.   And in the event of your processing homes -- and I assume over the years you've processed many residences.

A.   Yes, I have.

Q.   -- do you ordinarily process every square centimeter of the interior surface of a home that you examine?

A.   No, we do not.

Q.   What areas do you concentrate on?

A.   You will generally examine areas that appear to be disturbed or areas that would have high chances of contact such as doorknobs, door frames, light switches, appliances if it appears that they have been turned on or off.

Q.   And doorknobs, door sills, light switches, and the sort where people frequently place their hands, is the fact that fingerprints may be deposited as preservation of such a fingerprint in any way affected by subsequent placement of fingers on such doorknobs, light switches, and the like?

A.   It's very easy for one latent print on a surface to be

Page 227

completely obliterated by a second touch on that surface. That's quite common.

Q. And in all fairness, if you don't look, you can't find.

A. That's correct.

Q. And again, in all fairness, it's possible for fingerprints to remain on some surfaces for lengthy periods of time.

1946

A. That's correct.

Q. Okay. But in the examination of a home which has been occupied by family after family involving children after children for a period of seven years, is there any reasonable likelihood of finding an identifiable fingerprint seven years later?

A. Not from seven years ago, no.

MR. MILLER: Thank you. No further redirect.

THE COURT: Mr. Stowers?

RECROSS-EXAMINATION

BY MR. STOWERS:

Q. You're not the only guy in the state of Iowa who knows how to lift fingerprints, are you?

A. No, sir, I'm not.

Q. Are you aware there's people in the Mason City area who know how to do that?

A. Yes, there are. I've trained some of them.

Q. Okay. With the Cerro Gordo County Sheriff's Office and --

A. Yes, sir.

Q. -- Mason City Police Department?

A. Yes, sir.

Q. So the fact that it might take you four to seven hours to get loaded up from Des Moines to go to Mason City, it's a little

Page 228

shorter drive for the folks in Mason City; is that true?

A. Yes, it is.

1947

MR. STOWERS: That's all I have. Thank you.

THE COURT: You may step down.

Members of the jury, that concludes the testimony for today. And I do have an updated status report for you on kind of where we are, and it's different than what I told you this morning.

It now appears that all of the evidence will be submitted tomorrow, and we may not even go the full day tomorrow. That's what they're telling me. Now, it could change tomorrow morning. I'm just giving you the current information that I have, and I have to rely on what the lawyers are telling me, and they're giving me their best good-faith judgment.

So I think we will conclude the evidence some time tomorrow, and it will be some time before 4:30. I'm not exactly sure when. That means we will not be holding court on Thursday. Well, we will be. The lawyers and I probably will be here on Thursday, but you all won't because we have some matters that we have to discuss including jury instructions.

And so I'm telling you this because we don't want to surprise you, and if we're not going to be holding court on Thursday, I want you to know that at the earliest possibility. So as I sit here now, my best judgment is that we will not be having court on Thursday. We're still going to stick with the schedule if we finish the evidence tomorrow of coming back Monday morning, and on Monday morning we'll do the final

1948

Page 229

instructions on the merits phase, and then we'll have closing arguments, and that's going to take the better portion of the day. But I imagine the jury may have some time to start deliberating on Monday.

And my rule on deliberation is just so you know -- you can kind of be thinking about this -- once the jury starts deliberating, you get to set your own hours. I just don't feel it's appropriate for me to set them for you.

And so sometimes I have juries that want to deliberate into the evening. Then we'll have a meal brought in and I'll just stay here or be very close by, and that's fine. You can stick with the 8:30-to-4:30 schedule if you want to. Sometimes jurors move it up to 9 or 9:30 and knock off at 4 or go till 6. It's kind of whatever the jury's going to agree on. So I just give you a heads-up on that. But it looks like the case will go to the jury on Monday on the merits phase. And we will not be having court on Thursday.

So please remember my cautionary instruction. Keep an open mind until you've heard all of the evidence. Don't talk to anybody about this case. Don't talk among yourselves. Don't let anybody talk to you about the case. And we'll see you back here tomorrow morning, and we'll start at 8:30. Thank you.

(The jury exited the courtroom.)

THE COURT: Okay. Please be seated. Anything we need to take up from the lawyers? And then I'll go through my list.

1949

MR. WILLIAMS: Your Honor, the only thing on behalf of the government is just to touch base with you concerning the photographs of the witnesses. We have been compiling those as we've been going. The instruction that I've given our staff is

Page 230

to compile those in notebooks, one for each juror in alphabetical order. They're all going to be printed the same size on 8 1/2-by-11 sheets of paper and to have those in a notebook simply by alphabetical order based on the last name.

THE COURT: Can you have a mock-up for it so that defense counsel can see it and I can see it and we can make any further record on it by tomorrow? We just really need one I guess. It doesn't even have to have all the photographs in it if you can just, you know, show us a mock-up of what it's going to look like.

MR. WILLIAMS: Sure.

THE COURT: Because we had some discussions about the size -- I'm not so sure the size of the photographs but what information. I think it will just be the witness's name. I'd just like to see what it is that you're proposing. I'm sure defense counsel wants to too. They've already objected to it but . . .

MR. WILLIAMS: May not be able to do it by first thing in the morning because I'm not sure where we're at in that process but certainly before we get done tomorrow.

THE COURT: That's fine, at the end of the day. Okay.

1950

We'll take a look at that tomorrow.

MR. WILLIAMS: That's all I had.

THE COURT: Okay. Anything from the defense?

MR. BERRIGAN: No, sir.

THE COURT: Okay. I really need your list of mitigators. It's way overdue. It was technically due before the trial started pursuant to my pretrial order. So, I mean, it's way, way overdue. It's beyond every deadline I've set.

Page 231

It's beyond the deadline you committed to, so I'm going to press you. When am I going to have it.

MR. BERRIGAN: Tomorrow?

THE COURT: When tomorrow?

MR. BERRIGAN: I suppose I can have it by tomorrow morning.

THE COURT: Okay. I would appreciate that because I'm going to give you a proposed set of both preliminary and final penalty phase instructions in a couple of minutes.

MR. BERRIGAN: Okay.

THE COURT: But obviously they do not have the list of mitigating factors in there.

MR. BERRIGAN: Yes.

THE COURT: And, you know, it's a matter of just adding that to it. So I will get that proposed set of final penalty phase instructions and preliminary penalty phase instructions should we have a penalty phase to you in a few

1951

minutes.

What I would like to do is tomorrow morning at 7:30 have a preliminary conference. The number-one priority would be in the sequence that we would need the instructions. So I would first like to take up -- just have a preliminary discussion about the eligibility and gateway phase 2 instructions of which there's only one set. There's not a preliminary set and a final set. There's only one set for obvious reasons.

And then I'd like to make the full record on that tomorrow afternoon at the end of the day. I'd also like to have a preliminary discussion about the preliminary and final penalty phase instructions tomorrow morning before we get started and at

Page 232

least have an additional conference tomorrow afternoon at the end of the day if we have time about the penalty phase instructions, but we obviously have some more time to work on that.

And then tomorrow I'd like to hear argument on an issue that's going to affect the substance of the penalty phase instructions, and that is the effect of Booker on the -- what we told the jury in jury selection and what we're going to tell them in the penalty phase. I've deferred having to discuss it until the penalty phase. It was actually in some preliminary eligibility instructions, but I redid those to defer that until the penalty phase, and I feel comfortable doing that.

But I'd like to have argument on it tomorrow if we

1952

could, or, if everybody's going to be here, we could do that -- Thursday morning would be fine. I have actually gone ahead -- and I have not decided what I'm going to do on that issue. I have a leaning, but I haven't decided, but I've gone ahead and revised the instructions if I follow the government's position on it because that took a lot of work to do that. And I just wanted to have a set -- you know, I'm basically using the Honken set, so that would be the defense view.

But if I actually, in light of Booker, make a substantial change in what we tell the jury, I felt I should have that language, and I've got that language ready to go. I really have gone both ways on what to do on it, and I want further argument from counsel on it.

So that's the plan. Anything else we need to take up? Okay. Why don't I go get you the set of preliminary and final penalty phase instructions. And then we'll be done for the day.

Page 233

Thanks.

MR. WILLIAMS: Thank you.

(The foregoing trial was adjourned at 4:43 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                9-17-05
                                        Date

1953

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| J.D. SMITH | | |
| | MR. MILLER | 1711 |
| | MR. STOWERS | 1727 |
| | MR. MILLER | 1729 |
| MARY BUCKLEY | | |
| | MR. MILLER | 1731 |
| | MR. BERRIGAN | 1739 |
| JOHN FRASCO | | |
| | MR. MILLER | 1741 |
| | MR. STOWERS | 1758 |
| JOHN KRAEMER | | |
| | MR. MILLER | 1760 |
| | MR. STOWERS | 1777 |
| | MR. MILLER | 1786 |
| DENNIS KLEIN | | |
| | MR. MILLER | 1788 |
| | MR. BERRIGAN | 1853 |
| | MR. MILLER | 1870 |
| | MR. BERRIGAN | 1873 |
| | MR. MILLER | 1874 |
| JULIA GOODIN | | |
| | MR. MILLER | 1875 |
| | MR. STOWERS | 1890 |
| | MR. MILLER | 1893 |
| WILLIAM BASLER | | |
| | MR. WILLIAMS | 1903 |
| | MR. STOWERS | 1909 |
| FRANK TARASI | | |

Page 234

                    VOLUME 8, 5-17-05
          MR. MILLER                              1913
          MR. STOWERS                             1934
          MR. MILLER                              1941
          MR. STOWERS                             1946

                        * * * * *

♀
                                                  1954


     EXHIBITS:

      914                                         1718
      917A through 917H                           1720
      700                                         1735
      816                                         1736
      800                                         1738
      721                                         1739
      710                                         1756
      906                                         1769
      909                                         1772
      912 and 913                                 1775
      814                                         1800
      505 and 506                                 1803
      511                                         1806
      502 and 503                                 1808
      515                                         1809
      520                                         1812
      500                                         1813
      531 and 532                                 1815
      504                                         1817
      605 and 608                                 1819
      609 through 614                             1822
      602                                         1826
      603 and 604                                 1827
      619 through 624                             1829
      625                                         1831
      701 and 702                                 1842
      704 and 706                                 1844
      801 and 802                                 1847
      805 and 808                                 1850
      1007, 1047, 1048, 1049, 1050                1881
      1000                                        1885
      449                                         1906
      500 and 600                                 1923

                        * * * * *

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1710 of 3592

1955

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,          No. CR01-3046

      Plaintiff,          Sioux City, Iowa
                      May 18, 2005
  vs.                 7:31 a.m.

ANGELA JANE JOHNSON,         VOLUME 9 of 24

      Defendant.
                 /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

1956

APPEARANCES:

For the Plaintiff:      C. J. WILLIAMS, ESQ.
                    Assistant United States Attorney
                    Suite 400 - Hach Building
                    401 First Street Southeast
                    Cedar Rapids, IA  52401

                    THOMAS HENRY MILLER, ESQ.
                    Iowa Attorney General's Office
                    Area Prosecutions Division
                    Hoover State Office Building
                    Des Moines, IA  50319

For the Defendant:      PATRICK J. BERRIGAN, ESQ.
                    Watson & Dameron
                    2500 Holmes
                    Kansas City, MO  64108

                    DEAN STOWERS, ESQ.
                    Rosenberg, Stowers & Morse
                    1010 Insurance Exchange Building
                    505 Fifth Avenue
                    Des Moines, IA  50309

                    ALFRED E. WILLETT, ESQ.
                    Terpstra, Epping & Willett
                    Higley Building - Suite 500
                    118 Third Avenue Southeast
                    Cedar Rapids, IA  52401

Also present:           Bill Basler

Page 1

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1711 of 3592

1957

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Okay.  The record should reflect that Angela Johnson is present with her three defense lawyers and Mr. Williams is present on behalf of the United States.  We have a number of matters to take up this morning before the jury comes in at 8:30.

I'd first like to take up the proposed eligibility phase instructions.  We'll just go in order.  What's the government's position?  This is just a preliminary discussion. It's not our final discussion.

MR. WILLIAMS:  Certainly.  Your Honor, my first thought would be to instruction number 2, page 3, the second full paragraph, at the bottom -- and this is just a wording process.  The last two sentences starts, You must make your determination of whether or not the pertinent aggravating factors have been proved and whether the defendant is, therefore, eligible for the death sentence in three steps.  That would suggest that there's three steps to the death sentence as if, you know, she will be killed in three different steps.

I think if you take away the "in the three steps" at the end of that sentence and then start the next one saying, I will explain the three-step process for making this determination in the following instructions, it might read better.

1958

Page 2

THE COURT: Sure. Thank you.

MR. WILLIAMS: Going to instruction number 3, page 8 --

THE COURT: I assume you may not be pursuing some of these.

MR. WILLIAMS: Exactly. We are not pursuing the first two. The only one we're pursuing is the third one.

THE COURT: Number 3.

MR. WILLIAMS: Right.

THE COURT: Which would now become number 1.

MR. WILLIAMS: Correct.

THE COURT: I assumed that but --

MR. WILLIAMS: Wanted to hear from me first obviously.

THE COURT: Right.

MR. WILLIAMS: And obviously that's going to create a number of wording changes throughout that.

THE COURT: Yes, right.

MR. WILLIAMS: Okay. Instruction number 5, page 15, just a note in that first paragraph there, because we're only seeking one gateway aggravating factor, there's a change in the middle of that, if you found one and only one.

THE COURT: Yes.

MR. WILLIAMS: We'll have to just change that to the gateway aggravating factor and then just the changes on the verdict form --

1959

THE COURT: Right.

MR. WILLIAMS: -- at page 2 to reflect that issue. Other than that, we have no objections to it.

Page 3

THE COURT: Okay. Mr. Stowers?

MR. STOWERS: I think Mr. Berrigan's . . .

THE COURT: Okay. Mr. Berrigan?

MR. BERRIGAN: I don't think we have any additional recommendations at this point, Your Honor. We were concerned mostly about page 8 and the language therein so . . .

THE COURT: Okay. When you say at this time, does that mean you have some concerns and you're not disclosing them now?

MR. BERRIGAN: No.

THE COURT: Or you have no concerns at this time?

MR. BERRIGAN: No, we haven't really recognized any concerns. We did go through these last night, and that kind of jumped out at us because it was such an obvious difference with the government's position. But nothing else has, so that's my honest assessment at this point.

THE COURT: Okay. Thank you.

Now, how about the penalty phase instructions? Why don't we start with the government.

MR. WILLIAMS: Page 6, Your Honor, just wording. The first full paragraph where it says -- at step 3, it says, For each count you must consider whether the gateway aggravating

1960

factor and the one or more statutory aggravating factor that you found for that count during the eligibility phase, comma, and any nonstatutory, I would just suggest a wording change saying, Together with any nonstatutory. It's not a big deal, but it just sounds -- reads better to me.

THE COURT: Okay.

MR. WILLIAMS: I'm thumbing through quickly here,

Page 4

Judge, but I don't think I have anything else. No, I have no other changes.

THE COURT: Okay. Mr. Berrigan?

MR. BERRIGAN: I had a number in this instruction, Your Honor.

THE COURT: Okay.

MR. BERRIGAN: Starting on page 3, the first line which reads, You must give separate consideration to whether or not the death penalty should be imposed on each count on which you have found the defendant eligible for a death sentence. And I think many of these suggestions are going to depend on ultimately the Court's position regarding how the verdict director instructions are going to read in terms of what the options are for the jury.

But just to bring them to your attention now, we would prefer that this language to whether or not the death penalty should be imposed be removed all together and that the jury just be advised you must give separate consideration to the

1961

appropriate sentence on each count, period.

Our position is -- and I'll -- this will be clear as we go on -- that the instructions overly emphasize the death penalty as the option for punishment rather than giving equal consideration to the available punishments, and this is just one example of that.

THE COURT: Okay.

MR. BERRIGAN: The third sentence down, Your determination of whether or not to impose the death penalty, we'd like the language "whether or not to impose the death penalty" be replaced with "your determination of the sentence on

Page 5

a particular count."

THE COURT: Okay.

MR. BERRIGAN: The next paragraph, the very last line, that the defendant should not be sentenced to death, we'd ask the Court to replace -- I'm sorry. I can't read my own note here. Oh, yes. This is -- I should read that whole sentence in context. I think it will be helpful. A mitigating factor, on the other hand, is any aspect of a defendant's character or background, any circumstance of the offense in question, or any other relevant fact or circumstance that might indicate that the defendant should -- the current language says, Not be sentenced to death. And we'd ask that be replaced by "be sentenced to life in prison without possibility of parole." The discussion is about mitigating factors, and we think that mitigating

1962

factors are essentially reasons to vote for life in prison without parole rather than not the death penalty.

THE COURT: Okay. Well, we just have a -- yeah, I doubt if I'm going to go with you on any of these.

MR. BERRIGAN: Right, it's a language thing. I understand you may not agree. I'm just proffering these suggestions.

THE COURT: Yep.

MR. BERRIGAN: The very next sentence, The three steps you must go through to make your final determination of whether or not the death penalty should, we'd like that language omitted, "whether or not the death penalty should be," and be replaced by "the sentence to be imposed." So that would read, The three steps you must go through to make your final determination of the sentence to be imposed on each count would

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1716 of 3592

be our preference.

THE COURT: You -- okay. I don't know where you are now.

MR. BERRIGAN: I'm sorry, sir.

THE COURT: But you want your mitigating factors listed in the preliminary instructions or not?

MR. BERRIGAN: We'd really prefer neither the preliminary -- the aggravating or the mitigating circumstances be listed.

THE COURT: Why would that be?

1963

MR. BERRIGAN: Well, I guess this is consistent with our earlier position about the preliminary instructions all together -- and I don't want to beat a dead horse -- our position merely being that we'd rather not have the jurors with preliminary instructions to evaluate the evidence as it's coming in in terms of whether certain mitigating or aggravating factors have been met during the course of the testimony. So to be consistent with that position, we would not want them listed.

THE COURT: But if I'm going to list aggravating factors, you want mitigating factors.

MR. BERRIGAN: If you are, yes, sir, right.

THE COURT: Right.

MR. BERRIGAN: Then my next suggestion would be on page 6, sir.

THE COURT: Okay.

MR. BERRIGAN: In the middle of the first paragraph right after step 2, we'd ask the Court to put a period after step 2, period, and omit the language "so that the count in question calls for a sentence of death," that that language be

Page 7

omitted. And then two lines down where it says, Themselves sufficient to call for, and the Court uses this language throughout the instructions, call for. We'd ask that that be replaced with "justify" which is consistent with the statute and at least the little case law that I've looked at.

THE COURT: I just want to -- okay. Where it says,

1964

Calls for a sentence of death?

MR. BERRIGAN: Yes, sir.

THE COURT: Change that to "justify"?

MR. BERRIGAN: To justify, yes.

THE COURT: Okay. That's consistent with the statutory language.

MR. BERRIGAN: Yes, sir.

THE COURT: Yeah.

MR. BERRIGAN: Then the very next sentence, Based on your weighing of all the factors, you will decide whether to impose a sentence of death, we'd like the Court to then put "or life in prison without possibility of parole," period, and omit the language that's presently there, Rather than a sentence other than death authorized by law for the count in question. And this is one of those issues where it will depend on what you decide.

THE COURT: Right, right. I'm tracking you there.

MR. BERRIGAN: Okay. And then in that same paragraph, Your Honor, the very last sentence where it says, If you unanimously -- and this again is a language issue I know. But our concern is unanimously sounds very much like the instructions that the jurors get in terms of the merits phase. We'd ask the Court to consider replacing "unanimously" with the

Page 8

language "each independently," so that would read, If you each independently find that a death sentence should be imposed. And

1965

that would be -- we'd ask the same change on the very next page, the third line down where it says, Unanimously find.

THE COURT: Okay.

MR. BERRIGAN: And then on page 11, Your Honor, very top of the page, The task of determining whether or not to impose a death sentence, and we'd ask that the language "whether or not to impose a death" be omitted and that that be replaced with merely "the," so that would read, The task of determining the sentence for any count in this case is an extremely important one. Then halfway through that paragraph, sir, the sentence that begins with, Remember whether or not the circumstances in this case -- language presently reads, Call for a death sentence.

THE COURT: Justify?

MR. BERRIGAN: Yes, sir, justify, and we'd ask the Court to include "or life without parole," so it would read, Justify the death penalty or life without possibility of parole on any of the counts in question is entirely yours.

THE COURT: Okay.

MR. BERRIGAN: Page 13, the very first line says, You must give separate consideration to whether or not the defendant should be sentenced to death. We'd ask that the language "whether or not the defendant should be sentenced to death" be replaced by "the appropriate sentence," so that would read, You must give separate consideration to the appropriate sentence on

1966

Page 9

each count. And then we'd ask the Court to omit the language after count that says, For which the death penalty and just leave that "on each count at issue." At this point the death penalty is obviously at issue in every count.

THE COURT: What else?

MR. BERRIGAN: The fourth -- I guess it's the end of the third line, the sentence that's in italics, Your determination to impose a death sentence on a particular count must be unanimous, we'd ask that the Court add a sentence immediately following that regarding life without parole. That sentence would be, You are not required to be unanimous in order to return a verdict sentencing Angela Johnson to life without possibility of parole.

THE COURT: Okay.

MR. BERRIGAN: Immediately after that, Your Honor, the sentence that starts, If you find that a death sentence should be imposed, we'd ask the Court to change the initial language, "if you find that a death sentence," and replace that with "whichever sentence you find should be imposed."

THE COURT: Well, except that's not a true statement of the law. Well, that gets us back into --

MR. BERRIGAN: I'm sorry? Whichever sentence you find should be imposed on a particular count, then I'm required to impose that sentence. Yes, I understand this is --

THE COURT: Well, you know, I think, you know -- I

1967

mean, we're getting into this other area now.

MR. BERRIGAN: Right, I know.

THE COURT: But if you really insist on this, then you're going to be estopped if the jury comes back with a life

Page 10

Case 3:09-cv-03064-MWB-LTS Document 284-71 Filed 06/23/11 Page 1720 of 3592

sentence.

MR. BERRIGAN: Yeah, we recognize that, and we'll argue this later, but that's exactly our position. We didn't go into this blind. We knew that if we took this position that it's death or life then we're held to that and we're willing to be held to it, and I don't want -- I know you're going to take this up at some point, but we've not made any bones about that.

THE COURT: Okay, fine.

MR. BERRIGAN: I'm not going to argue otherwise.

THE COURT: Okay.

MR. BERRIGAN: And then halfway through that same paragraph, Your Honor, there's a sentence that begins, On the other hand, comma, if any one of you finds that a sentence of death is not called for, and we just ask that language be replaced with "justified."

Two lines down, "unanimously" appears again in the sentence "you unanimously find that a sentence of death." We'd ask that that "unanimously" be replaced with "each independently" consistent with our earlier position.

THE COURT: I don't actually understand that argument, but you expressed it in jury selection. I don't really

1968

understand it because in any unanimous verdict, the jurors make an independent judgment.

MR. BERRIGAN: Well, I think the process is different, Your Honor.

THE COURT: Well, the process is different, but the independence isn't any different. The effect of the independence might be different.

MR. BERRIGAN: Right.

Page 11

THE COURT:  But the fact -- they always operate independently.  Every juror makes an independent judgment, and then you determine whether that judgment is unanimous or not. That's no different in the penalty phase than it is in the merits phase.

MR. BERRIGAN:  Well, I guess I'd respectfully disagree that the process in the merits phase encourages deliberation in a joint decision regarding the verdict.

THE COURT:  Well, we don't tell them they can't discuss it.  We don't tell them --

MR. BERRIGAN:  No, I know that.

THE COURT:  I just totally disagree with your characterization.  There's nothing in the law that supports your characterization in my view.

MR. BERRIGAN:  I do think there are very different processes, and the fact that we use the same term to describe them I think's misleading.

1969

THE COURT:  I don't think they are misleading.  The effect is different.  We don't put them in 12 different rooms and say deliberate independently and then collect the verdict separately.  Do we?

MR. BERRIGAN:  No.

THE COURT:  And that's kind of what you suggest.

MR. BERRIGAN:  Not at all.

THE COURT:  Well, when you suggest they do it independently, that's exactly what you suggest.  It's not independent.

MR. BERRIGAN:  I don't suggest --

THE COURT:  It's the same independence that they do in

Page 12

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1722 of 3592

every jury verdict in a civil case or a criminal case that requires a unanimous verdict.

MR. BERRIGAN: Well, with all due respect, I completely disagree.

THE COURT: Well, I disagree with you, so move on to another area.

MR. BERRIGAN: Then the next area I'd like to move on to is the last sentence in that paragraph which begins, I will then determine the sentence. We ask the Court omit that all together consistent with our position that the jury's determining sentence in this case.

THE COURT: You can keep going.

MR. BERRIGAN: The next suggestion we have is on page

1970

14, Your Honor, the sentence that is in the middle of the first paragraph, These aggravating factors are sometimes called nonstatutory aggravating factors because they are not identified by the statute authorizing the death penalty for conspiracy murder and CCE murder, we'd ask that the language "authorizing the death penalty for conspiracy murder and CCE murder" be omitted all together. The sentence suggests that the aggravating circumstances authorize the death penalty which they do not. Then in the --

THE COURT: Well, it says the statute authorizing the death penalty, not that the factors authorize the death penalty. How could you read it that way?

MR. BERRIGAN: Well, because they're mixed together. "The aggravating factors are sometimes called nonstatutory aggravating factors because they're not identified by statute" is plenty sufficient. It's the language authorizing the death

Page 13

penalty for conspiracy murder and CCE murder that we object to. Our position is that even the proof of aggravating factors doesn't authorize the death penalty and that we think this sentence suggests that it does.

THE COURT: It talks about the statute authorizing the death penalty.

MR. BERRIGAN: It's unnecessary verbiage that suggests that the factors authorize the death penalty in our view.

The next suggestion we would have, sir, is under

1971

subparagraph 1, and we'd ask that the language beginning with "evidence," that whole paragraph, be omitted. There are particular factors that the defense believes are, in fact, not evidence of future dangerousness at all, particularly low rehabilitative potential which is C, lack of remorse, high custody classification. Those things in our view have nothing to do with future dangerousness. And we don't frankly know what the authority is to define that particular language in any case.

On page 15, we have the same position regarding the Court's definition of the effect of the crime upon the victims' family was injurious. We believe this language -- first of all, we think that language is self-explanatory but that the language that follows beginning with "the prosecution must prove", that explanation makes the finding of that aggravator a certainty, and we'd ask that that subparagraph be omitted.

THE COURT: You think it just doesn't need definition?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. What else?

MR. BERRIGAN: Our next recommendation, sir, would be on page 17. We'd ask that the Court omit the language in

Page 14

fairness that appears on line 5 -- or 4, I'm sorry. That's -- it says, Would suggest, comma, in fairness that a sentence of death is not the most appropriate punishment.

THE COURT: Okay.

MR. BERRIGAN: We'd also ask the Court change the

1972

language "death is not the most appropriate punishment." Because this is a discussion about mitigating factors, we'd ask the Court replace that with life without parole is the most or more appropriate punishment, whatever you think is more appropriate.

THE COURT: What else?

MR. BERRIGAN: On page 18, sir, in the first paragraph, third line down, that line begins, Or her role in the offenses in determining whether or not to impose a sentence of death, we'd just ask that "whether or not to impose a sentence of death" be replaced with her sentence, so that would read, Or her role in the offenses in determining her sentence, comma, even though those doubts did not rise.

THE COURT: What else?

MR. BERRIGAN: The next to last sentence on that same page where it says, Defendant's background or character that would mitigate against imposition of the death penalty, and we would ask that the Court insert the language "for life without parole" and between "mitigate" and "against" so that that would actually read, Defendant's background or character that would mitigate for life without parole and against imposition of the death penalty.

THE COURT: Okay.

MR. BERRIGAN: Then page 19, that first paragraph is I
Page 15

think essentially identical to the preliminary instruction

1973

paragraph that describes step 3, and we'd have the same recommendations in terms of changes. That is, after step 2, there should be a period on the fourth line omitting the language "so that the count in question calls for a sentence of death." And then two lines down, the language "call for a sentence of death" we'd ask the Court to replace with "justify."

And then the last sentence in that paragraph, Based on your weighing all of the factors, you will decide -- it says, Whether or not to impose a sentence of death. And we'd ask the Court to take out "or not" so that language would read, You will decide whether to impose a sentence of -- we like "of life without parole or death for the count in question," that those two options be inserted.

In the next paragraph, the very last sentence of the paragraph -- this would be the second paragraph on page 19 -- reads, Your deliberation should be based on the evidence that you have seen and heard and the law on which I've instructed you. We'd ask the Court to omit that sentence all together. At this point in the discussion the Court's talking about the weighing process. And our view is that that sentence is -- although it's accurate -- I'm not complaining about the language -- it's just not in the proper place. Perhaps if it was moved later in the paragraph -- later in the instruction it would be fine.

And another one -- a minor suggestion at the very last

1974

Page 16

line, Your Honor, on that page 19, it says, In order to determine whether or not the death penalty should -- and we'd just ask the Court to insert "the appropriate punishment," so that would read, In order to determine the appropriate punishment instead of the language about the death penalty.

In the middle of the very next page on page 20, there's a sentence that reads, I will then determine the sentence other than death to which the defendant should be sentenced for that count. And obviously our position is life without parole. That's the only other option, so we'd just like you to say that. I will then determine the sentence to be life in prison without possibility of parole.

Two sentences down there's another "call for," and again, "justify" we think should be more appropriate.

And then the very next paragraph that begins, Your determination to impose a sentence must be unanimous, here I don't think we could change that language given the structure of the sentence, so I was going to ask the Court if you would consider inserting an explanation immediately after "unanimous" as to what that means.

(Mr. Miller entered the courtroom.)

MR. BERRIGAN: And the explanation I was going to proffer is that after "unanimous" instead of a period there be a comma followed by "that is, all 12 jurors in their own weighing process independently found that aggravating factors outweigh

1975

mitigating factors," comma, and --

THE COURT: Well, what does that mean, independently? They can't talk to the other jurors about it?

MR. BERRIGAN: No.

Page 17

THE COURT: I mean, I don't know what the word means.

MR. BERRIGAN: It means they have to make a decision, each juror, independently respecting this momentous decision about life or death.

THE COURT: But they make that in every case.

MR. BERRIGAN: Well, they don't in my view make it in every case.

THE COURT: They don't make an independent judgment in every case?

MR. BERRIGAN: No, I think it's a group dynamic, Your Honor. They're told that the --

THE COURT: But it's a group dynamic here because they're allowed to discuss it.

MR. BERRIGAN: Except they're told here that the failure to come back with a unanimous verdict is a verdict.

THE COURT: That's the effect of their deliberations. It doesn't -- well, we just disagree.

Okay. What else? Did you submit your own penalty phase instructions with all these suggestions?

MR. BERRIGAN: No, sir.

THE COURT: Okay. Why not? It's not your obligation?

1976

MR. BERRIGAN: Well, we -- well, I don't know. I mean, my -- I had not dealt with these preliminary instructions before in my career, so I'm very unused to that.

THE COURT: Well, you have a pretty limited career then.

MR. BERRIGAN: We usually take them up after the evidence, and we do submit proposed instruction after the evidence but obviously the process is different here. Just for

Page 18

the record, I don't know that I finished that sentence. If you want me to, we can do it later.

THE COURT: No. Go ahead.

MR. BERRIGAN: I don't want to waste time. What I had suggested is the language we'd like to have inserted after "unanimous" in the paragraph that starts, Your determination to impose a death sentence must be unanimous, we'd like the Court to include after that a comma and the following language: That is, all 12 jurors in their own weighing process independently found that aggravating factors outweigh mitigating factors, comma, and that you are also -- that you also independently found death to be the appropriate punishment consistent with, we believe, the position of the Eighth Circuit in Allen.

Our next suggestion is the very next page on page 22. This is the defendant's right not to testify instruction. The second sentence begins, However, there is no burden upon a defendant to prove that he or she should not be sentenced to

1977

death. We'd ask the Court before that sentence to insert a sentence that says, She has a constitutional right to remain silent. I know we've told the jurors that repeatedly in the voir dire, but it's not in the instruction. And then that "however" would be changed to "furthermore" given the addition of that sentence. Otherwise that's fine.

And then the very last line in that -- or the last sentence in that same paragraph, consistent with our position regarding the death sentence language, we'd ask the Court to change the current language which says, In arriving at your decision on whether or not to impose the death sentence, to change that to "in arriving at your decision -- at your

Page 19

punishment decision, in arriving at your punishment decision, for any count in this case."

Then the very last suggestion we have, Your Honor, is the next instruction number 6 on page 23. The very first line, it says, In your consideration of whether the death sentence is called for, we'd ask that the Court insert after "sentence" "or life in prison without parole." So that would read, In your consideration of whether the death sentence or life imprisonment without parole is called for. And that's it.

THE COURT: Well, let me ask you a question. Going to -- I'm shifting gears now to the final merits instructions.

MR. BERRIGAN: Yes, sir.

THE COURT: Final merit instruction number 11,

1978

defendant's decision not to testify, you didn't complain about the fact that it doesn't discuss her constitutional right in that instruction.

MR. BERRIGAN: Yeah, and we should have, and I apologize for that. And as you know by now I'm sure, we have sometimes split responsibilities, and not all of the lawyers are doing the same things, but that language we believe should be included, and the Court's been very, I think, forceful in telling all the jurors that it's a constitutional right that she has.

THE COURT: No, I don't have any --

MR. BERRIGAN: We're not complaining about that.

THE COURT: I don't have any problem putting it in. I was just pointing out the inconsistency.

MR. BERRIGAN: It was an omission. That's plain and simple.

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1730 of 3592

THE COURT: Why don't we take the first shot at emphasizing in final instruction number 11 entitled defendant's decision not to testify that it's her constitutional right.

MR. BERRIGAN: Yes, sir. Thank you.

THE COURT: And then you can critique it after we've done that. How's that?

MR. BERRIGAN: Thank you, Your Honor.

THE COURT: Now, you want to take up now or defer till after the close of the evidence today the issue of what to tell

1979

the jury about punishment?

MR. BERRIGAN: We'd like to put it off if that's not a problem. We're going to have a short day anyway, and we want to have as much time as we need.

THE COURT: That's fine.

MR. BERRIGAN: Thank you.

THE COURT: Did you want to respond generally to the critique of the defense about the penalty phase instructions, Mr. Williams?

MR. WILLIAMS: Yes. Thank you, Your Honor. Generally I guess I don't have a problem with the change of the words "call for" to "justify" where it's been suggested in here.

As far as the unanimous aspect of it, I have the same concerns the Court do -- does. And that is it clearly suggests that this jury should not talk, that somehow they should go back and break off into individual decision making, come back, and then poll their decision and whatever that decision is done that's the end of it. I think this is a deliberative process, and I do not like the suggestion of independently.

Mr. Berrigan is very articulate. He can explain that

Page 21

to the jury. He can explain all he wants to I think to the jury the effect of them not agreeing unanimously.

THE COURT: Is he going to assign them the 12 different rooms, though, because we don't have that many in the courthouse?

1980

MR. WILLIAMS: I'm sure he'd like to. But other than that, I guess I don't have a strong opposition to the rest of the suggested changes in here. I think they're largely semantic, but that's my only real concern.

With regard to the future dangerousness and the Court's explanation in the subparagraph, I do contest the deleting of that paragraph. I think that's an appropriate paragraph, and I'll --

THE COURT: We'll try and find the authority. It obviously comes from somewhere. And we'd have that in our Honken set where we found it so . . .

MR. BERRIGAN: And we'd like to, belated as it is, take advantage of your invitation to -- we're willing to rewrite the complaints that we have about the instructions and get those to the Court by Monday if that's helpful to you rather than this oral presentation.

THE COURT: No. I think the oral presentation's fine.

MR. BERRIGAN: All right, sir.

THE COURT: Yeah. I'm sorry, Mr. Williams. Anything else you want to add?

MR. WILLIAMS: No, Your Honor. I would just for -- to alert the Court ahead of time in preparation for our argument this afternoon, given the defendant's position here that they're willing to be bound by a life-in-prison sentence, as much as I'd

Page 22

be fine with that, I don't think that can work.  And there's

1981

a -- I think it's Greatbear or -- I can't remember the name of the case.  Now it's an Eighth Circuit case that came down about two years ago in which a court I believe from South Dakota imposed a sentence that the parties agreed to but it wasn't the law, and the Eighth Circuit overturned it and said doesn't matter if the parties agree to it.  The law is the law, and you have to properly follow the law.

And so I just alert the Court to that decision because I think that may impact on whether I'd like to agree to that or not, I don't know that it can be done.

THE COURT:  Well, I don't think I could agree to it because I have to exercise my own independent judgment post-Booker if I'm given the authority to do so.

MR. WILLIAMS:  And I don't know how you would effectuate legally the defendant's willingness to be sentenced to life without parole other than having the jury impose it.  And, I mean, there's a possibility I suppose we could put into the --

THE COURT:  Well, put it this way.  It's a 2255 motion either way.

MR. BERRIGAN:  You know, the government -- again, I think we're jumping the gun.  I know we're going to discuss this this afternoon.  But two years ago, two years ago, their proposed penalty phase instructions included three options, life, death, and a sentence other than life.  That was their

1982

position two years ago, and there's nothing that's changed in my
Page 23

view legally, Your Honor, that should make things any different. I understand Booker and Fanfan don't require now the Court to follow the guidelines. But I don't know that that makes much of a difference. The jury could at least have those options at the very least, and we'll discuss it further this afternoon.

THE COURT: Yeah, why don't we take it up at the end of the day.

MR. WILLIAMS: Very good.

THE COURT: Okay. Anything else?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: No, sir.

THE COURT: Anything else about the trial this morning? Any heads-up?

MR. WILLIAMS: Yeah, just have the two witnesses, Your Honor. And, you know, before noon or maybe slightly after noon.

THE COURT: Okay.

MR. BERRIGAN: Nothing by the defendant, Your Honor.

THE COURT: Okay. Thank you.

(Recess at 8:11 a.m.)

THE COURT: Ready to have the jury brought in?

MR. MILLER: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated.

Is the government ready to call its next witness?

1983

MR. MILLER: Yes, Your Honor. The government calls Dawnie Wolfe Steadman. Dr. Steadman, if you'll please step forward and be sworn.

DAWNIE STEADMAN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Please adjust the chair

Page 24

and the microphones so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is Dawnie Wolfe Steadman, S-t-e-a-d-m-a-n.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good morning, Dr. Steadman.

A. Good morning.

Q. Your occupation, ma'am?

A. I'm an assistant professor at the State University of New York at Binghamton.

Q. Where is Binghamton, New York?

A. It's in the southern tier of New York just north of the Pennsylvania border in the middle of the state.

Q. And that's part of the state University of New York system?

A. Yes, it is.

1984

Q. As an assistant professor there, what are your duties, ma'am?

A. I teach both graduate and undergraduate courses in forensic anthropology, skeletal biology, general biological anthropology, diseases and evolution, and I also do research in bioarchaeology and forensic anthropology.

Q. Please briefly describe for us your educational background that brings you to this position.

A. I received my bachelor's degree at University of Arizona in

Page 25

1989, and from there I went to graduate school at University of Chicago where I received my Ph.D. in 1997.

Q.   And your experience since that time in the field of academia includes what?

A.   Research that has led to a number of publications as well as a book that I edited in forensic anthropology.  I have done publications in both bioarchaeology as well as forensics.

Q.   And you've done teaching anywhere other than Binghamton, SUNY?

A.   Yes, I was also an assistant professor at Iowa State University between 2000 and 2003.

Q.   We've heard a little bit about forensic anthropology --

A.   Excuse me.  I'm sorry.  Between 1997 and 2000.

Q.   That's when you were at Iowa State University.

A.   Yes.

Q.   Went from there to New York.

1985

A.   That's correct.

Q.   And please do feel free to interrupt me to correct anything that needs correction.  We're here to -- accuracy is more important than speed; okay?

A.   Yes.

Q.   We've heard a bit about forensic anthropology already, and I wonder if you could just briefly describe for us in your own words what this field involves.

A.   Sure.  Forensic anthropology is the study of the skeleton and the analysis of the skeleton in order to answer questions of a legal nature.  Typically those questions are who is this individual.

          For instance, if an individual has been found that's

Page 26

decomposed or skeletonized or fragmentary, then a forensic pathologist will often call in a forensic anthropologist to help with the identification and to assess the circumstances of the individual's death as well.

Q.    So forensic anthropology is where the study of anthropology interacts with the law?

A.    Yes.  With the study of the skeleton, we're experts in understanding the biology, the physiology, the histology, the growth and development of the skeleton and how the skeleton responds to diseases that an individual has during life as well as traumatic injuries that the individual may incur.

Q.    Do you have any particular qualifications or certification

1986

in the area of forensic anthropology, Dr. Steadman?

A.    In addition to my Ph.D., this year in February I became a diplomate of the American Board of Forensic Anthropology which is the only certifying board for my discipline of forensic anthropology.

Q.    And can you give us some idea of the total number of such people in your profession?

A.    There are currently 74 individuals who have received diplomate status, and I believe around 60 of them are still practicing today, and that's throughout the entire country.

Q.    Dr. Steadman, in visiting a little bit about the field of forensic anthropology, is that strictly confined to matters of criminal investigation?

A.    No.  I also do work in human rights investigations internationally.  Sometimes that also goes to court for evidence that's given to international tribunals, for instance, or national tribunals.  But often the work that I do is

Page 27

humanitarian in nature where I do the identifications and the analysis of trauma for the historical record and for the families, but it doesn't necessarily enter any evidence into court.

Q. It's a matter of modern history in trying to reconstruct mass disasters and mass atrocities?

A. Yes, mass disasters as well as some of the work that I do. I assisted with the identifications of the people who died in

1987

the World Trade Center on 9-11. And I also worked at the Georgia crematorium in 2002 identifying the people that were found at that site.

Q. Getting back away from mass disasters to the subject of mass atrocities and human rights violations, where around the world have you done such work?

A. I've worked with the Argentine forensic anthropology team in Argentina and Buenos Aires helping them to identify some of the 15,000 people that were -- disappeared there in the late '70s and early '80s. I've also worked in Cyprus working with trying to locate and identify the missing there from the 1974 war. And currently I'm training a team in Spain, and we're investigating atrocities that took place during the Spanish Civil War and also during Franco's regime subsequent to that.

Q. Which was approximately what years?

A. Late '30s through the '40s is the era that we're concentrating on.

Q. Franco had some affiliation with Adolf Hitler during those years?

A. Yes.

Q. In addition to the work that's been done by you in the

Page 28

realm of international human rights investigations, you've also mentioned you've worked on mass disasters nationwide. Have you also assisted law enforcement agencies in pursuing criminal investigations, ma'am?

1988

A.    Yes, I've worked with local jurisdictions both in Iowa and in New York. In New York I've worked with the New York State Police and also county authorities on local cases. I have a contract with the Illinois -- or excuse me, the Iowa state medical examiner's office, and I've also worked with several counties here in Iowa on criminal matters.

Q.    And are currently also working with New York authorities.

A.    Yes.

Q.    Dr. Steadman, in connection with your relationship with the Iowa state medical examiner's office, did you do any such work in the fall of the year 2000?

A.    Yes, I did.

Q.    And calling your attention specifically to October of 2000, did you respond to a request from Dr. Klein for assistance in connection with autopsies on bodies recovered from a mass grave here in Iowa?

A.    Yes, I did.

Q.    What was your first such contact if you recall?

A.    They called me in New York and asked if I would come from New York to Des Moines to assist in the analysis of four individuals that were recovered from a mass grave.

Q.    You responded to that request?

A.    Yes, I did.

Q.    Arriving in Des Moines, Iowa, I assume?

A.    Yes, I did.

Page 29

Q. Approximately what date if you recall?

A. I believe I arrived on the 23rd and we began work on the 24th, but I may have arrived on the 24th. I don't recall.

Q. Okay. It turned into a long week.

A. It was, yes, a long week of work, yes.

Q. Long week, long hours.

A. That's correct.

Q. During that period of time -- we've heard it mentioned that it was the 24th through the 28th of October of 19 -- excuse me, of the year 2000 -- who besides yourself worked on this project in Des Moines, ma'am?

A. I worked closely with Dr. Dennis Klein who is the medical examiner on this case. Investigator William Basler was also there. And for a period of time Dr. John Frasco who is a forensic odontologist also came to assist with the identifications.

Q. Briefly describe for the jury the procedure that was employed in conducting these autopsies.

A. Each individual arrived to the ME's office in individual body bags. And so we washed each individual separately, and then there were also bags of bones that were commingled in the grave, and the excavators put those into labelled bags, and so we washed those, and then I was able to successfully reassociate all those bones with the correct person.

When we have mixing of bones like that, we call that

commingling of bones. And it's quite common in a mass grave to

have that commingling. As individuals decompose, the bones are going to settle on each other and fall to the bottom of the grave, and so we were able to successfully reassociate all of the bones with the correct individuals.

MR. MILLER: Your Honor, previously you received in evidence Government's Exhibit 814, and if I may have permission to publish it at this time, I'd ask the witness simply to explain that process in slightly more detail.

THE COURT: You may.

MR. MILLER: 814.

BY MR. MILLER:

Q. Is that necessarily a simple process, ma'am?

A. It's not -- I don't know if I would call it a simple or complex process. It can be a lengthy process depending on how many individuals in the grave and the extent of the commingling. It's an exacting process. You want to make sure that you have all of the bones reassociated with the correct person.

In this case we were able to do that because of the age differences between the children and the adults and between the children. Children have more bones than adults because the bones haven't quite -- haven't fused together yet. And so there are a number of bones that had to be reassociated with each child. But because of the difference between the sexes of the adults and the ages, I was confident that I was able to

1991

reassociate everything properly.

Q. The ultimate purpose of your examination or purposes was to try to answer what questions?

A. The tasks that I was given were primarily twofold. One was to develop a biological profile that would assist in the

Page 31

identification of all four individuals. And the second task was to assess the trauma in all four individuals if there was any.

Q. And I want to define our terms just a little bit. When you talk about a biological profile, what is that, and how do you go about arriving at such?

A. A biological profile from an anthropological perspective is the estimation from the skeleton of age, sex, ancestry, stature, and any pathologies, diseases, or anomalies that the individual had in their skeletons during life that are unique to that individual that would help us identify that individual.

An example of that might be a healed fracture that we can see on the bone that would be unique to one individual to the exclusion of others. Those types of anomalies and pathologies help us make identifications.

Q. And your other task was to assess trauma. How do you go about that in general in the area of forensic anthropology?

A. Thorough examination of the skeleton and of each skeleton independently, and there are three categories of trauma that we need to distinguish between: Antemortem trauma which means trauma that happens before death, perimortem trauma which means

1992

trauma that occurs at or around the time of death, and postmortem trauma which is injuries that occur to the bones well after death.

So antemortem trauma would be like what I just explained, a fracture that occurred months to years before an individual died where we can see healing on the bone.

After an individual dies and decomposes, especially if that individual is buried, the bones turn the color of the surrounding soil, and usually that's a dark color. So if we see

Page 32

an injury in bone, say a fracture in a bone, and the margins of that fracture are the same color as the surrounding bone, that indicates to us that it's a perimortem injury because that -- the margins of that fracture have undergone the same decomposition process as the rest of the bones.

Conversely, if a bone is injured after decomposition and you make an injury to it, it's going to make a white mark in that bone, and that margin will be lighter than the surrounding bone, and so that's one of the ways that we can distinguish between perimortem and postmortem injuries to bone.

Q.   And by perimortem, again you mean injuries that occurred about the time of death?

A.   We call it at or around the time of death, that's correct, if we don't see evidence of healing and we don't see evidence of very recent injury.

Q.   Finally, with regard to the assessment of trauma, do you

1993

have the ability in your field to distinguish between different categories of trauma?

A.   Yes.   There's several types of trauma that can leave marks on bone.   Gunshot trauma will leave distinct marks on bone. Blunt trauma will cause fractures of bone.   We can often see burning to bone and other -- sometimes strangulation, other types of categories like that, but blunt trauma and gunshot trauma -- and excuse me, also sharp trauma.   If a sharp instrument strikes bone and leaves a mark, we can interpret that as well.

Q.   Different weapons or instruments of trauma leave sometimes characteristic information behind.

A.   Yes, they may leave signatures behind on the bone.

Page 33

Q. And did you, in fact, undertake the task of doing both a biological profile and a trauma assessment on each of the five individuals displayed on Government Exhibit 814?

A. These are the first four individuals, and yes, I did do both a biological profile and an analysis of trauma.

Q. That was the one -- that was the work that was done between the 24th and 28th of October of the year 2000?

A. That's correct.

Q. And just so we can give the jury a heads-up on the scope of your testimony, ultimately you also did such an assessment on a fifth victim, that of Terry DeGeus; is that correct?

A. That's correct.

1994

Q. Well, I want to take them with you one at a time.

MR. MILLER: We can take this exhibit down now, please.

Q. At the time that they were received by you, they had not names but numbers; is that correct?

A. That is correct.

Q. Numbers assigned by the state medical examiner?

A. Yes.

Q. Do you recall the number assigned to the first individual you did an examination on?

A. Yes. It was 00SME115. We also referred to it from the field notes, from the excavator notes, as individual number 1.

Q. And that was a number assigned by Mr. Hochrein as being the individual first recovered from that clandestine grave.

A. That's correct.

Q. Dr. Steadman, in -- two things. First of all, in documenting the work that you and pathologists and other

Page 34

scientists do in forensic science, is it important to document your work in every way possible for the purpose of accuracy?

A.   Yes, it is.

Q.   And in what fashions do you document your work?

A.   I take notes as I'm doing the analysis and inventory of the remains, and we also -- I also take a number of photographs.

Q.   Were photographs taken in these five death investigations?

A.   Yes.

1995

Q.   Any idea approximately how many?

A.   No, I couldn't put a number on it, but I took a large number of photographs.  I'm not sure whether it would be 100 or 150, but a large number.

Q.   Photographs were also taken by Dr. Frasco, Dr. Klein, and Agent Basler; is that correct?

A.   That's correct.

Q.   So that for purposes of documenting the work that was done, there are actually totally available hundreds, literally hundreds of photographs.

A.   I imagine that would be the case, yes.

Q.   Nevertheless, for purposes of demonstrating your findings, did you go to the trouble of sorting through those and selecting a select few which would assist you in describing what your findings were in the area of biological profile and trauma?

A.   I did.

Q.   And in addition, you are in the teaching profession; is that correct?

A.   Yes, I am.

Q.   And just viewing this process as to some degree a teaching process, would it assist you in helping us to understand your

Page 35

findings if you would be able to use the model we've designated as Government's Exhibit Number 6, specifically a plastic model of the human skeleton?

A.   I believe it would.

1996

Q.   Okay.  And finally, have you been supplied with a portable microphone?

A.   Yes.

MR. MILLER:  Your Honor, the process that I propose is that the witness be allowed to step down from the podium, move our friend the plastic skeleton to a position where he is visible to the members of the jury and using both that and photographs displayed on the screen explain to the jury what her findings were.

THE COURT:  Any objection?

MR. BERRIGAN:  No, sir.

THE COURT:  Okay.  You may.

THE WITNESS:  Thank you.

THE COURT:  And my law clerk Carey will assist you with the -- oh, do you already have the lavaliere mike?

THE WITNESS:  I do have it.

THE COURT:  You do.  Okay.  Great.  Thank you.

BY MR. MILLER:

Q.   Before you begin, I'll mention just a couple things to you, and I know you have done this before.  But I simply want to remind you, number one, of course, to speak clearly and loudly so that if you happen to be speaking with your back turned to the court reporter she can hear clearly what it is that you're saying, likewise, if your back should be to defense counsel or me or the judge or even the jury, heaven forbid, your language

Page 36

would be clearly understood.

And also in view of the fact that you're using a model, feel free to ask the Court if you suspect at any time that there are members of the jury not able to see what you're trying to show. I simply want to be sure that they do so.

First of all, would you go ahead and describe what Government Exhibit 6 is.

A. This appears to be a plastic model of a human skeleton.

Q. What are the -- well, let me just go ahead and ask with regard to SME115, that was the first examination, skeleton examination, you did in connection with this case; is that correct?

A. That is correct.

Q. Did you do an assessment of the condition and inventory of the bones of the body?

A. Yes, I did.

MR. MILLER: I believe Exhibit 520 has been received in evidence already and would ask permission to publish it at this time.

THE COURT: You may.

BY MR. MILLER:

Q. First of all, Exhibit 520 is being shown to the jury. What is that?

A. These are the skeleton -- excuse me. This is the skeleton of 00SME115, individual 1, and who was later identified as

1998

Mr. Nicholson.

Q. And if you would briefly describe for the jury what your

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1747 of 3592

findings were as to a biological profile.

A.   I determined that this was a white male between 30 and 40 years of age.

Q.   And how did you make that basis?

A.   For the age -- well, I'll start with the sex.  For sex we look at two primary places of the skeleton assuming that we have the entire skeleton.  The best place to assess sex is from the pelvis because there are functional differences between the female and male pelvis.  The female pelvis is broader in every aspect because females have the function of childbirth.  A broader pelvis allows an infant to pass through the birth canal without causing damage to the mother or to the baby.

A male pelvis, on the other hand, is going to be more narrow and more vertical than that of a female pelvis.  So we see changes, differences, in the pelvic inlet which is what I'm pointing to here on skeleton number 6, areas in the front of the pelvis as well as the back of the pelvis.  And again, the female is just going to be broader in every aspect.

In the case of individual number 1, the pelvis was very narrow and very vertical and indicated a male.

A second area that we look at is the skull.  We don't have functional differences between males and females, but what we do see is that the muscle attachments of males of the neck

1999

muscles are much more robust.  That is, they're larger and more prevalent.

And you can see that, for example, back here where the neck muscles come from the back of the neck and attach to the head and allow us to move our head backwards like this.  So this area we call the nuchal area is going to be much more prominent

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1748 of 3592

and robust in males than females because the thickness of that muscle mass is larger.

Other areas that we look for for muscle attachment is right behind the ear called the mastoid process. Again, that's going to be more robust in a male than in a female.

So those are some of the indicators that we look at for sex.

And for this individual, all of the indicators indicated that this indeed was a male.

To estimate the age, for subadults, for children, we look at how the skeleton is growing and developing. For an adult which is the case that we have here, all of the small bones have fused together, and you have the full 206 bones of an adult skeleton. And so we look at different things.

One area that we look at is called the pubic symphysis. It's here in the front, and again I'm referring to Exhibit 6. And it's where the two halves of the pelvis meet in the front here. And if you look at the face of the pubic symphysis, in young individuals, there's a lot of topography to

2000

that face. We call it ridges and furrows. And as an individual gets older, those ridges and furrows begin to wear down and the face becomes flatter.

In addition, as the individual ages, a rim develops around that face, and eventually as the individual becomes even older, all of that begins to break down. So we have these age-related changes in the pubic symphysis that allow us to estimate the individual's age.

Another area that I looked at in this case is in the back of the pelvis, a different joint, where each side of the

pelvis meets the sacrum here in the back. You might have heard this joint called the sacroiliac or SI joint.

If we look at the ilium side of it, again, the part of the hipbone itself, we see similar changes to that that I described for the pubic symphysis, but they're a little bit more subtle. We see some topography that again is going to even out with age, some rim changes and some texture changes that again are documented to be age related in its progression.

And the last area I looked at of the skeleton for age estimation is the skull. Now, the skull is actually made up of a number of different bones that are held together by sutures. When a child is born, those bones are very far apart because it allows molding of the skull during childbirth. And as we get older, the bones come closer and closer together, but they don't actually fuse or close. These sutures don't actually fuse or

2001

close until our 30s or 40s or even later.

And so by looking at the sutures, we can tell whether -- generally whether we're looking at a younger individual, a middle-aged individual, or an older individual.

So by looking at all three of these areas of the skeleton, I estimated that individual number 1 was between 30 and 40 years of age.

Q. Dr. Steadman, in addition to providing a biological profile, did you do an assessment of perimortem or time of death injuries on the remains of Greg Nicholson?

A. Yes, I did.

Q. And before we go any further, I referred to 115 as Greg Nicholson. That identification was made through dental examination by Dr. Frasco; is that correct?

Page 40

A.    That's correct.

Q.    So I'll use those two terms interchangeably, but we're referring to Greg Nicholson at this point; is that correct?

A.    That's correct.

MR. MILLER:  Your Honor, I've already displayed to counsel for the defense Government Exhibits 523 and 525 and would offer them in evidence at this time.

*   *   *   *

(Government Exhibits 523 and 525 were offered.)

*   *   *   *

THE COURT:  Any objection to 523 and --

2002


MR. BERRIGAN:  No objection, sir.

THE COURT:  523 and 525 are admitted.

*   *   *   *

(Government Exhibits 523 and 525 were admitted.)

*   *   *   *

BY MR. MILLER:

Q.    Among the areas of this individual's body, did you observe any indication of trauma in the thorax or chest cavity area?

A.    Yes, I did see evidence of perimortem trauma in the thorax.

MR. MILLER:  With the Court's permission, I would ask that Exhibits 523 and 525 be displayed at this time.

THE COURT:  They may.

BY MR. MILLER:

Q.    I'll do them side by side if that will help you describe them.  With the effort to make sure that the record is kept clear as to which of the two exhibits you're describing, please go ahead and, using the skeleton as well, describe for the jury what, if anything, of significance you observed on the thorax or

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1751 of 3592

chest area of Greg Nicholson.

A.     When we refer to the thorax, what I'm referring to is this area of the body here that we commonly call the chest but also where the ribs are anchored to the spine back here.  And what you're seeing in Exhibit 523 as well as Exhibit 525 is the right fifth rib of Mr. Nicholson.  And the right fifth rib -- I'm now referring to Exhibit 6 -- would be -- we count from the top ribs

2003

down.  There's 12 ribs on each side typically.  And so the top rib would be rib 1.  We count down on the right side one, two, three, four, five.  And this rib -- I'm now turning the skeleton around so that the back is facing the jury.

        The injury that you're seeing, you can see that there's traumatic separation of the bone, and the area in which this is occurring is near where the rib 5 anchors to the vertebra in the back of the skeleton.  And the closer view which is Exhibit 525, you can see a semi-circular defect on the bottom of that bone with bone loss on one side.  And that is indicative of a gunshot wound that entered the bottom of the bone from the back and then exited through the front of the bone.

        One of the things that I should explain now is when a bullet perforates a bone, it leaves a cone-shaped defect; okay?  And I'll use the skull as an example because it's a bit easier.  If a bullet enters a skull on this side, it's going to create a cone-shaped defect such that on the outside you're going to see a circle, okay, assuming that it impacted perpendicular.  And then as the bullet exits the bone on the other side, it's going to have bevelling on that side, and that tells you the direction that the bone is going; okay?

        So if the bullet had enough energy to leave the other

Page 42

side of the skull, we would see the reverse. We would see bevelling on the external surface of the skull because this is where the bullet was exiting. So that can help tell us

2004

trajectory. So we have internal bevelling on an entrance wound and external bevelling on an exit wound. And so that's how I could tell that this particular gunshot was likely back to front because of the type of damage that we see on this rib.

Q. And by bevelling, we may have some carpenters on the jury that would understand that, but for those of us who don't, the entrance wound would actually be smaller in diameter than the exit wound going through the bone?

A. Yes, yes, because the bevelling will be on the side that the bullet was passing through.

Q. And the bevelling is the cone-shaped increase in the diameter of the wound as it passes through the bone?

A. That's correct.

Q. Thank you. And, Doctor, I believe on the table behind you is a laser pointer. I'm not asking that you necessarily do it now, but at whatever point it would assist you in helping the jury understand your descriptions, please feel free to use that.

In addition to injuries in the thorax, did you find trauma elsewhere on the body of Greg Nicholson?

A. Yes, I also found trauma in the neck as well as the head.

MR. MILLER: I have shown to counsel for the defense Government Exhibits 529 and 530 and offer them at this time.

* * * *

(Government Exhibits 529 and 530 were offered.)

* * * *

2005

Page 43

THE COURT: Any objection?

MR. BERRIGAN: No objection.

THE COURT: 529 and 530 are received.

* * * *

(Government Exhibit 529 and 530 were admitted.)

* * * *

MR. MILLER: And with the Court's permission, I would like to publish them at this time side by side again.

THE COURT: You may.

BY MR. MILLER:

Q. The jury is now looking at Government Exhibits 529 and 530. And would you please describe for the jury what they see in those photographs?

A. You see two views of the same vertebra. This is the fourth cervical vertebra. And again referring to Exhibit 6, the cervical vertebra are those of your neck that allow you to rotate your neck. And there are seven total typically. And so, again, we count from the head down. So the fourth cervical vertebra would be one, two, three, this one about in the middle of the neck.

And the injuries that I saw here in this case were small hairline fractures of the sides of the vertebra which would be over here, and again, I'm referring to the left side of the C4 of the exhibit and then also on the spinous process which is the part that you actually feel when you feel the back of

2006

your neck here. So those are the injuries that I saw to that particular vertebra. I did not see any injuries to any of the

Page 44

other vertebra that would be perimortem.

Q.   Now, Dr. Steadman, you described the injuries that you previously showed in the rib as being gunshot wounds?

A.   Yes.

Q.   Or a gunshot wound?

A.   A gunshot wound.

Q.   Are you able to give us an opinion as to the nature of this wound to the neck?

A.   No.  In terms of these small hairline fractures, the etiology or the cause of the injuries is unclear.  They're not diagnostic of any particular type of injury.  There's no defect, a hole in the bone, to indicate it's a gunshot wound.  It could be due to direct trauma or twisting trauma.  I couldn't reliably give you a cause of this particular injury.

Q.   You simply assess it as a trauma that occurred at about the time of death.

A.   That's correct.

Q.   We've talked about gunshots, stabbing, blunt trauma.  Are there any that you would rule out?

A.   Well, because, again, there's no defect or hole through this bone, I would rule out -- gunshot wound to this bone I would rule out, but I don't think I could rule out anything else.

2007

Q.   Was there any other area of trauma to the body of Greg Nicholson that you noted during your examination?

A.   Yes, there is trauma to the skull in this case.

MR. MILLER:  And, Your Honor, we have shown to Mr. Berrigan Government Exhibits 541, 540, 537, 539 and offer them in evidence at this time.

Page 45

* * * *

(Government Exhibits 537 and 539 through 541 were offered.)

* * * *

MR. BERRIGAN: No objection.

THE COURT: Government's Exhibits 541, 540, 537, and -- is it 539?

MR. MILLER: First with regard to --

THE COURT: -- are admitted. I'm sorry.

* * * *

(Government Exhibits 537 and 539 through 541 were admitted.)

* * * *

MR. MILLER: And with the Court's permission, I would display these first beginning with 537.

THE COURT: You may.

BY MR. MILLER:

Q. This shows us what?

A. This is the skull of Mr. Nicholson. And you're looking at

2008

the underneath part of the skull. So if I pulled this skull off and turned it upside down, you would be looking at this part here. And again, I'm referring to the back bottom part of the skull of the Exhibit Number 6.

And what I would like to call your attention to is I observed large amount of fragmentation and some bone loss in this area here, and I was able to reconstruct part of the fragments that had been detached from this area that were recovered.

Q. Moving on to Government's Exhibit 539 -- and put that side

Page 46

by side perhaps, 539 -- we now have before the jury Government Exhibit 539 side by side with Government Exhibit 537. Would you go ahead and continue to describe the process that you undertook?

A. I was able to successfully reconstruct the bone fragments that were recovered from this area of the skull. And this area here that I'm pointing to at the very bottom of the skull, this is a natural opening that everybody has. This is called the foramen magnum. This is where the spinal cord exits the brain and comes down the vertebral column. But this area here and this area here on the lower side of the skull and at the base of the skull, these are areas of traumatic bone loss.

What I observed in the area I'm marking with the light here is a semi-circular area that exhibited internal bevelling that is indicative of an entrance wound of a gunshot trauma.

2009

Q. And you've been describing Exhibit 539; is that correct?

A. Yes, referring specifically to Exhibit 539. And it's on the lower left side of the skull.

Q. And the internal bevelling tells you what, Doctor?

A. The internal bevelling indicates that this is consistent with an entrance gunshot wound.

Q. Thank you. Moving on to Government Exhibit 540, please, what does Exhibit 540 show, please?

A. 540 shows again the reconstructed skull. You're looking at what we call a left lateral view. See if I can figure out right and left. And so I'm arranging Exhibit 6 in the same position.

And what I observed was this defect here behind the left mastoid process which is the left ear area. Immediately behind that area is that defect that exhibited the internal

Page 47

bevelling. It's the same defect, a different view. And there are also fractures radiating from that site. Those fractures sometimes occur in different types of trauma to try and relieve the stress of the impact.

So, therefore, then referring to Exhibit 6, the entrance wound is located approximately here on the left side behind the left ear of the lower part of the skull.

Q. And, Doctor, again from the bevelling, that hole in the back of the head is an entrance wound.

A. Consistent with an entrance wound, yes.

Q. Let me ask you this. We've already heard a bit from

2010

Dr. Klein, but I think it bears reiterating. Are you, from looking at the bone alone without any surviving nondecomposed soft material, skin, or flesh, able to draw any conclusions about the muzzle target distance or how far away from the head the gun was when this person was shot?

A. The target distance, no, we can't determine that from bone.

Q. Thank you. And then moving on to Exhibit 541, please. What does the photograph that the jury is now viewing as Government Exhibit 541 show us, Doctor?

A. Exhibit 541 shows Mr. Nicholson's skull in the same position, but it has a probe through the entrance wound. There is no exit wound in this skull. Upon radiographing the skull, we found that the bullet was lodged behind the nasal area inside the skull. And so the bullet entered into the left lower area of the skull behind the area but did not exit the skull.

Q. The pink probe that is shown in the photograph is there to demonstrate what, ma'am?

A. The pink probe is demonstrating the approximate trajectory

Page 48

of the bullet through the skull. So the trajectory was back to front.

Q. While we're on the subject, Doctor, can you as a forensic anthropologist -- and by you I mean all of those in your profession, not just Dr. Steadman but all in your profession -- can you tell us what caliber of bullet passed through a bone?

A. No. There is no reliable way to determine the caliber size

2011

from the defect left in the bone. There are simply too many factors involved in creating the defect, factors related to the elasticity and plasticity of the bone especially in younger individuals, the exact location of where the bullet entered the bone and also many elements of the bullet itself, whether it impacted the bone perpendicular to the bone, whether it had any sort of deformation and so on. All of these factors make it unreliable to try to estimate caliber from the dimensions of a defect.

Q. So I take it you would not rule out any standard caliber bullet as having possibly caused this injury to Mr. Nicholson.

A. I could not rule out any caliber, no.

Q. And I want to be very clear. Without suggesting that you are making any such diagnosis, is it at least consistent with what you see that a nine-millimeter could have done this damage?

A. It is possible.

Q. As are any number of other calibers.

A. That's correct.

Q. Can you at least give us a -- some limit on the caliber of a weapon, because obviously a bullet can't make a hole smaller than the diameter of the bullet itself, can it?

A. Actually a bullet -- the diameter of a defect can be

Page 49

smaller than the diameter of the bullet. The reason why that can occur is the actual physics of the bone itself. Again, especially in young individuals where the bone has a lot of

2012

collagen, the bone is very elastic. And after a bullet impacts and penetrates a bone, the bone can actually snap back a little bit and so that the resulting defect in a dry bone is a little bit smaller than the known caliber that went through it. So that is indeed possible and another reason why it's very unreliable to estimate caliber size from the diameter of a defect.

Q. Trajectory, on the other hand, is something that you can much more reliably conclude.

A. The trajectory we can reliably conclude because of the bevelling dynamics of the entrance and exit aspects of a defect, yes.

Q. And then just to summarize in the case of Mr. Nicholson if you would using the model, Exhibit 6, show us the total number of gunshots that you diagnosed and the trajectories of those gunshots.

A. We can only estimate the minimum number of bullets that traversed a body based on the bony injuries. There may have been many more bullets that went through a body. If you'll notice, there's a large area here in the abdomen where a bullet could go through, cause soft tissue damage, but not touch any bones. So, therefore, conservatively, I only estimate the minimum number of bullets based on clear evidence from the bony trauma.

And given that, in this case I estimated there were a

2013

minimum of two bullets that impacted the skeleton of Mr. Nicholson, one to the back of the right rib cage at right rib 5 and the other to the left side of the back of the skull. So two -- those are the two bullets that I could reliably determine passed through the skeleton.

Q.   Thank you, Dr. Steadman.  Now, after concluding your examination of the remains of Greg Nicholson, did you move on to the other adult victim in this case?

A.   Yes, I did.  I then examined the remains of individual number 2.

Q.   Individual number 2 was also known as SME116?

A.   That's correct.

Q.   And ultimately by Dr. Frasco identified as the remains of Lori Duncan.

A.   That's correct.

Q.   First --

MR. MILLER:  And I believe Exhibit 625 has already been received in evidence if we, with the Court's permission, can show that to the jury at this time?

THE COURT:  You may.

BY MR. MILLER:

Q.   There we go.  For the record, Exhibit 626 (sic) is being displayed before the jury, and using whatever laser pointer or other tool you wish, I'd like you to go ahead and describe for the jury the condition of the body as you discovered it and the

2014

inventory on the skeleton.

A.   What you're seeing in Exhibit 526 (sic) are the recovered skeletal remains of individual number 2 later identified as Lori

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1761 of 3592

Duncan. The remains are relatively complete, and they're laid out in anatomical position here. You can see most of the major bones -- I'm using the laser pointer to point to Exhibit 526.

THE COURT: Excuse me. I think there's confusion as to the number. I think it's 625.

A. Oh, I'm sorry.

Q. Yes, and just so the record's very clear, you've been referring to what is before the jury as Exhibit 625.

A. My apologies.

Q. Is that correct?

A. Yes. My apologies. On that exhibit this area to the left of the skull are small pieces of the facial skeleton that were traumatically detached from the skull.

MR. MILLER: And again, subject to any objection from defense counsel, the government offers Exhibit 626.

* * * *

(Government Exhibit 626 was offered.)

* * * *

MR. BERRIGAN: No objection.

THE COURT: 626 is received.

* * * *

(Government Exhibit 626 was admitted.)

2015


* * * *

BY MR. MILLER:

Q. And with 626 now being published to the jury with the Court's permission --

THE COURT: You may.

Q. -- I would ask that you describe what they see in Exhibit 626, Doctor.

Page 52

A.   This is a closer view of the upper part of the remains of Lori Duncan with the vertebra on your right side of the skull and some of the facial fragments that were recovered on the left side of the skull and mandible.  And again, it's laid out in anatomical position.

Q.   Did you recover a substantial portion of that skeleton?

A.   I reassociated what was recovered, yes, and most of the skeleton was recovered, yes.

Q.   Were you able from there to arrive at a biological profile?  And if so, just very briefly describe what your findings were.

A.   Using the same methods that I discussed before for estimating age and sex of adults, I estimated that this was a white female, age between 30 and 40 years.

Q.   And did you, during your examination, locate any areas of perimortem trauma?

A.   Yes, I did.

Q.   In what general areas of the body?

A.   In the thorax, the pelvis area, one extremity, and the

2016

skull.

Q.   Let's begin with the pelvis area if we could.

     MR. MILLER:  And at this time the government offers Exhibit 638 in evidence.

                    *   *   *   *

     (Government Exhibit 638 was offered.)

                    *   *   *   *

     MR. BERRIGAN:  No objection, sir.

     MR. MILLER:  And with the Court's permission would display it at this time?

     THE COURT:  638 is received and may be displayed.

Page 53

* * * *

(Government Exhibit 638 was admitted.)

* * * *

BY MR. MILLER:

Q.   What is Exhibit 636, ma'am?

A.   638?

Q.   I apologize.  And this confusion on the exhibits is my fault, not yours.  It's my job to keep the record straight, and I'll try to do a better job of that.

The jury is now viewing what has been received in evidence as Government Exhibit 638.  Please describe that for us if you would, please.

A.   This is the right ilium or hipbone.  Again, you're looking at this bone here referring to the right pelvis of Exhibit 6.

2017

And what I observed on this right ilium or hipbone is a small hairline fracture here which is -- I will demonstrate on Exhibit 6 -- a fracture that runs along a portion of the back of the pelvis but on the front side of it, and the dark margins indicate to me that this is a perimortem fracture, not something that occurred during recovery of the remains.  The etiology or cause of the fracture is unclear.  It's nonspecific.  It could be due to direct trauma or could be due to a fall.  There's nothing specific about it that would allow me to reliably determine what the cause of the fracture is.

Q.   All we know is that there was a hip fracture at about the time of death.

A.   That is correct.

Q.   You mentioned that there was observed traumatic injury to the thorax of this victim.

Page 54

A.    Yes, I did observe that.

Q.    And you found this on a number of different areas of the rib cage; is that correct?

A.    That is correct.

          MR. MILLER:  Government offers Exhibit 629.

                         *   *   *   *

          (Government Exhibit 629 was offered.)

                         *   *   *   *

          MR. BERRIGAN:  No objection, Your Honor.

          THE COURT:  629 is received.

2018

                         *   *   *   *

          (Government Exhibit 629 was admitted.)

                         *   *   *   *

BY MR. MILLER:

Q.    Referring specifically to the fourth right rib area of the thorax --

          MR. MILLER:  With, of course, permission, I'd like to publish those to the jury.

          THE COURT:  You may.

BY MR. MILLER:

Q.    -- what does Exhibit 629 show, please?

A.    Exhibit 629 shows the top portion of right rib 4 which is near the middle or front of the rib.  Referring again to Exhibit 6, counting down on the right side the fourth rib, the area of this injury would be approximately here near the front right side of the rib cage on the right rib 4.  And the nature of this injury is again consistent with a gunshot wound.  There's not a circular defect, but instead what we see is on the internal surface, that is, where the lungs would be in life, on the

Page 55

internal surface, there is fragments of bone that are pushed forward towards the external surface.  And what you're seeing referring to Exhibit 629 is a large area of bone loss on that external surface.

What that indicates to me is that the bullet passed over the bone from the back towards the front exiting the front

2019

of the chest area.

MR. MILLER:  Exhibit 630 is offered.

*   *   *   *

(Government Exhibit 630 was offered.)

*   *   *   *

MR. BERRIGAN:  No objection.

THE COURT:  630 is received.

*   *   *   *

(Government Exhibit 630 was admitted.)

*   *   *   *

MR. MILLER:  And again with the Court's permission, I would display it to the jury at this time.

THE COURT:  You may.

BY MR. MILLER:

Q.    What does Exhibit 630 show us, Doctor?

A.    Exhibit 630 is a different rib.  This is the seventh rib on the right side, so two ribs farther down on the right side, and I'm pointing to this area on the Exhibit 6, the mounted skeleton.

And what I observed here is a fracture, complex fracture, of the area just lateral or just to the side of where the sternum meets -- or excuse me, the rib meets the cartilage that goes to the sternum.  So this is more towards the front of

Page 56

the chest area. And there is no defect or hole in the bone that suggests that this is gunshot trauma. So the etiology of this

2020

wound is again unclear. It is a perimortem fracture in my opinion based on the dark margins of the wound.

Q. Do you rule out gunshot fire?

A. In this case I cannot rule out gunshot fire because what might happen is when a bullet hits bone or sometimes even soft tissue, the bullet can fragment. In addition, the bone will fragment. And oftentimes that means you have secondary projectiles that are now loose within the body. And so this fracture could have occurred from an impact with a bullet fragment, but it also could have been due to blunt trauma. I can't rule out anything at this point. It's simply not clear enough to reliably assess a cause.

Q. It is, however, a fracture suffered at about the time of death.

A. I believe it is perimortem, yes.

Q. In addition to fractures discovered on the fourth and seventh ribs, did you also discover a fracture on the eighth rib?

A. I'm not sure if it was the eighth or the ninth, Mr. Miller.

Q. Well, would it refresh your recollection possibly to view some of the photographs?

A. Yes.

MR. MILLER: Government offers Exhibit 635 in evidence.

* * * *

2021

Page 57

(Government Exhibit 635 was offered.)

                              *   *   *   *

MR. BERRIGAN:  No objection.

THE COURT:  635 is received.

                              *   *   *   *

(Government Exhibit 635 was admitted.)

                              *   *   *   *

MR. MILLER:  And with the Court's permission would display it to the jury at this time.

THE COURT:  You may.

BY MR. MILLER:

Q.   And can you tell us, please, what Exhibit 635 shows?

A.   My recollection is that this is the left ninth rib.

Q.   Please describe what that shows.

A.   This is -- Exhibit 635 is showing traumatic fragmentation of the rib on the back of the rib on the left side, the ninth rib.  So that's going to be fairly far down in approximately this area, and I'm pointing to the post -- the back of the rib cage to the left rib 9, actually left.  Sorry.  Now I'm pointing to the left side of the rib cage.  And this fragmentation occurred just to the side of where the rib meets the vertebral column in the back of the chest area of the thorax.  This fragmentation is consistent with a gunshot wound passing through this area.  And when I reconstructed those fragments, I estimated that the bullet was passing from back to front through

2022

that rib at the back of the rib cage.

Q.   Okay.  And if we can just then summarize as to the torso of Lori Duncan what you observed in the way -- and just -- again,

Page 58

just using the skeleton model what you found in the way of trauma and, to the extent that you could do so, any trajectory.

A.    I estimate that there is a minimum of one bullet that passed through the rib cage.  And again, that's a minimum estimate.  It is possible that one bullet could have caused the injury to the back of rib 9 as you see in Exhibit 635 and -- because it came from the back to the front and then exited out of right rib 4 at the front.  I can't rule out that that happened, so again, for the purposes of conservation, we don't want to inflate the number of bullets.  I estimate that one, a minimum of one bullet, went through the rib cage from back to front.

Q.    And the infliction of multiple fractures by a single bullet projectile is explainable how?

A.    Because of the potential for fragmentation of that bullet as well as the bony structures that it passes through creating secondary projectiles.

Q.    In addition to bone trauma to the pelvis and chest area, I believe you also mentioned trauma to the extremities?

A.    Yes, there is trauma to one extremity.

MR. MILLER:  And the government offers Government Exhibit 636.

2023


*   *   *   *

(Government Exhibit 636 was offered.)

*   *   *   *

MR. BERRIGAN:  No objection.

THE COURT:  636 is received and may be shown to the jury.

*   *   *   *

Page 59

(Government Exhibit 636 was admitted.)

* * * *

BY MR. MILLER:

Q.   Doing so now, Doctor, and describing what the jury is viewing as Exhibit 636 and orienting them in relation to Exhibit 6, the skeleton, would you please describe what they see there?

A.   In Exhibit 636 you see the majority of the lower end of the left ulna.  The ulna is one of the bones of the forearm.  It's the bone that's on the pinky side of the forearm here.  And I'll demonstrate that bone on Exhibit 6.  I'm referring to this bone here on the left side.

And what I observed in this bone in the case of Lori Duncan is that the proximal part of it, that is, the part that comes up to meet the elbow, to form part of the elbow here, was traumatically missing.  You can -- I observed that the edges of the margin are again the same color as the surrounding bone indicating to me that this is a perimortem wound.  And the nature of the free margins of that fracture are consistent with

2024

gunshot trauma through this area.

Q.   Were you able to estimate trajectory?

A.   I was not able to estimate trajectory in this case, no.

Q.   Were there any other traumatic injuries on the extremities of Lori Duncan?

A.   I also observed on the same left arm on the left hand, the left fourth metacarpal which is the bone of the palm of your hand on the fourth side, would be this ring finger, okay, but down near the palm there is a spiral fracture that you see -- that I observed on the back side of that.  Again, it's a small fracture.  The margins were dark indicating that it was

Page 60

perimortem, but I could not -- the fracture was not specific enough for me to estimate a reliable cause of that injury.

Q. Did it bear any of the characteristics of a gunshot wound at all?

A. There was no defect in the bone to suggest gunshot wound, no.

Q. Was it consistent in any manner with either blunt trauma or twisting?

A. It is -- both of those causes are possible. Twisting of the hand or a fall or an impact, I can't rule out any of those possibilities, no.

Q. All we know is this is an additional fracture that occurred at about the time of death.

A. Yes.

2025

Q. A spiral fracture on the ring finger?

A. Not on the finger, on the metacarpal down here, a bone in the palm, yes.

Q. Now, you've described for us a number of gunshot injuries to the thorax or chest area of this woman as well as a gunshot injury to what this layman would call a forearm; correct?

A. That's correct.

Q. How many gunshots have we added up so far?

A. The minimum number of gunshot wounds that we've discussed so far would still be one.

Q. Why only one?

A. The reason for that is the forearm is so highly movable it could have been in front of the chest at the time the bullet was exiting. There's no way we could reconstruct that; and, therefore, I can't rule it out because it's anatomically

Page 61

possible. And so again, to keep the number of bullets estimated that passed through the body to be conservative, I would still say that it's a minimum of one bullet at this time.

Q. With a trajectory of back to front?

A. With a trajectory in the thorax of back to front, that's correct.

Q. Thank you, ma'am. Did you find any evidence of traumatic injury on this body of Lori Duncan other than what you've described so far?

A. There were traumatic injuries to the skull.

2026

MR. MILLER: Your Honor, the government offers Government Exhibits 644 and 648.

                    *   *   *   *

(Government Exhibits 644 and 648 were offered.)

                    *   *   *   *

MR. BERRIGAN: No objection.

THE COURT: 644 and 648 are received and may be shown to the jury.

                    *   *   *   *

(Government Exhibits 644 and 648 were admitted.)

                    *   *   *   *

BY MR. MILLER:

Q. Beginning with 644, please, Dr. Steadman, can you describe for us what Exhibit 644 shows?

A. Yes. Exhibit 644 shows the top left skull of Lori Duncan. If I may move the Exhibit 6 skeleton to approximate the angle that you're seeing the skull on the screen, you would be looking at the left side of the top of the skull approximately here above the forehead.

Page 62

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1772 of 3592

Q. And what sort of a wound is that?

A. I observed a large what we call a keyhole-shaped defect with external bevelling. This is consistent with an exit keyhole fracture. A keyhole fracture is due to the bullet not perforating the bone per -- directly perpendicular to the bone but rather at an angle to the bone such that -- and again, I'm

2027

referring to Exhibit 644 with the laser pointer -- such that it began to exit the bone here at the circular defect but did so at an angle, therefore creating this more somewhat triangular defect attached to it. And that suggests to me that this is an exit wound because of the external bevelling and that the trajectory of the exit was sideways right to left as it exited the skull.

So again, I'm using the laser pointer in the circular area right here and exiting the skull this way, right to left.

Q. And referring now to Exhibit 648, would you tell us, please, what Exhibit 648 shows.

A. 648 demonstrates several things. Again, this -- 648 is the skull of Lori Duncan. And it's a anterior view such that -- and I'm referring to Exhibit 6 -- looking at the skull, at the face of the skull. As I demonstrated before, most of the face is traumatically detached and in small pieces.

What I did observe on the right side of Lori Duncan's skull, although there's some bone missing there, are a number of fractures that converge in this one area immediately behind the right eye, and I'm pointing to that on the Exhibit 6. And although there is no clear entrance wound defect in this area because of the tremendous amount of bone loss, I interpret based on these converging radiating fractures to this site and based

Page 63

on the trajectory of the exit wound that the entrance wound was in this area of the right side of the skull behind the right eye

2028

area and then exited through the top left part of the skull.

Q.   One gunshot wound.

A.   It's consistent with a single gunshot wound, yes.

Q.   Entering on the -- approximately the right side of the face and entering the upper left part of the skull?

A.   That's correct.

Q.   And referring to this project as a whole, namely the autopsy of SME116, Lori Duncan, your ultimate conclusion as to a conservative estimate as to the number of gunshots and their trajectory was what, sir -- was what, ma'am?

A.   Minimum number of total bullets that I could estimate, the minimum number of bullets, was two, one to the back of the thorax as I discussed before and now a second one to the skull.

Q.   The one to the thorax being back to front and the one to the skull being from front to back and upwards.

     MR. BERRIGAN:   Object to that, Judge.   It misstates the evidence.

Q.   Please just -- I'll withdraw the question.   Just please explain in your own words your understanding of the trajectory of each of those two.

A.   The thorax bullet I believe was back to front, and the gunshot wound to the skull was mostly right to left and perhaps a bit upwards, yes, but right to left.

Q.   Entering right behind the right ear -- or excuse me, the right eye?

2029

Page 64

A.    Yes.

THE COURT:   Mr. Miller, the jury's been sitting for quite a while, so I'd like to give them a stretch break.

And, Dr. Steadman, you may want to sit down and rest for a minute.  So we'll just take a short stretch break.

MR. MILLER:   Feel free to have a sip of water too if you'd like.

THE COURT:   Okay.  Please be seated everyone.

BY MR. MILLER:

Q.    Doctor, before we move on to the next autopsy, you indicated in looking at Government Exhibit 648 that there's significant amount of bone loss.  Can you explain that?

A.    The bone loss would be consistent with the gunshot wound through this area of the skull, and we recovered many of the fragments, but I was not able -- because the facial bones are very thin and some of the fragments were missing, I was not able to reliably reconstruct the facial part of the skull.  And so I did not attempt to do so.

Q.    Thank you.  Let's move along to the next autopsy, and that's number SME117; is that correct?

A.    Yes, that's correct.  Sorry.

Q.    You followed the same procedure of cleaning, assembling, and inventorying the skeletal remains on this child as you had with the adults?

A.    Yes, I did.

2030

Q.    And what were your findings as far as condition and inventory on 117?

A.    With individual 117 who was later identified as Kandace Duncan, the skeletal remains were commingled with that of her

Page 65

sister, Amber. And so I did spend a fair amount of time making sure that the bones were reassociated with the proper child. And most of the bones were present and properly reassociated.

MR. MILLER: Government offers Exhibit 707 and request permission to publish.

* * * *

(Government Exhibit 707 was offered.)

* * * *

MR. BERRIGAN: No objection, Your Honor.

THE COURT: You may. 707 is admitted.

* * * *

(Government Exhibit 707 was admitted.)

* * * *

BY MR. MILLER:

Q. Dr. Steadman, please describe Government Exhibit 707 if you would.

A. These are the skeletal remains that were recovered of Kandace Duncan which was at that time known as SME117. You can see that the remains are smaller obviously than the adults and also that there appear to be more bones, and that's because the child was still growing and the bones had not all fused together

2031

yet, an indication that we are dealing with the remains of a child.

Q. Any other biological profile or conclusions?

A. I was able to estimate the age to be between 8 and 11 years old based on the stage of growth and development of the bones.

With children we do not estimate the sex of children. There's no reliable way of doing that based on the morphology because it's not until they enter puberty and after that the

Page 66

pelvis of the female begins to differentiate from that of the male, that is, get wider. And so the skeletons of children, both boys and girls, look very similar. And so I did not estimate sex in this case of this child.

Q. In your examination did you find indication of perimortem trauma, Dr. Steadman?

A. I did find perimortem trauma, yes.

Q. In what area or areas?

A. In the area of the skull.

MR. MILLER: Your Honor, the government offers Government Exhibits 711, 710, and 716.

* * * *

(Government Exhibits 710, 711, and 716 were offered.)

* * * *

MR. BERRIGAN: No objection, sir.

THE COURT: Okay. 710 I think is already in evidence. 711 and 716 are received and may be shown to the jury.

2032

* * * *

(Government Exhibits 711 and 716 were admitted.)

* * * *

MR. MILLER: That is correct.

BY MR. MILLER:

Q. And beginning with 711, please, Exhibit 711 shows us what, please?

A. Exhibit 711 is the back of the skull of Kandace Duncan, and I'm referring to Exhibit 6 showing that the view that you're looking at is just right at the back of the skull.

And what I observed in this case was a small circular defect on the occipital bone which is the bone of the posterior

Page 67

skull. Again, I'm referring to this area on Exhibit 6. And it is just to the right of the midline. And it's a complete perforation of the bone with internal bevelling which again is indicative of a gunshot entrance wound. And I also observed several fractures radiating from that site.

Q. Those fractures radiating from that site indicating what?

A. Indicating that the bone was doing what it's supposed to do which is to try to relieve the stress of the impact to that area.

Q. And again, that is a fairly circular defect. Does it tell you anything about the caliber of the weapon?

A. It cannot tell us anything about the caliber of the weapon for the reasons I described before, the elasticity of the bone,

2033

the location of where the bullet impacted the bone, and the nature of the bullet itself. I could not determine reliably the caliber.

Q. But again, a mid-range caliber such as a nine-millimeter would at least be consistent with that.

A. That's possible.

Q. And to be perfectly clear, so would any number of other calibers of an ordinary firearm.

A. That's correct.

Q. Moving on to Exhibit 710 which has already been received in evidence, I'll ask that that be shown to the jury at this time. And if you would, please, Doctor, describe for the jury what they see in Government Exhibit 710.

A. Government 710 or Exhibit 710 is also the skull of Kandace Duncan looking at -- directly at the face. And what I observed when examining this area of the skull is area of traumatic bone

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1778 of 3592

destruction on the left side of the nasal area, and I'm referring to the left side of the nasal area of Exhibit 6 here near approximately the bridge of the nose. And this I interpreted or I estimated this to be the location of the exit of the bullet. The bones here are very thin and fragile, and they don't exhibit the bevelling that we see in thicker bones. But based on the type and location of destruction, this is consistent with an exit area of the bullet that entered the back of the skull.

2034

Q. Having located both the entrance and estimated the exit location, were you able to arrive at an opinion as to the trajectory of the bullet as it passed through this child?

A. Yes. My opinion is that the bullet was back to front.

Q. And if I can interrupt you and offer an exhibit at this time.

MR. MILLER: Request permission to publish Government Exhibit 716.

THE COURT: You may.

BY MR. MILLER:

Q. Please describe for the jury Exhibit 716.

A. This is the -- looking at the right side of the skull of Kandace Duncan. And there's a probe going through the skull entering the -- I'm going to use the laser pointer -- entering the entrance wound on the back of the skull, passing through the cranial cavity of the skull, and exiting in the area of traumatic bone damage that I observed on the left nasal area of the face. So this is demonstrating my interpretation that the bullet entered the back of the skull and exited the front of the skull.

Page 69

Q.   And again, as to this victim, 117, Kandi Duncan, this was the sole traumatic injury discovered at your autopsy.

A.   I did not see any other perimortem wounds on the skeleton, no.

Q.   And yet again just so we're very clear, you are as a

2035

forensic anthropologist scientifically unable to render an opinion as to the distance between the muzzle of that gun and the back of this young girl's head at the time of her shooting.

A.   No, there is no reliable way to determine the distance from the skeleton.

Q.   After completing your autopsy on Kandi Dunker -- excuse me, Kandi Duncan, did you move on to do an examination of the skeleton of Amber Duncan?

A.   Yes, I did.

Q.   And would you describe for the jury, please, the findings that you made as to the condition of her skeleton and the inventory of her skeletal parts?

A.   Again, I had to reassociate the skeletal remains between the two girls, and I believe I did so successfully.  The skeleton was relatively complete.  I estimated the age to be between, I believe, five and seven years old based on the same methodology that I used for her sister, looking at the stage of growth and development of the skeleton at the time she died. And again, I did not estimate sex in this case for the same reasons I described before.

Q.   Estimated age again was what?

A.   I believe five to seven years.

MR. MILLER:  The government offers Exhibit 806 in evidence.

Page 70

* * * *

2036

(Government Exhibit 806 was offered.)

* * * *

MR. BERRIGAN: No objection.

THE COURT: 806 is received and may be published.

* * * *

(Government Exhibit 806 was admitted.)

* * * *

BY MR. MILLER:

Q. Dr. Steadman, drawing your attention to Government Exhibit 806 currently being published to the jury, would you describe for them what they see in this photograph?

A. These are the skeletal remains that were recovered and I inventoried for Amber Duncan, case number SME118, also known as individual number 4. Some of -- some more of the hand and foot bones were not recovered. They're very small.

Q. Was that surprising to you that you were unable to recover every tiny bone of the hands and fingers?

A. That they were not recovered? No, that's not surprising.

Q. In a child at that age, they're very small.

A. They are very small.

Q. And as someone who has some experience herself in body recoveries and mass graves, is this a common difficulty in being able to locate every last bone and assemble it correctly with the appropriate victims?

A. It is a common problem, yes, to not recover all the small

2037

Page 71

bones.

Q.   How would you characterize the work that was done in this case by Mr. Hochrein and his team?

A.   Excellent.

MR. MILLER:  Government offers in evidence Government Exhibit 809.

*   *   *   *

(Government Exhibit 809 was offered.)

*   *   *   *

MR. BERRIGAN:  No objection.

THE COURT:  809 is received and may be shown to the jury.

*   *   *   *

(Government Exhibit 809 was admitted.)

*   *   *   *

BY MR. MILLER:

Q.   Dr. Steadman, please describe for the jury what they see in Government Exhibit 809.

A.   Exhibit 809 is again the back of the skull -- and I'm referring to this area of the back of the skull on Exhibit 6 -- of SME118, Amber Duncan.  And what I observed on the back of this skull is again a round defect just to the right of the midline at the back of the skull on the occipital.  And this is actually on a suture that separates the lower bone of the skull, the occipital, from one of the side bones, the parietal which is

2038

up here on the right side.  And the characteristics of this defect, again, exhibit internal bevelling consistent with a gunshot entrance wound to the back of the head.

MR. MILLER:  Exhibit 808 the government offers and

Page 72

requests permission to publish at this time.

* * * *

(Government Exhibit 808 was offered.)

* * * *

MR. BERRIGAN:  No objection.

THE COURT:  808 is -- I'm sorry, did you say 808?

MR. MILLER:  808.

THE COURT:  Yeah, I thought 808 was already admitted.

MR. MILLER:  I believe it has been.  My apologies.

THE COURT:  That's okay.

BY MR. MILLER:

Q.   Bringing up what's already been received as Exhibit 808, would you please describe for the jury what they see in that photograph?

A.   The bones that I'm pointing to on the right side of Exhibit 808, the jury's right, are small fragments of the facial bones of Amber Duncan that were traumatically detached.

Q.   Was it possible to do a complete reassembly?

A.    It was not possible again because the bones are very small and in this case incomplete.  I was not able to reconstruct the facial skeleton of the skull.

2039

MR. MILLER:  Government offers Exhibit 807 and requests permission to publish.

* * * *

(Government Exhibit 807 was offered.)

* * * *

MR. BERRIGAN:  No objection.

THE COURT:  807 is received and may be shown to the jury.

Page 73

* * * *

(Government Exhibit 807 was admitted.)

* * * *

BY MR. MILLER:

Q.   What is Exhibit 807, ma'am?

A.   This is looking at the anterior or front of the skull again looking at the face as I'm demonstrating on Exhibit 6.  And I'm pointing to where the lower face would be, but those are some of the fragments that you saw in the previous exhibit that were traumatically detached from the skull, and I was unable to reliably reattach or reconstruct them.

Q.   What was it in your opinion that traumatically detached those bones from her skull?

A.   I believe that similar to her sister the exit wound, although there is not clear bevelling because of the very thin nature of the bones in this area, is again near the midline of the nasal area, and that could cause the traumatic separation of

2040

the facial bones in this area.

Q.   The exiting of the bullet.

A.   The exiting of the bullet, that's correct.

Q.   Basically removing the bones of the face.

A.   That's correct.

MR.  MILLER:   Moving on, the government offers Exhibit 813.

* * * *

(Government Exhibit 813 was offered.)

* * * *

MR.  BERRIGAN:   No objection.

THE COURT:   813 is received and may be shown to the

Page 74

jury.

* * * *

(Government Exhibit 813 was admitted.)

* * * *

BY MR. MILLER:

Q.   Exhibit 813 shows what, Dr. Steadman?

A.   This is the right -- or a view of the right side of Amber Duncan's skull with a probe going through it again demonstrating, using the laser pointer on Exhibit 813, that the wounds are consistent with entry of a bullet in the back of the skull that I'm demonstrating with the pointer, passing through the cranial cavity, and then exiting in the upper to middle facial area of the skull, so a back-to-front trajectory of the

2041

bullet.

Q.   And that pink probe is placed there by yourself to demonstrate your professional opinion and estimate as to the trajectory of that bullet through the skull of Amber Duncan.

A.   That's correct.

Q.   Thank you, ma'am.  That's all I have on these first four.

MR. MILLER:  May it please the Court.  We do have one remaining individual left.  We could push on, but if there's to be a mid-morning break, now might be the appropriate time.

THE COURT:  Okay.  I think now would be a good time.

Members of the jury, we'll be in recess until 10:30. Please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence in the case, and we'll see you back here at 10:30.  Thank you.

(The jury exited the courtroom.)

THE COURT:  Is there anything we need to take up?

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1785 of 3592

MR. MILLER: No, sir.

THE COURT: Okay. Thank you. See you back here at 10:30.

(Recess at 10:05 a.m.)

THE COURT: Ready to have the jury brought in?

MR. BERRIGAN: Yes, sir.

MR. MILLER: Yes, sir.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

2042

Mr. Miller, you may continue your direct examination of Dr. Steadman.

MR. MILLER: Thank you, Your Honor.

BY MR. MILLER:

Q. Dr. Steadman, I'll ask you to go ahead and approach the skeleton if you would, please. For the record, we've been referring to this as Government's Exhibit 6, and just to dispel any curiosity if there is any, that's a plastic model of a human skeleton; is that correct?

A. Yes, it's plastic.

Q. In your field you've actually from time to time used an actual physical skeleton wired together, but this is a plastic model as such.

A. Correct.

Q. Anatomically correct, however.

A. More or less, yes.

Q. Terry DeGeus, SME number 00135, did you participate in the autopsy and anthropological examination of his remains?

A. I did the anthropological analysis, yes.

Q. Please describe how you came about to do that and when you

Page 76

did so.

A.   I was notified by the Iowa state medical examiner's office that another skeleton had been found and that they would like me to do the biological profile and analysis of trauma on the skeleton.  And so they shipped the skeleton to me, and I

2043

analyzed the skeleton in my laboratory at Binghamton University in New York.

Q.   At your laboratory in New York, did you do an examination of the condition and inventory of the remains?

A.   I did, yes.

MR. MILLER:   Government offers Exhibit 1011 at this time and request permission to publish.

                              *   *   *   *

(Government Exhibit 1011 was offered.)

                              *   *   *   *

MR. BERRIGAN:   No objection.

THE COURT:   1011 is received and may be shown to the jury.

                              *   *   *   *

(Government Exhibit 1011 was admitted.)

                              *   *   *   *

BY MR. MILLER:

Q.   1011 shows what, Dr. Steadman?

A.   1011 is the skeleton laid out in anatomical position that was identified to me as those of Terry DeGeus.

Q.   Now, first as you've done with the other four victims, did you in this case conduct as part of your standard protocol a biological profile?

A.   Yes, I did.

Page 77

Q. What were your findings?

2044

A. Using the methods that I've described to you previously for the other adults, this individual was an adult. All of the bones were fused together. I estimated that this was a white male between I believe also the age of 30 to 40.

Q. And just while we're on the subject, you did a biological profile on these five victims. Is that unique for you, or do you do it in all cases where you're doing skeletal examinations?

A. I do a biological profile in all cases in which I have skeletal remains.

Q. Why is that, Doctor?

A. So I make sure to examine every bone thoroughly and also independent corroboration of others' results.

Q. As a scientist, you like to take nothing for granted in the way of information provided to you by others.

A. That's correct.

Q. Just because a body comes to you with a wallet that says Greg Nicholson, for example, you're not necessarily going to just assume that's true. You're going to do your own examination and see if there are any discrepancies between such and the known identity of the man in question.

A. That's correct.

Q. In this case I take it you found no such discrepancies with the dental identification of this as the remains of Terry DeGeus.

A. That's correct.

2045

Q. After doing the biological profile, did you do an

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1788 of 3592

examination of the body for perimortem or time-of-death trauma?

A.   I did analysis of perimortem trauma, yes.

Q.   And did you find such in one or more than one areas of his body?

A.   I found evidence of perimortem trauma in multiple areas of the skeleton.

Q.   Where?

A.   In one extremity, in one side of the pelvis, in the thorax, and in the skull.

Q.   I'd like to go through those one at a time.  You mentioned the pelvis.

MR. MILLER:  The government at this time offers an exhibit -- offers in evidence, rather, Exhibits 1019 and 1020.

*   *   *   *

(Government Exhibits 1019 and 1020 were offered.)

*   *   *   *

MR. BERRIGAN:  No objection.

THE COURT:  They are received and may be shown to the jury.

*   *   *   *

(Government Exhibits 1019 and 1020 were admitted.)

*   *   *   *

MR. MILLER:  Thank you, Your Honor.

BY MR. MILLER:

2046

Q.   First as to 1019, what does Exhibit 1019 show as the jury views it?

THE WITNESS:  Mr. Williams, could you turn that vertically for me?  Thank you.

A.   This is the left side of the pelvis that we've discussed

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1789 of 3592

before, so I'm referring to Exhibit 6, this hipbone here on the left side of the individual. And what I observed is a defect on the top of the ilium which would be where you rest your hands if you are putting your hands on your hips, in this area here. And again, I'm referring to Exhibit 6, the top of the ilium or hipbone.

And what I observed is a defect passing through the top of that bone. And on this surface which is the back surface of the hip, I noticed that the fragments around that defect are pushed inwards towards the front. And in another exhibit I'll demonstrate the other side.

Q. 1020, please. Showing you Government Exhibit 1020, would you please describe what that is and what your conclusions are.

A. Exhibit 1020 is the same hipbone or ilium viewed from the front side, so now you're looking at it from the front. And I am demonstrating with the laser pointer on Exhibit 1020 the defect at the top of the ilium or hipbone, and there's a larger defect on this side, and the fragments are pushed outwards towards the front. This is consistent with a gunshot wound with a back-to-front trajectory.

2047

Q. Because of the direction of the bevelling.

A. Because of the direction of the bevelling and the direction the fragments of the margins are facing, that's correct.

Q. And again, the nature of the wound is that of a gunshot?

A. That's correct.

Q. In addition to gunshot trauma in the area of Terry DeGeus's pelvis, you've mentioned you also found such in the area of his thorax or chest cavity; is that correct?

A. That is correct, yes.

Page 80

MR. MILLER: At this time the government offers in evidence Government Exhibits 1013 and 1038.

* * * *

(Government Exhibits 1013 and 1038 were offered.)

* * * *

MR. BERRIGAN: No objection.

THE COURT: 1013 and 1038 are received and may be shown to the jury.

* * * *

(Government Exhibits 1013 and 1038 were admitted.)

* * * *

BY MR. MILLER:

Q. And first with reference to 1013, what is 1013, ma'am?

A. Exhibit 1013 is a frontal view of the third thoracic vertebra. And referring to Exhibit Number 6, the skeleton, we talked about the cervical vertebra that are up in the neck.

2048

There are seven of those. The next set of vertebral type are called thoracic vertebra, and they're in the middle of the back, and they're what anchors the rib cage to the spine. And so there are typically 12 thoracic vertebra. And again, we count from the top down in order. So 1 would be the highest and 12 would be the lowest. So the third thoracic vertebra would be the third -- let me see where I'm at -- third from the top, so around the shoulder area on the inside.

And what you're seeing is the front of that vertebra, so that would be the side closest to all of the organs on the inside of the chest.

And what I observed is an area of bone loss that is consistent with perimortem bone loss because, again, the margins

Page 81

of the injured area are all the same color as the surrounding bone. And I also observed some green metal staining around the margins of this. And upon X-ray, I also observed some metallic fragments in this area. And this is all suggestive of gunshot injury, although I could not tell you the trajectory of this. The nature of the bone in this area doesn't allow bevelling, and so I would not be able to tell you right to left, up or down; simply that a bullet did pass through this area.

Q. You diagnosed that as a gunshot wound.

A. Yes.

Q. The staining indicates what?

A. A staining is typical of what we see when metal goes

2049

through -- metal doesn't decompose, but it goes through chemical changes over time, especially in contact with bone and body fluids and clothing and so on. And so it can create this green staining. And that's what I believe we have here.

Q. And again, finally, a bullet wound but trajectory undetermined because of the nature of the bone loss.

A. That's correct.

Q. Was there any additional traumatic injury noticed in the thoracic area in addition to the one on the vertebra?

A. Yes. An adjacent rib, a third rib, also had some trauma and also some metallic fragments that I saw on X-ray.

Q. Publishing Exhibit 1038 and offering it if I've neglected to do so so far. The jury is now viewing Exhibit 1038. Can you tell us what that shows?

A. Yes. This is, I believe, the sternal end of the left third rib which is going to be towards the front. And there's not that much damage here, and the damage isn't diagnostic of any

Page 82

one particular trauma type. But when I X-rayed the remains, I saw that there was metal fragments on the margins. And so that indicates that a bullet passed through that area.

Q. And again, on Exhibit 6, the model, that damage is where, ma'am?

A. Mr. Miller, am I correct that it's the left third rib?

Q. Yes.

A. Shall I refer to my notes?

2050

Q. Yes.

A. It would be the third rib down on the left side right in the front where the ribs meet the cartilage.

Q. And again, Doctor, if -- as with that or any other matter, in addition to taking multiple photographs, you made detailed documentation and report of your findings; is that correct?

A. Yes, that's correct.

Q. And I noticed you posed a question to me. If at any point you feel that it's important to the accuracy of the information that you provide to the jury, please feel free to consult your notes as long as we make clear that that's what you're doing and have permission of the Court to do so.

As to that left third rib, again, I just want to be sure we understand exactly what your findings were as to the nature of the injury and what conclusions, if any, you made as to trajectory.

A. No conclusions as to trajectory because there are no distinctive marks. What I observed on X-ray was some of the metallic fragments in that area.

Q. As to the locations of gunshot trauma to the thorax, are you able to come to any conclusion as to the number of bullets

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1793 of 3592

that are necessarily responsible for that trauma?

A.    No.    There's a minimum of one, but I have no further refinement of that estimate.

Q.    And again, I assume that's for the reasons previously

2051

articulated as far as making a conservative estimate and allowing for the possibility of fragmentation of lead and bone?

A.    That's correct.

Q.    I believe you mentioned that you also found evidence of trauma on one of the extremities of the body of Terry DeGeus?

A.    Yes, I did.

Q.    Where specifically?

A.    In the left humerus which is the left upper arm bone or the arm bone on -- the upper arm bone on the left side that I'm referring to on Exhibit 6.

        MR. MILLER:   Government offers Government Exhibit 1015 at this time.

                        *   *   *   *

        (Government Exhibit 1015 was offered.)

                        *   *   *   *

        MR. BERRIGAN:   No objection.

        THE COURT:   1015 is received and may be shown to the jury.

                        *   *   *   *

        (Government Exhibit 1015 was admitted.)

                        *   *   *   *

BY MR. MILLER:

Q.    What does Exhibit 1015 that the jury's now looking at show us, Doctor?

A.    Exhibit 1015 is a picture of three fragments of the left
Page 84

humerus of Terry DeGeus, and again, the left humerus is the left upper arm bone as I'm demonstrating on the mounted skeleton, Exhibit 6. And there's traumatic separation of part of the upper shaft near the shoulder of the upper arm bone. And embedded inside the bone itself in this area that I'm pointing to with the laser pointer which is near the proximal shaft of the upper arm bone, I observed some green staining, and on X-ray there's a large amount of metal in that area that is consistent with either a bullet or a fragment of a bullet still being embedded in that bone.

Q. On occasion you've given us an opinion as to trajectory. Are you able to do so in connection with this wound?

A. I was not able to estimate trajectory in this case. The fragments that are remaining I couldn't reconstruct in such a way to allow me to estimate trajectory in a reliable manner. So no.

Q. Finally, Doctor, you indicated that there was also evidence of trauma to the head of Terry DeGeus.

A. That is correct.

MR. MILLER: Government at this time offers Government Exhibits 1046, 1040, and 1034.

* * * *

(Government Exhibits 1034, 1040, and 1046 were offered.)

* * * *

2053

MR. BERRIGAN: No objection.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1795 of 3592

THE COURT: 1046, 1040, and 1034 are admitted and may be shown to the jury.

* * * *

(Government Exhibits 1034, 1040, and 1046 were admitted.)

* * * *

MR. MILLER: Showing them to the jury in that order, please, Mr. Williams, would you first bring up Exhibit 1046.

BY MR. MILLER:

Q. And if you would, please, Doctor, describe in general terms before you get to any specifics as to the process that you undertook in attempting to diagnose what happened to Terry DeGeus in the area of his skull.

A. When I received the remains, the skull was highly fragmented and in many, many pieces. And so I attempted to reconstruct as much of the skull as I could reliably with the pieces that were available. And so Exhibit 1046 shows the right side of the skull of Terry DeGeus. And what I'm pointing out with a laser pointer on that exhibit are all of the -- some of the fracture lines to demonstrate some of the fractures that occurred in this place and the reconstruction that I did.

Another thing that I noticed in this area is that there is also some green staining on this area that I'm pointing at on the right side of the skull. It doesn't show up real well

2054

in this color format, but it is there, and there's also some green staining on the inside of those fragments as well. And again, I interpreted that as being in contact with metal during decomposition.

Q. Again, further evidence that a gunshot was cause of trauma

Page 86

in that particular area?

A. Yes, that's correct.

Q. Moving on to Government Exhibit 1040 now being displayed to the jury, would you please describe that for us.

A. This is an extreme close-up of a fragment of the right side of the skull of a bone of the skull called the sphenoid bone which is directly behind the right eye orbit here, and I'm pointing to that on Exhibit 6 for the jury on the right side.

And what I observed in that bone -- and this is an external view of it, so this is -- you're viewing skeleton 6 here from the outside. And referring to the Exhibit 1040, what I observed is a semi-circular defect that I'm outlining with a laser pointer now. The rest of the defect, the bones are missing from this area up here, so this is all I had. This again is in an area of the skull that is very, very thin, and we don't expect to see bevelling in this area. But the size and nature of the wound and the location with all of the radiating fractures that I showed you in the last slide pointing to it suggest to me that this is the likely site of an entrance wound which would be on the right side of the skull behind the right

2055

eye.

Q. Dr. Steadman, in addition to the metallic staining, either by yourself or by members of the state medical examiner's office, were there any missile fragments recovered from the skull of Terry DeGeus?

A. I did not recover any.

Q. Those were done by Dr. Goodin?

A. Yes, that's correct.

Q. Thank you. Finally moving to Exhibit 1034, would you

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1797 of 3592

please describe for us what 1034 shows.

A.   Exhibit 1034 is a top and frontal view of the skull of Terry DeGeus after I reconstructed what I could of this area of the skull.  And so using my laser pointer, I'm referring to here is the reconstructed face of the skull below, and then there's a large defect on the frontal bone which is in the area and perhaps just above the forehead, and I'm demonstrating on Exhibit 6 here.  And there's a large area of bone loss there that I'm outlining with a laser pointer.

There is a hint in one area of a little bit of external bevelling, but there is no very clear exit wound in this area.  Based on the bone loss and the location of what I believe is the entrance wound behind the right eye, I would suggest that the bullet likely entered the right side of the skull behind the right eye and then likely exited out the frontal in the area where you see the traumatic bone loss here.

2056

This is very similar to what I saw with Lori Duncan's trajectory.

Q.   Your opinion as to trajectory of the gunshot wounds to Lori Duncan and Terry DeGeus is that they're similar?

A.   They appear similar, yes.

Q.   Behind that right eye and out the left portion of the top of the head?

A.   That's correct.

Q.   Now, you've described a number of gunshot injuries on the body, the remains of Terry DeGeus.  I'd like you to summarize for us what your findings are as to a minimum number of gunshots and their location and trajectory to the extent that you're able to provide such information.

Page 88

A. In this case I estimate the minimum number of gunshot wounds that affected bone in Terry DeGeus to be three, one in the left pelvis, one in the thorax, and one in the skull.

Q. With the gunshot wound to the arm possibly being the same bullet that would have passed through any other portion of the body.

A. Yes. Again, as a minimum conservative estimate, the humerus could have been in front of the thorax, for instance. We have no way of gauging the position of the victim when he was shot. And so conservatively I would keep the estimate at three.

Q. You also have no way of knowing whether it was possibly a fourth gunshot that did that damage to the arm.

2057

A. There certainly could have been more, but I can document reliably three independent gunshot wounds.

Q. I think you've already indicated that bullets that pass entirely through human soft tissue do not ordinarily leave evidence on bone.

A. Correct.

Q. So all any forensic anthropologists can do is give a minimum number of gunshot wounds if gunshot wounds are what's diagnosed.

A. Based on the skeletal evidence, that's correct.

Q. In this case at least three.

A. Correct.

Q. As to the skull of Terry DeGeus, you mentioned that it came to you in a great number of pieces. Have you any idea how many?

A. Off the top of my head I don't remember how many fragments there were, no.

Q. Do you have any idea how much time and effort you spent in

Page 89

attempting to reconstruct that skull?

A. I spent several hours reconstructing the skull, yes.

Q. Using what sort of material?

A. Glue.

Q. Glue works.

A. Glue.

Q. Do you rule out any other form of trauma other than gunshot?

2058

A. No. Because of the fragmentary nature of the skull, I couldn't rule out that other sorts of trauma could have occurred. I couldn't rule that out, no.

Q. Your findings are diagnostic as to gunshot trauma in multiple locations including the skull, but they did not rule out blunt trauma to the skull?

A. I can't rule that out because it was so fragmentary. No, I couldn't rule it out.

Q. Again, however, from the standpoint of a scientist and one whose opinions might be conservative, what you diagnose is multiple gunshot wounds.

A. That's correct.

Q. Did you notice any other fractures about the head other than that which was in the -- we've heard the term vault referred to. What's the vault?

A. The vault is colloquially what we refer to as just the top of the skull here, the part that actually houses the brain.

Q. Was there fracturing in any other areas of the skull of Terry DeGeus?

A. There were fracturing in a number of areas of the skull, yes.

Page 90

Q.    Such as?

A.    Fractures all around the frontal, through the parietals, and also of the occipital and the right side as I showed you before.

2059

Q.    How about the teeth?

A.    There were some fractures of the -- of several teeth, yes.

Q.    In other words, a great deal of fracturing about the skull of Terry DeGeus.

A.    Yes.

        MR. MILLER:   Thank you.   I have no further direct.

        THE COURT:   Mr. Berrigan?

        MR. BERRIGAN:   May it please the Court.

        THE COURT:   Why don't we give everybody a short stretch break before we begin your cross.

                       CROSS-EXAMINATION

BY MR. BERRIGAN:

Q.    Dr. Steadman, my name's Pat Berrigan.   I'm one of Miss Johnson's lawyers.   I really just have a few questions as we had the benefit of Dr. Klein's testimony yesterday.   First of all, I wanted to see if we could clear up this conservative estimate stuff that you've been talking about.   Isn't it true that the opinions you're giving here today are to a reasonable degree of scientific certainty?

A.    Yes.

Q.    And isn't that the standard you use when you testify in courts of law?

A.    Yes.

Q.    Okay.   So if you were to tell us, for example, that you thought there were four bullets shot into the body of Terry

Page 91

DeGeus, the fact is that would not be to a reasonable degree of scientific certainty, would it?

A.   I couldn't rule out four, but the minimum estimate is I believe I said three.

Q.   Yeah, well, the truth is he could have been shot a hundred times for all you actually know because you weren't there at the time he was shot; right?

A.   That's correct.  I cannot estimate a maximum number, only a minimum number for the reasons I discussed earlier.

Q.   The evidence to a reasonable degree of scientific certainty supports your conclusion that as far as you can tell it's your estimate that he's shot three times, perhaps more.

A.   A minimum of three.

Q.   Minimum of.

A.   Yes.

Q.   Okay.  This testimony you gave at the end about Mr. DeGeus having some fractures to his teeth and skull, are you contending that those were caused by blunt force trauma at the time of his death?

A.   I was asked if I could rule out blunt trauma, and I cannot.

Q.   You cannot.

A.   I cannot rule out blunt trauma, no.

Q.   Okay.  And I guess one clarification we should have is this definition of perimortem in terms of the time frame relative to death.  Is there any particular time frame?  You know, is it 24

2061

hours before the person died, 24 hours after, 24 hours either way, or do you have any time frame that you attach to perimortem

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1802 of 3592

injuries?

A.    Anthropologically we do not have a set time frame attached to what perimortem means.

Q.    Okay.  So is there even an outside limit?  For example, if Mr. DeGeus was run over by a tractor while he was in his two-and-a-half-foot grave a couple of days after being buried, would you be able to say that wasn't a perimortem injury?

A.    It depends on the nature of the injuries and also on the coloration of the wounds.  If it was two days -- in the scenario that you suggest, two days afterwards, then the body would still undergo decomposition, and the margins would be similar to the surrounding bone.  And in that manner, the color would suggest that it was still perimortem.  But the nature of the injuries would still have to be examined, yes.

Q.    And then were you aware that he was buried on the edge of a cornfield, by the way?

A.    I knew he was buried in a field.  I don't know the specifics.

Q.    I see.  And that it was a two-and-a-half-foot grave?

A.    I remember hearing a number similar to that, yeah, two, two and a half feet.

Q.    That he was buried headfirst or face down into the grave.

A.    I did see that he was buried face down, yes.

2062

Q.    Okay.  And in terms of I guess how he was buried, you really don't know anything about how his body was thrown or put into this grave; right?

A.    Only from what I saw in pictures.  I was not there at the exhumation.

Q.    Well, I mean, you weren't there at the time he was buried

is what I mean.  You don't know what kind of force might have been used to put him in the grave that might have caused some injuries after he was actually dead.

A.   I couldn't comment on that, no.

Q.   And if there was a use of a shovel or some kind of a blunt instrument that was used to bury him and it hit his body and caused injuries, you'd have no real knowledge of that either, would you?

A.   Direct knowledge of a shovel, no, I could not comment on that.

Q.   Okay.  I just had a couple of questions on these trajectory issues.  You've spoken about trying to determine the trajectory of projectiles as they pass through these various victims' bodies and their heads.  You're not trying to tell us the relative positions of the person shooting the shooting victim, are you, by these trajectory estimates?

A.   No, I'm not.

Q.   Because we really have no idea what the position of the person's head was, for example, at the time that they were shot;

2063

right?

A.   That's correct.  All I can tell is how the bullet entered and perhaps exited the body.

Q.   The position of the person's head, the person -- position of the person's head who was shot, obviously that's going to affect the trajectory of the bullet no matter where the person's standing that's shooting the gun.

A.   Yeah, I can't comment exactly on how a person was standing, no.

Q.   I wanted to ask you specifically about Greg Nicholson.  You

Page 94

found in that case there was evidence at least of the two gunshot wounds, one to the back that broke his fifth rib and then the one to the lower left rear of his skull; is that right?

A. Those were my findings, yes.

Q. And then there was some testimony about a hairline fracture to the fourth cervical vertebrae, and I thought I heard you say you had no opinion on how that might have been caused. Is that correct?

A. I do not know the etiology of those -- of those hairline fractures of the fourth cervical vertebra, no.

Q. And, in fact, I'm not sure if it was Mr. Nicholson or Miss Duncan, but you specifically mentioned it could have been caused by a fall perhaps. Did I hear that correctly?

A. I don't recall either if I said it in relation to --

Q. Is that true?

2064

A. Is that true for which?

Q. Yeah. This injury, Mr. Nicholson's injury to his fourth cervical vertebrae, do you know whether or not that was caused by a fall?

A. I do not know whether it was caused by a fall.

Q. Some of these people might have been standing, walking, or running at the time they were shot. That's certainly possible.

A. That's certainly possible.

Q. Have you seen this area at all where they were found?

A. No, I did not go to the scene where the bodies were recovered.

Q. Nobody's mentioned to you that some folks have used it as a dump site, for example?

A. I don't know that, no.

Page 95

Q.    So if somebody ran into a tree or hit a rock as they were falling or were thrown into a grave where other bodies were already located, that could have caused such an injury as what you're talking about here with Mr. Nicholson's vertebrae?

A.    There are all sorts of possibilities --

Q.    Okay.

A.    -- to what would cause that injury.

Q.    And he may have been dead already.

A.    There's no way I can determine that.

Q.    And that would be true also, would it not, regarding the hairline fracture of the hipbone of Lori Duncan?  You have no

2065

idea how that was caused?

A.    I do not know the etiology of that wound, no.

Q.    Whether or not she was already dead when that occurred.

A.    There's no way I can determine that.

Q.    Would that be true also of this -- she apparently had a rib fracture, rib number 7.  You said the etiology on that was unclear, could be blunt trauma, could be anything; is that correct?

A.    I said it could be blunt trauma, yes.

Q.    Okay.  And you couldn't rule out a fall or something that happened during the burial process to cause that injury either.

A.    I could not rule that out, no.

Q.    I think you mentioned she had a spiral fracture on a bone in her hand; is that correct?

A.    I did, yes.

Q.    Okay.  And is this the same type of an injury, one of these perimortem injuries?

A.    I believe it is perimortem because of the colorations of

Page 96

the margins of the wound, yes.

Q.   And is that an injury you could definitively say could not have been caused by somebody moving her body and grabbing her by the arms, wrist, or hands?

A.   That's another possibility I couldn't rule out based on the nature of the injury, no.

Q.   And you've been able to tell us quite a lot about these

2066

gunshot wounds and what trajectories they had and what damage they caused the various bones in these people's bodies; right?

A.   I told you what I could reliably determine.

Q.   Well, I think it was quite a lot.  None of your work really helps us in terms of who killed these people, does it?

A.   No.

            MR. BERRIGAN:   Thank you.  That's all I had.

            THE COURT:   Mr. Miller, any redirect?

                      REDIRECT EXAMINATION

BY MR. MILLER:

Q.   These people were killed by a person or persons with access to a firearm.

A.   There was definitely a gun used in this.

            MR. MILLER:   Thank you.  I have no further examination.

            THE COURT:   Mr. Berrigan, anything further?

            MR. BERRIGAN:   No, nothing further, sir.

            THE COURT:   You may step down.

            THE WITNESS:   Thank you.

            MR. MILLER:   Your Honor, the government calls Victor Murillo.

                VICTOR MURILLO, PLAINTIFF'S WITNESS, SWORN
                              Page 97

THE COURT: Thank you. Please be seated in the witness box. And if you would adjust the chair and the microphones so you can speak directly into the microphones, that

2067

would be appreciated. And when you're settled in and ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is Victor Michael Murillo. Last name is spelled M-u-r-i-l-l-o.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Your occupation, Mr. Murillo?

A. I'm employed as a criminalist with the Iowa Division of Criminal Investigation's state crime laboratory in Ankeny, Iowa.

Q. A colleague of Mr. Bush, Ms. Davis, and Mr. Tarasi and others?

A. Yes.

Q. How long have you been in that line of work, sir?

A. I've been with the laboratory since July 16 of 1982.

Q. Nearly 23 years.

A. Yes.

Q. What are your current duties with the laboratory?

A. Currently I'm working in the firearms and tool mark section of our laboratory. About 80 percent of the case work that I do is firearms related looking at obviously different types of firearms, looking at fired components, usually bullets or cartridge casings, trying to match those components to one

2068

Page 98

VOLUME 9, 5-18-05

another or match them to a specific firearm.

I also do a tool mark examination where we look at several different types of tools and the marks made by those tools and try and match them up as well.

I also do some gunshot residue analysis where we look at the clothing from the victim of a shooting trying to get an idea as to the distance the firearm was to the victim's clothing when the weapon was discharged.

I also do some serial number restorations where we try to recover serial numbers from obliterated firearms.  A lot of times serial numbers are either ground off or filed off, and there are some techniques we can use to try and make those numbers visible again to help in the investigation.

I'm also involved in the crime scene investigation as well.

Q.    Aside from the last itemized duty, the rest I believe in one way or another relate to firearms; is that correct?

A.    Yes, they do.

Q.    Firearms and tool marks.  How long have you been working in that particular subspecialty of forensic science, sir?

A.    In one capacity or another since I've been working with the laboratory in 1982.  In 1989 I became full time in the firearms section.  However, before that I was working with different types of firearms and gunshot residue analysis and also working with the firearms reference collection in our laboratory.  So

2069

I've been working with firearms since I began with the laboratory but full time in the firearms section since 1989.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1809 of 3592

Q.    I want to get into the firearms matter with you in a few minutes, but first let's talk about crime scene processing. You've indicated that that's been a portion of your responsibilities over the years?

A.    Yes, probably for the last 15 to 16 years excluding the last 2 I've been involved in crime scene work where we usually go to a scene and collect evidence, take photographs, et cetera.

Q.    These are scenes throughout what geography, sir?

A.    The crime scene team is made up of two persons. We can travel anywhere in the state of Iowa that we are requested to go. We don't just simply pick up and go. We have to be requested either by an agent in the field, local law enforcement agency, and we cover the entire state.

Q.    Calling your attention, sir, to the month of November in the year 2000, did you happen to have any such duties in connection with a crime scene in rural Mason City, Iowa, Cerro Gordo County in particular?

A.    Yes, I did.

Q.    Please describe when and how you came about to be involved in that investigation, sir.

A.    On November 6 of the year 2000, I was contacted by one of our agents and asked if myself and my partner could come to the Mason City area.

2070

On the following day, on November 7, we did proceed to Mason City, met with several special agents, other law enforcement agencies, and went to the scene of what was actually a farm area. We were told that a body had possibly been buried near this site, and I spent approximately the next two and a half days at the scene recovering the remains of one individual

Page 100

and searching for evidence that may be important in the case.

Q. And were you actually engaged in the process of actually searching for -- the burial site itself?

A. Yes, I was.

Q. You were there I think you mentioned over a period of days?

A. Yes, the entire day on November 7, the entire day November 8, and about half of the day on November 9.

Q. Please in general terms -- we've already heard from Agent Smith and Mr. Kraemer, but just in general terms, can you just very briefly summarize for us the task that went on out there that November day or two and your role in that task in particular.

A. The first day or so was spent just simply looking for the body or trying to figure out where the body had been buried. Once we discovered partial remains that had been uncovered by a large shovel truck, that's when basically my partner and I took over the investigation or the search of that particular area.

Once we recovered one of the victim's legs and a boot that was showing, we began taking some photographs of what we

2071

saw initially and then began excavating the actual grave site. There was dirt that was hand-removed from the grave site, was placed on to a large tarp so that we could later examine all of the dirt and the soil that was being removed from that grave site.

We eventually recovered the body of the remains of Terry DeGeus. Medical examiner's office came in and removed the body. At a later time, over the next probably day or so I spent looking at the dirt and the soil that had been removed from the grave site and eventually had come to recover several

Page 101

projectiles, several bullets, and all of those items were taken into custody and later examined at the laboratory.

Q. Earlier this week the jury saw a number of photographs from that scene, one of which showed a fire truck and a hose and a couple fellas standing out there in the cold screening dirt through some screen. Was one of those guys you?

A. Yes, it was.

Q. And again remind us if you haven't told us already what success, if any, you had in locating any firearm components from that grave of Terry DeGeus.

A. As I mentioned before, once the body had been removed, my job was to try and sift through all the dirt. We had some large screens or sieves, kind of like a screen door. It's a quarter-inch squared screen material that we sat on top of a -- like a podium, and then we began with buckets and buckets and

2072

buckets of soil and dirt pouring them over the top of the screens and then using some water that was brought into the scene to wash over the soil to try to remove all the dirt and the mud and looking at all the debris, the hard debris.

We recovered obviously several rocks and eventually recovered three bullets that were recovered from, again, a part of the grave site. We're not sure exactly where it came from, but it was removed from the dirt that was sifted from that grave site.

Q. Now, your expertise is in the area of firearms examination.

A. That's correct.

Q. Did you continue your work at the laboratory in relation to what was found at this particular crime scene?

A. Yes, I did.

Page 102

Q.    And in addition to that, did you also review or examine a firearm component recovered from the autopsy of Greg Nicholson?

A.    Yes, I did.

Q.    And in addition to that, did you in addition examine as a firearms expert any evidence recovered of that nature from the autopsy of Terry DeGeus -- excuse me, of -- yeah, of the autopsy of Terry DeGeus?

A.    Yes, I did.

Q.    Autopsy as opposed to the grave site itself.

A.    That's correct.  The body had been removed from the grave site and was taken to Des Moines for the autopsy.  I was not

2073

involved in the recovery of any evidence at the autopsy.

Q.    But evidence identified to you as having been recovered from the skull of Terry DeGeus was added to the collection of lead or other firearm components that you were asked to examine in connection with this case?

A.    That's correct, I did.

Q.    Before you get into your specific examinations and findings, would you please educate this jury a little bit as to how firearms examinations are conducted and what there is about bullets that yields evidence that may be of evidentiary significance.

A.    As I mentioned before very briefly, my job is to look at a number of different types of firearms.  There was never a firearm that was recovered in this particular case, so I didn't have that type of examination to perform.  There were, as I mentioned earlier, several bullets that were recovered from the grave site, from the autopsy of at least two of the victims in this case.

Page 103

My job is to look at each of those items, those fired components, the bullets that were recovered or bullet fragments, try and determine what they are, what they're made of, what's the chemical composition of each of those items.

There are several notes that I take on each of those items as well. I look at the overall size and shape of that projectile, try and determine the diameter of the bullet or the

2074

caliber of the bullet, if you will. I look at the weight of that bullet, try and determine what type of cartridge, what type of round of ammunition that bullet could have come from.

Then I begin looking at what we call class characteristics which include the caliber diameter width of the bullet as well as rifling information that would be present on the outside of the bullet. As a bullet passes through a barrel of a firearm, there is going to be rifling impressions, markings that are placed on the outside of the bullet from having made contact with the inside of the barrel as the bullet leaves the barrel. So I'm looking for rifling information on the outside of the bullets that I have that were recovered from each of these locations.

I determined that there was rifling information present. It was the same on all the bullets that I looked at, and then I began looking at what we call individual characteristics. In every bullet that's fired from a firearm, there will be a unique set of markings, a signature or a fingerprint, if you will, that's left on every bullet from a specific firearm. My job is to try and figure out what those individual characteristics are, whether there is a fingerprint that's left on each of the bullets, and if they match up between

Page 104

all of the bullets that I've examined.

Q.   And are such conclusions always possible?

A.   Not always.  Initially when the bullet is fired from a

2075

barrel, there should be some markings present.  But a bullet, as you know, travels down the barrel, is going to eventually hit a target which is going to cause some damage to the bullet, and there are a lot of other things that can cause damage to the bullet as well which would render some of those -- some of that information I'm looking for is not going to be possible to find that information.

Q.   Passage of time, for example?

A.   Yes.  In this particular case we had bullets that had been in the grave site for quite a number of years.  The bullets were very corroded.  Some of the ones that I looked at were very corroded.  They were pitted out.  They were damaged.  I could still see some rifling information from the barrel.  However, the individual characteristics, that fingerprint, that signature that I was looking for, the very tiny scratches and markings that are left from the barrel, were not present on the bullets because of wear and tear over time, environmental factors, water, the corrosion, and impact damage as well.

Q.   Your job as a scientist is simply to locate and document whatever evidence is still available.

A.   That's correct.

Q.   Despite the passage of time.

A.   Yes.

Q.   And that's the nature of forensic science; fair statement?

A.   Yes, it is.

2076

Page 105

Q.    Did you, among the firearms components examined by you, examine lead fragment recovered from the skull of Greg Nicholson at autopsy?

A.    Yes, I did.

Q.    I've handed you what is marked as Government Exhibit 504. Do you recognize that, sir?

A.    Yes, I do.

Q.    What is it?

A.    This particular item which is Exhibit 504 is a lead fragment that was recovered from the head of Victim Nicholson.

Q.    And it's today been packaged in plastic and has with it some containers with notes including your own initials on it; is that correct?

A.    That's correct.

Q.    Okay.  But does it at least give us some idea of the appearance of that item when first received by you, sir?

A.    Yes.  Again, my initials appear on the packaging, on the outside of the white dish that the bullet was initially put into it, so I definitely looked at these items in the past.

Q.    Did you receive also in connection with your firearms examination in this case any bullet fragments or other firearm components recovered at the autopsy, in other words, recovered from the body of Terry DeGeus?

A.    Yes, I did.

Q.    Mr. Murillo, I've handed before you Government Exhibit 1005

2077

and ask if you recognize that, sir.

A.    Yes, I do.

Q.    What is 1005?

Page 106

A.   Exhibit 1005 is fragments of a copper jacket that came from the head of the victim DeGeus.

Q.   And aside from the fact that that too has been packaged and marked for identification, is it in substantially the same condition as received by you for examination?

A.   Yes, it is.

Q.   And finally, sir, you've indicated that at the scene of the Terry DeGeus body recovery engaged in that screening process out there in the field you recovered three chunks of lead?

A.   Three copper-jacketed bullets, that's correct.

Q.   I've handed you what is marked Government Exhibit 902.  Do you recognize that Exhibit, sir?

A.   Yes, I do.

Q.   And its contents, what is it?

A.   Exhibit 902 are the three bullets we recovered from the grave site of Terry DeGeus.

Q.   And again, apart from the fact that they've been packaged and contain information, case labeling, are they substantially as located by you out in that field in November in Cerro Gordo County?

A.   Yes, they are.

MR. MILLER:  Your Honor, the government offers in

2078

evidence Exhibits 504, 902, and 1005.

* * * *

(Government Exhibits 504, 902, and 1005 were offered.)

* * * *

MR. STOWERS:  No objection.

THE COURT:  504 is already in evidence.  902 and 1005 are received.

Page 107

* * * *

(Government Exhibits 902 and 1005 were admitted.)

* * * *

BY MR. MILLER:

Q.   Mr. Murillo, what I'd like you to do is go ahead and describe each of these exhibits for the jury describing for them also what examinations you did and what findings, if any, you arrived at.

A.   As I mentioned earlier, there's, again, quite a bit of information that I can take from each of the bullets.  I started with the three bullets that were recovered from the Terry DeGeus grave site.  That's Exhibit 902.

Again, those were three copper-jacketed bullets.  When I weighed them, looked at the diameter of the bullets, I determined that they originated from a nine-millimeter Luger cartridge.  That's the type of ammunition that was used to create this fired component.

Each of the bullets did possess some rifling

2079

information as I mentioned earlier.  They each possessed six land and groove impressions with a right-hand twist which means that the barrel had a configuration of six right as well, the barrel that these bullets were fired from.  Each of the three bullets had the same rifling information on them, the same number, the same direction of twist, the same width of land and groove impressions on each of them.  So it's very possible that each of those three items were fired from the same firearm.  Now, there's no indication that there was a different firearm that was used to fire each of these three items.

The next item was the copper jacket fragment that was

recovered from the head of Terry DeGeus.

Q.    And that, just to keep the record clear, is exhibit what?

A.    That is Exhibit 1005.

Q.    Please continue.

A.    That particular item is not a copper-jacketed bullet but rather just the copper jacket.  When a bullet is manufactured, it first usually will start with a copper cup.  That cup is then filled with lead.  There's a lead core then on the inside of the jacket.

With the first three items that I looked at from the Terry DeGeus grave site, those were copper-jacketed bullets that had the copper jacket as well as the lead core.  So the bullets were almost fully intact, almost 100 percent intact.

The item that was recovered from the head of Terry

2080

DeGeus was just the copper jacket, just the cup.  The lead core was missing and was not found.  The copper jacket fragments, there are several pieces of them present in the sack that I have here.

When I looked at those, those had -- those were consistent with having come from a nine-millimeter Luger bullet as well.  They also had some rifling information present on them which was similar to the three bullets that were recovered from the grave site.

So they're all consistent with being from a nine-millimeter, all consistent with the six number of rifling right-hand twist, and the width of the land and groove impressions that were present were the same as well on all four of the items, the three from the grave site and the one from the head of Terry DeGeus.

Page 109

The third item which is the lead fragment that came from the victim Nicholson was a fragment of lead. It appears to be either a lead bullet or it's the core from a copper-jacketed bullet, just the opposite of the one that came from the head of Terry DeGeus where just the jacket was found.

From Nicholson what was found was the lead core only, or possibly it's a lead bullet. There was no rifling information present on this particular item, on this lead fragment that was recovered from Nicholson. All I can do is say yes, it's a lead fragment possibly from a fired bullet. It

2081

could be a bullet itself, or it could be the core from a jacketed bullet as well.

Q. I just want to summarize and make sure we're clear on this. You've talked about lands and grooves. Just in layman's terms, what are lands and grooves and left- and right-hand twist?

A. Lands and grooves are what are imparted into a barrel when it's manufactured. When a barrel is manufactured, first of all, there's a hole that's drilled from the barrel blank from one end to the other. The diameter of that hole is what's going to be in the future referred to as the caliber.

So if we drill a hole that's 22/100 of an inch in diameter through that barrel blank, then we have a 22-caliber barrel. If we drill a hole that's approximately 38/100 of an inch in diameter, then it's going to be a 38-caliber barrel, same for a 45. It's going to be 45/100 of an inch or so in diameter, little less than a half of an inch, and that's going to determine the caliber of that particular barrel and, therefore, the type or the diameter of the bullets that's going to be used to pass through that barrel.

Page 110

Once the hole is drilled, there is rifling that is manufactured in that barrel. There are going to be grooves now that are cut from one end of the barrel to the other in a spiraling fashion, again, from one end of the barrel to the opposite end of the barrel.

In this particular case, the firearm that was used had

2082

six grooves that were cut in its barrel. When a bullet passes through the barrel, the outside of the bullet having made contact with the inside of the barrel, the outside of the bullet is going to have a mirror image of the inside of the barrel.

So when we talked about the rifling in a barrel, there's a portion of the barrel that's cut away. That is called a groove. The portion that's left uncut in the barrel is called a land. The land is going to be sticking out into the middle of the barrel. Looks like a little tooth that's sticking out into the center portion of that barrel. Again, the groove is the cutaway portion.

As the bullet passes through the barrel, the land is going to cut a groove along the outside of the bullet. So the land in the barrel is making a land impression or a groove in the bullet. The groove in the barrel, part that's cut away from the barrel, the bullet is going to move into that groove, and we're going to see a raised portion on the outside of the bullet, just the opposite of what we see on the inside of the barrel. We should be able to see the number of rifling impressions on the outside of the bullet that come from that particular barrel, and we should be able to count them, look at the direction of twists. In other words, when that bullet left the barrel, was it spinning in a clockwise fashion as it left

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1821 of 3592

the barrel, or was it leaving in a counterclockwise fashion? Was the bullet spinning to the right or spinning to the left as

2083

it left that particular barrel? That spinning motion is placed on the barrel -- or excuse me, placed on the bullet by the barrel for a reason.

When the bullet leaves the barrel, it continues to spin as it's in flight until it hits the target that we're aiming at. It's a lot like playing catch with a football. If you've ever played catch with a football before, if you throw a perfect spiral with the football, the football will spin true. It won't wobble, and it will go very straight. If you don't put the right spin on a football as we throw it, it will wobble. It will move. It will yaw as we call it in bullet terms. And the flight path of that particular football, just like the bullet, will not be true and straight, and so that's why we impart that spin on it so that it will fly true and straight and will hit whatever we're aiming at with the firearm when we discharge it.

Q. Just then to summarize, as to the three bullets that were recovered from the grave site of Terry DeGeus, namely Exhibit 902, the copper jacket recovered from the head of Terry DeGeus, namely Exhibit 1005, and the lead fragment recovered from the head of the autopsy of Greg Nicholson, what, if anything, can you tell us as to the possible correlation between those three sets of projectiles and the possible weapon that fired them?

A. The three copper-jacketed bullets that were recovered from the grave site all had -- they were all of the same caliber, had the same rifling information. The copper jacket that came from

2084

Page 112

the head of Terry DeGeus also had some rifling information indicating it could have also been fired from the same firearm.

The lead core that was recovered from Greg Nicholson could be again the core from a jacketed bullet. And it's possible that that bullet was nine-millimeter and could have come from the same firearm as the other bullets that were recovered from the grave site and the head of Terry DeGeus. That lead core that I looked at from Greg Nicholson is of the correct diameter and could be, as I mentioned, the core from the jacketed bullet.

There's no rifling information there, so I can't say it has the same rifling information as the others that were recovered, only that the lead core is about the same diameter and could have come from a nine-millimeter bullet and obviously could have come from the same firearm as well.

Q. All five pieces of ammunition are at least identified or consistent with being copper-jacketed, lead-cored nine-millimeter bullets.

A. Yes.

Q. And I want to be perfectly clear. As a scientist, because of the corrosion and the absence of specific information due to that corrosion, can you make a positive identification as to any of those two as definitely having come from the same firearm?

A. Yes, I cannot do that in this particular case due to the damage, the corrosion on the outside of all of the bullets that

2085

I looked at, all the fragments that I looked at. They were pitted, corroded, damaged from erosion, water, et cetera.

The individual characteristics, that fingerprint that

Page 113

I would normally look for, was not present on any of the items that I looked at. I need that individual information, that unique pattern, to say that they were all fired from the same firearm. That information was not present on any of the bullets, so I can't make a positive identification. I can't say that definitely those items were all fired from the same firearm. I cannot do that.

Q. Accordingly, from a purely scientific standpoint, you cannot rule out the possibility that each of those five bullets was fired from a different firearm, in other words, five different firearms.

A. That's certainly possible as well, but they had to be nine-millimeter caliber. They had to have the same rifling information. At least four of them did. But other than that, if it's another firearm that has the same caliber, same rifling information, yes, it's possible it could be another firearm.

Q. The caliber and rifling information in this particular case was -- at least where the caliber could be determined was nine-millimeter with six lands and grooves and a right-hand twist of a particular dimension?

A. That's correct.

Q. Did you -- are scientists in your field able to consult

2086

data banks that list the makes and models of firearms that have that specific characteristic?

A. Yes, I did.

Q. And in doing that research, what was your finding, sir?

A. In this particular case, again, I can take all that information, the fact that they're nine-millimeter, that they have six lands and grooves, right-hand twist, and I measure the

Page 114

width of the land and groove impressions on the bullets as well. I can enter that information into what is called a GRC database or a general rifling characteristics database which is put together by the FBI. I can enter that information in the database, and the database will tell me all of the firearms manufacturers who produce barrels with those same rifling configurations in their barrels.

And I did that in this particular case and came up with about 15 different manufacturers of firearms who produce 9-millimeter barrels, 6 lands and grooves, right-hand twist, and the width of the lands and grooves are the same as what was found on the unknown bullets.

Q. It's not an entirely uncommon class characteristic, in other words, because there were approximately 15 manufacturers who utilized those characteristics.

A. That's correct, it is.

Q. Any idea how many total firearm manufacturers there are in total?

2087

A. All the ones that matched the rifling characteristics that I have --

Q. I'm going to interrupt you. You've already indicated that there are I think 15 that would match this particular specification?

A. Yeah, I think I came up with about maybe 15 different manufacturers that matched the rifling characteristics and caliber of this particular -- of the bullets that were found.

Q. And I don't know if you know the answer to this question or not, but can you give us some idea of how many firearms manufacturers there are active worldwide?

Page 115

A. Too many to count. There are literally hundreds and hundreds of manufacturers of firearms in different calibers, different models within that manufacturer, and I don't know the numbers. There are certainly quite a few. I just listed the manufacturers in this particular case. Each manufacturer is going to have several different models that they produce, different designs of firearms which may also have the same rifling information as well.

Q. But of all of those many and many firearm manufacturers, there are 15 that manufacture firearms with the characteristics that you've described, 6 lands and grooves with a right-hand twist with the dimensions of twist noted.

A. Yes.

Q. Without asking you to name all 15 of those, does one of

2088

them happen to be the Intratec Tec-9?

A. That's correct. Intratec Tec-9 was one of the manufacturers that was listed in my report as possibility of having fired the unknown bullets.

Q. One of the 15 that cannot be excluded.

A. That's correct.

Q. Out of the many hundreds.

A. Yes.

Q. Mr. Murillo, during the course of this investigation, were you asked to examine a hand drawing of a firearm?

A. Yes, I was.

Q. Showing you what I believe has already been received in evidence as Exhibit 40, can you identify that document, sir?

A. Yes, I do.

Q. What is Exhibit 40?

Page 116

A.   Exhibit 40 is a yellow-lined piece of paper that has a drawing of what appears to be a large pistol.

Q.   You've been working in the firearms business for how many years, sir?

A.   Again, approximately 23 years.

Q.   Does the DCI and, in particular, your section of the DCI keep a collection of seized firearms?

A.   Yes, we do.

Q.   Do you have any idea how many items you have in that collection?

2089

A.   Well, we actually receive in our laboratory about 2,000 firearms a year that we look at.  We keep several of those firearms in our reference collection for case work if we need to borrow parts, use them for demonstration, for court, use them in lineups.  There are several training things that can be done with a lot of the firearms as well.  So about 3,000, a little more than 3,000 of those firearms, have been kept in my reference collection in the laboratory that can be used on a day-to-day basis for case work.

Q.   And that reference collection is not just for fun, but it serves a legitimate forensic science purpose in your laboratory.

A.   That's correct, it does.

Q.   Out of those thousands of firearms, is there one that more than any other is similar to that which is drawn in Exhibit 40?

A.   Yes, it is.

Q.   And what would that be, sir?

A.   The drawing that I have in front of me is very similar to an Intratec Tec-9 semi-automatic pistol.

        MR. MILLER:  With the Court's permission, I would ask

Page 117

that Exhibits 40 and 44B be exhibited to the jury at this time.

THE COURT: You may.

BY MR. MILLER:

Q. Exhibit 44B shows what, sir?

A. Exhibit 44B is a photograph of an Intratec Tec-9 semi-automatic pistol that was actually taken in my laboratory.

2090

So I'm very familiar with this particular photograph and the pistol.

Q. And Exhibit 40 is a hand drawing of a handgun?

A. That's correct. On the left is the drawing that -- at least a copy of the drawing that I have in front of me which shows the very similar and overall design pistol.

Q. And again, the Intratec Tec-9, a photograph of which exhibit is shown in Government Exhibit 44B, is one of that class of 15 or so firearms that have the class characteristics imparted to the bullets recovered from the grave of Terry DeGeus.

A. That's correct.

Q. Thank you. You can take those down now.

Mr. Murillo, would you be able to describe -- and I just want a yes-or-no answer to this question. Would you be able to describe for the jury the means in which a Intratec 9 is loaded and operated and the means in which it functions as a weapon?

A. Yes.

MR. MILLER: With the Court's permission, I would -- and strictly for demonstrative purposes, Your Honor -- ask that the witness be permitted to display to the jury Exhibit 10, an Intratec 9.

Page 118

MR. STOWERS:  That's fine.

THE COURT:  You may proceed.

2091

BY MR. MILLER:

Q.    Mr. Murillo, I am handing you a black box that bears on the outside Government Exhibit 10.  And before you do anything else -- and I know you're experienced at this -- but I want there to be no question either in the record or in the minds of anyone here that your first responsibility is and will be to ensure for all of us that this is safe to handle.

A.    Yes, it is safe.

Q.    It is unloaded and entirely safe for you to handle here in our presence.

A.    Yes, it is.  As a matter of fact, as you can tell, there's a plastic or nylon tie that's been run through the barrel so that no ammunition can be loaded into the chamber which would be located at the back end of the barrel into this particular pistol.

MR. MILLER:  And for the record, the witness has been holding Exhibit 10.  And with the Court's permission, I would ask that the witness again be permitted to continue to display it to the jury while demonstrating to the jury its functions, loading, and operation, again ensuring that it is done so in a perfectly safe fashion.

THE COURT:  Any objection?

MR. STOWERS:  No.

THE COURT:  You may proceed.

BY MR. MILLER:

2092

Page 119

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1829 of 3592

Q.   And again, would it assist you and assist the jury in understanding what you're showing them if you would be allowed to approach the jury?

A.   I can do it from here.  I can do it --

Q.   That's fine.  If you can do it safely and clearly from there so everybody can see what you're showing, that's my only concern is that everybody is able to see clearly what you're showing us.  Can you do that from the witness chair?

A.   I think so, yes.

Q.   Thank you.  Then please do proceed to -- and before you go any further, what you are holding is what, sir?  Exhibit 10 is what?

A.   This is Government Exhibit Number 10 which is an Intratec semi-automatic pistol.

Q.   Can you tell us just a little about the nature of that weapon as compared to other firearms?

A.   Most semi-automatic pistols are going to be a little bit smaller than this, first of all.  This is actually fairly large for a semi-automatic pistol.  There are several parts to this particular firearm.

First of all, I mentioned semi-automatic several times.  There's a difference between automatic, semi-automatic, or even a revolver.  Revolver is going to be a firearm that has a cylinder that turns every time you pull the trigger.  The cylinder turns to the next chamber and fires a different

2093

cartridge.  The cartridge cases that are fired in that particular type of firearm or revolver are going to stay in the cylinder and are not going to be extracted or ejected by the firearm.  They have to be manually removed from that particular

Page 120

firearm.

This is a semi-automatic pistol. The semi-automatic portion comes from the firearm doing a lot of the work for the shooter. The firearm will load the cartridge for you, and it will also cycle the ammunition in and out of the chamber of the firearm.

The way that this particular firearm functions, first of all, this is what is called a magazine, not a clip as some will refer to but a magazine. It's made of a steel tube. At the top of the magazine is a follower which is either plastic or metal, and the follower is being pushed toward the top of the magazine by a spring which is located inside the tube of the magazine. That spring is pushing the follower upwards which eventually will push all of the ammunition to the top of the magazine as well.

First of all, we need to load the magazine with ammunition. There are several cartridges that can be loaded into the top of this magazine. You can see two feed lips, if you will, on the top of the magazine, and the cartridge is simply placed against the follower, is pushed downward until the cartridge snaps in place at the top of the magazine. We can

2094

then put another cartridge on top of the first cartridge pushing against the follower and spring, and that cartridge will be snapped in place. And we can load as many cartridges as we can to completely fill the magazine if we wanted to. I think this particular magazine will hold about 35 cartridges, 35 rounds of ammunition.

Q. If I can interrupt you at this point, is it necessary that it be completely full in order to be functional?

Page 121

A.     No.   We can simply load one cartridge into the magazine if we wanted to and simply fire that one cartridge.   We can load as many cartridges as we want into this particular magazine.   It's much simpler to load it this way by loading the magazine first and inserting the magazine into the pistol.

Q.     But one might load the magazine with 1, 3, 5, or anywhere up to 35 rounds.

A.     That's correct.   We can load, again, the magazine with as many cartridges as you have.   You may only have three or four with you, but you can load to the maximum capacity if you want which is obviously several rounds.

Q.     Please continue, sir.

A.     Once the magazine has been loaded, the magazine has to be inserted into the pistol.   The pistol is made up of basically three different parts.   This is what we refer to as the frame. The frame has the grip, the part that we're going to hang on to, all the internal mechanism which is the trigger we have here and

2095

what is referred to as a magazine well.   This is where the magazine is going to be inserted into the bottom of the frame.

On top of the pistol is sometimes what we refer to as a receiver.   This top round tubular portion can come off of the frame as a separate piece.   But this is called a receiver.   On the inside of the receiver is a bolt.   The bolt, as it cycles ammunition in and out of the gun, is going to reciprocate back and forth inside of the receiver, this tubular portion of steel. That's how we get the ammunition to and from the chamber and eventually cycle the ammunition in and out of the gun if we wanted to.

The first thing that we need to do -- one other thing

Page 122

I might mention that I hadn't talked about, and that's a safety. This is also called a bolt lever. This allows me to pull the bolt physically to the rear if I wanted to. It's under spring tension, so if I let it go, it automatically pushes the bolt to the full forward position so it's ready to be fired.

This bolt lever or bolt handle is also the safety. You can push the safety in or out. I don't know if you can hear that. So by pushing the safety in or out, that either turns the safety on or turns the safety off so there's no other manual safety on this gun other than this bolt knob and pushing it in and out.

The way that we get the ammunition into the gun then is, as I mentioned earlier, load the magazine. Now we have

2096

cartridges that are next to the follower. The magazine is simply inserted into the magazine well. And we push it until it snaps in place, and the gun is not ready to be fired at this time. There's ammunition in the magazine.

What we have to do now is get one of the cartridges from the magazine into the chamber. The chamber is the back side of the barrel. We can all see the barrel here which is inside the receiver. We can see the end of the barrel anyways. But there's a barrel underneath this shroud and receiver assembly. The back end of the barrel is called the chamber. The chamber is where the cartridge -- the live cartridges will rest until it's ready to be fired.

So what we need to do is get one of those cartridges from the magazine into the chamber. And we have to do that manually by cycling the bolt, push the bolt all the way to the rear and then allow it to go forward. The forward movement of

Page 123

the bolt on its own under spring tension is going to strip one of the cartridges from the top of the magazine and push it up and into the chamber so it's now seated at the back end of the barrel and it's ready to be fired. Instead of ten cartridges that we may have had in the magazine, now we have nine cartridges. One of them has been inserted into the chamber, and it's ready to be fired.

All we have to do now is simply pull the trigger. I don't know if everybody heard that or not, but you can hear the

2097

hammer and the firing pin going forward when we pull the trigger.

This is a semi-automatic pistol which means every time I fire this particular firearm I have to let go of the trigger and pull it again to fire a second round. I can't just hold the trigger and the gun continues to fire. That would be what we refer to as a fully automatic firearm.

When we pull the trigger, you heard the hammer go forward. That strikes a firing pin inside of the bolt. The firing pin goes forward, strikes the primer at the base of the cartridge. That's what starts the firing process. It ignites the powder in the cartridge. All the powder creates a lot of pressure inside of that cartridge, and that's what pushes the bullet down the barrel and towards the target.

There's still quite a bit of pressure that's built up in that cartridge from all the powder being burned. For every action, you have to have an equal and opposite reaction. The action first is the bullet being pushed down the barrel. The opposite reaction is all the pressure in that cartridge case now is going to force on its own the bolt to the rearward position.

Page 124

There's a lot of pressure in there that's pushing that bolt rearward.

When the bolt moves to the rearward position, there's an extractor and an ejector, two pieces of metal that will pull the empty cartridge case out of the chamber and eject it out of

2098

the ejection port.

There's a very small window that you can see here. The cartridge case, the fired cartridge case, is going to be extracted and ejected from the chamber and out the ejection port, and the cartridge case is going to land somewhere fairly close to the weapon where it was discharged.

Remember this bolt was under spring tension. So once we've moved it to the full rearward position by firing it, the bolt is automatically going to go to the full forward position. When it does so, it picks up another cartridge off the top of the magazine, loads it into the chamber, and now it's ready to be fired.

We're not going to do any of this manually. All we're going to do is pull the trigger. Once we've done that, cartridge fires, bullet goes down the barrel, bolt moves to the rear, cartridge case extracts and ejects all automatically. Next cartridge is chambered, and we've done nothing but pull the trigger on this particular firearm.

Now, as I mentioned, it's semi-automatic. We have to let go of the trigger. Once the bolt has already cycled on its own, we can now pull the trigger a second time, fire a second round. And we can continue to do that until we've used up all the ammunition in the magazine.

Once we've done that, there is a magazine release

Page 125

lever on the back side of the magazine well.  We can now remove

2099

the magazine.  We can load it again with several more cartridges.  If we have a different magazine, we can load it into the magazine well and start the process all over again, first cycle that first round into the chamber so it's ready to be fired.  Once we've done that, all we have to do is pull the trigger several different times until we fired all the cartridges that we want to.

Q.   When you fire a cartridge, is there any noise generated?

A.   A lot of noise, yes.  With a 9-millimeter cartridge, anywhere from about 120, 130 decibels are going to be generated, quite a bit of noise.  So yes, you're going to hear something when the gun goes off.

Q.   We've heard about something called a silencer.  What does a silencer do?  Does that eliminate the noise?

THE COURT:  Mr. Miller, before we get to the silencer, I just want to find out, approximately how much direct examination do you have left?

MR. MILLER:  Oh, 80 seconds.

THE COURT:  That's what I thought.  How much cross?

MR. STOWERS:  Probably 15 to 20 minutes.

THE COURT:  Okay.  I think we'll go ahead and take our lunch break then.  Members of the jury, we'll be in recess. It's about five after noon.  We'll be in recess till 1:05, and then we'll come back and finish up with this witness, and then we'll see what happens then.  Thank you.

2100

Page 126

(The jury exited the courtroom.)

THE COURT: Anything we need to take up at this time?

MR. WILLIAMS: Your Honor, we do have -- you requested yesterday to come up with a mock-up of the binder.

THE COURT: Okay. We can take that up after the jury goes home today.

MR. WILLIAMS: Very good. Nothing else.

MR. STOWERS: I think they're going to rest after this witness. And then I think we're going to rest.

THE COURT: Okay.

MR. STOWERS: And so I think we could just do all that before they go home today, but I just wanted to make sure --

THE COURT: Do all what before they go home?

MR. STOWERS: Rest in their presence.

THE COURT: Exactly. And we'll reserve your Rule 29 motion until after we send the jury home, and we can do that this afternoon yet. But it will be deemed having been made after the government rests.

MR. STOWERS: That's fine.

THE COURT: Okay?

MR. STOWERS: Thank you.

THE COURT: Good. We'll see you back here at 1:05. Oh, I do have one thing. Are you offering 10? I realize it was the subject of the motion in limine ruling. But are you going to actually offer it, because it's been a while since I ruled on

2101

it? My recollection is I ruled that it can be admitted as a replica and, therefore, go back to the jury. Or if you don't want to admit it, it can just be demonstrative.

MR. MILLER: In view of the fact it's in a perfectly

Page 127

safe condition, yes, we would offer it.

&ast; &ast; &ast; &ast;

(Government Exhibit 10 was offered.)

&ast; &ast; &ast; &ast;

THE COURT: Okay. Well, you'll have to do that in front of the jury, but I've essentially ruled on it in the motion in limine, but I just wanted to make sure you knew you had to offer it. I'm not going to change my mind; okay? Thanks.

(Lunch recess at 12:06 p.m.)

THE COURT: Ready to have the jury brought in?

MR. MILLER: Yes, sir.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Miller, you may conclude your direct examination.

MR. MILLER: Thank you, Your Honor.

BY MR. MILLER:

Q. Mr. Murillo, we were about to conclude by visiting briefly about silencers. Is that a subject with which you as a professional firearms examiner have some familiarity?

A. Yes, I have.

2102

Q. And silencers, do they come in both commercial and hand-made variety?

A. Yes, they do.

Q. Okay. Is the term silencer accurate as far as being something that completely eliminates all noise?

A. Not necessarily, no. There are, as you mentioned, several different types of silencers that are manufactured whether it's commercial or homemade. To become a silencer, all it really has

Page 128

to do is reduce the amount of sound that that particular firearm produces.

Q.   So if it reduces the rather large level of noise, it still goes by the term silencer.

A.   Yes.   Even if it reduces the sound by one or two decibels and we can record that difference, then it's technically still a silencer.

Q.   And you've indicated there is such a thing as a commercially made silencer as well as homemade silencers.

A.   Yes, commercially made silencers are still available.   You have to have a license to possess them and to buy them.   They're still made for law enforcement purposes, tactical units, SWAT units, and certainly there are a lot of people out there who are still making them.   We see several homemade silencers that come into my laboratory quite often, and I get to examine them and take them apart and photograph them.

Q.   Legitimate commercially produced silencers are highly

2103

regulated and difficult to obtain.

A.   That's correct, they are.

Q.   Homemade silencers, on the other hand, are made from time to time.

A.   Yes.   Again, if you have the right equipment, a machinist shop of some sort where you can make threads and make all the metal parts, you can certainly produce one.

Q.   And the effect of such compared to the commercially produced such silencers is what as far as ability to reduce noise?

A.   Usually the homemade ones are not going to be as good as the commercial ones obviously.   I've seen some homemade ones

Page 129

that reduce the sound pretty well. They've really taken the time to make it accurately. But as a whole, yes, the homemade ones are usually not as good as the commercially available.

Q. There's still an audible report.

A. Yes.

MR. MILLER: Thank you. No further direct.

THE COURT: Mr. Stowers?

CROSS-EXAMINATION

BY MR. STOWERS:

Q. Mr. Murillo, why don't we start off by going back a little bit to the earlier portion of your testimony just to make sure that the big picture is clear here for the people on the jury seated across from you. Number one, at the grave site where

2104

Mr. DeGeus's remains were found, you found how many different bullet remnants?

A. There were three that were found at the grave site.

Q. Now, you've also talked about having found -- I guess it's a copper-jacketed item or a copper, metal piece; is that right?

A. There was a copper jacket that was also recovered. I didn't recover it. That was recovered at the autopsy by another individual and the medical examiners, so I wasn't involved in the actual recovery process, but I did look at that item.

Q. Right. So you had involvement at the DeGeus location uncovering through this process of sifting through this dirt three pieces of metal which were, in fact, pieces of lead; is that right?

A. They were actually fired bullets. They were copper-jacketed bullets having a copper jacket and a lead core, so they're not just metal as you referred to them, but they were

Page 130

copper-jacketed fired bullets.

Q.   Okay.  And then you were also given this copper jacketing that had been retrieved during the autopsy of Mr. DeGeus.

A.   That's correct.

Q.   Okay.  And all that was recovered during the autopsy and presented to you for your examination was this copper jacketing material from a bullet; is that right?

A.   From Mr. DeGeus?

Q.   Yes.  I'm sorry.

2105

A.   Yes, that's correct.  Just the jacket was recovered.  The lead core was not recovered.

Q.   And what you also have indicated just for the jury, the three lead pieces that you recovered are exhibit numbered -- which exhibit number, the three lead pieces out of the ground that you located through this screening?

A.   Again, those were copper-jacketed bullets.  They're not lead.  Copper-jacketed bullets, yeah, there were three of them which was Exhibit 902 that were recovered from the grave site.

Q.   And the copper jacketing material that was recovered during the autopsy which you examined is which exhibit number?

A.   That was Government Exhibit 1005.

Q.   Okay.  Now, you also indicated that you looked at a bullet that was recovered during the autopsy of Mr. Nicholson; is that right?

A.   That's correct.

Q.   And the exhibit number that goes with that item?

A.   That's Exhibit 504.

Q.   And it's Exhibit 504 that you weren't able to identify any bullet characteristics on such as lands and grooves; is that

Page 131

right?

A.    That's correct.

Q.    Now, you did, however, weigh, for example, the bullet that was taken at the autopsy from Mr. Nicholson; is that right?

A.    Yes, I did.

2106

Q.    And then you did the same thing with the bullets that you recovered during the sifting at the DeGeus location; is that right?

A.    That's correct, I did.

Q.    And the weight of those bullet -- those bullet pieces that you recovered can tell you something about the caliber of the weapon; is that true?

A.    It's certainly one of the things that we look at.  Weight is one.  As I mentioned before, the diameter of the bullet is another thing we look at, the length of the bullet.  So there's several characteristics we look at including the weight as you mentioned.

Q.    Because certain sizes of guns like a 22 will only fire lead bullets in certain sizes of lead; is that true?

A.    That's correct, yes.

Q.    And so you know if you've recovered a greater weight of lead than the amount that a 22 commercially manufactured bullet would contain that you've got a higher-caliber bullet than that; wouldn't that be fair?

A.    That's correct, yes.

Q.    And, of course, sometimes this can be difficult because you don't always recover all of the lead bullet because the bullet sometimes when it strikes bone or other things will split and fragment.

Page 132

A.    That's correct.

2107

Q.    But in any event, what was the weight -- if you can refer to your notes if you need to, that's fine -- of the bullet that you examined that was provided to you from Mr. Nicholson?

A.    The weight of that particular piece of lead was 70.7 grains.

Q.    And is that more grains in weight than you would expect to find with a 22-caliber?

A.    Yeah, a 22-caliber bullet is normally going to weigh about 40 to sometimes 30 grains total weight.  So we're looking at something that's obviously about twice as heavy as what you would find from a 22.

Q.    And what was the size of the -- or the weight, I should say, of the three pieces of lead that you uncovered in your screening at the DeGeus grave site?

A.    Those three items weighed 144.5 grains, 134.4 grains, and 138.5 grains.

Q.    And those three all included some of the copper jacketing material; is that correct?

A.    Yes, they all had some jacket material on them.  The first one that I gave you was pretty much a hundred percent intact. There wasn't a whole lot that was missing from that particular bullet, and that's the one that really gave away the actual weight of the bullet, its original weight.

Q.    Now, one of the things I want to make sure the jury understands, when you speak of copper jacketing material, can

2108

you explain what it is that that -- what you're talking about I
Page 133

guess?

A. I think I mentioned it a little bit earlier, but when a copper-jacketed bullet is manufactured, again, we start with usually a flat piece of copper, copper sheeting. There is a -- like a coin that's stamped out of that piece of sheeting which would look like maybe a half dollar or quarter-size metal, if you will.

From that piece of copper is molded a cup. They have machining that's used to push the inside, wrap it around a piece of machining material, and you make a cup of copper. And that cup is then filled with lead to give it some weight, and the lead is what is used to fill the inside of that cup.

The cup is then formed to make what is the final size and shape of the bullet that will be used to enter into the cartridge, the overall cartridge, the round of ammunition that's produced. It has a copper cup on the outside and a lead core as we call it on the inside of that jacketed bullet.

Q. Okay. And the cartridge, of course, contains the gun powder, and it also has on the end of it a firing -- a primer.

A. That's correct.

Q. Okay. And that primer is what the firing pin strikes.

A. That's correct.

Q. To ignite the gun powder causing combustion, and that forces the lead and the copper-jacketed lead projectile out of

2109

the gun through this rifled barrel and hopefully to its intended destination; is that right?

A. That's correct.

Q. Now, what classes of firearms shoot, I guess, projectiles, if that's the right word, in the range of these 134- to

Page 134

144-grain pieces that you recovered at the DeGeus site?

A.    The bullets that were recovered could be classified as what we sometimes refer to as medium caliber which would include possibly a 380, a 9-millimeter, 38 Special, 357 Magnum, the last two being revolver cartridges for the most part, the first two being semi-automatic cartridges.

Q.    Now, are you saying that based on what you found with regard to those three items from the DeGeus location that you can definitively say that those are nine-millimeter bullets?

A.    Yes.  Again, from the weight, the design of the bullet, if it's a revolver cartridge or bullet that's used in a revolver cartridge, it will have a -- what is called a knurled cantilever.  There's a groove that's placed around the circumference of the bullet so the cartridge can be crimped into the bullet to hold the bullet in place so the bullet won't slide into the cartridge case or out of the cartridge case.

Again, that knurled cantilever was not present on any of these bullets that I examined.  Therefore, it can't be from a revolver cartridge.  It's either from a 380 or from a 9-millimeter Luger cartridge, a 380 auto or 9-millimeter Luger

2110

cartridge, one of those two.

The next thing we do is weigh it.  When you weigh these bullets -- and as I mentioned, one of them was almost a hundred percent intact, weighed about 145 grains I think. 147-grain bullet is very common for 9-millimeter.  So we know it's not a 380.  380 auto cartridges possess bullets that are about 90 to 95 grains, so we can eliminate that medium class of bullet.  So the only thing left is a nine-millimeter.

So I started looking at several different

nine-millimeter cartridges and the bullets that are used in those cartridges. I have a CD or reference material that gives me all the manufacturers' bullets that they produce. This one had an unusual design to it in that it had kind of a black coating on the outside of it. It had a base that was not made of copper but rather had exposed lead, so this particular bullet design, they produced the copper cup, if you will. There was no base to it. So you can see the lead at the base of the bullet. You can see lead at the nose of the bullet.

When you look at the overall design, it's only manufactured by Winchester as an SXT or Black Talon type of cartridge in nine-millimeter. That's the only manufacturer out there that produced that particular type of bullet in one of their cartridges.

So we can narrow it down quite a bit to the manufacturer, the caliber, the original weight of the bullet,

2111

and so we can totally eliminate all of the others.

Q. All right. So basically what you're telling us is that the bullets that you recovered at the DeGeus grave site were fired from a nine-millimeter weapon; is that correct?

A. That's correct.

Q. And you believe they're also a particular type of ammunition.

A. Yes. I think even in the report that I generated I mention that it was manufactured or marketed by Winchester as either Black Talon or SXT type of ammunition. That's what they call the box of ammunition.

Q. All right. Now, the bullet, however, from Mr. Nicholson was apparently substantially less intact. Would that be fair to

Page 136

say?

A.   Yes.   The one from Mr. Nicholson was just a piece of lead. It didn't have a copper jacket.   I don't know if it even had a copper jacket at one time.   All I can say is it's consistent with possibly the lead core of a jacketed bullet.   It could be just a lead bullet only.   It's possible that this is just a fired lead bullet.   There's quite a bit of damage to this particular item.   It's been mushroomed, been flattened out, and so it's very hard to see anything.   I didn't see any rifling obviously because of the corrosion, the damage to the bullet, the weathering to the bullet, so I can't say a whole lot about that particular item.

2112

Q.   Okay.   Now, let's jump forward then to Exhibit Number 10 which I believe is the replica firearm that you have shown to the jury.   Can you, first of all, describe -- that item is in a case of some type; is that correct?

A.   Yes, it is.

Q.   And is that case a case that you know to be one of the cases that that particular firearm is commonly sold with?

A.   Yes, it is.

Q.   And that would be a hard plastic material with a foam cushiony inside; is that correct?

A.   Yes.

Q.   And can you show the -- by holding that up and point on that, there appears to be a couple of holes on the top of that case that might be used to attach a -- to attach something to; is that correct?

A.   You said holes?

Q.   Yeah, on the side that's facing you.

Page 137

A.     Yeah.  On one end of the case there are a couple of holes here that can be used to place a locking device through the holes if you want to put a small padlock or something like that through it, safety concerns.  That's basically what they're there for.

Q.     Or a shoulder strap?

A.     You could certainly, yes.

Q.     And then can you open that case up then and remove the

2113

fire -- have you injured yourself in getting the case open?  I hope not.  Okay.  And can you, first of all, describe for the jury, on the end of that weapon there's -- obviously there's the end of the barrel.  If you can show them that where that plastic cord comes out.

A.     Yes.

Q.     On the end of that barrel, does it have some threading on it?

A.     Yes, it does.

        MR. STOWERS:  Your Honor, could he show that to the jury?

        THE COURT:  Sure.

        MR. STOWERS:  Just step down and show it to the jury?

        THE COURT:  You may.  Are you going to ask him to speak?

        MR. STOWERS:  Not at this moment.  I'm going to ask him to go back once he's done showing it.  Thank you.

        THE COURT:  Thank you.

BY MR. STOWERS:

Q.     And if you could make sure the folks in the front row here get a look, I'm not sure if they're . . .

Page 138

A.    (Witness complied.)

Q.    Now, that threading is part of the weapon as it is sold and manufactured by the manufacturer; is that right?

A.    That's correct, it is.

2114

Q.    And what is the purpose of that threading it?

A.    Threading is actually placed on the barrel.  It's part of the barrel.  It's actually designed into the barrel.  And there are devices which you can use to attach to the firearm, thread on to the end of the barrel that are sold by Intratec, by the manufacturer of this particular firearm.

Q.    And you're aware that there's various barrel extensions that the manufacturer of that firearm sells; is that correct?

A.    Yes.

Q.    I want to show you an item which I'm just going to use as a demonstrative exhibit to see if you recognize it.

A.    Yes, I do recognize this.

Q.    And is that one of the barrel extensions that the Tec-9 manufacturer would sell commercially?

A.    Yes, it is.

MR. STOWERS:  And for the purpose of showing the jury what that item would look like if it were attached to the weapon, I'd like to display that to the jury.

THE COURT:  Well, you can.

BY MR. STOWERS:

Q.    Is that the item that is now displayed on the visual screen?

A.    Yes, it is.

Q.    And that item would actually have threads that would thread into the end of the Tec-9 that you have as Exhibit Number 10?

Page 139

2115

A.   Yes, it would.

Q.   And are you familiar with that item also sometimes being referred to as a fake silencer?

A.   I think the manufacturer sells it as a barrel extension. It certainly could be -- in just examining the item, it could be misconstrued for a silencer.  You could mistake it for a silencer.

Q.   And the reason it's sold as a barrel extension is because if it were, in fact, a silencer, it could not be sold except under highly restrictive circumstances.  You agree with that?

A.   It's not a silencer.  It's not produced as a silencer. It's not manufactured to reduce the sound.  It's just simply a device that can be screwed on to the end of the barrel, and it's not really even a barrel extension.  It doesn't extend the barrel.  The bullet -- this particular device doesn't have rifling in it, so it's not going to touch the bullet as it's being fired.  It just simply gives the shooter something to hang on to sometimes, and it can be used as a device to dissipate the heat that's generated on the barrel as well.

Q.   And I wanted to talk about that last point you just made in a second, but let me show you what it looks like when it's put on.  Now, when that barrel extension is screwed on to the end of the Tec-9 and the Tec-9 is fully assembled with the magazine, would that image there correctly show how that would appear?

A.   Yes, it does.

2116

Q.   And you've seen Tec-9s in that configuration I assume.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1850 of 3592

A.   Yes, I have.

Q.   Now, you've talked about the function of the barrel configuration on this weapon with the perforated metal around the outside of the barrel; is that right?

A.   That's correct.  It's just a piece of metal.  It's a perforated shroud that sits on the outside away from the barrel extension.  There's a solid tube that's inside of that extension that attaches to the barrel, and then there's a metal shroud around the outside that's perforated or has holes in it.

Q.   And actually in that configuration, this weapon would be really a two-handed weapon.  One hand would go up on the barrel area, and the other handle -- or the other hand I guess of the operator would be on the handle grip and the trigger.

A.   Yes, you could.

Q.   Now, the Tec-9 that we're talking about was purchased I believe in the year 1993.  Is -- this Tec-9 that you've introduced into evidence as Exhibit 10, is it in any way different than the way that gun would have been appearing as it was manufactured back in 1993 if you know?

A.   I think it's going to be pretty much the same.  All the same parts, even this particular firearm has been produced by other manufacturers, and it looks exactly the same after they took over the company, so nothing has really changed a whole lot.

2117

Q.   And that -- you probably also know, frankly, it was a pretty popular firearm.

A.   Yes, it was.  We see quite a few of them in the laboratory.

Q.   And that firearm is marketed and sold as a personal protection weapon by this company; is that correct?

Page 141

A.    I'm not familiar with how it's sold, but yes, that's certainly a possibility.

Q.    And it's kinda got a certain quality to it, if you could call it that, of being sort of a menacing-looking weapon; would you agree with that too?

A.    Yes.

Q.    And it's not sort of Grandma's little pistol; right?

A.    Probably not, no.

Q.    Your grandma doesn't have one anyway, does she?

A.    Mine didn't, no.

Q.    Now, you've talked about silencers, and you've talked about how a silencer can actually have the effect of reducing the noise that might emanate from a firearm when it's shot; right?

A.    Yes.

Q.    That's why it's called a silencer; right?

A.    Yes.

Q.    Now, on a gun like that, as with any gun, I take it, the direction that the gun is fired in would impact where the bulk of the sound would go; is that true?

A.    Yes.

2118

Q.    So if the gun is fired in a northerly direction, most of the sound will go in a northerly direction; is that true?

A.    For the most part, yes.  I mean, it's going to radiate everywhere around that firearm.  You're going to be able to hear it within a 360-degree range.  But yes, the noise, powder, everything is being pushed down the barrel and towards the target that you're aiming at or shooting at, sound as well.

Q.    And, of course, a silencer would have the effect of reducing the amount of sound that emanated out the -- I guess

Page 142

principally out the barrel end of the gun; isn't that right?

A. That's correct.

Q. And the reason you put the silencer on the barrel end of the gun is because that's where the sound is coming out mostly.

A. That's correct.

Q. And a silencer, as you indicated, is something that's capable of being homemade, if you will?

A. Yes.

Q. And there are books that exist out there that you've probably encountered in your profession that describe how these things can be homemade.

A. Yes, there are.

Q. And I think we've got a couple of exhibits that the government has introduced in this trial. One's called the Anarchist Cookbook. Have you ever seen that?

A. I have, yes.

2119

Q. And you're familiar that that book kind of gives some ideas on how one might make a silencer if they wanted to.

A. Yes.

Q. I think there's another book called The Poor Man's James Bond. You ever hear that one?

A. I think I've heard of that, yes.

Q. Apparently a book that Mr. Honken had in his possession in 1996 I believe. Are you familiar with that book at all?

A. I've heard of it. I've not read it or sifted through it.

Q. Well, it says in one of those publications that you can take a 22-caliber weapon and through a homemade silencer make it sound just like a BB gun. Would you agree with that?

A. It's certainly possible to do that. Most of the silencers

Page 143

that I've seen are not quite that good. But again, given the manufacturing process, time and effort that's put into it, it certainly would be possible to make something homemade that would produce sound like that, almost totally reduce all of the sound that's produced by the gun.

Q. One of the things you didn't get a chance to do in this case is do a comparison of these bullet fragments or these bullet remnants that you recovered from the DeGeus grave site, from Mr. Nicholson's autopsy when it was provided to you, two bullets fired from a suspect weapon; right?

A. That's correct. There was never a firearm submitted to the laboratory for comparison.

2120

Q. And do you know anything about the composition of that item there, Exhibit 10, and what it would take to essentially melt that gun down?

A. Yes, I do. The frame is made of a polymer or plastic material. The receiver, the bolt, all the internal parts are made out of steel. So you could obviously melt all of it down if you wanted to. If you got it hot enough obviously, the steel will melt. The plastic's going to be very easily melted as well. But the steel and plastic are a composition of the firearm.

Q. Can you help the jury so they understand when they're thinking about this case what parts of this Exhibit 10 are plastic if you know?

A. Again, I think we talked about it earlier, the frame or the part that you're going to hang on to is plastic, the magazine well. Basically everything from this line down is going to be made out of what they call a polymer material. Some of the

Page 144

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1854 of 3592

internal parts, the trigger, all the little pieces on the inside are going to be made out of steel. The receiver, the bolt, part that goes back and forth that we mentioned earlier are all going to be made of steel.

Q. And I assume law enforcement has to destroy firearms from time to time --

A. Yes, we do.

Q. -- that are recovered from various sources and they wind up

2121

destroying them. How is that done?

A. Usually the 2,000 or so firearms that we get into our laboratory are taken to a hammer mill, a different part of the state, and they usually just grind them up into small pieces.

Q. With super powerful equipment.

A. Yes.

Q. Okay. And so it's your testimony that you believe many of the parts of this weapon, at least the frame and those items that you just indicated, are made of a composite plastic-type material, although a very high-impact and very strong composite; right?

A. Yes.

Q. And that those materials under high-enough heat conditions can be melted physically down.

A. Sure, they can.

Q. And then there's other parts of this weapon which are actually made out of steel and iron, the barrel being part of it. I assume the part that the person would hold on to around the barrel as well; is that right?

A. That's correct.

Q. And those items would not be so easily meltable; is that

Page 145

true?

A.   Not as easily meltable, yes.  They're all going to be made of iron including the shroud on the outside of the barrel that you mentioned.  They're all steel, so it's going to take a very

2122

high temperature obviously to melt those.

Q.   And what about the magazine?

A.   Magazine is made out of steel as well.  The spring on the inside is steel.  The follower, as I mentioned, depending on where you get the magazine, can sometimes be made of steel, other times made of plastic material.

Q.   That'd be quite a bit of work to cut up and melt down even just one of those firearms, wouldn't it?

A.   It would, yes.

MR. STOWERS:  That's all I have.  Thank you.

THE COURT:  Mr. Miller?

MR. MILLER:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. MILLER:

Q.   Mr. Murillo, the firearm before you marked Exhibit 10 is same make and model as an Intratec Tec-9.  It is an Intratec Tec-9 such as those marketed in 1993; is that correct?

A.   Yes, it is.

MR. MILLER:  Government offers Exhibit 10 in evidence.

*   *   *   *

(Government Exhibit 10 was offered.)

*   *   *   *

THE COURT:  Any objection?

MR. STOWERS:  No.

THE COURT:  Exhibit 10 is received.

Page 146

* * * *

(Government Exhibit 10 was admitted.)

* * * *

BY MR. MILLER:

Q. And just so we're very clear, items received in evidence, sir, are free to be handled by the members of the jury. Would you -- obviously that has no ammunition with it; is that correct?

A. That's correct. There's no live ammunition here. The magazine is empty. I've already checked the gun. As long as we keep that plastic nylon tie in the barrel, should be very safe to handle and touch.

Q. Just hold it up and demonstrate that nylon tie so they know what it is that makes that a safe item to hold.

A. Yes. Again, it's very safe. The nylon tie is going to have to be physically cut off in order to be removed from the firearm. So it's basically a tamper-proofing device.

Q. Okay. Keeping that nylon strip in there and keeping it away from any live ammunition obviously keeps it safe.

A. Yes, it does.

Q. Okay. Thank you, sir. I just want to be very clear about that.

Guns are appropriately something that a lot of people have a very natural and understandable fear of; fair statement?

A. Yes, they do.

2124

Q. This one is an item made of plastic and steel or plastic and iron; fair statement?

Page 147

A.   Yes.

Q.   Now, does that make it unique among firearms?

A.   No.   There are lots of firearms that are manufactured like this one that are either polymer or plastic in the frame and steel in the barrel and the receiver.   Obviously you have to have a very strong material to hold all the pressure that's built up by the cartridge when you fire this.   So steel is the number-one choice of materials for the barrel and the receiver. Just about every firearm is going to have something made out of steel in it.   Some of the cheaper weapons will be made of like a zinc alloy, an aluminum alloy, some other parts, but at least the barrel is going to have to be made of steel.

Q.   And steel is an iron alloy.

A.   Yes.

Q.   And just so we're clear, if one were to melt down a firearm and leave beads of melted metal behind that were iron, that would be consistent with a melted Tec-9.

A.   It could, yes.

Q.   It'd be consistent with a melted virtually any firearm.

A.   Yes, it would.

Q.   Okay.   It'd also be consistent with a melted farm plow.

A.   Yes, it would.

Q.   Could be a lot of different things.

2125

A.   Anything that's made out of iron, yes.

Q.   Including a Tec-9.

A.   Including a Tec-9, yes.

Q.   It was pointed out by Mr. Stowers that -- and I think you mentioned that you quite frequently receive those in the laboratory.

Page 148

A. Yes, we see quite a few of them during the destruction process as I mentioned before. We get about 2,000 firearms a year that come into our laboratory for destruction. Once they've gone through the criminal justice system, case has been adjudicated, everything's finished, the firearm is usually submitted to our laboratory so that we can take care of it. Either it goes into our collection or it can be given to law enforcement. Most of them are destroyed as I mentioned earlier.

Q. And they become a member or an item in your collection because they are seized items.

A. That's correct.

Q. Seized from felons.

A. Usually, yes.

Q. And a Tec-9 is a popular such item.

A. Yes, we see probably a dozen of these or so every year, and that's not including the case work that we get in. We'll probably see three or four of them during the case work of a year's time.

Q. Are you a hunter, sir?

2126

A. Yes.

Q. That's not the sort of thing you use to hunt white tail deer.

A. No, it is not.

Q. Pheasant?

A. No, it is not.

Q. Any of the other popular game animal or bird around this part of the country?

A. It certainly could be used -- I'm not going to say it's not, but it could be used for hunting purposes. It's not -- it

Page 149

wouldn't be my choice and most hunters' choices for the type of firearm that you would use for Iowa game.

Q. What it actually is is a popular urban assault weapon; fair statement?

A. Technically, yes. It's been banned as an assault weapon, and it could be -- could be definitely referred to as an assault pistol.

Q. And getting back to the possibility of melting it down, if one were acquainted with the operation and happened to be possessed of a cutting torch, would one be able to, in fact, melt down such a weapon?

A. Yes, you could.

MR. MILLER: Thank you, sir. No further redirect.

THE COURT: Mr. Stowers, any recross?

MR. STOWERS: No, Your Honor. Thank you.

2127

THE COURT: You may step down.

MR. MILLER: May it please the Court. Your Honor, the United States rests.

THE COURT: Does the defense desire to put on any evidence?

MR. WILLETT: Your Honor, if it please the Court, the defense rests.

THE COURT: Okay. Thank you.

Members of the jury, that concludes all of the evidence in the case. Let me explain what's going to happen next.

We're going to send you home now. I'm going to be meeting this afternoon with the lawyers and probably tomorrow. We'll bring you back at 8:30 on Monday. When you come back on

Page 150

Monday morning, we will collect your set of preliminary instructions, and I will pass out a new set that includes the original 17 preliminary instructions and 13 final instructions and then a verdict form. I will go over most of the final instructions with you. The last two I will probably leave until after argument. And then we'll hear the closing arguments of the lawyers.

Because the government has the burden of proof, the government goes first and last. So there will actually be three arguments. The government will start with their closing argument. Then the defense will give a closing argument if they

2128

want to. And then if the defense does give a closing argument, then the government has the right to give what's called a rebuttal closing argument.

At the conclusion of the closing arguments in the case, we'll let you know who the alternate jurors are. And then the 12 trial jurors will go down to the jury room and begin the deliberations. We may have the alternates stay at the courthouse during the deliberations. I haven't decided that yet, and I need to talk to the lawyers about that. But that's kind of a preview of what's going to happen on Monday.

Now, because there's some period of time between when you're going home now and Monday and because some of you may go to work tomorrow, I want to make sure that all of you realize how important it is not to talk yet among yourselves about this case. You'll be able to do that on Monday after the closing arguments and you go down and begin your deliberations. You'll be able to talk as much and as long as you want to among yourselves. But until we get to that point, you're not allowed

Page 151

to discuss this case with anyone.

And most importantly, don't let anybody talk to you about the case. I know if you do go back to work on Thursday or Friday, you know, there's obviously some interest that varies from community to community and employer to employer and place of employment. But it'd be totally inappropriate for you to discuss with anyone or let anyone try and talk to you about the

2129

case. And so I urge you in the strongest possible terms not to discuss this case with anyone and not to let anybody talk to you about the case.

And we'll see you back here 8:30 Monday morning. Hope you all have a good weekend, and we'll see you back here Monday morning. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. Would the defense like to make their Rule 29 motion at this time? Or would you like a recess?

MR. STOWERS: No, I can do it now.

THE COURT: Okay.

MR. STOWERS: Your Honor, pursuant to Federal Rule of Criminal Procedure 29 -- am I coming through?

THE COURT: That's a little better if you move a little closer. Thank you.

MR. STOWERS: Pursuant to Federal Rule of Criminal Procedure 29, we would at this time move the Court to enter a judgment of acquittal on each of the ten counts of the indictment filed in this matter for the reason that the government's evidence even when viewed in the best light to the government including drawing all of the inferences in their

Page 152

favor that they're entitled to under the law is not sufficient to warrant submission of any one of those counts to the trial jury.  Thank you.

2130

THE COURT:  Mr. Williams?

MR. WILLIAMS:  Your Honor, the United States obviously resists the defendant's motion.  The government's evidence is more than sufficient for the jury to determine this case, and this case ought to be submitted to the jury for their decision. Thank you.

THE COURT:  Defendant's Rule 29 motion is denied.

Why don't we take a recess.  But here's my kind of agenda, and then I'll be happy to add anything to the agenda that either side would like to add.  We need to talk about the use of the witness photos and the prototype that I asked you, Mr. Williams, to have and that it appears that you now have.  We need to work out any logistical arrangements for tomorrow's 12:30 telephonic conference call with Mr. Honken's defense team and Mr. Honken about his assertion of his Fifth Amendment right in response to the defense subpoena for the penalty phase.

I want to talk to you about how to handle the alternate jurors in the case.  I've got several questions and possibilities.  I want to go through the list of mitigating factors that the defense submitted and just share some observations and maybe get some comments from both sides.

I will now give you or in a moment or two give you the revisions to the eligibility phase instructions that have been made in light of our conference at 7:30 this morning and also the revision to the merits instruction, number 11 specifically

2131

Page 153

mentioning the defendant's constitutional right not to testify.

And then we can have some further discussion on the eligibility instructions, and I'd like to go ahead today and make the final record on the final merits instruction. We made a lot of record on it, but I just want to give the parties another opportunity to make any additional record on the final merits instructions.

That's everything on my list. Anything else we need to talk about? Oh, and then obviously we need to take up this issue about the effect of Booker on the Court's instructions in the penalty phase should there be a penalty phase. Anything else?

MR. WILLIAMS: No, Your Honor.

THE COURT: Anything else from the defense, Mr. Berrigan?

MR. BERRIGAN: No, sir. That's it.

THE COURT: Okay. How much of a break would everybody like?

MR. WILLIAMS: Whatever you want, Your Honor.

THE COURT: Okay. Why don't we take a break until 2:15 and then come back. Thank you.

(Recess at 1:54 p.m.)

THE COURT: Okay. In no particular order, why don't we do something easy. What are the logistics for the 12:30 conference call tomorrow? Who's going to be here? Who's going

2132

to be by telephone?

MR. BERRIGAN: Mr. Stowers and I will be here present.

Page 154

Mr. Willett, if the Court will allow him to be excused, has some other matters to attend to.

THE COURT: That's fine.

MR. WILLETT: Thank you.

THE COURT: And why don't we do it right in the courtroom, and you'd like to have your client present?

MR. BERRIGAN: Yes, sir.

THE COURT: She certainly has a right to be present.

MR. BERRIGAN: We'd like her to be.

THE COURT: Okay. And Mr. Williams?

MR. WILLIAMS: If it's permissible with the Court, I'd like to appear by phone.

THE COURT: That's fine.

MR. WILLIAMS: And Mr. Miller will not be participating.

THE COURT: And Jennifer or Carey has your number?

MR. WILLIAMS: They do.

THE COURT: Actually I was just told that conference call is set up.

MR. WILLIAMS: Very good.

THE COURT: Okay. So that takes care of 12:30 tomorrow.

Let's talk about the alternate jurors. My plan is to

2133

not discharge the alternate jurors so that should we lose a juror -- well, first -- yeah, so that if we lose a juror during the merits phase instruction (sic) we could use an alternate juror. And then I plan on having at least some of the alternates sit in on the penalty phase if there is one.

But just the logistics of doing that, do we need all

Page 155

six -- do we have to hang on to all six alternates? I think it's highly unlikely in a short period of time, but it's the safer thing to do, so that's one question.

MR. BERRIGAN: We'll defer to your judgment, Your Honor. It's hard to imagine we'd lose six people from this point onward, but whatever you think is appropriate.

THE COURT: I'd hate to be wrong, though.

MR. BERRIGAN: We have no position about that. Whatever you think's appropriate.

THE COURT: I was thinking three or four, but then if you're going to do four, you know, it's only another two. Do you have any thoughts on it?

MR. WILLIAMS: Boy, I don't, Judge. I mean, if nothing else, we picked a healthy jury. We've not lost anybody yet on this. Defense counsel and I have been talking about our penalty phase witnesses. We're both cutting down what our initial lists are. That said, I think we're still looking at a couple weeks of evidence.

THE COURT: Oh, really. A couple weeks. Yeah. I

2134

mean, I'm not surprised. I thought it was less than a couple weeks when you told me you were going to call everybody.

MR. WILLIAMS: I guess what I'm thinking of in a couple weeks, I'm thinking a couple weeks including the deliberations, the arguments on the gateway and, you know, you add all that stuff in, and I think we'll burn a couple weeks.

THE COURT: Sure.

MR. WILLIAMS: But I don't really have a strong feeling on it. Fourteen fit nicely into the box, and that's the only reason I think if you're going to cut it and all, I'd just

Page 156

cut it to fourteen because you can get them all in the box -- I'm sorry, sixteen fit in the box. Sixteen fit in the box and you could lose the front two, but I don't have a strong feeling one way or the other on it.

THE COURT: I'd be comfortable going with four alternates.

MR. BERRIGAN: The only thing -- we're presuming this will happen, but the two that would be excused would be alternate number 5 and 6?

THE COURT: Correct.

MR. BERRIGAN: Okay, sir. Just to be perfectly clear.

THE COURT: No, it's good to be clear. I appreciate that. That's right. So we're talking about excusing them Monday after closing arguments, excusing 5 and 6.

MR. BERRIGAN: (Nodded head.)

2135

THE COURT: Now, with the other four, do you think that -- I mean, I have to give them a very strong admonition. Do you think they have to be at the courthouse, or can they go on with their lives and we call them back if we need them?

MR. BERRIGAN: I see no reason for them to have to physically be present unless you foresee some difficulties letting them go. They're just going to be sitting here twiddling their thumbs while the other jurors are deliberating, and I'm sure were I one of them, I would appreciate an opportunity to do something else.

THE COURT: I would think so.

MR. BERRIGAN: But again, we'll defer --

THE COURT: And if we do lose one, they have to start deliberations anew anyway.

Page 157

MR. BERRIGAN: Right.

THE COURT: So what's your position, Mr. Williams?

MR. WILLIAMS: I agree. I think with a strong admonition from the Court, I think it'd be sufficient to allow them to get back to their lives while the other ones are deliberating.

THE COURT: But, you know, they may be done, but then again, they may have to come back. Is there any reason to have them here for the eligibility arguments? Probably.

MR. WILLIAMS: Your Honor, I guess my position would be any -- any juror who is going to sit through any portion of

2136

the penalty phase should sit through all of it. And my concern from the beginning with trifurcating this is that they're not going to get the full picture, and I would be concerned if an alternate wasn't here for the eligibility came in and suddenly was here for only part of it. I want to at least have them have the benefit of whatever arguments I have about the eligibility stage as well. So I'd want whoever -- whatever alternates are going to be here, I want them here for the entire penalty phase.

MR. BERRIGAN: We agree that they should be here for any court proceedings, Your Honor, that involve the other jurors including the eligibility part of the trial. You know, I'm not talking about jury questions.

THE COURT: Wait a minute. If that's the case, then I'm going to have them here at the courthouse because when you say could involve any of the other jurors, we might have a note that comes up.

MR. BERRIGAN: I was just about to say that.

THE COURT: Okay.

Page 158

MR. BERRIGAN: Except for things like juror questions that involve the deliberations, but I mean the -- something like the eligibility phase, even if they aren't participating, I agree with Mr. Williams they probably should be here.

THE COURT: Okay. And then obviously here during the -- if there is a penalty phase, during all of the penalty phase evidence, instructions, opening statements. I kind of

2137

took everything out of order. Preliminary instructions, opening statements, penalty phase evidence, final instructions, closing arguments. Okay.

Now, have you -- oh, I forgot to add -- I had it on my list here. Have you gone over the list of exhibits that we've kept to make sure that everybody's in agreement on what's been admitted and what hasn't?

MR. WILLIAMS: On behalf of the United States, we're going to address that this afternoon when this hearing's over. Myself and Carey and Sali are going to. It's my understanding the defense don't have their notes they need, and so they're going to handle that separately with Carey tonight and tomorrow morning.

THE COURT: Oh, okay. As long as, if there's a dispute, I know about it before Monday.

MR. BERRIGAN: We weren't smart enough to just keep a running list, and my list is in my notes which is now on I think pad 11, Your Honor, but Carey was kind enough to give me her list. I'll check them tonight, and when we're back in court tomorrow, if there are any discrepancies, we'll --

THE COURT: I doubt if there will be any, but it's just my practice.

Page 159

MR. BERRIGAN: If there are, I'm sure it will be our notes that are deficient. I feel very confident about that.

THE COURT: And I've kept very detailed notes on it as

2138

well, too. Carey hasn't seen my notes.

MR. BERRIGAN: We'll work on it tonight.

THE COURT: Okay. It doesn't sound like that's going to be a problem.

Why don't we take up the witness photo.

MR. WILLIAMS: May I approach?

THE COURT: You may. Oh, you actually put it in alphabetical order rather than the order in which they testified?

MR. WILLIAMS: Yeah, we debated that, but we thought it's most neutral in alphabetical order.

THE COURT: Yeah, it's easier for them to probably find a witness. And just why don't you describe for the record the process you went through in doing the photos.

MR. WILLIAMS: After each witness testified, Your Honor, my witness coordinator, Shari Konarski, took the witness downstairs within our office space, found a blank wall, and then took a digital photograph of them and then went into the computer and then would try to edit the -- or crop the photos so they were roughly all the same size. I think in some cases she was closer or farther away than others, so there's a slight difference in the dimensions of the faces, but that's it. And then she attached a name underneath each one and then placed them in alphabetical order.

Our intent would be to have actually smaller

2139

Page 160

notebooks.  We have one-and-a-half-inch three-ring binders that we're going to put together instead of that-two-and-a-half-inch binder with simply, as you see on that one, just the juror number listed on the front cover of it.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  Your Honor, I think we made a lengthy record about this issue at the beginning of the trial.  I don't feel any need to reiterate the defense arguments against this idea unless you'd like me to.

THE COURT:  No.

MR. BERRIGAN:  I did want to suggest that the government initially proposed this idea in the form of a board. As you'll recall during Mr. Honken's trial, the issue arose in closing argument when they had this board with the pictures on them.  And our preference would be that if this is going to happen that it be used much like a demonstrative exhibit.

We don't have any problem with the way this has been done, that is, with the photographs or how they're arranged or anything like that.  But if the jurors need this book, it's something that's available to them so they can look at the people to refresh their recollection, that it be like an item of demonstrative -- a demonstrative exhibit, if you will, or a piece of evidence that they could go to if they'd like as opposed to each person actually having a book which we feel is not only unnecessary but it sort of suggests in our view that

2140

the jurors review that in some fashion, that it's being given to them by the Court for a specific purpose.

THE COURT:  Well, let me ask you this question because
Page 161

I'm not exactly tracking what you're saying, and I think I'm overly optimistic in my view of what you're saying, so I want to be very clear.

MR. BERRIGAN: Yes, sir.

THE COURT: Would you actually have an objection if we just had one book?

MR. BERRIGAN: No. If we just had one book, we'd withdraw our objection because, frankly, having looked at the book, I don't find it objectionable.

THE COURT: You just object to each juror having the book.

MR. BERRIGAN: We've had nine days of evidence, Your Honor, and, I mean, I still don't think the jurors are going to have a hard time remembering these folks, and I think we were contemplating a 2-month trial and like 90 witnesses, and, you know, this case has gone in in 2 weeks.

THE COURT: The use of the book is less compelling than --

MR. BERRIGAN: Far less, right.

THE COURT: -- than when we undertook the process.

MR. BERRIGAN: It's not a big deal if the Court thinks that the book would be helpful to them. That's quite a little

2141

different thing.

THE COURT: You're actually -- I knew there was a phone up here for some reason. I have to call 911. You're actually not going to object --

MR. BERRIGAN: If you use that one book, we're not going to object.

THE COURT: Okay.
                    Page 162

MR. BERRIGAN: That's right.

THE COURT: And what would I tell them? I don't really want to put it in the written instructions. I think just when they go back, I'll say the exhibits will be going back, and, by the way, we have a notebook with the pictures of all the witnesses who testified if any jurors feels it would be helpful.

MR. BERRIGAN: Yeah, that's fine.

THE COURT: Something like that?

MR. BERRIGAN: Yes, sir.

THE COURT: You okay with that?

MR. WILLIAMS: Certainly.

THE COURT: I'm not actually all that worried about the objection, but, you know, to the ex -- there was -- you know, every issue has some merit on both sides. It's not like you're raising frivolous issues. And I think having one book ameliorates some of the concerns that the defense raised. And so I would be very comfortable with one book. So now why don't we see if we can actually agree on what it should say on the

2142

cover. Witness photographs?

MR. BERRIGAN: Yeah, witness photographs would be fine.

THE COURT: Or witness photos?

MR. BERRIGAN: Either one, sure.

THE COURT: Okay.

MR. WILLIAMS: Either one.

THE COURT: I defer. Either witness photos or witness photographs.

MR. WILLIAMS: We could have witness photo display. No.

Page 163

MR. BERRIGAN: Mug shots would be good, sir.

THE COURT: Actually how about photos of witnesses? That's a little more descriptive than witness photos.

MR. WILLIAMS: That's fine.

THE COURT: Photos of the witnesses. Okay. We got that out of the way.

Now why don't we turn to the instruction issues. Did you see attached to the eligibility phase instructions the very first instruction was the redo of final instruction number 11 on defendant's decision not to testify?

MR. WILLIAMS: Yes, Your Honor. On behalf of the United States, we've reviewed it. We have no objection.

THE COURT: I imagine the defense is going to object because I did not specifically refer to the Fifth Amendment.

2143

Would you like me to refer to the Fifth Amendment?

MR. BERRIGAN: No, sir. I think a constitutional right's sufficient. We have no objection to this instruction.

THE COURT: Okay. Are you ready to make the record then on the final instructions?

MR. WILLIAMS: Yes, Your Honor.

MR. STOWERS: (Nodded head.)

THE COURT: Okay.

MR. WILLIAMS: On behalf of the -- I'm sorry.

THE COURT: No, go ahead.

MR. WILLIAMS: On behalf of the United States, we have no objections to the Court's final instructions with the understanding that the new instruction 11 be inserted in place of the old.

On the verdict form, it does strike me on page 5, we

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1874 of 3592

have on the right-hand column "before or after the killings or both" the name -- after Greg Nicholson it's blanked out for obvious reasons. We need to do the same thing with Terry DeGeus.

MR. STOWERS: Where is that?

MR. WILLIAMS: On page 5 of the verdict form on the merits phase.

THE COURT: Right.

MR. WILLIAMS: Because he could not have obviously acted in concert after he was killed. So that --

2144

THE COURT: You would concede that.

MR. WILLIAMS: Yeah, I would concede that.

THE COURT: On behalf of the entire United States of America you make that concession.

MR. WILLIAMS: I think I'm authorized to make that one.

THE COURT: Okay.

MR. WILLIAMS: So I think the same thing on Terry DeGeus as well to make sense there. But that's the only comment I have on the final merits.

THE COURT: Okay. Mr. Stowers?

MR. STOWERS: I believe the Court revised in the final instructions number 8 after we met -- was it yesterday? And that is the definition of continuing criminal enterprise.

THE COURT: Yes.

MR. STOWERS: Organizer, supervisor, manager. And we -- this is a vexing issue out of the case law as I know you're aware. We believe in our proposal number 28 which is admittedly imperfect that the concept --

Page 165

THE COURT: Now where are you talking about in this instruction? So can you be specific?

MR. STOWERS: Well, I think the way it's worded it is fine, but I think there's this buyer-seller concept that we were trying to get at in our proposal number 28. And our proposal number 28, the first two sentences of which I believe could be

2145

inserted within the Court's final version of number 8 that appears on page 54 at some location within the second paragraph perhaps. The third sentence of our proposal number 28 --

THE COURT: Why don't you read that sentence.

MR. STOWERS: The third sentence I would remove from our proposal, and the first two sentences read, An organizer or manager must exercise some form of managerial authority, and the mere relationship of a seller of methamphetamine to a buyer of methamphetamine is not enough to establish that the seller is the organizer or manager of his or her customers, period. And then the next sentence reads, Furthermore, to be a manager or organizer requires more than simply setting up a system of supplying drugs, period.

In our proposal number 28 there's a third sentence, but I'm withdrawing that request because there's some possible conflict between that language and some of the Eighth Circuit cases that you identified in your last draft on number 8. And so we'd withdraw that last sentence but just those first two sentences of our number 28 either as they're submitted or in some substantially similar form.

THE COURT: Mr. Williams, what's your view?

MR. WILLIAMS: I think the first part of the first sentence incorrectly states the law. It says, An organizer or

Page 166

manager must exercise some form of managerial authority, and I don't think that's true. The second part of that sentence, The

2146

mere relationship of a seller of methamphetamine to a buyer of methamphetamine is not enough to establish that the seller is an organizer or manager of his or her customers, I think is a correct statement of the law. I don't object to the language. I think it's unnecessary. I think the Court's instruction provides the jury with enough instruction for them to apply their common-sense understanding of those common-sense terms, and the defense is free to argue that during closing argument. But I don't see a need to instruct that.

With regard to the third sentence, Furthermore, to be a manager or organizer requires more than simply setting up a system of supplying drugs, I don't think that's a correct statement of the law either. I think an organizer can be -- I think it's too broad because I think you could be found to be an organizer if you set up a very sophisticated system of supplying drugs in such a way that it created a sense of control and organization to it and coordinated the separate activities of a large number of people. I think it could be an organizer. So I'm opposed to that language.

Bottom line is I think your instruction is fine the way it is and the defense is free to argue that all we've shown is a buyer-seller relationship and that's not enough.

THE COURT: I'll take it under advisement. What else?

MR. STOWERS: The only other thing is it relates to the same issue which is -- and we talked about this before and I

2147

Page 167

think it's partially cured by the Court's method of the interrogatories in the verdict forms, but we think as to particularly David Patrick and Gary Solland there's no factual basis to submit to the jury because if they're anything, they definitely are purchasers from other persons in this overall activity. And there really is no basis to submit them as being included within the five people in the CCE that were organized, managed, or supervised and those two in particular.

And I think the other one who's maybe closer on the bubble would be Ryerson who testified who I think you might recall was DeGeus's roommate for a period of time up to maybe I think about a year and apparently used drugs with DeGeus. I'm not sure what his other activities were, but he never bought anything from him. He never sold any drugs for him. He never paid him for anything, and he's just sort of a hanger-onner as they're known in the drug trade I guess. So I don't really think he's in any way one of the five either.

And although the instruction's going to ask the jury one way or the other, I think to put it in there leaves the jury with the impression that there might be something there that would be enough to allow them to make a finding, and I don't think there's any way there is. But that's our only other objections other than the other things that we talked about the other day. Thank you.

THE COURT: Okay. Thank you very much. Have you had

2148

a chance to look at the revisions to the eligibility phase instructions, or would you like some more time?

MR. BERRIGAN: We honestly have not, Your Honor,

Page 168

although I remember our complaints about those were rather limited. I apologize. We just haven't had a chance to look at it. If we could do that tomorrow at some point before or after the conference call with Mr. Honken, I'm sure we'd be ready.

THE COURT: Would you be ready to do that by telephone maybe after the conference call with the Honken defense team?

MR. WILLIAMS: Certainly, Your Honor. On behalf of the United States, I'm ready to do it now. We've reviewed it. I have no objections to it. But I'll be on the phone tomorrow to have any input that the defense might have on any objections they might have.

THE COURT: Okay. Let's talk a little bit just about the list of mitigating circumstances that the defense has submitted. I have a couple of observations. You know, I can submit them in any order you want. It strikes me that there is a logical basis to group them, but this isn't it. But if there's -- and one, maybe you don't want them in a logical order. There's no requirement that they be in a logical order.

MR. BERRIGAN: I specifically did not want to group them that way, Your Honor, because I think it has a tendency that the jurors might jumble them sort of in the package that we're anticipating and that if they're sort of mixed up then

2149

they really get more individual consideration. Now, that could be -- who knows, I mean? But that's the theory.

THE COURT: Yeah, I'm willing to defer to your view on that. I actually -- I have a little bit different view, but I understand it, and if that's -- you know, I kind of view mitigating as it's the defense thing.

MR. BERRIGAN: Yeah, and I could be completely wrong.

Page 169

That's the theory under which I've kind of cobbled these together.

THE COURT: No, it's less likely they would skip over or mush them together if you have them kind of spread out.

MR. BERRIGAN: Right.

THE COURT: Would you agree with me, though, for example, that 6 and 25 are identical and that you're not entitled to have two identical mitigators submitted?

MR. BERRIGAN: Yes, I would totally agree with that. Yes, sir. That was an oversight. I apologize.

THE COURT: This is just an observation. I don't really know why I have kind of a negative view of it. But it would be with regard to mitigators 1, 2, and 23. And it's the second clause of the sentence, Regardless of whether duress was of such a degree as to constitute a defense --

MR. BERRIGAN: Those are -- you probably know this, but I just took those from the statute. I think that is the language that's used.

2150

THE COURT: That "regardless of" is the language of the statute?

MR. BERRIGAN: I believe so. I don't like it either. I don't.

THE COURT: I just thought because we never instructed -- I could understand that if you instructed on it.

MR. BERRIGAN: Right. No, I don't like it either, Your Honor, and perhaps I'll propose an amendment to that, but that's how it reads in the instruction.

THE COURT: Okay. I'll tell you what. We'll leave it in then, and if you decide you want it out and you just want to

Page 170

end it with "Angela Johnson was under unusual and substantial duress," period --

MR. BERRIGAN: Okay. Yeah, I almost prefer that. I just -- those were statutory mitigators, so I followed the exact language. I'm not crazy about it at all.

THE COURT: I would suspect you don't need to have it.

MR. BERRIGAN: Right.

THE COURT: But that it's important to make that clear for purposes of it can be a mitigator.

MR. BERRIGAN: Yes, sir.

THE COURT: But that the jury doesn't need -- I think it'd just be confusing.

MR. BERRIGAN: I agree. I have no disagreement about that.

2151

THE COURT: Okay.

MR. BERRIGAN: I'll amend those.

THE COURT: Do you have a problem then if I just take that language out?

MR. BERRIGAN: No, sir.

THE COURT: Okay. Now, can you work with me on the language of number 8?

MR. BERRIGAN: Yes, sir.

THE COURT: I mean, I have some exception with the way it's phrased.

MR. BERRIGAN: That again is -- I guess it's a combination of my language and the statutory mitigator. There is a statutory mitigator concerning the victims consenting to the actions that caused their death. Obviously these men didn't consent to their death. But they were willing participants, we

Page 171

believe the evidence is, in a drug conspiracy and/or a continuing criminal enterprise that eventually led to their deaths.

THE COURT: Well, that's where I have a problem with it where it says, The methamphetamine manufacturing and distribution that resulted in their deaths.

MR. BERRIGAN: Right.

THE COURT: What resulted in their deaths was an intervening act.

MR. BERRIGAN: No, that's right.

2152

THE COURT: And so I don't have a problem with kind of the substance of it.

MR. BERRIGAN: All right. I'll be happy to work on rephrasing that, Your Honor. I think we're on the same page. It's not artfully worded.

THE COURT: To me you could just lop off that "resulted in their deaths." Everybody knows they died, every juror in this trial, and you could just -- but, you know, I'm not insisting on my language. I think you're for the most part entitled to your language unless I have a serious objection to it.

MR. BERRIGAN: I'll try to rework that by tomorrow; is that all right?

THE COURT: That's fine. That's fine. And then in 14.

MR. BERRIGAN: Yes, sir.

THE COURT: For some reason I just kind of have a red flag reaction to the word "fateful."

MR. BERRIGAN: Fateful, all right.

Page 172

THE COURT: I mean, in many senses, of course, that's true.

MR. BERRIGAN: You're not the only one that's brought that to my attention. The members of my defense team didn't think that was a great word either.

THE COURT: Would you just take a look at that?

2153

MR. BERRIGAN: Yes, sir, absolutely.

THE COURT: And then I think in 19 "would suffer grievously," I think you want to add the word "by her execution."

MR. BERRIGAN: Yes, sir.

THE COURT: And, you know, some of that's a little bit redundant, should she be -- by her execution should she be sentenced to death.

MR. BERRIGAN: That is redundant. You're right.

THE COURT: So you might just want to say, By her execution, but why don't you look at that and we can talk about that tomorrow.

MR. BERRIGAN: I could either take out the -- either "by her execution" should be omitted.

THE COURT: Or the other.

MR. BERRIGAN: One or the other, right.

THE COURT: In 22, religiously doesn't really work for me.

MR. BERRIGAN: Okay.

THE COURT: Is there another word that you could find?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay.

MR. BERRIGAN: It wasn't meant to convey a religious

Page 173

concept. I understand your concern.

THE COURT: Right. But I think it's ambiguous. And

2154

those are the only comments I have.

Now, does the government have any comments on the list of mitigators?

MR. WILLIAMS: No, Your Honor. In my view I think the defense is -- let me put it this way. I don't think I want to be in a position of impacting what they claim to be mitigators.

THE COURT: Now, there has to be evidence ultimately to support them I think.

MR. WILLIAMS: Right. If there's nothing that supports some of these things obviously before the final instructions, I'll take issue with them. But assuming they have evidence to back this up, then that's something I think they're entitled to claim whatever they want to in the realm of mitigation.

THE COURT: Now, Mr. Berrigan, did you -- I asked Roger to make copies of the Eighth Circuit model 12.08 on the nonstatutory aggravating factors.

MR. BERRIGAN: Yes, sir.

THE COURT: So I don't know that there will be any evidence -- there has to be evidence to support it.

MR. BERRIGAN: I understand.

THE COURT: But at least I wanted to let you know where it came from.

MR. BERRIGAN: I appreciate that, and I have been enlightened as a result. I find it hard to believe, but it's

2155

Page 174

obviously there in print. I mean, things like custody classification, frankly, largely depend on what crime you're charged with. It has nothing to do, in my humble opinion, with future dangerousness, but obviously the Eighth Circuit thinks otherwise, and they're going to I'm sure influence the Court more in this decision.

There is an issue about whether or not we still need to define that aggravator in the way that it's being done. That is, I understand that there's some support for the elements that have been included. I'm not sure that we need to actually insert those elements.

THE COURT: Right.

MR. BERRIGAN: So I'd still like to reserve my objection at least in that regard, but obviously there's a basis for some -- all of the subparagraphs that the Court had previously inserted.

THE COURT: Do you really think we have to define it?

MR. WILLIAMS: I think it helps, Your Honor, because, you know, for the jury simply to get the word, you know, danger to the future lives and safety of other persons, in my view I think it is helpful to the jury to have some idea of what the Court means by that or what has been taken or understood to create that. So in my view I think it helps, and if the purpose of the instructions are to aid the jury in their deliberations, I think it's helpful. Is it absolutely necessary? No. But I

2156

think it's helpful.

MR. BERRIGAN: Even the Eighth Circuit notes that some of these factors are very much debatable, Your Honor. I see the note number 5 in this handout, United States versus Davis, held

Page 175

that threatening words and warped bravado without affirmative acts were not admissible to prove future dangerousness which seems to contradict subparagraph A, specific threats of violence. And I suspect if we look we might be able to find other cases, but we haven't done that yet.

So our strong preference -- and I don't know that we're deciding this finally today. Perhaps we're not.

THE COURT: No, we're not.

MR. BERRIGAN: But our strong preference is we not have these kind of a checklist that we think is very much in debate as to whether these are specific acts of future dangerousness.

THE COURT: To me, you know, this is one of those situations where it seems to me the parties are flip-flopped in what they're arguing, that they would want specifics, that you're better off without them, but the parties don't see it that way, and that's why you're advocates and I'm just sitting in the middle. So I don't know. I think if the defense was insisting on specifics I would instruct on specifics. But with the defense taking just the opposite posture --

MR. WILLIAMS: I can live without them. I mean, I'm

2157

fine without them.

THE COURT: I think I'm probably inclined not to go the specific route because it's clear that I'm doing that at the request of the defense in the case.

MR. BERRIGAN: Well, there's no doubt about that, sir. No, we really don't think -- I know the Eighth Circuit disagrees, and who am I to say? But this list --

THE COURT: Is that the first time they disagreed with

Page 176

you, Mr. Berrigan? I know it's not with me.

MR. BERRIGAN: I think it's the second time, sir. But some of these things like, as I mentioned, custody classification and low rehabilitative potential, how that could possibly equate to future dangerousness is beyond me, frankly. I suppose a gentleman who's mentally retarded sitting in prison has low potential for future rehabilitation. That doesn't mean he's a danger to anybody. It baffles me that that would be included, frankly. And if it's in the instruction, our fear is that it suggests to the jurors it's a valid consideration, and I think it's really up to them to determine these things, not the Eighth Circuit, with all due respect to them. So we'd very much like them not to be included.

THE COURT: Okay. I'm inclined not to include it. Mr. Williams?

MR. WILLIAMS: Just for fun, I was going to note that I believe if I recall Mr. Cunningham's testimony -- that'd be

2158

their expert -- I think he's talked about low custody classification being an indicative factor in determining low --

THE COURT: But you're free to argue that.

MR. WILLIAMS: Right. Oh, yeah. I just think it's ironic that their expert has actually argued that very fact, but that's fine. I can argue all that.

THE COURT: And I'm off track a little bit here, but, Mr. Berrigan, you said something this morning that caught my attention.

MR. BERRIGAN: Yes, sir.

THE COURT: And when you were going through your numerous objections to the penalty phase instructions, you did

Page 177

make a reference to United States versus Allen.

MR. BERRIGAN: Yes, sir.

THE COURT: And without going back to the realtime, could you refresh my recollection? And do you know which United States versus Allen opinion it would be?

MR. BERRIGAN: I actually have copies of that section. It's very brief if I could provide that, and I should have this morning.

THE COURT: Yeah, that'd be very helpful.

MR. BERRIGAN: I didn't think we were going to take it up. I have it right here if I can have just a second to give Mr. Williams a copy.

THE COURT: Sure.

2159

MR. BERRIGAN: May I approach?

THE COURT: You may.

MR. BERRIGAN: The specific language, not that you don't want to read the whole thing I'm sure, Your Honor, but on the third page, page 781, the court discusses the differences between the death penalty statutes under Title 18 and Title 21. And we think that's the language that we'd like the Court to take a look at.

THE COURT: And in your view our instructions don't do that or they don't do it often enough or in the place you want it?

MR. BERRIGAN: No. I can't remember the context in which I brought this up, quite honestly, but I don't think that anywhere in the Court's instructions there's a sentence -- and I may be absolutely wrong -- that says that if the jury determines that the aggravating circumstances outweigh the mitigating

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1888 of 3592

circumstances they're still not required to vote for life, and that's the difference between the Title 18 and Title 21 statutes.

THE COURT: Yes, I am aware of that, and we'll go back and take a look at that.

MR. BERRIGAN: All right, sir.

THE COURT: And seems to me that if that's what the circuit said in Allen --

MR. BERRIGAN: That's what we think it says, sir.

2160

THE COURT: -- we better have it in the instructions.

Now, are we ready to talk about the issue of what to tell the jury with regard to punishment that both sides have now briefed?

MR. WILLIAMS: Certainly, Your Honor.

MR. BERRIGAN: Yes, sir.

THE COURT: Okay.

MR. WILLIAMS: Your Honor, I did pull that case that I was thinking about called Greatwalker. I've had a chance to review that decision. And again, just for the record, it's 285 Fed. 3d 727. It's a 2002 decision from the Eighth Circuit. But my recollection was a little off on it from what happened there versus what's happening here.

In that case the defendant was facing a death penalty or life in prison as a mandatory minimum sentence. The parties agreed to a 30-year sentence, and that was declared to be an illegal sentence the parties could not agree to.

In dicta the court does say, however, that there's an exception to the general rule that the parties can't agree to something that is not statutory if the defense agrees to a

Page 179

sentence that exceeds the sentence authorized by law and the government accepts a sentence reduced to the legal term. The last part of that, I'm not quite sure what that means, but at least in dicta on page 730 of the decision it appears to me that it wouldn't necessarily be an illegal sentence if the defendant

2161

agreed to be sentenced to a life term which exceeds what is the statutory mandatory minimum in the case.

And I just wanted to clarify for the record that my recollection of the holding of that case was slightly off. The holding's the same. I forgot about that dicta in there.

That said, I don't know if I have a whole lot more to add to what I briefed on this in my written submission. Mr. Berrigan's right. Three years ago when -- or two, two and a half years ago when we submitted our first set of proposed jury instructions to the Court, we had all three options in there. I would just note that the case was under control of somebody else at that point.

After that point I learned that the department's position was that the government should not be advocating that given that the guidelines were binding; if the Court rejected a requested instruction from the jury -- or from the defense that there was only two options, that we could intervene at that point and agree with the Court that that's not required, but we were not to propose that.

And so that's why we backed off of it in Honken. That's why we backed off of making that renewed suggestion in this case until Booker came out. And then once I realized the ramifications of Booker, that changes the advice that we were provided from Washington and the position we're supposed to take

on this case. I think Booker does change the landscape here.

2162

So that said, I don't really have anything more to add to this argument other than what I've already provided in the brief. I think the jury's entitled to know what the law is, and I think the Court's obligated to instruct the jury as to the law.

THE COURT: And, Mr. Berrigan, before you respond, I just want to clarify one thing because I don't know if this was in a telephone conference that we had that wasn't on the record, and I suspect it was. Well, I'll talk to you back in chambers about it.

MR. BERRIGAN: And I'm aware of what you're referring to, Your Honor. I think Mr. Miller participated, not Mr. Williams.

THE COURT: Yes, and let me just try and describe. The difference was there's a difference between me rejecting an 11(c)(1)(C) agreement that restricts my discretion --

MR. BERRIGAN: Right.

THE COURT: -- and having the full discretion post-Booker to deviate or vary from the guidelines using the 3553(a) factors. And I just want -- I think you're catching the drift of what I'm saying.

MR. BERRIGAN: Yes, sir. I understand that.

THE COURT: And I wouldn't want those comments to influence your decision here.

MR. BERRIGAN: No. I can't say that they had no

2163

Page 181

effect in our determination about our position all together. It was certainly a factor, but I wouldn't want to mislead you to think that I relied upon that in making this decision.

Our very strong feeling was that after we got -- well, first of all, my understanding of the proceedings of Mr. Honken -- and I'm the last one that can speak authoritatively about that here -- is that there were just two options presented, and I understand he had a mixed count Title 21 and Title 18 situation. I don't know that that would make a difference, frankly, under the law. Doesn't seem to me it would, but I wasn't privy to the discussions had by the Court and counsel.

And then we got our order from the Court respecting the voir dire, the scope of voir dire, and it was very clear to me from that order -- I don't know how it couldn't be more clear -- that there were going to be two options discussed, the death penalty and life imprisonment. We had no problem with that, frankly.

THE COURT: Yeah, but here's where -- but you had -- you knew about -- I think you told me the other day that you recognized the impact of Booker.

MR. BERRIGAN: Well, actually Mr. Stowers and I saw a Fourth Circuit decision that precedes Booker, precedes Booker, that said that even if -- and I wish I had it before you. I apologize. But even if the guidelines did require a life

2164

sentence, that doesn't mean the court was required in the Fourth Circuit to submit a verdict that said death or life.

So in my mind if that was out of the Fourth Circuit, Booker wouldn't change anything. But that's not what we had

Page 182

been led to believe would apply to this case. We've never thought for a moment that there would be sentences other than life or death, life imprisonment without parole or death. And the parties have conducted themselves in such a manner as to I think enforce that proposition up until whenever Mr. Williams stood up a week ago and said, I looked at the law over the weekend and think maybe there should be a change.

THE COURT: Well, here's where I'm confused. I thought you said when we had that discussion that you were well aware of the change, you had thought it through, and you knew that before we started jury selection. That's how I understood your comment.

MR. BERRIGAN: I think we could have taken the position, Your Honor -- and maybe to some lawyers it would make sense. We could have come in and said, Your Honor, what are you talking about? Life or death? The statute says she can get as little as 20 years, and we want to voir dire on that because there might be jurors sitting there who would not be able to consider a sentence if the Court's going to impose it --

THE COURT: But here's my point. I was operating under a misapprehension of the law that you knew about.

2165

MR. BERRIGAN: No, I don't think --

THE COURT: And you had an obligation in my view -- you had an ethical obligation to correct that.

MR. BERRIGAN: Well, I didn't know you were operating under a misapprehension of the law. I find it hard to believe that this hadn't come up -- in fact, I talked to Mr. Rogers about it, Charlie Rogers, about this very issue in the discussions about how the voir dire was conducted because he had

Page 183

informed me -- I didn't sit through the voir dire -- that the only two options discussed were life or death. So I was never under a misapprehension that you were uninformed as to what Title 18 provided in terms of punishments given that we had already had this experience, extended experience, with Mr. Honken.

And then just from my own experience with the Court and its research and writing, that never even remotely entered my mind that this hadn't been considered by the Court. And certainly it was not, in our view, inappropriate to have these two options. We believe that those should be the two options that are before the jury. This hasn't been an issue with the defense at all at any point, and I'm not sure why the government decided all of a sudden in the middle of the trial that it was an issue.

But it seems to me if they wanted to change the rules that should have been something that was done before the trial.

2166

This Booker decision I think came out in January. It wasn't like -- I think that was on the -- at least there was some -- I can't remember the appellate decision, circuit court appellate decision, that preceded that, but it's been an issue I think for some time as to whether the federal sentencing guidelines might not be mandatory, that people have known about the possibility of Booker since before the decision came down.

THE COURT: Oh, sure, because you had Blakely.

MR. BERRIGAN: Right. But, you know, in my mind, Your Honor, I don't see how Booker changes the equation. The statute hasn't changed. The statute was always as little as 20 years. And so I don't understand the government's position, frankly,

Page 184

that all of a sudden now because the statute's -- the guidelines aren't mandatory --

THE COURT: Because the guideline put it at a base offense level that was mandatory life, so that's why you could -- because you were bound by the guidelines, you could tell the jury that it was either death or life because the guideline range was I think a 43.

MR. BERRIGAN: Well, I don't know of any case law that supports that, and the Fourth Circuit expressly rejected that position. They said, No, that doesn't matter; we don't care what the guidelines say in terms of being bound. That decision preceded Booker. And I'll get the decision for you.

THE COURT: Yeah, I wasn't aware of that decision

2167

either.

MR. WILLIAMS: It's the Stitt decision, Your Honor, 250 Fed. 3d 878, 2001. But in Stitt basically the Fourth Circuit said it was not an error for the court to reject the defense request that the jury be instructed there was only two options. And there's a difference between that and the government ever coming forward saying that they affirmatively wanted the jury instructed that there was more than two options.

And that's the difference, because the department in a nutshell basically to some degree found it to be disingenuous for the government to stand up and request the jury be instructed that there's more than two options when in all practical purposes there were really only two options.

Booker has changed that, and that's why before we were never supposed to ask the jury be instructed that there is more than two options because in reality there wasn't. The Fourth

Page 185

Circuit said it's not error for the court to reject an instruction like that but the government wasn't supposed to be asking for those kind of instructions, and that's where it's changed.

And it's my fault.  You know, I did not think about the ramifications of Booker until we were into this trial or else I would have raised it long before this.  And I don't have a strong opinion one way or the other about how the Court should resolve this issue, but I felt duty bound to alert the Court

2168

that this is an issue because you're going to be instructing the jury as to what the law is, and I didn't want it to be inaccurate.  But how ever you resolve it is fine with me, but I wanted to raise the issue.

THE COURT:  Well, I guess I'm trying to understand -- and I'm sure you have it clear in your mind -- why you wouldn't have pointed that out.

MR. BERRIGAN:  Why we didn't point out what, sir?  You mean that the statute provides for a sentence of as little as 20 years?

THE COURT:  That, or the effect of Booker.

MR. BERRIGAN:  We don't think Booker has any effect.  I mean, we just disagree.  And as a practical matter, there's just a virtual certainty that if our client gets convicted of aiding and abetting in five murders and all of the drug evidence that's been in this case and the conspiracy and the CCE, there's no chance that she's going to get a sentence of less than life.  And to suggest to the jury --

THE COURT:  Why do you say that?  I have an independent obligation after Booker to evaluate the Title 18

Page 186

3553(a) factors, and I have done that on my own when defense lawyers haven't even argued them and varied from the guidelines in case after case sua sponte where the defense wasn't even asking for it. And that's how I view my role.

MR. BERRIGAN: And I'm not being disparaging of the

2169

Court that it couldn't be a possibility. But, you know, we have to look at this realistically. Our client -- these are decisions literally involving life and death. We did not think there was a realistic possibility of Miss Johnson getting a sentence of less than life if she was convicted.

THE COURT: Well, whether you thought that or not, don't you think you had an obligation to point out that my preliminary instructions were in error?

MR. BERRIGAN: Well, we don't think that that's supported by the Fourth Circuit. They said, Fine, you want to have death or life, go with it. I mean, that's our option. We're the ones that are giving up a chance to get a sentence as little as 20 years. Who's prejudiced by this? Not the government. It's us. We're coming before you and saying, Hey, there are two options, life or death, and we're willing to live with that. We'll make a record with our client if we need to. We've discussed this.

We don't want to play some game where -- with the jury, particularly given this possibility that, you know, if they're told now that what we told them in voir dire really isn't true and furthermore we're going to talk to them about, you know, there's a possibility that she could get as little as 20 years and be released, we have grave concerns that there are people that could be sitting there, Your Honor -- we don't

Page 187

know -- that would never have been able to sit on the jury if

2170

they had known that.  They were willing to give punishments that involved her never getting out of jail.  Either one, life or death, they'd give those consideration, but they may not have considered a punishment that might involve her being out of jail in as little as 20 years, and now we're talking about the possibility I guess of changing that equation.  And that would be very much to the detriment of the defense.  We're not --

THE COURT:  And it would be to the detriment of the defense because in your view it affected your voir dire strategy.

MR. BERRIGAN:  Absolutely, and it will affect the decision -- the grave fear I have is it will affect the decision of the jurors if they learn, wait a second; do you mean to tell me that this woman, we find her guilty of five murders, and she might get out of jail?  I'm not going to abide by that.  If it means that she has to be incarcerated, then death is the only option that a juror might be willing to consider.  And we have no way of finding that out at this point which is our really big concern about this whole issue is to how to deal with that.

And we don't think it's an illegal sentence. Mr. Williams has pretty much conceded that, that if the defense is saying life sentence is an option to death and that's within the range of punishment that's available to the Court, I don't know why you couldn't consider us bound by that if we're asking to be bound by it.

2171

THE COURT:  Because it --
Page 188

MR. BERRIGAN: That doesn't --

THE COURT: For the same reason that I vary when defense lawyers don't raise it: Because I have an independent obligation to determine the appropriate sentence.

MR. BERRIGAN: Right.

MR. WILLIAMS: Your Honor, I think that a practical solution to this issue is if the defendant is, in fact, willing to be bound by two options -- and I think we would have to have a record made by the defendant herself that she agrees to that -- then I think the Court could honestly instruct the jury that there's only two options available to them, life or death, and it would not be an incorrect statement of the law and it would be binding on the defendant.

I do feel -- I think Mr. Berrigan's right. I do feel after my review of the law, I don't think there's anything that would prohibit the defendant from agreeing to a sentence higher than what is the statutory mandatory minimum. So I wouldn't have an objection to doing that.

THE COURT: Well, it's not anything I have to decide today. Would it -- would you -- do you have in front of you my proposed preliminary and final penalty phase instructions that we talked about this morning?

MR. BERRIGAN: Yes, sir. If you could give me just a minute, I'm sure I could.

2172

THE COURT: Yeah.

MR. BERRIGAN: I have them here, sir.

THE COURT: Okay. Now, page 2 was the first draft of the alleged cure for the problem if I went with the government's initial view. You with me?

Page 189

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1899 of 3592

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. Would it make any difference to you if we came up with different language -- and I'm now in that bracketed first paragraph on page 2 -- so it would read something like this? Rather, if you determine that a death sentence should be imposed on a particular count -- death sentence should not be imposed on a particular count, then I will determine whether the defendant should be sentenced to life imprisonment without the possibility of release or some lesser punishment and not get into the 20 years to life that the statute refers to?

MR. BERRIGAN: And I appreciate that, Your Honor, but the lesser punishment obviously is something less than life without parole.

THE COURT: Yes, it is, yes, yes.

MR. BERRIGAN: And the jurors would be informed of that.

THE COURT: Yes.

MR. BERRIGAN: I think it would be better result that they not be informed of any options other than the death penalty

2173

if we're bound by this course, that you just not say anything to them at all and they're making a decision about death penalty or no death penalty. I'm not advocating this, believe me. But as opposed to talking about lesser sentences, they're not -- I don't know why they would be even advised about the lesser sentences given that they're not making a decision about whether a lesser sentence is to be given. Seems like the statute's going to say that if they don't give death then you provide the sentence.

Page 190

THE COURT: How about this? Rather, if you determine that a death sentence should not be imposed on a particular count, then I will determine the appropriate sentence for the defendant.

MR. BERRIGAN: That's certainly preferable to what's here, yes, sir, not to abandon my position because I do feel strongly about it.

THE COURT: I'm trying to come up with all kinds of other options.

MR. BERRIGAN: Right. I think that's a better option certainly than what's presently in the instruction, yes, sir.

THE COURT: But it wouldn't be -- there isn't really any option I could propose that would sway your opinion.

MR. BERRIGAN: It really wouldn't, Your Honor. I think I'd feel compelled to object at some point, to be perfectly honest, only because of what we've done up to this

2174

point with the voir dire, and I don't think any of us wants a mistrial, but I don't know how I'd have -- how I could avoid at least moving for one if we're in a posture where we're doing something other than death or life.

THE COURT: No, I understand your position.

MR. BERRIGAN: Yeah, and Mr. Williams apparently doesn't have at least the strenuous objections he might have had earlier. So I guess we'll just ask the Court perhaps to reconsider. I know you haven't made a decision yet.

THE COURT: No, I haven't made a decision actually.

MR. BERRIGAN: And we're happy to propose, particularly in this area -- I know I haven't given you anything -- but propose a specific instruction other than what

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1901 of 3592

the Court has.

THE COURT: No. I think I can figure it out.

MR. BERRIGAN: I have no doubt about that. That's a preferable alternative, sir, but it wouldn't be our choice.

THE COURT: Okay. Well, I've exhausted my imagination. I'll take it under advisement and let you know. I mean, I'm inclined -- I've sensed a shift in position a little bit, Mr. Williams. There's nothing wrong with that.

MR. WILLIAMS: No. There has been. My biggest concern was that the Court was going to be put in a position of incorrectly stating the law to the jury, and that was my biggest concern. If, in fact, the defendant's willing to be bound by

2175

those two options, then I don't think there's a problem with the Court instructing the jury that they only have two options to consider because reality is they would.

And my other concern was whether the defendant could, in fact, do that. My research has suggested she can limit herself to those two options even though that's greater than what the statute requires if that's her choice.

THE COURT: But I'm not sure that limits me.

MR. WILLIAMS: Yeah, it may not.

THE COURT: I mean, I'm not sure I'm bound by any record that they make.

MR. WILLIAMS: It probably would be basically the same thing as a plea agreement the Court can accept or reject as the Court wants to do.

THE COURT: What, Mr. Stowers?

MR. STOWERS: I'm just frustrated with the whole situation. That's all.

Page 192

THE COURT: Well, I'm feeling that you all kind of sandbagged me on this one, but maybe I'm missing the boat.

MR. BERRIGAN: Your Honor --

THE COURT: I think you gave me more credit than I was due is the problem.

MR. BERRIGAN: Well --

THE COURT: I should have figured it out. I understand that. Believe me, I understand that.

2176

MR. BERRIGAN: No. It isn't just you. I mean, Mr. Williams -- and he's a sharp guy. I mean, I've learned that over the years. We get these instructions from the Court, and we're talking about life or death. Nobody's saying anything. And I'm like puzzled. I was puzzled initially, but then I talked to Mr. Rogers, and I thought you had mixed counts there and there must have been some decision that we weren't going to talk about 20 years.

THE COURT: They never raised it.

MR. BERRIGAN: That's amazing to me knowing the people involved. And I looked at this case in the Fourth Circuit that said, well, okay, if you want to do that and it's in our interest, to be quite honest, not to be talking about 20 years when realistically we don't think that's a possibility, this voir dire could have drug on for ages if we're going to have to get jurors that could say, Well, I would be okay with a sentence as little as 20 years if the judge decided to impose that when realistically -- and I understand the statute says it's possible and the Court would be willing to consider it. But we don't think that that's a possible punishment that's very likely.

THE COURT: Well, before I decide, I'm going to have

Page 193

to hear the record that's made on the issue.

MR. BERRIGAN:  Yes, sir.

THE COURT:  You want to take some time out and do that later today or --

2177

MR. BERRIGAN:  Can we do it tomorrow?

THE COURT:  Well, there's not going to be anybody here from the government.

MR. BERRIGAN:  Oh, I see.

THE COURT:  I mean, we'll have time to do that.

MR. BERRIGAN:  We've discussed it with Miss Johnson on a number of occasions, but I'd like to talk about it one more time before we make a record just so we're crystal clear about what's happening.  But I don't anticipate any problem, frankly.

THE COURT:  Well, why don't we go ahead and make that record Monday when the jury goes out to deliberate.  Would that be okay?

MR. BERRIGAN:  That'd be fine, sir.

THE COURT:  Give you time to, you know, think it through again.  You're obviously a very thoughtful lawyer, very conscientious.  I'm sure you've thought a lot about this.

MR. BERRIGAN:  I could make the record myself quite easily.  But obviously that's Miss Johnson's decision.  We'll talk about it again.

THE COURT:  Yeah, it is her decision.

MR. BERRIGAN:  Right.  I understand that.  Yeah.

THE COURT:  Okay.  Anything else we need to talk about?

MR. BERRIGAN:  Just for scheduling purposes, Your Honor, I know there's been some discussion that there might be a

Page 194

break of perhaps a day between the jury's verdict, and I'm not sure in which phase, to be quite honest, a break between the merits phase verdict and the beginning of the eligibility phase or maybe it's after the eligibility phase but before the penalty phase. But I know we all have witnesses to schedule.

THE COURT: Yeah. I think it depends a little bit on when there's a verdict and the timing of it in relationship to our trial week and those type of things. But I'm not going to rush into the penalty phase. I might rush into the eligibility phase.

MR. BERRIGAN: Sure.

THE COURT: I'm not going to rush into the penalty phase. I think you know what I mean by that.

MR. BERRIGAN: Yes, sir. We'll be ready to go on the eligibility phase as soon as -- and obviously there's not a lot of preparation on that. So we'll be ready to go on that. But we would really appreciate a break between the eligibility phase and penalty phase even if it's a day just to kind of get our act together on that.

THE COURT: And I'm sure the government probably would too because you go first; right?

MR. WILLIAMS: That's right, that's right. That'd be fine.

THE COURT: And do you actually think we're going to have about two weeks worth of test -- oh, that was with

deliberation and argument, instructions?

MR. WILLIAMS: Yeah, that's with the gateway phase and deliberation, argument, and everything combined I figure we'd eat two weeks. I think the government's front-end case -- and I'm assuming that they're going to be calling -- presenting some type of psychological defense, so I'm going to have some rebuttal to that, but my front-end case I think would take a day and a half, maybe two days but probably just a day and a half to present.

THE COURT: Are there any 12.2 issues bubbling that I need to know about in terms of reports? I mean, I did extensive rulings on it.

MR. BERRIGAN: Not that we're aware of, Your Honor. We don't have any reports, and I presume we will not until we're at the posture of being in the penalty phase.

THE COURT: So I imagine all the problems will develop then, not now.

MR. BERRIGAN: Right, all of a sudden, that's right. I think -- I don't know if Mr. Williams agrees, but, you know, it's inconceivable to me that we wouldn't be finished before the break, the June 10 break, because we have 3 full weeks left. There's a possibility I think we could go into the week of June the 6th, but I'd be very surprised if it went past the 8th to be honest.

THE COURT: Okay. And do you have any agreement among

2180

yourselves about witness list exchanges? I don't recall if I've ordered those.

MR. BERRIGAN: We're doing that. That's an ongoing process.

MR. WILLIAMS: You did order it. We've been revising

Page 196

it, and we've been exchanging as we go with updated versions of it.

Exhibit list, I'm not sure if you guys have any. We provided you I think with a copy of our exhibits and an exhibit list as well.

MR. BERRIGAN: Yeah, and I think we've given them exhibits but maybe not a list, so maybe we should get a list together.

THE COURT: Are there going to be any objections to either side's exhibits in the penalty phase; do you know?

MR. WILLIAMS: Based on what Mr. Berrigan's provided me, if that's going to be his exhibits, I doubt that I'm going to have any objections to it.

MR. BERRIGAN: Ours are largely records and photographs, and I will make copies of the photographs for you.

THE COURT: And are you objecting to the Honken -- oh, you haven't seen it yet.

MR. WILLIAMS: I don't know. Yes. Until I see it --

THE COURT: When's that going to happen? Do you know?

MR. WILLIAMS: I don't want to see it until the

2181

verdict is back on the guilt phase.

THE COURT: Okay.

MR. WILLIAMS: But as I understand it, it is fairly short. I think I'm going to be able to read it quickly and articulate, if I have any objections, what those are very quickly.

THE COURT: Okay. Anything else?

MR. BERRIGAN: Nothing by the defendant, sir.

THE COURT: Okay.

Page 197

VOLUME 9, 5-18-05

MR. WILLIAMS: Your Honor, if I could off the record and just in private with one of the defense counsel present bring up something with you?

THE COURT: Sure, yeah.

(At sidebar off the record.)

THE COURT: I guess we'll see the Johnson defense team or two-thirds of it tomorrow at 12:30.

MR. BERRIGAN: Yes, sir.

THE COURT: Why don't we assemble about 12:15, and then we'll get you by telephone.

MR. WILLIAMS: Very good.

MR. STOWERS: We're doing that in this courtroom?

THE COURT: Yeah, we'll just be in this courtroom.
(The foregoing trial was adjourned at 3:36 p.m.)
                    CERTIFICATE
I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.
                                          9-20-05
     Shelly Semmler, RMR, CRR              Date

♀

2182


INDEX

WITNESS:                                              PAGE:

DAWNIE STEADMAN
          MR. MILLER                                  1983
          MR. BERRIGAN                                2059
          MR. MILLER                                  2066

VICTOR MURILLO
          MR. MILLER                                  2067
          MR. STOWERS                                 2103
          MR. MILLER                                  2122

                    *****



EXHIBITS:

523 and 525                                           2002
529 and 530                                           2005
537 and 539 through 541                               2007
626                                                   2014
638                                                   2016
629                                                   2018

Page 198

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1908 of 3592

| | |
|---|---|
| 630 | 2019 |
| 635 | 2021 |
| 636 | 2023 |
| 644 and 648 | 2026 |
| 707 | 2030 |
| 711 and 716 | 2032 |
| 806 | 2036 |
| 809 | 2037 |
| 807 | 2039 |
| 813 | 2040 |
| 1011 | 2043 |
| 1019 and 1020 | 2045 |
| 1013 and 1038 | 2047 |
| 1015 | 2051 |
| 1034, 1040, and 1046 | 2053 |
| 902 and 1005 | 2078 |
| 10 | 2123 |

* * * * *

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1909 of 3592

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,               No. CRO1-3046

        Plaintiff,             Sioux City, Iowa
                         May 19, 2005
   vs.                  12:38 p.m.

ANGELA JANE JOHNSON,            VOLUME 10 of 24

        Defendant.
                   /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

2184

APPEARANCES:

For the Plaintiff:      C. J. WILLIAMS, ESQ.
(via speakerphone)     Assistant United States Attorney
                    Suite 400 - Hach Building
                    401 First Street Southeast
                    Cedar Rapids, IA 52401

For the Defendant:      PATRICK J. BERRIGAN, ESQ.
                    Watson & Dameron
                    2500 Holmes
                    Kansas City, MO 64108

                    DEAN STOWERS, ESQ.
                    Rosenberg, Stowers & Morse
                    1010 Insurance Exchange Building
                    505 Fifth Avenue
                    Des Moines, IA 50309

For Dustin Honken:      ALFREDO PARRISH, ESQ.
(via speakerphone)     Parrish, Kruidenier, Moss, Dunn
                     Boles, Gribble & Cook
                    2910 Grand Avenue
                    Des Moines, IA 50312

                    LEON F. SPIES, ESQ.
                    Mellon and Spies
                    Suite 411
                    Iowa State Bank Building
                    Iowa City, IA 52240

Also present:          Dustin Honken
(via speakerphone)

Page 1

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 1910 of 3592

Court Reporter:            Shelly Semmler, RMR, CRR
                           320 Sixth Street
                           Sioux City, IA  51101
                           (712) 233-3846

⚲

2185

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  This is United States versus Angela Johnson, Criminal Number 2001-3046.  I'm in the courtroom in Sioux City, and present here would be the defendant, Angela Johnson, and two of her lawyers, Pat Berrigan and Dean Stowers. And we set up this conference call concerning the issue relating to the subpoena of Dustin Honken in the penalty phase by Defendant Angela Johnson and the communication from Mr. Honken's defense team that pursuant to that subpoena that Mr. Honken would be invoking his Fifth Amendment right not to testify.  And I just wanted to make a record about that.  Or, more importantly, the defense lawyers requested that we make a record about that in this case.

So why don't we hear first from Mr. Parrish.  Is my understanding correct that you've consulted with Mr. Honken in this matter and he has elected to assert his Fifth Amendment right?

MR. PARRISH:  Your Honor, this is Alfredo Parrish. That is correct.  I'm in Ottumwa, Iowa, at the Wapello County Courthouse.  I spoke with Mr. Spies, spoke with --

THE COURT:  You know what?  Let me interrupt you for a second.  I forgot.  You actually filed a motion to seal.

MR. PARRISH: We did, Your Honor.

THE COURT:  What's the government's position?

⚲

2186

Page 2

MR. WILLIAMS: Your Honor, we don't oppose that the defense for Honken has a concern what that might do for his safety. We have an equal concern what that might do if the press got ahold of this and somehow made this more available. I just think there's a danger to the Johnson case and the publicity it creates there as well. So we don't oppose the sealing of this hearing.

THE COURT: Well, what's the Johnson defense team?

MR. STOWERS: We believe this is part of the trial proceedings and that the proceeding should not be closed and that there's not an adequate basis to close the proceeding.

THE COURT: I don't think there's an adequate basis to close the proceeding, so I'm going to deny the motion.

Excuse me for interrupting you, Mr. Parrish.

MR. PARRISH: Okay. That's okay, Your Honor. Mr. Spies spoke to Mr. Honken last week. Additionally after I spoke with him, he spoke with Mr. Spies. He made his point clear with regard to this matter he wanted to take -- exercise his Fifth Amendment right.

Secondly, our law clerk spoke with him. He then asserted again he was going to assert his Fifth Amendment right. We've been having terrible difficulty communicating. He called me on an unsecured line yesterday morning, and we had a conversation that was not protected by attorney-client privilege. However, he did tell me in no uncertain terms that

2187

he was going to assert his Fifth Amendment rights.

Also, Your Honor, I want to alert the Court on this matter that he feels any inquiry into this area without the

Page 3

record being sealed jeopardizes his prior terms in the matter with the government, and he feels -- it's his position that he cannot answer any inquiry regarding the matter if the record is not under seal as previously indicated.

THE COURT: Well, let me ask this then. Is the Johnson defense team satisfied that the record Mr. Parrish has made and prior correspondence indicating that Mr. Honken would invoke his Fifth Amendment right sufficient?

MR. STOWERS: I hate to say that we don't believe that it is because we believe that the Fifth Amendment right is the defendant Mr. Honken's personal privilege and that for the purpose of making a record for future proceedings if there are any we should have Mr. Honken personally indicate what his position is on that. It's not that we're questioning Mr. Parrish and his assertions but that ultimately this is a personal decision for Mr. Honken to make in this case on the record which is why he's -- why he's on the phone.

MR. PARRISH: Your Honor, let me say this. I have not been given any authority to compromise this position. I have not discussed it with Mr. Spies. However, it might be possible to just ask him without going into details regarding what the inquiry's about --

2188

THE COURT: The only question I was going to ask is if called as a witness in the penalty phase would he assert his Fifth Amendment right. That's the only question I was going to ask.

MR. SPIES: Your Honor, this is Leon Spies.

THE COURT: Yes.

MR. SPIES: I believe that Mr. Stowers is incorrect.

Page 4

I think that the law is that counsel can assert the privilege on behalf of the client, and we -- you know, I don't know how much more clear we can be that he intends to do that, and I'll make my professional statement that he's indicated that to me as well.

MR. PARRISH: And I would echo that and go with the conversation we had again yesterday on the same issue.

THE COURT: Well --

MR. PARRISH: Unreported conversation.

THE COURT: -- I want it on the record, so if I have to seal it to get it on the record, then I'm going to go ahead and seal the remainder of the hearing and ask the members of the public to leave the courtroom.

(Sealed proceedings are contained in a separate, sealed transcript labelled Volume 10A.)

(Proceedings reconvened in the presence of the Court, Mr. Williams, Mr. Berrigan, Mr. Stowers, and the defendant.)

MR. WILLIAMS: C.J. Williams.

2189

THE COURT: Mr. Williams, Mark Bennett.

MR. WILLIAMS: Yes, Judge.

THE COURT: We are on the record now in United States versus Angela Johnson. And I think we were going to have some discussion about the eligibility phase instructions.

MR. WILLIAMS: Very good.

THE COURT: Was there something the defense wanted to raise?

MR. STOWERS: I assume the court can be reopened.

THE COURT: Yeah, court can be reopened. Thank you for reminding me of that.

Page 5

MR. BERRIGAN: Your Honor, the defense has some --

THE COURT: Is your microphone on now?

MR. BERRIGAN: It's on now. The defense had some minor suggestions to the Court regarding the eligibility phase instructions. Most of them concern a very particular specific issue.

THE COURT: Okay.

MR. BERRIGAN: And that is that pursuant to this Allen decision which we provided at least a portion of to the Court we believe the language that appears throughout these instructions where the Court talks about the defendant is eligible for the death sentence, we would ask the Court's consideration of that being modified very slightly.

That is, our position is the defendant really isn't

2190

eligible for the death penalty even after the eligibility phase because the jurors haven't engaged in the weighing process. And she's really not eligible until -- really eligible until after they've made the weighing determination. And we think this is very easily corrected if the Court would put "consideration of" in between "for" and "the death sentence." So the language would be -- "is eligible for consideration of the death sentence" we believe would fix that problem to the extent it is a problem. And that language appears --

THE COURT: Throughout.

MR. BERRIGAN: -- on numerous occasions. I've noted them, and I'm sure we don't want to waste time going through them unless you'd like me to.

THE COURT: No, no, no. Let's just take them one at a time. Does the government have any objection to that change?

Page 6

MR. WILLIAMS: No, Your Honor.

THE COURT: I think it's a good suggestion.

MR. BERRIGAN: The other suggestion, Your Honor, is particular to instruction number 1, and it's in the -- it's in the top of page 2, the very first paragraph that begins, If you determine that the defendant is not eligible. The second sentence currently reads, I will then be responsible for determining the appropriate sentence for the defendant. And I realize this issue is still undecided.

But the defense preference would be that that read, I

2191

will then impose a sentence of life imprisonment without possibility of parole consistent with our position on this issue. I know you haven't made a determination about that, but I just wanted to bring that to your attention. This is the life-or-death question that we've been raising throughout.

THE COURT: Right.

MR. BERRIGAN: And then on page -- I think it's page 8, instruction number 3 --

THE COURT: Well, before we get to that --

MR. BERRIGAN: I'm sorry. I apologize. I'm jumping ahead.

THE COURT: Mr. Williams -- I think we have to change that sentence, I will then be responsible for determining the appropriate sentence.

MR. WILLIAMS: I think you could do it in a neutral manner by saying, I will then be responsible for imposing the sentence on the defendant without getting into what that sentence would be.

THE COURT: Although didn't I tell you at the end of

Page 7

the -- I am going to go with the -- what the parties have now agreed to.

MR. WILLIAMS: Okay.

MR. BERRIGAN: That discussion was off the record.

THE COURT: Right. Subject to --

MR. WILLIAMS: Then I have no objection to that change

2192

suggested by the defense, Your Honor.

THE COURT: Okay. And why don't you read back the language that you suggested, Mr. Berrigan.

MR. BERRIGAN: Yes, sir. The language would be, Your Honor, I will then impose a sentence of life imprisonment without possibility of parole.

THE COURT: Okay. Why don't we move on to the next.

MR. BERRIGAN: The next one would be on page 8, instruction number 3. The second sentence that begins, The gateway aggravating factors are also sometimes called threshold aggravating factors because the death sentence cannot be imposed unless the prosecution proves one such factor as to the count in question. We'd ask the Court's consideration to change "imposed" to "considered" consistent with our position on that language.

THE COURT: Any objection, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Consider that change made as well.

Anything else?

MR. BERRIGAN: We addressed this yesterday, Your Honor, and I may not have done a good job. I wanted to revisit it just briefly. It's instruction number 4. It's on page 11, and it's the sentence, the second sentence in the paragraph, the

Page 8

one that says, These aggravating factors are called statutory aggravating factors because they are expressly identified in the

2193

statute authorizing the death penalty for conspiracy murder and CCE murder.  I voiced a suggestion that we eliminate the language after "statute," and I think in hindsight to put that in context this would be a better sentence if "death penalty" preceded "statute" so that that language said, Expressly identified in the death penalty statute.  And I know the Court may want the language about conspiracy murder, CCE murder, but our position was it was unnecessary.

THE COURT:  So in your view how would the sentence read now?

MR. BERRIGAN:  It would read, Your Honor, these aggravating factors are called statutory aggravating factors because they are expressly identified in the death penalty statute, period, which I think is an accurate reflection of the law.  Our only concern with that sentence was the word "authorizing the death penalty," and that would eliminate that concern.

THE COURT:  Do you have any problem with that, Mr. Williams?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Okay.  We'll make that change.  What else?

MR. BERRIGAN:  Nothing else other than --

THE COURT:  You're on a roll.  You shouldn't quit now.

MR. BERRIGAN:  The "consideration of" language, Your Honor, is also applicable to the verdict form.

2194

Page 9

THE COURT: Yes.

MR. BERRIGAN: And I don't know if you want me to point that out or you'll figure it out, but there's just two places where I think it's applicable.

THE COURT: Okay. Why don't you point them out as long as you've identified them.

MR. BERRIGAN: I've got them right here. Step 2, just above checkmark where you'll see that's in bold, the checkmark.

THE COURT: Yes.

MR. BERRIGAN: There's a sentence in parentheses that says, You must unanimously agree on one or more of these factors as to a particular count for the defendant to be eligible for the death penalty, and we'd ask the Court to insert "for consideration of the death penalty."

THE COURT: Yes.

MR. BERRIGAN: And then that exact same change would take place on step 3, the very next page, at the very bottom line where it says, For the death penalty, we'd ask for "for consideration of the death penalty."

THE COURT: Yes.

MR. BERRIGAN: That's all, sir.

THE COURT: And, Mr. Williams, I assume you have no objection there either.

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Anything else by either side on the

2195

eligibility phase instructions?

MR. BERRIGAN: Nothing else by the defense, sir.

MR. WILLIAMS: Nothing by the government, Your Honor.

Page 10

THE COURT: Okay. I think we'll defer further discussion on the penalty phase instructions should we need them until I've had a chance to incorporate what I told the lawyers off the record yesterday into a new proposed set. And we're making changes in it now. The set's going to be sent to me when I'm out of town tomorrow to review. And then we'll get it to you tomorrow by e-mail. You know, we'll have time to talk about it next week, but at least we'll have a set, more advanced set, of penalty phase instructions to work with.

MR. WILLIAMS: Very good.

THE COURT: Okay. Anything else?

MR. WILLIAMS: Your Honor, just one matter to bring to the Court's attention to think about. The victims' families all live three to four hours away from the courthouse, and at the last trial the Court agreed to give a period of time after the jury let us know that they had a verdict to allow the victims' families to travel -- along with the defendant's families to travel to the courthouse for the reading of the verdict.

Government's concern for that has only increased after the passage of the Justice For All Act in effect in November of 2004 which gives greater rights to the victims' families and suggest that they have a right to attend all public court

2196

hearings which the government understands to require the Court to do -- to make some accommodation when possible to allow that to occur.

And so in the same vein that last time we requested the Court to give a window of opportunity for the families of both the defendant and the victims to travel to the courthouse, we'd ask the same consideration in this case.

Page 11

MR. BERRIGAN: We're not opposed to that, Your Honor, except that my recollection is that you actually told them that in Mr. Honken's case, and we are opposed to that because it seems to emphasize unduly -- our concern is it emphasizes unduly that consideration in the jury's determination about the decision. It's fine with us that there's a delay. We just would ask the Court not to --

THE COURT: Let me ask you this. And I understand your point completely, and I agree with your point. And I'm just trying to balance, you know, inconvenience. Would it be permissible to tell them there would be a delay but not tell them the reason for the delay?

MR. BERRIGAN: Yes, exactly. Obviously you need to tell them something. They're going to sit there or even go home or whatever they're going to do for three and a half hours, but we just didn't want the reason to be so that the victim family members can be here present when you return the verdict.

THE COURT: Right, right, and I understand that.

2197

MR. BERRIGAN: Okay. That's all we had.

THE COURT: Is it okay if I tell them that before they reach their verdict without giving them the reason? And here's why. They may, for example, want to think about it overnight, come back, then know that there would be a four-hour delay, and it may affect their timing of it. And I wanted to give them a heads-up ahead of time.

MR. BERRIGAN: Yes, we're not opposed to that, Your Honor. We only had that one slight problem with that procedure.

THE COURT: Sure, which I not only understand, but I agree with it now that it's been pointed out.

Page 12

MR. BERRIGAN: Okay.

MR. WILLIAMS: And, Your Honor, along those lines, if I could just request that that be four-and-a-half-hour delay for this reason. I think last time the Court gave either three and a half or four hours, and a couple of the victims' families had trouble and one victim's family didn't get there in time because by the time we got the word and called them and they, you know, gathered up people and got in the car and headed over, it ate up more time than simply the drive time.

THE COURT: I assume the defense considers four and a half to be a friendly amendment to four?

MR. BERRIGAN: Yes, sir. It's not a time issue at all. Whatever they need is fine with us, and I'm sure the Court will have some explanation for the jurors. That's fine.

2198

THE COURT: Okay. Four and a half hours then.

MR. WILLIAMS: Thank you, Your Honor.

THE COURT: Okay. Anything else, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing from the defendant, sir.

THE COURT: Okay. Thank you very much. We'll be in recess.

(The foregoing trial was
adjourned at 1:02 p.m.)

Page 13

VOLUME 10, 5-19-05

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                    10-5-05
                                              Date

Page 14

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1923 of 3592

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CRO1-3046 |
| Plaintiff, | Sioux City, Iowa<br>May 19, 2005 |
| vs. | 12:38 p.m. |
| ANGELA JANE JOHNSON, | VOLUME 10A of 24 |
| Defendant. | |
| / | TO BE FILED UNDER SEAL |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

2200

APPEARANCES:

| | |
|---|---|
| For the Plaintiff:<br>(via speakerphone) | C. J. WILLIAMS, ESQ.<br>Assistant United States Attorney<br>Suite 400 - Hach Building<br>401 First Street Southeast<br>Cedar Rapids, IA  52401 |
| For the Defendant: | PATRICK J. BERRIGAN, ESQ.<br>Watson & Dameron<br>2500 Holmes<br>Kansas City, MO  64108 |
| | DEAN STOWERS, ESQ.<br>Rosenberg, Stowers & Morse<br>1010 Insurance Exchange Building<br>505 Fifth Avenue<br>Des Moines, IA  50309 |
| For Dustin Honken:<br>(via speakerphone) | ALFREDO PARRISH, ESQ.<br>Parrish, Kruidenier, Moss, Dunn<br>  Boles, Gribble & Cook<br>2910 Grand Avenue<br>Des Moines, IA  50312 |
| | LEON F. SPIES, ESQ.<br>Mellon and Spies<br>Suite 411<br>Iowa State Bank Building<br>Iowa City, IA  52240 |
| Also present:<br>(via speakerphone) | Dustin Honken |

Page 1

Court Reporter:        Shelly Semmler, RMR, CRR
                       320 Sixth Street
                       Sioux City, IA  51101
                       (712) 233-3846

2201

THE COURT:  Okay.  The members of the public have now left the courtroom.  Although there was a member of the press here, everyone has now left the courtroom except the Johnson defense team and Angela Johnson personally, my law clerks, and the U.S. marshals.  I'm going to seal the remaining portion of the record.

Is it permissible now, Mr. Spies and Mr. Parrish, if I make that single inquiry of Mr. Honken and ask --

MR. PARRISH:  Let me suggest it is, Your Honor. Mr. Honken, you understand what the judge has said to you?

MR. HONKEN:  Yes, I do.

MR. PARRISH:  And is that in agreement with what you and I discussed yesterday and what you discussed with Mr. Spies last week?

MR. HONKEN:  Yes, it is.

MR. PARRISH:  Okay.  We're prepared then, Your Honor.

THE COURT:  Okay.  Mr. Honken, you have been subpoenaed to testify on behalf of Angela Johnson in the penalty phase, and your lawyers have indicated to everyone in no uncertain terms that you intend to invoke your Fifth Amendment right not to testify, and I just wanted to make sure that that is the case.  If called as a witness by the defense in the penalty phase of Angela Johnson's trial, would you invoke your Fifth Amendment right not to testify?

MR. HONKEN:  Yes, Your Honor.

2202

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1925 of 3592

THE COURT: Okay. Thank you very much. I don't believe there's any -- let me ask the Johnson defense lawyers, is there any further record we need to make on this matter?

MR. STOWERS: Not with regard to Mr. Honken's position.

THE COURT: Okay. Well, with regard to --

MR. STOWERS: Well, we'd like to know if the government will contend at some future date that this record is not adequate to establish that Mr. Honken would take the Fifth if he were called in open court in this matter because we don't want the government to later claim there's some defect in the proceedings that we've undertaken.

THE COURT: Why would the government claim that? You're the one subpoenaing.

MR. STOWERS: I don't know why, but if our position at a later date is that Mr. Honken took the Fifth and, therefore, we weren't able to call him and then at some later date he becomes available, the government might say the record here was not adequate to do that, and I just --

THE COURT: Mr. Williams?

MR. WILLIAMS: I guess, Your Honor, my position is the record is what the record is, and I'm not in a position to indicate whether it's adequate or not. It appears adequate to me. I don't know why it wouldn't be adequate. But ultimately, you know, if -- I can't imagine this issue arising, but if it

2203

ever did, I think that's ultimately up to the courts to decide whether the record's adequate or not.

THE COURT: Okay. Let me ask the Johnson defense
Page 3

team.  Is there any reason to leave the Honken defense team and Mr. Honken on the line?  We need to call Mr. Williams on a matter related to our case on jury instructions, but do we need either Mr. Honken or his defense team any further?

MR. PARRISH:  Your Honor, Al Parrish.  Do you have like two seconds -- if you don't, that's fine -- while Mr. Williams is on with one quick matter I think we could take care of?  If you don't have time, I can understand.

THE COURT:  No, I think I do.  But let me find out. Is there anything further, Mr. Stowers?

MR. STOWERS:  I don't believe so, Your Honor.

THE COURT:  Okay.  Mr. Parrish?

MR. PARRISH:  Yes.  It will take two seconds, Your Honor.  We were going to file another quick motion today.  We are having a terrible time with the telephone system at Marion, and we called Mr. Williams this morning to see if he could give us five extra days.  He does not oppose it.  I know you've been very patient about it.

THE COURT:  I think I've already granted the motion.

MR. PARRISH:  Great.  I'm in Ottumwa, so I haven't had a chance to look at it.

THE COURT:  I realize you're having a lot of

2204

difficulty, so I've already granted the motion.

MR. PARRISH:  Thanks, Judge, and we'll be in touch. And, Leon, we'll talk later.

MR. SPIES:  Thank you.

THE COURT:  Thank you.

MR. SPIES:  Thank you, Your Honor.

THE COURT:  And, Mr. Williams, do we have a number to
                    Page 4

call you back on?

MR. WILLIAMS:  Yes, I'm at my office.  It's my regular line, 391-363-6333.

THE COURT:  Okay.  We'll call you right back.

(Recess at 12:49 p.m.)

                              CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


                                        10-5-05
    Shelly Semmler, RMR, CRR                 Date




Page 5

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1928 of 3592

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

      Plaintiff,                          Sioux City, Iowa
                                             May 23, 2005
  vs.                                        7:54 a.m.

ANGELA JANE JOHNSON,                         VOLUME 11 of 24

      Defendant.
                                    /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

2206

APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                          Assistant United States Attorney
                          Suite 400 - Hach Building
                          401 First Street Southeast
                          Cedar Rapids, IA  52401

                          THOMAS HENRY MILLER, ESQ.
                          Iowa Attorney General's Office
                          Area Prosecutions Division
                          Hoover State Office Building
                          Des Moines, IA  50319

For the Defendant:        PATRICK J. BERRIGAN, ESQ.
                          Watson & Dameron
                          2500 Holmes
                          Kansas City, MO  64108

                          DEAN STOWERS, ESQ.
                          Rosenberg, Stowers & Morse
                          1010 Insurance Exchange Building
                          505 Fifth Avenue
                          Des Moines, IA  50309

                          ALFRED E. WILLETT, ESQ.
                          Terpstra, Epping & Willett
                          Higley Building - Suite 500
                          118 Third Avenue Southeast
                          Cedar Rapids, IA  52401

Also present:             Bill Basler

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1929 of 3592

VOLUME 11, 5-23-05
Court Reporter:        Shelly Semmler, RMR, CRR
                       320 Sixth Street
                       Sioux City, IA  51101
                       (712) 233-3846

2207

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  We need to make a record on the 801(d)(2)(E) co-conspirator hearsay evidence that I've admitted pursuant to United States versus Bell and the 804(b)(6) forfeiture by wrongdoing evidence that I've admitted pursuant to procedure similar to United States versus Bell.  Is there any record the parties want to make on it first before I make my findings?

MR. WILLIAMS:  No, Your Honor.

MR. STOWERS:  No, Your Honor.

THE COURT:  Okay.  I find that all of the evidence that I admitted pursuant to the co-conspirator hearsay exception, 801(d)(2)(E), and pursuant to the forfeiture by wrongdoing exception in 804(b)(6) was properly admitted under those rules and the case law interpreting those rules.  And, therefore, I do not have to address the question of whether or not any evidence should be stricken and/or a mistrial granted because I find that all of the co-conspirator hearsay evidence under 801 (d)(2)(E) and all of the forfeiture by wrongdoing evidence under 804(b)(6) was properly admitted in the case.

Is there any other findings I need to make, Mr. Williams?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Okay.  Any other record we need to make

this morning?

MR. STOWERS: I may be wrong about this. It seems like all this runs together after a while. But I think the Court had indicated perhaps on the organizer, leader instruction that it was going to consider the buyer-seller relationship language. I assume it has done so and decided to stick with the language that it has in the final set that it provided us this morning and that was provided at the last instruction conference.

THE COURT: Yes.

MR. STOWERS: Thank you.

THE COURT: Okay. Here's what I plan on doing. I'm going to read the first 11 final instructions and then go over the verdict form with the jurors, and then we'll have our multi-hour, most-of-the-day closing arguments. And then when everybody's done with closing, I'll do the final instructions 12 and 13 and then send the jury down to deliberate.

What should we do about taking a lunch break? Let's just kind of try and figure out the timing of this. If we bring the jury in at 8:30, I think the instructions and the verdict form, that will take 30 or 40 minutes probably, so that would take us to let's just say 9:15. Say the government goes two hours. Take us to 11:15 or 11:30. Why don't we just take a lunch break af -- well, how do you want to do it? I don't want to interrupt the . . .

2209

MR. WILLIAMS: Your Honor, while you're thinking about this, one thing we have not worked in is a morning break for the jury which I think we're going to need at some point. I talked

Page 3

with Tom, and he doesn't have a problem with, say, midway in his closing to have a break, have a mid-morning break for the jury. That will take us to noon basically if we give them another 20-minute break in the middle of the morning. We're probably quarter till 12.

THE COURT: Okay. And then we'll break for lunch.

MR. WILLIAMS: Break for lunch.

THE COURT: Before Mr. Willett's argument.

MR. WILLIAMS: Right. That way we're not interrupting Mr. Willett's closing. We come back. He does his closing. We do our rebuttal, and we get it.

MR. BERRIGAN: And we're amenable to a shorter lunch today if you'd like, Your Honor. Obviously we're eager to start our closing, so that sounds fine.

THE COURT: I think we're going to bring lunch in and everybody's going to be here. Would you rather just take a 45-minute break for lunch today?

MR. BERRIGAN: That'd be great, sure. Terrific.

MR. WILLIAMS: And, Your Honor, if it's amenable to the Court for Mr. Miller to pick a spot midway during his closing to --

THE COURT: No, I thought Mr. Willett would get to

                                                      2210

pick when -- yeah, that would be fine. I was obviously kidding about that.

MR. MILLER: Quite frankly, Your Honor, if the Court observes -- and I'll obviously be addressing these folks, so I would hope I would observe, but if there is an appearance of restlessness or tiredness -- there may even be that on part of our court reporter that I might not be paying attention to -- I

Page 4

certainly don't mind an interruption for that purpose.

THE COURT: I'll just hit the electronic hook button here that comes out of the wall. Yeah, but why don't you just try and gauge it. I don't really want to interrupt and pick a spot, so, you know, some time just kind of midway through I think would be fine.

MR. MILLER: May it please Court.

THE COURT: Yes.

MR. MILLER: Your Honor, I'm assuming you're going to be reading the instructions prior to argument.

THE COURT: Correct.

MR. MILLER: And there's no objection to referring to particular instructions during the argument.

THE COURT: That's why I do it first.

MR. MILLER: Very good. It makes sense. It's just I always want to know.

THE COURT: What percentage of the state court judges do instructions before argument?

2211

MR. MILLER: It's getting more and more common to where it's almost rare that you see it afterwards.

THE COURT: Is there any other record we need to make on anything before 8:30 that anybody can think of?

MR. WILLIAMS: No, Your Honor.

MR. STOWERS: (Shook head.)

THE COURT: Okay.

(Recess at 8:03 a.m.)

THE COURT: Parties ready to have the jury brought in?

MR. MILLER: Yes, Your Honor.

MR. WILLETT: Yes, Your Honor.

Page 5

THE COURT: Okay. Thank you.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated. Members of the jury, I wanted to kind of go over the schedule today so you'll know what's going to happen. After I go through the schedule, we'll have you pass your set of preliminary jury instructions, and we'll collect those, and then we'll pass out a new set which contains the original preliminary instructions as well as 13 final instructions.

I'll go through the final instructions with you, all but the last two instructions which I'm going to save till after closing argument. I put the verdict form in a chart format which saves a lot of pages. It would probably be about 40 pages long if we didn't use a chart, so I've used a chart for the

2212

verdict form. The verdict form is actually what the jury fills in to register your verdict, and I'm going to go through that with you. And then once we're finished with the instructions and the verdict form, then we'll have the closing arguments. And Mr. Miller is going to argue on behalf of the United States, and he'll go first.

About halfway through his argument, he'll stop, and we'll take our mid-morning recess. Then we'll finish Mr. Miller's argument. And then after Mr. Miller's argument, we'll take a lunch break. Lunch will be brought in again. We're going to cut the time for lunch down a little bit to 45 minutes.

After our lunch break, then we'll hear from the defense. And Al Willett will be giving the closing argument on behalf of Angela Johnson.

Page 6

After Mr. Willett finishes his argument, then the government has an opportunity for what's called a rebuttal closing argument, and Mr. Miller will also be delivering the rebuttal closing argument. We'll then go through the final two instructions. Then I'll let you know who the alternate jurors are. And then the jury will go down and deliberate. So that's kind of the plan for today.

If you would now pass your set of preliminary instructions down to CSO Rick and then Carey will go to the other end of the jury box, and you'll get your new set of

2213

instructions.

Okay. Would everybody just do me a favor? I actually found a last-minute mistake in the verdict form this morning, so we scrambled and took off the old verdict form, put on the new one. It was a pretty minor matter. But would everybody just look at their set and make sure the last seven or so pages are the verdict form? There will be -- it looks like this. It will just say Verdict Form, and then you'll see this set of charts kind of, and I just want to make sure everybody has a verdict form. It should be at the very end, very, very end. It will be the last seven pages at the very end. Raise your hand if you don't have one. Looks like everybody's got one.

Okay. Now, the good news is we don't have to go through the preliminary instructions, so we're going to start on page 35 of the set. Let me just kind of show it to you. It's just like the preliminary instructions except now it says preliminary and final instructions to the jury, has the caption of the case, United States of America, Plaintiff, versus Angela Johnson, Defendant. We've got the table of contents which

Page 7

includes the first 17 preliminary instructions, and then it indicates that starting on page 35, final instruction number 1. There are 13 final instructions.

This morning we're going to go through the first 11, and then after arguments right before you go back to deliberate, we'll do 12 and 13, and then this morning we'll also go through

2214

the verdict form. So if you all would please turn to page 35 and follow along with me, final instruction number 1, introduction.

(The Court read final instructions numbers 1 through 11 in open court.)

THE COURT: We're going to skip 12 and 13 until after all of the closing arguments by the lawyers, but if you'd please go to the verdict form, it's attached to the instructions, and it says United States of America, Angela Johnson -- United States of America, Plaintiff, versus Angela Johnson, Defendant, Verdict Form.

As to Defendant Angela Johnson, we, the jury, unanimously find as follows: Then when you go to page 2 of the verdict form, you'll see it in chart format. Up at the top, Counts 1 through 5, conspiracy murder. And then if you look at the left-hand side, it's got the step. Step 1 is the verdict. On each charge of conspiracy murder, as explained in preliminary jury instruction number 5, please mark your verdict. If you found the defendant not guilty of a particular count of conspiracy murder, do not consider the question in step 2 for that count. However, if you found the defendant guilty of a particular count, please answer the question in step 2 of this section on the verdict form for that amount (sic).

Page 8

And then to your right, there's a column entitled victims and counts: Greg Nicholson, Count 1, and then a place

2215

for not guilty or guilty for you to check; Lori Duncan, Count 2, same thing, check not guilty or guilty; Kandi Duncan, Count 3, same thing, not guilty or guilty; and then the same for Amber Duncan in Count 4 and Terry DeGeus in Count 5, not guilty or guilty.

Then step 2, objectives and quantity of methamphetamine. If you found the defendant guilty of a particular count of conspiracy murder, please indicate which one or more of the following offenses were objectives of the underlying conspiracy. To assist you in determining whether an offense was an objective of the underlying conspiracy, the elements of the objectives are set out in preliminary jury instruction number 6 in the explanation to requirement 1 on page 10.

And then it has distribution of actual pure methamphetamine, a hundred grams or more or less than a hundred grams; distribution of a methamphetamine mixture, a thousand grams or more, less than a thousand grams; manufacture of actual pure methamphetamine, a hundred grams or more or less than a hundred grams; and then manufacture of methamphetamine mixture, a thousand grams or more or less than a thousand grams. And then on the right-hand side it has victims and counts: Gregory Nicholson, Count 1; Lori Duncan, Count 2; Kandi Duncan, Count 3; Amber Duncan, Count 4; and Terry DeGeus, Count 5.

Then turning the page to page 3 of the verdict form,

2216

Page 9

up at the top Counts 6 through 10, CCE murder, step 1, verdict, on each charge of CCE murder as explained in preliminary jury instruction number 7, please mark your verdict. If you found the defendant not guilty of a particular count of CCE murder, do not consider the questions in step 2 and 3 for that count. However, if you found the defendant guilty of a particular count, please answer the questions in step 2 and 3 of this section of the verdict form for that count.

And then it has victims and counts on the right-hand side, and it's Gregory Nicholson, Count 6; Lori Duncan, Count 7; Kandi Duncan, Count 8; Amber Duncan, Count 9; Terry DeGeus, Count 10. And then a place to check either not guilty or guilty.

Then step 2, the existence of the CCE, series of violations. If you found the defendant guilty of a particular count of CCE murder, please indicate which of the alleged violations constitute the series of three or more violations that were part of the CCE. Also for violations that allegedly occurred over a substantial period of time, please indicate whether the violation occurred before or after the killings or both. The violations are listed in final jury instruction number 7.

You must unanimously agree on which violations constitute the series. And then it lists the same 13 alleged violations of the CCE which I just read to you in the

2217

instructions. And then on the right-hand side it has two columns: One, proved as part of the series of violations, yes or no; and then before or after the killings, before, after, or both for the first seven. And then you don't have to answer

Page 10

that for 8 through 10 because the time frames involved were obviously after the killings.

And then step 3 on page 5, if you found the defendant guilty of a particular count of CCE murder, please indicate which of the following persons were the five or more persons acting in concert with Dustin Honken in the CCE and whether or not each person was a member of the CCE before or after the killings or both.

In the case of Terry DeGeus, you are asked to indicate whether or not he was a member of the CCE before or after the killings of Nicholson and the Duncans or both. The acting in concert requirement of the CCE is explained in preliminary jury instruction number 8, requirement 3, beginning on page 20.

And then it has the alleged member of the CCE, Timothy Cutkomp, Terry DeGeus, Jeff Honken, Angela Johnson, Gregory Nicholson, David Patrick, Aaron Ryerson, and Gary Solland; and then acted in concert with Honken, yes or no; and then before or after the killings or both, a place to check before, after, or both.

And then page 6 is a place to put your jury number, and then page 7 is the place to actually sign the verdict form.

2218

Why don't you all take a stretch break, and then we'll hear from Mr. Miller.

Mr. Miller, whenever you're ready, you may proceed with your closing argument.

MR. MILLER: Thank you, Your Honor. May it please the Court, counsel.

Ladies and gentlemen, on the evening of July 25, 1993, a woman approached the front door of a home in a residential

Page 11

neighborhood in Mason City, Iowa. That woman knocked on the door or rang the doorbell. And when that door was answered, that woman told a lie. That woman said that she was a cosmetics saleslady who was lost and needed to use a phone and asked permission to do so there.

In telling that lie, ladies and gentlemen, that woman set a trap. And when she was allowed into that home, that woman took with her not only that cosmetics bag but a roll of duct tape, a roll of rope, a video camera, a loaded nine-millimeter semi-automatic assault weapon, and a murderous, drug-dealing boyfriend named Dustin Honken.

When she entered that home, ladies and gentlemen, the trap that she had laid by telling that lie at the front door of that residence was sprung by entering that house with all of the tools and implements of extortion, kidnapping, and murder.

That woman who sprung that trap the evening of July 25, 1993, that trap which had already been well planned and laid

2219

out in advance, only one element of which was the extortion of a statement from Greg Nicholson; also involved the kidnapping, the binding and gagging of Greg Nicholson; the kidnapping, the binding and gagging of the young mother who lived there in her home with her two children; the kidnapping of that ten-year-old daughter, Kandi Duncan; and the kidnapping of that six-year-old child, Amber Duncan.

And as you well know, throughout the night, this series of violent crimes that began with a trap laid, a trap sprung by that woman, culminated not only extortion and kidnapping but also in the killings of Greg Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan and not only their

Page 12

killings but the carefully planned concealment of these killings in a single shallow grave that at least some of the evidence in this case has indicated was actually dug in advance.

This horrifically violent crime, ladies and gentlemen, these five horrifically violent crimes, are crimes that required not only preparation and planning, but they necessarily required deception, and they required that someone other than Dustin Honken set and spring the trap. And she did so.

Ladies and gentlemen, it was barely three months later on November 5, 1993, when the same woman who had set and sprung the trap that killed those five people that lived in the Lori Duncan home in Mason City, Iowa, that same woman just barely three months later set another trap. She made a telephone call

2220

to a woman by the name of JoAnn DeGeus, mother of an ex-boyfriend of this lady by the name of Terry DeGeus, a man known to the woman who was setting this plan, setting this trap, to be violent and abusive and a drug dealer but also known -- well known to her to be possessive and jealous and still very much infatuated with her.

Members of the jury, when this woman made that telephone call to JoAnn DeGeus asking her to ask her son to return a telephone call to her, she set another trap and later that afternoon when Terry DeGeus returned that phone call and made a date with this woman for a meeting later that night, just the two of them, and when he left his ten-year-old child in the custody of his parents, Ed and JoAnn DeGeus, to go have a meeting with this woman and when this woman met Terry DeGeus and took him to a remote location in the country where Terry DeGeus thought they were going to talk, this woman, ladies and

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1941 of 3592

gentlemen, barely three months after set and sprung that murderous trap on five people in July of 1993 set and sprung yet another murderous trap resulting in, again, the violent killing of yet a fifth victim and, as with the previous four victims, a carefully planned concealment of this violent crime.

Ladies and gentlemen, five murders carried out during a period of three months, two separate occasions, both of those occasions murderous -- murderous events requiring planning and preparation; murderous events carried out by two people, one of

2221

whom very clearly Dustin Honken, a man who was in no position merely to walk up to Greg Nicholson or Terry DeGeus and say, Come with me; carefully planned killings which required deception, which required that a trap -- in each case that a trap be laid and that a trap be sprung.

And on each of those occasions, the person who laid that trap, on each of those two murderous occasions, the person who set and sprung that trap is the same person who's been on trial here these past several weeks, Angela Johnson.

Five murders which occurred on two separate occasions three months apart, ladies and gentlemen, each of them, as you know from the evidence in this case, requiring substantial planning and pre-preparation, each of them requiring deception, each of them requiring the setting and springing of a trap.

Members of the jury, what I'm going to do with you over much of the rest of this morning is discuss with you the evidence on behalf of the government, the United States of America, in this case. I'm going to do so in three parts. I had attempted throughout the presentation of evidence to do so expeditiously and efficiently in a manner that is respectful of

Page 14

VOLUME 11, 5-23-05

your time but that also brings out the facts that are necessary for you to do your job in arriving at a conclusion as to what actually happened here.

During summation I'm going to try to follow the same pattern, and I'm going to try to be as efficient and expeditious

2222

as possible. I trust, however, you folks understand that I have a job to do which requires me to summarize the evidence on behalf of the government. I'm going to do so in three parts.

Just to give you a heads-up as to where Miller's going with this final argument, first I'm going to review with you a chronology, a time table of events from 1992 through the year 2000. This is a circumstantial evidence case. We have no eyewitness testimony as to what happened at these killings. It's a circumstantial evidence, and circumstances -- circumstantial evidence is evidence based upon a series of events or circumstances which, when chained together, lead a logical and reasonable person to one conclusion. So that's going to be step one, simply going through the chronology, the time table of events.

Step two, I'm going to go through in just a bit more detail the evidence of a variety of natures which demonstrates the guilt of this defendant and her participation in these killings.

And finally and lastly, I am going to go through some of the Court's instructions. You have heard -- listened carefully to all of the Court's instructions, and, of course, you must carefully follow them all. There are a couple, however, which lawyers refer to as marshalling instructions that lay out the elements of the offense that's required for the

Page 15

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1943 of 3592

government to establish beyond a reasonable doubt in order for

2223

you to find the defendant guilty as charged.

And so it's incumbent upon me before I sit down to discuss with you how the evidence establishes each of the elements of each crime. So we're going to do that in three sections: The chronology time table of the occurrences; a discussion in somewhat more detail about the evidence that proves the defendant's guilt; and, finally, a discussion of the evidence as it relates to each of the elements charged.

I can only say that I hope the fact that we're covering three subject matters doesn't mean that we're covering three hours. I hope considerably less than that. But the only way we'll find out is by moving on, so I'll do that.

Chronology, ladies and gentlemen, in this case begins back in 1992 when Dustin Honken established a methamphetamine lab in Tucson, Arizona, originally in the home of his brother, Jeff Honken, where his experimentation based upon the education that he learned in two years at North Iowa Area Community College was put to work for the criminal purpose of developing a method of manufacturing highly pure methamphetamine, an illegal controlled substance.

He did so using his knowledge as a chemist, and he did so using chemicals and equipment purchased with money provided to him by his brother Jeff Honken.

While succeeding in developing the criminal controlled substance of methamphetamine, Dustin Honken recruited not only

2224

Page 16

the financial assistance of his brother Jeff Honken but also the labor, the physical labor, of his good friend and lifelong companion Tim Cutkomp. And the three of them made methamphetamine. Cutkomp and Honken made methamphetamine. Brother Jeff provided the funds. But that's of no value whatsoever unless you can turn this criminal substance into cold hard cash.

So Dustin Honken obtained a couple distributors in northern Iowa to move this poisonous illegal substance throughout the communities of southern Iowa -- excuse me, northern Iowa and southern Minnesota, fellas by the name of Greg Nicholson and Terry DeGeus.

Now, Nicholson and DeGeus did what wholesale drug dealers do. They found people in the chain who'd be willing to purchase from them and turn around and sell to others so that everybody along the line makes a little money by either cutting the substance and adding more baking powder or whatever they use or by jacking up the price or, as the case may be, whatever it takes for products in the line, whether legitimate or criminal, to provide profit to people in the line, distributors by the name of Patrick, Ryerson, Solland, and one even by the name of Angela Johnson.

Something in late 1992 happened about this distribution set-up, and as you heard from Aaron Ryerson, Terry DeGeus made a mistake, a serious mistake. He sent a woman, his

2225

girlfriend, Angela Johnson, to go to a meeting with this Dustin Honken. Whether it was to receive drugs or to turn over cash or to do both, it was a mistake because Angela Johnson who was up to that point below Terry DeGeus in this drug distribution

Page 17

network took the opportunity to leapfrog Terry DeGeus and establish a relationship with a bigger drug dealer, a fellow by the name of Dustin Honken.

You also heard from the testimony of Angela Johnson's good friend, Christi Cole, now Christi Gaubatz, that in December 1992 Angela Johnson began describing a relationship she'd begun with a drug dealer from Arizona.

So in late 1992 Angela Johnson established a relationship with Honken and a relationship which placed her above DeGeus instead of below him in this drug distribution network which continued. And it's a drug distribution network, ladies and gentlemen, that if you recall the testimony of the late Greg Nicholson as it came through at grand jury in 1993, it was a drug distribution system that existed throughout 1992 and well into 1993 and included multiple deliveries of methamphetamine to northern Iowa. It was a system that was discovered in the way that narcotics investigators uncover such crimes.

In catching someone in possession of a controlled substance, that person has a choice of cooperating or suffering the entire consequences of the law. And when they cooperate,

2226

they name their supplier, and then the supplier gets the same choice and so on up the ladder. And that's what happened in this case from Solland to Patrick to Nicholson.

And when information was developed that Greg Nicholson was a supplier of drugs throughout northern Iowa and southern Minnesota, a search warrant was applied for, obtained, and executed at the Greg Nicholson home. And found there, a vial containing a large substance of very pure methamphetamine. And

Page 18

on March 21, 1993, Greg Nicholson was faced with that same choice that other drug dealers are faced with, only it was a rather difficult choice for him if you recall the testimony of his ex-wife because not only did he fear the consequences of standing up to the law, he also had a very real fear and terror of what might happen to him if he betrayed Dustin Honken.

He did so, however. He wore a wire, and you heard the transcript and the tape of that wire that was recorded on March 21. I misspoke a couple minutes ago. Nicholson, of course, was actually arrested on March 17, but just 4 days later when Honken came to town, Nicholson recorded that conversation. And in that conversation you heard them discuss not only the large amounts of money that they had transpired over the previous months, that hundred thousand dollars or so that I must have made you, they discussed not only the money they'd made in the past, but they discussed the money they planned to make in the future moving up into the kilo market.

2227

What Honken didn't know during the course of those conversations, of course, was the fact that he was being recorded. And immediately after he was done with that conversation, he was arrested.

After he was released -- excuse me. After he was arrested, he was turned over from state authorities to federal authorities. He was indicted for felony drug offenses. But instead of being kept in prison, he was, according to the laws of our nation, accorded what is known as an order setting pretrial conditions of release. And he was released back into the community, although facing serious felony federal criminal charges.

Page 19

He was under supervision of a probation officer released on condition, among other things, that he avoid all contact with the following named persons who are considered either alleged victims or potential witnesses, and he didn't know which was which at the time he first received this release. But named -- and you'll see it. You saw it previously, and you'll see it again when you examine the exhibits back in the jury room, Exhibit 31. Avoid all contact with Dave Patrick, Greg Nicholson, Terry DeGeus, Russell Miller, Tim Cutkomp. He was placed on pretrial release which in hindsight was most unfortunate.

It wasn't long thereafter when, in conversation with his lawyer, his lawyer did what a lawyer must do which is to

2228

counsel his client. And in counseling his client, it is a lawyer's responsibility -- and Mr. Thinnes carried it out -- in informing his client of the evidence against him. And the principal evidence against him was the testimony of Greg Nicholson.

During that period of time in looking at the government's discovery file and looking at all the government had in the way of evidence, Mr. Thinnes learned and passed along to his client, Dustin Honken, the fact that the key evidence against him was the fact that Greg Nicholson had narked him off.

Early in July of 1993 -- and you'll see, among other things, Exhibit 45, a copy of a letter from an assistant U.S. attorney named Patrick Reinert to David Thinnes outlining the terms of a proposed plea agreement. And you heard from Mr. Thinnes that this plea agreement was scheduled between himself and Mr. Reinert to occur in federal court on July 30,

Page 20

1993. And again, of course, that's what's done in order to move the criminal system along. Attorneys and prosecutors engage in plea agreements, and that was done in this case. Mr. Honken agreed to plead guilty on July 30.

But he also had an alternate plan in place. He wasn't going to just trust his future to the judicial system. That was the last thing in the world he was going to trust his future to. He spent July of 1993 with his girlfriend, his drug-dealing partner, Angela Johnson, hunting for Greg Nicholson. You heard

2229

from Christi Gaubatz that she babysat on five or six occasions that month when her girlfriend, Angela Johnson, told her, We're going looking for Greg Nicholson.

As you'll recall, Greg Nicholson had moved out of his home with Leslie Nielsen -- excuse me, Leslie Nicholson. He'd moved briefly up to Osage where he was from, and through one of his coworkers, one of his old neighbors and friends, one of Lori Duncan's coworkers, they were introduced. And only a brief week or so before his disappearance, he moved in with her. But that was during a time, ladies and gentlemen, when Dustin Honken and Angela Johnson were doing surveillance on him. And they learned that he moved into this family home in that residential neighborhood in Mason City, Iowa, where a woman lived with her two young children.

On July 7 of 1993, that fateful month in which a plea bargain was entered, scheduled to be finalized on July 30 but also during which Johnson and Honken running around searching for Greg Nicholson, Angela Johnson purchased a weapon and not just some little tiny handgun that would fit into a woman's purse and allow her, if she wished, to have self-protection in

Page 21

our society but rather a large, big, black nine-millimeter, what Sheriff Pals described as an assault weapon. And the records establish that, Exhibit 43, Exhibit 42, Exhibit 42 being the application for purchase of a firearm, Exhibit 43 being the purchase record of a 9-millimeter Tec 9 from Duee's Pawn Shop in

2230

Waterloo, Iowa, on July 7, 1993, the purchase again not of some little, small handgun that might be used for self-protection but the purchase of that big black assault weapon, and you've seen it. You've seen not it. You've seen a similar weapon because the weapon itself, of course, was ultimately destroyed following the murders.

And on July 25, 1993, ladies and gentlemen, after those weeks of hunting for Greg Nicholson, Angela Johnson and Dustin Honken borrowed Christi Cole's car. And they asked her yet one more time to babysit ten-year-old daughter Alyssa at Angela Johnson's home. And on this occasion, unlike the four or five prior occasions when they went looking for Greg Nicholson and came home around midnight, on this occasion they were gone all night long. And on this occasion they returned not around midnight but around 5 a.m.

And when they returned, Christi Cole who testified before you as Christi Gaubatz -- she has since remarried -- was lying on the couch, and she noticed when Dustin Honken and Angela Johnson entered the home they whispered between the two of them and then went straight to the bedroom -- excuse me. They whispered and then went straight to the bathroom together, and Christi Cole heard that shower go on. And only after that happened at about dawn on the morning of July 26, 1993, did Christi Gaubatz, then Christi Cole, get up and go home.

Page 22

And that, ladies and gentlemen, July 25, 1993, was the

2231

last occasion on which Johnson and Honken went looking for Greg Nicholson, because, of course, by 5 a.m. that morning, Greg Nicholson and the family with whom he had been living with a few days were dead and buried in a shallow grave outside Mason City; July 25, 1993, ladies and gentlemen, the last day that not only Greg Nicholson but Lori Nicholson, Kandi Duncan -- excuse me, Lori Duncan, Kandi Duncan, and Amber Duncan were seen in life, last seen by Linda (sic) Asbe -- by Mrs. Asbe who had spent that day with little Kandi -- excuse me, little Amber and late that afternoon saw Nicholson and Lori Duncan arrive on Nicholson's motorcycle, who in Mrs. Asbe's understanding headed off to a picnic the last time they were seen in life, the same night that Johnson and Honken went looking for them for the last time.

The chronology continues, ladies and gentlemen. It was no coincidence that just a couple days later, July 30, 1993, Dustin Honken very suddenly and unexpectedly withdrew his agreement to plead guilty. He was supposed to plead guilty on that date in federal court. It was all set up between Mr. Thinnes and Mr. Reinert. He was going to plead guilty. Yet to Mr. Reinert's surprise, he said, No, I'm not going to plead guilty; I have changed my mind.

Of course, what Mr. Honken knew and the federal prosecutor did not know is the fact that the government's key witness, Greg Nicholson, was nowhere to be found. And more importantly, what he knew was that Greg Nicholson was

2232

permanently nowhere to be found. Or so he thought.
Page 23

At about the same time he turned over to his attorney, Mr. Thinnes, a videotape, the videotape that he, with the assistance of Angela Johnson, one of them holding the videotape, the other holding the gun -- we can only assume that was the scenario because there was a gun and there was a video camera -- under duress gave a statement, a false statement, exonerating Dustin Honken. That was on about the 30th of July of 1993.

And it wasn't for several days later, approximately August 2 of 1993, that the government, law enforcement authorities within the government, specifically the drug enforcement agency as you heard through the testimony of Agent Dave Mizell, it wasn't until several days after that sudden and unexpected withdrawal of that plea agreement that the federal law enforcement authorities even learned that this fellow was missing, the key witness. So they continued their investigation.

On October 27, 1993, the grand jury met continuing in its investigation of these drug crimes that had happened in northern Iowa in 1992 and up through March of 1993. And among the things they did that day, ladies and gentlemen, on October 27, 1993, they interviewed a number of witnesses. Each witness was taken into the grand jury room. Each witness was placed under oath and sworn to tell the truth.

One of those witnesses was Angela Johnson. And she

2233

did not tell the truth. She perjured herself. You have in evidence the transcripts of all four of the grand jury proceedings in which Mrs. Johnson was questioned and in every one of which she lied under oath.

But importantly, the one that happened on October 27

Page 24

of 1993 fits the time line importantly because that, three months after the disappearance of Greg Nicholson and in investigating his disappearance and what happened to his drug charge, the federal grand jury questioned Angela Johnson, among other things, questioned him -- excuse me, questioned her about the relationship between Dustin Honken and Terry DeGeus. And, of course, Terry DeGeus was the second of the two drug distributors that Mr. Honken had in northern Iowa, Greg Nicholson and Terry DeGeus, G Man and T Man. Terry DeGeus was the T Man in that situation.

And at that point the other half of the two potential witnesses against Dustin Honken was even a more serious danger to the freedom upon him, a more serious danger to the drug dealing of Angela Johnson's boyfriend, a more serious danger to the continuation and resumption of the drug-dealing business of Honken and Johnson.

It was during that fall -- and we cannot know from the testimony whether it was before or after October 27, but it was during approximately this time frame in the fall of 1993 as you heard from Christi Gaubatz who at that time was Christi Cole and

2234

Angela Johnson's best friend, she and Angela Johnson made a trip to -- I believe it was a KFC in Clear Lake where Angela Johnson had a date to meet with Terry DeGeus. She wasn't present in the restaurant, but she saw that there was animated conversation and that Mr. DeGeus had flailed his arms around in anger.

It was at about the time that the grand jury's investigation was coming to a head, and it was about the time that Mrs. Johnson herself was beginning to show her pregnancy, her pregnancy by another man, a man other than the possessive

Page 25

and jealous and infatuated Terry DeGeus. And after that meeting, Angela Johnson came out of that restaurant back into the car with Christi Cole and said to Christi, He can't be around anymore.

And he wasn't, for on November 5, 1993, as we've already discussed, Angela Johnson set that second trap and sprung that second trap. And last seen in life, Terry DeGeus was on his way to a meeting with Angela Johnson, his ex-girlfriend, yes, but also the woman to whom, like too many men in our society -- Terry DeGeus was like too many of our men in that he was possessive of the woman in his life. He allowed his jealousy to lead him to feelings of ownership and domination. His infatuation led him to control. We know that.

But we also know that that infatuation continued into the fall of 1993 and that as we know from the statement of Aaron Ryerson, his best friend, that when Angela called, Terry went.

2235

Unique among all the people in the world, the one who could call and have him summoned was Angela Johnson.

And as he left his daughter, that daughter, that ten-year-old child with whom he spent not just every other weekend and every other holiday like most divorced fathers do, young girl with whom he spent every weekend. He left her with his parents and assured all of them that he wouldn't be gone long, he was going to see Angie and would be home not long after midnight. She could stay up. And that, ladies and gentlemen, while Terry DeGeus was on his way to meet with Angela Johnson, is the last that he was ever seen in life.

The time line continues. Not long after the disappearance and what we now know to have been the death of

Page 26

Terry DeGeus, in the winter of 1993 and 1994, Christi Cole, Angela Johnson's best friend and the woman with whom they traded keys to their apartments, was cleaning out her apartment when she cleaned out a closet and observed a large black handgun in a cosmetics bag. And she immediately picked up the phone and called her friend Angela Johnson and told her to come over here and get it, and she did.

And it wasn't long thereafter also in the winter of '93 to '94 that Dustin Honken took that large black handgun to a farm near Britt, Iowa, in Hancock County, the farm, the Cutkomp farm, the farm where his best friend Tim Cutkomp lived.

And farmers, as you all know, are men who by nature of

2236

their profession have to be master of all trades, had the tools to cut down metal and the torches to melt and weld metal. And Honken and Cutkomp used those tools to cut that into small pieces and melt it down to nothingness, nothing other than melted beads of iron on a sheet of galvanized steel.

Also that winter, because she was emotional, perhaps because she was remorseful, perhaps because she had too much drugs and her emotions were volatile, she called her best friend and met with her and got something off her shoulders, and that was what had happened not only to Nicholson but to the Dustin (sic) family including those two children.

Couple years later, ladies and gentlemen, on March 21 of 1995, two years to the day after the arrest of Dustin Honken, with Nicholson and DeGeus still missing and, therefore, the witnesses necessary to make a drug case against Dustin Honken still missing, charges were dismissed.

That was by no means the end of the story, however,

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1955 of 3592

because Dustin Honken and his partners, people like Tim Cutkomp and Angela Johnson, had never, never ceased their agreement. They had interrupted their production of methamphetamine but had never ceased their business relationship, and their understanding began again to go into the meth business. They reassembled the meth lab, and I believe the evidence indicates that it was in Johnson's residence, in Cutkomp's residence, and finally in Honken's residence.

2237

Also in 1995, because it requires the efforts of a number of people, Dustin Honken recruited the efforts, the labor, of a rough-looking young man named Dan Cobeen. And he brought him into the operation because Cutkomp wanted out, and it takes time and effort and labor to make methamphetamine, and he needed time, and he needed help, and he needed additional labor, and Dan Cobeen was a pretty good candidate.

You saw him here. If you're working on the line with a guy named Dan Cobeen and you knew he had a criminal record, he'd be the perfect person to recruit for help in a criminal enterprise. And what he did was invite him into that criminal enterprise. But before he was approved, before he was a full-fledged member of that enterprise, Honken took him to Clear Lake to meet someone whose approval was necessary before Dan Cobeen could be a full member of the conspiracy. He sat down and met with Angela Johnson, and only when Angela Johnson approved did Dan Cobeen, if you'll recall his testimony, become a full member of the conspiracy. He needed her approval because in addition to Honken's know-how and Cutkomp's labor, there was Angela Johnson's finances, $5,000 at stake. And if you're the capitalist, if you're the man or woman who put the money into

Page 28

the business, you've got a say-so, and she did.

It wasn't long, however, before the police were on to it because Mr. Cobeen, rough looking though he was, a man with a criminal record though he was, didn't want more problems with

2238

the law.  So instead of involving himself in this criminal enterprise, he went to law enforcement.  He went first to his attorney, What should I do?  Am I getting roped into more problems?  And she immediately got him in touch with law enforcement including Special Agent John Graham of the DNE.

And together throughout those weeks they accumulated evidence and proof that Dustin Honken with Cutkomp was operating a meth lab at the Honken residence in Mason City, Iowa.  That lab was seized before any of the final product was made.  And the reason that was seized before any of the final product was made was explained to you.  That's dangerous stuff.  I think we all know that meth is dangerous stuff, dangerous to those who use it and dangerous to those who are around those who use it.

But even forgetting about the meth itself and those who use it and those who are in their company, the manufacturing process is a dangerous business.  It involves chemicals that are dangerous and explosive.  And for the sake of the people in that neighborhood, Agent Graham and others brought that laboratory to a conclusion before any meth was made, but that's what it was, a meth lab.

Spring of '96, while he was facing these charges, Tim Cut -- excuse me, Dustin Honken was up to his old tricks.  How do you get out of charges?  If you're facing serious criminal charges, how do you get out of them?  Do you trust the legal system?  Do you trust courtrooms, judges, lawyers, juries?

Page 29

Well, if you're Dustin Honken you don't.  If you're Dustin Honken you murder witnesses.

And in the spring of 1996, he set about the same business.  He tried to get Cutkomp to help him kill witnesses. And you heard a portion of one of a number of tapes in which he did just that.  In whispering tones he talked about who the key links are.  What would happen to this case if just the right people disappeared?

Dan Cobeen, if he disappeared, there would go Cutkomp's case.  John Graham would have to be gone too, though, in order for the case against Cutkomp -- excuse me, the case against Honken to have failure as a result.  And who are other key points of this case?  And he talked about them.  He mentioned the chemists.  You remember that little lady, Nila Bremer from the DCI lab?  You'll have a book full of pictures of witnesses.  She came in here.  She can't be much more than five feet tall, a woman -- and out of respect to her and all of the fairer sex, a woman in her middle years who just does chemical work, just works in a laboratory, all of them, people whose lives were in danger for the sake of the freedom of Honken and Cutkomp.

But those conspiracies, ladies and gentlemen, were not the sort of thing that Tim Cutkomp wanted to participate in. Tim Cutkomp and Jeff Cutkomp (sic) and Greg Nicholson and Terry DeGeus and Ryerson and Solland and Patrick, these are all people

who are more than happy to participate in the distribution, even

Page 30

the manufacture of poisonous substances, drugs, methamphetamine, and that's bad business, ladies and gentlemen.

But there's what at least many people consider a worse business, and that's murder. And when asked to participate in the murder of witnesses, Tim Cutkomp would have nothing to do with it, and he went to authorities, and he wore a wire. And because he did so -- and thank goodness he did so -- there were no murders, no additional murders.

Dustin Honken in February of 1998 -- immediately in '96 after Cutkomp reported to authorities and got these recordings, Mr. Honken was placed in jail. And our system, for our system to work properly, it does take time because doing things right is more important than doing things fast. And it took a little while. It wasn't until February of 1998 before he was ultimately convicted. But he was convicted and sentenced to prison for federal drug charges. And that's where he's been to this day.

But that's not the end of the story because in April of the year 2000, Christi Cole, now remarried and under the name of Christi Cole Gaubatz, as you recall, formerly the very close friend of Angela Johnson, no longer so, not after what she heard from Angela Johnson, Christi Cole, now Christi Gaubatz, carried on her shoulders for those years a terrible burden. Fear of Honken, fear of Johnson prevented her from sharing that.

2241

But ultimately and to her credit she did share it. And in April of the year 2000 in conversation with Special Agent Bill Basler who would not give up on this case and insisted on trying to find the truth even though years had passed, in conversation with Christi Gaubatz, she unloaded and told what

Page 31

she knew. She told Agent Basler, and days later she appeared before the federal grand jury and told them. And in July of the year 2000, Angela Johnson was indicted and arrested for the murders of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus.

She was incarcerated and has remained there. It wasn't long after her arrest, however, within a matter of weeks, Angela Johnson, an inmate of the Benton County Jail in Vinton, Iowa, was duped by a fellow inmate, a guy by the name of Bobby McNeese, duped by that fellow inmate into drawing maps that Angela Johnson hoped would set her free because the plan was that those maps would be given to another man.

McNeese is a lifer, long-time federal inmate, a guy who's in one institution after another and knows killers and knows lifers throughout the country. And he knew somebody who would take the rap for this. The plan was that she'd draw these maps because it would be important for whoever would take the rap to be able to convince authorities that he was, in fact, the guilty person, and what better way to do that than to lead them to the bodies.

2242

And so duped by her fellow inmate, Bobby McNeese, Angela Johnson drew maps. And she drew two maps, two maps which, turned over by Mr. McNeese to authorities, led authorities in early October of the year 2000 to two graves, two clandestine graves where the bodies of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and a second grave where Terry DeGeus were discovered. The ultimate evidence, ladies and gentlemen, but for seven years had been missing was finally found, and this case was finally complete.

Page 32

Ladies and gentlemen, that's a chronology, a time line, a description of the circumstantial evidence in chronological fashion that brings us here today and from which I suspect you will find to your own satisfaction the defendant is proven guilty.

I'm going to take a break now and tell you after the break what I want to do just very briefly as I can is go through in a little bit more detail some of the aspects of the evidence that proves Angela Johnson's participation and also discuss with you some of those elements. I trust you'll be happy to know that I think I'm halfway done.

THE COURT: Members of the jury, we'll be in recess until 10:40. So we'll see you back here at 10:40. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up, Mr. Miller?

MR. MILLER: No, Your Honor.

2243

THE COURT: Mr. Willett?

MR. WILLETT: No, Your Honor.

THE COURT: Okay. See you back here at 10:40.

(Recess at 10:14 a.m.)

THE COURT: Ready to have the jury brought in?

MR. MILLER: Yes, sir.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Miller, you may resume your closing argument.

MR. MILLER: Thank you, Your Honor.

We've discussed the chronology, the time line. What I want to do now is go through categories of evidence in a little more detail. Again, there may be some repetition. I'm not sure

Page 33

the conclusions to be arrived from the second part aren't already clear from the first part, but I do have a job to do, and I trust you will bear with me. I will again try to do it expeditiously and let you move on with your responsibilities.

There are a number of categories of evidence in this case that tie not just Dustin Honken but Angela Johnson to these crimes, and I want to discuss each of those six areas, possibly seven with you one at a time.

Motive, evidence that Angela Johnson, not just her boyfriend but Angela Johnson, had a motive to kill Greg Nicholson and Terry DeGeus and, because of where they were at the time that they were there, Lori, Kandi, and Amber Duncan as

2244

well; evidence that these two people, partners in crime, joint criminal conspirators, Honken and Johnson, had opportunity to commit their plan, opportunity to commit these murders; evidence that they had the means, the shared means, to commit these crimes; evidence in the form of guilty conscience; evidence that shows consciousness of guilt not just on the part of Dustin Honken but on the part of Angela Johnson in particular, statements, conduct, destruction of evidence, concealment of evidence, fabrication of evidence that shows a consciousness of guilt, conduct inconsistent with behavior of an innocent woman.

Guilty knowledge, proof that Angela Johnson had knowledge that only a guilty person would have. That, ladies and gentlemen, will be summarized not chronologically but in a different fashion, the evidence that ties Angela Johnson, the circumstantial evidence that ties her to this crime, these crimes, these five murders.

In addition to them, however, we also have admissions,

Page 34

and I speak not of one but of several from numerous witnesses, five, six, seven, eight witnesses in this case to whom Angela Johnson made statements admitting her participation in the killing of these five people. Taken all together, ladies and gentlemen, five, six areas of evidence, and I want to discuss them with you one at a time, and I'll get right on with it.

Motive, greed. Nicholson and DeGeus, the two distributors in northern Iowa for Dustin Honken, were threats to

2245

Dustin Honken's drug business, and Dustin Honken was, of course, Angela Johnson's boyfriend.

You heard from Ryerson, as I mentioned to you this morning, that Terry DeGeus told him that the biggest mistake he did was to send that woman, Angela Johnson, to meet Terry (sic) Honken and that that was a mistake because when they met she placed herself in Terry DeGeus's position. Nicholson and DeGeus at that point were a threat to Dustin Honken's drug business which gave not only Greg -- excuse me, which gave not only Dustin Honken but also Angela Johnson a motive, Dustin Honken, a motive to kill; Angela Johnson, his lover, a motive to aid and abet, assist, and encourage him in his crime.

You heard in Exhibit 20 a recording which was transcribed, but you heard the recording. And I will remind you now as the judge did at the start of this morning in describing your responsibilities that what I recall, what I write down, what you read in the transcript, what any attorney has to say to you is not evidence. It's merely a recollection or a summary of evidence. The evidence is specifically what you heard. And where there's a difference, obviously you rely upon your recollection. But you read that transcript, and you heard that

Page 35

testimony taken on the 21st of March. And again, what it does is establish Angela Johnson's position in that drug conspiracy as of that time.

(A portion of an audio recording was played in open

2246

court.)

MR. MILLER: Discussing not only what they have done but what they plan to do and the fact that Angela has a place and they're locating future points of distribution and she knows all those people, more people through whom they can market this methamphetamine.

Motive, greed. And whenever we're talking about drug dealing, that's the motive, isn't it, greed?

Nicholson and DeGeus were threats not just to Dustin Honken's freedom. They were threats to the freedom of the boyfriend of Angela Johnson. And as he had a motive to get rid of these witnesses, she had a motive as his girlfriend to aid him and abet him. And we know from Christi Cole, now Christi Gaubatz, that in December of 1992 her close girlfriend, Angela Johnson, shared with her the fact that she had a new boyfriend, a guy named Dustin Honken.

On March 21 when that motel room or hotel room in Mason City was searched, more information in the form of a lipstick -- a love lipstick note smeared on the mirror was recited to you by Sergeant Stearns: Hope you had a happy birthday. Love, A. Again, establishment of a motive that she had in her personal connection with Dustin Honken, not only her boyfriend but a drug dealer through whom she had business and income continuing through late '92, well into 1993, well in effect on March 21 when he's arrested.

Page 36

Terry DeGeus, not just Greg Nicholson but Terry DeGeus, was a threat to Dustin Honken's freedom. Terry DeGeus was a threat to Dustin Honken's drug business. And, ladies and gentlemen, it wasn't just Dustin Honken's drug business. It was also Angela Johnson's drug business. And in 1993 in October when she was questioned by the grand jury -- and it's Exhibit 115. There will be a number of exhibits that go to the jury room with you. 115 through 118, transcripts of the sworn and, I would submit to you, perjured grand jury testimony of Angela Johnson includes on the very first one, just 9 days before his sudden disappearance inquiry into the relationship, this grand jury investigating the drug nature, the drug organization of Dustin Honken inquires of Angela Johnson the relationship between Mr. Honken and Terry DeGeus. And that's a motive because that's knowledge at that point that Terry DeGeus's continued existence is a threat to her boyfriend's freedom, her drug dealer boyfriend's continued drug business, and, therefore, her own continued drug business. Motive, ladies and gentlemen.

And finally as to Terry DeGeus there's a secondary motive. In addition to the fact that his continued existence endangers the freedom of her new boyfriend, Dustin Honken, in addition to the fact that Terry DeGeus's continued existence on this planet is a threat to the continued drug business that Angela Johnson shares with Dustin Honken, there's also more than a bit of revenge. There's hatred and anger. You heard again

from Christi Gaubatz, He can't be around anymore. And that was at a time when she was beginning to show, hated and feared Terry

DeGeus for what was likely to transpire once he knew for sure that she was pregnant with another man's child.

A multitude of motive, ladies and gentlemen, not just that of Dustin Honken but that of Angela Johnson as well, two people tied together in a drug and murder conspiracy.

Opportunity, ladies and gentlemen, there was opportunity for these people to commit the murders that occurred on the night of July 25. There was also opportunity seized, developed and seized by them on November 5 during the murder of Terry DeGeus.

Let's talk about the first opportunity, Nicholson. Honken and Johnson had stalked the man for weeks not long after he got released from court on pretrial order. Despite the fact that he pursued the one course of negotiating as best he could a favorable plea agreement through his attorney, a legitimate means of trying to bring his criminal problems to resolution, he also pursued an illegitimate means in hopes that that would get him out sooner. And he went about seizing the opportunity to kill Greg Nicholson, and it took him weeks to do so, and it took him multiple occasions in which he and Angela Johnson would require a baby-sitter so that they could go out at night and hunt for the man.

And it wasn't easy to do because if you'll recall

2249

again from the testimony of his ex-wife, Greg Nicholson was afraid of the man. And why wouldn't he be, especially in hindsight, scared to death of Dustin Honken? But they found him anyway. Even though he'd moved out of that home, moved to Osage, and then back to a private small home of a woman and her children in a quiet residential neighborhood in Mason City, he

Page 38

hunted them down. They, Angela Johnson and Dustin Honken together, hunted him down and found him only a few days, only about a week before his sudden disappearance moved into a home in that quiet family neighborhood, moved into a home of a woman and her two little grade-school-age children.

So he had the opportunity. And it was an opportunity that not everyone would have. Greg Nicholson was hiding. This was an opportunity, ladies and gentlemen, that only very few people would have because Greg Nicholson didn't want the world to know where he was. He was afraid. But it was an opportunity that Dustin Honken and Angela Johnson had because in the weeks leading up to that disappearance, they took it upon themselves to find that man, and find him they did.

There was opportunity to locate Terry DeGeus, and that was a unique opportunity, a unique opportunity that lay with one person in the world more than anyone else, the one person to whom Terry DeGeus had an emotional attachment far greater than he had to anyone else with the possible exception of his own daughter, a woman to whom, yes, he was abusive and controlling

2250

like too many men are but a woman over whom he was possessive and infatuated and a woman to whose summons he would inevitably respond. And that provided Angela Johnson a unique opportunity, an opportunity that no one else would have.

Remember Terry DeGeus in the fall of 1993 was a paranoid man. He was afraid. He was every day asking his mother if he was going to get -- had he received a subpoena. He was a man worried about the fact that the other drug dealer in northern Iowa, a man known as Greg Nicholson, had suddenly disappeared. He was a man worried about his welfare, a man that

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1967 of 3592

few people were in a position to lure to a meeting. But one person was, the person who held some power over him as he did over her. That strong connection, that infatuation, that feeling of possession and, as his old buddy Aaron Ryerson said, if Angela called, Terry went.

So not only as to Greg Nicholson but also as to Terry DeGeus Angela Johnson was one of the very few who had an opportunity to commit the crime in question and, again, that it was confirmed by her own flesh and blood, her sister Wendy Jacobson, her sister-in-law Sherry (sic) Johnson who went to visit him -- excuse me, went to visit Angela Johnson shortly after those bodies were discovered and she was placed in the Linn County Jail, and she immediately blurted out to them, I lured him there, proof that she not only had but indeed used that opportunity.

2251

Means, motive, opportunity, means, the means that was -- the means of Dustin Honken was the means of Angela Johnson. It was a firearm acquired, as we pointed out repeatedly, pursuant to the permit to acquire and the actual purchase July 7, 1993, from a pawn shop in Waterloo, Iowa, the means to kill five people, the means, ladies and gentlemen, that, in fact, was used to kill five people.

Motive, opportunity, means, guilty conduct. Again, by guilty conduct we refer to conduct that evidences a consciousness of guilt, conduct inconsistent with innocence, conduct that shows a guilty conscience.

What did she do? That big Tec-9, that large handgun, did she keep it in a gun cabinet or wherever one might have reasonable access to a firearm? No. She hid it and not even in

Page 40

her own property. She hid it in a closet in that of a friend unbeknownst to her own friend. She hid that gun, hid evidence of a crime, evidence of five murders concealed by placing it in a cosmetics bag in the closet of her good friend Christi Gaubatz without Christi's knowledge. Again, concealment of evidence, guilty conduct.

Destruction of evidence. When Christi found that large cosmetics bag and found that gun inside the bag, what did she do? She immediately contacted Johnson. And what did Johnson do? We don't have direct but we have indirect and compelling knowledge as to exactly what she did. She took that

2252

gun to Dustin Honken and said, Get rid of it. And he did.

You have two pictures, one a hand-drawn job of Tim Cutkomp. He's no gun expert. He just drew several years later what he remembered spending hours melting down. And Vic Murillo told you there isn't in the 3,000-gun library at the DCI criminalistics laboratory a single weapon that so nearly represents and looks like a Tec-9 than the weapon that was drawn three years later by Tim Cutkomp. No question that that Tec-9 was melted down by Tim Cutkomp at the express direction of Dustin Honken and the indirect direction of Angela Johnson.

She was the one person able to hand it back to Dustin Honken. Get rid of it. That gun, again, the murder weapon, possession of a murder weapon is the classic evidence of guilt of a crime, and getting rid of that weapon is the perfect way to avoid having such evidence tied to yourself.

Guilty conduct in the form of false statements, we talked repeatedly about the night of November 5 when she arranged a meeting with her old boyfriend Terry DeGeus. And

Page 41

when Terry left to go meet Angela Johnson, he told his daughter where he was going. He told his mother where he was going. He made no secret of the fact that he was going to meet his old girlfriend Angela Johnson, told his ten-year-old daughter Ashley, I won't be long; wait up for me; I should be home not long after midnight.

He didn't return, not at midnight, not at dawn, never.

2253

For seven years that child wondered whether her father had shelter or not, but it wasn't seven years that they waited to try to find out. It was immediately that Terry DeGeus's mother, JoAnn DeGeus, got on the phone to Angela Johnson, Where's Terry? And Angela Johnson says to 'em, He didn't show up.

Days later, distraught daughter, a ten-year-old girl, as attached to her father as a ten-year-old girl can be, calls up Angela Johnson and says, Where's my dad? And she lies to her. He never showed up for the meeting.

And Wendy Jensen, now divorced from Terry DeGeus but still the mother of his child and a woman who cares naturally as all mothers do about the welfare of their children, gets on the phone to Angela Johnson and says, Where's Terry? And she lies to her too. He never showed up. But Wendy Jensen is no fool. She knows better, and she presses her. She says, I know better than that. And Angela Johnson changes her story and says, Well, yeah, I did see him. He showed up for the meeting, and then he left, and I don't know where he went.

The truth, ladies and gentlemen, doesn't need changing. And we know that what Angela Johnson was doing was lying time after time again to those who asked her what happened on the night of November 5, 1993.

Page 42

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1970 of 3592

And finally Sheriff Bob Gerdes from Hancock County contacted her and got the same inconsistent -- to him she said, Yeah, he showed up; we met; he left; I never saw him again. To

2254

four people, a variety of different stories again indicating nothing other than an intention, a voluntary intention, to lie about the events of November 5, 1993, the night that Terry DeGeus disappeared, the night that Terry DeGeus lost his life. And that, ladies and gentlemen, the repeated utterance of false statements, is the act of one conscious of her own guilt.

Guilty conduct, false statements under oath, I referred to that as perjury. You have not one but four written transcripts, Exhibits 115, 116, 117, and 118, transcripts of the sworn testimony of Angela Johnson before the United States grand jury in which she repeatedly denies any knowledge of any drug-dealing activity of Dustin Honken and his associates including herself and denies any knowledge of the whereabouts of Greg Nicholson, of Terry DeGeus, of the Lori Duncan family.

Guilty conduct, conduct that an innocent person has no reason to engage in includes the fabrication of false evidence. When she was thrown in the Benton County Jail, she met with Bobby McNeese. And you heard Mr. McNeese. He's a long-time criminal and con artist, and he took advantage of her. I'm not going to deny it. They talked about schemes in which she might manage to escape this terrible charge of participating in the killing of five people. And they came up with a scheme originally suggested by Dustin Honken that among the many people in the institutions throughout our country there must be one or more willing at no risk to himself to claim credit for these

2255

Page 43

five killings and, if he can do so credibly, get Angela Johnson off the hook, scheming to thwart a murder prosecution, ladies and gentlemen, and that too is guilty conduct, fabrication of false evidence, conduct that an innocent woman has no need to participate in.

Finally we have the area of guilty knowledge, and we've discussed this briefly. But there were only two people on this planet, two living people on this planet, who knew where those bodies were buried: Dustin Honken and Angela Johnson. The only people on the planet between 1993 and the year 2000 who knew that there were two graves, clandestine, secret graves in rural Cerro Gordo County, and that there were bodies, dead bodies, bullet-ridden dead skeletons, in the bottom of each of those two graves, the only people on the planet who knew where those two graves are are the people who put those bodies in those two graves.

And you have before you Exhibits 310 and 311. The actual and original documents with the changes noted by Mr. Tarasi as far as making his own notations on them and the fact that they have faded somewhat with age are still legible, and you will have an opportunity to look them over. Two maps which J.D. Smith and Deputy Pete Wright used over a period of one, at most two days in Cerro Gordo County driving the country were easily able to locate -- in examining Exhibit 310, easily able to locate 1500 block in Lark Avenue, a location that fit

2256

the description of a burial site.

And in examining Government's Exhibit 311, another

Page 44

hand-drawn map -- both hand-drawn maps by Angela Johnson -- were easily able to locate 11524 Killdeer Avenue, yet another rural address in Cerro Gordo County. And these two hand-drawn maps drawn by Angela Johnson and, as you heard from Special Agent Hochrein of the FBI, days later, those two sites, in fact, did unearth the remains of the five victims whose deaths bring us here to this courtroom.

And finally there's an area of evidence that is very important as well, and that's admissions. You heard from Christi Gaubatz detailed statements about the conversation she had with Angela Johnson that day in the winter of '93, '94 when Angela called up afraid, crying, whether through remorse or the overuse of drugs or some combination of the two wanting to talk to her best friend about a terrible night, and she did so.

And she talked about that last night that Christi then Cole, now Gaubatz, babysat and told her that she, Angela Johnson, went to that Duncan residence, posed as a cosmetics saleslady needing to use the phone; that she and Honken together videotaped, forced to leave, and drove into the country the victims, the four members of that household; that those victims were taken to a wooded location and one after another with one gun shot in the head, one and then another and then another and then another.

2257

Christi Gaubatz told you that Angela Johnson then told her in that tearful exchange that all four of these victims were buried together in the same hole, and that admission is corroborated because, in fact, as you found from the testimony of Mr. Hochrein of the FBI, that's exactly where they were found, top to bottom Greg Nicholson, Lori Duncan, Kandi Duncan,

Page 45

and at the very bottom, the mangled remains of Amber Duncan.

As to the death of Terry DeGeus, you also heard from Christi Gaubatz that it was later that same winter when her friend Angela Johnson sat down with her and told her that DeGeus is also no longer around. This was not such a tearful exchange because there really wasn't as much emotion involved. And there wouldn't be. Among other things, there isn't the execution of children.

But there was a description of the death of Terry DeGeus, and it was based in part upon a description of how that man died. And Angela Johnson told her friend that she knew he'd be hard to kill, and he was. And as you heard from the testimony of Dr. Steadman from New York who is a forensic anthropologist that there were many, many, many pieces of that skull and it took her hours to glue them back together, a skull that was crushed according to the statements of Angela Johnson to her friend Christi Gaubatz and others that occurred after emptying whatever guns (sic) were in that clip and, because he was still alive, taking a blunt object, possibly an aluminum

2258

baseball bat, and using it on that man and crushing his skull until he breathed his last gasp.

And, ladies and gentlemen, I submit to you that that admission tells us one more thing, that unlike the killings of Greg Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan which were, by comparison, excuse my use of the term clean, efficient, this one shows a bit more emotion, and we know that in the case of Angela Johnson there was a bit more emotion involved in her feelings toward Terry DeGeus than in her feelings toward the members of that Duncan household who she'd

Page 46

actually never even met before.

There were admissions made to her sister and sister-in-law again. We've already talked about them, but it was an admission. It was an expressive admission. It was volunteered by her before they had a chance to say anything else. She said it in writing, and she said it in mouthing the words, I lured him there, Terry DeGeus, setting the trap, springing the trap that ended the life of Terry DeGeus.

There was an admission to Bobby McNeese. And, ladies and gentlemen, the most important thing that we heard from Bobby McNeese was the undisputed fact that Angela Johnson authored and transferred possession of two maps that disclosed her knowledge in the location of these five victims. But they weren't given in a void, and there were conversations over a period of time, and Bobby McNeese told you that Angela Johnson told him, I

2259

helped him kill those people, and she said that to him in response to her knowledge from the discovery file that he'd even talked about killing her and getting rid of the one person who could tie him to these crimes. It made her angry. I did everything that man asked me to do. I killed those people. I helped him kill those people.

Now, I'm not clairvoyant. I can't see into the future, but I do have a vision that we're going to hear from Mr. Willett some criticism of Bobby McNeese. We heard it during opening statements. This man who will be -- has been referred to by the defense as a snitch, ladies and gentlemen, if it wasn't for that snitch, those two little girls would still be a pair of rotting skeletons at the bottom of an unmarked grave.

Ladies and gentlemen, I would submit to you we should

Page 47

be thankful that that so-called snitch took it upon himself to find where those girls are. And it was to him in addition to a number of other people that Angela Johnson made admissions. She made admissions to Sara Bramow: Lori didn't put up no fight; I took her out. What do you think I am? A weakling? Duct tape works really well. Every -- excuse me. They deserved everything they got. Every narc deserves it.

Angela Johnson told Sara Bramow that they brought the duct tape, the rope, and a gun and she and Dustin tied them up and despicably stated, They all deserved to die. Every one of them deserved to have their tongue cut out.

2260

Ladies and gentlemen, this is the testimony of a drug dealer -- this is the statement, excuse me, of a drug dealer, Angela Johnson, and it's the attitude drug dealers take, that those who tell on their fellow drug dealers are snitches and narcs and by telling on their fellow drug dealers they commit the worst crime in the world. They betray their cohorts in crime, and they should have their tongues cut out, and that was the attitude of Angela Johnson, ladies and gentlemen, in her admission to Sara Bramow.

But it wasn't yet again the only admission she made. If you'll recall, Peggy Baca in a meeting with Angela Johnson asked or was told, rather, I helped tie them up. They were shot execution style. And Peggy Baca asked, The kids too? What question would a mother and a grandmother ask when being told this woman had participated in the serial execution of a number of people knowing that two of them were children? Her own motherly instincts would lead any mother, certainly any grandmother, to say, The kids too? Starting with the adults.

Page 48

Those kids were the last executed.

There were admissions to Mickie Yager to the effect that one victim was her ex-boyfriend; one victim was a witness against her ex-boyfriend; another victim was a female the witness had been staying with for about a week and her two kids, an admission I would submit to you, ladies and gentlemen, that shows, among other things, a knowledge acquired during that week

2261

or more in which she was doing surveillance on Greg Nicholson, a knowledge that he was not alone, a knowledge that he was living in a home with a woman and two children, a knowledge that entering that home with a gun, a loaded gun, and the implements of kidnapping was an action undertaken with knowledge of what was going to happen not just to Greg Nicholson but to all four of the occupants of that home that, terrible as that might be, the price paid for escaping these years in prison and preserving this drug business.

And finally, ladies and gentlemen, there were admissions in the form of the maps and notes themselves. Him and her were gagged with kid socks with gray tape around their mouths. And again, this isn't just from fantasy. This is a statement describing what she hoped was going to be a co-conspirator and falsely claiming credit for these claims as to some details that would help him know what to tell authorities. And these are details, ladies and gentlemen, indeed which only someone who was there could know. Him and her were gagged with kid socks with gray tape around their mouths. I think the woman was shot more than once because she ran. Hit somewhere from behind, then in the head.

It was just a couple days ago you heard the testimony

Page 49

of Dr. Dawnie Steadman, a forensic anthropologist from State University of New York who said that the injury to the right fourth rib of Lori Duncan was not only a gunshot wound but was

2262

one of several for which she could determine a trajectory, and the trajectory of that wound was from back to front. Lori Duncan was shot fleeing. She was shot more than once because she ran. Hit somewhere from behind, then in the head. And we know that too, a bullet entering right behind her right ear and moving upwards through her head and out the top of her skull, a description in detail of the manner and means in which Lori Duncan was killed that night, the details of which are provided by someone who can only have been there.

Again in the notes, all shot in the head. And they were, Greg Nicholson in the back of the head going forward and -- excuse me, Lori Duncan in the head just behind the right side of her face going upward and each of those two children execution style with, I would submit to you, even though we have no muzzle target distance determination of a scientific nature, I would submit to you from a reasonable inference based upon all of the facts of this case killed execution style with a bullet straight to the back of her head each time. All shot in the head, again, admissions contained in writing described by one who can only have been there to know the details of how they occurred.

As to the death of Terry DeGeus, there were further admissions in these notes. State's Exhibit 312C -- and again, the large blow-ups are not what I expect will go back to the jury room with you but rather these smaller, detailed, somewhat

2263

Page 50

faded notes but which are nevertheless still legible -- the one is buried on his knees like he would make me be when I would beg for my life face down, not only the location of where this body was to be found, ladies and gentlemen, but the precise posture, the precise position, face down and on his knees in which whoever might dig him up would find him, again, ladies and gentlemen, information, specific information, which only one who was there could know and which like the multiple, multiple, multiple pieces into which Terry DeGeus's head was splintered is an indication of the hatred with which he was executed and buried, emotions that ran higher than they did against Nicholson and the Duncan family, emotions that placed him even in death in a position of disgrace repaying him for eternity the things that he had done to her.

So, ladies and gentlemen, I would submit that motive, opportunity, means, guilty conduct, guilty knowledge, and admissions were made by Angela Johnson as to her own guilt in these five killings.

I want to talk about one last thing in the area of the nature of evidence being presented against Angela Johnson that was presented. It was told to you in opening statement, suggested to you at least the evidence would show that she was an innocent person fooled into participating in these crimes; she was one who was there not realizing what was going to happen.

2264

And so I will discuss with you for a few minutes what the evidence shows otherwise, what the evidence shows in the nature of foreknowledge, what the evidence shows in the nature

Page 51

of knowledge at the times of the killing of exactly what was going on, not merely a videotaping, ladies and gentlemen.

Long after these five people were dead and buried in hidden graves, Dustin Honken's home was searched pursuant to a search warrant, and among the many items seized by law enforcement authorities was a letter from Angela Johnson to Dustin Honken marked Government Exhibit 69 which states in part, I expect you to keep your word about our business relationship. This is an angry letter but written from a woman scorned who feels that the man's paying more attention to the mother of some other child but who, despite all the personal problems that they have, all of the family problems that they have, insists that their business relationship by which she means their criminal relationship continue, a criminal relationship voluntarily continued, even suggested by Angela Johnson years after she was supposedly fooled into assisting in a killing that she knew nothing about at the time. Ladies and gentlemen, it's evidence of a mind-set of a woman who was more than happy to engage in criminal behavior.

Control of the weapon indicates the fact that she was a woman who had in her own mind criminal intent, was not merely an innocent person tricked or fooled into participating into a

2265

killing that she knew nothing about, she's the woman who acquired this weapon.

It's been pointed out to you before, will be again, I have no doubt, that the fact that she openly acquired it in her own name is evidence of the fact that she had nothing to hide. Ladies and gentlemen, after, after these killings occurred, this weapon was hidden and ultimately destroyed. Neither she nor

Page 52

Dustin Honken ever had any intention that this murder weapon ever come to light, and it hasn't. Been melted down in a thousand pieces.

But during the period of time between July 7, 1993, when she acquired this weapon until some time that following winter when she had her friend Dustin Honken destroy that weapon, she shared control of this murder weapon. She shared control of what she knew to be a murder weapon with whom she knew to be a murderer, assuming it was Dustin Honken and not Angela Johnson who pulled the trigger each of those times. They shared that gun. It wasn't the case of one controlling the other one tricking or fooling the other. These two people shared possession of that gun. She bought it.

But if we're to believe that Dustin Honken's the one who pulled the trigger each of the time these five people were killed, it's only because she shared control of the gun by passing possession from herself to Dustin Honken and not just a gun but a loaded gun.

2266

And, ladies and gentlemen, it didn't end there. Possession of that gun shared between these two killers passed back from Dustin Honken to Angela Johnson because we know that it was in Angela's friend's closet in a cosmetics bag that that gun was found weeks following the killing of Terry DeGeus. That gun which had gone from Johnson to Honken came back to Johnson for hiding.

And finally after she was less than successful in hiding this piece of very incriminating evidence, the decision was made to destroy it. And so possession passed again, this time from Johnson back to Honken. He'll get rid of it, she told

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 1981 of 3592

Christi Cole, and he did through the assistance of Tim Cutkomp.

Ladies and gentlemen, control of that weapon over a period of six months during which five people were killed was shared by two killers. If there was only one killer and that killer was a killer who only believed in tricking and fooling his accomplice into helping him, would he share the murder weapon with her over and over again? They shared that weapon, and they passed it back and forth between each other over the period of six months or more.

Criminal intent, again I point out that as to Terry DeGeus, both of these people had a motive to kill him. His continued existence endangered their mutual drug enterprise, but Angela Johnson had additional motive to kill him, a secondary motive to kill him: Hatred and revenge. He can't be around

2267

anymore, she told Christi Gaubatz shortly before his disappearance and murder.

Did she have criminal intent? Let's talk about the circumstances of this mass killing. Ladies and gentlemen, this killing didn't occur at the drop of a hat. There was weeks of stalking. There was the purchase of a firearm. There was a great deal of planning and preparation that went into the kidnapping and ultimately killing of Greg Nicholson and the Duncan family. And this was planning and preparation and surveillance that occurred by two people, not one.

Entry to the Duncan home, as I pointed out in the opening of this presentation, it is only through the deception, the ruse, the trap set by Angela Johnson that this killing, these killings, could be set into motion. Dustin Honken couldn't walk up to that house, knock on the door and say, Hi,

Page 54

Greg, how you doing?  Greg Nicholson was hiding from Dustin Honken.  He needed someone else to do so, and Angela Johnson was happy to do so posing as a cosmetics saleslady.

She laid that trap and sprung that trap when they allowed her into that home where she introduced along, with her boyfriend, a video camera, rope, duct tape, a loaded Tec-9, the rope and duct tape, ladies and gentlemen, instruments of kidnapping, the Tec-9, an instrument of death.

Between the two people, they had to control four victims, two children, a mother, and a man who feared Dustin

2268

Honken with his life.  How could one man do so?  He could not. He had to have an accomplice not only to get into this house, the trap that Angela Johnson set.  He had to have an accomplice not only to get into this house but to control these four people while they carried out their criminal plans of threatening them with a gun while forcing Greg Nicholson to perform on a videotape.

Then she had to have somebody -- which one I don't know -- but one of those two had to be holding a gun on these people while the other one bound and gagged them.  You don't just say, Hold on a second; I'm going to set this gun over on the table while I tie you up.  It takes two people to do that. It took Dustin Honken and Angela Johnson to bind and gag these two adults.  It took the two of them to transport four people, two of whom were not bound and gagged, out to that wooded spot in the country.  I would submit to you this cannot be done by one person.  It was done by two, two people heading out to the country where no good could be waiting for them.  What were they doing?  Going for a ride in the country?  They were going to

Page 55

kill and bury these people, and the reason they gagged Greg Nicholson and Lori Duncan was because they had to know they were about to die, and they had to be prevented from telling those two little girls, Run, Kandi, run Amber, run to Grandpa's house. He only lives a block away.

Finally, ladies and gentlemen, two people, not one,

2269

killed these people.  There may have been only one person and it may have been Dustin Honken who squeezed the trigger each of the six or more times, but a nine-millimeter chunk of lead was sent through the body of these four victims, but he shot them one at a time with the same gun.

And when he shot the first person, presumably Greg Nicholson, someone had to control Lori and Kandi and Amber and keep them from running.

When he came back and took Lori away from her two daughters and led her off to her execution and they heard that gunshot, someone had to assure those two little girls that everything would be just fine, keep them there, keep them under control, keep them from running.

And when Kandi, assuming it was Kandi, was taken off and executed and Amber heard that gunshot, someone had to remain with her and keep her from running.  It took two people to commit this crime, ladies and gentlemen.  It took two people to commit these crimes.

And these crimes occurred not once.  They occurred twice.  It was three months later.  If we were to pretend that Angela Johnson was fooled into participating in the killings of July 25, 1993, what explains the fact that three months and a few days later she again laid a trap, she again lured a victim

Page 56

to his death, she again shared that firearm with a known killer?

She set that trap when she called JoAnn DeGeus. She

2270

sprung that trap when she talked to her ex-boyfriend. And she participated in the killings as we've seen from her detailed description of the way in which Terry DeGeus died and the way in which his body was buried.

Finally, admissions of guilt. Ladies and gentlemen, I've talked to you about the statements that she made to Christi Gaubatz, to Bobby McNeese, to Sara Bramow, to her sister and sister-in-law, the inmates Baca, Hoover, and Yager. Ladies and gentlemen, you don't have to be a criminal detective, a judge, a prosecutor, a defense attorney, an expert in the field of the law. All you have to do is be an adult to understand that when someone confesses, when someone admits having done something wrong, it's human nature to put things in the light most favorable to yourself.

Certainly there are times when we go to confession where we lay out the very worst, but it's human nature when sharing the bad things we've done to put them in a light most favorable to ourselves.

MR. WILLETT: Your Honor, excuse me. I hate to interrupt Mr. Miller, but I'm going to have to object to this description as being no claim of innocence. I think that's a misstatement of the record, and we would object to it being described in that way. Thank you. And, Your Honor, if I may add to that objection, it would be contrary to my client's Fifth Amendment right under the United States Constitution.

2271

Page 57

THE COURT: Overruled.

MR. MILLER: When she described in detail to Christi Cole, now Christi Gaubatz, about what happened that night that Christi babysat, I would submit to you, ladies and gentlemen, that if, in fact, she was fooled into participating in this crime, the very first thing she would have told her is, I was tricked into participating in a crime. And yet there was no such comment.

I would submit to you, ladies and gentlemen, that when she spoke with Christi Cole, now Christi Gaubatz, about the death of Terry DeGeus, the very first thing -- if it was true, the very first thing she would have said was that I was fooled into helping Dustin kill Terry. But that was not any part of the confession she made to Christi Gaubatz.

I would submit to you, ladies and gentlemen, that when she told Bobby McNeese that she helped him kill these people that if it was true that she was tricked into helping him kill these people, that that's the very first thing she would have said, and she didn't. She merely said, I helped him kill these people.

I would submit to you, ladies and gentlemen, that as a matter of simple human nature -- and we're all adults here -- that if when she was talking to her sister and her sister-in-law, if the fact of the matter was that she was tricked into luring Terry DeGeus to his death, she would have

2272

said, I was tricked into luring him there. That's not what she said. She said, I lured him there.

And as with the statements of Inmates Baca, Hoover,

Page 58

and Yager, the descriptions of the manners in which Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus were taken from this life are descriptions no part of which was any claim she was tricked or fooled into participating. And had she been tricked or fooled into participating, I would submit to you certainly once, in fact, I would submit to you every single time that would have been the first thing she had said.

Ladies and gentlemen, this is the evidence upon which the government's evidence has established beyond any reasonable doubt that Angela Johnson participated with, jointly acted with Dustin Honken in taking the lives of these five people.

I want finally and as briefly as possible to review with you the Court's instructions. The Court has given you many instructions, and you are, of course, bound to follow them all. But it will help to do your job if you focus on what are known as the marshalling instructions, the instructions that tell you what it is that the government's required to prove because if we have failed to prove what the Court instructs you we must prove, then it's your job to find the defendant not guilty.

The defendant is charged with ten counts, the first five of which are conspiracy murder. The elements of conspiracy

2273

murder include conspiring to commit a drug crime, a conspiracy to commit a drug crime, that the defendant aided and abetted the intentional killing of the named victim, the killing actually resulted, and that the killing was connected to the conspiracy.

And again, ladies and gentlemen, as I go through these instructions briefly with you, I want to remind you that the Court has given you detailed instructions, and it is obviously

Page 59

those detailed instructions and not my abbreviated summary or shorthand of those instructions you must follow. I trust that's obvious, but I need to get through this, so I have shorthanded some of this information.

Aiding and abetting, she knew the killing was being committed or going to be committed. And again, ladies and gentlemen, I would submit to you that after the weeks of surveillance and after entering that house with the implements not only of extortion but of kidnapping and murder she knew what was going on. And certainly once in the country where those people were to be killed and buried, she knew the killing was being committed.

Second element, knowingly acted to cause, encourage, or aid in the killing. Aiding in the killing, ladies and gentlemen, as I pointed out, neither of these two events in which killings occurred could have occurred but for Angela Johnson setting the trap and springing the trap. And that's aiding.

2274

Acted with the purpose of causing the victim's death, and here too, ladies and gentlemen, despicable though that purpose may be, it's a purpose which is essential to carry out the continued crime of dealing drugs when there are two people, Greg Nicholson and Terry DeGeus, who can prevent you from continuing to do so. And ladies and gentlemen, if you have to kill Terry DeGeus and you have to kill Greg Nicholson, it isn't going to do you a bit of good unless you also kill the people who are with them, unless you also kill the people who witness those killings.

Conspiracy, and again the Court has defined for you

Page 60

conspiracy. I've shorthanded it somewhat. Again, please follow the Court's instruction, not my shorthand, but we do need to discuss this. A conspiracy occurs when two or more persons reach agreement to manufacture or distribute methamphetamine. Abundant evidence of that in this case, far more than two people came to such an agreement; that Johnson voluntarily and intentionally joined in the agreement. Again, recall the testimony of Ryerson, Gaubatz, Cutkomp, and Cobeen.

Johnson knew the purpose of the agreement, the purpose of the agreement, of course, distribution of a dangerous drug and that 100 grams or more of pure meth or 1,000 grams or more of a meth mixture was involved in the conspiracy.

Was it within a thousand grams or more of a mixture? Well, as you recall, there was a tape recording in which Honken

2275

and Nicholson discussed the fact that Nicholson must have made Honken over a hundred thousand dollars. One ounce sells for between one and two thousand dollars, and I believe the record reflects that an ounce contains many grams.

Was there a drug quantity in excess of 100 grams of pure methamphetamine? There was a great deal more than that. Government's Exhibit 25 alone points out, if you'll recall the testimony of Deb Davis, a DCI laboratory person, formerly worked in the drug section of the laboratory who back in '93 found there was, in fact, 148.34 grams of 97 percent pure methamphetamine and that simple arithmetic shows that 97 percent of 148 grams is slightly over 143 grams of pure meth. And 143 is bigger than a hundred as even a lawyer knows, so I'll move on to the next element of the conspiracy.

There was a conspiracy in effect in '92 and '93 when

Page 61

it began in Tucson with Jeff Honken, Tim Cutkomp, and Dustin Honken delivering methamphetamine to DeGeus and Nicholson. After they were discovered, there was destruction of the evidence, a call made to Melissa Friesenborg by Tim Cutkomp at Dustin Honken's request. There was killing of not one but five witnesses, most especially two who could connect them to this conspiracy, DeGeus and Nicholson.

There was collection of chemicals and equipment and trips to Arizona in '94 through '96. Production of this meth laboratory was resumed. And finally I wish to remind you, as

2276

you will find out from a reading of the Court's instructions, that the crime of the conspiracy is the agreement, not the actual manufacture or delivery. And based upon all that, I would submit to you it's clear beyond any reasonable doubt that there was, in fact, a drug conspiracy in effect.

Johnson's involvement in the conspiracy was manyfold. As we've talked about earlier through the testimony of Ryerson, among others, she replaced Terry DeGeus in Honken's drug distribution network who had -- according to Ryerson, she hooked up with a drug dealer, a tall blond guy and who wore glasses fitting the description of Dustin Honken.

Her involvement in the drug conspiracy included the fact that she was angry with Ryerson for using meth without paying. Why would she be angry about this? This came out through the cross-examination of Ryerson by, I believe, Mr. Berrigan pointing out that his client, Angela Johnson, was actually mad at him because he was using this meth without paying for it. Why on earth would she be upset about that except for the fact that that money came out of her pocket?

Page 62

Johnson's involvement in the conspiracy is shown by the fact that she kept a large supply of methamphetamine on hand. We know from Christi Cole, now Gaubatz, that she frequently shared it with her friend.

In 1993 she traveled with Honken to Arizona to pick up chemicals and equipment. Timothy Cutkomp testified to this. In

2277

1995 and '96, she allowed her Clear Lake residence to be used for making meth and for storing chemicals. Government Exhibit 76A shows a bottle of acid acetate found at her residence in the search. Government Exhibit 76J shows further equipment identified by, I believe, Agent Lori Lewis as being equipment typically used for the manufacture of methamphetamine, all of these photographs in Exhibit 76 taken during the search of Angela Johnson's residence in 1996.

Providing financing, again, as you noted in letter 69, the business relationship by which, of course, she meant the criminal relationship between herself and Dustin Honken only really had one basis for it, and that's the fact that she was the capitalist. She was the financier. She borrowed $5,000 on a credit card, and money is needed to set up a drug operation, at least a drug lab of the sophistication that Honken and Johnson were setting one up, one capable of having more than 90 percent pure methamphetamine.

Ladies and gentlemen, Counts 1 through 5 of the indictment call for your decision in step 1 as to whether this defendant is not guilty or guilty of conspiracy murder as to each of the five named victims, Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus. And I would submit to you that your answer in each of those cases should be

Page 63

guilty, guilty beyond any reasonable doubt.

Step 2 of your job involves distribution and

manufacture of methamphetamine; as to distribution, whether it was 100 grams or more. And again, as you know from Exhibit 25 alone, on a single occasion -- and there were many such occasions -- far more than a hundred grams of pure methamphetamine was delivered.

And so 100 grams or more should be checked as to each of these victims because it is in connection with that conspiracy that each of these victims ultimately was killed.

Distribution of 1,000 grams or more of methamphetamine. Again, the testimony as we showed just briefly involved more than a thousand dollars of methamphetamine over multiple deliveries to the state of Iowa to be mixed into and diluted by Greg Nicholson upon receipt. Pounds of methamphetamine worth approximately a hundred thousand dollars at one to two thousand dollars a gram comes to far more than a thousand grams of mixture of methamphetamine.

And forgetting distribution, getting to the subject of manufacture, again, Exhibit 25 which shows 143 grams of pure methamphetamine, based upon 148 grams of 97 percent pure shows manufacture of more than 100 grams and, for the same reason, manufacture of more than 1,000 grams of mixture since mixed is what they were ultimately to be. But as to each of these, to any checkmarks, the conspiracy to distribute and manufacture more than 100 grams of pure methamphetamine, in fact, many times more than 100 grams of methamphetamine and many times more than

1,000 grams of methamphetamine mixture was the basis of the conspiracy that led to the deaths of all five of these people.

CCE murder is the other five counts of the trial information. If you find by -- and again, the Court's definition is the one you must follow, but just to try to shorthand it, the elements include the claim that Johnson was working in furtherance of a CCE, continuing criminal enterprise as defined, is she aided and abetted the killings, that the killing or the killing as to each specific victim -- that the killing as to each specific victim actually resulted, and that it was substantially connected to the continuing criminal enterprise in each case.

What is a CCE? An organizer committed felony violations of federal drug laws. The organizer in this case was Dustin Honken. Felony violations, he's in prison for felony violations of federal drug laws. Item 2, as part of at least three related violations, and we'll discuss them shortly. Item 3, with 5 or more others, and we'll discuss that. Element 4, that Honken acted as organizer. And element 5, that Honken obtained substantial money or property.

Three or more related violations. You have some 13 set out, and I would submit to you that as you think about them you will find proof beyond any reasonable doubt that exist as to each of the 13. You need only unanimously agree to three. I would submit to you that evidence fully supports all 13.

2280

There were two for which he pled guilty, Exhibits 303 and 304. In the evidence in this case -- and you'll have them back in the jury room -- set forth his guilty plea and conviction as to two federal felony drug convictions.
Page 65

The first item of the 13 was from about '92 to and including '98 on specific dates unknown to the grand jury the participants distributed a methamphetamine mixture, and here we have the testimony of Nicholson, now deceased, but when he testified before the grand jury to that effect and the live testimony of Tim Cutkomp.

Item 2, from about 1992 to and including '98 on specific dates unknown to the grand jury the participants possessed with intent to distribute a methamphetamine mixture, and here again, the testimony of Nicholson and Cutkomp. Again, you need only agree as to 3 of these 13, but I'll go through the 13 with you.

Item 3, from about '92 to and including '98, the participants conspired with each other and with others to manufacture and possess with intent to distribute 100 grams or more of actual pure methamphetamine. And here to Exhibit 25 -- and you'll have it, even if I've misplaced it for the moment -- the laboratory report which found indeed more than 100 grams. It found 148 grams 97 percent pure or 143 grams pure methamphetamine.

Item 4, from '92 through '98, on specific dates

2281

unknown to the grand jury, the participants used communication facilities, including mail and telephone, to facilitate the commission of felony drug offenses. And the testimony of Cobeen, Cutkomp, and Nicholson discussed the use of the mail in order to arrange deliveries of drugs to Iowa and the use of telephone to arrange for such deliveries.

Item 5, between '92 and '93, Dustin Honken and Timothy Honken (sic) operated a methamphetamine-producing laboratory in

Page 66

Arizona using the name Printed Circuit Technology and knowingly and intentionally manufactured 100 grams or more. From Exhibit 25, again, you know on many occasions, not just the one, they manufactured more than 100 grams but from Jeff Johnson -- excuse me, Jeff Honken and Tim Cutkomp you know that they used the name Printed Circuit Technology in order to obtain those.

As to item 6, from '92 through '93 on specific dates unknown to the grand jury in Arizona the participants manufactured 100 grams or more of actual pure methamphetamine. Again, Exhibit 25 by itself proves that, but you also had his guilty plea to that charge and the testimony of both Tim Cutkomp and Jeff Honken.

Item 7 of the indictment, that on March 17, 1993, Greg Nicholson possessed with intent to distribute 143.89 grams or more of actual pure methamphetamine. Again, 148.34, 97 percent pure by simple arithmetic is exactly 143.89 grams or more of pure methamphetamine.

2282

Item 8 from the indictment, about the fall of '95 to and including February 7 of '96, Johnson together with Honken and others knowingly and intentionally attempted to manufacture 100 grams or more of actual pure methamphetamine. And here, ladies and gentlemen, you have multiple photographs beginning at Exhibit 51 but continuing for dozens of photographs thereafter documenting chemicals and the drug manufacturing equipment that was seized from Dustin Honken's home on February 7, 1996.

Item 9, during about '95 and '96 at Angela Johnson's residence, Angela Johnson knowingly and intentionally possessed chemicals, equipment, and materials which may be used to manufacture methamphetamine, MDMA, or listed chemicals knowing

Page 67

and intending or having reasonable cause to believe that the chemicals, equipment, and materials would be used to manufacture the controlled substance. Again, Exhibit 76 documents the seizure of such equipment from her residence.

Item 10, at about September '95, Honken had a mailbox established in the name of Cytomex Company in Des Moines. Testimony of Cobeen corroborated by Cutkomp establishes that beyond any reasonable doubt.

Item 11, that on or about the fall of '95 Dustin Honken knowingly and intentionally possessed hydrogen gas and, again, the photographs from his residence in the 70 series, Exhibit 78. In addition to the photographs, we have Exhibit 78 which is a receipt actually seized from his residence that shows

2283

the purchase of hydrogen compressed. From the photographs taken at the time of his search warrant execution, I think you know what that hydrogen is for.

Item 12, in January '96 alleged CCE participants Dustin Honken and Tim Cutkomp knowingly and intentionally possessed manganese chloride along with other chemicals. And as to both the last item and this one, both Cutkomp and Cobeen testified to such, but you needn't rely entirely on their testimony. It's corroborated by Government Exhibit 75 which is a receipt for manganese chloride also seized from the Honken residence in '96.

And finally 13, on or about February 7, '96, the participants knowingly and intentionally possessed at Dustin Honken's residence at 1104 16th Street Northeast, Mason City, Iowa, a three-neck round-bottom flask and other chemicals and equipment knowingly and intending and having reasonable cause to

Page 68

believe that these materials and equipment would be used to manufacture methamphetamine or a listed chemical. And here too, ladies and gentlemen, not to belabor it, but you have a long series of photographs beginning with Exhibit 50 taken by Agent Graham, and he described in detail how all of those are implements, chemicals and instruments used in the manufacture of methamphetamine.

The next thing the government is required to prove is that Dustin Honken was an organizer, which means that he

2284

developed the meth manufacturing process or at least in this case, ladies and gentlemen. Definition of organizer, Dustin Honken undertook the series of related violations in concert with five or more persons.

And whether he acted as organizer, I don't think there's any serious contention that Dustin Honken was the organizer of this drug conspiracy. He manufactured, developed the manufacturing process. He assembled the personnel, his brother, his life-long friend, and distributors to put this organization into effect. In Exhibit 20 that you listened to and read a transcript of, he described not only past profits but plans for future growth.

After he was arrested, through Tim Cutkomp and Melissa Friesenborg he ordered the destruction of evidence after the '93 arrest. He took steps to reassemble the lab after he was arrested and released in '93. And then after the charges were dismissed in '95, he reassembled the lab.

And finally, throughout he recruited the assistance first of his brother to finance, then from his friend Tim Cutkomp to help out, and ultimately in later years from Cobeen

Page 69

to help with the labor. In the meantime he not only had the assistance of Greg Nicholson and Terry DeGeus as distributors but also that of Angela Johnson and, more importantly, in the latter portion of this organization finances in the form of $5,000 from Angela Johnson.

2285

So there was, I would submit to you, no question but that the element he was an organizer has been proven.

A number of other elements; we need to go through these. I apologize for taxing your patience, but it's important that we point out that we've proved each and every element. It must be proven that he did so as an organizer with five or more others, and I would submit to you that Jeff Honken who provided financing in 1992 at the request of Dustin Honken proves that Dustin Honken was an organizer. The fact that he contacted Tim Cutkomp way back in '92 to come to Arizona and participate in the development, manufacture of methamphetamine shows that Dustin Honken was acting as an organizer.

With regard to Angela Johnson who at one point was merely a distributor in the chain but in late '92 met Dustin Honken and replaced Terry DeGeus in the organization was a part of that organization subject to Dustin Honken's organization; that Dustin Honken was an organizer as to Greg Nicholson and Terry DeGeus who were the two people through whom he directly during 1992 sought to have methamphetamine distributed and sold throughout northern Iowa; and finally, even though his participation with them was indirect -- and you'll find in the instructions -- and I'm quoting -- Dustin Honken must have organized, supervised, or managed, either personally or through others, five or more persons with whom he was acting in concert

Page 70

while he committed the series of offenses, five or more persons

2286

either personally or through others; that in addition to Jeff Honken, Tim Cutkomp, Angela Johnson, Greg Nicholson, and Terry DeGeus, through others he also organized Dave Patrick, Aaron Ryerson, and Greg (sic) Solland who were part of the drug distribution network. It is necessary in order to get these drugs delivered all the way from his Tucson laboratory into the hands of whatever members of our society would be foolish or naive enough to use it.

And finally substantial money, it must be established that he obtained financial money. You have it in the form of his drug ledger, Exhibit 33, where he kept track of how much money T Man and G Man, Terry DeGeus and Greg Nicholson, owed him for drugs. He talked about it.

(A portion of an audio recording was played in open court.)

MR. MILLER: Not only did he mention the substantial money, probably more than 100,000 last year alone had passed hands, but that Greg -- excuse me, Dustin Honken had even bigger plans for the future. Substantial money. We don't know how many times there was this kind of substantial money that could have been spread on the pool table of Greg Nicholson's basement, but on March 17 when they searched it which was we know not how many times did he receive deliveries from Dustin Honken over the previous year, there was $4,700 in cash, substantial money indeed, and the Court will describe it to you in the

2287

Page 71

instructions as being substantial money.

Ladies and gentlemen, wrapping up, you will have forms of verdict, and I just simply want it clear to you as to how it is that we are urging you to answer these.

As to step 1 on Counts 6 through 10, not guilty or guilty of CCE murder, we would urge that you check the mark guilty as to Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus for it was in connection with this criminal -- continuing criminal enterprise, but for and in connection with this drug business, a continuing criminal enterprise, none of them would be dead today.

And step 2, as to the alleged violations, 13 of which have been listed, I'm not going to go through with you again other than to say that to each of those 13 you have received more than enough evidence to find beyond any reasonable doubt that the answer is yes and that as to the first 4, distributing of a methamphetamine mixture from '92 through '98, that that occurred before the killing, possession with intent to distribute a methamphetamine mixture from '92 to '98 occurred before the killing, conspiracy to manufacture and possession with intent to deliver occurred both before and after, and using communication facilities to facilitate the commission of these drug offenses from '92 to '98 occurred both before and after.

We've already discussed the fact that we urge you in all 13 of these specifications of continuing criminal enterprise

2288

that it proves beyond a reasonable doubt.

Step 3, existence of a CCE, if you found the defendant guilty of a particular count of CCE murder, please indicate which of the following persons were the five or more persons

Page 72

acting in concert with Dustin Honken in the CCE and whether or not each such person was a member before or after the killing.

I would urge to you that Tim Cutkomp, as he admitted to you, was a member of that continuing criminal enterprise way back to '92 and continuing until '96 when he decided that while being asked to make drugs is one thing, asked to kill people is something else entirely when he reported this matter to authorities; that he was a member of that CCE both before and after the killings. Terry DeGeus, before the killings. Jeff Honken, before the killings.

Angela Johnson, again, someone who as early as 1992 had established not only a personal but a business criminal drug relationship with Dustin Honken was a member of the continuing criminal enterprise both before and after the killings of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus. Greg Nicholson was a member of that continuing criminal enterprise obviously only before his killing and that as to the last three, Patrick, Ryerson, and Solland -- and believe me, the first five were direct involvement, but as the Court I believe in the instructions pointed out, indirect is also involved -- Patrick, Ryerson, and Solland who were another step down the

2289

chain were also part of that organization because unless the distribution, unless the manufacture of methamphetamine ultimately results in distribution all the way down to the people who were going to spend their or their family's hard-earned cash to buy it and use it that there is no organization and no conspiracy; that Patrick, Ryerson, and Solland were also members; that, accordingly, based upon the evidence before you you should find beyond any reasonable doubt

Page 73

yes as to each of those eight alleged members of the CCE but especially and directly the first five.

Ladies and gentlemen, that's an outline of the government's case. I apologize for having taken more than the full morning. I merely want to mention to you in conclusion on behalf of my client in this case, the United States of America, I ask you to return the only verdicts possible under the evidence, the verdicts, the only verdicts that are reasonable and logical under the evidence in this case, ten verdicts finding Angela Johnson guilty as charged in the grand jury's indictment.

THE COURT: Members of the jury, we're going to take about a 45-minute lunch break and come back at the conclusion of that break to hear the closing argument by Mr. Al Willett on behalf of Angela Johnson.

And so that will take us till -- why don't we start at 1:05. We'll be in recess till 1:05. Lunch is being served to

2290

you down in the jury room. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated for one second. Is there anything we need to take up? Mr. Williams, Mr. Miller?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Willett?

MR. WILLETT: No, Your Honor.

THE COURT: I did want to run by counsel, I'm going to switch my usual practice of discharging the alternate jurors. Normally when we're ready to send the jury down, I dismiss the alternates first. I'm going to reverse it and send the jurors down, and I'll do that by indicating the juror numbers of the

Page 74

alternates and asking those folks to stay. Then we'll send the jury down. And the reason why I'm going to reverse it is I want to exercise my right under Rule 24 to retain the alternate jurors, and so I want to explain their duties to them. There's no reason the jury needs to hear or understand that. And if I slip up and goof which I don't anticipate that I will, it will at least be in front of the alternates and not in front of the entire jury panel.

So I think it's best just to get the jury panel down and then deal with the alternates, dismissing alternates 5 and 6 -- that would be Alternate Juror Number 9 and Alternate Juror 794 -- and then explaining the duties and responsibilities of the four remaining alternate jurors. But I just wanted to run

2291

that by the parties to see if they had any objection to it.

MR. BERRIGAN: Not at all, Your Honor.

MR. WILLIAMS: None, Your Honor.

MR. BERRIGAN: Does the CSO retrieve the belongings of the alternate jurors from the jury room, or do you have --

THE COURT: No, I send them down there to do that, but I give them a very strict admonition not to express their opinion in any way or discuss anything about the case with the remaining jurors.

MR. BERRIGAN: Okay.

THE COURT: Okay?

MR. BERRIGAN: Yes, sir.

THE COURT: Thank you. We'll see you back here at 1:05.

(Lunch recess at 12:19 p.m.)

THE COURT: Ready to have the jury brought in,

Page 75

Mr. Willett?

MR. WILLETT: The defense is ready, Your Honor.

MR. MILLER: Yes, sir.

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Willett, whenever you're ready.

MR. WILLETT: Thank you, Judge. Chief Judge Bennett, if it please this Honorable Court, counsel for the government,

2292

counsel for the defense, Angela Johnson.

Ladies and gentlemen of the jury, Angela Johnson has done some regrettable things in reference to this case. She failed to stop, if she could have, Dustin Honken from putting four people, including two little girls, to death on July 25, 1993.

When she learned of what he had done, she participated in the cover-up which followed. She lied over and over again to her friends, to her family, police officers, and grand jurors about knowing about what Dustin Honken had done. She lied about being involved in drugs, although most people in that business lie about it even when they're caught red handed selling drugs to snitches and undercover cops. She failed to report Dustin Honken to the proper authorities, a decision only partly explained by the fact that she was carrying his child.

And as a result of not telling anyone about what Dustin Honken had done to Greg Nicholson and the Duncans, Dustin Honken was free to kill Terry DeGeus as well.

As was mentioned during the defense's opening statement, there is a lot that Angela Johnson did wrong during

Page 76

her relationship with Dustin Honken, a lot to be angry, even disgusted with her about. She was weak, selfish, insensitive, and dishonest. She was caught up with a drug, methamphetamine, and a lifestyle, drug dealing, and a man, Dustin Honken, that took her to the abyss of immorality and self-destruction and

2293

threatens her life even still. She engaged in a great deal of regrettable conduct in 1993 and since.

But she did not, did not, knowingly help kill anyone. She did not aid and abet Dustin Honken in the four murders he committed on July 25, 1993, in the woods off of Lark Avenue in Mason City, nor did she aid and abet Dustin Honken in the murder of Terry DeGeus near Killdeer Road. She learned of them when it was far too late to change anything. She lied to authorities about what she knew, and she is undoubtedly guilty of obstruction of justice.

But that's not what she's charged with. She's charged with ten counts of murder, and it will soon be your job to carefully analyze the evidence you've heard, apply the facts to the law that Judge Bennett has given you, and find Angela Johnson not guilty of these charges because that's what she is. She is not guilty.

Ladies and gentlemen of the jury, the defense was afraid, quite frankly, that after all the time that was spent in talking about life imprisonment versus the death penalty that after all those questions that were put to you about whether you could consider this sentence or that sentence that you might think Angela Johnson's guilt was a foregone conclusion. The defense was concerned that the voir dire process would create a presumption of guilt instead of the presumption of innocence

Page 77

that Angela Johnson is entitled to.

2294

We were worried that all that discussion of punishment would perhaps cause you not to hold the government to its high burden, the highest burden of proof in all the law, to prove their allegations beyond a reasonable doubt.

But those fears were misguided. You have paid attention to the evidence. Many have taken copious notes, and you scrutinized the government's witnesses with probing, challenging eyes. And so the defense is confident that the big holes in the government's case we will discuss in the next few minutes, that you have also seen these holes and problems as well.

The defense trusts that in a case riddled with unanswered questions you will see an abundance of doubt, an abundance of reasonable doubt.

And finally it is obvious that you recognize that it is Angela Johnson, not Dustin Honken, who is on trial before you, that her case should be judged on the evidence against her, not Dustin Honken, and the fact that they shared drugs, money, and an unborn child 12 years ago does not mean, does not mean, that they shared their thoughts, their goals, and their plans. And it certainly doesn't mean Angela Johnson should share Dustin Honken's fate.

Dustin Honken, with premeditation and substantial planning, intentionally murdered Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus. That much is

2295

clear. What is far from clear is the government's allegation in
Page 78

this trial that Angela Johnson knowingly aided and abetted Mr. Honken for the purpose of killing these people.

It is this issue, aiding and abetting, that is at the heart of this case, not whether killing children is horrible, not what happened to the skeletons run over by tractors nor how many times Dustin Honken shot each person, not Dustin Honken's methamphetamine recipe nor how much money he has made selling drugs nor whether that drug business involved Angela Johnson.

Whether the government has proven beyond a reasonable doubt that Angela Johnson is guilty at all depends on this one issue: Aiding and abetting. Some may think they know what that means, aiding and abetting. But as Judge Bennett has instructed you now both orally and in writing, to aid and abet a murder requires proof of very specific facts.

Bobby McNeese, no choir boy by his own admission, also wasn't much of a jailhouse lawyer. He either lied or was mistaken about the death penalty being a potential punishment for the charges Angela Johnson faced. He was no expert on the statute of limitations. And Bobby McNeese told you his version of aiding and abetting: If an individual had knowledge of the murders or she was there, then she was just as guilty as the person who pulled the trigger.

Well, that may be what Bobby McNeese thinks, but that's not what the law says. The law that governs this case,

2296

the law that guides your deliberations, the law says Bobby McNeese is wrong again.

Instruction number 5 defines for you aiding and abetting in the intentional killings of the five victims in this case. All four elements are required to have been proved beyond

Page 79

a reasonable doubt or you must acquit Angela Johnson of these charges.

The first one is the easy one, that Dustin Honken intentionally killed these people. Not even the government claims that anyone other than Honken killed these folks, and we know when, where, how, and why he did it.

Second, that Angela Johnson knew that the killing of the victims was being committed or was going to be committed. This would be enough for Bobby McNeese if it were true. But it is not the law which says that mere knowledge of the murder is insufficient to be an aider and abettor.

The third requirement is that the government prove that Angela Johnson acted in some way to cause, encourage, or aid in the killing of the victims. But in any case, whatever aid he may have gotten from Angela Johnson was not for the purpose of killing anyone.

And that is requirement number 4, that the government must prove beyond a reasonable doubt that Angela Johnson acted with the purpose of causing the victims' deaths. This is the element that sinks the government's case against Angela Johnson.

2297

Through sobbing tears she tells Christi Gaubatz that nobody was supposed to be killed, that was never the plan. She tells Sara Bramow that she was with Dustin Honken to get a videotape from Greg Nicholson.

Not a single government witness provides any credible evidence that Angela Johnson did anything with the purpose that any of these five people be killed. She was but one of so many people close to Dustin Honken who he deceived into taking action on his behalf for a completely different purpose than what later

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2008 of 3592

turned out to be Dustin's secret plan.

Of course, the government will argue that she should have known this, she must have guessed that, she could have figured out what Dustin Honken was thinking. But you have learned one thing for certain during this trial, and that is that Angela Johnson doesn't question people's motives, doesn't examine their intentions as much as she perhaps should.

Bobby McNeese, Sara Bramow, Peggy Baca, Mickie Yager, Peggy Hoover, all fine examples of people with a secret agenda you and I would quickly suspect starting with why are you asking me about my case.

But Angela Johnson trusted these people, foolishly trusted them, just as she did Dustin Honken who was as skilled a con man as Bobby McNeese could ever hope to be.

So when you hear the government talking about Angela Johnson must have known this or she should have known that or

2298

she could have guessed that Honken was up to X, Y, or Z, your retort should be prove it. What evidence is there of that knowledge, that purpose to intentionally kill on Angela Johnson's part?

Don't be seduced into speculating or guessing about what, if anything, Angela Johnson knew and when. The government's responsibility which they gladly embraced was to prove these elements of aiding and abetting beyond a reasonable doubt. If you have to guess about the answers to these critical questions, then the government has failed that test, and Angela Johnson must be found not guilty of these crimes.

Let's talk about the evidence together for a few minutes beginning with how it is that Angela Johnson ever found

Page 81

herself with the likes of Dustin Honken back in 1993.

How desperate for love does a woman have to be to take as her lovers and boyfriends the likes of Terry DeGeus, Dustin Honken, and Bobby McNeese? What inner thirst for someone to protect her is exhibited with these choices? How hopelessly low could her self-esteem be that these men, all self-centered, egotistical sociopaths could be one woman's idea of a dream man? These men shared one quality that made them irresistable to this woman. Terry DeGeus, Dustin Honken, and Robert McNeese were all powerful men in different ways perhaps, but they could protect those they loved. No question about it. And it was that quality that drove Angela Johnson to an irrational attraction to

2299

such men as these.

Terry DeGeus could protect her with his fist. He was an unusually physically powerful man who could beat up men and did so regularly. He was unafraid of anybody, even armed police officers as you heard from Aaron Ryerson and Detective Stearns who was involved in the standoff during the search of Terry DeGeus's home -- house. This man, Terry DeGeus, was a natural choice as a protector for Angela Johnson even as he beat her with his fist just like other men he encountered.

Dustin Honken was powerful too but in an intellectual way. He was Terry DeGeus's boss. That alone made him powerful. But he controlled people with his smarts, seemingly had it all together. He was the master of his universe, a strong but silent type who, as Angela's sister-in-law Shelly Johnson told you, was completely different from anyone Angela Johnson had ever dated. Dustin Honken could protect her from anybody, and that fault alone made him a magnet for Angela Johnson's

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2010 of 3592

affections.

Nobody demonstrates Angela Johnson's desperation for a powerful protector better than Bobby McNeese.  There is no evidence they ever kissed, held hands, or even were in the same room together at the same time, yet in the span of two months Angela Johnson fell hard for Bobby McNeese.  He offered to help and protect her.  He was a mobster, a tough, confident, and experienced federal inmate and a guy who held himself out as

2300

wanting to have a relationship with her.  He gave her attention, something she craved, and promised her the one thing he knew she could never resist, a chance to get back to her daughters.

Remember what Bobby McNeese told Angela Johnson in his letter to her on August 20, 2000?  He had earlier proposed that his fictitious friend, Greg Long, would confess to the murders and exonerate Angela Johnson.  In return for McNeese getting a share of the money from the lawsuit he dreamed up for malicious prosecution and false arrest, he wanted Angela Johnson to buy his story so he could incriminate her and decrease his own prison sentence.

Bobby McNeese told Angela Johnson, You need to calm down and do some heavy soul searching and figure out what you are going to do; you need to be out there with your kids.

Angela Johnson didn't question Bobby McNeese's ridiculous plan for even a moment.  How would Bobby McNeese know where Greg Long was on July 25 or November 5, 1993?  What if Long was in jail, in prison then?  What would be Long's alleged motive for killing these people?  How could Bobby McNeese even connect Greg Long to Greg Nicholson or Terry DeGeus?  What was going to be Bobby McNeese's response when all of the relatives

Page 83

of Terry DeGeus said they'd never heard of Greg Long?

Angela Johnson didn't ask these questions of Bobby McNeese for the same reason she didn't ask questions of Dustin Honken on the way to Lori Duncan's house on the night of July

2301

25, 1993. Honken had told her he needed her help to get a videotape of Greg Nicholson perhaps at gunpoint exonerating Dustin Honken from any methamphetamine dealings in north central Iowa. She believed him.

As she would tell her friend Christi Gaubatz months later, she openly wept and sobbed about the lives lost that night. She naively, even stupidly believed these protectors of hers even as they plotted behind her back for their own advancement and gain.

She desperately wanted to believe Bobby McNeese when he said he could get her back to her girls, so she did believe him. She believed the bright, intelligent Dustin Honken when he told her that all his problems would go away and that he could be a father to the baby in her womb if only he could get Greg Nicholson to say on videotape for the feds that Dustin had nothing to do with methamphetamine, that Greg had lied about that, that Dustin had been an innocent dupe for Nicholson to save himself.

Angela Johnson was clueless as to what Bobby McNeese was going to do to her behind her back just as she was clueless to the secret plans of Dustin Honken to kill Greg Nicholson and anybody else who might be so misfortunate as to be with Nicholson at the time.

Of course, as you'll recall from Tim Cutkomp's testimony, Dustin Honken's closest friend on earth, Dustin

Page 84

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2012 of 3592

frequently kept even his closest friends and associates in the dark. Tim Cutkomp knew Dustin Honken was looking for Greg Nicholson. Dustin Honken thought he could talk Greg Nicholson out of testifying against him, particularly if Honken paid Nicholson a lot of money to keep quiet about it.

. But even Tim Cutkomp, Dustin Honken's childhood friend, methamphetamine partner, and closest confidant, had no idea Honken was secretly planning to kill Greg Nicholson.

Tim Cutkomp, who knew Dustin Honken better than anyone, didn't think Dustin was capable of such violence. Of course, in hindsight, we know Tim Cutkomp was wrong about his buddy Dustin Honken. Dustin Honken had a particular talent for being able to get people to perform particular tasks for him without these accomplices being aware of the whole picture. Dustin Honken would weave these intricate plans to do this or do that and get his friends and lovers to contribute pieces here and there, but only he knew the entire puzzle.

As Tim Cutkomp told us, Dustin Honken operated on a need-to-know basis. He kept people in the dark about his plans, giving them only enough information to accomplish their specific task.

Jeff Honken, in talking about how Dustin could easily juggle several girlfriends at one time without them knowing about each other, said, He seemed to be able to parallel multiple relationships at the same time.

Jeff Honken said his brother Dustin was not an

Page 85

impulsive person but instead very much of a thinker. He would think a lot before he would act. And so when Dustin Honken is manufacturing pounds of methamphetamine in a rented house in southern Arizona with his buddy Tim Cutkomp, the woman in love with him seeing him constantly and engaged to be married to him, Melissa Friesenborg, has absolutely no idea what's going on. Dustin Honken is making pounds of methamphetamine and selling it at $2,000 an ounce, and the woman who's planning on marrying him thinks he's some young executive for a computer circuits company.

He stored chemicals in Melissa Friesenborg's house even in the freezer of her refrigerator, and yet because of Dustin Honken's deceptions, she doesn't even know about it. As Tim Cutkomp told you, Dustin Honken stored chemicals, drugs, and even a Tec-9 assault pistol at the homes and apartments of the women in his life including Melissa Friesenborg, Kathy Rick, Angela Johnson, and Christi Gaubatz. Christi Gaubatz told you herself that he kept Kathy Rick's video camera at Gaubatz's place. It's not surprising that he would hide a gun there.

You'll recall Miss Gaubatz told you she found the Intratec Tec-9 in a bag -- she called it a cosmetics bag -- in a closet in her house in the winter of 1994. The defense submits to you that is exactly where Dustin Honken left that gun after using it to kill Greg Nicholson and the Duncans and Terry

2304

DeGeus.

Tim Cutkomp told you that he and Dustin Honken stored drug-making chemicals at Christi Gaubatz's house. It was certainly safer for him to hide this gun at Christi Gaubatz's house. Being on pretrial release while awaiting trial on his

Page 86

own methamphetamine conspiracy case, Dustin Honken couldn't afford to be caught with a gun at his house. No cop who found the gun at Christi Gaubatz's place would be able to connect it to Dustin Honken.

And after that, it was Angela Johnson's gun. Did Dustin Honken suggest to Angela Johnson that she might need a gun for protection from Terry DeGeus? That would be classic Dustin Honken, wouldn't it? He needs a gun to go after Greg Nicholson, but he's on pretrial release and can't get it himself without risking going to jail. He could buy a gun on the street, but that carries the same risk. In any case the gun would then be tied to him.

Why not simply tell Angela Johnson to get one, that Terry DeGeus was injecting too much methamphetamine into his veins, that he would be upset about her relationship with Dustin Honken and the pregnancy and that without a gun Angela Johnson would be powerless to stop him? As Jeff Honken told us, his brother Dustin was a thinker. He would think a lot. He would plan before he would act. Getting Angela Johnson to get a gun for him was child's play for this guy.

2305

After all, she really was afraid of Terry DeGeus. As you heard from Bill Basler, she had some years earlier gotten a shotgun because of Terry DeGeus. Angela Johnson was no hunter. She never deer hunted, quail hunted, or pheasant hunted in her life. But as her observant sister-in-law Shelly Johnson told you just a week ago, Angela Johnson kept that shotgun loaded in her house. Why? Because Terry DeGeus was stalking her, and she was tired of being beaten by him.

The prosecution would like you to believe that she

Page 87

bought this Tec-9 for Dustin Honken knowing that he would use it to kill Greg Nicholson. What real evidence is there of such a plot in this record? None.

First we already know Dustin Honken doesn't share his plans with others close to him unless absolutely necessary, particularly his women who he clearly didn't trust to keep quiet. Angela Johnson with her mouth was the worst girlfriend to rely on for secrecy.

Second, he didn't need to tell her. Remember Dustin Honken's need-to-know philosophy? He needed a gun, needed Angela Johnson to get one, but he had the Terry DeGeus card readily available. Why take a chance on Angela Johnson balking at the real plan, murder?

Third, Angela Johnson obviously takes no steps to hide this gun from authorities. Does she go to one of these drug connections and buy a gun surreptitiously? All these drug

2306

dealers have guns. Take a look at the pictures of Greg Nicholson's gun in Government Exhibit 26D, and we know old Terry DeGeus kept a few guns around. It's a dangerous business dealing drugs, ladies and gentlemen. Guns are as much a part of it as needles, pipes, razors, mirrors, and straws.

Why on earth would Angela Johnson personally go to the local sheriff's department and obtain a permit for all the world to see that she was buying a gun if the plan is that this gun will be used to murder people? She wouldn't. That's not why she bought it.

Dustin Honken may have planned secretly for Angela Johnson to get a gun he could borrow for his own purposes, but Angela Johnson didn't need to know that.

Page 88

Fourth, do you remember Tim Cutkomp testifying that Dustin Honken himself told Cutkomp that Angela Johnson had purchased the gun for protection and that she had gotten it in Cedar Falls, a suburb of Waterloo? Refer to your notes during your deliberations. What motive did Dustin Honken have to lie about that? Tim Cutkomp knew why Dustin Honken needed this gun melted down. It had been used to kill potential witnesses against Honken, notably Greg Nicholson and Terry DeGeus.

Did Angela Johnson buy this gun in early July 1993? Of course she did. Did she know it was being bought so Dustin Honken could use it to kill people? Absolutely not. There is no evidence of that in this trial record.

2307

Rick Held -- you remember him, the farmer working at Kraft with Dustin Honken so he could make ends meet at home -- Rick Held was a perfect example of how Dustin Honken deals with guns. You'll recall it was 1996 and Dustin Honken and Rick Held had been working together at the pudding plant for about a year and a half. They both loved guns, shared gun magazines, talked about guns. Dustin Honken knew a lot about guns.

Rick Held knew Dustin Honken was in some kind of legal trouble. He was, after all, wearing an electronic monitor. Rick Held also knew Dustin Honken was very intelligent, could talk to anybody, and seemed to be completely nonviolent.

So when Dustin Honken gave Rick Held a little methamphetamine to help him stay awake, then asked Held to buy a gun for him, Rick Held believed Honken's explanation. Dustin Honken told Rick Held what he needed to tell him which was only what Rick Held needed to know. Dustin Honken told him his girlfriend was moving to Des Moines and needed a gun for

Page 89

protection. He wanted a 380. Rick Held got it for him, although Dustin would be arrested in June 1996 and never came by to pick it up.

Was the story Dustin Honken told Rick Held true? Of course not. You heard Tim Cutkomp and Dustin Honken talking about what that gun is really for, to kill Dan Cobeen, the snitch. Dustin Honken had given Rick Held a story to get Held to do what he, Honken, wanted. Get the gun. Dustin Honken

2308

never revealed the whole puzzle to Rick Held, just his tiny, lying piece. Dustin Honken operated that way as a matter of course, and he did so with Angela Johnson just as much as anyone.

What did Angela Johnson tell Christi Gaubatz in the winter of 1994 when Gaubatz, who disliked Dustin Honken from the start, calls Angela Johnson, not Dustin, when she finds this Tec-9 with a silencer on it in a case in her closet? Dustin will take care of it. It was no longer her gun. That certainly wasn't her silencer. This was a murder weapon, Dustin Honken's murder weapon.

The government was pretty excited about the silencer on the gun that Christi Gaubatz found in her stairway closet. They knew Dustin Honken could make a silencer. Look at this incredibly complicated methamphetamine lab he set up. He knew a lot about guns, loved gun magazines Rick Held told us. And then he has the Poor Man's James Bond at his house which is a step-by-step recipe for silencer manufacturing.

But best of all, Tim Cutkomp, who destroys this Tec-9 for Dustin Honken, noticed that it had a silencer that screwed on the end of the barrel. The government initially pursued this

Page 90

evidence of a silencer because obviously a person who brings a silencer with them clearly intends to shoot somebody.

The problem which they realized almost too late is this, that the gun Angela Johnson bought didn't have a silencer.

2309

She wouldn't know what a silencer looked like much less how to make one if one hit her in the nose. That was Dustin Honken and Dustin Honken alone fooling around with making a silencer.

The other troubling aspect of a silencer for the government was that if these people are walked 75 to a hundred yards into the woods by Dustin Honken while Angela Johnson remained behind in Christi Gaubatz's car or Greg Nicholson's truck, she may never have heard the gunshots that killed these people. That would truly be disastrous for the government.

Not only could they not place Angela Johnson at the actual grave site, but she may not have even heard the shots. Who's to say she didn't walk into these woods a football field away and find Dustin Honken already digging the grave for Greg Nicholson and the Duncans? She could have seen that Lori Duncan's body was apart from the body of Greg Nicholson and surmised that she must have run. Maybe Dustin Honken told her later what had happened. We have no evidence of these matters.

Why did she write to Bobby McNeese that the girls were in pajamas when we know Kandi Duncan was wearing a flowered dress and Amber Duncan a bathing suit with a T-shirt? And why does Angela Johnson tell these girls to pack some clothes, that they are going to take a vacation? Did they pack some clothes? Nobody testified about that. If you have a big gun like this Tec-9, you don't have to pretend to accommodate two little girls. That gun will get them to do whatever you want to do.

Page 91

Sara Bramow says Angela Johnson told her there was never any plan to kill these people. The plan was to get a videotaped statement from Greg Nicholson. She told Christi Gaubatz the same thing. They had been looking for Greg Nicholson for a few days, if he gave a videotaped statement exonerating Dustin Honken, that Dustin's problems would be all over.

Nobody was supposed to be killed. So when did the plans change? For Dustin Honken it never changed. He was there to kill Greg Nicholson. A videotaped statement from Nicholson might be helpful, but Dustin Honken couldn't take a chance on that videotape alone, so he told Greg Nicholson, Give me the videotaped statement that I need, and I'll hide you out till my trial's over.

So why is Angela Johnson telling the girls to pack some clothes? Because to Angela that's still the plan. Dustin Honken's going to hide these people out till after his trial. They've all agreed.

That's why when David Thinnes, Dustin's attorney, sees Greg Nicholson talking to the camera as calm, cool, and collected as he could possibly be while saying he had set Dustin Honken up, that Honken was not involved in drugs, that he, Nicholson, was leaving town, Nicholson really was relaxed. He had agreed to disappear for a while to help his friend Dustin Honken. David Thinnes watched the tape over and over looking

for signs that Greg Nicholson was coerced or frightened, nervous, or upset. He was none of these. He was relaxed, said

Thinnes, low key and apologetic. Greg Nicholson was not rehearsed. He wasn't reading anything, and he wasn't drugged or intoxicated.

Greg Nicholson wasn't upset because Dustin Honken had assured him he just wanted to get the videotape, then hide Nicholson and the Duncans out for a while. The kids were packing for this trip because Angela Johnson was clueless as to Dustin's real plans and so was telling them to pack. They weren't wearing pajamas. They were packing pajamas.

But what about the adults? They were at some time tied up. Maybe they were tied up in the house, then gagged so they couldn't run or alert neighbors as they walked to the car or truck or both. We have no evidence about when they were tied up or why or when they were untied or why.

What excuse did Dustin Honken proffer when he stopped at the road to the farm field off Lark Avenue? What did he say to Greg Nicholson and Lori Duncan then? Come with me, we have to change cars? Did Dustin Honken cut their bindings so they could walk more easily the 75 to a hundred yards through the woods to where he shot them in the back and in the head? Was Angela Johnson even in the same vehicle as Dustin Honken and the adults?

There's a strong suggestion from the evidence that she

2312

might not have been. If Dustin Honken is alone driving Greg Nicholson and Lori Duncan to Lark Avenue, then he needs them tied up. If Angela Johnson is driving Christi Gaubatz's car with the girls, why would she necessarily know anything more than what Dustin Honken may have told her, Follow me?

Surely four adults, two of them possibly tied up, did

Page 93

not squeeze into Gaubatz's Toyota Tercel, or did they? Was Greg Nicholson's truck used instead? Perhaps Dustin Honken drove Nicholson's truck with Angela Johnson and the girls in the front seat while Lori Duncan and Greg Nicholson were tied up in the truck bed safely covered by the camper shell. Why did Dustin Honken take the adults so far into the woods away from Angela Johnson and the girls? He was out of sight surely, but was he also trying to be out of hearing? He did have a silencer.

Remember what Mr. Murillo said about silencer? They work. And some of the homemade ones work almost as well as the factory silencers. Were these homemade silencers useless? That wasn't his testimony. And the sound travels in the direction in which the gun is pointed.

What if the silencer that Dustin Honken, the brilliant chemistry student, made worked well? What if the gun is pointed north as Dustin Honken pulls the trigger and shoots Greg Nicholson and Lori Duncan while Angela Johnson and the girls are a hundred yards south in a car or a truck possibly with the air conditioning on or a radio on and the windows rolled up? What

2313

if when Dustin Honken comes back for the girls Angela Johnson has no idea that Greg Nicholson is dead, that Lori Duncan is dead, and that these girls are next?

The prosecution would like you to think there was a road to the grave sites back in 1993. They put Bill Basler on the stand after Mr. Berrigan questioned Dr. Dennis Klein about the untied or cut ligatures on the legs of Lori Duncan and Greg Nicholson. It was going to be hard for Dustin Honken to march Greg Nicholson and Lori Duncan 75 to a hundred yards out into the woods with their legs tied together. That was clear.

Page 94

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2022 of 3592

So the prosecution recalls Bill Basler to the stand to say, hey, maybe there was a road there back to those bodies. Maybe it was there in 1993. Who knows? Of course, the farmer who owns that property would probably know, but we didn't see him.

We heard Bill Basler, who sees this property for the first time in his life after the bodies are uncovered in October of 2000, bring in a picture after his colleagues mow the grass down nice and low and say, Look at the tire tracks. He can't say if they were there for 2 years or 10 years let alone in October of 2000, but the implication is the government would like you to speculate that there was a road there 7 years before, on July 25, 1993, to be precise.

That way the government wouldn't have this problem with Honken parking his car or Nicholson's truck or whatever

2314

vehicle he was in on the farm access road and taking Lori Duncan and Greg Nicholson a football field away into the woods where nobody could see or hear him including these two girls and Angela Johnson. That way the government wouldn't have this problem that Angela Johnson may not have heard or seen the adults get shot much less know ahead of time it would happen.

The burial site is not terribly far from a creek. Of course, there was some flooding in Iowa back in the spring and summer of 1993. The farmer might come in and say nobody could have driven a car, a truck, a Humvee, or anything else into those woods back then without being permanently stuck in the mud. Who knows? There are just too many unanswered questions.

On November 5, 1993, Angela Johnson had called JoAnn DeGeus and asked to have Terry DeGeus contact her when he got

off work. When Terry DeGeus picked up his daughter, Ashley DeGeus, from his mother's house after work that day, Miss DeGeus passed the message along to him. According to Mrs. DeGeus, it wasn't particularly unusual for Angela Johnson to call Terry DeGeus, particularly at his mother's house because Terry DeGeus didn't have a phone at his place.

Terry DeGeus later spoke with Angela Johnson by phone that night and arranged to meet her at the Mason City Country Club where she was working.

In November of 1993, the relationship between Angela Johnson and Terry DeGeus was no longer one of romance. It was

2315

about business, business of drugs. Terry DeGeus had his own girlfriend according to Aaron Ryerson, although that doesn't mean he was all happy with Angela Johnson for sleeping with his drug supplier, Dustin Honken.

Whether Terry DeGeus knew it or not that night is unclear, but Dustin Honken wanted to see Terry DeGeus that night as well. Terry DeGeus and Dustin Honken were restricted by a no-contact order back then. But as you heard from Tim Cutkomp, Dustin regularly used his girlfriends to contact those persons with whom he was to have no contact.

Terry DeGeus, now under investigation by the federal government, owed Honken over $27,000 and was now a potential witness against Honken. Dustin Honken had lots of reasons to talk to Terry DeGeus.

Terry DeGeus then dropped his daughter off at his mother's house. Ashley DeGeus testified this was unusual because her dad would usually take her with him wherever he went during her weekend time with him, particularly to Angela

Page 96

Johnson's because Alyssa Johnson was Ashley's same age. Ashley didn't understand why she couldn't go. Her dad understandably kept his drug activities secret from her, and so it was not surprising that Terry DeGeus wouldn't have mentioned Dustin Honken to Ashley that night.

Terry DeGeus told his daughter he was going to see Angela Johnson and that he had to pick up some stuff in Mason

2316

City. Dustin Honken lived in Mason City at that time. On Terry DeGeus's remains were two baggies possibly containing decomposed drugs.

Two weeks after Terry DeGeus's disappearance, Angela Johnson told Hancock County Deputy Sheriff Robert Gerdes and Terry DeGeus's ex-wife, Wendy Jensen, that Terry DeGeus had, in fact, showed up at the Mason City Country Club on November 5, that they talked in the parking lot, and that he did, in fact, leave to see someone else in Mason City. That person was the man who killed him, Dustin Honken.

If Angela Johnson knew anything at all about Dustin Honken's plan to kill Terry DeGeus, then she sure picked a terrible place to meet him. The Mason City Country Club is on a major roadway, Highway 18, and the parking lot is fully visible to anyone driving on the highway or coming to or going from the country club.

Plus everybody Angela Johnson works with would be there after work. Many of these folks might know Terry DeGeus given their long relationship together. It was a good place to meet to exchange drugs for money but not for murder.

The credible evidence in this case does not support the conclusion that Angela Johnson was aware that Dustin Honken

Page 97

intended to kill Terry DeGeus when she called Terry DeGeus to meet him much less that Angela Johnson was present when Terry DeGeus was killed by Dustin Honken.

2317

But even if you conclude she was present when Terry DeGeus was killed, you know from instruction number 5 on aiding and abetting that her presence does not at all prove she aided and abetted Dustin Honken in the killing. We have Christi Gaubatz's recollections of what Angela Johnson told her about Terry DeGeus's killing.

We know, however, that Christi Gaubatz's account is not credible, although we don't dispute Angela Johnson told her about what Angela knew. There was no 35-shot clip of bullets emptied into Terry DeGeus as Christi Gaubatz claimed in her trial testimony. She testified under oath in her 2000 grand jury testimony, testimony given after she decided to come clean with everything Angela Johnson had told her about the murders, that Angela Johnson told her that Angela was not at the scene of the Terry DeGeus murder.

Angela Johnson did tell Christi Gaubatz as Angela later told her sister Wendy Jacobson and sister-in-law Shelly Johnson that she believes she had lured Terry DeGeus to his death at the hands of Dustin Honken. But she certainly does not know this on November 5, however.

As for Sara Bramow, well, let's put it this way. Would you hesitate to rely and act upon what this woman told you? She testified in 2001 before the grand jury under oath as a cooperating witness that Angela Johnson denied any involvement in Terry DeGeus's murder. Now she testifies Terry DeGeus sold

2318

Page 98

drugs for Angela Johnson, that Angela Johnson was driving his car around after the murder, and that Angela Johnson was happy he was dead. She couldn't even keep her story straight when she was asked to read what she had said in the past even when the prosecutor showed it to her. She couldn't even get the name straight referring repeatedly to Justin rather than Dustin.

Is it possible that Ms. Bramow had such a severe drug and alcohol problem that her brains are literally scrambled? Or is she just looking for a reduction in her own prison sentence?

There is just no evidence upon which you could rely to the certainty the law requires, proof beyond a reasonable doubt, in order to convict Angela Johnson of aiding and abetting Dustin Honken in killing Terry DeGeus. She can't even draw an accurate map to his body, although there is little question Dustin told her where DeGeus was killed.

Counts 3 and 8 are the conspiracy murder and CCE murder theories involving Kandi Duncan. Counts 4 and 9 are the conspiracy murder and CCE murder theories involving Amber Duncan. The fourth element of those respective counts state the killing of the named victim was substantively connected to the conspiracy or continuing criminal enterprise, depending upon the count you're referring to.

How was ten-year-old Kandi Duncan substantively connected to a drug conspiracy or a CCE? How was six-year-old Amber Duncan substantively connected to a drug conspiracy or a

2319

CCE? The short answer is they were not. These little girls were certainly not murdered to settle a drug-related dispute.

Page 99

These little girls were certainly not murdered because they were potential informants against Dustin Honken. Dustin Honken murdered these little girls because due to fate they were the daughters of Lori Duncan.

Dustin Honken murdered these little girls because they were at the wrong place, their own home, and at the worst time, when he was carrying out the elimination of Greg Nicholson. There is no evidence in this trial that these girls were witnesses to anything transpiring at their home or at Lark Avenue before their deaths.

Attorney Dave Thinnes testified the videotape he reviewed of the man he believed to be Greg Nicholson was two to four minutes in length, that only Greg Nicholson was on the tape. No one else could be seen on the tape. No one else could be heard on the tape.

Paul Bush, a DCI criminalist, testified that the living room and dining room in Lori Duncan's home were on the main floor and the bedrooms were on the upper floor.

Dr. Dennis Klein testified that there were no ligatures, no duct tape, and no gags connected to the skeletal remains of Kandi and Amber Duncan.

Christi Gaubatz testified that when they arrived at Lark Avenue Dustin Honken took Greg Nicholson and Lori Duncan

2320

away first together and subsequently came back to the vehicles for the two girls.

Bill Basler's testimony that he walked through the burial site area after the bodies are uncovered in October 2000, almost seven and a half years later after the tall grass was cut down in that area is not informative nor helpful on the issue of

Page 100

access to that area in July 1993.

What we can learn from these witnesses' respective testimonies is that these two girls were not a witness to anything before their demise. They weren't present to witness Greg Nicholson's videotaped exoneration of Dustin Honken. They weren't led out of their homes bound and gagged as kidnapped victims. They weren't physically in a position to view or hear the murder of Greg Nicholson and their mother Lori Duncan in a dark, wooded area.

How were Kandi and Amber Duncan substantively connected to a drug conspiracy or a CCE? They were not.

I want to take just a few moments and digress to talk about just a couple of the arguments made by Mr. Miller this morning. He actually suggested to you that Terry DeGeus may have been killed because Angela Johnson wanted him dead.

Remember the discussion between Angela and Christi Gaubatz after Terry DeGeus is yelling at Angela at the Kentucky Fried Chicken restaurant, He can't be around? Does that mean he can't be around me anymore because I'm afraid of him hitting me

2321

while I'm pregnant? Or do you actually believe that after all their time together, abusive as it was, that Angela has suddenly decided to kill Terry DeGeus, a guy she once loved, because he yelled at her in a restaurant? It's really outrageous that the government would even for a moment suggest that Angela Johnson and not Dustin Honken shot Terry DeGeus.

We all know who shot Terry DeGeus, and we know why. DeGeus was about to be indicted for drug distribution and faced with a long prison sentence. He might very well choose to roll on his supplier, Dustin Honken. That fact and the 27,000 other

Page 101

reasons Honken already had to kill DeGeus, that sealed his fate. Angela Johnson had nothing to do with Terry DeGeus's murder other than she inadvertently set up DeGeus with Honken that night by passing on Honken's message to DeGeus. And that's not aiding and abetting.

On the PowerPoint presentation that you viewed during the morning session, guilty conduct, concealment of evidence, Johnson hid the Tec-9 in a cosmetics bag in Christi Cole's closet. There is no evidence in this trial record as to how that container or bag with that gun made its way into Christi Cole's closet. There is none, and we would ask you to refer to your notes.

It was suggested to you this morning on the PowerPoint dealing with criminal intent and mass murder, serially executing all four victims one at a time. That's not Christi Gaubatz's

2322

testimony. Greg Nicholson and Lori Duncan were led out together initially, and then Honken came back for the two little girls, and the defense would ask that you refer to your notes and discuss this.

And it was suggested that it was my client, Angela Johnson, who brought in duct tape and rope and a video camera into the Duncan home. There's no evidence of that in this trial as to who brought those items into the Duncan home.

Mickie Yager testified -- and this was brought up by the government -- Angela Johnson knew Greg Nicholson lived with a woman and two kids for about one week, and it was argued to you that this shows knowledge that Angela Johnson knew ahead of time that Lori Duncan and her two children were living with Greg Nicholson. This conversation occurred seven years after the

Page 102

event, ladies and gentlemen of the jury. Seven years after the event this conversation occurred.

There's no evidence in this record that my client had any knowledge prior to walking into Lori Duncan's home as to what the living arrangements were. There's evidence in this record to show she didn't know Lori Duncan or these children in this record.

It was argued to you by the government this morning that Angela Johnson was the financier of their drug operations. She had to borrow $5,000 on her credit card line to get in or ante up if you will. $5,000 is nothing to Dustin Honken. He's

2323

getting $2,000 an ounce for methamphetamine. The defense would submit that Angela Johnson was not financing this organization.

The defense only has a few minutes left with you before I sit down. The prosecutor will get to come back and talk to you some more, maybe for a long time, rebutting my arguments to you. The defense wishes that it could respond to those arguments for Angela Johnson's sake, but that's not the way this works in a court of law.

The defense wants to ask you to do something for us when you go back to deliberate on this case. Perhaps several of you can speak for the defense in response to the prosecutor's final argument. You may be in the jury room going, Well, Mr. Miller said this, and Mr. Miller said that. And the defense requests that some of you can say, Sure, but, you know, Mr. Willett said this instead, and he answered those arguments in this way. And the defense would appreciate that because I won't be able to do that after Mr. Miller's done speaking.

There are a lot of unanswered questions that arise

Page 103

from the evidence in this case. It is not necessary that every single question have an answer, just as the government is not required to prove the case against Angela Johnson beyond all doubt.

But at the end of a two-and-a-half-week trial and approximately 45 government witnesses, you should not still be asking yourself these questions at all: One, what did Angela

2324

Johnson really know about Dustin Honken's plan to kill Greg Nicholson and the Duncans?

Two, what did Angela Johnson really know about Dustin Honken's plan to kill Terry DeGeus?

Three, when did she actually realize what was happening? Was it before, during, or after the events?

Four, what did Angela Johnson do, if anything at all, to aid and abet Dustin Honken in the commission of these murders?

The defense submits to you, ladies and gentlemen, that these were the questions the government absolutely had to answer for you in this trial. The government had to answer them firmly and unequivocally, had to answer them so convincingly that you would have no need to speculate about their answers or try to recreate events yourself because the government failed to prove what transpired.

Instead these important questions are still left unresolved. We know little more than the fact that Angela Johnson was with Dustin Honken on the night of July 25, 1993. We know that she was helping Dustin Honken find Greg Nicholson so that Honken would get a videotaped statement from Nicholson exonerating Honken for methamphetamine manufacturing and

Page 104

distribution.

We know from Angela's sobbing, anguished disclosures to her close friend Christi Gaubatz that things got out of hand

2325

at some point that night. They sure did. They tragically got out of hand.

We know Dustin Honken's role in these murders. Greg Nicholson was snitching on Dustin Honken to the federal government, and Honken secretly decided he would fix that problem. Dustin Honken was equally concerned that Terry DeGeus would testify against him. Dustin Honken wasn't about to let that happen. These people were shot dead by Dustin Honken, killed for his benefit, no one else's; by his hand, no one else's; on his initiative, no one else's.

You could and undoubtedly would convict Dustin Honken in a New York second were he sitting in that chair. But he's not sitting in that chair, is he? Angela Johnson is sitting in that chair. And Angela Johnson cannot be found guilty merely due to her association with Justin -- Dustin Honken. That wouldn't be justice, ladies and gentlemen. It would be a travesty of justice.

Judge Bennett, thank you.

THE COURT: Why doesn't everybody take a stretch break, and then we'll have the rebuttal closing argument.

Okay. Please be seated.

Mr. Miller, whenever you're ready.

MR. MILLER: Thank you, Your Honor. I'll be ready in about three seconds. I just need to be organized here.

The purpose of rebuttal, ladies and gentlemen, as I

2326

Page 105

believe the instructions pointed out, is purely by virtue of the burden of proof that the government has the opportunity to respond to comments made in conclusion by the defense. And I would be in violation of my responsibilities if I went beyond that. I will confine myself to responding to the comments that Mr. Willett has made and limit myself to that purpose.

But I, with due respect for your patience, trust that each of you understand that I would not be doing my job if I did not respond to some of the comments we've heard.

Mr. Willett was to the point, and I will try to be likewise. What I have done is made notes as Mr. Willett went through his argument, and there are a few things that I feel should be mentioned in response.

Angela Johnson failed to stop the killings on July 25 if she could have done so. It's conceded that she didn't stop them if she could have, but it is clearly implied, suggested to you that she could not stopped those killings.

And, ladies and gentlemen, the instruments of those killings are manyfold. The instruments of those killings are the tools and the properties that evidence not only planning and preparation but coordination because one person cannot simultaneously threaten an adult with a gun and also tie ropes around his or her wrists and ankles.

Failed to stop if she could. Not only did Angela Johnson fail to stop, she necessarily either pointed this

2327

murderous weapon at the head of another human being while Dustin Honken tied that person up, or while Dustin Honken pointed this semi-automatic assault weapon at one of those two adults, she,
Page 106

Angela Johnson, tied up the victim.

And, ladies and gentlemen, I believe the Court has instructed you and I would further point out that you need no instruction as adults to know that all of us as adults are reasonably expected to understand the nature and consequences of our voluntary, intentional acts and to accept consequences for our behavior and for our choices just as Angela Johnson is here to accept responsibility in her choice to participate in a crime that involved the bring -- not only the luring and the setting of the trap committed by her but also the carrying into the scene of that crime ropes and ligatures and a loaded semi-automatic gun, again, not just some small firearm that a lady might put in her purse for personal protection but something that, according to the testimony of Kevin Pals, is designed as an assault weapon, a loaded assault weapon.

It is suggested to you that Angela Johnson was a vulnerable woman. I would suggest that that's a question for another day. She was introduced to drugs I don't know when, but she was not introduced to drugs by Dustin Honken. She was a meth user well before Dustin Honken entered her life.

Of all the things that the defense would blame on Dustin Honken as though Angela Johnson had no choice as an adult

2328

in her own behavior, of all of those things, that is the last to bear any merit.

It is claimed to you today as it was urged to you in opening statement that Angela Johnson did not learn until it was too late what was going to happen on July 25. But again, ladies and gentlemen, the consequences of one's own voluntary, intentional behavior are in this case the consequences of a

Page 107

woman who laid a trap, set a trap, and entered a home with a murderous, drug-dealing boyfriend armed with rope, armed with duct tape, armed with a video camera, and, most importantly, armed with a loaded semi-automatic assault weapon.

And these didn't come into that home with her surprise. She's the one who got them into that home, ladies and gentlemen. And recall -- I would submit to you that it is a reasonable inference to think about how she got into that house -- she posed as a cosmetics saleswoman -- and at the same time to think about six months later how this gun was discovered in Christi Cole's apartment closet, in a cosmetics sales bag, and ask yourselves if it wasn't indeed not Dustin Honken but rather Angela Johnson who brought that gun into the Duncan family home.

Obstruction of justice is not murder, and Mr. Willett is correct. I apologize to every one of you if I suggested otherwise. I believe what I told you is that there is a number of areas of evidence in this case that indicate guilt and that

2329

one and only one of those areas is guilty conduct.

Like guilty knowledge, like admissions, obstruction of justice, which is an act that subverts what we are about here, the obstruction of justice, the hiding of a murder weapon, the participating in the destruction of a murder weapon, the killing of witnesses, the hiding of people whose death would give notice to the guilt of members of a drug-dealing conspiracy, that these are all acts that indicate an obstruction of justice.

And if hiding that gun was the only thing that happened, hiding a gun, obstructing justice, is not in and of itself murder. But I believe I told you this morning it is

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2036 of 3592

evidence of murder. And when taken with all the other destruction of evidence, the destruction of the gun, the hiding of the gun, the false statements to numerous people, the false testimony, the killing of five people who themselves in the form of sworn testimony would be evidence, all of those things, all of that destruction of evidence, is evidence of guilt.

It's possible for anyone to obstruct evidence (sic), but if a person goes to the trouble of hiding what is known to be a murder weapon and goes to the trouble of seeing to it that it's destroyed, that is evidence of guilty conscience, consciousness of guilt, evidence of guilt.

It is pointed out there are big holes in the state's case that should lead you to doubt, that they shared drugs and money and an unborn child in the summer of 1993, but that proves

2330

nothing. Ladies and gentlemen, that minimizes what Dustin Honken and Angela Johnson shared. They shared the implements of kidnapping and murder. They shared the weapon of death. They shared far more than drugs, money, and an unborn child.

The elements of aiding and abetting, element number 1, Dustin Honken killed the victims. Let's stipulate to that. Before we do so completely, let's understand that two people were there. There was two occasions five people died, four on the first occasion, one on the second, and the only two people who survived were the killers, Dustin Honken and Angela Johnson.

And as to who pulled the trigger on each occasion, there is no direct evidence, but let's stipulate, let's agree that Dustin Honken is an evil man. He's a despicable human being. He's a scheming conniver. He's a drug dealer. He's a killer.

Page 109

And so item 1 of whether or not Angela Johnson aided and abetted these killings is met. We'll agree with the defense. Let's just assume Dustin Honken pulled the trigger every time a gun entered one of those five people -- a bullet entered one of those five peoples' body.

Item 2, Angela Johnson knew that a killing was being committed or was about to be committed. I would submit to you that the preparation that went into these killings, the first one involving weeks of surveillance and acquiring a murder weapon, not acquiring a little handgun but a big assault weapon,

2331

a murder weapon that will do the job, indicates that she knew what was to be committed.

But it's knew that it's being committed or knew that it was about to be committed. And while I submit to you that she knew full well when she was buying that gun and knew full well when she was participating in the surveillance and the stalking of Greg Nicholson and participated in the knowledge that Greg Nicholson had moved into a family (sic) in a quiet residential neighborhood in northern Mason City where a woman lived with her two little children, that when she participated in all of that, she knew what was going to happen.

But even for a second if we argue, accept the defense claim that she did not know that it was about to be committed, ladies and gentlemen, during the course of the killing of four people, not one, whose killing required their being tied up and gagged and transported out into the country and with one weapon one after the other murdered, she had to know. I submit she knew well in advance and that the evidence draws only that reasonable inference.

Page 110

But it was stated by Angela Johnson to Christi Cole Gaubatz the hearing of the gunshots, the gunshot wound number one to Greg Nicholson, the return to that car, of the bound and gagged Lori Duncan, and at that point there can be no knowledge what -- no lack of knowledge whatsoever but that Angela Johnson knew full well what was about to happen to Lori Duncan and that

2332

two little girls who were with Angela Johnson and their mother, their mother who was bound and gagged and who had heard those same two fired shots, those same two gunshots, knew full well the terror and the horror that an innocent child can only feel when she knows that her only adult parent is about to die.

They knew it. Angela Johnson knew it, and she kept control over those two little children as their mother was taken out and killed, and she kept control over those two little children knowing that the killing of Kandi Duncan was about to be committed. And as that little ten-year-old child was taken into the woods and the gunshot heard, she maintained control over the last of the four, six-year-old Amber Duncan, who likewise would have been long gone but for Angela Johnson's control, knowledge the crime was about to be committed or knowledge that the crime was being committed.

And it is argued to you that, well, maybe it was a silencer and maybe she didn't hear a thing. Well, that's not what she told others, including Christi Gaubatz. She told them that she heard gunshot after gunshot after gunshot after gunshot.

MR. WILLETT: Your Honor, I apologize for interrupting, but I have to object. I don't think that's the statement of the record in this case, and I need to object.
Page 111

THE COURT: That's fine. I'm just going to tell the jury to use their own judgment about what the evidence in the

2333

case establishes. Thank you for the objection.

MR. WILLETT: Thank you, Judge.

MR. MILLER: If there was, however, a silencer as again contended -- and, ladies and gentlemen, this firearm taken into the Duncan residence is more than sufficient to threaten a man to give a coerced extorted false statement before a video camera. But if this with a homemade silencer on the end of it is brought into a final -- a residence in a residential neighborhood, there's a much deadlier conclusion that every reasonable person comes to, that this is no longer an instrument of threat. With a silencer on it, it's an instrument of murder because the killing is to be concealed, and Angela Johnson was there.

And if we buy the contention that this gun had a silencer on it, she was there with the knowledge that four innocent victims were to die. Again, not this. This is a replica. This is what's left of the actual gun, a few drops of melted iron.

And finally that the purpose -- the four elements of the purpose -- excuse me, the four elements of aiding and abetting is knowledge of the purpose, ladies and gentlemen, Dustin Honken, you'll not hear me say a kind word about Dustin Honken. But he shared to one degree or another the criminal purpose of his scheme with every member of his scheme, with his brother Jeff, his friend Ted -- excuse me, Tim, his partner and

2334

Page 112

paramour Angela Johnson, with Greg Nicholson, with Terry DeGeus. With at least two of them he shared the purpose of death.

Tim Cutkomp, didn't take long to decide that he wanted no part of that. I'm not here to condone Tim Cutkomp. He's a drug dealer. He brings poison to Iowa. But when it was suggested to him that he should participate in the killing of witnesses, he went straight to John Graham and said, Sir, I have information to share.

Dustin Honken is a conniving, manipulating, scheming son of a gun, and he doesn't share his entire scheme or plan with anyone. But more than anyone, he had a woman with whom he was having a child and who was doing things for him like no one else could. She was the one with access to Terry DeGeus, and she was the one with access to Greg Nicholson's home. She set those traps. She pulled those traps. And with her, unlike with Tim Cutkomp, Dustin Honken succeeded in persuading assistance.

Obstruction of justice, what's obstruction of justice? Those of us who stand here in this courtroom, obstruction of justice is a horrible thing. But it's just obstruction of justice. And every time somebody sits down there and tells a fib -- and believe me, it happens -- it's obstruction of justice. So what?

Obstruction of justice in this case is the murders of Greg Nicholson, Lori Duncan, Terry DeGeus, and Kandi Duncan and Amber Duncan. And while Tim Cutkomp and anyone else to whom he

2335

may have shared a scheme that involved violence toward others beyond the violence that methamphetamine is itself -- and we know that it is -- but the physical, murderous, destructive

Page 113

violence of a bullet through the head, with anyone else, specifically with Tim Cutkomp, I want no part of it.

That was not the case. It wasn't the case with Angela Johnson on July 25, 1993, and even though she participated in that multiple mass killing and mass grave, barely three months later she participated in another. Knowledge of the purpose.

Ladies and gentlemen, it's been suggested to you that Terry DeGeus had no knowledge about Dustin Honken's plans for a meeting and that he was planning on meeting her; he wasn't planning on meeting Angela Johnson. Again, that was suggested during opening statement. It's been suggested to you during final argument.

I'm not going to belabor the point. The fact of the matter is, as the Court's instructions set out, as with opening statements, closing arguments are not evidence, and there is not one shred of evidence that Angela Johnson was on her way to meet Dustin Honken on November 5, 1993. She was on her way to meet Terry DeGeus. That's what Terry DeGeus told his daughter, the closest person in his life and the one to whom he wouldn't lie. It was the understanding of his mother.

And even when Wendy Jensen and Ashley DeGeus and JoAnn DeGeus called up and asked where's Terry, she said -- she never

2336

said, I didn't have any meeting with him; he was on his way to meet Dustin Honken. She said, He never showed up, or at least for a couple of them she said that. For a couple more she changed her story and said, Oh, he showed up, but he left again.

Ladies and gentlemen, I'll try not to tax your patience. We've heard a great deal from Mr. Willett. He's a talented attorney. It would take me a great deal of time to go

Page 114

through every point, but I do have an obligation to hit the high points.

There is an indication to you that there's no evidence that Angela Johnson had no knowledge of the intent of what the gun was to be used for. Again, ladies and gentlemen, I remind you it's not what a lady or anybody else is going to hide on their person for personal protection. It isn't something that's used to kill white-tailed deer or ringneck pheasant in the state of Iowa nor even for protection in a woman's purse. It's just too darn large. It's ugly, and whatever you think about the gun laws of our country, it's a killing machine. And that's what it was purchased for three weeks before the deaths of Nicholson and the Duncan family.

It was pointed to you, pointed out to you, that Angela Johnson didn't exercise control over that gun, Dustin Honken did, it was Dustin Honken who melted it down to nothingness. Well, that's true. She (sic) and Tim Cutkomp did, but it wasn't anyone but Angela Johnson who placed it in his possession and

2337

placed it in his possession for that specific purpose.

To Christi Gaubatz she said, Dustin will take care of it, and Dustin did take care of it. And the last remnants, one of the last remnants, physical remnants, of the proof of their guilt was the gun melted down to nothingness, spots on a sheet of galvanized steel, a sheet of galvanized steel perfectly good. Frankly, you could still use it at anybody's farm for whatever you want to. Even that was thrown in a ditch.

They were so desperate, Dustin Honken and Angela Johnson, to destroy every piece of physical evidence that might conceivably link them to this crime, and they did.

Page 115

Ladies and gentlemen, it's been pointed out to you that Exhibits 310 and 311 which are the hand-drawn maps prepared by Angela Johnson in hopes that someone else would take credit for her involvement in the murders of these five people, if you'll read them carefully you'll notice there are some discrepancies.

It was her recollection that the children were in PJs. She wasn't sure exactly what everybody was wearing nor the order in which their bindings were cut. She knew that the adults were gagged and bound, she thought with duct tape. All of it was prepared seven years after the fact, seven years which I'm going to again give Angela Johnson credit. I've said so twice already. I could be wrong, but I'm assuming and I'm willing to accept the fact that there is some remorse motivating her to

2338

share, as intoxicated or drugged as she might have been at the time, motivating her to share some of these details with her friend Christi Cole.

But years had passed by the time she drew those maps. And what she did remember was remarkable, not only how all four were killed, each shot in the head; not only the fact they were buried in a common grave; not only the fact that Lori broke and run. And wouldn't she have no matter how bag -- excuse me, gagged and bound she might have been? Wouldn't she have run in a last desperate fruitless effort to try to save the lives of her only flesh and blood, those two little girls? Was shot from behind and once in the head, again, precisely the findings of Dr. Steadman; that the four were buried in that common grave and that Terry DeGeus was buried not at a specific location but face down on his knees as he would make me be when I begged for my

Page 116

life.

Ladies and gentlemen, I would submit to you that there is no reasonable, no reasonable, inference to be drawn -- and again, opening statements and concluding arguments are not evidence, not evidence at all. There is no evidence in the record that she wasn't present at the killing of Terry DeGeus.

There is evidence that she was, and the strongest evidence is in the maps that she drew and the descriptions that she made describing not only the exact location -- and let's give old Dustin Honken one little piece of credit. If this

2339

scheming manipulator is so scheming and manipulating, why would he be telling Angela Johnson, Oh, by the way, I just killed some people, and here's a map to exactly where I killed them, and here's the exact position they're in; just thought you'd want to know?

Of course he wouldn't. Need to know. He's a schemer. The only way she'd know or the only way anybody knows or could know is if they were there or if seven years later she was foolish enough to draw maps for Bobby McNeese and if Bobby McNeese were decent enough to hand them over to authorities and share them with you.

As to all of the confessions that were made -- and there were discrepancies -- and there was a self-serving claim or two that there was an intention to videotape, again, I only remind you that each of us as part of our human nature -- I think all of us do it -- all of us who are parents know that it's human nature for people to admit, if at all, in a fashion that places themselves in the best light possible.

And despite having done so to Christi Gaubatz not once

Page 117

but twice and to Bobby McNeese and to Bramow, Baca, Yager, Bramow, Jacobson, and Johnson and every single time she did so she said in one way or another, I helped Dustin Honken kill these people, she didn't say, Dustin Honken tricked me into helping him kill these people.

Ladies and Johnson -- excuse me, ladies and gentlemen,

2340

Angela Johnson was a 29-year-old, nearly 30-year-old adult. She had made some bad choices in her life. And there isn't a one of us adults in this room who hasn't, I hope not as serious as Angela Johnson has made, but we've all made some stupid choices. But we are all also responsible for our choices.

Urgently, urgently, her attorney points out that even if, even if, his client is guilty of participating in a drug conspiracy, even if his client is guilty of participating in a continuing criminal enterprise, that the killings of these two little children was different, that certainly the adults who were involved in selling drugs and maybe the woman who was foolish enough, naive enough to invite one of those into her home, are somehow remotely engaged in a continuing criminal enterprise or a drug conspiracy but certainly not those two little girls. Well, in a way, of course, he's right. Kandi and Amber Duncan weren't out pushing meth around the neighborhood. That little Asbe girl wasn't buying meth from little Amber.

But their killing, I would submit to you, ladies and gentlemen, under the Court's instructions, their killings, were carried out in connection with drug conspiracies. Their killings were carried out in connection with continuing criminal enterprises. It was the desire on the part of Dustin Honken and, yes, Angela Johnson to keep that criminal enterprise going

Page 118

and to keep that kingpin alive and well and out of prison.

And part of that occupation, that organization, that

2341

those motivations motivated them -- first of all, motivated them to kill Terry DeGeus and Greg Nicholson but that killing Greg Nicholson and Terry DeGeus, while that may have furthered their drug conspiracy or continuing criminal enterprise, certainly, certainly, would not have terminated their danger. They had to kill the people who had knowledge of their drug conspiracy.

And the day, the evening that Angela Johnson and Dustin Honken kidnapped, videotaped, forcibly extorted a videotape and kidnapped all five of -- four of those people, they could only do so because they knew that the other three, Lori and Kandi and Amber, could not be left alive because if they were, if they were left alive, authorities would know all too soon who it was who had killed Greg Nicholson. And killing Greg Nicholson had only been motivated by an effort to thwart that investigation of Angela Johnson and Dustin Honken's drug conspiracy, not to mention that of all the others who were involved in it to a lesser degree.

The last thing -- well, darn near the last thing pointed out to you was a statement by Mr. Willett -- and I've heard it before, and I have no problem with any defense attorney bringing it to your attention, and that's pointing out to you that I do have the last argument. I don't apologize for that. It's in accordance with the rules of court. I trust you know from the weeks that you've spent here that rules are applied in this courtroom strictly as they should be. I'm given the

2342

Page 119

opportunity of a last statement. I've taken advantage of that. Looking from the clock, I've taken too much advantage of it, so I'm going to shut up and sit down here in a second.

But I want to point out that while you've been invited to respond to my arguments, that you're invited to go back down to that jury room to speak for the defendant in response to anything I have said to you in that last hour, that the Court has instructed you that you are judges of the facts and that your sole interest is to ascertain the truth in this case. You're not advocates. You're judges.

When you go down there, it's not your job to speak for me, Mr. Williams, Mr. Willett, Mr. Berrigan, Mr. Stowers, or anyone else in this courtroom. It's your obligation to look at the evidence impartially, logically, and reasonably and ascertain the truth and do justice.

THE COURT: Members of the jury, we have two final instructions to cover, so if you would please pull out your instructions set and turn to page 61, final instruction number 12. Okay. Page 61, final instruction number 12, duty to deliberate.

(The Court read final instructions numbers 12 and 13 in open court.)

THE COURT: Just a couple of matters before you go down to the jury room now. I wanted to explain the process to you that I must go through if I get a note from the jury because

2343

I would think that jurors without the explanation would be frustrated at how long it takes me to respond. And I tell you this to neither encourage nor discourage you from sending a note but just to let you know what has to happen.

Page 120

When I get a note from the jury, if I do get one, I make copies of the note. I have to round up the lawyers and Miss Johnson. They have to have an opportunity to read the note. We have to have a conference on the record with the court reporter. I have to solicit opinions from both sides as to what they think the appropriate response should be. I then have to decide what I think the appropriate response would be. Sometimes we all agree; sometimes we don't. So it may take a little bit longer. And then my practice almost always is to prepare a written response and send that back to you.

So I just wanted you to know that in case there is a jury note and in case you're wondering why it's taking me so long to respond, I'm not ignoring you, but I have a process that I always go through.

Another thing for the jurors is that we have put together a book which has photos of all the witnesses that have testified in the case. There will be one copy of the book, and that will go down with you with all of the evidence in the case.

The photos are not evidence. They're simply to assist any jurors in recalling a particular witness because a lot of people visualize it better when they see a photograph of a

2344

witness who has testified.

Now, I'm sure you're all waiting to find out who the six alternate jurors are in the case. And here's the process that I'm going to go through with you all. I'm going to read the numbers of the six alternate jurors. If you are an alternate juror, you'll know that because I've read your number. I'm asking -- I'm going to ask you to stay in the courtroom for a minute, and we'll send the 12 trial jurors down to the jury

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2049 of 3592

room. And then I'll explain the procedure for the alternates.

Now, for the 12 jurors who are going down to deliberate, I mentioned this before, but I want to remind you. My practice is not to set your time of deliberation. In other words, once I give the case to the jury to deliberate, you can start -- if, you know, I was starting too late for you every morning at 8:30, you're more than welcome to start earlier than that. If you'd like to start a little bit later, that's fine. If you want to go, you know, to beyond 4:30, that's fine. If you want to deliberate in the evenings and have dinner brought in, that's fine. We'll accommodate whatever the jury decides to do. Just keep the CSOs, court security officers, notified so that I'll know to adjust my schedule because I like to remain in the building whenever possible when you all are deliberating.

The other thing is that when the 12 of you go down there, the 6 alternates, I need to spend a minute to talk to them about their duties. They may come into the jury room just

2345

for a minute to gather any things they have, coats or purses or anything like that. It would be totally inappropriate for any of the 12 trial jurors to ask any of the alternate jurors their opinions in the case. And it would be totally inappropriate for any of the alternate jurors to express any opinions to the 12 trial jurors in the case.

So if you happen to see each other for a moment or two after I'm done with the alternate jurors, you can say good-bye to each other, but it would be totally inappropriate to discuss this case among yourselves because only the 12 trial jurors at this point will be allowed to discuss the case among yourselves.

Here are the names of the -- I'm sorry, the numbers of

Page 122

the alternate jurors: 9, 214, 167, 402, 78, and 794. You're the alternate jurors, so would you all please remain in the courtroom, and the 12 trial jurors can go down to the jury room. We'll have all of the evidence that has been admitted in the case and the photos of the witnesses brought down to you in just a couple of minutes.

(Jury out at 2:56 p.m.)

THE COURT: Okay. If the six alternate jurors would please be seated. Here's what we're going to do. Two of you are actually going to be dismissed from any further service at this point, and right before I send you down to get your stuff, I'll indicate which two are completely discharged from jury duty. And I'll try and explain to you why we've done it that

2346

way.

That was just a decision that was made within the last couple of days. I think it's unlikely that if there is a second phase and a third phase that we would need more than four alternate jurors. And to do our best to try and accommodate the alternate jurors, we made a decision that we could release two today. I'm not going to tell you who you are right now, but I will in just a minute or so.

You're free to leave today, and you can come back if there is a second and third phase and sit in the back of the courtroom if you want to. And you're free to discuss this case. I'd ask you not to do any interviews with the press at all and give any opinions about the case until the actual trial jury has concluded their service in the case. But you're actually technically discharged as of about a minute from now.

The four remaining jurors, alternate jurors, you are

Page 123

not discharged as jurors in this case. You are retained as jurors. You won't participate in the deliberations, but if there is a second phase and if there is a third phase, you will come back for the second and third phase. The second phase will involve argument, but it won't involve any evidence.

And if there is a third phase, we're anticipating that that could involve anywhere from a week to two weeks' worth of testimony. And you will come back and sit through the testimony. Before we get to the testimony, there will be a new

2347

set of jury instructions actually in both the second phase and the third phase if there is one. There will be arguments from the lawyers, and you'll participate fully in all of that. And then we'll see if we have a need for any alternate jurors and then participate in the deliberations in either the second or third phases.

But because you are still part of the jury, you have to follow my admonition about not discussing this case with anyone. Don't let anybody talk to you about the case. And don't read any newspaper reports or listen to any radio or television reports. You're under the same admonition as you've been throughout the actual trial.

And we will notify you as soon as we can if we need you to come back and, if we need you to come back, when we need you to come back. So . . .

Anything else from the lawyers that I need to tell the alternate jurors, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Willett?

MR. WILLETT: Not on behalf of the defense, Your

Page 124

Honor.

THE COURT: Okay. Thank you. The two jurors who are now dismissed from jury service and will not be coming back to participate if we have a second phase and/or a third phase would be Juror 214 and Juror 794. And I know your employer will

2348

appreciate that, Juror 794. And so you two are dismissed. And the other four are retained as alternate jurors in the case. And if we need you for the second and/or third phases, our clerk's office will let you know as soon as we can. Thank you very much. You're dismissed. Thank you.

(The alternate jurors exited the courtroom.)

THE COURT: Please be seated. Is there any other record we need to make at this time, Mr. Williams?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. Do you want to go over -- I think we still have to give you the revisions we've made in the second phase and third phase instructions. Do you have time this afternoon to go over those?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: You do.

MR. WILLIAMS: Yes, sir.

MR. BERRIGAN: We don't have those yet, Your Honor.

THE COURT: Okay. We'll get them to you right now. There are just a couple of minor changes based on our last conference, so why don't we take a recess maybe till four o'clock or take as much as time as you need and let me know, and

we'll come back and have any further discussion we need to on

2349

the record regarding those instructions. Okay. We'll be in recess. And could I see the lawyers for one second just up at sidebar?

(At sidebar off the record.)

(Recess at 3:02 p.m.)

THE COURT: Okay. You have the latest revisions to the phase 2 eligibility phase instructions, the proposed preliminary and also the proposed final penalty phase instructions. Why don't we just take them in order that they may be used if at all in this case. And that would be the revised proposed eligibility phase instructions. Does the government have any objections?

MR. WILLIAMS: No, Your Honor.

THE COURT: Does the defense?

MR. BERRIGAN: Your Honor, there is -- on page 3, eligibility instruction number 2, in the first paragraph next to the last sentence, Therefore, you must treat this eligibility requirement for a death sentence, and that's just one -- there was missed a "consideration of" language. It's the only one I found, but I just wanted to note it.

THE COURT: Okay.

MR. BERRIGAN: And then I don't have an objection, sir, but I'm just confused about the verdict forms. The signature pages, I have signature lines on both pages 4, 5, and 6, and I'm not sure why there's like a duplicate set on page 6,

2350

Page 126

and I might just be being obtuse about that.

MR. WILLIAMS:  One's for numbers and one's for signatures.

MR. BERRIGAN:  Oh, I'm sorry.  Okay.  Well, that explains it.

THE COURT:  Juror numbers and then juror signatures just like on the verdict form we just did.

MR. BERRIGAN:  I see.  I got it.  Okay.  Thanks.

THE COURT:  Anything else on the --

MR. BERRIGAN:  No, sir, nothing else on the eligibility instructions.

THE COURT:  Okay.  Well, we'll make that change that you suggested to be consistent and conform it.

MR. BERRIGAN:  Thank you.

THE COURT:  Are you in a position -- well, can we take up the preliminary penalty phase instructions?

MR. BERRIGAN:  To some extent, Your Honor.  We've at least gotten through a good portion of the mitigating factors.

THE COURT:  Aren't they the ones you gave us?

MR. BERRIGAN:  They are, and I --

THE COURT:  When you see it in our format, you want to change them now.

MR. BERRIGAN:  Well, actually you made some changes that I thought were good changes, and I had just a couple that I wanted to propose, and they're very minor.

2351

THE COURT:  Sure.

MR. BERRIGAN:  The first one is on mitigating -- mitigator number 2 which would be page 5 of the instruction packet.

Page 127

THE COURT: Yes.

MR. BERRIGAN: Number 2 says, Even though Angela Johnson is punishable as a principal in the offense, and it occurs to me that that really -- that language is not quite what we would like because the issue of punishment is now on the table.

THE COURT: Right.

MR. BERRIGAN: So I was going to suggest that we take out all together "punishable as a principal in the offense" and insert in its place "guilty". So it would read, Even though Angela Johnson is guilty as an aider and abettor, her participation was relatively minor as compared to Dustin Honken's role in these murders.

THE COURT: Yeah, I don't have a problem with that. Do you, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay.

MR. BERRIGAN: The only other suggestion, Your Honor, at least at this point -- I apologize for not having gotten all the way through it.

THE COURT: No, that's fine.

2352

MR. BERRIGAN: We'd like to take that "notably immature," and I couldn't really distinguish "notably immature" from "immature," so I think that's a good point, so if we could omit "notably" from the language in that instruction, I'd appreciate that.

THE COURT: Okay.

MR. BERRIGAN: That's really all we found, sir.

THE COURT: Now, have you at least been through the --

Page 128

well, you've been through it because you've been through it before, but is there anything else in the preliminary penalty phase instructions that we haven't talked about that you think you might have a problem with?

MR. BERRIGAN: Not that we discovered in our somewhat speedy evaluation of these instructions, and I know we have discussed it before, and my intention is to take these back to the hotel tonight and look at them very closely. I don't want to suggest to you I've been through there with a fine-tooth comb as I try to do on some of these. I think they're very important. If I could have just a little bit more time to look at them . . .

THE COURT: You can. I just wonder when we're going to be able to make our record on it.

MR. WILLIAMS: Your Honor, I intend to be available by phone whenever you need me.

THE COURT: Okay. Well, maybe we'll have a hearing

2353

Wednesday, Thursday, or Friday, just a short hearing where we'll get you by telephone to make a record on these.

MR. BERRIGAN: And I missed the conference at the end. I apologize. Is Mr. Williams available by e-mail? And if so, I'd be happy to e-mail whatever suggestions I have to him before we discuss it with the Court. I think we can do that tonight, just sit down and look at these for an hour or so.

MR. WILLIAMS: I'll have my laptop with me.

THE COURT: Okay.

MR. WILLIAMS: And access to e-mail.

MR. BERRIGAN: That would at least hasten our record when we came back, sir.

Page 129

THE COURT:  Sure.

MR. BERRIGAN:  And I'll copy the Court.  If there's any agreement, that would even be better.

THE COURT:  Okay.  Great.  So that really kind of does it for now I think, doesn't it?

MR. BERRIGAN:  I think so, sir.  Sorry we didn't get further.

THE COURT:  Hang on one second.  Let me ask you this. Would either party have an objection on page 4 of the preliminary penalty phase instructions where in the number 2, nature of proceedings, in the first paragraph on page 4 where it says in step 1 -- we're talking about the nonstatutory aggravating factors, last sentence of that paragraph before we

2354

list them, The prosecution contends.  See the word "contends"?

MR. BERRIGAN:  Yes, sir.

THE COURT:  And then flipping over to the next page, page 5, last sentence of the paragraph at the top of the page before the list of mitigators, However, as a preliminary list, Angela Johnson contends.  Would either side object if I put that in bold because at the preliminary stage it's a contention?

MR. BERRIGAN:  How do you feel about "alleges", Your Honor?

THE COURT:  Well, we actually had "alleges", and then we changed it to "contends".

MR. BERRIGAN:  Okay.

THE COURT:  My law clerk and I have actually been through that, you know.

MR. BERRIGAN:  All right.  That tells me how you feel about it.

Page 130

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2058 of 3592

THE COURT: Right. I just want to make sure they understand it's a contention of the party, that I haven't said that this is a -- well, let me just take a look at what we say in the finals then. You don't like the word "contends" in bold?

MR. BERRIGAN: I don't like that in bold so much, but if you thought perhaps --

THE COURT: Well, you know what? Here's the alternative which we had but we never showed to you. Every one, in other words, your mitigators --

2355

MR. BERRIGAN: Right.

THE COURT: Number one, Angela Johnson contends she was under unusual and substantial duress; number three, Angela Johnson contends she --

MR. BERRIGAN: Right. I don't have any problem with "contends," Your Honor. I think putting it in bold might suggest, well, this is -- they're contending. I was wondering how you might feel about this language in the same sentence: The prosecution contends that the following nonstatutory aggravating factors will be proven in this case, and then the same language would apply to the defense mitigators, and then it's very clear that this is an element of proof. You haven't heard the evidence, but this is an allegation.

THE COURT: Yeah, that accomplishes my goal without putting anything in bold.

MR. BERRIGAN: Great.

THE COURT: I like that. But let's now just take a look at it -- I'm not going to bind you to it -- about what we would then do in the finals; okay?

MR. BERRIGAN: All right, sir.

Page 131

MR. WILLIAMS: Your Honor, if I may.

THE COURT: Yeah.

MR. WILLIAMS: Just do a past tense of Mr. Berrigan's suggestion for the preliminaries. Angela Johnson contends that she has proven the following mitigating factors, and the

2356

government contends that it has proven in past tense, again emphasizing that there's a burden of proof and that these are contentions of the parties.

MR. BERRIGAN: And I'd have no problem with that, Your Honor, but I suppose I would at least ask that we be -- because of the different burdens of proof that perhaps some language be included to indicate that, so government's language would be --

THE COURT: We'd put in the burden.

MR. BERRIGAN: Right, it would be proven beyond a reasonable doubt or have been proven beyond a reasonable doubt and that the defense will be proven to a preponderance of the evidence, has been proven to a preponderance of the evidence.

THE COURT: Sure. That's fine. Okay. I don't really have anything else, so we'll just try and set up a telephonic conference to finalize everything. But I think we're in pretty good shape on eligibility which we wouldn't get to before Tuesday. Is there a chance that if we have an eligibility phase on Tuesday and the jury were to come back in the middle of the day or something on Tuesday, would we then start the penalty phase?

MR. WILLIAMS: I'd be prepared to do so, yes.

THE COURT: So we'd probably just get through preliminary instructions and opening statements.

MR. WILLIAMS: Yeah, probably.

Page 132

THE COURT: But we probably wouldn't get to any

2357

evidence I would imagine.

MR. WILLIAMS: I'd be surprised if we got any farther. I'd be ready to go whenever.

THE COURT: Just so I'm clear in my own mind because we all have such experience with trifurcation, there aren't any opening statements. It's really instructions and closing argument.

MR. BERRIGAN: Right, just argument. That's how I understood the Court's --

THE COURT: But then on penalty, it's preliminary instructions, opening statements, evidence, final instructions, closing arguments.

MR. BERRIGAN: Just like Mr. Honken's case.

THE COURT: That's what I thought. I wanted to make sure we were all on the same page.

MR. WILLIAMS: Here's yet another quandary on this. Do I have a rebuttal argument during the eligibility phase?

THE COURT: Well, I'm sure Mr. Berrigan doesn't think that you do.

MR. BERRIGAN: Well, I can't imagine it would be necessary, frankly. It would shock me that would even be necessary, but I don't know that there's any precedent probably.

THE COURT: But he would be able to do it had I not trifurcated it.

MR. BERRIGAN: Yes, I agree.

2358

THE COURT: Because it would be included in the
Page 133

penalty phase; right?

MR. BERRIGAN: That's right. And it's not a huge deal to us, Your Honor. I don't think there is much --

MR. WILLIAMS: And I don't know that I would but . . .

THE COURT: Well, I want to think about it a little bit more, but if pressed, if I need to rule on it, I think you're probably entitled to it, and I don't think it would be error to allow rebuttal because they do have the burden of proof. And had it not been trifurcated, you would have been able to do rebuttal on eligibility phase, so that's kind of my thought on it.

Anything else?

MR. BERRIGAN: Two very informal matters, Your Honor.

THE COURT: Sure.

MR. BERRIGAN: Ever since there was the discussion with the jurors -- it might have been in voir dire -- after a jury note that they couldn't see Miss Johnson, I've been considering how to kind of address that. You've seen me shuffle the chairs now and then.

But I understood the Court to say, you know, these counsel tables were pretty much up for grabs, and one very strong consideration that I have is that we switch sides at the penalty phase if we got to that point because I do think to some extent the tables are literally turned at that point. I know

2359

the government still has the burden of proof in terms of their efforts, but it seems to me that would only be fair given the nature of the proceedings that we have an opportunity that the jurors are closer to Miss Johnson and they would have a chance to see her, and that's a particularly important time to see her

Page 134

in my view when they're making that decision.

So I just wanted to throw that out on the table. I haven't talked to Mr. Williams about it, whether he's for it or against it.

THE COURT: You can throw it out. It's open for consideration.

MR. BERRIGAN: Okay.

THE COURT: And, you know, just -- I brought it up one day and nobody followed up on it, and that is I'm fairly confident that the defendant's in-court reaction is not evidence.

MR. BERRIGAN: Right.

THE COURT: And that I would be well within my discretion to instruct the jury that they can't consider any in-court reaction, and I'm not saying that's a quid pro quo for switching sides.

MR. BERRIGAN: Right.

THE COURT: I'm just saying that nobody asked me to give that instruction. I mean, I'd have to research and make sure it was a correct statement of the law. I think it is.

2360

MR. BERRIGAN: No, I don't -- that's not the purpose of the request. I agree with you it's not -- you know, they shouldn't be wanting to see her and analyze her reactions to evidence. It's just to be able to see her at all. I mean, this is a person who at that point in the trial her life is literally in their hands, and they should at least have a chance to look at her not to determine what her reaction is to testimony or anything so subversive as that; just to see this person they're going to make a judgment about.

Page 135

THE COURT: I'm not sure it's subversive, but I personally don't have any problem with switching sides of the tables.

Mr. Williams? I don't think it would create -- it's not like you have, you know, stacks and stacks of stuff at each table. It really wouldn't be a problem, would it?

MR. WILLIAMS: Yeah. No, I certainly don't have a legal basis for objecting to it, and it's more of a practical consideration of what the jury's suddenly going to think when all of a sudden we're in different locations in the courtroom.

THE COURT: Hopefully they'll think this is such a fair-minded judge that he forced the lawyers to switch sides for the second half of the proceedings. That's what I'd like them to think.

MR. WILLIAMS: The question I have is --

THE COURT: I could tell them -- we don't have to tell

2361

them anything, but we could. But I'd be glad to tell them something.

MR. WILLIAMS: Yeah, and I'm just not sure what you'd tell them at that point either.

THE COURT: Yeah. The trial had multi-parts, and we're switching sides. That's all. That's all I'd have to tell them. I don't really feel a need to tell them anything. But that's not -- that doesn't bother me that they might wonder.

MR. WILLIAMS: Yeah, I don't have a legal basis for objecting to a change. And if you ordered it, it's done obviously.

THE COURT: Do you have any real strong practical basis?

Page 136

MR. WILLIAMS: No, not really. I don't think there's -- I'm assuming there's no issue with the marshals or else that would have been raised a long time ago, so aside from that, no, unless the marshals tell me they have a concern.

THE COURT: Well, we got a bunch of them but not the boss in the courtroom.

Chad, you want to step up to the plate?

DEPUTY MCCORMICK: There's no problem with that from our view.

THE COURT: No problem?

DEPUTY MCCORMICK: No.

THE COURT: Okay. Consider that done.

2362

MR. BERRIGAN: Thank you, sir. The other thing is would you like us here at 8:30 in the morning? I don't know what your procedure is with the lawyers.

THE COURT: I'm starting a preliminary injunction hearing at 8:30 tomorrow morning that I think's going to go a big chunk of the day. And so we'll just get ahold of you if we need you.

MR. BERRIGAN: All right.

THE COURT: You're more than welcome to come to the courthouse. You could learn a lot about employment law involving a veterinarian and bull semen.

MR. BERRIGAN: And if I had nothing else to do, I'd really enjoy that, sir.

THE COURT: But I'm sure you have other pressing work.

MR. BERRIGAN: And that's the last thing I wanted to bring up with you because there is one potential legal issue that involves one witness that the government has, a gentleman

Page 137

by the name of Steven Vest. I believe he testified in
Mr. Honken's trial. And you might recall --

THE COURT: I do recall him.

MR. BERRIGAN: -- that his testimony was based on
conversations with Mr. Honken. And some district courts have
applied the Sixth Amendment to such witnesses as Mr. Vest, that
is, that they have not found that the traditional rules
regarding sentencing are sufficient to preserve this defendant's

2363

Sixth Amendment rights in the penalty phase of a capital murder
case.

But having said that, those are not trifurcated cases.
And so we weren't really sure that this is much of an issue
given the way the Court has divided the case because we have
probably a more pure -- if you will, pure sentencing hearing
than we would otherwise, and that was the purpose of that
proceeding.

We did -- we are looking at that. If there's anything
to it, we'll get something right away on file because we're not
sure, frankly, whether we have a leg to stand on respecting
complaining about Mr. Vest's testimony as being hearsay given
that we have a trifurcated trial now instead of just a two-phase
trial.

THE COURT: It's not only -- when you say Sixth
Amendment, are you talking -- there are lots of parts to the
Sixth Amendment. I assume you're talking about a Bruton
situation?

MR. BERRIGAN: Yes, sir, it's a Bruton problem.

THE COURT: Yes.

MR. BERRIGAN: I -- right. I think that's largely it.

Page 138

Obviously there's a real confrontation issue there. Mr. Honken's not available to testify. He is a codefendant, et cetera, et cetera, and my understanding is all of the evidence from Mr. Vest is from Mr. Honken's lips, so he has

2364

no --

THE COURT: And what is the -- and this would come in -- and what is the evidence you want to use from Vest?

MR. WILLIAMS: Exactly that, what Dustin Honken told Vest about what happened, and it's important to the extent of establishing exactly what the roles were because part of the mitigators listed by the defense was her mitigating role. Part of what I need to prove on my end is a number of things, frankly, future dangerousness, the obstructive behavior of it.

THE COURT: Can you just -- what I'll probably do is get Shelly to get me a copy of Vest's testimony. But can you just kind of summarize what it was?

MR. WILLIAMS: Yeah. In a nutshell, Honken told Vest that they had this plan to go over to the house ahead of time; they knew what they were doing; that they entered the house with -- as I recall with Johnson in the lead very much like we heard from Christi Gaubatz pretending to be a saleslady of some form; that the victims were brought out; that -- if I recall correctly, she drove the vehicle; that she had the girls in the vehicle while the adults were taken out and shot; that she told the girls that the gunshots she heard were fireworks and not gunshots and when Honken came back to get the girls, handed them over to Vest (sic) for the girls to be taken out and shot.

With regard to Terry DeGeus, indicated that when they went to the scene -- well, that she drove to the scene with

Page 139

Terry DeGeus; that Dustin was there waiting for him; that Dustin confronted.  They were all standing outside the car, and they were talking for a while about the drug debt and so forth and at some point Angela Johnson gets in the car and Dustin understands that to be an indication get on with it, Dustin, get it over with, so Dustin then shoots him multiple times.  She hands a baseball bat to Dustin Honken from the car after Terry's shot, and Honken beats him with a baseball bat.  Then she helps drag the body over.  Going back to the --

THE COURT:  Let me ask you a question.  Was Vest the individual in the housing unit that had access to all of Dustin Honken's records that he stored -- remember there was one guy who did the cleaning and had access to it?  But that would all be in the cross.

MR. WILLIAMS:  Yeah, I don't think that was Vest that I recall.

THE COURT:  That wasn't Vest?  You know who I'm talking about.

MR. WILLIAMS:  Yeah.

THE COURT:  I don't remember which Dustin-confessed-to-me witness it was.

MR. WILLIAMS:  I don't think that was Vest.

THE COURT:  Dustin-allegedly-confessed-to-me witness. Are you representing just on your best information and belief that there are cases out there where judges have said based on

Bruton issues it's not reliable for purposes of penalty phase

evidence?

MR. BERRIGAN: In a nontrifurcated procedure I know that's true. And there isn't in a case I have pending in Tennessee.

THE COURT: You think trifurcation would make any difference on that issue?

MR. BERRIGAN: Well, I don't know. That's the problem, Your Honor, because the courts have -- in some instances at least, these district courts have said if the case were trifurcated we might look at this differently because it would be a pure sentencing hearing at the end and the traditional rules regarding sentencing, of course, allow hearsay testimony. So that's kind of been the dilemma, that we're not sure -- it's hard to find other trifurcated cases, and to the extent we can't, we need to find out very quickly if --

THE COURT: Do you have any of these rulings just out of curiosity? Are they reported or not reported?

MR. BERRIGAN: Mr. Stowers has a couple with us.

MR. STOWERS: I don't physically have them here, but I have them at the hotel.

THE COURT: Will you just bring them over tomorrow?

MR. BERRIGAN: Yes, sir.

THE COURT: And we can make the copies. You can get Jennifer to make the copies. But I'd like to get working on

2367

that because I have strong feelings both ways.

MR. BERRIGAN: Right.

THE COURT: No. What I'm really saying is it troubles me.

MR. BERRIGAN: Well, it's a troubling issue in this

Page 141

case because, frankly, Mr. Vest gives the most detailed account of the murders from Dustin Honken's lips of any other witness, certainly much more than any other witness the government's going to call in this case. They don't have anybody else that could stand in his stead. And so whether he's in or out or what the parameters of his testimony would be are very important because nobody else will duplicate that testimony.

THE COURT: Yeah.

MR. WILLIAMS: Just to give the Court a heads-up on why I think it's admissible and not just as hearsay but actually as co-conspirator hearsay, statements were made to Dustin Honken in 1998. It was still during the time of the charged conspiracy. It was made to Steve Vest by Dustin Honken in an effort to recruit him as a member of an escape plan once Dustin Honken came back, and our argument would be that it's a continuation of the concealment aspect of the conspiracy because Honken's plans were to --

THE COURT: So it's 801(d)(2)(E) testimony in your view.

MR. WILLIAMS: Right, because the plan was to come

2368

back and kill witnesses and so forth.

MR. BERRIGAN: Yeah, there may be a disagreement about the dates, but the defense thinks that that happened a couple years later, these conversations with Vest, that it was in 2000 or maybe even later than that.

MR. WILLIAMS: And if I'm mistaken on the dates, then yeah, we're not going to be obviously asserting that conspiracy.

MR. BERRIGAN: There's so many statements from Mr. Honken, they are hard to keep track. But that's our

Page 142

recollection, Your Honor, and we'll obviously have more detailed information about that the next time we visit about this issue. I just wanted to bring it to your attention.

THE COURT: You weren't involved in Vest's case, were you?

MR. BERRIGAN: No, sir. I certainly was aware of it. It was a huge case in Kansas City, got a lot of publicity. It settled I think on the eve of trial. There were brothers involved. There were a lot of interesting aspects to it, but I had nothing to do with it fortunately.

THE COURT: Okay. Anything else?

MR. BERRIGAN: Nothing by the defense, sir.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. You'll get those cases. And then how do you want us to get you those cases?

MR. WILLIAMS: Just get them to my people here, and

2369

they'll get them to me.

THE COURT: Okay. Okay. And, Pat Berrigan, can I see you for just one second on a CJA matter?

MR. BERRIGAN: Yes, sir.

(The foregoing trial was

adjourned at 4:26 p.m.)

Page 143

VOLUME 11, 5-23-05

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR      10-16-05
                                        Date

2370

INDEX

| CLOSING ARGUMENT | PAGE |
| --- | --- |
| By Mr. Miller | 2218 |
| By Mr. Willett | 2291 |
| By Mr. Miller | 2325 |

Page 144

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2072 of 3592

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2073 of 3592

2371

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,             No. CRO1-3046

       Plaintiff,            Sioux City, Iowa
                         May 24, 2005
  vs.                  11 a.m.

ANGELA JANE JOHNSON,         VOLUME 12 of 24

       Defendant.
                     /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

2372

APPEARANCES:

For the Plaintiff:      THOMAS HENRY MILLER, ESQ.
                     Iowa Attorney General's Office
                     Area Prosecutions Division
                     Hoover State Office Building
                     Des Moines, IA  50319

(verdict only)          JANET L. PETERSEN, ESQ.
                     Assistant United States Attorney
                     Terra Centre - Suite 670
                     600 Fourth Street
                     Sioux City, IA  51101

For the Defendant:      PATRICK J. BERRIGAN, ESQ.
                     Watson & Dameron
                     2500 Holmes
                     Kansas City, MO  64108

                     DEAN STOWERS, ESQ.
                     Rosenberg, Stowers & Morse
                     1010 Insurance Exchange Building
                     505 Fifth Avenue
                     Des Moines, IA  50309

                     ALFRED E. WILLETT, ESQ.
                     Terpstra, Epping & Willett
                     Higley Building - Suite 500
                     118 Third Avenue Southeast
                     Cedar Rapids, IA  52401

Also present:          Bill Basler

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2074 of 3592

VOLUME 12, 5-24-05
Court Reporter:        Shelly Semmler, RMR, CRR
                       320 Sixth Street
                       Sioux City, IA  51101
                       (712) 233-3846

2373

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  I'm going to give the defense a minute to consult with Miss Johnson about the note.

MR. STOWERS:  We're ready, Your Honor.

THE COURT:  Okay.  Who's taking the lead for the defense?

MR. STOWERS:  I will, Your Honor.

THE COURT:  Okay.  Mr. Stowers, what's your position?

MR. STOWERS:  The jury obviously has given you a note asking if they can receive the transcript of the tape of Greg Nicholson and Dustin Honken.  I believe that's a recording from March of 1993, maybe actually the 21st or so of 1993.  And then it says at the end, "Or the actual tape," in the note, and I'm a little confused by that.

THE COURT:  Well, they have the actual tape.  I think they want to know can they have a transcript to read or have the tape replayed even though that's not what they said, so what's your response?

MR. STOWERS:  Okay.  Our position is that they can have a recording device to -- or playing device to play the tape.  The transcript, however, is not in evidence and should not be provided to them.

THE COURT:  What's the government's position?

MR. MILLER:  Your Honor, I think it's within the

2374

Page 2

VOLUME 12, 5-24-05

Court's discretion either to bring them up and replay the tape with the tape provided or provide them a tape-playing device that they could use in the jury room. I think either one would be appropriate with or without the transcript.

THE COURT: What's the ability to actually ascertain what's on the tape without the transcript?

MR. MILLER: I think this is a far clearer transcript than the covert transcript between Cutkomp and Honken. However, I do believe the use of a transcript would make the jury's job easier which I think is one of our goals, and I don't think there's any substantial controversy about the accuracy of the transcript either.

THE COURT: So let me get this straight. You don't care what I do, and the defense wants me to just send down a machine so they can play the tape as often and for as long as they want.

MR. STOWERS: That's right.

MR. MILLER: And to give my druthers, I would do whatever provides the most assistance to the jury which would be to give them a tape player and a copy of the transcript, but I would be --

THE COURT: Well, I'm not giving them a copy of the transcript down in the jury room. The only time I've allowed use of the transcripts when the transcripts are not in evidence which is the case here is to do the playback in the courtroom.

2375

I don't really have a strong preference for doing a playback in the courtroom with a transcript or sending the tape recorder down there. If we do the playback in the courtroom, we do it

Page 3

one time.  If we send the tape recording down there, the jury's free to play it as often as they want for as long as they want. And as I understand it, you don't have a preference really, or you do, Mr. Miller?

MR. MILLER:  I have no preference.  A third alternative would be play it with the transcript in the courtroom and allow them to take not the transcript but the tape and the tape recorder back with them to the jury room if they wanted to look at it later.

THE COURT:  Yeah, that would be a third alternative.

MR. MILLER:  And that would be the one that would provide the most assistance to the jury which I think -- my preference is whatever we do we provide them the opportunity to view the evidence that's been submitted.

THE COURT:  Do you have an objection to bringing it back up, having the tape played back one time, and using the transcript?

MR. STOWERS:  I feel compelled to object to that because it seems to us that that's going to emphasize this one little piece of evidence in a case --

THE COURT:  Well, sending the tape recording down there and letting them play it as often as they want would

2376

emphasize it more.

MR. STOWERS:  Well, I guess I --

THE COURT:  Your only concern is with the transcript they might actually understand it.

MR. STOWERS:  Well, the tape on this one actually was pretty clear I remember because they just played it with the boom box that Mr. Miller has, and I think they just had a

Page 4

microphone up to it, and it sounded clear. That second tape is far less than clear, the one where Mr. Cutkomp and Mr. Honken were talking in 1996. This one's pretty clear. I don't think the jury's going to have a problem with that. We got no problem with them in the context of their deliberations going over the tape. And -- as much as they want.

I don't know if this has any significance or not, but there's -- two jurors signed this. I don't know if this means only two jurors have an interest in this or how this works, but in any event, that's our position. I don't want to belabor it. Thank you.

THE COURT: Well, how about I send a note down basically saying, The tape is already in evidence, its exhibit number. You may not have a copy of the transcript because the transcript is not in evidence. And we are sending down a tape recorder or a tape player, whatever you want to call it, for their use to play the tape?

MR. STOWERS: That'd be perfect.

2377

THE COURT: Okay.

MR. STOWERS: And then maybe that's even the machine that it was played on in open court and Mr. Miller can provide that to the Court and the jury can use it.

THE COURT: Yeah, we'll have -- Mr. Miller's not taking it down. I've actually read cases where judges allowed one of the parties to take the tape recorder into the jury room, and that's not going to happen in this case. We'll just have Carey take it down.

But why don't you hang on -- why don't we take a short recess. I'd actually like you to see the note before we

Page 5

actually send it down. We'll get that note prepared and then send it down and everybody can sign off on it. We'll make a record on it. So why don't we take a short recess till that's done. And I also need to give our court reporter a break. She hasn't had a break yet today.

(Recess at 11:07 a.m.)

THE COURT: I have prepared a response as follows: Members of the jury, I have received a note signed by two jurors, a copy of which is attached. In response to your note, I state the following: You have a copy of the recording in question because it is already in evidence as Exhibit Number 20. I am providing you with a tape player so that you can review the recording. In evaluating the tape recording, you may consider any testimony you heard at trial concerning the context of the

2378

recording and any other relevant evidence. However, you may not have a copy of the transcript because the transcript is not in evidence. This instruction should be taken together with the preliminary and final instructions I previously gave to you. The instructions must be considered as a whole. Then it's dated today. Is it fine with the government?

MR. MILLER: Yes, Your Honor.

THE COURT: Okay with the defense?

MR. STOWERS: Yes, Your Honor.

THE COURT: Okay. Thank you.

MR. STOWERS: Thank you.

THE COURT: Why did it take you so long to get over here just out of curiosity?

MR. WILLETT: I'm sorry, Judge. We were at the Marina, and as soon as Mr. Berrigan called up to my room, we all

Page 6

met in the parking lot, and we drove straight over.

THE COURT: Okay. It seemed like it took an inordinate amount of time, but I don't exactly know when Jennifer called you either.

MR. BERRIGAN: Quarter of, sir.

THE COURT: Oh, okay.

MR. BERRIGAN: It took us 15 minutes from the call.

THE COURT: Okay. Thanks.

(Recess at 11:17 a.m.)

THE COURT: Please be seated. We have been informed

2379

that we do have a verdict in the case, so I'm about to bring the jury in to take the verdict. It's a rather complicated verdict form, so after discussing it with the lawyers, I am going to read that portion of the verdict on Counts 1 through 5 where the jury determines whether the defendant is not guilty or guilty and then do the same on Counts 6 through 10. And then we're going to have the verdict form copied and passed out to the lawyers on both sides so that we can review it to ensure that there's nothing inconsistent in the verdict form before I make a decision as to what to tell the jury. So that will be the procedure.

I wanted to request all members of the public who are in the courtroom to do everything they can not to react in any way with regard to the verdict. I know there are exceptionally strong feelings on both sides of the case, and that's understandable. But because there may be a second phase and a third phase in the case depending upon what the jury does, it would not be appropriate for the jury to be influenced by anybody's reaction.

Page 7

So I realize there are very strong feelings, but I'd ask everybody to do their best to hold their reaction. It's not a basketball game, so I don't expect any high-fiving or shouting or yelling. And once you get out of the building or out in the hall, that would be an appropriate place for some limited emotion, but it is a United States District Court.

2380

So is the government ready to have the jury brought in?

MR. MILLER: Yes, Your Honor.

THE COURT: Is the defense?

MR. WILLETT: The defense is ready, Your Honor.

THE COURT: Okay. Thank you.

(The jury entered the courtroom.)

THE COURT: Please be seated, members of the jury. Members of the jury, you may note that one of the assistant United States attorneys, C.J. Williams, is not in the courtroom. He is absent with my permission for a matter totally unrelated to this case that was totally unforeseeable but required him to leave the state. And you shouldn't draw any inference in any way from the fact that Mr. Williams is not here. He would like to have been here, but it just wasn't possible for him to be here.

Juror 108, are you the foreperson? I have the number wrong? Oh, I'm sorry. 621 because we had the change in the seating chart, excuse me. Juror 621, are you the foreperson?

JUROR 621: Yes.

THE COURT: And has the jury reached a unanimous verdict in this case?

JUROR 621: Yes, we have.

Page 8

THE COURT: Okay. Would you please hand the verdict form to my law clerk Carey, and then she'll hand it to me? And

2381

then so you know, I'm going to review the verdict form, and then I'm just going to read part of it. And we'd ask everybody obviously to remain in the courtroom. I'm going to have then Carey make copies of the entire verdict form because it's a lengthy verdict form so that both sets of lawyers have an opportunity to review it. I'll probably consult with the lawyers at sidebar about the verdict form, and then I'll inform the members of the jury what's going to happen next.

Okay. In the matter of United States of America, Plaintiff, versus Angela Johnson, Defendant, on Counts 1 through 5 which is conspiracy murder, Count 1, Gregory Nicholson, guilty; Count 2, Lori Duncan, guilty; Count 3, Kandi Duncan, guilty; Count 4, Amber Duncan, guilty; Count 5, Terry DeGeus, guilty.

Counts 6 through 10, continuing criminal enterprise or CCE murder, Count 6, Gregory Nicholson, guilty; Count 7, Lori Duncan, guilty; Count 8, Kandi Duncan, guilty; Count 9, Amber Duncan, guilty; Count 10, Terry DeGeus, guilty.

Now I'm going to hand the verdict form to Carey and if you would make copies for counsel. Thank you.

Members of the jury, if you would just sit tight for a few moments, I would appreciate it.

If counsel would take a moment and review the verdict form, and then we'll just meet up at sidebar.

MR. BERRIGAN: May we approach?

2382

Page 9

THE COURT: You may. Thank you.

(At sidebar on the record.)

THE COURT: Does counsel for the government see anything inconsistent?

MR. MILLER: No, Your Honor.

THE COURT: Counsel for the defense?

MR. BERRIGAN: No, sir.

THE COURT: Okay. Anything else we need to do? We'll just let them know that Tuesday, 8:30 start the second phase. Okay. Thank you.

(The sidebar was concluded.)

THE COURT: One other matter, Mr. Berrigan.

MR. BERRIGAN: Yes, sir.

THE COURT: I think unlike most judges, I do have each juror sign the verdict form.

MR. BERRIGAN: I noticed that.

THE COURT: I think you still have the right, though, if you request it to have the jury polled.

MR. BERRIGAN: Yeah, I understand that, and we will decline to request that at this time.

THE COURT: Okay. Thank you. But I wanted to afford you that right.

MR. BERRIGAN: Thank you, sir.

THE COURT: Members of the jury, there will be a second phase of the trial, and we had originally intended to

2383

start that as quickly as we could. Due to circumstances outside of all of our control, we're not going to start the second phase until Tuesday morning at 8:30. I believe the date is May 31, but it would be next Tuesday at 8:30. I apologize to each of

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2083 of 3592

you for the delay, but it was unavoidable.

And so just to give you a heads-up on what we think the schedule will be, we'll be going the same 8:30 to 4:30 four days next week. If there is a need for a third phase, the lawyers anticipate that we will finish the third phase hopefully towards the end of the second week, not next week but the following week if there is a need for a third phase. So that's just to give you a heads-up on the schedule.

MR. MILLER: May it please the Court.

THE COURT: Yes.

MR. MILLER: Would four days next week include next Friday, or is next week a three-day week?

THE COURT: Oh, I'm sorry. What did we decide?

MR. WILLETT: Your Honor, if it please the Court, I believe we had decided we would go Tuesday, Wednesday, and Thursday of next week.

THE COURT: Just three days next week.

MR. WILLETT: Yes, that would adhere to the Court's earlier opinion that all Fridays would be off.

THE COURT: I'm terrible at arithmetic, so when I said four days, I should have said three days, and I appreciate

2384

counsel pointing that out. So just because you need to plan, we'll just be going next week Tuesday, Wednesday, Thursday. Then the following week if we need to, we'll go the four days, and, depending upon what happens with the second phase, we may not need to have a third phase, and we may not need all of those days.

It's very important because you're still jurors in the case to follow my prior admonitions about not discussing any

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2084 of 3592

further aspect of this case among yourselves.  Don't discuss it with anyone else.  Don't let anybody talk to you about this case.  Don't read any newspaper reports or listen to any radio or television reports about the case.  We will have -- just so that we're not surprised on Tuesday morning, we will have four of the six alternates coming back, and they'll be participating in the second phase of the trial, and if there is a third phase, they'll participate in the instructions and argument and evidence on the third phase as well.

So we'll see all of you back here Tuesday at 8:30.  And it's very, very important that you do everything in your power to follow that admonition about not discussing it among yourselves, with anyone else, and not let anybody talk to you about the case.  We'll see you back here Tuesday morning at 8:30.  Thank you very much.

(The jury exited the courtroom.)

THE COURT:  Please be seated.  Is there any further

2385

record we need to make, Mr. Miller?

MR. MILLER:  No, Your Honor.

THE COURT:  Mr. Berrigan?

MR. BERRIGAN:  None that we know of, sir.

THE COURT:  Okay.  We were going to have a telephonic conference.  We don't have much work left to do on the instructions, but I think we were contemplating doing that.  And is there a date and a time the rest of this week that would work for counsel?

MR. BERRIGAN:  I'll be here personally, Your Honor, the rest of the week.  This afternoon I was preparing a letter outlining the suggestions that the defense had regarding the

Page 12

final instructions as you had allowed me to do from yesterday. That will be e-mailed to the Court this afternoon and to Mr. Miller and Mr. Williams as well just so we have a heads-up on at least our points of view, and they're very minor, frankly, so we're available any time you'd like us.

THE COURT:  Okay.  And, Mr. Miller, I assume you'll probably be heading back to Des Moines.

MR. MILLER:  Yes, Your Honor.  And Mr. Williams will be also available by phone beginning any time tomorrow.

THE COURT:  Okay.  Why don't we shoot for -- he's an hour ahead, right, Mr. Williams?  Right?  Sali's saying no.

MS. VAN WEELDEN:  I don't believe he is, Your Honor.

MR. MILLER:  He's an hour ahead.

2386

THE COURT:  Why don't we set it for three o'clock tomorrow.  And, Mr. Berrigan, why don't you -- will you be here in the courtroom?

MR. BERRIGAN:  Yes, sir.

THE COURT:  And you obviously have the right to have --

MR. BERRIGAN:  I'll be here with Miss Johnson.  I suspect Mr. Stowers will be here as well.  Mr. Willett has another engagement if you don't mind.

THE COURT:  No, that's fine.  And then we'll just hook the two prosecutors in by phone.  Okay.  We'll be in recess. Thank you.

(The foregoing trial was
adjourned at 3:11 p.m.)

Page 13

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR 10-16-05
Date

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2087 of 3592

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CRO1-3046 |
| Plaintiff, | Sioux City, Iowa |
| | May 25, 2005 |
| vs. | 2:58 p.m. |
| ANGELA JANE JOHNSON, | VOLUME 13 of 24 |
| Defendant. | |

/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

2388

APPEARANCES:

| | |
|---|---|
| For the Plaintiff:<br>(via speakerphone) | C. J. WILLIAMS, ESQ.<br>Assistant United States Attorney<br>Suite 400 - Hach Building<br>401 First Street Southeast<br>Cedar Rapids, IA  52401 |
| (via speakerphone) | THOMAS HENRY MILLER, ESQ.<br>Iowa Attorney General's Office<br>Area Prosecutions Division<br>Hoover State Office Building<br>Des Moines, IA  50319 |
| For the Defendant: | PATRICK J. BERRIGAN, ESQ.<br>Watson & Dameron<br>2500 Holmes<br>Kansas City, MO  64108 |
| Court Reporter: | Shelly Semmler, RMR, CRR<br>320 Sixth Street<br>Sioux City, IA  51101<br>(712) 233-3846 |

♀

2389

(Proceedings reconvened outside the presence of the jury.)

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2088 of 3592

THE COURT: Good afternoon. Mr. Miller, Mr. Williams, are you on the line?

MR. WILLIAMS: Yes, Your Honor.

MR. MILLER: Yes.

THE COURT: You're both on the line?

MR. MILLER: Yes, sir.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. I'm here in the courtroom, and we have Patrick Berrigan and Angela Johnson. Where are we? The eligibility instructions?

MR. BERRIGAN: We had no recommended changes to those, Your Honor.

THE COURT: You can remain seated.

MR. BERRIGAN: Okay. The only changes we had proposed to the Court are contained in an e-mail that I sent last evening, and it concerns the final proposed penalty phase instructions, the version of May the 24th, 2005.

THE COURT: Okay.

MR. BERRIGAN: And I've copied Mr. Miller and Mr. Williams on that e-mail, and hopefully they've received it.

THE COURT: And then did you get the e-mail we sent to you making all of those revisions?

MR. BERRIGAN: No, sir. I'm sorry.

2390

THE COURT: Oh.

MR. BERRIGAN: That's not to say I haven't gotten it. I have not been near a computer for various reasons, and I'm sure the e-mail's sitting there and I have not seen it. But if, of course, the Court's made those revisions, then I don't have any other requests.

Page 2

THE COURT: We adopted really all of your requests. There was just a very slight wording change in one, but I'm sure you would consider it a friendly amendment. I don't even remember exactly what it was, but it was very minor.

MR. BERRIGAN: Okay. I'm perfectly satisfied with that. I apologize I haven't looked at it.

THE COURT: Okay. But we'll make sure you have a chance to look at it before we make the final, final record.

MR. BERRIGAN: Okay. I apologize. I'll look at it as soon as I get back.

THE COURT: Mr. Williams, were you able to get a copy of the instructions we e-mailed to you earlier today?

MR. WILLIAMS: Yes, I was able to, Your Honor.

THE COURT: And I went ahead and adopted all of the requests by Mr. Berrigan because, one, I thought they were correct statements of the law, and I didn't really have any problem with them. Do you have any problems with his suggestions?

MR. WILLIAMS: No, I did not, Your Honor.

2391

THE COURT: Is there any record that the government needs to make with regard to either the eligibility or the proposed or final penalty phase instructions?

MR. WILLIAMS: No, Your Honor. We're satisfied with the instructions in their latest form.

THE COURT: Okay. And is there any other record that the defense wants to make?

MR. BERRIGAN: No, sir.

MR. WILLIAMS: Unless, Tom, did you have anything you wanted to add on those?

Page 3

MR. MILLER: No.

MR. WILLIAMS: You and I have not had a chance to talk.

MR. MILLER: No, not at all.

MR. WILLIAMS: Okay.

THE COURT: Now, Mr. Williams, I know you're in a difficult situation being out of state, but did you get a copy by e-mail of the penalty phase motion in limine regarding --

MR. WILLIAMS: I did, Your Honor.

THE COURT: -- Mr. Vest?

MR. WILLIAMS: Yes, Your Honor, I did, and I've actually -- I've got some help from the staff in Sioux City who are doing some research for me, and it's my understanding they're going to be sending me a draft response today or tomorrow on that, and I would hope to be able to file a response

2392

by Thursday if that would be satisfactory.

THE COURT: Yeah, that would be satisfactory. Given your situation, I was actually going to relieve you of the necessity to file a response, and I thought you could just do it orally Monday morning -- I'm sorry, I guess it'd be Tuesday morning if you'd like. We've actually started working -- I personally have read not only all the cases cited by the defense but several other cases as well. So I'm pretty -- I'd say I'm very up to speed on the issue.

MR. WILLIAMS: Yeah, and the only additional case that I would want to bring to the Court's attention -- you're probably already aware of it -- is the Bodkins case. I'm not sure --

THE COURT: Can you spell that for me?

Page 4

MR. WILLIAMS: B-o-d-k-i-n-s.

THE COURT: Yep, I sure am.

MR. WILLIAMS: Okay. Very good. That's probably the primary authority we're going to be relying on.

THE COURT: Yeah. I mean, I think I've read virtually everything out there on it that I need to read. And I'll probably rule on it -- well, I will rule on it orally Tuesday morning, but I'm actually going to do a publishable opinion on it. It's kind of a fascinating area.

MR. WILLIAMS: It is.

THE COURT: So don't worry too much about your

2393

resistance because I'm fairly confident I've read everything there is out there that I need to know.

MR. WILLIAMS: Sure. I appreciate that, Your Honor.

THE COURT: If you can file it by Thursday, that's fine. If you want to wait and file it later than that, that's fine too given your situation.

MR. WILLIAMS: I appreciate your understanding, Your Honor.

THE COURT: While we're at it, though, I did have an opportunity this morning to look at the government's penalty phase exhibits. And the only one that was somewhat of a kind of red flag for me was the psychiatric report of Dustin Honken. I don't remember the exhibit number. I don't have those exhibits with me.

MR. WILLIAMS: Your Honor, I'll short circuit this. We're not going to use that.

THE COURT: Okay.

MR. WILLIAMS: What we did -- that was just so we had

Page 5

a good record because we used some of the same exhibits in both trials or at least potentially -- is I didn't want to use any new numbers for any penalty phase exhibits so we didn't get confused on them. So that exhibit list is the same one we filed in Honken with additional numbers. And we're not going to be introducing Honken's psychiatric records at all.

THE COURT: Okay. Then that takes care of it.

2394

MR. WILLIAMS: I should have made that clear.

THE COURT: That takes care of it. Do you know now, Mr. Berrigan, are you going to have objections to other exhibits?

MR. BERRIGAN: I don't think exhibits, Your Honor. There was one witness -- and unfortunately I don't have the government's witness list with me, but this is one familiar to the Court. It's a former clerk.

THE COURT: Law clerk, yeah.

MR. BERRIGAN: Yes, sir, who was present during Mr. Honken's sentencing, and as I understand it, the government's calling her basically to say that Miss Johnson reacted unfavorably to the sentence that Mr. Honken received and might have used some swear words at the time, You're going to be sorry, something to that effect. I frankly don't know what the probative value of that is. And to the extent it has any at all, it's severely outweighed by its prejudicial effect, and I'll be happy to do a very brief motion on that, but that's my understanding of that sole reason that that witness is being called. And, of course, her relationship with the Court makes it a particularly difficult situation.

THE COURT: And I have not talked to her about it at

Page 6

all.  I want to assure you of that.  Maybe it might be helpful if I tell you my recollection of what happened.

MR. BERRIGAN:  Great.

2395

THE COURT:  And it's a very, very foggy recollection, but here's what I remember about it.  I think as I was getting off the bench and walking out of the courtroom Angela Johnson allegedly said something.  I don't recall whether I personally heard it or not.  I'm just telling you I don't recall whether I personally heard it or not.  I remember my law clerk coming back to me and saying something about Angela Johnson had threatened me, and I said something to the effect, She was just upset about the sentence; don't worry about it.

Well, she was worried about it.  She came back and talked to me again.  And I said, Well, if you think there's a problem, you go down and report it to the marshal, or something like that.  That's just my recollection.  It may not be very accurate.

And then I remember a week or so later getting a letter from Angela Johnson that I think Al Parrish had kind of asked her to write.  And I don't remember why I think that or if the letter said something about Mr. Parrish had said something.  I don't remember.  And I got the letter.  It was a very nice letter.  I have no idea what happened to it.  I'm sure I didn't save it.  I never gave it a second thought.  And that's essentially all I know about it.

And I think this did come up when the case was assigned to me when Angela Johnson was first indicted, and we talked about it on the record.  I'm fairly confident that we

2396

Page 7

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2094 of 3592

talked about it. It seemed like nobody had a problem with it. All I remember thinking was that whatever it was she said she was upset about the sentence and it was somebody blowing off steam being upset about the sentence. She certainly isn't the first person, nor will she be the last. And that's my sole recollection of it.

Now, I have never -- well, I think maybe a while ago Jennifer Rinden said to me that she had been subpoenaed because I knew she had been subpoenaed, and I'm in fairly close contact with her when I'm over in Cedar Rapids and all, and I actually officiated at her wedding last year. But once she told me she was subpoenaed, then we've never talked about it. We've never, ever. So that's the extent of what I recall and what I know.

MR. BERRIGAN: Yeah. I don't want to suggest that we have any problem with the Court presiding over the proceedings. It has nothing to do with that.

THE COURT: No, I know that.

MR. BERRIGAN: It's just that this woman worked in a position I guess similar to Carey.

THE COURT: Right. She had Carey's old job.

MR. BERRIGAN: The report at least says -- I've never talked to her. The report says that she said Miss Johnson said, You'll be sorry. And I don't know, you know, frankly what that means. The government's perceiving that apparently as a threat to the Court, and obviously I think the letter that was written

2397

was one of apology. To the extent that anybody perceived that to be a threat, that was not Miss Johnson's intent. She was naturally upset about Mr. Honken. He got a 27-year sentence. I

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2095 of 3592

don't know what the government's position is in trying to get that in.

THE COURT: Which the circuit said was too low, by the way. Mr. Williams --

MR. WILLIAMS: I might be able to clarify this a little bit. The testimony from Alyssa Nelson, Honken's brother -- or sister, will be that she was present during the sentencing hearing sitting next to Angela Johnson and Angela Johnson was singing under her breath or low enough for not everybody else to hear necessarily but singing, Angie's going to get you, Angie's going to get you. She made threatening comments concerning some of the agents involved in the case. She indicated that she was taking photographs of all the people involved in the prosecution of the case.

And the comments by Miss Rinden is corroborative of that testimony, not that there was a threat to the Court, and I'm not going to ask Miss Rinden what she believes that meant because I don't know, number one, whether that's terribly relevant what her belief is but simply what did she say.

And what it's going to be corroborative of in the government's view is not a threat to the Court but a threat to law enforcement officers and prosecutors involved and witnesses

2398

involved in the prosecution of Dustin Honken which is consistent with the testimony that came in through the guilt phase of her desire to assist Honken in eliminating witnesses and retaliating which is also going to be consistent with testimony that comes in through Agent Mittan when he was doing undercover work with Angela Johnson in 1998 that she wanted to -- she talked about hiring the agents to get back at somebody for the purposes of

revenge.

So that's where we're going with it. I don't intend to elicit testimony that there was a threat to the Court or elicit testimony from Miss Rinden about what she thought that meant. I do think Miss Rinden perceived it to be a threat to the Court, but she also wasn't privy to the other comments that were made which in context I think makes it appear that she wasn't saying that -- Angela Johnson wasn't saying she was going to get the Court; rather she was going to get at the people involved in the prosecution.

MR. BERRIGAN: I don't know how that's corroborative. Mr. Williams is suggesting that these are different comments, that Alyssa Nelson, who's Mr. Honken's sister -- and you remember her; she testified in Mr. Honken's trial -- is going to be talking about specific comments regarding threats that she heard while she's sitting next to Miss Johnson. And then Miss Rinden Clark is going to come in and testify about something that's said on the way out the door which she certainly

2399

perceived to be a comment about the Court, not law enforcement officers.

And it seems to me that's quite a stretch, Your Honor, and there's still this very real, we think, prejudicial effect from Miss Rinden Clark that's not present with Miss Nelson given her relationship with the Court. It's not -- it's different than the Court speaking and testifying but not a whole lot different. She's an official. I think the jury would at least perceive her as a court officer, somebody who reports directly to the Court, and they may very well perceive those comments as threats to the Court, not to law enforcement officers because

Page 10

there's no comment about law enforcement officers and you'll be sorry.

So to the extent that they are related -- and I would argue they're not at all -- the probative relevance, if you will, or her corroborative value seems quite minimal, and it has a great prejudicial effect on Miss Johnson if it's admitted.

MR. WILLIAMS: In brief response, Your Honor.

THE COURT: Yes.

MR. WILLIAMS: I think it's highly probative from this standpoint. Alyssa Nelson obviously is going to be easily attacked because of her relationship with Dustin Honken, and for some neutral person to come in and say "I also heard Angela Johnson as she was leaving the courtroom talk about threatening somebody" corroborates and is very probative to corroborate

2400

another witness who can be attacked more easily concerning the fact there were threats made.

THE COURT: Well, let me ask you a question. I know it's not my job to structure your witnesses and your evidence. But if that statement was said by Angela Johnson, you couldn't find somebody else in the courtroom like a U.S. marshal or court security officer who heard it and could come in and say the same thing and wasn't an employee of mine?

MR. WILLIAMS: I wish I could, Your Honor. We have looked into that. The statement was made in the hallway, not in the courtroom according to Miss Rinden.

THE COURT: Oh.

MR. WILLIAMS: And it was made as she was getting on the elevator, and so only according to Miss Rinden, only Miss Rinden was nearby enough to hear the comment.

Page 11

THE COURT: Okay. Well, here's something that I'd suggest. Matter of fact, I may order it. Technically Jennifer Rinden is not employed directly by me in the sense that it's what we call our third law clerk position, and it's funded actually through the clerk's office budget, and she is technically an employee of the clerk of court whereas my other law clerks are technically my employees. For all practical purposes she's my employee. So if I was going to allow her testimony, it could be solicited that her position was --

MR. WILLIAMS: An employee of the clerk's office.

2401

THE COURT: -- an employee of the clerk of court. You wouldn't have to mention the fact that her actual job duties were as my law clerk.

MR. WILLIAMS: I'd have no problem with that at all, Your Honor.

THE COURT: And then doesn't that alleviate -- if there is any prejudice, it would alleviate most of it.

MR. BERRIGAN: Well, the problem is, Your Honor, at least as I understand it -- Mr. Williams has yet to contradict me -- what she claims she heard was, You'll be sorry. So how does the cross-examination go on that? Who's going to be sorry? Who was she talking about? Her perception was that it was you. It was Miss Rinden's perception that that comment was directed to the Court, not law enforcement officers, not these people Mr. Williams is talking about, the Court who's hearing her case.

And I don't understand how Mr. Williams is going to be able to get up and argue that that's corroborative of threats against law enforcement officers when that's not what Miss Rinden says. She doesn't claim these are threats against law

Page 12

enforcement officers. She came back to talk to you because she thought you were in danger.

So I don't think it's corroborative at all. It's almost so vague and ambiguous as not to be probative. So she's upset. She says, You'll be sorry. Who will be sorry? Who will be -- what does that mean? She took it as a threat. That was

2402

her subjective interpretation of those comments.

THE COURT: Well, but I suggest you wouldn't want to get into that.

MR. BERRIGAN: No, I know it, but the jury -- what are they going to be wondering about? Is Mr. Williams going to say, What did you do after you got those threats, Miss Rinden? I went back and talked to Judge Bennett? I mean, I just don't know how that's corroborative of the other testimony they're trying to elicit through Alyssa Nelson, and so she's subject to cross-examination doesn't mean some inadmissible evidence comes in to bolster some admissible evidence that's subject to impeachment, and that's what they're trying to do here.

We're going to get some person who can't be attacked, a clerk from the court, that we're not going to be able to question about these statements because she might very well say what she told you, that she thought you were being threatened. I'd be the last thing I'd want to elicit, and I can see that happening. What's her response going to be? I didn't think she was talking about police officers, Mr. Berrigan. I thought she was threatening the judge.

So my position's unchanged. I understand you're trying to cure the tie between the Court, but the comment goes directly to her perception that you were the one being

Page 13

threatened, and that's wholly conjecture and speculation, and our position would be it's not true.  Nobody said, you know, The

2403

Court's going to be sorry, Judge Bennett's going to be sorry. What does that mean, you'll be sorry?  What probative value does that have?

MR. WILLIAMS:  It has probative value in the context of what Miss Rinden didn't hear, and that is the comments that Angela Johnson made in the courtroom, and in that context, "you'll be sorry" makes sense that she's referring to the agents.  I do not intend to elicit any comment or conjecture from her about what she understood it to mean or what she did afterwards.

THE COURT:  Well, it seems to me it's probative of one of two things.  If Miss Rinden is wrong in who she thought it was aimed at, it can be corroborative, arguably corroborative, of Mr. Honken's sister's testimony about what was allegedly said by Angela Johnson in the back of the courtroom.  Or it could be a threat against me.  And I'm just saying that to me that would be more prejudicial than probative.  And so I wouldn't allow Miss Rinden to give that opinion, but I think -- and I guess your problem is, well, you can't cross-examine her about it.

MR. BERRIGAN:  I certainly couldn't ask her, How did you take that, Miss Rinden?

THE COURT:  Well, you could if you wanted to.

MR. BERRIGAN:  Well, I know, but not without opening the door to the very problem I'm trying to prevent.

THE COURT:  So why does that make the statement

2404

Page 14

inadmissible?

MR. BERRIGAN: That's a sign of how vague it is, Your Honor. It'd be one thing if she said that was a threat against the agents. Well, the very woman who heard this so-called threat did not perceive it that way.

THE COURT: Yeah, but she wasn't privy to the conversation between Angela Johnson and Alyssa Nelson.

MR. BERRIGAN: They're not even made in the same place. Her comments are while she's sitting next to her in the course of the hearing. Miss Johnson's out in the hall, according to Mr. Williams, going down an elevator saying, You'll be sorry. We don't know if it's five minutes later or when it is. There's no context in which the government can argue that's a threat against the agents other than they have somebody in the courtroom that heard specific threats against law enforcement officers, and they want the people to speculate that we're still threatening agents on the way to the elevator. That wasn't Miss Rinden's perception.

THE COURT: I think it's better for your sake that the jury interpret it that way than it was a threat against me.

MR. BERRIGAN: Of course. Wouldn't that be speculation, you'll be sorry, if she was actually able to come in and say, I thought that meant the judge? I dare say we wouldn't contemplate that speculation. I don't know why we're doing it the other way. It's okay; you can speculate that it

2405

wasn't the judge, but law enforcement officers don't claim it was the judge. It's still speculation. That's all it is.

MR. WILLIAMS: Reasonable inference to be drawn from

Page 15

the testimony, and the fact is there was a threat against somebody.

MR. BERRIGAN: Well, "you'll be sorry" in my view is hardly a threat with all due respect to the prosecution's opinion, and I dare say that the testimony of Miss Nelson's going to be quite a bit more specific about what these threats were, and they don't need this. This is just a person from the Court coming in to bolster testimony they're concerned is subject to impeachment, and that's the only value that it has.

THE COURT: Yeah, but that's not an impermissible value assuming it's otherwise probative.

MR. BERRIGAN: That's right. I agree with you.

THE COURT: You just don't think it's otherwise probative.

MR. BERRIGAN: That's right. And let me ask you this. If there was not the testimony from Miss Nelson about the threats to the officers specifically, would we even be talking about this?

THE COURT: Probably not.

MR. BERRIGAN: Right.

THE COURT: But I don't think that proves that it's not probative of the conversation with Alyssa Nelson.

2406

MR. BERRIGAN: I agree if the testimony's tied to law enforcement officers. I just don't know how --

THE COURT: But that's not an impermissible inference. It may not be the inference that you would draw or I would draw or the jury would draw, but it's not an impermissible inference one could draw -- particularly I don't know what Alyssa Nelson's going to say, when in relation to the alleged conversations with

Page 16

Angela Johnson the sentencing hearing ended, Angela Johnson left, and then allegedly made the comment to Jennifer Rinden.

MR. BERRIGAN: Well, I don't even know that Miss Nelson didn't hear the comments. What if she heard the comments out there at the elevator?

MR. WILLIAMS: She did not.

MR. BERRIGAN: Okay.

MR. WILLIAMS: She wasn't there at the same time.

MR. BERRIGAN: I guess our point, Your Honor, is the jury's not going to be directed in any fashion that that comment of "you'll be sorry" applied to the law enforcement officers and not the Court.

THE COURT: No. It would be impermissible to direct that.

MR. BERRIGAN: Right, exactly, so they're left to speculate that maybe that's not the law enforcement officers. This is a woman who's working in the courtroom, not working for the prosecution or the law enforcement officers. She's a --

2407

whatever we're going to call her, but she is functioning as a person who's working for the Court no matter who pays her check, and then she comes in and says, You'll be sorry, and that's it. I don't think the inference is unfair, just as she thought that that comment had to do with the Court, not some law enforcement officers.

THE COURT: Yeah, but she wasn't privy to that conversation. Had she been privy to it, her opinion might have been that it was aimed at law enforcement.

MR. BERRIGAN: No. I understand that. It's possible that might have been her opinion. We don't know.

Page 17

THE COURT: We don't know.

MR. BERRIGAN: Right. We don't know.

THE COURT: But that's for the jury to decide the inference, if any.

MR. BERRIGAN: Yeah, and one of the inferences they could decide from that is it was a threat to the Court.

THE COURT: Yeah, but I'm going to do everything in my power to minimize that inference. You know what? It is a permissible inference that they could make. And if I allowed the prosecutor to establish that she was my law clerk and that she was sitting where Carey sat throughout the trial, then that's an inference the jury might make. But I'm going to try and minimize that by not allowing any of that testimony.

MR. BERRIGAN: Yeah, I appreciate that, that you are

2408

trying to minimize it. My position is that we can't do enough to prevent prejudicial effect from that vague and ambiguous comment, that that's not even a threat I think some people could argue much less --

THE COURT: And you're free to argue it's not a threat.

MR. BERRIGAN: Okay.

MR. WILLIAMS: And we will not argue that it was a threat to the judge. I will never get up and argue --

THE COURT: Well, and you have to -- you know, I can't talk to Miss Rinden nor would I. So it's up to you to make sure that -- I don't want it coming into evidence that she was my law clerk.

MR. WILLIAMS: And I will make sure that doesn't come in, Your Honor.

Page 18

THE COURT: And if she heard the statement out in the hallway, there doesn't have to be any reference to the fact that she was in the courtroom as my law clerk as part of the sentencing.

MR. WILLIAMS: Sure.

THE COURT: And that she was employed by the clerk of court, and, you know, I don't technically know what her title was back then. We've kind of changed titles. She may know what her technical title was. But I want you to do everything you can to avoid testimony that would allow the jury to make an

2409

inference that she was my law clerk and she worked directly under my direction. She was employed by the clerk of court, paid by the clerk of court.

MR. WILLIAMS: And I think all we need to deal with, frankly, is we don't need to get into a lot of detail what her job was. Were you a lawyer, and were you employed by the United States Clerk of Court for the Northern District of Iowa, and on this date were you on the third floor of the courthouse outside the elevators, and were you aware that Dustin Honken was being sentenced, and did you see a woman, and what did she say, and is that the woman? and leave it at that.

MR. BERRIGAN: What difference would her employment make in this testimony?

MR. WILLIAMS: To explain why she's in the courthouse.

MR. BERRIGAN: Well, it's a courthouse. Lawyers go to court. I mean, I don't know that she needs any more explanation for being in the courthouse than she's a lawyer because that's what we do. But to suggest now she's an employee of the court, maybe not this court, this judge, but employee of the court only

Page 19

emphasizes my concern.

MR. WILLIAMS: It emphasizes it during the trial because the concern I have at that point then if she's just a lawyer, it could be a lawyer working for the government. It could be a defense lawyer trying to create favor with the government. I think it's important for the jury to assess her

2410

credibility that she be identified as a neutral person.

THE COURT: I'm going to let you identify her as an employee of the clerk of court.

MR. WILLIAMS: Very good, Your Honor.

THE COURT: And unless I rule otherwise as it comes up, I'm going to allow her testimony but subject to the record that we've made, and you have to be very clear with her that she -- I'm essentially granting an oral motion in limine with regard to her employment with me as my law clerk and her subjective assessment of how she took that statement. She can only come in and say what she heard, not what she thought it meant.

MR. WILLIAMS: And the only other additional question I think I would ask her is did she -- from her observation of the demeanor, did it appear to her to be a statement made in jest or a serious statement?

THE COURT: Yeah, you can ask the circ -- right, you can ask those type of questions because you could ask that of any witness.

MR. WILLIAMS: The only thing I would say, Judge, in this area if I could have leave of the Court to perhaps use more leading questions with her than I would typically just to make sure that I can -- and I'll talk with Miss Rinden, but if she's

Page 20

like any other lawyer, all lawyers have a hard time answering
questions.  And if I could lead her a little bit more in this

2411

area, I could make sure that we keep it within the bounds of the
Court's ruling.

THE COURT:  Mr. Berrigan, would you have any problem
with that?

MR. BERRIGAN:  No, of course not.

THE COURT:  Okay.  Okay.

MR. BERRIGAN:  Without, you know, waiving my previous
objection.

THE COURT:  Nope, nope, no waiver, no waiver.

MR. BERRIGAN:  That's for the benefit of the Eighth
Circuit, Your Honor, as you well know.

THE COURT:  I understand.  I do understand that.  You
have a record and a job to do.  I totally understand that.

Okay.  Anything else we need to talk about?

MR. WILLIAMS:  Not on behalf of the United States,
Your Honor.

MR. BERRIGAN:  Nothing by the defense, sir.

THE COURT:  Okay.  Thank you.  We'll be in recess.

MR. WILLIAMS:  Thank you.

(The foregoing trial was
adjourned at 3:28 p.m.)

                        CERTIFICATE
        I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.


                            10-16-05
     Shelly Semmler, RMR, CRR              Date



Page 21

2412

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CR01-3046

        Plaintiff,                       Sioux City, Iowa
                                May 26, 2005
    vs.                                      1:13 p.m.

ANGELA JANE JOHNSON,                         TO BE FILED UNDER SEAL

        Defendant.
                          /     VOLUME 14 OF 24

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

| | |
|---|---|
| For the Plaintiff:<br>(via speakerphone) | ROSEANN KETCHMARK, ESQ.<br>MATT WHITWORTH, ESQ.<br>Assistant United States Attorney<br>Charles Evans Whittaker Courthouse<br>Room 5510<br>400 East Ninth Street<br>Kansas City, MO  64106 |
| For the Defendant:<br>(via speakerphone) | PATRICK J. BERRIGAN, ESQ.<br>Watson & Dameron<br>2500 Holmes<br>Kansas City, MO  64108 |
| Court Reporter: | Shelly Semmler, RMR, CRR<br>320 Sixth Street<br>Sioux City, IA  51101<br>(712) 233-3846 |

2413

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Good afternoon, Counsel.  This is United States of America versus Angela Johnson, Criminal Number 2001-3046.  I'm here in Sioux City, and I have my court reporter, and I'm not exactly sure what the purpose of the

Page 1

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2109 of 3592

meeting is, of this conference is, but I know there was a request yesterday by the outside taint attorneys Roseann Ketchmark and Matt Whitworth from the Western District of Missouri who are the taint team lawyers in this case, and you did send me a courtesy copy of the outside taint attorneys' request for disclosure by defendant of results and reports of any examination on mental conditions, and that's about all I know.

MS. KETCHMARK: Yes, sir, that's correct. And I think yesterday Matt and I had a telephone conference with Pat Berrigan to discuss getting the experts' reports to each other and just talking about the mental condition. And there were basically four comments that Pat made that are of concern to us that because time is of the essence in some areas we thought it might be best to have a conference call and take it up immediately with you and go from there.

THE COURT: Okay.

MS. KETCHMARK: I can just kind of tell you what our four concerns are. The first one is in our discussing with Pat

2414

reports and results of experts, Pat's opinion is that the rule requires the government's expert to prepare reports but not the defense experts. I just was not able to read that from the rule. I could be wrong. I just didn't find that the rule supported that, and that's of some concern. And Pat said that he is recommending that the defense experts not prepare reports.

And the third concern is --

THE COURT: Well, what's the second concern? I thought that was the first concern.

MS. KETCHMARK: The first concern is that the

Page 2

government's experts have to prepare reports and the defense experts do not.

THE COURT: Okay. That's two concerns or one?

MS. KETCHMARK: That's the first concern is that just that there are different rules for the experts.

THE COURT: And the second concern is the fact that apparently Mr. Berrigan has indicated he's instructed his experts not to prepare reports.

MS. KETCHMARK: Recommending that they not prepare reports.

THE COURT: Yeah.

MS. KETCHMARK: And then third, our experts are prepared to -- if needed prepare reports. They're believing that they should prepare a report and have asked Pat for additional information specifically to what information the

2415

defense experts are relying on that they should also review, witnesses, collateral witnesses that may be important, if they can have contact information so they could call -- Pat told us yesterday he is not inclined to provide any of those requested information to our experts. And so that's our third concern.

And then our fourth concern is -- and this kind of is reflected in our letter brief, that the position we're put in and the prosecution, that the mental condition does not have any bearing on the defendant's thinking or behavior at the time of the offense and, therefore, we cannot ask questions about the offense, and we can sure live with that.

And our point is that although -- that the jury needs to understand that. Yesterday Pat said that the judge is clear, the prosecution team, the taint team, the experts, and that he

Page 3

are all clear on those parameters, but our point is the most important folks that need to have that basic understanding is the jurors, that this mental condition didn't affect the behavior and the thinking of the defendant at the time of the offense, yet Pat's opposed to preparing a stipulation to advise the jury of that, those parameters.

So those are our four concerns. And our experts are put in the position where they don't know what they're looking for. We've kind of tried to move forward with a lot of unknowns, and so we sure don't hold it against Pat in any way that he's been very strategic in trying to put himself in the

2416

best advantage, but we're just trying to level the playing field.

THE COURT: Okay. Why don't we try to get through to the heart of the matter. Let's go through them one at a time.

Mr. Berrigan, what's your authority for the proposition that the government experts have to prepare reports but your experts don't?

MR. BERRIGAN: The rule, Your Honor, Rule 12.2(c)(3) talks about the disclosure of the results and reports of the defendant's expert examination. I don't see anywhere in the rule and I'm not aware of any other authority and, frankly, in the past I have not had experts prepare reports necessarily when they're testifying in the mitigation phase of a capital murder case and the testimony is not about the defendant's mental state at the time of the murders. So I don't think it's a situation where there's some burden upon the defense to put on -- put in reports, written reports in order to --

THE COURT: How do you get -- just a second. How do

Page 4

you get your construction out of the rule?

MR. BERRIGAN:  I just don't think the rule -- the rule addresses government's examination and reports.  It doesn't compel any reports from defense experts.  So I don't think the defense is compelled to produce any reports.  Certainly we, I think, need to provide by way of a general explanation about what the expert's testimony's going to be about.  We need to

2417

provide some explanation about what the testimony is going to be about.

THE COURT:  I don't understand how you conclude that under the rule.  Which specific rule are you looking at?

MR. BERRIGAN:  I'm looking at 12.2.

THE COURT:  Well, what part of 12.2?

MR. BERRIGAN:  12.2(c)(3).

THE COURT:  After disclosure under Rule 12.2(c)(2) of the results and reports of the government's examination, the defendant must disclose to the government the results and reports of any examination.

MR. BERRIGAN:  Right.

THE COURT:  What's ambiguous about that?

MR. BERRIGAN:  Nothing.  I think if there was a report we would absolutely have to disclose it.

THE COURT:  Well, I think it's unethical for you to instruct an expert not to prepare a report.

MR. BERRIGAN:  I haven't in -- well, okay.

THE COURT:  Well, what have you done?  You've told them not to prepare a report.

MR. BERRIGAN:  The experts asked me, Your Honor, whether we want a report.  I have not asked them for a report.

Page 5

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2113 of 3592

THE COURT: Well, here's the deal. I'm going to make it real simple. You can either have them prepare a report -- has the government -- has the government exchanged their results

2418

and reports yet?

MR. BERRIGAN: No, sir.

THE COURT: Okay. And your -- let me ask the taint team lawyers. Your experts don't have their reports done?

MS. KETCHMARK: Not at this point. They have requested additional information before they prepare their report.

THE COURT: Well, we're out of time.

MS. KETCHMARK: They can prepare it very quickly.

THE COURT: Okay. Okay. I hear you. Well, here's what I'm ruling. Either your experts, Mr. Berrigan, prepare reports and turn them over, or I'm going to give the government the right to take their telephonic deposition.

MR. BERRIGAN: Okay.

THE COURT: So it's your choice.

MR. BERRIGAN: All right.

THE COURT: But I don't think you can do this. And I don't think you can evade the rule by not having them prepare reports.

MR. BERRIGAN: I'll have them prepare a report if I'm being directed to do so.

THE COURT: Well, either that or I'm going to give the government the right to take their deposition.

MR. BERRIGAN: Right. I understand the options.

THE COURT: So we've resolved number one. Have we --

2419

Page 6

is there anything else about number one that I need to rule on, Miss Ketchmark or Mr. Whitworth?

MS. KETCHMARK: No, sir. That takes care of 1 and 2.

THE COURT: Okay. Three is -- this is a little bit more problematic. The experts apparently relied on interviews of other individuals? Is that it? Is that what you're saying?

MS. KETCHMARK: We're saying we don't know what they've relied on, and they just want to make sure that they covered the important information.

THE COURT: Well, as part of their -- as part of the -- as part of their report, they're going to have to list all information they relied upon. And if it's interviewing individuals, they'll have to list the individuals and summarize the nature of the interview.

MS. KETCHMARK: Okay. Okay. They were interested in talking to like her ex-husband, her sister, and curious about contact information like phone numbers. Those folks would be helpful to get a better understanding.

MR. BERRIGAN: Your Honor?

THE COURT: Yes.

MR. BERRIGAN: These individuals, these two gentlemen that the government has hired to do the evaluation, talked to Miss Johnson for five and a half hours a month ago. And as far as I can tell, they've not done anything since. They certainly had the opportunity to ask her any questions they wanted about

2420

who they should interview, how to get ahold of those folks. I have a copy of their transcript of that interview. They did not do that. Now you're kind of asking me at the eleventh hour to

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2115 of 3592

give the prosecution work product of the defense in order for them to kind of, I guess, get up to speed.

THE COURT: Well, who the experts talked to is not work product.

MR. BERRIGAN: No, I understand that. But they're apparently wanting me to put them in contact with people.

THE COURT: Well, I don't think you have to do it, but I think the experts do. The experts have to list all the information that they relied upon. And if they talked to somebody, they have to list identifying information about who it is they talked to and their address and phone number if they have it.

MR. BERRIGAN: Well, the rule -- and again, this is Rule 12.2(c)(3) -- anticipates that that report would go to the government after we have the government's report. So I don't know how they use our report to then be the base of their subsequent investigation to do their report when they should have done that from the beginning.

MS. KETCHMARK: I think the judge addressed that in his order how the taint team effects the raw data sent to the government's expert as well as the report.

THE COURT: Well, I don't remember what the order

2421

said, but this was exactly the kind of problem I was trying to avoid. But you know, Mr. Berrigan, I just knew it was going to happen.

MR. BERRIGAN: Your Honor, I got a letter about this on Tuesday. I mean, these guys talked --

THE COURT: Yeah, but, Mr. Berrigan, to tell your experts not to prepare reports --

Page 8

MR. BERRIGAN: Well, Your Honor, even if -- let's assume my experts had prepared a report. Let's assume that happened. The government would not get that until after they'd already given us a report, and now they're asking us for information that they want to use in preparation I guess to do some more investigation to prepare a report. I mean, they --

THE COURT: Okay. I under -- here's -- I understand what you're saying. I'm going -- here's what I'm going to do. The government has to turn over their reports without that additional information.

MS. KETCHMARK: Okay.

THE COURT: You then, Mr. Berrigan, have to give the government in your reports all of the information your experts relied upon. And if the government experts then want to go out and contact those people and change any opinions in their reports, they're free to do so.

MR. BERRIGAN: Okay.

MS. KETCHMARK: We understand.

2422

THE COURT: But that solves -- and I think Mr. Berrigan's right. There's no requirement that that information be turned over in advance to the government -- to assist the government in conducting their investigation and report. But I think it's only fair that the government experts have the information that the defense experts relied upon. And they may, in fact, revise or modify any initial conclusions that they came to based on that new information.

MS. KETCHMARK: I understand.

THE COURT: And that's consistent or at least it's not inconsistent with 12.2.

Page 9

MS. KETCHMARK: Okay. Okay.

THE COURT: What other problems are there?

MS. KETCHMARK: Our concern about the jury drawing the inference -- the common sense inference that if they're putting on mental condition as a mitigator that the jurors probably would say, well, that should -- that affected her behavior and thinking at the time of the offense, and they've clearly said that is not what they are arguing.

THE COURT: Did you ever enter into a written agreement about that?

MS. KETCHMARK: Well, we asked Mr. Berrigan about that yesterday, to enter into a stipulation that we had talked about on one of our previous conference calls. He said he was disinclined to enter a stipulation which I'm sure that's his

2423

choice.

THE COURT: Yes. I think there's nothing that I can do to require him to stipulate to it. I just want you to reduce to writing what your agreement is, and then I'll decide if the jury should be told that in the instruction.

MS. KETCHMARK: Thank you. And I think that may be the best resolution is an instruction.

THE COURT: But right. Neither the government nor I can require Mr. Berrigan to stipulate to it. All I'm trying to do is see if you can agree on what the agreement was because I think we were all in agreement about it. And if not, I can go back and get a transcript done, but it would just be faster and easier if you would just reduce to writing what you agreed upon, and then I'll take up the question about whether at the appropriate time the jury should be informed of that agreement

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2118 of 3592

by way of either an oral instruction from me or include it in the written instructions.

MS. KETCHMARK: My notes reflect that that understanding is the mental condition did not affect the behavior or the thinking of the defendant surrounding the time of the offense.

THE COURT: Mr. Berrigan, is that in the ballpark?

MR. BERRIGAN: Well, it is, Your Honor, but there are really two issues. One is -- and I'm not sure which one the government's interested in or both. One is the limitations on

2424

the experts in terms of questioning Miss Johnson, and none of the experts have questioned her about the actual homicides. And that was based upon our representation our expert did not do that as well, and this was a rebuttal evaluation.

What the government's asking for a little different I think which is kind of the -- some instruction to the jurors that tells them not to consider her mental state in some regard, and I'm not exactly sure, you know, what that pertains to.

THE COURT: Well, I thought you indicated in the prior hearing -- if I have to get the transcripts, I will -- that you were not taking the position that she had a -- that -- your mitigation had nothing to do with her mental state at the time of the offense.

MR. BERRIGAN: That's right, yeah. And I've tried to be consistent about that. We've not suggested at all that her mental condition affected her ability to in any way participate in the homicides. She does have a couple chronic conditions, chronic meaning going back almost her entire life -- one is depression, and one is posttraumatic stress disorder -- which

Page 11

certainly existed at the time of the homicide, but they don't go away, but we're not claiming that these homicides had anything to do with her conditions or vice versa. In fact, that will be our position certainly in the penalty phase. I'm not sure why we need a stipulation or something to that effect, Your Honor, when that's going to be clear from the testimony, but the

2425

government's alleging we do. None of the experts are going to talk of any opinion different than what I've told you.

THE COURT: And, Mr. Berrigan, I'm not saying I'm going to instruct the jury about that. I'm just saying if I decide to I'd like agreed-upon language.

MR. BERRIGAN: Okay. Well, I guess we can see what they proffer and take a look at it.

MS. KETCHMARK: In our letter brief, we addressed our concern. This has been a concern from the --

THE COURT: Now just a second. When you say letter brief --

MS. KETCHMARK: Yes, sir.

THE COURT: -- I don't have a letter brief.

MR. BERRIGAN: I don't either.

MS. KETCHMARK: It was a March 14 letter brief that we mailed to you. Let's see. It's about --

THE COURT: Back in March?

MS. KETCHMARK: Yes. And Pat didn't submit one. And based on our letter brief and our conference call, you issued about a 36-page order.

THE COURT: Oh, okay. I thought you were talking about a letter brief filed in the last 24 hours.

MR. BERRIGAN: I did as well.

Page 12

MS. KETCHMARK: This has been a concern from the beginning, and we addressed that on page -- specifically page 5

2426

about the possibility -- and 6, the top of page 6, about possible stipulations and our beliefs that the jury would draw a wrong inference from this mental condition. And then in your -- in response to our letter brief and our conference call, in your order you addressed it specifically on page 34 about how we may enter into stipulations and that a stipulation would likely dissipate our concern, and you mentioned -- and I can't put my finger on it now but how an instruction may be necessary, and I just can't put my --

THE COURT: Yeah, okay. But the bottom line is I think a stipulation would be in order, but I can't make Mr. Berrigan stipulate to it nor can the government. And if he doesn't want to stipulate to it, he doesn't have to, and then I'll have to decide based on the evidence and probably the argument whether or not a further instruction is necessary. If I think the defense is trying to somehow get around this agreement -- and I don't suspect that Mr. Berrigan would ever do that -- I just want to be ready with language if I think I need to tell the jury something. And the language I would tell the jury would simply reflect what the parties have previously agreed to.

MS. KETCHMARK: Okay.

THE COURT: So I want to make it clear I'm not saying I'm going to tell the jury anything. I'm just trying to anticipate if I ever need to tell them which I kind of doubt

2427

Page 13

based on what Mr. Berrigan is representing to me, I'd be ready to go with some language that the parties at least can agree that that's what their agreement was. I don't expect Mr. Berrigan to agree that I should tell the jury that.

MR. BERRIGAN: Right.

THE COURT: Mr. Berrigan, are you tracking me?

MR. BERRIGAN: Yes, I am, Your Honor. Yes, I am.

THE COURT: Okay. And Miss Ketchmark and Mr. Whitworth, are you tracking me?

MS. KETCHMARK: Yes.

MR. WHITWORTH: Yes, Your Honor.

MS. KETCHMARK: It was page 7 of your order, I'm sorry, where it says it might be necessary for the Court to give an instruction.

THE COURT: Okay. Are there any other issues that are outstanding now? And how soon will the parties -- well, let me back up here. I guess under the rule the defendant has to confirm an intent to offer during the sentencing proceeding expert evidence on mental condition after the defendant is found guilty. And, Mr. Berrigan, you're doing that, aren't you?

MR. BERRIGAN: That's exactly right, Your Honor.

THE COURT: Yeah, there's no question about that.

MR. BERRIGAN: Right.

MS. KETCHMARK: Okay.

THE COURT: Do the parties anticipate problems in the

2428

timing of the exchange of this information?

MR. BERRIGAN: No, sir. I guess it depends on when the government report comes in, but I think my experts can have

Page 14

their reports in very quickly I suspect. I'll call them right away.

MS. KETCHMARK: We will.

MR. WHITWORTH: Judge, we talked to our experts, and they had indicated to us they could have something -- they thought they could have something ready by the end of this week which is tomorrow or Saturday I would think. But as soon as we get it, we will get it to Pat.

THE COURT: And it's not likely, is it, Pat Berrigan, that you'll be putting on any experts next week?

MR. BERRIGAN: Well, no. That's right, Your Honor. I think our first expert is scheduled for 8:30 in the morning on Monday, the 6th. So I won't have any experts testifying next week. Of course, we do have the matter of opening statements.

THE COURT: Yes.

MR. BERRIGAN: And so it would be helpful obviously to have the information as soon as possible. But I don't anticipate expert testimony until the week following.

THE COURT: Okay. So we at least have some time to get these reports exchanged but not a whole lot of time.

MR. BERRIGAN: Right.

MS. KETCHMARK: I do have a couple of issues. When

2429

does the wall actually come down? Will that be when --

THE COURT: I don't know. That's a good question. I was wondering the same thing.

MS. KETCHMARK: Surely by opening statement when they advise the jury? I don't know if maybe any sooner. Or maybe I'm wrong and it's later. But I think my plan is to go up and personally turn over our information we have, our collection

Page 15

of --

THE COURT: What's the need for the taint team after the finding of guilt?

MR. BERRIGAN: I suppose theoret -- well, we're not presenting any evidence, Your Honor.

THE COURT: Yeah, your eligibility argument?

MR. BERRIGAN: Right. That's the only thing I can think of.

THE COURT: But because there's no --

MR. BERRIGAN: It would seem to me there's no reason at all to have the taint team continue.

THE COURT: Now let me ask you this. Because we're not putting on any evidence on the eligibility phase, would you have any problem with the wall coming down now once the guilty verdicts had come in?

MR. BERRIGAN: I'm sorry. I didn't understand that question, sir.

THE COURT: Well, because we're not --

2430

MR. BERRIGAN: No, I don't really -- no, I think after the exchange of the reports I've got no problem with the wall coming down.

MS. KETCHMARK: Okay.

MR. BERRIGAN: I think -- see, I think, Your Honor, the defense has an opportunity -- I'm not going to suggest we'd exercise it, but we'd have an opportunity once we got the government's reports I suppose theoretically to change our mind.

THE COURT: Yes.

MR. BERRIGAN: Withdraw our notice, so I don't think until we've made that determination that the wall can come down.

Page 16

But, you know, that's not going to take me any time at all, and I'd be very surprised if we made a change in our strategy in terms of putting on mental health evidence, but I suppose as a legal matter that should at least occur that we would have the government's evaluation and have made a determination about whether it was still going forward.

THE COURT: Well, why would it be necessary to keep the wall in effect if -- you're obviously not going to turn over your reports once you've seen the government reports unless you're going to proceed.

MR. BERRIGAN: Right. It's the government -- it's the trial attorneys' access to the government's report I think is the danger. They could potentially use that I suppose in the penalty phase if they have access to it, and I think that's the

2431

whole idea, that if the defense isn't going forward, then that information does not become available to them, to the government attorneys that are trying the penalty phase. Did that make any sense?

THE COURT: Well, what was the original reason for the taint team anyway?

MR. BERRIGAN: Well, it's this whole idea under the rule that these reports not be available to the government's trial prosecutors until we're in the penalty phase and the defense has made the determination to go forward with mental health evidence, and one way that -- it's supposed to make the process a little easier I think for the government because they can have some attorneys that are out of the process that are kind of working on this evaluation, and that would be, of course, Miss Ketchmark and Mr. Whitworth, and they're going

Page 17

along preparing that evaluation for potential use by the trial team lawyers, and having a taint team would, you know, better enable that process. At least that was my understanding.

THE COURT: Well, but if you look at Rule 12.2(c)(2) --

MR. BERRIGAN: Uh-huh.

THE COURT: -- it says, "Must not be disclosed to any attorney for the government or the defendant unless the defendant is found guilty of one or more capital crimes and the defendant confirms an intent to offer during sentencing

2432

proceedings expert evidence on mental conditions." You've already confirmed that intent.

MR. BERRIGAN: Yes, we have. And you could take the position that that's sufficient to turn it over. I think the danger in that is if we withdrew it to what extent that report then could be used by the government in penalty phase creates legal issues that at least it seems to me we might not want to deal with.

But having said that, it would be extremely unlikely that we're going to change our position, and I don't expect, you know, waiting for us to look at the government's report's really going to take any additional time at all, but it provides quite a bit of, I suppose, safety in terms of not having any possibility that the government's mental evaluation would be misused for any purpose for which it was not intended.

THE COURT: Okay. So your position, Mr. Berrigan, is that the wall doesn't come down until you've seen the government reports and reconfirm your intent to proceed with mental health evidence.

Page 18

MR. BERRIGAN: Right, because at that point really it seems to me no need for the taint lawyers any longer since we're going forward and all the information's on the table.

THE COURT: And we don't know exactly when the government reports are going to be produced to you?

MR. BERRIGAN: Apparently not, sir.

2433

THE COURT: Do you have a date in mind, Miss Ketchmark or Mr. Whitworth?

MS. KETCHMARK: Earlier this week they said they could have it by the end of the week, that they were waiting for Mr. Berrigan's response, so it sounds as if it could happen quickly.

THE COURT: Okay.

MR. WHITWORTH: Your Honor, as soon as we finish this phone call, we'll get in touch with them and ask them to get that done as quickly as possible.

THE COURT: Okay. And, Mr. Berrigan, I suspect that once you review those reports you'll know immediately whether you intend to proceed or not?

MR. BERRIGAN: Yes, sir, yeah. I have no reason to delay, Your Honor.

THE COURT: And then would you then make a commitment to me to inform the taint team that you're proceeding and that we can all agree that once you do that and you will do that as soon as reasonably practicable after receiving the government reports then the wall can come down?

MR. BERRIGAN: Absolutely. And I can't -- hopefully I'll have these reports this week, and I would hope that decision would be made no later than by the start of court on

Page 19

Monday morning if not sooner.

THE COURT: Well, I would think -- unless I'm missing

2434

something here, I think you could read the reports and pretty much make a decision after you read them and let them know some time this weekend by e-mail.

MR. BERRIGAN: Yeah, absolutely. But they're talking about Saturday. I don't know -- yeah, we could send you an e-mail as well so you'd know ahead of time. Sure. I'll be happy to do that.

MR. WHITWORTH: Are you holding court Monday, or is it --

THE COURT: No, I'm not holding court, but I'll be in town, so if I get an e-mail and I have to hold court, I will.

MR. BERRIGAN: Yeah, I misspoke. I meant Tuesday, right.

THE COURT: No, I knew you meant on Tuesday. Yeah, but if issues come up, feel free to just e-mail me over the weekend. I've got a Blackberry, and I'm never far from it. And I deal with a lot of things that come up on short notice.

MR. BERRIGAN: Okay. We'll do that.

THE COURT: I think we've resolved everything we need to resolve.

There is this issue -- but I don't have the right lawyers on here -- about the proffer -- oh, but let me -- as long as I've got some government lawyers. They're not actually the right lawyers, but it's good enough for me, so, Miss Ketchmark and Mr. Whitworth, you're not exactly going to know

2435

Page 20

what I'm talking about, but all I need to know is a response from Mr. Berrigan. Mr. Berrigan, the government filed a motion -- the other taint team filed a motion about telling the victims' family members about the nature of the proffer.

MR. BERRIGAN: Yeah, we're opposed to that, Your Honor. I did read the motion. It's rather short.

THE COURT: Yes.

MR. BERRIGAN: It seems to rely on what effect this might have on the victims' family members. Frankly -- and I don't know. The Court hasn't made the decision yet on Mr. Vest, but, you know, if he testifies, the victim family members are already going to have heard very similar testimony. They already heard it in Mr. Honken's case.

THE COURT: I was going to say that's right, they've already heard it in Honken's case.

MR. BERRIGAN: Yeah, when Mr. Vest testified.

THE COURT: Right.

MR. BERRIGAN: So I don't know what their concern is, to be honest, and I don't --

THE COURT: Well, is the Honken proffer all that different than the Vest testimony?

MR. BERRIGAN: That's what I'm suggesting to you, sir. I know you haven't had a chance to see it, but it's not that much different. And there's no bombs in there that they would not have already heard having listened to Mr. Vest, so I'm not

2436

sure what the concern is there. Maybe the taint team's unaware that Mr. Vest testified in the Honken case or is unaware of his testimony is the only thing I could surmise because it makes no sense, frankly. This testimony's been out there. The victims'

Page 21

families already heard it from a different source admittedly, but there's nothing new in this.

We are opposed to it. It seems like it creates a lot of potential problems because a lot of these folks are going to testify. And I don't know what effect, if any, it's going to have on their testimony. But, you know, I suppose if the government wanted to put the proffer in -- I doubt they're going to -- they could do that before the victims' family testified and they'd know about it. But other than that, we don't think it's appropriate.

THE COURT: Okay. I just wanted to know what your position is.

MR. BERRIGAN: Yes, sir.

THE COURT: We'll take it up with everybody Tuesday morning.

MR. BERRIGAN: We have a written response, Your Honor, that will be filed today.

THE COURT: Oh, okay. I made a decision that I'm not going to look at the proffer until af -- until after the eligibility phase determination.

MR. BERRIGAN: Sure.

2437

THE COURT: And if there's a determination that's favorable to the defendant, then I never need to see the proffer.

MR. BERRIGAN: Right.

THE COURT: If the eligibility phase goes against the defendant, then I need to see it so I could rule on its admissibility.

MR. BERRIGAN: Right.
Page 22

THE COURT: Right?

MR. BERRIGAN: Yes, sir. I think that makes sense, and it's not going to take long I don't think for the Court to make -- I mean, if we're at the penalty phase, I don't think it will take long to make a determination about the admissibility of the proffer, frankly.

THE COURT: Okay. Yeah, I've given it a lot of thought.

MR. BERRIGAN: I know. I know you have.

THE COURT: You know, I'd like to see it before I rule on it obviously, but if it's similar to Vest, I have a very good understanding of what that might be like.

MR. BERRIGAN: Right.

THE COURT: Okay. Anything else?

MR. BERRIGAN: Nothing by the defense, sir.

MS. KETCHMARK: Since we're in a better position than the prosecution team to submit our understanding of the

2438

agreement or proposed instruction that we should do that before we wrap up as taint counsel?

THE COURT: Yes, that'd be nice.

MS. KETCHMARK: And should that be a formal response or an informal correspondence?

THE COURT: You can kind of just do it informally.

MS. KETCHMARK: Okay.

THE COURT: Great. Thank you. Thank you all very much.

(The foregoing hearing was
concluded at 1:47 p.m.)

Page 23

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

                                          5-31-05
        Shelly Semmler, RMR, CRR              Date

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2132 of 3592

2439

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,  No. CR01-3046

       Plaintiff,  Sioux City, Iowa
                               May 31, 2005
   vs.  7:42 a.m.

ANGELA JANE JOHNSON,  VOLUME 15 of 24

       Defendant.
                     /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

2440

APPEARANCES:

For the Plaintiff:  C. J. WILLIAMS, ESQ.
                     Assistant United States Attorney
                     Suite 400 - Hach Building
                     401 First Street Southeast
                     Cedar Rapids, IA  52401

                     THOMAS HENRY MILLER, ESQ.
                     Iowa Attorney General's Office
                     Area Prosecutions Division
                     Hoover State Office Building
                     Des Moines, IA  50319

For the Defendant:  PATRICK J. BERRIGAN, ESQ.
                     Watson & Dameron
                     2500 Holmes
                     Kansas City, MO  64108

                     DEAN STOWERS, ESQ.
                     Rosenberg, Stowers & Morse
                     1010 Insurance Exchange Building
                     505 Fifth Avenue
                     Des Moines, IA  50309

                     ALFRED E. WILLETT, ESQ.
                     Terpstra, Epping & Willett
                     Higley Building - Suite 500
                     118 Third Avenue Southeast
                     Cedar Rapids, IA  52401

Also present:  Bill Basler

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2133 of 3592

VOLUME 15, 5-31-05
Court Reporter:          Shelly Semmler, RMR, CRR
                         320 Sixth Street
                         Sioux City, IA  51101
                         (712) 233-3846

2441

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Okay.  Why don't we go on the record to take up a few matters.  I did e-mail the lawyers on both sides over the weekend about Supplemental Instruction A, special instruction before commencement of eligibility phase which reads as follows:  We will be bringing you up to the courtroom for jury instructions and argument on the eligibility phase at 8:30 this morning.  You are not to discuss any aspect of the merits phase, the deliberations on that phase, or the verdict reached in that phase with anyone, including any other jurors or alternate jurors, until you retire to deliberate with your fellow jurors on the eligibility phase, nor should you discuss with anyone or speculate about any aspect of the eligibility phase which starts today until you retire for your deliberations on that phase.  Dated this 31st day of May, 2005, signed by me.

And I asked the lawyers if they thought it was a good idea to hand that to each of the jurors and alternates this morning when they came into the building, and I did get an e-mail response saying that the lawyers agreed, but I just wanted to go on the record and make sure everybody was in agreement with the Supplemental Instruction A.  Mr. Williams?

MR. WILLIAMS:  Yes, Your Honor, we're in agreement.

THE COURT:  And Mr. Berrigan?

MR. BERRIGAN:  Yes, Your Honor, we are as well.

2442

Page 2

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2134 of 3592

THE COURT: Okay. And then I also raised by e-mail this weekend the issue of making a record with the defendant on the kind of major theme in the penalty phase instructions, and that was whether we were going to stay with what we told the jurors during jury selection about the only penalties being life imprisonment without the possibility of parole and the death penalty or whether we would somehow try and inform the jurors of the effect of United States versus Booker and indicate that the options were really death or a sentence I guess less than life imprisonment without the possibility of parole all the way down to the statutory minimum sentence of 20 years.

And it was a subject of much debate with the lawyers and myself last week or the week before, and both sides ultimately convinced me that the better way to proceed would be with what we told the jurors during jury selection, that the only two penalties they could consider would be life imprisonment without parole and the death penalty. And at that time Mr. Berrigan suggested that he was willing to make a record about that, that that's what his client wanted to do. And I thought now would be the time to make that record.

MR. BERRIGAN: May it please the Court. I think I've stated in the past but I'll state again for the record that Miss Johnson and her defense counsel have spoken about this issue on several occasions, Your Honor, including over the course of this weekend. And Miss Johnson understands and has understood since

2443

the beginning of trial that if the defense took the position that only two options were presented to the jury, life without parole or the death penalty, then, in fact, those would be the

Page 3

only options in terms of sentencing, that the alternative was perhaps that the jurors would be presented with an option of the death penalty or Miss Johnson would be sentenced by the Court pursuant to statute for a term perhaps as low as 20 years.

And it was our position, a position which she concurred, that we have a better opportunity to get a life sentence if the jurors have the option of imposing life in prison without possibility of parole rather than the indeterminate situation where the jurors are unsure as to what sentence might be imposed by the Court if they don't give the death penalty, and that obviously is somewhat of a tactical decision, and it certainly has consequences. That is, Miss Johnson's aware that if the jury imposes a life sentence then the Court's not going to be considering a sentence of 20 years or something less than life.

But that is the course that we have chosen. We think that's the best course for Miss Johnson to escape a potential sentence of death because there could be jurors sitting on this jury who would not realistically consider a sentence other than death if they knew that a sentence as low as 20 years might be applied or that that was an option for the Court if they failed to return a death sentence.

2444

And even if they weren't given that information specifically, if they weren't told anything, that's inconsistent with what we've been telling them in terms of the alternative sentence, and we don't want any ambiguity for these jurors in terms of what the options are in terms of sentencing.

So we have asked the Court consistently throughout the trial and do so again to advise the jury that there are only two

Page 4

possible punishments, the death penalty or life in prison without possibility of parole, if Miss Johnson is eligible for those sentences after the findings in phase 2 of the trial.

So, Miss Johnson, is everything that I've stated to the Court accurate?

THE DEFENDANT:  It is.

MR. BERRIGAN:  And is it your desire to do as I have indicated to the Court, that we stay the course and continue to request that the two options available to the jury are life imprisonment without possibility of parole and the death penalty?

THE DEFENDANT:  It is.

MR. BERRIGAN:  And knowing that, you understand that if we proceed on that course, then a sentence of less than life without parole will not be an option that will be available to you.

THE DEFENDANT:  I understand that.

MR. BERRIGAN:  Okay.  If there's anything else, Your

2445

Honor, I have nothing further.

THE COURT:  No.  Let me ask you this.  Is it fair to say that this is a matter of trial strategy with the defense?

MR. BERRIGAN:  I know those words are going to come back later at a habeas proceeding, but yes.

THE COURT:  That's why I'm asking you.

MR. BERRIGAN:  Right, I understand.  Yes, absolutely. I think -- and I think I've made that clear throughout.  It's our very strong view, particularly given the course that we've been on through voir dire, I don't think we could possibly change course at this point without a very severe detrimental

Page 5

effect to Miss Johnson. So yes, given that we spent four weeks telling jurors that there were two possible punishments, that is the course we choose to stay on.

THE COURT: Any other record the defense wants to make on this issue?

MR. BERRIGAN: Nothing by us, Your Honor.

THE COURT: Any record the government wants to make, Mr. Williams?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Are there any other matters we need to take up this morning?

MR. WILLIAMS: Your Honor, it's not going to arise today, but the extent to which we do have this proffer from Mr. Honken, we did file a motion to seek permission to reveal

2446

that to the families, the contents to the families.

THE COURT: Oh, yes.

MR. WILLIAMS: So they don't hear that for the first time. The government's not going to be introducing this proffer during its case. And I'm only assuming the defense is going to. If the defense doesn't, then obviously this isn't an issue we have to take up. And in their response they intimated I guess perhaps or at least I read into it that perhaps they may not introduce this proffer, but I'm just not sure where they're at on this. But if they're going to do it, I would like to be able to disclose the content to the family before they hear it in court for the first time.

THE COURT: I actually brought this up, but you weren't present, but it was on the record, and it was -- and, Mr. Berrigan, you correct me if I'm wrong. It was in the

Page 6

context of discussing an expert issue rule, and I wanted to find out what the defense position was knowing that you were actually the lawyer that filed the motion. You weren't available. We had two assistant U.S. attorneys on the line. I felt comfortable asking them. So I know the defense position, but you don't. So we need to go ahead and make our record with you present on that.

MR. BERRIGAN: Actually I think Mr. Williams may know our position because we discussed this very briefly on the phone, and we filed a written response which obviously he's

2447

seen.

And if Mr. Vest testifies -- that was sort of ambiguous at the time that this motion first arose, at least in our minds. If Mr. Vest testifies, then certainly we don't think there's any need to disclose Mr. Honken's proffer to the victims' family members because our contention is that they're not so dissimilar that they would be shocked in any way.

In addition, many of these people are going to be testifying as witnesses. That is, the victims' family members will be testifying as witnesses in the penalty phase, and to the extent that information might have even the slightest potential to change some testimony that they've proffered, we object to it, Your Honor. We frankly just don't think there's a need for this.

And the Court's the only one in the dark regarding Mr. Honken's proffer, but it's just not so far outside the realm of information that these victims' family members have already heard in Mr. Honken's trial that we think this unusual step is at all necessary.

Page 7

THE COURT: Well, let me ask you this. Why is it that I'm even involved in this issue, because normally you wouldn't -- I mean, you wouldn't need Court permission to talk to the victims.

MR. WILLIAMS: It's the Court's order, Your Honor. The order in which you gave disclosure explicitly said we can't

2448

give it to anyone else.

THE COURT: Gotcha. Thank you. That's right. I'm going to go ahead and deny the motion. I just don't think there are sufficient grounds. And while I think it's highly unlikely that the disclosure could affect any of the family member victims who may be testifying, I'm not willing to run the risk of that.

And so I agree with Mr. Berrigan's position, and out of an abundance of caution, I'm going to go ahead and deny the government's motion.

As a practical matter, isn't he essentially correct if Vest testifies? Plus I assume all of the victims who would testify and all of the people who are the subject of your motion heard Vest's testimony or at least read about it or heard about it if they weren't, in fact, here present hearing it live in the Honken trial. So there's really nothing of any shock value or surprise I wouldn't think.

MR. WILLIAMS: No, not terribly, Your Honor. There are differences between Vest's version and what Mr. Honken provided, although not shocking. And I'm doing this as a duty to the victims. I had a duty to request it, and we're perfectly happy with the Court's ruling.

THE COURT: Okay. I did want to clarify one thing

Page 8

that we talked about. I don't remember whether it was on the record or off the record. I was led to believe at some point

2449

about the Honken proffer that there was also a polygraph examination. I don't know whether there was or there wasn't. Somebody said that there was, and I have never seen it. I don't know anything about it. And I believe at some point I asked you, Mr. Berrigan, because that's a little bit different issue than just submitting the Honken proffer.

MR. BERRIGAN: I think -- Mr. Williams and I have spoken about this as well, Your Honor. And we're in agreement -- at least I believe we are -- that there will be no mention of polygraphs even during Mr. Honken's proffer. Now, he gave some additional statements. Certainly if some party wants to introduce those, I suppose they're fair game.

THE COURT: Statements in the context of a polygraph examination?

MR. BERRIGAN: Well, not exactly. He took a polygraph, and then he was subsequently reinterviewed and gave some additional information, frankly not a whole lot. And it's not terribly significant in our view, so the polygraph's, frankly, not significant either, and I think the Department of Justice has a position that is consistent with the defense in this particular case, that they don't want any mention of polygraphs. That's my understanding. So that's our intent, not to discuss the polygraph in Mr. Honken's proffer.

THE COURT: Okay. So you're not going to discuss it.

Mr. Williams, I assume you're not going to discuss it.

2450

Page 9

MR. WILLIAMS: That's correct, Your Honor. What we may do, just so the Court understands where we're going, Mr. Honken was found to be deceptive on two questions concerning primarily Johnson's role in the offense and whether he was being honest about describing her role in the offense. He was found to be deceptive on questions concerning that. He was subsequently interviewed. He did add some additional -- but I agree with Mr. Berrigan -- minor information concerning her role and other facts, other information.

And so the way I see it coming out in this case would be to the extent they call -- I don't know how they're going to do it, with let's say an agent. The agent's going to testify he interviewed him, he said this. I anticipate asking, Did the government believe that Honken was deceptive concerning her role in the offense, and as a result of that, did you request additional statements from Mr. Honken, and did he provide you additional statements, and what additional things did he say after you confronted him with your belief that he was being deceptive? without talking about a polygraph or that he was subject to a polygraph, just do it in the terms of was he confronted with being deceptive about her role and what was the consequences of that.

THE COURT: Okay. So there's not going to be a mention of the polygraph. That's the bottom line.

MR. BERRIGAN: Right.

2451

THE COURT: Any other issues we need to take up?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. BERRIGAN: Nothing at this time, Your Honor.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2142 of 3592

THE COURT: Okay. Well, we'll see you back here at 8:30. Let's see. I'm going to do the eligibility instructions and then -- oh, we haven't decided this rebuttal argument, have we? Did I go ahead and rule on that?

MR. WILLIAMS: You didn't really rule on it. I think I'm entitled to one. I doubt that I'll actually exercise that. And so perhaps when Mr. Stowers is done with his argument if you want to ask -- have us approach the bench or something, I'd let you know at that point if I feel a need to respond to anything that he said. But I doubt that I will. But, you know, not knowing what he's going to say, I don't want to foreclose that possibility.

THE COURT: And have we discussed the length of argument?

MR. WILLIAMS: I intend to stay under four hours, Your Honor.

THE COURT: The Tom Miller rule?

MR. WILLIAMS: That's right.

THE COURT: You're invoking the Tom Miller rule?

MR. WILLIAMS: As a practical matter, I think I'm going to be maybe 20 minutes or half an hour.

2452

THE COURT: Mr. Stowers?

MR. STOWERS: I haven't timed anything, but I would say around a half hour.

THE COURT: Okay. I think what I'm going to do is have the alternates stay in the building so that -- my plan, just so you know, if we do get a eligibility phase verdict prior to about three o'clock or so, then I think we'll just go ahead with the penalty phase, get as far as we can. So, you know, get

Page 11

through the instructions and see if we have time for opening statements.

I'd rather not have -- if we can't finish all of the openings today, I'd rather just wait and start tomorrow.  I don't think it's necessarily fair to split it up overnight.  I don't know why I think that.  There's probably nothing wrong with it.  For example, let the government do their rebuttal tomorrow morning.  So we'll just make a decision and see where we go.  But hopefully we can -- well, not hopefully.  If we have time to get farther and if there is a third stage to get into the third stage, I'd like to do it today if we could.

Okay.  Anything else?

MR. WILLIAMS:  No, Your Honor.

MR. BERRIGAN:  Nothing by the defense, sir.

THE COURT:  Thank you.  We'll be in recess until 8:30.

(Recess at 7:59 a.m.)

THE COURT:  You ready to have the jury brought in?

2453

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Okay.  Just to review things, I will do the first seven instructions, go over the verdict form.  Then we'll have our argument.  And then after the arguments I'll do the final instruction number 8, and then we'll send the jury down to deliberate.

MR. WILLIAMS:  Very good.

THE COURT:  Okay?  Thanks.

(The jury entered the courtroom.)

THE COURT:  Good morning.  Please be seated.  Nice to have everybody back.

Members of the jury, you should have -- do they

Page 12

have -- did you pass them out, Carey?

THE CLERK: They should have them on their chairs.

THE COURT: Okay. Great. You should have a new set of instructions, same caption, United States of America, Plaintiff, versus Angela Johnson, Defendant, but it's entitled Eligibility Instructions to the Jury. And you can see from the table of contents that there are eight instructions and then an eligibility phase verdict form. We're going to go through the first seven instructions now. Then we'll go through the verdict form. Then we'll hear the arguments of the lawyers. And then I'll conclude with instruction number 8, the concluding instruction. And then the jury will go down and deliberate on phase 2.

2454

As we've said all along, there's not any evidence presented in this second phase. It's just argument and answering a verdict form. So, members of the jury, if you'd please turn the page to eligibility phase instruction number 1, introduction.

(The Court read eligibility phase instructions numbers 1 through 7 in open court.)

THE COURT: I'm going to save the final instruction on eligibility phase number 8 until after the arguments in the case. If you would please turn to the six-page verdict form, it's got the caption, Eligibility Phase Verdict Form. As to Defendant Angela Johnson on the eligibility phase issues submitted for our determination, we, the jury, unanimously find as follows.

And then you'll see a chart which is somewhat familiar to you as to form. Step 1, aggravating factors, for each count,

Page 13

do you unanimously find that the prosecution has proved the gateway aggravating factor beyond a reasonable doubt? This gateway aggravating factor is explained in eligibility phase instruction number 3. You must unanimously agree that this gateway aggravating factor has been proved for a particular count for the defendant to be eligible for consideration of the death penalty on that count. Please put a checkmark in the column for any count for which you find that the gateway aggravating factor has been proved.

2455

Then it's the gateway aggravating factor. The defendant intentionally engaged in conduct intending that a victim in question be killed or that lethal force be employed against the victim which resulted in the death of the victim. Counts 1 and 6, Gregory Nicholson; Counts 2 and 7, Lori Duncan; Counts 3 and 8, Kandi Duncan; Counts 4 and 9, Amber Duncan; and Counts 5 and 10, Terry DeGeus. And then there's a box for you to check.

If you unanimously found this gateway factor for a particular count, go to step 2 for that count. However, if you did not find this gateway factor for a particular count, then you cannot consider the death penalty on that count. Therefore, do not consider step 2 for that count. Instead you must enter a not-eligible verdict for that count in step 3.

Then you turn the page to page 3 of the verdict form, on the right-hand side, victims and counts. On the left-hand side, step 2, statutory aggravating factors. If you found the gateway aggravating factor for a particular count, which one or more of the statutory aggravating factors, if any, do you unanimously find the prosecution has proved beyond a reasonable

Page 14

doubt for that count? Statutory aggravating factors are explained in eligibility phase instruction number 4. You must unanimously agree on one or more of the aggravating factors as a to a particular count for the defendant to be eligible for consideration of the death penalty for that count. Please put a

2456

checkmark in the column for any count for which you find a particular statutory aggravating factor has been proved.

Then we have victims and counts: Gregory Nicholson, Counts 1 and 6; Lori Duncan, 2 and 7; Kandi Duncan, 3 and 8; Amber Duncan, 4 and 9; and Terry DeGeus, 5 and 10.

And then there's a list of the statutory aggravating factors: The defendant committed the offense in question after substantial planning and premeditation. There's a place for all ten counts for you to put a checkmark or not put a checkmark. The defendant committed the offense in question in an especially heinous, cruel, or deprived -- depraved manner in that it involved torture, serious physical abuse of the victim, or both. You may find torture, serious physical abuse, both, or neither for any particular count. And then torture is available for all counts except 3 and 8, 4 and 9. Serious physical abuse, same thing, is available but not for Counts 3 and 8 and 4 and 9.

Then the third statutory aggravating factor, the victim was particularly vulnerable due to her young age, and that is available only on Counts 3 and 8 and 4 and 9.

If you unanimously found one statutory aggravating factor for a particular count in this step and you found the gateway aggravating factor for that count in step 1, then you must enter an eligible verdict for that count. However, if you did not find any statutory aggravating factors for a particular

Page 15

count, then you cannot consider the death penalty on that count.

2457

Therefore, you must enter a not-eligible verdict for that count.

And then you turn the page to page 4. Again, the same victims and counts, step 3, eligibility verdict, as explained in the eligibility phase instruction number 5, if you did not find the gateway factor for a particular count or did not find any statutory aggravating factor for that count, then enter a verdict that the defendant is not eligible for consideration of the death penalty on that count. However, if you found the aggravating factor and at least one statutory aggravating factor for a particular count, enter a verdict for that -- enter a verdict that the defendant is eligible for consideration of the death penalty on that count.

Again, Gregory Nicholson, Counts 1 and 6; Lori Duncan, Counts 2 and 7; Kandi Duncan, Counts 3 and 8; Amber Duncan, Counts 4 and 9; Terry DeGeus, Counts 5 and 10. Then there's a place for you to check not eligible for consideration of the death penalty on this count or check eligible for consideration of the death penalty on this count.

And then there's your certification, by signing below by juror number, then by name, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same determination regarding the defendant's eligibility for consideration of a

2458

Page 16

sentence of death for the crime or crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant or of the victim or victims, see eligibility phase instruction number 7.

There's a place to date it, place for the juror numbers, first for your foreperson, then the other 11 jurors, and then on page 6 for your actual signatures. Again, that will be sealed.

Members of the jury, why don't you take a stretch break. And then we'll hear argument from the United States.

Mr. Williams, you may proceed.

MR. WILLIAMS: May it please the Court, counsel. Seven days ago, each of you individually and then together acting as a body determined beyond any reasonable doubt the defendant in this case, Angela Johnson, intentionally aided and abetted Dustin Honken in the intentional murder, slaughter of five people acting in furtherance of, in connection with a drug conspiracy and a continuing criminal enterprise.

Having as a body made that determination, we're here now to determine what your options are for punishment for the defendant.

As the judge instructed you, we're not here today to determine what that punishment is, but we're here to decide what your options are, because Congress decided it was going to be a decision made by a jury. So there's a process we're going to go

2459

through that Congress has set up, and the judge has described that to you in the instructions.

The defendant in this case should be eligible for your consideration for the death penalty because she had the

Page 17

necessary criminal intent, and the evidence that we presented during the guilt phase of this case proved all the aggravating factors were present.

This two-stage process is designed by Congress because the idea is to find whether this crime had facts, had evidence involved in it, had occurrences that sets this apart from other murders that calls for the consideration of the death penalty. And the question for the jury in this case is were there facts that we proved during the guilt phase that sets this murder apart from other murders that suggests that you should consider the death penalty?

Let me talk about these in order. The Court has already instructed you that the first part is the intent issue. The idea is that somebody should not be considered for the death penalty if the murder wasn't deliberate, if it was not intentional, if it was an accident or mistake. But if, if there is evidence of intent, deliberation, thought process involved in a case like this, then that person should be considered for the death penalty. Absent that, they shouldn't be.

In this case you found as part of your verdict that the defendant intentionally aided and abetted the intentional

2460

murder of five people. Necessarily you found that by doing that the defendant intentionally engaged in conduct intending for people to be murdered and that death resulted from that. I'll talk about this factor a little bit more in a few minutes.

The next step in this process is for you to determine if there are one or more statutory factors present. Now, understand for you to consider the possibility of imposing the death penalty in this case, you need to find both the intent was

Page 18

present, but then you have to find at least one aggravating factor, one of the statutory aggravating factors as to that victim on a particular count in order for you to consider the possibility of the death penalty for that victim.

Now, the government has alleged three statutory factors in this case were present. I've listed them up there on the screen for you: That there was substantial planning and premeditation; that as to the adults, that the crime was committed in a particular heinous, cruel, or depraved manner; and that as to the little girls, they were vulnerable victims.

And if you think about it, this makes sense. These are facts that, if proven by the government -- and we submit we did -- sets this crime apart from other murders and should allow you to consider the possibility of the death penalty for somebody capable of doing these things.

Think about substantial planning and premeditation. I mean, it's one thing to commit a murder, a gun's nearby in a fit

2461

of anger, and you do it. But it's another type of person who can sit and plan and think and think and think about the choices they're making. Somebody capable of that is somebody for whom the death penalty should be considered.

And to commit a murder in an especially heinous, cruel, or depraved manner, somebody capable of that, not just killing them but doing it in such a way that it is cruel and tortures them, somebody like that should be considered for the death penalty.

And then, of course, vulnerable victims. Somebody capable of killing children is somebody that should be considered for the death penalty.

Page 19

Let me talk about each of these factors as we go through. And first thing I want to talk to you about is the intent issue. With regard to Greg Nicholson, the defendant, acting with Dustin Honken, intended and engaged in conduct intending that Greg Nicholson be killed. Of course, the motive for Greg Nicholson was that he could testify against Dustin Honken, also testify against Angela Johnson. And that was the reason for the murder in this case.

And we know that the defendant engaged in conduct intending for Mr. Nicholson to be murdered when she helped Dustin Honken hunt him down, literally hunt him down as if it was an animal. They conducted surveillance. They tracked him. They located him. And it was with the defendant's actions, her

2462

conduct in gaining entry into the Duncan house using that deception, going through the process of having that bag from -- the saleslady bag and going in there and gaining entry, it was that conduct that was intended to allow entry into the house for only one purpose, and that was to kill.

Then ultimately once entry in the house was made, the defendant continued to engage in conduct intending the death of Greg Nicholson. She helped either hold the gun or tie and bind him, to put a child's sock in his mouth and duct tape his head. They had to drive out to the site, and somebody had to hold the gun while they were being driven out there.

And the same can be said for what happened with Lori Duncan and the little girls. Now, they weren't killed in this case because they could testify against Dustin Honken about his drug activity. You heard the evidence in this case. Lori Duncan wasn't involved in the least with drugs and certainly not

Page 20

the girls. But once they made entry in that house, once they determined, once the defendant and Dustin Honken determined, they were going to enter that Duncan house on a Sunday night in order to kill Nicholson and that time was running out -- remember? Time was running out. This was July 25. Dustin Honken's supposed to be pleading guilty in five days. They don't have time to wait. So they're going to make entry into that house, and they don't care who's there.

And when they enter that house, they know at that

2463

moment before they walk in the house, before the gun is pulled out of that bag they know at that point everybody in the house is going to have to die because there's no way they can go in that house knowing that their entire intent from the beginning was to kill Greg Nicholson and walk away with witnesses there.

And so Angela Johnson knew when she engaged in the conduct she engaged in, by making entry in that house, by helping to tie up Lori Duncan, to help bind her, to gather up the girls and put them in the vehicle and to drive out there, she knew at each step along that way that in her conduct she was intending to help Dustin Honken kill everybody there because they couldn't walk away with witnesses to what they were going to do to Greg Nicholson. And she knew that. She knew at each step of the process what was going to happen.

Then let's talk about the intent involved with Terry DeGeus. Obviously Terry DeGeus could be a witness against Dustin Honken again, and that was certainly motivation for the killing there, but there was more in this case.

You've heard the testimony often brought out by the defense during cross-examination that Terry DeGeus was a mean

Page 21

person to Angela Johnson in their past relationship and that she wanted him dead. Remember the testimony by Christi Cole, now Gaubatz, that after that meeting outside the Kentucky Fried Chicken Angela Johnson came out and said, He can't be around anymore.

2464

So with that in mind, with that intent in mind, she engaged in conduct after that intending for his death to occur at the hands of Dustin Honken. Only she was in a position to lure him out. Certainly by this time, Terry DeGeus was afraid. You heard the testimony that he was worried about what had happened to Greg Nicholson. He was concerned about what happened to Greg Nicholson because he knew Greg Nicholson was the only person other than himself that was getting dope from Dustin Honken, and now Greg Nicholson along with a woman and her two children are gone, and Terry DeGeus has got to be thinking to himself, what's going to happen now?

It was only too clear the grand jury investigation was continuing. Aaron Ryerson spoke with him about that investigation. He knew that Angela Johnson had been pulled down to the grand jury, and so did Angela Johnson and Dustin Honken know what was coming next. The pressure was going to be brought to bear on Terry DeGeus, and he had to be eliminated.

But Dustin Honken no way could get him out someplace where he could be killed. It was only Angela Johnson through her conduct that was able to take somebody who was very skeptical, very concerned, very worried for his own safety and lure him out to his own death.

When you're thinking about the intentional conduct in this case, think about how this event went down. You know,

Page 22

without confluence basically of these two individuals together,

2465

ask yourself whether any of these murders would have occurred because you know Dustin Honken was a planner. He was a thinker. He liked to read books. He liked to think out things in advance, but he wasn't a doer. We heard that from Jeff Honken. He was a planner.

And you also heard through the testimony of Jeff Honken and Tim Cutkomp there was no violence -- Dustin Honken was not involved with violence, did not carry weapons until after he meets up with Angela Johnson. And you heard testimony about what her personality was like through a number of witnesses.

Ask yourself absent both of them coming together, Dustin Honken being the planner in this case and obviously with the motivation to kill and Angela Johnson who was somebody who acts, whether without her intentional conduct and prodding along Dustin Honken whether this murder would have happened. But for her, Dustin Honken couldn't have made entry into that house. Greg Nicholson would have seen him at that point and resisted.

But for her, there was no way to get Terry DeGeus out to a point where he could be killed. But for her, Dustin Honken, he could have come up with a gun maybe someplace, but would he have? Could he have? It's that conduct by the defendant in this case that led to these murders.

Now, as I said, during your verdict, you found that the defendant intentionally aided and abetted the intentional

2466

murders of five people, and thereby you found that she
Page 23

intentionally engaged in conduct intending people to be killed. That's the intent gateway factor that I've been spending some time on, but I want to move to some of the other factors in this case.

You have to find the intent, and then you have to find at least one of the statutory aggravating factors the government's identified for you to be able to consider the death penalty as to a particular def -- or as to a particular victim. In this case we've alleged substantial planning and premeditation existed as to all of the people involved in this case, so let me spend some time talking to you about that.

Now, we know up front that the defendant purchased a weapon fairly close in time with when these murders occurred. She bought this weapon, an Intratec Tec-9. She didn't buy it at any number of gun shops up in Mason City or Clear Lake or even Charles City or any of the other outlying cities. She traveled all the way down to Waterloo, Iowa, and not to a licensed dealer like a sports shop; to a pawn shop.

And she bought not just any weapon, not just a handgun but an Intratec Tec-9, a killing weapon. No other purpose for this other than to use as violence against somebody else, and she knew that.

She had to have known when she went in at Dustin Honken's request and with him to purchase that weapon there was

2467

only one thing that was going to happen with that weapon, and that was that people were going to die.

To have bought the weapon that many days in advance of the killing meant that they were thinking about it for a long time. At any step along this way, Angela Johnson could have

Page 24

made a decision not to go farther. Instead the planning continues. The thinking continues. The thought process to go through with this continues. Ask yourself what kind of person can do that.

As I said before, she helped hunt down Greg Nicholson and track him to this house, Lori Duncan's house on that quiet street in Mason City, Iowa. And they used Christi Cole or Christi Gaubatz's car.

Now, there's some significance in that too. You heard during the argument by the defense during the guilt phase that the intent was just to go over and make a videotape of Greg Nicholson and that's what the defendant must have understood was the intent, get that videotape and leave.

But ask yourself, if that was the intent, right, if it wasn't intended all along, planned all along, premeditated all along to kill Greg Nicholson and necessarily anybody else present at that point, why borrow Christi's car; right? If you're going to go over there to make a videotape and leave -- Greg Nicholson's going to know you made the videotape -- why do you have to disguise the car you're in? Why not just drive your

2468

own vehicle? If that was what was going to happen, if that's what they knew was going to happen from the git-go is just go over and make this tape and leave, there would be no reason to drive somebody else's car because Greg Nicholson would have known who took that videotape of him when he left.

The conclusion to draw from the fact that they borrowed Christi Cole's car was that when they did that, that was part of the plan to kill from the git-go. They knew they were going to commit a murder that night and the car was going

Page 25

to conceal who committed the murder.

Ultimately they had to come up with this plan, this deception, and the deception took some planning. I mean, they had to have this sales bag. They had to think out ahead of time how are we going to make entry into this house? Greg Nicholson's going to know that we're -- going to know Dustin Honken obviously, so we gotta figure out a way to get in. We gotta figure out some way to get in there and secure the place before Dustin Honken's face appears. Otherwise we're going to have resistance. And so this took some planning, took some thinking, took some thought process to figure this out.

When we're thinking about substantial planning, premeditation, let's talk, first of all, about just premeditation. For a murder to occur with premeditation, means some thinking, some thought process ahead of time, a plan to do it, but it doesn't take much time.

2469

The mere loading of bullets as Vic Murillo explained to you, as you're loading each bullet into this magazine, you're thinking about what you're going to be doing with those bullets as you're adding them in. And then to take the magazine and seat the clip knowing that what you're going to do with this gun is to kill somebody, that's premeditation.

But substantial planning and premeditation is something more than that. It's what the defense -- defendant and Dustin Honken did in this case, not just take the gun, load it, and kill. But they came up with an elaborate plan. They thought it out. They had a lot of opportunity to back out of that plan at any stage of it and didn't. Somebody capable of that is somebody that should be considered for the death

Page 26

penalty.

Not only did the defendant enter this house with the weapon, but she entered the house with duct tape and rope and a video camera. We know from Exhibit 80 which was that -- one of the books that Dustin Honken had that you can infer from the date, the copyright date on that of 1990, Dustin Honken had that before the murders occurred in 1993 and that they had researched this. They had thought out the various ways to tie somebody up, to secure them so that they could remove them from the house and ultimately did so in this case. That took some planning.

Then ultimately they located a hidden grave. Now, you know that this was part of the plan because, again, use your

2470

common sense to think this out. At this point they've gone through some elaborate planning. They had, first of all, purchased a weapon that was intended for no other purpose than to kill somebody. They came up with a scheme for how to make entry into the house. They had to hunt down Greg Nicholson, find out where he lived, located him in that house with Lori Duncan and her kids.

And, by the way, think about that. It's a Sunday night. Sunday night, of course Lori Duncan's going to be home with her kids. They had done enough surveillance of that house that you remember the comment that Angela Johnson made to Sara Bramow in which she said that that woman didn't deserve those kids because she left them alone all the time? Now, you know from that that their surveillance was so good at that house they knew when they were alone and when they weren't alone, when the kids were there, when the kids weren't there, when Lori was there and when they weren't there. They just didn't have time

Page 27

anymore. Five days, five days later and Honken was supposed to plead guilty. So they had to act.

So once they go through all this planning stage, what are they going to do? Hop in the car afterwards, grab all that family out of there, and then drive around and look for a burial site with people duct taped and tied up in the back of the vehicle? Of course not. Of course not.

The way they planned this, they had to have gone out

2471

ahead of time, figured out where they were going to bury these people, where they were going to kill them at, find a remote site. They knew ahead of time where they were going to go. The route was probably even chosen so they could get that family out of there as fast as possible, get them to the site, kill them at a remote site and bury them there. They didn't just put these people in a car bound with the chances that a cop could pull them over at any point and then drive around looking for a burial site. No way. That was part of the plan from the beginning.

Same thing with Terry DeGeus. We know in this case that they already had the weapon, but they had to get it from Christi Gaubatz's house. You heard during the testimony how the gun was always either kept one place or another. Dustin Honken wasn't going to be found with a gun, not while he's on pretrial release, not when he's subject to search, not when people are looking at him.

So they had to retrieve the gun from wherever it was. Then they had to lure him and again come up with a pretty sophisticated plan to do that. This wasn't just a crime of opportunity. This wasn't just a murder that arose at the last

Page 28

minute. This again was substantially planned and premeditated, thought out.

And again, at any step along that way, Angela Johnson could have backed out. Any step along that way, she could have

2472

decided not to go through with her conduct of calling up, locating Terry, having Terry's own mother call up or have Terry call Angela Johnson which ultimately led to his death. Angela Johnson could have decided not to have made that conversation with Terry DeGeus, could have decided even though he called her at that point decided to back out.

But no, she -- her conduct was to continue to lure Terry DeGeus there. And then when Terry DeGeus met up with her, at that point she could have said no. She could have said, I'm not going to go through with this. I mean, think about this. This is a woman who had already been involved with killing four people including two little kids. She's had three months to think about the consequences of her conduct, and yet she continues to plan and premeditate and think about killing again.

So she goes through with it and brings him there but not only brings the killing weapon there. But remember the testimony that -- how the skull on Terry shattered? Somebody brought a bat or club or some object along with them for only one purpose, and that was to use to beat him, beat him in revenge for the times that he beat her when they had a relationship. That's thinking ahead.

And again, they didn't just grab Terry DeGeus and then drive around and try to find a place to kill him or bury him. They chose the site in advance. That took some thinking. What kind of person drives around trying to figure out where is a

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2161 of 3592

good place to kill somebody and bury them?  What kind of person is capable of that kind of thinking?  That kind of person is somebody who should be eligible for the death penalty.

I want to talk about the next statutory aggravating factor, and this is applicable only to the adults in this case, Greg Nicholson, Lori Duncan, and Terry DeGeus.  So let me talk about this.  This is committing the crime in an especially cruel, heinous, or depraved manner involving either torture or substantial physical abuse of the victim.  For the purposes of time I have here today, I'm going to focus on the substantial physical abuse on the victims here.

Greg Nicholson we know was physically abused in the process of killing him.  He wasn't just taken out, but he was taken out with a sock, a girl's sock stuffed in his mouth.  He was bound and gagged.  He wasn't shot just once, but you heard the testimony of the experts in this case that he was shot at least twice, once in the head, once in the body.

Lori Duncan, likewise, was bound, gagged, and was shot at least twice, once in the body, once in the head.  So these aren't murders that are done in a way that does not substantially abuse them, but these people were abused.

And try to picture what that situation was like.  Lori Duncan, two little girls.  Somebody takes one of her girl's socks and stuffs it in her mouth and then tapes her mouth shut.  She's not even in a position to scream, not even in a position

to scream to her daughters to run.  Then she's tied up to where

she's helpless at this point, helpless to keep these people from dragging her own children out to their deaths.

Somebody who's capable of doing that to a young mother is somebody for whom you ought to consider the death penalty.

And then with Terry DeGeus, he wasn't bound and gagged like the others, but remember the testimony about the forensics on what his body was like when they found it. This person was shot over and over and over and over, not just killed, not just quickly killing this person but shooting him over and over and over and over for what purpose? To cause pain, to hurt him. And then his skull was shattered, beaten with some type of club or bat or something. Why? He was going to die. Could have walked up and shot him one more time in the head. He was beaten to inflict pain as revenge for what Angela Johnson believed was done to her in their relationship.

Vulnerable victims, last statutory aggravating factor applicable only to these little girls because of their age. There's not much more that I need to say with regard to these little girls except just to consider how young they were, Amber Duncan.

But there's a little bit more when you think about the vulnerability of these little girls. I mean, they weren't bound and gagged. And yet they didn't run. When they were being led outside and put in whatever vehicle they used at that point, the

2475

little girls didn't kick and scream or run at that point, didn't fight, or did they?

But the bullet holes in the back of the head tells you something more. When Dustin Honken took these little girls out in the woods -- and we don't know whether he took them together

Page 31

or separate.  Let's say he took him together at the same time like he did the adults; right?

So he takes them out in the woods.  The gun's loaded at this point.  And the little girls are walking out there barefoot through those weeds, and he walks them out into the woods side by side, and he brings the gun up behind one of the little girl's head just right of center of the back of the skull, pulls the trigger.  And you heard the testimony.  The impact of that bullet into that little girl's face blew her face apart to the point where there were no bones.  And the other little girl standing with her at that point doesn't even move, doesn't run, doesn't fall to the ground, doesn't crumple because we know at this point that Dustin Honken is able to move the gun from one little girl's head to the next little girl's head in almost exactly the same location in the back of the head just right of center, pull the trigger a second time.

Or perhaps it's even worse in some ways.  You can think about it if they went out separately.  Let's picture this.  First we've got all four of the victims in the car.  And we know the adults are taken out together and they're shot.  Do the

2476

girls hear the gunshot?  Maybe.  Maybe not.  We know there's a silencer on this weapon.  Don't know how good the silencer was, homemade silencer.  So maybe they hear the gunshots.  Maybe they don't.

But they do know this.  The man who's carrying this weapon around, walking around with this weapon just took their mother bound and gagged out into the woods and comes back into her.  And then he grabs probably Kandi.  Probably takes the older one, the more capable of running or putting up a fight,

Page 32

and takes Kandi out in the woods, puts the gun up behind her head just right of center and pulls the trigger. Amber's sitting back in the car with the defendant, Angela Johnson, continuing to hold her. And Honken walks back again for one more victim. And what's Amber thinking at this point? My mom's gone. My sister was taken out in the woods. Now the guy with the gun is coming back for me. And she walks out barefoot in those weeds to the point where she doesn't move when Honken puts the gun up behind her head. That's a vulnerable victim.

The death penalty should be an option for you to consider in this case. The defendant in this case had the necessary intent. This was a deliberate act. It was intentional. It wasn't an accident or mistake. This was something that was intended. Her conduct was committed at each step of this process where she could have walked away. She took conduct, took steps, took actions intending for people to die.

2477

Even when they got into the house, even if you believe for the sake of argument that they entered the house without knowing that Lori Duncan and the kids were there despite the surveillance, once they entered that house, each step taken by the defendant, each act taken by her was intending for these people to die. She helped tie people. She helped hold the gun. She helped drive them out to the woods. She helped hold the little girls as their mother was slaughtered.

And the government's evidence presented during the guilt phase proved beyond any reasonable doubt each of the statutory aggravating factors involved in this case. This was substantially planned and premeditated. What kind of person can think out these crimes to this degree? What kind of person can

commit these crimes in such a cruel manner, and ultimately what kind of person can actually kill children? That kind of person is somebody for whom you as a jury, as a body, should have the right to consider the death penalty.

So when you get to the point of filling out the verdict forms, government suggests that you check on the step on intent each of the boxes; with regard to the statutory aggravating factors, that you check each of those boxes because the government's evidence proved beyond a reasonable doubt each of those factors; and that you find the defendant eligible for consideration of the death penalty with respect to each count and with respect to each victim in this case. Thank you very

2478

much.

Thank you, Your Honor.

THE COURT: Members of the jury, why don't you take a short stretch break, and then we'll hear from the defendant.

Mr. Stowers, whenever you're ready.

MR. STOWERS: Thank you, Your Honor. Thank you.

I think I'm scattered out sufficiently now that I'll never find all my notes and papers.

Thank you all for sitting here this morning and returning after the holiday weekend and after what had to be a very lengthy period of time since we last heard the evidence and before you returned your verdicts last Tuesday.

Let's get one thing out of the way. First of all, on behalf of Angela Johnson and all the people who've worked on her behalf, we understand and accept your verdicts, and we certainly appreciate the hard work that you folks did in going through the evidence which is very gruesome, sitting through a nine-day

Page 34

trial of evidence much of which consisted in this case of very disturbing facts and allegations about these killings.

They were horrible. There's no question about that. They involve two young children who clearly were vulnerable victims in this case who clearly were killed in cold blood, who clearly were killed at the hand of Dustin Honken.

And you've returned your verdicts against Angela Johnson, and you did so after a night I'm sure of thought about

2479

this process and deliberations, and you came back, and you said she's guilty. We accept that. Now let's move on to where we have to go from here.

That's what this phase of the trial is all about. What do we do now? What do you do now specifically? Sixteen of you, soon to be twelve, what are you going to do from this point forward?

This is what's known as what's called the eligibility phase of the case for lack of a better label to affix to it. It's the point in the trial where you as jurors have the opportunity to evaluate the evidence once again not for what you've already determined, not for the crimes that you've already convicted Angela Johnson of, but to determine whether or not these crimes, each of the ten crimes, five separate murders charged two separate ways, should be separated out from all the murders that one can imagine having been committed under this very statute, separate these out, treat them specially, treat them differently than any other murder because the law does not say that every murder committed in violation of these statutes warrants the death penalty even be considered. It doesn't say that.

Page 35

It says, as Mr. Williams explained to you, that only certain things, if proven beyond a reasonable doubt, warrant, warrant the death penalty even being considered by a jury. And that's what we're here to decide is whether or not, folks, the

2480

death penalty should in any way even be considered in this case.

I believe it's instruction number 2 that I've just put up for you, a section of it, and in that instruction the judge tells you that it's up to you folks on this jury, your exclusive decision, your exclusive right to determine whether or not Angela Johnson should be considered for the death penalty. It's not anybody else's decision. It's just you jurors. You get to decide that, your exclusive decision. I think he even says that in one of his later instructions.

And he tells you that even if you decide at this point in the trial that she's not eligible for the death penalty, then Judge Bennett is going to impose the sentence, and that sentence will be that Angela Johnson will serve the rest of her life in prison without the opportunity for parole. She will serve the rest of her life in prison without the opportunity for parole. And that's what a decision that she's not eligible for the death penalty at this point will mean.

So what are we here to talk about? Frankly, there's three factors that are really the focus of the evidence at this point. I'm not going to stand up here and talk to you about whether or not a six- and ten-year-old girl, two girls, were vulnerable victims because of their age and their youth. I'm not going to make that argument to you. I think a lot more of you folks than that, and I'm not going to embarrass myself and insult you by doing that.

Page 36

But I do want to talk to you about what we're here evaluating. If you look at instruction number 3, instruction number 3 is the so-called gateway factor. I don't know who came up with these labels for some of these things, but that's what they came up with as a label for this. It's not Judge Bennett. It's some legal beagle somewhere came up with this. Maybe some congressman from Idaho or somewhere came up with the idea that this would be labelled in the law the gateway factor.

And that factor is explained to you, as I said, I think in instruction 3, and this is the intentionally engaged in conduct intending that the victim in question be killed or that lethal force be employed. And the judge explains to you in that instruction that the prosecution must prove that the defendant deliberately acted with a conscious desire that the victim be killed, et cetera.

Now, this isn't, as Mr. Williams explained to you, the same thing as what it took for you to find Angela Johnson guilty of assisting Mr. Honken in some way in causing the deaths of these people. This is a heightened aspect to her state of mind. This is an additional thing that has to be proven. That's why it's an additional factor that the government has to prove in this separate second part of the trial above and beyond what it took to convict Ms. Johnson in the first part of the trial.

So what are we talking about here? We're talking about some additional heightened desire, conscious desire, on

the part of Angela Johnson to have killed each of these five people. And you have to consider each of the five persons

separately. Each of them has to be considered separately, and each count has to be considered separately. But for these purposes, we're talking about each victim because each count in all practical purposes, there's two for each victim, so we don't need to really parse it further than that. But you're going to have to fill out the verdict form count by count.

And when we talk about this heightened mental state, this heightened requirement, this conscious desire, you have to think back too to the other thing that the judge has told you in one of the other instructions, and that's that they have to prove that beyond a reasonable doubt. It's not just, well, this witness said it and, therefore, we've proved it. Okay? And I think you understand that. But I think it warrants being reemphasized that proof beyond a reasonable doubt isn't there's some evidence of it. Proof beyond a reasonable doubt is proof to a high degree of certainty, very, very certain. And the judge gives you a definition for reasonable doubt.

This isn't "I think this happened that way. I think she had a conscious desire to kill Kandi and Amber Duncan. I think that." It's has it been established to such a high degree of certainty that I don't hesitate as a juror in my own mind to act and rely upon the evidence in reaching that conclusion that she did have that conscious desire.

2483

This isn't the type of a decision that you would make as you go through the checkout line at the grocery store and you see a pack of gum or a display item put there for the impulse buyer and that you pick it up and purchase it.

This is more like something you do in a more important matter in your life. That's the type of activity we're talking

about you evaluating this decision by, purchase of a house, major surgery, who are you going to spend the rest of your life with in marriage. These are major decisions in life. These are the types of things that we're talking about, not trivial matters.

And what's the evidence, frankly, what is the actual evidence that Angela Johnson had the conscious desire to kill or assist Mr. Honken directly in killing? What's the evidence that she had deliberate and thoughtful and conscious thoughts that she wanted to kill these people? What is the evidence of that? What is the credible evidence of that?

Sure, you've been told about Sara Bramow and what she had said from the witness stand in her testimony. But, folks, I think we could all agree that Sara Bramow's nobody you would put somebody else's life on the line for. You wouldn't rely on her to that degree. You'd hesitate before relying on her in a big way.

What was the testimony? One of the witnesses who testified that Angela Johnson talked to her or more than one of

2484

the witnesses I believe testified that Angela actually said the kids were not supposed to die or words to this effect, I didn't want the kids to die; that wasn't supposed to happen. That wasn't part of any plan that she undertook to participate in.

With regard to Mr. DeGeus, where is the evidence that she had a conscious desire that he would be killed when she called his mother up, left word for him to come and call her? Where is the conscious desire of that? What do we really know about what particularly transpired on the last night of his life? What do we really know about that? Comb your notes.

Page 39

Talk amongst yourselves. Ask yourself those questions. What do you really know? What's really been proven, and what's really been proven, not just what do I think, what do I think is probably true, what am I pretty sure of but what am I sure of beyond a reasonable doubt?

Mr. DeGeus, luring, that's the word. That's the word that Angela Johnson's sister and sister-in-law believed she used when talking to them and that she wrote down on a slip of paper in the jail when they were having this emotional discussion. At some point in time it became apparent to Angela Johnson that, in fact, that is what happened. She, in fact, did lure Mr. DeGeus to his death.

Now, when did she find out about that? What does the evidence really tell us about that? When did she really know? We don't really know. You've obviously convicted her of knowing

2485

that at some point in time because that was required for you to convict her of that charge, that at some point along this continuum of events she became knowledgeable of what was going to happen to Mr. DeGeus. But when did that happen? And what exactly did happen with regard to that? And the same is true with regard to the first situation from July of 1993.

So let's talk about substantial planning and premeditation. Let's try that. That's instruction number 4 that I'm showing you. You've got it in your packet there. Substantial planning and premeditation, let's bear in mind something else as you think about the evidence.

What we're talking about here is Angela Johnson, not Dustin Honken. We're not talking about whether or not Dustin Honken planned, premeditated, whether he did that substantially,

Page 40

et cetera. What we're talking about is whether or not Angela Johnson substantially planned and premeditated these killings. Did she do that? Does the evidence show that she did that, and does the evidence show that she did that, not just do you think she did that, not just do you believe it's probably true, not are you pretty sure that it's true, but are you so sure that you're sure beyond all reasonable doubt that she substantially planned and premeditated these four killings?

And what's the evidence of that? We heard Mr. Williams talk about that. What is the evidence that she thought, Angela Johnson thought, and deliberated over these

2486

killings for a significant and considerable amount of time and that she planned these killings significantly and considerably? What is the real evidence of that?

Well, the closest that Mr. Williams was able to come was the evidence from Christi Cole, Christi Gaubatz, that Angela Johnson had, in fact, borrowed her vehicle with Dustin Honken on several occasions I believe for a couple of weeks prior to the very end of July, the 25th of July, 1993, and that Christi Gaubatz Cole, interestingly enough, was aware of why her vehicle was being borrowed, is aware it was being borrowed because she had seen the video camera in her house. She'd been told they were looking for Nicholson to make a videotape of him exonerating Mr. Honken.

Now, they didn't think he'd give that videotape to them if he saw them coming to wherever it was that he was, and they hadn't been able to find him during this couple-of-week period until the very end obviously.

So what does all that tell you? Well, was Christi

Page 41

Cole in on this murder plot in some way?  Her car was being used.  And she knew there was a camera.  She knew they were looking for Mr. Nicholson.  Was she aiding and abetting Angela Johnson and Dustin Honken in killing these people just because the car was used?  No.  I would submit to you she wasn't. Definitely not.

But at the same time what does it tell you that that

2487

vehicle was used?  Does it really tell you much of anything? Not really.  It just tells you consistently with what the explanation was to Christi Cole that the car was used for the purpose of being able to approach Mr. Nicholson without him fleeing, and the reason was they clearly were going to force him into making this videotape which was the plan.

And we have not hid that from you.  We told you that at the beginning of this case when Mr. Willett stood up and gave the opening statement so many weeks ago now.  That's exactly what the plan was, to go and make a videotape forcibly of Mr. Nicholson wherever he could be located.  There was no plan to locate him when he was living with a woman and her two young daughters.  That was not a plan that anybody had set out.

So the vehicle really doesn't tell us anything about planning and premeditation that Angela Johnson supposedly undertook with regard to any killings.  It might tell you that yes, she planned and premeditated going with Dustin Honken to make a videotape forcibly of Mr. Nicholson exonerating the man who at that time was the father of her unborn child Marvea.

And that isn't enough.  That isn't enough to prove substantial planning and premeditation on the part of Angela Johnson to commit these killings.

Page 42

Now, was Mr. Honken secretly and without disclosing to Angela Johnson planning substantially, premeditating substantially to actually kill these people after he had used

2488

Angela Johnson to gain access to this home, after he had used her to purchase a weapon in her name to threaten people with? That certainly seems to be what the evidence would indicate, that Mr. Honken did have such a plan.

There's some evidence, though, that maybe that wasn't even Mr. Honken's plan when they went to that house. It may not have been his plan. There's evidence that what was actually occurring there was exactly what had been planned.

Remember Mr. Thinnes, Mr. Honken's attorney, who says that Mr. Nicholson appeared quite calm, cool, and collected. He gave many descriptions for this videotape that he had viewed which no longer exists because Mr. Honken has destroyed it. But there's an image there that you can take out of that situation that Mr. Nicholson was not under any duress or fear at that time for his life as he made that videotape.

But the testimony further was that things somewhere apparently while in that house got out of control. Things blew up. Things changed. And ultimately these persons were led out of the house, taken out of the house and ultimately killed in an area off of Highway 18 on Lark Avenue where they were buried in the ground only to be found 7 years later.

So what's the evidence really of substantial planning and premeditation on the part of Angela Johnson? And I wanted to go over a few things that Mr. Williams said on that topic.

Well, there's discussion by Mr. Williams -- I think

2489

Page 43

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2175 of 3592

you folks can talk about this yourself -- about how it was Angela Johnson who had been prodding Mr. Honken along to participate in these activities, that it was her who was behind this, et cetera, et cetera, prodding him along, that it was her who apparently turned this wonderful guy Mr. Honken into a quintuple murderer.

Frankly, folks, there's no evidence to support that. It's somewhat, I would submit to you, a desperate attempt to transform Ms. Angela Johnson as a very limited participant in these killings into something that she's not, that she never was, that she never will be, and that the evidence certainly doesn't establish.

Discussion that the gun was bought for this purpose, frankly, no evidence of that either. Again, the gun was bought with a permit that was obtained openly and notoriously right at the sheriff's office by Angela Johnson where she showed up, filled out the form, gave them the relevant identification. They did a background check on her, and they found that form later as a part of their investigation of these killings.

I would suggest that if she was planning to go out, buy a gun to use in homicides, she very easily could have done so without having to go get a gun from a gun shop, having to go and get a gun after getting a permit, having to go and get a gun where she had to show ID where it would all be traceable back to nobody else but her. What in the world Mr. Honken told her

2490

about that gun, God only knows. There's no evidence of that.

But I would suggest to you if you want to look at a

Page 44

little bit of a parallel situation, you might think back to the testimony of Rick Held.  Remember Mr. Held testified that he worked with Mr. Honken at the pudding plant, at Kraft Foods, in Mason City for a year and a half, and somewhere Mr. Held got himself involved after Mr. Honken was arrested in 1996, February I believe it was, in purchasing a gun, a handgun, from Mr. Held.  Mr. Honken's story at that time to Mr. Held was that he wanted that handgun purchased to give to a girlfriend.  That's what his story was and that she was going to need it for protection in the big city of Des Moines where she was moving.

Now, Mr. Held bought the gun, was going to deliver it to Mr. Honken under very interesting circumstances where he left it in his truck.  Mr. Honken was apparently going to get it over the lunch hour or something.  It was a cash purchase, done behind the scenes through an acquaintance of theirs, a mutual acquaintance by the way.

But Mr. Honken didn't go to this mutual acquaintance to buy the gun.  He sent Mr. Held.  And Mr. Held fully trusted Mr. Honken despite having read all of these things about Mr. Honken that were appearing in the press and despite the fact that Mr. Honken was known to have been arrested on a new charge, despite the fact that Mr. Honken was wearing an electronic monitoring device around his ankle, despite, despite, despite,

2491

despite.

That kind of gives you an idea of how persuasive, convincing, seductive if you want to use that term Mr. Honken could be when he wanted to be.  He was able to get people to do things for him, and he only operated on a need-to-know basis.

So when did Angela Johnson know?  When did she know

Page 45

with regard to the first four killings that that was something that was going to definitely happen? How certain are you of that? Not what do you think, not what do you think is probably true, not what are you pretty sure of, but what have they proven in the evidence beyond a reasonable doubt?

There's a suggestion that apparently Ms. Johnson entered the house -- I want to make sure I understand this, just get this image from Mr. Williams' argument, that when she did so she was carrying a roll of duct tape -- we know what a roll of duct tape looks like -- that she had a rope. She apparently also was carrying a video camera and probably a tripod and this gun and apparently this cosmetic bag I think was the description in which the gun apparently was either carried or some of these other items were carried.

And I think the testimony was that she somehow gained access to the house by saying she was lost or something to the person at the house, so I'm trying to see this now as I have the prosecution displaying this, Angela Johnson walking up to the house with a tripod, a video camera, a bag, and these various

2492

items and knocking on the door. I think it's somewhat improbable and highly unlikely and really doesn't make a lot of sense, and, frankly, there's no evidence that that's what happened.

Suggestion was made by Mr. Williams still on this planning topic they thought out ways to tie people up, and he shows you a picture from one of these magazines. I don't know if it's the Poor Man's James Bond that Mr. Honken had or if it's the Anarchist Cookbook that Mr. Honken had, very interesting reading materials. Those items were seized in a search of his

Page 46

place in Mason City in 1996. There is not one drop of evidence that those items were even seen by, read by Angela Johnson, no evidence of that at all, no evidence that she even saw or read those prior to July of 1993.

But we take a piece of evidence from 1996. We flip it around, put it up on a nice display, and tell that you she was reading that with Dustin Honken in 1993, just no evidence whatsoever of that. Pure speculation.

Says she drove around with Mr. Honken and located a hidden grave site. No evidence that she did that prior to the time when she obviously was aware of where these bodies wound up being buried.

Oh, there's a suggestion she was surveilling the house and this sort of thing, that the route of travel from the house to the supposed hidden grave site was prechosen. There's no

2493

real evidence of any of those things. This is really in the zone of speculation all made out as part of an effort to take this case which is, frankly, a horrible case of murder of five people and bring it into a zone where you folks are going to be placed in the position of having to weigh Angela Johnson's life. And it's just not there. The evidence just isn't there.

Now, one of the other things they've got to prove is this -- this instruction number 4. Second aggravating factor is this concept of the especially heinous, cruel, or depraved manner of the killings of the three adults.

Again, they haven't alleged that with regard to the two children. Reason they haven't alleged that is because, as the Court explains to you in this instruction, it requires more than killing a person, committing the murder and the things that

Page 47

would typically be associated with a murder. Horrible things are always associated with the crime of murder. People are killed necessarily when there's a murder. People in this case were shot to death. That's how they were murdered.

But we're not talking about people getting shot to death when we talk about this aggravating factor. We're not talking about the fact that they were killed at the hand of Dustin Honken shooting a gun into their heads and/or bodies. That's not what we're talking about.

What we're talking about here is that there's some additional degree, an especially heinous, especially depraved

2494

type of killing, especially cruel killing, not just cruel, not just depraved, not just heinous, but it's gotta be especially so. And it's not enough that these people were killed and shot to death. And frankly, it's not enough that they were tied up first to the degree that they were, and the evidence is somewhat curious on that point because some of these ropes appear to be loose. Some of them appear to be, I believe, cut according to the evidence around the legs, and it means more than being restrained. It means being treated in a way heinously, cruelly to such an extreme degree that this separates these killings out from killings.

Now, there's no good way to kill somebody. If somebody's going to get killed, they're going to get shot, perhaps stabbed, perhaps hit over the head. There's many ways people can be killed, none of which are pleasant, none of which result in very nice pictures or photographs, particularly after people have been buried in the ground for years.

But that's not what we're talking about is the

Page 48

condition of these remains. What we're talking about is the conduct of Angela Johnson, not the conduct of Dustin Honken. We're not talking about here what he did. We're talking about what the evidence proves that Angela Johnson did.

Let me talk about the evidence with regard to Mr. DeGeus for a minute. You can check your notes. The testimony was from Dr. Goodin who's the blond-haired woman who's

2495

the head of the state pathology department -- I'm not using the right terms, but that's okay. I think your notes are probably better than my memory so -- but she's the woman who with a southern accent testified from this witness stand about, among other things, the condition of Mr. DeGeus's skull. And what she told you is that she had determined that he had died of multiple gunshot wounds, that there was a gunshot wound to the head.

And she was asked by me on cross-examination, the fracturing of the skull that you're seeing, is that consistent with a gunshot to the head? She says yes. The bullet in many instances as the witnesses told you -- I think it was Mr. Murillo as well as her testified that when a bullet strikes bone such as in your skull, the bullet very oftentimes can fragment. And I know this is horrible to think about, but the bullet can fragment and break into more than one piece. And as the bullet exits and as those pieces project out, they will strike whatever they strike. And if they fragment on the way in to a head, they will break into multiple pieces and upon exiting the skull will fracture.

And that was what Dr. Goodin told us was that the skull shattering was consistent with what you would expect to see from a person shot in the head and the bullet fragmenting as

Page 49

it exited the skull would break into pieces.

I'd also ask you to consider this situation with regard to Mr. DeGeus's remains, where they were found which was

2496

in a farm field right on the edge of the farm field. They were in a shallow, shallow grave. As you could see from the pictures, when they scraped off a couple of inches of the topsoil in that area, the boot became exposed, the boot that was sticking up a little bit in the rear area of his body which would indicate a grave of whatever the lower portion of your leg would be from the knee to the foot, maybe a couple feet in depth. I think the witnesses estimated the depth of that grave was up to two and a half feet.

I would also ask you to consider as you think about that evidence the fact that Mr. DeGeus's remains were uncovered in I believe the span of about an hour or so by those digging him up and that the very detailed witness -- I can't remember, the guy from the FBI who talked about the body farm, Hochein or Hochrein, he wasn't there for that because he was on another job at that time.

So the local people unearthed Mr. DeGeus's remains, and I think you'll see in the evidence that with all respect to them the care and detail with which they documented what they did, the care and detail of their drawings and the information about what they found in that particular location was not certainly up to the standard that Mr. Hochrein set when he unearthed the four other remains.

But in any event, his skull, as they say, was shattered. Whether or not it was shattered at or before the

2497

Page 50

time of his death, whether it was caused by the bullet or, as Mr. Williams would have you believe, by somebody hitting him with perhaps a baseball bat -- I don't believe there's any evidence of that -- is something, frankly, we're into a little bit of speculation here. May be something you think happened. Maybe you think probably it's true. Maybe you think it's likely but not beyond a reasonable doubt, not beyond a reasonable doubt.

So as you sit back on this case and get ready to retire to the jury room, you're going to be asked to fill out these verdict forms. And these verdict forms are, once again, very lengthy. The government has done a good job of showing you how they want them to be filled out. But you folks are the exclusive ones who get to decide how to fill out those verdict forms.

And at the end of this case, we're going to ask you to fill out the verdict forms, and the number-one verdict form that counts is the last one, and we're going to ask you to fill them out that way, and that is we're going to ask you to find that Angela Johnson is not eligible for the death penalty and to check each of those boxes for each of those victims and each of those counts, and underneath there I've written in LWOP. You certainly don't have to write that in there, but if you care to, you can. That indicates life without parole. That's what that would mean if you fill out the verdict form that way. And as

2498

you get ready to retire and deliberate, think about where you're being asked to go if you choose to proceed further in this case. You don't have to go there. Thank you.

Page 51

THE COURT: Could I see the lawyers for a very, very brief sidebar? Members of the jury, you can take a stretch break.

(At sidebar on the record.)

THE COURT: Do you want to give a rebuttal?

MR. WILLIAMS: I think so, Your Honor, but it's going to be less than ten minutes, probably more like five.

THE COURT: Okay. That's fine. Thank you.

(The sidebar was concluded.)

THE COURT: You can continue with your stretch.

Okay. Please be seated. Members of the jury, we're going to have a relatively short rebuttal argument by the government. Then we'll go through final instruction number 8, and then you'll begin your deliberations on the phase 2 eligibility phase.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

Ladies and gentlemen, I will be very brief. I have an obligation to respond to some of the comments made by defense counsel, and I'm going to be to the point and succinct in this area.

The question you have regarding the intent is do you

2499

have any reasonable doubt in your own mind whatsoever that Angela Johnson acted, engaged in conduct fully intending people to die in this case? Remember that Angela Johnson and Dustin Honken acted together. Without either one of them, these murders would not have occurred certainly in the way that they occurred. And they acted together as a group or as a couple to carry out these crimes.

Page 52

We know from the evidence in this case that they surveilled the Duncan household and surveilled Greg Nicholson. Again, as I mentioned during my argument before, they knew so much about their whereabouts and their dealings and when they were going and coming that apparently thought Angela Johnson was in a position that she could criticize Lori Duncan about how she took care of the kids and whether she was home or not. They knew when they entered on a Sunday night that those children and Lori Duncan were going to be there.

And ask yourself why take duct tape and rope if the purpose is to make a videotape? You take rope and duct tape if you're going to take a victim away from the site.

So there was no -- should be no doubt in your mind whatsoever that they entered that house for the purpose of killing. Now, certainly the videotape was part of it, but the intent was to kill once they got in there.

Now, the defense counsel suggests that there was some evidence that Angela Johnson said the kids weren't supposed to

2500

be killed, it wasn't part of the plan. And perhaps it wasn't at first. I suspect that if they could have they would have killed Greg Nicholson without killing additional people.

But again, remember the time is running out. They've surveilled him. They've tried to find him alone. They can't find him alone. Five days left and Dustin Honken's going to be pleading guilty, and he doesn't have any time left. There's no time to wait, and it's gotta be done on a Sunday night when the kids are home, when Lori's home, so be it. At that point it has to be done.

But even if, again, you think even slightly that they

Page 53

didn't have the intent to kill everybody when they first went up to that house, once they entered that door, every step, every act committed by the defendant after that point was still in furtherance of killing the entire family knowing that everybody there was going to have to be killed, every witness was going to have to be killed.

Every act she took, every time she held the gun, every time she helped tape somebody up, every time she helped tie somebody, when she helped get them in the vehicle, when she drove them out to the site, when she held the children as Dustin Honken took their mother out to kill her, every act she took at that point was conduct by her committed with the intent the people would be killed.

Defense counsel talked about this gun and that --

2501

suggested that Angela Johnson didn't know the purpose of the gun. Ask yourself again looking at that weapon, buying that weapon what other possible purpose could there be for buying a weapon like this? This is nothing but a killing weapon. You don't hunt rabbits with it. You don't even use this for personal protection. Doesn't fit in a purse. This is used to kill. It's the only purpose for buying a gun like this.

But if that's not enough, think about the testimony by Christi Gaubatz. Christi Gaubatz said when she found this in the bag, in this cosmetics bag, she knew immediately that it had a silencer attached to it. She knew because she watches TV like we all do, and she knew what a silencer looked like, and she knew on the end of this was a silencer. Now, Christi Cole just by looking at it, not a gun expert, not somebody who knew anything about guns but just from what she sees on TV, knows

Page 54

immediately that's a silencer on the end of the gun. Defendant knew there was a silencer on the end of that gun.

So even if you buy up to this point that she's conned by Dustin Honken into going and buying this weapon not knowing what the purpose is, when she enters that house with a silencer on the end of the weapon, there can only be one conclusion, that she's engaged in that conduct knowing and intending that somebody's going to die. You don't have a silencer on a gun without intending to kill somebody.

With regard to the cause of death on Terry DeGeus, the

2502

defense asks you to believe if you will that his skull was shattered some other way. Either the tractor ran over it or today we hear that maybe she did a shoddy job of pulling him out of the ground in such a way that the agents broke up the skull pulling him out of the ground.

Now, first of all, Dr. Steadman indicated she could tell you the difference between perimortem and postmortem injuries to bones, and she testified that with the skull these were perimortem. In other words, there was nothing indicating they were broken after the murders which tells her because of the coloration that these -- this skull was fractured at or about the same time as the murders themselves.

We know the murder was conducted on November 5 of 1993. And so even if you buy for sake of argument that a tractor could have created such force as to go down more than two feet and fracture the skull but no other bone but fracture the skull on this, we know that there could not have most likely been a tractor over that ground again until spring, many months afterwards, and would have been inconsistent with Dawnie

Page 55

Steadman's testimony about it.

But here's where you need to put pieces of the evidence together to ask yourself whether you have any reasonable doubt realistically that Terry DeGeus's skull was bashed in with some type of blunt force trauma. Dr. Steadman testified she can't rule out blunt force trauma on that head,

2503

but there was not enough pieces and not enough there for her to say definitively one way or the other, so we have to look somewhere else. We can't just rely on forensics.

We know that Angela Johnson told Christi Cole, Christi Gaubatz, her best friend, that he was beaten. We also know that Angela Johnson drew maps to these bodies in which she made the notation he's buried on his knees like he used to make me be when I was begging. Now, somebody who writes that down combined with the other evidence in this case, you gotta ask yourself, do you have any reasonable doubt at all in your mind, any reasonable doubt that Terry DeGeus was beaten multiple times to the point that his skull and his teeth were fractured?

And finally the defense asks you that -- or indicated that we've raised the statutory aggravating factors in an effort to take this case where you folks are going to be placed in a position to weigh whether she should live or die.

Ladies and gentlemen, there's only one person in this room who brought us all here to this point. Wasn't the government. Angela Johnson by her choices, by her decisions, by her actions brought us all to the position where we're here today having to make these choices.

Government submits that we presented evidence beyond any reasonable doubt that supports the intent gateway factor and

each of the statutory aggravating factors.  We ask that you return a verdict indicating that this defendant is eligible for

2504

consideration of the death penalty.  Thank you.

Thank you, Your Honor.

THE COURT:  Members of the jury, if you'd please turn to page 18, we have one final instruction, eligibility phase instruction number 8, concluding instruction, page 18.

(The Court read eligibility phase instruction number 8 in open court.)

THE COURT:  You're now going to go back down to the jury room for deliberations.  Of course, our alternate jurors who were here this morning, Juror 167, Juror 402, Juror 9, and Juror 78, we're going to have you go to a separate room in the building, and I'll explain in just a second why that is.  Lunch will be served, and the alternate jurors will be eating separately.

If the jury does return a verdict yet today on the eligibility phase and if that verdict then requires the third phase, the penalty phase, we're going to move directly into that phase yet today.  And depending upon if there is a verdict and if the third phase is required, we might not get very far into the third phase today depending upon the timing of it.  But our intent is to move directly into the third phase should there be one.

So good luck to all of you in deliberations.  And I'm sure the CSOs will escort you down and then take the four jurors -- I believe they're going down to the first floor, the

2505

Page 57

alternate jurors. And the reason why we need to have the alternate jurors in the building is so we can have you back for the penalty phase if there is a penalty phase and we can start that immediately. Thank you very much.

(Jury out at 10:32 a.m.)

THE COURT: Please be seated. I just want to make sure we're clear on the issue about the taint team handling the mental health issues that are lurking in the third phase, the penalty phase, should we need a third phase. And, Mr. Berrigan, I just wanted to make sure. I have a pretty clear understanding. The metaphor we've been using is the wall for the taint team. That wall is now down; is that correct?

MR. BERRIGAN: As far as I'm concerned, yes, sir.

THE COURT: Okay. And Mr. Williams can now communicate with the two assistant U.S. attorneys from the Western District of Missouri that have been handling the mental health issues, and that information can be provided to Mr. Williams.

MR. BERRIGAN: Certainly.

THE COURT: Okay. Is there anything further? Any other record we need to make at this time?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

THE COURT: Okay. We didn't specifically discuss, I don't think, this four-and-a-half-hour rule, but I wasn't

2506

planning on applying it to the eligibility phase.

MR. WILLIAMS: I don't think it's necessary, Your Honor.

Page 58

THE COURT: Okay. Good. Okay. We'll be in recess. Thank you.

(Recess at 10:34 a.m.)

THE COURT: Okay. We're going to go on the record now. And, Mr. Williams, what exhibit number is this from the penalty phase exhibits?

MR. WILLIAMS: It is Exhibit 1148.

THE COURT: And it purports to be a tape of?

MR. WILLIAMS: It's a tape from an answering machine that has Angela Johnson making numerous phone calls and leaving messages, probably six to ten separate phone calls and from, again, references to children and so forth, and the timing, our best guess, is some time in 1994, 1995.

THE COURT: And where was the tape machine located that picked up these calls? Or let me put it another way. To what phone number were the calls directed to?

MR. WILLIAMS: It's our understanding it was made to Kathy Rick's phone, that at some point Dustin Honken split up or stopped living for a period of time with Angela Johnson, took his answering machine from the Angela Johnson residence, took it over to Kathy Rick's residence, hooked it up there, and it's there that the phone calls were made.

2507

THE COURT: And this would be a series of phone calls?

MR. WILLIAMS: Series of phone calls.

MR. BERRIGAN: That's not our understanding, Your Honor. These phone calls are made to Dustin Honken, not to Kathy Rick. He wasn't living with Kathy Rick at the time, and we don't expect that she'd testify to that if called as a witness, that they were not living together. So whoever's

Page 59

machine this is, the calls were made to Mr. Honken. He later gave the tape or Miss Rick found the tape in the trunk of his car according to police reports that we have. She never had this tape.

So these calls -- and you'll see when you hear them -- are not addressed to Miss Rick at all. They're addressed to Mr. Honken in the residence occupied by Mr. Honken, not by Miss Rick.

THE COURT: Okay. What do you have to say to that, Mr. Williams?

MR. WILLIAMS: He may know more about the origin of this tape than I do. I've not had a chance to talk to Miss Rick about this. We know that Miss Rick was ultimately in possession of this and handed it over. My understanding is from Leon Spies who explained to me what his understanding of where this tape came from, and that's what I reported.

THE COURT: That's why we have a hearsay rule.

MR. WILLIAMS: So I'm going to be talking with Miss

2508

Rick today, and we'll ask her obviously these questions. I might have a better idea where it came from.

THE COURT: Okay.

MR. WILLIAMS: And, Your Honor, contrary to what I'd indicated before, till I got on this phone call with counsel from Kansas City, we may have some objections to the mitigating factors the defense has listed. Given the time frame and what limited time we have, I don't expect the Court to be able to -- and, frankly, I don't expect me to be able to get up to speed on these issues before we instruct the jury on preliminary instructions. And so I don't object to them withdrawing some of

Page 60

them. It's my understanding there may be some other ones out there. It's my understanding there may be a proposed jury instruction by the government and so forth. I'm just alerting the Court that between the preliminary instructions and the final instructions we may have a fight on some of these mitigating factors being listed.

THE COURT: Well, why don't we take that up after we hear the tape.

MR. WILLIAMS: Yeah, although I'm not even sure I'm in a position to take it up other than just to give you a heads-up there's going to be some issues because I don't have anything that I've looked at yet. And so I just don't think it's something you're going to be able to deal with between now and the preliminaries. I think we're just going to have to go with

2509

the preliminaries the way they are. And then if I'm in a position to object to them later, we can deal with it at the final instructions to the jury which the Court will normally instruct the jury preempts the preliminary instructions anyway.

THE COURT: Okay.

(Government Exhibit 1148 was played in open court.)

MR. WILLIAMS: That's the end of it. Frankly, the last two minutes could probably be deleted from that.

THE COURT: Now, the defense is moving orally in limine to preclude the admission of Government's Exhibit 1148. Did I get the exhibit number right? Sali's nodding correctly.

MR. WILLIAMS: That's correct, Your Honor.

MR. BERRIGAN: That's correct, Your Honor.

THE COURT: Okay. Want to be heard by way of argument?

Page 61

MR. BERRIGAN: Please. Not only is this tape very difficult to hear, but the portions that you can hear are largely profanities and screaming by Miss Johnson at Mr. Honken, and it's very important that the Court understand that these calls are to Mr. Honken if that's not clear from the tape -- I think it should be -- not to Miss Rick. And they're made early in the morning after Mr. Honken apparently is not home, and you'll recall there was -- part of that tape says, Better get your ass home. Miss Johnson is upset because she believes that Mr. Honken is with another woman.

2510

And the idea that the government would introduce this as some evidence of either future dangerousness or is somehow probative of the relationship between Mr. Honken and Miss Johnson's ludicrous other than that they were in a relationship. It'd be kind of like my wife discovering that I wasn't home last night and getting very upset on a tape and when she's later accused of murder that that's evidence of future dangerousness or our relationship when what it is evidence of is anger, very deep anger, about a situation that was then occurring that arguably justified anger.

These people had a child together, and you can hear at the beginning -- I don't know if you could hear it, but I've listened to this tape more than the Court has -- there's a child crying in the background, and that's Marvea Johnson who's been born months not even, just weeks before. There's no question she's angry at Miss Johnson (sic), and she does say a couple of things about Miss Rick. You know, I'm going to get in my car, come over there, beat the fuck out of her. That's some reference to smashing Miss Rick's head.

Page 62

None of that happens. Miss Rick isn't going to come in and testify, Miss Johnson told me that. These are threats made toward Mr. Honken to get him to answer the phone and respond to Miss Johnson's concern that he's not home where he's supposed to be. She's getting ready to go to work, and there's a little child there who needs to be taken care of, and it's

2511

Mr. Honken's child, by the way. There's no disagreement about that.

So this evidence is being offered really to prejudice Miss Johnson because obviously it's not one of her better moments. We'd be the first to admit that. She's swearing, and she's angry, and she's talking about beating up Mr. Honken. Mr. Honken never got beat up by Angela Johnson in his life. The government's not going to present one iota of evidence that he was ever touched by her physically, never happened.

And this is information we think the rule specifically should exclude, and I'm referring to 21, 848(j) which deals with proof of aggravating circumstances. Any other information relevant to such mitigating or aggravating factors may be presented by either the government or the defendant regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

This both misleads the jury in terms of the relationship between this couple, and it also has great danger of unfair prejudice. It's a moment in time where Miss Johnson's particularly angry, and the danger is this, Your Honor, that a

Page 63

jury could use this information and decide we don't like this woman. We don't like her personality. We don't like the way

2512

she uses profanity, and instead of making a decision based on an impartial assessment of aggravating and mitigating circumstances, they're going to rely on something like this in making a determination about life or death. That would be wholly inappropriate. It advances the arbitrary and capricious infliction of the death penalty, not prevents it.

So for these reasons and Miss Johnson's due process rights under the 5th, 8th, and 14th Amendments of the United States Constitution, we'd ask the Court to exclude Government's Exhibit Number 1148 from evidence in the penalty phase in this case.

THE COURT: Mr. Williams?

MR. WILLIAMS: Your Honor, while at least arguably this advances the government's aggravating factor of future dangerousness, we are offering it much more in response to the defense assertions in their mitigating factors that this defendant had a mitigating role because she was under the influence and under duress and under the direction of Dustin Honken.

And what this tape does more than anything else is tells you exactly what the relationship was between those two people. I mean, she's -- this is a guy who murdered five people, and she's threatening to kick his ass, he better get him (sic) home, that she told him not to fuck with her.

I mean, this is somebody who's not led, who's not been

2513

Page 64

under duress or under the influence of Dustin Honken. This is somebody who very much can stand up for herself, if anything else, is the one telling Dustin Honken what to do, where to go, where to be. And so I think this opens up a huge window into what the relationship really was like between them.

Now, if the defense wants to go through these mitigating factors and withdraw all the mitigating factors in which they claim she was under the influence of Dustin Honken and she was under duress and that he influenced her, then we won't play the tape. But to the extent that they're pushing this as what the relationship was, this tape shows what really happened between them.

THE COURT: Well, let me ask you this. Setting aside for a moment the question of its admissibility, isn't it more properly admissible, if it's admissible at all, in the government's rebuttal case than it would be in your case in chief? And maybe you weren't planning on using it in your case in chief.

MR. WILLIAMS: I wasn't at this point planning on it. I wanted to talk to Kathy Rick, and so I did tell Mr. Berrigan that until I learned more about where this came from and whether there was any actual threats carried out or anything like that, I wanted to at least reserve the option. That's where Mr. Berrigan asked me this morning was I thinking about playing it with Kathy Rick, and I said maybe. And so that's where I

2514

bring it up.

But no, unless Kathy Rick tells me something I don't know about this point about an actual attack by Angela Johnson on her, then I agree it is most appropriately brought in during

Page 65

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2197 of 3592

rebuttal, and that's where I planned on doing it, frankly, with Special Agent Basler.

THE COURT: Mr. Berrigan, let me ask you this. Particularly in light of this weekend's revision to mitigating factor 21 which is now out and your new mitigating factor as is follows: At the time of the murders of Gregory Nicholson, Lori Duncan, Kandace Duncan, and Amber Duncan, Angela Johnson was under the substantial domination of Dustin Honken causing in her unusual stress, anxiety, and an impairment of her normal judgment, why isn't this arguably relevant to rebut the substantial domination of Dustin Honken?

MR. BERRIGAN: Well, for two reasons, Your Honor. Number one, there's the time element. The murders we're talking about there in the mitigator are on July the 25th, 1993. This conversation arguably at the earliest takes place in the late spring of 1994.

THE COURT: So almost a year later.

MR. BERRIGAN: Almost a year later.

THE COURT: Why isn't it probative even though it's a year later?

MR. BERRIGAN: Because of the circumstances. It's

2515

very clear from this -- correct me if I'm wrong -- that Miss Johnson's angry at Mr. Honken for a specific reason. She's alleging allegedly without coming right out and saying that he's sleeping with Kathy Rick who the Court may or may not be aware of had sort of a tangential relationship with Mr. Honken. These women were pregnant with Mr. Honken's children at the same time.

Miss Rick's going to come in here and testify, I suspect, she didn't know anything about Angela Johnson, not a

Page 66

thing, until police officers told her in March or April of 1993, didn't have a clue. She didn't know anything about Angela Johnson until after she gave birth to her son Ryan who was born on August the 11th of 1993.

And so here's Mr. Honken kind of playing both sides against the middle bouncing back from Miss Rick to Miss Johnson, and Miss Johnson finds out about it one night and gets angry.

What does that say about their relationship in terms of substantial domination on July the 25th, 1993, during the commission of murders? Nothing. I dare say that if any one of us were in a situation where we thought we were in a relationship, that is, a fairly significant relationship with somebody that we loved and cared about and found out they're sleeping with somebody else to our dismay, we might react angrily to that situation.

That does not speak to the underlying relationship and who's dominant over another. It just says, you know what? I'm

2516

really angry. It's seven o'clock in the morning here. You're not here. Get your ass home is what she keeps saying. Answer the phone. There's a crying baby here, and I've gotta go to work until two o'clock. That's what this conversation's about. Has nothing to do with the relationship between Mr. Honken and Miss Johnson back on July the 25th, 1993.

And the government's really putting this in, in my view, to prejudice Miss Johnson entirely. It's not even a remote connection, frankly. But this is bad stuff because obviously the tone and tenor and the profanities used are going to be very prejudicial against Miss Johnson.

And to the extent the Court may disagree with me and

find that there's some thin shred that ties this telephone conversation almost a year later to events that took place back on July the 25th, 1993, I dare say, Your Honor, that the prejudicial effect far, far outweighs the probative value.

If Miss Rick wants to come in here and testify about threats made to her by Miss Johnson, that would be entirely appropriate, and I think she's intending to do that. But it doesn't have anything to do with this telephone conversation.

Mr. Williams says he wants to talk to her about the telephone conversation. There's not an iota of evidence in the discovery we've been provided that these are linked, that is, that what you heard on the tape resulted in any threats to Miss Rick.

2517

These are women, frankly, that are calling each other back and forth all the time, neither of them happy with Mr. Honken. But on this occasion the call is to Mr. Honken. It's not to Miss Rick. And we really don't think even in rebuttal this should come up. But if it has a chance at all to survive, certainly that's the point in time at which it might be revisited based on the evidence that comes to the jury during the course of the penalty phase.

THE COURT: Okay. I have a couple of questions for you.

MR. BERRIGAN: Yes, sir.

THE COURT: In the proposed language for the new number 21 mitigator, what does "at the time of the murders" mean?

MR. BERRIGAN: That means on the date, and I'll be happy to change that. I mean literally at the time of the

Page 68

murders when these murders are taking place.

Our contention -- it's not going to be any great surprise -- Mr. Honken's the one with the gun. We've consistently argued even in the eligibility phase that Miss Johnson knew nothing about a plan to kill any children or Lori Duncan.

Now, the jury may have rejected that, and they may do so again, but there may be at least residual doubt about that, Your Honor, and we think that's very relevant. And if that

2518

wasn't the plan, that is, if the plan was not to go there for the purpose of killing these people, then that is going to create a great deal of anxiety when during the course of this episode Miss Johnson's told that's not really the plan, Angela Johnson. I, Dustin Honken, have a different plan. But it's very much related to the events of the occurrence. It doesn't have anything to do with their relationship, you know, a year later when Miss Johnson's angry with Mr. Honken for not coming home.

THE COURT: And this mitigator, number 21, I'm not sure I read it super carefully the first time through.

MR. BERRIGAN: Yes, sir.

THE COURT: But it clearly only applies to the four murders, not to the murder of DeGeus.

MR. BERRIGAN: That's right, which is a good point. I'm not alleging that Mr. Honken dominated her at the time of Terry DeGeus's murder because I don't think there's evidence of that, frankly, because Mr. DeGeus's situation is quite different, and you heard no testimony from anybody saying, Miss Johnson told me this was the plan about Mr. DeGeus.

Page 69

Well, you heard several witnesses say, Miss Johnson told me the plan was to get a videotape of Gregory Nicholson in Christi Gaubatz's words who I think arguably was the most credible witness at this point; things went awry; things happened; it got chaotic. That's not the situation with

2519

Mr. DeGeus.

And so I'm not trying to claim that during the whole course of their relationship Miss Johnson's dominated by Dustin Honken. That's not true at all.

And the government's going to present evidence to that effect because they're going to show Miss Johnson engaged in illicit drug activity when Mr. Honken's in jail that has nothing to do with Mr. Honken. So this argument I think by the government's, frankly, I think very weak on this particular point.

THE COURT: What is -- can you give me a little preview? What is the evidence going to be in support of mitigation number 21?

MR. BERRIGAN: Just the circumstances of the offense, what you've heard and the proffer of Mr. Honken.

THE COURT: Okay. Because based on what I've heard so far, I'm not sure there would be evidence to support -- I mean, you tell me -- you're the expert in death penalty law, but you tell me if I'm wrong about this. You're entitled to phrase the mitigators as you want pretty much I think. At least that's the position I've taken.

MR. BERRIGAN: Right.

THE COURT: But you would agree there has to be some evidence to support them.

Page 70

MR. BERRIGAN:  Yes, sir, I do agree.

2520

THE COURT:  That we agree on.

MR. BERRIGAN:  My argument would be --

THE COURT:  There's sufficient evidence --

MR. BERRIGAN:  -- there's circumstantial evidence to support the proposition if -- and this is a big if -- but if there are jurors who believe that when they went to the house, when they went there the plan was to get a videotape from Mr. Nicholson, not to kill anybody -- at least that's what Miss Johnson knew -- and that during the course of the events at the house of Lori Duncan on that fateful day on July 25 things changed, that is, that the plan for her changed because of Mr. Honken's desires and his intentions and his determination, frankly, to kill all of the witnesses.

THE COURT:  Well, even if that's true, where's the evidence of substantial domination, though?

MR. BERRIGAN:  Well, he's got the gun.  I mean, I don't think the government's ever alleging at any point that Miss Johnson has this weapon.  Or if they are, I'm not getting that.  Mr. Honken has a gun.

THE COURT:  They've argued in the alternative both in the merits phase and in the eligibility phase that she either had the gun while Mr. Honken was doing the tying up or vice versa.

MR. BERRIGAN:  Yeah.

THE COURT:  And it's a permissible inference I would

2521

Page 71

think from the evidence.

MR. BERRIGAN: Yeah, and that's as good as it gets.

THE COURT: Yeah, but where's the -- while that's a permissible inference, where's the permissible inference that she was under substantial domination? Why is that not just wishful thinking rather than actually an inference supported by the evidence?

MR. BERRIGAN: Well, maybe domination's not the best word. Maybe that should be modified and a more appropriate word inserted. But our only contention is in that respect, Your Honor, Mr. Honken has the gun, Mr. Honken's calling the shots. I'm not claiming that he's got a gun pointed at Angela Johnson. I took out the substantial duress language because I was concerned about that. And maybe domination isn't the best word.

But our contention is that the circumstantial evidence is if the plan to get a videotape of Mr. Nicholson changed, that created a great deal of anxiety and stress in Miss Johnson as a result of Mr. Honken's decision about what was going to happen, that it was Mr. Honken making the decisions and he's the one who killed these people and it was for his benefit that they were killed. This is his plan, not hers. And to the extent that she's participating in it, she does so with a great deal of anxiety and stress and reluctance.

THE COURT: And you're willing to --

MR. BERRIGAN: Maybe "substantial influence" might

2522

have been a better term than "substantial domination." Maybe that might be more appropriate.

THE COURT: And you're willing to modify the language "at the time of the murders" to be a little bit more precise?

Page 72

MR. BERRIGAN: Yes, sir, absolutely.

THE COURT: We're really talking about --

MR. BERRIGAN: July the 25th, 1993, when they're at the house.

THE COURT: And into the -- well, we don't know how late that took place, you're right. They got back at five in the morning.

MR. BERRIGAN: So the time frame of those murders, from the time they get to the house until the time these people are buried is what we're really talking about.

THE COURT: I'm having a hard time seeing the probative value. You know, if the time frame of the murders meant, you know, the entire summer through November, the murder of DeGeus, you know, maybe this might be probative. But if it's specifically narrowed to the July date, what exactly is this probative of in your view?

MR. WILLIAMS: Her role. I mean, because they have argued not just with regard to the four murders but with regard to DeGeus as well is that Honken was in charge, Honken was the one who called the shots, Honken was the one who manipulated her, who led her astray, who misled her even about the killing

2523

of Terry DeGeus. The defense has argued that she wasn't aware that that was the plan to kill Terry DeGeus.

And so what they're suggesting is this is a woman who is easily manipulated and led around by a very conniving Dustin Honken. And what this tape is probative of is that this is a woman who's not led around at all. It references the fact she's told him before she's going to kick his ass and he has to do what she tells him to do and she's threatening to physically

Page 73

abuse him.

So under those circumstances, it completely runs contrary to their assertion of trying to paint this woman as a timid woman easily influenced by Dustin Honken.

Now, what I would suggest, Your Honor, I guess at this point is let's see how this evidence comes in, but I'm guessing the way they're going to paint her during their mitigation case and the way her psychiatrists are going to paint her is somebody who's manipulated by Dustin Honken. And if they're going to go down that road and keep pushing that she was under duress by him, then I think this is probative to suggest that it wasn't the relationship that existed between them. And we can see, you know, perhaps at a later time after all the evidence comes in what your thoughts are at that point.

One thing I do want to raise and just alert the Court to the issue -- and you may already be aware of this -- but it's my understanding from having talked to Mr. Whitworth that our

2524

experts were specifically prohibited from asking any questions of Angela Johnson concerning her mind-set and her thinking at the time of the murders themselves. Now the defense is pushing the mitigating factor suggesting at the time of the murders themselves she was under duress --

THE COURT: But they're not going to support it with any specific psychiatric or psychological evidence.

MR. BERRIGAN: That's right.

THE COURT: And that was kind of the quid pro quo there if you will.

MR. BERRIGAN: That's exactly right. Our experts weren't allowed to question her about that either.

Page 74

THE COURT: And yet it sounds like they're using psychological terminology to suggest just that.

MR. BERRIGAN: What's psychological about being anxious or under duress?

THE COURT: I think it's substantial domination.

MR. BERRIGAN: The domination, I'm with you on that. That was a poor choice of words. And none of our experts are going to say anything about substantial domination at the time of the murders. It's not going to happen.

THE COURT: Right, right.

MR. BERRIGAN: But you can be under very severe stress and anxiety as a result of circumstances, and I'd have to say these are pretty extreme circumstances without having to present

2525

mental health testimony. I wouldn't have to put a single psychiatrist or psychologist on to present that mitigator to a jury. All we'd --

THE COURT: If there was otherwise evidence to support it.

MR. BERRIGAN: That's right, Your Honor. If there otherwise is evidence, absolutely, and we're not putting on expert evidence for that purpose.

THE COURT: I think I'm going to reserve ruling on it and see what happens. I don't think it's admissible in the government's penalty case in chief. I'm leaning towards not admitting it under the Title 21, 848(j) standard, but I'm open to the possibility that it could be admitted depending upon what happens in the mitigation case of the defendant. So I'm going to reserve ruling on it.

Now, the only problem I see with reserving ruling on

Page 75

it is do you need a foundation basis for it through Miss Rick and can you lay the foundation for it if you're going to call her in your case in chief and either not use the tape or use it in the rebuttal penalty phase evidence if I allow it at that time, or would you be prejudiced by laying the foundation for a tape that you might not ever get to use, or are you just going to waive foundation?

MR. BERRIGAN: Yeah, I've not alleged that we have a foundation problem with this tape although, I think it needs to

2526

be clear at some point Mr. -- I'm comfortable with Mr. Williams making a representation --

THE COURT: Could you stipulate that this is a -- could you just maybe stipulate that this is a tape recording of the defendant, Angela Johnson, calling Dustin Honken's answering machine?

MR. BERRIGAN: Yes, sir, because we believe that's what it is. These calls are clearly to Dustin Honken.

THE COURT: Well, she clearly called his answering machine. Whether the answering machine was at his house or Miss Rick's house you two dispute, but it sounds like it was probably at his house. And actually if she dialed the number, it's at his house.

MR. BERRIGAN: Right. She's calling Dustin Honken at his house. That's our contention. And if they talk to Miss Rick and they have some contrary information, we're not aware of it.

THE COURT: Okay. We can kind of wait and see what the evidence holds on that one, but it doesn't sound like there will be a foundation problem for you.

Page 76

MR. WILLIAMS: No, doesn't sound like it. And I think it would be better and, frankly, more fair even to the defense not to lay a foundation for some tape that the jury's later going to speculate about if they never actually hear it.

So if there's an understanding between us -- and I'll

2527

talk with Mr. Berrigan about this -- I think all that needs to come in is the fact that it is a tape made some time in 1994 or 1995 from Angela Johnson to Dustin Honken's phone that was recorded on the answering machine, and that's all that needs to come in in my view, but I can talk to Mr. Berrigan.

MR. BERRIGAN: I don't disagree with that, Your Honor.

THE COURT: Okay.

MR. BERRIGAN: The argument here is about the admissibility of the tape, not the foundation for it.

THE COURT: Okay. I'm going to just go ahead and reserve ruling on it. But I'm leaning towards the fact that the prejudice substantially outweighs any probative value, but it depends upon what the defense puts on for mitigation.

And it may also depend on, you know, the scope of what their expert psychiatric testimony is other than with regard to this particular mitigator. I mean, if they try and create an impression that there was this general subservient role of Miss Johnson, then the tape may be relevant to rebut that. Matter of fact, I think it probably would be, but it all depends on what the evidence is.

Now, can you revise this -- we've now revised the jury instructions again today in light of your weekend correspondence about 21 and a few of the other matters. The government didn't object. That's all done. Now we have to quickly revise it yet

Page 77

once again because we need those instructions immediately if we,

2528

you know, are going to go into the penalty phase.

MR. BERRIGAN:  If you're comfortable with our suggestion, it's just a one-word revision, and that would be to change "domination" to "influence" and then the date as opposed to "at the time of the murders" or whatever the Court might suggest there.  I'm comfortable with that, on the date of the murders, on July the 25th, 1993, whatever you think is going to cure that problem.

THE COURT:  Why don't we just use "on the date."  And what did you want to substitute for "domination"?

MR. BERRIGAN:  "Influence."

THE COURT:  Okay.  I'm comfortable with those changes. We'll make those changes in the preliminary penalty phase instructions should we need them either today or at some later time.

Now, as long as I've got you all here, is it premature to start working on some of the potential problem areas there may be with regard to the 12.2 psychiatric and psychological evidence by the defendant and rebuttal by the government?  I realize this has all been dumped in your lap just within the last hour or so, Mr. Williams.

MR. WILLIAMS:  Yeah, I'm afraid to say, Your Honor, I feel incredibly disadvantaged at this point, and I don't think --

THE COURT:  Well, blame that on Congress.

2529

MR. WILLIAMS:  Yeah, I know it.  I'm not blaming
Page 78

anybody.

THE COURT: Okay. Good.

MR. WILLIAMS: It's just the way the thing is set up. It does lump the stuff -- or dump the stuff in my lap at the last minute, and I don't think I could contribute intelligently to any discussion on this until I have a better idea of exactly what's happened up to this point.

THE COURT: Okay. Well, I'll be available, you know, most of this week. I'd like to get a head start -- if we are going to have problems on the -- in the mental health area with regard to experts, I'd just as soon try and flesh out what the problems are and work on starting to get a solution earlier rather than later only because I don't want to keep the jury waiting. That's all. We can do it in the evening this week, whenever you want.

MR. BERRIGAN: We're not going to have any experts testifying this week, Your Honor, even if we start the penalty phase.

THE COURT: But I think we will -- are we going to -- well, let's see. Your experts testify in rebuttal, so we actually wouldn't -- but we'll get to your case next week.

MR. BERRIGAN: We could get to it this week. All I'm representing to you is even if that happens, we at least have this week to work on this issue. We're not going to have any

2530

experts till next week at the earliest no matter when we start the penalty phase.

THE COURT: If we start the penalty phase.

MR. BERRIGAN: If we start the penalty phase is what I should have said, sir.

Page 79

THE COURT: Got you covered. Anything else at this time?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Thank you very much. We'll be in recess.

(Recess at 12:05 p.m.)

THE COURT: Please be seated. How do you want to handle the verdict, Mr. Williams?

MR. WILLIAMS: In what sense, Your Honor?

THE COURT: Well, we did it a little differently on the merits phase than we did in the Honken trial. You want me to review it, have copies made, have the lawyers review it before there's any -- to make sure there's no inconsistency?

MR. WILLIAMS: That'd be fine. I wasn't here on the merits phase of this one, so I'm not sure how we did it differently.

THE COURT: Oh, that's right.

MR. WILLIAMS: But I'm open to whatever.

THE COURT: I think I'll just review it. If I think there's anything inconsistent, I'll call a sidebar, and then I

2531

think I'll just announce the verdict.

MR. WILLIAMS: Okay.

MR. STOWERS: That's good.

THE COURT: Then we'll take a short recess to assemble the instructions. I mean, they're ready to roll, but it depends on if they don't find her eligible on all ten counts, then we have to change that introductory instruction, and I've left them unstapled because you don't know. That assumes we have a third phase. So ready to have the jury brought in?

Page 80

MR. WILLIAMS: Yes, Your Honor.

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. Thank you.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Juror 621, has the jury reached a unanimous verdict on the eligibility phase?

JUROR 621: Yes, we have.

THE COURT: Okay. Would you please hand it to my law clerk Carey. She'll hand it to me. I will review it.

Here's what I'm going to do. I'm going to read the step 3 eligibility verdict and then have copies of the verdict form made, have the lawyers look at it, and then we'll determine what to do at that point.

Step 3, Gregory Nicholson, Count 1, jury found defendant eligible for consideration of the death penalty.

2532

Count 6, eligible for consideration of the death penalty. That would be for Gregory Nicholson. Lori Duncan, Counts 2 and 7, eligible for consideration of the death penalty; Kandi Duncan, Counts 3 and 8, eligible for consideration of the death penalty; Amber Duncan, Counts 4 and 9, eligible for consideration of the death penalty; Terry DeGeus, Counts 5 and 10, eligible for consideration of the death penalty.

Members of the jury, here's what I think I'll do. I'm going to send you back down to the jury room, and then we'll be bringing you up in just a few minutes to start the penalty phase with preliminary instructions in the penalty phase. But I think we'll take until two o'clock to start the penalty phase because we need to assemble all of the jury instructions for that.

Page 81

They're basically ready to go, but it depended a little bit on what you did in this verdict form, so we have to make adjustments.

So we'll be in recess until two o'clock. Thank you.

(The jury exited the courtroom.)

THE COURT: Why don't I just see the lawyers at sidebar for a second.

(At sidebar off the record.)

THE COURT: Okay. We'll see you back at two o'clock.

(Recess at 1:39 p.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

2533

MR. BERRIGAN: Yes, sir.

(The jury entered the courtroom.)

THE COURT: Please be seated. Members of the jury, you now have a new set of instructions, and this would be entitled the preliminary penalty phase instructions to the jury, and you will note that we have five preliminary instructions. Because these are preliminary, you can guess there will be some final instructions at the end of the penalty phase. If you'd please turn the page, preliminary penalty phase instruction number 1, introduction.

(The Court read preliminary penalty phase instructions numbers 1 through 5 in open court.)

THE COURT: Members of the jury, why don't you take a short stretch break, and then we'll hear the opening statements.

Thank you. Please be seated.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. May it please

Page 82

the Court, counsel.

Ladies and gentlemen, we're here where we talked about we might be during jury selection, and that is where you all are now going to be in a position of determining what the appropriate punishment is for the crime, and you have two options: It's the death penalty or life in prison. And that's a tough decision. It's going to be a tough decision for you, as well it should be. Congress decided when they set up this

2534

scheme that's a decision best made by citizens from the community reflecting the community's views about what the appropriate punishment should be in any given case.

The judge has identified for you through the instructions the process we're going to be going through here, and he's indicated that it basically is going to be a number of steps.

The government will be producing evidence of additional aggravating factors that we've alleged in addition relying on evidence we've already presented during the merits phase concerning a couple of those aggravating factors. At some point you will be weighing all of the factors, both the government's aggravating factors and any mitigating factors either you find or the defense presents to you that you find in this case. And ultimately it will be your job to determine the just punishment to fit this crime.

Let me talk to you about the government's aggravating factors. We listed four, and the judge has instructed you as to those four additional aggravating factors the government intends to prove. You'll see the first one up there is future dangerousness to others. Obstruction of justice is the second

Page 83

one.  Killing more than one person in a single episode is the third.  And the fourth one, of course, is the impact on the victims and their families.

We're going to be presenting evidence basically on the

2535

first and last one during this penalty phase.  We have 17 witnesses we're going to be calling and roughly divided evenly between these two factors.  With regard to the obstruction of justice, we are relying on the evidence we presented during the penalty phase (sic).  You know that through the penalty phase we presented evidence concerning the motivation behind the killings in this case, and that is because of the status of these people as witnesses.

And as to the killing more than one person in a single episode, you found as part of your verdict that the defendant was involved in the killing of four people in one episode.  And so, again, during the penalty phase we're going to be presenting to you -- probably just over the next day and a half, maybe two days, we're going to be presenting evidence on the first and the last factors.

Let me briefly summarize for you if I can what the evidence is going to show with regard to those.

You're going to learn that in 1997 and 1998 after Dustin Honken was arrested and incarcerated sitting in the local jail here for a period of time, then ultimately sent to federal prison, that without him, without his influences, the defendant, Angela Johnson, was again dealing methamphetamine and quantities of methamphetamine.  She had a source here in Sioux City by the name of Jimmy Rodriguez.  Jimmy Rodriguez was supplying her with ounces and ounces and ounces of methamphetamine that she was

Page 84

distributing to a number of people.  During the course of this continued criminal conduct, Jimmy Rodriguez ended up shorting her.  She sent some money to Jimmy to buy some dope, and the dope didn't come, and she didn't get any money.

And so she ended up hiring or employing a couple people.  Ends up that the people she employed was a cooperating individual working with the government and an undercover special agent.  And what she hired them to do was to find Jimmy or the people who owed him money and collect that money.  And you're going to hear through that special agent, Mike Mittan, that this occurred over the course of months, that they had communication with Angela Johnson, they met with her on a number of occasions, and she was sending them out to go collect debts and use whatever force was necessary to do so.

Ultimately when nothing was coming of this in July or in the summer of 1998, she ends up meeting with the undercover agent and the cooperating individual in a hotel room.  And that meeting was recorded by videotape.  And you're going to see that videotape.

During that meeting, Angela Johnson gives instructions to the cooperating individual and to the undercover agent to go out and find Jimmy Rodriguez.  Either get the dope, get the money, or bring him to her and that they were to use whatever was necessary to do that.

Now, ultimately you're going to learn that she was

warned that the cooperating individual was a cooperator and

nothing ultimately came of that meeting or of those plans.

In 2000 when the defendant, Angela Johnson, is arrested on these charges and is placed in the Benton County Jail, you're going to hear evidence that she threatened a dispatcher in that jail, threatened to kill a dispatcher, and the dispatcher called in over the intercom and tried to discipline her for violating some rules.

You're going to learn that during the time period of 2000 through 2004 while she was in the Linn County Jail that she controlled any block that she was put into and she was involved in assaulting other inmates while in prison.

So with regard to the evidence of future danger to others, we're talking about jail employees, other inmates, and other people.

As to the impact on the victims and their families, we're going to be asking a number of the victims' -- excuse me, Your Honor. I believe there's a note from the jury --

THE COURT: Thank you.

MR. WILLIAMS: Thank you, Your Honor. We're going to be asking a number of the victim family members to come in and testify to you concerning the impact it had. And during that time period, you're going to learn a little bit more about what these people -- who these people were that were murdered. They weren't just names. They weren't just bones that were

2538

ultimately dug up, but they were people, people who had impact on other people's lives, on their families' lives, on their parents, on their cousins, on their brothers, and the impact that had when they were murdered.

Ultimately we're going to be asking you to consider

Page 86

all of the aggravating factors as the government -- or as the Court instructed you, both the aggravating factors that we proved to you during the eligibility phase and that you found as to those specific individuals as reflected in your verdict as well as any aggravating factors that you find during the penalty phase, and take into account all of those factors when you're determining what the appropriate punishment should be and ultimately determine what the just punishment is to fit the crime.

I will be standing up back before you when this case is concluded, and I will be asking you that based on all the evidence, based on the crime committed by the defendant, based on her involvement in this case that you impose the death sentence for these murders. Thank you.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Thank you. May it please the Court, counsel.

It was a week ago you decided after some very hard deliberation and thought that this woman who's 41 years of age could spend the rest of her life in a cell in a penitentiary.

2539

That decision's been made now. We recognize that. We thought her role in the offense warranted a different punishment, that that wasn't the punishment that was appropriate, and you decided otherwise. And let me tell you that Mr. Willett and Mr. Stowers and I, we all very much -- and so does Miss Johnson -- respect and honor that decision. There will be no argument about what's already taken place.

But now we have a different decision all together, and the decision is this. It's one you've never undertaken and

Page 87

hopefully never will again, is is this woman so far beyond redemption that we have to execute her to remove her from the human race, or are there circumstances about her background, her relationships with her family and her daughters mitigating factors that are going to be shown to you and I'll talk about in a minute and her role in this offense that would allow you to give her a severe and just punishment to die in prison not in a few years from lethal injection but maybe 20 or 30 years when she dies in that prison cell?  That's the choice.

The judge has already told you -- and we talked about it you remember; it's been a long time since jury selection.  But the rules are different now.  You've had a foreman, a fine foreman.  But you know what?  Now you're each your own foreperson.  You're each your own forewoman.  You're each your own foreman, because this decision you're going to make, it's an individual one.  You're going to have to live with this the rest

2540

of your lives.  You're going to have to leave this courtroom and years from now be comfortable with that decision.

And so the law has made provisions for that.  Up until now, you've made this decision as a group.  You've carefully deliberated.  You've listened to each other.  You checked each other's facts, and you've come to a conclusion.

And now that's going to change.  These mitigating factors the judge read to you, you decide, each one of you, whether they've been proven for you.  And it's not beyond a reasonable doubt.  That's not the test.  The test is is it more likely true that that mitigating circumstance exists for me, and if so, you should consider it.  You don't have to agree about that.  And some of you may find mitigating circumstances that

Page 88

others may not, and that's okay.

That weighing decision, weighing the aggravating and mitigating circumstances, that's not a group dynamic. You individually do that, and you have to reach a decision in your heart and conscience that's true and just. How do I feel about these aggravating and mitigating circumstances? What weight do they have for me? There's no foreman required for that.

And then finally, when that weighing process is done just as the judge told you, it's not predetermined. You know, even if you decided those aggravating circumstances, they outweigh the mitigating circumstances, that does not mean the death penalty. You are absolutely never required to impose the

2541

death penalty no matter how that weighing process comes out, but it does -- it is predetermined the other way, that if you decide that those mitigating circumstances for me outweigh the aggravating circumstances, that is life.

This is the only time in our criminal justice system where jurors get to disagree. The law recognizes that because you're going to make this decision yourself, it's okay to disagree because you're the one that lives with it. And so that verdict form says any one of you, any one of you, has the power and the right to make a determination that for me this is a life sentence and that determination will be carried out. Any one of you get to decide that.

So what evidence will the defense present to you in this momentous decision-making process? Well, we have five categories, and I'll tell you what they are briefly and go back.

One is we're going to present evidence that this woman suffered a very traumatic and abused childhood. And I'm not

Page 89

going to get up here and tell you about how these exorcisms took place and what Ted Dillo did to her when she was nine years old because there are witnesses who are going to talk about that, but that evidence you're going to be asked to consider, and I'll explain why in a second.

Number two, there are some people that are important to her in her life and that she's important to them, and they're going to come in and tell you why, that what redeeming value

2542

does this woman have that we want her to live.

Number three, we're going to present some evidence to you about Mr. Honken's case, what happened to him last fall, and why you should consider that in arriving at your decision about the punishment.

Number four, we're going to present to you some evidence, strong evidence, that this woman is not a danger to other people if incarcerated and you're not going to have to worry about that if you sentence her to life in prison.

And finally, we're going to present evidence from her daughters. And I'm not going to do that to tug at your emotional heartstrings, but the fact is that the people most affected by this decision are Angela Johnson and those two girls. And you should hear from them.

So let's go back. During the jury selection we talked about these issues, punish the crime, punish the person. The evidence that you're going to hear about her traumatic background and the abuse she suffered is important for this reason: That there will be testimony from experts about things that you already know as parents, that children who are subject to violence and to abuse and to neglect, there are repercussions

Page 90

from that.

If this was an egg carton and I dropped it, not all the eggs are going to break. Some of them are going to have cracks in them. And later in life, those cracks are going to be

2543

there, maybe wider. And they're going to impact upon the choices and the decisions and the actions that these children, now adults, make.

And not for a moment am I suggesting to you that something that happened to Angela Johnson at nine years old excuses this conduct. Absolutely not. There are no excuses. You already made that determination. But there are explanations that should be taken into account in making a decision about whether to execute her or not, and this is the type of information that should be considered.

We strive as parents to protect our children very, very strongly from some of the negative influences you're going to see in this case, and there's good reason for that. And experts will tell you why. But you know that.

The evidence of Mr. Honken's case, he had a trial last fall. We'll present one of his lawyers to testify. He stood trial before a jury, and they determined that he was guilty much as you have. They rendered life sentences for the murders of Greg Nicholson, Lori Duncan, and Terry DeGeus; for Dustin Honken, life sentences for those three people.

We're going to present evidence that Angela Johnson's been incarcerated now for coming up on five years, and it hasn't been in a prison. It's been in these little county jails where you don't get to go outside, where they don't have work programs, where they don't have education programs. There will

Page 91

be women that will tell you about these jails and all the time exchanging, people are coming and going, and these are not women there for choir practice. These are women, many of whom, are on their way to penitentiaries for having done bad things. They're not the people you'd choose to invite to dinner. And they come into these cell blocks, and there's conflict because somebody's going to decide who's going to do what to whom.

In five years of this, five years of not getting outside, of being locked in a small cellblock with other women, without being able to work or do anything other than study and get her GED, she's never once hit a guard ever. She's never hurt another inmate.

The evidence you're going to hear from these disciplinary reports at worst is that she's had some pushing matches with other girls and got ten days -- four times in the course of five years got ten days in lockdown. That's the evidence of dangerousness while incarcerated.

And you're going to hear experts tell you that's nothing. These are federal penitentiaries we're talking about. They deal with bad people all the time. This woman's not going to be a problem, not at all. And you're not going to have to worry that if you sentence her to life that some guard's going to get hurt or some inmate's going to get killed. Nonsense, not going to happen.

And I'm going to ask her daughters to testify, and we

do that very, very cognizant of the fact that in this courtroom there are two other little girls that have been present this

whole time that are dead and that their deaths were senseless and needless and it has caused untold grief to their families, untold pain and suffering not just to their families, the same for Terry DeGeus, the same for Lori Duncan, the same for Greg Nicholson. And we are sorry for that. These people are going to come in and testify in their own words about the pain and suffering that they've suffered, but I'd be remiss not to say that we are very regretful and sorry about that, and I hope not to visit that on my client's family.

At the end of this penalty phase -- and it may be a week or two from now -- I'm going to get back up just like Mr. Williams, and I'm going to argue that, you know, to render a just punishment in this case, to punish this woman severely for what she's done, that you don't have to kill her; that you don't have to kill her in order to protect society; that you don't have to worry about anybody getting hurt if you put her in jail for the rest of her life; that relative to Dustin Honken, just because they're equally guilty doesn't mean they share the same sentence; we punish the person and the crime; and that a just, appropriate, and fair punishment in this case is and should be life in prison without any possibility of parole. And that's what we're going to ask you to do.

THE COURT: Members of the jury, that concludes the

2546

opening statements in the penalty phase in this case. We're going to send you home for the day now. It's just a little bit before three. And we'll start tomorrow morning. We're back on our regular trial schedule. We'll start at 8:30 tomorrow morning, and we'll go through all of the government's witnesses. And when we're done with all of the government's witnesses -- I

don't know when that will be -- then we'll start the defense penalty phase. So that's our plan.

Remember my cautionary instruction about not discussing any aspect of this case among yourselves. Don't let anybody talk to you about the case. Don't talk to anybody else about the case. We have a number of news media folks in the courtroom today, so they'll be writing about the case in the newspapers. It will be on TV and the radio. And we're all lucky we live in a country where we have the First Amendment and we don't do trials in private, that everybody has a right to attend. But I'm going to ask you not to read any of those news stories about the case or listen to any radio or television reports about the case. Everything you'll need to know about the penalty phase will be presented right here in the courtroom. So we'll see you all tomorrow morning at 8:30. Thank you very much.

(The jury exited the courtroom.)

THE COURT: Please be seated.

Mr. Williams, anything we need to take up?

2547

MR. WILLIAMS: Not that I'm aware of, Your Honor.

MR. BERRIGAN: Nothing by the defendant, sir.

THE COURT: Okay. Why don't we meet at 8:15 tomorrow morning, and we'll go from there; okay?

MR. WILLIAMS: Very good.

THE COURT: Thank you.

MR. WILLIAMS: Thank you.

THE COURT: We'll be in recess.

(The foregoing trial was adjourned at 2:50 p.m.)

Page 94

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

```
                                        11-1-05
      Shelly Semmler, RMR, CRR              Date
```

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2227 of 3592

2548

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,  No. CRO1-3046

       Plaintiff,  Sioux City, Iowa
                      June 1, 2005
   vs.  8:29 a.m.

ANGELA JANE JOHNSON,  VOLUME 16 of 24

       Defendant.
                    /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

2549

APPEARANCES:

For the Plaintiff:  C. J. WILLIAMS, ESQ.
                    Assistant United States Attorney
                    Suite 400 - Hach Building
                    401 First Street Southeast
                    Cedar Rapids, IA  52401

                    THOMAS HENRY MILLER, ESQ.
                    Iowa Attorney General's Office
                    Area Prosecutions Division
                    Hoover State Office Building
                    Des Moines, IA  50319

For the Defendant:  PATRICK J. BERRIGAN, ESQ.
                    Watson & Dameron
                    2500 Holmes
                    Kansas City, MO  64108

                    DEAN STOWERS, ESQ.
                    Rosenberg, Stowers & Morse
                    1010 Insurance Exchange Building
                    505 Fifth Avenue
                    Des Moines, IA  50309

                    ALFRED E. WILLETT, ESQ.
                    Terpstra, Epping & Willett
                    Higley Building - Suite 500
                    118 Third Avenue Southeast
                    Cedar Rapids, IA  52401

Also present:  Bill Basler

Page 1

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2228 of 3592

Court Reporter:            Shelly Semmler, RMR, CRR
                           320 Sixth Street
                           Sioux City, IA  51101
                           (712) 233-3846

2550

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Ready to have the jury brought in, Mr. Williams?

MR. WILLIAMS:  Yes, sir.

THE COURT:  Mr. Stowers?

MR. STOWERS:  Yes.

(The jury entered the courtroom.)

THE COURT:  Morning.  Please be seated.

Mr. Williams, are you ready to call your first witness in the penalty phase?

MR. WILLIAMS:  We are, Your Honor.  United States calls Steve Vest.

STEVE VEST, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated in the witness box.  And try and pull up that chair so you can speak directly into the microphones.  You may adjust the microphones.  And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS:  Steven Joe Vest, V-e-s-t.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q.   Mr. Vest, I want you to share a little bit of information

Page 2

Q. with the jury about your background, sir. Where are you from originally?

A. Kansas City.

Q. And how long did you live in the Kansas City area?

A. My entire life.

Q. Could you explain to the jury how far did you go through school, sir?

A. Eleventh grade.

Q. Once you completed eleventh grade, did you start employment?

A. Pardon me?

Q. Once you got through school, did you start employment?

A. Yes, I did.

Q. And up until the point you got incarcerated -- and we're going to talk about that in a minute -- what type of work did you do in Kansas City?

A. I owned a couple businesses, a forklift company and a car wash.

Q. And did you own those companies for a period of time down there?

A. Yes, I did.

Q. Are you married, sir?

A. Yes, I am.

Q. And do you have any children?

A. Two kids.

2552

Q. Let's talk about the fact that you are in custody right

Page 3

now.  First of all, why are you in prison?  What crime were you convicted of, sir?

A.   Conspiracy for drugs, two homicides, money laundering, arson.

Q.   And are those federal or state crimes?

A.   Federal.

Q.   When were you convicted, sir?

A.   '96.

Q.   And did you plead guilty, or was that a trial result?

A.   I pled guilty.

Q.   When you pled guilty, was it a -- what we call a cooperation plea agreement?  In other words, did you agree to cooperate against other people involved in your criminal conduct at that time?

A.   No, I didn't.

Q.   What sentence did you receive, sir?

A.   A life sentence.

Q.   And was it one life sentence or multiple life sentences?

A.   Four I believe.

Q.   And are you currently serving those life sentences?

A.   I am.

Q.   At some point, sir, did you agree to cooperate with authorities on at least a couple matters, one with SIS -- and we'll talk about that in a minute -- in the federal prison and

2553

also with regard to the Honken and Johnson investigation?

A.   I did.

Q.   And pursuant to a written agreement with the government or under what circumstances did you agree to cooperate?

A.   No, just I found out somebody was getting ready to get hurt

Page 4

on the yard, so I just let them know about it.

Q.   As a result of cooperating in this case, have you up to this point received any reduction in your sentence?

A.   No, I have not.

Q.   What is your understanding about the possibility of whether you could receive a reduction in your sentence for your cooperation?

A.   I have no understanding really at this point.

Q.   Do you have any understanding of whether it's possible that there could be a reduction in your sentence?

A.   I'm not aware of it.  At this moment, no.

Q.   Who would have to make that decision?

A.   My prosecutor.

Q.   Did you, in fact, testify in the Dustin Honken case?

A.   I did.

Q.   And after testifying in the Dustin Honken case, did your prosecutor -- this is a prosecutor down in Kansas City?

A.   Yes.

Q.   Did he give you a reduction in your sentence?

A.   No, he did not.

2554

Q.   Do you have any promises for testifying here today that you're going to get any reduction in your sentence, sir?

A.   No, I don't.

THE COURT:   Mr. Williams, I just want to correct a misimpression.  You said did a prosecutor make a reduction in his sentence.

MR. WILLIAMS:   Yeah, I --

THE COURT:   And as everybody but the jury might not

Page 5

know, a prosecutor can't make the reduction. They can make the motion.

MR. WILLIAMS: That's right.

THE COURT: Then it's up to the district court judge who sentenced this --

MR. WILLIAMS: That's right. I'll rephrase, Your Honor.

THE COURT: Thank you.

MR. WILLIAMS: I jumped a step there.

BY MR. WILLIAMS:

Q. Did your prosecutor make a motion to ask the judge to reduce your sentence?

A. No, he didn't.

Q. And you understand that without that motion from the prosecutor the judge can't reduce your sentence.

A. Yes, I do.

Q. Let me ask you then about the time that you had contact

2555

with Dustin Honken. Was there a period of time that you were incarcerated at the United States Penitentiary in Florence, Colorado?

A. Yes.

Q. And during what time period roughly was that?

A. From '96 to 2000.

Q. The USP, Florence, can you give the jury an idea of what type of facility that is?

A. It's a high-level penitentiary.

Q. Which means what?

A. Everybody there has long sentences. You know, it's a rougher place to be in.

Page 6

Q. Is it a very high-security facility?

A. Yes, uh-huh.

Q. During that time period as I understand it, USP, Florence is divided into different units?

A. Yes.

Q. And did you -- were you housed in various units at USP, Florence while you were there?

A. I was.

Q. At some point were you housed in the bravo B unit?

A. Yes, I was.

Q. And while housed in the bravo B unit, did you come to know somebody by the name of Dustin Honken?

A. I did.

2556

Q. Can you describe for the jury how is it that you came to know Dustin Honken?

A. I met him in a Spanish class first. This was when I was in another unit. And then -- so I knew him a little bit there. And then when I moved over to the unit he was in, then I started hanging out with him a little bit there in the unit.

Q. And how long were you and Dustin Honken in the same unit then?

A. I think about a year.

Q. During the course of that year, could you describe for the jury how your relationship changed during that time period if it did?

A. Yeah, we became closer because we started, you know, hanging out together and working out and eating together and things like that.

Page 7

Q.   And when you moved into the bravo B unit, it would have been roughly November of 1999?

A.   Yes.

Q.   So really the last year you were at USP, Florence was the time period you would have been housed with Dustin Honken.

A.   Yes.

Q.   During that time period that you came to know Dustin Honken better and better, did you share information with him about what you were in prison for?

A.   Yes.

2557

Q.   And did he share information with you about what he was in prison for?

A.   Yes.

Q.   So Dustin Honken knew that you were convicted of murders in relation to a drug crime.

A.   Yes.

Q.   Did you end up attending any type of religious groups with Dustin Honken?

A.   Yes.

Q.   And as a result of attending those groups, did you form an even closer friendship with him?

A.   I did.

Q.   This religious group that you would have attended, was that a fairly small group?

A.   It was.

Q.   Was there loyalty among the members of that group?

A.   Yes, there was.

Q.   As a result of that, was there even further confidences disclosed between members of the group?

Page 8

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2235 of 3592

A.   I'd say they were.

Q.   At some point did Dustin Honken talk to you about escape plans from USP, Florence?

A.   Yes, he did.

Q.   Could you describe for the jury just in very general terms how it was that he came to talk to you about wanting to escape?

2558

A.   He approached me one day and said that he was going to come back to trial for some murders and he wanted to call some witnesses for him and that we would all come back to the jail here and he would kill a couple of the guards and break us out and we would all escape that way.

Q.   And so this was a plan he talked to you about?

A.   Yes.

Q.   Now, as a result of him disclosing this to you, what was your initial reaction, first of all?

A.   When he first asked me if I'd be interested, I said no, that I wouldn't be interested in doing something like that.  So I went and told the SIS guy since I already had talked to him before about somebody getting hurt, and I let him know what was going on.  And he said, Well, you probably should talk to him a little bit more and see, you know, what else they're doing, is there anything else.  I said okay.

So I went back, and I told him later on -- about a week later or so I said, Okay, I'd be interested, and I might be interested in going.

Q.   So let's back up a little bit and explain some of these things to the jury.  First of all, you and I both referenced SIS.  What is SIS?

Page 9

A.    It's kind of like an FBI agency inside the prison.

Q.    And they investigate possible crimes committed within the prison system itself?

2559

A.    Yes, they do, drugs or, you know, fights, stabbings, that kind of thing.

Q.    You indicated in your testimony that you had previously contacted SIS about some other matter in the prison.  Could you explain that to the jury?

A.    I had some information.  Somebody had an argument over some drugs that were coming in, and one guy was -- they were going to stab some guy, and I went and told them what I heard.

Q.    When you say drugs coming in, drugs coming into a maximum security federal prison?

A.    Yes.

Q.    That happens?

A.    All the time.

Q.    So as a result of informing the SIS about this other matter, did you form some type of at least business, if you will, relationship with one of the SIS agents there that you felt you could trust?

A.    I did.

Q.    And as a result of that, is that who you went to then when Dustin Honken came to you about this plan to escape?

A.    I did.

Q.    You indicated in your testimony that once Dustin Honken came to you and you went and talked with this SIS agent he suggested you go back and try to learn more.

A.    Yes.

Page 10

Q.    And did you do that?

A.    I did.

Q.    In the process of discussing this escape plan -- and let me just ask you, was this over a course of a number of conversations with Dustin Honken that he would talk about this scheme and plan to escape?

A.    Yes, it was.

Q.    During the time period you were with him, Dustin Honken never escaped; is that right?

A.    That's right.

Q.    Okay.  During this time period, though, when you're talking to him about these escape plans, does he disclose further to you the circumstances that led him to be in prison and murders he was involved with?

A.    He did.

Q.    Let's focus then -- recognizing this information came to you not just in one conversation but in a series of conversations, I want to question you about different topics that Dustin Honken spoke with you about.  First of all, did he talk to you about why he was serving time at that point?

        MR. BERRIGAN:  I'm sorry to interrupt, Your Honor, but for the record could I renew our motion in limine regarding Mr. Vest's testimony and our complaint that this violates the defendant's Sixth Amendment right to confront the witnesses against her, specifically Mr. Honken?

        THE COURT:  And would you like a standing objection?

MR. BERRIGAN: I would, assuming you're going to overrule that. I wasn't going to assume that.

THE COURT: Well, I'm going to overrule it.

MR. BERRIGAN: All right, sir. Then may I have a continuing objection?

THE COURT: You may. Thank you.

MR. BERRIGAN: Thank you.

BY MR. WILLIAMS:

Q. Did Dustin Honken tell you why he was in prison at that point?

A. Yes, he did.

Q. And what was he in prison for at that point in time?

A. I believe it was a meth charge.

Q. And during the course of the conversations you had with him, did he talk to you about his involvement with drugs dating back to 1993?

A. Yes, he did.

Q. What did he tell you about that?

A. He said that him and a friend went down to Arizona and was cooking meth down there and his brother was financing it and they would bring it up to Iowa and sell it.

Q. And did he indicate to you the meth, whether it was good quality, bad quality meth?

A. He said it was the best around because he was some type of

2562

chemist and so he made it better than most people.

Q. Did he talk to you about the quantities of meth that he was distributing back in Iowa?

A. He probably did, but I don't recall what it was right now.

Q. What about the people he was selling to? Did he tell you

Page 12

who those were?

A.   Yeah, he sold it to two people is all he told me he sold it to, was Greg Nicholson and Terry DeGeus.

Q.   At some point did he talk to you about an Angela Johnson?

A.   Yes.

Q.   And did he indicate whether she was involved at all in this operation in 1993?

A.   Yes, he did.

Q.   What did he tell you was her role?

A.   He said that he met her through Terry, that Terry owed him 30,000 and he'd brought over some drugs one day and she was there and that's where he first met her, and then he left, and she called him, had him -- and they met at a hotel, and he said he thought it was a set-up at first because she was coming there by herself.  So he patted her down, and she gave him $10,000 and said that -- told him -- told -- she told Dustin, I don't know why you're messing with Terry because I'm the one who has all the contacts; you know, I'm the one who's doing everything.

Q.   And so he said when she first came over he thought it was a set-up meaning that she might be an informant working for the

2563

police?

A.   Yes.

Q.   And so he patted her down I assume for a microphone or something?

A.   Yes, he did.

Q.   The $10,000 that she brought over, was that drug money?

A.   Yes, it was.

Q.   After she has this conversation with Dustin Honken and

Page 13

says, I'm the one with the connections, what happens -- did Dustin Honken tell you what happened then with her role in the organization at that point?

A. Yeah. He said after that they had sex and he started dating her after that.

Q. Did he indicate to you that he was arrested in March of 1993?

A. Yes.

Q. And did he tell you what led to his arrest?

A. Yes, he said that he went over to Greg Nicholson's house and -- he went over there, and he said that there was some people in Minnesota that just got arrested, and he went in, and the wife said something about it was on TV, and he went downstairs to talk to Greg, and he asked Greg about it, and Greg said, Well, I don't know anything about that. And he said -- Dustin said as soon as Greg said that he should have known something was up. But he didn't. He went and Dustin -- he

2564

bought drugs from him, and when he left, he got arrested. They pulled him over and got arrested.

Q. After he was arrested, was he placed in a local jail for a period of time?

A. He was.

Q. And ultimately his charges became federal. Before they became federal, did he indicate to you whether he had any visits or conversations with Angela Johnson while he was in the local jail there?

A. He did. He said that she came to visit him and she wanted to break him out of jail, and he said, Just hold on a minute, just wait. I'm going for a bond hearing, and let's see what

Page 14

happens with the bond hearing.

Q.   Now, ultimately his charges were federal.  Did he indicate once his charges were taken federal whether he, in fact, got out on bond?

A.   He did.  And he told Angela that Greg was going to testify against him and he was looking at ten years, and the only way that --

MR. BERRIGAN:  I'm going to have to object.  This is nonresponsive to the question, Your Honor.

MR. WILLIAMS:  I can ask a question in here, Your Honor.

THE COURT:  Okay.

BY MR. WILLIAMS:

2565

Q.   He indicated he did get out on bond.  And after that did he have any further conversations with Angela Johnson concerning what he was going to do about his charges?

A.   Yes.

Q.   And what were those conversations?

A.   Well, he said that he was looking at ten years, going away for ten years, and the only way he could do something about that is if they got rid of Greg, and Angela said, Okay, I'll help you.

Q.   And when he said get rid of Greg, did he indicate that he told her that getting rid of him meant killing him?

A.   Yes.

Q.   And so he told you there was an agreement from the beginning to kill Greg Nicholson.

A.   Yes, there was.

Page 15

Q.   And Angela Johnson agreed to assist him.

A.   Yes.

Q.   So what did he tell you happened after they had agreed to take the steps to kill Greg Nicholson?

A.   He said Angela went over to the house and --

Q.   Let me stop you, Mr. Vest.  Did he indicate what house that Angela went over to?

A.   She went over to Greg Nicholson's house and got in the door.  I don't know what pretext that she used to get in, but she got in the door, pulled a gun on him, his wife, and two

2566

children and had everybody sit on the couch and wait there for Dustin to come.

Q.   And then what happened?

A.   Dustin comes through the door, and he says -- Greg says, Oh, shit, and Dustin says, Oh, shit's right, you know.  And he started talking to him, and they were asking, What's happening, what's going on?  And Dustin said that, well, you're going to testify against me in court, so I'm going to take you to a house and keep you there until after my court date passes, and once my court date passes, I'll let you out.  And they said okay.  And when -- he had the wife write some note and had Greg make a video announcing all the stuff that he's already said about Honken.

Q.   And then what happened at that point?

A.   Then they left, and they drove them out to some woods and Dustin took the mother and -- Greg and his wife out to the woods and shot them.

Q.   Let me stop you at that point.  When he's telling you about these events that night, did he indicate to you at all whether

the adults were tied up or bound in any way?

A.  No.

Q.  So at this point they made entry in the house.  He tells the story to Greg Nicholson that they're going to take him someplace else, but Angela Johnson already agreed to participate in killing Greg Nicholson.

2567

A.  Yes.

Q.  Okay.  Takes them out to some location.  Did he tell you what location they took them out to?

A.  No.

Q.  Once he gets them out to the woods, did he indicate what vehicle they went in to get out there?

A.  No.

Q.  Did he indicate who was driving or what was going on with the gun?

A.  No.

Q.  Did he indicate what kind of gun he had?

A.  No.

Q.  Did he indicate where the gun came from at all?

A.  No.

Q.  So take the jury back to this location, this remote location.  They get out to this site.  Is Angela Johnson with him at this point?

A.  Yes.

Q.  Dustin Honken takes the adults out together?

A.  Yes.

Q.  And does what with them?

A.  He takes them out to where the kids and -- away from the

Page 17

car, and he shoots them.

Q. He indicate where he shot them at all?

A. No.

2568

Q. While he's out there shooting the adults -- and this is this Greg Nicholson and his wife is what Dustin Honken tells you.

A. Right.

Q. When he's out there doing that, where are the two little girls?

A. They're in the car, and he said that when the girls heard the shots they hugged each other like, you know, they were scared and they hugged each other, and he said Angela told them, Don't worry, that's just fire crackers, and you'll be with them shortly.

Q. Then what happened?

A. Dustin came back and got the kids and walked them to the -- where the parents were and shot them.

Q. Out together?

A. Yes.

Q. He indicate where he shot the children at all?

A. Behind the head I believe.

Q. At any point when he's telling you about this, does he indicate that Angela Johnson protested any of this conduct?

A. No.

Q. Did he indicate what happened with the bodies of the murder victims after they were shot?

A. They buried them.

Q. And when you say they buried them, what did he tell you

Page 18

about the burial itself?

A.    He didn't say anything about that burial.  He just said that they buried them.  That's all he said.

Q.    Did he indicate whether the grave was dug ahead of time or not dug ahead of time or anything like that?

A.    He didn't say.

Q.    With regard to the site that they took the victims to before they shot him, did he indicate to you whether that was a site that they had selected ahead of time?

A.    He didn't say.

Q.    Did Dustin Honken tell you about any other murders he was involved in?

A.    He did.

Q.    And could you explain to the jury what he told you about that murder?

A.    He said that after they killed them that he started believing that Terry DeGeus was going to testify against him, and so he talked to Angela about that again, and they decided to get rid of him.  And so they set up a meeting.  She had him -- she set up a meeting to meet with him.

Q.    And what did Dustin Honken tell you about how the meeting was set up?

A.    He said that Angie called him and said to meet her somewhere.

Q.    Did he explain to you why it is that Terry DeGeus would

comply and meet up with Angie Johnson someplace?

Page 19

A.   Well, she used to date him.

Q.   Did he indicate what happened then after Angie called him up?

A.   Yeah.  Once she got -- he pulled up and they were leaning on the car, and he pulled up and got out of the car and Dustin was leaning against his car, and he had a pistol in his waistband.

Q.   Let me stop you at this point.  He indicate where this was?

A.   No.

Q.   He indicate anything about whether it was in town, out of town, anything like that?

A.   No, he did not.

Q.   Okay.  So they're at some site is all he tells you.

A.   Right.

Q.   And who pulls up?

A.   Terry.

Q.   And is Terry with anybody when they pull up?

A.   No, he's not.

Q.   Where is Angela Johnson at according to Dustin Honken at this point?

A.   She's standing next to him.

Q.   Already at the site.

A.   Yes.

Q.   And Terry pulls up, gets out, and Dustin's leaning against

2571

the car, and he has a gun.

A.   Yes.

Q.   What happens?

A.   Terry says, What's the gun for?  And he says, It's for protection.  And he's like -- then he starts going into like,

Page 20

Well, I know I owe you that 30,000, but don't worry about it. I'm going to get it to you, this and that. And they start arguing over the 30,000, and Dustin said at that point they're arguing for like five minutes or so, and Angie gets in the car, and he said that means to him hurry up, mother fucker, you know, get this over with.

So Dustin says, Well, I'm not here to argue about the 30,000. I think you're going to testify against me. And he says, No, I'm not going to testify against you. And at that point Dustin pulls the gun out and shoots him, started shooting him.

Q. Did he indicate to you whether he shot him once or multiple times?

A. Multiple times.

Q. Did he indicate where in his body he shot him?

A. In the stomach. He said the first shot he kind of bent over, and he says -- and he said that was his last words. He said, I said I wasn't going to say anything.

Q. What happened at this point? Dustin Honken shoots him multiple times. What happens?

2572

A. He falls down on the ground he said. He was supposed to be known as a bad ass around town. And so Dustin went over and got a bat, aluminum bat, that he'd boughten for this thing that he was doing and he --

Q. Let me stop you. He indicated to you he got an aluminum bat specifically for this purpose.

A. Yes.

Q. Where did he get the bat -- when he's at the scene, he's

Page 21

just shot Terry DeGeus. Where is the bat at?

A. The bat's in the car.

Q. And so when he needs the bat, what's he do?

A. He walks over to the car and tells Angie to hand him the bat.

Q. And did she do it?

A. She did.

Q. And then what happened?

A. He takes the bat over to Terry and starts beating him with a bat, and he said he, you know, beat him until he couldn't swing the bat no more, till he was just wore out.

Q. He indicate where on his body he was hitting Terry DeGeus with the bat?

A. All over.

Q. What happened at that point?

A. He walks back over to the car, and he said when he gets over there Angie screams a little when he first shows up because

2573

he's got blood all over him, and he said, What's wrong? And she said, Oh, you look like that guy from The Shining, and Dustin tells her, Well, come on, you gotta help me because I'm too tired to drag him. So Dustin goes over and gets the shovel out of the car, and she gets out of the car, and they walk over to Terry, and he's still barely breathing, I guess, he said, and he finished him off with a shovel.

Q. Finished him off with a shovel how?

A. He said he killed him, finished him off with a shovel, finished killing him with the shovel.

Q. So did he indicate whether Angela Johnson helped him then drag the body someplace?

Page 22

A.   He did.  They both grabbed him by the leg and started pulling him to the wooded area, and at that point when they was dragging him he made some kind of noise, and she dropped a leg and said, You think that was his soul?  And Dustin said, No, that was just air coming out of him.  And so they picked him -- they dragged him over to where they were burying him.

Q.   They brought the shovel with them for this purpose?

A.   Yes, they did.

Q.   Did he indicate then who drug -- who dug the grave?

A.   No.

Q.   Did he indicate whether the digging took a while?

A.   He didn't say.

Q.   While he's digging, did he indicate to you whether he did

2574

anything?

A.   He said he started singing and making jokes and grabbing his foot and things like that.

Q.   Grabbing whose foot?

A.   Terry's, and shifting it like a four-wheel transmission or something he was saying.

Q.   After he's dead, he grabs Terry's foot and pretends to be shifting it like a --

A.   Yeah.

Q.   -- gear shift.

A.   Yes.

Q.   Did he indicate whether the weapon used in the DeGeus murder was the same as the weapon used in the murders of the four people?

A.   He didn't say.

Page 23

Q.    You indicate in your testimony he didn't tell you where he killed Terry DeGeus.  Did he ever indicate to you, though, any concerns about whether Terry DeGeus's body might be found?

A.    Yeah.  He said he was afraid about it being dug up before, you know, some type of field or something he said.

Q.    So it was in a field is the most you learned from Mr. Honken.

A.    Yes, uh-huh.

Q.    The murder weapon used in this -- at least with either of the two cases, did he indicate to you what ultimately happened

2575

with that weapon?

A.    He said he had it melted down.  He had a friend of his that was in the meth business, that Tim, gave the gun to Tim, and Tim was going to melt it down.

Q.    Did he indicate what he did with the gun after they melted it down?

A.    No.

Q.    At some point did Dustin Honken indicate whether he knew he was under investigation for these murders?

A.    Yes.

Q.    And it was in connection with that that he kind of hatched this escape scheme or plan.

A.    Yes.

Q.    Did he indicate to you whether, in fact, at any point the bodies had been discovered during the time period that you were in the same cellblock with Dustin Honken?

A.    Yes.  He said that he got mad at Angie because she gave some guy a map to find the bodies, and he was mad about that. Then he was pretty sure they wouldn't be able to use that
Page 24

against him.

MR. WILLIAMS:  I have no further questions, Your Honor.

THE COURT:  Mr. Berrigan, you may cross-examine.

MR. BERRIGAN:  Thank you, Your Honor.

CROSS-EXAMINATION

2576

BY MR. BERRIGAN:

Q.    How are you, Mr. Vest?

A.    Good.

Q.    My name's Pat Berrigan.  I'm one of the lawyers for Miss Johnson.

A.    Okay.

Q.    By the way, I'm from Kansas City as well.  So I know a little bit about your case because your case was one of the first federal death penalty prosecutions in the Kansas City area, was it not?

A.    Yes.

Q.    And not only were you charged, but there were like 27 --

A.    33, I believe.

Q.    -- 33 codefendants.  And you were alleged to be the head guy; isn't that right?

A.    Yeah.

Q.    And your brothers -- you're the oldest of seven children; is that right?

A.    I am.

Q.    And you have some younger brothers that were also charged with you, Mark, James, and Darrell?

A.    Yeah.

Page 25

Q. But Darrell wasn't charged with murder. He just had the drug charges.

A. Yes.

2577

Q. But you and Mark and James all faced capital murder charges in federal court back in 1994 in Kansas City.

A. Yeah.

Q. And not only that, but these were death penalty cases, weren't they?

A. Yeah.

Q. Chuck Ambrose was the prosecutor?

A. Yes, he is.

Q. Your attorneys Pat Peters and John O'Connor; right?

A. Yeah.

Q. And you pled shortly before trial with your brothers.

A. Yes.

Q. And avoided the prospect of the death penalty.

A. Yes.

Q. Is that right?

A. Uh-huh.

Q. And you said you told -- talked to Mr. Honken about your case.

A. Yes.

Q. And told him about it while you were in the prison together.

A. Yes.

Q. And told him the circumstances under which you were convicted or pled guilty?

A. Yes.

Page 26

Q.    And it was kind of an all-or-nothing deal, wasn't it, that it had to be that all three of you pled guilty or the government was going to take you to trial?

A.    Yes.

Q.    You really didn't -- the prosecutor asked if you had a chance to cooperate.  The government didn't really ask you to cooperate, did they?

A.    No, not really.

Q.    Your brother Darrell had agreed to testify against you and James and Mark.

A.    Yes.

Q.    But you yourself never really had an opportunity to cooperate.

A.    Well, they asked me when I first got arrested if I would cooperate.

Q.    Was that before they learned about these murder charges?

A.    I think it was, yeah.

Q.    Yeah.  And these were drug dealers that were killed.

A.    Yes.

Q.    Handcuffed and suffocated around their mouths till they suffocated with duct tape; isn't that right?

A.    Yes.

Q.    And you've been in jail since February the 28th, 1994.

A.    Yes.

Q.    And you're a person who had no prior criminal record

2579

whatsoever; right?

Page 27

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2254 of 3592

A. That's right.

Q. And you're still a young man. What are you? In your mid 40s?

A. 44.

Q. 44. And this was 11 years ago.

A. Yes.

Q. So you were 33.

A. Yes.

Q. Had a wife and two very young children at that time, two boys.

A. Yes, I did.

Q. Were they three and five?

A. Yes.

Q. And now they're 14 and --

A. 16.

Q. -- 16. And that for somebody who's never been in jail much less prison, I'm just thinking that was a difficult situation.

A. It was.

Q. You're not placed necessarily anywhere close to where your family is; right?

A. No, I'm not.

Q. In fact, you were sent to -- apparently to Florence, Colorado, which is a good ways away from Kansas City.

A. Yes, it is.

2580

Q. And it's gotta be expensive for you to maintain contact with your family in terms of telephone calls; isn't that true?

A. Yes.

Q. The telephone companies seem to charge a premium rate for people that are in the prisons trying to call home and vice

Page 28

versa?

A. They give you 300 minutes, so it's $70 a month now.

Q. 70 bucks a month for 300 minutes.

A. Uh-huh.

Q. And then, of course, to see your family, for them to come see you, they'd have to make a trip all the way out to Florence, Colorado; right?

A. Yes.

Q. And that -- that's one of the things that's motivating you, would that be fair to say, that as much as anything else in the world you'd like to have at least a chance to get back with your wife and kids?

A. Motivating me for what?

Q. To be a cooperating witness.

A. No, it has nothing to do with that.

Q. Nothing to do with that.

A. No.

Q. So you're just telling us that you just decided out of the goodness of your heart to call the SIS people about Dustin Honken after he told you about his case.

2581

A. Yes, I started talking to him with somebody on the yard. I didn't even know the guy that was going to get hurt. That's how it all started.

Q. So this has nothing to do with whether you could get home or see your kids again.

A. No, had nothing to do with it.

Q. You're not even going to request a reduction in your sentence, are you?

Page 29

A.    If they would give me one, I would take it, yes.

Q.    What do you mean?  You gotta ask for one, don't you?

A.    I don't know.

Q.    You don't know?  You've been in prison -- let me see if I got this right.  You've been in prison 11 years, in a federal prison.

A.    Yes.

Q.    And you're telling me that you don't know whether or not you have to ask for this reduction in order to get it?

A.    Well, when you're in prison, you don't go around telling somebody that you're wanting a reduction in your sentence on those pre --

Q.    Mr. Vest, you know people in prison have gotten reductions in their sentences for being snitches, don't you?

A.    No, no.

Q.    You don't.

A.    No.

                                                      2582

Q.    Never heard of it.

A.    No, because if they're a snitch, they won't even -- nobody will talk to them.  They won't even be on the yard.  They'll run them off the yard.

Q.    That's how you know they're snitches is they get run off the yard, right, or they end up in the witness sec. or the wit. sec. program like you're in; right?

A.    Right.

Q.    And being in the wit. sec. program, are you still claiming that you don't know anything about Rule 35 motions, that you can file a motion or the prosecutor could file a motion to get your sentence reduced?  You really want us to believe that?

Page 30

A.    I heard of 35, but that's all I know about it.

Q.    Don't know anything about it.

A.    I don't know anything more about that.

Q.    Okay.  Let's talk a little bit about your relationship with Mr. Honken for just a moment.  As I understand it, you met him in a Spanish class, but you actually started living with him in November of '99 in the BB unit in the USP, Florence; right?

A.    Yes, uh-huh.

Q.    And at some point in early 2000 he starts talking to you about his case?

A.    Yes.

Q.    Okay.  So really you'd just known him, at least living with him for a few months at that point.

2583

A.    Yes.

Q.    And one of the things that you told the prosecutor is that you got close to him over time by working out together, eating together, and participating in some of the same activities that Mr. Honken did; is that right?

A.    Yes.

Q.    And is it fair to say, Mr. Vest, that you did this in an effort to solicit information from Mr. Honken?

A.    After they -- you know, I talked to the SIS agent, yes.

Q.    Yeah, so the SIS agent encouraged you to do this, and you did it.

A.    Yes.

Q.    And one of the things you did is apparently you joined this odinist group?

A.    Odinists.

Page 31

Q.   Odinists.  Tell the jury what is the odinists.

A.   It's a religious group.

Q.   Religious group.

A.   Uh-huh.

Q.   What kind of religion to the odinists practice?

A.   It's an old-style religion like a pagan religion.

Q.   Isn't it a white supremacy group posing as a religious group?

A.   Well, that's what they say.

Q.   Well, there aren't any African Americans in there, are

2584

there?

A.   No.

Q.   And they have some really strong views about African Americans, don't they?

A.   Yes.

Q.   Would it be unfair to characterize the odinists as a white supremacy group?  Would that be unfair of me?

A.   No.

Q.   But they claim they're a religious group?

A.   Yes.

Q.   And they practice some -- what did you say?  It was old-time religion?

A.   Yeah, something like the pagans.

Q.   Do they have odinist priests or spiritual leaders?

A.   Somebody does the ceremony, but he's just a regular --

Q.   Just a regular old white supremacist?

A.   He's a regular inmate, whatever, nobody off the street.

Q.   And you were in this group with Mr. Honken.

A.   I was.

Page 32

Q.   You talk about drugs coming into prison.  Were you using drugs in prison?

A.   Pardon me?

Q.   Were you using drugs in prison?

A.   No.

Q.   Did you ever see Mr. Honken using drugs in prison?

2585

A.   No.

Q.   You happened to mention -- oh, let me ask you something else.  One of the first contacts you had about Mr. Honken, with Mr. Honken about his case, had to do with a fellow by the name of Ron McIntosh; isn't that right?

A.   Yeah.

Q.   Who is Ron McIntosh?

A.   He was a cellie of mine.

Q.   Cellie of yours.  And would you consider yourself friends?

A.   Yeah.

Q.   And Mr. Honken approached you regarding Mr. McIntosh; is that right?

A.   He did.

Q.   And what is it Mr. Honken wanted you to do?

A.   He told me that Mr. McIntosh was going to testify against him.  He had McIntosh do some legal work for him, and so if I ever ran into him again on another yard or something like that, I could let whoever, you know, was running the yard, let them know, hey, he testified against somebody.

Q.   And didn't he also ask you to write a letter regarding Mr. McIntosh?

A.   No, not that I recall.

Page 33

Q.   You don't recall him asking you to write a letter to Angela Johnson's attorneys about Mr. McIntosh?

A.   Not that I recall.

2586

Q.   All right.  You talked on a number of occasions to Mr. Basler sitting right over here, the gentleman with the mustache, the distinguished-looking man in that group?

A.   I have.

Q.   And I guess the first time you actually talked to him in person, that would have been in January of 2001, January 29, 2001?

A.   It would.

Q.   But he talked to you on the telephone before that.  Do you remember that?

A.   Yes, once I think it was.

Q.   And I don't know.  Were you taking notes during your conversation?

A.   No.

Q.   And I suggest to you that Mr. Basler might have been?

A.   I don't know.

Q.   All right.

MR. BERRIGAN:  May I approach the witness, Your Honor?

THE COURT:  You may.

BY MR. BERRIGAN:

Q.   Mr. Vest, I've handed you a report authored by Mr. Basler dated December the 7th, 2000.  Purports to be a report regarding a telephone conversation with yourself.

A.   Uh-huh.

Q.   Have you ever seen that document before?

Page 34

A.    Not that I'm aware of.

Q.    Could you take a look at the second paragraph on the first page, sir?

A.    Okay.  Yes.

Q.    All right.  Having read that now, Mr. Vest, do you have a recollection that you told Mr. Basler that Mr. Honken approached you about writing a letter to us, Angela Johnson's lawyers, about this guy McIntosh?

A.    Yes.

Q.    And what was that supposed to do?

A.    I don't remember.  I don't even remember the letter as I stated already, so I don't remember what the letter was supposed to say or what it was supposed to do.

Q.    Well, why was Honken asking you to write a letter of all the people on the face of the planet?

A.    I have no idea.

Q.    Okay.  And did Mr. Honken explain to you if he had ever written a letter to Miss Johnson's attorneys very likely that nobody would believe anything he had to say?

A.    I'm not aware of anything.

Q.    All right.  You indicated that -- or maybe you didn't.  Let me just ask you.  When you talked to Mr. Basler on that particular occasion on the 7th of January, did you tell him, in fact, that these discussions about the murders you've talked about today, those had occurred two weeks before?

2588

A.    Yes.

Page 35

Q. And so that would have been right around Christmastime, would you say, 1999?

A. Yes.

Q. And you'd known Mr. Honken or actually you'd been living at least in the same cell, cellblock --

A. Right.

Q. -- for a couple of months.

A. Right.

Q. Okay. Now, when Mr. Honken's relating this information to you, I'm taking that that's in sort of a confidential setting.

A. It was, yeah.

Q. Is that right?

A. Uh-huh.

Q. Just the two of you.

A. Exactly.

Q. And he's not sharing that with a group of him at that time?

A. No, just me and him in his cell.

Q. Apparently Mr. Honken had talked to some other folks in the penitentiary about his case. Did you become aware of that?

A. Yeah, Artie. He talked to Artie about it, Artie Dufur.

Q. Artie Dufur?

A. Uh-huh.

Q. And did you and Mr. Dufur compare notes about what Mr. Honken supposedly said?

2589

A. No.

Q. How about Mr. McIntosh?

A. No, never talked to him after that.

Q. Well, Honken himself told you McIntosh was going to be a witness.

Page 36

A.    Yeah, he was already gone when that happened.

Q.    McIntosh was gone?

A.    Yes.

Q.    So you didn't have an opportunity to talk to him because you didn't know anything about it till he left.

A.    Exactly.

Q.    And in hindsight now, do you realize McIntosh left because he had already indicated to prison authorities he was going to be a witness against Honken?

A.    I assume that.  I don't know.  He told me he had another case in California I believe it was.

Q.    That's what McIntosh's story was to you.

A.    Yes.

Q.    Of course, it would be unlikely he'd tell you, Hey, Steve, I'm going to be a witness against Honken and going to be testifying against him; right?

A.    Yes.

Q.    That's not one of the things that people in his situation or your situation do; right?

A.    Right.

2590

Q.    You don't go advertising around just as you pointed out, Hey, I'm going to be a rat against this guy or that guy.

A.    Right.

Q.    Because that could have potentially bad consequences; right?

A.    That would.

Q.    And so you don't know what McIntosh was supposed to say against Honken or what story Honken might have told McIntosh

Page 37

about these murders.

A. I have no idea.

Q. Were you taking notes when you were talking to Mr. Honken?

A. No, I never took notes.

Q. Okay. So when Mr. Basler calls you on the phone on January the 7th, you're relating to him -- and I understand it was a fairly brief conversation. But you're relating to him essentially by memory what Mr. Honken had told you two weeks before.

A. Yes.

Q. And, I mean, it wouldn't be hard to remember something like this in terms of the general nature of the discussion; right?

A. Yes.

Q. And then Mr. Basler comes out and visits you then a couple of weeks later. Actually I guess it's three weeks later on the 29th of January. Does that ring any bells with you?

A. Yes, that's about right.

2591

Q. And at that point he actually sits down and talks to you and does take notes about your conversation; is that right?

A. Yes, yes.

Q. He was there with another fella by the name of John Graham?

A. Yes.

Q. And did you have notes yourself at that point that you were working off of?

A. No, I never had any notes.

Q. So by January the 29th, the conversations that you had had with Dustin Honken had occurred about a month before.

A. Yes.

Q. And you were operating based on your memory of those

Page 38

conversations.

A.    Yes.

Q.    Is that accurate?

A.    Uh-huh.

Q.    Okay.  All right.  I want to ask you a little bit about Mr. Honken and Miss Johnson.  You've already told us he wasn't all that happy about these maps, was he?

A.    No.

Q.    Because these maps, of course, led to the discovery of these bodies; right?

A.    Yes.

Q.    And Mr. Honken was already suspected of having killed these people.

                                                          2592

A.    Yes.

Q.    You knew that; right?

A.    Yes.

Q.    And so now Miss Johnson's essentially provided information that potentially is damaging to Mr. Honken.

A.    Yes.

Q.    Although he's claiming he doesn't think it's going to hurt him; right?

A.    Yeah, that's why he was upset about it because he felt like he had an ace up the sleeve, and he said that he told her, you know, Don't worry about it, you know, I got this covered.

Q.    Yeah.  He's kind of a legal beagle, Mr. Honken is, is he?

A.    Not that I'm aware of.

Q.    Okay.  Well, so did he explain to you how it is that the recovery of five bodies that he was suspected of having caused

                           Page 39

their deaths wasn't going to hurt him?

A.    No.

Q.    No.  But he wasn't happy with Miss Johnson about it.  He made that pretty clear to you.

A.    Yeah, he thought that she was, you know -- he said that what happened was a guy said he was mobbed up and told her that if she'd give him the map to these bodies told her some -- what happened that he would get somebody to say that he did it and it would take it off her and Dustin, and so she gave the guy the maps to find the bodies and told him some information, and he

2593

was mad that -- you know, that she did that because, you know, that just gives them more --

Q.    Yeah.

A.    -- fuel.

Q.    Fuel, sure.  Did he tell you the maps she gave this guy is a guy she'd only known for two months?

A.    Yeah.

Q.    She met him in jail?

A.    Yeah.

Q.    A guy who was a federal inmate himself?

A.    I don't know if he knew that.

Q.    Did Mr. Honken tell you he thought she was pretty stupid to have done that?

A.    Yeah.

Q.    And that she was pretty easily manipulated by this guy apparently, this federal snitch up in the county jail.

A.    I don't know.

Q.    He didn't say anything about that.

A.    No.

Page 40

Q.    What about Mr. Honken mentioning to you somebody by the name of Dean Donaldson?  Does that ring a bell with you?

A.    Dean what?

Q.    Dean Donaldson?

A.    No.

Q.    Dean Donaldson was a fellow who was in the Woodbury County

2594

Jail that Mr. Honken was supposedly bonding out so that Mr. Donaldson could go kill witnesses for Mr. Honken?  Nothing about that?

A.    No.

Q.    Mr. Honken did tell you that he wanted Angela Johnson dead, didn't he?

A.    Yes.

Q.    Yeah.  In fact, he mentioned to you that he had another girlfriend, lady by the name of Kathy Rick?

A.    Yes.

Q.    And according to Mr. Honken, Miss Rick wanted -- when Mr. Honken was out, she wanted Mr. Honken to come live with her.

A.    Yes.

Q.    And you knew from your discussions with Mr. Honken that he had children by both of these women?

A.    Yes.

Q.    Did he tell you he had them both pregnant at the same time?

A.    I don't recall now if he did or not.

Q.    Okay.  But Miss Rick wanted Mr. Honken to leave Miss Johnson and to come live with her.

A.    Yes.

Q.    And according to Mr. Honken, he says, Well, I can't do

Page 41

that; I might piss Angie off; right?

A.    Yeah.

Q.    And, of course, the potential consequence of pissing Angie

2595

off is that she could put him in for these murders; right?

A.    Yeah.  He said that he was scared, you know, for a couple reasons.  One would be, you know, that she could tell on him, but he said he also didn't trust her because she was crazy and who knows what she would do.

Q.    Yeah.  She's unreliable, wasn't she?  Mr. Honken was -- was it pretty clear to you he's a planner and a scheming kind of guy?

A.    Not really.

Q.    He had these pretty elaborate plans for breaking out of jail right here in Sioux City during this trial, didn't he?

A.    Yeah, but he killed, you know, two children and a woman.  I mean, that wasn't very good planning.

Q.    Well, we're going to talk about that in just a second. Yeah.  So the story is that Mr. Honken tells Miss Rick, doesn't he, Kathy Rick --

A.    Yeah.

Q.    -- that he wants to kill Angie Johnson?  That's the way he can get rid of her.

A.    Yeah.

Q.    And supposedly she says, I'll help you; right?

A.    Yes, yes.

Q.    In fact, the conversation's supposed to be to Miss Rick talking to Mr. Honken, I don't know why you had Angie help you in the first place.  That's supposed to be with these murders;

Page 42

2596

right?

A. Yes.

Q. Why didn't you ask me? I would have helped you.

A. Yes.

Q. So Mr. Honken's claiming that Miss Rick knows about the murders.

A. Uh-huh.

Q. Right?

A. Right.

Q. And not only that but that if Mr. Honken had asked her she would have helped him commit the murders instead of Angie Johnson. That's his story.

A. That's what he said.

Q. That's what he said.

A. Uh-huh.

Q. And she volunteers, that is, Miss Rick, to help kill Angie Johnson according to Mr. Honken.

A. Yes.

Q. Now, you don't know Kathy Rick, do you?

A. No.

Q. You don't know Angie Johnson.

A. No.

Q. And you really don't know anything about these women in terms of your personal knowledge about their credibility or how credible this story is, do you?

2597

A. No, I do not.

Page 43

Q.   Okay.  You don't know whether or not this deal about Kathy Rick has even a grain of truth in it, do you?

A.   No.

Q.   But this is what Dustin Honken told you.

A.   Yes.

Q.   In fact, he said he was planning on killing Angie Johnson back in 1996 just before he got arrested.

A.   Yes.

Q.   And at the time he was getting guns to do that very thing; right?

A.   That's what he said.

Q.   Did he mention a fella by the name of Rick Held to you by any chance?

A.   Not that I remember.

Q.   How about a coworker he was working with at the Kraft Pudding factory that was supposed to be getting him a gun, a 380 semi-automatic?  Didn't say anything about that?

A.   Nope.

Q.   But he did say he was trying to get guns.

A.   Yes.

Q.   And that Kathy Rick had volunteered to help kill Angie Johnson at this point.

A.   Yeah, uh-huh.

Q.   Did Mr. Honken ever say anything to you about Kathy Rick

2598

calling the gun a pup, Mr. Honken doesn't need that pup anymore?  Did he ever mention that phrase to you?

A.   No.

Q.   And his plan to kill Angela Johnson was foiled when he got arrested in '96; right?

Page 44

A.    Yes, uh-huh.

Q.    And in terms of him hiring somebody else after that, somebody named Dean Donaldson, you don't know anything about that.

A.    No, I do not.

Q.    I want to now talk a little bit about these stories that Mr. Honken told you about the murders; okay?  And let's start with the Greg Nicholson story.  But before that, let me see if I have the sequence right.  According to Mr. Honken, he first really meets Angela Johnson in early 1993?

A.    Yes.

Q.    And do you know if it was January or February or March?

A.    I don't know.

Q.    But he gets arrested in March '93.  Did he tell you that?

A.    I believe so, yes.

Q.    And according to him, Angie Johnson visits him at the jail and offers to break him out of jail?

A.    Yes.

Q.    Is that right?

A.    That's what he said.

                                              2599

Q.    Did Mr. Johnson (sic) tell you that Angie Johnson had never been in a jail in her life much less know how to break out of one?

A.    He said that she came there to visit him and, you know, said she was going to break him out.  That's what he said.

Q.    Break him out of jail.

A.    Yeah.

Q.    And, in fact, this is the time he claims that when he got

Page 45

out he goes to Angie Johnson and says, I'm looking at ten years, and so I need to kill Greg Nicholson; right?

A. Yes.

Q. And even by his own admission, Mr. Honken, at this point Angie Johnson would have known Dustin Honken for maybe two months.

A. I'm not -- I guess that's what it adds up to. I don't know.

Q. And supposedly according to him, she agrees to participate in a murder with a guy she's known for two months. That'd be the deal?

A. That's what he said.

Q. Yeah. Okay. So Dustin Honken does tell you how it is he got arrested. He went to Greg Nicholson's house to do a drug transaction with him; right?

A. Yes.

Q. And he goes into the house, and he encounters upstairs in

2600

Mr. Nicholson's house none other than Mrs. Nicholson, Greg's wife; right?

A. Yes.

Q. And Dustin Honken says, Hey, did you notice there were a bunch of people arrested in Minnesota yesterday on a drug deal; right?

A. Right.

Q. And she says, Yeah, it's all over the news.

A. Uh-huh.

Q. That's the deal; right?

A. Yeah.

Q. And then he goes downstairs where Greg Nicholson is in the

Page 46

basement of the house, and he says the same thing to Greg
Nicholson, and Greg Nicholson says, I didn't hear anything about
it; right?

A.   Yes.

Q.   And Honken tells you, That was a red -- that was a red flag
for me.  I should have realized I got a problem; right?

A.   Right.

Q.   But he kind of ignored it.

A.   Yes.

Q.   And so he and Nicholson do their deal, and as he's leaving
Nicholson's house, he gets arrested.

A.   Yes.

Q.   Now, Honken told you he had been dealing with Nicholson for

2601

how long?

A.   I don't recall what he said.

Q.   It wasn't just -- it was some period of years, wasn't it?

A.   I don't remember.

Q.   He didn't say when he started making these drugs in
Arizona?

A.   No.

Q.   Or how well he knew Greg Nicholson?

A.   No.

Q.   How well he knew his wife?

A.   No.

Q.   Did Honken tell you he saw some kids there that day that he
was arrested at Greg Nicholson's house?

A.   He didn't say.

Q.   Didn't say anything about kids at all, did he?

Page 47

A.    No.

Q.    But then later when he's talking to you about the murders, he's talking about them being at Greg Nicholson's house; right?

A.    Yes.

Q.    And the people killed are Greg Nicholson's wife and two kids; right?

A.    Yes.

Q.    Now, Honken would know who Greg Nicholson's wife was because she was right there the day he got arrested; right?

A.    Yes.

2602

Q.    And we don't know how long Dustin Honken knew Greg Nicholson before he got arrested in March of 1993.  That's what you're telling me.

A.    Yes.

Q.    So what Honken's leading you to believe is that the person he killed was Greg Nicholson, Greg Nicholson's wife, and two kids.

A.    Yes.

Q.    He didn't say a word to you, not a word, about Greg Nicholson having left that house, his wife moved out, anything like that, does he?

A.    No.  He's just telling me -- he's just telling me the story.  I'm not asking him any questions.

Q.    Oh, I understand.  It's the story we're interested in, Mr. Vest.

A.    Yeah.

Q.    Yeah, I understand you're not quizzing him about it.

A.    Right.

Q.    But he tells you it was Nicholson's wife he killed, didn't

Page 48

he?

A.    That's what he said.

Q.    Yeah.  Nicholson's kids; right?

A.    That's what he said.

Q.    Never said anything to you about, Oh, Greg Nicholson, you know, he had just been in the house a week, didn't really know

2603

these women, didn't really know these kids.

A.    No.

Q.    That never came up.

A.    No.

Q.    And then the story that he tells you about the situation once they get in the house is that Angie supposedly goes in first and pulls the gun on these people; right?

A.    Yes.

Q.    And then Honken comes in shortly thereafter.

A.    Yes.

Q.    And by the way, he doesn't say anything to you about any duct tape.

A.    No.

Q.    He doesn't say anything to you about any rope.

A.    No.

Q.    Right?

A.    That's right.

Q.    He doesn't say anything to you about, Oh, we're going to take Nicholson somewhere and make the video or take Nicholson somewhere or do anything; right?

A.    He says he's going to take him to another house.

Q.    That's after the videotape.

Page 49

A.    Yes.

Q.    Okay.  So once Honken arrives, according to Honken, these four people are being held at gunpoint by Angela Johnson; right?

2604

A.    Yes.

Q.    And it's at that point that Honken sees that there are kids there; isn't that right?

A.    I'm not so sure because after he told me the story I said, Well, why didn't you just get him alone, Greg alone?  You know, why did you have to include his wife and kids?  And he told me the reason for that was the way he looked at it is if you was going to rat on somebody you put you and your family in danger so it didn't matter to him.

Q.    Yeah, I understand that, it didn't matter that he killed the kids.  But in terms of expecting the kids to be there, okay, you understand where I'm coming from?

A.    Yes.

Q.    Isn't it true Honken told you that once he got in the house he realized the kids were too old and he was going to have to kill them?

A.    No, he didn't say that.

Q.    He didn't say that.  Did you give some grand jury testimony in this case, Mr. Vest?

A.    I did.

Q.    March the 8th, 2001?

A.    I did.

Q.    Came in, was sworn to tell the truth under oath just as in today's proceeding; is that right?

A.    That's right.

Page 50

Q.    Have you seen your grand jury testimony at any time, sir?

A.    No, I haven't.

          MR. BERRIGAN:  May I approach, Your Honor?

          THE COURT:  You may.

BY MR. BERRIGAN:

Q.    I want you to turn to page 44, sir.

A.    Okay.

Q.    I want to read this following question and answer starting on line 7.  This is the prosecutor.  I think it was Mr. Miller, Tom Miller, asking you questions.  Let me just check that. Yeah.  Question, Was there ever any discussion about, you know, were the children witnesses?  Do you see where I'm reading from?

A.    Yes.

Q.    Your answer, He said that he couldn't very well leave them once Angie went into the house and pulled the gun on them and Dustin showed up.  He said he couldn't leave the kids there. They were too old and would be able to identify him, so that was the reason why he couldn't leave them.

A.    Uh-huh.

Q.    Do you see that?

A.    Yes.

Q.    Tell me something.  If Dustin Honken knew Greg Nicholson so well and they'd been dealing drugs, how is it that Dustin Honken wouldn't know that Greg Nicholson had two kids?

A.    He didn't say that he didn't know.

Q.    Did Dustin Honken tell you how much drugs it is that Greg

          Page 51

Nicholson was selling for him every year? He ever give you any indication of that?

A.   No.

Q.   How often they met --

A.   No.

Q.   -- dealing drugs?

A.   No.

Q.   And Honken's telling you that once he gets in the house, in the house the day of the murder, he suddenly realizes that Greg Nicholson had kids that are too old to be left alive?

MR. WILLIAMS:  Objection, Your Honor.  That's not what the testimony said.

THE COURT:  Overruled.  You may answer.

A.   I don't know.  He didn't -- he just told me the story, so that's all I am going by, what he's saying.  I don't have any insights to any of the other -- you know, to what he was looking at or none of that.

Q.   No, I understand that, Mr. Vest, and you're not Dustin Honken.  I wish you were.  But the fact is we're interested in Mr. Honken's story to you; right?

A.   Right.

Q.   I know you're not vouching for his credibility; right?

A.   Right.

Q.   We're on the same page.  I'm just wanting to know if Dustin

2607

Honken ever explained to you how it is that he would not have known that Greg Nicholson had these kids that were too old to be witnesses --

A.   No.

Q.   -- until he shows up to kill them.

Page 52

A.  No, he never said anything.

Q.  He never said anything.  Okay.  The story, according to Dustin Honken, was he tells Greg Nicholson, Give me a videotape, and I'm going to stash you away until trial; right?

A.  Yes.

Q.  And Nicholson supposedly buys that?

A.  That's what he said.

Q.  Okay.  Even though they're in there with a gun.

A.  Yeah, they had no choice I would imagine at that time.

Q.  Yeah.  Well, in fact, Honken could have just pointed the gun at Nicholson and said, Give me the damn video; right? Nicholson wouldn't have had much choice then either.  He didn't have to give them any story about I'm going to stash you away in a house.

A.  I assume that was just to get them out of the house.

Q.  To get them out of the house afterwards.

A.  Yes.

Q.  Well, Mr. Honken doesn't say anything to you about Greg Nicholson being bound up with duct tape and rope in the house.

A.  No.

2608

Q.  Or how it is that Greg Nicholson got out of the house.

A.  No.

Q.  And got to the place where he was shot.

A.  No, he didn't.

Q.  What we do know according to Mr. Honken is that once they get out to this place where Nicholson is shot, Lori Duncan and these kids are shot, Mr. Honken takes Lori Duncan and Mr. Nicholson together; right?

Page 53

A.    Right.

Q.    And he walks them away from where Miss Johnson is with the kids.

A.    Yes.

Q.    Mr. Honken say anything to you about a silencer?

A.    No.

Q.    No.  And, in fact, he walks them quite a ways away, didn't he?

A.    He didn't say.

Q.    He didn't say how far.

A.    No.

Q.    And according to Mr. Honken, he shoots Greg Nicholson and Lori Duncan you don't know how many times.

A.    I don't know.

Q.    There's a lot of stuff we don't know from Mr. Honken's account; right?

A.    Yeah.  Like I said, he's telling me this story, but I'm not

2609

asking him any questions, so I only can remember, you know, what he's telling me.

Q.    I understand.  He doesn't say anything to you about where they're shot.

A.    No.

Q.    How many times they're shot, whether they're bound and gagged.  He's pretty vague about this shooting.

A.    Yeah, he didn't say anything about that.

Q.    Yeah, but what he does say to you is, Mr. Vest, while I'm shooting -- while I'm shooting Lori Duncan and Greg Nicholson and Angie Johnson is back there with these kids that the kids hear the shots and hug each other.

Page 54

A. Yes.

Q. And Angie Johnson tells them it's fire crackers.

A. Yes.

Q. Well, how far away does Dustin Honken claim to be to be able to hear that conversation?

A. Well, I'm assuming that she told him that but I --

Q. You assume.

A. Yeah, but I don't know, so I don't know how that worked out.

Q. The other possibility is he makes it up as he goes; right?

A. I'm only repeating the story he told me. I don't know how he knows.

Q. And that's his story is that this conversation takes place

2610

although he's out in the field somewhere killing the adults.

A. Yes.

Q. And he comes back and takes the kids; right?

A. Yes.

Q. And Angie Johnson stays back wherever she is.

A. He didn't say.

Q. He doesn't say. And I want to get back to what you said a little earlier. You asked him about the kids, why he had to kill the kids; right?

A. Yes.

Q. Because that's a bad thing in prison, isn't it?

A. It is.

Q. You don't go around telling people you hurt kids, you kill kids, do you?

A. No.

Page 55

Q.    That also has adverse consequences not unlike being a rat,
does it?

A.    Right, women or kids.

Q.    That's right.  And so Honken's story on that is, Hey, look,
Nicholson's a snitch.  He put his whole family at risk.

A.    Yes.

Q.    His family; right?

A.    Yes.

Q.    Wouldn't it be even worse for Honken in prison if he had
said, I didn't even know these kids, never saw them before in my

2611

life, didn't know this woman, and I just killed them for the
heck of it because they happened to be there when Greg Nicholson
was going to meet his demise?

A.    It wouldn't be any worse.

Q.    That wouldn't be.

A.    Just be the same.

Q.    Yeah, but he could at least justify or did apparently
justify to you ostensibly, Well, they were the family of a
snitch.

A.    Yeah.

Q.    That was his story; right?

A.    Yes.

Q.    Let's talk a little bit about the Terry DeGeus murders;
okay?

A.    Okay.

Q.    Or murder, I'm sorry.  Honken's story on this is that Angie
lures -- is that the word he used?

A.    Yes.

Q.    Lures.  She lures Terry DeGeus out into a field somewhere;

Page 56

is that right?

A.    Yes.

Q.    I think if I heard you tell it -- if I heard it correctly,
Mr. DeGeus drives out there himself.

A.    Yes, he does.

Q.    And Angie Johnson is already there with Dustin Honken

2612

according to this version?

A.    Yes.

Q.    And Terry DeGeus sees these people and drives right up to
them.

A.    Yes, he does.

Q.    So Mr. Honken certainly doesn't indicate, even suggest
really, that Terry DeGeus is afraid of Dustin Honken, does he?

A.    No.

Q.    Because obviously if he was, he could have turned around
and drove the heck out of there; right?

A.    Yes.

Q.    But what happens is according to Honken, DeGeus sees him,
gets out of his car, walks over, and starts talking to Dustin
Honken.

A.    Yes.

Q.    That's the story; right?

A.    Uh-huh.

Q.    And Angela Johnson gets back in a car.

A.    Yes.

Q.    Now, whose car is this that Angela Johnson's supposedly in?

A.    He didn't say.

Q.    He doesn't say.  But he did tell you that he, Dustin

Page 57

Honken, brought the baseball bat.

A.    Yes.

Q.    He purchased it.

2613

A.    That's what he said.

Q.    He's got a shovel, Dustin Honken; right?

A.    Uh-huh.

Q.    And we don't know if it's his car or whose car it is.

A.    Yeah.

Q.    And we don't really know where the car is either.

A.    No.

Q.    Because that's something I want to ask you about.  When Angela Johnson sees Dustin Honken, according to Honken, there's blood all over him and she yells at him?

A.    Uh-huh.

Q.    Screams or something because of all this blood all over him.

A.    Yes.

Q.    Well, by that time, by the time that happens, Dustin Honken has shot Terry DeGeus who knows how many times?

A.    Right.

Q.    At who knows what range or how close they were; right?

A.    Right.

Q.    He's beaten him with a baseball bat God knows how many times; right?

A.    Right.

Q.    And according to Honken, Angela Johnson's surprised to see blood on him.

A.    That's what he said.

Page 58

Q.    That was his story.

A.    Yes.  He said he had it all over him.

Q.    Suggesting that perhaps Angela Johnson hadn't seen blood on him before that point until he comes up to the car.

A.    I don't know.  He said that he had blood all over his fa -- just all over his body.

Q.    Yeah.

A.    It was -- you know, that's what he said.

Q.    Yeah.  But she was surprised about the blood.

A.    Yeah, she said he looked like the guy from The Shining.

Q.    And he'd been at this for some period of time shooting and beating Terry DeGeus to death.

A.    Yeah.

Q.    According to him.

A.    Yeah, this was after he beat him with the bat.

Q.    After the bat, right.  So that's my point, that there's a shooting, then there's a beating with the bat, and then Dustin Honken comes up to some car that Angela Johnson's in God knows where, and she screams because he's got blood all over him.

A.    Uh-huh.

Q.    That's his story.

A.    Yeah.

Q.    Yeah.  Did I hear you correctly?  Honken's claiming that Angela helps drag this body, Terry DeGeus's body, to some grave?

A.    Yes.

2615

Q.    And according to Honken, is she digging the grave as well?

Page 59

A.   He didn't say.

Q.   He didn't say?  Did he happen to tell you she was six months pregnant at that time?

A.   Yes.

Q.   He did.

A.   Uh-huh.

Q.   And she's supposed to be -- you don't know whether she's digging a grave.

A.   I don't know.

Q.   I want to go back a little bit to something you talked with the prosecutor about, and that was this breakout Mr. Honken planned at the Woodbury County Jail.  That's supposed to be during his trial here in Sioux City; right?

A.   Yes.

Q.   And I wonder if you could elaborate on the plan a little bit, tell us specifically what it is that Mr. Honken claimed he was going to do.

A.   He was going to take a shower.  He figured that everybody would be locked in the hole, in a special section of the jail, and he would get out of the cell to take a shower, and then he would overpower and kill the guard, take his keys, and let everybody out.

Q.   And then once everybody got out, presumably there might be some people killed in the process?

2616

A.   Yes.

Q.   And there were going to be guns involved, weren't there?

A.   Yeah, he said that they had some place there that he knew where they kept the guns, so he was going to go down to get the guns.

Page 60

Q. And once you got out, wasn't the plan to go rob a bank, get some money?

A. Yeah, we was going to go to a grocery store and pick up a woman hostage, switch cars, and then go to a bank and rob a bank.

Q. Okay. And then with the money -- and I don't know. What was supposed to happen to the woman hostage?

A. He was going to kill her.

Q. Kill her. And then the plan was to go to Canada.

A. Yes.

Q. And you were going to hide out. This group of people were going to hide out for a year and train.

A. Yeah.

Q. What does that mean?

A. Artie and Dustin were going to train.

Q. Train. This kind of the white supremacist odinists group in Canada?

A. I wouldn't say that, but it's just a -- I don't know, just they were into that stuff.

Q. Yeah. Did the odinists have a branch in Canada that you

2617

know?

A. No. Not that I'm aware. I don't know.

Q. So after the training, then the group is coming back to wreak more havoc on the criminal justice system; isn't that right?

A. I wouldn't say the group. It was just Dustin as far as I know.

Q. Okay. Dustin, what was he supposed to be doing after --

Page 61

A.   He was going to come back and kill everybody that testified against him.

Q.   Didn't he -- it was more than that.  He was going to come back and torture people and torture their families; right?

A.   Yes.

Q.   He was going to cut people's heads off and keep them in bags.

A.   That's what he said.

Q.   Didn't he talk about taking the skulls and making bowls out of these people?

A.   Uh-huh.

Q.   And the people we're talking about were prosecutors?

A.   Prosecutors and FBI agents.

Q.   FBI agents?

A.   Yeah.

Q.   He went on at some length about this too, didn't he?

A.   Yes.

2618

Q.   And think that was very credible story, Mr. Vest?  Pretty wild stuff, isn't it?

A.   Yeah, but I don't know.

Q.   Who knows?

A.   Yeah.

Q.   Let me ask you something, Mr. Vest.  You know Mr. Honken a little bit.  If you had to rely on the credibility of Dustin Honken in making an important decision in your life, maybe something about your boys' health or their future, would you hesitate to act on what Dustin Honken told you?

A.   I'm not sure what you're asking.

Q.   Okay.

Page 62

MR. BERRIGAN: Well, I think that's it. Thank you.

THE WITNESS: Okay.

THE COURT: Mr. Williams with, any redirect?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Why don't we give the jury a short stretch break. They've been sitting for quite a while. Thanks.

Please be seated.

Mr. Williams, whenever you're ready.

MR. WILLIAMS: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Vest, I want to talk to you about some items or issues that were brought up during your cross-examination, first of

2619

all. This S -- I'm sorry, the odinists group that you joined, was that as an effort at the request of SIS to try to get in closer to Dustin Honken in this group?

A. I mean, I went to the mee -- I didn't really join. I wouldn't say I joined up. It's not like you sign anything or anything. But I went to some of the meetings with Dustin every week, and we was hanging out together every day at that point doing everything.

Q. And do you continue to be a member of this odinist group?

A. No.

Q. Did you subscribe to the -- every religion has different extreme views, members in the religion have extreme views. Did everybody belonging to the odinists believe in white supremacy?

A. I would probably say not. I don't know.

Q. Did everybody in there subscribe to violence?

Page 63

A.    No.

Q.    And did you ultimately then leave this group?

A.    Yes.

Q.    It was brought out during cross-examination that you are in the witness security program.  Is that because of your cooperation on this case?

A.    Yes.

Q.    Have you cooperated on any other case that led you to be in the witness protection program?

A.    No.

2620

Q.    And is the witness protection program designed to protect you even while you're in custody?

A.    Yes.

Q.    And so is there a danger to people like you even in a federal penitentiary?  With all the guards and all the security and everything else, you could still be harmed?

A.    Yes.

Q.    The attorney asked you about Ron McIntosh and the fact that Ron McIntosh was somebody that Dustin Honken was concerned about.  Do you remember that line of questioning to you?

A.    Yes.

Q.    Is this the Ron McIntosh that used a helicopter to aid in the escape of a female prisoner from another federal penitentiary?

A.    Yes, he did.

Q.    The defense attorney asked you about Dean Donaldson and about bonding Dean Donaldson out.  Do you remember that line of questioning?

A.    Yes.

Page 64

Q.    Did Dustin Honken ever tell you about Angela Johnson obtaining a thousand dollars in cash and attempting to bond out another inmate from the Woodbury County Jail so he could go kill people?

A.    Not that I recall.

Q.    You indicated that when you're talking with Dustin Honken

2621

at some point he said he was afraid of Angela Johnson for two reasons.  One is that she had information that could hurt him. The other one you said because he said she was crazy.

A.    Right.

Q.    What did he tell you he meant by that?

A.    Well, he said he was afraid of her, a little bit afraid of her.

Q.    Physically afraid of her.

A.    Yes.  Said if they -- that she was pretty stout or whatever, you know.  He said that they would come back from a party or something and that she would knock him down on the front lawn and wrestle around with him.

Q.    He was fearful of him for -- fearful of her for his own physical safety.

A.    That's what he said.

Q.    Defense attorney asked you about the murder concerning Terry DeGeus and how that took place and so forth.  Did Dustin Honken tell you whether this took place at night, late at night?

A.    He didn't say.

Q.    So you don't know whether it was dark out or not?

A.    I don't know.

Q.    Did he describe for you when he's shooting and beating

Page 65

Terry DeGeus whether he had his back turned to Angela Johnson when he's doing this?

A.    He didn't say.

2622

Q.    So for all you know from the description, this could have been right outside the car where Angela Johnson's sitting, his back is turned to Angela Johnson, he's beating him, and it's at night, and the first time she sees the blood is when he turns around and approaches.

A.    Could have been.

Q.    You were asked about this escape plan from Dustin Honken and credibility of Dustin Honken and so forth.  Artie Dufur is somebody you mentioned was part of this plan by Dustin Honken.

A.    Yes.

Q.    Are you aware of whether Artie Dufur was actually caught on the roof of the Marion penitentiary during an escape attempt?

A.    That he was what?

Q.    Caught on the roof of Marion prison?

A.    No, I'm not aware of that.

Q.    Do you know whether he successfully escaped from a federal prison before?

A.    No.

          MR. BERRIGAN:  I'm going to have to object, Your Honor, as to the relevance of this.  It has nothing to do with Mr. Honken whatsoever.

          THE COURT:  Well, it's already in evidence, so the objection's untimely.

          MR. WILLIAMS:  I have no further questions.

          THE COURT:  Any recross, Mr. Berrigan?

Page 66

MR. BERRIGAN:  Just very briefly, sir.

RECROSS-EXAMINATION

BY MR. BERRIGAN:

Q.   Not to belabor the obvious, Mr. Vest, but based on Mr. Honken's account of the Terry DeGeus murder, you frankly have no idea whether Angela Johnson saw him shooting, beating, killing Terry DeGeus or not; right?

A.   No.

Q.   All you know is that when -- after all this beating and shooting takes place, according to Honken, he comes over to the car Angela Johnson is, and she screams because he's covered with blood.

A.   Yes.

Q.   That's his story; right?

A.   Yes.

Q.   Okay.  And then this deal about Honken telling you he's physically afraid of Angela Johnson, did you ever tell Bill Basler that when you met with him or talked to him on the phone on January the 7th?

A.   I don't know.

Q.   How about when you talked to him on January the 29th?

A.   I don't know.

Q.   How about in your grand jury testimony on March the 8th, 2001?

A.   I don't know if it came up or not.

2624

Q.   Isn't this the first time you ever said anything under oath

Page 67

about any of this Dustin Honken being afraid of Angela Johnson?

A.   I don't recall.

Q.   Let's make sure we understand what we're talking about. This is the Dustin Honken who cold bloodedly killed five different people; right?

A.   Yes.

Q.   The Dustin Honken who was threatening to kill this girlfriend --

A.   Uh-huh.

Q.   -- before he was arrested had plans to do so?

A.   Yes.

Q.   This is the Dustin Honken who's planning to get out of jail and go train up in Canada so he can come back and kill federal prosecutors and federal law enforcement officers?  This is the guy supposedly afraid, huh?

A.   That's what he said.

Q.   This is the guy you're working out with in the penitentiary?

A.   Yes.

Q.   Yeah.  I just want to be sure I understand this.  Are you claiming to us that you're not hopeful of getting some type of reduction in your sentence as a result of your testimony in this case?

A.   I'm hopeful every -- I'm hoping that they bring back

2625

parole, you know.

Q.   You're hopeful they bring back parole.

A.   Yeah.

Q.   Well, isn't it true, in fact, Mr. Vest, that that's the whole reason you're here?

Page 68

A.    No.   Like I said, this ain't how it started.

Q.    I'm not saying that's how it started.   But that's the reason that motivated you to cooperate with the SIS.   It's the reason that motivated you to cooperate with the law enforcement officers.   It's the reason you testified in Dustin Honken's case.   It's the reason you're testifying here.

A.    No, it's not.

Q.    It's because you got 2 kids you haven't seen in 14 years and you're desperate to get back with them.

A.    What motivated me to say anything about Dustin was the fact he killed an innocent woman and two innocent kids.   That was the motivating factor.

Q.    I see.   Okay.

MR. BERRIGAN:   Thank you, sir.

THE COURT:   Mr. Williams, anything further for Mr. Vest?

MR. WILLIAMS:   No, Your Honor.

THE COURT:   Okay.   Would now be a good time to take our mid-morning recess?

MR. WILLIAMS:   Certainly, Your Honor.

2626

THE COURT:   Okay.   Members of the jury, we will be in recess until 10:20.   Please remember my prior cautionary instruction about keeping an open mind in this phase until you've heard all of the evidence, had a chance to receive my final instructions and hear the arguments of the lawyers, and, most importantly, go back and deliberate among yourselves. Thank you.

(The jury exited the courtroom.)

Page 69

THE COURT: Anything we need to take up, counsel? Mr. Williams?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Thank you. We'll be in recess till 10:20.

(Recess at 9:54 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams, are you ready to call your next witness?

MR. WILLIAMS: Yes, Your Honor. United States calls Kathy Rick.

KATHY RICK, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Try and adjust the chair, scoot it up so you can speak directly into the microphones. And you can adjust those

2627

microphones and pull them towards you. And would you state your full name, please, and spell your last name.

THE WITNESS: Kathy Ann Rick, R-i-c-k.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Rick, can you let the jury know what state are you living in now?

A. Minnesota.

Q. And how long you been living in Minnesota?

A. Eight years.

Page 70

Q. Prior to that did you live in the Mason City, Iowa, area?

A. Yes.

Q. How far did you go through school, ma'am?

A. Some college.

Q. What did you study in college?  Just general studies?

A. Yeah.

Q. Are you working?

A. Yes.

Q. And what do you do for a living?

A. I work part time at a resort.

Q. When you were living in Mason City, during what time period was that?

A. I lived there till 1998.

2628

Q. Were you born and raised there?

A. Yes.

Q. And in 1998 is when you moved to Minnesota.

A. Yes.

Q. When you were working in the Mason City, Iowa, area, were you employed then?

A. Yes.

Q. What type of work did you do?

A. I worked at a printed circuit company, and I managed the front-end engineering.

Q. The printing circuit company, what was the name of that company?

A. Wellborn Industries.

Q. Wellborn Industries?

A. Uh-huh.

Page 71

Q.    And was it while you were working at Wellborn Industries that you met somebody by the name of Dustin Honken?

A.    Yes.

Q.    Had you known him before that?

A.    No.

Q.    Was Dustin Honken also working at Wellborn Industries at that time?

A.    Yes.

Q.    And during what years would you have been working at Wellborn Industries?

2629

A.    I worked there from 1983 until 1998.

Q.    Can you describe for the jury how your relationship with Dustin Honken evolved over the time period after you first met him working at Wellborn Industries?

A.    We became friends, and eventually we started dating.

Q.    How long were you more of a friend relationship with him before you started dating?  Was that a period of weeks, months, years?

A.    Close to a year.

Q.    And at some point after you started dating, did Dustin Honken ever live with you or you live with Dustin Honken?

A.    No.

Q.    Did you have a child together?

A.    Yes.

Q.    And that child was born in August of 1993?

A.    Yes.

Q.    Did Dustin Honken make any promises to you with regard to the fact that you were having a child?  Did he make promises to you about marriage or anything like that?

Page 72

A.    No.

Q.    Did you know going into it that Dustin Honken was not making promises to you?

A.    Yes.

Q.    So explain that to the jury a little bit if you could.   In 1993, you and Dustin Honken had been friends for a while.   You

2630

then started dating.   Ultimately you become pregnant by him. What is the status of your relationship with Dustin Honken in 1993?

A.    Well, Dustin was living in Arizona, so I didn't see him often.   I lived in Iowa.   We didn't have any commitment plans. He planned on being a part of his child's life.

Q.    Did you understand whether he was seeing other people while he was seeing you?

A.    Did I understand that then?

Q.    Sure.

A.    Not specifically.

Q.    Did you have any agreement that it was supposed to be an exclusive relationship?

A.    No.

Q.    I want to ask you during the time period from when you first met Dustin Honken -- do you remember what year that was?

A.    1989.

Q.    So from 1989 until March of 1993, explain to the jury, what was Dustin like as a man?

A.    He was a good friend.   He tried to help other people.   He was involved with my children.   He was good to them.   He was going to school, to college, when -- after he didn't work at

Page 73

Wellborn anymore.  And then eventually he moved to Arizona.

Q.    Is he much of a reader?

A.    Yeah, he liked to read.

2631

Q.    What kind of things did he read?

A.    Books, magazines.  I don't specifically know what all he was reading.

Q.    How about the relationship between you and Dustin Honken? What was that like as far as did one dominate the other?  Did you tell him what to do and he jumped, or did he tell you what to do and you jumped?  Explain that to the jury.  What was that type of your relationship like?

A.    I don't think either person controlled the relationship.

Q.    Was he violent with you?

A.    No.

Q.    Did he ever threaten you or --

A.    No.

Q.    -- do anything -- was there ever a point where he made you do anything you didn't want to do?

A.    No.

Q.    In 1993, in March of 1993, did you become aware that he was arrested back in Iowa?

A.    Yes.

Q.    Did you know he was back in Iowa at the time he was arrested?

A.    No.

Q.    At that point did some agents confront you to let you know he may have been involved with some other person?

A.    Yes.

Page 74

Q.   Did you know anything about this Angela Johnson before that time?

A.   No.

Q.   Explain to the jury if you would then, if we're in March of 1993, you're at that point pregnant with Dustin Honken's child; is that right?

A.   Yes.

Q.   And you find out that Dustin Honken apparently had a relationship with another woman that you weren't aware of.  What was your reaction to that?

A.   I was upset.

Q.   And how did Dustin Honken deal with that?

A.   He was there as my friend.  He didn't lie about it.

Q.   So what happens to your relationship then with Dustin Honken after this part?  He's arrested.  You find out he's got another woman on the side.  You're pregnant with his child. What happens with the relationship between you and Dustin Honken at this point in time?

A.   We weren't really in a dating relationship at that point.

Q.   Okay.  So how would you describe your relationship at that point?

A.   He would come to see the kids.  He'd stop by.  He'd go to ballgames.  I didn't see him on any regular basis.

Q.   How would you describe your relationship?  Romantic at that point or friendships at that point or something else?

2633

A.   We were trying to be friends.

Page 75

Q.   Explain to the jury then, does this kind of relationship with Dustin Honken where you're trying to be friends and he visits with the kids and so forth, does that ever change up until the point in 1996 when he's arrested the second time and put in jail?

A.   Not specifically.

Q.   Do you get romantically back involved with Dustin Honken at any point between 1993 and 1996?

A.   Somewhat.

Q.   He ever come to live with you?

A.   No.

Q.   Did you have any other children with him?

A.   No.

Q.   Did he ever propose marriage to you or ever get engaged with him?

A.   No.

Q.   So if you were going to describe for somebody, categorize your relationship with Dustin Honken between those years in 1993 and 1996, how would you do it?

A.   We were close.  We were the parents of a child.

Q.   Was Dustin Honken --

A.   Wanted to be a part of that.  We tried to work together at that.  We were friends.

Q.   During this time period, what did you know then of the

2634

ongoing relationship, if any, that Dustin Honken had with Angela Johnson?

A.   I didn't know about that relationship till later, till fall.

Q.   Of 1993?

Page 76

A.   Correct.

Q.   All right.  And when you say you didn't learn about the relationship until that fall, what did you learn in the fall of 1993 about Dustin Honken's relationship with Angela Johnson?

A.   I knew that he was seeing her.

Q.   Did you find out at some point --

A.   I didn't know to what extent.

Q.   Okay.  Did you find out at some point that she was pregnant by Dustin Honken?

A.   Yes.

Q.   And do you recall when you would have found that out?

A.   Shortly before she had a child.

Q.   That would have been in February of 1994?

A.   Correct.

Q.   So what do you know of the relationship between Dustin Honken and Angela Johnson after the child was born in February of 1994?

A.   I know that he lived with Angela Johnson at one point in time.

Q.   And was there a period in between 1994 and 1996 that Dustin

2635

Honken was living at a couple different places throughout that time period?

A.   Yes.

Q.   Where were some of the places Dustin was living during that time period?

A.   After he lived with Angela, he lived in a house in Mason City.

Q.   Was that with Tim Cutkomp on Eighth Street?

Page 77

A.    Yes.

Q.    Where else did he live?

A.    Then he moved to the other house further north in Mason City.

Q.    The house that ultimately was raided by the law enforcement officers?

A.    Correct.

Q.    Okay.  Were there times where he would stay with his father in Steamboat Rock?

A.    Yes.

Q.    So during this time period in 1994 to 1996, did you understand that -- even after Dustin Honken moved out and no longer was living with Angela Johnson, did they maintain some type of relationship after that?

A.    Yes.

Q.    And how were you aware that they maintained some type of relationship after that time period?

2636

A.    Well, I knew she was a part of his life.  She was there.

Q.    Did you have contact with her during that time period of 1994 to early 1996?

A.    Yes.

Q.    And were there periods where you would have had confrontations with her?

A.    Yes.

Q.    Do you recall any time where Angela Johnson was following you in a car?

A.    Yes.

Q.    Can you describe for the jury what happened on that occasion?  How'd that come about, first of all, that she's

Page 78

following you in a car?

A.   I stopped by Dustin's on my way to his mother's house.

Q.   And let me stop you.  Dustin's, is this at the Eighth Avenue or Eighth Street address with Tim Cutkomp?

A.   Uh-huh, yes.

Q.   Okay.  So you stopped by there, and what happened?

A.   I stopped there, and Dustin and Angela were outside.  And he came over to the car, and I asked him what I needed to ask him.  And then I left and went downtown at which point Angela was behind me.  I went through the bank, through the drive-through.  I came out, and she was still behind me, and I pulled over.  And she got out of the car.

Q.   What happened when she got out of the car?

2637

A.   She banged on the car windows.  I rolled the window down, and she yelled and screamed.

Q.   Anybody with you at that time?

A.   My three children.

Q.   And what was she yelling and screaming at you about?

A.   I don't know specifically.

Q.   Did you take anything that she was yelling and screaming about as threatening to you?

A.   Yeah.

Q.   Did you have concern about your safety at that point?

A.   Yeah, I wanted to get out of there.

Q.   What ultimately happened?  Were you able to leave?

A.   Yes, she went back to her car, and I left and drove to Dustin's mother's house.

Q.   And what were you going to Dustin's mother's house for?

Page 79

Was there some occasion you were going to?

A. We were taking the kids to carnival.

Q. And what happened when you got to Dustin's mother's house?

A. She said Dustin had called her and indicated Angie may be on her way over there and that she may have a gun and we needed to leave.

Q. And so did you?

A. Yes.

Q. Were there other occasions where you had confrontations with Angela Johnson?

2638

A. Yes.

Q. In particular was there an occasion one night or early, early in the morning when Angela Johnson came to your house?

A. Yes.

Q. Can you tell the jury about that event?

A. It was a weekend day. The kids and I were sleeping. And somebody was banging on the door.

Q. About what time of day or night was this?

A. Five, six in the morning. I'm not sure.

Q. Was it still dark outside?

A. It may have been starting to get light. I don't know.

Q. So what happened at that point?

A. I looked out the window and saw it was Angie. She was screaming to get in the house. I called Dustin and asked him why Angie would be at my house.

Q. And what was Dustin Honken's response?

A. He said he didn't know, that I should call the police.

Q. So did you?

A. Yes.

Page 80

Q.   What happened at that point?

A.   She had left the property, and then she returned.

Q.   Did the police come at some point?

A.   Yes.

Q.   And so when she returned, were the police still there?

A.   I called the police again when she was pounding at the door

2639

and --

Q.   This is a second time?

A.   Right.

Q.   Okay.  And what was happening then at that point?

A.   She was threatening to break into the house if I didn't open the door, and the dispatcher said yes, she could hear her at the door because I said, She's not gone; she's back.

Q.   What was -- did -- Angela Johnson, when she was screaming, why was it she was trying to get into your house?

A.   I believe she thought that Dustin was at my house.

Q.   And you had your children there at that time?

A.   Yes.

Q.   At some point in early or mid-1996, was there an occasion when your car was vandalized?

A.   Yes.

Q.   What happened to your car?

A.   It was parked in my garage, and when I went and loaded my kids in the car to go to work, I had four slashed tires and damage to the inside and outside of the car.

Q.   And explain the damage to the outside of the car if you would.

A.   There was cuts on the inside on the seat and the steering

Page 81

wheel, and there was a lot of scratching on the hood.

Q. And was there anything noticeable about the scratching on your car?

2640

A. It looked like it could resemble an A.

Q. An A?

A. Yes.

Q. On -- someplace scratched on your car?

A. Yes.

Q. Did you become aware at some point that during a search of Dustin's house on February 7 of 1996 that a letter from Angela Johnson to Dustin Honken dated October 26, 1995, was seized? It was actually introduced into evidence in this case as Exhibit 69.

A. Yes.

Q. That referenced the vandalism to your car?

A. Yes.

Q. Did you ever talk to Dustin Honken about that vandalism?

A. When it happened.

Q. What'd he say?

MR. BERRIGAN: For the record, Your Honor, I'm going to object to Mr. Honken's testimony coming through this witness for the same reasons previously lodged about Mr. Vest, and that is that it deprives Angela Johnson of her ability to cross-examine Dustin Honken in violation of her 6th Amendment rights and her due process rights under the 5th, 8th, and 14th Amendments.

THE COURT: Overruled. You may answer.

MR. BERRIGAN: May I have a continuing objection so

Page 82

not to interrupt again?

THE COURT: You may. Thank you.

MR. BERRIGAN: Thank you, sir.

BY MR. WILLIAMS:

Q. You can answer that question if you recall it.

A. Yes.

Q. What did Dustin Honken say when you asked him about the vandalism to your car?

A. I called him that morning. He said that I needed to call the police and report it.

Q. Did you do that?

A. Yes.

Q. Did he indicate to you at that point whether he was aware or knew anything about who had done that to your car?

A. He did not know for a fact at that time.

Q. Did you ever have conversations with Dustin Honken about Angela Johnson and their relationship?

A. Some.

Q. Was there ever an occasion where you asked him about whether he was going to leave Angela Johnson or end that relationship at all?

A. I asked him why he didn't get out of that situation. Nobody appeared to be happy.

Q. What was his response?

A. He said he was not strong enough to leave Angela, that he

2642

knew what she was capable of.

Page 83

Q. Did he indicate to you at any point that he was afraid of her?

A. That was the impression that I received.

Q. The Angela Johnson that confronted you on these occasions, do you see her in the courtroom?

A. Yes.

Q. Can you describe for the jury where she's sitting and what she's wearing?

A. She's sitting at the defense table wearing a cream-colored sweater.

MR. WILLIAMS: No more questions, Your Honor.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Thank you, sir.

CROSS-EXAMINATION

BY MR. BERRIGAN:

Q. Miss Rick, we haven't met. My name is Pat Berrigan, and I'm one of Miss Johnson's attorneys. I'm just going to ask you a few questions; okay?

A. Okay.

Q. I wanted to kind of turn the clock back if we could to your relationship with Mr. Honken I guess going back to 1989. Is that when you said you first met him?

A. Yes.

Q. And at some point this relationship developed from being

2643

friends to something more serious. Would that be fair?

A. Correct.

Q. Do you have an appointment?

A. I do.

Q. Okay. I'm sorry. I'll try to be as brief as I can. I

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2311 of 3592

hope you'll bear with us given the serious nature of the situation.

And isn't it true that as you've testified you at one point actually gave birth to a son Ryan. That was August 11, 1993. That was Mr. Honken's child?

A. Correct.

Q. And that was your second pregnancy involving Mr. Honken as a child -- as a father; isn't that right?

A. Yes.

Q. And when were you first pregnant by Mr. Honken?

A. I don't recall the dates.

Q. How many years before you gave birth to your son Ryan?

A. One to two years.

Q. So you had this kind of ongoing relationship with Mr. Honken at least over a span of two or three years.

A. Yeah, we were dating at that time.

Q. And I thought I heard you say that there were no commitments involved in this relationship. Is that right?

A. We were not married. There were no plans to do that.

Q. And yet you decided to have -- at least allowed yourself to

2644

get pregnant by this man not once but twice; is that true?

A. That's correct.

Q. Well, how did you become aware of a lady by the name of Melissa Friesenborg?

A. From some detectives after Dustin was arrested.

Q. In fact, they came out to your house on the night of March the 25th, 1993, to talk to you. Do you remember that?

A. Yes.

Page 85

Q. I'm imagining detectives don't come out to your house all that often, but this would have been the first time they came to talk to you about Mr. Honken.

A. That's correct.

Q. Right? Just so we're on the same page. Is that when these detectives talked to you about Mr. Honken being involved with other women?

A. They talked to me about Melissa.

Q. Melissa Friesenborg.

A. Uh-huh, correct.

Q. And up until that point, had you ever heard that name before?

A. I don't believe so.

Q. You said you knew Dustin Honken had been living in Arizona.

A. Correct.

Q. Right? Did the detectives inform you that this woman in Arizona was a woman he was engaged to be married to?

2645

A. They didn't specifically say that.

Q. Didn't you actually call Melissa Friesenborg yourself?

A. Yes.

Q. Because you found a piece of paper in Dustin's belongings with her telephone number on it?

A. No, it wasn't her number.

Q. I'm sorry?

A. It was actually a family member's number.

Q. Were you able to get in touch with Miss Friesenborg through that number?

A. I eventually got in touch with her. I don't know if that -- where I got the number.

Page 86

Q.   And what was the purpose of you calling her?

A.   I wanted to know what was going on.

Q.   You wanted to know whether it was true that Dustin was involved with this woman?

A.   Sure.

Q.   And you found out that according to her she was engaged to be married to him.

A.   That was her perception.

Q.   That's what she told you.

A.   I don't know if she told me she was engaged.

Q.   Okay.  Well, did that come as a surprise to you?

A.   Yeah.

Q.   Yeah.  Mr. Honken certainly hadn't said he was engaged to

2646

be married to some woman in Arizona.

A.   No.

Q.   And this happened while -- that is, you learned of this woman in Arizona while you were carrying his child, while you were pregnant with your son Ryan; isn't that true?

A.   That's true.

Q.   Okay.  And then the detectives talked to you, and they tell you, Wait, not only that.  There's a woman right here in Mason City that this man is involved with, Angela Johnson.  Do you remember telling them about -- them telling you about Angela Johnson?

A.   They specifically did not know her last name, and they specifically did not indicate he was having any personal relationship with her.

Q.   They didn't.  Didn't they have a picture of a mirror at a

Page 87

hotel room that said, "Happy Birthday, Dustin," with a big A on it?

A.   Yeah.

Q.   It was a hotel room, wasn't it?

A.   Yes, it was.

Q.   And you didn't believe them.  You told the detectives when they came to your house, I don't believe he's involved with anybody else.  Isn't that what you said to them?

A.   I don't know what I said to them.

Q.   That they actually brought you down to the police station

2647

at that night to come down and look at the picture.  Do you remember that?

A.   Yeah.

Q.   And then you got upset, and you left the police station and went home; isn't that what happened?

A.   I don't recall.

Q.   You don't recall leaving --

A.   I went home at some place -- some point in time.

Q.   You don't recall being upset because you had just learned that the man whose child you're carrying is engaged to a woman in Arizona you knew nothing about and he's having a relationship with another woman there in Mason City right under your nose that you knew nothing about.  That didn't upset you.

A.   I don't believe they indicated he was having a personal relationship with Angela.

Q.   Just that she signed happy birthday on a hotel room mirror.

A.   It was my understanding there was numerous people staying in that hotel room.

Q.   I see.  Could have been anybody.

Page 88

A.   No, I believe he probably had a business relationship with Angela.

Q.   The point is, ma'am, you didn't know anything about any of that until the detectives told you on March the 25th, 1993; right?

A.   That's correct.

2648

Q.   And you were angry and upset about it.

A.   I'm sure I was upset.

Q.   And, in fact, the next day you called Detective Stearns back and said, Hey, let me tell you about Melissa Friesenborg. Isn't that how that went down?

A.   I don't know specifically the next day.  I'm sure I talked to somebody about her.

Q.   You called him back because you were angry about Dustin fooling around behind your back.  True?

A.   Is that a question?

Q.   Yes, ma'am.

A.   I definitely was upset --

Q.   Yeah.

A.   -- that I didn't know about it.

Q.   And then he gets arrested March of 1993; right?

A.   Correct.

Q.   And you knew that was for -- he was arrested, charged with distribution of methamphetamine, manufacturing and distribution of methamphetamine; right?

A.   Correct.

Q.   And that certainly was news to you, wasn't it?

A.   Yes.

Page 89

Q.   You didn't know anything at all -- this guy you've been pregnant with not once but twice, you knew nothing at all about him manufacturing pounds of methamphetamine and selling it

2649

throughout the Mason City/Clear Lake area; isn't that true?

A.   That's true.

Q.   This is a secret life he's leading behind your back along with these women you knew nothing about; right?

A.   I guess so.

Q.   And so you decided maybe this guy's not such a great idea. But you continued to see Mr. Honken, did you not?

A.   Yes, I did see him.

Q.   When you say suggesting that you remained friends even after the spring of 1993 after he was charged with the methamphetamine, after you learned about these women, isn't it true that you continued a sexual relationship with him?

A.   Not for quite some time.

Q.   What do you mean by that?

A.   It was a long time after that.

Q.   Well, how long is long?

A.   More than a year.

Q.   Well, you didn't know while you were pregnant that Angela Johnson was pregnant as well; right?

A.   No, I didn't know that.

Q.   He didn't say anything to you at all about the fact that he had impregnated this other woman until after she had given birth to that child.  It was in February, February the 14th, 1994; right?

A.   No.  I actually found out before that time.

Page 90

Q. You found out from Mr. Honken?

A. Yes, in January.

Q. Okay. Let me just make sure I understand you correctly. Are you telling me that you knew that Angela Johnson was pregnant before she delivered her child?

A. Yes.

Q. And that would have been a month before?

A. Right.

Q. So throughout the summer and the fall of 1993, you're continuing to see Mr. Honken; right?

A. Correct.

Q. He's coming over to see his child; is that true?

A. He came to see my children.

Q. And he doesn't say anything about this woman being pregnant with his child.

A. No.

Q. I wanted to ask you a couple questions about these confrontations you had with Miss Johnson. One was at a bank apparently? She came up and started yelling at you through the window? Did I hear that correctly?

A. It was on a street.

Q. On a street. And you rolled the window down?

A. Yes.

Q. So you were still in your car.

A. Correct.

2651

Q. With your children.

Page 91

A.    Correct.

Q.    Was the car still running?

A.    I was behind a parked car.

Q.    Did you drive behind the parked car?

A.    Yes.

Q.    Was there anything keeping you from backing up and leaving wherever it is that you were parked?

A.    Yes.

Q.    What's that?

A.    Angela was parked behind me.

Q.    I see.  So did you get out of the car and approach the bank personnel and say, This woman is threatening me; would somebody call the police?

A.    I was not at the bank.

Q.    Did you get out of your car and ask anybody for help?

A.    No, I did not get out of my car.

Q.    After the incident did you pick up the phone and call the police and say, I've just been threatened by Angela Johnson?

A.    No, I didn't.

Q.    This thing about a gun --

A.    I'd called the police before.

Q.    You called the police before.  Did you call the police on the day you claim that you were threatened after you stopped?

A.    No, I did not.

2652

Q.    Okay.  And even after -- who is it that tells you she supposedly has a gun?

A.    Dustin's mother.

Q.    Dustin's mother.  Dustin's mother says she has a gun.

A.    No, she did not say -- I did not say she said -- she said

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2319 of 3592

that she was told she may have a gun.

Q. She may have a gun. Did you know your boyfriend Dustin Honken had a gun?

A. No.

Q. You never saw him with a gun.

A. No, I didn't.

Q. You never saw Angela Johnson with a gun.

A. No, I didn't.

Q. She never threatened you with a gun.

A. Not with a gun.

Q. She's right outside your window, and you're sitting there in the car. Did she hit you or strike you or attempt to strike you?

A. No.

Q. And wasn't she upset because you were still seeing Dustin Honken? Wasn't that what she was angry with you about?

A. I was not seeing Dustin Honken. Yes, I saw him. We are parents of a child.

Q. She suspected that you were having sexual relations with him; isn't that true?

2653

A. If he moved out from her house, that probably wasn't a good sign for their relationship.

Q. No, the question was she suspected that you were having sexual relations; isn't that true?

A. I have no idea what she suspected.

Q. Did she tell you that?

A. I do not know.

Q. She didn't want you messing around with Dustin Honken

Page 93

anymore.

A.    She didn't want me near him.

Q.    She had a baby with this guy and apparently thought their relationship was more serious than the relationship you had with Mr. Honken which apparently didn't involve any ties.  Wasn't that the situation, Miss Rick?

A.    I have no idea what she believed.

Q.    This coming over to your house where she comes over at five or six o'clock in the morning, you've admitted she was looking for Dustin Honken then; right?

A.    She knew where he was.

Q.    When was that that she came over to your house?

A.    I don't recall the dates.

Q.    You can't remember.  You called the police.  Were you sleeping with Dustin Honken then?

A.    No, he was not at my house.

Q.    No, no, I don't mean that night.

2654

A.    I have no idea.

Q.    So you might have been sleeping with Dustin Honken at that time, and Angela Johnson might have been upset about that; right?

A.    I do not recall.

Q.    You want us to believe you didn't really care about Dustin Honken at this time?

A.    No, I've never said I didn't care.

Q.    And, in fact, you talked to him about moving out of Angie Johnson's house and leaving her; right?

A.    I did not talk to him about moving out.

Q.    I see.  Isn't it true that you gave him some money to put a

Page 94

rental deposit on a house to move out of living with Angela Johnson?

A.    I did not give him a rental deposit.  I've borrowed him amounts of money.  I believe I may have gave him a utility deposit.

Q.    Wasn't it for the purpose of him moving out of living with Angela Johnson?

A.    No.  He already lived at a different house prior to that, not with Angie.

Q.    You've given some testimony in the past to various grand juries in this case, haven't you?

A.    Yes.

Q.    Took an oath to testify truthfully just like you did today?

2655

A.    Yes, I did.

        MR. BERRIGAN:  May I approach, Your Honor?

        THE COURT:  You may.

BY MR. BERRIGAN:

Q.    I'm going to hand you, ma'am, your sworn testimony before the grand jury April the 22nd, 1997.  I wonder if you could turn to page 16, please.  At the bottom, let me read you the following questions and answers starting on line 22:  Had you ever provided him with any money in connection with whatever he was doing?  Answer, No.  I loaned him money to move out of living with Angie because I wanted that to happen.  Is that what you said?

A.    Well, he previously lived somewhere else.

Q.    Is that what you told the grand jury under oath?

A.    Yes.

Page 95

Q.   The next page on the top of page 17, How much did you loan him for that?  I couldn't tell you exactly right now.  I gave him money for a deposit on the house.  I gave him money for a deposit on utilities, probably somewhere between 500 and a thousand dollars.  Is that what you told the grand jury?

A.   Yes.

Q.   You wanted Dustin Honken moving out of living with Angie Johnson, and you gave him money to do that; right?

A.   If that's what it says, then that's what I did.

Q.   Is that what it says under oath, ma'am?  Is that the

2656

testimony you gave?

A.   Yes.

Q.   And that was April the 22nd, 1997, which is by my calculations eight years ago.  Do you think your memory might have been fresher then than it is today?

A.   Probably.

Q.   The car vandalized incident, Dustin Honken told you when you called him to call the police.  Is that what you said?

A.   Yes.

Q.   Why are you calling Dustin Honken after your car is vandalized?

A.   I needed a ride to work.

Q.   So you weren't calling him to report the vandalism.

A.   Was I calling Dustin to report it?  I was calling him to tell him about it.

Q.   And he told you to call the police.

A.   That's correct.

Q.   And that's what you did.

A.   That's correct.

Page 96

Q. So your first call after discovering this vandalism to your car is to call Dustin Honken; is that right?

A. I don't know if he was the first call. I know I called him.

Q. Were you sleeping with Dustin Honken at that time?

A. I have no idea.

2657

Q. You might have been; is that right?

A. It's a possibility.

Q. I wanted to explore with you this idea that you wanted Dustin to leave Angela Johnson. Did you ever tell Dustin Honken that you knew about these murders that he was alleged to have committed?

A. No.

Q. Did you know anything about them?

A. No.

Q. Did you ever tell him, you know, Dustin, I don't know why you asked Angela Johnson to help you because I would have been willing to help you?

A. No.

Q. That conversation ever take place?

A. No.

Q. Never. You're sure about that.

A. Yes.

Q. Did you ever tell Dustin Honken -- well, let me ask you, did Dustin Honken tell you that he had plans to kill Angela Johnson?

A. No.

Q. Ever tell you that? Did he ever ask you to participate in

Page 97

such plans?

A.   No.

Q.   Did you ever volunteer to help him kill Angela Johnson?

2658

A.   No.

Q.   You know a fella by the name of Dean Donaldson?

A.   Not personally.

Q.   Well, you were involved in bonding him out of jail, weren't you?

A.   That's correct.

Q.   And you did that at the request of Dustin Honken.

A.   That's correct.

Q.   Right?  And you didn't know this guy Dean Donaldson from Adam; isn't that true?

A.   True.

Q.   Dustin Honken calls you and says, You can make some money if you bond this guy out of jail for me, a friend of mine, Dean Donaldson; right?

A.   Correct.

Q.   And you went and got $500 from Dustin's dad, and you went to a bonding company, and you gave them 500 bucks, and you pledged your house to get Dean Donaldson out of jail.

A.   Correct.

Q.   And you didn't have any idea what that was for.

A.   I know what I was told it was for.

Q.   You know what Dustin told you.

A.   Yeah.

Q.   What did he tell you?

A.   I don't recall specifically.  The man was going to go draw

Page 98

out his -- some retirement money, something to do I believe with -- at a hog place and that he needed to go sign out that money.

Q.   But that was to pay you back.  That is, Mr. Donaldson was going to draw out the money -- he was going to get a thousand bucks to pay you back for the 500 you had invested in bonding him out of jail; right?

A.   It wasn't my $500.

Q.   No, I understand that.  You didn't have to put any money down on this deal at all; right?

A.   Correct.

Q.   But you were going to make 500 bucks on the deal for bonding him out, weren't you?

A.   Correct.

Q.   Because you were going to pay back Dustin Honken's father 500 bucks and keep 500 bucks yourself; right?

A.   I don't know if I was going to keep all the money or $500.

Q.   And then we have the matter of your house being pledged as security for the bond; right?

A.   Correct.

Q.   And do you know what Mr. Donaldson's bond actually was?

A.   Pardon me?

Q.   Yeah.  Do you know how much the bond actually was for Mr. Donaldson?  I understand you gave the bonding company 500 bucks, but do you know how much money the bonding company

pledged to pay if Mr. Donaldson didn't show up for court?

Page 99

A.    I don't know if I knew or not.  I don't recall.

Q.    Well, when you're putting your house at risk, did anybody say anything to you, Hey, Miss Rick, Dean Donaldson doesn't show up, your house is on the line to pay whatever obligation there is as a result of his failure to appear?  Anybody talk to you about that?

A.    I believe someone from the bonding company came to my house.

Q.    And they had you sign papers putting a lien on your house, didn't they?

A.    Correct.

Q.    And then Dean Donaldson does not show up for court; isn't that right?

A.    Correct.

Q.    Well, tell me why it is that Dustin Honken supposedly wanted Dean Donaldson bonded out of jail.

A.    I just did tell you.  He was going to go draw his retirement money out.

Q.    That tells me how he was going to pay you back.  What was the reason given by Mr. Honken as to why he wanted this guy out of jail?

A.    Well, he was going to have the rest of his money.  He was going to be with his family.

Q.    Who?  Who was going to be with his family?

2661

A.    Dean Donaldson.

Q.    So this is a good-will gesture on the part of Dustin Honken so that Dean Donaldson could get out of jail and be with his family?  Is that what you understood the situation to be?

A.    Yes.

Page 100

Q. Have you since learned differently?

A. Yes.

Q. That Dean Donaldson was actually being used by Dustin Honken in a plan to kill federal prosecutors and law enforcement officers and Angela Johnson?

A. I don't recall that specifically. He asked Angie to bond him out also, so that'd be a little far fetched.

Q. Yeah. Far fetched. Well, certainly Mr. Honken didn't share that plan with you, did he?

A. No.

Q. No. And he did get you to bond Dean Donaldson out of jail nonetheless.

A. Yes.

Q. And this is -- just to be clear, this is after Dustin Honken's arrested in 1996; right?

A. I believe so.

Q. So Mr. Honken is back in jail on his second meth distribution case. Was that what you understood?

A. Yes.

Q. And you didn't know anything about any drugs or Dustin

2662

Honken having anything to do with drugs.

A. No, I didn't.

Q. Did you have a video camera back in 1993, ma'am?

A. Yes.

Q. What kind of camera was it?

A. A VCR camera.

Q. Do you know what brand it was, what kind of tapes it used, what model, how big it was? Could you tell us anything about it

Page 101

at all?

A.   It used eight-millimeter tapes.

Q.   Okay.  How long had you had it?

A.   I don't recall.  Six months, a year.

Q.   Did Dustin Honken know about it?

A.   Yes.

Q.   How do you know he knew about it?

A.   Videotaped the kids before.

Q.   So he used to borrow the camera periodically?

A.   I don't know if he did.  He had it before when he was with the kids.

Q.   Well, when you say you don't know if he did, does that mean that he had your permission to take the camera if he wanted to use it for whatever purpose he might choose to use it for?

A.   He could have done that.

Q.   He didn't need to check in with you in order to get the video camera.

2663

A.   No.

Q.   And how big of a camera was this?

A.   Regular size.

Q.   Regular size?  Well, you know, they've changed over the years.

A.   Right.

Q.   I suppose you know that.  Now we have these little ones you can hold in one hand.  Was this a bigger camera than that?

A.   It's about this big.

Q.   About as big as that page?

A.   (Witness nodded head.)

Q.   And, of course, this was back in 1993; right?
Page 102

A.    Correct.

Q.    Did the camera have a tripod?

A.    No.

Q.    No.  Was Mr. Honken storing stuff at your house back at that time?

A.    In 1993, no.

Q.    Didn't he, in fact, store stuff out in your garage?

A.    Not at that time.

Q.    When did he start storing stuff at your garage?

A.    When him and Tim moved.

Q.    When was that?

A.    I don't recall.

Q.    What was he supposed to be storing?

2664

A.    Tim had furniture, household belongings, toys.

Q.    Out in the garage.

A.    Correct.

Q.    I want to ask you one other thing.  You told Mr. Williams that you were upset about learning that Mr. Honken had a relationship with Angela Johnson, but I thought you said he didn't lie about it.  Did I hear that correctly?

A.    Correct.

Q.    What do you mean he didn't lie about it?

A.    He didn't lie about it when I asked him.

Q.    When you asked him after you had already found out from the police; is that right?

A.    No, I did not believe he was having that kind of relationship with her at that point in time.  I believed he was having a relationship with Melissa.

Page 103

Q. You didn't find out about Melissa Friesenborg until the police came to you in March of 1993.

A. Right.

Q. You didn't find out about Angela Johnson until the police told you or came to you in 1993; right?

A. I knew she existed.

Q. You didn't know he was having sex with her, that she was pregnant by him.

A. Well, she wasn't pregnant at that time.

Q. And you didn't learn she was pregnant till a month before

2665

she delivered her child.

A. Correct.

Q. He didn't say anything to you about all these drugs that he's dealing out of Arizona and selling in Mason City and Clear Lake.

A. No.

Q. You didn't know about his relationship with Terry DeGeus or Greg Nicholson.

A. No.

Q. You certainly didn't know that he executed four people including Greg Nicholson on January (sic) the 25th, 1993, did you?

A. No.

Q. Didn't know that he executed Gregory -- Terry DeGeus on November the 5th, 1993; right?

A. Correct.

Q. There was a whole -- you didn't know anything about Dean Donaldson's two motives in getting out of the jail, out of the Woodbury County Jail; right?

Page 104

A.    True.

Q.    So there was a whole lot about Dustin Honken that he didn't reveal to you; would that be fair, Miss Rick?

A.    Correct.

Q.    He kind of operated on a need-to-know basis.  Would that be unfair to Mr. Honken?

2666

A.    No.

Q.    He still communicates with you and your children?

A.    He communicates with his children.

Q.    Do you monitor the mail that he sends them?

A.    I read the letters he sends them.

Q.    I'm sorry?

A.    I read the letters he sends them typically before they do.

        MR. BERRIGAN:  May I approach, Your Honor?

        THE COURT:  You may.

BY MR. BERRIGAN:

Q.    I'm handing you, ma'am, Defendant's Exhibit 2137 dated February the 7th, 2005, a letter to Brandon Rick, return address, Dustin Honken, number 06951-029, United States Penitentiary Marion, Post Office Box 1,000, Marion, Illinois 62959.  Is this one of the letters you monitored?

A.    I don't recall.

Q.    How old is your son Brandon?

A.    Fifteen.

Q.    Fifteen?  Is that Dustin Honken's handwriting?

A.    I assume so.

Q.    Well, you've been getting letters from him for years, haven't you?

Page 105

A.    Yeah, the kids have.

Q.    Okay.  And you said you've been reading them.

A.    I can't say I've read every letter.

2667

Q.    Is Brandon your -- is that Dustin Honken's child?

A.    No.

Q.    No.  How old is Brandon?

A.    Brandon's 15.

Q.    Fifteen, okay.  And on February the 7th, 2005, was he 15?

A.    No.

Q.    Fourteen?

A.    Correct.

Q.    So at the date of this letter he would have been 14; is that correct, ma'am?

A.    Correct.

        MR. BERRIGAN:  Defendant offers Defendant's 2137, Your Honor.

                        *   *   *   *

        (Defendant Exhibit 2137 was offered.)

                        *   *   *   *

        THE COURT:  Any objection?

        MR. WILLIAMS:  No objection, Your Honor.

        THE COURT:  Defendant's Exhibit 2137 is admitted.

                        *   *   *   *

        (Defendant Exhibit 2137 was admitted.)

                        *   *   *   *

BY MR. BERRIGAN:

Q.    Could you read the next to the last paragraph for the jury, please, ma'am, starting with do you read?

Page 106

A.   Do you read Maxim, Stuff, or FHM magazine?  If you don't, I would suggest you start.  They would give you all kinds of good advice on picking up chicks.  The best ones to read are the articles by the girls when they say what kind of guy makes them interested.  Knowledge is power especially when it comes to women.  The more you know about them and what they want, the more you get what you want.  I'll get a subscription if you read it.

Q.   Do you know what these magazines are, ma'am?

A.   No.

Q.   This sentence that Mr. Honken writes, The best ones to read are the articles by the girls when they say what kind of guy makes them interested.  Knowledge is power, Brandon, especially when it comes to women.  The more you know about them and what they want, the more you will get what you want, does that in your experience sound like Mr. Honken in terms of his attitude towards women?

A.   I haven't talked to him about his attitude towards women.

        MR. BERRIGAN:  That's all I have.  Thank you.

        THE COURT:  Mr. Williams?

                    REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q.   Miss Rick, from the time that you first met Dustin Honken in 1989 until he hooked up with Angela Johnson in 1993, did you ever see Dustin Honken use violence against any other person?

2669

A.   No.

Page 107

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2334 of 3592

Q.   Did you ever see him with a weapon?

A.   No.

Q.   Did you ever see him use force against anybody else?

A.   No.

       MR. WILLIAMS:  Nothing else.

                    RECROSS-EXAMINATION

BY MR. BERRIGAN:

Q.   Very briefly, ma'am, but were you anywhere near Dustin Honken on July the 25th, 1993?

A.   I don't know where I was on July --

Q.   You certainly didn't see him execute four people in a field off of Lark Avenue in Mason City, did you?

A.   No.

Q.   And on November the 5th, 1999, were you anywhere near Dustin Honken when he shot and beat to death Gregory Nicholson?

A.   No.

Q.   That sounds like use of force, doesn't it, killing somebody with a baseball bat and a shovel?  Would that be use of force to you?

A.   Yes.

       THE COURT:  Mr. Berrigan, I think you misspoke.  You said Gregory Nicholson.

       MR. BERRIGAN:  And I apologize.  Terry DeGeus.  I apologize, ma'am.

                                                    2670


       That's all I had, sir.

       MR. WILLIAMS:  Nothing else, Your Honor.

       THE COURT:  Anything further?  Okay.  You may step down.

       Jury can take a stretch break.
                    Page 108

Is the government ready to call its next witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls Alyssa Nelson.

ALYSSA NELSON, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated. Please adjust the chair, scoot it up so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your full name.

THE WITNESS: My name is Alyssa, A-l-y-s-s-a, Marvea, M-a-r-v-e-a, Nelson, N-e-l-s-o-n.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Nelson, where are you from originally?

A. I'm originally from Britt, Iowa.

Q. And where are you living now?

A. I'm living in South Sioux City, Nebraska.

Q. What do you do for a living, ma'am?

A. I am employed by the state of Nebraska as a probation

2671

officer.

Q. And are you married?

A. Yes, I am.

Q. And what's your husband do?

A. My husband is employed by the city of South Sioux City as a police officer.

Q. How far did you go through school, ma'am?

A. I graduated with a bachelor's degree in criminal justice

Page 109

from Morningside College in 1993.

Q. Morningside College here in Sioux City?

A. Yes, I did.

Q. And it's after that that you began your career in law enforcement?

A. No. I worked five years at the Boys and Girls Home here in Sioux City, Iowa, and then I started as a probation officer in 1998 for the state of Nebraska.

Q. Dustin Honken is your brother.

A. Yes, he is.

Q. Can you share with the jury a little bit of information about what your brother was like growing up with him and over the years? What's his personality like? If you were going to describe him to somebody else, how would you describe him?

A. Well, my brother and I, he's three years older than I am. And growing up, you know, it's a regular brother-sister relationship. And we got along, you know, quite well. Of

2672

course, you know, as any brother-sister relationship, you know, we would have our arguments and that kind of thing. And we got to be --the older we got, the closer we got where I could confide in him if I had any problems and vice versa.

Q. During his years growing up and through the point of 1993, did you maintain contact with him during that time period?

A. Yes, I did, sporadically.

Q. I'm sorry?

A. Sporadically I did since I was in college and I also got married and things like that.

Q. And up to that point, up until 1993, did you ever know Dustin Honken to engage in violence with anybody?

Page 110

A.    No, never.

Q.    Did you ever see him use force up until 1993 against anybody?

A.    Never.

Q.    Did -- growing up with Dustin Honken, did he have a lot of plans and projects in mind?

A.    You mean as far as like careerwise?

Q.    More just on an ongoing basis.  Did he have different projects or different things he got interested in and pursued for periods of time?

A.    Well, he was in -- started out in high school in like karate for quite a while, and that lasted for quite a while with him, and then he stopped that.  Other than that, you know, he

2673

would start little things here and there, but mainly it was karate.

Q.    Did he complete plans?  Did he follow through with plans he started?

A.    Quite a bit.  He was -- like he was in the high school band where he played the trombone for a while, and then he stopped doing that.  He never -- he'd start something, and he wouldn't finish it.

Q.    Wouldn't finish it.

A.    No.

Q.    Angela Johnson, did you come to know her at some point?

A.    Yes, I did.

Q.    And how -- at some point did you learn that Angela Johnson had a relationship with your brother Dustin Honken?

A.    Yes, I did.

Page 111

Q.    How did you first learn about that relationship?

A.    I first learned about Angie from Dustin telling me about her through a conversation, and that conversation was Dustin and I were taking a car ride back from Des Moines, Iowa, where I was -- I tested for the Iowa State Patrol, and he drove me there to test for them, and then he waited for me and then drove me back.  And on the way back he was telling me about a new girl that he had met which was Angela Johnson and was trying to sell me on her because he had always told me about his girlfriends even --

2674

MR. BERRIGAN:  Sorry.  Apologize to interrupt, ma'am, but for the record I need to renew this objection regarding Mr. Honken not being here to testify and our client being deprived of her right to cross-examine him pursuant to her 6th Amendment constitutional right and her due process rights under the 5th, 8th, and 14th Amendments, Your Honor.

THE COURT:  The objection's overruled, and you can have a continuing objection with regard to this witness.

MR. BERRIGAN:  Thank you.

THE COURT:  Thank you.

BY MR. WILLIAMS:

Q.    So you can go on.  You were saying?

A.    Anyway, as our conversation was going -- like through high school and stuff like that, he always wanted me to meet his girlfriends, kind of, I guess, just to kind of get a little bit of approval, and he's telling me, Oh, well, you know, this Angie, she's really nice, Alyssa; I want you to meet her, and, you know, she's -- you know, she used to date Terry DeGeus.  And I kind of stopped, and I looked over at him, and I said, She

used to date Terry DeGeus? Yeah, well, she dated him for a while.

And I said, Well, what are you doing with a woman that used to date Terry DeGeus? because I never, you know, knew Terry DeGeus personally. I just knew of him through rumors and that he wasn't a very nice person. That's just through the rumors I

2675

heard.

And he said, Well, Terry used to physically abuse her. And I said, Well, I don't think that's the kind of person that you should be with. And he says, Oh, Alyssa, give her a chance. And I said, Well, I said, I'll meet her. He said okay. And he just went on to say that, you know, she's just -- she's just a nice person, you need to meet her.

Q. Now, at the point he's telling you about this and first meeting her, this would have been in late 1992 or early 1993?

A. Approximately in there. That's about when the conversation took place.

Q. At that point were you aware at all that your brother was involved in any type of drug activity?

A. I had absolutely no idea.

Q. That's something he kept from you.

A. Yeah, he did keep that from me. I was in college.

Q. So you learned from your brother that he has this new person in his life named Angela Johnson. Did you end up meeting her, in fact?

A. Eventually I did. He had to break some news to me one day when I was home from college. I can't remember. I would come home a lot on the weekends. You know, I'll admit by nature I'm

Page 113

a home body, and I'm quite the momma's girl, and I would come home, and he was there at my parents' house living, and he had to tell me that -- he said, Alyssa, you need to sit down; I need

2676

to tell you something. You know, I need to tell you first, you know, Kathy is pregnant. And I said -- first I kind of go, Okay, you're pretty stupid, you know, and --

Q.    This is Kathy Rick.

A.    Kathy Rick.

Q.    Did you know about their relationship before?

A.    Yeah, I knew that he was helping out with Brandon, he was there for the birth of Brandon, and he pretty much took -- you know, was kind of in the father role of Brandon, and we treated Brandon as our own. And I said, Well, then I guess you need to take your responsibility, Dustin.

And he says, Well, I'm not done yet, Alyssa. And I said, Well, what are you talking about? He says, Well, Angie's pregnant too. And, of course, I was just floored speechless, and instantly I was angry, and I called him an idiot, and, you know, I got incredibly angry with my brother and admit I jumped up and I smacked him.

Q.    Smacked your brother, Dustin Honken.

A.    Oh, you bet I hit him. He deserved it because that was very stupid, and that is not something by our family that we condone. No, we do not. So he was more worried -- he wanted to break it to me first and then break it to my mother next because he has a real hard time breaking things to my mother and I as far as like -- I don't know -- disappointing us. That's very difficult with him.

Page 114

Q.   So did you ultimately meet this woman Angela Johnson?
A.   Yes, I did.  I don't exactly remember the day or the time or anything like that.  But yes, I did eventually meet Angie.
Q.   And was it on one occasion or multiple times you would have met her over the years?
A.   I met her probably I'd say multiple times.  I mean, I don't exactly remember the number of times, but it was, you know, multiple times.  She came to my wedding, you know, with my niece Marvea.  And she actually was there when I went into labor with my son Nolan because my brother was -- my brother was in jail in Woodbury County.  She was up here to visit.  I think she came for a holiday once.  And I don't remember a lot of other times. I went to her house once I think for a Thanksgiving that she had at her home.
Q.   Did you have occasion to observe the interaction between your brother and Angela Johnson on occasion?
A.   Yes, I have.
Q.   And would you describe what they were like when they were together?
A.   The times that I've seen is -- just the couple of times that I've seen them together when they were together is just, you know, usually, you know, if Angie needed something for, you know, the baby Marvea, she'd say, Dustin, go get me this. Dustin, he'd jump up, and he'd get it.  Dustin was very good with his children.  You know, he'd jump up and he'd get it.  Or,

2678

you know, she'd plop the baby on Dustin, you know.  He'd take

Page 115

care of the baby, that kind of stuff.

Q. Did you observe Dustin your brother controlling Angela Johnson?

A. No.

Q. Did you observe him ordering her around?

A. No.

Q. Ever see her -- I'm sorry. Ever see him get physical with Angela Johnson at all?

A. Never.

Q. Ever see him intimidate her in any way?

A. No.

Q. Did Dustin Honken ever tell you about Angela Johnson's temper or violence?

A. Yes, he did tell me. At one time he was just saying that -- like I said, I can't remember specific time, date, anything like that. But he just made reference, he said, you know, Angie, she has a horrible temper, Alyssa. And I said, Well, you know, what do you mean by that? He says, Well, you know, she just -- she flies into rages, Alyssa, he goes, you know. And I go, What do you mean by rages, you know? And he goes, She gets so angry sometimes, you know, he goes, She scares me sometimes. She just -- she goes crazy. She just flies into rages. And that's all he said.

Q. Ever tell you about any involvement with a weapon in

2679

connection with Angela Johnson?

A. At one time he just said that he had been sleeping and he was woken up by something being pressed to his head and he woke up and Angie was standing over him with a gun being pressed to his head and she was -- he didn't really tell me what was being

Page 116

said or anything like that. But it scared him. He woke up. He had a gun pressed to his head by Angie and that she was just screaming at him and that he had to talk her down, that kind of stuff, and that usually that was -- you know, Dustin, you know, would talk her down out of these getting angry or something like that.

Q. Now, you know that your brother has been convicted of murdering five people.

A. Yes, I'm aware of that.

Q. Knowing what you know about his personality absent some outside influence, can you see Dustin Honken murdering five people?

MR. BERRIGAN: I'm going to object to that as calling for speculation and conjecture on the part of this witness.

THE COURT: Sustained.

BY MR. WILLIAMS:

Q. Let me direct your attention to 1998. Are you aware that in 1998 your brother Dustin Honken was sentenced on drug charges?

A. Yes.

2680

Q. And that took place here in Sioux City in this courtroom.

A. Yes, it did.

Q. Did you attend that sentencing in February of 1998?

A. Yes.

Q. And while you were there, did you see Angela Johnson also at the sentencing hearing?

A. Yes.

Q. Did you have conversations with her, first of all, outside

Page 117

of the courthouse?

A. I don't remember any specific conversations. I remember, you know, being outside of the courthouse with her like during a break. I do remember that.

Q. And what happened outside the courthouse?

A. Well, I remember during a break that, you know, it was a nice day and there were people sitting outside on the steps, and that was like facing the library parking lot. And I had kind of went out there and was just kind of watching facing the library, and Angie had said, Well, I need to go to my car. And her car was out in the library parking lot.

And she walked across the street, went into her car, and she kind of rummaged around in there for a while. She got out, and she had a camera, and she started facing the direction of the people that were sitting on the steps of the courthouse where they were all sitting. And she started taking a picture of the people that were sitting on the steps of the courthouse

2681

sitting there.

And then after she got done doing that, she put -- she put the camera back into her car, and then she came back over across the street. And she came back inside because the break was over. And then she came in. And I said, you know, Angie, what were you doing? And she says, You don't want to know. And I left it at that because I did not want to know.

Q. So did you sit with her at any point in this courtroom during your brother's sentencing in February of 1998?

A. Yes, she came and sat beside me.

Q. And when she was sitting beside you -- back in these rows back here?

Page 118

A.   Yes.

Q.   -- what happened at that point?

A.   Well, I believe my brother was sitting at one of these tables here, and she was sitting beside me, and as we were listening to the sentencing and that kind of stuff, I was, of course, getting quite distraught.  You know, my brother's being sentenced to 25 years, something like that, and, you know, I'm starting to cry and what not.

And she started taking out like a small gold or silver like little cigarette case, and she just told me kind of calm down, that kind of stuff.  And she took out a cigarette, and she started kind of playing with it, and then she says, Oh, you know, Alyssa, you know, put this between your fingers, you know;

2682

this will make you feel good; this will make you feel good.

And I don't smoke, and I'm like, Oh, Angie, put it away.  And she's like, Oh, no, it will make you feel good; it will make you feel good.

So just to kind of appease her to make her be quiet and kind of -- you know, we're in the courtroom and --

Q.   Let me ask you this:  At any point did she sing at all?

A.   Yeah, it was quite strange.  She -- I don't remember all the words since it was so long ago, but the one thing that stuck in my head, it was something ding, dong, whatever, and she was making implications towards the prosecutor at that time, something Angie's coming for you and made it toward the prosecution at that time.

And I just kind of looked at her, and, you know, of course, I was just -- kind of was trying to stay away, you know,

Page 119

of course, and I was very much crying because of my brother so . . .

Q. At the end of that sentencing, were you in the courtroom as everybody kind of got up and ultimately walked out of the courtroom?

A. Yeah, everybody got up and walked out. I was standing up, and she stood up with me, and I believe it was a bunch of people that worked in the courthouse that were standing up against the back of the wall, and it was a bunch of males except for one female, and we turned around, and Angie turned around and

2683

looked, you know, at one of them, and she looked at the female, and she says, you know, What are you looking at? The woman said, Well, nothing. And she says, Well, you're just a chick with a dick anyway, and I was incredibly embarrassed.

Q. Did you understand those people standing at the back of the courtroom were law enforcement officers?

A. I believe they were, you know. I'm, you know, not quite stupid to those things, so I figured yes, that probably was that or marshals or U.S. probation officers.

Q. Did your brother ever indicate to you that if something happened he'd do something to try to protect Angela Johnson from getting held responsible for what happened?

A. Can you please repeat that?

Q. Sure. Did Dustin ever tell you at any point that if he had to he would do something to protect Angela Johnson from getting the blame, he would take the blame himself or anything like that?

A. The only thing that Dustin has ever really said to me is that -- he just said that, you know, of course, he wished that
Page 120

his trial would have been after this one because he would have taken the stand, and he would have said what would have happened just in the fact that, you know, that he didn't do what he's been convicted of and also that a lot more people he said, Alyssa, were involved than were brought out and that, you know, he just says that, you know, Alyssa, I didn't do this.

2684

MR. WILLIAMS:  I have no further questions.

CROSS-EXAMINATION

BY MR. BERRIGAN:

Q.   Did you say "I didn't do this"?  Is that what he said?

A.   Yes, he did.

Q.   When did he tell you that?

A.   I don't remember the day or the time or anything, sir.

Q.   Was it after his trial?

A.   No, he's told me that clear from the beginning when it --

Q.   From the beginning he's told you he wasn't involved with any murders of any people on July the 25th, 1993, or November the 5th, 1993; isn't that true?

A.   He's told me since far as I can remember, sir.

Q.   Nothing to do with any murders, that's your brother's story to you.

A.   He didn't say anything about any murders until everything, you know, when they started accusing him.

Q.   Well, he got accused of murders back in when?  Back in the '90s?

A.   I don't remember, sir.

Q.   Weren't you at his sentencing hearing when the government put on evidence about these five people that disappeared blaming

Page 121

your brother for their disappearance?  Weren't you there for that?

A.    Yes, I was, sir.

2685

Q.    Wasn't the government alleging your brother was responsible for the disappearance of those people?

A.    Uh-huh, yes.

Q.    And that they were dead.

A.    Yes.

Q.    And that was in 1998.

A.    Yes.

Q.    And his story's been, Hey, I didn't have anything to do with that.

A.    Yes.

Q.    To you, right, consistently?

A.    Yes.

Q.    And, of course, you're a probation officer.  I know you're his sister, but you are a probation officer.

A.    Yes, I am.

Q.    And your husband is a police officer.

A.    Yes.

Q.    That's not terribly surprising he wouldn't be talking to you about murders if he were involved in them, is it?

A.    Excuse me, sir?

Q.    Do you find it surprising that your brother would deny that he was involved in any murders involving drugs and kids?  Would you expect him to come up and tell you, Oh, listen, Alyssa, hey, let me just tell you, keep this to yourself, but, you know, I did execute these four people on July the 25th, 1993, and 2 of

Page 122

them happened to be little girls 10 and 6 years old?  Would you really expect him to tell you that?

A.   Well, tell you the truth, you know, everything -- you know, I've been told from the beginning that, you know, all our mail has been read, all our mail is copied, all our phones are tapped or whatever.  So, you know, I mean, you know, you know, tell you the truth, you know, I really don't know -- as far as if he could tell me and sit down in one room, I would like to know exactly what he'd like to tell me.

Q.   Well, he didn't get arrested until 1996 the second time; right?

A.   I don't know the specific date, sir.

Q.   Well, let me put it to you this way, Miss Nelson.  Don't you know by now that your brother was out walking the streets three years after these people were killed back in 1993?

A.   Yes, I'm aware of that.

Q.   And at any point during those three years did he sit down with you in a room and say, Hey, Alyssa, I gotta break some bad news.  Not only are these women pregnant, blah, blah, blah, but let me tell you about the people I killed?  Did that ever happen?

A.   No.

Q.   No.  And, in fact, he's never admitted to you he was a methamphetamine dealer, did he?

A.   He admitted that -- he admitted that yes, that he was

2687

making it in Arizona.  Yes, he did.

Page 123

Q.   When did you first find out that your two brothers were engaged in a scheme to make methamphetamine in Arizona?

A.   I found out when Dustin was indicted for it.

Q.   Was indicted for it.

A.   Yes.

Q.   And how long had it been going on at that time?

A.   I don't know how long it had been going on before then.

Q.   Years.

A.   I don't know how long.

Q.   You don't know?

A.   No, I don't.

Q.   And you found out because he was indicted.

A.   That's true.

Q.   Okay.  I understand your contention is as far as you know up until 1993 your brother as far as you know had never used violence.  Did I hear that correctly?

A.   Yes.

Q.   And never used force?

A.   Yes.

Q.   Wasn't he at least tangentially involved in a bank robbery?

A.   Yes.

Q.   You don't consider that violence?

A.   No, I don't.

Q.   You said you knew the reputation of Terry DeGeus.

2688

A.   I said that I had heard it from rumors.  I don't know it.

Q.   You didn't know him personally.

A.   No, I did not.

Q.   But you had an adverse reaction.  At least -- you tell me.

Did you have an adverse reaction when your brother says, Hey,
Page 124

I'm dating this woman that used to date Terry DeGeus?

A.   Yes.

Q.   And that didn't have anything to do with the woman.  That had to do with Terry DeGeus or what you had heard about him; isn't that right?

A.   That's true.

Q.   You told us that your brother has a real hard time breaking things -- and I think you meant by that disclosing things -- to you and your mother.  Did I hear that correctly?

A.   Breaking what?

Q.   Well, when the conversation took place about these two women being pregnant at the same time and you slapped your brother, I thought I heard you say something about, you know, my brother has a hard time breaking bad news to my mother and I.

A.   Disappointing is what I said.

Q.   Disappointing.

A.   Yes.

Q.   Certainly being involved in homicides would be disappointing I would suspect.

A.   That's what I believe, yeah.

2689

Q.   Okay.  You told us about this conversation where he told you Kathy Rick and Angela Johnson were both pregnant at the same time.  Did he tell you he was engaged to a woman in Arizona at the same time by the name of Melissa Friesenborg?

A.   I didn't know he was engaged with her.

Q.   We've heard some testimony that your brother Dustin was very good at compartmentalizing the aspects of his life, that is, that he could separate out certain aspects of his life and

Page 125

keep them separate from each other. Has that been your experience with your brother?

A. Can you maybe explain that a little better?

Q. Well, let me ask you this. When he was telling you about Kathy Rick and Angela Johnson being pregnant, did he give you any indication that he had told either of those women about the other one?

A. I have no idea.

Q. Okay. And according to Dustin, Angela had a bad temper.

A. Yes.

Q. And your brother didn't have a bad temper, did he?

A. Not towards any of the women he dated, no.

Q. Well, did you ever experience throughout growing up with him any indication that he had a quick temper?

A. Brother-sister relations, yes.

Q. Well, just kind of your normal brother-sister bouts. Is that what you're talking about?

2690

A. Yes, yes.

Q. Would it be fair to characterize your brother as much more of a deliberate planning type of person as opposed to a hothead, somebody who didn't -- somebody who acted impulsively?

A. No, Dustin is not impulsive, no.

Q. He's not impulsive.

A. No.

Q. He thinks about things carefully before he carries them out.

A. Yeah. None of us are impulsive, no.

Q. Okay. I know your brother told you that he didn't do what he was convicted of, but he was convicted by a jury after a jury

trial right here in this very courtroom; isn't that true?

A. Yes, that's correct.

Q. And you and your mom partic -- sat through most if not all of the trial, didn't you?

A. Yes.

Q. And you testified on his behalf as a penalty phase witness when the case got to the penalty phase.

A. Yes, I did.

Q. And you know what the results were of the trial.

A. Yes.

Q. And certainly not only did the jury convict him of all of the counts, but he was sentenced to death on the counts involving Kamber and -- Kandi and Amber Duncan, wasn't he?

2691

A. I don't believe he was sentenced.

Q. Well, did the jury return a verdict of death?

A. Yes, they did.

Q. And in terms of the adults, did the jury return verdicts of life imprisonment without possibility of parole?

A. Yes, they did.

Q. I want to ask you a little bit about this sentencing hearing, Miss Nelson. I -- you haven't mentioned it, but let me just ask you. Did you ever have occasion to actually be present when either your brother or Angela Johnson were using methamphetamine?

A. No.

Q. All right. And were you aware -- back when your brother was sentenced, were you aware whether or not Miss Johnson was a regular user of methamphetamine?

Page 127

A.    No, I was not.

Q.    Is it true that during the course of the sentencing hearing when there were breaks that she'd leave the courtroom and go out to the car?

A.    I actually did not pay much attention to that.

Q.    Do you remember giving that testimony before to a grand jury?

A.    I don't recall.

MR. BERRIGAN:  May I approach the witness, Your Honor?

THE COURT:  You may.

2692

BY MR. BERRIGAN:

Q.    If I could direct your attention, Miss Nelson, to page 11 and specifically to a question by a grand juror that starts on line 9.  Grand juror asked you, Did you know Angela Johnson, his girlfriend, then?  Can you see that?

A.    Yes, I do.

Q.    I know there's a water mark there and it might be difficult to read.  So we'll do the best we can.  Was your answer, Yes, I did?

A.    Yes.

Q.    All right.  And then the grand juror said, What kind of person do you think she was, or what do you know about her?  And your response was, Well, I just want to make sure to let everybody know that I do not have the education to give a proper diagnosis, but I believe she is a nut to put it frankly.  Is that what you told the grand jury?

A.    Yes, I did.

Q.    During Dustin's sentencing, she -- when it was up in Sioux City, I was there for the whole sentencing, and she had the

Page 128

oddest behavior I've ever witnessed. I mean, frankly she scared me. I didn't want her to sit by me or people to think I was with her, but I couldn't get away from her unfortunately. Am I reading that correctly?

A.   Yes, you are.

Q.   The very next sentence, During Dustin's sentencing at the

2693

breaks and stuff, she would go out to her car to smoke a cigarette or whatever, and she was really wired the whole time. Is that what you told the grand jurors?

A.   I must have.

Q.   Okay. And I'm just kind of guessing that your experience as a probation officer you must have had clients that are drug abusers.

A.   Yes, I do.

Q.   And do some of those folks abuse methamphetamine?

A.   Yes, they do.

Q.   And is that one of the common symptoms of people that are using methamphetamine is that they get wired?

A.   Yes.

Q.   Yeah. And by that we mean hyperactive, paranoid, really act bizarrely.

A.   Yes.

Q.   And was that consistent with what you saw of Miss Johnson on the day of your brother's sentencing?

A.   Yes.

Q.   Yeah. She's got a camera taking pictures outside the courthouse I guess from some distance away. You weren't really clear about that. Where was she taking the pictures?

Page 129

A.    She was taking them directly at the courthouse where the people were sitting.

Q.    At the courthouse?

2694

A.    Where the people were sitting.

Q.    And for what purpose?

A.    That I do not know.

Q.    There was a court reporter at the sentencing hearing, wasn't there, just as there is today?

A.    I believe so.

Q.    Taking everybody's name down that might have testified or been involved in the proceedings?

A.    I believe so.

Q.    Okay.  And there was some comments about her singing during the course of the proceedings?

A.    Yes.

Q.    Did I hear that correctly?

A.    Yes.

Q.    And she's trying to get you to smoke in the courtroom?

A.    No, not smoke in the courtroom.

Q.    Oh, what was it -- she just gave you the cigarette to hold.

A.    Yes.

Q.    Okay.  And she thought that might ease your tension while you're crying while your brother's getting 25 years.

A.    That's correct.

Q.    You thought that was pretty strange behavior.

A.    Yes, I did.

Q.    She was acting pretty bizarrely during this entire episode, wasn't she?

Page 130

A.    Yes, she was.

Q.    And then these comments about the marshal or whoever it is standing at the back of the room she thought was looking at her strange, that's a pretty common symptom of people on methamphetamine, that they're paranoid, aren't they?

A.    Yes, that is.

Q.    And, in fact, some probation officer called you about this episode some time after the incident, after the sentencing hearing?

A.    Yes.

Q.    And you told the probation officer you thought she was a nut.

A.    Yes, I did.

Q.    Did you see her strike anybody or attempt to strike anybody?

A.    No, I have not.

Q.    Did she overtly threaten anybody there in the courtroom, say "I'm going to get you" or "I'm going to kill you or hurt you" or something like that?

A.    No.

Q.    Was there a metal detector downstairs at that time?

A.    Yes.

Q.    And right inside the front door, isn't it?

A.    Yes.

        MR. BERRIGAN:   Thank you.   That's all I have.

2696

        THE COURT:   Mr. Williams?

        Page 131

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: You may step down.

Your next witness is relatively short; is that right?

MR. WILLIAMS: Very short.

THE COURT: Okay. Why don't we take your next witness before we take our lunch break.

MR. WILLIAMS: United States calls Jennifer Rinden.

JENNIFER RINDEN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated. Make yourself comfortable. Please adjust the chair and the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Jennifer Estelle Rinden, R-i-n-d-e-n.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Ma'am, can you tell the jury where do you live now?

A. I live in Cedar Rapids, Iowa.

Q. And what is your profession?

A. I'm an attorney.

Q. And how long have you been an attorney?

A. I graduated from law school in 1997 and passed the bar that year.

2697

Q. You currently work in a private firm?

A. I do.

Q. And what type of law do you practice?

A. Civil defense trial work.

Q. And when you first got out of law school in 1997, did you

Page 132

become an employee of the United States Clerk's Office for the district court?

A. I did.

Q. And was that a job you had for a couple years here in Sioux City?

A. Yes, from 1997 to 1999.

Q. And did that require you to work in this courthouse itself?

A. It did.

Q. And did you work on occasion up here on the third floor of the courthouse?

A. Yes.

Q. I want to direct your attention to February of 1998 and ask you if during that month were you aware of a sentencing hearing that was taking place in this courtroom involving Dustin Honken?

A. Yes, I was.

Q. And after the sentencing hearing, did you happen to be outside this courtroom in the hallway by the elevators after the sentencing let out?

A. I was.

Q. Did you hear a woman make some comment at that point?

2698

A. Yes, I did.

Q. The woman that you heard make a comment, do you see her in the courtroom here today?

A. I do.

Q. And can you identify her for the jury?

A. Yes, she's sitting between two gentlemen at counsels' table.

Q. What comment did you hear her say?

Page 133

A. I heard her utter some profanities. I don't remember specifically what those were. She then said something to the effect of "You'll be sorry."

Q. Did you understand that to be some type of a threatening comment?

A. I did.

Q. What was her demeanor when she made that comment?

A. She appeared upset and angry. I took her posture and demeanor to be of a threatening nature.

Q. Did you believe it to be a serious comment?

A. I did.

MR. WILLIAMS: I have no further questions.

THE COURT: Mr. Berrigan?

CROSS-EXAMINATION

BY MR. BERRIGAN:

Q. Miss Rinden, who was standing there with her at the elevator?

2699

A. I believe it was just myself and Miss Johnson.

Q. Did you take it to be a threat on you?

A. I took it to be threatening. I wasn't sure who it was directed to.

Q. Was she looking at you when she said it?

A. She did make eye contact with me I think shortly after she made that comment.

Q. Well, had you had any interaction with this woman at all?

A. No, sir.

Q. Do you have any idea why she'd look at you and say, "You'll be sorry"?

A. I have no idea.

Page 134

Q.    Pretty bizarre behavior.

A.    I don't know.

MR. BERRIGAN:  Okay.  Thank you.

MR. WILLIAMS:  Nothing further, Your Honor.

THE COURT:  You may step down.

THE WITNESS:  Thank you.

THE COURT:  Members of the jury, we'll take an hour for our lunch break, so we'll see you back here at one o'clock. Please remember my prior cautionary instruction about keeping an open mind in the penalty phase till we've heard all of the evidence.  Thank you.

(The jury exited the courtroom.)

THE COURT:  Is there anything we need to take up?

2700

MR. WILLIAMS:  No, Your Honor.

MR. BERRIGAN:  Nothing by the defense.

THE COURT:  Okay.  We'll see you back here at one. Thank you.

(Lunch recess at 11:57 a.m.)

THE COURT:  Ready to have the jury brought in?

MR. MILLER:  Your Honor, may it please the Court.  One brief matter.

THE COURT:  Okay.

MR. MILLER:  It is my understanding --

THE COURT:  Please be seated.

MR. MILLER:  It is my understanding that a transcript has been ordered of a March 7, 2005, telephone hearing involving defense counsel and the government's taint team, and the government and I believe counsel has no objection, but it's the

Page 135

government's request that the ex parte portion of that be included in the transcript provided to both the government and defense counsel.

THE COURT: We'll take up afterwards because I don't really know what you're talking about; okay?

MR. MILLER: Very good.

THE COURT: Thanks.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams, are you ready to call your next witness?

2701

MR. WILLIAMS: I am, Your Honor. The United States calls Mike Mittan.

MICHAEL MITTAN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated. Make yourself comfortable. Please adjust the chair and the microphones so you can speak directly into the microphones. And when you're ready, would you please state your full name and spell your last name for us.

THE WITNESS: Sure. My name is Michael Paul Mittan. It's M-i-t-t-a-n.

THE COURT: Thank you.

Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Mittan, can you explain to the jury what you currently do for a living, sir?

A. Yes, sir. I'm a special agent with the state of Iowa Division of Narcotics Enforcement, and I'm assigned to the

Page 136

Council Bluffs field office.

Q.    How long have you been a DNE -- that's the initials for that office?

A.    Right.  I've been with the division of narcotics for about 14 1/2 years.

Q.    Did you have prior law enforcement experience before

2702

joining the DNE?

A.    I did not specifically law enforcement.  I actually acted as a private investigator for a company out of the Waterloo area, but I have a bachelor's -- I was doing that while I was attending the Wartburg College in Waverly to get a bachelor's degree in criminal justice.

Q.    After you obtained your criminal justice degree, did you receive any further training from the Department of Public Safety before becoming an agent?

A.    Yes, sir.  I was actually -- I graduated in May of 1990 from Wartburg, and I was hired I believe it was June of 1990 and went to -- it's kind of hard to explain, but the Division of Narcotics Enforcement is another division within the Iowa Department of Public Safety.  Just so the jury's clear, it's the state patrol, Division of Criminal Investigation, Division of Narcotics Enforcement, state fire marshal's office, and we all are under the Department of Public Safety.  So I actually attended the DPS academy in -- I believe it began August of 1990 where I became a certified police officer for the state.

Q.    And after that you went immediately into your duties then as a special agent with the Iowa Division of Narcotics Enforcement?

Page 137

A.    Yes, sir, I did.

Q.    Since you've joined that agency, did you receive additional training in the area of narcotics enforcement?

2703

A.    Yes, sir.  Over the last 14 years, I can't recall all the schools that I've been to, but I started with several schools put on by the Drug Enforcement Administration, schools put on by the Iowa Attorney General's Office.  I've been to numerous schools sponsored by the Bureau of Alcohol, Tobacco, and Firearms; courses sponsored by the Federal Bureau of Investigation.  I've actually taught several courses on CI management.  I've also taught courses in indoor marijuana growing operations.  I've testified as actually an expert witness in both state and federal court in relation to drug-trafficking crimes.

Q.    You indicated you've taught a course on CI management.  And CI is an acronym or initials for confidential informant?

A.    Yes, sir, that's correct.

Q.    Can you explain to the jury what are your duties as a special agent with the Iowa Division of Narcotics Enforcement?

A.    We are the lead agency to investigate narcotics crimes at the state level.  Our course of duties are pretty wide, but they're all narcotics investigation specific.  We do undercover buys.  We do a lot of interviews.  We do search warrants to search people's homes or businesses or vehicles to find controlled substances.  We assist other agencies that maybe don't have the expertise or the knowledge on how to work a multi-level narcotics case.

We assist the state patrol in what we consider

Page 138

interdiction stops where if a car, for instance, is going from Arizona to Chicago, if it's stopped in Iowa, we then are contacted to interview those people to try to figure out where the drugs came from, where they're going to.

So our job description is pretty wide, but our specific area that we handle is all narcotics related, mostly narcotics-related cases. Obviously guns are involved in narcotics crimes and money laundering and stuff like that, but it all stems from narcotics usually.

Q. Let me take you off in just one branch of what you talked about, and that's undercover operations. Could you explain to the jury when we say undercover operations, what are we talking about?

A. Actually how an undercover operation usually works is at some point in time the division or an agent is contacted by another law enforcement agency or by a person directly that wants to be a confidential informant. Either the agency has a confidential informant. Maybe, for instance, all of the police officers from that agency are known because of their -- they're usually wearing a uniform, you know, or whatever as a uniformed officer. So they will contact us and ask us if we could actually act in an undercover capacity so that the confidential informant could introduce an undercover agent like me specifically into the targets to either purchase narcotics from them directly, purchase guns from them, or obtain information to

further the investigation.

Page 139

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2366 of 3592

Q.   So these undercover operations for an agent to kind of get introduced into the drug world, it often takes a cooperator who's already or has been in the drug world to introduce you.

A.   Yes.  And that's kind of one thing I taught in one of the classes about confidential informants is you hate to look at it this way, but it takes bad guys to catch bad guys.  We can't take people off of church benches and put them into the society of drug -- of drug crimes and crimes.  It's just not -- it's just not possible.  It takes the use of informants, and informants are a valuable tool for us as far as how to make cases or how to assist us in making cases against people.

Q.   When you conduct these undercover operations, do you often use recording devices to record what happens when you're acting undercover?

A.   Yes, sir.  Each case is specific, but we usually use some type of recording device.  Either we wear some kind of an audio transmitter that will actually transmit the conversation that we're having with the target or with the individual that's involved in the narcotics crimes.

It's a two-fold purpose.  One fold is for actually maintaining our safety.  That way the people that are listening to the transmitter can hear what's going on.  If something bad happens, they're able to come and help us out.  It's a surveillance team, and I can get into that further a little bit.

2706

But also we'll sometimes use just a microcassette recorder or nowadays -- that was a while back, but nowadays it's pretty much all digital recorders and things so we can record the conversation so it technically isn't just our word against the defendant's word, but, in fact, there's usually a tape

Page 140

recording of it so that people know what is said.

Q. Let's talk about this for a minute. You talked about surveillance teams. When you go undercover as a police officer in a narcotics-related transaction, you are putting yourself at some risk for your own personal safety.

A. Correct.

Q. And do you have, in fact, then back-up teams or surveillance teams who work with you in conjunction with any undercover operation?

A. Yes, that's correct. In fact, there hasn't probably -- I know, in fact, there's never been a time where I've actually been out there on my own unless, for instance, the surveillance team has lost me during some kind of -- you know, we move vehicles or move to a different location. But I've never been out there on my own trying to buy drugs on my own. There's always somebody that's a back-up team or surveillance team to -- they're there in case of an emergency.

Plus they're also there to observe what's maybe going on, something that I might not be able to see working in the undercover capacity. For instance, if there's

2707

countersurveillance, if the bad guy actually has some other bad guy looking at us, looking to see if we're meeting other law enforcement officers or even maintaining our -- what's the word I'm looking for -- kind of maintaining us, really watching us also.

Q. Now, the various scenarios under which you would go undercover I would assume would include going undercover acting as a buyer, somebody who -- you want to buy some drugs off of

Page 141

somebody.

A.    That's correct.

Q.    And there are reverse buys as well where you would pretend to be a seller of drugs and you would pretend to sell drugs to somebody else.

A.    That's also correct.  Yes, sir.

Q.    And are there other occasions where you might go undercover?  I think you mentioned money laundering and other aspects of the investigation.

A.    Yeah.  Pretty much any type of an investigation where you think you can work a police officer in the investigation as an undercover officer, you know, there's really nothing better than that because the officer's been trained how to testify in court. You don't have to worry about maybe some of the criminal history that the informants may carry with them because of them being involved in the drug world.

You know, we've done it for, you know, buying drugs,

2708

selling drugs, what we call reverses.  We've done it just to obtain information about other crimes, for arsons, for instance, specifically, or if somebody wants their ex-husband taken care of for an insurance thing, you know, hired out as a hit man.

We've also done exchanges, money laundering, setting up basically like a business account where somebody can bring in money.  You know, we'll clean the money up for them or pretend to clean the money up for them just to further investigations.

Q.    Let me direct your attention to 1998 and ask you if in that year you were asked to become involved in an undercover capacity investigating Angela Johnson and her involvement with drug trafficking.

Page 142

A.   Yes, sir, I was.

Q.   Could you -- that was in March of 1998 when you first got involved?

A.   That's correct.

Q.   Can you explain to the jury how did this investigation begin in March of 1998?

A.   I was actually contacted by one of our other agents who works out of the Mason City office named Lori Lewis.  With me being in the Council Bluffs office, they had an occasion -- or it's to my understanding that there was an individual wanting to act as a confidential informant in the case regarding Dustin Honken and Angela Johnson.  The informant had been incarcerated with Mr. Honken at the Woodbury County Jail, and he had

2709

conversations with Mr. Honken in the jail that the informant and Mr. Honken made arrangements that when the informant got out of jail, he would actually assist Miss Johnson in collecting debts, money owed to her or to some of her associates involved with drug trafficking.  He would assist in collecting those debts.

Q.   That individual was who?

A.   Duane White.

Q.   And once he got out of jail, did he, in fact, contact law enforcement instead?

A.   Yes, he did.

Q.   And can you explain, what did you learn was the first contact, if any, that Duane White had once he got out of jail with Angela Johnson?

A.   To my understanding, the first contact is actually a March 22 contact where Mrs. Johnson or Miss Johnson actually contacted

Page 143

Mr. White and indicated that she wanted him to collect some monies that were owed to her, her and/or some of her associates -- I want to clarify -- her or some of her associates involved in the drug-trafficking crimes.

Q.   So what happened at that point?

A.   At that point I believe Mr. White actually contacted an agent that he had previously met with the FBI.  The FBI -- his name was Special Agent Bob Birnie.  Mr. Birnie was currently on vacation when that contact was made.  That office put him in touch with someone here in the Sioux City area office.

2710

Kind of to make a long story short, the person he needed to contact was actually an agent out of the Des Moines DEA office who in turn contacted Special Agent Lewis.

Q.   And that's how you got involved.

A.   And that's how I got involved.  I don't mean to make it a long story, but there were people on vacation, and there were some manpower shortage issues, so we were trying to make do with what we could to make the contact continue between Miss Johnson and Mr. White.

Q.   Based on the information that Mr. White provided to you in preparation for going undercover, did you have an understanding of what type of drug Angela Johnson was involved with at that point?

A.   Yes, to my understanding it was methamphetamine.

Q.   And did you have an understanding of who was her supplier of methamphetamine in 1998?

MR. STOWERS:  Your Honor, to the extent that this testimony relies on things that were told to this agent, we'd object on the grounds of the Sixth Amendment right to confront

Page 144

and cross-examine witnesses, and we'd ask that there be a continuing objection throughout this witness's testimony to anything that he learned from third parties including Duane White.

THE COURT: The objection's overruled. You may have a continuing objection.

2711

You may answer.

THE WITNESS: Thank you, sir.

A. Could you ask the question again, please?

Q. Sure. Did you have an understanding of who was supplying Angela Johnson with methamphetamine in this time period?

A. Yes, sir. To my understanding it was a gentleman, his real name is Jaime Rodriguez, but he actually went by the first name of Jimmy Rodriguez, and he was here from the Sioux City area.

Q. Was there any connection between Jimmy Rodriguez and Dustin Honken?

A. Yes, sir. To my understanding they had actually served time together here at Woodbury County while Mr. Honken was awaiting his sentencing federally for his drug-related crime.

Q. Based on not just what Mr. White told you but based on subsequent recorded conversations between Mr. White and yourself and Angela Johnson, did you have an understanding how long Angela Johnson had been maintaining a drug relationship with Jimmy Rodriguez prior to your involvement in 1998?

A. To the best of my recollection, I believe it was approximately a year that they had had this involvement. And I know that at some point in time during that time Mr. Rodriguez had been incarcerated. I don't actually recall what dates he

Page 145

was incarcerated with Mr. Honken, but I know it was within some time of a year to my understanding.

Q. So Mr. White gets this contact from Angela Johnson on March

2712

22 of 1998. And just by the way so we can put things in context, are you aware of whether Dustin Honken by this point had already been sentenced to federal prison?

A. Yes, sir, he had. I believe he was sentenced February 25, so approximately a month later is when Miss Johnson makes her first contact with Mr. White.

Q. And on March 22 she makes that contact, and he ultimately contacts law enforcement. You get involved, and so I want to direct your attention to March 24 of 1998. And were you able to actually set up a meeting with Mr. White and Angela Johnson yourself?

A. Yes, sir.

Q. Where did that meeting take place, sir?

A. The meeting actually took place at the Holiday Inn, and I don't remember the name of the road it's on, but it's right down the road here at the next exit on Interstate 29.

Q. Here in Sioux City?

A. Here in Sioux City, yes, sir.

Q. And what was the purpose of the meeting?

A. The purpose of the meeting was so that actually Mr. White and Miss Johnson could actually meet face to face. They had both heard about each other through Mr. Honken. They had talked on the phone obviously on the March 22 date, but to my understanding, they had never actually met face to face, and that was the purpose of the meeting.

Page 146

Q.    And were you present also to be part of that meeting initially?

A.    Initially, yes, sir, I was.

Q.    And do you recall what the situation was?  You know, we talked earlier in your opening remarks about surveillance teams and so forth.  Can you explain to the jury what the arrangement was at the Holiday Inn on March 24 of 1998?

A.    Yes, sir, I can.  We had made arrangements that actually we had two rooms at the Holiday Inn.  They were adjoining rooms. One of the rooms was actually going to be the room for the meeting location between myself, Mr. White who was acting as a confidential informant, and Miss Johnson.  We actually wired the room with video and audio surveillance.  We had a video set up in the room.  It's actually an undercover video.  You can't -- it's not a video camera, but it's a clock radio that actually has a camera lens in it that we used to videotape what was happening in the room.

          We also then had another audio transmitter placed in the room so that we could monitor and record -- it tends to never fail, something electronically goes wrong, so it was kind of a back-up plan.  If it did go wrong, we would indeed have -- hopefully have some other type of communication that could be recorded.  Basically that was set up in the room where the meeting was to take place.  In the adjoining room was actually a surveillance team that would be monitoring both the video and

2714

the audio recorder.

Page 147

Q. There for evidentiary purposes but also there for safety.

A. Correct. And I forgot to indicate that there were actually other teams of other surveillance officers that were in vehicles out in the parking lot around the area of the hotel.

Q. So did, in fact, Angela Johnson show up at the Holiday Inn on March 24 of 1998 to attend this meeting?

A. Yes, she did. I believe that prior to the meeting Mr. White had made either two or three recorded phone calls to Miss Johnson telling him (sic) what the room was and that he was, in fact, there.

Q. What happened when Angela Johnson arrived at the hotel room for this meeting then?

A. When Miss Johnson arrived at the hotel room, it was apparent to me that she was very paranoid and very nervous, and she was very upset about my presence actually in the room. And, in fact, if I remember correctly, Mr. White actually asked Miss Johnson if she was carrying any firearms. She indicated that she was not, but then she actually reached into her purse, and it really kind of caught me off guard. She reached into her purse and pulled out what I thought initially was a small handgun, but it ended up being a lighter. But you could see she was a little uneasy with my presence because Mr. White was actually supposed to be meeting there -- meeting her there alone.

2715

And so I decided and we made a decision that I would actually wait out in my vehicle that was parked outside the room while her and Mr. White had further conversation about what she wanted him to do.

Q. Now, you weren't present then for the conversation that
Page 148

took place between her and Mr. White then.

A. Not at that time, no, sir.

Q. But that was recorded.

A. Yes, sir, it was.

Q. And you've had an opportunity to review the recording, and you're aware of what happened in that room.

A. Yes, sir.

Q. Can you relate to the jury based on your review of the recording what happened in the room while you were outside?

A. While I was outside the room, actually Mr. White and Miss Johnson searched each other. Miss Johnson actually -- the defendant -- not the defendant. I'm sorry. The informant Mr. White actually had very long hair, and she actually searched even parts of her (sic) hair, and she searched the hotel room looking for any kind of a wire device.

And then in the same turn Mr. White I believe searched Miss Johnson, and they still kind of -- in just listening to the tapes and talking with Mr. White after the fact, it was very apparent they were both kind of nervous about each other.

But Miss Johnson ultimately indicated that she had

2716

some people that money needed to be collected from for an individual that she was associated with, this Mr. Rodriguez, that she was associated with in the drug-trafficking crimes.

They had made arrangements that Mr. White and myself would be the ones collecting the money for Mr. Rodriguez on behalf of Miss Johnson. And it was apparent to Mr. White that she actually wanted to take part in those collections, but, in fact, Mr. White indicated to her if we were going to be the ones

Page 149

collecting the money, then she would actually have to just stand back and watch and let us do our jobs.

Q. So you were in a way enforcers being hired to go out and collect overdue drug debts.

A. Correct. In fact, the plan was -- is that whatever money we would collect on behalf of the individuals that owed money, we would actually keep 50 percent of that which obviously wouldn't happen. We would keep it as evidence money, but that was the -- that was the role playing or the scheme that we had designed.

Q. Was there yet another meeting then the next day on March 25 of 1998?

A. Correct. At the end of the meeting on the 24th, the plan was to meet her somewhere between 6:30 a.m. or around 6:30 a.m. at her motel room at the Travelodge in South Sioux City.

Q. And did you, in fact, go there then?

A. Yes, sir, we did.

2717

Q. What was the purpose of meeting her that morning?

A. On that morning she was actually going to give us names and addresses of individuals that actually owed Mr. Rodriguez money.

Q. Did you have any discussions with her then about those names, and did she, in fact, give those to you?

A. Actually I wasn't present during the initial part of that. I actually waited in the car while Mr. White went into the room and met with Miss Johnson. But he came out with a list of names and addresses and vehicle descriptions on who owed Mr. Rodriguez money.

Q. Was there a conversation or statements made by Angela Johnson during this meeting about possession of any weapons?

Page 150

A.    Yes, sir.

Q.    What did she say?

A.    At some point in time during the meeting she indicated that she had just purchased a Uzi with a silencer but that she needed a magazine clip for that weapon.

Q.    An Uzi is what type of weapon, sir?

A.    It's a semi-automatic -- I think it's classified actually as a rifle, but it's about the size of a pistol.  It's a semi-automatic handgun, has usually a magazine capacity of somewhere between 20 and 30 rounds.

Q.    Did she make any statements concerning wanting to hurt anybody?

A.    That was actually after the fact.  It was a little later on

2718

in the day when those statements were made.

Q.    I'm out of order then.  Why don't you explain to me then what happened and how those statements came up.

A.    Okay.  Initially we had went to collect some money from those people.  We followed her directions.  We met with a couple, actually two different individuals here in the Sioux City area, that we were supposed to be collecting money from. Both of those people indicated that yes, indeed they were also in the drug connection or the drug-trafficking network with Mr. Rodriguez; Mr. Rodriguez had provided them with methamphetamine; and yes, they, in fact, did owe him money.

If I remember correctly, one of the individuals was kind of surprised that we were there that day because not too long ago Mr. Rodriguez had come by there looking for money and had actually confiscated one of their cell phones as part of the

Page 151

drug debt.

Q. So was Angela Johnson then following you around when you were doing this attempts at drug collection activity, or was she somewhere else?

A. I believe she was somewhere else. But I do remember from meeting her at the room specifically that morning that Mr. Rodriguez was actually identified walking out of the room or out of the motel in the close proximity of Miss Johnson as Mr. White, the CI, was walking into the room. They were driving a blue Ford Probe at the time, and I remember as we were driving

2719

around Sioux City that some of the countersurveillance officers actually -- I'm sorry, not countersurveillance officers. Some of our surveillance officers noticed a blue Ford Probe in some of the areas where we went.

Q. Basically doing countersurveillance on you.

A. Correct.

Q. So when you first met up with Angela Johnson at the Travelodge that morning, Jimmy Rodriguez was walking out as you were walking in.

A. Correct.

Q. And then when you were out attempting to collect these debts, the same vehicle that you had associated with him that morning is out in the same area that you're conducting these attempts to collect on.

A. That's what I recall, yes, sir.

Q. And then later that day I guess -- and I'm recalling this now. Later that day you end up meeting up with her after your efforts that day to collect debts and have further conversation with her.

Page 152

A.    Right.  While we were in Sioux City, we actually didn't collect any money.  The only thing I think we did get was in one of the -- one of the houses there was a small amount of methamphetamine, and I actually seized that methamphetamine to be kept as evidence because knowing that it's illegal, I didn't want the lady to keep and hold on to it.

2720

But we met Miss Johnson back at her hotel room initially -- I think it was around 8 -- between 8 and 10 in the morning.  I can't remember specifically.  But at that time myself and Mr. White actually went into her hotel room and met with her there.  And I believe it was during that time she indicated that there was another person to collect some money from, and that person actually lived up in LeMars, Iowa.

And one thing from that meeting that I recall kind of specifically that caught me off-guard -- or not really off-guard but I thought was interesting is that Mr. White had talked with her earlier in the morning about owning an Uzi and a silencer. And when I actually went up to the hotel room, there were some guns and ammo magazines actually in the hotel room.  And it just kind of struck me odd.  I'm actually a firearms instructor, and I have been for our division since 1992.  And there's not a lot of women that I know that read guns and ammo magazines, and it just kind of struck me to be very unique.  That would have been the morning of the 25th.

Q.    In her hotel room.

A.    In her hotel room, yes, sir.

Q.    And so when you meet up with her later in the day, does she make some comment about wanting to hurt somebody?

Page 153

A.    Yes, sir.

Q.    Explain that.

A.    Ultimately -- yeah.  Ultimately we went up to Sioux City --

2721

I'm sorry.  We went from Sioux City to LeMars and met with a woman up there and attempted to collect some money from her there.  After that we actually went and met with Miss Johnson in a parking lot.  I believe it was at the Wal-Mart parking lot in LeMars where she asked us what it would take to put a world of hurt on somebody.  And Mr. White indicated that it would depend upon, you know, where it was, who it was, how it was done.  And the only other response we could get from her is that it actually was a male subject that she was wanting to put the world of hurt on.

Q.    Did she indicate the purpose for why she wanted to put the world of hurt on this person?

A.    No, she didn't.

Q.    Do you recall her making any comments about vengeance in connection with this comment?

A.    I do recall that now that you bring it up, yes, sir.  She actually seemed a little upset about this obviously, about this whole conversation and wanting to put a world of hurt on somebody.  And if I remember correctly, at some time during that, it was because she was upset about Mr. Honken getting sentenced on his federal drug charge.

Q.    Now, at some point in these contacts you had with Angela Johnson on March 25 of 1998, did you have an opportunity for some reason to look in the back of her car?

A.    Actually, yes, sir.  One of the -- it wasn't the first time

Page 154

that the CI went in her hotel room at the Travelodge. It was actually -- and I wasn't very specific earlier, and I apologize.

But when we returned to the hotel where she was staying after we had gone to the Sioux City area to collect the money, I actually sat in the car for a short period of time by myself as Mr. White went into her hotel room.

As I was sitting there, Miss Johnson came out and got into the trunk of her car, and she retrieved a manila envelope. But while she was in the trunk of her car, I observed a roll of duct tape. And I've never seen a big roll of duct tape before or since that was probably somewhere between five and six inches wide. And being a guy and liking duct tape, I just kind of thought that was very unique and how big that was.

But after that point we exchanged a little bit of conversation about how the weather was, but ultimately I did end up back -- or I did end up in her hotel room with Mr. White, and then we came back out, went up to LeMars, and then it went on from there.

Q. And ultimately unsuccessful in really collecting any cash on that occasion.

A. That's correct. But I do believe that on that date Mrs. Johnson -- Miss Johnson actually paid Mr. White $25 in cash for kind of running around and trying to -- trying to track down some of the money.

Q. Now, what I want to do is cover the time period between

2723

March 25 and this meeting we've just talked about that you and

Page 155

Duane White attempted unsuccessfully to collect some drug debts on behalf of Angela Johnson and Jimmy Rodriguez and cover the period through June of 1998 and have you summarize if you would any continuing contact you had with Angela Johnson during that time period.

A. I believe there wasn't a lot of contact. I know there were several recorded calls made to Miss Johnson through Mr. White, and it was done by one of the agents up here in Sioux City, calls, periodic calls, just kind of keeping in contact wondering, you know, if any of the money had been collected, you know, did they still want us to try to go collect some money.

And that's pretty much the gist of it from the May date until -- I believe there's a call on like June 30 where she actually wants us to meet with her to discuss some specific things she wants done.

Q. Now, up to this point, you were initially hired, if you will, to collect drug debts on behalf of her and Jimmy Rodriguez. During the ensuing months between March and June of 1998, did you learn from her that her relationship with Jimmy Rodriguez had soured in some way?

A. Yes, sir, actually we had. And I'm also remembering specifically that on April 17 we actually met with Mr. Rodriguez in order to see if he had collected any money to pay us our portion of that money as being hired out to be the collection of

2724

that. But the contacts were made.

While we were at his apartment pursuing the fact of him owing us money, he actually called Miss Johnson on the phone and was very nervous about our presence there and how we tracked him down and how we found him. So their relationship was still

Page 156

ongoing at that time. But once toward the end of June, I believe their relationship went south.

Q. And did you learn why it went south?

A. Yes. I actually know that according to Miss Johnson she had provided Mr. Rodriguez $1,500 in cash to purchase 2 ounces of methamphetamine.

Q. So what went sour because of that?

A. She never received any of her product for the cash that she fronted to him.

Q. So you had mentioned that by the time we get to the end of June there's a June 30, 1998, meeting where she wants to hook up with you and Duane White with further instructions?

A. That's correct.

Q. And was that, in fact, recorded?

A. The call?

Q. The call.

A. Yes, sir, it was.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may. I'm sorry.

BY MR. WILLIAMS:

2725

Q. Agent Mittan, I've just handed you what's been marked as Government's Exhibit 1120A and the transcript 1120B. Do you see those?

A. Yes, sir, I do.

Q. And first of all, going with the tape, can you identify for the jury what is that tape, sir?

A. On the front of the tape there's a label. It's dated 6-30, 1998, phone call to A. Johnson, and it's a copy, and it's marked

Page 157

with the exhibit number from the government.

Q.    And have you reviewed that tape, sir?

A.    Yes, sir, I have.

Q.    And is that a fair and accurate recording of the conversation that was had with Angela Johnson on June 30 of 1998?

A.    Yes, sir, it is.

Q.    And Exhibit 1120B, what is that, sir?

A.    This is actually the transcript of the recording.  It indicates, for instance, that a digitally recorded phone call was made on June 30 at approximately 4:30 p.m., and then it is the written-out version of this recorder -- recording.

Q.    Have you had an opportunity to compare that transcript with the recording?

A.    Yes, I have.

Q.    And does it fairly and accurately reflect what was actually said during the recording?

2726

A.    Yes, it does.

Q.    And does it attempt to attribute identity to different speakers that occur during that recording?

A.    Yes, and, in fact, that is exactly who is talking on the recording.

          MR. WILLIAMS:  United States would move to admit Exhibit 1120A, Your Honor.

                         *   *   *   *

          (Government Exhibit 1120A was offered.)

                         *   *   *   *

          MR. STOWERS:  No objection.

          THE COURT:  1120A is received.
                    Page 158

* * * *

(Government Exhibit 1120A was admitted.)

* * * *

MR. WILLIAMS:  And the United States requests permission of the Court to play 1120A and to provide the jury with copies of the transcript marked 1120B for purposes of aiding them in listening to the recording.

THE COURT:  Any objection to the use of the transcript?

MR. STOWERS:  No.

THE COURT:  Okay.  You may.

MR. WILLIAMS:  With the Court's permission?

THE COURT:  You may.

2727

(Government Exhibit Number 1120A was played in open court.)

BY MR. WILLIAMS:

Q.    Agent Mittan, I want to ask you a couple questions about this transcript and some statements made in it, and directing your attention, first of all, to page 4 of this transcript, there is a conversation about halfway down, and the CI asks, How's your boy?  Who's that in reference to?

A.    Mr. Honken.

Q.    And at that point he was, in fact, at Florence, Colorado, United States Penitentiary?

A.    Yes, sir.

Q.    And then on the next page if you would about midway down the page, again, the CI makes a statement about "I'm with Pizza Boy again."  Who's Pizza Boy?

Page 159

A.    That's actually me.  It was kind of a nickname that he had named me while we were working together.

Q.    And then there's a reference at the very bottom of that to a roll of duct tape as big as yours.  Do you see that?

A.    Yes, sir.

Q.    What's that a reference to?

A.    That's the same roll of duct tape that I was describing earlier, the one that's about five to six inches in width, and we had kind of talked about that because technically while we were hired for her as being the collectors of money, that is

2728

what we portrayed ourselves to be throughout.  That's what we did.  Therefore, I was looking for a roll of duct tape that would help me facilitate that kind of an operation whether I needed to tie people up or use it to -- as an intimidation factor.

Q.    And this is a conversation you had with Angela Johnson where you talked about the fact you may want to use duct tape for that purpose.

A.    Correct.

Q.    So during this conversation on June 30, 1998, you're trying to set up a meeting to take place what?  The next day?

A.    Yes, sir.

Q.    And this is to be taking place in Clear Lake, Iowa.

A.    That is correct.

Q.    Now, when you first make the phone call on this afternoon, a child answers the phone.

A.    Correct.

Q.    On the prior occasions when you were doing drug deals and attempting to collect drug debts for Angela Johnson and she met

Page 160

with you here in Sioux City on March 24 and 25, did she have her children with you -- with her at that point?

A.    No, sir, I don't believe so.

Q.    So did you, in fact, meet on July 1, 1998, with Angela Johnson?

A.    Yes, sir, we did.

2729

Q.    Where did you meet at?

A.    We were actually in Clear Lake, Iowa, and if I remember correctly, the name of the hotel was the American Inn.

Q.    And who was present during this meeting?

A.    It was kind of set up the same way as what we set up for the meeting on the March 24 date.  We had actually got rooms at the hotel.  We had one room again set up to be audio recorder and a video recorder in it.  Actually I'm not sure about the audio recorder, but I know for sure there was a video recorder in it, and then their room next door had a team of surveillance officers that were there to monitor that recording, that camera that was placed in the meeting room.  And then there were other surveillance officers out in the parking lot in vehicles.

Q.    Again, in this case the camera is a hidden camera?

A.    Yes, sir.

Q.    And is it sitting on a table or something in that room?

A.    Yes, sir, it is.

Q.    Same clock radio-type thing?

A.    Yes, sir.

Q.    Did Angela Johnson show up at the meeting and come into that room with you?

A.    Yes, sir, she did.

Page 161

Q.   And did, in fact, the recording device work and record the meeting in a video recording?

A.   Yes, sir, it did.

2730

Q.   Agent Mittan, I've handed you now Exhibit 1121A and 1121B. Starting with 1121A, can you identify that for the jury, please?

A.   Yes, sir.  It's a video cassette tape, and there's a label on it marked 7-1-98 motel meet with Angela Johnson.  It has our DNE case number on it and indicated our exhibit is Exhibit 6-1, and then on the top of the tape it has Government Exhibit 1121A.

Q.   And have you had an opportunity to review that video recording?

A.   Yes, sir, I have.

Q.   And did it fairly and accurately record the meeting that took place on July 1, 1998, with Angela Johnson?

A.   Yes, sir, it did.

Q.   1121B is what, sir?

A.   1121B is actually -- as I indicated earlier, it's actually the transcript of this videotape.  It depicts who's talking, what they're saying, and the conversation basically in a written form from the videotape.

Q.   Have you compared that to the videotape?

A.   Yes, sir, I have.

Q.   And did it fairly and accurately record what was said during the meeting and who said it?

A.   Yes, sir.

        MR. WILLIAMS:  United States moves to admit Exhibit 1121A, Your Honor.

                        *   *   *   *

Page 162

(Government Exhibit 1121A was offered.)

                        *   *   *   *

MR. STOWERS:  No objection.

THE COURT:  1121A is received.

                        *   *   *   *

(Government Exhibit 1121A was admitted.)

                        *   *   *   *

MR. WILLIAMS:  And United States would seek permission from the Court to play 1121A and to provide the jury with a copy of the transcript for them to aid them in reviewing that videotape.

THE COURT:  Okay.  Why don't we pass out the transcript, and the jurors can keep both transcripts till after we're finished with this witness.  Then we'll collect them, because the defense may want to use them if they cross-examine.

(Government Exhibit Number 1121A was played in open court.)

BY MR. WILLIAMS:

Q.   Agent Mittan, I want to go back over a few things.  First of all, when the jury's looking at that video camera or looking at the shot inside that room, you're sitting to the left on the bed?

A.   That's correct.  The glass was kind of actually blocking me in most of that video, but yeah, that's me sitting on the bed.

Q.   And the person sitting nearest there smoking and dumping

ashes in that cup is actually the confidential informant Duane

White?

A.    That's correct.

Q.    Now, during this conversation, there's multiple references to a young girl that's probably under 18, an Alicia Medina?

A.    That's correct.

Q.    Can you explain to the jury, there's a conversation about confronting her and so forth.  What was that all about?

A.    We actually -- that was one of the individuals we had confronted trying to find Mr. Rodriguez during our previous meetings prior to this date and meet with Miss Johnson.

Q.    And at some point there's a comment about her being re-upped at the same time you were over there.  What does re-upped mean?

A.    Actually we were talking about another girl.

Q.    Okay.

A.    The woman as you read through the transcript by the name of Paula -- and I don't know if we've actually knew her last name at the time.  Her actual name is Paula McDonald.  She was the woman up in LeMars on the day of March 25 when we went to LeMars to collect money.  Mrs. McDonald was the woman who we went to collect money from.  When we went back to find Mr. Rodriguez I believe on the April date, Miss McDonald was sitting there in the hallway.  She was one we were explaining being re-upped. Re-upped actually means you come to the source who you get the

2733

drugs from, and you get more.  It's just a slang terminology.

Q.    All right.  So I was mixing up two different people there.

            If you could turn to page 7 of the transcript and the top of that page, there's a reference to this Alicia Medina, and what was the connection that you understood between Alicia

Page 164

Medina and Jimmy Rodriguez, the person that Angela Johnson wanted you to find?

A.    Alicia Medina was his ex-girlfriend.

Q.    And indicated here at the top of that page, she took a buddy with her and went down there and shook up Alicia Medina a tad bit and her momma.  Her mother would be who?

A.    You know, I don't know who that is specifically.

Q.    Okay.  And what did you understand she was talking about when she said she shook her up?

A.    I would say intimidated her in some fashion in order to try to find Mr. Rodriguez.

Q.    Going to the next page, page 8, if you look at the top of that page, now, there's an inconsistency because at one point she talks about $1,200.  The next page, on page 8, she talks about $1,500 cash there.  Do you see that?

A.    Yes, and actually that kind of refreshed my memory.  I indicated I think initially in my testimony that she had provided him with $1,500 when, in fact, as we were going through this, I remember her telling us she had actually provided him $1,200 for the 2 ounces of methamphetamine, and the 1,500 that

2734

she wanted was like an interest-bearing account.

If she's providing money and she's not getting her product, you would -- if you did get the product, you'd be able to turn that product around and make more money, and I think that's exactly what she's talking about there is if he's not going to get her -- since she didn't get what she needed with the 1,200 that it was going to cost him 1,500 now or the 2 ounces of meth or rock as it classifies there.  Rock is a slang

Page 165

term for methamphetamine.

Q. You anticipated my next question.

A. I'm sorry.

Q. No, that's great. That's where I was going to go. Now, at some point during this meeting, did she have a piece of paper she provided you?

A. Yes, sir. Actually I believe there was several pages, but it was pieces of paper with her handwritten notes explaining what she wanted us to do.

Q. Agent Mittan, I've handed you what's been marked as Government's Exhibit 83. Can you identify that for the jury, please?

A. Yes, sir. This is actually the notes that Miss Johnson had initially given to Mr. White, the informant. In turn Mr. White ultimately gave those to me. I in turn gave those to the case agent Lori Lewis, and this is the exact -- the same notes.

MR. WILLIAMS: United States moves to admit Exhibit

2735

83.

* * * *

(Government Exhibit 83 was offered.)

* * * *

MR. STOWERS: No objection.

THE COURT: 83 is received.

* * * *

(Government Exhibit 83 was admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Page 166

Q. On the screen in front of you and also you have the original there, Exhibit 83, could you walk the jury through what is it that this provided you as far as information and instructions from Angela Johnson?

A. Basically as you can see, I mean, it is literally a list of instructions. Locate Jimmy Rodriguez. It shows us where his ex-girlfriend lives, who she lives with, that her brother lives there and he works and the best time -- when the best time would be to find her. And then if we find her, she could show us where Patty Rodriguez was staying and that Patty will ultimately know where Jimmy lives.

And then she kind of talks about how Jimmy fucked her out of -- pardon my language, but that's what it says -- $600

2736

twice. He owes me 2 ounces of rock or $1,500 cash, interest for all my long-distance phone calls, wasted trips, and pissing me off. If he cannot produce this, bring him to me or call me to go where you are. Do not let him out of your sight or he will give you the slip.

Basically then says do whatever it takes. For your info or call your own -- I'm sorry. For info your call on how to deal with that. Just don't manhandle or disrespect my friend Patty. And then on the back of one of the pages --

Q. I don't think it shows up there. Hang on a second.

A. Okay.

Q. Is that on the screen there, the back of the page?

A. Yes, sir. And then it says, in fact, take her to a phone if need be. Do not -- and then she indicates, Do not scare this girl. She's my friend. It's not her fault, but she is the link

Page 167

to her brother. Then it indicates where she works at, what shift she works, and the address where that is and that her little sister also, that Letty or Leticia also works the same shift. And this is a note that Miss Johnson provided to us on how to find Mr. Rodriguez.

Q. Fair amount of detail and planning on who was where and who lived where and who worked when and so forth.

A. Exactly.

Q. Now, during the -- at the very end of this tape recording, you and the other participants there, there's a conversation

2737

about going to get some cocktails.

A. Correct.

Q. What happened after that videotape that the jury has just witnessed?

A. After we had the meeting in the hotel room, we then, in fact, went to -- it's called North Beach. It's the bar and restaurant where Miss Johnson was employed at the time.

Q. And who all went to the North Beach restaurant?

A. It was myself, Mr. White, the CI, and Miss Johnson, and we rode in her vehicle.

Q. What happened once you got there?

A. When we got to the restaurant or bar, whatever it is, it's actually a pretty nice place. There's actually a large deck that kind of sits over the top of the water of the lake. We sat out there. She actually bought us some drinks. I don't believe the CI actually drank alcohol, and I don't remember what I was drinking. But the conversation there, we basically took our -- it somewhat changed a little bit. It was kind of more of a get-to-know-you session than the instructions that she provided

Page 168

on how to find Mr. Rodriguez. It was kind of a --

Q. Kind of a free-flowing conversation?

A. Yeah, exactly. I mean, we discussed anything from -- the things I remember specifically is we talked about Miss Johnson's sister's wedding. We talked about how Clear Lake had a problem with the sewage treatment center. We talked about her

2738

relationship with her boss. That was the conversation unrelated and not real specific to anything. But then we did have some conversations there that were specific in her involvement in the drug trafficking and her involvement with Mr. Honken and some other things.

Q. And just on a side, she had a conversation about the relationship she had with her boss there at the waterfront --

A. Yeah, at North Beach. That's what I recall.

Q. And what was the name of this individual if you recall?

A. The name of the individual I have here is George. Last name is B-a-r-l-a-s. Barlas is how I'd pronounce it. And there's actually part of Government's Exhibit 83 -- I believe during part of that meeting at the bar, she actually provided us with a business card, and it's also in Exhibit Number 83 here. And on the back of it is her home phone number I believe and then her cell number, Miss Johnson's.

Q. So during this kind of free-flowing conversation you had with her -- and just give the jury an idea how long were you at this restaurant/bar having a conversation with her roughly?

A. Without actually looking at my notes, I'd say we were there 45 minutes to an hour I would say. Like I said, I don't have my specific notes here, but that's what I recall.

Page 169

Some of the things that were related to the drug conversations that I recall, one of the things that kind of caught my attention was the fact that she was talking about her

2739

daughter, and I think it was her older daughter that was school age, and she indicated that when the other school kids would talk about what their parents do for a living, her daughter didn't know what to say about how to tell them that her mom and dad were dope dealers and that actually I also recall specifically that her daughter liked it when she smoked marijuana because she was easier to deal with. So that goes to show me that even a young elementary school age girl knew what was going on somewhat.

Q.   Did she have any conversations with you talking about Dustin Honken's continued involvement even though he's in prison with any drug activity she was involved with?

A.   She indicated that she actually either had or was attempting to smuggle methamphetamine into the correctional -- the federal correctional facility where he was at in Colorado. She indicated if I remember correctly that she could get a sizable amount of cash or he could get a sizable amount of cash if he indeed could get methamphetamine into the correctional facility.

Q.   It would sell for a lot more inside the prison than it would on the street.

A.   Yes, sir, that's correct.

Q.   Did she make any statements concerning a desire to be a hit woman?

A.   As a matter of fact, she did. We were talking about

Page 170

Mr. Honken. In Colorado, in Florence, it's actually defined as the federal facility, kind of a super max facility. And there were other inmates that were there with Mr. Honken. Some of those inmates were individuals involved with John Gotti. Mr. Gotti was in control of the New York mafia and mob back in the -- I believe it was the early '90s if I remember correctly. Some of those people that worked for Mr. Gotti were actually in prison with Mr. Honken. Miss Johnson indicated that Mr. Honken had made contacts with those people and was offering her to be hired as a hit woman for them. And when she talked about that, she was very animated about wanting to do that.

Q. When you say animated, what do you mean by that?

A. I mean, I don't know how to describe it other than her eyes kind of lit up when she talked about doing it. I mean, it's not obviously your normal nine-to-five job, nor would it be -- you know, it just caught me -- it just really stuck in my mind that obviously I knew what had happened in the past, and when she started talking about being a hit woman, it just really -- it really set in deep.

Q. After this meeting on July 1 when you get these instructions, these detailed instructions from Angela Johnson, to go find and bring her Jimmy Rodriguez, what happens then after that in your continuing involvement with Angela Johnson?

A. We actually had made several attempts to find Mr. Rodriguez. We went to his last known locations. We

attempted to find his sister Patty or his other sister Leticia,

Page 171

and we were never able to find him after our contact here in July. But I want to say there were probably, oh, half a dozen to ten phone calls back and forth between the CI and Miss Johnson about our involvement in trying to find him.

Q. At some point in the late summer or early fall of 1998, did Duane White get himself in some trouble again?

A. Actually he did, yeah. I believe it was in October. I haven't looked at his criminal history recently, but I believe he was arrested again in October.

Q. Drug-related charges?

A. Yes, sir, they were.

Q. Now, what happens when you have a person who's supposed to be cooperating with law enforcement that gets arrested on drug charges? What happens with their involvement at that point?

A. Well, we usually tend not to use them anymore because it's really hard to -- I mean, it's hard enough making sure they're being as credible as they can be. I mean, you can't babysit these people 24 hours a day. I'm sure not going to have them move in with me. So they're really kind of hard to maintain depending on each -- obviously it depends upon each person. But once you know that there's an overt act that they're dealing dope and trying to work both sides of the fence, work for us, deal dope on his own, we made a decision we were not going to use him anymore.

2742

Q. He was your link to Angela Johnson, wasn't he?

A. That's correct, yes.

Q. Did that have adverse effects in your ability to maintain contact with Angela Johnson?

A. Yes, sir, it did, because I felt that she, because of

Page 172

Mr. White's involvement with Mr. Honken, trusted Mr. White more than she would specifically trust me.

Q.   Directing your attention to October 6 of 1998, did you have one final recorded conversation with Angela Johnson?

A.   Yes, sir, we did.  Actually I had made a phone call to her indicating that I had to go up to the Twin Cities to take care of some business and that I would be coming through the area and had made arrangements to actually meet with her so we could discuss what we were going to do next.  We went -- or myself -- I met with other agents and other officers from the Mason City area and I believe also from DEA at that time.  There were some agents there.  We had made an arrangement where we were going to attempt another meeting in a hotel room.

I made a call to Mrs. Johnson or Miss Johnson, and she indicated that she couldn't get away because she was actually babysitting her youngest child.  And during that phone call we discussed the fact that -- and I'm going to try to make this a short version but basically Mr. Honken had been in contact with another individual.  His first name is Luis, and I can't remember his last name.  But Luis was actually in prison with

2743

Mr. Honken.  Mr. Honken and Luis were talking, and Luis indicated to Mr. Honken that he thought Mr. White had made some kind of a deal with the government, and, therefore, that actually made Miss Johnson a little nervous because they're thinking now he may be an informant.

Q.   And that came out during the conversation you had with her that was recorded on October 6 of 1998?

A.   Yes, sir.

Page 173

Q. She questioned you about whether, in fact, Duane White was cooperating with law enforcement?

A. That's correct.

Q. What was your response?

A. My response was still acting in my undercover role that he was indeed not cooperating, that I was with him all the time and that, in fact, if he was cooperating it would be news to me and I just couldn't see him doing that.

Q. In an attempt to kind of put her off her suspicion, did you question her about whether she was cooperating?

A. As a matter of fact, I did, yes, because I actually asked her, you know, if your old man's in jail, why aren't you in jail basically was my bottom line. And if I remember correctly, her response was "Because I can keep my mouth shut." And a little bit later in that conversation, she indicates to me that if -- something to the fact she told him what to do, he didn't listen, so he's gotta basically fend for himself.

2744

Q. The Angela Johnson that attempted to hire you to bring Jimmy Rodriguez to her, is she in the courtroom here today, sir?

A. Yes, sir, she is.

Q. Can you identify her, where she's sitting and what she's wearing for the jury, please?

A. Yes. Her counselor's actually kind of in the way, but she's sitting right next to Mr. Stowers, long kind of light brown hair wearing a white sweater and a skirt, glasses.

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Members of the jury, why don't you take a stretch break, and then we'll do the cross-examination. Then we'll take our afternoon break.
                    Page 174

Please be seated.

CROSS-EXAMINATION

BY MR. STOWERS:

Q. Hi, Agent Mittan. Let me just go backwards I think to the beginning of your testimony where you were talking about Mr. Duane White. Now, do you know the date or the approximate date when he first had some contact with law enforcement in early 1998?

A. Without looking at a report, sir, I would believe -- I believe he actually contacted an FBI agent in relation to another case, and because of his involvement with Mr. Honken and where he was with Woodbury County, I don't have a specific date. I know it was prior to the March 22 date when he contacted law

2745

enforcement after Miss Johnson contacted him.

Q. Approximately how much before March the 22nd would that have been? Just approximately.

A. I would say sometime in February or January. It wasn't like a year prior. I would say, you know, a couple months.

Q. Now, when Mr. White contacts law enforcement in January or February of 1998, was he still in custody, or was he out of custody at that point?

A. He was out of custody at that point.

Q. Had he gotten out just before that?

A. Yes, sir, he had.

Q. So he contacted law enforcement shortly after his release from custody?

A. Correct.

Q. And he'd been serving time at the Woodbury County Jail?

Page 175

A.    I don't know if he was actually serving time, but I know he was in the Woodbury County Jail correctional facility.

Q.    Can you give the jury an idea of Mr. White's criminal history?

A.    It's been a long time since I looked at it, Mr. Stowers, but I know it is somewhat lengthy.  I know he has done time before in a state facility.  I don't recall specifically what it was, but I know that he has had prior contact with law enforcement on the other end of things.

Q.    And he's served prison time.

2746

A.    Yes, sir, he has.

Q.    On felony charges.

A.    I believe so, yes, sir.

Q.    And about how old would he have been in 1998 approximately?

A.    You know, he looks a little bit older than what he is I think, but I would guess him to be mid to late 30s.

Q.    Have you brought your files with you to the courthouse?

A.    I brought some of them with me, yes, sir.  Actually I did not sign him up as an informant.  Therefore, I never really took his date of birth or really specifically looked at his criminal history.  That was actually done by the case agent, Lori Lewis.

Q.    Are your files with you here in the courtroom such that somebody could provide them to you so you could refer to them in trying to answer some of these questions that I'm going ask for you or of you?

A.    No, they're not actually.  We don't have any of his CI files.  I do have some notes.  They are not in the courtroom here.  They are in the courthouse.  But I think if you bear with me I'll do the best I can.  If I need something, I'll ask.

Page 176

Q.    Okay.  Well, I don't want you to guess; okay?

A.    That's fine.

Q.    And if it would help you to refer to those things, perhaps at an appropriate time we'll take a break, and then you can get your file.

But in any event, Mr. White was a convicted felon.

2747

He'd been in the Woodbury County Jail.  Do you know how long he'd been there?

A.    No, sir, I do not.

Q.    And he had apparently met Mr. Dustin Honken in the Woodbury County Jail; is that right?

A.    That's correct.

Q.    According to the information you now know.  And he had been apparently told by Mr. Honken that he should get ahold of Angela Johnson after he got out of the Woodbury County Jail.

A.    That's correct.

Q.    Okay.  And this time period that we're talking about is 1998.

A.    That's the best of my recollection because to my understanding Mr. Honken was sentenced on February 25.  So I know it was up until that time at least that Mr. White had been in Woodbury County with him.

Q.    Okay.  Well, actually Mr. Honken was sentenced twice, but we don't need to go there.  That could get a little confusing.  He was sentenced in December of '97, and then he was I believe resentenced in February '98 according to earlier testimony that the jury heard.

A.    Okay.  I wasn't aware of that specific dates, but I know

Page 177

for sure I believe he was sentenced February 25.

Q. So in any event, you believe that Mr. White would have been in the Woodbury County Jail until Mr. Honken was finally

2748

sentenced in late February of '98.

A. That's my understanding, yes, sir.

Q. Okay. So your contact actually would have been with him within a matter of weeks of his release from the Woodbury County Jail.

A. If, in fact -- without looking at the date, if, in fact, he had still been serving time with Mr. Honken with him being sentenced, then yes, I would agree with that statement.

Q. Okay. Now, did Duane White indicate to you whether or not he had had any contact with Angela Johnson at any time prior to the time when he had met Mr. Honken in the Woodbury County Jail?

A. I don't believe so.

Q. So he didn't know Angela Johnson, Mr. White.

A. No, sir. To my understanding their first meeting was on the March 24 date at the Holiday Inn where we had actually set up the meeting.

Q. So would it also be correct to say that the only contacts that Mr. White had with Angela Johnson would have been contacts that he had after he got out of the Woodbury County Jail when he was working with law enforcement in a cooperating person capacity?

A. That's to the best of my knowledge, yes, sir.

Q. And all of his conversations would have been with her in a monitored situation; is that correct?

A. I would hope all of them would have been. Like I said, I

Page 178

wasn't with him 24 hours a day, but if he had -- if he contacted her or if she contacted him, he usually advised one law enforcement or another of those contacts.

Q.    Well, how many different times from this March -- I think it was the 22nd of 1998 first contact; right?

A.    That's to my understanding, yes.

Q.    First contact is March 22 of '98.  And that's a call by Mr. White to Ms. Johnson.

A.    No.

Q.    Call by law enforcement to Ms. Johnson?

A.    No.  Miss Johnson I believe called Mr. White.

Q.    How did she get Mr. White's number?

A.    I have no idea.

Q.    Didn't Mr. White call her first and ask her to call him back?

A.    I don't believe so.  If I remember correctly, she had actually contacted him.

Q.    Wasn't Mr. White given Ms. Johnson's phone number to call her by Mr. Honken after he was released?

A.    That very well could have been.  My involvement specifically was -- started on March 24.

Q.    Okay.  So you're not really familiar with the particular circumstances of the March 22 initial contact firsthand.

A.    Right, not firsthand.  I'm actually reading it from one of the investigator's reports.

2750

Q.    All right.  But in any event, after that, a series of phone

Page 179

calls are placed by Mr. White to Ms. Johnson.

A. Correct.

Q. And do you know how many times it would be that he would have called her over the course of your working with Mr. White?

A. From the March date till the October date?

Q. Right. Approximately.

A. That's kind of hard. I don't want to guess necessarily because on some dates when we'd actually be working with her, I mean, there may be a time frame where we call her ten times that day. I would say less than 50 if -- that's a fair and accurate for you, Mr. Stowers, if that'd be all right.

Q. That's fine. How many times did she call you personally?

A. Call me personally?

Q. Right.

A. I don't believe she ever contacted me personally.

Q. Right. All the contacts that we're talking about here would have been from law enforcement and Mr. White to Ms. Johnson; isn't that true?

A. No. I believe there was occasion that she'd actually contacted Mr. White directly or she would page him. That's how Mr. White usually was contacted was through pager.

Q. He would sometimes attempt to reach her and not be able to get ahold of her. You're aware of that?

A. Yes, sir.

2751

Q. And he'd leave word for her to call him or leave a pager number for her to return contact to him?

A. That's correct.

Q. And so she would then in response to his contacts have called him back sometimes.

Page 180

A. That's correct. And I believe on occasion for sure that like a week prior to the June 30 phone call that the jury had an opportunity to listen to she had actually contacted Mr. White's sister somehow and left word with her that she was looking to contact Mr. White.

Q. Now, when you go through these tapes -- have you listened to all the tapes of conversations that were had between Mr. White and Ms. Johnson recently?

A. I haven't listened to them recently, but I have had the opportunity to look at most of them because most of all the contacts that were at least recorded, there was a transcript made of those. And I've had an opportunity to at least kind of review or give an overlook to those conversations.

Q. You're aware that there was actually a time when you and Mr. White had actually lost -- somehow lost contact with Ms. Johnson, didn't have a way to reach her.

A. That's correct.

Q. Can you explain that to the jury?

A. I believe that Mr. White actually lost the number that he had for her. She had actually switched phone numbers.

2752

Q. And she didn't leave a number for Mr. White to get ahold of her at; isn't that correct?

A. I think that's correct.

Q. When was that?

A. It would have been prior to the -- like the week before -- it would have been between basically April and like the second week of June. My guess is it was probably somewhere around in there.

Page 181

Q. And it was only a result of your and Mr. White's efforts to get ahold of Ms. Johnson that she was -- contact was established; isn't that correct?

A. I don't believe so, because if she changed phone numbers like I think she did or like I remember she did and then she actually made the contact through Mr. White's sister that she actually reached out for us to contact her.

Q. Don't you remember a call with Ms. Johnson in which -- I believe it was either you or Mr. White had remarked, We didn't know where you were; we lost contact with you; we don't have your number?

A. Yes, I remember that.

Q. Okay. And you as a law enforcement officer in this kind of an undercover role would need to do what you called in your testimony role play; is that correct?

A. That's correct.

Q. And role playing would be in this kind of a situation

2753

forming a particular character part, if you will, in an undercover capacity.

A. That's correct.

Q. And a character that you were trying to portray was exactly what character? Can you kind of describe that for the jury?

A. I would characterize it as an enforcer type of an individual. We were to collect debts, collect money. I think I indicated earlier if somebody owed money for some dope-related thing or any other criminal-related thing, that we would actually be the enforcers to go take care of the problem.

Q. And was that a role that you had kind of invented for yourself?

Page 182

A.   Actually, yeah, because it actually fit the scenario for what Mr. Honken talked with Mr. White about doing in doing the drug collections for Miss Johnson and the organization.

Q.   And this role, can you kind of describe if you would for the jury the character part or what kind of traits you were trying to create as you role played?

A.   In the lack of a better word, kind of the traits that we were tough guys or, you know, bad asses and we took care of business the way we needed to.

Q.   And so when you were -- and Mr. White -- of course, Mr. White, this was kind of a natural role for him, wasn't it?

A.   Yes, sir, it was.

Q.   You knew from his background that he didn't have to role

2754

play to fulfill this role for him; is that right?

A.   Not too much.

Q.   He just had to pretty much be himself.

A.   Somewhat, yes, sir.

Q.   Okay.  And you, of course, not being an enforcer other than enforcer of the law hopefully, you didn't really have to -- you did have to do a little role playing; is that right?

A.   That's correct.

Q.   All right.  Now -- so when you're doing this part, you'd have to, I assume, use certain manners of speaking including foul language; is that right?

A.   That's correct.

Q.   And we heard some of that on the tape.

A.   Yes, sir, you did.

Q.   And a lot of that was engaged in by Duane White and not

Page 183

particularly by you. In fact, you did very little of the talking at times; is that correct?

A. That's correct.

Q. In fact, on all these phone calls, you really aren't one of the main conversants.

A. Except for towards the October 6 date, yeah, that's correct.

Q. And when you're talking with Ms. Johnson and Mr. White, I assume that you and Mr. White before you would have these conversations would kind of go over a script, if you will, or

2755

sort of an outline about what you wanted to accomplish with that particular meeting.

A. It necessarily wouldn't be me specifically. He actually was contacting one of our other agents here in Sioux City because I live in Council Bluffs. But yes, usually before we'd make a call, just to make things easier and kind of figure out what we're going to do with the investigation, okay, if she says this, you say this; if she says this, you say this.

Q. And this kind of tough talk is something that people who are involved in drug-related relationships need to kind of engage in to be kind of part of that group; is that right?

A. That's correct.

Q. And they need to kind of talk tough, act tough, you know, that kind of stuff.

A. The video you tape -- the videotape that the jury saw is pretty much real for the drug world.

Q. And what you also know I assume from your experience is that people who are under the influence of drugs or who are users of drugs can a lot of times kind of have exaggerated ways

Page 184

of behaving; is that true?

A.   That's also correct.

Q.   And one of the ways they can kind of exaggerate, they can be real loud.  They can be real mumbly in their speech; is that right?

A.   It depends upon the person, but yes, sir.  And no two

2756

people are ever going to act the same either on drugs or off drugs.  So, I mean, if the person's animated while they're off, they become a little more animated if they're using.

Q.   And you'd kind of need to know the person in a pretty good way to be able to judge what kind of person they are when they're not on drugs versus how they are when they're on drugs; is that correct?

A.   You try to obviously, but in not every instance is that going to happen.

Q.   Now, there's a lot of tough talk coming from Duane White on this videotape; would you agree with that?

A.   Yes, sir.

Q.   Going to go do this, going to go do that; right?

A.   That's correct.

Q.   And there's also some descriptions about things that you and he in the videotape are claiming to have done, and I think that may also be described in the audio tape that was played for the jury.

A.   That's correct.

Q.   In terms of collection work.

A.   That's correct.

Q.   Did you actually do the things that you and he were

Page 185

describing on the tape?  That is, did you go to people's houses?

A.    We did go to the people's houses from the list that Miss Johnson had provided to us.  Other than that, no.  I mean, we

2757

did not -- other -- we only went to places where she told us to go.

Q.    Did you go to people's houses, knock on the door, confront people, and play roles with the people that you were confronting as if you were actually trying to collect something or accomplish something, to find somebody, whatever it was?

A.    Yes, sir.

Q.    Okay.  So those representations that you make about what you and Mr. White had done are actually truthful.

A.    Yes, sir.  I was kind of misunderstanding you earlier.  I thought you meant when we talked about everything, like other things that we did.  But no, when we -- when we talked about collecting money or knocking on the person's door or going in and confronting them about the money they owed Mr. Rodriguez from the directions we got from Miss Johnson, those indeed took place.

Q.    Now, I wanted to go back also to make sure I understood some of your other testimony because I think I maybe misheard you, and I want to make sure that the jury understands what you're saying about who it is that you at least initially were trying to collect money for.  Who were you trying at least initially to -- trying to collect money for?

A.    We were initially trying to collect money for I believe Mr. Rodriguez who had contacted -- to my understanding, Mr. Rodriguez was Miss Johnson's source.  That had been arranged

Page 186

through Mr. Honken while he was in jail with Mr. Rodriguez. I think personally that this was a test for us to figure out whether or not we could get something done for Mr. Rodriguez and then if there's anything that Miss Johnson or Mr. Honken wanted done, that they could then rely on us.

Q. All right. So Mr. Rodriguez from what you understood was a source of methamphetamine for Ms. Johnson, and he was owed some money by people that you were asked to contact.

A. Correct. I believe Miss Johnson got her information from Mr. Rodriguez, and we were actually collecting for him on behalf of her.

Q. Well, you're collecting for him at her request.

A. Yes, I'm sorry, correct.

Q. Okay. And how much money did you collect from Mr. Rodriguez, from these people that you contacted?

A. We did not collect any money.

Q. How much money is it that you believe you were attempting to collect from Mr. Rodriguez?

A. I don't recall the specific amounts from the individuals here in Sioux City, but to my recollection, the woman up in LeMars that owed the money, it was I believe $9,000.

Q. So the woman in LeMars owed 9,000, and that would be the big amount; is that right?

A. That's correct.

Q. And then there was some smaller amounts.

2759

A. That's correct. But it would have to be in the -- from

Page 187

reviewing some of the tapes without -- or from reviewing some of the reports, it would have to be, I would say, within the thousand-dollar ranges because some of the people were picking up quarter pounds of methamphetamine from Mr. Rodriguez. And based upon my training in the drug culture, that would be up in the thousand-dollar range if -- it's kind of common that some drug dealers front their drugs out and then expect payment at a later date. And I think that's what was happening in this case.

Q. Okay. But in any event, your collection efforts were pretty darned unsuccessful because you got zippo.

A. Correct. In one of the instances, though, at Miss McDonald's residence up in LeMars, we were trying to make a decision whether or not to take firearms from her residence. But after thinking about it during our role playing, I did not want to turn those firearms over to Miss Johnson, so we'd technically have to keep those as evidence, so, therefore, I didn't collect anything as collateral.

Q. Okay. So you collected no money for Mr. Rodriguez. Did you ever meet Mr. Rodriguez?

A. Yes.

Q. Okay. Did you ever arrest Mr. Rodriguez out of this investigation?

A. I did not out of this investigation, but I know ultimately he was arrested on another related investigation for

2760

methamphetamine trafficking here in the Sioux City area.

Q. On a different case.

A. I believe so, yes, sir.

Q. I guess on that point was anybody arrested as a result of your work with Mr. White from this March of '98 time period

Page 188

onward to October or so?

A.    In relation to the drug crime specifically?

Q.    Yeah.

A.    No, sir.

Q.    Did you ever go back to this McDonald's house, execute a search warrant there, and seize the firearms that she had?

A.    No, I did not.

Q.    And you made reference to some comment that you believe Angela Johnson made to -- I think it was Mr. White about an Uzi or something?

A.    Yes, sir.

Q.    Okay.  Were you present during that conversation?

A.    No, sir, I was not.

Q.    Was that by phone or in person?

A.    It was in person on the meeting of the morning of March 25 between Mr. White and Miss Johnson.

Q.    And was Mr. White wired up at that time?

A.    I believe there was an audio recorder.

Q.    Was it working?

A.    I believe so.  I'm not -- I haven't listened to that tape

2761

specifically.

Q.    And -- on March 25, 1998?  Is that the date?

A.    Yes, sir.

Q.    And as I understand it, you're claiming that there was a conversation that you believe Mr. White had according to apparently what he's told you about an Uzi firearm; is that right?

A.    That's correct.

Page 189

Q.   Without a clip.

A.   A magazine, yes, sir.

Q.   And did you ever see that gun?

A.   No, sir, I did not.

Q.   Did you ever attempt to locate that gun by searching for it in any locations?

A.   No, there were no search warrants made.

Q.   You do have the ability through your position in law enforcement at an appropriate time during an investigation to go to a judge like Judge Bennett here or any judge in state court and obtain -- through providing a sworn affidavit obtain a search warrant to search people's vehicles, their homes, their persons, their hotel rooms; is that correct?

A.   That's correct.  But as you indicated, you said the appropriate time.  At the time that we're conducting the undercover and working the undercover angle, you don't really want to take the overt step of executing a search warrant

2762

necessarily if -- because most of the time the information to get that search warrant would have been done through the undercover contacts.  You would then technically -- you might as well stop your undercover operation.

Q.   Right.  But you didn't do that in October either.  You didn't go looking for this supposed Uzi.

A.   No, sir.

Q.   And how much methamphetamine did you and Mr. White succeed in purchasing from Angela Johnson during this seven months, six months of investigation of her?

A.   We did not purchase any.  On one of the meeting occasions she asked us if we wanted some, but we both declined.

Page 190

Q. To use.

A. To use, correct.

Q. She was going to share some with you.

A. That's correct.

Q. And you knew from your contact with her that she was, in fact, a methamphetamine user.

A. That's correct.

Q. And did you see signs in her behaviors of any methamphetamine usage?

A. Yes, sir, I would -- I did.

Q. Okay. Can you describe what you noticed?

A. I would say her mood swings would probably be part of methamphetamine addiction or use of, and I would also say that

2763

her extreme paranoia and untrustworthiness would also probably come from methamphetamine use.

Q. Sometimes you can be paranoid and right, and sometimes you can be paranoid and wrong; isn't that true?

A. That's correct.

Q. You felt you were playing a very good role and that she should not have had any reason to be paranoid about you.

A. That's what we were -- that's the angle we were going for, yes, sir.

Q. And the same with Mr. White. You felt there was no reason that she should have been paranoid or suspect of him.

A. That's correct.

Q. But based on her consumption of methamphetamine, it was your judgment that she was unduly paranoid of at least the two of you and perhaps others.

Page 191

A.   At the initial standpoint, I believe she was, and then I think -- I think she trusted us more.  The farther in the investigation obviously that went, the more trust was gained up until the time of the October 6 phone call I had with her where she had thought that Mr. White had actually been given a deal for cooperation.

Q.   Now, you made reference to a blue -- what was it?  A Pontiac -- what was it?  A blue Neon, or what was the vehicle?

A.   It was a blue Ford Probe.

Q.   Okay.  And that vehicle was discussed on the videotape.  Do

2764

you remember that?

A.   Yes, sir, I do.

Q.   And it was identified as being whose vehicle?

A.   I believe it was identified as being Patricia Rodriguez's vehicle.

Q.   And you know that Angela Johnson had her own vehicle, don't you?

A.   Yes, sir.

Q.   She had a black Pontiac Firebird.

A.   That's correct.

Q.   You're also aware that -- oh, by the way, Patricia Rodriguez is related to Jimmy Rodriguez in what way?

A.   Brother and sister.

Q.   Was she involved in the drug trade with her brother according to your investigation in some way?

A.   In some way I believe she was.  In fact, it would lead me to believe that specifically from Miss Johnson's conversation that we had about the fact that she actually did a Western Union to Patricia Rodriguez.  That's who the money was actually sent

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2419 of 3592

to when, in fact, it was going to Jimmy Rodriguez.

Q.    Now, you're aware that duct tape frequently is used in the packaging of controlled substances including methamphetamine; isn't that right?

A.    Yes, sir, it is.

Q.    And can you describe how it is that duct tape is used in

2765

the packaging, for example, of methamphetamine or marijuana?

A.    Usually -- it obviously depends on each person.  But duct tape is used to wrap the package, and they're usually pound packages or larger where they'll put plastic wrap around it, wrap it up with duct tape, and that's how the package will be held until it's opened up and either weighed out and distributed or used or whatever the next step's going to be.

Q.    And the duct tape in the case of wrapping up a controlled substance will, I take it, serve the purpose of concealing the contents; is that correct?

A.    It will conceal the contents, and some people believe that it will actually try to mask or hide the odor from a dog if you get it air tight.  It doesn't work, but the perception or the persona's out there.

Q.    It also can kind of compress the stuff down so that it's a smaller package than if it were uncompressed.

A.    Correct.

Q.    And then you can conceal it easier, for example, for shipping.

A.    If you wanted to do that, yes, sir.  We also find the same stuff with contact paper.  We find the same stuff with shrink wrap.

Page 193

Q.   Yeah.  Sometimes they use the Seal a Meals, and they suck all the air out of it in the plastic bags and get it all down as small as possible for shipment; is that right?

2766

A.   That's correct.

Q.   There's all sorts of different techniques, but duct tape is one of the commonly used methods for wrapping controlled substances that are also wrapped underneath the duct tape in plastic; is that correct?

A.   Yeah, I'd say it's common.

Q.   Now, what do you know currently about Mr. Duane White?  Do you know where he is now?

A.   Yes, sir, I do.

Q.   Is he in or out of jail?

A.   He's in jail.

Q.   And is he serving a prison term?

A.   Yes, he is.

Q.   And what's that for?

A.   I'm not exactly sure what it's for.  I know during this investigation he was arrested in possession of controlled substance.  I don't know if that's what he's actually serving the time for or if it's for another unrelated matter.

Q.   Do you know what the substance was?

A.   Methamphetamine.

Q.   So during the time period that Mr. White was role playing with you, he was apparently actually role playing in another way as well which is he was two-timing you; is that right?

A.   Yes, sir.

Q.   And he was actually continuing to be involved on his own

Page 194

independently of his relationship with you in an undercover capacity or as an informant. He was continuing to deal drugs.

A. He could have been. Actually when we approached him about the methamphetamine that was found in the vehicle that he was in -- I don't believe it was his vehicle -- he indicated that it wasn't -- that the drugs weren't his, but obviously at some point in time he either took a plea or took it to a jury trial and they found him guilty or he pled guilty to the possession of that.

Q. And based on the circumstances of his arrest and his prosecution, you determined that Mr. White would no longer be a reliable informant witness.

A. Correct. And just to kind of clarify one of your -- just your earlier question, I did not specifically know Mr. White was dealing drugs on the side or two-timing us. If I'd have known that, obviously we would have cut him off a lot sooner than the date of his arrest.

Q. Because that would impact on his reliability; right?

A. Correct.

Q. His trustworthiness.

A. That's correct.

Q. And you wouldn't want to be involved working with somebody who was at the same time committing crimes of their own.

A. Correct.

Q. Now, what investigation did you do of the situation where

2768

you had been told that some crime family supposedly according to

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2422 of 3592

Mr. Honken wanted to supposedly hire Ms. Johnson to be a hit woman?

A.    That was from her own testimony or from her own conversation with me.  I know obviously that in regard to this whole investigation as a whole, I know that law enforcement officers, in fact, did go to Colorado and interview other inmates that were either cellmates or in close proximity or had conversations with Mr. Honken.  I don't know specifically if that information was ever asked of those inmates, but I do know that there was at least some follow-up done in relation to the investigation.

Q.    Well, are you aware that every single letter that Mr. Honken has written from prison in Colorado and every single phone call that he has made from prison and every single visit that he's had while he's been in prison except those with his attorneys have been monitored?

A.    Yes, sir, I'm aware of that.

Q.    And that they've been recorded?

A.    Yes, sir, I'm also aware of that.

Q.    Are you aware of any recordings wherein Mr. Honken would have been telling Miss Johnson, Hey, these guys want to hire you to be a hit woman?

A.    I'm not familiar with any.

Q.    Are you aware of any correspondence from Mr. Honken,

2769

written documents, where he would have expressed to her a desire to hire her or have her hired as a hit woman?

A.    No, I'm not familiar with any.

Q.    So this appears to simply be some kind of a fanciful role playing on her part perhaps?  Would you agree?

Page 196

A.   I don't know.  She told me, and that's what I went off of.

MR. STOWERS:  One moment, Your Honor.

Q.   Are you aware of how many different actual federal prison facilities there are in Florence, Colorado?

A.   No, sir.  I was only aware of one.  I thought it was the super max that was in Florence.  If there's another, there very well could be.

Q.   Well, I guess did you even go so far as to figure out that Mr. Gotti at this time when he was still alive was actually in a different federal prison in Florence, Colorado, than was Dustin Honken?

A.   Actually I believe my testimony indicated that they were associates of Mr. Gotti, not Mr. Gotti specifically.  Therefore, I'm not sure where Mr. Gotti was.

Q.   Did you get any names of who these people allegedly were?

A.   No, sir.

Q.   Are you aware of any correspondence from any of these people with Ms. Johnson seeking to hire her as a hit woman?

A.   No, sir.

Q.   Or any phone calls that would have been intercepted at the

2770

federal prison there wherein they would have been discussing hiring her?

A.   Not that I know of, but again, I haven't listened to them.

Q.   Now, just to be sure about this, when the thing changes around with Ms. Johnson, okay, and Mr. White where you actually decide now you're going to collect some money directly for Ms. Johnson because her relationship with Mr. Rodriguez broke down, we're talking there about a $1,500 amount or 2 ounces of

Page 197

methamphetamine.

A.   That's correct.  Actually I think I indicated it was initially the $1,200 amount.  According to her notes specifically given to us, there were -- says here, Jimmy fucked me out of $600 twice.  He owes me 2 ounces of rock or $1,500, and then it goes into detail about interest for all my long-distance calls, wasted trips, and pissing me off.

Q.   Now, this seemed to be a lot of money to Ms. Johnson. Would you agree with that?  She was quite upset about it?

A.   Yes.  In fact, I think during part of our conversation with her -- and I don't recall if it was at the motel room or if it was indeed at the restaurant/bar afterwards, she indicated that it was pretty much the last of the money that she had.

Q.   In other words, she was broke.

A.   Without a job, I would assume that.

Q.   Now, one of these conversations I think she announces she's actually now gotten a job.

2771

A.   That's correct.

Q.   As a waitress.

A.   Correct.

Q.   And that's the place where you had the drinks with her in Clear Lake; is that right?

A.   Yes, sir.

Q.   What was the name of that bar again?

A.   North Beach.

Q.   Did you check any of her bank records to determine what her financial situation was during this time period?

A.   I did not.  I wasn't the case agent.  My role in this, as the jury well knows, is just acting in the undercover capacity.

Page 198

What we try to do specifically with cases, if, in fact, you act as the undercover officer or in an undercover capacity, you are usually not the case agent. It just -- it doesn't make you think as much. You know what I mean? You know, you can -- I don't mean to make it a joke, but you really -- you can really concentrate on the role that you need to play and not have to worry about being the case agent. I was not the case agent in this case.

Q. And you've never seen any bank records of hers which show her with any large amounts of money?

A. No, sir.

Q. And you have no reason to disbelieve her when she told you and I believe it was Mr. White in the one conversation that she

2772

was broke.

A. That's correct.

Q. And that this was the last of the money that she had.

A. That's my understanding, yes, sir.

MR. STOWERS: That's all I have. Thank you.

THE COURT: Why don't we hold it for after the break.

MR. WILLIAMS: It's going to be one question basically.

THE COURT: Ooh. That's the first time in this trial.

MR. WILLIAMS: I'll say one question.

THE COURT: That's the first time. Let's see it.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Agent Mittan, during this undercover operation you had with Angela Johnson, was Angela Johnson playing a role?

Page 199

A.   I don't believe so, no.

MR. WILLIAMS:   Nothing else, Your Honor.

MR. STOWERS:   No further questions.

THE COURT:   Okay.   I'm going to let the jury in on a little joke which is why the lawyers were laughing.   I've been keeping track in the almost 11 years now that I've been a United States District Court judge about lawyers who say, I just have one more question.   The high is 167 additional questions.   The median is 8.7 questions.   And less than ten lawyers have actually just asked the one question.   So that's what the

2773

chuckle among the lawyers was about because they know that.

Members of the jury, we'll just take a 25-minute recess until 3:35 and then come back and go till 4:30.   Thank you.

(The jury exited the courtroom.)

THE COURT:   Anything we need to take up?

MR. WILLIAMS:   No, Your Honor.   We can talk I think at the end of the day maybe about the matter that Mr. Miller --

THE COURT:   Okay.   The transcript?   I think I'm now tracking maybe what you're talking about.   Was it a 12.2 issue?

MR. MILLER:   Yes, Your Honor.

THE COURT:   Okay.   I'm sorry.   I just wasn't tracking. We can take that up at the end of the day.   Is that okay?

MR. MILLER:   That's fine.

THE COURT:   Okay.   Thank you.   We'll be in recess.

(Recess at 3:12 p.m.)

THE COURT:   Ready to have the jury brought in?

MR. WILLIAMS:   Yes, Your Honor.

THE COURT:   Okay.   Thanks.

Page 200

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated. Could you pass the two transcripts of the conversations to your left?

And is the government ready to call your next witness?

MR. WILLIAMS: We are, Your Honor. We call Kyla Davis.

2774

KYLA DAVIS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. And could you adjust the chair and scoot it up so you can speak directly into the microphones. You can adjust the microphones. And would you spell your -- would you state your full name, please, and spell your full name for us.

THE WITNESS: It's Kyla Marie Davis, K-y-l-a M-a-r-i-e D-a-v-i-s.

MR. WILLIAMS: Thank you, Your Honor.

THE COURT: Mr. Williams?

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Davis, can you explain to the jury where are you from?

A. I'm from Vinton, Iowa.

Q. And Vinton, Iowa, is a small town located just north of Cedar Rapids, Iowa?

A. Correct.

Q. How long have you been living in the Vinton, Iowa, area?

A. All my life, 28 years.

Q. How far did you go through school, ma'am?

A. I graduated from high school, 12 years.

Q. And are you currently employed?

Page 201

A.    Yes.

Q.    What do you do for a living?

A.    I am a dispatcher for the Benton County Sheriff's Office.

2775

Q.    Could you explain to the jury what are your duties as a dispatcher for the Benton County Sheriff's Office?

A.    I answer 911 calls, answer phones for the police department, sheriff's office.

Q.    The sheriff's office is actually connected to the county jail there as well; is that right?

A.    Yes.

Q.    Do you have any duties that require you to have any interaction with inmates within the Benton County Jail?

A.    Yes, we have to matron they call it once in a while which means there always has to be a female in the facility if there's females in jail which would mean searching females, that sort of thing.

Q.    Were you located in the Benton County Jail at your dispatch center -- there's actually a window that looks down the hallway which is where all the inmates' cells are as well; is that correct?

A.    Yes.

Q.    And as part of your duties at the Benton County Jail, do you also monitor TV monitors that have -- that reflect what's shown in the various cells?  In fact, there's cameras in the cells, and you can see what's going on.

A.    Yes, correct.

Q.    And on occasion are you provided instructions by some of the jailers to communicate with the inmates and pass along

Page 202

instructions at their request?

A.   Yes.

Q.   How long have you worked at the Benton County Jail?

A.   Eight years.

Q.   In July to October of 2000, were you working in that capacity then?

A.   Yes.

Q.   And did you have a particular shift that you worked?

A.   Yes, I worked four-to-midnight shifts.  I believe I was four to midnight at that time.  It's been a while.  I think my shift's changed once since then but . . .

Q.   Mike Merino testified earlier in this trial.  He's a jailer at the Benton County Jail?

A.   Correct.

Q.   And he explained that it's a fairly small jail, perhaps as many as 30 inmates, somewhere in there?

A.   Right.

Q.   Back in the period of July to October of 2000, was one of the inmates Angela Johnson?

A.   Yes.

Q.   Could you describe for the jury given your position as a dispatcher there what kind of contact did you have with Angela Johnson between July of 2000 and October of 2000?

A.   She was in her jail cell, and she did not have her uniform on properly.  And we viewed it in the camera that she did not

2777

have her jail uniform on correctly.  She did not have her pants

Page 203

on. I at that time had told her over the intercom, Do you have your -- Angela, do you have your pants on? And she at that time had said to us yes, she did, and then said to the other inmate that was in there at the time, How do they know I don't? and then went to her cell to get them.

Q. And when you say the intercom, you're actually able to communicate to individual cells through the --

A. From the dispatch room.

Q. And this occurrence occurred on August 30 of 2000?

A. Yes.

Q. Now, prior to that occasion, had you had much contact with Angela Johnson?

A. Just maybe in passing.

Q. Your day-to-day responsibilities didn't call for you to have a lot of contact with the inmates there; is that fair to say?

A. No. Yes.

Q. And so when you confronted her about having the -- not having her clothes on correctly, what was the response after that?

A. Well, after she said that she had them on, I said that she shouldn't lie to us because she didn't have them on. And then at that time she said to me, I'll find out who you are; you're dead.

2778

Q. What was your response to that?

A. I was shocked I guess, scared.

Q. Did you take that as a serious threat?

A. Yeah, yes.

Q. Now, inmates I assume from time to time get angry when

Page 204

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2431 of 3592

they're in jail there?

A.   Yes.

Q.   Sometimes they say things to you and other jailers on occasion as well.

A.   I had never had anybody say anything to that effect to me before.  Maybe the jailers have, but me as being a dispatcher, no, I have not had anybody say that to me.

Q.   And did you actually take that as a serious threat to you?

A.   Yes, I did.

Q.   When she said she'll find out who you are -- is that what she said?

A.   Uh-huh.

Q.   -- are you aware of whether after that occurrence any steps were made by anybody to find out who you were or where you went?

A.   I had found out later that they were.  I didn't know at that time, but I found out later that she did try to find out who I was and what I drove and where I lived.

Q.   The woman who threatened you, the Angela Johnson in the Benton County Jail, do you see her in the courtroom here today?

A.   Yes.

2779

Q.   Can you identify where she's wearing -- where she's sitting and what she's wearing for the jury?

A.   Khaki-colored coat over there.

        MR. WILLIAMS:  No further questions, Your Honor.

        THE COURT:  Mr. Stowers?

                    CROSS-EXAMINATION

BY MR. STOWERS:

Q.   Is it Miss Davis, Ms. Davis?

Page 205

A. Yes.

Q. Okay. My name's Dean Stowers. How are you?

A. Good.

Q. In August and September of the year 2000, how old were you?

A. How old was I?

Q. Yes.

A. I'm 28 now, so 23.

Q. Okay. And how long had you been working for the sheriff's office at that time?

A. I'd been there since I was 18, 19 years old, maybe 19.

Q. So you worked there maybe five years?

A. Yes.

Q. And had you always been a dispatcher?

A. I worked in the kitchen facility for maybe six months before that.

Q. Dispatcher's sort of supposed to be a noncontroversial, nonconfrontational position, I take it.

2780

A. For the most part, but like I said, we do have contact with inmates. We do have to -- when somebody's brought to jail, we do have to be the first person that they see as far as going and changing them out of their street clothes, that sort of thing.

Q. Now, as the dispatcher, do you do the dispatch work for the whole sheriff's office or for just in connection with the jail, or how does that work?

A. Dispatch for everything.

Q. Okay. So you're dispatching for the patrol --

A. Yes.

Q. -- deputies and that sort of thing.

A. We answer the phones for, you know, the office, the jail,

Page 206

everywhere.

Q.   And then one of your functions I guess from what you've described a few minutes ago is that you also try to monitor the activities in the jail itself.

A.   Yes.

Q.   So you kind of have a little bit of a --

A.   Yes.

Q.   -- more than one role at the same time; is that right?

A.   Yes.

Q.   Yet there's also jailers -- I think of them as guards -- who actually work inside the wall, if you will, with the inmates; is that right?

A.   We're all kind of back in the same area but . . .

2781

Q.   But you don't go back in the area where the inmates reside.

A.   We have had to, yeah.  We can, yeah.  If -- where my room sits, I have to actually walk through the jail to get to my room to where I dispatch at.

Q.   When somebody comes to the Benton County Jail, they have to fill out some type of an intake form; is that right?

A.   Yes.

Q.   The jail does?

A.   Yes.

Q.   And they fill out such things as their height and their weight; is that right?

A.   Yes.

Q.   And you're aware that Angela Johnson would have arrived on July the 29th of 2000; is that right?

A.   Yes.

Page 207

Q.   And she would have had one of these booking worksheets filled out at the Benton County Jail?

A.   Sure, yeah.  Like I said, I don't do that part of it but . . .

Q.   At that time she was 5 foot 7 inches and 145 pounds.  Does that sound right to you?  You want to look at this?

A.   No, that's fine.  Do you want me to --

Q.   Does that sound right to you?

A.   Yes.

Q.   The conversation that you had with Angela Johnson wherein

2782

she reacted to what you said to her by saying that you're dead, this conversation occurred on the 30th of August; is that right?

A.   Yes.

Q.   At about ten at night.  Is that correct?

A.   Yes.

Q.   And you wrote out a handwritten statement in your own handwriting of what you recall right at about the time that this event happened; is that right?

A.   It would have been after it happened.

Q.   Within a day or two.

A.   (Witness nodded head.)

Q.   Is that right?

A.   Within a day or two?

Q.   Yeah.

A.   Yeah.

Q.   Shortly after.  How about that?

A.   Yeah, yeah, right.

Q.   And the situation was that you were there at the jail monitoring through the video camera system that the jail has,

Page 208

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2435 of 3592

and you could see that Angela Johnson was wearing I guess boxer shorts; is that correct?

A.   Yes, biker shorts I guess I'd call them, not -- yeah.

Q.   And the jail issues to inmates some kind of a full-length jail pant; is that right?

A.   Yes.

2783

Q.   Can you describe those for the jury, what they look like?

A.   They would just be like cotton -- I guess I'd describe them as like pajama pants, cotton-type pajama pants.

Q.   What color are they?

A.   Blue, dark blue, navy blue.

Q.   A dark navy blue.

A.   Uh-huh.

Q.   And is there a matching top that goes with that?

A.   Yes.

Q.   So when you saw her on the camera, she had what you're calling biker shorts.  Are you referring to underwear, or are you referring to boxer shorts, or what are you talking about there?

A.   They're just a -- I'd call it like a Lycra tight black shorts.

Q.   Okay.  Is that something that the jail issues as well or not?

A.   No.

Q.   This would have been the end of August.  Would it have been hot at that time?

A.   Not in our jail.

Q.   Okay.

Page 209

A.  We have air conditioning.

Q.  Okay.  The jail is air conditioned; right?

A.  Yes.

2784

Q.  Okay.  And in any event, you saw her at 10 p.m. in the evening wearing these tight Lycra-type shorts.  Were they underwear, or what were they?

A.  I don't know what she used them for.  They were shorts, but I don't -- maybe she wore them as underwear.  I don't know.

Q.  Was she wearing a top?

A.  Yes.

Q.  Was she wearing the dark blue top?

A.  Yes.

Q.  And it's bedtime.  Wouldn't it be -- 10 p.m., wouldn't that be about bedtime?

A.  I think it's 10:30 that lights are out or not lights out, TVs off, that sort of thing.

Q.  Right.  Because the lights never really go off in the Benton County Jail, do they?

A.  No.

Q.  The inmates have to sleep with the lights on.

A.  Yes.

Q.  And so it's ten o'clock.  She's in her cell.  She's wearing shorts and a shirt, and that was a problem; is that correct?

A.  With the jailer, yes.

Q.  With the jailer?

A.  Well, the policy I believe is that they have to have -- until they are in their own -- like this was the day area.  Until they go to their cell where they sleep, they need to have

Page 210

their clothes fully on which means their top and their pants that they have issued to them.

Q. Okay. So you saw that. You called it to her attention over the audio system in the jail.

A. Right.

Q. And she replied by saying something to the effect "I got my pants on."

A. Right.

Q. Which you believed was not true because you had seen her on this video camera not wearing her jail-issued pants; is that right?

A. Yes.

Q. And then did you say to her -- what was the conversation from that point?

A. She had asked the other lady that was in there with her, How did they know that I don't have my pants on? Can they see us?

Q. And you overheard that through the monitoring system.

A. Right, right.

Q. And then you turned, and you said something in response to that even though she wasn't at that point talking to you; is that right?

A. Right.

Q. And what did you say to her?

A. I said that she shouldn't lie to us about not having her

2786

pants on because you can lose your privileges.

Page 211

Q. And then she said what?

A. I'll find out who you are; you're dead.

Q. Well, didn't she say something before that, ma'am?

A. If she did, I do not remember.

Q. Didn't she say, according to what you wrote up, at this time Angela said to me, What are you going to do about it, question?

A. Okay.

Q. Remember that now?

A. Yes.

Q. What was your reply?

A. I'm not sure. It's been five years ago. I . . .

Q. I'll show you your handwritten statement. Is that your handwritten --

A. Yes.

Q. -- statement?

A. Yep.

Q. Can you read to the jury what it is that you wrote that you replied to her when she said to you, What are you going to do about it?

A. Yes. And I said, You want your family to be able to come and visit with you. You could have your privileges taken away.

Q. So in response to her statement to you about what are you going to do about the fact that I'm here in shorts versus pants

2787

at 10 p.m. at night 30 minutes before bedtime, you said essentially, I can take your family visiting privileges away.

A. I didn't say that I personally could, but I said they could be taken away, not by me.

Q. And that was intended on your part to be a threat of your

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2439 of 3592

own, is that correct, that you could cause that to happen or you would try to cause that to happen to deny her visitation with her own family. Isn't that fair what you were trying to communicate with her?

A. I would say not necessarily. That's part of the rules of having your -- you need to be fully dressed when you are not in your sleeping quarter.

Q. Well, what were you intending her to be thinking when you told her, I can take your visitation with your family away from you?

A. Well, the attitude that she had given us when she was told to put her pants on, I was just saying to her that, you know, you need to follow the rules here like everybody else has to follow the rules, and if that means putting your pants on, then you need to have your pants on.

Q. Did you think that would be a very serious punishment to take her family visitation away from her?

A. Things like that happen. I mean, there's times when people get locked down, they don't get to see their family members. I mean, it's common. It's not something that's uncommon.

2788

Q. Did you think that would be serious, a serious consequence to her?

A. Yes.

Q. And that's why you told her that, isn't it?

A. Like I said, I probably -- I would have said it to anybody. I mean, I would have said that to any of the inmates.

Q. Because that's the way you treat the inmates; right? You threaten to take their visitation away if they don't comply with

Page 213

all the rules; is that correct?

A.   I don't personally myself.  This time, yes, I did, but that's how they do it, yes.

Q.   Now, were you aware that she had had visitation with her two daughters right there at the Benton County Jail over the time period that she'd been there since the end of July heading into the end of August when you made this statement to her about taking her visitation away?

A.   Was I aware that she had family visit her?

Q.   Yeah.

A.   Yes.

Q.   Were you aware that that was important to her to have her family visits?

A.   I wasn't aware it was important to her, no.

Q.   Were you aware that Angela Johnson was on any type of medications?

A.   No, I was not.

2789

Q.   You weren't aware of that at all.

A.   No.

Q.   You weren't aware that she was on Excedrin P.M., for example, for sleeping problems.  She couldn't sleep.

A.   No, I was not.  I wouldn't know that information.

Q.   And you weren't aware that she was taking a drug I believe called Seroquel.

A.   No, I was not.  I don't have access to their medical records.

Q.   And so when you said, I'm going to take your family visitation away --

          MR. WILLIAMS:  Objection, Your Honor.  That is not

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2441 of 3592

what she said.

Q. Well, when you said that you could --

MR. STOWERS: I'm sorry. I'll rephrase, Your Honor.

THE COURT: Okay. Rephrase.

BY MR. STOWERS:

Q. When you said that you could do that, were you intending to get a rise out of her?

A. No.

Q. Were you intending to get some type of a reaction out of her?

A. No. I was intending for her to go put her pants on like she was supposed to.

Q. And so you used that tool "I can take your family

2790

visitation away" to try and get her to comply with your request that it would --

A. That it could be taken away.

Q. And you don't think that was a threat.

A. No.

Q. Are you aware of any written disciplinary procedures at the jail?

A. No.

Q. You're not aware of any?

A. As far as what?

Q. You're aware that the jail has written disciplinary procedures?

A. I'm aware that they have them, yes. I don't see them.

Q. So you wouldn't be aware of any disciplinary action that would have been taken as a result of this situation over her

Page 215

wardrobe at 10 p.m. at night?

A.    No, I would not have.

MR. STOWERS:  Thank you.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q.    Miss Davis, is it part of your job to enforce the rules of the Benton County Jail?

A.    Yes, it is.

Q.    Do you have a choice on whether you enforce them or not, or is that part of your job?

2791

A.    Yes, we are supposed to.

Q.    And is part of your job informing the inmates of the consequences of their violation of the rules?

A.    Yes.

Q.    And apparently when you enforced a rule and advised this woman that somebody close to her may -- that she may be impacted on her ability to be with somebody that was close to her, her response was to threaten to kill you.

A.    Yes.

MR. WILLIAMS:  Nothing else.

MR. STOWERS:  Nothing further.

THE COURT:  Okay.  You may step down.

Everybody can take a stretch break.

Government ready to call its next witness?

MR. WILLIAMS:  United States calls Laura Shelley.

LAURA SHELLEY, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated in the witness box.  Please adjust the chair and the microphones so you can speak directly into the microphones.  And when you're ready,

Page 216

would you state your full name, please, and spell your last name.

THE WITNESS: Laura Lynn Shelley, S-h-e-l-l-e-y.

THE COURT: Thank you.

DIRECT EXAMINATION

BY MR. WILLIAMS:

2792

Q. Miss Shelley, you were formerly known as Miss Getty?

A. That's right.

Q. And where do you live at, ma'am?

A. In Des Moines.

Q. And how long have you lived in the Des Moines area?

A. Four years.

Q. Can you just explain to the jury a little bit about yourself? How far did you go through school?

A. I graduated high school. I went to EMT-B school and CNA.

Q. EMT-B, what is that?

A. Emergency medical technician.

Q. And what was the last thing you said?

A. I was a CNA.

Q. CNA, what is that?

A. Certified nurse's assistant.

Q. Okay. Are you working now?

A. Yes, I am.

Q. And what do you do?

A. I am a purchasing manager for the Iowa Orthopedic Center.

Q. How long you been working that type of job?

A. Since 2001 when I moved to Des Moines.

Q. Now, prior to 2001 when you moved to Des Moines, had you

Page 217

worked in Vinton, Iowa?

A.    Yes, I did.

Q.    What was your job there?

2793

A.    I was a dispatcher for the Benton County Sheriff's Office.

Q.    And were you a dispatcher on August 30 of 2000 at the Benton County Jail?

A.    Yes, I was.

Q.    Was one of the people that you worked with Kyla Davis?

A.    Yes, it is.

Q.    Did you guys work at the same time on occasion?

A.    Yes, we did.

Q.    And on this particular night of August 30 of 2000, were you working together?

A.    Yes, we were.

Q.    Do you remember an inmate by the name of Angela Johnson being present in the Benton County Jail?

A.    Yes, I do.

Q.    And on August 30 of 2000, do you recall a confrontation occurring over an intercom between Angela Johnson and Kyla Davis?

A.    Yes, I do.

Q.    Can you share with the jury what you recall about that incident?

A.    Kyla had asked her to -- if she had her pants on.  She said she did.  Kyla left the microphone on, and Angela said, How does she know that?  Can they see me?  She went into her cell and got her pants, and Kyla explained to her, you know, You shouldn't have lied to us about that.  You can lose your privileges.

Page 218

Angela then came back and said, You're dead.  I'll find out who you are, and you're dead.

Q.   And you overheard this conversation because of the way the intercom system worked you could hear what was going on.

A.   Yes.

MR. WILLIAMS:  I have no further questions, Your Honor.

THE COURT:  Mr. Stowers?

CROSS-EXAMINATION

BY MR. STOWERS:

Q.   In the year 2000 you were known as Laura Getty?

A.   Yes, I was.

Q.   G-i-t-t-y.

A.   G-e-t-t-y.

Q.   Okay.  I can't read your handwriting that well.  You did yourself write out a handwritten statement concerning these events; is that correct?

A.   Yes, I did, yep.

Q.   And have you reviewed that recently?

A.   I have a sheet with me at the motel last night.

Q.   So last night?

A.   Uh-huh.

Q.   Page and a half of handwritten notations of what you recall?

A.   Yes.

2795

Q.   Now, check (sic) me if I'm wrong, but what you saw and

Page 219

heard is you heard Ms. Davis -- Kyla Davis; is that right?

A.   Yes.

Q.   -- ask Angela Johnson if she was wearing any pants, and Angela said yes; is that right?

A.   That's right.

Q.   And then Angela went into her cell from the day room and grabbed her pants and put them on.

A.   Correct.

Q.   And during that time while she was putting her pants on, Angela was heard to make a statement, How do they know that? How can they see that I don't have my pants on, something to this effect?

A.   Right.

Q.   And after Angela got her pants on, Kyla Davis then got on the intercom again; isn't that right?

A.   Yes.

Q.   And told Angela it's not very smart to lie about things like that; isn't that right?

A.   Yes.

Q.   Did she have kind of a snotty tone of voice when she said that?

A.   She just did it like she does with everything else.

Q.   Was it kind of a smart tone?  You can tell us.

A.   She just said it's not very smart to lie about things like

2796

that.

Q.   And then Angela said, What are you going to do about it, question mark; is that correct?

A.   Correct.

Q.   And Kyla then said, You want to keep your privileges, don't

Page 220

you?

A.    Right.

Q.    You want your family to come and visit you; right?  Isn't that what she said to her?

A.    Yes.

Q.    And it's after that statement, after Angela had put her pants on and complied with the complaint of Kyla Davis about her not having her pants on, that she then replied to Kyla Davis ultimately, You're dead; I found out who you are, and you're dead; right?

A.    She said, I'll find out who you are.

Q.    Right.  So she did put her pants on.

A.    Yes, she did.

Q.    And it was only after that that Miss Davis threatened essentially to take away Ms. Johnson's visitation privileges with her family which resulted in a response; is that fair?

A.    Correct.

Q.    Would you characterize -- how would you characterize Miss Davis's statement to Angela Johnson about her visiting privileges with her family being taken away?  How would you

2797

characterize that?

A.    I don't really understand.

Q.    Well, would you characterize it as a threat that she was going to cause that to happen, that is, to cause Angela Johnson to lose the ability to see her children and her other family members?

A.    I don't know.  I don't know how she meant it when she said it.

Page 221

Q. How did it sound to you?

A. I don't know.

Q. Is that the way you think it was taken by Ms. Johnson based on her reaction?

MR. WILLIAMS: Objection, Your Honor. Calling for speculation.

THE COURT: Overruled. You may answer.

A. I'm not sure how Angela took it.

Q. Do you think she took it as a threat from Ms. Getty (sic) to disrupt her ability to see her children?

MR. WILLIAMS: Same objection, Your Honor.

THE COURT: Same ruling. You may answer.

A. I don't know.

Q. Did you have much contact with Angela Johnson during the -- I guess it'd be about a little more than two months that she was there at the Benton County Jail?

A. Verbal communication?

2798

Q. Yeah.

A. No.

Q. Did you have any role in dispensing any of her medications?

A. No, I did not.

Q. You were aware that she did have some medications that were being dispensed.

A. No.

Q. Are you aware of any inmate complaint system where complaints about inmate behavior can be documented by the jail?

A. No.

Q. You're just here telling us what you remember about what happened at the end of August of 2000.

Page 222

A. That's right.

Q. Just the best you can.

A. Uh-huh.

Q. And that's why you wrote it all down back then was so that you'd remember it as well as you could; right?

A. Right.

MR. STOWERS: Thank you.

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: Okay. You may step down.

MR. WILLIAMS: United States calls Bill Basler.

WILLIAM BASLER, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated.

Mr. Williams?

2799

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Just to remind everybody here in case they don't know, you were the case agent in this investigation; is that correct, sir?

A. Yes, it is.

Q. As part of your duties in this investigation, have you, among other things, monitored through documents the performance of Angela Johnson while she has been an inmate in the Linn County Jail?

A. Yes.

Q. And did you obtain records during that time period that she was there?

A. Yes.

Q. The time period would have been November of 2000 through

Page 223

June of 2004, sir?

A. That's correct.

Q. And based on your investigation, was there kind of a different -- different levels of reports or disciplinary reports that would be written up on inmates in the event that they violated the rules of the Linn County Jail?

A. Yes.

Q. Can you explain that system to the jury, please?

A. There appeared to me to be two different levels of violations, if you will, that the inmates could incur while at

2800

the Linn County Jail. The most serious is a formal report, and there seems to be another level lower than that called a behavioral warning.

Q. And the formal reports, are they -- if they are actually followed through on actually go through almost a mini trial process?

A. Yes.

Q. And explain that to the jury, please.

A. There is a system set up at the Linn County Jail where the inmate that is accused of the violation can fill out a statement as to what happened. They're given the opportunity to have a hearing in regards to the matter and even call witnesses that they might choose to show their side of it.

Q. On the other side there may be witnesses on behalf of the jail testifying or on behalf of complainants as well?

A. Certainly, very similar to a mini trial.

Q. Once a guilt is found, let's say, of whatever the violation is, is there an appeal process available to the --

A. Yes, there is.

Page 224

Q.   As part of your investigation, did you determine whether Angela Johnson has received any formal disciplinary reports while an inmate at the Linn County Jail?

A.   Yes, I did.

Q.   And how many formal reports?

A.   There were four formal reports, the more serious violations

2801

in the jail, while Ms. Johnson was incarcerated there.

Q.   Agent Basler, I've handed you four exhibits, 1142, 1143, 1144, and 1145.  Can you identify what those are for the jury, please?

A.   Yes.  These exhibits appear to be the documentation regarding those four formal reports on Angela Johnson.

MR. WILLIAMS:  United States moves to admit Exhibits 1142 through 1145, Your Honor.

                    *   *   *   *

(Government Exhibits 1142 through 1145 were offered.)

                    *   *   *   *

MR. STOWERS:  No objection.

THE COURT:  1142 through 1145 are received and admitted.

                    *   *   *   *

(Government Exhibits 1142 through 1145 were admitted.)

                    *   *   *   *

BY MR. WILLIAMS:

Q.   Agent Basler, you had testified Angela Johnson was admitted as an inmate at the Linn County Jail in November 2001; is that correct?

A.   November of 2000.

Page 225

Q. I'm sorry, 2000. She actually obtained her first formal disciplinary report just a few months later on February 2 of 2001?

2802

A. Yes.

Q. And that's Exhibit 1142?

A. Yes, it is.

Q. She received another disciplinary report on December 28 of 2001, and that's Exhibit 1143?

A. Yes.

Q. She received another disciplinary report on March 23, 2002, and that is 1144?

A. Yes, sir.

Q. And she received another disciplinary report on 11 -- I'm sorry, on January 28 of 2004, and that's Exhibit 1145.

A. Yes.

Q. Disciplinary reports can be written up for any number of violations of jail rules; is that correct?

A. That appears to be the case, yes.

Q. And some perhaps more serious than others.

A. Yes.

Q. In this case did she, in fact, receive two of those formal disciplinary reports for assaulting other inmates?

A. Yes.

Q. In addition to investigating the formal disciplinary reports, you indicated there's a lower level of discipline meted out by the Linn County Jail for violating rules called behavioral warnings.

A. Yes, sir.

Page 226

Q.   As part of your investigation, did you obtain records pertaining to those violations?

A.   Yes.

Q.   How many such violations -- how many such behavioral warnings did you find Angela Johnson incurred during the time period she was in the Linn County Jail from November of 2000 through June 2004?

A.   I counted up the warnings, and I believe there was 89.

Q.   Handing you Exhibit 1146, can you identify that?

A.   Yes, I can.

Q.   And what is that?

A.   It's captioned the Linn County Correctional Center Prisoner Activity Log, and it lists those behavioral warnings that were given to Miss Johnson.

Q.   And that's a printout that the Linn County Jail could provide specifically of behavioral warnings.

A.   Yes.

     MR. WILLIAMS:   United States moves to admit into evidence 1146, Your Honor.

                    *   *   *   *

     (Government Exhibit 1146 was offered.)

                    *   *   *   *

     MR. STOWERS:   No objection.

     THE COURT:   1146 is received.

                    *   *   *   *

2804

     (Government Exhibit 1146 was admitted.)
                    Page 227

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2454 of 3592

* * * *

BY MR. WILLIAMS:

Q. Mr. Basler, I want to shift to another area here. As part of your investigation, you testified that you were present at the autopsy of the four individuals recovered from the Lark Avenue site which included Greg Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan; is that correct?

A. Yes, that's true.

Q. And when you were part of that autopsy, from the bags and from the actual bodies that were recovered pertaining to Lori Duncan, were any rings, jewelry, or a purse or billfold or anything of that nature recovered from her remains?

A. No rings, no billfold. There was a gold necklace that possibly had been worn by Lori Duncan when she was murdered.

Q. And you're familiar from the investigation on the grave site recovery itself was any rings or purse belonging to Angela -- I'm sorry, to Lori Duncan found at the Lark Avenue site itself after the bodies were removed?

A. No.

Q. Ultimately through contact to law enforcement, was a ring and billfold belonging to Lori Duncan recovered in this investigation?

A. There were rings that were recovered that once belonged to Lori Duncan.

2805

Q. And could you describe for the jury, first of all, where were they recovered from?

A. The items that I just mentioned were recovered from the Winnebago River near Fertile, Iowa.

Q. Where is Fertile, Iowa, in relation to Mason City, Iowa?

Page 228

A.   It's northwest 20, 25 miles.

Q.   And how was it that those items were recovered?

A.   There had been three young boys playing in the river near the town of Fertile, and it was during the summer of 1995.  The water below the dam in Fertile is fairly shallow and fairly solid bottom so that it's conducive to children playing in that area.  These three boys were, as I mentioned, playing there.  One of them dropped his glasses in the water, and when he retrieved them by hand, he also felt an object which he picked up which turned out to be a woman's purse.

Q.   What did the boys do with the purse at that point?

A.   As young boys will, they took it to the bank and looked through it to see what was inside.  They found a woman's driver's license, a video card, and some small change as well as some game tokens for a video arcade and two rings.

Q.   What did they do once they took it to the river bank, pulled out these items?  What happened at that point?

A.   For whatever reason, they decided to keep the tokens and the two rings and threw the rest of the items back into the river.

2806

Q.   Did they ultimately contact law enforcement regarding their finding?

A.   I think that they contacted their parents, and it probably was the parents that got ahold of the police.

Q.   The purse that had a driver's license and some family photos and so forth that they threw back in the river, was that ever recovered?

A.   Not to my knowledge, no.

Page 229

Q. Was an investigation actually launched and did law enforcement officers go down to the river and search that location again after this was reported?

A. Yes. Again, this was in 1995, some years before my involvement or the DCI's involvement. But the findings, the rings, were reported eventually to the Mason City Police Department, and they did a fairly thorough search of that area trying to locate the other items that had been in the purse as well as the purse itself.

Q. No success.

A. No.

Q. But the rings and the game tokens that were recovered by the boys and turned over to their parents, were those ultimately turned over to law enforcement?

A. Yes. Those rings and tokens were given by the boys to their parents. The parents gave them to the Mason City Police Department, and I retrieved them from the Mason City Police

2807

Department.

Q. I've handed you Exhibit 1113. Can you identify that exhibit, please?

A. Yes, I can.

Q. And what is in Exhibit 1113?

A. Inside this particular exhibit are two game tokens for a video arcade and also a -- what appears to be a woman's ring with two pearls on it and also a class ring with a yellow stone.

MR. WILLIAMS: United States moves to admit Exhibit 1113, Your Honor.

                    *   *   *   *

        (Government Exhibit 1113 was offered.)
                    Page 230

* * * *

THE COURT: Any objection?

MR. STOWERS: No objection.

THE COURT: 1113 is admitted.

* * * *

(Government Exhibit 1113 was admitted.)

* * * *

BY MR. WILLIAMS:

Q.    Is there an inscription on Exhibit 1113?

A.    Yes.

Q.    On the class ring there?

A.    Yes.  On the inside of the band of the class ring is the name Lori Milbrath which was the maiden name of Lori Duncan.

2808

Q.    As further part of this investigation, did you make any attempt to determine the length of time it would have taken to have traveled from the Lori Duncan residence to the location on Lark Avenue where Lori Duncan and her daughters were murdered?

A.    Yes.

Q.    Can you explain with the aid of Exhibit 1 which is the map of the Mason City, Iowa, area the route that you measured and the time it took?

A.    Yes, I can.

MR. WILLIAMS:  With permission from the Court for the witness to step down and put on a lavaliere mike, can I have him do that?

THE COURT:  You may.

BY MR. WILLIAMS:

Q.    Mr. Basler, if you would, explain to the jury what route

Page 231

you measured, how you chose that route, and why you chose it and what -- the time it took for you to drive that route.

A.   Some time early last year, Special Agent Graham and myself were brainstorming for lack of a better term how the individuals that kidnapped and later murdered Greg Nicholson, Lori Duncan, and her two daughters might have gotten from her house which is marked here on the map, 619 North Van Buren, to where their bodies were ultimately recovered here at the 1500 block of Lark Avenue.

We were aware at the time that we were doing this

2809

brainstorming the bodies had been recovered.  We knew that they had been bound and gagged; at least Lori and Greg had been at that time.  And we tried to put ourselves in the position of the persons that might have been responsible for these killings as to how they might have gotten from point A, Lori Duncan's house, to the place where they were ultimately murdered.

We decided that the best route, the most direct route that wouldn't take you through a largely populated area, would have been to go from Lori's house north rather than south through the heart of the city, north to a road that's called 12th Street Northwest which, as you can see, takes you out of the town itself.  At this location there's a stop sign, an intersection with Eisenhower Avenue.  Again, you have the option of going south to the four-lane of Highway 18 or to continue another mile on the gravel to where you can go straight south to Lark Avenue to the grave site itself.

Q.   Did you determine a particular speed to drive this route?

A.   Yes.  Again, during this brainstorming session that we had, we assumed that the victims were -- at least the adult victims

Page 232

were bound and gagged at that time and also assumed that the kidnappers at that point wouldn't want to bring any undue attention to themselves. So we naturally assumed that they would drive the speed limit.

Q. So did you and Special Agent Graham drive the route you've outlined for the jury within the speed limit to determine the

2810

length of time?

A. Yes. We actually started from the driveway itself at 619 North Van Buren, backed out on to the street, went north on Van Buren to 12th Street, again west and then south to the grave site on Lark Avenue. The speed limit changes several times during that course, but we observed all the posted speed limits.

Q. Assuming that you were right in your estimation of how that route would have been chosen and the speed they would have driven, how long would it have been that Greg Nicholson and Lori Duncan would have been sitting in the vehicle with a sock in their mouth duct taped and the little girls would have been sitting in the car driving from the Duncan house to the place where they were murdered?

A. The distance was 5.3 miles, and it took us just over 11 minutes to make that drive.

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Mr. Stowers?

CROSS-EXAMINATION

BY MR. STOWERS:

Q. Agent Basler, I wanted to start off and talk to you a little bit about the Linn County Jail. You've obviously been there even though you're from the Mason City area.

Page 233

A.    I've been there.

Q.    Many times probably.

A.    No, but a few.

2811

Q.    You're familiar with the difference between a county jail and a state of Iowa correctional facility; is that correct?

A.    Yes.

Q.    And there are differences.  For example, county jails in the state of Iowa are only designed and allowed to hold people for up to what?  A year?

A.    I believe so.

Q.    And --

A.    Well, as part of a sentence?  Is that what you mean?

Q.    Correct.

A.    As far as a sentence, I believe you can be sentenced to a year in a county jail.

Q.    But if it's a sentence to longer than a year, the requirement in Iowa is that the person has to go to a state correctional facility.

A.    I believe that's right.

Q.    Which is better equipped to house people for extended periods of time; is that correct?

A.    I don't know if they're better equipped or not.

Q.    You've been to some of the state correctional facilities as well, haven't you?

A.    Yes.

Q.    And you know that in a state correctional facility there are significant differences between the privileges and things that they have for inmates to do versus the things that our

Page 234

local county jails have. Would you agree with that?

A. Yes, there's better privileges certainly.

Q. And can you describe some of those things for the jury?

A. The one that comes to mind is educational opportunities certainly are different. Another one might be exercise opportunities. I'm sure there's more.

Q. Ability to get out in the sunshine be another one?

A. Yes.

Q. Can't do that in a county jail typically.

A. Well --

Q. Not in the Linn County Jail.

A. Not for any extended period of time, no.

Q. And you're aware that Angela Johnson was not allowed any outdoor privileges while she was at the Linn County Jail.

A. No, I wasn't aware of that.

Q. Are you aware that at many of the correctional facilities inmates are given jobs?

A. The state correctional --

Q. Yeah.

A. Yes, I believe they have jobs.

Q. But in our county jails we generally don't have that.

A. They might have tasks, but I'm not sure that they have paying jobs if that's what you're asking.

Q. There's just -- you know, basically in a county jail for an inmate the opportunities for things to do are fewer and farer

2813

between than they are at a state correctional or other penal

Page 235

institution.

A.   Yes, I'd agree with that.

Q.   And county jails are typically far more confining and uncomfortable places for people to spend their time; would you agree with that as well?

A.   They're certainly more confining.  I don't know about the comfort.

Q.   In fact, in your experience, you've probably encountered the situation where many inmates just can't wait, for example, to get sentenced so they can go off to the prison where they'll get some freedoms that they don't have and some things to do that they don't have in the local holding facilities.

A.   Possibly.  I've also talked to some state prisoners that wished they were back in the county jail.

Q.   Some people like different things.

A.   I guess.

Q.   But generally inmates find local jails, county jails, to be relatively, in comparison to prisons, unfriendly and unwelcoming places to be.

A.   I guess I don't know about that.

Q.   Now, when Angela Johnson was --

THE COURT:   How much more cross-examination do you think you have, Mr. Stowers?

MR. STOWERS:   Quite a bit, Your Honor.  It's going to

2814

go into the morning, so if you want to stop, that's fine.  It's going to be at least --

THE COURT:   That's fine.  You don't have to give us an estimate.

MR. STOWERS:   Yeah.  Well, if I did, it'd be probably

Page 236

like my opening statement estimate of 20 minutes which was 40 to 45 minutes.

THE COURT: So don't give us an estimate. Remember Chuck Barris on The Gong Show where he hits the gong? That's what I'm doing. It's 4:31. I'm hitting the gong.

MR. STOWERS: Okay. Thank you.

THE COURT: That's the evidence for today. We'll see you back here tomorrow morning. Again, we'll start at 8:30. Now, I don't remember what the schedule told you about tomorrow. I think it might have said we're going to break a little bit early. I think we'll be able to go till about 3:15 to 3:30, in that range. We won't go beyond 3:30 tomorrow, but we'll probably go until 3:15 or so, somewhere in there, tomorrow. Then we'll break and start next Monday again.

So remember my cautionary instruction about keeping an open mind until you've heard all of the evidence in the penalty phase. And we'll see you tomorrow morning at 8:30. Thank you.

(The jury exited the courtroom.)

THE COURT: Okay. Please be seated.

Mr. Miller, the issue of a transcript?

2815

MR. MILLER: Yes, Your Honor. On March 7 it's my understanding there was a conference on the issue of the appropriate limits of the government expert's questioning of Ms. Johnson that occurred with Mr. Berrigan and the government's so-called outside taint attorneys. It's also my understanding that a small portion of that proceeding consisted of an ex parte statement by Mr. Berrigan of the mental health mitigating factors. A transcript of the hearing itself has been ordered,

Page 237

and I'm asking that the Court authorize Ms. Semmler to include the ex parte statement in the transcript ordered by the government.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: I have no objection to that, sir.

THE COURT: I don't think they're entitled to it.

MR. BERRIGAN: Well, I don't know what the relevance is to be quite honest, but I guess we'll find out after they get it. I'm happy to argue this again once again.

THE COURT: Okay.

MR. MILLER: Your Honor, I just --

THE COURT: You don't have any objection to the --

MR. BERRIGAN: No, I don't care if they get it. I think the reason it was ex parte at that time is we hadn't started the trial, and I'm not sure that we were not under an obligation at that point -- and I could be wrong. I'm not sure where we were with mitigating factors to be quite honest, but

2816

we've already submitted --

THE COURT: I know where I was, in the dark, and that's why we had the ex parte conversation I believe.

MR. BERRIGAN: That's undoubtedly true, but none of us are in that position any longer. We have it on the table. So I'm happy --

THE COURT: What's the relevance -- I take it somebody ordered the transcript?

MR. MILLER: It's my understanding the taint attorneys ordered the transcript, and being still a little bit in the dark myself, I'm trying to get up to speed as fast as possible about exactly what the mitigating -- what the mental health issues are

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2465 of 3592

pertaining to the mitigating factors, and I felt that would be perhaps the best way to educate myself on that.

THE COURT: I guess the best way would be the reports that you've gotten.

MR. MILLER: They did arrive today, Your Honor.

THE COURT: Right. But I don't have any problem with you having a copy of the transcript. And Mr. Berrigan doesn't, so that's fine.

Now, are you anticipating ongoing issues or problems that will need my resolution with regard to the 12.2 -- the Rule 12. -- Federal Rule of Criminal Procedure 12.2?

MR. MILLER: Your Honor, possibly. Before, however, I suggest we'd have any at all, I'd like an opportunity to look at

2817

Dr. Logan and Dr. Hutchinson's reports and perhaps visit with Mr. Berrigan and possibly, if Ms. Semmler is so able, to review the transcript, and then there we may not have any issues. I'm sure Mr. Berrigan can educate me somewhat as to what we're looking at in the way of --

THE COURT: Do you know of any outstanding issues at this point?

MR. BERRIGAN: No, I really don't. I think the problem is we're dealing with two different teams and these guys don't know where the other guys are. As far as I'm concerned -- and I'm not on either one of their teams -- we don't have any issues. But, you know, they're uncertain about that, and if they need some more time, I'm fine with that, Your Honor.

MR. MILLER: And what could be an issue -- and I'm not even sure that it is, Your Honor -- is the mitigator number 20

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2466 of 3592

appears to me to be an effective claim of duress. I don't know that any of the psychological or psychiatric reports or findings at all address mitigating issue number 20, and if they don't, then we really don't have an issue probably. If they do, then possibly that's an issue, but I haven't talked to Mr. Berrigan about it, and I'm not even sure that's the case.

MR. BERRIGAN: For the benefit of Mr. Williams and Mr. Miller, let me tell them what I've told the Court on more than one occasion and the taint team, that none of the experts, not a single one that the defense calls, is going to proffer

2818

testimony about Angela Johnson's specific state of mind on either of the dates of the murder. They're talking about chronic conditions she's largely had her whole life. And they did not interview her about the murders. They were not permitted to do that because that would completely be unfair, that one side could do it and the other side couldn't.

We never intended to offer expert mental health testimony on her mental status at the time of the offense as any kind of a defense or diminished capacity defense or anything of that nature. So I'll make that representation again. If it's still an issue after you've looked at the reports, I'm certainly happy to take time to address it yet again.

MR. MILLER: And I want to be very clear I'm not making any accusation. I've not yet had time to look at it completely. I'm sure Mr. Berrigan's accurate in his representation. It's just mitigator number 20 did concern me as potentially being something that could have been if it wasn't an appropriate question for an expert to look at, and that's the only reason I was concerned about it.

Page 240

THE COURT: Sure.

MR. MILLER: The other thing -- and I'm not even suggesting this at the moment, but it was recommended to me by government attorneys who know this area better than I do that we may wish to request an opportunity for the government's experts to sit in during the defense experts' testimony. I haven't even

2819

made a decision that we would want to make such a request but just to forewarn the Court and counsel that that is a conceivable issue, and we would hope to maybe have that by tomorrow morning decided as to whether we would even have such a request.

THE COURT: And there's at least some indication about a reciprocal request.

MR. BERRIGAN: Yeah, that's right.

THE COURT: I mean, it comes from the -- well, it comes from a CJA matter.

MR. BERRIGAN: Right. I think that if the government chose to put on rebuttal evidence -- and I think that's very much up in the air at this point -- the defense may want to have one of its experts present for that, and I think I have indicated that ex parte in a CJA request, so we wouldn't have any opposition to their people --

THE COURT: I don't think you actually indicated that. My recollection is that one of the experts in their kind of proposed budgeting indicated that.

MR. BERRIGAN: Yeah. I shouldn't put that on the expert, Your Honor. I certainly had discussions with the expert.

Page 241

THE COURT: I'm just saying you haven't had discussions with me about it.

MR. BERRIGAN: That's right.

2820

THE COURT: My source of information is from reviewing the budget from your experts pursuant to the Criminal Justice Act.

MR. BERRIGAN: All I'll tell you is I consulted with them about that.

THE COURT: Yeah, I don't imagine that decision was made by the expert without your input.

MR. BERRIGAN: Right, right.

THE COURT: And the bottom line is my tentative view is that both sides have the right to have the others' experts sit in on each others' experts. And I don't think anybody really disputes that.

MR. BERRIGAN: No, we certainly don't.

THE COURT: So if you want to, you can for both sides.

MR. MILLER: And that's all the issues I see from just a real quick read through from your memorandum opinion.

MR. WILLIAMS: One addition -- and I've not had a chance to talk to Mr. Miller. He's been asked to take care of this. I had enough of a conversation to know or it's my understanding there's a pending motion that was filed by the taint team for a jury instruction along the same lines that if what Mr. Berrigan says is true that the mental health evidence they're going to present has nothing to do with what her mind-set was at the time of the murders that the jury be so instructed that that evidence is not to be considered by them to

Page 242

determine whether she was capable of having the mind-set and so forth, and I think there's a proposed instruction that's been filed with the Court, and we would most likely renew that motion.

THE COURT: And the defense at least objected to it in the conference we had with the Western District of Missouri taint -- I can't keep all these taint teams straight, but it would be that taint team.

MR. BERRIGAN: I think I also indicated to you in an e-mail, Your Honor, that we'd file a written response. This is one of my deleting mitigator e-mails, and we haven't done that yet, and I apologize. We will file a brief response.

THE COURT: Okay. We've got a lot of time to reach that issue.

MR. BERRIGAN: Right. I thought so too. Right.

MR. WILLIAMS: We just wanted to make sure we were giving you a heads-up as much as possible.

THE COURT: And what I'd like you to do if you can --

MR. WILLIAMS: Yes, sir.

THE COURT: -- and I'm not saying I'm going to give the instruction, although my initial inclination was I was leaning towards giving some instruction about that -- without waiving any objection to me giving the instruction, would you make some modest effort to see if you could agree on the language of the instruction? Then we can argue about whether I

ought to give it or not, and I haven't decided whether I'm going

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2470 of 3592

to give it or not.

MR. BERRIGAN: You made the exact same request of the taint team, but that didn't happen. The next thing that happened was there was a motion, and so I'm happy to talk to these gentlemen about that, Your Honor. I apologize we did not do that before the motion was filed.

THE COURT: No, but I don't think it was necessarily your obligation to do it at that point. And now that the taint team is essentially out of it and you two can deal directly with each other, I suspect that can happen, and I'm in no big hurry. It's really a pretty simple concept. But I'd like you to take a stab at it just in case I decide to do it. We can plug it into one of the final instructions.

MR. WILLIAMS: We will certainly do that, Your Honor.

MR. BERRIGAN: Sure.

THE COURT: Okay. We'll see you tomorrow morning at -- well, I guess we -- we'll be meeting at eight o'clock tomorrow morning; correct?

MR. WILLIAMS: That's correct, on the telephone call.

THE COURT: So why don't we meet at 7:45, see if there's anything else before we have our 8:00 matter to take up.

MR. WILLIAMS: Very good.

THE COURT: Thank you. We'll be in recess.

(The foregoing trial was adjourned at 4:41 p.m.)

2823

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Page 244

VOLUME 16 6-1-051

Shelly Semmler, RMR, CRR

11-5-05
Date

2824

INDEX

WITNESS:                                                    PAGE:


STEVE VEST
        MR. WILLIAMS                                        2550
        MR. BERRIGAN                                        2576
        MR. WILLIAMS                                        2618
        MR. BERRIGAN                                        2623

KATHY RICK
        MR. WILLIAMS                                        2627
        MR. BERRIGAN                                        2642
        MR. WILLIAMS                                        2668
        MR. BERRIGAN                                        2669

Page 245

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2472 of 3592

VOLUME 16 6-1-051

ALYSSA NELSON
      MR. WILLIAMS                  2670
      MR. BERRIGAN                  2684

JENNIFER RINDEN
      MR. WILLIAMS                  2696
      MR. BERRIGAN                  2698

MICHAEL MITTAN
      MR. WILLIAMS                  2701
      MR. STOWERS                  2744
      MR. WILLIAMS                  2772

KYLA DAVIS
      MR. WILLIAMS                  2774
      MR. STOWERS                  2779
      MR. WILLIAMS                  2790

LAURA SHELLEY
      MR. WILLIAMS                  2791
      MR. STOWERS                  2794

WILLIAM BASLER
      MR. WILLIAMS                  2799
      MR. STOWERS                  2810

* * * * *

2825

EXHIBITS:

1120A                                      2726
1121A                                      2731
83                                                2735
1142 through 1145                  2801
1146                                        2804
1113                                        2807

2137                                        2667

* * * * *

Page 246

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2473 of 3592

2826

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

       Plaintiff,                        Sioux City, Iowa
                      June 2 2005
   vs.                                   8:03 a.m.

ANGELA JANE JOHNSON,                         VOLUME 17 of 24

       Defendant.
                      /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                          Assistant United States Attorney
                          Suite 400 - Hach Building
                          401 First Street Southeast
                          Cedar Rapids, IA  52401

                          THOMAS HENRY MILLER, ESQ.
                          Iowa Attorney General's Office
                          Area Prosecutions Division
                          Hoover State Office Building
                          Des Moines, IA  50319

For the Defendant:        PATRICK J. BERRIGAN, ESQ.
                          Watson & Dameron
                          2500 Holmes
                          Kansas City, MO  64108

                          DEAN STOWERS, ESQ.
                          Rosenberg, Stowers & Morse
                          1010 Insurance Exchange Building
                          505 Fifth Avenue
                          Des Moines, IA  50309

                          ALFRED E. WILLETT, ESQ.
                          Terpstra, Epping & Willett
                          Higley Building - Suite 500
                          118 Third Avenue Southeast
                          Cedar Rapids, IA  52401

2827

Page 1

APPEARANCES (continued):

| | |
|---|---|
| For Dustin Honken: (via speakerphone) | ALFREDO PARRISH, ESQ. Parrish, Kruidenier, Moss, Dunn Boles, Gribble & Cook 2910 Grand Avenue Des Moines, IA 50312 |
| (via speakerphone) | LEON F. SPIES, ESQ. Mellon and Spies Suite 411 Iowa State Bank Building Iowa City, IA 52240 |
| (via speakerphone) | CHARLES M. ROGERS, ESQ. Wyrsch, Hobbs & Mirakian Suite 1300 1101 Walnut Street Kansas City, MO 64106 |
| Also present: | Bill Basler |
| Court Reporter: | Shelly Semmler, RMR, CRR 320 Sixth Street Sioux City, IA 51101 (712) 233-3846 |

2828

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Okay, gentlemen. This is United States versus Angela Johnson, 2001-3046. We are in open court, and there is a -- there is at least one member of the media here and members of the public. I'm not going to seal this hearing. And the issue arises out of a subpoena for one member of the Johnson -- I'm sorry, the Honken defense team, and why don't I actually turn it over to Mr. Berrigan. Mr. Berrigan?

MR. ROGERS: Your Honor, before you do that -- this is Charlie Rogers, I'm sorry. Before you do that, could I ask you to revisit the issue of closing this to the public and the media? I believe there is a very real danger to Mr. Honken's safety and well being if the things we're going to talk about become public knowledge.

Page 2

THE COURT: Yeah. Well, you can ask me to reconsider. I've considered, and I'm not sealing the hearing. The lawyers are going to try to be very circumspect in what we're going to cover this morning. The only issue really is which lawyer is going to be here when pursuant to the subpoena as I understand it.

And, Mr. Berrigan, is that the issue?

MR. BERRIGAN: We believe it is, Your Honor. The defense originally subpoenaed all three of Mr. Honken's lawyers, Mr. Spies, Mr. Parrish, and Mr. Rogers. I have had discussions

2829

with Mr. Rogers on the telephone about this issue. I know Mr. Stowers has as well. And we decided that Mr. Rogers would be a logical choice. He's recently informed us that he has some plans to go on vacation.

And when we learned of that -- and that was very recently -- we offered to allow him to substitute Mr. Spies or Mr. Parrish if he was available. We understood Mr. Parrish might have a trial. And that's kind of where we left our discussions. The response we got from Mr. Rogers to that offer was this letter to the Court that's before us now dated May the 31st, 2005.

THE COURT: Actually it was a letter to the Johnson defense team with a copy to me.

MR. BERRIGAN: I'm sorry. You're right. It is to the Johnson defense team. There's really little question that this testimony we believe is admissible as exculpatory evidence particularly at this phase of the trial without discussing any of the specifics of it. And so the issue becomes who's going to

Page 3

be available to present that.

Obviously Mr. Honken has already exercised his Fifth Amendment privilege, and we recognize that. But we do not believe the conversations that took place regarding this proffer in the presence of government lawyers are at all privileged materials. We're not seeking in any way to invade the attorney-client privilege of Mr. Honken and his lawyers

2830

respecting conversations they had privately. That's not our intent at all.

But there must be some setting made in terms of testimony for the evidence that's in this proffer that we seek to introduce, and the people that are in the best position to do that, at least in our view representing Miss Johnson, are the attorneys for Mr. Honken. And frankly, it doesn't much matter to us which one of them appears. And if Mr. Parrish or Mr. Spies would rather take Mr. Rogers' place, we're happy to accommodate them. Sorry we prematurely released them from the subpoenas. We were not anticipating this problem, frankly. But that's essentially our position, Your Honor.

MR. ROGERS: Your Honor, may I respond? This is Charlie Rogers again.

THE COURT: Yes.

MR. ROGERS: First of all -- when I received a copy of the subpoena I want to say a month ago, over a month ago, I telephoned Mr. Stowers' office which was the contact information given on the subpoena. I told one of his employees who answered the telephone about it and told them of my vacation plans, so this is not something that is recent. I also have talked with Mr. Stowers about that more than once within the past couple of

Page 4

weeks, so it's not something that has been sprung on them.

But basically, Your Honor, first of all, I think even mentioning of the subject matter of the proposed testimony is a

2831

risk to Mr. Honken. But having said that, whether or not the conversation was privileged, it certainly was confidential.

THE COURT: Mr. Rogers, just a second. The only issue I'm addressing is which lawyer's going to be here on what day. You can move for a protective order. I'm not taking that up at this time.

MR. ROGERS: Okay. We'll have to do that.

THE COURT: The only question is which lawyer's going to be here on what day, and so what's the answer to the question?

MR. ROGERS: I certainly --

THE COURT: Mr. Berrigan, what day is it that you're requesting or subpoenaing one of the lawyers for?

MR. BERRIGAN: I think Mr. Rogers' subpoena says the 6th, Your Honor, but, frankly, any day next week, whatever is most convenient for these lawyers, we would accommodate them. We expect the mitigation phase to go through at least the end of Wednesday, possibly and probably into Thursday which would be the 9th. So the 6th, 7th, 8th, and 9th are all available days, and we'd be willing to put them on any day that's convenient to any of those gentlemen.

THE COURT: And basically put them on out of order at the time.

MR. BERRIGAN: You bet, absolutely.

THE COURT: Okay.

Page 5

MR. PARRISH: Judge, Alfredo. My trial -- my trial in Fairfield is still scheduled to go on Monday, and it will go at least through Wednesday I know.

THE COURT: Okay. What about Mr. Spies?

MR. SPIES: Your Honor, this is Leon Spies. I have a trial that was scheduled to start on Monday, but I believe it has been bumped. I do have hearings in Davenport on Wednesday, the 8th. If the sole issue is which lawyer, I think that Mr. Rogers and I can work that out.

THE COURT: Okay. Now let me ask you this. Based on the letter that I was copied in on from Mr. Rogers, there may be a question on whether or not the subpoena was -- complied with the technical requirements of the rule. And if you're going to raise that, the lawyers are entitled to know that now.

My position is I think as officers of the Court you ought to make yourself available, but I understand that because you're not agreeing to come that you may require a valid subpoena. Could that just be served on you when you're here, or are you going to require them to serve it on you before you come, because I'm not so sure the subpoena was lawfully served?

MR. ROGERS: I'm the one who raised that, Your Honor, and I'm not going to quibble about that. I mean, I wasn't actually served. It was left at my office when I was out. I came back and got a copy of it and was told that the marshal's office would be by to serve it. They weren't, but that's not

a -- I'm not making that an issue.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2479 of 3592

THE COURT: Okay. So what day -- do I understand that the three of you are going to kind of decide among yourselves who's going to be here and on what day?

MR. SPIES: Yes.

MR. PARRISH: Alfredo. Yes, Judge, we will do that.

THE COURT: Okay. And, you know, you're free to file a protective order, but you probably -- my suggestion would be before you go ahead and file the protective order, why don't you get on a joint conference call with Mr. Williams and Mr. Berrigan or who's ever going to handle it on the Johnson team, and we had a discussion this morning about what the scope of the questioning would be.

And my understanding is they would be happy to talk to you about that, and that may -- I don't know, but it could obviate the need to file a protective order, but you're obviously free to file a protective order. But I think you'd be in a better position to file a protective order after you had a discussion with counsel on both sides to figure out what it is that they're going to be asking you and what the scope of the testimony will be. And then you'd be in a better position to file your protective order. So that's just a suggestion.

MR. PARRISH: Alfredo here. Do we have an idea of the time yet that we could discuss this? We'll have a meeting right after this by phone.

2834

THE COURT: Oh. When you can reach the lawyers?

MR. PARRISH: No, Judge. As to what day they would want us. I think there was an option of probably Monday or Tuesday but not Wednesday and maybe Thursday if they have to go

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2480 of 3592

to that date.

THE COURT: I think it's Monday, Tuesday, or Wednesday.

MR. PARRISH: Oh, okay. All right. Gotcha. All right.

THE COURT: I think they're trying to be as flexible as they can.

MR. PARRISH: Okay.

THE COURT: Okay. Is there anything else we need to talk about?

MR. PARRISH: Charlie and Leon, I'll call -- I'll set up a conference right after.

THE COURT: Okay. Thank you, gentlemen.

(Mr. Honken's attorneys withdrew from the hearing by hanging up.)

THE COURT: Anything we need to take up before 8:30?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. Thank you. We'll see you at 8:30.

(Recess at 8:15 a.m.)

                                                    2835

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. STOWERS: Yes.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated.

Mr. Basler, you're still under oath. And we're in the -- your cross-examination by Mr. Stowers.

WILLIAM BASLER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
                    Page 8

CONTINUED CROSS-EXAMINATION

BY MR. STOWERS:

Q.   Agent Basler -- hopefully everybody can hear me today.   I kind of talk a little quietly.

Agent Basler, I think yesterday we started talking about some things, but I want to make sure the jury has the correct time table as far as Angela Johnson's whereabouts over the past period of time since she was arrested at the end of July in the year 2000; okay?

A.   Sure.

Q.   Now, she was arrested on the 29th of July I believe it is of 2000 and booked into the Benton County Jail after being arrested.

A.   That's true.

Q.   Okay.  And she remained in the Benton County Jail in Vinton, Iowa, until October -- was it 3rd or so, 2nd, 3rd, 4th, somewhere in there?

2836

A.   Somewhere in there.

Q.   Okay.  And then she was in -- after being removed from the Benton County Jail, she was transported to the Black Hawk County Jail which is in Waterloo, Iowa; is that right?

A.   Yes.

Q.   And she was held up there I think for 13 days or 14 days including the time that she spent in the hospital following her suicide attempt; is that right?

A.   I believe so.

Q.   And then it was actually the 16th -- I believe it's the 16th, maybe -- yeah, the 16th of October of the year 2000 that

Page 9

she checked into the Linn County Jail.  That sound right?

A.   I'll trust your judgment on that.  I thought it was in November, but you could be right.

Q.   Let me show you what we've previously marked as Exhibit 2121 and ask you if you can take a look at that to help yourself out with some of these time issues.  Does that help you remember that she actually was checked into the Linn County Jail on about the 16th of October of the year 2000?

A.   It doesn't help me remember because I never knew, but it indicates that she was in the Linn County Jail in October.

Q.   And Exhibit 20 -- is that 2121 in front of you?

A.   Yes.

Q.   -- is actually the full inmate activity log -- prisoner activity log I think they call it -- for her stay there at the

2837

Linn County Jail, and it's about 239 I think pages; is that right?

A.   I don't know how many pages but . . .

Q.   Can you read the last page?

A.   That's right.

Q.   And the exhibit just so the jury understands it that you referred to which is a behavior sheet, Exhibit Number 1146, which is several pages in length, the behavior warnings sheet, you remember that exhibit?

A.   Yes.

Q.   That actually is a computer selection of items that are contained in that inmate activity log which is much, much longer; right?

A.   I believe so, yes.

Q.   And apparently there's a way through the computer system at

Page 10

the Linn County Jail that certain, I guess, searches can be done of the inmate activity log so that you select out certain categories of information at the request of somebody who might want to know certain things about what an inmate was doing at different times; is that right?

A.    I don't know.

Q.    Do you know anything about how Exhibit Number 1146 which is headed Prisoner Activity Log For Event Type, colon, Behavior Warning was created?

A.    No.

2838

Q.    You know how those computer entries are made?

A.    No.

Q.    In any event, continuing with our time table, when is it, according to the Linn County --

        MR. STOWERS:  And I'd offer Exhibit 2121 at this time.

                        *   *   *   *

        (Defendant Exhibit 2121 was offered.)

                        *   *   *   *

        MR. WILLIAMS:  No objection, Your Honor.

        THE COURT:  2121 is received.

                        *   *   *   *

        (Defendant Exhibit 2121 was admitted.)

                        *   *   *   *

BY MR. STOWERS:

Q.    When is it according to that Linn County prisoner activity log that Angela Johnson would have departed the Linn County Jail?  You'd need to probably look at -- I don't know if it's on the first page.

Page 11

A.    It's on the first page.  Indicates she was there through August 6 of 2004.

Q.    Okay.  So she was there for almost -- how many months would that be?

A.    Looks to be two months shy of four years.

Q.    Forty-six months in a county jail in Cedar Rapids, Iowa; is that right?

2839

A.    Yes.

Q.    Okay.  And she then went to what location?

A.    She was then transferred to the Hardin County Jail in Eldora, Iowa.

Q.    Sort of moving across the state, getting a tour of all the county jails from Vinton to Linn County, now over to Eldora; is that right?

A.    I think there was a reason for each move.

Q.    Right.  Why don't you tell the jury why she was moved from the Linn County Jail as long as you've brought that up.

A.    She was moved at the discretion of the United States marshals.

Q.    Right.  And you're aware that there had been some information received of threats that were being made toward her and directed towards her by Dustin Honken about things that he was going to do or have witnesses in his trial do to her in the Linn County Jail when they were brought back here supposedly to testify on his behalf.  Aware of that generally?

A.    Generally aware of that, yes.

Q.    And so the marshals took that information sufficiently seriously that although Ms. Johnson had been held at the Linn County Jail for almost four years they felt it necessary to move

Page 12

her to another location that Mr. Honken would not know about which was in Eldora, Iowa, which is central part of the state I guess, isn't it?

2840

A.    Yes.

Q.    And then she remained in the Hardin County Jail in Eldora right up until the time shortly before the commencement of our trial here with the jury selection; right?

A.    Yes, it is.

Q.    And obviously you'd be aware that there would be times when she would be transported to and from court proceedings that have been held here in Sioux City, some of which you've attended, and she'd be transported up here by the marshals for those things from these various jail sites; true?

A.    Yes.

Q.    Or I guess we've held court a couple times over in Cedar Rapids, so that was a little more convenient if she was in the Linn County Jail at that time.

A.    I'm generally aware when she was moved.  I'm not on the list where they contact me when that happens.  The marshals have her in their custody, and they do what they want with her.

Q.    Right.  And at the same time you have made some requests, you and the U.S. attorney who has been working on this case before Mr. Williams -- that was a guy by the name of Mr. Reinert; is that right?

A.    Yes.

Q.    And you've made some requests of the jails holding Angela Johnson that they monitor her activities with some degree of closeness; is that right?

Page 13

A.    I don't believe I asked them to monitor her activities, no.

Q.    Did you ask them to monitor her phone calls?

A.    Yes.

Q.    Okay.  Did you ask them to monitor and copy all of her mail?

A.    A qualified yes.  Can I explain?

Q.    Well, I don't need an explanation right now.  All I really need to know is did you ask them to copy all of her mail other than her legal mail?

A.    Then the answer without the explanation would be no.

Q.    Did you through the U.S. attorney ask that that be done?

A.    No.

Q.    Okay.  Are you aware that it was asked to be done?

A.    No.

Q.    Was it done?

A.    No.

Q.    Her mail was not copied?

A.    It was for periods of time.

Q.    Oh, I see.  Not 100 percent.

A.    That's right.  That's what I was trying to explain.

Q.    Okay.  Do you want to explain that now?

A.    I wanted to before, but you didn't want me to.

Q.    Do you want to now?

A.    If you'd like.

Q.    Would you?

2842

A.    When she was in Linn County for those months, almost four
Page 14

years, they claimed not to have the staff or the manpower or the capability or whatever to either monitor the mail, copy the mail for me, or to make copies of her telephone calls. So for that nearly four-year period of time when Ms. Johnson was in the Linn County Jail, we did not have access to any correspondence that she sent or received or any telephone calls that she may have made.

Q. Can you take a look at Exhibit 2121 and see if you can determine in there whether or not they, in fact, logged every item of mail that came or went for Ms. Johnson in that exhibit. Just take a look in there.

A. You want me to look at all 239 pages?

Q. No. Just take a look in there and see if that appears to be the case, that they were logging her mail, incoming and outgoing, through her entire stay there.

A. Yes. By logging you mean indicating that she received a letter?

Q. Or her outgoing correspondence.

A. I didn't see that, but I would assume that would be the case as well.

Q. Just so the jury knows what we're talking about, I'm going to show them page 8 of that exhibit, and hopefully I'm going to focus it as well. See in there there are certain entries that indicate mail log on that page of the exhibit?

2843

A. Yes, I do.

Q. The jury will have this exhibit with them back in the jury room, but they have logged all of her mail including to whom it was sent or from whom it was sent to her at the jail including

Page 15

her attorney correspondence; is that correct?

A. Yes.

Q. So apparently they had the time to make these detailed entries in the log book but didn't have the time to simply copy the contents of the mail.

A. I don't know what their reason was. They just said they couldn't do it.

Q. Now, at the same time you're aware that inmate correspondence from Ms. Johnson would have been opened and inspected pursuant to their routine practice at the Linn County Jail. You're aware of that.

A. Yes. Generally I think that every jail has that policy. I don't know that I've reviewed theirs specifically, but I'm sure they have that.

Q. And they don't open and inspect attorney materials because of the nature of those papers; right?

A. I would assume.

Q. Now, when she was in the Benton County Jail, you did, in fact, have success in getting copies of all her correspondence.

A. I think so. I requested it, and they said that they would try and get me copies of all the letters that she wrote and

2844

also --

Q. And --

A. Excuse me. I'm sorry.

Q. Go ahead. I'm sorry. I didn't mean to interrupt.

A. No, that's fine. I asked for both incoming and outgoing mail.

Q. Now, when she was in the Benton County Jail, I assume you then received and reviewed many letters that she would have

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2489 of 3592

either received from her children or her siblings or her parents or that she had sent to them.

A.   Yes, I did.

Q.   Did you also ask the folks at the Benton County Jail to record any conversations that she would have had with visitors?

A.   No.

Q.   Are you aware that that was done?

A.   No.

Q.   And with regard to her stay at the Hardin County Jail, you were able to get all of her letters there; is that correct?

A.   I requested them all.  It's pretty much up to them if I get them all, but I believe that I did.

Q.   And they have a better phone system at the Hardin County Jail at least as far as taping and capturing phone calls; is that correct?

A.   Better than what?

Q.   Apparently better than Linn County.

2845

A.   I don't know what Linn County's system is.

Q.   Well, you were able to get Angela Johnson's phone calls while she was in the Eldora jail; is that correct?

A.   Not quite.  They were switching their telephone system I believe shortly after Ms. Johnson arrived there.  When she first arrived, they told me that they didn't have the means to retrieve every call that she made and that, therefore, the recording of her telephone calls would be sporadic at best. They would have to visually see her on the telephone and then manually make that recording.  After she arrived, there was a switch in systems that I mentioned, and then they were fully

Page 17

automated to be able to retrieve those calls.

Q.   And that happened -- when they switched over to this fully automated system was later in the -- late last year.

A.   That sounds right, yeah.

Q.   So from that point on you were able to monitor all her phone calls and listen in on them after they were captured.

A.   I didn't listen in, but I listened to recordings of those calls.

Q.   Now, you testified a little bit yesterday about these four disciplinary reports I think they're called from the Linn County Jail.  They were Exhibits 1142, 1143, 1144, and 1145.  I'm going to give you those now so you can have those while we talk about them.

     Do you have 1142 in front of you, Agent Basler?

2846

A.   Yes.

Q.   Now, is this activity that occurred with regard to 1142 which is the disciplinary packet, is this an event that is said to have occurred on February the 2nd of 2001?

A.   Yes.

Q.   And did you have any involvement yourself in actually investigating this event?

A.   No.

Q.   What you've actually done is you acquired the information that the jail put together or puts together in such a situation, and it's been put together in the form of an exhibit which has been introduced through you as a witness; is that correct?

A.   Yes, it is.

Q.   Okay.  Do you see on page -- well, first of all, generally the nature of this is what?  The nature of this disciplinary

Page 18

action was for what?

A.    I believe that Miss Johnson was found in possession of some improper items.

Q.    Do you see on page 3 which I'm showing the jury now those items included paper, apparently four sheets of carbon paper, typing paper which was described as numerous, 13 white envelopes, a paperclip, and 13 square pieces of cardboard, and apparently a matchstick.  Is that what that disciplinary action was all about?

A.    Yes.

2847

Q.    Not an assault?

A.    No.

Q.    Not striking or hitting anybody?

A.    No.

Q.    Now, can you turn to page 9 of that -- yeah, it's page 9 of that exhibit which is -- which exhibit number is it again? 1142?

A.    Yes, it is.

Q.    Thank you.  And is there an explanation in handwriting there which is on pages 9 and 10 by Angela Johnson?

A.    Yes.

Q.    As to her explanation of those events?

A.    Yes.

Q.    And you've read that I assume; is that correct?

A.    I scanned it, yes.

Q.    And I'm showing that to the jury now.  Page 9 is up on the screen.  And Ms. Johnson indicated that she had some misunderstanding about certain of the items; is that right?

Page 19

A.    Yes, it is.

Q.    And that she didn't know that she couldn't have, I guess, certain types of paper or something?  I'm not sure what the rule is and that she explained that in her written explanation to the disciplinary people at the jail; right?

A.    Yes.

Q.    She denied knowing anything about this matchstick, though;

2848

is that right?

A.    Yes.

Q.    And said she wouldn't even know what to do with it; is that right?  Maybe that's not on that page.  But in any event, she explained that she didn't know the matchstick apparently was somehow taped underneath her bed at some point in time.

A.    Yes, I don't see where it says she didn't know what to do with it.

Q.    Right.  That may be somewhere else within these documents. So she wrote out an explanation, and at the bottom of page 10, this troublesome inmate signed it, Thank you for your consideration in this matter, signed Angela Johnson; is that right?

A.    Yes.

Q.    So the first disciplinary report in February of 2001 concerned certain pieces of paper and envelopes, paperclip, et cetera, that were in her cell apparently improperly.  They were not allowed to be in the cell of the inmate I guess; is that right?

A.    Yes.

Q.    So let's talk about number 1143 then.  This would be the next disciplinary packet, and this relates to an incident

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2493 of 3592

occurring on -- can you give us a date on that one?

A.    December 28, 2001.

Q.    At the Linn County Jail.  And this indicates -- page 3 if

2849

you would kind of gives you a synopsis, doesn't it?

A.    Yes.

Q.    And in this synopsis, page 3, which I'm sort of displaying here to the jury indicates that there was an inmate named Rawhouser with whom Angela Johnson had an argument over Rawhouser's body odor; is that right?

A.    Yes.

Q.    And Angela Johnson apparently denied assaulting Rawhouser but did admit to physical contact occurring by both sides; is that true?  Is that your understanding of this situation?

A.    Yes.

Q.    And then apparently there's a tape that the Linn County Jail would have had at least depicting a portion of this situation which is referred to there in this packet; is that right?

A.    Yes, it is.

Q.    Do you know where that tape is?

A.    No, I don't.  I haven't seen it.

Q.    Have you ever sought to acquire it?

A.    No.

Q.    Would the tape be the best way to explain or illustrate to the jury what precisely occurred with reference to this situation if it depicted the situation as apparently this packet indicates?

A.    I would assume so.

Page 21

Q.   Are you familiar with -- let me ask you this.  When they do these disciplinary actions in Linn County, apparently they try to talk to the other inmates and get statements from them?  Are you aware of that?

A.   Yes.

Q.   And in this packet the jury's going to get, 1143, they'll be able to read the various accounts of these inmates about what transpired; is that right?

A.   Yes, it is.

Q.   And, in fact, you're aware that at least some of these inmate accounts corroborated Ms. Johnson's position apparently made in this disciplinary proceeding that she, in fact, had been pushed also by Rawhouser, the -- for lack of a better word, the smelly inmate?  If you look at page -- for example, page 14, do you see that?  That's a witness statement by a witness -- is it Shannon Durek or something to that effect?

A.   Yes, I have that page.

Q.   And you see in there where she reports that Amy, the alleged victim of this pushing, called Angela a F'ing -- she spelled it out -- b-i-t-c-h as she pushed Angela.  Do you see that?

A.   Yes, I do.

Q.   Did you interview that witness?

A.   No.

Q.   Did you interview any of these witnesses in connection with

2851

this episode?

Page 22

A. I didn't interview any witnesses in regards to any of these disciplinary actions by the Linn County Jail.

Q. Thank you. So that episode is an argument which apparently started over -- frankly over one inmate's view of another inmate's body odor, precipitated to profanity, and then resulted in a little bit of pushing back and forth apparently.

A. That incident was an assault.

Q. Or so you say.

A. So the report says and the videotape showed.

Q. And could have been what we call a cross-assault. You'd agree with that.

A. I'm not sure what that is.

Q. Well, where Ms. Rawhouser assaulted Ms. Johnson.

A. Yeah, I don't know if she was disciplined for that or not.

Q. Right. You didn't even look into that.

A. No.

Q. Let's talk about 1144. The date of this occurrence is March the 23rd of 2002; is that right?

A. Yes, it is.

Q. And on this occurrence which is summarized I believe on page 2 if you could turn to that -- I'll show it to the jury -- the summary is basically -- apparently this is -- Angela Johnson was yelling at female inmates. Is that what this episode is about?

2852

A. Yes, it is.

Q. It's not about an assault; is that right?

A. No, it's not.

Q. Or any injuries to anybody; is that right?

Page 23

A.    No.

Q.    It's about what they characterize under their rules as --
on page 6 if you turn to that under the jail rules, they have
labels they put on these things; is that right?

A.    Yes.

Q.    For these disciplinary situations, and I'll show page 6 to
the jury.  There they indicate that this constituted conduct
which disrupts or interferes with the security, tranquility, or
orderly running of this institution because she was yelling at
other women; is that right?

A.    Yes.

Q.    Now, with reference to that exhibit which is 1144, if you'd
turn to page 12 which I'm going to show the page to the jury, do
you have that in front of you, sir?

A.    Yes, I do.

Q.    That's a letter from Angela Johnson to Sheriff Don Zeller
dated March 30 of 2002; is that right?

A.    Yes.

Q.    And what -- who is Sheriff Don Zeller, or who was he?

A.    I'm guessing he was the sheriff of Linn County.

Q.    And the sheriff is the head guy who runs, if you will, the

2853

jail.

A.    That's right.

Q.    As well as all the other county sheriff functions; is that
right?

A.    Yes.

Q.    And have you read this letter?

A.    I scanned it, yes.

Q.    And in this letter Angela Johnson talks about some of these
Page 24

episodes that have been happening while she's been an inmate at the Linn County Jail. Are you aware of that?

A. Yes.

Q. And she explains some things in there about her situation. She says she's a federal detainee, she's been there since October 16 of the year 2000; is that right?

A. Yes.

Q. She knew that. And she believes that people weren't listening to her, didn't care what they had to say, right, first paragraph?

A. I don't see where it says people weren't listening to her.

Q. Didn't care what they had to say or what she had to say.

A. That's right.

Q. And she talked about the confining conditions in the second paragraph under which she was being housed and how they had to share shower and toileting facilities, et cetera; is that right?

A. Yes, it is.

                                        2854

Q. And she talks about how she candidly concedes in this letter that she's -- she's in there with a wide range of women who aren't very happy. A lot of them have bad attitudes and she's had her share of run-ins herself including occasional spats with other inmates; is that right?

A. Yes.

Q. Nothing got too out of hand until she pushed another inmate in December which is one of the prior -- one of the prior incidents that we've talked about?

A. That was the prior assault that we described, yes.

Q. She concedes she was wrong for putting her hands on that

Page 25

other person.  I guess that would be Rawhouser; right?

A.    Yes.

Q.    Says that it should never have happened, I don't foresee it happening again; right?

A.    Yes.

Q.    Charges were filed but later dropped.  Now, you're aware that that situation resulted in a charge being filed in court; right?

A.    Yes.

Q.    And that case was dismissed.  You're aware of that.

A.    Yes, I am.

Q.    She even describes some of the things that have happened to her and how she's tried to avoid conflict, isn't that correct, how people have pulled her hair, threatened her, stolen from

2855

her, and much more and she didn't retaliate?  See that at the bottom of the --

A.    Yes, I see that.  I don't see where she tried to avoid it.

Q.    She says she's walked away from more than you could imagine.

A.    Yes, I see that.

Q.    I'm saying that means she tried to avoid it.  Do you interpret it that way?

A.    Yes.

Q.    She goes on -- I'll figure it out eventually.  She goes on to explain that it's not possible to get along with everyone.  She stopped a lot of fights in the jail; is that right?

A.    Yes.

Q.    And at times she's been a peace maker.  See that in the first sentence?

Page 26

A.   Yes, I do see it.

Q.   And her situation was different than most of the women there in Linn County because these people were passing through and she was there to stay.

A.   She was there being held until her trial.

Q.   For almost four years; right?

A.   Yes.

Q.   But yet she's met people there that she's still in contact with, right, and she got along with more than she didn't, meaning more inmates than those that she didn't get along with.

2856

A.   Yes, that's what it says.

Q.   She says she doesn't run the block, putting that in quotes. She's been accused of that, but she didn't do that; right?

A.   That's what she said.

Q.   And then she had a complaint later on in that exhibit, page 13, about a particular jailer named Vicki Kosina, number 428; right?

A.   Yes.

Q.   Who was apparently somebody she had a good deal of contact with while she was an inmate there; is that right?

A.   Apparently, yes.

Q.   And she goes on to explain her living conditions and how she didn't enjoy her stay there which was, after all, jail, but she seems to be fairly insightful, wouldn't you agree, in this letter into her own behavior?

A.   I don't know if I'd describe it as insightful.

Q.   Have you -- well, the jury's going to get this letter, and they can read it during their deliberations.

Page 27

Let's talk about Exhibit 1145. Now, this is an incident said to have occurred on January the 28th of 2004; is that right?

A. Yes, it is.

Q. And if you turn to page 5, page 5 kind of summarizes the situation there; is that right?

A. Yes.

2857

Q. And this was an assault situation; is that right?

A. Yes. The rule violation is fighting with another person.

Q. And in this situation Miss Johnson's position was that she was essentially defending herself from this other inmate named Jefferson; is that right?

A. Yes.

Q. Now, the report claims that Johnson is twice as big and twice as old as the other combatant which would tend to indicate to me that the situation here was understood by the disciplinary people to involve sort of a mutual combat situation; would you agree with that?

MR. WILLIAMS: Objection. It's a compound question, Your Honor.

THE COURT: Can you rephrase it?

MR. STOWERS: Well, yeah, I will.

BY MR. STOWERS:

Q. The other combatant would be Jefferson as referred to in this report; is that correct?

A. Yes, it is.

Q. And even with this situation we've got some statements, is that right, of witnesses?

A. Yes.

Page 28

Q.   At the end of it on page 10 a complaint which says in the Iowa District Court in and for Linn County, but it's not signed or sworn to.  Do you see that?

2858

A.   Yes, I do.

Q.   Are you aware that complaint was never filed?

A.   I don't know if it was filed or not.  I don't believe so.

Q.   You don't believe it was filed?

A.   I don't think so.

Q.   Yeah.  So there was a complaint prepared.  Those complaints would have to be approved and filed by a local county attorney, the Linn County attorney?

A.   I assume, yes.

Q.   And apparently if this was sent over to the county attorney's office, it was never filed or deemed worthy of filing?

A.   I don't know.

Q.   Did you do anything to look into that?

A.   No.

Q.   By the way, was this Inmate Jefferson put in the hospital?

A.   I don't have any idea.

Q.   Was she seriously injured in any way?

A.   I don't know.

Q.   Do you know if she even had any injuries?

A.   Well, it says she got hit in the head with a closed fist, so I assume there was an injury.  I don't know what extent those injuries might have been.

Q.   Do you know what discipline was taken against Inmate Jefferson?

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2502 of 3592

A.    I'm sorry?

Q.    Do you know what discipline was taken against Inmate Jefferson?

A.    I don't know that there was any discipline taken.

Q.    You don't know one way or the other.

A.    No.

Q.    Now, you're familiar with the layout in the Linn County Jail and the fact that there's a women's unit there if you will; is that right?

A.    No, I'm not familiar with how it's laid out.

Q.    Oh, you actually haven't been inside there?

A.    I have, but I've never had a tour.

Q.    Okay.  But you have talked to many of the female inmates who had contact with Angela Johnson over the years; is that true?

A.    I've talked to a number of the females that had been locked up with Ms. Johnson at the Linn County Jail, but I don't know that I talked to any of them while they were still incarcerated there.  Usually they had either been released or taken to another facility by the time that I did my interviews.

Q.    You've heard reference I think from a prior witness to the term baby killer.  Remember that?

A.    Yes.

Q.    You know from your work on this case that that's a tag, a label, that's been placed on Angela Johnson by other inmates?

2860

A.    Possibly.

Page 30

Q.   Now, while Angela Johnson was in the Linn County Jail, she had made reference I believe in one or more of her letters to certain grievances and things that she had made against people there; is that correct?

A.   I'm not sure what you're referring to.

Q.   Well, one of her letters -- I think it was the letter to the sheriff -- she talked about grievances.  Do you remember that?

A.   Yes.

Q.   And you're familiar with the Linn County Jail has grievance records.

MR. STOWERS:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. STOWERS:

Q.   I'm going to hand you what I've marked as Exhibit 2120, and I'm going to set Exhibit 2028 next to you because we'll talk about that next.  You know that Exhibit 2120 are inmate grievance forms?

A.   Yes.

Q.   From the Linn County Jail?

A.   Yes.

Q.   Completed by Angela Johnson?

A.   That's right.

MR. STOWERS:  I'd offer 2120.

2861

*   *   *   *

(Defendant Exhibit 2120 was offered.)

*   *   *   *

MR. WILLIAMS:  No objection.

Page 31

THE COURT:  2120 is received.

                    *   *   *   *

(Defendant Exhibit 2120 was admitted.)

                    *   *   *   *

BY MR. STOWERS:

Q.  And Exhibit 2028 I think is next to you there.  Do you see that?

A.  Yes, I do.

Q.  And you're aware that when inmates want -- when inmates want something from the jailers they have to fill out these request forms.  Sometimes they're called I think kites and things like that.  You're familiar with that process from your many years in law enforcement.

A.  Yes.

Q.  And Linn County has such forms for inmates to fill out as well, don't they?

A.  Yes, they do.

Q.  And Exhibit 2028 is exactly what that is, some inmate request forms that the Linn County Jail would have retained from Angela Johnson; true?

A.  Yes.

                                              2862


MR. STOWERS:  Okay.  I'd offer 2028.

                    *   *   *   *

(Defendant Exhibit 2028 was offered.)

                    *   *   *   *

MR. WILLIAMS:  No objection.

THE COURT:  2028 is received.

                    *   *   *   *

(Defendant Exhibit 2028 was admitted.)
                    Page 32

* * * *

BY MR. STOWERS:

Q. I just wanted to give you -- oh, if we just go to -- maybe you can't see this. I'm going to display it on the --

A. Excuse me. Can you tell me which exhibit?

Q. We're on 2028.

A. All right.

Q. And I'm probably halfway in it. I'm just going to display it up here on the ELMO, and then it's a 2-21-02 item. Just to give you and the jury an idea of what these might look like, in some instances they've copied these for us on four to a page; is that right?

A. Yes, it is.

Q. In some instances they're two to a page?

A. Yes.

Q. Okay. In any event, you can see Angela Johnson filling out these things asking for some attention to various matters

2863

whether it be the water isn't running right or shower is not functioning properly or the drains are stopped up, et cetera, et cetera. But throughout these documents you can see that although she's making requests she's being quite polite. Wouldn't you agree with that?

A. Yes.

Q. Now, you've got another exhibit that you introduced called a behavior record. That was Exhibit 1146 which I've got right here. Now, Exhibit 1146 would be a computer-generated listing of items which would be considered to be behavior warnings concerning Angela Johnson during her almost four years there at

Page 33

the Linn County Jail; right?

A.   Yes.

Q.   And these would be situations at the jail where a jailer would tell her you're not supposed to be doing that and then somehow it would wind up being entered on this computer record; is that right?

A.   Yes.  I believe that the warnings are those violations that the jail determined didn't rise to the level of the formal report that we talked about earlier.

Q.   And I wanted to go through a few of those items with you so that the jury understands what we're talking about.  This is the list of 89 behavior items; is that right?

A.   I believe so, yes.

Q.   And are you aware, by the way, that after Angela Johnson

2864

got out of the Black Hawk County Jail she was on suicide watch when she was taken to the Linn County Jail?

A.   No, I'm not aware of that.

Q.   Are you aware that she was on a watch at the Linn County Jail where they checked her every 15 minutes for a period of time from October of 2000 all the way until early 2002?

A.   No.

Q.   And that they kept detailed sheets called inmate blue sheets, an inmate blue sheet log, noting everything she was doing every 15 minutes for her whole stay at the Linn County Jail.  Have you seen those?

A.   No.

Q.   You remember ever seeing the inmate blue sheet logs?

A.   I may have, but I don't recall seeing them.

Q.   Big stack of paper about six inches for that year and a

half that she was on suicide watch?

A.    No, I don't remember seeing them.

Q.    Would it surprise you to know that many of the incidents that are referred to in this printout, 1146, don't appear in the inmate blue sheet logs?

A.    Would it surprise me?

Q.    Yeah.

A.    No.

Q.    Even though they were checking and noting things every 15 minutes on her during the time she was on suicide watch, it

2865

doesn't surprise you.

A.    No.

Q.    You don't really know how this Exhibit 1146 was created, do you?

A.    No, I don't.

Q.    Well, let me go through just a few of these items just so you can understand what I'm talking about.  For example, you've got an entry there on January 15 of 2001 on the Exhibit 1146; is that right?

A.    Yes.

Q.    And I put up next to you the Linn County Correctional Center inmate blue sheet log for that date and time period; is that right?  Either I'm blind or -- well, I think that's the best I can do with it.  In any event, is there an entry there for January of 2002?  Do I have the wrong year now?  I'm sorry, January of 2001, January 15, 2001.

A.    Yes, there is.

Q.    I know the print's quite fine on that exhibit.  But next to

Page 35

the date there's a time; is that right?

A.    Yes.

Q.    And the entry on the computer is -- on the computer sheet, Exhibit 1146, refers to caught inmate trying to slide letter, da, da, da, da, da.  Is that in the inmate blue sheet log?  Does that entry appear there?

A.    No.

2866

Q.    But you'd agree that they have log entries every 15 minutes for Ms. Johnson for that date.

A.    Yes.

Q.    And looking at the February 3 date, that's an entry for February 3 at 2211 which would be military time.  That would be 10:11 p.m.; that right?

A.    Yes, it is.

Q.    See an entry in there that corresponds to the entry that appears on the computer record, 1146?

A.    No.  The entry on the blue sheet indicates the same offense only apparently there was an hour different time.

Q.    And if you take, for example, oh, March 21 of 2001 and look at the entry in your exhibit for that and compare it to the blue sheet log, what is the time on the March 21, 2001?

A.    11:21 a.m.

Q.    Is there an entry in the blue sheet log that supports that computer entry?

A.    No.

Q.    And what about the entry for April 9, 2001?  Is there an entry in the blue sheet log to support the computer entry in your Exhibit 1146?

A.    No.

Page 36

Q.    What about September 30 of 2001?  Is there an entry in the blue sheet log to support the entry in your Exhibit 1146?
A.    No.

                                                    2867

Q.    In fact, what are the entries that they made during that time period in the blue sheet log on that date?
A.    It says okay.
Q.    Before and after the time.
A.    Before it says, Back to cell.
Q.    And what about the December 4, 2001, date?  Do you see anything there in the blue sheet log that supports the computer entry?
A.    No.
Q.    In fact, again, I think that one says okay during that time period?
A.    Yes, it does.
Q.    And again on December the 5th of 2001, there's an entry in the computer.  Is that supported by anything in this blue sheet log?
A.    No.
Q.    Now, there's a number of entries on there that are supported by entries on the blue sheet log.  Do you have any explanation for why there would be an entry on the computer but not in the blue sheet log?
A.    No, I don't.
Q.    And you do know, however, that there's a number -- showing you Exhibit 1146 again, there's a number associated very oftentimes with the entries; is that correct?
A.    Yes.

                        Page 37

Q. And is there a jailer number associated with those entries 428 very oftentimes under the event activity column? 428, you see that?

A. Pardon me?

Q. Do you see that?

A. Do I see what?

Q. 428 on Exhibit 1146.

A. Yes, I do.

Q. Okay. And that's the jailer Kosina, the one that Ms. Johnson was complaining about in her letter to Sheriff Zeller?

A. I'm familiar with the letter. I don't know who 428 is.

Q. Okay. Do you remember in her letter she referred to Jailer Kosina, number 428?

A. Yes. I don't know that independently.

Q. And if you go through there on this exhibit, it appears that a very high percentage -- would you agree with this question? It appears that a very high percentage of the entries on the computer log are by Jailer Number 428?

A. I'm not sure I'd agree with that.

Q. Well, some of them aren't identified who the jailer is who's making the entry. Would you agree with that?

A. Yes, I would.

Q. But for those where it is identified, a very high number of them are 428.

2869

A. Yes.

Page 38

Q. And the jury will have that exhibit, and they can look at it and evaluate that themselves.

Are you aware of any assaults that Angela Johnson would have perpetrated on any jail staff at the Benton County Jail, any physical assaults?

A. Physical assaults?

Q. Right.

A. Benton County?

Q. Right.

A. No.

Q. Do you know if she assaulted any of the jailers, struck any of them, hit any of them, at the Linn County Jail?

A. No.

Q. In fact, you have no reports of that, do you?

A. No, I don't.

Q. Are you aware of any assaults she committed against any of the jailers, struck them, hit them, tried to strike them or hit them, swung at them, kicked at them, any of those things in Eldora when she's been at the Hardin County Jail?

A. No.

Q. Are you aware of any inmate who has been physically hurt or injured, had their nose bloodied, their lip bloodied, anything of that nature, as a result of any assault that Angela Johnson is alleged to have committed against them?

2870

A. Am I aware of any inmate that was assaulted by her?

Q. And injured, yeah.

A. Yes.

Q. Well, the one that was hit on the head; right?

Page 39

A.    Certainly.

Q.    Okay.  So you'd say that's an injury because it probably hurt.

A.    I would expect, yes.

Q.    Okay.  Now, other than that, are you aware of any others?

A.    No.

Q.    Now, this route -- switching gears, we're getting out of prison now, outside of the prison walls.  We're back in Mason City, so put yourself in Mason City; okay?  And this route you're talking about from Lori Duncan's home, okay, that you've described where you went north and then you took the rural roadway and then you turned south on Lark Avenue I believe it was; is that right?

A.    Yes.

Q.    That route that you took I think you said was 5 point something miles?

A.    5.3 miles.

Q.    And took you driving the speed limit -- and Agent Graham -- 11 minutes to get there from Lori Duncan's house.

A.    Yes, just over 11 minutes.

Q.    Okay.  And did you do that just one time or more than one

2871

time?

A.    We kind of had a false start on our first try.  We started out this experiment, and we run into some road problems that caused us to stop.  So we went back, started over again.  So in that sense we did it twice.  But we only successfully made it from Lori Duncan's house to the site of the graves one time.

Q.    And that route was one you selected because you thought, well, if somebody was going to kidnap four people and take them

from their home in a vehicle to this location on Lark Avenue they wouldn't probably want to be driving through the city.

A.   I didn't expect that they would want to drive through the heart of Mason City when they had people in the vehicle that were duct taped and bound.

Q.   Right.  And there were certain assumptions obviously that you had to make in reaching that conclusion.  But if you had gone through Mason City, gone down to Highway 18, and then over to Lark Avenue, would the distance have been shorter in terms of travel time first?

A.   I think you just asked me two questions.  The distance would be shorter, but it would have taken longer to get there because we would have been passing through the city itself.

Q.   And did you ever time that route?

A.   No, I didn't.

Q.   So you believe that would have been longer.  And you've lived in Mason City a good number of years.

2872

A.   I've lived there for many years, and I'm almost certain that it would take longer.

Q.   Now, are there any other routes you could have taken other than the route through the city or the route to the north and over?

A.   Of course.  You can take any route you want to get from point A to point B.  What we tried to do was take the most direct route that would take you through the least populated areas of the town as possible.

Q.   Now, are you aware of -- based on the testimony of Mr. Thinnes whether or not this videotape was actually shot in

Page 41

the Duncan home?

A.   Do I know that it was?

Q.   Yeah.  Do you remember Mr. Thinnes testified way many weeks ago?

A.   Sure, I do.

Q.   And indicated that it was his perception that the location was not like a residential one?  Remember that testimony?

A.   No, I don't remember that.

Q.   You really don't know whether or not these folks were bound and duct taped when they left the house or not.  That's just your conclusion that you've reached based on your work on this case.

A.   I don't know why you'd kidnap someone and take them to the location where you're going to kill them and then bind them up

2873

and tape them up.

Q.   Right.  But that assumes that's where they were taken from the house, doesn't it?

A.   Yes, it does.

Q.   Now, you remember there was some testimony about these folks packing or being told to pack because they were going to be gone for a while?

A.   Yes.

Q.   And you're aware that based on your finding as a result of this investigation that a purse was taken with Ms. Duncan when she left the home?

A.   Yes.

          MR. STOWERS:  That's all I have.  Thank you.

          THE COURT:  Mr. Williams?

          MR. WILLIAMS:  No questions, Your Honor.
                    Page 42

THE COURT: Okay. You may step down.

Members of the jury, why don't you take a stretch break.

Ready to call your next witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls Ronda Francis.

RONDA FRANCIS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Thank you. Please be seated in the witness box. And if you'd make yourself comfortable and please adjust that chair, and you can adjust the microphones. And when

2874

you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is Ronda Francis. It's R-o-n-d-a F-r-a-n-c-i-s.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Francis, I'd like you to share some information about yourself with this jury. First of all, where are you from?

A. I'm from Britt.

Q. And were you born and raised in Britt, Iowa?

A. No, I wasn't. When I was younger, we lived several different places, but most of my life I've been in Britt.

Q. And are you married?

A. Yes, I am, for 27 years.

Q. And to whom?

Page 43

A.    Jerry Francis.

Q.    Do you have children?

A.    Yes, I do.  I have three sons.  Joshua's the oldest.  He's 23, and he's at home with us right now.  The second one is Michael.  He's 21, and he was just married in September.  So I have a new daughter-in-law Heather.  And my youngest one is Daniel, and he is 15.

2875

Q.    Are they living all at home with you at this point, or have some of your children flown the nest now?

A.    Michael's married, so he lives in Clear Lake now.

Q.    Do you work outside the home, ma'am?

A.    Yes, I do.  I work for Alliant Energy.  I read the meters, the gas and the electric, so I do a lot of walking.

Q.    How long you been doing that job?

A.    A little over seven years now.

Q.    Now, your last name now is Francis.  Your maiden name is what?

A.    DeGeus.

Q.    You are one of the DeGeus family extended family; is that fair to say?

A.    Yes.

Q.    And Terry was your brother.

A.    Yes.

Q.    I'd like you to explain to the jury a little bit about the rest of your family.  Can you explain, first of all, your and Terry's parents are who?

A.    Our parents are Ed and JoAnn DeGeus, and they live in Britt.  They live probably about three miles cross-sections from where we live now.  My dad does digging.  He has a backhoe and a

Page 44

Komatsu and dump trucks. He does demolition and tears out groves and things like that. My mom does the books for him, so she helps out a lot.

2876

Q. A family business he's had for some time?

A. Yes.

Q. How many years has he been doing that type of work?

A. Oh, at least as many years as I've been out of school, and that's getting close to 30 so . . .

Q. That's kind of an excavating work among other things?

A. Yes.

Q. Hard labor.

A. Yes.

Q. I'm going to bring up some photographs to you and ask you if you can identify these generally.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Ma'am, I think I've just handed you the following exhibits: 1110, 1111, 1114, 1157, 1158, 1161, 1162, and 1164. Can you just generally tell the jury to begin with, are those generally photographs of members of your extended family?

A. Yes, they are.

MR. WILLIAMS: United States would move to admit those exhibits, Your Honor, 1110, 1111, 1114, 1161, 1162, 1157, 1158, and 1164.

                              *   *   *   *

(Government Exhibits 1110, 1111, 1114, 1157, 1158, 1161, 1162, and 1164 were offered.)

Page 45

                              *  *  *  *

        MR. BERRIGAN:  No objection, Your Honor.

        THE COURT:  Those exhibits are received.  Thank you.

                              *  *  *  *

        (Government Exhibits 1110, 1111, 1114, 1157, 1158,

1161, 1162, and 1164 were admitted.)

                              *  *  *  *

BY MR. WILLIAMS:

Q.   We've been talking about your father, Ed DeGeus.  Is

that -- if you look on your screen right there, is that your

father there?

A.   Yes, it is.

Q.   How old of a gentleman is he at this point?

A.   I believe he's 66.  I'm not positive.

Q.   And your mother JoAnn DeGeus actually testified in this

trial earlier in the trial; is that correct?

A.   Yes, she did.

Q.   Has she been attending this trial throughout up until just

recently?

A.   Yes, she has.

Q.   You have siblings other than Terry?

A.   Yes, I do.

Q.   Let's talk about them.  Who are they?

A.   Next in line is my brother Jeff, and he lives in Britt also

not very far from me.  And he works at -- hauling feed and

2878

mixing feed in Garner.  And then my sister Brenda works in Mason

City, lives in Charles City.  She's a nurse.  And my brother Brian lives in Florida, and he does odd jobs like doing drywalls and redoing apartments and hanging blinds and things like that.

Q.    Kind of light construction-type work.

A.    Yes.

Q.    I'm going to show you on the screen here because for some reason my computer isn't working on this one Exhibit 1157.  Can you tell the jury who we're all looking at in that photograph?

A.    Yes.  This is all my brothers and sisters.  It's myself, and Jeff is next to me and then Brenda and then Brian.

Q.    Going from left to right.

A.    Yes.

Q.    Okay.  All your siblings save one; that would be Terry.

A.    Yes.

Q.    You indicated what some of your siblings do for a living. Ronda -- I'm sorry.  You are Ronda.  Brenda -- I always get you guys confused.  Brenda does -- is a nurse you indicated?

A.    Yes, she is.

Q.    And is she married?

A.    Yes, she is.

Q.    And does she have children?

A.    Yes, she does.  She's married to Brian, and when she married Brian, he had three children, so she was a stepmom to three children right off the bat.  And then they had three

2879

children of their own.  They have Brianna who just turned 13 and then a set of twins, Brody and Carissa.

Q.    I'm showing you Exhibit 1158 now.  It's on the screen as well.  Can you tell the jury -- you've just identified her

Page 47

husband Brian and the children; is that right?

A.    Yes.

Q.    And the twins are the smaller children in that photograph.

A.    Yes.

Q.    How old are they at this point?

A.    I believe that they are 11.

Q.    Just slightly older than Amber -- I'm sorry, Kandi would have been at the time of her death.

A.    Yes.

Q.    Your brother Jeff, is he married?

A.    Yes, he is.

Q.    Showing you Exhibit 1162 on the screen there.  Is that your brother Jeff?

A.    Yes, it is.

Q.    And who's with him there?

A.    His wife Becky.

Q.    And have they been married for a while?

A.    Yes, they have.

Q.    And do they have children as well?

A.    Yes, they do.  They have -- actually my brother was married before, and we lost her to an illness.  So from his first wife

2880

he has Nicole and Holly, the two girls.  And then he's married to Becky now.  And she had a daughter Sarah and a son Cody.

Q.    I'm showing you Exhibit 1161.  And can you identify who the children are in that photograph, ma'am?

A.    Yes.  The bottom one on the left is Cody, and next to him is Holly, and then the one on the top left is Nicole, and the one on the right is Sarah.

Q.    You have a lot of members to your immediate and extended

family here.  Is that fair to say?

A.    Yes, yes, we do.

Q.    Can you describe for the jury what kind of a family are you?

A.    We try to stay as close as possible.  If we don't have a reason to get together, we try to make a reason to get together because we like to see each other and spend a lot of time together.

Q.    Do you all live fairly close to each other?

A.    Brenda lives in Charles City, so that's a ways away. That's about hour, hour and 20 minutes I suppose.  But Jeff only lives about ten minutes from me so . . .

Q.    And then your brother Brian lives in Florida.

A.    Lives in Florida.

Q.    That's right.  And you and other members of your family have been in attendance during this trial fairly often.

A.    Yes, we try to as much as we can.

2881

Q.    Now, hardly a day's gone by, ma'am, in this trial where something bad hasn't been said about your brother Terry.  I want you to explain a little bit in your own words the Terry DeGeus that you knew.  Let's start off with him as a brother when you were growing up.  Can you share with the jury something about him as a young man?

A.    Well, growing up we always seemed to live in the country most of the time, so as children we had to play together.  That was our only form of activity.  So we played outside a lot.  We weren't hardly ever found in the house.  We used to do a lot of things on the farm.  We'd climb trees, make forts, snow forts,

Page 49

climbed in the haymow.  We used to have some animals to take care of, a few billy goats one year and some geese.  We used to climb trees.  Lot of trees we climbed.

Q.    You had some motor bikes?

A.    Motor bikes.  We had motor bikes.  We used to make hills and little jump ramps and stuff and play with the motor bikes.

Q.    Terry was older or younger than you?

A.    Younger.  I'm the oldest.

Q.    And he was about three years younger than you.

A.    Yeah.

Q.    As a little brother to you, what was Terry like with you and the other children?

A.    We were always there for each other.  We always helped each other out.  If one was in trouble, we helped the other one out

2882

and vice versa.  We used to ride the motor bikes, and one time they showed me how -- the first time that I ever rode it, they showed me how to shift it, and we lived up a driveway that was a half a mile long.  And they put me on it, and they let me go, and when I got to the other end, they forgot to teach me how to downshift, and I went off the end of the driveway, and they left where I left, and they were racing down the driveway coming to check on me to make sure I was all right.  We got the bike picked up.  It was all right too but . . .

Q.    Terry among them?

A.    Oh, yes.

Q.    What was Terry like?  Did you get along with him, and did he get along with the rest of the children?

A.    Oh, yeah.  We all got along really good.  Like I said, we had to learn how to play together and do everything together

Page 50

where all we had were each other.

Q.   Was he helpful to you on occasion when you got in trouble or got yourself in a fix?

A.   Yeah.  There was a few times.  There was one time when I climbed a tree.  They talked me into climbing this huge cottonwood tree, and we got up there in it, and I couldn't get down.  I was scared to death.  So he had to climb back up and stay behind me and guide me down the whole way and get me back to the ground.  So yeah, he's always been very caring, very loving.

2883

Q.   As you got older and became young adults, what was your relationship like with Terry at that point?

A.   We still communicated with each other.  We were still close.  I used to play softball when I was younger, and every once in a while we'd run into each other, and we'd have a beer, talk together, talk about how come I was out of the house that night, and I said I was at a meeting, and he said, Well, don't be too late at your meeting.  I said, No, I won't, so we always had fun.

Q.   Did you ever have a chance to talk to him about his belief in God?

A.   Yes, I did.  After Terry divorced Wendy, it was a struggle for him in there for a while, and he was back home with Mom and Dad for a while.  And he'd gone to the flea market, and he brought home a few things.  He liked collecting, oh, fancy little trinkets, bottles.  He had a bottle that looked like an "I Dream of Jeannie" bottle that he'd purchased, and he also purchased a picture of the Lord, and he made sure I knew that

Page 51

because Terry always did make sure that Ashley went to church and that she was baptized, and he liked to make sure I knew that.

Q. Strong Christian belief system in your family, ma'am?

A. Yes, there is.

Q. At some point you learned that Terry disappeared.

A. Yes.

2884

Q. Can you share with the jury what your feelings were and what the rest of your family's feelings were they shared with you during those long years where Terry was gone but you didn't know where he was?

A. It's very hard on a family when somebody you love disappears and you don't know what happened to them. It's very stressful. You have nightmares about what could have happened, and you try to tell yourself that he was probably gone, that there was nothing we could do, but you still kept a hope inside of you that since we never found a body or anything that he was probably all right because Terry was that type of guy, you know. So myself, I let myself believe that he was under witness protection or something so that I knew that he was safe.

But then you go through the whole thing all over again because when they took up the remains, then you had to grieve again. It's been very hard on my parents. My mom's not here today because her health isn't good. She's been way too stressed.

Q. She saw the doctor last Friday, in fact, and the doctor's orders was --

A. That she was not to come anymore. It's too hard to sit and listen to the things that probably happened to my brother and to

Page 52

know that he was hurt like that.

Q.   Your father's a tough man, hard laboring man.

A.   Yes, he is.

2885

Q.   How's he taking this?

A.   Very hard.  My dad's a tough man.  He exudes power and authority.  He always made us behave when we were younger.  We grew up in a very strict household.  But my father really is a teddy bear at heart.  He's kind and loving.  And this has really brought him down.

Q.   Can you compare what Terry was like because we've heard statements that Terry was a tough young man?

A.   Terry was just like my dad.  He's a guy that when they walk in the room that you know that they are strong and they are powerful, but you also know that they are loving and kind and caring, and all you have to do is ask and they'd do anything for you.

Q.   Did Terry work with your dad for a number of years?

A.   Yes, he did.

Q.   Did they become close as a result of that?

A.   Yes, they did.

Q.   What was Terry like as a worker?

A.   Terry's a very hard worker.  That's one of the things my father instilled in all of us.  I know that we're all very athletic and strong, and we try to do the best that we can do at what we do.  And so Terry always did a really good job and worked with Dad.

Q.   Seven years elapsed between the time of Terry's disappearance and the recovery of his skeletal remains.  How did

Page 53

your parents deal with that long period of not knowing?

A.   That's a very long time to go without being able to ever put closure to anything.  So it's very hard on the whole family. My parents were a lot like me.  They knew that the night that he left that he probably would never come home again, but like me, they always thought he'd walk through the door some day.  Their health has really suffered for it because your mind just -- it just plays -- it just wanders, takes you on trips where you know things are going to be great, but then you have nightmares about how you know things weren't.

Q.   And that's happened with you as well.

A.   Yes.

Q.   How about your sister and your other brothers, Jeff and Brian?

A.   Yes, very much so.  It's affected pretty much all of our health.  Our blood pressures haven't been too good, a lot of depression and a lot to deal with.  It was a lot to deal with. It's a journey that I wish on nobody ever in their lifetime.

Q.   In addition to your mother seeking medical treatment, have other members of your family also on occasion as things have gotten tough sought medical treatment for their emotions and feelings?

A.   Yes, they have.  My dad's blood -- my dad's diabetes shot up, and so he's been dealing with that.  My brother Jeff has been trying to get his blood pressure under control, and my

2887

sister, she's had a hard time.  She can't sleep very well at
Page 54

night, and she's on depression medication and things too.

Q.   You've heard testimony through the times you've attended this trial and the last one about how Terry died.  Have you thought about that much?

A.   Yeah, and I know that's why my mother -- the brother that we know and the son that we know, the father, he was a good, kind, loving man.  And to hear the things that they did to him was very, very hard on everybody.

Q.   Sounds like he went down fighting.

A.   Yeah, and we knew that he would because he's a very strong guy like everybody said.  And we're still all surprised that he was able to be surprised like that.  And every day we thank the Lord that he left my niece with my mother.

Q.   Ashley.

A.   Yes.  Otherwise we wouldn't have her either, and she's all we have left of my brother.

Q.   You indicated earlier that it was tough a second time when you learned that the remains were found and you had to grieve again.  Can you share with the jury what impact that had on you and your family?

A.   The day the remains were found was like -- to us is like the day that he died because that's the day we had to face the facts that he was actually gone from us.  So it's like you go a long time and you grieve, and then you hope, and then your hopes

2888

are dashed because you find out what truly happened.  And it was very hard on all of us.

Q.   Were you able, you as an extended family able, immediately to provide him a Christian burial?

Page 55

A.   The time was hard.  We had to wait a while to get all the remains back because of the trials going on.  So that meant another waiting period.  But we finally did receive the remains, and my brother is properly in a burial spot, and he has a headstone, and we know where he is now.

Q.   There was a funeral for him this last fall, in early October; is that right?

A.   Yes.

Q.   Well attended?

A.   Very well attended.  Terry had many, many friends and all the family.  They came from quite a ways away to pay their respects and to say their good-byes.

Q.   The Terry DeGeus that's been described by witnesses in this case, is that the Terry DeGeus that you and your family knew?

A.   No, it is not.  The Terry we know was loving and fun.  He was always at the family functions, and he loved the kids, and he played with the kids, and he was always a good father, always a good brother, always a hard-working son.

Q.   There was a period where Terry dated a woman by the name of Angela Johnson.  Do you remember that time?

A.   Yes, I do.

2889

Q.   Angela Johnson actually attend some family functions?

A.   Yes, she did.

Q.   There's a photograph in front of you of a picnic table.  Can you find that for me?  What exhibit number is that?

A.   1114.

Q.   Showing the jury Exhibit 1114, is that Terry we see back there with the mustache back toward the camper there on the right-hand side?

Page 56

A.    Yes, it is.

Q.    It's your brother Jeff that's kind of closest here on the left-hand side of the photograph with the mustache and glasses?

A.    Yes, it is.

Q.    It's your mother behind him?

A.    Yes.

Q.    JoAnn?

A.    Yes.

Q.    The woman that's to the right of your brother Terry there, who is that?

A.    The one with the camera?

Q.    No, the one with the glasses.

A.    The one with the cigarette?  That's Angela.

Q.    Angela Johnson at a DeGeus family function?

A.    Yes.

Q.    The Angela Johnson that's been convicted by this jury of helping Dustin Honken brutally murder your brother.

2890

A.    Yes.

Q.    Was Terry loved by his family?

A.    Pardon me?

Q.    Was Terry loved by his family?

A.    Very much so.

Q.    Did he love you and the rest of the family?

A.    Yes.

Q.    Do you miss him?

A.    Oh, yes, very much so.

Q.    What do you miss most about Terry, your brother?

A.    He was always there, always there to lend a helping hand.

Page 57

We always had fun. My sons even remember him, and they miss him because he used to play with them a lot and do things with them. He's very well missed.

Q. Not just by you, not just by your parents, not just by your sister and your brothers but by even grandchildren and --

A. Yes, yes, very much.

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Mr. Berrigan, can we defer your cross until after the morning recess?

MR. BERRIGAN: You bet. Absolutely.

THE COURT: Members of the jury, it's ten after ten. We'll be in recess for 25 minutes until 10:35. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up?

2891

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: No, sir.

THE COURT: Thank you.

(Recess at 10:10 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Berrigan, you may cross-examine.

CROSS-EXAMINATION

BY MR. BERRIGAN:

Q. Miss Francis, my name's Pat Berrigan. I know we haven't met, but if you've been here during the trial, I'm sure you know I'm one of Miss Johnson's attorneys.

A. Yes, I do.

Page 58

Q. And I know this is painful for you, and I'm going to try to be brief; okay? This is obviously a -- and you've testified about how painful and stressful this has been for your whole family; am I right?

A. Yes.

Q. And you obviously have a close family, and I notice that many of you have been present almost throughout the entire trial.

A. Yes.

Q. And that's taken a good deal of the time, at least these

2892

last couple of months out of your life.

A. Yes.

Q. It had to be expensive for you in many ways not just financially.

A. Yes.

Q. Does the government at least cover some expenses in terms of your hotels and meals and things of that nature?

A. Not that I know of. I don't -- we had a crimes victim thing that helped out a little bit.

Q. Okay. So there's a fund apparently for some of the expenses.

A. Yeah.

Q. I wanted to show this picture to you again, 1114. This is the last picture that you saw, Number 1114. Do you see those glasses that Miss Johnson has on?

A. Yes, I do.

Q. And obviously this is outside, and looks like it's pretty sunny.

Page 59

A.    Yes, it was.

Q.    Did you ever notice Angela Johnson wearing dark glasses indoors when she used to date your brother?

A.    No, I didn't.

Q.    This testimony that you've heard, some of this difficult testimony about your brother beating Miss Johnson, that wasn't anything certainly you were aware of at the time it was going

2893

on.

A.    No, I was not.

Q.    And you've heard some other testimony I'm sure that's been difficult, Mr. Ryerson talking about he and your brother injecting methamphetamine.  Did you hear him testify in the trial?

A.    I can't recall if I was in the courtroom that day or not.

Q.    There's been some testimony about your brother selling drugs, methamphetamine, for Mr. Honken.  You didn't know anything about that stuff, did you?

A.    No, I did not.

Q.    Or that your brother owed Mr. Honken almost $30,000 for methamphetamine?

A.    No, I did not.

Q.    And the truth is that isn't the brother that you knew anyway, is it?

A.    No, he is not.

Q.    You've described him as a tough -- guy who's a tough man on the exterior, has a strong physical physique and character about him but he has a good heart; right?

A.    True, yes.

Q.    And whatever problems he may have been having regarding
Page 60

methamphetamine or whatever else was going on, to you he was a brother that cared and loved you and vice versa.

A.   Yes.

2894

Q.   And you miss him very much.

A.   Yes.

MR. BERRIGAN:   Thank you, ma'am.

MR. WILLIAMS:   Nothing further, Your Honor.

THE COURT:   You may step down.   Thank you.

MR. WILLIAMS:   United States calls Wendy Jensen.

THE COURT:   It's been a while, so I'll swear you back in.

WENDY JENSEN, PLAINTIFF'S WITNESS, SWORN

THE COURT:   Okay.   Thank you.   Please be seated. State your full name, please.

THE WITNESS:   Wendy Jensen, J-e-n-s-e-n.

THE COURT:   Mr. Williams?

MR. WILLIAMS:   Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q.   Miss Jensen, will you remind the jury who you are in relation to Terry DeGeus?

A.   I'm his ex-wife.

Q.   And you and Terry had a child together by the name of Ashley.

A.   Right.

Q.   I want to have you explain some of the background of your relationship with Terry.   When did you first meet Terry DeGeus?

A.   The summer out of my sophomore year.   I was 16.

Page 61

Q. And how did your relationship with Terry develop after that, ma'am?

A. We were together pretty much every -- from then till when we got married.

Q. High school sweethearts?

A. Yes.

Q. And when did you get married?

A. June 5, 1982.

Q. And how long did you remain married with Terry?

A. We got a divorce in '90, but he left in 1989.

Q. During that time period, what kind of a husband was he to you?

A. He was a good provider. He always worked.

Q. What type of work did he do?

A. He worked for his father, excavation. He was a truck driver. He worked for Holland Construction, and I think when we first got married he worked at Marting's Manufacturing.

Q. Did you work outside the home during those years?

A. I babysat in the home.

Q. At some point you had Ashley.

A. Right.

Q. When was that?

A. September 2, 1983.

Q. And did you have an opportunity to observe him as a father to your child before you split up with Terry?

A. Yes.

Page 62

Q.   How was he as a father?

A.   He was great.  When she was two years old, she got her first pair of cowboy boots and went trucking with her dad.

Q.   I want to show you some pictures.  A couple of them have already been admitted into evidence.

MR. WILLIAMS:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. WILLIAMS:

Q.   I've shown you Exhibit 1110 and 1111 that have been admitted into evidence.  I'd ask that we pull up 1110 first. Can you tell the jury who all's in that picture?

A.   Ashley's on the bottom there.

Q.   Ashley is the little girl with the glasses in front?

A.   Yeah.  And JoAnn and Terry, and I'm really not sure of the other --

Q.   Some of the other cousins?

A.   Yeah.

Q.   Nieces and nephews?  Terry's the man in the back with his hand on his mother's shoulder?

A.   Right.

Q.   And 1111, again, that's Terry there with his arm on the sofa?

A.   Yeah, that's Brenda's husband Brian with the camera I think, Great Grandma DeGeus.  Ashley has a sweater on.

2897

Q.   Which one's Ashley there?

A.   She's got the little sweater on with the pink stripe, the taller girl, and I assume one of those is Nicole maybe.  I'm not sure.

Page 63

Q. Ashley's the one with her back kind of to the camera there a little bit?

A. Yeah, holding the package.

Q. And how old approximately is Ashley in that picture if you know?

A. Going by the date on there, it's '91, and she was born in '83, so 8, 9 years old.

Q. Just maybe about a year or two at the most before Terry disappeared.

A. Right.

Q. I'm showing you Exhibit 1109. Can you identify that for the jury, please?

A. This is Ashley's first birthday party I'm thinking. It's Terry holding Ash.

MR. WILLIAMS: United States moves to admit Exhibit 1109, Your Honor.

* * * *

(Government Exhibit 1109 was offered.)

* * * *

MR. BERRIGAN: No objection.

THE COURT: 1109 is received.

2898

* * * *

(Government Exhibit 1109 was admitted.)

* * * *

MR. WILLIAMS: And permission to publish, Your Honor.

THE COURT: You may.

BY MR. WILLIAMS:

Q. And again, that's Terry holding Ashley.

A. Yeah.

Page 64

Q. On her first birthday?

A. I'm thinking that's what it was.

Q. Now, you were still married at that time.

A. Right.

Q. Can you describe for the jury some of your favorite memories of Terry when you and he and Ashley were all together still?

A. When we were all together?

Q. Yes.

A. The most memories I had, he hauled hogs to Sioux City here, and we went with him most all the time, and there was one time where we didn't know we were going to be going on to Texas, but we went right from Sioux City on to Texas, and Ashley had a doll that her Aunt Ronda gave to her after our house had burned down, and she took it everywhere, and we stayed in a motel that night. And the motel people didn't know that Ashley and I were along, so they just thought there was a trucker staying there.

2899

And we got about a hundred, 200 miles away and Lucy wasn't with us.

Q. Lucy?

A. The doll wasn't with us. So we turned the rig around, and Terry had to walk into the office and ask for his doll back.

Q. What was the best qualities of Terry as a husband and as a father?

A. He -- his eyes always sparkled. He came home from work, and he always went right to Ashley. He just -- he enjoyed fun. He likes to make jokes as most of the family does.

Q. At some point you and Terry did divorce.

Page 65

A.   Right.

Q.   What was the cause of that?

A.   He left me for Angela Johnson.

Q.   And can you describe for the jury what your relationship was like with Terry?  I assume immediately during the divorce and during the separation there was probably hard feelings between you.

A.   Yes.

Q.   Did those ebb after a while?

A.   Yeah, they did.

Q.   Can you describe for the jury how did your relationship -- what was it like in about 1993?

A.   '93?  We were friends again.  He just would come to my house.  I was remarried by then and had a son.  And he would

2900

come to the house and just walk in, pour a cup of coffee down and ask what was on TV.

Q.   That close at that point.

A.   Yeah.

Q.   You had a son by then.  Was Terry around when that son was born?

A.   Yeah, that was March 1 of 1992.

Q.   Tell the jury about that.

A.   I went in the hospital on a Saturday night to have the baby, so Ashley went to my parents'.  We had him about 9:30, 10:00 in the morning, so when we called, Ashley was still at Sunday school.  And when she got home, my mom and dad told her she had a new baby brother, and the first person she called was her dad who was at Angie's house, so he was the first person to the hospital to see our baby.

Page 66

Q.   He came to the hospital to see the baby you had by your new husband.

A.   Right.

Q.   And was it a warm meeting there?

A.   The nurses were a little nervous about it, but my husband told him come on in, and he gave me a kiss and a flower and a card I think, and then my husband asked him if he wanted to go see my son, so they went to the nursery and seen him.

Q.   So despite the fact that you and Terry divorced, by the time your son was born, you were pretty close again at that

2901

point.

A.   Right.

Q.   Did you maintain -- other than obviously being the parents of Ashley, did you maintain contact with him and talk with him from time to time?

A.   We usually -- it was like once or twice a week.  Ashley usually went to her dad's house every weekend, and either his mother would pick her up or Terry would pick her up or sometimes my mom and dad would take her there.  And sometime during the course of the week we'd talk and figure out how we were going to do it that weekend.

Q.   Did he share with you things about his love life and how he was doing and things like that during that time period?

A.   Yes.

Q.   How was Terry financially as far as supporting Ashley after you divorced?

A.   Our divorce was very friendly.  We rode together to the lawyer's office to sign the papers and stuff, and I just always

Page 67

knew that Terry -- if Ashley needed something, he would get it for her.

Q.   Were you ever concerned about Terry not supporting Ashley in her needs?

A.   No.

Q.   And you said pretty much every weekend Ashley would go over with Terry?

2902

A.   Pretty much.  Sometimes he shared the weekend with my mom and dad but . . .

Q.   At some point in 1993 we've already heard you testify that you learned Terry disappeared, and you even made some phone calls to try to find out what happened to him.

A.   Right.

Q.   What impact did that have on you, first of all?

A.   As a mother, you want to be able to protect your children and not see them hurt.  She was only ten, and there was nothing I could do to make it better.  I didn't have any answers for her.

Q.   How did Ashley deal with it?

A.   I don't know that she ever really did deal with it.  She was ten and couldn't understand why her dad just left her.

Q.   That was difficult on you as a mother, your natural instinct being to protect your child, and you couldn't in this situation.  And how did that affect you then over the years when you still couldn't explain until 2000 what happened to Ashley's dad?

A.   It was -- I just kept reassuring her that her daddy loved her and that there had to be a reason, there was an explanation of some kind.  And I would always try to remember things that he

Page 68

might have said in a situation to keep him alive in her heart.

Q.   Were there photographs and things like that to keep around to let Ashley know?

2903

A.   Yes.

Q.   What impact did it have on Ashley as she grew up from the age of ten on not knowing until 2000 what happened with her father?

A.   It was very, very difficult.  She had a terrible fear of being away from me by then.  She couldn't -- she wouldn't leave my side.  We went to a county fair one year, and I wanted her to sign up for a -- it was a DARE camp that you could win for a week away, and she said, No, mommy I don't want to.  And I asked her why, and she said she was afraid she'd win and she'd have to be gone away from me.

Q.   Did you see that kind of need to be close to people manifest itself with other people, not just you?

A.   It was mainly me until when she was like 17.  After they found the bodies and she had to accept that her daddy was dead, she would find groups of friends, and then she wouldn't want to leave them.

Q.   Did Ashley have trouble in school and with other children for periods of time as she grew up?

A.   Yeah.  She was in fourth grade when he disappeared.  And by fifth grade the kids would tease her horribly.  They'd be on the bus, and they'd be like, Oh, look, there's your dad dead in the ditch, just made fun of her all the time.

Q.   Did you end up having to do anything with her schooling because of that?

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2542 of 3592

A.    I took her out, and she went to Kanawha Christian School for two years.

Q.    And why?

A.    It was a private schooling.  They had a lot of structure. We thought the religious background would be good for her support.

Q.    In 2000 Terry's remains were found.  How did you find out, first of all?

A.    I think Bill called me.

Q.    Bill Basler?

A.    Right.

Q.    And do you know who informed Ashley?

A.    I called the school she was attending at that time and called her home.

Q.    And you told her.

A.    Right.

Q.    How'd you take the news?

A.    I remember just falling down on the floor and crying, and I called my mother.

Q.    And Ashley?

A.    A lot of disbelief.  Was very, very hard on her.  She didn't think anybody would be able to hurt her dad.  But then she thought that -- she got kind of -- you know, that she'd be able to bury him, and that still was another five years, four or five years.

2905

Q.    What impact did that have on you and Ashley not being able
Page 70

to bury Terry for a while?

A.    It was very difficult.

Q.    Ashley continuing to have problems in school, or is she doing better now?

A.    She had trouble in high school too.  It was the same group of kids.  She was a sophomore, and she finally had enough, and they had a confrontation, and she was expelled.

Q.    She was expelled from school?

A.    (Witness nodded head.)

Q.    They confronted her about her dad again?

A.    (Witness nodded head.)  Every time it came up back in the newspaper it would start all over again.

Q.    Miss Jensen, you've remarried now.  You've got another son --

A.    Three boys.

Q.    Three boys now.

A.    Yeah.

Q.    And Ashley.

A.    Uh-huh.

Q.    Has life just started over for you at this point?  Is Terry behind you?

A.    No.

Q.    Can you explain that to the jury, please?

A.    I don't know.  Terry just -- he was a big part of my life,

2906

and it will always be like that.

Q.    You still loved him when he divorced you?

A.    Yes.

Q.    You still loved him when he left you to go with Angela

Page 71

Johnson?

A.    Yes.

Q.    Is there still a part of you that loves him to this day?

A.    Yes.

Q.    Do you miss Terry?

A.    Yes.

Q.    What do you miss the most about him?

A.    Just his ways.  He just had a presence.  People just -- you met him; they liked him.

        MR. WILLIAMS:  Thank you.  I have no further questions.

        MR. BERRIGAN:  I have no questions of Mrs. Jensen. Thank you.

        THE COURT:  Thank you.

        Is the government ready to call its next witness?

        MR. WILLIAMS:  Yes, Your Honor.  The United States calls Ashley DeGeus.

           ASHLEY DEGEUS, PLAINTIFF'S WITNESS, SWORN

        THE COURT:  Okay.  Thank you.  Please be seated. Would you state your full name, please.

        THE WITNESS:  Ashley DeGeus.

                                                    2907

        THE COURT:  Mr. Williams?

        MR. WILLIAMS:  Thank you, Your Honor.

                    DIRECT EXAMINATION

BY MR. WILLIAMS:

Q.    Miss DeGeus, how old are you today?

A.    Twenty-one.

Q.    And you were ten years old at the time that your father disappeared.

Page 72

A. Yes.

Q. Can you describe for the jury the father you remember for the first ten years of your life?

A. He was the father that any kid would wish for.

Q. In what way?

A. Every way. He was just always there. He always played with me. He always involved himself with me.

Q. We've heard that you guys spent weekends together, almost every weekend together, even after your parents divorced.

A. Yes.

Q. What would you do with your dad on those weekends?

A. Anything I wanted to. He'd take me to Lady of the Lake in Clear Lake. I always rode in the semi with him.

Q. What was Lady of the Lake?

A. A big pleasure boat thing like -- it would take you on rides on the lake.

Q. We know from the receipt and some of the items found in

2908

your dad's house on the weekend that he died that he had bought some groceries including children's cereal and things like that for you.

A. Yes.

Q. Did he do that on a regular basis?

A. Yes.

Q. You didn't live with him except for weekends after your parents divorced. Did you still feel close to him, though?

A. Yes.

Q. And what about your parents? You've heard your mother just testify that while -- there was a brief period of time right

Page 73

during the separation and the divorce they had hard feelings. After that what was it like with your dad and your mother?

A.   It was Mom and Dad lived in two different houses.  I never seen them -- I never seen the hard time.  They were always still parents to me, and they got along just fine.

Q.   So as best they could, they were still your dad and mom just living two different places?

A.   Yes.

Q.   As you think back now about your dad, do you have favorite memories of him?

A.   Every memories.  Every memory I have is a favorite memory.

Q.   What was the best part about your dad that you remember?

A.   Just him being there, that he always included me, riding in the semis with him.

2909

Q.   Was that fun?

A.   Yes.  I got to be his little helper everywhere we went.

        MR. WILLIAMS:  May I approach, Your Honor?

        THE COURT:  You may.

BY MR. WILLIAMS:

Q.   Miss DeGeus, I've handed you Exhibit 1116.  Do you see that?

A.   Yes.

Q.   And is that a photograph?

A.   Yes, it is.

Q.   And who's in that photograph?

A.   My dad and myself.

        MR. WILLIAMS:  United States moves to admit Exhibit 1116.

                        *   *   *   *

Page 74

(Government Exhibit 1116 was offered.)

&ast;   &ast;   &ast;   &ast;

MR. BERRIGAN:  No objection.

THE COURT:  Exhibit's received.  Thank you.

&ast;   &ast;   &ast;   &ast;

(Government Exhibit 1116 was admitted.)

&ast;   &ast;   &ast;   &ast;

MR. WILLIAMS:  Permission to publish, Your Honor.

THE COURT:  You may.

BY MR. WILLIAMS:

2910

Q.    That's your dad holding you when you were just a very small child.

A.    Yes.

Q.    Drinking milk out of a bottle still there.

A.    Yes.

Q.    The night that your father dropped you off at your grandmother's house you've already testified about.  What impact did it have on you, though, when despite the next day and the next week and the next month and the next year your father didn't come home and your mother couldn't explain to you what happened to him?  What did that do to you?

A.    It's done a lot to me.  I never understood why my dad had to leave.  I didn't understand why he couldn't be there for me.  I knew it wasn't my fault, but I wondered why Dad couldn't be there for me, what I did wrong or if he was coming home.  It's impacted me in many ways.  He wasn't there for eighth grade graduation.  He wouldn't have been there for graduation from high school.  He wasn't there when I got my license and to help

Page 75

me pick my first car. He's not going to be there to walk me down the aisle.

Q. You have a young man here, in fact, that has come to the trial with you that you're pretty serious with even these days.

A. Yes.

Q. And if you and this young man or some other young man decide to get married, have you thought about who's going to be

2911

there to give you away?

A. I wish it could be my dad, and it's a really hard decision to make.

Q. Did you worry about him during the years you didn't know where he was?

A. Yes, I did.

Q. In what way?

A. At first when I was still younger and didn't understand, every time it would storm outside, I was scared he didn't have shelter, that he was out there by himself, if he had food.

Q. As you got older, what were you thinking at that point about your dad?

A. I always knew from day one something bad happened to him because my dad would never leave without talking to me.

Q. That make you worried about other people in your life that you loved?

A. Yes. If I don't know where my mom is, it scares me. If someone leaves and doesn't tell me where they're going to be or how long they'll be gone, it scares me.

Q. Are there things that you still hang on to that belonged to your father and that remind you of your father?

A. Yes, fuzzy blankets like the ones in the motels. He had a

pink one, and I have that now.  I've got his leather coat that he had.

Q.   And are those special things for you?

2912

A.   Yes.

Q.   You still love your father?

A.   Yes, I do.

Q.   Terry DeGeus we've heard about in this trial, the mean Terry DeGeus, the drug-dealing Terry DeGeus, is that your dad to you?

A.   No.

Q.   Who was he to you?

A.   Everything.  As a little kid, I wanted to marry Dad.  Every little girl wants to marry their daddy.

Q.   You were the same age as Kandi Duncan when she was murdered.

A.   Yes.

Q.   Did you ever think what would have happened if you would have gone with your father on that night, November 5, 1993?

A.   Yes.

Q.   Does that bother you?

A.   Yes, it does.

Q.   Is there a day that goes by that you don't think about this?

A.   No.

        MR. WILLIAMS:  No further questions, Your Honor.

                        CROSS-EXAMINATION

BY MR. BERRIGAN:

Q.   Miss DeGeus, I have to ask you just a couple of questions,

Page 77

okay, just a couple?

A.    Okay.

Q.    I think you made it really clear to us that you didn't know anything about your dad having anything to do with drugs; right?

A.    Right.

Q.    And it's not very likely, is it, that your dad would have taken you on a ride to meet any drug dealers, is it?

A.    No.

Q.    No.

MR. BERRIGAN:  Okay.  Thanks.

THE COURT:  Any redirect?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Okay.

MR. WILLIAMS:  United States calls Kathy Nicholson.

KATHY NICHOLSON, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Okay.  Thank you.  Please be seated. Would you please state your full name, please, and spell your last name.

THE WITNESS:  My name is Kathy Nicholson, N-i-c-h-o-l-s-o-n.

THE COURT:  Thank you.

Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

2914

Q.    Miss Nicholson, I'd like to have you explain just a little
Page 78

bit about yourself so this jury knows who you are and how you're connected to this case.  You have the same last name as one of the victims in this case, Greg Nicholson.  Can you explain to the jury how that is?

A.    He was my ex-husband.

Q.    Let's learn a little bit more about you, first of all. What -- how far did you go through school, first of all?

A.    I graduated from high school.

Q.    And are you employed now?

A.    Yes, I am.

Q.    What type of work do you do?

A.    I work at a chicken hatchery, and I ship chickens.

Q.    And all over the nation, don't you?

A.    Yeah, even to Hawaii.

Q.    Even to Hawaii.

A.    Yeah.

Q.    This is a job that you have where, ma'am?

A.    In Rudd, Iowa.

Q.    How long have you lived in the Rudd, Iowa, area?

A.    I believe 13 years.

Q.    And Rudd for the jury's knowledge is a little town just a little bit east of Mason City.

A.    Yes, about 20 minutes away.

Q.    When were you married to Greg Nicholson?

2915

A.    We met when we were in junior high.  I was 13.  He was 15. And we were high school sweethearts and got married in 1980, and we had 2 daughters, and we were divorced in 1989.

Q.    Can you tell the jury a little bit about Greg Nicholson?

Page 79

We know him as somebody who was involved with drugs and some skeletal remains.  What was Greg Nicholson like when he was alive and he was married to you?

A.   He was a person you'd meet and everybody liked him.  He made you laugh.  He was a good father.  He took the girls on -- he had a Harley.  He took the girls for rides on his Harley, and he was just a great person to be with.

He had a band.  He played music.  And they played for wedding dances and anniversaries and a few school dances.  And he also had -- he liked to work on cars.  He had a show car that he would take around to the various car shows, and he had a trophy case full of trophies.

Q.   The music was a big part of his life from a very early age.

A.   Yeah.  Him and his dad and his sister had a country western band.  He was, I believe, 13 when he was playing in the band, and that band was together for, oh, 7, 8 years I believe.

Q.   And even after that band stopped, he was in other bands?

A.   Yeah.  He was in I believe five different bands all together.

Q.   And what type of music did he play?

A.   Country western, rock and roll, top 40 music.

2916

Q.   Was he a vocalist, or did he play instruments?

A.   He could play any instrument in the band.  He started off playing drums and mainly bass guitar, but he could play keyboard, lead guitar, played the harmonica.

Q.   When you were married with Greg Nicholson, did he work outside the home?

A.   Did I work outside the home?

Q.   Did he, Greg, work outside the home?

Page 80

A.    Just the band.  He played every weekend just about.

Q.    And did he have another full-time job as well?

A.    Oh, yeah.  He worked at Curry's Manufacturing.

Q.    Can you tell the jury what he did at Curry's Manufacturing?

A.    He was lead man on the door line.  He had, I believe, five people underneath him.  He worked there for about 13 years I think.

Q.    Curry's Manufacturing makes what?

A.    Steel, metal doors for hospitals and bigger facilities, custom doors.

Q.    And he worked there a fairly long time then, 13 years?

A.    Yes.

Q.    Was he working there throughout the time you were married to him?

A.    Yes.

Q.    During the time you were married to him, was he successful at his work?

                                                           2917

A.    Oh, yes.  He never missed work.  It was rare if he did.  He was a very punctual person.

Q.    Apparently got promoted to the point where he had five people working underneath him.

A.    Yes.

Q.    When you were married to him, was he involved at all with the drug trade to your knowledge?

A.    Yes.

Q.    And did that have impact ultimately on your marriage?

A.    Yes, it did.

Q.    And ultimately you and Greg divorced.

Page 81

A.    Yes.

Q.    Before you divorced, you had some children, though, you indicated.

A.    Yes, two daughters.  Kristin was born in 1983, and Jamie was born in 1985.

MR. WILLIAMS:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. WILLIAMS:

Q.    Ma'am, I've handed you a series of photographs there, Exhibits 1112, 1155, 1156, and 1163.  Can you explain or identify those as photographs of your ex-husband, Greg Nicholson, and your daughters?

A.    Yes.

MR. WILLIAMS:  United States moves to admit Exhibits

2918

1112, 1155, 1156, and 1163.

*   *   *   *

(Government Exhibits 1112, 1155, 1156, and 1163 were offered.)

*   *   *   *

MR. BERRIGAN:  No objection.

THE COURT:  Those exhibits are admitted.

*   *   *   *

(Government Exhibits 1112, 1155, 1156, and 1163 were admitted.)

*   *   *   *

MR. WILLIAMS:  And permission to publish, Your Honor.

THE COURT:  You may.

BY MR. WILLIAMS:

Q.    I'd like to show you, first of all, Exhibit 1112.  And
Page 82

explain to the jury, please, who are they viewing in that photograph marked as Exhibit 1112?

A.    That would be myself and Greg, and Kristin's on my lap, and Jamie's on Greg's lap.

Q.    Again for some reason we do not have these working on our computer, so I'm going to show you a couple other photographs here.  I'm showing you Exhibit 1155.  Can you tell the jury who they're viewing there?

A.    That would be Greg, and Jamie's on his lap, and it's right before Greg was going to leave to go play in the band.

2919

Q.    And Exhibit 1156, is that --

A.    That would be Greg and Kristin reading books.

Q.    And Kristin's the older of your two daughters.

A.    Yes.

Q.    At the time of your divorce, how old were your girls, Kristin and Jamie?

A.    I believe five and seven.

Q.    And at the time that Greg disappeared, how old were they?

A.    Kristin was ten, and Jamie was eight.

Q.    Now, have you ever remarried, ma'am?

A.    No, I haven't, but I do have three other children.

Q.    Your daughters, Kristin and Jamie, have grown into young women now.

A.    Yes.

Q.    Can you display Exhibit 1163, please?  1163 shows who?

A.    Kristin's on the left, and Jamie's on the right.

Q.    What kind of a father was Greg to your children, Kristin and Jamie?

Page 83

A.    He was a very good father.  I never had to worry about leaving them with him.  I never had to worry about child support being paid.

Q.    Did he always punctually pay his child support?

A.    Always.

Q.    And did he ever miss any holiday or birthday or anything like that for the girls?

2920

A.    No.  We'd sometimes argue about who would get the kids but . . .

Q.    You both wanted them.

A.    Yeah.

Q.    And what kind of visitation did Greg have with his girls?

A.    He would take the girls every other weekend.

Q.    Till his death did he ever miss a child support payment?

A.    No.

Q.    Now, at some point after you divorced in part because of Greg's involvement with drugs, was there a period of time where you and Greg weren't that close other than taking care of your children?

A.    Oh, sure.  There was, you know, some hard feelings at first, and it took a little while to get over it, but we both came around, and we became good friends.

Q.    By the time of 1993, can you describe for the jury what was your relationship like with your ex-husband Greg Nicholson?

A.    We were good friends.  That was -- we had already moved -- my boyfriend and I had already moved to our acreage by Rudd.  And he would go over to the house to drop the girls off sometimes or I would, and we took turns, you know, taking them to each other's house, and we'd sit down and have conversations.

Page 84

Q.    Now, after you and Greg divorced, did he see other women from time to time?

A.    Yes.

2921

Q.    Actually got married to one for a period.

A.    Yes.

Q.    Did he ever talk to you about the women in his life after you guys divorced?

A.    Oh, sure.  Rather than take the new girlfriend home to Mom, he would bring the new girlfriend over to me to introduce me to her and I suppose to get some approval.

Q.    So you and Greg would have discussions about various interests in his life, female interests?

A.    Oh, sure.

Q.    You kind of approved his girlfriends or didn't approve of them --

A.    Yeah.

Q.    -- or at least gave him your feedback anyway.

A.    Yeah, yeah, and he would ask the girls too.

Q.    And over the course of this time period in the late 1980s and early 1990s after you and Greg divorced, you talked about his father, early on that Greg played in a band with him.  Did Greg maintain contact with his parents?

A.    Oh, yes.

Q.    Was he close with them?

A.    Not always, but for the most part, yeah.

Q.    Among the various girlfriends that Greg brought over for you to meet, was Lori Duncan a woman that he brought and introduced you to at some point?

Page 85

A.    Yes.

Q.    Did you meet her once or more than once?

A.    I seen Lori at least four times.

Q.    And the last time was, in fact, on July 25 of 1993, the day that Greg was murdered.

A.    Yes.

Q.    Can you tell the jury about that day?

A.    Well, someone was watching Lori's two daughters, and they went for a ride on their -- on his Harley, and they rode to Osage.  It was the first time his parents had met Lori, and on the way back, then they stopped at our house.  It was Sunday afternoon.  It was a beautiful day, and him and Lori stayed and spent a couple hours at our house.

Q.    With the girls.

A.    Yeah, and with -- with our two daughters and before they headed back to Mason.

Q.    Now, you had had obviously some hard feelings with Greg when he got involved with drugs, and you learned at some point that, in fact, he had been arrested in March of 1993 on drug charges.

A.    Yes, he called and told me.

Q.    After he was arrested, did that have some impact on his life that you observed?

A.    Oh, yeah.  His life just fell apart.

Q.    And did he do anything about changing his life during the

2923

time period between his arrest in March of 1993 and the time,
Page 86

the last time, you saw him on July 25 of 1993?

A.   He stopped -- he stopped doing drugs.  It finally -- after being arrested, it finally hit him in the head.

Q.   And did you see a change in his personality and his demeanor and his appearance after that?

A.   Oh, yeah.  He was generally an appearance person.  It mattered to him what kind of -- what people thought of him.  It mattered to him what kind of car he drove, you know.  It mattered to him the things that he had.  And after he was arrested, those small little things, you know, didn't mean anything to him anymore.  He knew he would probably be going to jail, and all those little things didn't really much matter anymore.

Q.   Had a major impact on his life.

A.   Yeah.  He had a hard time dealing with -- he had done drugs for so many years that it was hard, hard on him.  He -- when he lived -- his wife left him immediately; he lost his house; he lost pretty much everything and had to move back home with his mom and dad and had to get a different job because he lost his job at Curry's, and he would stop in the afternoon after he got off work over to my house and sit and talk before he went home.

Q.   That was something new after he was arrested that he spent that much time with you.

A.   Oh, yeah.  He was over to the house at least twice a week.

2924

Q.   And we've heard evidence in this case that he became involved with Lori Duncan just a couple weeks before their deaths, and you'd indicated, though, even during that time period you'd seen them four times.

Page 87

A.    Uh-huh, yeah.

Q.    Did the Duncan little girls, Amber and Kandi, and your daughters spend time together as well?

A.    Oh, yeah, yeah.  Lori asked if I'd mind if the girls went with them.  They were going to go camping and just spend time together.  I said sure, that'd be fine.  And her and the girls and Greg came out with his pickup which had a topper and loaded the girls up, and they went and had a good time.

Q.    Where'd they go if you recall?

A.    I believe somewhere they went and camped at Clear Lake I think.

Q.    At some point in 1993 after that last time you saw Greg and Lori, did you learn that they disappeared?

A.    Yes.

Q.    How did you learn of that?

A.    Monday morning Greg's dad called me and told me that he didn't show up for court and was worried he didn't because he had just seen him the day before.  And he knew that he was coming to visit me afterwards and just didn't know who else to call.

Q.    So what happened after that?  Was there a period of time

2925

where you looked for Greg or . . .

A.    Oh, yeah.  I spent on and off the next three years trying to find any information I could to help locate him.

Q.    What'd you tell your young daughters about their dad?

A.    I told them the truth, that it's possible that he left, you know, possibly -- I know he didn't take the witness protection. He told me he'd refuse that.  We weren't sure, you know. Hopefully we'd hear from him some day, but I made sure they

Page 88

didn't dwell too much on that hope.

Q. How did your daughters take that news of their father disappearing?

A. Kristin is always pretty quiet about things. Jamie took it really hard.

Q. In what way?

A. She just couldn't understand why something like this would happen.

Q. Years went by before Greg's remains were discovered.

A. Yes.

Q. Did that have an impact on your life and on the lives of your daughters?

A. Yeah, the not knowing. You think about it every day.

Q. What about Greg's parents, his dad?

A. Their health really -- really went downhill, especially his dad. They'd, you know, see things published in the paper, and it was just too much for them to handle, and Greg's dad became

2926

ill, and he -- so much so that he ended up having to go to Rochester every two weeks because his body stopped producing blood, making blood, and he had to go for blood transfusions.

Q. In 2000 the bodies of Greg Nicholson and Lori Duncan and her two little girls were discovered. Do you learn about it shortly after they were discovered?

A. Yeah, I was -- Mr. Basler called, called me right away and told me. I waited till the girls got home from school.

Q. Was that hard news to break to your daughters?

A. Yeah, because they're -- you know, they're girls. They're always hoping that the news would be that he's back.

Page 89

Q. How did they handle knowing now finally that their father wasn't going to come back?

A. They cried. They wondered what happened, you know, why did it happen.

Q. Despite the fact that you've moved on, you have a boyfriend, some other children now, and live in a different place, do you still miss Greg Nicholson?

A. Of course.

Q. Do you still have love for him?

A. Yes.

Q. And your daughters, how about them?

A. Oh, of course.

Q. Has this whole thing been difficult on their lives and their ability to live normal lives?

2927

A. Well, they're good kids. They've really never gotten in any real trouble or anything. They both graduated from high school. But then again, Dad wasn't there when they got their first car or for graduation.

Q. Dad missed a lot of birthdays, a lot of Christmases.

A. Yeah, and Kristin graduated from college.

Q. Greg's father is named Jim?

A. Yes.

Q. Ultimately at some point after Greg's body was discovered were you able to give him a burial?

A. Yes.

Q. And was Greg's father able to attend that?

A. Yes, he was. We buried Greg last fall, September 11, and his dad hung on for that funeral, and two weeks later we buried his father.

Page 90

Q.    Two weeks after you buried Greg you buried his father.

A.    Yes.

MR. WILLIAMS:  No further questions, Your Honor.

THE COURT:  Mr. Berrigan?

CROSS-EXAMINATION

BY MR. BERRIGAN:

Q.    Can I ask you just a couple of questions, ma'am?

A.    (Witness nodded head.)

Q.    This is a man you knew a long time going way back to when you were just teenagers.

2928

A.    Fifteen years we were together.

Q.    And at some point in your time together Mr. Nicholson developed a problem with drugs.

A.    Yes.

Q.    And you've already testified that that caused you essentially to divorce him.

A.    Yes.

Q.    It was a problem in your marriage.  And after that happened, that is, after you were divorced, you still had the situation where your daughters were seeing him every other weekend?

A.    Yes.

Q.    And that went on for a period of years; right?

A.    Yes.

Q.    And during that time were you having some contact with Mr. Nicholson at least in reference to taking your daughters to his house or him coming to get your daughters?

A.    Yes, we always seen each other.

Page 91

Q. Okay. Were you aware as to whether or not that drug problem continued after your divorce?

A. Yes, I knew about his drug usage.

Q. Okay. Was that of some concern to you?

A. I never needed to bring up the subject really because appearance makes -- you can tell if someone needs to be set straight on things or not. And for all appearance's sake, he

2929

was still handling his life correctly.

Q. Well, certainly in terms of your daughters, would it be fair to say that despite whatever problems he was having with drugs, that was kind of a separate deal.

A. Yes.

Q. That he was a good father to your daughters. You weren't concerned about their safety when he was with them. You knew that he loved for them and cared for them, and you were never of such a concern that you had any reservations about your daughters spending the time with their dad that they should spend.

A. That's correct.

Q. That's all true; right?

A. Yes.

Q. And then he gets arrested in March 1993, and it's after -- is it after that -- because I'm just not sure I understand, is it after that that you really became closer after he stopped using the drugs?

A. Well, we were close before that, but the twice a week coming over to visit was after his arrest.

Q. Okay. And he was more confiding with you and open with you after that point in time when he stopped using the drugs.

Page 92

A.    Uh-huh.

Q.    And one of the things you learned is that he had a new interest, a romantic interest, Miss Duncan?

2930

A.    Yes.

Q.    And I thought I heard you say something that -- we know his wife left him and he lost his house.

A.    Uh-huh.

Q.    And did you say he was living with his parents?

A.    Yes.

Q.    Okay.

A.    And then I believe he moved in with Lori a week previous to their death.

Q.    Just a week before this happened, huh?

A.    Yes.

Q.    Okay.  The other thing I'm -- regarding his dad Jim, you mentioned that it was really hard on him because of the newspaper stuff.

A.    Yes.

Q.    This got a lot of publicity up there in that area, did it not?

A.    Yes, it did.

Q.    And was that when Mr. Nicholson learned about his drug -- son's drug situation?

A.    You mean through the paper?

Q.    Yeah.

A.    He knew before.

Q.    He did, okay.

        MR. BERRIGAN:  Thank you, ma'am.  That's all I have.

Page 93

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No, Your Honor.

THE COURT: You may step down.

Ready to call your next witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls Robert Milbrath.

THE COURT: Members of the jury, you might want to take a stretch break.

MR. WILLIAMS: Your Honor, if we could have just a minute.

THE COURT: That's fine.

ROBERT MILBRATH, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated. Try and adjust the chair and the microphones so you can speak directly into them. And when you're ready, would you state your full name, please, and spell your last name for us.

THE WITNESS: It's Robert Milbrath, M-i-l-b-r-a-t-h.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Milbrath, how old are you, sir?

A. I'm 42.

Q. And how far did you go through school?

2932

A. High school, 12th grade.
Page 94

Q.    After high school, did you serve the country in the military for a period of time?

A.    Yes, I did.  I joined the Iowa Army National Guard.  I was 1133rd transportation company truck driver.

Q.    And how many years did you do that?

A.    Six years.

Q.    Are you currently employed?

A.    Yes, I am.

Q.    What kind of work do you do, sir?

A.    I do truck driving and auctioneering.

Q.    How long have you been in that type of employment, sir?

A.    Truck driving, 20 -- be 24 years now and auctioneering, 4 years.

Q.    Where do you live?

A.    In Mason City.

Q.    And how long have you lived in the Mason City, Iowa, area?

A.    All my life.

Q.    We know from other testimony in this case that Lori, the person we know as Lori Duncan, was -- had a maiden name of Milbrath.  Can you explain to the jury your relationship to the person we know as Lori Duncan?

A.    Lori Duncan or Lori Milbrath was my older sister.

Q.    How much older than you was Lori?

A.    Two years.

2933

Q.    Your parents are who?

A.    David and Marge Milbrath.

Q.    Do you have other siblings besides Lori?

A.    I have a younger sister, Mary Buckley.

Page 95

VOLUME 17 6-2-051

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Sir, I've handed you a series of exhibits there, 1149, 1150, 1165, and 1166. Do you see those photographs, sir?

A. Yes, I do.

Q. And are those all photographs of your family and your extended family, the Milbraths?

A. Yes, they are.

MR. WILLIAMS: United States would move to admit Exhibits 1149, 1150, 1165, and 1166, Your Honor.

(Government Exhibits 1149, 1150, 1165, and 1166 were offered.)

MR. BERRIGAN: No objection.

THE COURT: Those exhibits are admitted.

(Government Exhibits 1149, 1150, 1165, and 1166 were admitted.)

MR. WILLIAMS: Permission to publish, Your Honor.

THE COURT: You may.

BY MR. WILLIAMS:

Q. Showing you Exhibit 1166, first of all, sir, can you tell

2934

the jury who they're seeing in that photograph?

A. That is my father and mother, David and Marge Milbrath.

Q. What's your father do for a living now?

A. Now he's retired.

Q. How long has he been retired, sir?

A. Four years I believe now.

Q. Few years now.

A. Yeah.

Page 96

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2569 of 3592

Q. What did he used to do?

A. He was a electrician and a machinist.

Q. And they always lived in the Mason City, Iowa, area as well?

A. Yes.

Q. We've heard a little bit about the house that they lived in just down the street from where Lori ended up living. How long did they live in that house?

A. I believe they moved into that house just shortly after Lori was born, so they've been in that house for at least 40-plus years.

Q. Your mother, when you were growing up, did she work outside the home?

A. She was a stay-at-home mom until us kids were old enough to take care of ourselves, and then she went out and got a job.

Q. And what type of work has she done after she raised you children?

2935

A. She got a job at Metalcraft Industries where she stamps metal plates for various parts of whatever the company needed it for.

Q. I'd like to show you Exhibit 1165. 1165, the photograph we just saw, 1166 is kind of a closeup of a portion of that photograph. Can you tell the jury who all the rest of those people are in that photo?

A. Starting on the left side, the lady in the Christmas sweater would be my wife Connie.

Q. Connie's attended a lot of this trial over the last few weeks.

Page 97

A.   Yes, she has.

Q.   Next person in line there, sir?

A.   Of course, that would be me and then my mother, Marge Milbrath, and my father, David.  The guy in the middle would be Darren Buckley.  That's Mary's husband.  The young man standing beside him in the blue shirt is my son Brock.

Q.   How old is Brock these days?

A.   Brock's 15.

Q.   And the next person in line there?

A.   The next young man sitting with the hood is Brad.  That's Mary's older boy, and then beside him is Mary.

Q.   And we heard from Mary earlier in this trial when she testified.

A.   Right.

2936

Q.   If I could show you Exhibit 1149 but it won't come up on the screen there -- I'm going to do it here -- 1149 is a picture of what, sir?

A.   That is my family.  That's Connie and Brock and me.  That's our church photo.

Q.   And Exhibit 1150, who's that young man?

A.   That is my sister Mary's oldest, Brad Buckley.

Q.   And Brad is 18 years old?

A.   He is.

Q.   Same age Amber would be today if she was alive.

A.   Yes.

Q.   And then does Mary have any other children?

A.   She does.  She has a little girl, Jada Buckley.

     MR. WILLIAMS:  Exhibit 1151, please.  I'm sorry.  I may not have -- hold on a second.
                    Page 98

Q.    Showing you Exhibit 1151, can you identify that, please?

A.    That is my sister Mary's little girl Jada.

MR. WILLIAMS:   United States moves to admit Exhibit 1151, Your Honor.

*   *   *   *

(Government Exhibit 1151 was offered.)

*   *   *   *

MR. BERRIGAN:   No objection.

THE COURT:   1151 is admitted.

*   *   *   *

2937

(Government Exhibit 1151 was admitted.)

*   *   *   *

MR. WILLIAMS:   If you could display that, please.

BY MR. WILLIAMS:

Q.    1151 is now on the screen.   And how old is Jada?

A.    I believe she's ten.

Q.    We heard a little bit about Lori during this trial.   I'd like to have you help the jury understand who she was when she was alive.   Can you tell the jury about your sister and what she was like as a young woman growing up with you in Mason City?

A.    She was the typical older sister.   She -- she was very caring, very loving.   She would do the world for you.   There -- there wasn't nothing that you couldn't ask that she wouldn't try to help you out with.   She was always there for you.

Q.    Lori get in legal trouble when she was growing up with the law?

A.    Never.

Q.    Ever get involved with drugs or controlled substances at

Page 99

all?

A. No, never.

Q. As she grew up and became an adult, did you remain close with her?

A. Yes, we did.

Q. And did she at any point to your knowledge ever become involved in any illegal activity?

2938

A. No, she never did.

Q. Never got involved with drugs.

A. Never.

Q. Your sister graduate from high school, sir?

A. Yes, she did, in 1980.

Q. And when she graduated from high school, did she have a class ring?

A. Yes, she did. She -- like everybody in high school, they would get the class ring, and she got hers, and she wore it every day.

Q. She was married for a period of time. We're going to talk about that. But after the divorce, did she continue to wear that class ring of hers?

A. Yes, she did. After her divorce, she wore it on her ring finger. Why in particular I'm not sure, but she wore that ring on her left-hand ring finger all the time.

Q. Every day.

A. Every day.

Q. Were you here when there was testimony presented by Dawnie Steadman, a forensic anthropologist, who indicated that on Lori's left hand there was a spiral fracture on her bone that comes down from her ring finger on her left hand? Were you here

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2573 of 3592

that day?

A.    I was here for the previous trial when she was here.

Q.    That would have been the ring -- that would have been the

2939

finger that Lori wore that class ring on.

A.    Yes, it would have.

Q.    You're aware that class ring was found in Fertile, Iowa, some two years later.

A.    Yeah, in the Winnebago River.

Q.    Lori had children?

A.    Yes, she did.  She had two little girls, Kandi and Amber.

Q.    I'm showing you Exhibits 1105 and 1106.  Do you recognize those photographs, sir?

A.    Those are my two -- those are my two nieces Kandi and Amber.

Q.    1105 is Kandi, and 1106 is Amber?

A.    Yes.

         MR. WILLIAMS:  United States moves to admit Exhibits 1105 and 1106, Your Honor.
                              *   *   *   *
         (Government Exhibits 1105 and 1106 were offered.)
                              *   *   *   *
         MR. BERRIGAN:  No objection.
         THE COURT:  1105 and 1106 are admitted.
                              *   *   *   *
         (Government Exhibits 1105 and 1106 were admitted.)
                              *   *   *   *
BY MR. WILLIAMS:

Q.    I want to show you Exhibit 1105 to begin with.  That's

Page 101

Kandi?

A.   Yes, it is.

Q.   Again, this jury knows Kandi as a murder victim.  They know her as some bones pulled out of the ground in 2000.  Can you tell the jury something else about Kandi?  What was she like as a little girl before she died?

A.   Kandi was a fairly quiet little girl.  She was very close to her mom and dad.  She was one that didn't venture too far away from either one of their sides.  She was one that liked to listen to the adult conversation.  You had to go tell her play.  She was very much the little mother to Amber.

Q.   In what way?

A.   She was always watching out for Amber, making sure that Amber was doing the -- in her mind the right thing at the right time.  She played.  There was times that she would play for a couple hours especially with Amber, you know, hounding her let's play, let's go play.

Q.   Your sister Lori divorced from her husband John also known as Jay Duncan.  And we've heard testimony that he lived in Des Moines after that for a period of time after Lori moved back to Mason City.  Did Kandi -- was she attached to her father?

A.   Very much attached.  She would almost count the days down to when she could see her dad again on visitations.  They were very close together -- or very close to each other.  There was never -- there was never a time that Kandi would want to miss

2941

out on seeing her dad.

Page 102

Q. Despite the fact that Lori divorced from Jay Duncan, did they still get along well and share custody of the children and do what was best for them?

A. Yes. They got -- after their divorce, they got along just fine for the girls' sake. Lori and John would work out some drop-off/pick-up type thing between them being that they lived in Mason City and Des Moines to make sure that the girls got a chance to see their dad and grandparents and such in Des Moines.

Q. I'd like to show you Exhibit 1106. This is a photograph you identified earlier as Amber.

A. Yes.

Q. Again, this jury knows very little of Amber other than some pile of bones that were pulled out of the ground. Can you tell the jury what was Amber like when she was alive?

A. Amber was the -- Amber was the spitfire. She would wake up in the morning and have one thing on her mind is play, and you'd be chasing her for the rest of the day to get her to sit down and eat or whatnot. She had a mind of her own at such a young age. There was never a time that she wasn't ready to play either with her older sister or her friend that lived across the alley. She was just constantly on the go.

Q. Full of energy.

A. Full of energy.

Q. During the last year of Lori's life in 1992 into 1993, were

2942

you aware of where she was working at that time?

A. She was working at Fieldstone Cabinetry in Northwood.

Q. And I think we heard from your sister that she was working there too at the same time.

Page 103

A.   Yes, she was.

Q.   How about you?

A.   I had worked there earlier for five years.  The company started to fall apart a little bit, and they started to let people go, so the last -- the last two, three years that the company was there, I wasn't there.

Q.   There was a period of time, though, when all three of you were working at the same company.

A.   Right.

Q.   Were you working the same shift?

A.   No.  Lori and Mary worked the day shift, and I worked nights.

Q.   Did you in these later years in your life -- you're all young adults now, either have or starting your families.  Did you and Mary and Lori maintain contact?

A.   Yes, we did.  Being that I worked the nightshift and they had days, we had about an hour layover from where the dayshift quit and the nightshift started, so I would generally go into work anywhere from about a half an hour or so earlier, and that gave me a chance to visit with Lori and Mary, see how things were going.  It was just pretty general idle chat.  Sometimes we

2943

didn't have that chance, but at least four days out of the five I had a chance to stop and say hi, what's going on, you know, are we doing anything maybe for a weekend or, you know, what's -- you know, what's up.

Q.   And would your family get together from time to time?

A.   Yeah.  We would get together and sit around and chat and have little family outings just to keep up on things.

Q.   We saw a photograph earlier of the Milbrath family

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2577 of 3592

Christmas.

A.    Right.

Q.    That Christmas photo we saw earlier.  When Lori and the girls were alive, did they attend Christmas gatherings and holiday gatherings like that with the rest of the family?

A.    Yes, they did.  They -- since -- well, especially after they moved up to Mason City, we were able to get together more frequently, being that for some time when Lori lived out of state it was a little bit harder to get together.  But after everybody started kind of coming back closer to Mason City, it was a lot easier to have a family gathering.

Q.    Lori in 1993 was a single mother of two children working a job at Fieldstone.  How did she manage as a single mother?

A.    She did all right.  There -- of course, working the dayshift, she had to get up early to be to work.  Her neighbor lady that she was living beside at the time was hired to watch the girls for an hour or two in the morning, to go and wake them

2944

up and get them breakfast and get them off to school.  Lori made sure that that happened all the time.  And then after Lori was done with work, she would come home and get the girls, make sure they had their play time and made sure that they had a good meal to eat for the night and did it all over again the next day.

Q.    What was -- in 1993 what was the priorities in your sister Lori's life?

A.    To make sure the girls got what they needed, to make sure they had a decent, clean life.

Q.    And did you have opportunities to see interaction between Lori and her daughters, Kandi and Amber?

Page 105

A.    Yeah.

Q.    And what kind of a mother was she?

A.    Oh, she was a great mother.  She was always there for them, always provided for them, made sure they got what they needed.

Q.    Now, in 1993 Lori and Kandi and Amber were murdered outside Mason City.  And have you, through the course of this trial and this investigation, learned of how that happened to them?

A.    Yes, we -- as a family, yes, we have.

Q.    And knowing Lori like you did, knowing the woman she was, have you thought about what was going through her mind at that time?

MR. BERRIGAN:  I'm going to have to object, Your Honor.  This calls for conjecture and speculation if he's asking the witness, even her brother, to speculate what her mind-set

2945

was at the time of the commission of the offenses.

THE COURT:  Sustained.

MR. BERRIGAN:  And may I also ask if the prosecutor's done with -- nevermind.

THE COURT:  Mr. Williams, I know you're probably pretty close to wrapping up.  Would now be a good time to break?

MR. WILLIAMS:  Yeah, let's go ahead and take a break, Your Honor.  That'd be great.  Thank you.

THE COURT:  Okay.  Members of the jury, it is noon.  We'll be in recess until one o'clock.  Please remember my prior cautionary instruction about keeping an open mind until you've heard all of the evidence in the penalty phase.  Thank you.

(The jury exited the courtroom.)

THE COURT:  Anything we need to take up, Mr. Williams?

MR. WILLIAMS:  No, Your Honor, not right now.

Page 106

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Nothing by the defense.

THE COURT: Okay. Thank you. See you back at one.

(Lunch recess at 12:02 p.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

2946

BY MR. WILLIAMS:

Q. Mr. Milbrath, we left off talking about the time when you and the rest of your family learned at some point about how your sister and her girls died. How was your sister with her girls? Was she protective of them?

A. Oh, yeah, very protective. She wouldn't let anybody do anything that would harm them. She would go all out to protect her girls.

Q. Do you or have you thought about what your sister and her daughters went through the night that they were murdered?

A. Oh, yeah, many times over.

Q. And what effect has that had on you?

A. It's difficult to live with knowing that one day they're there and the next day they're gone to try to figure out where they're at and then the conversations with your -- with your family on where they could be or what they're doing or, you know, what could have happened to them. It's emotionally draining.

Page 107

Q. There was a long period of time when you and the rest of the family didn't know what happened to them; is that right?

A. Yes.

Q. And what -- I think you've described a little about the impact it had on you. What impact did you observe that it had on your sister Mary?

A. Again, very emotionally draining. She's had a little

2947

trouble with it, but like myself, she can -- she can take the full blow and understand what's going on and accept it. May not like it like I -- but she can understand what's going on and deal with it.

Q. In 2000 -- I'm sorry.

A. I'm sorry. And just deal with it.

Q. In 2000 the remains of your sister and Kandi and Amber were discovered. Do you remember the day you found out about that?

A. Yes. It was very -- that was a bad day. To have somebody come over and say, We're sorry, but the remains that we found were identified as your sister and nieces, it just devastated the family.

Q. You have a young son. Has it had an impact on him?

A. It has not. At his -- at the time the disappearance happened, he was three years old. He has a real, real hard time remembering anything about Lori or the girls.

Q. He didn't have the benefit of growing up with his cousins Kandi and Amber.

A. No, he did not. He remembers very little. We can show him a picture of his Aunt Lori and say, This is the Aunt Lori that used to sing with you on the front porch, but he doesn't really comprehend who that person is. It's like looking at a stranger.

Page 108

Q. His own aunt, he didn't even have a chance to know.

A. Right.

Q. The relationship that Lori had with you and your sister

2948

Mary, can you describe or how would you describe that for the jury?

A. I'm sorry. Repeat that, please.

Q. Sure. The relationship that you and your sister Mary had with your sister Lori, if you had to describe that to somebody, how would you describe that?

A. We were the typical siblings. We, of course, loved each other. We kept in touch with each other. We did the normal brother-sister, sister-sister things. It wasn't nothing out of the ordinary. But you kept in touch with them and knew what was going on.

Q. Do you and Mary miss your sister Lori?

A. Oh, very much so.

Q. If you had to summarize it in a very short phrase or short way to this jury, what is it you miss most about your sister Lori?

A. Wow. Put it in words. You miss -- you miss everything about her. You miss going over and talking with her, seeing the girls playing. You miss -- you miss her, you know, watching -- watching her interact with my son even. There's just the everyday little things that people take for granted that will never happen again.

Q. Like what?

A. You can't go over and visit. You can't watch her girls grow up with your son. You can't even talk to them or just give

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2582 of 3592

them a jingle or invite them over.  You can't do your family picnics with them anymore.  There's all the things that the girls are going to miss out on growing up, the spending time with the grandparents.  The things that they're going to miss is just tremendous that they've never even had a chance to experience, the first -- the first time they are asked out by a boy, the first dance, getting behind a car to drive for the first time.  Everything you take for granted will never happen.

Q.    Ultimately after their remains were found, were you able to provide a funeral to Lori and her girls?

A.    Yeah.  After the remains were found, we were able to give them a proper burial and say our final good-byes.

Q.    Just this last summer.

A.    Yes.

Q.    They buried in Mason City?

A.    Yes, they are.

Q.    I trust you attended the funeral.

A.    Yes, I did.

Q.    You talked earlier in your testimony about Amber.  When you were describing what she was like as a little girl, you talked about the energy she had and the fact that she always -- she would wake up wanting to play including with the little girl that lived behind her, Brittany Asbe.

A.    Yes.

Q.    At the funeral for Lori and the girls was a poem read that

Brittany had written about her -- her little friend Amber?
Page 110

A. There was a poem read at the funeral by the pastor that -- Brittany and Amber were fairly close, and this poem was describing their relationship with each other.

Q. I've just handed you that poem and would ask you if you could read that for the jury, please.

MR. BERRIGAN: I'm sorry, Judge. I don't know if this has been marked and it's in evidence.

MR. WILLIAMS: It's not.

MR. BERRIGAN: Okay. Then I'm going to object to it. This is not the funeral, and I don't think a eulogy during these court proceedings is appropriate, and I object as it's improper victim impact evidence.

THE COURT: Overruled. You may read the poem.

A. Named Amber. She was only six when she left on a picnic. Then the left -- excuse me. Then the theft. She never would be able to get to the age of seven for she was not -- shot, sent to heaven. I never got to say good-bye. The nights I was scared, those nights I'd cry wishing to see her face again, wishing that it would have never been. For my dear friend, I loved her so. I never wanted her to go. Only five and not aware of what would be ahead. Oh, what a scare. Amber isn't just a color. She was my best friend.

MR. WILLIAMS: No further questions.

MR. BERRIGAN: I have no questions of Mr. Milbrath.

2951

Thank you.

THE COURT: You may step down.

MR. WILLIAMS: United States calls Marge Milbrath.

MARGE MILBRATH, PLAINTIFF'S WITNESS, SWORN

Page 111

THE COURT: Okay. Please be seated.

Would you state your full name, please.

THE WITNESS: Marge M. Milbrath.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q.   Miss Milbrath, we've heard from you once in this trial already.  I'd like to have you just remind the jury a little bit about yourself.  You live in Mason City, Iowa?

A.   Yes, I do.

Q.   And how long have you lived there?

A.   We've lived there for about 45 years.

Q.   You are married to your husband David?

A.   David, right.

Q.   And we've heard from Robert that you had three children.

A.   Yes, we did.

Q.   Lori was your first child.

A.   Lori was my firstborn.

Q.   Can you tell the jury something about Lori as a girl growing up in Mason City?

2952

A.   She was the cutest little baby I ever had.  She -- we raised her over there on North Van Buren, and she went to Sunday school, was baptized.  Her godparents took her away from me that same day so they could go and show her off, so I didn't get to have too much of her that day.  She was about three months old. She went on and went on to school, graduated, went and joined the Navy and spent four years in the Navy, came back, got married.

Page 112

While she was -- well, before she got married while she was in the service, she called me to let me know she was pregnant, but she was going to surprise me and not tell me right away, and then somebody in the background said, Hi, grandma, and I thought -- I knew right away what was wrong. I always raised her, of course, to wait. I'm from the old school. So I said you needed to wait until you got married.

So I -- excuse my French. I called her a little shit. She turned around. She says, Mom just called me a little shit. I thought, yeah, I did, but I was happy.

Q. What was your relationship like with Lori over the years?

A. We had quite a good relationship. She was around till she graduated and went in the service, and while she -- when she came back to Mason City, she -- her and I used to go to a lot of cooking classes together. She liked to cook. And so whenever there was one out at the NIACC college in Mason City, I'd ask her if she would want to go, and she always went. We had a good

2953

time.

Q. Pretty close.

A. Pretty close.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Ma'am, I've just handed you Exhibits 1100 through 1104 and 1159. Do you recognize, first of all, 1100, 1101, 1102, 1103, and 1104 as photographs of your daughter and your daughter's children Kandi and Amber?

A. Yes, I do.

Page 113

Q. And 1159, can you identify who's in that photograph? Be the last one I think in the -- 1159.

A. Oh, it's the last one, okay. This is my daughter's ex-husband.

MR. WILLIAMS: United States moves to admit Exhibits 1100 through 1104 and 1159.

* * * *

(Government Exhibits 1100 through 1104 and 1159 were offered.)

* * * *

MR. BERRIGAN: No objection.

THE COURT: They are admitted.

* * * *

(Government Exhibits 1100 through 1104 and 1159 were

2954

admitted.)

* * * *

BY MR. WILLIAMS:

Q. I'd like to show you some of these exhibits, ma'am. First of all, 1100.

MR. WILLIAMS: Permission to publish, Your Honor, I should ask.

THE COURT: You may.

BY MR. WILLIAMS:

Q. Can you tell the jury what they're seeing in that photograph.

A. This is my daughter Lori.

Q. And when was that photograph taken?

A. This is a graduation picture.

Q. High school graduation?

Page 114

A.    High school graduation.

Q.    And what year did she graduate from high school?

A.    '82 I believe it was.  '80 or '82.

Q.    You indicated earlier in your testimony that after graduating from high school she went into the service.

A.    Yes, she did.

Q.    For four years.  Show you 1101, ask you if you can describe that for the jury, please.

A.    This is Lori when she went into the Navy.  This is in her Navy uniform.

2955

Q.    And this was active duty Navy?

A.    Pardon?

Q.    This was active duty Navy?

A.    Yes, it was.

Q.    And you said I think earlier in your testimony for four years.

A.    Four years.

Q.    Did she have the opportunity to travel much when she was with the Navy?

A.    Yes, she did.  She was stationed in -- she had gone to Disney World.  She was stationed down around Florida.  I'm not sure where all the Naval bases are.  But she was -- called me from Florida anyway at Disneyland, and she said she was -- I asked her what she was doing there, and she said she was on leave with some other Navy people, and she said they was having a really good time.  Well, Lori didn't really care to go into the service at first, and then after she had been in there, she was wearing her summer uniforms, and that's the day she had

Page 115

called me, and she said, Mom, she says, I'm really happy to be in the service. Everybody's just looking at me. It makes me really feel good. And I thought, yes, it isn't as bad as you thought it would be.

Q. When she was in the Navy, is that where she met her husband Jim?

A. Jay.

2956

Q. He goes by Jay?

A. He goes by Jay. Yes, she did.

Q. And they ultimately did get married?

A. Yes, they did get married.

Q. To the point -- at any point in Lori's life, were you ever aware of her being involved in any, any criminal activity at all?

A. No, she was never involved in any.

Q. Ever involved in drugs in any way?

A. Never involved in drugs at all, very much against drugs.

Q. Was that something that she learned from you and your husband, David?

A. Yes. We instilled that into them never to get involved in anything of that nature.

Q. How long were Lori and Jay married roughly?

A. Well, long enough to have Kandi and Amber. I think Amber was just young when they got -- were divorced.

Q. When Lori left the service, the Navy, did Jay also leave about the same time?

A. He was out earlier than she was. He had gone in a year before she had.

Q. And when they -- after they got married and left the

Page 116

service, where did they relocate to?

A.    They moved to Des Moines, Iowa.

Q.    And did you see a lot of them during that time period in

2957

their lives?

A.    We saw not a lot of them.  We saw quite a bit of them.  We would go down quite often on weekends to see them.

Q.    Ultimately they got divorced, and I think you've testified earlier that after their divorce Lori moved back home to Mason City.

A.    Yes, she did.  Yes, she did.

Q.    And ultimately moved into a house just down the street from you.

A.    Yes, she did.

Q.    Showing you Exhibit 1102, can you describe for the jury what they see in that photograph?

A.    This is Lori with her two children in her living room.

Q.    That would have been shortly after her divorce from Jay and after she moved back to Mason City.

A.    Yes, it would have been.

Q.    And at that point she was a single mother raising her two daughters by herself there in Mason City.

A.    Yes, she was.

Q.    Did you and your husband help out?

A.    Yes, we did, as much as we could, as much as she would let us because she was very independent.  My husband raised our children to be very independent, so she asked for very little help.

Q.    What opportunity did you have to observe how she was

Page 117

raising her kids?

A.   She was a very, very good mother.  We offered to watch the kids quite a bit so she could go and do something with her brother or sister or friends, and the friends she did have most of the time that she would -- she would take those kids with her, so -- and I said that's fine.  She said, No, I'll take care of my kids.  So I said that was fine.

Q.   You only lived a half a block away or less.  Did you have occasion to go over to her house?

A.   Almost every day some time or another just even if it was to say hi.

Q.   What kind of a housekeeper was she?

A.   Very, very good housekeeper, never left anything sitting around.  She always got her work done.

Q.   That close to your granddaughters, did you have occasion to develop a close relationship to Kandi and Amber before they died?

A.   Yes, we did.

Q.   What kind of contact would you have with them typically on a weekly basis?

A.   Every so often they'd just -- they'd just come up and spend the day hanging around watching us -- we were in the process of remodeling our house, so they would be up there just asking questions and wondering what we were doing.

Q.   This is in 1993.  You were remodeling your house?

2959

A.   Yes, it was.

Page 118

Q.   Were there times when they would stay overnight with you either individually or together?

A.   Kandi didn't very often stay overnight.  She was kind of a mommy's girl, so she stayed with Mom quite a bit.  But Amber had stayed overnight before, and that particular day, she had asked her grandfather if she could stay overnight, and we both had to work the next day, and he told her no.  And he has a very hard time with that now.  He told her no, and he said, I wish I had never said that.  She would be with us today.

Q.   This is the night of July 25 Amber had asked to stay overnight with you guys.

A.   Yes, it was.

Q.   And your husband, does he blame himself?

A.   Yes, he does.  He'll have that on his mind for the rest of his life.

Q.   But there were happier times with these children I trust before they died?

A.   Yes, there was.

Q.   The events that little girls typically go through, Halloween and things like that.

A.   Right.

Q.   Show you Exhibit 1103 and ask you if you can describe for the jury what they see in that photograph.

A.   This is Kandi and Amber dressed up in their little

2960

Halloween outfits at Halloween time.

Q.   And did they come down the street to your house on Halloween?

A.   Oh, definitely did, yeah.  They stopped at my house

Page 119

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2592 of 3592

probably first just to show me their outfits.

Q. Did -- you talked about Lori doing a lot of things with her daughters. What type of things would she do with them?

A. She took them to everything that she ever went to. And she -- she just -- everything you could think of that a mother would do with their child she did. She would hold birthday parties for them at McDonald's or the Pizza Hut. And, of course, they always wrote your name up there, happy birthday, and just everything that a mother would do with her child or could do, she did.

Q. Show you Exhibit 1104 and ask you if you can tell the jury what they see in that photograph.

A. This is Kandi and Amber on a fishing trip.

Q. This is a fishing trip with Lori?

A. Yes, it was. Lori I'm assuming took the picture.

Q. During the last year of the life of your daughter Lori and Kandi and Amber, what was their life like on a daily basis?

A. She was a working mother, and the minute she got home from work, she would take her girls, and she would see that they had a decent meal every single day and just -- she would just be with them as much as she possibly could until bedtime.

2961

Q. Leading a normal life doing the normal things that --

A. Yes.

Q. -- we do in small town America?

A. Shopping, take them shopping, take them every place she went, grocery store shopping, everything.

Q. You indicated that on July 25 of 1993 Amber asked to stay overnight with you and that did not happen. At some point you learned that they disappeared that next day, and you've talked

Page 120

about that in your prior testimony about that day and about what you observed and entry into the house. You've not had an opportunity to explain to this jury what impact that had not just that day but in the days and weeks and months and years that followed where you didn't know what happened to them. Can you share with the jury how that affected you?

A. Well, it's very hard. I go by her house every single day on my way to work, and it's very hard to go by that house knowing that you will never see your daughter or your granddaughters outside playing or Lori sitting on her porch watching her girls knowing they'll never come up to your house again. If Amber had been there, I would have -- I would have -- if I had been home that day, I would have said she could have stayed home or stayed overnight with us, but that will never happen. They died such a horrible death that that will stay in our minds forever.

Q. Has that affected you emotionally to the point where you've

2962

sought professional help at all?

A. Pardon?

Q. Has that affected you to the point where you've sought any professional help?

A. Yes, I did. In fact, my doctor has told me I don't need to be at these trials every day, it's too hard for me, but if I felt like coming, I could. I am on a depression pill right now, and I probably will be on one for a long, long time.

Q. You've explained to the jury that your husband blames himself for Amber's death. How has that affected his daily life?

Page 121

A.    My husband tries not to talk about it because every time he does we both just sit down and cry.  It's very, very hard on him, like I said, because he said no to his granddaughter.  And if he had it to do over again, he would never have said that.

Q.    These little girls had a father as well -- we've talked about him a little bit -- Jay Duncan.  Can you explain to the jury after they divorced, did the girls stay close with their father Jay?

A.    Yes, they did.  Kandi was very close to her father, and she looked forward to going down there on the weekends, and she would spend every other weekend with her dad.  They did an awful lot together.  He's the one that took her fishing.  Amber was small, so she didn't do too much of that.  But Kandi would go down and spend time with her grandmother, and then she would

2963

go -- her dad would take her, and they would go and do things together.

Q.    The summer of 1993 was a summer of rain in Iowa with flooding.  You remember the floods we had in Iowa?

A.    Yes, I do.  Yes, I do.

Q.    Was Jay Duncan living down in Des Moines at that time?

A.    Yes, he was.

Q.    And did -- when the floods hit Des Moines, what involvement, if any, did Jay have in the efforts there?

A.    Well, Des Moines flooded quite a bit, and they needed people to help do some sandbagging, and he volunteered to do that.  In the process of doing that, he got spinal meningitis and ended up paralyzed from the waist down.

Q.    I'd like to show you Exhibit 1159.  You previously identified this as a photograph of Jay, Kandi and Amber's

Page 122

father.

A.    Yes, it is.

Q.    He's paralyzed from the waist down now?

A.    Yes, he is.

Q.    And on top of affecting his ability to move, did the spinal meningitis affect his mind?

A.    Yes, it did.

Q.    Can you describe for the jury in what way?

A.    Well, I haven't seen an awful lot of him.  He was, of course, up here for their funeral.  And I talked to him a little

2964

bit.  But his mind is not all that good.  He stops and he'll ask his mother, he says, Don't I have two daughters?  And she said yes.  And she said that's as far as she'll go until he asks her something else.  He doesn't quite remember everything that went on.

Q.    Does he, based on your conversations with you, have any appreciation for the fact that his two little daughters were murdered?

A.    I'm sure he does.  I don't know that he actually understands what has happened.  All he knows is that he had two daughters, and his mother, like I said, will explain something to him when he asks.  She says, I don't know how long he remembers it, but she will explain to him what . . .

Q.    You indicated that there was a funeral for Lori and her girls.

A.    Yes, there was.

Q.    That was, we heard from Robert, held last summer in Mason City.

Page 123

A.    Yes, it was.

Q.    Was there a good turnout for that?

A.    Pardon?

Q.    Was there a good turnout?

A.    Yes, there was more people than I thought there would be. We heard from people that didn't even know us that just sent their sympathy and hearts out for us.

2965

Q.    You had some choices to make about Lori's funeral including caskets.  Did you choose to bury Lori and the girls in separate caskets?

A.    No, we chose to bury them all together because they spent all their time together.  We felt that they belonged together.

Q.    And so now Lori and Kandi and Amber are buried together again.

A.    They are together again.

        MR. WILLIAMS:  No further questions.

        THE COURT:  Mr. Berrigan?

        MR. BERRIGAN:  I have no questions of Mrs. Milbrath.

        THE COURT:  You may step down.  Thank you.

        MR. WILLIAMS:  Your Honor, the United States rests its case in the penalty phase.

        THE COURT:  Is the defense ready to proceed?

        MR. BERRIGAN:  We are, Your Honor, but we need to make a brief record outside of the hearing of the jurors.

        THE COURT:  Okay.  Can we reserve that until -- or you want to make it now?

        MR. BERRIGAN:  I'm fine with reserving it as long as the Court doesn't feel I've waived anything by not doing it now.

        THE COURT:  No.
        Page 124

MR. BERRIGAN: You know how that works.

THE COURT: I know how that works.

MR. BERRIGAN: You're all right with that.

2966

THE COURT: We'll reserve that, and then when we send the jury home for the day, you can make your motion, and it will be deemed having been made at the close of the government's penalty phase evidence; okay?

MR. BERRIGAN: Very well, sir. Thank you.

THE COURT: Thank you.

MR. BERRIGAN: The defense calls Pearl Jean Johnson to the witness stand.

THE COURT: Members of the jury, why don't you take a short stretch break.

PEARL JEAN JOHNSON, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Please adjust the chair and the microphones so you can speak directly into the microphones. So you'll have to scoot that chair up a little bit; okay? And when you're settled in, would you state your full name, please, and spell your last name.

THE WITNESS: Pearl Jean Johnson, J-o-h-n-s-o-n.

THE COURT: Thank you.

Mr. Berrigan?

MR. BERRIGAN: May it please the Court.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q. Miss Johnson, where do you live?

A. In Mason City. In Mason City.

Page 125

Q.   I know you have a soft voice.  If there's a problem, we'll remind you about the microphones; okay?

Could you tell us what relationship you are to Angela Jane Johnson?

A.   She's my daughter.

Q.   You have other children?

A.   Yes, I do, four others.

Q.   Four others.  And tell us their names and ages and where they presently live.

A.   Wendy is my oldest, Wendy Jean.  And Wendy's what? Forty -- going to be 44, 43.  Okay.  I can't remember.  There's so many of them.  And then there's Angela.  She's 41.  There's Jimmy, and he's 37.  And there's Jamie, and Jamie is 38, 39. 38, 39.  And then there's Holly, and she's 32.

Q.   So you have four girls and one boy.

A.   Right.

Q.   Now, does Jamie live up in Mason City?

A.   Jamie lives in Minnesota.

Q.   Okay.  And what about Holly?

A.   Holly, she lives in Klemme, Iowa.

Q.   And Jim.

A.   Jim lives in a suburb of Chicago, Illinois.

Q.   Okay.  Let me ask you a little bit about yourself before we talk about your children; okay?  I know it's impolite, but can I ask your age?

2968

A.   Yeah.  Sixty-five.
                     Page 126

Q.  Sixty-five.

A.  Uh-huh.

Q.  And do you still work?

A.  Yes, I do.

Q.  What kind of work do you do?

A.  In-home care.

Q.  What does that mean?

A.  I take care of a little gal that's in a wheelchair, 24-hour position.

Q.  And so that suggests that you live with this lady.

A.  Yes, I do.

Q.  What is her name?

A.  Mary Crawford.

Q.  How long have you been taking care of Miss Crawford?

A.  It was a year December 6, last December.

Q.  What kind of work does that involve being a 24-hour caretaker?

A.  I'm there for whatever she needs, and she's in a wheelchair, so I use a Hoyer lift on her, you know.  I dress her.  I make her meals, take care of the house, and, you know, the duties you would have as -- in a home I do for Mary, plus I put her in a Hoyer lift to put her into bed at night and, you know, like that.  I don't know what else you would . . .

Q.  Besides physically being not able to walk, does she have

2969

any other medical conditions?

A.  She has MS.

Q.  Okay.  And so we know that's a degenerative disease; right?

A.  Uh-huh.

Page 127

Q. This kind of work, have you done it before you started working for Miss Crawford?

A. Yes. I've been doing this for the last six, seven years now.

Q. Do you drive a car?

A. No, I don't.

Q. You don't. Have you ever driven?

A. No.

Q. Never, okay. How do you and Miss Crawford get around if you need to leave the house?

A. She has a lift bus.

Q. Oh, I see, okay. So you can call the bus and get a ride for her.

A. Right.

Q. Before you started doing this type of work, Miss Johnson, what other kinds of work have you done in your life?

A. Well, I've had -- run a truck stop and a little restaurant.

Q. When you say run a truck stop, what do you mean?

A. Well, the cafe in a truck stop, and I cooked. I leased it. I cooked there, you know.

Q. Where was your cafe, your truck stop cafe?

2970

A. In Leland, Iowa.

Q. And tell the jurors that might not know where Leland, Iowa, is.

A. Forest City is the home of the Winnebago. Well, Leland is just about three miles from there, two, three miles from Forest City. And there was a little truck stop there at one time. It isn't there anymore. I don't know what it is now.

Q. And at this truck stop there's some kind of a cafe or a

Page 128

diner?

A. Yes.

Q. What was the name of the place?

A. It was a funny name, but I changed it as soon as I could. It was called Lavern and Shirley's, but I changed the name because my partner left, so I changed the name right after that.

Q. You ran this truck stop with another lady?

A. Yes, I did.

Q. And were either of you named Lavern or Shirley?

A. No. It was a suggestion someone made, and we thought it was funny at the time and said okay because we were trying to decide on a name for it. And someone said, Why don't you call it Lavern and Shirley's, some friends of ours, so we did. But it wasn't that long.

Q. Okay. And after your partner left, you continued the business.

A. Yes, I did.

2971

Q. And is this kind of a typical truck stop kind of a diner where it's, you know, grill-type work and that kind of food?

A. Yes, yes, it was.

Q. And what was your role in the business?

A. Well, a little bit of everything. You know, I cooked, and the girls worked for me. Ang and Wendy worked for me when my partner left and worked long hours, very long hours.

Q. When you say -- I'm sorry. I didn't mean to interrupt you. I apologize. When you say the girls, other than Wendy, did you have other --

A. Wendy and Angela, they worked for me, and it was in bad

Page 129

shape when my partner left, and my girls, I had to take them out of school to help me keep it going because I could not afford to pay a waitress at that time.

Q. How old were the girls at that time?

A. Let's see, Wendy was 16. I think she was 16 1/2, and Ang was 15, 14. 14, 15.

Q. 14, 15. You call Angela Ang. That's your nickname for her.

A. Yes, I do. I call her Angie or Angela. I love her name.

Q. I want to take you back before the truck stop.

A. Okay.

Q. Way back to when you got married to the man who is Angela's father. Can we talk a little bit about that?

A. All right.

2972

Q. First of all, are you presently married?

A. No.

Q. And you have been married.

A. Yes.

Q. On how many occasions?

A. Just once.

Q. Just once.

A. Uh-huh.

Q. Okay. And the man that you met, what was his name?

A. Jim Johnson.

Q. Jim Johnson. Where did you grow up yourself?

A. In between Mason City and Clear Lake.

Q. So have you lived in that area, the Mason City/Clear Lake area, all of your 65 years?

A. Quite a few of them, yes.

Page 130

Q.   Quite a few of them, okay.

A.   Most of them.

Q.   Most of them.

A.   Uh-huh.

Q.   You went to school in that area?

A.   Yes, I did, Mason City.

Q.   How did you meet Angela's father, Jim Johnson?

A.   He came to a party.  I lived with some girls, and he came to a party there.

Q.   All right.  This Christmas party or Valentine's Day?

2973

A.   No, just a party.

Q.   Just a party.

A.   Uh-huh.

Q.   And about how old were you when you met Mr. Johnson?

A.   Probably 20.  Let's see.  I don't think I was 21 yet. About 20.

Q.   And you and Mr. Johnson started dating after that?

A.   Three months.

Q.   Three months.

A.   Uh-huh.

Q.   Okay.  And then what happened after three months?

A.   We decided to get married.

Q.   You did.

A.   Yes.

Q.   When was that?

A.   April 1, 1961.

Q.   I'm testing your memory here a little bit.

A.   I know.  It's been so long.  I forget some of this.  I'm

Page 131

not really good with dates right now.

MR. BERRIGAN:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. BERRIGAN:

Q.    Ma'am, I've handed you what has been marked as Defendant's Exhibit 2001D.  Do you recognize that?

A.    Yes, I do.

2974

Q.    What is that?

A.    It's a marriage license.

Q.    Okay.  In fact, it's your marriage license, isn't it?

A.    Yes, it is.

Q.    Okay.  And does it indicate just what you've told me, you got married to James Jeffrey Johnson on April the 1st, April Fool's Day, of 1961?

A.    Right, uh-huh.

Q.    And you had known Mr. Johnson at that period of time for --

A.    Three months.

Q.    -- three months.  He must have been a very attractive young man.

A.    He was really cute.

Q.    Okay.  How did that marriage start off?  Was it a good marriage for you?

A.    We had problems from the beginning.

Q.    Okay.  And what kind of problems did you have?

A.    Well, when I married Jim, I had -- I had previous problems in my life and brought some baggage to the marriage, and unfortunately Jim brought some.  So there was a lot of conflict.

Q.    Would you mind if we talked a little bit -- and I know it might be difficult for you, but can we talk about your problems

coming into the marriage?  Would that be all right?

A.    All right.

Q.    Could you tell us what the major problems were?

2975

A.    Well, from a little girl, I raised myself.

Q.    Okay.  What do you mean by that?

A.    Well, it's so hard to talk about.  I was alone most of the time.

Q.    Did you have a mother and father that were alive?

A.    I had a mother and a father, but they divorced when I was just a little girl, and I had a brother.  And it was my brother and myself for a long time.  And we were alone a lot.

Q.    What was your mother's name, ma'am?

A.    Florence Jensen.

Q.    Florence?

A.    Uh-huh.

Q.    And after Florence -- and your father's name?

A.    My real father?

Q.    Yes, ma'am.

A.    Al Gomez.

Q.    And after Florence and Al divorced, who did you live with?

A.    My grandmother.

Q.    Your grandmother.

A.    Uh-huh, yes.

Q.    Did your grandmother raise you?

A.    My grandmother, part time she did.

Q.    And then who on the other part time?

A.    I would be with my mother, you know.  My mother and father divorced, and when I was a little girl, I came to Mason City to

Page 133

live and stayed with my grandmother, my brother and I. But at first it was just me, and then later my brother came, and my mother had remarried.

Q. Can you tell us why it is that you didn't live with your mother and you were living with your grandmother?

A. My mother waitressed and she -- we lived on what she made, and at the time she was making $25 a week.

Q. 25?

A. $25 a week, uh-huh, at a Kreske's Dime Store here in Mason, and it wasn't enough to take care of us, you know, so part time I was with her, and part time I was with my grandmother.

Q. While you were growing up, did your mother Florence ever remarry?

A. Yes, she did.

Q. And did that change your living situation?

A. Yes, it did.

Q. What happened?

A. My stepfather was an alcoholic. Sorry. And he abused my brother and myself.

Q. And when you say abused, ma'am, I wonder if you could tell us a little more specifically what you mean.

A. He abused my brother, and he sexually abused me.

Q. Okay. And I know this is difficult for you, Miss Johnson, but about how old were you at the time?

A. When we lived with him for seven years, I was in -- let's

see. I'm trying to remember. I think fifth, sixth grade when

the marriage broke up.

Q.   When the marriage between Florence and Mr. Gomez broke up?

A.   No, my stepfather.

Q.   Your stepfather.

A.   Right.

Q.   So how long had your stepfather been married to your mother Florence before they divorced?

A.   I don't know because they -- I never knew.  No one talked in my family.  No one talked.  It was -- when we were -- my brother and I lived with my grandmother, they talked Norwegian if we were in the room.

Q.   Talked what?

A.   Norwegian.

Q.   Norwegian.

A.   If we were in the room.  And they never talked to us, never talked to us.  We were just kind of seen and not heard.

Q.   Your mother spoke Norwegian?

A.   No, my mother understood some of it, though, but she never talked it.

Q.   But Mr. Gomez, was he Norwegian?

A.   When my mother married my dad, they went to Illinois, my real father, and lived there.  And the marriage broke up.  My father had gone to war.  The marriage had broke up when he came back, and the next thing I knew I was in Iowa, and I was a

2978

little girl and very small because I don't even remember the ride, you know, how we got there.

Q.   But this abuse that we're talking about at the hands of your stepfather -- and I might not have asked you.  What was his

Page 135

name?

A.   Virgil Ashley.

Q.   Mr. Ashley, he and your mother Florence, they broke up when you were in the fifth grade.

A.   Yes.  It was fifth or sixth.  I can't remember because those years were kind of like a blur.

Q.   But this abuse would have had to have been before then.

A.   No, the abuse started with --

Q.   I'm sorry, ma'am?

A.   The abuse started with him.

Q.   No.  I understand that.  Correct me if I'm wrong, but are you telling us that when Virgil was married to your mother Florence that he was abusing you at that time?

A.   Yes, both my brother and myself.

Q.   And yourself.  And do you know how long that went on?

A.   About seven years.

Q.   Okay.  So that -- you relate that to us because you felt that was a problem when you later got married when you were 20.

A.   Yes.

Q.   And what was the problem there that that sexual abuse you had suffered as a little girl caused you when you married your

2979

husband Jim?

A.   Well, I never said anything.  I just never said anything to anybody.  It's not something you talked about, you wanted to talk about.  It was just something you wanted to forget.

Q.   So this was not information you disclosed to your husband back in 1961.

A.   No one knew it.  I never told anybody.

Q.   And so that presupposes you never got any kind of

Page 136

treatment, any kind of mental health treatment.

A.  No.  You, you know -- in my family, we never talked.  No one talked to anyone.

Q.  You never went to see a doctor as a result of the sexual abuse?

A.  No.

Q.  So when you married your husband Jim, how did this sexual abuse history kind of manifest itself in your marriage?

A.  Well, I was saying I had, you know, brought some baggage to the marriage, and I think Jim did too.  And Jim -- I -- I don't know what to say there.  He -- it was both of us that was hard on the marriage, both of us.  It wasn't just one person.  But Jim, when we first got married, he wanted me to be like his mom, and I was having trouble being me.

Q.  You were having trouble being you much less his mom.

A.  Right.

Q.  It sounds like Wendy -- do you recollect her birth date?

2980

A.  My birthday?

Q.  Wendy, your daughter Wendy.

A.  Yes.

Q.  When was she born?

A.  About -- what was it?  Little over nine months after we were married she was born.

Q.  Okay.  So you got pregnant then I guess relatively quickly.

A.  Right, almost right away, yeah.

Q.  All right.  Was Wendy born in 1961?

A.  It would be '62.  Wendy was born in '62.

Q.  1962.

Page 137

A.    Yeah.

Q.    And then obviously you had -- Angie was your next child. She was born in 1964.

A.    Right.

Q.    January 17; right?

A.    Right.

Q.    Did you have any children in between Wendy and Angie?

A.    I lost a baby.

Q.    You lost a baby in between the two of them.

A.    Yes.

Q.    When you were at this early stage in your marriage when you were married to Jim Johnson, what was Mr. Johnson doing for a living?

A.    When we first married, he was working for a little -- kind

2981

of a cold meat factory.  I don't know.  They didn't process it, but they packaged it.  It was like a storage house for cold meat.

Q.    What is it that he did for them?

A.    For them?

Q.    Yeah.

A.    Packaged it.  I think he loaded it if I remember right, loaded it on trucks.

Q.    And when you first got married and you were having these babies, where were you living then?

A.    Lived here in Mason City with Wendy, and then we moved. Jim wanted to go to Wisconsin, so we went to Wisconsin to live.

Q.    What is it about Wisconsin that attracted you to Wisconsin?

A.    Jim's parents were there.

Q.    Okay.  So his mother lived in Wisconsin.
Page 138

A.    Mother and his stepfather.

Q.    Okay.   When Angela was born, were you living in Wisconsin or Mason City?

A.    No, in Wisconsin.

Q.    Wisconsin.

A.    Yes.

        MR. BERRIGAN:  May I approach, Your Honor?

        THE COURT:   You may.

BY MR. BERRIGAN:

Q.    Ma'am, I have just handed you Defendant's Exhibit 2000A.

2982

Do you recognize that document?

A.    I'm looking at it.

Q.    Can you read it?

A.    Yes.

Q.    Isn't that Angela's birth certificate?

A.    Yes, it is.

Q.    And is it January 17, 1964?

A.    Yes, it is.

Q.    Where is that --

        MR. BERRIGAN:  Let me offer this.  Defense offers Defendant's Exhibit 2000A, Your Honor.

                    *   *   *   *

        (Defendant Exhibit 2000A was offered.)

                    *   *   *   *

        MR. WILLIAMS:  No objection.

        THE COURT:   2000A is received.

                    *   *   *   *

        (Defendant Exhibit 2000A was admitted.)

Page 139

VOLUME 17 6-2-051
* * * *

BY MR. BERRIGAN:

Q. And where was your daughter Angela born?

A. Burlington.

Q. At the Burlington Memorial Hospital?

A. Yes.

Q. Were there any particular problems with her delivery?

2983

A. She was a breech baby.

Q. I guess back in those days we were still using forceps is my recollection. Do you recollect that at all? Was there anything like that involved in her delivery?

A. I -- you know, I can't remember for sure.

Q. Okay.

A. Because I was in a lot of pain with Angie, and it was a really hard delivery.

Q. Were you working at this time, Miss Johnson?

A. No.

Q. You were taking care of young children.

A. I -- yes.

Q. And then after Angie your daughter Jamie was born.

A. Yes.

Q. And how far behind Angie was she?

A. Let's see. She came in -- Ang was '64, and Jamie came right after her, and then it was Jimmy. They were just like stairsteps almost.

Q. And during that time Mr. Johnson and you were still married; isn't that right?

A. Yes. Yes, we were.

Q. How was your marriage doing by the time your daughter Jamie
Page 140

was born and then your son Jimmy?

A.    Not too good.

Q.    Not too good.

2984

A.    No.

Q.    And what was the problem with the marriage at that point in time?

A.    Well, it was stressful, very stressful.  And being brought up alone, it was hard to raise children and relate to them because I just lived by my own rules, you know, lived -- never talked to anybody.  I never talked, and I was always home with them, you know.  I loved the children very much, but it was hard.  It was hard, you know, and hard to show them that I loved them because you end up treating them the way you were treated.  And when I first had children, I was pretty hard on them.  I was abusive to them.  I did get better, but it took a while.

Q.    You hadn't had a good role model in your own mother, had you?

A.    Mom was just never around, you know.  And my stepfather was a pretty bad man.

Q.    Ma'am, if the marriage wasn't going all that well with Mr. Johnson, Jim, your husband, why did you keep having these children?

A.    That probably sounds silly to most people, but I didn't take birth control because I was really afraid -- at that time there were babies being born, you know, without limbs and there was different things.  And I was afraid that would happen to me.

Q.    Okay.

A.    And I knew I would never be able to cope with that, and it

Page 141

scared me.

Q.  Some time during the 1960s you and Mr. Johnson ended up getting divorced.

A.  Right.

Q.  And do you recollect exactly when that was?

A.  In '68.  I can't remember the month.

Q.  That's all right.  So you were married to Jim Johnson for about seven years; is that right?

A.  Right.

Q.  And what is it that caused your divorce from Mr. Johnson?

A.  There was the two of us.  We had a lot of conflict.

Q.  Was any of that physical in nature?

A.  Yes.

Q.  Could you tell us what it is that happened physically between you and Mr. Johnson?

A.  I got hit a few times, and Jim -- his mom interfered a lot. I don't like to say that, but she did interfere a lot because the one time we were alone without anyone, we did get along. But his mom was a strong person in his life.  She was.  And she was -- there were different instances where very innocent things that I don't know -- I still don't understand some of it, but I can remember just innocent things happening and him being really mad at me and . . .

Q.  I wanted to ask you specifically about this hitting.

A.  Yes.

2986

Q.  Were you hitting Mr. Johnson, or was he hitting you?
Page 142

A. He was hitting me.

Q. And did that happen in the presence of your children?

A. The first time I was carrying Wendy when he hit me, and I hit the wall.

Q. And when you say he hit you, could you tell us a little more specifically what that means?

A. Well, I guess it was a slap, but he was a big man, and it was over -- it was the wrong answer. I gave him the wrong answer to a question he asked.

Q. And he slapped you?

A. Hard, and I hit the wall.

Q. Okay. When he did hit you, was it usually that he slapped you?

A. Yes.

Q. Did he ever punch you?

A. It seemed like it, you know. When it happens, it's -- when it happens, you're just -- you know, you say that it's -- it's so fast, you don't really know what hit you. It feels like a Mack truck.

Q. Did -- that hitting, did that continue throughout your marriage from when you were pregnant with Wendy until you left Mr. Johnson?

A. No, not all the time. It wasn't all the time, but there were different things. I remember just a little episode of my

2987

mom and dad came to town, my stepfather. This was the last -- Mom's last marriage. And I was going to go shopping for a birthday present for him, and my mom and dad had come in, so we went together. And when I got home, there was a phone call

Page 143

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2616 of 3592

telling me not to be there when he come home.

Q.  A phone call from your husband?

A.  Yes, because I'd gone shopping and I had left a note telling him where I was going and put his lunch on the stove, you know, because he would come home at dinnertime or lunchtime.

Q.  And so did you go home?

A.  I went home with them.  He told me not to be there, so I left.  I went with my parents back home.

Q.  When you mean back home, you mean --

A.  To Clear Lake.  They were living in Clear Lake.  They were building a home in Clear Lake.

Q.  So just to make sure I have this correctly, your husband called you and said, Don't be home when I get home.

A.  Right.

Q.  What was the reason for that?

A.  Because I went with them.

Q.  Went with your mother and her husband.

A.  Right, uh-huh.  And after that his mom told him not to let me have the checkbook anymore.  So all the time I was married to him I never had a cent of my own.

Q.  Did Mr. Johnson have any problems with alcohol?

2988

A.  Yes, he liked to drink, and he liked to fight.  It was just a sport to him, you know.  He loved that.  It was just part of -- I don't know.  Made him feel alive I guess because we had problems and -- you know, and I know that a lot of it was my fault, but his too, you know.  I used to think it was all my fault but --

Q.  These --

A.  But I realized that, you know, it takes two to make it work

Page 144

in a marriage.

Q. Sure. These problems, the physical hitting, did that usually involve alcohol abuse?

A. One time it didn't and -- not always.

Q. Not always.

A. Huh-uh, huh-uh, huh-uh.

Q. Was there ever, you know, any kind of a rational explanation from Mr. Johnson as to why he was hitting you?

A. Just mad.

Q. He was just angry.

A. Just angry.

Q. And then after these episodes where he would hit you, did you leave him or go somewhere or take off?

A. At first I stayed with him, and then, you know, like I said, it was a hot marriage. I mean, we were both -- it was just a lot of conflict, and then one day I just knew if I could hold a job I would leave.

2989

Q. Well, did you leave Mr. Johnson --

A. Yes.

Q. -- or did he leave you?

A. No, I left him.

Q. And what were the circumstances under which you finally left him?

A. I went to work in a factory, and I made some friends. They were girls. One was a guy, was a man, but I made some girlfriends, you know, and I never had any friends while I was there. I never had any friends at all. Matter of fact, I was -- but I -- a lot of that was my fault because I was very

Page 145

distant from people and you don't know how to talk to people.

Q. So you got a job in a factory.

A. Yes.

Q. And you got some friends.

A. And one morning -- and I worked a nightshift, and the girls said -- there were a couple of them -- did I want to go with them just bar hopping during the day, you know, just in the morning getting off of work, so I had a baby-sitter, so I said sure. I've never done that before. So I went. And when I come back -- and I really didn't think I did anything wrong. I didn't feel like I had. But he did. He was really angry.

Q. And did he strike you then?

A. Yes.

Q. And is it after that you left with the children?

2990

A. Yes.

Q. Where did you go then after -- you had been living in Wisconsin; right?

A. Yes.

Q. Were you living in Burlington or some other town?

A. No, we were living in Eau Claire where his parents lived.

Q. And where did you and the children go after you left Mr. Johnson?

A. We went to -- I got us a little apartment on Half Moon Lake in Wisconsin. It was in Eau Claire, but I didn't stay there.

Q. Where did you go?

A. My mother and my father -- my mother had remarried for the third time a real, really neat man, and he loved my children, and he was just a great grandpa to them. He was just a real sweet man. They just didn't come any better than him.

Page 146

Q. This was Florence's third husband.

A. Yes.

Q. What was his first name?

A. Andrew Jensen.

Q. All right. Well, you started to explain that when I asked you where you went.

A. They were going to Colorado and asked if we wanted to go along.

Q. Okay. And you left then.

A. Yes, I did.

2991

Q. You and your -- I guess you had four children by that point; right?

A. Yeah, four, uh-huh.

Q. And you left and went with Mr. Jensen and your mother Florence to Colorado.

A. Right.

Q. Did you tell Mr. Johnson you were leaving, or was this a sudden kind of out in the middle of the night?

A. No, he knew because I had an auction and sold things and, you know, to raise enough money to go out there, and I'd had some from a car accident, and that's what I used.

Q. What was Mr. Johnson's response to you taking his four young children off to Colorado with your mother and stepfather?

A. I don't think he liked it, but he never, you know -- I went, and I know he wasn't happy about it, but I did go. There was no problem.

Q. And Mr. Johnson knew you were in Colorado.

A. Right.

Page 147

Q. And knew where you were.

A. Yes, uh-huh.

Q. Now, do you remember when it is that you went to Colorado with your mother and Mr. Jensen?

A. It would have been '69.

Q. And so you had already gotten divorced?

A. Yes.

2992

Q. So you had been at least at Half Moon, Wisconsin, for --

A. Yes.

Q. -- enough time to get a divorce and get out, huh?

A. Right, uh-huh.

Q. And then when you got out to Colorado, what did you do for a living?

A. I was on aid. What do you call it?

Q. Aid to Families With Dependent Children?

A. Yes, right, uh-huh, and -- while we were there, and it was a big place.

Q. What town in Colorado were you in?

A. Pueblo. It was big, and rent was high. We had a nice place. My parents lived with us, and, you know, we fixed it up. It looked -- it looked great, you know. It was nice looking. It was a mess when I started with it, but, you know, a little paint and that, it looked good.

Q. When you got divorced, was Mr. Johnson ordered to pay child support?

A. Yes, he was.

Q. How much was that?

A. $200 a month.

Q. $200 a month in 1968 was a lot of money.

Page 148

A.   (Witness nodded head.)

Q.   Did he pay you that child support?

A.   No.

2993

Q.   Never?

A.   Never.

Q.   Never.  What about in terms of visitation where he could come and see his children?

A.   He could come and visit them any time he wanted, and there was a few times -- well, there was a time when he was tending bar and I sent the children up in a cab to see him.  They wanted to see their dad.  He called me shortly after to come and get them.  He sent them home -- four little children running around -- I'm sorry.  Four little children running around was kind of hard on him.

Q.   So there was at least one occasion where he came out to Colorado?

A.   No, he never came to Colorado.

Q.   He never came to Colorado.

A.   No, he didn't.

Q.   At the time of your divorce from Jim Johnson in 1968, Angela would have been 4 years old?

A.   Right.

Q.   And certainly up until that point she got to see her father pretty much every day; right?

A.   When we were living together.

Q.   When you were living together, right.

A.   We lived in the same town, but he took them once in a while, but it wasn't very often.

Page 149

Q.	Now, you're talking about before you went to Colorado?

A.	Right, uh-huh.

Q.	Okay.  And then once you got to Colorado, how long were you out there in Pueblo, Colorado?

A.	I was only there -- we were there for probably a year, about a year.

Q.	During that year did Mr. Johnson ever have any visitation with his children?

A.	No, he didn't.

Q.	Not at all.

A.	No.

Q.	Did you ever send the children back on a bus or anything like that to see him in Wisconsin?

A.	No, I didn't, no.

Q.	How was your relationship with Mr. Johnson at that point? You were living in Colorado, and he's still in Wisconsin, and you've got the kids.

A.	Stormy.  It stayed stormy.

Q.	Stormy.

A.	Yes, it did.

Q.	So this is not one of these divorces where people kind of reconcile and become buddies, huh?

A.	Right.

Q.	That's really never happened, has it?

A.	No.  It just kept boiling and churning, and I would have

2995

liked for it to be, you know, friendly for the children, but I
Page 150

was hot tempered, and when my children did see their father, he said terrible, terrible things about me, and if the children said anything back, they got in a lot of trouble.

Q. You know, we've kind of heard your side of the story regarding the divorce and the abuse.

A. Yes.

Q. What was Mr. Johnson -- or maybe he didn't have any complaints. But did he have some complaints about you during the marriage?

A. I'm sure he had a lot of them, you know, but he would spend a lot of time with his mom, you know, and I spent a lot of time at home with the children. And he loved his mom. He loved his mom very much, and I -- you know, I can't fault him for that, but he had told me one time -- that was in the beginning when we were first married -- that -- and I was carrying Wendy. If anything happened to his mom, he wanted to die too, and somehow I never could forget that.

Q. So he had this kind of unusually close relationship with his mother.

A. And I don't think that's bad. I don't think it is. But it -- his mom was a real strong woman.

Q. Let me take you then kind of chronologically if we could for the jurors. You're out in Colorado for about a year, and so Angela's around five or six years of age?

2996

A. Right.

Q. And then what happens? Why do you leave Pueblo, Colorado?

A. My mother and my stepfather, we were living together, and my grandmother was in a nursing home, and she called and asked

Page 151

them to come take her out of the nursing home. So they went back. There were problems there, and they lived with her for a while.

Q. When you say they went back, ma'am, we're not real sure about --

A. They came back to Mason City, Iowa.

Q. Mason City, okay.

A. Yes, I'm sorry.

Q. So your mother is coming back to Mason City to take her own mother out of a nursing home.

A. Right.

Q. And because you had been living with your mother and Mr. Jensen, you came too.

A. No, we stayed in Pueblo after they left, and then later we came back. We were out there for close to a year when we came back to Iowa and lived together.

Q. You were supporting the kids on AFDC out in Pueblo.

A. Right.

Q. So you left Pueblo, and you came back to Mason City.

A. Right.

Q. And about what year might this have been?

2997

A. It would have been, let's see, '71. '70, '71.

Q. '70, '71.

A. Yeah, uh-huh.

Q. And I guess in '70, '71, Angela, of course, is about 6 or 7 years old; right?

A. Yeah, right.

Q. So she's in school.

A. Yes.

Page 152

Q. And her sister Wendy obviously had been in school because she's a couple years older.

A. Yes.

Q. So they're making these changes from Pueblo to Mason City.

A. Yes, uh-huh.

Q. And then when you came back to Mason City in '70 or '71 --

A. Right.

Q. -- what did you do to support yourself and your children then?

A. I was on ADC until they were old enough that I could go to work because when I first worked I had someone stay with us and take care of them. And I knew I couldn't go to work until I was sure, you know, they were all in school.

Q. Well, you mean all into school.

A. Yes, into school.

Q. And so you're talking now about Wendy, of course, is already in school.

2998

A. Right.

Q. So is Angie.

A. Right.

Q. And then you had Jamie.

A. Jamie.

Q. And Jimmy.

A. And Jimmy.

Q. So how long were you in Mason City not working?

A. We stayed there -- we were only there probably one school year if they even finished the year because my mother and I, we were having trouble getting along.

Page 153

Q.   And so you were living with your mother and Mr. Jensen again, huh?

A.   Yes.

Q.   What was the problem with you and your mother?

A.   My mother, I believe she had a nervous breakdown is what I -- I believe that's what happened to her because some strange things happened after that.

Q.   Well, the truth is that some of this had a lot to do with some religious beliefs and practices that your mother had; isn't that true?

A.   Yes.

          MR. WILLIAMS:   Objection, Your Honor.   Leading the witness.

          MR. BERRIGAN:   Oh, I'll rephrase.

                                                  2999

BY MR. BERRIGAN:

Q.   Ma'am, tell us what your mother's problems were, would you?

A.   My mother was given some tapes by a friend, and this man -- I don't know how to explain this too well, but this man believed that the things that were bothering you inside, he could help you to be rid of them.

Q.   Who's this man, ma'am?

A.   Bishop Whitlock.

Q.   And this is the man that's on the tapes?

A.   Yes.

Q.   What kind of tapes are these?

A.   They were -- I never listened to them, so I really don't know.  And I didn't want my children listening to them either, you know, and Mother and I quarrelled about it because when I'd been gone a few times and come home, the children had said she'd

Page 154

made them listen to the tapes.

Q. Well, how do you know what was on the tapes if you never listened to them?

A. The children told me.

Q. I see.

A. Uh-huh. And then my mother and I had words about it.

Q. Well, could you tell us why you were so averse to listening to these tapes that your mother was listening to?

A. Well, this man -- I call it a cult -- he was going to help my mother be free of all the things that she felt like she was

3000

tormented over and -- this is so hard to talk about.

Q. Well, you didn't listen to the tapes yourself.

A. No.

Q. And these children are telling you that they've listened to the tapes, your young children?

A. Yes.

Q. And they're telling you about the tapes, and you come to a determination it's a cult?

A. Yes. Some of the people -- there was a group of people that were listening to these tapes, and they helped my mother set up a room in the basement, and it was surrounded with blankets, blanketed off, so it was just a little room, and my mother would go down there during the day. There was a tire down there.

Q. Well, where would you be during the day, Mrs. Johnson?

A. It was -- if I was gone somewhere and I had a friend and -- I would go with her sometimes just for coffee or to get groceries. Whenever I was gone -- actually take that back.

Page 155

Most of the time I was there when she would beat that tire with the bat. I was there most of the time. It was the tapes she would play when I wasn't there.

Q. And so this room in the basement had a tire, and by that are you talking about like an automobile tire or bicycle tire?

A. No, it was an automobile tire.

Q. Okay. And there's some blankets?

3001

A. And blankets to close it off so it was a little room.

Q. Well, were the blankets to stop the sound of stuff that was taking place in the basement?

A. Apparently, but it didn't work.

Q. So your mother had strung up blankets in the basement.

A. Yes.

Q. And what was the tire used for?

A. She would take out her aggressions on it, and I don't know how to say it any more than that and beat the tire.

Q. Beat it with what?

A. The bat.

Q. The bat.

A. And I would put the vacuum cleaner on.

Q. You mean there's like a baseball bat?

A. A baseball bat.

Q. And when your mother's beating the tire with the baseball bat, is she listening to the tapes, or is there --

A. No.

Q. What's going on?

A. The tapes she played when I wasn't there or she played them in her room because she wasn't allowed to play them when I was home. She just would go down the basement every day and beat

Page 156

that tire.

Q.   Well, she apparently played them when your children were there because they're the ones that told you about them; right?

3002

A.   Right.  I wasn't there.  Otherwise I wouldn't have let her.  But when I found out, we had words.

Q.   Well, what else went on down in the basement where the tire was when you weren't there when your children were there with your mother?

MR. WILLIAMS:  Objection, Your Honor.  Calls for hearsay.

Q.   If you know.

A.   I don't know of anything else.

Q.   You don't know.

A.   No, I don't know of anything else.

Q.   This time when your mother's down in the basement beating a tire with a baseball bat in a room surrounded by blankets to muffle the sound, how old are your children?

A.   Young.  Let's see.  It would have been in '73 when we moved in the house.  I bought a home, and we were in Forest City, Iowa.

Q.   This house that you're talking about with the blankets and the tire was in Forest City?

A.   Right.  It was the first home I had boughten, and it was probably -- excuse me.  I have to think how long that's been.  No, it wasn't in '73.  It was more like -- let me see.  I think we moved in there, in the home, in '74, '75.  About '75.  And it was -- we hadn't been in the home too long when my stepfather died, and my mother called me.  She couldn't stay where she was

Page 157

any longer, so she come to live with us.

Q.   And you think that was in 1974, 1975?

A.   Well, we moved in the home, our first home, and it was about -- let's see.  I'm trying to remember.  It was about '74 or '75.

Q.   Up until this point, Mrs. Johnson, had you spent any time in Kansas?

A.   Yes, I did.

Q.   We missed that in the progression of where you lived.

A.   All right.

Q.   Can we go back for just a second, and I just want to make sure we're getting this so people can understand it; okay?

A.   All right.

Q.   So when you came back from Pueblo, Colorado, after being out there a year -- and you told us at that point you thought it was around 1970 or '71.  Did I get that right?

A.   Right.

Q.   And you came back, and you lived with your mother in Mason City with Mr. Jensen.  Did I hear that correctly?

A.   Yes, right.

Q.   Because your mother had come back to get her mother out of a nursing home.

A.   Right.

Q.   Okay.  And so when you're living there in Mason City with your mother in the early '70s, was there any kind of a room with

3004

a baseball bat and a tire in the basement?
Page 158

A.    No.

Q.    This is something that happened a little later.

A.    Later.

Q.    Okay.  So let's try to pick up where we are in Mason City, and Angela would have been, in '71, just 7 years old; right?

A.    Right.

Q.    And what school district did she go to then?

A.    It was Lincoln School.  I believe it was Lincoln School. And they tore that down later.  We were living there when Jim's mom called.  His mother called and asked if we would come up and spend Easter, and we hadn't been back very long.  So the kids wanted to go, so we went.

Q.    Well, they hadn't seen their father in how long at that point?

A.    It would have been over a year.

Q.    Well, it was at least that long because you had been in Pueblo, Colorado, for a year; right?

A.    Uh-huh.

Q.    How long --

A.    Probably a year, just a little over a year.  And anyway, so we went.

Q.    And is it true that -- I think you told us earlier that you were letting Mr. Johnson know kind of where you were in case he wanted to see the kids.

3005

A.    Yes, he knew.

Q.    Was that true when you came back and you were in Mason City living with your mother?

A.    Well, she knew we were there, so --

Page 159

Q. Who?

A. His mother, because she called.

Q. I see.

A. And, you know, I can't remember, but I'm sure we let her know because otherwise she wouldn't have known where we were. That's been so long ago now.

Q. Sure. All right. So in any case, after at least a year I guess these children finally get to see their father.

A. Yes, they did.

Q. Then you brought them back to Mason City where you were living?

A. Yes, that's where we came from, right from Pueblo to Mason City and lived with my parents.

Q. You're still not working, and you're on AFDC.

A. Right.

Q. You told us a little earlier that changed at some point when your son Jimmy finally was of school age.

A. Right, uh-huh.

Q. And Jimmy is five years younger than Angie.

A. Yes.

Q. Right?

3006

A. Right.

Q. Ang, okay. So what age would Jimmy have been when he started school?

A. When we left Wisconsin, he was three years old. And he started school -- I believe he started when he was five. I'm trying to remember. It's been so many years, you know, ago, and I -- you know, I'm not very good with dates.

Q. All right. Well, let me ask you this. Jimmy goes back to

school, and you said at that point you started working?

A.   Yes, I did.

Q.   What kind of work were you doing?

A.   Well, when we were -- when we were living in the first house in Forest City, I had a friend that came.  Her marriage broke up, and she needed a place to go.  So she came to stay with her children.  And we made a lot of big meals, you know.  And a friend of mine had said, Why don't you start a restaurant, because it was all home cooking.

So I thought about it, and I was going to do something anyway because the children were old enough and I could go to work.  So I fixed up my house, and I sold it for twice what I bought it for and went into business.

Q.   In the restaurant business.

A.   Yes.

Q.   Okay.  And is that the diner that you talked to us about earlier?

3007

A.   The truck stop.  I leased it.

Q.   Lavern and Shirley's.

A.   Right.

Q.   When did you start that, ma'am?

A.   Oh, my goodness.  Let's see.  1970 -- let's see, '76, something like that.  And I just want to say that I knew nothing about the restaurant business.  I jumped into that blind, but I wanted to get off of ADC.  I hated being on that.  But you have insurance, and I had no insurance.

Q.   There is this period of time we've kind of not accounted for, and I want to see if we can do that.

Page 161

A.    All right.

Q.    When you came back from Pueblo, Colorado, after being there a year --

A.    Right.

Q.    -- and now it's gotta be 1971 or '72 at least; right?

A.    Yes.

Q.    And then you start a diner four years later, and so we have this kind of four-year stretch where are you just staying home?

A.    Staying home, uh-huh.

Q.    Okay.  And taking care of these children.

A.    Yes.

Q.    And was your mother living with you then?

A.    Not all the time.  When we moved to Forest City, she didn't live with us until my stepfather died.

3008

Q.    When did he die, ma'am?

A.    When or --

Q.    Yeah, Mr. Jensen.

A.    He died of leukemia, and it was a few months after Holly was born.

Q.    When was Holly born?

A.    February 5, 1973.

Q.    Okay.  I want to talk about the period of time just before Holly was born.

A.    All right.

Q.    Isn't it true that you lived for a period of time in the state of Kansas?

A.    Yes, we did.

Q.    Okay.  Can we talk about how that happened?  How did you get from Mason City, Iowa, to Kansas?

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2635 of 3592

A. When we came back from Pueblo with -- Pueblo, Colorado, I had a phone call. It was from Jim's mother asking us if we would come up there for Easter. So we went up. I said sure, we would, so we went up there.

And we hadn't been in the house more than a few minutes when the phone rang, and my mother-in-law answered the phone and this happy look on her face when she answered the phone, and then she had this real not-so-happy look when she handed the phone to me. She said, It's for you.

When I divorced Jim, I was seeing a man. It's my

3009

daughter, my last daughter, Holly's father. And when I started seeing him, I did not know he was married. And when I found out -- he said he was separated, they were having difficulties in the marriage, but he was still with her but wanting to leave is what he said.

Q. What was this man's name?

A. Robert Claus.

Q. And you were telling us you were seeing Mr. Claus.

A. Yes.

Q. At the time of your divorce from Jim Johnson.

A. Yes.

Q. That was back in 1968.

A. Right.

Q. And now we're in --

A. I saw him for the year I was there. Before I left to go to Colorado, I saw him. We were together a lot. And I decided -- when my mother asked me to go to Colorado, I talked to him about it and said I was going because I was not going to stay in a

Page 163

relationship like that forever. I had, you know -- I couldn't do it.

Q. Miss Johnson, I'm sorry to interrupt you, but I'd like to talk about after we got back from Colorado; okay?

A. All right.

Q. You're telling us about this phone call and you're in Wisconsin and this is the first time that the kids have seen

3010

their dad in well over a year, maybe more.

A. Right.

Q. And you get some call about Robert Claus. Is that what you're telling us?

A. He was on the phone.

Q. He was on the phone, okay.

A. Asking if they knew where I was because he had written to me. For the year I was in Colorado he wrote to me.

Q. And what was the significance of Mr. Claus calling you now that you're back in Iowa?

A. He wanted to see me, you know.

Q. And you resumed a relationship with him?

A. Yes, we did.

Q. And I think your explanation was -- did I hear you correctly that you were not aware that Mr. Claus was married?

A. No, not in the beginning, huh-uh.

Q. So this relationship with Mr. Claus, how long did that go on now after you moved back to Iowa from Colorado?

A. Another -- about another year or so. Probably a three-year you could say because we wrote back and forth.

Q. Was this a relationship that you had openly?

A. Yes.

Page 164

Q.   So you weren't trying to keep this from other people.

A.   No, but -- no, I wasn't hiding it from anyone.

Q.   And you started to tell us about this because I'd asked you

3011

about Kansas.

A.   Right.  Well, I take that back.  I found out I was going to have a baby, and Bobby and I -- he came down, and we went back to Wisconsin to Eau Claire to look for a house or something, and we had been looking at an old school building to remodel because he had two children.  He had actually three children, one by another marriage.  And we were thinking about buying this old schoolhouse.

Q.   So you were going to move in with Mr. Claus?

A.   And --

Q.   Is that right?

A.   Right.  And I didn't -- we were talking about getting married.  And I was afraid to live there.  I just didn't think I could live there again.  So I asked him if he would consider coming down and applying for work in Iowa, and he said he would, but he filled out applications different places and no answer, no response on them.  So meanwhile I found out I was going to have Holly, and I couldn't tell my mother or my father.  I just couldn't tell them.

Q.   Could you explain that to us, ma'am, because at this point you're how old?

A.   Thirty-two, something like that.

Q.   Thirty-two, and you already have four children?

A.   Yeah, thirty -- I think I was thirty -- yes, thirty-two at the time.

Page 165

Q.    And you're divorced; right?

A.    Right.

Q.    You're dating a guy from Wisconsin, and you're pregnant. So what is the big deal about telling your mother?

A.    I don't know.  I just could not tell her.  I couldn't tell her.  I wanted to.

Q.    Are you sure you -- I'm sorry to interrupt you.

A.    I'm sorry.

Q.    Are you sure you weren't trying to keep the relationship with Mr. Claus secret from your mother?

A.    No, not the relationship, just the baby.

Q.    Just the pregnancy.

A.    Yeah, I just couldn't tell her.  I couldn't tell, you know, either one of them.  I think my stepfather would have been good about it.  My mom, I don't know what that would have done to her.  I just knew I couldn't tell her.

Q.    Not only didn't you tell them, but you took some affirmative action to keep them from finding out; isn't that right?

A.    Yes.

        MR. WILLIAMS:  Objection, Your Honor.  Leading the witness.

        MR. BERRIGAN:  I'll rephrase, Your Honor.

BY MR. BERRIGAN:

Q.    Not only did you not tell them, but did you take any action

3013

or what action did you take from preventing them from finding
Page 166

out you were pregnant?

A.   A girlfriend of mine that I'd had for probably -- we've been friends for thirty -- oh, let's see now, about 34, 35 years, said she knew a family that was trying to start an orphanage in Chanute, Wisconsin -- or I'm sorry, Chanute, Kansas, and that I could go there and stay with them until the baby was born because I was having problems dealing with the fact that I had another child.  And Bobby and I talked about getting married, but he was not divorced yet.  He was separated, had his own home with his children, but he was not -- there was no divorce yet.

Q.   Who was this friend of yours, Miss Johnson?

A.   Carol Mann.

Q.   And did you want to have another child?

A.   Not really.  I was -- I was afraid.

Q.   How did you feel about being the mother to the four children you already had?

A.   I loved the children dearly, but it was hard for me to show them that I did.  It took a long time.

Q.   So this idea about an orphanage, what was your intent in going to an orphanage?

A.   I was thinking about giving them Holly.  But there was no way I could.  I couldn't.  You know, when I carried her, I kept going back and forth, you know, giving her up, don't give her

3014

up.  Just you go -- when you're a mother and you're carrying a baby, you do that, you know.  That stuff goes back and forth in your mind.  And there was things going on, and I knew I couldn't give her up.

Page 167

Q.   Well, you didn't know that when you went out there, did you?

A.   No, I didn't.

Q.   Let's talk about that for just a moment.

A.   Okay.

Q.   You said Holly was born February the 5th, 1973; right?

A.   Right.

Q.   So when is it that you went to Chanute, Kansas, with your children?

A.   I went -- I was almost three months along when I went there.  And everything seemed fine, seemed normal.  They seemed like really neat people, and Carol thought they were, and I took her word for it, and I believed Carol.

Q.   Can you tell us -- I'm sorry to interrupt you again.

A.   That's all right.

Q.   Could you tell us who these people are that were running the orphanage?

A.   Ted and Bobbi Dillo.

Q.   What was the name of the place?

A.   It didn't have a name yet --

Q.   Well, how many children were in the orphanage?

3015

A.   They had three girls of their own, and they had adopted two little Sioux Indian boys and a little boy that was being sold in a bar.

Q.   I'm sorry.  I missed that last part.

A.   A little boy.

Q.   That was being sold did you say?

A.   In a bar.  They bought him.

Q.   They bought him in a bar.

Page 168

A.    (Witness nodded head.)

Q.    I see.  So this orphanage in Kansas has a grand total of six children, three of whom are the children of the people that run the orphanage.

A.    Right.  They were just starting it.

Q.    And when you went out to the orphanage in Chanute, Kansas, with your -- first of all, I guess to kind of set the date, this would have been in the summer, fall 1972?

A.    The summer.

Q.    '72.

A.    Right.

Q.    And Angela's at that point eight years old.

A.    Right.

Q.    Sister Wendy's a couple years older, ten?

A.    Yes.

Q.    When you -- well, you don't drive, so how did you get out to Kansas?

3016

A.    Carol and I went out there.  She went along.  She knew them, and she had told them, talked to them, and they had wanted me to come.

Q.    What -- could you tell us how this was supposed to work in terms of payment or how you were supporting your children when you were at the orphanage or what the financial arrangements were?

A.    I paid my rent on my house that we were renting, and the rest of what I made or what I was getting went to them for the care of the children.  And at that time I was on food stamps, so the food stamps went to all of us.

Page 169

Q.   The people running the orphanage you mean got your food stamps.

A.   Yes.

Q.   Did you tell anybody that you were taking your kids out to Kansas?

A.   No.  My sister knew.

Q.   She's the only person.

A.   My sister, yes, and Carol.

Q.   So Mr. Johnson, for example, the father of these four children, did you make any effort at all to contact him to tell him you were going to take your kids to an orphanage in Kansas?

A.   I can't remember telling him.  I don't think -- I think they knew.  I'm not -- you know . . .

Q.   What about --

3017

A.   I think they might have known.

Q.   What about Mr. Claus?  Did he know you were pregnant?

A.   Yes, he did.

Q.   And he --

A.   He stayed in Wisconsin.  He was not at first happy about that I was going, but I told him I couldn't stay.  I didn't feel like I could stay and face my mother.

Q.   Well, what did you tell Mr. Claus about your intention to put up your child to --

A.   If -- well, I was going there at first just to wait until his divorce was final, and then we were talking of getting married.  But he was killed in a car accident.  I'm sorry.

Q.   That's fine.

A.   This is hard for me to talk about.

Q.   Was Mr. Claus -- could you tell us when he was killed in a

Page 170

car accident?

A.    In -- I think it was around November.

Q.    After you were already at the orphanage.

A.    Yes.

Q.    I wanted to know what you told Mr. Claus about what you were going too do with his child.

A.    I wasn't.  I was just going to stay until his divorce was final, and I had no plans to give her up then.  But it was after -- I had thought about it when I first went there, didn't know if I could take care of her, you know, if I could be a

3018

mother again.  But I just kept thinking we were going to get married and it will be all right.  And after he was killed in a car accident, that's when I decided I would give her up, and I was back and forth, but I couldn't do it.  I just could not do it.  I couldn't give her up.

Q.    So when you got out to this orphanage in Kansas, Chanute, Kansas, were you surprised about the condition of the orphanage your friend Miss Mann had recommended?

A.    Yes.

Q.    And what is it that was surprising about it?

A.    There were no living quarters.

Q.    What do you mean by that?

A.    There was -- we bunked on the floor for a while, and they took an old garage and renovated it, so to speak, so we'd have living quarters.

Q.    You lived with your children in a garage.

A.    Yes.

Q.    And they slept on the floor.

Page 171

A. No, we had beds.

Q. You had beds.

A. Yeah, we slept on the floor until it was ready to move into.

Q. And I understand you were pregnant at the time, so were you able to work?

A. I worked. I helped take care of the house and cook, did

3019

whatever I could.

Q. What kind of a facility was this, this orphanage? How did these people support themselves?

A. He worked. He was a maintenance man at a school, Ted was.

Q. And this orphanage, was it located in town or --

A. In Chanute.

Q. In Chanute.

A. Or I mean on the outskirts of Chanute. They lived on an acreage.

Q. I'm sorry?

A. They lived on an acreage on the outskirts of Chanute, and that's where they were going to have an orphanage.

Q. So Mr. Dillo had a job.

A. Yes, he did.

Q. And that supported the entire orphanage?

A. That and what I contributed.

Q. I don't understand. What did you contribute?

A. Whatever money was left over that I had and food stamps.

Q. I see, okay, and your food stamps and whatever you had.

A. And I worked, you know, did what I could to help.

Q. You worked with Mr. Dillo, though.

A. No, I worked around the house.

Page 172

Q. Nobody was paying you, were they?

A. No, nobody, but I just -- I worked. You know, I needed something to do. I've never been one who could just do nothing.

3020

I had to have something to do.

Q. What were your children doing? That is, the four young children you had, what were they doing at the orphanage once they got out there?

A. They had chores. They had chores. And it was good at first. Later it became -- it turned bad. It got bad.

Q. What kind of chores did they have, ma'am?

A. Just helping whatever needed to be done. If it was -- I don't know. Whatever needed to be done, that's -- they just, you know, asked for help, not just mine, but they all had to help whatever he wanted done, you know. And I think there were some little critters there that they took care of.

Q. What do you mean by that?

A. I think there were a few animals. I can't remember, you know, just exactly what was there now. Been so long ago.

Q. You mean pets?

A. I think there were some, yes. There were cats and dogs, and, you know, I can't remember just everything that was there until --

Q. You --

A. I'm sorry. A reporter came out after we -- shortly after we were there and wanted to talk to me, and I wrote an article, and he put it in the paper, the town paper. It was on what Ted was trying to do and how -- how many we were, the plans that he had.

Page 173

Q.    Could we go back to the children for a minute?

A.    Sure.

Q.    Your oldest child Wendy's ten years old.  Angie's eight; right?

A.    Uh-huh.

Q.    Jamie would have been seven?

A.    Yes.

Q.    And Jimmy -- no, Jamie would have been just only six by then at that point.

A.    Yes, uh-huh.

Q.    Jimmy would have been four or five years old?

A.    Jimmy was just starting school.

Q.    And do you have any idea what chores they were supposed to be doing?

A.    Well, there were minimal -- there weren't very many in the beginning.  It became something else later on.  I can remember a winter ice storm and making my children go outside and pick up sticks and walk in all that icy, muddy water with no boots, and he insisted that they do it, and we argued about it, but I was kind of outnumbered.

Q.    Outnumbered --

A.    Was him and Bobbi and his children were out there.

Q.    I see.

A.    And actually it was -- it was just -- I can't remember if all his girls were out there, but I know -- I think some of them

3022

were, and all the little boys were out there.  But mine were out
Page 174

there without any boots, and we had war about it.

Q.    When Mr. Dillo was having your children do chores, were you supervising them?

A.    I was there most of the time, but in the afternoons -- I was getting pretty big, far along with Holly, so I'd go in and lay down in the renovated garage, because it was getting hard to --

Q.    So in the afternoon Mr. Dillo had charge of your children?

A.    Yes.

Q.    And is the worst thing you ever saw happen there that they had to go out in an ice storm without boots?

A.    There were a few times when -- they wanted to start a halfway house in Chanute, and I went along to help with it.  It was for teenagers, troubled teenagers, and anyone who wanted to come.  And I would go in -- I went in on the weekends just on a weekend, just an evening, but there were just a few of them because I was getting too big to, you know, be gone very long, and it was hard, you know, so far along.

Q.    Does that mean, ma'am, on the weekends that you were away from your children?

A.    Yes, but he was in town.  He was in town on those times, yeah.

Q.    Mr. Dillo was in town with you?

A.    Dillo, yes.

3023

Q.    Dillo, I'm sorry.

A.    Uh-huh.

Q.    During the time that your children were out there at this orphanage, did you ever become aware of any unusual activity

Page 175

involving Mr. Dillo --

A.   Yes.

Q.   -- and your children?  Could you tell us what that was?

A.   I come home, and Wendy was really upset.  She had been trying to protect the children, you know, and seemed like things were happening when I was gone.

Q.   Could you please explain to us what you mean by Wendy was trying to protect the children, that ten-year-old?

A.   She said that the girls were being mean to the kids when I was gone.

         MR. WILLIAMS:  Objection.  Hearsay, Your Honor.

         THE COURT:  Just a second.  There's a hearsay objection.

         MR. BERRIGAN:  I understand, Your Honor, but we're in the sentencing phase of the trial.  We've certainly had a lot of hearsay up till now.  I thought the rules were relaxed in the sentencing phase.

         MR. WILLIAMS:  We have.  My only point is at some point -- and I haven't objected a lot, but I think it's getting beyond that.

         THE COURT:  I'll overrule the objection.

                                                 3024

A.   On times that I was gone, there was trouble.  Holly would -- or not Holly, but Wendy would say there were problems there and there was fighting going on, and I just know there was trouble, and so I quit going, and it was a good excuse not to go.  I liked going to it, but I was getting too big.

Q.   Liked going to what, ma'am?

A.   To the center.  It was this little halfway house.

Q.   But that was just on the weekends.

                Page 176

A.   Yes, uh-huh.

Q.   And Wendy, your daughter, was telling you there were problems.

A.   When I was gone, uh-huh.

Q.   Okay.  And could you tell the jury what the problems were?

A.   At first it just seemed like it was squabbling.  The older children were being not so nice to my children.  And then one day Wendy told me that Ted had been molesting her and Ang.

Q.   Ted had been molesting her?

A.   I did not know it.

Q.   Did you undertake any investigation or inquiry yourself?

A.   I talked to one of his daughters, the youngest daughter.

Q.   Why were you talking to Ted Dillo's daughter about sexual abuse of your daughters by Ted Dillo?

A.   Because when that happened, I was very upset, and we were outside, and she was burning garbage, and we were talking, and she said something to me.

3025

Q.   About the sexual abuse of your daughters.

A.   She hinted at something, yes, and we went back just -- you know, it was very brief because she didn't want even to tell me, and I suspected it was -- you know, you get this feeling.

            THE COURT:  Mr. Berrigan, would now be a good time to break?

            MR. BERRIGAN:  Sure.  You bet, Your Honor.  Yeah. Great.

            THE COURT:  Members of the jury, that's going to conclude the evidence for the week, so we'll see you back here on Monday morning at 8:30.  Please remember to keep an open mind

Page 177

until you've heard all of the evidence in the penalty phase, received my final instructions, heard the closing arguments of the lawyers, and had an opportunity to deliberate. Have a good weekend, and we'll see you back here Monday morning. Thank you.

(The jury exited the courtroom.)

THE COURT: Okay. Mrs. Johnson, you can go back to the back of the courtroom or wherever you'd like to go. And I have a matter I need to take up with the lawyers. Mr. Berrigan?

MR. BERRIGAN: I've forgotten what it is that we're supposed to take up, Your Honor.

THE COURT: Oh. Well, I assume that you were going to make a motion at the close of the --

MR. BERRIGAN: I'm sorry. You're right.

THE COURT: -- evidence, penalty phase.

3026

MR. BERRIGAN: I don't know if it's old age or what. Yes, I wanted to make a motion at the close of the government's evidence respecting the government's evidence on future dangerousness. They've submitted an aggravating circumstance alleging that Miss Johnson would be a future danger to the lives and safety of others if she -- I don't think it says if she were sentenced to life imprisonment, but that's the aggravating circumstance -- that's a nonstatutory aggravating circumstance that's alleged.

And the defense position is, frankly, that there's wholly insufficient evidence of that factor so much so that even if the evidence that they have is believed it's insufficient for a jury to make that finding beyond a reasonable doubt which is what the law would require them to do.

The evidence presented really so far is that she's had

Page 178

two, two, physical, quote, unquote, assaults during the almost five years she's been incarcerated. The worst of those resulted in a pushing which she got ten days in the hole for. The other one she punched a lady apparently in the head with her fist, Miss Jefferson, and got five days.

Every other piece of evidence that the government has elicited is her mouth saying this or that without anything happening to anybody at any time. Even this drug evidence, this Jimmy Rodriguez, Duane White stuff, nobody gets hurt. She doesn't make any specific threats to anybody, go out and kill

3027

somebody or do this or that. And most importantly, the only options that are available involve her being in jail.

So to the extent that even that might be relevant to some issue if she were on probation or outside of a penal institution, in our view it's not relevant to whether she's a threat to people in jail because that really is the test at this point in terms of that nonstatutory aggravator, is she going to be a threat to the lives and safety of others if she lives essentially.

So the defense moves the Court to strike the nonstatutory aggravating circumstance of future dangerousness on the basis that there's just wholly insufficient evidence to support a finding of that nonstatutory aggravating circumstance even in a light most viewed favorably to the government.

THE COURT: Mr. Williams.

MR. WILLIAMS: Your Honor, the United States resists that motion. Taken in the light most favorable to the government, this jury can reasonably conclude this defendant

Page 179

does pose a danger to the lives and safety of people within the prison system. She has in the last years assaulted -- I'm sorry, in the last four years assaulted two people. She has threatened the lives of jail personnel there.

She has a history of violence, a history of a violent temper, an uncontrolled temper. And there's a reasonable basis for the jury to conclude that if sentenced the rest of her life

3028

in prison she's going to dominate whatever cellblock she's in, she's going to use violence to make sure that things go her way, and that that could pose a danger both to other inmates and to the jail personnel.

So viewed in the light most favorable to the government, we believe there's sufficient evidence for the jury to be able to at least consider that as an aggravating factor in this case.

THE COURT: Well, I must be missing something here. Couldn't the jury infer that she's likely dangerous due to the fact that she's been convicted of multiple murders on different occasions whether or not you put on any evidence in the penalty phase at all?

MR. WILLIAMS: And I think I mentioned that, but certainly. When I said she has a history of violence, that certainly includes the fact that she was involved in the murder of five people.

THE COURT: And --

MR. WILLIAMS: So that standing alone --

THE COURT: And two separate instances.

MR. WILLIAMS: Right. So that alone, I mean, the history there suggests it. Then you add on top of it the
Page 180

additional evidence we put in, and certainly I think there's enough there to submit this to the jury.

MR. BERRIGAN: May I briefly respond, Your Honor?

3029

THE COURT: Mr. Berrigan? Sure.

MR. BERRIGAN: I think if that were true then this aggravating circumstance would stand in essentially almost any murder case, that is, a murder in its essence is violent, particularly first-degree murder. And --

THE COURT: Yeah, but these were two separate murders.

MR. BERRIGAN: Well, I understand that, Your Honor.

THE COURT: So it wouldn't apply in every single murder case whether it was a single murder.

MR. BERRIGAN: Well, I think the reasoning could. Why couldn't you say, Hey, look, you've killed somebody intentionally. I'll admit it might be a little more aggravated in the facts we're talking about in that reasoning, but why couldn't the reasoning be if you intentionally kill somebody at one point you were obviously a danger so you're therefore potentially a danger in the future?

THE COURT: Because that's not the facts of this case. The facts of this case are she stands convicted of killing four people on one occasion and then three months later killing Terry DeGeus, and I think a reasonable jury could infer from that that she's dangerous.

MR. BERRIGAN: Okay. Well, if the Court's reasoning is that it's two homicides as -- two separate instances I should say as opposed to one --

THE COURT: And I think that does separate it out from

Page 181

many cases, not all cases.

MR. BERRIGAN:  Yes, I agree that does separate it, Your Honor.  Our position would be irrespective of that she wasn't in jail, and we think that's the factor that the Court needs to weigh given that that's what's going to happen.  There are no other options other than imprisonment certainly in this situation, and the evidence regarding future dangerousness in that setting is what the jury should be considering.  And in that respect our view is the government's proof fails.

THE COURT:  Well, I appreciate you making the motion.  But I think based on the evidence in the merits phase coupled with the evidence that the government offered in the penalty phase that they've met their burden of going forward with future dangerousness as a aggravating factor in the case.  So your motion is denied.

Is there any other record you want to make on that motion?

MR. BERRIGAN:  No, sir, not at all.

THE COURT:  Okay.  Is there anything else we need to take up in anticipation of what's going to be happening next week?

MR. WILLIAMS:  No, Your Honor, not at this time.  The -- I have a phone call set up with my experts tomorrow, and what I will do is I will e-mail both you and Mr. Berrigan if I believe there's any issues that we need to take up.  At this

point I'm getting the impression that I don't think there's
Page 182

going to be issues other than our request for the instruction. And Mr. Miller and Mr. Berrigan are going to discuss the wording of the instruction and work on that.

But I think that's where we are. I don't think we're going to end up having a big issue on this. I need to consult with my experts tomorrow, and I will e-mail everybody and let them know if there's an issue.

THE COURT: Have you made a decision yet whether you're going to call your experts in your rebuttal case or not?

MR. WILLIAMS: I have not, Your Honor.

THE COURT: Do you know what the likelihood is?

MR. WILLIAMS: Jeez, Judge, I apologize, but I just don't. I just have not had time to --

THE COURT: Well, you haven't had a chance to get into this issue because of the taint team, so I can appreciate the fact that you're not in a position to really let me know.

MR. WILLIAMS: Just not right now, Your Honor. Hopefully maybe tomorrow I'll have a better idea once I talk to my experts. I just haven't even had a chance to talk with them yet.

THE COURT: And, Mr. Berrigan, do you anticipate any issues coming up next week?

MR. BERRIGAN: No, Your Honor, and I'm comforted that if the experts are going to determine whether or not the lawyers

3032

have an issue, then I'm not concerned about that. So no, we have nothing that we can anticipate being a problem.

THE COURT: Because you're actually all pretty good at raising the issue on your own.

Page 183

MR. BERRIGAN:  That's my feeling, that the government would easily raise an issue if they saw it, and they haven't yet, so I'm comforted by that fact.

THE COURT:  And you haven't been shy about that either.

MR. BERRIGAN:  No, sir.

THE COURT:  And that's your job.

MR. BERRIGAN:  Not to pretend that I was.

THE COURT:  Thank you.  We'll be in recess.

(The foregoing trial was
adjourned at 3:10 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

```
                                    11-7-005
     Shelly Semmler, RMR, CRR          Date
```

3033

INDEX

```
WITNESS:                                        PAGE:

WILLIAM BASLER
          MR. STOWERS                           2835

RONDA FRANCIS
          MR. WILLIAMS                          2874
          MR. BERRIGAN                          2891

WENDY JENSEN
          MR. WILLIAMS                          2894

ASHLEY DEGEUS
```

Page 184

VOLUME 17 6-2-051
MR. WILLIAMS 2907
MR. BERRIGAN 2912

KATHY NICHOLSON
MR. WILLIAMS 2913
MR. BERRIGAN 2927

ROBERT MILBRATH
MR. WILLIAMS 2931

MARGE MILBRATH
MR. WILLIAMS 2951

PEARL JEAN JOHNSON
MR. BERRIGAN 2966

* * * * *

EXHIBITS:

1110, 1111, 1114, 1157, 1158, 1161, 1162, and 1164    2877
1109                                                   2898
1116                                                   2909
1112, 1155, 1156, and 1163                             2918
1149, 1150, 1165, and 1166                             2933
1151                                                   2937
1105 and 1106                                          2939
1100 through 1104 and 1159                             2953

2121                                                   2838
2120                                                   2861
2028                                                   2862
2000A                                                  2982

* * * * *

Page 185

3034

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CRO1-3046 |
| Plaintiff, | Sioux City, Iowa |
| | June 6, 2005 |
| vs. | 8:03 a.m. |
| ANGELA JANE JOHNSON, | VOLUME 18 of 24 |
| Defendant. | |

/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

3035

APPEARANCES:

For the Plaintiff:    C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:    PATRICK J. BERRIGAN, ESQ.
Watson & Dameron
2500 Holmes
Kansas City, MO 64108

DEAN STOWERS, ESQ.
Rosenberg, Stowers & Morse
1010 Insurance Exchange Building
505 Fifth Avenue
Des Moines, IA 50309

ALFRED E. WILLETT, ESQ.
Terpstra, Epping & Willett
Higley Building - Suite 500
118 Third Avenue Southeast
Cedar Rapids, IA 52401

Also present:    Bill Basler

Page 1

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2659 of 3592

Court Reporter:          Shelly Semmler, RMR, CRR
                         320 Sixth Street
                         Sioux City, IA  51101
                         (712) 233-3846

                                                  3036

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Okay.  Everybody can be seated.  Good morning.  We have pending the motion for protective order filed by Mr. Spies on behalf of Dustin Honken and the various briefs that were filed in support of the motion for protective order.  And let me ask you, Mr. Berrigan, has that been resolved?

MR. BERRIGAN:  It has, Your Honor.  That is, the defense is not intending to question Mr. Spies regarding the Honken proffer this morning during the course of his testimony.  So I think the issue Mr. Spies has raised is moot as a result.

THE COURT:  Okay.  Is that the government's position as far as the government has a position on this matter?

MR. WILLIAMS:  As far as we have a position, it's my understanding it's moot.  The only thing that Mr. Spies is going to be questioned about is the outcome of the Honken case is my understanding.

THE COURT:  Okay.  Mr. Spies, would you just come up to the podium so we can hear you?  Good morning.

MR. SPIES:  Good morning, Your Honor.

THE COURT:  Thank you for traveling across the state on such short notice.  And thank you for filing the two briefs this weekend too on obviously very short notice.  They were very helpful to me, and unfortunately I didn't foresee a resolution, so I did work on it quite a bit on Saturday and Sunday.  But --

Page 2

and your briefs were of assistance.

Are you basically in a position to either say that your motion for protective order is moot based on what you just heard or withdrawn or . . .

MR. SPIES: Yes. Mr. Stowers informed me this morning that I'm only going to be inquired about the nature of the prosecution brought against Mr. Honken, the resulting verdict in the merits phase and in the penalty phase. So I would -- again, a long answer to your short question, the answer is yes.

THE COURT: Okay. It's withdrawn?

MR. SPIES: Yes.

THE COURT: The motion for protective order.

MR. SPIES: As to my testimony, yes, Your Honor.

THE COURT: Yes. And just so that you know this and we're on the record, I have scrupulously avoided looking at the proffer. Matter of fact, I don't have a copy of it. I did not request a copy of it. I was going to wait until after the eligibility determination, and then after that I decided -- well, I asked the government if they were going to object to it. And when they said no, there was no need for me to see it in advance because there was not going to be anything for me to rule on with regard to the admissibility of the proffer. And so I've never seen the proffer. So I just wanted you to know that.

MR. SPIES: I appreciate that, and I'll pass it on to the interested party.

3038

THE COURT: Okay. Thank you. Anything else?

Page 3

MR. SPIES: No, Your Honor.

THE COURT: Okay. Thank you.

Let's take up one more motion that was filed I think either this weekend or on Friday, and that would be the memorandum regarding the allocution of the defendant, and I know the government hasn't had a chance to respond, but we did face this issue in United States versus Honken.

MR. WILLIAMS: That's correct, Your Honor. I drafted a response, and it's my understanding that Sali's filing that this morning.

THE COURT: Oh, okay.

MR. WILLIAMS: Hopefully as we speak.

THE COURT: Okay. Do the parties want to be heard on it? I'm not going to issue a formal written ruling. I would add that all due respect to the defense, I think you missed your key case. There's a district court decision from the District of Hawaii as I recall that allowed the defendant's right to allocute in a federal death penalty case. I think it was Judge Kay as I recall. I don't remember the name of the case. But I remember when I faced this issue in Honken finding that there was that additional authority, and I don't recall seeing that in your brief. But Mr. Berrigan's nodding. It sounds like you're familiar with the decision. And maybe it was in your brief and I missed it. I didn't read the brief all that carefully.

3039

MR. BERRIGAN: I think it may be mentioned in passing, Your Honor, not in any great detail is my recollection. Mr. Stowers really did most of the work on the brief.

THE COURT: Oh, okay. But I recall that was probably the best authority for the proposition.

Page 4

You know, I rejected it in Honken, and no surprise to the defense, I'm probably going to do the same thing here, but I wanted to at least wait till I see the government's resistance before I rule on it, and I'll probably just rule orally on it. But I'm not inclined to grant it. So that's obviously no surprise, but I wanted you to know that early because it might affect your strategy in the penalty phase.

MR. BERRIGAN: Appreciate it.

THE COURT: Anything else that's pending that we need to take up or any other new matters that we need to take up? Mr. Berrigan?

MR. BERRIGAN: We did e-mail the prosecution over the weekend -- and I don't know if they've received it -- a proposed instruction at the Court's request regarding this mental health evidence and what -- to what use it would be put. And I don't know. We haven't talked. That is, neither side has actually talked I think since the e-mail, but we're still making progress on that.

THE COURT: Okay. Why don't you continue to see if you can make any progress on it without waiving any of your

3040

objections that I should not give the instruction.

MR. BERRIGAN: Right.

THE COURT: See if you can agree on the language, and then if you can agree, let me know, and if you can't agree, let me know. But, you know, we're several days away from needing to know the answer.

MR. BERRIGAN: Right. I just wanted to let you know we're working on that.

Page 5

THE COURT:  I appreciate that.  Anything else?

MR. WILLIAMS:  No, Your Honor.

MR. BERRIGAN:  Nothing by the defense, sir.

THE COURT:  Okay.  Then we'll get started right at 8:30.  Thank you.

(Recess at 8:09 a.m.)

THE COURT:  Ready to have the jury brought in?

MR. WILLIAMS:  Yes, Your Honor.

MR. BERRIGAN:  Yes.

(The jury entered the courtroom.)

THE COURT:  Good morning, everyone.  Please be seated.

Mr. Berrigan, you may resume your direct examination.

MR. BERRIGAN:  May it please the Court.

Miss Johnson, would you get in the witness stand? Thank you.

PEARL JEAN JOHNSON, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

CONTINUED DIRECT EXAMINATION

3041

BY MR. BERRIGAN:

Q.    Ma'am, before we moved on in Angie's life, I wanted to be sure we had completely covered some of these instances of trauma that you've touched upon; okay?  And one of the things that I wanted to ask you about is in any of these instances where Mr. Johnson physically struck you, did you receive any medical attention?

A.    The first time, uh-huh.

Q.    What happened then?

A.    Well, I was carrying my first daughter.  And he'd asked me something and didn't like the answer, and he hit me, and I hit the wall.  I did have to go out to emergency, and I thought I

Page 6

had a dislocated jaw, but it wasn't.  It just felt like it.  It just took a little while to heal, and they said it was okay, it would be all right.

Q.    So you went to an emergency room?

A.    Yes.

Q.    Did you tell the hospital staff that you had been struck by your husband?

A.    No.  I told them --

Q.    What did you tell them?

A.    I told them I fell.

Q.    You fell.

A.    Uh-huh.

Q.    Okay.  You mentioned early in your testimony that you

3042

yourself considered your treatment of your children to be abusive in some respects; is that right?

A.    Yes, yeah.

Q.    Could you explain to the jury what you did with your children yourself?

A.    Well, I was very angry.  When I went into the marriage, I was angry, but -- I just got angrier.  My husband and I, there was conflict from the time we were married.  And every time he hit me, things were not good and we argued or had trouble, I just got angrier.

Q.    What about the children?

A.    And I was abusive to the children.  It was slapping at them, hollering at them.

Q.    Slapping them with your hand?

A.    Yes.

Page 7

Q.   And where would you do that when you slapped them?

MR. WILLIAMS:  Objection, Your Honor.  Her testimony was she wasn't slapping her.

Q.   Oh, I'm sorry.  Maybe I misheard her.  Could you be -- and you're going to need to speak up a little bit, ma'am.  Why don't we go back to that.  Did you physically abuse or touch your children?

A.   Yes, I did.

Q.   Okay.  Could you tell us what it is that you did to them specifically?

3043

A.   Slapped them, hollered at them, you know, never was really there for them.

Q.   When you said you slapped them -- that's what I was asking you about earlier -- where did you slap them?

A.   I think on the back or arm, sometimes maybe -- maybe the back of the head.  I'm -- I can't remember.  I remember slapping them a lot, hollering at them a lot, you know.

Q.   And how old would the children have been at this time?

A.   They were very small, small.

Q.   And the time when you slapped the children, when you did do that, what was your emotional condition?

A.   It was very stressful, very angry.

Q.   Angry.  Did you ever hit them with anything other than your hand?

A.   Yes.

Q.   What else did you hit them with?

A.   This didn't happen till a few years later.  I had a belt, and I would spank them with the belt.

Q.   And what did you spank them for?

Page 8

A.   You know, now I can't remember.  I can't remember.  Just -- I remember at the time spanking them with it, but I can't tell you why.

Q.   Well, can you tell us whether it was a disciplinary tool or you were just angry with them or what your thinking was at the time?

3044

A.   No, it was disciplinary at that time when I used the belt. I remember that, but I couldn't tell you what it was over.

Q.   And how often did you hit them with the belt?

A.   I don't think it was too often because it only happened -- it was just a short time.  I'd never used a belt on them, and I had this belt, and I remember using it, but it was like a short time, maybe a couple months or something like that.  I don't even -- I don't think it was any longer than that.

Q.   Why was it such a short time, Miss Johnson?

A.   Because the belt disappeared.

Q.   The belt disappeared.

A.   I'm sorry.  Yes, and I was really glad.  This -- I was very relieved when it was gone.

Q.   Okay.

A.   I'd had . . .

Q.   Let me ask you a little bit about this Kansas situation before we move on.  You told us a little bit about your suspicions that Mr. Dillo --

A.   Dillo.

Q.   -- Dillo had sexually abused your two older daughters, Wendy and Angela.

A.   (Witness nodded head.)

Page 9

Q.   Yes?

A.   Yes.

Q.   Did you report that to any authorities at the time?

3045

A.   No.  I was so frightened.

Q.   What were you frightened of?

A.   Well, I didn't know what he would do because my stepfather would lock me in a basement and my brother.  We spent a lot of time in that basement, and I didn't know what he would do to us.  So I had to be really careful and just get us out of there.  And . . .

Q.   Well, had Mr. Dillo ever locked you in a basement or threatened you any harm?

A.   No, he hadn't, but my stepfather had, and I didn't know what he would do.  I didn't know what he was capable of doing because he -- you know, I was shocked when I found it out.

Q.   Did you confront Mr. Dillo about the allegations?

A.   When we left.  When we left I did.

Q.   What did you say to him?

A.   I told him -- I told him that the orphanage would never last, it would never be an orphanage.

Q.   Well, that doesn't exactly explain what you thought was going on, does it?

A.   Yeah.  I told him I knew what he was doing, but it wasn't until we left.

Q.   Wasn't until you left the --

A.   Right.

Q.   -- the Dillos and came back to Iowa.

A.   Right.

Page 10

Q.    Let's talk a little about the timing of that.  You told us Holly was born on February the 5th, 1973?

A.    Yes.

Q.    When did you get back to Iowa from the Dillos' orphanage in Kansas?

A.    It was at the end of January.

Q.    The very end of January 1993.

A.    No.

Q.    I'm sorry, 1973.  My apologies.

A.    No, it wasn't '73 because -- oh, yes, it was.  Take that back.  Let's see.  Holly was born February 5, 1973.  And we came home just a few days before she was born.

Q.    So it was coincidence that you were coming back to give birth to Holly just about the same time you found out about this sexual abuse.

A.    Right.  Well, when I found out about it, I made arrangements to come home right away.

Q.    And what were the arrangements that you made?

A.    A girlfriend came and picked us up, and we come home.

Q.    What's her name?

A.    Carol Mann.

Q.    Did you tell Miss Mann -- what did you tell her when she arrived in Kansas to take you back to Iowa?

A.    I -- she knew about it because I had called her.

Q.    She knew about what, ma'am?

3047

A.    About Ted and what he was doing.

Page 11

Q.   So you told Miss Mann about the sexual abuse.

A.   Yes, I did.

Q.   You told us a little about your mother and her unusual practice regarding the bat and the tire and the blankets in the basement.  Did she engage in any other unusual behavior during the time that you lived with her and Andy Jensen with your children?

A.   When I was gone, if I went grocery shopping or was out for -- I was never gone very long -- she had these tapes she would play for the children.  I never listened to them, so I don't know what they were about.  But we had a lot of problems over it.

Q.   Yeah.  Those were those Bishop Whitlock tapes you told us about?

A.   Yes.

Q.   Was there anything particularly regarding the children that you did, any unusual practices that she engaged in with the children?

A.   When -- are you talking now when we were -- she was living with us?

Q.   Yes, ma'am.

A.   Okay.  We lived on -- J Street was our first home.  She was a woman where you couldn't make a lot of noise, and she didn't want them watching TV, but if they did, it had to be turned down

3048

very low.  And like I say, when I wasn't there -- when I was home, it was okay.  When I wasn't, she was playing those tapes for the children.

Q.   Well, was there anything about casting out of demons that you thought might be a little bit unusual respecting your young

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2670 of 3592

children?

A.   That happened when we were in Mason City before -- when we'd come back from Pueblo, Colorado, we lived together in Mason City.

Q.   And this is even before you went to Colorado.

A.   No, this was --

Q.   I mean before you went to Kansas.

A.   Right.

Q.   So Angela would have been how old at the time that you were living on J Street?

A.   I can't remember.  She was just a little girl, maybe six years old.

Q.   And what kind of things was your mother doing with the children in terms of the casting out of demons?

A.   Angie was hearing voices under her bed.  And she come to me about it.  And I was scared.

Q.   Why were you scared, ma'am?

A.   Because when -- when my brother -- when my brother and I were locked in the basement and it happened a lot -- it was a dark basement -- I could always hear a lion growling.

3049

Q.   You could always hear what, ma'am?  I'm sorry.

A.   A lion.

Q.   A lion?

A.   Growling.

Q.   Growling, okay.  And how did that relate to your daughter hearing voices when she was six years old under her bed?

A.   I was very scared.  And I was really frightened for her because it's -- nobody knows how horrible that is when you're a

Page 13

little girl.

Q.   So what did you do about the voices under the bed?

A.   Prayed for her.

Q.   And --

A.   Prayed that it would go -- whatever it was would leave her.

Q.   How did you pray for her, Miss Johnson?

A.   I anointed her with oil, and I just had my hand on her head, and my mother had one arm and my stepfather had the other arm and prayed over her.

Q.   Had her arms did you say?

A.   Just -- yeah, just one arm here and one arm here.

Q.   Well, could you tell us what it is that your mother and Andy Jensen were doing with your six-year-old daughter's arms during the prayers?

A.   Just holding it.

Q.   Holding it.

A.   Just holding the arm, you know.

3050

Q.   They weren't stretching them out or holding her down or pushing her down or keeping her down.

A.   No, just holding her arm.

Q.   I see.  What else went on during these prayer sessions when your mother and Andy Jensen were holding your daughter's arms and you were putting oil on her?

A.   We just prayed over her and called it out, whatever was there, called it out.

Q.   Now, I wonder if you could explain to us what you mean by "we called it out."

A.   Yeah, if there was something there, a spirit or something there, just commanded it to leave her in Jesus' name.

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2672 of 3592

Q.  I know it's been probably a long time, but could you give us some idea how that would go?

A.  Just like I said.  That was how it went, you know.

Q.  Is that the tone in the --

A.  No, I think it was fearful.

Q.  Fearful.

A.  Fearful, yes.  It was very fearful.

Q.  Would that involve loud voices?

A.  Yes, it did.

Q.  And who would be doing the yelling or the talking about casting out?

A.  It was probably me telling it to come out.  I think -- and my dad, my stepfather, he was just -- just softly praying, and

3051

my mother I think was telling it to leave too.

Q.  Okay.  And did you believe at that time, Miss Johnson, that --

A.  Pardon?

Q.  I'm sorry.  I'm not loud enough now.

A.  No, you're fine.

Q.  Did you believe at the time that your daughter was possessed by some type of evil spirits?

A.  I didn't know.  Not until that happened I didn't know.  All I know is I was afraid because I remembered what -- I remembered what I heard.

Q.  You're talking about the lion growling.

A.  Yes, it was every time I was ever in that basement.

Q.  The prayer sessions involving your mother and Andy Jensen holding Angela's arms and you putting the oil and casting out

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2673 of 3592

the demons, how often did those things occur?

A.    That only happened that time.  That was the only time that happened.  And then when the kids got older, I prayed over every one of them because I didn't want anything to be there in the kids, nothing.  I prayed over them all myself.

Q.    And the prayers over the other kids, did that involve the same kind of activity in terms of --

A.    Yes, but it wasn't -- it wasn't real fearful, you know.  By that time -- by that time it wasn't.  I talked to them and told them that, you know, I was going to pray over each one of them,

3052

if there was something there that it would leave them.  But it wasn't anything -- I don't think because I wasn't -- when I did that, I wasn't mad or angry at them or anything.

Q.    I wanted to get back to your daughter Angela for a moment.  I just want to be sure I understand you.  Are you saying the casting out of demons with respect to Angela only happened one time?

A.    I don't remember another time of that with Ang.

Q.    Okay.

A.    I can't remember another time with that.

Q.    How would you know or how would you know if that worked, the casting out of demons?

A.    She seemed fine after that.

Q.    Meaning what?  She wasn't hearing voices anymore?

A.    No, and maybe she was too afraid to say something.  I don't know.  But I don't think -- I don't think she heard them anymore.

Q.    You mentioned something about your mother didn't like the children to have the television up loudly?

Page 16

A.    Yeah.

Q.    Were they restricted in terms of what programs they could watch?

A.    Yes, yes.  There wasn't a lot they could watch.  And I'm trying to remember.  It's been so long ago.  When I was home, the TV was up louder.  When I was gone, it was down low.

3053

Q.    And how do you know that?

A.    They would tell me.  The children told me she would turn it way down.

Q.    Okay.  And did she give some explanation as to the reason why the television needed to be down low?

A.    So she couldn't hear it.

Q.    I see.  And you said that there wasn't much they could watch.

A.    Not a lot.

Q.    Did you restrict -- what is it that they could watch or couldn't watch?

A.    Oh, they watched mostly cartoons and things like that, you know, and I think little -- just little sitcoms, stuff like that.

Q.    I see.  Was that different than what you perceived other children to be watching at the time?

A.    Not really.  I think most little children watched that or, you know, younger children.  I know when they got older they started watching more things.  We even went to the show together a few times, went to a movie together.

Q.    Were there any practices in your household regarding fasting?

Page 17

A. Yes, there were.

Q. Could you tell the jurors about that?

A. Uh-huh. In the Bible when God would call a fast, everyone

3054

did. You know, it was families, children, animals, and everything. And we did that. But it wasn't that often. It wasn't. And my stepfather worked, so he would have to eat in the evening, so I'd -- I did most of the cooking, so I always cooked. But the kids did fast with me. I fasted with them. We all did.

Q. And how long did that fasting practice --

A. Just until the evening, till the evening meal.

Q. I see. And is this something that you did on some type of a regular basis, how ever infrequently?

A. No, just once in a great while when I -- I did fast a lot. I just never had much of an appetite, you know, and anyway, and the -- it was never very often with the children, very, very rare that that ever happened.

Q. How did that work with school, when your kids were going to school?

A. They never fasted when they were going to school.

Q. What do you mean they never fasted when they were going to school?

A. Yeah. When they were going to school, they never had them fast.

Q. The school didn't have them fast.

A. No, I didn't have them fast.

Q. Were you concerned the school might be upset about you not feeding the children?

Page 18

A.   No, because it never happened when they were in school.

Q.   I see.  So this would be something you'd restrict to the summer months or when they weren't in school?

A.   It happened one summer.

Q.   I see.

A.   It happened, but it was only a couple times.  It was never -- it wasn't an everyday thing.

Q.   I see.

A.   No, it wasn't a once-a-week thing.

Q.   Can I ask you, ma'am, was there ever an incident involving the burning of the children's toys during the time your mother --

A.   Yes.

Q.   -- and Mr. Jensen lived with them?

A.   Yes.

Q.   Could you tell the jurors about that incident?

A.   Mom -- my mother was going through something, and at the time I didn't really -- I didn't realize it until it was all over, and Mom was calling everything an idol and --

Q.   I'm sorry?

A.   My mother was calling everything an idol, and she was afraid it was all coming between us and the Lord, that we were putting it first before the Lord.  And she said it had to go.

Q.   That the children were putting their toys before the Lord.

A.   Wasn't just the children.  It was everything, even my

3056

things, you know.  She was including herself and my stepfather.

Page 19

Q. Okay. But did it include the children's toys?

A. Yes, it did.

Q. And the children at this point are -- what's their kind of age group?

A. They were just little children. You know, they weren't very old. Probably up to eight years old, something like that, eight.

Q. So Wendy might have been eight, Angela six, somewhere in there?

A. Right, right.

Q. And tell us how this went, the toy burning.

A. They just hauled everything out.

Q. Who hauled everything out?

A. Mom and my stepfather, and I brought out a few things which I didn't have much, so brought it out. I remember saying -- and I told them this -- if this isn't of God, I want everything back.

Q. If this isn't what?

A. If this is not of God, I want everything back.

Q. And how is it that you might know that, ma'am?

A. Might know what?

Q. That this is of God or not.

A. If it wasn't. I said if it wasn't because I didn't feel like it was right, but my life was so messed up, what did I

3057

know?

Q. So were these items actually burned, physically burned?

A. And smashed and things.

Q. Smashed and burned.

A. Yes.

Page 20

Q.    Where did this take place?

A.    Mason City.

Q.    In your yard?

A.    Yes.

Q.    Where were the children when that was going on?

A.    They were there.

Q.    They were there watching adults smash and burn their toys.

A.    They saw it.

Q.    Was there any kind of religious incantation or anything like that during this ceremony of the burning?

A.    No, no.  They just took it out, and it was right after that that I moved and -- moved to a little town with the children by myself.

Q.    How did your children respond to the burning of their toys?

A.    Upset.  I was upset.  They were upset.

Q.    Were there ever any instances when you were living with your mom where you'd suddenly leave the house in the middle of the night?

A.    We were still in Mason City, and one night, probably the scariest night of our lives, my mother woke me up.  And she said

3058

we had to leave the house.  She had seen a wolf in the window. It had frightened her.

Q.    A wolf did you say?

A.    Right.

Q.    Okay.

A.    And frightened her, frightened me.  She said, We've got to go.  She said it was the end of the world.

Q.    So what happened after she told you she saw a wolf in the

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2679 of 3592

window of your house in Mason City, Iowa?

A.   She woke up my stepfather.  I was so scared.  I'd been afraid all my life, but that was the very worst.

Q.   Were you afraid of the wolf or the fact that it was the end of the world?

A.   I -- you know, I was just afraid.  I don't -- it was almost the same thing to me, you know, the end of the world, and it was just so fearful.  It was so fearful.  It was so -- can't tell you.  It was just . . .

Q.   What did you do with your children?

A.   I grabbed my kids, and we went out to the car, and my father drove around.  It was the middle of the night.  Just drove around, and I was so afraid.  I was -- we were just huddled together, the kids and I.

Q.   What explanation did you give for your children for waking them up in the middle of the night and driving around in the dark?

3059

A.   I told them we had to go, you know, we had to leave.  And I don't -- I can't even remember what all was said.  I was so afraid I don't think I said hardly anything.

Q.   Well, did you tell them it was the end of the world?

A.   Probably did.  I'm sure, you know, if I didn't, they heard it.

Q.   Where did you go, ma'am?

A.   We went to a little mission.  It wasn't open.  But my father drove up into the yard under a tree of a little mission.  And that's where we stayed.  And I'll tell you just exactly what I did.  I got out of that car, and I went and prayed, and I said, God, you've gotta do something.  And that was -- and I

Page 22

heard -- and these are words I heard -- that there would be a man that would lay hands on my mother and she would recover. Those were the words.

And when the children were awake and my dad was awake, I went back to the car. We went to Charles City. There was a little mission there. And we hadn't been there more than a few minutes when there was an evangelist -- and all I can remember, his name was Bennett -- had come to the mission, and he knew my mother, and he knew my dad. And he prayed over my mother, and my mother was better.

Q. How long did this episode of fleeing at the end of the world last, ma'am?

A. The afternoon. We went to this little mission, and Mom

3060

wanted to stay there. And we'd gotten there early in the morning, and we stayed there, and my mom didn't want to leave after Bennett prayed over her. She didn't want to leave. But meanwhile my father had gone and got -- and brought back hamburgers and French fries for us to have something to eat. And what happened is I took the kids, and I said, You can stay if you want to, but we're going, and I said, I either gotta trust God. If I can trust him in this church, I'm going to have to trust him when I walk out that door.

Q. I was asking you about how long this lasted. Are you telling us just overnight?

A. It was overnight until almost -- it was late afternoon of the next day when we came home. And I took the kids, walked out of the church, and that's what I told my mother, and I said, We're going home. And Mom was afraid. And I was afraid to walk

Page 23

out that -- out of that church because I didn't know what was going to happen, but I said to the kids, We're going, and we'll either trust him in here, we're going to trust him on the outside too. We walked out the door, and the sky didn't fall in, and we went home.

MR. BERRIGAN: May I approach, Your Honor?

THE COURT: You may.

BY MR. BERRIGAN:

Q. Ma'am, I'm going to show you a series of photographs. They've been marked as Defendant's Exhibits 2045, 2049, 2033,

3061

2057, 2092, 2080, and 2089. Could you just look through those, please, and tell me if you can identify them?

A. It's my number-one daughter Wendy --

Q. I'm sorry, ma'am. And I wasn't very clear.

A. My number-one daughter --

Q. Miss Johnson, could you hold on one second? I'd like you to kind of just look -- flip through them. And I'm just going to ask you a general question if those are pictures of your children, okay, and your husband -- ex-husband.

A. Okay. These are pictures of my children.

Q. Can I have those back, please, ma'am?

A. Yes.

Q. Thank you.

MR. BERRIGAN: Your Honor, at this time the defendant would offer Defendant's Exhibits 2092, 2057, 2033, 2049, 2045, 2089, and 2080.

* * * *

(Defendants Exhibits 2092, 2057, 2033, 2049, 2045, 2089, and 2080 were offered.)

Page 24

Case 3:09-cv-03064-MWB-LTS Document 284-71 Filed 06/23/11 Page 2682 of 3592

* * * *

THE COURT:  Any objection, Mr. Williams?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Okay.  2072 (sic), 57, 33, 49, 45, 89, and 80 are admitted.

* * * *

3062

(Defendant Exhibits 2092, 2057, 2033, 2049, 2045, 2089, and 2080 were admitted.)

* * * *

BY MR. BERRIGAN:

Q.   Miss Johnson, I'm just going to take you through these one by one quickly so we can just introduce these to the jury; okay?

A.   Uh-huh.

Q.   I'll show you first 2045.  Are you able to tell the jurors who appears in that photograph?

THE COURT:  Ma'am, if you just look at the screen right in front of you, you'll see it.

THE WITNESS:  Oh, I'm sorry.  All right.

A.   Number one, the child at the left is my daughter Wendy.

Q.   You need to talk into the mike.  I'm sorry.

A.   Okay.  My number-one daughter at the left, my little daughter Jamie in the middle, and Angie on the end.

Q.   And your number-one daughter on the left would be who?

A.   Wendy Jean.

Q.   And about how old are the children when that photograph was taken?

A.   Well, they're just a couple years apart, and Jamie was only about two years old in that picture, two, maybe three.

Page 25

Q.    Up on the screen now is Defendant's Exhibit 2049.   Who's that?

A.    Angela, Angela Jane.

3063

Q.    Where is that picture taken?

A.    I think it was at her grandmother's home.

Q.    This isn't a picture you took yourself.

A.    No.

Q.    Defendant's Exhibit 2033, who's depicted in that photograph?

A.    Angela Jane, and she's holding her little brother Jimmy.

Q.    Jimmy.   How old is Jimmy there?

A.    Maybe six months old, six, seven months old.

Q.    Do you know where that picture was taken?

A.    I can't remember.

Q.    This is 2057, ma'am, Defendant's 2057.   Who's in this picture?

A.    The child at the left is my -- is my brother's daughter, his oldest girl.   The next one with the number on is Angela Jane.

Q.    Angela has the number 64 shirt on.

A.    Yes.

Q.    Okay.

A.    The next one is Wendy, my number-one daughter.   And the little girl standing next to her is Jodi, my brother's middle child.

Q.    Is your brother still alive, ma'am?

A.    No, my brother passed away a few years ago.

Q.    This is Defendant's Exhibit 2092.   Who's depicted in that

Page 26

picture?

A.    It's the children's father with Angela Jane.

Q.    Can you tell us where that picture was taken?

A.    At his mother's home, mother and father's.

Q.    Did you take that picture?

A.    I don't think so.  I can't remember.  I think it -- I can't remember.

Q.    Did you have a camera when the kids were growing up, Miss Johnson?

A.    I don't remember having one.

Q.    This photograph we're looking at is 2080.  Who's in that picture?  It's kind of white.

A.    Angela Jane is with her little brother.

Q.    That's with Jimmy?

A.    Yes, Jimmy.

Q.    And this last picture I'm going to show you is 2089.  And who's that a picture of?

A.    Angie, Angela Jane.

Q.    About how old is Angela there?

A.    About six, probably six years old, five, six years old.

Q.    Do you know where that picture's taken?

A.    At her grandparents' house.

Q.    Did you take any pictures of any of your children yourself?

A.    I can't remember.  If I did, it was very few.

Q.    I wanted to ask you a few questions about your interaction

3065

with your children's schools and education; okay?

Page 27

MR. BERRIGAN: Before I do that, Your Honor, I think I made reference on Thursday to Defendant's Exhibit 2000D which was a marriage record but did not offer that. And if I did make reference to it -- I think it was identified by the witness -- I'd offer Defendant's Exhibit 2000D at this time.

* * * *

(Defendant Exhibit 2000D was offered.)

* * * *

THE COURT: Any objection?

MR. WILLIAMS: No, Your Honor.

THE COURT: 2000D is received.

* * * *

(Defendant Exhibit 2000D was admitted.)

* * * *

MR. BERRIGAN: May I approach the witness, sir?

THE COURT: You may.

BY MR. BERRIGAN:

Q. Ma'am, I have put before you Defendant's Exhibits 2006 to 2010. Do you recognize what those exhibits are?

A. Yes.

Q. What are they?

A. Angela's report cards. Oh. Yes, Angela's report cards.

Q. Those are her school records, aren't they?

A. Yes, her school records.

3066

Q. From the various school districts that she attended?

A. Yes.

MR. BERRIGAN: I'd offer Defendant's Exhibits 2006 through 2010, Your Honor.

* * * *

Page 28

(Defendant Exhibits 2006 through 2010 were offered.)

* * * *

THE COURT: Any objection?

MR. WILLIAMS: No, Your Honor.

THE COURT: 2006 through 2010 are admitted.

* * * *

(Defendant Exhibits 2006 through 2010 was admitted.)

* * * *

BY MR. BERRIGAN:

Q. Now, you told us a little bit about your employment situation, for a time you were on AFDC and then later working.

A. Yes.

Q. Were you involved at all in any of the children's activities at school?

A. Very few.

Q. What about things like parent-teacher conferences or meeting with the teacher regarding grades and report cards and things?

A. I went to them once in a while, not very often.

Q. And you say once in a while. Could you give us an idea?

3067

A. I did try to go every year, but I -- I -- this is so hard, but I really didn't go anywhere, very, very few places. I just kind of was like a recluse. I -- I never went --

Q. So things like --

A. -- anywhere hardly at all.

Q. -- school plays, graduations, things that parents might attend --

A. No.

Page 29

Q.  -- were you typically in attendance on those things?

A.  Never went to weddings or graduations or anything.  I just -- I just stayed by myself most of the time.

Q.  Your son Jimmy, he was an athlete, wasn't he?

A.  Yes.

Q.  How did he do in athletics in school?

A.  He was -- he was very -- he did very well.

Q.  What sports did he play?

A.  He was in track and basketball and football, wrestling.

Q.  Did he get an athletic scholarship to college?

A.  Yes, he did.  He --

Q.  Did you ever attend any of his athletic events when he was in high school?

A.  I did when he was in high school football.  I went -- I didn't go to all the games.  I went to a few.  And when he was in college, I tried to go to some of them.

Q.  You went to a few of his football games did you say?

3068

A.  Yes.

Q.  Okay.  I wanted to ask you a few questions about your financial situation during the time you were raising these kids; okay?

A.  Right.  Okay.

Q.  What was your financial situation when you were raising Wendy and Angela, Jamie, Jimmy, and Holly?

A.  I was on ADC until the children were old enough I could go to work, but -- and when I did, I supported them myself the best I could.  Their father never paid child support, and a lawyer had -- there was a settlement.  He was to pay so much a month, but he never paid it.

Page 30

Q. I'm going to ask you about that in a little bit, Miss Johnson. But in terms of when the children were being raised, is it true a good part of the time you weren't working?

A. Up until -- yes, for the first few years. And then I went into business. I had bought a home, sold it, and went into business so I could get off of ADC. I didn't want to be on it.

MR. BERRIGAN: May I approach the witness, Your Honor?

THE COURT: You may.

BY MR. BERRIGAN:

Q. Ma'am, I've just handed you Defense Exhibit 2021A, ask you if you recognize that document.

A. Yes.

Q. Are those your Social Security records?

3069

A. Yes.

MR. BERRIGAN: Defense offers Defendant's Exhibit 2021A.

* * * *

(Defendant Exhibit 2021A was offered.)

* * * *

THE COURT: Any objection?

MR. WILLIAMS: No, Your Honor.

THE COURT: Exhibit's received.

* * * *

(Defendant Exhibit 2021A was admitted.)

* * * *

BY MR. BERRIGAN:

Q. In your view, ma'am, how did your financial situation affect your ability to provide for your children?

A.    It was -- it was not easy, you know, and my husband didn't pay child support.  And when I -- he'd come to me and said he couldn't afford to pay it.  And I went to the lawyer and asked him to cut the amount down, and he didn't want to do it, but I said just until he got on his feet because he couldn't afford to pay it.  So it was knocked down to a hundred dollars a month, and he never paid that.

Q.    And is it -- did you at some time take some legal action against him?

A.    Yes, I did years later and received an amount from the

3070

court, and I gave the children a thousand dollars of it, each of them, and paid off a loan, and there wasn't very much left.

Q.    When did you receive that money, ma'am?

A.    The children were grown when that money -- when I received the money.  And Jimmy was in college.  I think --

Q.    Jimmy was in college when you got this child support settlement?

A.    Yes.

Q.    So Angela -- if Jimmy was in college, of course, she's three years older than him.

A.    Yes.

Q.    And Wendy obviously was two years older than Angela.

A.    Yes.

Q.    And how much money did you get?

A.    $17,000.

Q.    And you gave the children?

A.    A thousand dollars each.

Q.    I see.  I neglected to ask you -- well, let me ask you this.  How far did your daughter Angela get in school?

Page 32

A.   I think she was in the ninth grade when she quit.

Q.   And your daughter Wendy who preceded her, how far did Wendy get in school?

A.   I think Wendy was in, if I remember, tenth grade when she -- she quit, didn't want to go back.  I --

Q.   How far --

3071

A.   I did want the girls to finish, but Wendy said she talked to a counselor and the counselor had said to her that it probably wouldn't do her any good to stay in school is what she said.  I can't remember the exact words but more or less giving her permission to quit.

Q.   And did you give your daughters permission to quit school?

A.   I asked them to please finish, but I felt like, you know, it was mostly my fault that they quit because I had a partner in the business, and it wasn't supporting two families.  And she left.  And when she left, there were a lot of unpaid bills, and I couldn't pay them and a waitress.  So I had to have the girls come and help me.

Q.   And that's what they did after they quit school.

A.   Yes.

Q.   Work for you.

A.   They did.

Q.   How far did you yourself get in school?

A.   Sophomore.

Q.   You quit also.

A.   Yes, I did.

Q.   In the tenth grade.

A.   Yes.

Page 33

Q.   And when the girls came to work for you, were those full-time jobs?

A.   I think pretty close to full time.  And it was because of

3072

the girls the truck stop got back on its feet and we could make a living.  There was never just the children and I.  There were more.  Sometimes there were more of us than that.

Q.   After Angela quit school, she was working for you at the truck stop?

A.   Yes.

Q.   Did she become engaged to a gentleman by the name of Steve Hugo?

A.   Yes, she did.

Q.   Could you tell the jury how old it is when that -- how old she was when that happened?

A.   She was 15.  She was 15, 16 when she was married.  She'd -- Steve -- she met him in school.  Steven was a nice -- a nice kid, you know.  I like Steven.  And Angie just felt like she was kind of like a savior to him.  See, Steven was blind in one eye and had a tumor behind the other eye.

Q.   Did she need to get permission from you --

A.   Yes.

Q.   -- in order to get married at the age of 16?

A.   I asked her not to marry him, but Ang had just such a heart for him, you know, and she was sure it was love, and, you know, I'm sure, you know, she did think she loved him, you know.

MR. BERRIGAN:  May I approach, Your Honor?

Q.   Ma'am, I've just handed you Defense Exhibit 2001A which I wonder if you'd look at, and if I could ask you, is that the

Page 34

marriage certificate of your daughter Angela with Steven Hugo?

A.   Yes, it is.

Q.   So you -- eventually apparently you consented to that marriage.

A.   I said no, and she -- she cried.  So we went to get a license.  We had to see a judge, had to talk to a judge.  And Ang -- he talked to both of us, and he asked her not to marry him but to think about it.  And she cried because, you know, she thought this was right.

Q.   Had your daughter Wendy gotten married at an early age?

A.   Yes, she did.

Q.   How old was she when she got married?

A.   She was I think 17 when she -- 16, 17 when she was married to -- I can't remember right now.

Q.   And these girls when she got married, did they leave your house?

A.   Yes, they did.

Q.   Did you know a fella by the name of Arlyn Johnson?

A.   Yes, I did.

Q.   Who was Arlyn Johnson?

A.   Angie's second husband.

Q.   How long did that marriage to Steve Hugo last that Angie --

A.   It didn't last very long.  They were children, you know, and just, you know, you're not ready for marriage at 16.  I wasn't even ready for marriage when I got married, you know.  I

3074

shouldn't have, but I did.  I -- you know, because I hurt, you

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2693 of 3592

know -- between my husband and myself, it was just not good and . . .

Q.    Miss Johnson, can I ask you about Arlyn Johnson for a moment?

A.    Sorry.  Yes.

Q.    That's okay.  What were the circumstances under which your daughter Angela married Arlyn Johnson?

A.    They had been going together for a while, and I wanted to -- my father wanted my children and I to come out to Colorado to live there, and so I sold everything to get enough money to go and went out to see him, and Ang went along.  She left A.J., come with us, but she was never happy, and she cried a lot when she was out there.  She looked for work and just couldn't find -- put her application in different places and couldn't find anything.  And she was very unhappy.

Q.    Well, wasn't she pregnant?

A.    Yes, she was.

Q.    And isn't that what prompted the marriage between Angela and Arlyn Johnson?

A.    She came back home to be with A.J.  I thought she was because she was very emotional at times, you know, but I'd asked her, and she didn't say.  Anyway, she came back home, flew back, and married A.J. and called me and said they were going to have a baby.

3075

Q.    During the time that your daughter Angela was growing up, did you ever notice whether or not she used any drugs?  And by that I mean, you know, illicit drugs.

A.    No.

Q.    You never did.

Page 36

A.    No.

Q.    When did you first learn that she was using drugs, if ever?

A.    I -- it was kind of just heard it, and I can't tell you where.  I just heard it.  And I'd heard just a little, you know.

Q.    Okay.

A.    It wasn't -- it was mostly I think pot.

Q.    Well, was she -- roughly, roughly, how old was she or what relationship was she involved in when you heard she was using pot?

A.    It was when she was -- I think she was around 18, something like that I'd heard it and heard later that she was involved in it.  I've never seen her, you know, use them.

Q.    Did you know a fella by the name of Terry DeGeus?

A.    Yes, I did.

Q.    How did you know him?

A.    My daughter was going with him.

Q.    Had you ever met Mr. DeGeus yourself?

A.    Yes, I did.

Q.    And what did you think of him?

A.    The first time I saw him, he just talked, you know, just

3076

hi, you know, was very casual.  I never talked to him very much.  He'd come into the store to see Ang.  She was in the store.  And --

Q.    What did you think of Mr. DeGeus?

A.    I really didn't have an opinion of him.  He was just -- he was there talking to her.  He'd said hi to me, and that was about it, you know, and I just saw him from a distance.

Q.    Did that ever change?  Did you get to know him any better?

Page 37

A.    Yes.

Q.    And what did you learn about him?

A.    Ang had come to me to talk to me about Terry.  He had -- he was beating her badly.  And he'd hurt her.

Q.    Did your daughter ask you to do anything about that?

A.    Yes.

Q.    What did she ask you to do?

A.    By this time I had a little walk with the Lord, and my life was changing, and my life was better.  I was finally -- I had come out of all that stuff.  I had come out of a few years before, and my life was a good life for me.

Q.    What did she ask you to do, ma'am?

A.    Anyway, Ang come, and she was hurting, and she come to talk about Terry, and we had talked about him, and this was the first time we had a talk about him, and she was hurting, and she loved him, but he was hurting her so badly.

Q.    What did she ask you to do?

3077

A.    Asked me if I would lead him to the Lord.

Q.    What does that mean?

A.    Give his heart to the Lord, to Lord Jesus, so his life would be different and they could have a life together because it was hurting her so bad and she loved him very much.

Q.    She loved him.

A.    (Witness nodded head.)

Q.    What did you do in response to this request of your daughter?

A.    Well, I have to tell you, it was the hardest thing I've ever done.  I didn't want to do that, but I loved Angie, and she loved him.  So I said I would, I would do that.  If, you know,

Page 38

the Lord made the way, I would do that.

Q. I'm not exactly sure what it is that you did. Could you tell us what specifically it is you did with Mr. DeGeus?

A. She brought him to me, and I asked him if he wanted to get his heart right with God, if he wanted to give his heart to the Lord, you know, because he was a very, very tormented man, very angry, and Ang had told me some of the things he'd done to her. And she had told me that she had woke up one morning and he had held a gun to her head.

Q. Miss Johnson, what is it that you did with Mr. DeGeus?

A. I prayed for him. I prayed with him. I took his hand, and I just said -- asked him, you know, if he wanted, you know, a heart change, and he said he did. He told me he did. So I said

3078

just -- I say, It's just a little prayer. I said, It's all you have to say if you mean it, but I said, It has to come from the heart or it won't mean anything, and he said he wanted -- he wanted his heart to be right with God is what he told me.

Q. Did you have any contact with him after this prayer session?

A. No. I had gone on vacation to Tennessee, and a friend was taking care of my store and I had left, and I guess he had come in to see me, and I was gone.

Q. You were gone, okay.

A. Yes.

Q. I wanted to ask you finally about Dustin Honken.

A. Yes.

Q. Do you know Mr. Honken?

A. Yes.

Page 39

VOLUME 18 6-6-051

Q.   And how do you know him?

A.   Through Angie, and he's the father of my little granddaughter.

Q.   Father of your granddaughter Marvea.

A.   Marvea.  Can I -- can I finish telling you this about Terry?  I just wanted you to know that when Terry gave his heart to the Lord, he turned and looked at Angie, and he -- he was smiling, and Angie was crying.

Q.   Thank you, ma'am.

MR. BERRIGAN:  May I approach, Your Honor?

3079

THE COURT:  You may.

BY MR. BERRIGAN:

Q.   I'm going to hand you three photographs, ma'am, Defendant's Exhibit 2095, 2097, and 2101.  Could you look at those for me, please?  And could you just tell us briefly, ma'am, what are those photographs of?

A.   It's a picture of Angela Jane.

Q.   What number is that?

A.   2095.

Q.   Okay.  The next one?

A.   Picture of my little granddaughter Marvea, 2097.

Q.   And then the last one.

A.   Picture of Ang and Marvea, and it's 2101.

MR. BERRIGAN:  The defense would offer Defendant's Exhibit 2101, 2097, and 2095, Your Honor.

*   *   *   *

(Defendant Exhibits 2095, 2097, and 2101 were offered.)

*   *   *   *

Page 40

THE COURT: Any objection?

MR. WILLIAMS: No, Your Honor.

THE COURT: They're admitted.

* * * *

(Defendant Exhibits 2095, 2097, and 2101 were admitted.)

3080

* * * *

BY MR. BERRIGAN:

Q. Ma'am, I'm showing you first Defendant's Exhibit 2095. Who is that a picture of?

A. Angie.

Q. Angie. How old is she there?

A. Oh, she's probably eight, nine years old.

Q. Is that a picture you took?

A. Pardon?

Q. Is that a picture that you took?

A. No.

Q. That's a school photograph?

A. Yes, it is.

Q. 2097, who's that?

A. My granddaughter Marvea.

Q. That's your daughter Angela's second child.

A. Yes.

Q. And that's also the child of Dustin Honken.

A. Yes, it is.

Q. Okay. What did you think of Mr. Honken when you met him?

A. He never really said anything. He was polite, clean cut, very neat but aloof. I guess that's a good word for him.

Page 41

Q.  And was that consistent throughout your relationship with
him?

A.  Yes.

3081

Q.  Do you have a relationship with Angela's children?

A.  Yes, I do.

Q.  And you've told us about Marvea.  How old is Marvea now?

A.  She's 11.

Q.  And what's the name of Angela's other child, her older
daughter?

A.  Alyssa.

Q.  Alyssa?

A.  Yes.

Q.  How old is Alyssa?

A.  Alyssa is -- I believe she'll be 22 in August.

Q.  Where does she live?

A.  She lives in Forest City.

Q.  And about how far is that from you?

A.  About 30, 35 miles, not any farther than that.

Q.  And what about Marvea?  Where does she live?

A.  She lives with my number three daughter Jamie in Minnesota,
Faribault.

Q.  How far is Faribault, Minnesota, from you?

A.  Probably 80 miles.

Q.  Eighty miles?

A.  Around there.

Q.  Do you get to see your granddaughters?

A.  Yes, I do.

        MR. BERRIGAN:  May I approach, Your Honor?

Page 42

THE COURT: You may.

BY MR. BERRIGAN:

Q. I'm showing you, ma'am, what's been marked as Defense Exhibit 2147. Can you tell us what that is?

A. This is a picture that Marvea drew of her mother. She would come to visit, and I have all kinds of papers and pens and, you know, things for them to draw with, and my little granddaughters love to draw. And she drew a picture. I had her draw a picture of her mommy, a picture of her, and then I framed them, and it was a present for Marvea so she could be close to her momma.

Q. I should have also --

MR. BERRIGAN: One more time?

THE COURT: You may.

BY MR. BERRIGAN:

Q. I should have also given you this ma'am, 2145. Could you tell the jury what that's a picture of?

A. That's my granddaughter Alyssa.

Q. This is Defendant's Exhibit 2147. Who did you say drew that?

A. Marvea drew that of her momma. She calls her Mommy.

Q. Okay. 2145, is that a picture of your granddaughter Alyssa?

A. Yes, it is.

Q. Do you have any great grandchildren by her?

3083

A. A little granddaughter, Angeleah.

Page 43

Q.    How old is Angeleah?

A.    Two.

Q.    Two.  Have you been able to observe yourself through your connections with your granddaughters their relationship with their mother, your daughter Angela?

A.    Yes.

Q.    What could you tell us about that?

A.    They love their mother very much.

Q.    How do you know that?

A.    Because they tell me, and we spend some time together, and Marvea comes to stay with me, and she'll be coming in a few days now to spend a few weeks.  And my youngest daughter's daughter is coming, and the two of them are very, very close.  They're more like sisters.  And they spend all their time together.  And they're going to be together.  Haley's with me now, and Marvea will be coming in a couple days.  The girls spend -- we spend a lot of time together, the girls when they're there, and do things.  We do things together.

Q.    I want to ask you just a couple questions before we finish about your own relationship with your daughter.  When you were -- when she was growing up as a teenager and left your house, how would you characterize your relationship with Angela during her teenage years and her 20s?

A.    We had -- I think, you know, we've always been close, but I

3084

know that if there was distance in the relationship it was my fault.  But it's -- we have a good relationship.

Q.    How's it been since she's been in jail?

A.    Good, very, very good.

Q.    Do you have any communication with her?

Page 44

A.    Yes.  She calls me, and I write to her every week.  I try at least two times, sometimes three times a week to write to her, you know, so she's not so alone.

Q.    And how would this decision respecting her punishment affect you?

A.    Breaks my heart.

Q.    If she was to be sentenced indefinitely to the penitentiary, would you continue to have contact with her?

A.    Yes, I would.  I'd like to . . .

Q.    Thank you.

A.    . . . to tell the Court about Ang.

Q.    Well, what is it you'd like to tell about specifically, ma'am?

A.    I'd like to tell them what they don't know about her is from a very little girl she had a very giving heart, a real loving heart.  I've seen Angie give her most favorite things away to people who liked them, to her friends that liked her things.  She'd just give them to them.  She's always done that.  Excuse me.  I've seen her when her baby sister was born carrying her around.  She carried her all over and was like a protector

3085

to her.  She just loved -- loved Holly.  She was good to Holly, took her everywhere.

        When Ang was a teenager, when everything was going on, the war in Cambodia, Angie wanted to bring a busload of babies back, asked me if she could.

Q.    Busload of Cambodian orphans?

A.    Little Cambodian children.  She wanted to bring them back home.  And, of course, I didn't know what we'd do with them, you

Page 45

know. I thought it was a wonderful idea, but I said, Ang, where would we ever put them, you know? But she wanted to in the worst way.

When her sister was married and had her baby, Angie cried and cried when Brian was born, held Brian and cried. She did. She wanted a baby herself. She wanted her own baby. And when she married A.J. and had her own little baby, she loved that baby more than anything in the world. She loved Alyssa. It was the best thing that ever happened to her, Alyssa. She just loved her, loved her, did things for her.

But when Ang -- when Terry DeGeus come into Angie's life, she brought Ashley and Marvea over -- Marvea, I'm sorry, Alyssa to my store, and she had bought them long fur coats. I'll never forget. She was smiling. She was just beaming. She was so -- she was so proud of the girls, and they were close to the same age. And she had bought them these long, long fur coats, and they were beautiful. The girls were so -- they were

3086

just sweet girls, and they looked so -- they were pretty girls, and they looked beautiful in those coats, and she was so proud of them. And she did things with the girls together, Ashley and Alyssa, and the girls were close, and she was good to Ashley, very good to her and treated her like her own.

Q. Miss Johnson, you're obviously very close to your daughter.

A. Yes, I am.

Q. Do you foresee that continuing?

A. Yes.

Q. No matter what happens.

A. Yes.

MR. BERRIGAN: Thank you, ma'am. That's all the
Page 46

questions I have, sir.

THE COURT: Members of the jury, why don't you take a stretch break, and then we'll see if there's any cross-examination.

Please be seated. More pictures, Mr. Berrigan?

MR. BERRIGAN: Mr. Williams is kind enough to let me interrupt, Your Honor. I forgot to offer Defense Exhibits 2145 and 2147 which I'd do so at this time.

* * * *

(Defendant Exhibits 2145 and 2147 were offered.)

* * * *

THE COURT: No objection?

MR. WILLIAMS: No objection, Your Honor.

3087

THE COURT: They're admitted. Thank you.

* * * *

(Defendant Exhibits 2145 and 2147 were admitted.)

* * * *

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Ma'am, I just have a few questions for you. First of all, you indicated in your testimony that your husband James Johnson abused alcohol; is that correct?

A. He liked to drink. He liked to drink and -- yes. Well, I don't know as, you know, you would call it -- I really don't know what to say about that. He liked to drink.

Q. It wasn't real bad, though.

Page 47

A.    From time to time.

Q.    He never abused any controlled substances like drugs or something like that, marijuana?

A.    Not that I know of.

Q.    All right.  In any event, he left Angela Johnson's life when she was four years old; is that right?

A.    Yes, yes.

Q.    You yourself never abused any drugs or alcohol.

A.    No.

Q.    And, in fact, you've talked about the childhood Angela

3088

Johnson had.  She grew up watching cartoons and sitcoms like other children; right?

A.    No.  For a long time we didn't have a TV.  After the one was broken, we didn't have one for a few years, and then I believe -- I'm not sure, but I think it might have been Ang's father -- I can't remember for sure, but I remember -- I think it was her father that bought them a little TV.  I'm not real positive on that, but I think it came from him.

Q.    And as Angela Johnson grew up, she played with other kids.

A.    Yes.

Q.    Right?  Played with her sisters and her brother; right?

A.    Yes.

Q.    She went to school like other children go to school; right?

A.    Yes.

Q.    Okay.  And she was never expelled from school.

A.    No.  I think --

Q.    She wasn't -- she was never expelled from school; right?

A.    No, she wasn't.

Q.    Wasn't a truant.

Page 48

A.   I think she was sent to the office a few times.

Q.   Sure.  She did not get into trouble with the law when she was a child living with you?

A.   No.

Q.   She ended up marrying young and moved out of the house, and at that point she got a job; right?

3089

A.   Yes.

Q.   And she ultimately, in fact, even ran a restaurant/bar; right?

A.   Yes, she did.

Q.   She ultimately ended up having children.

A.   Yes.

Q.   And she took care of those children.

A.   She was a good mother.

Q.   She maintained employment?

A.   Yes.

Q.   In fact, did more successful -- was more successful financially at times in her life than you were; fair to say?

A.   I really don't know about her finances.  She never told me, you know, shared that with me.  I never asked.

Q.   Steve Hugo never abused her to your knowledge; right?

A.   Not that I know of, but Ang was pretty quiet about her relationship with Steven, and I never -- I never really asked her about it.

Q.   In any event, she moves out.  She moves on.  She makes some new choices; right?  She gets married again.

A.   Yes, she did.

Q.   She continues to hold a job.

Page 49

A.    When Ang married A.J., I didn't see her that often.

Q.    The other children that -- of yours likewise grew up, went to school, got married, have jobs; isn't that fair to say?

3090

A.    Yes.

Q.    Okay.  They -- they're all doing fine these days; right?

A.    Yes.  I think, you know, my number-one daughter I think has problems, but I -- you know, but I think, you know, Jimmy and Holly and Jamie are fine.

Q.    And, in fact, none of them have ever gotten in trouble with the law; isn't that right?

A.    No, they haven't, no, but -- and I just wanted to say my number-one daughter, she has -- she has a good life, but I think she's -- she's troubled, and I blame myself for that, you know, but she's -- she does real well.  She has a website, and she's a seamstress, you know, and into crafts and things like that so . . .

MR. WILLIAMS:  I have nothing else, ma'am.

THE COURT:  Anything further, Mr. Berrigan?

MR. BERRIGAN:  No redirect, sir.

THE COURT:  Okay.  You may step down.

Ready to call your next witness?

MR. BERRIGAN:  We are, sir.

THE COURT:  Okay.

MR. STOWERS:  We'd call Leon Spies.

LEON SPIES, DEFENDANT'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated.  Please adjust the chair and the microphones so you can speak directly into the microphones.  And when you're ready, would you state your full

Page 50

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2708 of 3592

name, please, and spell your last name.

THE WITNESS: My name is Leon Spies, L-e-o-n S-p-i-e-s.

THE COURT: Mr. Stowers?

DIRECT EXAMINATION

BY MR. STOWERS:

Q. Good morning, Mr. Spies. We're taking your testimony a little bit out of order. Can you tell the members of the jury what your occupation is?

A. I'm a lawyer. I practice in Iowa City, Iowa.

Q. And how long have you been an attorney, sir?

A. Thirty years.

Q. And you're licensed to practice law in the state of Iowa; is that correct?

A. Yes, I am.

Q. And do you have an area of practice that you focus on?

A. Primarily criminal defense and trial law.

Q. And in that capacity have you had the occasion to represent a person by the name of Dustin Honken?

A. Yes.

Q. And you currently represent him.

A. Yes, I do.

Q. And how long have you represented Mr. Honken?

A. I think I've been representing Mr. Honken together with two other lawyers since 2002.

3092

Q. And those other lawyers are who?

Page 51

A.    Alfredo Parrish from Des Moines and Charles Rogers from Kansas City.

Q.    And did you represent Mr. Honken in connection with some charges of murder or homicide?

A.    Yes.

Q.    And did that occur in this very courtroom?

A.    It did.

Q.    And was Mr. Honken charged with the same killings, if you will, the same homicides, the murders, that Angela Johnson is presently on trial for?

A.    Yes, he was.

Q.    And those killings, of course, as you very well know through your long work, involved five killings, four of them occurring in July of 1993 and the fifth occurring in November of 1993.  Those are the same killings we're talking about; correct?

A.    That's right.

Q.    And was there a trial?

A.    Yes.  The trial occurred from August until I believe October of last year.

Q.    So about ten weeks?

A.    Yes.

Q.    And what was the verdict that the jury reached with regard to the first four killings?

A.    Well, the jury returned verdicts of guilty as to all of the

3093

charges that Mr. Honken was facing, and in the penalty phase, those verdicts?

Q.    Was he convicted of the first four killings?

A.    Yes.

Q.    And was he convicted of the fifth killing as well?

Page 52

A. Yes, he was.

Q. And did the case then as, in fact, has this case proceeded to what's called a penalty phase?

A. Yes, it did.

Q. And did the jury return a verdict with regard to Greg Nicholson with regard to the penalty that the jury believed was appropriate for your client? And if so, what was that verdict?

A. Yes, it did return a verdict, and as to Greg Nicholson, it returned a verdict of a penalty of life without possibility of release.

Q. And did it return a verdict with regard to Lori Duncan with respect to the penalty? And if so, what was that verdict?

A. It also returned a verdict in the -- with respect to Lori Duncan of life imprisonment without possibility of release.

Q. And with regard to the two children, the two Duncan children, what were the verdicts with regard to their killings as to your client with respect to the penalty?

A. Jury returned penalties of death.

Q. And with regard to Mr. DeGeus's killing, you already indicated that he was convicted. Did the jury return a penalty

3094

verdict with regard to Mr. DeGeus as well?

A. Yes, it did.

Q. And what was that verdict?

A. Life without possibility of release.

MR. STOWERS: Thank you. That's all I have.

THE COURT: Mr. Williams, anything for Mr. Spies?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: You may step down.

Page 53

THE WITNESS: Thank you.

THE COURT: Ready to call your next witness?

MR. BERRIGAN: We are, sir. The defense calls James Jeffrey Johnson.

JAMES JEFFREY JOHNSON, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And please adjust the chair and the microphones so you can speak directly into the microphones. And when you're settled in, would you state your full name, please, and spell your last name.

THE WITNESS: Name is James J. Johnson.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q. Mr. Johnson, could you tell the jury just a little bit about yourself? How old are you, sir?

A. I'm 62 years old.

Q. Where do you live?

3095

A. Chippewa Falls, Wisconsin.

Q. Chippewa Falls?

A. Chippewa Falls, yes.

Q. And what is it that you do for work up there?

A. I'm retired now. I worked at Uniroyal Goodrich, and we had a small supper club.

Q. Are you a married man --

A. Yes.

Q. -- or single? And who are you married to?

A. Pamela Jean Johnson.

Q. How long have you and Pamela Jean Johnson been married?

A. Thirty-six years.

Page 54

Q. And is Pamela Jean Johnson your first wife?

A. No, she's my second wife.

Q. Who was your first wife?

A. Pearl Jean Johnson.

Q. Pearl Jean Johnson.

A. Yes.

Q. Is that the lady that just testified this morning?

A. Yes.

Q. I want to ask you just a few questions about yourself before we turn our attention to your marriage with Pearl Jean Johnson; okay?

A. Okay.

Q. Where are you from originally?

3096

A. I was born in Chippewa Falls, Wisconsin.

Q. Have you lived there your whole life?

A. No. We lived in Kenosha, Wisconsin. I worked at Rambler plant there. And then I lived in Mason City, Iowa, when I got married to Jean and worked at Higgley's Cold Storage, and then we moved back to Wisconsin.

Q. So you've been at least in Wisconsin or Iowa it sounds like.

A. Yes.

Q. Most of your life.

A. All my life, yes.

Q. Do you yourself have brothers and sisters?

A. I got a half brother and a full sister.

Q. Are your parents still alive?

A. No. My dad got killed before I was born.

Page 55

Q.    In the war.

A.    Pardon?

Q.    Is that in the war?

A.    No, he got killed in a car accident.

Q.    Car accident.  I'm sorry.  So you were raised by your mother.

A.    Well, yeah.  My brother's dad came into the picture about a year after my dad died or two years, whatever it was, and then they got divorced, and then my ma didn't get married again till I was about 12 or 13, and she raised us.

3097

Q.    As a young man, were you involved in any criminal problems yourself?

A.    When I was 14, I got sent away to a reformatory -- sort of hard to talk about this -- for a year for -- I had beat up a kid.

Q.    And where was this reformatory?

A.    Waukesha, Wisconsin.

Q.    You were there for a year at the age of 14.

A.    Right.

Q.    And then after you got out of the reformatory, did you finish high school?

A.    No.  I got out.  When I was in the reformatory, my folks had moved to Mason City, Iowa.  And then I got released to the custody of Mason City, Iowa.  And then I went to school there, and I couldn't -- it wasn't the same after --

Q.    After the reformatory?

A.    Reform school, yeah.

Q.    Have you always gone by the name of James Jeffrey Johnson?

A.    No.  During the reformatory I took my name back.  I went

Page 56

through school as Wayne and Jim Hopp.

Q. You and your brother?

A. Right.

Q. So you were known as Jim Hopp for quite a while.

A. Right.

Q. Why did you use the name Jim Hopp?

3098

A. Because that was my brother's name, and years ago I guess you went to a Catholic school, they didn't like it when, you know, two different names or whatever. That's -- I always figured that she wanted her boys to have the same name.

Q. So why did you change to James Jeffrey Johnson?

A. I just thought, well, I'm getting older. I might as well get -- going to a new place, I might as well take my own name. So I took my own name back.

Q. How old were you when you met Pearl Jean -- I guess it was Gomez at that time; right?

A. Right. Eighteen years old.

Q. You were 18?

A. Right.

Q. How did you meet?

A. I met her at a New Year's Eve party.

Q. New Year's Eve party.

A. Right.

Q. And you were married shortly thereafter?

A. Probably three or four months afterwards, yeah.

Q. Three or four months.

A. Yes.

Q. And you were 18 when you got married?

Page 57

A.    Yes.

Q.    At that time, sir, when you met Pearl Jean Gomez and got married to her, where were you living?

3099

A.    In Mason City, Iowa.

Q.    And were you working at that time?

A.    Working at Higgley's Cold Storage.

Q.    Okay.  What did you do for the cold storage company?

A.    Just worked unloading and loading box cars and in the freezers.

Q.    Kind of a laborer?

A.    Laborer.  I been a common laborer all my life.

Q.    Was it full-time employment?

A.    At that time it was.  I don't think they're in business anymore.

Q.    When you met Miss Gomez, was she working also?

A.    No.

Q.    Is she older, younger, the same age than you?

A.    She's three years older than me I guess.

Q.    Three years older.

A.    Three.

Q.    What happened after you got married?  Did you stay there in Mason City?

A.    We stayed in Mason City until Higgley's Cold Storage laid me off, and then I was looking for a job, so I finally got a -- went back to Eau Claire, Wisconsin, stayed with my folks for maybe a month or two, and then I got a job at Nash Rambler in Kenosha, Wisconsin, and then I went there, and she stayed with my ma with Wendy.  And then I went there and a couple months put

Page 58

3100

Q. In Kenosha?

A. In Kenosha, yes.

Q. Now, Wendy, that's your oldest daughter?

A. Yes.

Q. How long after you married Pearl Jean Johnson was Wendy born?

A. Nine months and four days.

Q. Okay. Were you planning on having children right away?

A. I guess we didn't even plan, you know. It just came, you know.

Q. And then you had more children with Pearl Jean Johnson.

A. We had children seemed like every year. She had a miscarriage in '63 I think it was.

Q. That was between Wendy and Angela.

A. Between Wendy and Angie, right.

Q. And while you were having these children, were you continuing to work?

A. Yes.

Q. What about your wife? What was she doing at this time in the early years of your marriage?

A. She was just a homemaker.

Q. She stayed home with the children.

A. Right.

3101

Q. How was the marriage? How did you do those first few years

Page 59

of the marriage?

A. I guess we did all right except for as life went on, I sort of noticed that the kids couldn't mess up the house. I mean, she was a good house cleaner, but that's all she did. We couldn't touch nothing. We couldn't -- I didn't. Every once in a while I told her, Cookie -- I mean, Jean, let these kids play. Let them do something. Everything is spotless in the house. You couldn't touch nothing. It was just -- you know, it wasn't a happy childhood for the kids I mean. The kids couldn't be kids.

Q. Did you happen to know how your wife behaved towards the children in terms of her mothering abilities?

A. She could never show affection. She -- I mean, she always -- she always had a paddle or she always had a belt, and that's -- I think she got more satisfaction out of whipping them than letting them be kids.

Q. What about you and she? How were the two of you getting along?

A. Well, I guess we got along. The only time we would probably maybe argue was over the kids because I didn't like the way she was disciplining them. I told her, I said, You don't need these paddles and stuff.

Q. How old were the children when your wife Jean was using the paddles and the belt?

3102

A. Not very big. I would say two, three years old, four years old. These kids were raised with a paddle.

Q. Is this stuff that took place in your presence or while you were gone?

A. She wouldn't do it in my presence. It was something where

Page 60

I'd stop her.

Q.    How did you know about it?

A.    Because she used to hang the paddle up on the wall and like her belt and that, even her Grandma Sund would take and steal the belt, and the kids would get nervous, Don't take that, Grandma, because Ma will get mad, you know.

Q.    Who's Grandma Sund?

A.    My mother.

Q.    Your mother.

A.    Right.

Q.    Was there any conflict between your mother and your wife Pearl Jean?

A.    No.  They, in fact, got along good.  She was -- every time Jean wanted something or whatever, she would go to my Ma, and, you know, I always thought they got along good, you know, in fact, maybe too good as far as I was concerned.

Q.    What do you mean by that?

A.    That I would think, well, Ma, you know, I'm your son too, you know, but I know a couple of times I decided, well, I don't know where the kids are, and then she wanted to find us, and my

3103

ma told her where we were at, you know.  I got to the point where I just wanted to distance myself from her, you know, because every time she was around there was a problem.

Q.    You're talking about later after your divorce.

A.    Right.

Q.    I want to concentrate on the marriage for just a few minutes; okay?

A.    Okay.

Page 61

Q. Was there a point where you and Pearl Jean did start to have some problems with the marriage as between the two of you?

A. Well, you couldn't understand her like not even arguing. When we first went to Kenosha, we was working, figure everything was going; come home one day, and she was gone. She went back to her ma Florence in Clear Lake, Iowa. So I called her, and she said, Well, I'm staying there. I said, Well, why? Well, she said, you know, she's not happy.

So a couple months went by. Then I guess she must have -- I went down to see her and see the kids, and then she decided to come back. But in the meantime she had gotten religion and that. Then she got away from that a little bit when she came back. And then after we went back to Kenosha and we lived in Paddock Lake, and then from there we moved back to -- American Motors was cutting back and this and that, so I got a job at Peters Meats in Eau Claire, Wisconsin.

Q. Let me interrupt you for a minute, Mr. Johnson. You're

3104

suggesting that at some point early in your marriage your wife just took the kids and moved away for a couple months?

A. Yes.

Q. Was there any explanation given for that?

A. No explanation, just -- that happened more than once the last time too. I went to work one day at Peters Meats in Eau Claire. There was no arguments, no nothing. Then I come home. All my clothes are out on the front porch, you know. And I don't know why, but she could have set the clock by me for going to work, back and forth, you know. I don't think she wanted to be married.

Q. Well, let me ask you, did you ever have any problems or did

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2720 of 3592

she ever indicate to you that she was unhappy with your performance in the marriage, anything about you that she didn't like?

A.   I don't think she liked my size, and she must not have liked me romantically or whatever because I caught her a few times with -- one time -- first when I first got a job we were going to buy a house and we were going to work together and we were going to save our money, get our own house.

Well, then she got a job, and pretty soon she was riding back and forth to work with some guy.  And, I mean, I tried not to be a jealous person, and then it was getting later, and they were listening to records, and they always had an excuse for being late.  And I don't know what possessed me to go

3105

look on the top of this MonTom Hill which was about probably six blocks from our house.  There was this guy's car.  And I went up to the car, and I jerked open the door, and here this guy is with my wife.  She's naked.  And I says, Jean, why are you doing this?  I says, We got kids and everything.  And the guy, he took off running down the hill.  She said, Well, you don't love me.  You just love the kids and this and that.  And I says, Get dressed.  I'm taking you home.  And that went on for about two months, you know, and I'm trying to -- you know, try to put it out of your mind.  And this time they talk about being abusive -- I'm sorry.

Q.   That's all right.  Can I ask you, Mr. Johnson, you brought up this term abusive.  Were you abusive to your wife Pearl Jean?

A.   Well, I did slap her one time when we got to talking about this.  I had heard that -- where she worked, she kept working,

Page 63

and they came back to me; they were making fun of it.

Q.    Making fun of what?

A.    Of me catching them.

Q.    Catching her naked with this coworker.

A.    Right.  And so I confronted her, and she started, you know, like it was nothing, and I did slap her twice.  And I just left, you know.  That's the only time I ever hit her.  I don't know how that makes me an abusive person.  In fact, when the lawyer said, Well, your wife is divorcing you for cruel and inhume treatment, I thought she was divorcing somebody else.  I

3106

couldn't figure where I was at.

Q.    What about -- what about drinking?

A.    I drank beer.  I liked beer.  I still like beer.

Q.    Did you drink when you were married to Pearl Jean?

A.    Yes.

Q.    And what did you drink?

A.    Just beer.

Q.    Did you ever have any treatment or counseling for alcohol abuse?

A.    No.

Q.    Did you feel like you were abusing alcohol during the course of your marriage?

A.    No, just -- I don't think so, no.  I never went to the tavern.  I always drank at home.  Sometimes we went to the tavern, but usually my biggest share of drinking was at home in the backyard having a cookout or whatever, you know.

Q.    How did you feel about being a father?

A.    I enjoy -- I liked it.  I always wanted to be a father.  As a father I did a good job.  I mean, the kids loved me.  Then

Page 64

when she started doing all this stuff, she was destroying my life I thought.

Q. Who filed for divorce as between the two of you?

A. She did.

Q. And did you want to get divorced?

A. No.

3107

Q. No?

A. No.

Q. Despite all this stuff that had happened.

A. No, I still wanted to raise the kids. I wanted to, you know.

Q. What happened after Pearl Jean divorced you?

A. We got divorced, and then I went and stayed with my ma for a while until I got my own place. And then we worked out -- I had my visitations, this and that, and I'd get the kids, and we'd always go to the parks and this and that on the weekends, and I'd even go to the house and babysit the kids when she wanted to take off and go. And I thought, well, if I couldn't be a full-time dad, maybe a part-time dad is better than anything, you know.

Q. And at that time when you were living back at your mom's after the divorce, Pearl Jean and the kids, were they still around and close by?

A. They were still in the same house we lived in, right.

Q. What was your visitation schedule?

A. Like on every other Saturdays and Sundays, but I would take them more than that. Whenever I'd call, you know, I'll come and get the kids, you know, because they liked going to the park.

Page 65

Q. And so you got them as much as you could.

A. I got them as much as I could, right. And then --

Q. At some -- at some point did that change where you couldn't

3108

continue to see them?

A. Then I think she started using the kids as a tool to get away with things with me or whatever. You can't come and get the kids if you can't do this. Then it seemed it got to the point where I was only getting the kids when she wanted to do something or she wanted to go away for the weekend, but I still did it, you know. I mean, I would go over to her house and babysit the kids for the weekend. Then when she come back wherever she was at, you know, I would have to leave and whatever.

Q. So you still were still getting to see them pretty regularly.

A. Yes.

Q. And at some point did that change?

A. Yeah. She moved from the house. She had a big auction, sold everything she had, and she left and went to Mason City, Iowa, I think. I think she went with her folks, and then we still seen the kids less but on weekends, and then finally she took off someplace in Colorado which I didn't know. I mean, she was gone. We used to even take Holly with us when the kids would all come visit us, and we'd take Holly, this and that. Then finally she quit that. She didn't want us to have her there, and I think that was the case where Holly was enjoying herself with us because my wife now, we treated all the kids the same. I mean, there was -- it was -- you know, we was glad for

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2724 of 3592

them to be there.

Q. Well, when Pearl Jean left for Colorado, did you know where she had gone?

A. No. I knew she had -- somebody said she was going to her dad's, but I only seen her dad once, and I didn't know where he lived in Colorado or whatever.

Q. Well, up until that point, how often had you been seeing your children?

A. Well, it started out almost every weekend. Then it got to be a month and then two months. And when she went to Iowa, it was less and less. And when she went to Colorado, I didn't see them at all. She didn't tell us where she was at.

Q. Why did -- the frequency of your visits, why did it decline before she left for Colorado?

A. I didn't see her in Colorado. Decline -- I suppose financially too we couldn't afford to, you know, go or whatever too.

Q. How far is that from Mason City to Chippewa Falls?

A. 200 miles, 225 miles.

Q. And when you went to see the kids, did you have to go get them yourself, or did she bring them up to see you?

A. We went and got them ourselves.

Q. So if you wanted to see them, you had to drive down and get them.

A. Right.

3110

Q. When you say we, who are you talking about?

Page 67

A.   Me and my wife now.

Q.   So you had remarried.

A.   Yes.

Q.   When did you remarry?

A.   I got married in -- to my wife now in 1969, about a year and a half, two years after.

Q.   After the divorce.

A.   After the divorce, right.  In fact, I think -- I believe me and my wife, we met each other at a park.  She was divorced, and I was divorced.  We had kids there, and then a friend of mine at Peters Meats knew her, and we got to talking.  You know, it was probably three months before we finally ever got a date, you know.  I mean, I was -- wasn't the dating-type person.  I mean, it was hard for me to, you know, just I guess -- I wasn't one that dated all the time and whatever.

Q.   When Pearl Jean went out to Colorado, did you try to find out where they were?

A.   Yes, I did.

Q.   What did you do?

A.   I called her ma, this and that.  They wouldn't tell me either, you know.  So I guess I did sort of give up.  I thought -- Cookie, I said, I don't know where these people are.  And then I quit paying support then because if I can't -- if I couldn't see my kids, I thought, I don't know where they're at.

3111

I don't know if these kids are getting this or that.

Q.   Had you been paying child support up until the time she went to Colorado with the kids?

A.   I paid support until I couldn't get the kids no more.

Q.   And then you stopped.

Page 68

A.    Then I stopped.

Q.    There was some litigation about that later on, wasn't there?

A.    Yes.  She had come back to Mason City or Clear Lake or whatever, and she got ahold of -- then she didn't know where we were at because in the meantime me and my wife had moved to Belvidere, Illinois.  And she didn't know -- then she didn't know where we were at.  Well, then my ma told her where we were at.  And then she hired a lawyer -- or she didn't have to hire a lawyer.  She was one of the lucky people that in Wisconsin they call it AdjudiCare Card where they could hire a lawyer any time they want and the state would pay for it.

So anyway, she -- me and my wife lived in a farmhouse that we rented, and a sheriff comes up.  I got subpoenaed for nonsupport.  Anyway, I went to court, and then I got sentenced to 90 days in jail for nonsupport.  And then I had to pay to the clerk of court in Cook County, Illinois.  And so that's where I started paying my support payments there.

Q.    How much time went by when Jean took the kids to Colorado where you weren't able to see your children?

3112

A.    I want to say a year, year and a half.

Q.    How did that affect you?

A.    I didn't like it.  And then, you know, as much as it hurts, you start getting used to it, you know.  You don't -- I mean, I guess what I'm saying is she's stealing the love from her kids, and I -- I just can't believe that -- and I honestly believe that she didn't want these kids.  She was using these kids as a meal ticket.  She didn't have to work.  I don't know how much

Page 69

money she got, but she got plenty from the state of Wisconsin for AFDC. She didn't have to work anymore. And she used these kids as meal tickets, and I told her, I says, If you don't want the kids, give them to me. I'll raise them. But she wasn't very happy when I got married the second time because she had mentioned to my ma, Well, why did he have to go get married again? Well, I guess I wanted to get on with my life because I've never had a real good childhood and I was ready and prepared to give that to my kids.

Q.   Well, you knew, though, that when she took off to Colorado she had not been working. She had been getting AFDC; right?

A.   Right.

Q.   And you don't know how much money that was.

A.   No.

Q.   And your child support payments were how much money at that time?

A.   I only had to pay when we first started out $25 a week

3113

because I didn't make that much.

Q.   Hundred bucks a month.

A.   Right.

Q.   So -- when you stopped paying that, obviously she didn't have that money?

A.   Right. Well, no, she still got the money.

Q.   Your child support money.

A.   She still got the money from the state. I paid it to the state.

Q.   I'm sorry. You're suggesting the state paid her the child support even though you weren't contributing.

A.   Right.

Page 70

Q. That's what you understood.

A. Right.

Q. I see.

A. And then we went to -- after this went on for years, she sued me and my wife for $25,000. Well, there was no way me and my wife owed her that kind of money because, well, we had paid to Illinois. I got put in jail for three months, and then we did pay her under the table too so she would get more. And so I told my wife, I says, She's going to get this money. So I wrote a letter to the state of Wisconsin and told them, I says, you know, I says, You've been supporting this woman for 10 years, and I says, Now she's suing me and my wife for $25,000. And I says, That's fine, I says, but I don't believe this woman should

3114

get the money. If the state of Iowa was paying her welfare, then, I said, I think that the state of Iowa should get this money if I owed it.

Q. It didn't work out that way, did it?

A. No, I never got no response from them, you know, so . . .

Q. Did she get a judgment against you?

A. She got $25,000, so she collected ADC all these years, plus she got every dime of support that she had coming and then some.

Q. And about when was that, Mr. Johnson, that you paid her all that money?

A. I'm going to say it must be 20 years ago probably now, 15 years ago, because, I mean, it was -- because I know me and my wife, we says, Let's just pay her and get her off -- get her away from us. And I went down, and at the time we had bought the tavern, and I worked at Uniroyal Goodrich. So we had a

Page 71

mortgage on that. So I borrowed the money against my ma's house to pay her off, and then I paid off my ma's house after we sold the tavern. So . . .

Q. I want to take you back just a minute, Mr. Johnson. You had mentioned earlier on there was a period one of these times your wife left you she went back to Clear Lake.

A. Yes.

Q. With her mother.

A. Yes.

Q. What was her mother's name?

3115

A. Florence Jensen.

Q. And you said something about she got religion.

A. She went down there and got religion and that which is fine, you know.

Q. What does that mean?

A. Well, she had went to a revival tent, this and that and got saved and, you know, which is fine too. I mean, it's -- this would be a bad world without religion, but she got going so carried away. I was thinking, man, she's going nuts. In fact, I went down there. In fact, they almost had me into it. And I remember one night we was staying there because I was trying -- trying to get her back because I wanted to get on to with a life. And we're laying in bed, and she says, Oh, look at, I see an angel, I see angels. And I looked, and I said, Where? Up there in the corner. What it was was the street light shining through the curtains. I couldn't convince her it wasn't an angel, so I went and moved the curtain. I said, Here, it's not, you know, but then, you know, she didn't -- she was a fanatic I have to say.

Page 72

Q.   Would she like --

THE COURT:  Mr. Berrigan, could we take our mid-morning recess?

MR. BERRIGAN:  Yes.

THE COURT:  I was a little late in asking.

Members of the jury, we'll be in recess till 10:50.

3116

Thank you.

(The jury exited the courtroom.)

THE COURT:  Anything we need to take up?

MR. BERRIGAN:  Nothing by the defense, sir.

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Okay.  Thank you.

(Recess at 10:25 a.m.)

THE COURT:  Ready for the jury?

MR. WILLIAMS:  Yes, sir.

MR. BERRIGAN:  We are, sir.

(The jury entered the courtroom.)

THE COURT:  Thank you.  Please be seated.

Mr. Berrigan, you may continue your direct examination of Mr. Johnson.

MR. BERRIGAN:  Thank you, Your Honor.

BY MR. BERRIGAN:

Q.   Pull those microphones right up to you, Mr. Johnson.  Thank you, sir.

Mr. Johnson, how long were you married to Pearl Jean Gomez?

A.   Little over seven years.

Q.   And do you remember when it was that you got divorced?

Page 73

A.    Pardon me?

Q.    Do you remember when you got divorced?

A.    I'm going to say in '67.

3117

MR. BERRIGAN:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. BERRIGAN:

Q.    Sir, I've handed you what's been marked as Defendant's Exhibit 2005.  Do you recognize what those documents are?

A.    Yeah, these are the divorce papers.

Q.    And they're from which county in Wisconsin?

A.    Eau Claire County.

Q.    And these include the documents regarding your failure to pay child support and the judgments that were entered in the divorce case respecting your child support payments as well, do they not?

A.    Yes.

MR. BERRIGAN:  Your Honor, defendant would offer Defendant's Exhibit 2005.

                    *   *   *   *

(Defendant Exhibit 2005 was offered.)

                    *   *   *   *

THE COURT:  Any objection?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  The exhibit's admitted.

                    *   *   *   *

(Defendant Exhibit 2005 was admitted.)

                    *   *   *   *

BY MR. BERRIGAN:

Page 74

Q.   Mr. Johnson, I want to go back briefly to the marriage, while you were married, before we move on.  You talked a little bit about your wife Pearl Jean having a paddle and a belt.  Was there a point in time where you or somebody took those items away from her?

A.   Grandma Sund, the last time she had went down to Iowa and seen them, when they lived in this bungalow, Grandma said, Who's belt's that?  And they said, oh, that's their mother's belt that they whip them with.  And so my grandma said -- my ma said, Well, we're going to get rid of that, and all the kids were nervous because the belt was gone that when Jean come back they'd want to know where that belt was.  But my ma was sort of a headstrong woman.  She would have told Jean why I'm taking that away, you know.

Q.   So your mother took the belt.

A.   My mother took the belt, yes.

Q.   During the time that you and Jean were together with the kids, you mentioned that she hit the kids with a paddle and a belt.  Did you try to take those things away from her at that time?

A.   Yes, I did, but she always seemed to find another one.  The paddle was probably about this long, probably this wide, and it come together with a little handle.  It looked like a ping pong paddle with the round sides cut off.  And I don't know where she'd get them.  She would throw one away and get one, and she'd

3119

always have another one.

Page 75

Q. Did you ever see your wife hit any of the children with her hand?

A. Oh, yes, yes.

Q. What would she do?

A. She'd take and slap them on the backs, and I would tell her, I said, You don't have to hit them kids that hard. I mean, I even spanked the kids on the butt once in a while, but, I mean, she would get too carried away. I mean, they're still just small kids.

Q. And did she lose control with them?

A. She would lose control, but she wouldn't go on no screaming rage or nothing. She just hit them, you know. And I'd say, Jean, that's too much for them little kids, you know, so . . .

Q. You yourself, did you -- other than what you've told about, did you hit the kids?

A. No. I had a hard time doing it, you know.

Q. You'd had some bad experiences in that regard yourself, had you not?

A. Yes, I had.

Q. Could you tell us a little about that?

A. Well, from my brother's dad, he was quite a drinker. And me and my brother were petrified of him. We lived in a government project then. That was, you know, right after the war, them little white huts they used to have. And I can

3120

remember my brother's dad coming home drunk. My brother had a problem peeing the bed. And he grabbed him and threw him out of the bed and broke his collarbone and that when I was a kid I used to play with matches, and I had a fire, and for my punishment he would put my hand on the stove and burn it. He

Page 76

was going to teach me or whatever so -- but, you know, no matter how bad you get treated as a kid, you still love your parents, I mean.

Q.    Sure.

A.    I don't know why, you know.

Q.    You mentioned this reformatory situation.  Did you have any bad experiences there as well?

A.    Yeah.  I think it made me wiser before my time or whatever. I mean, that's -- I figured -- in fact, I was talking to some guy that was in jail for stealing cars, and I was nervous.  Then you could talk to the adults and everything, and I told him, I said, Well, I'm going to Waukesha, Wisconsin.  And he says, Well, he told me, he says, Just don't let them get you down.  He said, Fight for whatever you can.  And I guess a guy being in prison as long as he was -- he was up there two or three times or whatever -- I guess probably that was the best advice any people gave me.  So . . .

Q.    These people at the reformatory, were they your age?

A.    I was the youngest one in the state of Wisconsin to ever get sent to Waukesha.

3121

Q.    Did you experience any abuse there?

A.    Yeah.  I wasn't ever sexually abused there, but we were even abused by some of the guards that was there.  They call it control college.  Back then they didn't have lawnmowers, so they had all the kids line up in single file and cut grass, you know, so they could take a 15-foot spread.  And, you know, it'd be hot, and I can remember going in -- I was in control college because I had got smart with one of the -- this is after I was

Page 77

in there for about six months -- for getting smart with one of the guards there.

And I remember it was real hot out, and when you was in the control cabin, you always were the first ones to eat and the last ones to eat at supper, and they put us -- it was a block building, and this one guard one day, You guys are hot, huh? He takes the hose, and he's hosing us all down, you know. I mean, today -- I mean, back then you just thought, well, this is normal. I mean, you'd never get away with it today. And I can remember one of the guys that run the reformatory on weekends he'd say, I'm taking some of the boys out. We'd go over to his house. I mean, it was great to get out of there, but we'd go over there, and they'd have us cutting his grass, cleaning his house, and this and that. And they did it under -- the thing that he's doing as a favor, you know, but what he was doing, he was getting --

Q. Free labor.

3122

A. -- free labor, you know. But you wasn't going to find a kid there that was going to complain because you got out of the reformatory. But yeah, I -- I guess I don't really regret going there because I didn't have much on the outside, and it did make me smarter. I mean, I wasn't a criminal. I never ever went back to the reformatory again after that. But when I got out, I had a hard time in school.

You know, we used to go up in school in Waukesha, and I think some of the teachers there were probably ones that couldn't get jobs on the outside. Back then I didn't know that, but now as I look back, we used to go up there, and if you had it down for an F, them guys would go up there and put an A in

Page 78

there. Your report cards would come out; you'd have an F where you were supposed to get, you know, so -- and then when I -- I ain't making that as an excuse that I didn't make it good in school. It's just that I guess it didn't mean much to me after that, you know. I had a hard time with it. Then about two weeks before ninth grade was out, and then I went -- painting bridges was my first job.

Q. And never went back to school?

A. Never went back to school, no. The only school I went to then was even after my divorce I went to heavy equipment operating school.

Q. What about -- when you were married to Jean, did she drink at all?

3123

A. No, she wasn't a drinker.

Q. This --

A. Once in a great while she'd have a few beers but not -- I would say she wasn't a drinker.

Q. I want to focus you in time to Jean coming back from Colorado with the kids.

A. Okay.

Q. And at that point you hadn't seen them in quite a long, long time; right?

A. Right.

Q. How did you find out that they were back in Iowa?

A. I really can't -- I don't know if one of the kids had called me or my ma had told me, but when I found out, then we got them. Then we went -- we used to take the kids in the summertime then, and they would stay with us for the summer, and

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2737 of 3592

then they would go back and go to school or wherever they went.

Q.   So would you have the whole family?

A.   We would even take Holly with us.

Q.   And Holly would have been --

A.   One of her boyfriend's --

Q.   Okay.

A.   -- kids, but we didn't -- me and my wife, my wife loves kids, and we didn't care.  You know, anybody could make kids. It's the ones that raise them I guess are the dads or the mas.

Q.   How did the kids seem to do when they were with you?

3124

A.   Great.  Wendy got straight A's in school.  Jimmy was doing real good.  But then Wendy got a letter from her ma or her ma had called and said, I need some help in this restaurant, because I guess they had the restaurant in Forest City or Columbia or wherever it was and wanted her to come.  And Wendy was starved for affection from her mother.  I mean, she's never had it.

And so she called, and Wendy said, Well -- and my wife sat down and talked to her.  And we said, Well, Wendy, we don't want you to go, but we're not going to force -- we weren't going to force anybody to stay with us if they didn't want to stay with us, because you gotta understand even though you're doing good and you love where you're at, you still miss your other brothers and sisters.  And I'm sure that played an influence on Wendy's decision.  So then she had went back.

Q.   Well, when Wendy went back, where was her sister Angela?

A.   Living with her mother yet.

Q.   So Angie stayed with her mom.

A.   Yes.

Page 80

Q.    Let me ask you, did you ever learn that Pearl Jean had taken the kids to Kansas?

A.    Not until after they were even back.  I mean, I didn't know -- I couldn't imagine who they knew in Kansas.  I didn't know they were back -- there until they had come back.

Q.    So you didn't know they were out there in Kansas at all.

3125

A.    No.  That was one of the times where I didn't know where they were at.

Q.    And do you know how long they were in Kansas?

A.    I couldn't even tell you that either, no.

Q.    How did you find out that they had been in Kansas?

A.    My oldest daughter Wendy was telling me that they were there and later on after it was all over how they had got abused there and that from some guy that I guess he was -- I said, Well, where was your ma at this time?  Well, they were uptown handing out tracks and stuff, religious thing.  And, you know, I said -- well, she thought that she was going to eventually leave Holly there and Wendy both because her ma had said, Well, do you want to stay with Holly?  And they didn't -- they didn't want to stay there.  They wanted to be with their ma.  And that's why I can't understand it.  If she didn't want the kids, why didn't she just drop them off with me and my wife?  I don't believe this problem would be here today if it wasn't for that.

Q.    What about this abuse?  Your daughter Wendy related that to you?

A.    She had told me that, and we was sitting around and maybe one of the things about drinking beer, this and that.  Then she broke down and tell me how they were sexually abused from -- I

Page 81

forget the guy's name. It was some religious thing.

Q. How long after these events did Wendy tell you or how old was Wendy when she told you about these things?

3126

A. Oh, I'm going to say she was in her 20s probably.

Q. So it was quite a long, long time afterwards.

A. Right.

Q. Had she ever said anything to you earlier in life?

A. No. If I would have knew that was happening, I would have been down there.

Q. Down where?

A. To wherever they were in Kansas, and I would have probably confronted the guy and said -- you know, but I didn't know, you know. I guess the old saying is what you don't know don't hurt, and it's probably maybe a good thing I didn't know it at the time.

Q. Did Wendy indicate to you who was the subject of the abuse?

A. Her, Angie, and then Jimmy. They said one time they dragged -- they had pigs there, and they said they were going to throw Jimmy to the pigs, and I don't know if they would have or not, but it's still gotta be scaring the kid dragging him out to a pig pen. So -- I mean, I'm ashamed for me not knowing it, you know, I mean. How -- you know, what can you do if you're not there?

Q. The truth is that after the divorce was there a pretty good period of time where you really didn't have much contact at least with your daughter Angela?

A. No. Angie I think got bitter towards us because she thought that my wife had broke their marriage up. Well, the

Page 82

truth of the matter is I never met my wife now until after -- three months after we were divorced. I met her in the park with her kids. And I think Angie sort of was brainwashed to thinking that Cookie was the one that took her dad away from her kids.

Q. So some of the kids you had a relationship with and others not.

A. Right.

Q. And the kids that went up with you sort of later on in life to spend time with you, which of the kids were they?

A. Was Wendy, Jimmy, and Jamie came, but Jamie didn't come as much. I don't know why, but, I mean, Wendy actually lived with us, and Jimmy actually lived with us and went to school and then -- but whenever -- you know, in fact, at the time that Jimmy had left -- Jimmy come twice and lived with us. His mother had called, and my wife noticed that he was looking real sad. And my wife went and asked him and said, Jimmy, what's wrong? And, you know, he was crying. He says, Well -- she said, Do you miss your ma? He said, Yeah.

Then she says, Well, do you want to go home and see your brothers and sisters? And he said, Yeah. And the kid wanted to go home with his ma and his brothers and sisters. I mean, not that he didn't like us. It was -- you know, the kid was homesick. I mean, he was with us. It was his home, but his other brothers and sisters weren't there either, you know.

Q. Respecting Jimmy particularly, is it true that he was quite

an athlete when he was in high school?

Page 83

A.    Yes, he was.

Q.    Were you active in terms of following his sporting activities?

A.    Whenever we could, but working two jobs and having a restaurant, we'd go to all the home games, but, you know, Cookie would take him to his practice and this and that because I worked the second shift.  But yeah, we were involved in it, yes.

Q.    What about the other kids?  Did you -- I mean, given the distance, things like parent-teacher conferences and things going on in school, was that any part of your life?

A.    Oh, yes.  I used to go to Wendy's PTA meetings.  Jean would never go there, and we were divorced at the time, but I would still go.  And I know I would -- I'd write her notes and put it on her desk, you know, saying that your dad was here and this and that.

Q.    Your wife Pearl Jean did she ever go to any of those?

A.    No, she never had time.

Q.    You knew they had kind of a bleak financial situation, your ex-wife and the kids; right?

A.    Yes, yes.

Q.    What were your observations in terms of Jean's ability to care for the children financially, provide for their clothes and food?

A.    Well, when I used to go and see the kids, my wife always

3129

would get them clothes.  But when we'd go there and we didn't see them for a while, these kids would have nothing.  And she would walk around -- and somebody dressing good and this and that, they gotta, but you think your kids would get the best stuff before you would get it, and she'd have an 80-dollar long

Page 84

leather coat and that, and I'd think to myself if she can hardly make it, how come she's dressing like this and going out and these kids ain't got nothing.

And we used to buy the kids -- here's another thing I could not believe. When we was buying the kids' toys, we got to the point where we'd go down to Mason City and we'd rent a hotel room, go get the kids and watch the kids open their presents because their Grandpa Jensen would take the toys and smash them with a hammer saying this is of the devil, this is the devil and that. So the kids would have to take their toys. Well, he smashed them? You know, that's something sick there, you know. That's why we would take the kids to the motel. We wanted to at least know the kids got their presents because we used to send them and we never knew if the kids would get them or not.

Q. Some of the religious practices of Florence and Andy Jensen, Pearl Jean's mother and stepfather, were you aware of those things going on at the time they were going on, some casting out of spirits and things of that nature?

A. I didn't realize it was as bad as it was. First Florence got religion. Then she got Andy. Andy worked at Nagel Hart as

3130

a heavy equipment operator mechanic, and he was a big nice guy. I mean, he was stout. And then Florence got him so involved in it, which I'm not knocking the religion, but they kept telling him fast, fast, you'll get the power from the Lord, you'll get the power from the Lord. Well, within 2 or 3 years' time, this guy weighed 125 pounds, and he died of leukemia. And I'll tell you to this day I swear this fasting and that killed the guy because he just -- and Andy wasn't a bad guy. He was just --

Page 85

went nuts.  Florence and that religion made him nuts.

Q.    Well, were your children ever subject to fasting?

A.    Oh, yeah.  The kids -- my son to this day says -- in fact, he told his wife, My kids are never going to bed hungry like we used to go to bed hungry when we was living with my ma.  If them kids -- his kids wanted to eat, he lets them eat.  If they get up and say, Dad, I'm hungry, they get to eat.  And his wife couldn't believe that it was that bad at their house.

Q.    Did you ever witness your ex-wife performing any of these casting out of spirit exercises?

A.    I never witnessed it, but I could see her praying for these people and that.  And her mother come over to our house once in a while and this -- and she's mumbling and bumbling, and I'll tell you what, if you seen her, I mean, to the -- you'd think she was nuts.  And these kids are little.  And I told Jean, I says, I don't think these kids should be around her with this stuff.  In fact, she -- the neighborhood where she lived in

3131

Forest City, Iowa, the neighborhood took up a petition to get her mother out of there she was so nuts, sitting down the basement and, you know, holding Angie down with her hands spread out.  Now, I didn't see this, but I heard about it and from the other kids casting out devils and beating on tires and spitting in a bucket and that.  I mean, for kids 8, 10 years old, I mean, that's gotta be scary.  And these kids -- as far as I'm concerned, it's my kids' mother, but I think she should burn in hell for what she put these kids through.

Q.    I want to show you a few photographs, Mr. Johnson.

        MR. BERRIGAN:  May I approach, Your Honor?

        THE COURT:  You may.
                Page 86

BY MR. BERRIGAN:

Q.    I'm going to hand you, sir, what's been marked Defendant's Exhibit 2100, then 2117, 2068, 2074, 2084, 2091, 2103, 2105, 2050, 2044, 2039, and finally 2037.  I just want you to take a look at these, and I'll ask you one question about them; okay?

A.    Okay.

Q.    Could you look through those others?

A.    Sorry?

Q.    I'm sorry.  I wasn't very clear.  Just flip through the other ones there, the stack.  Yeah, that's it.

A.    Okay.

Q.    Are those pictures of you and your ex-wife Pearl Jean and your children when you were married to Pearl Jean?

3132

A.    When we were married, but the ones with the park pictures -- some of them are when we were married, and some of them are when I had the kids at the park.

Q.    All right.  And there's a picture there of you as well, isn't there?

A.    Yes.

        MR. BERRIGAN:  I'd offer, Your Honor, 2100, 2117, 2068, 2074, 2084, 2091, 2103, 2105, 2050, 2044, 2039, and 2037.

                        *   *   *   *

        (Defendant Exhibits 2100, 2117, 2068, 2074, 2084, 2091, 2103, 2105, 2050, 2044, 2039, and 2037 were offered.)

                        *   *   *   *

        THE COURT:  Any objection, Mr. Williams?

        MR. WILLIAMS:  No, Your Honor.

        THE COURT:  Those exhibits are admitted.

Page 87

* * * *

(Defendant Exhibits 2100, 2117, 2068, 2074, 2084, 2091, 2103, 2105, 2050, 2044, 2039, and 2037 were admitted.)

* * * *

MR. BERRIGAN:  Thank you.

BY MR. BERRIGAN:

Q.   I'd like to go through these with you just quickly, Mr. Johnson, if you could explain them to the jury what's depicted.  I'm going to start with this handsome young man here, Defendant's Exhibit 2100.  Who is that?

3133

A.   That was me.

Q.   How old are you there?

A.   Probably 13 years old.

Q.   So this is a pre-reform school picture.

A.   Yes.

Q.   2044?

A.   That's Wendy, Angie, and --

Q.   Which -- tell us from left to right or right to left.

A.   From the right is Wendy.  In the middle is Angie, and on the end is Jamie.  That's in a house on Birch Street in Eau Claire, Wisconsin.

Q.   Did you take that picture?

A.   Yes.

Q.   What about this one here, 2050 --

A.   That's at Grandma Sund's house with -- I believe it's Wendy with me there.

Q.   These are -- that's your mother's house.

A.   That's at my mother's house, yes.

Q.   2105.

Page 88

A.    That's at Irvine Park in Chippewa Falls, Wisconsin.    And from right is Angie, the middle is Jamie, and on the end is Wendy.

Q.    Did you take that picture?

A.    Yes.

Q.    How about 2103?

3134

A.    That's at Eau Claire Rod and Gun down by where the ducks are.    On the right is Angie.    On the left is Wendy.

Q.    Is this a place that you took your children?

A.    I used -- they used to like to go down by there and see the ducks on a park like on a weekend visit.    The park was a place to take the kids.

Q.    2091, 2091.

A.    That is in back my wife's house, now my wife now.    I think that's her daughter.    And we're shooting baskets.

Q.    How about this one here, 2084?

A.    That was the place on Birch Street, and that's me, Jean, and Jimmy, little Jimmy.

Q.    How old is Jimmy there?

A.    Jimmy was just, you know, a year old, year and a half old.

Q.    A couple more.    Here's 2074.

A.    Okay.    That's at Eau Claire Rod and Gun in Eau Claire.    And that's Angie on the right, Wendy in the middle, and Jamie on the left.

Q.    And would you have taken that picture?

A.    Pardon?

Q.    Did you take this picture?

A.    I took them pictures, yes.

Page 89

Q. Was Pearl Jean with you at this park at the time?

A. No, she never come to the parks.

Q. She didn't go with you.

3135

A. No.

Q. Here's a picture, 2068.

A. I think that's -- that's me and Jean, and I was probably goofing around or something or trying to, you know . . .

Q. This is while you were still married obviously.

A. Yes.

Q. 2117.

A. That's Wendy. That's Christmastime on one of her trikes.

Q. Where is that picture taken?

A. That's in our house because I recognize the wing back chairs.

Q. Your house in Chippewa Falls.

A. No, on Birch Street in Eau Claire.

Q. Right. My fault. Two more. 2039?

A. That's in Chippewa Falls at the Irvine Park there on the swings and monkey climbs, another weekend we were at the park.

Q. And then 2037.

A. That was me and Jean in our house on Birch Street I believe.

Q. Except for the pictures that you're in, did you take those pictures?

A. Yes.

Q. You know, they're all around the same time period, most of those pictures.

A. Right.

Page 90

Q.  Did you have occasion to take pictures of your kids later on in life?

A.  Yeah, we got pictures at home and that later on, yeah.  I mean, there used to be a lot more pictures, but the ones I salvaged and -- when Jean had her auction and sold everything out, she threw everything away.  I mean, she didn't take nothing.  We could probably maybe have had a few more pictures.

Q.  Pictures included.

A.  Pictures included.  She didn't care.

Q.  Did you ever see Jean taking any pictures of the kids?

A.  No.

Q.  You mentioned earlier Jean had you arrested for failure to pay child support.  You were prosecuted and served 90 days.

A.  Yes.

Q.  Is that the only time she ever prosecuted --

A.  When I went to court, the judge said, you know, Three months in jail.  Well, evidently it must be different in Illinois because the jail said, What are you here for?  And I said, For nonsupport.  And he -- and he said, Well, I'm not going to keep you here for that.  I told him I had a family, you know, I worked at Chrysler Corporation.  So he let me go home during the week, and I'd have to go spend the weekends at the jail.  So, I mean, evidently there must have been a discrepancy in what -- you know, once I got to jail, it was the decision of the jailer.  I was tickled to death, you know.

3137

Q.  You had some kind of work release situation?

Page 91

A. Yeah, must have been. I don't know. But I didn't have to go back -- I had to go there on Fridays, and I'd leave Sunday night.

Q. I want to turn our attention now to -- back to Angela and ask you about some events in her life and whether you were familiar with them, and one was her quitting school in the ninth grade.

A. No, I --

Q. Were you ever consulted about that?

A. No, I never knew anything about it, no.

Q. Didn't know it at all?

A. I would have never let her quit school, I mean, if I had any say over it.

Q. Do you know what she did after quitting school?

A. No, I don't. See, that was another thing that I don't know if I had foreseen it or what. But in my divorce decree I says I want the kids to stay in the state of Wisconsin so I could have some control over it, but that didn't mean -- it wasn't worth the paper it was wrote on because a year and a half or two years later she was gone, took the kids with her, you know. I always thought, well, what's the sense of having that in your divorce decree if they can get away with it and leave?

Q. What about Angela getting married? Were you aware that she got married when she was 16?

3138

A. No. The first time I heard about her getting married when she was 16 was here.

Q. In court.

A. In court. I didn't know it, no.

Q. Did you know a fella by the name of Steve Hugo?

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2750 of 3592

A.   No, I didn't know him.

Q.   How about her second husband, Arlyn, A.J. Johnson?  Did you know him?

A.   No, I didn't.  I mean, this is -- the first time I ever seen A.J. was -- we was at the motel room, and I'm walking out. It was a nice day.  I was putting some garbage in the garbage, and I was coming back, and the guy says, Nice day.  I said, Yeah, beautiful.  And he says, I'm from Forest City.  Where are you at?  I says, We're from Wisconsin.  And I sort of watch who I'm talking to here because I don't want to get into a discussion about my daughter here or that.  I don't want to talk about it.  And then we're sitting up here Thursday, and here comes this same guy that was staying at the hotel.  And Wendy said, Well, hi A.J.  And I thought that was Angie's husband, and I said, I'm sorry.  I went and shook his hand.  I said, I didn't realize that you were Angie's husband.  And I don't know if I ever seen him before.  Wendy said, Well, you might have seen him at Jamie's wedding.  And I said, Well, I don't remember it.  I didn't know who this guy was.

Q.   So there's a period of time where you're really kind of out

3139

of her life, weren't you?

A.   Right.

Q.   How did that work, Mr. Johnson, with these five kids?  Were you close to all of them or some of them side with Jean, or how did that shake down at the end?

A.   I was close to them all.  No matter what my kids did or do, I still love them.  I'm still their dad.

Q.   Sure.

Page 93

A. And I'm not going to pay no favoritism amongst them. Kids are kids.

Q. Well, is that true of your ex-wife? Does she have a relationship with all of your children?

A. No. She -- this is my own opinion. I think she always sort of disliked Wendy because she's a larger girl, and Jean I think sort of looks down on bigger people. She -- and I have to say I think Angie and Holly would probably be her favorite, and then Jamie she -- Jamie's sort of a larger girl too. And I think she picked her feelings from the way people look. I mean, I think she was ashamed of them. Angie's a goodlooking girl and thin, and that's what Jean sort of -- she was proud of that part of it.

Q. So of the children that you shared with Pearl Jean Johnson, Pearl Jean Gomez before you married her, who were closer to Pearl Jean and who were closer to you as they became adults?

A. In -- the first one would be Wendy. Second one would be

3140

Jimmy, Jamie, and Angie.

Q. Has your relationship with Angie changed more recently?

A. Oh, yes.

Q. And in what way?

A. That I'm there if she needs me, and when I first seen her here visiting, she said, Dad, you hate me? And I said, No. I says, No matter how it turns out, I'll be with you.

Q. You've communicated with her while she's been in jail?

A. Yes.

Q. And are you much of a letter writer?

A. No, I'm a very poor speller.

Q. Okay.

Page 94

A. I was never blessed with being a speller.

Q. Didn't win any spelling bees as a child.

A. No, I can guarantee you I should have made book in school, when they used to have them spelling bees that I'd be the last one picked and the first one out.

MR. BERRIGAN: May I approach, Your Honor?

THE COURT: You may.

BY MR. BERRIGAN:

Q. I'm going to hand you, sir, what have been marked as Defendant's Exhibit 2139 and 2138. Do you recognize those documents?

A. Yeah, that's my printing.

Q. What are they?

3141

A. Letters that I wrote to Angie.

Q. While she was incarcerated?

A. Yes.

Q. Has she written back to you?

A. Yes, she writes to me probably three to four letters to my one because, like I say, I tell her I'd rather have you call because I have such a hard time writing letters.

Q. And does she call you?

A. Yes. She tries to space it out because with the system they got, she calls me and it costs us $23 per call, so she tries to hold back on the calling.

Q. It costs you $23.

A. Yeah, she has to call collect, so it's $23.

Q. You can't call her at the jail.

A. I can't call her, no.

Page 95

Q. This decision, you know, that's going to take place here soon, obviously you know what that involves.

A. Yes.

Q. Are you going to be affected by how that goes?

A. Yes, she's my daughter.

Q. If she's sentenced to a term in the penitentiary, are you going to maintain a relationship with her?

A. I'll be there until the day I die.

MR. BERRIGAN: That's all I had. Thank you, sir.

THE COURT: Mr. Williams?

3142

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Johnson, it sounds like you had a little bit of trouble yourself growing up that you related to the jury during your testimony here today.

A. Yeah.

Q. Fair to say?

A. Yes.

Q. You and your brother were abused, beaten from time to time; right?

A. Yes.

Q. Ended up in a reformatory school.

A. That's right.

Q. Sounds like it was pretty rough there.

A. Yes.

Q. Yeah. When it was all done, though, you -- even though you quit school, you kind of picked yourself up, and you went on and got yourself a job and got married, and you've been married for how many years, sir?

Page 96

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2754 of 3592

A.    Now?

Q.    Yes, sir.

A.    Thirty-six years.

Q.    And never been in trouble with the law other than this one time of having to go in to pay back child support.

A.    Oh, no.  I've had some scrapes with me and my brother in

3143

the bar and this and that.  I'm no saint.

Q.    Sure.  No felony criminal history, though.

A.    Well, no, I don't think I've been charged with a felony, no.

Q.    No.

A.    Misdemeanors.

Q.    Right.

                MR. WILLIAMS:  Nothing else, Your Honor.

                MR. BERRIGAN:  I have nothing further.  Thank you.

                THE COURT:  You may step down.

                MR. BERRIGAN:  The defense calls Wendy Jacobson.

                  WENDY JACOBSON, DEFENDANT'S WITNESS, SWORN

                THE COURT:  Okay.  Please be seated in the witness box.  Please adjust the chair and the microphones so you can speak directly into the microphones.  And when you're ready, would you state your full name, please, and spell your last name.

                THE WITNESS:  Wendy Jacobson, J-a-c-o-b-s-o-n.

                THE COURT:  Mr. Berrigan?

                MR. BERRIGAN:  Thank you, Your Honor.

                          DIRECT EXAMINATION

BY MR. BERRIGAN:

Page 97

Q.   Miss Jacobson, I'm not sure we ever got to this the last time you testified, so where are you from?

A.   I am from Iowa.

3144

Q.   You were born in Iowa?

A.   Born in Mason City, Iowa.

Q.   Would you do me a favor?  Do you think you could pull that microphone just a little closer to you, please, and the other one?

A.   This cold's kinda probably . . .

Q.   Thank you.  Where do you live right now?

A.   I live in Balch Springs, Texas.

Q.   And are you single or married?

A.   I'm married.

Q.   Where is your house in reference to the major metropolitan areas in Texas?

A.   About 17 minutes away.

Q.   From?

A.   Dallas.

Q.   Dallas, okay.  How long have you lived there?

A.   About nine years.

Q.   Do you have any children?

A.   Yes, I do.

Q.   How many?

A.   Two.

Q.   What are their names and ages?

A.   Brian Jacobson, he's 26; Brooke Jacobson, she's 23.  Then I have a stepdaughter.

Q.   Do any of your children live with you?

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2756 of 3592

A.    My daughter lives with me basically when she's not at school.

Q.    Okay.  Your daughter Brooke.

A.    Yes.

Q.    What is your relationship to Angela Jane Johnson?

A.    She's my younger sister.

Q.    And you're the oldest of five siblings?

A.    That's correct.

Q.    I know it's impolite, but how old are you?

A.    Forty-three.

Q.    Forty-three.  I want to take you back quite a ways in time, Miss Jacobson, to when your father and mother were married, Jim who just left and your mother Pearl Jean; okay?

A.    Okay.

Q.    Do you have any memories of that time?

A.    One of the memories I have of them living in the same house together was not a very good memory.

Q.    What was that, ma'am?

A.    I just remember I was looking at this big plastic poodle-shaped bottle thing, and it had some pearlescent-colored liquid in it, and I think it was bubble bath, and I spilt it on the chenille bedspread.  And the next thing I remember, putting my head in the bedspread crying and my parents were arguing. I'm sorry.

Q.    That's all right.  You know what?

3146

MR. BERRIGAN:  May I approach, Your Honor?

Page 99

THE COURT: You may. We're out of tissues so . . .

A. I'm sorry.

Q. You were born in 1962.

A. Yeah.

Q. And do you remember when your parents were divorced or how old you were?

A. I was in kindergarten I believe. It was when we lived on Half Moon Lake in Eau Claire.

Q. Was there any physical striking as a result of the argument you've described?

A. You know what? I just remember the yelling. I was -- and I was really scared.

Q. After your parents divorced, you know now some time thereafter that your mother physically moved you to Iowa.

A. Yes.

Q. Okay. Did you have contact with your father after moving to Iowa with your mother after the divorce?

A. Very little. We did have some in Mason City. It was one -- I remember one time, and he had come down to bring us some Christmas presents and let us unwrap them in a hotel room.

Q. How was your relationship with your dad after your parents got divorced?

A. Actually we didn't really know we could contact him at all until I was in my -- junior high, and that was when we wanted

3147

something we were told to call him, and it was like a revelation that we could even call him.

Q. What do you mean by that? Why couldn't you call him before then?

A. We didn't know we could. It was just like -- I remember

we -- I had asked her for something. I can't even remember what it was, and she said, Call your dad. And I was like, What? We can call him?

Q. And you were how old?

A. In junior high. I was in seventh grade.

Q. I want to talk a little bit about some of the things that happened before that period of time; okay?

A. (Witness nodded head.)

Q. And in particular I want to start with this trip to Colorado. Do you remember living in Colorado, Pueblo, Colorado, for a year?

A. Yeah, I remember living there.

Q. What school age or what grade would you have been in at that time?

A. It was kindergarten or first grade because I remember walking to school, and I remember they still made you lay on the mats and wand your head when you were good. When you took your nap, you could get them. They'd wand your head with a brush.

Q. Did you live there with anybody other than your mother and your siblings?

3148

A. Yes, my grandparents Florence and Andy Jensen.

Q. Okay. We've heard a little testimony about your grandmother Florence, but I wanted to ask you what are your memories of your grandmother Florence when she was alive?

A. She was overreligious I believe. It was -- her whole life revolved around religion, and so did my grandfather's.

Q. Could you tell us what you mean by that?

A. I remember her listening to Bishop Whitlock tapes, some

Page 101

religious demon deliverance, and fasting and she -- it was fire and brimstone-type religion.

Q. What do you mean by demon deliverance?

A. We had -- they always had to -- they thought demons lived with us and within us, and, I mean, we lived in fear of being -- having demons inside of us.

Q. You being you and your brother and sisters?

A. Yeah.

Q. About how old were you, Mrs. Jacobson, when you first got exposed to this Bishop Whitlock and the demon deliverance?

A. Let's see. I think they started listening to them in Pueblo, and it went on into Mason City.

Q. Did your mother participate in this at all?

A. Actually she did. She looked to her parents for guidance because years later she told me it was because she was a baby Christian and, you know, she looked to them for their guidance.

Q. Was there anything more sinister than listening to the

3149

tapes? Is that all you did?

A. No. They cast out demons out of us.

Q. Could you explain to us what you mean by that?

A. They would hold Angie down on the floor, and my grandfather would be at her head, and Jean and Florence would hold her arms and legs down on each side, and they would talk in tongues and wave the Bible over her head, and they would keep doing it until she was physically exhausted, she couldn't move anymore. She would scream, and she looked at me, and I wanted to help her so bad, and I couldn't because I wasn't old enough. I just remember the look in her eyes when she -- and I told them to leave her alone.

Page 102

MR. BERRIGAN: May I, Your Honor?

A. And he said, Get behind me Satan.

Q. The people that participated in this practice, Miss Jensen -- Miss Jacobson, I'm sorry, that was your grandmother and Andy Jensen?

A. Yes.

Q. Was your mother involved in this?

A. Yep.

Q. And could you explain what the purpose, if you know, with the holding down, why Angela was being held down?

A. They were restraining her so they could deliver the demons out of her.

Q. Was she resistant to those efforts?

3150

A. Yes, because she was being restrained, and until she was not moving and completely just still, almost -- it was like until she had no more fight left in her, and then the demons would be delivered out of her, and then they would quit.

Q. You said there was something about speaking in tongues. And we've heard that term before, but could you tell us what you mean about speaking in tongues?

A. It's supposed to be a language to God that God -- it's a gift God bestows on people with the holy spirit. And when they pray, they lift their hands up in the air, and, you know, their tongue starts making foreign language.

Q. Is the Bible involved in these proceedings?

A. Yeah, my grandfather waved -- he'd sit -- when she was on the floor, he was at her head, and he had the Bible over her head, and he was speaking in tongues, and Jean and Florence,

Page 103

they held her down, and they talked in tongues and rebuke you, I rebuke you, deaf and dumb spirit. I rebuke you. And they just kept it up.

Q.   What were you doing there when this was going on?

A.   I was standing there. I told them, I just -- they wouldn't leave her alone. I said, Leave her alone. Leave her alone.

Q.   Were you subject to this treatment of casting out of demons?

A.   In my later years I remember it.

Q.   You mean later when you were older you remember it.

3151

A.   Yeah, I don't remember my younger years. I remember witnessing it a lot.

Q.   You said earlier this happened when you were in Pueblo, Colorado, and after you got back from Pueblo, Colorado.

A.   After in Mason City.

Q.   How old would you have been after moving back from Pueblo, Colorado?

A.   I was in third grade I believe.

Q.   And your sister Angela?

A.   First.

Q.   First grade. And that would have made her roughly how old?

A.   She would have been approximately six I think.

Q.   How did Angela respond to these episodes of casting out of demons?

A.   She -- I mean, she just -- I mean, we lived in fear that they would do it. We didn't know -- I mean, she just -- I think when she tuned into something, they assumed it was a demon because they couldn't detract her attention.

Q.   Was there certain behavior that Angela engaged in that

Page 104

brought on these episodes of casting out of demons?

A. Yes, yes.

Q. What was that?

A. I -- I mean, as an adult, I can recognize the symptoms now, but I believe that she had undiagnosed ADD because she would focus on something, and then it would be hard to get her

3152

attention because she was so focusing on one thing. And they determined that she was deaf because they couldn't take her attention away from whatever it was she was focused on. And then when we used to draw pictures, she would get her letters backwards and symptomatic of dyslexia, and that was the dumb part.

Q. Well, are you telling us that these episodes of casting out of demons would be as a result of her writing letters, or was there something that she did that caused this stuff to happen?

A. It was just whenever they felt -- whenever -- I mean, it was like a cause-and-effect thing. If they -- but it wasn't one thing or the other, but it would be both that they cast out.

Q. So could you tell when these episodes were about to start or when they were coming, the casting out of demons?

A. They came whenever they decided it was necessary. It was frequently throughout the weeks.

Q. Well, how often did Florence and Andy Jensen and your mother engage in casting out of demons when Angela was six, seven years old? How often did that happen?

A. They did that throughout their whole -- from the time I can remember until my grandfather was deceased, till my grandmother was deceased. Jean I knew was doing that up to a few years ago.

Page 105

Q. Well, up -- over a period of time, did the process change? That is, was the ritual done in a different fashion?

A. Laying on of hands to cast them out, naming them. And if

3153

you coughed or sneezed or burped, that meant the demon left your body, but it would continue until something -- till some noise or something escaped your body, and that meant the demon had left.

Q. But that's a little different than the holding down on the ground --

A. Yeah.

Q. -- with the Bible.

A. Yeah. They quit doing that -- I think in my junior high years they quit holding down.

Q. And who was most often subject to this treatment?

A. I remember Angie getting it a lot.

Q. What about you or Jamie or Jimmy?

A. I have so many holes. I basically remember Angie getting it.

Q. Did she display a personality when you were younger and just children that you attribute to these episodes being more frequently applied to her?

A. I guess she wasn't as passive as the rest of us kids.

Q. When you moved back to Iowa from Pueblo and this kind of activity was taking place at the house, do you know whether or not any other adults were ever part of this activity, the casting out of particular --

A. We used to go to a church in Charles City called the Oak Park Church, and they had demon deliverances there, and we were

Page 106

brought to the church to watch them.  And they were scary. They'd get up there, and they'd have an altar call for the demon deliverances, and I remember one time when I went.  The guy was screaming, and his whole body was shaking and writhing around. And there's things that if you don't cast the demon into the Red Sea, it can walk on the earth with you.  It's free to enter anybody that has a hole in their heart or an empty space.  It can lodge itself in it.

Q.    Now, you're, I think you told me, now 43 years old.

A.    (Witness nodded head.)

Q.    But when you were 8, 9, 10, 11, did you believe in this demon possession situation?

A.    Yes.  My brothers and sisters and I lived in fear.  We were so scared that we were going to hell.  We would search each others' heads to make sure we didn't have the mark of the beast.

Q.    What do you mean search each others' heads?

A.    We would look on each other's head to make sure we didn't have the 666 number in it.

Q.    You mean on your skull.

A.    (Witness nodded head.)  Because it --

Q.    Why would you do that?

A.    If you had that, it was a mark of the beast and you were going to hell.

Q.    Were there other unusual religious practices that your grandmother and mother and grandfather Andy Jensen engaged in

3155

when you were small?

Page 107

A.    One time they woke us up in the middle of the night because the world was ending.  We went on a three-day trip to Charles City, ended up at the Oak Park Church, and we were all driving in the car, and by day -- Jean had a scar on her leg from the knee down to the ankle, and it was in the shape of an arrow.  Whatever direction the arrow pointed when she was sitting is the direction we drove in the car.  And at night, the brightest star we followed.  We did it for three days, no food, no water.  We thought we were seeing things in the sky, Bible people, chariots of fire.

Q.    Do you know what prompted this drive for three days, Mrs. Jacobson?

A.    Grandma said the world was coming to end.  I believe she saw a wolf in the window and Satan will come as a -- I can't -- there was some Bible scripture about Satan coming as a thief in the night.  It was at nighttime when she saw it.

Q.    Why did you drive around for three days?

A.    They were running away from the end of the world.

Q.    How old were you at the time that happened?

A.    It was in Mason City so about third grade.

Q.    Third grade?

A.    Yeah.  We had no food, no water that whole time.  We ended up at the Oak Park Church, and they said something to the preacher or I don't know who it was, and he left right away and

3156

went and got us some food, and we were so hungry, and we ate it and we --

Q.    Are you sure it wasn't just overnight?

A.    No, it wasn't.  It was three days.

Q.    You got fed at the church?

Page 108

A.    (Witness nodded head.)  And we were so hungry, and we ate
it, and we just started puking and puking and puking because we
ate it so fast because we were so hungry.

Q.    I wanted to ask you about fasting for a minute.  Were you
ever subjected to fasting, that is, you know, not having any
food when you were a child?

A.    Yes.

Q.    Could you tell us under what circumstances that would
arise?

A.    If we stayed home from school because we were sick, we had
to fast until sundown.  Chocolate milk we got to drink.  She --
every time she wanted us to fast, we were on fast.  Just when we
had to pray for something, we had to go on a fast because it
would bring us closer to God.

Q.    And were you all -- all of you, all children, fasting?

A.    Every one of us.

Q.    And that would include even Holly?

A.    Yeah.

Q.    And she's what?  Ten or eleven years younger than you?

A.    Yes.

3157

Q.    When do you remember this fasting, or when do you first
remember this fasting taking place?

A.    I remember fasting in Mason City when we were in the --
when I was in the third grade is my first recollections of it.

Q.    Well, how would that work if you went to school and you
were supposed to be fasting?

A.    Well, when we went to school, we ate breakfast, and we ate
lunch, but we got -- you know, we had a choice.  Stay home, be

Page 109

sick, and fast or go to school, eat breakfast and lunch, and get beat up after school because we were preaching the religious stuff we were learning at home.

Q.   You were preaching religious stuff as a child?

A.   Telling our -- she told us to tell them.

Q.   Tell who what?

A.   Everybody, everybody we came in contact with.

Q.   What were you supposed to tell them?

A.   That Jesus is coming soon.  Everything about -- everything she taught us in the Bible studies, we were supposed to pass it on to the people at school or to anybody we saw.

Q.   And your classmates didn't respond well to that?

A.   No.

         THE COURT:  Would now be a good time to take our noon recess?

         MR. BERRIGAN:  Yes, sir.

         THE COURT:  Okay.  Members of the jury, we'll take our

3158

usual hour recess.  Please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence in the penalty phase, received my final instructions, had an opportunity to hear the closing arguments of the lawyers, and, most importantly, the views of your fellow jurors.  We'll see you back here at one o'clock.  Thank you.

         (The jury exited the courtroom.)

         THE COURT:  Anything we need to take up?

         MR. WILLIAMS:  No, Your Honor.

         MR. BERRIGAN:  Nothing by the defense, sir.

         THE COURT:  Okay.  Thank you.

         (Lunch recess at 12:02 p.m.)
                    Page 110

THE COURT:  Ready for the jury?

MR. BERRIGAN:  Yes, sir.

MR. WILLIAMS:  Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT:  Thank you.  Please be seated.

MR. BERRIGAN:  May it please the Court.

THE COURT:  Mr. Berrigan.

BY MR. BERRIGAN:

Q.    Could you pull your chair up, please, ma'am, and then pull those mikes close to your mouth, please.  Thank you.

I wanted to kind of go back to where we were before the lunch break which was discussing some of the religious practices that your mom and your grandmother Florence and Andy

3159

Jensen engaged in, and we had just finished talking about fasting; okay?  I wanted to ask you something about a prayer closet.  Does that term have any significance to you?

A.    Yeah.

Q.    What is a prayer closet?

A.    It's where we had to go pray because if we weren't able to speak in tongues or display out the spirit, our heart wasn't pure, and so God couldn't give us those gifts.  So we had to go to the closet and pray until our heart was pure and he could give us those gifts.

Q.    And why did you pray in the closet?

A.    That's where she told us to go.

Q.    What kind of a closet was it?

A.    A closet -- it was just a regular closet with a door, dark. We just had to go in there and shut the door and stay there

Page 111

until she was ready for us to come out.

Q.    Was there a light on in the closet?

A.    No.

Q.    Did you pray on your knees or sit down or stand, or how did that work?

A.    Well, we were supposed to be on our knees, but sometimes you were in there so long you'd fall asleep.

Q.    Could you get out of the closet from the inside?

A.    I can't even remember because I don't remember trying to ever get out.

3160

Q.    Why would you not try to get out of the closet?

A.    Because we had to stay in there until she let us out.  We never questioned anything.

Q.    Were there consequences if you failed to follow your mother's instructions about something like the prayer closet?

A.    Well, we did get a few.  She got -- lost her temper sometimes, and she -- she had a belt.

Q.    A belt?

A.    Yeah.

Q.    That she used to discipline you?

A.    Yeah.  And she -- when she'd hit us with it, she'd leave red -- you know, like on the side of the belt, red lines.  They would go up -- you know, they would raise up.  You could feel it after she hit us, and Angie got -- she usually got hit the most, but we'd have red welts, round red welts.

Q.    Do you remember your mother ever using a paddle to discipline you?

A.    Yeah, she had a double-ended paddle.

Q.    What is a double-ended paddle?

Page 112

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2770 of 3592

A.   It was this long, green stick thing like this, and it had two round ends.  And she would hit us with this.  She would line us up because us kids, we kind of stuck together.  And if we didn't tell on each other, we all got a spanking, and she'd just line us up and keep going until she couldn't go anymore.

Q.   I wonder if you could explain that a little better,

3161

Mrs. Jacobson.

A.   She would keep hitting on us until she was too tired to hit on us anymore.

Q.   What about -- you said something to the effect you stuck together, wouldn't tell on each other?

A.   Right.

Q.   You mean you and your sisters and brother?

A.   Yeah.

Q.   Why wouldn't you tell on each other?

A.   Because we were scared because we knew what would happen to one.  Nobody wanted that to happen to the one.  You know, we all seen examples of what would happen if you did something that wasn't right, and not one of us wanted to see that happen, so we wouldn't tell.  We'd just not say anything at all.

Q.   And then you'd all get hit?

A.   (Witness nodded head.)

Q.   Was that better in some way?

A.   I don't know.

Q.   Did your mother ever hit you with her hands?

A.   Yeah.

Q.   What would she do?

A.   When she'd lose her temper, she hit me in my face, and I

Page 113

was in school, fifth grade.  I was wearing makeup to cover up the bruises.  My eyes would get swollen, and she just -- she had to cover it up.  Otherwise we'd get -- I'd get in trouble.  It's

3162

the only way I could go to school.

Q.   What did she hit you for?

A.   She was angry.

Q.   Angry about what?

A.   She'd just get angry, and she'd just -- whatever she was mad about would get lost because she was so mad, so frustrated, so -- I don't ever remember seeing her happy.  I don't -- she . . .

Q.   There were a couple other -- I'm sorry.  I didn't mean to interrupt you, but there were a couple other things, specific things, I wanted to ask you about.  We've heard some testimony regarding the smashing and burning of toys, and I wanted to know if you remember anything about that.

A.   My -- when we were living in the house in Mason City, my -- we didn't have much, but my dad had given us some toys, and we couldn't have anything because they became idols to God, so they took the toys, and they burned them in a metal barrel.  My dad had gotten us a little TV, black and white TV, and I remember seeing my grandfather take it with a hammer and bash it out, all the toys that my dad had given us because they were idols to God.

Q.   Was there a -- do you remember a burning that accompanied the smashing, or was it just the smashing?

A.   It was in the barrel, burning in the barrel.

Q.   They were smashed, put in --

Page 114

A.   Toys were all put in the barrel, metal barrel, and he set it on fire.

Q.   Was there a room in any of the houses that you grew up with a tire in the basement with blankets?

A.   Yeah.

Q.   What was that used for?

A.   When I was in Forest City --

Q.   How old were you then?

A.   I was in junior high.  And Florence was living there with us.  And she -- it was this demon deliverance.  She thought she had demons.  And she set up a tire in the basement in a room with a great big coffee can beside it and a baseball bat.  And she'd sit there in front of that baseball bat on her knees -- or tire on her knees, and she'd take the bat and just swing at the tire and keep batting it, and she'd go (unintelligible noise) and start spitting into the coffee can to get the demons out.  We were so scared.  We thought the demons were running around in the basement.

Q.   Were you still believing in demons when you were in junior high school?

A.   Yeah.  In fact, in our mind demons wouldn't hurt the young and innocent, and that's where we were supposed to go downstairs to take our showers.  We were so scared that the demons were down there, we'd send my little sister Holly down there first because we were too scared to go down there, but she was the

young and innocent, so we knew she wouldn't get hurt, but we

Page 115

watched to see if anything -- because we were so scared. And the people around the block petitioned, signed a petition, to get Florence off our block because they could hear pounding and making that horrible sound when she was getting demons out of her.

Q. So if Holly got down the stairs okay to where the shower was, then that meant it was safe for the rest of you?

A. Yeah.

Q. And this continued even into junior high school.

A. Yeah.

Q. Aside from the unusual religious practices that your mom and her mom were engaged in with you, how was your mom's mothering otherwise? How did she mother you the rest of the time?

A. She was not very supportive of me, and I always felt like I owed her for being here. It wasn't like a -- like the relationship I have with my daughter now, I wish I would have had that.

Q. Did your mother ever indicate to you that she didn't want you as a child?

A. She -- time and time again she said she wished she had given us to our father.

Q. Did you ever have a conversation with your mother where she indicated she might be willing to sacrifice you?

3165

A. Yeah. One time she read us that Bible story about the man that sacrifi -- had to sacrifice -- God told him to sacrifice his firstborn child, and she read it to me, and I said, Well, if God asked you to sacrifice me, would you do it? And she said yes.

Page 116

Q. As the oldest child in this household being run by your mother, did you have special responsibilities regarding your brother and sisters?

A. I always, always took -- watched them. I was always there. She just -- she was never there.

Q. When you say she was never there, I mean, do you mean physically or just kind of emotionally or both?

A. Both. She just wasn't there. I mean, it was like us four kids -- I don't know if you guys ever read the Boxcar Children, but I did, and that was my thing. If I could have found a box car, I would have tried to bring my brothers and sisters there.

Q. Where was your mother when she wasn't at home?

A. I don't know.

Q. I'm sorry? I didn't hear you.

A. When we were at the Dillos?

Q. No, I'm going to talk about the Dillos in a minute. But were there long periods of time where your mother physically wasn't at home when you were small children?

A. She just wasn't there. I don't know where she was. She just wasn't there.

3166

Q. Let's talk a little bit about the Dillos. And, of course, we've heard a little bit about the Dillos already. But how did you first learn that you were going to be moving to Kansas from Iowa?

A. We were living in Thornton, and I remember she started to show because she was pregnant.

Q. Did you know who the father of this child was?

A. Actually I didn't even know she was pregnant until she

Page 117

started to show, so I didn't find out until I started questioning her, because her belly started to get big, what was going on.

Q. How old were you at that time?

A. I was in fifth grade -- let's see, fourth -- the end of fourth grade. It was the summer of fifth grade.

Q. So you knew about pregnancies.

A. (Witness nodded head.) And then she told me that we were going to go to an orphanage and help start an orphanage out, and Holly was going to be the first one.

Q. The first one what?

A. The first child orphanage (sic) for this home.

Q. Your mother was going to give Holly to the orphanage.

A. Yes.

Q. How did you get out to Kansas?

A. She had a friend named Carol that took us in her -- I think it was a Datsun B210 or I can't remember, some Datsun car. And

3167

we drove all the way to Chanute, Kansas. And it was in the summertime out in the country.

Q. Can you tell us a little bit about what the Dillos' orphanage was like?

A. It was a big farmhouse, lots of people. I mean, there was my family. There was Ted and Bobbi Dillo. They had three daughters. They had three little Indian boys that were placed there in their care. And there was Neil and Bruce I believe it was. They all lived there. It was a farm-type establishment. And everybody lived in the house.

Q. Everybody lived in one house?

A. Until they built the hut.

Page 118

Q. What kind of a hut are you talking about?

A. They built a little hut outside. It was just no running water. It was like a little garage-type thing, just like a little empty building with a cement floor.

Q. What happened after the hut was built?

A. Well, then we lived in the hut. They put some beds in there and a couple dressers.

Q. And you think you were in fifth grade?

A. I started fifth grade that year.

Q. Started out in Chanute, Kansas.

A. Yes.

Q. When you arrived there and you were living with all these people in the big farmhouse, was your mother with you during the

3168

day time, with you and the children?

A. I don't know where she went. It was me and my brothers and sisters. We were there basically fending for ourselves. I kept a pretty good eye on them because she just was never there. She was at that -- she went to this little church. They had this church downtown where they were having these services and passing out tracks and trying to get donations in for this children's orphanage. So she was gone pretty much most of the time.

Q. And while your mother was gone at this church trying to raise money, what were you and your sisters and brother doing back at the Dillos' farm?

A. Well, we were expected to do as -- you know, do chores, do -- a lot of manual labor we did. And we -- it wasn't just manual labor.

Page 119

Q.    You would have been in the fifth grade.  What?  Maybe 11, 12 years old?

A.    (Witness nodded head.)

Q.    That sound about right?

A.    Yeah.

Q.    Well, how -- your brother Jimmy is how much younger than you are?

A.    Let's see.  He was born in '67.  About five years.  He's about 38 now.

Q.    So he's about six years younger than you are, isn't he?

3169

A.    Yeah.

Q.    What kind of manual labor would a five-year-old be doing on a farm?

A.    Well, we had to slop the pigs.  And they had buckets that were bigger -- those five -- I think they're like five-quart round bucket things that we'd have to slop the pigs, and we'd have to help harvest the chickens and the rabbits.  I remember they had one of the chick -- when we were doing the chickens, they cut off the head, and my little brother was right there, and the chicken started chasing my brother around with his head cut off.  And then we had to kill the rabbits.  And they took and put a nail in the beam, put the rabbit's head over the nail, and hit it on the head with a hammer till its eyes went popping out.

Q.    Who is it that you're talking about, Mrs. Jacobson?  Who did that?

A.    The Dillos.

Q.    Were you present for these things?

A.    Yeah.

Page 120

Q.   For a city boy, when you say harvest the chickens, did you say harvest the chickens?

A.   (Witness nodded head.)

Q.   What does that mean?

A.   When they had to kill them.

Q.   Kill them.

3170

A.   And cut off their heads.

Q.   Did you participate in that?

A.   Yeah.

Q.   What did you do?

A.   They cut off the heads, and the chicken, we'd have to take the chicken and put it in scalding water until the feathers -- for the feathers to get off, and then when the feathers were off, we had to pull them by their feet and take -- you know, start cutting them up and stuff.

Q.   Did you have some chores related to the rabbits?

A.   Yeah.

Q.   What did you have to do with the rabbits?

A.   That was when we were butchering the rabbits and they -- when we had to watch and help kill them, you know, and they hammered their head.  And then after the hammering of the head and they took the rabbit down, then we'd have to start skinning them and soaking them in salt water.

Q.   As you're relating these experiences now, it seems like they're troubling memories to you.

A.   Yeah, we never saw that before.

Q.   Did you say something to Mr. Dillo about not wanting to participate in those kind of activities?

Page 121

A.   We were expected -- the rules was we had to do as theirs did.

Q.   As the Dillo children did.

3171

A.   There's no exceptions.

Q.   Okay.  And did your sisters and brother all participate in the various chores that the Dillos had for them?

A.   Yeah, we all did it.  We slung mud and sticks and worked the garden.  It was a great big huge garden, slopped the pigs and milked the cow.

Q.   And these are experiences you hadn't had before.

A.   No, never had them before.

Q.   How did you like working at the Dillos?

A.   Was pretty -- pretty scary to see how they killed those animals.  And everybody was so hungry there, and like one of the scary things I saw when I was there, the pigs were so hungry, when we went to slop the pigs, the kittens were so hungry, when we went like this, the kittens tried to get the food that we were pouring in there, and the pigs ate them alive.

Q.   Ate the kittens?

A.   (Witness nodded head.)  Ate the -- yeah.

Q.   Were there some bad things that happened there to you personally?

A.   Yes.

Q.   Could you share that with the jury?

A.   Me and Jeanine and Shirley and Erlene were in the house.

Q.   Could you tell us who Jeanine and Erlene and --

A.   Jeanine and Shirley and Erlene are Ted's daughters.

Q.   How old were they?

Page 122

A.    They were teenagers.  They were older than me.  One day Jeanine and Shirley said, You have to take a nap with Dad.  I said, What?  I don't take naps anymore.  They said, We have to, and so do you.  And I said, I'm not taking a nap with him.  I'm too old for naps.  And they both went on each side of me and escorted me to his bedroom door and shut the door.

Q.    And did Shirley and Jeanine stay with you?

A.    No.

Q.    Who was there in the room then when they left you?

A.    Ted Dillo was laying on the bed.

Q.    And what is it that happened with Mr. Dillo?

A.    I was told to lay on the bed, and I laid away from him, facing away from him.  And he came up next to me, and he took his hands and started rubbing all over my body with his hands and pressing up against -- against me.  I could feel him up against me.  And he kept doing it until he had finished his -- till he had finished his arousal.

Q.    Did that happen more than once, ma'am?

A.    I don't remember.  I have so many holes, I can't tell you. I just remember this time.  But he did it to his daughters.

Q.    How do you know he did it to his daughters?

A.    Because they said they had to take naps with him too.  And Erlene and I were folding laundry one time, and I seen a pair of see-through underwears.  I never seen one before.  They were these pretty blue underwears, and I said to her, Whose are

these?  And she said they were hers.  And I said, Where'd you

Page 123

get those? She said her dad bought them for her.

Q. You've told us about your experience taking a nap with Mr. Dillo. Do you know whether or not any of your other sisters had that experience?

A. Yeah. Years -- you know, years later, Angie and I were talking about some of the Dillo stuff, and she was talking about -- we were just going over some of the things that we remembered. And she mentioned that he had sexually molested her. And I said, Me too. So we were talking to each other about that.

Q. Had you told Angie when you were there at the Dillos that Mr. Dillo had done this to you?

A. No.

Q. Did she say anything to you while you were there at the Dillos about having taken a nap with Mr. Dillo?

A. No.

Q. It was some time much later that you talked to each other about this.

A. Yeah.

Q. What about your mother? After the map -- the nap session with Mr. Dillo, did you say anything to your mother about what had happened?

A. She was never there. The only time I remember her knowing about any of the things that was going on there or caring is one

3174

time she happened to just arrive after I had jumped on Bobbi Dillo and knocked her on the floor. She used to make this display with the little Indian boys. The little Indian boys had ratty T-shirts. They had holes in them, but they were so nervous all the time that sometimes they would chew a new hole

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2782 of 3592

in their shirt.  And one time she lined them -- all three of them up, and she made all us kids watch, and she told Jeanine to go out and get the pig bottles.

Q.   What are the pig bottles?

A.   They were the bottles they used to nurse the baby pigs. And so Jeanine went out there and got them.  She filled them up, and Mrs. Dillo made the boys drink out of them because of the new holes in their shirts.

Q.   Because they had chewed holes in their shirts?

A.   (Witness nodded head.)

Q.   Your mother must have been -- at least at the evenings must have been there with you at the Dillos.

A.   I don't remember her being there hardly ever.  I remember when we got banned to the hut she was there, but she was never there when I needed her to be there.

Q.   Well, when you got back to the hut, did you ever say anything to her about what Ted Dillo had done?

A.   No.

Q.   Why didn't you tell her?

A.   Didn't know it was abnormal.  We were pretty naive.  There

3175

was --

Q.   How did -- go ahead.  I'm sorry.

A.   There was one time when we were there and -- Bobbi was mean --

THE COURT:  You know, actually there's not a pending question.

MR. BERRIGAN:  Yeah.

THE COURT:  You have to respond to his questions, not

Page 125

volunteer stuff on the narrative.

MR. BERRIGAN:  I apologize.  I thought she was finishing an answer, and this is something different, so let me address that.

BY MR. BERRIGAN:

Q.   Were there any other incidents at the Dillos that caused you some emotional pain and distress?

A.   Bobbi Dillo, one day she got off on this tangent, and she told the girls to bring the Indian boys and grabbed my brother, told him he was getting it too, and she was going to brush the kids' -- boys' teeth with the pig toothbrushes, and I told her, You're not brushing my brother's teeth with the toothbrush.  And she grabbed him, and I grabbed my brother back, and I said, Run to the hut, run to the hut.  Then I jumped on Bobbi Dillo and knocked her on the floor because she was going to brush my brother's teeth with a pig toothbrush.

Q.   How did you -- how did you come to leave the Dillos'

3176

orphanage?

A.   There was a big storm, and there was ice and branches everywhere.  And Mr. Dillo had us all outside wading through the mud picking up these branches, and it was cold, and we didn't have coats or anything, coats or boots to do it, but we did it. And Jean got mad and said something to Mr. Dillo, and he banned us from the house, and I don't know if she called from in there or how ever, but it was like just a few days after that Carol was there to pick us up --

Q.   Carol Mann.

A.   (Witness nodded head.) -- and bring us back.

Q.   And do you remember your sister Holly being born shortly

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2784 of 3592

thereafter?

A. Yeah, she was born in February.

Q. I want to change gears a little bit and talk about your experiences in school. How far did you eventually get in school?

A. I went -- I got up to the ninth grade.

Q. Ninth grade.

A. (Witness nodded head.) And then I --

Q. Then what happened?

A. I -- she needed somebody to work at the restaurant, and so I would work and go to school, and then I would get sick, and I'd fall behind in school, and I told her I was having a problem with that. So she said, Well, I need somebody to work at the

3177

restaurant, and I said, well, I was going to talk to my student counselor, and I talked to them about it. And she said, Well, you can stay in school or you can quit, but I can only afford to pay somebody at the restaurant $50 a week to work. She couldn't afford to pay anybody so . . .

Q. You're talking about Jean.

A. Jean needed me to work.

Q. So did you quit school?

A. Quit school to work.

Q. Up until the ninth grade, do you have any idea how many different schools you had attended?

A. I think it was about one every year.

Q. Did your mother participate in any of the school activities?

A. No.

Page 127

Q. Did people have parent-teacher conferences back in those days?

A. Years ago when I was in elementary school, my dad would go to the PTA things. I was so excited when there was a PTA meeting because the next day after he'd been there, I would always know because I'd lift up my desk and he'd have little surprises in there for me and little notes, and I was so excited. I'd come home from school and have those.

Q. What about your mom?

A. She never --

3178

Q. Never went to any of those.

A. No.

Q. What about was she more active with the school activities of your siblings? That is, did she go to things for Angela or Jamie or Jimmy?

A. No.

Q. No.

A. I think she might have went to Jamie's graduation.

Q. Jamie graduated.

A. Yeah, Jamie and Jimmy both graduated.

Q. So Jamie would have been the first one to graduate from high school.

A. Right.

Q. Out of all of you.

A. Right.

Q. And after you dropped out of school, I guess Angie, was she still in school when you dropped out?

A. I be -- I'm going -- I'm going to say I believe so.

Q. Well, you dropped out in ninth grade; right?

Page 128

A. Yeah.

Q. She was a couple years behind you.

A. Yeah.

Q. Do you remember her coming to work at the restaurant with you at some point?

A. We worked a lot. We used to work in the afternoons

3179

together.

Q. Doing what?

A. Cooking and waitressing at the restaurant.

Q. And which restaurant was this?

A. We worked at the -- she used to call it Lavern and Shirley's and the Leland Truck Stop.

Q. You worked at both of them.

A. Yeah.

Q. I want to ask you a few questions about your relationship with your father. After your parents divorced and you moved to Iowa and then these moves to Colorado and Kansas and so on, did you maintain a relationship with your father during those periods of time?

A. We didn't really know we could have a relationship with him until -- well, we didn't know we could call him. I had tried when I was younger, tried to write letters, but Jean took the letters, threw them away because she said I wasn't -- mixing up the story, so I never got to write to him. And it wasn't until I was in seventh grade and I asked her for something and she said, Call your dad. It was like, What? We didn't know we could call him.

Q. So after seventh grade did you kind of renew your

Page 129

relationship with your father?

A.    Yeah, but it was hard at first because we didn't know what a relationship with our father was because it was call him when

3180

you want something.  We didn't -- you know, she didn't advocate having, you know, a good relationship, and we didn't even know what one was.

Q.    But did that change at some point where you spent some time with your father up in Wisconsin?

A.    Yes, it did.

Q.    Did you, in fact, live with him for a while?

A.    Yes, I did.

Q.    For how long?

A.    Couple years.

Q.    And you left?

A.    Yeah.

Q.    Why did you do that?  Why did you leave your father after living with him for a couple years?

A.    Well, because Jean wanted me to come back.

Q.    Where was your sister Angie when you were living with your dad in Wisconsin?

A.    With Jean.

Q.    She stayed with your mother.

A.    Yeah.

Q.    Is the marriage you're currently in your first marriage, ma'am?

A.    Pardon me?

Q.    Are you in your first marriage?

A.    No, I'm in my -- this is my third marriage.

Page 130

Q.   How old were you when you first got married?

A.   I was 16 the first time I got married.

Q.   Sixteen?

A.   Yes.

Q.   And your sister Angela, do you know how old she was when she married Steve Hugo?

A.   Sixteen.

Q.   Sixteen.  Did you need to get any permission in order to do that?

A.   Yes.  She had -- let's see.  We had to get permission from Jean to get married, and for Angie it was different, the rules for her.  She had to get permission, but the judge made them go to some counseling, marital counseling thing.

Q.   You didn't have to do that.

A.   No, I didn't have to do that.

Q.   When you got married, did you move out of your mother's house?

A.   Yes, I did.

Q.   Have you ever lived with her since?

A.   I lived with her when I was pregnant with my daughter Brooke.

Q.   How old's your daughter now?

A.   She's 23.

Q.   Twenty-three.

A.   Going to be 23.

3182

Q.   I want to ask you just a couple of questions about some of

Page 131

the significant men in your sister's life if we could before we finish. Arlyn Johnson or A.J. Johnson, your sister's second husband, did you know Mr. Johnson?

A. Yep. He was quite the catch in Forest City.

Q. Why is that?

A. Just all the girls liked him because he had a nice truck and he looked -- was nice looking and real personable.

Q. Do you know how long your sister was married to Mr. Johnson?

A. I'm not sure how long it was, but I do recall one of the times that they did have an argument, and she come to the house, but I can't remember for sure how long it was.

Q. You don't remember the dates. That's all right. Let me ask you about a fella named Terry DeGeus. Did you know Terry DeGeus?

A. Yes, I did.

Q. How did you know him?

A. He was dating my sister.

Q. Was this after she and Mr. Johnson were divorced?

A. That would be correct.

Q. Okay.

A. Terry DeGeus and Angie were seeing each other, and it was along the time frame as -- I had already been divorced and was married to someone else. And she was dating Terry, and I would

3183

notice bruises on her here and there.

Q. Did you ever ask her about the bruises?

A. Yeah, but she wouldn't say anything, and then my second husband who's now deceased told me that Terry DeGeus had put his first wife in the hospital from beating her up and that he was

Page 132

probably hitting on Angie when I told him what -- they were dating.

Q. Did you ever confront your sister about that?

A. I did confront her about that, and she said -- first she said, He gets a little rough, and then pretty soon it just seemed to escalate. One time she came to visit me, and she was purple from head to toe. It was night out, and I said to her, What did he do to you? She said, Angie -- Angie said, Wendy, I don't want to talk about it. She goes, If you keep talking about it, I'm going to leave right now. So I just kind of backed off until she was ready to talk about it when we were at the house.

Q. So she didn't share a lot of this information with you.

A. No.

Q. Okay. Do you know how long she and Mr. DeGeus were together?

A. It was a while. And I remember one of the times we would go once in a while -- one time we went out.

Q. Let me interrupt you again. Was there some incident where you saw Mr. DeGeus actually hit your sister?

3184

A. Oh, there was -- well, I didn't see it. I heard it.

Q. You heard him hit her?

A. Yeah, I heard him -- we had stayed overnight there, and Terry got mad at her, and he started -- he had brought her hands -- he started holding her at the neck, started banging her against the headboard of the bed. I could hear it hitting the wall back and forth, back and forth, and then she ran out, and then we went up to -- Terry came out of the room. He was still

Page 133

there.  She left, and I heard the noise, so I had come out, and I told Terry, I said, What's going on?  And he said, Well, I hate -- he was mad at her, and he goes, I hate it.  I hate it when I do that to her.  And it's bad stuff.  I don't know if I should say it.

Q.  Well, what about Dustin Honken?  Did you know Mr. Honken?

A.  Yes, I did.

Q.  How did you know him?

A.  We met him at -- I believe it was Alyssa's birthday party.

Q.  What was he like?

A.  A preppy nerd, highly intelligent, totally out of character for Angie to date.

Q.  Why was he out of character for your sister to date?

A.  Because he didn't look like, you know, a Harley guy.  He didn't -- you know, he wasn't real racy and bold and wearing leather and, you know.  He was -- Dustin was way toned down, and we thought, wow.  You know, finally somebody that's, you

3185

know . . .

Q.  You thought that was a good thing.

A.  Yeah.

Q.  That she was involved with Dustin Honken.

A.  Yeah.  We were -- we were sadly disappointed.

Q.  I want to ask you a couple of questions about your nieces before we finish, specifically Alyssa and Marvea.  As Angie's older sister, have you had an opportunity to observe her relationship with her daughters?

A.  They're strong.  It doesn't matter.  She can be anywhere, and it's going to be strong.  And both of them, her and Alyssa and Marvea need that.  And I don't know -- it seems like the

Page 134

relationship is -- the bond has grown since they've been apart because they --

Q.   Since she's been in jail?

A.   Yeah, because they're actually talking more and getting into -- you know, it's not just hugging and holding.  I mean, they're having meaningful conversations because that's the only thing they can have right now.

Q.   You went through a lot of this, all these experiences you've related to us with the abuse at the hands of the Dillos and the problems with your mother and so on.  Have you committed any felonies?

A.   Not to my knowledge.

Q.   Okay.  Do you feel like you've been affected in any adverse

3186

way as a result of the experiences you've had as a child?

A.   I'm probably the most anti-religious person you'll ever meet.  I cannot -- I can't stomach it.

Q.   Well, has it caused you any problems in terms of your own emotional and psychological well being?

A.   Yeah.  It's really hard to get through talking about things that have happened without crying, and I carry a lot of guilt for some of the things.

Q.   How's your relationship been with your sister?

A.   We used to be really, really close.  It's gotten better now.  It's gotten a lot better now.

Q.   Have you been communicating with her while she's been in jail?

A.   Yeah, we're writing, talk on the phone when we can talk.

Q.   This decision about the punishment, is that something that

Page 135

would affect you?

A.   Yeah, it would.

Q.   Do you -- if she receives a sentence of imprisonment, would you continue to support, maintain contact with her?

A.   Oh, yes, yes, and I think at this point in time that's the only fair --

Q.   I'm not asking you to comment about the choice, though. Would you continue to maintain, keep close contact?

A.   Yes, I would.

MR. BERRIGAN:  Thank you.  That's all I have.

3187

THE COURT:  Mr. Williams, you may cross-examine.

MR. WILLIAMS:  No questions, Your Honor.

THE COURT:  You may step down.

Members of the jury, why don't you take a stretch break.

And are you ready to call your next witness, Mr. Berrigan?

MR. BERRIGAN:  Yes, we are, sir.

ARLYN JOHNSON, DEFENDANT'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated.  And try and adjust the chair and the microphones so you can speak directly into the microphones.  And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS:  Arlyn Dale Johnson, J-o-h-n-s-o-n.

THE COURT:  Thank you.

Mr. Berrigan?

MR. BERRIGAN:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Page 136

Q. Mr. Johnson, where do you live, sir?

A. I live in Forest City, Iowa.

Q. And what do you do for a living?

A. I am a shop supervisor for Waldorf College in Forest City.

Q. And what kind of a school is Waldorf College?

A. They're a private four-year Lutheran college.

3188

Q. How long have you worked there?

A. Three and a half years.

Q. What did you do before that?

A. I had several short-time jobs, but I worked for Winnebago Industries for approximately 18 years previous.

Q. What did you do for Winnebago?

A. I worked in the plastic and fiberglass tooling department, started off ten years on the floor and worked my way into supervising for eight years.

Q. Are you married or single, sir?

A. I am currently married.

Q. And to whom are you married?

A. Carey Johnson.

Q. How long have you been married to Carey Johnson?

A. It will be five years this week.

Q. Do you have any children, you and Mrs. Johnson?

A. No, we do not.

Q. Do you -- is this your first marriage?

A. No, it is not.

Q. How do you know this young lady over here with the glasses and white sweater?

A. Angela and I met back when we were young, and we were

Page 137

married, and we did have a child together.

Q. At that time where were you living when you met and married Angela Johnson?

3189

A. I was living a couple miles from Forest City.

Q. And when you say you were young, how young were you?

A. Twenty-three.

Q. Twenty-three. And was this your first marriage?

A. Yes.

Q. How did you and Angela meet?

A. Actually we met through her older sister Wendy.

Q. Wendy Jacobson?

A. That's correct.

Q. Did you go to school in Forest City?

A. Actually I went to school in Garner-Hayfield which is a community about 20 miles away.

Q. So you didn't know Angela when you were in school.

A. No, I did not.

Q. And then you met, and did you date for a while?

A. Yes, we dated through the summer months into the fall, and then she relocated.

Q. And about roughly when was this timewise?

A. I'd say it was in 1982.

Q. Where did Miss Johnson relocate to?

A. She relocated to Colorado. I'm not sure what town.

Q. How did you feel about that at the time?

A. We both missed each other tremendously, and we communicated via love letters.

Q. Did she come back from Colorado at some point?

Page 138

A.    Yes, she did.

Q.    Why did she come back?

A.    Well, upon being out there, she discovered that we were going to have a child, so we decided to have her together and be married.

Q.    How did you take the news that you were going to be a father?

A.    I was pretty excited about it.

Q.    Was this something that you were happy about or displeased about or what?

A.    Oh, I was very happy about it because I very -- cared for Angela very much.

Q.    Did you make any decisions regarding whether you'd get married?

A.    Yes.  I decided that I would like to do that, and I asked her, and she agreed, and we were married.

Q.    And when was that, sir?

A.    In early 1983.

Q.    Your child that you had with Angela after you were married, what's her name?

A.    Alyssa Dale.

Q.    And Alyssa, where does she live now?

A.    She currently lives in Forest City.

Q.    And how far from you?

A.    About four blocks.

3191

Q.    Are you pretty active in her life?

Page 139

A. I sure try to be.

Q. What does she do for a living?

A. Well, actually she's a full-time student at Waldorf College, and on top of that she's also a full-time mother, and right now she's taking the summer off.

Q. Okay. She has a baby.

A. That's correct.

Q. So that makes you a grandfather.

A. Yes, it does.

Q. How old are you, Mr. Johnson?

A. I'm 46.

Q. How old is your grandchild?

A. Two and a half.

Q. And what's her name?

A. Angeleah.

Q. Do you have other children besides Alyssa?

A. Yes, I have two other children from my second marriage.

Q. Let's talk a little bit about your marriage with Angela. After you got married and you were expecting this child, were you working at that time?

A. Yes, I was. I was -- had been employed at Winnebago Industries since I was 18.

Q. So this is during the 18 years you were at Winnebago Industries.

3192

A. That's correct.

Q. What about Angela? Was she working?

A. I kind of wanted her to be a stay-at-home mom and take care of the household and our daughter. She did try working at Winnebago for a few months. I'm not exactly sure how long that

Page 140

was.

Q. And was that after -- before or after Alyssa was born?

A. That was after.

Q. Afterwards, okay. After the birth of Alyssa, were you able to observe how Angela did with this new baby, how she managed with her new daughter Alyssa?

A. Yes. I feel she did a very good job of taking care of her daughter and also the household, and I was happy to be the only one working even though it meant at times we couldn't do everything we'd like to do.

Q. How was your marriage? What was the state of your relationship with your wife after your daughter was born?

A. I felt that we got along real well and we had a happy marriage.

Q. At some point during the course of your marriage with Angela, did that change?

A. Yes, it did change a little bit. We had some struggles.

Q. Before we talk about those, let me take you back for just a minute. You said you knew Wendy. You met Angela through Wendy Jacobson, Angela's older sister.

3193

A. That's correct.

Q. Did you know the other members of the Johnson family?

A. Of course, we'd go there to visit, and I did meet her mother and her other siblings.

Q. Did you notice anything unusual about the family, particularly Angela's mother, Pearl Jean?

A. The only thing I did notice, she was also a single mom, and she had five children to care for, and I felt that she did very

Page 141

good in taking care and providing for the family.

Q.    And in the time that you -- by the time you met Pearl Jean, how old was Angela?

A.    Eighteen.

Q.    Eighteen, okay.  Did Mrs. Johnson -- and by that I mean Pearl Jean Johnson -- did she solicit you to engage in any religious practices that she typically observed?

A.    No, she did not.

Q.    Had you had much interaction with Pearl Jean Johnson before you married her daughter Angela?

A.    Well, there was probably like five to six months there before they left to Colorado, and we frequently visited her mother.

Q.    And what was Angela's relationship with her mother like at that time?

A.    From when Ang and I were together and always there visiting, everything seemed fine.

3194

Q.    Seemed to have a normal mother-daughter relationship.

A.    Yes.

Q.    Okay.  Later on then, we're talking about your marriage, and you mentioned at some point there were some problems that developed in your marriage, and I wanted to ask you a little more specifically about that.  About how long had you been happily married before things started to turn unhappy?

A.    I'd say approximately two years.

Q.    And was there any event that you could point to that seemed to change things in your marriage, or was there a gradual decline?

A.    I'd say it was probably more of a just gradual decline.
Page 142

Q.   What is it that you noticed that was different from when you first married Angela and everything was going well?

A.   I believe that when we first started seeing each other we did a lot of things.  We were always out having fun.  And as we were married and had a child together and a house, life kind of changes a little bit and the person's responsibilities, so maybe a little bit of boredom might have set in.

Q.   How did you happen to notice that?

A.   I guess I would say probably just in our interaction between each other.  It just seemed like there was not the spark that was there that originally was.

Q.   Did you at some point determine that Angela was involved with another man?

3195

A.   Yes.

Q.   How did you learn that?

A.   From the dreaded rumor mill.

Q.   Okay.  Is this a fella that you knew?

A.   I knew who he was.

Q.   You knew his name.

A.   Right.

Q.   And did you know him personally, or did you know of him?

A.   I just knew who he was.  I did not know him personally.

Q.   Did you ever confront your wife about these rumors?

A.   At one point I had asked her, and I just went off from what she told me.

Q.   Which was what?

A.   She said that there was nothing there.

Q.   So she initially denied any involvement with this

Page 143

gentleman.

A.   That's correct.

Q.   And at some point despite her denial, did you believe she was involved, romantically involved, physically involved with some other gentleman?

A.   I did my best to stay away from those kind of thoughts trying to hang on as long as I possibly could hoping things would turn around for us.

Q.   And something happened that things couldn't turn around.

A.   That's correct.

3196

Q.   What is that?

A.   One night we had a disagreement, and Angela was trying to make a phone call, and I pulled the phone cord in two, and she went back to the bedroom, and things escalated, and I kind of cleared off a wall in the hallway that was full of pictures, and that was kind of the end.  She went and moved in with her mother at that point the next day.

Q.   She left you.

A.   Yes.

Q.   Okay.  Now, at that time about how long had you been married, Mr. Johnson?

A.   I'd say approximately two years.

Q.   Two years?  And you would have been around 25 years of age?

A.   That's correct.

Q.   And Angela was about a year younger than you?

A.   Actually five or six.

Q.   Okay.  You're right.  Sorry about that.  Had you ever noticed her to use drugs during the time that you knew her?

A.   When we were together?

Page 144

Q. Yeah.

A. Yes, I admit that we did like to party. We did smoke marijuana and drink liquor in moderation.

Q. Any drugs other than marijuana?

A. No.

Q. Did you feel that her use of marijuana in any way affected

3197

her ability to be a good mother to your daughter?

A. No, I do not.

Q. Did you or she -- were you ever in a situation that you felt either of you was abusing the drug? And by that I mean using it all the time.

A. No. I felt that we maintained a home together and we took care of our daughter together without any problems or issues.

Q. The use of marijuana, how often would that take place?

A. Probably especially on weekends.

Q. Okay. So that was kind of a weekend kind of a deal?

A. That's correct.

Q. And there was some drinking alcohol also?

A. Right, only on weekends.

Q. What about more serious drugs, you know, cocaine, heroin, methamphetamine? Did you use anything like that, you and your wife?

A. Nothing like that.

Q. Did you have any complaints at all about Angela's mothering of your child Alyssa?

A. No, I didn't. Even after we were divorced, I still had regular visitation, and Angela would invite me into her home. The home was always well kept. My daughter was always fed well.

Page 145

My daughter never complained of anything, and I felt Angie and I had a good relationship.

Q.    How long were you married before you got divorced?

3198

A.    Probably about two and a half years.

Q.    Okay.  So shortly after she left you and went back to her mother, you got a divorce.

A.    That's correct.

Q.    And how was that?  Was that amicable, or was it a bitter divorce, or how would you describe it?

A.    Well, probably in my own eyes I was pretty bitter about everything, but we actually just used one attorney and went through the process, and we were still able to communicate with each other in the best interests of our daughter.

Q.    You were bitter about it because you weren't wanting to be divorced.

A.    That's correct.

Q.    Okay.  So she was the petitioner, the person that filed for divorce?

A.    Actually we just used one attorney, so there was not really a petitioner.

Q.    After the divorce did you continue to have contact with Angela as a result of your visitation with your daughter?

A.    Most definitely.

Q.    Okay.  And were you also kind of abreast of the people that she was seeing, romantically seeing, after you got divorced?

A.    Yes.  We would communicate minimally about her boyfriends.

Q.    Did you ever know of a fella by the name of Terry DeGeus?

A.    Yes, I do.

Page 146

Q.    Had you known Mr. DeGeus before you married Angela?

A.    I had seen him around before at local bars and things, so I knew who he was, but I did not know him personally.

Q.    All right.  And then after you were divorced, did Angela at any time indicate that she was seeing Mr. DeGeus romantically?

A.    Yes, we visited briefly about that.

Q.    Did you ever spend any time, that is, you, spend any time with Angela and Mr. DeGeus at the same time?

A.    Very minimal if there was any.

Q.    Okay.  So did you have any relationship with Mr. DeGeus yourself?

A.    No, I did not.

Q.    Do you know how long Angela dated Mr. DeGeus?

A.    Not exactly.

Q.    Was it a rather lengthy period of time, or do you know?

A.    Things like that I don't really put -- document in my brain, but I don't think it was too long.

Q.    During the time that she was seeing Mr. DeGeus, did you happen to notice anything unusual about Angela's appearance that suggested there might be some abuse going on?

A.    Yes.  On several occasions I would notice big bruise marks on her arms, and there was a couple occasions where I did go to pick up my daughter and she'd be wearing sunglasses in the house, and I would pull them off to reveal a black eye.

Q.    And did you ask her, confront Angela, about what was going

3200

on?

Page 147

A.   I didn't really say a whole lot other than this isn't right.

Q.   Did she tell you how it is she was being injured, or did you just draw some assumption that she was being beaten?

A.   I just drew an assumption on that.

Q.   But you never actually questioned her about it.

A.   No.

Q.   Had anything like that gone on during the course of your marriage with Angela?  Were either of you physical with each other?

A.   No.

Q.   You said something about her wearing sunglasses in the house?

A.   That's correct.

Q.   Is that anything she had done when she was married to you?

A.   No, she did not.

Q.   I wanted to ask you, Mr. Johnson, did you -- well, first of all, were you concerned given that she had custody -- she did have custody of your daughter Alyssa at that point, did she not?

A.   That's correct.

Q.   And so did that cause you any concern that this woman to whom you had been married and had custody of your child appeared as if she was being physically abused?

A.   Of course, I did not care to see that, and I just hoped

3201

that it did not go over into my daughter.

Q.   Was there any indication that it ever did?

A.   No, there wasn't.

Q.   Did you take any action yourself, kind of any independent action, respecting your suspicions that Angela was being

Page 148

physically beaten?

A.   No.  I felt it was none of my business.

Q.   When Angela was with Mr. DeGeus, did you know whether there was any change in her use of illicit substances, drug usage?

A.   I can't say anything for sure.

Q.   Well, did she ever talk to you about it?

A.   She did mention something at one point, and my mind is pretty foggy on that because I was actually going through a second divorce, so I was, putting it mildly, more than stressed.

Q.   Did you have any suspicions that she was no longer merely smoking marijuana and drinking alcohol?

A.   Yes.

Q.   And what is it that aroused your suspicions?

A.   Probably just the extra talkativeness.

Q.   What do you mean by that?

A.   Like maybe there's some stimulation there by some other drug.

Q.   Had you had some familiarity with the effects of stimulants such as methamphetamine or cocaine?

A.   At that point, yes, I had.

3202

Q.   What did you know about it?

A.   Well, I knew it was a powder form and on ingestion it could keep you up and wide awake.

Q.   Did you at some point learn that your ex-wife Angela was actually involved with methamphetamine?

A.   Probably at that point.  There was one time I did stop in for a visit, and yes, I did learn that.

Q.   All right.  And what is it that you saw?

Page 149

A.    A white powder substance.

Q.    Where was it?

A.    It was within the home, but it was not laying like on the table or anything.

Q.    Okay.  Did you have any discussion with Miss Johnson about this white powdery substance that was in her house?

A.    No.

Q.    At that time that you saw that, do you know who she was involved with romantically?

A.    Yes.

Q.    Who was that?

A.    Terry DeGeus.

Q.    Do you know how it is that those two came to split up?

A.    No, I do not.

Q.    Did you ever meet a fella by the name of Dustin Honken?

A.    Yes, I did.

Q.    And how did you meet Mr. Honken?

3203

A.    Actually I went there to pick up our daughter, and Mr. Honken was there.

Q.    You mentioned several times being at Angela's house to pick up your daughter.  How often would you do that, Mr. Johnson?

A.    I would say -- when I went through my second divorce, there was issues between my second wife and our daughter Alyssa, so it was not on an every-other-week basis.  But I'd at least try to make it once a month.

Q.    All right.  And so on these occasions where you saw your daughter once a month, were you typically picking her up at Angela Johnson's house?

A.    That's correct.

Page 150

Q.   So you'd go inside?

A.   Yes, I would.

Q.   All right.  Mr. Honken, you said you saw him at Angela's house.  Did she introduce you to him?

A.   Yes, she did.

Q.   Okay.  How many times would you say you actually met Mr. Honken all together?

A.   There were several times that I would go to pick up Alyssa and he was there.

Q.   What were your impressions of him during the several times that you met him?

A.   I felt that he seemed like a great individual.  We had conversations about our children and vehicles.

3204

Q.   You thought he was a good choice for Angela?

A.   Yes, he seemed better.

Q.   Okay.  Than -- comparatively than Mr. DeGeus you mean.

A.   That's what I'm saying, yes.

Q.   I want to ask you a couple of questions about your daughter Alyssa.  She's 21 or 22 now?

A.   She's 21.

Q.   Twenty-one, okay.  And obviously it sounds like you've had a fairly close relationship with her through her whole life?

A.   Yes, we have.

Q.   And have there been periods of time where she's actually lived with you?

A.   There has been a couple occasions, yes.

Q.   All right.  And have you also been able to observe Alyssa's relationship with her mother over the course of the last 21

Page 151

years?

A. Of course.

Q. And what has that been like?

A. Both of them are very important to each other. They have always for the most part gotten along well. And they care for each other dearly.

Q. What's your observations of how often they communicate with each other?

A. In what time frame?

Q. Well, I guess -- that's a good question. What about

3205

recently, during the time that Angela's been incarcerated these last five years?

A. It's very important for Alyssa to talk to Angie as much as possible. I know we have mutual friends that Angie's able to call, and Alyssa likes to make a point to be there on those days. And she also writes letters and notes to her so . . .

Q. Who writes letters to whom?

A. Alyssa writes letters to her mother.

Q. Okay. Do you know if her mother writes to her?

A. I have -- when Alyssa lived with us here just a year and a half ago, I had seen letters.

Q. Okay. And what about telephone calls? Do they communicate by phone?

A. Yes, they do, a lot.

Q. If I could go back to Mr. DeGeus for just a second, during the time that Angela and he were involved with each other, did you ever become aware of whether she had a restraining order respecting Mr. DeGeus?

A. Yes, she had told me that.

Page 152

Q.   Were you ever -- did she or anybody else ever bring to your attention as to whether she kept any firearms out of concern for Mr. DeGeus or her safety from Mr. DeGeus?

A.   I was not aware of that, and nothing was ever said to me, but I did fear for Angie and her situation with Terry.

Q.   Did she ever express fear to you about her situation with

3206

Terry?

A.   Yes, she had.

Q.   Okay.  And what kind of things did she tell you?

A.   She told me she just didn't know which way to turn and how to handle Terry.  She didn't want to hurt him or anything.  She just wanted to be left alone.

Q.   What has your life -- what has your relationship been with your ex-wife here over the last five years?

A.   Actually we've visited very briefly on the phone.  There have been times when I've happened to be on the phone when she has called Alyssa.  But in all respect of allowing her to talk to Alyssa, I just talk very briefly.

Q.   So you let your daughter mostly talk to her mother.

A.   That's correct.

Q.   Okay.  Before Angie got locked up, what was your relationship like?

A.   Relationship with?

Q.   I'm sorry.  Your relationship with Miss Johnson.

A.   We have always gotten along well.  We've never had any marriage problems other than just getting over the initial divorce.  Like I say, we have a child together, and that was in both our best interests.

Page 153

Q. And have you been pleased with the way Angela has been a mother to your daughter?

A. Yes, I have. I feel that she has done the best job she

3207

possibly can raising her as a single-parent family.

Q. Is she still pretty active in Alyssa's life?

A. Yes.

Q. When Alyssa was back in school and you and -- Angie was out obviously and you were kind of going through your second divorce, would Angie keep you up to date on what was going on with Alyssa's life?

A. Oh, yes. She would try to keep me as involved as possible by letting me know school functions that were coming up. She'd also done some karate classes and kept me informed of that, encouraged me to attend them.

Q. So she tried to keep you involved with your daughter's life.

A. Most definitely.

MR. BERRIGAN: Okay. That's all. Thank you.

THE COURT: Mr. Williams?

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Johnson, explain if you would, who was the other man that ended up breaking up the marriage you had with Angela Johnson?

A. I don't know if I can blame just one person because we're all humans here, but Kirby Thompson.

Q. Okay. There was a period of time that you knew that she was romantically involved with Todd Graham as well.

Page 154

A.    That's correct.

Q.    Okay.  In 1993 when Angela Johnson was involved with murdering five people, can you explain to the jury what was your relationship like with her at that point in time?  This is July of 1993 and November of 1993.

A.    We've always just had good communication because of our daughter together, and nothing really changed at that point.

Q.    When you were married to her, you -- the way you've described it, you had a pretty normal marriage other than at some point she became involved with other men, but it sounded pretty normal to you.

A.    Yes.

Q.    If she had some difficulties in her childhood, it didn't seem to affect her ability to be a good wife to you?

A.    No.  That's one thing Angie and I, when we were together, we lived our lives for us and our family.  We didn't dwell on the past.  That's kind of my philosophy in everything to this day.  I don't dwell on the past.  That's why I have a hard time remembering some dates and times and things.

Q.    Sure.  Let's talk about the relationship that you and Angela Johnson had into 1995 after your divorce.  You've explained to the jury you maintained contact with her with regard to your child.

A.    That's correct.

Q.    Okay.  You had other relationships with her in addition to

the child, though, didn't you, sir?

Page 155

A.   As in?

Q.   As in didn't she provide you with methamphetamine from time to time as well?

A.   There might have possibly been on one or two occasions. Like I said, that's when I was going through my second divorce, and that's when it happened.

Q.   Sure.  And she would supply you with personal use quantities of methamphetamine from time to time in about 1995, roughly that time period.

A.   Right.

Q.   And you met Dustin Honken.  In fact, you and Angela Johnson and Dustin Honken smoked marijuana together.

A.   That's correct.

Q.   During the time period you've known Angela Johnson, you would describe her as having a pretty hot temper, wouldn't you?

A.   I guess you might say that she was a little excitable.

Q.   Well, you'd say she had a hot temper.  Isn't that fair to say?

A.   It all depends what a person has thrown at them, what their reactions are.

Q.   Sure.  Do you remember being interviewed back on February 20 -- I'm sorry, you were interviewed on February 14 of 1997 by a couple of DEA agents.

A.   Yes, I can remember that.

3210

Q.   And do you remember telling those agents at that time that Angela Johnson had a very hot temper?

A.   I probably did say that, but that was at a time I was trying to gain custody of my child, so I might have pushed things a little further than were actually true.

Page 156

Q.   Honken himself didn't have much of a temper, did he?

A.   Not that I ever saw.

Q.   In fact, what you saw was when Angela Johnson would have a temper and get upset, it was Dustin Honken who was in the position of getting her to calm down, wasn't it?

A.   He seemed to be one that would kind of calm her, yes.

Q.   What you observed of Dustin Honken was he was always nice to Angela Johnson and to your daughter, wasn't he?

A.   To the best of my knowledge, yes.

Q.   The best of your knowledge, Dustin Honken never laid a hand on Angela Johnson, did he?

A.   No, he did not.

Q.   Now, you knew about this temper because you observed it, but, in fact, Angela Johnson has also threatened you, hasn't she?

A.   I don't know if you call it a direct threat or anything, but there has been comments made, yes.

Q.   Comments made about harming you by Angela Johnson; isn't that right?

A.   I would say she was not real happy when I was trying to get

3211

custody of our daughter, and she actually called me many times saying that A.J., you have to tell her to come home; I need her home.  So Angie was very hurt not having her daughter with her at that time.

Q.   My question to you, sir, was that Angela Johnson threatened to harm you, didn't she, sir?

A.   Yes.

Q.   And she also told you about threatening to harm Honken's

Page 157

other girlfriend, didn't she?

A.   I guess I just wrote that off as just a common thing between two women after the same guy.

Q.   My question to you, sir, was did not Angela Johnson tell you that she threatened to harm Dustin Honken's other girlfriend?

A.   Yes.

MR. WILLIAMS:  I have nothing else.

REDIRECT EXAMINATION

BY MR. BERRIGAN:

Q.   Mr. Johnson, during this period where you were going through your second divorce, roughly what time frame would that have been?

A.   That would have been about '95 to 6.  It was over a two-year divorce, so it got kind of long.

Q.   And that divorce, was that amicable or contentious, or how would you describe that?

3212

A.   Could you restate that, please?

Q.   Was that a friendly divorce, or was it one that was contentious involving a lot of bitterness and argument, or how would you describe it?

A.   That one wasn't a friendly one.

Q.   Okay.  And that drug on for some time.

A.   Yes, it did.

Q.   And you -- during that period of time, were you having your own kind of difficulties, emotional difficulties?

A.   Yes, I did end up having a nervous breakdown and was hospitalized for that.

Q.   And you got a diagnosis?

Page 158

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2816 of 3592

A.   Yes.  I -- after a couple years, I was diagnosed with bipolar disorder, and then another year and a half, two years of different medications before I got things straightened out and on track.

Q.   And just kind of in lay terms, what is bipolar disorder?

A.   It's a disease that you have extreme highs and extreme lows.  You can be depressed and down, and then a lot of times I was to the other extreme of being way overactive, way hyper, almost being out of control you might say.  I'm not real proud of those years of my life.

Q.   And methamphetamine, did that help you at times when you were down, on the downside of the bipolar swing?

A.   The methamphetamine was very minimal usage, just on

3213

occasion, but yes, it would kind of bring me up.

Q.   During this period of time also, would you -- you had some ongoing dispute with Angela about custody of your daughter Alyssa.

A.   That's correct.

Q.   And there would be arguments about that.

A.   Yes, we did have arguments about that.

Q.   And did that work both ways, that you'd be yelling at her as well?

A.   Yes.

Q.   You seem like a pretty calm, kind of cool, collected guy, but are there times when you can get angry, raise your voice?

A.   Well, of course.  I think most anybody can.

Q.   Have you had occasions where in the fit of anger you might have said something you didn't mean or you regretted later?

Page 159

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2817 of 3592

A. Yes, I have.

MR. BERRIGAN: Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: Nothing, Your Honor.

THE COURT: You may step down.

Everybody can take a stretch break.

And are you ready to call your next witness?

MR. BERRIGAN: We are, sir.

THE COURT: Who would that be?

MR. BERRIGAN: Eva Dawn Hanawalt. It might take just

3214

a minute. This lady's in custody.

THE COURT: Okay. Thank you.

EVA HANAWALT, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And you can adjust the chair and kind of scoot it up so you can speak directly into the microphones. You can pull the microphones a little bit closer. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Eva Dawn Hanawalt, H-a-n-a-w-a-l-t.

THE COURT: Thank you.

Mr. Berrigan?

MR. BERRIGAN: May it please the Court.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q. I know it's impolite, ma'am. Can I ask your age?

A. Thirty-eight.

Q. Thirty-eight. And you're obviously in custody.

A. Yes.

Q. Where are you physically in custody?

Page 160

A. Greenville, Illinois.

Q. And what are you in custody for in Greenville, Illinois?

A. Aiding and abetting the manufacture of meth.

Q. Can we talk about that just for a second as to your status? When were you sentenced for the aiding and abetting in the manufacturing of methamphetamine?

3215

A. February of 2002.

Q. And you're serving a sentence?

A. Yes.

Q. How long?

A. I started out with an 8-year sentence, and I got a downward for -- of 25 percent, and now I got 6 years.

Q. And what's your present release date if you have one?

A. It was in November, but because I'm here, I've been pulled out of the drug program, and I can only miss 30 days, and that 30 days will be up on the 9th, so it will be in -- probably beginning of January now.

Q. I'm going to come back and talk about that a little later. So it looks like you might not get out until January of next year.

A. Right.

Q. Do you know Angela Jane Johnson?

A. Yes.

Q. How do you know her?

A. I was in Linn County with her in the cellblock with her.

Q. When was that that you met Miss Johnson?

A. June 2002.

Q. And when you went to the jail, was she already there?

Page 161

A.    Yes.

Q.    Okay.  Let me ask you a couple questions about that.  This is the Linn County Jail in Cedar Rapids, Iowa?

3216

A.    Yes.

Q.    Was the arrest that caused you to be in jail the same case that you're doing time for now?

A.    Yes.

Q.    Had you ever been in that jail before?

A.    No.

Q.    Tell us a little bit about what that was like going into the Linn County Jail back in 2002.

A.    Well, when I first got there, I was scared because I was facing federal charges.  I'd never been in that much trouble before.  I been in little county jails where I'm from.  And my brother had done time in Linn County, and he told me it was a rough place, so I was pretty scared.

       When I got there, the lady that was booking me in, I told her that I was just a little farm girl from a little town and not to put me in a cell with any mean people.

Q.    What town are you from?

A.    New Hampton, Iowa.

Q.    Okay.  Where's New Hampton?

A.    It's like 35 miles from -- by Mason City.

Q.    Okay.  So you told the lady that was booking you in that you had some concerns about being there at the jail?

A.    Uh-huh, yes.

Q.    What did you tell her?

A.    I told her not to throw me in a cell with a bunch of mean

Page 162

people.

Q.   Okay.  Why did you tell her that?

A.   Because I didn't want to be in a cell with mean people.

Q.   Okay.

A.   I was scared.

Q.   You were scared.

A.   Yeah.

Q.   Yeah.  You were there for this drug charge, but you knew there were people there for different types of charges.

A.   Yes.

Q.   And some charges might involve crimes of violence.

A.   Yes.

Q.   Did you have some concern about your own safety when you went into the Linn County Jail?

A.   No, not really.

Q.   Not even initially when you talked to the guards --

A.   You just don't know what kind of people you're going to run into.  I'm from a small town.  Cedar Rapids is huge compared to where I'm from.

Q.   And that's a pretty big jail there, isn't it?

A.   Yes, yes.

Q.   What did the -- was this a guard that booked you into the jail?

A.   Yes.

Q.   What did they tell you in response to your request?

3218

A.   Vicki told me there was only one cell open and there was

Page 163

two murderers in there.

Q.   Vicki was the guard?

A.   Vicki was the guard.  I don't remember what her last name was.

Q.   Kosina, does that ring a bell?

A.   Yeah, that sounds right.

Q.   So this guard Vicki told you you were going to be in a cell with some murderers?

A.   Two murderers.  That was the only cellblock that was open.

Q.   And what cellblock did that turn out to be?

A.   That was N.

Q.   M?

A.   N.

Q.   N as in Nancy.

A.   Yeah.

Q.   All right.  And then when you got into that N cellblock --

A.   Well, when we got up there, there was two doors leading into the cell, lockdown cell.  It's usually a cell for when people get into fights and stuff.  That's the punishment cell. That's what they put the men in anyway, but before we got in there, there was four girls in the cell, and she pointed to two of the girls and told me to stick by them and I'd be okay.  And then she pointed to Angie and told me to stay away from her and I'd be okay and that Angie was the meanest.

3219

Q.   So that's what this guard Vicki Kosina told you.

A.   Yes, yes.

Q.   And were these people in the cell, were they being punished, the four girls that were already in there?

A.   No, no, I think it was full at the time.
Page 164

Q. The jail was full.

A. Uh-huh.

Q. So they were using this space to house people.

A. Yes.

Q. Was this cell, the N cellblock, was it different than the other cellblocks? Do you know?

A. Yes.

Q. And you've learned that I suppose at some point.

A. Yes.

Q. But at the time you first went there, had you been in any of the other cellblocks at the jail?

A. No, no.

Q. What did you learn was different about the N cellblock as compared to the others?

A. Well, in N it takes two doors to get inside the cellblock, and it's just a small area with a TV and a steel picnic table in it. Then you have five cells that are lockdown cells. And when you're in those lockdown cells, you have to come out early in the morning, and all you can bring out is your towel, and it's just a cold cement floor that you'd sleep on, and you're locked

3220

out pretty much all day long. You get an hour at lunchtime you can go in and get your bed, and that's not like that in the other cells. You get your bed all day long. There's not even doors on the cellblocks.

Q. So in the other cellblocks you can come in and go out of your cell all day.

A. All day.

Q. And in this cellblock you couldn't do that.

Page 165

A.    No.

Q.    And that's -- why would you want to go in your cell anyway?

A.    Bed.

Q.    Okay.

A.    Because it's better than sitting on a hard floor or a steel picnic table all day.  You know, you just get bored.  You want to sleep your time away.

Q.    And in terms of items that you could keep in your cell, were you permitted to keep some personal items in there?

A.    Your shampoo and stuff and a couple books and paper to write.

Q.    Okay.  So in this particular cell, the N cell, you'd have to come out early in the morning.

A.    Yes.

Q.    And you'd be out all day.

A.    Yes.

Q.    And did you say you could bring sheets?

3221

A.    You could bring your towel, and you could bring your shampoo and stuff, you know, because the shower was on the outside of our cells, and you could bring your writing paper and your books.

Q.    And that was it.

A.    That's it.

Q.    What would you bring a towel for?

A.    To lay on the floor, keep warm, for your shower.

Q.    Is it cold inside these cells?

A.    It's very cold.

Q.    They have air conditioning apparently.

A.    Yes.

Page 166

Q.    Were you dressed much as you are right now?

A.    Yes.

Q.    Just a regular jail uniform.

A.    Yes.

Q.    When you first went into this N cell, did you do as the guard had suggested you do, Miss Kosina, that you hung around the two girls she told you to and stay away from Angela Johnson?

A.    I never even spoke to the two girls that she told me to keep close to because they were the meanest ones in the cell. They were -- they never went out of their way to ask me my name or to be friendly or nothing so --

Q.    Two girls that the guard had recommended you see --

A.    Yes.

3222

Q.    -- turned out not to be so friendly.

A.    No, they weren't friendly at all.

Q.    Okay.  And what was your experience with Miss Johnson?

A.    Angie's the one and only one in the cell when I first got in there that made me feel comfortable.  She told me if I needed to use shampoo, cream rinse, or anything I was welcome to it because you don't have commissary when you first get there.  And she was friendly to me.  She asked me my name and stuff, and she made me feel like it was going to be okay.

Q.    Had you known Angela Johnson before you met her in the jail?

A.    No, I didn't.

Q.    You never met her outside at all.

A.    No.

Q.    When you say you couldn't get commissary when you first got

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2825 of 3592

there, for people who haven't been in the jail before, what does that mean?

A.   Well, you only order -- in Linn County -- in every county it's different.  In Linn County you order commissary twice a week, and when I came in there, it was going to be a couple more days before you could order commissary, but you gotta have family send in money to your books.  So it takes a little while before you can get money on your books and before you finally can order commissary.

Q.   And the commissary would involve what?  What is the

3223

commissary?

A.   Your personal hygienes, your shampoo, your cream rinse, your deodorant, candy, brushes.

Q.   Toothbrush, toothpaste?

A.   Everything, everything.

Q.   So if you can't get commissary right away, if you can't get those kind of things, what do you have to do?

A.   You're going to be stinking for a couple days.

Q.   Until somebody gets money on your books, some family member?

A.   Yes.

Q.   And that is that they put money on an account at the jail.

A.   Yes.

Q.   And until that happens, you can't really buy anything.

A.   The jail will give you like generic soap and stuff, but they don't give you deodorant or anything like that, so you're pretty much going without anything unless there's somebody nice like Angie in the cell that will help you out.

Q.   And did you ask her to borrow her commissary or borrow

Page 168

these items?

A.   I never asked her for anything.  She come forward with it. She offered me.

Q.   Did she ask you for anything in return?

A.   Nothing.

Q.   Didn't ask you for money or to pay her back when you got

3224

commissary, nothing?

A.   No, no, no.

Q.   After that happened, that is, she offered you the use of her personal hygiene items, did you take her up on that?

A.   Yes, I did.

Q.   And then what happened after that in terms of your relationship with Miss Johnson?

A.   We just hit it off right away, we were just -- we became friends.  She was -- like I said, I was scared when I went in there, and I was facing a lot of time at the time.  You don't know what you're getting when you get in there, and it was hard for me because I felt like I'd abandoned my kids and stuff, and so I felt like my road had come to an end.  And I was real depressed, but she brought me out of that.  She was just a blessing, you know.  God put her in my path, and I'll never forget her for it.

Q.   You had children or you have children yourself; right?

A.   Yes.

Q.   How many children do you have?

A.   Three.

Q.   And could you tell us how old they are?

A.   My daughter's 20, and my son is 18, and my youngest son

Page 169

will be 16 in July.

Q.   And, of course, back at this time they were a few years younger.

3225

A.   Yes.

Q.   And you were depressed did you say?

A.   Yes.

Q.   About getting into the jail?  Had the children been living with you?

A.   Yes.

Q.   Did you learn whether or not Miss Johnson had children?

A.   Yes, right away.  She just adored her children and talked about them all the time, and she showed me pictures of them.

Q.   Now, how many other women were in there other than the two of you in this cell?

A.   Well, those two that weren't very friendly, they were only in there probably a week, and then Vicki moved them to M block. Those two girls were Vicki's little pets, and she moved them to M block.  But I was only in there a week, and then I got out on pretrial release, so I was gone for close to a month.  And then when I came back, I went in the same cellblock, and then it was just Brandy and Angie and a girl named Mickie Yager and me.

Q.   So you were out of the jail briefly on pretrial release did you say?

A.   Yes.

Q.   For about a month.

A.   Yes.

Q.   And then you came back.

A.   Yes.

Page 170

Q.   And at that point the four of you, you and Mickie Yager, Angela Johnson, and yourself, are in this N block, Nancy block, together.

A.   Yes, and Brandy Byrd.

Q.   How long did you stay in the N block with Angela?

A.   Four months, four and a half months, somewhere around there.

Q.   I wonder if we could talk just a little bit about the Linn County Jail and what that was like.  First of all, when you were talking about this lady Vicki, this guard, is it me or do I detect a hint of animosity towards her?

A.   Yes.

Q.   Did you get along well with this guard?

A.   No, I didn't.

Q.   What was the problem?

A.   Vicki was very rude.  She wasn't very professional, and she just treated you a whole lot different when you were in the cellblock with Angie.  She hated Angie, and she made it obvious.

Q.   Well, how did you know that she hated Angela?

A.   You could just tell by the way she talked to Angie, by the way she treated anybody that was in the cellblock with her.

Q.   Including you.

A.   Including me.

Q.   What kind of things did she do towards you that you felt you were not being treated appropriately?

3227

A.   You'd be asking her questions.  She'd shut the door right

Page 171

in your face before you were even done asking the question. And like one time when we were going -- you know, we're supposed to be able to go to rec. like twice a week. And Vicki, if she had two people to book in, she would just forget about our cellblock. You know, she just -- a lot of times we didn't go to rec., and she'd get mad when we'd ask her, Would you take us to rec.? And she would just snap at us, I got people to book in. Well, that's not our fault, and we just took a lot of crap from her while we were in there.

When we were coming out of the cell, she was taking us to rec. one night, and we were coming out of the cell. It was me and Brandy and Angie. And she just snapped at Angie and said, Cross your arms, Johnson, real snotty, and so Angie crossed her arms, kind of with an attitude. And Vicki said -- told her that you have an attitude problem, you know; you ever think about taking anger management? And Angie told her, Well, it looks like you got a seam problem. And Vicki said, What? She said, It looks like the seam of your pants ain't going to be holding you much longer.

And Vicki said, What? And Angie said it again, and Vicki got real mad and started shaking and told Angie, you know, I don't have to take this crap from you. She said other words. She was swearing. And Angie said, What are you going to do? You going to throw me in the hole? That's a vacation for me

3228

because I get a mat. It's a vacation. I get a mat and a blanket, so go ahead and throw me in the hole.

And Vicki was shaking, and Angie asked her, Why are you shaking, Vicki? And she said, Is it because you need a drink, you know, because it was -- I think Vicki had a drinking

Page 172

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2830 of 3592

problem. And Vicki just, I'm not shaking because I'm scared. I'm shaking because I'm mad.

Okay. Well, then we got up to the library or up to the rec., and she just slammed the door, and we thought that was the end of it. We started playing ping pong, and then ten minutes later here comes Vicki with about five guards, you know. She acted like -- she always made it look like Angie was going to go with a fight or something like that, but Angie never did. And Angie just turned around and said, See you later, and she left with Vicki and the guards.

And then Vicki left me and Brandy up there for a long time, at least two hours. And lockdown is at ten o'clock, and we got back like ten minutes to ten. We'd left the cell at eight o'clock. And when we got back, you know, we just thought Vicki was being mean to us leaving us in the library. And when we got back, our cell was tossed -- tore up, everything was tore up, everything. And Brandy asked her, What'd you do that for, Vicki? And Vicki said, Because I won't have you guys talk to me like she does, and Brandy told her, We don't talk to you at all, you know, so . . .

3229

Q.   So this is a guard that Angie had some problems with and you and the other ladies in that block had some problems with.
A.   Yes. Well, Vicki didn't tell the truth about things. Then the next day -- because it was 24-hour cooldown is what they called it. So the next day after her 24 hours were up, they brought Angie back to the cell. So me and Angie and Brandy wrote -- they call them kites to the jail administrator -- I believe his name was Mr. Jackson -- and told him, you know, that

Page 173

Vicki isn't very professional and she went out of her way to pick on Angie and Angie just kind of talked back, give it back to her what she was dishing out. And we told her that and told the administrator that she was swearing at us and stuff and that she just tossed up our cell for no reason and stuff, and then we just sent the kites in.

And it was like two days later Vicki came in, and she told me pack my stuff; I'm moving. And I told her, I don't want to move. And she said, Pack your stuff; you're moving. And I was asking a bunch of questions, Why? Where am I going? She just said, I told you pack your stuff. So I packed my stuff, and she moved me down to another lockout cell that used to be a man's lockout cell, but I think the jail must have emptied out a little bit so they had a little space.

Q. So you got moved out of the N block.

A. Yes, and that was K block. And then so the only way I could see Angie is going to Bible study or church, or there was

3230

a drug group rehabilitation class called ASAC we'd go to. And when that time come to go to church, Vicki said I couldn't go, that me and Angie had to alternate, and I said, Why? Because they usually just take all the cells, the girls to the class together. And she said because there was separatees on us.

Q. A separatees is what? What is a separatees?

A. It's so that I can't have no contact with Angie. I can't talk to her. I can't -- can't have no contact with her whatsoever.

Q. So Vicki --

A. It's like if you don't get along with somebody, they put a separatees, or if you're testifying against somebody, they put a

Page 174

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2832 of 3592

separatees on you.

Q.    It's a security measure.

A.    Yes.

Q.    To keep people that might have some adverse interest from coming into conflict with each other?

A.    Yes.

Q.    Had you asked Miss Kosina for a separatee so you could be kept away from Miss Johnson?

A.    No, no.

Q.    No.

A.    And when I was questioning her about it, she slammed the door in my face, and I was still talking to her, and she just slammed it and wouldn't answer me.  So I even called my lawyer

3231

and told my lawyer what had happened and asked him questions about it, you know, and he said he didn't understand and he was going to check into it because I told him, I'm sure Angie don't hate me and I don't hate Angie; we get along fine; why is there the separatees between us?  I didn't put it on her, and she didn't put it on me, so I didn't understand it.

Q.    Is that something somebody usually asks for?

A.    Yes, yes.

Q.    That if you're testifying against somebody you might ask for a separatees regarding that person so you're not going to be inadvertently thrown into a cellblock with them.

A.    Yes.  I'm not sure how it works, but I think -- yes, I think when a person is testifying against somebody they are supposed to automatically do it for security reasons.

Q.    I see.  And Miss Kosina instituted this herself.

Page 175

A.    Yes.  It was like four months later.  Angie had decided to ask the night guard Linda.  She worked third shift mostly, had asked her to check on the computer to see who put the separatees on us and why it was there.  And Linda checked and went back and told Angie, There never was a separatees between you two, so then we could start going to church again and seeing each other.

Q.    After that.

A.    Yes.

Q.    And you brought this up as just kind of an example of how you were having some problems with Miss Kosina.

3232

A.    Yes.

Q.    Okay.  I wanted to ask you a couple of things you mentioned in passing.  One is that -- well, your case involved aiding and abetting in the manufacture of methamphetamine; right?

A.    Yes.

Q.    Did you eventually plead guilty or get convicted of that charge?

A.    Yes.

Q.    Which was it?  Did you plead guilty or go to trial?

A.    I pleaded guilty.

Q.    And your original sentence was eight years did you say?

A.    Yes.

Q.    All right.  And that's -- you got a reduction later on?

A.    Yes.

Q.    And what was the reduction for?

A.    I testified against my codefendant's brother.

Q.    Your codefendant's brother?

A.    Yes.

Q.    Was he any relation to you?

Page 176

A. No.

Q. Your codefendant in that case, was he any relation to you?

A. That was my boyfriend at the time.

Q. So this was your brother's boyfriend?

A. My boyfriend's brother.

Q. I'm sorry, your boyfriend's brother.

3233

A. Yes.

Q. And so you got a two-year reduction as a result of that.

A. Yes.

Q. I wanted to ask you a little bit about methamphetamine just briefly if I could. You said you went to this drug rehab class while you were at the jail.

A. Yes.

Q. Did you have a problem with methamphetamine?

A. Yes. I think, you know, anybody that starts doing meth from the very beginning you might as well just sell your soul to the devil because you're just -- it's a one-way ticket to hell, and the only way of coming back through it is either incarceration or death. It's the devil's drug.

Q. What do you mean by that?

A. It's so powerful. It's so addicting. You know, there was -- I didn't want to be addicted to it. I didn't want it to control my life like it did. You know, many times I prayed to God to help me with it, but I couldn't. And the only way I would have ever been able to get off it is being separated from it, incarceration and not just -- I mean, I tried treatment a couple times, but 14 days ain't gonna cut it. You need that stuff out of your system for a long time. It's been four years

Page 177

since I've done it, and I still have dreams about it.  It takes over your mind, your choices, your responsibilities, your priorities.  Everything changes.

3234

Q.   Did it cause you any difficulties, Miss Hanawalt, in terms of your relationship with your children?
A.   All kinds of problems with them.  Me and my children have a close -- we're bonded close, but I wasn't the mother that they deserved because of it.
Q.   In what way?
A.   Well, I put them aside all the time.  I'd be running for the drug all the time.  A lot of basketball games and stuff I missed.  I just wasn't there.  I'd give them money to get them out of my hair so I could get high.
Q.   And since you've stopped -- since you've been incarcerated, you had to stop using methamphetamine obviously; right?
A.   Yes.
Q.   You didn't quit voluntarily.
A.   No.
Q.   And have you been in drug treatment since your incarceration began?
A.   Yes, I did the 40-hour drug program treatment so far, and then I did the nonresidential treatment, and now I'm in the 800-hour drug program.
Q.   There's an 800-hour drug treatment program at the federal penitentiary or the federal correctional center where you are.
A.   It's at the prison where I'm at.
Q.   It's a prison.
A.   Yes.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2836 of 3592

Q. Yeah. And you're a participant in that 800-hour program.

A. Right now, yes.

Q. So when you were back in jail back in Linn County, in addition to going to the drug rehab class, you said something about you were going to Bible study or some kind of religious class?

A. Yes.

Q. Were you involved with -- pretty heavily active in religion before you went to the Linn County Jail?

A. You know, I just was going to sit in my cell and mope and sleep as much as I could, but Angie's the one that talked me into going to church and the Bible study, and that's what got me started going.

Q. Is that anything that you've continued with?

A. Yes, yes.

Q. When Angie asked you to go, did you have any reservations about it, participating?

A. It took her a couple times at first to get me to go. Then I was glad that I went.

Q. I really was asking that. Is it more than a social thing where you get to go someplace other than your cell for a few minutes, or did you really get something out of it?

A. That's how she kind of talked me into getting -- going in the first place. It's just like you get out of the cell for a little while, and that's finally how she talked me into going.

3236

Okay, I'll go and check it out. After that I went all the time

faithfully.

Q.   And Miss Johnson, did she participate in that with you?

A.   Yes.

Q.   During the time at least you were in the cellblock with Angela in the N cell, did she have any physical altercations with anybody there?

A.   Not while I was in there.

Q.   Okay.  And I wanted to ask you a little bit about that. You've been in jail longer now obviously than when you first showed up in Linn County.

A.   Yes.

Q.   But do they have -- sometimes even in women's jails, do women get into fights with each other?

A.   Oh, yes.

Q.   And what's the problem?  That is, what is it that typically causes these kind of altercations?

A.   Well, a lot of times, especially when you're sitting in there for a long time in county jail, seniority does rule. You've been in there for a long time.  You know, that's -- it pretty much becomes your home.  It's your way of life, your everyday routine.  And all of a sudden they'll throw some person in that's -- a lot of heroin people, a lot -- that were addicted to heroin, a lot of them were tossed into our cell.  But they come in off the street, attitudes where they want to be loud,

3237

obnoxious.  They want to grab the remote control, run the TV. They don't want to help clean the cells.  And, you know, you take so much, and then there's usually an altercation sooner or later down the road.

Q.   And these folks that are coming in that are on heroin, are

Page 180

they put somewhere kind of isolated from the rest of the community for a period of time?

A.    By rights they should be because when they're coming down off of heroin it's a sad scene.  It's painful for them I guess, and they cry, and they scream, and they shake, and it's awful to see.

Q.    So they sometimes have problems with the other inmates.

A.    Yes.

Q.    Okay.

A.    Because they just have screaming fits, and they lash out at you.

Q.    You and Miss Johnson and the other folks that spent some time in there -- I think you said Brandy Byrd.  Sue Marsolek, was she in there, N block?

A.    I didn't meet Sue Marsolek until I got to Greenville.

Q.    The people that were there a long time, how did you get along with each other?

A.    Got along good.  It was usually just the new people that came in.

Q.    That had problems.

3238

A.    Yes.

Q.    Some of these folks, are they pretty young, some of these women?

A.    Yes, all different kinds of ages, all different kinds of women.

Q.    I wanted to ask you your observations about Miss Johnson and her relationship with a lady by the name of Brandy Byrd.  Do you know -- you said you knew Brandy Byrd.

Page 181

A. Yes, Brandy was in the cell with us.

Q. And she was there for murder, wasn't she?

A. Yes.

Q. Do you know whether or not Miss Byrd had been in the cellblock before?

A. She was there when I got there.

Q. She was already there?

A. Yes.

Q. She's an African American young lady?

A. Yes.

Q. Was there anything particular or peculiar about the relationship between Brandy Byrd and Angela Johnson?

A. Angie took Brandy under her wing, you know. Brandy is -- it's hard to explain her. She's like a little person in a big person's body. I think she's very abused when she was a child. It shows in some people, and I don't think she's ever had anybody really mother her or treat her with any kind of

3239

kindness, and Angie did that. And when Brandy was getting ready to leave after she'd been sentenced, that was one of the hardest things for her to do is leave Angie. Angie had become a mother to her.

Q. Angela you learned had these daughters; right?

A. Yes.

Q. Were you able to observe any interaction between them as a result of being locked up 24 hours a day with Angela Johnson?

A. Yes. It was just like -- Angie called her daughters almost every night, and the cell is a drab, cold, dreary place, and, you know, you look forward to that conversation. You're not supposed to eavesdrop on people's conversation, but it was

Page 182

just -- it was a blessing to be able to hear how she talked to her kids, and it brought sunshine into our cell. It was just neat to listen to Angie talk to her kids.

Q. Were you able to do that with your children?

A. I have changed my bonding with my kids so much, and Angie has taught me so much about being a mom, you know, because when I first got locked up, I felt like I still had control of everything on the outside. And she clearly made me see that that was awful selfish of me. I'm the one that got myself incarcerated, and I don't have control, and I learned a lot about communication through my kids from her. She's taught me so much, you know, and it's brought me and my kids closer together.

3240

Q. In addition to talking to her daughters on the phone almost every night, did she communicate with them in writing?

A. Oh, yes. She brought -- she wrote little stories, little nighttime stories for Marvea. I don't know what they said. They were animals, talking animals to each other, and I wanted to read them, but she said no, that she'd only write them for Marvea. I told her if they were good she could get them published and she could have some kind of income in jail. She said no, they were just for Marvea. She only wrote them for her.

Q. You mentioned earlier on that you were in this 800-hour drug program and you were due -- if you completed the program you were going to get out at a certain date.

A. In November.

Q. November of this year.

Page 183

A.   Yes, I was supposed to graduate the drug program in September.

Q.   Because you get some reward for participating and completing this 800-hour drug program.

A.   You get a year off.

Q.   A year off.

A.   Uh-huh.

Q.   Okay.  And as a result of being here, is that going to happen?

A.   Well, I'll be pushed back into the next class.  That will

3241

set me back.  So now instead of graduating in September, I'll graduate in December, and hopefully I'll get out -- then they'll have to process my papers -- hopefully in January.

Q.   Okay.  So you're going to end up doing another three months.

A.   Uh-huh.

Q.   Do you regret being here as a result of that?

A.   No.

MR. BERRIGAN:  That's all.  Thank you, ma'am.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.   Ma'am, you mentioned something about publishing.  Were you in the Linn County Jail at the same time as Valli Williams was?

A.   No.  I met Valli later on when I went to Pekin.  Valli was in Pekin.

Q.   And you got to talk to her maybe a little bit about the fact she knew Angela Johnson, didn't she?

Page 184

A.   Yes.

Q.   And did she tell you about the plans they had for Angela Johnson and her to publish a book about Angela's --

MR. BERRIGAN:  I'm going to object -- sorry to interrupt, but I'm going to object as well beyond the scope of direct examination, some conversation she had with a woman

3242

later, Your Honor.

THE COURT:  Overruled.

BY MR. WILLIAMS:

Q.   Did she tell you about the plans that she had with Angela Johnson to publish a book about Angela Johnson's life and crimes?

A.   No.

MR. WILLIAMS:  Nothing else.

REDIRECT EXAMINATION

BY MR. BERRIGAN:

Q.   Do you know this woman, Valli Williams, Miss Hanawalt?

A.   Yes, I did.

Q.   She used to be a lawyer; isn't that right?

A.   Yes.

Q.   Been disbarred?

A.   I never asked her.

Q.   You don't know what it was for?

A.   I'm not sure.  I knew it was something about her being a lawyer and something.

Q.   You didn't know she had stolen a million dollars from people fraudulently?

A.   No.

Page 185

THE COURT: Anything further, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Why don't we take our afternoon

3243

recess. It's three o'clock. We'll be in recess until 3:25. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. STOWERS: No, Your Honor. Thank you.

(Recess at 2:59 p.m.)

THE COURT: Ready to have the jury brought back in?

MR. BERRIGAN: Yes. I wanted to give you a heads-up, Your Honor. This is our last witness. I doubt that she's going to take till 4:30.

THE COURT: Okay. Not your last witness, period, but your last witness for the day.

MR. BERRIGAN: No, no. Today. I apologize. You know, the situation with Mr. Spies obviously was abbreviated. We didn't fill the box.

THE COURT: No problem. I understand.

MR. BERRIGAN: All right.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Berrigan?

MR. BERRIGAN: May it please the Court. The defense calls Holly Dirksen.

HOLLY DIRKSEN, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness

Page 186

box.  Please adjust the chair so you can speak directly into the microphones.  You can scoot it up.  And would you state your full name, please, and spell your last name.

THE WITNESS:  Holly Justine Dirksen, D-i-r-k-s-e-n.

THE COURT:  Thank you.

Mr. Berrigan?

MR. BERRIGAN:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q.   Where do you live, Miss Dirksen?

A.   I live in Klemme, Iowa.

Q.   And what relation are you to Angela Jane Johnson?

A.   She's my older sister.

Q.   What do you do for a living?

A.   I am a home healthcare worker.

Q.   And what does a home healthcare worker do?

A.   I'm a nursing assistant.

Q.   What does that involve?

A.   That involves helping people get over their ailments when they come home from the hospital.  Sometimes it's long term.  Sometimes it's short term.

Q.   Do you work at a doctor's office?

A.   Well, I work for a hospital, but it's the home care division, so we're a little bit separate from the full-time routine at the hospital.

3245

Q.   So you go to people's homes.

Page 187

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2845 of 3592

A. Right. I help rehabilitate people.

Q. I see. It's kind of like rehabilitation at home.

A. Correct.

Q. How long have you been doing that work?

A. Nine years now.

Q. Are you married or single?

A. I'm married.

Q. And what's your husband's name?

A. Michael Dean Dirksen.

Q. How long have you been married?

A. Seven years this month.

Q. I hope you remember the date. Do you have any children?

A. Yes, I have one. She's a 12-year-old girl.

Q. What's her name?

A. Her name is Haley Thornton.

Q. Does your husband work outside the home as well?

A. Yes, he does. He works for Curry's Manufacturing. Right now he took a part-time job with the local grocery store in Garner, and he's also in the National Guard 17 years now.

Q. So he has a full-time job, a part-time job, and he's in the National Guard.

A. That's correct.

Q. Okay. Where is Klemme actually?

A. It's north Iowa. It's probably 30 miles from Mason City.

3246

Q. Thirty miles, and that would be kind of southwest?

A. Yes.

Q. I want to see if we can talk to you a little bit about your childhood and growing up in the Johnson family; okay?

A. Okay.

Page 188

Q.   First I guess we should establish, I know it's impolite, but what is your age?

A.   Let's see.  Thirty-two.

Q.   Thirty-two.

A.   Yes.

Q.   So you're nine years younger than your sister Angela.

A.   That's correct.

Q.   And 11 years younger than your sister Wendy.

A.   That's correct.

Q.   And then after those two, who's the next in line?

A.   That would be my sister Jamie.

Q.   Jamie, and how much older is she than you?

A.   Seven years I believe.

Q.   And then who's next?

A.   Then my brother Jim, and he's six years older than I am.

Q.   So you kind of came later on in life.

A.   Correct.

Q.   And, in fact, your mother is Pearl Jean Johnson?

A.   That's correct.

Q.   Who is your father?

3247

A.   Robert Claus.  He is deceased.

Q.   Did you ever meet your father?

A.   No, I have not.

Q.   As you were growing up, was there anybody in your life that kind of acted as your father?

A.   Not really.

Q.   You know your siblings have a father who's alive.

A.   Correct.

Page 189

Q. James Jeffrey Johnson.

A. (Witness nodded head.)

Q. Did you have any contact with Mr. Johnson, Jim Johnson, as you were growing up?

A. I had some, yes, and he was always very kind to me.

Q. But you never considered him your father.

A. No.

Q. You know, we've heard some testimony today about some unusual things that happened to your siblings growing up, and I just wanted to see whether you had had any of these experiences; all right?

A. Okay.

Q. When you were growing up in the Johnson family with your mother and siblings, at that time was your mother involved in some unusual religious practices such as casting out of demons, things of that nature?

A. That's correct.

3248

Q. Did she ever do that with you?

A. A few times, yes.

Q. And what did it involve specifically as pertains to you? What did she do with you?

A. Well, she would lay hands on me and demand the demons to come out or to surface their name, what the name of them were.

Q. Was there any speaking in tongues involved in that?

A. My mother did that quite often.

Q. Were there other adults that participated in these activities with you?

A. I do remember a lady that stayed with us for a while that did participate in this.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2848 of 3592

Q.    Who was that?

A.    Kim Swalve.

Q.    And was there any point in time where demons were being cast out that you were actually physically restrained?

A.    Yes, there was.

Q.    And how did that work?

A.    They just had me by the arms and made sure I couldn't go anywhere and held me until they got the results they wanted.

Q.    And about how old were you at the time this happened, Miss Dirksen, when it first started to happen?

A.    I was very young.  I can't recall an actual age, but I know I was at least in the elementary level.

Q.    What was your reaction to these sessions of casting out of

3249

demons?

A.    I didn't like it very much.  I did not understand it.  And it was bothersome, but I got used to it after a while.

Q.    Were you frightened about it at all?

A.    A little.

Q.    We've heard some testimony about your siblings sending you into the basement to see if there were demons there.  Do you recollect any of that?

A.    Well, I don't think I liked the basement much anyway, so if they did that, I don't remember all the facts behind that.

Q.    All right.  Do you remember your grandmother, that is, your mother's mother, Florence?

A.    No, I don't.

Q.    She died before you were born?

A.    That's correct.

Page 191

Q. And so did her husband too, right, Andy Jensen?

A. That's what I believe.

Q. Okay. You didn't have any experiences with either of those folks.

A. No, I did not.

Q. All right. This casting out of demons we talked about or the laying of hands I guess is what you call it -- is that what you call it?

A. That is one of the things I've called it.

Q. Okay. How long did that continue in your life?

3250

A. Most of my life, most of my childhood. It was a regular practice.

Q. You said your mother would do that until she got the results that she wanted?

A. That's correct.

Q. And what result was that?

A. When she felt like the demons were gone.

Q. Was there any kind of event that would signal the departure of the demons from your body?

A. Could you repeat that question?

Q. Yeah. What would happen? How would she know if the demons had left you?

A. I think maybe I'd quit fighting. Sometimes I would get aggravated and make it hard for her. Sometimes if I just went along with it, it would get over faster.

Q. So after a while you kind of learned how to kind of play along with this.

A. That's correct.

Q. Did you happen to notice -- when you were younger, did you

Page 192

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2850 of 3592

see your mother doing this with your older siblings?

A.   I want to say yes, but I can't really think of any specific time at the moment, but I know it wasn't just me so . . .

Q.   Sure.  Were there any occasions where your toys were burnt or anything of that nature?

A.   Not that I recall.

3251

Q.   Okay.  And so we've heard a little bit about an incident where your mother drug the family out in the middle of the night and they drove around because it was the end of the world.  Do you have any recollection of anything like that?

A.   No, I don't remember that.

Q.   Okay.  So other than this casting out of demons or laying of the hands, did you have any other experiences with your mother in terms of religious experiences that you thought were a bit unusual?

A.   Well, the church that we would attend practiced in healing and things like that.  And there was plenty of times that she would send me up to the front of the room for a healing.

Q.   Your mother would send you to be healed.

A.   Correct.

Q.   And what was it you were supposed to be healed from?

A.   I had a leg that was shorter than the other, and she believed that if they prayed it would help me.

Q.   Did -- I mean, did your mother have similar beliefs, that is, that God could take care of some material problems on earth as a result of praying?

A.   Correct, yes.

Q.   And in what areas did she think God could be helpful in

Page 193

that regard?

A. Pretty much in everything.

Q. In everything.

3252

A. Yes.

Q. Were you encouraged as a child to share your mother's religious beliefs with your classmates at school?

A. Yes.

Q. Did you do that?

A. I might have. I don't think I was as open as my mother was on a -- you know, but I'm sure I did to some degree.

Q. Were there any adverse repercussions from doing that that you recollect?

A. We were just kids, you know, so I don't think it was too big of a deal back then, but I don't believe the kids probably would understand -- they would have understood the way things were at home.

Q. Sure. Did you have -- your friends, were they able to come over to your house like other kids' friends do?

A. They could, but sometimes they would end up in Bible study with us. I never knew when Mom would call Bible study, so sometimes I was a little leery of that.

Q. What do you mean when your mom would call Bible study?

A. Well, she would just decide it was time for Bible study, and we'd all have to participate, and we'd sit around, and she'd read scripture.

Q. Was that a voluntary thing, your participation in the Bible study?

A. Well, we went along with it because Mom told us we had to

Page 194

so . . .

Q. How did your mother discipline you when you were growing up?

A. I believe she put me in the corner or she grounded me. Depends on my age, you know, at the time, but I remember being grounded a lot.

Q. By the time you came along, did you ever get hit with a strap or a belt or a paddle or anything like that?

A. I believe I did one time.

Q. Just once.

A. Once. That's all I remember.

Q. How about in terms of slapping you about the side of the head? She ever do anything like that?

A. I can't recall.

Q. You don't recall that happening.

A. I don't remember.

Q. All right. And then so other than the Bible study, did your mom try to visit any of her religious practices on your friends as you were growing up?

A. No, I don't believe she did.

Q. When you were growing up as a young child, what kind of work was your mother doing at that time?

A. She worked in a restaurant. She worked very hard.

Q. Did you ever work in the restaurant yourself?

A. Yes, I did.

3254

Q. When did you start working there?

Page 195

A.    When I was 14.

Q.    And what was the restaurant called at that time?

A.    Jeannie's Kitchen.

Q.    Jeannie's Kitchen.  What did you do for your mother?

A.    I waitressed, and sometimes I helped her cook.

Q.    What grade would you have been in then?

A.    Eighth grade.

Q.    Eighth grade?

A.    Yes.

Q.    How far did you get through school?

A.    I went through half of my junior year.

Q.    So eleventh grade.

A.    That's correct.

Q.    Is there anything that caused you to drop out of school in eleventh grade?

A.    I was having a hard time with my studies, and I got behind, and I did not receive the help I needed to finish.

Q.    The help from whom?

A.    I had asked for help in the -- from the principal, help me get caught up, whatever he could do, and that never happened.

Q.    How active was your mother in your education?

A.    Well, she grounded me if I had a bad report card, and she went to conferences when she could.

Q.    To school conferences with teachers and things?

3255

A.    That's correct.

Q.    Did you -- how would you describe for us your relationship with your mother as you were growing up attending elementary and junior high school?

A.    I loved my mother very much through elementary school.
Page 196

When I got a little older, I kind of drew away from her a little bit. We didn't get along the greatest.

Q. Was there some change in your relationship that caused that?

A. Well, I -- my boyfriend died when I was 14 in front of my eyes, and -- sorry. It was very hard for me to get over it. And I got very depressed, and I started using drugs to make it go away I guess. And it ruined my relationship with my mother.

Q. Your drug use did.

A. (Witness nodded head.)

Q. What kind of drugs did you start using at 14?

A. Well, nothing real heavy at first. It was just basic marijuana, and I started drinking a lot. And it progressed later in years.

Q. What grade would you have been in at 14?

A. Ninth grade.

Q. Ninth grade.

A. That's correct.

Q. So you survived I guess another two years or almost two years despite the fact -- you survived in school despite the

3256

fact that you were using drugs.

A. Correct.

Q. Did that continue, that use of drugs continue through your junior year when you dropped out?

A. Yes, it did.

Q. And was it still just marijuana and drinking alcohol?

A. It progressed a little. I did -- I think I did more drinking than anything. The drugs, when they were available, I

Page 197

did them.

Q. And this drinking and depression you attribute to your boyfriend's sudden death.

A. I believe that to be the start.

Q. How is it that he died?

A. He was killed on a motorcycle.

Q. And you were present at the time?

A. That's correct.

Q. Not on the motorcycle.

A. No. I would have been but --

Q. Okay.

A. Yeah.

Q. Did your mother disapprove of drug usage?

A. Yes, she did. She fought me all the way through it.

Q. Did you ever get any treatment or counseling for your drug abuse?

A. Yes, I did go into a treatment facility for a while, but it

3257

was a bunch of hokey. They tried to keep me from seeing my sister, and I signed myself out of there.

Q. Your sister --

A. My sister Angie came to visit me one day to see how I was doing, and one of the workers up there said something to one of the people up there, and they barred my sister from seeing me, and I signed myself out.

Q. Why was she barred?

A. Because she knew my sister and she didn't like her, and she decided to tell my counselor, you know. And they said, Sorry, you can't see her. And I didn't find out until a little bit later. And when I found out, I was very upset because my sister

Page 198

and I were very close at the time.  So I signed myself out.  I didn't want to be there if I couldn't see my sister.

Q.    I wanted to ask you a little bit about the relationship with your sister Angie.  Your sister Wendy would have been the oldest sister; right?

A.    That's correct.

Q.    And when Wendy left high school, she was 16.  You would have been 5 years old?

A.    Correct.

Q.    Who did you have the closest relationship with amongst your three sisters?

A.    That would be Angie.

Q.    Angie.  And why was your relationship with her closer than

3258

your other sisters?

A.    Angie always seemed to be looking out for me all the time, always knowing where I was, making sure I had things that I needed.  She was always a good role model for me.

Q.    Well, did your mother -- didn't your mother perform those functions?

A.    She did.  My mother also worked a lot.

Q.    Worked a lot at the restaurant.

A.    That's correct.

Q.    Was she gone a lot in the evenings?

A.    I remember her being gone more during the day towards supper time I imagine.

Q.    So tell us then, Angie you said watched out over you quite a bit?

A.    Yes, she did.

Page 199

Q. Did you need a lot of watching out over?

A. Well, when I was young, yes, you know. And then when I got a little older, yeah, I probably needed more then.

Q. When your boyfriend died, was your sister supportive of you with that hard period of your life?

A. Yes, she was.

Q. In what way?

A. She was always -- she was always there for me to talk to. I never had to worry about talking to her. She was always there for me, always made sure I had the things I needed.

3259

Q. When you say the things you needed, could you be a little more specific?

A. My sister, well, she knew we didn't have a lot of money growing up and made sure -- she was always buying me clothes, and she bought me my first ten-speed. She bought me my first pair of roller skates. She bought me a car. And all the things that I -- she felt that I needed she made sure I had.

Q. And these are some things that your mother wasn't financially able to provide to you.

A. That's correct.

Q. What was the financial situation of your family when you were growing up?

A. We were very poor.

Q. And when you say very poor, I guess these things are all kind of relative, but did you have food on the table?

A. We ate real well when we had the restaurant. We ate a lot at the restaurant then, but money was tight for recreational things.

Q. Well, things like clothes for school and shoes and things

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2858 of 3592

of that nature, did your mother have money for those kind of things?

A.   Very little.  I remember having two pair of jeans to my name at one time.  It never bothered me, though.

Q.   It didn't bother you?

A.   No, that's just the way it was, and just that's the way it

3260

was.

Q.   You know, you're a fairly big lady.  Did you play sports in high school?

A.   I did two years.

Q.   What did you play?

A.   I played basketball.

Q.   Did you have basketball shoes?

A.   Yes, I did.

Q.   You know how you got them?

A.   My mother did buy me a pair of basketball shoes.

Q.   Was that after your brother complained that you didn't have any?

A.   Yes.

Q.   Well, what else about -- oh, I forgot to ask you something. Were you involved in any of these fasting practices where you wouldn't eat?

A.   I believe I was.  I don't remember it happening on a regular basis.  I do remember I experienced it a few times, but Mom always made it a fun thing, and it never seemed to bother me.

Q.   It didn't bother you.

A.   No, it didn't.

Page 201

Q.   Okay.  About how old were you when you were fasting?

A.   I think I was in the elementary level, so I was fairly young.

3261

Q.   Okay.  Did you ever rebel against your mother for these religious practices that she engaged in with you?

A.   When I started to go into my teen years, I rebelled a lot. I was very resistant towards any of her practices.

Q.   How did your mother respond to that?

A.   We fought a lot.

Q.   What about your siblings, your older siblings?  Were they still following your mother in these religious beliefs?

A.   No, they weren't.

Q.   None of them were.

A.   No.

Q.   And was there a division in your family as you got older regarding your mother and your siblings' relationship with your mother?

A.   Yeah.  Everybody moved out, had their own life, and they weren't very close with Mom.  They didn't come around too much.

Q.   What about you?

A.   I've been by Mom's side my whole life.

Q.   You've been one of her supporters, somebody who's close to her.

A.   That's correct.

Q.   And there isn't any other -- you've already mentioned you were never that close to Jim Johnson.

A.   That's correct.

Q.   And a lot of the conflict that involved your mother, did

Page 202

some of that have to do with Mr. Johnson?

A.    I believe so.

Q.    Okay.  Your other siblings, your brother Jim, Jamie and Angie and Wendy, did they have the same response?  That is, did they stay with your mom?

A.    They -- I think they tried to have a relationship to some level with Mom, and for a while it was pretty good.  We always seemed to have trouble in our family with getting along for periods of time.  We would go not talking to each other, and then pretty soon we'd start talking again, and it was pretty back and forth.

Q.    How long a period of time would you go not talking to your siblings or your mother?

A.    Sometimes it could go up to months to a year.

Q.    Are you close with all your siblings now?

A.    No.

Q.    Who aren't you close with?

A.    My brother and one of my sisters.

Q.    Your brother Jim?

A.    That's correct.

Q.    When's the last time you had any contact with him?

A.    Four years ago.

Q.    And he has some different feelings about your mother than you do; would that be fair?

A.    That's correct.

3263

Q.    And the other sister you don't have any contact with?

A.    I haven't spoken with her till the last two days.

Q.    And who's that?

A.    Wendy Jacobson.

Q.    And does that revolve around the same issue that your sister Wendy has some problems with your mother that you don't share?

A.    Well, there was other things stemming off of that, but yeah, that is part of it.

Q.    Have you heard, Miss Dirksen, that your other siblings, your older siblings, had some experiences particularly in Kansas and then back in Mason City that you might not have experienced or if you did you don't remember them?

A.    That's correct.  I don't remember any of those things.

Q.    And you weren't even born when they spent their time out at the Dillos' orphanage in Kansas; right?

A.    That's correct.

Q.    You mentioned that you have a little girl, Haley, 12 years old.

A.    Yes.

Q.    And she's just a year older than Angela's second child Marvea.

A.    That's correct.

Q.    I wanted to ask you something.  After your sister Angela got arrested, was there a point in time where you took custody

3264

of her daughter Marvea?

A.    Yes, I did.

Q.    What were the circumstances there?

A.    Well, they arrested my sister at my home.  Marvea was already staying with us, and my sister had been staying with us

Page 204

previously too. So I continued to care for Marvea after my sister was incarcerated.

Q. Is Marvea still living with you?

A. No, she is not.

Q. Why not?

A. She was repeatedly harassed and tormented by the children from my town and at school, and I felt that it was not a safe place for her to be any longer.

Q. When you say harassed and tormented, could you be a little more specific as to what they did?

A. The kids were very cruel. They said very hateful things to her regarding her mother and her father, and sometimes they even got physical.

Q. And so you decided it wasn't a safe place for Marvea to be.

A. That's correct.

Q. Was that a hard decision for you?

A. It killed me.

Q. Because she had a pretty close relationship with you.

A. Marvea was like my own since the day she was born. I love that little girl very much.

3265

Q. I wanted to ask you about a couple of the men in your sister's life, particularly Terry DeGeus. Did you know Mr. DeGeus?

A. Yes, I did.

Q. How did you know him?

A. My sister introduced me to him when she first started seeing him.

Q. And were you around while your sister was dating

Page 205

Mr. DeGeus?

A.   At times, yes.

Q.   Was there ever any indication to you that that relationship was causing your sister some problems or difficulties?

A.   Yes.

Q.   What was the indication?

A.   I saw my sister black and blue many times from head to toe. She was scared a lot.  He stalked her.  She showed me the proof of it many times.

Q.   What was her response to Mr. DeGeus hitting her and stalking her?

A.   She was afraid.  She was afraid for her life.  But at the same time she loved him very much, and he liked to guilt her into coming back, kind of that classic man battering syndrome where they guilt you and you believe it and you come back and they do it again.  It was like that quite often.

Q.   Did you see that yourself?

3266

A.   Yes, I did.

Q.   In fact, there was a point, wasn't there, where your sister went to Wisconsin to get away from Mr. DeGeus?

A.   That's right.  I went with her.

Q.   What did you do in Wisconsin?

A.   We stayed with my sister Wendy and worked together at a restaurant called Country Kitchen.

Q.   The three of you.

A.   That's correct.

Q.   And how long did you stay up in Wisconsin?

A.   It was a summer.

Q.   Summer.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2864 of 3592

VOLUME 18 6-6-051

A.   Yes.

Q.   Did your sister have any contact with Mr. DeGeus at that time?

A.   She did call him one time that I believe and talked to him. I think she was worried about him.  And the next day he showed up there.

Q.   And what happened after that?

A.   Well, then they were all happy again, and it was like everything was okay and she was madly in love with him once again.

Q.   Did you ever try to get your sister out of this cycle with Mr. DeGeus?

A.   Yes.

3267

Q.   And how did that work?

A.   Well, my sister was afraid of him, and she had mentioned one time that if I ever saw -- there was a house across from her, and she asked me if my friend's there or if I was there if we ever saw his truck pull in if we would call the police, and I happened to be there one night, and his truck pulled in, and I ran to the house, and I called the police.

Q.   And did the police respond?

A.   I think he left before they even got there, but I stood in front of the door and was not going to let him go through till he left.

Q.   Did you have any confrontation with Mr. DeGeus yourself as a result of that?

A.   He kind of laughed at me because he knew there wasn't a whole lot I could do, but I was going to stand my ground, and I

Page 207

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2865 of 3592

wasn't letting him through that door, but that's as far as that got.

Q. You wouldn't have been able to stop him if he wanted to go.

A. No, but I sure would have tried.

Q. How long did this situation with Mr. DeGeus and your sister continue?

A. Several years.

Q. What about Mr. Honken, Dustin Honken? Did you know him?

A. Yes, I did.

Q. And how did you meet Mr. Honken?

3268

A. My sister introduced me to him.

Q. What was he like?

A. He was very nice. He was a gentleman, totally unlike someone my sister would ever date. He was very smart, very intelligent.

Q. What made him different than the people your sister had dated?

A. Because my sister kind of liked the guys that were a little rough around the edge, and Dustin was more the brainiac type, so it was different. It was new, and it was exciting for her.

Q. Before your sister got arrested, what was your relationship like with her?

A. My sister and I were close. She was my best friend my whole life.

Q. So after she got arrested five years now almost, have you continued to maintain contact with her?

A. Yes, I have.

Q. How often do you say -- how often would you say you talk to her on the phone or you write letters to her?

Page 208

A.    We talk once a week, maybe once every two weeks.  I bring her children to see her once a month, sometimes every other month.  And my writing isn't as good as it should be, it used to be.  It used to be better, and it will continue but -- to get better.  But we have taken advantage of every opportunity we can to stay in touch.

3269

Q.    Her daughters, you've talked a little about Marvea, but her daughter Alyssa, do you have contact with Alyssa?

A.    Yes, I do.

Q.    And where does she live now?

A.    She lives in Forest City.

Q.    And about how far is Forest City from Klemme?

A.    About 20 miles.

Q.    And has Alyssa lived with you, in fact, on occasion?

A.    Alyssa did live with me for a short time after her mother was incarcerated.

Q.    And what's your relationship like with Alyssa?

A.    We're very close.

Q.    She has a baby.

A.    Yes, she does.

Q.    What have been your observations regarding your sister's relationship with her daughter Alyssa?

A.    Angie and Alyssa were very close.  They were very good friends as well.  And Angie loved her mother very much as did Alyssa loved her mom very much.

Q.    And has that changed since Angie's been incarcerated?

A.    No, it has not.

Q.    What about Marvea?  She's got Dustin Honken as her father,

Page 209

and her mother obviously is Angela.

A.   Correct.

Q.   Has it been difficult for her to kind of go through this

3270

legal situation?

A.   It has been difficult because she's lost two of her homes now.  She's been uprooted twice.  And it's been very hard to see her mother through a glass window for the last five years and to be so far away from each other.

Q.   When you say see them through a glass window, what do you mean?

A.   When I take her to see her for visitation, they have to look at each other through a glass window and a telephone.  She hasn't been able to touch her mother in five years.

Q.   And how is she doing?  How is Marvea doing?

A.   She's adjusting, but it's been hard.  She misses her mom.

Q.   Do you know whether they have contact, Marvea and her mom?

A.   Yes, they write letters.  They've -- my sister calls her as often as she can, but it's very expensive to call.  And I bring Marvea to see her mom.  I try to -- once at least every other month to get her there.

Q.   So let me just ask you a little bit in closing about your relationship with your sister.  You know, this decision that has to be made regarding her sentencing, is that something that's going to have an effect on you?

A.   Yes.

Q.   If your sister was sentenced to a term of imprisonment, life imprisonment, would you continue to maintain contact with her?

Page 210

A.    Yes, I would, definitely.

Q.    For how long?

A.    As long as I live.

          MR. BERRIGAN:  That's all I have.  Thank you.

          THE COURT:  Mr. Williams, anything?

          MR. WILLIAMS:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.    Miss Dirksen, you testified about Dustin Honken.  During the time period that you knew your sister to have a relationship with Dustin Honken, you would agree he was never violent with her.

A.    That's correct.

Q.    In fact, from all appearances to you, it appeared they had a very normal relationship, didn't they?

A.    I wouldn't call it normal but . . .

Q.    Well, do you remember being interviewed on February 17 of 1997 and calling their relationship a normal relationship?

A.    I might have.

Q.    When were you exactly in drug treatment?  What year was that?

A.    I don't remember the year, but I was very young.  I was I believe -- I was either -- I was 14 or 15 years old.

Q.    So it would have been approximately what year?

A.    Let's see.  I can't recall right now.

Q.    Well, in 1993 where did you live at, ma'am?

                    Page 211

A. I lived in -- I moved around a lot during that time, but I was kind of back and forth between Forest City and Clear Lake and Mason City. I moved a lot.

Q. Didn't you live in Fertile, Iowa, in 1993 for a period of time?

A. I lived in Fertile for a few months.

Q. Fertile, Iowa, would be the location where some of the murder victims' rings were found and tokens and purse in 1995. Are you aware of that?

A. I guess so. If I did, it was from a newspaper clipping.

Q. You talked about the drug problems you had. Did you have, in fact, access to drugs through your sister?

A. There was a few times that we experimented, that I experimented. It was not a habitual thing.

Q. And this is with methamphetamine?

A. That's correct.

Q. And this would have been your sister Angela Johnson supplied it to you.

A. Yeah.

Q. At some point your sister told you before the body was ever found that Terry DeGeus was dead, didn't she?

A. I believe so.

Q. And what did she tell you before the body was found about Terry DeGeus being dead?

3273

A. Excuse me, sir. She never actually told me she was dead -- he was dead. That was not knowledgeable until the bodies were recovered. Those weren't her words. Her words were --

Q. What did she tell you?

A. That he was missing.

Page 212

Q. You know Leslie Nedved, don't you?

A. Yes, I do.

Q. Your best friend in 1997, wasn't it?

A. She was.

Q. You had known her since 1992 or 1993.

A. Yes.

Q. In fact, you worked together.

A. That's correct.

Q. In fact, you were the matron of honor at her wedding; is that right?

A. Yes.

Q. And it was around the time of that wedding that you had told her that, in fact, Angela Johnson had supplied you with methamphetamine on occasion.

A. I might have.

Q. You also told her that you knew where DeGeus was, didn't you?

A. No, I did not.

Q. You told her that you knew he was in a pit and he was right under the nose of the police and they weren't looking hard

3274

enough.

A. No, sir, I never said that.

Q. Didn't you tell Miss Nedved that they took care of him, meaning killed him?

A. No, I never said those words.

Q. You were aware that Miss Nedved was contacted by law enforcement officers to be interviewed, weren't you?

A. That's correct.

Page 213

Q.   And you also learned at some point that she was subpoenaed to appear before a federal grand jury concerning her knowledge of the disappearance of Terry DeGeus.

A.   That's correct.

Q.   You were aware that that knowledge came from you.

A.   No.

Q.   Isn't it true, ma'am, that you confronted Miss Nedved in front of her husband Greg and told her to deny any knowledge of the disappearance of Terry DeGeus when she appeared in front of the grand jury?

A.   Those were not my words.  I never said that.

Q.   You told her to tell them that you knew nothing; isn't that what you told her?

A.   Leslie never knew my sister.  She was not involved in it, and there was no reason for her to make herself involved in it.

Q.   And so you encouraged her not to be involved in it and not to tell the grand jury what she knew about the disappearance of

3275

Terry DeGeus, didn't you?

A.   At that time she was not grand juried.  They wanted to meet with her before the grand jury subpoenaed her.  And it was her right to not talk to them, and I told her that.

Q.   And then when she was subpoenaed to appear before the grand jury, you told her she didn't have to obey to that subpoena, didn't you?

A.   No, I did not.

Q.   The very morning that she went to the grand jury to testify about what statements you had made to her about Terry DeGeus's disappearance, you appeared at her house that morning, didn't you?

Page 214

A.    I don't remember that.

Q.    And Leslie's husband Greg was present when you again told her she did not have to appear before the grand jury, not to go down and say anything.

A.    At the time the grand jury was in Cedar Rapids, I would have had to get up at six in the morning to go down to her house to tell her not to go that day.

Q.    You know Amy Wonsmos?

A.    Yes, I do.

Q.    W-o-n-s-m-o-s?  Is that right?

A.    Yes, I do.

Q.    She worked with you also at the North Iowa Human Services for a period of time, didn't she?

3276

A.    Very little.

Q.    She was also in the Nedved wedding party; is that right?

A.    That's correct.

Q.    And before the wedding you and a bunch of other people went to a bar up in the Forest City area called Shaboom's I think; right?

A.    I believe so.

Q.    And while you were in this bar, in walks Aaron Ryerson.  Do you remember that?

A.    Yes, I do.

Q.    You knew Aaron Ryerson, didn't you?

A.    Yes, I did.

Q.    And when you saw him, you said that if Aaron Ryerson doesn't watch his mouth he'll end up dead like Terry DeGeus, didn't you?

Page 215

A.   No.  Actually Aaron attacked me in the bar and threatened me is how it went, and I had no idea he even knew my sister at that time.

Q.   Didn't you say to Amy Wonsmos if Aaron Ryerson doesn't watch his mouth he'll end up dead like Terry DeGeus?

A.   No, I wouldn't say that.

Q.   During your testimony you indicated that you had some problems with your sister Wendy.  Do you recall that testimony, ma'am?

A.   Which year are you speaking of?

3277

Q.   Well, when you testified earlier just a few minutes ago --

A.   Correct.

Q.   -- you indicated that you don't get along with Wendy Jacobson.

A.   Correct.

Q.   And you were asked the question did that have to do with differences about your thoughts of your mother, and you said, well, that was maybe part of it.  You said there were some other issues too.

A.   Correct.

Q.   One of those issues is that when you learned that your sister Wendy Jacobson testified in the grand jury about statements that your sister Angela Johnson made about luring Terry DeGeus to his death you became very angry with her, didn't you?

A.   Yes, I did, because I did not understand why she had made a statement like that.

Q.   Why she would tell the truth under oath.

A.   No, that's not what I said.  I did not understand why she
Page 216

had said what she did. I did not believe it to be true.

Q. And at some point did you, in fact, threaten to kill your sister Wendy?

A. No, I never threatened to kill my sister. And she knows I never threatened to kill my sister.

MR. WILLIAMS: Nothing else, Your Honor.

3278

THE COURT: Mr. Berrigan?

REDIRECT EXAMINATION

BY MR. BERRIGAN:

Q. Do you happen to know this fellow, Aaron Ryerson?

A. Unfortunately, yes.

Q. We had the pleasure of meeting him at the trial. Do you know what his methamphetamine practices were?

A. Not exactly. I know he was a user. I went to high school with him, and he used to OD on our gym floor.

Q. When you met him at this bar and he attacked you, do you know whether or not he was under the influence of methamphetamine?

A. Not as a fact, but he was intoxicated. He could have before he got there.

Q. What was Mr. Ryerson upset about?

A. Aaron was always upset about somebody. He was always picking fights with everybody. And, in fact, Aaron and I never had a problem with each other until that night.

Q. Well, he attacked you for some reason ostensibly; is that right, Miss Dirksen?

A. Right.

Q. And what reason was it if you can tell us that he attacked

Page 217

you?

A. Well, he didn't like my sister, and I did not know it at the time, but he was friends with Terry DeGeus. So, therefore,

he knew her through her (sic). And he was obviously upset about something because he confronted me.

Q. These statements that you supposedly made to Leslie Nedved, as far as you're aware, does Miss Nedved have some independent information about the murder of Terry DeGeus?

A. No.

Q. Okay. What about this lady, Amy Wonsmos? Does she have any independent information that you know of --

A. No.

Q. -- about the murder of Terry DeGeus?

A. But Amy's friends with Aaron, so it wouldn't surprise me if he would have mentioned some things to her.

MR. BERRIGAN: Thank you.

THE COURT: Mr. Williams, anything further for this witness?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. You are excused.

Members of the jury, that concludes the testimony for today. We'll start in again tomorrow morning at 8:30. Please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence. And we'll see you back here tomorrow at 8:30. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. Mr. Berrigan, I just wanted to check in with you on your witness list. I have in

Page 218

front of me defendant's second amended mitigation witness list as of 6-1-05. Are there some witnesses on here that you will not be calling?

MR. BERRIGAN: Yes, sir. Obviously as a result of the decision not to put on testimony about Mr. Honken's proffer, I think you have on your list Steve Badger and perhaps a fella by the name of Ray Fiedler. I don't have that list in front of me, but if they're on there --

THE COURT: They are. They're 25 and 26.

MR. BERRIGAN: -- neither one of those gentlemen will be testifying.

THE COURT: Okay. Everybody else is going to be a witness?

MR. BERRIGAN: I'm at a disadvantage, Your Honor, because I don't have the list in front of me, but I believe so. I could certainly check overnight and inform you in the morning.

THE COURT: That's fine.

MR. WILLIAMS: Your Honor, if it's helpful, I was advised by Mr. Stowers that number 4, this Kim -- I don't know how to pronounce that last name.

MR. BERRIGAN: Oh, yes. Kim Swalve, we've cancelled her as well.

THE COURT: So 4 is off?

MR. WILLIAMS: Then 21, Al Haubrich, Haubrich, how ever you pronounce it.

3281

THE COURT: Okay. And how many doctors are you

Page 219

calling?

MR. BERRIGAN:  Three.

THE COURT:  Logan, Cunningham, and --

MR. BERRIGAN:  Hutchinson.  Oh, and Evans.  Dr. Evans is the psychopharmacologist.  There's three mental health people and one psychopharmacologist.

THE COURT:  When are they going to be testifying?

MR. BERRIGAN:  Dr. Logan is tomorrow.  On Wednesday Marilyn Hutchinson and Lee Evans are testifying, and on Thursday morning Dr. Cunningham's testifying.

THE COURT:  How long do you think Cunningham's testimony's going to be?

MR. BERRIGAN:  It's kind of hard to say, sir.  But I'd say between 90 minutes, 2 hours on the outside.

THE COURT:  Okay.

MR. BERRIGAN:  Be my best guess.

THE COURT:  Any issues on the experts?

MR. BERRIGAN:  Not that I'm aware of, sir.

MR. WILLIAMS:  Your Honor, I've spoken with my experts.  On Friday I've looked over, I've read through all of the transcripts and the rulings and all that kind of stuff.

The only place I see where this could run afoul, frankly, is if the defense goes someplace different with their witnesses than what they've indicated they would, and I have no

3282

reason to believe they will.  So if they, you know, follow what they've indicated with their witnesses, I don't think we'll end up having a problem.

We still do want an instruction.  We think an instruction would be appropriate because despite the fact the

Page 220

witnesses won't testify in a particular way, that's not going to prevent the jury from reaching some conclusion independently, so we think an instruction would be appropriate. But with that caveat and assuming we can work out some language on the instruction, I think we'll be in fine shape.

THE COURT: Do you know whether you're going to be calling any rebuttal witnesses?

MR. WILLIAMS: I don't. It all -- I mean, if it is, it will be strictly rebuttal. It will be that they went someplace that I wasn't prepared for based on their reports.

THE COURT: Are you planning on calling any experts as rebuttal witnesses?

MR. WILLIAMS: If their experts -- depending on what their experts say, yes, I have one expert I might call, potentially two depending on Cunningham, but I don't think Cunningham will go -- I think he'll be fine, but potentially I would have an expert from the Bureau of Prisons to testify depending on what Mr. Cunningham said.

THE COURT: And that'd be on the future dangerousness issue?

3283

MR. WILLIAMS: Correct.

THE COURT: Okay. Anything else we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defendant, sir.

THE COURT: Okay. Thank you. Why don't we just meet at 8:15 tomorrow morning. Thank you. We'll be in recess.

(The foregoing trial was
adjourned at 4:13 p.m.)

Page 221

VOLUME 18 6-6-051

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                    11-26-05
                                            Date

3284

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| PEARL JEAN JOHNSON | | |
| | MR. BERRIGAN | 3041 |
| | MR. WILLIAMS | 3087 |
| LEON SPIES | | |
| | MR. STOWERS | 3091 |
| JAMES JEFFREY JOHNSON | | |
| | MR. BERRIGAN | 3094 |
| | MR. WILLIAMS | 3142 |
| WENDY JACOBSON | | |
| | MR. BERRIGAN | 3143 |
| ARLYN JOHNSON | | |
| | MR. BERRIGAN | 3187 |
| | MR. WILLIAMS | 3207 |
| | MR. BERRIGAN | 3211 |

Page 222

EVA HANAWALT

MR. BERRIGAN                                           3214
MR. WILLIAMS                                          3241
MR. BERRIGAN                                         3242

HOLLY DIRKSEN

MR. BERRIGAN                                         3244
MR. WILLIAMS                                         3271
MR. BERRIGAN                                         3278

*****

EXHIBITS:

2092, 2057, 2033, 2049, 2045, 2089, and 2080     3062
2000D                                                     3065
2006 through 2010                                 3066
2021A                                                   3069
2095, 2097, and 2101                             3079
2145 and 2147                                     3087
2005                                                  3117
2100, 2117, 2068, 2074, 2084, 2091, 2103, 2105,   3132
2050, 2044, 2039, and 2037

*****

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2881 of 3592

VOLUME 19, 6-7-05

3285

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                       No. CR01-3046

        Plaintiff,                         Sioux City, Iowa
                                                June 7, 2005
   vs.                                          8:30 a.m.

ANGELA JANE JOHNSON,                            VOLUME 19 of 24

        Defendant.
                                    /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

3286

APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                          Assistant United States Attorney
                          Suite 400 - Hach Building
                          401 First Street Southeast
                          Cedar Rapids, IA  52401

                          THOMAS HENRY MILLER, ESQ.
                          Iowa Attorney General's Office
                          Area Prosecutions Division
                          Hoover State Office Building
                          Des Moines, IA  50319

For the Defendant:        PATRICK J. BERRIGAN, ESQ.
                          Watson & Dameron
                          2500 Holmes
                          Kansas City, MO  64108

                          DEAN STOWERS, ESQ.
                          Rosenberg, Stowers & Morse
                          1010 Insurance Exchange Building
                          505 Fifth Avenue
                          Des Moines, IA  50309

                          ALFRED E. WILLETT, ESQ.
                          Terpstra, Epping & Willett
                          Higley Building - Suite 500
                          118 Third Avenue Southeast
                          Cedar Rapids, IA  52401

Also present:             Bill Basler

Page 1

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2882 of 3592

VOLUME 19, 6-7-05
Court Reporter:          Shelly Semmler, RMR, CRR
                         320 Sixth Street
                         Sioux City, IA  51101
                         (712) 233-3846

                                                        3287

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Ready to have the jury brought in?

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Who's up?  But who?

MR. BERRIGAN:  Oh.  Dr. Logan.  I'm sorry.

THE COURT:  Okay.  I didn't think you were testifying.

(The jury entered the courtroom.)

THE COURT:  Good morning.  Please be seated.  I noticed Juror 55 switched from Pepsi to Mountain Dew this morning so --

JUROR 55:  Need the caffeine.

THE COURT:  Something new every day.  That's what they say about trials, something new every day.

Mr. Berrigan, are you ready to call your next witness?

MR. BERRIGAN:  Yes, Your Honor.  The defense calls Dr. William Logan to the stand.

WILLIAM LOGAN, DEFENDANT'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated in our witness box.  You can adjust the chair and the microphones so you can speak directly into the microphones.  And we'll let you get settled in there.  Should be a fresh glass of water for you, and you're free to move that.  And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS:  William Searle is the middle name,

                                                        3288

Page 2

S-e-a-r-l-e, and the last name is Logan, L-o-g-a-n.

THE COURT:  Thank you.

Mr. Berrigan?

MR. BERRIGAN:  Thank you.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q.    Dr. Logan, where do you live, sir?

A.    Currently I'm in the process of moving from Topeka, Kansas, to Lawrence, Kansas.

Q.    And what do you do for a living?

A.    I'm a physician that specializes in psychiatry.

Q.    I want to start your examination by talking a little bit about your background and qualifications if we might.  Could you tell us a little about your educational experience?

A.    When I went to college, I had wound up with two majors. One of them was in biology with a specialization in microbiology, and the second was a major in psychology that I kind of picked up on the side.  At that point it was a secondary interest.  My undergraduate university was out in New Mexico at New Mexico State University.  That's in southern New Mexico, fairly close to El Paso where I grew up.

I then attended medical school in Dallas which is about 600 miles away from El Paso but still in Texas at the University of Texas Southwestern Medical School which is located there.

3289

Q.    When did you graduate from medical school, sir?

A.    1977.  And during that time I had received a scholarship from the Public Health Service through medical school, the

Page 3

requirements of which were that I work in an underserved area eventually.

After I finished my medical school training, I decided to specialize in psychiatry. I remained in Dallas and did four years of what they call a psychiatric residency. That's what they call subspecialty training. And that was at Baylor Hospital located in Dallas and also at a private psychiatric hospital called Timberlawn Psychiatric Hospital, and that also included, as psychiatric residencies now do, about six months worth of internal medicine and two months of neurology. So that lasted from 1977 to 1981.

And then it came time for me to do the Public Health Service commitment which was three years, and that was actually done in a federal prison facility called the Medical Center For Federal Prisoners, and that's located in Springfield, Missouri.

Q. What kind of facility is that?

A. It's a fairly complex facility. It has one section that's to address the medical and surgical needs of inmates, federal inmates, from around the country. There's also another section that serves as a camp section or technical support, painting, you know, nursing facilities, things of that nature. And then a third part of that facility is for psychiatric patients also

3290

from around the federal prisons around the nation.

In my case, however, I actually did a fairly substantial amount of work on one particular section in the psychiatric unit that worked with people who had not yet been convicted, and they were separated from the other inmates. But they were actually sent there from the federal courts for determinations of whether they were competent to stand trial,

Page 4

sometimes their mental state at the time of an offense, on other occasions for recommendations about treatment provisions in conjunction with their sentencing.

Q. And are these federal courts from around the country that were seeking these services?

A. Yes. You know, during the three years itself there, I did well over 500 evaluations and testified actually all the way from San Juan, Puerto Rico, to Sacramento, California.

Q. Is -- that Federal Medical Center in Springfield, Missouri, is that the major medical and psychiatric unit for federal prisoners nationwide?

A. It's one of the major ones. They've got other facilities in Rochester, Minnesota, and Butner, North Carolina, for the psychiatric patients. But at the time I was there, Springfield was handling the bulk of the load.

Q. When you finished that internship, we're going to talk a little bit about your work experience, but is that when you began to work in private practice?

3291

A. No. Actually several other things came before that.

Q. Okay.

A. While I was at the medical center, I had initially intended to go back to the hospital where I trained in Dallas, but I talked to the director there, and he wanted me to get a fellowship in the area of forensic psychiatry because at that point I decided to make that a subspecialty. And a consultant at the medical center was Walt Menninger from the Menninger Clinic which was in Topeka, and he invited me to do the fellowship there, so for an additional there I did training in law and psychiatry at the Menninger Clinic.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2886 of 3592

Q.    Could you tell the jurors a little bit about the Menninger Clinic for those of us that might not be familiar with?

A.    Sure.  The Menninger Clinic was formed by a family of doctors, not unlike the Mayo Clinic, only it specialized in the area of psychiatry.  And it had a number of departments.  One of the things that it did was specialize in the treatment of severely ill psychiatric patients who were referred from around the country who had not done well in shorter-term hospitalizations or in outpatient treatment.

They also had a number of community outreach components of the Menninger Clinic that worked with things like business leaders.  It worked with the police department.  It worked with county social service agencies.  They had a children's hospital, and they worked with a number of group

3292

homes, and so they had a wide variety of services.

Q.    Where is it located?

A.    At the time it was located in Topeka, Kansas.  It's since relocated to Houston, Texas, and is now part of Baylor Medical Center there.

Q.    While we're talking about your specialty in forensic psychiatry, could you tell us whether or not you're licensed as a medical doctor anywhere in the country?

A.    Yes, in four states:  Texas, Missouri, Kansas, and Nebraska.

Q.    Do you -- go ahead.  I'm sorry.

A.    Those are primarily states where I've lived with the exception of Nebraska where we had considered moving when my father-in-law was ill.

Q.    Are you board certified in any particular areas?

Page 6

A.    Yes.  I'm board certified in psychiatry, and I have certifications from two different boards in forensic psychiatry.

Q.    What are those boards?

A.    One of them is the American Board of Forensic Psychiatry. The other one is a subspecialization in forensic psychiatry by the American Board of Psychiatry and Neurology.

Q.    What does it mean to be board certified?

A.    Board certification means that you have gone through an approved training program which is approved by another organization called the American Council of Graduate Medical

3293

Education and that you have had several years of experience and that you have passed a written examination and, in the case of a couple of those boards, an oral examination.

Q.    If we could go back now to your work experience, after you completed your fellowship in forensic psychiatry, what was the next line of work that you engaged in?

A.    I got asked to stay on at the Menninger Clinic as director of their department of law and psychiatry, and in that regard I had a number of clinical responsibilities including working with the police department and doing private psychiatric evaluations of all types that involved forensic issues, and those could vary anywhere from assessing the emotional damages of, say, someone who was in a motor vehicle accident to determining which parent might be the better parent in a custody battle to determining whether someone was competent to make a will to looking at someone's treatment who was suffering from, say, a work-related injury.  So a wide variety of issues and not just things in the criminal sphere.

        And also there was a teaching component of that with

Page 7

working with the trainees in psychiatry about issues that might come up in their practice that involved court procedures, things like civil commitments, and also child psychiatrists who were in training there as well.

Q. How long were you the director of the department of law and psychiatry at Menninger's?

3294

A. From 1985 through 1993.

Q. What did you do thereafter?

A. Menninger's was downsizing at that point in anticipation of this move to Houston, and our department was doing fairly well on our own, so we broke away as a department and formed a private practice in Kansas City.

Q. Is that practice still ongoing?

A. Yes.

Q. What's the name of the practice?

A. Logan and Peterson.

Q. And what's your position there?

A. Well, I'm technically president as far as the corporate structure of it goes, but it's basically a small practice with a couple of physicians in it.

Q. What does that practice encompass? That is, what kind of work do you do?

A. I do just regular psychiatry quite a bit in terms of, you know, treating patients, medicating them, doing individual psychotherapy with a wide variety of different constellations actually, a wide variety of age ranges and also become involved with a fair variety of different cases that involve some area that requires an expert opinion about some legal issue usually involving somebody's mental state to do some particular task.

Page 8

Q.   And could you tell us -- give us maybe an example of the variety of legal issues you might be asked to address and who it

3295

is that asks you to address those?

A.   Well, in different areas, different people ask.  The variety of issues can range from, as I said, somebody who's involved in some type of accident assessing their emotional damages, determining the standard of care of some physician who has been named in a malpractice suit.

I've also been asked to look at impaired physicians by the medical boards in Kansas and Missouri.  It can involve some training.  We did a suicide prevention workshop with the large county jail in Kansas City.  It can involve such things as looking at various prison systems.

At one point I was asked by a federal court to design an entire prison mental health system for the state of Nevada and then was asked by the judge in that case to act as his agent in implementing that project that took six years or more.  It can involve looking at whether someone is competent to enter a contract or to make a will.  It can involve many areas in the criminal justice system all the way from whether someone's competent to stand trial, the reliability of statements they may have made, say, to police during an interrogation.  It can involve their ability to stand trial, work with their attorneys, understand courtroom procedures.  It can involve their mental state at the time of a crime, whether they had intent or whether they were mentally ill.

So it can involve most commonly actually issues

3296

Page 9

regarding -- when they're being sentenced, if you testify in capital cases, it can involve things such as we're here today for about whether somebody has aggravating or mitigating circumstances. Many times I become involved in cases even after a conviction in something called postconviction relief where they take a backwards look and see if things should have been done but weren't.

Q. Does this work involve you testifying in court frequently?

A. Yes, fairly frequently, although many times, for example, in Iowa when I do cases up here, unlike Missouri and Kansas and Nebraska, they actually have depositions during a criminal part of court proceeding that is fairly unusual, and they've been pretty gracious in doing that by phone, so many times it doesn't involve a lot of time, just testifying from my office. But on the average I would say that I testify anywhere from 25 to 40 times a year on average.

Q. If we could talk about the instances where you're involved in criminal-type proceedings, who is it that calls you to testify or to work in a particular criminal case?

A. That also varies somewhat by state, who you -- what area you come known for and the circle of attorneys in that area. In Iowa I think it's almost been exclusively for defense attorneys. In Kansas where I have a longer history, it often is the attorney general's office or also defense attorneys. In Missouri, many times in Kansas City federal courts I'm often

3297

called in by judges particularly to look at the issue of whether somebody's competent to stand trial.

Q. So there are occasions when you're working in Kansas City, it's neither of the parties but the court's asking you to do an

Page 10

evaluation?

A.    Right, because of the way the law is designed, the -- anybody can bring up an issue if they have reason to believe somebody may not be competent to stand trial because that's such an important principle, and that includes the judge.  If he sees, for example, that an inmate has done something that would cause concern about that individual's competency, he's perfectly free to contact me himself.  He'll usually do that through court services and request an evaluation.

Q.    Have you been involved in cases in which judges have asked you to do evaluations in capital murder cases?

A.    Yes.

Q.    Do you have any memberships in any professional organizations?

A.    Pretty much the standard ones which are the American Medical Association, the American Psychiatric Association, and two that are kind of more related to my area which one is the American Academy of Psychiatry and the Law, and the other one is the American Academy of Forensic Sciences.

Q.    I want to turn our attention to this particular matter if I might.  And I'll ask you to tell the jury when you first became

3298

involved with Miss Angela Jane Johnson.

A.    I first became involved I think when I was contacted by an attorney named Al Willett in -- I believe it's Cedar Rapids, Iowa, and I had done a few evaluations for him before, and he wanted me to come see Miss Johnson because she had had a rather serious suicide attempt while she was in the -- I believe Black Hawk County Jail that she was in and the Linn County Jail.  So I initially saw her in January of -- I believe the year was 2001.

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2892 of 3592

Q. And where was she when you actually saw her?

A. In the Linn County Jail.

Q. In custody in Linn County.

A. Right.

Q. The suicide attempt that you saw her for and that had taken place in the Black Hawk County Jail, do you recall roughly when that occurred?

A. Ironically I do only because of the coincidence of the date. It was on a Friday, the 13th of October.

Q. October.

A. Yes.

Q. So you saw her roughly about three months thereafter.

A. Almost four months later I think.

Q. Almost four months.

A. Yeah.

Q. And what was the purpose of your seeing Miss Johnson at that point?

3299

A. To make any recommendations about treatment that might be applicable. I think there was some concern at that point. Four months later she was still on a daily suicide watch, and I think her attorney had questions about whether that was still necessary, so he wanted me to give an opinion about that and also to give him kind of an overview if there were any mental health issues that might be relevant to her charges.

Q. And did you make a determination first I guess about the necessity for continued suicide watch at that point, the early part of 2001?

A. Well, as I told Mr. Willett, you know, the jail has the primary responsibility for making that decision, so any comments

Page 12

I made would be advisory only. But I did make some recommendations about medication which I think the jail psychiatrist eventually did try. And also I thought by that time she had stabilized enough that the suicide precautions weren't necessary. Actually I think the administration at the jail which is responsible for security played some role in that, and she actually was continued on suicide precautions for almost a year after her initial suicide attempt. I don't believe she got off until the following September.

Q. What medication was Miss Johnson on if you recall at the time that you visited her at the Linn County Jail in January of 2001?

A. I believe she was taking an older antidepressant that had

3300

some sedative side effects. The trade name of it is Elavil. The generic name is amitriptyline. She also -- that was supplemented by a second antidepressant called Trazodone which is also an older antidepressant with some sedative side effects. Part of the reason for that was she continued to have difficulty sleeping.

Q. Did you recommend that that course of treatment be continued, the Elavil and the Trazodone?

A. I didn't recommend continuing Elavil because ironically that's a particularly lethal drug in overdose. And I've actually seen a couple of cases where inmates have killed themselves by hoarding the medication and overdosing on it. I recommended something that was a little more targeted for people with depression and anxiety and some posttraumatic symptoms which was one of the newer antidepressants. I think I recommended Paxil. The psychiatrist I think prescribed

Page 13

Prozac -- and that didn't work very well -- and several others before he -- including Paxil before eventually she settled on the two medications she's on now which one is an antidepressant called Zoloft and the other one is a -- basically started as an antipsychotic drug. It's named Seroquel, but they have found it has mood-stabilizing properties. And she's been on that now for probably nearly a year and a half and seems to be doing fairly well on it.

Q. After you saw her in the Linn County Jail in January 2001

3301

and you made these recommendations in terms of a change in medication and that perhaps she didn't need to be on suicide watch, did you follow up with Mr. Willett, that is, kind of report back to him about your findings and observations?

A. At his request he had me write a brief letter to the jail. I also did follow up with him and let him know my interview findings with her, and he asked that I actually see her again to kind of assess her progress, and I believe that was in June of 2001. And I think I combined those two interviews and kind of gave him an overview of what I had seen. And after that, I really did not hear about the case again for years.

Q. How was Miss Johnson doing when you saw her again in June 2001, five months after your initial visit?

A. I thought she was doing somewhat better. She had been on -- she had had a medication change. I thought that she was responding fairly well in terms of that medication change. She was certainly not as depressed. She wasn't suicidal.

Q. After that visit with her in June 2001, you reported back to Mr. Willett you said?

A. Right.

Page 14

Q. And then for a period of time you really didn't have much contact with her or her case.

A. Yes. The next time I heard from anyone about her case, I think Mary Goody sent me some records in June of 2002 with really not very much explanation, just some jail mental health

3302

records. And then the next contact -- that was a year later. And then the next contact I had was actually about three and a half years later when you contacted me in November of 2004.

Q. And at that time what were you asked to do in reference to Miss Johnson and her case?

A. At that time I was asked to basically reassess her situation, particularly with the possibility that if she was convicted there might be psychiatric testimony at the penalty phase of her capital sentencing.

Q. And is that something you've done in the past in other capital murder cases?

A. Yes.

Q. All right. So in response to that request, what did you do?

A. I reinterviewed her in January of this year, prepared a list of things that I had not seen which is really pretty extensive, and then after I did that, beginning in about April of this year, I really received pretty much a barrage of materials that wound up being about two banker's boxes full of things to review.

Q. So you got a bunch of stuff closer to the trial date.

A. Always happens that way.

Q. Yeah. That probably does. Did you have occasion to interview anybody in connection with Miss Johnson's case other

Page 15

than she herself?

3303

A.   Yes, I did.

Q.   Who did you interview?

A.   Basically this got organized by I believe Mary Goody who had done some mitigation work and had done quite a bit of work over the interim talking to a number of friends and associates of Miss Johnson.

Q.   Just to interrupt you for a second, Doctor, but I'm sure the jurors haven't heard of Miss Goody's name.  Do you know what she does for a living?

A.   Yes, I do.

Q.   What is that?

A.   She generally works with attorneys in developing mitigation evidence not only for federal capital cases but for other cases as well.

Q.   Have you had occasion to work with Miss Goody in the past?

A.   Yes.  She now lives in Wyoming, but I had known her for many years since probably I began doing work in Missouri in the mid-1980s.

Q.   And I interrupted you.  You were starting to tell us about the interviews of other individuals that were arranged by Miss Goody.

A.   Basically it was arranged that we would interview a number of people one after another over a two-day period which occurred in early May of this year.  And the interviews were with Pearl Jean Johnson who is her mother.  We interviewed all of her

3304

Page 16

siblings, Holly, her youngest sister; James, her brother; her older sister Wendy; her younger sister Jamie.

We also interviewed -- in addition to her mother, we interviewed her father and her stepmother. We interviewed Carol Mann who is a friend of her mother. We also interviewed several of her friends, Mikell Olson and Dave Nieman, and we also interviewed Kim Swalve who is a woman who had become a friend of her mother who actually lived in the home with them as she was growing up. Talked to both of her daughters Marvea and Alyssa; her former husband Arlyn Johnson; and another friend, Todd Graham.

Q.   And approximately over how much time did these interviews take place?

A.   Well, it was 2 days, a little over 16 hours.

MR. BERRIGAN:  May I approach the witness, Your Honor?

THE COURT:  You may.

BY MR. BERRIGAN:

Q.   Dr. Logan, I've just handed you Defendant's Exhibit 2167. Do you recognize that document?

A.   Yes, this is a copy of my curriculum vita.

Q.   And what is a curriculum vita?

A.   It's a resume where you list your educational background and training and different professional activities that you've done over the years.

MR. BERRIGAN:  Defendant would offer Defendant's 2167,

3305

Your Honor.

                    *   *   *   *

            (Defendant Exhibit 2167 was offered.)

                    *   *   *   *

                    Page 17

MR. WILLIAMS: No objection, Your Honor.

THE COURT: 2167 is received.

* * * *

(Defendant Exhibit 2167 was admitted.)

* * * *

BY MR. BERRIGAN:

Q. So in addition to interviewing these people that you interviewed over the course of the 16 hours or so and your discussions with Miss Johnson, roughly what other materials were provided you to aid you in coming to your determinations and findings regarding her mental conditions?

A. Kind of a time line had been prepared by Miss Goody that I reviewed. She labels it a chronology. But it is based on a collection of a number of records, everything from county records to Social Security Administration records to family medical records to the person's prior records from various mental health facility and even police records and employment records. And so I reviewed her chronology, and then I got the background documents and reviewed those as well which included kind of wide spectrum of records I talked about.

I also had looked at all of her correctional records

3306

since her arrest back in July of 2000, and that included the Benton County Jail, the Black Hawk County Jail, the Linn County Jail, and more recently the Hardin County Jail.

Q. In connection with the work that you did in this case, Dr. Logan, are you being compensated?

A. Yes, I am.

Q. What is the rate of compensation that you charge?

A. My standard price is $225 an hour.

Page 18

Q. And how does that compare to a person of your expertise and experience of 25 years or so of psychiatry?

A. Pretty standard.

Q. Okay. Based on the interviews and all the materials you reviewed and your discussions with Miss Johnson, were you able to make findings regarding some mental health conditions that existed in her case?

A. Yes.

Q. What in a summary fashion -- before I do that, let me interrupt you for one moment. Are there occasions in which you are sometimes asked to assess defendant's mental health at the time of the actual incident, that is, what their mental state is at the time of the murders for which they're charged or for which they've already been convicted? Does that occur in your practice?

A. Yes, it does.

Q. And does it happen both pretrial and posttrial?

3307

A. Well, the only time it would occur posttrial, of course, I suppose would be in a sentencing issue, but sometimes in postconviction relief if they determine that perhaps an attorney should have raised a defense based on the person's mental state and did not, it may come up later in appeals.

Q. Were you asked to do that in this particular case?

A. No.

Q. And as a result, in fact, did you question Miss Johnson about her mental state at the time of the murders for which she was charged?

A. I was specifically asked not to, as a matter of fact, and so --

Page 19

Q.    And was there an explanation given to you for that?

A.    Yes.  Basically that there was no intent on the part of the defense to raise mental health issues in relation to the acts that form the basis for her charges themselves.

Q.    And so when you proceeded to kind of incorporate all this information that you had received, all these documents and records and these interviews and your discussions with Miss Johnson, what were you looking at specifically in terms of mental health issues?

A.    Generally what her life experiences had been and how that affected her emotional composure, stability, and life adjustment.

Q.    And in doing that, in a summary fashion first before we

3308

discuss it in detail, what conclusions did you come to?

A.    The conclusion I came to is that she had had a very stressful childhood marked by a number of things that often predisposed a depression when a person reaches adulthood, and those included things like physical abuse, divorce, some emotional abandonment on the part of her mother, potentially some sexual abuse, and then also some fairly unusual and traumatic religious experiences that had created an atmosphere of fear.

Q.    What was the significance again in sort of a summary fashion of these findings?

A.    The significance of them is that any of these things alone normally will predispose somebody, make them more fragile as they go through adulthood in terms of how they respond to various life changes and crises in their life.  Certainly people who've had this type of background just don't have the

Page 20

foundation that somebody would have emotionally that has come from a more stable environment, and you find that they're often more likely to become depressed, to have anxiety attacks, to have a poor life adjustment, to have higher rates of things such as drug use.

Q.    In regard to depression, did you find the presence of existing depression with Miss Johnson?

A.    Yes, I did.

Q.    And were there particular areas in her history that you

3309

thought were significant for that particular finding?

A.    Yes.

Q.    And what were those?

A.    Basically in her history as a child, her parents divorced at a fairly early age.  She witnessed conflict between her parents before the age of four when they divorced.  Her mother had her own mental health issues and had been a victim of physical abuse and sexual abuse herself as a child.  Consequently, her mother often would blow up, and not only Ms. Johnson but her siblings would describe frenzied beatings with a belt and later a paddle.

Later she -- her mother and her grandparents became involved heavily in religion.  There were episodes not just with Miss Johnson but with her siblings as well when her mother or the parents would suddenly believe if they were demon possessed for some reason, this would result in exorcisms.  Several -- her older sister Wendy particularly gave a fairly graphic description of one that was done on Angela where she was held down by three people screaming and kicking that lasted for several hours, described it as a terrifying experience.  Wendy

Page 21

tried to intervene and kind of was rebuked by the grandfather who said, Get thee behind me, Satan.

Other siblings and Miss Johnson told incidences where her parents would suddenly just decide that their toys were satanically influenced. The toys were then taken and thrown

3310

into a trash barrel and burned. Her grandfather decided the TV was Satanic, and it was smashed with a hammer. They had a pet dove. They decided that that had a demon in it, and they did a three-day exorcism and eventually let the dove go because they thought that was demonic.

There was a time when her grandmother Florence thought she saw a wolf at her window. She went over in the middle of the night to their home and said the end of the world was coming. Her mother loaded and her grandparents got in the car with all four of the kids at that point, and they drove around with nothing but -- no food at all for approximately three days. For direction they were following a scar on their the mother's leg during the day and a star in the sky at night. Her sister Wendy talked about how the kids were beginning to hallucinate from lack of food. They eventually stopped at a church and were fed, but they hadn't eaten in so long that they just vomited the food back up.

There was a whole series of these kind of religious experiences. The grandmother later in life became involved with various spiritual exercises. She would go down their basement and beat on a tire with a hammer or a baseball bat and would make loud groans. The kids were afraid to go in the basement because they were -- thought demons were there. They frequently had to check each other's head for the mark of the beast, see if

Page 22

number 666 were on their heads.

3311

At various times their mother would decide that they had a demon inside, and they would have to go through exorcisms not just with Angela but also with the kids. The exorcisms would sometimes be two or three times a week.

Q. Did they describe -- the information that you got, first of all, when you were talking about Wendy had described this or the kids had described that, did they talk to you about these matters during the interviews that you conducted with them?

A. Yes, face to face I heard it from not only -- well, I actually heard from her mother too. Her mother admitted that she would slap and beat the kids and was at times overwhelmed and really wasn't able to be there for them emotionally. Every -- not only Angie but every single one of her siblings told exactly the same story about the three days roaming around thinking the end of the world was going to come, the multiple exorcisms, the physical abuse, the being scared about demons, having the toys destroyed. All of these things all of the siblings remembered, not just her.

Q. What about the exorcisms? How did they describe them?

A. Basically they described the exorcism that the person would be made to lie down. They would be held down actually, and the grandfather would be at their head with a Bible kind of rebuking Satan while the other two, the mother and grandmother, would be on each side holding the person down, and they would be yelling and screaming and praying and that Angie was somewhat more

3312

resistant than the other siblings and it would last longer with
Page 23

her. Eventually the siblings caught on that -- and Angie did too that if they gave some sign that the demon had left, if they could belch or make some kind of a grown or utterance or do something, then that exorcism would stop. And so they eventually learned ways to truncate it at the time.

Q. They would pretend that some demon had passed from their body.

A. Right, and that would end that session. But it was very capricious. They really didn't know when it was coming or when their mother would make some decision that this needed to be done.

Q. What -- well, before we talk about the results of these experiences, besides the physical abuse that you heard about and the religious experiences that the children went through, was there any other abuse noted in Miss Johnson's childhood history?

A. Yes, there was, but there was more I might want to say about the religious abuse.

Q. Oh, I'm sorry. I didn't mean to interrupt you. What other things were you told?

A. In terms of the religion, it had a couple of effects. The immediate effect, of course, was in terrifying the kids and making them panic and fearful.

But the other thing that it really did is it isolated them because the other kids in the community learned about this.

3313

They attempted to talk about some of their experiences at school. The other kids thought they were weird, they couldn't come over to -- you know, have kids over to their house because they didn't know when this was going to happen. Really saw themselves as kind of the town freaks and were kind of looked
Page 24

down upon they thought by other people because of these religious beliefs.

Another factor was because of fear perhaps their mother moved repeatedly during their childhood, and so they never really had a chance to put down roots and get to know people very well. And this had probably a little bit more severe impact on the older kids than it did the younger ones because eventually the mother did get a restaurant and they settled down somewhat. But particularly in the early years, this really had the effect of not only traumatizing them directly because these experiences were very frightening but also isolating them from other people.

And then a third thing was that because their mother was so obsessed by religious ideas, they really didn't feel like she was available for them in any other way. It was not a very nurturing environment. There were very few normal times they spent with her.

Q. Did you talk to Pearl Jean Johnson about that aspect of her mothering skills? Did she give any explanation as to what she attributed her problems to?

3314

A. Well, one of her problems was her own background in that she had been physically and sexually abused by a stepfather herself, that when her mother and stepfather divorced, then her mother went to work, and she had been raised by a grandmother who spoke primarily Norwegian and kind of had the opinion the kids should be seen and not heard. So the grandmother was pretty distant. Her mother was working, and she'd been abused by her stepfather. Her own father had died very early. She just didn't have an emotional background to give the warmth and

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2906 of 3592

empathy that a kid might need growing up.

In addition to that, there was a lot of conflict when she married Angie's father. And they had fought, divorced when the kids were pretty young, and all of a sudden, she was a single mother with four kids on welfare.

Q.   Would you do me a favor, Doctor? Do you think you could slide your chair up maybe six inches? Yeah. Okay. Thank you. Appreciate that. It's sometimes hard to hear here.

A.   All right. Is this better?

Q.   Yes, much better. Thank you.

A.   Okay. Great.

Q.   Okay. So you've discussed -- was there anything else about sort of the unusual religious practices that was discussed with you during these interviews and your review of the material we haven't talked about?

A.   No.

3315

Q.   Do you remember anything about fasting being discussed?

A.   Yes, excuse me. I didn't mention that. But yeah, that was a pretty standard practice for them not to be able to eat food during the daylight hours, and a couple of them did mention that one of their memories of childhood was being not only poor but continuously hungry.

Q.   And then we were starting to talk about other aspects of abuse. Other than the physical abuse and then this sort of unusual religious ideology, was there anything else in Miss Johnson's background that suggested abuse to you?

A.   Yes, there was. One additional thing about the religion -- and this played a significant part in a couple of the siblings -- is that their mother would read them stories from

Page 26

the Bible. And one of them was about Abraham sacrificing his son Isaac. And they had asked if she would ever do that with them. And she said, you know, If I'm led to, yes, I would kill you. And so they never knew whether they were in immediate threat from their mother in terms of where her religious beliefs might lead her.

There also was another area that was traumatic in that there were several father figures that came along through relationships with their mother that were disruptive. At one point they had moved out to Colorado, and there was a repairman who had taken an interest in Jean, Angie's mother, and had done some family activities with them, and this was really one of her

3316

first experiences of having more of a normal family existence. This was before her mother became preoccupied with religion.

But then inexplicably, her mother had moved back to Iowa, and primarily that was to resume a relationship with a man who was married at the time and eventually became Holly's father. Actually the man died in a motor vehicle accident during the time that her mother was pregnant with her youngest sister Holly, so there was a loss of that individual as well.

Her mother was depressed enough about the unexpected pregnancy with her youngest sister that she loaded all the kids in a car and she and the kids drove to a place called the Teardrop Orphanage near Chanute, Kansas, and this was run by two individuals named Ted and Bobbi Dillo who were known to a friend of hers named Carol Mann.

Q.     Do you know where Chanute, Kansas, is?

A.     Yes. I'm from Kansas. I've lived in Kansas a lot. I know where Chanute is.

Page 27

Q. Could you tell the jurors roughly where Chanute, Kansas, is located?

A. Sure. Well, as you know, like a lot of midwest states, Kansas is kind of square. And if -- it's kind of -- if you divided it into quadrants, Chanute is probably in the middle of the southeast quadrant of Kansas. It would be, oh, probably 150 miles or so south, southwest from Kansas City.

Q. And I interrupted you. You were talking about this

3317

orphanage run by Ted and Bobbi Dillo. What did you learn about that?

A. Well, that the Dillos had been involved with Carol Mann through some of their shared religious beliefs and were in the process of trying to build a church with an outreach ministry which included an orphanage, and they had taken in several small Indian boys, American Indian boys, and also had three of their own daughters who I believe were teenage years, and Jean went down there with her children which at the time included Wendy, Andy -- Angie, Jamie, and the youngest, Jim. And basically they all described that the experience was absolutely terrifying. The Dillos had some rather sadistic practices, would purposely try to scare them.

Jim recalled that they would have him touch a fence to see if it was electrocuted or wired with electricity, and he would get shocked. They would have him go slop the hogs standing very close to the -- some fairly large hogs that he had seen eat live cats and kittens that would go in to get the food. They would cut the heads off of chickens and have the chickens chase the kids around the barnyard. They had the kids witness animal butcherings including butchering a rabbit where they

Page 28

would hold the rabbit's head down and then drive the rabbit's head into a nail causing its eyes to pop out and see the rabbit's stomach eviscerated.

This is the kind of things that they would have

3318

nightmares about. Angie's younger brother Jim described that he continued to have nightmares about his experience there clear up through the time he was in college.

There was also a suggestion that Ted Dillo was sexually molesting his older daughters who would have to go in in the afternoon and take naps with him. Eventually this happened to Wendy as well, and she basically described how Ted Dillo masturbated while lying next to her in bed.

Ms. Johnson's memory of that has varied somewhat. When I first interviewed her back in 2001, she recalled that Mr. Dillo had approached her sexually one time and tried to fondle her, and she basically had told him if he did that that she would come back later and get him, and he had backed off.

Wendy recalls, though, later, some years later, they both got to talking about their sexual experiences, and Angie had told her that she too had been abused by Ted Dillo but didn't go into specifics. More recently when I interviewed her, she didn't recall that, and sometimes people do repress memories of experiences like that.

Q. Can I ask you about that briefly?

A. Sure.

Q. In your practice over the last almost three decades, have you treated patients that have suffered from sexual abuse as a child?

A. Numerous times.

Page 29

Q.    And is that an area that is sometimes difficult in terms of getting the client to reveal the underlying abuse?

A.    Well, absolutely.  I mean, it's things that people like to -- it's embarrassing.  It's traumatic.  They like to bury it, not talk about it.  It's kind of a taboo subject, and it's something that's pretty hard for somebody in a forensic interview who hasn't had the opportunity to establish an ongoing relationship to have somebody come in and talk to them about it freely.

Q.    Was there anything else at the Dillos that was reported to you that you thought was significant?

A.    Yeah, the living conditions.  Apparently they were in some kind of a shed.  The shed was mice infested, the kids being -- talked about being force fed food.  I think at one point the Dillos threatened to wash Jim's mouth out with a hog brush. Wendy and Angie I think both intervened to try and stop that from happening.  Jim recalls being made to eat a bar of soap.

One of the more significant things about this is even though Jean had gone down there with the kids, she was so involved with doing things with the church that several of the kids actually didn't even remember she was there.  They thought that she had just left them there.  All of them thought that they were basically going to be abandoned at that point.

Eventually I think Wendy did contact her mother and told her about some of the sexual things that Ted Dillo was

3320

doing, and she got ahold of her mother and had -- and Carol Mann

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2911 of 3592

recalls driving basically down to Chanute to pick them up in the middle of a snowstorm, not an opportune time for Jean to leave because she was very far along in her pregnancy with Wendy (sic) who was delivered about a month later after they left.

Q.   Were there other aspects of Angela's childhood that were reported to you that you thought were significant in your findings?

A.   Just in terms of some of the emotional impact of this kind of childhood --

Q.   We haven't discussed sort of the impact of these episodes, and, of course, we want to know what that is.  You've sort of mentioned that -- this kind of a constant siege of terror in this household as a result of lots of these incidents.  Is that one of things you thought was significant?

A.   Well, actually I think you're borrowing some words from what her brother actually called their childhood.

Q.   What did he tell you?

A.   Under siege I think is a word he used primarily in an interview with Miss Goody, certainly was something they wanted to escape, and eventually all of them did escape in various ways and something that all of them have struggled to deal with in various ways throughout their life.

Q.   What's the significance of that childhood experience, this constant living in siege or living in terror for people as they

3321

get older?

A.   Well, for one, they have very poor self-image.  Certainly to believe and being told by your mother that you are demon possessed and evil isn't something that isn't a positive self-concept for a child.  Also the fact that you're constantly

Page 31

under threat from invasion by unseen forces such as demons creates an atmosphere of fear. To be suddenly exorcised or to be beaten certainly creates an atmosphere of intimidation.

Certainly children exposed to that kind of pyrotic trauma, there have known to be shrinkage in certain areas of the brain where it's possible for memory integration. Additional impact of that is the kids become impulsive in terms of trying to escape. There can be fairly early drug abuse, early sexual experiences that are premature. Their normal maturation process is stunted. Often they don't go through a normal school development in terms of graduating from school. They drop out early, can't concentrate well in school.

Q. Did you find that some of these predictors, if you will, were actual experiences of the children involved, that is, the Johnson children?

A. Yes. Particularly the two oldest girls, Wendy and Angie, both married fairly early to get away from home. There was fairly early substance abuse. I think Miss Johnson said that she was drinking alcohol by fifth grade. By seventh and eighth grade, there was experimentation with stronger drugs including

3322

LSD, an hallucinogen, and also marijuana use which kind of can have a tranquilizing impact, also some stimulants in the form of white crosses. At age 13 she was depressed enough that she tried an overdose and was taken to a local hospital to have her stomach pumped.

So there was early evidence of wear-and-tear depression, drug use, the efforts to escape the home situation. Others of her siblings escaped in various ways. Her younger sister became more withdrawn. Her older brother -- her younger

Page 32

brother had athletic talent and eventually began spending more and more time at home -- away from home as he grew older at the homes of girlfriends and friends. Experience was more normal.

Another thing that Ms. Johnson did was -- by the time she entered junior high school, her mother with another friend had formed a restaurant in a small town, and she basically quit school fairly early, I think the fall of her ninth-grade year, and spent most of her time working in the restaurant, and that was a more stable existence for her. But even there there was some impairment about the religion as the mother would try to evangelize various ones of the customers.

Q. I know we're going to have another psychologist talk about the sexual abuse in more detail and what implications that has, but does -- the report of sexual abuse, does that have any long-term implications for somebody who suffered that type of experience as a child?

3323

A. Well, sexual abuse, of course, varies from individual to individual. I mean, you know, under that collective heading you have people who've been in incestual relationships for years or been abused by pedophiles for years or have had terrifying one-time experience, so the stressor varies.

In terms of Miss Johnson's background, the sexual abuse could be a factor, but certainly it would be hard to choose between the various stressors. Certainly you don't have to isolate one alone. It would be hard to tease out one alone.

Simply I think the thing is -- that I noted was this was a childhood that really predisposed somebody to being mentally ill, to really struggling during life, to having a lot of anger, resentment, depression, bad feelings about themselves,

Page 33

no sense of real security, perhaps a search for that because, you know, she was basically also estranged somewhat from her father, had conflict with the stepmother. Her mother and grandparents were involved in this religious situation. Various men would come through, but for various reasons they were never there long enough to form any kind of real stabilizing influence.

So these kids basically -- and Miss Johnson wasn't the only one. They had the sense of a group of survivors who banded together themselves, and they took various roles.

Wendy was the -- somewhat of a parental figure. Angie was somewhat more forceful, and she was kind of seen as a

3324

protector of some of the younger siblings. And particularly her youngest sibling Wendy really talked about her in more like a surrogate mother for her.

Q. You mean Holly?

A. Or Holly rather, excuse me, yes. Holly talked about her more as being kind of a surrogate mother. There was a story told by Jean -- and I think Angie told me this as well -- about her using her babysitting money to try and send it to Cambodian orphans, and eventually she was sending all of her babysitting money, and her mother made her stop. But there was a strong need on her part to try and rescue people that she saw as being bullied or disadvantaged in some way.

Q. What did you -- did you attach any significance to the fact that Pearl Jean Johnson knowing of this abuse didn't make any effort to report it to authorities or take any action respecting what she claims she knew?

A. It didn't really surprise me. I mean, basically there's

Page 34

still a lot of stigma associated with psychiatric care. Particularly that stigma's pretty prevalent in small towns, not unknown in large towns either. And it's really not unusual at all for people to kind of struggle on for years with some major problems without really seeking out help.

Certainly there were times when her mother herself could have used some help and she didn't seek it for herself. I just don't think the idea of doing that was something that she

3325

was attuned to. She was a survivor. She did the best she could. She did raise the four kids. You know, some of the religious preoccupation she had she got from her mother and was a way of coping herself with some of the uncertainties in her own life in feeling overwhelmed.

And so in this way you can often see problems that began in one generation passing on down to another generation, and one of the things that I picked up through my interviews that was really important to Ms. Johnson was that as much as possible she wanted to be a better influence on her own daughters than what she had experienced.

Q.   And you're talking about Angela respecting her daughters as opposed to her mother and her experience.

A.   Right, in terms of her relationship with Alyssa and Marvea and a real concerted effort on her part to be nurturing to them, to be loving to them, to become involved with them in their school, and uniformly everyone who knew her did talk about her being a really good mother to her kids.

Q.   In addition to your investigation regarding her childhood, did you also look at her adolescent years and her years as a young adult?

Page 35

A.    Yes.

Q.    Were there areas of significance in that period of her life that you thought might be important to your findings regarding her mental health situation?

3326

A.    Yes, there were.

Q.    And what areas did you find were significant?

A.    A fairly early marriage, early I believe when she was 16, to a man named Steve Hugo, primarily as a way to get away from home.  That marriage lasted only a very brief time.  She moved back home again, and then there was a marriage to Arlyn Johnson.  There was a -- soon that marriage for a short time and the production of a daughter Alyssa ended, and she moved on to other relationships.  And there was a real sense that she never really felt protected or secure or satisfied in a relationship, so there was a constant searching for something, a need that she really couldn't fill.

Q.    Did you learn anything regarding a relationship she had with a fella by the name of Terry DeGeus?

A.    Yes, I did.

Q.    And what were your sources in terms of that information?

A.    Angela Johnson herself, her sister Wendy talked about that.  Her younger sister Holly talked about that.  She had a friend Dave Nieman who talked about that.  Other family members were aware secondhand of what the relationship had been, although they didn't meet Mr. DeGeus on any kind of regular basis, but they certainly saw the impact of that relationship on her.

Q.    That relationship with Mr. DeGeus, was that in any way relevant to your findings regarding her depression and anxiety?

A.    Yes, it was.  I also forgot to mention another source of

Page 36

information. There are actual police records of times when she reported some abusive activities on his part including a lot of stalking that went on.

I've also forgot to mention her daughter Alyssa was witness to a lot of this and made some pretty revealing statements about the relationship with Mr. DeGeus. Particularly to summarize, when she tried to separate from him, he became very possessive and abusive. It developed into a battering relationship and then a stalking relationship.

There was one I believe, Dave Nieman, who talked about picking her up on the roadside and giving her a ride after she'd been thrown out of a car with her face being bloody. There were times when she had gone to motels to escape when he had threatened her. For a time they went to Wisconsin, she and her younger sister Holly, to live with her sister. Alyssa talked at one point of remembering him raping her mother when she was in the next room and hearing that going on. There was also a kind of ambivalence or kind of aspect of the relationship that Ms. Johnson couldn't resolve.

Q.   What would that be?

A.   Her sister talked about -- I believe this was Holly -- talked about this, that when they were in Wisconsin Mr. DeGeus called her and told Angie that he was suicidal and that she talked to him for several hours on the phone to convince him not to kill himself and eventually they reconciled much to the

amazement of other people.

And so there was an aspect that she really loved him

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2918 of 3592

and hoped he would change. And this is not unusual in this type of relationship where there's chronic physical conflict in that there's emotional explosions and beatings, and then there's remorse and sorrow and then a hope that things will be better and reconciliations only to have the pattern repeat.

Q. This is kind of a cycle of abuse that occurs.

A. Yes, not unknown.

THE COURT: Mr. Berrigan, could I just give the jury a stretch break?

MR. BERRIGAN: Sure. Absolutely, sir.

THE COURT: Okay. Why don't we just take a short stretch break. Thank you.

Pardon the interruption. Thank you.

MR. BERRIGAN: No. That's fine.

BY MR. BERRIGAN:

Q. Dr. Logan, I think I forgot to ask you one area that we covered earlier about the childhood experience in terms of its relevance later in life, and that was the emotional abandonment issue respecting her mother not being there. Did you find that that had any relevance to your findings regarding her depressive condition?

A. Yes. I think I probably did touch on that issue somewhat, but certainly the kids felt abandoned by their mother when they

3329

were taken to the orphanage down in Kansas. They often felt that she was not there for them emotionally because of her preoccupation with the religion. The mother admitted that often she thought she wasn't there emotionally for her kids. She would blow up and strike them.

At other times the kids heard her say things like they

were a burden or an imposition to her. She did have particularly the first four kids in fairly rapid succession. Then she was left with really no income. She was divorced. The father lived in a different state. There were some visits, but particularly for Angie those visits did not go well and didn't continue. So there was a real issue that the kids had where there is just no stability there, no one here who will always be here for us or who can support us. And so there was really no stable foundation.

Q. Were there particular records -- let me withdraw that question first.

In her history did you find documented instances where Miss Johnson had been diagnosed as being depressed or that she had taken action such as suicide attempts to substantiate your findings of depression?

A. In terms of documents, there was a time in 1996 when she went to a local mental health center on referral from I guess a hospital emergency room. And the issue at the time was that she was once again moving. She had gotten an opportunity to take a

3330

job with a country club down in Urbandale, a suburb of Des Moines. Her daughter Alyssa was at an age where some of her primary attachments were to friends, really was not enthusiastic about this move, and both Alyssa and Ms. Johnson herself were depressed.

Q. I'm sorry to interrupt you, but do you recall specifically the agency from which those documents came?

A. I think there was North Iowa Community Hospital, and then there was the Mental Health Center of -- North Iowa Mental Health Center. They were both located I believe in Mason City.

Page 39

MR. BERRIGAN: May I approach the witness, Your Honor?

THE COURT: You may.

BY MR. BERRIGAN:

Q. Dr. Logan, I've just handed you Defendant's Exhibits 2020 and 2016. Do you recognize those records, sir?

A. Yes, I do.

Q. Could you tell the jury what they are?

A. One of them is the North Iowa Mercy Health Center where she went in March of 1996 and first discussed some of her own suicidal thoughts, and she got referred then for additional care to the Mental Health Center of North Iowa. Both of these as I recall were in Mason City and was seen at the Mental Health Center for the next several months both by an individual therapist and a psychiatrist.

Q. And was her daughter Alyssa also experiencing some mental

3331

health problems at the same time?

A. Yes.

MR. BERRIGAN: Defense would move to admit, Your Honor, Defendant's Exhibits 2016 and 2020.

*   *   *   *

(Defendant Exhibits 2016 and 2020 were offered.)

*   *   *   *

MR. WILLIAMS: No objection.

THE COURT: 2016 and 2020 are admitted.

*   *   *   *

(Defendant Exhibits 2016 and 2020 were admitted.)

*   *   *   *

BY MR. BERRIGAN:

Q. Were there other records provided to you that aided you in
Page 40

coming to a determination about her mental health findings particularly in the area of depression?

A.    Well, in terms of depression, really the most consistent records that I had were those after she was incarcerated in July of 2000 through about April of this year.

Q.    And that would include the jail records from the Benton County Jail?

A.    Yes.

Q.    Those were records from 2000, were they not?

A.    Yes.

Q.    And she was also in the Black Hawk County Jail in 2000?

3332

A.    Very briefly, for about two weeks in October of 2000.

MR. BERRIGAN:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. BERRIGAN:

Q.    Dr. Logan, I've handed you records that have been marked Defendant's Exhibits 2027 and 2126.  Do you recognize those documents?

A.    Yes.  These are records from the Benton and the Black Hawk County Jail.

MR. BERRIGAN:  Defendant would move to admit 2027 and 2126, Your Honor.

                    *   *   *   *

(Defendant Exhibits 2027 and 2126 were offered.)

                    *   *   *   *

MR. WILLIAMS:  No objection, Your Honor.

THE COURT:  Those exhibits are received.

                    *   *   *   *

(Defendant Exhibits 2027 and 2126 were admitted.)
Page 41

* * * *

BY MR. BERRIGAN:

Q.   You've told us a little bit already about the Black Hawk County Jail incident in terms of that prompting your involvement in the case when you were called by Mr. Willett.  What do you understand -- from your review of the records and your interviews and assessment of the materials provided you, what do

3333

you understand the situation to have been, this suicide attempt in October of 2000?

A.   Well, to start with, she was evaluated at the Benton County Jail and found to be depressed there and was placed on an antidepressant medication called Serzone.

Q.   I'm sorry?  What type?

A.   Called Serzone, S-e-r-z-o-n-e.  It's an antidepressant.

Q.   And was that a medication that she was prescribed daily?

A.   Yes.

Q.   And do you know whether that was continued throughout the period of time she was at the Benton County Jail?

A.   It was continued until early on, first day or so, in the Black Hawk County Jail, and then they changed that and put her on a different antidepressant for sleep called Elavil.

Q.   Do you know what prompted the Black Hawk County Jail to change her medication?

A.   Depression -- oh, the change.  Boy, that I don't know. Frankly, it's usually the situation that if somebody's on a certain medication they'll remain on it.  Serzone, however, is a newer antidepressant that doesn't have a generic equivalent yet because it's still under patent.  Many jails from my own experience choose to go with older antidepressants because of

cost. I don't know if that was a factor. I'm speculating.

Q. As between those two medications, the Serzone and the Elavil, is one of those a preferable medication for the

3334

treatment of antidepression as to the other?

A. Both of them can be equally effective. The Elavil is often given for sleep because it carries a side effect of sedation. It can also cause blurred vision, dry mouth, and constipation, and it's particularly lethal if somebody hoards the medication for an overdose, so I don't like to use it with patients that I'm concerned about their stability. The Serzone is a newer antidepressant and more effective in people who have both depression and anxiety.

Q. Was Miss Johnson then kept on Elavil during the time she was at Black Hawk County?

A. Yes, she was.

Q. And then we were starting to discuss the actual suicide attempt. Were you able to, from your review of the records and interviews, make some determination as to what had occurred there?

A. Yes, I talked to her directly about it and also reviewed the records from the jail and from Allen Hospital where she was taken after the attempt.

Q. We've heard some testimony about that, Doctor, but I wonder if you could just summarize for the jury what you determined the suicide attempt at the Black Hawk County Jail to consist of.

A. Basically she was upset about two -- well, one issue in particular. She was really upset about the potential long-term separation from her daughters, and she had appealed I think the

3335

fact that the judge had not granted bail and learned in a letter that day that she had lost that appeal and would have to be incarcerated through the time of trial and wouldn't be able to have any physical contact at least with her daughters.

I believe she also got news that day that the bodies of Mr. Nicholson and the Duncans were found.

Q.    Not to interrupt you, but were you aware that the Black Hawk County Jail did not allow visitation for Miss Johnson's children because of their age?

A.    No, I wasn't actually.

Q.    Okay.

A.    That became -- the type of note -- the no-contact visits had been an issue for her in terms of not being able to touch her children in various jail settings, but I wasn't aware that Black Hawk had not even visible contact.

Q.    All right.

A.    But that certainly could have influenced her I think.  At any rate, she had already been depressed.  She had mentioned to another female inmate who had a history of suicide about what would be the best way to kill yourself, and the inmate had mentioned with a sheet.  She had gone to an area of the jail where there was poor visibility from the cameras.  There was an unmonitored area.  And she had tied a sheet around her neck and had jumped off the second rail, upper balcony I guess of the jail.  And another inmate had just received an intercom to come

3336

out for her medication and, in the process of doing so, happened to see her and started screaming for help.

Page 44

There was some other behavior they discovered afterwards. There were several letters in her jail that contained references to her death including one to her daughter and one to a boyfriend at the time. She had turned down a visit from her attorney that morning and also a professional visit from a mental health person. They had called in to assess her. So she refused both of those.

When they found her, she was -- her feet were dangling, didn't touch the floor. They had to hold her up. The noose was tight enough around her neck that they couldn't untie it. One of the officers had to run upstairs and untie the other end from the rail. She was blue in the face. She was foaming at the mouth. She was initially not breathing but then began gasping for area and began spitting and flailing. They restrained her and called an ambulance, and she was taken to the hospital, assessed in the emergency room, placed in the ICU.

Later she had no memory of this which is not atypical when somebody suffers a period of anoxia. So this was a very serious suicide attempt that very nearly worked.

Q.    In your career as a psychiatrist, have you had occasion over the last two and a half decades or so to treat people who have attempted suicide?

A.    Yes, I've been involved in legal suits where inmates have

3337

successfully hung themselves in jail. Hanging is the most common method of suicide in jails. I've also been involved in jail prevention suicide programs, training for actual officers what kind of signs to look for and have dealt with that issue also in state forensic units I've visited and consulted in.

Q.    Is there a term that's used to describe people who sort of

Page 45

pretend suicide, they make some overt -- take some overt action but not seriously engage in a real suicide attempt, more of a cry for help type of a situation?

A.   There are some people who make suicide gestures.  Some of those same individuals are sometimes accidentally successful in killing themselves, and some of them are more attention seeking.

I remember particularly back when I was in training I had a moonlighting job at a county hospital, and every weekend they would bring in the same lady who was found laying across a bridge, and she would get a free room for the weekend and was probably not a serious suicide attempt.

Q.   Was this a suicidal gesture in your view?

A.   Not at all.  This was a serious suicide attempt that very nearly worked.

Q.   I wanted to ask you about one aspect of it that's come up, and that is there's been some testimony that as Miss Johnson was being restored or revived, if you will, and was able to start breathing that she was combative with the individuals who were trying to treat her actually.  As a medical doctor, is that an

3338

unusual occurrence for people who have been deprived of oxygen for some period of time?

A.   No.  I mean, from people I've treated in the emergency room and also even from surgical experiences I've had, when somebody's in a delirious state and they're not completely aware of their surroundings, it's not unusual at all for them to be combative.  So usually that's something at least medical personnel are prepared for and move in fairly quickly and administer restraints if they need to if the person's highly agitated like that.

Page 46

Q. I wanted to ask you just a few questions about illicit drug usage by Miss Johnson. When you were kind of assessing her mental condition and reviewing all this information, did you receive information that she had used drugs, illicit drugs, for a period of time during her life?

A. Yes.

Q. And I think you've described some of that already in terms of her alcohol usage going back to fifth grade and then starting smoking marijuana in seventh grade and so on. What other types of information were you provided regarding her illicit drug use?

A. Some by herself, some by, you know, friends, former husband, other people that knew her, siblings.

Q. Is there any correlation or relationship between that type of drug usage and people that suffer from depression on a chronic basis?

3339

A. Yes, enough so that many psychiatric units have what they call dual diagnosis units where they both treat substance abuse but underlying usually mood disorders that tend to trigger and fuel the substance abuse. They found that simply an abstinence program alone without addressing the underlying emotional instability that often is a part of it is just not successful.

Q. So these are conditions they frequently do simultaneously?

A. Right, they often coexist.

Q. Let me ask you -- and we're going to have some testimony about methamphetamine in some detail, but as a medical doctor, are you familiar with the drug methamphetamine?

A. Unfortunately quite a bit lately. Really epidemic proportions across the midwest.

Q. Could you generally describe for the jurors what that drug

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2928 of 3592

is and what it does in a summary fashion if you could?

A.   Sure.   Methamphetamine is a really strong stimulant.   It really kind of produces a manic-like feeling of euphoria, and it does this by releasing a brain neural transmitter called dopamine.   It has very strong antidepressant effects in milder form, not -- not nearly as strong as methamphetamine, but in a milder form it actually was used by psychiatrists in the 1930s and 1940s to treat depression.   It was perhaps the earliest antidepressant.

Drugs called Ritalin was an example.   And that was fairly helpful for depression, but it had some downsides that

3340

are even more characteristic of methamphetamine.   It causes sleeplessness.   If someone continues to use it, they can become emotionally agitated.   They can become hostile; aggressive is fairly typical.   Many of them become paranoid.

There's also a problem that caused discontinuation of its use pretty much for standard depression in psychiatry in that if you try and withdraw from this medication there's a very strong rebound depression.   The depression comes back very quickly once the medicine's withdrawn.   It causes long periods of sleeping; hypersomnia they call it.

The medicine is still used in -- not methamphetamine but similar type drugs that are stimulants in lower dosage with hyperactive kids who seem to have what we call a paradoxical or just opposite reaction to these drugs.   They, in fact, slow them down.

And the other place that it's still used is in the elderly who sometimes have depression in very low dosages because it has a low incidence of side effects on things like

Page 48

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2929 of 3592

the heart function which might be important for elderly people.

But for -- in terms of street drug use, the methamphetamine produces an air of confidence, energy, well being. You may see truck drivers use it that need to drive long hours or people that work two jobs. And often Ms. Johnson did work two jobs and was pretty productive. But eventually it catches up with them in terms of lack of sleep and other things.

3341

Q. That rebound effect that you talked about, does that have some implications for long-term methamphetamine abuse?

A. Certainly makes it difficult to quit. I mean, there's two reasons to get addicted to it. Number one is being on it is very pleasurable. It's certainly a feeling of confidence and not having any -- being invincible and being self-sufficient is certainly something that the individual finds, you know, comforting and basically likes a lot.

But also if they try and stop, the effects of stopping are not good. You know, there can be sobbing episodes, crying, really strong rebound depression. So if they stop, there's really a period they will have to go through where it's really difficult and they probably would need some treatment to help.

Q. You've, I know, reviewed a lot of records. Have you looked at Miss Johnson's progress in terms of her treatment for depression now since she's been incarcerated over the last five years?

A. Yes, I have.

Q. And what do the records reveal in terms of her progress there?

A. Initially they had some difficulty finding a good antidepressant for her. She had a lot of side effects to a

Page 49

number of the different antidepressants, and sometimes they just didn't work all that well. But she went through the Serzone, the Elavil, Trazodone, Celexa, Prozac, and Paxil and didn't

3342

really do very well on any of those. And then they came up with a combination of what she's currently been on for the last couple of years, and that's an antidepressant called Zoloft, and she takes a fairly heavy dosage of that.

And then the second medication she's on is a mood stabilizer called Serzone that has just been found in the last couple of years to have this mood-stabilizing effect. It was originally used for another purpose. But on those medications she appears to be very stable, to be doing fairly well, has really been able to focus a lot more of her attention particularly on her younger daughter and on maintaining family contacts. And she has made a real effort to continue relationship with her mother, to repair relationships with her father. She's maintained contact with her sisters and to some extent her brother, and particularly she's been able to establish a line of support with her two daughters, particularly the youngest daughter Marvea.

Q. Is it safe to say she's not currently suicidal?

A. Yes.

Q. And hasn't been for some period of time?

A. Right. I don't see any evidence really since the fall of 2000 that that has been an issue.

Q. Way back when you first assessed her back in January of 2001, did you discuss suicide with her?

A. Yes, I did.

3343

Page 50

Q. And in terms of any concern that she might commit suicide in the future, did you talk to her about that?

A. Sure. And, you know, I certainly did not think that she was suicidal when I talked to her even back in January of 2001, but you never know, of course, you know, how somebody is going to react to the impact of future events.

But certainly the fact that she's on medication right now, that she has sources of support that she didn't have before, that she has not been suicidal in some time, that she has this real attachment to her daughters gives me a lot more confidence that she'll be able to weather other things in her future.

Q. In fact, even back then didn't she reference her daughters in discussing with you why she wouldn't consider further suicide attempts?

A. Yes, she did. And, I mean, the daughters played a role, frankly, in the suicide attempt itself in terms of the separation issue. I think what's happened is that she has a better hope now of being able to be a meaningful part of their life, of being able to establish some contact with them. She's got a project with Marvea that I'm sure Marvea will testify about, a memory book, that's been really important to her.

MR. BERRIGAN: That's all I have. Thank you, Doctor.

THE COURT: Mr. Williams, would you have any objection to deferring your cross-examination till after our morning

3344

recess?

MR. WILLIAMS: No, Your Honor. That'd be fine.

THE COURT: Okay. Members of the jury, it's ten
Page 51

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2932 of 3592

o'clock. We'll take our usual 25-minute recess. Please keep an open mind until you've heard all of the evidence in the penalty phase. Thank you.

(The jury exited the courtroom.)

THE COURT: Counsel, anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. Thank you. We'll be in recess.

(Recess at 9:59 a.m.)

THE COURT: Ready?

MR. BERRIGAN: Yes, sir.

MR. WILLIAMS: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Williams, you may cross-examine.

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.   Good morning, Doctor.

A.   Good morning.

Q.   I want to go back over some of the points you made during your testimony here this morning. One of the first things is

3345

you indicated you interviewed a number of people in addition to the defendant in this case in order to arrive at your opinions. Do you remember giving that testimony, sir?

A.   Yes, I do.

Q.   Those people were chosen by Mary Goody who was employed specifically to find mitigation evidence in this case; isn't that right?

Page 52

A.   Yes, it is.

Q.   And the people that were chosen were friends and family of the defendant; isn't that right?

A.   Well, certainly people that knew her.  Those would have been some of the same people I would have talked to if I'd been selecting people that certainly had contact with her.

Q.   Sure.  You didn't go out and find anybody who were enemies of the defendant --

THE COURT:  You know, Doctor, that wasn't responsive to his question, so you need to answer the question he asks you and not volunteer information.  Do you understand, Doctor?

THE WITNESS:  Yes.

THE COURT:  Okay.  It wasn't responsive at all.  He didn't ask you about who you would pick if you were picking witnesses, did he?

THE WITNESS:  No, sir.

THE COURT:  Okay.  So then why did you answer it that way?

3346

THE WITNESS:  Primarily to convey that the picks were logical.

THE COURT:  But it wasn't --

THE WITNESS:  But I didn't make them.

THE COURT:  That's right.  And so you need to answer his questions, not some question you hoped he had asked you; okay?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.

BY MR. WILLIAMS:

Q.   So the fact is, Doctor, you didn't interview anybody who

Page 53

was an enemy of the defendant; right?

A. No.

Q. Didn't interview any law enforcement officers about their dealings with the defendant, did you?

A. No.

Q. So you took as your guide who to interview the people that were told to you to be interviewed by an expert hired by the defense to find mitigation evidence. That's fair to say, isn't it?

A. Yes. They were selected by Mary Goody.

Q. Now, all of these people I think your testimony was indicated that Angela Johnson was a good mother; is that correct?

A. Yes.

3347

Q. And you agree with that assessment based on your analysis in this case.

A. From talking to her daughters I would say yes.

Q. Okay. And so you would apparently think that it's a good mother to -- while you have young daughters at home to be out dealing large quantities of methamphetamine while your daughters are sitting at home?

MR. BERRIGAN: I'm going to have to object to that, Judge. There's no evidence that the defendant was dealing large quantities of methamphetamine.

MR. WILLIAMS: I'll rephrase.

MR. BERRIGAN: One ounce is the highest we've ever heard.

THE COURT: You can rephrase.

MR. WILLIAMS: I'll rephrase, Your Honor.

Page 54

BY MR. WILLIAMS:

Q.   Are you suggesting that it's a good mother who is out dealing methamphetamine while her young daughters are at home?

A.   No.

Q.   Are you suggesting it's a good mother who goes out and buys an Intratec Tec-9 semi-automatic firearm while her daughters are at home?  Is that a good mother, sir?

A.   No.

Q.   Is it a good mother who gets herself so involved in criminal activity that she causes, she causes, herself

3348

ultimately to be incarcerated and separated from her children?  Is that being a good mother, sir?

A.   No, not at all.

Q.   These Kansas events I want to talk to you about.  First of all, they lasted less than nine months, didn't they, sir?

A.   I didn't hear all of your question.  I'm sorry.

Q.   Yes.  The Kansas events that you testified about, this event where they were in Kansas at this orphanage down there --

A.   Yes.

Q.   -- the entire time period they were down there was significantly less than nine months, wasn't it?

A.   Yes, it was.

Q.   And you called the activities down there sadistic.  Do you remember giving that testimony, sir?

A.   Yes, I remember using that word.

Q.   Sadistic is a pretty strong word, isn't it, sir?

A.   Yes, it is.

Q.   This was a farm, wasn't it?

A.   Part, yes, it was a farm.

Page 55

Q.   And the practices you're talking about is practices -- in part about the animals is the slaughtering practices that occur on farms even here in Iowa, isn't it, sir?

A.   Yes.

Q.   You indicated that they had the chickens after they cut off their heads chase the children around.  Are you suggesting that

3349

the Dillos cut off the heads of the chickens and then instructed the headless chickens to chase the children around?

A.   What I was suggesting was that they purposely placed the children where the chickens would chase them around and frighten them.

Q.   They had the children help them in chores on this farm during that brief period they were in Kansas.  Isn't that what really happened here, sir?

A.   That was not the way it was conveyed to me.

Q.   The sexual abuse I want to talk to you about.  First of all, I think your testimony was that Angela Johnson told you that she didn't recall any sexual abuse.

A.   At least on one occasion, that's correct.

Q.   Okay.  Wendy Jacobson indicated that Angela Johnson told her at some point later in their lives that she had been sexually abused down there.  I think you indicated that during your testimony as well.

A.   Yes.

Q.   Okay.  But, in fact, during the evaluation process conducted as part of your analysis, Angela Johnson told you that she had been told by somebody else that she'd been sexually abused but she didn't recall it.

A.   Go over that again if you would.  I'm sorry.

Page 56

Q. Yeah. As part of your evaluation of Angela Johnson, didn't she tell you that she was told by Wendy, in fact, that she had

3350

been sexually abused but didn't recall it?

A. She said that on the last time I interviewed her. That was not her response the first time.

Q. All right. And so ultimately we have the records from 1996 in which Angela Johnson's questioned about whether she was sexually abused or molested, and she indicated to the doctor in 1996 that that never happened.

A. Yes, that's correct.

Q. You can't tell this jury that you know in any way that Angela Johnson was sexually molested ever in her life, can you, sir?

A. No, I can't.

Q. I want to talk to you about her pregnancies. You indicated in this case you evaluated and talked with Angela Johnson about her personal history, is that correct, as part of your efforts to arrive at an opinion in this case; correct?

A. Yes.

Q. And part of that you took down her personal history, when she was pregnant, what her drug use was, and what boyfriends she had and all that kind of stuff; is that right?

A. Yes.

Q. And you have to rely upon those statements in order to formulate your opinion; is that correct?

A. In part, yes.

Q. In fact, she told you that she did not use any controlled

3351

Page 57

substances during her pregnancies, didn't she?

A.   Yes, she did.

Q.   Your ultimate conclusion in this case is that the defendant in this case has suffered from depression.  Is that fair to say?

A.   Yes.

Q.   And you were asked is there evidence in her past that you looked to to confirm, in fact, she suffered from depression, and you were pointing out the 1996 medical records as some indication to verify your conclusion that she suffered from depression.  Have I got that right?

A.   Mostly.  My answer was in specific response to what documents from her past would show that she is depressed.

Q.   Fair enough.  So you came to the conclusion she was depressed, and then we went through some discussion about what documents would back up that depression; is that correct?

A.   Yes.

Q.   Now, the first time that there's documentation of any depression was in March of 1996 when she went to Mercy Medical Center.

A.   Yes.

Q.   All right.  What happened immediately before March of 1996 in relation to any criminal activity that the defendant was involved in, sir?

A.   I don't know if I have a time line that would tell me that.

Q.   In fact, what happened immediately before that is on

3352

February 7 of 1996, federal law enforcement officers executed search warrants of Dustin Honken's house in which they found a meth lab in which Dustin Honken, Tim Cutkomp, and Angela Johnson

Page 58

and others were involved in manufacturing methamphetamine, and that had just been seized by law enforcement officers prior to the first time she goes to a medical facility and announces that she has depression.

MR. BERRIGAN:  Just for the record, Your Honor, I'll object that also misstates the evidence.  There's no evidence Miss Johnson was involved in the meth manufacturing process whatsoever.

THE COURT:  Overruled.

BY MR. WILLIAMS:

Q.   Isn't that the timing, sir?

A.   I didn't make a time line of some of the criminal investigation of the case.  I'll have to take your word for it.

Q.   The next time there's documentation of depression that you identified was when she was taken to the Benton County Jail; isn't that correct?

A.   Yes.

Q.   In the Benton County Jail she's incarcerated; right?

A.   Yes.

Q.   And that's an event that would be depressing to anybody; isn't that fair to say?

A.   Sure.

3353

Q.   The next documentation that you identified was the suicide attempt in the Black Hawk County Jail on October the 13th of 2000; isn't that correct?

A.   Yes.

Q.   Okay.  And what happened immediately before that suicide attempt was that the bodies of five -- I'm sorry, of four murder victims were discovered by law enforcement officers; correct?

Page 59

A.   Yes, that's correct.

Q.   And you know from your investigation in this case that the way they were discovered is because the defendant in this case drew a map that led authorities directly to the bodies.  You know that, don't you, sir?

A.   Yes, I do.

Q.   And as a result of that, the defendant would be in a position of having to face her family knowing now for the first time they would know that she was, in fact, involved in the murder of children; isn't that fair to say?

A.   Yes, it is.

Q.   And that would, to any normal person, be a depressing thought that you now have to face your family and know that they know that you were involved in murdering kids; right?

A.   Sure.

Q.   Despite your diagnosis the defendant suffered from depression, the fact is that that depression did not cause her to be unable to hold a job; right?

3354

A.   No.  She worked consistently.

Q.   In fact, I think your testimony was that she was quite productive; right?

A.   Yes.

Q.   Those are your terms.

A.   Yes, I . . .

Q.   So this depression didn't keep her from having a house and making house payments.

A.   Not to my knowledge, no.

Q.   The depression didn't keep her from being able to clothe and feed herself and her children.

Page 60

A.    No.

Q.    The depression really didn't impact her ability to function on a daily basis in society, did it?

A.    That's correct.

Q.    And you covered this with defense counsel, but I just want to make sure that we understand.  You are not providing any opinion whatsoever that her depression affected her thinking or her behavior at the time of the offenses involved in this case, are you?

A.    No, I'm not.

Q.    In fact, you were specifically instructed not to question her about what her thinking and behavior and mind-set was at the time she committed the offense.

A.    That's right.

3355

Q.    So it's fair to say you're not offering any opinion about whether the defendant's mental capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law was significantly impaired or not impaired at the time that she committed the offense, are you?

A.    No, I'm offering no opinion about that area at all.

Q.    You're not offering any opinion about whether she was under any form of duress or pressure or anything else at the time she committed these offenses.

A.    That's right.

        MR. WILLIAMS:  I have nothing further, Your Honor.

        THE COURT:  Mr. Berrigan?

        MR. BERRIGAN:  Thank you, sir.

                    REDIRECT EXAMINATION

BY MR. BERRIGAN:

Page 61

Q.    You are sometimes asked by lawyers for those types of findings, aren't you, Doctor?

A.    Yes.

Q.    Because certainly somebody who suffers from a mental disease or defect, the terms we lawyers use, that is so profound that they can't even appreciate the wrongfulness of their conduct or what they're doing or are psychotic, that can be a defense to even the most severe criminal activity, can it not?

A.    Yes.  I mean, it involves not only the act but the mental state in which it occurs.

3356

Q.    So we have people like John Hinckley hearing voices from Jodie Foster and shooting the president.  He's an example of such a type of an individual; is that right?

A.    In the distant past, yes.

Q.    And then there are sometimes cases where, depending on where you are, what state you are, that the mental elements for murder in the first degree might vary from murder in the second degree.  That might be a significant determination as to whether a crime was committed deliberately versus intentionally or something of that nature; is that right?

A.    Yes.

Q.    And you weren't asked -- specifically you were not only not asked but you were told that nobody was making those kind of allegations in this case.  Weren't you told that?

A.    Yes.

        MR. WILLIAMS:  Objection, Your Honor, to leading the witness.

        MR. BERRIGAN:  I'll rephrase.

BY MR. BERRIGAN:

Page 62

Q. What were you told when you were asked to look at Angela Johnson's mental condition in this particular case? What were you told regarding her mental state at the time of the commission of the offense?

A. Basically that that was an area that I was not to question her about, that that had been kind of an agreed-on area, and

3357

that I was to focus on other aspects of her life but not those events.

Q. And, in fact, weren't you told that the defense wasn't claiming that, you know, she was nuts at the time of the offense or that that was some kind of a defense?

MR. WILLIAMS: Objection, Your Honor. Leading the witness again.

THE COURT: Overruled. You may answer.

A. Right. There was no claim in that area.

Q. Okay. And so you didn't make any inquiry in that area.

A. No. It just wasn't my issue. That wasn't the task that I was charged with.

Q. The Black Hawk County Jail suicide attempt, you were asked some questions about these bodies being uncovered at about that same time. That's certainly true, isn't it?

A. Yes.

Q. But were there other explanations given to you by Miss Johnson that you were able to verify in terms of why she was particularly distressed at that time?

A. I think the most consistent one I heard from her was that she was looking at -- realizing that she was facing a long time of separation from her children, and she's always been very attached to her own two daughters and was highly distressed by

Page 63

that.

Q. The discussion that was had about this North Iowa Mental

3358

Health report where Miss Johnson in 1996 was depressed, what was going on in her life at that time other than Dustin Honken's house being searched? Do you know from the records?

A. She was in the process of a move down to Urbandale. I think a lady named Vanderpool who was her boss at the Mason City Country Club had recommended her for a job. Her daughter who had experienced numerous moves and transitions in her life was highly upset about the prospect of leaving the area and had herself begun acting out and was very depressed.

Q. Where is Urbandale?

A. It's a suburb of Des Moines.

Q. Okay.

A. I think to the west, northwest of Des Moines and a considerable distance from Mason City. I'm guessing 125 miles or so. And she was distressed not only about herself. She also was distressed about how her daughter was doing.

Q. Was there some concern that, in fact, her daughter wasn't going to go with her?

A. Yes. In fact, for the first time Alyssa had said that she wanted to remain with her father, A.J., Arlyn Johnson.

Q. Rather than be with her mother.

A. Right.

Q. And Mr. Johnson at that time, do you know where he was living?

A. Actually no, I don't.

3359

Page 64

Q.    Forest City, does that ring any bells with you at all?

A.    I thought you meant in the type of place.

Q.    I'm sorry.

A.    Yeah, he was living in Forest City which is up in that same area as Mason City.  It's not near Des Moines at all.

Q.    When you were talking about your observations about Angela Johnson being a good mother, I take it you weren't discussing Tec-9s and selling drugs and getting herself incarcerated.

A.    What I was referring to specifically was her emotional involvement with them in terms of trying to be loving and supporting of them and particularly in terms of her recent contact with them since her incarceration, particularly the last couple of years being able to be involved in a much more supportive and consistent way.

I didn't want to convey that she was always a responsible parent, although she did provide for their material needs.  But certainly there are other areas in terms of her choice of romantic attachments and frequent moves and use of drugs and other things that certainly wouldn't put her in the category of an ideal mother.

Q.    You've also testified in your experience you've done a lot of work in prisons and the federal mental health hospital in Springfield in particular.  Have you evaluated and had contact with people who are incarcerated that are parents?

A.    Yes.

3360

Q.    And do you know from your experiences whether these people have at least the capability of being good parents even in an incarcerated setting?

A.    They can be.  Certainly women have a greater desire to do

Page 65

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2946 of 3592

that. Unfortunately, many of the men I've seen have not really maintained very good family contacts. But certainly in facilities that I've seen that have been -- where women are housed, there's a much -- for example, Mitchellville here in Iowa, there's certainly a much greater focus on these women maintaining contacts with their family, and the family ties are much stronger generally.

Q. I wanted to ask you just a couple of questions about the people you did interview, the ones that Miss Goody selected. If you had to categorize those folks and their relationship with Miss Johnson, how would you categorize them?

A. The primary group were people in her immediate family growing up and people who lived with her and then her own daughters and to some extent a couple of people who had known her over the years, long-time friends, people who have had a lot of contact with her over the years.

Q. Were you made aware of any police officers that had known Angela Johnson for four decades or any enemies that had grown up with her in the household run by Pearl Jean Johnson?

A. No.

Q. Were there any people brought to your attention that might

3361

have known what happened in Chanute, Kansas, during the time they were with the Dillos that you weren't able to talk to other than the Dillos themselves and the people that were at the orphanage?

A. Right. I didn't talk to the Dillos themselves. But in terms of Angie and the three siblings that were there, I talked to them. I talked to Jean. I also talked to Carol Mann who transported them there and actually recommended they go there.

Page 66

Q. I don't know what your experience is with farms or farming practices or animals being slaughtered on farms, although I did think you said you were raised in Texas and spent a good deal of time in Kansas.

A. Not a great deal of time on farms.

Q. In your experiences doing this type of work, this practice of having five-year-olds watch squirrels' eyes pop out as the hammer's plucked into the squirrel's head, is that a common experience in your career when you've talked to people?

A. Well, I've talked to a lot of people that have grown up on farms in Kansas. That's not something I frequently hear.

Q. What about little boys being asked to touch electrical fences to see if they're working and there's electricity going through them?

A. No.

Q. How about children between five and ten watching live kittens being eaten by hogs? Is that something that comes up

3362

frequently?

A. No.

Q. You did have a chance to talk to all the Johnson children about these experiences.

A. Yes.

Q. Did any of them consider these experiences to be pretty routine farm work that children would typically be involved in?

A. No.

MR. BERRIGAN: That's all. Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: Nothing, Your Honor.

THE COURT: You may step down.

Page 67

Ready to call your next witness?

MR. BERRIGAN: Yes, we are, Your Honor. The defense calls Jamie Jo Hays.

JAMIE HAYS, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Try and adjust the chair and the two microphones so you can speak directly into them. And would you state your full name, please, and spell your first and last names. You'll have to get your chair closer to the microphones too.

THE WITNESS: My name is Jamie Jo Hays.

THE COURT: You're going to have to get closer to the microphones or nobody's going to hear you.

THE WITNESS: Like that?

3363

THE COURT: Yes.

THE WITNESS: Is that better? Jamie Jo Hays.

THE COURT: Okay. And if you take that other microphone and pull that a little closer too, then that will work as well. Thank you. Would you spell your first name and your last name.

THE WITNESS: J-a-m-i-e H-a-y-s.

THE COURT: Thanks.

Mr. Berrigan?

MR. BERRIGAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q. Miss Hays, I wanted to start if you could tell the jury just a little about yourself. Where is it that you live?

A. Faribault, Minnesota.

Q. And where is Faribault, Minnesota?

Page 68

A.    Just north of Owatonna.  It's about 45 miles south of the Iowa -- or north of the Iowa border.

Q.    And what major highway is that near?

A.    Well, it's right off Interstate 35.

Q.    Okay.  About how far is Faribault, Minnesota, from the Mason City/Clear Lake, Iowa, area?

A.    Well, in travel time it's about an hour and a half-drive south.

Q.    Okay.  So you're right off the interstate about an hour and

3364

a half north on Interstate 35?

A.    Right, right.

Q.    How long have you lived there, ma'am?

A.    Seventeen years.

Q.    Are you single or married?

A.    Married.

Q.    What's your husband's name?

A.    Timothy Harold Hays.

Q.    What type of work does your husband do for a living?

A.    He's a bus mechanic for motor coaches for Northfield Bus Lines.

Q.    And do you work outside the home yourself?

A.    Yeah, I do.

Q.    What type of work do you do?

A.    I work at Hy-Vee grocery store.  I work at night.  I'm in the process of learning to be head checker at night and help stock the shelves at the same time.

Q.    Is it a full- or part-time job that you have?

A.    Well, it's part -- I'm considered part time because I can work around my own schedule because I don't have benefits, but I

Page 69

work about 41, 42 hours a week.

Q. Do you and your husband Tim have children?

A. Yes, we do.

Q. How many children do you have?

A. Three.

3365

Q. Three. And what are their ages?

A. Nineteen, seventeen, and fifteen.

Q. What's your relationship to this young lady seated at my left, Angela Jane Johnson?

A. She's my older sister.

Q. Where are you in the line of the Johnson children?

A. Third born.

Q. Third born.

A. (Witness nodded head.)

Q. I know it's impolite, but can I ask your age?

A. Thirty-nine.

Q. Thirty-nine. And the difference in years between you and your sister Angela?

A. It's a little less than two years.

Q. You said you've been living in Faribault for 17 years?

A. Yes.

Q. Where did you live before that?

A. Albert Lea, Minnesota.

Q. Albert Lea, Minnesota? When's the last time you lived in Iowa?

A. When I got married in 1985 and I moved away.

Q. You moved out.

A. Yeah.

Q. We've had a chance to listen to some testimony regarding

Page 70

your siblings and their experiences being raised in the

household, and I want to ask you a few questions about that as well if we could; okay?

A.    Okay.

Q.    Your mother obviously is Pearl Jean Johnson.

A.    Correct.

Q.    And your father?

A.    James Johnson.

Q.    James Johnson.

A.    Senior.

Q.    And he lives up in Minnesota.

A.    Chippewa Falls, Wisconsin.

Q.    I mean Wisconsin.  I'm sorry.  What are your earliest memories if you even have any about your parents' marriage, that is, the time that Jim and Pearl were --

A.    I don't have any.

Q.    You don't have any.

A.    (Witness shook head.)

Q.    And they were divorced in 1968?  Were you aware of that?

A.    I'm assuming that's correct, yes.

Q.    And you would have been born in 1963?

A.    '65.

Q.    '65.  I'm sorry.  So you were a very small child obviously when they got divorced.

A.    Yes.

Q.    So your first memories in terms of growing up in your

household with your mom and your siblings, where physically were you living at that time?

A.    I can remember as far back when we were in Pueblo, Colorado at the beginning.

Q.    Okay.  Did you go to school out there in Pueblo, or were you --

A.    I don't think I did because I remember Jim and I sitting on the steps outside the apartment complex we lived in waiting for Angie and Wendy to come home from school.

Q.    And Jim would be your younger brother.

A.    Correct.

Q.    And how much younger is Jim than you?

A.    I would say he's less than two years younger than me.

Q.    Do you recall moving back from Pueblo, Colorado, back to the Mason City area?

A.    That I remember.

Q.    All right.  And when you came back to Mason City with your siblings and your mom, who did you live with?

A.    My mother.  My grandparents were around a lot.  I don't know that they lived with us in the same house.  I don't remember that.  But I know they were just there a lot.

Q.    And your grandparents would be who?

A.    Florence Eleanor Jensen, Andrew Jensen.

Q.    I want to ask you just a few questions first if we could about some of the religious practices that your mother was

3368

engaged in and perhaps you as children.  When you were living in Mason City with your mom and your siblings after the move back from Colorado and your grandmother Florence and Andy were around, was there -- did your mother involve you in any type of

Page 72

religious practices that had to do with demons or casting out of spirits or anything like that?

A. Well, I wasn't involved with it. I had -- I was subjected to it.

Q. Okay. And when you say subjected to it, tell us what it is that would happen.

A. Well, we were just -- we overheard everything that they believed, and it was just continual programming of that sort of thing that we heard all the time and saw. I mean, they were very -- they had a lot of fear in what they believed, and we saw it, I mean. We were intimidated by it.

Q. When you say they had a lot of fear, could you tell us what they were afraid of?

A. Satan, the end of the world. They were afraid that we wouldn't go to heaven.

Q. Do you recall any kind of tapes being played or records of religious nature?

A. I remember my grandmother had the records when we lived at 936 West J Street in Forest City. I remember those.

Q. And what kind of records are you talking about?

A. They were records about people being exorcised of demons.

3369

Q. And could you give us a little description of how these records would go? What did they sound like?

A. Well, you'd hear a lot of praying and screaming.

Q. I'm sorry? Praying and screaming?

A. Yeah.

Q. Did you find that experience at all troublesome?

A. You mean listening to it?

Q. Yeah.

Page 73

A.   I just thought it was stupid.  It didn't bother me that much.

Q.   Let me ask you about something we've heard a little bit about having to do with casting out demons or casting out devils.  I think earlier you said you were subjected to some of that; is that right?

A.   All of us were.

Q.   What did that involve?

A.   Laying on hands and praying, and they prayed for you until you gave some kind of physical reaction that it was released from you.

Q.   Was that done in any particular location in the house?

A.   Well, if it was a really serious need for one of us, then we were all taken in a room by ourselves with our grandparents, but that never happened to me in the house in Mason City.

Q.   You never had a serious need for demons to be exorcised?

A.   I didn't think I did, but at one time that happened to me

3370

in Forest City.

Q.   Later on.

A.   (Witness nodded head.)

Q.   What about your other siblings?  Did they have more of a serious need to be exorcised when you were in Mason City?

A.   I don't remember Jim and I being subjected to it like Angie was.

Q.   Well, what is it about Angie that got her subjected to the exorcisms more frequently?

A.   I think that Angie has a very strong choleric personality, and I think my grandmother saw things in her personality that she tried to subdue, and I think maybe the same thing with my

Page 74

mother, that they saw things in her personality that they didn't like, and they tried to get it out of us I guess.

Q. Did you witness any of these exorcisms of your sister Angie?

A. I heard it. I don't recall if they did it out in the open. I just remember hearing a lot of it, and I know she was petrified.

Q. What would you hear that would make you think she was being exorcised?

A. Well, my grandparents praying very loudly, and Angie was scared. She screamed, and she just kind of -- you know, kind of panicked. What could you do? They were holding her down, and you're a little kid. I mean, we're powerless to do anything

3371

about it.

Q. The screaming from your sister, did she scream anything in particular?

A. I don't remember.

Q. But you could hear her screaming.

A. Yeah, and she was petrified of that Bible verse that says that Satan goes around like a roaring lion seeking whom he may devour. We heard that all the time, and she was petrified of that for years.

Q. Could you repeat that for me, please, ma'am?

A. That Bible verse?

Q. I didn't hear you.

A. She was petrified of that Bible verse that says that Satan goes around like a roaring lion seeking whom he may devour, and my grandparents used to repeat that all the time, and it was basically pointed at her all the time. You just got used to it.

Page 75

Q. If you know, what was the purpose of your grandparents saying that to you, Satan goes around seeking whom he may devour? Was that anything specific?

A. Because they were afraid. They were afraid that he was really doing that. It was just something that was very conscious in their minds that they were obsessed with.

Q. Was there any other discussion of demons in the home while you were growing up?

A. They were always lurking around the corner somewhere. Some

3372

of them were bad. Some of them weren't that big, you know. Just you get used to it.

Q. What about as children? Did you get used to these discussions about demons being -- lurking around the corner?

A. Sure, sure. We heard it so much we got used to it. It was just normal. But as we got older, we were less afraid. And we heard it so much, you just, you know -- it was just our lifestyle.

Q. How long did you grow up being afraid of demons lurking around the corner?

A. I wasn't that afraid because I couldn't see them. I didn't have the fear like Wendy and Angie had. I had more of a fear of my mother than them.

Q. Angie and Wendy were more afraid of the demons than you were.

A. (Witness nodded head.) At one time Wendy told me that she was nor -- that Satan was more real to her than God was.

Q. And did you take any precautions while you were growing up as children to make sure the demons didn't get you?

A. Well, you mean like little games we played or . . .

Page 76

Q. Well, were there areas in the house where you were afraid to go for fear of demons, or did you do anything --

A. I wasn't afraid a lot, but I know Angie and Wendy were terrified of the basement, and there were times where they made me go down in front of them, and everybody thought that was kind

3373

of funny, and I thought it was funny. I thought, sure, I'll go with you.

I'm pretty thankful for Loretta Lynn because I used to listen to her sing hymns on a record album, and I still have that record album in my collection. I listened to it over and over and over because I just liked it, and my grandmother bothered me. I think she thought I was holding it for her.

Q. So you weren't particularly singled out for a demon extraction or exorcism yourself.

A. Not when I was younger. Not when I was younger.

Q. That changed at some point when you were a child?

A. When I got to be a teenager I had to go through that. And nobody was really around that really knew that except Kim Swalve was there too, and it was just me and my mom and Kim. We just didn't have a choice. Mom was right about everything.

Q. Well, when you were younger when this -- these exorcisms or the demon extractions were going on with your siblings -- you've displayed some emotion here -- were you afraid of the demons at that time?

A. I didn't have a lot of fear because I was just so used to it. What I have is just very hurt feelings because we couldn't do anything about it, and it's a very sad story to tell.

Q. Were there any other practices as you look back on your childhood and growing up with your mother that you thought now

Page 77

in hindsight that this was pretty unusual stuff respecting her

3374

religious practices?

A.   For little kids you mean?

Q.   Yes.

A.   Well, the fasting and making us sit and watch Billy Graham, making us do Bible study was boring, and we were so tired.  We didn't understand it.  We just had to.

Q.   What about this fasting?  What did that involve?

A.   Going without food from morning till sun night -- sunset.

Q.   How often would you engage in these fasts?

A.   Probably every week.

Q.   And how old would you have been that you remember first being subjected to fasting?

A.   I believe we were -- we started when we lived either in Mason City, but most of it happened I think when we were in Thornton.

Q.   Thornton, Kansas.

A.   Thornton --

Q.   I mean Thornton, Iowa.  I'm sorry.

A.   Iowa.

Q.   I'm jumping ahead of myself because I want to ask you a little bit about Kansas.  But before I do that, let's talk a little bit about your mother's practices respecting discipline.  When you were growing up in Mason City, did your mother use physical discipline in the household?

A.   Yeah, I remember . . .

3375

Q.   What did that involve?

Page 78

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2959 of 3592

A.   Using the belt, but actually that was used in Pueblo.   That followed us to Mason.   And we used to hide it and she'd have to go looking for it.   Our favorite hiding place was underneath the couch.

Q.   Why were you hiding the belt from your mother?

A.   Well, we were afraid of it because when one of us got in trouble we'd all get it because we were too petrified to speak up and say who did it and didn't want to tell on anybody.   You know, we were all kind of trying to protect each other, and we didn't always really know why.

Q.   Didn't always know why you were being disciplined?

A.   Right, but as little children, it had to have been something that made her mad that she couldn't handle.

Q.   How was your mother as a mother in terms of her relationship with you and her mothering skills and her affection, her display of affection towards her children?

A.   Well, it was mostly outward.   We weren't very intimate with her.   She didn't know how to be that way with us, but she took good care of us.   We were clean.

Q.   In terms of providing for you?

A.   Yeah, our outward physical needs.

Q.   When you were a small child, do you remember whether or not your mom worked?

A.   I don't ever remember, no.

3376

Q.   Don't remember either way.

A.   No.

Q.   Okay.   Were there any father figures in your life when you were growing up?

A.   Best father figure I ever had that I could remember was my

Page 79

grandfather.

Q. That would have been Andy Jensen?

A. Grandpa Kenny.

Q. I'm sorry.

A. And I would say Andy Jensen too. I loved him too but --

Q. Did you have --

A. But my Grandpa Kenny was pretty much one of the most important men in our lives.

Q. Did you have a relationship with your real father?

A. Not a very good one. I couldn't remember him for a long time.

Q. Did he visit you or come to see you or you go to see him?

A. I remember visits. That's all. I didn't go to Wisconsin a lot when I was little, but he would come with my grandmother.

Q. And what was that like?

A. Maybe once a year. It was like maybe once a year. They were wonderful. They were the highlight of our lives, the highlight of the year.

Q. What was the excitement about that? Why were you happy?

A. Because we felt very loved, and we felt really safe with

3377

them.

Q. And you didn't feel that with your mother.

A. Well, I would just -- I would say the feeling was very different.

Q. Different in what way?

A. Wasn't a lot of joy living with my mother growing up. Lot of sadness, depression.

Q. Were you allowed to have toys as children?

A. Yeah. I think we got the majority of the toys from my

Page 80

father.

Q.    And were you always able to keep them?

A.    Until they broke, but Angie and Wendy would remember more of that than I would.

Q.    So you don't remember anybody breaking your toys or burning your toys.

A.    I only remember the television set being smashed in front of us outside.

Q.    And what was that -- why was that done if you know?

A.    They must have thought it was evil.  I remember them taking us all outside.  I remember them unplugging it, and I was angry because I was watching my favorite cartoon at the time, and we all had to go outside, and my Grandpa Andy took a hammer or something and just started smashing it.  And we all had to watch.

Q.    You were brought outside for that purpose.

3378

A.    Yeah, yeah.

Q.    At some point do you remember your mother taking you and your siblings to Kansas?

A.    Yes.

Q.    And about how old would you have been when your mom took you out to Chanute, Kansas?

A.    I'm guessing maybe I was five.  I'm not correct because I don't have a good memory of my age back then.

Q.    What was that experience like?

A.    Very traumatic.

Q.    In what way?

A.    It was scary.  We didn't know why we had to go there.  We didn't want to be there.  We wanted to go back home.  We didn't

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2962 of 3592

feel like we were liked there. And I had a sense that there was always a lot of trouble going on and fighting.

Q.   Were there specific things that happened that made you feel like you were unwelcome there in Chanute, Kansas?

A.   I don't recall a lot of specific things because I can't remember them. But I remember the feelings more. I remember Wendy being very angry, Angie being fearful, and Jim and I just always were along for the ride no matter where we went.

Q.   So in terms of you having memories of any specific instances involving animals --

A.   Well, when you --

Q.   -- and things like that, do you remember anything like

3379

that?

A.   I remember the animals.

Q.   What do you remember about the animals?

A.   That we had to feed the pigs every day and that one time I don't know how these kittens got inside the pig pen, but I remember one sow had a kitten in his mouth, and it was alive, and the sow went after it like he was crazy. And then I remember all the sows in the pig pen following the one that had it in his mouth, and I remember that little kitten being ripped apart in front of us by all the rest of them. That made me sick. I was afraid. I thought, oh, God, what could I do to -- how did them kittens get in there? You know, as a little child you think, God, is there any way I could help them little kittens? But we were outside the pig pen just watching it and nothing you could do.

Q.   Was there anything that the Dillos -- do you remember the family that lived there?

Page 82

A.    (Witness nodded head.)

Q.    Was there anything that the Dillos did to you there that you --

A.    I don't recall them doing anything to me physically.  I don't think I was a lot of trouble at all.  I just don't recall.

Q.    Are you the kind of child or were you the kind of child that generally did what you were told?

A.    Yeah.

3380

Q.    And were your sisters different than you?

A.    Oh, yeah.

Q.    What way?

A.    They outwardly rebelled.  They weren't afraid to oppose my mother.  They weren't afraid to act out.  I remember one time Wendy jumping on the back of somebody up in Kansas, and I think there was a fight going on about something, but I don't remember the specifics about it.  There was a ruckus going on in the kitchen.  That's all I remember.

Q.    Did you go to school when you were in Kansas?

A.    I don't recall.  I don't remember.

Q.    What about your mother in terms of her being around when you were out in Kansas?  What do you recall about that?

A.    I recall being left there and being babysat by the people there.

Q.    Being left --

A.    In the house.

Q.    By your mother?

A.    I suppose.  I remember my mother being around more when we were in the cottage.  I liked the cottage because to me it was like a little Barbie dollhouse.

Page 83

Q. What was the cottage at the Dillos?

A. It must have been -- I don't know. It must have been like a small little house or -- I don't know. I just remember there were walls and some beds, and I liked it better than being in

3381

the house because it was quiet and private and we were not in there. It was more peaceful in there, more -- it was safer.

Q. Earlier when I first asked you to describe this experience, you said it was a time that you were fearful. Were you fearful?

A. In the house or --

Q. No, during the time you were at the Dillos'.

A. I suppose I was. I had -- when Carol's car pulled up into the driveway to take us home, we were knee deep in mud, and they were making us pick up branches that had blown down from a storm the night before, and when she drove in, I dropped those branches, and I ran to that car because instantly I knew who she was, and I said -- I screamed Carol's name, and I said, Carol, we're saved. That's the only way I can explain how I felt.

Q. But in terms of that response, I mean, you're --

A. I didn't understand what I was feeling when I was a child.

Q. I see.

A. All I can tell you is how I responded.

Q. When you came back from Kansas, when your mother brought you back, do you remember where you lived then?

A. I think we went back to the house in Thornton which surprised me because I thought, we're back here? You know, we always had to go somewhere else new.

Q. Did you move around quite a lot when you were a child?

A. Yeah, we did.

Q. Did your mom ever explain why, you know, why you were

Page 84

moving?

A.   No.   Too young to understand I suppose, and it didn't occur to her that we need an explanation for anything.

Q.   How was that in terms of your school work?  Did that cause you any problems being shifted from place to place?

A.   I don't remember.

Q.   Did your mom ever talk to you about sharing her religious beliefs with your classmates, your -- other school children of your age?

A.   My friends?

Q.   Yeah, the people that you went to school with.

A.   I never really brought a lot of friends home.  I kind of isolated myself from a lot of people.  I was -- Mother would -- her beliefs she would try to use on anybody that would let her.

Q.   She didn't ask you to proselytize at school or try to get people to convert or anything like that.

A.   No.

Q.   What about -- you said you didn't bring people home very often.  Did you ever bring any of your school friends home?

A.   No, I don't think so.

Q.   How -- and as you look back on your early years in school, were you treated any differently than the other kids that you went to school with?

A.   Yeah.

Q.   In what way?

A.   I was isolated.

Q.    Why were you isolated?

A.    Because they didn't like me because I think they must have thought there was something wrong with me, and I wasn't popular, and I had problems, and I just wasn't an outgoing person like a lot of them were.

Q.    When you say you had problems, was there anything specific you could talk to us about?

A.    A lot of them were just mental.  A lot of them were physical.

Q.    Your mental problems, do you attribute any of that to --

A.    Physical problems.

Q.    -- the circumstances under which you were raised?

A.    Oh, most certainly I'm sure they were.  Lot of -- I had a lot of confusion when I was growing up.

Q.    And what were you confused about, ma'am?

A.    What right and wrong was, what truth was.  We were taught to accept truth was whatever my mom's interpretation of it was. We didn't know anything different.

Q.    You said your --

A.    We weren't allowed to think any differently than my mother thought about things.

Q.    You said your sisters rebelled against your mother.

A.    Yep.

Q.    And what about you?

3384

A.    I didn't.

Q.    You didn't.

A.    I took it.  I took it until I was married and left home.

Q.    We haven't talked much about your brother.  You haven't mentioned him.  How did he tolerate growing up with these

Page 86

religious beliefs?

A.   He was very hurt by them, and he had a lot of friends that he would leave home with just to get away from being at home.

Q.   Do you remember your sisters leaving home?

A.   Yeah.

Q.   And about how old were they when they left the house?

A.   I would say they were around 15, 16, each one of them.

Q.   And then your brother Jim, when did he leave home?

A.   When he graduated and went to college.

Q.   When he got out of high school.

A.   Yeah.

Q.   Did you graduate from high school?

A.   Yes, I did.

Q.   And then after you graduated, did you continue to live with your mom?

A.   For about a year till my husband graduated, and then we got married and moved to Minnesota.

Q.   What's your relationship like with your mother now?

A.   I'm not very close to her.  I still love her because she's my mother, and I'm thankful for all the good things that she did

3385

try to do while we were growing up.  I still have a lot of memories that hurt.  I don't hate her, and I know she's sorry for a lot of things, but I don't get close to my mom because I'm afraid -- I'm afraid of how I would feel, and I'm afraid of fighting and arguing with her because I think differently than she does, and in order to have a close, real relationship, I need to be able to have the liberty to tell her what I think about things and not have her make me feel like I'm wrong and I might be stupid because she's right and I'm not.

Page 87

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 2968 of 3592

Q.   You said that you still have memories that hurt you.

A.   Yeah.

Q.   Are those -- any of those memories things that we haven't talked about?

A.   I'm not sure.

Q.   You also said something a minute ago that you're afraid you might be thought of as stupid?  Did I hear that correctly?

A.   (Witness nodded head.)

Q.   Did your mom ever refer to you in those terms?

A.   Sometimes.  She would get angry.  If she was really mad sometimes, she would slap me, pull my hair, call me stupid, act like she didn't like me.

Q.   You said a little earlier when we were talking about the casting out of demons and the exorcisms, you eventually were subjected to that on a little more serious scale as you became a teenager?

3386

A.   When I was about 14, 15.

Q.   Was there any specific conduct that you were engaging in or some behavior --

A.   No.

Q.   -- that prompted that?

A.   No.  I was just klutzy and nervous.

Q.   How often would these casting out of demons situations occur with you?

A.   Well, I would say that my big appointment with it happened one time down the basement, and then after that Mom would always pray over us all the time to deliver demons that she thought she saw in us.

Q.   The praying over, that's different than the exorcism-type

Page 88

things in the basement.

A. Yeah, that's not as dramatic. It's almost silly.

Q. But these things in the basement, did you think that was silly?

A. No.

Q. And what was the big difference between the things that happened in the basement and the laying of hands stuff that took place that you thought was silly?

A. I felt like a horrible person. I hated myself because I asked myself -- when my mother was doing that to me, I asked myself how could I be such a bad person if I ask Jesus into my heart and at the same time I have all these things inside of me?

3387

I couldn't understand it. And so I just hated myself for what I wasn't, what I wasn't. I hated myself for what -- for not being able to live up to my mother's expectations of what I should be like as a person.

Q. And you never confronted your mother about these things.

A. No, never.

Q. But your sister Angela, did she confront your mother about these kind of behavior?

A. Angie was so used to being subjected to it, but Angie just reacted in anger. It wasn't just that. It was just a lot of things.

Q. Did you ever get any kind of counseling or any kind of mental health treatment as a result of the feelings you had about your own self-worth?

A. Yeah, took a long time to undo all that damage. I went to counseling in 1996 up in Minnesota.

Q. And how long were you in counseling?

Page 89

A. Couple years.

Q. And is that an ongoing process?

A. Sometimes if I need to go I can always go.

Q. You mentioned you don't really have a close relationship with your mother now.

A. (Witness shook head.)

Q. What's your relationship like with your siblings?

A. Well, I don't initiate strongly a lot of contact because

3388

I'm a very quiet, private person, and I'm very meek about it. I love them. I'm always there for them if they ever need me.

Q. Regarding your dad, Jim Johnson, do you have a relationship with him now?

A. Yeah.

Q. And how is that?

A. Well, my dad is my best friend.

Q. Your brother Jim that lives up near Chicago, have you maintained a relationship with him at all?

A. Yeah.

Q. What about your sister Angela?

A. Yeah, we have a relationship.

Q. In fact, isn't her daughter living with you?

A. Correct.

Q. And this would be --

A. Marvea.

Q. -- Marvea. How long has Marvea been staying with you?

A. It will be two years in August.

Q. And what were the circumstances under which Marvea came to live with you?

A. Holly, Angie, and I had discussed a better place for her

Page 90

other than Iowa the closer the trials got and because of the harassments that she was subjected to, and we felt that moving her up there with me would be a safer place for her as the time grew closer for that.

3389

Q.   Were there some particular problems with Marvea living with Holly?

A.   With what?

Q.   With Holly, with your sister Holly.

A.   Holly had a hard time sometimes with her, and Holly and Haley -- sometimes they were competing for Holly's love, but yet there was a lot of harassment from school children.

Q.   Harassment about what?

A.   Her parents.

Q.   Do you know what form that harassment took?

A.   I'm sure the media's exposure to the whole thing.

Q.   And your sister Holly, she lives where?

A.   Klemme, Iowa.

Q.   And where is that in relation to Mason City and Clear Lake?

A.   It's like a suburb of Clear Lake.

Q.   While Marvea's been with you, have there been newspaper accounts in your local papers about the case?

A.   No, I haven't seen any.

Q.   Do you know of any harassment that she's gotten from other kids at school as a result of being the daughter of Dustin Honken and Angela Johnson?

A.   No, no, there has not been any.

Q.   So that situation's improved.

A.   Right, right.

Q.   How long did you say Marvea's been with you?

Page 91

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2972 of 3592

A.   It will be two years in August.

Q.   How's she done at your home?

A.   She's done well.  She's adjusted well.  She knows that she's just as important as anybody else and that's her home. And she loves it out there.

Q.   What's your relationship been like with her?

A.   With Marvea?

Q.   Yeah.

A.   Well, we're close to her.  I've always been close to her since she was a baby.  She's just like the youngest now.

Q.   The youngest --

A.   Child.

Q.   -- child in your house you mean.

A.   Yeah.

Q.   During the last two years that she's been with you, has she maintained contact with her mother?

A.   Of course.

Q.   And is that something that you go out of your way to make sure that happens?

A.   Try to if we can.  Everybody in my family tries to.

Q.   How does she communicate with her?

A.   Phone calls, letters, visits.

        MR. BERRIGAN:  May I approach the witness, Your Honor?

        THE COURT:  You may.

BY MR. BERRIGAN:

Q.   Ma'am, I have just laid before you Defendant's Exhibits 257, 258 -- I'm sorry.  I'm misreading these.  I apologize.  Let

Case 3:09-cv-03064-MWB-LTS     Document 284-71     Filed 06/23/11     Page 2973 of 3592

me do that again.  2157, 2158, 2159, 2160, and 2161.  Do you recognize what those are?

A.    Letters.

Q.    Letters from whom?

A.    Angela to Marvea.

Q.    And do these come to your house?

A.    Of course they do.

Q.    I've only given you five.  But in the last two years, do you know how many letters your sister Angela's written to her daughter Marvea at your house?

A.    I don't keep track of it.

Q.    Okay.

A.    But I have every one that she's ever written.

Q.    And about how often does Marvea get a letter from her mother?

A.    Once a week, maybe twice a week.

Q.    Do the letters sometimes come with other things?

A.    Yes.

Q.    Like what?

A.    Newspaper articles, pictures that she cuts out and sends her.

Q.    Does she occasionally send her gifts?

A.    Yeah.

3392

Q.    Like what?

A.    Maybe candy around the holidays and just little things that she might like that she can get to her.

        MR. BERRIGAN:  Defendant would offer 2157 through 2161, Your Honor.

        (Defendant Exhibits 2157 through 2161 were offered.)
                              Page 93

MR. WILLIAMS:  No objection, Your Honor.

THE COURT:  Those exhibits are received.

(Defendant Exhibits 2157 through 2161 were admitted.)

* * * *

BY MR. BERRIGAN:

Q.  What about you?  Do you keep in touch with your sister by way of written communication?

A.  Angela?

Q.  Yeah, Angela.

A.  When she writes me back, I write her back.

Q.  Okay.  And what about telephone calls?

A.  She calls, and I talk to her if she needs to talk to me, but I would rather her spend her time talking to Marvea because that's more important.

Q.  And these calls are pretty expensive, aren't they?

A.  Yes, they are.

Q.  And she has to call collect.

A.  Yeah.

Q.  And you're raising your own three kids and Marvea.

3393

A.  Right.

Q.  Both you and your husband are working.

A.  (Witness nodded head.)

Q.  Some of these communications involving your sister Angela talking to you or writing to you, does she ever talk to you about, you know, the raising of Marvea, matters that concern --

A.  Yes.

Q.  -- how you raise her?

A.  Yeah.

Q.  And how often does that happen?

Page 94

A.   Well, it just happens when, you know, like there's issues that come up or something or modifications of behavior that need to be made or, you know, suggestions and stuff.

Q.   Okay.

MR. BERRIGAN:   May I approach again?

THE COURT:   You may.

BY MR. BERRIGAN:

Q.   Ma'am, I've just handed you a letter, Defendant's Exhibit 2156.   Do you recognize this letter?

A.   I recognize the handwriting.   I know it's from Angie, but I don't think I ever read this one because there's so many letters that I just let Marvea read them.   I don't have to read every letter that Marvea gets.

Q.   Well, this letter's to you.

A.   This one?

3394

Q.   Yeah.   Hi, Jamie.   Am I reading that correctly underneath the heading Commit to the Lord?

A.   I suppose, but there's been so many, I guess I don't recall right now but . . .

Q.   Okay.   I'm not asking you whether you memorized it or not, but does it look like a letter to you?

A.   Of course.

Q.   And is it signed by your sister?

A.   Yes.

Q.   In fact, even the envelope's attached there.   Do you see that?

A.   Yeah.

Q.   Have there been some concerns raised by your sister regarding matters such as, you know, how Marvea's doing in

Page 95

school and --

A.    Yeah.

Q.    -- how she's being disciplined and things of that nature?

A.    Yeah.

Q.    Has your sister been pretty active in terms of Marvea's life?

A.    Yeah, she's always -- yeah, she's always concerned.

Q.    What about you?  Do you tell your sister Angela what's going on with Marvea?

A.    When there's a problem that I can't solve, if it's a continual thing that's a repetitive thing, then we end up

3395

talking about it, but I don't tell about every little thing that she doesn't do perfect.

Q.    How about when she's doing well?

A.    Marvea tells her those things.

Q.    Okay.

A.    And if Angie wants to know, all she's gotta do is ask.

Q.    So they talk to each other a lot, and you don't have to worry about those kind of things?

A.    No, I don't worry.

        MR. BERRIGAN:  Defense would offer 2156, Your Honor.

                    *   *   *   *

        (Defendant Exhibit 2156 was offered.)

                    *   *   *   *

        MR. WILLIAMS:  No objection.

        THE COURT:  2156 is admitted.

                    *   *   *   *

        (Defendant Exhibit 2156 was admitted.)

                    *   *   *   *

                    Page 96

MR. BERRIGAN: May I approach the witness one more time, sir?

THE COURT: Sure.

BY MR. BERRIGAN:

A. This is an old letter. I do recall it now.

Q. I'm going to show you two pictures, ma'am. They've been marked as 2090, 2109. Do you recognize those photographs?

3396

A. Yes.

Q. What are they pictures of?

A. My Aunt Winnie, my dad, my cousins, and one of me myself on my grandmother's couch.

Q. Did your mother take a lot of pictures of you growing up?

A. I don't recall that she did. The only thing I've ever seen is when my dad and my grandmother's given us, and when we got older, we were old enough to have our own cameras and we did it ourselves.

MR. BERRIGAN: Defense would offer 2090 and 2109.

* * * *

(Defendant Exhibits 2090 and 2109 were offered.)

* * * *

MR. WILLIAMS: No objection.

THE COURT: They're admitted as well.

* * * *

(Defendant Exhibits 2090 and 2109 were admitted.)

* * * *

BY MR. BERRIGAN:

Q. I want to finish by asking you just a couple of questions, ma'am, about the situation we're in here. You understand that this is a sentencing hearing.

Page 97

A. Yes.

Q. Is this decision going to affect you in any way?

A. Sure, it will.

3397

Q. You said you've maintained contact with your sister. Has that been true over the last five years of her incarceration?

A. Correct.

Q. And do you intend to continue to do that if she's sentenced to a term of life in prison?

A. Of course. Of course.

MR. BERRIGAN: Okay. Thank you. That's all I have.

THE COURT: Mr. Williams?

MR. WILLIAMS: I have no questions, Your Honor.

THE COURT: You may step down. Ma'am, you're done. You may step down.

THE WITNESS: I'm sorry. I didn't hear you.

THE COURT: That's okay.

Why doesn't the jury take a stretch break.

And, Mr. Berrigan, are you ready to call your next witness?

MR. BERRIGAN: We are, sir. The defense calls Marvea Johnson Honken.

MARVEA JANE HONKEN, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated there in the witness box.

MR. BERRIGAN: May I assist the witness, Your Honor?

THE COURT: You may. Would you tell us who you are by stating your full name for us.

THE WITNESS: I am Marvea Jane Honken.

3398

Page 98

THE COURT: Okay. Thank you. Now Mr. Berrigan's going to ask you some questions.

MR. BERRIGAN: Thank you.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q. You nervous?

A. Little bit.

Q. All right. Just take a deep breath, and there's some water.

THE COURT: Marvea, don't worry. Almost everybody who sits there is a little bit nervous, some a lot more nervous than others. So you're in good company.

Q. We're going to try not to make you more nervous than you are; okay?

A. Uh-huh.

Q. Will you do me a favor and just keep your voice up nice and loud so that those people can hear you?

A. Okay.

Q. Why don't you tell us first how old you are.

A. I am 11 years old.

Q. And when's your birthday?

A. Valentine's Day.

Q. And so you turned 11. It's what? Four months ago now, huh?

A. Uh-huh, yep.

3399

Q. Where do you live?

A. I live in Faribault, Minnesota.

Page 99

Q.   And who do you live there with?

A.   My Aunt Jamie.

Q.   Okay.  Is there anybody else living there besides you and your aunt?

A.   My uncle Tim, Harmony, Heather, and Stephan.

Q.   And you're the youngest one; right?

A.   Yep.

Q.   What grade are you in now, Marvea?

A.   I'm in fifth grade.

Q.   And how do you do in school?

A.   Pretty good.  I get A's and B's.

Q.   A's and B's.  And right now are you still in school, or are you done for the summer?

A.   I'm done for the summer.

Q.   What do you have planned for your summer this year?

A.   I'm going to go to camp, and I'm going to go visit relatives like my Grandma Marvea, Grandma Jeannie, and all the rest of them.

Q.   So you got a pretty full schedule planned, huh?

A.   Yep.

Q.   Okay.  Now, we know this, but that lady over there in the glasses with the brown hair, who's that?

A.   My mom.

3400

Q.   All right.  What's her name?

A.   Angela.

Q.   All right.  I want to ask you a few questions, a little bit about yourself, okay, and then we'll talk about you and your mom; all right?

A.   Uh-huh.

Page 100

Q. What's your dad's name?

A. Dustin Honken.

Q. And where does your dad live?

A. He right now for sure -- last time I visited him he was in Marion, Illinois. Right now I don't really know.

Q. When you last visited him?

A. Yeah.

Q. Was he staying in a jail?

A. A prison.

Q. A prison. And when you went to visit him at the prison, were you able to, you know, give him a hug and a kiss or --

A. No, it was through glass and some kind of little wire thing.

Q. Is that usually the situation when you visit your dad?

A. Yeah. Before it wasn't. I could hug him when I was littler in his other one in Colorado.

Q. I see. Okay. But now you have to visit with the glass.

A. Uh-huh.

Q. And do you talk to him on the phone sometimes?

3401

A. Sometimes.

Q. And you write to him and keep in touch?

A. Yeah, sometimes. Sometimes we just get a little lazy and then just call, you know.

Q. Okay. Let me see your left wrist there. You got your bracelets on today.

A. Yeah.

Q. And is one of those from your dad?

A. Yeah, this one is with the heart on it. It says Marvea on the front, has a real diamond on it, and on the back if you flip

Page 101

it over it says, Love Dad, 2005.

Q.   And it's got a real diamond.

A.   Uh-huh.

Q.   Wow.  And what are those other bracelets you have on there?

A.   This one is from Mommy, and it says Marvea on it.  She had it specially made, and when I first got it, I never took it off. And this other one, it's from Colorado when me, Mommy, and Sissy, we went to Colorado for a little vacation thing, and, well, we got it, and it's bendable and everything.

Q.   So does that make your left wrist heavy having all those bracelets on there?

A.   No.

Q.   Not hard to raise your hand?

A.   Nope.

Q.   Sissy, who's Sissy?

3402

A.   Alyssa Johnson.

Q.   Alyssa.

A.   Uh-huh.

Q.   You live up in Minnesota now; right?

A.   Yep.

Q.   And your sister lives where?

A.   In Iowa.

Q.   In Iowa.  Do you get to see her very often?

A.   Sometimes.  Usually when I go to Aunt Holly's.

Q.   When you go to Aunt Holly's.

A.   Yeah.

Q.   And you and your sister, do you get to talk on the phone sometimes?

A.   Yeah.

Page 102

Q. What's your -- how do you feel about your sister?

A. I feel happy for her and proud of her.

Q. Yeah. What are you proud about?

A. That, you know, she has a good life and she's a nice person and people get along with her easy.

Q. And she has a baby; right?

A. Yep.

Q. Which makes you an 11-year-old aunt?

A. Yeah.

Q. Did you ever think you'd be an aunt at that age?

A. No. I always thought I'd have to be like 21 or 27 in order

3403

to be an aunt.

Q. What are the responsibilities of aunthood? What do you have to do?

A. Buy Christmas presents a lot and buy clothes and be able to keep in touch with her.

Q. Okay. And do you do those things?

A. Yep.

Q. So you're a pretty good aunt, are you?

A. Yeah, I think so.

Q. Okay. I want to ask you some questions about your mom; okay?

A. Okay.

Q. Now, you said you visited your dad and he was in this prison.

A. Yeah.

Q. Have you been able to visit your mom?

A. Yes, I get to visit her a lot.

Q. And where has she been when you've gone to visit?

Page 103

A.      Eldora most.

Q.      Mostly in Eldora?

A.      Yeah.

Q.      And when you got to visit her in Eldora, did you get to hug her there or --

A.      No, it's always been through glass.

Q.      Always been through glass.  When's the last time you

3404

actually had a chance to hug her or touch her?

A.      When I was six years old.

Q.      Long time ago.

A.      Uh-huh.

Q.      Yeah.  But you go and visit her with your aunt?

A.      Yeah.

Q.      Okay.  Did you go to some special class for children who have parents that are in jail?

A.      No, I never went to any kind of special class, but last year we went to -- well, I went to camp.  It's called Angel Tree Camp like I said and --

Q.      What kind of camp?

A.      Yeah.

Q.      I didn't hear you.  I'm sorry.

A.      Yes, I'm going to camp.

Q.      What kind of camp?  What's it called?

A.      It's Angel Tree Camp.

Q.      Angel Tree Camp.

A.      Yeah.

Q.      And what's Angel Tree Camp like?

A.      Well, all the kids there either have a father or a mother in prison or jail or maybe both, and they get to go there for

Page 104

free, and it has all kinds of activities for kids like swimming, playing games, getting to know other people like you so then you don't feel like you're the only person like that.

3405

Q.   And how did that go?  Did you like that camp?

A.   Yes, it's great.  First year I met like whole -- all kinds of friends, and they're all similar as me.

Q.   Before you went to that camp, were you worried that you might be one of the only people that had parents in jail?

A.   Yeah.

Q.   Now you know there's a whole bunch of you, huh?

A.   Yeah.

Q.   You know, you used to live with your Aunt Holly.

A.   Yes.

Q.   Is that right?

A.   Yep.

Q.   And there were some problems?

A.   A little bit, but most of it was good.

Q.   Most of it was good.  You liked living there.

A.   Yeah.

Q.   Why did you go to live with your Aunt Jamie?

A.   Because it was -- well, every time I went to school, kids would be harassing me because of my parents, that they were gone, and they kept teasing me that some -- like one of my parents killed five people.  Yeah, so -- and to get away from that, I have to go to a different state.

Q.   And has it been better?

A.   Yes, it's a lot better.

Q.   And the kids don't bother you in Minnesota?

3406

Page 105

A.    No, because they don't even know about it.

Q.    They don't even know who you are.

A.    Right.

Q.    But you have to live far away from your sister and your aunt.

A.    Yeah, that's kinda sad.

Q.    Because your cousin -- you were close to one of your cousins, weren't you?

A.    Yes, Haley.

Q.    Who's that?  Haley.  Yeah.  Is she about the same age as you?

A.    Yeah.

Q.    And she lived with your Aunt Holly.  That's Holly's daughter, huh?

A.    Yeah, uh-huh.

Q.    But you still talk to her, don't you?

A.    Yeah, and on the Internet and everywhere we go we call and everything.

Q.    Do you chat on the Internet?

A.    Yes, I do.

Q.    No kidding.

A.    With my friends.  Not in the chat rooms, though.

Q.    Oh, I see.  You're not allowed to be in chat rooms.

A.    I just don't want to.  It's just a lot of people go in there, and then they turn all bad and stuff.  I'm like, no thank

3407

you.

Q.    So you just chat with people you know.

A.    Yeah.

Page 106

Q. Do you have -- do you ever get to see your grandmother?

A. Yeah, I get to see all of them a lot.

Q. Good, okay. What about you writing to your mom? Do you ever do that?

A. Yeah, sometimes when I get the time because usually I'm pretty busy doing other stuff.

Q. What keeps you busy other than going to school and keeping your grades up and being an aunt and visiting all your relatives and chatting on the computer?

A. My aunt, she does foster care too, so I help with that and some kind of day care. Yeah, so I help with that. Then I go places all the time, go to Wal-Mart and stuff and try to get to try on new things, go with my friends places.

Q. Do you have chores that you do at home?

A. Sometimes, yeah.

Q. What kind of things do you have to do?

A. We do like the dishes, putting away dishes, cleaning the kitchen, stuff like that, pick up stuff in the backyard.

Q. You like doing that?

A. Yeah, sometimes.

Q. Okay. Your Aunt Holly, is she taking pretty good care of you?

3408

A. Yeah, she took really good care of me.

Q. When you talk to your mom on the telephone --

A. Uh-huh.

Q. -- do you get to call her, or does she call you?

A. I don't get to call her. She calls me all the time, but I wish I could call her. Otherwise every day I'd call.

Q. And how often does she call you on the telephone?

Page 107

A. As many times as she can. Usually once or twice a week if it's possible unless somebody's on the Internet.

Q. And what kind of things do you talk about with her?

A. How things are going and say we love each other and stuff and what we do and pretty much normal what you'd talk to somebody else with.

Q. What you would talk to your mom about, huh?

A. Yeah.

Q. Do you remember last night did we listen to some telephone calls that you had with your mom?

A. Yep.

Q. And they were on tapes, weren't they?

A. Yep.

MR. BERRIGAN: May I approach?

THE COURT: You may.

BY MR. BERRIGAN:

Q. I doubt you're going to remember these numbers, but let me just ask you, do you remember us listening to some tapes and a

3409

CD of telephone calls last night?

A. Yes.

Q. And do you remember what numbers I told you they were?

A. No.

Q. I didn't think so. What numbers are those that I have in front of you there? Can you read those numbers for us?

A. 2163, 2162, 2125.

MR. BERRIGAN: The defendant would offer, Your Honor, Defendant's Exhibits 2125, 2162, and 2163.

* * * *

(Defendant Exhibits 2125, 2162, and 2163 were
Page 108

offered.)

* * * *

MR. WILLIAMS: No objection.

THE COURT: They're admitted.

* * * *

(Defendant Exhibit 2125, 2162, and 2163 were admitted.)

* * * *

MR. BERRIGAN: With permission of the Court, could I play one of these tapes?

THE COURT: You may.

MR. BERRIGAN: Your Honor, this is 2162 for the record.

THE COURT: Thank you.

3410

(Defendant's Exhibit Number 2162 was played in open court.)

THE COURT: Mr. Berrigan, would now be a good time to take a break?

MR. BERRIGAN: This is going to end in 30 seconds, Your Honor. Might be a minute.

(Continuation of Defendant's Exhibit 2162.)

MR. BERRIGAN: Thank you.

THE COURT: Members of the jury, it's about five after one. We'll take an hour recess until one -- I'm sorry, five after noon. We'll take an hour recess till five after one. Please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence in the penalty phase. Thank you.

(The jury exited the courtroom.)

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 2990 of 3592

VOLUME 19, 6-7-05

THE COURT: Anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: At some point today, Your Honor -- it doesn't have to be now -- we'd like the Court to consider or reconsider because of the special circumstances our motion regarding a contact visit. I just wanted to alert you to that.

THE COURT: And I have been.

MR. BERRIGAN: Thank you, sir.

THE COURT: Okay. Thank you.

(Lunch recess at 12:06 p.m.)

3411

THE COURT: Ready to have the jury brought in?

MR. BERRIGAN: We are, sir.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Marvea, you can go right back to the witness box there.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Berrigan, you may continue your direct examination.

MR. BERRIGAN: May I approach the witness, sir?

THE COURT: You may.

BY MR. BERRIGAN:

Q. Marvea, I've given you a picture. It has a number on it. Do you see that, 2148?

A. Uh-huh.

Q. Who is that a picture of?

A. Me, and my aunt's way in the back with her head cut off, though.

Q. With her head cut off?

Page 110

A.    Yeah, in the background anyways.

Q.    Thank you.

MR. BERRIGAN:  Defendant would offer 2148, sir.

* * * *

(Defendant Exhibit 2148 was offered.)

* * * *

3412

THE COURT:  Any objection?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Exhibit's received.

* * * *

(Defendant Exhibit 2148 was admitted.)

* * * *

BY MR. BERRIGAN:

Q.    Is that a picture of you playing the piano?

A.    Yep.

Q.    We got to hear your piano work here just a few minutes ago.
How long have you been playing the piano?

A.    Maybe a year and a half.

Q.    Do you take lessons for that?

A.    Yep.

Q.    And do you play on the phone once in a while?

A.    Yeah.

Q.    That telephone call that we heard --

A.    Yeah.

Q.     -- is that the kind of telephone calls you have with your
mom?

A.    Yeah, most of the time.  Sometimes we just, you know, talk
normally like you'd talk to your like cousin or somebody.

Q.    Okay.  Sometimes -- we didn't play to the very end, but do

Page 111

you get to talk as long as you want?

A.   No.   We get time that usually says one minute remaining

3413

sometimes, and yeah, that gets really annoying.

Q.   When that happens, when it says one minute remaining, what happens at the end of the minute?

A.   Then we have to say bye as quick as we can, and then it hangs up, and you're like, okay.

Q.   The phone hangs up by itself?

A.   Sometimes, yeah.

Q.   Okay.   Before -- let me ask you one other thing.   Do you have some particular talents in addition to playing the piano and doing well in school?

A.   I like drawing, and I like to do flips on trampolines and climb trees and swim.   I like to do that.

Q.   Your drawing in particular, what do you draw?   What kind of things do you draw?

A.   Usually pictures like the one I drew in that Celebration of Faith book.

MR. BERRIGAN:   May I approach, sir?

THE COURT:   You may.

BY MR. BERRIGAN:

Q.   This book I'm handing you has been marked with another sticker like we put on everything.   It says 2166.

A.   Yeah.

Q.   Are you in that book?

A.   Yes, right here.

MR. BERRIGAN:   First defendant offers 2166.

3414

Page 112

VOLUME 19, 6-7-05

                          *   *   *   *
          (Defendant Exhibit 2166 was offered.)
                          *   *   *   *
          MR. WILLIAMS:  No objection.
          THE COURT:  2166 is admitted.
                          *   *   *   *
          (Defendant Exhibit 2166 was admitted.)
                          *   *   *   *
BY MR. BERRIGAN:
Q.   Could you tell the ladies and gentlemen across from you
what that book is?
A.    It's a book called Celebration of Faith.  It's like -- it's
almost like advertisements of different churches and has like
Bibles and stuff in there, and it has people writing how -- like
what faith means to them.  And for my school we had to draw a
picture of faith, what it means to us.  And I drew a picture of
somebody standing right by Jesus, and I wrote on the top, Faith
is trusting in Him, and I drew a picture of a cross, him
pointing to it, and a dove and, you know, all that extra stuff
and flowers.
Q.   Why is your picture in the book?
A.   Because I guess they found mine the best, and I got first
place.
Q.   You got a prize.
A.   Yes, I got some McDonald's dollars, and I got some candy

                                                         3415


and a little bit of money.
Q.   Is that the only art award you've won so far in your 11
years?

                          Page 113

A.   I don't know.  I've won a little one.  It was just a little contest between some people in my school, and so when we do a drawing contest, the principal would say, Okay, let's see who draws best, and I got like first runner-up or something like that.

Q.   First runner-up?

A.   Uh-huh.

Q.   That cross that you have on your neck there, could you hold that up for us just for a minute?  Oh, that's your drawing.

A.   Oh, my cross.

Q.   In fact, why don't I take that back.

A.   (Witness displayed.)

Q.   Let me show the jurors the picture first; okay?  All right. That picture up in the top left, is that your picture?

A.   Okay.

Q.   Can't see you very well, but that's you right under the picture, isn't it?

A.   Yes.

Q.   That cross that you have there in front of you in your hand, who did you get that from?

A.   I got it from my mom, and one of my mom's friends made it.

Q.   One of your mom's friends in jail?

3416

A.   Yes.

Q.   And how did your mom get that to you?

A.   She sent it.

Q.   Did she tell you anything about it when she sent it to you?

A.   She told me about like -- she told me how she dyed it, and she said it was really complicated to make and she doesn't even know how to make it, you know, so . . .

Page 114

Q. She told you how it got to be pink? Is that what it is?

A. It's red actually.

Q. Red. I'm sorry. How is it that she did that?

A. She took the lead out of a colored pencil and smashed it up, and then she put it in a bowl of water or something, and then she waited a little while, and then she put some blanket sheets or something in there, and then they got dyed, and then she knew that it was time for it to go in, so set it in there, and it got dyed, and she sent it.

Q. Do you wear that just for special occasions?

A. No, I wear it every day unless I'm taking a bath or something, swimming, yep.

Q. Your hair is getting pretty long. That's as long as your hair's been, isn't it?

A. Yeah, it's been growing.

Q. Are you growing your hair for any particular reason?

A. Not really, but me and my mom just came up with a little idea we can cut it for Locks of Love.

3417

Q. You know what that is?

A. Yep. It's for kids that have leukemia or cancer and their hair goes away somehow, and so your hair can be made into wigs.

Q. Whose idea was that?

A. I don't know who first came up with it, but Mommy just said maybe we can go to a hair dresser some time and we can cut our hair and do that.

Q. When people ask you, you know, where are your mom and dad, do you tell them?

A. No. I say -- sometimes I mostly say that they're spies in Hawaii and they catch bad people and they go undercover. And

Page 115

sometimes I just tell people that they're in government business.

Q. Okay. Does that work?

A. Yeah, most of the people believe me when I say that. I'm like, pfew.

Q. Is this your suitcase here?

A. No, it's not.

Q. There's some books in here.

A. Yeah.

Q. Do you know what these books are?

A. Those are my memory binders.

Q. What's a memory binder?

A. You collect all the things that you get, like, letters and news clips from Mommy and things you make and stickers and

3418

stuff, and you put them all in there and little stories you write, you know, and you put it in there, and then one day you'll think, oh, I haven't looked at these in a while, and pfew, you remember everything.

          MR. BERRIGAN: May I approach the witness?

          THE COURT: You may.

BY MR. BERRIGAN:

Q. I'm just going to give you one of those books, Marvea. How did you get these books?

A. Well, I owe some of it to Aunt Jamie because she was the first person who came up with the idea for me. And she just started taking a binder, putting plastic sheets in there and filling them up, and I'm like, oh, I guess I got a memory binder.

Q. And what do you have in that book?

          Page 116

A.   I have like bags from McDonald's and news clips and little things from church, word searches and everything.

Q.   There's some letters in there?

A.   Yeah, like from Mommy, like this one that says, You are my Valentine, my only Valentine.  It goes to the song You Are My Sunshine.

Q.   And do you put the things in the book?

A.   I just kinda started a couple weeks ago.  Otherwise Aunt Jamie did it all.

Q.   Aunt Jamie made them for you.

3419

A.   Yeah.

Q.   And you have at least three of these books.

A.   Yep, so far anyways.

Q.   So far.  Do you plan on making some more books?

A.   Oh, we probably will.  This is actually the third book.

Q.   The third book.

A.   Uh-huh.

Q.   I've got them out of order.  All right.  Something I forgot to ask you earlier about, but let me ask you now, before your mom went to jail, you remember that day, don't you?

A.   Yes, I do.

Q.   What happened?

A.   Well, as it was, me and Haley, we decided to wake up early like a lot earlier, so I was only six years old.  Haley was six and -- six and almost seven.  And so we woke up early to play with our dollhouse.  And we were playing with it for a while, and then I heard Uncle Mike call me.  He's like, Marvea, come down here, and then -- and he says, Haley can come down too if she wants to.  And so we both went down because we never leave

Page 117

our side.  If somebody gets called, you know, we just go, Okay, I'm going with you so -- and then I went out there, and Aunt Holly and Uncle Mike were out there, and I went out there.  I saw police cars and police, and my mom sitting on the steps with handcuffs on.  And I asked where she was going, and then Uncle Mike and Aunt Holly said, Cedar Rapids.  And I thought they said

3420

rabbits, so I'm like, she's going with the rabbits.  And I got to hug her and kiss her good-bye, and she went in the car, and she left.

MR. BERRIGAN:  May I approach the witness, Your Honor?

THE COURT:  You may.

BY MR. BERRIGAN:

Q.  Do you remember what grade you were in when your mom went with the police officers?

A.  I was in first grade.

Q.  First grade.  And that year in first grade, did you get in the paper, get a picture of you in the paper?

A.  When Mom left -- I don't know.  I never saw any papers after that.  But this paper was when I was in kindergarten.

Q.  Oh, I've got the wrong year.  I'm sorry.  There's a picture of you in the paper; is that right?  This is Exhibit 2123.

A.  Yes.

Q.  And what are you doing in the paper?

A.  I have a basketball in my hands, and I'm going to shoot a hoop in the new painted gym that my mom painted for me.

Q.  This is the gym at your school?

A.  At my really, really, really old school, yes.

Q.  Really old school.

A.  Uh-huh.

Page 118

Q.   You said the gym got painted.  Did you say your mom painted the gym?

3421

A.   Yes, she did, and I was there all night watching her and playing with hula hoops and stuff.

MR. BERRIGAN:  Okay.  Defendant would offer 2123.

*   *   *   *

(Defendant Exhibit 2123 was offered.)

*   *   *   *

MR. WILLIAMS:  No objection.

THE COURT:  2123 is admitted.

*   *   *   *

(Defendant Exhibit 2123 was admitted.)

*   *   *   *

BY MR. BERRIGAN:

Q.   When you talk to your mom on the phone this once a week or so when she calls you --

A.   Yeah.

Q.   -- does she always talk like she did on the phone what we heard?

A.   Yeah, yeah, she usually says the same stuff, she loves me and stuff, and I don't get sick of it.

Q.   You what?

A.   I don't get sick of it.

Q.   You don't get sick of it.

A.   No.

Q.   You pretty sure she loves you?

A.   Yes, I'm very, very, very sure.

3422

Page 119

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3000 of 3592

Q.   Okay.

MR. BERRIGAN:  That's all I had.  Thank you.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  No questions, Your Honor.

THE COURT:  Marvea, you can step down now.  Thank you.

THE WITNESS:  Thank you.

MR. BERRIGAN:  The defense would call Shelly Johnson.

SHELLY JOHNSON, DEFENDANT'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated.  Would you state your full name, please.

THE WITNESS:  Yep.  It is Shelly Johnson.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q.   Miss Johnson, I know you've already testified, but just to reacquaint the jury with you just a little bit, could you tell us where you live?

A.   Yep.  I live in the Chicagoland area in Illinois.

Q.   Are you a married lady?

A.   Yes, I am.

Q.   And who's your husband?

A.   My husband is Angie's brother Jim.

Q.   Jim.

A.   Yes.

Q.   And you have children?

A.   Yes, two children.

3423

Q.   What are their names and ages?

A.   Morgan is nine, and Gable is seven.

Q.   And Morgan is a girl.

A.   Yes.

Page 120

Q. And Gable's a boy.

A. Yes.

Q. Do you work outside the home, ma'am?

A. Yes, I substitute teach.

Q. Okay. I want to direct your attention back to when you first became acquainted with the Johnson family.

A. Okay.

Q. Okay? How did you meet the Johnsons? What were the circumstances?

A. My father had just taken a new position. He was the superintendent of schools, and we were there a few weeks, and I met Jim when school started and then soon after began dating, and he introduced me to his family.

Q. What town was your dad the superintendent of schools in?

A. Forest City, Iowa.

Q. And was Jim living in Forest City at that time?

A. Yes, he was.

Q. What grade were you in when you and he started dating?

A. I was a junior in high school.

Q. And Jim?

A. Junior in high school.

3424

Q. When you first started dating Jim, obviously you were attracted to him in some fashion.

A. Yes.

Q. What about him attracted you?

A. He was very handsome. He was very tall, had a very nice presence about him, an excellent personality. He was just a very nice guy.

Q. Did you have a chance to meet his family at some point

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3002 of 3592

while you were dating?

A.   I did.  He introduced me.

Q.   And what were those circumstances if you can recollect?

A.   I believe he just brought me to the house and introduced me to his mother, to Pearl Jean.  And I don't -- I think Jamie was living at home at the time, and I might have met her at some point.  Holly was younger, so I met her.  And then very soon after I was introduced to Angie, and I don't think I met Wendy for quite a while.

Q.   When Jim introduced you to his family or before he did, did he give you any kind of warnings about his mother?

A.   Not at first.  He was self-conscious of their home, and they obviously did not have a lot of money, and he sort of prepared me for that, and it didn't matter to me.  But he had just said his mom was kind of different I believe or something along those lines.

Q.   Okay.

3425

A.   And didn't go into it very much.

Q.   Did Jim -- once you started dating, did he seem like a pretty normal guy to you?

A.   Yes.

Q.   And then at some point while you were dating, did you start to have more contact with the other members of the family?

A.   I did.  The longer that we dated, very small community, I had more contact with -- I got to meet Angie and her husband and daughter.  Again, I didn't meet Wendy till much later.  She was not there and then more regular visits to his home.

Q.   When did you first notice that perhaps his mother was a little eccentric or a little different in her ways?

Page 122

A.   Right from the beginning.  She was very different from anybody I had ever met, very different from people my family were acquainted with, so right from the beginning.

Q.   Jim was pretty active in athletics in high school?

A.   He was, yes.

Q.   Did you happen to notice -- well, you probably went to his games I suspect.

A.   Yes.

Q.   Did you happen to notice whether his mom was present at any of his school activities?

A.   No, she did not attend.

Q.   Did Jim ever give you -- or even Pearl Jean give you any explanation about that?

3426

A.   I never asked her about it.  I know awards banquets were particularly a touchy subject with Jim.  His friends' families would invite him to come with, and my family often, you know, would obviously include him, and he would not attend with us. It just wasn't a subject we discussed.  She just had never come was all he had said.

Q.   Jim didn't attend the awards banquets?

A.   I don't believe that he would attend them either.  I don't recall him -- perhaps there would be maybe one at the end of our senior year, but I don't remember him attending them.  It was a very touchy subject.

Q.   You both graduated from high school?

A.   Yes, we did.

Q.   And then where did you go on to college thereafter?

A.   Jim received a scholarship to go on to the University of Iowa and attended there for five years, and I got a scholarship

Page 123

to the University of Northern Iowa, spent a few years there, and then eventually transferred to Iowa, to the university.

Q. What was Jim's scholarship for?

A. For athletics, for football.

Q. Was that a full scholarship?

A. Yes, it was a full scholarship.

Q. Based on their financial situation from what you could observe, did that seem to be a requirement for Jim to attend?

A. Jim wouldn't have attended without it.

3427

Q. Once Jim got to college -- I guess you said you were at North Iowa.

A. Uh-huh.

Q. For a while before you transferred?

A. Yes.

Q. How long were you there?

A. I was there for two years at the University of Northern Iowa and did an exchange program for a year and then eventually transferred there permanently to the University of Iowa.

Q. Despite the fact that you were at different colleges your first two years --

A. Yes.

Q. -- did you and Jim continue to maintain contact?

A. Yes.

Q. And continue to date.

A. Yes.

Q. Did you continue to have contact with the Johnson family?

A. I did.

Q. And his mother particularly, was Pearl Jean supportive of her son's educational endeavors in college?

Page 124

A.    No.  She didn't like the idea of him leaving her.  She was very possessive of Jim.  She always referred to him as, My Jimmy will do this for me and my that.  Our freshman year Jim had a -- it was a hard transition for him that first year at college.  For any freshman it is, but for him with not a lot of support

3428

from home it was especially difficult.  There was a point where football was overwhelming and academics were overwhelming, and he had just reached the breaking point, and his mother told him to come home, to just quit.

Q.    Did he do that?

A.    No, he did not.  There were a number of friends and myself and coaches who made sure that did not happen, but she told him to quit.

Q.    As time went on and as Jim continued in college, what was -- what happened to his relationship with his mother?

A.    We saw her less frequently.  The only visits home -- he was required to stay there during the summertimes for workout purposes, and, you know, he got jobs all summer long, so he did not go home very often, so it was definitely, you know, dissipating over time I guess.

Q.    What about Angela?  What was your observations dating Jim these number of years that you did?  What kind of a relationship did you observe between him and his sister?

A.    She loved him very much.  It was very obvious.  Of all of Jim's sisters, I was closest to Angela the quickest and could see that she was very protective of Jim, always looking out for him, always sort of pushing him in the right direction.  So it was a good relationship.

Q.    Did she ever come and watch any of his football games or

Page 125

any of his athletic events?

3429

A.   Yes, she did come down for a few events when she was able.

Q.   At some point did you have -- was there a point in time where your husband -- or maybe he was your boyfriend then -- just stopped having contact all together with his mother?

A.   Yes.  We were engaged to be married, and I think it was about two months prior to the wedding that was the end.

Q.   What is it that happened or if anything?

A.   I think it was a lot of things.  The event that caused it was she had decided not to attend the wedding, and at that point he had just said, I'm done.  But prior to that there were a number of things that caused that to happen.

Q.   When did you get married?

A.   We got married June 1, 1991.

Q.   So you just had an anniversary.

A.   Yes, we did.

Q.   What year would you have been in college then, or were you in college?

A.   I had graduated in December of 1990, and Jim was just finishing up his senior year, so he was going to graduate in May I believe of '91.

Q.   Did Pearl Jean attend his college graduation?

A.   No, she did not.

Q.   Has there been any point during the time of your relationship with your husband before or after you were married that he ever confided in you any of the problems that he

3430

Page 126

experienced in childhood growing up with Pearl Jean?

A. Yes. We became best friends in high school, and, you know, he had confided in me he had nightmares. He couldn't explain them. He would tell me the nature of them, and they progressed into college, so we discussed that. He obviously I guess warned me about his mother's religious beliefs and how to avoid some of that.

Q. Did you actually ever see him have nightmares?

A. Yes, I did, and they were very -- very real. The one that I -- I only saw one nightmare. I heard of the others. He would always be the next day a little preoccupied.

The nightmare I did see, we were in college. It was our freshman year, and I believe it was his last nightmare. I was up to visit for the weekend, and in the middle of the night there was this large crashing noise, and Jim was -- he was very like kicking the covers, and then his arm flew out, and he hit a speaker that was near the bed, and he -- I don't believe that he fully awoke from that, but the next morning he had told me that -- I asked him if he had another nightmare, and he said yes, he did.

Q. And as time's gone on now -- you've been married looks like 14 years.

A. Yes.

Q. -- has that situation, his nightmares, has that stopped?

A. The nightmares have stopped, yes.

3431

Q. Of course, in getting ready for this trial and in testimony, have you had occasion to talk to your husband about these events, kind of revisit these childhood events?

A. We revisit them very carefully and at specific times. We

Page 127

don't discuss it -- it's a hard subject to address, so we don't talk about it very much.

Q.    Has that -- has anything about his childhood experiences in your observations of him as a husband now affected the way he behaves with your children?

A.    There are a few things.  I know my father had told me when we got married that in any new marriage there are things that, you know, you have to work through obviously.  But he had said I would probably encounter different things with Jim, and I didn't think I would.

But he -- when the kids were very young -- well, you know, when you try to teach your kids that they have to finish their meals or they'll go to bed hungry, and I was trying to teach Morgan that, and she was I think two years old, and she came down at ten o'clock one night and was very hungry.  And I told her, No, if -- you don't get any dinner; you didn't finish your food, and Jim was very adamant that she would eat and his children would not ever go to bed hungry.  And I said, Okay then; why don't you feed her, because otherwise I'm going to be feeding her every night because she's going to think this is fun.  So he did.  He made her a meal.  They sat down, and then

3432

they ate together, and he put her back to bed, and since that day they do not go to bed hungry.

We were on a -- I guess on the same subject, when you have your kids, you know, you teach them to try different foods.  There was a time when one of the children was eating a vegetable and they didn't like it and they began to gag, and I said, Now that's enough of that; you need to try this; we don't do that at the table.  And he -- he said, If they don't like that -- and he

Page 128

hit his hand down. He said, If they don't like it, they don't eat it. You don't force them to eat something they don't like. And, you know, the mother in me knew that at that instant.

Q. Is that pretty unusual behavior?

A. Oh, entirely. He's the most laid-back person, so for him to be that adamant that that would not happen, and I didn't understand. It was just something we did in our house. You tried new things. So that was mostly when they were young. It doesn't happen anymore. But it was just when they were very little and these situations first arose.

Q. Did he explain to you why he felt so strongly about those things?

A. No, there was no discussion of that, and I think the only other thing I would say that was different was we were on a walk probably five years ago and having a conversation about the kids growing up and what we would do at retirement, and he said that over the course of them growing maybe he might need help with

3433

issues. Maybe he wasn't confident that he could handle them which has never been the case. He's a wonderful father, but the fact that he was nervous about how he would address that . . .

Q. Do -- your children Morgan and Gable, do they have any contact with their paternal grandmother Pearl Jean Johnson?

A. No, they do not.

Q. Do they know of her, where she lives or anything about her?

A. No, they do not.

Q. You've never discussed her with them.

A. No. I just had a brief conversation with my nine-year-old because I figured she would hear the name in passing, but their grandmother is Cookie and my mom.

Page 129

Q.    Okay.  I wanted to finish by just getting back to Angela. Obviously you live quite a ways away outside of Chicago.

A.    Yes, yes.

Q.    Have you and your husband had contact with Angela nonetheless during the period that she's been incarcerated?

A.    Yes, we have.

Q.    In fact, do you provide her some type of financial support?

A.    Yes.  Jim felt it was very important that he have Angie talk with Marvea as much as possible and Alyssa, and so from the git-go, he has made all decisions regarding contact.  I didn't know how to address it with him, and he has been very adamant that those children need her and it was important that we make sure that they get to continue to have contact.

                                                    3434


                    MR. BERRIGAN:  Thank you.  That's all I have.

                    THE WITNESS:  Okay.

                    MR. BERRIGAN:  But you need to wait just one second.

                    THE COURT:  We need to wait and see if Mr. Williams has any questions for you.

                    Mr. Williams?

                    MR. WILLIAMS:  No questions, Your Honor.

                    THE COURT:  Okay.

                    MR. BERRIGAN:  The defense calls James Jeffrey Johnson Junior, Your Honor.

                    JAMES JOHNSON, JR., DEFENDANT'S WITNESS, SWORN

                    THE COURT:  Okay.  Please be seated there.  Make yourself comfortable, and please adjust the chair and the microphones so you can speak directly into the microphones.  And when you're ready, would you state your full name, please.

                    THE WITNESS:  James Jeffrey Johnson Junior.

                    Page 130

MR. BERRIGAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q. You're a large man, Mr. Johnson, but you have kind of a soft voice, so if you get as close as you possibly could to those microphones, we'd very much appreciate it.

Where do you live, sir?

A. I live in the suburbs of Chicago.

Q. And who do you live there with?

3435

A. My wife Shelly and two kids.

Q. And your two children, what are their names?

A. Morgan and Gable.

Q. How long have you and Shelly been married?

A. Fourteen years, couple days.

Q. You know that because you just had an anniversary.

A. Right.

Q. What relationship are you to this lady at the table to my left, Angela Jane Johnson?

A. She's my sister.

Q. And what is the difference in your age?

A. I'm never good with numbers. She's a couple years older.

Q. Well, how old are you?

A. I'm 38.

Q. Thirty-eight, okay.

A. Forty-two. I believe she's 42?

Q. She's 41. You're giving her one extra year.

A. Forty-one. Sorry.

Q. We're going to ask you some questions about your background, but I wanted to kind of ask you just a few questions

Page 131

about what you do presently. What line of work are you in?

A. I work for a small appliance company and manage a group of sales professionals.

Q. We've heard a little bit about your educational background, but could you just tell us where it is that you went to school?

3436

A. Well, grew up in Forest City and went to University of Iowa.

Q. And did you major in a particular subject there?

A. Liberal arts.

Q. When did you graduate from the University of Iowa?

A. Graduated in May of '91.

Q. May 1991.

A. Yeah.

Q. You said you grew up in Forest City. You actually lived in a number of places growing up, didn't you?

A. That's true.

Q. Okay.

A. That's where I graduated high school.

Q. That's what you say.

A. Yeah.

Q. Your mother is Pearl Jean Johnson.

A. Correct.

Q. And your father, James Jeffrey Johnson Senior.

A. Yes.

Q. I want to take you back, Mr. Johnson, quite a ways to when -- your first memories of your parents being married. You know obviously they divorced in 1968.

A. Right. I was pretty young, I mean.

Q. Do you remember them being married to each other at all?

Page 132

A.    Not at all.

3437

Q.    So your first memories of a child, your mother was raising you and your siblings?

A.    That's correct.

Q.    Where were you living when you first have a memory of being with your mother?

A.    Probably -- it was either -- I don't know the dates.  We were either in Thornton or -- yes, probably Thornton, Thornton, Iowa.

Q.    We've had quite a bit of testimony about your mother and some of the things that happened in your house, but I'd like to revisit that briefly with you, and I wanted to start asking you about what her disciplinary practices were in terms of how she disciplined you and your sisters.  Do you remember that?

A.    Yes.  We'd often get a whoop in, you know, whether it's a belt or a hand regularly, and kind of if one goes down everybody goes down so . . .

Q.    What is the principle there in terms of one being punished and all the others being punished?  Was there any reason for that that you know of?

A.    I'm not sure.  It was more of a protective mechanism or something that I think we convinced ourselves that if someone got in trouble or did something that deserved a beating or -- we'd -- no one would say a whole lot in an effort to protect the other kids.

Q.    When you were hit by your mother, did she use any

3438

particular instruments?
Page 133

A.   I remember a paddle and a big belt -- a couple of belts I remember -- and a hand.

Q.   When she hit you with her hand, where would she hit you?

A.   Right in the face, on the back side.

Q.   And did she hit you hard?

A.   Oh, yeah.  It was hard.

Q.   What about the belts or the paddle?

A.   Hard enough to leave you welts.

Q.   Were these episodes connected to some misbehavior that had gone on either with you or your siblings?

A.   Well, like I said, I mean, you may not have been the root cause of what the beating was for, but you knew you were going to get one if someone messed up whether you knew what that issue was.

Q.   Okay.  Was it a predictable situation?  That is, could you tell -- you knew it was coming ahead of time?

A.   Yeah, you knew it was coming.  You just knew.

Q.   And did that cause you any fear?  Did you have trouble with it?

A.   Yeah.  I mean, we'd all be afraid.  Fear was a common thing in our house.

Q.   One of the other areas that's been discussed has to do with fear of things like demons or devils.  Were you fearful of demons as a child?

3439

A.   Yeah.

Q.   What was the cause of that?

A.   I guess it's -- I don't know.  It was religious beliefs of my mother, and we'd live by the fear of God versus the power of God.  I mean, the power was -- presented itself in a negative

Page 134

manner. I mean, we were -- we were afraid. I mean, we felt like Jean had the power to make bad things happen to you.

Q. Well, when you say, you know, the power of God presented itself in a negative manner, what do you mean by that?

A. Well, after I've been able to move on, I've seen two different sides of religion. One's a love of God, and one's a fear of God. And the household we grew up in was the fear of God. I mean, it was -- we were afraid of the devil. That was pretty common.

Q. Did your mother discuss the devil with you?

A. Yeah, I mean, in a manner that would strike fear into us and to the point where if we felt like we weren't God's child that there was only one other place you were going to go.

Q. Where was that?

A. That was hell.

Q. Do you recall listening to any tapes or records of people preaching about God during the time you were growing up?

A. Well, I mean, we had tapes and things of, you know, religious stuff and everything. I mean, I never heard them.

Q. Your mother also -- did she -- did your mother ever speak

3440

in tongues with you?

A. Absolutely, pretty frequent.

Q. And under what circumstances would that arise?

A. Typically you heard it when she was doing what was called laying on hands. She felt like she had the power to heal people.

Q. You mean physically heal people?

A. Physically heal people. If it were from an allergy to dying of cancer, she believed she had that power.

Page 135

Q.   Was there something a little more intense than the laying of hands bringing out the devil?

A.   Absolutely.  Have times where there was laying on hands and trying to rebuke demons, devils out of you.  My older sisters went through it more so than I did and Holly, and I think that was because they refused it a little bit more.  I mean, the laying of hands and the rebuking of devils and anointing you with oil was a little bit less invasive for myself and Jamie and Holly because --

Q.   What -- what was involved in the rebuking devils?

A.   She would say we had a spirit or a bad spirit or demon in us, and she would convince us of this, and then we'd have to sit there and wait until she got through her prayer session, and if you made some type of sign that the demon left, whether it was a yawn or blink your eyes or things of that nature, it would be out of you until another day.

3441

Q.   Did any of these activities involve physical restraint?

A.   Absolutely.  My first recollection was -- I was probably in first grade.  We lived on J Street in Forest City.  And we lived in this big house close to the high school.  And on the second floor, the first room on your right as you go up the steps is my bedroom.  And that's where it started to begin, and it started with Wendy, and it started with Angie and the Abbott kids, and they would have these in my room, and it was loud, screaming, hollering.  And I remember these girls coming downstairs.  Their eyes were like popping out of their heads crying, beat, worn down.  And one by one those older kids would go up in that room and go through this procedure.  When it was all said and done, I'd go up in that room and try to go to sleep.

Page 136

Q. They used your bedroom for the rebuking devils?

A. Yep.

Q. Were you able to hear -- if you couldn't see, were you able to hear what was going on up there?

A. Yeah.

Q. What is it you could hear?

A. You could hear pounding. You could hear what I would call bodies getting thrown against the wall, loud noises. You heard the speaking in tongues thing.

Q. Did you ever see one of these sessions when your sisters were being --

A. No.

3442

Q. -- having the devils rebuked?

A. I knew it was happening. And Angie and Wendy would try and protect us, and they would like coach us and say, Hey, just don't resist. And we didn't.

Q. But your sisters didn't behave the same way.

A. They didn't take it or it was very difficult for them.

Q. Were there other unusual religious practices that your mother engaged in when you were children?

A. We would -- we'd have these mile-long Bible studies in our house. I mean, they were forever.

Q. How old were you when you were in these Bible study sessions?

A. They started when we were real young, but vividly by the time I hit junior high, I mean, before I could go out and play or do normal things that kids do, we'd sit through this two-hour Bible study, and it was on the weekend. I mean, come on.

Q. And who ran the Bible studies?

Page 137

A.    Jean would.  We'd fast often.

Q.    And when you say fast, just to be specific, what are you talking about?

A.    You wouldn't eat.  You'd go through days, typically sunup to sundown.  That's pretty tough when you're a little kid.

Q.    Did you ever complain about that to anybody at school or --

A.    No.

Q.    -- any other adults?

3443

A.    We thought it was normal.

Q.    You thought other people fasted?

A.    Yeah.  We thought that was what people did.

Q.    Were you ever subject to something called a prayer closet?

A.    I don't remember the prayer closet.

Q.    What about your grandmother Florence?  Do you remember her?

A.    I remember her.

Q.    Did she have any unusual behavior or proclivities?

A.    She was a nut job.

Q.    And what makes you say that?

A.    She was mean.  She thought the TV was the devil.  I remember coming home from school wanting to watch Daniel Boone. I'd be sitting on the couch watching it.  She'd come in there, turn that TV off, and threaten to break it.  I'd leave the room.

Q.    Did you ever have your TV broken?

A.    I don't remember it ever being broken.  I don't remember it being there at times.  I don't know what happened to it.

Q.    Were you allowed to have toys as children?

A.    I don't remember a whole lot of toys.

Q.    When all this was going on with your mother and your grandmother, where was your father, Jim Johnson?

Page 138

A.   He was -- he was home at his home up in Wisconsin.

Q.   Did you see him regularly?

A.   No.

Q.   Did your mother encourage you to visit your father?

3444

A.   No.  We knew he existed, but we didn't see him very often, and that was by design.

Q.   By whose design?

A.   By Jean's design.  She wasn't too fond of my dad.

Q.   I need to ask you about a particular trip to Chanute, Kansas, for a minute if we could.  Do you remember taking a trip to Chanute, Kansas, to an orphanage there?

A.   Yeah.

Q.   About how old were you at that time?

A.   I couldn't have been three or four years old.

Q.   What do you remember about the time that you spent in Chanute, Kansas?

A.   I remember bits and pieces.  I remember we lived in a shed. At least I think it was a shed.  There was hay.  There was mice. There was -- not what you would call a home.  Accommodations were bad.

Q.   Did you -- do you recall there being other children there at this orphanage?

A.   I do remember other children being there, but I struggle to remember my sisters being there.  I think that's partly because they were at school, but I felt alone there.

Q.   You were too young to be in school.

A.   (Witness nodded head.)

Q.   So you spent your time at the orphanage during the day.

A.   Yeah.

Page 139

Q. Was your mother there at the time?

A. I don't remember her being there at all.

Q. Did you have any interaction with the animals, the farm animals, there?

A. I remember being chased by a bull in the field. I remember there's these sows in a pen that ate everything. If there was slop, if there was baby kittens, if there was anything, they'd eat anything. We watched them eat live kittens, and no one said boo.

Q. Do you have any recollection of being asked to test an electric fence?

A. Absolutely.

Q. And could you tell us a little bit about that?

A. I'd be outside. You can blame it on poor timing because if I was outside and Ted Dillo was out there, he'd make me grab that electric fence to see if it was on, and I'd do it, and I'd do it again.

Q. Well, was the fence on?

A. It was on.

Q. So why --

A. He knew it was on.

Q. Why did you do that?

A. I was afraid.

Q. How did Mr. Dillo treat you and your sisters while you were there in Chanute, Kansas?

A. I remember it was a place where the behavior towards us was

pretty aggressive. My sisters would always try to protect us, and they would defend us.

Q. And which sisters are you talking about?

A. Angie and Wendy. They were older. I mean, Jamie and I, we didn't know how to defend ourself. Stupid stuff. Sitting at dinner, I swear the only thing they had to eat was black-eyed peas. Today I struggle eating vegetables.

Q. What was it about the black-eyed peas?

A. I refused to eat them, and the punishment for that was getting picked up, taken to the bathroom, and had my first experience with a bar of soap, put that soap in my mouth, pushed under my chin, and grabbed the soap and scraped it out, and that's what I got for not eating black-eyed peas.

Q. Did you -- do you remember other children at the Dillo orphanage being punished?

A. I remember other kids. I don't remember them being punished. I remember -- I think it was a cow dying, and I remember them taking that cow, bringing it in the house, and putting it on the dinner table, and I remember these people having large knives and butchering this cow on this table. They just butchered it up right there. I couldn't believe what I was seeing.

Q. There's been some testimony regarding chickens at the Dillo farm. Do you remember any chickens?

3447

A. I remember chickens being on the farm, but that's all I remember.

Q. What about rabbits?

A. I don't remember rabbits.

Q. The sows that we've talked about -- you talked about a

Page 141

little earlier, you said that they used to eat anything that was given to them and they ate some kittens?

A. Yeah.

Q. Do you know how the kittens got in there?

A. They walked into the pen. There's probably seven, eight kittens. They don't know what they're doing. They walked into the trough probably to eat some food. They'd be right there in that trough, and they'd just get eaten.

Q. Some of these memories that we're talking about from Chanute, Kansas, have you had problems with those even as an adult?

A. Yeah.

Q. Have you gotten any counseling or had any professional assistance in dealing with those, Mr. Johnson?

A. No. I had a reoccurring nightmare from the time we lived there to the time I graduated.

Q. Was it a nightmare based on an experience you had there?

A. Yeah. This nightmare was people. I don't know if they were demons or devils, but they would chase me. In each dream they'd get closer, and they had big knives, and it was real. It

3448

was real.

Q. I want to take you back to Mason City after the Dillos. Was there a point in time where you were going to school where you did finally realize that the home life that you were experiencing with your mother and siblings was not normal?

A. Yeah.

Q. How did that realization come to you?

A. Once you're able to develop some friends and when you're invited into their homes, it was a chance to explore and see

Page 142

what actual normal households -- how they operate.

Q. When do you first recall doing that, that you were spending some time in your friends' homes?

A. I'd say by the time I was late elementary, maybe fifth grade or junior -- junior high. I mean, that first time I was able to spend the night away, we got as much food as we wanted. We watched TV. We played games. There was -- it was something I'd never experienced, and I would, growing up, ask my friends to invite me over to spend the night because I knew I'd get some food.

Q. Was that a problem with your mother? Did she have enough food for you to feed you?

A. It seemed like we had always had very little. And I'm sure that was a function of economics. It didn't seem like we ever had any money, and we were pretty limited with what we had.

Q. I wanted to ask you about that in terms of how your school

3449

peers treated you and perceived you. Did you feel you were treated differently as a result of your financial situation than other kids your age?

A. During -- during your elementary years, kids can be pretty cruel, and they know you have limitations when you're wearing the same clothes to school or you don't have a coat when all the other kids do. I mean, you dealt with it, but later in school during high school, I developed some pretty close friendships which I still have today, and they know.

Q. Well, was your mother supportive of your educational and athletic endeavors when you were in school?

A. No. Yes and no. I mean, there's very little encouragement to be active in school. The biggest benefit for me is I've had

Page 143

some pretty amazing coaches and teachers that cared.

Q.   And, in fact, did some of those people provide you with some of the necessities that you needed to participate in those athletic activities?

A.   Absolutely.

Q.   Did your mother ever buy you shoes for football or wrestling or any of those athletic activities?

A.   One time for football, but I didn't even know what kind of shoes to get.  I mean, there was no involvement there.  She couldn't help me.  But yeah, I'd have coaches provide me with basketball shoes or -- they knew we didn't have anything.

Q.   Was that embarrassing for you?

3450

A.   Absolutely.

Q.   What about your sisters?

A.   Same deal.  Holly, I mean, the expectations were pretty high for her because I had had some success in athletics, and her first basketball game, Jean didn't even go.  I got done with practice and went to her game.  She was the only kid out there with street shoes on running up and down the court.  It was embarrassing.  That night I went home, told Jean she needed basketball shoes.

Q.   Did she get them?

A.   I don't remember.

Q.   Was the situation that your mother didn't have the money or had the money and wouldn't spend it, or do you even know?

A.   I don't even know.  I like to think she didn't have the money.

Q.   By the time you were in high school, wasn't she operating a cafe at the truck stop?

Page 144

A.    Yeah.

Q.    Wasn't she the owner?

A.    Yeah.  I don't think it did very well.  At least there was -- I mean, we ate the same thing for dinner all the time unless we were eating at the restaurant.  I mean, it was the same stuff.

Q.    As you progressed through high school, Mr. Johnson, did your attitudes change about your mother's religious beliefs?

3451

A.    Yeah.

Q.    What is it that happened?

A.    Time.  It took time.  I mean, I didn't know if we were Christian, Baptist.  I knew we weren't Lutheran or Catholic.  It just -- it was different.  And meeting friends and other people, you get to learn what a sense of normalcy is.

Q.    I wanted to ask you about sort of the flip side of the coin to what we've been talking about, you know, not the discipline and abuse, but was your mother loving and caring towards you as you were growing up?

A.    I believe she loved us.  She told us she loved us.  But it was a different kind of love.  The kind of love I needed was someone being there at sporting events.  My biggest day was my senior year, and I had the greatest high school football coach any kid could have, and we had an awards banquet.  And this was his opportunity to say, Mr. Johnson, thank you for leaving everything on the field, but I didn't get to hear that because she didn't want to go, and it was important.

Q.    So you didn't go because your mother didn't go.

A.    My high school coach sent these friends of mine that we played ball with looking for me, and they found me, and I told

Page 145

them I couldn't go, but it was important. One day, one hour, that's all it took.

Q. Did your mother give you an explanation as to why she couldn't attend?

3452

A. Usually these were like potluck things where parents would bring a dish. It was the same excuse: I didn't prepare anything.

Q. You did well nonetheless in football in high school; right?

A. I had a lot of help.

Q. Didn't you get a scholarship to college?

A. Yes.

Q. And you attended University of Iowa?

A. That's correct.

Q. And while you were there at the University of Iowa, did your relationship with your mother change?

A. Yeah.

Q. What is it that happened and why?

A. We -- I mean, going to college was the best thing that happened to me. It was a whole different world, scary at first. That first year was pretty tough as it is for most kids, even the -- going off on their own.

But as I become more involved in social events and dealing with more coaches and other players, you saw things, and my relationship with my mother became more distant, and that was more by design. Kind of embarrassing when she'd come to a game and start praying in the stands, and all she has to do is cheer. She's frickin' praying. We say a prayer before every game. Is that good enough? Laying hands on my roommates. It's like stop, enough's enough. My girlfriend, those are the type of

Page 146

things that said to myself that, hey, maybe this relationship isn't working out.

Q. You know, when you were growing up, as you pointed out, your sister Angie was about three years older than you. Do you remember her leaving the house?

A. Yeah. She escaped. She didn't leave.

Q. Wendy, your oldest sister, do you remember when she left?

A. She escaped too.

Q. Was that hard on you to have your older sisters gone?

A. Shifted the focus. They protected us. They were there for us.

Q. What about after you left and you went to college and obviously your circumstances changed? Did you still have a close relationship with your sister Angela?

A. After I left college, I became what you call distant. I moved a lot with my job, talked to my dad pretty frequent but not so much with my sisters. I still don't that much today, not like I should. But there's a lot of bad memories, and always in these conversations, never fails, it goes back to a "do you remember when?" I buried "remember when" a long time ago.

Q. So it makes it hard to talk to your sisters about these things.

A. They got the worst of it.

Q. Do you have any contact with your mother now?

A. No.

3454

Q. When's the last time you had any contact with her?

A. I can't remember, but I know it's been over 14 years.
Page 147

Q.    You have these two children.  Morgan's 9 and Gable's 11.

A.    Morgan's nine and Gable's seven.

Q.    Seven.  I'm sorry.  Do you allow them to see their grandmother?

A.    She could be standing in this room.  If my kids were here, they wouldn't know who she is.

Q.    Is that your intention?

A.    That's by design.

Q.    As a result of your experiences, Mr. Johnson, do you treat your children differently --

A.    Absolutely.

Q.    -- than the way you were treated?

A.    Absolutely.

Q.    And in what way?

A.    My kids live in a perfect world.  They have friends.  They have food.  They have a lot of love.  They have a grandma and grandpa.  They've got two sets of them, Grandpa Jim and Grandma Cookie, Grandma Jan and Grandpa Phil.  We have a normal neighborhood.  They have it all.

Q.    Is it important to you to protect your kids from some of the things that you experienced?

A.    Absolutely.

Q.    You've gone on.  You've gotten a job.  You played at the

3455

University of Iowa football team; right?

A.    Uh-huh.

Q.    In fact, did you win some kind of awards there while you were playing football?

A.    I had some pretty good success.  I had some honors.

Q.    What honors did you receive?

Page 148

A.   I was voted team captain my senior year.  I made All-Big Ten my junior and senior year, defensive lineman; voted by the media my junior year Preseason All-American.  I mean, these are things that I never could achieve without the help of my coaches, wife.

Q.   Who was your coach at the University of Iowa?

A.   Excuse me?

Q.   Who was your coach?

A.   Dan McCarney.

Q.   Didn't you go to the Rose Bowl?

A.   Yeah.

Q.   You're a pretty big, tough guy.  Do you think these childhood experiences have had any effect on your success in life?

A.   It made me appreciate what was being offered, and I didn't know what I had that first year.  I quit the team.  I called my girlfriend, and I asked her to bring me my car.  If I would have got that car, I don't know where I'd be at today.

Q.   You mean if you had gone back.

3456

A.   Yeah.  But luckily I had people like my wife, Dan McCarney helping me make the right choices and not giving up on me because if he would have gave up on me and Shelly, those accomplishments would never have been there.  I don't know if I'd be where I'm at today.

Q.   You might have had a different life.

A.   (Witness nodded head.)

Q.   I want to ask you just a couple questions about your relationship with your sister, Mr. Johnson, before we finish.  You said earlier you were -- you've gotten a little distant from

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3030 of 3592

your whole family, your mother and your sisters.

A.   Yeah.

Q.   In the last five years that your sister Angela's been incarcerated, have you had contact with her?

A.   Yes.

Q.   What's that been?

A.   Letters, more letters from her than what I send unfortunately.

Q.   She's got a little more time on her hands.

A.   Yeah.  And she's pretty -- you know, she's pretty consistent.  I mean, she loves her kids.  She loves us.  She loves me.  She loves my wife.  We talk every now and again on the phone.

Q.   Have you provided any financial support to enable her to do that?

3457

A.   Some, a little, help with the phone bill so she can talk to her daughter.

Q.   Has that been important to you?

A.   Yeah.

Q.   This decision -- obviously you understand that there's going to be a decision made as a result of the trial regarding the sentencing.  Is that a decision that will affect you?

A.   Could you say that again?

Q.   This decision about what punishment your sister's going to receive, will that affect you?

A.   Absolutely.

Q.   If she is sentenced to a term of imprisonment, would you still be in contact with her?

A.   Absolutely.

Page 150

Q.    How long do you envision that occurring?

A.    Until she dies or I die.

MR. BERRIGAN:  May I approach the witness, Your Honor?

THE COURT:  You may.

BY MR. BERRIGAN:

Q.    I've handed you, sir, a picture.  It's Defendant's Exhibit 2081.  Do you recognize that little boy?

A.    I think that's me.

MR. BERRIGAN:  Defendant offers 2081, Your Honor.

*   *   *   *

(Defendant Exhibit 2081 was offered.)

3458

*   *   *   *

MR. WILLIAMS:  No objection.

THE COURT:  Exhibit's admitted.

*   *   *   *

(Defendant Exhibit 2081 was admitted.)

*   *   *   *

BY MR. BERRIGAN:

Q.    Do you know how old you are in this picture, Mr. Johnson?

A.    No.

Q.    Think you could be two or three or four?

A.    Probably.

Q.    Just a couple of years younger maybe than when you spent time with Ted and Bobbi Dillo.

A.    (Witness nodded head.)

MR. BERRIGAN:  That's all I have.  Thank you.

MR. WILLIAMS:  No questions, Your Honor.

THE COURT:  You may step down.

Members of the jury, why don't you take a stretch

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3032 of 3592

break.

CAROL MANN, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And I'll ask you to adjust that chair so you can speak directly into the microphones. And would you tell us your full name, please, and spell your last name.

THE WITNESS: Carol May Mann, M-a-n-n.

3459

THE COURT: Okay. Miss Mann, could I get you to scoot that chair up just a little closer to the microphones?

THE WITNESS: Yes, sir.

THE COURT: There you go. Thank you.

DIRECT EXAMINATION

BY MR. STOWERS:

Q. And you can pull both of those microphones sort of towards the middle so you're speaking into them; okay?

A. Okay.

Q. Keep the voice up so the jury can hear you; all right?

A. All right.

Q. Where are you from, ma'am?

A. Mason City, Iowa.

Q. And how long have you lived in that area?

A. Probably 30 years.

Q. And what do you do currently?

A. I'm retired.

Q. Okay. And what did you do before you retired?

A. I had quite -- several real estate rentals.

Q. And in that area of Mason City?

A. Yes.

Q. And so you rented properties?

Page 152

A. Yes, I did.

Q. Residential or --

A. Residential.

3460

Q. Are you presently married?

A. No, I'm not.

Q. Have you been married in the past?

A. Yes, I have.

Q. And do you have a couple children?

A. Yes.

Q. And they're grown up now; is that correct?

A. Yeah, they're grown up.

Q. Do you know a woman by the name of Pearl Jean Johnson?

A. Yes.

Q. And how long have you known her?

A. November of '71 I met Jean.

Q. And how do you remember that?

A. My ex-sister-in-law took me over there to meet her sister.

Q. Pearl Jean's sister?

A. Yes.

Q. And you have that date in your mind?

A. Yes.

Q. Why do you remember that?

A. Because I was very pregnant.

Q. Okay.  So it was around the time of a pregnancy?

A. Yeah.

Q. Which is a date that sticks in your mind.

A. Yeah.

Q. And can you describe for the jury how you came to know

3461

Page 153

Pearl Jean Johnson and the depth of your relationship with her and the nature of it?

A.    I met, like I said, Jean through her sister Darlene.  I liked her right away.  And then the second visit I initiated myself because Jean had told me if ever I was up there to stop in and visit her in Mason City.

Q.    And over time did you develop a relationship with Pearl Jean Johnson?

A.    Yes.

Q.    Can you describe what that developed into?

A.    I feel like we were pretty close.  We differed in a lot of areas, but there was just something about her I liked.

Q.    Did you become acquainted with her on a personal level?

A.    Yes.

Q.    Did you come to know her family?

A.    Yes, I did.

Q.    Did you know her husband, Jim Johnson?

A.    No, I didn't.

Q.    Was she already divorced from him by the time that you met?

A.    Yes.

Q.    And when you got to know her on a personal level, did you have any contact with her with respect to religious issues?

A.    Yeah.  The very first time I visited her on my own, there was something going on there at the house, and she invited me in, and I just -- I basically sat for quite a long time

3462

wondering what was going on.  All the adults were walking around praying, and I really don't have a whole lot of memory what was

Page 154

going on with the children, but maybe some were upstairs, but I do remember one or two were on the staircase going upstairs, and it's just -- I didn't know what was going on.

Q.   Did you come to know that Pearl Jean lived with her -- was she living with her parents then?

A.   Yes, she was, yes.

Q.   Did you know her mother Florence?

A.   Yes.

Q.   Did you know her father?

A.   Yes, her stepfather Andrew.

Q.   Andrew?

A.   Yeah.

Q.   And were they living at this location when you first met Jean?

A.   Yes.

Q.   And when you say they were walking around the house --

A.   Yeah, they were all praying.  One or two might have been speaking in tongues, and I thought maybe something had happened and, you know, that I was just going to wait and see what was going on.  And after a couple hours -- it might have been an hour, but it seemed like longer -- Jean come to me and asked me what did I feel there, and I said, All I feel is a bunch of fear.  Everybody here is afraid of something.

3463

Q.   And this was to you a memorable experience I take it.

A.   Yes, it was.

Q.   As you recall it now 30-some years after the fact.

A.   Yes.

Q.   Do you recall introducing her to any religious materials during the time that you knew her?

Page 155

A. There was a time that a friend of ours from a neighboring town had gave us a box of tapes from somebody he'd -- his wife had come across, and he wanted to know what we thought of them. Well, we thought they were a little different, so I took a few of them up to Jean's and -- for her to listen to. Well, her mother got ahold of them and I think got a little strange with them.

Q. Do you remember what the tapes were?

A. They were -- the only thing I remember about those tapes were this guy named Bishop Whitlock had some kind of a method of deliverance that you would go get anger out by pounding on a pillow or hitting something.

Q. Did you come to learn -- well, let me ask you this. Do you remember approximately when it was when you would have provided those materials to Jean and her family?

A. She was in Forest City at the time. I'm going to say probably in the late '70s, mid to late '70s.

Q. And after you recall providing those materials to Jean, do you have a recollection of whether or not you made any

3464

observations regarding their use of those materials or the adoption of any of the things being advocated by them?

A. She said she had made a mistake by letting her mother listen to some of them, and her mother really thought they were the answer. And I said, Well, Jean, we threw all of ours out, and you probably should too.

Q. Did you make any other observations? You described the one time when you were at the house when you first visited there in the early '70s. Did you make any other observations of any unusual or noteworthy religious practices?

Page 156

A.    Well, there was nothing on the walls.  And the only thing I remember about conversation is that her mom and stepfather said that they were idols, that she couldn't have them.

Q.    Have what?

A.    Any ornamental things.

Q.    Including things on the walls?

A.    Yes.

Q.    That they were idols?

A.    Yep.

Q.    What does that mean?

A.    That anything like that people are distracted with and they're like they're worshipping material things and that people shouldn't get distracted with that kind of thing.

Q.    Did you have any familiarity with any fasting practices that were going on at the home?

3465

A.    I heard things from time to time.  I knew Jean fasted a lot and the mother, Jean's mother, fasted a lot.  And then I remember little things here and there about, you know, making the children fast.  Even if they only fasted one meal a day, she said that did them good.  Then I heard about this trip where they drove around for several days and that the children didn't eat, and I don't think they ate the whole three days.  I don't know.

Q.    And when did you hear about this trip, and what did you hear about it, this three-day trip?

A.    It was early on in knowing Jean.  I don't think she was real happy with the situation or went along with it so much as that's what the parents, mother and stepfather, wanted to do. And if my memory's right, it was something to do with the end

Page 157

times.

Q. What do you mean by end times?

A. Like something -- it was the end of the world or something. It was real strange.

Q. Was there a time when you came to speak to Jean and she would talk to you about her communications with God?

A. Oh, yeah.

Q. Okay. Can you describe some of those times?

A. There was a long, long time, like several years, of her having this sensation of being pricked, and then when she'd get pricked, she'd open her Bible, and it was -- on one of those

3466

pages there was something that God was trying to speak to her and . . .

Q. Would you seek her out?

A. Pardon?

Q. Would you seek her out for information?

A. Oh, yeah, early on. I was young, and it was certainly different than anything I had ever been in, but I had seen so much that was -- what would you say? Credible or -- and I believed her heart was right in the things of God. It's just that, you know, the mother's influence to me was the biggest problem, her mother's influence.

Q. Now, you said that she would get picked. I'm not sure what you mean.

A. I'm not sure either. It was something like a pin prick and it could be in her foot, could be in her hand. See, I didn't pay a whole lot of mind to it because I thought it was too strange.

Q. And what would that pin pricking do for her?

Page 158

A.    She felt like God was getting her attention and she was to go to the word or go to prayer.

Q.    And she would flip the Bible open?

A.    Most of the time that's the way it was.

Q.    Was it flipped open at a page of her selection, or was it --

A.    No.  I could tell it was pretty random.  She just opened it

3467

wherever.

Q.    And then she'd find a place there, and there would be a message?

A.    Yeah, she would skim along it and see what there was there.

Q.    Was she -- during times you had visited with her or talked to her over the years,  did she tell you that she had received communications?

A.    Oh, yeah, yeah.

Q.    From God?

A.    Yes.

Q.    What would she tell you?

A.    Oh, different instructions.  The one that just comes to me right now was that they were to move, and the words that the Lord give her were Jerusalem and Paul, something like that.  And then when they found a place, it was in Klemme, and it was on Jerusalem Street, so that was the answer.

Q.    So they moved?

A.    Yeah.

Q.    Based on what she believed was a message from God?

A.    Yes.

Q.    As she described it to you?

A.    Yes.

Page 159

Q.    Do you remember her making any predictions to you?

A.    Yes.

Q.    About your own life?

3468

A.    Yes.

Q.    Can you tell the jury about that?

A.    In 1973 I'd went over to her place in Klemme, and there was a situation going on with another friend, and it was kinda -- it was all kinda weird.  But what I remember her telling me was to put my affairs in order and to go home and take care of business because I was going to die.

Q.    Did she tell you how she knew this?

A.    I don't remember if she did, but I know fear took hold of me like that.

Q.    And why would you be afraid if she just told you you were going to die?

A.    Probably because I had a lot of fear, and I did respect her.  I had seen things happen.

Q.    So you kind of believed she did have some special connection.

A.    Uh-huh, yes, I did.

Q.    And that she was, in fact, receiving communications.

A.    Uh-huh, yes.

Q.    And did she give you that impression?

A.    Yes.

Q.    Well, you didn't die.

A.    No.

Q.    Is that right?

A.    Right, but I had a nervous breakdown.

3469

Page 160

Q. Huh?

A. But I had a nervous breakdown.

Q. As a result of --

A. Yes, I did.

Q. A result of what?

A. Of the fear that took hold of me. Two weeks later I was just a basket case.

Q. And was there some way that you came to the conclusion that your -- the prediction that had been made I guess for your death had come to pass and that you no longer were going to die?

A. My ex-husband took me to a man of God, and we told him what had happened, and he said that as far as he knew God had never appointed anybody to go around telling when people were going to die and that I was going to be just fine, and he prayed for me, and I got better every day.

Q. Your name has come up in this trial in connection with some people named Ted and Bobbi Dillo in Chanute, Kansas.

A. Yes, I know them.

Q. Did you know those folks?

A. Yes, I did.

Q. And how did you come to know them?

A. My ex-husband had a brother that was a pastor. He had a church in Chanute, Kansas. And we went down there to be in the church and help him out.

Q. What kind of church was it?

3470

A. It was a Church of God.

Q. And you had gone down there to help him out?

A. Yes.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3042 of 3592

Q. Do you know approximately what year that would have been?

A. 1969.

Q. And so they had a church down there in Chanute, Kansas, area.

A. Yes.

Q. You'd gone there to work in what connection?

A. You mean working?

Q. Yeah.

A. Well, my ex got a job when we got there at a -- delivering cement, but my brother-in-law left right when we got there. He was transferred on. So we went to a different kind of church, you know. We didn't know anyone there anyway, so we went to another. That's where we met Ted and Bobbi Dillo.

Q. Okay. And what type of church were they involved with?

A. It was a nondenominational.

Q. So you met them there.

A. Yes.

Q. And what did you come to learn about them that ultimately led to you suggesting that Jean look into going down there?

A. Ted and Bobbi were very friendly. They invited us to Bible studies. We got to know them not intimately, but we thought a lot of them. They had adopted two boys. They were thinking

3471

about having foster children. They just seemed like, you know, they really love kids.

Q. And during this time period that you got to know the Dillos, had you still been maintaining some contact with Jean, Pearl Jean?

A. I knew Dillos in '69, and I met Jean in '71.

Q. Okay. So in '71 you meet Jean.

Page 162

A.    Yes.

Q.    What time is it that you had contact with Jean when she was pregnant with her youngest child?

A.    Repeat that question.

Q.    When did you -- did you come to learn that Jean was pregnant with her youngest child?

A.    Oh, yeah.  When did I?

Q.    Yeah.

A.    My son would have been -- it would have been -- I realized it -- she told me in '73 I think.  No, maybe '72.

Q.    All right.  In any event, she was pregnant; is that right?

A.    Yes.

Q.    And do you know how far along she was in her pregnancy?

A.    It had to have been real quick because I never met the boyfriend, but he come from Wisconsin, and he stayed there, and then when he was gone, I went over to visit her, and it just seemed like real quick she told me she was probably pregnant.

Q.    And what was her attitude about her pregnancy?

3472

A.    Scared to death.  Scared, a nervous wreck.  She had to get out of there.  She didn't know what she was going to do if her mother found out, and she said she probably should give Holly up for adoption.

Q.    What was she scared about with respect to her mother finding out?

A.    Just the shame of it.

Q.    What was the shame?

A.    Having an illegitimate child.  I mean, this is back in the '70s.  This is not -- you know, back then it was more shameful.

Q.    So she was ashamed?

Page 163

A.   Yes, very.

Q.   Was she concerned about whether or not she should keep the child?

A.   Yeah, she was really considering it, giving her up.

Q.   And did you talk to her about that?

A.   Well, after I realized she was serious about it, I told her I knew people in Kansas that had adopted children and they planned on adopting more so I would call them.  So I did.  And they said they would take care of her, her other children, and take care of all the expenses.

Q.   And the people you're referring to were?

A.   Ted and Bobbi Dillo.

Q.   And did you then make arrangements for her to go down there?

3473

A.   Yes.  It was quite quick we went down there.

Q.   Okay.  And how did Pearl Jean Johnson and her children get down to Chanute, Kansas?

A.   I took them.

Q.   You drove them down?

A.   Yes, I did.

Q.   And Pearl Jean didn't drive herself down there.

A.   No.

Q.   And why didn't she drive herself down there?

A.   I've never known her to drive.  I've known her 30-some years.  I've never known her to drive.

Q.   And so you took her down there.

A.   Yes.

Q.   And do you know approximately what time of year it was?

A.   I'm going to say early summer.

Page 164

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3045 of 3592

Q. And when you took her down there, did you stay at all?

A. No, I didn't. No. I had a little guy at home. My mother was watching my son.

Q. So you had a son at home.

A. And a daughter.

Q. And a young daughter.

A. Uh-huh.

Q. And you took them down to Kansas.

A. And come right back.

Q. Came right back. And did she bring all of her children

3474

with her?

A. Yes, she did. She had four.

Q. And what were the living arrangements if you knew?

A. What I was told was they'd kind of sort of fixed up an old garage so they'd have a place of privacy and all five of them stayed in that area.

Q. And so when you went down there, what was the plan with respect to what Pearl Jean was going to do with herself, with the kids, and her unborn child?

A. I felt like she was fairly certain about giving the child up, and at the time I thought it was a good arrangement, but I just kind of waited to hear how it was going with her.

Q. How was she going to support herself?

A. Down there?

Q. Yes.

A. She had ADC.

Q. So her money was going to go down there from her A --

A. No, her money came to either her mailbox -- I don't have good memory on this -- or someplace that I got ahold of it, put

Page 165

it in her account, and I don't think they had direct deposit at the time, but I don't have a memory, but -- and then she would send me a check for the rent, and then she would send a blank -- a signed check for utilities.

Q.   The rent and utilities for what?

A.   For Thornton, Iowa, where she had her home and all of her

3475

belongings.

Q.   So she maintained her home in Thornton, Iowa, while she was in Kansas the way you remember it.

A.   Yes.

Q.   And she was paying for that.

A.   Yes.

Q.   How was she supporting herself, though, in Kansas?

A.   I really don't know.

Q.   And her --

A.   I know that I would send her whatever was left over, so that must have been it.

Q.   Did you stay in contact with her or the Dillos while they were down there in Kansas?

A.   Yes, just Jean.

Q.   And what did you understand from those conversations was going on down there?

A.   That she was very miserable, even at some times seemed frightened, and I find out later why she was frightened.

Q.   Was there a time eventually that you came to have contact with Jean about returning to Iowa?

A.   Yes.

Q.   Okay.  Can you describe that for the jury?

A.   One day she called me very, very upset.  When Jean gets

Page 166

upset, you can't understand her real good, but I knew enough that it was something bad enough that she wanted out of there

♀

3476

and wanted out now, and so I said, I'm on my way.

Q. And when you say you were on your way, what did you do?

A. I called my mom. I said -- told her about my friend Jean and could I bring the kids over, and she said certainly. And so I took my -- packed a few belongings, took them to my mom, and headed out.

Q. Did you have any kind of sense that this was an emergency or was this --

A. Yes, yes, I did.

Q. And did she explain to you what the crisis was that required you to come down?

A. I do not remember exactly what she told me except that I -- I know now and I knew then that I had to get there. It was something very important.

Q. What was the conditions like at that time when you headed out from the Mason City area?

A. A snowstorm.

Q. So you took off in a snowstorm.

A. Yes.

Q. To drive to Kansas.

A. Yes, I did.

Q. To pick up Pearl Jean Johnson.

A. Yes, I did.

Q. And did you do that?

A. Yes.

♀

3477

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3048 of 3592

Q.    And you got down there.  And what did you encounter when you got down to Chanute, Kansas, to pick up Pearl Jean?

A.    Some very, very happy children to see it was Carol coming to get them.

Q.    Can you describe that to the jury, what exactly happened?

A.    Those kids were just so, so ecstatic to get out of there. I think I probably figured there was something -- they were pretty miserable kids there.  But, see, I didn't know any of the details until later.  And then we couldn't talk going home because the kids were there.

THE COURT:  Mr. Stowers, would now be a good time to take our recess?

MR. STOWERS:  That would be fine, Your Honor.

THE COURT:  Okay.  Members of the jury, we'll be in recess for 25 minutes until 3:15.  Thank you.

(The jury exited the courtroom.)

THE COURT:  Anything we need to take up?

MR. WILLIAMS:  No, Your Honor.

MR. BERRIGAN:  Nothing by the defense, sir.

THE COURT:  Do you have the agreed language on that proposal to modify the jury instruction yet?

MR. BERRIGAN:  Apparently we do.  Mr. Miller's just given us a nod.

MR. MILLER:  I think defense counsel improved upon the originally proposed language, Your Honor.

3478

MR. BERRIGAN:  We'll get that to the Court.

THE COURT:  Well, I've never seen it.

MR. BERRIGAN:  We can get that to you as soon as we

Page 168

get back, Your Honor.

THE COURT: Okay. Thank you.

(Recess at 2:52 p.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. STOWERS: Yes.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Stowers, you may continue your direct examination.

MR. STOWERS: Thank you.

BY MR. STOWERS:

Q. If you want to pull those microphones just a little bit closer to you.

A. Okay.

Q. You were saying that when you picked Pearl Jean and the kids up down in Kansas and brought them back to Iowa that you did not know at that time why you had been summoned, if you will, to come down and pick her up in the middle of this snowstorm; is that right?

A. Right, that's right.

Q. And that you found out later.

A. Yes.

3479

Q. First of all, when you went down there, picked them up, did you stay overnight at the Dillos'?

A. No. We loaded them up. She was ready to go when I got there. We packed them up and headed back.

Q. And how long of a car ride was that for you?

A. Like on average conditions it's eight hours because I lived there and came back and forth a few times. And then this was

Page 169

probably like ten hours each way.

Q. So you didn't -- you drove 20 hours basically round trip?

A. Yes.

Q. Jean didn't drive back?

A. No.

Q. And what did you find out later about why it was that they wanted you to come and get them under those conditions?

A. Jean told me that she believed that he was molesting his own daughters.

Q. And do you know about when it would have been that you think you were told that by Jean?

A. Within -- within probably a couple days of returning home.

MR. STOWERS: That's all I have.

MR. WILLIAMS: No questions, Your Honor.

THE COURT: You may step down.

Who's next?

MR. STOWERS: Mr. DeSotel.

HARVEY DESOTEL, DEFENDANT'S WITNESS, SWORN

3480

THE COURT: Please be seated in the witness box. And adjust the chair and the microphones, please, so you can speak directly into the microphones. And when you're ready, would you state your full name and spell your last name for us.

THE WITNESS: My name's Harvey, last name DeSotel, D-e-S-o-t-e-l.

THE COURT: Thank you.

Mr. Stowers?

DIRECT EXAMINATION

BY MR. STOWERS:

Q. Can you pronounce your last name for me so I don't

Page 170

continually mispronounce it?

A.   It's pronounced Harvey DeSotel actually.

Q.   DeSotel?

A.   Yeah.  It's actually pro -- it's DeSotel, but it's always been DeSotel.

Q.   Okay.  Could you pull those microphones a little bit closer and then scoot your chair up a little bit and get yourself up there so the jury can hear what you have to say; all right?

A.   Okay.  Can you hear me now?

Q.   Yeah.  If you keep your voice up and speak as directly into the microphones as you can, that will help a ton; okay?

A.   Okay.

Q.   Now, how are you employed, sir?

A.   I'm a sergeant for the Linn County Sheriff's Department in

3481

Cedar Rapids, Iowa.

Q.   And how long have you been employed there?

A.   I've been employed since 1977 to -- until now.

Q.   With the sheriff's office?

A.   Yes, sir.

Q.   Been in law enforcement longer than that, or is that your entire term?

A.   I started as a police department on the Anamosa Police Department in 1971, and I worked there from '71 to '77 and became deputy in 1977.

Q.   So you've got a career in law enforcement in excess of 30 years.

A.   That's correct.

Q.   And with the Linn County Sheriff's Office, what positions have you held over the time period that you've worked for them?

Page 171

A.   When I was promoted in 1979 as sergeant, I went into the jail, and until last March, I've been senior sergeant in the jail, and I currently work transport and warrants at the present time.

Q.   And as the -- and we're interested in your term serving at the Linn County Jail; okay?

A.   Okay.

Q.   So let's talk about what your duties were during the time period October of 2000 until August of 2004.

A.   I was one of five sergeants that worked at the jail.

3482

Q.   Okay.  And what were your duties in connection with your position there at the jail?

A.   Our duties consist of -- basically the sergeants run the day-to-day operation of the jail including safety and security of the inmates, supervision of staff, medical department, records, and the female correctional officers were all under our command.

Q.   What shifts did you work, if you will, during that time period?

A.   My main shift was -- we worked 12-hour days.  I worked from noon till midnight.  And it varied.  Every 13 weeks we would rotate whether we'd have weekends off or we worked during the week.  For example, Monday, Wednesday -- or Monday, Tuesday, Wednesday.  Then we'd have every other Thursday off and then weekends off and then vice versa.

Q.   So help me out.  You worked a 12-hour shift?

A.   Yes, sir.

Q.   How many days a week did you work?

A.   We worked 3 days one week and three 12-hours.  Then the

Page 172

next week we worked three 12s and the 8-hour. Give us our 80 hours in a 2-week period.

Q. Approximately how many people are employed by the sheriff's office there at the jail in Linn County?

A. There's about 80-plus people. That's including the civilians, the deputies, the female correctional officers,

3483

records clerks and support staff.

Q. And about how many inmates does the Linn County Jail or did the Linn County Jail typically hold during this year 2000 to 2004 time period?

A. It varies. About the best way I can describe it, our daily count was average about 350 inmates. It would go up to 400. It would go down, but it stayed on the average about 350 of daily count.

Q. And of the 350 inmates, about how many of those inmates would generally -- if you give us a range, that would be fine -- have been females?

A. Anywhere from -- I'd say average 30 to 40, less. More in the 30 range.

Q. Did you house the females in a particular area or areas of the jail?

A. Yes. Our females are housed on third floor.

Q. And is the entire third floor dedicated, if you will, or devoted, if you will, to female inmates?

A. No. We have men up there, but our "I" block is mostly our medical unit for males, medical unit. When our females population got up, we would move them to certain areas, and we would move the males out. But we have a section that's just -- M, N, and K blocks are segregated for females.

Page 173

Q.    So you got three blocks on the third floor, M, N, and K,
that are typically utilized for female prisoners; is that right?

3484

A.    Normally, yes, but we have used -- we have opened other
cell blocks when we've had a large . . .
Q.    Can you give the jury just a little general idea of what
the differences are, if there are any, between M, N, and K
blocks?
A.    M block is a dormitory style which is bunks, two bunks
high, and houses anywhere from 20 to 25 females.  N block is a
single-cell where the inmate is locked down by herself at night,
out in the day room and the area.  That's a five-cell cellblock.
K block is a two-cell cellblock with bunk beds in cell 1 and
cell 2, so it'd be housing 4 prisoners.
Q.    There's only two cells in K block?
A.    Yes, there's only two cells.
Q.    And in the N block there's -- did you say four cells?
A.    In M block there's bunk beds in a dorm-type style which
would house 20 to 25 females, open area.
Q.    Then M --
A.    Okay.
Q.    Maybe I have my -- maybe we're not -- M as in Mary, how
about that?
A.    Yeah, that's the one I'm talking about that was the
dorm-style cellblock.
Q.    Okay.
A.    And N block was the one with the five cells, individual
cells.  And we've doubled them in the past, but normally they're

3485

Page 174

single cells.

Q. Now, the inmates there at the Linn County Jail would be typically people there that were being held on pretrial basis before their trial; is that right?

A. On the third floor we have a mixture. We have the federal inmates. We have work release inmates, females. We have arraignments, awaiting trial. And we hold our arraignments on first floor. If they're kept after arraignments, then they're moved to the third floor area waiting trial.

Q. Okay. So you've got people waiting for trial.

A. And we have one unit that houses our work release females, and then we have the serving time, so it's a mixture basically.

Q. You have pretrial people. You got people serving short jail sentences, and you've got some federal people; is that right?

A. That's correct.

Q. And the federal people are there for a variety of reasons, sometimes are there because they've been called to testify for court, sometimes because they have federal court cases going on, that sort of thing; right?

A. That's correct.

Q. And you contract with the federal government to provide bed space for federal persons.

A. Yes, we do.

Q. Both male and female.

3486

A. Yes, that's correct.

Q. Now, in this county jail in Linn County, is that one of the largest county jails in the state of Iowa?

A. Polk County's larger. We're second in the state of Iowa.
Page 175

Q.   On a day-to-day basis in the M, N, and K blocks, how many different jailers would have contact with those inmates?

A.   With the female inmates, on the average we have one female correctional officer handle the duties of taking care of feeding the female inmates.

Q.   All of them, all three blocks.

A.   All the females, yes, whether they're -- yes.

Q.   And during the time period in question, did you become familiar with an inmate by the name of Angela Johnson?

A.   Yes, I did.

Q.   Okay.  And how did you become familiar with her?

A.   As a supervisor, we're kept abreast if there's problems. Just normal routine things like if there was a fight or if there was a staff member had a particular problem with an inmate, it was brought to our attention.

Q.   And so through your duties as a sergeant there at the jail, you became aware of Angela Johnson.

A.   Yes, I did, about as normally as I do other inmates.

Q.   She's pretty unusual.  Do you know of any other inmates who ever served a time period, almost four years, from October of 2000 till August of 2004, at the Linn County Jail?

3487

A.   No, not continuously.  We have -- the federal inmates will come and stay a while.  Then they get moved and they come back. But Angela Johnson was probably the longest continuous inmate there that I'm ever aware of.

Q.   This became her home for almost four years.

A.   That's correct.

Q.   And when she's there at the jail on a day-to-day basis, she's dealing with individual jailers.  Is that what you call

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3057 of 3592

them there, jailers or guards?

A. Our females are called correctional officers. Then we have the sworn personnel which would be the deputies and . . .

Q. Were you, during the time that you knew that Angela Johnson was there in the Linn County Jail, aware of any difficulties that were occurring or any conflicts that were occurring between her and any of the individual correctional officers?

A. I think the one that I recall the most was Correctional Officer Vicki Kosina and Angela just did not like each other. And there was -- there was some conflict there.

Q. Okay. And I bet in your many, many years working there at the jail that it is probably not an uncommon situation.

A. No, it's not. For any particular reason, an inmate might not like a particular staff member and vice versa.

Q. And are you aware of records that the Linn County Jail keeps for inmate activities?

A. Yes, sir.

3488

Q. Is there something called an inmate activity log, in fact?

A. Yes, sir. We call it the B map log. That's what we've always called it as long as I can remember, but it's an activity log.

Q. Do you know who makes the entries in that log?

A. Yes, sir, staff members.

Q. So the individual correctional officers can make entries?

A. Yes.

Q. Are you aware of Vicki Kosina's ID number that she used there at the jail?

A. Yes. Her ID number is 428, 428.

Q. Did I ask you before you came into the courtroom here to

Page 177

review an exhibit which contains -- Exhibit Number 1146, Government Exhibit 1146, which contains what are called behavior warnings from the Linn County Jail?  It's a computer printout in reference to Angela Johnson.

A.   Yes, you did.

Q.   And I think the jury has been advised earlier that there was a number of behavior warnings listed on this exhibit.  I think they were told that the number was 89.  Have you gone through there to try and identify how many different behavior warnings there were on Exhibit 1146?

A.   Yes, sir.  You asked me to look at it, and I looked at it, and I found 60 I believe.

Q.   Sixty?

3489

A.   Yeah.

Q.   Six-zero?

A.   Six-zero, yes.

Q.   And -- not 89.

A.   No.

Q.   And somebody who isn't familiar with this record, can you understand how it is that they might conclude that there were 89 separate behavior warnings?

A.   Yes, sir.  On the entries when they log an entry on the computer, on the B map, they won't have enough space, so they'll probably put it two or three times under the same incident.  So one incident will be -- it will be one incident, but it will be like three or four lines.  And the way you can tell is by the time.  For example, if the time is -- I think on this one it's 1014, and you can see where there's two 1014s.

Q.   Let me -- I think you've got it on your screen but the jury

Page 178

can't see what you're pointing to.

A.    Oh, I'm sorry.

Q.    So I'm going to show page 4 of Exhibit 1146.  I think you were trying to make a point about the entries there.  For example, the July 26, 2002, entries.

A.    Yes.  Yeah, there's one, two , three, four, five, six entries for that, but it's actually only one behavior warning because you can tell where the log's -- I can't -- my bifocals aren't kicking -- the top one, 726, is that 1014, the time?  I

3490

know the bottom ones are 1914.

Q.    I believe it's 1814.

A.    Okay.  The times, you look at the times.  Like 1814 would be one incident.  Then the ones 7-26 would be 1914.  They would be another incident?

Q.    So the jury who's going to be looking at this exhibit will be able to look at it.  But over in the middle column there's a column there that's headed event, slash, activity, location; is that right?

A.    Yes.

Q.    And in that column with the computer program and the setup of this form the way it is, is there only so much information that can be entered in that program before it jumps over and starts what appears to be another entry?

A.    Yes, sir.  This is our old computer system.  We have since updated.  This is the old 400 system.  And you only had so many lines and you have to hit enter, and you would keep hitting enter until you put everything you wanted to put into that, and that's why it would show up as several entries on the left-hand column.

Page 179

Q.    What kind of an inmate was Angela Johnson to your knowledge?

A.    Angela Johnson was not a model prisoner, but she wasn't our worst prisoner.  She was an average inmate.

Q.    When you say an average inmate, what do you mean by that?

3491

A.    She basically did her time.  She had a few scrapes, few disagreements with the staff.  And I believe there's one incident where she got into a fight with another inmate.  I don't know all the details.  I haven't looked at the report.

Q.    Now, when you looked at this behavior warning listing of 60 behavior warnings, first of all, in the lingo of the Linn County Jail, what's a behavior warning?

A.    We document usually minor infractions.  If a staff member and an inmate gets into an argument, it don't warrant a disciplinary action which is a write-up report, we'll give them minor -- we'll put them on the computer as a minor behavior warning.  If they get several of them, then we can choose to put it on a disciplinary report and then go from there.

Q.    So an inmate whose conduct doesn't rise to the level of what a jailer says rises to the level of a disciplinary report gets a behavioral warning.  Is that --

A.    Basically minor infractions, having pictures on the wall of your cell, not wearing clothing in the day room area, not showering frequently or getting up or sleeping late.  There's many minor infractions.  We have -- in our rules and regulations we have 71 major -- major infractions.  And if it don't constitute one of the major ones, then we just put it as behavior warning.

Q.    So maybe that's going to help the jury understand what a
Page 180

behavior warning is.  So the jail actually identifies some

3492

things as major infractions.

A.   Yes, it's basically -- it's common sense-type thing which you and I would take for granted or we do daily, but it'd be something that an inmate is just refusing to do.  For example, they're constantly late locking out during the day.  And after several warnings, they would build up to a disciplinary.

Q.   What do you mean by late locking out?

A.   When we stand count, they have to come out, stand by their doors, be counted, coming out, going back in, and three counts a day.

Q.   Now, when you looked through this behavior warning document earlier, the exhibit which we were just showing you, did you see a number of minor infractions?

A.   The most I seen was just -- when I read briefly through them was just minor infractions, clothing, not having your green top uniform on or -- most of them, the ones I read, were minor.

Q.   All right.  And did you make any observations about who the correctional officer was that was reporting a lot of those infractions?

A.   Most of them was Correctional Officer Vicki Kosina.

Q.   The person with whom Angela Johnson had a personality conflict?

A.   Yes, sir.

Q.   Could a jailer who wasn't getting along with an inmate make a lot of entries on that inmate's record --

3493

Page 181

A. They could.

Q. -- when they might not otherwise?

A. They could, but as a supervisor or one of the other supervisors, we would -- that would stand out. If there was a potential problem with an inmate or a staff member with that inmate, we'd usually discuss it, and then there was some of the entries on there where you could see 4-28, slash, and then one of the -- like 153 which was Sergeant Davidson where she had talked to Sergeant Davidson about that. So before it was entered, they had to talk to a sergeant.

Q. Now, let's talk about the one assault that you talked about. There's one incident that you looked at where she had actually struck another inmate.

A. Yes, sir.

Q. And you may have seen this in the file that she had indicated, that is, Angela Johnson indicated, according to the disciplinary file that she believed that she was acting in self-defense.

A. Yes. I haven't read the report for some time but . . .

Q. Yeah. Now, in the jail setting, is it okay as far as the jail is concerned for disciplinary purposes for an inmate who's the subject of an assault by another inmate to respond in kind as part of an effort to defend themselves, or if they do so, will they also be disciplined?

A. Usually when two inmates are involved, whether it would be

3494

verbal or physical, we charge them with fighting. We always -- we have a rule of thumb it takes two to tango. Normally what happens is they both get locked down for 24 hours until we review the reports, talk to other witnesses, review the

Page 182

videotapes. But when you get up there, you're kind of getting up there after the fact, and so you don't know who's telling you what, so we just charge them with that and then lock them down, then figure it out later.

Q. Is there a self-defense as far as the jail's concerned to a disciplinary action?

A. For --

Q. For an inmate.

A. To --

Q. To assault another inmate in defending themselves?

A. In a jail setting you're in a totally different world. If you don't defend yourself, then you'll be fighting the next day too. It's kind of a weakness thing, dominance, weakness. And so it's -- you're kind of darned if you do and darned if you don't. If you try to back out of a situation, that's a sign of weakness, and you'll be fighting somebody else the next day. So it's a different world.

Q. I guess what I'm asking is if somebody is an inmate at the old Linn County Jail there and they wind up in a situation where another inmate is physically coming after them assaulting them and they respond by punching them, is it the situation that both

3495

of those inmates are going to get a disciplinary --

A. Yes, it is. Now, if we find out later through our investigation, our in-house investigation, that the person that got attacked was trying to back out of the situation, then we just charge the individual with in-house assault. Or if it's serious enough where there's injuries, we will charge them criminally too.

Q. Now, for an inmate with almost four years in there at the

Page 183

Linn County Jail to have had one situation where she struck another inmate and another where she pushed one, would that be what you would consider a very bad disciplinary record in your jail?

A.    No.   That's way below the norm.

Q.    And having looked at these behavior warnings that were issued according to this exhibit, the 60 behavior warnings in this four-year period, is that a high number of behavior warnings for somebody who's served there almost 4 years given the type of the warnings that were issued?

A.    Yeah.   Sixty is, I consider, a high number, but over a four-year period if you break it down, that's what?  One, two a month maybe if you were averaging it out which isn't -- for minor infractions, that's not bad.  We've had people with more. We've had people with none so . . .

Q.    And a lot of these had to do with clothing as you noticed.

A.    Minor infraction.

3496

Q.    Right.   Now, tell the jury a little bit about the clothing situation for the female inmates at the Linn County Jail and what the situation would be there.

A.    Most of the infractions that we have is that -- for the clothing is like they might not wear their green jump top suit. They have a T-shirt on, but they wouldn't be wearing it out in the day room, several reasons.  Biggest excuse we get is it's too hot.  Rolling up of the pant legs up to the knees.  It's just styling.  And so they're supposed to maintain a certain -- you're supposed to keep your jail uniform on while they're out in the day room, while they're being locked out.  While they're in their cells during their rest periods or at night, then they

Page 184

can remove their uniforms.

Q. And do female inmates wear T-shirts as well?

A. Yes, sir.

Q. And have you found it common that the female inmates at the Linn County Jail will commonly not want to wear their -- what is it? Green?

A. Yeah, it's a green top for the females, orange for males.

Q. Green for the females?

A. Yeah.

Q. That they won't want to wear their green top over their T-shirt?

A. Yes.

Q. For one reason or another?

3497

A. For one reason or another.

Q. And that can be a basis for disciplinary warning.

A. Yes.

Q. And you've seen that in these records?

A. Yes.

Q. A number of times.

A. Yes.

Q. And what about rolling up the cuffs on the pants a little bit?

A. I didn't see that on that particular one, but that's another common one in the jail.

Q. What about not coming out of your cell at the right time of the day?

A. The major infrac -- or most of that happens in the morning. We get them up, 5:30 and -- for breakfast, and a lot of them don't like to eat breakfast. They'd rather stay in their cells,

Page 185

and then final lockout is at seven o'clock, and they like to

sleep up to that time, and sometimes they oversleep.

Q.   Is another infraction that you saw some entries of in these

records these minor behavior warnings due to sort of a bad

attitude towards the staff?

A.   Yes.  I seen a lot of those, yes, sir.

Q.   Language?

A.   Yes.

Q.   And those can be a basis for a behavior warning.

3498

A.   Yes, sir.

Q.   Now, do you have the experience in your time there at the

Linn County Jail to kind of get the sense that some inmates come

and go and some stay there and certain inmates kind of get

acclimated to the jail and the routine of the jail?

A.   Yes.

Q.   And can you describe that situation and what you experience

in that regard with inmates, including female inmates in

particular?

A.   When inmates have been in there for some time, they have

their own little set routines.  In Angela's case I remember that

she used to sit at a certain spot at the table.  She used to

have her stuff there so when she came out in the day area she

would sit in that area.  Well, if you get a new inmate in, a

younger inmate, they didn't understand the rules, and then there

would be conflicts about that.  There's rules inside of rules.

Inmates have their rules.  We have inmates follow our rules, but

they have their own set of rules.

Q.   Are the quarters there in the three blocks of the Linn

County Jail that you've described, are they pretty tight

Page 186

quarters for these female inmates?

A.   Yes, you have very little room.

Q.   And when you say very little room, can you give the jury an idea, for example, on N block and M block?

A.   The best way I can describe it, if you go from here to here

3499

to the jury and here is about the size of that, and that's probably a little smaller in just this little box area here.

Q.   And what would that represent?

A.   That would be five -- five inmates would be in that area.

Q.   For how long?

A.   24 hours a day unless they were going to rec., unless they were going to Bible study or court or whatever.

Q.   And those kind of -- what kind of furnishings would be in that little area there?

A.   You have a bathroom that's in -- the day room toilet facilities.  Then you'd have steel tables that are bolted to the floor and with stools.

Q.   What kind of bathroom facilities?  Would they be private or would they be --

A.   No, they're open.

Q.   Such that the other inmates could see you?

A.   Yes.

Q.   Using the facilities?

A.   Yes.

Q.   And would it be a steel-type toilet?

A.   Yes.

Q.   And then there would be sort of a picnic-type table to sit on?

A.   That's correct.

Page 187

Q. What type of chairs?

3500

A. They're stools that are bolted in one place underneath the -- under the tables.

Q. Are they hard or do they got cushions?

A. No, they're steel.

Q. Any other furnishings in that area?

A. No.

Q. Would you --

A. Other than a TV.

Q. Okay. And the inmates in at least one of the blocks I think we've heard from another witness had to spend their daytime period in that area; is that correct?

A. Yes. In that particular cellblock, you had to come out into the day room area after lockout and couldn't go in until lock -- well, till your rest time which is meal times and then lockdown at 10:30 at night.

Q. Is that a pretty difficult thing for some of the inmates to do, to come out there and sit out there and intermingle in that tight area with three, four other inmates?

A. Yes. The space is awful cramped. You either have the steel or the concrete to sit on. There's not really much walking area, basically read and watch TV.

Q. Now, an inmate like Angela Johnson who'd be there for an extended period of time would -- what was your experience with whether or not she enjoyed being out of her cell?

A. I think any inmate that's been there a long time, they look

3501

for any break in their routine. It's just -- it's -- you know,

Page 188

day in and day out it's the same thing, but then when there's a break in the routine, they kind of look forward to that whether it's going to visit, whether going to church or Bible study or one of the other programs that we have.

Q.    And did you have a feeling that Angela Johnson had acclimated her way into the Linn County Jail such that she was as comfortable as she could be there?

A.    Yes.

Q.    And I think you've used the term for that institutionalized in the past?

A.    Yes.

Q.    What do you mean by institutionalize?

A.    Routine.  Like I mentioned before, Angela was not a model prisoner, but she wasn't a bad prisoner where we had to constantly watch all the time other than the minor scrapes and arguments that she got in with staff that was -- I wouldn't consider it was bad.  It wasn't good, but it still wasn't bad. She was a typical inmate.

Q.    Let me show you a few exhibits.

        MR. STOWERS:  If I could approach, Your Honor?

        THE COURT:  You may.

BY MR. STOWERS:

Q.    Exhibit 2026, 2168, and 2118.  Let me start first with 2118.  Does the Linn County Jail keep a computer log entry for

3502

all visitors who pass through the jail and visit their inmates?

A.    Yes, sir.

Q.    And is that what that exhibit is in connection to visits with Angela Johnson?

A.    Yes, sir.

Page 189

MR. STOWERS: And I'd offer that exhibit which is numbered --

Q. Mr. DeSotel, can you read --

A. Oh. 2118.

MR. STOWERS: I'd offer 2118.

* * * *

(Defendant Exhibit 2118 was offered.)

* * * *

MR. WILLIAMS: No objection, Your Honor.

THE COURT: 2118 is admitted.

* * * *

(Defendant Exhibit 2118 was admitted.)

* * * *

BY MR. STOWERS:

Q. And you've talked about a couple of the programs -- you can set that exhibit down there, Mr. DeSotel. You've talked about a number of programs that the prison has there. One of the programs that the prison makes available to inmates is the opportunity for them to obtain education; is that correct?

A. Yes, that's correct.

3503

Q. And are you aware of whether or not Angela Johnson during her four-year stay there at the Linn County Jail availed herself of that opportunity?

A. Yes. She got her GED, and that's usually handled through our chaplain.

Q. The prison chaplain?

A. The prison chaplain.

Q. He sort of runs that program?

A. Yeah, he -- they have a self-study, and then when -- final

Page 190

exams, they put the inmate in the room, and they'll take the exam, and the chaplain watches over it.

Q. And is that exhibit that you have in front of you which number is --

A. 2026.

Q. Is that the paperwork that relates to the GED that was obtained by Angela Johnson and awarded to her during her time at your jail?

A. Yes, sir.

MR. STOWERS: I would offer that exhibit.

* * * *

(Defendant Exhibit 2026 was offered.)

* * * *

MR. WILLIAMS: No objection.

THE COURT: Exhibit's received.

* * * *

3504

(Defendant Exhibit 2026 was admitted.)

* * * *

BY MR. STOWERS:

Q. And final exhibit relates to another program. Is there some alcohol and substance abuse counseling that is done there at the jail?

A. Yes. It's ASAC, and this is a voluntary thing the inmate can participate in if they so choose to.

Q. Can you explain what the ASAC program consists of to the best of your knowledge?

A. I'm not involved in it that much because it's usually people from the outside that comes in. But they basically come in and try to make the inmate understand what alcohol and drugs

Page 191

can do to a person, and hopefully they'll change their ways.

Q.   What's the name of the woman who was active in that program there at the Linn County Jail?

A.   Carol Meter.

Q.   And was she sort of the person running that program during the time period in question here?

A.   Yes.

Q.   And have you been provided an exhibit there which consists of a letter from Carol Meter is it?

A.   Yes.  It's Exhibit 2168.

      MR. STOWERS:  I'd offer 2168.

                          *   *   *   *

                                              3505

      (Defendant Exhibit 2168 was offered.)

                          *   *   *   *

      MR. WILLIAMS:  No objection.

      THE COURT:  2168's received.

                          *   *   *   *

      (Defendant Exhibit 2168 was admitted.)

                          *   *   *   *

BY MR. STOWERS:

Q.   And you're aware that the ASAC program involves the inmates on a volunteer basis attending various classes in the area of alcohol and substance abuse awareness and education.

A.   That's correct.

Q.   Did you yourself pursue further education in the area of teaching in preparation for your eventual retirement from law enforcement?

A.   Yes, I did.  About three years ago I got my teaching certificate in order to teach middle and high school students.

Page 192

Q. And around when did you do that?

A. 2002.

Q. About three years ago.

A. Yeah, about three years ago.

Q. And in connection with that, did you have a project that you and other students in your class had undertaken?

A. Yes. Every year I have to recertify and take a class to keep my hours up in order to keep my teaching certificate. And

3506

the one that -- in March of 2003 we did a group study. In class we were studying different aspects of the middle high -- the middle school students, and then we got to talking saying, well, you know, inmates at the Linn County Jail, kind of curious how they read, how teachers affected their lives, and so we set up a group study, myself and four full-time school teachers. We passed out a questionnaire. I think I passed out 30, got 18 back. We looked over the questionnaire and, you know, what teachers, what reading, et cetera, affected your life. And then we had Angela Johnson as part of our group study where I didn't participate in the question and answer, but the four other teachers did, and they found it quite interesting.

Q. So can you describe -- this study, I take it, was trying to figure out how people who may not have gone all the way through high school, why they might not have done that? Is that part the direction of it?

A. Basically, yeah. The biggest thing we were looking at was how a particular teacher affects you on your life, how reading helps you. A lot of the inmates like to read, and we were looking at the kind of books they liked to read, and we were looking at the different aspects of it.

Page 193

Q. Did you know that Angela Johnson liked to read?

A. Yes.

Q. Prolific reader of books?

A. Yes.

3507

Q. Of a wide variety. Didn't you determine that?

A. Yes.

Q. And she was -- were you aware that she pretty much read her way through the whole Linn County library during her stay there?

A. Yes. At one particular time one of my jobs was purchasing books, and I'd always get kites in that said, We're done with these books. So we'd have to go rotate them or buy new ones.

Q. And she was reading all the books in the library that she could get her hands on?

A. Yes, sir.

Q. And you had arranged as a result of your contact and knowledge of Angela Johnson for her to participate in this class project with these other four --

A. School teachers.

Q. -- school teachers; is that right?

A. Yes, sir.

Q. And her participation, can you just describe, did it involve filling out a questionnaire and writing?

A. I believe she did. Like I say, we passed out 30 of the questionnaires. We got 18 back. I think she enjoyed it because it broke up the routine. And it was an interesting session, yes.

Q. And was she somebody that you selected to participate in this?

A. Pardon me?

Page 194

Q. Was she somebody that you selected to participate in this?

A. You --

Q. Did you select Angela Johnson to participate in this class project?

A. Yes, I did.

Q. Okay. And why did you select her?

A. Because I knew she was a reader, she liked to read, and that's what our -- basically of our teacher certificate, the reading effect on . . .

Q. And other than filling out the questionnaire, did she meet with these other folks?

A. Yes. She met with the other four. I did not participate in the question and answer for the simple reason I'm a supervisor, and a lot of times inmates will speak more freely if a member of the staff's not around.

Q. And did you talk to Angela Johnson yourself personally about whether or not she'd be interested in participating in this?

A. I asked her. Any time an inmate -- we ask an inmate to do something that's a volunteer basis, we ask them if they -- if she didn't want to do it, then I would have picked somebody else.

Q. And so you did talk to her.

A. Yes.

Q. And she was willing to do it.

3509

A. Yes, sir.

Page 195

Q. And she did it.

A. Yes.

Q. And she met with these people in person?

A. Yes.

Q. Can you describe the setting in which she would have met with these four civilian teachers?

A. We met in a conference room just off of the female section. It's just an open conference room, attorney conference room, long table, chairs, and it's got a window out front where I -- I was outside, and I could keep an eye on things, so she was in there with the four other people.

Q. Alone with them?

A. Yes. Well, I was outside the door.

Q. Was she shackled?

A. No.

Q. She was unshackled, unchained just as she sits here today.

A. That's correct.

Q. With four civilian teachers in a conference room at the Linn County Jail.

A. That's correct.

Q. Do you know how long she was in there with them?

A. I can't recall. It was less than an hour. I'm not sure.

Q. And they found it interesting?

A. Oh, they found it very interesting, and then we did a --

3510

after we talked to Angela, then we went around, and I give them a tour of the facilities.

Q. And they eventually wrote up a paper on their project?

A. Yes, then we did a group paper and turned it in for our section.

Page 196

MR. STOWERS: Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Sergeant, the correctional officers there at the Linn County Jail, they don't make up the rules there; is that correct?

A. That's correct.

Q. Your job as a correctional officer, as deputies, is to enforce the rules that are passed by other people. Isn't that fair?

A. Yes.

Q. And the reason for the rules is because it's essential that you have rules for the orderly and safe conduct of a jail.

A. Yes, sir.

Q. And even the rules that might seem odd like the fact that you want the female prisoners to wear their outer green shirt, there's a reason for that, isn't there, sir?

A. That's correct, yes, sir.

3511

Q. The reason for that, in particular that rule, is because the white T-shirts underneath could show breasts and be a sexual problem with some of the male guards.

A. No, I don't think so much of that. Is that we -- like the inmates -- the female inmates wear green. Our inmate workers wear green. And our male inmates wear orange. So if somebody happens to get out of a place of assignment, we would automatically know where they were supposed to be at.

Q. The inmates don't always follow those rules, do they?

Page 197

A. No, they don't.

Q. And enforcing the rules is part of the responsibility of the staff there.

A. That's correct.

Q. In fact, fair to say that that jail as any jail can be a dangerous place to work?

A. It's a very volatile place, yes.

Q. Now, the questions you received was about -- in part about the number of write-ups that a Vicki Kosina, one of the correctional officers, wrote up on Angela Johnson. You remember that series of questions, sir?

A. Yes, sir.

Q. Now, first of all, how many female correctional officers between 2000 and 2004 would have been working in that particular area during the daytime when inmates are awake?

A. Vicki, her shift was four to midnight. She's been

3512

4-to-midnight correctional officer for 15, 20 years. During the day hours, Jan Hora (phonetic), 426, works that shift. Sometimes we have two female officers -- or two female correctional officers working the eight-to-four shift. But Vicki mostly worked the four-to-midnight shift, and she worked alone.

Q. She worked alone.

A. Yes.

Q. So it's not surprising that if there's misconduct that occurs between four to midnight it's going to be written up by Vicki Kosina.

A. That's correct.

Q. And, in fact, as you indicated, Vicki Kosina's write-ups,

Page 198

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3079 of 3592

even behavior warnings were reviewed by the staff members and approved?

A.   The ones that were the behavior warnings, the B mapping, the minor infractions, no, they just put them on.  There was occasions where CO Kosina would contact the sergeant and then the ser -- she would call, say, I'm having an argument; Angela Johnson's doing this or that.  And then she would put in -- you could see on there where it says 428 which is her PIN number and then slash and then the number behind it would be the sergeant she talked to.

Q.   And there were times when Angela Johnson filed grievances complaining that she was being picked on by Vicki Kosina, and

3513

those were rejected, weren't they?

A.   Yes.

Q.   The fact is Vicki Kosina was actually quite afraid of Angela Johnson, wasn't she?

A.   Are you asking my personal opinion on that or --

Q.   Yeah.  I mean, didn't she tell you that?

A.   Yes.  I think that she was very uncomfortable around Angela Johnson.

Q.   The one incident that you've been asked about, this fight, in that fight, the woman with whom Angela Johnson was fighting was half her age and half her size, wasn't she?

A.   I couldn't remember that.

Q.   In fact, what happened was that Angela Johnson pulled her hair, threw her into a wall, and hit her in the face with a closed fist during that fight.  Isn't that what happened?

A.   Without reviewing the report, yes, sir, if that's what you said.

Page 199

Q.   And she claimed self-defense, and that was rejected by the staff, wasn't it?

A.   If I remember correctly, I did not handle the disciplinary part of it.  I believe either probably another sergeant or lieutenant -- without looking at the disciplinary thing, I couldn't tell you who did what.

           MR. WILLIAMS:   No further questions.

           MR. STOWERS:   Nothing further.

                                                    3514

           THE COURT:   You may step down.

           Do you have another witness you'd like to start with, Mr. Berrigan?

           MR. BERRIGAN:   It's certainly up to you, sir.  We have somebody that's available, and she's in custody.  We could start.  Depending upon what time you could finish, I couldn't promise we'll be right on time, but we're happy to start, or we could put her off till tomorrow.

           THE COURT:   Why don't we just start tomorrow morning.  I have a couple other matters I need to attend to.

           So, members of the jury, that will conclude the testimony for today.  We'll see you back here tomorrow at 8:30.  When you come in at 8:30, I'll tell you the schedule.  Here's what I think is probably going to happen.  I'm not sure yet.  I think there's a reasonable possibility that we will be done with all of the evidence on Thursday.  But then we're taking this break, and we're taking that regardless of whether we're done with the evidence or not.

           But I think we'll be done with the evidence or there's a good possibility that we'll be done with the evidence on Thursday.  We'll be coming back, you know, a week from the

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3081 of 3592

following Monday which I believe would be June 20. And we'll either finish up the evidence on that day if we have some evidence to finish up on, or we'll just start with the final penalty phase instructions and the closing arguments, and then

3515

it will go to the jury on the 20th if we don't have any evidence to finish up.

If we have evidence to finish up, there's still a possibility it could go to the jury on the 20th, but it might go to the jury on that following day, the Tuesday. But I'll meet with the lawyers and try and get their latest thinking. That's kind of what we were thinking yesterday, but it can change day to day.

So I'll give you an update tomorrow, but I just wanted to kind of let you know for planning purposes. We'll see you tomorrow morning at 8:30. Thank you very much.

(The jury exited the courtroom.)

THE COURT: Please be seated. Other than this limiting instruction, is there anything outstanding that we need to be concerned about?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

THE COURT: Mr. Berrigan? I guess I technically haven't ruled on your allocution motion, but I haven't had a chance to read the government's resistance.

MR. BERRIGAN: I understand, Your Honor. You did kind of brief us or give us a heads-up on kind of where that was going.

THE COURT: Yeah.

MR. BERRIGAN: We don't have any other concerns. We

Page 201

did have one final matter before recess.

THE COURT: Okay.

THE DEFENDANT: Your Honor, I'd like to thank you for the contact visit with my daughter Marvea. It's going to mean a lot to both of us. I can't wait to put my arms around her. My only regret is that my daughter Alyssa and granddaughter Angeleah aren't here, but I just can't tell you how grateful I am. Thank you very much.

THE COURT: I was pleased to do it. Thank you.

MR. BERRIGAN: That's all we had, sir.

THE COURT: Okay. Thank you. On this limiting instruction, I'm not sure we really need it, and I know the defense has opposed it. I mean, there's really nothing wrong with giving it. It can't be error to give it.

MR. BERRIGAN: No. And I think probably it's a matter that you need to wait to hear all the evidence, Your Honor.

THE COURT: Yeah.

MR. BERRIGAN: I mean, we feel strongly we will not need it, but --

THE COURT: Because you made it so crystal clear with Dr. Logan, and I assume you're going to do it with the others.

MR. BERRIGAN: Crystal, right, yeah.

THE COURT: But -- and, of course, being picayunish, I'm not particularly enamored with the wording so . . .

MR. WILLIAMS: It was the defense wording, Your Honor.

MR. STOWERS: Yeah. Figures.

THE COURT: Which you agreed to.

MR. WILLIAMS: We're open to any changes you might suggest, Your Honor.

THE COURT: Well, how seriously do you think we actually need to instruct it? And if we do, where does it go? It's probably a stand-alone. It doesn't really fit very well with any of the other final instructions.

MR. WILLIAMS: Yeah. I think that's right because I don't think the final instructions in the penalty phase you have anything about expert testimony which is where it would logically go.

THE COURT: So I'd probably do it as a stand-alone.

Okay. Let's go through it. I'm not sure I'm going to give it. But we have to have a title consistent with how I title instructions which I know is idiosyncratic. I don't think I've ever seen another judge title instructions, but I do because I like to have a table of contents because I think that's helpful for the jury. So I was just thinking the title would be "mental health expert testimony" for a title, and then I don't have any problem with the first sentence, You have heard testimony -- you have heard expert testimony concerning defendant's mental condition.

The second sentence is fine, but I'd make a little bit of a change. This evidence has not been offered for the purpose

3518

of exploring her thinking or behavior at the time of the offenses charged. I would just put "at the time of the charged offenses" or -- which -- here's a suggestion because it's more specific, but I suspect the defense wouldn't like it: "At the time of the five murders" or "the murders" and then list the five, but we can just use "charged offenses." And then instead

Page 203

of saying -- consequently, whoever made this editorial change is fine, and "you may not consider it for that purpose." So the only thing I would do essentially in that sentence would be switch "offenses charged" to "charged offenses."

You know, I'm not so sure we have to have that last sentence, "You may, however, consider it for any other purpose," because -- well, I mean, I realize that evidence is admitted generally, but it's not really relevant for any purpose in the world. It wouldn't be relevant, for example, to prove a statutory -- a nonstatutory aggravating factor. But, you know, I don't feel strongly about it.

MR. BERRIGAN: I think the concern, Your Honor, is if that sentence is omitted, then there may be some question about what it's to be considered for at all or if it should be considered which is part of our whole problem with the instruction to begin with if we're actually discussing that at this point. We intend to make it very clear as we did today with Dr. Logan these mental health experts are not here to offer some type of quasi-defense to these crimes that the jury's

3519

already convicted our client of.

So we really think this instruction, not only is it unnecessary, but it kind of creates this whole issue about what are these people doing here. And frankly, we just think it's unnecessary. But the last sentence certainly could be reworded. We'll attempt to do something else.

THE COURT: I thought maybe you'd tie it into mitigation.

MR. BERRIGAN: That's the whole reason we're putting on these experts, right. But there's no wording about

Page 204

mitigation obviously in that instruction. Maybe we should do something to suggest the purpose of the testimony now that we're telling them not to consider it for her mental state at the time of the charged offenses.

THE COURT: Right.

MR. WILLIAMS: Well, to be helpful, Your Honor, frankly, what maybe we ought to do is tie it specifically to the numbered mitigating factor that the defense is arguing this evidence is in support of.

MR. BERRIGAN: Well, the problem with that -- I'm sorry. I didn't mean to cut you off. The problem with that is obviously the jurors can consider any aspect of the defendant's background or character in making a determination about --

THE COURT: But do we give that one a separate number?

MR. BERRIGAN: Yes, we did actually, right.

3520

THE COURT: So we could tie it to the numbered mitigation factors including the general catch-all.

MR. BERRIGAN: We could. I guess we could.

THE COURT: I see you're thrilled about that suggestion.

MR. BERRIGAN: Right, right.

THE COURT: I don't have a huge problem -- I mean, the only reason why we would say you could consider it for a particular purpose which we don't do with regard to any other type of evidence is that this is a kind of limiting instruction. And generally in a limiting instruction you tell the jury you can't consider it for A but you can consider it for B, C, and D. And that's why at least it makes some sense to tie it to your mitigators to me. But, you know, I don't have strong feelings
Page 205

about "you may, however, consider it for any other purpose."

MR. BERRIGAN: And I don't disagree, but I think typically we give a limiting instruction because we're concerned that the jurors may consider the evidence in an inappropriate fashion or it's being offered for a particular purpose and we don't want them to consider it for some other purpose. And my view is at least so far -- admittedly this could change -- there's no danger of that, that we're making it very, very clear that this is offered not to have anything to do with mental state at the time of the offenses.

THE COURT: Yeah, and let me ask you that,

3521

Mr. Williams, because -- assuming that you make it that clear with the other experts who testify, why is it that we need this instruction? You're free to argue it, but why do we actually need it?

MR. WILLIAMS: Because it's an instruction to the jury. What we've heard so far is the expert saying, I'm not offering it for that purpose and Mr. Berrigan saying, I'm not asking you about it for that purpose. They're instructed you cannot consider it for that purpose, and there's a big difference there, and I think they need to be instructed that they cannot consider it for an inappropriate purpose.

THE COURT: Okay. Well, then let's focus on that last sentence, either leave it alone or tie it to mitigation.

MR. BERRIGAN: All right, sir.

THE COURT: I think I'm probably going to give it. I think that makes sense to me. I don't think you're going to argue it in an inappropriate way. Matter of fact, I'm sure you wouldn't, having told me you're not going to.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3087 of 3592

MR. BERRIGAN: Yes, sir.

THE COURT: So that's not a concern, and I assume you'll do what you've done with Dr. Logan with the other experts, so that's not a concern. But I think the jury's entitled to be told it. So I don't want to overemphasize it, and that's kind of why I was looking to tuck it into another instruction, but there really isn't one that it fits well into.

3522

MR. BERRIGAN: And we haven't even, frankly, elected to consider where it should be if it's given.

THE COURT: You know, we may be able to wrap it into that first introductory instruction, but it doesn't really fit all that well either. I've kind of looked at that. Why don't we work on that. It's really not a big deal, but I'd like to have it ironed out tomorrow.

MR. BERRIGAN: Yes, sir.

THE COURT: Are there any issues regarding closing arguments we're going to have to address?

MR. BERRIGAN: Well, not in terms of substance, Your Honor. I do have some real concerns about time. That is, I understand the practice of the Court not only in this trial but Mr. Honken's was to virtually give the attorneys as much time as they want or need, and I'm not opposed to that as long as it's established ahead of time what that time is and that the attorneys be held to an equal amount of time.

And my concern, to be quite honest, is I don't think it's quite fair that the prosecution obviously gets to go first and last but that they could actually have a rebuttal closing that's longer than the defense closing argument. And we've seen that. We've seen that happen not -- we've seen it happen in

Page 207

this trial, and I saw it happen, I think, in Mr. Honken's trial or pretty close to it. And I do think that's inappropriate.

It's supposed to be a rebuttal argument, and the

3523

government really should have the same amount of time as the defense all together. I don't care how much time that is. If Mr. Williams wants 3 hours, fine, and then I'll, I suppose, quit after 15 minutes, and there will be 2 hours and 45 minutes of blank time.

But I do think the rules should provide some equal amount of time and that we should be largely held to that, not maybe to the second or even to the minute.

But this idea that, you know, the government can get up for an hour or an hour and a half after the defense has used a 45-minute closing I do think really disadvantages the defense. And because we don't know ahead of time how much time they're going to take, that's a real disadvantage.

So I just wanted the Court to consider that complaint in making a determination about the practice, whatever rules we're going to follow regarding the time in closing.

THE COURT: Mr. Williams?

MR. WILLIAMS: Your Honor, I have yet in my career to ever sandbag anybody in a closing argument and to take more time than the defense did, nor did that happen in this case. Mr. Willett took 57 minutes in his closing argument during the guilt phase, and Tom took 40 minutes in the rebuttal. I will not and I promise the Court I will not take more time. In fact, my practice usually is in my rebuttals I'll be lucky if I'm up there for 10 or 15 minutes. I get to the point. I sit down.

3524

Page 208

I don't know how long my rebuttal's going to be because I don't know what he's going to say, so it's hard for me to give a time estimate, but I will assure you there won't be any danger of me coming even close to the time period that Mr. Berrigan takes in his closing argument.

MR. BERRIGAN: May I respond briefly, Your Honor?

THE COURT: Yes.

MR. BERRIGAN: It's more than that. I don't have the times in front of me for Mr. Miller, and I'm not at all besmirching his closing. He did a fantastic job just as he did with Mr. Honken's case, but my recollection is it went on for at least a couple of hours, and I think all together his closing argument if you counted both the rebuttal in the first phase of his closing in this case was probably at least three hours. If the attorneys knew ahead of time, I would have no problem with Mr. Miller saying, I need three hours. Okay, Mr. Willett, you've got three hours, I mean, if you really want to do that.

THE COURT: What's the difference between doing that and just saying take as much time as you need?

MR. BERRIGAN: Number one, I don't think -- I hope we're not going to need three hours for closing in the penalty phase. But the idea is it's a rebuttal argument.

THE COURT: But isn't the real concern -- I'm sorry to cut you off. The real concern which I'm very sensitive to -- and Mr. Williams knows I've imposed it on other lawyers in his

3525

office because they do sandbag. They give a very brief opening, kind of sucker punch the defendant in, and then they come back

Page 209

with everything in rebuttal, and I put a stop to that because that's unfair.

I'm confident based on past experience -- I mean, you never know the future. You never do know. I'm confident based on past experience Mr. Williams has never even come close to doing that and he's not going to do it in this case. And so I don't see the need to impose that kind of rule because I don't think there's a history of it with regard to Mr. Williams. And I'm not exactly sure what you're asking. If I say you can have three hours --

MR. BERRIGAN: Well, a lot of it is I think what we're used to in terms of our practice. I've never in 20 years had a closing argument that was not timed, not only that but that the prosecution had one more minute than the defense or vice versa ever.

THE COURT: What do you mean by that? You mean the judges give you time limits for closing?

MR. BERRIGAN: You bet, absolutely, and we're held to them very strictly, and the prosecution cannot use more time in their rebuttal than they did in the first part which is what you're discussing now I think. That is, they can't get up for 15 minutes if they wanted an hour, use 15 minutes in the first part of closing and then take 45 minutes in rebuttal. They're

3526

limited. In fact, if they use -- if they had an hour and they used 20 minutes in the first half, they only get 20 minutes in rebuttal. That's how strictly they're held to the sandbag rule, but that both parties know ahead of time you're going to get an equal amount of time in front of that jury. Nobody's going to get more time than the other lawyer. Take as much time as you

Page 210

decide ahead of time you need, and the parties negotiate that with the court and then the Court says, Okay, this is going to be the time. Mr. Williams, you've got 90 minutes. Use it how ever you'd like, but you can't use more time than --

THE COURT: Oh, but you can't use more time in rebuttal.

MR. BERRIGAN: That's right, in the second part than the first part. I've never really had any difficulty with that practice. This has been a new experience, quite frankly. And the advantage of that, frankly, is that that jury doesn't get to see Mr. Williams any more time than they get to see me. And when our client's life's on the line, that means something in my view to me, that we're up there for the same amount of time, whatever that is.

I'm not trying to impose my views about how much time Mr. Williams needs. But in terms of us being able to argue to the jury about whether my client lives or dies, I don't want him to have one extra minute than I have, and I don't know why he should. Why does he need more time than the defense is

3527

provided? I understand he's going to do a rebuttal. He should anticipate whatever time he needs based on what we decide ahead of time. But I would urge the Court --

THE COURT: How much time do you think you'll need?

MR. BERRIGAN: I think an hour, frankly. I would think closing arguments could be done very safely in an hour in this case for each side. And if we'd need more time, I'd certainly be amenable to that, but I think I can do a closing argument in one hour.

THE COURT: So in your view -- I'm just trying to make

Page 211

sure I understand your view -- I should give each side an hour and he can't use his full hour if he -- well, he can't take any more time in rebuttal than he took in his --

MR. BERRIGAN: He would tell you how he wants to split it, so he'd say, I want 40 minutes in my first half, 20 in my second, 30, 30, 35, 25, whatever he'd decide is appropriate.

THE COURT: He's gotta tell me that ahead of time.

MR. BERRIGAN: That's right, because we've decided how much time we're each going to have. You know, and a lot of prosecutors are going to take every minute they can on their rebuttal, so they'd split it 30, 30, and he'd use 30 minutes. Berrigan would go for an hour, and he'd get back up for 30 minutes, but he only has an hour, and I don't know why that would be unfair to him. I mean, we both have to anticipate --

THE COURT: I'm not saying it's unfair. I'm not sure

3528

I have -- no, I probably have the authority to do it. I've actually never heard of that before.

MR. BERRIGAN: See, one of those things like the defendant not testifying in voir dire. We're all used to different things.

THE COURT: Yes, we are.

MR. BERRIGAN: I've never not had a judge impose time limits to be quite honest, ever. And we can ask for warnings, and that's typically done, oftentimes two warnings.

THE COURT: We got these shock bracelets for the ankle.

MR. BERRIGAN: Well, these are usually oral.

THE COURT: This works much better.

MR. BERRIGAN: I bet it does.

Page 212

THE COURT: But you have to learn not to react to it. Might throw you off your pace.

MR. BERRIGAN: I just wanted the Court to consider that. I had not discussed it with Mr. Williams.

THE COURT: I'll consider it. Why don't you two discuss it, and we'll chat about it tomorrow.

MR. BERRIGAN: All right, sir.

THE COURT: Thank you. Anything else?

MR. BERRIGAN: Nothing by the defense.

MR. WILLIAMS: No, Your Honor.

THE COURT: We'll be in recess. Thank you.
(The foregoing trial was adjourned at 4:30 p.m.)

3529

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR                    12-3-05
                                            Date

Page 213

3530

INDEX

WITNESS:                                                    PAGE:

WILLIAM LOGAN
              MR.  BERRIGAN                                 3288
              MR.  WILLIAMS                                 3344
              MR.  BERRIGAN                                 3355

JAMIE HAYS
              MR.  BERRIGAN                                 3363

MARVEA JANE HONKEN
              MR.  BERRIGAN                                 3398

SHELLY JOHNSON
              MR.  BERRIGAN                                 3422

JAMES JOHNSON, JR.
              MR.  BERRIGAN                                 3434

CAROL MANN
              MR.  STOWERS                                  3459

HARVEY DESOTEL
              MR.  STOWERS                                  3480
              MR.  WILLIAMS                                 3510

                         * * * * *

EXHIBITS:

2167                                                       3305
2016 and 2020                                             3331
2027 and 2126                                             3332
2157 through 2161                                         3392
2156                                                      3395
2090 and 2109                                             3396
2125, 2162, and 2163                                      3409
2148                                                      3412
2166                                                      3414
2123                                                      3421
2081                                                      3458
2118                                                      3502

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3095 of 3592

2026                                                    3504
2168                                                    3505

\* \* \* \* \*

Page 215

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3096 of 3592

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CR01-3046

     Plaintiff,                         Sioux City, Iowa
                                             June 8, 2005
  vs.                                        8:30 a.m.

ANGELA JANE JOHNSON,                         VOLUME 20 of 24

     Defendant.
                              /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

3532

APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                          Assistant United States Attorney
                          Suite 400 - Hach Building
                          401 First Street Southeast
                          Cedar Rapids, IA   52401

                          THOMAS HENRY MILLER, ESQ.
                          Iowa Attorney General's Office
                          Area Prosecutions Division
                          Hoover State Office Building
                          Des Moines, IA   50319

For the Defendant:        PATRICK J. BERRIGAN, ESQ.
                          Watson & Dameron
                          2500 Holmes
                          Kansas City, MO   64108

                          DEAN STOWERS, ESQ.
                          Rosenberg, Stowers & Morse
                          1010 Insurance Exchange Building
                          505 Fifth Avenue
                          Des Moines, IA   50309

                          ALFRED E. WILLETT, ESQ.
                          Terpstra, Epping & Willett
                          Higley Building - Suite 500
                          118 Third Avenue Southeast
                          Cedar Rapids, IA   52401

Also present:             Bill Basler

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3097 of 3592

3533

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Ready to have the jury brought in?

MR. BERRIGAN:  Yes, sir.

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Okay.

(The jury entered the courtroom.)

THE COURT:  Good morning.  Please be seated.

Mr. Berrigan, are you ready to call your next witness?

MR. BERRIGAN:  We are, sir.  The defense calls Theresa Milton.

THERESA MILTON, DEFENDANT'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated in our witness box.  And if you could adjust the chair and scoot it up so you can speak directly into the two microphones.  And you can adjust those microphones, pull them a little closer to you.  Would you state your full name, please, and spell your last name for us.

THE WITNESS:  Theresa Ann Milton, M-i-l-t-o-n.

THE COURT:  Okay.  Thank you.

Mr. Berrigan?

MR. BERRIGAN:  May it please the Court.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q.   Miss Milton, where are you from?

A.   Waterloo.

3534

Page 2

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3098 of 3592

Q.   Waterloo, Iowa?

A.   Uh-huh.

Q.   Is that where you were born and raised?

A.   No, I was born in Mississippi.

Q.   Mississippi.

A.   Uh-huh.

Q.   We can see obviously you're in custody.

A.   Yes.

Q.   What are you in custody for?

A.   I had five counts of forgery so -- it all ran concurrent, so I got one count of forgery.

Q.   When did you get that forgery conviction?

A.   About five years ago.

Q.   And were you sentenced to prison time at that time?

A.   No.

Q.   What was your sentence?

A.   Being I was on probation, I had back and forth from the facility, and I ended up in prison.

Q.   Okay.  You were on probation originally?

A.   Uh-huh.

Q.   And then eventually your probation was revoked?

A.   Yes.

Q.   How long have you been in jail now?

A.   How long I been in prison?

Q.   Yes, ma'am.

3535

A.   It will been a month.

Q.   Just a month.

A.   Uh-huh.

Page 3

Q.   So you still have your sentence kind of ahead of you.

A.   Uh-huh.

Q.   How do you -- do you know Angela Johnson?

A.   Yes.

Q.   How do you know Angela?

A.   I met Angela in Black Hawk County Jail.

Q.   Okay.  And when was that?

A.   2000.

Q.   2000.

A.   Yes, sir.

Q.   What were you doing in the Black Hawk County Jail back in 2000?

A.   For the same charge I'm on now.

Q.   The same charge you're doing time on.

A.   Yes, sir.

Q.   So you're on probation for how long?

A.   I was on probation for five years.  I kept messing up.  I kept doing the same thing that I was doing so . . .

Q.   What was the problem you were having?

A.   I was using drugs.

Q.   Drugs.

A.   Bad.

                                                        3536


Q.   Is there a particular drug that you abused?

A.   Crack.

Q.   Crack cocaine?

A.   Yes.

Q.   So back in October of 2000 you were in the Black Hawk County Jail.

A.   Yes, sir.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3100 of 3592

Q.    And why were you in jail at that time?

A.    I violated my probation.  I -- like I say, I kept using crack, and I dropped dirty, and they put me back in jail.

Q.    When you were in jail in Black Hawk County, was Angela Johnson already there?

A.    Yes, sir, when I got there.

Q.    When you got there.

A.    Uh-huh.

Q.    All right.  And this jail, we've heard a little bit about it and seen some pictures.  But it obviously has an area for women and men.

A.    Yes, it does.

Q.    What's that area called?

A.    You got the F pod for the ladies.

Q.    For the ladies.

A.    Yes.

Q.    And when you were there back in October 2000, how many ladies were in F pod at the Black Hawk County Jail?

3537

A.    Okay.  The pod that Angela and I was in, it was like four women, but the other pods I can't accurately say.

Q.    And when you talk about a pod, you know, the jurors haven't been in any pods.

A.    Okay.

Q.    So they're not real sure what you mean by that.  Could you tell us?

A.    Okay.  The pod that me and Angela was in, it's like maximum security.  There's no TV.  There's just four ladies.

Q.    Do you have cells?

A.    Yeah.  It's four cells for four, you know, ladies, and it's

Page 5

apart, the area that you eat at, and then you go back to your cell.

Q.    So there's a place for eating outside of the cells.

A.    Uh-huh.

Q.    How many floors are there to the F pod?

A.    Two.

Q.    Two floors.

A.    Yes, sir.

Q.    Which floor were you living on?

A.    On the top, first floor -- I mean second floor.

Q.    And what floor was Angela Johnson living in?

A.    Second floor.

Q.    How did you and Angela Johnson get along there?

A.    We got along great.

3538

Q.    Had you known her before you met her in jail?

A.    No, sir.

Q.    What is it about her that you developed a liking for her?

A.    Angela, she was just the kind of person that you could easily talk to.  She understood the same thing that -- a lot of problems I was going through.  She helped me the time that I was in there.  She just was a wonderful person.

Q.    Did you have some things in common in terms of your situations?

A.    Drugs and bad things that guys have did to us.

Q.    Are you a mother also, Miss Milton?

A.    Yes.

Q.    How many children do you have?

A.    I have two.

Q.    Two?  And how old are your children?

Page 6

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3102 of 3592

A.    Twenty-five and twenty-four.

Q.    Twenty-four and twenty-five.

A.    Uh-huh.

Q.    During the time that you were in jail, did you talk to each other kind of about your personal lives?

A.    Yes, we did, a lot.

Q.    A lot.

A.    Uh-huh.

Q.    And did you learn some things about Miss Johnson?

A.    I learned that Angela loved her kids unconditionally.  I

3539

learned that she was going through a lot of things with a boyfriend and drugs.

Q.    I want to kind of direct your attention to a specific time.

A.    Okay.

Q.    And that was around the time of October the 13th.

A.    Uh-huh.

Q.    It was a Friday.

A.    Yes.

Q.    2000.  Do you remember that day?

A.    I remember.

Q.    Before we talk about that day in particular, had you and Angela Johnson ever had any discussions about suicide?

A.    Yes, sir.

Q.    Could you tell the jurors how those discussions arose?

A.    Well, when I first came to F pod, the place me and Angela was put in, I was thinking about killing myself.  I got tired of the things that I was doing and stuff, and I wanted a way out. So I was talking -- I went down and talked to the nurse, and that's when I started discussing things like that with Angela.

Page 7

Q.   You saw the nurse about --

A.   My -- yeah, the psych nurse.

Q.   Psychiatric nurse.

A.   Uh-huh.

Q.   So you were having some problems yourself.

A.   Yes.

3540

Q.   And you were contemplating killing yourself?

A.   Yes, I was.

Q.   Did you do anything to try to commit suicide?

A.   Not at that time I didn't.

Q.   You didn't.

A.   No, sir.

Q.   But you talked with Miss Johnson about it.

A.   Yes.

Q.   And what was the discussion that you had with her?

A.   I just, you know, told her about my problems, and I told her what I was, you know, thinking about doing.  And that was it.  I mean, at that time that was it.

Q.   After you saw the psychiatric nurse, did you get better?

A.   Yes.

Q.   Were you on medication yourself at the Black Hawk County Jail, Miss Milton?

A.   Yes.

Q.   What kind of medication were you taking?

A.   Meds to help me with my depression.

Q.   With your depression.

A.   Uh-huh.

Q.   Did you know whether Miss Johnson was taking medications?

A.   No, I didn't.

Page 8

Q. You didn't.

A. I didn't really pay any attention to it.

3541

Q. At some point around October the 13th, did Miss Johnson discuss with you -- did she talk about suicide?

A. Angela never did tell me, you know, that she was going to do it. She just asked me, you know, if I was to do it how would I do it. And I told her I would have got a sheet and I would take some, you know, poison -- I mean not poison, the chemicals that you use to clean your cell with before I did it.

Q. I wonder if you could do me a favor. You have kind of a soft voice. Could you pull that other microphone together, the one on your left.

A. Okay.

Q. There you go. So she asked you a question about how you would kill yourself?

A. Uh-huh.

Q. And what did you tell her?

A. I told her I would use a sheet. I would have found some kind of way to get a extra sheet, and I would have got the stuff that you clean the cells with and I would use that too.

Q. Well, when she asked you that question and you gave her that response, did that raise any concerns with you about what she might have been thinking about doing?

A. No, sir, not at the time.

Q. Not at all.

A. No.

Q. Were there any other discussions about suicide or how to

3542

Page 9

commit suicide?

A.    We talked about it, you know, in different -- you know, a long ti -- I mean I couple of days probably.

Q.    Over the course of a couple of days?

A.    Yes.

Q.    Did you happen to notice -- Miss Milton, you were in this cell, just the four of you.  Was there a telephone in the cell?

A.    Yes.

Q.    And was it one that you could all use?

A.    Yes.

Q.    Did any -- did you happen to notice around October the 13th whether or not Miss Johnson had occasion to use the telephone?

A.    Yes.

Q.    Did she talk to you about any of these discussions she had with people on the telephone?

A.    No.

Q.    Were you aware of what the conversations were about?

A.    Yes, sir.

Q.    How did you know that?

A.    I was sitting there listening.

Q.    You were listening in.

A.    Yes, sir.

Q.    All right.  As a result of your listening in, what did you learn?

A.    I learned that she cares a awful lot for her kids.  That

3543

day she was saying like good-bye to them like -- she also had made plans for her kids to be -- if anything happened that her sister was the one that was going to take care of them.

Q.    You heard these discussions on the phone?

Page 10

A.    Yes, sir.

Q.    Did she tell anybody on the phone she was going to commit suicide?

A.    No, sir.

Q.    No.

A.    No.

Q.    On October the 13th, on that Friday --

A.    Yes, sir.

Q.    -- what was the kind of usual routine for the four women at the Black Hawk County Jail F pod at that time?

A.    We got -- we had to be up to, you know, get our breakfast. Then we had to clean the cells. That particular day we had to change our, you know, sheets. In that part of the cell, you have to let them know, you know, when you get ready to take a shower or whatever, but we was changing sheets that day.

Q.    What do you do with the sheets then when you change them?

A.    Take them off your bed, and you take the old ones, the one you have used, and put them in a little cart outside where the guard was at.

Q.    And the guards come by and pick those up at some point?

A.    Uh-huh.

3544

Q.    And how many sheets are on these beds?

A.    You get two.

Q.    Two.

A.    A fitted one and one that you just throw over.

Q.    Did you happen to notice anything unusual about Miss Johnson's behavior during the day of Friday, October the 13th?

A.    She wasn't herself. She wasn't calm. She was like nervous like, antsy like. You could just tell something was different

with her like she had a lot on her mind or whatever. She wasn't the same calm person that I had been, you know, talking to or whatever.

Q. That she had been usually.

A. Uh-huh.

Q. What about the cleaning of the cells? You mentioned that you clean your own cells.

A. We get products, stuff that we clean the cells with, the toilet and wipe down the furniture, the sinks and whatever.

Q. And what kind of stuff is this, and where do you get it?

A. The guard give it to us in our unit because he have to know where it's at at all times, you know. He gave it to us.

Q. And does it come in a spray can, or what is it?

A. A spray, spray bottle, but you could take the cap off.

Q. You could take the cap off.

A. Yes, sir.

Q. Did anything unusual happen with the cleaning solution or

3545

solvent that day?

A. Angela -- we had been using the stuff, and it come up some kind of way where the guard didn't know where it was at the time, and Angela, you know, she had it, and I know we had kind of had a conversation about it not being given back to the officer. And I had told Angela I would get in trouble for it, but, you know, I wasn't thinking anything, you know, about it. But she didn't want me to give it back.

Q. So she had the cleaning solvent.

A. Yes, sir.

Q. And you wanted it back to give back to the guards?

A. Yes, because he was asking for it.

Page 12

Q.    And she wouldn't give it back to you?

A.    She gave it back, but it was after she went to her cell.

Q.    I see.  With the solvent.

A.    Yes, sir.

Q.    Had there been any discussion with Miss Johnson up to this point between the two of you in terms of what would happen to you if you took your own life?

A.    Well, I had been reading the Bible for a little while the time that I was in the cell, and Angela kept, you know, just acting funny or whatever, and I was still contemplating what I was going to do, but I had read in the Bible that if you take your own life you won't go to heaven, you won't be able to make it there.  And I passed that on to her.  I told her about it.

3546

Q.    What did she say to you?

A.    Angela went to her room and came back, and she said she didn't find it in the Bible about you won't go to heaven if you kill yourself.

Q.    She didn't find that in the Bible.

A.    Uh-huh.

Q.    Did you give her any of the -- either of the two sheets that you were changing on your bed?

A.    No, sir.

Q.    You sure?

A.    I'm positive.

Q.    After the -- she returned the cleaning solvent to you at some point, did you happen to notice whether any of it was missing or not?

A.    I really didn't pay attention to it.

Q.    Didn't think much of it.

Page 13

A.    No, no.

Q.    When did you first notice that there was really something wrong?

A.    I had asked Angela that particular day for paper to write my kid, and I asked her also for a envelope.  Angela ran down the stairs and brought me the paper and the pen, and I said, Girl, what am I going to do without an envelope?  How am I mail it off?  So Angela went back to get the envelope, and as I was writing, she never did come back down.  And I kept hearing

3547

something like somebody was breathing, you know, fast like trying to catch their breath.  By that time Susan ran out the room.  It's another lady that's in the unit with us, in the cell.  She came out of the cell and seen Angela hanging there, and I got up, and I looked around, and she was just hanging there.

Q.    And what did you do, Miss Milton?

A.    I ran to the door and start banging on the door to let the guard know that something was wrong.

Q.    And what did the guards do?

A.    They told us to go to our room, and we went to the room, and I looked back out, and I saw them trying to get her down.

Q.    When you say she was hanging there --

A.    Yes, sir.

Q.    -- where was she hanging?

A.    From the top of the cell.  They got bars around it.

Q.    Bars up on the second level there?

A.    Yes, sir.

Q.    And what was she hanging by?

A.    Some sheets.

Page 14

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3110 of 3592

Q. Sheets.

A. Yes.

Q. Had Miss Johnson said anything to you about being depressed before she attempted the suicide?

A. She was depressed, but I kind of felt -- I didn't know she

3548

was going to do it, but when she was on the phone, she was -- now that I think, you know, about it later, she was making plans because she knew what she was going to do.

Q. Did she ever mention to you what she was upset about?

A. Her boyfriend, how he was no good, how she was afraid of him, drugs.

Q. Had there been any developments in her case that you were aware of?

A. Yes. She had called home and was talking to her kids, and I think her daughter told her that they had turned down her appeal, and after that, after the phone call, she received the paper saying her appeal had been turned down.

Q. What appeal was that, ma'am?

A. I think it was a bond reduction. I'm not real sure.

Q. Do you know whether anybody came to visit her that day on the 13th?

A. She had told me earlier before she did what she did that her lawyer had been there to see her. She also told me she didn't want to speak to him again, she didn't want to have nothing to do with no one. She didn't want to talk to no one but me she said.

Q. After the jailers took her down, was she taken out of the Black Hawk County Jail?

A. Yes.

Page 15

Q. Did she ever come back while you were there?

3549

A. No.

MR. BERRIGAN: That's all I have. Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Ma'am, you indicated on direct examination that you and Angela Johnson shared information about yourselves with each other?

A. Yes, sir.

Q. Right? And she told you about her own two daughters; right? She had two young daughters.

A. Yes.

Q. And how much she cared for them.

A. Yes.

Q. In the process of sharing this information with you, did she tell you that in July of 1993 she went out and bought an assault weapon for her boyfriend?

A. No.

Q. Did she tell you that she helped her boyfriend track down a guy named Greg Nicholson and find out where he lived?

A. No.

Q. She tell you that she helped her boyfriend make entry into this house with the weapon?

A. No, sir.

3550

Page 16

Q. Did she tell you that she either duct taped and tied up or held a gun on this Greg Nicholson and a woman named Lori Duncan and two little girls?

A. No, sir.

Q. Did she tell you that she helped take those people out to some woods?

A. No, sir.

Q. Did she tell you that she held these two little girls, ages 6 and 10, as Dustin Honken took Greg Nicholson and their mother, those little girls' mother, out into the woods as he shot them? Did she tell you that?

A. No, sir.

Q. Did she tell you that she continued to hold those two little girls until Dustin Honken came back to take them out to the woods and blow their faces off?

A. No, sir, she didn't tell me that.

REDIRECT EXAMINATION

BY MR. BERRIGAN:

Q. Miss Milton, did Miss Johnson discuss any of the facts of her case or the allegations against her?

A. No.

Q. Did she ask you questions about your case?

A. No, sir.

Q. Did you ask her questions about hers?

A. No, sir.

3551

MR. BERRIGAN: Thank you.

THE COURT: You may step down.

MR. BERRIGAN: The defense calls Dave Nieman to the witness stand.

Page 17

DAVID NIEMAN, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Please adjust the chair so you can speak directly into the microphones. You can scoot that chair up a little. Can you try and get a little closer for us? And you can pull those microphones back. And when you're ready, would you state your full name and spell your last name, please.

THE WITNESS: David L. Nieman, and my last name is N-i-e-m-a-n.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: May it please the Court.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q. Mr. Nieman, could you tell the jury a little bit about yourself? Where do you live, sir?

A. I live in Forest City, Iowa. My address is 1120 330th Street, Forest City.

THE COURT: And can you slow down a little bit too?

THE WITNESS: Okay.

THE COURT: Are you a little bit nervous?

THE WITNESS: Little bit.

3552

BY MR. BERRIGAN:

Q. Mr. Nieman, where is Forest City in reference to the Clear Lake/Mason City area?

A. Oh, about 20 miles west.

Q. How long have you lived in that area?

A. All my life.

Q. Your whole life.

A. (Witness nodded head.)

Page 18

Q. Where did you go to school?

A. Forest City.

Q. Forest City High School?

A. Yeah.

Q. And did you graduate from high school?

A. Yes, I did.

Q. What year might that have been?

A. 1981.

Q. 1981. What have you done for a living most of your life?

A. Little bit of everything from road -- or from construction work to driving semis over the road, factory.

Q. I'm sorry?

A. Factory too.

Q. What kind of work do you do presently?

A. Heavy construction.

Q. Construction work?

A. Yep.

3553

Q. Are you a married or single man?

A. I'm single.

Q. Have you ever been married?

A. Yes, I have.

Q. Do you have any children?

A. I got one boy.

Q. How old is he?

A. He's 14.

Q. Fourteen. I wanted to ask you some questions about the Johnson family, and by that I mean Angela Johnson's family. Do you know Pearl Jean Johnson and her children?

A. Yes, I do.

Page 19

Q.   How do you know the Johnsons?

A.   I kind of grew up with them.

Q.   And what do you mean by that?

A.   My mom and her mom used to be good friends.  We were -- between me and Angie, we were about one year apart, and her older sister and my older sister were a year apart.  We kind of grew up together, same school, same grade.

Q.   So you have siblings that are about the same age as Angela's siblings.

A.   Yep.

Q.   What's the difference, the age difference, between you and Angie?

A.   About one year.

3554

Q.   Year, the one year.

A.   Yeah.

Q.   So when you were going to school, was she in your same grade?

A.   No, one year below me.

Q.   She was one year behind you.

A.   Yeah.

Q.   Okay.  Did you know her when you were going to school?

A.   Yes.

Q.   When did you first get to know the Johnson family?  How old were you?

A.   Probably around eight years old, nine.

Q.   So you've known them quite a long time.

A.   (Witness nodded head.)

Q.   Let me ask you a few questions about Pearl Jean Johnson if we could talk about her for a minute.

Page 20

A.    Okay.

Q.    As a result of knowing this family, did you get to know Pearl Jean Johnson, Angela's mother, pretty well?

A.    Not real, real well.  I kind of stayed away from her.  She was -- at my age she was kind of a different lady.

Q.    And what about her was different than most mothers?

A.    She kind of scared me.  She practiced religion kind of a different way.

Q.    You said your mother was a friend of hers.

3555

A.    Yes, she was.

Q.    What did they have in common with each other?

A.    Lot of it was religion from what I recollect, mostly religion.  My mom tried to help her out in certain ways when it come to religion.  Her -- the other was they were pretty close to the same age.  I don't think they were really much for going to school-wise but -- it was more religion I think.

Q.    Your mother, was she a very religious lady?

A.    Yes, she is.

Q.    And did she and Miss Johnson have the same religious beliefs?

A.    No, huh-uh.

Q.    No.  And how were they different?

A.    My mom talks -- well, she talks a lot about Jesus and God where Angie's mom, she -- we -- I don't know.  From what I recollect, she believes more in casting out demons and where everybody's possessed by demons to where she believes in God but first she believes that people were possessed by demons.

Q.    Did -- go ahead.  I'm sorry.

A.    No.  I guess that's about it.

Page 21

Q.   Did you ever see that yourself, that is, in the presence of Miss Johnson have her talking about demons?

A.   Yeah.  There was a couple times I went to kind of like a little séance, or I don't know what her mom kind of called it where she tried to cast out the devil.

3556

Q.   Did she ever do that with you?

A.   No, huh-uh.

Q.   Or accuse you of having demons in you?

A.   Yeah, I've been accused of it, but she never did it to me.

Q.   Did you see her try to cast out the devil on -- in her own children?

A.   Yes, I have.

Q.   What did that involve?

A.   Just lot of holding her down, praying over her or putting a cross up to her.  Just -- it's the kind of stuff to where I don't really want to remember much.  I don't really remember that much of it.  I know it wasn't a very good scene.  It was scary.

Q.   How did Pearl Jean Johnson's children react to these episodes?

A.   They hated it.

Q.   Did you spend much time over at the Johnson house?

A.   A little bit.  When I was real young, I did.

Q.   Were those good experiences for you?

A.   No, huh-uh, not the best.

Q.   You mentioned that you have some siblings that were close in age to Angela's siblings?

A.   (Witness nodded head.)

Q.   Did you know her sister Wendy, for example?

Page 22

A.    Yeah.

Q.    And Jamie and Jim and --

A.    Yep.

Q.    And Holly?

A.    I don't really remember much of Holly.  She was the youngest one of the group to where she was quite a bit younger than I was.

Q.    Did you and Angela spend much time together kind of hanging out with each other as you were growing up?

A.    A little bit.

Q.    Little bit?

A.    Yeah.

Q.    Do you recall her dropping out of high school?

A.    Yep.

Q.    Do you know what she did after she dropped out?

A.    Got married.

Q.    Got married.

A.    (Witness nodded head.)

Q.    Who'd she get married to?

A.    Steve Hugo I think it was.

Q.    Did you know Mr. Hugo?

A.    Just by name, face.  I never really -- I mean, we knew each other, but that's about it, just from living in the same area.

Q.    All right.  Were you -- after she got married to Steve Hugo, did you see much of her?

A.    No, huh-uh, not really.

Q.    You kind of --

A.    Grew apart.

Q.    -- went your own ways.

A.    Yeah.

Q.    At some point did that change where you kind of came back together, your lives kind of coincided again?

A.    Yes, she married a good friend of mine.

Q.    Who was that?

A.    Arlyn Johnson.

Q.    Arlyn Johnson.  Mr. Johnson was a friend of yours at the time?

A.    Yes, he was.

Q.    And at the time that he married Miss Johnson, were you having regular contact with them?

A.    Yes, I did.  I ended up buying a house -- trailer right beside theirs.

Q.    I'm sorry?

A.    I bought a trailer home right beside their trailer.

Q.    I know you talk quickly naturally.

A.    I'm sorry.

Q.    But if you could try to slow down just a little; okay?
          You bought a trailer right next to theirs.

A.    Yes.

Q.    Did you happen to go to their wedding?

A.    Went to the wedding reception.

3559

Q.    Wedding reception.  Did you happen to notice whether Pearl Jean Johnson was at her daughter's wedding?

A.    Nope.  She wasn't.

Q.    She wasn't there.

A.    Nope.

Page 24

Q. Do you know if she was at the Steve Hugo wedding?

A. I don't -- I don't think so. In fact, I know she's against it.

Q. Against weddings?

A. Steve Hugo's wedding, their first wedding.

Q. Oh, I see. Miss Johnson, Pearl Jean Johnson, was against that.

A. Yeah.

Q. This marriage between Arlyn and Angela Johnson, was that something that surprised you, or had they been dating a long time, or what was the situation?

A. It kind of surprised me a little bit where I know they were -- it was -- I think a lot had to do with she was pregnant.

Q. She was pregnant.

A. Yeah.

Q. And you thought that had something to do with them getting married?

A. Yeah.

Q. After they got married, did you continue to have contact with them?

3560

A. Yes, I did.

Q. And you lived in close proximity to them?

A. Yeah.

Q. What about Mr. Johnson, Arlyn Johnson? Does he go by A.J.?

A. Yes, he does.

Q. How good of friends were you at that time?

A. We were pretty close.

Q. Would you see Miss Johnson and Mr. Johnson on a regular basis?

Page 25

A.    Yes, I would.

Q.    And how did that marriage go?  How was the marriage?

A.    It was kind of -- I don't know.  It was kind of a one-sided marriage where A.J. was a nice person and everything, but when it come to, oh, treating his wife good, he kind of neglected her.  There was no wedding ring.  There was one instance at Christmastime he went out and bought a leather vest for her, and for some odd reason, it didn't fit her, but it fit him real good, and that's all she got.  She actually didn't get nothing for Christmas.

Q.    Mr. Johnson, did he have a motorcycle?

A.    Yes, he did.

Q.    Are you a motorcycle rider yourself?

A.    Yes, I do.

Q.    At some point did that marriage break up?

A.    Yes.

3561

Q.    And after that happened, do you know who Miss Johnson ended up with eventually?

A.    Yes.

Q.    Who was that?

A.    Kirby Thompson.

Q.    Kirby Thompson.  And is this a fella that you knew?

A.    Yes, I knew him too.

Q.    How did you know Mr. Thompson?

A.    Just acquaintance from small town, up at the bar.

Q.    I didn't ever ask you, how big of a town is Forest City?

A.    3,500.

Q.    3,500.  Did you know a lot of people about your age in that town?

Page 26

A.  Pretty much everybody.

Q.  Okay.  What about Angela's father -- did you ever meet him -- Jim Johnson?

A.  No, I didn't.

Q.  Never had any contact with him.

A.  No.

Q.  Did Angela ever talk to you about him?

A.  Not really a lot.  She hated her dad.

Q.  I'm sorry?

A.  She hated her dad.

Q.  She hated him?

A.  Yeah.

3562

Q.  Did she ever tell you why?

A.  Because he more or less neglected her, told her he didn't want nothing to do with the family.

Q.  Did Miss Johnson ever talk to you about her childhood?

A.  No, not really.

Q.  She didn't talk about that.

A.  No, not -- she kept pretty much quiet about most of it. There's some things I think she don't want to remember.

Q.  At some point did Miss Johnson end up with a fella by the name of Terry DeGeus?

A.  Yes.

Q.  Did you know Mr. DeGeus?

A.  Yeah.

Q.  How did you know him?

A.  Just up at the bar, acquaintance, same age.

Q.  He was another one of these people that hung around up there at Forest City?

Page 27

A.    Yeah.

Q.    What did you know about Mr. DeGeus?

A.    He had a temper.

Q.    How do you know that?

A.    Just from all the fights he got into.  He was known as -- he was known as a bad ass.

Q.    Did you ever have any fights with him yourself?

A.    No, huh-uh.

3563

Q.    You ever see him involved in any fights?

A.    Yeah.

Q.    You have.

A.    Yeah.

Q.    And how did he do?

A.    Well, nobody's ever knocked him down to where he kind of -- not really black out, but he gets such an adrenaline rush that you could hit him with a baseball bat and it wouldn't even faze him; I mean literally wouldn't even faze him.

Q.    And you've seen him actually fight yourself.

A.    A little bit.  It got broke up right away.  I seen him get into a tumble up at the bar.

Q.    Was it usually in bars?

A.    What's that?

Q.    Were these fights in bars?

A.    Most of them were.

Q.    How -- from your observations of the relationship between Mr. DeGeus and Miss Johnson, what kind of a relationship was that?

A.    I thought it was good at first, but one instance I come across her walking down the highway where he had beat her on up
Page 28

and pushed her out of the vehicle while it was still rolling and just left her walking down the road.

Q. How do you know that happened?

A. I picked her up.

3564

Q. You picked her up on the side of the road?

A. Yeah.

Q. When you picked -- was this during the daytime or at night?

A. No, it was at night.

Q. At night. And when you picked her up, what was her physical condition?

A. It wasn't good. She was cut up a little bit just from tumbling on the rocks and red marks on her face from getting hit.

Q. You said there were cuts, and I just didn't understand you.

A. She was -- like cuts and scratches from the rocks and stuff just from rolling on the ground, from him pushing her out of the vehicle, like red marks across the side of her face or stuff. I don't know if he slapped her or hit her or what happened to her. She just said her and Terry got in a fight and he pushed her out of the vehicle and left her.

Q. What did you do when you saw Miss Johnson in this condition?

A. I took her to K-Way gas station so she could get cleaned up.

Q. This is a gas station in Forest City?

A. Yeah.

Q. Did she get cleaned up there?

A. Yeah.

Q. Did you take her to the hospital?

Page 29

A.    No, huh-uh.  Terry ended up showing up when I was at K-Way.

Q.    I'm sorry?

A.    Terry showed up when I was at K-Way.

Q.    He showed up at the convenience store?

A.    Yeah.

Q.    What happened when he showed up at the convenience store?

A.    He talked to Angie for a minute where they ended up leaving together.

Q.    They ended up leaving together?

A.    Yeah.

Q.    How did you feel about that at the time?

A.    I told her I wasn't happy.

Q.    Why not?

A.    I thought she should get away from him.

Q.    Were there other instances in which you observed Miss Johnson in a condition where she appeared to have suffered some type of a beating?

A.    Not really.  Just -- we kind of -- when she started going out with Terry, we grew apart.  I really didn't have much to do with her just for the fact of Terry.  Terry was trouble.

Q.    So you stayed away from the both of them.

A.    Yeah.

Q.    You and Mr. DeGeus were never buddies then.

A.    No.  We were acquaintances.

Q.    During the time that Angela and Terry DeGeus were together,

did you know anything about their drug usage?

Page 30

A.    I knew Terry dealt.

Q.    Dealt?

A.    Yeah.

Q.    What does that mean?

A.    Meth, he dealt meth.  As far as how much he did, I don't really know that, but I think Terry was a dealer.

Q.    Do you know a fella by the name of Dustin Honken by any chance?

A.    Just by hearsay.  I never met him.

Q.    You never met the guy.

A.    I did meet him one time I guess.  It was when Angie started going out with Todd -- a friend of mine, Todd Graham.  We stopped by her place, and he was there, and she introduced me for a minute.  That's the only thing I knew about him.

Q.    Well, after you said you sort of stopped seeing Angie when she was with Terry, did you ever -- lives ever get back again together?

A.    After she got -- actually after she broke up with Terry and Dustin Honken and she started going out with a friend of mine Todd, that's when we got back together again.

Q.    Todd Graham.

A.    Yeah.

Q.    Now, she's been incarcerated for quite a while.

A.    Yeah.

3567

Q.    Have you kept in touch with her while she's been incarcerated?

A.    Yes, I have.

Q.    Do you happen to know her daughters, Mr. Nieman?

A.    Yes, Alyssa.

Page 31

Q.   You know Alyssa.

A.   Yeah, real well.

Q.   And how do you know Alyssa?

A.   Been trying to help her out where I can.  When Angie calls me, I let her daughter who's there and her granddaughter talk to her mom that way so they can talk.

Q.   So they come to your house to talk?

A.   Talk on the phone.

Q.   On the phone.  Are -- those calls, do they cost you money?

A.   Yeah.

Q.   How much is it?  Do you know?

A.   Oh, it's usually about $15 every week I suppose.  It all depends how long they talk, but 10 to $15 a week.

Q.   And how often do they come over and use your phone?

A.   It varies.  Sometimes twice, two to three times a month.

Q.   And these are collect calls from the jail?

A.   Yeah.

Q.   What about you yourself?  Do you have contact with Miss Johnson?

A.   On the phone.

3568

Q.   On the phone.

A.   Yeah.

Q.   Has she written you letters?

A.   Yes, she has.

Q.   And what do you talk about when you talk to her?

A.   About hopefully everything's going good for her and just it will be over with soon where hopefully, you know, everything will turn out all right.

Q.   When these calls take place with her daughters on the

Page 32

phone, are you there?

A.   Yeah.

Q.   What kind of relationship does she have with her daughters?

A.   Real good.

Q.   Real good.

A.   Most of the time there's crying going on.

Q.   Crying going on?

A.   Yeah.

      MR. BERRIGAN:  That's all I have.  Thank you, sir.

      THE COURT:  Mr. Williams?

      MR. WILLIAMS:  Thank you, Your Honor.

                      CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.   Good morning, Mr. Nieman.  I want to talk to you about some of these topics that defense counsel covered with you.  First of all, you continued to have contact, you indicated on direct

                                                      3569

examination, with Angela Johnson after her involvement with Dustin Honken and Terry DeGeus; right?

A.   Yep.

Q.   Okay.  Know somebody by the name of Rick Summers?

A.   Yes.

Q.   Rick Summers ended up having a relationship with Angela Johnson during the time period of -- what was it?  About 1997, 1998?

A.   Something around in there, yeah, around in that area.

Q.   Yeah.  You actually introduced them; right?

A.   Yep.

Q.   And you introduced them because you knew that Angela Johnson was moving methamphetamine at a cheaper price than what

                      Page 33

Rick was able to purchase it for at that time.

A. No, huh-uh. I introduced them just as friends.

Q. You introduced her because you knew -- you told Rick Summers that Johnson paid $600 per ounce and that he was paying about 4 times that price from his Mason City source.

A. No, no.

Q. Isn't it true that you purchased methamphetamine from Angela Johnson during the period of 1997, 1998?

A. Nope. I've never purchased no meth from her.

Q. Never have.

A. Never have.

Q. How about Terry Olson? Wasn't that another one of her

3570

customers back in 1998?

A. I know they were friends.

Q. And you didn't continue to receive methamphetamine from Angela Johnson during the time period 1998.

A. No.

Q. That's your testimony?

A. Yes, it is.

Q. What is your involvement with methamphetamine, sir?

A. As far as my involvement?

Q. Yeah.

A. As far as -- I don't understand what you mean.

Q. Well, have you been a user of methamphetamine, sir?

A. Yeah, I've done it before.

Q. Okay. And during 1998, who were you getting your meth from?

A. Not from Angela or from -- from Rick Summers or anybody. I more or less -- if somebody turned me on to some, I'd do some.

Page 34

Q. You indicated that Angela Johnson was beaten up from -- or beaten up by Terry DeGeus on a number of occasions as part of your testimony?

A. I know one time for sure, the time I picked her up.

Q. So she would, you would agree with me, have a pretty strong motive to seek revenge on him at some point, wouldn't she?

A. No. I guess I really can't answer that. I'm not sure -- I'm not sure how she feels about that. I know she wasn't happy

3571

what he done to her, but she loved him, so what revenge could there have been?

Q. You talked about your relationship with Alyssa Johnson, the fact you knew her. Did she, in fact, stay with you for a period of time, sir?

A. When Arlyn Johnson was living with me.

Q. When what?

A. When Arlyn Johnson was staying with me.

Q. Okay. Didn't she kind of move in with you for a period of time after Angela Johnson was arrested on these charges?

A. No, she never did.

Q. Who's Rita Chumbly?

A. My last girlfriend.

Q. Okay. And wasn't there a period of time that Alyssa was spending a lot of time with you and Rita?

A. No. Alyssa was out -- it was during the summertime, and she was picking my yard up just trying to do some work for money I was giving her, actually all the money I helped her out with with her mom for phone bills and stuff. She was doing work out there.

Q. And there's been some communication between Angela Johnson

Page 35

and you and Rita concerning your contact with Alyssa, hasn't there?

A. Yeah, because she thought we were doing something together, but we weren't.

3572

Q. In fact, there's one point where Angela Johnson became pretty angry with Rita, didn't she?

A. I wasn't there on the conversation, but that's what I heard there was an argument between the two of them over the phone.

Q. Yeah. And during that phone conversation, it was just this last September or October, wasn't it?

A. About that area.

Q. Yeah, just this last fall. In fact, during that conversation, Angela Johnson got so upset with Rita that she threatened her and said that if you don't leave Alyssa alone I'm going to take Dave away from you, and then I'm coming after you. Isn't that how it was done?

A. No, my -- Rita told me that she threatened to take her away -- take me away from her, not come after her but she was going to take me away from Rita.

MR. WILLIAMS: I have nothing else, Your Honor.

THE COURT: Mr. Berrigan?

REDIRECT EXAMINATION

BY MR. BERRIGAN:

Q. Be kind of hard for Angela Johnson to come after Rita Chumbly, wouldn't it?

A. Yeah.

Q. Yeah. Let me ask you something. This Rita Chumbly, where does she live?

A. She lives in Forest City.

Page 36

3573

Q. Does she have a car?

A. Yes, she does.

Q. Does she know where Sioux City, Iowa, is?

A. Yes, she does.

Q. How about this guy Rick Summers? Where does he live?

A. He lives in Belmond now.

Q. Where's Belmond?

A. About 35 miles to the south.

Q. Thirty-five miles to the south? And Mr. Summers, does he have a car?

A. Yes, he does.

Q. Think he knows where Sioux City, Iowa, is?

A. Yeah.

MR. BERRIGAN: Thanks.

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: You may step down.

Ready to call your next witness?

MR. BERRIGAN: We are, Your Honor. Dr. Lee Evans.

THE COURT: Members of the jury, why don't you take a stretch break.

ROSWELL LEE EVANS, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Please adjust the chair and the microphones so you can speak directly into the microphones. And would you state your full name and spell your last name.

3574

THE WITNESS: My full name is Roswell Lee Evans Junior. My last name is E-v-a-n-s.

Page 37

THE COURT:  Thank you.

Mr. Berrigan?

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q.   Dr. Evans, good morning.

A.   Good morning.

Q.   Where do you live, sir?

A.   I live in Auburn, Alabama.

Q.   And what do you do for a living?

A.   I am a professor there and also serve as the dean for the school of pharmacy at Auburn University.

Q.   How long have you been the dean at Auburn University School of Pharmacy?

A.   Little over ten years.

Q.   I want to ask you a few questions about your background and qualifications before we talk about the subject matter that you're here to testify about; okay?

A.   That's fine.

Q.   Could you tell the jury a little bit about your education?

A.   Certainly.  I received my bachelor of pharmacy at the University of Georgia.  Subsequent to that I completed my doctor of pharmacy degree at the University of Tennessee Health Sciences Center in Memphis, Tennessee.  I completed a

3575

postgraduate residency at the Medical University of South Carolina in Charleston, and that's my formal background, training background.

Q.   After you completed your formal education, what was your initial work experience?

A.   My initial position was with the University of Tennessee

Page 38

College of Pharmacy in Memphis as an assistant professor. And I worked in psychiatry and taught pharmacy and medical students.

Q. How long did you work at the University of Tennessee?

A. I was there for four years. Subsequent to that I joined the faculty at the University of Missouri, Kansas City, the school of pharmacy and the school of medicine.

Q. What did you teach there?

A. I taught psychiatry essentially, psychiatric medicine, therapeutics, how to use medications to treat psychiatric illnesses to both pharmacy and medical students and to psychiatric residents.

Q. I need to ask you because you're not a psychiatrist, what were you doing teaching psychiatry there?

A. Well, the issue with psychiatric illnesses is that they're primarily treated now with medications. And so I am a, quote, unquote, expert, if you will, in the treatment of psychiatric illnesses with medications.

Q. Because of your education and knowledge of the medications.

A. Yes.

3576

Q. How long did you teach at the University of Missouri?

A. I was there for a little more than 19 years. And prior to my leaving, I was the department head for pharmacy practice for the school, had obtained the rank of professor in both medicine and in pharmacy.

Q. So you were the head of the school of pharmacy at the University of Missouri, Kansas City?

A. Actually I was the head of one of the departments in that school. There's also a dean there.

Q. I see.

Page 39

A.    So I worked both clinically and administratively for a number of years before I left.

Q.    And where did you go then?  After your 19 years with the University of Missouri, where'd you go?

A.    I left there, and in '94, '95 I joined the faculty at the Auburn University School of Pharmacy as dean and professor and have been there ever since.

Q.    Now, the position you have presently as dean and professor, what are your chief responsibilities?

A.    For the overall educational operation of the school of pharmacy including obviously the three departments that we have: The research departments, social behavior departments, and practice departments.  I have a faculty of 66.  Over half are clinicians or engaged in day-to-day patient care activities and teach students at the bedside, again, including both pharmacy

3577

and medical students because they're based in medical teaching centers.

Q.    How many students attend the University of Auburn School of Pharmacy?

A.    There are -- we admit 125 students a class, and it's a 4-year program, professional program.  So there's -- at this juncture I think there's a little over 430 students enrolled.

Q.    Are there any other universities in Alabama that have schools of pharmacy?

A.    Yes.  There's a private university.  Samford University has a school of pharmacy in Birmingham.  Other than that, those are the only two schools in the state.

Q.    Do you have any teaching responsibilities in your present position?

Page 40

A. Some. I still maintain a clinical practice. All of our students start seeing patients day one, and they're assigned to a team. I serve as a team leader on one of those teams. So I still get my fingers wet in clinical practice on a regular basis.

Q. Are you required to be licensed in your position?

A. Yes, I am. I'm licensed in actually Missouri and Georgia. I am not licensed in Alabama. And so I have to -- and I end up working with a licensed practitioner in order for me to do what I do, but probably 95 percent of what I do is administrative now so . . .

3578

Q. And then in order to keep up your licensure requirements, are you obligated even as the dean of the school of pharmacy to continue pharmaceutical education classes every year?

A. Yes. Pharmacists are required to maintain continuing education credits on a regular basis, submit those to the Board of Pharmacy every year. In addition, I'm a board-certified psychiatric pharmacist and have to maintain that certification through examination.

Q. Dr. Evans, have you ever been called to testify before in a court of law?

A. Yes, I have.

Q. Approximately how many times would you say you've done that?

A. Sort of a rough guess, I would imagine about 20 times.

Q. When did that start that you were being called in to testify in court cases?

A. 1985 when I was in Kansas City.

Q. And who was it that asked you to testify?

Page 41

A.    I think it was you, sir.

Q.    Did you ever testify for the prosecution in cases?

A.    Yes, I have.

Q.    Have you done that?

A.    I have.  Only a few times, but I have qualified -- I mean I have testified for the prosecution.

Q.    Do you belong to any professional boards or associations?

3579

A.    Yes, I do.

Q.    Could you tell the jury which ones?

A.    I belong to the College of Psychiatric and Neurologic Pharmacists, the American Society of Health Systems Pharmacists, the American Pharmacists' Association, the Alabama Pharmacy Association, the American Association of Colleges of Pharmacy. And I'm sure I'm missing one or two, but that's pretty much it. Those are the main ones.

Q.    On these occasions over the years when you have been asked to testify, what has usually been the subject matter of your testimony?

A.    Most often it has been substance-induced problems with people's behavior, oftentimes capital cases looking at the impact of drugs on individuals' behaviors.

Q.    Are you being compensated for your time appearing to testify today?

A.    I sure hope so.

Q.    What rate is it that you charge for your services as the dean of the school of pharmacy?

A.    I charge a flat rate of $2,500 a day for testimony and then prep time.

Q.    And you traveled here from Auburn University here recently

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3138 of 3592

to testify?

A.   Yes.   Yesterday I spent most of the day getting here.

Q.   Getting here.   In this particular case, Dr. Evans, how were

3580

you contacted, and what is it that you were asked to do
specifically?

A.   I was contacted by you, and I was asked to appear to talk
about methamphetamines, their actions, what do they do, and
pretty much from an informational perspective.

Q.   Have you -- do you know this lady seated to my left here,
Miss Johnson?

A.   No, I do not.

Q.   You never seen her before?

A.   No.

Q.   Have you been provided with any material concerning her
case, investigative reports from police departments or any legal
documents or charges or anything like that?

A.   No.

Q.   Are you here to testify about anything that has to do with
her state of mind at the time of the commission of the
offenses --

A.   No.

Q.   -- that we're here about?

A.   No.

Q.   You were just asked to talk about methamphetamine.

A.   Correct.

Q.   Okay.   So why don't we do that.

A.   Okay.

Q.   What is methamphetamine exactly?

3581

Page 43

A.    Well, there are a lot of terms for it.  Most of us would recognize it as a stimulant, an upper.  To be more precise, it's a psychostimulant that has a very, very long history, both therapeutically and illicitly.

Q.    When you say therapeutically, just to be clear, what are you talking about?

A.    Okay.  When the drug was first introduced, it had a therapeutic use.  The drug was used in the treatment of people with attention deficit disorder.  It was also used as a weight loss drug.  It's a kissing cousin, if you will, to amphetamine, which was a parent compound, and methamphetamine was an isomer of amphetamines.  There's some differences between the two drugs that caused its demise in --

Q.    Caused the demise of one of those two?

A.    Yeah.  Methamphetamine is no longer a therapeutic entity.  We do not use the drug at all in medicine.

Q.    Why not?

A.    Well, the reason is it's just so incredibly addictive that it really made the black market and was abused as a prescription drug, and now it's abused as a drug that's made illicitly and is abused in our country rather rampantly right now.

Q.    Is methamphetamine also known by other names or terms?

A.    It has a dozen names, but the names that we probably are familiar with are chalk or crank or crystal, a number of other names.  But those are the ones we probably recognize the

3582

easiest.

Q.    From your experience with medications over the last few

Page 44

decades in research regarding methamphetamine -- and you mentioned that it's no longer used for legitimate purposes -- have you been able to uncover any research regarding the prevalence of its illicit, illegal use in the United States?

A. Well, unfortunately about 7 percent of the adult population has been exposed at least once to methamphetamine casual use. The incidence of abuse is somewhere around 1 percent of our population which is really rather astounding because that rivals some chronic diseases that we know that are rampant in our society like schizophrenia.

Unfortunately, what's happened to the drug from an epidemiological standpoint is that it has moved into rural communities in this country. It's so easy to make, and it doesn't take much skill to do it. It's a cookbook approach. You can literally get on the web, in just a few minutes get the recipe about how to make it.

And so it's -- and it's also -- street value is quite high, so we're seeing this drug become an epidemic, and it's been an epidemic now for the last probably ten years, and it doesn't seem to be abating very much because of the ease of access to making the drug.

Q. You mentioned that these recipes, if you will, are apparently easily available.

3583

A. Yes.

Q. Are they uniform, do you know? That is, is there any one particular way to make methamphetamine?

A. No. The most common way is to use a base compound that's already what we call a simpathomimetic, and the one we all know is pseudoephedrine. We use it every day for colds. And it's a

Page 45

very effective drug, but it doesn't take much to take that drug and convert it to methamphetamine.

And so, you know, essentially bathtub operations will take those base compounds and convert them. There are other compounds that could be used, but at this juncture pseudoephedrine is readily available. It's now being controlled somewhat in the United States.

I think this state, for instance, has just made pseudoephedrine only available behind the counters. The pharmacist controls release of the drug. But in Canada and Mexico, it's easily brought in the country. So there's still a huge amount of access to the drug.

And right now if you looked at the southwest which is probably one of the biggest manufacturing areas for methamphetamine and distribution areas, it's probably because of the adjacency to Mexico. So there's a huge amount of drug that's brought in.

Q. And I know you don't live in the midwest any longer, Doctor. You've kind of gone back home. But do you know whether

3584

methamphetamine is also a serious problem in this part of the country?

A. Yes. The midwest is one of the worst. It's actually becoming more intense. If you talk to law officials, they talk about the number of busts they make a year which is pretty extraordinary for a relatively rural state. Even my own state, the county in which I reside, which only has a little over 150,000 people in the county -- and the sheriff's a friend -- they made over 400 busts last year.

Q. For methamphetamine.

Page 46

A.   For methamphetamine labs.

Q.   Labs.

A.   Yeah.

Q.   How is this drug used?  That is, how is it used by the people that use it?

A.   Well, it can be used a lot of ways, but today the primary route is smoking it, and the reason it's smoked is because, number one, you don't have to inject it; and, number two, you get almost the same effect, the same intensity of effect as you do from IV use.  So, you know, essentially people smoke it.

It's smoked in a -- just like you would smoke cocaine. The crystal rock compound that you get is heated, and the drug evaporates.  You inhale it, and there's an intense, immediate effect from the drug.  It can be used IV.  It can be snorted, and it can be taken orally.  But those routes don't provide the

3585

same sort of impact.

Q.   You mentioned cocaine when you were analogizing its use. Is this drug different in terms of its effect than smoking cocaine or crack?

A.   It is different based on the fact that cocaine intensity of effects lasts for just a few minutes.  What you find with a cocaine addict is that they're readministering the drug every 15, 20, 30 minutes in order to maintain a high.  This drug, methamphetamine, the high lasts for quite some time.  So there is not quite as much administration.  You get the same sort of euphoric high.

Some of the complications from the drugs are a little different, but methamphetamine is quite a stimulant.  When you talk to people who use the drug, they'll tell you that it's

Page 47

almost a substitute for sex because the intense rush that you get. But there is such a euphoria secondary to this massive infusion of the drug into someone's body and the central nervous system that it's pretty difficult to replicate any other way. So that's the reenforcing part of the use of the drug.

Q. What -- physiologically, what is really going on in the brain that causes this euphoria or the rush or high that we're talking about?

A. Methamphetamine causes a release of a number of what we call neurotransmitters, and some people might recognize the names dopamine, serotonin. It causes an intense release, a

3586

bolus release of those neurochemicals, neurotransmitters, into the cells, the nerve endings. And that's what causes the rush, the euphoria, centrally.

And basically when you first start the drug, those receptors repair themselves, regenerate the amount of dopamine or serotonin in those receptors, and you can start all over again.

But as you use the drug for a prolonged period of time, those receptors that contain those chemicals begin to become very sparse. We almost wear them out if you use that analogy. And so the density of those vesicles that contain those neuron -- those catecholamines, those substances, becomes very, very sparse. And in order to get the impact of the drug, you use more and you use it more frequently. That also causes some long-term effects of the drug.

Q. Before we talk about the long-term effects, I know you're using terms like neurotransmitters, and we'd be interested knowing what neurotransmitters actually are.

Page 48

A.   Okay.  Neurotransmitters are substances that basically are transmitters in terms of thoughts.  When you look at our brain, it's like a massive network of connections that control various parts of our physiology, our thinking, our behavior.

So if you're, for instance, thinking that catecholamines, these transmitters, actually help you think, they control thinking, they control motion, they control

3587

everything that happens to us, they control even heart rate.

So when you go to affect our physiology and the way that we work from a human perspective, what we're doing with drugs is beginning to affect those transmitters and those receptor sites.  The transmitter's released.  It goes across, if you will, a gap, what we call a synapse, and has an impact on the other side of the neuron.  And that causes the transmission of electrical impulse that has us doing everything.

So those drugs have an impact on the way we transmit messages throughout not only our brain but the rest of our body.

And the brain, there are parts of our brain -- our brain is very, very densely populated with substances, neurotransmitters like serotonin, dopamine, and a few others that have different functions, can have even different functions on the same receptors.

So it's complex, but if you keep it simple, the idea is that these drugs basically help us communicate internally about how we do things and how we think and how we learn because they also impact how we learn.

Q.   And you mentioned that methamphetamine has a detrimental permanent effect on these neurotransmitters?

A.   Yeah.  We've always suspected that individuals that are --

Page 49

abuse methamphetamines chronically would have some long-term residual effects. Most of that, however, has been kind of anecdotal or based on postmortem examination of brain slices.

3588

Today we have technology that lets us look at what happens to those parts of the brain while people are alive and while they're abusing the drug. PET scan technology allows us to do that.

What we know now is that individuals who are using chronically and abusing drugs like methamphetamine and cocaine in particular begin to see a reduction in the number of those receptor sites, those storage vesicles, in the brain. And it's pretty obvious. Not only that, it appears to be a long-term effect.

So there is some improvement once an individual stops the medication, stops the drug, but there is some long-term residual effects that don't go away. So our suspicion clinically has now been confirmed by multiple studies, and that work is going on right now. The technology is there now for us to look at that, and because of the huge epidemic that we have of methamphetamine, the National Institute of Drug Abuse, NIH, are very, very interested in seeing what is actually happening as a result of long-term use of methamphetamines and other stimulants.

Q. Is that a different effect -- this reduction in the storage sites in the brain and the receptors, is that -- this permanent effect, is that different than the results of other types of drug abuse?

A. Far as we know. I'm not aware of any other studies at this

3589

Page 50

point where people have looked at chronic use of anything that would cause that. Now, there are other drugs obviously that impact the dopamine receptors, serotonin receptors, but there is nothing at this juncture that would suggest -- for instance, antipsychotic medications. Everybody is familiar with drugs like Thorazine and Haldol and those kinds of things. If you're not, just only from movies. But those drugs work because of their impact on dopamine receptors. But there is nothing yet that that would say is an effect, similar effect.

Q. What are the long-term repercussions for an individual who has had permanent damage in terms of reduction of storage sites and receptors in the brain?

A. Well, I mean, the issue of an individual being able to control outbursts, control anger issues, control perhaps even some memory issues would be there. The propensity to become readdicted is higher. The propensity for becoming psychotic as a result of using the drug is higher.

So if you've got a reduced number of receptors and you introduce something like another stimulant, you can easily see profound side effects.

Q. Are there medical repercussions, not mental or psychiatric but actual physical problems that can result from this?

A. Yes. Other organ systems, the heart is also potentially engaged, and we know that chronic exposure to methamphetamines has caused cardiovascular problems.

3590

Q. Is there any treatment available that you're aware of as a result of your experience and expertise for methamphetamine abuse?

Page 51

A.    Abstinence.

Q.    Abstinence.

A.    Abstinence.  There is no drug treatment obviously for the problem.  The big issue is being able to get somebody into a program that would help them stay off the drug and to allow the brain to repair to the extent that it will.

From a cardiovascular standpoint and other organ systems, there are some treatments that would have to be engaged if there was a clinically significant problem like whether or not we have induced arrhythmias and stuff like that or valve problems.  But from a CNS perspective, it's just time and abstinence.

MR. BERRIGAN:  That's all I have.  Thank you.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  Thank you.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.    Good morning, Your Honor -- or good morning, sir.

MR. WILLIAMS:  Thank you, Your Honor.

Q.    Good morning, sir.

A.    I like the promotion.

Q.    Yeah.

3591

THE WITNESS:  We could exchange jobs.

THE COURT:  You'll have to talk to the President about that.

THE WITNESS:  Okay.

THE COURT:  And, you know, for 2,500 bucks a day, I'd switch with you in a heartbeat.

MR. WILLIAMS:  I think I'd switch with either one of

Page 52

you.

BY MR. WILLIAMS:

Q.  I just want to talk to you a little bit about the basis for your understanding just so I have a better idea of how you came to this knowledge.  In your clinical work, have you treated people on methamphetamine from time to time?

A.  Yes.  Yes.  As a matter of fact, when I was in Kansas City, 43 percent of the pop -- I go back a ways, so if you go back the last big bolus of academics of methamphetamine, it's the late '60s, early '70s, and I was there during that period of time and got to treat tons of people.  The psychiatric population that we treated, 43 percent of them were involved with stimulants.  So it was a mixed diagnostic population.  And so we had a lot of experience with methamphetamine as well as cocaine.

Q.  Meth was a real big drug back in that time period, but it's had a resurgence here recently.  Is that fair to say?

A.  Yeah, it was a big drug then.  It dropped off.  And then now it's back.

3592

Q.  The recent epidemic, have you been involved in treating people involved with the drug trade and drug usage during this recent period in the last ten years?

A.  In the last ten years my experience has been relatively local in Auburn.  The patients that my team follows are psych patients for the most part.  They give me the psych cases, and my team is pretty experienced with that.  And so yeah, we are involved in those cases, but it's not as intense as it was when I was in Kansas City on the frontline every day.

Q.  Sure.  Nonetheless, you're familiar that -- based on your education and your training and your experience, frankly, you

Page 53

know that there are people involved in the drug trade who are out there for profit, not for the drug use.

A.   Yes.

Q.   Right?

A.   Exactly.

Q.   And you also know from your experience that methamphetamine can have different effects on different people.

A.   Yes.

Q.   Some people become highly addicted to it; right?

A.   Yes.

Q.   And other people can kind of use it to some degree recreationally?  They can stop, they can start, they can stop, they can start.

A.   Yes.

3593

Q.   Fair enough?

A.   That's true.

Q.   So the people that are involved in this drug trade for profit are actually contributing to this horrible epidemic of the methamphetamine in our culture, aren't they?

A.   Absolutely.

Q.   The -- there is actually a diagnosis for drug dependency, isn't there, recognized in the field of psychiatry?

A.   Yes, yes, there is.

Q.   Any awareness of whether this defendant in any way has been diagnosed with that problem?

A.   No, I don't know.

Q.   In fact, you were right up front with us to begin with. You really don't know anything about this particular case.

A.   No, I don't.

Page 54

Q. And you weren't asked to present any testimony about this case.

A. No, I wasn't asked to evaluate the defendant, no.

Q. Okay. And there's nothing stopping you from evaluating the defendant. You just weren't asked to do it.

A. True.

Q. So -- and I know this is obvious, but I want to go through this. You have no idea then what Angela Johnson's drug usage was during any time period.

A. No, I don't.

3594

Q. You don't know how often she used methamphetamine?

A. No.

Q. You don't know what quantity of methamphetamine she used?

A. I do not.

Q. You don't know during what time period she used methamphetamine.

A. No, I don't.

Q. You would have no reason to dispute the report that she quit using methamphetamine during her pregnancies.

A. No.

Q. So you'd have no reason to dispute that during the time period of July of 1993 and November of 1993 when she was involved with murdering five people she wasn't using methamphetamine during that time period?

A. I have no idea.

Q. You'd have no idea whether the methamphetamine use she was involved with had any impact on her ability to function in day-to-day society.

A. No, I don't.

Page 55

Q.   And in substance you're here to educate this jury on the effects that methamphetamine could have, but you have no basis to suggest to this jury that any of these effects you've talked about, any of these possible long-term damage to the brain, any of these physiological effects has any application whatsoever to Angela Johnson?

3595

A.   That's true.

        MR. WILLIAMS:  Nothing else, Your Honor.

        THE COURT:  Mr. Berrigan?

        MR. BERRIGAN:  Just very briefly.

                    REDIRECT EXAMINATION

BY MR. BERRIGAN:

Q.   Doctor, what do we know from the experience and research of methamphetamine regarding its rate of addiction versus other illicit drugs as well?

A.   Right.

Q.   What do we know about that?

A.   We know that the exposure to methamphetamine has a very high likelihood leading to addiction, especially with its repeated use.

        MR. BERRIGAN:  That's all I have.  Thank you.

        MR. WILLIAMS:  Nothing, Your Honor.

        THE COURT:  Okay.  You may step down.

        THE WITNESS:  Thank you.

        THE COURT:  Members of the jury, why don't you take a stretch break.

        And are you ready to call your next witness?

        MR. BERRIGAN:  We are, sir.

            DOUGLAS BOOK, DEFENDANT'S WITNESS, SWORN
                        Page 56

THE COURT: Okay. Please be seated in the witness box. Try and adjust the chair and the microphones so you can

3596

speak directly into the microphones. And would you tell us your full name, please, and spell your last name.

THE WITNESS: Douglas Wayne Book, B-o-o-k.

THE COURT: Mr. Stowers?

DIRECT EXAMINATION

BY MR. STOWERS:

Q. Can you tell us, sir, how it is that you're presently employed?

A. I am the chief of police at Forest City, Iowa.

Q. And how long have you held that position?

A. Since 1974.

Q. And have you been in law enforcement since before that time?

A. Yes, I started in law enforcement in 1968.

Q. So you've had a law enforcement career that's spanned some 37 years at this point; is that true?

A. Yes.

Q. And can you describe for the jury your background, your training since you've been the chief of police for Forest City?

A. I've gone to numerous seminars on management, on basically law enforcement topics, attended the Iowa Law Enforcement Academy in 1968, have a bachelor's degree in law enforcement from Truman State University in Kirksville, Missouri.

Q. And I take it that the Forest City Police Department, if you're the chief of police, you must have other officers that

3597

Page 57

work for you?

A.    Yes.

Q.    Okay.  And about how big is that police force?

A.    I have eight other officers that work for me.

Q.    And has the size of your department fluctuated over your many years there?

A.    Yes, it has.

Q.    What's the range been?

A.    When I started in 1968, it was 4.

Q.    And so it's grown to eight?

A.    It's grown to nine, from four to nine.

Q.    Nine?  Do you know an individual or did you know an individual by the name of Terry DeGeus?

A.    Yes.

Q.    And how did you know him?

A.    Well, through law enforcement.  I mean, it was not a social contact with him.  It was through my occupation as a police officer.

Q.    And did you have occasion to have contact in your role as a police officer in Forest City with Mr. DeGeus?

A.    Yes.

Q.    And was there a time, directing your attention to 1985, when you had some contact with him?

A.    Yes, there was.

Q.    Okay.  And can you describe that for the jury?

3598

A.    I was called out to assist some officers.  There was a party going on, and there was a person arrested, and they were having trouble controlling him, and I was requested to respond

Page 58

to the scene and assist. That person they were having trouble controlling was Terry DeGeus.

Q. And what happened when you got there?

A. Well, he was resisting arrest, and we had to subdue him and take him to jail.

Q. And can you describe what he was doing, what had to be done to get him into custody?

A. At the time I arrived, the officers -- there was two officers on the scene -- had just gotten him into handcuffs, but they were still having trouble getting him into the backseat of the patrol car. So the three of us finally got him in the backseat of the patrol car, and he was taken to jail.

Q. What was Mr. DeGeus doing, if anything, that was creating difficulty in getting him into the squad car?

A. Everything he could to resist: Kicking, trying to head-butt us, just generally resisting.

Q. Can you describe Mr. DeGeus's physical condition as you observed it in 1985?

A. I would say he was in very good physical condition, excellent physical condition. He was very strong.

Q. Was there a time after that when you would have had some contact with a woman by the name of Angela Johnson?

3599

A. Yes. You mean in regard to Mr. DeGeus?

Q. Yes, in connection with Mr. DeGeus.

A. Yes.

Q. And can you describe for the jury what that contact was and approximately when you recall that occurring?

A. That would have occurred when she and Mr. DeGeus were I believe living in Leland and operated a bar in Forest City

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3155 of 3592

called the Silver Bullet. And at that time -- it was in that time span. I don't recall the dates. But we received a radio call from our dispatch that there was a person laying alongside Highway 69 north of Forest City and had either been thrown from a car or at least some medical emergency was in the process there.

So being about two miles outside of our jurisdiction -- the sheriff's department was farther away -- asked us to go, and I was the first officer to respond.

Q. And what did you observe when you got to the location?

A. I observed a female laying on the side of the road, sort of on the shoulder in the ditch area and obviously injured -- beaten up or found out later probably beaten up but very bloody.

Q. And can you describe her condition a little bit better for the jury?

A. Blood all over her face, blood on her clothing, swollen facial features.

Q. Did you observe any blood emanating from her nose or her

3600

mouth?

A. Yes.

Q. And did you recognize this woman?

A. No, I didn't.

Q. Did you know -- prior to the time that you encountered this female, did you know Angela Johnson?

A. Yes, I did.

Q. And did you recognize her when you encountered her at first that evening?

A. Not at first. As I talked with her, then I realized -- I think I might have even asked her name, and then after that it

Page 60

was obvious who I was talking to. But by facial features, no, I did not recognize her.

Q. And why didn't you recognize her?

A. Because she was beaten and bloody.

Q. She was in pretty bad shape?

A. Yes.

Q. What was her emotional state when you encountered her?

A. Really she didn't want any law enforcement involvement. I believe if my recollection is correct I called for an ambulance and she didn't want to go in the ambulance, she didn't want to talk about the incident. We assumed that she had been assaulted and she didn't want to give any information about that. I believe we even talked about the assailant being Terry DeGeus, and she didn't say it was, but she didn't want to file any

3601

charges and didn't want us to pursue it.

Q. You had a pretty good idea this was the work of Mr. DeGeus; is that right?

A. I assumed that, yes.

Q. And why would you assume that Mr. DeGeus had assaulted her?

A. Because there was a number of what we refer to as domestic abuse incidents at that time in their relationship, most of them outside of Forest City. I don't recall any at the Silver Bullet. But I know the county, both Hancock and Winnebago County, had dealt with that.

Q. In connection with Mr. DeGeus and Miss Johnson.

A. Yes.

Q. And did any charges get filed out of that contact with Ms. Johnson?

A. No, sir.

Page 61

Q. Did you leave her there, or did you transport her somewhere, or how did that go as best as you can recall it now?

A. As best I recall, the ambulance arrived and checked her out, and I believe she refused to go anywhere with them. I don't know if she sought medical attention later. I returned to Forest City and just went back on patrol.

Q. Did she have a vehicle there in the area where she was?

A. No, she didn't.

Q. Was she left there at the roadside or . . .

A. No, I'm sure not. I'm sure that either the ambulance or

3602

probably a deputy would have assisted her, but I left before that occurred.

Q. And what did you do after you left that scene?

A. I returned to Forest City and actually started looking for DeGeus.

Q. And did you find Mr. DeGeus?

A. Yes, I happened to see a vehicle parked in a motel parking lot almost like trying to observe the highway but yet not be seen, and I pulled into the parking lot, and it was Terry DeGeus, and I talked to him.

Q. And can you describe for the jury your contact with Mr. DeGeus that evening?

A. He was defiant, would not give any information, would not admit anything. He had abrasions on his knuckles, so I knew he'd been in some sort of altercation. Basically didn't admit it but said we can't prove anything, can't do anything about it anyway.

Q. And what did you do?

A. He was right. There was nothing we could do. At that time

Page 62

the Iowa domestic abuse laws weren't as they are today. And unless Miss Johnson wanted to pursue it, there was nothing we could do.

Q. And you're quite familiar, I take it, with these type of domestic abuse situations from your many years in law enforcement.

3603

A. Yes.

Q. It's quite common for whatever reason for women in those situations not to want to press charges against the battering individual.

A. That's true.

Q. That's one of the difficulties in your job, I take it, that you see this going on and you would like to assist but you can't.

A. Well, it's one of many frustrations, yes.

Q. You've got many frustrations as chief of police, I take it.

A. That's one of them.

Q. That's one of them.

A. Yes.

Q. Now, can you describe Angela Johnson's appearance as you knew her in 1985 if you would?

A. I -- well, she was a very goodlooking young lady. I don't know, you know, how to go beyond that. She was just a very nice-looking, goodlooking young lady.

Q. Did she have a nice figure?

A. Yes.

Q. You never dated her, though.

A. No, no.

Q. But you knew -- you knew Angela Johnson as a goodlooking

Page 63

woman who operated a bar called the Silver Bullet in Forest City?

3604

A.   That's correct.

Q.   And you'd known her for or known of her for years.

A.   Yes.  She -- I don't know that she grew up in Forest City, but she had lived in Forest City for quite some time before that.

Q.   And was there another contact you had with Mr. DeGeus after this episode where you encountered Ms. Johnson along Highway 69?

A.   Yes.

Q.   And do you remember when that was?

A.   It was shortly after that, but I don't recall exactly the date.

Q.   Do you remember it being in approximately May of 1992?

A.   Well, there was a time in between that is what I was referring to.

Q.   Okay.

A.   But yes, I had contact with DeGeus in May of 1992.

Q.   Okay.  Was the time in between that an incident where a vehicle of his brother's had been impounded?

A.   Yes.

Q.   Okay.  And then after that situation, was there a time in May of 1992 that you did have some contact with him as well?

A.   Yes.

Q.   Okay.  And can you describe that for the jury?

A.   I was -- actually earlier that day -- it was May 9 of 1992 -- another officer and myself had made some drug buys in a

3605

Page 64

small town in southern Hancock County, Kanawha, Iowa, and -- as part of our drug task force is what we were doing, and we had then wanted to make sure that the Hancock County Sheriff's Office knew of these locations because we had talked to them before about doing this but not -- we didn't have the locations.

So I met Officer -- or excuse me, Deputy Scott Dodd approximately 20 -- or, excuse me, 7 p.m. that evening and was going to ride with him to show him those locations.

So we were southbound from Britt and met a pickup that was speeding. We turned around to go after it. I remember the deputy asked if I had time to do this because I was basically off duty at the time or in plain clothes at the time and actually was going to go to a wedding reception after that. But I said, No, we've got time; it's just a speeding ticket. And we turned around, stopped the vehicle, and the driver of the vehicle was Terry DeGeus.

Q. What happened after you stopped Mr. DeGeus's vehicle?

A. Deputy Dodd realized that he was probably under the influence of alcohol or some other substance and gave him a PBT, field breath test, and he was over the legal limit. So Deputy Dodd then continued to interview him and waited a few minutes, then went back, gave him another PBT, and he was still over the limit. So he got him out of the car. He was seated in the front right of the deputy's car. I was in the back right.

Q. So Mr. DeGeus was in Deputy Dodd's vehicle?

3606

A. Yes.

Q. And was there a time where he was asked to exit the vehicle?

A. Yes, the deputy got out and came around and asked him to

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3161 of 3592

get out, and DeGeus was -- probably understood what was happening and started talking about his terrible life and give him a break and this is going to ruin everything. And Deputy Dodd placed him under arrest.

Q. And what happened as that was occurring?

A. He instructed him to get his hands up on the car, and DeGeus became very rigid which is sort of a precursor to we know we were going to have a fight. I was standing right beside the rear passenger door, and DeGeus was standing by the front passenger door, and Deputy Dodd was standing right behind him. He did put his hands up on the car and then all of a sudden turned and the fight was on.

Q. Can you describe the fight that occurred with Mr. DeGeus?

A. It was -- it seemed like it took forever but probably, you know, was probably less than ten minutes. But it was very violent. It was very -- it was very fluid. We went from the roadside to the bottom of the ditch and back up the ditch and back to the bottom, and then we were flying all over.

Q. Were you hit or struck by Mr. DeGeus?

A. Yes.

Q. And can you describe that?

3607

A. At one point he had Deputy Dodd on the shoulder of the road on his back and was trying to hit him. I pulled him off. We went rolling down. Then he was on top of me. Then I got hit. Then Deputy Dodd came back and pulled him off, and we started wrestling around trying to get him in handcuffs.

Q. And was there a time where you became injured?

A. Yes.

Q. And can you describe that?

Page 66

A.   When we finally got him handcuffed and back to the squad car, the deputy asked me to go back into the ditch and find his car keys because his car keys had been lost during the struggle. And I did that.  And as I reached for the car keys with my right hand, I saw them, I tried to grab them, and I couldn't make a fist, so I couldn't clamp down, and I looked down, and there was looked like -- almost like a golf ball underneath the skin where my thumb joins my wrist.  I assumed that I had dislocated it. As it turned out, it was broke.

Q.   And was that the result of the combat that you and Deputy Dodd had with Mr. DeGeus?

A.   It wasn't that way before, so I'm assuming it was.

Q.   And how was it that the two of you were ultimately able to get Mr. DeGeus under control?

A.   Well, finally realized that the hold I had on him was a bit precarious because I couldn't make a fist, so the deputy and I actually maneuvered to change positions so that the deputy could

3608

get a better grip on DeGeus's hand that wasn't handcuffed.  We did everything from shove his face in the dirt to apply a choke hold on him to get him to quit fighting, and finally we were successful, I think only successful because we shoved his face down in the dirt and he couldn't breathe.

Q.   And ultimately he was handcuffed, placed in the car.

A.   Yes.

Q.   Did you become aware that Mr. DeGeus kind of viewed his time with you and this assault and the fact that he had injured you as something of a badge of honor, if you will?

A.   Well, I don't think he was ashamed of it if that's what you mean.

Page 67

Q.    You remember him ever having any items of clothing that related to you?

A.    I was told of it.  I didn't see it.  But I was told about it.

Q.    And can you describe that?

A.    He had a T-shirt that he had and I think some other members of a band had that he traveled with, and I believe -- not seeing it, I was told that it said "fuck Doug Book" on it.

Q.    And you were told that he was wearing this T-shirt?

A.    Yes.

        MR. STOWERS:  That's all I have.

        THE COURT:  Mr. Williams?

                    CROSS-EXAMINATION

3609


BY MR. WILLIAMS:

Q.    Morning, Chief.

A.    Good morning.

Q.    Sounds like such a bad guy he's probably better off dead; right?

A.    I don't think that's for me or anyone else to decide.

Q.    In fact, despite everything that Terry DeGeus did to you and to other officers, you actually were actively involved assisting law enforcement in trying to find out who murdered Terry DeGeus after 1993; isn't that fair to say?

A.    That's correct.  That's correct.

Q.    So despite how bad he was, it was still obviously a crime to murder somebody like that.

A.    Absolutely.

Q.    And part of your investigation that you assisted in ultimately lapsed all the way into 1998, didn't it, as part of

Page 68

this investigation?

A.    Yes.

Q.    Kind of evolved into a drug investigation because it was learned that Angela Johnson was involved with distributing methamphetamine up in the Mason City and Forest City, Iowa, area.

A.    Correct.

Q.    She was involved with a guy named Rick Summers at that time?

3610

A.    Yes.

MR. STOWERS:  I'm going to object to this, Your Honor, as outside the scope of direct.

THE COURT:  How is it within the scope of the direct, Mr. Williams?

MR. WILLIAMS:  It's going, frankly, to Miss Johnson's involvement with violence herself, Your Honor.

THE COURT:  Members of the jury, we're going to take our morning recess.  It is ten after ten.  We'll be in recess until -- we're going to take an additional ten minutes.  We'll be in recess until 10:45.  Thank you.

(The jury exited the courtroom.)

THE COURT:  Please be seated.  Okay.  Why don't you explain to me where you're going with it, and then we'll come back to the question of how it's within the scope.

MR. WILLIAMS:  Sure.  I'm going to go actually just a couple more questions.  We know that as part of this investigation there was a search conducted at Rick Summers' house and a grand jury subpoena served on Holly Johnson and other people in the Johnson family.  It was after that that

Page 69

VOLUME 20, 6-8-05

Mr. Book, Chief Book, received phone messages on his answering machine of a threatening nature from Angela Johnson.  And that's where I intended to go with it.

THE COURT:  Mr. Stowers?

MR. STOWERS:  I don't know what this has to do with

3611

the direct exam.  It's not even close to within the scope of it. It's got nothing to do with it.  I think these events are occurring in '98 allegedly, so I don't know what --

THE COURT:  Well, it may be proper rebuttal evidence. But how is it related to the scope of the direct examination?

MR. WILLIAMS:  It's related to the scope of direct in the sense that what the defense is certainly trying to portray here is that Terry DeGeus was a horrible person that beat up Angela Johnson and, therefore, she was suffering from some type of psychological impact that the jury should take into account as a mitigating factor.

The extent to which Angela Johnson -- we can show Angela Johnson was equally violent as Terry DeGeus or was involved with violence herself, I think it detracts from their position that she was an innocent victim of a very violent man that had a huge psychological impact on her.  This is a woman who was no stranger to violence herself.

THE COURT:  Well, setting aside the question of whether that would be relevant in the sentencing proceeding, it strikes me as it may well be beyond the scope of the actual direct examination.  I'm not so sure in the penalty phase that I'm limited -- that you're limited, excuse me, to the scope of the direct examination because it's a relaxed standard and relaxed proceeding.  So I think I'm going to allow you to do it

Page 70

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3166 of 3592

without directly addressing the question of whether it's

3612

technically beyond the scope of the direct examination in the case.

So you'll be allowed to get into the area.

MR. STOWERS: Before we go there, Your Honor, could I --

THE COURT: Yeah.

MR. STOWERS: -- I think ask the witness a couple questions because it might relate to whether or not there are materials that relate to this evidence that he either has not brought with him but do exist that --

THE COURT: Well, you had more discovery than you're ever entitled to, so the answer is no. You can ask him on redirect.

(Recess at 10:15 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Williams, you may proceed with your cross-examination.

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. Chief, right before the break, we were talking about your continued involvement in 1998 in the investigation of the disappearances of, among other people, Terry DeGeus. You had

3613

Page 71

indicated that as part of that larger investigation you were involved in the investigation of continued drug activity by Angela Johnson and that it involved Rick Summers. Do you recall that's where we left off right before the break?

A.   Yes.

Q.   And pursuant to that investigation, were you, in fact, involved in a search warrant, executing a search warrant, at Rick Summers' house in 1998?

A.   Yes, I was.

Q.   After that search warrant was executed, did you receive any messages from Angela Johnson?

A.   Yes, I did.

Q.   And could you describe for the jury how you received that message to begin with?

A.   It was on my voice mail when I got home.

Q.   And can you describe, do you actually recognize Angela Johnson's voice?

A.   Well, I recognized it, and I believe she even said who it was.

Q.   And what was the message she left you after executing that search warrant?

A.   That I'd better back off, I was in over my head, this is bigger than I can handle, things like that.

Q.   She talk about you being hurt at all?

A.   She indicated that I should back off or I could get hurt.

3614

Q.   Pursuant to the ongoing investigation into the disappearances of the victims in this case, did you also serve grand jury subpoenas on various people to assist in this investigation?

Page 72

A.    Yes.

Q.    And among those was Holly Johnson somebody on whom you served a grand jury subpoena?

A.    That's correct.

Q.    And after you served a grand jury subpoena on Holly Johnson, did you receive any further messages from Angela Johnson?

MR. STOWERS:  I'm going to object to this, Your Honor, for the reasons stated before as well as section 848(j).

THE COURT:  Overruled.  You may answer.

A.    Yes.

Q.    And what was the form of the message?

A.    Again, it was left on my answering machine.

Q.    And what was the message you received?

A.    It was that leave her family alone, you know, back off. And it was, again, you don't know what you're getting into, you could get hurt type of thing.

Q.    And what was the tone of the second message?  How would you describe her voice?

A.    Screaming, irate, out of control.

Q.    Now, based on what you had at that point, did you write up

3615

any reports concerning these phone messages you'd received?

A.    No.

Q.    Did you have enough based on your belief of what the evidence was for you to actually be able to charge her with anything in relation to leaving those messages on your phone?

A.    No.

Q.    Were you ultimately involved in the end in assisting Mr. Basler in arresting Angela Johnson on these charges in July

Page 73

of 2000?

A.    Yes.

MR. WILLIAMS:   Nothing else, Your Honor.

THE COURT:   Mr. Stowers?

REDIRECT EXAMINATION

BY MR. STOWERS:

Q.    Mr. Book, did you save either one of these answering machine messages that you remember receiving many years ago from Angela Johnson?

A.    No.

Q.    Did you do anything to follow up on those answering machine messages in terms of investigation or contact with Angela Johnson?

A.    No.

Q.    Did you stop doing any work in connection with your investigation as a chief of police after you received these messages?

3616

A.    No.   To the contrary, it kind of encouraged me.

Q.    And you just went on about your business.

A.    Did my job.

Q.    Okay.   And you didn't really feel threatened at all by these calls, did you?

A.    Oh, yes.   I mean, not to the point that I could file charges, but yes, I was concerned about them.

Q.    And you made no report of them?

A.    There was in my opinion no crime committed.   The elements of the terrorism charge which would have been appropriate at that time -- it has a new meaning today -- but at that time weren't there.

Page 74

Q. And you're familiar with the fact that under Iowa law there's a charge of harassment that can be filed against somebody for making threatening phone calls.

A. Uh-huh.

Q. Is that right?

A. Yes.

Q. And that existed at the time of these calls, that offense, under Iowa law. It's a misdemeanor I believe to make a threatening phone call to somebody; right?

A. I'm pretty sure it is.

Q. And she wasn't charged with anything to do with harassment, was she, out of either one of these phone calls?

A. Neither.

3617

Q. And yet you're telling us that you knew who the caller was and you had a tape recording of both of these calls.

A. Yes. The tape was not maintained. It was destroyed, but yes.

Q. But you're the one that destroyed it.

A. Yes.

Q. When did you destroy it?

A. As soon as another call came in, it recorded over. Whenever that occurred.

Q. And when is the first time that you reported having received these phone calls to somebody seated over here at government counsel table?

A. I probably talked with Agent Graham or Agent Lewis about it at the time, probably Agent Lewis, since that's who we were -- excuse me. That's who I was with when we served the warrant, both the search warrant and then the subpoena.

Page 75

Q. Have you seen any documents anywhere, whether authored by you or somebody else, documenting these phone calls in any way?

A. I haven't seen any, no.

MR. STOWERS: That's all I have. Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: Nothing, Your Honor.

THE COURT: You may step down.

Ready to call your next witness?

MR. BERRIGAN: Yes, we are, Your Honor. We call

3618

Dr. Marilyn Hutchinson.

MARILYN HUTCHINSON, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box.

THE WITNESS: May I get a glass of water?

THE COURT: Sure. There's a fresh glass of water there for you already.

THE WITNESS: Oh, okay.

THE COURT: And would you adjust the chair and the microphone so you can speak directly into the microphones. And would you state your full name and spell your last name.

THE WITNESS: I will, sir. Just one second. My name is Marilyn, M-a-r-i-l-y-n, Anne with an "e" on the end Hutchinson, H-u-t-c-h-i-n-s-o-n.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: May it please the Court.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q. Good morning, Dr. Hutchinson.

A. Good morning.

Page 76

Q.    I wanted to start by introducing you to the jury and telling them where you live and what kind of work you do.

A.    I'm a psychologist in Kansas City.  I own a practice called Hutchinson and Associates.  I've been doing that for 19 years.  Over the course of that time, I've had post-master's and

3619

post-doctorate --

Q.    Well, before we get to your education --

A.    Oh.

Q.    -- I know you're eager to talk a little bit about that, but I wanted to have you explain to the jurors what kind of a practice Hutchinson and Associates is.  What do you do there?

A.    I do both a clinical practice.  I see about 18 clients a week.  I see adults and sometimes older adolescents but mostly adults, couples, a few families now and then.  And my partic -- our office is dedicated to the concerns of women, children, and their families.  My particular emphasis within that is usually survivors of trauma and violence and how that impacts them.

         Half of my practice, in addition to seeing the clinical clients -- I usually do that on Monday, Tuesday, and Wednesdays, and then usually on Thursdays and Fridays I do court evaluations for civil and criminal cases.  And then I do things like testify.

Q.    How many people work with you at Hutchinson and Associates?

A.    I currently have seven.  I've had as many as 12 in that office, people who have done post-doc's or post-master's.  I make the choices from amongst those and invite some of them to stay on in our practice.  As I said, we've been doing that for -- I've been doing that for 19 years.

Q.    You've been a psychologist for 19 years?

Page 77

A.    Actually a little longer than that.  I was a psychologist

3620

when I was teaching in Wisconsin, and then I moved to Kansas City in 1983.

Q.    Okay.  Let's talk a little bit about your education if we could.

A.    Okay.

Q.    Where did you go to school?

A.    Well, I did my undergraduate degree in Nebraska Wesleyan. I grew up just down the river at Plattsmouth, Nebraska, and went to Nebraska Wesleyan and majored in music.  Student taught and didn't like it and decided I needed to do something different. I then went and got a master's and a Ph.D. from Purdue University in Indiana, finished that in 1975.  I was 25 years old at that point, and I went to Wisconsin where I taught for seven and a half years in the University of Wisconsin system in a master's training program for counseling.  I taught predominantly those people who were going to be headed into community mental health centers, but I taught some of the basic courses which also included students who were training to be guidance counselors.

Q.    After that experience, Dr. Hutchinson, as a teacher for seven years, what did you next do in your career?

A.    Well, I moved to Kansas City, and I --

Q.    When was that?

A.    What?

Q.    When was that?

3621

A.    In January of 1983.  I moved there, and I had a position at

Page 78

the University of Missouri, Kansas City, where I was in the counseling and placement center. And there I was supervising doctoral students and teaching part time at the university in their Ph.D. program and master's training program.

After two years I went full time into a private practice and opened the office of Hutchinson and Associates.

Q. And that would have been in 1983?

A. Well, some of that was concurrent. I was full time in Hutchinson and Associates by 1985.

Q. I'm sorry. Okay. That's right, because you said you were teaching for two years.

A. Yes.

Q. Are you a licensed psychologist?

A. Yes, I am.

Q. And where are you licensed?

A. Well, I was originally licensed in Wisconsin. That license is now on an inactive status since I don't live there, and I'm licensed in Missouri where I live and where I have my office.

Q. You mentioned a little earlier that although you see patients and do clinical work you've also been involved in court evaluations.

A. Yes.

Q. What kind of evaluations have you been involved in, that is, court forensic evaluations?

3622

A. I initially started out doing battered women's cases, women who had been violently abused by spouses or boyfriends, also teenagers who were abused by their parents and who either attempted to murder, did murder, or hired someone to murder their abuser. And over the last 15 years, I've evaluated over

Page 79

300 of those kinds of cases.

That has broadened then into also doing civil litigation on both sides, defense and plaintiffs, people who allege some kind of a harassment. I've done some product liability cases where people have been harmed by some product, some car wrecks, dog bites, sort of miscellaneous things in which people have been hurt and had some kind of trauma or some kind of mental health issue that resulted from that.

Most recently I've been doing more general mental health kinds of issues for criminal defendants, how their mental health issues and/or their childhood abuse or violence may have impacted their behavior, their personality as adults.

Q. Has any of your work involved capital murder cases or death-penalty cases?

A. Yes, it has.

Q. And typically when you've been involved particularly in criminal work, who is it that's retained your services?

A. Usually it's the defense, someone from the defense bar. In most of the states where I've done most of my work, in Missouri and Kansas, the evaluations that are done for the state are

3623

usually done at state facilities. I have done some of those evaluations when they were seeking a second opinion. But usually those are done at state hospitals.

Q. So when you're doing evaluations in criminal cases, do you do evaluations both for people that are in custody and out of custody?

A. Yes.

Q. Have you had occasions to do evaluations for the court system?

Page 80

A.    Yes, I have.

Q.    And what have those evaluations involved?

A.    Sometimes they are orders for competency that have been ordered by the court irrespective of defense or prosecution. Sometimes they've been an evaluation of fitness of parents where a judge was involved in a custody or visitation kind of concern and she didn't know whether either parent was competent and wanted me to evaluate both of them.  I think that's mostly the court-ordered ones.

Q.    The testimony that you've been involved in, where has it been in terms of geographically where have you been testifying?

A.    Well, I've testified from New Hampshire to Hawaii, but certainly the predominance of them have been in Iowa, Nebraska, and Missouri.

Q.    And have those been in state and federal courts?

A.    They have.

3624

Q.    Okay.  Are you compensated for your time in these cases, Dr. Hutchinson?

A.    Yes, I am.

Q.    And what is the rate that you typically charge to work on a case such as a capital murder case?

A.    Well, I have -- when I'm working at home, reading records, writing reports, that fee is $150 an hour if it's -- $140 an hour if it's a public defender's case or something that's a government case.  If it's a civil case, then it's 160 an hour. If I'm on the road, then it's 160 and 175, and then testimony is 175 an hour.

Q.    So you have kind of a government rate like a hotel.

A.    I try to cut a little break.

Page 81

Q.   Well, let me ask you about this case if we could.

MR. BERRIGAN:  Oh, before I do that, may I approach the witness, Your Honor?

THE COURT:  Yes.

MR. BERRIGAN:  Thank you.

BY MR. BERRIGAN:

Q.   I'm handing you, Dr. Hutchinson, what's been marked as Defense Exhibit 2170, 2170.  Do you recognize that document?

A.   I sure do.

Q.   Could you tell the jury what that is?

A.   It's my curriculum vitae.  It indicates my current employment, previous employment, education, professional

3625

activities.

Q.   I neglect --

MR. BERRIGAN:  Defense would offer 2170, Your Honor.

*   *   *   *

(Defendant Exhibit 2170 was offered.)

*   *   *   *

MR. WILLIAMS:  No objection.

THE COURT:  2170's admitted.

*   *   *   *

(Defendant Exhibit 2170 was admitted.)

*   *   *   *

BY MR. BERRIGAN:

Q.   I neglected to ask you about your membership, if any, in any professional organizations.  Are you involved with any professional organizations?

A.   I belong to the Greater Kansas City Psychological Association, the psychoanalytic division of that; the American

Page 82

Psychological Association, and I belong to the forensic division of that; and Missouri Kansas -- Missouri Psychological Association.

Q. Thank you. Doctor, how were you contacted to become involved in this case, United States versus Angela Johnson?

A. I was called by you, given a brief summary I believe over the telephone, and asked if I would be interested in doing an evaluation for mitigation.

3626

Q. And did you agree to do that? Obviously you did, huh?

A. I did agree.

Q. Were you provided with any materials either at that time or subsequently?

A. Lots.

Q. Lots. Could you just summarize for the jury what types of materials you were given?

A. If I could look at my report, I'll just kind of read through that.

Q. Certainly, if that helps you to aid your recollection.

A. Yeah. It's a file box this big, but it includes things like her indictment; change of venue motion; family chronology; divorce records for Miss Johnson; divorce records for her mother; employment records for Miss Johnson; jail records; police records; newspaper accounts; her mother's Social Security records; school records; court files; traffic violations; legal records for the family; various other legal records; medical records; neurological, psychological testing; and the report of other experts.

Q. In addition to the materials that you were given, did you conduct any independent investigation yourself?

Page 83

A.    Yes, I did.

Q.    And what is it that you did?

A.    On February the 23rd and 24th, I met with Miss Johnson for 9 hours, 4 hours one day, 5 1/2 hours the other day.  I -- on

3627

that same trip to Iowa, I met with her mother for two and a half hours and one of her sisters, Holly, for one and a half hours.

Q.    Before you met with Miss Johnson, at some point either before or after you received these materials, were you advised as to the scope and nature of the investigation that was being sought by the defense?

A.    Yes, I was.

Q.    And in particular I want to direct your attention to whether or not you received any instruction regarding whether the defense was claiming that Miss Johnson was suffering from a mental disease or defect that might exclude responsibility for the crimes for which she was charged?

A.    I did not.

Q.    I'm sorry?

A.    I did not receive any instruction about that.

Q.    Okay.  Did you receive instruction about in discussing with Miss Johnson whatever it is you wanted to discuss with her that you were not to discuss anything surrounding the homicides for which she was charged?

A.    I was given explicit instructions on that, yes.

Q.    And was there an explanation given to you about why?

A.    That the questions I would be addressing were related to mitigation only.

Q.    Okay.  Were you made aware that the defense wasn't raising any, you know, insanity defense or some claim that mental

Page 84

illness may have prevented Miss Johnson from understanding the nature and quality of the conduct for which she was charged?

A.    I was not given any implication about that.

Q.    Okay.  Not one way or the other.

A.    No.

Q.    And in talking to Miss Johnson, did you, in fact, discuss with her the actual homicides for which she was charged?

A.    I did not.

Q.    What was the focus of your investigation in discussing with Miss Johnson, her mother, and her sister Holly and reviewing all of the materials you were provided?

A.    What I was looking for was from my point of view an understanding of how this tragedy could have occurred.  And so I did many of the things that I always do which is to do what's known as a mental status exam which is the psychological equivalent of going to the doctor for a physical.

So you check through psychological symptoms, and you check through various aspects of psychological health.  I paid a lot of attention to her childhood history and a lot of attention to how that impacted her from her point of view.

I then met with two family members to just get another point of view on that same information.  And I always think of myself in some ways as sort of an investigator of psychology.  It's -- I'm not investigating the crime scene, but I'm investigating her mind and her point of view, her way of looking

at the world to say how could this have happened and how does it

Page 85

make sense because I think the world makes sense if we know all the pieces.

Q. Dr. Hutchinson, I just want to be crystal clear about this, okay, crystal clear. Are you making some claim that your testimony today has to do with the mental state of Angela Johnson at the time of the commission of the homicides for which she has been convicted?

A. No.

Q. Okay. We're clear about that.

A. We are very clear about that.

Q. All right. And so let's discuss then what it is that we are going to talk about; okay?

A. Okay.

Q. Based on your investigation, were there certain issues or findings that you thought were significant regarding Miss Johnson's childhood experiences regarding abuse that you thought were noteworthy in terms of mitigation?

A. There were many.

Q. I wanted to ask you, when you were making this type of an evaluation or examination, what -- how does a psychologist compare an experience of a childhood such as Miss Johnson to what one might term a, quote, unquote, normal child?

A. Well, there are a couple of different frameworks, and I sort of incorporate both which is that there is a body of

3630

literature about childhood development, what normal stages does a child go through. We expect 8-year-olds to be doing and learning things differently than we expect 3-year-olds. We expect 15-year-olds to be different than 6-year-olds. So looking at what experiences happened during different time

Page 86

periods to say could this young child have learned the things that they needed to learn during those stages, that's one part.

There also is a huge body of literature about the consequences of childhood abuse. And what I also try to do is to look at how does this person present themself today, how does their adult and adolescent history match up, if you will, to what kinds of things are predictable outcomes of childhood abuse, and to what extent does that match. For a myriad of reasons, some children match a great deal, and for some other reasons some children don't seem to have quite as much damage from ostensibly the same act.

Q.   Regarding this first area when you're talking about the stages of learning --

A.   Yes.

Q.   -- are there any widely accepted models that psychologists such as yourself use to make a determination about what the child would be learning at various points in their childhood development?

A.   Yes, there are.

Q.   What is the model that is typically used?

3631

A.   Well, one of the sort of -- I think sort of the grandfather models of all models of child development was developed by a man by the name of Erik Erikson, and he was a child psychiatrist in the early 1900s. He actually died I think in 1994. He was a German immigrant escaping the Nazis, and he subsequently taught at Harvard and Yale and Berkeley. And he devoted his life to studying how children come to have the identity or the development that they do.

And in doing that, he wrote -- he studied the Lakota

Page 87

Indians as an alternative to American culture. He did extensive studies on individual people like Gandhi and Hitler -- in fact, he got a Pulitzer Prize for his study of Gandhi -- and how do people develop these kinds of virtues or, in Hitler's case, how did those virtues not get developed? And his book, Childhood and Society, that was published in 1950 is just a classic and is still a widely accepted model of the phases that children go through as they grow up.

Q.   Is that the model that you employed in analyzing Miss Johnson's childhood?

A.   Yes, it is.

Q.   And in connection with that, did you prepare an exhibit that might aid you in explaining this model to the jurors?

A.   Well, I didn't personally prepare it, but I copied one.

Q.   You copied one and brought it with you.

A.   Yes, I did.

3632

THE COURT:   It's on the screen in front of you.

MR. BERRIGAN:   Thank you, Judge.

THE WITNESS:   Yeah, I was just checking that it was up there.   That's pretty cool.

MR. BERRIGAN:   I didn't see it.   I apologize.

THE COURT:   That's not your job; okay?

THE WITNESS:   Okay.

BY MR. BERRIGAN:

Q.   Dr. Hutchinson, on the screen in front of you and on the overhead, there is a document.   Let me see if I can bring it down.

A.   That's fine.   Thank you.

Q.   I only have half the page there, but can you recognize what

Page 88

that is?

A.    Yes.   This is a -- sort of a summary encapsulated version of Erik Erickson's developmental tasks.

Q.    These categories on the side seem to be self-explanatory, but could you just tell us briefly what those are that run up and down the page on the left?

A.    They are sort of broad guidelines of the ages through which students usually or children usually move through these stages. They're somewhat fluid.  They don't -- you know, when you turn two, you don't automatically jump into a new place.  It's sort of a slow evolution, but these are markers to kind of indicate when things happen.

3633

Q.    And what about the top column that runs across the top of the page?  What are those categories?

A.    Those are the ways that it's been sort of boiled down into this chart.  What is the crisis that the person has to resolve? Who are the significant people that contribute to that?  What are the behaviors that are associated with it, which is labelled the modalities?  If someone successfully negotiates that stage, what virtue will they have?  And if they don't successfully negotiate that stage, what maladaptation or malignancies would they have?  And a maladaptation is where they have an overextenuation of the positive, or a malignancy is where they have too much of the negative side.  The object is to have some of both.

Q.    The virtues of the maladaptations and the malignancies, do they necessarily grow out of these psychosocial modalities, the behavior, or is there some correlation, a recognizable percentage of people that if they suffer this psychosocial

Page 89

behavior that they're going to have either this virtue or this malignancy?

A. Well, no one does it perfectly, and no one does it not at all. So, I mean, every -- it's sort of a question of how well you successfully navigate it. It's not a black and white, all or nothing. But what you look at is the adult behavior and whether there is more or less of one side or the other, and then you can look back at what experiences took place during that

3634

time of their life to make some inferences and some hypotheses about what actually might have interfered with the successful navigation of that stage.

Q. Well, let's take for an example the first column which would be the infant stage, zero to one. When you employed this model, the Erikson model, respecting Miss Johnson, were there any findings that were relevant to Miss Johnson at this age in her life?

A. Yes. I believe that there was some lack of successful moving through this stage that left her sometimes overtrusting and sometimes not trusting enough, that she was overly trusting of men that she thought would rescue her and ones that she thought could protect her even in the face of great evidence that they wouldn't, couldn't, aren't doing that. That seemed to be some kind of defense in order to maintain what might be popularly called a Pollyanna stance.

Q. What is a Pollyanna stance?

A. Sort of like everything's fine, everything's going to be okay. So instead of having the virtue of hope and faith, she had a somewhat naive idea of, you know, not taking seriously, not dealing with some reality of some pretty serious things that

Page 90

were going on.  And she sort of blithely or naively went forward with this hope and faith.  So she had some of the maladaptation of too much trust and, on the other hand, a mistrust which is that the world is an okay place, the world is safe.

3635

And one of the most basic ideas that forms our personality because it takes place at such a young age is is the world a safe place or is the world not a safe place.  And I think in general she thought that the world wasn't a safe place but that she could pick out particular men who would rescue her and she put overtrust in them.

Q.    Well, in making that analysis, do you have any information about kind of her childhood at that stage in her life?

A.    There isn't a lot of information about her first year of life.  What I do know is that her mother was likely pretty overwhelmed.  She had a sister who was two years older and a brother who was two years younger.  So her mother didn't evidence strong parenting skills.  And I think that there probably was some instances or substantial number of instances where she wasn't giving -- wasn't given the holding, trusting atmosphere.

This doesn't mean that you run every time a baby cries.  It doesn't mean that they get everything that they need because that leads them to not understand how the world works either.  But to be normally responsive and reliable is what's expectable and what's needed.

What I do understand is that there was a great deal of marital tension at this time, domestic violence between her father and mother, and that couldn't not have impacted her mother's ability to be a reliable nurturing caretaker.

Page 91

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3187 of 3592

Q. Well, those factors you just mentioned regarding the violence in the home, those things, did they continue into the next two stages of her life, the toddler and preschool?

A. Yes, they did.

Q. And what is it that at this age of the literature and research indicates children should be learning?

A. The age of two to three?

Q. Two, three.

A. Okay. This is the age where you're learning autonomy versus shame and doubt. This is the I can do it stage when you have a two- and a three-year-old who wants to do things by themselves. And the good parent, even though it takes longer, you let them do it because that will build for them the sense of will and determination. It gives them the idea of holding on and letting go to things. This is the age of toilet training, so there's holding on and letting go sort of quite explicitly in that.

But it also is the age at which issues about dependency, impulsivity, compulsivity, and attachment are beginning to be learned. This was, as you mentioned, the time when there was I think increased physical violence between the parents. Her father left a year later than that. Her mother told me that she had the philosophy that she felt like she was so bad that she was going to make her children perfect as compensation for her own badness. She herself was a sexual

3637

abuse survivor and I think left her with a great deal of shame and sense of inadequacy. The way that she tried to make her

Page 92

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3188 of 3592

children perfect which in her mind meant they would get to go to heaven was that she was very strict and used a great deal of physical punishment.

What consequences that had for her was that she ended up with a lot of impulsivity throughout her life, issues around holding on and letting go in terms of her attachment and her adult relationships.

Q.   Were there changes in Miss Johnson's childhood, what was going on in her life then as she entered into stage 3 as a preschooler?

A.   Well, her father left at that time.  My descriptions from hearing a variety of family members talk about it was that it was a pretty chaotic time.  Her father broke into the house, and Angie found her (sic) under her mother's bed one time when there was a baby-sitter in the middle of the night.  She often reported that she cried when she wanted to leave with her dad. She was still wetting the bed.  Her mother would be gone for weekends.  The report is that her mother was pretty nervous and upset during this time.

They moved into her grandparents' home.  The physical abuse was pretty substantial as reported by a number of the children.  This is the time period in which perhaps you've heard about the incident where her mother believed the world was going

3638

to be coming to an end and they drove for three days with the children without food in the backseat.  They began to hallucinate from hunger.  Mother was following some religious symbols that she believed would direct them.  The children were neglected in terms of food and clothing.

So at an age when the family is supposed to be able to

Page 93

help a child learn to have purpose in life and have courage in life and make decisions, her life was chaotic.

Q. And what's the -- in terms of the literature and research in this area, what's the consequence of the experiences such as Miss Johnson's?

A. Impulsivity and attachment problems, unable to attach and stay attached, unable to let go sometimes when you are attached. So it's that holding on and letting go phenomena that's crucial to this learning.

Q. Was there evidence of that actually later in life then?

A. Yes, there was.

Q. What was that?

A. That she couldn't let go of Terry DeGeus, and other times in relationships that we might have thought could have been more stable for her, she wasn't able to hold on. I think part of that also comes from this stage in confusing love and abuse, that if the people who are supposed to love you and that you love and seem like the ones who should love you also abuse you, then it gets very confusing about, well, people who love me

3639

abuse me. And that idea learned at that very young age is difficult to break into adulthood. And we find evidence that she, like many other battered women, believed if he's really jealous, if he's really possessive, he loves me so much that he hits me. And that kind of belief plays into the holding on and letting go phenomena.

Q. What about the next stage there? Is it 4? I'm sorry. Did I skip the preschooler?

A. Yeah, we're on three to six.

Q. Right, three to six, initiative versus guilt. What's the

Page 94

psychosocial crisis? What does that mean there?

A. Well, this is where the family is more influential, and it's -- this is the age of great fantasy for children. And they learn through play that they can plan things, and they learn that they can fantasize the future. This is where little boys and girls have all kinds of ideas of what they're going to be when they grow up because they're fantasizing their future. This is where they begin to have a sense of personal adequacy because they are now being successful at things, going to school, and they are much more accomplished in the world.

And so they learn I can do things, I can be competent, and they learn to trust their own feelings if parents give them the decision making to make choices which are, of course, age appropriate. If they don't get that kind of -- those kinds of choices, that kind of autonomy, then they end up with less

3640

initiative or an overinitiative versus guilt.

Q. What -- I'm sorry to interrupt you, but what was the evidence based on your investigation of Miss Johnson's childhood at that age as to whether she was getting this type of autonomy and being able to make these kinds of choices?

A. This is a time when -- I think we may be blending a bit here because I talked about this a little bit. This is when they did the three-day drive. She became estranged from her father. There seems to be some disagreement these many years later about whether Mom was keeping Dad away or Dad was staying away. But it was clear that the children were not having the kind of regular contact that they needed to have with their father. There was neglect of the children in terms of clothing. Mom would be gone for weekends it's reported. So I think it was

Page 95

a very chaotic time.

The children didn't have enough food. They began doing fasting and -- which for children just means you're hungry.

Q. And the maladaptations and malignancies from behaviors such as this at the age of three to six the literature suggests is what?

A. Well, the maladaptations can either be ruthlessness or inhibition so -- or some of both, is that you hold yourself back from things that might be good for you or you might have this impulsive ruthlessness to go out and act.

3641

Q. What about this next stage, 7 to 12? Based on your review of the reports and your discussions with not only Angela Johnson and her sister but her mother, did you find this to be a particularly traumatic period of time for the Johnson children?

A. I think this was the worst of the worst. This -- according to Wendy, she said that at about age 10 she became the mom with Angela, age 8, as chief sidekick. I think Jim described this time of their life as a siege. This is where the exorcisms, the rebuking, spitting the devil out, beating the tire became much more commonplace.

On one occasion their grandparents made them throw away all of their toys because if they loved God they wouldn't want toys. There was group punishment of all of them. They didn't have enough to eat. They were beaten with a belt a couple times a week. They began looking for the sign of the beast on each other, that their mother believed that if they were possessed by the devil then the sign of the beast, the number 6, would be on their bodies, and they took to looking

Page 96

over each other's heads on a regular basis to see if it had appeared which says that these are little kids who thought they were really bad because they were looking to see whether the beast had appeared on them.

They were sure they were never going to go to heaven. Angie reported that at this time she had a strong belief that her father did not love her. She held out this sort of fantasy

3642

rescuer idea that he was going to come and rescue her, but, of course, he never did. This was a pattern that she subsequently repeated with boyfriends, was looking for boyfriends who would rescue her.

She had the sense that she never fit in. She was living with her grandparents' craziness, her mother's -- what the children have called Mother's religious disorder. She said when they did occasionally visit her father, her father and his stepchildren had all the toys, all the everything, and they were living in pretty extreme poverty.

It was at this time that they made the trip to Kansas, and I'm pretty sure you've probably heard about the trip to the, quote, orphanage in Kansas. The children knew that the intention to go there was to leave Holly because the mother, Pearl Jean, was afraid of her own mother, if her mother discovered that she had had a child out of wedlock. So she was going to take -- she moved there at the beginning of her pregnancy so to hide that pregnancy and intended to leave this new baby at this orphanage. The children report that they thought they'd all get left too at what seems like absolutely a horrific place.

The children regularly witnessed sadistic treatment of

Page 97

animals, beating the heads of rabbits and squirrels with sledgehammers, butchering a cow on the kitchen table, throwing kittens in to the hungry pigs to eat, being threatened that they

3643

would get thrown in to the pigs.

Wendy reports that she was sexually abused at this place, says that she remembers that her sister also had to take naps with this man. Although she wasn't in the room, she assumed that what happened to her at that time is what happened to her when she had to take naps with that man.

She said that her mom -- there's some discrepancy between the children's memories which was that Mom was almost never there or that she was there some. Mother reports that she was out trying to raise money to support the orphanage. So we know at least that she was gone for significant periods of time. They lived in a converted garage that had rats and mice in it.

It sounds -- they watched the abuse, the sadistic treatment of two young Indian boys. It sounds like it was probably a torturous situation beyond what any child could incorporate into a sense of the world is not a safe place.

Q. So I want to ask you about what should be going on in terms of the psychosocial modalities at this point in a child's life if it's a normal childhood.

A. Well, the ages of 7 to 12, we have what's called industry versus inferiority. They begin more involvement with their neighborhood and their school. This is when teachers start giving them a lot of projects to do, science projects, home projects, where they learn to be able to complete things and get a sense of planning and follow-through. And out of that they

3644

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3194 of 3592

get a sense of competence in the school.

Q.    And to contrast that sort of normal childhood with the Johnsons' experience and the malignancies and maladaptations that resulted from their experiences, what would those typically be?

A.    I believe that out of this, Angie left this stage with extremely poor self-esteem on top of the religious abuse that she had to have another set of adults treat her as if she didn't matter, certainly left her with the feeling that she didn't matter which is poor self-esteem, very poor social skills.  When you feel like you don't fit in, when your clothes don't look right when you go to school, your social skills don't -- kids learn how to talk and have friends through moms and dads having kids over and saying, you know, you really shouldn't -- you should learn to share your toys.  And, you know, that sort of just gentle guiding through social relationships didn't happen in this family.

Angie developed posttraumatic stress disorder out of the kinds of trauma and abuse that occurred at that time in her life.  She began having nightmares.  And also what I've listed as sadistic and masochistic repetitions, that it's clear to me that the Dillos were sadistic.  They seemed to have no end of ways to be mean and traumatic to these young children.  When someone is treated in a sadistic manner, then they develop a sense of masochism for themself which is that they will treat

3645

themselves in that same sadistic manner.  We treat ourselves in the way we were treated.  So she directed that same kind of

Page 99

self-hatred, self-sabotaging, self-nonaffirming to herself which is a -- masochistic. So she repeated it internally just in her own psyche, and she also repeated it in terms of tolerating abuse and unhealthy situations subsequently in her life.

Q. The stage from 12 to 18, this would be typically children who are about to enter early high school through high school age or so?

A. Yes.

Q. What is the psychosocial crisis that's going on at that time typically in children's lives?

A. This is where they learn to be themselves. This is where they're battling between am I going to be just like everybody else, and almost every adolescent goes through the "but everybody else is doing it," "but everybody else has these kind of shoes." And then out of that you hope that they begin to identify the ways that they are unique, the ways that they are special, the ways that they are not like everybody else. Usually they have to go through the "I am" before they can begin to differentiate that "I'm not."

It's how you learn to be one's self, and that happens by having your individual differences supported. So one kid in the family might be an athlete. Somebody might be a musician. Somebody else might like to cook. Somebody else might be good

3646

with children. So it's like all of those things are good. Those are you. That's the way you are unique.

Out of this kind of support and validation, the child experiences others being -- particularly parents, being loyal to them, validating them individually. And when others are loyal to them, they learn to be loyal to others.

Page 100

This didn't happen for Angie and for most of her siblings. They said that Mom disappeared for days at a time. There was one time when they were living in a very minimal housing while Mother was living in a motel with a boyfriend, that there were rats there.

It was at this time that Angie said that she began to have an attraction to the bad boys in school. I think that there were a number of reasons for that, one of which was she said that she decided it was better to be feared than loved. Now, if we look back, we can see why it was better to be feared than loved. People who were bigger and stronger than her had hurt her over and over and over and so this initial identification with "I can hook up with some boy, and if he's the bad boy, then he's going to protect me. I don't want one of these nice boys who might not be able to protect me."

Along with being with the bad boys, she began using drugs. She said she was introduced to marijuana by her sister Wendy who was two years older. She liked the feeling of being high.

3647


One of the things that happens for these kinds of children is that when they begin using things like marijuana or other street drugs is they find a group that they fit in. For the first time in their life they fit somewhere, and this had been an ongoing issue for Angela that she never fit anywhere. So all of a sudden she's got a club she belongs to. It's the bad kids who smoke dope.

Smoking dope also served a number of other sort of helps for her. She had an anxiety disorder it appears at this time. She said that she began compulsive hand washing and there

Page 101

were other family members who recalled that and she developed an obsessive, ruminative habit of spelling words in her head. These kinds of compulsive or repetitive habits are used as ways to get control, ways to control anxiety.

I think that, you know, the rebukings were still continuing, the physical punishment was still continuing, the craziness in the family was still continuing. She was looking for some kind of way to get an escape from that, and smoking marijuana gave her that.

The other escape that she looked for was she said, I was always looking for a man to rescue me, and they just never do. I always wanted a guy who would take care of me and take care of my problems and I could just relax and not have to worry, but men have always been a major pain for me.

I think what we see there is the repetition of the dad

3648

that she wanted to rescue her who never came to rescue her. Whether he could or he couldn't have, I don't know. But her sense was as a little girl he just didn't. And so that kind of childhood history sets up women to go looking for somebody else who will rescue them, the unavailable father.

She recalled also that it was very difficult for her to be alone. She never wanted to be alone. And when I asked her what the theme of her life was, she said, I was looking for love in all the wrong places. And I think that's really true, is that she didn't feel love. She was trying to find a way to do that. She had an early pregnancy which is often the result of a teenager going, I'm going to have somebody who will love me. She was using drugs to hide, trying to find a place to be, trying to stop her feelings. And that's a train wreck.

Page 102

Q. So instead of learning what should have been learned at this stage, psychosocial virtues of fidelity and loyalty, what are the maladaptive and malignant behaviors that can result from these types of experiences she had at the age of 12 to 18?

A. She could have either gone to a fanaticism or a repudiation of society. And it seemed as if she went more to the repudiation of society in saying, I'll smoke dope; I'm going to sort of live on the edge. And society hasn't worked for me. I don't know why I should try and follow all the rules because nobody's followed the rules in relation to me.

This is the age where we look for people to sort of

3649

find their place in society, not where they're going to be forever, but by the time they're 18, we have a good sense of what kind of an adult are they moving towards, what kind of place are they going to have? Are they going to be one who's going to be seeking achievement? Are they more oriented towards a family? And she didn't have that kind of sense of direction. She was into a group that was a drug group, and she decided that being bad was better than being a nobody. Just like a small child who will act out to get attention, being a nobody is the worst thing. So being bad is better than being a nobody.

Q. Let's talk about this last category I'd like to discuss with you before lunch if we could, Dr. Hutchinson, and that is the early 20s, young adult years, this category 6 in the left column.

A. Uh-huh.

Q. The Erikson model would suggest that this is a time where the psychosocial crisis they're in is intimacy versus isolation. What does that mean exactly?

Page 103

A.    Well, it's learning to connect to a partner.  This is the age when we begin seriously thinking about who do we want to connect with?  Do we want to connect with somebody?  How involved are we going to be in the world?  How am I going to interface with friends and intimates?

At this time when she was 24, she began to use meth on a daily basis.  She began her involvement with Terry DeGeus

3650

where she was regularly physically abused.  She tried for police help.  That didn't work.  She called police lots of times, sometimes right in the middle of things.  They'd tell him, you know, Go on, Terry, you know, leave her alone.  And I think that she just didn't have a sense that society worked for her.

And so she had to find some other way to have something for herself, and I think that part of that was to say, I'm not going to fit in society; I'm going to be promiscuous; I'm going to use drugs.  And one of the things that she said was, I felt like my whole life I'd been fighting, struggling, and defending, and I never got a break.  But when I did crank, I got a break from that.

Q.    You knew what she was talking about when she said crank.

A.    Yes.

Q.    What was that?

A.    It's methamphetamine.

Q.    And did your discussions with Miss Johnson and the other materials that you received substantiate that claim?

A.    Yes.  From everything I understand, she was a prolific drug user.  What she indicated was that it gave her the energy to be with her daughter in the daytime, work long double shifts at night, come home, sometimes stay up all night and get the

Page 104

housework done. It most likely was a way to fight her depression that she'd had coming out of her childhood abuse, a way to block the memories of her posttraumatic stress disorder.

3651

So, I mean, it worked. It gave her the ability to have the energy to try and make it in the world, to try and block out her history so that she could keep functioning and to have the energy and capability to care for her daughter in the way that she wanted to.

Q. This period of time -- and you've already touched upon this to some extent, but this is a period of time where young adults should be learning which virtues based on their life experiences?

A. Love.

Q. Love. And the maladaptive consequences and the malignancies, promiscuity and exclusivity. We know what promiscuity is, but could you tell us what do you mean by exclusivity?

A. Well, it can be a real narrowing of your life into some very small facet. It can be the jealousness or possessiveness of a partner that you try and make everything. It's saying I'm going to make all of my life just one little narrow piece and leave out the broad spectrum of religious, social development that makes for a healthy life.

Q. There's a couple of areas that we could at least touch on.

A. Okay.

Q. And you've mentioned them already. One is this posttraumatic stress syndrome as a consequence of some of the violence and trauma that occurred in Miss Johnson's childhood.

3652

Page 105

A.    Yes.

Q.    In your discussions with her and your review of the materials and the discussions with her sister, did that symptom resurface later in adult life?  That is, did she have other experiences that would contribute to posttraumatic stress syndrome?

A.    Yes.

Q.    And what were those experiences?

A.    I think she experienced the abuse and the subsequent stalking by Terry DeGeus as traumatizing, and perhaps it might make sense to explain what traumatizing means to a psychologist.

Q.    Yes, please.

A.    Traumatizing isn't just that you feel bad like if -- I mean, I might watch -- I watch some mother in K-Mart be mean to her children, and that's distressing to me, but it isn't traumatizing.  Traumatizing is when my ego or my self is overwhelmed such that I can't process it, sort of ingest it, work through it by talking to people, sometimes by having a few dreams about it, working through it so that it isn't left hanging in my psyche if you will.

If I'm not capable either because of the trauma was so intense or I don't have the psychic resources to make that resolution, then I will end up with posttrauma stress disorder. So that trauma can be car wrecks.  It can be childhood abuse. It can be domestic violence.  It can be witnessing a murder.  It

3653

can be held up at the Kwik Trip.

Anything that happens to a person that overwhelms them and so it's -- one person can be traumatized by an event, and
Page 106

another person can have the same event and it not be traumatizing in the way that I'm speaking that it overwhelmed their ego.

If your ego or your self is overwhelmed, then you develop a whole range or a syndrome of compensatory behaviors.

Q.   And this is a psychologically recognized disorder or syndrome, is it not?

A.   Oh, certainly, yes.

Q.   What are the elements of posttraumatic stress syndrome?

A.   All of these -- there are different sections, and you have to have some of each of them in order to have that diagnosis.

Posttraumatic stress disorder has that you have to reexperience the trauma repetitively after the trauma's over. So you might have nightmares.  We heard a lot about Vietnam flashbacks:  Car backfires; they drop to the ground.  That's a reexperiencing.

It can be intrusive recollections.  You're driving down the street and just out of nowhere pops up an image of what it was that was traumatic.  It can be physiological distress, so your body reacts if you see or think of something that's similar to it.  Women that have been raped or women that have been abused will report that if they see a television show that's

3654

similar to that, they might break out in a sweat.  So all of those are ways in which someone can reexperience it.  You have to have that first.

The second criteria is that you have some kind of way that you try and numb that experience.  So you may avoid things that are like it.  You may never watch the television shows that would trigger you.  You don't go back to the location where it

Page 107

happened. You withdraw from people. You try and numb yourself out in any kind of way to say, I'm not going to feel those things.

The other component then is that that anxiety that's from that breaks through anyway and it breaks through kind of sideways. It can break through in hypervigilance. This is the looking over your shoulder kind of thing. It can be in sleep disturbance. It can be in irritability. I just blanked on the other two. I forgot them.

Q. That's all right.

A. But it's that your body still has this trauma inside of it. You're going, Don't think about it, don't think about it, avoid it, avoid it, but your body has it, and so it's popping out in these anxious responses, and it's popping out in these reoccurring responses.

Q. So in terms of Miss Johnson's experience, the evidence in terms of her reexperiencing the trauma that she suffered both in childhood and then at the hands of Mr. DeGeus was what?

3655

A. She talked about having nightmares. One of the other somatizations that she had by responses to it as a child, she had headaches. She had a lot of stomach aches. Those lasted into her adulthood. She had a lot of terror and intrusive recollections, particularly of the stalking kinds of things.

The hyperarousal, not feeling safe were present, trying to distance herself, trying to numb out her feelings with drugs and avoidance of people sometimes, distance from other people.

Another one of the numbing ones is belief that you will have a foreshortened future thinking that you're just not

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3204 of 3592

going to live a life. She believed that Terry would kill her. Whether Terry really was going to kill her or whether that was a manifestation of the posttraumatic stress disorder we can't say, but she believed that she was going to die at a young age at his hands.

So she had the reexperiencing. She had the numbing. And she had the break-through anxiety.

MR. BERRIGAN: I think this is probably a good place to break, Your Honor, just a suggestion.

THE COURT: Sure. That's fine. Thank you, Mr. Berrigan.

Members of the jury, it's noon. We'll take our standard hour recess. Please keep an open mind until you've heard all of the evidence in the penalty phase, and we'll see

3656

you back here at one o'clock. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Please be seated.

MR. WILLIAMS: Your Honor, this witness has been reading from some materials at the witness stand, reading from materials that I don't have. She's been reading statements from -- by Angela Johnson about nightmares. There's nothing in her report about Angela Johnson suffering from nightmares. And in order for me to be in a position to adequately cross-examine her, I think I need to be able to look at what materials she's using and quoting to the jury so that I'm in a position to adequately cross-examine this witness.

THE COURT: Mr. Berrigan?

Page 109

MR. BERRIGAN: Yeah. I -- frankly, I'm not sure what those materials are either, Your Honor. But we're -- I think Mr. Williams is arguably entitled to any materials the witness is relying on, so we'll be happy to get those and provide them.

THE COURT: Okay. Can you just try and work that out among yourselves because there doesn't appear to be a dispute about it?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay.

MR. BERRIGAN: I have one other matter.

3657

THE COURT: And if you want a brief period of time in addition to the noon recess before you begin cross, we can probably do that. How much longer, just so we're scheduling --

MR. BERRIGAN: I bet not more than 15, 20 minutes.

THE COURT: Okay. You know what we'd probably do? If you need some additional time, we'll just -- you know, at 10 to 1 or something, we'll just have the CSO tell the jury it will be till 1:15 or 1:30.

MR. WILLIAMS: Thank you, Your Honor.

THE COURT: Why don't you just let Carey know, and assuming there's no objection from Mr. Berrigan --

MR. BERRIGAN: No, that's fine, Judge.

THE COURT: -- we'll just take a little longer if you need it.

MR. WILLIAMS: Sure. I'll let her know.

THE COURT: Okay. Now then you had a matter.

MR. BERRIGAN: Yes, sir.

THE COURT: Yes.

MR. BERRIGAN: I raise this reluctantly, but I raise
Page 110

it because I'm concerned about it. Today when Dr. Hutchinson turned around and looked at the screen --

THE COURT: Yeah.

MR. BERRIGAN: -- the Court in my view addressed her -- maybe curtly might be the nicest way I could describe it in terms of "that's not your job." Yesterday a similar incident

3658

took place with Dr. Logan. I didn't raise an objection at that time, and the record will reflect what was said with Dr. Logan.

But my concern is -- and I'm sure the Court does not intend this, but the jurors have spent a good deal of time with the Court. I suspect based on the treatment the Court has provided them, which has been gracious to say the least, they have a very high view of the Court presently. They don't know these experts from Adam until they come in and testify. And when the Court addresses them in what I would have to describe at least as a hostile manner right at the beginning of their testimony for what I perceive in my humble opinion to be very minor infractions, it sets a tone with the expert that's very difficult for me to overcome.

Again, I'm going to presume, do presume, that the Court -- that this is just a matter of perhaps some annoyance with these individuals, but I very much fear the effect that it has on the jurors, and we still have at least one more expert to go.

So I'm just going to note it for the record because I fear later on appeal if I don't somebody's going to ask me about it. But -- and they probably will based on my silence regarding Dr. Logan, but I do have a concern about it, and I'd ask the Court to at least consider it. If our experts are acting

Page 111

inappropriately, I'd be happy to address it at the bench or in some fashion where the jurors are not left with the impression

3659

that the Court right away is unhappy with them for some perceived reason. And I just wanted to state that before our break.

THE COURT: Anything else you'd like to say?

MR. BERRIGAN: Nothing else, Your Honor.

THE COURT: Okay. Thank you. We'll be in recess.

(Lunch recess at 12:05 p.m.)

THE COURT: Mr. Williams, you didn't need any additional time. Everybody can be seated.

MR. WILLIAMS: No, Your Honor. They got the information to me right away, and I had enough time to digest it, so I appreciate it.

THE COURT: Okay. Where is the witness?

MR. BERRIGAN: Oh, sorry, Judge.

MR. WILLETT: They went to get her, Judge, and I'll follow up on that.

MR. BERRIGAN: Your Honor, I frankly don't know where Dr. Hutchinson is. It's two minutes of one, so obviously she should be here. She might be in the ladies' room. We're trying to check on that right now. We do have other witnesses ready to go if you don't want to delay at all. If I could have just maybe another 120 seconds.

THE COURT: Actually I had her CJA voucher here, and I had some questions about it, and I wanted to clear that up, and obviously I'm not going to do that in the presence of the jury.

3660

Page 112

(The witness entered the courtroom.)

THE COURT: You're late.

MR. WILLETT: Judge Bennett, may I say something on Dr. Hutchinson's behalf?

THE COURT: Not really.

You're late. Let's get in the witness box. I have some questions for her. I don't keep the jury waiting.

THE WITNESS: I was sitting upstairs by a guard and was told I couldn't stay here, sir, or I wouldn't have left.

THE COURT: Well, whatever. You knew we were starting at one. It's after one.

I'm confused by your hourly rates, and you seemed a little bit confused by it too when you were testifying, and I was just reviewing one of your CJA vouchers, and let me ask you this. If a person comes in that's private pay, what do you charge that patient?

THE WITNESS: For forensic or therapy client?

THE COURT: Therapy. For an hour's worth of your time, what do you charge?

THE WITNESS: For therapy --

THE COURT: Private pay.

THE WITNESS: Private pay clinical work is $110.

THE COURT: Okay. And what do you charge if it's -- what's the usual and customary rate if you're being reimbursed by insurance?

3661

THE WITNESS: It varies from $90 to $110.

THE COURT: And what's your rationale for charging 170 for forensic work?

Page 113

THE WITNESS:  I only charge that for trial testimony because it's a very different kind of work.  It involves a lot more stress.  It involves travel away from home.  It seems a reasonable rate to me.

THE COURT:  Well, when you submit your additional bills, one thing in your billing that you don't do that I've never seen an expert do is you just block bill.  You put $400 for X service.  You don't indicate what the hourly rate is.  And you don't indicate the time you spent on it.  And it's impossible to extrapolate either one of those things from your bill because you don't indicate how much time you spent on each activity.

THE WITNESS:  There is a notation.  I can show you how to read it.  I have a copy of it with me if you'd like some explanation because it does say how much everything is.

THE COURT:  Not in the bill I have.

THE WITNESS:  Well, it says units, and that indicates percent -- a unit is an hour unless it's a test, so there are things like 3.75 units, so that's 3.75 hours.

THE COURT:  It doesn't say that on the bill.

THE WITNESS:  I'm sorry that that's confusing to you.

THE COURT:  Well, it's more than confusing.  It

3662

doesn't indicate on the bill.  But anyway, you're going to have to indicate the time you spend on each unit and what you do.

And while we're at it, review of records is not sufficient for me because I can't determine whether that's reasonable.  I have to know what records you reviewed.

THE WITNESS:  Okay.

THE COURT:  Because it's not reasonable to just say

Page 114

review of records. I would have no idea what you're doing.

THE WITNESS: Okay.

THE COURT: That's not a sufficient specificity to make a judgment about whether it's reasonable or not, and ultimately I'm the one that has to make that determination.

THE WITNESS: Yes, sir.

THE COURT: So I passed on your first bill, but I'm going to be a lot more careful this time.

MR. BERRIGAN: I should apologize to the Court as well, Your Honor, because based on our earlier conversations regarding Dr. Gelbort's bill as you recall --

THE COURT: His was worthless too.

MR. BERRIGAN: -- his was worse.

THE COURT: His was terrible. His didn't indicate anything.

MR. BERRIGAN: These bills come through my office, and I have an obligation --

THE COURT: But I'm sending Gelbort's back too.

3663

MR. BERRIGAN: We sent it back, sir.

THE COURT: No, the one I just got. I'm sending it back because it hasn't met any of my criteria. I don't want to keep the jury waiting.

MR. BERRIGAN: No, I should have given Dr. Hutchinson a heads-up.

THE COURT: Yeah, but I was just confused by the hourly rate.

MR. BERRIGAN: I understand.

THE COURT: Because it's so layered. There are so many different rates.

Page 115

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3211 of 3592

MR. BERRIGAN: Right. That's unusual, yes.

THE COURT: Okay. Let's bring the jury in.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Berrigan, you may continue.

MR. BERRIGAN: May it please the Court.

BY MR. BERRIGAN:

Q. Dr. Hutchinson, I'd like to turn our attention to one of the principal subject areas in Angela Johnson's life, her choice in men --

A. Yes.

Q. -- and ask you how her childhood and adolescent experiences relate to that particular subject matter. Can we discuss that for a moment?

3664

A. Of course.

Q. Okay. You've made some reference to it as we've gone on.

A. Yes.

Q. But specifically how does Miss Johnson's experience growing up as she did and her experiences as an adolescent, how did they later affect the decisions she made respecting the significant men in her life?

A. There's kind of a common statement that people say, you know, we marry our parents or you marry your mom, and that has some wisdom to it which is that psychology has substantiated that we do, in fact, repeat the patterns that were established for us early in life.

The particular patterns that Miss Johnson had were that she had an unavailable father and she had an abusive mother. So those two patterns are ones that she is going to be

Page 116

unconsciously seeking to replicate in adolescence and adulthood.

One theory is that we're trying to, quote, get it right this time or we're trying to overcome what didn't work the first time. So sort of basically she was repeating finding men who were abusive and who were abandoning like her two parents.

Q. And are there examples, concrete examples, of that behavior that she exhibited in her adult life?

A. Yes. Certainly with Terry DeGeus he was physically abusive. A number of the men that she chose were in varying ways unavailable. They were married. They lived out of town.

3665

Dustin Honken had another woman that he was simultaneously involved with. So unavailability can be -- take different forms, but they were ones that couldn't provide the kind of day-to-day nurturance and the day-to-day relationship that we would think of as a healthy relationship.

Q. Well, Mr. DeGeus seems to fall into a different category, would that be right, than being unavailable?

A. Yes.

Q. And certainly he was available to her in terms of being with her for a significant period of time.

A. Yes, he was.

Q. Before we talk about Mr. DeGeus, though, why would a woman choose to consciously make decisions about men choosing people that would be unavailable to be a realistic significant life partner?

A. Well, first I don't think they consciously choose them. I think that we are unconsciously drawn to those things in our life that we are trying to resolve psychologically. So I think she was unconsciously drawn to the unavailable and the abusive.

Page 117

Q. Let's talk about the abusive then.

A. Okay.

Q. And specifically Mr. DeGeus. You were provided and also in your interviews received information about her relationship with Mr. DeGeus?

A. Yes.

3666

Q. What did you understand the relationship between Angela Johnson and Terry DeGeus to have been?

A. I think it's the -- when it was good, it was very, very good and when it was bad, it was really bad fits for her, that she found him to be strong and a rescuer like her dad. He was a man who could do many things, and she looked to him to be that kind of strong person that she had wanted her father to be for her as a child. And there was some period of time when, in fact, initially that I think he was that kind of a man for her.

But his drug usage prompted extreme jealousy and paranoia, and out of that grew a violent relationship. He was physically abusive to her numerous occasions. And when she tried to break that off, he obviously had failed some of his own developmental stages, and he was very possessive, and he wouldn't let her go.

Q. Well, why didn't Miss Johnson leave Mr. DeGeus given the nature of their relationship and all of the violence that she experienced at a much earlier stage than she finally did?

A. Well, it was that "when it's good" part. The research on battered women is that battered women are hooked, if you will, by the cycle of violence where there will be a tension-building phase and then an instance of violence and then a honeymoon phase. And the honeymoon is the "I'm sorry; I didn't mean to do

Page 118

it; I'll never do it again; I'm going to bring you presents."

And this was a typical kind of behavior that Mr. DeGeus engaged

3667

in.

And what most battered women do is that they deny to themself that the violence is really violence. It's because he loves me or it's because I didn't have the house clean or it's because I didn't make pork chops or it's because he had a bad day. And they excuse the violence and pretend, if you will, that the relationship is really the honeymoon part. As time progresses, the honeymoons get shorter and the violence gets longer and the violence gets harder and more extreme.

Q. I want to ask you if there was any evidence from the materials and the interviews that you were provided that during the course of the relationship between Terry DeGeus and Angela Johnson -- and just to be very specific, I'm talking about certainly well before November of 1993; okay? Were there any instances in which Miss Johnson responded to this violence perpetrated upon her by Mr. DeGeus in a violent fashion herself acting out of any sense of vengeance against Mr. DeGeus?

A. None that I recall.

Q. You didn't see anything.

A. None that I recall.

Q. I want to ask you a few questions about some of the things that you said a little earlier this morning regarding choices that people make, even people that have had the experiences Miss Johnson's had. One of the things that you said was she had made a choice to be feared rather than loved, and I wanted to ask you

3668

Page 119

exactly what that means.

A.   Well, it wasn't a choice like do I want to go to this movie or that movie where you're thinking which do I want or do I want to go to this college or that college.  Retrospectively she labelled it a choice, but psychologically, it would have been in the moment an experience of I'm going to do the best I know how to do.

When she was ten, she recalled to me that she decided that she wasn't going to be a victim anymore.  And she kind of got a puffed-up bravado image defending her younger siblings, protecting herself.  And, you know, it's -- in a family where the biggest and the strongest get to beat up on the ones who aren't, then being bigger and stronger seems like the only way to survive.

Now, she didn't beat up people, but she wanted to get bigger and stronger, and she had this bravado about her.  We might say that she didn't act like a lady.  She liked to ride motorcycles and she ran a bar, so she had a strongness about her that is sometimes atypical for women.  And that was her way to try and be big enough in the world that nobody was going to hurt her anymore.

Q.   I want to ask you about the choice to use drugs from a psychological standpoint.  Is the choice to use illicit substances such as methamphetamine, is that the same choice for a person who has had Angela Johnson's life experiences as a

3669

child and an adolescent as it is for a person who's had a, quote, unquote, normal childhood and experience growing up?

A.   It's not the same at all.  Children who have childhood violence end up with a brain chemistry that is significantly

Page 120

different than children who don't grow up with that. The hypothalamus, pituitary and the adrenal glands function together to produce what's known as the fight-or-flight response, and we all have that, and it's available for us when we need it.

And a child who has been subjected to lots of danger, lots of instances where fight-or-flight mechanisms are triggered, they end up with an excessive chemical called cortisol. They have an excess of that in their brain, and it's also retriggered faster than it is in people who have not had childhood violence. That means that in situations where it wouldn't trigger such a big response in somebody else it's going to more quickly and to a greater extent trigger in them.

This leads to a need to in some way self-medicate that triggering, that hyperactivity, that startle kind of response that's there. It leads to promiscuity, drug abuse, passive and active suicide, promiscu -- I said that one -- in both teenagers and adults. That brain chemistry is looking for some kind of way to mitigate those responses, and she found that initially in the marijuana which calmed things down, and then as life progressed, she changed it to meth in order to get the things done that she needed to get done.

3670

Q. These childhood and adolescent experiences that caused some of the problems you've discussed with Miss Johnson such as her developmental disorders and the posttraumatic stress syndrome, are those treatable conditions?

A. They all can receive some kind of treatment. I believe that what she has received so far during the last few years has actually in part treated her posttraumatic stress disorder. One of the two main things that are treatment for posttraumatic

Page 121

stress disorder are the same drugs that you use for the treatment of depression which she has been using for four or five years since her incarceration. Those serotonin drugs help alleviate the reactivity that's common in posttraumatic stress disorder.

The other way that posttraumatic stress disorder is treated is through talking through those experiences. The whole investigation for this instance here has led her to talk to people about her childhood that she never had done before. And I believe that she has made significant progress. She indicated that she had forgiven her mother, she'd forgiven her father, and that's really pretty far along in the treatment of PTSD.

Q. What about the other -- you know, the other maladies, if you will, from the Erikson model that we've talked about and some of her feelings of self-worth and depression and some of the other matters you've discussed? Are those treatable conditions?

3671

A. They are. They're a little more difficult to treat. One of the things that is crucial is that the person stops doing chemicals. At the point that somebody starts doing chemicals, they stop developing. So if you start doing drugs at 14, you stop growing up at 14 because you just can't move through those cycles if you're in an impaired consciousness.

So having been drug free and emotionally stable on her regular medications has allowed her a lot of experiences of growing up.

Again, there are redemptive kinds of experiences that can help people. I usually say that there are three things that can help people who have bad childhoods. One is long-term

Page 122

psychotherapy which is expensive, time consuming, and pretty tough for most people to accomplish.

The other is religious experiences, religious conversion kinds of experiences and being involved in a spiritual community of some kind.

And the third one is having a loving, long-term relationship is also a way to mature and heal some of the things from childhood.

Q.   Of those three methods I suppose that you'd recommend, does Miss Johnson have any of those available to her?

A.   I think that she's in some ways working on all three, that she's not involved in psychotherapy per se, but she's been doing a lot of soul searching and a lot of talking and trying to come

3672

to terms with the things that have happened to her in her life.

Given the time that she's had, she's pursued her religious expression, sort of undoing what she got as religion and finding her own way of spirituality.

I think that children who believe they're bad believe that they'll never be anything, that there's nothing to them can heal a lot of that when they realize that God loves them and God cares for them and that that's really bigger than Mom and Dad had lots of troubles and they didn't know how to treat me.

And thirdly is because of her new stability, she has reestablished very substantial, loving relationships with many members of her family and through that I think is also getting additional healing.

MR. BERRIGAN:  Thank you.  That's all I had.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

Page 123

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Doctor, I want to go back over some of the things you spoke about with counsel here. In arriving at your opinion, you looked at the defendant's past history.

A. Yes.

Q. And there were certain events in that past history that were significant to you in helping you arrive at your diagnosis in this case; is that fair to say?

3673

A. Sure.

Q. One of those events was this conduct that occurred down at the Dillo orphanage in Kansas. Is that fair to say?

A. That's fair.

Q. Okay. And your understanding that you used in part to arrive at your analysis is that down there these Dillos engaged in sadistic practices with animals. I think those were your words.

A. It was sadistic for the children how they treated the animals, yes.

Q. Okay. And your understanding is they beat rabbits and squirrels in the head with sledgehammers?

A. Yes.

Q. And threw kittens into the pen with pigs.

A. In part, yes.

Q. You also based in part your analysis on the fact that she had a young pregnancy and this to you was an outgrowth, if you will, a result of some of her trauma or problems growing up in her adolescence.

A. Yes.

Page 124

Q. I think in your own notes you indicated when we're talking about the various stages you put this at the stage of 12 to 18, married and had a child.

A. Yes.

Q. Okay. And that was a young pregnancy.

3674

A. Beg pardon?

Q. That was a young pregnancy.

A. Yes.

Q. And young pregnancies can have an effect on people if you have a child too young; right?

A. They certainly can.

Q. So when is it that you believe she had a child the first time, ma'am?

A. I think it was when she was 18.

Q. Okay. How about 19 1/2?

A. Okay.

Q. Okay? And that wouldn't actually fit within that time period of 12 to 18; right?

A. I made a mistake on that year. I thought it was 18.

Q. And she got married when she was 16, but she didn't get pregnant with that first marriage, did she?

A. No.

Q. So she was able to make a decision whether to have or not have a child when she was pretty young.

A. I don't know whether that was a decision or an accident.

Q. You indicate in part that your decisions or at least one of the conclusions I guess you've reached is that she was attracted to, I think in your term, bad boys.

A. Yes.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3221 of 3592

Q.    Abusive and abandoning men; right?

3675

A.    Yes.

Q.    Okay.  Steve Hugo, her first husband, was a guy that was blind in one eye, and she left that marriage because she was bored; right?

A.    Exactly.

Q.    He was not a bad boy in the definition, was he?

A.    Right, which is why she left.

Q.    Her next husband was Arlyn Johnson.

A.    Yes.

Q.    And she thought he was boring and acted like a married man.

A.    Yes.

Q.    So, in fact, she was also attracted and married -- the only two marriages in her life were to men who were not bad boys; fair?

A.    Yeah, those were very short relationships.

Q.    You indicate that she has a poor self-worth.  But, in fact, ma'am, hasn't she described herself as a good person?

A.    Those aren't incompatible.

Q.    She's described herself as a good worker.

A.    Yes.

Q.    She's described herself as a good mother.

A.    Yes.

Q.    And she described herself as a good person.

A.    Yes.

Q.    The posttraumatic stress disorder diagnosis you arrived at,

3676

Page 126

ma'am, in order to arrive at that diagnosis, you need to rely on her self-reporting of having nightmares or flashbacks. That's one of the requirements for you to be able to diagnose as a clinician somebody with posttraumatic stress disorder.

A. Neither nightmares nor flashbacks are requirements. They're one of the possibilities.

Q. And one of the possibilities you relied upon in this case to reach your diagnosis, her self-reporting that she had nightmares.

A. That's true.

Q. And that was necessary for you to be able to arrive at your diagnosis in this case.

A. It wasn't necessary. It was part of it.

Q. Without that, would you be able to have arriven -- arrived at your diagnosis, ma'am?

A. I would have to go back and look at the exact criteria that I used on that diagnosis now. I don't believe that that was a make it or break it.

Q. It's what you relied on in this case, though, to reach your diagnosis is that she had nightmares reported to you by her.

A. That's one of the things she reported, yes.

Q. And she told you this after she had been charged with a capital offense.

A. Yes.

Q. She told you this after you had been specifically hired for

3677

the purpose of analyzing this case for mitigating evidence.

A. Yes.

Q. She was actually treated or seen by a psychiatrist back in 1996, wasn't she?

Page 127

A.    Briefly.

Q.    And she was not diagnosed with posttraumatic stress disorder in 1996, was she, ma'am?

A.    No.

Q.    And this woman upon whom you're relying to tell you that she had these events that occurred to her and had these nightmares and so forth, are you aware this is the same woman who repeatedly appeared before the federal grand jury and lied to the federal grand jury?

A.    I don't know that testimony.

Q.    Despite these problems that you've identified with Angela Johnson in her adolescence, the fact is she was not a juvenile delinquent, was she?

A.    Well, there are many definitions of juvenile delinquent.

Q.    All right. Let me just do it this way. She was not involved in the criminal justice system as a child.

A.    That's correct.

Q.    She was not arrested for committing crimes as a child.

A.    That's correct.

Q.    Even after she got married when she was 16, she wasn't arrested for being involved in any criminal activity, was she?

3678

A.    No.

Q.    Despite these problems, she apparently was able to confine her conduct to the dictates of society after she was in her early 20s and was not arrested for any criminal activity in that time period either.

A.    She was not arrested.

Q.    She was able, despite all these problems, to have jobs; right?

Page 128

A.   Yes.

Q.   She was able to have a house that she maintained; correct?

A.   For a short period, yes.

Q.   She was able to have some children that she raised.

A.   Yes.

Q.   In fact, she did not become involved in criminal activity based on your knowledge until she was in her late 20s; isn't that fair to say, ma'am?

A.   Well, she was involved in drug usage prior to that.  She wasn't ever arrested for any of that, but it was still criminal activity.

Q.   And, in fact, her drug usage wasn't so bad that she ended up getting arrested.  There are people out there that have such bad drug habits that it actually impacts their day-to-day life, doesn't it?

A.   Sure.

Q.   They repeatedly get arrested for drug possession; right?

3679

A.   Yeah.

Q.   They can't show up to work because they're so off on drugs; right?

A.   Yes.

Q.   Their attendance falls off; right?

A.   Sure.

Q.   Can't keep -- can't take care of their children; right?

A.   Sometimes.

Q.   That doesn't describe Angela Johnson, does it, ma'am?

A.   There are pieces of that that occurred occasionally.

Q.   The beginning of your testimony in part was a discussion of what you were hired to do in this case.  Do you remember that

Page 129

discussion with defense counsel?

A.    Of course.

Q.    And you were specifically not to ask any questions of Angela Johnson concerning her state of mind at the time that she committed these five murders.

A.    That's correct.

Q.    There wasn't anything stopping you from doing that other than the fact that you were instructed not to do that; is that correct?

A.    I guess not, yeah.

Q.    And so you are not here offering any opinion whatsoever concerning whether this mental condition of posttraumatic stress disorder that you've diagnosed her with had any effect on her

3680

thinking or behavior at the time that she committed these offenses, are you, ma'am?

A.    I've been very clear that I'm not saying that that contributed to it.

Q.    You are not suggesting in any way that she was acting under any form of duress at the time that she committed these murders?

A.    I have not asserted that.

Q.    You are not asserting that she acted under any form of mental defect that affected her ability to recognize that what she was doing was wrong when she participated in the murders of five people.

A.    I wouldn't be -- I would have been in the other phase of the trial had I been doing that, yes.

Q.    So the answer to my question is you are not giving that opinion.

A.    That's correct.

Page 130

Q.  You are not asserting that she was unable to understand what she was doing when she went out and purchased an assault weapon for Dustin Honken.

A.  I'm not asserting that.

Q.  You're not asserting that she did not understand what she was doing when she helped him gain entry into a house and tie up and gag victims.

MR. BERRIGAN:  I'm going to object to this whole line of inquiry.  It's been repeated now with the earlier witness,

3681

and this witness has made it clear, Your Honor.  This is repetitious, and these questions have already been asked and answered several times.

THE COURT:  It's getting real close, so you can wrap this part of your cross up.

MR. WILLIAMS:  I will wrap it up.

THE COURT:  Okay.

BY MR. WILLIAMS:

Q.  I do want to make perfectly clear, though, ma'am, you are not in any way indicating that she did not know exactly what she was doing and acted with free will at the time that she participated in the murders of five people.

A.  I don't know what she did in relation to those.  I haven't discussed them.

Q.  And, ma'am, free will has a place in this society, doesn't it?

A.  Of course.

Q.  Despite all the problems that any one of us grew up with and have as experiences in our life, bottom line is we all have the ability to make choices, don't we, ma'am?

Page 131

A.    We all have the ability to make choices within our biological, psychosocial histories.

Q.    Okay.  I'm just trying to make sure.  Are you suggesting that somehow she did not have the ability to make choices?

A.    I think that she had the ability to make choices.  I think

3682

some choices are different for different people.  And I'm just making sure that I'm not saying that everybody can choose everything at every time.

Q.    Just so we're clear, you're not asking this jury to conclude that Angela Johnson somehow suffered mental defects that affected her ability to make choices.

        MR. BERRIGAN:  Asked and answered again.  I'll object, sir, repetitious.

        THE COURT:  Overruled.

A.    Yes, I've said that.

        MR. WILLIAMS:  Nothing further, Your Honor.

        THE COURT:  Mr. Berrigan?

        MR. BERRIGAN:  I'll be brief.

                    REDIRECT EXAMINATION

BY MR. BERRIGAN:

Q.    Why don't I explore this idea of choices first.  Are the choices for a person who's had Angela Johnson's life in your view as a psychologist these many years and your experience with patients, are those the same choices that I get to make having grown up in a normal if not advantaged childhood and adolescence?

A.    No.

Q.    And why are they different?

A.    The biology is different.  If you have an alcoholic parent,

Page 132

you have a 50 percent chance of inheriting a gene or the biology

3683

that if you drink you'll become alcoholic.  You don't have that list of virtues that we talked about in terms of trust and initiative and ways of being positive in the world.  You're not going to have those as a backdrop, as an undergirding.  You're not likely to have a family upon whom you can rely when things get tough the way I've done, the way many of you have probably done, whether it's you call home and just cry on somebody's shoulder or you ask for a loan for a hundred dollars.  Some people don't have those choices, and it makes a difference in what life choices are available to them.

Q.   The prosecutor asked you several questions about Miss Johnson having the ability to, I guess, pay the mortgage on a house, have a job, sort of go through the everyday experiences of life.  Are those things, the ability to kind of survive day to day, does that mean she's not mentally or psychologically impaired?

A.   No.

Q.   Do you have patients that are even severely mentally ill that are able to do those types of things?

A.   Oh, sure.  And some of them do them with psychotropic drugs to help them.  Some of them do them with coming to therapy twice a week.  Angela did it by taking meth.  You know, I think we -- if you have deficiencies, if you have a broken leg, you use crutches.  If you have psychological weaknesses, you either try and find somebody to lean on or you use drugs or you find a way

3684

to cope and that all of us do that with what things are
Page 133

available in our environment and within our psyches.

Q. You were asked, Dr. Hutchinson, about some mental health treatment that Miss Johnson received back in 1996. Do you remember seeing that in the records?

A. Yes, I do.

Q. And there was a diagnosis at that time, was there not?

A. Yes. I believe it was major depression.

Q. And that was an axis 1 diagnosis.

A. That's correct.

Q. And tell the jury what that means to be an axis 1 diagnosis of major depressive disorder.

A. There are different kinds of diagnoses. An axis 1 diagnosis is what are the clinical symptoms that the person is most profoundly presenting at this time. Major depression includes sleep disturbance; eating disturbance; mood disturbance; often irritability; concentration; affect variability, kind of up and down; thoughts of suicide; feeling blue and depressed and hopeless. That was what she was manifesting most at that time, and so, of course, that was the most appropriate diagnosis, and she received medication for that.

Q. Well, not only that, but the examiner at that time, do you -- is there anything in the records to reflect that the psychologist -- I think it was a psychiatrist that examined her

3685

at that time made any inquiry about what happened to her in Chanute, Kansas, or what the religious practices of her mother Pearl Jean Johnson were 25 years before or whether there was any discussion about Terry DeGeus repeatedly beating her and throwing her out of moving cars and leaving her on the side of

Page 134

the road? Do any of those things appear in those records?

A. I think there were a couple brief sentences or references to that she had a pretty tough childhood, she didn't want to talk about it, and the person didn't push her on that.

Q. Finally, this discussion that was had about Miss Johnson's poor self-image and you were asked questions about whether she had reported or described herself as a good person, a good worker, and a good mother, do you recollect those questions?

A. Yes.

Q. Do those responses indicate to you at all that she had some high self-esteem or high self-worth?

A. No. I think what they do is reflect some of the growth that she's made in the last few years, that she is beginning to improve her self-esteem and beginning to say, I'm going to do these things better, and I can be a better person; I can be a good mom, and those things are really important to me where I live now. I have no doubt that there is still an underlying "I'm a bad girl" that came from her childhood that is still there that in the darkness of the night still eats at her in some ways and that that will take some time to resolve through

3686

her religious faith and the love of her family. The "I'm a good person" is in some ways a new awareness for her.

Q. This is the real finally. That was only the false finally. When you were retained in this case, when I contacted you, was it made clear to you that the investigation that you were going to conduct and the evaluation of Miss Johnson was strictly for purposes of presenting evidence in the penalty phase of a capital murder trial if we got there?

A. Yes.

Page 135

Q. Now, in your practice in working for lawyers and judges, do you think you'd have much of a forensic practice if a judge told you to do an evaluation for a specific purpose and received instructions and you violated those instructions?

A. I can't even fathom doing that. One, it'd be unethical. Two, it'd be stupid.

MR. BERRIGAN: That's all. Thank you.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No, Your Honor.

THE COURT: You may step down.

Members of the jury, you can take a stretch break.

Are you ready to call your next witness?

MR. BERRIGAN: We are, sir.

LOU ANN HARE, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And you can adjust the chair and the microphones so you

3687

can speak directly into the microphones. And you have to scoot up that chair and get nice and close to the microphones. You can adjust those microphones and pull them towards you. And then when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is Lou Ann Hare; spelling of my last name, H-a-r-e.

THE COURT: Mr. Berrigan?

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q. Is Lou Ann one or two words?

A. Two words.

Q. Two words.

Page 136

A.    Uh-huh.

Q.    And could you tell the jury a little bit about yourself, Miss Hare?  Where do you live?

A.    I live in Mason City, Iowa.

Q.    And what do you do there?

A.    I'm a nurse's aide.

Q.    How long have you been a nurse's aide?

A.    Four years.

Q.    Where do you work there?

A.    Good Shepherd.

Q.    And what kind of a facility is that?

A.    Nursing home.

3688

Q.    Are you a married or single lady?

A.    I'm divorced.

Q.    Do you have any children?

A.    I have one daughter who's 14.

Q.    Where were you born and raised?

A.    I was born in Denver, Colorado, but I was raised in Fertile, Iowa.

Q.    And how long have you lived in the Mason City area?

A.    In Mason City?

Q.    Yes.

A.    Probably ten years.

Q.    Ten years.

A.    Uh-huh.

Q.    Okay.  Before you lived in Mason City, where were you living?

A.    I've kind of lived around Fertile, Forest City, Clear Lake, Garner.

Page 137

Q.    In the kind of Clear Lake/Mason City metropolitan area?

A.    Yeah, that big metropolis, yes.

Q.    Do you know the lady seated to my left, Angela Jane Johnson?

A.    Yes, I do.

Q.    And how is it that you know her?

A.    Her and I are friends.

Q.    How long have you known Miss Johnson?

3689

A.    Since we were in seventh grade.

Q.    And when you were -- I know it's probably 10 or 12 years ago, but when you were in the seventh grade, where were you going to school?

A.    Forest City Middle School.

Q.    Middle school.

A.    Right.

Q.    Did you complete your education in Forest City?

A.    Yes, I did.

Q.    And how far did you get in school?

A.    I have -- I went and got an associate's of arts degree at NIACC.

Q.    So you obviously graduated from high school.

A.    Yes.

Q.    At Forest City?

A.    Uh-huh.

Q.    And then you went on and got some college degree, associate's degree.

A.    Yes, a community college, yes.

Q.    Community college.

A.    Uh-huh.

Page 138

Q. Was Angela Johnson in the same grade as you?

A. Yes, she was.

Q. And do you know whether she finished high school at Forest City?

3690

A. No, she didn't. I believe she dropped out in seventh grade.

Q. After she dropped out of school, was there a period of time there that you and she didn't see much of each other?

A. Right. We lost contact of each other from when she dropped out of school until -- I would want to say it was 1986 or '87.

Q. You got back -- your lives kind of crossed again.

A. Yes, they did.

Q. What were the circumstances under which that happened?

A. She was a waitress at Perkins, and I was working at Unisys. It was a computer factory in Clear Lake. Perkins was in Clear Lake as well, and I just stopped in there one night to -- I can't remember if I was getting a bite to eat or something to drink, and she was working and kind of just got to be friends again.

Q. And you hadn't seen each other for a number of years up till then.

A. That's right.

Q. At that time were you married?

A. No, I was single.

Q. You were single.

A. Right.

Q. And what about Miss Johnson when she was working at the Perkins?

A. She was divorced.

Page 139

Q.    She was divorced.

A.    I believe.

Q.    So what kind of things -- once you and she kind of got reacquainted or renewed your friendship, what kind of things did the two of you do together?

A.    Well, we just did normal girl things.  We would lay out, go shopping, do our nails, stuff like that.

Q.    Did you get to meet some of the people in each other's lives?

A.    Yes, we did.

Q.    Did you know some folks that -- I mean, did you have some acquaintances in common?

A.    Yes, we did.

Q.    What -- at that time do you know what Miss Johnson's situation was regarding any significant relationships with men in her life?

A.    At that time she dated several -- it was no one steady, but there was always men that were taking her out on dates, sending her flowers, stuff like that.

Q.    And at some point did that change where she went from, you know, dating a number of men to dating one person exclusively?

A.    Yeah, but I can't tell you for sure what year it was.

Q.    That's okay.  I just wanted to know really who that was.

A.    She started seeing Terry DeGeus.

Q.    Did you know Mr. DeGeus?

A.    Yes, I did.

Page 140

Q.   How did you know him?

A.   I -- kind of an acquaintance.  He would be out and about when we would be out as well.

Q.   And before Angela started dating him, what was your opinion of Mr. DeGeus?

A.   I thought he seemed like a nice guy.

Q.   So were you pleased that she was -- your friend was dating Mr. DeGeus?

A.   Yeah, nice looking.  He was muscular, yeah, nice guy.

Q.   And how did she seem to feel about him?

A.   She liked him.  I couldn't say for sure if she loved him, but they had a rather up-and-down relationship I guess I would call it.

Q.   Kind of turbulent?

A.   Yeah, it was never a smooth -- it was kind of rocky.

Q.   What about it, that relationship, made it rocky from your perspective?

A.   He was abusive to her.

Q.   And when you say abusive, just to be clear, what are you talking about?

A.   Physically abusive, verbally abusive.  I can't speak of the rest, like emotionally or sexually.  I don't know about that.

Q.   But verbally and physically you did see that.

A.   Yes, uh-huh.

3693

Q.   And what -- did you ever see Mr. DeGeus personally physically abuse Angie?

A.   No, I did not.

Q.   How did you know that he did that?

A.   Well, one night she came up to my house in the middle of

Page 141

the night. I was living in Mason City, and she had two black eyes that came -- they were huge, and her nose was all busted up, and she had told me that Angie -- or that Terry had done that and that she was going to leave town for a couple months while her face healed up.

Q. Did she do that? Did she leave town?

A. Yes, she did.

Q. Do you know whether they got back together thereafter nonetheless?

A. I believe they did.

Q. During this time that Miss Johnson was seeing Mr. DeGeus, were you still seeing her pretty regularly?

A. Kind of off and on. We would run into each other, maybe do stuff for a couple of weeks, but -- then we would kind of go our separate ways and maybe reconnect in six months, nine months, a year. Just depended.

Q. Were you aware either before or after she was using -- dating Mr. DeGeus whether she was using any type of illicit drugs?

A. Yes.

3694

Q. How did you become aware of that?

A. We did them together.

Q. Okay. About when roughly? I'm not pinning you to some date, but roughly when did you and Miss Johnson start doing drugs together?

A. I would say it was '88, '89, somewhere in there.

Q. And was there one drug that you used more than others?

A. Yes.

Q. What was that?

Page 142

A.     Methamphetamine.

Q.     Methamphetamine.

A.     Uh-huh.

Q.     How did that work?  I mean, we've learned a little bit about methamphetamine, but how often would you use methamphetamine, you and Miss Johnson together?

A.     Usually once or twice a month we would get some crank, crank, methamphetamine, on a -- we would usually get an eight-ball which I can't tell you grams, ounces.  I don't know what that was.  But we would get that, and then we would do it from Thursday night till Sunday morning.

Q.     And while you were using that methamphetamine, were you sleeping or resting?

A.     No, we didn't sleep.

Q.     Not at all.

A.     No, not at all.

3695

Q.     So what would you do between like a Thursday night and a Sunday if you weren't at all sleeping?

A.     A bunch of nothing.  Just wasted.  Did our nails, talked on the phone, maybe would clean our house; kind of wasted energy it was when you're on it.

Q.     How much would an eight-ball of methamphetamine cost back then anyway?

A.     $250, and me and her would split the cost.

Q.     You'd split it.

A.     Right.

Q.     Now, were you spending time with Angela Johnson together at that time in your life where you weren't using methamphetamine?

A.     Say that again.

Page 143

Q.  Yeah.  You've told us that you did this once or twice a month.

A.  Right.

Q.  And what I was asking is would you be spending more time with Angela than once or twice a month, or every time that you were together were you using methamphetamine?

A.  I understand.  No, we would spend time whether we were doing drugs or not.

Q.  Okay.  So you were friends irrespective of the drug use.

A.  Absolutely.

Q.  And is this something that you both enjoyed, the methamphetamine?

3696

A.  We did I believe, yeah, at first.

Q.  And that at first that you just mentioned, was there a change in your behavior regarding methamphetamine at some point?

A.  I can't tell you what year it was.  I'm not very good with dates.  But I was starting to question if I was getting addicted to it because it seemed like -- Angie had bought a bar, and I would go up and help her on the weekends, and it seemed like we were doing lines like once every 15 minutes, every half an hour, and I thought to myself, am I getting addicted to this stuff, which I thought I probably was.  And I didn't want to be, and so I just quit doing it.

Q.  So you were able to just stop?

A.  Yes, I was.

Q.  And what about Miss Johnson?  Did you have any discussions with her about, Hey, you know, I think maybe we're doing too much of this methamphetamine?

A.  Yes, I did.

Page 144

Q. What was her response to your concerns about this potential for addiction?

A. She told me that she loved crank and she wanted to do it every day for the rest of her life.

Q. So she didn't --

A. She loved it.

Q. -- didn't have your concerns.

A. No.

3697

Q. In fact, quite the contrary.

A. Quite the opposite, yeah.

Q. Do you know whether or not when you stopped doing it, did she seem to continue her drug usage?

A. Yes, I believe so.

Q. And was it the same as it had been before, or did it seem to increase to you?

A. I think it increased.

Q. While that was going on, even while Miss Johnson was using methamphetamine, was she still working?

A. Yes.

Q. And you yourself, did you have a full-time job?

A. Yes, I did.

Q. And you said already you had a child.

A. Not at that time.

Q. Oh, not at that time.

A. No, I didn't have my daughter till '91.

Q. Were you paying the rent and --

A. Absolutely.

Q. -- paying your car payments and everything else?

A. Paid all my bills. Absolutely.

Page 145

Q.   So at least at that time when you were using meth once or twice a month, it didn't seem to affect the other aspects of your life.

A.   No, it didn't.

3698

Q.   And Miss Johnson, she was kind of in a different situation than you?

A.   Yes.

Q.   Certainly in terms of her usage.

A.   Yes, I believe so.

Q.   Okay.  This change when you decided you're not going -- I'm not going to do this anymore --

A.   Right, and I also -- I kind of quit hanging around with Angie as well so I could kind of get away from it.

Q.   That was my next question.

A.   Sorry.

Q.   That is, did that change your relationship with her?

A.   Yes, it did.  It wasn't that we weren't friends.  I just chose not to be around her and the drugs for a while.

Q.   Okay.  And why did you make that decision about not being around the drugs?

A.   I was just getting very concerned that I was doing it a lot I thought.

Q.   And if you were around it, did you have some concern that you might be tempted to do it?

A.   Absolutely.

Q.   So you made a change then in your personal circumstances.

A.   Yes.  I also moved.

Q.   You moved.

A.   Yes.

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3242 of 3592

Q.   Did that have something to do with your methamphetamine use?

A.   Yes.

Q.   What about the move do you think helped you in terms of not using methamphetamine?

A.   From what I've heard from people -- and it did seem to work in my instance -- that change your friends and your -- and like the people that you hang around with and then maybe you're not as apt to do drugs.

Q.   And that was helpful to you.

A.   Yes, it was.

Q.   Did you also make some changes in your own working situation and what you were doing for a living?

A.   Yes, I went to college, and I went and graduated from NIACC, a community college, and got my degree for nursing.

Q.   So you not only stopped using methamphetamine, you went back to school.

A.   Yep.

Q.   And as a result you have the job that you have today.

A.   That's correct.

Q.   I want to ask you just about some of these folks we haven't talked about.

A.   Okay.

Q.   But do you know a lady by the name of Christi Cole Gaubatz?

A.   I'm sorry.  Christi what?

3700

Q.   Christi Gaubatz.

A.   Yes, I do.

Page 147

Q.   She once went by Christi Cole.

A.   Oh, I didn't know that.

Q.   You didn't know her as Cole.

A.   No.

Q.   You know her as Christi Gaubatz?

A.   She's employed at the Good Shepherd Nursing Home.

Q.   So you work together.

A.   We don't work together.  She works down in laundry, so we work in the same facility but not together.

Q.   I see.  And are you and she friends by any chance?

A.   I wouldn't say that -- no, not friends.  Coworkers.  We work in the same facility.

Q.   What about Mr. DeGeus?  When you made this change in your life to kind of get away from methamphetamine, did you continue to have any contact with Mr. DeGeus?

A.   No.

Q.   Not at all.

A.   None at all.

Q.   Did you ever meet a fella by the name of Dustin Honken?

A.   Yes, I did.

Q.   How did you meet him?

A.   I met him on, I would say, two or three times over at Angie's house.

3701

Q.   And what was he doing there?

A.   One of the times I know it was her daughter Marvea's birthday, and another time I believe he was just over visiting her, and I happened to stop by.

Q.   And do you know whether or not when you saw Mr. Honken at Angie's house whether they were in a relationship?

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3244 of 3592

A.    Yes, they were.

Q.    They were.

A.    Uh-huh.  They had a daughter together as well.

Q.    Okay.  So what did you think of Mr. Honken in terms of the other men that you knew Angie had been involved in?

A.    Very out of character for her.  Normally she -- like Terry DeGeus and other men that she dated were more the biker, Harley rider tough guys.  Dustin Honken, totally opposite end of the spectrum.  To me he seemed almost like Opie Taylor, kind of a nerd, kind of geeky.

Q.    And so did that surprise you she was involved with a fellow like that?

A.    Very much so.  Very much so.  And I even asked her about it.  And she just said that she liked him.  I said, Well, he's sure not your type so . . .

Q.    Okay.  Do you know whether or not she was still involved with methamphetamine at that time?

A.    Yes, she was.

Q.    Her -- regarding the biker-type folks that she was involved

3702

with and obviously we talked a little bit about Mr. DeGeus --

A.    Right.

Q.    -- did you have any view as her friend about how she was in terms of her choices in men?

A.    I did question it at times, but I figured that's her choice.  I myself have made a few choices -- I made choices as far as relationships and didn't ask for her approval, so I pretty much did what I wanted.

Q.    And she didn't ask for your approval necessarily.

A.    No.

Page 149

Q. Okay. During the time that you knew her, did she always work as a waitress?

A. Not always, not always.

Q. Okay. What other types of work did she do?

A. At one point she was a dancer.

Q. A dancer?

A. Yeah.

Q. And just to be clear, when you're -- you're not talking about kind of a country dancer.

A. No. She was a stripper.

Q. A stripper. Kind of an exotic dancer if you will.

A. That would be the term, yes.

Q. And we were I guess all younger and thinner then, but was she a pretty goodlooking young lady?

A. Very pretty, very attractive.

3703

Q. And would you -- how did you know that she was doing this dancing?

A. Occasionally I would go down wherever -- whatever town she was dancing in, I would go down and visit her on the weekend.

Q. And you said whatever town she was dancing.

A. Yeah, she didn't dance in north Iowa.

Q. She didn't.

A. No. It was more Fort Dodge, Des Moines, Austin, not around our stomping ground.

Q. Do you know why she wasn't dancing around locally?

A. I would guess she probably didn't want everyone in north Iowa to know that's what she was doing.

Q. Was that a pretty well-paid position?

A. Very well. In fact, I know many times she made, say,

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3246 of 3592

$1,500 in a week. That was a lot of money. I even thought myself, boy, that would be a good profession if a girl would be able to do that. I just couldn't do that so . . .

Q. You said you spent some time with her when she was actually doing this.

A. Right.

Q. Doing the exotic dancing.

A. That is correct.

Q. Was there any aspect of prostitution or sex involved with that?

A. Absolutely not. And, in fact, she would make several

3704

comments about other girls that were getting paid to have sex, dancing very raunchy on the stage or whatever it's called. That very much bothered her. She was in it strictly to dance. Of course, she did take her clothes off but not to have sex with men.

Q. It was a financial deal for her.

A. Right, absolutely.

Q. And at some point did she stop doing the dancing?

A. Yes, she did.

Q. Do you know why?

A. She had told me she had -- she was going to stop doing it because she was afraid that her older daughter Alyssa -- at the time it was the only daughter she had. She was afraid that it might get out or kids might start giving her daughter a hard time for what her mom did for a living.

Q. She didn't want other people to make fun of her daughter because of her --

A. Absolutely. She didn't want that.

Page 151

Q.   And she stopped doing that.

A.   Yep.  She did even though the money was extremely good.

Q.   Have you maintained contact with Miss Johnson over these years?

A.   Yes, I have.

Q.   And how do you keep in contact with her?

A.   We write letters.

3705

Q.   Is she able to call you on the telephone?

A.   No.

Q.   No.  And you said you have a daughter.  And how old is your daughter did you say?

A.   My daughter is 14.

Q.   Did Miss Johnson have a relationship with your daughter?

A.   Yes, she did.  They were very good friends.  My daughter, she loves Angie.  I never seemed to have a whole lot of money and Angie would come by, go for a ride.  We'd go get ice cream, go to the park, maybe go for a drive and stop at a fast food restaurant.  My daughter liked Angie a lot.

Q.   This decision about the punishment, Miss Hare, is that a decision that would have an effect on you?

A.   On me?

Q.   Yeah.

A.   Yes, absolutely.

Q.   And your daughter as well?

A.   Absolutely.  She's even talked to me about -- within this last week about she asked me, Is Angie going to have to be in jail forever, and I said, Yeah, and she said, Wow, that really sucks.  Excuse my language.  And I've tried to explain to her why I'm coming here to testify today, and she I know will have a

Page 152

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3248 of 3592

very hard time with -- if she does get convicted of death penalty or whatever it's called.

Q. What about if Miss Johnson were to get a sentence of

3706

imprisonment? Would you continue to maintain a relationship with her?

A. Yes, I would. Yes, I would.

MR. BERRIGAN: Thank you. That's all I have.

THE WITNESS: Thank you.

THE COURT: Mr. Williams, any questions?

MR. WILLIAMS: No questions, Your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you.

VERLEEN VANDERPOOL, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And you can adjust the chair and the microphones so you can speak directly into the microphones. So we'll need you to kind of scoot that chair up. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Verleen Olive Vanderpool, V-a-n-d-e-r-p-o-o-l.

THE COURT: You're very soft spoken, so can we get you to scoot up even a little bit closer if you can? Thank you.

Mr. Berrigan?

MR. BERRIGAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q. Miss Vanderpool, could you tell us a little bit about yourself? Where do you live?

3707

Page 153

A.    I live just outside of Des Moines in Adel, Iowa.

Q.    Adel, Iowa?

A.    Uh-huh.

Q.    And are you from Iowa originally?

A.    Yes, I'm from Clear Lake.

Q.    Clear Lake.  And how long have you lived outside of Des Moines?

A.    In the Des Moines area.

Q.    Yeah.

A.    We've lived there since '95.

Q.    1995.

A.    Uh-huh.

Q.    Before that where did you live?

A.    In Mason City.

Q.    And did you grow up in Mason City?

A.    No, in Clear Lake.

Q.    Oh, I'm sorry, in Clear Lake.

A.    Uh-huh.

Q.    They're pretty close to each other, aren't they?

A.    Right.

Q.    What is it that you do for a living?

A.    I have restaurants currently.

Q.    And when you say you have restaurants, what do you mean by that?

A.    I went on my own in 2000 and opened up cafes and have

3708

franchised -- we own two of them, and I franchised three of them with a fourth to open.

Page 154

Q.    What kind of restaurants are they?

A.    Unique, interesting, upscale, creative artsy bistros like.

Q.    Give you a chance to plug them.  You said you own two of them and you have two others that are franchised?

A.    A fourth will be in the works here soon.

Q.    And do you work in any of these restaurants?

A.    Actually I just kind of at this point go between all of them and just make sure everything is being done the same way.

Q.    You indicated that you went out on your own in 2000 and did this.

A.    Correct.

Q.    Do you mean purchase your own restaurant or started your own restaurant?

A.    Right, came up with the idea of, concept.  Having been in the country club business for so many years, I was ready to not work the evenings and the weekends that that required.

Q.    That was -- you kind of anticipated my next question, and that is, what did you do before you became a restaurant owner?

A.    Seventeen years in the country club environment.

Q.    And for the jurors, what does it mean?  Seventeen years in the country club environment, what does that mean?

A.    I managed 2 country clubs, 12 years in Mason City and 5 in Urbandale.

3709

Q.    And the management of these country clubs, is it the whole country club that you're responsible for?

A.    Unfortunately.

Q.    The whole thing.

A.    Yeah, except the golf course.  Okay.  No golf course.

Q.    The golf course is run independently.

Page 155

A. Just the food and beverage on the golf course.

Q. So you've been in the food and beverage business, the restaurant business for quite a long time.

A. Yes.

Q. The lady seated over to my left with the glasses on, do you know her?

A. Yes.

Q. How do you know her?

A. She was an employee of mine beginning at the Mason City Country Club.

Q. And just -- I know you said you worked in Mason City for 12 years; right?

A. Uh-huh.

Q. But could you tell us what years those were roughly?

A. Okay. I left in '95, so '83 until '95.

Q. And Miss Johnson worked for you for a period of time then?

A. Correct.

Q. Do you know how long she worked up there at the Mason City Country Club?

3710

A. Well, three years.

Q. What was her job there?

A. She was a waitress.

Q. Waitress? Did you hire her yourself?

A. Yes.

Q. How did she do as a waitress?

A. Very well.

Q. What kind of hours did she work when she was a waitress for you at the Mason City Country Club?

A. It's not uncommon in a country club situation where there

Page 156

are split shifts where you come -- it just -- full- and part-time work, split shifts. You work lunch, 10 to 2, and then you may come back in the evenings at 5 on any given night.

Q. You have to work when the need requires you to be there.

A. Correct.

Q. And so there's some fluidity to that. You have to be flexible.

A. Exactly.

Q. Usually did the work involve at least 40 hours a week kind of a schedule?

A. Yes.

Q. And sometimes more than that?

A. I tried not to get into overtime.

Q. They'd have to pay overtime after --

A. Right.

3711

Q. Is that place -- the Mason City Country Club, was it open seven days a week?

A. Correct, uh-huh.

Q. And how was Miss Johnson as a waitress during the period of time she worked for you there?

A. She was a good waitress, good worker.

Q. How did she get along with the other members of the staff, the other people that worked there?

A. To my recollection, she got along well, uh-huh.

Q. And what about with the customers at the country club?

A. They liked her.

Q. Are the waitresses there as in a lot of places kind of largely dependent on tips for a substantial portion of their income?

Page 157

A.    Yes, but in a country club environment, it's in your paycheck.

Q.    The tips -- you don't get a cash tip on the table.

A.    Right.  There may be an occasion where someone will leave something up and beyond the service charge that's automatically tagged on to your ticket that evening.

Q.    And the adverse consequence of having it in your paycheck, of course, it's going to be taxed; right?

A.    Correct.

Q.    How did Miss Johnson seem to do in terms of tips, or is that a situation where everybody kind of split the pot?

3712

A.    No.  I don't understand what you're asking.

Q.    Well, in some places the waitress or the waiter gets to keep his own or her own tips; right?

A.    Right.  Whatever volume they did as a server, you know, how ever many tables they were capable of taking, they got the tip according to that.

Q.    And how did she seem to do during the time she was working for you in terms of tips?

A.    She was definitely on the upper level of producer, producing tips, taking tables, being capable of that.

Q.    During this period of time -- and I don't know that we've really established the dates.  You said it was about three years.  Was it just before you left Mason City to come to Des Moines?

A.    I left in '95 to go to Des Moines, so it would have to be two to three years prior to that.

Q.    And so this would have been around somewhere between '93, '95, '92, '95, somewhere in there?

Page 158

A. Right, because -- okay. My son was born in '94, so yes.

Q. Did you happen to notice, ma'am, during the time that Miss Johnson was working for you at the country club, did she use any illicit drugs, at least in your presence?

A. No.

Q. Okay. Would that have been permitted --

A. No.

3713

Q. -- for an employee? Did she ever have an appearance at least in your view -- I'm not sure how familiar you are with drugs like methamphetamine or their reactions, but did you ever have a sense she might be on drugs during the time she was working with you?

A. No, not -- at that time, no.

Q. And, in fact, in 1995 when you moved to Des Moines, did you not offer her employment with you?

A. Yes.

Q. And Des Moines's a much larger area, we could agree, than Clear Lake and Mason City?

A. Oh, yeah.

Q. Is there a shortage of waitresses?

A. Even more than in Mason City, yes.

Q. Even more, okay. When you offered this position to Miss Johnson, did she take it?

A. Yes.

Q. You seem unsure.

A. No. Yes.

Q. Did she come to work for you in Des Moines?

A. Yes.

Q. And what kind of job did she have there?

Page 159

A.    She was a waitress.

Q.    And where were you and she working at that time?

A.    Living in Des Moines?

3714

Q.    Yes, when you were in Des Moines.  That's right.  I'm sorry
I'm not being very clear.  Let me rephrase the question.

      When you moved to the Des Moines area in 1995 and you
said you started work at another country club --

A.    Urbandale Country Club.

Q.    Urbandale Country Club.  And was this the same type of a
situation?

A.    Yes.

Q.    You had to have a flexible work schedule and such?

A.    Exactly, double shifts.  Your tips are on your ticket.  You
get them in your paycheck.

Q.    Did you get to know Miss Johnson personally, you know, more
than an employee-employer relationship?

A.    I would have to say that began in Mason City because we
were pregnant together.

Q.    Okay.  And when you were trying to calculate, that's what
you said.  Your son was born in 1994?

A.    Yeah, he was born in '94, so I was trying to back up
perhaps to my pitiful memory when maybe she did start.

Q.    Okay.  And in terms of being pregnant together, what did
that do in terms of your relationship?

A.    I just -- just your typical chit chat between women, you
know, sharing stories about pregnancy.

Q.    Was this your first pregnancy?

A.    Second.

3715

Page 160

Q.    Second.  And it was her second.

A.    Correct.

Q.    Did you know that?

A.    Uh-huh.

Q.    Did you spend time together socially or anything like that?

A.    No.

Q.    Did you know her older daughter Alyssa?

A.    Yes, I did.

Q.    How did you know her?

A.    I would have to say I probably never -- I may have met just to say "this is my daughter Alyssa" when I was in Mason City, but I was not really in contact with her until she moved to Des Moines, to Urbandale.

Q.    And to Urbandale.

A.    Uh-huh.

Q.    What about the significant men in Miss Johnson's life?  Did you have any contact with them while she was working for you?

A.    Say that again.

Q.    Did you have any contact with the significant men in Miss Johnson's life while she was working with you, her boyfriends?

A.    Okay.  In Mason City I had met Dustin at an employee party.

Q.    Dustin Honken?

A.    Correct.

Q.    And had you known or heard of Mr. Honken before that time?

A.    Only she may have made a comment of his name, but I'd never

3716

met him until this employee party that I had for the staff.

Q.    And approximately when was that if you can tell us?  Was it near the end of your time?
Page 161

A.    Yes.  I'm not sure to be honest with you.  I think it is towards the end of my time.

Q.    Okay.  I wanted to ask you, in 1995 when you hired Miss Johnson down in the Des Moines area to work at the Urbandale Country Club, how long did she work for you then at that period of time?

A.    Two to three years.

Q.    Two to three years again.

A.    Yes.

Q.    And how did she do as a waitress during this period of time in Urbandale?

A.    She did a good job.  I mean, the customers liked her.  She was a hard worker.  But, you know, there came a point where I could see that there was stress.  Something was going on in her life.

Q.    I want to ask you just a little bit about that; okay?  What kind of behavior led you to believe that something was going wrong or amiss in Miss Johnson's life?

A.    Well, having the DCI or FBI or whomever come to my job place, having her come to work and reporting that her apartment was being --

Q.    Searched?

3717

A.    -- searched.  I mean, that's a big thing right there.  Her bringing the newspaper to me and showing where Dustin was, you know, found or under suspicion or whatever for these events that we're all here for talking about.  So yeah, I'm thinking, yeah, there's some stress going on here.

Q.    Well, did she have some kind of overt behavior, some kind of a change in how she did her job for you or some change in her

Page 162

personality that you noticed she's not right?

A.    There was times that she didn't come to work, and so I do recall her calling me and either being asked to come to the apartment in need of talking to someone, and then I did bring a couple other members of my staff along.  So I'm thinking that, okay, you know, we're depressed or we're this or that or whatever.  There was definitely days she was not coming to work and then -- okay.

Q.    Was that unusual for her not to show up for work?

A.    Compared to Mason City, yeah.

Q.    And when you went to see her at her apartment when she wasn't at work, did she seem to be depressed?

A.    Yes.

Q.    In fact, didn't you take some action in respect to that yourself?

A.    I recommended her, you know, seeking treatment, going to a doctor.

Q.    You mean a mental health type of treatment?

3718

A.    Definitely, yeah.

Q.    I just want to ask you a couple questions about her daughter.  You said you met Alyssa when Angela Johnson was working for you in Urbandale?

A.    Uh-huh.

Q.    Yes?

A.    Yes.

Q.    And had Angela talked to you about her daughter before that?

A.    In part of her moving to Des Moines, some of -- part of the discussion was that she wanted her to get out of whatever

Page 163

environment of peers that she was in in Mason City or I'm not sure exactly what town they were moving from, Clear Lake, wanting to relocate her and getting her maybe a fresh start.

Q. Getting Alyssa a fresh start.

A. Right, exactly.

Q. Did she tell you what kind of problems Alyssa was having up there?

A. No.

Q. But that was of concern to her.

A. I don't recall anyway. I don't recall.

Q. Miss Johnson was concerned about her daughter's situation.

A. Right.

Q. Was that pretty unusual for you in terms of your other employees to take such an active interest in an employee

3719

waitress for you?

A. Prob -- you know, I'd have to say Angela was always someone that was fun to have in the workplace, okay, so maybe she made light of life for me. On the other hand, I'm also a person that has always tried to help out the single mother with children, family.

Q. And that's what you did here.

A. Excuse me?

Q. That's what you did.

A. Right.

Q. For Miss Johnson.

A. And I kind of see a pattern over the long time that I have been in this business that I seem to lend this hand to single parents.

MR. BERRIGAN: Thank you. That's all I have.
Page 164

THE COURT: Mr. Williams?

MR. WILLIAMS: No questions, Your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you.

REED CORSON, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Try and adjust the chair and the microphones so you can speak directly into the microphones. And when you're settled in and ready, would you state your full name, please, and spell your last name.

3720

THE WITNESS: Reed Thomas Corson, C-o-r-s-o-n.

THE COURT: Thank you.

Mr. Stowers?

DIRECT EXAMINATION

BY MR. STOWERS:

Q. Can you tell the jury where it is that you reside?

A. Waterloo, Iowa.

Q. Okay. And what do you do for a living?

A. I'm a lieutenant for the Black Hawk Sheriff's Office.

Q. And how long have you been employed in that position?

A. Almost 25 years.

Q. And you work in the Black Hawk County Jail; is that right?

A. I'm actually the second shift shift commander right now.

Q. At the jail?

A. The whole shift.

Q. For all functions of the sheriff's office?

A. Correct.

Q. One of the things the sheriff's office does is run the Black Hawk County Jail; is that right?

Page 165

A.    Correct.

Q.    Which is in Waterloo.

A.    Yes.

Q.    And about how many inmates does the Black Hawk County Jail generally hold?

A.    It can hold up to 272.

3721

Q.    So it's one of the larger jails in the state of Iowa; would you agree with that?

A.    Yes.

Q.    And were you working at the Black Hawk County Jail in the fall of 2000?

A.    I was not working in there, no.

Q.    Okay.  Did you have any jail duties at that time?

A.    Not at that time.

Q.    Even though you didn't have any specific jail duties in the fall of 2000, was there a time on the 13th of October of 2000 that you became involved in connection with a suicide attempt relating to Angela Johnson?

A.    Yes.

Q.    And can you tell the jury how it was that you became involved?

A.    I was contacted by another lieutenant and the captain stating there had been an attempted suicide there.  They wanted me to come in and assist, so I did.

Q.    You weren't even working at the time that you got the call, were you?

A.    No.

Q.    Okay.  So you came from home.

A.    Correct.

Page 166

Q.    And where did you go?

A.    I first went down to the jail and assisted Sergeant

3722

Peterson who was finishing up taking photographs and collecting any evidence.

MR. STOWERS:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. STOWERS:

Q.    I'm going to hand you some photographs which I've previously marked Exhibits 2129, 2130, 2132, 2133, 2134, 35, and 2136.  Are those some photographs that would have been taken in connection with the suicide investigation relating to Angela Johnson?

A.    Correct.

Q.    Inside the Black Hawk County Jail?

A.    Yes.

MR. STOWERS:  I'd offer that series of photographs, Your Honor.

                    *   *   *   *

        (Defendant Exhibits 2129, 2130, 2132, 2133, 2134, 2135, and 2136 were offered.)

                    *   *   *   *

        THE COURT:  Any objection?

        MR. WILLIAMS:  None, Your Honor.

        THE COURT:  Exhibits are received.

                    *   *   *   *

        (Defendant Exhibits 2129, 2130, 2132, 2133, 2134, 2135, and 2136 were admitted.)

3723

Page 167

* * * *

BY MR. STOWERS:

Q.    Now, this area of the jail is a particular pod; is that right?

A.    Yes.

Q.    And that's what they call them is pods at the Black Hawk County Jail?

A.    Correct.

Q.    And it's, as we've heard earlier, a four-cell female pod?

A.    Correct.

Q.    Consisting of two floors within the Black Hawk County Jail?

A.    Yes.

Q.    And this area of the jail, is it always used by female inmates?

A.    Yes.

Q.    Now, every jail has its own set of conditions and criteria; is that right?  You're familiar with that.  Every jail's different.

A.    Correct.

Q.    Okay.  And every jail is a little different with regard to different privileges that they afford to the inmates.  Is that also true?

A.    Yes.

Q.    And in Black Hawk County Jail, what was the situation or the policy at least in the fall of 2000 with respect to inmates

3724

there including female inmates having the opportunity to visit minor children?

A.    There is no opportunity for that.  You have to be 18 to

Page 168

visit.

Q. And you're aware that other jails have different policies; is that right?

A. It could be, yes.

Q. And you started to describe the fact you became involved through this phone call placed to your home and you became involved in this October 13, 2000, investigation of this suicide attempt. And I think you started to say that you went first to the jail?

A. Yes.

Q. And where did you go from the jail?

A. To Allen Hospital.

Q. Allen Hospital, is that located in Waterloo?

A. Yes, it is.

Q. And why were you going there?

A. To, first of all, secure the hospital and get security lined up.

Q. Did you have an understanding as to where Angela Johnson was at that time?

A. She was in the emergency room at that time.

Q. At the Allen Hospital.

A. Yes.

3725

Q. All right. Did you as the lieutenant there take some measures to secure the jail -- to secure the hospital?

A. Yes.

Q. Because at that point obviously Angela Johnson was still an inmate even though she was now receiving some medical attention at the hospital; right?

A. Correct.

Page 169

Q. She'd been transported to the hospital by who if you know?

A. Waterloo Fire, I believe.

Q. So they had showed up at the jail, is that right, and transported her to the hospital?

A. That would have been prior to me being called, yes.

Q. And was there a time that you as the lieutenant who was sort of in charge of that area there at the hospital had an opportunity to have some contact with Angela Johnson?

A. Yes.

Q. Okay. And can you describe that for the jury?

A. It was in the intensive care unit. And when they moved her up there, I believe she had a tube in her throat at the time, and they removed the tube, and as is in my report, she stated, Didn't I do it right?

Q. She told you that.

A. Yes.

Q. Didn't I do it right?

A. Right.

3726

Q. And did you say anything to her after that?

A. I asked her if she was hurt and had any injuries, and she said that she was only hurt in her heart.

Q. Only hurt in her heart? Is that what she said to you?

A. Yes.

Q. And then did you have further conversation with her?

A. There may have been some other conversation, none noteworthy that I know of.

Q. Did you have any concerns that she might attempt to injure herself further?

A. I did talk to her about that, and I told her, you know, we

Page 170

couldn't have that, having her hurt herself, and she stated that she wouldn't do that anymore. However, we had deputies and security officers aware of it.

Q. And what was her emotional state by your observation there in the intensive care unit at the Allen Hospital?

A. She was very upset.

Q. And how was that displaying itself to you?

A. She was crying, visibly upset.

MR. STOWERS: Thank you. That's all I have.

THE COURT: Mr. Williams?

MR. WILLIAMS: No questions.

THE COURT: You may step down.

THE WITNESS: Thank you.

MR. BERRIGAN: We have an in-custody person.

3727

THE COURT: Okay. Everybody can take a stretch break. It may take a little while.

SUSAN MARSOLEK, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And can you try and adjust the chair and scoot it up so you can speak directly into the microphones. And you can move those microphones, get them as close to you as you can. And would you state your full name, please, and spell your last name.

THE WITNESS: Susan Marie Marsolek, M-a-r-s-o-l-e-k.

MR. BERRIGAN: May it please the Court.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q. Miss Marsolek, I wanted to start by having you introduce yourself to the jury just a little bit and talk about your

Page 171

background. Where are you from?

A. Austin, Minnesota.

Q. And where do you live right now?

A. Waterloo, Iowa.

Q. Okay. You have an unusual looking jail outfit. Are you in custody?

A. No, I am not.

Q. Why do you have leg irons on your legs?

A. Because I'm still in federal custody, and I had to be I guess moved that way because I'm not out of the federal

3728

marshal's custody yet till September.

Q. Okay. You said you weren't in custody but you are in custody.

A. Yeah, I guess I am in custody.

Q. Where is it that you're in custody?

A. I'm in custody -- just travelingwise, I mean, I'm at the facility and I'm free I guess, but yet I'm not because I'm still under U.S. marshals till September 10.

Q. Okay. Let me see if I can be clear. You're not in a jail, are you?

A. I'm not in a jail or a prison.

Q. And you're not in a prison.

A. No.

Q. But you are still in a custody situation.

A. I got six months to do in the halfway house.

Q. Halfway house, okay.

A. Yes.

Q. And you know I bet most of the jurors have heard what a halfway house is, but why don't you tell us what exactly a

Page 172

halfway house is.

A.   It's a facility where you move up in levels to get your status and you get a job and you work your way out the door till you're back in -- I don't know -- out of -- back in --

Q.   In the society?

A.   Into society.  That's it.

3729

Q.   And how does a halfway house differ than being across the street in the Woodbury County Jail?

A.   You have the right to wake up every morning, to go out job seeking, to go to your own job.  You have to, you know, be back -- it's like at certain times of the day to check in and then I gotta be back by nine o'clock at night.

Q.   Are you in any kind of a cell at the halfway house?

A.   Nope.  I have my own room with my own key, bed.

Q.   And you can have your own personal items in your own room.

A.   Yep.

Q.   What about your ability to kind of contact people on the outside in a halfway house?  Is that different than the jail?

A.   A little.  I can have people -- I have a visiting list, and they have to be approved, but they can come in and see me.  They can pick me up to take me to my jobs.  They can -- they only have visiting one day a week, so actually that's worse than prison, but . . .

Q.   Where is this halfway house that you're in?

A.   It's in Waterloo, Iowa.

Q.   And you said it's a six-month term that you're in the halfway house?

A.   Yes.

Q.   Have you served a term of imprisonment recently?

Page 173

A.   Yes, I have.

Q.   And where did you serve your imprisonment term?

3730

A.   Greenville, Illinois.

Q.   Okay.  What were you serving a sentence in Greenville, Illinois, for?

A.   Conspiracy to manufacture.

Q.   And when were you convicted of that crime?

A.   September of 2000.

Q.   What type of a sentence did you receive?

A.   Seventy months.

Q.   Seventy?

A.   Yes.

Q.   So just short of six years.

A.   Yes.

Q.   And you were in jail in Greenville for -- in prison in Greenville for a period of time before you went into the halfway house?

A.   Yes.  I was released March 28 of 2005.

Q.   And when do you get to leave the halfway house?

A.   September 10.

Q.   September 10.

A.   Yes.

Q.   And I suspect you're looking forward to that.

A.   Yes.

Q.   This term of six years that you got for conspiracy, is that conspiracy to distribute methamphetamine or manufacture methamphetamine?

3731

Page 174

A.    Conspiracy to manufacture.

Q.    That sentence that you received, ma'am, was that a result of a plea, or did you go to trial?

A.    A plea.

Q.    And did you testify against somebody else in order to get that type of a sentence?

A.    No.

Q.    So you didn't cooperate with the government against some codefendant or something like that.

A.    No.

Q.    Did you have any codefendants?

A.    Yes, I had three codefendants.

Q.    Do you know the young lady seated over here with the glasses in the teal top?

A.    Yes, I do.

Q.    How do you know her?

A.    I worked with her in Clear Lake at the Waterfront Restaurant and Lounge, became very good friends with her and spent time with her.

Q.    When did you first meet Angela Johnson?

A.    I think in about May of '98.

Q.    May of '98?  And are you and she about the same age without disclosing --

A.    I think I'm older.

Q.    You think you're older.  What type of work did you do at

3732

the Waterfront Lounge?

A.    I made salads and prepared desserts and stuff for the waitresses, and she was a waitress and cleaned the place, and she did everything around there pretty much.

Page 175

Q.    How long did you and Angela work at the Waterfront Lounge together?

A.    Couple years.

Q.    And during the period of the couple years that you worked together, what kind of relationship did you have with her?

A.    We had a good relationship.  Actually she became one of my -- the better friends I met in my life.  I mean, she's a very compassionate, loyal friend.  She was trustworthy.  I don't know.  Just the type of friend that you want to keep around.

Q.    And I might have asked you this, and if so, forgive me, but do you know what years it was that you were at the Waterfront Lounge?

A.    Do I know what?

Q.    The years roughly that you were there.

A.    I think I was there from about May of '98 to about January 2000.

Q.    This conviction that you got in September of 2000, when did you get arrested for that?

A.    I got arrested September 11 I think, and then they didn't turn around and pick me up again until the following -- June of 2001 I got indicted on it.

3733

Q.    So there was a period of time that you were arrested and then you were released?

A.    I was arrested and released.

Q.    And then rearrested.

A.    Yeah.

Q.    After being indicted.

A.    Yes.

Q.    And that was, you said, June 2001.

Page 176

A.   Yeah.

Q.   In June 2001 when you got arrested or rearrested, what jail did you go to?

A.   Cedar Rapids.

Q.   And do you know the name of the county jail there?

A.   Linn County Jail.

Q.   Linn County.  At that time was Angela Johnson in the jail?

A.   No, she was not.

Q.   Do you know where she was?

A.   She was in Clear Lake, Iowa.

Q.   You mean when you first got arrested.

A.   Yeah.

Q.   Okay.  I'm sorry.

A.   She wasn't in that jail then.  When I first got down there -- they took me down there; they arrested me; they charged me.  And then I didn't go in and take my plea till September, and that's when they held me.

3734

Q.   I see.  September then of 2001?

A.   2001, yes.

Q.   2001, okay.  At some point while you were in the Linn County Jail on this conspiracy to manufacture, did you see Angela Johnson in the jail?

A.   Yes, we were both housed in M block for the entire time I was in there, and that was from like October of 2001 till they took me here in Sioux City to charge me in January of 2002.

Q.   So you were in the M, M as in Mary, block?

A.   Yes.

Q.   And we've heard a little bit about the jail, but could you tell us what that block was like, how many people lived in the

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3273 of 3592

block?

A.   I think there was 14 beds in there, and they were pretty much usually all full, and there was times that we had mats and cots or mats all over the floor too because it was -- the beds were full, and there was other people that came in too.

Q.   Did you ever spend any time in the N block, you know, N as in Nancy block?

A.   No.  They took me over there one time I think because there was a fight in the cell or something but just all over there just to question us or something.

Q.   Was that a disciplinary area over there, or do you know?

A.   It was individual lockdown.  All the doors locked down individually where M block was -- we were all together, and N

3735

block, the time that I was over there, yeah, had all -- individual beds with individual doors, and then you had to be let out of there.

Q.   And in M block where you were living with Angela and the other at least 14 of you if not more, that was a different situation over there.

A.   Yes.  It was seven bunk beds and all arranged in an open room, and we all were just in our own -- in the beds in the same room, no individual lockdown or nothing like that.

Q.   At that time when you were incarcerated for those four months or so at the M block, had you ever spent any period of time in a jail before?

A.   That was the first jail I was at.

Q.   So that was a new experience for you.

A.   Yeah.

Q.   And when you first went in there, into the M block, that
Page 178

is, was Angela Johnson already there?

A.   Yes, she was.

Q.   And how did you get along with the other inmates once you got over to the M block in October of 2001?

A.   I got along good, but Angela just kind of took me under her wing.  And I don't know.  She just was, you know, just like a big sister -- or like a sister to me or something, you know.  I mean, there was, you know, people -- I don't know.  I'm easy to get along with anyway I think, but, you know, then you got the

3736

ones that -- I don't know -- people just try to take advantage of people everywhere, you know.  Then you got the ones that -- you know, that try to roughhouse this one or that one and are meaner than others, and, you know, that's everywhere really.

Q.   Is it sometimes difficult to get along with the other women that are housed in the jail with you?

A.   Yes.

Q.   What kind of problems arose at least in your experience in the four months you had in the M block?

A.   Like I said, the only time I seen, there's this fight that arose once, and that's when they took us -- that's when I went to the N block, and they kept us all separated, and they questioned us about this fight, if we knew or we seen it or whatever, you know, and I wasn't paying attention, so I really didn't get involved in it.

Q.   Wasn't that a fight that Miss Johnson was supposed to be in?

A.   No.  Miss Johnson was not in that -- no fight.  She was never in a fight while I was there.

Q.   Okay.  These were some other people.

Page 179

A.    Yeah, these were other people.

Q.    Did that happen with any regularity that women would get into fights with each other?

A.    Not really.  I mean, like I said, I seen it maybe happen once or twice, arguments, you know, and they were usually over

3737

like stupid -- like over the TV or something stupid.

Q.    And these fights, did they involve weapons, or how did they go?

A.    It was usually just hands and fists, no weapons.

Q.    Did you ever see anybody get hurt while you were there?

A.    No.

Q.    No.  You yourself were able to avoid getting in any fights?

A.    Yep.  I made it all through this whole time and never got in one fight the whole time, jail, prison, anywhere.

Q.    During the time now that you're with Angela in the M block, did you and he -- did you and she engage in any of the extracurricular activities like the Bible study and the drug treatment classes or anything like that together?

A.    Yes, we did.  She was going to Bible study when I got there, and I started going to that with her.  I got up and went to a few AAs.  I went -- she got me -- we went down to the law library a few times and just to type and do things that we wanted to do down there.  She got me going down to the gym and playing ping pong and lifting weights.  And, you know, there was things to do there that other jails didn't have.

Q.    And there was some kind of a drug class that you could go to at the Linn County Jail.  Did you know whether or not there was?

A.    I don't know.  I don't think I -- I don't know if it was

Page 180

there at the time I was there.  I don't remember it right now.

3738

If there was, I don't remember.

Q.   What about when you served your time in prison in
Greenville?

A.   I did all kinds of things.  I did a 30-hour class, a
500-hour residential drug abuse class, and I graduated from all
of them.  I did wellness classes.  I don't know.  I pretty much
tried to keep busy.  I did Bible studies.

Q.   You mentioned this crime that you were doing the time for
had to do with methamphetamine.

A.   Yes.

Q.   Were you a methamphetamine user before you went into the
jail?

A.   Yes, I was.  Well, I'd been clean before I got to the jail,
but about 11 months before I got incarcerated, I mean, I went
into treatment before I went to jail.  I did continued care the
whole time I was in Waterloo waiting to get indicted because my
daughter was down there going to school.  And then I just --
I've been clean -- I've been clean five years October 1.

Q.   Have you found that to be difficult to maintain your
sobriety?

A.   The first year was the hardest, but now that I've made it
that far, I mean, I like the clean life.  I went to -- got my
first out where I got a furlough and got eight hours and went to
AA/NA convention last weekend in Waterloo before.  And, I mean,
it's interesting, I mean, to listen to speakers and listen to

3739

Page 181

VOLUME 20, 6-8-05

them talk about this drug that's -- I mean, it's, you know, killing everybody. I mean, meth is probably worse than cocaine and anything out there nowadays.

Q. During the four months you spent with Angela at the jail -- was it just those four months between October of 2001 and January of 2002 that you were together in the jail?

A. Yes, I think so.

Q. During that period of time, what were your observations of how Angela Johnson got along with the other inmates that were there with you in the M block of the Linn County Jail?

A. Like I said, I thought, you know, she seemed to try to take people under her wing, try to help them out, try to, you know, care for them and be there for them. I mean, you know, as long as they weren't running around acting stupid, you know, she went out of her way for people. And you got the ones that turn around and just come in there and, you know, want -- I don't know. They just act stupid, and then you just kind of quit feeling sorry for them after a while but -- I don't know. She was very caring.

Q. Was there a lady there by the name of Brandy Byrd at the time you were there?

A. No, there was not.

Q. Obviously you knew Angela Johnson's -- or I shouldn't say obviously. Did you know Angela Johnson's daughter Alyssa as a result of having been her friend before you went to treatment?

3740

A. Yes, I knew Alyssa and Marvea.

Q. And Marvea both.

A. Uh-huh.

Q. And you said you have children yourself?

Page 182

A.    Yes, I do.  I have a daughter 22, a son 19, and a daughter 15.

Q.    Were you able to observe both in and out of jail --

A.    Yes, I was.

Q.    -- Angela Johnson's relationship with her children?

A.    Yes, she was a good mother, very good mother.  I mean, she had boundaries and structure and everything I didn't have.  I had kids that were out of control, but when they were at her house, they respected and minded me because she just said, You will respect your mom at my house, and they did, I mean.  They were different kids around her.  She was very caring.

Q.    Have you kept in touch with Miss Johnson?

A.    Have I -- yes, I have for the most part.

Q.    How were you able to do that?

A.    I don't know.  They just let my letters come through.  I figure there's a reason for everything, but yeah, they never stopped them.

Q.    Usually it's --

A.    Usually you can't, but they let them -- yeah, they let us write.  Why I don't know.

Q.    And you've done that even since back in 2002.

3741

A.    I've wroten her since I've been locked up.

Q.    Is that a relationship that you'd like to continue if you could?

A.    Yes, I will.

MR. BERRIGAN:  That's all I had.  Thank you.

THE WITNESS:  You're welcome.

THE COURT:  Mr. Williams?

CROSS-EXAMINATION

Page 183

BY MR. WILLIAMS:

Q. Good afternoon, Miss Marsolek.

A. Good afternoon.

Q. We know each other, don't we?

A. Yes, we do.

Q. I was actually the prosecutor who prosecuted you on your case; is that right?

A. Yes, you were.

Q. And, in fact, let's talk about that for a minute. You indicated that you didn't cooperate in connection with your case. Do you remember telling the defense counsel that?

A. Yes.

Q. In fact, when you were -- initially pled guilty, you were interviewed by law enforcement officers concerning your knowledge of the criminal activity of the people that were involved with you in your case, wasn't you -- weren't you?

A. Yes.

3742

Q. And in the process of that, you told the law enforcement officers a lie, didn't you?

MR. BERRIGAN: I'm going to object to this as beyond the scope of her direct.

THE COURT: Goes to her credibility.

MR. BERRIGAN: I just wanted to make my objection.

THE COURT: You can make your objection, but it's overruled.

MR. BERRIGAN: May I have a continuing objection?

THE COURT: You may.

BY MR. WILLIAMS:

Q. You lied, didn't you, ma'am?

Page 184

A.    I just didn't tell the whole truth.

Q.    You lied when you said that J.D. Starkey, another person in that vehicle, had no knowledge of the meth lab that was later found in the back of the vehicle.  That wasn't the truth, was it, ma'am?

A.    No, it was not.

Q.    J.D. Starkey was a friend of yours, and he had asked you to lie for him, and so you did, didn't you?

A.    Yes, I did.

Q.    You didn't tell law enforcement officers that on that same trip where you picked up part of a meth lab that another person in that same vehicle named Michael Vieth had gone down and sold some methamphetamine to some contacts of yours, did you?

3743

A.    No, I did not.

Q.    You lied to the law enforcement officer about that as well, didn't you, ma'am?

A.    Yes, I did.

Q.    In addition to knowing Angela Johnson during the 1998 to 2000 time period because you worked with her, you also obtained methamphetamine from her, didn't you, ma'am?

A.    No, I never obtained methamphetamine from Angela Johnson.

Q.    You were arrested in 2000.  You talked to the defense counsel about that.  Some notes were seized off of you, weren't they?

A.    Yes, there were.

Q.    And you were later interviewed about those notes, and you told Special Agent Graham who's right back here that all those notes were actually drug notes reflecting drug debts that were owed to you or that you owed to other people, didn't you?

Page 185

MR. BERRIGAN: I'm going to object to this, Your Honor.

A.    No, I did not.

MR. BERRIGAN: Excuse me, ma'am.  It's not in evidence, and it's contrary to the evidence, and I object to it.

THE COURT: Overruled.

BY MR. WILLIAMS:

Q.    Didn't you tell him that?

A.    No.  I don't remember, but I don't think I did.

3744

Q.    All these notes that --

A.    I said it was for things that I got from a rummage sale that she had sold me some things from a rummage sale and I -- you know, there was different things there, but it wasn't all drug notes.

Q.    When you were asked the question, Are these all drug notes, you said, Yep, those are all drug notes, didn't you?

A.    No, I did not.

Q.    And then you were asked the question, Well, isn't Angie's name down on here with some notations next to it with numbers?  You were asked about that, weren't you?

A.    I said there's -- yes, I was, and I said --

Q.    You said, Everything else is drug notes; everything else is drug notes on there, but that one entry with Angie Johnson, that has to do with some money that she loaned you or something.

A.    I purchased a computer from her and some things that she sold at a rummage sale.

Q.    In fact, you still owed Angie Johnson what?  About $140; is that right?

A.    Yes, I did.

Page 186

Q. So you're telling this jury that during the time period of 1998 to 2000 you didn't get any methamphetamine at all from Angela Johnson.

A. No, I did not.

Q. You were using methamphetamine at that time period, weren't

3745

you?

A. I was using methamphetamine, but I never knew her as a user.

Q. Angela Johnson was distributing methamphetamine during that time period.

A. Not that I knew of.

Q. Remember telling the jury just a few minutes ago that when you were in prison with Angela -- when you were in the jail with Angela Johnson she was never involved in a fight? Do you remember telling the jury that?

A. Yes, I do remember telling them that.

Q. Actually in December of 2001 she was involved in a fight, wasn't she?

A. Not that I know of.

Q. You were questioned about it, ma'am.

A. I was questioned about a fight, but it wasn't because of her involvement. She wasn't involved in it. It was some girl named Nancy or something that I remember.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Ma'am, I'm showing you what's been marked and already entered into evidence as Government's Exhibit 1143. Do you recognize this one page, page 16, from this exhibit as a

Page 187

statement that you provided?

3746

A. I don't even remember the statement actually. No, I don't.

Q. That is your statement.

A. It is my statement, but I do not remember it or recall it.

Q. And in this statement you made a statement to the law enforcement officials at the Linn County Jail that Angela Johnson did not get into a fight with Miss Rawhouser at all. Isn't that the essence of your statement?

A. Yeah, that she was arguing with her or there was an argument going on but she wasn't involved in no fight.

Q. Wasn't involved in a fight. Are you aware, ma'am, that Angela Johnson actually was found to have been involved in a fight?

A. No, I'm not aware of that.

Q. Were you aware there was actually a videotape of that fight that the law enforcement officers there had?

A. No, I --

MR. BERRIGAN: Object to that. There's certainly no videotape that we've seen in this trial.

A. I'm not aware of no videotape. I don't even remember the fight. I don't even remember that statement that you showed me.

Q. And were you aware that Angela Johnson herself later admitted in a letter to the sheriff that, in fact, she was involved in a fight with Miss Rawhouser in December of 2001?

A. No, I don't remember any of that.

MR. WILLIAMS: Nothing else, Your Honor.

3747

THE COURT: Mr. Berrigan?
Page 188

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3284 of 3592

MR. BERRIGAN: May I approach the witness, Your Honor?

THE COURT: You may.

MR. BERRIGAN: Thank you.

REDIRECT EXAMINATION

BY MR. BERRIGAN:

Q. Ma'am, I have handed you the statement that you gave to the correctional officers that questioned you about this big fight in the Linn County Jail back in -- looks like December of 2001?

A. Uh-huh.

Q. Let me show you, just so we're clear, this is the same thing. Do you see the number there, Government's Exhibit 1143?

A. Uh-huh.

Q. And this statement here?

A. Uh-huh, yes.

Q. Can you read that? Are they the same?

A. They look like it, yeah.

Q. I know it's kind of hard to read, isn't it?

A. Yes.

Q. Let me see if I have another copy.

A. I think I can read it if I need to.

MR. BERRIGAN: May I re-approach, sir?

Q. Let's compare these. Government's Exhibit 1143, your statement in that document which is in evidence and what I've just handed you.

3748

A. Okay.

Q. Are they the same?

A. Yes.

Q. Okay. In fact, why don't I just give you 1143. And would you be so kind as to read that to the jury what it is that you

Page 189

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3285 of 3592

told the officers?

A.    Yes.  I was playing cards with Shannon and Nancy when Amy and Angie started arguing.  Angie was telling Amy that none of us should have to put up with her body odor.  And they kept us -- and they just kept arguing, and Amy kept calling Angie stupid.  And Angie said, Don't call me stupid, and the next thing I see is Valli between them, and she's telling Angie ignore her and told them both to go sit down.  And Amy kept saying things to Angie just like she wanted to make her angry to start a fight, and then the jailer, Linda, came and told Amy to put -- pack her stuff.

Q.    Okay.  So you told the person who questioned you you saw these ladies arguing.

A.    Yes.

Q.    And what they were arguing about even; right?

A.    Body odor, yeah.

Q.    But you didn't see the pushing match or whatever it is that happened.

A.    Right.  I didn't see anything.

Q.    Okay.  You were asked some questions about the statement

3749

you gave to police officers I guess after your guilty plea?  You were questioned by some law enforcement officers?

A.    Actually what happened is the fourth person in our indictment was on the run, and they brought me back here last December, and then that's when that stuff happened.

Q.    Okay.  And so --

A.    They caught the fourth person.  He told a different story, and then we just redebriefed basically.

Q.    And basically you were unwilling to snitch on these people.

Page 190

A.    I was unwilling to snitch, yeah.  I just . . .

Q.    That happens, doesn't it, sometimes?

A.    Yeah.

Q.    People decide not to snitch and get other people in trouble just so they can benefit themselves.

A.    Yes.

Q.    There are some, maybe not many --

A.    There's not many, but there's some.

Q.    There's a few people in jail that will refuse to do even that.

A.    Yes.

Q.    Even when they can get time cut off their sentence or get some other benefit as a result of snitching on some other inmate.

A.    Yeah.

Q.    And you're one of those people who wouldn't do that.

3750

A.    Yeah.

          MR. BERRIGAN:  That's all.

          THE COURT:  Mr. Williams?

                    RECROSS-EXAMINATION

BY MR. WILLIAMS:

Q.    Ma'am, to be sure here, you testified in the trial of Michael Vieth and got a reduction in your sentence for cooperating and, as defense counsel calls it, snitching on Michael Vieth, didn't you, ma'am?

A.    Yes.  I just redebriefed and told you what you wanted to hear.

          MR. WILLIAMS:  Nothing else, Your Honor.

          MR. BERRIGAN:  I have nothing else, sir.
Page 191

THE COURT: Okay. Do you have any more witnesses today?

MR. BERRIGAN: I do, Your Honor. We have at least one more.

THE COURT: Okay. Well, we'll go ahead and take our three o'clock recess.

MR. BERRIGAN: Okay. Great.

THE COURT: It's three o'clock. We'll be in recess until 3:25. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up?

MR. WILLIAMS: No, Your Honor.

3751

MR. BERRIGAN: Just as a scheduling matter, sir, we do have one more witness, but I do not expect her to take the rest of the day. It will be our tenth witness for today. It's just gone a little faster than we'd expected.

THE COURT: Sure.

MR. BERRIGAN: We will finish very safely tomorrow. I wanted to let you know that.

THE COURT: Okay. Why don't you be seated for a second. What do you have tomorrow? Who's your next witness?

MR. BERRIGAN: We have one really short witness by the name of Todd Graham.

THE COURT: Okay. Is that one you're planning on calling this afternoon?

MR. BERRIGAN: Yes, sir. No, he's going to be in the morning. These two witnesses are together, Alyssa, the daughter of Angela Johnson, Alyssa Johnson -- she won't be very long -- and then Dr. Cunningham, and that's it.
Page 192

THE COURT: Is there any chance -- well, you sure we're going to finish with Cunningham tomorrow.

MR. BERRIGAN: Yeah. In fact, we may not call Mr. Graham at all. I don't know that he's necessary. We're going to evaluate that this evening.

THE COURT: What do you have? One more this afternoon? Brandy Byrd?

MR. BERRIGAN: Yes, sir, exactly.

3752

THE COURT: And then tomorrow you have potentially Dr. Cunningham, Alyssa Johnson, and Todd Graham?

MR. BERRIGAN: That's right, and I'd say Mr. Graham is shaky at this point. Dr. Cunningham's not in town yet, but we're expecting him this evening.

THE COURT: And are you planning on -- who are you planning on putting on first?

MR. BERRIGAN: I think I'm going to put Dr. Cunningham on to make sure we can get him on because obviously we don't want to have a problem with him having to come back if that's not necessary.

THE COURT: Okay. Do you know yet whether you're going to have any rebuttal mental health testimony, Mr. Williams?

MR. WILLIAMS: Your Honor, I don't think we will. We'll reevaluate that tonight, and obviously we'll reevaluate it after Dr. Cunningham testifies, but it doesn't look like it at this point, Your Honor.

THE COURT: Okay. Good. See you back here at 3:25.

(Recess at 3:04 p.m.)

THE COURT: Ready for the jury?

Page 193

MR. BERRIGAN: Yes.

MR. WILLIAMS: Yes.

(The jury entered the courtroom.)

THE COURT: Please be seated. Would the witness --

3753

would you raise your right hand, please.

BRANDY BYRD, DEFENDANT'S WITNESS, SWORN

THE COURT: Please be seated. Can you, yeah, scoot that chair up so you can speak directly into the microphones. And would you state your full name, please, and spell your last name.

THE WITNESS: Brandy Renee Byrd, B-y-r-d.

THE COURT: Thank you.

MR. BERRIGAN: May it please the Court.

THE COURT: Mr. Berrigan.

DIRECT EXAMINATION

BY MR. BERRIGAN:

Q. Miss Byrd, how are you this afternoon?

A. Good.

Q. Good. I wanted to start by having you tell about yourself, just a little bit about the -- your background to the jurors; okay?

A. All right. I'm Brandy Renee Byrd. I'm 23 years old. I'm originally incarcerated at Mitchellville, Iowa, for a life sentence, life plus 25.

Q. And Mitchellville, Iowa, where is that located?

A. Mitchellville?

Q. Yeah.

A. Mitchellville.

Q. Okay. I guess you're right. Is that near -- is that near

Page 194

3754

Des Moines?

A.    Yeah.

Q.    Okay.  And are you from Iowa originally?

A.    No.

Q.    Where are you from?

A.    South Carolina.

Q.    Where did you grow up?

A.    Everywhere.

Q.    Everywhere.  You moved around quite a bit.

A.    Yeah.

Q.    And you mentioned obviously you're in custody.

A.    Yes.

Q.    And you're serving a life sentence?

A.    Life plus 25.

Q.    Plus 25.

A.    (Witness nodded head.)

Q.    And you were convicted of what?

A.    I was convicted of first-degree murder and first-degree robbery.

Q.    In what county were you convicted in?

A.    Where I caught it at?  Marion, Iowa.

Q.    Marion, Iowa?

A.    Yeah.

Q.    Do you know what county that happens to be?

A.    Linn County I'm assuming.

3755

Q.    Because you spent some time in the Linn County Jail; am I

Page 195

right?

A.   Yeah, in Cedar Rapids.

Q.   Do you see this lady sitting over here with the glasses in the teal top?

A.   Yes.

Q.   Who is that?

A.   Angela Johnson.

Q.   How do you know Miss Johnson?

A.   I did some time with her in county.

Q.   You said you're 23 did you say?

A.   Yes.

Q.   How long have you been in prison now?

A.   Probably three years, going on three.

Q.   Okay.  So you were about 20 when you went down?

A.   Yes.

Q.   And when you were first charged in Linn County and put in jail there, how old were you?

A.   Twenty.

Q.    Twenty.  So how much time did you spend in the Linn County Jail?

A.   A year and nine months.

Q.   Year and nine months.

A.   Yes.

Q.   When was that?  You know, I mean by that the dates.  Do you

3756

remember?

A.   January 7 of 2002 until September -- well, September 30 I got -- I went to Mitchellville.

Q.   Mitchellville.

A.   Yeah.

Page 196

Q. So you were in the Linn County Jail for about a year and almost nine months?

A. Yes.

Q. During the period of time that you were in the Linn County Jail, was there a particular cellblock that you lived in?

A. All of them.

Q. All of them.

A. Yeah.

Q. So you'd get moved around periodically, would you?

A. Uh-huh.

Q. What would cause that to happen?

A. Because they want to.

Q. Okay. Was some of that a function of how many people were in the women's section of the jail?

A. Yeah.

Q. When you first went into the Linn County Jail back on January the 1st, 2002, was Miss Johnson in the jail then?

A. Yes.

Q. Do you know which cell block they put you in?

A. That was M block.

3757

Q. M block.

A. Yeah.

Q. And where was Miss Johnson?

A. In M block.

Q. Okay. So you met her right when you went into jail.

A. Yes.

Q. How many people were in the M block at that time?

A. All the beds were filled.

Q. Filled?

Page 197

A. Uh-huh, except for the one that I was going to.

Q. Except for the one --

A. Actually maybe two or three of them weren't filled.

Q. And about how many women would be there in the M block if it was filled?

A. Supposed to be or when they crowded up?

Q. Well, supposed to be.

A. I don't know. Probably like 20 maybe.

Q. And sometimes it would get as high as how many women?

A. Till you have to step over people to go to the bathroom.

Q. People were sleeping on the floors?

A. Yeah.

Q. So when you first got there to the M block, did you have to sleep on the floor?

A. No.

Q. Where were you put?

3758

A. I was put -- well, I got to choose the bed I wanted to go to at first, and it was -- it's like a big cell, and it's in the far back corner, in the far back corner on the top.

Q. On the top.

A. Yeah.

Q. And why did you pick that cell?

A. Because it was by the window. I could see out.

Q. Did you get to stay there?

A. No.

Q. What happened to you?

A. Well, a CO by the name of Jan took me up, and I guess it was time for count when they do their rounds or whatever, and another CO came in with the sergeant and made a remark saying

Page 198

that it's too dark, she can't see me over there so I need to be moved up front where Angela Johnson was in front of the camera.

Q.   And this remark to you about the lighting conditions being too dark, did you take that as a racial --

A.   Yeah, I did.

Q.   -- comment?  And so they put you in a different cell.

A.   No, same cell but just different bed.

Q.   I see.

A.   Yeah.

Q.   And so even though you stayed in the same cell, the claim was that if you were in a different bed it wouldn't be as dark there?

3759

A.   I guess she was saying that the lighting was bad where I was at so she needed me up front.

Q.   Okay.  And so Miss Johnson was in that cell.

A.   Yes.

Q.   And were there just the two of you there?

A.   No.

Q.   How many people in the cell there?  Oh, you mean the whole cellblock.

A.   Yeah.

Q.   Oh, I'm sorry.  I misunderstood you.

A.   It was like a big dorm.

Q.   Gotcha.  So they moved you from one part of the dorm to another part of the dorm.

A.   Yes.

Q.   And they told you at least that that had to do with lighting conditions.

A.   Yes.

Page 199

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3295 of 3592

Q.   Is that what they told you?

A.   Yeah.

Q.   Did you feel like it had anything to do with the lighting conditions in the dorm?

A.   No.

Q.   Okay.

A.   You can see perfectly fine when you walk in there.

Q.   All right.  And so what happened then when you got moved

3760

over to where Miss Johnson was?

A.   Nothing.  Just climbed on the bed and laid down.  She was reading her book, didn't really say much, just watched me go up. That was it.

Q.   Had the two of you ever met before?

A.   Talking about before that, before I got --

Q.   Yeah, before that.  Did you know Angela Johnson from outside?

A.   No, no.

Q.   In Cedar Rapids?

A.   No.

Q.   So after you got moved in the same bunk -- you were actually in the same bunk with her then; right?

A.   Yeah.

Q.   You were at the top, and she was at the bottom?

A.   Yeah.

Q.   How did you get along after that?

A.   Pretty good.  Before I even got moved over there because I got moved to that block during the day, I spent the night down in the holding cell.  And then the next morning I came up.  And Angela Johnson and another inmate by the name of Nancy Johnson

Page 200

I'm pretty sure -- we called her Indian. I think her name was Nancy. They came over and talked to me, and Angie offered me some socks, T-shirt, soap, lotion, so I could take care of myself. She asked me did I have any family help. I told her

3761

no, and she said, Well, it's going to be me and you for a long time. I said, All right. She was pretty nice to me.

Q. These things you're talking about like lotion and socks and a T-shirt --

A. Yeah.

Q. -- didn't you have those kind of things?

A. No.

Q. You didn't.

A. No.

Q. And she wanted to know whether you had any family on the outside?

A. Right.

Q. Why did she ask --

A. Because in order for you to buy things off commissary, you have to have money from the outside sent in to you, and she asked me did I have that, and I told her no, and she's like, I'll help you.

Q. So that's really kind of a question about whether you had any money to buy your own stuff.

A. Right.

Q. And you didn't have any.

A. No.

Q. Was it true what you told her? You didn't have people on the outside that were supporting you financially?

A. Yes, right.

Page 201

Q.    Did that continue during the whole time you were there?

A.    About --

Q.    Not having any money.

A.    Yes.

Q.    And so when you needed things like shampoo or things you had to buy, how were you able to do that, buy things, personal hygiene items and things of that nature?

A.    I just used Angie's.

Q.    Used hers.

A.    Uh-huh.

Q.    Did that continue the whole time you were in there with her?

A.    Since day one.

Q.    Day one.  Obviously you were charged with a very serious crime at that time.

A.    Yes.

Q.    And so was she.

A.    Yeah.

Q.    And did people in the cellblock -- and I'm talking about the other inmates particularly.  Did they treat you differently as a result of the serious charges that you faced?

A.    They would make their little comments, but they really wouldn't say much because I was hanging out with Angie.

Q.    She'd been there quite a lot longer than --

A.    Yeah.  When I got there, I think she's been there maybe

3763

like three years.

Q.    Three years.

Page 202

A.    (Witness nodded head.)

Q.    Okay.  And was there anybody else in the Linn County Jail at least while you were there, any other women that had been in the jail for three years?

A.    Not that I know of.

Q.    Okay.  Your term there of a year and nine months, how did that compare to most folks that spent time in the Linn County Jail?

A.    What you mean?

Q.    Is that short?  Long?

A.    It's pretty long.

Q.    Pretty long.

A.    Not as long as Angela's but pretty long for a state person to be in county.

Q.    You spent all this time there in the jail with her, and you mentioned earlier there were times where you'd get transferred or moved from one cellblock to another.

A.    Yeah.

Q.    When that happened, were there occasions where you and Miss Johnson weren't together?

A.    Uh-huh.

Q.    And how long would that last?

A.    They split us up one time for maybe about two months, two

3764

or three months.

Q.    Okay.  And so all the other time that you were there were you with her?

A.    Yes.

Q.    Out of the whole period of a year and nine months, you were with her all but two or three months.

Page 203

A.    Yes.

Q.    I mean housed together.

A.    Yeah.

Q.    While you were there in the jail with her, did you participate in any of these activities that they offer the female inmates, things like Bible study and --

A.    Yep.

Q.    -- drug classes and things of that nature?

A.    Uh-huh.

Q.    Yes?

A.    Yep.  I went to get out of the cell and be with Angie.

Q.    Was she in these programs as well?

A.    Yeah, she went.

Q.    Earlier you mentioned when you first met her she was reading a book.

A.    Uh-huh.

Q.    Did she do a lot of reading up there?

A.    That's all she ever did was read.

Q.    If you're an inmate in the women's section of the Linn

3765

County Jail, where do you get books to read?

A.    They bring in a cart, a book cart, and you can pick off the cart what you want to read.

Q.    Kind of like a library?

A.    Yeah.

Q.    Do they let you buy books there?

A.    I don't remember.  I think they did.  I'm not for sure.

Q.    Could you get books sent in from the outside?

A.    I think so.

Q.    You didn't have any money to buy books anyway, did you?

Page 204

A.    No, I wasn't really interested in reading.

Q.    You weren't a big reader.

A.    No.

Q.    How far did you get in school yourself, Miss Byrd?

A.    I graduated col -- or high school.

Q.    High school?

A.    Uh-huh.

Q.    While you spent all that time with Miss Johnson, were you -- I guess for lack of a better term, were you bunkmates the whole time?

A.    Just about.

Q.    Just about.

A.    Until they moved us into another block that had just single-man cells.

Q.    So the time that you were bunkmates I guess, did you and

3766

Miss Johnson spend a lot of time talking to each other?

A.    Uh-huh.

Q.    Did you get to know her pretty well?

A.    Yeah.

Q.    And you disclosed some of your background and your childhood experiences to her?

A.    Yes.

Q.    And in terms of your background and childhood experiences, just kind of generally, did you have a good childhood growing up?

A.    No.

Q.    What was bad about it particularly?

A.    I was always alone in and out of foster homes not because of anything I did, just, I mean, the family wasn't a family like

Page 205

they were supposed to be.

Q. I see. As time went on and you and Miss Johnson spent all this time together, did you develop kind of a special relationship with each other?

A. Yeah. She was my mother, and I was her son.

Q. Her son.

A. Yep.

Q. Okay. Well, you're obviously not a --

A. I know I'm not a boy, but that's -- I was her son.

Q. She had -- well, you knew that she had some daughters.

A. Yeah, she had two daughters.

3767

Q. Okay.

A. One was my age, and one's a little younger.

Q. Did you ever have occasion to see, observe yourself during this year and nine months in the jail what Miss Johnson's relationship with her daughters seemed to be like?

A. She was stir crazy over her kids. She loved her kids. She would ask when they would come see her because she ain't seen them in a long time because they were either busy or didn't have a ride up, something happened to the car, so she just would sit and talk on the phone with them. Or sometimes they wouldn't be home like she expected, so that kind of disappointed her. But she's just like, Well, I'll just call back later. She loved them.

Q. What about writing to them? Did she communicate, Angela, communicate in writing?

A. Yeah, writing. She wrote both of her daughters, her mom, and I think she wrote a letter to her little niece too -- or no, her granddaughter when she was born. I think her daughter was

Page 206

going to save it for her when her grandbaby got older till she could read it.

Q.   At some point during your stay did your case end up going to trial?

A.   Yes.

Q.   And did that affect your kind of custody status within the jail?

3768

A.   What you mean?

Q.   Did they move you as a result of --

A.   Yeah, they moved me.  They moved me to the hole.

Q.   To the hole.

A.   To the hole.

Q.   We've heard that term, but what does that mean to be in the hole?

A.   Be by yourself under -- I guess all the blocks are supervision but just by yourself.

Q.   You were all by yourself.

A.   All by yourself.

Q.   And this is during the period of your trial.

A.   Of my trial, yeah.

Q.   Did you remain in the hole by yourself during the whole period of your trial?

A.   No.  Angie was allowed to come in with me and stay in the hole with me through my whole trial.

Q.   She was allowed to come in there.

A.   Yeah.

Q.   And do you know how that was arranged?

A.   They knew me and Angie were close, and Angie didn't want me to be alone.

Page 207

Q.  Was that helpful to you?

A.  Very helpful, yeah.

Q.  After your trial and you were sent off to prison in

3769

Mitchellville, were you able to communicate with Miss Johnson anymore?

A.  No, wasn't allowed to.

Q.  Because there's some rules about that, aren't there?

A.  Right.

Q.  And what do the rules provide?

A.  That you're -- when you're incarcerated you can't write anybody on parole, probation, or currently in county.

Q.  Those are just kind of rules that the prison has.

A.  Yeah, Mitchellville I'm assuming.

Q.  Okay.  You understand what this hearing's about in terms of sentencing, don't you?

A.  Yes.

Q.  Is that a decision that would personally affect you, the decision about whether or not Angela Johnson got a life sentence or the death penalty?

A.  Yes.

Q.  And I understand you can't write to her because of your situation in Mitchellville, but are you interested in her and what happens to her?

A.  Very much so.  She's like my mother.  Of course.

MR. BERRIGAN:  Thank you, ma'am.  That's all I have.

THE WITNESS:  All right.

THE COURT:  Mr. Williams?

CROSS-EXAMINATION

3770

Page 208

BY MR. WILLIAMS:

Q.   Miss Byrd, you got a life sentence for killing a single adult male; is that right?

MR. BERRIGAN:  I'm going to object to this, Your Honor.  She's been asked the appropriate questions regarding her prior conviction, and the Court's already previously ruled that we're not allowed to get into the specific facts of the underlying conviction.

THE COURT:  What's the relevance of it?

MR. WILLIAMS:  The rules under penalty phase are relaxed, Your Honor.

MR. BERRIGAN:  Not in that respect, Your Honor.  It's supposed to be convictions, prior convictions, are for credibility purposes, not to denigrate the character of the person who's testifying.

THE COURT:  If you'll stop I'll sustain your objection.

MR. BERRIGAN:  I'm sorry.

THE COURT:  That's okay.

MR. WILLIAMS:  I have nothing else then, Your Honor.

THE COURT:  Okay.  You may step down.

MR. BERRIGAN:  I'm afraid those are all the witnesses we have today.

THE COURT:  Okay.  But we're going to finish up the evidence tomorrow.

3771

MR. BERRIGAN:  We are.  That's right.

THE COURT:  Members of the jury, that's going to

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3305 of 3592

conclude the evidence for today. You know, we've run short a couple days, but it's very hard to schedule because you don't know how many -- we went through a lot of witnesses today. Both sides have done an excellent job scheduling their witnesses. And given the length of this trial, it's been remarkable about how we've been able to have full days most of the time. But this happens, and it happens more often than you'd ever know. It happens even in short trials.

So we'll see you tomorrow morning at 8:30. And I suspect we're not going to go the full day tomorrow, that we'll be done some time early afternoon. That would be my guess. And then we'll go through it in some more detail tomorrow. But then we'll be coming back on the 20th for final instructions and closing arguments on June 20. So we'll see you tomorrow morning at 8:30. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. Well, why don't you sit down because I've got just one issue and then a CJA matter that we'll be meeting with privately with the defense.

My understanding is that it would be inappropriate to

3772

submit either an aggravator or mitigator upon which there's no evidence, and in my review of them, I've got questions about several. Either in my view there's no evidence of it; or there's evidence of part of the mitigator, but it has to be revised in light of the lack of evidence with regard to other parts of the mitigator. And I've kind of been keeping track

Page 210

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3306 of 3592

using the defense play book if you understand my metaphor, and I'm sure you do.

MR. BERRIGAN: Yes, uh-huh.

THE COURT: So I think at some point we need to comment on that. I mean, part of me says, you know, they're your mitigators; I might just submit them anyway even if there isn't any evidence to support them, but I'm not sure that's the law. I think there has to be some evidence to support them.

MR. BERRIGAN: Well, frankly, Your Honor, I mean, we'd at least like some guidance. If the Court thinks some of them are unsupported or that part of them are valid and not, other parts aren't, then, you know, I haven't gone through the play book, quite frankly, because we've been putting on witnesses, but we would appreciate whatever guidance the Court could give us. Obviously we might take a contrary position. I don't want to suggest that we might not argue about it.

THE COURT: Right. And you're going to have every opportunity to argue about it. And if it's even remotely close, I'm going to go ahead and submit it. I'm not really in a

3773

position to tell you now because I don't think it'd be fair to the government because you haven't closed your evidence yet.

MR. BERRIGAN: Right.

THE COURT: But I suggest before you close your evidence tomorrow you may want to take a look at the mitigators and see if there's some that you think maybe you haven't put on evidence of that you could put on evidence of or that you want to just revise in light of the way the record's come in.

I mean, I'll just -- I mean, I don't want to alarm you, so I'll just -- I have question marks next to five. Some

Page 211

are fairly hypertechnical. And even though I have a question, I would suppose with regard to at least two of them I'd submit it anyway even though I have some reservations about it. The others I've just got some questions; I don't think there's any evidence to support it. But we can take that up tomorrow after you finish your evidence.

Are you going to have any rebuttal evidence? Do you know, Mr. Williams?

MR. WILLIAMS: I don't believe so at this point, Your Honor.

THE COURT: Okay.

MR. WILLIAMS: Unless I'm surprised tomorrow.

THE COURT: Okie-dokie. Well, why don't we meet at 8:15 just to go over anything like we've done. And why don't we meet at four o'clock back in chambers just -- it's some voucher

3774

stuff is all it is really, but it's been stacking up, and I need to -- I've signed a couple, and there are others I have questions about, and I just thought it'd be better to go through it all and get it done because I may not have time to talk to you about it tomorrow; okay?

MR. BERRIGAN: Yes, sir.

THE COURT: Yeah. Thank you.

(The foregoing trial was
adjourned at 3:50 p.m.)

Page 212

VOLUME 20, 6-8-05

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR

12-11-05
Date

3775

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| THERESA MILTON | | |
| | MR. BERRIGAN | 3533 |
| | MR. WILLIAMS | 3549 |
| | MR. BERRIGAN | 3550 |
| DAVID NIEMAN | | |
| | MR. BERRIGAN | 3551 |
| | MR. WILLIAMS | 3568 |
| | MR. BERRIGAN | 3572 |
| ROSWELL LEE EVANS | | |
| | MR. BERRIGAN | 3574 |
| | MR. WILLIAMS | 3590 |
| | MR. BERRIGAN | 3595 |
| DOUGLAS BOOK | | |
| | MR. STOWERS | 3596 |
| | MR. WILLIAMS | 3609 |
| | MR. STOWERS | 3615 |
| MARILYN HUTCHINSON | | |
| | MR. BERRIGAN | 3618 |
| | MR. WILLIAMS | 3672 |
| | MR. BERRIGAN | 3682 |
| LOU ANN HARE | | |
| | MR. BERRIGAN | 3687 |
| VERLEEN VANDERPOOL | | |
| | MR. BERRIGAN | 3706 |
| REED CORSON | | |

Page 213

VOLUME 20, 6-8-05
MR. STOWERS 3720

SUSAN MARSOLEK
    MR. BERRIGAN 3727
    MR. WILLIAMS 3741
    MR. BERRIGAN 3747
    MR. WILLIAMS 3750

BRANDY BYRD
    MR. BERRIGAN 3753
    MR. WILLIAMS 3770

\* \* \* \* \*

♀ 3776

EXHIBITS:

2170 3625
2129, 2130, 2132, 2133, 2134, 2135, and 2136 3722

\* \* \* \* \*

Page 214

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3310 of 3592

3777

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR01-3046 |
| Plaintiff, | Sioux City, Iowa |
| | June 9, 2005 |
| vs. | 8:27 a.m. |
| ANGELA JANE JOHNSON, | VOLUME 21 of 24 |
| Defendant. | |

/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

3778

APPEARANCES:

For the Plaintiff:  C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA  52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA  50319

For the Defendant:  PATRICK J. BERRIGAN, ESQ.
Watson & Dameron
2500 Holmes
Kansas City, MO  64108

DEAN STOWERS, ESQ.
Rosenberg, Stowers & Morse
1010 Insurance Exchange Building
505 Fifth Avenue
Des Moines, IA  50309

ALFRED E. WILLETT, ESQ.
Terpstra, Epping & Willett
Higley Building - Suite 500
118 Third Avenue Southeast
Cedar Rapids, IA  52401

Also present:  Bill Basler

Page 1

VOLUME 21, 6-9-05
Court Reporter:        Shelly Semmler, RMR, CRR
                       320 Sixth Street
                       Sioux City, IA  51101
                       (712) 233-3846

                                                    3779

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Good morning.  Ready to have the jury brought in?

MR. WILLIAMS:  Yes, Your Honor.

MR. STOWERS:  Yes, sir.

THE COURT:  Okay.

DR. CUNNINGHAM:  Morning, Judge.

THE COURT:  Morning, Dr. Cunningham.  Good to see you again.

DR. CUNNINGHAM:  Good to see you, sir.

(The jury entered the courtroom.)

THE COURT:  Good morning.  Please be seated.

Looks like bottled water, two; cola products, two today so . . .

Okay.  Mr. Berrigan, are you ready to call your next witness?

MR. BERRIGAN:  We are, sir.

MR. STOWERS:  We'd call Dr. Cunningham.

THE COURT:  Oh.  Mr. Stowers.  Thank you.

MARK CUNNINGHAM, DEFENDANT'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated in the witness box.  Please adjust the chair and the microphone so you can speak directly into the microphones.  And when you're ready, would you state your full name, please, and spell your last name

                                                    3780

Page 2

for us.

THE WITNESS:  Mark Douglas Cunningham, C-u-n-n-i-n-g-h-a-m.

THE COURT:  Mr. Stowers?

MR. STOWERS:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. STOWERS:

Q.    What is your occupation?

A.    I'm a clinical and forensic psychologist in private practice and part-time researcher.

Q.    And how long have you been a psychologist?

A.    About 27 years.

Q.    And did you say you were a clinical psychologist?

A.    Yes, sir, by training.

Q.    And what is a clinical psychologist?

A.    Clinical psychology is the evaluation and treatment of psychological disorders.  It's what you would think of a psychologist doing in terms of interviewing and testing and providing counseling services.

Q.    And can you explain what a clinical psychologist is?

A.    Yes, sir.  That's what I just described.  A clinical psychologist is a psychologist that evaluates and treats people.

Q.    What's a forensic psychologist?

A.    Forensic psychology is the application of psychological research and techniques to legal issues.  It's any way that

3781

psychology as a science can be helpful in some issue that's before the Court all the way from things like parental capability in a child custody case, psychological injuries in

Page 3

civil cases, or in criminal court things like competency to stand trial or mental state at time of offense or sentencing considerations such as are being considered today.

Q. Do you have any professional licensing requirements in your field? And if so, do you hold such licenses?

A. Yes, sir. There is licensing in order to hold yourself out as a psychologist, and often the practice of psychology is protected as well. And yes, sir, I'm licensed in 12 or 13 states.

Q. Okay. And I'm not going to ask you to list all the states, but where do you do business?

A. My offices are in Dallas. My practice is national in scope.

Q. And can you give us and the jury a summary briefly of your educational background as it relates to psychology?

A. Yes, sir. I received my undergraduate degree from Abilene Christian College and graduated from there in 1973 with high honors with majors in psychology and also mass communications and a minor in Bible.

I then attended graduate school in a graduate program that was accredited by the American Psychological Association as an accredited training site for clinical psychology -- that was

3782

at Oklahoma State -- and received both my master's and doctorate degrees from Oklahoma State.

I then did a one-year clinical psychology internship that was also accredited by the American Psychological Association at the National Naval Medical Center in Bethesda, Maryland, where I was an active duty Naval officer and clinical psychology intern.

Page 4

Q. And what does it mean to be accredited?

A. The accreditation standards of the American Psychological Association are extremely high. And as a result, there are relatively few graduate programs that meet those requirements in terms of faculty and library and research and practicum opportunities and those kinds of things. Because there are a very limited number of those programs, the admission requirements or standards are also extraordinarily competitive.

Q. I think you indicated at one point that you were in the Navy for a period of time?

A. Yes, sir.

Q. Did you say you did an internship there?

A. Yes, sir, I did my internship at the large Navy hospital in suburban Washington, D.C., at Bethesda and then was assigned as a staff psychologist, a staff clinical psychologist, at the Naval Submarine Medical Center in Groton, New London, Connecticut, which at that time was the primary submarine base on the Atlantic coast. And I was a clinical psychologist and

3783

active duty Navy officer there.

Q. And what did you do?

A. I provided evaluation and treatment services along with a psychiatrist for about 15,000 active duty and, to the extent that we could, about 40,000 dependents or what we call dependents in the Navy, the families of these individuals.

I was on call for the first couple of years about every other night to the emergency room in terms of handling emergencies that came in under the supervision and consultation of physicians who were on the staff. I was also doing consults and following people in the hospital there.

Page 5

I provided a consultation to the commanders, the submarine commanders, the submarine tender commander, the base commanders, about personnel issues that they had. I provided forensic-type services in what are called captain's mast which are kind of low-level administrative hearings as well as court martials which are more formal court-like activities.

And then I also worked part time teaching college classes on base through a -- what's called an extension program so that active-duty servicemen can take -- and women can take courses and advance their education. I also taught part time in the community college system there. And then I was involved in a two-year part-time postdoctoral program at Yale University while I was in the Navy as well.

Q. When you were in the Navy, did you receive any recognition

3784

for your work?

A. Yes, sir. I was decorated with a Navy Commendation Medal which is an unusual award for a junior officer on his first assignment.

Q. And after you withdrew with the Navy, what did you do next with regard to your professional experience?

A. When I left the Navy, I took a full-time academic position at a small private university, Harden-Simmons University, in Abilene, Texas, and was a full-time assistant professor of psychology for a couple of years.

During that same period of time, I began a private practice in psychology, principally clinical psychology at that time with just a little bit of forensic work. After a couple of years, I resigned the academic position and have been exclusively in practice since 1983.

Page 6

As I described, initially that was almost all clinical or treatment oriented in focus with just a little bit of court-related work. Over time the percentage of practice involved in forensic psychology steadily grew until several years ago it became essentially a hundred percent of my practice.

Q. Now, have you done any work in terms of writing materials that have been published in any way?

A. Yes, sir, I have. I have had 12 peer-reviewed papers that I have coauthored that have been published in the last -- the

3785

last seven years. Additionally, there's an edited law journal article that is in press. That means it's been accepted but has not yet been actually printed. And there are two other papers that are under review in peer-reviewed journals. In other words, the study has been written up, and now the journal is reviewing it.

I've also -- I'm the first author -- the first author of a chapter in the Handbook of Psychology. The Handbook of Psychology is a 12-volume series that's intended to represent the state of the art of psychology at this time that was published in early 2003. One of those volumes is on forensic psychology, and I was asked to write the chapter on capital sentencing evaluations for that volume. And I asked Dr. Alan Goldstein, an eminent forensic psychologist in New York City, to author that with me.

There's another book chapter that's in press that I authored. There's a case book where two of my reports have been published that are intended to serve as a model for psychologists about how to do these evaluations and how to write

Page 7

them up. And then there are four or five other papers in professional publications but not peer-reviewed journals.

Q. What are -- these materials that you have had published in peer-review journals as you call them, what has been the general subject area of those materials?

A. The general focus has been associated with capital

3786

sentencing. Some of the papers have to do with violence risk assessment at capital sentencing, in other words, how you scientifically go about evaluating the likelihood that somebody will commit serious violence in prison. Some of them have addressed standards and issues of evaluations in capital cases. Two papers have looked at death row populations and their characteristics. Then there are some other studies that have actually tracked inmates in prison to look at their conduct and identify what factors are associated with violence.

In one of those we followed about 2,500 inmates in a high-security prison in Missouri between 1991 and 2003. The prison system provided us with all of their disciplinary -- with the computer records for that period of time, and we compared individuals in that high-security prison in terms of what factors were associated with risk.

That was a very unique setting because Missouri has been mainstreaming their death-sentenced inmates since 1991 in this prison. In other words, instead of keeping them on a segregated death row, they've been mixing them in the general prison population of this high-security prison so that they go to recreation and have jobs and are celled with individuals that are not sentenced to death.

And our study was the first that compared how they did

in prison as compared with life-without-parole inmates and

parole-eligible inmates that they were side by side with in the

3787


same facility.

And then we also developed a risk measure based on that same study.  Some of the more recent research, the papers that are under review, involve analysis of the disciplinary records of over 50,000 inmates in the Florida Department of Corrections both in 2003, that fiscal year, and also looking at their behavior over several years before that.

Q.    Now, from your testimony it sounds that you are very heavily published in the area of capital sentencing evaluations of persons; is that correct?

A.    Yes, sir, that's correct.

Q.    Do you know sort of your little field of expertise which is these capital sentencing evaluations, are there any other persons in that field let's say in the last five to seven years who've published more or written more than you have in that field that you know of?

A.    Not to my knowledge in the peer-reviewed journals.

Q.    And by the way, what is a peer-review journal?

A.    Peer-reviewed journals are the primary way that scientists exchange information with each other.  And the way that works is that a study is performed and written up and described, analyzed and described, or the existing research in a given area is gathered and critically reviewed and integrated and written up into kind of like a term paper if you will.  And that paper is then submitted to the peer-reviewed journal.

3788


Page 9

The editor of this scientific journal is typically a leading scientist himself, and he reviews it and also sends it out to two or three other leading scientists in the area that this paper is in. And they review it for its scholarly merit, for whether it seems to make an important contribution to the literature for the soundness of the methodology.

If they feel like it makes that kind of contribution and is sufficiently sound, then they accept it for publication, and it's then said to have passed peer review.

Q. Now, you're no longer involved in teaching at this time; is that correct?

A. No, sir, I teach continuing education, but I don't have a formal academic position.

Q. I ordinarily think of persons who take an interest in writing articles and materials as you've described them as sort of professorial types working at some university with a pipe and rumpled clothes. Is --

A. Yes, sir.

Q. Is this something that's common or unusual for somebody who's actually in the private sector working as you do to be involved in publishing to this degree?

A. Yes, sir. It's very unusual for somebody who's outside of an academic institution or research organization to be involved in this level of research and publishing.

Q. And does that relate to the amount of time that's involved

3789

in doing these -- doing these writings?

A. Yes, sir, it's extraordinarily time intensive.

Q. Now, are you board certified?

A. Yes, sir, I am.

Page 10

Q.   And in what particular area?

A.   I'm board certified in forensic psychology by the American Board of Professional Psychology which is the board certification organization that's recognized by the American Psychological Association.

Q.   And what does it mean to be board certified?

A.   It's somewhat -- it's a different kind of designation in psychology than it is in medicine.  In medicine it's a pretty routine credential that someone obtains when they finish their residency or specialty apprenticeship.

In psychology you're not even allowed to sit for the boards until you have been five years out from your doctorate degree.  And most psychologists don't attempt it until mid-career.  And it's intended to represent the highest levels of practice within a given specialty.

Q.   How many persons are board certified in the particular specialty that you're board certified in across the United States?

A.   Approximately 200 psychologists in the United States that are board certified in forensic psychology.

Q.   And how long have you been certified?

3790

A.   About ten years.  That was in January 1995.

Q.   And do you actually have a -- I always mispronounce this word.  Is it curriculum vitae?

A.   Yes, sir, kind of a fancy word for a resume.

MR. STOWERS:  I'm going to approach the witness, Your Honor?

THE COURT:  You may.

BY MR. STOWERS:

Page 11

Q.    Exhibit 2171.

A.    Yes, sir, this is my current curriculum vitae.

MR. STOWERS:  I'd offer 2171, Your Honor.

*  *  *  *

(Defendant Exhibit 2171 was offered.)

*  *  *  *

MR. WILLIAMS:  No objection.

THE COURT:  2171 is received.

*  *  *  *

(Defendant Exhibit 2171 was admitted.)

*  *  *  *

BY MR. STOWERS:

Q.    Are there some workshops that you've been involved in?

A.    Yes, sir.

Q.    Okay.  Can you tell the jury what a workshop is?

A.    Workshops are what psychologists call continuing education programs.  Typically a workshop is longer than just an hour or

3791

so.  It's a half-day or a day-long process.

I'm an active student in attending continuing education myself, so there are many seminars and workshops that I attend.  And then I'm part of the teaching faculty of the American Academy of Forensic Psychology.  That's the scholarly association of board-certified psychologists.  And I teach day-long workshops on behalf of the academy in the area of capital sentencing evaluations.

One of the primary goals of the academy is to raise the standard of practice of psychology as it comes into the courtroom, not in terms of making psychologists more persuasive or teaching them to talk better but instead equipping them with

Page 12

the best understanding of the psycho-legal issues that they're evaluating, this interface between psychology and legal issues, as well as the best methods for doing that and the best research that can illuminate their findings.

Q.   And who attends those workshops?

A.   Psychologists primarily, although sometimes attorneys do, defense attorneys and occasionally prosecuting attorneys.

Q.   Do you ever do any continuing education of attorneys?

A.   Yes, sir, I do, very frequently.

Q.   And what type of attorneys do you provide that for?

A.   To whatever group I'm asked to speak to.  Sometimes those are defense attorney organizations.  Sometimes they've been courses for judges and defense attorneys and prosecutors.  But

3792

primarily I've been invited to present by defense organizations.

Q.   And have you testified in court in the past?

A.   Yes, sir, I have.

Q.   In federal court?

A.   Yes, sir.

Q.   State court?

A.   Yes, sir.

Q.   All across the United States?

A.   Yes, sir.

Q.   About how many times do you think?

A.   Over 200 times.

Q.   Have you been recognized in connection with your work in this field as an expert?

A.   Yes, sir, in those cases as a clinical and/or forensic psychologist.

Q.   Now, let's talk about the work that you did in connection

Page 13

with the case of Angela Johnson; all right?

A.    Yes, sir.

Q.    Can you -- first of all, you've got a -- I'm sorry.  Let's go to one thing first.

Are you getting paid today?

A.    Yes, sir, I am.

Q.    Okay.  And is that something that happens frequently when you're employed in cases?

A.    Yes, sir, I'm paid for my time, for the hours that I spend.

3793

Q.    And can you tell the jury, first of all, what your hourly rate is?

A.    Yes, sir.  My rate in this case is $240 per hour.  That's reduced from my current standard rate of 270 an hour because my initial involvement in this case, at that time my rate was still 240, and so it stayed that through my involvement.

Q.    All right.  And is it common for persons in this field who do these evaluations and testimonies to be compensated?

A.    Yes, sir.

Q.    And are you familiar with the compensation that is paid to other experts that are frequently employed in such cases?

A.    Yes, sir.

Q.    And their rates.

A.    Yes, sir.

Q.    And there are people in your field who commonly testify in cases; is that correct?

A.    Yes, sir.

Q.    And how do your rates compare to their rates if you would?

A.    They're on the mid to lower end of the scale, on the lower end of the scale for folks that are involved in a national level

Page 14

as I am but in a mid-range for people that do work in one region.

Q. Now -- and I assume that you keep yourself abreast of the other people in the same area that you do work in which is these federal capital sentencings; is that correct?

3794

A. In general, yes, sir.

Q. Now, you've testified in cases other than federal capital cases; is that correct?

A. Oh, yes, sir, I have. This is a -- I think I've testified in about 37 federal capital cases, 37 or 38, something like that. But I've testified in over 200 cases all together. I've testified in about 65 state capital cases as well.

Q. You ever testified on behalf of the federal government?

A. I never testify in anybody's behalf. I may be called by the defense or by the government, but I'm not testifying for them or on their behalf. I have not been called by the office of the U.S. attorney in any cases. I have been called in court martial proceedings by the government. And I've been called by the state in state prosecutions.

Q. And are you surprised that you've not ever been called by the U.S. Attorney's Office in various locations across the country?

A. I guess the answer to that would be yes and no. I have offered to consult on behalf of the -- well, I've offered to consult with the U.S. Attorney's Office in federal capital cases and have not been taken up on that. But at the same time I'm not particularly surprised.

My testimony is highly research based in terms, for example, of how it is that childhood ends up affecting adult

Page 15

outcome.  I'm a student of that research, much of it published

3795

by the U.S. Department of Justice.  Those research findings that I'm a student of and that I testify routinely about, many of those findings are not particularly helpful to the government's position in these cases.

And also the research on risk assessment demonstrates that most capital offenders are not going to seriously hurt people in prison when you look at the numbers.  Those findings that I'm also a student of and have published research in, those findings are also not ones I would typically be called by the state to offer.

Q.    Now, I take it from your testimony and the number of times you've testified that the government would be familiar with the general testimony that you give, the methods, and the data that you rely on; is that correct?

A.    Yes, sir, that's correct.  The studies that I apply often have application in more than one case, and those are studies that the government has heard me testify about before.

Q.    Now let's turn to the work that you did in this case; okay?

A.    Yes, sir.

Q.    Dr. Cunningham, can you tell the jury what it is that you were asked to do in this case and when it is that you believe you were first asked to do it?

A.    Yes, sir.  I was asked to do basically two types of evaluations or to address two issues.  The first one is how did we get here; what factors in Angela's life were formative in

3796

Page 16

nature; what put her on this trajectory that brought her to this juncture in her life? And so that's the first one of how did we get here. And then the second issue is where do we go from here? How is she likely to adjust in prison?

The first issue involves an examination of her development and factors in her development that may have injured her. It's what we call mitigation or, more broadly, moral culpability which is the idea of what formed and shaped you, what brought you, made you the person who you are that brought you to a given place in your life.

Q. Now, just so that it's clear to the jury, will you be giving any opinions about Ms. Johnson's mental state at the time of the killings for which she stands convicted by this jury?

A. No, sir. My testimony will be about what formed and shaped her, not about her mental state at the time of the offense.

Q. Now, have you put together some materials in preparation for your testimony in consultation with Ms. Johnson's attorneys that would aid you in presenting your testimony?

A. Yes, sir, I have.

Q. And are those in the form of what's known as a PowerPoint presentation?

A. Yes, sir, they are.

Q. What's PowerPoint?

A. PowerPoint is a software program by Microsoft that is -- essentially it's a program for making slides so that information

3797

can be displayed visually.

Q. And I believe that you'll see on the screen in front of you there --

A. Yes, sir.

Page 17

Q.    -- which is being projected for the jury behind you there your first PowerPoint slide; is that correct?

A.    Yes, sir, that's correct.

Q.    And this is -- first of all, can you give the jury sort of an overview of the two areas that you're going to be talking to them about this morning?  One is the section that we have here which is headed Adverse Developmental Factors; is that right?

A.    Yes, sir, that's correct.

Q.    What's the second subject area?

A.    And the second subject area is violence risk assessment or the likelihood that Angela Johnson would make an adjustment to federal prison without serious violence.

Q.    And it's going to take some time for you to get through this material; is that correct?

A.    Yes, sir, it is.  There are many factors to describe, and I anticipate that my testimony on direct will last until lunch.

Q.    Now, there's a term that you'll be using in some of these slides, and I want to make sure that you have an opportunity to explain that.  There's a phrase "moral culpability."

A.    Yes, sir.

Q.    What are you referring to when you use that phrase?

3798

A.    Moral culpability is one of the two primary issues at capital sentencing that a forensic psychologist might be called on to address.  The two issues principally that psychologists are called to address are either, one, moral culpability -- that's kind of what formed and shaped the person -- or violence risk assessment, how are they likely to behave in prison.

It's important for the psychologist to know what questions he's trying to answer as he begins.  And that's part

Page 18

of what we teach psychologists about in these workshops. And that concept of moral culpability is distinct from an evaluation that might happen at the guilt phase where we would look at questions of criminal responsibility or whether somebody is sane or not.

Q. And you didn't do any evaluation whatsoever of Angela Johnson to determine whether or not she was sane or anything else.

A. No, sir. I was retained for the purpose of looking at her at sentencing, and so that naturally assumed that she would be -- that she was criminally responsible, that she was not insane at the time of the offense, that she knew right from wrong, that she had a choice, that all those questions were done because she -- by the time I would be called, she'd already be convicted of this offense. And so those issues were all concluded and were not a focus for me at all.

Q. Okay. Now, is there a slide that -- could you turn to your

3799

first slide there?

A. Yes, sir.

Q. And can you explain what you're trying to illustrate to the jury with this slide?

A. Yes, sir. You'll see on the right-hand side a moral culpability scale from high to low. And the question is as a psychologist would examine it, so that's the issue the jury will be examining or weighing is Angela's moral culpability. So what does that have to do with the damaging or impairing factors that may have happened to her as she was growing up, and what does that have to do with her exercise of choice in general as a person?

Page 19

Q.    Now, Dr. Cunningham, can you give the jury a quick overview of the types of things that you looked at or did to evaluate Angela Johnson in connection with the testimony that you're going to be giving here?

A.    Yes, sir, I can.  I interviewed many individuals in her family and other folks as well, and I reviewed an extensive body of records.  I think it fills about ten binders, and those include records from her background as well as records about her extensive four to five years of confinement in jail pretrial.

Q.    And did you interview folks?

A.    Yes, sir, I did, many individuals.

Q.    And we're going to go through that in a later slide to sort of show the jury who exactly it is that you interviewed.

3800

A.    Yes, sir, that's correct.

Q.    Are these things that you did, that is, reviewing these records, interviewing these people, -- and those interviews were both by phone and in person; is that right?

A.    Yes, sir.  Most of them were in person, but there were a number of interviews I did by phone as well.

Q.    And are those the types of things that somebody in your field trying to do such an evaluation as you did here would do and be expected to do in order to form conclusions and opinions?

A.    Yes, sir.

Q.    What is it, Dr. Cunningham, that during your workup on this case that you were looking for?

A.    In terms of looking at this first issue of moral culpability or damaging developmental factors, I was looking for just that.  I was looking for what happened in Angie's development that went awry.

Page 20

I was also looking for factors that might be considered protective in nature. In other words, what is there that might have insulated her from the effects of some of those bad experiences?

Q. And how are those factors relevant to the choices that a person might make throughout their life?

A. Quite simply, as the damaging and impairing factors increase, then choice is at an increasing angle, and moral culpability, if you will, is lower. It's the idea that we all

3801

get a choice, but we don't all get the same choice. The nature of the choice that we have, the angle that our choices are made from, is impacted by what forms us and shapes us. That's why we're so careful about how we raise our kids, because we know that what happens in childhood has such a lasting effect.

Q. Dr. Cunningham, we started to talk a little bit about the folks that you interviewed.

A. Yes, sir.

Q. Have you prepared a slide which sort of summarizes that for the jury?

A. Yes, sir, I have.

Q. And does this slide indicate that you interviewed these various folks, Pearl Jean Johnson, Jimmy Johnson?

A. Yes, sir. I interviewed her parents, both Pearl Jean and Jim, and also her stepmother Cookie. That's within this parent and stepmother area.

I also interviewed all of her brothers and sisters both in person and by telephone. Wendy I spoke to initially for about an hour and a half by phone and then followed up 70 minutes by phone.

Page 21

Jamie Jo -- I never saw Wendy in person. Jamie I talked to for over an hour in person and then for 51 minutes by phone.

Jimmy, her brother, I also only spoke to by phone for 77 minutes.

3802

And Holly I spoke to for almost an hour in person and then about 45 minutes by phone.

Then I talked to Angie's children, Alyssa for 50 minutes and Marvea for 36 minutes.

Then I spoke to extended family members, many of them by telephone. Rita Roach who is a maternal half aunt, Winnie Jergenson who is a paternal aunt, Wayne Hopp who's a paternal half uncle, Mark Jacobson who is Wendy's husband, and A.J. Johnson who is her ex-husband. And then I interviewed some other individuals as well. I talked to Kim Swalve, Carol Mann, Dave Nieman, and Mikell Olsen. And I've identified their relationship or their role in Angie's life out beside their names.

Q. And what was the reason you talked to these various different people?

A. There are a number of reasons. First, in forensic psychology unlike clinical psychology, you don't just interview the person and take their word for it. Instead you want to interview other individuals and look at records to verify and corroborate what the individual who's facing charges has told you.

Additionally, there's a lot that a defendant or Angie won't know about her own life. She may not know a lot of family history that has affected the family system genetically and in

Page 22

other ways.   Her early childhood she may not have -- obviously

3803

have good memory of herself.

In my experience often capital defendants rather than trying to make up a story about how bad their childhood was do just the opposite.  They tend to be kind of protective of their family in the reports that they give, and so you may not get accurate information in that way from the defendant.

And then all of these people have different -- they all have different perspectives and different views of the same events, and the more individuals you talk to, the more likely you are to get both an accurate and more complete picture.

And so in forensic psychology it's pretty routine to do third-party interviews and to look at records in capital cases because there are such grave stakes that are involved. This is kind of the heart surgery of forensic psychology.  Then much more efforts and time are spent in interviewing many more people and looking at many more records.

Q.   And how consistent was the history, if you will, that you obtained from Angela Johnson during your 5 hours and 25 minutes that you spent with her with the remainder of the history that you were able to gather in your work?

A.   I guess I would characterize it as broadly consistent.  She has her own view of some of the things that happened to her as a child.  Much of the traumatic experiences are very, very consistent.  There are some things like the way that she perceives her stepmother and the stepmother's role in her life

3804

that's somewhat different from how her siblings see their
Page 23

stepmom. And so there's some things like that that are more perspective, but historical events were quite consistent.

Q. What records did you review? Could you just briefly list those out?

A. Yes, sir. I reviewed interview summaries that had been done by Mary Goody of a number of third parties, not as many as I ended up talking to. I reviewed the records from all of her jail incarcerations pretrial, and those were very extensive. I also reviewed things like birth certificates and marriage and divorce records and school records and hospital records. I reviewed some investigation records. I reviewed reports that had been filed by Dr. Logan and Dr. Hutchinson and also by a couple of forensic psychologists that had been retained by the government, Dr. Martell and Dr. Dvoskin. I reviewed their reports, and I also reviewed the transcript of their five- or six-hour interview that they had done of Angela Johnson.

I also reviewed the records of Dr. Michael Gelbort who had done some intellectual and neuropsychological assessment -- related assessment of Angela Johnson and looked at employment records.

I think that's kind of the broad spectrum. There may be some specific categories that I've neglected to mention.

Q. Okay. But you looked at a whole bunch of records that you've described as ten big binders?

3805

A. Yes, sir, fills a bookshelf.

Q. And did you, during your work on this case, your interviews, documents that you reviewed, find any evidence of damaging or impairing factors in connection with Angela's -- Angela Johnson's background?

Page 24

A. Yes, sir, I did.

Q. And have you prepared a slide which sort of summarizes that?

A. Yes, sir, I have.

Q. And can you simply list those out for the jury? I don't know that we need to go through them all.

A. Yes, sir. Under generational and biological factors, there is multi-generational family distress, genetic predispositions to substance dependence, genetic predisposition to psychological disorder, attention and learning difficulties in childhood, all of those in the generational and biological arena.

Then under parenting factors, there was maternal neglect and inadequate parenting, in other words, from her mom. There was inadequate parenting and neglect from her father. There was chronic marital conflict, domestic conflict, in early childhood between her parents. There was her observation of the maltreatment of her siblings, a pathological divorce between Pearl Jean and Jim, instability of the home and recurrent relocations, physical and emotional abuse, bizarre religiosity in the home and associated maltreatment, inadequate supervision

3806

and guidance, psychological terror in the foster/orphanage setting of the Dillos, sexually traumatic exposures in the Dillos' home. Those all were parenting-related factors.

Then under peer factors, there was peer harassment and rejection. And then there's what I call disturbed trajectory which is the idea that as these sorts of damaging developmental influences push somebody's life off track, as they're off track, that has its own damaging effect and carries them further off track.

Page 25

And those include childhood onset psychological disorder, premature employment which then resulted in her dropping out of school and being economically exploited by her mom, premature marriage and teen pregnancy, early adolescent onset substance abuse and dependence, methamphetamine dependence, repeated violent victimizations in her relationship with Terry DeGeus -- and I apologize; I have misspelled his last name -- inadequate interventions, psychological disorders in adulthood, and her relationship with Dustin Honken.

Q.   And when you talk about damaging developmental factors from your field, what are you trying to get at there?

A.   As I talk about damaging developmental factors, these are things that increase the likelihood of bad outcomes, that increase the likelihood of psychological disorder and substance abuse and being victimized in relationships or being involved in crime and violence.  It's ways that a child is damaged as they

3807

grow up that forms them and shapes them.

It's the idea that I think all of us intuitively recognize that during childhood the concrete is wet, and so the things that happen in childhood have the capability of distorting the shape of the person, of leaving an indelible imprint in them which is why we're so careful about trying to protect our kids from being traumatized or emotionally injured.

When you're an adult and the concrete gets hard, the things that happen may put chinks in it, but they're less likely to shape it.  And that's what we're talking about are things that early on in childhood -- and some of this crosses that juncture -- that were formative and then how that began to push things on to a track that resulted in things getting further off

Page 26

course as she went along.

Q. Okay. Now, is there -- I know you've shown an earlier slide with sort of a -- I don't know what it was. It was a bar -- a moral culpability and then the damaging or impairing factors on the other side, and it was kind of --

A. Yes, sir.

Q. In the middle there was a box that said choices. Do you have another way that you can illustrate what you're trying to explain to the jury?

A. Yes, sir. And in this way to talk about some of the -- I guess broadly the damaging factors and also what protective factors might insulate somebody, here's the person, and here are

3808

the bad outcomes: Psychological disorder, victimized relationships, drug dependency, criminal activity.

An issue that developmental psychology and forensic psychology are critically concerned with that is also relevant to these evaluations of moral culpability in a capital case is how does this person get over here and how does that happen? What occurs there?

Well, fundamentally if when you're growing up there's no family history of addiction or psychological disorder and there's no childhood maltreatment or violence exposure and no developmental abandonment or instability, then that's a foundation that your whole life rests on, and the choices that you make in your life rest on that as well.

And what often goes along with that is that you come from an intact family where there's acceptance and affirmation and stability and structure and consistency. Those are all the ways that we try to keep our kids' lives pretty much the same

Page 27

day in and day out, week in and week out in terms of not changing schools too often and bedtimes and standard meal times, that the routine in their life is predictable because we know that that's what helps them develop security and a sense of structure within themselves and modeling of positive values. And then we want our kids interacting with other kids that have come from similarly secure backgrounds.

Now, this person gets a choice, but it's a choice

3809

that's on this entire foundation. It's a choice that rests on this entire structure. Now, somebody who looks like this can still get to the bad outcomes, but it's quite a leap for them to do that. But if you grow up in a family where there is a history of addiction or psychological disorder, now it's as if we've ramped this thing up a little bit, and if there's childhood maltreatment and violence exposure, now we've ramped it up some more. And if there's developmental trauma and abandonment and instability, now we've ramped it up some more.

Now, if this person begins to drink or drug, it's as if we've put this thing on rollers in terms of the risk of these bad outcomes. Of course, if these are all the things that are going on in your family as you're growing up, it's very unlikely that you're going to have these. And so this person ends up looking like this. Now, they get a choice, not the same choice this person has. They have a choice that's on this ramp.

Now, the angle of that ramp, the angle of the ramp on which the choices are made is what we call mitigation or moral culpability. And that's this notion that we don't all come from the same place and that that fundamentally affects the way we perceive our life and our relationships and the choices broadly

Page 28

that we make.

Q.   Did you identify in Angela Johnson's family history that you researched any history of addiction or psychological disorders?

3810

A.   Yes, sir, I did.

Q.   Can you describe that?

A.   Yes, sir.   There is -- and I'll talk about that.   I have a slide later on that gives the whole family tree and depicts that, but I can talk about it now if you would like for me to jump to that.

Q.   We can save the details on that for later, but you did identify that.   Did you also identify childhood maltreatment or exposure to violence?

A.   Yes, sir, I did.

Q.   And did you identify in your workup on this case developmental trauma and abandonment and instability?

A.   Yes, sir, I did.

Q.   Now, what about abuse and neglect?   What impact does that have on the risk of a bad outcome for a person?

A.   It much increases the risk of bad outcomes.

Q.   And did you identify whether or not Angela Johnson had been mistreated in any way as a child?

A.   Yes, sir, she was.

Q.   And whether or not she'd been exposed to violence in her home as a child.

A.   Yes, sir, she was.

Q.   And how does emotional injury through these types of occurrences affect the choice and likelihood of bad outcome for people in life?

Page 29

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3339 of 3592

A.   It increases it.

Q.   And was she, Angela Johnson, subjected to traumatic experiences as a child?

A.   Yes, sir, she was.

Q.   Now, I think on your chart there you've also got a category for drug dependency.

A.   Yes, sir.

Q.   Did you determine whether or not at some point in Angela Johnson's life she commenced consuming illicit drugs?

A.   Yes, sir, I did.

Q.   And did you determine whether or not she had become to some degree dependent on those drugs?

A.   Yes, sir, I did, and she did become dependent.

Q.   And, Mr. Cunningham, if someone like Angela Johnson has these factors in their life that you've identified in your various charts here, what happens then -- and I think maybe you've already kind of explained this -- to the choices that they have and to the likelihood of a bad outcome?

A.   It puts those choices on a ramp, on an angle, and it increases the likelihood that they will find themselves in one of those bad outcomes.  It doesn't make it inevitable.  It doesn't remove choice from the equation, but it does much increase the likelihood that they end up there.

Q.   So you're not saying that Angela Johnson had no choices with respect to the path that she took in life, are you?

A.   No, sir.  She gets a choice after the ramp is set.  She

Page 30

doesn't get a choice about the angle of the ramp. Most people don't. Most people don't get a choice about what factors stand between them and the bad outcomes. But after the ramp is created, after the blocks are taken away, then they have choices that are before them but, as I described, not the same choices that somebody has who grows up like this.

Q. With all of the -- with all of the support and insulating mechanisms that you've described.

A. Yes, sir.

Q. The peer relationships that are positive, the positive values being modeled. What do you mean by modeling of positive values, Dr. Cunningham?

A. That means that we don't just tell our kids the right thing to do, but we actively display that in our behavior. I guess it's the idea that the way that I act toward my -- the way that I act toward my children, the way I treat my spouse, the way I interact with other people, the way I go about living my life is a sermon every day. It's without ever saying anything. It's an instruction for good or ill, and it's the idea that -- I guess it's that little eyes are watching and are making their own value judgments and modeling their own behavior off of what they see.

Q. Now, Dr. Cunningham, this ramp that you've developed as an illustration, you've used that in other cases; true?

3813

A. Yes, sir, I have.

Q. Across the country?

A. Yes, sir, I have. I find it to be -- it's a useful model for me to conceptualize, so I often will present this.

Q. And slides of this nature you've used as a means of

Page 31

illustrating your testimony elsewhere; is that correct?

A.   Yes, sir, that's correct.

Q.   Is this just essentially, Doctor, some kind of a abuse excuse that you're explaining here to the jury?

A.   No, sir, not according to the U.S. Department of Justice it's not an abuse excuse.

Q.   And when you talk about the U.S. Department of Justice, do they do studies into these things?

A.   Yes, sir, they do.

Q.   And do you have a slide that quotes from that material?

A.   Yes, sir, I do.

Q.   And is that the type of material that people in your field would rely upon in rendering their opinions and conclusions?

A.   Yes, sir.  These studies are the best available research in the field.

Q.   And I don't know if you have that fully up.

A.   Yes, sir.  The U.S. Department of Justice is critically concerned with reducing the amount of criminal violence in our society.  One way to do that is to lock people up who've committed violent offenses.  Only then a tragedy has already

3814

occurred.  Much more effective if those crimes could be prevented from ever happening in the first place.

And so the U.S. Department of Justice has become a major sponsor of research examining the processes that cause or that are associated with a trajectory that starts off in a drug-abusing delinquent ultimately criminally violent sort of way with the idea that if those factors can be identified, that's then the beginning to what -- how to target prevention resources to interrupt those processes that -- in the word of

Page 32

this study, the processes that cause this trajectory beginning early in life and continuing on into adulthood.

Now, while this research is oriented toward targeting individuals when the concrete is soft, in fact, the research that this is based on includes follow-up of people up into their 50s. So it's not just about children or teenagers but also informs us about how -- the beginnings of individuals who find themselves in the criminal justice system even later in life.

And as the Department of Justice has looked at this research over the last 30 years summarized looking back over this period of time, they've identified risk factors for delinquency or criminal violence. Those are things that would increase the angle of the ramp as well as protective factors. Those are things that would push down the angle or put blocks up to stand between this person and the bad outcomes.

And, you know, obviously the best prevention is one

3815

that reduces the risk factors and increases the protective factors. And this slide is from a well-known study that was published in 1995 by the Department of Justice.

Q. Now, these factors that -- the risk factors and the protective factors that the Department of Justice has identified in this report from 1995 that you're displaying in part to the jury, is that -- are those factors the types of thing that correlate with a person's choices and outcomes in their life?

A. Yes, sir. That's what they're looking at. They're looking at the factors that are associated with what ultimately are bad choices, delinquency, criminality, drug abuse, violence, that kind of thing.

Q. And do they break that down into various time periods,

Page 33

developmental time periods, in an individual's life?

A.    Yes, sir.  In this 1995 study they did.  The first set of factors, risk factors, that they identified are ones that are present from conception to age 6.  And I've listed all of the factors, the risk factors, that were identified by the Department of Justice that may occur conception to age 6, and then I have checkmarks beside the ones that were present in Angie's life.

Now, this first factor, perinatal difficulties, has a plus-minus by it.  Her mother was in labor for about three days with her, and then she was a breech delivery.  So that has some potential complications to it, but it's not -- there's no

3816

evidence that her -- that she was necessarily injured by that or had developmental problems.  So that's why I don't have a checkmark by that.  I've got a plus-minus indicating that history but uncertain outcomes associated with it.

There is a family history of substance abuse, and her father at one time served a several-month jail sentence.  There were family management problems.  That means that there were problems in how this household is being run and the routine and procedures and discipline and that kind of thing.  There was family conflict, and there were parental attitudes that were favorable toward and parental involvement in substance abuse in the episodic heavy drinking of her father.

Q.    So of -- are those the risk factors that -- what is there? Seven of them there that the Department of Justice identified for the time period of an individual's life from conception to the age of 6?

A.    That's correct.

Page 34

Q. And how many did Angela Johnson have?

A. She has four of those and potentially a fifth but certainly four.

Q. And did Angela Johnson have a choice, if you will, with respect to whether or not those risk factors were going to be in existence in her life?

A. No, sir, none whatsoever. We don't get to choose the family that we're born into.

3817

Q. Is there another time period that the Department of Justice study from 1995 would have looked at in a person's life, additional risk factors?

A. Yes, sir. They also describe risk factors that are present from age 6 through adolescence. And again, I've listed all of the factors, and I have checkmarks beside the ones that there was evidence of in Angie's background.

The ones that there's evidence of in her background include extreme economic deprivation; transitions and mobility; media portrayals of violence; family management problems; family conflict, parental attitudes that were favorable toward and parental involvement in, in this case, drinking and the early-on domestic violence; lack of commitment to school; alienation and rebelliousness; and potentially some attention or learning-related difficulties, although I don't have sufficient information to find that with certainty, so that also has a plus-minus by it.

Q. And of those factors there's what? How many are there that the Department of Justice study identified as influencing or being risk factors?

A. I believe there are 15 here, and she has 2, 4, 6, about 8

Page 35

of them.

Q. And has the Department of Justice done additional research since this 1995 study?

A. Yes, sir. They've published a great deal of research in

3818

this area. One of the best studies that puts a lot of information together was published in April of 2000. The Department of Justice brought together 22 nationally prominent researchers for a couple of years to look at all of the research in this arena. They looked at 67 major research studies as well as studies that had been done within the Department of Justice, again trying to distill from all that research the factors that are associated with delinquency and criminality and violent outcome.

And this time one of the most important factors that they identified was that there's a cumulative impact. In other words, it's not just factors in isolation, but it's the added effect of one factor after another, A plus B plus C, the idea being that as you add on more risk factors, you are steadily increasing the likelihood of a bad outcome.

Q. Now, can you explain a little bit about this study and how it was done?

A. Yes. As I described, they were the nationally prominent researchers. They're brought together; they reviewed all the research; and they distilled out from that these primary factors.

Q. Are they just looking at people who committed crimes and going back in their life, or what was the method of the study?

A. Different studies have different designs. Many of them are longitudinal in nature. In other words, they start tracking a

Page 36

group of children at some point in childhood and then follow them for a period of time across their adolescence or even into adulthood.

One of the more well-known studies that I'll present a slide from later, some research that was initially published by Cathy Widom where she started out with almost 900 children who in elementary school had been identified as being abused and neglected and came before the courts as such.

And she began tracking as well a group of kids from the same elementary school, the same classrooms, the same area who had not come before the courts as abused or neglected. And those -- and seven or eight hundred of those control kids, and they then followed those children out fifteen to twenty-four years now on out into adulthood so they have some comparisons. And that's an example.

Others have looked at very large-scale studies in the community where they go in and interview the children and their caretakers every six months. The Rochester Youth Development Study is like that. These are large-scale studies that have been performed as well as looking back at 30 years of research in this area.

Q.    Are there some individual and family factors that the Department of Justice study also looked at?

A.    Yes, sir. This time instead of breaking it out by age they broke it out into different type of factors, individual factors,

3820

family factors, school factors, peer factors, community factors, and situational factors.

Page 37

And again, on these first two, individual factors and family factors, I've listed all of the factors that were identified in the study and then put checkmarks beside the ones that were present in Angie's life.

Those include descriptions of some problems in concentration or attention. Perhaps this should have a plus-minus by it. Again, as the -- there is only partial evidence for this. There is early aggressiveness in response to being kind of bullied and harassed by her peers that she begins to fight as a kid.

Most of the risk factors, though, are family factors. Those include parental criminality -- that's in response to her father's jail incarceration -- child maltreatment, poor family management practices, low levels of parental involvement, poor family bonding and family conflict, residential mobility, parental attitudes that are favorable to substance abuse and violence, and parent-child separation.

You'll notice out beside some of these that there is -- like this one, parentheses, x 2, dash, 5. Those are odds ratios. Some of the studies in this area report odds ratios. So, for example, if you were hyperactive as a child, then you were two to five times as likely to end up involved in criminality and violence simply from that factor alone

3821

regardless of the additive effects of other factors.

Now, in some studies you're only twice as likely. In other studies you're five times as likely. So that's that 2, dash, 5. Not all of the studies report odds ratios, so those -- I don't have odds ratios indicated for all of them.

Others of them, for example, residential mobility
Page 38

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3348 of 3592

where I have this plus-minus beside, that means that sometimes moving around a lot as a child seems to be affected with bad outcomes and sometimes it's not. Likely it has to do with what other risk factors are there, how stable is the home.

So, for example, if you're a child that's moving around regularly in a military family where the marriage is intact and you move on to a base with other kids who are just now forming their social networks too and it's a familiar culture and Mom and Dad stay the same and you don't have any special needs in terms of learning problems or concentration problems or emotional problems, probably doesn't hurt you any to be moving around a lot.

As there are problems in the home, the more unstable it is, the more special needs of an emotional type or learning type the child has, the more likely it is that those moves will be destructive to their outcomes.

Q. Now, from this year 2000 study by the Department of Justice, they had these predictors of youth violence broken down into these four -- I guess five or six categories.

3822

A. Yes, sir, these two and then these next three.

Q. Okay. And how many of those risk factors in total did the Department of Justice study identify, and then how many of those that the Department of Justice study identified did Angela Johnson have in her life according to your work?

A. You know, I think there are about 25 factors that are here. She has all eight of the family factors, one or two of the individual factors. Eight plus two is ten. Her siblings are also involved in drug abuse and some problems but are not, frankly, delinquent, and there are a couple community

Page 39

neighborhood factors. She has someplace around 12 or 13. About half the risk factors that they identified were present in her life.

Q. And how would you characterize that?

A. That's seriously cumulative. It's a good number of risk factors. Sometimes somebody will have 23 of them or I'll call that catastrophic, and I guess I would term this seriously cumulative.

Q. Now, other than just looking at risk factors, has the Department of Justice also studied or evaluated what might be called factors that would reduce the risk, or I think you've called them protective factors?

A. Yes, sir, they have.

Q. And do you have a slide to --

A. Yes, sir. This is from that 1995 study, the first one we

3823

looked at, is they broke out not just risk factors but also protective factors and have those broken out into four primary areas: Individual characteristics, social bonding to positive role models; healthy beliefs and clear standards for behavior; and effective early intervention. Those are the four primary areas. And then there are some subgroups within these first two.

Q. And you've put some checkmarks there?

A. Yes, sir. I've listed all the protective factors. I put checkmarks beside those that were present to some degree in Angie's life.

Q. So for protective factors for Angela Johnson, you identified one of those obviously are gender?

A. Yes, sir. And, in fact, that's the most powerful

Page 40

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3350 of 3592

protective factor. Being female is the most powerful protective factor against delinquency, crime, and violence. Now --

Q. And one of the other factors is a positive social orientation. What does that represent?

A. That means that as Angie was relating to her siblings, for example, that she was not a bully, she wasn't aggressive, that she was protective and seemed oriented toward trying to assist them, that -- I mean, the problem in her adolescence along with the substance abuse is primarily that she's working so much, and that's what pulls her out of school. And so there are some things about her general social orientation that have been

3824

positive, and so I've indicated that.

Q. And then you've got a check by friends under social bonding?

A. Yes, sir.

Q. What does that denote?

A. Well, that means that there were individuals that she was friends with who had positive values and constructive outlooks.

THE COURT: Mr. Stowers, I'd like to give the jury a stretch break.

MR. STOWERS: That's fine. Thank you.

THE COURT: Please continue. Thank you.

MR. STOWERS: Thank you.

BY MR. STOWERS:

Q. Dr. Cunningham, can you tell us, is there some significance to family history in your work?

A. Yes, sir, there is a great deal of significance.

Q. And what is that?

A. Family background ends up affecting people in a number of

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3351 of 3592

different ways. One of those ways is by simple heredity, by genetics. You know, risk of cancer and heart disease, high blood pressure, obesity, all kinds of things are associated with heredity; and in the psychological arena so are things like risk of substance abuse or dependence, alcoholism and drug addiction, psychological disorders, personality disorders. Those all have very significant hereditary components.

3825

There are also other ways that family history ends up affecting somebody. One of those is what we call scripts. Scripts are sort of the unwritten story of how your life is supposed to go.

So, for example, in my clinical practice I've had a 16-year-old girl in my office who was pregnant and unmarried whose mother was pregnant and unmarried at 15 or 16 whose mother was pregnant and unmarried at 15 or 16. This is a script in this family. This is not just this little girl's personal decisions in the backseat of a car. This is the story of how your life is supposed to go.

Positive scripts might include things like, you know, in some upper middle-class families it never occurs to the kid not to go to college, doesn't cross their mind to get married before they're 22 or 23 years old. Again, it's the story of how your life is supposed to go.

Then there are things like modeling. Modeling is where you catch yourself doing the same thing your parents did that you swore you never would. It's that imitation effect.

And then there's what's called sequential damage, and that's the idea that as Mom was growing up, she was damaged as a person by the maltreatment that she got, and now when she gets

Page 42

ready to be a parent, she loves her kids as best she can, but she ends up parenting them in a destructive way, and now the next generation gets damaged, and that's part of how you get

3826

damaged from generation to generation.

So all of those processes, both genetic and kind of family systems factors, are at work in influencing the person in this generation.

Q.   Now, have you prepared a family tree to kind of help the jury understand this family history?

A.   Yes, sir, I have.   This is on her mother's side of the family.   We have Albert Gomez Senior and Florence.   Those are Angie's maternal grandparents.   And out of this marriage there's Albert Junior.   And I've indicated that eventually he had three children, Pearl Jean.   Then their marriage ends, and Florence marries a man named Virgil Ashley, and from their marriage there's Darlene.   Then that marriage ends, and Florence later marries Andrew Jensen.   And these are the two individuals that were present then in Angie's life that were also involved in the religiosity and that sort of thing in the home were Florence, the maternal grandmother, and Andrew Jensen or Andy who was the maternal step-grandfather.

And then Albert Senior after the relationship ended with Florence, he later married a woman named Madelyn, and they had one daughter, a daughter named Rita.   And this is the maternal family system.

Then on the father's side, the paternal grandfather was Merlin Johnson, and he was married to Winifred.   And from their marriage there was Winnie and Jim.   Merlin Johnson died in

3827

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3353 of 3592

a single-vehicle accident when he was about 21 or 22.  And after his death, Winifred married a man named Warren Hopp and from their marriage produced Wayne who is then a half paternal uncle of Angie.  After she split up with Warren, then she married Kenneth Sund, and that's the paternal family system.

Then from Pearl Jean and Jim there's Wendy and Angela and Jamie and Jimmy.  After the marriage ended between Pearl Jean and Jim, then later Pearl Jean got involved with a man named Robert Claus, and from their relationship Holly was born. Then Jim Johnson remarried a woman named Cookie, and Cookie had three children of her own, but Jim and Cookie had no children together.

Now, as we would look at some of the things that happened within this family system -- and initially I will talk about things that happened to the females in the family system. Remember I said that one of the most powerful protective factors against criminality and violence is being female.  We know that demographically.  Ninety percent of the people in prison are males.  Ninety percent of homicide offenders are males or more.

So simply being female has tremendous protective effect.  It doesn't mean, though, that women are undamaged by the bad things that happen to them in childhood.  It means it comes out in different ways besides criminality in most instances.  They become sexually active early.  They drop out of school.  They marry early.  They're more likely to be in abusive

3828

relationships, have children early, depression, anxiety, substance abuse.  Their lives may be a wreck, but it doesn't

Page 44

typically come out in criminality and violence. And you can see some different family processes in the females within the system.

Q. Yeah. Could you describe some of those processes as you call them with the females in this family tree?

A. Yes, sir. Everyone in the kind of violet color -- and by the way, the females are circles and the males are squares. Everyone in the violet color was a teenage mother. Everybody with the yellow designator at some time in their life had a history of alcohol or drug abuse. Everybody with the heavy red outlines -- and those would be Winifred and Pearl Jean and Angie and Holly -- those were all victims of domestic violence. Everybody with the gray dropped out of school.

With the wavy lines that go through the center of it, these are individuals who their children at some time in their childhood did not grow up with them as mothers. In other words, the children were in the care of somebody else for a period of time.

Let me back up here. The lines -- to describe both Pearl Jean and Albert during a good part of their childhood were in the home of the maternal grandmother as well as in a -- Pearl Jean was in kind of an institutional setting for a period of time and without a -- sometimes not knowing where Florence was

3829

or why it is that they weren't in their mother's care.

Darlene who is the product of Virgil Ashley, she grew up across most of her early childhood with the maternal grandmother, with Florence's mother.

Then additionally on this other side of the family, Jim and Winnie and Wayne also ended up being separated from

Page 45

Winifred who at one point was declared an unfit mother, and so they then are farmed out to relatives or to foster care settings.

Then Winnie's oldest -- her son, her oldest child, she relinquished custody of to her ex-husband and subsequently had very limited contact with. And, of course, Angela has ended up losing contact with her own children as a result of the situation that she's in.

Q. So what does this family tree at least on the female side of the family tell you?

A. That there are significant problems, and there's one more, by the way. Everybody in the dotted line had a psychological disorder or evidence of it. That doesn't mean that they've been to a psychiatrist and had a diagnosis. In many cases they haven't. It means that by their self-report, by the descriptions that others have of them that they have had some significant problems with their own emotions, with the way that they relate to other people, that there are indications that something is amiss emotionally.

3830

And what you see here is that while these women have not been involved in criminal activity that they have not come out unscathed either, that their lives have many of the problems that Angie's life had up to the time that she came into the criminal justice system.

Q. And how is this type of study of the family helpful to you in evaluating a case such as Angela Johnson's?

A. Well, it identifies things like genetic risk for psychological disorder, for substance abuse. It identifies family scripts and what kind of modeling and sequential damage

Page 46

is occurring within a family system.

It's not unlike I guess -- it's kind of like a miniseries on television like Roots or Captains and the Kings or something. To really know what's happening in the current episode, you need to have seen the two episodes before where you see what's happened in this family across generations. Then you understand the nature of the story that's in front of you now.

Q. Now, if we can return I think to the list of protective factors, can you explain how intelligence, for example, is a protective factor?

A. Yes, sir. If -- and this means that you are extremely smart. This is, you know, doctor, lawyer, graduate school bound kind of intelligent. Then no matter how crazy things are at home, when you get to school, this is a place where you excel, where the world works just the way it's supposed to, and where

3831

you get a good deal of affirmation and attention and people talk to you about your future and where you can go and are more likely to be there to mentor you so that you have a zone of safety. You have people that are paying positive attention to you, and you just have more horsepower to bring to bear to try to make sense of and cope with the situation you're in.

Q. Where does Angela Johnson fit with respect to the intelligence?

A. Angie doesn't have that kind of intelligence. The IQ testing that was done on her in the last year or two, her full-scale IQ score as I recall was about a 91. IQ is distributed on a curve. The 50 percentile -- most people have an IQ score around a hundred. Then if you go down to 85 which is about where her verbal IQ score is, that's about -- about 84

Page 47

percent of the population have an IQ score higher than that, and about 16 percent have an IQ score lower than that.

Her performance IQ score -- that means nonverbal kind of intelligence -- that's right about a hundred. Her verbal IQ score as I recall was about an 84. And her full-scale IQ score is then a 91.

I didn't look up the percentile on that. It would be in the -- that's at the bottom of the average range, just kind of bordering low average, a low average range. It's far below the IQ score, say, of 120 or 130 that we're talking about -- the average attorney has an IQ score of 125. And so Angie is --

3832

she's two standard deviations below that. She's a huge position down the curve from that kind of smart.

Q. I'm not going to ask you what your IQ score is; all right?

A. Yes, sir.

Q. Dr. Cunningham, do you have a graphic display that will illustrate or would help illustrate how these protective factors and the risk factors that have been identified by the Department of Justice and that you've been talking about and explaining in your testimony would -- would appear?

A. Yes, sir. Essentially the nature of this Department of Justice model is that -- and they're represented by weights representing this cumulative effect, that if there are lots of weights over here on this side, if there are a lot of risk factors for criminality and violence, then the likelihood of that happening is growing increasingly great if you've got lots of risk factors, not many protective factors.

Alternatively, if you look like this, this is how we're trying to raise our kids. If you have lots of protective

Page 48

factors and not many risk factors, then you're not very likely to end up in criminality and violence. That's the basic model that we're working with here.

Q. Now, have you also prepared a graphic display or a model, if you will, that explains your analysis of Angela's background?

A. Yes, sir, I have.

Q. And do you have that?

3833

A. Yeah. The model that I often find to be -- to be helpful in trying to understand both people more broadly in given individuals is one of a bridge. And it's the idea that the amount of stress or the amount of injury, emotional injury, that any of us can tolerate before something bad happens is based on three factors.

One of those is what's the integrity of the concrete in the span, how good's the concrete, and how much rebar is in it, and that's one factor.

Another is what kind of supports are here holding up the span? What's the quality of supports?

And the third factor is what kind of blocks or weights end up being piled on this bridge. And the outcome is often a function of the interaction of those factors.

To give you an example, in World War II what they found is they looked at who broke down in combat, that it wasn't just a function of how much combat somebody had faced -- that'd be kind of a stress of the weights -- but instead what was the quality of support they had within their unit because they found that new -- new soldiers being assigned to existing units were much more likely to break down. The guys that had been together for a long time and had strong bonds, they were much less likely

Page 49

to. It's an illustration of this process.

Q. What makes a strong span or a strong bridge?

A. Most importantly, if you have a strong and stable

3834

relationship with your parents, that dramatically adds to the concrete and the strength of it. Then in terms of the rebar going into this, if you're neurologically and developmentally healthy, if you're genetic resilient, in other words, if your family background is one that is full of resilient, successful people, low incidents of psychological disorders, not many drug- or alcohol-dependent folks, that adds rebar as well. And then if you were free from childhood trauma, that's how you get a strong, healthy bridge of a person. That's the background, early background, of somebody who is going to be best able to tolerate the adversities of life.

Q. Now, can you tell us what you found with respect to Angela's bridge, if you will?

A. Yes, sir. The bottom line with Angela's bridge is I thought -- found that the span of her bridge was weakened and weakened from a number of factors. The most important of those was the inadequacy, the parenting inadequacy, of both of her parents, particularly early in childhood, and that that factor is most powerful in terms of the kind of corrosive effect it has on the structure of the bridge.

Now, there are reasons why both Jim and Pearl were inadequate as parents. They were each the product of a dysfunctional family system on both sides of their own family, and it's the sequential damage idea as well as genetic vulnerabilities and modeling, that kind of thing, that they both

3835

Page 50

were products of that, and I've described already these factors that are associated with what makes that family history so important as we would look at outcomes and look at generation to generation.

I had previously put up this slide that just shows the females in this family system. Here I've added the males as well. The additional legend on this, anybody with the vertical bars has been sentenced to prison or served a significant jail sentence, and the heavy black outline is an individual that was involved in spouse or child abuse.

And so you can see -- as you look at the dysfunctional family systems, both here on the mother's side as well as on the father's side, that -- and think about how that's impacting on these two parents, these are the family systems that these guys are growing up in. And then, of course, the outcomes of the children end up, you know, being pretty clearly damaged as we would look at this as well.

There's one other family dysfunction that's present on the mother's side of the family --

MR. WILLIAMS: Your Honor, I'd like to object. This is just becoming a narrative at this point.

MR. STOWERS: That's fine.

BY MR. STOWERS:

Q.   Doctor, was there another point that you wanted to make about that graphic display?

3836

A.   Yes, sir. There's another process that's happening on the mother's side of the family that is part of the sequential damage of Pearl. It's part of what damaged Pearl in her life.

Page 51

Q. And what would that be?

A. There is a history of sexual abuse that is generational in nature. Pearl described that she was repeatedly sexually abused including fondling and intercourse by her stepfather, by Virgil Ashley, for a considerable period of time when she was a kid. Now, there is an additional history of the maternal aunt Rita who --

Q. And what's that?

A. Well, she was sexually abused by Albert Gomez Senior's -- one of his brother's. Additionally, at the Dillos', Wendy is sexually abused. And then during that period of time while they're at the Dillos', Wendy turns to Jamie and asks -- and elicits Jamie who's younger to sexually stimulate Wendy, to fondle Wendy which is not an unusual thing for a child to do who's being sexually abused herself as she's processing that to then begin to act that out with another child, indications that Angela was also subjected to that sexual abuse at the Dillos', and then Holly was sexually abused by a pastor when they lived in Colorado.

Q. Let me stop you right there. You've mentioned Angela Johnson and the Dillos and sexual abuse. What information have you gotten with respect to that situation, that is, the

3837

possibility of sexual abuse of Angela while she was there in Chanute, Kansas?

A. Yes, sir. First, Angie was in a zone of high risk. The information that I got from Wendy, for example, was that Ted Dillo was making his own girls take naps with him and -- naps and that his girls then were part of who pushed Wendy into the room to also have to take her turn taking naps with Ted and that

Page 52

that nap consisted of her being sexually molested when she was there.

Now, typically individuals that are involved in sexually abusing multiple persons, as that's involving more people, the risk is increasing obviously for the other children who are in proximity. And so Angie's in the zone of risk.

Wendy described that years later as she talked to Angie about this experience of being molested that Angie confided in her that this same thing had happened to her as well.

Now, when I interviewed Angie and asked her about it, she denied that this had happened to her at the Dillos'. Wendy's report of their conversation was that it had and certainly she's in a zone of high risk.

Q. So it's somewhat unclear.

A. Yes, sir. At the very least, she's in a context that is sexually perverse in nature and as a third grader would -- living in this small household would certainly have been aware

3838

of this whole nap phenomena that the Dillos' daughters are having to participate in and that is occurring with Wendy as well.

THE COURT: Mr. Stowers, would now be a good time to take our break?

MR. STOWERS: Yes.

THE COURT: Members of the jury, we'll be in recess until 10:30, and please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence, had a chance to receive my final instructions on the penalty phase, hear the closing arguments of the lawyers, and, most

Page 53

importantly, go back and begin your deliberations. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Yes, sir.

THE COURT: Please be seated.

MR. BERRIGAN: Your Honor, usually I've been at the podium where Mr. Stowers is today, but today I'm sitting here, and during the course of Dr. Cunningham's testimony, I have noticed on repeated occasions Juror 147 talking to Juror 274. I'm far enough away I can't hear what they're saying, but that concerns me.

I know the Court's been reminding them of the cautionary instruction, but certainly the jurors should not be

3839

talking to each other about the testimony, at least in my view, while it's going on.

So I wanted to ask the Court two things, if you'd pay particular attention and see if the Court's observations conform to my observations and, secondly, at every opportunity that we remind the jurors that they're not to discuss the evidence with each other.

THE COURT: Yeah, I've told them that, you know, 50 times or more in this trial.

MR. BERRIGAN: I know that.

THE COURT: And how do you actually know that that's what they're talking about?

MR. BERRIGAN: I don't, sir, and there's no way to know that without inquiring of the jurors. I'm not asking for that at this point.

Page 54

THE COURT: Okay. I'll monitor it.

MR. BERRIGAN: I appreciate it.

THE COURT: And -- yeah, I'll be happy to monitor it.

MR. BERRIGAN: Thank you. That's all I wanted to say.

THE COURT: Thank you. We'll be in recess.

(Recess at 10:08 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. STOWERS: Yes, Your Honor.

THE COURT: Thank you. Please be seated.

3840

Mr. Stowers?

BY MR. STOWERS:

Q.    Dr. Cunningham, you've got up in front of you a family tree with a number of different indicators on it of various things that symbolize various impact factors on this family throughout its existence, and I know that's based on your interviews and your workup on this case, and the jury's heard from all the siblings of Angela Johnson. You're aware of that?

A.    Yes, sir.

Q.    As well as her parents.

A.    Yes, sir.

Q.    As well as some of the people that you yourself interviewed --

A.    Yes, sir.

Q.    -- have testified here. So we're not going to go through those things that led you to form those conclusions. I think you've explained that chart there sufficiently. So let's move on to your next subject which is the risk factor of the parenting inadequacy if we could.

Page 55

A.   Yes, sir.  And this is essentially a continuation of that, that both Jim and Pearl Jean were themselves damaged as they grew up by the loss of their fathers.  Jim's father died.  Pearl Jean's father abandoned her.  Both of them had inadequate mothers.  Both of them were mistreated in childhood.  They were damaged themselves so that when they got ready to be parents,

3841

understandably their resources and capabilities were limited.

Q.   Were there other factors that you identified that led to the conclusion that there was inadequate parenting by the parents of Angela Johnson in this case?

A.   Yes, sir.  Jim drank heavily during Angela's early childhood.  There was chronic marital conflict and Jim's domestic violence in the household.

Q.   And what do you know from your work as an expert in this field about the effects of family violence that is observed by, for example, children?

A.   One of the best summary statements I've seen comes from this study that was published by the American Psychological Association.  Quite simply, it appears to damage children about as much to see one of their parents hit the other as it does for the child to be hit himself or herself.

     I guess it's the idea that the wounds on your heart are slower to heal than the cuts on your skin.  And so as this damages them emotionally, those results are at least equal to being directly physically abused.

Q.   And this emotional -- you're talking about physical abuse here.  Is there also another concept of an emotional aspect with regard to the parent-child relationship that you identified as somewhat missing?

Page 56

A. Yes, sir, there was.

Q. And can you describe that?

3842

A. Yes, sir, and that's this next factor, that it appears that Pearl Jean never really formed the kind of glue that you -- that a child needs from its mother, that she seems to never have effectively bonded as a momma to her children. And you see that in the things like the poor level of emotional nurturance, the absence of affection, her broad inattention to the emotional or social or physical needs that our kids have and seemed not to be tuned into that at all and then by acting in ways that are exploitative of the children or that caused them to have to suffer instead of her.

You know, for example, when they had the cafe and the children were sleeping on the floor of the basement of the cafe and she's staying in a motel across the street with a guy that she's seeing or that she gives Jim's Social Security Number to one of her friends or has her children drop out of school to work in a restaurant without getting paid much of anything, all these ways are just the opposite of what you think that a momma does which is that she puts her own needs aside for the outcome of the kids. And when that doesn't happen, you begin to wonder about what's missing from the glue that this person has with her children.

Q. What's the significance of strong parental -- child-parent bond?

A. It's the most important thing in emotional development. To have good glue, to have a good nurturing momma and hopefully a

3843

Page 57

good dad as well, that's the most important thing that happens in childhood, and that's what -- that's what essentially -- it's the most important ingredient to the span. That's the foundation that everything else is going to be built on.

Q. And what kind of difficulties can occur when this situation exists between a parent and a child where there isn't this bonding, this type of support, and this relationship?

A. When you don't have that, the effects are disastrous. I mean, that's -- the absence of that glue with a momma is a far greater injury than whatever kind of abuse and neglect might happen later. If you can have a really good momma for the first four years of life, that lays down all kinds of concrete to help insulate you from what happens after that.

Q. And is that supported by the research that's been done that you're aware of?

A. Yes, sir, it is. This is an issue that there is really no disagreement about in the field of psychology. We discuss the mechanism for why that bond with a parent is so important, but nobody really disagrees about its fundamental significance.

There's a core statement that I think helps illustrate the effects of this issue and the importance of it. And that says that the quality of attachments to parents and other members of the family during childhood is central to how the child will relate to and value other members of society as an adult. That's kind of a way of distilling this down, that what

3844

happens there and the quality of the glue between these different members of the family, particularly with parents, that's what forms the basis this person will then use to be a

Page 58

good citizen later on.

This statement comes from the FBI's behavioral science unit as they were investigating a particular type of homicide. At the core cause of that homicide they found bad glue between family members.

And then additionally, again, this is a finding from the Department of Justice, that the influence of those family factors, the effects of whether you had that glue or not, don't just affect you as a child. The effects of that last a lifetime.

Q. And that's from the Department of Justice?

A. Yes, sir, that's correct.

Q. Is that from one of these studies from the Department of Justice that you talked about earlier, or is it a different one?

A. Yeah, this is a different one. This is authored by Cantelon, 1994, and published by the U.S. Department of Justice Office of Juvenile Justice and Delinquency Prevention.

Q. What other factors impacted on Angela's ability to cope?

A. There's a family history of alcohol abuse as reflected -- there's a family history -- well, there's a family history of alcohol abuse that has some important genetic implications for this family.

3845

Q. And can you explain geneticism as it might relate to alcohol and drug dependence and what the works in your field of expertise show in that regard?

A. Yes, sir. I'm just going to put up just two or three studies. There is a vast research literature that again is widely -- widely recognized and agreed with, and that is that if you have a first-degree relative -- that means mother, father,

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3369 of 3592

brother, sister -- who's alcoholic or drug dependent, then you are four to five times as likely to be alcoholic or drug abusing yourself, four to fivefold.

Now, that holds even if you are separated from them at birth and raised by a family that doesn't drink at all. Your risk of alcoholism or drug addiction does not track the family that raised you. It tracks your family of origin in terms of your biological family.

Now -- and finally, this risk is not just alcohol to alcohol like my dad was an alcoholic so, therefore, I only have a risk of alcohol abuse. Rather it's really substance abuse. If you have close relatives who have histories of substance abuse, drugs or alcohol, then you are at markedly higher risk for drugs or alcohol abuse.

Q. So let's go to the family tree again of Angela Johnson. And what did you find in that regard with regard to alcohol or drug abuse according to your interviews and the other information that you reviewed in connection with your

3846

preparation for this case?

A. There's a significant family history of alcohol abuse in this family system. The individuals that would not have a genetic relationship in that are Virgil Ashley and Warren Hopp. But the other individuals that are depicted here are all part of the genetic lineage or share a common genetic lineage in terms of her siblings. And as you can see, there is very significant -- what we would call penetration of drug and alcohol abuse in this family system.

Q. Now, Angela's father you've got highlighted there in yellow, what's the basis for that?

Page 60

A. That's based on his own self-report that he described beginning to drink abusively at age 14 or 15. In early adulthood he ended up spending three months in jail for being involved in a bar fight that he and his brother were in when they were both intoxicated. He described drinking 12 to 18 beers at a time pretty regularly, most weekends, across his adulthood, that he and Cookie would split a case of beer on a Saturday. And so it's not getting drunk every day. It's not that he can't go to work. But it is episodic alcohol abuse typically on weekends, and this is by his report and also by descriptions of others as well.

Q. What other factors impacted on Angela's ability to cope if you will?

A. There's also a family history of psychological disorder.

3847

Q. And going again then to the family tree, what were your findings in that regard?

A. In this kind of violet yellow (sic) are the individuals who have histories of psychological difficulties. Again, in most instances not that they've been to a psychiatrist and been diagnosed but rather their descriptions of themselves, their life patterns, their relationships point to their having psychological difficulties.

Q. And you've labelled on that chart psychological disorder.

A. Yes, sir.

Q. That sounds pretty ominous just reading it. What are you intending to communicate there?

A. Those are things like depression, anxiety, significant relationship problems, suicidal ideation, bizarre religiosity that really crosses the threshold of sort of normal thought

Page 61

processes.

Q.   And are those the type of things that you would see and expect to see generationally according to the research data that exists and the information that exists within your field of expertise?

A.   Yes, sir, it is.  It's a part of a typical psychological interview that you interview about a family history of different psychological disorders much like your physician asks you if you have any family -- history in your family of cancer or heart disease or high blood pressure because those are things that he

3848

needs to be aware of because they're relevant to your risk.

In a similar way, if somebody comes into my office with a complaint of being depressed, I'm going to want to take a family history from them about the incidence of depression in their family because it helps illuminate the nature of the disorder that may be occurring and what sort of treatment is likely to be effective.

Q.   And does the research support the idea that there is a genetic element to psychological difficulties?

A.   Yes, sir, it does.  These are all summaries from DSM-IV, the Diagnostic and Statistical Manual, Fourth Edition, which is the handbook of diagnoses that psychologists and psychiatrists use so we can communicate using a common language.

And within that DSM-IV, there are descriptions or summaries of the research about what we know about what causes these disorders.  And so, for example, with schizophrenia, there's a ten-fold risk for first-degree relatives.

Now, I include that not because there is a diagnosis of schizophrenia in this family system.  But as Pearl Jean talks

Page 62

to me about having hallucinations as a child and as the children are describing the degree of distorted perception of reality that's occurring associated with this religiosity that they're involved in, it begins to approach a psychotic sort of disturbance.

Major depression, Angie has had childhood depressive

3849

symptoms, made a suicide attempt as an adolescent, and has been treated for depression as an adult as well, that that also has a significant genetic predisposition to it as well as an increased risk for concentration, attention problems.

Anxiety disorder has a family association to it.

Attention deficit disorder problems also tend to run in families and are associated with mood problems, personality disorders, learning problems, substance dependence, a number of things that you see some indication of in her family system as a whole.

Learning disabilities are more common among biological relatives. Angie's mother and father describe significant difficulty in school. Father was held back for two or three grades. And then Angie also talked about a personal perception of struggling to learn and descriptions of her reversing her letters. Then personality disorders are also more common in families.

Q. I'm sorry. At the bottom of that display there, you have some letters, DSM, dash, 4. What does that represent?

A. That's that Diagnostic and Statistical Manual, Fourth Edition, which is the current edition that we are now using. Actually the most current is TR, DSM-IV-TR, which, is text revision. These sort of factors have not changed in that text

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3373 of 3592

revision.

Q. And the Diagnostic and Statistical Manual is what?

3850

A. That's what we psychologists and psychiatrists use to communicate with each other. That's what we put on our insurance forms, and it allows us to have a common language so we're all talking about the same thing when we talk about somebody being depressed or so that when research is done everybody's clear about who was identified as depressed to participate in this research study.

Q. Is it in essence the uniform and accepted definitions and criterion that are used for evaluating and diagnosing mental conditions?

A. Yes, sir.

Q. Now, were there some symptoms that you identified from your review and work in this case and from your interview of Angela and her relatives of some continuing conditions that Angela herself was displaying?

A. Yes, sir.

Q. And what were those?

A. When she was a kid, she described that she often felt sad and would cry in her room by herself. She had low self-esteem, that she didn't feel like she was good enough for anybody or anything, that she was more of a problem than she was worth. She described a pervasive sense of guilt as a child, that she was disappointing to her mother, that she was not good enough for God to love, that she couldn't protect her brothers -- her sisters and brother from this religious stuff that was going on.

3851

Page 64

Even some of the good things that she did in early teens have this overwhelming guilt-driven quality to it. She talked about when she was 12 or 13 they had the Save the Children commercials that would come on television, and so she made $32 a week from babysitting, and she started out supporting one child for $7 a week and then ended up supporting 4 children for $28 a week. She was giving almost all of her babysitting money to this, and Pearl Jean stepped in and said, You gotta stop; this is getting out of hand.

And it's -- that degree of sense of kind of guilt about what's happening even other places also points to a kid that's taken a lot on herself.

Q. What -- I'm sorry.

A. Also she often felt lonely. She was having nightmares about her mother and the rabbits and pigs at the Dillos. She described first considering suicide in elementary school, and then at age 14 she overdosed on aspirin.

Q. And so at age 14 she did an overdose?

A. Yes, sir.

Q. Unsuccessfully?

A. Yes, sir.

Q. What other factors that you identified that impacted on this model that you've created which you've headed Angela's Bridge?

A. There are also descriptions of attention and learning

3852

problems, not a diagnosis that I have. In looking at her school records, it's difficult to detect the presence of learning disabilities, for example. There are descriptions, though, of her reversing her letters. The pattern of her IQ scores, of her

Page 65

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3375 of 3592

verbal IQ being substantially less than her performance IQ, is often seen in learning disabilities and is a pattern that would contribute to problems with reading and spelling and those kinds of things.

Then her sister Wendy talked about her getting overengrossed in things and seeming not to be able to shift her attention. And this whole thing about casting out the deaf and dumb demons in Angie seemed to have been related to deaf, her not responding when she was called upon, being kind of preoccupied, and the dumb part being that she was having these problems in school and also that she seemed to be a greater target for both the discipline and the demon deliverances within the family as if there's some characteristics that she has that are calling for additional attention to be directed toward her.

Q. In a negative way.

A. In a negative way, yes, sir.

Q. What other factors impacted on this model?

A. There was what I would characterize as unrelenting trauma exposure, in other words, that the trauma begins early in childhood and it just keeps coming wave after wave after wave.

There's the chronic marital conflict of her parents,

3853

her father's physical abuse of her mother, this pathological divorce, and then inconsistent contact with her father. She's emotionally neglected and abused. She's physically abused.

There's this bizarre religiosity that crosses a good chunk of her childhood that involves her grandparents and friends of the family. And there's the terror, what I call the terror, of the Dillos that has a continuing traumatic legacy, just wave after wave of emotional injury.

Page 66

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3376 of 3592

Q. And I think we heard some testimony yesterday from Dr. Hutchinson regarding the effects of childhood trauma on the actual childhood brain, if you will.

A. Yes, sir.

Q. On a person's brain functions.

A. Yes, sir.

Q. And I don't want to go into that in a great deal of detail; okay? But can you just briefly explain that to the jury?

A. Yes, sir. The research at this point identifies that traumatic experiences in childhood don't just create bad memories, but rather the brain of a child is what we call plastic. In other words, it's in a state of formation. And chronic trauma exposures in early childhood particularly, childhood in general, early childhood particularly, change the chemistry and architecture of the brain. The chemical processes, the hormonal processes of the brain as well as the laying down of tracks and pathways end up being modified or

3854

impacted by those trauma experiences.

Q. And do you have a way that you can illustrate this point to the jury?

A. Yes, sir. The model that I would describe is one -- in looking at the effect particularly of family trauma on this experience of wiring is that what happens in the family and the traumatic experiences there end up affecting the wiring, all of this being part of what forms the person who makes the choices to behave and, you know, to act in whatever they do. And so it impacts on the quality of those choices.

Q. And what, according to your review of materials and your interviews that you did, did Angela Johnson do when she was a

Page 67

child to sort of support herself and support what you've used in your model as a device, this Angela's bridge?

A.    Yes, sir.  Early on there seems to have been this sort of fantasy position that her father had in her mind.  She's not seeing him very often, but the kids are really excited when they do see him.  And so he's kind of this magical figure who shows up periodically with presents or positive attention.  So he's there as a dotted-line support because it's not like a father who's present, but it's the fantasy of who he is that seems to give her some reassurance.  Unfortunately that's also accompanied by a weight on this bridge that his contact with her is very inconsistent in nature.

Q.    And what additional weights were added?

3855

A.    The next thing that happens is that -- let me skip through this.  Essentially the notion is in terms of what effect it has to be without a father is that research tells us that fatherless children -- and functionally she is effectively fatherless for good chunks of her childhood -- that there are dramatically greater risk for drug and alcohol abuse, mental illness, suicide, poor educational performance, teen pregnancy, and criminality, all of those risks having been realized in Angie's life.

The next thing that happens then is there is a pathological divorce between her parents that the children are part and parcel of throughout the rest of their childhood.

Q.    What's that mean, pathological divorce?

A.    Well, divorce is never a vitamin for a child.  It's never like this is a good thing that we would prescribe for them as a positive event.  But parents that divorce can very significantly

Page 68

reduce the damaging effect that has on a child if they continue to see that the first priority that they have is to raise these children.

Pathological divorce means that the goal of raising the children has been lost, and instead you have the bitterness that may have characterized the breakdown of the marriage being kept alive for years afterwards. It's talking bad about the other parent. It's enlisting the children as sort of on your side as your ally which Pearl Jean seems to have particularly

3856

done with Angie, to recruit her as an ally against her father and stepmother. It's the failure -- it's the keeping alive of the divorce conflict and the failure to nurture and continue to parent these kids effectively, and that's what I would characterize as a corrosive and ongoingly pathological process.

Q. And what other weights were piled up on this support bridge of Angela's?

A. There's her mother's physical and emotional neglect.

Q. And I think you've covered that and described that previously. And there you're talking about what again?

A. Well, there I'm talking about things like her not recognizing the emotional needs of the kids, there being no consistency in the household, little affection, putting her religious obsession above the children's welfare, failing to protect them from obvious risks like are happening at the Dillos', yelling at the children, exploiting them, all of those things.

Q. What is the impact on a child when they're emotionally neglected?

A. The effects of emotional abuse in many ways are greater

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3379 of 3592

than the effects of physical abuse. Again, it's this notion of the wounds on your heart being slower to heal than the wounds on your skin.

There's disturbed attachment. In other words, this glue that's supposed to connect the mom and the kid is --

3857

doesn't form well, and you end up with all kinds of problems as a result of that often beginning with some sort of fantasy of an idealized relationship that ultimately there's tremendous anger and disillusionment about because it doesn't happen and maybe problems in relationships as an adult as well.

When you think about what it means to be a child who is effectively emotionally alone and for whom it's not just that the world represents physical risks but there are ongoing risks to your self-esteem and even your boundaries -- your mother thinks you have demons. There are these lengthy exorcisms where you're being held down and people are praying over you. You think about what it's like to be a child and have this kind of thing going on that you can't control and don't understand that is terrifying and confusing and leads to psychological disorders and behavior problems.

Q. What was the next item that came to bear on Angela's support?

A. The next item was physical abuse.

Q. And what are you talking about there?

A. Those are things like the mother's frequent beatings of Angie with different instruments, the wide black belt, the bruises and welts, and these lasting until she's done venting. It's not that it's proportionate to what the child has done because often it's just for typical kid behaviors, but it's that

Page 70

Mom is venting in the process of this.

3858

Angie described that one of the disciplinary techniques of her mom was if you said something that she thought was a little smart or out of hand that she would wash your mouth out with soap but not just soap up her hand and move it inside your mouth but instead to rub the bar of soap back and forth across the teeth so that you'd have the taste of soap in your mouth for hours. Those are examples.

Q. Okay. And what is the impact according to the research of abuse and neglect in regard to criminality?

A. This is the study that I mentioned earlier by Widom where they started out following almost 900 kids with the matched controls and looked at them where we're now at 15 to 24 years of follow-up.

And here's what they found, the kids that were abused and neglected, the mistreated kids, were almost five times more likely to be arrested as juveniles. They were twice as likely to be arrested as adults, and they were three times more likely to be arrested for violent crime as an adult.

This series of studies were initially published in the peer-review literature with Cathy Widom as the lead author. This follow-up at this point has been published with English as the lead author. Widom's the second author, and it's been published by the Department of Justice.

Q. And what was the next item that was stacked up on her support mechanisms?

3859

Page 71

A.    The next weight on the bridge was the abuse of her siblings that she is then there watching.

Q.    And there you'd be talking about just generally?

A.    Yes, sir.  I'm talking about that Angie's not always the target of these beatings.  Sometimes it's her brother or sisters or the mom is punching them or slapping the face enough that it leaves a hand print on the face.  On one occasion Pearl Jean put makeup on Angie's face to cover up the marks so that she could go to school.

Q.    And what does the research show about the effects of observing the abuse of siblings?

A.    There are a number of things.  Obviously it contributes to negative perceptions and feelings about your parents and not just the parent who's doing it but because your parents symbolize sort of the whole social order, they symbolize authority in general, it contributes to kind of a disaffection of generalized authority; a more fearful and vigilant posture toward adults in general; feelings of guilt and responsibility that they're being hit instead of you or it's because of something that you were involved with them about or you can't stop it; mixed feelings about the siblings; behavior problems; anxiety; shyness; fear of failure; believing that aggression is somehow a normal way to behave or that this is what's supposed to happen in families; problems learning how to modulate your own feelings.

3860

In other words, part of the way that children learn to control their own feelings is by observing their parents stay in control.  And finally psychological disorder is also a part of a potential legacy of observing the abuse of your sisters and

Page 72

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3382 of 3592

brother.

Q.    Are there any studies that support what you're indicating here with regard to the effects of abuse?

A.    Yes, sir.  This one is another study published by the Department of Justice.  This is called the Rochester Youth Development Study.  To give you some idea of the scale of this research, here they're following a thousand children, and they're interviewing both the children and their caretakers every six months across their adolescence.  Think of the scale of this, of what's involved in interviewing a thousand children and their caretakers every six months.  And they're looking at three different types of abuse.

They're looking at spouse abuse which there was early on in this household; abuse of the children which was ongoing; and a climate of violence and hostility which was also present in the marriage and also as the children are growing up.

And here's what they found in terms of the outcomes for the kids, the rates of violence among the children growing up in these households.  And these were in zones of some risk.  If there was --

Q.    What did the study show about the rates of serious youth

3861

violence?

A.    Well, if there was no family violence, if you didn't have any of these things, then 38 percent of the teens were violent.  If there was one type of violence, it jumped to 60 percent.  If there were two types, it jumped to 73 percent.  If there were all three types of violence, then it was 78 percent of the children.

So you see the effects of that cumulative weight that

Page 73

we were talking about earlier.

Q. And how many types of violence did you identify in your research with regard to Angela Johnson?

A. All three types.

Q. And what was the next weight that you added on to Angela Johnson's support bridge?

A. The next weight was bizarre religiosity.

Q. Of course, we've heard a good deal about that, and I know the jury has. I think at this point it pretty well speaks for itself, but I assume that you did discuss that with Angela Johnson?

A. Yes, sir, at great length and with others and with the other family members as well.

Q. And are your findings that that weight existed supported by your interviews of all the family members?

A. Yes, sir.

Q. And of Angela?

3862

A. Yes, sir.

Q. And just very, very briefly, when you talk about that topic, I assume what you're talking about is topically the fear in the home; is that right?

A. Yes, sir, that's part of it. There's a climate of fear that that creates that your household is full of demons, that the end of the world may happen at any moment, that you're surrounded by forces that are malevolent and out of control.

Q. And are you referring to the instances or incidents of casting out of demons that occurred?

A. Yes, sir.

Q. And those were described to you as they were to this jury,

Page 74

although I know you weren't here for the whole trial; is that right?

A.   That's right.   This is my first day in the courtroom.

Q.   But you've heard some of the descriptions that were relayed to you; is that correct?

A.   Yes, sir.

Q.   And those were told to you in interviews?

A.   Yes, sir, from all of the children that were old enough to remember this, they described this experience and in very consistent ways.

Q.   And then there was an episode about the end of the world and the three-day journey?

A.   Yes, sir.

3863

Q.   And you found out about that in your investigation?

A.   Yes, sir.

Q.   And the Bible studies that were going on at the home with these very young children?

A.   Yes, sir, daily studies that would last for an hour that are not child directed.   It's not like they're reading children's Bible stories.   It's Pearl reading the Bible, waving her hands, speaking in tongues, praying, rebuking the devil.

Q.   Also I think one of the other categories that you fit into this general heading of bizarre religiosity is the claims of messages that Pearl Jean would have been claiming to have received directly from God?

A.   Yes, she routinely saw almost every experience as representing some divine guidance, not that God infuses your perspective and then you bring your best problem-solving skills to bear.   But instead she gets pricked, gets a tinge, and opens

Page 75

the Bible. Whatever verse she sees, that's the instruction that she's supposed to apply.

This is pretty terrifying to the kids as she's told them the story about Abraham being prepared to sacrifice Isaac and that she would certainly do the same thing if she thought God called on her to do that and then you're having this experience where at any moment Mom opens the Bible, looks at the verse, and decides that's her instruction from God about how to proceed. It's -- not only is it -- not only is it such terrible

3864

modeling about how to go about solving problems in your life, but it's terrifying about what may happen next in response to some supposedly divine message.

Q. Did you find in your review that there were some suggestions of -- in this category as well of failure to provide medical care and relying on the power of healing, placing hands on people?

A. Yes, sir, only going to the doctor as a last resort.

Q. And, of course, you heard about the grandmother's behaviors with regard to this tire in the basement and beating the tire?

A. Yes, sir, and Wendy and Angie describing their fearfulness of the basement. That was where the shower was. If they had to go take a bath, they're scared to death to go down into the basement because of their fear of this whole demon phenomena.

Q. And you in your review heard about the fasting.

A. Yes, sir, routinely, that they're not eating all day, maybe only get to drink chocolate milk until that night, that they're simply hungry a good deal of the time.

Q. And was there some inconsistency or illogic, if you will, to the religiousness in the home?

Page 76

A. Yes, sir, it's what I guess I would characterize as tortured logic because on one hand there's this intoning of spiritual values while at the same time the day-to-day behavior in the home is abusive and neglectful and even exploitative in nature. So you've got this failure of all the spirituality

3865

issues that are there to somehow practically infuse behavior for any kind of a benevolent outcome.

Q. And what are the implications that you identified in your work on this case of this bizarre religious behavior?

A. There are many of these, and let me just try to capsule a few of them.

You know, one of the jobs of a parent is to provide a modulating and stabilizing influence for the child. Children are scared of the boogieman. Children think somebody's under their bed. For children their world is full of things that are potentially terrifying. And Mom and Dad are calm and reassuring and are not joining them in that terror. And so they provide some reality testing and some soothing. The child gets to where they look to Mom or Dad to see whether they're supposed to be afraid or not because the parent is providing that stabilizing effect.

In this household it's just the opposite. The adults in the household are the ones that are coming up with the demons and the malevolent forces that are only very marginally in control. And if you don't say just the right words, the demon will come out of one person and may go into another which is -- apparently on one occasion the demon went into the parakeets and then the parakeets have to be released because that's where the demon went. It's just -- there's no modulation. Mom is out of

Page 77

control in her abuse and her neglect and then this religiosity

3866

as well.

Obviously the adults aren't strong enough to provide security or safety because the demons are everywhere. It instills fearfulness and anxiety in the child. The child can't rely on the parent as a good test for what's reality. Because everything is kind of the demons and God and these things are going on and you're looking in the Bible, the child doesn't learn good cause and effect: If you do this, then this is what happens -- or good problem solving. It doesn't demonstrate personal responsibility or that I have control over my own outcomes because everything is kind of put off into the divine.

They ended up being alienated from their peers and isolated because if you had a kid come in the house, they'd have to go to Bible study. There's a violation of body boundaries and autonomy boundaries as the kid's being held down, certainly a grave risk of becoming alienated from organized religion and maybe with authority in general.

Q. And how did Angela Johnson, according to your work on this case, your interviews, the information you received, how did she deal with this bizarre or how did she attempt to cope with this bizarre religious behavior?

A. She was -- did the best she could to try to preserve a sense of autonomy. She was more resistive than the other kids. You know, if the requirement was that you pass gas in some way or belch or sneeze or speak in tongues, she resisted doing that.

3867

She kept struggling and fighting when she was being held down,
Page 78

that a part of the support system seemed to be I'm not going to let you take my individuality away from me.

Q.   And was there a price that she paid for that?

A.   Yes, sir, it was.  The abuse that was directed toward her increased as did the casting out the demons.  The exorcisms increased as well.

Q.   So the more she fought, the more she got back in return.

A.   Yes, sir.

Q.   What was the next thing that was piled upon Angela's support system or her bridge as you've headed it?

A.   There are indications of a failure to provide emotionally and physically before.  But this religiosity also included a neglect of physical needs like the fasting and the medical care and those kinds of things.  So at that point it's almost as if you now have two different issues at stake, one of them being Mom's broad emotional neglect and then also particularly joined with the religiosity the physical neglect that was a part of that.

Q.   And so when you talk about neglect, is there known in the field in which you practice to be an impact on a child of neglect of a child's physical needs?

A.   Yes, sir, there is.

Q.   What is that?

A.   Fundamentally, neglect is seen as more damaging than abuse.

3868

And here's the mechanism of that.

Often children that are abused get pretty good parenting in between the times that they're abused.  Their parents love them.  They get fed emotionally.  It's just periodically the parent loses it and is abusive toward them.

Page 79

Now, neglect, though, particularly emotional neglect, is more like chronic emotional starvation. You just never do get the groceries, and that ends up being more damaging in the long run than, you know, kind of getting pretty good love and affection and nurturance but periodically you get hurt physically. So that's that understanding of why neglect is more problematic, is more damaging to the child than abuse is.

Q. And what else was stacked up on this support system of Angela Johnson? There you go.

A. The terror of the Dillos.

Q. And these would be the folks from Kansas that the jury's heard a fair amount about?

A. Yes, sir.

Q. There any reports there in connection with Angela Johnson's stay down there in Kansas that were made to you by Angela Johnson that you found to be noteworthy separate and apart from or in addition to the ones that had already been made to you by other family members?

A. Yes, sir, they were consistent, but they represented specific instances that I found pretty compelling.

3869

Q. Can you share those with the jury, just a couple of those?

A. Yes, sir. Angie described an instance where Ted Dillo had the children come out to the barnyard and they were feeding corn to the chickens. And she really liked that. She said it was like Snow White tossing the corn to the chickens. And in the middle of this, Ted Dillo picked up a couple of the chickens and threw them into the hog pen where the hogs immediately began to tear these chickens apart, and the corn that the chickens had just eaten was flying in the air and the horror of the sudden

Page 80

transformation of this scene that occurred.

She talked about there being an instance where Bobbi asked her to come into the barn and she sat down and put a rabbit in Angie's lap which Angie was petting, and after she petted the rabbit for a minute, Bobbi jerked the rabbit out of her arms, put it down on a stump, hit it in the head with a sledgehammer. The rabbit's eyes pop out, jerks it up, slits its throat, jerks the hide off of it and guts it, and the legs are still jerking, this little rabbit that she just had in her lap and was petting, instances that are not just life on the farm but instead seem to be designed to be terrorizing to the child.

Q. Or at least they were perceived that way.

A. Yes, sir, the experience of it from a kid's standpoint -- I mean, you have to remember that children think of themselves and animals as being kind of like all the same. You know, children's storybooks are about animals who talk to each other

3870

and have human emotions and personalities. And the cartoons that they see from The Lion King to The Little Mermaid and all these things are about animals that have personalities like people do.

And so when you do sudden violence like this to an animal, that's part of why these nightmares continue. It isn't that we saw an animal just being butchered. It's the identification that kids make with animals, particularly if you encourage them to with the whole petting thing and then suddenly violence is done to this little animal.

Q. Do you find it a little odd that the various Johnson children in their reports to you seem to be emotional in their descriptions of these events that occurred down in Chanute,

Page 81

Kansas, at least as they're recalling them many, many years after the fact?

A. No, sir. I think it's a testimony to how extraordinarily traumatic these experiences were that you have -- Jim is a high school or college student who's having nightmares about what happens to the animals at the Dillos'. I mean, it says something about the -- this sort of nuclear explosion that was set off in these kids in their little psyches in the period of just a few months living there with the Dillos.

Q. And can you talk a little bit about the sexual trauma that can occur to a person who is the subject of sexual abuse?

A. Yes, sir. This is based on a friend-of-the-court brief

3871

that was filed by the American Psychological Association that summarized some of the research about what is it about sexual trauma that injures children so much. And essentially there are four processes that appear to be responsible for that injury.

There's traumatic sexualization; in other words, this ends up inappropriately shaping the sexuality of the child. Jamie talked about how both Wendy and Angie after the Dillos were sexualized and were interested in pornography and became sexually active early and this whole -- this sort of evidence of the traumatic shaping of their sexuality.

There's betrayal. That's the idea that as a child you depend on the adults around you to be benevolent or to protect you, and that didn't happen.

There's powerlessness where the will of the child is overwhelmed and stigmatization which means that the kid -- the child takes on the bad feelings about what happened as if they were responsible for it, that they feel bad and defective in

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3392 of 3592

response to what happened.

Q. Now, Dr. Cunningham, were there any other things that were added on to the support mechanisms or the bridge, if you will, of Angela Johnson according to your workup on this case?

A. Yes, sir, there were recurrent moves.

Q. What are you referring to there?

A. I'm talking about the moves of this household from place to place. Now, the ones that I have are essentially the moves to

3872

different cities. As they describe the history, there were other moves between households within the same city that they had a real hard time nailing down exactly where they were living when.

Q. And have you prepared a real quick chart that you can run through very quickly?

A. Yes, sir. This begins with Angie's birth which was here in this Wisconsin area. There's a first move when she's 4 to an adjacent area in Wisconsin; then at age 5 to Pueblo, Colorado; in kindergarten to Mason City; in second grade to Thornton; in third grade to Chanute, Kansas; returning in third grade back to Thornton; fourth grade in Klemme; fifth grade, Forest City; seventh grade, Thompson; in seventh grade Forest City. This is a significant amount of disruption of social network and school setting for a little girl whose life is already pretty out of control at home.

Q. And very briefly, what does that -- recurrent moves and those frequent moves, what does the research show with regard to that?

A. Well, not uncommonly it makes visitation more difficult in a divorce situation, and certainly it did here. This is part of

Page 83

how Dad lost contact with the kids. It disrupts whatever beginnings of peer friendships you might have; increases the likelihood that the next place where you're the new kid that you'll be bullied or harassed; makes it more difficult to get

3873

interventions to detect abuse or neglect, to get special services psychologically or learning; increases the economic hardship of the household in most cases. Moving's expensive to set up another household. And it just broadly increases the experience of instability and chaos.

Q. And, Dr. Cunningham, were there any other things that Angela Johnson attempted to do to cope and to support herself?

A. Yes, sir. She began to abuse drugs.

Q. And is that based upon your interviews of the various people in this case?

A. Yes, sir, her siblings as well her.

Q. And what do you know about teenage drug abuse and the dependence and what you found out in connection with this case?

A. Let me describe the history of that. Obviously drug abuse is not an effective support system, although it may seem to be. That's why the lines are dotted. It's an additional weight on the bridge.

Angie described to me that she began smoking marijuana when she was 12, that she was introduced to it by her sister; that it made her happy and she laughed, and it gave her some relief from this -- from the anxiety and disturbance of the family. And that's why I've identified this -- often as teenagers begin to use drugs or alcohol, it reflects both the genetic predisposition as well as they're medicating themselves from the anxiety that they have.
Page 84

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3394 of 3592

From age 14 to 18, she was buying her marijuana with her part-time jobs and smoking daily, actually full-time jobs as she was working at her mom's restaurant.

After age 14, she said she no longer wanted religion in her life, no more healing, no more speaking in tongues, no more demon possession. She just wanted to smoke pot and be happy.

Q.   And there was some drinking as well that you've identified?

A.   Yes, sir, at age 12 or 13 she began drinking. Between the ages of 13 and 16 she was drinking until she was intoxicated one night of the weekend.

Q.   And then you've got something in there about LSD which is a hallucinogenic illegal substance; is that right?

A.   Yes, sir, and she was using it on occasion when she was 14.

Q.   And then what else did you find out about her substance abuse?

A.   Those are the primary substances that she was using as a teenager. There are others then that she used later on. Later she begins to abuse cocaine and methamphetamines as well.

Q.   So let's talk about that.

A.   That will come later here as I . . .

Q.   All right. Was there -- you've now put up another graphic which is the Angela's bridge graphic.

A.   Yes, sir.

Q.   And you've added a support post, if you will, underneath

there called employment.

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3395 of 3592

A.    Yes, sir.

Q.    She obviously learned -- was able to maintain employment despite her many difficulties.

A.    Yes, sir.  In fact, she began working when she was 13 or 14, and that seems to have been a mainstay in her life.  She worked very hard, often two shifts most of the time across a good part of her adolescent and adulthood, and that structure of working seems to have been an important support system for her.

Unfortunately, as she was a kid, as she was working, she was being exploited by Mom who was having her work 50 or 60 hours a week in the restaurant, might give her 40 or $50 for all that work, might or might not.  And so largely Mom has free labor from her daughters in the restaurant which then results in them having to drop out of school in order to continue that pace of demand and the sense that they're somehow obligated to Mom to help her in this way.

Q.    So she drops out of school.  Is that another factor that you've illustrated?

A.    Yes, sir, it is.

Q.    And that as you learned occurred at -- I believe it was the ninth grade; is that right?

A.    Yes, sir.

Q.    And then she became married?

A.    Yes, sir.  Then she's working, and when she's 16 years old,

3876

she ends up marrying Steve Hugo in a marriage that lasts -- they're together just over a year.  She's 16 at the time.

Q.    And you've illustrated that by also knocking down the weak support of father.

A.    Yes, sir.  One of the things that happened in her -- in her

Page 86

mid-teens is that she became quite disillusioned with her dad and began to feel as if his absence from her life was evidence of his lack of caring for her and so became alienated and estranged from him and, you know, within a couple of years of that had found a substitute support system, had married.

Q. And then what happened?

A. Well, then she -- now that marriage ends. She's with him for just over a year. Then she marries A.J. and has a baby, and so now this support system has expanded into a parenting role as well. Of course, she's a teenager when these things are happening, and that represents an additional weight and demand on the bridge.

Q. Being a young mother and being married?

A. That's correct.

Q. And then what happened?

A. Well, the marriage fails with A.J., and now we have two marital failures by the time she's in her very early 20s.

Q. And then what happened to Angela's bridge?

A. Then she -- she first begins to abuse cocaine and after about a year of that first tries methamphetamines, and that

3877

escalates very rapidly into a very serious problem. Again, she's finding that it represents like her medication to her. She said the first time she tried it she realized that she was going to use this every day for the rest of her life if she could. The problem is, of course, methamphetamine is not a legitimate support. It's not a vitamin. It's a tremendous additional weight on a life structure.

Q. And these drugs that she was using did have, according to your evaluation, not unexpectedly I assume, an erosion on

Page 87

Angela; is that correct?

A.    Yes, sir, they did.

Q.    And can you describe that?

A.    Yes, sir.  Effectively, the methamphetamine abuse doesn't just represent a weight on the bridge, but it's a corrosive effect on the concrete itself.  It's changing the way that somebody looks at themselves, the way they look at other people, their emotional reactions.  Methamphetamine abuse promotes extreme mood lability in terms of fluctuations in mood and explosive irritability.

And later when she's involved with Terry DeGeus, she describes their mutual methamphetamine abuse as contributing to the conflicts they have there.  It contributes to the person becoming extremely suspicious, and with sufficient abuse, you may even see what's called a methamphetamine-induced psychosis which she does not report but gives you some sense of the

3878

continuum that may occur in response to methamphetamine abuse.

Angie described to me that she was in jail for two or three years before the lights began to come on about how destructive meth had been in her life.  When she was out in the world, she told herself that she wasn't dependent, that she could use it or not, that it had some helpful effect to her, kept her energized, let her work, those kind of things, and that she was -- it wasn't until she had been off of it and had had time to reflect for several years that she came to realize how fundamentally this had been distorting her priorities and her sense of herself and other people.

Q.    And what happened in her relationship with Terry DeGeus other than the methamphetamine consumption and abuse that she

Page 88

had participated in?

A. In that relationship she was savagely battered.

Q. Physically abused, and they've heard about that from various witnesses, so I'm not going to go through that with you in a good deal of detail. But that obviously would be something that would impact somebody quite significantly as well as after the battering relationship came to an end, there was this additional pursuit aspect of it; is that right?

A. Yes, sir, that's correct, that she ends up being stalked by Terry. It's not surprising that somebody from this kind of background would be involved in a profoundly dysfunctional romantic relationship. That's why all of this matters, because

3879

that ends up affecting the way you perceive yourself and the relationships around you. And so women from this kind of background are far more likely to end up being stuck in a cycle with somebody who is -- who's abusive of them.

Q. And now at this point Mr. DeGeus in her life is out of -- at this point in time on your display, he's now in a stalking role, if you will.

A. Yes, sir.

Q. And who comes into play then?

A. Then Dustin Honken.

Q. And the father of her second child?

A. That's correct, who again is an emotional support of sorts, but that relationship is its own additional weight on this bridge.

Q. And what happens?

A. Ultimately her life comes apart.

Q. Now, Dr. Cunningham, let's turn your attention now to the

Page 89

second area of your testimony.

A.    Yes, sir, if I could step up to change files.

Q.    Oh, okay.  Please.  Are you set up now?

A.    Yes.  Thank you.

Q.    One of the areas that you've taken an interest in in addition to the direct psychological aspects of persons in these types of situations, these very serious sentencing proceedings --

3880

A.    And I would like to clarify.  Much of this is more developmental as an explanation of their trajectory rather than necessarily a psychological biopsy in the present.

Q.    Right.  It's sort of a life study.

A.    Yes, sir.

Q.    And one of the things you've taken an interest in in addition to doing that aspect is in the areas -- in the area of what's called a violence risk assessment?

A.    Yes, sir, that's correct.

Q.    And can you tell the jury what a violence risk assessment is?

A.    Yes, sir.  That's simply a scientifically informed way of going about looking at the likelihood that somebody will be violent in the future.  Sometimes those risk assessments are done for risk of violence in the community.  And in a sentencing proceedings like the capital sentencing proceedings, it's looking at risk of violence in prison.

       And I'm a student of that research and that methodology about violence risk assessments and have actively done research in this area particularly looking at factors that are associated with risk of violence in prison.

Page 90

Q. And, in fact, are these things that the government itself studies?

A. Oh, yes, sir, regularly. In fact, one of the publications that I'll be referring to next is a paper that's published by

3881

two government researchers, one Miles Harer who was with the Bureau of Prisons and is now with the National Corrections Commission and another who's a senior researcher at the Bureau of Prisons. So yes, sir, there's active research that's being done both government sponsored and by government personnel.

Q. And have you done some writings in this area as well?

A. Yes, I have. A number of my peer-reviewed publications have been in this area of violence risk assessment, both reviewing the research that's been done up to now as well as performing studies on large groups of inmates.

Q. In this case did you do an assessment of how it is that you believe Angela Johnson will handle herself in the context of a federal life prison sentence?

A. Yes, sir, I have.

Q. And do you have some slides that are going to help you illustrate the points that you'd like to have the jury understand from your testimony?

A. Yes, sir, I do. I think there are a number of factors that point to her being likely to have a positive adjustment in the federal Bureau of Prisons.

Q. And can you tell the jury what those are?

A. Yes, sir. That -- those include her being female; her age; that she's earned a GED; that she has a history, a longstanding history, of employment in the community; her behavior in jail over a lengthy period of time pretrial; the appraisal of the

Page 91

jail correctional staff, in other words, the degree of risk that the correctional professionals who are interacting with her every day, what level of security they have brought to bear on her, what practical steps they've taken as they would evaluate her; and her continued contact and relationship with family.

Q. And what is your conclusion regarding the likelihood that Angela will make a positive adjustment if she's sentenced to serve a life sentence in prison?

A. I think that she is likely to make a positive adjustment to the Bureau of Prisons, and by -- I would define positive adjustment in that there is a low likelihood that she would exhibit serious violence.

Q. What did you look at to reach that conclusion?

A. All of these factors that I have listed here.

Q. Okay. And the first one is the fact that she's a woman.

A. Yes, sir.

Q. And do you want to talk about that?

A. Yes, sir.

Q. What can you tell the jury about the fact that she's a woman and why that leads to your conclusion that she's likely to make a positive adjustment while in prison?

A. As I said, risk assessment is a scientifically informed process, so as we look at factors, we want to identify what research is there that helps support that.

There is an extremely large study that was published

several years ago by Miles Harer and Dr. Langan that -- who are the government-related researchers of extraordinary size. This

Page 92

is a study of almost 25,000 female inmates in the Bureau of Prisons and compares them with 177,000 male inmates in the Bureau of Prisons and looks at their rates of violence across a period of time from 1991 to 1998.

And here's what they found:  There is no record of a female committing a homicide while in federal custody.  As these researchers looked at data within the Bureau of Prisons, as they talked to people who had spent their careers there, as they looked in their archives, they could identify no instance where a female inmate had ever killed anybody, whether inmate or staff, in the Bureau of Prisons, never happened.

The second thing that they found is that it's extremely rare for women to commit serious assaults in the Bureau of Prisons, that that's an extremely rare event.  In fact, women are involved in serious assaults only 1/12 the rate that men are in the Bureau of Prisons.  In other words, if you're male, you are 12 times more likely to commit an act of serious violence in the Bureau of Prisons than if you're female. They have 8 percent of the rate.

Women use a sharp or pointed weapon at a third the rate of men.  In other words, of all the women that were violent during this period of time, less than 2 percent of them used a sharp or pointed weapon as compared to 5 percent of the men who

3884

were violent.

The bottom line of this study was, in sum, women commit violence -- this is in the Bureau of Prisons -- at substantially lower rates than men, and the nature of the violence women commit is less serious.

So first they're not involved as often.  And then when

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3403 of 3592

they are, it's much more likely just to be a fight and not to be an assault that results in serious injury.

Q. What we might refer to as a cat fight?

A. Yes, sir.

Q. Between two women?

A. Yes, sir.

Q. Pulling hair, screaming, yelling, slapping, pushing?

A. Yes, sir.

Q. Maybe even punching?

A. Yes, sir.

Q. What was another factor that leads you to your conclusion that Angela Johnson is likely to make a good adjustment to a life term?

A. The next factor is age. Angie is now 41 years old.

Q. Why does age matter?

A. Age is -- I suppose after being female, age is one of the most powerful factors in identifying who's going to get in disciplinary problems in prison and who's going to be violent in prison. And I'll show you a couple of studies that illustrate

3885

this.

Q. Yeah. Are there some?

A. Yes, sir. Now, the next two slides that I'll show are based on male data, but one of the findings of this very large study that I just described, the 25,000 female inmates and 177,000 male inmates in the Bureau of Prisons, is that the same risk factors apply to men and women in terms of risk of violence in prison. It's just what they're predicting in women is happening much less often and is much less serious, but the same kind of factors apply.

Page 94

This is a graph that shows disciplinary write-ups of any sort. This is in the New York prison system. This is the age of the inmate, and this is the frequency of those disciplinary write-ups. Could be for anything.

And what they found is that the rate of those write-ups peaks here at age 20 and then falls steadily across the life span until when you're out here where Angie is at age 41, you're down at about 40 percent of the level of the youngsters that are there.

Same kind of results from a study of state prisons nationwide. Again, this is the annual rate of disciplinary violations, and this is how old the inmates are, 17 or less, 18 to 24, 25 to 34. And your rate is peaking right in this zone, 35 to 44. Here's where Angie is right here, and you can see that that rate, the inmates at this age are getting disciplinary

3886

write-ups in prison at about 1/6 the rate or 1/5 the rate of these inmates that are in their early to mid-20s.

Q. So the older inmates are less likely to have any type of rule infractions?

A. Yes, sir, and less likely to be involved in violence as well.

Q. And that's supported by the data and the research that you have reviewed and accumulated in your role not only in connection with this case but in your work in many, many cases over the years?

A. Yes, sir, that's correct.

Q. And what does -- the role of her having obtained a GED while she was in the Linn County Jail, where does that play into your analysis here?

Page 95

A.    One of the findings of this study that I just described out of the BOP with the 25,000 female inmates, one of their findings was that having a GED was associated with a better adjustment to prison, with being less likely to be involved in violence.  This is similar to some results that we have out of our own research looking in Missouri and also in Florida, that education -- the more education someone has, the less likely they are to be involved in prison violence.

Q.    So there's a correlation between educational level and violent activity by an inmate in a correctional institution.  Is that your testimony?

3887

A.    Yes, sir, that's correct.

Q.    Somebody who's obtained a GED or high school diploma or done better have lower rates of violence than those who haven't gotten that educational background?

A.    Yes, sir, that's correct.

Q.    Does it say anything that Angela Johnson obtained her GED while she was in the Linn County Jail?

A.    What that speaks to is the potential for her to use incarceration in a positive way.  The study that I described, it doesn't -- it isn't focused on when the person got their GED, but in terms of a risk assessment model, if somebody is working when they're incarcerated, which she has really not had the opportunity to do, or is pursuing education, which she did have the opportunity to do, it points to their making constructive use of their confinement.

Q.    Dr. Cunningham, was there another factor that you looked at, the employment in the community, as a factor that relates to violence risk assessment in prison?

Page 96

A. Yes, sir, it is. And quite --

Q. Can you explain, first of all, to me how somebody's previous employment when they're out of prison can say anything about violence risk while they're in prison?

A. Well, it speaks to a number of things. First, if somebody has a history of being industrious in the community and that's how they occupy themselves is that they're industrious, they

3888

work hard, then when they come into confinement, you're more likely to see that in them, that they also work in prison. And, in fact, most people in prison have jobs they go to almost every day. They either work in the maintenance of the prison itself or there are prison industries there that they work in.

So when somebody has a history of having done that already when they get to prison, they're less likely to simply be trying to occupy themselves with one scam or another and instead are likely to continue that pattern.

It also demonstrates an ability to respond to authority, to exhibit self-discipline, to kind of keep your eye on the ball and be focused on longer-term, you know, goals or issues. Those also translate into a prison setting.

Q. And was there another factor which was the past pattern of behavior while in jail?

A. Yes, sir.

Q. And, of course, you know because you reviewed jail records related to her; is that correct?

A. Yes, sir, I have.

Q. And you know she's been in jail for almost five years now.

A. Yes, sir.

Q. July 29 of 2000 till now she's been in custody in various

Page 97

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3407 of 3592

county jails.

A.    Yes, sir.

Q.    And you've just put up a graphic display which kind of

3889

summarizes -- summarizes her journey, if you will, across the state of Iowa from one county jail to another; is that right?

A.    Yes, sir, that's correct.

Q.    And Eldora County Jail is actually in Eldora, Iowa, but it's the Hardin County Jail.  Are you aware of that?

A.    I recall that the -- that Hardin is what my records say.

Q.    Okay.  In any event, you've made some observations about her past behaviors in jail as determined from the jail records and the materials that you've reviewed; is that correct?

A.    Yes, sir and also descriptions of how she was confined, some of which I observed, you know, in part when I came into the -- at least the local jail and others that she gave me a description of.

Q.    And what does her pattern of behavior in jail indicate to you as somebody who reviews jail records and things of this nature on a routine and recurring basis for cases all across this country?

A.    First, she has been involved in a high number of disciplinary incidents.  Almost all of those are minor in nature and are ones that are very -- that represent pretty typical inmate behavior and inmate interactions.

          And I found the conclusion of one of the government's experts, Dr. Joel Dvoskin, because I reviewed his report, that was his observation as well, that while she has a lot of write-ups, they're behaviors that are pretty typically seen in

3890

Page 98

inmates and don't really cause a lot of concern.

What's most important is that there are no acts of serious violence. There are a couple of fights, but there are no serious assaults that take place. And that's what we are most focused on, not if tempers flare up or there is some sort of mutual confrontation that happens on occasion but is there a pattern of predatory assaults, are there physical assaults of staff members, those kind of things?

It's also important as you put that in some perspective, I think there are about 60 write-ups that she has in the Linn County Jail. As I understand it, about half of those are associated with a particular corrections officer that there seems to have been a conflict with. And again, those are largely minor in nature.

Jail is a very hard place to do time. Jails are not equipped for long-term confinement. You know, in a prison there are activities that you have the inmates in all day long. You have them programmed, that they're going to jobs and education and groups and one thing or another, and they're set up to house people for years at a time.

A jail is not. Most jails don't have anything except the people just kind of warehoused there together idle, and that's a setting that raises the likelihood of misconduct because everybody's there in that same mix, particularly if you're an inmate or jail detainee like Angie who's kind of high

3891

profile and may then get some extra attention from other inmates or staff.

Page 99

Q. And I think in any of the records you've reviewed that you've referred to serious assault, can you give the jury your definition of serious assault?

A. Yes, sir, that would be an assault with a weapon. That would be going after a staff member where you begin to beat them down. That would be jumping on and injuring another inmate unprovoked. Those are the sorts of things that would rise -- where there's a use of a serious weapon or where some sort of significant injury occurs or where there is a -- an attack of some magnitude of the staff member.

Q. All right. Are you aware of anything in any of these records anywhere that says that Angela Johnson attacked any jailers?

A. No, sir.

Q. Are you aware of any comments that she made to any jailers or persons employed at the jails that the jailers subsequently took as threatening or that were obviously by what was said threatening in nature?

A. Yes, sir. There are many write-ups that she gets for being insolent or disrespectful or profane. Angie shoots off her mouth, and there are -- there is an instance where an officer had -- as I recall had threatened to take away a visit with her children and she said something about you're dead or I know

3892

where you live or I'm going to get you or some things along -- a threat along those lines.

Q. Anything she's ever carried out, any of those threats to any of those people that she's accused of threatening at these institutions?

A. No, sir, no follow-up on that. And additionally, what's

Page 100

important is that you don't see the institutions then proceeding to lock her down. When correctional institutions perceive that somebody is a imminent threat to other inmates or staff, they simply lock them in a cell by themselves, and they leave them there 23 hours a day and they come out an hour a day to exercise. And any time you let them out into the hall, they're handcuffed behind their back before you pop the door and you pass their meals to them for them to eat by themselves. That's a typical high-security setting that's employed whenever you've got an inmate who's outside the pale that you're going to -- and that you're particularly concerned about their violence potential.

Q. Now, are you aware of any treatment by correctional staff that would impact on your analysis of her past behavior and her likely future behavior?

A. Yes, sir.

Q. And what's that?

A. Well, as we look at each of these jail settings, even in knowledge of the charges that she has and eventually with

3893

knowledge of her accumulated disciplinary history, here's what happens: That she is double celled initially in Benton County and comes out and exercises with a cellie or the cellmate. Then she's single celled but has access with three other inmates. For two weeks she is simply single celled. That's what I'm talking about, not moved at all in Waterloo.

Then in Linn County at various times she's in an open bay dorm which means bunk beds and a common area until all the federal inmates were moved to single cells, not from her conduct but by a change in policy. Then she's single celled. But she's

Page 101

locked out of her cell from 7 in the morning until 10:30 at night with 4 other inmates that share a common area so you can't even get back by yourself during that time. And the write-ups are happening in this context.

Hardin or Eldora, she's single celled but shares a common dayroom room at will, can go in and out from 5:30 in the morning till 11 at night. Woodbury she's in an open bay with 20 inmates and then requests a single cell so that she can have a little bit more privacy.

Effectively what we see here is that as the correctional staff evaluates her day to day in terms of the housing assignments that they make, that she's been housed with routine access to other inmates and routine contact with staff. She was placed in an open bay dorm at the Woodbury County Jail.

When I went in to evaluate her, she was brought out to

3894

see me without restraints, without handcuffs, just walking along next to a staff member, put her in the room with me. They left. After a while a long line of inmates came through the room that we were in which is kind of a passageway on to the hall, and she spoke to them, and staff members were standing there. We took breaks, and they walked her up and down the hall. Nobody was reacting to Angie as if she was about to jump on somebody.

And as I am in jails and in prison facilities routinely, the degree of concern that's expressed only is reflected in how the inmate's restrained, and you simply don't see that in terms of the appraisals that are being made of her.

Q. Are you aware of a situation where she was allowed to participate in a study with four civilians at the Linn County Jail who were writing some type of a teaching paper for teaching

Page 102

certification?

A. Yes, sir, I'm aware of that.

Q. Left in a conference room. Would that be the type of thing you'd be talking about here?

A. Yes, sir, it's not unlike my own interview with her except this involved some other civilians that are doing interviews for a school or university purpose. That I think happened at Linn County which is also then the site of all these disciplinary records, that that's happening in the same context.

MR. STOWERS: Your Honor, I'm almost done.

THE COURT: We're going to go till you finish.

3895

MR. STOWERS: That's fine.

BY MR. STOWERS:

Q. Dr. Cunningham, what are the alternatives for how inmates are housed that relate to your analysis of this issue of future risk of violence?

A. As I described, this is how she has been housed and treated, and I gave a brief summary of these very common features that are part -- that are brought to bear when there is concern with imminent violence by an inmate.

Q. And what do these indicate just very briefly?

A. Well, that these are not the sorts of things that are being done with Angie day in and day out despite knowledge of the charges and despite whatever disciplinary history that she has in the institutions. These procedures are not being brought to bear, though they are routinely employed and routinely available if needed.

Q. And you're talking about her being placed in a single cell, being locked in her cell for 23 out of 24 hours a day?

Page 103

A.    Yes, sir, exercising by herself for that hour out, meals in the cell, back up to the door and get handcuffed before they open it, exercise by yourself or with small groups, frequent searches of the inmate as well as their cell area.

Q.    Now, what does continuing relationships that she may have with family and friends have to do with your assessment of future risk of violence if she's sentenced to life?

3896

A.    Inmates who have continuing contact with family, in other words, if they have ongoing relationships, those inmates do better in prison partly because they have some anchor to community values and may be concerned with how they're perceived by their children or loved ones.  And partly they have an incentive to behave because they want to keep their visitation, and one of the things that will be taken away from them is that visitation contact for misconduct.

        And so in Angie's case, there are a number of family members who she continues to be involved with, most importantly, her daughters, for whom maintaining access to that visitation contact is very important, and so you've got some incentives that are there as well as some reasons to stay anchored to community values.

Q.    And have you come to learn that Angela Johnson, since her time in custody from the summer of 2000 till now, has actually developed closer family ties?

A.    Yes, sir.  Along with the growth in her perspective during this time, it appears that much of the bitterness and estrangement that she had with family members has subsided and the relationships with them have grown.

Q.    Are there any kind of studies that you look to that relate

Page 104

to the nature of the offense that the person stands convicted of as whether or not that has any bearing on conduct subsequently in prison by persons convicted of such offenses?

3897

A.    Yes, sir, there is research that looks at that.

Q.    And do you have some of that that you'd like to share with the jury to explain your testimony in that regard?

A.    Yes, sir.  These are -- this is data that's based on an analysis that I did with a colleague, John Sorensen, where the Florida Department of Corrections provided us with the disciplinary data for 51,000 inmates who were in the Florida Department of Corrections for the entire year of 2003.

And we're doing a number of different analyses of this data, but this one looks at the offense that sent the person to prison, disciplinary violations of any sort, potentially violent things like weapons possession or threats or those kind of thing, assaults, assaults with injuries, and assaults with serious injuries.  Serious injuries are typically considered things like a cut that requires stitches, a broken bone, a concussion, admission to the hospital.

And what we're looking at here, we're going to compare 5,000 murderers with 11,000 inmates that are there for property crimes, and we're going to compare them also to the whole prison population, 51,000 inmates.

Q.    And what does the -- what does this study by the Florida Department of Corrections show about the relative potential violenceness -- violentness, if that's even a word, of first-degree murderers versus property offenders versus all inmates as a whole?

3898

Page 105

A.    I would direct your attention in answering that question to these numbers that are in the parentheses here under each group. Your first-degree murderers are much less likely to have disciplinary write-ups or to be involved in potentially violent conduct than these other groups.  See 35 percent, 48 percent, 44 percent.  That's the number percentage of inmates involved in that in any given year.

So, for example, in 2003, 35 percent of the first-degree murderers got a disciplinary write-up for something as compared to 48 percent of the property offenders and 44 percent of all inmates.  And they also did better -- potentially violent infractions, you can see how much less frequent those are, 8.8 percent versus 11 percent for the property offenders versus 10 1/2 percent for all inmates.

When we start looking at from here over, of all assaultive misconduct, actual violence, not just write-ups or threats but actual violence, there's no difference in these groups.  The first-degree murderers who are here, their percentages are no different statistically than the other inmates who are in prison.  They're not involved in violent misconduct any more often than anybody else is.

The other thing that you see here is as the severity of violence increases, its frequency dramatically decreases. So, for example, in 2003, in each of these groups, between 2 1/2 and 3 percent of the inmates were involved in an assault, but

3899

only 1/5 of a percent or, in other words, about 1/13 that rate were involved in an assault with serious injury.  And that's one of the other findings that comes out of prison research is that

as the severity of the offense increases, its likelihood dramatically decreases.

Q.   So it's a -- I think there's a word for that.  What's the phrase that is used?

A.   Well, they're inversely correlated.

Q.   So that it's sort of counterintuitive I guess to what people might think, that the murderer would be the most dangerous type of an inmate in a prison, but you're telling us that the research shows actually the opposite; is that correct?

A.   Yes, sir.  And there's some -- and there's a pretty good understanding of why that's the case.  And it has to do with how long a sentence the inmate is going to have to serve.

Inmates that are facing very long prison terms take a different approach to doing time.  This is where they're going to be from now on or for decades at a time, and that makes it particularly important to them to go along with the program so that they can maintain their job, so that, you know, when you're eating institutional food for the next 30 years, your ability to purchase a package of potato chips from the commissary gets pretty important; to come out of your cell to go to a job as opposed to spending decades in a walk-in closet, that those things are more important for the inmates that are going to be

3900

there for a very long time.

These short-term offenders, they can kind of do this time standing on their head, and that's what seems to account for what we have here in the approaches to disciplinary infractions.

There are some other studies.  Our Missouri data showed, for example, that the inmates serving life without

Page 107

parole were about half as likely to be involved in violent offenses in prison as the parole-eligible inmates that they were side by side with.

Q. So as you have chosen to use this Florida study, there are other studies that show the same darn thing as what the Florida study of this 51,000 inmates showed.

A. Yes, sir. In fact, some like our Missouri data that showed the life without parole do better, this is more conservative in showing that really sentence made no difference.

Q. So let's talk about Angela's -- Angela Johnson's prospects and how things are going to look for her in your estimation should she be sentenced to a life term in prison.

A. Yes, sir. If I were to use our same bridge model, here's how I would depict that.

Q. And can you explain what you're depicting there?

A. Yes, sir. I'm again using the bridge, and Angie still has lots of issues. There are still many weights on the bridge, although their magnitude seems to be shrinking in terms of her,

3901

you know, steady increase in perspective and sobriety and kind of making amends with family and that kind of thing. But most importantly, the quality of supports that are holding up this bridge have increased dramatically.

Q. Can you explain those?

A. Yes, sir, that there is the structure and staff of prison. That represents a very significant support and simplification of life that holds individuals in check even who weren't controlling themselves well in the community. That's why as we looked at those rates of violence in the Florida prisons, that the rates of serious violence were so low, because prison was

Page 108

working. It has a significant stabilizing effect.

In her case now she is regularly taking medication which addresses her emotional issues and without all the burden that the methamphetamines did in that regard. And there are work opportunities which is what she's availed herself of before, and her parenting investment continues to be important to her.

And so while her issues are there, there's no longer the methamphetamine dependence, and we've dramatically bolstered the supports that are holding the system up.

Q. And so how would you characterize the prospects for Angela Johnson on a going-forward basis should she be sentenced to life in prison?

A. I think there is a good expectation of a positive

3902

adjustment to prison, of an adjustment without serious violence. I think that serious violence is at a low likelihood.

MR. STOWERS: That's all I have.

THE WITNESS: Thank you, sir.

THE COURT: Members of the jury, we're going to take a noon recess. It won't be quite as long as usual. We'll be back at one o'clock, so you've got about 47 1/2 minutes. Enjoy it.

Remember my cautionary instruction about not discussing this case among yourselves or with anybody else. And most importantly, keep an open mind until all the evidence is in and you have a chance to go back and deliberate. Thank you.

(The jury exited the courtroom.)

THE COURT: Counsel, anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. BERRIGAN: Nothing by the defense, sir.

THE COURT: Okay. Thank you. We'll be in recess till one.

(Lunch recess at 12:13 p.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Williams?

MR. WILLIAMS: Your Honor, I have no questions of this witness.

⚥

3903

THE COURT: Okay. Thank you.

THE WITNESS: Thank you, sir.

THE COURT: You can step down.

MR. BERRIGAN: The defense calls Alyssa Johnson, Your Honor.

THE COURT: Okay. Thank you.

ALYSSA JOHNSON, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated up here in the witness box. And could you adjust the chair and the two microphones so you can kind of scooch that chair up a little bit, and you can pull those microphones back. And then -- there you go. And would you state your full name for us.

THE WITNESS: Alyssa Dale Johnson.

THE COURT: Okay. Can you spell your first name for us?

THE WITNESS: Sure. A-l-y-s-s-a.

THE COURT: Okay. Mr. Berrigan?

MR. BERRIGAN: May it please the Court.

DIRECT EXAMINATION
Page 110

BY MR. BERRIGAN:

Q.   Miss Johnson, we're going to start by introducing you to the jury and letting them get to know who you are; okay?

A.   Okay.

Q.   So why don't we start with me impolitely asking how old are you.

3904

A.   Twenty-one.

Q.   Twenty-one.

A.   (Witness nodded head.)

Q.   When were you born?

A.   August 7, 1983.

Q.   Where do you live?

A.   I currently live in Forest City, Iowa.

Q.   And how long have you lived in Forest City?

A.   Going on two years now.

Q.   What do you do there in Forest City?

A.   I'm currently enrolled at the Waldorf College located at Forest City as a full-time student.

Q.   And what kind of a school is the Waldorf College?

A.   Waldorf is actually a private school based on Lutheran religion, just a local school.

Q.   And you're full time there?

A.   Correct.

Q.   What year are you in?

A.   I'm going in my junior year -- or sophomore year.

Q.   You wish you were in your junior year.

A.   Yes.

Q.   What are -- are you in a major?  Have you selected your major yet?

Page 111

A.   As of right now, I've selected business management as my major.  However, with the core curriculum, I'm interested in

3905

psychology and may in the future change my major to something in that area.

Q.   Well, we know psychologists are well paid.

A.   Yes.

Q.   Let me ask you how you doing in school?

A.   Actually I'm doing very well, better than I thought I would do.  I've excelled a lot more than when I was in high school.

Q.   And how do you like college so far?

A.   It's been an excellent experience.  Waldorf has a great atmosphere that I really enjoy.

Q.   Are you working?

A.   No.

Q.   So if you don't mind me asking, how do you afford to pay for college?

A.   Sure.  I have -- they have various grants.  I've received two scholarships as well as financial aid.

Q.   Great.  You're also a mother, aren't you?

A.   Correct.

Q.   And how old is your baby?

A.   She's two and a half.

Q.   I believe this Exhibit 2144 is already in evidence, so I'm going to show this to you.  Miss -- yes, right on the screen there, do you recognize that little girl?

A.   Yes, that's my daughter Angeleah.

Q.   She's getting brighter as we watch.  Okay.  How old is

3906

Page 112

Angeleah?

A.    Two and a half.

Q.    Does she live with you?

A.    Yes, she does.

Q.    And so you're able to manage taking care of a two and a half-year-old while you're attending school full time?

A.    Yes, it's been a tremendous experience, but yes, I am.

Q.    Okay.  We met your father, but why don't you refresh us as to his name.

A.    Arlyn Johnson.

Q.    And where does he live in reference to you?

A.    He also lives in Forest City, actually just two blocks away from me.

Q.    And has that been helpful for you in having him available to help with you going to school and having a baby?

A.    Yes, he's helped out a lot as far as babysitting my daughter for exams, mid-terms, finals, what not.

Q.    It's probably obvious, but I'm going to ask you, do you know the lady over here at the counsel table with glasses?

A.    Yes, I do.

Q.    And who's that?

A.    That's my mother.

Q.    Okay.  I want to ask you a few questions about growing up with your mom; okay?

A.    Okay.

3907

Q.    We'll try to keep them brief for you; all right?

A.    (Witness nodded head.)

Q.    Your -- by the time that you could first have memories of

Page 113

Q. your mom and dad, were they already divorced?

A. Yes.

Q. Okay. And so your first memories would be living with your mom as your mom being a single parent.

A. Yes.

Q. And where were you living back then?

A. My earliest memory, I believe we were living in Leland.

Q. Leland. Where's Leland?

A. Leland's a small town just about five miles outside of Forest City.

Q. Have you always lived in that area most of your life?

A. Most of my life, north Iowa, yes.

Q. Where did you go to high school?

A. I went to high school at Forest City.

Q. And you graduated obviously because you're in college.

A. No, actually did not graduate from Forest City. I received my GED.

Q. Oh, you got your GED.

A. Yes.

Q. Okay. And at some period of time have -- in some period of time in your life have you also worked?

A. Oh, yes.

3908

Q. Yeah?

A. Uh-huh.

Q. What kind of work have you done?

A. I worked with my mother at North Beach for possibly going on a year and a half. I worked back in the kitchen as a salad girl, what not, desserts, as well as a wait assistant on the floor of the restaurant.

Page 114

Q. We met your sister Marvea; right?

A. Yes.

Q. Now, she doesn't live with you, does she?

A. No.

Q. What kind of a relationship do you have with Marvea?

A. We're very close. Every time she comes down to the area, we always make sure to get together and have a chance to visit. We always -- we do talk on the phone as well.

MR. BERRIGAN: May I approach the witness, Your Honor?

THE COURT: You may.

BY MR. BERRIGAN:

Q. I'm going to hand to you, Miss, four photographs, and I'd ask you to just look at those all together and then tell us what they're photographs of.

A. Okay. The first one labelled 2181 is a picture of my little sister Marvea holding my daughter Angeleah. She's probably about, I'd say, four or five months old.

Q. I'm going to have you describe them to the jurors in just a

3909

second.

A. Oh, okay.

Q. Maybe I could help you with this. These photographs I've given you, 2179, 2183, 2182, and 2181, are those all photographs of you and your sister and your two-year-old?

A. Yes.

MR. BERRIGAN: The defense would offer, Your Honor, 2181, 2179, 2182, and 2183.

* * * *

(Defendant Exhibits 2179, 2181, 2182, and 2183 were offered.)

Page 115

* * * *

MR. WILLIAMS: No objection, Your Honor.

THE COURT: Those exhibits are received.

* * * *

(Defendant Exhibits 2179, 2181, 2182, and 2183 were admitted.)

* * * *

BY MR. BERRIGAN:

Q. On the screen right now, Miss Johnson, could you tell us who that's a picture of? That's Defendant's Exhibit 2181.

A. Yes, my sister and my daughter.

Q. How old is Angeleah in that picture?

A. Approximately four or five months.

Q. Okay. And how about -- this is Defendant's 2182. Do you

3910

recognize the baby in that picture?

A. Yes, I do. It's my sister Marvea.

Q. Marvea. About how old is Marvea there?

A. Oh, I'd say maybe six, seven months, about that.

Q. 2179?

A. That's myself and Marvea again.

Q. And 2183.

A. Again, that's me and my sister.

Q. You and your sister Marvea.

A. Uh-huh.

Q. You said you've been pretty close to your sister?

A. Yes.

Q. Her whole life?

A. Yes.

Q. There's a little bit of an age difference between the two

Page 116

of you.

A.   Yes, there is.

Q.   Okay.  For a period of time was she living closer to you than she does now?

A.   Yes, she did.

Q.   Okay.  And were you able to see her more frequently then than you do now?

A.   Yes.

Q.   How often do you get to actually see her these days?

A.   Unfortunately, since she has moved out of state and I've

3911

been attending full time, it has dwindled down slightly since than the usual, but I'd say every holiday, birthday and as well as, you know, a visit or two in between.

Q.   You've been able to talk to her on the telephone?

A.   Yes.

Q.   Okay.  Let me ask you a couple of questions about kind of how things were when you were growing up with your mom.

A.   Okay.

Q.   Maybe before your sister came along; okay?

A.   Okay.

Q.   Was your mom a working mom back then?

A.   Yes, she was.

Q.   Do you know what kind of work she did?

A.   Mostly the line of restaurant as a waitress.

Q.   And did that take her away from home quite a bit?

A.   Yes, it did.

Q.   Did you have babysitters when she was working?

A.   Yes.

Q.   What about your home life, you know, kind of how things

Page 117

were in terms of if you had everything you needed, you were fed, and all the things that kids need? What could you tell the jury about that?

A. My mother always made sure that I had what I needed and usually then some, you know, for -- as far as wants. But I was always cared for, you know, clothed, fed, you know, proper

3912

shelter.

Q. For a while I guess you were an only child. How was your mom as a disciplinarian?

A. Probably more lenient maybe if anything. She didn't ever spank me, anything of that nature. Mostly along the lines of grounding me.

Q. I know you're probably a little prejudiced in this regard, but was your mom an attractive lady?

A. Yes.

MR. BERRIGAN: May I approach, Your Honor?

THE COURT: You may.

BY MR. BERRIGAN:

Q. Before you are two more pictures, Miss Johnson. One's 2180. The other one's 2184. Do you recognize who's depicted in those two?

A. Yes, I do.

Q. Who is that?

A. They're both of my mother and me.

MR. BERRIGAN: The defense would offer 2180 and 2184, sir.

* * * *

(Defendant Exhibits 2180 and 2184 were offered.)

* * * *

Page 118

MR. WILLIAMS: No objection.

THE COURT: They're admitted.

3913

* * * *

(Defendant Exhibits 2180 and 2184 were admitted.)

* * * *

BY MR. BERRIGAN:

Q. That's 2180. Now, you're the young girl in the purple dress; right?

A. Yes.

Q. About how old are you there?

A. I'd say I'm guessing seven.

Q. About seven years old.

A. (Witness nodded head.)

Q. Okay. In terms of your school work back then when you were a young girl and going to elementary school, was your mom involved in your educational activities?

A. Yes, she was.

Q. What do you remember about that?

A. I remember she would always attend any type of plays or whatever we may perform for a class as well as parent-teacher conferences. She was always present for those.

Q. Did you have to do homework and things of that nature?

A. Yes, I did.

Q. What about her expressions of affection towards you? Was she kind of cool about that, or how did you perceive your mom kind of expressing her feelings about you?

A. Well, I find myself to be very lucky. I believe she's

3914

Page 119

showed me the most affection perhaps more than anyone. I've always known and felt very loved by her.

Q. Was she pretty open about that with you?

A. Yes.

Q. And did you ever feel your mom was at all neglectful of you, didn't pay you any attention despite the fact she had to work?

A. No.

Q. You're just a mother a couple of years now yourself; right?

A. Yes.

Q. As a mother yourself, have you recognized the importance of being affectionate with your own child?

A. Extremely.

Q. Let me ask you a little bit about some men that we've heard during the course of the trial and just what your experience with them was; okay?

A. Okay.

Q. One is a fella by the name of Terry DeGeus. Do you remember him?

A. Yes, I do.

Q. Okay. And you were born in 1983?

A. Yes.

Q. So about how old were you, do you think, when Mr. DeGeus kind of entered your life?

A. I believe it's when I was in kindergarten. At least that's

3915

what I remember.

Q. All right. What do you remember about him?

A. I remember Terry being a very loud type of person, very violent.

Page 120

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3430 of 3592

Q.    Was he violent towards you?

A.    No.

Q.    No.

A.    (Witness shook head.)

Q.    Well, your mom was with him for quite a long time, wasn't she?

A.    Yes.

Q.    What leads you to believe that he was ever violent?

A.    Well, there has been times where they would be arguing and he would then become physical towards her as far as, you know, pushing, you know, roughhousing, you know, manhandling her.

Q.    And did that ever happen in your presence?

A.    Yes.

Q.    Did you ever see him punch her?

A.    No, I don't recall a specific time where he struck her with a closed fist.

Q.    All right.  Other than the pushing that you've talked about, at least in your presence --

A.    Yes.

Q.    -- have you ever seen him forceful or violent towards your mother?

3916

A.    I'm sorry?  Could you repeat that?

Q.    Yeah.  Other than what you've told us about, are there any other things he did to your mother that you thought were violent?

A.    Yes, I do recall an incident when I was approximately in second grade.

Q.    Uh-huh.  What happened in second grade?

A.    I remember that day I had been very sick, and when I was

Page 121

sick my mother always allowed me to sleep with her in her bed. And I remember waking up some time in the middle of that night, and I could hear something going on in just the living room that was, you know, just right from -- off the room. And after, you know, listening momentarily, I could hear that there was activity going on of sexual behavior. And after further listening, I could hear my mother repeat in a -- repeat "no more" several times. And I could tell by her demeanor of that that it was not consensual, it was something she did not want to be happening and which I was in a state of shock and soon then came out of it and yelled for my mother.

Q. And what happened then?

A. The noises came to an abrupt stop, and my mother came in shortly after the bedroom that I was in.

Q. And you were in the second grade at the time?

A. I believe so.

Q. Were there periods of time where Mr. DeGeus would be out of

3917

your mother's life and then come back in?

A. Yes. There was -- they got finally to a point where my mother, you know, decided to end the relationship with Terry, and there would be a month or two, a couple of months that would go past. Then out of the blue he would -- one way or another he'd show up again and would just kind of continue that pattern.

Q. How did you feel about that?

A. I did not approve of it myself. I -- actually when he would -- I realized that he was again back in the picture, it was almost devastating to me.

Q. Did you ever talk to your mother about it?

A. Yes. The first time or two that he came back into our

Page 122

lives, my mother -- I would talk to her about it, and she would always, you know, be in a hap -- you know, happy spirited as if he'd changed or was, you know, going to try harder, that relationship would be better this time around. And also Terry had a daughter that was my age that we played and we were friends, and she always liked to, you know, be able to let us get together as well.

Q. Your mom liked the fact that you and Ashley could get together.

A. Yes.

Q. And she'd be happy to have Terry back for a period of time?

A. Yes, but it never seemed to last long.

Q. Okay. What about Dustin Honken? Did you know him?

3918

A. Yes, I did.

Q. What was Mr. Honken like?

A. Dustin was not as violent or even as loud spoken as Terry. He was very smart. He would come off as a easy, laid-back going guy.

Q. How did you get along with him? How did he treat you?

A. Well, at first I right off the bat didn't really care for him, but I made an attempt to give him a shot, and he almost took over a role of authority figure over me pretty much right away of my mother and him dating in which I didn't really care for.

Q. And you were about how old when you met Mr. Honken?

A. I would say about ten.

Q. Ten.

A. (Witness nodded head.)

Q. Were you used to having a man sort of telling you what to
Page 123

do?

A.   No.

Q.   No.   Back then your mother, she was obviously younger.   We all were, weren't we?

A.   Yeah.

MR. BERRIGAN:   May I approach the witness, Your Honor?

THE COURT:   You may.

BY MR. BERRIGAN:

Q.   I've handed you some photographs, Miss Johnson.

3919

A.   Yes.

Q.   I'm not going to put these all up, but could you just look through those for me for just a moment, tell me who those are pictures of?

A.   They are pictures of my mother.

Q.   And the numbers that you have are 2177, 2178, 2176, 2175, 2174, 2173, and 2172; is that right?

A.   Yes.

MR. BERRIGAN:   Defense would offer Exhibits 2172 through 2178, Your Honor.

                    *   *   *   *

(Defendant Exhibits 2172 through 2178 were offered.)

                    *   *   *   *

MR. WILLIAMS:   No objection.

THE COURT:   They're admitted.

                    *   *   *   *

(Defendant Exhibits 2172 through 2178 were admitted.)

                    *   *   *   *

BY MR. BERRIGAN:

Q.   This is a picture of 2174.   Is that your mother?

Page 124

A.   Yes, it is.

Q.   Okay.  And do you know roughly how old she was then?

A.   I would say approximately mid-20s.

Q.   Okay.  2172, do you recognize that picture?

A.   That's my mother again.

3920

Q.   Okay.  2175.

A.   My mother again.

Q.   All right.  And 2178.

A.   And my mother again.

Q.   Did you at some time in your life learn your mother had been an exotic dancer at one point?

A.   Yes, I did learn later through the years that my mother was doing some dancing over the weekend periodically when I was younger.

Q.   Okay.  You didn't know about that at the time it was going on.

A.   No.

Q.   You did learn too, though, that your mother -- at some point in your life you learned that your mother was using drugs, didn't you?

A.   Yes.

Q.   Could you tell the jurors how you found that out?

A.   Basically as I got older from things that I would observe of the behavior type that there could be possibility of drug use.

Q.   Well, what kind of behavior are you talking about?

A.   There would be times that I'd be up late and she would, you know, still be up maybe doing -- cleaning up the house or working on something, and when I woke up, she'd still, you know,

Page 125

be -- she'd already be up and at 'em basically.  And then there

3921

would be times where she would -- she wouldn't sleep for like two days straight, but she would be, you know, lazy when she was awake and, you know, just kind of hang around the house, and then she'd take a nap and eat dinner and then go back to bed.

Q.    So she had these kind of long periods where she'd be awake and excited or active?

A.    Yes.

Q.    And other long periods of time where she wasn't doing anything.

A.    Correct.

Q.    And you thought that might have something to do with drugs.

A.    Yes.

Q.    Did she use drugs in front of you?

A.    No.

Q.    You remember when she was arrested?

A.    Yes, I do.

Q.    Okay.  And were you at home when that happened?

A.    Yes, I was.

Q.    Tell us what you remember.

A.    I remember I had just woken up maybe not even a half an hour before it happened.  It was early morning.  There was -- I was downstairs in the basement actually, and I came up, and my uncle Mike was holding my sister saying, Your mother's getting arrested.  And I didn't believe him at first, and I went around to the living room and out the front door and all -- there

3922

Page 126

was -- I could say maybe five to more cars, cop cars, some marked, and people everywhere almost and kind of almost like a scene out of a movie.

Q. Did you have a chance to say good-bye to your mother before she went to jail?

A. Yes, I did have a chance to say good-bye to her briefly, and I did get a chance to hug her.

Q. And, of course, that was back in 2000.

A. Yes.

Q. And have you had any physical contact with her since that time?

A. I would say approximately maybe a year or two after her arrest during her Massiah hearing I believe there was two occasions where the U.S. marshals allowed us to hug before or after court.

Q. Court.

A. Yes.

Q. And that was a few years ago.

A. Yes.

Q. Since she's been in jail, have you been visiting her?

A. Yes.

Q. Now, when she was first in the Benton County Jail, you were able to go see her then, weren't you?

A. Yes, I was.

Q. Even though you would have been what? Seventeen?

3923

A. Yes.

Q. And then she got moved to the Black Hawk County Jail in Waterloo?

A. Yes.

Page 127

Q. And did you see her there?

A. I was unable to visit her at that facility due to their guidelines.

Q. How did you feel about that?

A. I was very upset, very, very upset. I didn't understand why and didn't -- it's something that I couldn't handle.

Q. Well, you learned they had a policy against people under 18.

A. Yep, they do.

Q. What about your sister Marvea? Early on was she able to visit your mom as well?

A. Yes, she was.

Q. And then when your mom went to Linn County, were you able to visit her there?

A. Yes.

Q. And how did that work at Linn County? What was the situation of the visit?

A. I believe they get an hour and a half total for visitation every week starting over on Sundays. And we would go up on to like, I believe, the third floor and enter a room that's actually almost like just a hallway, very small, where they have

3924

little stools you sit on, and the inmates would be on the opposite side of glass from you, and you would actually communicate over a phone.

Q. Over a telephone.

A. Yes.

Q. And those are monitored too, aren't they, or do you know?

A. I would think so, yes.

Q. But in addition to visiting your mom in the jail, have you

Page 128

been able to communicate with her in other ways?

A. Yes. We write letters with each other often as well as talk over the phone.

Q. And when you have these conversations on the phone with your mom, what kind of things do you talk about?

A. I usually fill her in on what I've been up to since the last time we spoke on the phone, if there's a situation that is going on in particular that I'd like to discuss with her, get her input or just vent to her, I do so and her vice versa.

Q. And obviously you've had some changes in your life during this time of five years she's been in jail.

A. Yes, I have.

Q. Are those the kind of things that you talk to her about?

A. Yes.

Q. She was in jail when your daughter was born.

A. Yes, she was.

Q. What about letters? Have you had a chance to exchange

3925

letters with your mom during the time she's been incarcerated?

A. Yes, I have.

Q. How often do you do that?

A. When she was first incarcerated, I would probably write her four or five pages front and back twice a week. And I did. I stayed consistent with that for maybe even a year or so. Then after that it did cut back to, you know, shorter letters but at least a few each month.

Q. And what about on her end? How often does she write?

A. She's stayed very consistent. I mean, there would be a point in time where I'd get two letters every week and then maybe only one letter every week, but it's always been

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3439 of 3592

consistent.

Q. So you either get one letter or two letters every week?

A. Yes, it's always -- she doesn't ever allow a long period of time to go without getting a letter from her.

Q. I might not have asked you this. How often do you get to talk to her on the telephone?

A. Lately I've been really fortunate and it's been anywhere from one to two times every week.

Q. And she has to call you.

A. Yes.

MR. BERRIGAN: May I approach the witness, Your Honor?

THE COURT: You may.

BY MR. BERRIGAN:

3926

Q. Miss Johnson, I've laid before you Defendant's Exhibits 2153, 2154, and 2155. What are those?

A. They appear to be letters from my mother sent to me.

Q. Now, you probably have more than just these three I suspect piled up at home?

A. Yes.

MR. BERRIGAN: The defense would offer 2133, 2154, and 2155.

                        *  *  *  *

(Defendant Exhibits 2133, 2154, and 2155 were offered.)

                        *  *  *  *

MR. WILLIAMS: No objection.

THE COURT: They're admitted.

                        *  *  *  *

(Defendant Exhibits 2133, 2154, and 2155 were

Page 130

admitted.)

                                    *   *   *   *

BY MR. BERRIGAN:

Q.    It's been five years now since your mom's been in custody;
right?

A.    Yes.

Q.    And so how has that been for you?

A.    It has been a hard time but something that we've been able
to work through together.

                                                        3927

Q.    Have you missed having her around?

A.    Tremendously.

Q.    This decision, you know, the jurors have to make about the
penalty here, is that a decision that will affect you?

A.    Yes.

Q.    You understand now your mom's going to be in prison; right?

A.    Yes.

Q.    That she's not going to get out of prison; right?

A.    Yes, I understand that.

Q.    Okay.  Your hopes for a continued relationship with your
mom, what things would you like your mom to be able to do for
you if she received a sentence of imprisonment?

A.    First things first, I want nothing more than a hug, a hug
from her, and an opportunity to be able to continue our
relationship even though she will have to remain incarcerated.
That's something very important to me as well as important for
my daughter Angeleah to know her grandmother.

              MR. BERRIGAN:   Those are all the questions I have.
Thank you.

              MR. WILLIAMS:   I have no questions, Your Honor.

                          Page 131

THE COURT: You may step down.

MR. BERRIGAN: Your Honor, the defense rests in the penalty phase of the trial.

THE COURT: Thank you.

Mr. Williams, does the government have any rebuttal

3928

testimony?

MR. WILLIAMS: We do not, Your Honor.

THE COURT: Okay. Is there any reason why I shouldn't send the jury home now and have them come back a week from Monday as arranged?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Mr. Berrigan, anything else we need to take up with the jury here?

MR. BERRIGAN: No, sir, not that I know of.

THE COURT: Okay. Members of the jury, that concludes the evidence in the penalty phase. As I told you I think in jury selection and at the beginning of the trial, we would be taking a break starting after today. We'll ask you to all come back on June 20 at 8:30. We will start with the final penalty phase instructions, and then we'll have the closing arguments of the lawyers to summarize and interpret the evidence and argue the law with regard to the penalty phase, and then the jury will begin their deliberations.

I imagine the -- I don't really know how long the closing arguments are going to be, but it will probably be a good chunk of the day in any event, but it will definitely go to the jury on Monday, the 20th.

I just want to remind you of a few things particularly because we have a little longer break this time. It's very,

Page 132

very important that you not discuss this case among yourselves

or discuss it with anybody else.  Don't let anybody talk to you about the case.  Don't talk to anybody about the case.

We have a number of news media folks in the courtroom. They've done a fine job reporting on the case, but you're not allowed to read any of it, so I want you to continue your efforts not to read anything about this case.  Everything you need to know about the evidence in this case has been presented here in the courtroom.  So don't read any news reports, listen to any radio or television reports about the case or do any research on the Internet or any other type of research or investigation on your own.

And we'll see you all back here at 8:30, June 20, for final instructions and closing arguments in the penalty phase. Thank you very much.

(The jury exited the courtroom.)

THE COURT:  Please be seated.  Any legal matters we need to take up?

MR. WILLIAMS:  Your Honor, with respect to the defense mitigating factors, I think there are a few that they failed to present any evidence on we could take up either now or we can take it up at some other time.

THE COURT:  There isn't another time where I'll have time to take it up, so we better take it up now.

MR. WILLIAMS:  Very good.  The first one would be the evidence of sexual molestation which is number 7 of the defense.

I think it is at best extremely weak that there is any evidence
Page 133

that Angela Johnson was sexually abused. Their own expert said -- I think it was Miss Hutchinson if I recall correctly -- that they really have no evidence, no proof, that she was ever sexually molested. So that'd be the first one.

Do you want to take these seriatim or . . .

THE COURT: Well, why don't we -- yeah, go ahead. Why don't we do it that way, take them -- well, let's take them all, and then we'll come back for their response.

MR. WILLIAMS: Okay. Very good. The next one would be -- and this is perhaps just the language here, but number 9, Angela Johnson was youthful. She was -- if I got my math right, I think she was 29 years of age at the time she committed these offenses. Naive and immature, I don't recall hearing any evidence during the mitigation phase whether she was naive and immature, and the facts would not support that she was youthful.

Number 11, that Angela Johnson was physically, emotionally abused as an adult by Terry DeGeus, no problem. I think they can submit that to the jury. Where I have a problem with is after that, And this abuse drove her in part to the relationship with Dustin Honken from which the underlying murders sprung.

There's no evidence presented either during the guilt phase or the mitigation phase suggesting that the physical abuse by Terry DeGeus drove her in any way to a relationship with

3931

Dustin Honken.

Number 13 -- see if I can read my handwriting here -- I'm going to withdraw any objection to that. I think the evidence is weak on any anxiety, but there's probably enough there that it should go to the jury.

Page 134

Number 17 would be my next one. There is absolutely no evidence at all that her -- number one, that she was addicted to methamphetamine; number two, that this addiction to methamphetamine had any effect on her judgment or personality or relationships or her ability to deal with difficult self-esteem and psychological issues.

There are -- there is a diagnosis for drug addiction, drug dependence. She was not diagnosed by any of her psychiatrists with that affliction, and there was no evidence that her drug use affected her judgment and so forth.

And then finally the last one is number 20. Again, there is no evidence presented either during the guilt phase or during the penalty phase that she was under substantial influence by Dustin Honken which caused her unusual stress, anxiety, and impairment of her normal judgment. I don't think there's any evidence of that that should be submitted, particularly when it's premised with "on the date of the murders she was under substantial influence of Dustin Honken." No evidence, no evidence, of that whatsoever, and that should not be submitted to the jury.

3932

THE COURT: What about 21? I mean, there's no evidence that the pregnancy disadvantaged her in any way, is there?

MR. WILLIAMS: No. I think, though -- the reason I didn't object to that, Your Honor, is I think it's something they should be allowed to argue as kind of common sense. I think it's weak, but it's common sense. I think they can say, Gee, she's pregnant; and, therefore, she was going to be concerned about her response. That one I think is something

Page 135

they're probably allowed to argue.

THE COURT: But there's no evidence in the record that she was disadvantaged by her pregnancy.

MR. WILLIAMS: No, there isn't other than common sense. I mean, I think that's where that has to come in at is -- in other words, I think the defense is allowed to argue -- and I feel like I'm arguing their case for them, but I'm just trying to be straight with the Court. I think that the defense can argue that they can logically infer that if she's pregnant she's going to be influenced in her decision making about how much she's going to resist the father of her daughter under those circumstances. I agree there was no direct evidence at all.

THE COURT: You know, they have a lot of experts, and not one of them testified to that, and they clearly could have. It's clearly a subject that would be permissible subject of

3933

expert testimony or have fact witnesses testify to it. Not a shred of evidence to support it.

MR. WILLIAMS: No, there was no direct evidence of it.

THE COURT: Okay. Let's hear the -- you're done, aren't you?

MR. WILLIAMS: I am, Your Honor. Thank you.

THE COURT: Yeah. You want to just take them up in order, Mr. Berrigan?

MR. BERRIGAN: Yes, sir. Number 7 which currently reads, Angela Johnson was inappropriately touched, fondled, and sexually abused by Ted Dillo during the time the Johnson family spent with the Dillos in Chanute, Kansas, when Angela Johnson was approximately nine years old, there is evidence in the

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3446 of 3592

record, particularly the testimony of Wendy Johnson, that she had a discussion with Miss Johnson years later where Miss Johnson specifically admitted that that had occurred. Arguably the state -- I mean the government might want to challenge the veracity of that, but the evidence is certainly there.

In addition, the psychologists have admitted that people frequently aren't all that forthcoming with this type of abuse, so there's a reasonable explanation as to why Miss Johnson might not have been so willing to disclose this the first time she talked to a mental health professional.

So our position is there's certainly evidence and it's enough evidence that it should be allowed.

3934

Mitigating circumstance number 9, Angela Johnson was youthful, naive, and immature at the time of the murders, our contention is that's certainly circumstantial evidence, that nobody's testified to that. Youthful, I probably should look that up in the dictionary. I suppose there's an argument that 29's not youthful.

I don't feel strongly about that mitigating circumstance, so we're certainly willing to rephrase it. And if the Court thinks it's inappropriate, that's not one that has been directly addressed by the evidence. I'd certainly admit that. But I think the naive aspect of it certainly under the circumstances is warranted.

THE COURT: Well, what was she naive about?

MR. BERRIGAN: Well, our contention is that she was naive about the actual plan of Mr. Honken, and you'll recall that the jurors did not find substantial planning and deliberation as to the murders of the first four victims on July

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3447 of 3592

the 25th.

THE COURT: There's really no evidence of that other than the hearsay statement that the government didn't object to that came in through one of the sisters which was clearly hearsay. It wasn't admissible, but the government didn't object to it. But outside of that, there's not a shred of evidence to support that.

MR. BERRIGAN: Well, there is this evidence, Your

3935

Honor, that the professionals that testified, I think specifically Dr. Hutchinson, talked about how your development is stunted by use of drugs. And Miss Johnson's use of drugs started at a very early age.

THE COURT: But she didn't give the opinion that her development was stunted or naive at the time at age 29. She didn't testify to that.

MR. BERRIGAN: No, she didn't. What she testified was a person who engages in drug usage, particularly abuse, thereby stunts their growth as a result, and what we know from the evidence is that Miss Johnson certainly was heavily into drugs before the age of 29.

Number 17 --

THE COURT: Well, there was an objection to 11.

MR. BERRIGAN: Oh, I'm sorry. My apologies. Angela Johnson was physically and emotionally abused as an adult by Terry DeGeus, her former boyfriend, and this abuse drove her in part into the relationship with Dustin Honken from which the underlying murders sprung, I don't have any problem actually changing that language to the extent that it suggests that one necessarily caused the other because there's at least I think a

Page 138

period of time that goes by between the end of the relationship between Mr. DeGeus and the relationship that begins with Mr. Honken, and that was largely circumstantial. So I think the government has a valid argument.

3936

THE COURT: Do you have any suggested language changes now? Well, why don't we keep going, and then we'll . . .

I think the next one the government objected to was --

MR. BERRIGAN: Seventeen.

THE COURT: -- seventeen.

MR. BERRIGAN: Angela Johnson has been addicted to methamphetamine. The government actually contends that because she wasn't diagnosed there's no evidence of that. I'd suggest that there's no requirement for a diagnosis and of the millions of people that are addicted to this drug, probably very few actually have a formal diagnosis, but the evidence is very clear that she used it regularly.

In fact, Miss Hare, her friend, testified she loved cocaine (sic) and would use it every day or as much as she could if she could get ahold of it. The evidence really has been pretty uniform that she not only used methamphetamine but abused methamphetamine for most of her life.

And Dr. Cunningham even talked about that, that it took her years to realize the effects this drug had caused upon her.

So we don't -- and in addition, I guess they're objecting that the drug profoundly affected her judgment, personality, relationships, and her ability to deal with difficult self-esteem and psychological issues. And Dr. Evans talked about that at length, and I believe there was some

Page 139

testimony about --

THE COURT: This is simply a contention, and there's enough evidence in the record that the jury could find that.

MR. BERRIGAN: I don't want to belabor that.

THE COURT: Right.

MR. BERRIGAN: Number 20, substantial influence of Dustin Honken, certainly there's evidence of that.

THE COURT: There is?

MR. BERRIGAN: Yes, sir, quite a bit of evidence. There's the --

THE COURT: Not that I heard.

MR. BERRIGAN: Well, it's all the first-phase evidence that we would rely on for that. Mr. Honken is the one who's looking for Mr. Nicholson. This is his plan. Mr. Nicholson's about to testify against him. He's the one that does the shooting.

THE COURT: Yeah, but none of that indicates that Angela Johnson was under the substantial influence of Dustin Honken. It just indicates Honken had a superior motivation. There was not a shred of evidence in the record that she was under the substantial influence of Dustin Honken.

MR. BERRIGAN: Well, that again has to be circumstantial. She didn't testify, nor did Mr. Honken, so who else could be able to --

THE COURT: Everybody who knew the two. You had a lot

3938

of people. The daughter just testified that she knew

Page 140

Mr. Honken. She didn't testify that her mother was under the substantial influence. You must have asked 25 witnesses the relationship between Dustin Honken and Angela Johnson. Not one of them testified that Angela Johnson was under the substantial influence of Dustin Honken.

MR. BERRIGAN: Well, this mitigator --

THE COURT: There's no testimony about that. Now, maybe somehow there's -- I don't even know where the inference comes from.

MR. BERRIGAN: The mitigator's directed specifically to the time of the murders, and our position is nobody could testify about that in terms of any direct testimony. It's not an allegation that she's always under the substantial influence of Mr. Johnson (sic) at all times.

THE COURT: But there's no evidence on the date in question that she was under his --

MR. BERRIGAN: We think the circumstantial evidence certainly supports that inference.

THE COURT: How?

MR. BERRIGAN: The government took that position in Mr. Honken's trial: He's running the show; this is his plan; he's orchestrated it very carefully.

THE COURT: Well, he may be the leader, but that doesn't show that she's under substantial influence.

3939

MR. BERRIGAN: Well, I suppose --

THE COURT: Because he took a superior role in the planning does not mean that anyone else involved was under substantial influence by Mr. Honken.

MR. BERRIGAN: It isn't just the planning, sir. I

Page 141

mean, even the government concedes that Mr. Honken's the one that's killing these people. He's shooting them.

THE COURT: But where's the evidence that she was under substantial influence by him?

MR. BERRIGAN: The circumstances surrounding the events that day in our contention clearly establish that and the fact that the jury --

THE COURT: Clearly establish that. Now there's an overstatement.

MR. BERRIGAN: That's our position.

THE COURT: That it clearly establishes it.

MR. BERRIGAN: Yes, that's our position, yeah. When the jury comes back and finds substantial planning in Mr. Honken's case on the same murders and a different jury admittedly finds no substantial planning or at least they don't agree that it's proven beyond a reasonable doubt, we think that certainly suggests to us that Mr. Honken did the planning.

THE COURT: Well, assuming he did the planning, just because Honken did the planning does not mean that Angela Johnson was under substantial influence.

3940

MR. BERRIGAN: Well, our position --

THE COURT: How do you jump -- how do you get there? There's not a shred of evidence to support that.

MR. BERRIGAN: Not only does he do the planning, he carries out the murder.

THE COURT: But that doesn't mean she's under any influence.

MR. BERRIGAN: Our position is she's a surrogate as to these first four murders. There's no other way to look at it.

Page 142

THE COURT: There's no other way to describe it. I don't see the evidence that way. I don't think there's any evidence to support this.

MR. BERRIGAN: Well, I respectfully disagree. The evidence is what it is, and we can't add evidence now. So we think there's plenty of evidence for that mitigating --

THE COURT: Plenty of evidence.

MR. BERRIGAN: Yes, sir.

THE COURT: What's the plenty of evidence?

MR. BERRIGAN: What I've just been talking about. Without repeating myself over and over again, Mr. Honken is the one that had the motive to kill these people. He's the one that planned the murders. He's the one that carried out the murders. Angela Johnson was with him. She aided and abetted him, no more than that. He's the head honcho on these deals, and she's under his influence in carrying out the murders.

3941

And I think that's also amply demonstrated by her confession to Christi Gaubatz where she goes in and tells her in sobbing, tearful fashion kind of how this went down. It was never her intention to kill any children. Things went awry at the house. Well, the government's position would not be, I dare say, that anything went awry particularly as to the intention of Mr. Honken. Things went exactly as planned. Miss Johnson, on the other hand, found out too late, again our contention, what was going to happen.

THE COURT: Where is the evidence to support number 15?

MR. BERRIGAN: Well, that testimony I already mentioned, Christi Gaubatz, and Miss Johnson having an emotional

Page 143

breakdown as she's relating these things to her.

THE COURT: Yeah, and how does that establish which remorse will continue to plague her conscience every day of her life? There's no evidence of that.

MR. BERRIGAN: No, other than human nature. She repeated this story to various individuals throughout the period of time, the 7 years between 1993 to 2000 and then indeed after she was arrested under various circumstances.

THE COURT: But that could have been the subject of expert testimony.

MR. BERRIGAN: What would be the expert testimony? How would an expert --

3942

THE COURT: Psychologists interview people all the time about remorse.

MR. BERRIGAN: Well, they'd be interviewing somebody other than our client, Your Honor.

THE COURT: Well, no. Our psychologists interviewed your client.

MR. BERRIGAN: Yes.

THE COURT: I'm saying that could have been the subject -- you had ample opportunity to prove it is my point.

MR. BERRIGAN: Well, if we had done that, how could the psychologists talk to our client about remorse without talking about the murders? How would that work? What are you remorseful about, Miss Johnson? I mean, the next question has gotta be, Well, didn't you kill those people, because there's no remorse unless you're going to talk about what it is that you're remorseful about.

THE COURT: You could talk about current remorse now.

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3454 of 3592

Matter of fact, you're not even arguing now. You're talking plagues her conscience every day of her life. You can simply ask, Do you have some remorse? Is it bothering you now? Do you think it's going to bother you in the future? That's something the experts -- all three experts clearly could have gone into.

MR. BERRIGAN: In the cross-examination I can just imagine it now: Aren't you remorseful that you got arrested and you left your children? I mean, the remorse could be about

3943

anything because nobody's asked her --

THE COURT: But you're the one that's asking for the mitigator, and you have the burden of proof, and I'm just saying there's no evidence.

MR. BERRIGAN: I'm just saying that none of our experts could have possibly offered evidence about remorse without talking to Miss Johnson about the crime which we had no intention of ever doing.

THE COURT: Of course they could have. You're just dead wrong on that. Of course they could have talked about remorse.

MR. BERRIGAN: I think that would be a meaningful discussion -- a meaningless discussion.

THE COURT: It would have been some evidence. Now you have no evidence. I'm just telling you there was an opportunity that you could have presented evidence on a point that you're arguing as mitigation and there's no evidence in the record that it continues to plague her conscience every day of her life. Where's the evidence of that?

MR. BERRIGAN: That it continued. It continued from the period of the 1993 murders at least through all these

Page 145

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3455 of 3592

confessions that she's given in jail. So why is there any reason to suspect that wouldn't continue? Mr. Miller got up in closing argument I think at least once if not twice, admitted that she was remorseful about these murders, and now we're

3944

removed 8 years or more, 12 -- how far's it been? Twelve years since the time of the murders.

MR. WILLIAMS: Just to weigh in on that very briefly, Your Honor, the only remorse that was ever testified to at all was when she spoke with Christi Gaubatz. The other witnesses who testified about the confessions, to the contrary, said that she was -- had no reaction, had no expression, had no remorseful appearance when she was talking about the murders.

THE COURT: So the one you're agreeing to try and rewrite is number 11?

MR. BERRIGAN: Yes, sir, and also number 9 as to the youthful aspect of that.

THE COURT: Yes.

MR. WILLIAMS: Your Honor, if I could just very briefly revisit number 17 --

THE COURT: Yes.

MR. WILLIAMS: -- my concern is really with the word "addicted" because that carries with it in just the general population some belief of somebody addicted is out of control, cannot control their behavior and so forth. It has that common understanding. I have a concern. I don't have a problem if they want to say Angela Johnson has used and abused methamphetamine for most of her life, so forth and so on, and that's what I heard Mr. Berrigan indicate was their evidence. There is a way to determine if somebody is clinically addicted

Page 146

to a drug, and they had an opportunity to present that evidence, and they didn't.

THE COURT: The only evidence that I know that remotely comes close to the addiction is the testimony of one of her friends who said she enjoyed it, she was going to continue to use it when the friend indicated she was going to quit.

MR. BERRIGAN: That was Lou Ann Hare, sir.

THE COURT: Yes. But would you accept some other combination of words as a friendly amendment?

MR. BERRIGAN: Well, if it's close to "addicted." It wasn't just Lou Ann Hare. I mean, government's --

THE COURT: No, there are a number of witnesses who testified about the frequency of it.

MR. BERRIGAN: Exactly, right. I mean, the government's allegation is -- and they've continued to advance it -- that she used methamphetamine right up until the time she was arrested, not only used it but sold it. And obviously through the testimony of Miss Hare -- and my recollection is there was testimony from at least one of the experts that she loved cocaine -- I mean methamphetamine and would use as much of it as she could. And Dr. Evans testified that that's what these people do, that they get into the cycle and they can't stop using it and that that's very common in this drug -- with this drug particularly.

THE COURT: Well, why don't you work on some language

3946

for that one as well. So the three you're going to work on are 17, 9, and 11.

Page 147

Well, getting back to number 20, where is the evidence that she was under unusual stress, anxiety, or impairment of her normal judgment on that date in July 1993? Where's even the circumstantial evidence? Even if you could overcome the substantial influence question, where is the evidence that unusual stress, anxiety, impairment in normal judgment?

MR. BERRIGAN: Again, that would be largely in the confession that she gave to Christi Gaubatz where she told her that there was never any plan to kill people and she was upset about the kids particularly having been killed. Miss Johnson, we contend, unlike Mr. Honken, never intended to kill any children, would not have participated in that but for the unusual stress and anxiety and an impairment that she was under at the time of those murders on July the 25th.

THE COURT: Mr. Williams?

MR. WILLIAMS: It just doesn't support it because they're tying it to substantial influence, again, you know, which caused in her unusual stress, anxiety, and impairment. So even if you accept for the sake of argument that you can read into the confession to Christi Gaubatz that she was upset about the killing of the children afterwards, number one, that doesn't equate to unusual stress, anxiety, and impairment of her normal judgment. There's no evidence at all that her judgment was

3947

impaired as a result of anything, and there's no evidence of a causal link between any alleged substantial influence by Dustin Honken and those results.

And I just go back there's no evidence of substantial influence by Dustin Honken over her behavior that night. She may not have liked what he did, and she may have been upset

Page 148

about it afterwards, but there is not a shred of evidence to suggest that he substantially influenced her that night.

MR. BERRIGAN: Your Honor, not to belabor this point --

THE COURT: Go ahead. It's an important point.

MR. BERRIGAN: -- but what she told Miss Gaubatz was that the plan was -- now, you can disbelieve this, but we think that at least some jurors think this is a possibility.

THE COURT: Right. The jurors are entitled to credit it. Right.

MR. BERRIGAN: That there's some jurors there that think she might have gone into that house thinking the plan was to videotape Greg Nicholson or maybe even perhaps kill Greg Nicholson but there weren't other people that were planned to have been killed. And she tells Miss Gaubatz months later sobbing -- and that testimony was clear -- that things went awry in the house. I don't know that that was the term. She probably used some other term but that there was a sudden change in circumstances or sudden change in plans. And what we know is

3948

that there was no change in plan for Mr. Honken. That is, that was always the plan.

And so in the middle of this event, our contention is Miss Johnson participates with Mr. Honken. He's got a gun, and clearly nobody else has put the gun in her hand certainly when these people are killed and he's going through with his plan. And it's too late for her to get out of it. We contend she was under substantial influence.

And keep in mind that she is pregnant. I understand from your discussion already you may have some doubt about

Page 149

whether that makes a difference. I've never been pregnant, never will be, but I think that there's a -- and the government acknowledges that that makes some sense, that if you're carrying this man's baby that you might be under some influence.

And so we think these things very naturally go together and that her demeanor and her discussion with Miss Gaubatz suggests quite clearly -- more than suggest that this was a very unanticipated situation for Miss Gaubatz -- I mean Miss Johnson and certainly an impairment of her normal judgment. But, I mean, if the real contention is --

THE COURT: Yeah, but the problem is it's a substantial influence that you're claiming caused the impairment in judgment.

MR. BERRIGAN: Right, and I was just about to say that. I can understand the causal argument.

3949

THE COURT: Right.

MR. BERRIGAN: That is, it wasn't the substantial influence. Because it's really more that Mr. Honken and the circumstances in which Miss Johnson found herself, and maybe that should be more clear.

THE COURT: Can we throw this into that --

MR. BERRIGAN: Yes, sir.

THE COURT: Personally I don't think there's any evidence of it. I'm probably going to submit some format of it.

MR. BERRIGAN: Yes, sir.

THE COURT: But you're much more likely to get it submitted if you revise it.

MR. BERRIGAN: I will address that causal aspect of that.

Page 150

THE COURT: I'm not so sure that's going to be easy to do, but why don't you work on it.

MR. BERRIGAN: We can give it a shot.

MR. WILLETT: Your Honor?

THE COURT: Yes.

MR. WILLETT: I don't want to violate the double teaming.

THE COURT: That's fine. We're now under World Federation of Wrestling rules.

MR. WILLETT: Thank you. In regards to mitigator 17 and Mr. Berrigan and Mr. Williams' debate over the term

3950

addicted.

THE COURT: Yes.

MR. WILLETT: If it please Court, Your Honor, I know that when Mr. Williams stood up to make the comment that you know he was looking for some sort of diagnosis, if you will, that she was addicted or some clinical diagnosis --

THE COURT: Yeah, I'm not looking for that.

MR. WILLETT: Okay. I just want to draw the Court's attention to Title 21 section 802 subparagraph (1) which deals with definitions because it struck me, Judge, as I was listening to this that I've heard this term before. And as the Court's aware, I've done some unlawful user of controlled substances cases while in possession of firearms, and the term addict is defined at Title 21 section 802, subsection (1). The term addict means any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his

Page 151

addiction.

Judge, I would respectfully submit to the Court that my client certainly fits within the first prong of that definition of addict. Therefore, I would suggest the Court consider allowing the word "addicted" to remain in mitigator 17 because under the statutory definition of addict, with all due respect to my client, I think she was an habitual user of

3951

methamphetamine and her conduct did endanger the public morals, health, safety, or welfare by the convictions which she stands before the Court now on if that would help. Thank you.

THE COURT: Well, I don't know why you wouldn't just agree to what Mr. Williams suggested, and that was used and abused but . . .

Well, why don't you do your best to revise them including number 20. I'm not going to give 20 as is. So it would take some substantial revision before I would give 20.

Twenty-one I'll probably -- I mean, I don't think there's any evidence to support it, but I'll probably give it anyway out of an abundance of caution.

So when do you think you'll be able to -- you'll have to e-mail me the results of your labors. Why don't you do that in the next couple of days, and why don't we meet Sunday evening at seven o'clock because we'll have to finalize this and make our sets of instructions so we'll be ready to go at 8:30 Monday morning. Would that work for -- would you rather do it Sunday afternoon? Do you know what your travel plans are?

MR. BERRIGAN: I think I'll be here at least by Thursday, Your Honor, so I'll be available at any time Sunday would be fine or sooner.

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3462 of 3592

MR. WILLIAMS: That would be fine, Your Honor. Whenever you want.

THE COURT: I was assuming maybe people were traveling

3952

in on Sunday.

MR. WILLIAMS: Yeah, we probably would, but if you want to meet earlier in the day . . .

THE COURT: No, I'm confident between seven and ten Sunday evening we can get it resolved.

MR. WILLIAMS: Or midnight.

THE COURT: So we'll just plan on -- and I want obviously Angela Johnson here, and so we'll just have to make arrangements with the marshals to bring her over seven o'clock. This would be June 19; is that right?

MR. BERRIGAN: Yes, sir.

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: June 19 at 7 a.m.

MR. MILLER: May it please the Court.

MR. BERRIGAN: P.m. or a.m.?

THE COURT: Pardon me?

MR. BERRIGAN: I thought you said p.m.

THE COURT: P.m., I'm sorry, 7 p.m.

MR. MILLER: Your Honor?

THE COURT: Yes.

MR. MILLER: Over here.

THE COURT: Yes.

MR. MILLER: Co-counsel assures me he can handle that without my assistance, and with the Court's permission, I'd --

THE COURT: Absolutely.

3953

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3463 of 3592

MR. MILLER: Thank you very much.

THE COURT: Anything else we need to take up?

MR. BERRIGAN: The defense would like to make a motion to dismiss two of the four aggravators that the government has alleged, Your Honor.

THE COURT: Okay. I was waiting for that, but I gave you an opportunity earlier.

MR. BERRIGAN: I was just letting the government go first.

THE COURT: Okay.

MR. BERRIGAN: The number 1 aggravator, on Counts 1 through 10, the defendant would be a danger in the future to the lives and safety of other persons, I just wanted to renew -- without belaboring the argument I already made, we don't believe there's really any evidence that this aggravator could be supported particularly to beyond-a-reasonable-doubt standards.

THE COURT: But that's for the jury to decide. You want every possible inference. I'm not going to belabor it. But somebody who's involved in murders three months apart the jury can find is a risk of future danger.

MR. BERRIGAN: Again, you've already indicated --

THE COURT: Right.

MR. BERRIGAN: I think I need to renew this for the record.

THE COURT: Sure. You bet.

3954

MR. BERRIGAN: And then the third aggravator for Counts 1 through 4 and 6 through 9 the defendant intentionally

Page 154

killed more than one person in a single criminal episode, and that aggravator suggests the defendant herself intentionally killed, and we don't believe there's really any evidence to support that allegation. I understand initially when the case started that might have been applicable if there were evidence to support it. But the government's not even alleging that she killed intentionally anybody. So we don't think that aggravating circumstance should be submitted based on a lack of evidence to support it.

THE COURT: Mr. Williams?

MR. WILLIAMS: I think that's one we can amend to say aided and abetted the intentional killing of more than one person in a single criminal episode. It's something that we frankly maybe should have caught earlier on. Yeah, our contention has not changed, that she's the aider and abettor.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Yes, sir.

THE COURT: What's your reaction to what Mr. Williams just indicated?

MR. BERRIGAN: I was just talking to Mr. Stowers about that, Your Honor. We think this is a nonstatutory aggravating circumstance. I don't know, frankly, what the case law is to support that. It would really surprise me that that would be a

3955

nonstatutory aggravator, but perhaps it is. If we could have a chance to take a look at that and then respond.

THE COURT: Okay.

MR. BERRIGAN: That's news to me.

THE COURT: Yeah. I don't know.

MR. BERRIGAN: Right. I don't either.

Page 155

THE COURT: I think it's at best an open question whether it could be.

MR. BERRIGAN: Right.

THE COURT: Right. So, Mr. Williams, seeing as you're the one asserting it, you're going to have to convince me that modifying it to aiding and abetting would qualify as a nonstatutory aggravating factor.

MR. WILLIAMS: Will do.

MR. BERRIGAN: Then we had two other -- I'm sorry. Mr. Williams have anything else?

THE COURT: Okay.

MR. BERRIGAN: We had two other brief issues, Your Honor. I just wanted to revisit -- I'm not going to argue it any longer -- but the issue of the closing argument that we've discussed over the course of the week. I don't know if the Court's been able to give it any further consideration.

THE COURT: Yeah.

MR. BERRIGAN: But I wanted to at least renew my efforts that time limits be set pursuant to the discussions we

3956

had earlier.

THE COURT: What's your second matter?

MR. BERRIGAN: I'm sorry?

THE COURT: Wasn't there another matter?

MR. BERRIGAN: Yes, there was. The other issue -- and I want to preface this request by saying that what you already heard from Miss Johnson, she was very appreciative of the opportunity to visit her daughter. She'd like that opportunity with this daughter. You heard her testimony. And it's been quite a while since she's had any contact with her daughter

Page 156

Alyssa as well.  And so I promised I'd make that request, and I do so now.

THE COURT:  Duane, what's your position?  I have to leave very soon here.

DEPUTY WALHOF:  I'd have to kick it back up, Judge. It's a separate case.  I'd have to call headquarters again. That's the best I can do right now.

THE COURT:  Well, would you do this?  Would you make the request and tell them this will be the last request from me in this case but go ahead and make the request?

DEPUTY WALHOF:  I will, Your Honor.

THE COURT:  Okay.  Thank you.

MR. BERRIGAN:  That's all we had, sir.

THE COURT:  Mr. Williams, why are you really disadvantaged if I impose a two-hour time limit and you can

3957

really pick as much -- you know, an hour per your main argument, an hour per rebuttal?

MR. WILLIAMS:  I can live with that, Your Honor.

THE COURT:  Okay.

MR. BERRIGAN:  He told me he could do it in an hour and 15 minutes, Your Honor.

MR. WILLIAMS:  Yeah, I don't know that I'll end up using the full two hours, but I haven't prepared my closing yet.

THE COURT:  Right.

MR. WILLIAMS:  So I don't want to commit myself to -- I probably won't use two hours, but I don't want to commit myself at this point to --

THE COURT:  Here's what I'm going to do.  I'm going to impose kind of a soft rule because I don't want to yank

Page 157

somebody -- you know, I realize other judges give you a five-minute warning in closing. I don't really want to do that. So each side will have up to two hours, and the government can split their time but no more than an hour for rebuttal. See, what's kind of counterintuitive by the way you -- kind of the negative policy implication of how you propose the rule is in order to get that extra hour -- in order to get the full hour of rebuttal, it encourages the government to go longer than they really should.

MR. BERRIGAN: Yeah, I don't disagree with that.

THE COURT: And that's kind of one of the reasons why

3958

I don't like the rule as you phrased it.

MR. BERRIGAN: Well, to be honest, Your Honor, usually the judge imposes the time limit. I mean, you've been very gracious in allowing the lawyers to say, hey, take as much time as you need. And when you tell lawyers to do that, obviously we do. We've certainly seen that. So usually the judge has some input on that decision. So there are some limitations to it.

But I don't disagree. Prosecutors often go longer than they need because they want all that extra time at the end, so they waste a good portion of their first half just to have the whole second hour.

THE COURT: Right. I think we're going to kind of come out the same place if I didn't impose anything.

MR. BERRIGAN: Here's where it really helps is it helps me to prepare an argument that if I really wanted to go two hours I guess I could do that, you know.

THE COURT: Sure. You can go two hours.

MR. BERRIGAN: And that's a whole lot different than

Page 158

not knowing.

THE COURT: Yeah, but my rule is you can take as much time as you need, so if you want to go four hours, you can.

MR. BERRIGAN: Yeah, but I thought you just said we were going to go two hours.

THE COURT: But you're not disadvantaged by my original rule because you can go as long as you want. You want

3959

to go as long as you want. You just don't want the government to go as long as they want to go.

MR. BERRIGAN: No. I think I said I could do it in an hour. I would be held to an hour, easily could do the closing argument in an hour.

THE COURT: I'm not going to limit the government just because you only want to take an hour.

MR. BERRIGAN: All I'm saying is I don't want to limit anybody.

THE COURT: Of course you want to limit somebody. You want to limit him to the amount of time he thinks he'll need and then further limit his rebuttal to as long as his opening argument is, so you're the one that wants to impose limitations. Don't be switching gears on me. I'm the one that says no limits.

MR. BERRIGAN: No, I want to limit him to the same time I have, whatever that is.

THE COURT: Why should he be limited -- he's got the burden of proof.

MR. BERRIGAN: He already has the advantage of first and last. That's what the law gives him. That's a --

THE COURT: You're just almost talking me out of

Page 159

agreeing --

MR. BERRIGAN: I'll sit down.

THE COURT: Good. Wise move, Mr. Berrigan. Wise

3960

move. Not always easy for lawyers but wise. We're going to go with the two hours. But it's going to be flexible. It's going to be flexible for you too.

MR. BERRIGAN: I understand. Right.

THE COURT: At an hour and 55 minutes, I'm not doing my judicial hook and pull you in. It's too important in my view. You want to go an extra whatever, you're going to go an extra whatever; okay?

MR. BERRIGAN: Yes, sir. Thank you.

THE COURT: Okay. Thank you.

MR. WILLIAMS: Your Honor, just one minor matter actually on the Honken case just to give you a heads-up, we have a telephone hearing that's scheduled for 6-22. I've been told by my witness/victim coordinator that at least one of the victim's families would like to be present. Under the new Justice For All Act effective November last year, I think it requires the Court to attempt to accommodate the victims' families if they want to be present.

THE COURT: They can come.

MR. WILLIAMS: Yeah, I just -- we have it set up as a telephone conference call.

THE COURT: I'll do it here in the courtroom.

MR. WILLIAMS: Very good. I just didn't know how you wanted to work that.

THE COURT: No, it should be open to the public.

3961

Page 160

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3470 of 3592

MR. WILLIAMS: Certainly.

THE COURT: And if they can't make it that date, file a motion for continuance.

MR. WILLIAMS: Very good. Thank you, Your Honor.

THE COURT: Okay? And, you know, maybe it's not real wise to do that during what will probably be the -- they probably don't know what we're talking about. Do you know?

MR. BERRIGAN: Is it the unsealed motion, the Honken unseal -- oh, the Court's already entered an order on that.

THE COURT: I entered an order setting the oral argument on the post-trial motions in the Honken case giving each side an hour, and I believe I set it for 6-22.

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Yeah, which will probably -- the jury will still be deliberating in this case. It's just oral argument on the motion.

MR. BERRIGAN: Right.

THE COURT: Do you see that as a problem?

MR. BERRIGAN: Well, it concerns me. I know that you've put the sentencing off specifically so as not to influence this jury.

THE COURT: It's not the sentencing. It's the argument on the post-trial motions.

MR. BERRIGAN: All it does, Your Honor, is if jurors got wind of that, they'd at least know that Mr. Honken's

3962

proceedings are still at least being litigated.

THE COURT: They would know that if they read the newspapers prior to getting their notice from jury selection.

Page 161

MR. BERRIGAN: Well, it's set.

THE COURT: Well, I can move it if you think it's a problem.

MR. BERRIGAN: Well, I -- no, I don't think it will be a problem. I think the jury's going to come back before the 22nd if we have an argument on the 20th. So I really don't think it's going to be a problem.

THE COURT: Okay. Okay. Anything else?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Thank you. We'll be in recess.

(The foregoing trial was

adjourned at 2:20 p.m.)

                              CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


                                          12-19-05
     Shelly Semmler, RMR, CRR                Date

                                                        3963


                              INDEX

WITNESS:                                              PAGE:

MARK CUNNINGHAM
          MR. STOWERS                                 3780

ALYSSA JOHNSON
          MR. BERRIGAN                                3903

                            *****


                          Page 162

EXHIBITS:

| | |
|---|---|
| 2171 | 3790 |
| 2179, 2181, 2182, and 2183 | 3909 |
| 2180 and 2184 | 3913 |
| 2172 through 2178 | 3919 |
| 2133, 2154, and 2155 | 3926 |

* * * * *

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3473 of 3592

3964

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CRO1-3046

            Plaintiff,                       Sioux City, Iowa
                                             June 19, 2005
      vs.                                    6:56 p.m.

ANGELA JANE JOHNSON,                         VOLUME 22 of 24

            Defendant.
                              /

                  TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE MARK W. BENNETT
     CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

                                                  3965

APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                          Assistant United States Attorney
                          Suite 400 - Hach Building
                          401 First Street Southeast
                          Cedar Rapids, IA  52401

For the Defendant:        PATRICK J. BERRIGAN, ESQ.
                          Watson & Dameron
                          2500 Holmes
                          Kansas City, MO  64108

                          DEAN STOWERS, ESQ.
                          Rosenberg, Stowers & Morse
                          1010 Insurance Exchange Building
                          505 Fifth Avenue
                          Des Moines, IA  50309

                          ALFRED E. WILLETT, ESQ.
                          Terpstra, Epping & Willett
                          Higley Building - Suite 500
                          118 Third Avenue Southeast
                          Cedar Rapids, IA  52401

Court Reporter:           Shelly Semmler, RMR, CRR
                          320 Sixth Street
                          Sioux City, IA  51101
                          (712) 233-3846

                                                  3966

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3474 of 3592

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Please be seated. Happy Father's Day to all the fathers in the courtroom.

MR. WILLIAMS: Same to you, Judge.

THE COURT: And thank you so much for agreeing to meet this evening. We have a lot of matters to get through. And why don't we take up the -- I don't really have a particular order in which we want to take up things. Why don't we take up the mitigators and go through those. And why don't we -- we'll just go in number that anybody has an objection to. I think the first one is number 11.

MR. BERRIGAN: First one is number 9, Your Honor.

THE COURT: Okay. Number 9 but --

MR. BERRIGAN: We agreed to delete it.

THE COURT: Everybody's agreed to delete it.

MR. BERRIGAN: Right.

THE COURT: Nine is deleted. And then we go to 11. And there is disagreement I think concerning the language?

MR. WILLIAMS: I think there's kind of agreement and disagreement. I think we both agree to take out the phrase that's currently in there that starts with the word "and" and ends with the word "sprung." Then the defense wants to add in "causing her great fear and traumatic stress." I guess I don't have a problem with "great fear" because I think there's been

3967

some evidence of that. I'm not sure that there was really any evidence or testimony about "traumatic stress" or even what specifically that means.

Page 2

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3475 of 3592

THE COURT: It would seem to me, though, that this is one I kind of agree with the defense that a reasonable juror could infer from the severity of the beatings and the testimony about at least one beating where she was black and blue from head to toe basically -- there's evidence in the record that says that -- that one would have traumatic stress from that. I mean, that's a -- I just don't find that as a very big inference.

MR. WILLIAMS: And I don't have a big problem with that, but when we get to the point of inferences, then we're talking argument, and absent them having some evidence to support these things, they can argue from the evidence that it's clear that she must have had traumatic stress, but I just -- and I don't really have a big problem with that one.

Where I have more of a problem later on is where they've also argued an inference and, therefore, they ought to get an instruction on it. So I think there is a distinction between an inference and evidence.

MR. BERRIGAN: Our position on that, Your Honor, is Dr. Hutchinson testified about Miss Johnson's relationship with Mr. DeGeus at some length and that one of the repercussions from those beatings and the cycle of abuse was --

3968

THE COURT: You can just remain seated.

MR. BERRIGAN: -- she suffered from posttraumatic stress disorder which is why I got the specific language.

THE COURT: Yeah, I'm going to leave that in. That doesn't necessarily mean I'm going to leave in some of the inferential stuff later on, but I think 11 -- so just so we're all in agreement, it would read -- setting aside for the moment

Page 3

whether we'll use "Angela Johnson contends," so let's set that part aside. Angela Johnson contends that she was physically and emotionally abused as an adult by Terry DeGeus, her former boyfriend, causing her great fear and traumatic stress; correct?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. Now, the next one, 15, I've reviewed all of the transcripts you've indicated in your e-mail that you sent I believe on Friday. I've reviewed Wendy Johnson, Shelly Johnson. I went back -- and I think we provided for you Gaubatz's testimony. I don't see any evidence of remorse. I just don't see it. I mean, I realize that Gaubatz testified that the defendant was tearful at the time and upset but also that she was paranoid, wasn't sleeping well, and was worried about getting caught. That's what being upset is about.

There's absolutely not a shred of evidence in Gaubatz's testimony -- I reread it twice. I don't see a shred of evidence suggesting remorse.

And then you have the evidence that Angela Johnson was

3969

crying at the time she held up the message about she lured Terry DeGeus, but if you read the entire transcript of Shelly Johnson and Wendy Johnson -- and I realize Wendy Johnson's name is different -- it says she started crying at the beginning when she saw them. And there's really nothing to suggest remorse in that. I mean, it's something I guess you could argue somehow, but there's no evidence -- there's not a shred of evidence of remorse in my view, not a shred, nothing, zero.

So I'm a little bit at a loss what to do because I just don't see it. I mean, I reread those transcripts, and that's the evidence that you said was the evidence in the

Page 4

record.  I just didn't see it.

MR. BERRIGAN:  Well, with all due respect to the Court having reviewed the transcript, if you looked at Mr. Miller's closing argument, on two separate occasions he acknowledges before the jury that the government believed that Angela Johnson showed remorse.

THE COURT:  Well, I don't care whether Mr. Miller says that.  There's nothing in the record to suggest it.

MR. BERRIGAN:  I'm just suggesting that there could be different views of that evidence than the one the Court took.  And when the government who's obviously not acting in our interest admits to the jury in closing in the first phase that there was remorse exhibited by our client, we think that there's some evidence of that.  The standard --

3970

THE COURT:  Well, what is the evidence of it?

MR. BERRIGAN:  What we've discussed many times, Your Honor.  Christi Gaubatz testified that our client came to her, called her on the phone, said, I need to talk to you; I need to get something off my chest; come over to my house.  Christi Gaubatz goes to Miss Johnson's house, and she basically through sobbing and tears confesses her involvement in the murders.

THE COURT:  Why does that establish remorse?

MR. BERRIGAN:  Well, Your Honor, that's clear -- and with all due respect again, when people come in and confess in sobbing state such as Miss Johnson did, I think a reasonable conclusion there is that's somebody who's remorseful.  She's talking about getting something off of her chest.

With respect to Mr. DeGeus, she talked about having nightmares.  Jurors can look at that certainly much as

Page 5

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3478 of 3592

Mr. Miller did as evidence of remorse, and the Court may not view that. I respect your view about that. But to deprive the jury from making that determination based on the evidence that's before the jury would deprive our client certainly of her due process rights we believe under the 8th and 14th Amendments.

THE COURT: Certainly would, huh?

MR. BERRIGAN: Well . . .

THE COURT: Well, I don't think there's any evidence of remorse.

MR. BERRIGAN: Even the government's not alleging that

3971

this is inappropriate. They're not arguing the first part about the remorse. This is something the Court has raised, not the government. Again, I think the Court might be just a little out of step with the parties' view of the evidence here with all due respect.

THE COURT: Or you might be out of step with my view.

MR. BERRIGAN: I certainly am. I think I acknowledged that. But I raise that only because, again, the government's not acting in our interest when they come in before the jury and say there's evidence of remorse and now they don't argue that this is an inappropriate instruction in terms of the remorse element, then we think that that substantiates our position.

THE COURT: Mr. Williams?

MR. WILLIAMS: Well, I disagree.

THE COURT: You can remain seated. We're pretty informal tonight.

MR. WILLIAMS: Thank you, Judge. I disagree what Tom Miller said that during his closing argument. But I do recall Tom Miller couching his language in terms of let's even give her

Page 6

the fact that she was remorseful. I mean, he did it in a let's-assume-that-she-was-remorseful circumstance.

I agree with the Court. I don't think there's evidence, direct evidence, of remorse. And there could have been. I mean, during the confession to Christi Gaubatz, she never did say, "And I feel horrible about what happened" or "I

3972

feel terrible" or "I'm so sorry about what I did." She never actually says anything that suggests remorse. The only evidence we have is that she cried, so I agree there is no --

THE COURT: And that she was worried about getting caught.

MR. WILLIAMS: Right.

THE COURT: That's what -- when I reread the transcript twice, I read her being upset, zero remorse but the fact that she was worried about getting caught and that's why she was losing sleep.

MR. WILLIAMS: And this also ties in about the same time as I understand it about when Christi finds the gun over at her house, you know, so she has to give some explanation what's going on.

So I agree with the Court that I don't think there's any direct evidence of remorse. I'm not -- I'm not absolutely opposed to this mitigator going in fully intending to point out to the jury let them contend it but there is no remorse in this evidence before them.

I do have a real problem with the last phrase of this, Which remorse will continue to plague her conscience the rest of her life for every day of her life. There isn't a wit of evidence to support that, and I have a real concern with that.

Page 7

I think the Court would be within its bounds to not allow this mitigator at all, but I also don't oppose this going to the jury

3973

with the first part of that phrase with the full intention of pointing out to the jury that this mitigator is not supported by the evidence.

THE COURT: Mr. Berrigan, anything else you want to add?

MR. BERRIGAN: I don't think there's much I can add, Your Honor. The Court has taken an interpretation of this sobbing, crying Angela Johnson confessing to Christi Gaubatz as some indication she's afraid to get caught when there's no objective evidence of that.

THE COURT: Well, of course there is because right in the testimony of Gaubatz she says that Angela Johnson was paranoid. What was she paranoid of? She's paranoid of getting caught.

MR. BERRIGAN: She's on methamphetamine, Your Honor. You heard testimony after testimony how methamphetamine causes people to be paranoid. She called Miss Gaubatz --

THE COURT: There's no evidence she was on methamphetamine the day she asked to get this off her chest. There's not a shred of evidence about that.

MR. BERRIGAN: There's consistent evidence that she used methamphetamine regularly over a long period of time. Now, you're right. There's not specific evidence on that day she used methamphetamine. But one very reasonable view -- and again, I think Mr. Miller was quite candid in saying that this

3974

Page 8

was remorse. It's an admission we believe by a party opponent that that's a factor that exists in this case, and for the Court to take that away --

THE COURT: If there was actually genuine -- you had all kinds -- I pointed this out before. You had all kinds of opportunities through family member witnesses, through three -- two psychologists -- or two psychiatrists -- I'm sorry, one psychiatrist and two psychologists to put in evidence of remorse, and there's no evidence of remorse. You want to infer from three different crying spells over a seven-year period that there is remorse. I'm not willing to infer that. I mean, there's all kinds of reasons why she was crying.

MR. BERRIGAN: Yeah, and one of the reasons is remorse.

THE COURT: Well, that could be.

MR. BERRIGAN: Right, and that's why it gets to go to the jury. We only have to prove a preponderance of the evidence at this point in the trial, Your Honor.

Mr. Miller -- once again, not to belabor or beat a dead horse, but when Tom Miller thinks it's remorse, I think it's reasonable to think that there might be one or two jurors who think it's remorse also. That's not an unreasonable interpretation to find what happened between Miss Johnson -- and for the Court to preclude even the possibility of a mitigator being considered -- and I'll point out remorse is a very

3975

important mitigating factor.

THE COURT: Then you should have put on evidence.

MR. BERRIGAN: You might have argued the evidence isn't as good as what it should have been.

Page 9

THE COURT: It borders on being nonexistent in my view. It would have been very easy to put on evidence of remorse if there had been any remorse. I didn't hear any.

MR. BERRIGAN: Again, I think there are all kinds of problems with that not the least of which any evidence regarding remorse concerning the facts of the crime is an admission by Miss Johnson. That's exactly what happened with Miss Gaubatz. That has adverse repercussions. She's told very specifically not to discuss the case with anybody, and you heard both Shelly Johnson and Wendy Johnson say that.

THE COURT: Well, you could have had the psychologists interview her after the jury finding.

MR. BERRIGAN: They'd have to interview her about the murders, Your Honor. We specifically stayed away from that. That was not to be a topic of discussion. You can't talk to Miss Johnson about the murders.

THE COURT: Look, after the jury finding of guilt in this case, you could have had the psychologists, psychiatrists interview Angela Johnson about whether she had any remorse without getting into the day of the murders.

MR. BERRIGAN: You mean after they found her guilty?

3976

THE COURT: Yes.

MR. BERRIGAN: What significance would that possibly have? That would look ridiculous in my view for me to put on evidence that some psychologist interviewed her after the jury found her guilty and she said she was sorry. How self-serving can you get?

THE COURT: There would at least be evidence in the record.

Page 10

MR. BERRIGAN: That would be horrible evidence. I wouldn't dare do that in a million years, frankly.

THE COURT: Well, there's no evidence in the record of remorse.

MR. BERRIGAN: Well, we respectfully disagree, Your Honor.

THE COURT: Well, you're not -- well -- well, I'll let you put on -- well, you can have 15. I'm taking out the word "genuine" and ending it after Amber Duncan, period, and I don't think there's any evidence to support it, but I'm going to go ahead and give it anyway.

Now, on 17, did you ever have any meaningful discussion, Mr. Berrigan, with the government about their concern about the word "addicted"?

MR. BERRIGAN: No, sir, no.

THE COURT: Why is that?

MR. BERRIGAN: Well, because we just -- we disagree.

3977

We made a record at some length the other day about addiction. It's not some pie-in-the-sky standard. We believe it was met. Dr. Evans testified about it at length, the addictive nature of these drugs, methamphetamine. It's not a diagnosis that needs to be rendered, and there's all kinds of evidence that Miss Johnson used methamphetamine on a regular basis for a period of years. And you heard Miss Hare say that the difference she and Miss Johnson had regarding this drug is Miss Hare was able to quit it and Miss Johnson was not. That's addiction. So we don't think the alternative suggestion, user and abuser, frankly measures up.

THE COURT: What difference does it make?

Page 11

MR. BERRIGAN: Well, it makes a difference to us.

THE COURT: Why?

MR. BERRIGAN: Because addiction more accurately characterizes our client's --

THE COURT: How about regular user and abuser?

MR. BERRIGAN: Well, there's still this idea that you can quit any time, that this isn't going to be a problem, and addiction isn't that. Miss Hare, she's a regular abuser of methamphetamine, but she by her own admission quit when she decided to quit. Miss Johnson really has never been in that situation, was using drugs up until the time of her arrest.

THE COURT: Mr. Williams, what difference does it make?

3978

MR. WILLIAMS: It's not a big deal, Your Honor, one way or the other. I do differ with the defense. There was evidence that Miss Johnson quit using methamphetamine during both of her pregnancies, but regardless, it's not something that's that important to me. I don't think there's evidence of addicted, and if they want to keep it in, I'll point out to the jury they didn't prove it.

THE COURT: Well, I think I'll leave "addicted" in.

The next one in contention is 20. What's the evidence of that, Mr. Berrigan?

MR. BERRIGAN: We argued this at length also, Your Honor, at the last day of the trial. Our contention is that when Miss Johnson went to the Nicholson house with Mr. Honken on July the 25th, 1993, she believed the plan to be that they were to get a videotape of Greg Nicholson and move on. We think our position is substantiated at least in part by the jury's

Page 12

determination that they found no substantial planning and premeditation, or, more accurately, I should say they didn't agree beyond a reasonable doubt it was present.

So the circumstances at the time were that during the course of the time they were in the house Mr. Honken either reveals his plan directly or it becomes obvious to Miss Johnson that this is not going to be merely obtaining a videotaped statement from Greg Nicholson but that people were going to be murdered, and that's the plan of Dustin Honken. That was his

3979

intention from the beginning, and the change in circumstances we believe is what caused Miss Johnson to be under stress, anxiety, and impairment of her normal judgment, and those circumstances were under the direct influence of Dustin Honken. So that's our justification for mitigating circumstance number 20.

THE COURT: Mr. Williams?

MR. WILLIAMS: I just fundamentally disagree. I don't think there was a shred of evidence to suggest that at any point she was under substantial influence of Dustin Honken. Even if you accept the defense argument for how the murders went down, all that shows is that he's the one who planned it and maybe advised her what the plan was at that point, but there's nothing indicating that he had substantial influence on her.

The thing that even causes me more concern the more I've thought about this is the language that on the date of the murders, so forth and so on, she was under unusual stress, anxiety, and impairment. And the defense specifically kept out of the evidence in this case and out of our ability to examine the defendant what her state of mind was at the time of the murders. And so for them to tie the date of the murders to

Page 13

anything to do with her state of mind is completely inappropriate, and we would ask that that language be struck.

MR. BERRIGAN: I would agree with Mr. Williams' last comments if the stress, anxiety, and impairment weren't directly tied to the substantial influence of Mr. Honken, Your Honor.

3980

We're not claiming that this is some result of some mental disease or defect she suffered stress, anxiety, or impairment, and I've modified that language as you'll recall because I think earlier there was a suggestion there might be a mental defect. I don't remember what we earlier proposed, but it's only because of the influence of Mr. Honken that we're alleging that there's stress, anxiety, and impairment, not because of some mental disease or some type of a mental illness that was present on that day.

THE COURT: And, Mr. Williams, you don't think there's evidence to support 20 at all.

MR. WILLIAMS: I don't.

THE COURT: I don't either, so I'm going to strike 20.

Okay. I think that resolves the -- are there any other contested issues on the mitigators themselves other than the prefatory language issue? And then there are some other matters but . . .

MR. WILLIAMS: No, Your Honor.

THE COURT: What's the government's position with regard to the prefatory language about "Angela Johnson contends"?

MR. WILLIAMS: I think it's fine. I think you have the same prefatory language on page 17 on the government's aggravating factors, and I think it's important that the jury

Page 14

know that these are contentions and not evidence.  I understand

3981

the defense concerns, but I think they're speculative that the jury's somehow going to read something into that that it's a judgment by the Court of anything.

THE COURT:  Mr. Berrigan, anything else you want to add?

MR. BERRIGAN:  I'm not sure my letter to you is part of the record, Your Honor.

THE COURT:  Only if you file it.

MR. BERRIGAN:  Okay.  So it isn't, so I should add yes because otherwise it's a complete omission as to our objection. The Court immediately preceding the discussion of the mitigating factors has language in there that says it's the defendant's burden to establish any mitigating factor and then explains what the burden is.  Even the sentence that immediately introduces the list of mitigating factors says, Angela Johnson contends that the following mitigating factors have been established by the greater weight of the evidence.

In the preliminary instructions, number 4 specifically, the burden of proof regarding mitigating circumstances being on the defendant and what that is, is again set out in the preliminary instructions that the jurors already have.  And for the Court to repeat this language for each and every mitigator we believe suggests to the jury that these mitigating factors are less worthy of consideration by the jury than other elements that they've been allowed to determine

3982

Page 15

without such prefatory language, specifically the language of the charged offenses and the elements that are contained therein, the gateway factor, the statutory aggravating factors, none of which have language that precedes them as the Court proposes to do here.

Frankly, it's unnecessary. Government counsel's free to argue and undoubtedly will that the mitigating factors are not self-proving. But for the Court to suggest before each one Angela Johnson contends we think suggests a skeptical view of these factors to the jury which could negatively influence the jury's determination.

THE COURT: Well, I guess that same skeptical view would be on the government nonstatutory aggravating factors which would help --

MR. BERRIGAN: It doesn't matter, though. They've already got aggravating circumstances proven. You've already pointed that out. Even if the language applies to the nonstatutory aggravating factors, they already have in the bank the aggravating factors the jury's going to be weighing, and certainly the Court didn't use that with the statutory aggravating factors. We see no reason why we should use a special exception now for the defense mitigating factors all of a sudden in front of each one repeating this language.

THE COURT: It's not a special exception -- that's misleading when you say that because I'm applying it to the

3983

government nonstatutory aggravating factors.

MR. BERRIGAN: They have 4, Your Honor, and we have 20 -- 23. I don't think that's equal application, frankly, and I don't know why at this point in the trial all of a sudden

Page 16

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3489 of 3592

we're particularly concerned that the very plain language that the Court has introduced describing what the burden of proof is is insufficient, particularly when the sentence immediately preceding the mitigating circumstances says these are nothing but contentions. That was sufficient for the preliminary instructions. I don't know why all of a sudden it's insufficient for the final instructions, and we object to it again on the basis of our client's due process rights under the 8th and 14th Amendments.

And I'll just point out that -- and I don't know what your intention is, and I'll raise this later, and I might be premature. But if the jury gets the preliminary instructions to go back with the final instructions, it's going to be patently obvious to them that there's a substantial difference not only in the number of mitigating circumstances and what they are but in this language.

THE COURT: Yeah, but part of the difference is because you're withdrawing some.

MR. BERRIGAN: Well, that's true. No, I agree on that. But they're not going to know that. They're not going to have any idea --

3984

THE COURT: Why do you think they would infer something sinister from it?

MR. BERRIGAN: They could, Your Honor. I don't know what they're going to infer. But one of the inferences, you made a determination that those aggravating circumstances should be in there -- or the mitigating circumstances. And more importantly, the language is going to be very obvious to them, that they weren't given this "Angela Johnson contends" language

Page 17

in the preliminary instructions but it's present for some reason in the final instructions, but one of the inferences is you made a determination.

THE COURT: Mr. Williams, anything else you want to add on it?

MR. WILLIAMS: No, Your Honor.

THE COURT: Well, how about this potential compromise? On page 17, final instruction number 2, the last sentence of the paragraph before it lists the nonstatutory aggravating factors, The prosecution contends that the following nonstatutory aggravating factors have been established beyond a reasonable doubt, what if I put that sentence in either italics or bold and then do the same thing in paragraph 19 -- I'm sorry, page 19, final instruction number 3 on mitigating factors, same thing with the lead-in -- the very last sentence down on the bottom of page 19, Angela Johnson contends that the following mitigating factors have been established by the greater weight of the

3985

evidence in the case, either put that in bold or italics, obviously do the same thing, and then delete the word "contends" in both the nonstatutory aggravating factors and the mitigating factors?

MR. BERRIGAN: That's certainly preferable, Your Honor. I just want to point out, I don't know --

THE COURT: Well, you didn't object to it before -- I mean you didn't object when it was in there before. I guess now --

MR. BERRIGAN: I don't object to the --

THE COURT: Language. You object if I italicize it?

MR. BERRIGAN: Right. Why are we doing that? I don't

Page 18

understand the Court's concern about that. These instructions are very easy to read. They're very plain.

THE COURT: Because I'm giving you mitigators that I don't think the evidence supports. That's why.

MR. BERRIGAN: I understand that, Your Honor, but that, frankly, is the jury's determination. And we risk -- we make a risk -- if I put in mitigating circumstances they don't find, then I'm taking a very serious risk. Mr. Williams is going to point that out to them. Mr. Berrigan's not credible when he gets up here and contends that these mitigating factors exist. You shouldn't weigh them, and, by the way, anything else he says isn't particularly credible either. I've tried to narrow the mitigators. I think what you've seen is a paring. I

3986

don't know where we started, but it was a whole lot more than where we are.

THE COURT: Not substantially more.

MR. BERRIGAN: Well, I've tried to pare them when I thought it was appropriate, particularly in response to the Court's concerns about some of these. Number 9, we've completely took it out.

THE COURT: But you've been very thorough, and that's your job. I don't have a problem with the number of mitigators because, like I told you, I could get them down to about 7.

MR. BERRIGAN: Right, and it's not a numbers game, and we're both going to tell the jury that.

THE COURT: Well, it is kind of a numbers game.

MR. BERRIGAN: I truly don't believe that.

THE COURT: Want me to take my best shot at reducing yours to 7?

Page 19

MR. BERRIGAN:  Well, obviously I don't want to do that.

THE COURT:  You're being a little disingenuous here.

MR. BERRIGAN:  I think they're very separate and independent, and I understand you might not agree, but I really think that this instruction's very clear.  And whatever doubt the Court may have about mitigators -- and I think the Court may have a different view about mitigating evidence all together which could be the subject of another discussion, but this is a

3987

jury determination, and the standard's very low.  It's a preponderance of the evidence.  That's all that's required, and they really should be able to consider these --

THE COURT:  I take exception with your last comment. I think I've taken a very broad view of mitigating evidence in this case.

MR. BERRIGAN:  Well, again, I really don't want to debate that.  I just don't understand why the Court's particularly concerned that we need to bold or highlight what's very obvious, that these are mere contentions and the Court tells the jury that in several places in the instructions.  And I'm sure Mr. Williams and I will both argue that they're nothing more than contentions by either party that require proof, and if they're going to weigh these mitigators, they have to find them, and they're given a verdict form that specifically instructs them to do just that.

So I think there's plenty of room here already for the jurors to find that there's no mitigating circumstances if they don't think they're present.

THE COURT:  Mr. Williams?

Page 20

MR. WILLIAMS: I don't have a problem at all with your suggestion, Your Honor, and I can't see how any reviewing court would ever suggest that there would be something improper with bolding and italicizing or either one in that sentence, and I think that is a response to the defense concern, frankly, about

3988

the repetition of the language.

MR. BERRIGAN: May I inquire, Your Honor?

THE COURT: Yes.

MR. BERRIGAN: Did the Court find it necessary in Mr. Honken's case to put the contention that these are mere contentions in bold or italics? And if not, what plausible difference is there --

THE COURT: Well, I made a lot of changes.

MR. BERRIGAN: I know that.

THE COURT: Most of which are favorable to you that have been at your request.

MR. BERRIGAN: We've made substantive changes in the mitigating circumstances.

THE COURT: Well, we've done more than make substantive changes. We made a lot of changes in the instructions in wording that's more favorable to the defendant than what Honken either asked for or got. You don't deny that, do you?

MR. BERRIGAN: You know, to be quite honest, I couldn't tell you what Mr. Honken's instructions said. It's the last thing that's been on my mind.

THE COURT: Right.

MR. BERRIGAN: I really meant that as a genuine inquiry. If this was a problem in Mr. Honken's case, I could

Page 21

see the Court's concern here.

3989

THE COURT:  I think -- what about this?  It's even one step down from what I've been thinking.  What if we just put the word "contends" in italics both for the government and for the defendant and then take out -- I mean, I'm content to just leave them all in.  I don't see how that could possibly be error.  I just totally disagree with you.

MR. BERRIGAN:  I'll be honest with you, I'd rather have the whole sentence in bold because then it at least doesn't highlight the "contends."  So if those are the choices, Your Honor, I'd go with choice number 2.

THE COURT:  Okay.  Then we'll put the whole sentence in bold or italics.

MR. BERRIGAN:  I suppose italics.

THE COURT:  Better than bold; right?

MR. BERRIGAN:  Who knows?

THE COURT:  We have three choices.  We have italics bold, bold, or italics.

MR. BERRIGAN:  You wouldn't consider smaller font, would you?

THE COURT:  How about 4-point font for the government's statutory aggravating factors and 16 font for the mitigators?

MR. BERRIGAN:  That would be great, sir.

THE COURT:  We'll put the whole sentence in italics, and we'll take out the "Angela Johnson contends," and I guess

3990

we'll just go back to the original language that you had?
Page 22

MR. BERRIGAN: Yes, sir.

THE COURT: Is there anything else?

MR. BERRIGAN: There is one other matter for the defense if the government has nothing else.

THE COURT: Okay.

MR. BERRIGAN: I know you've told us many times informally. I don't know that we've ever had a ruling on our motion for allocution.

THE COURT: No, you haven't had a ruling.

MR. BERRIGAN: And I understand we rested on the presumption that that was denied, but I think the record really should be established on that if you don't mind, sir.

THE COURT: No. You're absolutely right. I'm going to go ahead and formally now --

MR. BERRIGAN: Because we'd sure like to have allocution if we could obviously.

THE COURT: I understand that you requested it. I'm going to go ahead and deny it.

MR. BERRIGAN: All right, sir.

THE CLERK: Judge, there was one other thing I had marked. The defendant wanted the mitigator -- or the gateway factor -- the aggravating factor that was not found.

THE COURT: Oh, yeah, you raised in your letter -- yeah, I'm not going to do that because I'm not putting in things

3991

that weren't found.

MR. BERRIGAN: All right. There was one other matter, Your Honor.

THE COURT: That's in your letter or that's new?

MR. BERRIGAN: It's in the letter, and I want to raise

Page 23

it with you.

THE COURT: What's that?

MR. BERRIGAN: It's in the letter at the very end.

THE COURT: Oh, about the --

MR. BERRIGAN: Yes, the preliminary instructions.

THE COURT: I'm fine with that. It's not how I normally do it.

MR. BERRIGAN: I understand.

THE COURT: Matter of fact, I've never done it that way, but just to show you that I try and be flexible and there's no real reason not to do it, that we're going to carve out the final instructions, so we'll just have a set of final instructions.

MR. BERRIGAN: Great.

THE COURT: And what we'll do is collect their preliminary instructions, pass out -- and instead of having a set that includes preliminary and final penalty phase instructions, we'll just have a set that says Final Penalty Phase Instructions.

MR. BERRIGAN: Great. That's all we had, sir. Thank

3992

you.

THE COURT: Okay. Any objection to that?

MR. WILLIAMS: No, but there will have to be some changes. For example, the first final set of instructions talks about them having the preliminary instructions as well I believe.

THE CLERK: The second paragraph on page 15 I believe it is says that the preliminary instructions will be in the jury room.

Page 24

MR. WILLIAMS: Yeah. So I think there's going to be -- we'll have to do a careful edit of the rest of the instructions to eliminate language like that.

MR. BERRIGAN: I think it's only that instruction, Your Honor. There's reference in the next-to-last paragraph as well, in the last paragraph of instruction number 1 to preliminary instructions.

THE COURT: Okay. So we'll have to edit probably only the introductory instruction number 1 to remove the references to the preliminary instructions; right?

MR. BERRIGAN: Yes, sir. I don't think any of the other instructions make reference to the preliminary instructions that I've seen anyway.

THE COURT: Right.

MR. WILLIAMS: And I don't recall. I would just suggest maybe Roger do a word search just to make sure there's

3993

not another reference to preliminary instructions.

THE CLERK: Now, are the cross-references to preliminary instructions all right, or you want those out entirely and just stand alone in the finals?

THE COURT: Well, the cross-references will be out completely because they're not actually going to have a set of preliminary instructions. And as a practical matter, unlike the merits where we actually need them because we didn't repeat some of the definitions, they don't really need the preliminary instructions here which is one of the reasons why I'm willing to do it.

THE CLERK: Then on page 19, there's a reference to the definition of greater weight of the evidence, preliminary

Page 25

penalty phase instruction number 4. Do you want me to repeat a definition of greater weight of the evidence at that point rather than have a cross-reference?

MR. BERRIGAN: That would certainly be our preference, Your Honor.

THE COURT: Right. Take out -- yeah, delete the cross-reference but just define it.

MR. BERRIGAN: Define it, right.

THE COURT: Which goes perfectly in that sentence because it follows "but only by the greater weight of the evidence," and then we define the greater weight of the evidence.

3994

MR. WILLIAMS: Your Honor, the defense had one other suggestion to final penalty phase instruction number 5 found on page 29 in their letter of June 17.

THE COURT: Oh, that's right, on the changing the thinking or behavior to mental state. I don't have a problem with it. Does the government?

MR. WILLIAMS: And I don't either. I just wanted to alert the Court there was --

MR. BERRIGAN: I'm sorry I forgot that. Thank you, Mr. Williams.

THE COURT: We'll make that change. I had actually noted it, but we didn't discuss it. What I'd like you to do -- Roger, how long do you think it will take you to make these changes? About an hour?

THE CLERK: To be sure that they're clean, yes. I will probably have them done in half an hour, but then it's a case of reading them to make sure I haven't missed anything.

Page 26

THE COURT: I'd like to have everybody sign off on them tonight.

MR. WILLIAMS: Certainly.

THE COURT: So why don't we just take a recess and we'll get them to you when we can; okay?

MR. BERRIGAN: That's fine, sir.

THE COURT: Okay. Thanks.

MR. BERRIGAN: Would it be all right if one or more of

3995

the defense team had to leave?

THE COURT: That would be fine.

MR. BERRIGAN: Thank you.

THE COURT: Thanks. Okay. We'll be in recess.

MR. WILLIAMS: Oh, Your Honor, I'm sorry, if I could.

THE COURT: Yeah.

MR. WILLIAMS: We have a set of photographs of all of the penalty phase witnesses in a separate binder that I provided to Carey to give to you. The defense has reviewed it. They don't have an objection to it. We would suggest that the jury get both the guilt phase witnesses and the penalty phase notebook at the same time during deliberations, but I just wanted to bring that to the Court's attention.

THE COURT: What's the defense position, Mr. Berrigan?

MR. BERRIGAN: That's fine with us, sir. Are they going to be in two different books or one book?

MR. WILLIAMS: I don't care. We have them in two now, but I have no preference.

THE COURT: Do you have a preference?

MR. WILLETT: I suppose it's probably easier to have them in two different books. It'd certainly make it easier for

Page 27

the jurors I suspect to find what they're looking for if they had to look for people.

THE COURT: Okay.

MR. BERRIGAN: But it doesn't much matter, frankly.

3996

THE COURT: Okay. We'll do it in two books.

MR. WILLIAMS: Very good.

THE COURT: Thank you. Why don't we tentatively plan on meeting back here in an hour.

MR. BERRIGAN: Yes, sir.

THE COURT: Thanks.

(Recess at 7:35 p.m.)

(Mr. Berrigan was not present for the remainder of the proceedings.)

THE COURT: We have now made the changes in the final penalty phase instructions to the jury based on the hearing that we had earlier this evening. I note one typographical error on the bottom of page 10, third line up in the sentence that starts, Second, as statutory aggravating factors. There is no close parentheses, so we're just going to add those parentheses.

THE CLERK: Quotation marks.

THE COURT: I'm sorry, quotation marks.

THE CLERK: I think it's page 11.

THE COURT: Page 11, third line up. So we'll make that change to add the quotation marks on page 11 to the statutory aggravating factors. Does the government have any proposed changes, modifications, or objections to the jury instructions?

MR. WILLIAMS: No, Your Honor.

THE COURT: Does the defense?

Page 28

MR. STOWERS: No, Your Honor.

THE COURT: Okay. We'll see you tomorrow morning. Why don't we meet at eight o'clock, our -- well, I guess we really don't have much to talk about if anything. Why don't we just meet at 8:15 unless something comes up.

MR. STOWERS: I believe we've gone through all the exhibits and everybody's figured out which exhibits are actually received according to the court reporter's notes and everybody else's notes, and I think all the exhibits have been located and are here in the courtroom so that they'll be ready to go to the jury.

THE COURT: Okay. Sounds good. Anything else? Okay. Thank you. We'll see you tomorrow morning.

MR. WILLIAMS: Thank you, Judge.

THE COURT: Thank you very much.

(The foregoing trial was

adjourned at 8:25 p.m.)

                    CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


                                        12-19-05
    Shelly Semmler, RMR, CRR                Date



Page 29

3998

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CRO1-3046 |
| Plaintiff, | Sioux City, Iowa |
| | June 20, 2005 |
| vs. | 8:15 a.m. |
| ANGELA JANE JOHNSON, | VOLUME 23 of 24 |
| Defendant. | |

/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

3999

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | C. J. WILLIAMS, ESQ. |
| | Assistant United States Attorney |
| | Suite 400 - Hach Building |
| | 401 First Street Southeast |
| | Cedar Rapids, IA 52401 |
| | |
| | THOMAS HENRY MILLER, ESQ. |
| | Iowa Attorney General's Office |
| | Area Prosecutions Division |
| | Hoover State Office Building |
| | Des Moines, IA 50319 |
| | |
| For the Defendant: | PATRICK J. BERRIGAN, ESQ. |
| | Watson & Dameron |
| | 2500 Holmes |
| | Kansas City, MO 64108 |
| | |
| | DEAN STOWERS, ESQ. |
| | Rosenberg, Stowers & Morse |
| | 1010 Insurance Exchange Building |
| | 505 Fifth Avenue |
| | Des Moines, IA 50309 |
| | |
| | ALFRED E. WILLETT, ESQ. |
| | Terpstra, Epping & Willett |
| | Higley Building - Suite 500 |
| | 118 Third Avenue Southeast |
| | Cedar Rapids, IA 52401 |
| | |
| Also present: | Bill Basler |

Page 1

4000

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Okay.  Good morning.  There's a few things I want to make a record on.  I pointed out to the lawyers that there was an error in the verdict form that no one caught last night.  We caught it after our instruction conference, and that would be with regard to the statutory mitigator on page 2 -- I'm sorry, the nonstatutory aggravating factor.

We had left in the original one about the defendant intentionally killed more than one person in a single criminal episode, and we had changed the text but not the verdict form, and so now the verdict form has been changed to "the defendant aided and abetted the intentional killing of more than one person in a single criminal episode."  I assume nobody has any objection to having the verdict form conform to the text of the instruction, but I just wanted to bring that to everybody's attention.

MR. WILLIAMS:  No objection.

MR. BERRIGAN:  None by the defendant to the change, Your Honor, given the Court's prior ruling.

THE COURT:  Okay.  And with regard to the alternates, I think what I'm going to do is at the end of closing arguments, we'll send the jury down.  I think I'm going to still retain the alternates, give them a cautionary instruction.  I think it's highly unlikely that we would need them because once the jury

4001

Page 2

starts deliberating, under the rule we can go down to 11, but I'd like to retain the alternates by giving them the proper admonition about not discussing this case with anybody else, not reading anything about the case in the unlikely event that we would need an alternate during deliberations.  I just wanted to make sure nobody had any objection to doing that.  Mr. Berrigan?

MR. BERRIGAN:  None by the defendant, sir.

MR. WILLIAMS:  None, Your Honor.

THE COURT:  Okay.  Anything else we need to talk about this morning?

MR. BERRIGAN:  Nothing by the defense, sir.

MR. WILLIAMS:  Nothing, Your Honor.

THE COURT:  Okay.  Thank you.  We'll see you back here at 11:30 -- I'm sorry, at 8:30.

(Recess at 8:17 a.m.)

THE COURT:  Ready to have the jury brought in?

MR. WILLIAMS:  Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT:  Good morning.  Please be seated.

Members of the jury, if you would please pass your preliminary instructions towards our court security officer, and then we'll pass out the final set of instructions.

Okay.  Members of the jury, these are the final penalty phase instructions to the jury.  There are nine instructions and a verdict form.  We're going to go over the

4002

first eight instructions now.  Then we'll have the closing arguments.  And just like previously, the government gets to go first and last.  And so if you would turn the page to final

Page 3

penalty phase instruction number 1, introduction.

(The Court read final penalty phase instructions numbers 1 through 8 in open court.)

THE COURT:  I'm going to save the final penalty phase instruction number 9 until after closing arguments, but if you'd turn to the verdict form which is attached, and I want to go through that with you.  It has the caption of the case, and it's entitled Penalty Phase Verdict Form.  And when you go to page 2, the format should be somewhat familiar.

On the right-hand side, it has the victims and counts, Gregory Nicholson, Counts 1 and 6; Lori Duncan, Counts 2 and 7; Kandi Duncan, Counts 3 and 8; Amber Duncan, Counts 4 and 9; and Terry DeGeus, Counts 5 and 10.  And then on the left-hand side is the step 1 nonstatutory aggravating factors.  For each count, which one or more of the nonstatutory aggravating factors, if any, do you unanimously find the prosecution has proved beyond a reasonable doubt?  Nonstatutory aggravating factors are identified and explained in final penalty phase instruction number 2.  Parentheses, please put a checkmark in the column for any count for which you find a particular aggravating factor has been proved, close parentheses.

And then it lists the nonstatutory aggravating

4003

factors:  The defendant would be a danger in the future to the lives and safety of other persons.  The defendant obstructed justice by preventing the victim from providing testimony or information to law enforcement officers or by retaliating against the victim for cooperating with authorities.  Next one, the defendant aided and abetted the intentional killing of more than one person in a single criminal episode.  And then the next

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3506 of 3592

and final one, the effect of the crime upon the victim's family was injurious. And then you obviously place the checkmark if it applies to any of the boxes.

If you unanimously found at least one nonstatutory aggravating factor for a particular count, you may consider that factor or those factors in step 3 below for that count. Whether or not you find any nonstatutory aggravating factors, go on to step 2.

Turn the page to page 3. The victims and counts on the right-hand side remain the same. And then it's step 2 mitigating factors. Which mitigating factors, if any, do any of you find the defendant has proved by the greater weight of the evidence for a particular count? Mitigating factors specifically asserted by the defendant are identified for you in final penalty phase instruction number 3. You may also identify any further mitigating factors that any juror finds. Parentheses, please indicate the number of jurors finding any mitigating factor in the column for any count for which those

4004

jurors find that the mitigating factor applies, close parentheses.

And then it's the list of mitigating factors: One, even though Angela Johnson is guilty as an aider and abettor, her participation was relatively minor as compared to Dustin Honken's role in these murders; two, Angela Johnson does not have a prior criminal record; three, there is a strong maternal bond between Angela Johnson and her daughters, Alyssa and Marvea, and this mother-daughter relationship will continue to survive and flourish if Angela Johnson is sentenced to life imprisonment without the possibility of parole;

Page 5

Four, another person, Dustin Honken, who is equally or more culpable in the murders of Greg Nicholson, Lori Duncan, and Terry DeGeus, will not be punishable by death for those murders; five, two victims, Greg Nicholson and Terry DeGeus, consented to the conduct, methamphetamine manufacturing and distribution, that significantly contributed to the circumstances of their deaths.

Going on to page 4, mitigating factor number 6, Angela Johnson was physically and psychologically abused as a child by her mother and other adults who engaged in exorcisms, casting out of spirits, and other unusual religious practices upon her; seven, Angela Johnson was inappropriately touched, fondled, and sexually abused by Ted Dillo during the time the Johnson family spent with the Dillos in Chanute, Kansas, when Angela Johnson

4005

was approximately nine years old; eight, if Angela Johnson is incarcerated in a federal penitentiary for life, she would not be a danger to the lives and safety of others;

Nine, Angela Johnson was raised in a single-parent household by an emotionally unstable mother who subjected her children to unusual fasting practices, long periods of abandonment, and physical detachment and occasional physical abuse resulting in Angela Johnson being far more susceptible to escape through illicit drug use, a series of unhealthy relationships with men, and chronic feelings of abandonment and poor self-esteem; ten, Angela Johnson was physically and emotionally abused as an adult by Terry DeGeus, her former boyfriend, causing her great fear and traumatic stress.

Going on to page 5, mitigating factor number 11, Angela Johnson has loving, lasting relationships with her

Page 6

mother, Pearl Jean Johnson, and her four siblings, Wendy Jacobson, Jamie Jo Hays, Jimmy Johnson, and Holly Dirksen, which will continue into old age if Angela Johnson is sentenced to life imprisonment without possibility of parole; 12, Angela Johnson suffers from anxiety and depression as a result of experiences endured in childhood, and these mental conditions have hampered her ability to make intelligent, thoughtful, and wise choices in many of the important decisions in her life; 13, Angela Johnson is very much loved by her daughters, Alyssa and Marvea, and that her death would have a profoundly disturbing

4006

effect on their young lives now and for years to come; 14, Angela Johnson has felt remorse for the role that she played in the deaths of Greg Nicholson, Lori Duncan, Terry DeGeus, and particularly Kandi and Amber Duncan.

Turning to page 6, mitigating factor 15, Angela Johnson is loved and cherished by her mother, Pearl Jean Johnson, and her siblings, Wendy Jacobson, Jamie Jo Hays, Jimmy Johnson, and Holly Dirksen, all of whom would suffer grievously should Angela Johnson be sentenced to death; 16, Angela Johnson has been addicted to methamphetamine for most of her adult life, a drug which has profoundly affected her judgment, her personality, her relationships, and her ability to deal with difficult self-esteem and psychological issues which have plagued her since childhood; 17, Angela Johnson has demonstrated that she can lead a productive, worthwhile life in prison through her kindness and helpfulness to other inmates, her interest in Bible study and religion, her artistic endeavors, and the furtherance of her education by obtaining a GED while incarcerated after having dropped out of school years earlier in

Page 7

the ninth grade; 18, in spite of her problems with drugs, men, and her own depression, Angela Johnson has always held a steady job and consistently worked to provide for the care and comfort for her daughters, Alyssa and Marvea.

Turning to page 7, mitigating factor 19, although she is guilty of these murders, Angela Johnson was pregnant by

4007

Dustin Honken with her daughter Marvea at the time of the murders and, as a result, was in a disadvantaged position to resist Mr. Honken, leave him, or turn him in to authorities which she offers as an explanation of her conduct, not as an excuse; 20, despite her own personal problems, past drug addiction, and present incarceration, Angela Johnson has always been a good mother to her daughters in that she communicates with them regularly, stays as active as possible in their lives, and attempts to pass on the values and beliefs that will help her daughters avoid her own fate; 21, there are other factors in Angela Johnson's background or character that mitigate in favor of a sentence of life imprisonment without possibility of parole and against the death penalty.

Then turning to page 8, mitigating factors, any residual or lingering doubts as to Angela Johnson's guilt or innocence or her role in the offenses even though those doubts did not rise to the level of reasonable doubts under the instructions given to you during the merits phase of the trial.

And then there are one, two, three, four, five additional lines to add any additional mitigator that anybody finds. You should identify that mitigator and then indicate what counts and which number of jurors find it.

And then at the bottom of page 8 in step 3, for each

Page 8

count on which the defendant is eligible for consideration of the death penalty, each of you must weigh any mitigating factor

4008

or factors that you individually found to exist in this step. Each of you may also weigh any mitigating factor or factors that another or others of your fellow jurors found to exist.

And turning to page 9, the victims and counts remain the same on the right-hand side. On the left-hand side, step 3, weighing the factors, after weighing the aggravating factors found in the eligibility phase together with any nonstatutory aggravating factors found in step 1 of this penalty phase and any mitigating factors found in step 2 as explained in final penalty phase instruction number 4, what sentence do you impose for each count? Parentheses, please put a checkmark in the column for any count for which you find a particular sentence must be imposed, close parentheses. And then for Counts 1 through 10, there's a place to check either a sentence of death or a sentence of life imprisonment without the possibility of parole.

And then there's the certification: By signing below, by juror number and then by name, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same determination regarding a sentence for the crime or crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant or the victim or victims, see

4009

Page 9

final penalty phase instruction number 7.

There's a place to date it, juror numbers on page 9 for the foreperson, the other 11 jurors going on to page 10, and then the final page, page 11, would be for the signatures of the foreperson and the other 11 jurors.

That concludes the final penalty phase instructions. Why don't we take a stretch break, and then we'll hear from the government.

Please be seated.

Mr. Williams, are you ready to proceed on behalf of the United States?

MR. WILLIAMS: I am, Your Honor.

THE COURT: You may.

MR. WILLIAMS: May it please the Court, counsel.

Members of the jury, back in April when we went through jury selection together, each of you assured us that in the appropriate case you could impose the death penalty on another person. This is the appropriate case.

On behalf of the United States of America, I'm asking you to impose the death penalty on Angela Johnson for the horrendous, horrible crimes that she committed in this case. It's the right thing to do in this case.

Now, it's been several weeks since you heard any evidence concerning these murders, and it's incumbent upon me to remind you about these murders because that's why we are here.

4010

It is the horrible crimes that she committed that led us to this point, so let's talk about this.

First and foremost, do not forget the context in which these murders took place. This was not a crime of violence

Page 10

(sic). This was not a sudden decision to murder after robbing a bank and you come out and there's somebody there and you have to shoot them. This was a long-term, premeditated decision.

In the context of what? In the context of a drug conspiracy that this defendant knowingly and willfully joined, of which she was a vital member. The drug conspiracy has only one reason: Greed, money, drugs. That's the context in which these murders took place, selfish criminal enterprise.

The defendant, we know, was involved in this drug trafficking for a couple years before the murders took place. We know that from the evidence. She was distributing methamphetamine for her former boyfriend, Terry DeGeus. Now, they had split up in '91, but she was still connected with him distributing methamphetamine.

But the defendant, she saw an opportunity. She saw an opportunity to get herself to the top of this organization. She slept her way to the top. She met up with Dustin Honken, and she convinced him -- she betrayed her ex-boyfriend and said, Look, Terry DeGeus, he's using most of the dope. He owes you a lot of money. I've got connections. I can sell dope better than he can. Take me on.

4011

And she, through her efforts, through her manipulation, got herself to the top of this organization, partnered up with Dustin Honken in an organization that was producing over a hundred thousand dollars of drug proceeds in a year. She got herself to the top, and then Dustin Honken gets arrested.

Now, when he gets arrested, she's there ready, willing, and able to do whatever it takes to maintain her

position she worked so hard to get to at the top of this organization.

When Dustin Honken gets released on pretrial release and indicates that he has to kill Greg Nicholson, she's there willing to do it. You heard the testimony from Steve Vest. This was not a case where they went over to get a videotape and then once they got there realized things got out of control and they had to kill somebody.

This was a plan from the beginning that she made with Dustin Honken to go kill Greg Nicholson, and toward that end, they plotted. They borrowed Christi Gaubatz's car. They surveilled. They purchased a handgun, a killing weapon, and they watched. And they knew. They knew that night it's a Sunday night. It's a Sunday night after they've been conducting surveillance of the Duncan house. They knew that Lori and the girls were home that night. We know from the comments she made to Sara Bramow that she criticized Lori Duncan for leaving those

4012

girls alone.

Don't forget, during the penalty phase testimony, we heard from Mrs. Nicholson, Greg Nicholson's ex-wife, who said that very day Greg Nicholson and Lori Duncan had gotten on the motorcycle and came out to visit his girls. The defendant knew that night that Lori and those girls were home.

Even if you assume for the sake of argument that they entered that house and they were only going to kill Greg Nicholson and they didn't realize Lori and the girls were home, it is the defendant by her decision, by her choice who made the decision that these other victims were going to die because you remember how they got in the house? She got in the house. She

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3514 of 3592

got in the house using a ruse. She had the gun in a bag, in a cosmetics bag, and she got in there with the purpose of allegedly using the telephone or the telephone book claiming she was lost.

And when she made entry in that house, we heard from the testimony it was Lori Duncan who opened the door. When she made entry in that house to use that phone, she had to have seen those girls there. She hadn't pulled the gun out yet. When she pulled this gun out, once she made entry into that house, the defendant condemned Lori Duncan and those two little girls to die.

She could have walked out. She could have walked out and decided, oh, this isn't going to work. Greg Nicholson's not

4013

here alone. I gotta get out of here. We'll find him another time. She didn't.

You heard from the testimony. Steve Vest again explained to you she pulled out the gun, and she held them there until Dustin Honken showed up. And when Dustin Honken showed up, she helped continue to hold them while Dustin Honken made this videotape of Greg Nicholson. She either tied up or bound Lori and Greg or she held the gun on them while Dustin Honken did that. And she helped drive these victims out to the murder site.

Remember Bill Basler's testimony. That drive took 11 minutes. Now, 11 minutes doesn't seem like a long time, but I invite you to do this. When you go back and you deliberate in this case, I invite you to stop, just stop, set the time on the clock, and watch 11 minutes go by. Don't say a thing. Just wait for 11 minutes.

Page 13

And while you're doing that, think about this. It's 11 minutes Lori Duncan is riding in the back of that car with one of her little girl's socks stuffed in her mouth with duct tape around her face. For 11 minutes as they're driving out to that site to be murdered, those little girls are sitting beside the defendant in this car full of strangers with people with guns, with their mother tied up, duct taped, 11 minutes of riding along in that car, 11 minutes of pure terror.

And once they get to that site, we know what happens

4014

out there. Dustin Honken takes the two adults out into the woods and shoots them. Lori tries to run and is shot in the back and then shot in the head.

The two little girls are sitting in the vehicle with the defendant in this case. And when they hear the gunshots that killed their mother, the defendant says to them, It's just fireworks. As they're hugging each other, crying, she holds them.

Now, at that point she could have let them out of the car, said, Run, run literally for your lives. She didn't. She could have driven away. Honken's out in the woods. She could have driven away and saved those girls' lives, but she didn't. She chose, she made a decision at that point, and that decision was to hold them so that Dustin Honken could come back and slaughter them as well.

Three months later, she acts again. During these three months, life goes on for her. She celebrates her oldest daughter's ten-year-old birthday. Her own daughter's birthday is celebrated. She has time to think. She has time to contemplate. She has time to reflect upon the conduct that she

Page 14

engaged in.

And during that time period, she decides to act again. You remember on October 27 of 1993, she's brought before the grand jury and questioned about Terry DeGeus and Dustin Honken and their drug relationship. Nine days later, she lures Terry

4015

DeGeus to his death. Again, she has the power to do that through her ability to manipulate Terry DeGeus.

And we've heard a lot about Terry DeGeus. And one thing we know is that he was absolutely in love with her. This is a man who was very skeptical at this point in time. You remember the testimony from Christi Gaubatz that he got in her car at one point and he knew that Greg Nicholson had disappeared and he was worried about what was going to happen to him? He was concerned about his own safety. And a man like that, a tough man like that, this woman had the power to manipulate, to bring him to his own death.

And they met out at that remote site, and when they met out there, they had a gun, they had a baseball bat and a shovel. Remember the testimony from Steve Vest? They're out there for a while. Dustin Honken's talking, apparently can't go through with this, so she gets in the car as if to say, Come on, get on, I don't have all day, kill him. And she sits in the car as Dustin Honken shoots Terry DeGeus over and over again.

And then when he's done shooting Terry DeGeus, she hands him a baseball bat so he can use the baseball bat in order to beat the rest of the life out of Terry DeGeus. And then she helps bury Terry DeGeus. Remember the note that she provided to McNeese? Buried him on his knees like he used to make me be.

Ladies and gentlemen, it is for those crimes, for

Page 15

those horrible crimes, we are asking you to impose the death

4016

penalty on Angela Johnson.

Now, the Court has instructed you concerning where we go from here and how you reach decisions in this case. The Court has given you instructions about aggravating factors, mitigating factors, the weighing process that you go through. I'm not going to go through and repeat those. I'm going to talk to you, though, about these factors.

Keep in mind that the aggravating factors the Court has instructed you incorporates what you've already decided in this case, the gateway intent. You concluded beyond a reasonable doubt that this defendant intentionally engaged in conduct intending the victims be killed. This was, as I said before, no accident. This is nothing but cold-blooded, premeditated murder. And you found that beyond a reasonable doubt. That is a factor you should continue to weigh in your process to determine what the appropriate punishment is.

Intentional conduct, as we went through before, involved Greg Nicholson, was going to testify against Dustin Honken. They had to kill him for that reason.

Lori and the girls had to be killed we know because they were going to be witnesses to what was going on. They had given up. Time was running out. Honken was supposed to plead guilty. It's too late at this point. They had to go through, kill everybody in that household because at that point if they just killed Nicholson they were in more trouble than ever

4017

Page 16

before.

And Terry DeGeus we know could testify not only about Dustin Honken, but think about the damage he could have done to Angela Johnson in his testimony.

So you found and you need to continue to weigh in your process, your deliberations, the intentional conduct.

The aggravating factors the Court went through with you: Substantially planned and premeditated as to Terry DeGeus. Inflicted serious physical abuse on the victims, the adult victims, you found. Murdered vulnerable victims you found. And then there's additional ones that we put on evidence and we're asking you to find we proved beyond a reasonable doubt: Defendant poses a future danger, obstructed justice, killed four in a single episode, devastated the victims' families, the victim impact.

So let's take those one at a time again. You already found substantial planning and premeditation as to the killing of Terry DeGeus. We know the defendant purchased a murder weapon from a pawn shop at a remote site from Mason City. That firearm you heard had a silencer attached to it. There could only have been one purpose for that: To kill.

They developed a plan. Remember, she was the one in a position to manipulate Terry DeGeus to appear and put himself in a position where he was going to be murdered. This is a guy who was skeptical and concerned for his safety, yet she had the

4018

power to take him there to his own death.

Substantial abuse, again, you found as to the adult victims, and remember why. Think about this. Don't forget, he was bound and gagged and shot multiple times.

Page 17

Lori Duncan, bound and gagged and shot multiple times.

Terry DeGeus, shot multiple times, beaten with a bat and a shovel we know from the testimony of Steve Vest to the point where his skull was shattered in so many pieces that Dawnie Steadman could not put his skull back together again.

And vulnerable victims, Kandi, ten years old, innocent little girl, loved her dad, loved her mother, quiet, shy. Amber, six-year-old little girl, full of energy, full of life. Both of their lives blown away, literally blown away, their faces blown away by the impact of the bullets that went through their heads.

These are vulnerable victims who didn't have the power or the ability to protect themselves. In society we protect children. Children are not prey. In this case these children could not protect themselves. Remember where those bullets hit. After Kandi Duncan was shot, little Amber Duncan didn't even move. This factor I'm asking that you give overwhelming weight to. There is no way to mitigate the murder of children.

Let's talk about the future dangerousness. At Honken's sentencing, you remember you heard testimony from Honken's sister and then also from this clerk about her

4019

threatening law enforcement officers in this very courtroom at Honken's sentencing. This is a woman who, after Honken is sentenced, hires what she believes to be a couple thugs to collect drug debts in whatever manner was necessary.

Now, that was a unique opportunity for you to see what this woman was like. Remember that videotape? Remember her in that hotel room? This is a woman, number one, who was in control. She was in control. She was hiring these people to go

Page 18

out and use violence.

Number two, she was violent. She had no problem, no qualms with talking about violence. Remember her talking about that young girl that was less than 18 years old that she had to put in her place? Remember her talking about that, bragging about that, saying something about the effect that that's pleasure and pleasure isn't profit? And this is a woman who was willing to have these two guys go out and kidnap Jimmy Rodriguez and bring him to her.

Now, ask yourself when you watch that woman on that videotape knowing what you know about her, knowing what you know about what she's done in the past and what she was capable of doing, do you have any doubt in your mind that if they would have brought Jimmy Rodriguez to her what would have happened to him? Any doubt in your mind what she would have done with that duct tape she had?

After the arrest she threatens guards, a dispatcher at

4020

the Benton County Jail. And while incarcerated she assaults other inmates.

Now, obstruction of justice is another aggravating factor we believe was proven by the evidence submitted to you during the guilt phase of this case. Now, obstruction of justice is an aggravating factor for this reason: Somebody who kills witnesses or potential witnesses tears at the very heart of the criminal justice system. Our criminal justice system cannot operate unless it operates safely. Somebody who is willing to kill a witness has no fear of authority, has no respect for the law, and is ruthless.

In this case you heard the defendant herself on that

Page 19

undercover tape indicate she's not afraid of the law, and she showed that by her own actions in killing witnesses in this case.

If we do not punish with death somebody willing to kill witnesses, then what deterrence is there? Why not? If you're facing time in prison and all you're going to get is time in prison if you kill witnesses, then kill witnesses. You have nothing to lose at that point. This factor too deserves great weight with you.

Killed more than one person in a single criminal episode, this is an aggravating factor because of the nature of the murder in that case. Think about this. Somebody capable of killing not just one person but more than one person in a single

4021

episode, somebody capable of mass murder, somebody who has absolutely no respect for life, that's somebody who is so violent and so -- so utterly evil that it frightens you. How could you do that? How could you do that? How could you kill more than one person in a single episode like that? That kind of person deserves the death penalty.

Now, victim impact. Aside from vulnerable victims, this is the other aggravating factor that I'm going to ask that you give overwhelming weight to. The victim impact goes not just to the victims who actually died from these murders but also to the family that continues to suffer as a result of these murders. So let me talk to you about the victims in this case.

Greg Nicholson, Greg Nicholson you remember was a musician, played in a band since he was a kid, a young man who worked for years and years and years at the same factory until he got diverted into the meth trafficking. Remember the

Page 20

testimony from his ex-wife? After he was arrested in March, I mean, it's interesting how this works. Dustin Honken gets arrested in March, and he decides to kill. Greg Nicholson gets arrested in March, and he decides to cooperate and to turn his life around. You remember her testimony about how he had changed after that, how he had come out to the house more often, how she saw a real change in his behavior? He was coming back to the person he used to be right before he was murdered. He had two young daughters, and his life was taken; a young man

4022

with potential, potential to turn around, murdered.

Terry DeGeus, we've heard about him being a tough young man, but this is a tough young man who had a huge heart and a lot of love for his family, lot of love for his daughter Ashley. Remember how he would meet with her on every single weekend? This is a man who didn't have to do that. He could have been off doing drugs, doing whatever. But he had a large heart. He was a tough guy, no doubt about it, mean guy. But he had a big heart for his family.

Remember even Wendy, Wendy Jensen, who testified that after she remarried and had a child with a new husband Terry DeGeus, her ex-husband, comes into the hospital room and brings her flowers. It's that man, how ever tough, how ever mean he was who had a heart who died because of the defendant.

Lori Duncan, Lori Duncan, totally innocent woman. You heard the testimony she was never involved in any criminal activity, never involved in drugs. She was a Navy veteran. She was a single mother living on a quiet street in Mason City, Iowa, just down from her parents' house, the same house where she grew up herself as a little girl. She was struggling to

Page 21

make ends meet working a full-time job trying to raise those little girls.

Think about the terror she felt the night she was murdered. Remember that she is bound and gagged, one of her little girl's socks stuffed in her mouth. She knows -- at some

4023

point that night she knows that she's dying. But worse than that, at some point she knows her little girls are going to die, and she can't do a thing about it. She's tied up. She's gagged. She can't even tell them to run. She can't even tell them that she loves them.

And when she goes out -- if at no other point, when she goes out in the woods and Greg Nicholson is blown away next to her, she knows that she's dying, and she knows her little girls are dying and there's not a thing she can do about it. Don't forget the suffering that she went through that night.

And Kandi and Amber, think about their lives cut off in youth. Think about what they didn't ever get to do. They never got to graduate from school. They never got to go to a prom. They never got to kiss their first boy. They never got to hug their mother good-bye.

But as I said, the impact goes beyond the victims, the actual murder victims in this case. Greg Nicholson had two very young daughters when he died. Those little daughters grew up to be young women, grew up without a father for years not knowing what happened to their father.

Ed and JoAnn DeGeus, parents who lost a son. JoAnn you heard was having such trouble that her doctor ordered her not to attend this trial anymore. Ed DeGeus, tough like Terry, crushed by the fact that his son was murdered. And we know this

Page 22

is a close family.  Siblings now without a brother, and you saw

4024

through the testimony how close this family was.  As bad as Terry DeGeus was, there was something there.  He had great love by this family, and they all suffer now because he's gone.

And Ashley, remember Ashley's testimony how for years she worried about whether her father had shelter, for years not knowing what happened to him, the abuse she got from other students, finding out that her father was murdered, Ashley DeGeus who has so little to remember her father by that one of the things -- one of the few things she could articulate is she has a pink fuzzy blanket like they had in hotels, and that's what she has left of her father.

And the Milbraths, Milbraths lost, and they lost in a big way.  They lost an entire branch of their family tree.  They lost a daughter, granddaughters, cousins, nieces, aunts -- an aunt.  Remember Robert Milbrath?  Remember him when he was on the stand?  Remember how he struggled with his emotions about what he suffered, what the rest of the family suffered as a result of these murders?  Don't forget that suffering when you're back there trying to think about what the appropriate penalty is for this defendant for her actions.

Remember Mary testified during the guilt phase about identifying the girls' clothes, how difficult that was for her? Marge Milbrath testified to you about the suffering she's felt, the depression she's suffered, treatment she's received, the fact that every day when she drives down that same little street

4025

near her house she looks at the house where her daughter lived
Page 23

and her granddaughters lived.

And Dave Milbrath, Dave Milbrath who blames himself, inappropriately blames himself because remember Amber came over that day and wanted to stay overnight with Grandpa and Grandma. Dave said no, blames himself to this day for telling Amber no because had he said yes, at least Amber would be alive today.

And Jay Duncan and Jay Duncan's family, his parents, other grandparents of the Duncan girls, they're without anyone in that branch of the family. Remember Jay Duncan, though, that didn't testify before you because the same summer, same summer these murders took place, Jay Duncan was down in Des Moines volunteering trying to fight the flood and in the process contracted a disease that afflicted him to the point where he was in a wheelchair, cannot walk. He's paralyzed, and it affected his mind to the point that now all he does is can barely remember that he had daughters. He doesn't know what happened to them and doesn't understand that they were murdered.

I beg you not to forget the suffering of these victims and the suffering of these family members when you're back there trying to figure out what's the appropriate punishment for this crime.

I want to talk to you about the mitigating factors the defendant has identified. Now, you have a list of about 20 in there, in the jury instructions, but you may have noticed

4026

yourself when you're listening to them a lot of them sound alike. If you condense those, there's really only about seven categories of mitigating factors that have been talked about here. Let's talk about them.

The role in the offense, we've got -- 1, 4, and 19

Page 24

deal with role in the offense. When you're back thinking about role in the offense, do not, do not, just jump to the conclusion that the person who pulls the trigger is the person who's the most morally culpable for the crime. Think about what you know about this defendant and her violence, her impulsivity, her ability to manipulate Honken, Terry DeGeus. And ask yourself this question: Is it more morally culpable to pull the trigger, or is it more culpable for somebody to egg on, to push?

Remember the testimony from Tim Cutkomp who talked about when they were dealing drugs in 1996, 1995, it was the defendant who kept pushing and pushing and pushing and pushing Dustin Honken to get done with manufacturing methamphetamine. This is a person who is manipulating and pushing Dustin Honken.

And then remember the testimony? You may have forgotten it by now. I want to remind you of it. Testimony by Tim Cutkomp, he said -- and this is at the point where he came in and he was going to cooperate with law enforcement. He sat down at the first debriefing, and he told everything, told everything he knew about what happened, told about Dustin Honken and what he knew and suspected about his involvement in the

4027

murders back in 1993, talked about Dustin Honken wanting to murder again and wanting to kill people. And he was asked this question during the debriefing: What are you afraid of, or are you afraid of anything now? And his answer was what? You remember? His answer was, I am most afraid of Angela Johnson, not Dustin Honken. I'm not afraid of Dustin Honken, the guy who killed. I'm afraid, I'm the most afraid of Angela Johnson. And why? Because she's pushing Honken to kill again.

So when the defendant talks to you about role in the

Page 25

offense, don't accept their premise that the person who pulls the trigger is more morally culpable than the person who's egging on and pushing and cajoling and putting the person in the position of pulling that trigger.

In that same category of role in the offense, the defendant suggests to you that because she was pregnant that somehow she was not in a position to control her actions. Now, I beg you to go through the evidence the defendant presented during the penalty phase and ask you where that evidence was.

Now, they had experts. They had a multitude of experts come in and talk about her mental state. Not one of them testified that her mental state was such at the time of these murders that because she was pregnant somehow she didn't have the ability to control her actions or that her judgment was impaired or somehow she couldn't turn him in or walk away or save those children, not one of them. There's no evidence of

4028

that, not a shred. Don't find that.

No prior criminal record, this is an interesting mitigating factor. Does she have a prior criminal record? No, she doesn't. You should find that factor. But keep in mind it's not simply whether the defendant proved those factors. You need to find, first of all, did they prove those factors, and they've proved she had no prior record. There's no evidence she had a prior criminal record.

Then you have to determine what weight you give to that, what weight you give to those factors, because simply because you find they proved it you should give it no weight.

This is under give no weight to for this reason: The fact she has no prior criminal record is simply a product of the

Page 26

fact she was not caught. We know from the testimony that she was distributing drugs for a year or two prior to these murders taking place. We know she was distributing methamphetamine during that time period. We know after these murders took place she continued to distribute drugs, and we know even after Honken went to prison in 1996 the defendant on her own was out there distributing methamphetamine again. We know that she tried to hire Mike Mittan to inflict violence on people to collect drug debts. We know that she tried to hire them to kidnap another person. So while she has no criminal record, that should carry no weight with you.

Defendant's family, there's a number of factors that

4029

deal with her family, the fact that she loves them, they love her, whether she was a good mother and so forth to them, the impact it's going to have on them.

When you consider these mitigating factors, think of this: It is the defendant and the defendant alone who put her family in this position. It's through her willful choices, the choice that she made to engage in criminal conduct that put her family in this position. Nobody else is to blame for that.

And in 5 and 10 she blames the victims. She says in 5 that Terry DeGeus and Greg Nicholson were involved in the drug trade and --

MR. BERRIGAN: Sorry, truly sorry to interrupt, Your Honor, but I think that's completely inappropriate. That's a statutory mitigating factor as the Court knows, and to denigrate it is inappropriate by the prosecutor.

THE COURT: Objection's overruled.

MR. WILLIAMS: She claims that these men were involved

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3529 of 3592

in the drug trade and the drug trade, therefore, led to the circumstances where they ultimately were killed.

That's not what killed them. They were not murdered because they were involved in the drug trade. They were murdered because they were witnesses, not because they were involved in the drug trade.

Number 10 she says that Terry DeGeus abused her. Now, we've heard a lot of evidence Terry DeGeus did abuse Angela

4030

Johnson. A couple things I want you to think about when you consider that mitigating factor. Number one is the evidence was this abuse occurred years before the murders. They split up in 1991. There may have been some stalking after that, but there was no evidence that for the two years preceding the murders in 1993 that Terry DeGeus laid a hand on her.

But be that as it may, he did abuse her in the past, and that's not excusable. But it was not the defendant entitled to determine the punishment Terry DeGeus was to receive for that. It was not the defendant entitled to make the decision that he should receive the death penalty for his past abuse of her.

No future danger is 8 and 17, and I've talked about that. Keep in mind that not even her own expert indicated that he could guarantee she wouldn't be a future danger. He said that danger, he thought it was a low possibility.

Well, you know this defendant better from the evidence you've seen than Dr. Cunningham knows this defendant. You know what she's capable of doing. You know what she did in the past. It will be of little consolation to a victim of Angela Johnson to let them know or their family know afterwards that

Page 28

Dr. Cunningham testified that it was a pretty low possibility that there was going to be future violence.

Abuse history, there's a number of factors that deal with her history of abuse as a child. Two things to keep in

4031

mind in this regard. Despite this abusive history in the past, even assuming it occurred, she grew up. She left home. She got married. She got married twice. She had jobs. She continuously worked throughout this time period. She had children. She took care of those children. This is a woman living a normal life. Despite that abusive history, this is a woman living a normal life in Mason City, Iowa.

This is not some woman who grew up in an inner city slum with drug parents, with no food. This is a woman, while she may have had an abusive childhood, was a woman who was out on her own living a normal life. She did not engage in criminal conduct until she was 27 or 28 years old when she first started getting involved dealing drugs. She did not commit these murders until she was 29 years old.

There wasn't -- the second thing is there wasn't any evidence -- because their experts were specifically instructed not to talk to her about these crimes, there's no linking of any of this abuse to have anything to do with what her mental state was at the time of the murders, no evidence to suggest she wasn't fully capable of making that choice, no evidence to suggest she was under duress, no evidence to suggest she was somehow mentally impaired when she decided to pull that gun out in the Duncan household and condemn Lori Duncan and those girls to death.

And remorse, there's no evidence, not a shred of

Page 29

evidence, of remorse in this case. Now, when she spoke with Christi Gaubatz in 1993 and confessed those crimes, she was crying. And Tom Miller during closing argument during the guilt phase suggested that maybe that's remorse. You can assume maybe that's remorse.

But ask yourself is that remorse when you combine it with the rest of the evidence in this case? Was that a woman who said -- at that point who said she was paranoid, she's worried, she's crying because of the predicament she got herself in? This was crying over self-pity, over her own concern about what was going to happen to her.

Not once, not once, did you hear Christi Gaubatz testify from this stand that during this confession, during this time period she's crying, did Angela Johnson say, I'm so sorry about what happened to those little girls; I feel horrible that that young, innocent mother died. You didn't hear those statements come out. There's no remorse in this case.

Ladies and gentlemen, this is the appropriate case for the death penalty. Do not forget this crime. Do not forget what the defendant did in committing this crime. Do not forget what the victims felt and suffered and their families suffered.

After she engages in those four murders and has time to reflect, she kills again. What kind of person would do that? What kind of person who, after killing four people, including two little girls, what kind of animal can then go and kill

again? Is that somebody that you feel comfortable with not

receiving the death penalty?

You know, in our society we impose the death -- or I'm sorry, we impose life in prison for people who kill one person. In this case the defendant's involved with killing five. People receive life sentences for killing for a single episode. In this case the defendant killed and killed again. People receive life sentences for killing adults. In this case the defendant was involved with the killing of innocent children.

The intentional murder of children is an unspeakable evil. It's an evil that cannot be mitigated by any evidence. None of the defendant's mitigators can take away what she did and her involvement in killing those children. Somebody involved in the murder of children deserves the death penalty.

I'd ask you that when you go back and you deliberate on the aggravating and the additional nonstatutory aggravating factors that we've asked you to find that she's a future danger, that she obstructed justice, that she was involved in the killing of more than one person during a single episode, and the victim impact, that you check the boxes for each of the victims in this case and on the final verdict form that you choose the death penalty for each of the victims.

Now, part of the role issue and the mitigators the defense raised was that Dustin Honken got the death penalty for killing the children and not the adults. You are not bound as a

4034

jury by the Dustin Honken verdict. In the end, however, Dustin Honken got the death penalty for the same crime.

So I ask you when you deliberate in this case as a jury that you think about the crime that was committed and don't lose sight of that. This is about the crime. This is not about

Page 31

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3533 of 3592

Angela Johnson and her childhood.  This is about the murders.
This is about the victims in this case.  This is about those
little girls.  So I ask you that when you deliberate you think
of all that and you impose the death penalty on this defendant.
Thank you.

THE COURT:  Mr. Berrigan, do you have any objection if
we take our mid-morning recess at this time?

MR. BERRIGAN:  No, not at all, sir.

THE COURT:  Okay.  Members of the jury, it is about
ten minutes to ten.  We'll be in recess until 10:15, and then
we'll come back and hear the closing argument on behalf of
Angela Johnson.  Thank you.

(The jury exited the courtroom.)

THE COURT:  Anything we need to take up?

MR. BERRIGAN:  Nothing by the defense, sir.

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Okay.  Thank you.

(Recess at 9:51 a.m.)

THE COURT:  Mr. Berrigan, you ready to have the jury
brought in?

4035

MR. BERRIGAN:  Yes, sir.

(The jury entered the courtroom.)

THE COURT:  Please be seated.

Mr. Berrigan?

MR. BERRIGAN:  May it please the Court, counsel,
ladies and gentlemen.

The facts and the evidence in this case and certainly
justice do not require that you impose the death penalty, and
the reason is that Angela Johnson's not even in the same

Page 32

ballpark as Dustin Honken as a murderer.

Now, I'm not for a minute arguing that she's not guilty. We already determined that, didn't we? You heard all the evidence. You considered it carefully, and you found beyond a reasonable doubt she aided this monster in the commission of the murders of five different people. That makes her criminally responsible.

But we're past that now. Now we're talking about punishment, and although the prosecutor denigrates it, her relative role in these offenses regarding Dustin Honken's is huge. It's a huge difference, and you know that from listening to six weeks of evidence.

You hadn't heard Steve Vest when you made the decision that she was guilty of aiding and abetting. He's the only person that claims on the face of the earth that Dustin Honken claims that he told Angela Johnson that the plan was to kill

4036

Greg Nicholson. And you make a determination about whether you want to believe Steve Vest, much less anything Dustin Honken has to say about Angela Johnson at the time. You'll recall Dustin Honken's planning to kill Angela Johnson at the time he's talking to Steve Vest.

He's trying to bond a guy out of jail by the name of Dean Donaldson, get him out of the Woodbury County Jail, so he can go kill Dan Cobeen, a poor chemist at the drug lab -- God knows why -- some law enforcement officers, and his former girlfriend, Angela Johnson, and that's the context in which these statements with Steve Vest arise. But we sure know, we sure know, Dustin Honken planned to kill Greg Nicholson.

Contrast that with what Angela Johnson tells Christi

Page 33

Gaubatz in the winter of 1994, and you remember her testimony? Angela Johnson calls her on the phone, Can you come over? I gotta tell you something. I've gotta get this off my chest.

She comes over, Christi Gaubatz, to Angela Johnson's house, and Angela Johnson tells her, I've gotta tell you this. It's been eating me up. And she then breaks down crying and sobbing and confesses her involvement in these murders to Christi Gaubatz through tears.

There was a series of questions of Christi Gaubatz: Was she crying? Was she sobbing? Yes. What did she tell you? The plan was to get a videotaped statement of Greg Nicholson. That was supposed to be the plan. Nobody is expecting kids.

4037

You know, even Dustin Honken, even Dustin Honken, tells this guy Vest, we didn't expect any kids there. And you remember Honken telling Vest that it was Nicholson's wife? Honken knew it wasn't Nicholson's wife. There weren't any kids that lived with Nicholson and his wife. Nicholson's kids lived somewhere else. They weren't expecting kids.

And that's what Angela Johnson told Christi Gaubatz: Something went terribly wrong. But they're still pushing this idea we knew there were kids. There's no evidence of that, none.

Dustin Honken planned to kill Gregory Nicholson for one reason, and we all know what it is. Gregory Nicholson was going to testify against him. That's it. Gregory Nicholson didn't know Angela Johnson, didn't know her from Adam. He had nothing to say against her. He couldn't testify in front of a grand jury against Angela Johnson. She had no reason to kill him, and she wasn't there to kill him.

Page 34

And this idea that, you know, Gregory Nicholson's not involved in the drug trade or he's not killed because he's involved in the drug trade? Come on. Who's kidding who? These people are in a very dangerous business. It doesn't mean they volunteer to get killed, but they're all -- you saw Greg Nicholson's gun. Do you remember that? These are people that are involved in a dangerous, life-threatening business. And yes, Gregory Nicholson was killed because he was a witness, but

4038

he's also killed because he's involved in the drug business.

Dustin Honken and the gun, there was lots of testimony in the first part of the trial about this Tec-9 and how Angela Johnson came to get it, and you remember that. She actually goes down to the sheriff's office, fills out a permit in her own name, gets the gun, says she wants it to protect herself against Terry DeGeus. And you've heard now that there's some reasonable basis for that fear. She's had guns to protect herself against Terry DeGeus in the past. They have a very peculiar relationship.

But Dustin Honken has a whole different idea for that gun, and you see him do this again. You remember the testimony of this guy Rick Held that he worked with at Kraft Puddings and he gets Held to go get him a 380 semi-automatic, and Held has no idea what the gun's for, and we know what it's for. Dustin Honken's going to give it to Dan Cobeen so he can go kill people including Angela Johnson.

What about this idea, there's been a lot of testimony -- I shouldn't say testimony -- argument from the prosecutor, Angela Johnson did this, she tied up these people. Is there really any evidence of that honestly?

Page 35

Now, why couldn't, why couldn't, Dustin Honken point a gun at Lori Duncan and say, I want you to put duct tape around the back of Greg Nicholson and wrap his hands and Angela Johnson's upstairs with the kids getting them packed? How do we

4039

know who duct taped who? What real evidence is there?

This contention that Lori Duncan's riding in the car with her daughters, what's the evidence of that? There's none. We don't know, we don't know how that went down. You know, Greg Nicholson's got a camper. He's got a pickup truck with a camper there. And, you know, these people at one point, they have their ankles bound together with duct tape. Why is that? Why do you think that is? Because they're not going to be able to run going from the house to the pickup truck.

And once they're in the pickup truck and they've got their ankles bound and they're all tied up with ropes behind their backs, they're not going anywhere, and I submit to you it's just as likely as this scenario that you've heard that Lori Duncan's riding in the car with her daughters that she and poor Greg Nicholson are tied up and duct taped and gagged in the back of Greg Nicholson's pickup truck. That's where they are on this 11-minute drive out to the country. We have no testimony to the contrary, none. We don't know how that went down.

We do know this, that when they got out there, it's Dustin Honken, not Angela Johnson, that's marching people out into the field. And after arguing all about whether there's a road there or not and whether or not it was there in 1993, here comes Steve Vest and says, Honken told me he marches these people out into the field, into the woods out of sight. That's what he said. Do you believe it? That's up to you.

Page 36

But it's consistent with the physical evidence in the case, isn't it? You remember the bodies? They're 75 to a hundred yards from the road that leads to the field in the middle of this wooded area.

And the silencer, all this talk as if Dustin Honken has a silencer strapped to the end of the gun when they go in the house, how do we know that? How do we know Dustin Honken doesn't put a silencer on the gun just before he uses it to blow away the heads of Greg Nicholson and Lori Duncan? How do we not know that? We have no idea. The gun certainly wasn't sold with a silencer. We all know that.

And then Dustin Honken comes back, and according to Steve Vest, here's the conversation: Angela Johnson has heard these bullets whether there was a silencer or not. She's heard them. And Vest says Honken says they're all fire crackers.

Well, ask yourself how that works. She's 75 to a hundred yards away from Dustin Honken when that shot or shots go off, so how does he know that? How do we know that?

Here's what we know. Honken comes back, and he takes the girls. Should she have gotten them out of there? Absolutely. That's the reason she's sitting in that chair. Absolutely. She was weak. She could have saved them. There's no doubt about that. Nobody is asking you to excuse that behavior; okay? You've already determined she's guilty for that. Could she have saved these little girls? Yes. She's

4041

regretting it now for the rest of her days. But she didn't do it. And Honken takes them back into the woods.
Page 37

You know, there's this talk about, well, what's Lori Duncan doing while Greg Nicholson's getting shot and what's Kandi doing while Amber's getting shot or vice versa? You know how fast this gun fires? It fires as fast as you can pull the trigger. That's how fast. Do you really think that poor Amber had even a second to think about what had happened after her sister just had her head blown off? I don't think so. Dustin Honken didn't hesitate to shoot these people.

And, you know, the evidence is that Angela Johnson's not physically with him when these people are shot. She's still back there at this car next to the road while these four people are being executed in the woods because she can't stand to be there.

Even the Terry DeGeus shooting, do you remember Vest's testimony about that? That was kind of bizarre. He says DeGeus pulls up and he sees Angela Johnson standing there, standing there, with Dustin Honken. Terry DeGeus is supposed to be deathly afraid of Honken. And instead DeGeus gets out of his car. He doesn't drive off. He approaches him. They have this discussion, and they're talking for a while.

And then Angela Johnson gets in the car. Well, you know what? It's November the 5th, 1993. It's at night, and it's probably pretty cold. And now that's supposed to be some

4042

kind of a sign, a sign, from Angela Johnson, some kind of mental telepathy going to Dustin Honken who would not have shot Terry DeGeus but for Angela Johnson getting into the car.

Do any of us believe that for a minute really, that Dustin Honken, the people that he shoots, six- and ten-year-old girls, with as much thought as he would give to squashing a

Page 38

mosquito, do you really think that he was going to hesitate to shoot Terry DeGeus until Angela Johnson got in the car? It's ridiculous.

And then what does Vest say? He shoots him several times. We know that from the medical evidence, right, Terry DeGeus gets shot? And then he beats him with a baseball bat according to Vest and then a shovel according to Vest.

And then Honken comes back to the car, wherever it is. We don't know where. Angela Johnson's still sitting in the car, not helping beating. She's supposed to have this horrible anger, this real fury against Terry DeGeus. Why? Who knows? Because he used to beat her up when they were together? They hadn't been together. They hadn't been together in years. He's supposed to be really angry that she's pregnant? That's the story. He's threatening to cut the baby out of her or some such nonsense, and so supposedly this is a retaliatory murder.

Well, if it's a retaliatory murder, she really doesn't play much of a part sitting in the car, and then here comes, according to -- again, according to Steve Vest, Dustin Honken

4043

walks over to the car, and what happens? She's surprised that he's bloody? Do you remember that cross-examination? I asked him, Well, how does that work she's watched this guy get shot, beat to death with a bat and a shovel, and she's surprised supposedly that he's bloody.

And it's really unclear whether she even watches that murder take place either. We know why Terry DeGeus was killed, and it had nothing to do with Angela Johnson having been beat up from him. God knows, you know, there may have been points in time in that relationship where she might have actually been

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3541 of 3592

legally justified in killing Terry DeGeus. Who knows? She never did. She never threatened him. She was afraid of the guy.

The reason Terry DeGeus got killed is because Dustin Honken decided he needed to kill him. This grand jury investigation was going on October the 27th. Terry DeGeus's buddy, Aaron Ryerson, gets subpoenaed. Angela Johnson gets subpoenaed. I find it remarkable, frankly, this idea that drug dealers would come in before a grand jury and instead of either doing what these two did, lying, or taking the Fifth, that they're supposed to come in and say, Mea culpa, mea culpa, I'm a drug dealer; let me tell you all about it. I mean, is that what we expected was going to happen?

Yeah, Angela Johnson lies. She says, You know what? I never saw Terry DeGeus use drugs, never used drugs with him,

4044

never saw him and Dustin Honken together. She's not trying to get Terry DeGeus in any trouble.

But Dustin Honken doesn't really care about that. He's already decided DeGeus has to go. And it's not the money. Terry DeGeus owes him $30,000. Terry DeGeus is using as much cocaine (sic) ingesting into himself as he is selling, and he's giving it to his buddy Ryerson for free.

And, frankly, Honken's not going to ever collect that debt. But Honken's not going to prison, and it's Honken's plan to kill Terry DeGeus. None of these people would have been killed but for Dustin Honken. He's the person that pulls the trigger in every instance or uses a bat or uses a shovel, and they're killed for one reason, so that he can keep himself out of jail.

Page 40

Does he use Angela Johnson to help him? Yeah, you bet. He uses her like all the other tools in his bag, his duct tape, his video camera.

I thought it was interesting, you know, when he wrote this letter to little Brandon, 14-year-old kid, Kathy Rick's son. Knowledge is power, Brandon, especially when it comes to women. The more you know about them and what they want, the more you get what you want, which is kind of his general attitude about women.

You'll recall that all at once he's engaged to this Melissa Freelander (sic) down in Arizona. He's got Kathy Rick

4045

pregnant, and he's got Angela Johnson pregnant, and none of them really know anything about the other one because this is a guy who pigeon holes his life. He's able to keep separate and apart various slices of his life from other people because he's a scheming, conniving, planning, evil guy. There's no doubt about it, and it's horribly unfortunate that Angela Johnson ever got involved with him.

It makes a difference whether somebody's killing somebody or aiding and abetting in the killing. This idea that it doesn't is ludicrous. We know that. We know it from the facts in this case. We know it from cases like Terry Nichols and Timothy McVeigh. It makes a huge difference, and it should in your punishment decision who's actually doing the killing and why.

And in this case there's a huge disparity between Dustin Honken and Angela Johnson. They're criminally equally responsible just like if they robbed a bank together, and you'll remember our discussion. But that doesn't mean they share in

Page 41

the same punishment. They don't.

Now, the murder of Terry DeGeus, just to be clear, you've already found substantial planning and premeditation on that. And, you know, it only makes sense. I mean, how is it possible that after these murders in July you would give her the benefit of the doubt that she didn't know that was going to happen, that Terry DeGeus was going to be murdered? And

4046

certainly she did nothing to stop that.

But again, it's not Angela Johnson egging on Dustin Hoffman -- Honken. That idea's ridiculous. Dustin Honken didn't need egging on. The only egging on he needed was a grand jury convening on October 27. That was enough egging for him. That's the reason why DeGeus, frankly, hung on as long as he did because they weren't investigating him until late October, so he got to stay alive.

And when it looked like DeGeus might roll because the pressure was going to come down, that was a risk Honken wasn't willing to take, and so he got rid of Terry DeGeus as well. That's Dustin Honken's decision, not Angela Johnson's decision.

There's a number of aggravating circumstances that you've already found, and obviously we don't need to talk about those. You're going to decide what weight to give those as you deem appropriate.

And then we have four nonstatutory aggravating circumstances. And, frankly, two of those are undisputed, the idea that, you know, more than one person was killed in a criminal single episode. Obviously that's true.

The other idea that these people were killed, certainly Greg Nicholson and Terry DeGeus, were killed because

Page 42

they were potential witnesses, that's the reason they were killed. That's absolutely the reason they were killed. Those aren't in dispute.

4047

There are two other nonstatutory aggravating circumstances I'd like to talk to you about, and one of those is not in dispute, and that has to do with the impact, the impact of these murders, on the families of the victims, Gregory Nicholson, Terry DeGeus, the Duncans.

In 20 years I've yet to see a situation where somebody died suddenly, suddenly, and family members weren't horribly affected by that death. You know, we all have people that love us. An eight-year-old boy hit by a drunk driver, he's as dead as if he were shot. A prostitute stabbed for her money, she's dead. There are going to be people that love those victims. And they're going to be hurt, very badly hurt, by what's happened to them.

But, you know, the number of people affected, how many people show up at your funeral, that really shouldn't be the measure of somebody's life. I frankly find it abhorrent, the idea that because somebody might have been a drug dealer or somebody might have been a wife beater, that that somehow means that their life was worth less than some little girl or somebody who was never involved in drugs.

You know, we were all made with our own frailties in God's image with an equal right to life. And when it's taken away, it's taken away. It doesn't matter. It doesn't matter who you were, and the people that love us, they're going to be affected by that, and that's happened here.

4048

And I'll apologize again on behalf of Angela Johnson for the pain and suffering that those people have been caused. They're absolutely needless deaths, absolutely. But you need to take that emotion for what it is. It is the deep suffering by people who have been affected by loss.

And you heard similar emotion in Angela Johnson's relatives coming in and through tears saying how this decision might affect their lives. There's a lot of people that are going to be affected by what happens here and have already been affected by what's already occurred back in 1993. We can't base a decision as jurors based on that kind of emotion.

You know, if that was the test, then it really would be a life for life, wouldn't it? You took a life; you should forfeit your life. And we all discussed that in jury selection, and we all agreed that's not the law.

If we did that, there would be nothing but a funeral with voters, and that's really not justice. I want you to take into consideration the suffering of the victims' families, absolutely. But if you're making a determination based on that, let me suggest that that's pretty arbitrary and unfair.

The other aggravating circumstance that I want to talk with you a little bit about is this idea that Angela Johnson, if she's incarcerated, is going to be a danger to the lives and safety of others. You know, that in my mind, that's a huge aggravating circumstance. Just think of it. She's 41 years

4049

old, and this woman could live for 3 more decades, and if she was really going to be a danger, really, if she was going to be

Page 44

a physical danger to a guard or an inmate, somebody's life in jeopardy, I think you'd have to give that some real serious consideration. Do you want to put other people in that position?

But what evidence is there of that? None, not one iota of evidence. She's been in jail for five years already, five years. And what harm has she committed? Has anybody been stabbed or hurt? She's been in two fights: One, a pushing match and the other one, she punched a gal. And we don't know even now as we stand here whether these gals got disciplined for the same fight that she got disciplined for. But we know neither one of them were hurt.

You heard Harvey DeSotel, the senior sergeant, come in -- he's watched her for almost four years -- say, Look, she's a typical inmate. She's become institutionalized. You know, if you're going to be in a jail like this so long, most of these folks aren't there for three years. They're there; they're waiting for trial; they hit the road. Or they come in, and they get convicted of a misdemeanor, and they do their 30, 60, 90 days, and they're gone.

She's been there for three years, and he told you what happens. These women, they treat this like their home. This is where they live. They want it clean. They want it neat. They

4050

want it orderly. They get used to a routine.

And when some woman comes in, some kind of a crack head who's on methamphetamine or heroin and is kind of strung out, some young gal comes in and, you know, she doesn't care, well, there's going to be some conflict. They don't get to go out. They're stuck in there. There's no work programs. You

Page 45

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3547 of 3592

know, they sit around all day. It's a frustrating existence.

In five years of that now, five years, she's had two fights, a pushing and a punching. That's it.

So what evidence does the government counteract this demonstrated history of peaceful behavior with? They bring us Mike Mittan and this guy Duane White, Duane White who's a real drug guy and Mike Mittan who's posing as an undercover drug guy. And they decide in March of 1998 they're supposed to collect debts, drug debts, for Angela Johnson, and they spend six months videotaping her, audio taping her. And you saw the best that they got. That was it, a discussion about Jimmy Rodriguez owes her $1,200. He didn't pay for some methamphetamine she fronted him, $1,200.

Dustin Honken was doing $200,000 a year in his methamphetamine business. Do you remember Greg Nicholson saying, I was 100,000 last year, so was DeGeus? He's manufacturing methamphetamine at $2,000 an ounce is what he told us and pounds and pounds of it. And Angela Johnson's big sale, two sales, 600 bucks apiece. Did you hear any other numbers?

4051

Maybe I missed them. That's what I heard.

And her big crime, her big threat is that she said, Bring Jimmy to me, whatever that means. Was Jimmy supposed to get hurt? I didn't hear anybody say they were going to hurt him. He certainly didn't get hurt. That's for sure. Nobody got hurt.

This gal they're talking about, this 18-year-old, where is she? Where is she? She supposedly got beat up. Where the heck is she? Nobody got beat up. You know, she talks to these guys like she's some big wig John Gotti wants to hire as a

Page 46

hit man. She supposedly has an Uzi. It's nonsense.

This idea she's got duct tape, they can't even get the cars right. They got her in two different cars, and God knows which one's got the duct tape. And they wrap drugs with duct tape after all if you'll recall. Does she have any money in her bank account, Detective? I don't think so. She's still working full time as a waitress, this big drug dealer? Yeah, still working full time supporting her daughters. She's a waitress. Does she have any visible assets at all? None. So that's Mike Mittan and Duane White.

And then we have Kathy Rick come in, Kathy Rick, Dustin's other girlfriend, and she says, Oh, Angela's threatened me. I've called the police on her. She's threatened to throw a brick through my house.

Has anything happened? Did she ever throw a brick

4052

through her house? No, nothing. You know, it isn't terribly surprising that these women wouldn't be exactly best friends, Kathy Rick and Angela Johnson. They're sleeping with the same guy. Every time I ask Kathy Rick, Hey, you know, when Angela Johnson threatened you that time, were you still sleeping with Dustin? I can't remember. Maybe, maybe I was.

She was never so afraid of Angela Johnson that she stopped sleeping with her boyfriend Dustin Honken, was she? That never happened.

And even when they're actually next to each other, this little meeting they have at the bank parking lot, not even a slap exchanged between Angela Johnson and Kathy Rick, nothing.

What does our buddy Steve Vest tell us about Kathy Rick? Well, according to him, according to Honken, Kathy Rick

Page 47

was ready to sign up to help Honken kill people including her. Do you remember him saying that? That's probably nonsense, frankly, but it isn't surprising Kathy Rick and Angela Johnson wouldn't exactly get along being pregnant with the same guy unaware of each other.

And so then we have Alyssa Nelson, Dustin Honken's sister, and a lady by the name of Jennifer Rinden Clark who is an attorney, and Miss Clark comes in and says Angela Johnson during Dustin's sentencing was talking in the elevator and said, Somebody's going to pay for this, or some nonsense like that. And Angela Johnson supposedly threatens law enforcement

4053

officers. What I heard was she said some very disparaging remarks to a female CSO. You remember that.

And I asked Alyssa Nelson, a probation officer, Well, Miss Nelson, you deal with people that are strung out on methamphetamine all the time. Did this seem consistent with methamphetamine? Yeah, sure did. That was her danger is that she was strung out on methamphetamine and appeared at Dustin's sentencing hearing. That was the big threat there. Anybody hurt? Anybody injured? No. No.

And then we had Kyla Davis, another witness for the government, threatened by Angela Johnson. That was the young lady that came in in the kind of halter top and studded belt and she had been a dispatcher back in 2000 at the Benton County Jail. She had saw her on the monitor that Angela didn't have her pants on, you know, her uniform pants, and so she said, Put your pants on.

And Angela puts her pants on, and then she says to this woman, you know, I had them on. She lies. Kyla Davis

Page 48

says, You shouldn't lie to us. Angela Johnson says, What are you going to do about it? And then Kyla Davis says the only thing that really she knew would get her upset because the only thing that mattered to her were her visits from her daughters, and she says to Angela, you know, You really want your family to be able to visit with you.

And so Angela Johnson says to her something like, I'm

4054

going to get you; I'm going to find out where you are; you're dead. That was the threat.

Did Angela Johnson get punished for that? No, not even disciplined. Nobody thought that was a big deal except for Kyla Davis. And you know why? Because real guards, real jail guards and real prison guards, they hear this crap all the time, all the time. It's nonsense. Kyla Davis wasn't in any danger. She never was. This was a little spat that they got into, the two of them. But that's supposed to be evidence of future dangerousness.

The Department of Justice own statistics, their own statistics, go against them here. Did you hear Dr. Cunningham? There's not one single reported instance, not a single one, of a guard or an inmate in a women's federal correctional institution having been killed -- hasn't happened -- that women have dramatically lower instances of violent and aggressive behavior than men when they're in prison; that as we get older into our 40s and 50s, the incidence of violent behavior, aggressive behavior goes down even lower than the rare instances that happened earlier because we all kind of mellow out, not surprisingly; and finally that people that have life sentences, they've got the lowest risk of violent or aggressive behavior of

Page 49

anybody.

And that sort of seemed counterintuitive to me, but it makes sense, because these are the people that have to live in

4055

the jail. They're not going to get to get out, and so losing your privileges to see your family or make telephone calls, that means something to them, and these folks that are just passing through, it's not a big deal.

And so people in exactly the situation Angela Johnson is in, life sentences, they're the lowest of the low. There's just no evidence at all, none, that she's a future danger to the lives and safety of other people.

And let's be clear. We mean future danger, lives and safety to other people, not are you going to have her over for dinner; okay? This language that she uses on the tapes, none of us endorse that. These drug dealers, they swear at each other. She's not Mary Poppins, but that's not why they're asking you to kill her; okay? This isn't about an aggravating circumstance would you like Miss Johnson over for dinner. There aren't a lot of Mary Poppinses, frankly, running around in federal penal institutions. They just aren't there.

It's just like Harvey DeSotel said. This is typical. This is how these women are. They swear at each other. They use bad language. It's not unlike being in the Navy. That doesn't make you a future danger.

She likes to boast about how tough she is. I'm tough. And, you know, Dr. Hutchinson talked a little bit about that. Do you remember? You know, when you're getting beat up like these kids were when they were little, the kind of stuff they

4056

Page 50

endured from their mom, at some point you've got to make a decision, and the decision she made was I'm going to be a tough gal because if I act tough, then I'm less likely to be abused; I'm less likely to get picked on in school; I'm less likely to get beat up; I'm less likely to have these problems.

And, you know, she's a big gal now, but she wasn't always. There she is in her 20s, and we know when she was a child she got all kinds of problems. So she acts tough. That's not future dangerousness.

What we really know about her prison incarceration is that she has positively affected the lives of several women, and we brought them in here so you could hear them.

Dawn Hanawalt, do you remember her testifying? She was a woman like so many of these poor women that got involved in methamphetamine. She called it the devil's drug, took her away from her kids, and she said, I got in jail with Angela. I was with her for months. When I walked into the jail, she said, They told me, you know, you should stay away from her. She's a murderer.

And instead Angela Johnson's the nicest person to her in the jail. She doesn't have any money on her books when she first gets there. She needs shampoo and deodorant and T-shirts. Angela gives it all to her. She's afraid she's just sitting around in her cell. Angela gets her involved in Bible study, gets her involved in drug treatment, and she went on, and she

4057

was in this drug treatment class when she came in here. She gave up three months in the penitentiary to come and testify. She was due out in November. That's not going to happen because

she was here.

That's a woman who told you that the best part of her day in the dull existence of the Linn County Jail was at night when Angela Johnson got telephone calls or called her children, and that was like sunshine in her cell.

Sue Marsolek came in, and she said the same thing: I wasn't going to be involved in these programs. Angela Johnson's 20 years out of school doing self-study to get her GED. Sue Marsolek says, You know something? I had a pretty bad relationship with my kids, and I learned how to be a better mother being around Angela Johnson. That's what she said.

And what about Brandy Byrd? This poor girl gets locked up for murder. They put her in the cellblock, and the guard's response when she picks out a cell at the end of the row, You're too dark to be down there. We can't see you down there at the end.

And so they bring her up, and they put her in with Angela, and they spend 19 months together. Brandy Byrd never had any money the whole time she was there. She didn't have any family. She didn't have any friends. This poor girl from South Carolina, she had nothing except for Angela Johnson. And Angela Johnson shared with her all about her kids and how much she

4058

loved them.

There was talk about those little books that Angela would make for Marvea that she'd send home, all these letters and telephone calls, and Brandy Byrd said she treated me like a son which is kind of an interesting description.

Brandy Byrd had to go to trial. They put her in isolation. Angela volunteered to go down there with her so she

Page 52

wouldn't be all by herself. That's the kind of prisoner that she's been, not a future danger. She's had a positive influence on people's lives, and you should be able to expect that to continue if she receives a sentence of life in prison without parole.

I want to talk a little bit about remorse, but let me first contrast what I've just told you about Angela with Dustin Honken. You remember what Steve Vest told us about Dustin Honken's behavior in prison? Dustin Honken, while he was coming up for trial in Sioux City, was going to subpoena a bunch of other inmates. Why? So that when he got to the jail, he could enlist these buddies of his to break out. That was their plan. And then they were going to kill guards if necessary, prosecutors, maybe even the judge.

And you remember Vest talking about they were going to steal cars and rob banks, go up to Canada for a year, come back, kill prosecutors, law enforcement officers and their family members, make bowls out of their skulls. That's what I heard

4059

him say. That's Dustin Honken. Do you think if a jury heard that testimony they might be concerned about Dustin Honken being a future danger to the lives and safety of other people while he's in prison? Might that have made a difference in his case?

The prosecutor doesn't want to admit that Angela Johnson has remorse even though they did that, they did it in closing argument in the first phase because, you know, that shows she has a conscience, and that makes her different than Dustin Honken also. But she does have genuine remorse, and we know that from several different sources.

First, we do have the confession to Miss Gaubatz,

Page 53

Christi Gaubatz. She actually calls her up. That isn't a chance meeting. She calls her up and says, Come over, I've gotta get this off my chest, and then she bawls her eyes out telling her about the murders.

Well, she doesn't say, I'm sorry. That's their complaint, that somewhere in there you were supposed to say, I'm sorry, that the crying and bawling and confessing to five murders isn't enough remorse. You gotta say you're sorry or it doesn't count I guess is the position of the prosecution. It's nonsense.

The first time she gets visits while she's incarcerated from her sister Wendy and her sister-in-law Shelly, she's already been told by her lawyers, Keep your mouth shut; don't talk about the case. And what does she do? She starts

4060

bawling and crying through the glass. "I lured Terry DeGeus" is what she tells them before they stop her to get out of there. That's not remorse apparently.

She's on antidepressants from the minute they evaluate her at the Benton County Jail. We know that. Dr. Logan testified about it at length. She has these bad dreams about Terry DeGeus, so she confesses to Christi Gaubatz about him as well, that she can't take it anymore, it's getting to her.

And then in the Black Hawk County Jail, she tries to kill herself. Now, there were a couple things going on there. One is she can't have visits from her daughters there. They're too young. She's been able to see them, and that's clearly the most important thing in her life.

But the other thing going on, just like the prosecution alleged, they're digging up the bodies. And soon

Page 54

she's not going to be able to hide what she's done. She's going to have to acknowledge that she participated in these crimes, and that is literally killing her.

Now, they want to say, Well, no, that's not it. She was really worried that this was going to implicate her. She's already in jail. She's in jail. She's already confessed to Christi Gaubatz. She's already charged with murders. She's already confessed to Robert McNeese. She's already talked to Sara Bramow. She's already in a world of hurt.

But when these bodies get recovered, she's going to

4061

have to confront what she did including these children, and she can't handle that, and she tries to kill herself.

Now, that is a conscience. When the lieutenant comes by to see her, she's out of the ICU that night and he says, Well, Miss Johnson, are you okay? Did you break anything? You know, you tried to kill yourself. Yeah, I broke -- I got a broken heart is what she said.

Remorse is important. Tom Miller admitted it in the closing argument. They want to deny it now. But it's important because we know she has a conscience and that that's a redemptive quality.

Do you think for a minute Dustin Honken thought about killing himself before he made these plans to kill Angela Johnson, Dan Cobeen, these judges, and law enforcement officers, escape out of jail, make skulls into bowls? Do you think there was any thought that he was sorry for what he had done? And that too differentiates them.

You know, life without parole, it's a long time. She's 41. It's been over ten years now since the crimes. In

Page 55

another 10 years she'll be 51. Her daughter Marvea will be 31 -- I'm sorry. Alyssa will be 31. Marvea will be 21. Angeleah by that time I guess will be 13. She'll have gone through grade school and junior high. Alyssa might be married by then and have more kids. Marvea might be out of college by then. And in ten years Angela Johnson will be still sitting in

4062

a cell in a federal penitentiary having missed all of that, and she will have only herself to blame, and she'll know that by the actions that she did with Dustin Honken she's caused herself to miss that.

In 20 years, hopefully I'll be retired. My boys will be in their 30s and maybe have kids of their own, and her Alyssa will be 41, the same age she is right now. Marvea will be 31, and she'll undoubtedly be married and have kids by then. And Angeleah will be in her 20s. There will be a lot of birthdays in there she'd have missed. Her parents might have died. She won't go to their funerals. And she'll still -- 20 years from now, she'll be sitting in a federal penitentiary in a cell. The rest of us would have long gone on with our lives.

Thirty years -- that's not unrealistic -- she'll be 71 in 30 years. People live that age regularly, more. Alyssa, her daughter, will be 51 years old. She might be a grandmother by then. Marvea in 30 years will be 41. It's hard to believe. And even this little granddaughter of hers -- and there will be more granddaughters by then and grandsons. All those picnics, times in the park, family get-togethers, none of that will have taken place for her because she put herself in a situation to lose that.

And she'll be -- still 30 years from now, she'll be

Page 56

shuffling down the corridor of the federal penitentiary or sitting in her cell in 30 years. That's a long time. It's a

4063

severe punishment. It's a severe punishment to know you're going to take your last breath in jail, your last breath. That's never, ever going to change.

I want to talk to you a little bit about the mitigation evidence in the case. You know, I thought I was pretty clear when we had the opening statements about the purpose of that mitigation evidence. I never, never claimed that I was going to tell you about her background and this abuse that's happened to her as some kind of an excuse for the murders. It is no excuse. I could say that a hundred times. The time for excuses was back in the first phase. That was your time where you'd come in and you'd say, Hey, I'm crazy or these murders took place in self-defense or whatever it is that you're going to contend. We didn't even pretend to do that. That's not the purpose of that evidence. It's not an excuse. It is an explanation for what her life has been.

You remember I used the analogy of the egg carton? Well, we know now that the egg carton that Angela Johnson was in, there was four other people in there: Her sister Wendy, her sister Jamie, her brother Jimmy, and her little sister Holly. And what we know from the evidence is, boy, that egg carton, it got dropped a lot. And those people told you those tales, the horror, and I'm not going to go back over that. Even though we've had a break, you're going to remember that testimony.

And the question becomes, you know, what does that do

4064

Page 57

to people?  What kind of effect does that have on you later in life?  We know that Angela, she was on the bottom of the egg pile most of the time.  She decided she wanted to resist these bizarre religious practices, that she wasn't going to go along. Her brothers and sisters learned pretty early on, look, you burp or you do something, and you pretend the demon has left you. And she wouldn't play along.

And Wendy told you through tears what that meant. That meant we're going to have the demon exorcism.  That means adults when you're six, seven, eight years old are going to hold you down on the ground by your arms and start singing in tongues and hit you in the head with the Bible and all the pulling in the world isn't going to get you free.  All the screaming isn't going to help you.  And there's nothing that any of your brothers and sisters could do.

And the one person in the world that's supposed to protect you from that, your mother, is the one that's doing it to you.  She's the one.

And Dr. Hutchinson talks about later, you know, there's no father figure in her life.  And that really caused some problems because later when she grew up, the one thing she valued in men above anything else, above all else to the exclusion of everything else, was that you better be a tough guy and able to protect me.  And that's what she looked for.  And that's how she finds these characters like Terry DeGeus and

4065

Dustin Honken and Robert McNeese.

It's important to hear this evidence because you told us at the beginning it was important because it isn't all about

Page 58

the crime like they claim. You know, if that were true, we wouldn't have a penalty phase. We could just say, Hey, look, you've killed children; you participated in the killing of children. Even if you did have a minor role, that means death.

That's not what the law says. We talked a lot in jury selection about punish the crime, punish the individual. You remember it was even on your questionnaire. And every one of you remember this, me asking you, hey, look, fast forward, imagine she's been convicted, intentional murder, five murders, children. You remember that? I said even there, even there could you realistically consider a sentence of life in prison without possibility of parole? And without exception every one of you said yes.

And then I said to you, hey, what about mitigating circumstances, no prior criminal record, lesser role in the offense? What about evidence of her background as a child? What about being abused and neglected, sexually abused, physically abused? Would you be willing to consider that as evidence in making a decision about punishment? Yes. Everybody said yes.

Why is it important? Because it explains how Angela Johnson got from being a 4-year-old, 5-year-old, 6-year-old

4066

terrified little girl constantly subject to abuse and terror to dropping out of school in the ninth grade because she's working with her mother instead of earning an education and then using drugs and getting married at 16 just to get out of the house and then getting involved in a relationship with a very, very strong guy who just beat the living daylights out of her all the time and that she really didn't think she deserved any better than

Page 59

that because she never had gotten anything better than that. That was perfectly acceptable that she'd get beat up and return to this guy again and again and then addiction to methamphetamine and then Dustin Honken and then murder.

You know, those of us who've had children, can you imagine even for a minute walking up to your child and just cuffing them in the side of the head for no apparent reason without any warning or deciding that they needed to spend a few hours in a prayer closet? Could you imagine on your worst day lining up your children, lining them up because, you know, they're not going to confess, they're not going to point out which one had the horrible crime that they spilled something on the rug or whatever it was? They won't do that because they have at least each other, and they're not going to snitch out each other, and that's a trait that Angela Johnson carries with her to this day. And then so what happens? Their mother takes the belt to the first one while the rest watch, and then you wait for your turn.

4067

We spend so much time as parents trying to keep our kids away from watching violence much less experiencing it. And why do we do that? Because we innately know that's not a good thing. Only bad things can happen from that; only bad stuff can happen. People get affected permanently.

It's not just Angela Johnson that has cracks in her egg. You know, none of these people are right. None of them are. They're all damaged people. And they make bad choices. That's the problem when you're damaged.

We got some examples from Dr. Cunningham about this idea about choices because, you know, that's the big pitch.

Page 60

Everybody has a choice. Well, you know what? That's true. You do have a choice. You have a choice not to engage in criminal conduct. And if you do, you're guilty. I agree with that; okay? But does that mean we're not going to decide in assessing punishment what your background was, what choices you had?

What about this idea that if you're the child of an alcoholic, somebody who abuses alcohol, you're five times as likely to become an alcoholic? That's statistically proven.

So now you're an adult, and you choose to drink, and now you're a drug abuser or an alcohol abuser. Did you have a choice? Yes, of course you had a choice. Was it the same as somebody that didn't have parents who were drug abusers or alcohol abusers? Well, statistics would say no.

What if you were abused as a child, sexually abused?

4068

We know these sex offenders we deal with in our courts all the time, a lot of them were sexually abused as kids, way higher percentages than the norm. Does that really mean that when you grow up you don't have a choice to abuse children sexually? Of course not. Is it the same choice that you were sexually abused when you were a kid? Is that the same choice as somebody who grew up in a loving, caring home? It's not the same.

And where is that important? It's important in punishment. Yeah, you made the choice; you committed the crime; you're guilty. But in punishment, we're going to look at the factors that you had to overcome to make those choices. That's only fair.

Then the prosecutor talks about some inner city kids that are deprived of -- I don't know, whatever they're deprived of. Well, that apparently counts. Well, what about kids that

Page 61

are beaten all the time, that don't know whether or not we're going to be fasting tomorrow? Tomorrow might be a fast day. I wonder how that works. Jim Johnson describes his childhood. What does he say? It was a state of siege. That's what it was. That's what he grew up in.

Dr. Cunningham talked about choices. That's the choice for most of us. You know, we don't have this stuff, damaging or impairing factors. That's not a problem for most of us. And so our choices are pretty clear. And if we decide we're going to commit a crime, I go out and murder somebody,

4069

boy, I'm not going to have some kind of reason that I could explain to you that my parents kept me in a closet for hours and I never got whacked in the side of the head for no reason. I've got no explanation. I've got nothing. That was a conscious decision. I had a choice, and I had no damaging factors.

And here's Angela Johnson. Here's the list. You know, I'm not going to go through it. You heard -- you heard her brothers and sisters talk about it, what it was that they went through. Her mother was just on the wrong track. Why would you pull kids out of school in the ninth grade to work in a restaurant full time?

Even her son Jimmy's away in college, and she's trying to lure him back. And he says, The only thing that saved me was I had coaches, I had football, I had friends, and I didn't go back, and that kept me sane. And now he has nothing to do with the woman, won't even talk to her. His kids don't know their grandmother.

What does that do? This is what it does. Do you still have choices? Yeah, you bet you do. You know, you still

Page 62

got a choice not to use methamphetamine I suppose. But if you're starting off and you're using drugs at 13 or marijuana and alcohol at that age and that's what you've been subjected to, your choices kind of diminish. You're damaged. That's what you are, and that's not going to change.

That does not excuse conduct; okay? That doesn't mean

4070

that you're not guilty. But it is a factor that you should be assessing in punishment because that's part of the person that you're looking at. And this is about the person in the courtroom. That's what it's about.

Now, you know, they're going to come up and say, Well, these Johnsons, they didn't all kill anybody, did they? Wendy Johnson didn't kill anybody; neither has Jim; neither has Holly; neither has Jamie. And they are damaged, no question about that. And that's true. They didn't. Just this one.

Those sexual predators, the sex offenders we talk about, they don't all grow up to be sex offenders just because they were sexually abused, but a lot of them do.

The parents that drink or use alcohol and drugs or are alcoholics, not all their kids are going to grow up to be alcoholics, but a lot of them do. And so there are choices, and there are choices. And they're not all the same for all of us. That's what that evidence is about.

You know, I bet there's not one of you here that would let your child spend one night, not a single night, in the house that that woman was raised in. I sure as heck wouldn't, never. And, you know, when you're going to make a decision about whether or not to kill her or spare her life, you should at least know the person that you're dealing with. You should know

Page 63

what her history is and what her life's been like to this point. I think that's only right, and that's why you should be thinking

about this evidence. It's not an excuse.

You know, we talked about this in the opening. You're each judges now. You don't get to wear the robe, but this is a different process now. We're not making the decisions we made before as a group. Now it's on you. You're going to look at this list of mitigating circumstances, and you're going to decide this is what I think, Mr. Berrigan. I think these have been shown to a preponderance of the evidence, maybe these haven't, and I'm going to give them this weight or that weight.

And you might find that one of your fellow jurors agrees with you or disagrees with you. And you know what? It doesn't matter. The aggravating circumstances, yeah, you all have to agree on those or you can't weigh them at all.

So, for example, you don't find substantial planning and premeditation on the July the 25th murders, nobody should be weighing that, nobody at all. That's already been decided. This weighing process, it's not a group. It's you. You decide because you're going to live with this decision the rest of your life just as this woman is.

There's also the idea that the law in this area, it doesn't require you to agree. That's different than any other area of the law. And the reason that is is because if you're going to go through the agony of making this determination, whatever it is, one way or the other, your fellow jurors should respect that decision. And there shouldn't be anybody that

Case 3:09-cv-03064-MWB-LTS   Document 284-71   Filed 06/23/11   Page 3566 of 3592

feels like they gotta be coerced from a position that they hold because somebody else doesn't like it because what the instructions tell you is any one of you can say, any one, it's going to be life or two or three, and the law says we respect that decision. That's what Congress intended.

So when you're going to make this momentous decision about life or death, in a large sense, you're the last vote. And you're really making it alone.

I'm going to sit down in a couple of minutes, and I want to talk to you a little bit about mercy. You know, the prosecution gets to come back up, and I would love to do that. I tell you, to be able to have to sit there and listen and not be able to respond is a difficult thing.

They've made some points that I should address before I sit down. The idea that Tim Cutkomp is afraid of Angela Johnson and not afraid of Dustin Honken, it's ludicrous. The person that's going around killing people here and planning to kill people is Dustin Honken. This idea that Angela Johnson has some kind of mystical control over Dustin Honken, what is the evidence of that? What is it, because I haven't seen it?

The prosecutor says that Angela Johnson, despite an abusive childhood, is living a normal life. Well, I guess it all depends on your definition of normal. But I don't think there was anything normal about dropping out of school and working with her mother, getting involved with drugs at the age

4073

of 13, getting married at 16 just so you can get out of the house, and then getting in a relationship with Terry DeGeus where you regularly get beat and put out at the side of the curb, literally put out at the side of the curb to the point

Page 65

where Doug Book who's known you his whole life can't recognize you because of the bruises and swelling on your face. I don't think that's normal.

He said Angela Johnson didn't get to decide Terry DeGeus's sentence, his death sentence, because he beat her. He wasn't killed because he beat her. If he had been killed because he beat her, it would have happened a whole long time before 1993. She never retaliated against that guy, never. He was killed because he was going to testify against Dustin Honken.

The idea that intentional murder of children cannot be mitigated, well, you know what? That's not what the law says. That's not the law. When we were talking about these books, that is the intentional murder of children, and we're still here talking about punishment.

And that's the only sentence that they can point to really that could possibly justify death, isn't it? How could Dustin Honken get a life sentence for killing Terry DeGeus and they ask you for death on Angela Johnson? How does that work? How could they possibly argue for death for the deaths of Lori Duncan and Greg Nicholson when Dustin Honken got a life

4074

sentence? Does that make any sense to you at all? No.

It has to be the kids, doesn't it? That's all they have. And they don't want you to look at anything else. That's all you look at. Children are dead. It doesn't matter you didn't pull the trigger. It doesn't matter you were 75, a hundred yards away. It doesn't matter you didn't know before you went to the house that night the kids were going to be there. It doesn't matter you weren't strong enough to stand up

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3568 of 3592

to this guy and save kids, and we don't frankly care what your childhood was about or whether you were put in closets or what kind of pain you suffered or was inflicted.

It doesn't matter to them, but it should matter to you because if you're not looking at this mitigation evidence, then you're abdicating your responsibility as jurors frankly, and you're certainly going against what you told us in jury selection. That's what you're doing.

Now, here's the advantage of getting back up here in a minute and talking for as long as he wants and I can't come back, and this will be my last chance to talk to you about saving this woman's life.

But we have an advantage. We, the defense, have an advantage, and the advantage we have, it's the law. It says to you, each and every one of you, you know what? No matter what you come out with on this weighing process, you don't have to -- you don't have to vote for death. You never have to do it. It

4075

doesn't matter what the weighing process is. If you don't want to vote for death, you're not required to. That's what the law says. You can always give life.

And you gotta figure that if 1 or 2 or 3 people can do it in a group of 12, that sort of favors life, doesn't it? But that's what Congress intended, so you could decide you know what? I'm going to exercise mercy as to this woman. That's a concept we don't usually deal with. You know, we don't usually have an opportunity, particularly over somebody's life, to exercise mercy as human beings. That just doesn't happen because we're not often in the position, hardly ever, in our lives of deciding whether somebody gets to live or die.

Page 67

And many jurors, many came in here and told us in the jury selection process, I can't do that. Mr. Berrigan, if you're telling me I'm going to have to decide whether somebody lives or dies, that's not my province. That's for somebody higher up. But it is your responsibility. That's where you are. And so you have the ability to exercise mercy if you want.

Prosecutors tell me all the time, well, you know, that'd be one thing if we had some woman that had stolen some bread to feed her kids or maybe some elderly man who had helped his wife commit euthanasia because of the horrible pain the cancer was inflicting and she was sure to die. You know, those aren't the people that need mercy. Mercy isn't for those people.

4076

When they're talking about in the Beatitudes, you know, blessed are the merciful, they're not talking about giving mercy to people that haven't sinned. They're talking about the sinners, the people who've failed, the criminals, the murderers.

And it doesn't mean forgiveness necessarily because you could decide, you know what? I can't forgive these crimes. It's compassion. That's what it is. And it comes from the best places in our heart. And you can do that or not as you deem to.

Angela Johnson you know from this trial, she believes in God. We heard a lot of talk about that. And so she's hopeful some day and maybe sooner than later when she meets her maker that he'll be merciful on her.

But in the meantime, that belief gives her strength, and it makes her a better person. That's one thing about religion, no matter what religion you are. If you believe in a higher being, it makes us want to be better people, and that's

Page 68

what she wants to do.

She wants to be a better daughter to her mother, Pearl Jean, a better daughter to her father, Jim. She strives to have a closer relationship with her brother Jim and her sisters.

And most of all, most, more than anything, she desperately tries to be there for her daughters, Alyssa and Marvea, even in jail. She wants them to grow up not making the mistakes she made. She wants them to be successful, productive, happy people. And she's trying very, very hard to do that, and

4077

you know that from some of the testimony that you heard in the penalty phase.

You might decide, you know, I can't -- I can't do that for Angela, but you could do it for her father. You could exercise mercy for Jim Johnson who blames himself every day because he wasn't there to protect his kids when they were being abused and tortured by his ex-wife.

You could do it for Jim, Angela's brother, who still, still, isn't right, big strong football player up here crying, has nightmares.

You could do it for Wendy. You could do it for Jamie. You could do it for Holly. Her sisters are going to be around. You could be merciful to them. You could do it.

You could be merciful for Alyssa and Marvea. Alyssa needs her mother. She needs her desperately. And Marvea is already going to lose one parent as a result of this, and she surely doesn't need to lose another. It's in your power to do that if you choose.

I hope that you will. I hope you'll do it for Angela. I hope you'll do it for her family. I hope you'll do it for

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3571 of 3592

yourself. Ten or fifteen or twenty or even twenty-five years from now when we're a little closer to meeting our maker, we're going to look back on this day, and you're going to realize that this, this day here, this was your finest hour. You literally had the life of this woman in your hands, her whole life, and

4078

you could have crushed it, and you chose life. You choose life over death. You chose hope over despair. You chose mercy over vengeance.

God bless you all, and thank you for your service, and Godspeed in your deliberations.

THE COURT: Mr. Williams? Why don't we give the jury a stretch break before your argument.

Please be seated.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

Defense asks you to sentence the defendant to life in prison without parole. He talks about 10 years from now she'll be 51 years old and 20 years from now she'll be 61 years old and so forth and so on.

Those victims have been dead for 12 years. This defendant has lived for 12 years after being involved in the murder of 5 people.

Ten years passes from now, and Kandi and Amber will still be dead. Twenty years will pass while Angela Johnson's living in prison, and Lori Duncan will still be dead. Thirty years from now, Kandi Duncan will still be ten years old, and Amber Duncan will still be six years old.

No matter how small Angela Johnson's cell may be, it's going to be larger than the coffin that Amber and Kandi Duncan

Page 70

are laying in now. I make no apologies for focusing on the

4079

murder of those kids. That was the facts of this case. They are horrendous facts, and they are facts that justify the imposition of the death penalty in this case.

If you send Angela Johnson to prison for life without parole, you are sending her back to her room. You heard the defense evidence. She's institutionalized at this point. She's quite comfortable in prison. She knows what she's doing at this point. She has her TV. She can control her cells, control her other cellmates. Sending her back so she can go back to the institution that, as the defense themselves said, is home to her is not punishment for the crimes that she committed.

Now, it's interesting that, as you would expect, the lawyers are in a position of painting basically two different pictures. What I was trying to describe to you is the Angela Johnson who manipulated her way to the top of the Honken organization, who constantly pushed and pressured Honken to get with it and make that methamphetamine so she could get her money back, who has kept pushing Dustin Honken after he was caught again in 1996 to kill again, and that's the image that I asked you to accept.

The defense gets up and gives you a different image of her and what her role is and that Dustin Honken was the one in charge and so forth. I'm not going to go back over that stuff. That's for you to determine.

But I ask you to look very carefully at the evidence

4080

Page 71

and consider all the evidence and ask in your own mind what picture do you see? Angela Johnson, the unwitting, innocent person who gets duped into killing or the Angela Johnson who's violent, who's pushing, who's cajoling Dustin Honken to commit these crimes?

Defense spent some time with you talking about this abuse that she suffered as a child, and defense counsel says over and over again it's not offered as an excuse, it's not offered as an excuse, it's not offered as an excuse.

Of course it is. Of course it is. Listen to what he said. Why am I talking to you about this? Because it explains her choices. It explains it. It excuses her choices. She didn't have the same choices as other people, so, therefore, take that into account. It's the old abuse excuse that we get.

Aren't we tired as a society already of people not taking personal responsibility for what they've done? You think there's a defendant facing a capital case that doesn't have some excuse, doesn't have something in their background they point to to excuse, to differentiate themselves from other people and to explain their behavior?

But you know what the defense did not do and they had the opportunity to do it with all those experts? They never once put an expert up there to explain how any of this affected her state of mind whatsoever at the time that she engaged in these murders. They gave you a bunch of statistics.

4081

I mean, you know, part of the problem here is this is an interesting slide by Dr. Cunningham. But you know what? In life gravity isn't around. He implies that there's a trajectory. In fact, I think he uses that word trajectory of

Page 72

downhill slide. He uses this bridge, and he puts all these things on there suggesting at some point it's going to collapse. That's just not so. In life there isn't this other factor applying as he has in his graphs, and that's gravity.

What we have in reality is free choice, God-given free choice that differentiates us from other people. It's that ability to make the decision to choose at that point whether to participate in a crime or not that distinguishes the murderers from those who don't kill.

There's a lot of statistics about, you know, people that grow up with alcoholic families or parents and so forth, statistics about people that are abused and how often they get involved in this stuff. Statistics are interesting. Mark Twain is famous for saying that there are three types of lies. There are lies; there are damn lies; and there are statistics. And the point to be made there is you can do whatever you want to with statistics.

The fact is despite the statistics as the defense understands and admits, in that same household there are other children who grew up, moved away, got jobs, got married, live normal lives, didn't kill.

4082

And defendant's own conduct belies those statistics because if it is this inevitable downward trajectory that Dr. Cunningham talks about, it didn't happen with her. She didn't -- she wasn't a juvenile delinquent. She didn't get involved in criminal activity. She didn't harm other people.

It wasn't until she was 28 to 29 years old when she was old enough to know exactly what she wanted, and what did she want? Money and drugs. She knew exactly what she was doing.

Page 73

She chose the route she took. It wasn't inevitable. It wasn't a trajectory. It wasn't something where she had a downhill slide and didn't have that choice.

She absolutely had the choice, and she chose money. She chose greed. She chose selfishness. She's thinking about herself and her own children when she holds those children for Dustin Honken to come back and kill.

Defense talked to you about lack of future danger in this case, and, you know, the best predictor of future behavior is past behavior. So just look at this case and think about the past behavior this defendant engaged in.

She has a history of violence. She has a history of killing, being involved in the killing of four people, of months going by, plenty of time to reflect and killing again. She has a history of killing federal witnesses that show no fear of the law and no fear of authority. She killed Terry DeGeus out of mixed motives.

4083

You think about it. The defense asks how can we ask for the death penalty when Dustin Honken didn't get the death penalty on the three adults. Well, the fact is you don't know what the evidence was that was shown to the Dustin Honken trial, and you're not bound by that verdict as much as the defense would suggest you are.

But keep this in mind. You know, with Terry DeGeus, who had the greater motive to kill him? Now, sure, Dustin Honken had a motive to kill him because he was going to be a witness, and so did Angela Johnson. She knew that Terry DeGeus could put her in prison as well as Dustin Honken.

But she also had revenge as a motive. We know from

Page 74

her own conduct that she continued to engage in drug trafficking even after involvement in killing of five people. We know that she assaulted other people in prison. We know that she threatened other people. So when you're thinking about what her future behavior's going to be, think about what her past behavior was.

Now, remorse, the defense again talks to you about this remorse, and they talk to you about the fact that she cried when she talked to Christi Gaubatz and that she cried again when she talked to her sister and sister-in-law in the jail.

Look at all the evidence, though, and think about their testimony. Again, Christi Gaubatz, what she was crying about there, was that remorse, or was that simply being upset

4084

about the predicament she got herself into at this point? Was that remorse feeling bad about what she had done, or was that self-pity concern about what was going to happen to her and what might happen to her?

And when her sister and sister-in-law visited her in the Linn County Jail, the testimony was that she was crying from the beginning. The minute they saw each other, they started crying as a group, and in the process she talks about luring Terry DeGeus there. It was not the testimony that they were talking just fine and all of a sudden she breaks down and shows this note about "I lured Terry DeGeus to his death." They were crying from the beginning. That is not evidence of remorse.

The suicide, the suicide, if the suicide was motivated out of remorse, ask yourself why wasn't it done earlier? If it was I can't live with myself for what I did to those girls, why didn't she kill herself or try to kill herself earlier? The

Page 75

timing on that attempted suicide was after it had been exposed that she knew where the bodies were.

And at that point what is that? That again is self-pity, the embarrassment of knowing that despite the family -- of telling her family "I'm innocent," now they're going to know, everybody's going to know I knew where the bodies were. That's not remorse. That's pity. That's self-pity.

Where was the remorse when she was telling Sara Bramow about this? Remember the rest of the people that she made

4085

confessions to, Sara Bramow and to Robert McNeese and to Peggy Hoover? They testified that when she was talking to them and talking about her involvement in the murders she had no remorse, she showed no remorse, she showed no emotions. Defendant did not have remorse in this case.

If you think, if you think for a minute, that by sentencing her to life in prison without parole that she is going to go back to her prison cell and she's just going to sit there and think about what she did for 30 years, think again. You think she's going to spend one minute in her cell thinking about what she did? She's going to go back to her home. She's going to go back to figuring out how to manipulate the system to get the most out of it. She's going to go back to running her cellblock.

Defense talks to you about mercy and have mercy on the defendant, have mercy on her family, show mercy and give her life in prison without parole. Now, it begs the question, of course, what mercy was ever shown to the victims in this case?

The more important thing is to think about it from the standpoint that the defendant brought it up themselves. Mercy

Page 76

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3578 of 3592

is something that you give when it's deserved. Mercy is somebody -- something you show to somebody who did commit a crime but for a reason, that while they committed that crime, they have to be punished, you show mercy on the punishment because there's an explanation that deserves pity.

4086

And when you think about that, go back to the room and ask yourself what, what did she do, what were the circumstances in this case that you believe she deserves any mercy from you?

Now, she will, as the defense says, meet her maker at some point, and God may have mercy on her soul. But that's not the decision to be made here. It's your decision to decide what punishment to give her for what -- the acts she did here on earth, and the acts she committed here on earth deserve the death penalty.

If we give life in prison to somebody who kills a single adult, somebody who kills five people, who kills and kills again, who kills two little girls, deserves the death penalty.

Somebody who can kill a federal witness must be deterred, and there must be deterrence. We must be able to tell our society that we protect our children and that if you kill children, you deserve the greatest punishment that Congress has provided for by law for that crime.

Finally, the defense has encouraged you to make this as an individual decision, and they're right to a degree. The individual weighing or the weight you give to these aggravating factors and mitigating factors is an individual decision, but this is a group decision. This is a group decision.

The judge is not sending you back to 12 separate rooms

Page 77

to come up with your decision and meet together and announce

what your verdict is. You are sent back to a single room expected to deliberate, to talk, to debate, to come to a decision.

It's going to take courage for each of you to make any decision you make in this case. It's going to take individual courage, but courage also comes from a group. There's courage in numbers. You can't impose the death penalty in this case unless each and every one of you agree the death penalty is called for in this case.

And if you choose the death penalty, you choose it as a group. It doesn't rest on the shoulders of any one of you. It's a decision that Congress has entrusted to you, citizens from this community, to reflect the judgment what we think of as a community. What do we think about this crime? What do we think is the deserving punishment for what was done here? What do you think?

It's up to you to reflect society's judgment in this case. And if you do so, you do so for society, and you do so as a group.

Ladies and gentlemen, this is the appropriate case for the death penalty. If not this case, what case? If not now, when? I ask you on behalf of the United States of America to impose the penalty provided for by Congress for this crime and sentence the defendant to death. Thank you.

THE COURT: Members of the jury, we have one short

final instruction. That would be on page 19 of your instruction

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3580 of 3592

set. Final penalty phase instruction number 9, concluding instruction.

(The Court read final penalty phase instruction number 9 in open court.)

THE COURT: Members of the jury, they'll be serving lunch now. And in just a few minutes we'll have all of the exhibits that have been admitted both in the merits phase and in the penalty phase brought down. There are also two juror notebooks with the photographs of the witnesses in to help you remember the testimony of the witnesses. One photograph -- one book is for the merits phase. One book is for all of the witnesses who testified in the penalty phase.

The four alternate jurors -- I think you all know who you are, but just to go through it again, one's 167, 402, 9 and 78 -- I've discussed this with the lawyers, and we're not going to discharge you at this time.

Here's what that means. I'm going to ask that you not discuss this case among yourselves or with anybody else. Don't read any newspaper reports or any media reports about the case. Don't let anybody talk to you about the case, and don't talk to anybody about the case.

There's still a possibility -- and it actually happened in the Honken trial where we lost a juror during the penalty phase deliberations. And so that's why I'm retaining

4089

all four alternates.

When you go down to the jury room, you can take your meals, and they're finding another spot for you. The building is very full right now because Judge O'Brien, our 81-year-old senior judge, is trying a 3-defendant criminal case for me this

Page 79

week, and they just started jury selection this morning, so we have jurors for other trials.

But I understand they're trying to find a room for the alternate jurors in the bankruptcy court, and I'd ask you to stay in the courthouse while the other jurors are deliberating in case we need to use any of you, and that way you'll be here because I'm sure you kind of want to be sitting in the jury box and find out what the verdict is.

The important thing for the alternate jurors in addition is when you do go down to the jury room to get your meal, it would be inappropriate for any of the alternate jurors to give any opinions about what they think the penalty in the case ought to be. You'll only be allowed to do that should you replace a sitting juror and deliberate with the remaining jurors.

Good luck to you in your deliberations. Thank you.

(Jury out at 11:53 a.m.)

THE COURT: Please be seated. Is there anything further, any other record that anyone would like to make? Mr. Williams?

4090

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. BERRIGAN: Nothing by the defendant, sir.

THE COURT: Okay. I just wanted to compliment the lawyers on both sides for the exceptional job they did starting in jury selection and concluding with arguments today.

I've had Mr. Williams in many, many trials. He always does an excellent job, so I expect that.

Mr. Berrigan, this is the first time I've had you in

Page 80

trial. You gave just an absolutely terrific closing argument.

And all three lawyers, Miss Johnson, did an excellent job. They've worked incredibly hard for a number of years, for four or five years on the case. It's taken a huge toll on them. They have worked incredibly hard. No stone was left unturned from my perspective. They gave you the finest defense that you could have, and I think they just did a terrific job. And I know it's been difficult for you, so it's not always easy to appreciate the job that lawyers do on behalf of a client. But all three lawyers just performed exceptional well. You couldn't have asked any more from my perspective from the quality of the representation that the lawyers have given.

So you like to see that in every case, but obviously when the stakes are the ultimate stakes, you definitely want to see that. I'm not sure it happens in every case, but it certainly happened in this case. So I appreciate the excellent

4091

representation on both sides of the case. Thank you. We'll be in recess.

(The foregoing trial was adjourned at 11:55 a.m.)

Page 81

                              CERTIFICATE

          I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.

                                           12-20-05
          Shelly Semmler, RMR, CRR            Date

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3584 of 3592

4092

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,                    No. CR01-3046

        Plaintiff,                         Sioux City, Iowa
                                             June 21, 2005
    vs.                                      1:52 p.m.

ANGELA JANE JOHNSON,                         VOLUME 24 of 24

        Defendant.
                          /

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

4093

APPEARANCES:

For the Plaintiff:        C. J. WILLIAMS, ESQ.
                          Assistant United States Attorney
                          Suite 400 - Hach Building
                          401 First Street Southeast
                          Cedar Rapids, IA  52401

                          THOMAS HENRY MILLER, ESQ.
                          Iowa Attorney General's Office
                          Area Prosecutions Division
                          Hoover State Office Building
                          Des Moines, IA  50319

For the Defendant:        PATRICK J. BERRIGAN, ESQ.
                          Watson & Dameron
                          2500 Holmes
                          Kansas City, MO  64108

                          DEAN STOWERS, ESQ.
                          Rosenberg, Stowers & Morse
                          1010 Insurance Exchange Building
                          505 Fifth Avenue
                          Des Moines, IA  50309

                          ALFRED E. WILLETT, ESQ.
                          Terpstra, Epping & Willett
                          Higley Building - Suite 500
                          118 Third Avenue Southeast
                          Cedar Rapids, IA  52401

Also present:             Bill Basler

Case 3:09-cv-03064-MWB-LTS    Document 284-71    Filed 06/23/11    Page 3585 of 3592

VOLUME 24, 6-21-05
Court Reporter:          Shelly Semmler, RMR, CRR
                         320 Sixth Street
                         Sioux City, IA  51101
                         (712) 233-3846

4094

(Proceedings reconvened outside the presence of the jury.)

THE COURT:  Please be seated.  Just moments ago I received the following juror note:  Need a clean copy of verdict forms with steps 1, 2, and 3, signed by Juror 621, the foreperson.

Pursuant to my practice of never responding to juror notes without the parties' input, I assume I know the answer is that they can have a clean copy of the verdict form, but I just wanted to make sure.

Mr. Berrigan?

MR. BERRIGAN:  Certainly, Your Honor.  We have no objection to that.

THE COURT:  Okay.

MR. WILLIAMS:  No objection, Your Honor.

THE COURT:  Okay.  Carey, why don't you just have a clean copy of the verdict form just sent down to the jury.

I did want to correct one oversight.  When I was complimenting the lawyers at the end of the case, I left out Mr. Miller.  And on my way home, I for -- it dawned on me that I had done that.

Mr. Miller, you did a fine job in the case.  We haven't heard from you in a while, but I should have said all five lawyers did a terrific job.  That's what I meant to say. And I'm sorry that I slighted you in my oversight.  It was

4095

Page 2

certainly not intentional. But I did want to correct myself on the record.

MR. MILLER: Thank you, Your Honor. No offense taken.

THE COURT: Okay. Thank you.

Why don't we talk about going over the verdict form. How do you want me to -- how do you want to handle it actually? You want me to read through the whole verdict form, or would you like me to look at the verdict form, determine if I think there's anything inconsistent, and then just read page 9?

MR. BERRIGAN: The latter, Your Honor, would be our preference, sir.

THE COURT: Okay. Just go right to the -- I'll review it. If I see anything that I think is inconsistent or a problem, we'll either have a sidebar or I'll send the jury back down, and we'll confer.

MR. BERRIGAN: Great.

THE COURT: If I don't see anything, then I'll just go ahead and read the -- I guess it would be page 9; okay?

MR. BERRIGAN: Yes, sir.

THE COURT: Okay. Thank you. We'll be in recess until further word. Thank you.

(Recess at 1:54 p.m.)

THE COURT: Okay. I wanted to address the potential of post-trial motions in the case. Federal Rule of Criminal Procedure 33(b)(2) requires that a motion for new trial be filed

4096

within seven days after the verdict or within such further time as the Court sets during the seven-day period.

I'm going to be out of town seven days from today's

Page 3

date, and so I was fairly confident the defense needed more time than the seven days provided in the rule to file post-trial motions, and I thought we should make a record about that now and extend the time now.

MR. BERRIGAN: May it please the Court. We would respectfully request up until and including Friday, July the 25th, 2005, Your Honor, to file our -- I'm sorry, 29th -- I misspoke -- Friday, July the 29th, 2005, to file our post-trial motions under the rule.

THE COURT: Any objection from the government?

MR. WILLIAMS: None, Your Honor.

THE COURT: Would you like additional time, or you think that's going to be sufficient?

MR. BERRIGAN: We really think that's going to be sufficient, Your Honor, and plan to have the motion filed by then. If it turns out that becomes impossible, we'll notify the Court at the very first opportunity.

THE COURT: Okay. Okay. I'm going to go ahead and extend the time for filing any post-trial motions to and including Friday, July 29, 2005, with the understanding that leave will be freely granted for additional time if you need it; okay? Anything further?

4097

MR. BERRIGAN: Thank you, Your Honor. That's all the defense has.

THE COURT: Okay. Thanks. We'll be in recess until further notice. Thank you.

(Recess at 2:09 p.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

Page 4

MR. BERRIGAN: We're ready, Your Honor, but I'd ask --

THE COURT: Okay. I'm sorry.

MR. BERRIGAN: Would you consider giving a cautionary instruction to the audience that's present?

THE COURT: Sure. I will.

MR. BERRIGAN: Thank you.

THE COURT: Just so you know this, I told the CSOs that the alternate jurors can come in. They kept them separated until after they reached a verdict, but they're going to come in together. I didn't want you to be surprised by that.

MR. BERRIGAN: Thank you.

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Juror 621, has the jury reached a verdict in the penalty phase?

JUROR 621: Yes, we have.

THE COURT: Okay. Would you please hand that verdict

4098

form to my law clerk Carey, and she'll hand it to me to review. It's going to take me a few minutes or so to review it, and then by agreement of the lawyers, I'm going to just go to page 9 and read the verdict at that time.

And I'd ask that members of the public who are seated behind the rail who have been so good throughout the trial, I know emotions run very high in this case, but I'd ask that you have the same excellent decorum and respect for the proceedings that you've demonstrated throughout the trial when I do announce the verdict.

The jury imposed the death sentence on all counts

Page 5

except Counts 1 and 6 upon which they imposed a sentence of life imprisonment without parole.

Mr. Berrigan, would you like me to poll the jury?

MR. BERRIGAN:  I would, sir.

THE COURT:  Okay.  We're going to start at the back corner, and I have the following question:  Is it your true and correct verdict?  And that would be on Count 1, life imprisonment without the possibility of parole; Count 6, life imprisonment without the possibility of parole -- that would be for Gregory Nicholson -- and then on Counts 2 and 7 for Lori Duncan; 3 and 8 for Kandi Duncan; 4 and 9 for Amber Duncan; and 5 and 10 for Terry DeGeus, the death penalty.  And I just wanted to make sure is that your true and correct verdict.  The answer would be yes or no.  Juror 600?

4099

JUROR 600:  Yes, it is.

THE COURT:  Juror 489.

JUROR 489:  Yes.

THE COURT:  Juror 55.

JUROR 55:  Yes.

THE COURT:  Juror 504.

JUROR 504:  Yes.

THE COURT:  Juror 797.

JUROR 797:  Yes.

THE COURT:  Juror 108.

JUROR 108:  Yes.

THE COURT:  Juror 621.

JUROR 621:  Yes.

THE COURT:  Juror 727.

JUROR 727:  Yes.

Page 6

THE COURT: Juror 147.

JUROR 147: Yes.

THE COURT: Juror 170.

JUROR 170: Yes.

THE COURT: Juror 509.

JUROR 509: Yes.

THE COURT: And Juror 513.

JUROR 513: Yes.

THE COURT: Okay. Is there any reason why the jury should not be excused, Mr. Williams?

4100

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: None by the defendant, sir.

THE COURT: Okay. On behalf of the judges and employees of the Northern District of Iowa, I wanted to thank each of you very much for your service in this case. I can only imagine how difficult it would be to be a juror in a case of this magnitude. If you'd go down to the jury room, I'll be happy to meet you down there, and I have some juror questionnaires that I'd like you to fill out. You can take it home and fill it out and mail it in. But you're excused, and I'll meet you down in the jury room in just a couple of minutes.

(The jury exited the courtroom.)

THE COURT: Please be seated.

Is there any further record that anyone would like to make at this point? Mr. Williams?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Mr. Berrigan?

MR. BERRIGAN: Nothing by the defense, sir.

Page 7

VOLUME 24, 6-21-05

THE COURT: Okay. Thank you. We'll be in recess.

(The foregoing trial was concluded at 3:44 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

12-20-05
Shelly Semmler, RMR, CRR                    Date

Page 8